**EN EL TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS**
**PARA EL DISTRITO DE PUERTO RICO**

| | |
|---|---|
| En el caso:<br><br>LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>como representante de<br><br>EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO,<br><br>Deudores.[1] | Título III de PROMESA<br><br>Núm. 17 BK 3283-LTS<br><br>(Con administración conjunta) |

**DECLARACIÓN DE DIVULGACIÓN PARA EL TERCER PLAN DE AJUSTE CONJUNTO ENMENDADO DEL TÍTULO III DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, *Y OTROS*.**

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036 | **O'NEILL & BORGES LLC**<br>Avenida Muñoz Rivera 250, Suite 800<br>San Juan, PR 00918-1813 |

*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico como representantes de los Deudores en sus Casos de Título III*

Fecha: 11 de mayo de 2021

---

Si tiene preguntas sobre esta Declaración de Divulgación, comuníquese con el Agente de la Convocatoria, Prime Clerk LLC:
**Teléfono**    (disponible de 10:00 a.m. a 7:00 p.m. Horario Estándar del Atlántico):
        (844) 822-9231 (llamada gratuita para EE.UU. y Puerto Rico)
        (646) 486-7944 (para llamadas internacionales)
**Correo electrónico:** puertoricoballots@primeclerk.com (referencia "Commonwealth Plan of Adjustment/Plan de Ajuste del ELA" en el asunto)
Tenga en cuenta que Prime Clerk LLC no está autorizado a proporcionar asesoramiento jurídico y no lo hará.

---

[1] Los Deudores en estos Casos del Título III, junto con el número de caso de Título III respectivo de cada Deudor y los últimos cuatro (4) dígitos del número federal del contribuyente de cada Deudor, según corresponda, son (i) el Estado Libre Asociado (ELA) de Puerto Rico (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos del Número federal del contribuyente: 3481); (ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos del Número federal del contribuyente: 8474); (iii) la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos del Número federal del contribuyente: 3808); (iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos del Número federal del contribuyente: 9686); (iii) la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos del Número federal del contribuyente: 3747); y (iv) la Autoridad de Edificios Públicos de Puerto Rico ("AEP") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos del Número federal del contribuyente: 3801). (Los números de caso de Título III figuran como números de Caso de Quiebra debido a limitaciones del software). La Junta de Supervisión presenta esta Declaración de Divulgación en los Casos Núm. 17 BK-1283-LTS (ELA), 17 BK-3566-LTS (SRE), y 17 BK-5523-LTS (AEP).

LA PRESENTE NO CONSTITUYE UNA SOLICITUD DE VOTOS SOBRE EL PLAN DE AJUSTE. LA SOLICITUD DE VOTOS SE ENCUENTRA VEDADA HASTA QUE EL TRIBUNAL DEL TÍTULO III HAYA APROBADO UNA DECLARACIÓN DE DIVULGACIÓN. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN SE PRESENTA PARA SU APROBACIÓN, PERO AÚN NO HA SIDO APROBADA POR EL TRIBUNAL DEL TÍTULO III. LA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN SE ENCUENTRA SUJETA A CAMBIOS. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN NO REPRESENTA UNA OFERTA PARA VENDER TÍTULOS VALORES NI SOLICITA UNA OFERTA PARA ADQUIRIR DICHOS TÍTULOS.

NO SE HA APROBADO JUDICIALMENTE NINGUNA OTRA INFORMACIÓN

LA JUNTA DE SUPERVISIÓN, COMO REPRESENTANTE DE LOS DEUDORES EN ESTOS CASOS DEL TÍTULO III, DE ACUERDO CON LA SECCIÓN 315(b) DE PROMESA, NO HA AUTORIZADO A NINGUNA PERSONA A OFRECER NINGÚN TIPO DE INFORMACIÓN CON RESPECTO AL PLAN DE LOS DEUDORES, O EL VALOR DE LAS PROPIEDADES DE LOS DEUDORES, SALVO SEGÚN SE ESTIPULA EN ESTA DECLARACIÓN DE DIVULGACIÓN O EN LA ORDEN DE LA DECLARACIÓN DE DIVULGACIÓN.[2] LOS TENEDORES DE RECLAMACIONES DEBEN TENER CONOCIMIENTO DE QUE CUALQUIER INFORMACIÓN, DECLARACIÓN, GARANTÍA O INCENTIVO OFRECIDOS PARA OBTENER LA ACEPTACIÓN O EL RECHAZO DEL PLAN, U OBTENER UNA DECISIÓN DE TRANSIGIR CIERTAS RECLAMACIONES DE CONFORMIDAD CON EL PLAN NO HAN SIDO APROBADOS POR EL TRIBUNAL DEL TÍTULO III. ADEMÁS, LOS TENEDORES DE RECLAMACIONES NO DEBEN ACTUAR DE CONFORMIDAD CON NINGUNA INFORMACIÓN QUE SE DISTRIBUYA A TRAVÉS DE LAS REDES SOCIALES, ENTRE ELLAS, SIN LIMITACIÓN, FACEBOOK, TWITTER E INSTAGRAM.

EL PLAN ES EL PRODUCTO DE NEGOCIACIONES SUSTANCIALES ENTRE LA JUNTA DE SUPERVISIÓN (COMO ÚNICO REPRESENTANTE DE LOS DEUDORES EN SUS RESPECTIVOS CASOS DE TÍTULO III), LAS PARTES DE LOS ACUERDOS DE APOYO AL PLAN (COLECTIVAMENTE, LAS "PARTES DE APOYO"), Y OTRAS PARTES. LA JUNTA DE SUPERVISIÓN Y LAS PARTES DE APOYO CONSIDERAN QUE EL PLAN REPRESENTA UN RESULTADO JUSTO Y RAZONABLE PARA TODOS LOS ACREEDORES DE LOS DEUDORES Y, POR LO TANTO, LA CONFIRMACIÓN DEL PLAN REDUNDA EN EL INTERÉS DE LOS DEUDORES Y DE SUS ACREEDORES. LA JUNTA DE SUPERVISIÓN Y LAS PARTES DE APOYO RECOMIENDAN QUE USTED VOTE PARA ACEPTAR EL PLAN.

PARA EVITAR DUDAS, ESTA DECLARACIÓN FUE REDACTADA POR LA JUNTA DE SUPERVISIÓN, Y ALGUNAS DE LAS DECLARACIONES DEL PRESENTE PUEDEN SER IMPUGNADAS POR CIERTOS ACREEDORES O EL GOBIERNO, LO QUE INCLUYE, SIN LIMITACIÓN, DECLARACIONES SOBRE LA INTERPRETACIÓN DE PROMESA Y LOS DERECHOS Y REMEDIOS DE LOS DEUDORES Y ACREEDORES. SALVO DISPOSICIÓN EN CONTRARIO, LAS OPINIONES EXPRESADAS EN LA PRESENTE DECLARACIÓN DE DIVULGACIÓN SON ÚNICAMENTE LAS DE LA JUNTA DE SUPERVISIÓN Y LOS DEUDORES Y NO PUEDEN ATRIBUIRSE A NINGUNA DE LAS PARTES DE APOYO O A NINGUNA OTRA PARTE.

INFORMACIÓN IMPORTANTE

---

[2] Los términos con mayúsculas que no estén definidos en esta Declaración de Divulgación tienen los significados respectivos que se les da en el Plan.

i

FACULTAD DE LA JUNTA DE SUPERVISIÓN. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO ("PROMESA", POR SUS SIGLAS EN INGLÉS) DISPONE QUE LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO (LA "JUNTA DE SUPERVISIÓN") PUEDE TOMAR CUALQUIER MEDIDA QUE SEA NECESARIA PARA ENTABLAR UN CASO DE ACUERDO CON EL TÍTULO III DE PROMESA DE UN DEUDOR, LO QUE INCLUYE PRESENTAR UNA PETICIÓN DE TÍTULO III, PRESENTAR UN PLAN DE AJUSTE PARA UN DEUDOR Y HACER CUALQUIER OTRA PRESENTACIÓN DE MODO GENERAL EN RELACIÓN CON EL CASO DE TÍTULO III. PROMESA TAMBIÉN DISPONE QUE ÚNICAMENTE LA JUNTA DE SUPERVISIÓN PUEDE PRESENTAR UN PLAN DE AJUSTE PARA LAS DEUDAS DE UN DEUDOR. PROMESA REQUIERE QUE EL PLAN DE AJUSTE PARA UN DEUDOR DEL TÍTULO III SE PRESENTE EN SU CASO DE TÍTULO III JUNTO CON UN DOCUMENTO DENOMINADO "DECLARACIÓN DE DIVULGACIÓN".

PROPÓSITO DE LA DECLARACIÓN DE DIVULGACIÓN. ESTE DOCUMENTO ES LA DECLARACIÓN DE DIVULGACIÓN (LA "DECLARACIÓN DE DIVULGACIÓN") PARA EL TERCER PLAN CONJUNTO ENMENDADO DE AJUSTE DE TÍTULO III DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, Y OTROS QUE SE DESCRIBE EN LA PRESENTE (EL "PLAN"). LA FUNCIÓN DE UNA DECLARACIÓN DE DIVULGACIÓN ES PROPORCIONAR A UN INVERSIONISTA HIPOTÉTICO TÍPICO DE LOS TENEDORES DE RECLAMACIONES DEL CASO INFORMACIÓN RAZONABLEMENTE FACTIBLE A LA LUZ DE LA NATURALEZA Y LA HISTORIA DE LOS DEUDORES Y LAS CONDICIONES DE SUS LIBROS Y REGISTROS PARA PERMITIR QUE EL INVERSIONISTA HIPOTÉTICO TOME UNA DECISIÓN INFORMADA DE ACEPTAR O RECHAZAR EL PLAN.

LISTA DE DEUDORES. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN ACOMPAÑA A UN PLAN CONJUNTO DE AJUSTE PARA LOS SIGUIENTES DEUDORES:

- EL ESTADO LIBRE ASOCIADO DE PUERTO RICO (EL "ELA" O "PUERTO RICO")

- EL SISTEMA DE RETIRO DE EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO ("SRE"), Y

- LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO ("AEP").

FUENTE DE LOS DATOS. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN INCLUYE CIERTOS APÉNDICES, CADA UNO DE LOS CUALES SE INCORPORA A LA PRESENTE DECLARACIÓN DE DIVULGACIÓN COMO SI SU TEXTO FIGURARA EN EL PRESENTE EN SU TOTALIDAD. ESTA DECLARACIÓN DE DIVULGACIÓN HA SIDO PREPARADA Y PRESENTADA POR LA JUNTA DE SUPERVISIÓN EN NOMBRE DE LOS DEUDORES.

EL GOBIERNO DE ESTADOS UNIDOS CREÓ LA JUNTA DE SUPERVISIÓN EL 30 DE JUNIO DE 2016. EL PRESIDENTE DE ESTADOS UNIDOS (EL ENTONCES PRESIDENTE EN FUNCIONES BARACK OBAMA) DESIGNÓ A LOS SIETE MIEMBROS CON DERECHO AL VOTO DE LA JUNTA DE SUPERVISIÓN EL 31 DE AGOSTO DE 2016. EN SUS COMIENZOS, LA JUNTA DE SUPERVISIÓN NO DISPONÍA DE INFORMACIÓN NI base DE DATOS PROPIA, PERO TENÍA EL DERECHO LEGAL DE OBTENER INFORMACIÓN Y DATOS DEL ELA.

ORIGEN DE LA INFORMACIÓN FINANCIERA. TODA LA INFORMACIÓN FINANCIERA QUE FIGURA EN LA PRESENTE SE BASA EN DATOS QUE LA JUNTA DE

SUPERVISIÓN HA RECIBIDO DEL ELA Y SUS INSTRUMENTALIDADES O QUE SE ENCUENTRA DISPONIBLE PARA EL PÚBLICO EN GENERAL. A LA FECHA DE ESTA DECLARACIÓN DE DIVULGACIÓN, EL ELA AÚN NO HA PUBLICADO DECLARACIONES FINANCIERAS AUDITADAS PARA LOS AÑOS FISCALES 2018, 2019 Y 2020. EN ALGUNOS CASOS, COMO PARA OBLIGACIONES DE PENSIÓN Y DETERMINACIONES DE EFECTIVO DISPONIBLE, LA JUNTA DE SUPERVISIÓN HA CONTRATADO EXPERTOS PARA AYUDAR A VERIFICAR Y COMPRENDER LOS DATOS. POR CONSIGUIENTE, SI BIEN LA JUNTA DE SUPERVISIÓN HA HECHO LO POSIBLE PARA OBTENER INFORMACIÓN COMPLETA Y VERAZ, SE ENCUENTRA LIMITADA AL USO DE LOS SISTEMAS Y DATOS DEL ELA COMO FUENTES Y NO PUEDE CORROBORAR INDEPENDIENTEMENTE LA VERACIDAD DE ESTOS DATOS. ESTA DECLARACIÓN DE DIVULGACIÓN Y LA INFORMACIÓN ECONÓMICA Y FINANCIERA QUE SE PROPORCIONA EN LA PRESENTE NO HA SIDO APROBADA POR EL AGENTE FISCAL DEL ELA, LA AUTORIDAD DE ASESORÍA FINANCIERA Y AGENCIA FISCAL DE PUERTO RICO.[3]

REVISIÓN DEL TRIBUNAL. EL TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO (EL "TRIBUNAL DEL TÍTULO III") HA EXAMINADO ESTA DECLARACIÓN DE DIVULGACIÓN Y HA DETERMINADO QUE CONTIENE INFORMACIÓN ADECUADA DE ACUERDO CON LA SECCIÓN 1125(b)[4] DEL CÓDIGO DE QUIEBRAS Y PUEDE SERLE ENVIADA A USTED PARA SOLICITAR SU VOTO SOBRE LA ELECCIÓN DE LA FORMA DE DISTRIBUCIÓN A RECIBIRSE DE CONFORMIDAD CON ESTE. SIN EMBARGO, EL TRIBUNAL NO HA DETERMINADO SI LA INFORMACIÓN CONTENIDA EN LA PRESENTE ES CORRECTA O COMPLETA.

VOTO DESPUÉS DE LA CONSIDERACIÓN DE LOS FACTORES DE RIESGO. SE RECOMIENDA QUE TODOS LOS TENEDORES DE RECLAMACIONES CON DERECHO A VOTAR SOBRE EL PLAN, O A TOMAR UNA DECISIÓN DE ACUERDO CON ESTE, LEAN Y ANALICEN CUIDADOSAMENTE ESTA DECLARACIÓN DE DIVULGACIÓN EN SU TOTALIDAD, INCLUSO LOS FACTORES DE RIESGO MENCIONADOS EN LA PRESENTE Y EL PLAN QUE SE ADJUNTA A LA PRESENTE ANTES DE VOTAR POR ACEPTAR O RECHAZAR EL PLAN O DE TOMAR UNA DECISIÓN DE ACUERDO CON EL PLAN. CONSULTE LA SECCIÓN VIII DE ESTA DECLARACIÓN DE DIVULGACIÓN, BAJO EL TÍTULO "CIERTOS FACTORES DE RIESGO A CONSIDERAR"

DECLARACIONES A FUTURO. ESTA DECLARACIÓN DE DIVULGACIÓN CONTIENE AFIRMACIONES QUE SON "DECLARACIONES A FUTURO" DE ACUERDO CON LA DEFINICIÓN DE ESTAS EN CIERTAS LEYES FEDERALES DE TÍTULOS VALORES. TODAS LAS AFIRMACIONES QUE FIGURAN EN LA PRESENTE Y QUE NO SON DE NATURALEZA CLARAMENTE HISTÓRICA SON A FUTURO, Y LAS PALABRAS "PREVER", "CREER", "PODRÍA", "DEBERÍA", "ESPERAR", "ESTIMAR", "PRONÓSTICO", "INTENCIÓN", "POTENCIAL", "PROYECTO", "OBJETIVO" Y EXPRESIONES SIMILARES SE ENCUENTRAN GENERALMENTE DESTINADAS A IDENTIFICAR DECLARACIONES A FUTURO. TODAS LAS AFIRMACIONES QUE FIGURAN EN ESTA DECLARACIÓN DE DIVULGACIÓN, QUE NO SEAN AFIRMACIONES SOBRE HECHOS HISTÓRICOS, INCLUSO LAS AFIRMACIONES SOBRE EL

---

[3] El Gobierno de Puerto Rico, con sus agencias e instrumentalidades (incluida AAFAF), no ha verificado ni aprobado independientemente la información que figura en las afirmaciones hechas en esta Declaración de Divulgación.

[4] Todas las disposiciones del Título 11 del Código de Estados Unidos (el "Código de Quiebras") a los que se hace referencia en la presente son aplicables a estos casos de Título III conforme a la Sección 301(a) de PROMESA.

PLAN, ESTRATEGIAS, PERSPECTIVAS Y EXPECTATIVAS CON RESPECTO A EVENTOS FUTUROS Y EL DESEMPEÑO FINANCIERO DE LOS DEUDORES, SON DECLARACIONES A FUTURO QUE INVOLUCRAN CIERTOS RIESGOS E INCERTIDUMBRES. SI BIEN ESTAS DECLARACIONES REPRESENTAN EL JUICIO ACTUAL DE LOS DEUDORES SOBRE LO QUE PUEDE ESPERARSE A FUTURO, Y LOS DEUDORES CONSIDERAN QUE ESTAS DECLARACIONES SE BASAN EN SUPOSICIONES QUE SON RAZONABLES BAJO LAS CIRCUNSTANCIAS, ESTAS DECLARACIONES NO SON GARANTÍAS SOBRE CUALQUIER EVENTO O RESULTADO FINANCIERO, Y LOS RESULTADOS REALES DE LOS DEUDORES PUEDEN PRESENTAR DIFERENCIAS MATERIALES CON RESPECTO A ELLAS. LA INFORMACIÓN QUE SE INCLUYE EN ESTA DECLARACIÓN DE DIVULGACIÓN, INCLUSO LAS DECLARACIONES A FUTURO Y PROYECCIONES DE CIERTOS DATOS FINANCIEROS POSTERIORES A LA CONSUMACIÓN DEL PLAN, SOLO SE HACEN A LA FECHA DE LA PRESENTE DECLARACIÓN DE DIVULGACIÓN A MENOS QUE SE ESPECIFIQUE LO CONTRARIO. LOS DEUDORES NO SE COMPROMETEN A NINGUNA OBLIGACIÓN DE ACTUALIZAR PÚBLICAMENTE LA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN, LO QUE INCLUYE CUALQUIER DECLARACIÓN A FUTURO, PARA REFLEJAR NUEVA INFORMACIÓN, EVENTOS FUTUROS U OTROS, SALVO SEGÚN SEA EXIGIDO POR LEY. TODAS LAS DECLARACIONES A FUTURO INVOLUCRAN RIESGOS E INCERTIDUMBRES, MUCHAS DE LAS CUALES SE ENCUENTRAN FUERA DEL CONTROL DE LOS DEUDORES, Y QUE PUEDEN HACER QUE LOS RESULTADOS, DESEMPEÑOS O LOGROS REALES DIFIERAN MATERIALMENTE DE LOS RESULTADOS, DESEMPEÑOS O LOGROS PREVISTOS. LOS DEUDORES NO PUEDEN GARANTIZAR QUE LOS RESULTADOS O EVENTOS PROYECTADOS SE CONCRETEN. LOS FACTORES QUE PODRÍAN HACER QUE LOS RESULTADOS REALES DE LOS DEUDORES SEAN MATERIALMENTE DIFERENTES DE LAS EXPECTATIVAS DE LOS DEUDORES INCLUYEN LOS FACTORES QUE SE DESCRIBEN EN LA PRESENTE BAJO LA SECCIÓN VIII, "CIERTOS FACTORES DE RIESGO A CONSIDERAR". LOS DEUDORES EXHORTAN A LOS TENEDORES DE RECLAMACIONES A ANALIZAR CUIDADOSAMENTE ESTOS FACTORES AL EVALUAR LAS DECLARACIONES A FUTURO Y NO COLOCAR EXCESIVA CONFIANZA EN ESTAS DECLARACIONES A FUTURO.

LOS HECHOS PUEDEN CAMBIAR. LAS DECLARACIONES Y OTRA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN SE REALIZARON A LA FECHA QUE FIGURA EN LA CARÁTULA, A MENOS QUE SE ESPECIFIQUE LO CONTRARIO. LOS TENEDORES DE RECLAMACIONES QUE LEAN ESTA DECLARACIÓN DE DIVULGACIÓN NO DEBEN SUPONER QUE LOS HECHOS QUE SE DESCRIBEN EN LA PRESENTE SE HAN MANTENIDO INALTERADOS DESDE LA FECHA QUE FIGURA EN LA CARÁTULA DE LA PRESENTE. CADA TENEDOR DE UNA RECLAMACIÓN CON DERECHO AL VOTO, O A OPTAR CON RESPECTO AL PLAN DEBE BASARSE EN SU PROPIA EVALUACIÓN DE LOS DEUDORES Y SU PROPIO ANÁLISIS DE LOS TÉRMINOS DEL PLAN AL DECIDIR SI ACEPTAR O RECHAZAR O TOMAR UNA DECISIÓN CON RESPECTO AL PLAN.

SUPLEMENTO DEL PLAN. UN SUPLEMENTO DEL PLAN, CON VERSIONES EN BORRADOR O FINALES DE LOS DOCUMENTOS PRIMARIOS REQUERIDOS PARA CONSUMAR LAS TRANSACCIONES CONTEMPLADAS POR EL PLAN, SE PRESENTARÁ ANTE EL TRIBUNAL DEL TÍTULO III TAN PRONTO COMO RESULTE FACTIBLE (PERO EN NINGÚN CASO DESPUÉS DE LOS SIETE (7) DÍAS) ANTES DE LA FECHA LÍMITE PARA LA VOTACIÓN,[5] O EN CUALQUIER OTRA FECHA DETERMINADA POR EL TRIBUNAL DEL TÍTULO III. EL

---

[5]   La "Fecha límite para la votación" se define como las 5:00 p.m. (Horario Estándar del Atlántico) el [        de 2021], a menos que dicho plazo se prorrogue.

SUPLEMENTO DEL PLAN SE CONSIDERARÁ INCORPORADO Y PARTE DEL PLAN COMO SI SU TEXTO FIGURARA EN EL PLAN EN SU TOTALIDAD.

LA DECLARACIÓN DE DIVULGACIÓN SE DESTINA ÚNICAMENTE PARA LA VOTACIÓN Y/O LAS ELECCIONES. LOS DEUDORES PROPORCIONAN LA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN ÚNICAMENTE PARA LOS FINES DE SOLICITAR A LOS TENEDORES DE RECLAMACIONES CON DERECHO AL VOTO QUE ACEPTEN O RECHACEN EL PLAN U OPTEN POR LA FORMA DE DISTRIBUCIÓN DE ACUERDO CON ESTE. NINGUNA DISPOSICIÓN DE LA PRESENTE DECLARACIÓN DE DIVULGACIÓN PUEDE SER USADA POR NINGUNA PERSONA PARA NINGÚN OTRO FIN. NO SE CONSIDERARÁ QUE EL CONTENIDO DE ESTA DECLARACIÓN DE DIVULGACIÓN PROPORCIONA ALGÚN TIPO DE ASESORAMIENTO LEGAL, FINANCIERO, SOBRE TÍTULOS VALORES, IMPOSITIVO, DE NEGOCIOS O DE OTRO TIPO. LOS DEUDORES EXHORTAN A CADA TENEDOR DE RECLAMACIONES QUE CONSULTEN A SUS PROPIOS ASESORES PARA OBTENER DICHO ASESORAMIENTO LEGAL, FINANCIERO, SOBRE TÍTULOS VALORES, IMPOSITIVO, DE NEGOCIOS O DE OTRO TIPO AL EXAMINAR LA DECLARACIÓN DE DIVULGACIÓN Y EL PLAN.

LA APROBACIÓN JUDICIAL NO SIGNIFICA QUE TODOS LOS HECHOS SON CORRECTOS. ESTA DECLARACIÓN DE DIVULGACIÓN Y LA APROBACIÓN DEL TRIBUNAL DEL TÍTULO III SOBRE LA ADECUACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN NO CONSTITUYEN, Y NO DEBEN INTERPRETARSE COMO, UNA ADMISIÓN DE HECHOS, OBLIGACIONES, ESTIPULACIONES O RENUNCIAS.[6] ADEMÁS, LA APROBACIÓN DEL TRIBUNAL DEL TÍTULO III SOBRE LA ADECUACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN NO CONSTITUYE LA DETERMINACIÓN DEL TRIBUNAL DEL TÍTULO III DE QUE LA INFORMACIÓN QUE FIGURA EN LA PRESENTE ES CORRECTA O COMPLETA Y NO SIGNIFICA QUE EL TRIBUNAL VAYA A CONFIRMAR EL PLAN. EL TRIBUNAL DEL TÍTULO III HA PROGRAMADO UNA VISTA EL [    ] DE 2021 PARA ANALIZAR LA CONFIRMACIÓN DEL PLAN DE ACUERDO CON PROMESA Y LAS DISPOSICIONES ESPECÍFICAS DEL CÓDIGO DE QUIEBRAS APLICABLES A LOS CASOS DEL TÍTULO III DE ACUERDO CON LAS SECCIONES 301 Y 314 DE PROMESA.

SIN APROBACIÓN GUBERNAMENTAL. NI LA COMISIÓN DE TÍTULOS VALORES DE ESTADOS UNIDOS NI NINGUNA COMISIÓN DE TÍTULOS VALORES DEL EXTRANJERO O DE ALGÚN ESTADO HA APROBADO O DESAPROBADO LOS TÍTULOS VALORES QUE SE DESCRIBEN EN LA PRESENTE, NI ESTA DECLARACIÓN DE DIVULGACIÓN, NI HAN EMITIDO SU OPINIÓN SOBRE LA EXACTITUD O ADECUACIÓN DE LAS DECLARACIONES CONTENIDAS EN LA PRESENTE. CUALQUIER DECLARACIÓN EN CONTRARIO PUEDE CONSTITUIR UN DELITO PENAL.

TÍTULOS VALORES NO REGISTRADOS. NINGUNO DE LOS TÍTULOS VALORES A EMITIRSE A LOS TENEDORES DE RECLAMACIONES PERMITIDAS DE ACUERDO CON EL PLAN HABRÁN SIDO REGISTRADOS ANTE LA COMISIÓN DE TÍTULOS VALORES (LA "SEC", POR SUS SIGLAS EN INGLÉS) DE ACUERDO CON LA LEY DE TÍTULOS VALORES DE 1933, CON SUS ENMIENDAS, O DE ACUERDO CON LAS LEYES "BLUE SKY" DE CUALQUIER

---

[6] Para evitar dudas, el uso del término "recuperación" en la presente Declaración de Divulgación no constituye, ni deberá interpretarse como, una admisión de hechos, obligaciones, estipulaciones o renuncias en litigios en curso o futuros con respecto a fondos históricamente asignados de manera condicional por el ELA a ciertas instrumentalidades del ELA.

ESTADO, Y DICHOS TÍTULOS VALORES SERÁN EMITIDOS EN BASE A LAS EXENCIONES DE LOS REQUISITOS DE REGISTRO DE LA LEY DE TÍTULOS VALORES Y LAS LEYES EQUIVALENTES DE LOS ESTADOS.

CONSECUENCIAS DE LA TENENCIA DE TÍTULOS VALORES EMITIDOS DE ACUERDO CON EL PLAN DE AJUSTE. LOS DEUDORES RECOMIENDAN A LOS POTENCIALES DESTINATARIOS DE NUEVOS BONOS GO Y DE INSTRUMENTOS DE VALOR CONTINGENTE EMITIDOS DE ACUERDO CON EL PLAN QUE CONSULTEN A SUS PROPIOS ASESORES CON RESPECTO A CUALQUIER RESTRICCIÓN SOBRE LA TENENCIA O LA TRANSFERIBILIDAD DE DICHOS TÍTULOS VALORES, O CUALQUIER OTRA CONSECUENCIA POTENCIAL DE LA TENENCIA DE DICHOS TÍTULOS VALORES.

CONSIDERACIONES IMPOSITIVAS. LAS CONSECUENCIAS IMPOSITIVAS DEL PLAN PARA LOS TENEDORES DE RECLAMACIONES SON COMPLEJAS, Y DEPENDEN EN PARTE DEL TIPO DE RECLAMACIÓN Y LAS CIRCUNSTANCIAS INDIVIDUALES DE CADA TENEDOR DE UNA RECLAMACIÓN. LOS DEUDORES RECOMIENDAN QUE TODOS LOS TENEDORES DE RECLAMACIONES CONSULTEN A SUS RESPECTIVOS ASESORES IMPOSITIVOS CON RESPECTO A LAS CONSECUENCIAS IMPOSITIVAS DEL PLAN DE ACUERDO CON LAS NORMAS FEDERALES, ESTATALES, TERRITORIALES (LO QUE INCLUYE PUERTO RICO) Y LOCALES DE ESTADOS UNIDOS Y DE OTROS PAÍSES APARTE DE ESTADOS UNIDOS EN SUS CIRCUNSTANCIAS INDIVIDUALES RESPECTIVAS.

CONTROLES DEL PLAN DE AJUSTE SOBRE ESTA DECLARACIÓN DE DIVULGACIÓN. ESTA DECLARACIÓN DE DIVULGACIÓN RESUME CIERTAS DISPOSICIONES DEL PLAN, CIERTOS OTROS DOCUMENTOS Y CIERTA INFORMACIÓN FINANCIERA RELACIONADA CON LOS DEUDORES. LOS DEUDORES CONSIDERAN QUE ESTOS RESÚMENES SON JUSTOS Y VERACES. NINGUNA OTRA PARTE, INCLUSO LAS PARTES DE UN ACUERDO DE APOYO AL PLAN, HACE NINGUNA DECLARACIÓN CON RESPECTO A LA JUSTICIA O VERACIDAD DE ESTOS RESÚMENES O LAS DESCRIPCIONES DE LOS DERECHOS LEGALES DE LAS PARTES Y LOS REMEDIOS CONTENIDOS EN LA PRESENTE. SI EXISTEN INCOHERENCIAS O DISCREPANCIAS ENTRE UNA DESCRIPCIÓN QUE FIGURA EN LA PRESENTE DECLARACIÓN DE DIVULGACIÓN Y LOS TÉRMINOS Y DISPOSICIONES DEL PLAN O CUALQUIERA DE LOS DEMÁS DOCUMENTOS O INFORMACIÓN FINANCIERA A LOS QUE SE HACE REFERENCIA EN LA PRESENTE, LOS TÉRMINOS Y DISPOSICIONES DEL PLAN O DEMÁS DOCUMENTOS O INFORMACIÓN FINANCIERA, SEGÚN CORRESPONDA, SERÁN LOS QUE PREVALEZCAN PARA TODOS LOS FINES.

EL PLAN DE AJUSTE PUEDE RECIBIR ENMIENDAS. LA JUNTA DE SUPERVISIÓN SE RESERVA EL DERECHO DE ENMENDAR, MODIFICAR O RETIRAR EL PLAN EN CUALQUIER MOMENTO, DE ACUERDO CON LOS TÉRMINOS DE LOS ACUERDOS DE APOYO DEL PLAN, EL PLAN Y EL TÍTULO III DE PROMESA.

# <u>Índice</u>

**Página**

I.      Prefacio ........................................................................................................ 2

II.     Introducción ................................................................................................ 17

    A.      Plan de Ajuste del Título III de la Ley PROMESA: Descripción general ........... 20

    B.      Resumen de los principales componentes del Plan de ajuste ............................. 20

    C.      Tenedores de Reclamaciones con derecho a votar por el Plan de Ajuste ............ 52

    D.      Procedimientos de solicitud y de votación ........................................................ 57

    E.      Vista de confirmación y fecha límite para las objeciones a la confirmación ........ 57

III.    III. Descripción general de los Deudores ....................................................... 58

    A.      A. Información General ..................................................................................... 58

    B.      Obligaciones Financieras de los Deudores a la Fecha de Petición. ..................... 66

    C.      Régimen de Ingresos y Tributos de Puerto Rico ............................................... 93

    D.      Los Sistemas de Administración de Caja de los Deudores ................................ 131

    E.      Cuentas de Caja de Deudores ........................................................................ 139

    F.      Liquidez del Estado Libre Asociado y Análisis de Necesidades Mínimas
        de Efectivo .................................................................................................... 149

IV.     Acontecimientos significativos que dieron origen a los casos del Título III ................. 155

    A.      El constante deterioro operativo y financiero del ELA ...................................... 155

    B.      Legislación aprobada por el ELA para abordar la crisis fiscal y de deuda ......... 159

    C.      PROMESA ................................................................................................... 165

    D.      Adopción de los presupuestos y planes fiscales del año fiscal del ELA ............. 192

    E.      Negociaciones con acreedores ....................................................................... 221

V.      Descripción de los Casos de Título III de los Deudores ................................. 223

    A.      Inicio de los Casos de Título III de los Deudores ............................................. 223

    B.      Los huracanes Irma, María y Dorian, los terremotos de enero de 2020, la
        COVID-19, el ciclón tropical 9, la tormenta tropical Laura y el huracán
        Isaías, y la respuesta de la Junta de Supervisión ............................................ 224

    C.      Proceso de reclamaciones y fecha límite ........................................................ 234

    D.      Rechazo o aceptación de arrendamientos vigentes de bienes inmuebles no
        residenciales ................................................................................................. 239

    E.      Aspectos de paralización de Título III ............................................................ 240

    F.      Procedimientos contenciosos significativos y litigios relacionados .................. 260

| | G. | Mociones bajo la Regla 2004 ................................................................... | 297 |
|---|---|---|---|
| | H. | Investigación de la Junta de Supervisión sobre potenciales causas de acción ........................................................................................................... | 300 |
| | I. | La orden de paralización y los informes del Equipo de Mediación .................. | 335 |
| | J. | Reestructuraciones relacionadas de la deuda ................................................ | 339 |
| VI. | | Plan de ajuste del Título III ............................................................................ | 356 |
| | A. | Generalidades ............................................................................................... | 356 |
| | B. | Descripción general del plan de ajuste .......................................................... | 357 |
| | C. | Acuerdo mutuo y transacción de disputas / Reestructuración de entidades ........ | 358 |
| | D. | Disposiciones para el pago de reclamaciones de gastos administrativos ............ | 361 |
| | E. | Clasificación y tratamiento de las reclamaciones ........................................... | 365 |
| | F. | Disposiciones con respecto a los Nuevos Bonos GO, CVI y deudas adicionales ...................................................................................................... | 430 |
| | G. | Disposiciones relativas a los bonos asegurados por Assured, los bonos asegurados por National y los bonos asegurados por Syncora ......................... | 441 |
| | H. | Tratamiento de contratos condicionales y arrendamientos no vencidos ............ | 448 |
| | I. | Derechos y facultades del agente pagador ..................................................... | 450 |
| | J. | Disposiciones que rigen las distribuciones ..................................................... | 451 |
| | K. | Fideicomiso de Acciones de Revocación ....................................................... | 455 |
| | L. | Enjuiciamiento y extinción de reclamaciones de los Deudores ........................ | 463 |
| | M. | Aceptación o rechazo del Plan, efecto del rechazo por una o más Clases de Reclamaciones .............................................................................................. | 463 |
| | N. | Derechos y facultades del agente pagador ..................................................... | 463 |
| | O. | Procedimientos de tratamiento de reclamaciones bajo disputa ......................... | 464 |
| | P. | Gobernanza y disposiciones sobre la reserva de pensiones. .............................. | 465 |
| | Q. | Condiciones precedentes a la confirmación del Plan ....................................... | 466 |
| | R. | Condiciones precedentes a la Fecha de Entrada en vigencia ............................ | 467 |
| | S. | Modificación, revocación o desistimiento del Plan ........................................ | 471 |
| | T. | Gobernanza corporativa y manejo de deudores reorganizados ......................... | 472 |
| | U. | Disposiciones con respecto a la Junta de Supervisión y el cumplimiento de PROMESA ................................................................................................... | 473 |
| | V. | Disposiciones sobre comités ......................................................................... | 473 |
| | W. | Disposiciones misceláneas ............................................................................ | 476 |

VII.    Confirmación del Plan de Ajuste ......................................................................... 486

    A.    Vista de confirmación .............................................................................. 486

    B.    Fechas límite para objetar la Confirmación ........................................... 486

    C.    Requisitos para la confirmación del Plan de Ajuste ............................... 486

VIII.   Ciertos factores de riesgo a considerar............................................................... 491

    A.    Riesgos relacionados con los Casos del Título III ................................. 491

    B.    Riesgos relacionados con los Deudores .................................................. 493

    C.    Riesgos relacionados con los Nuevos Bonos GO .................................. 494

    D.    Riesgos relacionados con los CVI........................................................... 496

    E.    Riesgos relacionados con la Elección de Assured .................................. 497

    F.    Riesgos relacionados con las elecciones de los bonistas de Assured ................ 498

    G.    Riesgos relacionados con la elección del Tratamiento de conmutación de National.......................................................................... 498

    H.    Riesgos relacionados con el tratamiento de no conmutación de National ......... 498

    I.    Riesgos relacionados con hacer u omitir hacer una elección de conmutación de National............................................................................ 499

    J.    Riesgos relacionados con los Certificados de National................................... 499

    K.    Riesgos relativos a la Cuenta de custodia de National..................................... 500

    L.    Riesgos relativos a la elección del Tratamiento de conmutación de Syncora ...................................................................................... 501

    M.    Riesgos relacionados con el Tratamiento de no conmutación de Syncora ......... 501

    N.    Riesgos relacionados con hacer u omitir hacer una elección de conmutación de Syncora............................................................................ 501

    O.    Riesgos relacionados con los Certificados de Syncora .................................... 501

    P.    Riesgos relacionados con la cuenta de custodia de Syncora............................. 503

    Q.    Riesgos relativos a las proyecciones de ingresos y gastos del Plan Fiscal del Estado Libre Asociado ...................................................... 503

    R.    Riesgos relacionados con la recaudación de los ingresos necesarios para el pago de los Nuevos Bonos GO ........................................... 509

    S.    Factores de riesgo relacionados con futuras acciones judiciales....................... 513

    T.    Factores de riesgo relacionados con la acción legislativa ................................ 514

    U.    Factores de riesgo relacionados con el tratamiento fiscal de los Nuevos Bonos GO................................................................................. 515

| IX. | Consideraciones  materiales a efectos del Impuesto federal sobre ingresos de EE.UU. | 518 |
|---|---|---|
| | A. Aspectos generales | 518 |
| | B. Tenedores de EE.UU. | 519 |
| | C. Personas naturales y jurídicas de Puerto Rico | 536 |
| | D. Tenedores no de EE.UU. | 539 |
| X. | Consideraciones materiales a efectos del impuesto sobre el ingreso de Puerto Rico | 542 |
| | A. Aspectos generales | 542 |
| | B. Tenedores de P.R. | 542 |
| | C. Tenedores no de P.R. | 553 |
| XI. | Aplicabilidad de ciertas leyes de valores federales y estatales | 555 |
| | A. Nuevos Bonos GO | 555 |
| | B. CVI | 556 |
| XII. | Información Financiera y Proyecciones | 558 |
| | A. Información Financiera Histórica | 558 |
| | B. Plan Fiscal del Estado Libre Asociado y Proyecciones | 563 |
| XIII. | Información Adicional | 565 |
| XIV. | Conclusión | 566 |

**Tabla de Anexos**

**Anexo A** – Tercer Plan de Ajuste Conjunto del Título III Modificado del Estado Libre Asociado de Puerto Rico, *y otros*.

**Anexo B** – Acuerdo de Apoyo al Plan (el "AAP"), de fecha 22 de febrero de 2021, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, la Autoridad de Edificios Públicos de Puerto Rico y el Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico, así como ciertos Bonistas GO y de la AEP, Assured Guaranty Corp. y Assured Municipal Corp., Syncora Guarantee Inc., y National Public Finance Guarantee Corporation

**Anexo C** – Acuerdo de Apoyo al Plan (AAP del SRE/ADCC), del 5 de mayo de 2021, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, la Autoridad de Carreteras y Transportación de Puerto Rico, ciertos tenedores de Reclamaciones de Bonos de la ACT, ciertos tenedores de Reclamaciones de bonos de la ADCC, la Assured Guaranty Corp., la Assured Guaranty Municipal Corp. y la National Public Finance Guarantee Corporation

**Anexo D** – Estipulación (la "Estipulación del SRE") del 2 de abril de 2021, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, y el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico.

**Anexo E** – Acuerdo de Apoyo al Plan ("AAP del Comité de Jubilados"), del 7 de junio de 2019, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, y el Comité Oficial de Jubilados designado en el Caso del Título III del Estado Libre Asociado

**Anexo F** – Acuerdo de Apoyo al Plan ("AAP de AFSCME") y, conjuntamente con el AAP del Comité de Jubilados, los "Acuerdos de Apoyo al Plan"), del 7 de junio de 2019, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, y el sindicato internacional de la *American Federation of State, County, and Municipal Employees* (Federación Americana de Empleados Estatales, de Condados y Municipales) AFL-CIO

**Anexo G** – Plan Fiscal Certificado del Estado Libre Asociado (que incluye a SRE y AEP)

**Anexo H** – Presupuesto Certificado del Estado Libre Asociado de Puerto Rico (que incluye a SRE y AEP)

**Anexo I** – Informe de la Junta de Supervisión sobre Pensiones

**Anexo J** – Cuadro de Resumen de los Bonos en Circulación de los Deudores

**Anexo K** – Lista de Entidades que Integran el Gobierno Central del Estado Libre Asociado

**Anexo L** – Lista de Cuentas Bancarias, Balances y Categorizaciones de Restricciones Preliminares de los Deudores a 31 de diciembre de 2020

**Anexo M** – Últimos Estados Financieros Auditados de los Deudores

**Anexo N** – Informes sobre Prueba del Interés Superior

**LAS DECLARACIONES CONTENIDAS EN LAS SECCIONES I Y II HAN QUEDADO ÍNTEGRAMENTE CALIFICADAS POR LA INFORMACIÓN MÁS DETALLADA CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN, EN EL PLAN Y EN LOS RESPECTIVOS ANEXOS.**

## I.   Prefacio[7]

*La decadencia económica del Estado Libre Asociado.* En las últimas décadas, diversos factores contribuyeron a una abrupta desaceleración económica del Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado"), entre ellos la contracción de la economía, la disminución de la población, las variaciones de la situación fiscal y la disponibilidad de créditos de conformidad con el código tributario estadounidense. Desde principios del siglo XXI hasta 2016, la deuda pública de Puerto Rico incrementó rápidamente, en parte por la toma de préstamos para cubrir los déficits (incluyendo el pago de la amortización de la deuda), y por las perspectivas de continua contracción de la economía nacional.

En 2016, Puerto Rico se encontraba "en medio de una crisis fiscal".[8] En esa época, el Estado Libre Asociado estaba "aplastado bajo el peso de una deuda pública mayor" que su producto interno bruto, "había comenzado a incumplir sus obligaciones de deuda" y había perdido el acceso al financiamiento exterior.[9] El Estado Libre Asociado sumaba más de $120,000 millones combinados entre deuda y pasivos de pensiones sin fondos. Peor aún, esta calamitosa situación financiera amenazaba con provocar una crisis humanitaria a los más de 3 millones de ciudadanos estadounidenses residentes en la isla de Puerto Rico. Como señaló el Secretario del Tesoro de EE.UU., la capacidad del Estado Libre Asociado de proporcionar "servicios sanitarios, legales y educativos básicos" estaba en serias dudas.[10]

*Aprobación de PROMESA.* En consecuencia, el 30 de junio de 2016, el Presidente firmó la ley aprobada por el Congreso denominada Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (en inglés, Puerto Rico Oversight, Management, and Economic Stability Act, o "PROMESA"), 48 U.S.C. § 2101 *y ss.*, con el objeto de buscar una solución a la crisis fiscal y humanitaria de Puerto Rico. El objetivo de PROMESA es atender a la necesidad inmediata de prestar a servicios efectivos a sus ciudadanos, formular una reestructuración de la deuda e implementar la reforma fiscal que conlleve una economía sostenible, responsabilidad fiscal y acceso a los mercados.

*Principales componentes de la Ley PROMESA.* PROMESA establece dos mecanismos fundamentales para restablecer la responsabilidad fiscal. En primer lugar, los Títulos I, II, IV y V de la Ley PROMESA establecen la constitución de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión") y determinan las facultades y obligaciones que rigen la supervisión y aceptación de los planes fiscales multianuales, los presupuestos anuales, la revitalización de las infraestructuras y la agilización del seguimiento de los principales proyectos

---

[7]   Los términos en mayúsculas utilizados en este documento que no estén definidos de otra manera tendrán los significados adscritos a los mismos en el Plan (tal como se define a continuación).

[8]   *Puerto Rico c. Franklin California Tax–Free Trust.,* 136 S. Ct. 1938, 1942 (2016).

[9]   *Wal-Mart Puerto Rico, Inc. c. Zaragoza-Gómez*, 174 F. Supp. 3d 585, 602 (D.P.R. 2016); H.R. Rep. No. 114- 602, en 40 (2016).

[10]   Carta de Jacob L. Lew, Secretario del Tesoro, a Paul Ryan, Presidente de la Cámara de Representantes de Estados Unidos (15 de enero de 2016), https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

de infraestructuras.[11] En segundo lugar, los Títulos III y VI de PROMESA contemplan reestructuraciones de la deuda, similares a casos de quiebras y reestructuraciones extrajudiciales, respectivamente, de Puerto Rico y sus instrumentalidades.[12] Al incorporar muchas disposiciones del Título 11 del Código de Estados Unidos (el "Código de Quiebras") en el Título III de PROMESA, que estipula reestructuraciones similares a las previstas por los Capítulos 9 y 11 del Código de Quiebras, la ley también protege a los deudores contra las actuaciones judiciales de los acreedores[13], que de otra manera podrían absorber miles de millones de dólares del Estado Libre Asociado e infligir daños irreparables a la economía puertorriqueña. La ley incluye atributos únicos, como la activación de una paralización automática una vez que la propuesta se convirtiera en ley. La Junta de Supervisión pasó a ser la representante única de toda entidad deudora en cualquier caso del Título III, con facultades exclusivas para proponer un plan de ajuste. El Título VI de la Ley PROMESA prevé un proceso de reestructuración alternativa y extrajudicial sujeto a umbrales de votación.

***Problemas históricos que llevaron a la creación de la Junta de Supervisión.*** Con el objeto de superar varias décadas de grave retroceso económico, déficits de explotación, falta de transparencia fiscal, ineficacia de gestión y excesivo endeudamiento,[14] la Ley PROMESA estableció una entidad autónoma dentro del gobierno de Puerto Rico: la Junta de Supervisión.[15] La Junta de Supervisión es "una entidad dentro del gobierno territorial", en vez de un "departamento, agencia, institución u instrumentalidad del Gobierno Federal".[16] La Junta de Supervisión está encargada por ley de restablecer la responsabilidad fiscal del Estado Libre Asociado y su acceso a los mercados.[17] Para cumplir su obligación legal, la Junta de Supervisión está facultada para supervisar la reestructuración de la deuda del Estado Libre Asociado y de sus instrumentalidades, y para exigir reformas fiscales. Algunos elementos de esta potestad han sido objetados,[18] aunque fueron confirmados por el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto

---

[11] La Comisión de Recursos Naturales de la Cámara de Representantes de EE.UU. está evaluando las enmiendas propuestas a PROMESA que incluirían, entre otras cosas, una definición más específica de los servicios esenciales protegidos (incluyendo la salud pública, la educación, la seguridad y las pensiones); la provisión de fondos federales para la Junta de Supervisión; financiamiento garantizado para la Universidad de Puerto Rico; una auditoría de la deuda pública del Estado Libre Asociado; y el permiso para que el gobierno del Estado Libre Asociado cancele ciertas deudas. En una audiencia celebrada el 11 de junio de 2020 y en posteriores consultas de seguimiento, la Junta de Supervisión y la AAFAF comunicaron sus respectivas preocupaciones a la Comisión de Recursos Naturales.

[12] 48 U.S.C. § 2161.

[13] 11 U.S.C. § 362(a) (incorporado al caso del Título III por 48 U.S.C. § 2161(a)).

[14] PROMESA § 405(m)(1).

[15] 48 U.S.C. § 2121(a)(1).

[16] Ibídem § 2121(c)(2); véase asimismo 48 U.S.C. § 2194(i)(2) (donde se define el término "Gobierno de Puerto Rico" para incluir a la Junta de Supervisión para todos los efectos de esa sección); 48 U.S.C. § 2127(b) (estipulando que la Junta de Supervisión es financiadas exclusivamente por el gobierno territorial de Puerto Rico).

[17] PROMESA § 101(a).

[18] Los resúmenes de las presentaciones judiciales de esta Declaración de Divulgación han sido plenamente calificados por los documentos presentados públicamente.

Rico (el "Tribunal del Título III") y el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito (el "Primer Circuito").[19]

**Actuaciones iniciales de la Junta de Supervisión para cumplir el mandato de la Ley PROMESA.** El 31 de agosto de 2016, el Presidente Obama designó a los siete integrantes con derecho a voto de la Junta de Supervisión que, en virtud de la Ley PROMESA, prestarían sus servicios sin remuneración, aunque tendrían derecho al reintegro de los gastos razonables y necesarios incurridos en el desempeño de sus funciones.[20] Cuando fue designada, la Junta de Supervisión carecía de personal, de instalaciones y de datos. Sus primeros pasos consistieron en conseguir instalaciones y en captar expertos para cumplir su cometido. Para entonces, el Estado Libre Asociado tenía unos $74,000 millones en deuda consolidada, un pasivo de pensiones estimado en $51,600 millones[21] y recursos insuficientes para cumplir estas obligaciones. El 30 de septiembre de 2016, la Junta de Supervisión (i) anunció un proceso para la elaboración, presentación, aprobación y certificación de planes fiscales para el Estado Libre Asociado y los instrumentalidades territoriales correspondientes, (ii) designó un grupo inicial de 63 entidades

---

[19] Como se describe con mayor detalle en la sección VI.C.3, el 5 de julio de 2018, el entonces Gobernador Ricardo Rosselló Nevares ("Gobernador Rosselló") demandó a la Junta de Supervisión alegando, entre otras cosas, que "todos los asuntos que constituyan recomendaciones (tanto si se presentan como tales como si no) en el marco del Plan Fiscal que el Gobierno haya rechazado o pudiera rechazar en el futuro (tal como se definen aquí o de otra manera) no son vinculantes para el Gobierno, que no está obligado a implementarlas". Demanda del Gobernador contra la Junta de Supervisión del 5 de julio de 2018, Proc. Cont. Núm. 18-00080-LTS en 17 BK 3283-LTS (D.P.R.), en ¶ 83. Por opinión y orden del 7 de agosto de 2018, el Tribunal del Título III falló en contra del entonces Gobernador, explicando que: "Los poderes otorgados a la Junta de Supervisión por la Sección 205(b)(1)(K) de la Ley PROMESA permiten a la Junta de Supervisión establecer políticas vinculantes para el Estado Libre Asociado, a pesar del rechazo del Gobernador de las recomendaciones basadas en la Sección 205 . . ." . ." *Rosselló Nevares c. la Junta de Supervisión y Administración Financiera para Puerto Rico* [Proc. Cont. Núm. 18-00080-LTS ECF Núm. 33], en 25. En la apelación presentada por el entonces Gobernador Rosselló, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito confirmó la sentencia del Tribunal de Distrito, manifestado que nada de lo contenido en la Sección 205 de PROMESA "sugiera que, por el hecho de solicitar en primera instancia la conformidad del Gobernador en algún asunto, la Junta pierda de algún modo las facultades que tenga para actuar unilateralmente con respecto al mismo", y que la Junta de Supervisión está empoderada para adoptar "una recomendación rechazada si tuviera la facultad para adoptarla por sí misma". *Vázquez-Garced c. la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico.),* 945 F.3d 3, 5 (1er. Cir. 2019). También la Asamblea Legislativa de Puerto Rico (la "Legislatura") objetó las potestades presupuestarias de la Junta de Supervisión. Sostuvo que "la decisión de la Junta de autorizar su presupuesto por encima de la Asamblea Legislativa fue una 'intrusión ilícita en las potestades legislativas exclusivas de la Asamblea Legislativa en virtud de la Constitución de Puerto Rico'". *Méndez-Núñez c. la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico.),* 916 F.3d 98, 116 (1er. Cir. 2019). El Tribunal del Título III falló c. la Legislatura, sentencias confirmada por el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que dictaminó: ". . . En virtud de la cláusula de prioridad de §§ 201 y 202 la Ley PROMESA, la potestad de la Junta de aprobar Planes fiscales y Presupuestos 'tiene precedencia sobre cualesquiera disposiciones generales o específicas del derecho territorial', incluyendo las disposiciones de la Constitución de Puerto Rico que sean 'incompatibles con [PROMESA]'". *Ibídem*

[20]   PROMESA § 101(g).

[21] GASB 67 Pasivo neto de pensiones para SRE, SRM y SRJ al 30 de junio de 2016, tal y como se recoge en los informes de valoración actuarial al 30 de junio de 2016 realizados por el actuario del sistema. Excluye las contribuciones a los planes de seguro medico medidas conforme a GASB 45.

sujetas a la Ley PROMESA,[22] (iii) solicitó al Gobernador un volumen significativo de información financiera y presupuestaria como primer paso para elaborar mejoras de la gobernanza tributaria, la rendición de cuentas, los controles internos y los asuntos financieros del Gobierno, e (iv) inició el proceso de proyectos críticos autorizados por el Título V de la Ley PROMESA estableciendo criterios y procesos de selección para agilizar ciertos proyectos de energía e infraestructura críticos. Por otra parte, la Junta de Supervisión inició sus reuniones con representantes de múltiples grupos de acreedores, desde jubilados hasta bonistas de obligaciones generales (los "Bonos GO", dichos tenedores, los "Bonistas GO"), aseguradoras de bonos, bonistas garantizados y no garantizados, bonistas de la Isla, bonistas del Banco de Desarrollo del Gobierno de Puerto Rico ("BDG"), los bonistas y aseguradoras de la Autoridad de Carreteras y Transportación de Puerto Rico ("ACT"), los bonistas y aseguradoras de la Autoridad de Acueductos y Alcantarillados de Puerto Rico ("AAA"), los bonistas y aseguradoras de la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR"), y muchos otros.

*Primer Plan fiscal certificado del Estado Libre Asociado.* La elaboración del primer Plan fiscal certificado para el Estado Libre Asociado abarcó dos administraciones. El 14 de octubre de 2016, el entonces Gobernador Alejandro Javier García Padilla presentó la propuesta de Plan fiscal para el Estado Libre Asociado de su administración. Mediante una carta del 29 de noviembre de 2016, el Gobernador García Padilla rechazó la petición de la Junta de Supervisión de que se presentaran ciertas revisiones al Plan Fiscal antes del 15 de diciembre de 2016, manifestando que toda iniciativa de reducción del gasto público agravaría la crisis económica y debería ser abandonada. El 1 de enero de 2017, asumió su cargo el Gobernador Rosselló y, el 28 de febrero de 2017, presentó su propuesta de Plan fiscal del Estado Libre Asociado. La Junta de Supervisión y sus asesores venían colaborando con el entonces Gobernador y su administración durante varios meses para elaborar el Plan fiscal del Estado Libre Asociado y sus instrumentalidades. El 13 de marzo de 2017, la Junta de Supervisión certificó el Plan Fiscal del Estado Libre Asociado, que constaba del plan fiscal del Gobernador con ciertas enmiendas planteadas por la Junta. La Junta de Supervisión también colaboró con el Gobierno para elaborar, y eventualmente certificar, los planes fiscales de otras instrumentalidades, como el BDG, la ACT, la AAA y la AEEPR, el 28 de abril de 2017.

*Inicio de los casos del Título III.* Cuando se aprobó la Ley PROMESA, estableció una paralización automática temporal para proteger al Estado Libre Asociado y a sus instrumentalidades contra actuaciones de acreedores para cobrar sus deudas hasta el 1 de mayo de 2017.[23] Una vez concluida la paralización prevista por la Ley PROMESA, la Junta de Supervisión inició los casos del Título III del Estado Libre Asociado (3 de mayo de 2017), de la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (5 de mayo de 2017), del Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico ("SRE") y la ACT (21 de mayo de 2017), de la AEEPR (el 2 de julio de 2017) y de la AEP (Autoridad de Edificios Públicos) (27 de septiembre de 2019. El inicio de los casos del Título III activó la entrada en vigencia de la

---

[22] El 9 de mayo de 2019, la Junta de Supervisión designó asimismo a 78 municipios como entidades cubiertas.

[23] PROMESA §§ 5(11), 405(b). Inicialmente, estaba previsto que la paralización impuesta por la Ley PROMESA se extinguiera el 15 de febrero de 2017, aunque la Junta de Supervisión la prorrogó 75 días más, como lo permite la sección 405(d)(1)(B) de la Ley PROMESA.

paralización automática prevista por la sección 362 de Código de Quiebras, con lo cual las entidades citadas siguieron protegidas contra acciones judiciales hasta tanto se resolviesen los casos del Título III.[24]

*Un nuevo panorama: los huracanes Irma y María.* En septiembre de 2017 empeoraron las perspectivas de mejorar la situación financiera de Puerto Rico cuando este resultó devastado por los huracanes Irma y María. Estos fenómenos meteorológicos arrasaron gran parte de las infraestructuras de Puerto Rico y trastocaron las vidas de todos los puertorriqueños, así como el trabajo de la Junta de Supervisión.

Inmediatamente después de los huracanes, la Junta de Supervisión ofreció al Gobierno la posibilidad de reasignar hasta $1,000 millones en gastos presupuestados para cubrir los desembolsos vinculados con los desastres. Tras varias reuniones, testimonios ante el Congreso y otras interacciones con el gobierno federal y las autoridades de Puerto Rico, la Junta de Supervisión abogó activamente por la obtención de los recursos necesarios para sustentar la recuperación de Puerto Rico, las iniciativas de reconstrucción críticas y la liquidez necesaria.

*Terremotos y réplicas recientes.* El 28 de diciembre de 2019, Puerto Rico sufrió el primero de varios terremotos y réplicas significativas, registrando una magnitud de 4.7 en la escala de Richter. El 6 de enero de 2020, Puerto Rico sufrió un terremoto de magnitud 5.8 y al día siguiente, uno de magnitud 6.4, el más fuerte y destructivo ocurrido en el Caribe en un siglo. Luego, el 2 de mayo de 2020, otro terremoto de magnitud 5.4 sacudió la costa suroeste de Puerto Rico. El evento sísmico, que interrumpió brevemente el suministro eléctrico en algunas áreas, tuvo su epicentro cerca de la ciudad de Ponce, donde cientos de estructuras, incluyendo casas y templos, permanecen dañadas o destruidas por los devastadores terremotos anteriores de 2020.

Estos terremotos representan solo cuatro de los más de 1,000 terremotos en total de magnitud 3 o superior en Puerto Rico durante 2020, siendo seis de ellos de magnitud superior a 5.5. Según un informe del 29 de enero de 2020 publicado por el Servicio Geológico de los Estados Unidos, existe una alta probabilidad de que continúen las réplicas materiales en el transcurso de los próximos años.[25] Los terremotos causaron daños significativos en viviendas y edificios en la costa sur de Puerto Rico y también daños significativos en la planta de energía eléctrica Costa Sur de AEE, que habitualmente genera aproximadamente el 21% de la energía eléctrica de Puerto Rico. En respuesta, la Junta de Supervisión autorizó el uso del balance de $160 millones de los fondos de la Reserva de Emergencia para responder a los terremotos. El 6 de enero de 2020, el presidente Trump firmó una declaración de catástrofe grave que autorizaba los programas de asistencia individual, asistencia pública para las municipalidades afectadas y mitigación de riesgos para todo el ELA, habilitando una serie de ayudas federales en virtud de la Ley Stafford. Esta declaración autoriza el financiamiento de la asistencia para desastres con el objeto de complementar las iniciativas de recuperación del ELA y los gobiernos locales ante las consecuencias de los terremotos.

---

[24] PROMESA § 301(a).

[25] U.S. Geological Survey, Secuencia del terremoto en el suroeste de Puerto Rico, 2020 (29 de enero de 2020).

*Impacto y respuesta a la pandemia de COVID-19.* El 11 de marzo de 2020, la Organización Mundial de la Salud declaró la Enfermedad del Coronavirus 2019 ("COVID-19") como una pandemia mundial. Como resultado de la amenaza sanitaria y para contener la propagación del virus en Puerto Rico, el entonces gobernador Vázquez-Garced emitió una orden ejecutiva el 12 de marzo de 2020, declarando el estado de emergencia en Puerto Rico para concentrar todos los esfuerzos e implementar las medidas necesarias para salvaguardar la salud, el bienestar y la seguridad pública de los ciudadanos de Puerto Rico. La orden ejecutiva autorizó al Secretario de Hacienda del Estado Libre Asociado y al Director de la Oficina de Gerencia y Presupuesto de Puerto Rico (OGP) a establecer un presupuesto especial, con cualquier fondo disponible, incluyendo la Reserva de Emergencia, para cubrir todos los costos necesarios para la contención de la COVID-19 en todo Puerto Rico y compartir información con los municipios.

Para combatir los retos económicos asociados a la pandemia, se proporcionaron fondos del gobierno federal y local a individuos, familias, empresas, organizaciones sin fines de lucro y otras organizaciones en todo Estados Unidos, incluido Puerto Rico. El 3 de marzo de 2020, la Junta de Supervisión puso a disposición del Gobierno una cantidad inicial de $5 millones de los Fondos de la Reserva de Emergencia para contener y mitigar la COVID-19. El 13 de marzo de 2020, la Junta de Supervisión puso a disposición el resto de los $160 millones de los Fondos de Reserva de Emergencia para responder a la pandemia. El 23 de marzo de 2020, el Gobierno y la Junta de Supervisión acordaron proporcionar $787 millones en apoyo financiero (Paquete de Apoyo a las Medidas de Emergencia) a los que están en primera línea de la pandemia de COVID-19 y a los más afectados por las medidas de emergencia que se han producido.

El 27 de marzo de 2020, la Ley de Ayuda, Alivio y Seguridad Económica por el Coronavirus, Ley Pública Núm. 116-136 (la "Ley CARES", por sus siglas en inglés), fue aprobada por el presidente Donald J. Trump. La Ley CARES creó el Fondo de Ayuda para el Coronavirus ("CRF", por sus siglas en inglés), que proporcionó $150,000 millones en asistencia general para los gobiernos del país. En virtud de la Ley CARES, se destinaron $2,200 millones de ayuda a Puerto Rico. La fecha límite para gastar los fondos del CRF era inicialmente el 30 de diciembre de 2020, pero se prorrogó hasta el 31 de diciembre de 2021 mediante la Ley de Asignaciones Consolidadas de 2021, Ley Pública Núm. 116-260, que se aprobó el 27 de diciembre de 2020. Además de la prórroga, la Ley también combina $900,000 millones de ayuda de estímulo para la pandemia de COVID-19 en los Estados Unidos con un proyecto de ley ómnibus de gastos de $1.4 billones para el año fiscal federal 2021. De los aproximadamente $900,000 millones de ayuda de estímulo, se estima que Puerto Rico recibirá $7,000 millones. El 11 de marzo de 2021, el presidente Biden firmó la Ley del Plan de Rescate Estadounidense ("ARP"). Dicho instrumento dispone un fondo de $1.9 billones para financiamiento, cambios de programas y políticas fiscales dirigidos a mitigar los efectos de la pandemia. La ARP contempla asimismo $350,000 millones adicionales para ayudar a gobiernos estatales y locales, de los cuales se estima que Puerto Rico (incluyendo los municipios) recibirá $4,000 millones.

*Nuevos Planes fiscales.* Dado que los huracanes de 2017 propiciaron una nueva realidad para el país, la Junta de Supervisión inició un proceso de reelaboración de los planes fiscales del Estado Libre Asociado y sus instrumentalidades cubiertas en octubre de 2017. Durante los nueve meses posteriores a los huracanes Irma y María, la Junta de Supervisión colaboró con el Gobierno para definir nuevos Planes fiscales, con el objetivo fundamental de cumplir los mandatos de la Ley

PROMESA. Para ello, los planes fiscales requerirían de una serie de ambiciosas reformas estructurales y de medidas fiscales para restablecer el crecimiento y abrir oportunidades a las personas y empresas de Puerto Rico.

Mientras que la Junta de Supervisión y el Gobierno eventualmente alcanzaron un amplio acuerdo sobre los diversos aspectos de cada plan fiscal —incluyendo la acordada reforma laboral, del bienestar, de facilitar los negocios, de la energía y de las infraestructuras, entre otras—, el Gobierno se opuso a algunas de ellas, como por ejemplo el así llamado "empleo a voluntad" para los empleados del sector privado. En última instancia, la Junta de Supervisión llegó a un acuerdo con el entonces Gobernador Rosselló para cambiar las leyes con el objeto de implementar el empleo a voluntad en el sector privado, al igual que en 49 de los 50 estados. Sin embargo, la Legislatura no aprobó las leyes necesarias, manteniendo las leyes laborales de Puerto Rico tal cual estaban.

Al concluir este proceso con el Gobierno, el cual llevó meses, la Junta de Supervisión elaboró y certificó su propio Plan fiscal para el Estado Libre Asociado el 29 de junio de 2018, con numerosas medidas fiscales necesarias para racionalizar el Gobierno. El Plan fiscal de la Junta de Supervisión no incorporó una reforma exhaustiva del mercado de trabajo privado, dado que dicha propuesta no consiguió el apoyo legislativo necesario.

A lo largo de los últimos años, la Junta de Supervisión ha certificado nuevas revisiones de los planes fiscales del Estado Libre Asociado para adaptarlos a la nueva información, las proyecciones financieras actualizadas y las nuevas catástrofes naturales y crisis de salud pública. Por ejemplo, el 23 de octubre de 2018 y el 9 de mayo de 2019 se certificaron nuevos planes fiscales del ELA para incluir la nueva información financiera del año fiscal ("Año fiscal" o "AF") 2018, las estimaciones revisadas del gasto federal por catástrofes y las proyecciones demográficas actualizadas. El 27 de mayo de 2020, la Junta de Supervisión certificó su propio plan fiscal para el ELA con el fin de reflejar los impactos sustanciales de los terremotos de 2020 y la pandemia de COVID-19, conjuntamente con una implementación más lenta de las reformas estructurales. El Plan fiscal 2020 implementó una pausa de un año en las medidas fiscales para permitir al gobierno centrarse en la implementación de reformas.

El 23 de abril de 2021, la Junta de Supervisión certificó el Plan Fiscal 2021 del Estado Libre Asociado. Dicho Plan fiscal 2021 tiene en cuenta las repercusiones económicas y fiscales de la pandemia de COVID-19, así como los sustanciales estímulos federales y fiscales (más de $45,000 millones procedentes de los fondos para el alivio de las consecuencias de la pandemia), un retraso en el gasto de los fondos para para paliar desastres y la actualización de las estimaciones del potencial impacto de las reformas estructurales. Asimismo, el Plan Fiscal 2021 restablece medidas fiscales fundamentales —como las reducciones de subsidios a la Universidad de Puerto Rico y a los municipios, medidas de atención sanitaria y de eficiencia de los organismos—, aunque incrementando los fondos para la reforma del servicio civil y otras prioridades gubernamentales.

***Elección del gobernador Pierluisi.*** El 3 de noviembre de 2020, Pedro Pierluisi fue elegido Gobernador de Puerto Rico. El gobernador Pierluisi juró su cargo para un mandato de cuatro años el 2 de enero de 2021, y ha declarado que el Estado Libre Asociado no apoyará los recortes o ajustes de las prestaciones de pensiones del gobierno.

*Reformas políticas de la Junta de Supervisión.* Simultáneamente con la elaboración de los planes fiscales y los presupuestos, la Junta de Supervisión y el Gobierno colaboraron para implementar significativas reformas legales y de gobernanza. Estas iniciativas legislativas conllevaron que Puerto Rico emprendiera significativos proyectos reformistas, incluyendo una transformación operativa y estructural de la red eléctrica de Puerto Rico, medidas para profundizar la transparencia financiera del Gobierno y controles presupuestarios.[26] Durante el Año fiscal 2019, la Junta de Supervisión implementó un proceso consolidado de revisión presupuestaria para el Fondo General,[27] Fondos de Ingresos especiales,[28] otros fondos y fondos federales, conjuntamente con agencias públicas sin planes fiscales independientes, para mejorar la transparencia del financiamiento, el control de los fondos y entender las tendencias operativas del Gobierno. En el Año fiscal 2020, los esfuerzos por mejorar la transparencia continuaron con la decisión de la Junta de Supervisión de presupuestar las subvenciones e incentivos en efectivo en los Fondos de Ingresos Especiales. En el Año fiscal 2021, muchos de estos fondos se trasladaron de los Fondos de Ingresos Especiales al Fondo General, de manera que queden bajo el ámbito presupuestario del Gobierno y reflejen con mayor precisión la verdadera naturaleza de esos fondos.

La Junta de Supervisión pretendió conseguir ahorrar costos consolidando muchas de las más de 100 agencias gubernamentales del Estado Libre Asociado y garantizando la prestación de servicios públicos más eficientes. Además, la consolidación permitiría hacer que las administraciones públicas resultasen más manejables en el transcurso del tiempo. Por otra parte, las reformas políticas también reinvierten una parte de esos ahorros en áreas con mayores necesidades. Por ejemplo, la Junta de Supervisión autorizó considerables incrementos salariales de docentes y policías. La Junta de Supervisión también introdujo cambios para que los oficiales de policía puedan afiliarse al Seguro Social, lo que aumenta la seguridad de su pensión para los policías que alcanzan los cuarenta trimestres de contribución al Seguro Social requeridos.

Además, promovió importantes avances en la transparencia financiera del Gobierno permitiendo al pueblo de Puerto Rico un mejor acceso a información de alta calidad sobre reformas gubernamentales, gasto público y administraciones públicas. La Junta de Supervisión ha exigido transparencia fiscal, de manera que el público general tenga pleno acceso a la información relativa al gasto del dinero de los contribuyentes. Ahora, las cuentas públicas disponibles en Internet incluyen información sobre la evolución de la ejecución presupuestaria, informes de fondos, balances en bancos y registros de asistencia. Los presupuestos certificados por la Junta de Supervisión correspondientes al Estado Libre Asociado y a algunas de sus instrumentalidades y corporaciones públicas ahora presentan información más detallada acera de la naturaleza del gasto público. Además, ordenó la supervisión de todas las contrataciones externas y de las emisiones de

---

[26] JSAB, Informe Anual, Año fiscal 2018, en 8-11.5; JSAB, Informe Anual, Año fiscal 2019, en 37-52.

[27] El concepto "Fondo general" es un término contable utilizado en toda la Declaración de Divulgación para describir el principal fondo operativo del Estado Libre Asociado.

[28] El término "Fondo de Ingresos Especiales" es un término contable utilizado en toda la Declaración de Divulgación, y no implica que el dinero de los Fondos de Ingresos Especiales sean rentas especiales. Los deudores se reservan todos sus derechos con respecto a los mismos.

deuda. Por último, la Junta de Supervisión publica en línea la evolución de los planes de implementación comunicados por las agencias del Gobierno.

La transparencia y la rendición de cuentas de las finanzas pública son aspectos fundamentales de una gobernanza responsable. Cuando la transparencia no fue posible, la Junta de Supervisión promovió la creación de bases de datos para subsanar esta situación. La Junta de Supervisión encargó la elaboración de un informe que detallase los balances en las cuentas bancarias y de inversión de ciertas entidades e instrumentalidades del Estado Libre Asociado. El análisis de la liquidez es continuo, y se describe con mayor detalle en la sección III.D.1.

En 2017, la Junta de Supervisión contrató a la firma de abogados Kobre & Kim para preparar una reseña completa e independiente de la deuda pública. En agosto de 2018, la Junta de Supervisión recibió el resultado de esta investigación y presentó el informe de Kobre & Kim. Posteriormente, la Junta de Supervisión creó una Comisión de Reclamaciones Especiales, que ha objetado unos $6,000 millones de Bonos GO, entre otros instrumentos de deuda, emitidos por el Estado Libre Asociado y sus instrumentalidades y corporaciones públicas.

***Casos del Título III de los Deudores y reestructuraciones relacionadas.*** En el transcurso de los Casos del Título III, la Junta de Supervisión ha encabezado o aprobado las negociaciones lideradas por el Gobierno tendientes a la reestructuración de la deuda, sobre la base del paradigma de que las negociaciones consensuadas suelen ser mejores que las resoluciones objetadas. Trabajando estrechamente con el Gobierno y sus acreedores, la Junta de Supervisión y el Gobierno completaron dos reestructuraciones que involucraban más de $22,000 millones en deuda de bonos públicos, incluyendo (i) aproximadamente $17,600 millones bajo un plan de ajuste de Título III para COFINA, y (ii) aproximadamente $4,700 millones bajo una Modificación Calificatoria del Título VI para el BGF. La Junta de Supervisión también firmó acuerdos de apoyo al plan con algunos acreedores que afectan a más de $50,000 millones en reclamaciones de pensiones del Estado Libre Asociado y otros $35,000 millones en reclamaciones de bonos y de recuperación ("clawback") relacionados con el Estado Libre Asociado, así como un acuerdo en apoyo a la reestructuración con $9,000 millones en reclamaciones de bonos de AEE.

En noviembre de 2018, el Gobierno y la Junta de Supervisión completaron la Modificación Calificatoria del BGF. El BGF tenía más de $4,000 millones en deuda de bonos heredados y aproximadamente $8,000 millones en pasivos totales. Estas reclamaciones se resolvieron con la emisión de $2,600 millones en nuevos bonos bajo el procedimiento del Título VI de PROMESA. Dichos bonos están garantizados principalmente por el flujo de caja de los préstamos que el BGF hizo previamente a los municipios de Puerto Rico y otros activos del BGF. Los objetivos políticos de la Junta de Supervisión y del Gobierno en la reestructuración del BGF eran asegurar que estos nuevos bonos fueran pagaderos únicamente con los activos heredados del BGF, sin recurrir a ninguna futura asignación del gobierno general del Estado Libre Asociado, y amortiguar el efecto financiero de la reestructuración del BGF en los numerosos municipios de Puerto Rico que también eran acreedores del BGF.

La Junta de Supervisión y el Gobierno también negociaron con las partes interesadas de COFINA sobre una cuestión de si ciertos fondos procedentes del Impuesto sobre Ventas y Uso ("IVU") eran propiedad del Estado Libre Asociado o de COFINA. Estas negociaciones

10

desembocaron en una asignación consensuada de los ingresos del IVU y, en última instancia, a la confirmación de un plan de ajuste para COFINA (el 5 de febrero de 2019), con lo que la deuda de COFINA se redujo desde unos $17,000 millones a aproximadamente $12,000 millones. La resolución de la disputa sobre la asignación del IVU hizo que el Estado Libre Asociado avance un paso más en la reestructuración de su deuda, pues esto eliminó la incertidumbre acerca de miles de millones de dólares reclamados tanto por el Estado Libre Asociado como por COFINA.

En mayo de 2019 y septiembre de 2019, la Junta de Supervisión, la AEE y la AAFAF celebraron un acuerdo de apoyo a la reestructuración con una mayoría sustancial de los bonistas sin garantía de la AEE y todas las aseguradoras monolínea de los bonos de la AEE para reestructurar la deuda heredada de la AEE. Si se aplica, el acuerdo de apoyo a la reestructuración de la AEE reduciría la deuda de la AEE hasta en un 32.5%, protegería a los consumidores de las subidas de precios de la electricidad sin tope para pagar la amortización de la deuda, y ahorraría a los residentes y empresas de Puerto Rico que dependen de su suministro eléctrico unos $3,000 millones en pagos de la amortización de la deuda durante los próximos 10 años. El acuerdo se diseñó para apoyar la transformación y modernización del sistema energético de Puerto Rico para suministrar energía asequible y fiable al pueblo de Puerto Rico, al tiempo que traslada gran parte del riesgo de la potencial reducción de la demanda de electricidad por parte de los clientes de la AEE a los bonistas en lugar de los residentes y las empresas atendidas por la AEE.

En agosto de 2019, la AAA y la AAFAF celebraron una reestructuración consensuada de aproximadamente $1,000 millones de las obligaciones pendientes de la AAA en virtud de los bonos de Desarrollo Rural del Departamento de Agricultura de los Estados Unidos ("USDA") y los préstamos de los programas del Fondo Rotatorio Estatal de la Agencia de Protección Ambiental de los Estados Unidos ("EPA"). La Junta de Supervisión aprobó la reestructuración de acuerdo con la Sección 207 de PROMESA. Esta reestructuración permitiría a la AAA ahorrar en torno a $400 millones en los primeros 10 años, eliminando aproximadamente $1,000 millones en reclamaciones de garantía contra el Estado Libre Asociado y reinició nuevos fondos federales de la EPA y el USDA a través de varios programas de agua limpia para apoyar el esfuerzo continuo de la AAA para mejorar la calidad y seguridad del agua para el pueblo de Puerto Rico. Además, esta reestructuración consensuada otorgó importantes beneficios a la AAA sin necesidad de que esta se sometiera a un procedimiento de Título III o de Título VI.

En diciembre de 2020, la Junta de Supervisión aprobó, de acuerdo con la Sección 207 de PROMESA, la emisión por parte de la AAA de un monto de capital total de $1,351,300,000 en Bonos de Refinanciamiento de Ingresos, Serie 2020A (Gravamen Prioritario) y un monto de capital total de $18,775,000 en Bonos de Reembolso de Ingresos Federalmente Tributables, Serie 2020B (Gravamen Prioritario) (colectivamente, los "Bonos AAA 2020). Los ingresos de los Bonos AAA 2020 se utilizaron para (i) refinanciar una parte de los Bonos de Ingresos en circulación de la AAA, Serie A y Serie B (Gravamen prioritario), (ii) refinanciar todos los Bonos de Refinanciamiento de Ingresos en circulación de la AAA, Serie A y Serie B de 2008, cada uno de ellos garantizado por el Estado y (iii) pagar los costos de emisión de los Bonos AAA 2020.

*Motivos de discrepancias.* Mientras que la Junta de Supervisión abordó los retos identificados por el Congreso en la Ley PROMESA, acumulados durante las décadas pasadas y exacerbados por los huracanes Irma y María, los terremotos sucesivos y la actual pandemia de la

COVID-19, varios acreedores, involucrados y, en ocasiones, el Gobierno discreparon con las reformas de la Junta de Supervisión y objetaron la ejercitación de su potestad y del mandato otorgado por la Ley PROMESA para posibilitar la estabilidad económica y el acceso a los mercados de capitales del Estado Libre Asociado y de sus instrumentalidades. Algunas de las discrepancias se derivaron de las diferencias de interpretación de PROMESA, la Constitución del Estado Libre Asociado, las resoluciones sobre bonos y otros contratos y leyes aplicables. En la mayoría de los casos, la gente razonable suele discrepar y, en ese caso, llevan dichas discrepancias a los tribunales.

*Pleitos que afectan a las reestructuraciones de la deuda.* En uno caso del Título III en virtud de la Ley PROMESA, el plan de ajuste debe ser congruente con el plan fiscal certificado del deudor.[29] A su vez, el plan fiscal debe contener, entre otras cosas, un análisis de sostenibilidad de la deuda.[30] Los acreedores que creyeron que el plan fiscal certificado del Estado Libre Asociado contenía un análisis de sostenibilidad que demostraba que el Estado Libre Asociado podía emitir nueva deuda para pagar las reclamaciones de los acreedores que estos consideraban sostenible, pleitearon y exigieron que la Junta de Supervisión se abstuviera de proponer cualquier plan de ajuste congruente con el plan fiscal certificado del Estado Libre Asociado. Además, algunos acreedores pidieron la anulación del plan fiscal certificado del Estado Libre Asociado para canalizar al pago de la deuda miles de millones de dólares de ingresos. *Véase* en la sección 0 de esta Declaración de Divulgación un resumen del pleito contra la Junta de Supervisión.

La Ley PROMESA estipula expresamente que "ningún Tribunal de Distrito de los Estados Unidos será competente para revisar las objeciones a las decisiones certificadas de la Junta de Supervisión".[31] Ningún acreedor pidió interdictos contra la Junta de Supervisión, y las reclamaciones de canalizar ingresos fueron desestimadas por no ser el foro competente, o bien rechazadas por sus méritos. En especial, los tribunales de primera instancia y de apelación dictaminaron que la sección 922(d) del Código de Quiebras no requiere la aplicación de ingresos especiales pignorados a la deuda de ingresos especiales durante los Casos del Título III, y la Corte Suprema de los Estados Unidos rechazó dos peticiones de *certiorari* solicitando una nueva revisión.[32]

*Acuerdos iniciales con grupos de acreedores que posibilitaron el Plan de Ajuste inicial y Enmienda del Plan de Ajuste con apoyo adicional de los acreedores.* En mayo de 2019, la Junta de Supervisión alcanzó acuerdos con varios grupos importantes de acreedores acerca del tratamiento de sus reclamaciones, en virtud de acuerdos separados en apoyo al plan, cuales tratamientos fueron incorporados en el plan de ajuste propuesto del 27 de septiembre de 2019 [ECF Núm. 8765] (el "*Plan inicial*"). Estos grupos incluían a: (a) el Comité Oficial de Jubilados (el "Comité de Jubilados"), que representa a quienes reclaman las obligaciones pendientes por más

---

[29] PROMESA § 314(b)(7).

[30] PROMESA § 201(b)(1)(I).

[31] PROMESA § 106(e).

[32] *Assured Guar. Corp. c. Carrión (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)*, 919 F.3d 121 (1er. Cir. 2019), *certificación rechazada*, Núm. 19-391, 2020 U.S. LEXIS 237 (13 de enero de 2020).

de $50,000 millones en concepto de pensiones, (b) la American Federation of State, County, and Municipal Employees, Federación Americana de Empleados Estatales, de Condados y Municipales, "AFSCME"), que representa a más de 10,900 empleados actuales del Estado Libre Asociado y sus instrumentalidades, y (c) grupos de bonistas emitidos por la Autoridad de Edificios Públicos ("Bonos AEP" y tenedores de los Bonos AEP, "Bonistas AEP") y garantizados por la buena fe, el crédito y el poder impositivo del Estado Libre Asociado, y los Bonos GO emitidos por el Estado Libre Asociado. El Acuerdo de Apoyo al Plan, del 31 de mayo de 2019 (el "AAP inicial"), entre la Junta de Supervisión y ciertos Bonistas GO y Bonistas AEP incluía el compromiso y la transacción de una controversia entre el Estado Libre Asociado y la AEP sobre si los arrendamientos entre las dos entidades lo eran a los efectos de la sección 365 del Código de Quiebras, o si se trataban de financiamientos, y la transacción opcional de ciertas objeciones a los Bonos GO, incluyendo su validez, prioridad y grado de garantía.

Tras la presentación del Plan inicial, la Junta de Supervisión continuó convocando a los interesados a negociaciones con el objeto de obtener más apoyo para el Plan. Estas negociaciones, facilitadas por el Equipo de Mediación,[33] desembocaron en un acuerdo en principio con grupos tenedores de una mayoría de los Bonos AEP y Bonos GO circulantes, y estableciendo un marco para el tratamiento de ambos, así como una propuesta de transacción para todas las objeciones a la validez, prioridad y grado de garantía de los mismos. Este acuerdo en principio quedó plasmado en el Acuerdo de Apoyo al Plan del 9 de febrero de 2020 (el "AAP de 2020"), entre la Junta de Supervisión (como representante del Estado Libre Asociado), el SRE, la AEP y ciertos bonistas GO y Bonos AEP.[34] El AAP fue firmado por los bonistas GO y Bonos AEP valorados en aproximadamente $8,000 millones en reclamaciones. Además, el AAP permite que cada tenedor de Bonos GO o Bonos AEP con bonos de un valor nominal superior a $1 millón incorporarse al AAP. Tenedores de Bonos GO o Bonos AEP valorados en $2,000 millones adicionales se han incorporado a AAP 2020. El Gobierno no ha suscrito el AAP 2020.

En cumplimiento del AAP 2020, el 28 de febrero de 2020, la Junta de Supervisión presentó una propuesta de plan de ajuste enmendado [ECF Núm. 11946], una declaración de divulgación relacionada [ECF Núm. 11947], y la *Moción Conjunta del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, y la Autoridad de Edificios Públicos de Puerto Rico para solicitar una Orden (I) que apruebe la Declaración de Divulgación, (II) que fije la Fecha de Registro de la Votación, (III) que apruebe la Notificación de la Vista de Confirmación y el Cronograma de Confirmación, (IV) que apruebe los Paquetes de Convocatoria y los Procedimientos para su Distribución, (V) que apruebe los Modelos de Boletas y los Procedimientos de Votación y Elección, (VI) que apruebe la Notificación de la condición de miembro sin derecho a Voto, (VII) que fije las fechas límite para la Votación,*

---

[33] El "Equipo de Mediación" es el grupo mediador presidido por la Juez Barbara J. Houser, del Tribunal de Quiebras de los Estados Unidos para el Distrito Norte de Texas (la "Líder del Equipo de Mediación"), establecido por el Tribunal del Título III en virtud de su Orden de nombramiento del Equipo de Mediación del 23 de junio de 2017 [ECF Núm. 430].

[34] En relación con la formalización del AAP, el AAP inicial caducó el 9 de febrero de 2020.

*Elección y Confirmación, y (VIII) que apruebe los Procedimientos de Recuento de Votos [ECF Núm. 11950].[35]*

El 10 de marzo de 2020, el Tribunal del Título III dictó la *Orden de (I) programar una vista para considerar la adecuación de la información contenida en la Declaración de Divulgación, (II) de establecer el plazo para la presentación de la traducción al español de la Declaración de Divulgación, (III) establecer el plazo para la presentación de objeciones a la Declaración de Divulgación y las respuestas a esta, y (IV) de conceder la ayuda relacionada* [ECF Núm. 12187] estableciendo los días 3 y 4 de junio de 2020 como fechas para la vista para considerar la adecuación de la información contenida en la Declaración de Divulgación y los plazos relacionados. En respuesta a la propagación de la COVID-19 a nivel mundial y en todo Puerto Rico, y sus efectos sobre el pueblo y la economía de Puerto Rico, la Junta de Supervisión solicitó el aplazamiento de la vista para considerar la aprobación de la Declaración de Divulgación y los plazos relacionados, con sujeción a los informes de estado adicionales que se proporcionarán al Tribunal del Título III [ECF Núm. 12485], que el Tribunal del Título III concedió por orden de fecha 27 de marzo de 2020 [ECF Núm. 12549]. Durante el último año, la Junta de Supervisión reanudó las discusiones, bajo la dirección del Equipo de Mediación, con la AAFAF y los acreedores que eran parte del AAP 2020 en relación con los términos de un plan de ajuste y qué modificaciones o enmiendas, de haberlas, deben proponerse a la luz de la incertidumbre creada por la COVID-19.

***Nuevo acuerdo de apoyo al plan y nueva enmienda del plan de ajuste*** . El 29 de octubre de 2020, el Tribunal del Título III dictó la Orden sobre la *Moción Conjunta de los Acreedores de AAP de acuerdo con la Sección 312 de PROMESA y la Sección 105 del Código de Quiebras para imponer plazos para el Plan de Ajuste* [ECF Núm. 14987] (la "Orden de Programación del Plan"), que ordenó a la Junta de Supervisión presentar en o antes del 10 de febrero de 2021 los términos propuestos de un plan de ajuste y una moción para la aprobación de un calendario propuesto para la presentación de un plan enmendado y una declaración de divulgación propuesta, entre otras cosas. De acuerdo con la Orden de Programación del Plan, y con la orientación del Equipo de Mediación, la Junta de Supervisión participó en (a) sesiones grupales o individuales de mediación informativa y de negociación (según lo programado por el Equipo de Mediación) o (b) sesiones informales con el Estado Libre Asociado, las partes del AAP 2020, las Aseguradoras Monolínea (como se define más adelante), el Comité Oficial de Acreedores No Garantizados, el Comité de Jubilados y varios sindicatos, todo ello diseñado para establecer un marco y un calendario para el desarrollo de una reestructuración consensuada de la deuda.

El 9 de febrero de 2021, la Junta de Supervisión anunció que, como resultado de las discusiones dirigidas por el Equipo de Mediación, la Junta de Supervisión y las partes principales del AAP 2020 llegaron a un acuerdo en principio sobre los términos de un plan de ajuste enmendado, sujeto a la firma de la documentación definitiva. El 23 de febrero de 2021, la Junta de Supervisión anunció la terminación del AAP 2020 y la firma del Acuerdo de Apoyo al Plan, con

---

[35] En relación con el AAP 2020, el Equipo de Mediación ha recomendado que se paralice cualquier litigio relativo a la validez, la prioridad y la condición de garantía de las reclamaciones de los GO/AEP/BAN de la AFI hasta que se tome una decisión sobre la confirmación del Plan. *Enmienda al Informe y recomendaciones del Equipo de Mediación* [ECF Núm. 10756], pp. 9-10.

fecha del 22 de febrero de 2021 (el "AAP"), entre la Junta de Supervisión, como representante del ELA, SRE y AEP, ciertos Bonistas GO, ciertos Bonistas AEP, Assured Guaranty Corp. y Assured Guaranty Municipal Corp, únicamente en su calidad de aseguradores y tenedores declarados, tenedores considerados o subrogados con respecto a los Bonos GO y los Bonos AEP, Syncora Guarantee Inc., como titular, subrogado con respecto a o asegurador de las Reclamaciones de Bonos GO y las Reclamaciones de Bonos AEP, y National Public Finance Guarantee Corporation ("National"), únicamente en su calidad de asegurador y tenedor declarado, tenedor considerado o subrogado con respecto a los Bonos GO y los Bonos AEP.[36]

Como se describe adicionalmente más abajo, el AAP contempla, entre otras cosas:

(a) un total nominal de capital en bonos GO/AEP de $14,478 millones, lo cual consiste en

    1. $7,024 millones en efectivo[37] y

    2. $7,414 millones de Nuevos bonos GO y las Reclamaciones de garantía del Estado Libre Asociado, de acuerdo con el Plan);

(b) la emisión de los siguientes Nuevos Bonos GO por el Estado Libre Asociado, por un capital total original de:

    1. $6,683,315,000 en bonos de interés corriente,

    2. $442,506,553.50 en bonos de apreciación de capital de 5.375%, y

    3. $288,241,989.75 en bonos de apreciación de capital de 5.000%;

(c) la emisión de ciertos instrumentos de valor contingente por parte del Estado Libre Asociado, de los que solo se harán pagos si la recaudación del 5.5% del Impuesto sobre las Ventas y el Uso supera el Plan Fiscal Certificado del Estado Libre Asociado de mayo de 2020 (con un límite anual de $200 millones y un límite vitalicio de $3,500 millones, de la siguiente manera:

    1. los CVI de GO están sujetos a un límite anual de $200 millones, más los importes no utilizados de años anteriores, siempre que el pago anual no supere los $400 millones, y a un límite vitalicio de $3,500 millones,

(d) pago de unos Derechos de restricción del AAP a las partes iniciales del AAP y a ciertas partes que se incorporaron al mismo como más tardar el 9 de marzo de 2021, hasta un total de $350 millones, y pago de un total de $50 millones a las clases de inversionistas

---

[36] National se reserva el derecho de terminar el AAP, únicamente en lo que respecta a sí mismo, en ejercicio de su exclusivo criterio, el 31 de marzo de 2021 o antes, de acuerdo con el AAP.

[37] Los $350 millones de contraprestación en efectivo están supeditados a que los ingresos del Año fiscal 2021 superen los $350 millones (p.ej., si se superan los $349 millones, el efectivo adicional será de $0, pero si se superan los $351 millones, el efectivo adicional será de $1 millón).

minoristas bonistas GO y Bonos AEP, por un total nominal de hasta un millón de dólares ($1,000,000) cada uno si cada clase acepta el Plan; y

(e) la transacción global de todos los asuntos y controversias entre todos los bonistas de GO/AEP, los tenedores de los BAN de la AFI[38], la Junta de Supervisión, el Estado Libre Asociado y la AEP, incluyendo la validez, la prioridad y grado de garantía de las Reclamaciones de Bonos del ELA, Reclamaciones de Bonos AEP y Reclamaciones de Bonos del ELA Garantizados, a cambio de las contraprestaciones propuestas en el Plan.

Si el Plan es confirmado, la Junta de Supervisión considera que no serán necesarios pleitos adicionales con respecto a cualquier controversia sobre la validez, prioridad y grado de garantía de las Reclamaciones de Bonos del ELA, Reclamaciones de Bonos AEP y Reclamaciones de Bonos del ELA Garantizados, ya que el Plan implementará una transacción global de todas las discrepancias y será vinculante para todas las partes en interés de los Casos del Título III.

En relación con el anuncio del AAP por parte de la Junta de Supervisión, el Gobierno de Puerto Rico señaló que si bien "[l]os términos económicos del acuerdo anunciado por la JSF y el Grupo de Acreedores tienen muchos aspectos positivos para Puerto Rico", el Gobierno no podía sumarse al AAP porque el "Plan de Ajuste no debe estructurarse de manera que afecte aún más a nuestros pensionados".[39] La Junta de Supervisión tiene la intención de entablar conversaciones significativas con el Gobierno con la esperanza de que se pueda alcanzar una resolución consensual.

Tras la formalización del AAP, el 2 de abril de 2021, la Junta de Supervisión alcanzó un acuerdo con ciertos grupos de tenedores de bonos emitidos por el SRE y The Bank of New York Mellon, en calidad de agente fiscal de los Bonos del SRE, con respecto a la propuesta de tratamiento y resolución de diferencias relativas a dichos bonos.

El 5 de mayo de 2021, la Junta de Supervisión alcanzó un acuerdo con ciertos tenedores de bonos emitidos por la ACT, ciertos tenedores de bonos emitidos por la Autoridad del Distrito del Centro de Convenciones de Puerto Rico ("ADCC"), Assured Guaranty Corp. y Assured Guaranty Municipal Corp., exclusivamente en calidad de aseguradores, y tenedores confirmados, tenedores considerados o subrogados con respecto a los Bonos de ACT y Bonos de ADCC, y National, exclusivamente en calidad de aseguradores, y tenedores confirmados, tenedores considerados o subrogados con respecto a los Bonos de ACT, en relación a la propuesta de tratamiento y resolución de, entre otras cosas, ciertas "reclamaciones de recuperación (Clawback)" contra el ELA.

*[El resto de la página se ha dejado intencionadamente en blanco]*

---

[38] Por BAN de la AFI se entienden ciertos instrumentos de deuda emitidos por la AFI en virtud de un Acuerdo de Fideicomiso del 1 de marzo de 2015 entre la AFI y The Bank of New York Mellon, en calidad de síndico.

[39] AAFAF, 23 de febrero de 2021 Comunicado de prensa://aafaf.pr.gov/press-roomj

## II.   Introducción

*Inicio de los casos del Título III.* El 3 de mayo de 2017 (la "Fecha de la petición del Estado Libre Asociado"), la Junta de Supervisión publicó un certificado de reestructuración en nombre del Estado Libre Asociado, de conformidad con las secciones 104(j) y 206 de la Ley PROMESA, y presentó una petición voluntaria de quiebra (de acuerdo con la sección 304(a) de la Ley PROMESA), ante el Tribunal del Título III, con lo cual se inició un caso al amparo del Título III de dicha Ley (el "Caso del Título III del Estado Libre Asociado").

El 21 de mayo de 2017 (la "Fecha de la petición del SRE"), la Junta de Supervisión publicó un certificado de reestructuración en nombre del SRE de conformidad con las secciones 104(j) y 206 de la Ley PROMESA, y presentó una petición voluntaria de quiebra del SER (de acuerdo con la sección 304(a) de la Ley PROMESA), ante el Tribunal del Título III, con lo cual se inició un caso al amparo del Título III de dicha Ley (el "Caso del Título III del SRE").

El 27 de septiembre de 2019 (la "Fecha de la petición de la AEP") y, conjuntamente con la Fecha de Petición del Estado Libre Asociado y la Fecha de Petición del SRE, según corresponda, la "Fecha de la petición"), la Junta de Supervisión publicó un certificado de reestructuración en nombre de la AEP de conformidad con las secciones 104(j) y 206 de la Ley PROMESA, y presentó una petición voluntaria de quiebra de la AEP (de acuerdo con la sección 304(a) de la Ley PROMESA), ante el Tribunal del Título III, con lo cual se inició un caso al amparo del Título III de dicha Ley (el "Caso del Título III de la AEP" y, conjuntamente con el Caso del Título III del Estado Libre Asociad y el Caso del Título III del SRE, los "Casos del Título III"). Tal como lo prevé la sección 315 de la Ley PROMESA, la Junta de Supervisión es la representante exclusiva de los Deudores[40] en sus Casos del Título III.

*Certificación del Plan de Ajuste propuesto.* El 11 de mayo de 2021, de conformidad con la sección 104(j) de la Ley PROMESA, la Junta de Supervisión certificó la presentación del Plan de ajuste enmendado conjuntamente de los Deudores (el "Plan"). El 11 de mayo de 2021, los deudores presentaron (a) la *Enmienda al Tercer Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros,* [ECF Núm. ___], y (b) la presente declaración de divulgación [ECF Núm. ____] (la "Declaración de Divulgación"). [41]

*Aprobación de la Declaración de Divulgación y confirmación de la fecha de la vista.* El [_____] de 2021, el Tribunal del Título III dictó la Orden de Declaración de Divulgación, aprobando la misma (la "Orden de Declaración de Divulgación"). **SIN EMBARGO, LA APROBACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN NO CONSTITUYE UNA DETERMINACIÓN, POR PARTE DEL TRIBUNAL DEL TÍTULO III, SOBRE LOS MÉRITOS DEL PLAN. EL TRIBUNAL DEL TÍTULO III CONSIDERARÁ LA CONFIRMACIÓN DEL PLAN EN LA VISTA DE CONFIRMACIÓN PREVISTA PARA EL [                 DE 2021].**

La Vista de confirmación podrá ser aplazada o continuada de tiempo en tiempo. Por consiguiente, las partes interesadas deberían consultar el registro en línea https://cases.primeclerk.com/puertorico para confirmar la fecha y hora programada más reciente de la Vista de confirmación.

---

[40] La Junta de Supervisión, en su calidad de representante del Estado Libre Asociado, del SRE y de la AEP, se denominan colectivamente "Deudores", y cada uno de ellos "Deudor Estado Libre Asociado," "Deudor SRE" o "Deudor AEB", según proceda.

[41] Las referencias a los registros corresponden al Caso Núm. 17-BK-3283-LTS, salvo que se indique algo distinto.

El Tribunal del Título III ha establecido el siguiente calendario para los procedimientos de confirmación:

- **13 de julio de 2021:** Vista para considerar la idoneidad de la información contenida en la Declaración de Divulgación;
- **[          ] de 2021:** Inicio de la indagatoria de confirmación;
- **[          ] de 2021:** Fecha límite para el envío del paquete de solicitud aprobado;
- **[          ] de 2021:** Fecha límite para presentar objeciones a la confirmación del plan y a la indagatoria de confirmación;
- **[          ] de 2021:** Vista previa al juicio de confirmación del Plan;
- **[          ] de 2021:** Fecha límite de votación y elección; y
- **[          ] de 2021:** Vista de confirmación.

Los Deudores presentan esta Declaración de Divulgación en calidad de proponentes del Plan en virtud de la sección 1125 del Código de Quiebras y en relación con la solicitud de votos para aceptar o rechazar elecciones para resolver ciertas demandas derivadas, y celebrar elecciones sobre la forma de las distribuciones, con arreglo al Plan, según puedan modificarse o complementarse en cada momento, de acuerdo con el Título III de la Ley PROMESA y el Reglamento Federal de Procedimientos de Quiebra (el "Reglamento de Quiebra"), según corresponda al Título III de conformidad con la sección 310 de la Ley PROMESA.

Esta Declaración de Divulgación aporta la información exigida por la sección 1125 del Código de Quiebras y resume el Plan, las operaciones de los Deudores, sus respectivas condiciones financieras (incluyendo las proyecciones financieras) y otros asuntos relacionados, como el tratamiento de los tenedores de Reclamaciones contra los Deudores. Asimismo, esta Declaración de Divulgación describe ciertas potenciales consecuencias tributarias a nivel federal y de Puerto Rico para los tenedores de las Reclamaciones, los procedimientos de votación y de elección de la transacción y el proceso de confirmación.

*Formularios de elección y votación.* A la copia de la Declaración de Divulgación distribuida a los tenedores de Reclamaciones de las clases con derecho a voto se les adjunta una boleta ("Boleta") y/o una notificación de las elecciones previstas en el Plan (una "Notificación de elecciones") para aceptar o rechazar el Plan, optar por resolver determinadas reclamaciones de conformidad con el Plan y/o elegir la forma de las distribuciones previstas por el Plan. La Boleta incluye información relativa a los plazos de votación e instrucciones detalladas para votar por aceptar o rechazar el Plan. La Notificación de elecciones incluye información acerca de la fecha límite de las mismas e instrucciones detalladas para elegir resolver ciertas reclamaciones y/o la forma de distribución de conformidad con el Plan. Antes de votar y/o realizar la elección pertinente, todo tenedor de una Reclamación con derecho a votar y/o elegir debería leer esta Declaración de Divulgación (incluyendo los anexos y documentos que por el presente quedan incorporados por referencia a la misma), así como las instrucciones adjuntas a la Boleta y a la Notificación de elecciones. Estos documentos contienen, entre otras cosas, información importante acerca de la clasificación de las Reclamaciones a efectos de votación y contabilización de los votos. No será posible solicitar votos en relación con el Plan, salvo como lo estipule la Declaración de Divulgación, con sus correspondientes enmiendas, la Orden de Declaración de Divulgación y la sección 1125 del Código de Quiebras.

*Anexos a la Declaración de Divulgación.* La presente Declaración de Divulgación incluye los siguientes anexos y suplementos:

<u>Anexo A</u> – Enmienda al Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros

18

**Anexo B** – Acuerdo de Apoyo al Plan, de fecha 22 de febrero de 2021, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, la Autoridad de Edificios Públicos de Puerto Rico y el Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico, ciertos Bonistas GO y AEP, Assured Guaranty Corp. y Assured Municipal Corp., Syncora Guarantee Inc., y National Public Finance Guarantee Corporation

**Anexo C** – Acuerdo de Apoyo al Plan (AAP del SRE/ADCC), del 5 de mayo de 2021, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, la Autoridad de Carreteras y Transportación de Puerto Rico, ciertos tenedores de Reclamaciones de Bonos de la ACT, ciertos tenedores de Reclamaciones de bonos de la ADCC, la Assured Guaranty Corp., la Assured Guaranty Municipal Corp. y la National Public Finance Guarantee Corporation

**Anexo D** – Estipulación (la "Estipulación del SRE") del 2 de abril de 2021, entre la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, y el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico.

**Anexo E** – Acuerdo de Apoyo al Plan ("AAP del Comité de Jubilados"), del 7 de junio de 2019, entre unta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, y el Comité Oficial de Jubilados designado en el Caso del Título III del Estado Libre Asociado

**Anexo F** – Acuerdo de Apoyo al Plan ("AAP de AFSCME"), del 7 de junio de 2019, entre unta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante del Estado Libre Asociado de Puerto Rico, y el sindicato internacional de la American Federation of State, County, and Municipal Employees (Federación Americana de Empleados Estatales, de Condados y Municipales) AFL-CIO

**Anexo G** – Plan fiscal certificado del Estado Libre Asociado (que incluye a SRE y AEP)

**Anexo H** – Presupuesto certificado del Estado Libre Asociado (que incluye a SRE y AEP)

**Anexo I** – Informe sobre pensiones de la Junta de Supervisión

**Anexo J** – Tabla resumida de los bonos circulantes de los Deudores

**Anexo K** – Lista de entidades que comprenden el Gobierno Central del Estado Libre Asociado

**Anexo L** – Lista de las cuentas bancarias, balances y categorización de restricciones preliminares a 31 de diciembre de 2020

**Anexo M** – Últimos estados financieros auditados de los Deudores

**Anexo N** – Informes de pruebas de mejores intereses

En la medida en que existan incongruencias entre esta Declaración de Divulgación, cualquiera de los Acuerdos de Apoyo al Plan (y cualquier anexo o ficha de condiciones adjuntos a los mismos) y el Plan, prevalecerán los términos y condiciones de este último.

A.     **Plan de Ajuste del Título III de la Ley PROMESA: Descripción general**

La confirmación de un Plan de ajuste a tenor del Título III por un Tribunal del Título III vincula al deudor, a cualquier emisor de valores de conformidad con el plan de ajuste, a toda persona que adquiera bienes con arreglo al plan de ajuste y a todo acreedor de un deudor. Con las salvedades previstas en la Ley PROMESA, el plan de ajuste o la orden de confirmación, la confirmación de un plan de ajuste dispensa a un deudor de cualquier deuda que se produjese antes de la fecha de conformación del plan, y las sustituye por las obligaciones específicas asumidas en virtud del plan de ajuste confirmado.

El Tribunal del Título III confirmará un plan de ajuste si satisface lo estipulado por la sección 314(b) de la Ley PROMESA y las subsecciones incorporadas de la sección 1129 del Código de Quiebras, que se exponen con mayor detalle en la sección VII.C. de esta Declaración de Divulgación, bajo el título "Requisitos para la confirmación del Plan de ajuste". Entre otras cosas, la sección 314(b) de la Ley PROMESA estipula que (i) el plan de ajuste cumpla lo dispuesto por la Ley PROMESA y las cláusulas pertinentes del Código de Quiebras, (ii) se habrán obtenido todas las aprobaciones legislativas, reglamentarias o electorales necesarias para llevar a cabo cualquier disposición del plan de ajuste, o bien dicha disposición estará condicionada a la citada aprobación, (iii) el plan de ajuste deberá ser viable y favorecer los mejores intereses de los acreedores, y (iv) el plan de ajuste será congruente con el plan fiscal pertinente certificado por la Junta de Supervisión de conformidad con el Título II de la Ley PROMESA.

Aunque los Deudores consideran que todas las clases de Reclamaciones deberían votar para aceptar el Plan, este podrá ser confirmado sin la aceptación de todas las clases. La sección 1129(b)(1) del Código de Quiebras estipula que, si se cumpliesen todos los requisitos aplicables de la sección 1129(a) (incluyendo el requisito de que al menos una clase afectada aceptase el plan de ajuste) salvo la aceptación por todas las clase (en virtud de la sección 1129(a)(8)) con respecto a un plan de ajuste, el Tribunal del Título III, a solicitud de los proponentes, confirmará el plan de ajuste si no discrimina injustamente, y resulta justo y equitativo para cada una de las clases de reclamaciones perjudicadas que no haya aceptado el plan de ajuste.

B.     **Resumen de los principales componentes del Plan de ajuste**

Con la excepción de las Reclamaciones administrativas y las Reclamaciones profesionales, que no están clasificadas y no votan en el Plan, de conformidad con el mismo todas las Reclamaciones existentes a la Fecha de petición están divididas en clases. Según el Código de Quiebras, un plan puede categorizar una reclamación dentro de una determinada clase solamente si es sustancialmente similar a las demás reclamaciones de dicha clase. Según la sección 301(e) de la Ley PROMESA, para determinar si las reclamaciones son "sustancialmente similares" entre sí, la Junta de Supervisión considerará si están o no garantizadas, y si tienen o no prioridad sobre otras reclamaciones. La siguiente tabla muestra las clases de reclamaciones contra los Deudores, el monto estimado de la reclamación y estimaciones del porcentaje, o intervalo porcentual, de recuperación que se propone pagar a las reclamaciones de cada clase. La cuantía que un acreedor pueda efectivamente recobrar podrá variar sustancialmente de las siguientes estimaciones.

| Reclamación[42] | Clase | Importe estimado de la reclamación | Recuperación fija aproximada de deudores (%)[43] | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones de Bonos PBA Vintage | Clase 1 | 2,049,817,786.66 | 23.0% † | Efectivo |
| Reclamaciones de Bonos AEP Vintage (Assured) | Clase 2 | 207,035,580.89 | 23.0% † | Efectivo |

---

[42] Preliminares y sujetas a revisión.

† La estimación excluye los recobros por cuenta de una Reclamación permitida de Bonos ELA garantizados Vintage contra el Estado Libre Asociado. Recobro total por cuenta de (I) una Reclamación de bonos AEP Vintage permitida, una Reclamación de Bonos AEP Vintage (Assured) permitida, una Reclamación de Bonos AEP Vintage (National) permitida, una Reclamación de Bonos AEP Vintage (Syncora) permitida, una Reclamación de Bonos AEP Vintage (Otros asegurados) permitida, o una Reclamación de Bonos AEP Vintage permitida, según proceda, y (II) una Reclamación de Bonos ELA garantizados Vintage permitida, una Reclamación de Bonos garantizados del ELA Vintage (Assured) permitida, una Reclamación de Bonos ELA garantizados Vintage (National) permitida, una Reclamación de Bonos ELA garantizados Vintage (Otros asegurados) permitida, una Reclamación de Bonos ELA garantizados Vintage (Syncora) permitida o una Reclamación de Bonos ELA garantizados Vintage (tributables) permitida, según proceda, que se estima que son un 80.4%.

‡ La estimación excluye los recobros por cuenta de una Reclamación permitida de Bonos ELA 2011 garantizados contra el Estado Libre Asociado. El recobro total a cuenta de (I) (a) una Reclamación de Bonos AEP 2011, o bien (b) una Reclamación de Bonos AEP 2011 minoristas permitida, según proceda, y (II) (x) una Reclamación de Bonos ELA 2011 garantizados permitida, o bien (y) una Reclamación de Bonos ELA 2011 (Tributables) permitida, según proceda, que se estima en un 79.6%.

* La estimación excluye los recobros por cuenta de una Reclamación de Bonos ELA 2012 garantizados permitida contra el Estado Libre Asociado. El recobro total a cuenta de (I) (a) una Reclamación de Bonos AEP 2012 Permitida, o bien (b) una Reclamación de Bonos AEP 2012 minoristas Permitida, según proceda, y (II) (x) una Reclamación de Bonos ELA 2012 garantizados permitida, o bien (y) una Reclamación de Bonos ELA 2012 (Tributables) permitida, según proceda, que se estima en un 74.8%.

§ La cantidad dependerá del número de tenedores de Reclamaciones permitidas elegibles y que se determine que serán tratados dentro de dicha clase.

± Recobro total por cuenta de (I) una Reclamación de bonos AEP Vintage permitida, una Reclamación de Bonos AEP Vintage (Assured) permitida, una Reclamación de Bonos AEP Vintage (National) permitida, una Reclamación de Bonos AEP Vintage (Otros asegurados) permitida, o una Reclamación de Bonos AEP Vintage permitida, según proceda, y (II) una Reclamación de Bonos ELA garantizados Vintage permitida, una Reclamación de Bonos ELA garantizados Vintage (Assured) permitida, una Reclamación de Bonos ELA garantizados Vintage (National) permitida, una Reclamación de Bonos ELA garantizados Vintage (Otros asegurados) permitida, una Reclamación de Bonos ELA garantizados Vintage (Syncora) permitida o una Reclamación de Bonos ELA garantizados Vintage (tributables) permitida, según proceda, que se estima que son un 80.4%.

£ El recobro total a cuenta (I) (a) una Reclamación de Bonos AEP 2011 Permitida, o bien (b) una Reclamación de Bonos AEP 2011 minoristas permitida, y (II) (x) una Reclamación de Bonos ELA 2011 garantizados permitida, o bien (y) una Reclamación de Bonos garantizados del ELA 2011 (Tributables) permitida, según proceda, que se estima en un 79.6%.

[43] No incluye las recuperaciones a cuenta de los CVI.

| Reclamación[42] | Clase | Importe estimado de la reclamación | Recuperación fija aproximada de deudores (%)[43] | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones de Bonos AEP Vintage (National) | Clase 3 | 218,888,864.87 | 23.0% [†] | Efectivo |
| Reclamaciones de Bonos AEP Vintage (Otros asegurados) | Clase 4 | 166,398,746.29 | 23.0% [†] | Efectivo |
| Reclamaciones de Bonos AEP Vintage (Syncora) | Clase 5 | 19,098,898.35 | 23.0% [†] | Efectivo |
| Reclamaciones de Bonos Vintage de AEP Minoristas | Clase 6 | [44] | 23.0% [†] | Efectivo |
| Reclamaciones de Bonos AEP 2011 | Clase 7 | 1,335,422,892.78 | 23.0% [‡] | Efectivo |
| Reclamaciones de Bonos AEP 2011 minoristas | Clase 8 | [45] | 23.0% [‡] | Efectivo |
| Reclamaciones de Bonos AEP 2012 | Clase 9 | 674,308,470.06 | 23.0% [*] | Efectivo |
| Reclamaciones de Bonos AEP 2012 minoristas | Clase 10 | [46] | 23.0% [*] | Efectivo |
| Reclamación garantizada AEP/ARD | Clase 11 | 66,222,028 | 0% | - |
| Reclamaciones Generales No Garantizadas de AEP | Clase 12 | [____] | 100% | Efectivo |
| Reclamación No Garantizada de AEP/ARD | Clase 13 | 134,357,497 | 0% | - |
| Reclamaciones de Bonos ELA Vintage | Clase 14 | 3,495,194,571.99 | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Vintage Minoristas. | Clase 15 | [47] | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Vintage (Assured) | Clase 16 | 1,129,725,670,51 | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Vintage (National) | Clase 17 | 897,708,496.22 | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Vintage (Otros asegurados) | Clase 18 | 293,269,428.20 | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Vintage (Syncora) | Clase 19 | 27,354,745.97 | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Vintage (Elección Tributable) | Clase 20 | [§] | 77.6% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA Vintage | Clase 21 | 1,578,940,452.56 | 74.5% [±] | Nuevos Bonos GO / Efectivo |

---

[44] Incluido en el importe de las Reclamaciones de Bonos AEP Vintage.

[45] Incluido en el importe de las Reclamaciones de Bonos AEP 2011.

[46] Incluido en el importe de las Reclamaciones de Bonos AEP 2012.

[47] Incluido en el importe de las Reclamaciones de Bonos ELA Vintage.

| Reclamación[42] | Clase | Importe estimado de la reclamación | Recuperación fija aproximada de deudores (%)[43] | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones de Bonos Garantizados ELA Vintage (Assured) | Clase 22 | 159,476,054.86 | 74.5% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA Vintage (National) | Clase 23 | 168,606,441.80 | 74.5% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA Vintage (Otros asegurados) | Clase 24 | 128,174,178.94 | 74.5% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA Vintage (Syncora) | Clase 25 | 14,711,562.85 | 74.5% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA Vintage (Elección Tributable) | Clase 26 | § | 74.5% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2011 | Clase 27 | 250,580,732.35 | 73.0% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2011 Minoristas. | Clase 28 | 48 | 72.9% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2011 (Assured) | Clase 29 | 225,917,592.71 | 73.0% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2011 (Elección Tributable) | Clase 30 | § | 73.0% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA 2011 | Clase 31 | 1,028,653,981.06 | 73.45% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA 2011 (Elección Tributable) | Clase 32 | § | 73.45% ± | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 | Clase 33 | 634,719,627.45 | 76.45% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2011 Serie D/E/PIB (Assured) | Clase 34 | 10,953,484.03 | 76.45% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas | Clase 35 | 49 | 76.45% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 (Elección Tributable) | Clase 36 | § | 76.45% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2012 | Clase 37 | 2,540,851,157.04 | 72.4% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2012 Minoristas. | Clase 38 | 50 | 72.4% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2012 (Assured) | Clase 39 | 393,576,302.36 | 72.4% | Nuevos Bonos GO / Efectivo |

---

[48] Incluido en el importe de las Reclamaciones de Bonos ELA 2011.

[49] Incluido en el importe de las Reclamaciones de Bonos AEP ELA 2011 Series D/E/PIB.

[50] Incluido en el importe de las Reclamaciones de Bonos ELA 2012.

| Reclamación[42] | Clase | Importe estimado de la reclamación | Recuperación fija aproximada de deudores (%)[43] | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones de Bonos ELA 2012 (Elección Tributable) | Clase 40 | § | 72.4% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA 2012 | Clase 41 | 519,408,567.83 | 67.3%[51] | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA 2012 (Elección Tributable) | Clase 42 | § | 67.3% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2014 | Clase 43 | 3,836,611,111.11 | 67.8% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2014 Minoristas. | Clase 44 | [52] | 67.8% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos ELA 2014 (Elección Tributable) | Clase 45 | § | 67.8% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA 2014 | Clase 46 | 346,242,219.86 | 67.8% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de Bonos Garantizados ELA 2014 (Elección Tributable) | Clase 47 | § | 67.7% | Nuevos Bonos GO / Efectivo |
| Reclamaciones de jubilados | Clase 48A | [____] | [____] | |
| Reclamaciones de Participantes Activos de SRE | Clase 48B | [____] | [____] | |
| Reclamaciones de Participantes Activos de SRJ | Clase 48C | [____] | [____] | |
| Reclamaciones de Participantes Activos de SRM | Clase 48D | [____] | [____] | |
| Reclamaciones de Participantes del Sistema 2000 | Clase 48E | [____] | [____] | |
| Reclamaciones de empleados de AFSCME | Clase 49 | [____] | [____] | |
| Reclamaciones de productores de leche | Clase 50 | 61,999,999.00 | 50% | Efectivo |
| Reclamaciones de dominio eminente | Clase 51 | [____] | [____] | Efectivo |
| Reclamaciones de incentivos energéticos | Clase 52 | [____] | 100% | Efectivo |
| Reclamaciones de centros médicos | Clase 53 | Si la Clase acepta, $293,583,772.78; Si la Clase rechaza, $145,982,458.41 | 50% | Efectivo |
| Reclamaciones de créditos fiscales | Clase 54 | [____] | 100% | Efectivo |

---

[51] Recobro total a cuenta de (I) (a) una Reclamación de bonos AEP 2012 Permitidos, o (b) una Reclamación de bonos AEP 2012 Minoristas, según proceda, y (II) (x) una Reclamación garantizada del ELA 2012 Permitida o (y) una Reclamación de Bonos ELA garantizados 2012 Permitidos (Tributables, según proceda, que se estima en 74.8%

[52] Incluido en el importe de las Reclamaciones de Bonos ELA 2014.

| Reclamación[42] | Clase | Importe estimado de la reclamación | Recuperación fija aproximada de deudores (%)[43] | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones ELA Generales No Garantizadas | Clase 55 | [___] | [___] | Efectivo |
| Reclamaciones ELA/ACT | Clase 56 | 6,257,585,807.42 | Contingente | |
| Reclamaciones ELA/Centro de Convenciones | Clase 57 | 386,637,854.25 | Contingente | |
| Reclamaciones ELA/Impuesto al Ron de AFI | Clase 58 | 1,928,867,051.00[53] | Contingente | |
| Reclamaciones ELA/AMA | Clase 59 | 30,106,786.87 | Contingente | |
| Reclamaciones por Asignaciones del ELA | Clase 60 | [___] | 0% | - |
| Reclamaciones Subordinadas del ELA 510(b) | Clase 61 | [___] | 0% | - |
| Reclamaciones de Bonos SRE | Clase 62 | 3,168,698,776.55 | 14.0%[54] | Efectivo/Cartera de inversiones del SRE |
| Reclamaciones SRE Generales No Garantizadas | Clase 63 | [___] | [___] | Efectivo |
| Reclamaciones Gracia-Gracia | Clase 64 | [___] | 100% | Efectivo |
| Reclamaciones de conveniencia | Clase 65 | [___] | 100% | Efectivo |

**Resumen de asignación de CVI de GO:**

| Reclamación | Clases aplicables | % de asignación de CVI de GO |
|---|---|---|
| Reclamaciones de Bonos ELA Vintage | Clases 14, 15, 16, 17, 18, 19, 20 | 32.244% |
| Reclamación de Bonos ELA 2011 Series D/E/PIB | Clases 33, 34, 35, 36 | 3.514% |
| Reclamación de Bonos ELA 2011 | Clases 27, 28, 29, 30 | 2.479% |
| Reclamación de Bonos ELA 2012 | Clases 37, 38, 39, 40 | 15.157% |
| Reclamaciones de Bonos ELA 2014, Reclamaciones de Bonos ELA 2014 garantizados | Clases 43, 44, 45, 46, 47 | 20.266% |

---

[53] Reclamación en disputa de admisibilidad en el Tribunal del Título III

[54] Recobro por cuenta de la contrapartida de $373 millones en efectivo y de la Cartera de inversiones de SRE que, a efectos de calcular el recobro de las Reclamaciones de Bonos de SRE, se supone que tiene un valor equivalente al Precio de la Cartera de SRE.  Excluye los pagos abonados de conformidad con la Estipulación de SRE de 2017 (Caso Núm. 17-03566-LTS, ECF Núm. 170), y los pagos de protección correspondientes

| Reclamación | Clases aplicables | % de asignación de CVI de GO |
|---|---|---|
| Reclamaciones de Bonos ELA Vintage garantizados | Clases 21, 22, 23, 24, 25, 26 | 15.194% |
| Reclamaciones de Bonos ELA Garantizados 2011 | Clases 31, 32 | 7.552% |
| Reclamaciones de Bonos ELA Garantizados 2012 | Clases 41, 42 | 3.594% |

**Resumen de asignación de CVI de recuperación**:

| Reclamación | Clases aplicables | % de asignación de CVI de recuperación |
|---|---|---|
| Reclamaciones ELA/ACT | Clase 56 | 68.6% |
| Reclamaciones ELA/Centro de Convenciones | Clase 57 | 4.0% |
| Reclamaciones ELA/Impuesto al ron de AFI | Clase 58 | 27.0% |
| Reclamaciones ELA/AMA | Clase 59 | 0.4% |

Los Deudores consideran que la reestructuración prevista por el Plan es viable y defiende los mejores intereses de los acreedores de los Deudores. Si se rechazase la confirmación del Plan, las opciones de los Deudores serían que la Junta de Supervisión proponga un plan de ajuste alternativo al amparo del Título III tras una nueva ronda de negociaciones con los acreedores, o bien que los Casos del Título III sean desestimados, en cuyo caso la paralización automática terminaría y se iniciaría un pleito de múltiples partes y facetas (incluyendo los incoados por los bonistas y otras partes contra el Estado Libre Asociado, sus funcionarios e instrumentalidades), por cuanto los tenedores de las reclamaciones competirán por los limitados recursos disponibles para pagarlas.

El siguiente panorama general resume algunos de los principales componentes del Plan. Esta información es totalmente compatible con el texto completo del Plan.

1.     **Implementación de los Acuerdos de Apoyo al Plan en el Plan de Ajuste**

a)     **Acuerdo de Apoyo al Plan con algunos tenedores de Reclamaciones de Bonos ELA y Bonos AEP**

El 23 de febrero de 2021, la Junta de Supervisión —en calidad de representante de los Deudores en sus Casos del Título III— anunció que, tras exhaustivas negociaciones, había formalizado un AAP con

ciertos tenedores de Reclamaciones de Bonos ELA y Bonos AEP por valor superior a los $11,700 millones, que incluyen inversores municipales tradicionales y aseguradoras de bonos monolínea Assured, Syncora y National, en el marco de un plan de ajuste que propone resolver las controversias pendientes con los bonistas ELA y Bonos AEP, incluyendo su valides, prioridad y grado de garantía de los mismos. El AAP reduce la amortización de la deuda del Estado Libre Asociado (incluyendo el capital y los intereses de los Bonos de COFINA Reestructurada) en un 62%, de $90,400 millones a $34,100 millones.

El AAP incorpora una propuesta de Conciliación global de controversias en cuanto a la validez y derechos afines de los Bonos GO que se emitieron vulnerando el límite constitucional de deuda de Puerto Rico, tal y como lo estipula el Artículo VI. sección 2 de la Constitución del Estado Libre Asociado (el "Límite de deuda constitucional")[55], así como las diferencias en materia de prioridades de los Bonos GO de conformidad con la Constitución del Estado Libre Asociado de Puerto Rico (la "la Constitución del Estado Libre Asociado") en relación con otras deudas del Estado Libre Asociado. *Véase* en la sección **Error! Reference source not found.** de esa Declaración de Divulgación un resumen de dichas controversias, y en la sección V.H.7, una descripción detallada de las mismas.

Además, el acuerdo prevé la Conciliación de controversias entre el Estado Libre Asociado y la AEP en lo que respecta a (i) la caracterización de los pretendidos arrendamientos entre la AEP y el Estado Libre Asociado disfrazados de transacciones financieras, (ii) la cuantía, si acaso, de la renta administrativa que el Estado Libre Asociado adeudaría a la AEP en concepto del uso y ocupación de instalaciones de la AEP antes del comienzo del Caso del Título III del Estado Libre Asociado, y (iii) la titularidad de ciertas instalaciones y bienes de la AEP a dirimir entre el Estado Libre Asociado y la AEP (en conjunto, el "Pleito de la AEP"). *Véase* en la sección **Error! Reference source not found.** de esta Declaración de Divulgación un resumen de dichas controversias.

Por último, el AAP dispone la transacción de controversias relativas a los BAN de AFI. *Véase* en la sección V.H.7.e) de esta Declaración de Divulgación una descripción de dichas controversias.

***Transacción de las controversias pendientes relacionadas con los Bonos GO y AEP, y los BAN de la AFI***. A cambio de las contraprestaciones previstas en el Plan, las siguientes controversias relativas a los Bonos GO y AEP, y los BAN de la AFI quedarán resueltas en virtud de la confirmación del Plan, incluyendo las discrepancias en materia de la validez, la prioridad y el grado de garantía de los citados títulos (discrepancias resumidas en la sección III.B.1.a de esta Declaración de Divulgación):

- **Objeciones relativas a la deuda**:

  o Objeción ómnibus de (I) la Junta de Supervisión y Administración Financiera para Puerto Rico, a través de su Comité Especial de Reclamaciones, y (II) el Comité Oficial de Acreedores sin Garantía, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las reclamaciones presentadas o incoadas por tenedores de ciertos Bonos de Obligación general del Estado Libre Asociado de Puerto Rico, del 14 de enero de 2019 [ECF Núm. 4784],

  o Objeción ómnibus del Comité Oficial de Acreedores sin Garantía, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, contra el

---

[55] Consulte en la sección V.H.7.a)(i) una descripción detallada.

Estado Libre Asociado por bonistas de Obligación General del Estado Libre Asociado de 2011, del 21 de mayo de 2019 [ECF Núm. 7057],

o   Objeción ómnibus del Comité Oficial de Acreedores sin Garantía, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, contra el Estado Libre Asociado por bonistas de la Autoridad de Edificios Públicos de Puerto Rico, del 18 de julio de 2019 [ECF Núm. 8141],

o   Objeción ómnibus de la Coalición de Deuda Constitucional Legítima, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las Reclamaciones presentadas o incoadas por tenedores de ciertos Bonos emitidos o garantizados por el Estado Libre Asociado, del 8 de enero de 2020 [ECF Núm. 9730],

o   Objeción ómnibus del Comité Oficial de Acreedores sin Garantía fundamentada en el Límite de deuda constitucional a (I) la Reclamación del Banco de Desarrollo del Gobierno de Puerto Rico [Reclamación Núm. 29485] basada en ciertos pagarés emitidos por el Estado Libre Asociado y en la Garantía del Estado Libre Asociado de ciertos bonos emitidos por la Autoridad del Puerto de las Américas, (II) la Reclamación del ScotiaBank de Puerto Rico [Reclamación Núm. 47658] basada en un pagaré de plena fe y crédito emitido por la Administración de Servicios Generales de Puerto Rico, y (III) las Reclamaciones presentadas o incoadas contra el Estado Libre Asociado basadas en la Garantía del Estado Libre Asociado de ciertos pagarés emitidos por la Autoridad de Financiamiento de Infraestructura de Puerto Rico, del 8 de enero de 2020 [ECF Núm. 9735], exclusivamente en lo relativo a las Reclamaciones de Bonos ELA y las Reclamaciones de Bonos ELA Garantizados.

o   Objeción del Comité Oficial de Acreedores sin Garantía a la Reclamación del Banco de Fomento del Gobierno de Puerto Rico contra el Estado Libre Asociado de Puerto Rico (Reclamación Núm. 29,485) [Caso Núm. 17-3283-LTS, ECF. No. 8000], exclusivamente en lo relativo a las Reclamaciones de Bonos ELA y de Bonos ELA Garantizados,

o   Objeción ómnibus del Comité Oficial de Acreedores sin Garantía, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las Reclamaciones presentadas o incoadas contra el Estado Libre Asociado por bonistas de Obligación General que alegan prioridad sobre otros Acreedores sin Garantía del Estado Libre Asociado, del 3 de febrero de 2020 [ECF Núm. 10638], y

o   Cualesquiera otras objeciones o procesos acumulativos a las mismas, u otras objeciones que puedan presentarse de la misma forma y causa de amparo objetando, entre otras cosas, la validez y derechos relacionados de los Bonos GO 2011, los Bonos GO 2012, los Bonos GO 2014, los Bonos AEP, las Reclamaciones de Bonos ELA y las Reclamaciones de Bonos ELA Garantizados.

- **Acciones de invalidez:**[56]

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. Jefferies LLC*, Proc. cont. Núm. 19-00281

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. BNY Mellon/POP Sec*, Proc. cont. Núm. 19-00282

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. First Southwest Co.*, Proc. cont. Núm. 19-00283

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. los Demandados 1E-59E*, Proc. cont. Núm. 19-00284

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. los Demandados 1A-100A*, Proc. cont. Núm. 19-00285

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. los Demandados 1B-100B*, Proc. cont. Núm. 19-00286

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. los Demandados 1C-53C*, Proc. cont. Núm. 19-00287, y

  o *El Comité Especial de Reclamaciones de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores sin Garantía del Estado Libre Asociado de Puerto Rico c. los Demandados 1D-73D*, Proc. cont. Núm. 19-00288

- **Acciones de objeción al gravamen:**

  o *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité*

---

[56] Consulte en la sección V.H.7.b. de esta Declaración de Divulgación un resumen detallado de las Acciones de invalidez.

*Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Autonomy Master Fund Ltd.*, Proc. cont. Núm. 19-00291

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Cooperativa de Ahorro y Crédito de Rincón*, Proc. cont. Núm. 19-00292

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Ortiz de la Renta*, Proc. cont. Núm. 19-00293

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Martínez Sánchez*, Proc. cont. Núm. 19-00294

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Valdivieso*, Proc. cont. Núm. 19-00295

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Friedman*, Proc. cont. Núm. 19-00296, y

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y otros, y el Comité Oficial de Acreedores sin Garantía de todos los Deudores del Título III (excepto COFINA) c. Blackrock Fin. Mgmt.*, Proc. cont. Núm. 19-00297

• **Pleitos de la AEP**:

o   *La Junta de Supervisión y Administración Financiera para Puerto Rico c. la Autoridad de Edificios Públicos de Puerto Rico,* Proc. cont. Núm. 18-AP-149-LTS[57]

• **Pleito de Expropiación de los BAN de la AFI**:

---

[57] Consulte las secciones III.A.3 y III.B.1.c) de esta Declaración de Divulgación.

> o *Puerto Rico BAN (VL) LLC, y otros, c. Estados Unidos de Norteamérica*, Caso Núm. 19-482C (Cl. Fed. presentado el 1 de abril de 2019), actualmente pendiente en el Tribunal de Reclamaciones Federales de los Estados Unidos.[58]

- **Pleito de los BAN de la AFI**:

> o *La Junta de Supervisión y Administración Financiera para Puerto Rico c. The Bank of New York Mellon y otros*, Proc. cont. Núm. 19-AP-269-LTS[59]

La Junta de Supervisión ha evaluado el riesgo de pleitos relacionados con las acciones citadas, y ha determinado que los recobros propuestos reflejan razonablemente el riesgo de pleito relacionado con las controversias vinculados con los Bonos GO y AEP, y los BAN de AFI. La Junta de Supervisión manifiesta que la resolución de las objeciones a los Bonos GO, los Bonos AEP y los BAN de AFI incluidos en el Plan es razonable y equitativa, y debería ser aprobada.

***Marco para el tratamiento de las Reclamaciones de bonos del Estado Libre Asociado y las Reclamaciones de Garantía.*** Las condiciones principales del tratamiento de los Bonos GO y de las reclamaciones contra el Estado Libre Asociado por cuenta de la garantía del Estado Libre Asociado de (a) bonos emitidos por la AEP, y los (b) BAN de la AFI incorporados en el Plan incluyen las siguientes:[60]

- **Contraprestación de GO/AEP total contemplada en el Plan de Ajuste:** $14,438 millones.

  - $7,024 millones en efectivo (de los cuales $350 millones están supeditados a que los ingresos del Año fiscal 2021 superen los $350 millones).

  - Emisión de $7,414 millones de nuevos Bonos GO.

  - Emisión de CVI por parte del Estado Libre Asociado, de los que solo se harán pagos si la recaudación del 5,5% del Impuesto sobre las Ventas y el Uso supera el Plan Fiscal Certificado del Estado Libre Asociado de mayo de 2020 (sujeto a (i) un límite anual de $50 millones a $400 millones y (ii) un límite vitalicio de (x) $3,500 millones para los CVI de GO.

    - En la transacción del Pleito de la AEP, el Estado Libre Asociado aportará $1,073 millones en efectivo a la AEP como reclamación permitida de gastos administrativos en el Caso del Título III del Estado Libre Asociado.

- **Estructura de los nuevos bonos GO:**

  - Los siguientes Nuevos Bonos GO serán emitidos por el Estado Libre Asociado, cuyo pago estará respaldado por la buena fe, crédito y poder

---

[58] Consulte la sección V.F.2.f de esta Declaración de Divulgación

[59] Consulte la sección V.I.7.e) de esta Declaración de Divulgación.

[60] Se encuentran términos adicionales o modificados en el AAP HTA/CCDA. El siguiente resumen incluye solo los términos incluidos en al AAP.

impositivo del Estado Libre Asociado de conformidad con la Constitución del Estado Libre Asociado.

- $6,683,315,000 de capital total original de bonos de interés corriente.

- $442,506,553.50 de monto de capital total original de bonos de apreciación de capital de 5.375%, y

- $288,241,989.75 de monto de capital total original de bonos de apreciación de capital de 5.000%;

- **Fecha de emisión considerada de nuevos bonos GO:** 1 de julio de 2021.

- **Nuevos Bonos GO – Exención de impuestos / Tributables**:

  - Como se describe con mayor detalle en las Secciones 71.1-71.4 del Plan, en caso de que el IRS decidiese, o que se obtuviera una opinión del Consejo de Bonos previsto por la Sección 103, antes de la Fecha de entrada en vigencia, disponiendo que la relación del importe total de todos los nuevos bonos GO tributables que se emitan en la Fecha de entrada en vigencia hasta el importe total de los nuevos bonos GO sea inferior al trece por ciento (13%), los nuevos bonos GO tributables que se consideren exentos de impuestos recibirán nuevos bonos GO exentos de impuestos emitidos a tenor con los mismos con cupones para todos los vencimientos iguales a los cupones de los correspondientes Nuevos Bonos GO exentos de impuestos que figuran en el Anexo J del Plan. En la medida en que las Partes del Gobierno y los Acreedores del AAP Inicial lo determinen, durante el período que transcurre hasta la Fecha de entrada en vigencia, modificar los cupones establecidos en el Anexo J del Plan, el importe de los Nuevos Bonos GO a la par aumentará o disminuirá, dólar a dólar, en función de la estructura de los cupones, con sujeción al importe del servicio de la deuda máximo anual previsto en el Anexo J del Plan, y cualquier modificación de este tipo se aplicará a los acreedores de manera prorrateada sobre la base de la recuperación de los Derechos de Restricción del AAP y los Costos de Perfeccionamiento, tal como se describe en la nota a pie de página 8 del Anexo 2-A del Anexo I del AAP.

  - Como se describe con mayor detalle en las Secciones 71.1-71.4 del Plan, si la decisión o la opinión así obtenida con posterioridad a la Fecha de entrada en vigencia, y la relación del importe total de todos los Nuevos Bonos GO tributables que se emitan en la Fecha de entrada en vigencia hasta el importe total de los Nuevos Bonos GO sea inferior al trece por ciento (13%), los tenedores de bonos tributables afectados serán invitados a canjear sus bonos por bonos convertidos y, sin perjuicio de la aplicación de todos los gastos razonables en que incurran las Partes del Gobierno en relación con dicha oferta de canje, la tasa de interés de los bonos convertidos será la misma que la de los bonos tributables afectados del mismo tipo, tasa de interés, serie y vencimiento.

- **Cascada de los bonos tributables:**

- Los nuevos bonos GO tributables se distribuirán en primer lugar a los Inversionistas de Puerto Rico que opten por recibir una distribución de bonos tributables.

- Los demás nuevos bonos GO tributables tras la distribución a los Inversionistas de Puerto Rico se distribuirán proporcionalmente a todas las Reclamaciones de Bonos ELA y Reclamaciones de bonos ELA garantizados.

- **Estructura del CVI:**

  - Medición del exceso de rentabilidad:

    - Medido al final de cada año fiscal, a partir del Año fiscal 2022.

    - Base de referencia del 5.5% del IVU para los AF 2022 a 2043, incluida en el Anexo J del Plan.

  - El Estado Libre Asociado pignorará su plena fe, crédito y poder impositivo de conformidad con la Constitución de Puerto Rico y la legislación aplicable de Puerto Rico para el pago de los CVI.

  - Límite nocional y vitalicio:

    - CVI de GO:

      - $3,500 millones, con un pago anual máximo de $200 millones para los CVI de GO más los importes no utilizados de años anteriores, siempre que los pagos anuales no sean superiores a $400 millones para los CVI de GO.

- Condiciones del exceso de rentabilidad:

  - Los tenedores de CVI reciben anualmente el menor de los siguientes importes:

    - El 50% del exceso de rentabilidad acumulado, a partir del 1 de julio de 2021, menos los pagos efectuados anteriormente, y el 75% del exceso de rentabilidad anual (el "Importe del Exceso de Rentabilidad").

- Cascada de pagos anuales:

- Los primeros $100 millones a los CVI de GO, y

  - Los siguientes $11,111,111 millones a los CVI de recuperación.

- Fecha considerada de emisión: 1 de julio de 2021

- Plazo:

  - CVI de GO: Plazo de 22 años

  - CVI de recuperación: Plazo de 30 años

33

- **Tratamiento del descuento de la emisión original:**[61]

    - La asignación de las contraprestaciones del Plan entre las clases de las Reclamaciones de Bonos ELA, las Reclamaciones de Bonos AEP y las Reclamaciones de Bonos ELA garantizados se realizará proporcionalmente en función de la cuantía de la reclamación a la Fecha de petición del Estado Libre Asociado o la Fecha de petición de la AEP (según proceda), incluyendo intereses no vencidos (es decir, intereses devengados al valor nominal).

    - La distribución dentro de una clase de las Reclamaciones de Bonos ELA, las Reclamaciones de Bonos AEP y las Reclamaciones de Bonos ELA garantizados se realizará proporcionalmente en función de la cuantía de la reclamación a la Fecha de petición del Estado Libre Asociado o la Fecha de petición de la AEP (según proceda), excluyendo intereses no vencidos (es decir, descuento de emisión original no devengado más intereses devengados).

- **Fuentes de los pagos:** Algunos de los tenedores de las Reclamaciones de Bonos ELA y las Reclamaciones de Bonos ELA garantizados sostienen que sus bonos están garantizados por el impuesto sobre la propiedad del 1.03% aplicado en virtud de la Ley 83-1991 (el "1.03% del Impuesto sobre la Propiedad") y recaudado por el Centro de Recaudación de Ingresos Municipales ("CRIM") y por los fondos históricamente asignados a determinadas instrumentalidades, aunque, en virtud del Artículo VI, sección 8 de la Constitución del Estado Libre Asociado, son retenidos por el Estado cuando los ingresos disponibles (incluyendo superávit) de un determinado año fiscal son insuficientes para cubrir las asignaciones. Aunque el Deudor Estado Libre Asociado discrepa que los Bonos GO y las garantías estén avalados por el 1.03% del Impuesto sobre la Propiedad y/o por los fondos histórica y condicionalmente asignados, para eliminar estas controversias jurídicas, a tenor con la transacción global prevista por el AAP, el recobro de las Reclamaciones de Bonos ELA se distribuirá cada año fiscal a partir de: (i) en primer lugar, el 1.03% del impuesto sobre la propiedad aplicado a tenor con la Ley 83-1991 y recaudado por el Centro de Recaudación de Ingresos Municipales del Estado Libre Asociado con respecto a los Nuevos Bonos GO hasta que se haya pagado el monto total de dichos impuestos a la propiedad a los tenedores de los Nuevos Bonos GO, (ii) en segundo lugar, los fondos obtenidos de la ejecución del Artículo VI, Sección 8 de la Constitución de Puerto Rico hasta que el monto total de dicho dinero haya sido pagado a los tenedores de los Nuevos Bonos GO, y (iii) por último, otros recursos del Estado Libre Asociado.

*Marco para el tratamiento de las Reclamaciones de Bonos AEP*. Entre los principales términos para el tratamiento de las Reclamaciones de Bonos AEP incorporadas al Plan se incluyen los siguientes:

- **Transacción con la AEP:** Para transigir el Pleito de la AEP, el Estado Libre Asociado aportará $1,073 millones a la AEP en concepto de reclamación permitida de gastos administrativos para el Caso del Título III, como contraprestación por los alquileres impagados desde la Fecha de

---

[61] Los bonos de apreciación de capital se devengan en la Fecha de petición del Estado Libre Asociado o la Fecha de petición de la AEP (según proceda) en todas las distribuciones.

petición del Estado Libre Asociado y la titularidad y tasación de ciertos bienes de la AEP. Dichos fondos serán distribuidos por la AEP a las Reclamaciones permitidas de Bonos AEP.

- **Admisibilidad de las Reclamaciones de Bonos AEP**:[62] Los bonistas AEP tendrán una reclamación permitida contra AEP equivalente a la cuantía del capital pendiente de los Bonos AEP, más los intereses devengados e impagados de los mismos, a partir de la Fecha de petición de la AEP.

  - Exclusivamente a efectos de la distribución prevista por el Plan, la Reclamación de Garantía del ELA contra el Estado Libre Asociado en concepto de la garantía otorgada por el ELA a los Bonos AEP se calculará como dicha cuantía <u>menos</u> el importe de la transacción, de $1,073 millones.

*Costos de consumación*. Los Acreedores que sean parte del AAP en la fecha de su ejecución, el 22 de febrero de 2021, tendrán derecho a una participación proporcional en efectivo por una cuantía equivalente al 1.50% del monto total de las Reclamaciones de Bonos AEP, Bonos GO y Reclamaciones de garantía de Bonos del ELA (sin duplicación) de dichos tenedores o aseguradores. Los Costos de consumación son como contraprestación de los derechos y gastos incurridos por dichos tenedores o aseguradores en relación con la negociación y ejecución del AAP, la obtención de la aprobación de la Declaración de Divulgación y la confirmación del Plan.

*Derechos de restricción del AAP*. Ciertas partes del AAP percibirán una cuantía total de $350 millones en efectivo. Dicho importe total se reducirá en los Costos de consumación pagados. Los Derechos de restricción del AAP son como contraprestación de la ejecución del AAP y por aceptar el "bloqueo" de los bonos de dichas partes, de conformidad con los términos y condiciones del AAP.

Las siguientes partes tienen derecho a percibir los Derechos de restricción del AAP:

- Acreedores que hayan sido partes del AAP a la fecha de su ejecución, el 9 de febrero de 2020.

- Acreedores del AAP como más tardar en alguna de las siguientes fechas (lo que antes se produzca): (a) 9 de marzo de 2021, y (b) fecha y hora en que las partes del AAP tengan derecho a percibir los Derechos de restricción del AAP tenedores del setenta por ciento (70%) de la cuantía total de las Reclamaciones de Bonos GO, Reclamaciones de Bonos AEP y Reclamaciones de garantías de Bonos del ELA (sin duplicación).

*Honorario de apoyo a minoristas*. Para proporcionar a todos los bonistas GO y Bonos AEP la posibilidad de percibir la comisión por apoyo al AAP, se han dispuesto cincuenta millones de dólares ($50,000,000.00) en efectivo para los Inversionistas minoristas tenedores de dichos bonos. Los Inversionistas minoristas son aquellos bonistas GO y Bonos AEP por un valor nominal total máximo de un millón de dólares ($1,000,000.00). El Honorario de apoyo a minoristas estará a disposición de cada clase de inversionistas minoristas que voten, como clase, aceptar el Plan. Si una clase de Inversionistas minoristas votase por rechazar el Plan, la cuota del Honorario de apoyo a minoristas que le hubiera correspondido se reasignará proporcionalmente a las clases de Inversionistas minoristas que hayan votado por aceptar el Plan

---

[62] En virtud de las clases del Plan, las Reclamaciones de Bonos AEP definidas en el Acuerdo de Apoyo al Plan también incluyen las Reclamaciones de Bonos AEP (Asegurados).

y a las partes elegibles para percibir los Derechos de restricción del AAP.

b) **Acuerdo de Apoyo al plan con ciertos tenedores de reclamaciones de bonos de la ACT y la ADCC**

El 5 de mayo de 2021, la Autoridad de Supervisión, en calidad de representante del Estado Libre Asociado y de la ACT en sus casos del Título III, anunció que, tras exhaustivas negociaciones, había formalizado el AAP de ACT/ADCC (adjunto a este documento como Anexo C) con ciertos tenedores de bonos valorados en más de $2,000 millones reclamantes contra la ACT, que incluyen más del 85% de los Bonos de la ACT 1968, casi el 50% de los Bonos Senior de 1998 y casi el 40% de los bonos de la ADCC, que incluyen a los inversionistas municipales tradicionales y a las aseguradoras de bonos Assured y National, en el marco de los planes de ajuste que proponen, entre otras cosas, resolver las "reclamaciones de recuperación" contra el ELA y la emisión de ciertos instrumentos de valor contingente basados en el potencial superávit del Impuesto a las Ventas y el Uso del 5.5% en relación con las proyecciones del Plan Fiscal Certificado de 2020, tal como se explica con mayor detalle en el Anexo I al AAP de ACT/ADCC.

*Resolución de las diferencias pendientes en relación con las "reclamaciones de recuperación".* A cambio de las contraprestaciones previstas en el Plan, las siguientes discrepancias relativas a las "reclamaciones de recuperación" relacionadas con Assured y National serán resueltas una vez confirmado el Plan:

- **Acciones de recuperación**:

  o *La Junta de Supervisión y Administración Financiera para Puerto Rico contra Ambac Assurance Corporation y otros* Proc. Cont. Núm. 20-00005-LTS,

  o *La Junta de Supervisión y Administración Financiera para Puerto Rico contra Ambac Assurance Corporation y otros* Proc. Cont. Núm. 20-00004-LTS,

  o *La Junta de Supervisión y Administración Financiera para Puerto Rico contra Ambac Assurance Corporation y otros* Proc. Cont. Núm. 20-00003-LTS, y

  o *La Junta de Supervisión y Administración Financiera para Puerto Rico contra Ambac Assurance Corporation y otros* Proc. Cont. Núm. 20-00007-LTS.

- **Mociones de levantamiento de paralización:**

  o *Assured Guaranty Corp. y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso del Título III de la ACT [Extr. núm. 673],

  o *Ambac Assurance Corporation. y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso del Título III del Estado Libre Asociado [Extr. núm. 10104],

  o *Ambac Assurance Corporation. y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso del Título III del Estado Libre Asociado [Extr. núm. 10602],

o *AmeriNational Community Services, LLC. y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso del Título III de la ACT [Extr. núm. 591],

o *Assured Guaranty Corp. y otros contra Estado Libre Asociado de Puerto Rico y otros*, Caso nº 20-1930, actualmente pendiente en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito,

o *Ambac Assurance Corporation y otros contra Estado Libre Asociado de Puerto Rico y otros* Caso nº 2—1931, actualmente pendiente en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito,

o *Peaje Investments LLC contra Autoridad de Carreteras y Transportación de Puerto Rico y otros.*, Proc. Cont. Núm. 17-00152-LTS, presentada en el Caso del Título III de la ACT [Extr. núm. 1], y

o cualquier moción o procedimiento contencioso para levantar la paralización automática prevista por las Secciones 362 y 922 del Código de Quiebras (si procediese) con respecto a los ingresos similares a aquellos a los que se hace referencia en las Mociones de levantamiento de paralización correspondientes.

La Junta de Supervisión ha evaluado el riesgo de litigio de las acciones precedentes, determinando que las recuperaciones propuestas reflejan razonablemente los riesgos de litigio relacionados con las discrepancias vinculadas a las "reclamaciones de recuperación". La Junta de Supervisión manifiesta que la resolución de las objeciones relativas a las "reclamaciones de recuperación" incluidas en el Plan son razonables y equitativas, y que deberían ser aprobadas.

c) **Estipulación con ciertos bonistas del SRE**

El 9 de marzo de 2021, la Junta de Supervisión, en tanto que representante del Estado Libre Asociado y del SRE en sus Casos del Título III, acordó una estipulación (adjunta a este documento como Anexo D) con ciertos bonistas del SRE (y posteriormente modificado el 2 de abril de 2021, en adelante "Estipulación del SRE"), que prevé, entre otras cosas, la resolución de las diferencias relativas al ámbito de los derechos prendarios alegados por los Bonistas del SRE sobre diversos pagos y activos, incluyendo reclamaciones de gastos administrativos y reclamaciones basadas en la promulgación de la promulgación de la legislación "PayGo" por el Estado Libre Asociado, y que otorga al ELA y a los Bonistas del SRE determinados derechos de compra de la cartera de inversiones del SRE (la "Cartera de inversiones del SRE"), según se expone más adelante con mayor detalle.

***Desestimación y/o rechazo de acciones pendientes.*** A cambio de las contraprestaciones que obtendrán los Bonistas del SRE en virtud del Plan, las siguientes disputas serán desestimadas y/o rechazadas, sin perjuicio:

• **Acciones de objeción al PayGo por los Bonistas del SRE:**[63]

---

[63] Consulte una descripción en la Sección **Error! Reference source not found.Error! Reference source not found.**.

- o *Altair Global Credit Opportunities Fund (A), LLC y otros contra Estado Libre Asociado de Puerto Rico y otros,* Proc. Cont. Núm. 17-00219; 17-00220.

- **Objeciones *Ultra Vires* de la Junta de Supervisión:** [64]

  - o *Comité de Reclamaciones Especiales de la JSAF contra Jefferies LLC y otros,* Proc. Cont. Núm. 19-00355

  - o *Comité de Reclamaciones Especiales de la JSAF contra American Enterprise Investment Servs. Inc. y otros,* Proc. Cont. Núm. 19-00356

  - o *Comité de Reclamaciones Especiales de la JSAF contra First Southwest Company y otros,* Proc. Cont. Núm. 19-00357

  - o *Comité de Reclamaciones Especiales de la JSAF contra Demandado 1F y otros,* Proc. Cont. Núm. 19-00358

  - o *Comité de Reclamaciones Especiales de la JSAF contra Demandado 1H y otros,* Proc. Cont. Núm. 19-00359

  - o *Comité de Reclamaciones Especiales de la JSAF contra Demandado IG y otros,* Proc. Cont. Núm. 19-00361

- **Procedimientos contenciosos de alcance del gravamen:** [65]

  - o *Junta de Supervisión y Administración Financiera para Puerto Rico contra Andalusian Global Designated Activity Company,* Proc. Cont. Núm. 19-00366

  - o *Junta de Supervisión y Administración Financiera para Puerto Rico contra Glendon Opportunities Fund, L.P.* Proc. Cont. Núm. 19-00367

- **Reclamaciones de gastos administrativos y anteriores a la Petición de los Bonistas del SRE:** [66]

  - o *Moción y solicitud de asignación y pago de reclamaciones de gastos administrativos posteriores a la Petición de los Bonistas del SRE,* Caso nº 17-bk-3566, ECF Núm. 707

---

[64] Consulte una descripción en la Sección V.H.6.

[65] Consulte una descripción en la Sección **Error! Reference source not found.Error! Reference source not found.**.

[66] Consulte una descripción en la Sección **Error! Reference source not found.Error! Reference source not found.**.

- o *Moción y solicitud de asignación y pago de reclamaciones de gastos administrativos posteriores a la Petición de los Bonistas del SRE,* Caso nº 17-bk-3566, ECF Núm. 710

- **Acción de los Bonistas del contra el Gobierno de los Estados Unidos en el Circuito Federal:**

  - o *Altair Global Credit Opportunities Fund (A), LLC y otros contra EE.UU.* (Caso nº 21-1577) (Cir. Fed. 2021)

*Marco para el tratamiento de las reclamaciones de Bonos SRE*. Entre los principales términos para el tratamiento de las reclamaciones de los Bonistas del SRE incorporadas al Plan se incluyen las siguientes:

- **Asignación de la prueba de reclamación del agente fiscal del SRE**: la prueba de reclamación presentada por el Bank of New York Mellon contra el SRE (Reclamación Núm. 16777) (la "Prueba de reclamación del agente fiscal del SRE") contra el SRE se considerará asignada por un importe total de $3,168,698,776.55.

- **Reclamaciones presentadas contra el ELA o el SRE con respecto a los bonos del SRE**: las evidencias de reclamación de los bonistas (tal como se definen en la Estipulación del SRE), la evidencia de reclamación del agente fiscal del ELA (tal como se definen en la Estipulación del SRE) y todas las demás reclamaciones presentadas contra el ELA o el SRE con respecto a los Bonos del SRE se considerarán satisfechas y extinguidas.

- **Reclamaciones permitidas con respecto a los Bonos del SRE**: los demandantes autorizados con respecto a bonos del SRE recibirán, sin compensaciones ni deducciones de impuestos, (i) $373,000,000.00 en distribuciones de efectivo, pagos que se abonarán con cargo al SRE y al ELA con fondos procedentes de la compra de activos del SRE; y (ii) el SRE colocará su cartera de inversiones en un fondo (el "Fideicomiso del SRE"), cuya documentación será razonablemente aceptable para los bonistas del SRE, y el SRE continuarán administrando tales activos hasta la fecha en que los mismos, o la participación en el Fondo, sean adquiridos por el ELA o por demandantes autorizados con respecto a los bonos del SRE de conformidad con la Elección del bonista (según se define en la Estipulación del SRE).

*Compra de la cartera de inversiones*. Desde la Fecha de entrada en vigencia y hasta el 10 de abril de 2023, el ELA tendrá derecho a adquirir (la "Elección del ELA") la Cartera de inversiones por $70,750,000.00, tras lo cual los beneficios se distribuirán a los titulares de reclamaciones autorizadas con respecto a los bonos del SRE. Si el ELA omitiese comunicar por escrito su ejercitación de la Elección del ELA hasta el 10 de abril de 2023, los titulares de las reclamaciones autorizadas con respecto a los bonos del SRE tendrán la opción de adquirir (las "Elección del bonista) todas las participaciones en el Fideicomiso del SRE por $70,750,000.00, más aquellas cantidades que pudiesen ser necesarias para reintegrar al ELA cualesquiera déficits financiados, notificándolo por escrito al ELA como más tardar el 15 de abril de 2023. Los citados

bonistas pagarán proporcionalmente el importe total al ELA como más tardar el 20 de abril de 2023. Si no se ejercitasen la Elección del ELA ni la Elección del bonista hasta el 25 de abril de 2023, el ELA adquirirá la Cartera de inversiones por $70,750,000.00. Los beneficios obtenidos de la compra de la Cartera de inversiones se distribuirá a los titulares de las reclamaciones permitidas con respecto a los bonos del SRE sin ninguna compensación ni deducción por impuestos.

*Pagos de consumación*. Los bonistas del SRE que acepten ser parte de la Estipulación del SRE en el momento de su ejecución tendrán derecho a su participación proporcional de $75,000,000.00 en distribuciones de efectivo, sin compensaciones ni deducciones de impuestos.

*Activos del SRE*. Como contraprestación por la decisión del ELA de realizar pagos para sustentar las distribuciones que se realizarán en virtud del Plan todos los demás activos del SRE serán transferidos al, y pasarán a ser propiedad del, ELA.

d) **Acuerdo de Apoyo al Plan con el Comité de Jubilados**

Tras significativas negociaciones, el 7 de junio de 2019 la Junta de Supervisión y el Comité de Jubilados[67] formalizaron el AAP del Comité de Jubilados (adjunto a este documento como Anexo E), que plasma el apoyo del Comité de Jubilados a los términos y condiciones de la reestructuración convenida de las obligaciones de pensiones del Estado Libre Asociado en virtud del Plan. La Junta de Supervisión ha determinado que las siguientes medidas son esenciales para aportar el financiamiento adecuado de las obligaciones de futuras pensiones: (a) reducir los beneficios jubilatorios por encima de determinados niveles con el objetivo de conseguir un ahorro significativo en el pago de las pensiones durante los próximos 30 años, sin perjudicar a las prestaciones de los jubilados de rentas más bajas; y (b) establecer un fondo de reserva de pensiones en calidad de fuente de pagos garantizados en los años fiscales en los que el presupuesto anual entre en déficit. Estas medidas se han incorporado al AAP del Comité de Jubilados y desde entonces se han ajustado para aumentar el umbral a partir del cual se aplican[68] las reducciones de beneficios, tal como se describe a continuación:

(i) *Reducciones de beneficios*

Los beneficios de pensiones del SRE, del Sistema de Retiro de Maestros ("SRM") y el Sistema de Retiro de la Judicatura ("SRJ") adquiridos por los empleados en activo y jubilados a partir del 3 de mayo de 2017 no están sujetos a reducciones en los beneficios de pensiones o jubilaciones. Los beneficios de pensiones de los tres sistemas adquiridos por empleados en activo y jubilados antes del 3 de mayo de 2017 están sujetos a las siguientes reducciones.[69]

---

[67] El 15 de junio de 2017, el Síndico de los Estados Unidos designó al Comité de Jubilados para los Casos del Título III. *Designación del Comité Oficial de Jubilados en el Estado Libre Asociado de Puerto Rico*, [ECF Núm. 340].

[68] Estos cambios representan una actualización del Plan fiscal 2020. El AAP del Comité de Jubilados incluyó disposiciones adicionales para proteger a los empleados que habrían recibido una reducción menor de las prestaciones según la reducción original del 25%. Dado el aumento a 1,500 $, estas protecciones ya no son necesarias.

[69] Los Participantes del Sistema 2000 (definidos a continuación) no están sujetos a estas reducciones, y sus reclamaciones se tratarán tal y como se estipula para la Clase 48E.

A aquellos particulares cuyo Beneficio de Retiro total mensual (excluyendo la Aportación mensual al Plan de seguro médico, que no se reducirá en absoluto) sea superior a los $1,200 mensuales (umbral por encima del cual se aplicarán los recortes), un porcentaje de recorte plano equivalente a (A) 8.5% del Beneficio de Retiro total mensual, siempre y cuando el Beneficio de Retiro total mensual no caiga por debajo de los $1,500 mensuales. Los umbrales mínimos mensuales de beneficios después de aplicar las reducciones de acuerdo con el Plan se mantendrán en $1,500. Los importes devengados en concepto de pensiones y los umbrales no se indexarán en el futuro por ningún motivo, salvo de conformidad con las disposiciones de Restablecimiento de beneficios de retiro, tal como se describe a continuación.

La reducción del Beneficio de Retiro total mensual se calculará en un proceso de cuatro pasos:

(1)     toda Bonificación de Navidad anual se reducirá hasta que (i) el Beneficio de Retiro total mensual quede reducido hasta los $1,500, (ii) se obtenga la reducción total calculada arriba, o bien (iii) se elimine íntegramente la Bonificación de Navidad, lo que antes se produzca;

(2)     a continuación, toda Bonificación de Verano se reducirá hasta que (i) el Beneficio de Retiro total mensual quede reducido hasta los $1,500, (ii) se obtenga la reducción total calculada arriba, o bien (iii) se elimine íntegramente la Bonificación de Verano, lo que antes se produzca;

(3)     a continuación, todo Bono de Medicinas se reducirá hasta que (i) el Beneficio de Retiro total mensual quede reducido hasta los $1,500, (ii) se obtenga la reducción total calculada arriba, o bien (iii) se elimine íntegramente el Bono de Medicinas, lo que antes se produzca; y

(4)     a continuación, la Pensión básica mensual se reducirá hasta que (i) el Beneficio de Retiro total mensual quede reducido hasta los $1,500, o bien (ii) se obtenga la reducción total calculada arriba.

Bajo ninguna circunstancia esta fórmula de reducción tendrá como consecuencia la reducción del Beneficio de retiro total mensual de un jubilado individual por debajo del umbral de los $1,500 mensuales. Si el Beneficio de Retiro total mensual de un jubilado empieza por debajo de este umbral, su Beneficio de Retiro total mensual no se verá afectado por el Plan.

(ii)     *Restablecimiento de beneficios*

Todos los jubilados sujetos a la Reducción de beneficios mensual anteriormente descrita también son elegibles para el restablecimiento total o parcial de sus beneficios en cualquier Año fiscal en caso de que se hubiera generado un superávit superior al proyectado en el Plan Fiscal de dicho año. El restablecimiento del beneficio se producirá en tras la confirmación posterior a cualquier Año fiscal, toda vez que el Deudor Estado Libre Asociado obtenga un superávit presupuestario de más de $100 millones superior a los superávits previstos en el Plan Fiscal del año correspondiente. Si se obtuviera dicho superávit excedente, el 10% del mismo se distribuirá proporcionalmente a los jubilados, como más tardar el 1 de octubre siguiente al cierre del año, con el objeto de restablecer total o parcialmente la reducción de beneficios experimentada en dicho año. Cada jubilado percibirá un Restablecimiento mensual de beneficios proporcional basado en la cuantía del total de los recortes experimentados, teniendo como límite la reducción experimentada por el jubilado. Si en algún Año fiscal el superávit fuera inferior a los $100 millones, en dicho año no se abonarán pagos de restablecimiento a menos que se incluyan pagos adicionales de restauración en el presupuesto certificado. Los pagos en concepto de restablecimiento de beneficios se materializarán tras la confirmación de los resultados anuales, hasta el Año fiscal 2033 (incluido).

(iii)     *Fideicomiso de reserva de pensiones*

En la Fecha de entrada en vigencia del Plan, el Deudor Estado Libre Asociado establecerá un Fideicomiso de reserva de pensiones. Este fondo será mantenido en fideicomiso para beneficio exclusivo de los jubilados, y será gestionado por los tres miembros del Comité de Inversiones de la Reserva de Pensiones designado en virtud del Plan. Los gastos administrativos del asesor de inversiones serán con cargo al Fideicomiso.

El Plan prevé que el Estado Libre Asociado efectúe aportaciones anuales al Fideicomiso de reserva de pensiones con cargo al Fondo General del Estado Libre Asociado durante ocho (8) Años fiscales a partir del Año fiscal siguiente al de la Fecha de entrada en vigencia, por una cuantía no inferior a los $175 millones anuales. Asimismo, dispone que en todo Año fiscal cerrado después de la Fecha de entrada en vigencia (según se defina en el Plan) en el cual el Superávit del Plan Fiscal sea de al menos $1,750 millones, el Estado Libre Asociado efectuará una aportación (con cargo al Fondo General del Estado Libre Asociado) al Fideicomiso de reserva de pensiones equivalente al 25% del Superávit del Plan Fiscal proyectado para dicho año (cuantía que se denominará "Aportación básica").[70] Tras la formalización del Comité de Jubilados, las partes negociaron y pactaron (y el Plan lo establece en el apartado 65.2) que la aportación anual del Estado Libre Asociado deberá asimismo incluir: (a) aquella cuantía adicional calculada como el superávit primario real del año correspondiente o el superávit primario proyectado del Plan Fiscal de dicho año (el menor de ambos importes) menos la suma de (i) la Aportación básica correspondiente a ese año, más (ii) la obligación de la amortización de la deuda del Estado Libre Asociado de conformidad con el Plan para ese año, más (iii) doscientos millones de dólares ($200,000,000.00); aunque siempre en el bien entendido de que, en todos los casos, dicha cuantía adicional no podrá ser inferior a cero dólares ($0.00), y (b) con sujeción a la legislación vigente (incluyendo, entre otros, los Títulos I y II de la Ley PROMESA), aquellos importes adicionales que el Estado Libre Asociado opte, a su discreción, por depositar en el Fideicomiso de reserva de pensiones. La aportación anual deberá hacerse efectiva hasta el 1 de octubre siguiente al cierre de cada Año fiscal.

El Estado Libre Asociado podrá aplicar las retiradas de fondos del Fideicomiso de reserva de pensiones solamente al pago de las obligaciones corrientes de pensiones en el marco del sistema PayGo (tal como se define a continuación).

e)     **Acuerdo de Apoyo al Plan con AFSCME**

La Junta de Supervisión entabló negociaciones con AFSCME con respecto a los nuevos convenios de negociación colectiva ("CNC"), los beneficios de los sistemas SRE y el Acuerdo de Distribución del superávit remanente del Plan Fiscal, lo cual conllevó un pacto mediante el cual AFSCME apoya al Plan, obteniendo a cambio de ello importantes ventajas para los afiliados a AFSCME. El 7 de junio de 2019, la Junta de Supervisión y AFSCME, en su propio nombre y en nombre de dos de sus ramas locales, Servidores Públicos Unidos ("SPU"), AFSCME Consejo 95 y Capítulo de Jubilados de SPU, así como sus catorce sindicatos locales afiliados de Puerto Rico, formalizaron el AAP que conviene el apoyo de AFSCME a los términos de los CNC, conjuntamente con la citada reestructuración de las obligaciones de pensiones, en virtud del Plan. El acuerdo fue aprobado con el 92% de los votos de los afiliados. Además, el acuerdo estipula el apoyo de AFSCME a los términos y condiciones pactados en el Plan con respecto al tratamiento de las reclamaciones de beneficios de pensiones. AFSCME ha aceptado apoyarlos y promoverlos para conseguir el voto favorable de sus afiliados. AFSCME dispondrá de representación institucional, con

---

[70] El AAP y el Plan también contemplan una aportación inicial de $5 millones para financiar los derechos, costos y gastos administrativos del Fideicomiso de reserva de pensiones.

interacción directa con la Junta de Supervisión para garantizar que sus perspectivas sean tomadas en cuenta con respecto al Plan fiscal, el presupuesto y el proceso de reestructuración del Estado Libre Asociado.

El Plan prevé que los CNC existentes entre el Estado Libre Asociado y AFSCME, o sus filiales locales, sean rechazados de conformidad con la sección 365 del Código de Quiebra, y sustituidos por los CNC modificados. Como resultado de dicha modificación, el tratamiento de las reclamaciones será, en parte, la implementación de CNC modificados válidos y viables. Los CNC existentes, combinados con las cláusulas de la lista adjunta como Apéndice I al AAP de AFSCME (también adjunto como Anexo F de esta Declaración de Divulgación), constituirán los CNC modificados, que tendrán una vigencia de cinco años. Este plazo de cinco años está vinculado al ahorro económico del Plan y contempla CNC viables e importantes protecciones contractuales a AFSCME y sus afiliados, como por ejemplo una protección contra las privatizaciones durante el período. Los empleados representados por AFSCME tienen garantizado que, durante la vigencia de los nuevos CNC, no habrá variaciones en sus salarios básicos, otras compensaciones, bajas, vacaciones u otros beneficios sin el consentimiento explícito de AFSCME. Por otra parte, el período de cinco años también admite un procedimiento de urgencia para alcanzar las reducciones de personal previstas por el Plan Fiscal, y está abierto a las iniciativas de ahorro de costos de AFSCME. El resultado del proceso de colaboración mantiene la mayoría de los beneficios previamente negociados por AFSCME y los traslada a los CNC quinquenales modificados.

Las reclamaciones derivadas del rechazo están categorizadas en la Clase 48, y el tratamiento de las mismas es la propuesta de CNC modificados compatible con el AAP de AFSCME, que se ejecutará y surtirá efecto de conformidad con el Plan y la Orden de confirmación. Los términos de los CNC incorporan a los afiliados de los siguientes sindicatos:

- Junta de Libertad bajo Palabra y Local 3584 / Funcionarios Públicos Unidos
- Departamento de Asuntos de Consumo y Local 3986 / Funcionarios Públicos Unidos
- Departamento de Corrección y Rehabilitación y Local 3500-Unidad B Oficiales Correccionales (ACU) / Funcionarios Públicos Unidos
- Departamento de Corrección y Rehabilitación / Oficina de Instituciones Juveniles y Local 3559 (ACU) / Funcionarios Públicos Unidos

- Departamento de Educación y Local 3840, cubriendo solamente a los empleados dentro de la jurisdicción de PASO de AFSCME
- Departamento de Recursos Naturales y Ambientales y Local 2082-Unidad A / Funcionarios Públicos Unidos
- Departamento de Recursos Naturales y Ambientales y Local 3647 (Cuerpo de Vigilantes) / Funcionarios Públicos Unidos
- Departamento de Transportación y Obras Públicas y Local 3889 / Funcionarios Públicos Unidos
- Departamento de Trabajo y Recursos Humanos / Administración de Rehabilitación Vocacional y Local 3251 / Funcionarios Públicos Unidos
- Departamento de la Familia y Local 3227-Unidad A / Funcionarios Públicos Unidos
- Departamento de la Familia y Local 3234-Unidad B (UPETEC) / Funcionarios Públicos Unidos
- Oficina de Ciencias Forenses y Local 2099 / Funcionarios Públicos Unidos
- Departamento de Corrección y Rehabilitación / Programa de Servicios con Antelación al Juicio y Local 3573 (ACU) / Funcionarios Públicos Unidos
- Departamento de Transportación y Otros Servicios Públicos y Local 3897 / Funcionarios Públicos Unidos

El AAP de AFSCME prevé la negociación de múltiples beneficios entre la Junta de Supervisión y AFSCME con el objeto de mantener la protección de los afiliados al sindicato, incluyendo lo siguiente.

*Atención sanitaria uniforme*. El AAP de AFSCME contempla un incremento de la aportación mensual de los patronos de $170.00 por persona y mes, frente a la propuesta del Plan Fiscal, de $125.00 por persona y mes. Además, el AAP prevé la representación sindical a través de un administrador negociado de atención sanitaria, lo cual facilitará una mayor cobertura, una variedad de opciones de cobertura más alta y costos generales menores para los afiliados al sindicato.

*Bonificación por participación*. El AAP de AFSCME contempla un mecanismo para que los partícipes afiliados al sindicato y todos los demás empleados del Estado Libre Asociado con derecho a ello compartan cualquier "Superávit en efectivo" (cuyas condiciones se describen a continuación) superior al del Plan Fiscal certificado vigente a la fecha del Plan para el Estado Libre Asociado. Considerando los sacrificios sufridos por los trabajadores de Puerto Rico, así como los sacrificios adicionales que exigirá el Plan Fiscal, el Acuerdo de Distribución de Superávit del Plan Fiscal incorpora un mecanismo para compartir cualquier potencial remanente con quienes han afrontado los actuales retos y que se esforzarán por estabilizar Puerto Rico en los próximos años.

*Honorario de apoyo*. AFSCME percibirá un pago único de $5 millones como reconocimiento por sus esfuerzos como negociador principal y firmante del Acuerdo.

*Comisión adicional*. AFSCME percibirá un pago único de $5 millones, que se desembolsarán de la manera en que lo especifique, como concesión de la Junta de Supervisión por los esfuerzos realizado por AFSCME para cumplir las obligaciones contraídas en virtud del Acuerdo.

*Bonificación por firma*. Los afiliados sindicales participantes percibirán una bonificación por firma única de $500.

*Sistema 2000*. Los afiliados sindicales percibirán el reintegro pleno de sus aportaciones en el marco del Plan Sistema 2000, con intereses hasta el 3 de mayo de 2017. Los siguientes términos y condiciones describen el tratamiento a los partícipes del Sistema 2000:

- segregación de la totalidad de las aportaciones al Sistema 2000 desde 2000 hasta 2013;
- segregación de la totalidad de las aportaciones de los partícipes del Sistema 2000 de conformidad con la Ley 3-2013 desde 2013 hasta 2017; y
- segregación de la totalidad de las aportaciones de los partícipes en virtud de la Ley 3-2013 (que no habían participado en la Ley 1 de 1990, en la Ley 447 ni en el Sistema 2000 desde 2000 hasta 2013) hasta 2017.

Los partícipes del Sistema 2000 que todavía no se habían jubilado a la Fecha de Entrada en vigencia del Plan recibirán el importe de sus aportaciones al Sistema 2000 (y a los planes de la Ley 3 desde y después de 2013) hasta el 30 de junio de 2017, más los intereses devengados por las mismas desde ese momento hasta la Fecha de petición. Esta cuantía se canalizará a las cuentas de aportaciones individuales definidas por los partícipes y se invertirá por defecto en un fondo de ciclo de vida, lo cual conllevará que no se vean afectadas sus aportaciones al sistema y el devengo de intereses de conformidad con las leyes de Puerto Rico, la protección de sus ahorros para la jubilación en nuevas cuentas de aportaciones y flexibilidad para que los partícipes puedan invertir su dinero según sus preferencias personales.

A la Fecha de entrada en vigencia, los partícipes con aportaciones al Sistema 2000 ya no tendrán derecho a los beneficios administrados por el futuro sistema, como provisiones por muerte o discapacidad.

***Beneficios de la Ley 3-2013***. Los "Partícipes" (como se definen a continuación) de los planes de pensiones de la Ley 1 de 1990 y de la Ley 447 incluirán sus aportaciones de conformidad con la Ley 3-2013 desde el 1 de julio de 2013 mediante la implementación del plan de aportaciones definido por la Ley 106 en julio de 2017, incluyendo los intereses devengados hasta la Fecha de petición, anualizados de conformidad con la Ley 3-2013. El tramo de la anualidad relacionado con las aportaciones bajo la Ley 3-2013 estará exento de la fórmula de reducción de prestaciones descrita en la subsección 1.b(i) precedente para los partícipes que se retiren después de la Fecha de entrada en vigencia del Plan. Esto servirá para reforzar la protección de las prestaciones a los trabajadores tras la jubilación.

***Fideicomiso de reserva de pensiones.*** El establecimiento y dotación de un Fideicomiso de reserva de pensiones protegerá tanto a los actuales como a los futuros jubilados del sindicato. El AAP de AFSCME prevé, a partir del Año fiscal 2020 y hasta el Año fiscal 2027, que el Estado Libre Asociado efectúe aportaciones anuales al Fideicomiso de reserva de pensiones con cargo al Fondo General del Estado Libre Asociado durante ocho (8) años fiscales a partir del Año fiscal siguiente al de la Fecha de entrada en vigencia, por una cuantía no inferior a los $175 millones anuales, por una cuantía no inferior a los $175 millones anuales. Asimismo, dispone que en todo Año fiscal cerrado después de la Fecha de entrada en vigencia en el cual el Superávit del Plan Fiscal sea de al menos $1,750 millones, el Estado Libre Asociado efectuará una aportación (con cargo al Fondo General del Estado Libre Asociado) al Fideicomiso de reserva de pensiones equivalente al 25% del Superávit del Plan Fiscal proyectado para dicho Año fiscal.[71]

---

[71] Esta fórmula (descrita en el Plan como Aportación básica) está incluida en el AAP de AFSCME (Anexo F). No obstante, el Plan prevé una fórmula más ventajosa (véase la sección 65.2 del Plan), congruente con las revisiones de la fórmula negociada entre la Junta de Supervisión y el Comité de Jubilados descrita anteriormente. EL Plan contempla una aportación inicial de $5 millones para financiar los derechos, costos y gastos administrativos del Fideicomiso de reserva de pensiones. A partir del año fiscal en que se produce la Fecha de entrada en vigencia del Plan, el Estado Libre Asociado Reorganizado realizará ocho aportaciones anuales al Fideicomiso de reserva de pensiones por una cantidad (por cada año fiscal) equivalente a (a) la Aportación básica correspondiente a dicho año, más (b) aquella cantidad calculada como el superávit primario real de ese año fiscal o el superávit primario proyectado del Plan fiscal de ese Año Fiscal (el menor de ambos importe), menos la suma de (i) la Aportación

*Superávit líquido remanente.* El AAP de AFSCME contempla un mecanismo para que los miembros del sindicato compartan cualquier superávit remanente superior al del plan fiscal certificado vigente a la Fecha de entrada en vigencia del Plan. Estipula un fondo de bonificaciones para los integrantes del sindicato si el Estado Libre Asociado supera las proyecciones incluidas en el Plan fiscal. El Superávit líquido remanente se define como el superávit líquido remanente superior al del Plan Fiscal certificado vigente a la Fecha de entrada en vigencia del Plan. Si el Superávit líquido remanente es inferior a $100 millones, no se distribuirá ninguna cantidad. Si el Superávit líquido remanente es de $100 millones o más, el 25% del Superávit líquido remanente se asignará al fondo de bonificaciones por participación, que se repartirá proporcionalmente entre los partícipes representados por AFSCME y otros empleados elegibles del Estado Libre Asociado. Todos los beneficiarios de este fondo de bonificaciones tendrán la opción de asignar cualquier tramo de sus bonificaciones a sus cuentas de aportaciones definidas, y el resto se distribuirá en efectivo.

*Empleados corrientes no sindicados.* A aquellos empleados corrientes no representados por un sindicato y, por consiguiente, no elegibles para firmar un acuerdo de apoyo al Plan, la Junta de Supervisión les proporcionará ciertos beneficios otorgados a los empleados representados por un sindicato que firmen un acuerdo de apoyo al Plan. Por ejemplo, dichos empleados percibirán una aportación mensual incrementada de sus patronos de $170.00 por persona/mes, en lugar de los $125.00 por persona/mes propuestos por el Plan fiscal. Además, se les permitirá participar en la bonificación para partícipes que distribuyan el superávit remanente superior al del plan fiscal certificado a la fecha del Plan para el Estado Libre Asociado.

2.   **Permiso para realizar elegir opciones a los tenedores de Reclamaciones permitidas**

De conformidad con la Orden de la Declaración de Divulgación y con el Plan, los tenedores de determinadas Reclamaciones podrán elegir opciones relativas a las distribuciones que recibirán en el marco del Plan y a consecuencia de la transacción de ciertas controversias. A continuación, presentamos un panorama general de las opciones de distribución y de las limitaciones de voto aplicables a ciertos tenedores de Reclamaciones.

*Elección de Bonos tributables.* Si es usted tenedor de una Reclamación permitida de alguna de las siguientes Clases, podrá optar por recibir su distribución en Nuevos Bonos GO, a tenor con el Plan en forma de cupones de tipos de interés más elevados, pero sus bonos son considerados como tributables a efectos de los impuestos federales:

| Reclamaciones con derecho a la elección tributable | |
|---|---|
| **Reclamación** | **Clase** |
| Reclamaciones de Bonos ELA Vintage | Clase 14 |
| Reclamaciones de Bonos ELA Vintage Minoristas. | Clase 15 |
| Reclamaciones de Bonos Garantizados ELA Vintage | Clase 21 |
| Reclamaciones de Bonos ELA 2011 | Clase 27 |
| Reclamaciones de Bonos ELA 2011 Minoristas. | Clase 28 |

---

básica del citado año, más (ii) la obligación del servicio de la deuda del Estado Libre Asociado correspondiente a ese año, más (iii) $200 millones.

| Reclamaciones con derecho a la elección tributable | |
|---|---|
| **Reclamación** | **Clase** |
| Reclamaciones de Bonos ELA Garantizados 2011 | Clase 31 |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 | Clase 33 |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas | Clase 35 |
| Reclamaciones de Bonos ELA 2012 | Clase 37 |
| Reclamaciones de Bonos ELA 2012 Minoristas. | Clase 38 |
| Reclamaciones de Bonos ELA Garantizados 2012 | Clase 41 |
| Reclamaciones de Bonos ELA 2014 | Clase 43 |
| Reclamaciones de Bonos ELA 2014 Minoristas. | Clase 44 |
| Reclamaciones de Bonos ELA Garantizados 2014 | Clase 46 |

Por cuanto, en general, los residentes de Puerto Rico están exentos del pago de impuestos federales sobre el ingreso, para poder optar a los bonos tributables el tenedor de dicha Reclamación permitida deberá certificar que es un **Inversionista de Puerto Rico**; es decir, que es:

- Una persona natural residente en el Estado Libre Asociado (a efectos del impuesto sobre las rentas personales de Puerto Rico); o bien

- Una persona jurídica perteneciente en su totalidad por, o de titularidad usufructuaria de, una o más personas naturales residentes del Estado Libre Asociado (para propósitos del impuesto sobre las rentas personales de Puerto Rico).

Si elige esta opción, se considerará que acepta el Plan. Si se determinase que no tiene derecho a la elección de bonos tributables, su Reclamación será tratada de conformidad con su Clase original, y se considerará que acepta el Plan.

DESPUÉS DE LA FECHA LÍMITE DE ELECCIÓN, SE RESTRINGIRÁ LA NEGOCIACIÓN O TRANSFERENCIA DE TODOS LOS TÍTULOS OBJETO DE LA MISMA HASTA LA FECHA DE ENTRADA EN VIGENCIA DEL PLAN. ESTO ES NECESARIO PARA QUE LA EMPRESA FIDEICOMISARIA DEPOSITARIA REALICE LOS PROCEDIMIENTOS PARA ASOCIAR UNA ELECCIÓN A LA RECEPCIÓN DE BONOS TRIBUTABLES CON EL VALOR SUBYACENTE, LO CUAL SOLAMENTE SERÁ POSIBLE COTIZANDO EL VALOR SUBYACENTE.

**SI OPTA POR LOS BONOS TRIBUTABLES, PERCIBIRÁ UNA DISTRIBUCIÓN CONSISTENTE EN NUEVOS BONOS GO TRIBUTABLES, CVIS, Y EFECTIVO, POR UN VALOR APROXIMADAMENTE EQUIVALENTE A:**

| **Reclamación** | **Clase** | **Recobro aproximado de la elección de bonos tributables** |
|---|---|---|
| Reclamaciones de Bonos ELA Vintage | Clase 14 | 77.6% |

| Reclamación | Clase | Recobro aproximado de la elección de bonos tributables |
|---|---|---|
| Reclamaciones de Bonos ELA Vintage Minoristas. | Clase 15 | 77.6% |
| Reclamaciones de Bonos ELA Garantizados Vintage | Clase 21 | 74.5% |
| Reclamaciones de Bonos ELA 2011 | Clase 27 | 73.0% |
| Reclamaciones de Bonos ELA 2011 Minoristas. | Clase 28 | 73.0% |
| Reclamaciones de Bonos ELA Garantizados 2011 | Clase 31 | 73.45% |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 | Clase 33 | 76.45% |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas | Clase 35 | 76.45% |
| Reclamaciones de Bonos ELA 2012 | Clase 37 | 72.4% |
| Reclamaciones de Bonos ELA 2012 Minoristas. | Clase 38 | 72.4% |
| Reclamaciones de Bonos ELA Garantizados 2012 | Clase 41 | 67.3% |
| Reclamaciones de Bonos ELA 2014 | Clase 43 | 67.8% |
| Reclamaciones de Bonos ELA 2014 Minoristas. | Clase 44 | 67.8% |
| Reclamaciones de Bonos ELA Garantizados 2014 | Clase 46 | 67.8% |

**SI NO OPTA POR LOS BONOS TRIBUTABLES, PERCIBIRÁ UNA DISTRIBUCIÓN CONSISTENTE EN NUEVOS BONOS GO, CVIS Y EFECTIVO, POR UN VALOR APROXIMADAMENTE EQUIVALENTE A:**

| Reclamación | Clase | Recobro aproximado |
|---|---|---|
| Reclamaciones de Bonos ELA Vintage | Clase 14 | 77.6% |
| Reclamaciones de Bonos ELA Vintage Minoristas. | Clase 15 | 77.6% |
| Reclamaciones de Bonos ELA Garantizados Vintage | Clase 21 | 74.5% |
| Reclamaciones de Bonos ELA 2011 | Clase 27 | 73.0% |
| Reclamaciones de Bonos ELA 2011 Minoristas. | Clase 28 | 73.0% |
| Reclamaciones de Bonos Garantizados ELA 2011 | Clase 31 | 73.5% |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 | Clase 33 | 76.5% |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas | Clase 35 | 76.5% |
| Reclamaciones de Bonos ELA 2012 | Clase 37 | 72.4% |
| Reclamaciones de Bonos ELA 2012 Minoristas. | Clase 38 | 72.4% |
| Reclamaciones de Bonos ELA Garantizados 2012 | Clase 41 | 67.3% |
| Reclamaciones de Bonos ELA 2014 | Clase 43 | 67.8% |
| Reclamaciones de Bonos ELA 2014 Minoristas. | Clase 44 | 67.8% |

48

| Reclamación | Clase | Recobro aproximado |
|---|---|---|
| Reclamaciones de Bonos ELA Garantizados 2014 | Clase 46 | 67.8% |

Los Nuevos Bonos GO tributables distribuidos a los tenedores que opten por bonos tributables tendrán ciertos plazos de devolución diferentes de los de aquellos que no opten por los mismos. Recomendamos leer detenidamente la totalidad de la Declaración de Divulgación, incluyendo las consecuencias tributarias de realizar la elección expuesta en VIII, titulada "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU.", y la sección X, titulada "Consideraciones materiales a efectos del Impuesto sobre el ingreso de Puerto Rico" de este documento antes de optar por los bonos tributables. En general, los residentes de Puerto Rico no están sujetos a los impuestos federales sobre el ingreso de EE.UU. Recomendamos a los residentes de Puerto Rico leer la sección VIII de la Declaración de Divulgación, titulada "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU.: personas físicas y jurídicas de Puerto Rico", que expone algunas importantes limitaciones de esta norma general. Incluso si puede ser considerado Inversionista de Puerto Rico, es posible que no esté exento de pagar el impuesto federal sobre el ingreso de EE.UU. por los Nuevos Bonos GO tributables. Las consecuencias tributarias descritas en esta Declaración de Divulgación no sustituyen a una cuidadosa planificación fiscal ni al asesoramiento fiscal de un profesional para sus circunstancias individuales, por lo cual recomendamos consultar a su propio asesor.

*Reclamaciones de bonos asegurados por Assured— Elección y votación de la distribución*. Si usted es un tenedor beneficiario de Reclamaciones de Bonos Asegurados por Assured Permitidas, y solamente en la medida en que Assured (i) declinase ejercitar la Elección de Assured con respecto a cualquiera de los Bonos asegurados por Assured de los cuales sea usted tenedor beneficiario, y (ii) decidiese ofrecer más de una Elección de tenedores de Bonos de Assured, usted podrá elegir una de las Elecciones de tenedores de bonos de Assured en su Formulario de Elección para recibir plena satisfacción de su Reclamación de bonos asegurados por Assured Permitidas y de los derechos estipulados por la Póliza de seguros de Assured correspondiente.

Los titulares beneficiarios de las Reclamaciones de Bonos Asegurados por Assured Permitidas, las Reclamaciones de Bonos de ELA/ACT Permitidas y las Reclamaciones de Impuesto al ron de ELA/AFIPR Permitidas derivadas de bonos garantizados por Assured no tendrán derecho de votar por la aceptación o rechazo al Plan. Assured tendrá derecho a votar por cuenta de las Reclamaciones de Bonos Asegurados por Assured Permitidas, las Reclamaciones de Bonos de ELA/ACT Permitidas y las Reclamaciones de Impuesto al ron de ELA/AFIPR Permitidas derivadas de bonos garantizados por Assured en el marco del Plan, de conformidad con la Sección 301(c)(3) de PROMESA y de otras leyes y documentos rectores aplicables.

*Reclamaciones de bonos asegurados por National— Elección y votación de la distribución*. Si usted es un tenedor beneficiario de Reclamaciones de Bonos Asegurados por National Permitidas, puede elegir en su Formulario de Elección recibir en plena satisfacción, liberación y canje de su Reclamación de Bonos Asegurados por National Permitida y sus derechos bajo la Póliza de Seguro de National aplicable, (1) el Tratamiento de Conmutación de National o (2) el Tratamiento de No Conmutación de National.

Los tenedores de Reclamaciones de Bonos Asegurados por National Permitidas y las Reclamaciones de Bonos de ELA/ACT Asegurados por National Permitidas no tendrán derecho a votar por la aceptación o rechazo del Plan. National tendrá derecho a votar por cuenta de las Reclamaciones de Bonos Asegurados por National Permitidas y las Reclamaciones de Bonos de ELA/ACT Asegurados por National

Permitidas en virtud del Plan en nombre de los tenedores beneficiarios de las mismas, de acuerdo con la Sección 301(c)(3) de la ley PROMESA y otras leyes y documentos rectores aplicables.

**Reclamaciones de bonos asegurados por Syncora— Elección y votación de la distribución.** Si usted es un tenedor beneficiario de Reclamaciones de Bonos Asegurados por Syncora Permitidas, puede elegir en su Formulario de Elección recibir en plena satisfacción, liberación y canje de su Reclamación de Bonos Asegurados por Syncora Permitida y sus derechos bajo la Póliza de Seguro de Syncora aplicable, (1) el Tratamiento de Conmutación de Syncora o (2) el Tratamiento de No Conmutación de Syncora.

Los tenedores de Reclamaciones de Bonos Asegurados por Syncora Permitidas tienen derecho a votar por la aceptación o rechazo del Plan. Syncora tiene derecho a votar a cuenta de las Reclamaciones de Bonos Asegurados por Syncora Permitidas en virtud del Plan en nombre de los tenedores beneficiarios de las mismas, de acuerdo con la Sección 301(c)(3) de la ley PROMESA y otras leyes y documentos rectores aplicables.

DESPUÉS DE LA FECHA LÍMITE DE ELECCIÓN, SE RESTRINGIRÁ LA NEGOCIACIÓN O TRANSFERENCIA DE TODOS LOS TÍTULOS OBJETO DE LA MISMA HASTA LA FECHA DE ENTRADA EN VIGENCIA DEL PLAN. ESTO ES NECESARIO PARA QUE LA EMPRESA FIDEICOMISARIA DEPOSITARIA REALICE LOS PROCEDIMIENTOS PARA ASOCIAR UNA ELECCIÓN A LA RECEPCIÓN DE BONOS TRIBUTABLES CON EL VALOR SUBYACENTE, LO CUAL SOLAMENTE SERÁ POSIBLE COTIZANDO EL VALOR SUBYACENTE.

**Elección de reclamación de conveniencia**. Los tenedores de Reclamaciones de ELA generales no garantizadas permitidas (Clase 55) y de Reclamaciones de SRE generales no garantizadas permitidas (Clase 63) podrán optar por:

(a) reducir la cuantía de dicha Reclamación permitida hasta $10,000.00 y percibir el pago íntegro y en efectivo de la reclamación así reducida, de conformidad con el tratamiento de Reclamaciones de conveniencia de la Clase 65; y

(b) aceptar el Plan como tenedor de una Reclamación de la Clase 65.

Los tenedores de múltiples Reclamaciones de ELA generales no garantizadas permitidas o múltiples Reclamaciones de SRE generales no garantizadas permitidas podrán optar por:

(a) reducir la cuantía de dichas reclamaciones hasta un total de $20,000.00 y percibir el pago íntegro y en efectivo de la reclamación total así reducida, de conformidad con el tratamiento de Reclamaciones de conveniencia de la Clase 65; y

(b) aceptar el Plan como tenedor de una Reclamación de la Clase 65.

4. **Información general sobre los Nuevos Bonos GO e Instrumentos de Valor Contingente que se emitirán en la Fecha de entrada en vigencia**

   a) **Nuevos Bonos GO**

En la Fecha de entrada en vigencia, el Estado Libre Asociado Reorganizado emitirá Nuevos Bonos GO consistentes en:

(i) $6,683,315,000.00 de monto de capital total de los Nuevos CIB de GO,

50

(ii) $442,506,553.50 de monto de capital inicial de los Nuevos CAB de GO al 5.375%,

(iii) $288,241,989.75 de monto de capital inicial de los Nuevos CAB de GO al 5.0%,

con once (11) fechas de vencimiento distintas, con un monto de capital total original en el momento de la emisión de $7,414,063,543.25. Los Nuevos Bonos GO serán garantizados por un gravamen legal prioritario y pignoración de los montos en depósito en el Fondo de Reserva de la Amortización de la Deuda y el Fondo de Amortización de la Deuda y una pignoración de la plena fe, el crédito y el poder impositivo del Estado Libre Asociado, de acuerdo con el Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado y de las leyes vigentes del mismo a la Fecha de entrada en vigencia. Los Nuevos Bonos GO estarán fechados y acumularán o devengarán intereses a partir de (i) el 1 de julio de 2021 y (ii) la Fecha de Entrada en vigencia, lo que antes se produzca.

Los Nuevos Bonos GO se emitirán de conformidad con la Escritura de los Nuevos Bonos GO y de la Legislación de los Nuevos Bonos GO.

Los Nuevos Bonos GO se distribuirán tal y como se estipula en el Plan. No obstante el momento en que se produzca la Fecha de entrada en vigencia, los Nuevos Bonos GO comenzarán a devengar o acumular intereses, según sea el caso, desde la Fecha de entrada en vigencia o desde el 1 de julio de 2021, lo que ocurra primero, que se considerará fecha de datación de los Nuevos Bonos GO.

En la medida en que las Partes del Gobierno, cada una de ellas actuando a su exclusiva y absoluta discreción, decidan solicitar la calificación crediticia de los Nuevos Bonos GO, deberán hacer todos los esfuerzos comercialmente razonables para obtenerla, tras consultarlo con al menos dos (2) Acreedores iniciales del AAP, designados conjuntamente por el Grupo de Deuda Constitucional, el Grupo GO, LCDC, el Grupo QTCB, Assured (únicamente en la medida en que no haya terminado el AAP en lo que respecta a sí mismo), National (únicamente en la medida en que no haya terminado el AAP en lo que respecta a sí mismo) y Syncora, cada uno de los cuales deberá formalizar un acuerdo de confidencialidad, de forma y contenido satisfactorios para la Junta de Supervisión, y que restringirá a que los Acreedores inicial del AAP negocien Nuevos Bonos GO y que posteriormente utilicen sus mejores esfuerzos comerciales razonables para obtener las mejores calificaciones posibles.

Los Nuevos Bonos GO no tendrán ningún tipo de interés predeterminado, siempre que devengue interés sobre toda la amortización de la deuda no pagada a la tasa de cupón regular, componiendo semestralmente, hasta que se pague o satisfaga totalmente de acuerdo con sus términos.

No obstante cualquier disposición en sentido contrario contenida en el Plan, en la medida en que se emitan Nuevos Bonos GO tributables, los mismos se distribuirán a los tenedores de Reclamaciones permitidas en el siguiente orden de prioridad: (1) *en primer lugar*, a los tenedores de Reclamaciones de Bonos ELA permitidas que elijan la elección tributable, y (2) *en segundo lugar*, proporcionalmente a todos los demás tenedores de Reclamaciones permitidas y quienes reciban Nuevos Bonos GO, sin duplicación.

b)      **Instrumentos de valor contingente**

En la Fecha de entrada en vigencia, el Estado Libre Asociado Reorganizado emitirá los CVI de GO y los CVI de recuperación. Los CVI de GO tendrán un límite vitalicio máximo de $3,500,000,000.00 y un plazo de 22 años. Los CVI de recuperación tendrán un límite vitalicio máximo equivalente a $3,697,688,995 en concepto de las Reclamaciones de ELA/ACT Permitidas, a $217,228,391 en concepto de las Reclamaciones de ELA/Centro de Convenciones Permitidas, a $22,580,090 en concepto de las

Reclamaciones de ELA/AMA Permitidas y a $1,446,650,288 en concepto de las Reclamaciones de ELA/Impuesto al ron de AFIPR Permitidas (en total, $5,384,127,764),[72] y un plazo de 30 años.

Los CVI tendrán como garantía la pignoración de plena fe, el crédito y el poder impositivo conforme a la Constitución del Estado Libre Asociado y las leyes aplicables del Estado Libre Asociado. Los pagos de los CVI se harán únicamente si la recaudación del 5.5% del Impuesto sobre las Ventas y el Uso supera el Plan Fiscal Certificado del Estado Libre Asociado de mayo de 2020. El pago de los CVI está sujeto a los máximos aplicables, incluido el Pago Anual Máximo de los CVI de GO, el Límite vitalicio de los CVI de GO, el Pago Anual Máximo de los CVI de Recuperación y el Límite vitalicio de los CVI de recuperación.

Los CVI de recuperación sujetos a cascada representan una parte de los pagos a los CVI de recuperación abonados con cargo a la cuantía del superávit sujeto a cascada. Los CVI de recuperación no sujetos a cascada representan una parte de los pagos a los CVI de recuperación abonados con cargo a la cuantía del superávit no sujeto a cascada.

**C. Tenedores de Reclamaciones con derecho a votar por el Plan de Ajuste**

De conformidad con el Título III de la Ley PROMESA y del Código de Quiebras, solamente los tenedores de Reclamaciones permitidas de las clases afectadas y que no se considere automáticamente que han aceptado o rechazado una propuesta de Plan de Ajuste del Título III, tendrán derecho a votar si aceptan o rechazan dicho Plan de Ajuste. Se considerará que las clases de reclamaciones cuyos tenedores no están afectados en virtud del Plan han aceptado el mismo y no tienen derecho a votar para aceptarlo o rechazarlo. Se considerará que las clases de reclamaciones cuyos tenedores no percibirán ningún recobro según el plan de ajuste han rechazado el mismo y, por consiguiente, no tienen derecho a votar.

A continuación, presentamos un resumen de las Clases de Reclamaciones (a) con derecho a votar si aceptar o rechazar el Plan, (b) con derecho a elección de distribución, y (c) sin derecho a votar si aceptar o rechazar el Plan:

| | Clase | Votación | Con derecho a elección | Notificación de no votación |
|---|---|---|---|---|
| Reclamaciones de Bonos AEP Vintage | Clase 1 | X | - | - |
| Reclamaciones de Bonos AEP Vintage (Assured) | Clase 2 | * | - | - |
| Reclamaciones de Bonos AEP Vintage (National) | Clase 3 | * | X | - |
| Reclamaciones de Bonos AEP Vintage (Otros asegurados) * | Clase 4 | X | - | - |
| Reclamaciones de Bonos AEP Vintage (Syncora) | Clase 5 | * | X | - |
| Reclamaciones de Bonos AEP Vintage Minoristas. | Clase 6 | X | - | - |
| Reclamaciones de Bonos AEP 2011 | Clase 7 | X | - | - |
| Reclamaciones de Bonos AEP 2011 Minoristas. | Clase 8 | X | - | - |
| Reclamaciones de Bonos AEP 2012 | Clase 9 | X | - | - |

---

[72] Aplicable a los pagos globales de CVI de recuperación, incluyendo pagos en concepto de CVI de recuperación sujetos a cascada y CVI de recuperación no sujetos a cascada.

| | Clase | Votación | Con derecho a elección | Notificación de no votación |
|---|---|---|---|---|
| Reclamaciones de Bonos AEP 2012 Minoristas. | Clase 10 | X | - | - |
| Reclamación garantizada AEP/ARD | Clase 11 | - | - | X |
| Reclamaciones AEP Generales no Garantizadas | Clase 12 | - | - | X |
| Reclamación no Garantizada de AEP/ARD | Clase 13 | - | - | X |
| Reclamaciones de Bonos ELA Vintage | Clase 14 | X | X | - |
| Reclamaciones de Bonos ELA Vintage Minoristas. | Clase 15 | X | X | - |
| Reclamaciones de Bonos ELA Vintage (Assured) | Clase 16 | * | - | - |
| Reclamaciones de Bonos ELA Vintage (National) | Clase 17 | * | X | - |
| Reclamaciones de Bonos ELA Vintage (Otros asegurados)* | Clase 18 | X | - | - |
| Reclamaciones de Bonos ELA Vintage (Syncora) | Clase 19 | * | X | - |
| Reclamaciones de Bonos ELA Vintage (Elección Tributable) | Clase 20 | - | - | - |
| Reclamaciones de Bonos ELA Garantizados Vintage | Clase 21 | X | X | - |
| Reclamaciones de Bonos ELA Garantizados Vintage (Assured) | Clase 22 | * | - | - |
| Reclamaciones de Bonos ELA Garantizados Vintage (National) | Clase 23 | * | X | - |
| Reclamaciones de Bonos ELA Garantizados Vintage (Otros asegurados)* | Clase 24 | X | - | - |
| Reclamaciones de Bonos ELA Garantizados Vintage (Syncora) | Clase 25 | * | X | - |
| Reclamaciones de Bonos ELA Garantizados Vintage (Elección Tributable) | Clase 26 | - | - | - |
| Reclamaciones de Bonos ELA 2011 | Clase 27 | X | X | - |
| Reclamaciones de Bonos ELA 2011 Minoristas. | Clase 28 | X | X | - |
| Reclamaciones de Bonos ELA 2011 (Assured) | Clase 29 | * | - | - |
| Reclamaciones de Bonos ELA 2011 (Elección Tributable) | Clase 30 | - | - | - |
| Reclamaciones de Bonos ELA Garantizados 2011 | Clase 31 | X | X | - |
| Reclamaciones de Bonos ELA Garantizados 2011 (Elección Tributable) | Clase 32 | - | - | - |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 | Clase 33 | X | X | - |
| Reclamaciones de Bonos ELA 2011 Series D/E/PIB (Assured) | Clase 34 | * | - | - |
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas | Clase 35 | X | X | - |

| | Clase | Votación | Con derecho a elección | Notificación de no votación |
|---|---|---|---|---|
| Reclamaciones de Bonos ELA Serie D/E/PIB 2011 (Elección Tributable) | Clase 36 | - | - | - |
| Reclamaciones de Bonos ELA 2012 | Clase 37 | X | X | - |
| Reclamaciones de Bonos ELA 2012 Minoristas. | Clase 38 | X | X | - |
| Reclamaciones de Bonos ELA 2012 (Assured) | Clase 39 | * | - | - |
| Reclamaciones de Bonos ELA 2012 (Elección Tributable) | Clase 40 | - | - | - |
| Reclamaciones de Bonos ELA Garantizados 2012 | Clase 41 | X | X | - |
| Reclamaciones de Bonos ELA Garantizados 2012 (Elección Tributable) | Clase 42 | - | - | - |
| Reclamaciones de Bonos ELA 2014 | Clase 43 | X | X | - |
| Reclamaciones de Bonos ELA 2014 Minoristas. | Clase 44 | X | X | - |
| Reclamaciones de Bonos ELA 2014 (Elección Tributable) | Clase 45 | - | - | - |
| Reclamaciones de Bonos ELA Garantizados 2014 | Clase 46 | X | X | - |
| Reclamaciones de Bonos ELA Garantizados 2014 (Elección Tributable) | Clase 47 | - | - | - |
| Reclamaciones de jubilados | Clase 48A | X | - | - |
| Reclamaciones de Participantes Activos de SRE | Clase 48B | X | - | - |
| Reclamaciones de Participantes Activos de SRJ | Clase 48C | X | - | - |
| Reclamaciones de Participantes Activos de SRM | Clase 48D | X | - | - |
| Reclamaciones de Participantes del Sistema 2000 | Clase 48E | X | - | - |
| Reclamaciones de empleados de AFSCME | Clase 49 | X | - | - |
| Reclamaciones de productores de leche | Clase 50 | X | - | - |
| Reclamaciones de dominio eminente | Clase 51 | X | - | - |
| Reclamaciones de incentivos energéticos | Clase 52 | - | - | X |
| Reclamaciones de centros médicos | Clase 53 | X | - | - |
| Reclamaciones de créditos fiscales | Clase 54 | - | - | X |
| Reclamaciones ELA Generales no Garantizadas | Clase 55 | X | X | - |
| Reclamaciones ELA/ACT | Clase 56 | X | - | - |
| Reclamaciones ELA/Centro de Convenciones | Clase 57 | X | - | - |
| Reclamaciones ELA/Impuesto al Ron de AFI | Clase 58 | X | - | - |
| Reclamaciones ELA/AMA | Clase 59 | X | - | - |
| Reclamaciones por Asignaciones del ELA | Clase 60 | - | - | X |
| Reclamaciones Subordinadas del ELA 510(b) | Clase 61 | - | - | X |
| Reclamaciones de Bonos SRE | Clase 62 | X | X | - |
| Reclamaciones Generales no Garantizadas SRE | Clase 63 | X | X | - |
| Reclamaciones Gracia-Gracia | Clase 64 | - | - | X |
| Reclamaciones de conveniencia | Clase 65 | - | - | X |

\* El Plan provee que, a efectos de votación, el "tenedor" de una Reclamación de bonos asegurados se determinará de conformidad con la Sección 301(c)(3) de la Ley PROMESA y de cualesquiera leyes o documentos aplicables a dichas reclamaciones de bonos asegurados. Los tenedores beneficiarios de Reclamaciones de Bonos Asegurados por Assured Permitidas, Reclamaciones de Bonos de ELA/ACT Asegurados por Assured Permitidas, Reclamaciones de Bonos de ELA/Centro de Convenciones Asegurados por Assured Permitidas, Reclamaciones de ELA/Impuesto al Ron de AFIPR Asegurados por Assured Permitidas, Reclamaciones de Bonos Asegurados por National Permitidas, Reclamaciones de Bonos de ELA/ACT Aseguradas por National Permitidas y Reclamaciones de Bonos Asegurados por Syncora Permitidas no tienen derecho a votar por la aceptación o rechazo del Plan. Assured, National y Syncora tienen derecho a votar por cuenta de las Reclamaciones de Bonos Asegurados por Assured Permitidas, las Reclamaciones de Bonos de ELA/ACT Asegurados por Assured Permitidas las Reclamaciones de Bonos de ELA/Centro de Convenciones Asegurados por Assured Permitidas, las Reclamaciones de ELA/Impuesto al Ron de AFIPR Asegurados por Assured Permitidas, las Reclamaciones de Bonos Asegurados por National Permitidas, las Reclamaciones de Bonos de ELA/ACT Aseguradas por National Permitidas y las Reclamaciones de Bonos Asegurados por Syncora Permitidas, según proceda, en virtud del Plan en nombre de los tenedores beneficiarios de las mismas, de acuerdo con la Sección 301(c)(3) de la ley PROMESA y otras leyes y documentos rectores aplicables.

Los tenedores de Reclamaciones permitidas de las Clases 11 (Reclamación de AEP/ARD garantizada), 13 (Reclamación de AEP/DRA no garantizada), 60 (Reclamaciones de apropiaciones de ELA) y 61 (Reclamaciones subordinadas 510(b) ELA) no percibirán ninguna distribución en virtud del Plan, considerándose que han rechazado el Plan y, por consiguiente, no tienen derecho a votar.

Los tenedores de Reclamaciones permitidas de las Clases 12 (Reclamaciones de AEP generales no garantizadas), 52 (Reclamaciones de incentivos energéticos), 68 (Reclamaciones Gracia-Gracia) y 69 (Reclamaciones de conveniencia) no se ven afectadas por el Plan, se considerará que lo aceptan y, por tanto, no tienen derecho a voto.

La sección 1126 del Código de Quiebras define "aceptación" de un plan de ajuste por una clase de reclamaciones como la aceptación por parte de los acreedores de dicha categoría tenedores de al menos dos tercios de la cuantía y más de la mitad del número de reclamaciones permitidas de esa clase que votan por aceptar o rechazar el Plan. Por consiguiente, la aceptación del Plan por las Reclamaciones de cada clase con derecho a votar se producirá solamente si al menos las dos terceras partes de la cuantía, y una mayoría de los tenedores de las Reclamaciones permitidas de esa clase, votan a favor del Plan. Una votación podrá ser desestimada si el Tribunal del Título III determina, tras una notificación y una vista, que la aceptación o el rechazo no han sido solicitados o procurados de buena fe, o de acuerdo o las cláusulas aplicables de la Ley PROMESA o del Código de Quiebras.

Es importante que los tenedores de Reclamaciones de las clases indicadas en la tabla precedente con derecho a voto ejerciten dicho derecho de votar o rechazar el Plan. **INCLUSO SI NO VOTA, O NO TIENE DERECHO DE VOTAR, LA ACEPTACIÓN DEL PLAN, ESTARÁ LEGALMENTE VINCULADO POR EL MISMO SI ES CONFIRMADO POR EL TRIBUNAL DEL TÍTULO III.** La cuantía de las reclamaciones y el número de votos requeridos para la aceptación o el rechazo del Plan por una determinada categoría se calcularán sobre la base de las Reclamaciones que efectivamente voten por cualquiera de ambas opciones. No existen requisitos de quórum con respecto al número de Reclamaciones de una Clase que efectivamente voten.

Si al menos una clase de Reclamaciones afectadas acepta el plan de ajuste del Título III (sin contar los votos de personas internas), en aplicación de la Sección 1129(b) del Código de Quiebras previsto por la sección 301(a) del Título III de la Ley PROMESA, se entenderá que el plan de ajuste ha sido aceptado bajo

ciertas condiciones, a pesar de que sea rechazado por una o más de las demás clases de reclamaciones afectadas. De conformidad con dicha sección, un plan de ajuste podrá ser confirmado por un tribunal si no "discrimina de manera injusta" y es "justo y equitativo" con respecto a cada clase que lo rechace. *Véase* información más detallada en la sección VII.C de esta Declaración de Divulgación.

La decisión de los Deudores sobre si solicitar o no la confirmación del Plan de conformidad con la sección 1129(b) del Código de Quiebras se anunciará como más tardar en la Vista de confirmación.

**D.     Procedimientos de solicitud y de votación**

El [_____]de 2021, los Deudores presentaron la Moción de aprobación de la Declaración de Divulgación [ECF Núm. 11950], solicitando al Tribunal del Título III una orden (i) que apruebe la idoneidad de la información contenida en la Declaración de Divulgación propuesta, (ii) estableciendo una Fecha de registro de votación (tal como se define en este documento) para votar por el Plan, (iii) aprobando la Notificación de la Vista de Confirmación (tal como se define en este documento) y el cronograma de confirmación, (iv) aprobando el contenido propuesto de los paquete de solicitud (aquí definido) y los procedimientos para distribuirlos, (v) aprobando los formularios de elección, y estableciendo los procedimientos de solicitud, votación, distribución, elección y recuento de votos, (vi) aprobar la forma y el contenido de la Notificación de no votación (como aquí se define), (vii) establecer la Fecha límite de votación (como aquí se define), la Fecha límite de elección (como aquí se define) y las fechas límite de confirmación, y (viii) aprobar los procedimientos para el recuento de los votos de los acreedores. El [_____] de 2021, el Tribunal del Título III dictó la Orden de Declaración de Divulgación.

Si desea información más detallada acerca de los procedimientos de solicitud y de divulgación relativos al Plan, *consulte* la Orden de la Declaración de Divulgación.

**E.     Vista de confirmación y fecha límite para las objeciones a la confirmación**

En virtud de la sección 1128 de la Ley de Quiebras, el Tribunal del Título III ha señalado la Vista de confirmación para determinar si los Deudores han satisfecho los requisitos de confirmación de la sección 314 de la Ley PROMESA, y las subsecciones incorporadas de la sección 1129 de Código de Quiebras para el [_____de 2021 a las ____ a.m./p.m.] (Hora estándar del Atlántico), ante la Honorable Laura Taylor Swain, Jueza de Distrito de Estados Unidos designada por el Presidente del Tribunal Supremo de los Estados Unidos, John Roberts, para presidir el Caso del Título III del Estado Libre Asociado ante el Tribunal de los Estados Unidos Clemente Ruiz Nazario, Avenida Carlos Chardón 150, San Juan de Puerto Rico, P.R. 00918, en la sala o en una vista virtual según se determine oportunamente. La Vista de confirmación podrá ser aplazada en cada momento sin previo aviso, salvo el comunicado en la propia Vista de confirmación o en cualquier Vista posteriormente aplazada.

El Tribunal del Título III (i) estableció como Fecha límite de votación y Fecha límite de elección las 5:00 p.m. (Hora estándar del Atlántico) del [____de 2021], y (ii) ordenó que todas las objeciones, en su caso, a la confirmación del Plan sean presentadas y cursadas como más tardar a las [_____] (Hora estándar del Atlántico).

*[El resto de la página se ha dejado intencionalmente en blanco]*

### III.    III. Descripción general de los Deudores

**A.    A. Información General**

**1. El Estado Libre Asociado**

Puerto Rico tiene una superficie aproximada de 3,500 millas cuadradas y una población estimada por la Oficina del Censo de los EE.UU. en aproximadamente 3.2 millones al 1 de junio de 2019.

Puerto Rico quedó bajo la soberanía de los EE.UU. como resultado del Tratado de París de 1898. En 1917, de acuerdo con la ley Jones-Shafroth, Pub. L 64-368, los ciudadanos de Puerto Rico se convirtieron en ciudadanos de los EE.UU. En 1950, el Congreso de los Estados Unidos autorizó a Puerto Rico a que aprobara su propia Constitución, la cual fue elaborada por una convención constitucional, aprobada en un referendo especial por el pueblo de Puerto Rico, enmendada, confirmada por el Congreso de los Estados Unidos, y posteriormente aprobada por el Presidente de los Estados Unidos en 1952. La Constitución del Estado Libre Asociado dispone la separación de poderes entre los poderes ejecutivo, legislativo y judicial del gobierno. La Legislatura se compone de un Senado y una Cámara de Representantes, cuyos miembros se eligen por períodos de cuatro años.

Desde que se aprobó la *Ley PROMESA*, Puerto Rico ha tenido cinco Gobernadores. El primero, Alejandro García Padilla, fue elegido Gobernador el 6 de noviembre de 2012 y juramentado para un mandato de 4 años el 2 de enero de 2013. El segundo, Ricardo A. Rosselló Nevares, fue elegido Gobernador el 8 de noviembre, 2016, y fue juramentado para un mandato de cuatro años el 2 de enero, 2017. El 24 de Julio, 2019, el entonces Gobernador Rosselló anuncio su renuncia con fecha efectiva del 2 de agosto, 2019. Antes de que su renuncia fuera efectiva, el entonces Gobernador Rosselló nombró al ex-Comisionado Residente Pedro Pierluisi como Secretario de Estado, que es el primer funcionario en la línea de sucesión del Gobernador de acuerdo con la Constitución del Estado Libre Asociado. Después de ser confirmado solamente por la Cámara de Representantes de Puerto Rico, aunque no por el Senado, el Sr. Pierluisi fue juramentado como Gobernador interino el 2 de agosto de 2019. Sin embargo, el 7 de agosto de 2019, la Corte Suprema de Puerto Rico unánimemente determinó que el Sr. Pierluisi había sido juramentado inconstitucionalmente, y el Sr. Pierluisi inmediatamente renunció. Más tarde ese mismo día, la Secretaria de Justicia de Puerto Rico, Wanda Vázquez, fue juramentada como Gobernadora en conformidad con la constitución del Estado Libre Asociado para completar la gestión del Gobernador Rosselló hasta el año 2020. Pedro Pierluisi fue elegido Gobernador el 3 de noviembre de 2020 y juramentado para un mandato de cuatro años el 2 de enero de 2021.

Si bien los ciudadanos de Puerto Rico son ciudadanos de los Estados Unidos de conformidad con la Constitución de los EE.UU., los residentes de Puerto Rico no tienen representación directa en el gobierno federal. Puerto Rico no tiene electores en el Colegio Electoral que vota al presidente; sin embargo, los residentes de Puerto Rico pueden participar en las primarias para seleccionar candidatos presidenciales de EE.UU. De forma congruente con el tratamiento de todos los demás territorios de los EE.UU., bajo las reglas vigentes del Congreso de EE.UU., la representación de Puerto Rico en el Congreso se limita a un solo Comisionado Residente, el cual no tiene las facultades otorgadas a los demás miembros del Congreso. No se permite que el Comisionado Residente vote en el pleno de la Cámara, ni se le inscribe en el registro de los Miembros elegidos; tampoco puede votar por el Presidente de la Cámara, ni presentar ni firmar peticiones para la consideración de proyectos de Ley en el pleno. Por otra parte, las contribuciones federales, tales como los impuestos federales sobre el ingreso, con excepción de las contribuciones sobre la nómina (como las contribuciones de Medicare y Seguro Social) generalmente no son tributables sobre

ingresos que se originan en Puerto Rico.[73]

Como resultado de la crisis fiscal actual que afecta al Estado Libre Asociado, el Congreso de los Estados Unidos aprobó la Ley PROMESA, que estableció la Junta de Supervisión y Administración Financiera para Puerto Rico como una entidad dentro del gobierno del Estado Libre Asociado, para ejercer controles presupuestarios y financieros sobre los asuntos fiscales del Estado Libre Asociado y reestructurar su deuda.

*El Gobierno Central del Estado Libre Asociado.* El Gobierno Central del Estado Libre Asociado ("el Gobierno Central") provee servicios esenciales para la población de Puerto Rico, por medio de sus agencias y otras entidades. La lista de entidades que constituyen el Gobierno Central se adjunta como el Apéndice K de esta Declaración de Divulgación.[74] El Gobierno Central contabiliza los costos de dichos servicios esenciales por medio del Fondo General, los Fondos de Ingresos Especiales, y Fondos Federales.

*Instrumentalidades y Corporaciones Públicas del Estado Libre Asociado.* Muchas de las funciones gubernamentales y cuasi-gubernamentales del Estado Libre Asociado son desempeñadas por corporaciones públicas que son entidades legalmente separadas, creadas por la Legislatura, y con diversos grados de independencia del Estado Libre Asociado. Las corporaciones públicas pueden obtener sus ingresos de las tarifas que cobran por servicios o productos, pero como se describe más abajo, muchas reciben importantes subsidios del Estado Libre Asociado. La mayoría de las corporaciones públicas son gobernadas por juntas cuyos miembros son designados por el Gobernador con el consejo y consentimiento del Senado de Puerto Rico. Las mejoras de bienes capitales de la mayoría de las corporaciones más importantes históricamente han sido financiadas por bonos emitidos bajo acuerdos de fideicomiso o resoluciones de bonos, o acuerdos de préstamos.

Durante años, muchas corporaciones públicas y otras instrumentalidades tradicionalmente se han valido de subsidios, en forma de asignaciones del Fondo General del Estado Libre Asociado o asignaciones de impuestos u otras rentas del Estado Libre Asociado u otros ingresos para financiar sus operaciones. Algunas de estas instrumentalidades, incluyendo la Administración de Seguros de Salud de Puerto Rico ("ASES"), la Administración de Servicios Médicos de Puerto Rico; la Autoridad de Transporte Integrado de Puerto Rico (ATI), la Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio, la Autoridad Metropolitana de Autobuses ("AMA"), ACT, y la Universidad de Puerto Rico ("UPR"), proveen servicios a los residentes del Estado Libre Asociado y dependen en medida importante de dichos subsidios para financiar sus operaciones cotidianas. Otras corporaciones públicas subvencionadas le proveen servicios al Gobierno Central y otras entidades del gobierno, los cuales a su vez entregan servicios a los residentes del Estado Libre Asociado.

Los ingresos tributarios y/o asignaciones del Estado Libre Asociado también han sido una fuente principal del financiamiento de ciertas corporaciones públicas dedicadas a funciones fiscales y de asesoría (por ejemplo la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AAFAF"), para el desarrollo de infraestructura (por ejemplo, la Autoridad para el Financiamiento de la Infraestructura ("AFI"), y la Autoridad para Alianzas Público-Privadas de Puerto Rico ("AAPPPR"), transporte y logística aérea y marítima (por ejemplo, la Autoridad de los Puertos de Puerto Rico), y la promoción económica, turística, y cultural (por ejemplo, la Compañía de Turismo de Puerto Rico ("CTPR"), la Autoridad del Distrito del Centro de Convenciones de Puerto Rico ("ADCC"), la Compañía de Fomento Industrial de

---

[73]La información se basa en la asesoría de AAFAF (según se define a continuación) con respecto al contenido del Estado Financiero del Estado Libre Asociado.
[74] La lista está sujeta a cambios.

Puerto Rico  ("PRIDCO") (principalmente con respeto al Fondo Especial para el Desarrollo Económico y el Programa Rones de Puerto Rico), y el Instituto de Cultura Puertorriqueña).

Otras corporaciones públicas, como COFINA (Corporación del Fondo de Interés Apremiante) y la Corporación para el Financiamiento Público de Puerto Rico ("CFP") han sido creadas para emitir deuda, garantizada por el poder de imponer contribuciones (en el caso de COFINA) o asignaciones (en el caso de la CFP) como su única fuente de amortización.

Pese a las sustanciales subvenciones de apoyo del Estado Libre Asociado, algunas de estas corporaciones públicas sufren importantes pérdidas operativas anuales y llevan montos sustanciales de cuentas por pagar. Si el Plan no logra mejorar la condición financiera del Estado Libre Asociado, ni las reformas que la Junta de Supervisión ha incorporado a sus presupuestos y planes fiscales certificados, es posible que no se pueda seguir sosteniendo estas operaciones al mismo nivel sin que se tomen medidas para reducir otros gastos o aumentar los ingresos.

El Estado Libre Asociado tiene aproximadamente $13,700 millones de deuda GO y aproximadamente $5,000 millones garantizados por su fe y crédito y su poder impositivo. Los tenedores de la deuda GO y deuda garantizada del Estado Libre Asociado afirman que tienen (i) derecho de prelación a "todos los ingresos disponibles" del Estado Libre Asociado, y (ii) gravámenes sobre determinadas contribuciones sobre bienes y los fondos asignados históricamente de forma condicional a determinadas instrumentalidades en conformidad con el Artículo VI, sección 8 de la Constitución del Estado Libre Asociado. En conformidad con la sección 8, "cuando los recursos disponibles, incluyendo el superávit, de un Año fiscal no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por Ley". Los tenedores de la deuda GO y deuda garantizada del Estado Libre Asociado afirman que hasta que todos sus intereses acumulados y capital vencido se hayan pagado en su totalidad, cualquier dinero que de otra forma sería asignado históricamente de manera condicional a la ACT y otras entidades en conformidad con el Artículo VI, sección 8 de la Constitución del Estado Libre Asociado constituyen "recursos disponibles" pagaderos a dichos tenedores.

La Sección 202 de PROMESA le otorga a la Junta de Supervisión Fiscal poder sobre el presupuesto. La Junta de Supervisión interpreta que a sección 4 de PROMESA tiene prioridad sobre cualesquiera leyes incongruentes del Estado Libre Asociado, que a juicio de la Junta de Supervisión incluyen Leyes aprobadas antes de PROMESA que históricamente asignaron de manera condicional ingresos del Estado Libre Asociado a sus instrumentalidades. La Junta de Supervisión considera que aun si no fuera el caso que PROMESA tenga prioridad sobre los estatutos del Estado Libre Asociado, se permite que este dinero históricamente asignado de manera condicional sea usado por parte del Estado Libre Asociado para pagar la deuda GO y deuda garantizada por el Estado Libre Asociado. Desde el 30 de junio de 2016, el Estado Libre Asociado no ha utilizado  dicho dinero para pagar deuda GO, ya que (a) la aplicación de la prioridad de la Deuda GO o deuda garantizada por el Estado Libre Asociado bajo el Título III no se ha decidido aún, y/o (b) el poder del Estado del Estado Libre  Asociado le da derecho a usar los recursos disponibles para la salud, seguridad, y bienestar del público. Notablemente, el Congreso de EE. UU. determinó que en la sección 405(m)(2) de PROMESA, el Estado Libre Asociado no tenía la capacidad de proporcionar a sus ciudadanos servicios eficaces, lo cual según el criterio de la Junta de Supervisión justifica el uso del poder del Estado para financiar los servicios a sus ciudadanos, en lugar de pagos de deuda.

**2. SRE**

60

Antes de la aprobación de la Ley 106-2017 el 23 de agosto de 2017 ("Ley 106"),[75] SRE administraba un plan de beneficios definidos de costos compartidos y patronos múltiples y un plan híbrido de aportaciones definidas. Los beneficios entregados a los empleados participantes de SRE se establecían por ley. En su calidad de plan de costos compartidos, los activos del plan no estaban segregados legalmente y, por consiguiente, podían haber sido usados para pagar beneficios a los jubilados de cualquier patrono participante. Antes de las enmiendas hechas en el año 2013 por la Ley Núm. 3-2013 ("Ley 3-2013"), SRE consistía en una variedad de estructuras de beneficios. Miembros cuya participación inició previo al 1º de enero de 2000 participaron en un programa de beneficios definidos. Los miembros que iniciaron su participación antes del 1º de abril de 1990 ("Participantes Ley 447") tenían derecho a la estructura de beneficios más alta, mientras los que iniciaron su participación el 1º de abril de 1990 o posteriormente ("Participantes Ley 1") estaban sujetos a un periodo más prolongado de adquisición de derechos y un nivel reducido de beneficios, en conformidad con la Ley Núm. 1 del 16 de febrero de 1990 ("Ley 1 de 1990").

En 1999, se enmendó la Ley 447 para cerrar el programa de beneficios definidos para participantes nuevos y, prospectivamente, establecer una nueva estructura de beneficios similar a un plan de balances en efectivo (a esta nueva estructura de beneficios se le refiere como el "Sistema 2000"). Miembros que iniciaron su participación el 1º de enero de 2000 o posteriormente ("Participantes Sistema 2000") participaban únicamente en el sistema 2000. Antes de la enmienda hecha por la Ley 3-2013 (descrita a continuación) bajo la estructura de beneficios del Sistema 2000, un participante tenía derecho a recibir un pago único (o sea, a tanto alzado), el cual o bien se podía recibir en su totalidad o se podía utilizar para comprar una anualidad de un tercero, basado exclusivamente en los montos en efectivo contribuidos por dicho participante y las ganancias acreditadas a dicho monto en efectivo. Las cuentas de balances en efectivo de los participantes del Sistema 2000 no gozaban de ningún beneficio de Contribuciones Patronales. Las Contribuciones Patronales pagadas a cuenta de participantes del Sistema 2000 se usaron para reducir las obligaciones acumuladas de beneficios de pensiones no-financiados del SRE.

Sin embargo, el Sistema 2000 no fue establecido como un plan separado, y no existen cuentas segregadas para los Participantes del Sistema 2000. Las contribuciones recibidas de los Participantes Sistema 2000 y las Contribuciones Patronales realizadas a cuenta de Participantes Sistema 2000 fueron agrupadas en un fondo e invertidas por SRE, junto con los activos correspondientes a la estructura de beneficios definidos. Por consiguiente, los pagos futuros de beneficios bajo la estructura de beneficios definidos de la Ley 447 y Ley 1 de 1990 y la estructura de aportaciones definidas del Sistema 2000, según enmendada por la Ley 3-2013, eran pagaderas, y de hecho fueron pagadas, del mismo fondo de activos de SRE.

En abril del 2013, el Estado Libre Asociado aprobó la Ley 3-2013, como una reforma integral de SRE para abordar los crecientes déficits que amenazaban la viabilidad de SRE. Los aspectos más importantes de los cambios efectuados al SRE por la Ley 3-2013 fueron los siguientes: (i) en el caso de empleados que eran Participantes Ley 447 y Participantes Ley 1 (o sea, aquellos con derecho al plan de beneficios definidos, contratados previo al 1º de enero de 2000), todos los beneficios definidos devengados al 30 de junio, 2013 fueron congelados, y en adelante todos los beneficios futuros se devengarán bajo una fórmula de aportaciones definidas que serán pagadas en el momento de retiro por medio de una anualidad vitalicia similar a la del Sistema 2000; (ii) la edad de retiro para Participantes Ley 447 sube gradualmente de 58 a 61 años; (iii) la edad de retiro para participantes Sistema 2000 sube gradualmente de 60 a 65 años; (iv) la edad de retiro para empleados sube a los 67 años, con excepción de policías municipales y estatales, bomberos, y funcionarios penitenciarios nuevos, para quienes será 58 años; (v) la contribución del

---

[75] Antes de la aprobación de la Ley 106, la dirección de SRE correspondía a una Junta de Síndicos, que establecían políticas y supervisaban las operaciones de conformidad con la ley aplicable. La Ley 106 disolvió la Junta de Síndicos y creó una nueva Junta de Retiro, como se ve más adelante.

empleado aumentó del 8.275% al 10%; (vi) en el caso de los Participantes Sistema 2000, los beneficios de retiro ya no serán pagados en un solo pago (a tanto alzado) sino que serán pagados en forma de una anualidad vitalicia; (vii) con respecto a beneficios post-empleo, el bono de Navidad pagadero a pensionados actuales se reduce de $600 a $200 (y se elimina para pensionados futuros) y se elimina el bono de verano ($200); (viii) jubilados futuros no recibirán ningún otro beneficio post-empleo; y (ix) se modifican los beneficios de discapacitación y para supervivientes.

Como parte integral de la reforma de la Ley 3-2013, el Estado Libre Asociado reconoció que una aportación anual del patrono sería necesaria para mantener suficientes recursos en el sistema para poder satisfacer los pagos de beneficios en la medida que iban venciendo, y así mantener un balance mínimo de activos. Por lo tanto, la Ley Núm. 3-2013 estableció una Aportación Uniforme Adicional ("SRE-CUA") para SRE que se le requeriría al Estado Libre Asociado y los otros patronos participantes hacer anualmente. La SRE-CUA se estableció en $120 millones para el Año fiscal 2014, y para los Años fiscales del 2015 al 2033, sería el monto certificado por el actuario externo de SRE con por lo menos 120 días de antelación al comienzo de cada Año fiscal, como el monto necesario para evitar que los activos brutos proyectados de SRE en cualquier Año fiscal subsiguiente cayeran por debajo de $1,000 millones. Sin embargo, debido a la agudización de la crisis fiscal desde la aprobación de la Ley 3-2013, si bien ciertas corporaciones públicas y municipios efectuaron sus pagos SRE-CUA, el Estado Libre Asociado y otros patronos participantes no fueron capaces de pagar la mayoría de las SRE-CUA y como resultado, SRE proyectó que sus activos líquidos quedarían agotados.

El 23 de agosto del 2017, la Legislatura aprobó la Ley 106, de acuerdo con la cual el Estado Libre Asociado adoptó un sistema de pagar en la medida que se avanza (conocido como "PayGo", como abreviación del inglés de "pay-as-you-go") para el pago de beneficio de pensión a pensionados de los tres Sistemas de Retiro. La Ley 106 contempla que los tres Sistemas de Retiro transferirían sus activos líquidos restantes a una cuenta PayGo bajo la custodia del Departamento de Hacienda. El Estado Libre Asociado y otras instrumentalidades contribuirían al sistema PayGo en lugar de las previas contribuciones patronales estatutarias pagaderas a los Sistemas de Retiro para reembolsar pagos de pensiones realizados por el Estado Libre Asociado a los participantes jubilados en los Sistemas de Retiro. A las entidades legalmente separadas, cuyos empleados recibían pagos de pensiones (tales como los municipios) se les requirió reembolsar al Estado Libre Asociado los montos necesarios para satisfacer los pagos de beneficios de pensión a sus jubilados respectivos. El Presupuesto Certificado del Año fiscal 2021 para el Estado Libre Asociado incluye aproximadamente $2,610 millones para cubrir el gasto, de los cuales $2,055 millones se pagan con el presupuesto del Fondo General y $555 millones se pagan a partir de presupuestos de ingresos especiales financiados por reembolsos de las corporaciones públicas participantes y patronos municipales, de acuerdo con la Ley 106.

La Ley 106 también estableció un nuevo plan de aportaciones definidas para todo participante activo del SRE, así como para los Participantes Ley 160 (que se discuten a continuación). Por lo general, la contribución requerida del empleado a su cuenta de plan de aportaciones definidas es de 8.5%, y dichas contribuciones se han de mantener en cuentas individualmente segregadas. La Ley 106 establece medidas correctivas y sanciones penales si no se remiten al plan las correspondientes aportaciones de PayGo o las retenciones de las nóminas de los trabajadores sin causa justificada. En junio de 2020 se crearon las cuentas individuales de retiro estipuladas por la Ley 106, que permiten a los empleados dirigir las inversiones y gestionar sus aportaciones al plan.

La Ley 106 creó una Junta de Retiro de trece miembros para SRE, SRM y SRJ, compuesta de: (1) el Director Ejecutivo de AAFAF, (2) el Secretario de Hacienda, (3) el Director de la Oficina de Gerencia y Presupuesto (OGP), (4) el Director de la Oficina de Recursos Humanos y Transformación, (5) un maestro activo del Departamento de Educación nombrado por el Gobernador, (6) un representante de las

corporaciones públicas nombrado por el Gobernador, (7) un representante de la Rama Judicial nombrado por el Presidente de la Corte Suprema, (8) el Presidente de la Federación de Alcaldes, (9) el Presidente de la Asociación de Alcaldes, (10) un jubilado del SRM nombrado por el Presidente de la Federación de Alcaldes, (11) un jubilado del SRE nombrado por el Gobernador, (12) un representante de los oficiales de policía nombrado por el Gobernador, y (13) un representante del interés público nombrado por el Gobernador. Todas las facultades de las juntas de síndicos del SRE, SRT y SRJ fueron transferidos a la nueva Junta de Retiro y las juntas independientes fueron disueltas.

En el año 2013, el Estado Libre Asociado trato de reformar al SRM y SRJ de forma similar al SRE, por medio de dos estatutos separados. Antes del 2013, el SRM consistía en un plan de beneficios definidos. La Ley 160-2013 (la "Ley 160"), sin embargo, pretendió congelar el sistema de beneficios definidos de SRM y sustituirlo por un plan de aportaciones definidas. La Corte Suprema de Puerto Rico rechazó parte de la Ley 160 y, como resultado, la SRM administra dos sistemas de beneficios: (i) un plan de beneficios definidos para empleados activos contratados al 31 de julio de 2014 o antes, y (ii) un plan híbrido para empleados contratados al 1º de agosto de 2014 o antes ("Participantes Ley 160"), los cuales posteriormente fueron transferidos al plan de aportaciones definidas bajo la Ley 106.

La Ley 162-2013 estableció un nuevo sistema de retiro híbrido (el "Programa Híbrido") para jueces nombrados en o a partir del 1 de julio de 2014. El Programa Híbrido incluye beneficios definidos y componentes de aportaciones definidas. El componente de aportación definida se estructuró de acuerdo con las reformas del SRE y del SRM y el beneficio se basa en el balance de las aportaciones acreditadas en la cuenta del Programa Híbrido del participante.

Por consiguiente, no se han congelado los beneficios de pensiones adscritos a los participantes de beneficios definidos en los planes de pensión SRM y SRJ previos al 2014, tal y como se indica arriba. En conformidad con el Plan, como se describe a continuación, todos los beneficios restantes que siguen acumulándose bajo SRM y SRJ quedarán congelados, y los participantes serán inscritos en el plan de aportaciones definidas bajo la Ley 106, o un plan similar de contribución definidas.

En mayo de 2019, el Estado Libre Asociado aprobó la Ley 29-2019, el cual, entre otras cosas, convirtió al Estado Libre Asociado en el responsable exclusivo por los pagos PayGo a jubilados municipales y eliminó la obligación de los municipios de reembolsar al Estado Libre Asociado. El 3 de julio de 2019, la Junta de Supervisión presentó una acción contra el Gobernador para bloquear la ejecución o invalidar la Ley 29, fundamentado en varios motivos, incluyendo que el Estado Libre Asociado había violado las secciones 108(a)(2), 204, y 207 de PROMESA.[76] Tras un proceso judicial iniciado por la Junta de Supervisión en el que se impugnaba la validez de la Ley 29-2019 en virtud de la ley PROMESA, el tribunal del Título III dictaminó que la Ley 29-2019 violaba PROMESA y anuló la ley, por lo que se restableció la obligación de los municipios de cubrir los pagos de PayGo y de asistencia sanitaria de sus empleados. Las consecuencias de esta decisión permitieron al Estado Libre Asociado solicitar el reembolso de los pagos anteriores realizados en el marco de la Ley 29-2019 y facultaron al Estado Libre Asociado para actuar en caso de que no se recibieran estas aportaciones (por ejemplo, para retener los pagos por servicios públicos, asignaciones). La fecha de entrada en vigencia de la decisión del tribunal se retrasó hasta el 7 de mayo de 2020 para permitir a las partes debatir posibles soluciones a los desafíos financieros a los que se enfrentan los municipios, especialmente a la luz de la pandemia de COVID-19.

En julio de 2019, el Estado Libre Asociado aprobó la Ley 71-2019, el cual otorgó el beneficio de Seguro Social federal a ciertos miembros del Negociado de la Policía de Puerto Rico. Esta ley reduce la

---

[76] Consulte la sección V.C.3h (iv) de esta Declaración de Divulgación para ver una discusión de la acción de la Junta de Supervisión para impugnar la Ley 29-2019.

aportación del empleado a su cuenta de aportación definida creada bajo la Ley 106-2017 del 8.5% al 2.3%. Esta reducción del 6.2% es la aportación mínima que el empleado debe hacer para tener derecho al Seguro Social. En casos de aquellos miembros del Negociado de la Policía de Puerto Rico a los cuales les quedan menos de diez (10) años para reunir los requisitos para el retiro obligatorio, en conformidad con la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, la reducción no será aplicable opcionalmente si no han declarado su deseo de valerse del retiro del término que se dispone para el mismo. Las disposiciones de la Ley 71-2019 se aplicaron plenamente a partir de enero de 2020.

En agosto de 2020, el Estado Libre Asociado aprobó la Ley 80-2020 que otorga un programa de retiro incentivado para ciertos participantes del SRE, la Ley 81-2020 que otorga beneficios mejorados a los miembros del Sistema de Rango de la Policía de Puerto Rico, Negociado del Cuerpo de Bomberos, del Cuerpo de Oficiales de Custodia de Puerto Rico y a los técnicos de emergencias médicas del Negociado del Cuerpo de Emergencias Médicas y del Sistema de Emergencias Médicas Municipal, y la Ley 82-2020 que otorga crédito a los beneficios de retiro derivados de los balances de licencia por enfermedad no utilizados para los participantes del Sistema de Retiro de Maestros. La Junta de Supervisión ha pedido al Gobierno que demore la aplicación de cada una de estas leyes hasta que se haya realizado un estudio completo y preciso que garantice que el Estado Libre Asociado ha identificado una fuente de ahorro significativa para pagar los costos de los beneficios previstos en las leyes. El 20 de noviembre de 2020, el Estado Libre Asociado notificó a la Junta de Supervisión que estas leyes no se aplicarían hasta que se llegara a un acuerdo con la Junta de Supervisión sobre la viabilidad financiera de cada ley.

SRE tiene una deuda de aproximadamente $3,170 millones en bonos, que, según los bonistas de SRE, están garantizados por ciertos activos en SRE y contribuciones del empleado a SRE. Si bien la Ley 106 puso fin a las contribuciones al SRE, los bonistas sostuvieron que los nuevos pagos de PayGo son el equivalente de contribuciones patronales, y los reclaman como garantía. Sin embargo, el 27 de junio de 2019, el Tribunal del Título III falló que los bonistas SRE no tienen una garantía prendaria perfeccionada en ninguna aportación patronal post-petición, debido al Código de Quiebra, sección 552, y el Primer Circuito lo confirmó el 30 de enero de 2020[77]. Ese fallo se convirtió en definitivo e inapelable después de que el Tribunal Supremo de los Estados Unidos denegara la solicitud de los bonistas SRE de revisar la opinión del Primer Circuito.

Previamente, el Tribunal del Título III había dictaminado que los bonistas SRE jamás habían perfeccionado correctamente ninguno de sus derechos prendarios; esto fue anulado por el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. Los bonistas SRE también han afirmado reclamaciones de confiscación indebida contra el Estado Libre Asociado y el Gobierno de EE.UU., por supuestamente haberles despojado inconstitucionalmente de sus contribuciones patronales originales. El Tribunal de Reclamaciones Federales ha dictaminado que los bonistas SRE carecen de cualquier reclamación de confiscación indebida contra el Gobierno de EE.UU.; las reclamaciones de confiscación indebida contra el Estado Libre Asociado no se han resuelto de forma definitiva a la fecha de la presente.

### 3. Autoridad de Edificios Públicos (AEP)

La AEP es una corporación pública creada por la Ley Núm. 56 el 19 de junio de 1958 (según enmendada, la "Ley para Crear la Autoridad de Edificios Públicos", la Ley AEP). La AEP fue creada para diseñar, construir, administrar, y proporcionar mantenimiento a edificios de oficinas, tribunales, bodegas,

---

[77] *Opinión y Orden que conceden la Moción del Demandante para Sentencia Sumaria en cuanto a la Causa III y las Reconvenciones II y III, y que deniegan la Moción de los Demandados para Sentencia Sumaria,* del 27 de junio de 2019 [Caso Núm. 17-03566, ECF Núm. 251], 385 F. Sup. 3d 138 (D.P.R. 2019), *confirmado en el caso Junta de Supervisión y Administración Financiera para P.R.*, 948 F.3d 457 (1er Cir. 2020).

escuelas, centros de salud, centros de bienestar, tiendas, instalaciones relacionadas arrendadas al Estado Libre Asociado o a cualquier de sus departamentos, agencias, instrumentalidades, corporaciones públicas y municipios. La renta anual para cada edifico se basa sobre los montos requeridos por la AEP para cubrir el pago de:

1. Capital, intereses, y otros requerimientos de amortización de las notas y bonos emitidos para financiar los edificios.

2. Gastos operativos y de mantenimiento de los edificios, incluyendo una participación en proporción razonable de los gastos administrativos, excluyendo depreciación; y

3. Costos para reemplazar equipos y reparaciones extraordinarias.

Se hace referencia al Componente (1) como "Rentas de amortización de la deuda" con respecto a arrendamientos aplicables entre AEP y el ELA, y se encuentra ligado a los pagos de capital e intereses adeudados sobre los Bonos de AEP. Los componentes (2) y (3), indicados arriba, están sujetos a escalonamiento para permitir que la AEP recupere costos incurridos. Los montos debidos por departamentos y agencias oficiales del Estado Libre Asociado pueden estar sujetas a revisiones y/o ajustes periódicos en base a la disponibilidad de fondos a nivel del Estado Libre Asociado.

La ley que estableció la AEP dispone que la fe y crédito del Estado Libre Asociado sirven para garantizar el pago de alquiler bajo cualquier contrato de arriendo celebrado en conformidad con la Ley de AEP con cualquier departamento del Estado Libre Asociado. La Ley AEP también dispone que el Departamento de Hacienda del Estado Libre Asociado de Puerto Rico (el "Departamento de Hacienda") hará anticipos a la AEP para cualquier porción no pagada de rentas pagaderas a la AEP por cualesquiera agencias o instrumentalidades del Estado Libre Asociado que hubiesen celebrado contratos de arriendo con la AEP. Dichos anticipos se contabilizan como una reducción de cuentas por cobrar, ya que la responsabilidad de reembolsar le corresponde a la agencia arrendataria, en conformidad con la ley AEP.

A la AEP se le otorgaron facultades amplias bajo la Ley AEP, incluyendo el poder de elaborar y celebrar contratos; adquirir propiedades (incluso mediante expropiaciones), preparar planes, proyectos, y estimados de costos para la construcción, mejoramiento, o reparación de cualquier propiedad o instalación; contratar con departamentos, agencias, instrumentalidades, corporaciones públicas u oficiales, o con cualquier persona o entidad privada con respecto a la administración de cualquier propiedad o instalación de la AEP; y tomar préstamos de dinero y emitir bonos.

La AEP es gobernada por una junta de siete miembros, a saber: el Secretario del Departamento de Transportación y Obras Públicas ("DTOP"), el Secretario del Departamento de Educación del Estado Libre Asociado, el Director Ejecutivo de la AAFAF y cuatro miembros designados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado, con plazos escalonados de 6 años. En enero de 2021, Andrés Rivera Martínez fue designado por el gobernador Pierluisi como Director Ejecutivo de la AEP.[78]

La AEP ha construido más de 200 edificios de oficinas, incluyendo comisarías, tribunales, e instalaciones de estacionamiento relacionados, con aproximadamente 6.8 millones de pies cuadrados de espacio arrendable para ser usado y arrendado por diversos departamentos, agencias, e instrumentalidades del Estado Libre Asociado, entre otros.

---

[78] http://www.aep.gobierno.pr/det_content.asp?cn_id=67

AEP ha construido 376 edificios escolares con aproximadamente 20.3 millones de pies cuadrados de espacio arrendable. Todo el espacio que forma parte del programa de edificios escolares se arrienda al Departamento de Educación. El costo del programa de construcción de edificios escolares supera los $2,500 millones. El financiamiento para la construcción fue aportado principalmente por AEP por medio de la emisión de Bonos de Instalaciones de Educación Pública y Salud bajo la Resolución de Bonos de 1978, así como la emisión de Bonos de Instalaciones del Gobierno bajo la Resolución de Bonos de 1995. Se han programado planes adicionales de mejoras y construcción de escuelas.

La AEP también ha construido 18 instalaciones de salud, con aproximadamente 1.5 millones de pies cuadrados de espacio arrendable, arrendados al Departamento de Salud. La construcción de las instalaciones de salud hasta la fecha ha costado aproximadamente $203 millones, aportado principalmente por la AEP mediante la emisión de bonos. Junto con el Departamento de Corrección y Rehabilitación (el "Departamento de Corrección"), la AEP inició un programa en 1994 para proveer la construcción, operación y mantenimiento de instalaciones correccionales a ser arrendados al Departamento de Corrección por AEP. AEP construyó ocho instalaciones correccionales con aproximadamente 1.7 millones de pies cuadrados de espacio arrendable a un costo de aproximadamente $287 millones. Las instalaciones son operadas por el Departamento de Corrección.

La AEP también ha construido oficinas de edificios, escuelas, e instalaciones de salud financiados por subvenciones federales y asignaciones del Estado Libre Asociado. AEP también está habilitado para realizar obras de construcción de parte o en calidad de agente de las otras agencias públicas del Estado Libre Asociado.

Para febrero de 2017, la AEP tenía un monto acumulado de capital de bonos en circulación de aproximadamente $4,000 millones, los cuales son garantizados por el Estado Libre Asociado. Los Bonos AEP están sujetos a varias reclamaciones pendientes de resolución bajo el Plan. En conformidad con la Ley AEP y las resoluciones que rigen las emisiones de Bonos AEP, los Bonos AEP se pagarían de los pagos de "renta" bajo los arriendos (y algunos subarriendos) de la AEP a arrendatarios (los "Arriendos AEP"), y se requiere que dichas "rentas" sean suficientes, en lo agregado, para pagar el capital y los intereses de los Bonos AEP cuando maduran. Sin embargo, la Junta de Supervisión ha alegado que los Arriendos de la AEP no son arriendos genuinos y que las obligaciones supuestamente debidas bajo los mismos son meramente obligaciones generales mal caracterizadas del Estado Libre Asociado. *Ver Demanda* [Proc. Cont. Núm. 18-00149, ECF Núm. 1] (la "Demanda sobre Arriendo AEP"). Los bonistas de AEP han disputado los argumentos presentados en la Demanda sobre Arriendo AEP. *Ver, p. ej., Respuestas a la demanda* [Proc. Cont. Núm. 18-000149, ECF Núm. 56-60, 67]. Si se confirma el Plan, la Junta de Supervisión considera que no serán necesarios litigios adicionales que involucren cualquier disputa con respecto a la validez, prioridad o estado garantizado de las reclamaciones de los BAN GO/AEP/AFI, dado que el Plan tendrá el efecto de una transacción global sobre cualquier disputa de esta índole que sea vinculante sobre todas las partes con interés sobre los Casos de Título III.

**B.     Obligaciones Financieras de los Deudores a la Fecha de Petición.**

**1.     Resoluciones de Bonos y Bonos Pendientes**

**a)     Deuda Pública del Estado Libre Asociado**

La Constitución del ELA incluye disposiciones específicas respecto a la "deuda pública"[79], que incluye (i) Bonos GO y notas emitidas por el Estado Libre Asociado y respaldados por la fe y crédito y

---

[79] A la "Deuda Pública" también se le refiere en la presente como "Obligaciones Generales."

poder impositivo del Estado Libre Asociado y (ii) bonos y notas emitidos por las instrumentalidades públicas del Estado Libre Asociado y garantizados por la fe y crédito y poder impositivo del Estado Libre Asociado (Los "Bonos Garantizados por el Estado Libre Asociado").

La Sección 8 del Artículo VI de la Constitución del ELA dispone que "se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley". Si el Estado Libre Asociado no tiene fondos suficientes para pagar todas las asignaciones aprobadas para un Año fiscal determinado, la Constitución del ELA requiere que los recursos disponibles del Estado Libre Asociado se utilicen para pagar la "deuda pública" antes de ser usados para otros propósitos. P.R. Const. art. VI, § 8. Adicionalmente, la Constitución del ELA habilita al tenedor de bonos o notas que evidencian una "deuda pública" a demandar al Secretario de Hacienda para requerir la aplicación de los recursos disponibles del Estado Libre Asociado para el pago del capital y los intereses sobre dicha deuda pública a su vencimiento. P.R. Const. art. VI, § 2. La Constitución del ELA también dispone un límite sobre la "deuda pública". El Estado Libre Asociado no puede emitir deuda GO si el capital y los intereses sobre toda la mencionada deuda pagadera en determinado Año fiscal, junto con cualquier monto pagado por el Estado Libre Asociado en el Año fiscal previo por motivo de bonos o notas garantizadas por el Estado Libre Asociado,[80] supera el 15% del promedio anual de las rentas internas del Estado Libre Asociado en los dos años fiscales precedentes (las rentas internas constan principalmente del impuesto sobre el ingreso, impuestos sobre bienes, arbitrios y la parte de los impuestos sobre ventas y uso no pignorados a COFINA). P.R. Const. art. VI, § 2.

***Dinero Asignado Históricamente Condicionalmente Sujeto a Retención.*** Ciertos arbitrios y otros ingresos, e ingresos de tarifas del Estado Libre Asociado han sido históricamente asignados de manera condicional a ciertas corporaciones públicas u otras instrumentalidades sujeto a la disposición incluida en la sección 8 del Artículo VI de la Constitución del ELA,[81] y pueden ser sujetos al poder del Estado del Estado Libre Asociado. Este dinero asignado históricamente de manera condicional, que, están sujetos a la retención por el Estado Libre Asociado bajo los términos de los documentos y estatutos aplicables que rigen los bonos, incluyen (i) una porción de la contribución indirecta sobre embarques de ron afuera de la Isla, cobrada por el gobierno de Estados Unidos y transferida al Departamento de Hacienda de Puerto Rico, y una porción de la contribución al consumo sobre productos de petróleo, ambos históricamente asignados de manera condicional por el derecho del Estado Libre Asociado a AFI; (ii) tasas sobre licencias de vehículos, arbitrios de gasolina, gasóleo y diésel, y una porción de la contribución al consumo sobre cigarrillos, las cuales por ley del Estado Libre Asociado se asignaron históricamente de manera condicional al ACT;[82] (iii) una porción de la contribución al consumo sobre cigarrillos, la cual por ley del Estado Libre Asociado se asignó históricamente de manera condicional a la AMA y (iv) una porción de las contribuciones sobre habitaciones de hotel, que el ELA asignó históricamente de manera condicional al ADCC. Desde el año 2015, el Estado Libre Asociado ha venido reteniendo dicho dinero ingresos en conformidad con sus

---

[80] La Sección 2 del Artículo VI no limita el monto de la deuda que el Estado Libre Asociado puede garantizar, siempre y cuando no se haya excedido la limitación sobe la deuda del 15%. Los pagos anuales de la amortización de la deuda en bonos garantizados por el Estado Libre Asociado no se incluyen en el cálculo de la limitación del 15% de la deuda, a menos que se le requiera al Estado Libre Asociado hacer pagos bajo su garantía. Ciertos bonistas han aseverado que el pago de alquileres por parte del ELA a AEP conforme a los Arriendos AEP son pagos por cuenta de obligaciones garantizadas por el ELA y por lo tanto deben contarse bajo el límite de la deuda. Consulte *Objeción Ómnibus de la Coalición de Deuda Constitucional Legítima, de conformidad con la Sección 502 del Código de Quiebras y la Regla 3007 de Quiebras, a Reclamaciones Presentadas o Aseveradas por Tenedores de Ciertos Bonos Emitidos o Garantizados por el ELA*. [ECF Núm. 9730].

[81] Consulte Informe sobre Información Financiera y Datos Operativos, p.178, Estado Libre Asociado (18 de diciembre de 2016).

[82] Una porción de las tasas para licencias de vehículos se entrega de AFI a ACT, a tenor con el Acuerdo de Asistencia Económica, fechado el 1° de marzo de 2015, entre ACT y AFI.

facultades constitucionales. Los bonistas han impugnado la retención y aplicación de ingresos históricamente de manera condicional para servicios esenciales.[83]

La sección 202 de PROMESA otorga a la Junta de Supervisión facultades sobre el presupuesto. La Junta de Supervisión considera que la sección 4 de PROMESA, entre otras disposiciones, tiene prioridad sobre las leyes del ELA que no sean congruentes con PROMESA, lo que incluye leyes aprobadas con anterioridad a PROMESA que asignarían históricamente de manera condicional cierto dinero del ELA a sus instrumentalidades según resulte apropiado, en los Años fiscales donde el Estado Libre Asociado se encuentre sujeto al presupuesto certificado de la Junta de Supervisión. El dinero asignado históricamente de manera condicional era retenido y seguirá siendo retenido por el ELA durante los casos del Título III debido a que los presupuestos y planes fiscales certificados no asignaban ese dinero a las instrumentalidades respectivas, y PROMESA tenía prioridad sobre las leyes existentes que asignan de manera condicional dicho dinero a las respectivas instrumentalidades. Además, la Junta de Supervisión considera que las leyes existentes eran aprobadas por legislaturas anteriores y no eran vinculantes para la legislatura actual, independientemente de la prioridad de las leyes.[84]

**Resolución sobre Bonos.** Los Bonos GO son emitidos en conformidad con una autorización legislativa específica o la Ley Núm. 33 del 7 de diciembre de 1942 (según enmendada, "Ley 33"), y en conformidad con resoluciones que autorizan la emisión de dichos bonos.

**Bonos en Circulación y otras Obligaciones.[85]** Los Bonos GO actualmente en circulación[86] fueron emitidos entre 1998 y 2014, con tasas de interés de entre 1.86% y 8.00%, y vencimiento el 1° de julio de 2016 y el 1° de julio de 2041. A la fecha de la Petición del Estado Libre Asociado, el Estado Libre Asociado tenía en circulación aproximadamente $12,570 millones en montos acumulados de capital[87] en sus Bonos

---

[83] Consulte p. ej., sección III.B.1 y V.E.4. para más información.

[84] Los acreedores de ACT, ADCC y AFI rechazan esta posición. Consulte la sección V.F.5 de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[85] Los montos de bonos en circulación se basan sobre la mejor información disponible al público y pueden ser montos aproximados.

[86] Los Bonos GO del Estado Libre Asociado en circulación son los siguientes: (i) Bonos de Refinanciamiento de Mejoras Públicas, Serie 1998, (ii) Bonos para Mejoras Públicas de 1998, (iii) Bonos para Mejoras Públicas de 1999, (iv) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2000, (v) Bonos para Mejoras Públicas de 2001, Serie A, (vi) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2001, (vii) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2002 A, (viii) Bonos para Mejoras Públicas de 2002, Serie A, (ix) Bonos para Mejoras Públicas de 2003, Serie A, (x) Bonos de Refinanciamiento de Mejoras Públicas, Serie de 2003 A, (xi) Bonos para Mejoras Públicas de 2003, Serie C-7, (xii) Bonos para Mejoras Públicas de 2004, Serie A, (xiii) Bonos para Mejoras Públicas de 2005, Serie A, (xiv) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2006 A, (xv) Bonos para Mejoras Públicas de 2006, Serie A, (xvi) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2006 B, (xvii) Bonos para Mejoras Públicas de 2006, Serie B, (xviii) Bonos para Mejoras Públicas de 2007, Serie A, (xix) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A, (xx) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A-4, (xxi) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2008 C, (xxii) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2008 A, (xxiii) Bonos para Mejoras Públicas de 2008, Serie A, (xxiv) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009 A, (xxv) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009 B, (xxvi) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009 C, (xxvii) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011 A, (xxviii) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011 C, (xxix) Bonos para Mejoras Públicas, Serie 2011, (xxx) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011 D, (xxxi) Bonos para Mejoras Públicas, Serie 2011E (xxviii) Bonos para Mejoras Públicas, Serie 2011 C, (xxix) Bonos para Mejoras Públicas, Serie 2011, (xxx) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011 D, (xxxi) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011 E, (xxxii) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012 B, (xxxiii) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012 A, y (xxxiv) Bonos de Refinanciamiento de Mejoras Públicas, Serie 2014 A.

[87] Para bonos de apreciación de capital, este monto incluye el valor devengado a la fecha de la Petición del Estado Libre Asociado.

GO. Aproximadamente $1,647,320,000.00 de los Bonos GO están asegurados por Assured Guaranty Corp., Assured Guaranty Municipal Corp. y/o sus filiales (colectivamente, "Assured"), $840,228,793.15 están asegurados por National, $249,090,000 están asegurados por Financial Guaranty Insurance Co. ("FGIC"), $24,960,000 están asegurados por Ambac Assurance Corp. ("Ambac"), y $25,585,000.00 están asegurados por Syncora Guarantee Inc. ("Syncora")[88]. Se adjunta una relación de los Bonos GO en circulación como la Apéndice J.

A la fecha de la Petición del Estado Libre Asociado, el Estado Libre Asociado tenía en circulación aproximadamente $169.4 millones en montos de capital acumulado de préstamos del BGF, que posteriormente fueron transferidos a la Autoridad de Recuperación de Deuda para el Banco Gubernamental de Fomento (BGF) los cuales subsiguientemente fueron transferidos a la Autoridad de Recuperación de la Deuda para el Banco Gubernamental de Fomento (la "Autoridad de Recuperación de la Deuda del BGF", a tenor con la Modificación Calificadora de la BGF (definida a continuación). Estos préstamos fueron emitidos por el Estado Libre Asociado en virtud de legislación autorizando al Estado Libre Asociado a emitir dicha deuda y comprometer su fe y crédito y poder impositivo para el pago de la misma. Estos préstamos tienen intereses a una tasa variable equivalente al U.S. Prime Rate, más 150 puntos básicos, sujetos a un piso del 6% y un límite legal sobre la tasa de intereses del 12%, y maduran el 30 de junio de los años 2041, 2042 y 2043. Para un resumen de la Modificación Calificadora del BGF bajo el Titulo VI de PROMESA, véase la sección V.J.1.g) de esta Declaración de Divulgación.

El 26 de diciembre de 2013, la Administración de Servicios Generales del Estado Libre Asociado ("ASG") celebró un contrato de crédito con Scotiabank de Puerto Rico ("Scotiabank"), mediante la cual Scotiabank extendió a ASG un crédito a plazo no rotativo hasta un máximo de $33,270,451 para la compra de cuatro helicópteros a ser usados por el Departamento de Policía de Puerto Rico. Este es un crédito no garantizado, con intereses al 3.02% y venció el 15 de julio de 2020.

En base a los últimos informes públicamente disponibles, a la fecha de la Petición del Estado Libre Asociado, el Estado Libre Asociado tenía en circulación los siguientes montos aproximados de Obligaciones Garantizadas del Estado Libre Asociado: (i) $4,000 millones en Bonos AEP, (ii) $1,260 millones en Bonos Subordinados AAA[89], (iii) $227 millones en Bonos de la Autoridad del Puerto de las Américas ("APLA"), y (iv) $78 millones en BAN de AFI.

En conformidad con la Orden Ejecutiva 2016-30 emitida bajo la Ley Núm. 21 de 2016, conocida como la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico (según enmendada, la "Ley de Moratoria"), el Gobernador declaró que el Estado Libre Asociado se hallaba en un estado de emergencia, suspendió pagos de intereses y capital sobre todos los Bonos GO del Estado Libre Asociado, suspendió pagos por el Estado Libre Asociado de Obligaciones Garantizadas del Estado Libre Asociado, y suspendió toda acción, incluyendo demandas contra el Secretario de Hacienda, para cobrar dichos bonos y notas. El 29 de enero de 2017, el Gobernador firmó la Ley Núm. 5 de 2017, conocida como la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico (según enmendada, la "Ley 5-2017"), la cual derogó ciertas disposiciones de la Ley de Moratoria, y autorizó medidas de emergencia adicionales. Sin embargo, en conformidad con la Ley 5-2017, las órdenes ejecutivas emitidas bajo la Ley de Moratoria seguirían en vigencia hasta que sean enmendadas, revocadas, o sustituidas. Estaba estipulado que el periodo de emergencia bajo la Ley 5-2017 expiraría el 31 de diciembre de 2019. El 8 de enero de 2020, el 30 de

---

[88] Los importes incluyen los bonos asegurados a tenor con una póliza de seguro del mercado secundario, si los hubiera.

[89] Los Bonos Subordinados AAA fueron refinanciados en su totalidad por AAA en diciembre de 2020 y ya no están en circulación.

junio de 2020 y el 17 de diciembre de 2020, el Gobernador Vázquez Garced emitió órdenes ejecutivas que prorrogan el período de emergencia por otros seis períodos de un mes. Actualmente, dicho período está programado para expirar el 30 de junio de 2021. Ciertos poderes adicionales otorgados al Gobernador por medio de la Ley 5-2017 incluyen la facultad de (i) ejercer poderes de síndico para rectificar la emergencia financiera, (ii) ejercer control supervisor general sobre las funciones y actividades de todas las entidades gubernamentales dentro del Poder Ejecutivo, y (iii) emitir órdenes para implementar y obligar cumplimiento con la Ley 5-2017.

Desde el 1º de julio de 2016, el Estado Libre Asociado no ha pagado intereses ni capital sobre sus Bonos GO u Obligaciones Garantizadas por el Estado Libre Asociado.[90]

*Litigación Relacionada con Bonos GO.*[91]

(i) *Aurelius Capital Master, Ltd., y otros contra Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 17-00189[92]

El 29 de junio de 2017, ciertos bonistas de GO y bonos emitidos por determinadas instrumentalidades del Estado Libre Asociado que son presuntamente garantizadas por el Estado Libre Asociado, presentaron una demanda en el Tribunal del Título III contra el Estado Libre Asociado y la Junta de Supervisión pidiendo interdictos [Proc. Cont. Núm. 17-00189, ECF Núm. 1]. Entre otras cosas, la demanda solicitó declaraciones de que (i) ciertos ingresos de impuestos inmobiliarios y otro dinero históricamente asignado de manera condicional a ciertas instrumentalidades (colectivamente el "Dinero") se pueden aplicar únicamente para pagar la deuda pública; (ii) el Estado Libre Asociado no tiene un derecho de usufructo o un interés equitativo en el Dinero, y los Demandantes tienen gravámenes estatutarios sobre el Dinero; (iii) Los alegados gravámenes de los Demandantes sobre el dinero históricamente asignado de manera condicional son gravámenes sobre ingresos especiales; (iv) el uso del Dinero por el Estado Libre Asociado para cualquier otro propósito que no sea el pago de la deuda pública es una expropiación inconstitucional; y (v) el Dinero se deben segregar y no pueden ser usados para ningún propósito que no sea el de pagar la deuda pública. Los Demandantes también solicitaron un interdicto requiriendo que los Demandados segregaran y preservaran el Dinero.

Los Demandados presentaron una moción de desestimación de la demanda el 21 de agosto de 2017 [Proc. Cont. Núm. 17-00189, ECF Núm. 35]. Los Demandados alegaron principalmente que las reclamaciones quedaban excluidas por la sección 305 de PROMESA, que prohíbe que el Tribunal del Título III interfiera en los bienes del Estado Libre Asociado sin el consentimiento de la Junta de Supervisión. Los Demandados también alegaron que: (i) ciertas reclamaciones quedaban excluidas por las secciones 4 y 106(e) de PROMESA; (ii) los Demandantes no tienen derechos de propiedad ni gravámenes sobre el Dinero; y (iii) la Constitución del ELA no crea ningún derecho de propiedad recuperable bajo su esquema de prioridades para amortizar la deuda[93]. El 30 de enero de 2018, el Tribunal del Título III admitió la moción de los Demandados y desestimó la acción, sosteniendo que (i) ciertas reclamaciones solicitaban opiniones de asesoría que eran inadmisibles por ser vagas o porque no resolverían ninguna controversia concreta

---

[90] En base a información públicamente disponible, ciertas emisiones fueron pagadas de los fondos de reserva del Estado Libre Asociado.

[91] Si se confirma el Plan, la Junta de Supervisión considera que no corresponde el litigio de disputas adicionales con respecto a la validez, prioridad o estado garantizado de las reclamaciones de BAN GO/AEP/AFI dado que el Plan funcionará como una transacción global de cualquier disputa de ese tipo que sea vinculante para todas las partes con interés en los casos de Título III.

[92] La opinión se puede encontrar en 918 F.3d 638 (D.P.R. 2019).

[93] La opinión se puede encontrar en 582 B.R. 579 (D.P.R. 2018).

actual; (ii) la reclamación en base a la Clausula sobre Expropiaciones (en inglés, "Takings Clause", refiriéndose a la Quinta Enmienda de la Constitución de los EE.UU.) no estaba madura, ya que el Estado Libre Asociado aún no había propuesto la forma en que se compensaría a los Demandantes por su garantía alegada en un plan de ajuste, y (iii) otras reclamaciones quedaban prohibidas por la sección 305 de PROMESA ya que habrían interferido en el uso del Estado Libre Asociado de su propiedad, ingresos o poderes gubernamentales sin el consentimiento de la Junta de Supervisión [Proc. Cont. Núm. 17-00189, ECF Núm. 124]. El 1 de febrero de 2018, los Demandantes apelaron esta decisión del Tribunal del Título III ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, inscrito como el Caso Núm. 18-1108. El 26 de marzo de 2019, el Primer Circuito emitió una opinión escrita confirmando la desestimación de la demanda.[94]

(ii) Impugnaciones de la Validez de los Bonos GO y las garantías del ELA

El 14 de enero de 2019, la Junta de Supervisión, en su Comité de Reclamaciones Especiales, y conjuntamente con el Comité Oficial de Acreedores sin Garantía (el "CANA"),[95] opuso una excepción ómnibus a más de $6,000 millones de reclamaciones afirmadas por determinados Bonistas GO [ECF Núm. 4784]. La excepción ómnibus alegó que se deberían desestimar las reclamaciones de los tenedores de emisiones de Bonos GO del 2012 y 2014, ya que dichas emisiones violaban el límite constitucional sobre la deuda del Estado Libre Asociado.[96] Como consecuencia, el CANA y otras partes presentaron objeciones a reclamaciones adicionales relacionadas con los bonos GO y AEP y otros bonos garantizados por el ELA, sobre la base de teorías legales similares. Para proveer el debido proceso a todos los tenedores supuestos de los Bonos GO, el CANA y la Junta de Supervisión presentaron una moción, que fue estimada por el Tribunal, para establecer procedimientos con respecto a su excepción ómnibus, que el Tribunal del Título III concedió [ECF Núm. 5143]. La Junta de Supervisión y el CANA posteriormente incorporaron litigación en ocho procedimientos adversarios contra aproximadamente 450 supuestos tenedores beneficiarios de los bonos identificados como seudónimos y aproximadamente 120 bancos divulgados como tenedores de registros, pretendiendo expandir el número de emisiones de bonos y CUSI que se alegaba eran inválidos, y pretendiendo rescatar capital y pagos de intereses con respecto a los bonos impugnados. El 24 de julio de 2019, el Tribunal dictó una *Orden con respecto al período de paralización y mediación obligatoria* [ECF Núm. 8244] (la "Orden de Paralización")[97], que, entre otras cosas, paralizaba el litigio hasta el 30 de noviembre de 2019, y fue posteriormente prorrogada hasta el 11 de marzo de 2020. No obstante la paralización, el 19 de diciembre de 2019, el Tribunal del Título III dictó una orden provisoria de gestión de caso [ECF Núm. 9619] (la "Orden provisoria de gestión de caso GO/AEP) que permitió que ciertos procedimientos vinculados con los Bonos GO siguieran adelante, incluso ciertas cuestiones presentadas por esta objeción. A tenor con dicha orden, el 5 de febrero de 2020, Assured, el Grupo Ad Hoc de Tenedores de Deuda Constitucional, el Grupo Ad Hoc de Tenedores de Bonos de Obligaciones Generales y los Fondos de Invesco presentaron una moción de desestimación [ECF Núm. 10702], y Assured, el Grupo Ad Hoc de Tenedores de Deuda Constitucional y el Grupo Ad Hoc de Tenedores de Bonos de Obligaciones Generales

---

[94] *Assured Guaranty Corp. v. Fin. Overnight & Mgmt. Bd. for P.R. (In re Fin. Overnight & Mgmt. Bd. for P.R.)*, 919 F.3d 121, 124 (1er Cir. 2019).

[95] El 15 de junio de 2017, el Síndico de los EE.UU. designó al CANA en todos los casos Título III con excepción de COFINA. *Nombramiento del Comité Oficial de Jubilados en el Estado Libre Asociado de Puerto Rico* [ECF Núm. 338].

[96] Por ejemplo, el 21 de mayo de 2019, el CANA opuso la excepción *Objeción Ómnibus del Comité Oficial de Acreedores No Garantizados, en conformidad con el Código de Quiebras Sección 502 y Regla de Quiebras 3007, contra Reclamaciones Registradas o Afirmadas por Tenedores de Determinados Bonos de Obligación General 2011 del Estado Libre Asociado* [ECF Núm. 7057], impugnando la validez de los Bonos GO fundamentado en los mismos motivos que la Objeción de Reclamación Conjunta (según se define y discuta a continuación). Consulte la sección V.H.7 de esta Declaración de Divulgación para una descripción detallada de las diferentes objeciones.

[97] Consulte sección V.I. de esta Declaración de Divulgación para obtener un resumen detallado de la Orden de Paralización

presentaron un memorando complementario en apoyo de esta [ECF Núm. 10704]. También el 5 de febrero de 2020, la Coalición de Deuda Constitucional Legítima presentó una moción de desestimación por separado [ECF Núm. 10697], y el Grupo de Tenedores de Notas de Bonos de Crédito Impositivo Escolar Calificado (el "Grupo de Tenedores de Notas QTCB") se unieron en parte, [ECF Núm. 10705], a la moción de Assured, el Grupo Ad Hoc de Tenedores de Deuda Constitucional, y el Grupo Ad Hoc de Bonistas de Obligaciones Generales y los Fondos de Invesco y el 19 de febrero de 2020, una serie de partes presentaron acumulaciones y mociones complementarias[98]. El 10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado[99], donde se recomienda que este litigio siga paralizado para proporcionar a los Deudores la oportunidad de confirmar y perfeccionar el Plan, lo que, entre otras cosas, resolvería todas las impugnaciones a la validez, prioridad y situación garantizada de los Bonos GO y los Bonos Garantizados por el ELA.[100] Tras una vista celebrada el 4 de marzo de 2020, el Tribunal del Título III dictó la Orden de Paralización Definitiva y Mediación [ECF Núm. 12189], que adoptó la recomendación del Equipo de Mediación y paralizó este litigio a la espera de una decisión sobre la confirmación del Plan Enmendado. La paralización sigue vigente en este momento. Para más información sobre la Orden de Paralización Definitiva y Mediación, véase la sección V.I.3.b).

(iii) Impugnaciones de la condición de garantizadas de los bonos GO

El 2 de mayo de 2019, la Junta de Supervisión, por medio de su Comité de Reclamaciones

---

[98] Las acumulaciones y mociones de desestimación incluyen, *The UBS Trust Company of Puerto Rico, en representación de varios fideicomisos que poseen ciertos bonos de obligación general del ELA, Acumulación a la "Moción del Grupo Ad Hoc de Tenedores de Bonos de Obligación General, Grupo Ad Hoc de Tenedores de Deuda Constitucional, Assured Guaranty Corp. y Assured Guaranty Municipal Corp., y los Fondos de Invesco para desestimar las Objeciones a las reclamaciones ómnibus para reclamaciones presentadas o aseveradas por tenedores de ciertos bonos de obligaciones generales del Estado Libre Asociado y bonos de la Autoridad de Edificios Públicos"* [ECF Núm. 11251]; *Acumulación y moción complementaria de The Bank of Nova Scotia a la moción para desestimar la objeción del Comité Oficial de Acreedores sin Garantía a la Evidencia de Reclamaciones Núm. 47658 del Bank of Nova Scotia fundamentada en el límite de deuda constitucional* [ECF Núm. 11261]; *Moción de los tenedores de los BAN de la AFI para desestimar las objeciones ómnibus presentadas por el Comité Oficial de Acreedores sin Garantías y la Coalición de Deuda Constitucional Legítima con respecto a la garantía de los BAN de la AFI* [ECF Núm. 11267]; *Acumulación de The Bank of New York Mellon, en calidad de síndico, a la Moción de los tenedores de los BAN de la AFI para desestimar las objeciones ómnibus presentadas por el Comité Oficial de Acreedores sin Garantías y la Coalición de Deuda Constitucional Legítima con respecto a la garantía de los BAN de la AFI* [ECF Núm. 11281]; *Moción de la Cooperativa de Ahorro y Crédito Naguabena* para unirse a la moción de los bonistas BAN de la AFI para desestimar las objeciones ómnibus presentadas por el Comité Oficial de Acreedores sin Garantías y la Coalición de Deuda Constitucional Legítima. [Docket Núm. 11267] [ECF Núm. 11292]; Moción conjunta solicitando la desestimación de la "Objeción ómnibus" a las reclamaciones presentadas o alegadas por tenedores de ciertos Bonos de obligación generales del Estado Libre Asociado [ECF Núm. 11258] (la "Moción cooperativa"); Moción de Partes de ARD para desestimar (I) Objeción del Comité Oficial de Acreedores No Asegurados sobre el Límite de la Deuda Constitucional a la Reclamación del Banco Gubernamental de Fomento para Puerto Rico [Reclamación Número 29485] Basado en Ciertos Pagarés Emitidos por el Estado Libre Asociado y en la Garantía del Estado Libre Asociado de Cierto Bono Emitido por la Autoridad del Puerto de las Américas [Docket Núm. 9735] y (II) Objeción Ómnibus de la Coalición de Deuda Constitucional Legítima, de Conformidad con la Sección 502 del Código de Quiebras y la Regla 3007 de Quiebras, a las Reclamaciones Presentadas por los Tenedores de Ciertos Bonos Emitidos o Garantizados por el Estado Libre Asociado [Docket Núm. 9730] [ECF Núm. 11260].

[99] Como se define en la sección V.I a continuación.

[100] Consulte sección V.I. de esta Declaración de Divulgación para obtener un resumen detallado del Equipo de Mediación y el Informe Enmendado

Especiales, y conjuntamente con el CANA, registró siete demandas[101] contra más de 450 Demandados, solicitando declaraciones de que los Demandados bonistas emitidos o garantizados por el Estado Libre Asociado poseen reclamaciones totalmente no garantizadas (y en la medida que sus reclamaciones son válidas en absoluto), y que no poseen gravámenes sobre los bienes del Estado Libre Asociado, incluyendo a título enunciativo pero no limitativo; sobre (i) la fe y crédito, y poder impositivo, del Estado Libre Asociado; (ii) los "recursos disponibles" del Estado Libre Asociado (según lo referido en la Constitución del ELA, Artículo VI, sección 8), (iii) determinado dinero históricamente asignado de manera condicional a las instrumentalidades del Estado Libre Asociado bajo la Ley de Puerto Rico y (iv) ingresos de contribuciones sobre la propiedad autorizadas bajo la Ley de Puerto Rico 83-1991. Estos procedimientos contenciosos también solicitan sentencias: (i) declarando que los derechos del Estado Libre Asociado sobre sus bienes tienen prioridad sobre cualquier derecho sobre los bienes del Estado Libre Asociado que los Demandados bonistas pudiesen reclamar, (ii) previniendo cualquier gravamen que los bonistas pudieran pretender poseer en conformidad con los poderes de anulación en conformidad con el Código de Quiebra y (iii) desconociendo toda reclamación garantizada registrada en contra del Estado Libre Asociado por los bonistas Demandados.

El 7 de mayo de 2019, la Junta de Supervisión y el CANA presentaron una moción conjunta para (i) prorrogar los plazos límite para la notificación judicial de los Demandados en estos procedimientos contenciosos; y (ii) paralizar los procedimientos contenciosos hasta que los Demandantes o cualquiera de los Demandados solicitasen justificadamente la continuación de los procedimientos [ECF Núm. 6857]. Varias partes presentaron objeciones[102]. El 13 de junio de 2019, el Tribunal del Título III estimó parcialmente la moción conjunta, y prorrogó el plazo para la notificación judicial de los Demandados, y paralizó los procedimientos contenciosos hasta el 1º de septiembre de 2019 [ECF Núm. 7426]. El 24 de julio de 2019 el Tribunal del Título III dictó la Orden de Paralización, que se prorrogó hasta el 11 de marzo de 2020. [103] No obstante la paralización, de acuerdo con la Orden Provisoria de Gestión de Caso GO/AEP, el 5 de febrero de 2020, Assured y National presentaron una moción de desestimación [Proc. Cont. Núm. 19-00291, ECF Núm. 53], y varias otras partes presentaron acumulaciones a mociones de desestimación que ya se encontraban presentadas. Además, varios demandados pro se han presentado contestaciones a las demandas en estos procedimientos contenciosos. El 10 de febrero de 2020, el Equipo de Mediación presentó

---

[101] Proc. Cont. Núm 19-00291 a 19-00297

[102] Las objeciones incluyen: *Objeción de Financial Guaranty Insurance Company a la Moción Ómnibus del Comité Oficial de Acreedores No Asegurados, la Junta de Supervisión y Administración Financiera y su Comité de Reclamaciones Especiales para prorrogar el plazo de notificación de citaciones y demandas y paralizar ciertos procedimientos contenciosos relacionados con ciertos Bonos GO Impugnados* [Leg. Núm. 6857] [ECF Núm. 7114]; *Objeción del Grupo Ad Hoc de Tenedores de Bonos de Obligación General a la Moción Ómnibus del Comité Oficial de Acreedores No Asegurados, la Junta de Supervisión y Administración Financiera para Puerto Rico y su Comité de Reclamaciones Especiales para prorrogar el plazo de notificación de citaciones y demandas y paralizar ciertos procedimientos contenciosos relacionados con ciertos Bonos GO Impugnados* [ECF Núm. 7118]; *Objeción Limitada y Reserva de Derechos de Assured Guaranty Corp. y Assured Guaranty Municipal Corp. con respecto a la Moción Ómnibus del Comité Oficial de Acreedores No Asegurados, la Junta de Supervisión y Administración Financiera y su Comité de Reclamaciones Especiales para prorrogar el plazo de notificación de citaciones y demandas y paralizar ciertos procedimientos contenciosos relacionados con ciertos Bonos GO Impugnados* [ECF Núm. 7119]; *Objeción de Ambac Assurance Corporation a la Moción Ómnibus del Comité Oficial de Acreedores No Asegurados, la Junta de Supervisión y Administración Financiera y su Comité de Reclamaciones Especiales para prorrogar el plazo de notificación de citaciones y demandas y paralizar ciertos procedimientos contenciosos relacionados con ciertos Bonos GO Impugnados* [ECF Núm. 7135].

[103] Consulte sección V.I. de esta Declaración de Divulgación para obtener un resumen detallado de la Orden de Paralización.

su Informe Enmendado, donde se recomienda que este litigio se paralice[104] El 19 de febrero de 2020, también de acuerdo con la Orden de Gestión de Caso GO/AEP, ciertas Cooperativas presentaron mociones de desestimación. Tras una vista celebrada el 4 de marzo de 2020, el Tribunal del Título III dictó la Orden de Paralización Definitiva y Mediación el 10 de marzo de 2020, que adoptó la recomendación del Equipo de Mediación y paralizó este litigio a la espera de una decisión sobre la confirmación del Plan Enmendado [Proc. Cont. Núm. 19-00291, ECF Núm. 57]. Para más información sobre la Orden de Paralización Definitiva y Mediación, véase la sección V.I.3.b.

(iv)   Impugnaciones a la prioridad de los Bonos GO

El 3 de febrero de 2020, el CANA presentó una objeción ómnibus a pruebas de reclamaciones presentadas por ciertos bonistas GO que aseveraban prioridad sobre los acreedores no garantizados del ELA [ECF Núm. 10638] (la "Objeción a la Prioridad de GO de CANA"). La Objeción a la Prioridad de GO de CANA pretende obtener una orden que reclasifique las reclamaciones por cuenta de los Bonos GO o las Obligaciones Garantizadas del ELA como reclamaciones generales no garantizadas, y que se determine que dichas reclamaciones no tienen derecho a prioridad por encima de las reclamaciones de otros acreedores generales no garantizados. La Objeción a la Prioridad de GO de CANA busca la reclasificación porque, según CANA, PROMESA tiene prioridad sobre las prioridades de pago creadas por la ley de Puerto Rico en el caso de Título III del ELA, y son "antitéticas" para el propósito general de PROMESA, el Código de Quiebras, y las disposiciones específicas del Código de Quiebras incorporadas a PROMESA. A la luz de esto, CANA sostiene que los bonistas GO no tienen por lo tanto derecho a un recobro mayor que el recibido por otros tenedores de reclamaciones generales no garantizadas. Además, según CANA, el requisito de la sección 201 de PROMESA de que un plan fiscal debe "respetar las prioridades legítimas relativas" de la deuda establece que los Bonos GO tengan prioridad, porque el requisito se encuentra en el Título II de PROMESA, no en el Título III, y por lo tanto no se aplica cuando se presenta un caso del Título III porque esto "no sería congruente con el esquema de prioridad de la sección 507(a)(2) que se incorpora al Título III". Objeción a la prioridad de GO de CANA en 14.

El 9 de febrero de 2020, CANA presentó una objeción que procuraba establecer un calendario de sesiones de información para la Objeción a la Prioridad de GO de CANA y aprobar formas de notificación a los tenedores de reclamaciones afectados [ECF Núm. 10754] (la "Moción a los Procedimientos de Objeción a la Prioridad"). Allí, CANA sostiene que, debido a que las cuestiones presentadas por la Objeción a la Prioridad de GO de CANA son puras cuestiones de ley, no era necesaria la presentación de pruebas y la cuestión debía proceder a la práctica de mociones dispositivas inmediatas. El 10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado, donde se recomienda que este litigio se paralice. [105] La Junta de Supervisión, los Acreedores de AAP y Peter Hein presentaron objeciones a la Moción de Procedimientos de Objeción a la Prioridad [ECF Núm. 11462, 11133, 11150]. La Junta de Supervisión sostuvo que la Objeción a la Prioridad debía paralizarse porque el Plan transigiría las reclamaciones pertinentes, y que CANA carecía de legitimidad para presentar objeciones a la reclamación. CANA presentó una respuesta en apoyo a su Moción de Procedimientos de Objeción el 26 de febrero de 2020, con el argumento de que la cuestión de si los Bonos GO tienen derecho de prioridad es una "cuestión prioritaria" que necesita resolverse antes de la confirmación del Plan de Ajuste, y que la legitimidad es una cuestión legal pertinente para la Objeción y no la Moción de Procedimientos [ECF Núm. 11773]. Tras una vista celebrada el 4 de marzo de 2020, el Tribunal del Título III dictó la Orden de Paralización Definitiva y

---

[104] Consulte sección V.I.3.a) de esta Declaración de Divulgación para obtener un resumen detallado del Equipo de Mediación y el Informe Enmendado

[105] Consulte sección V.J.9 de esta Declaración de Divulgación para obtener un resumen detallado del Equipo de Mediación y el Informe Enmendado.

Mediación el 10 de marzo de 2020, que adoptó la recomendación del Equipo de Mediación y paralizó este litigio a la espera de una decisión sobre la confirmación del Plan Enmendado [ECF Núm. 12191]. Para más información sobre la Orden de Paralización Definitiva y Mediación, véase la sección V.I.3.b). [ECF Núm. 11773]. Tras una vista celebrada el 4 de marzo de 2020, el Tribunal del Título III dictó la Orden de Paralización Definitiva y Mediación el 10 de marzo de 2020, que adoptó la recomendación del Equipo de Mediación y paralizó este litigio a la espera de una decisión sobre la confirmación del Plan Enmendado [ECF Núm. 12191]. Para más información sobre la Orden de Paralización Definitiva y Mediación, véase la sección V.I.3.b).

El 19 de julio de 2020, CANA presentó una moción urgente para modificar la Orden de Paralización Definitiva y Mediación para permitirle proseguir con la Objeción a la Prioridad de GO de CANA. CANA argumentó que la base para que el Tribunal suspendiera la Objeción a la Prioridad de GO de CANA (evitar un litigio innecesario de cuestiones que se resolverían si el Plan de Ajuste fuera finalmente confirmado) ya no existía porque, según CANA, ciertos acontecimientos económicos impedían la confirmación del Plan de Ajuste propuesto [ECF Núm. 13726]. Se presentaron todos los escritos procesales para la moción urgente [ECF Núm. 14141, 14142, 14237]. El 17 de septiembre de 2020, el Tribunal del Título III emitió una orden que deniega la moción urgente de CANA para modificar la Orden de Paralización Definitiva y Mediación sin perjuicio [ECF Núm. 14331]. El 2 de octubre de 2020, CANA presentó una moción de reconsideración de la orden del Tribunal del Título III del 17 de septiembre de 2020 [ECF Núm. 14444]. El 5 de octubre de 2020, el Tribunal del Título III emitió una orden que deniega las mociones de reconsideración sin perjuicio [ECF Núm. 14452]. El 16 de octubre de 2020, CANA presentó una notificación de apelación ante el Tribunal de Apelaciones del Primer Circuito de las órdenes del Tribunal del Título III que denegaban la moción de levantamiento de la paralización y la moción de reconsideración [ECF Núm. 14590]. El 21 de octubre de 2020, la apelación fue registrada en el Tribunal de Apelaciones del Primer Circuito como Caso Núm. 20-2014 y CANA presentó una moción para un calendario de sesiones de información expedito y una determinación expedita. La Junta de Supervisión se opuso a la moción de CANA el 28 de octubre de 2020, y el 29 de octubre de 2020, CANA presentó una respuesta en apoyo de su moción. El 9 de noviembre de 2020, el Primer Circuito emitió una orden que instruye a las partes a presentar escritos sobre si el Primer Circuito tiene jurisdicción para considerar la apelación. El 23 de noviembre de 2020, CANA presentó una respuesta contra la orden del Primer Circuito, argumentando que la denegación del Tribunal del Título III de la moción de levantamiento de la paralización era apelable como una orden final análoga a una orden que deniega una moción de remedio de una paralización automática y, alternativamente, como una orden que tiene el efecto práctico de un interdicto. El 10 de diciembre de 2020, la Junta de Supervisión presentó una respuesta a la orden del Primer Circuito, argumentando (i) que la denegación de la moción del levantamiento de la paralización no era definitiva porque el Tribunal del Título III no resolvió la Objeción a la Prioridad de GO y simplemente pospuso cuándo se vería, y (ii) que la orden no era un interdicto dado que solo se refería a la secuencia en que el Tribunal del Título III consideraría las cuestiones. El 14 de diciembre de 2020, CANA presentó una contestación en apoyo de su respuesta a la orden del Primer Circuito. El 22 de febrero de 2021, el Primer Circuito dictó una sentencia desestimando la apelación por no ser el foro competente. El 15 de marzo de 2021, el Primer Circuito expidió su mandato.

b) **Deuda SRE**

A partir del 24 de enero de 2008, SRE emitió sus bonos sénior para financiamiento de pensiones (los "Bonos SRE")[106], en calidad de obligaciones limitadas y sin recurso de SRE, pagaderos exclusivamente de, y supuestamente garantizados exclusivamente por, ciertas contribuciones patronales hechas al SRE por

---

[106] Los bonos SRE en circulación de SRE consistían de los siguientes: (i) Bonos de Financiamiento de Pensión Sénior, Serie A (los "Bonos Serie 2008A"), (ii) Bonos de Financiamiento de Pensión Sénior, (los "Bonos Serie 2008B"), y (iii) los Bonos de Financiamiento de Pensión Sénior, Serie C (los "Bonos Serie 2008C"). Estas Series se discuten en mayor detalle en el Informe sobre Pensiones, adjunto a esta Declaración de Divulgación como la Apéndice G (el "Informe sobre Pensiones").

patronos participantes en los planes de pensión del SRE. El propósito de esta oferta era aumentar los activos del SRE disponibles para invertir y pagar beneficios.

Los bonos SRE fueron emitidos supuestamente en conformidad con la Ley del Sistema de Retiro SRE, Ley Núm. 447 del 15 de mayo de 1951, y la Resolución sobre Bonos para Financiamiento de Pensiones, adoptada por la Junta de Síndicos del SRE el 24 de enero de 2008, (según enmendada, la "Resolución General SRE"). Cada serie de los Bonos SRE también fue emitida adicionalmente en conformidad con tres resoluciones supletorias adoptadas por la Junta de Síndicos del SRE. Estas resoluciones supletorias dispusieron la emisión y los términos de cada serie de Bonos SRE. Bajo la Resolución General y las resoluciones supletorias (colectivamente, la "Resolución SRE", Bank of New York Mellon ("BNYM") actúa como agente fiscal de los Bonos SRE.

***Bonos en Circulación.***[107] Los Bonos SRE Bonos tienen tasas de interés de entre el 5.85% y 6.55%, y maduran entre el 1º de julio de 2023 y el 1º de julio de 2058. A la Fecha de la Petición SRE, SRE tenía en circulación un monto de capital total de $3,170 millones de sus Bonos SRE emitidos de acuerdo con la Resolución de SRE[108]. Todos los bonos SRE son no garantizados. Se adjunta un cronograma de los Bonos SRE en circulación como Anexo J.

A tenor con Orden Ejecutiva 2016-31 emitido bajo la Ley de Moratoria, el entonces Gobernador suspendió la obligación del Estado Libre Asociado hacia el SRE relacionada con los fondos pignorados del SRE (hasta un monto igual a la amortización de la deuda pagadero por SRE durante los Años fiscales 2016-2017) y suspendió la obligación de SRE de transferir fondos pignorados al síndico bajo la Resolución SRE.

***Litigios Relacionados con los Bonos SRE.*** Los Bonos SRE fueron impugnados en varios procedimientos contenciosos según se describe a continuación. Todos estos procedimientos contenciosos se han centrado sobre las mismas cuestiones: si los Bonos SRE fueron emitidos válidamente de acuerdo con la Ley Orgánica del SRE, el alcance de los derechos de garantía de los bonistas SRE y el grado en que se perfeccionaron los alegados derechos de garantía.

(i) *Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico c. Altair Global Credit Opportunities Fund (A), LLC y otros.*, Proc. Cont. Núm. 17-00213

El 31 de mayo de 2017, ciertos bonistas SRE incorporaron una moción preventiva contra la paralización automática del Título III [Caso Núm. 17-bk-3566, ECF Núm. 26] (la "Moción sobre Protección Adecuada"). El SRE se opuso a la Moción sobre Protección Adecuada, afirmando, entre otros, que los derechos de garantía reclamados por los bonistas SRE sobre los bienes pignorados reclamados no se habían perfeccionado debidamente.

Después de negociaciones entre las partes, el SRE y los bonistas SRE acordaron los términos de una estipulación, la cual fue ordenada por el Tribunal del Título III [Caso Núm. 17-bk-3566, ECF Núm. 170, 171]. La estipulación dispuso pagos de protección adecuada con respecto a los derechos de garantía de los bonistas SRE, estableciendo una cuenta segregada post-petición, y contemplaba que el SRE registraría una demanda para el 21 de julio de 2017. La estipulación también contemplaba que los intereses sobre los Bonos SRE se pagarían al vencer, desde la cuenta segregada establecida en conformidad con a una estipulación del 17 de enero de 2017, y que ninguna transferencia adicional del SRE se efectuaría a

---

[107] Los montos de los bonos en circulación se basan sobre la mejor información pública disponible y pueden ser aproximados.
[108] Para los bonos de apreciación de capital, este monto incluye el valor acumulado a la Fecha de Inicio de SRE.

dicha cuenta. En conformidad con una serie de estipulaciones adicionales entre el SRE y los bonistas SRE, SRE efectuó pagos de protección adecuada por el monto de la amortización de la deuda vencido sobre sus bonos, en su totalidad, de una cuenta segregada hasta junio del 2018 inclusive, sujeto a una reservación de derechos. Los activos de esta cuenta segregada se agotaron en julio de 2018, y no se efectuaron pagos adicionales. En conformidad con las estipulaciones, SRE hizo pagos de aproximadamente $200 millones a los bonistas SRE, y depositó aproximadamente $92 millones en la cuenta segregada post-petición.

El 21 de Julio, 2017, el SRE, por medio de la Junta de Supervisión, inició un procedimiento contencioso, caratulado *Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico c. Altair Global Credit Opportunities Fund (A), LLC*, Proc. Cont. Núm. 17-00213 (el "Procedimiento Contencioso (AP) de Impugnación de Gravamen"). Los Demandados son varios bonistas que afirmaron derechos de garantía en un contrato de garantía, en virtud de la resolución del 2008 sobre financiamiento de bonos de pensiones. El SRE solicitó: (i) una sentencia declaratoria que determinara (a) el alcance de cualquier gravamen e invalidando los derechos de garantía no perfeccionados de los Demandados sobre los bienes del SRE; (b) que toda garantía prendaria perfeccionada pre-petición no se vinculara con activos recibidos por SRE desde el inicio de su caso Título III en conformidad con el Código de Quiebra sección 552; (c) que SRE había cumplido sus obligaciones con respecto a ciertos bonistas a colocar bienes pignorados en una cuenta segregada; y (ii) una orden dirigiendo que los fondos depositados en una cuenta establecida por estipulación de las partes sea remitida al Estado Libre Asociado. El SRE alegó que los derechos de garantía sobre los activos del SRE reclamados por los Demandados no fueron debidamente perfeccionados, ya que incluían, entre otras cosas, que la descripción de la garantía contenida en las declaraciones de financiamiento, calificándola simplemente como "bienes pignorados", era demasiado vaga para identificar la garantía.

Los bonistas Demandados presentaron reconvenciones, solicitando una sentencia declarando que: (i) sus derechos de garantía habían sido perfeccionados correctamente; (ii) sus derechos de garantía no eran evitables en el caso Título III, (iii) PROMESA no se podía aplicar retroactivamente para eliminar los derechos de garantía, (iv) "bienes pignorados" abarcaba diversas categorías de bienes, y (v) las contribuciones patronales eran "ingresos especiales" bajo el Código de Quiebra sección 928(a) que permanecían sujetas a un gravamen post-petición [Proc. Cont. Núm. 17-00213, ECF Núm. 36].

El 3 de noviembre de 2017, el SRE y los Demandados ingresaron mociones cruzadas para sentencia sumaria [Proc. Cont. Núm. 17-00213, ECF Núm. 91, 94]. El 17 de agosto de 2018, el Tribunal del Título III emitió su *Opinión y Orden Otorgando y Denegando en Parte Mociones Cruzadas para Sentencia Sumaria* [Proc. Cont. Núm. 17-00213, ECF Núm. 215] (la "Orden MSJ"), determinando que (i) los derechos de garantía de los bonistas SRE no eran perfeccionados, debido a que las declaraciones de financiamiento correspondientes no contenían una descripción adecuada de la garantía en conformidad con lo requerido por el Código Comercial Uniforme; (ii) las supuestas enmiendas a dichas declaraciones de financiamiento no identificaron al deudor por su nombre correcto, en conformidad con lo requerido por el Código Comercial Uniforme, (iii) la Junta de Supervisión podría evitar los derechos de garantía no perfeccionados de los Demandados en conformidad con el Código de Quiebra, sección 544(a), que permite al síndico evitar cualesquier bienes de transferencia u obligaciones del deudor en ciertas instancias (aplicables al caso Título III en conformidad con la sección 301(a) de PROMESA); y (iv) el Deudor SRE no violó una estipulación perteneciente a contribuciones patronales, debido a que no tenía obligación alguna de segregar los fondos después del 1º de mayo de 2017.

El 3 de julio de 2018, antes de que el Tribunal del Título III emitiera su determinación sobre las mociones cruzadas para sentencia sumaria, los bonistas SRE registraron la *Moción de Ciertos Acreedores Garantizados del Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico Solicitando Desagravio Judicial de Paralización Automática* [ECF Núm. 3418] (la "Segunda Moción de

77

Protección Adecuada"), solicitando desagravio judicial de la paralización automática, o alternativamente protección adecuada de sus gravámenes sobre bienes del SRE en el cual el Estado Libre Asociado reclama derechos. El 17 de agosto de 2018, con base en la decisión del Tribunal del Título III sobre las mociones cruzadas para sentencia sumaria, el Tribunal del Título III denegó la Segunda Moción de Protección Adecuada [ECF Núm. 3793].

El 6 de septiembre de 2018, los Demandados apelaron la Orden MSJ (o sea, la moción para sentencia sumaria) y la orden denegando su Segunda Moción de Protección Adecuada. El 30 de enero de 2019, el Primer Circuito emitió una opinión afirmando la Orden MSJ en parte. El Primer Circuito determinó que los Demandados habían satisfecho los requerimientos de perfección de los derechos de garantía alegados, al 17 de diciembre de 2015, y lo devolvió al Tribunal del Título III para mayor consideración. El Primer Circuito confirmó la desestimación de las reclamaciones con respecto a la estipulación del 17 de enero de 2017. El 30 de abril de 2019, el SRE presentó una petición de *certiorari* para que la Corte Suprema de los Estados Unidos resolviera si los derechos de garantía afirmados por los bonistas SRE se habían perfeccionado, la cual se presentó bajo el número de caso 18-1389. La petición fue desestimada el 7 de octubre de 2019.

El 2 de abril de 2019, el SRE registró la Moción del Deudor para Permiso de Registrar una Demanda Adversaria Supletoria y Enmendada (la "Moción para Enmendar") [Proc. Cont. Núm. 17-00213, ECF Núm. 236], solicitando que el Tribunal del Título III otorgue permiso al SRE para registrar una demanda enmendada para presentar cuestiones concernientes a la naturaleza y extensión de los derechos de garantía alegados y el método apropiado para el perfeccionamiento de cualquier garantía prendaria y para determinar si la sección 552(a) del Código de Quiebra opera para evitar que el gravamen afirmado por los bonistas SRE se aplicará a las Contribuciones Patronales generadas y recibidas post-Petición (el "Asunto No Decidido"). El 6 de mayo de 2019, el Tribunal del Título III denegó la Moción para Enmendar en parte, y la concedió en parte, concediendo la solicitud del SRE de determinar el Asunto No Decidido, pero denegando la moción del SRE en la medida en que solicitaba permiso para enmendar la demanda en el PA de Impugnación de Gravamen, sin prejuicio de la posibilidad de registrar una demanda nueva [Proc. Cont. Núm. 17-00213, ECF Núm. 248].

El 27 de junio de 2019, el Tribunal del Título III emitió una orden decidiendo el Asunto No Decidido [Proc. Cont. Núm. 17-00213, ECF Núm. 251] (la "Orden Sección 552"). En la Orden 552, el Tribunal del Título III concedió sentencia sumaria a favor del SRE, sosteniendo que la Sección 552 del Código de Quiebra impide que cualquier garantía prendaria resulte de gravámenes otorgados a favor de los bonistas SRE previos a la Fecha de Petición SRE, al aplicarlos a ingresos generados y recibidos por SRE durante el periodo post-petición. Dicha orden también sostuvo que las Contribuciones de los Patronos no eran ingresos especiales según se definen en la sección 902 (a) y (d) del Código de Quiebra, y que la sección 552 del Código de Quiebra no debe interpretarse como se aplicara solo a las garantías reales otorgadas después de la aprobación de PROMESA. El 8 de julio de 2019, el Tribunal del Título III emitió una orden y sentencia cerrando el caso [Proc. Cont. Núm. 17-00213, ECF Núm. 253]. El 9 de Julio, 2019, los bonistas SRE Demandados registraron un aviso de apelación de la Orden Sección 552, y las apelaciones fueron registradas bajo Nos. 19-1699 y 19-1700. Las apelaciones fueron consolidadas el 26 de julio de 2019. El 30 de enero de 2020, el Primer Circuito afirmó la Orden de la Sección 552, con el argumento de que los bonistas SRE no tenían derecho de prioridad sobre las rentas generadas y recibidas por SRE en y después de la Fecha de Petición de SRE. El 13 de febrero de 2020 los bonistas SRE presentaron una petición de nueva vista y vista *en banc*. El 3 de marzo de 2020, el Primer Circuito emitió una orden que modificaba su decisión y denegaba la petición de los bonistas SRE de una nueva vista y una nueva vista *en banc*. El 10 de marzo de 2020, el Primer Circuito dictó su mandato. El 31 de julio de 2020, los bonistas SRE presentaron una petición de certiorari, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 20-126. Los bonistas SRE alegaron que la Orden de la Sección 552 creaba una división de circuito en cuanto a si la

Sección 552(b)(1) abarca las obligaciones de seguridad previas a la petición sobre futuros pagos y ganancias, y sostuvieron que la decisión del Primer Circuito desestabilizaría las prácticas de préstamos garantizados y los mercados de bonos municipales al socavar las definiciones largamente sostenidas de "propiedad" y "ganancias" cubiertas. El 8 de octubre de 2020, la Junta de Supervisión y el Comité de Jubilados presentaron oposiciones a la petición de los bonistas SRE a la petición de certiorari, argumentando la ausencia de división de circuito porque los casos citados por los bonistas SRE confirmaron que la ley estatal controla los derechos de propiedad, lo que hace que la Sección 552(b)(1) sea inaplicable cuando el Primer Circuito determinó que los bonistas SRE carecían de un derecho de propiedad en las futuras contribuciones patronales generadas por el trabajo futuro, posterior a la petición, bajo la ley estatal de Puerto Rico. La Junta de Supervisión y el Comité de Jubilados también argumentaron que la Orden de la Sección 552 no cambiaba la idea fundamental bajo la ley de quiebra de que los intereses de seguridad pueden adjuntarse a los ingresos posteriores a la petición que surgen de la propiedad que se tiene antes de la petición. El 27 de octubre de 2020, los bonistas SRE presentaron una respuesta en apoyo de su petición de certiorari. El 28 de octubre de 2020, la petición se distribuyó para conferencia. El 16 de noviembre de 2020, la Corte Suprema de los Estados Unidos emitió una orden denegando la petición.

        (ii)    *Altair Global Credit Opportunities Fund (A), LLC y otros c. Estado Libre Asociado de Puerto Rico, y otros,* Proc. Cont. Núm. 17-00219; 17- 00220

El 27 de julio, 2017, los bonistas presuntamente garantizados emitidos por SRE en el año 2008 registraron acciones con respecto a la Resolución Conjunta 188, la cual instruyó al SRE a que liquidara y distribuyera sus activos al Fondo General. Los Demandantes solicitaron una declaración de que, después de la aprobación de la Resolución Conjunta 188, seguían siendo acreedores garantizados del SRE y/o del Estado Libre Asociado, ya que (i) la Resolución Conjunta 188 viola la paralización automática en el Caso Título III de SRE, y por consiguiente es inválida; o (ii) en caso de que la Resolución Conjunta 188 no sea válida, su garantía prendaria sobreviene la transferencia de la supuesta prenda de la garantía. Alternativamente, los Demandantes alegaron que la desviación de su garantía prendaria violó las Cláusulas sobre Expropiaciones (en inglés, "Takings Clause", de las Constituciones de los EE.UU. y del ELA), y que tiene derecho a una reclamación de resarcimiento, equivalente al monto integral de los bonos, que no puede ser vulnerado en un plan de ajuste. El 8 de noviembre de 2017, los Demandantes enmendaron sus demandas para presentar los mismos alegatos respecto a la Ley 106, que reformó el sistema de pensiones y, entre otras cosas, convirtió el financiamiento de los sistemas de retiro a un sistema PayGo [Proc. Cont. Núm. 17-00219, ECF Núm. 39; Proc. Cont. Núm. 17-00220, ECF Núm. 39].

    Los demandados presentaron una moción para desistimiento el 17 de noviembre de 2017, en términos generales alegando que: (i) la reclamación de los Demandantes alegando una garantía prendaria perfeccionada debería ser desestimado, por ser duplicativa, ya que está siendo litigada en una acción incorporada previamente, o alternativamente, se debe desestimar, ya que los Demandantes no alegaron la existencia de una garantía prendaria perfeccionada; (ii) la paralización automática no se aplica a acciones tomadas por un gobierno para ejecutar su potestad policial y regulatoria; (iii) los Demandantes carecen de legitimación para ejecutar la paralización automática; (iv) la Resolución SRE reconoce la facultad del Gobierno para hacer modificaciones legislativas que podrían afectar adversamente a los bonistas SRE; (v) los Demandantes no declaran una reclamación para una expropiación constitucional, y (vi) toda reclamación contra la Junta de Supervisión debe ser desestimada en conformidad con la sección 105 de PROMESA, que dispone que la Junta de Supervisión, sus miembros y sus empleados no pueden responder por ninguna obligación de, o reclamación en contra de, la Junta de Supervisión, sus miembros, sus empleados o el gobierno territorial resultantes de acciones tomadas para propósitos de implementar la ley PROMESA [Proc. Cont. Núm. 17-00219, ECF Núm. 41, 44; Proc. Cont. Núm. 17-00220 ECF Núm. 41, 44].

79

El 6 de septiembre de 2018, el Tribunal del Título III paralizó estos procedimientos, ante hasta la adopción de una decisión del Primer Circuito en el PA de Impugnación de Gravamen [Proc. Cont. Núm. 17-00219, ECF Núm. 69; Proc. Cont. Núm. 17-00220, ECF Núm. 67]. El 27 de septiembre de 2018, el Tribunal del Título III revocó las mociones pendientes, sin prejuicio de la posibilidad de abrir autos subsiguientes, únicamente para propósitos estadísticos del Tribunal del Título III y sin emitir sentencia alguna sobre los méritos, en vista de los procedimientos paralizados [Proc. Cont. Núm. 17-00219, ECF Núm. 70; Proc. Cont. Núm. 17-00220, ECF Núm. 68]. Tal y como se declaró arriba, el 30 de enero de 2019, el Primer Circuito emitió una opinión sobre el PA de Impugnación de Gravamen[109]. El 5 de abril de 2021, las partes presentaron una moción conjunta para paralizar el procedimiento [Proc. Cont. Núm. ECF Núm. 79; Proc. Cont. Núm. 17-00220, ECF Núm. 77]. El 12 de abril de 2021, el Tribunal del Título III dictó una orden admitiendo la moción conjunta de paralizar el procedimiento [Proc. Cont. Núm. 17-00219, ECF Núm. 84; Proc. Cont. Núm. 17-00220, ECF Núm. 82].

(iii)   Procedimiento contencioso de alcance del gravamen

El 20 de mayo de 2019, el SRE y CANA presentaron dos nuevas demandas, *Junta de Supervisión y Administración Financiera para Puerto Rico c. Andalusian Global Designated Activity Company* [Proc. Cont. Núm. 19-00366, ECF Núm. 1] y *Junta de Supervisión y Administración Financiera para Puerto Rico c. Glendon Opportunities Fund, L.P.* [Proc. Cont. Núm. 19-00367, ECF Núm. 1] (los "Procedimientos contenciosos de alcance del gravamen"). Los Procedimientos contenciosos de alcance del gravamen sostienen que los bonistas de SRE no tienen derechos de garantía válidos y aplicables sobre ninguno de los activos restantes del SRE o los productos de estos (aparte de las Cuentas por Cobrar). Estos activos restantes incluyen entre otros, (i) cierto efectivo e inversiones en poder de SRE, (ii) cuentas a cobrar con respecto a Contribuciones Uniformes Adicionales que deben ser hechas por todos los patronos participantes a partir de 2013, y (iii) ciertos préstamos hechos a participantes de SRE, y los reembolsos de estos. El 26 de junio de 2019, el Comité de Jubilados presentó mociones para intervenir en ambos procedimientos contenciosos, que el Tribunal del Título III concedió en parte [Proc. Cont. Núm. 19-00366, ECF Núm. 33; Proc. Cont. Núm. 19-00367, ECF Núm. 55]. El 24 de julio de 2019, el Tribunal del Título III dictó la Orden de Paralización, que inicialmente paralizó estos procedimientos hasta el 30 de noviembre de 2020[110] El 18 de octubre de 2019, las partes presentaron una *Moción Conjunta Urgente para modificar la paralización y la mediación obligatoria con respecto a ciertos temas presentados en ciertas cuestiones controvertidas y procedimientos contenciosos relacionados con los bonos emitidos por el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico* [Caso Núm. 17-bk-3566, ECF Núm. 680] (la "Moción de modificación de paralización del SRE"), que solicitaba una modificación de la orden de paralización para permitir litigios relacionados con (i) si los bonos eran *ultra vires* y (ii) el alcance de los

---

[109] El 26 de febrero de 2019, los Demandantes presentaron una moción de desistimiento sin prejuicio de la posibilidad de abrir autos subsiguientes, la cual fue concedida por el Tribunal del Título III el 1º de marzo de 2019, con respecto a Altair Global Credit Opportunities Fund (A), LLC y Nokota Capital Master Fund, L.P. [Proc. Cont. Núm. 17-00219, ECF Núm. 72; Proc. Cont. Núm. 17-00220, ECF Núm. 70] Como resultado, el caso fue re-caratulado *Andalusian Global Designated Activity Co. et al v. Commonwealth of Puerto Rico, y otros*, Proc. Cont. Núm. 17-00219-LTS, 17-00220-LTS (D.P.R.). El 5 de marzo de 2019, el Tribunal del Título III ingresó una orden permitiendo que Crown Managed Accounts (a nombre y de parte de Crown/PW SP), LMA SPC (a nombre y de parte de Map 98 Segregated Portfolio), Oceana Master Fund Ltd., Pentwater Merger Arbitrage Master Fund Ltd., y PWCM Master Fund Ltd. comparecieran en el procedimiento contencioso [Proc. Cont. Núm. 17-00219, ECF Núm. 75; Proc. Cont. Núm. 17-00220, ECF Núm. 73]. El 13 de octubre de 2020, el Tribunal del Título III dictó órdenes de cierre de los procedimientos contenciosos [Proc. Cont. Núm. 17-00219, ECF Núm. 78; Proc. Cont. Núm. 17-00220, ECF Núm. 76].

[110] Consulte sección V.I. de esta Declaración de Divulgación para obtener un resumen detallado de la Orden de Paralización.

gravámenes para avanzar.

El 24 de octubre de 2019, el Tribunal del Título III registró una orden que modifica la paralización y establece un calendario de litigio para los temas identificados por las partes [Proc. Cont. Núm. 19-00366, ECF Núm. 40; Proc. Cont. Núm. 19-00367, ECF Núm. 58]. El 9 de junio de 2020 se completó la presentación de pruebas. El 11 de septiembre de 2020, las partes presentaron peticiones cruzadas para sentencia sumaria [Proc. Cont. Núm. 19-00366, ECF Núm. 91, 92, 93, 95, 96; Proc. Cont. Núm. 19-00367 Núm. 107, 108, 109, 111, 112]. El SRE argumentó que tiene derecho a una sentencia sumaria declarando que los bonistas SRE carecen de un derecho de garantía perfeccionado sobre las Contribuciones Patronales posteriores a la petición, como se define en la Resolución, y las cuentas por cobrar previas a la petición. El SRE también argumentó que tiene derecho a una sentencia sumaria que declare que los tenedores de bonos SRE carecen de un derecho de garantía perfeccionado sobre cualquier otro pago del empleador al SRE, incluyendo las contribuciones uniformes adicionales; los fondos liberados; los préstamos a empleados o los pagos de préstamos; y cualquier producto de estos. El SRE también sostuvo que tiene derecho a una sentencia sumaria: (i) anulando cualquiera de los derechos de garantía afirmados pero no perfeccionados por los bonistas; recuperando o preservando los derechos de garantía anulados para el SRE a tenor con las Secciones 550 y 551 del Código de Quiebras; y (ii) rechazando las reclamaciones de los bonistas a los derechos de garantía distintos de las contribuciones de los empleadores previos a la petición y las cuentas por cobrar previas a la petición y el producto de estas en virtud de la Sección 502(a) del Código de Quiebras [Proc. Proc. Cont. Núm. 19-00366 ECF Núm. 92]. Los bonistas SRE alegaron que los bienes pignorados incluían: cantidades sustanciales de, y los derechos a recibir, contribuciones de los patronos y cualquier producto de estas; contribuciones uniformes adicionales y cualquier producto de estas; fondos remitidos; fondos identificables en cuentas de depósito; y préstamos identificables a empleados, pagos de préstamos e inversiones. Los bonistas también sostuvieron que las reclamaciones restantes de SRE son irrelevantes, ya que los bonistas no afirman ningún derecho de garantía sobre o en las contribuciones de los patronos posteriores a la petición. Los bonistas argumentaron además que sus derechos de garantía sobre los bienes pignorados se encuentran perfeccionados, son válidos y ejecutables [Proc. Cont. Núm. 19-00366 ECF Núm. 95]. Además, el 11 de septiembre de 2020, el Comité de Jubilados presentó una acumulación a la moción del SRE y la Junta de Supervisión presentó una declaración de hechos materiales indiscutibles [Proc. Cont. Núm. 19-00366, ECF Núm. 93, 94; Proc. Cont. Núm. 19-00367, ECF Núm. 109, 110]. El 28 de octubre de 2020, las partes presentaron oposiciones a las peticiones cruzadas para sentencia sumaria [Proc. Cont. Núm. 19-00366, ECF Núm. 108, 110]. En su oposición a la moción del SRE, los tenedores de bonos SRE sostuvieron que la sentencia sumaria era inadecuada porque: (i) no existe ninguna reclamación justiciable relativa a los activos anteriores a 2008; (ii) las contribuciones uniformes adicionales son bienes pignorados; (iii) el derecho de garantía de los bonistas no se desprendió cuando el agente fiscal remitió los fondos al SRE; (iv) los préstamos a los empleados y los pagos de los préstamos son la garantía original y el producto de los bienes pignorados; y (v) los gravámenes de los bonistas no pueden ser evitados, recuperados o preservados automáticamente [Proc. Cont. Núm. 19-00366 ECF Núm. 110]. En su oposición a la moción de los bonistas, el SRE sostuvo que la definición de los bonistas de "contribuciones patronales" (a los que reclamaban un interés) es demasiado amplia, y que los bonistas carecían de un derecho de garantía sobre los fondos liberados o sobre los ingresos de las contribuciones patronales atribuibles a los préstamos a empleados, a los pagos de los préstamos y a los intereses de conformidad con la Sección 554 del Código de Quiebras. El SRE argumentó además que el monto en dólares de los activos supuestamente sujetos al derecho de garantía de bonistas no debidamente ante el Tribunal y es un hecho material controvertido que impide la sentencia sumaria en favor de los bonistas [Proc. Cont. Núm. 19-00366 ECF Núm. 108]. Además, el 28 de octubre de 2020, el Comité de Jubilados presentó una acumulación a la oposición del SRE y los Demandados presentaron una respuesta a la declaración de hechos materiales indiscutibles de la Junta de Supervisión [Proc. Cont. Núm. 19-00366, ECF Núm. 111, 114]. El 19 de noviembre de 2020, las partes presentaron contestaciones en apoyo de sus mociones de sentencia sumaria [Proc. Cont. Núm. 19-00366, ECF Núm. 120, 124]. Además, el 19 de noviembre de 2020, el Comité de Jubilados presentó una

81

acumulación para la respuesta del SRE y la Junta de Supervisión presentó una contestación en apoyo a su declaración de hechos materiales indiscutibles [Proc. Cont. Núm. 19-00366, ECF Núm. 121, 123]. El 24 de noviembre de 2020, los Demandados presentaron una moción para eliminar la contestación de la Junta de Supervisión en apoyo a su declaración de hechos materiales indiscutibles [Proc. Cont. Núm. 19-00366, ECF Núm. 127]. Se presentaron todos los escritos procesales para la moción de eliminación y el 23 de febrero de 2021, el Tribunal del Título III emitió una orden denegando la moción de eliminación de los Demandados [Proc. Cont. Núm. 19-00366, ECF Núm. 130-135, 148]. El 10 de marzo de 2021, el Tribunal del Título III dictó un auto convocando una vista oral para el 8 de abril de 8, 2021 [Proc. Cont. Núm. 19-00366, ECF Núm. 158]. El 2 de abril de 2021, las partes presentaron una declaración conjunta indicando que no necesitaban proseguir con la vista oral el 8 de abril, y destacando sus intenciones de solicitar una paralización de estas mociones pendientes [Proc. Cont. Núm. 19-00366, ECF Núm. 167]. El 5 de abril de 2021, las partes presentaron una moción conjunta de paralizar el procedimiento [Proc. Cont. Núm. 19-00366, ECF Núm. 169; Proc. Cont. Núm. 19-00367, ECF Núm. 186]. El 6 de abril de 2021, el Tribunal del Título III dictó una orden suspendiendo la vista oral y señalando una vista para tratar la moción conjunta de paralización [Proc. Cont. Núm. 19-00366, ECF Núm. 170; Proc. Cont. Núm. 19-00367, ECF Núm. 187]. El 8 de abril de 2021, CANA presentó un escrito de oposición a la moción conjunta de paralización de las partes [Caso Núm. 17-bk-3566, ECF Núm. 1128]. El 9 de abril de 2021, la Junta de Supervisión presentó una respuesta apoyando la moción conjunta de las partes, y el Comité de Jubilados presentó un escrito de adhesión limitada [Caso Núm. 17-bk-3566, ECF Núm. 1132 y 1133]. El 12 de abril de 2021, el Tribunal del Título III dictó una orden aceptando la moción conjunta de paralizar el procedimiento [Proc. Cont. Núm. 19-00366, ECF Núm. 175; Proc. Cont. Núm. 19-00367, ECF Núm. 192].

(iv) Objeción del Estado Libre Asociado a la Reclamación del Agente Fiscal del SRE.

El 24 de mayo de 2018, el Agente Fiscal del SRE, BNYM, presentó prueba de una reclamación contra el Estado Libre Asociado (Reclamación Núm. 16775), solicitando la recuperación de los Bonos SRE de parte de los tenedores de los Bonos SRE. El Agente Fiscal del SRE basó su reclamación sobre la aprobación por el Estado Libre Asociado de la Resolución Conjunta 188, la cual instruyó al SRE a liquidar y distribuir sus activos al Fondo General, y la Ley 106. Varios bonistas SRE también registraron pruebas de reclamación contra el Estado Libre Asociado.

El 12 de marzo de 2019, el CANA presentó una *Objeción Ómnibus a Reclamaciones Afirmadas por bonistas Emitidos por SRE* [ECF Núm. 5580], motivado en que la emisión de los bonos habría excedido la potestad legal del SRE, y por consiguiente era *ultra vires*, a su vez haciendo que los Bonos SRE fueran nulos e inválidos. El 23 de abril de 2019, el Comité de Jubilados presentó una *Objeción Ómnibus del Comité Oficial de los Empleados Reiterados del Estado Libre Asociado, en conformidad con el Código de Quiebra Sección 502 y Regla de Quiebra 3007, a Reclamaciones Afirmadas por bonistas SRE c. SRE y el Estado Libre Asociado* [ECF Núm. 6482], motivado, entre otros, en que la emisión de los bonos era *ultra vires*.

El 23 de abril de 2019, el Comité de Jubilados presentó una objeción ómnibus [Caso Núm. 17-bk-3566, ECF Núm. 469] (la "Objeción del Comité de Jubilados sobre Reclamaciones de Bonos SRE") contra todas las reclamaciones de los bonistas alegados contra tanto SRE como el Estado Libre Asociado, motivado en que la emisión de los bonos era *ultra vires* y que los bonistas SRE por consiguiente no tenían reclamación ejecutable alguna contra los Bonos SRE. El 2 de julio de 2019, el Comité de Jubilados presentó su propia moción procesal relacionada con la adjudicación de la Objeción del Comité de Jubilados sobre Reclamaciones de Bonos SER [Caso Núm. 17-bk-3566, ECF Núm. 632].

El 22 de mayo de 2019, la Junta de Supervisión presentó una objeción solicitando la desestimación

de la reclamación del Agente Fiscal del SRE, debido a que: (a) la reclamaciones garantizadas resultantes de la transferencia de los Activos Transferidos (activos transferidos del SRE al Estado Libre Asociado a cambio de que el Estado Libre Asociado le pagara a los jubilados de su Fondo General) serían determinados por medio de la resolución del PA sobre la Impugnación de Gravamen, y que aun en caso de que el PA de Impugnación de Gravamen no resolviese las reclamaciones garantizadas, la sección 9-332(b) del Código de Comercio Uniforme dispone que el Estado Libre Asociado recibió los Activos Transferidos lisos y llanos de cualquier garantía prendaria una vez que SRE los había transferido al Estado Libre Asociado, (b) ninguna reclamación garantizada resulta de la cesación de las Contribuciones Patronales y el comienzo de los pagos PayGo, que son pagos efectuados a los jubilados del Fondo General del Estado Libre Asociado, ya que el Agente Fiscal no tiene ninguna garantía prendaria en los Pagos PayGo, y (c) reclamaciones de cualquier índole motivadas en las constituciones de los EE.UU. y el Estado Libre Asociado alegando que legislación que implementó un sistema de retiro revisado viola las Cláusula sobre Contratos y sobre Expropiaciones (en inglés, "Takings Clause", refiriéndose a la Quinta Enmienda de la Constitución de los EE.UU.) al redireccionar las contribuciones del empleado fuera al SRE, y que dichas reclamaciones no pueden prosperar como cuestión de ley [ECF Núm. 7075].

El 24 de julio de 2019, el Tribunal del Título III registró la Orden de Paralización, que inicialmente paralizó la Objeción de Reclamaciones de Bonos SRE por parte de CANA y la Objeción de Reclamaciones de Bonos SRE por parte del Comité de Jubilados hasta el 30 de noviembre de 2019[111] El 18 de octubre de 2019, de acuerdo con la Moción de Modificación de la Paralización de SRE, las partes presentaron un calendario acordado para dicho litigio. El 24 de octubre de 2019, el Tribunal del Título III registró una orden que modifica la paralización y establece un calendario de litigio para los temas identificados por las partes [Caso Núm. 17-bk -3566, ECF Núm. 687]. El 9 de junio de 2020 se completó la presentación de pruebas. El 11 de septiembre de 2020, los bonistas SRE, BNYM, CANA, el Comité de Jubilados y el Comité de Reclamaciones Especiales presentaron mociones de sentencia sumaria [Caso Núm. 17-bk-3566, ECF Núm. 971, 976, 978]. El 18 de septiembre de 2020, UBS presentó una acumulación a las mociones de los bonistas SRE y BNYM para sentencia sumaria [Caso Núm. 17-bk-3566, ECF Núm. 987]. El 28 de octubre de 2020, BNYM y los bonistas SRE presentaron oposiciones a la moción de sentencia sumaria de los Comités [Caso Núm. 17-bk-3566, ECF Núm. 998, 1005], y el Comité de Jubilados, CANA y el Comité de Reclamaciones Especiales (conjuntamente, los "Comités") presentaron una oposición conjunta a las mociones de los Bonistas y del BNYM [Caso Núm. 17-bk-3566, ECF Núm. 1004]. El 4 de noviembre de 2020, UBS presentó una acumulación a las oposiciones de BNYN y los bonistas SRE [Caso Núm. 17-bk-3566, ECF Núm. 1012]. El 19 de noviembre de 2020, BNYM, los Bonistas SRE y los Comités presentaron contestaciones en apoyo de sus mociones de sentencia sumaria [Caso Núm. 17-bk-3566, ECF Núm. 1023, 1025, 1028]. El 25 de noviembre de 2020, UBS presentó una acumulación a las contestaciones de BNYM y los Bonistas SRE en apoyo de sus mociones de sentencia sumaria [Caso Núm. 17-bk-3566, ECF Núm. 1035]. El 10 de maro de 2021, el Tribunal del Título III dictó una orden convocando una vista oral para el 8 de abril de 2021 [Caso Núm. 17-bk-3566, ECF Núm. 1101]. El 2 de abril de 2021, las partes presentaron una declaración conjunta indicando que no necesitaban proceder a la vista oral del 8 de abril, e indicando sus intenciones de solicitar una paralización de las mociones pendientes [Caso Núm. 17-bk-3566, ECF Núm. 1119]. El 5 de abril de 2021, las partes presentaron una moción conjunta para paralizar el procedimiento [Caso Núm. 17-bk-3566, ECF Núm. 1122]. El 6 de abril de 2021, el Tribunal del Título III dictó una orden cancelando la vista oral y señalando una vista para tratar la moción conjunta de paralización [Caso Núm. 17-bk-3566, ECF Núm. 1123]. El 8 de abril de 2121, CANA presentó un escrito de oposición a la moción conjunta de las partes [Caso Núm. 17-bk-3566, ECF Núm. 1128]. El 9 de abril de 2021, la Junta de Supervisión presentó una

---

[111] Consulte sección V.I. de esta Declaración de Divulgación para un resumen detallado de la Orden de Paralización.

respuesta en apoyo de la moción conjunta de las Partes, y el Comité de Jubilados presentó un escrito de adhesión limitada [Caso Núm. 17-bk-3566, ECF Núm. 1132 y 1133]. El 12 de abril de 2021, el Tribunal del Título III dictó una orden aceptando la moción conjunta de paralizar el procedimiento [Caso Núm. 17-bk-3566, ECF Núm. 1135].

(v)   <u>Objeciones a las reclamaciones de acuerdo con una orden acordada que establezca procedimientos con respecto a las objeciones a ciertas reclamaciones de bonos SRE</u>

El 7 de octubre de 2019, el Tribunal del Título III registró una orden acordada que establece el 6 de enero de 2020 como la fecha para la cual deben presentarse las objeciones a cualquier reclamación presentada por el Agente Fiscal de SRE o ciertos grupos de bonistas SRE representados por Jones Day (el "<u>Grupo Jones Day</u>"), y White & Case (el "<u>Grupo White & Case</u>"), y cada uno de sus miembros [Caso Núm. 17-03566-LTS, ECF Núm. 676-2 en 6]. De acuerdo con estos, la Junta de Supervisión presentó seis objeciones a dichas reclamaciones, entre ellas:

1. La objeción complementaria del ELA a la Reclamación del Agente Fiscal, que agregó motivos adicionales de objeciones a la objeción original presentada en la Reclamación del Agente Fiscal [ECF Núm. 9700];
2. Objeción de SRE a la reclamación del Agente Fiscal contra SRE [ECF Núm. 9701];
3. Objeción ómnibus del ELA a reclamaciones presentadas por miembros del Grupo Jones Day contra el ELA (cada una de las cuales era sustancialmente similar) [ECF Núm. 9702];
4. Objeción ómnibus de SRE a reclamaciones presentadas por miembros del Grupo Jones Day contra SRE (cada una de las cuales era sustancialmente similar) [ECF Núm. 9703];
5. Objeción ómnibus del ELA a reclamaciones presentadas por miembros del Grupo White & Case contra el ELA (cada una de las cuales era sustancialmente similar) [ECF Núm. 9704];
6. Objeción ómnibus de SRE a reclamaciones presentadas por miembros del Grupo White & Case contra SRE (cada una de las cuales era sustancialmente similar) [ECF Núm. 9705].

***Orden de programación de las reclamaciones de gastos administrativos del SRE***. La orden del 7 de octubre de 2019 también estableció el 21 de noviembre de 2019 como fecha límite para presentar cualquier reclamación posterior a la petición relacionada con los bonos SRE. El Grupo Jones Day, el Grupo White & Case y el Agente Fiscal de SRE presentaron mociones para el pago de reclamaciones posteriores a la petición y de gastos administrativos (las "Mociones de reclamaciones posteriores a la petición y de gastos administrativos") [ECF Núm. 9285, 9294 y 9298]. Los bonistas SRE alegan que: (1) el SRE incumplió su obligación posterior a la petición de pagar el capital y los intereses de los bonos del SRE; (2) el SRE incumplió sus obligaciones posteriores a la petición en virtud de los bonos para asegurarse de recaudar todas las contribuciones; (3) el SRE se enriqueció injustamente a expensas de los Bonistas; (4) el Estado Libre Asociado aprobó ilegalmente legislación posterior a la petición que desvió activos a los que los Bonistas tenían derecho; (5) el Estado Libre Asociado y el SRE incumplieron una estipulación alcanzada en el Caso Núm. 16-02696; y (6) la protección adecuada había fracasado. El 25 de noviembre de 2019, el Tribunal del Título III emitió una orden de programación, que fue sustituida por una orden de programación del 2 de enero de 2020 [Caso Núm. 17-bk-3283, ECF Núm. 9322]. La orden de programación del 2 de enero de 2020 exigía a las partes que se reunieran y negociaran sobre los calendarios de presentación de pruebas e información [Caso Núm. 17-bk-3283, ECF Núm. 9688].

El 18 de marzo de 2020, el Tribunal del Título III emitió una orden de programación actualizada para las objeciones de reclamación y las Mociones de Reclamaciones Posteriores a la Petición y de Gastos Administrativos [Caso Núm. 17-bk-3283, ECF Núm. 12446]. La orden del 18 de marzo de 2020 levantó las órdenes de paralización que se aplicaban a estas cuestiones controvertidas y fijó un calendario para la

84

presentación de escritos para su resolución. El 6 de mayo de 2020, a tenor con la orden de programación de reclamaciones del SRE [Caso Núm. 17-bk-3283, ECF Núm. 12446, enmendado en ECF Núm. 12901], la Junta de Supervisión presentó la *Moción del Estado Libre Asociado de Puerto Rico y del Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico para rechazar y desestimar las reclamaciones presentadas o aseveradas por los Bonistas SRE y el Agente Fiscal del SRE a tenor con las Reglas de Quiebra 3007(b) y 7012(b)* (la "Moción para desestimar las reclamaciones posteriores a la petición y de gastos administrativos") [Caso Núm. 17-bk-3566, ECF Núm. 891]. Esta moción solicita la desestimación y el rechazo de los gastos administrativos y las reclamaciones previas a la petición presentadas contra el SRE y el Estado Libre Asociado basándose en gran medida en la aprobación por parte del Estado Libre Asociado de la legislación posterior a la petición. La moción sostiene, entre otras cosas, que la Orden de la Sección 552 del Primer Circuito (1) excluye cualquier reclamación de gastos administrativos de los bonistas SRE o del agente fiscal resultante de la legislación posterior a la petición contra el SRE, (2) excluye todas las reclamaciones contra el Estado Libre Asociado, y (3) deja al agente fiscal solo con "una reclamación previa a la petición contra el SRE por el importe del capital y los intereses no pagados de los Bonos SRE a la fecha de la petición del SRE en la cantidad acordada por las partes o determinada por el Tribunal[,]" sujeto a la resolución de la impugnación de la emisión de los Bonos SRE como *ultra vires*. El Comité de Jubilados también solicitó la desestimación de las reclamaciones presentadas contra el SRE y el Estado Libre Asociado [Caso Núm. 17-bk-3566, ECF Núm. 892]. AAFAF presentó una declaración y un memorando complementario en apoyo de la moción de desestimación de la Junta de Supervisión, centrándose en lo que AAFAF describe como "la protección de la sección 303 de PROMESA del derecho del gobierno a legislar para el pueblo de Puerto Rico" [Caso Núm. 17-bk-3566, ECF Núm. 893]. CANA presentó una acumulación limitada a las mociones de desestimación de la Junta de Supervisión y del Comité de Jubilados [Caso Núm. 17-bk-3566, ECF Núm. 894]. Los Bonistas SRE y el Agente Fiscal presentaron su oposición a las mociones de desestimación el 17 de junio de 2020 [Caso Núm. 17-bk-3566, ECF Núm. 923]. El 22 de julio de 2020, la Junta de Supervisión, AAFAF y el Comité de Jubilados presentaron contestaciones [Caso Núm. 17-bk-3566, ECF Núm. 947, 948, 949], y CANA presentó una acumulación a la contestación de la Junta de Supervisión [Caso Núm. 17-bk-3566, ECF Núm. 950].

El 10 de junio de 2020, los Bonistas del SRE y el agente fiscal presentaron una moción para que se dicte sentencia sobre los alegatos (junto con la moción para desestimar las reclamaciones posteriores a la petición y de gastos administrativos, las "Mociones de la Regla 12") [Caso Núm. 17-bk-3566, ECF Núm. 917], argumentando que (i) pueden hacer valer las reclamaciones de recurso contra el SRE y (ii) sus reclamaciones posteriores a la petición tienen derecho a un tratamiento de gastos administrativos y no son liquidables. El 8 de julio de 2020, la Junta de Supervisión y el Comité de Jubilados presentaron oposiciones a la moción [Caso Núm. 17-bk-3566, ECF Núm. 930, 932]. Además, el 8 de julio de 2020, CANA presentó una acumulación a la oposición de la Junta de Supervisión [Caso Núm. 17-bk-3566, ECF Núm. 934]. El 6 de agosto de 2020, los Bonistas SRE y el Agente Fiscal presentaron contestación en apoyo de su moción [Caso Núm. 17-bk-3566, ECF Núm. 960]. La vista sobre las Mociones bajo la Regla 12 está prevista para el 29 de abril de 2021. El 2 de abril de 2021, las partes presentaron una declaración conjunta indicando que no era necesario proceder a la vista oral e indicando sus intenciones de solicitar una paralización de las mociones pendientes [Caso Núm. 17-bk-3566, ECF Núm. 1119]. El 5 de abril de 2021, las partes presentaron una moción conjunta de paralizar el procedimiento [Caso Núm. 17-bk-3566, ECF Núm. 1122]. El 12 de abril de 2021, el Tribunal del Título III aceptó la moción conjunta de las partes de paralizar el procedimiento [Caso Núm. 17-bk-3566, ECF Núm. 1135].

(vi) Objeción *Ultra Vires*

Además de las seis objeciones descritas anteriormente presentadas por la Junta de Supervisión, otras partes presentaron objeciones, entre ellas CANA, que presentó, entre otras cosas, una objeción ómnibus adicional a reclamaciones aseveradas por Bonistas de SRE contra el ELA y SRE. La objeción

85

ómnibus presentó objeciones adicionales a aquellas ya presentadas en la objeción *ultra vires* de CANA, donde el Comité objetó todas las reclamaciones relacionadas con bonos SRE sobre la base de que los Bonos SRE fueron emitidos *ultra vires* (actuando fuera de los límites de la potestad legal), y la Objeción de los Jubilados, donde los Jubilados objetaron todas las reclamaciones relacionadas con los bonos SRE con el argumento *ultra vires*, entre otros [ECF Núm. 9708][112].

CANA sostiene que los Bonos SRE fueron emitidos ilegalmente "*ultra vires*". Según el argumento de CANA, la "autorización para incurrir en deuda" legal de SRE se limita a "buscar obtener un préstamo de cualquier institución financiera del Gobierno del Estado Libre Asociado de Puerto Rico o el Gobierno Federal de Estados Unidos de América o a través de la colocación directa de deudas" de acuerdo con la Ley de Establecimiento de SRE. CANA sostiene asimismo que una entidad gubernamental como SRE no tiene potestad inherente para emitir bonos al público, y que dicha potestad debe ser concedida expresamente por una ley. CANA observa que siempre que la Asamblea Legislativa de Puerto Rico ha concedido potestad para emitir bonos a una instrumentalidad del ELA (tanto antes como después de autorizar a SRE en 2008 para "obtener préstamos"), lo ha hecho expresamente y ha especificado que los bonos se vendan por vía pública o privada. En definitiva, CANA establece que, dado que considera que los Bonos SRE se emitieron *ultra vires*, son nulos y sin valor, y los bonistas no tienen remedio contra SRE.

El 7 de octubre de 2020, el Tribunal del Título III emitió una orden de programación para litigar la objeción ultra vires de CANA [ECF Núm. 8818]. El 11 de septiembre de 2020, CANA, los Bonistas SRE y BNYM presentaron mociones cruzadas para sentencia sumaria [ECF Núm. 14241, 14246, 14247]. Los bonistas SRE sostenían que los bonos SRE representan obligaciones válidas y vinculantes de SRE porque fueron autorizados por la Ley de Habilitación del SRE, incluso sin una referencia legal explícita a los "bonos". Los bonistas también argumentaron que los bonos son ejecutables bajo la sección 8-202 de CANA, y si los bonos son inválidos entonces los bonistas tienen derecho a recuperar en "equity" [ECF Núm. 14241]. CANA solicitó una orden que sostenga que los bonos SRE son nulos y sin valor o no aplicables porque fueron emitidos *ultra vires* y no son validados por la sección 8-202 de CANA porque los bonistas tenían conocimiento de la potencial invalidez de los bonos [ECF Núm. 14246]. CANA también sostuvo que los bonistas no tienen un remedio de enriquecimiento injusto. BNYM, presentó su propia moción por separado argumentando que los bonos son obligaciones válidas y ejecutables de SRE porque satisfacen todos los requisitos de la sección 8-202(b) de CANA, que se aplica a las emisiones de bonos *ultra vires* [ECF Núm. 14247]. El 18 de septiembre de 2020, UBS presentó una acumulación a las mociones de sentencia sumaria de los bonistas SRE y de BNYM, adhiriéndose a ambas mociones en su totalidad y reservándose todos los derechos con respecto a otros asuntos en los casos del Título III de los Deudores [ECF Núm. 14347].

(vii) *Cooperativa de Ahorro y Crédito Vegabajena v. Junta de Supervisión y Administración del Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 19-00028

El 14 de marzo de 2019, la unión de crédito Cooperativa de Ahorro y Crédito Vegabajena presentó una demanda contenciosa contra SRE y la Junta de Supervisión, alegando que tenía un gravamen estatutario (o de otra clase) sobre contribuciones de los empleados hechas a SRE, que el Demandante alegó sus prestatarios le habían cedido. El Demandante reclamó que el gravamen estatutario emergió en virtud de 2011 L.P.R.A sección 196, que permitió que instituciones de servicios financieros en todo el Estado Libre

---

[112] El 25 de octubre de 2019, los Demandantes en *Altair Global Credit Opportunities Fund* presentaron una moción informativa donde ponían en consideración del Tribunal del Título III su contestación a ciertos argumentos con respecto a la validez de los bonos emitidos por SRE. Según los Demandantes, su contestación era pertinente para ciertas cuestiones presentadas por los Demandados del Gobierno en su memorando de ley en respaldo a su moción para desestimar estos procedimientos [17-AP-0029-LTS ECF Núm. 76].

Asociado celebraran contratos de crédito individuales con empleados del Estado Libre Asociado que participaban en SRE. La unión de crédito Demandante adicionalmente alegó que tenía derecho a ejecutar su gravamen alegado sobre las contribuciones de empleados después de que ciertos de sus prestatarios habían incumplido sus préstamos. La unión de crédito Demandante previamente había presentado una moción para levantar la paralización automática a fin de ejecutar su gravamen alegado [ECF Núm. 4011], la cual fue denegada por el Tribunal del Título III [ECF Núm. 4011]. El 3 de mayo de 2019, el SRE presentó una moción para desestimar la demanda, motivada en que los prestatarios-empleados no podían haber cedido sus contribuciones de empleado al Demandante, ya que los empleados no tenían un derecho retenido a las contribuciones pagadas al SRE, y que aun si el Demandante tuviera una reclamación directa a las contribuciones, cualquier gravamen estatutario no sería ejecutable contra las contribuciones de los empleados, ya que los bienes no eran trazables a los prestatarios-empleados particulares [Proc. Cont. Núm. 19-00028, ECF Núm. 11]. La unión de crédito Demandante presentó su objeción a la moción de desestimación el 28 de mayo de 2019 [Proc. Cont. Núm. 19-00028, ECF Núm. 15], y SRE y la Junta de Supervisión presentaron su contestación el 21 de junio, 2019 [Proc. Cont. Núm. 19-00028, ECF Núm. 18]. La unión de crédito Demandante presentó una contestación supletoria de su objeción a la moción el 16 de julio de 2019 [Proc. Cont. Núm. 19-00028, ECF Núm. 21]. El 15 de noviembre de 2019, el Tribunal del Título III dictó una orden donde se requiere contestación supletoria [Proc. Cont. Núm. 19-00028, ECF Núm. 22]. El 2 de diciembre de 2019, la Junta de Supervisión presentó su contestación supletoria, y el 16 de diciembre de 2019 la unión de crédito Demandante presentó su contestación supletoria [Proc. Cont. Núm. 19-00028, ECF Núm. 23, 24]. El 27 de marzo de 2020, el Tribunal del Título III emitió una orden denegando la moción de desestimación de la Junta de Supervisión, pero observando que lo más eficiente sería abordar las cuestiones planteadas por este procedimiento contencioso a través del litigio de las objeciones a las reclamaciones y otras cuestiones impugnadas relacionadas con el Plan Enmendado [Proc. Cont. Núm. 19-00028, ECF Núm. 25]. Por esta razón, el tribunal del Título III paralizó este procedimiento a la espera del litigio sobre el Plan de Ajuste.

(viii)    Moción de los Bonistas SRE para designar un síndico

El 19 de noviembre de 2019, los Bonistas SRE presentaron una moción donde se solicita la designación de un síndico o un fiduciario externo independiente como síndico de acuerdo con la sección 926 de 11 U.S.C. en el caso de Título III de SRE[113]. Los Bonistas SRE habían solicitado antes la misma reparación en febrero de 2019[114] Los Bonistas SRE argumentaron que la Junta de Supervisión no había protegido de manera adecuada sus intereses, al no abordar ciertas supuestas reclamaciones en nombre de SRE contra el ELA. Los Bonistas SRE sostuvieron que la Junta de Supervisión se rehusó a abordar dichas reclamaciones supuestas contra el ELA debido a un supuesto conflicto de intereses creado por la representación por parte de la Junta de Supervisión tanto del ELA como de SRE de acuerdo con PROMESA. Los Bonistas SRE sostienen además que el supuesto conflicto de intereses podría remediarse mediante la designación de un síndico de acuerdo con la sección 926 del Código de Quiebras para enjuiciar las supuestas acciones de revocación contra el ELA.

Los Bonistas SRE sostuvieron que la Junta de Supervisión, en su capacidad como representante del Título III para SER, supuestamente se había rehusado a llevar adelante dos reclamaciones en su nombre: una acción de revocación de acuerdo con la sección 549 del Código de Quiebras y una acción de acuerdo

---

[113] *Moción Renovada de ciertos acreedores garantizados del Sistema de Retiro de Empleado del Gobierno del Estado Libre Asociado de Puerto Rico para la designación de Síndicos conforme a 11 U.S.C. §926* [17-03566-LTS ECF Núm. 704] (la "Moción renovada").

[114] *Moción de ciertos acreedores garantizados del Sistema de Retiro de Empleado del Gobierno del Estado Libre Asociado de Puerto Rico para la designación de Síndicos conforme a 11 U.S.C. § 926* (la "Moción Renovada") [ECF Núm. 5169].

con la sección 544 del Código de Quiebras para evitar una transferencia. Esa recusación, de acuerdo con los Bonistas SRE, ameritaba la designación de un síndico.

El 7 de enero de 2020, el Tribunal del Título III denegó la Moción Renovada [Caso Núm. 17-bk-3566, ECF Núm. 763]. El 8 de enero de 2020, los Bonistas SRE presentaron una notificación de apelación al Primer Circuito, que se designó como Caso Núm. 20-1065. El Primer Circuito registró una orden el 15 de enero de 2020, donde se establece un calendario expedito de presentación de escritos y argumentos orales el 4 de marzo de 2020. El 15 de enero de 2020, los bonistas SRE presentaron sus escritos iniciales. El 7 de febrero de 2020, AAFAF, la Junta de Supervisión y el Comité de Jubilados presentaron sus escritos de contestación. El 21 de febrero de 2020, los bonistas SRE presentaron sus escritos de contestación. La apelación se argumentó en el Primer Circuito el 3 de marzo de 2020. Mediante opinión de fecha 19 de marzo de 2020, el Primer Circuito confirmó la denegación de la Moción Renovada por parte del Tribunal del Título III [Caso Núm. 20-1065]. El 9 de abril de 20209, el Primer Circuito dictó su mandato.

    c)    **Deuda AEP**

La AEP emitió múltiples series de bonos, los Bonos AEP (según se definen más arriba), en conformidad con determinadas resoluciones sobre bonos, incluyendo: (i) Resolución Núm. 77, adoptada el 16 de noviembre de 1970 (la "Resolución de Bonos 1970"), y (ii) Resolución Núm. 468, adoptada el 22 de junio de 1995 (la "Resolución de Bonos 1995" y conjuntamente con la Resolución de Bonos 1970, las "Resoluciones de Bonos AEP") según suplementadas por resoluciones separadas autorizando la emisión de cada serie de bonos bajo la Resolución de Bonos 1995, incluyendo a título enunciativo pero no limitativo, (a) Resolución Núm. 1596, adoptada el 10 de agosto de 2011, autorizando la emisión de los Bonos de Ingresos de Instalaciones del Gobierno AEP, Serie R (los "Bonos Serie R"), y (b) Resolución Núm. 1618, adoptada el 19 de Diciembre, 2011, autorizando la emisión de los Bonos de Ingresos de Instalaciones del Gobierno AEP, Serie T (los "Bonos AEP Serie T"). Por ley, el Estado Libre Asociado ha garantizado el pago de (i) renta por cualquier departamento, agencia, corporación pública, o instrumentalidades del Estado Libre Asociado en conformidad con cualquier contrato de arriendo con AEP aparte de los Municipios[115] y (ii) a su vencimiento, el capital e intereses de los Bonos AEP.[116]

***Bonos en Circulación***.[117] A la Fecha de la Petición AEP, AEP tenía un monto acumulado de capital de bonos en circulación de aproximadamente $3,968 millones bajo las Resoluciones de Bonos AEP, con tasas de intereses entre 1.08% y 7.00%. Se adjunta una lista de Bonos AEP en circulación como el Apéndice J.

En conformidad con la Ley AEP y las Resoluciones AEP, los Bonos AEP son pagaderos de los pagos de "renta" bajo los supuestos "arriendos", en conformidad con los cuales AEP arrienda sus propiedades a los departamentos, agencias, instrumentalidades, autoridades, corporación públicas y municipios del Estado Libre Asociado, y se requiere que dicha "renta" sea lo suficiente, en lo agregado, para pagar el capital y los intereses de los Bonos AEP a su vencimiento.[118]

En conformidad con las Resoluciones de Bonos AEP, todo pago de amortización de la deuda sobre los Bonos AEP debe ser depositado inmediatamente en determinadas cuentas especificadas, supuestamente

---

[115] 22 L.P.R.A. § 916.
[116] Ley Núm. 17-1968 de la Asamblea Legislativa de Puerto Rico, según enmendada.

[117] Los montos de bonos en circulación se basan sobre la mejor información disponible al público y pueden ser montos aproximados.

[118] 22. L.P.R.A. §§ 907(g) y 916; Bonos Resolución 1995 §§ 208(c), 701.

a ser mantenidas en fideicomiso para los tenedores de los Bonos AEP. Los Bonos AEP supuestamente están garantizados por un gravamen sobre todos los fondos en dichas cuentas.[119] Los Bonos AEP no están garantizados por hipotecas sobre ninguna propiedad de AEP ni por la cesión de arriendos de AEP.

### *Litigios Relacionados con los Bonos AEP.* [120]

(i) <u>Litigios de Lex Claims</u>

El 20 de Julio, 2016, ciertos bonistas GO iniciaron una acción ante el Tribunal Distrital de los Estados Unidos para el Distrito de Puerto Rico, en contra del Estado Libre Asociado y varios de sus funcionarios, incluyendo el Gobernador. *Lex Claims, LLC v. García-Padilla*, Caso Núm. 16-02374 (la "<u>Litigación Lex Claims</u>"). Los Demandantes alegaron, entre otras cosas, que la constitución del ELA requiere que el Estado Libre Asociado pague la Deuda GO antes de erogar cualquier otro gasto. Los bonistas de COFINA que intervinieron, alegaron que, dado que el Estado Libre Asociado comprometió su fe y crédito para el pago de renta sobre los arrendamientos de AEP con agencias e instrumentalidades del ELA, los bonos de AEP debían haber sido incluidos como deuda directa del ELA en el cálculo del límite de la deuda. El Litigio Lex Claims fue desestimado en conformidad con la transacción y compromiso de la Disputa COFINA-Estado Libre Asociado (según se define en la Sección V.J.9) y confirmación del plan de ajuste de COFINA, según se discute en mayor detalle en la sección V.J.4.b)) de esta Declaración de Divulgación.

(ii) *<u>Junta de Supervisión y Administración Financiera para Puerto Rico, y otros c. Autoridad de Edificios Públicos de Puerto Rico</u>*, Proc. Cont. Núm. 18-00149

El 21 de Diciembre 21, 2018, la Junta de Supervisión, actuando como representante del Estado Libre Asociado, y conjuntamente con el CANA, presentó una demanda contra AEP, solicitando una sentencia declaratoria que los supuestos arriendos celebrados por AEP con departamentos, agencias, instrumentalidades, autoridades, corporaciones públicas, municipios del Estado Libre Asociado no son transacciones bajo condiciones de mercado, sino más bien transacciones de financiamiento disfrazadas, cuyo único propósito es proveerle al Estado Libre Asociado de un instrumento para amortizar más de $4,000 millones que emitió para financiar la adquisición, construcción y/o mejoras de espacio de oficinas y otras instalaciones utilizadas por varios departamentos, agencias, e instrumentalidades del Estado Libre Asociado. Los Demandantes sostienen que AEP no tiene derecho bajo PROMESA o el Código de Quiebra a recibir pagos de rentas post-petición de los Deudores, ni de presentar reclamaciones administrativas en contra de los mismos. La Demanda solicita declaraciones de que: (1) los contratos de arriendo entre el AEP y diversas agencias gubernamentales no están sujetos a tratamiento en conformidad con la sección 365(d)(3) del Código de Quiebra, que requiere cumplimiento de todas las obligaciones del deudor bajo cualquier arriendo no expirado de bienes inmobiliarios no residenciales, hasta que dicho arriendo se haya asumido o rechazado, y por consiguiente los Deudores no tienen obligación de efectuar pagos al AEP bajo los arriendos, y (2) el AEP no tiene derecho a una reclamación de gasto administrativo prioritario, en conformidad con las secciones 503(b)(1) y 507(a)(2) del Código de Quiebra.

Varios Bonistas AEP y los aseguradores de línea única presentaron solicitudes para comparecer

---

[119] Id. § 502

[120] El Plan propone resolver todas las impugnaciones a los Bonos AEP mediante un acuerdo y una transacción globales a implementarse de acuerdo con el Plan.

como Demandados, y/o de conformidad con la sección 1109(b) del Código de Quiebras, incluyendo los Fondos AEP, Assured, Ambac, National, el Sub-Grupo de Fondos AEP,[121] el Grupo de Tenedores de Notas QTCB, y la LCDC [Proc. Cont. Núm. 18-00149, ECF Núm. 12, 14, 21, 23, 24, 26, 50]. El Comité de Jubilados presentó una moción para comparecer en calidad de Demandante [Proc. Cont. Núm. 18-00149, ECF Núm. 35]. La Junta de Supervisión no se opuso a la comparecencia, bajo la condición de que estaba sujeta a determinadas limitaciones y que el Tribunal del Título III posteriormente concedió [Proc. Cont. Núm. 18-00149, ECF Núm. 41, 54].

El 19 de marzo de 2019, los Comparecientes-Demandados presentaron contestaciones, y tres de los Comparecientes-Demandados (el Grupo de Tenedores de Notas QTCB, Los Fondos AEP, y Assured) presentaron reconvenciones [Proc. Cont. Núm. 18-00149, ECF Núm. 56, 57, 58, 59, 60].

El 24 de abril de 2019, la Junta de Supervisión presentó mociones para desestimar o anular cada una de las reconvenciones [Proc. Cont. Núm. 18-00149, ECF Núm. 76, 78, 80]. Específicamente, la Junta de Supervisión alegó que: (i) la Junta de Supervisión no puede ser demandada bajo la sección 105 de PROMESA, ya que exime a la Junta de Supervisión, sus miembros y empleados, de responsabilidad por acciones tomadas para ejecutar la ley PROMESA; (ii) que las reconvenciones deberían ser desestimadas por redundantes. El CANA y el Comité de Jubilados presentaron peticiones de acumulación en las mociones de desistimiento de la Junta de Supervisión [Proc Cont. Núm. 18-00149, ECF Núm. 81, 82, 83, 84, 85, 86].

El 21 de marzo de 2019, los Fondos AEP, Assured, y el Grupo de Tenedores de Notas QTCB presentaron una moción solicitando sentencia sobre las pretensiones en conformidad con la Regla Federal 12(c) de Proceso Civil [Proc. Cont. Núm. 18-00149, ECF Núm. 63]. La contestación de la Junta de Supervisión fue presentada el 6 de junio, 2019 [Proc. Cont. Núm. 18-00149, ECF Núm. 88]. El 21 de junio de 2019, la Junta de Supervisión presentó una moción urgente para la modificación de los plazos límites en anticipación a una moción para paralizar los procedimientos contenciosos, mientras quedaba pendiente la confirmación de un plan de ajuste (o, alternativamente en el caso de AEP, una moción calificadora bajo el Título VI de PROMESA). El 22 de junio de 2019, AEP presentó una contestación consintiendo a la moción de la Junta de Supervisión solicitando la paralización, aunque muchos otros comparecientes Demandados se opusieron a la moción urgente [Proc. Cont. Núm. 18-00149, ECF Núm. 92]. El 27 de junio de 2019, la Junta de Supervisión presentó una moción para paralizar el procedimiento contencioso, mientras quedaba pendiente la confirmación de un plan de ajuste conjunto del Estado Libre Asociado y el AEP (o alternativamente, en caso de la AEP, una modificación calificadora bajo el Título VI de PROMESA) que incorpora el marco de reestructuración discutido en el AAP Inicial [Proc. Cont. Núm. 18-00149, ECF Núm. 99]. El 28 de junio de 2019, el Tribunal del Título III concedió la solicitud urgente de la Junta de Supervisión respecto a todos los plazos límites existentes en el procedimiento contencioso, para que el cronograma de la litigación pudiera ser evaluado en el contexto de la moción de paralización de la Junta de Supervisión y la transacción propuesta [Proc. Cont. Núm. 18-00149, ECF Núm. 101]. El 8 de julio de 2019, AAFAF y la AEP presentaron una objeción conjunta a la moción de paralización de la Junta de Supervisión, alegando que (i) el AAP Inicial se había negociado sin ninguna aportación de AEP, (ii) AEP no era un deudor Título III, por consiguiente la Junta de Supervisión no puede confirmar ningún plan conjunto AEP/Estado Libre Asociado, y (iii) que el plan supuestamente contenía "disposiciones inviables" [Proc. Cont. Núm. 18-00149, ECF Núm. 102]. El 9 de julio de 2019, (i) el LCDC presentó una contestación apoyando la moción de paralización de la Junta de Supervisión [Proc. Cont. Núm. 18-00149, ECF Núm. 107]; (ii) Ambac y Assured presentaron objeciones a la moción de paralización [Proc. Cont. Núm. 18-00149, ECF Núm. 105, 108]; y

---

[121] La Junta de Supervisión posteriormente estipuló con Sub-Grupo de Fondos AEP, desestimándose del caso, sin prejuicio de la posibilidad de abrir autos subsiguientes, lo cual fue aprobado por el Tribunal del Título III AAP [Proc. Cont. Núm. 18-00149, ECF Núm. 62].

(iii) la AEP presentó una contestación a la moción de la Junta de Supervisión declarando que no se oponía a la moción [Proc. Cont. Núm. 18-00149, ECF Núm. 104]. El 16 de julio de 2019, el Grupo de Tenedores de Notas presentó una declaración en apoyo a la moción de la Junta de Supervisión [Proc. Cont. Núm. 18-00149, ECF Núm. 110]. La Junta de Supervisión no está de acuerdo con las posiciones de AAFAF ni de los comparecientes Demandados que se opusieron a la moción de paralización, y el 17 de julio de 2019, la Junta de Supervisión presentó su contestación, apoyando la paralización [Proc. Cont. Núm. 18-00149, ECF Núm. 111].

El 24 de julio de 2019, el Tribunal del Título III emitió la Orden de Paralización, que posteriormente se prorrogó hasta el 11 de marzo de 2020.[122] [Caso Núm. 17-bk-3283, ECF Núm. 8244]. El 10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado, recomendando que este litigio continúe paralizado incluso después del 11 de marzo de 2020[123] [Caso Núm. 17-bk-3283, ECF Núm. 11258]. Tras una vista celebrada el 4 de marzo de 2020, el Tribunal del Título III dictó la Orden de Paralización Definitiva y Mediación el 10 de marzo de 2020, que adoptó la recomendación del Equipo de Mediación y paralizó este litigio a la espera de una decisión sobre la confirmación del Plan Enmendado [Proc. Cont. Núm. 19-00291, ECF Núm. 57]. La paralización sigue vigente a esta fecha. Para más información sobre la Orden de Paralización Definitiva y Mediación, véase la sección V.I.3.b).

(iii) Impugnaciones a la validez de los Bonos AEP.

Ciertas partes también han presentado objeciones a la validez de los Bonos AEP. Los Bonistas GO presentaron una *Objeción Ómnibus Condicional del Grupo Ad Hoc de Bonistas de Obligaciones Generales a Reclamaciones presentadas o aseveradas por la Autoridad de Edificios Públicos, los Bonistas de la Autoridad de Edificios Públicos y los Tenedores de Ciertos Bonos de Obligaciones Generales del Estado Libre Asociado* [ECF Núm. 6099], donde se afirma que, si AEP está decidido a ser una "evasión inconstitucional" del límite de la deuda del ELA, cualquier remedio por dicha violación debe recaer sobre los bonistas AEP y, como consecuencia los Bonos AEP, en lugar de los Bonos GO Vintage posteriores, deberían invalidarse. CANA también ha presentado una *Objeción Ómnibus del Comité Oficial de Acreedores sin Garantía de acuerdo con la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a las Reclamaciones presentadas o aseveradas contra el Estado Libre Asociado por los Tenedores de ciertos Bonos de la Autoridad de Edificios Públicos de Puerto Rico* [ECF Núm. 8141], que busca que se impidan todas las reclamaciones presentadas o aseveradas contra el ELA basadas en ciertos Bonos AEP emitidos en 2011 y 2012, debido a que, según CANA, su emisión violaba el Límite Constitucional de Deuda.

El 24 de julio de 2019, el Tribunal del Título III emitió la Orden de Paralización, paralizando numerosos procedimientos que plantean cuestiones potencialmente relacionadas con un plan de ajuste y ordenando a las partes de esos procedimientos a participar en la mediación obligatoria relacionada con ellos.[124] El 10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado en relación con el progreso de la mediación obligatoria, recomendando que este litigio se paralice a la luz del AAP de GO/AEP. Tras una vista celebrada el 4 de marzo de 2020, el Tribunal del Título III dictó la Orden de

---

[122] Consulte la sección V.I.1 de esta Declaración de divulgación para obtener un resumen detallado de la Orden de Paralización.

[123] Consulte las secciones V.I.2 y V.I.3 para obtener un resumen detallado del Equipo de Mediación y del Informe Enmendado.

[124] Consulte la Sección V.I. de esta Declaración de Divulgación para obtener una descripción detallada de la Orden de Paralización, del Equipo de Mediación y del Informe Enmendado.

Paralización Definitiva y Mediación el 10 de marzo de 2020, que adoptó la recomendación del Equipo de Mediación y paralizó este litigio a la espera de una decisión sobre la confirmación del Plan Enmendado [Proc. Cont. Núm. 19-00291, ECF Núm. 57]. La paralización sigue vigente a esta fecha. Para más información sobre la Orden de Paralización Final y Mediación, *véase* la sección V.I.3.b).

2.       **Obligaciones de Pensiones**

Para obtener una descripción de las obligaciones de pensiones del Estado Libre Asociado, consulte el Informe de Pensiones, adjunto a la presente como el Apéndice I. En conformidad con la sección 211 de PROMESA, la Junta de Supervisión determinó que los sistemas de pensiones del Estado Libre Asociado estaban materialmente subfinanciados. Por consiguiente, la Junta de Supervisión realizó un análisis de los sistemas de pensiones para ayudar a la Junta de Supervisión a evaluar los impactos fiscales y económicos de los flujos de caja de las pensiones. El Informe sobre Pensiones cubre la historia de los sistemas de pensiones, reformas para mejorar su sostenibilidad de los beneficios, las emisiones de los bonos SRE, el impacto de los gastos PayGo en el pronóstico del superávit del Plan Fiscal, y otros asuntos relacionados.[125]

3.       **Otras Obligaciones Relacionadas con Beneficios Post-Empleo**

El Estado Libre Asociado provee varios otros beneficios post-empleo (o sea, no de pensiones) (los beneficios "OPEB") a los empleados jubilados, incluyendo bonos navideños y bonos para medicamentos, bonos de verano para jubilados SRJ, contribuciones a planes de seguro médico, prestaciones de discapacitación para puestos de alto riesgo, prestaciones mínimas de fallecimiento adicionales, y otros beneficios similares para empleados jubilados y discapacitados. Estos beneficios diversos son administrados por SRE, SRJ y SRM. Los planes de seguro médico consisten en (i) Contribución al Plan de Seguro Médico del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades ("SRE MIPC"), cubriendo sustancialmente todos los empleados de tiempo completo de los gobiernos primarios, de determinados Municipios de Puerto Rico y determinadas Unidades componentes del Estado Libre Asociado que no tienen planes de seguro médico propios; (ii) la Contribución al Plan de Seguro Médico del *Sistema de Retiro* de la Judicatura del Estado Libre Asociado ("SRJ MIPC"), cubriendo todos los jueces de la Rama Judicial del Estado Libre Asociado; y (iii) Contribución al Plan de Seguro Médico del Sistema de Anualidades y Pensiones para Maestros ("SRM MIPC"), cubriendo todos los maestros activos del Departamento de Educación del Estado Libre Asociado y empleados SRM.

Los planes fueron creados bajo la Ley 95 del 29 de junio de 1963. Los tres planes fueron patrocinados por el Estado Libre Asociado. Los beneficios se aportaban por medio de compañías aseguradoras, cuyas primas fueron pagadas por el jubilado, con una aportación equivalente por parte del Estado Libre Asociado de hasta $100 por mes. SRE MIPC era un plan de patronos múltiples, de costos compartidos, no financiado, mientras que SRJ MIPC y SRM MIPC eran planes de patrono único, no financiado.

En el caso de SRE MIPC y SRM MIPC, los empleados del Estado Libre Asociado se convertían en miembros a partir de su fecha de contratación, y tenían derecho a beneficios al alcanzar la edad aplicable de retiro para beneficios de pensión. Sin embargo, la Ley 3-2013 eliminó este beneficio para miembros

---

[125] El 28 de junio de 2019, el U.S. Government Accountability Office ("GAO") emitió una actualización a los Comités del Congreso sobre la perspectiva de la deuda pública para los cinco territorios de los Estados Unidos, incluyendo el Estado Libre Asociado (el "Informe GAO 2019"). La GAO notó que si bien las reformas de la Junta de Supervisión tienen el propósito de estabilizar el sistema de pensiones a largo plazo, funcionarios y expertos han declarado que los pagos de pensiones a jubilados actuales ya han comenzado a desplazar los gastos para otros servicios del gobierno debido al sistema de "pagar en la medida que se avanza" (PayGo).

SRE MIPC que se retiraron después del 30 de junio de 2013 y la Ley 160 eliminó este beneficio para miembros SRM MIPC que se retiraron después del 21 de julio de 2014. En el caso de SRJ MIPC, los jueces de la Rama Judicial del Estado Libre Asociado se convertían en miembros en su fecha de contratación, y se hacían elegibles para beneficios al cumplir 60 años con 10 años de servicio.

Cada plan de seguro médico era financiado por el Estado Libre Asociado, y se financiaba en base al sistema PayGo (una abreviatura del inglés "pay-as-you-go", o sea, pagar en la medida que se avanza). El financiamiento de los planes de seguro médico se aportaba a SRE MIPC, SRJ MIPC y SRM MIPC a través de asignaciones cada 1° de julio por (i) el Fondo General del Estado Libre Asociado; (ii) ciertas corporaciones con sus propias cajas; (iii) ciertas corporaciones públicas con sus propias cajas y municipios para sus ex-empleados. No había requerimiento de contribución para miembros del plan durante su empleo activo. Los jubilados contribuían el monto de la prima de seguro de salud no cubierta por el Estado Libre Asociado. El costo anual de los OPEB y la contribución anual requerida ("ARC") se calculaban en base a una valoración actuarial en conformidad con la Declaración GASB Núm. 45. Bajo la Ley 106, estos montos se incluían en los montos PayGo de las pensiones.

Los AAP que se han celebrado con diversas partes contemplan una reducción de dichos beneficios. *Ver* la sección II.B.1.b) de esta Declaración de Divulgación para una descripción más detallada.

## C.      Régimen de Ingresos y Tributos de Puerto Rico[126]

El Estado Libre Asociado es financiado por fondos internos (principalmente ingresos de contribuciones, tasas, y cargos) así como fondos y fondos federales.[127] Los ingresos tributarios del Estado Libre Asociado se componen predominantemente del impuesto sobre el ingreso, contribuciones indirectas o al consumo, e IVU. Dichas contribuciones se recaudan en conformidad con la Ley Núm. 1-2011, conocido como el Código de Rentas Internas de Puerto Rico del 2011, según enmendada ("Código 2011"), u otras leyes sobre el Fondo de Ingresos Especiales. Las fuentes de ingresos no tributarios incluyen los cargos de registro de vehículos automotor, cargos por servicios (incluyendo para procedimientos judiciales, servicios de salud pública y la entrega de documentos), multas de vehículos automotor, así como cargos para licencias profesionales, marcas registradas, cargos relacionados con la vivienda, y otros cargos y tasas.

El Estado Libre Asociado contabiliza la mayor parte de los ingresos tributarios que recauda en su Fondo General, que constituye su fondo operativo primario. Sin embargo, determinados ingresos del Estado Libre Asociado provenientes de fuentes designadas no se contabilizan en el Fondo General. En cambio, estos fondos se contabilizan en Fondos de Ingresos Especiales ("SRF"), ya que se asignan a organismos designados, o instrumentalidades para usos específicos.[128] Los aportes de los SRF incluyen:

---

[126] No se pretende que esta sección sea una descripción exhaustiva de todos los ingresos del Estado Libre Asociado; su propósito más bien es presentar una vista de alto nivel de algunas de las principales fuentes de ingresos del Estado Libre Asociado. Por otra parte, no se pretende que esta sección aporte consejos fiscales, y a los contribuyentes se les insta consultar con sus asesores fiscales sobre las consecuencias del Plan, a nivel local, territorial (incluyendo Puerto Rico), estatal, y federal de los EE.UU., y fuera de los EE.UU., según sus circunstancias individuales respectivas. Para una descripción de Ciertas Consideraciones Materiales Relacionadas con el Impuesto sobre el ingreso Federal de los Estados Unidos y Ciertas Consideraciones Relacionadas con el Impuesto sobre el ingreso de Puerto Rico, ver las Secciones XI y XII de la Declaración de Divulgación, respetivamente.

[127] Las fuentes de ingresos inter-gubernamentales son pagos en exceso cubiertos, resultantes de las contribuciones federales al consumo o indirectas sobre cerveza, vino y ron exportados de Puerto Rico.

[128] Todos los ingresos mencionados, incluyendo aquellos contabilizados en los Fondos de Ingresos Especiales, se contabilizan en el "Fondo General" para los fines de los estados financieros anuales del Estado Libre Asociado, preparados en conformidad con U.S. GAAP.

(i)     ciertos impuestos históricamente asignados, de acuerdo con ciertas condiciones, por las leyes de Puerto Rico a agencias, corporaciones públicas y otros terceros,

(ii)    cargos y tasas por servicios recogidos por las agencias del Estado Libre Asociado,

(iii)   dividendos u otras distribuciones recibidas por el Estado Libre Asociado de sus corporaciones públicas, y

(iv)    algunos otros ingresos.

Ciertos ingresos fiscales, como los ingresos del IVU transferidos a la COFINA y los ingresos expresamente designados como ingresos no disponibles del Estado Libre Asociado, no se contabilizan en el Fondo General ni en los SRF. Esos ingresos son administrados y gestionados directamente por la instrumentalidad gubernamental pertinente. Dado que el ELA sigue la práctica de mancomunar su efectivo, todos los ingresos contabilizados en el Fondo General y la mayoría de los ingresos contabilizados en los SRF (con sujeción a ciertas excepciones limitadas) se depositan en el sistema centralizado de gestión de efectivo del Estado Libre Asociado (la "Cuenta Única de Hacienda" "TSA").

Para el Año fiscal a la fecha 2021, julio de 2020 hasta diciembre de 2020, el Estado Libre Asociado informó preliminarmente cobros de aproximadamente $5,190 millones en ingresos tributarios a su Fondo General.

Para todo el Año fiscal 2020, el Fondo General reportó aproximadamente $9,290 millones (ver Tabla 1 a continuación). Dado que los ingresos del Año fiscal 2020 se retrasan hasta el Año fiscal 2021 debido a la Ley 57-2020, el importe comunicado para el Año fiscal 2021 en lo que va de año (de julio a diciembre) también incluye los ingresos tributarios del Año fiscal 2020. En diciembre de 2020, el Estado Libre Asociado informó aproximadamente unos $479 millones de dólares de estos ingresos retrasados. Si se excluye esta cantidad retrasada de los $5,190 millones de ingresos, los ingresos del Año fiscal 2021 hasta la fecha (de julio a diciembre) son de aproximadamente $4,710 millones, lo que es inferior en comparación con los aproximadamente $5,220 millones del mismo periodo del Año fiscal 2020. El descenso de los ingresos en lo que va del Año fiscal 2020 al Año fiscal 2021 se debe en parte a un pago no recurrente de $488 millones en 2020 que aumentó los ingresos del impuesto de sociedades, mientras que dicho pago no está disponible en 2021. Al mismo tiempo, si estos ingresos retrasados ($479 millones a diciembre de 2020) se añaden a los ingresos del Año fiscal 2020, los ingresos de todo el Año fiscal 2020 son de aproximadamente $9,800 millones, en comparación con los $11,380 millones del Año fiscal 2019 y los aproximadamente $9,310 millones del Año fiscal 2018, categorizados como sigue:

94

**Tabla 1: Componentes clave de los ingresos del año fiscal 2010 hasta el Año fiscal 2021 hasta la fecha[129]**

| Categoría de impuesto (millones de $) | Ingresos[130] | | | | |
|---|---|---|---|---|---|
| | AF2010 | AF2018 | AF2019 | AF2020 | AF2021 Año a la fecha |
| | Fondo General | Fondo General | Fondo General | Fondo General | Fondo General |
| (a)   Impuestos sobre el ingreso | | | | | |
| • Impuestos sobre el ingreso individual | $ 2,594 | $ 1,960 | $ 2,224 | $ 1,852 | $ 1,030 |
| • Impuestos sobre el ingreso de las sociedades | $ 1,682 | $ 1,776 | $ 2,492 | $ 2,072 | $ 1,040 |
| • Retención de no residentes | $ 830 | $ 637 | $ 630 | $ 379 | $ 168 |
| (b)   Impuesto sobre Ventas y Uso ("IVU")[131] | $ 540 | $ 1,646 | $ 2,299 | $ 1,635 | $ 995 |
| (c)   Arbitrio y otros impuestos | | | | | |
| • Impuesto al consumo Ley 154 | - | $ 1,915 | $ 2,083 | $ 1,848 | $ 729 |
| • Arbitrio sobre la cerveza/el alcohol | $ 285 | $ 264 | $ 275 | $ 234 | $ 137 |
| • Arbitrio sobre el tabaco | $ 183 | $ 156 | $ 101 | $ 89 | $ 51 |
| • Arbitrio sobre vehículos automotores | $ 351 | $ 407 | $ 519 | $ 382 | $ 295 |
| • Otros | $ 899 | $ 325 | $ 523 | $ 546 | $ 595 |
| (d)   Pagos de transferencia de cobertura del ron | $ 352 | $ 227[132] | $ 230[133] | $ 251 | $ 150 |

[129] Los ingresos del Año fiscal 2020 no incluyen el importe parcial que se retrasó al Año fiscal 2021 debido a la Ley 57-2020, y los ingresos del Año fiscal 2021 incluyen parte de la recaudación del Año fiscal 2020 que se retrasa al año fiscal FY2021. El importe retrasado que debería trasladarse al Año fiscal 2020 a partir de la recaudación del año hasta la fecha en el Año fiscal 2021 (de julio a diciembre) es de $479 millones.

[130] Fuentes: http://www.hacienda.gobierno.pr/inversionistas/estadisticas-y-recaudos-statistics-and-revenues/ingresos-netos-al-fondo-general-general-fund-net-revenues

[131] El IVU depositado en el Fondo General equivale al 10.5% del IVU gravado por el ELA menos el 53.65% del Monto Base del Impuesto a las Ventas Pignorado transferido a COFINA cada año fiscal.

[132] Este monto refleja únicamente la parte de los impuestos al consumo sobre el ron del Gobierno federal que posteriormente se transfieren al Fondo General después de que una determinada parte se retiene en una cuenta de Hacienda y posteriormente se distribuye a varios destinatarios, incluidos, entre otros, determinados productores de ron de la Isla, el Fideicomiso de Ciencia, Investigación y Tecnología de Puerto Rico y el Fideicomiso de Conservación de Puerto Rico. El total de remesas de impuestos del gobierno federal de conformidad con 26 U.S.C. § 7652 para el Año fiscal 2019 fue de aproximadamente $430 millones.

[133] Consulte *supra* núm. 119. El total de remesas de impuestos del gobierno federal de conformidad con 26 U.S.C. § 7652 para el Año fiscal 2019 fue de aproximadamente $433 millones.

| Total | $ 7,716 | $ 9,313 | $ 11,376 | $ 9,289 | $ 5,190 |
|---|---|---|---|---|---|

Muchos de estos impuestos del Estado Libre Asociado son recaudados por un sistema fiscal integrado, llamado Sistema Unificado de Rentas Internas ("SURI"), que se implementó entre 2017 a 2020 paulatinamente. Un lanzamiento importante del 24 de febrero de 2020, migrará los impuestos de sociedades e individuales a la plataforma. Los beneficios de la plataforma incluyen mejores capacidades de archivo y pago, flujos de trabajo digitales e integración de fuentes de datos anteriormente dispares. Se espera que con el tiempo estas características mejoren la capacidad del Departamento de Hacienda para servir a los contribuyentes y mejorar su capacidad de cumplimiento.

La disminución reportada en los ingresos del Fondo General del primer trimestre entre el Año fiscal 2020 y el Año fiscal 2021 fue del 23%. Es importante señalar que la disminución del cuarto trimestre del Año fiscal 2021 (39.7%) es en parte atribuible a las medidas de aplazamiento de la presentación de impuestos (Ley 57-2020), los resultados del Año fiscal 2020 se siguen actualizando a medida que se dispone de datos en relación con el retraso en la recepción de fondos relacionados con los ingresos tributarios del Año fiscal 2020.

**Tabla 2 - Ingresos totales del fondo general de Puerto Rico, Año fiscal 2019-2020 hasta la fecha, en millones**

| | 2019 | | | | 2020 | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|
| *1T* | *2T* | *3T* | *4T* | *1T* | *2T* | *3T* | *4T* | *1T* | *2T* |
| 2,244 | 2,154 | 3,150 | 3,828 | 2,808 | 2,412 | 2,259 | 2,307* | 2,161 | 2,532 |
| *Variación interanual* | | | | *25%* | *12%* | *(28%)* | *(4%)* | *(23%)* | *5%* |

*\* Los $2,224 millones del cuarto trimestre del Año fiscal 2020 incluyen el importe del cuarto trimestre que se trasladó al Año fiscal 2021 hasta octubre de 2021.*

El confinamiento obligatorio de todo el Estado Libre Asociado relacionado con la COVID y las subsiguientes restricciones de los horarios hábiles han tenido un impacto crítico y adverso en prácticamente la totalidad de la actividad económica del Estado Libre Asociado. El verdadero impacto cuantificable para Puerto Rico se desconoce en este momento, ya que la situación sigue en curso y se está supervisando estrechamente.

Sin embargo, los ingresos del Año fiscal 2021 hasta la fecha están superando las proyecciones del Año fiscal 2020 en mayo. Hay aumentos en " IVU", el impuesto sobre vehículos automotores y otros impuestos varios, en parte atribuibles a la gran infusión de dinero en efectivo del gobierno federal (como los pagos de estímulo, la ampliación de las prestaciones de UI y el programa PPP). El superávit final del Año fiscal 2021 sigue siendo incierto de calcular a la fecha de esta Declaración de Divulgación.

1.     **Reformas tributarias de 2018 en Puerto Rico (Ley 257-2018).**

Ha habido varias revisiones importantes al código tributario de Puerto Rico desde 1994, incluso la aprobación del Código de 2011 y al menos seis ajustes al Código de 2011 desde 2013.[134] Por ejemplo, el 10 de diciembre de 2018, Puerto Rico aprobó la Ley 257-2018, que incluyó varias enmiendas al Código de 2011 de Puerto Rico. Las enmiendas se describen con más detalle en las secciones sobre impuestos que se

---

[134] Las reformas incluyen: Ley 40-2013, "Ley de Redistribución y Ajuste de la Carga Contributiva"; Ley 120-2014, "Generación y Retención de Empleos en las PyMEs"; Ley 72-2015, "Ajustes al Código de Rentas Internas de 2011"; Órdenes Administrativas 2017-01 y 2017-05; y Ley 257-2018, "Ley de Reforma Tributaria de Puerto Rico 2018".

incluyen en este documento. Un principio rector de la política fiscal incorporado en la Ley 257-2018 es la neutralidad de los ingresos.

Algunas de las características más dignas de mención de la Ley 257-2018 son:

- Las enmiendas a las disposiciones sobre el impuesto sobre el ingreso aplicables a particulares y sociedades locales

- Cambios a las disposiciones del IVU, especialmente en relación con alimentos preparados

- La reintroducción de un Crédito por Trabajo

- La legalización de ciertos juegos de azar autorizados

Otros cambios en la Ley 257 incluyeron los siguientes:

La Ley 257-2018 redujo los impuestos al ingreso personal mediante la aprobación de un crédito fiscal no reembolsable del 5% y la reducción de la tasa básica del impuesto de sociedades en un 1.5%. Para compensar la reducción en la recaudación de impuestos, la Ley 257-2018 confió más en el uso de un nuevo impuesto llamado Contribución Básica Alterna ("CBA") y una ampliación de la Contribución Mínima Alterna ("CMA").

Además, la Ley 257-2018 incrementó la tasa de retención del impuesto sobre el ingreso de los pagos por servicios prestados en Puerto Rico a partir del 31 de diciembre de 2018, del 7% al 10%. Sin embargo, esto no modifica el tratamiento fiscal de las sociedades cubiertas por las leyes de incentivos, que se benefician de una serie de créditos, exenciones y deducciones fiscales específicos de las empresas y la industria.

A partir del 1 de octubre de 2019, la Ley 257-2018 redujo el IVU sobre alimentos preparados al 7%, siempre que la empresa solicitante obtenga una certificación del Secretario de Hacienda.

La Ley 257-2018 también eximió del IVU a determinados artículos tributables anteriormente, como los libros electrónicos y digitales, artículos sanitarios femeninos y servicios jurídicos. Además, la Ley 257-2018 aumentó el umbral para la exclusión de IVU para empresas y servicios profesionales designados sobre la base del volumen anual de negocios de $ 50,000 a $ 200,000 (vigente a partir del 1 de marzo de 2019).

La Ley 257-2018 también dispuso la legalización de ciertos juegos de azar, abordando la concesión de licencias y operaciones de máquinas, flujo de fondos al gobierno, el entorno regulador.

El 27 de diciembre de 2018 la Junta de Supervisión presentó una carta al Estado Libre Asociado en la que expresaba su preocupación por los Artículos 132 a 163 de la Ley 257-2018 que se refieren específicamente a la operación de máquinas de azar fuera de los casinos. Se notificó al Estado Libre Asociado que ambos reglamentos deben ser emitidos en relación con la concesión de licencias para juegos de azar que operan fuera de los casinos, y se requiere un análisis del impacto fiscal relacionado con los Artículos 132 a 163 según la Sección 204(a) de PROMESA. La Junta de Supervisión se reservó el derecho de tomar las medidas necesarias si el Estado Libre Asociado optaba por aplicar los artículos que no fueran acordes al plan fiscal certificado.

97

Por último, el mandato establecido por la Ley 257-2018 crea mayores interdependencias entre los contribuyentes y la información que están obligados a informar, lo que se espera permita una mayor supervisión y verificación de la información que se comunica al Gobierno.

Desde la aprobación de la Ley 257-2018 ha habido 3 grandes modificaciones al Código 2011 y a las leyes fiscales especiales: Ley 60-2019, Ley 40-2020 y Ley 57-2020, que se resumen a continuación. Desde la aprobación de la Ley 257-2018 ha habido al menos otras tres (3) modificaciones al Código 2011 y a las leyes fiscales especiales, entre ellas: La Ley 60-2019, la Ley 40-2020 y la Ley 57-2020, que se explican en las secciones III.C.2, III.C.3 y III.C.4 de esta Declaración de Divulgación.

2.        **Incentivos fiscales y créditos fiscales**

En el Año Fiscal 2020, las empresas ordinarias, las empresas de incentivos y los particulares han reclamado colectivamente $386 millones en créditos fiscales, lo que ha reducido la recaudación de ingresos netos. Hasta diciembre de 2020, se han solicitado $330 millones en créditos fiscales en el Año fiscal 2021.

Además de los créditos, deducciones y exenciones incluidos en el Código 2011 de Puerto Rico, Puerto Rico ha aprobado más de 60 leyes que ofrecen incentivos fiscales a personas y empresas que cumplen los criterios estipulados (colectivamente, las "Leyes de Incentivos"). Las empresas o individuos con incentivos que reúnen las condiciones para recibir tratamiento en virtud de las Leyes de Incentivos suelen pagar una tasa impositiva reducida y reciben exenciones del pago de determinados impuestos y tasas de IVU, licencias, impuestos municipales y otros.

En septiembre de 2019, el Departamento de Hacienda de Puerto Rico publicó su primer informe de gastos tributarios para el año fiscal 2017, que proporciona estimaciones de los ingresos no percibidos por los gastos tributarios en el impuesto sobre las rentas personales, el impuesto sobre la renta de las empresas, el IVU y los regímenes de arbitrios. Las estimaciones de costos no tienen en cuenta los efectos de la retroalimentación conductual o los efectos de la retroalimentación macroeconómica de la aplicación de las políticas. En general, el Código de Puerto Rico de 2011 contiene 302 gastos, de los cuales 104 corresponden al régimen del impuesto sobre las rentas personales, 142 al impuesto de sociedades, 27 al IVU y 29 al arbitrio. La suma de estos gastos fue de $21,200 millones, de los cuales $16,100 millones correspondieron al impuesto de sociedades, $3,300 millones al IVU, $1,300 millones al impuesto sobre la renta personal y $491 millones al arbitrio.

A continuación se describen varias de las leyes de incentivos ampliamente utilizadas en el ELA.[135] La Ley 60-2019, descrita en la siguiente sección, derogó y consolidó muchas de las Leyes de Incentivos de Puerto Rico, con las correspondientes normas respecto de la emisión de decretos tributarios, incentivos, subsidios y beneficios fiscales, en una sola ley con beneficios conformes. A continuación, se resumen varios de los incentivos fiscales derogados y consolidados por la Ley 60-2019.

***Ley 73-2008 (Ley de Incentivos Económicos para el Desarrollo de Puerto Rico).*** Esta ley generalmente proporciona incentivos fiscales a las empresas establecidas en Puerto Rico para la fabricación de productos a escala comercial y a las empresas dedicadas a una amplia gama de actividades económicas específicas, como investigación y desarrollo científico, reciclaje, hidroponía, licencias de propiedad intangible y desarrollo de software. Las empresas beneficiarias reciben tasas preferenciales del impuesto sobre el ingreso a partir del 4%, junto con diversas exenciones de los impuestos sobre la propiedad, los impuestos municipales sobre las licencias, los impuestos sobre la construcción y algunos impuestos IVU.

---

[135] No se trata de una lista exhaustiva de todos los incentivos ofrecidos a particulares y empresas, sino más bien de una muestra representativa de los tipos de incentivos ofrecidos por el Gobierno.

Al 30 de junio de 2020, 784 empresas han recibido incentivos fiscales de la Ley 73-2008. Esta ley representa $15,700 millones o el 78% de los aproximadamente $20,000 millones de gastos tributarios estimados por el Departamento de Hacienda en el informe de gastos tributarios inaugurales.

**Ley 74-2010 (Ley de Desarrollo Turístico de Puerto Rico).** Las corporaciones que construyen, poseen, manejan o administran hoteles y se dedican a otras actividades turísticas elegibles pueden beneficiarse de las disposiciones de la Ley 74-2010, conocida como la Ley de Desarrollo Turístico de Puerto Rico. Las empresas exentas reciben un crédito fiscal negociable basado en la inversión turística, una exención fiscal de los impuestos sobre el ingreso y los bienes inmuebles y personales, una exención de los impuestos municipales sobre las licencias, una exención de los impuestos municipales sobre la construcción, y una exención fiscal de los arbitrios y de los IVU sobre la adquisición de determinados productos utilizados en la actividad turística.

**Ley 27-2011 (Ley de Incentivos Económicos para la Industria Cinematográfica de Puerto Rico).** Esta ley fue diseñada para subsidiar y promover la industria cinematográfica de Puerto Rico. La ley ofrece exenciones fiscales y créditos fiscales a las productoras de cortometrajes, largometrajes, documentales, series, mini-series, videos musicales, comerciales, videojuegos y producciones de televisión como "reality shows". Los beneficios incluyen una tasa fija de impuesto sobre el ingreso del 4% sobre los ingresos netos derivados de los proyectos elegibles y exenciones fiscales sobre impuestos sobre la propiedad, impuestos municipales de licencia, impuestos sobre la construcción y otros impuestos municipales.

**Ley 83-2010 (Ley de Incentivos de Energía Verde de Puerto Rico).** Esta ley tiene como objetivo promover la producción de energías renovables, la energía "verde". Puerto Rico define la energía verde como energía renovable sostenible y energía renovable alternativa. Las energías renovables sostenibles incluyen la energía solar, eólica, geotérmica, de biomasa, hidroeléctrica, hidráulica marina e hidrocinética y térmica oceánica. Las energías renovables alternativas incluyen los residuos sólidos municipales, el gas de vertedero, la digestión anaeróbica y las pilas de combustible. Al igual que otras estructuras de incentivos, las empresas beneficiarias de la Ley 83-2010 reciben una tasa impositiva del 4 % del impuesto sobre el ingreso fija, junto con diversas exenciones en las distribuciones, impuestos sobre la propiedad, impuestos municipales sobre las licencias y arbitrios estatales y las ventas y el uso de materias primas y maquinaria y equipos utilizados en la producción de energía verde.

**Ley 20-2012 (Ley de promoción de la exportación de servicios).** La Ley 20-2012 promueve el establecimiento de operaciones de servicios de exportación prestados en Puerto Rico. Proporciona incentivos fiscales a las empresas que exportan servicios desde Puerto Rico a personas fuera de Puerto Rico sin nexo con Puerto Rico. Entre los incentivos se encuentra una tasa impositiva del 4% sobre el ingreso neta de los servicios de exportación, ningún impuesto sobre el ingreso sobre la distribución de dividendos que la empresa obtiene de sus ganancias y beneficios derivados de actividades elegibles, una exención de los impuestos municipales sobre el volumen de negocios derivados de actividades subvencionables y una exención de los impuestos sobre bienes inmuebles y bienes personales sobre determinadas actividades de servicios de exportación.

De conformidad con la Ley de Asignaciones Consolidadas de 2020 (Pub. L. 116-93). el IRS completó y publicó un estudio sobre la interacción entre las nuevas leyes tributarias territoriales (Leyes 20 y 22 de 2012 de Puerto Rico) y la sección 933 del Código de Rentas Internas de EE.UU. que permite la evasión de impuestos y niega ingresos a los gobiernos federales, estatales y territoriales, incluyendo a Puerto Rico.

**Ley 22-2012 (Ley Para Incentivar el Traslado de Individuos Inversionistas a Puerto Rico).** Los beneficios fiscales bajo la Ley 20-2012 son a menudo complementados con los beneficios fiscales bajo la

99

Ley 22-2012, conocida como la Ley Para Incentivar el Traslado de Individuos Inversionistas a Puerto Rico. Entre los incentivos para los residentes de la Ley 22-2012 se encuentra una exención del 100% del impuesto sobre el ingreso de Puerto Rico sobre todos los dividendos, una exención del 100% del impuesto sobre el ingreso de Puerto Rico en todos los intereses, y una exención del 100% del impuesto sobre el ingreso de Puerto Rico sobre las ganancias netas de capital a largo plazo devengadas después de que el inversionista residente individual ("IRI") se convierte en residente de Puerto Rico. Para calificar como IRI bajo la Ley 22-2012, una persona debe comprar una propiedad residencial dentro de los dos años después de convertirse en residente de Puerto Rico, debe abrir una cuenta bancaria en un banco o cooperativa de crédito ubicada en Puerto Rico, y debe hacer contribuciones benéficas a las entidades benéficas de Puerto Rico por un monto de $5,000 al año. Al 30 de junio de 2020, 2,331 beneficiarios reúnen las condiciones para recibir las prestaciones de la Ley 22-2012. El IRS anunció recientemente que auditará las obligaciones fiscales de los beneficiarios de la Ley 22 para verificar si sus estados financieros cumplen con las leyes fiscales federales. Esto ocurre después de que el estudio del IRS descrito anteriormente concluyera que al menos 647 beneficiarios de la Ley 22 evitaron pagar casi $558 millones en impuestos federales sobre la renta al disfrutar de los beneficios del decreto de la Ley 22-2012.

*Ley 273-2012 (Ley Reguladora del Centro Bancario Internacional).* La Ley 273-2012 proporciona exenciones fiscales a las empresas que realizan actividades elegibles en Puerto Rico. Para recibir esta exención, una empresa necesita convertirse en una Entidad Financiera Internacional ("EFI") mediante la solicitud de un permiso y licencia y la obtención de un decreto de exención fiscal. Los beneficios incluyen una tasa fija de impuesto sobre el ingreso del 4% sobre el ingreso neta e impuestos reducidos sobre los dividendos, bienes muebles e inmuebles, y los impuestos municipales de licencia. De los impuestos sobre el ingreso pagados por una EFI, el 7.5% se deposita en el Fondo Especial para el Desarrollo de la Exportación de Servicios y Promoción del Departamento de Desarrollo Económico y Comercio, creado por la "Ley de Servicios de Exportación" para promover el crecimiento de servicios y otros negocios elegibles en Puerto Rico.

*Ley 21-2019 (Ley de Desarrollo de Zonas de Oportunidad de Desarrollo Económico de Puerto Rico de 2019).* Aproximadamente el 95% del territorio de Puerto Rico es considerado una Zona de Oportunidad calificada bajo los parámetros establecidos por la ley federal. La Ley 21-2019 establece incentivos fiscales adicionales para inversiones en Zonas de Oportunidad calificadas. Las empresas reciben tasas impositivas preferenciales, créditos fiscales transferibles y exenciones parciales de los impuestos sobre la propiedad y municipales. Estas disposiciones, entre otros beneficios como el trámite expedito de permisos, tienen la intención de hacer que el mercado inmobiliario de Puerto Rico resulte más atractivo para los inversionistas que buscan aprovechar las Zonas de Oportunidad.

Como se comunicó en una carta del 17 de febrero de 2021 a la Junta de Supervisión, el DDEC ha suspendido la emisión de directrices para la aplicación de los incentivos de la Zona de Oportunidad ofrecidos en virtud de la Ley 60-2019 porque la Junta de Supervisión se opuso a los reglamentos propuestos por el DDEC por considerar que violaban la política y la Sección 204(b) de PROMESA. Las preocupaciones de la Junta de Supervisión incluyen que, tal como está redactada, los reglamentos propuestos por el DDEC exponen al Gobierno a riesgos que reducirían, en lugar de mejorar, los ingresos y el desarrollo económico. Los reglamentos propuestos por el DDEC también proporcionan un preocupante nivel de discrecionalidad al Secretario del DDEC, exponiendo a la agencia a acusaciones de favoritismo y corrupción. El DDEC ha solicitado una reunión con la Junta de Supervisión para elaborar un plan de acción para aplicar los incentivos de la Zona de Oportunidad.

*Ley 14-2017 (Ley de Incentivos para la Retención y Retorno de Profesionales Médicos).* Aprobada como ley el 21 de febrero de 2017, la finalidad de la Ley de Incentivos para la Retención y Retorno de Profesionales Médicos es garantizar servicios de salud accesibles y de calidad para todos los

residentes de Puerto Rico. La ley crea un marco para incentivar a los profesionales médicos calificados para residir y ejercer la práctica médica en Puerto Rico a través de incentivos fiscales atractivos. Los beneficios en virtud de la Ley 14-2017 fueron incorporados al Código de Incentivos (Ley 60-2019). Un médico calificado puede solicitar y obtener una exención fiscal en virtud de la Ley hasta el 31 de diciembre de 2020 para recibir los siguientes incentivos fiscales por un período inicial de 15 años:

- Una tasa impositiva fija del 4% sobre los ingresos elegibles generados como resultado de ofrecer sus servicios médicos profesionales

- Una exención del 100% (incluso la CMA) de hasta $250,000 dólares recibidos de dividendos elegibles, por año

- Elegibilidad para contribuir hasta el 25% de los ingresos netos a los planes de retiro individuales (Keogh) o hasta el 25% de su salario en caso de planes corporativos de retiro, como después de las contribuciones fiscales.

El médico calificado puede solicitar una prórroga de la subvención por otros 15 años, si puede demostrar que dicha prórroga es para beneficio económico de Puerto Rico.

***Comité de Autorización de Desembolsos y Concesiones Contributivas.*** El 7 de marzo de 2017, AAFAF emitió la Orden Administrativa 2017-01, que creó un Comité de Autorización de Desembolsos y Concesiones Contributivas (el "Comité"). El Comité evaluó las solicitudes de créditos fiscales pendientes y nuevas y estableció límites al uso y el calendario de los créditos fiscales concedidos. La Orden Administrativa también detuvo la concesión de nuevos créditos fiscales autorizados por diversas leyes de incentivos. El Comité fue disuelto por la Orden Administrativa 2018-10 emitida el 2 de julio de 2018 y todos los controles y limitaciones restantes establecidos por el Comité fueron derogados por la Ley 60-2019, descrita más detalladamente a continuación.

El 31 de octubre de 2018, la Junta de Supervisión presentó una carta para, en parte, pedir el restablecimiento del Comité con potestad para restringir el porcentaje de ingreso neto que puede ser compensado por créditos fiscales e imponer limitaciones en el número de años durante los cuales un crédito fiscal puede ser reclamado. El Plan Fiscal certificado también requiere que el gobierno ponga un límite a la emisión anual de créditos fiscales. Hasta la fecha, no se ha restablecido un comité de supervisión general de los créditos fiscales con autoridad para aprobar y limitar la concesión y la magnitud de los créditos fiscales anuales. La Ley 60-2019 sí estableció un "Comité de Proyectos Prioritarios en Zonas de Oportunidad" con una supervisión limitada a los proyectos elegibles para el estatus de crédito fiscal prioritario en las Zonas de Oportunidad, y no elegibles para los créditos fiscales alternativos de la Ley 60.

3. **Código de Incentivos de Puerto Rico (Ley 60-2019)**

El 1 de julio de 2019, el Estado Libre Asociado aprobó la Ley 60-2019 (el "Código de Incentivos de Puerto Rico" o "Código de Incentivos") para consolidar y modificar prospectivamente los incentivos fiscales existentes bajo las leyes en vigencia y adoptar un nuevo marco legal y administrativo para normalizar la forma en que se crean, aprueban, procesan y supervisan los nuevos incentivos. Las leyes de incentivos existentes, incluidas muchas de las descritas anteriormente, fueron derogadas y sustituidas por incentivos similares en la Ley 60-2019.

Para evaluar el beneficio fiscal de cada incentivo, la legislación utiliza un enfoque de Retorno de la Inversión ("ROI") combinado con una evaluación de los multiplicadores fiscales para dar prioridad a los incentivos de alto valor agregado en relación con los que no generan suficiente rendimiento económico. Sin

embargo, la legislación no incluye topes explícitos, reducciones o la eliminación de incentivos específicos. Más bien, la finalidad del Código de Incentivos es medir el ROI de los incentivos fiscales y económicos agrupándolos en un código transparente y uniforme.

Mediante el Código de Incentivos, el plazo, la tasa y las características de los incentivos ofrecidos se armonizan entre las industrias y los créditos. El Código de Incentivos también crea una Oficina de Incentivos para Empresas en Puerto Rico centralizada en DDEC y establece un Portal de Concesiones de Incentivos para centralizar, estandarizar y agilizar los procesos relacionados con la aplicación y aprobación de decretos, subvenciones en efectivo, créditos fiscales, subsidios y otros incentivos.

La Ley 60-2019 también exigía la divulgación pública de los beneficiarios de determinados incentivos fiscales. De acuerdo con ese requisito, DDEC implementó una base de datos en línea de todos los beneficiarios, que se actualiza mensualmente e indica el nombre del beneficiario, el tipo de prestación y la fecha de emisión del decreto, y se actualiza mensualmente. En el momento de la publicación de este documento (octubre de 2020), la base de datos revela 10,809 beneficiarios de determinados incentivos fiscales. En el momento de la publicación de este documento (octubre de 2020), la base de datos revela 10,809 beneficiarios de determinados incentivos fiscales. DDEC ha publicado la información pertinente para los destinatarios de los beneficios de las siguientes leyes: Ley 14-2017 (Retención de Médicos); Ley 20-2012 (Exportación de Servicios); Ley 22-2012 (Traslado de Inversionistas); Ley 273-2012 (Ley Reguladora del Centro Bancario Internacional); y Ley 27-2011 (Producción Cinematográfica). El DDEC publicó posteriormente datos adicionales el 11 de febrero de 2020, revelando los beneficiarios de los siguientes gastos fiscales: Ley 73-2008 (Ley de Incentivos Económicos para el Desarrollo de Puerto Rico); Ley 83-2010 (Ley de Incentivos de Energía Verde de Puerto Rico).

Muchas disposiciones de la Ley 60-2019 requieren la elaboración y aprobación de reglamentos antes de su implementación[136]. Los reglamentos iniciales se han presentado a la Junta de Supervisión para su revisión. La Junta de Supervisión ha expresado sus reservas en múltiples ocasiones con respecto a la ley y los reglamentos propuestos, con los principales puntos destacados que se resumen a continuación:

- Falta de enfoque estratégico

- Falta de mecanismo de caducidad

- Concentración de la autoridad en DDEC

- Papel anormal del poder legislativo

- Norma de evaluación defectuosa

- Información pública insuficiente

- Auditorías no suficientemente rigurosas

- Requisito inusual de que los beneficiarios realicen asignaciones en efectivo a entidades sin fines de lucro

- Disponibilidad de nuevas condiciones mejoradas de incentivos fiscales

---

[136] Conforme a la sección 204(b)(4) de PROMESA y la política de la Junta de Supervisión con respecto a ella, las normas, reglamentos, órdenes administrativas y órdenes ejecutivas propuestas abarcadas por dicha política, incluso todos los reglamentos de la Ley 60-2019, deben presentarse ante la Junta de Supervisión antes de emitirse para garantizar el cumplimiento del plan fiscal certificado del Estado Libre Asociado.

- Capacidad ilimitada para transferir incentivos fiscales

- Alcance geográfico no válido

Como se comunicó en una carta de fecha 17 de febrero de 2021 a la Junta de Supervisión, DDEC ha suspendido la aplicación de la Ley 60-2019 declarando que el Secretario de DDEC puede utilizar los reglamentos en vigencia en virtud de leyes similares anteriores como directrices para la concesión de incentivos en virtud de la Ley 60-2019, siempre y cuando los reglamentos no sean incompatibles con la Ley 60-2019.

4.    **Impuestos del ELA**

a)    **Impuestos sobre el ingreso**

***Impuestos sobre el ingreso individual.***

El Código 2011 de Puerto Rico estipula impuestos a los individuos a tasas que van del 0.0% para aquellos individuos que ganan $9,000 o menos al año a una tasa marginal máxima del 33% para aquellos con ingresos superiores a $61,500. Los residentes son gravados sobre los ingresos de casi todas las fuentes, y solo reciben exenciones o deducciones limitadas de sus ingresos, a menos que reciban una exención en virtud de uno de los programas de incentivos autorizados por la ley local.

| Si el ingreso tributable neto es: | El impuesto será: |
|---|---|
| Menos de $9,001 | 0% |
| De $9,001 a $25,000 | 7% |
| De $25,001 a $41,500 | 14% |
| De $41,501 a $61,500 | 25% |
| Más de $61,500 | 33% |

Como se ha descrito anteriormente, la ley impositiva local recientemente aprobada, la Ley 257-2018, redujo la tasa efectiva del impuesto sobre el ingreso de los individuos al permitir un descuento del 5% sobre la obligación tributaria de los particulares para los años fiscales que comiencen después del 31 de diciembre de 2018. Como consecuencia, muchos contribuyentes individuales solo pagarán el 95% de su deuda tributaria total anualmente. Si una persona está sujeta a la tasa de CMA, no son elegibles para el descuento del 5% autorizado por la Ley 257-2018.

Esta reducción del impuesto sobre el ingreso se paga, en parte, mediante el establecimiento de un nuevo régimen tributario bruto facultativo para determinados trabajadores autónomos establecido como parte de la Ley 257-2018. Para los años fiscales que comiencen después del 31 de diciembre de 2018, las personas que trabajan por cuenta propia, cuyos ingresos proceden sustancialmente de la prestación de servicios, pueden optar por utilizar un régimen impositivo fijo para determinar su pasivo por impuestos sobre el ingreso. La tasa impositiva se determina de acuerdo con un esquema de ingresos brutos previsto en la ley, y oscila entre el 6% y el 20%. El esquema completo es:

103

| Nivel de ingresos brutos: | La tasa impositiva será: |
|---|---|
| Menos de $100,001 | 6% |
| De $100,001 a $200,000 | 10% |
| De $200,001 a $300,000 | 13% |
| De $300,001 a $400,000 | 15% |
| De $400,001 a $500,000 | 17% |
| Más de $500,000 | 20% |

Para los años fiscales que se inicien después del 31 de diciembre de 2019, la Ley 40-2020 realizó nuevos ajustes al Código de 2011, proporcionando un descuento adicional del 3% para las personas físicas con ingresos brutos no superiores a $100,000. Se estimó que este ajuste tendría un costo de $26 millones. La Ley 40-2020 también trajo otros ajustes fiscales para el IVU sobre los servicios y las contribuciones especiales para los servicios profesionales y de consultoría. Se calcula que estos tres ajustes fiscales costaron al Gobierno $33.6 millones. Para pagar adecuadamente esta pérdida de ingresos anuales, la Ley 40-2020 dispuso un aumento de la tasa de presentación anual para los beneficiarios del decreto fiscal de la Ley 22-2012 de 300 a 5,000 dólares, así como otros pagadores, incluyendo la moratoria o la derogación de los créditos fiscales, los topes y la limitación de la emisión del crédito fiscal, y otros cambios.

La Ley 40-2020 realizó nuevos ajustes a las disposiciones del IVU del Código de 2011 al aumentar el umbral de exención de los servicios prestados por comerciantes con ventas brutas anuales de $200,000 a $300,000. Se estimó que este ajuste tendría un costo de $5.3 millones.

A partir del Año fiscal 2019, la Ley 257-2018 también restableció un crédito tributario por ingreso del trabajo ("EITC") en Puerto Rico. El valor del crédito generalmente oscila entre $300 y $2,000, según el estado civil, número de dependientes, e ingreso bruto ajustado. Dadas las dudas con la implementación del anterior EITC de Puerto Rico, la ley estableció nuevos requisitos para que los contribuyentes casados puedan reclamar el crédito. Cuando sea reclamado, el EITC producirá un costo para el gobierno y reducirá la recaudación del impuesto sobre el ingreso.

El 11 de marzo de 2021, el presidente Biden firmó la ley ARP. La ARP prevé otorgar a Puerto Rico una contraprestación dólar por dólar por cualquier expansión que supere los $200 millones (hasta $600 millones en costos incrementales). Esto depende de que Puerto Rico aumente los incentivos al trabajo en el sistema EITC existente, lo que suele entenderse como un aumento de la tasa de introducción progresiva del EITC (aunque actualmente no existe ninguna normativa formal al respecto).

La ARP asimismo ampliaría el acceso de Puerto Rico al crédito fiscal por hijos ("CTC"). En la actualidad, la disposición del CTC en Puerto Rico está condicionada a tener al menos tres hijos, requisito que la legislación elimina. Esto haría que el CTC pueda aplicarse en un porcentaje de hogares puertorriqueños mucho mayor.

En la sección V.B.2.c) de esta Declaración de Divulgación se pueden encontrar detalles adicionales sobre las acciones del Gobierno, incluidas las órdenes ejecutivas, para establecer controles de costos y políticas fiscales.

104

*Impuesto al ingreso societario para las sociedades regulares*. Las sociedades en Puerto Rico generalmente se categorizan bajo uno de los dos tipos, sociedades regulares o sociedades que reciben incentivos. A menos que una sociedad reúna los requisitos para la exención parcial de ingreso societario y otros impuestos en virtud de los programas de incentivos fiscales, se la considera una sociedad regular sujeta al impuesto de sociedades a tasas graduales.

La Ley 257-2018 redujo la tasa máxima del impuesto de sociedades regulares en Puerto Rico para los años fiscales que comienzan después del 31 de diciembre de 2018. Se aplicó una reducción 1.5% la tasa impositiva básica, del 20% al 18.5%. Como resultado, la tasa marginal superior del impuesto de sociedades, incluidos los impuestos adicionales pertinentes, disminuyó del 39% al 37.5%. El esquema completo del impuesto de sociedades regulares figura a continuación:

| Ingresos netos sujetos a impuestos adicionales: | Impuesto básico: | Impuesto adicional: | Tasa marginal total del impuesto de sociedades: |
|---|---|---|---|
| Menos de $75,001 | 18.5% | 5% | 23.5% |
| De $75,001 a $125,000 | 18.5% | 15% | 33.5% |
| De $125,001 a $175,000 | 18.5% | 16% | 34.5% |
| De $175,001 a $225,000 | 18.5% | 17% | 35.5% |
| De $225,001 a $275,000 | 18.5% | 18% | 36.5% |
| Más de $275,001 | 18.5% | 19% | 37.5% |

Para pagar la reducción de la tasa base tributable para el impuesto de sociedades, la Ley 257-2018 permite a los contribuyentes societarios que desarrollan un comercio o una actividad donde los ingresos se derivan sustancialmente de los servicios y están sujetos a retención en origen, optar por utilizar una tasa impositiva fija para determinar su pasivo tributario por impuestos sobre el ingreso. La tasa fija se aplicará a los ingresos brutos derivados de la prestación de servicios de la siguiente manera:

| Nivel de ingresos brutos: | El impuesto será: |
|---|---|
| Menos de $100,001 | 6% |
| De $100,001 a $200,000 | 10% |
| De $200,001 a $300,000 | 13% |
| De $300,001 a $400,000 | 15% |
| De $400,001 a $500,000 | 17% |
| Más de $500,000 | 20% |

Además, la Ley 257-2018 incrementó la tasa de retención del impuesto sobre el ingreso de los pagos por servicios prestados en Puerto Rico después del 31 de diciembre de 2018, del 7% al 10%. Se espera que este nuevo proceso, combinado con un nuevo requisito de la Ley 257-2018 de transigir los rendimientos trimestralmente, conduzca a una recaudación de impuestos considerablemente mayor.

También es probable que la recaudación de ingresos societarios mejore con un cambio reciente en la definición de ingresos procedentes de fuentes de Puerto Rico. En general, la compensación por el trabajo realizado o los servicios personales prestados fuera de Puerto Rico no están sujetas a impuestos porque se consideran ingresos de fuentes fuera de Puerto Rico. La Ley 257-2018, sin embargo, provee un cambio por el cual los pagos por servicios ofrecidos fuera de Puerto Rico a cualquier agencia, dependencia o instrumentalidad del gobierno de Puerto Rico, una corporación pública, así como la legislatura, el poder judicial y los municipios, o cualquier otra entidad, creada por ley estatal o federal, cuyos fondos provienen, total o parcialmente, del Fondo General se considerarán como ingreso de fuentes dentro de Puerto Rico y se gravarán en consecuencia. Estas disposiciones fueron enmendadas mediante la Ley 17-2019 para limitar esta norma, a partir del 1 de agosto de 2019, a los servicios bajo un contrato que no sea remitido a la Oficina del Contralor de Puerto Rico, siempre que dicho contrato no esté expresamente exento de cumplir con el requisito de remisión a la Oficina del Contralor de Puerto Rico (en virtud de la Ley Núm. 18 de 30 de octubre de 1975, según enmienda, o su reglamento aplicable).

Puerto Rico también mantiene un Régimen Contributivo Mínimo Alterno. La tasa impositiva mínima alterna es del 18.5% para los contribuyentes con un volumen de negocios de menos de $3 millones. Si el volumen de negocios de un contribuyente es de $3 millones o más, la tasa de CMA aplicable es del 23%.

Además de los créditos, las deducciones y las exenciones incluidos en el Código de 2011 de Puerto Rico, Puerto Rico ha aprobado más de 60 leyes que ofrecen incentivos fiscales a individuos y sociedades que cumplen ciertos criterios (colectivamente, las "Leyes de Incentivos"). Las sociedades que reciben incentivos que reúnen las condiciones para recibir tratamiento en virtud de las Leyes de Incentivos suelen pagar una tasa impositiva considerablemente reducida y normalmente reciben exenciones del pago de determinados impuestos y tasas de IVU, propiedades, municipales y otros.

En julio de 2019, uno de los mayores declarantes de impuestos de Puerto Rico completó una transacción societaria por única vez, que resultó en un ingreso no recurrente de $488 millones en el Año fiscal 2020. El Departamento de Hacienda de Puerto Rico también proyectó una reducción de $39 millones en el impuesto societario como resultado de esta transacción a partir del Año fiscal 2021. El Departamento de Hacienda de Puerto Rico sigue evaluando la proyección del impacto a largo plazo, y la reducción estimada a futuro está sujeta a cambios.

A tenor con diversas Determinaciones Administrativas emitidas por el Departamento de Hacienda de Puerto Rico y de la Ley 57-2020, se pospusieron varios plazos de presentación de ciertos formularios y declaraciones tributarias, así como el pago de ciertos impuestos que debían pagarse durante el año 2020, sin la imposición de intereses, recargos o sanciones. Esto fue en respuesta a la orden ejecutiva del Gobernador OE-2020-020 que declara el estado de emergencia y el cierre de los servicios esenciales del gobierno para facilitar la desaceleración de la propagación del virus COVID-19.

Para el Año fiscal 2020, los ingresos fiscales combinados del Fondo General y del SRF para las sociedades regulares y sociedades que reciben incentivos del ELA ascendieron a aproximadamente $2,124 millones.

A diciembre de 2020, Hacienda informó unos ingresos incluidos en la categoría "Otros ingresos del Fondo General" que incluyen una recaudación total de $595 millones, de los cuales $35 millones son impuestos diferidos del Año fiscal 2020 recaudados durante el Año fiscal 2021, $182 millones se atribuyen a sociedades y $205 millones están relacionados con otros arbitrios no clasificados. Según Hacienda, los ingresos acumulados de las sociedades tienen que ver con una disposición opcional incluida en la Ley 60-2019 que permite a las sociedades presentar y pagar a nivel de sociedad en lugar de a nivel de socio. Según

106

Hacienda, el aumento de otros arbitrios es atribuible a los pagos de arbitrios que se han recibido sin que se haya presentado la declaración correspondiente. Hacienda sigue analizando estos ingresos para poder asignarlos a las categorías de arbitrios adecuadas. Según Hacienda, estos problemas surgieron durante la transición a la plataforma SURI.

*Retención a individuos no residentes*. En general, los no residentes están sujetos a una retención de impuestos sobre ciertos pagos recibidos de fuentes de Puerto Rico. La tasa de retención regular de estos pagos a no residentes es del 29%, sin embargo ciertos contribuyentes pueden gozar de un tratamiento fiscal más favorable. Por ley, se supone que el 10% de los ingresos derivados de la retención sobre regalías pagadas por sociedades que operan al amparo de la Ley 73-2008 se destinan al Fondo para el Desarrollo Económico ("FEDE"), un fondo de incentivos administrado por PRIDCO. Los ingresos consignados a FEDE se registran en un Fondo General y se utilizan para proporcionar incentivos económicos a empresas privadas. Sin embargo, el porcentaje transferido ha sido históricamente inferior al 10%. La sección 5010.01(i) de la Ley 60-2019 creó el nuevo Fondo de Incentivos Económicos y lo designó como sucesor de varios fondos, incluido FEDE.

Además del impuesto sobre regalías, a menos que exista un decreto de incentivos, los dividendos pagados a corporaciones y particulares no residentes están sujetos a una retención a cuenta del 10% y 15%, respectivamente, y los intereses pagados a subsidiarias no residentes están sujetos a una retención del 29%.

Para el Año fiscal 2020, los ingresos por impuestos retenidos a no residentes del ELA ascendieron a aproximadamente $379 millones, en el Fondo General y $11 millones en SRF.

*Otros impuestos sobre el ingreso.* Los ingresos procedentes de otros impuestos sobre el ingreso incluyen los ingresos procedentes de las asociaciones, los impuestos sobre intereses y dividendos y los impuestos sobre sucesiones y donaciones.

      b)    **IVU**

El <u>IVU</u> del Estado Libre Asociado se aprobó originalmente en 2006 en virtud de la Ley núm. 117-2006. El <u>IVU</u> reemplazó el anterior 5% (efectivo 6.6%) del arbitrio general sobre bienes importados y el 3.6% del arbitrio general sobre bienes manufacturados en Puerto Rico.

El <u>IVU</u> se grava a la venta, utilización, consumo y almacenamiento de elementos tributables, incluidos los bienes personales tangibles, los servicios tributables, los derechos de admisión y otros tipos de operaciones que cubran elementos tributables separables e identificables que se vendan a un precio único, con algunas excepciones y limitaciones. No obstante, determinados productos, como la gasolina, el petróleo crudo, los productos petrolíferos y los vehículos, siguen estando sujetos al arbitrio anteriormente aplicable a dichos productos y no están sujetos al <u>IVU</u>.

El <u>IVU</u> del Estado Libre Asociado tenía una tasa impositiva original del 5.5%. La Ley 117-2006 también autorizó a cada gobierno municipal a imponer un <u>IVU</u> del 1.5% (el "<u>IVU municipal</u>"), que generalmente tiene la misma base tributable, exenciones (excepto para alimentos no procesados) y limitaciones que las previstas para el <u>IVU</u> del ELA. En conjunto, la tasa fue del 7.0%. La Ley 18-2014 redujo la parte del <u>IVU</u> municipal asignada a los municipios al 1.0% y asignó el otro 0.5% al Fondo de Administración Municipal, un fondo creado para proporcionar un mecanismo financiero para financiar la deuda de los municipios.

En 2013, la Ley 40-2013 eliminó varias exenciones al <u>IVU</u>, lo que amplió su base, y la Ley Núm. 46-2013 exigió la declaración y el pago del <u>IVU</u> sobre bienes importados en el momento de su entrada a Puerto Rico.

El 29 de mayo de 2015, el Estado Libre Asociado aprobó la Ley 72-2015 que, entre otras cosas,

(i)      aumentó la tasa de <u>IVU</u> al 10.5% a partir del 1 de julio de 2015, con un aumento neto del 4.5% en beneficio del Fondo General, y

(ii)      eliminó varias exenciones.

Aunque las disposiciones aprobadas en virtud de la Ley Núm. 72-2015 han experimentado diversas enmiendas desde su aprobación original, el <u>IVU</u> del ELA sigue siendo del 10.5%. Una parte del IVU se asigna a COFINA de conformidad con una fórmula legal, ajustado con arreglo al Plan de Ajuste de COFINA, asignándose el balance al Fondo General del ELA. Con el 1.0% asignado al IVU Municipal, la tasa total del IVU en Puerto Rico es del 11.5%, una de las tasas más altas de los Estados Unidos. Aparte del IVU general, también hay un IVU especial del 4%, gravado por el ELA, que es generalmente aplicable a los servicios de empresa a empresa y servicios profesionales designados prestados por comerciantes con un volumen de negocios anual superior a $200.000 ($300,000 en el caso de los servicios de empresa a empresa prestados después del 1 de julio de 2020).

La Ley 257-2018 modificó tanto la tasa como los elementos sujetos al <u>IVU</u> del ELA. La Ley 257-2018 amplió la base del <u>IVU</u> al ampliar la posibilidad de gravar determinadas categorías, incluidos los clubes de compras con descuento y determinados tipos de dulces. La Ley 257-2018 también redujo otras partes de la base y tasa del <u>IVU</u> tributable. A partir del 1 de octubre de 2019, la Ley 257-2018 redujo el <u>IVU</u> sobre alimentos preparados vendidos por los restaurantes al 7.0%, siempre que el restaurante obtenga una certificación del Secretario de Hacienda. La Ley 257-2018 también eximió del <u>IVU</u> a determinados artículos tributables anteriormente, incluidos libros electrónicos y digitales, artículos sanitarios femeninos y determinados servicios jurídicos. Por último, la Ley 257-2018 aumentó el umbral para la exclusión de <u>IVU</u> para servicios de empresa a empresa y profesionales designados sobre la base del volumen anual de negocios del comerciante de $ 50,000 a $ 200,000 después del 1 de marzo de 2019. Este umbral fue aumentado a $300,000 por la Ley 40-2020 con respecto a los servicios de empresa a empresa prestados después del 1 de julio de 2020.

*Cannabis medicinal*. El uso de cannabis medicinal ha sido permitido en Puerto Rico desde 2015 a través de la Orden Ejecutiva Núm. OE-2015-35 e implementada por el Reglamento del Departamento de Salud de Puerto Rico Núm. 8766, en su forma enmendada. Sin embargo, el 9 de julio de 2017, el Gobernador de Puerto Rico firmó la Ley 42-2017, la "Ley para Manejar el Estudio, Desarrollo e Investigación del Cannabis para la Innovación, Normas Aplicables y Límites", que legaliza y regula el uso de cannabis en Puerto Rico con fines médicos, pero mantiene prohibido el uso recreativo. Con esta legislación, la nueva administración creó un sólido marco legal para proteger a los pacientes, y para abordar la regulación, control y supervisión de la industria del cannabis medicinal. La venta de cannabis medicinal está sujeta al 11.5% de <u>IVU</u>. Los médicos también pagan $1,500 cada tres años por un permiso para emitir recetas a los pacientes.

*Acciones federales*. Para mitigar el impacto económico de COVID-19, el Gobierno Federal emitió una serie de proyectos de ley de estímulo de emergencia para disminuir la carga de las empresas y los individuos en los Estados Unidos. Un resumen de las acciones de estímulo de COVID-19 tanto del Gobierno Federal de los Estados Unidos como del Estado Libre Asociado de Puerto Rico se proporciona en la sección de Desastres Naturales y COVID-19 de esta declaración de divulgación.

***Determinaciones administrativas de Hacienda del ELA***. El 9 de enero de 2020 se experimentó una actividad sísmica significativa en todo Puerto Rico, lo que hizo que el Gobernador declarara el estado de emergencia. Como resultado de esta declaración, el Secretario del Departamento de Hacienda anunció la eliminación temporal del cobro y pago del IVU hasta las 11:59 p.m. (hora estándar del Atlántico) del 31 de enero de 2020. Esto se hizo mediante la Determinación Administrativa 20-01, que notificaba a los comerciantes que las personas estaban exentas de pagar IVU sobre artículos tributables considerados como alimentos preparados, incluidas las bebidas carbonatadas y productos horneados y pasteles definidos en el Código de 2011 de Puerto Rico. La exención del IVU no se aplicó a las ventas de bebidas alcohólicas.

El 31 de enero de 2020, la exención del IVU en virtud de la Determinación Administrativa 20-01 se prorrogó mediante la Determinación Administrativa 20-02 durante 30 días más, hasta el 29 de febrero de 2020, para los municipios bajo la declaración de desastre mayor.

El 15 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-03, por la que se autoriza una prórroga de 30 días de las fechas límite en relación con la presentación de las Declaraciones del Impuesto sobre el Ingreso de 2019 y el pago de impuestos, así como la primera cuota estimada del año calendario 2020 hasta el 15 de mayo de 2020. Esta determinación fue aprobada por la Junta de Supervisión el 25 de marzo de 2020.

El 16 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-05, para prorrogar por dos meses los plazos para la presentación y el pago de otros impuestos, incluyendo el IVU, bonos y licencias. Esta determinación fue aprobada por la Junta de Supervisión el 25 de marzo de 2020.

El 18 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-07, emitiendo una exención temporal del IVU sobre "Artículos de Primera Necesidad" para el período del 23 de marzo de 2020 al 30 de abril de 2020. Esta determinación fue aprobada por la Junta de Supervisión el 16 de marzo de 2020.

El 18 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-08, emitiendo una exención temporal del impuesto sobre las ventas sobre los "alimentos preparados" para el período del 20 de marzo de 2020 al 19 de abril de 2020. Si un comerciante, por acción u omisión, cobra a un consumidor el Impuesto sobre las Ventas sobre la venta de artículos de alimentos preparados, el comerciante estaba obligado a devolver inmediatamente el importe del impuesto sobre las ventas cobrado al consumidor. Esta determinación fue aprobada por la Junta de Supervisión el 18 de marzo de 2020.

El 24 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-09, que modifica el Boletín Informativo 20-08 y deroga las Determinaciones Administrativas 20-03 y 20-05. Esta determinación fue aprobada por la Junta de Supervisión el 25 de marzo de 2020. En virtud de la Determinación Administrativa 20-09:

- El plazo para la presentación de las declaraciones mensuales del IVU y el pago correspondiente para los períodos de febrero, marzo, abril y mayo de 2020 se prorrogó dos meses.

- Las declaraciones del impuesto sobre el ingreso cuya fecha de vencimiento original era el 15 de marzo de 2020 se prorrogaron hasta el 15 de junio de 2020; las declaraciones del impuesto sobre el ingreso cuya fecha de vencimiento original era el 15 de abril de 2020 se prorrogaron hasta el 15 de julio de 2020; y las declaraciones del impuesto sobre el ingreso

cuya fecha de vencimiento original era el 15 de mayo de 2020 o el 15 de junio de 2020 se prorrogaron hasta el 15 de julio de 2020;

- Otras declaraciones cuyo vencimiento original caía durante los meses de marzo y abril de 2020 se prorrogaron hasta junio de 2020; y otras declaraciones cuyo vencimiento original caía durante los meses de mayo y junio de 2020 se prorrogaron hasta julio de 2020;

- Cualquier bono que tuviera una fecha de vencimiento entre el 15 de marzo de 2020 y el 30 de abril de 2020 se prorrogó hasta el 31 de mayo de 2020; y

- Todas las licencias de ingresos internos que tenían una fecha de vencimiento entre el 15 de marzo de 2020 y el 30 de abril de 2020 se prorrogaron hasta el 31 de mayo de 2020.

El 24 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-10, por la que se establecen medidas de flujo de caja sobre los impuestos. Esta determinación fue aprobada por la Junta de Supervisión el 25 de marzo de 2020. Las medidas de flujo de caja incluyen:

- No imposición de sanciones por la falta o insuficiencia de pago del primer y segundo plazo del impuesto estimado de 2020;

- Exención de la retención, pero no exención de pago; y

- Exención temporal del IVU en la importación y compra de artículos tributables para la reventa durante el período del 6 de abril de 2020 al 30 de junio de 2020.

El 26 de marzo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Carta Circular de Rentas Internas 20-21, estableciendo un incentivo de $500 para los trabajadores que trabajan por cuenta propia que sean residentes de Puerto Rico, los ingresos estén sujetos a la contribución federal del seguro social y estén debidamente registrados en el SURI como comerciantes. Esta carta fue aprobada por la Junta de Supervisión el 26 de marzo de 2020 y la prórroga fue aprobada el 4 de mayo de 2020. Este incentivo se prorrogó a través de la Circular 20-25 de Rentas Internas hasta el 30 de junio de 2020, y con la Circular 20-27 se amplió la elegibilidad del incentivo con el fin de extender los beneficios económicos a aquellas personas físicas que sean autónomas y que, a partir del 15 de marzo de 2020, hayan sido diligentes en el cumplimiento de su responsabilidad de obtener su Certificado de Registro de Comerciantes en SURI, tal y como lo exige el Código de 2011. La Circular 20-37 prorrogó los plazos de los incentivos de las Circulares 20-26 y 20-27 hasta el 15 de septiembre de 2020.

El 18 de abril de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-11 que enmendó la Determinación Administrativa 20-08 para prorrogar la exención del IVU en los alimentos preparados hasta el 3 de mayo de 2020.

El 1 de mayo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-12 que enmendó la Determinación Administrativa 20-07 para prorrogar la exención del IVU en los Artículos de Primera Necesidad desde el 30 de abril de 2020 hasta el 31 de mayo de 2020.

El 3 de mayo de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-13, que enmendó la Determinación Administrativa 20-011 para prorrogar la exención del IVU en los alimentos preparados hasta el 25 de mayo de 2020. El 26 de mayo de 2020, el Estado Libre

Asociado solicitó una nueva prórroga de la exención temporal del IVU en los alimentos preparados, pero fue denegada por la Junta de Supervisión.

El 1 de junio de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-16 que enmendó la Determinación Administrativa 20- 07 y 20-12 para prorrogar la exención del IVU en los Artículos de Primera Necesidad hasta las 11:59 del 30 de junio de 2020. Esta determinación fue aprobada por la Junta de Supervisión el 1 de junio de 2020.

El 16 de julio de 2020, el Secretario de Hacienda de Puerto Rico emitió la Determinación Administrativa 20-17 que enmendó la Determinación Administrativa 19-05 para posponer la fecha límite de implementación del Requisito de Exención de Arrendamiento Comercial al 30 de junio de 2021. La Exención de Arrendamiento Comercial exime a los inquilinos que reúnen los requisitos de pagar el IVU sobre el canon de arrendamiento de una propiedad comercial al propietario según la sección 4030.14 (b) del Código de 2011.

Además, el 16 de julio de 2020, se emitió la Determinación Administrativa 20-18 para modificar la Sección 4030.20 (b) del Código de 2011 y ampliar la exención del IVU sobre los uniformes y materiales escolares de 2 a 4 días. Esta determinación se emitió de acuerdo con las múltiples Órdenes Ejecutivas emitidas por el Gobernador para que se tomen precauciones de seguridad más rigurosas para ayudar a frenar la propagación de la COVID-19. El periodo establecido de exención del IVU fue el 29 de julio de 2020 al 1 de agosto de 2020.

El 29 de julio de 2020, el Gobernador de Puerto Rico emitió la Orden Ejecutiva 2020-59 en respuesta a la tormenta tropical Isaías, que obligó al cierre de las oficinas de las agencias del Gobierno de Puerto Rico desde el mediodía del 29 de julio de 2020 hasta el 31 de julio de 2020. Como resultado de la Determinación Administrativa 20-20 se tomaron las siguientes determinaciones:

- Fecha límite para presentar todas las declaraciones, formularios, pagos de impuestos (impuesto sobre los ingresos, arbitrios e IVU) o depósitos de contribuciones retenidas prorrogada del 31 de julio de 2020 hasta el 7 de agosto de 2020;

- No se impondría ninguna sanción por el incumplimiento de los pagos quincenales del IVU durante el mes de julio de 2020, siempre que las cantidades pendientes se presentaran con la remesa mensual del IVU; y

- La primera prórroga del período de exención del IVU para las compras de uniformes y material escolar, tal como se determinó en la Determinación Administrativa 20-18, se prorrogó hasta el 4 de agosto de agosto.

El 20 de enero de 2021, el Secretario de Hacienda de Puerto Rico emitió (i) la Determinación Administrativa 21-01, aclarando el tratamiento tributario de las asignaciones por transferencia (rollover) calificadas al nuevo plan de aportaciones definidas bajo la Ley 106-2017 del Plan de Retiro del Gobierno de Puerto Rico, y (ii) la Determinación Administrativa 21-02, para eximir a las Entidades Bancarias Internacionales y a las Entidades Financieras Internacionales de la presentación mensual de informes al Departamento de Hacienda bajo la Ley 131 del 23 de julio de 1974, con sus enmiendas, conocida como Ley de Transferencia de Fondos al Exterior.

***IVU impuesto a los vendedores de fuera del estado***. El 21 de junio de 2018, en el caso *South Dakota c. Wayfair Inc.* la Corte Suprema de los Estados Unidos revocó la regla de presencia física establecida en *Quill Corp. c. Dakota del Norte*. En virtud de *Quill Corp.*, los Estados tenían prohibido

111

imponer el IVU a los vendedores de fuera del Estado, independientemente de que el vendedor tuviera presencia física en el Estado que imponía el impuesto. La decisión *Wayfair* apoyó además la implementación de la Ley 25-2017 de Puerto Rico, cuyo objetivo era mejorar la recaudación del IVU de los minoristas que vendían productos tributables en Puerto Rico, pero no tenían presencia física allí. La Ley 25-2017 enmendó las disposiciones del Código de Rentas Internas de Puerto Rico con respecto a los requisitos de nexo sustancial para el IVU. Estas nuevas disposiciones incluyen a todo comerciante que venda y comercialice directamente por cualquier medio, a compradores puertorriqueños, a través de cualquier método de transporte, o el comerciante que venda bienes personales tangibles a un puertorriqueño para su uso, distribución o consumo en Puerto Rico.

Además, en virtud de la Ley 173-2020, la obligación de retener el IVU deja de ser facultativa, y los comerciantes dedicados al negocio de ventas despachadas por correo son calificados como agentes de retención y tienen la obligación de recaudar el IVU correspondiente. Como resultado de la misma ley, cualquier operación de venta enviada por correo después del 31 de diciembre de 2020, en la que un facilitador del mercado realice determinadas actividades, se considerará como una operación tributable y el facilitador del mercado será considerado un agente de retención con la obligación de recaudar el IVU en nombre del vendedor. El Boletín Informativo 21-02 del Departamento de Hacienda de Puerto Rico emitido el 19 de febrero de 2021 confirmó que la obligación de cobro ya no es voluntaria.

El Reglamento Núm. 9237, que enmienda el Reglamento No. 8049, establece un nexo económico por el cual los negocios que no tienen una ubicación física en Puerto Rico están sujetos al IVU si tienen ventas brutas de más de $100,000 o al menos 200 transacciones durante el año. Esto incluye a los facilitadores del mercado, los vendedores del mercado y otros vendedores a distancia. El reglamento también define el término "productos digitales específicos" como obras digitales audiovisuales, obras digitales de audio u otros productos digitales transferidos electrónicamente, siempre que un código digital otorgue al comprador el derecho a obtener el producto. A estos efectos, el término "otros productos digitales" puede incluir los productos de almacenamiento digital, las aplicaciones informáticas y cualquier otro producto que pueda considerarse un producto digital. El reglamento también adopta una norma especial de abastecimiento con respecto a los "productos digitales específicos" a efectos del IVU. Estas disposiciones amplían la base del IVU. El Departamento de Hacienda de Puerto Rico estima que la modificación del reglamento recaudará $200 millones adicionales en concepto de IVU durante el primer año de aplicación, a los que seguirán aumentos de dichos ingresos en años posteriores.

Para el Año fiscal 2020, el ELA recibió aproximadamente $1.600 millones en ingresos del Fondo General procedentes del IVU. A tenor con su plan de ajuste, COFINA recibió $437 millones en ingresos del IVU en el Año fiscal 2020.

c)      **Arbitrios, otros impuestos y otros ingresos y fondos**

*Impuesto especial de la Ley 154*. En 2010, el Estado Libre Asociado aprobó la Ley 154-2010 ("Ley 154") para abordar la crisis fiscal del Estado Libre Asociado en ese momento, aumentando los ingresos tributarios derivados y recaudados de las actividades de las empresas y asociaciones extranjeras que operan en Puerto Rico. En particular, la Ley 154 modificó el impuesto sobre el ingreso de determinados extranjeros no residentes, las empresas extranjeras y las sociedades mixtas extranjeras, ampliando las circunstancias en que esas personas estarían sujetas al impuesto sobre el ingreso de Puerto Rico e imponiendo un arbitrio sobre la adquisición de ciertos bienes personales fabricados o producidos total o parcialmente en Puerto Rico, y sobre la adquisición de determinados servicios de fabricación prestados en Puerto Rico. Este arbitrio, que se impone en lugar de un impuesto sobre el ingreso basado en la norma de ingresos de fuentes modificadas, afecta principalmente a empresas y sociedades extranjeras que se dedican principalmente a la fabricación de productos farmacéuticos y otros productos de alta tecnología. El arbitrio temporal al

consumo impuesto por la Ley 154 se ha convertido en una de las principales fuentes de ingresos fiscales del ELA. En el Año fiscal 2019, diez empresas representaron más del 90% de los ingresos del impuesto temporal al consumo.

Aunque inicialmente estaba previsto que el arbitrio de la Ley 154 se aplicara durante un período limitado y disminuyera con el tiempo, la continuación de la crisis fiscal dio lugar a la modificación de la Ley 154 en 2013. En virtud de la Ley 2-2013, la tasa de disminución, del 2.75% en ese momento, se restableció al 4.0% y el plazo se prorrogó hasta 2017. En 2017, en virtud de la Ley 3-2017, el impuesto se modificó nuevamente para ampliar la tasa fija del 4% hasta el 31 de diciembre de 2027.

Al expirar el 31 de diciembre de 2027 el arbitrio de la Ley 154, la Ley 154 establece que dicho impuesto será sustituido por la norma de la fuente de ingresos modificada. No está claro que el nivel de recaudación de impuestos en virtud de la norma de las fuentes de ingresos modificadas sea suficiente para sustituir los ingresos fiscales que recibe actualmente el ELA en virtud del arbitrio especial temporal en virtud de la Ley 154.

El 29 de septiembre de 2020, el Departamento del Tesoro de EE.UU. y el IRS publicaron una propuesta de reglamento para los ingresos intangibles de servicios digitales derivados del extranjero, restringiendo el uso de los créditos fiscales extranjeros y la asignación y el prorrateo de ciertos gastos (el "Reglamento DST propuesto"). El Reglamento DST propuesto se dirige a determinados impuestos sobre los servicios digitales aplicados por una serie de países miembros de la Organización para la Cooperación y el Desarrollo Económico. A primera vista, los reglamentos propuestos parecen eliminar la capacidad de las matrices estadounidenses de muchas empresas que operan en Puerto Rico para reclamar un crédito del impuesto federal sobre la renta de los Estados Unidos para el pago del arbitrio de la Ley 154 de Puerto Rico. Sin embargo, según un comunicado de prensa del Secretario Parés Alicea, el 2 de octubre de 2020, el Secretario auxiliar de Política Contributiva del Departamento del Tesoro de Estados Unidos, David J. Kautter, indicó en una reunión que ambos mantuvieron que la normativa propuesta no tenía como objetivo afectar a la posibilidad de que los contribuyentes acreditasen las contribuciones pagadas en el extranjero al amparo de las leyes federales de impuestos sobre las rentas, en concepto del arbitrio de Puerto Rico aplicado bajo el régimen de la Ley 154.

El 9 de febrero de 2021, el Secretario de Hacienda Parés envió una carta a la Secretaria del Tesoro de EE.UU., Janet Yellen, y al Subsecretario del Tesoro, Mark Mazur, con comentarios sobre la propuesta de actualización del tratamiento del crédito fiscal extranjero por parte del IRS, y posteriormente la Ley 154. La carta destaca el impacto de la Ley 154 en los ingresos de Puerto Rico, señalando que representa una porción significativa de los ingresos netos del Fondo General del Estado Libre Asociado, y que el arbitrio de la Ley 154 se impone a las empresas que permiten más de 78,000 empleos directos e indirectos en la Isla. La carta también sugiere que se modifiquen los reglamentos propuestos para dejar claro, por una serie de razones políticas y técnicas, que no se aplican en Puerto Rico. Por último, aunque la carta afirma que el impuesto de la Ley 154 no debería verse afectado por las normas porque cumple ciertos requisitos jurisdiccionales, también presenta propuestas de modificación de la normativa para excluir el impuesto del ELA de las nuevas normas o, como alternativa, establecer un periodo de transición de tres años antes de que las normas se apliquen al impuesto.

Para el Año fiscal 2020, el Estado Libre Asociado recaudó aproximadamente $1,800 millones en ingresos del Fondo General procedentes de la Ley 154.

***Arbitrio sobre la cerveza y las bebidas alcohólicas***. Los destiladores, rectificadores, productores, fabricantes e importadores deben pagar generalmente un impuesto sobre las bebidas espirituosas destiladas, los vinos con un contenido de alcohol igual o inferior al 24% en volumen, el champán importado y los vinos

113

espumosos o carbonatados o sus imitaciones, y la cerveza, la cerveza tipo ale o porter, el extracto de malta y otros productos similares fermentados o no fermentados. Si los vinos, el champán y los vinos espumosos carbonatados o sus imitaciones tienen un contenido de alcohol superior al 24% en volumen, se considerarán aguardientes destilados. El impuesto se aplica sobre galón medida o galón prueba.

Desde 1978 (Ley 37-1978), la tasa impositiva aplicada a la producción de cerveza ha variado en función de si la cerveza fue elaborada localmente o importada. La Ley 86-2019 reduce las tasas del arbitrio para los pequeños productores de cerveza. Las personas que produzcan menos de 1.86 millones de galones pero más de 400,000 galones serán gravadas a $1.50 por galón y las que produzcan menos de 400,000 galones serán gravadas a $0.95 por galón. La Ley 86-2019 mantuvo la actual escala graduada de cinco niveles para las personas que producen más de 1.86 millones de galones de cerveza al año. El impuesto más bajo en este nivel es de $2.55 por galón para las compañías que producen entre 1.86 millones y 9 millones de galones. El impuesto más alto es de $4.35 por galón para compañías que producen más de 31 millones de galones, o para cervezas importadas. La Ley 108-2004 modificó además la forma en que se grava el impuesto y, por lo tanto, el importe pagado por cualquier empresa sujeta al impuesto. Los productores de cerveza importada pagan el impuesto más alto por galón en la escala, independientemente de su nivel de producción. Del mismo modo, el arbitrio sobre las bebidas alcohólicas destiladas obtenidas de la fermentación y destilación de cualquier producto distinto de los derivados de la caña de azúcar paga $31.29 por galón medido.

Para el Año fiscal 2020, el Estado Libre Asociado recaudó aproximadamente $234 millones en ingresos del Fondo General procedentes de dicho arbitrio.

*Arbitrio sobre productos del tabaco*. El arbitrio aplicable a los cigarrillos, que se ha incrementado varias veces en la última década, es actualmente de $25.50 por cada cien cigarrillos. El Código de 2011 también impone un impuesto sobre los cigarros puros, el tabaco para liar, el tabaco de mascar, el tabaco en polvo (rapé), los cigarrillos electrónicos, los vaporizadores y otros productos derivados del tabaco.

El Código de 2011 establece que la Secretaría de Hacienda depositará las recaudaciones derivadas de los arbitrios sobre los productos del tabaco directamente en el Fondo General. La Ley 26-2017, modificó la disposición del Código de 2011 relativa a la asignación de fondos para dirigir el depósito de todos los fondos recaudados al Fondo General en lugar de distribuir una parte de los fondos entre la Escuela de Bellas Artes (0.33%), el Conservatorio de Música (0.33%) y la Corporación de Artes Musicales (0.34%).

Una parte del producto del arbitrio sobre los cigarrillos ha sido históricamente asignada de manera condicional para el pago de las obligaciones de deuda de ACT y AMA. Estas recaudaciones de impuestos fueron depositadas en la TSA u otras cuentas del ELA.

Desde el año fiscal 2016, una parte del producto del arbitrio sobre los cigarrillos se ha asignado a ATI para cubrir sus gastos de funcionamiento.

Para el Año fiscal 2020, el ELA recaudó aproximadamente $189 millones con cargo al arbitrio sobre el tabaco; en el Fondo General y $87 millones de dólares en el SRF.

*Arbitrio sobre vehículos automotores*. El arbitrio aplicable a los automóviles oscila entre $637.50 y $9,253 más el 34% del precio tributable en Puerto Rico que supere los $44,890. Las motocicletas y los vehículos todo terreno también están sujetos a un arbitrio del 8% y el 11.5%, respectivamente. Otros vehículos están sujetos a diferentes tasas de arbitrio sobre su precio tributable en Puerto Rico (p. ej., camiones tractores (17%), autobuses (20%), camiones (10%) y remolques de acoplamiento manual o de equipo ligero (6.6%)).

Una parte de los ingresos del arbitrio de vehículos automotores (inicialmente se presupuestaron $4.9 millones en el Año fiscal 2020 y $5.8 millones en el Año fiscal 2021) se ha asignado al Fondo de Energía Verde para proporcionar subsidios a residentes de Puerto Rico para cubrir el costo de la compra de materiales y equipos energéticamente eficientes. El Fondo de Incentivos Económicos de la Ley 60-2019 es el sucesor del Fondo de Energía Verde.

Para el Año fiscal 2020, el Estado Libre Asociado recaudó aproximadamente $382 millones en ingresos del Fondo General procedentes del arbitrio de vehículos automotores.

***Derechos de aduana y arbitrios sobre el ron fuera de la Isla.*** Los ingresos intergubernamentales incluyen las remesas del gobierno federal de impuestos federales al consumo sobre los envíos de ron, cerveza y vino importado de Puerto Rico y de jurisdicciones extranjeras a los Estados Unidos, de conformidad con la sección 7652 del Código de Rentas Internas de Estados Unidos y la Ley de Recuperación Económica de la Cuenca del Caribe de 1983 (P.L. 98-67).

Los arbitrios sobre los envíos de determinados rones, cervezas y vinos son impuestos y recaudados por la Oficina de Impuestos y Comercio de Alcohol y Tabaco de los Estados Unidos y se pagan al ELA por el subsidio de "cover over". El arbitrio sobre los envíos de ron desde Puerto Rico y otros países productores de ron es actualmente de $13.50 por galón de prueba. De esta cantidad, $10.50 por galón de prueba y el arbitrio real impuesto, lo que sea menor, se paga actualmente al ELA. Desde 1999, el Congreso de los Estados Unidos también ha aprobado leyes especiales complementarias que aumentan la cantidad máxima pagada al ELA a $13.25 por galón de prueba. La ley no impone restricciones sobre cómo Puerto Rico puede utilizar los ingresos transferidos.

Puerto Rico distribuye los ingresos de las remesas de arbitrios sobre los envíos de ron entre varias entidades gubernamentales y productores privados de ron. Además de enviar fondos al Fondo General, los ingresos del arbitrio se asignan y distribuyen entre i) el Fideicomiso de Conservación de Puerto Rico, (el "Fideicomiso de Conservación"), un fideicomiso de caridad de Puerto Rico encargado de proteger los recursos naturales de Puerto Rico, que recibe cada Año fiscal una cantidad equivalente a aproximadamente 45 centavos por galón de prueba de ron de la cantidad del extensor de impuestos, (ii) el Fideicomiso para Ciencia, Investigación y Tecnología de Puerto Rico (el "Fideicomiso para Ciencia"), un fideicomiso patrocinado por el gobierno creado por la Ley 214-2004 para establecer e implementar la política pública del Estado Libre Asociado para la investigación y el desarrollo tecnológico y científico, que recibe $5 millones en ingresos procedentes de arbitrios cada Año fiscal, y (iii) el Fondo de Incentivos Económicos (anteriormente administrado por PRIDCO), en beneficio del programa de incentivos "Rones de Puerto Rico", que recibe hasta 10 millones cada Año fiscal para ser utilizados en la promoción de las industrias locales del ron y el desarrollo de la industria de la caña. Este monto no tiene que remitirse en ningún Año fiscal en el que haya un excedente acumulado de asignaciones de años fiscales anteriores de al menos $50 millones.

Por último, hasta el 46% de los ingresos procedentes del arbitrio correspondiente a las ventas de ron de determinados productores de ron se transfiere a dichos productores de ron en virtud de determinados acuerdos de incentivos firmados con el ELA. Este programa de incentivos fue creado en respuesta directa al hecho de que en 2008, el Gobierno de las Islas Vírgenes de EE.UU. firmó un acuerdo con Diageo USVI, Inc. ("Diageo") para la construcción y operación de una nueva destilería de ron en St Croix, Islas Vírgenes de EE.UU., que fabricaría productos de la marca Captain Morgan, que antes de 2012 eran adquiridos a través de un contrato de suministro con la destilería Serrallés en Puerto Rico. Como consecuencia de la rescisión del contrato entre Serrallés y Diageo, después de 2011 los ingresos recibidos por el ELA del impuesto federal al consumo sobre los envíos de ron han disminuido considerablemente.

115

En un esfuerzo para apoyar a la industria local del ron como resultado de la amenaza planteada por el acuerdo de las Islas Vírgenes de EE.UU. con Diageo, y para proteger el monto de los impuestos federales al consumo sobre envíos de ron devueltos al ELA bajo el programa de pago "cover over", la Ley Núm. 178-2010 aumentó de 10% a 25% la parte de los fondos del impuesto federal al consumo que el Estado Libre Asociado puede invertir para proporcionar incentivos y promover la industria del ron de Puerto Rico. La ley también autorizó al Gobernador a aumentar este porcentaje hasta un 46% mediante una Orden Ejecutiva. Dicha Orden Ejecutiva fue emitida, y el límite porcentual se aumentó al 46% a partir del 1 de julio de 2012. Como se contempla en la Ley 178-2010 (ahora incorporada en el Código de 2011), el Estado Libre Asociado ha celebrado acuerdos finales con los tres principales productores de ron de Puerto Rico. Estos acuerdos proporcionan a los productores de ron el 46% de los fondos procedentes del arbitrio correspondiente a las ventas de ron de cada uno de estos productores de ron. Desde mayo de 2015, el gobierno federal ha depositado dinero recibido de impuestos federales al consumo sobre el ron en una cuenta de caja de seguridad del Secretario de Hacienda en un banco comercial privado. El banco comercial y el ELA han concertado instrucciones de distribución para que el dinero se transfiera de la caja de seguridad al Gobierno central, los productores de ron y otros cesionarios. Antes de este acuerdo, los impuestos federales al consumo sobre el ron se depositaron en la TSA y Hacienda remitió a PRIDCO los montos necesarios para pagar los incentivos adeudados a los productores de ron.

Para el Año fiscal 2020, los ingresos del Fondo General procedentes del impuesto federal al consumo sobre los envíos de ron fueron de aproximadamente $251 millones.

*Máquinas tragamonedas.* Las máquinas tragamonedas se gravan de conformidad con la Ley 221-1948, la Ley de Juegos de Azar. En virtud de la Ley de Juegos de Azar, los ingresos de las máquinas tragamonedas se dividen entre los operadores y el Estado Libre Asociado en proporciones variables en función de los ingresos totales recaudados. El Estado Libre Asociado distribuye su parte de la recaudación de las máquinas tragamonedas al Fondo General, a la CTPR y a la Universidad de Puerto Rico.

La Comisión de Juegos, habilitada por la Ley 81-2019, administra las distribuciones de todas las recaudaciones de las máquinas tragamonedas. Los costos operativos de la Comisión de Juegos se pagan antes de las distribuciones a los operadores o al Estado Libre Asociado. Antes de la Ley 81-2019, la CTPR administraba las recaudaciones y repartos de las máquinas tragamonedas mediante una cuenta bancaria privada. La Ley 81-2019 exige que el Departamento de Hacienda cobre los ingresos de las máquinas tragamonedas y los deposite en una cuenta especial administrada por la Comisión de Juegos.

En el Año fiscal 2020, la recaudación de las máquinas tragamonedas fue de $208 millones. Una vez deducidos $16 millones de costos operativos, la cascada de máquinas tragamonedas distribuye $92 millones a los operadores y $100 millones al Estado Libre Asociado.

*Impuesto a las máquinas de juegos de azar.* La Ley 257-2018 incluye disposiciones para la concesión de licencias y operaciones de máquinas de juegos de azar, flujo de fondos al gobierno, y el entorno regulador, entre otras orientaciones. Inicialmente, la ley legaliza 25,000 máquinas en dos años. 10,000 máquinas adicionales por año (20,000 en total) se autorizan en los años 3 y 4 hasta un máximo de 45,000 máquinas en total si la División de Juegos de Azar de la Comisión de Juegos concluye, sobre la base de un estudio, que el mercado de Juegos de Máquinas de Azar no está saturado.

Hay una cuota de licencia anual de $ 1,500 por máquina a pagar por los propietarios al por mayor. Las tarifas se pagan al Departamento de Hacienda, de las cuales $300 se transferirán a la Comisión de Juegos por servicios administrativos. También hay una cuota de licencia bienal de $3,000 pagadera al Departamento de Hacienda por los distribuidores, proveedores de bienes y servicios y fabricantes. Las

máquinas deben ofrecer a los jugadores al menos un 83% de devolución sobre la actividad de juego. El 17% restante de los ingresos se divide entre el operador de la máquina (67%) y el gobierno (33%).

De la parte de los ingresos que se envía al gobierno, los ingresos se dividen en varias cantidades entre el Fondo General (los primeros $40 millones, si las tasas de licencia bajo el Código 2011 no cumplen ese umbral), los municipios para su contribución ASES (45%), y los costos de pensión de la policía (50%). Una pequeña parte (5%) de la participación del gobierno también va a la PRTC para el mantenimiento y las operaciones.

Dado que todavía no se han aprobado los reglamentos para esta disposición de la ley, no se han recaudado ingresos de esta corriente de ingresos.

*Apuestas deportivas y juegos electrónicos.* Puerto Rico aprobó recientemente la Ley 81-2019, que legaliza las apuestas in situ y por Internet en eventos deportivos profesionales y universitarios, así como las ligas deportivas de videojuegos y de fantasía. La Ley 81-2019 establece que las apuestas deportivas estarán permitidas en casinos, pistas de carreras de caballos y salas de apuestas fuera de pista y por Internet. Adicionalmente, "centros o distritos de apuestas" podrían ser establecidos en "lugares estratégicos" como zonas turísticas, zonas históricas o cualquier otro lugar que cumpla la ley propuesta y las regulaciones impuestas por una recién establecida Comisión de Juegos que regulará las apuestas deportivas, carreras de caballos, juegos electrónicos y máquinas tragamonedas.

En virtud de la Ley 81-2019, los ingresos del gobierno se generarían a partir de los derechos de licencia de funcionamiento y los impuestos sobre las apuestas y ganancias. Además de la recaudación de derechos de licencia, la tasa impositiva de las apuestas será del 6% para las apuestas realizadas en persona y del 11.5% para las apuestas realizadas en Internet. El 50% de los ingresos, después de cubrir el costo de la recién creada Comisión del Juego, se destinaría a pensiones públicas y los ingresos restantes se asignarían a otros ámbitos, como los deportes juveniles, las iniciativas educativas y el equipamiento policial, municipios, y para tratar la adicción al juego.

Tras las comunicaciones entre la Comisión de Juegos y la Junta de Supervisión, algunos de los reglamentos propuestos fueron aprobados por la Junta de Supervisión

*Lotería tradicional y electrónica.* Puerto Rico supervisa dos tipos de sistemas de lotería, una lotería tradicional y una electrónica. La Lotería de Puerto Rico es la lotería moderna más antigua de los Estados Unidos. El sistema comenzó en 1934 y actualmente es operado por el Departamento de Hacienda de Puerto Rico. El Fondo General reconocerá los ingresos procedentes de premios de lotería no reclamados que por ley se registran en el Fondo General sobre una base presupuestaria después de expirado el plazo para reclamar premios de lotería (180 días). El registro de los ingresos en el Fondo General, sin embargo, no representa una transferencia de efectivo o un depósito a la TSA. Por ley, el 35% de los ingresos netos anuales de la lotería electrónica se financian con cargo al fondo de nivelación del CRIM con el fin de apoyar a los municipios más pequeños.

En el Año fiscal 2020, el Fondo General y SRF reconocieron o recibieron aproximadamente $18 millones y $47 millones en ingresos, respectivamente, procedentes de las loterías tradicional y electrónica.

*Arbitrio sobre productos petrolíferos y sus derivados ("crudita").* El arbitrio bruto sobre los productos petrolíferos y sus derivados es de $15.50 por barril (de los cuales $6.25 no se aplican a los productos diésel). Históricamente, 9.25 dólares de ese impuesto se asignaron condicionalmente a ACT y 6.25 dólares a AFI. Este impuesto está sujeto a un ajuste basado en el consumo y la inflación cada cuatro años.

Estas recaudaciones de impuestos fueron depositadas en la TSA u otras cuentas del ELA.

*Arbitrio sobre la gasolina, el gas oil y el diésel oil.* El impuesto sobre la gasolina se fija actualmente en $0.16 por galón, y el impuesto sobre el gas oil y el diésel oil, es actualmente $0.04 por galón.

Estos ingresos fueron depositados en la TSA u otra cuenta del ELA.

*Impuesto sobre el combustible de aviación.* La Ley 82-1959, en su forma enmendada, faculta a la Autoridad Portuaria de Puerto Rico para cobrar una tasa a los importadores de combustible de aviación. Esta tasa es actualmente de tres centavos por galón de combustible de aviación suministrado a las aerolíneas y otros proveedores.

*Impuesto a la ocupación hotelera.* El artículo 24 de la Ley 272-2003, en su forma enmendada, impone un impuesto sobre la ocupación hotelera, recaudado directamente por la PRTC, sobre todos los alojamientos en hoteles y moteles del ELA. Los ingresos del SRF contabilizados en el Año fiscal 2020 ascendieron a $56 millones.

Además, de conformidad con la Ley 46-2017, el Gobierno comenzó a cobrar el impuesto del 7% sobre la ocupación de habitaciones a los operadores de viviendas de alquiler a corto plazo. La ley modificó la definición de "posadero/anfitrión" para los diferentes modelos de negocio que han entrado en el mercado y sirven como intermediarios entre los hoteles y los huéspedes. Entidades como Airbnb, Homeaway y otras plataformas digitales recaudarán "impuesto de habitación" según lo dispuesto por la ley. Antes de la aprobación de la Ley 46-2017, el 22 de junio de 2017, el Gobernador y funcionarios de Airbnb firmaron un acuerdo voluntario para recaudar y remitir directamente el impuesto. Entre agosto de 2017 y agosto de 2020 Airbnb pagó aproximadamente 16 millones de dólares en concepto de recaudación de impuestos por habitación al Estado Libre Asociado.

*Otros ingresos del arbitrio, primas de seguros y carreras de caballos.* Para el Año fiscal 2020, el Estado Libre Asociado recaudó aproximadamente $254 millones en ingresos del Fondo General procedentes de otros arbitrios, primas de seguros y carreras de caballos. Esto incluye los ingresos de las carreras de caballos, las primas de seguros, arbitrios sobre el azúcar, el café, el cemento y otros. El arbitrio aplicable al azúcar y el café se asigna al Fondo Integral para el Desarrollo Agrícola ("FIDA") administrado por la Autoridad de Tierras de Puerto Rico.

*Ingresos en concepto de intereses.* El Gobierno de Puerto Rico ha establecido un programa para maximizar el interés generado a través de la redistribución mensual de los balances sin reservas de la TSA. Según el Secretario de Hacienda de Puerto Rico, la redistribución de las cuentas bancarias gubernamentales comenzó en octubre de 2019 y generó ingresos en concepto de intereses para el Estado Libre Asociado durante el Año fiscal 2020.

5.      **Cargos por servicios**

El ELA cobra honorarios y sanciones por los servicios prestados. Los más importantes de estos cargos por servicios se describen a continuación.

*Salud Pública / Honorarios cobrados al Paciente.* El Departamento de Salud opera tres hospitales en Puerto Rico ubicados en San Juan y Bayamón, Puerto Rico. El Departamento de Salud está autorizado a facturar los servicios médicos prestados en esos centros médicos. Si bien los ingresos obtenidos se utilizan exclusivamente para el funcionamiento de las instalaciones médicas, sigue siendo necesario consignar

créditos del Fondo General para sufragar una cantidad considerable de gastos operativos. Todos los ingresos obtenidos de estas tasas se registran en un SRF.

*Tarifas del servicio judicial*. La Rama Judicial del Estado Libre Asociado está autorizado por ley a cobrar tasas relacionadas con el sistema judicial de Puerto Rico. Esos ingresos deben ser utilizados exclusivamente por la Rama Judicial del Gobierno.

*Derechos por documentos*. Las instrumentalidades del ELA están autorizadas por ley a cobrar derechos por documentos certificados u otros documentos oficiales del Gobierno, como certificados de nacimiento y de defunción.

*Multas de vehículos automotores*. Se aplican multas impuestas a los vehículos automotores por una serie de infracciones con el vehículo en tránsito y detenido. La Ley 134-2019 se aprobó para establecer planes de pago e incentivos para las deudas de diversas multas y licencias de conducir.

*Permisos de vehículos automotores*. La Ley de Vehículos y Tránsito exige que las tasas de registro de vehículos automotores recaudadas se utilicen únicamente para el funcionamiento de los centros de servicios al conductor (conocidos como "CESCOS"), que son administrados por el Departamento de Transportación y Obras Públicas. Al Año fiscal 2021, los ingresos procedentes de los derechos de licencia de vehículos automotores se registran en el Fondo General.

*Otros*. Otros cargos incluyen los cargos proporcionados por las agencias, tarifas de licencia profesional, tarifas de marcas registradas, tarifas de alquiler, tarifas de vivienda pública y otros permisos, multas y tasas de registro. Una parte significativa de estos derechos de licencia se registran en Fondo de Ingresos Especiales. En el Año fiscal 2020, todas las demás fuentes de ingresos del ELA representaron $313 millones en el Fondo General y $548 millones en recaudaciones de fondos de ingresos especiales.

6.      **Impuestos sobre la propiedad**

El impuesto sobre la propiedad en Puerto Rico se aplica tanto a los bienes inmuebles como a los muebles, incluido el inventario, a empresas y particulares, principalmente en beneficio de los municipios.

Los impuestos sobre bienes inmuebles se gravan con los valores del Año fiscal 1957-1958. Desde el Año fiscal 1957-1958 no se ha realizado ninguna nueva tasación de los bienes inmuebles, y la construcción que tiene lugar después de ese año se ha tasado sobre la base del valor de la propiedad en el Año fiscal 1957-1958. Por consiguiente, la tasación global de los bienes inmuebles a efectos fiscales es sustancialmente inferior al valor real de mercado. También está disponible una exención de los primeros $15,000 de la tasación de 1958 (más de $215,000 en dólares corrientes) en residencias ocupadas por sus propietarios. Los impuestos sobre los bienes muebles, que en el Año fiscal 2020 representaron aproximadamente el 40% de la recaudación total de bienes tributables, se autoliquidan.

La tasa total del impuesto sobre la propiedad varía según el municipio, con los rangos que se enumeran a continuación para el Año fiscal 2020-2022:

| Categoría | Bienes inmuebles | Bienes muebles |
|---|---|---|
| Tasa básica fija del impuesto sobre la propiedad | 5.72% - 6.00% | 3.72% - 4.00% |
| Adic. Propiedad especial – Estado | 1.03% | 1.03% |
| Adic. Propiedad especial – Muni | Varía entre 1.20% y 5.50% | Varía entre 1.00% y 5.50% |
| Descontar del Estado | (0.20%) | (0.20%) |
| **Total (Varía según el Municipio)** | **8.03% a 12.33%** | **5.80% a 10.33%** |

Los impuestos sobre la propiedad son gravados, determinados y recaudados en beneficio de los municipios por el CRIM. El 1,03% del impuesto sobre la propiedad basado en el valor tasado de todos los bienes (que no sean bienes exentos) se deposita en el Fondo de Amortización de la Amortización de la Deuda del ELA (que no forma parte del Fondo General).

7.      **Fondos federales**

*Subvenciones y subsidios federales*. El ELA es el beneficiario de numerosos programas de fondos federales. Esto incluye fondos federales para el programa Medicaid de Puerto Rico y fondos del Título I de la Ley Federal de Educación Primaria y Secundaria para el Departamento de Educación de Puerto Rico. El ELA también recibe más de $2,000 millones anuales en fondos federales para financiar su Programa de Asistencia Nutricional ("PAN"), que proporciona una prestación mensual para alimentos a los hogares de bajos ingresos.

**Agencias del Estado Libre Asociado que reciben fondos federales en el Año fiscal 2021**



El presupuesto certificado del ELA incluye $8,790 millones de fondos federales para el Año fiscal 2021. También hay transferencias federales en forma de pagos directos a particulares, como el seguro de retiro y discapacidad del Seguro Social, el seguro médico y hospitalario complementario de Medicare o las prestaciones para veteranos. Algunos flujos de financiamiento de desastres directamente a través de la Oficina Central de Recuperación, Reconstrucción y Resiliencia ("COR3") y no se reflejan en los presupuestos de los fondos federales.

120

El mayor receptor de fondos federales es la Administración de Seguros de Salud de Puerto Rico ("ASES"). Se espera que el organismo reciba $1,280 millones en el Año fiscal 2021 de fondos federales del Gobierno Federal de Estados Unidos. ASES es responsable de hacer pagos mensuales a las compañías aseguradoras locales. Luego tiene que solicitar el reembolso de estos gastos al gobierno federal. El Departamento de Salud presenta estas reclamaciones al Gobierno federal en nombre de la ASES.

El segundo mayor receptor de fondos federales es la Administración para el Desarrollo Socioeconómico de la Familia, que administra el PAN. En el Año fiscal 2021, la agencia recibirá aproximadamente $2,000 millones en fondos federales

Se espera que el Departamento de Educación de Puerto Rico ("PRDE") reciba aproximadamente $1,500 millones de fondos federales en el Año fiscal 2021. Por ley federal, todos los servicios educativos básicos deben ser pagados por el uso de fondos estatales mientras que los fondos federales se utilizan para proporcionar servicios no básicos como programas de educación especial, programas de almuerzo escolar para estudiantes de bajos ingresos y fondos de Título I para estudiantes de bajos ingresos. Al retirar fondos federales para la mayoría de los programas de subvenciones, el PRDE debe proporcionar las facturas requeridas y otra documentación al Departamento de Educación de EE.UU. ("USDE"). Una vez aprobada la solicitud de retiro, los fondos se transfieren al Departamento de Hacienda, donde el PRDE debe completar los desembolsos en un plazo de 3 días hábiles.

En junio de 2019, el USDE impuso condiciones específicas al Estado Libre Asociado y al PRDE, como el requisito de que el PRDE debe contratar los servicios de un agente fiduciario externo para realizar las tareas de gestión financiera de los fondos federales proporcionados por el USDE y garantizar el cumplimiento de los requisitos de subvención del USDE. En consecuencia, el 7 de octubre de 2019, el PRDE emitió una Solicitud de Propuestas ("RFP") para Servicios de Agentes Fiduciarios externos. El objetivo de la RFP es obtener propuestas de organizaciones comerciales calificadas con experiencia demostrada en la prestación de servicios independientes de gestión fiscal y supervisión en el sector público, para realizar la supervisión fiduciaria de terceros, la gestión y la administración de los servicios de los fondos de subvención del USDE concedidos al PRDE, de conformidad con los requisitos federales aplicables. Tras un largo prolongado de RFP se seleccionó a Álvarez & Marsal como agente fiduciario, elección aprobada por la Junta de Supervisión en febrero de 2021.

Se esperaba que el Departamento de Salud de Puerto Rico ("DVPR") recibiera aproximadamente $449 millones de fondos federales en el Año fiscal 2021 de varias agencias federales. Aproximadamente $250 millones de la cantidad recibida están relacionados con el Programa Especial de Nutrición Suplementaria para Mujeres, Lactantes y Niños (conocido como el Programa WIC), que proporciona fondos para alimentos suplementarios, atención de la salud y educación nutricional para las mujeres y los niños de bajos ingresos que se encuentran en situación de riesgo nutricional. Otros programas incluyen: preparación para el bioterrorismo, subsidios para atención del VIH, subsidios para atención materno infantil y otros.

Las disposiciones federales de estímulo y recuperación ante desastres se analizan detalladamente en la sección de Desastres Naturales y COVID-19 de esta declaración de divulgación.

### *Financiamiento del programa Medicaid.*

En condiciones estables (es decir, en ausencia de legislación federal complementaria), los costos de Medicaid son financiados principalmente por el Estado, ya que existe un límite en el financiamiento federal disponible. Los flujos de financiamiento federales anuales típicos para el Estado Libre Asociado son los siguientes, y se proyectan en base a la ley actual y las tasas de crecimiento conforme a la ley:

- Financiamiento federal anual estándar de Medicaid. Aunque Puerto Rico tiene un 55% de porcentaje de asistencia federal (FMAP), la cantidad de fondos federales anuales recibidos bajo la Sección 1108 tiene un tope cada año. Para el Año fiscal 2021, se esperaba que este flujo de financiamiento tuviera un tope de $391.3 millones, y se prevén $402.7 millones para el AF 2022. Aunque el tope crece cada año de acuerdo con el CPI-U médico, no sigue el ritmo del crecimiento del gasto sanitario. Cada año, aproximadamente $100 millones de estos fondos no están disponibles para cubrir los gastos de las primas, sino que se transfieren al Departamento de Salud para cubrir los desembolsos a los Centros de Salud Federalmente Calificados ("Centros 330" o "FQHC") y las operaciones del Programa Medicaid.

- Financiamiento del Programa de Seguro Médico para Niños (CHIP). El financiamiento del CHIP no está sujeta a un límite de financiamiento federal. Sin legislación adicional, se espera que la tasa de correspondencia de CHIP (E-FMAP) para Puerto Rico sea del 68.5%. En virtud de la Ley de Cuidado de Salud Asequible, el E-FMAP para Puerto Rico se elevó al 91.5% hasta el 30 de septiembre de 2019; en virtud de la Ley de Asignaciones Consolidadas Adicionales de 2020, el E-FMAP se elevó al 83.2% hasta el 30 de septiembre de 2021 (con un aumento adicional del 11.5% hasta el 30 de septiembre de 2020 en virtud de la Ley HEALTHY KIDS de 2018); y en virtud de la Ley de Respuesta al Coronavirus de Families First, el E-FMAP se elevó al 99.0%. Cuando estas leyes expiren en octubre de 2021, se prevé que la participación federal en los costos se reduzca al nivel estándar (aproximadamente el 68.5%).

Desde 2011, Puerto Rico ha recibido un alivio temporal de los crecientes costos de atención médica a través de mayores niveles de reembolso federal disponibles a través de la aprobación de asignaciones de tiempo limitado, como la Ley de Cuidado de Salud Asequible y la Ley de Presupuesto Bipartidista de 2018.

En diciembre de 2019, el Congreso aprobó la ley de asignaciones, la Ley de Asignaciones Consolidadas Adicionales de 2020 (Pub. Ley 116-94), por la que se autoriza el reembolso de Medicaid de aproximadamente $2,600 millones y $2,700 millones, respectivamente, para los Años fiscales federales 2020 y 2021. Si bien el ELA accesó a estos fondos, en última instancia no puede generar gastos reembolsables para utilizar completamente esta disponibilidad. Además de los fondos de reembolso, la nueva legislación federal aumentó la cobertura de los Porcentajes de Asistencia Médica Federal ("FMAP") al 76%, eliminó el impuesto al seguro de salud ("HIT"), y proporcionó fondos adicionales de hasta $200 millones al año si el plan Medicaid que cubre a los médicos al menos el 70% de la tarifa programada de Medicare es certificado y permite que los pagos a las aseguradoras de salud sean auditados. Como parte del proyecto de ley de asignaciones recientemente aprobado, la *Ley de Asignaciones Consolidadas Adicionales de 2020* (Pub. Ley 116-94), el Congreso autorizó el reembolso de Medicaid de aproximadamente $2,600 millones y $2,7 millones, respectivamente, para los años fiscales federales 2020 y 2021. Si bien el ELA tiene acceso a estos fondos, en última instancia no puede generar gastos reembolsables para utilizar completamente esta disponibilidad. Además de los fondos de reembolso, la nueva legislación federal aumentó la cobertura de los Porcentajes de Asistencia Médica Federal ("FMAP") al 76%, eliminó el impuesto al seguro de salud ("HIT"), y proporcionó fondos adicionales de hasta $200 millones al año si el plan Medicaid que cubre a los médicos al menos el 70% de la tarifa programada de Medicare es certificado y permite que los pagos a las aseguradoras de salud sean auditados.

La legislación también incluye requisitos para mejorar la transparencia y la responsabilidad fiscal en la administración de Medicaid en Puerto Rico:

i) a más tardar seis meses después de la fecha de aprobación de la ley, la agencia responsable de la administración del programa Medicaid de Puerto Rico designará a un funcionario para que actúe como Líder del Programa de Integridad del programa;

ii) a más tardar 18 meses después de la fecha de aprobación, Puerto Rico debe publicar un plan sobre cómo desarrollará medidas para cumplir los requisitos de medición de la tasa de error de pago ("PERM"), incluso parámetros anuales y auditorías programadas para su cumplimiento; y

iii) debe haber un plan preparado para cumplir con los requisitos de control de calidad de elegibilidad de Medicaid ("MEQC").

En virtud de esta legislación, si no se cumplen las medidas de control del fraude establecidas, habrá una pena máxima de reducción del 2.5% en el FMAP. De acuerdo con la ley actual, la Junta de Supervisión espera que el ELA llegue a un "precipicio fiscal de Medicaid" el 1 de octubre de 2021, por lo que será responsable de gastos sanitarios anuales multimillonarios que anteriormente habían sido cubiertos por los fondos federales desde 2011. En ese momento, el financiamiento federal máximo será el establecido por la Sección 1108 de la Ley de Seguro Social, que es de aproximadamente $400 millones, sin incluir el financiamiento adicional para el CHIP y el Programa de Asignación Mejorada.

En respuesta a la pandemia de COVID-19, en marzo de 2020 se aprobó la Ley de Respuesta al Coronavirus "Families First", que aumenta tanto los fondos federales disponibles (añadiendo $183 millones adicionales) como la FMAP (incrementada en un 6.2% adicional para la mayoría de las poblaciones).

Aunque los fondos adicionales (183 millones de dólares) son asignaciones que se perciben por única vez, el aumento de la FMAP continuará hasta el final de la emergencia de salud pública. La Junta de Supervisión ha previsto inversiones en el sistema de Medicaid que han sido posibles gracias a los fondos federales complementarios hasta el 30 de septiembre de 2021. Estas inversiones están proporcionando cobertura de medicamentos contra la hepatitis C y aumentando las tasas de reembolso a los proveedores de atención primaria y especializada y a los hospitales.

Además, en octubre de 2020, la Junta de Supervisión aprobó la propuesta del Gobierno de ampliar temporalmente la cobertura de Medicaid a más de 200,000 puertorriqueños durante la pandemia de COVID-19, siempre y cuando exista un mayor financiamiento federal mediante el ajuste de la Línea de la pobreza de Puerto Rico. El incremento de la Línea de la pobreza de Puerto Rico ("LPPR") aparece reflejado en el primer trimestre del AF 2022 contemplado en el Plan Fiscal Certificado de 2021. Considerando la reducción del financiamiento del programa Medicaid que, en virtud de la ley actual, debe producirse a finales de septiembre de 2021, la Junta de Supervisión espera que el Gobierno vuelva a las normas de elegibilidad anteriores a partir de octubre de 2021. Asimismo, el Plan Fiscal refleja un incremento del número de beneficiarios para el segundo trimestre del AF 2022 debido a las previsiones de un aumento prolongado como consecuencia de la COVID-19. La Junta de Supervisión también ha informado al Gobierno de que todos los costos de la ampliación para el ELA (es decir, los que no están cubiertos por el financiamiento federal debido al tipo de elegibilidad o a los requisitos de contraprestación) deben ser financiados a través de los recursos presupuestarios existentes.

*Ayuda Federal para Desastres.* Puerto Rico fue diezmado por los huracanes Irma y María en 2017. Como consecuencia, el ELA prevé recibir una importante ayuda federal de conformidad con diversas leyes de ayuda en casos de desastre que ayudan a reconstruir la infraestructura dañada. Gran parte de este

financiamiento es administrado por COR3. La Asistencia Pública, [137] en la que la FEMA reembolsa al ELA los gastos subvencionables relacionados con los huracanes Irma y María, asciende a un total de $23,400 millones en obligaciones hasta la fecha.

Además, Puerto Rico fue aprobado para una declaración de desastre mayor tras las actividades sísmicas en curso que afectaron al ELA a partir de diciembre de 2019. Los terremotos comenzaron el 28 de diciembre de 2019 y continuaron hasta el 3 de julio de 2020. Catorce municipios han sido declarados aptos para recibir Asistencia Pública y se han comprometido $270 millones en proyectos aprobados en todas las categorías (Categorías A-G). Treinta y cuatro municipios han sido designados para Asistencia Individual y se han proporcionado más de $75,5 millones en asistencia por desastre directamente a individuos y familias.

El Departamento de Vivienda de Puerto Rico ("DVPR") continúa lanzando programas de acuerdo con el plan de acción en las áreas de vivienda, desarrollo económico, infraestructura, multisectorial y planificación. Al 31 de diciembre de 2020, se han puesto a disposición de Puerto Rico un total de $9,700 millones de los más de $20,000 millones asignados al Departamento de Vivienda y Desarrollo Urbano de EE.UU. a través de la Subvención en Bloque para el Desarrollo Comunitario para la Recuperación ante Desastres, ("CDBG-DR"). El más importante de los distintos programas es el de reconstrucción de viviendas, que tiene un presupuesto de $1,100 millones, de los cuales se han gastado aproximadamente $78 millones al 31 de diciembre de 2020, según el informe trimestral de diciembre de 2020 del DVPR.

El DVPR presentó el plan de acción para los $8,285 millones de Subvención en Bloque para el Desarrollo Comunitario - Mitigación ("CDBG-MIT") el 3 de diciembre de 2020. El plan de acción fue aprobado el 19 de abril de 2021.

El 2 de febrero de 2021, el gobierno Biden-Harris también anunció que desembolsaría $1,300 millones en ayuda por desastre del Departamento de Vivienda y Desarrollo Urbano (HUD) para Puerto Rico, y la agencia también anunció que comenzó a relajar las restricciones sobre otros $4,900 millones.

Una gran parte del financiamiento para la mitigación de desastres autorizada para Puerto Rico se destina a proyectos de infraestructura, planificación y desarrollo económico a gran escala con el objetivo de garantizar que Puerto Rico sea más resistente a futuros desastres. El financiamiento forma parte del financiamiento más amplio autorizado para Puerto Rico de los fondos para la Subvención en Bloque para el Desarrollo Comunitario para la Recuperación ante Desastres (CDBG-DR) del HUD y de los fondos para de mitigación del HUD (CDBG-MIT) del HUD en 2017 tras el huracán María.

Las autoridades puertorriqueñas también anunciaron que están trabajando con las autoridades federales para determinar una forma de levantar las restricciones a los desembolsos adicionales que fueron impuestos al ELA por el gobierno anterior.

---

[137] El Programa de Asistencia Pública reembolsa a los gobiernos estatales y locales y a ciertas organizaciones privadas sin fines de lucro por costos directamente relacionados con el incidente declarado, incluso la remoción de desechos, las medidas de protección de emergencias y la reparación o sustitución de infraestructuras elegibles (p. ej, carreteras, puentes, edificios y servicios públicos). FEMA asigna los fondos de la Asistencia Pública al COR3, que es el receptor de los fondos de la subvención. El COR3 es responsable de la supervisión de todos los subreceptores de fondos de subvención (es decir, departamentos, agencias, municipios y ciertos PNP).

*Algunos planes de acción para la CDBG-DR y la CDBG-MIT están preparados para su revisión y aprobación a principios de 2021.*

| | 2018 Cont. Apprps Act (P.L. 115-56) | Bipartisan Budget Act of 2018 (Pub. L. 115-123) | | | Supplemental Appropriation (Pub. L. 116-20) |
|---|---|---|---|---|---|
| **Appropriation** | **$1.5B** Housing & Economy September 8, 2017 | **$8.2B** Infrastructure February 9, 2018 | **$8.3B** Mitigation February 9, 2018 | **$1.9B** Electric Power February 9, 2018 | **$277.9M** Infrastructure[1] June 6, 2019 |
| **Federal Register Notice** | **Published** February 9, 2018 | **Published** August 14, 2018 | **Published** January 27, 2020 | --- | **Published** January 27, 2020 |
| **Action Plan and Action Plan Amendments** | **Submitted to HUD for approval** June 14, 2018 **Approved by HUD** July 29, 2018 | **1st Amendment Submitted** Nov 16, 2018 (Approved Nov 18, 2018) **2nd Amendment submitted** Aug. 15, 2019 (Approved Aug 23, 2019) **3rd Amendment submitted** February 24, 2020 (Approved Feb 24, 2020) | **Action Plan submitted to HUD** December 3, 2020 **FOMB review of Action Plan** December 17, 2020 (Approved Dec 18, 2020) | --- | **4th Amendment submitted** July 9, 2020 (Approved Aug 17, 2020) **5th Amendment submitted** December 4, 2020 (Pending approval) |
| **Grant Agreement** | **Executed** September 20, 2018 | **Partially Executed** Divided in 4 disbursements with first being $1.7B February 4, 2020 | --- | --- | --- |
| | **19 programs being rolled out** | --- (Adds 8 programs, so 27 total) | --- | --- | --- |

| Appropriation | Asignación |
|---|---|
| Federal Register Notice | Notificación al Registro Federal |
| Action Plan and Action Plan Amendments | Plan de acción y Enmiendas al Plan de acción |
| Grant Agreement | Acuerdo de subvención |
| 2018 Cont. Apprps Act (P.L. 115-56) | Ley de Asignaciones Continuas (L.P 115-56) |
| $1.5B<br>Housing & Economy<br>September 8, 2017 | $1,500 M<br>Vivienda y Economía<br>8 de septiembre de 2017 |
| Submitted to HUD for approval<br>June 14, 2018<br>Approved by HUD<br>July 29, 2018 | Enviado al HUD para su aprobación<br>14 de junio de 2018<br>Aprobado por el HUD<br>29 de julio de 2018 |
| Executed<br>20 September, 2018 | Ejecutado<br>20 de septiembre de 2018 |
| 19 programs being rolled out | 19 programas en ejecución |
| Bipartisan Budget Act of 2018 (Pub. L. 115-123) | Ley de Presupuesto Bipartidista de 2018 (L. P. 115-23) |
| $8.2B<br>Infrastructure<br>February 9, 2018 | $8,200 M<br>Infraestructuras<br>9 de febrero de 2018 |
| Published<br>August 14, 2018 | Publicada<br>14 de agosto de 2018 |
| 1ˢᵗ Amendment Submitted<br>Nov 16, 2018<br>(Approved Nov 18, 2018) | Presentación de 1ª Enmienda<br>16 de noviembre de 2018<br>(Aprobada el 18 de noviembre de 2018) |
| 2nd Amendment Submitted<br>Aug 15, 2018<br>(Approved Aug 23, 2018) | Presentación de 2ª Enmienda<br>15 de agosto de 2018<br>(Aprobada el 23 de agosto de 2018) |
| 3rd Amendment Submitted<br>February 24, 2020<br>(Approved February 24, 2020) | Presentación de 3ª Enmienda<br>24 de febrero de 2020<br>(Aprobada el 24 de febrero de 2020) |
| Partially Executed<br>Divided in 4 disbursements, with first being $1.7B<br>February 4, 2020<br>(Adds 8 programs, so 27 total) | Parcialmente ejecutado<br>Dividido en 4 desembolsos, el primero de $1,700 M<br>4 de febrero de 2020<br>(Agrega 8 programas; un total de 27) |
| $8.3B<br>Mitigation<br>February 9, 2018 | $8,300 M<br>Mitigación<br>9 de febrero de 2018 |
| Published<br>January 27, 2020 | Publicado<br>27 de enero de 2020 |
| Action Plan submitted to HUD<br>December 3, 2020 | Envío del Plan de acción al HUD<br>3 de diciembre de 2020 |
| FOMB review of Action Plan<br>December 17, 2020<br>(Approved December 18, 2020) | Revisión del Plan de acción por la JSAF<br>17 de febrero de 2020<br>(Aprobado el 18 de diciembre de 2020) |
| $1.9B<br>Electric Power<br>February 9, 2018 | $1,900 M<br>Energía eléctrica<br>9 de febrero de 2018 |
| Supplemental Appropriation (Pub. L. 116-20) | Ley de Asignaciones Suplementarias (L. P. 116-20) |
| $277.9M<br>Infrastructure<br>June 6, 2019 | $227.9 M<br>Infraestructuras<br>6 de junio de 2019 |
| Published<br>Janauary 27, 2020 | Publicado<br>27 de enero de 2020 |
| 4th Amendment Submitted<br>July 9, 2020<br>(Approved Aug 17, 2020) | Presentación de 4ª Enmienda<br>9 de julio de 2020<br>(Aprobada el 17 de agosto de 2020) |
| 5th Amendment Submitted<br>December 4, 2020<br>(Pending approval) | Presentación de 5ª Enmienda<br>4 de diciembre de 2020<br>(Pendiente de aprobación) |

El 18 de septiembre de 2020, funcionarios del Estado Libre Asociado y del gobierno de los Estados Unidos también anunciaron la aprobación de $12,800 millones en fondos relacionados con la ayuda del huracán María bajo el Programa 428. El acuerdo consistía en $10,500 millones para la AEE y casi $2,300

millones para el PRDE. Aproximadamente $11,500 millones corresponden a la participación federal en los costos y el resto se cubre con fondos complementarios de participación en los costos.

El financiamiento federal de los $10,500 millones permitirá a la AEE reparar y/o reemplazar las líneas de transmisión y distribución, las subestaciones eléctricas, los sistemas de generación de energía, los edificios de oficinas, junto con las mejoras generales de la red eléctrica. Los 2,300 millones fueron aprobados para la reparación o sustitución de las infraestructuras dañadas del Departamento de Educación.

En enero de 2021, se llegó a un acuerdo sobre el costo estimado de $3,600 millones para que la AAA reparara los daños en los sistemas de agua.

*Fondos federales adicionales.* El 15 de mayo de 2020, el Gobernador emitió el Boletín Informativo 20-14 para notificar el procedimiento a seguir para el desembolso de la Ayuda a Trabajadores Autónomos. El pago de la Ayuda a Trabajadores Autónomos debía abonarse a todas las personas que, al 14 de mayo de 2020, ya habían recibido el Incentivo de $500 a través de la Carta Circular de Rentas Internas nº 20-21. El pago de $1,000 se proporcionaría a los trabajadores autónomos a través de un depósito directo. El 19 de mayo de 2020, la Junta de Supervisión emitió una carta en respuesta, sugiriendo que en lugar de proporcionar más apoyo a partes de la población que están siendo apoyadas a través de otros paquetes de estímulo federales y locales, se elija una acción que ayude a proporcionar una solución equitativa a un espectro más amplio de nuestra población. En la sección V.B.2.b) de esta Declaración de Divulgación se pueden encontrar detalles adicionales sobre la respuesta federal a la COVID-19 y los pagos por impacto económico a los particulares.

El 15 de mayo de 2020, el Gobernador Vázquez Garced también emitió la Orden Ejecutiva 2020-040, adoptando un plan de gastos para los $2,200 millones que Puerto Rico está recibiendo a través del Fondo de Alivio del Coronavirus ("CRF") creado bajo la Ley CARES. En la sección V.B.2.b. de esta Declaración de Divulgación se pueden encontrar detalles adicionales sobre la respuesta federal a la COVID-19.

El 3 de agosto de 2020, el Tribunal de Distrito sostuvo en el caso *Peña Martínez c. el Departamento de Salud y Servicios Humanos de Estados Unidos*, Caso Núm. 18-1206 (D.P.R. 2018), que la exclusión por parte del gobierno federal de los residentes de Puerto Rico del programa de Seguridad de Ingreso Suplementario ("SSI"); el Programa de Asistencia Nutricional Suplementaria ("SNAP"); y el programa de Subsidio por Bajos Ingresos de la Parte D de Medicare ("LIS") violó la Cláusula de Igualdad de Protección. La decisión de *Peña Martínez* se produce tras una decisión similar del Primer Circuito *Estados Unidos c. Vaello-Madero*, 956 F.3d 12 (1er Cir. 2020), que sostuvo que los residentes de Puerto Rico no podían ser excluidos del SSI.

El 1 de marzo de 2021, el Tribunal Supremo de los Estados Unidos concedió la petición de certiorari en el caso *Vaello-Madero*.

*Retrasos en los Fondos Federales.* Varias entidades gubernamentales en Puerto Rico están clasificadas como beneficiarios de alto riesgo, por lo que se impone un cumplimiento adicional y controles antes de que los fondos federales sean liberados. El propósito de estas condiciones adicionales es asegurar la implementación efectiva de los programas federales a través de una gestión y responsabilidad fiscal apropiadas. Esto también, sin embargo, tiene el potencial de retrasar la ejecución de los proyectos financiados con dólares federales.

8.        **Capacidad para el aumento adicional de impuestos en Puerto Rico**

La capacidad de una entidad pública para aumentar los ingresos fiscales suele medirse por los niveles y tasas de cambio de la actividad económica y los ingresos de sus ciudadanos y empresas. El importe del impuesto pagado por los particulares y las empresas en relación con el ingreso total ("carga fiscal") es una aproximación de la capacidad para obtener ingresos adicionales a través del pago de impuestos. La composición de los impuestos también es relevante. Por ejemplo, algunos tipos de actividad pueden ser muy sensibles a la fiscalidad o a los costos incrementales en general. La imposición o el aumento de los impuestos sobre esa actividad podrían frenarla considerablemente o crear nuevas incertidumbres, que socavarían tanto los ingresos tributarios potenciales como el crecimiento económico.

Los factores que pueden frenar la inversión o introducir incertidumbre incluyen: (i) la disponibilidad de opciones sustituibles que estén sujetas a tasas impositivas inferiores a la base tributable para la que está aumentando; (ii) la elasticidad de los precios entre diferentes formas de consumo o utilización de recursos; (iii) la magnitud del aumento; y (iv) la amplitud de la cobertura de mercancías y el territorio geográfico del impuesto y la movilidad del contribuyente (es decir, donde hay jurisdicción vecina con una tasa impositiva más baja).

En consecuencia, al evaluar la capacidad de Puerto Rico para recaudar ingresos adicionales mediante impuestos, hay que tener en cuenta su base disponible, en su conjunto y en categorías específicas de actividad. En términos totales, la producción y los ingresos económicos pueden aproximarse al producto interno bruto ("PBI") y al PNB. El PBI mide los gastos e ingresos obtenidos por residentes y no residentes de Puerto Rico, mientras que el PNB incluye los ingresos obtenidos por residentes de fuentes locales y extranjeras.

La diferencia entre estas dos mediciones de actividad económica e ingresos es aguda en Puerto Rico. Según los datos del Banco Mundial, el PBI real de 2019 fue de alrededor del 66.3% del PNB nominal. Esto surge de las corporaciones continentales de EE.UU. que representan una parte sustancial de la producción que tiene lugar en Puerto Rico a través de las actividades de sus subsidiarias, particularmente en el sector manufacturero. El Estado Libre Asociado, sin embargo, aparte del arbitrio de la Ley 154, impone impuestos bajos sobre estas actividades manufactureras porque otorga decretos de exención de impuestos a muchas de estas empresas para incentivar su establecimiento en Puerto Rico.

**Relación histórica entre Producto Nacional Bruto Real PNB) y Producto Interno Bruto (PBI)**
(millones de $)

|      | PNB | PBI | PNB como % PBI |
|------|-----|-----|----------------|
| 1990 | $ 54,895 | $ 61,264 | 89.61% |
| 2000 | $ 73,336 | $ 92,069 | 79.65% |
| 2005 | $ 74,278 | $ 105,342 | 70.51% |
| 2010 | $ 64,295 | $ 98,381 | 65.35% |
| 2011 | $ 63,415 | $ 98,029 | 64.69% |
| 2012 | $ 66,993 | $ 98,057 | 68.32% |
| 2013 | $ 67,119 | $ 97,756 | 68.66% |
| 2014 | $ 66,012 | $ 96,593 | 68.34% |
| 2015 | $ 64,671 | $ 95,579 | 67.66% |
| 2016 | $ 62,885 | $ 94,372 | 66.64% |
| 2017 | $ 60,257 | $ 91,648 | 65.75% |
| 2018 | $ 59,152 | $ 87,378 | 67.70% |
| 2019 | $ 58,621 | $ 88,416 | 66.30% |

Fuente: Banco Mundial, Reserva Federal de St. Louis (FRED).

Como resultado, usar el PBI para calcular la carga fiscal actual en Puerto Rico puede exagerar la capacidad del ELA para recaudar ingresos adicionales a través de los impuestos. Además, las comparaciones con jurisdicciones internacionales que evalúan la carga tributaria en Puerto Rico en base al PBI pueden ser engañosas o requerir ajustes porque Puerto Rico demuestra comportamientos más similares a una economía regional que soberana, con el libre flujo de capital, personas y bienes entre Puerto Rico y Estados Unidos continental.

Puerto Rico también ya ha aumentado significativamente su carga fiscal sobre varias porciones de la economía durante la última década, a medida que el gobierno aprobó nuevos impuestos y tasas sobre los residentes y empresas del ELA. Ha habido al menos once revisiones significativas al código tributario de Puerto Rico desde 1994, incluso seis ajustes desde 2013.[138] Esto aumentó la carga tributaria sobre la economía local, en particular los arbitrios y los impuestos sobre las exportaciones. Como ejemplos, los ajustes recientes de los impuestos y tasas incluyen:

**Base Tributable** – La Ley 257-2018 aumentó la retención a cuenta y los impuestos sobre los trabajadores autónomos y las empresas de servicios. La ley también eliminó muchas deducciones AMT bajo ciertas circunstancias, aumentando aún más los impuestos sobre algunas personas y empresas. Esto siguió a varios otros ajustes de la base tributable que ampliaban ajustes aprobados por el gobierno en la última década.

**IVU e IVA** – La Ley 72-2015 aumentó el IVU del 7.0% al 11.5%, estableció un impuesto del 4.0% sobre los servicios entre empresas e introdujo un régimen de Impuesto al Valor Agregado (que habría sustituido al régimen IVU pero fue derogado de acuerdo con la Ley 54-2016). Las leyes recientes también ampliaron los elementos tributables, incluida la recaudación de impuestos sobre las ventas en las transacciones por Internet de acuerdo con la Ley 25-2017, los servicios telefónicos comerciales y diversas compras por cooperativas de crédito, universidades.

**Ley 154-2010** – En 2013, la Ley 154 del arbitrio se modificó en virtud de la Ley 2-2013 para aumentar la tasa decreciente, del 2.75% en ese momento, al 4.0% y ampliar el plazo hasta 2017. Originalmente se había previsto su transición a una norma de ingresos de fuentes modificadas en 2016. La Ley 3-2017 prorrogó adicionalmente la tasa del 4.0% del arbitrio hasta 2027.

**Arbitrio y otros impuestos** – La Ley 46-2017 implementó un nuevo impuesto sobre alquileres a corto plazo, como HomeAway y Airbnb, mientras que la Ley 25-2017 mejoró la recaudación de IVU sobre compras en línea de productos tributables en Puerto Rico, y la Ley 26-2017 aumentó el impuesto sobre cigarrillos. La Ley 42-2017 creó el marco legal y la capacidad de gravar el cannabis medicinal. Más recientemente, la Ley 257-2018 legalizó y propuso gravar ciertos juegos de máquinas de azar y la Ley 81-2019 implementó impuestos sobre el juego electrónico y apuestas deportivas.

**Tasas** – La Ley 24-2017 incrementó significativamente las multas de tráfico y las tasas por licencias de conducir y registro de vehículos, mientras que otras leyes introdujeron una cuota del contratista

---

[138] Ley 40-2013, "Ley de Redistribución y Ajuste de la Carga Contributiva"; Ley 120-2014, "Generación y Retención de Empleos en las PyMEs"; Ley 72-2015, "Ajustes al Código de Rentas Internas de 2011"; Órdenes Administrativas 2017-01 y 2017-05; y Ley 257-2018, "Ley de Reforma Tributaria de Puerto Rico 2018".

del 1.5%, agregaron tarifas sobre las transacciones monetarias y aumentaron las licencias de los proveedores para cajeros automáticos y máquinas de videojuegos, entre otros.

**Impuesto bruto** – La Ley 40-2013 implementó un nuevo impuesto sobre las ventas brutas comúnmente conocido como 'Patente Nacional'. Aunque el impuesto se derogó posteriormente, su aplicación afectó significativamente a las empresas de bajo margen, como los supermercados.

**Agua** – Las tarifas de servicios públicos de agua aumentaron en más de un 60% desde julio de 2013.

**Impuesto sobre el petróleo "Crudita"** – El arbitrio bruto sobre los productos derivados del petróleo es actualmente de $15.50 por barril ($6.25 de los cuales no se aplican a los productos diésel). La Ley 31-2013 aumentó el impuesto al por mayor sobre los productos petrolíferos de $3.00 a $6.00 por barril sobre la base del índice de precios por barril ($3.00 era la tasa impositiva aplicable en ese momento) a $9.25 por barril. En enero de 2015, la Ley 1-2015 aumentó aún más los impuestos sobre los productos derivados del petróleo (salvo el diésel) al crear un nuevo arbitrio de $6.25 por barril.

Como se muestra a continuación, si bien estos aumentos de impuestos han dado lugar a aumentos en las recaudaciones generales, también han dado lugar a un cambio en la fuente de ingresos. El Plan Fiscal del Estado Libre Asociado también contempla mayores aumentos de impuestos y tasas con el tiempo. Estos cambios han hecho que las estimaciones de ingresos sean cada vez más difíciles de predecir e introducido complejidad estructural, inestabilidad e incoherencia interna en la estructura de ingresos.

Dada esta realidad, si bien algunos ingresos tributarios pueden aumentar con un aumento de las tasas impositivas, es poco probable que el monto del aumento de los ingresos esté perfectamente correlacionado con el propio aumento de las tasas. Tampoco se garantiza un aumento de los ingresos tributarios porque, en determinadas circunstancias, un aumento impositivo podría empujar al comportamiento del consumidor a buscar alternativas no sujetas a impuestos que sean suficientemente sustituibles, reduciendo potencialmente los ingresos tributarios. Además, el aumento de los impuestos más allá de un cierto punto puede ser contraproducente para los esfuerzos por detener el éxodo de profesionales y empresas altamente educados que son necesarios para cumplir el plan fiscal.

**Fuentes de Ingresos Tributarios al Fondo General de Puerto Rico**
($ en miles de millones)

| Impuestos | 2010 | Participación en Ingresos del FG en el 2010 | 2020 | Participación en Ingresos del FG en el 2020 |
|---|---|---|---|---|
| Impuesto sobre el ingreso individual | $ 2.6 | 34% | $ 1.9 | 20% |
| Impuesto sobre el ingreso corporativo | $ 1.7 | 22% | $ 2.1 | 22% |
| Retención de no residentes | $ 0.8 | 11% | $ 0.4 | 4% |
| Impuesto sobre Ventas y Uso | $ 0.5 | 7% | $ 1.6 | 18% |
| Impuestos al Consumo (inc. Ley 154) | $ 0.8 | 11% | $ 3.1 | 27% |
| Remesas del Impuesto sobre Ron | $ 0.4 | 4% | $ 0.2 | 3% |

| Otros impuestos | $ 0.9 | 11% | $ 0.4 | 6% |
| **Total Ingresos Netos FG** | **$ 7.7** | **100%** | **$ 9.3** | **100%** |

**D.    Los Sistemas de Administración de Caja de los Deudores[139]**

**1.    El Sistema de Administración de Caja del Estado Libre Asociado**

El sistema de administración de caja del Estado Libre Asociado (el "Sistema de Administración de Caja del Gobierno Central") es sumamente complejo. La Ley Núm. 230 del 23 de Julio de 1974, según enmendada, dispone que el Secretario de Hacienda es el encargado de la custodia de todos los fondos públicos del Estado Libre Asociado. El Estado Libre Asociado observa la práctica de acumular sus recursos de efectivo del Fondo General, los Fondos Federales, y los Fondos de Ingresos Especiales para la gestión común de la caja y erogaciones centralizadas. El efectivo se acumula en múltiples cuentas, colectivamente referidas como la Cuenta Única de Caja ("TSA", por las siglas en inglés de Treasury Single Account).

Si bien los fondos para desastres generalmente se administran fuera del TSA, otros fondos federales se transfieren directamente al TSA. La mayoría de los flujos de caja (por ejemplo, impuestos, tasas, y otros cargos) del Estado Libre Asociado se arrastran al TSA desde un conjunto de otras cuentas que reciben recaudaciones de impuestos y otros ingresos (cada una de ellas, una "Cuenta de Transferencia TSA"). La TSA y las Cuentas de Transferencia TSA se mantienen en diversas instituciones financieras privadas.[140]

El diagrama a continuación ilustra los flujos de caja principales relacionados con la TSA y las Cuentas de Transferencia TSA:

---

[139] El análisis de la Junta de Supervisión del sistema de administración de caja de los Deudores sigue en curso, y las descripciones en la presente están sujetas a revisión en todos sus aspectos.

[140] Las discusiones sobre efectivo de en III.E. se refieren a los balances combinados de las cuentas TSA.



| Inglés | Español |
|---|---|
| Disbursements | Desembolsos |
| Hacienda Disbursement Account<br> - payroll, payroll related costs, vendor; operational; welfare outlays; debt service payment; pension benefits; tax return payments<br>Agency Payroll, Other Expenses Disbursement Account<br> - transferred to Agency | Cuentas de desembolsos de Hacienda<br> - nóminas, gastos relacionados con nóminas, proveedores; operaciones; gasto social, desembolsos de capital, pagos de la amortización de la deuda, beneficios de pensiones, pagos de devolución de impuestos<br>Nóminas de la Agencia, Cuentas de desembolsos de otros gastos<br> - transferidos a la Agencia |
| Daily Sweep of Excess Funds | Transferencia automática de excedentes |
| TSA | TSA |
| TSA Cash Concentration | Concentración de fondos de TSA |
| TSA Reserve (Per Fiscal Plan) | Reservas de TSA (según Plan Fiscal) |
| TSA Operational | TSA operativa |
| TSA Overnight Sweep (Repos) | Pases de transferencias intradía |
| TSA Accumulation Account | Cuenta de acumulación de TSA |
| Daily Sweep of all balances | Transferencia diaria de balances |
| Manual Sweep of Tax Balances | Transferencia manual de balances tributarios |
| TSA Sweep Accounts | Cuentas de transferencia a TSA |
| General Collection Posts | Puestos de recaudación generales |
| Agency Collection Posts | Puestos de recaudación de Agencia |
| IVU & Other (incl. tax collections, charges for services, proceeds of debt) | IVU y otros (incluyendo recaudaciones de impuestos, cargos por servicios, cobros de deuda) |
| COLECTORES – General Collection Posts<br> - Sweep into TSA with collections transferred with a 2-day time lag<br> - All gross income/corporate tax collections, fines received by all Hacienda Collection Posts<br>Corporate/income tax will be consolidated (once SURI Phase in complete) | RECAUDADORES – Puestos de recaudación generales<br> - Transferencia a TSA, con las recaudaciones traspasadas con 2 días de demora.<br> - Todas las recaudaciones de ingresos brutos/impuestos corporativos, multas cobradas por todos los puestos de recaudación de Hacienda.<br>El impuesto de sociedades quedará consolidado (una vez que concluya la fase de SURI) |
| COLECTORES – Agency Collection Posts<br> - Sweep into TSA with collections transferred with a 2-day time lag<br> -Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. | RECAUDADORES – Puestos de recaudación de Agencia<br> - Transferencia a TSA, con las recaudaciones traspasadas con 2 días de demora<br>Recaudaciones de las agencias del gobierno central en los puntos de recaudación de los servicios prestados por las agencias, así como tasas, licencias, permisos, multas y otros. |
| Sales & Use Tax (IVU/IVU)<br> -Partial Sweep performed manually into TSA Account management by BPPR Trust – transfers to COFINA indenture trustee and to TSA Operational Account<br> - All Receipts of sales and use taxes | Impuesto sobre Ventas y Uso (IVU)<br> - Transferencia parcial realizada manualmente a la cuenta de TSA gestionada por el Fideicomiso de BPPR – Transferencias al síndico de COFINA y a la cuenta de explotación de TSA<br> – Todas las percepciones del IVU. |
| Excise, Inheritance, Gifts and Licenses<br> - Partial sweep into TSA performed manually | Arbitrio, sucesiones, donaciones y licencias<br> - Transferencia a TSA realizada manualmente |
| Excise account can receive IVU<br>With manual transfer | La cuenta de consumo puede recibir IVU<br>Con transferencia manual |
| Employee, Judicial Teacher Requirements<br> -Pay Go | Jubilaciones de empleados, judicatura, maestros<br> - PayGO |
| Hacienda Incremento Petroleo AFI<br>Bank account for special revenue funds to account for excise tax from petroleum infrastructure "Crudita" | Hacienda Incremento Petróleo AFI<br>Cuenta bancaria para fondos de ingresos especiales a la cuenta de consumo para infraestructuras petroleras CRUDITA |
| System of Record | Sistema de registro |
| Collectoria | Recaudación |
| PS | PS |
| SIRAT | SIRAT |
| Gen Tax | Impuesto General |

132

| Gen Tax | Impuesto General |
| System of Record Inputs | Entradas al sistema d registro |
| Colecturia Virtual | Recaudación virtual |
| IMAR Bank | Banco IMAR |
| Manual Deposits | Depósitos manuales |
| Colecturia Virtual | Recaudación virtual |
| Online Res | Res. en línea |
| Manual Deposits | Depósitos manuales |
| SURI | SURI |
| Manual Deposits | Depósitos manuales |
| SURI | SURI |
| Manual Deposits | Depósitos manuales |
| Directly Deposited into TSA Operational: | Depósitos directos en la cuenta operativa de TSA: |
| - Avisos Salud; Avisos ASSMCA; Avisos Dep't of Ed; Federal Funds; Dep't of Labor | - Avisos Salud, Avisos ASMCA, Avisos Depto. de Ed., Fondos Federales, Departamento de Trabajo |

Las recaudaciones de la TSA incluyen recaudaciones de impuestos, cargos por servicios, recaudaciones intergubernamentales (tales como los reembolsos de subsidios de ayuda federal), reembolsos de las corporaciones públicas y municipalidades para beneficios de pensiones pagados y otras recaudaciones. Las recaudaciones al TSA se componen principalmente tanto de ingresos del Fondo General como del Fondo de Ingresos Especiales.

De acuerdo con las instrucciones del Departamento de Hacienda, los desembolsos de la TSA incluyen, directamente o indirectamente, muchos costos de nómina y relacionados de las agencias del Gobierno Central, erogaciones a vendedores, apropiaciones a corporaciones públicas y otras entidades gubernamentales no centrales, gastos capitales, pagos autorizados bajo los subsidios federales, gastos para atención a desastres con costos compartidos o pagos anticipados, reembolsos de impuestos, pagos de beneficios de pensiones corrientes, y otras erogaciones.

Estas erogaciones son principalmente para las agencias del Gobierno Central que no tienen cajas (o sea, tesorerías) independientes. Para propósitos de presupuesto, estas agencias del Gobierno Central reciben apropiaciones del Fondo General o los Fondos de Ingresos Especiales. Por ejemplo, el Departamento de Educación y el Negociado de Policía del Departamento de Seguridad Pública operan presupuestos compuestos de las apropiaciones del Fondo General y de los Fondos de Ingresos Especiales.

Algunas agencias gestionan actividades de administración de caja independientemente del TSA, incluyendo: control directo de cuentas, autorización o ejecución de erogaciones, y monitoreo y planificación de flujos de caja. Algunas agencias mantienen cuentas no-TSA para atender necesidades de flujo de caja que no pueden ser atendidos por la estructura centralizada de la TSA. Por ejemplo:

- La Administración de Vivienda Pública ("PHA - Public Housing Administration") recibe y desembolsa subsidios para vivienda asequible en conformidad con los subsidios federales, usando cuentas no-TSA.

- El Departamento de Trabajo gestiona las contribuciones de patronos para los impuestos de desempleo de Puerto Rico, la mayoría de las cuales están depositadas en la Tesorería de los Estados Unidos.

- La Lotería de Puerto Rico controla las cuentas para recaudación de compras de boletos y gestiona los flujos de caja para satisfacer las proyecciones de pagos de premios, y remite los ingresos netos a la TSA.

a)     **Flujos de Caja de la TSA**

Las recaudaciones de caja relacionadas con los impuestos, fondos federales, y cargos por servicios, se reciben en las Cuentas de Transferencia TSA, y se arrastran automáticamente o manualmente a la cuenta operativa primará de la TSA. La cuenta primaria de la TSA financiará otras cuentas en la TSA, según sea necesario, incluyendo para propósitos de reabastecer las reservadas fiscalmente exigidas y para invertirlas para generar ingresos. De acuerdo con las instrucciones del Departamento de Hacienda, la TSA, de parte de muchas agencias del Gobierno Central, desembolsa para nóminas, gastos operativos, beneficios de pensiones, gastos relacionados con programas financiados por agencias Federales, y varias otras apropiaciones presupuestadas.

La AAFAF elabora semanalmente un informe sobre el flujo de fondos en estas cuentas, titulado *Treasury Single Account FY 2020 Cash Flow* (Flujo de caja de la cuenta única del Tesoro del Año fiscal 2020), y además elabora informes de Flujo de Caja mensuales y trimestrales.

Las categorías de impuestos más grandes son los impuestos sobre el ingreso (impuestos sobre el ingreso corporativo y personal), IVU, ingresos del arbitrio Ley 154, y varios otros tipos de impuestos.

*Impuestos sobre el ingreso.* El Gobierno Central recauda impuestos sobre el ingreso de individuos, corporaciones, sociedades, así como impuestos retenidos de no-residentes. Los impuestos sobre el ingreso generalmente son depositados a la cuenta aplicable, o bien desde los puestos de recaudación físicos, o por medio de los portales en línea de recaudación del Departamento de Hacienda. Las recaudaciones de impuestos también se reciben de las cuentas de impuestos generales asociados con la plataforma SURI para recaudación de impuestos SURI. Usualmente las recaudaciones se arrastran con una demora de dos días. Sustancialmente, todos los impuestos sobre el ingreso son recaudaciones del Fondo General, que pueden ser desembolsados desde la TSA, en conformidad con apropiaciones generales de nómina, beneficios de pensiones, suministradores y gastos operativos, gastos capitales, rembolsos de impuestos, y otras apropiaciones.

*IVU.* La tasa IVU del 10.5% del Estado Libre Asociado se deposita en una cuenta, o bien desde un puesto físico de recaudación o desde uno de los portales de recaudación del Departamento de Hacienda. De ese porcentaje, se transfiere el 5.5% por un monto de hasta el 53.65% del Monto Base del Impuesto sobre las Ventas Pignorado (de acuerdo con lo definido en el Contrato de Fideicomiso Maestro de COFINA de fecha 12 de febrero de 2019) para el Año fiscal aplicable, a la cuenta del síndico de COFINA.[141] El remanente del IVU del Estado Libre Asociado se compone de la sobretasa del 4.5% del IVU, aprobado en el 2015, lo cual fluye al Fondo General, y el 0.5% del IVU asignado y transferido al Fondo de Administración Municipal, el Fondo de Redención Municipal, y el Fondo de Mejoramiento Municipal.[142] Las recaudaciones que componen la porción del 4.5% del IVU se arrastran con una demora de dos días. La ilustración a continuación presenta un flujo simplificado de los fondos relacionados con estos dos tipos de impuestos:

---

[141] Para el Año fiscal 2021, el Impuesto sobre las Ventas Pignorado es $1,270, de lo cual aproximadamente $448 millones se ha de transferir a COFINA. Los Impuestos sobre las Ventas Pignorado se ajustaron para las exenciones de alimentos preparados y las recaudaciones entre empresas durante el proceso de mediación de los acreedores y diferirán en comparación con el Plan Fiscal COFINA 2020. El importe transferido a COFINA aumenta un 4.0% anual hasta alcanzar los $1,850 millones. Consulte: *Suplemento al Tercer Plan Enmendado y Documentos Relacionados de la Corporación del Fondo de Interés Apremiante y Documentos Relacionados al Plan de la Corporación del Fondo de Interés Apremiante de Puerto Rico*, [ECF Núm. 578].

[142] Estas cuentas están a nombre del Municipal Finance Corporation ("COFIM").

134



| Inglés | Español |
|---|---|
| Municipal Admin Fund (FAM) | Fondo de Administración Municipal (FAM) |
| Muni Development Fund | Fondo de Desarrollo Municipal |
| Muni Redemption Fund | Fondo de Rehabilitación Municipal |
| Muni Improvement Fund | Fondo de Mejora Municipal |
| Merchant Point of Sale | Punto de venta del comerciante |
| By 10th day of month following transaction | Al 10 de cada mes siguiente de la transacción |
| Some remit twice a month. Others once a month. | Algunos, dos veces al mes. Otros, una vez al mes |
| Reported through SURI from Authorized Collector | Declarado a través de SURI desde el recaudador autorizado |
| Daily Sweep | Transferencia diaria |
| Dedicated Sales Tax Account | Cuenta Especial para Impuestos sobre Ventas |
| Within 2 days | Dentro de 2 días |
| Dedicated Sales Tax Fund | Cuenta Especial para Impuestos sobre Ventas |
| Daily Sweep | Transferencia diaria |
| Reported to COFIM on financial institutions website | Declarado a COFIM en el sitio web de la institución financiera |
| COFIM Debt Service Acct. (No Bonds Issued) | Cuenta de amortización de la deuda de COFIM (sin la emisión de bonos) |
| Municipality General Fund | Fondo General Municipal |
| Indenture Trustee | Síndico del Contrato de Bonos |
| 5.5% of revenues up to PSTBA | 5.5% de la recaudación hasta la RF |
| Distributed according to COFINA waterfall | Distribución de acuerdo con la cascada de COFINA |
| Trustee-Held Conduit Account | Cuenta transitoria mantenida por el síndico |
| 5.5% of revenues up to Pledged Sales Tax Base Amount transferred within hours (or day) to COFINA Trustee | 5.5% de la recaudación hasta el Monto Base del Impuesto a las Ventas Pignorado se transfiere en horas (o en un día) a Fideicomiso de COFINA |
| Govt gets "2nd dollars" from the 5.5% of Pledged Taxes after 53.65% PSTBA is first funded each FY | El Gobierno obtiene "la segunda recaudación" del 5.5% de los impuestos pignorados una vez que cada año fiscal se canaliza el 53.65% de la RF |
| "1st dollars" for 4.5% of IVU revenues, up to Pledged Sales Tax Base Amount | La "primera recaudación" del 4.5% del IVU, hasta el Monto Base del Impuesto a las Ventas Pignorado |
| "2nd dollars" from the 5.5& of Pledged Taxes after the 53.65% PSTBA is funded | La "segunda recaudación" desde el 5.5% de los Impuestos pignorados una vez cubierto el 53.65% de la RF |

El proceso de recaudación y remesa del IVU al TSA fue modificado para el Año fiscal 2020. El Departamento de Hacienda ha implementado un nuevo proceso para el Año fiscal 2020 para el IVU, en base al sistema SURI/cuenta de impuestos generales, para facilitar una transacción en tiempo real entre los tipos de productos depositados en las Cuentas de Transferencia TSA. Antes de este nuevo proceso, las multas, pagos de intereses, y el IVU del 4% entre empresas se incluían en la cascada a pesar de que se

pretendía excluir los ingresos. El nuevo proceso de administración de caja separa estos montos y permite que los cobros se transfieran a la TSA en base acelerada.

*Arbitrios.* El Estado Libre Asociado impone por lo menos siete categorías diferentes de impuestos, incluyendo el Arbitrio Ley 154, el Arbitrio de Bebidas Alcohólicas y Cerveza, el Arbitrio de Productos de Tabaco, la Tarifa sobre Vehículos Automotor, el Impuesto sobre Productos de Petróleo y Derivados, Gasolina, Gasóleo, y Aceite Diésel, y el Impuesto sobre Alcohol.

*Tarifas para licencias de vehículos automotor, tasas para licencias para bebidas alcohólicas, y tasas para licencias de maquinas de entretenimiento.* Las recaudaciones de las tarifas de vehículos automotores, alcohol, y licencias para las máquinas de entretenimiento se depositan en el TSA.

*Cargos por Servicios*. Ciertos cargos para servicios entregados y los cargos incurridos se recaudan en la TSA como recaudaciones del Fondo General.

*Ingresos de Tragamonedas.* La Comisión de Juegos de Puerto Rico regula las tragamonedas en varios casinos, y el Departamento de Hacienda recauda todos los ingresos de las máquinas tragamonedas. La Comisión de Juegos de Puerto Rico transfiere el 15.15% de los ingresos de tragamonedas pagaderos a partes del gobierno en el Fondo General, por medio de la TSA. Hasta el 30 de junio de 2020, estas recaudaciones del Fondo General correspondientes al Año fiscal 2020 ascendían a $15 millones. El balance restante de los ingresos de tragamonedas fue asignado conforme a lo siguiente: 25.80% a un Fondo Especial de la Compañía de Turismo, 13.60% al Fondo de Desarrollo de la Industria Turística de Puerto Rico, y el 45.45% al Fondo General de la Universidad de Puerto Rico, y el balance restante se transmitió a los operadores de casinos.[143]

*Remesas del Impuesto sobre Ron.* Los arbitrios federales sobre ron y otras cervezas, vinos, y licores, son recaudados por el gobierno federal y remitidos al Estado Libre Asociado ("Remesas del Impuesto sobre Ron") por medio de una "caja fuerte" a nombre del Departamento de Hacienda en un banco comercial. Este banco comercial distribuye los productos de tres arbitrios federales distintos (rones de Puerto Rico, rones importados, y licores aparte de ron), a varios destinatarios, incluyendo, entre otros, el Departamento de Hacienda de Puerto Rico, el Trust de Conservación de Puerto Rico (una entidad privada), PRIDCO, y los productores de ron de Puerto Rico elegibles (por medio del Agente Pagador). Del total de $458 millones de Remesas del Impuesto sobre Ron generados durante el Año fiscal que finalizó el 30 de junio de 2020, $245 millones fueron transferidos directamente al TSA.[144]

*Subvenciones Federales.* Los fondos y reembolsos se depositan en la TSA y, a su vez, estos son desembolsados a las agencias que se benefician de la subvención o a las cuales se les debe un reembolso. Las transferencias federales más importantes incluyen el NAP, Medicaid, FEMA, el Título I y otros fondos o reembolsos de programas federales.

b)   **Flujos de Caja Selectos Fuera del TSA**

Varias entidades o agencias desempeñan funciones de tesorería y desembolsan dinero independientemente de la Cuentas de Transferencia TSA, típicamente debido a requerimientos estatutarios

---

[143] Bajo la Ley de Juegos de Azar, los ingresos de los tragamonedas se apropian entre los operadores y el gobierno en proporciones que varían en función a los ingresos totales recaudados.

[144] Las cifras que se presentan se basan sobre el principio contable del devengo. Durante el año fiscal que finalizó el 2019, el efectivo recaudado para el Departamento de Hacienda fue $230 millones en recaudaciones del fondo general relacionados con las Remesas del Impuesto sobre Ron.

o estipulados. A continuación se presenta una lista ilustrativa de estas agencias; no se pretende que la lista sea completa.

**Administración de Vivienda Pública.** AVP administra subvenciones de vivienda asequible con fondos federales. Sustancialmente, todo el presupuesto AVP consiste de subvenciones de fondos federales, los cuales han especificado que las subvenciones no deben ser mezcladas con otros dineros del Estado Libre Asociado. Todo dinero de las subvenciones se recibe en las cuentas AVP y se desembolsa a los administradores de propiedades participantes.

**Lotería Electrónica y Tradicional.** La lotería tradicional es manejada por el Departamento de Hacienda, que recoge las recaudaciones de los boletos de lotería de vendedores en forma de cheques y transferencias ACH a una cuenta principal. Hay una transferencia semanal para financiar los premios, lo cual a su vez financia la cuenta para desembolsar los premios. La cuenta principal dispensa efectivos y cheques a los ganadores de premios. La cuenta principal también financia una cuenta de cero balance ("ZBA" por las siglas en inglés de Zero Balance Account) para pagos de nómina y a suministradores. La lotería electrónica recauda dinero de los vendedores de boletos por medio de transferencias bancarias, a dos cuentas ZBA que se arrastran a una cuenta de inversión. Todos los pagos de premios, nóminas, impuestos, anualidades, o para los suministradores se desembolsan por medio de una cuenta diferente. La lotería distribuye una porción de los ingresos netos a la TSA en conformidad con la Ley 10-1989.

**Departamento de Trabajo y Recursos Humanos ("DTRH").** Si bien el DTRH recibe apropiaciones de varias fuentes de fondos para sus diversas operaciones, el DTRH también administra ciertos aspectos del programa de seguro contra desempleo del estado, usando el efectivo que se le ha encomendado. Los patronos remiten las imposiciones del seguro contra desempleo al DTRH, que deposita estos fondos en una cuenta a nombre del Departamento de Trabajo de los EE.UU. con el Departamento del Tesoro de los EE.UU. el cual a su vez administra la distribución de beneficios. El DTRH también se reembolsa a sí mismo por concepto de penalidades impuestas a patronos y gastos operativos, al transferir montos de la recaudación de impuestos a la TSA. Al 31 de enero de 2021, el DTRH tenía $293 millones en su cuenta con el Tesoro de los EE.UU. para los beneficios del programa de seguro de desempleo. DTRH también mantiene cuentas que son usadas para desembolsos bajo el Work Opportunity Incentive Fund y desembolsos para los beneficiarios de los programas de beneficios de discapacitación.

**Departamento de Servicios de Emergencia 911.** Se generan ingresos de remesas enviadas por las empresas de telecomunicaciones por sus cargos a suscriptores por el pago del Servicio de Emergencia 9-1-1, De estas recaudaciones, la Junta 9-1-1 puede distribuir una porción de los gastos a las otras agencias de seguridad pública, en conformidad con el Reglamento Núm. 5303.

**Asamblea Legislativa.** La Legislatura recibe una apropiación del Fondo General por una doceava parte de su presupuesto cada mes. Los productos del mismo se separan, para las diversas unidades separadas de la legislatura (el Senado, la Cámara, comisión conjunta). El poder legislativo administra sus apropiaciones por medio de sus propias cuentas, para proveer los fondos para las necesidades legislativas. El Gobierno Central paga, y factura, a la Legislatura por el pago de los costos PayGo.

**La Rama Judicial.** La Rama Judicial administra efectivo para financiar sus gastos operativos no de nóminas, y ciertos costos de los tribunales locales. El Departamento de Hacienda financia directamente la nómina del personal judicial, al remitir a las operaciones de la tesorería judicial el total de las apropiaciones presupuestarias y los cargos judiciales estatutarios recaudados por el Departamento de Hacienda de parte del sistema judicial.

137

La caja de la Rama Judicial sostiene y financia cuentas locales en los tribunales de todo Puerto Rico, para el pago oportuno de costos judiciales directos, incluyendo los costos de jurados, tal y como se describe arriba. Sustancialmente todos los costos operativos restantes (consultores, contratistas, costos de arriendo, etc.) de la rama judicial se pagan por cheque. En conformidad con la Ley 69-1991, según enmendada, y el Reglamento de la Rama Judicial para la Administración de Fondos e Intereses, la Rama Judicial está facultada para abrir cuentas bancarias, depositar fondos, devengar intereses sobre dichos depósitos, y erogar los intereses devengados. Se requiere que el primer 0.05% de los intereses devengados sea transferido de vuelta al Departamento de Hacienda.

2.    **Sistemas de Gestión de Efectivo SRE**

El SRE ha estado utilizando su efectivo interno para pagar gastos corrientes. Se prevé que los balances de caja existentes se utilicen para la liquidación de los acreedores y, en consecuencia, el SRE recibirá una asignación del Fondo General para apoyar las operaciones. SRE mantiene una cuenta segregada en conformidad con la estipulación conjunta registrada al 14 de Julio de 2017 [Caso Núm. 17-03566-LTS, ECF Núm. 170, 171], disponiendo el depósito de contribuciones de empleador efectuadas por entidades no pertenecientes al Estado Libre Asociado, hasta la resolución de diversas reclamaciones entre las partes de dicha estipulación.

3.    **Sistemas de Administración de Efectivo AEP**[145]

a)    **Entradas de Efectivo**

AEP recibe fondos de los alquileres gubernamentales facturados directamente a otras entidades gubernamentales y de otros ingresos, como las recuperaciones relacionadas con los desastres. En el Año fiscal 2020, la AEP recibió $116.4 millones, de los cuales $106.0 millones fueron ingresos intergubernamentales, $6.6 millones fueron otros ingresos de explotación (por ejemplo, ingresos por ocupación de terceros, ingresos por intereses y ventas de activos) y $3.9 millones fueron ingresos relacionados con desastres relacionados con las reclamaciones de la FEMA por el huracán Irma y el huracán María.

Hasta marzo de 2021, se ha producido un retraso en el cobro de los recibos de alquiler, que se prevé que esté relacionado con el calendario; se espera que la recaudación se recupere en los meses siguientes. En el año hasta la fecha, a 31 de marzo de 2021, la AEP tiene una variación desfavorable de $2.7 millones con respecto al Plan de Liquidez, incluyendo una variación desfavorable de $11.6 millones, parcialmente compensada por una variación favorable de $8.9 millones en los desembolsos, gran parte de la cual se debe a la reducción del personal y a los cambios en las prestaciones. La AEP prevé unos ingresos intergubernamentales de $132.1 millones, ingresos por desastres de $1.5 millones y otros ingresos de explotación de $1.3 millones en el Año fiscal 2021.

b)    **Salidas de Efectivo**

Los desembolsos del AEP incluyen gastos operativos, PayGo, y desembolsos relacionados con desastres. Los principales componentes de los gastos operativos en el Año fiscal 2020 son salarios y beneficios ($47.4 millones), servicios comprados ($15.4 millones), pagos por servicios públicos ($15.3 millones), otros gastos operativos ($4.5 millones). Los gastos PayGo fueron $23.3 millones. Los gastos

---

[145] Liquidez de Componente AAFAF para el Mes de marzo de 2021.

138

relacionados con desastres fueron $400,000 y $2.9 millones, reembolsables por FEMA y seguros, respectivamente.

4. **Racionalización de Bancos**

El Departamento de Hacienda está llevando a cabo un proyecto de fases múltiples para centralizar y automatizar los proceses de administración de caja e informes financieros para el Gobierno Central y sus agencias, mejorar la visibilidad en las operaciones de caja, y preparar para la implementación del nuevo sistema Enterprise Resource Planning ("ERP"). El Departamento de Hacienda ha recopilado un inventario de las cuentas bancarias del Gobierno Central y está documentando la información relacionada con propiedad y control, disponibilidad, y flujos de caja para cada uno. El Departamento de Hacienda también está identificando cuentas a ser cerradas, para alcanzar eficiencias operativas mediante la centralización de la estructura de las cuentas bancarias. El propósito de este proyecto es brindarle al Departamento de Hacienda mayor control y supervisión de las cuentas que previamente eran controladas por partes externas al Departamento de Hacienda, y soportará el mejoramiento continuo por medio del seguimiento de informes, controles, y cumplimiento.

E. **Cuentas de Caja de Deudores**

La lista de las cuentas bancarias de los Deudores y balances al 31 de diciembre de 2020, y la categorización preliminar de restricciones se adjuntan como el Anexo L. La lista se basa sobre la información más actualizada disponible para los profesionales de la Junta de Supervisión, y dicha información sirve de base para el análisis legal y los juicios de la Junta de Supervisión.

1. **Informe del Equipo Independiente de Análisis Forense**

El 31 de enero de 2018, la Junta de Supervisión, actuando a nombre de y de parte del Comité de Investigación Especial (el "Comité de Investigación Especial"),[146] contrató a Duff & Phelps, LLC (el "Equipo Independiente de Análisis Forense" o "IFAT" (por las siglas en inglés de Independent Forensic Analysis Team) para conducir una investigación de las cuentas bancarias de las entidades gubernamentales, incluyendo las entidades cubiertas por el plan fiscal del Estado Libre Asociado, UPR, ACT, SRE, y la AEEPR. El alcance de la encomienda incluyó (i) un inventario del efectivo, equivalentes de efectivo, e inversiones del Gobierno de Puerto Rico, (ii) un análisis de las fuentes de dichos fondos y sus usos pretendidos, y (iii) cualesquier restricciones legales documentadas sobre estos fondos.

El objetivo principal del Equipo Independiente de Análisis Forense era la publicación de un informe que describiera los procesos empleados, los resultados obtenidos, y un opinión del Equipo Independiente de Análisis Forense, con respecto a si los procedimientos realizados validan o no validan las cuentas de inversión y bancarias del Estado Libre Asociado identificados, y si los balances habían sido divulgados con precisión. La investigación dependía del supuesto que un número importante de las entidades del Estado Libre Asociado voluntariamente le proveerían la información financiera específica a la Junta de Supervisión. La investigación fue diseñada a la medida para recoger y desarrollar información sobre si las cuentas bancarias identificadas por las entidades del Estado Libre Asociado contenían fondos restringidos, sus cantidades, y la naturaleza de los fondos restringidos.

---

[146] El Comité de Investigación Especial de la Junta de Supervisión se componía en ese momento de los Miembros Ana J. Matosantos, David A. Skeel, y el Juez Arthur J. González (Ret.), y tenía el mandato de perseguir investigaciones en conformidad con las facultades otorgadas a la Junta de Supervisión bajo PROMESA Sección 104(o), y aquellas otras facultades otorgadas a la Junta de Supervisión bajo PROMESA.

a)        **Procedimientos de la Investigación**

Para propósitos del informe, el Equipo Independiente de Análisis Forense identificó una fecha de medición del 30 de junio de 2018 (la "Fecha de Medición de junio 2018"). La investigación incluyó tres componentes: (i) un proceso de reelección de información; (ii) un proceso de indagación y recolección de datos; y (iii) un proceso analítico de reportaje.

*Recolección de Información.* La recolección de información fue un proceso secuencial. Se generó una baso de datos maestro de las entidades gubernamentales y sus cuentas bancarias respectivas a la Fecha de Medición de junio 2018. La información fue recibida principalmente del Departamento de Hacienda de Puerto Rico, AAFAF, e información oficial disponible al público.

*Proceso de Indagación y Recolección de Datos.* Una vez que se creó la base de datos maestro, cada entidad gubernamental que presentaba un informe fue contactada utilizando un formato uniforme. Las entidades gubernamentales fueron contactadas para obtener la información de las cuentas bancarias relevantes, así como la autorización de las entidades gubernamentales para permitir que las instituciones financieras aportaran la información directamente.

*Proceso Analítico y de Reportaje.* El último paso fue contactar a las instituciones financieras identificadas, para confirmar la información obtenida y verificar la información auto-reportada por las entidades.

b)        **Pasos Adicionales Relacionados con el Equipo Independiente de Análisis Forense**

El informe del Equipo Independiente de Análisis Forense sugirió tareas y actividades adicionales para desarrollar en mayor detalle la información referida en el informe, lo cual incluyó la actualización de la Fecha de Medición de junio 2018 a una fecha de medición más actualizada, en vista de que los montos podrían haber cambiado materialmente entre sendas fechas. Los cambios en los balances a las nuevas fechas de medición, así como los procedimientos adicionales para la transacción de balances y para categorizar las restricciones se abordan abajo. Debido a que los procedimientos de este análisis también siguen en curso, la Junta de Supervisión seguirá actualizando el análisis periódicamente.

2.        **Análisis Permanente de Cuentas Bancarias**

Después de la divulgado del informe del Equipo Independiente de Análisis Forense, la Junta de Supervisión siguió realizando análisis de las cuentas de caja del Estado Libre Asociado y sus instrumentalidades, en base rodante, lo más reciente siendo al 31 de diciembre de 2020 (la "Fecha de Medición de Diciembre 2020").

Como se describe a continuación, los análisis en curso de la Junta de Supervisión incluyeron la recolección, procesamiento, y evaluación de más de 9,000 documentos aportados por las instituciones financieras, agencias, y otras entidades gubernamentales. La recolección de documentos para todas las cuentas incluye extractos de cuenta (incluyendo extractos bancarios, extractos de corretaje, certificados de depósito o carta de confirmación de balance según el tipo de cuenta y la disponibilidad de la información), información sobre restricciones (incluyendo contratos y legislación federal y local) e información sobre el firmante. Otros datos solicitados incluyen información de la agencia, documentación de la estructura e información de la subvención. El análisis (realizado en inglés o español a través de correo electrónico, teléfono, reuniones en persona y mediante revisión contable y legal), incluyó más de 2,700 cuentas

bancarias potenciales en más de 140 entidades gubernamentales para identificar la población de cuentas bancarias relevantes para el Estado Libre Asociado y sus instrumentalidades.

a)    **Resumen de los Procedimientos Realizados**

La Junta de Supervisión se concentró, entre otros, sobre: (i) confirmar la población de cuentas bancarias y establecer sus balances, con lo más reciente siendo a la Fecha de Medición de diciembre 2020, y (ii) determinando, en base a la información disponible para el análisis legal, el importe de los fondos restringidos dentro de esas cuentas.

La Junta de Supervisión aprovechó y fortaleció los procedimientos indicados en el informe IFAT para arrastrar al futuro los balances a la Fecha de Medición de diciembre 2020. Específicamente, además de obtener la información sobre balances para una población determinado de cuentas por medio de solicitudes a las entidades gubernamentales, los procedimientos de la Junta de Supervisión incluían credenciales para acceder a plataformas en línea de cuentas para cada entidad, para una mayoría de los balances de cuentas bancarias. El acceso en línea a cuentas permite que se trasladen a futuro los balances y se identifique la población de cuentas en cada institución financiera para cada entidad gubernamental. Las solicitudes de información financiera también fueron enviadas a las entidades gubernamentales e instituciones financieras, en casos donde el acceso en línea no estaba disponible. Se realizaron procedimientos adicionales para alinear los datos de las instituciones financieras con la información aportada por las entidades gubernamentales para conciliar diferencias.

Concurrentemente, la Junta de Supervisión solicitó documentación sobre cualquier clasificación de restricciones de la entidad gubernamental. Se condujeron procedimientos adicionales para brindar soporte continuo a las entidades gubernamentales en proveer la documentación para la evaluación de diligencia debida legal. La vasta mayoría (99%) de los balances estaba concentrada en 76 de las 566 cuentas del Estado Libre Asociado, SRE, y AEP. Los asesores jurídicos de la Junta de Supervisión realizaron la evaluación de diligencia debida legal de las cuentas con balances superiores a $6.9 millones para obtener una cobertura del 95% del total del efectivo mantenido a la Fecha de Medición de diciembre de 2020. Las 490 cuentas restantes contenían $214.1 millones y equivalían al 1% del balance total de efectivo en la Fecha de Medición de diciembre de 2020. Los balances individuales de las 490 cuentas estaban todos por debajo del umbral de $6.9 millones y fuera del umbral de evaluación para diligencia debida legal.

Los procedimientos de la Junta de Supervisión se enfocaron sobre las entidades gubernamentales que componen el Gobierno Central (compuestos de las agencias del poder ejecutivo, legislativo, y judicial), SRE, y AEP.

(i)    *Identificación de la Población de Cuentas Bancarias y Determinación de sus Balances:*

La Junta de Supervisión despachó oficios, tanto en inglés como en español, solicitando los balances de cuentas a la Fecha de Medición de diciembre 2020 a las Instituciones Financieras (las "IF") para las cuentas de los Deudores. Las cartas fueron enviadas junto con una lista de las cuentas conocidas en poder de cada entidad gubernamental en la IF respectiva, y se solicitó que las IF enviaran lo siguiente a la Junta de Supervisión:

- los estados de cuenta, sea bancarios o de corredores, para cualquier balance en efectivo y/o de inversión para las cuentas en poder de la IF, relacionados con el Deudor aplicable, o acceso en línea para la Junta de Supervisión, para que obtuviera los datos relevantes de cada cuenta;

- una lista de signatarios con poderes sobre cada cuenta;

- información correspondiendo a cualquier gravamen, derecho de retención, o reclamación de terceros; y

- los detalles para toda cuenta adicional en poder de una entidad gubernamental, que no venía incluida dentro de la lista inicial de las cuentas entregadas.

Simultáneamente, se enviaron cartas a las entidades gubernamentales, adjuntando una lista de las cuentas conocidas, tanto en inglés como en español, solicitando la siguiente información:

- los estados de cuenta, sea bancarios o de corredores, para cualesquier balances en efectivo y/o de inversión para las cuentas en poder del Deudor respectivo, o un formulario de consentimiento completado otorgando acceso en línea para obtener los datos relevantes para cada cuenta de una IF;

- estatus de cada cuenta o cuentas, por ejemplo: activo, cerrado, suspendido, etc.;

- una lista de signatarios con poderes sobre cada cuenta;

- los detalles para toda cuenta adicional en poder de una entidad gubernamental, que no venía incluida dentro de la lista inicial de las cuentas entregadas.

- Una indicación de si los fondos en cada cuenta estaban categorizados como restringidos, no restringidos, o mancomunados (como se explica con más detalle a continuación).[147]

(ii)    *Determinación con respecto a si las cuentas y los balances incluyen fondos legalmente restringidos:*

Como ya se ha indicado, las solicitudes enviadas a las entidades gubernamentales incluían información con respecto a las clasificaciones de cuentas. Para ayudar a orientar a las agencias, se les entregaron descripciones de diversas designaciones de cuentas restringidas y no restringidas. En caso que la entidad gubernamental las considerara restringidas, se le pidió a la entidad gubernamental que seleccionara la categoría correspondiente a la restricción, y que enviará documentación de apoyo para la restricción, incluyendo información sobre las fuentes y usos de los fondos.

En caso que la entidad gubernamental las considerara restringidas, se le pidió a la entidad gubernamental que entregara información sobre las fuentes y usos de los fondos de la(s) cuenta(s).

El equipo legal realizó una evaluación minuciosa de los documentos entregados, para investigar y evaluar las conclusiones sobre restricciones establecidas legalmente, lo cual incluyó;

- evaluación de la documentación recogida como parte del informe IFAT;

- evaluación de más de 1,800 documentos recién obtenidos de las entidades gubernamentales con respecto a las clasificaciones de cuentas; y

---

[147] Las cuentas en fondos mancomunados pueden contener fondos tanto restringidos como no restringidos.

- colaboración con otras partes, como el Departamento de Hacienda de Puerto Rico y AAFAF, para obtener y evaluar la documentación requerida para hacer las evaluaciones preliminares con respecto a las clasificaciones de restricción legal de las cuentas bancarias gubernamentales.

Las cuentas luego fueron clasificadas en las siguientes categorías (se provee la designación preliminar para cada cuenta por encima del umbral de evaluación de $6.9 millones en el Anexo L):

- **Cuentas no Evaluadas**: Cuentas con un balance inferior al umbral de evaluación de diligencia legal de $6.9 millones a la Fecha de Medición de diciembre de 2020. También incluye las cuentas con confirmación de balances a la fecha de medición de diciembre de 2020 pendientes en el momento de la preparación y presentación de la Declaración de Divulgación. Las cuentas con balances inferiores al umbral de evaluación o con balances no confirmados se han designado "No Evaluados" en el Anexo L.

- **Cuentas restringidas:** La clasificación actual de las Cuentas Restringidas se basa en la revisión de las cuentas y en los análisis jurídicos. En el curso del desarrollo del análisis de las restricciones legales, ciertas categorizaciones de restricciones cubrían el efectivo destinado a ser utilizado para ciertos propósitos, como los fondos de emergencia, incluso si el efectivo estaba legalmente disponible para los acreedores generales. Desde entonces, la Junta de Supervisión se ha comprometido a limitar las categorizaciones de las restricciones a (a) Fondos Federales/por Ley, (b) Fondos de Terceros, (c) Orden Judicial, y (d) Productos de Bonos No Tributables. Estas categorizaciones están sujetas a cambios si se recibe nueva información que justifique un cambio.

- **Fondos Federales/Por Ley**: Fondos recibidos del gobierno federal, o restringidos por ley federal o reglamentación para usos específicos (p.ej. fondos de Medicaid, fondos de apoyo a proyectos de viviendas para personas de bajos ingresos del Departamento de Vivienda y Desarrollo Urbano de Estados Unidos). Este efectivo no podrá ser ni recuperado ni compensado por el gobierno federal si no se utiliza de acuerdo con lo especificado.

- **Fondos de Terceros**: Fondos pertenecientes a terceros y mantenidos en su nombre (p.ej. pagos de manutención infantil en cuentas bajo tutela de la Administración de Manutención de Menores (Child Support Administration).

- **Orden Judicial**: Fondos restringidos por una orden judicial.

- **Productos de Bonos No-Tributables**: Productos de bonos con usos restringidos y limitaciones en conformidad con el Código de Rentas Internas.

- **Cuentas que se Asevera son Restringidas:** Fondos sujetos a litigación activa con respecto a las restricciones sobre los fondos (p.ej. cuentas en el SRE, sujetas a una determinación sobre el alcance de la participación en garantía de los bonistas SRE).

- **Cuentas No Conclusivas:** Cuentas sobre las que el equipo jurídico no tiene hasta ahora suficiente información para determinar si los fondos están legalmente restringidos.

- **Cuentas No Restringidas:** Cuentas con fondos que no tienen restricciones legales. Los fondos no restringidos pueden ser usados para pagar gastos, en

143

conformidad con el presupuesto y el plan fiscal certificado, y para pagar a los
acreedores.

     b)        **Resumen de Hallazgos Preliminares**[148]

Si bien el análisis de la Junta de Supervisión está en curso, los resultados preliminares muestran
que los Deudores mantienen aproximadamente $16,900 millones en balances a la Fecha de Medición de
diciembre 2020, en 533 cuentas mantenidas en varias IF. Otras 33 cuentas adicionales (arrojando un total
de 566 cuentas) están pendientes a la documentación de balance de soporte de las IF, y actualmente están
siendo evaluadas. La lista de dichas cuentas y sus entidades gubernamentales respectivas se adjunta como
el <u>Anexo L</u>. A continuación se presenta un resumen:

---

[148] La información que se incluye en la presente es una actualización del estatus a la fecha de esta Declaración de Divulgación y se
debe considerar como preliminar y sujeto a cambios materiales. Los montos incluidos en esta Declaración de Divulgación con
respecto a las cuentas de caja de los Deudores están sujeto a modificaciones, en base a la recepción de información adicional y
su evaluación por los asesores legales.

| Categoría | Núm. Cuentas | Balance al 31/12/2020 | No Evaluada | Restringida | No Conclusiva | No restringida[149] |
|---|---|---|---|---|---|---|
| ELA – Agencias | 504 | $ 5,492,350,006 | $ 194,385,875 | $ 3,867,873,993 | $ 304,957,721 | $ 1,125,132,417 |
| ELA – TSA | 6 | 10,108,256,308 | - | 293,000,000 | - | 9,815,256,308 |
| *EIA - Subtotal* | 510 | 15,600,606,314 | 194,385,875 | 4,160,873,993 | 304,957,721 | 10,940,388,725 |
| SRE Total | 23 | 1,179,139,881 | 4,072,346 | 789,714,601 | - | 385,352,934 |
| AEP Total | 33 | 114,378,919 | 15,673,734 | 9,068,006 | 31,668,772 | 57,968,408 |
| Total | 566 | $ 16,894,125,114 | $ 214,131,955 | $ 4,959,656,600 | $ 336,626,493 | $ 11,383,710,067 |

La evaluación de diligencia debida legal de las clasificaciones de restricciones se realizó para más de $16,700 millones de los $16,900 millones de balances para la Fecha de Medición de diciembre de 2020. Las cuentas restantes, por un total de aproximadamente $214,100 millones, no fueron evaluadas para designaciones de restricciones, debido a que los balances para esas cuentas eran inferiores al umbral para evaluación de $6.9 millones a la Fecha de Medición de diciembre de 2020 y han sido clasificadas como no evaluadas. La diligencia debida legal sigue en curso: sin embargo, de los balances de cuentas analizados por $16,700 millones, aproximadamente $5,000 millones fueron clasificados como restringidos, y $11,400 millones fueron clasificados como no restringidos (aunque algunos podrían ser restringidos en caso que ciertas partes tienen éxito en los litigios relativos a sus derechos de garantía reales alegados). Los $336.6 millones restantes en saldos de cuentas se clasificaron como no concluyentes hasta que se disponga de más documentación y se pueda realizar el análisis legal.

---

[149] Ciertos fondos en las cuentas del Estado Libre Asociado, incluyendo la TSA, y las cuentas SRE están sujetas a litigio, con varias partes aduciendo que dichos fondos son restringidos, conforme a lo indicado en el Anexo L. Estos incluyen (i) litigio con bonistas del SRE con respecto a las participaciones den garantía de los bonistas SRE (Proc. Cont. Núm. 19-00366-LTS y 19-00367-LTS), los cuales, en caso de prevalecer los bonistas SRE, podrían resultar en que todos o la mayoría de los fondos son cuentas SRE y ciertos fondos en cuentas del Estado Libre Asociado sean restringidos para bonistas SRE, y (ii) litigio con ciertas aseguradoras monolínea, con respecto a participaciones en interés alegados contra ciertos ingresos históricamente apropiados condicionalmente a ACT, ADCC, y AFI. Los aseguradores monolínea, entre otros, aducen participaciones en garantía (i) contra por lo menos $1,397 millones en cuentas del Estado Libre Asociado, que alegan deberían pagar los bonos ACT; (ii) contra cualesquier ingresos de los impuestos de ocupación de hotel que se alega fueron transferidos ilegalmente al Estado Libre Asociado en vez de para el pago de los bonos ADCC, y (iii) contra por lo menos los primeros $117 millones de los impuestos sobre ron recibidos por el Estado Libre Asociado para cada año fiscal, los cuales alegan deberían pagar por los bonos AFI. Consulte, *p.ej.*, *Junta de Supervisión y Administración Financiera para Puerto Rico c. Assurance Corp., y otros,* Proc. Cont. Núm. 20-00004; *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros,* Proc. Cont. Núm. 20-00005; *Junta de Supervisión y Administración Financiera para Puerto Rico y otros c. Ambac Assurance Corp. y otros,* Proc. Cont. Núm. 20-00007; *Moción de Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, y Financial Guaranty Insurance Company, para Remedio ante la Paralización Automática o, en su defecto, Protección Adecuada* [ECF Núm. 10102]; *Moción de Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., y Bank of New York Mellon Relativa a la Aplicación de la Paralización Automática a los Ingresos que Garantizan los Bonos ADCC* [ECF Núm. 10104]; *Moción de Permiso para Enmendar la Moción de Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., y Financial Guaranty Insurance Company Relativa a la Aplicación de la Paralización Automática a los Ingresos que Garantizan los Bonos de Impuestos sobre el Ron* [ECF Núm. 10109], que enmienda la *Moción y Memorándum Jurídico de Ambac en Apoyo de su Moción Relativa a la Aplicación de la Paralización Automática a los Ingresos que Garantizan los Bonos de Impuestos sobre el Ron AFI* [ECF Núm. 7176].

(i)     *El Estado Libre Asociado:*

El Estado Libre Asociado se compone de 89 entidades gubernamentales con 510 cuentas bancarias en múltiples IF. En la actualidad, 479 cuentas bancarias por un total de aproximadamente $15,600 millones a la Fecha de Medición de diciembre de 2020 han sido confirmadas por medio de información entregada directamente por las IF. Otras 31 cuentas adicionales fueron identificadas que están pendientes a la información de apoyo necesario para completar el análisis de los balances. Por otra parte, varias entidades gubernamentales no tienen cuentas bancarias; más bien, sus actividades financieras son administradas por otras entidades gubernamentales. Por ejemplo, el Departamento de Hacienda administra fondos de parte de 38 entidades gubernamentales que no mantienen sus propias cuentas bancarias.

Seis cuentas administradas por el Departamento de Hacienda, usualmente referidas como las cuentas TSA, totalizan aproximadamente $10,100 millones de los $15,600 millones del Estado Libre Asociado a la Fecha de Medición de diciembre de 2020. Las cuentas TSA del Estado Libre Asociado reciben fondos, por ejemplo, de fuentes como las recaudaciones de impuestos y transferencias federales, y desembolsan fondos, por ejemplo para costos de nómina y operativos.

A la Fecha de Medición de diciembre de 2020, aproximadamente el 99% de los balances confirmados en las cuentas del Estado Libre Asociado (incluyendo las cuentas TSA) totalizando aproximadamente $15,600 millones fueron evaluadas por el equipo de diligencia debida legal. De los aproximadamente $15,400 millones que fueron evaluados aproximadamente $4,200 millones en fondos fueron evaluados como legalmente restringidos en base a la información actualmente disponible y el análisis legal, la mayor parte fueron evaluados como restringidos por ser fondos restringidos Federales/Por Ley. La mayoría de los $11,200 millones de fondos evaluados restantes para las entidades del Estado Libre Asociado, incluyendo las cuentas TSA, se evaluaron como no restringidos, aunque algunos podrían ser restringidos en caso que ciertas partes prevalezcan en litigios en torno a sus participaciones en garantía aducidos. De estos $10,900 millones en fondos no restringidos, aproximadamente $9,800 millones son atribuibles a la TSA[150] y $1,100 millones son atribuibles a otras entidades del Estado Libre Asociado. La restricción legal preliminar de los $300 millones restantes no es concluyente. Las cuentas con balances por un total de 194,4 millones, que representan el 1% de esta población, no se han revisado para la clasificación de restricciones legales, ya que los balances individuales de estas cuentas están por debajo del umbral de revisión de diligencia debida de 6,9 millones.

(ii)    *SRE:*

A la Fecha de Medición de diciembre de 2020, SRE mantiene 23 cuentas bancarias en múltiples IF. De esas 23 cuentas, 21 cuentas bancarias totalizando aproximadamente $1,200 millones, han sido confirmadas por medio de información obtenida directamente de las IF. Se identificaron dos cuentas adicionales que están pendientes de información de apoyo para completar el análisis de los balances.

A la Fecha de Medición de diciembre de 2020, aproximadamente 99% de los balances confirmados en las cuentas SRE totalizando aproximadamente $1,200 millones fueron evaluados por el equipo de diligencia debida legal. De los aproximadamente $1,200 millones analizados, $800 millones fueron evaluados como fondos de terceros legalmente restringidos sobre la base de la información disponible y los análisis legales. Los $400 millones restantes fueron evaluados como no restringidos, sujetos a un litigio con

---

[150] La Junta de Supervisión considera que la mayoría de los fondos en la TSA son generalmente no restringidas, con excepción de Fondos Federales remanentes en cuentas TSA (aproximándose a $293 millones a la Fecha de Medición de diciembre de 2020) y ciertos fondos que se aduce son restringidos, como se indica en nota de pie de página 148.

los bonistas SRE en relación con el alcance de sus participaciones en garantía en base a la información actualmente disponible. Las cuentas con balances por un total de $4.1 millones, que representan menos del 1% de esta población, no se han revisado para la clasificación de restricciones legales, ya que los balances individuales de estas cuentas están por debajo del umbral de revisión de diligencia debida de 6.9 millones.

(iii)   *AEP:*

A la Fecha de Medición de diciembre de 2020, AEP mantiene 33 cuentas bancarias en múltiples IF. Los balances de esas 33 cuentas, que ascienden a un total de aproximadamente $100 millones, han sido confirmados por medio de información obtenida directamente de las IF.

Se ha llevado a cabo la debida diligencia legal sobre aproximadamente el 86% de los balances confirmados en las cuentas AEP, que ascienden a un total de aproximadamente $114.4 millones a la Fecha de Medición de diciembre de 2020. De los aproximadamente $114.4 millones en balances, aproximadamente $9.1 millones fueron evaluados como legalmente restringidos, y $58.0 millones fueron evaluados como no restringidos en base a la información disponible en la actualidad. Los 47.3 millones restantes se refieren a $31.7 millones que no son concluyentes y 15.7 millones que actualmente no se han revisado para la clasificación de las restricciones legales, ya que los balances individuales de estas cuentas están por debajo del umbral de revisión de diligencia debida de $6.9 millones.[151]

c)   **Actualizaciones de la Información Mencionada en el Informe IFAT**

A continuación se presenta un resumen destacando las áreas donde se ha logrado hacer progreso desde el análisis IFAT del 30 de junio de 2018 a la Fecha de Medición de diciembre de 2020.

- Desde la Fecha de Medición de junio de 2018, 91 cuentas nuevas totalizando aproximadamente $7,200 millones fueron identificadas y respaldadas por documentos financieros. Estas cuentas nuevas fueron identificadas en base a información aportada por entidades gubernamentales e IF. Se identificaron 24 cuentas adicionales que actualmente están pendientes de recibir el apoyo a la entrega de la información de apoyo de las IF, lo que supone un total de 115 cuentas nuevas (aumento del ~22%), añadidas a la población previamente identificada.

- Desde la Fecha de Medición de junio de 2018, 210 cuentas fueron eliminadas de la población informada, debido a cuentas cerradas, cuentas duplicadas, o cuentas inexistentes confirmadas por las IF o entidades gubernamentales. De estas cuentas, 33 fueron consideradas como duplicadas y 36 como inexistentes, totalizando aproximadamente $167.5 millones y $17.0 millones (un total de $184.5 millones) al 30 de junio de 2018, respectivamente.

d)   **Continuación de las Tareas y Actividades Mencionadas en el Informe IFAT**

El Informe IFAT sugirió nueve tareas adicionales y actividades para desarrollar la información más plenamente. Después de la divulgación del Informe IFAT, la Junta de Supervisión adoptó las sugerencias

---

[151] Aunque no se especifica en el resumen anterior ni en el Anexo L, $18,3 millones de los fondos de una cuenta de la AEP clasificados como legalmente no restringidos están relacionados con una devolución de intereses del IRS que se pagó erróneamente a la AEP. Una vez que se resuelva la devolución de los intereses, se espera que este importe sea transferido por la AEP a la entidad beneficiaria correspondiente.

y procedimientos continuados para mejorar la información. A continuación se presenta una actualización del estado de las nueve sugerencias:

- La Junta de Supervisión continuó y actualizó sus procedimientos para evaluar y actualizar los balances de cuentas y clasificaciones de restricciones legales, con lo más reciente siendo a la Fecha de Medición de diciembre de 2020.

- La Junta de Supervisión actualizó sus procedimientos para evaluar cuentas en relación con las clasificaciones de restricciones legales para toda la población de cuentas de Deudores actualmente en un caso del Título III que resultaría en una evaluación de más del 95% del total de los balances de cuenta combinados.

- Los procedimientos para evaluar y actualizar los balances de cuentas y clasificaciones de restricciones legales incluyeron la recolección de documentos adicionales para todas las entidades gubernamentales, lo cual fue utilizado para actualizar y mejorar los procedimientos financieros y de diligencia debida legal. Específicamente, las entidades gubernamentales y las IF fueron contactadas con respecto a las cuentas y se les pidió proveer mayor información sobre cuentas cerradas o suspendidas, así como potenciales cuentas duplicadas, inexistentes, o nuevas. Se programaron llamadas y reuniones de seguimiento para clarificar y hacer preguntas sobre a la información aportada.

- Procedimientos analíticos adicionales fueron realizados para la evaluación de las clasificaciones de restricciones legales; esto incluyó obtener las descripciones de las entidades gubernamentales de las diversas categorías de restricciones legales para la designación de cuentas y fuentes de evaluación y usos de fondos para cuentas.

- Se aplicaron procedimientos actualizados para obtener la documentación de apoyo pertinente de las entidades gubernamentales para informar la evaluación de las designaciones de cuentas por el equipo legal.

- Se aplicaron procedimientos actualizados para identificar fondos federales dentro de los balances de cuentas y fueron aplicados a todas las entidades gubernamentales. Los procedimientos incluyeron la obtención de información del Departamento de Hacienda de Puerto Rico, AAFAF, y otras agencias.

- Discrepancias observadas en el Informe IFAT, entre las agencias y las IF, fueron conciliadas por medio de procedimientos adicionales, como la obtención de confirmación directa de parte de las IF, y la clarificación del estatus actual de una cuenta bancaria. Del mismo modo, las discrepancias observadas entre el Informe IFAT y la AAFAF fueron reconciliadas por medio de procedimientos adicionales, como la identificación de exclusiones fuera del alcance y diferencias temporales. En la actualidad, las diferencias no conciliadas son inferiores al 5% del balance total a la Fecha de Medición de diciembre de 2020.

e)    **Situación de la Evaluación**

Aproximadamente el 93% de las entidades gubernamentales respondieron a las solicitudes de información relacionadas con los balances de cuentas y clasificaciones de restricciones. Las entidades gubernamentales también brindaron acceso en línea a cuentas bancarias por medio de las IF, por $15,300 millones en 273 de 566 cuentas bancarias (aproximadamente el 48% de cuentas y 91% de balances en la

148

población total). Se anticipa que acceso a cuentas bancarias en línea, para $900 millones adicionales en 13 de las 566 cuentas bancarias (aproximadamente 2% de la población total) será entregada por las agencias por medio de las IF. Sin embargo, se anticipa que los estados de cuenta bancaria para los $700 millones restantes en 280 de 566 cuentas bancarias (aproximadamente 50% de la población total) serán obtenidos directamente de las IF y entidades gubernamentales.

Los balances indicados arriba, a la Fecha de Medición de diciembre 2020 para el Estado Libre Asociado, SRE, y AEP, han sido conciliados sustantivamente con el Informe de Balances de Cuentas Bancarias de AAFAF al 31 de diciembre de 2020 (el "Informe AAFAF").152 En la actualidad, las diferencias no conciliadas son inferiores al 5% del balance total al 31 de Diciembre de 2020 y atribuibles a que: (i) el Informe AAFAF incluye los balances de ciertas entidades, como las corporaciones públicas; (ii) el Informe AAFAF excluye balances para determinadas entidades, como las agencias del poder legislativo y judicial; (iii) el Informe AAFAF excluye ciertas cuentas de investigación para determinadas entidades; y (iv) diferencias temporales en la disponibilidad de la información.

La lista de las cuentas bancarias de los Deudores, balances a la Fecha de Medición de diciembre 2020, y categorizaciones preliminares de restricciones legales se adjuntan a la presente como el Anexo L. La información presentada en el Anexo L incluye cuentas cuyos balances han sido confirmados con información IF a la Fecha de Medición de diciembre 2020; las actividades de seguimiento continúan, para obtener información IF para cuentas adicionales que fueron identificadas.153 La Junta de Supervisión y sus asesores siguen analizando las evaluaciones de restricciones legales sobre las cuentas, y cualesquier determinaciones entregados en el Anexo L son preliminares, y sujetas a cambiar en todos sus aspectos en base que información nueva y adicional, y en la medida que se hace disponible. La Junta de Supervisión seguirá actualizando esta Declaración de Divulgación en conformidad con una nueva fecha de medición, según lo amerite el caso, hasta que haya sido aprobada por el Tribunal.

**F.      Liquidez del Estado Libre Asociado y Análisis de Necesidades Mínimas de Efectivo**

El Estado Libre Asociado experimentó severas insuficiencias de caja en el pasado que conllevaron a la crisis de liquidez. El Estado Libre Asociado no tiene una política formal que requiere un balance fondos mínimos sin restricciones, o un balance mínimo en efectivo para financiar las operaciones del gobierno. Más bien, el gobierno históricamente abordó estas insuficiencias por medio de una variedad de medidas de liquidez que eran insostenibles, incluyendo: préstamos a corto plazo (pagarés a modo de anticipos sobre ingresos de impuestos), difiriendo el desembolso de ciertas asignaciones presupuesto, activando (en conformidad con el Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado) la retención de ciertos ingresos del Estado Libre Asociado para el pago de la amortización de la deuda sobre los Bonos GO, y demorando el pago de los reembolsos del impuesto sobre el ingreso entre otros.

En conformidad con las pautas del Government Finance Officers Association ("GFOA"), es esencial que el Estado Libre Asociado establezca y mantenga un nivel adecuado de fondos no restringidos y un balance líquido. Este balance mínimo en efecto asegurará que el gobierno mantenga un nivel prudente de recursos financieros en todo momento para mitigar los riesgos de liquidez actuales y futuros (p.ej. insuficiencias de ingresos, diferencias temporales, y gastos no anticipados) y para asegurar tasas de impuestos estables. Este amortiguador financiero puede ayudar a suavizar la necesidad de severos cortes en

---

[152] *Resumen de Balances de Cuentas Bancarias para el Gobierno de Puerto Rico y sus Instrumentalidades, Datos al 31 de Diciembre de 2020* publicado por AAFAF el 1 de febrero de 2021.

[153] Los balances para las cuentas para las cuales se requiere mayor información IF actualmente están marcadas "pendientes" en el Anexo L.

gastos o aumentos en los impuestos cuando el gobierno enfrenta la necesidad de balancear su presupuesto. Ya que el balance de fondos no restringidos, en conjunto con las reservas de efectivo segregadas, es vital manejar los cambios imprevistos y mantener la salud fiscal, las agencias de calificación crediticia también le dan seguimiento a estos niveles y los usan como una medida clave para las calificaciones de bonos municipales.

El objetivo para fondos restringidos/balance de liquidez típicamente se calcula como un porcentaje de los desembolsos del Fondo General de un gobierno, aunque los recursos financieros disponibles en otros fondos también deben ser considerados al evaluar la idoneidad de un balance de fondos restringidos. Este porcentaje puede variar ampliamente entre jurisdicciones diferentes, en base a una variedad de factores que aumentan o mitigan los riesgos. Por ejemplo, para gobiernos que podrían ser vulnerables a los desastres naturales, más dependientes de una fuente de ingresos volátil, o estar potencialmente sujetos a cortes en las subvenciones federales y/o ayuda del estado podría ser necesario mantener nieles más altos de balances de fondos restringidos.

1.      **Liquidez Mínima del Fondo General**

Al establecer el mínimos del Fondo General no restringido/balance de liquidez necesarios para Puerto Rico, la Junta de Supervisión consideró varios factores de riesgo, incluyendo: (i) la previsibilidad de los ingresos del Fondo General del gobierno y la volatilidad de sus gastos del Fondo General (p.ej., niveles más altos de balance no restringido del Fondo General podrían ser necesarios si hay fuentes importantes de ingresos sujetos a fluctuaciones imprevisibles, o si los gastos operativos son sumamente volátiles); (ii) la percepción de exposición de Puerto Rico a importantes erogaciones únicas (p.ej. desastres, necesidades inmediatas de capital, cortes de presupuesto); (iii) la presión sobre los recursos del Fondo General de otros fondos, así como la disponibilidad de recursos en otros fondos; (iv) el impacto potencial sobre las calificaciones crediticias futuras de los bonos de Puerto Rico, y el aumento correspondiente en el costo de los fondos prestados; y (v) compromisos y asignaciones (p.ej. el deseo de mantener niveles más altos del balance de fondos no restringidos para compensar cualquier porción del balance de fondos no restringidos ya comprometidos o apropiados por el gobierno para un propósito específico).

La Junta de Supervisión también evaluó varias metodologías y enfoques de terceros, incluyendo aquellos propuestos por GFOA, Pew Charitable Trusts, y el Departamento del Tesoro de los EE.UU. Adicionalmente la Junta de Supervisión evaluó los protocolos de balances mínimos de efectivo en otras jurisdicciones con problemas financieros, como la Ciudad de Detroit. Estas metodologías se describen a continuación.

*GFOA*. Fundado en 1906, GFOA es una asociación profesional que representa más de 20,000 funcionarios de finanzas de gobierno local, provincial, y estatal en los Estados Unidos y Canadá, que está profundamente involucrada en la planificación, financiamiento, e implementación de miles de operaciones gubernamentales en cada una de sus jurisdicciones. La misión de GFOA es promover la excelencia en las finanzas públicas. Para satisfacer las necesidades de sus miembros, la organización provee orientaciones sobre mejores prácticas, y ofrece publicaciones sobre presupuestación, controles internos, gestión de deuda, administración de tesorería, y otros temas de administración financiera.

GFOA recomienda que los gobiernos deben mantener un balance de fondos no restringidos que protege a los contribuyentes y empleados de cambios imprevistos en la condición financiera. GFOA recomienda que los gobiernos mantengan, como mínimo, un balance de fondos presupuestarios no

150

restringidos que no sea inferior a dos meses de ingresos operativos regulares del Fondo General, o de gastos operativos.[154]

*Pew Charitable Trusts ("Pew")*. Fundado en 1948, Pew es una organización independiente sin fines de lucro, dedicado al mejoramiento de la política pública, mediante la realización de análisis riguroso, vinculando intereses diversos para alcanzar objetivos compatibles, e insistiendo en resultados tangibles. La organización mantiene un equipo de investigación dedicado enfocado sobre la salud fiscal de los estados, que frecuentemente pública investigaciones y recomendaciones estimulantes sobre las condiciones financieras de los estados, y especialmente de municipalidades con problemas.

Las investigaciones de Pew destacan que un balance de fondos positivo es necesario para manejar la incertidumbre presupuestaria, incluyendo errores en los pronósticos, insuficiencias presupuestarias durante altibajos económicos, y otras emergencias imprevistas, como los desastres naturales. La organización indica que este amortiguador financiero puede suavizar la necesidad de severos cortes en presupuestos cuando los estados necesitan balancear sus presupuestos. Acumular un balance positivo de fondos es una señal de recuperación fiscal, pero no existe ninguna regla fija sobre cuando, como, y cuanto se debe ahorrar. Amortiguadores más amplios podrían ser aconsejables para estados con historial de volatilidad económica o en sus ingresos.

Bajo la metodología de Pew, el objetivo óptimo para el balance de fondos no restringidos depende de tres factores: (i) el propósito definido de los fondos, (ii) la volatilidad de los ingresos por impuestos de un estado; y (iii) el nivel de cobertura que el estado desea proveer a su presupuesto.

En base a las investigaciones de Pew, el balance de fondos medio de los 50 estados para el año 2019 era aproximadamente 49.7 días de gastos del Fondo General.[155]

*Préstamos Comunitarios en Casos de Desastre ("CDL"-Community Disaster Loans)*. En octubre de 2017, poco después de que los huracanes Irma y María devastaron a Puerto Rico, el Congreso apropió $4,700 millones de fondos CDL para Puerto Rico, sujeto a las negociaciones finales entre el Estado Libre Asociado y el Tesorería de los EE.UU. El Programa CDL provee fondos operativos para ayudar a gobiernos locales que han incurrido importantes pérdidas de ingresos debido a un desastre mayor que afecta o afectará adversamente su habilidad de proveer servicios municipales.

Como parte del proceso de negociación, la Tesorería de los EE.UU. y FEMA transmitieron a Puerto Rico una política sobre balances de caja que gobernaría la habilidad del Estado Libre Asociado de acceder a fondos CDL. Esta política sobre balances de caja, que fue confirmada por la Tesorería de los EE.UU. y el Gobierno en marzo de 2018, permitirá que el Estado Libre Asociado acceda los fondos CDL en caso que los balances operativos de efectivo mínimos en la TSA del Gobierno caigan debajo de ciertos niveles, en cuyo caso el Gobierno podría experimentar problemas de liquidez.

*Ciudad de Detroit*. La Junta de Supervisión también evaluó los supuestos de balances mínimos de efectivo usados por la Ciudad de Detroit, en vista de su reciente caso de quiebra bajo el Capítulo 9. Como parte de su reestructuración y las proyecciones a 40 años en el plan de ajuste de la Ciudad, Detroit proyectó un balance mínimo de efectivo basado sobre dos meses de nómina, hasta el Año fiscal 2023 y una reserva

---

[154] GFOA, Pautas para Balances en el Fondo General, septiembre 2015.

[155] Pew Charitable Trusts, "Budget Surpluses Are Helping Many States Boost Their Savings" marzo 2019.

de efectivo para gastos del Fondo General del 5% posteriormente. Estos niveles todavía se mantienen anualmente para preservar los controles y la disciplina fiscal de la Ciudad.

      2.      **Análisis Adicional de Liquidez Mínima de la TSA**

      *Análisis de Flujos de Caja de la TSA para todos los fondos.* La Junta de Supervisión también evaluó las necesidades de efectivo proyectadas de la TSA, la cuenta operativa primaria del Estado Libre Asociado. Los ingresos primarios de la TSA son los ingresos por impuestos, que están sujetos al riesgo económico y también tienen un componente de estacionalidad. Los desembolsos primarios están relacionados con nóminas y pensiones, y son de carácter fijo. Al estimar la reserva mínima de efectivo operativo, estas consideraciones fueron tomadas en cuenta, junto con las fuentes de ingresos. El análisis evaluó y valoró los rendimientos de caja del plan de liquidez para el Año fiscal 2020, en base a supuestos de rezagos o demoras de varios meses en los ingresos. Los supuestos sobre meses de rezagos de efectivo disponible fueron determinados en base a la criticidad de las fuentes de pagos y financiamiento. Por ejemplo, nóminas financiadas por recaudaciones del estado requieren una reserva de dos meses, versus NAP, lo cual es una repercusión ("pass through") federalmente financiada que no requiere reserva.

      3.      **Otras Necesidades de Liquidez**

      *Subvenciones federales, Subsidios.* El Estado Libre Asociado es beneficiario de numerosos programas federales, que proveen financiero para servicios gubernamentales en las áreas de educación, salud, seguridad pública, y vivienda, entre otros. La mayoría de los programas financiados por agencias del gobierno federal están basadas sobre reembolsos. Esto significa que el Estado Libre Asociado típicamente desembolsará los fondos, para luego solicitar reembolsos de la agencia federal correspondiente. Sin embargo, ciertos programas federales tienen disposiciones que posibilitan anticipos de fondos federales a Puerto Rico, de tal forma que el Estado Libre Asociado pueda desembolsarlos en una fecha posterior. La TSA recibió $5,600 millones, $9,300 millones y $7,500 millones en fondos federales en el Año fiscal 2018, Año fiscal 2019 y Año fiscal 2020, respectivamente. Las variaciones en los tiempos de ingresos de los fondos federales y los desembolsos contribuyeron a los requerimientos mínimos de liquidez del gobierno.

      *Reembolsos del Impuesto sobre el ingreso.* El Gobierno recauda los impuestos sobre el ingreso para individuos y corporaciones a lo largo del Año fiscal. Típicamente, al finalizar el Año fiscal, hay cierto monto de rembolsos del impuesto sobre el ingreso reclamados y tramitados que siguen en circulación. Para el Año fiscal 2020, el Estado Libre Asociado preliminarmente informó recaudaciones del Fondo General de aproximadamente $9,289 millones en ingresos de impuestos (netos de $684 millones reservados para reembolsos del impuesto sobre el ingreso). El monto pendiente y exigible de los reembolsos del impuesto sobre el ingreso al fin del Año fiscal contribuye a los requerimientos mínimos de liquidez del gobierno.

      *Fondo Rotatorio de Ayuda para Desastres.* Para adelantar fondos en forma de uno o más préstamos, prórrogas de crédito o anticipos a las agencias del gobierno central, las corporaciones públicas y los municipios como un puente para la recepción de fondos bajo los programas de la FEMA para permitir que los proyectos de recuperación permanente financiados por los programas de la FEMA comiencen antes de lo que sería posible de otra manera para ayudar y acelerar la recuperación económica. El Fondo Rotatorio de Ayuda para Desastres se utilizará para adelantar la parte federal de los fondos reembolsables para los proyectos de obras permanentes que están totalmente obligados bajo el programa de asistencia pública de FEMA y los proyectos HMGP para los daños incurridos como resultado del huracán María, el huracán Irma o los terremotos declarados en enero de 2020. Los anticipos se repondrán con los reembolsos financiados por FEMA, los ingresos de los seguros, así como con otras fuentes de fondos, incluido otro financiamiento que cubra el componente de participación en los costos del solicitante. Esta liquidez permitiría que los proyectos de recuperación se iniciaran antes de lo que sería posible de otro modo y siguieran adelante

cuando el proceso de reembolso del financiamiento de FEMA sea más lento de lo previsto. Tras la presentación de una solicitud completa, los proyectos serán evaluados y priorizados según varios criterios, entre ellos: la disponibilidad del Fondo Rotatorio de Ayuda para Desastres, la alineación con el plan de recuperación del gobierno, la necesidad pública, el beneficio y la exposición, y las determinaciones hechas por el Consejo de Reconstrucción[156] basadas en las recomendaciones proporcionadas por el COR3 y la AAFAF.

La Ley 139-2020 estableció una autorización inicial de la línea de crédito. La ley exigía la implementación de directrices para el programa, que debían ser revisadas y aprobadas por la Junta de Supervisión. Las directrices incorporan considerables elementos de mitigación de riesgos en materia de gobernanza y controles, la subsanación de impagos, el plan del proyecto, el presupuesto y los requisitos de información continua. Es posible que sea necesario modificar la Ley 139-2020 para garantizar su alineación con el Plan de Ajuste.

*Apoyo a la transición de la AEE/LUMA.* El inicio del servicio de LUMA está condicionado a que la AEE financie ciertas cuentas de reserva de operación y de capital ("Requerimiento de Financiamiento de LUMA"), pero la AEE actualmente no dispone de suficiente efectivo para hacerlo. Por lo tanto, para asegurar que la Isla tenga una empresa de electricidad viable, confiable y eficiente, la AEE requiere fondos del Estado Libre Asociado para cerrar la transacción de LUMA. El Estado Libre Asociado debe proveer este financiamiento porque la reforma energética es una de las reformas estructurales más esenciales del Plan Fiscal del Estado Libre Asociado. Ayudará a que Puerto Rico sea más competitivo y favorezca el crecimiento, lo que supondrá la obtención de un superávit de aproximadamente $12,000 millones a lo largo de 30 años. Si no es financiada por el Estado Libre Asociado, la AEE tendría que financiar las reservas a través de medios alternativos, tales como el financiamiento externo apoyado por un ajuste de tarifas que aumentaría dramáticamente las tarifas de electricidad en el corto plazo (es decir, el período previsto entre ahora y cuando las reservas tendrán que ser financiadas). Se prevé que el importe total del financiamiento necesario sea importante, probablemente a través de una asignación.

### 4. Recomendación de Liquidez Mínima

*Liquidez Mínima.* Después de analizar los valores recomendados adscritos por cada uno de los enfoques arriba, ponderando el riesgo de las características financieras de Puerto Rico, considerando todos los presupuestos (incluyendo requerimientos PayGo), y evaluando la volatilidad de ingresos del Estado Libre Asociado, y en congruencia con el AAP, la Junta de Supervisión concluyó que el Gobierno debe mantener un balance líquido no restringido por un monto no inferior a $2,500 millones, aunque en última instancia podría ser necesario un balance mayor. Adicionalmente, se debe también establecer una reserva de emergencia separada y fondos del programa CDBG-DR, como se describe a continuación y como se incluye en el Plan Fiscal Certificado.

*Reserva de Erogación.* En adición a la liquidez mínima $2,500 millones que se describe arriba, la Junta de Supervisión concluyó que Puerto Rico también debe apartar apropiaciones anualmente en una reserva de erogación. El propósito de esta reserva de erogación es diferente que la del balance de liquidez. Está diseñada específicamente para garantizar que el gobierno tenga fondos adecuados disponibles para responder rápidamente a situaciones de emergencia, como los desastres naturales. Según el Fondo Monetario Internacional, la vulnerabilidad de la zona Caribe a los desastres naturales, que de por sí ya es

---

[156] El 8 de enero de 2021, el Gobernador Pedro R. Pierluisi Urrutia emitió la Orden Ejecutiva número OE-2021-011 que crea el Consejo de Reconstrucción, encargado de identificar y establecer una lista prioritaria de proyectos críticos de reconstrucción.

muy alta, probablemente se verá exacerbada en la medida que la frecuencia y severidad de los desastres aumenta debido a los efectos del cambio climático.

En conformidad con las pautas del Fondo Monetario Internacional para las otras islas del Caribe, la Junta de Supervisión concluyó que esta reserva de erogación eventualmente debe totalizar $1,300 millones, o sea, aproximadamente el 2.0% del PIB del Año fiscal 2018, reservando $130 millones anualmente durante 10 años. Esto proveería una reserva de erogación dedicada (entre 2% y 4% del PIB). A diferencia del balance del fondo, las restricciones colocadas sobre estos fondos deben asegurar que sea usada únicamente en caso de erogación. El Estado Libre Asociado no está permitido a desembolsar ningún monto de la reserva de erogación sin la aprobación de la Junta de Supervisión.

En la actualidad esta cuenta de reserva de erogación de emergencia se mantiene en una institución financiera privada. Al 31 de diciembre de 2020, la cuenta de reserva tenía $301 millones, cifra inferior a los $390 millones procedentes de la acumulación de reservas presupuestadas de los Años fiscales 2019 ($130 millones), 2020 ($130 millones), y 2021 ($130 millones). La Junta de Supervisión autorizó el uso de hasta $260 millones de las reservas presupuestadas de 2019 y 2020 para auxilio en casos de terremotos y COVID-19. El presupuesto del Estado Libre Asociado para el Año fiscal 2021 incluye una asignación de hasta $536 millones para reabastecer la reserva del presupuesto de emergencia que se usó en 2017, 2018, 2019 y 2020, aunque dadas las condiciones de GO AAP se espera que solo se repongan las reservas de los Años fiscales 2019 y 2020.

Después de los sismos de enero de 2020, la Junta de Supervisión colocó $260 millones del fondo de erogación disposición del gobierno hasta el 31 de enero de 2020. Como resultado de la planificación fiscal y priorización embebida en el Plan Fiscal Certificado y los Presupuestos Certificados, el Gobierno pudo acceder sus propios fondos oportunamente para ayudar al pueblo de Puerto Rico, en vez de que su respuesta se viera restringida de cualquier manera. Debido a la urgencia de las necesidades, los fondos fueron puestos a la disposición del gobierno en base informes ex post facto de los fondos erogados. Deposes del periodo inicial que terminó el 31 de enero de 2020, la Junta de Supervisión ajustó el procedimiento para la autorización de la utilización de los fondos, manteniendo un nivel apropiado de supervisión y diligencia debida. Las reservas no erogadas permanecieron disponibles para necesidades razonables relacionadas con los sismos, pero sujetos a una solicitud de erogación.

***Fondo equivalente local del programa CDBG-DR.*** La posibilidad de utilizar los fondos del CDBG-DR para los requisitos de contraprestación local no está garantizada. Para ser elegibles, los fondos deben seguir los objetivos nacionales del programa, incluyendo: (1) Beneficiar a personas con ingresos bajos y moderados (LMI); (2) Ayudar a la prevención o eliminación de tugurios o deterioros; y (3) Satisfacer una necesidad que tenga una urgencia especial (denominada necesidad urgente). Para asegurar que haya suficientes recursos para financiar la reconstrucción de Puerto Rico, debe reservarse suficiente financiamiento local para compensar el riesgo de que el financiamiento del programa CDBG-DR sea insuficiente y para mitigar el riesgo de que el financiamiento local anticipado del programa CDBG-DR finalmente no se permita.

[*El resto de la página se ha dejado intencionadamente en blanco.*]

## IV.   Acontecimientos significativos que dieron origen a los casos del Título III

**A.   El constante deterioro operativo y financiero del ELA**

*Generalidades.* El ELA y algunas de sus corporaciones públicas se encuentran en medio de una profunda crisis fiscal. A pesar de diversas medidas tomadas en años recientes para estimular el crecimiento económico, reducir el gasto público y aumentar los ingresos, el ELA no ha podido incentivar el crecimiento económico ni eliminar el problema recurrente de los gastos que superan los ingresos. Esto se debe principalmente a años de recesión económica, déficits presupuestarios recurrentes, el financiamiento de gastos recurrentes con deuda a largo plazo y la falta de financiamiento adecuado para obligaciones preexistentes como las pensiones. La situación económica del ELA se agravó posteriormente por la devastación causada por los huracanes de 2017, los terremotos de 2020 y la pandemia de COVID-19.

La Junta de Supervisión considera que el deterioro del balance del ELA, combinado con los permanentes desequilibrios estructurales entre ingresos y gastos y la imposibilidad de que el ELA acceda a los mercados de capitales, tuvo como resultado que el ELA y algunas de sus instrumentalidades no puedan realizar los pagos programados de la deuda y continuar proporcionando al mismo tiempo servicios públicos, lo que en definitiva lleva la presentación de casos de reestructuración de la deuda conforme al Título III de PROMESA.

*La economía del ELA.* La economía del ELA entró en recesión en el cuarto trimestre del Año fiscal 2006, y el PNB del ELA se ha contraído (en términos reales) todos los Años fiscales entre 2007 y 2018, salvo por un crecimiento del PNB del 5.6% en el Año fiscal 2012. El crecimiento del PNB en el Año fiscal 2012 se debió principalmente al gran número de estímulos y gastos deficitarios que se inyectaron a la economía del ELA durante el período, y no como resultado de una recuperación económica.

En su informe de mayo de 2018 (GAO-18-387), la GAO enumeró los cinco factores principales que contribuyeron a la situación económica de Puerto Rico.

- Emigración y disminución de la fuerza laboral. Puerto Rico ha experimentado una baja constante en su población y en su fuerza laboral.

- Dificultades regulatorias para hacer negocios en Puerto Rico. Esto incluye el alto costo que representa para las empresas el cumplimiento de las regulaciones de Puerto Rico, como el proceso de permisos para nuevas empresas, y las leyes federales como la ley del salario mínimo, que pueden ser un factor disuasorio para el empleo en algunos sectores locales.

- Elevado costo de la importación de bienes y energía. Muchos de los bienes que utilizan las empresas en Puerto Rico son importados, lo que aumenta su costo, además de que Puerto Rico depende principalmente de productos de petróleo con alto costo para la generación de energía.

- Eliminación gradual del crédito contributivo federal, que tuvo fin en 2006. Esto afectó principalmente las operaciones de manufactura en Puerto Rico, si bien no hay un consenso con respecto a la magnitud del impacto.

- Dificultades con bancos y viviendas. Los bancos de Puerto Rico están teniendo dificultades, y muchos de ellos han desaparecido. Los precios de las viviendas han caído un 25%, desde su valor máximo en 2009.

155

La Junta de Planificación de Puerto Rico (la "Junta de Planificación") tiene la responsabilidad legal de elaborar un Informe Económico anual al Gobernador y a la Legislatura, donde se describe el panorama económico del ELA y un análisis de su comportamiento económico. Según el informe de la Junta de Planificación presentado en junio de 2020, el PNB real del ELA para los Años fiscales 2016 y 2017 disminuyó 1.6% y 3.2%, respectivamente. El pronóstico del PNB de la Junta de Planificación para el Año fiscal 2018 estima una contracción del 4.2% y un aumento del 1.5% en 2019. El pronóstico del PNB de la Junta de Planificación para los Años fiscales 2020 y 2021 muestra una contracción del 5.4% y 2%, respectivamente.

En el Año fiscal 2019, los ingresos personales nominales del ELA comunicados por la Junta de Planificación fueron de $69,700 millones y, y la renta personal nominal per cápita alcanzó los $21,832.

La economía del ELA se encuentra estrechamente vinculada a la de Estados Unidos, dado que la mayor parte de los factores externos que afectan a la economía del ELA se ven determinados por las políticas y el desempeño de la economía de Estados Unidos. Estos factores externos incluyen exportaciones, inversiones directas, el monto de los pagos de transferencias federales, el nivel de las tasas de interés, la tasa de inflación y los gastos turísticos. Según el informe de la Junta de Planificación de 2019, durante el Año fiscal 2017, aproximadamente 78% de las exportaciones del ELA tuvieron como destino los Estados Unidos continentales, que asimismo fue el origen de aproximadamente 54% de las importaciones del ELA.

El plan fiscal del ELA certificado por la Junta de Supervisión el 23 de abril de 2021 ("Plan fiscal 2021") se basa en los pronósticos de diversas proyecciones macroeconómicas y demográficas, que incluyen las cifras de evolución del PNB, de la inflación y de los residentes de Puerto Rico. El Plan fiscal 2021 reconoce el importante impacto negativo de los huracanes Irma y María, los terremotos de 2020 y la crisis sanitaria y económica de COVID-19 sobre la actividad económica, así como las repercusiones positivas de los fondos de ayuda locales y federales canalizados para paliarlos. También incluye proyecciones sobre cómo las tasas de crecimiento reales del PNB hubieran sido diferentes debido a los shocks con y sin medidas del plan fiscal, reformas estructurales y gastos de reparaciones por desastres. Por ejemplo, sin medidas de un plan fiscal, reformas estructurales y gastos de reparaciones por desastres, se proyecta que la tasa de crecimiento del PNB real habrá experimentado una contracción del 3.0% y 0.7% en los Años fiscales 2020 y 2021, respectivamente, debido a los desastres naturales y a la pandemia de COVID-19. Sin embargo, con la implementación de los Planes Fiscal de 2020 y 2021, está previsto que las tasas de crecimiento PNB real ajustado a los ingresos retrocederán solamente el 1.1% en el Año fiscal 2020, y se avanzarán un 3.8% en el Año fiscal 2021.

Se prevé que la tendencia de crecimiento del PNB real resultará negativa en los Años Fiscales 2023 y 2024 debido a la reversión cíclica derivada de los significativos flujos positivos de los fondos de estímulo por la COVID-19 en los Años fiscales 2020 y 2021. A partir de ese momento las previsiones apuntan a cinco años de crecimiento positivo, desde el Año fiscal 2025 hasta 2029 como consecuencia de los efectos positivos a largo plazo de los fondos federales de ayuda a Puerto Rico, como los de reconstrucción de desastres o los beneficios de la prórroga permanente de los programas de acreditación de impuestos federales. Por último, se anticipa que la trayectoria de crecimiento del PNB real comenzará a tornarse negativa en el Año fiscal 2030, promediando un ritmo de descenso del 0.6% hasta 2051.

Las proyecciones económicas de Puerto Rico también se ven afectadas por las proyecciones de crecimiento de los Estados Unidos continentales, e incorporan los datos reales y previstos más recientes del PNB y de la inflación preparados por la Oficina Presupuestaria del Congreso de EE.UU. Sobre la base de esta información, la inflación anual de Puerto Rico cayó desde el 0.5% del Año fiscal 2019 al 0.0% del Año fiscal 2020, con una previsión del 0.0% en 2021. En cuanto a los años subsiguientes, a medida que la

economía se recupere del golpe de la COVID-19, todo apunta a que se mantendrán entre el 1.1% y el 1.9% a partir del Año fiscal 2022.

Además, el 28 de septiembre de 2020, la Oficina de Análisis Económico (la "BEA") publicó un "Prototipo de Producto Interior Bruto" para Puerto Rico. El informe publicado abarca el periodo de 2012 a 2018. Las estimaciones de la BEA difieren de las elaboradas por la Junta de Planificación. Para los años 2012 a 2014, las estimaciones de la Junta de Planificación muestran un crecimiento real negativo, mientras que las estimaciones de la BEA muestran un crecimiento positivo. Para los años 2016 y 2017, las estimaciones de la BEA muestran un descenso del PIB mucho más pronunciado que el de la Junta de Planificación. Las estimaciones de la BEA sobre el PIB son sistemáticamente superiores a las de la Junta de Planificación.

El Plan fiscal 2021 también incluye un pronóstico de disminución constante de la población durante los próximos años. Las proyecciones apuntan a que la población de Puerto Rico experimentó un retroceso del 1.5% en el Año fiscal 2020 seguido de un descenso mayor del 1.8% en el Año fiscal 2021 como consecuencia de un balance más negativo de la emigración. A partir del Año fiscal 2022, la disminución demográfica anual se reducirá cada año, con una disminución anual del 1.5% a partir del año fiscal 2025.[157]

El 25 de abril de 2021, la Oficina del Censo de EE.UU. publicó los resultados del Censo 2020 de Puerto Rico. La Junta de Supervisión está analizando tanto los resultados como sus implicaciones para el Plan Fiscal 2021.

**Déficits recurrentes.** Una de las causas principales de la crisis fiscal actual del ELA ha sido su incapacidad para aumentar sus ingresos y reducir sus gastos para evitar los déficits estructurales recurrentes. Estos déficits se han financiado históricamente con préstamos en el mercado de bonos públicos o instituciones gubernamentales, como el BGF, o difiriendo el costo de ciertos pasivos preexistentes. La práctica de la emisión de deuda a largo plazo para solventar los gastos operativos corrientes, junto con la falta de financiamiento adecuado para los pasivos preexistentes (como los beneficios de pensión de los empleados), el costo creciente de la salud y la contracción de la base de ingresos debido a las condiciones económicas dominantes, han llevado a un deterioro material en la posición neta consolidada del ELA, calculada de acuerdo con los principios contables generalmente aceptados en Estados Unidos.

**Empleo.** El empleo anual promedio total, medido por la Encuesta de Hogares sobre Empleo del DTRH, conocida como la "Encuesta de hogares", ha experimentado una baja en los años recientes. La reducción en el empleo total comenzó en el cuarto trimestre del Año fiscal 2007, cuando la cifra de empleo total era de 1,244,333, y continuó de manera uniforme hasta el primer semestre del Año fiscal 2015, después de lo cual se estabilizó en general. Según la Encuesta de hogares, la tasa de desempleo tuvo un promedio de 8.4% en el Año fiscal 2019, en comparación con el 10.3% del Año fiscal anterior. Esto es inferior al 16.2% para el año fiscal 2011. La tasa de desempleo se ha reducido en un 34% desde 2015; sin embargo, el empleo solo ha aumentado en un 1.1%. Desde el final del Año fiscal 2019 hasta el final del Año fiscal 2020, la tasa de desempleo aumentó en 1.2 puntos porcentuales, hasta el 8.9%, mientras que el empleo se redujo a 943,000, una disminución del 1.6% en el empleo desde el final del Año fiscal 2019.

Según la Encuesta de Estadísticas de Empleo Actual del DTRH (la "Encuesta de Establecimientos"), el total de nóminas de empleo no agrícola disminuyó 1% durante el Año fiscal 2017,

---

[157] Para una discusión completa de las proyecciones del Plan Fiscal Certificado del ELA, consulte el Capítulo 4 del Plan Fiscal Certificado del ELA, que se adjunta como Apéndice G de esta Declaración de Divulgación.

en comparación con el Año fiscal 2016. El empleo total privado también cayó durante el Año fiscal 2017 en 0.1%, lo que se traduce en una reducción de casi 700 empleados, en comparación con el mismo período del Año fiscal anterior. El empleo no agrícola disminuyó un 1.7% del Año fiscal 2019 al Año fiscal 2020. El empleo privado disminuyó un 2.1% del Año fiscal 2019 al Año fiscal 2020, lo que se traduce en una reducción de casi 14,000 empleados.

*Carga total de la deuda del ELA y sus instrumentalidades.* Al 3 de mayo de 2017, el monto total de capital de la deuda pendiente del ELA y sus instrumentalidades era de aproximadamente $72,800 millones (lo que incluye el interés devengado sobre los bonos de apreciación de capital). De este monto, aproximadamente $56,000 millones representan Bonos GO, deuda pagadera de impuestos o asignaciones del ELA y deuda de corporaciones públicas mantenidas con impuestos.

Para el Año fiscal 2021, la amortización de la deuda anual total programado sobre todos los bonos e instrumentos emitidos por el ELA y algunas de sus instrumentalidades[158] es de aproximadamente $2,790 millones. La carga de la deuda del ELA y sus instrumentalidades se redujo significativamente durante la última década. Una parte significativa de la deuda emitida durante este período se usó para cubrir gastos operativos del ELA y sus corporaciones públicas.

La proporción de Deuda con Garantía Impositiva a ingresos del ELA es más del doble que la de los estados de EE.UU. con la proporción de deuda a ingresos más alta, y casi siete veces la mediana de los estados de EE. UU.[159] La Deuda con Garantía Impositiva per cápita del ELA, como parte del PBI y como parte del ingreso personal, también es desproporcionadamente alta en comparación con las jurisdicciones del continente.

*Obligaciones de pensión.* Además de la amortización de la deuda sobre bonos en circulación, instrumentos y otras obligaciones financieras de deuda, uno de los gastos más significativos del ELA y sus corporaciones públicas son beneficios de pensión pagaderos a empleados jubilados. Las obligaciones de pensión netas de los Sistemas de Pensión combinados eran de aproximadamente $55,600 millones al 1 de julio de 2016.[160] Para una discusión y un análisis más profundos de las pensiones para el ELA, consulte el Informe de la Junta de Supervisión sobre Pensiones, adjunto al presente en el Anexo I.

Dada la insolvencia y el agotamiento inminente de los activos líquidos del SRE, la Junta de Supervisión inició un Caso del Título III para el SRE. Además, en agosto de 2017, la Legislatura sancionó la Ley Núm. 106-2017, de acuerdo con la cual el ELA adopta un sistema "PayGo" para el pago de beneficios de pensión. De acuerdo con la Ley Núm. 106-2017, el ELA realiza pagos de pensiones desde su Fondo General.

---

[158] Las instrumentalidades incluyen AEP, ACT, SRE, COFINA reorganizado, Autoridad de Recuperación de Deuda del BGF, AFI, PFC y ADCC.

[159] Según los datos del Censo de Gobiernos de los EE.UU. de 2017, los estados con las proporciones de deuda a ingresos más elevadas son Massachusetts y Connecticut. Los estados con la mayor proporción de deuda a ingresos de los gobiernos estatales y locales combinados son Kentucky, Illinois, y Texas (según la medida de los ingresos emitidos). Kentucky también tiene el nivel más alto de deuda del gobierno local en comparación con los ingresos locales.

[160] GASB 67 Pasivo neto de pensiones para SRE, SRM y SRJ al 30 de junio de 2016, tal y como se recoge en los informes de valoración actuarial al 30 de junio de 2016 realizados por el actuario del sistema. Excluye las contribuciones al plan de seguro médico medidas según GASB 45.

**B.    Legislación aprobada por el ELA para abordar la crisis fiscal y de deuda[161]**

1.    **Ley 7-2009 ("Ley 7")**

El 9 de marzo de 2009, el ELA aprobó la Ley 7, conocida como "Ley Especial declarando estado de emergencia fiscal y estableciendo plan integral de estabilización fiscal para salvar el crédito de Puerto Rico". Esta fue la primera legislación donde el ELA ejerció sus poderes de policía para abordar su crisis fiscal. La Ley 7 implementó una serie de iniciativas, entre ellas un plan de reducción gradual de los gastos operativos a través de una reducción de los gastos operativos y la reorganización del Poder Ejecutivo, y una combinación de medidas temporales y permanentes de aumento de los ingresos. Como parte de las medidas de reducción de los gastos, la Ley 7 estableció un plan para la reducción de la nómina de empleados públicos. La primera fase del plan fue un programa de incentivo a las renuncias voluntarias y reducción voluntaria de la jornada laboral. La segunda fase fue un plan de despidos que entraría en vigencia si los objetivos de reducción de gastos no fueran logrados en la primera fase. Dicha fase abarcaba la mayor parte de los empleados del Gobierno Central y se aplicó de acuerdo con la antigüedad de los empleados. Aproximadamente 12,505 empleados gubernamentales fueron despedidos durante la segunda fase. El plan también impuso un congelamiento temporal sobre los aumentos salariales y otros beneficios económicos dispuestos por leyes, contratos de beneficios comunitarios y otros acuerdos laborales.

2.    **Ley 3-2013**

Como se describe anteriormente en la sección **Error!  Reference source not found.**, el 4 de abril de 2013, el ELA aprobó la Ley 3-2013, como una reforma completa de SRE. La Ley 3-2013 congeló todos los beneficios de pensión devengados hasta el 30 de junio de 2013, y en adelante, y dispuso que todos los beneficios futuros se devengaran conforme a una fórmula de contribuciones definidas, se elevó la edad de retiro de los participantes, se aumentaron las contribuciones de los empleados y se redujeron o eliminaron beneficios post-empleo. Se aprobaron reformas similares para el SRM y el SRJ en virtud de las leyes 160-2013 y 162-2013, respectivamente, pero algunas de las reformas del SRM y el SRJ fueron anuladas por el Tribunal Supremo de Puerto Rico.

3.    **Ley 66-2014 ("Ley 66")**

El 17 de junio de 2014, el ELA adoptó la Ley 66, conocida como la Ley Especial de Sostenibilidad Fiscal y Operacional, que impuso múltiples medidas fiscales, entre ellas: (i) el congelamiento de las prestaciones en virtud de los contratos de negociación colectiva y la reducción de determinadas compensaciones no salariales; (ii) la contribución de los ahorros generados por determinadas corporaciones públicas en apoyo de determinados gastos del Fondo General; (iii) el congelamiento de los aumentos de asignaciones por fórmula a la UPR y los municipios; (iv) el congelamiento y reducción de las asignaciones por fórmula al Poder Judicial, la Legislatura y algunas otras entidades; (v) la reducción en los costos de transporte escolar; (vi) la reducción en las tarifas de servicios profesionales y adquiridos; (vii) el congelamiento de las tarifas de agua para las entidades gubernamentales; y (viii) la implementación de un

---

[161] La sección 4 de PROMESA tiene prioridad sobre la legislación aprobada por el ELA antes y después de la Fecha de Entrada en vigencia de PROMESA el 30 de junio de 2016 hasta el punto de ser incompatible. Además, viola la sección 204 de PROMESA hasta el punto de que los procedimientos para revisar la legislación para controlar su coherencia con el plan fiscal certificado no se aplican, viola la sección 207 de PROMESA hasta el punto de que modifica la deuda sin el consentimiento de la Junta de Supervisión, y viola la sección 108(a)(2) de PROMESA hasta el punto de que podría obstaculizar o frustrar los fines de PROMESA tal como estos han sido determinados por la Junta de Supervisión. Al describir la legislación en esta sección de la Declaración de Divulgación, la Junta de Supervisión no renuncia a la aplicación de PROMESA a ninguna de sus partes.

sistema de planes de pago para sentencias legales. Las medidas estuvieron originalmente planificadas para caducar después del año fiscal 2017, pero la mayoría fue prorrogada por la Ley 3-2017 hasta el Año fiscal 2021.

4.      **Ley 71-2014 ("Ley 71")**

Después de que las agencias de calificación bajaron el puntaje de las más grandes corporaciones públicas del ELA por debajo del grado de inversión, y dichas entidades enfrentaron limitaciones adicionales de liquidez y pérdida del acceso a los mercados de capitales, el ELA aprobó la Ley 71 el 28 de junio de 2014. Conocida como la Ley para el Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico, proporcionó un proceso ordenado para permitir que ciertas corporaciones públicas ajusten sus deudas. Debido a que el Congreso de EE. UU. excluyó a las municipalidades de Puerto Rico de obtener asistencia de acuerdo con el Capítulo 9 del Código de Quiebras, el ELA aprobó la Ley 71, que llena ese vacío al crear un marco legal que permitió un proceso ordenado de reestructuración de la deuda.

En junio de 2014, ciertos bonistas de AEEPR cuestionaron la constitucionalidad de la Ley 71 ante el Tribunal de Distrito de EE.UU. para el Distrito de Puerto Rico, que dictó sentencia a favor de los bonistas y sostuvo que el Capítulo 9 del Código de Quiebras tenía preferencia sobre la Ley 71.[162] La sentencia del Tribunal fue confirmada por el Tribunal de Apelaciones para el Primer Circuito de EE. UU. el 6 de julio de 2015[163] y por la Corte Suprema de EE. UU. el 13 de junio de 2016.[164]

5.      **La Ley de Moratorias y la creación de AAFAF ("Ley 21-2016")**

El 6 de abril de 2016, el gobierno aprobó la Ley de Moratorias, que concedía al Gobernador la potestad para, entre otras cosas, (i) implementar una moratoria sobre los pagos de la amortización de la deuda, (ii) derivar ciertos fondos históricamente asignados de manera condicional a entidades públicas para el pago de sus obligaciones al pago de servicios esenciales, y (iii) paralizar temporalmente remedios relacionados para los acreedores. En relación con la Ley de Moratorias, el entonces gobernador Alejandro García Padilla emitió una serie de órdenes ejecutivas, lo que incluyó órdenes para declarar una moratoria sobre el pago de la amortización de la deuda por parte de diversas entidades gubernamentales.

La AAFAF también se creó en virtud de la Ley de Moratorias con el propósito de asumir el papel del BGF como agente fiscal, asesor financiero y agente informador del ELA y sus instrumentalidades y municipios.[165] En enero de 2017, la Legislatura sancionó la Ley 2-2017, que amplió el papel de la AAFAF para incluir responsabilidades adicionales relacionadas con la reestructuración de la deuda del ELA y sus instrumentalidades y para supervisar el cumplimiento de los planes y presupuestos fiscales de dichas entidades aprobados por la Junta de Supervisión de acuerdo con PROMESA.

---

[162] *Franklin California Tax-Free Tr. c. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R. 6 de febrero de 2015).

[163] *Franklin California Tax-Free Tr. c. Puerto Rico*, 805 F.3d 322 (1er Cir. 2015).

[164] *Puerto Rico c. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938 (2016).

[165] Para una discusión de la Ley 5-2017, que enmendó la Ley de Moratorias, consulte la sección IV.B.8 de esta Declaración de Divulgación.

6.     **Ley 3-2017 ("Ley 3")**

El 23 de enero de 2017, el ELA aprobó la Ley 3, que declaró una crisis fiscal y económica y prorrogó hasta el 1<sup>ero</sup> de julio de 2021 la vigencia de muchas de las medidas de austeridad fiscal implementadas por la Ley 66 que estaban originalmente programadas para caducar el 1<sup>ero</sup> de julio de 2017. La Ley 3 adoptó las siguientes medidas: (i) suspensión de los contratos de negociación colectiva; (ii) congelamiento de beneficios de compensación y empleo; (iii) reducción de los costos de transporte escolar del Departamento de Educación; (iv) implementación de limitaciones sobre las ofertas de empleo; (v) eliminación del 20% de las posiciones de empleados de confianza; (vi) limitación del traspaso de días de licencia por enfermedad y vacaciones de un Año fiscal a otro; y (vii) aplicación de un sistema de plan de pago para sentencias legales. Dichas medidas pueden cancelarse con anticipación si se cumplen ciertas condiciones financieras, como un crecimiento del PNB de por lo menos 1.5%, que las obligaciones generales del ELA reciban una calificación de crédito de grado de inversión y el ELA no use financiamiento deficitario. La Ley 3 también prorrogó el arbitrio del 4% estipulado por la Ley 154 del 31 de diciembre de 2017 al 31 de diciembre de 2027.

7.     **Ley 4-2017 ("Ley 4")**

El 26 de enero de 2017, el ELA aprobó la Ley 4, conocida como la Ley de Transformación y Flexibilidad Laboral, para aumentar la participación en el mercado laboral agregando flexibilidad a las normas sobre horas extras, aumentando los requisitos laborales para ser elegible para recibir mesada y la autorización de períodos de prueba más largos. Además, se aumentaron los requisitos laborales para ser elegible para recibir el bono de Navidad y se redujo el bono por la mitad durante el primer año de trabajo de un empleado. También se derogó la ley de Puerto Rico para limitar los horarios laborales de ciertos negocios minoristas los domingos y en ciertos feriados.

8.     **Ley 5-2017 ("Ley 5")**

El 29 de enero de 2017, el ELA aprobó la Ley 5, conocida como la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico de 2017, para derogar partes de la Ley 21-2016 y declarar la emergencia financiera. Si bien ciertas disposiciones de la Ley 21-2016 se derogaron, las órdenes de moratoria de la deuda emitidas de acuerdo con la Ley 21-2016 siguen estando vigentes bajo la Ley 5. La Ley 5 también estableció un período de emergencia, durante el cual el Gobernador puede emitir órdenes ejecutivas para designar la prioridad del uso de los recursos disponibles. Asimismo se concede al Gobernador amplios poderes de sindicatura sobre las agencias gubernamentales, con el fin de rectificar la emergencia financiera.

La Ley 5 fue enmendada por la Ley 46-2017, para autorizar al Gobernador a seguir prorrogando la declaración del período de emergencia de a períodos de 6 meses adicionales, mientras exista la Junta de Supervisión. Actualmente se estipula que el Período de Emergencia caduque el 30 de junio de 2021, a menos que el Gobernador lo prorrogue adicionalmente.

La Cámara de Representantes de Puerto Rico está evaluando actualmente nuevos proyectos de ley, que, entre otras cosas, modificarían el papel actual de la Legislatura en los procesos presupuestarios del Estado Libre Asociado y enmendarían la Ley 5, o Ley de Emergencia Financiera y Responsabilidad Fiscal, reduciendo efectivamente varios de los poderes de emergencia fiscal del Gobernador bajo la ley. La exposición de motivos de uno de los proyectos de ley dice que las enmiendas propuestas a la Ley 5 apuntan a los "excesos" en los poderes de emergencia fiscal otorgados al Gobernador, incluyendo la autoridad "unilateral" para establecer prioridades de pago a través de una orden ejecutiva y "emitir deuda, redirigir fondos, vender activos y llevar a cabo otras acciones por decreto, sin la intervención de la asamblea

legislativa, como lo requiere nuestro sistema constitucional". La Junta de Supervisión ha expresado su oposición a esta legislación.

9. **Ley 26-2017 ("Ley 26")**

El 29 de abril de 2017, el ELA aprobó la Ley 26, conocida como la Ley de Cumplimiento con el Plan Fiscal, para implementar una amplia gama de medidas fiscales para reducir costos en todo el ELA y sus corporaciones públicas y apoyar el cumplimiento por parte del ELA del plan fiscal certificado por la Junta de Supervisión. Algunas de las medidas más importantes implementadas por la Ley 26 se relacionan con la estandarización de beneficios marginales en todo el Gobierno Central y las corporaciones públicas. Las medidas adoptadas por la Ley 26 son las siguientes, entre otras: (1) reducción de los beneficios de licencia por vacaciones y enfermedad; (2) reducción del número de feriados públicos; (3) reducción del bono de Navidad de los empleados de las corporaciones públicas a $600 y condicionamiento de su elegibilidad a seis meses de servicio por año o más; (4) reemplazo del pago de horas extras para empleados públicos con tiempo compensatorio; (5) eliminación del pago en efectivo por acumulación de días de licencia por enfermedad y limitación de la liquidación por acumulación de licencia por vacaciones a 60 días; (6) anulación de cualquier disposición de un contrato de beneficios comunitarios que proporcione a los empleados beneficios marginales que superen aquellos dispuestos por la Ley 26; (7) imposición de un arbitrio sobre los dividendos a la Asociación de Suscripción Conjunta del Seguro de Responsabilidad; (8) ordenar a todas las corporaciones públicas e instrumentalidades que transfieran los ingresos sobrantes al Fondo General del Departamento de Hacienda; (9) establecimiento de un proceso para la venta de bienes inmuebles del gobierno; (10) reducción de la vigencia de la mayoría de las asignaciones multianuales; (11) aumento de los impuestos sobre cigarrillos y productos del tabaco; (12) reducción del financiamiento del Conservatorio de Música y la Escuela de Artes Plásticas; y (13) reducción hasta el Año fiscal 2021 del monto reservado anualmente para el fondo de emergencia del ELA.

La Ley 26 dispone que cuando la situación fiscal se haya estabilizado y la situación fiscal pública así lo permita, el Comité de Cumplimiento con el Plan Fiscal establecido por la Ley puede suspender su vigencia. El Comité se compone de tres miembros, cada uno de los cuales es designado respectivamente por el Gobernador, el Vocero de la Cámara de Representantes y el Presidente del Senado.

10. **Ley 106-2017 ("Ley 106")**

El 23 de agosto de 2017, el ELA aprobó la Ley 106 para abordar el agotamiento inminente de los activos de los sistemas de retiro del ELA. Conocida como la Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos, la Ley 106 autorizó al Fondo General del ELA que asumiera los pagos de pensiones a los Sistemas de Retiro a través de un sistema "PayGo". En el modelo PayGo, cada empleador debe pagar un monto determinado por AAFAF correspondiente a los pagos reales de los beneficios de pensión a retirados y beneficiarios de dicho empleador. La Ley 106 también creó un sistema de contribuciones definido para los participantes del SRE y para los participantes del SRM contratados el o después del 1 de agosto de 2014. Todas las contribuciones por parte de estos participantes ahora deben derivarse al plan de contribución definido.

11. **Ley 29-2019 ("Ley 29")**

El 17 de mayo de 2019, el ELA aprobó la Ley 29-2019, que obliga al Gobierno a financiar los costos de PayGo y Medicaid de los municipios con cargo al Fondo General sin recibir el reembolso de los municipios. Sin embargo, tras un proceso judicial iniciado por la Junta de Supervisión en el que se impugnaba la validez de la Ley 29-2019 en virtud de la ley PROMESA, el Tribunal del Título III dictaminó que la Ley 29-2019 violaba PROMESA y anuló la ley, por lo que se restableció la obligación de los

municipios de cubrir los pagos de PayGo y de asistencia sanitaria de sus empleados. Esta sentencia permitió al Estado Libre Asociado solicitar el reembolso de los pagos anteriores realizados en el marco de la Ley 29-2019 y facultaron al Estado Libre Asociado para actuar en caso de que no se recibieran estas aportaciones (por ejemplo, para retener los pagos por servicios públicos, asignaciones). La fecha de entrada en vigencia de la decisión del tribunal se retrasó hasta el 7 de mayo de 2020 para permitir a las partes debatir posibles soluciones a los desafíos financieros a los que se enfrentan los municipios, especialmente a la luz de la pandemia de COVID-19. Se espera que los municipios financien sus respectivas contribuciones para los gastos de PayGo y de asistencia sanitaria en adelante.

12. **Programa de Retiro Incentivado**

   a) **Ley 80-2020 ("Ley 80")**

La Ley del Programa de Retiro Incentivado y de Justicia para Nuestros Servidores Públicos No. 80 de 2020 fue aprobada en agosto de 2020, con lo cual los empleados elegibles del Gobierno de Puerto Rico pueden optar voluntariamente por la separación incentivada de su empleo antes de la edad de retiro. La Ley 80 está disponible para los empleados del Gobierno de Puerto Rico que ingresaron al Sistema de Retiro (el "Sistema") bajo la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, conocida como la Ley del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("Ley 447-1951"), antes del 1 de abril de 1990; no optaron por participar en el Programa de Cuentas de Ahorro para el Retiro; y han aportado un mínimo de veinte (20) años al Sistema al 30 de junio de 2017. Asimismo, el Programa ofrece una oportunidad de retiro anticipado a los empleados de las agencias elegibles, conforme al Artículo 4(b) de la Ley 80-2020,[166] que ingresaron al Sistema bajo la Ley Núm. 1 de 16 de febrero de 1990, según enmendada ("Ley 1-1990"), entre el 1 de abril de 1990 y el 31 de diciembre de 1999; que no hayan optado por participar en el Programa de Cuentas de Ahorro para el Retiro; y que hayan aportado un mínimo de quince (15) años al Sistema al 30 de junio de 2017.

Los incentivos, tanto para los empleados en virtud de la Ley 447-1951 como de la Ley 1-1990, incluyen una pensión de jubilación vitalicia equivalente al cincuenta por ciento (50%) o de su mayor remuneración bruta anual devengada durante cualquiera de los tres (3) últimos años anteriores al momento de ingresar al programa de la Ley 80; una contribución mensual del empleador de cien (100) dólares al plan médico seleccionado por el participante hasta la edad de sesenta y dos (62); años; y la liquidación de las licencias por enfermedad y vacaciones acumuladas hasta la fecha de separación del servicio para participar en el programa de la Ley 80, de acuerdo con los topes establecidos por la legislación y los reglamentos aplicables, libre de impuestos. Asimismo, los participantes podrán solicitar el desembolso de las prestaciones con cargo a las aportaciones que hayan realizado al Nuevo Plan de Aportaciones Definidas, de acuerdo con lo establecido en el artículo 8 de la Ley 106 de 2017 y sus modificaciones.

Para pagar los nuevos beneficios, el Gobierno propone que se congelen todos los puestos dejados vacantes por los jubilados, con la posible excepción de "los puestos vacantes que se determine que prestan servicios esenciales para el funcionamiento de la agencia".[167] El análisis del Gobierno determinó que la Ley 80 le permitiría al ELA ahorrar $2,600 millones de dólares en los próximos treinta a cincuenta años en valor actual. Al realizar su propio análisis, la Junta de Supervisión determinó que los informes del Gobierno exageraban sustancialmente el ahorro de la Ley 80. En total, la Junta de Supervisión estima que la ley podría costar hasta $4,200 millones. La Junta de Supervisión estima que el costo incremental solo en el plan fiscal

---

[166] En febrero de 2020, la Legislatura presentó una legislación que pretendía modificar la Ley 80-2020 para eliminar el Artículo 4(b).

[167] Ley 80, § 9(b)

certificado del Estado Libre Asociado podría ser de hasta $2,200 millones. El análisis de la Junta de Supervisión muestra que la ley dará lugar a un aumento global de los costos, a menos que el Gobierno realice reducciones significativas y permanentes en la plantilla y la compensación de su personal, más allá de las exigidas por el plan fiscal certificado del ELA.

La Junta de Supervisión aconsejó al Gobierno que, si desea proceder a la aplicación de la Ley 80, debe presentar un programa sustantivo, del que la Junta de Supervisión pueda hacer responsable al Gobierno, por el que la Ley 80 (i) no imponga costos netos adicionales al Plan Fiscal, y (ii) se aplique de una manera fiscalmente responsable que garantice unos servicios esenciales adecuados. El Gobierno ha comunicado que no aplicará la Ley 80 hasta que se llegue a un acuerdo con la Junta de Supervisión.

b)    **Ley 81-2020 ("Ley 81")**

La Ley No. 81 de 2020, aprobada el 3 de agosto de 2020, modifica los regímenes de pensiones existentes para los oficiales de policía, los bomberos, los oficiales correccionales y los técnicos de emergencias, entre otros (colectivamente, "<u>Empleados Públicos de Emergencia</u>"), que ingresaron al Sistema bajo la Ley 447-1951 antes del 1 de abril de 1990 o bajo la Ley 1-1990 entre el 1 de abril de 1990 y el 31 de diciembre de 1999. Permite que los empleados públicos de emergencias se retiren anticipadamente con el 45 al 55 por ciento de sus salarios finales en la fecha de retiro como beneficios de pensión, así como una contribución de $100 al mes al plan médico por parte de su empleador.

El Gobierno certificó en octubre de 2020 que la Ley 81 se aplicará de "forma neutra desde el punto de vista presupuestario", limitando la contratación de nuevas personas o contratando a tasas más bajas y, por lo tanto, limitando los nuevos gastos en nóminas con un valor actual de $852 millones durante un período de 30 a 40 años. El propio análisis independiente de la Junta de Supervisión determinó que los costos de proporcionar beneficios mejorados a los aproximadamente 8,640 participantes que se espera que cumplan con los requisitos de elegibilidad de la Ley 81 en el momento del retiro es de $2,400 millones. El análisis de la Junta de Supervisión muestra que la ley dará lugar a un aumento global de los costos, a menos que el Gobierno realice reducciones significativas y permanentes en la plantilla y la compensación que no es probable que se logre a través de reducciones del personal de seguridad pública y, por lo tanto, es incompatible con el Plan Fiscal certificado del ELA.

La Junta de Supervisión aconsejó al Gobierno que, si deseaba proceder a la aplicación de la Ley 81, debía presentar un programa sustantivo, del que la Junta de Supervisión pueda hacer responsable al Gobierno, por el que la Ley 81 (i) o imponga costos netos adicionales al Plan Fiscal, y (ii) se aplique de una manera fiscalmente responsable que garantice unos servicios esenciales adecuados. El Gobierno ha comunicado que no aplicará la Ley 81 hasta que se llegue a un acuerdo con la Junta de Supervisión.

c)    **Ley 82-2020 ("Ley 82")**

La Ley 82 permite a los afiliados al Sistema de Retiro para Maestros aplicar los balances de licencia por enfermedad no utilizados a su elegibilidad de retiro y a su nivel de beneficios de pensión. El aumento de los beneficios de las pensiones, así como la probable e imprevista aceleración del calendario de retiro de los docentes, generan costos y vacíos de personal no contemplados por el Plan Fiscal.

La certificación del Gobierno para la Ley 82 declaró que ésta no tiene ningún costo porque los empleados no pueden liquidar su tiempo de licencia por enfermedad no utilizado. El análisis independiente de la Junta de Supervisión demostró que la aplicación de la Ley 82 costará al Estado Libre Asociado entre $635 millones y $1,570 millones durante los próximos treinta años, suponiendo que, como resultado, los participantes del SRM reciban entre dos y cinco años de crédito de servicio adicional. Por lo tanto, la Junta

164

de Supervisión ha determinado que la Ley 82 es significativamente inconsistente con el Plan Fiscal y está manteniendo diálogos continuos con el Gobierno para entender mejor la afirmación de que la Ley 82 no tiene ningún costo. El Gobierno ha comunicado que no aplicará la Ley 82 hasta que se llegue a un acuerdo con la Junta de Supervisión.

## C.   PROMESA[168]

### 1.   Aprobación de PROMESA

El 30 de junio de 2016, el Congreso aprobó la ley PROMESA, que proporciona un marco, entre otras cosas, para que el ELA y sus instrumentalidades cubiertas reestructuren su deuda mediante el establecimiento de:

- la Junta de Supervisión, que supervisa la reestructuración y los esfuerzos de revitalización del ELA y sus instrumentalidades[169] cubiertas mediante, entre otras cosas: (i) la certificación de los planes fiscales y los presupuestos para el ELA y sus instrumentalidades cubiertas y (ii) la representación del ELA y sus instrumentalidades cubiertas en todos los casos presentados bajo el Título III de PROMESA;

- un proceso supervisado por los tribunales, de cuasi quiebra, similar al Capítulo 9 del Código de Quiebras para permitir que el ELA y sus instrumentalidades cubiertas reestructuren su deuda de acuerdo con un plan de ajuste; y

- un marco para la designación, supervisión e implementación de proyectos críticos de infraestructura que apuntan al crecimiento de la economía del ELA.

### 2.   Creación de la Junta de Supervisión

La sección 101(a) de PROMESA estableció la Junta de Supervisión con el fin de proporcionar un "método para que un territorio cubierto logre la responsabilidad fiscal y acceda a los mercados de capitales". La Junta de Supervisión actualmente se compone de siete miembros con derecho al voto designados por el Presidente de Estados Unidos a partir de una lista bipartidista de nominados y un miembro *ex officio* sin derecho al voto designado por el Gobernador.[170]  El 31 de agosto de 2016, el Presidente Obama designó a los siete miembros con derecho al voto de la Junta de Supervisión: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González y (7) Ana J. Matosantos.

---

[168] Esta sección resume ciertas disposiciones de PROMESA. Aunque los Deudores creen que esta descripción cubre las disposiciones materiales de PROMESA, este resumen no pretende ser completo y está sujeto, y se califica en su totalidad por referencia a, PROMESA.

[169] El 30 de septiembre de 2016, la Junta de Supervisión designó a ciertas entidades, entre ellas los Deudores, como instrumentalidades cubiertas. Junta de Supervisión y Administración Financiera de Puerto Rico, Informe Anual, Año fiscal 2017 (30 de julio de 2017).  El 9 de mayo de 2019, la Junta de Supervisión complementó la lista de instrumentalidades cubiertas y designó 78 municipalidades como instrumentalidades cubiertas conforme a PROMESA.

[170] Para una discusión adicional de los litigios relacionados con impugnaciones conforme a la Cláusula de Designaciones, *véase* la sección V.F.1 de esta Declaración de Divulgación.

El 31 de agosto de 2020 se hicieron efectivas las renuncias de Carlos M. García y José R. González, y el 5 de octubre de 2020 se hizo efectiva la renuncia de José B. Carrión III, Presidente de la Junta de Supervisión. El 6 de octubre de 2020, David A. Skeel, Jr. fue designado Presidente de la Junta de Supervisión. El 7 de octubre de 2020, el presidente Trump nombró a Justin Peterson para sustituir a Arthur J. González como miembro de la Junta de Supervisión. En diciembre de 2020, el presidente Trump volvió a nombrar a Andrew G. Biggs y designó a Antonio L. Medina, John E. Nixon y Betty E. Rosa como miembros de la Junta de Supervisión. En enero de 2021, el presidente Trump volvió a nombrar a David A. Skeel, Jr. y nombró a Arthur J. González como miembros de la Junta de Supervisión. Los actuales siete miembros con derecho a voto de la Junta de Supervisión son: (1) David A. Skeel, Jr., (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson, y (7) Betty E. Rosa. El Gobernador Pedro Pierluisi Urrutia es actualmente miembro *ex officio* sin derecho al voto en representación del ELA en la Junta de Supervisión.

Cada miembro de la Junta de Supervisión presta servicio durante un período de tres años sin ninguna clase de compensación y puede ser designado por un número ilimitado de períodos consecutivos. Cuando expira un mandato, los miembros de la Junta prestan servicios hasta que son sustituidos. El Presidente de Estados Unidos puede destituir a cualquier miembro con justa causa.

Además de sus siete miembros con derecho al voto y su miembro *ex officio* sin derecho al voto, la Junta de Supervisión también tiene un equipo ejecutivo, que incluye a: (i) Natalie A. Jaresko, como Directora Ejecutiva y Coordinadora de Revitalización interina, (ii) Jaime A. El Koury, como Asesor Legal Principal, y (iii) Kyle A. Rifkind, como Asesor Legal Adjunto y Oficial de Reestructuración. De acuerdo con los estatutos de la Junta de Supervisión, el Director Ejecutivo actúa como funcionario ejecutivo principal de la Junta de Supervisión con poderes generales de supervisión y dirección de sus asuntos comerciales (lo que incluye la posibilidad de celebrar contratos en nombre de la Junta de Supervisión), sujeto a la supervisión y el control de la Junta de Supervisión. El Asesor Legal Principal actúa como oficial legal principal de la Junta de Supervisión. El Coordinador de Revitalización es responsable de la ejecución de los deberes estipulados en la sección 503 de PROMESA relacionada con la identificación, priorización e implementación de proyectos de infraestructura críticos para el ELA.

De acuerdo con la sección 108(a) de PROMESA, la Junta de Supervisión actúa como una entidad autónoma, de manera que ni el Gobernador ni la Legislatura pueden ejercer ningún tipo de control sobre la Junta de Supervisión y sus actividades y no pueden realizar acciones que impidan o frustren los propósitos de PROMESA. Si bien ha sido creada por una ley federal, la Junta de Supervisión no es "un departamento, una agencia, un establecimiento ni una instrumentalidad del Gobierno Federal". En lugar de ello, como se estipula en la sección 101(c) de PROMESA (1), la Junta de Supervisión es considerada como una "entidad dentro del gobierno territorial" del ELA. La Junta de Supervisión sigue siendo una pequeña organización, con una jerarquía plana, que funciona en sus oficinas de San Juan, Puerto Rico y Nueva York, Nueva York. Uno de sus objetivos como organización durante el Año fiscal 2019 fue el de aprovechar el increíble talento que hay en Puerto Rico para desarrollar la fuerza de organización mediante el reclutamiento local, reduciendo de esta manera costos y el uso de consultores externos. La abrumadora mayoría de los nuevos empleados de la Junta de Supervisión son puertorriqueños, varios de los cuales han vuelto de los EE. UU. continentales para ayudar a que Puerto Rico se recupere.

De acuerdo con la sección 209 de PROMESA, la Junta de Supervisión seguirá existiendo hasta que la Junta certifique que: (i) el ELA tiene acceso adecuado a los mercados de capitales a corto y a largo plazo a tasas de interés razonables para cumplir sus necesidades de préstamo y (ii) durante por lo menos cuatro Años fiscales consecutivos: (a) el ELA ha desarrollado sus presupuestos de acuerdo con las normas modificadas de contabilidad basada en valores devengados y (b) los gastos realizados por el ELA durante

cada uno de estos Años fiscales no superaron sus ingresos durante ese año, según se determine de acuerdo con las normas de contabilidad basada en valores devengados.

3.    **Poderes y responsabilidades de la Junta de Supervisión**

*Certificación de planes fiscales y presupuestos*

Uno de los pilares de PROMESA es el desarrollo, la certificación y la aplicación de planes fiscales y presupuestos para el ELA y sus instrumentalidades cubiertas. Dichos planes fiscales y presupuestos proporcionan un marco para lograr la responsabilidad fiscal y acceder a los mercados de capitales. Los planes fiscales son herramientas de planificación a corto y largo plazo, que abarcan un período de por lo menos cinco Años fiscales, mientras que los presupuestos abarcan por lo menos un Año fiscal. Los presupuestos deben ser coherentes con el plan fiscal que esté en vigencia en ese momento.

PROMESA contempla que la Junta de Supervisión y el gobierno electo del ELA trabajen en conjunto para adoptar un plan fiscal, pero concede a la Junta de Supervisión el poder de desarrollar y certificar su propio plan fiscal si el gobierno no le proporciona una propuesta de plan fiscal que determine certificar. El proceso comienza con la entrega por parte de la Junta de Supervisión de un cronograma para el desarrollo, presentación y certificación de planes fiscales para el ELA y cualquier instrumentalidad cubierta. El Gobernador debe entonces presentar el plan fiscal propuesto de acuerdo con dicho cronograma. Después de la presentación, la Junta de Supervisión puede certificar el plan fiscal propuesto si determina que dicho plan fiscal cumple 14 requisitos legales estipulados en la sección 201(b) de PROMESA, que están diseñados para "proporcionar un método para lograr la responsabilidad fiscal y acceder a los mercados de capitales". El plan fiscal debe:

- disponer estimaciones de ingresos y gastos de acuerdo con las normas contables acordadas y basadas en (i) leyes aplicables o (ii) proyectos de ley específicos que requieran su aprobación para alcanzar las proyecciones del plan fiscal dentro de lo razonable;

- garantizar el financiamiento de los servicios públicos esenciales;

- proporcionar financiamiento adecuado para los sistemas públicos de pensión;

- tomar medidas para la eliminación de déficits estructurales;

- para los Años fiscales cubiertos por un plan fiscal donde una paralización de acuerdo con el Título III o Título IV de PROMESA no es efectiva, disponer una carga de la deuda que sea sostenible;

- mejorar la gobernanza fiscal, la rendición de cuentas y los controles internos;

- permitir el logro de los objetivos fiscales;

- crear pronósticos independientes de ingresos para el período abarcado por el plan fiscal;

- incluir un análisis de sostenibilidad de la deuda;

- disponer gastos de capital e inversiones necesarios para promover el crecimiento económico;

- adoptar recomendaciones adecuadas presentadas por la Junta de Supervisión;

- incluir la información adicional que la Junta de Supervisión considere necesaria;

- asegurarse de que los activos, fondos o recursos de una instrumentalidad territorial no se presten, transfieran a o se usen de otra manera para beneficio de un territorio cubierto u otra instrumentalidad territorial cubierta de un territorio cubierto, a menos que lo permita la constitución del territorio, un plan aprobado de ajuste de acuerdo con el Título III o una Modificación Calificadora aprobada de acuerdo con el Título VI de PROMESA; y

- respetar las relativas prioridades legales o gravámenes legales, según sea aplicable, de la constitución, otras leyes o acuerdos de un territorio cubierto o instrumentalidad territorial cubierta en vigencia antes de la fecha de aprobación de PROMESA.

Los planes fiscales deben garantizar el financiamiento de los servicios públicos esenciales. La Junta de Supervisión considera que "Servicios esenciales" es una frase que se usa para hacer referencia, como mínimo, a servicios que, debido al poder del Estado, un tribunal con jurisdicción competente podría permitir que se paguen con fondos de ingresos sobre los cuales un acreedor tiene una reclamación prioritaria o una reclamación garantizada válida e inevitable. La Junta de Supervisión considera que el uso de dichos ingresos conforme al poder del Estado puede o no dar lugar a reclamaciones adicionales de los acreedores afectados, según las circunstancias. Esta Declaración de Divulgación y el Plan no definen lo que son los "servicios esenciales" ni los "gastos esenciales". La Junta de Supervisión considera que esto se debe a varias razones, entre ellas las siguientes.

*En primer lugar*, el Título II de PROMESA requiere que un plan fiscal "asegure el financiamiento de los servicios públicos esenciales". Este lenguaje establece un piso mínimo de gasto, lo que significa que el plan fiscal debe financiar servicios esenciales. En el momento de la confirmación, el Tribunal del Título III examina el Plan. La certificación del plan fiscal queda fuera de la jurisdicción por la materia del Tribunal del Título III de acuerdo con la sección 106(e) de PROMESA. La sección 314(b)(7) de PROMESA requiere que el Plan sea coherente con el plan fiscal, pero no impone ninguna prueba del plan fiscal. Por lo tanto, los servicios esenciales no son objeto de debate.

*En segundo lugar*, los ingresos disponibles de cada deudor son propiedad de cada deudor sujeto a la jurisdicción exclusiva por la materia del Tribunal del Título III de acuerdo con la sección 306(b) de PROMESA. El Título III de PROMESA incorpora la prioridad en la sección 507(a)(2) del Código de Quiebras, que concede prioridad a los gastos administrativos, pero no se pronuncia sobre las reclamaciones de Obligaciones Generales en el caso del Título III del ELA. Algunos bonistas afirman que las reclamaciones de Obligaciones Generales tienen prioridad, no por el Código de Quiebras, sino por la Constitución del ELA y PROMESA, incluso las secciones 201(b)(1) (N), 301(e) y 314(b). La transacción de la Junta de Supervisión con tenedores de aproximadamente $10,000 millones de dólares de reclamaciones de Bonos de Obligación General y Bonos AEP elimina la necesidad, en opinión de la Junta de Supervisión, de litigar sobre si las reclamaciones de Obligaciones Generales tienen prioridad y las condiciones de prioridad.[171] Por lo tanto, la Junta de Supervisión considera que, dado que los tenedores de reclamaciones de Obligaciones Generales no reclaman los ingresos de transacción necesarios para pagar servicios esenciales, no es necesario definir los servicios esenciales. Por lo tanto, la definición de "servicios

---

[171] La Junta de Supervisión no tiene conocimiento de ninguna concesión de una garantía prendaria sobre los ingresos disponibles para tales reclamaciones de Obligaciones Generales.

esenciales" no tiene aplicación ni repercusiones en la forma en que un acreedor debe votar sobre el Plan, que es el principal objetivo de la Declaración de Divulgación.

En tercer lugar, la transacción de la aplicabilidad de la prioridad de los tenedores de reclamaciones de Obligaciones Generales en virtud de la Constitución del ELA salvaguarda los pagos a los jubilados en virtud del Plan que podrían verse afectados adversamente si los deudores de Obligaciones Generales tienen una reclamación exigible a todos los ingresos disponibles. La transacción también salvaguarda la ejecución del plan fiscal certificado porque no deja ninguna base para que los tenedores de instrumentos de deuda de Obligaciones Generales reclamen los ingresos disponibles que de otro modo se utilizan para pagar los gastos con cargo al presupuesto certificado. Nuevamente, esto evita disputas sobre servicios esenciales. Para obtener estos beneficios y garantías, el Plan propone tratamientos de los tenedores de reclamaciones de Obligaciones Generales que ofrecen rendimientos más altos que los tratamientos ofrecidos a los tenedores de algunas reclamaciones que no son de Obligaciones Generales. Por lo tanto, la Junta de Supervisión afirma que PROMESA no plantea ningún problema en cuanto a la prioridad de la deuda de Obligaciones Generales respecto de los servicios esenciales.

En cuarto lugar, el Plan proporciona mayores distribuciones a las reclamaciones de Obligaciones Generales que a algunas reclamaciones que no son de Obligaciones Generales porque los tenedores de reclamaciones de Obligaciones Generales pueden tener una antigüedad relativa respecto de las reclamaciones de Obligaciones no Generales en virtud de la Constitución del ELA, que puede ser ejecutable en virtud el Título III de PROMESA. Esta antigüedad relativa, sin embargo, afecta los derechos de los tenedores de reclamaciones subordinadas, pero no es una reclamación prioritaria contra el ELA que conceda derechos a los tenedores de deuda de Obligaciones Generales a todos los ingresos disponibles. Por lo tanto, la definición de los servicios esenciales no tiene aplicación para los fines de confirmación del Plan.

Por último, el concepto de "servicios esenciales" no conduce a una simple inclusión en la lista de servicios o gastos que son esenciales y que no lo son, porque los servicios esenciales pueden variar considerablemente con el tiempo y en función de las circunstancias después de la confirmación. Por ejemplo, si la actividad económica del ELA fuera tan baja durante un período en que la eliminación de servicios impidiera el crecimiento económico sostenible, la Junta de Supervisión podría determinar que todos esos servicios son esenciales. El plan fiscal certificado del ELA abarca períodos de crecimiento y retracción, y muestra una retracción continua de la población. Como consecuencia, el análisis de lo que es más beneficioso para el ELA analiza la recuperación de los acreedores fuera del Título III asumiendo un recorte de diferentes porcentajes del plan fiscal certificado y gastos presupuestarios (además de los recortes que ya figuran en el plan fiscal) en diferentes porcentajes, en lugar de involucrarse en un debate sobre cada gasto. De esta manera, una definición de servicios esenciales no es necesaria ni relevante para los análisis de mejores beneficios de acuerdo con PROMESA.

Después de la certificación del plan fiscal, la Junta de Supervisión proporcionará al Gobernador y a la Legislatura un cronograma para el desarrollo y la certificación de presupuestos para el ELA y sus instrumentalidades cubiertas. La Junta de Supervisión también debe proporcionar al Gobernador y a la Legislatura un pronóstico de ingresos para su uso en el desarrollo del presupuesto. Si la Junta de Supervisión determina que la propuesta de presupuesto para el ELA presentada por el Gobernador cumple el plan fiscal aprobado, la Junta de Supervisión lo aprobará y lo presentará a la Legislatura. Si la Junta de Supervisión determina que la propuesta de presupuesto no cumple el plan fiscal certificado, presentará una notificación de violación al Gobernador con respecto al presupuesto que incluya una descripción de las acciones correctivas necesarias y una oportunidad para corregir dichas violaciones, presentando un presupuesto revisado que cumpla el plan fiscal certificado. El Gobernador puede presentar todos los presupuestos revisados que permita el cronograma establecido por la Junta de Supervisión. Sin embargo, si el Gobernador no presenta un presupuesto para el ELA que cumpla el plan fiscal certificado dentro del plazo establecido

169

por la Junta de Supervisión, la Junta de Supervisión debe desarrollar y presentar al Gobernador y a la Legislatura un presupuesto que cumpla el plan fiscal certificado. La Legislatura entonces presentará a la Junta de Supervisión el presupuesto que adopte para que la Junta de Supervisión pueda determinar si dicho presupuesto cumple el plan fiscal certificado. Si el presupuesto adoptado por la Legislatura cumple el plan fiscal certificado, la Junta de Supervisión lo aprobará y dicho presupuesto estará vigente a partir del primer día del Año fiscal. Si la Junta de Supervisión determina que el presupuesto adoptado por la Legislatura no cumple el plan fiscal certificado, la Junta de Supervisión deberá presentar a la Legislatura una notificación de violación que incluya una descripción de la acción correctiva necesaria y una oportunidad de corregir esta violación. La Legislatura puede presentar todos los presupuestos revisados que permita el cronograma establecido por la Junta de Supervisión. Sin embargo, si la Legislatura no presenta un presupuesto que cumpla el plan fiscal certificado dentro del plazo establecido por la Junta de Supervisión, la Junta de Supervisión debe desarrollar un presupuesto que cumpla el plan fiscal certificado y presentarlo al Gobernador y a la Legislatura. Dicho presupuesto se considerará aprobado por el Gobernador y la Legislatura y estará en vigencia a partir del primer día del Año fiscal. Los presupuestos de las instrumentalidades son desarrollados por el Gobernador y siguen un proceso similar entre el Gobernador y la Junta de Supervisión, en el cual el Gobernador desarrolla un presupuesto para la instrumentalidad y la Junta de Supervisión lo revisa para determinar si cumple el plan fiscal certificado de la instrumentalidad. Si el Gobernador no desarrolla un presupuesto para la instrumentalidad que cumpla el plan fiscal certificado correspondiente, la Junta de Supervisión debe ocuparse de desarrollarlo.

Al final de cada trimestre fiscal, el Gobernador debe presentar a la Junta de Supervisión un informe financiero para el ELA y cada instrumentalidad cubierta donde se describan los ingresos, gastos y flujos de caja reales para cada trimestre. Si la Junta de Supervisión determina que los ingresos, gastos y flujos de caja reales no son congruentes con los ingresos, gastos y flujos de caja proyectados en el presupuesto certificado para ese trimestre, la Junta de Supervisión deberá establecer una fecha límite en la cual el Gobierno debe proporcionar una explicación para esta incongruencia que la Junta de Supervisión considere razonable o el Gobierno debe implementar medidas correctivas para abordar dicha incongruencia. Si el Gobierno no ofrece una explicación razonable o no corrige la incongruencia, la Junta de Supervisión debe certificar al Presidente, el Congreso de Estados Unidos, el Gobernador y la Legislatura que el ELA presenta incongruencias con el presupuesto certificado y describir el monto de la incongruencia. Después de proporcionar esta certificación y determinar que el Gobierno no ha corregido la incongruencia, la Junta de Supervisión puede realizar reducciones adecuadas en los gastos no relacionados con la deuda para asegurarse de que los ingresos y gastos estén en línea con el presupuesto certificado. En el caso de una instrumentalidad, la Junta de Supervisión también puede implementar congelamientos automáticos en las contrataciones y prohibir que dicha instrumentalidad celebre contratos.

Desde la aprobación de PROMESA el 30 de junio de 2016, la Junta de Supervisión ha certificado presupuestos para el ELA para los Años fiscales 2018, 2019, 2020 y 2021.

Con el fin de que se cumplan las obligaciones anteriores, la Junta de Supervisión tiene la potestad para aplicar los planes fiscales y los presupuestos certificados revisando las actividades del gobierno del ELA y sus instrumentalidades. Como consecuencia, los actos legislativos propuestos del ELA deben ser presentados a la Junta de Supervisión y deben estar acompañados por una estimación del impacto de la nueva ley sobre los gastos e ingresos.

Desde su creación, la Junta de Supervisión y el ex Gobernador se han mostrado en desacuerdo en numerosas ocasiones, con respecto a si los informes del gobierno han cumplido las disposiciones de PROMESA y si ciertas órdenes ejecutivas y nuevas leyes han violado PROMESA y/o los planes fiscales y presupuestos certificados.

La Junta de Supervisión también tiene la potestad de revisar el impacto económico sobre los planes fiscales y presupuestos certificados de cualquiera de los contratos, normas, reglamentos y órdenes del ELA y sus instrumentalidades cubiertas. Si la Junta de Supervisión determina que cualquiera de las actividades anteriores es incongruente con un plan fiscal o presupuesto certificado, la Junta de Supervisión puede tomar las medidas necesarias para garantizar que la aprobación de una nueva ley o la ejecución de un nuevo contrato no afecten de manera adversa el cumplimiento de un plan fiscal o presupuesto certificado. Además, la Junta de Supervisión puede presentar en cualquier momento al Gobernador o a la Legislatura recomendaciones de acciones que garanticen el cumplimiento de los planes fiscales o que promuevan de otra manera la estabilidad financiera y la responsabilidad administrativa en las corporaciones públicas del ELA. El ELA puede adoptar o rechazar dichas recomendaciones, con la condición de presentar un informe al Presidente de Estados Unidos y el Congreso donde se justifique el rechazo de las recomendaciones. Sin embargo, la Junta de Supervisión, en su plan fiscal certificado puede adoptar e imponer recomendaciones que el Gobernador se rehúse a adoptar.[172]

La sección 207 de PROMESA también dispone que el ELA y sus instrumentalidades cubiertas no pueden emitir ninguna deuda sin la aprobación de la Junta de Supervisión.

### Título III de PROMESA

Si no se logra una reestructuración consensuada, el Título III de PROMESA dispone una opción de cuasi-quiebra para el ajuste de la deuda del ELA y sus instrumentalidades cubiertas. La elegibilidad para el ELA o una instrumentalidad del ELA para ser deudor de acuerdo con el Título III de PROMESA depende de que se satisfagan ciertos requisitos, como se estipula en la sección 302 de PROMESA. De conformidad con la sección 304(b) de PROMESA, la vista para considerar una objeción a una petición del Título III no puede iniciarse hasta el 120ᵐᵒ día después de la presentación de la petición. En esa vista, el Tribunal del Título III pondrá a consideración los requisitos de la sección 302 de que: (i) la entidad haya sido designada por la Junta de Supervisión como una instrumentalidad territorial cubierta; y (ii) la Junta de Supervisión haya emitido una certificación de reestructuración que determine que (a) se realizaron esfuerzos previos de buena fe con los acreedores para reestructurar la deuda, (b) las declaraciones financieras auditadas de la entidad estén públicamente disponibles, (c) la entidad haya adoptado previamente un plan fiscal (la "Certificación de reestructuración"), y (iii) la entidad está dispuesta a aplicar un plan para ajustar sus deudas. La Junta de Supervisión tiene potestad exclusiva, de acuerdo con las secciones de PROMESA 304 y 312, para presentar una petición voluntaria para obtener protección de acuerdo con el Título III y para presentar un plan de ajuste para el deudor y para modificarlo. Además, la sección 315 de PROMESA le concede a la Junta de Supervisión el derecho de "tomar las medidas necesarias en nombre del deudor para llevar a juicio los casos del deudor", y la Junta de Supervisión "es representante del deudor" en el caso de Título III.

### Otros poderes y responsabilidades

De acuerdo con la sección 208 de PROMESA, dentro de 30 días después del final de cada Año fiscal del ELA, la Junta de Supervisión debe presentar un informe anual al Presidente de Estados Unidos, el Congreso, el Gobernador y la Legislatura. El informe anual debe describir el progreso del ELA para lograr los objetivos de PROMESA y cómo la Junta de Supervisión ha asistido en ese progreso. Además, la Junta de Supervisión debe describir la manera precisa en que usó sus fondos durante el Año fiscal. El informe anual también puede incluir las recomendaciones de la Junta de Supervisión para una acción federal

---

[172] Para una discusión adicional de los litigios relacionados con los poderes de la Junta de Supervisión, *véase* la sección IV.C.3.h)(i) de esta Declaración de Divulgación.

futura, lo que incluye la enmienda de PROMESA o la aprobación de cualquier otra legislación, para apoyar el cumplimiento con planes fiscales certificados.

Además de las responsabilidades centrales anteriores, la Junta de Supervisión también ha recibido otros poderes significativos para asistir en el logro de sus objetivos. Estos poderes adicionales incluyen, entre otras cosas:

- realización de vistas y sesiones;

- la obtención de datos oficiales del ELA, el gobierno federal y los acreedores;

- la emisión y aplicación de citaciones legales;

- celebrar contratos;

- certificar acuerdos de reestructuración voluntarios y proteger ciertos acuerdos de reestructuración preexistentes entre el ELA y sus acreedores;

- certificar modificaciones de la deuda bajo el Título VI de PROMESA;

- iniciar acciones civiles para hacer valer su potestad bajo PROMESA;

- investigar las prácticas de divulgación y venta del ELA en relación con sus bonos;

- garantizar el pronto pago y administración de impuestos del ELA a través de la adopción de informes electrónicos y tecnologías de pagos y auditoría;

- analizar cualquier pensión con carencia material de fondos en el sistema de pensiones del ELA; y

- intervenir en cualquier litigio presentado contra el ELA o sus instrumentalidades cubiertas.

***Implementación de políticas de la Junta de Supervisión***

La Junta de Supervisión implementó varias iniciativas en sus esfuerzos por cumplir los objetivos de PROMESA, lo que incluye, entre otras cosas:

a)   **Mejora de la gobernanza fiscal, rendición de cuentas, controles internos y asuntos financieros del Gobierno**

Una de las responsabilidades centrales de la Junta de Supervisión es mejorar la gobernanza fiscal, rendición de cuentas y controles internos del Gobierno. Después de la presentación de los Casos del Título III, la Junta de Supervisión continuó identificando e implementando mejoras estructurales y de proceso para cumplir su mandato de acuerdo con PROMESA.

172

Un componente crítico de los esfuerzos de la Junta de Supervisión en esta área fue la incorporación de la Oficina del Director de Finanzas de Puerto Rico ("OCFO", por sus siglas en inglés)[173] en el plan fiscal certificado para el ELA. El Gobierno estableció previamente la base para el OCFO a través de una orden ejecutiva, y el plan fiscal prevé una expansión del rol para implementar mejores prácticas de gestión financiera de otros estados. La OCFO centralizará todas las funciones financieras, entre ellas: (i) manejo de la Hacienda y la liquidez, (ii) seguimiento del desarrollo, monitoreo y desempeño del presupuesto, (iii) mantenimiento e integración de sistemas financieros de TI, (iv) compras y recursos humanos, (v) informes financieros, que incluyen la emisión oportuna de los informes financieros anuales consolidados (CAFR), y (vi) administración general y validación de fondos, deuda y transacciones financieras.

La Junta de Supervisión ha ejercido sus poderes de acuerdo con la sección 104(c)(2) de PROMESA, que otorga a la Junta de Supervisión la potestad para solicitar "acceso directo a tales sistemas de información, registros, documentos, información o datos". La Junta de Supervisión celebró un memorando de entendimiento con la OCFO para establecer los procedimientos para otorgar a la Junta de Supervisión acceso directo a los sistemas de información del Gobierno. Como parte del memorando de entendimiento, y para ser más eficiente y eficaz en la transferencia de conocimiento, la Junta de Supervisión y la OCFO establecieron un grupo de trabajo compuesto por representantes de la OCFO, el Servicio de Innovación y Tecnología de Puerto Rico y la Junta de Supervisión para analizar sistemas de información y datos relacionados. La Junta de Supervisión obtuvo acceso a ciertos datos financieros del Sistema Integrado de Contabilidad de Puerto Rico ("PRIFAS", por sus siglas en inglés), uno de los sistemas de nómina del Gobierno y dos aplicaciones de la OGP. La Junta de Supervisión continúa con estos esfuerzos para obtener visibilidad de los datos financieros del Gobierno y obtener un conocimiento más profundo de las limitaciones de datos actuales.

La Junta de Supervisión estableció una serie de requisitos de informe para proporcionar más transparencia en la administración financiera del Gobierno, lo que incluye un requisito de informe de la TSA para el Gobierno Central y las principales agencias y corporaciones públicas (las "Unidades componentes") dentro del plan fiscal del ELA. Los informes ofrecen una instantánea de la situación de liquidez del Gobierno Central en comparación con el plan de liquidez anual proyectado. Este informe es dado a conocer al público por el Gobierno de manera semanal y mensual.

La Junta de Supervisión también creó un requisito de informe de presupuestado vs. real ("B2A") para el Gobierno Central y las veinte principales Unidades componentes, así como las corporaciones públicas como AEEPR y AAA, que ha obligado al Gobierno a agregar recursos y capacidad a sus departamentos de presupuesto y contabilidad. El requisito de informe de B2A ha permitido que el Gobierno ofrezca mayor visibilidad a las partes interesadas sobre sus patrones de gastos reales y un mecanismo de alerta temprana para advertir al Gobierno y a la Junta de Supervisión en caso de que los gastos reales se desvíen de los montos presupuestados. El informe B2A es dado a conocer al público por el Gobierno de manera mensual.

Otros requisitos de informe implementados por la Junta de Supervisión incluyen: (i) informe público mensual de los balances de obligaciones de pensión para el Gobierno y las corporaciones públicas, (ii) informe público mensual de la nómina, número y datos de asistencia sobre los empleados públicos, (iii)

---

[173] El 24 de junio de 2019, después de la destitución del entonces CFO Raúl Maldonado, el Gobernador designó al Director Ejecutivo de AAFAF Christian Sobrino como nuevo CFO del ELA. El Sr. Sobrino renunció a sus cargos como CFO y Director Ejecutivo de AAFAF el 13 de julio de 2019. El 31 de julio de 2019, el entonces gobernador Rosselló designó a Omar Marrero como nuevo CFO y Director Ejecutivo de AAFAF. En febrero de 2021, el gobernador Pedro Pierluisi nombró al secretario de Hacienda de Puerto Rico, Francisco Parés Alicea, como nuevo director financiero del ELA.

informe trimestral de pronósticos de ingresos, y (iv) el texto completo de todos los contratos del Gobierno están en el sitio Web de la Oficina de Contralor.

La Junta de Supervisión también estableció una disposición de retención en el presupuesto del Fondo General, que dispone que los receptores de asignaciones puedan recibir solo una parte de sus asignaciones presupuestadas hasta el trimestre final del Año fiscal, de manera que el Gobierno pueda determinar si los ingresos serán suficientes como para permitir el gasto de las asignaciones finales en el cuarto trimestre. Para el Año fiscal 2019, ese monto era de 95%, lo que significa que se retuvo el 5% restante de las asignaciones. Para el Año fiscal 2020, ese monto era de 97.5%, lo que significa que se retuvo el 2.5% de las asignaciones. Además, para el Año fiscal 2020, la Junta de Supervisión eliminó la capacidad para usar asignaciones del año anterior más allá de los primeros 60 días del siguiente Año fiscal, para obligar al Gobierno a cerrar el Año fiscal anterior de manera puntual, y estableció reservas de emergencia adicionales, cuyo uso se encuentra sujeto a la aprobación de la Junta de Supervisión. Para el Año fiscal 2021, el importe se mantiene sin cambios en un 2,5% de retención, pero incluye excepciones adicionales como los importes designados para los decretos de consentimiento, los fondos de incentivos económicos, las asignaciones de ACT y las distribuciones de cigarrillos y ron.

b) **Esfuerzos para promover una implementación más exitosa de las reformas al plan fiscal**

El plan fiscal requiere que el Gobierno presente planes de implementación para establecer plazos e Indicadores Clave de Rendimiento ("KPI", por sus siglas en inglés) para todas las medidas fiscales y reformas estructurales y para proporcionar informes de progreso mensuales sobre la implementación. Estos planes de implementación e informes de progreso son esenciales para garantizar que el Gobierno opere dentro de los límites fiscales y para progresar con las reformas estructurales, y para ofrecer a la Junta de Supervisión la oportunidad de proporcionar información sobre los esfuerzos críticos para restaurar la sostenibilidad y el equilibrio fiscal a Puerto Rico.

El Gobierno estuvo obligado a presentar todos los planes de implementación para el 30 de junio de 2018. Se recibieron aproximadamente 73% de 128 planes de implementación. En general, los planes de implementación presentados no estuvieron totalmente alineados con el plan fiscal certificado y no ofrecieron claridad suficiente para apoyar el cumplimiento. De tal manera, en septiembre de 2018 la Junta de Supervisión ofreció sus observaciones a las agencias sobre los planes de implementación presentados y solicitó al Gobierno que tome las medidas correctivas y complete las presentaciones sobre los planes de implementación faltantes. El Gobierno actualizó algunos planes de implementación basados en las observaciones recibidas pero, a la fecha de esta Declaración de Divulgación, no ha presentado todos los planes de implementación según lo solicitado.

A través de un proceso de colaboración, la Junta de Supervisión y el Gobierno establecieron una estructura de implementación para proporcionar información sobre las actividades de la agencia. Esta estructura, que incluye informes de progreso mensuales y reuniones con grupos de trabajo, proporcionó información sobre las actividades de la agencia, los riesgos y la probabilidad de alcanzar los objetivos de ahorro establecidos por el plan fiscal certificado.

La Junta de Supervisión ha trabajado con diligencia para promover una implementación más exitosa a través de:

1. reuniones mensuales con agencias prioritarias para fomentar el progreso de la implementación;

2.   informes públicos sobre la situación del progreso alcanzado en los planes de implementación del Gobierno e informes de progreso;

3.   uso de evaluaciones de preparación basadas en mejores prácticas para proveer un marco para que las agencias hagan un seguimiento del progreso sobre la implementación y entiendan el alcance de los diferentes hitos; y

4.   vistas públicas sobre la implementación en áreas donde las transformaciones son muy necesarias.

Debido a que la aplicación de las reformas ha sido más lenta de lo previsto hasta la fecha, la Junta de Supervisión ha celebrado reuniones públicas para obtener información actualizada y sensibilizar al público. En marzo de 2019, por ejemplo, la Junta de Supervisión realizó una Vista Pública sobre el progreso logrado hasta la fecha por el Departamento de Seguridad Pública. El 26 de septiembre de 2019, la Junta de Supervisión realizó una Vista Pública sobre el progreso logrado hasta la fecha en las reformas para la facilidad para hacer negocios. El 19 de diciembre de 2019, la Junta de Supervisión celebró una Vista Pública sobre el progreso de la implementación del Departamento de Corrección y Rehabilitación, y de Salud Correccional. En agosto de 2020, la Junta de Supervisión celebró dos vistas públicas sobre el estado de los CAFR con el Departamento de Hacienda. Durante la Vista Pública de la Junta de Supervisión de febrero de 2021, la Junta de Supervisión proporcionó más recomendaciones al Departamento de Hacienda en relación con la finalización puntual de los CAFR, la implementación de un sistema ERP común y el establecimiento de la Oficina del Principal Oficial Financiero.[174]

c)      Recomendaciones de la sección 205

De acuerdo con la sección 205 de PROMESA, la Junta de Supervisión puede, en cualquier momento, presentar recomendaciones formales al Gobernador o la Legislatura sobre las medidas que el Gobierno puede tomar para garantizar el cumplimiento del plan fiscal certificado, o para promover de otro modo la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la forma en que el Gobierno presta sus servicios.

La Junta de Supervisión envió cuatro Recomendaciones de la sección 205 al Gobernador en el Año fiscal 2020:

o   Recomendar a las autoridades que permitan el uso de los fondos de ayuda en caso de desastres para cubrir los estudios de la tierra, los títulos de propiedad y cualquier otro impuesto o tasa asociada a la transferencia de la propiedad.

o   Las siguientes recomendaciones en relación con el desarrollo económico:

▪   Fomentar un diálogo proactivo entre el Gobierno y los responsables de la política federal para encontrar soluciones mutuamente aceptables que permitan y atraigan

---

[174] En febrero de 2021, el Gobernador Pedro Pierluisi designó al Secretario de Hacienda de Puerto Rico, Francisco Parés Alicea, como nuevo CFO (Principal Oficial de Finanzas Públicas) del Estado Libre Asociado. El 9 de marzo de 2021, el Gobernador Pierluisi dictó la Orden Ejecutiva 2021-018 para crear el cargo y describir las funciones del mismo. Además, la orden detallaba la política de su administración de priorizar los estados financieros anuales auditados.

un aumento de la fabricación de productos farmacéuticos y médicos dentro de los Estados Unidos, y en particular de Puerto Rico;

▪ Solicitar que el Secretario de Comercio nombre al menos a un miembro con experiencia especial en turismo en Puerto Rico para la Junta Asesora de Viajes y Turismo de los Estados Unidos;

▪ Establecer un instituto Manufacturing USA en Puerto Rico para dotar a Puerto Rico de las asociaciones y los recursos necesarios para seguir desarrollándose como un centro de fabricación de productos farmacéuticos de renombre mundial y convertirse en un centro mundial de innovación biotecnológica;

▪ Conceder una exención temporal de la Ley Jones para el transporte de GNL dentro de Estados Unidos, permitiendo el uso de buques de pabellón extranjero mientras se construyen los buques estadounidenses calificados por la Ley Jones. Algunas jurisdicciones estadounidenses, entre ellas Puerto Rico, se ven obligadas actualmente a comprar GNL a proveedores extranjeros para satisfacer sus respectivas necesidades energéticas. Así, esta exención permitiría a estas jurisdicciones comprar GNL estadounidense;

▪ Eliminar el requisito de presentación de información electrónica sobre exportaciones para las mercancías enviadas entre el continente y Puerto Rico;

▪ Dirigir a las agencias pertinentes para que apoyen los proyectos de infraestructura financiables a través de la reducción de la burocracia, las inversiones específicas y un mayor acceso al crédito, (por ejemplo, apoyando la monetización de los créditos de peaje), y mantener a Puerto Rico como prioridad para el financiamiento y las mejoras de la infraestructura; y

▪ Alentar al Cuerpo de Ingenieros del Ejército de los Estados Unidos y a ENLACE a finalizar el Acuerdo de Asociación del Proyecto Caño Martín Peña.

o Las siguientes recomendaciones en relación con Medicaid y Medicare:

▪ Legislar una solución a largo plazo del programa Medicaid para mitigar la drástica reducción del financiamiento federal de la salud en Puerto Rico, que se producirá cuando expire la prórroga temporal;

▪ Enmendar la ley federal para que los beneficiarios de Medicare en Puerto Rico se inscriban automáticamente en la Parte B de Medicare con la opción de abandonar la cobertura, de la misma manera que sus homólogos en todos los estados y otros territorios, y

▪ Proporcionar un trato equitativo a los residentes de Puerto Rico en todos los programas de Medicare. Los residentes de Puerto Rico pagan el mismo nivel de impuestos de Medicare que los residentes del continente, pero Puerto Rico recibe pagos sustancialmente menores en los programas de Medicare y pagos

176

sustancialmente menores a los proveedores de atención médica, lo que afecta a la capacidad de Puerto Rico para atraer y mantener a los proveedores de atención médica en Puerto Rico.

o   Recomendar las siguientes participaciones laborales:

▪   Recomendar que el Congreso explore las formas de minimizar los desafíos y maximizar las oportunidades de extender un Crédito Tributario Federal por Ingreso del Trabajo a los residentes de Puerto Rico, ya que apoyará el Crédito Tributario por Ingreso del Trabajo implementado localmente, que busca promover la participación de la fuerza laboral formal, especialmente entre los trabajadores de ingresos bajos a moderados;

▪   Colaborar con el Gobierno de Puerto Rico para instituir un requisito de trabajo/voluntariado que se implementará antes del 1 de julio de 2022, para los participantes sanos de entre 18 y 59 años que reciban el Programa de Asistencia Nutricional ("PAN"), que es el mayor programa de bienestar social de Puerto Rico. Este requisito de trabajo debe establecerse de acuerdo con el Plan Fiscal de ELA. En general, los beneficiarios del Programa de Asistencia Nutricional Suplementaria en edad de trabajar en el continente deben inscribirse para trabajar, no pueden rechazar un trabajo si se les ofrece y el Estado puede exigirles que asistan a clases de educación o formación laboral;

▪   Empezar a utilizar las Guías de Pobreza del Departamento de Salud y Servicios Humanos ("HSS", por sus siglas en inglés) para fijar los límites de ingresos que determinan quién es elegible para la ayuda a la vivienda del Departamento de Vivienda y Desarrollo Urbano de EE.UU. en Puerto Rico, como se hace en la mayoría de los estados del continente. Si se aplicara este cambio, más personas podrían entrar en el mercado laboral formal sin el riesgo de perder la ayuda a la vivienda en el proceso. Según la Oficina del Censo de EE.UU., más de 314,000 familias de Puerto Rico viven en la pobreza, de las cuales aproximadamente el 54% son niños. Si los límites de ingresos se ajustaran adecuadamente, potencialmente miles de familias con bajos ingresos podrían empezar a beneficiarse de las ayudas a la vivienda. En otras palabras, mejoraría el acceso a la vivienda asequible, la movilidad económica, la participación laboral y, en definitiva, el desarrollo económico de Puerto Rico; y,

▪   Pedir al Departamento de Trabajo que se asocie con el ELA para permitir la expansión de los programas de aprendizaje para vincular la educación con las habilidades comerciales y el empleo con el fin de garantizar que la fuerza de trabajo esté preparada para los trabajos del futuro.

o   Recomendar la siguiente reforma de las prestaciones:

▪   Proporcionar fondos adicionales del PAN para permitir que el Gobierno de Puerto Rico continúe proporcionando beneficios del PAN a las poblaciones más

vulnerables de Puerto Rico durante otro año mientras Puerto Rico se recupera de la angustia económica que sigue causando la pandemia de la COVID-19;

▪ Permitir que Puerto Rico participe en el programa Pandemic-EBT, para que pueda proporcionar beneficios en tarjetas EBT para reemplazar el valor de las comidas escolares para los niños que normalmente recibirían comidas gratuitas o de precio reducido, pero cuyas escuelas están cerradas durante al menos cinco días debido a la crisis sanitaria por COVID-19;

▪ Extender la totalidad del Crédito Fiscal por Hijos federal a los residentes de Puerto Rico para permitir que las familias de Puerto Rico con un hijo o dos hijos que reúnan los requisitos necesarios puedan reclamar el crédito fiscal adicional por hijo;

▪ Abordar las disparidades nutricionales de Puerto Rico mediante la transición de Puerto Rico al Programa de Asistencia Nutricional Suplementaria (SNAP, por sus siglas en inglés) para garantizar un tratamiento equitativo en la asistencia federal de nutrición alimentaria; y

▪ Ordenar a la Administración de Recursos y Servicios de Salud que utilice la Encuesta Comunitaria de Puerto Rico cuando asigne fondos a Puerto Rico bajo el Programa de Visitas al Hogar para Madres, Bebés y la Primera Infancia.

o   Formular las siguientes recomendaciones en materia de educación y empleo:

▪ Recomendar la ampliación de los beneficios federales de desempleo relacionados con la COVID-19;

▪ Recomendar que se aliente al Departamento de Seguridad Nacional a establecer un límite mínimo de inversión para los visados EB-5 en relación con los estados para adaptar los programas de visado a las necesidades de Puerto Rico; y

▪ Recomendar que se aliente a la Fundación Nacional de Ciencias a colaborar con todas las partes interesadas posibles para evitar la pérdida de fondos para el Observatorio de Arecibo y aumentar las operaciones centradas en la ciencia y la educación.

o   Formular las siguientes recomendaciones para las pequeñas empresas:

▪ Recomendar la ampliación del Programa de Protección de Cheques de Pago ("PPP") para las pequeñas empresas; y,

▪ Recomendar que se ofrezca una mayor flexibilidad a los programas de la Administración de Pequeñas Empresas para ayudar a los propietarios de pequeñas empresas de Puerto Rico durante la prolongada crisis económica. Esto incluye muchas de las recomendaciones incluidas en el Informe del Grupo de Trabajo del Congreso:

- Aprobar legislación para aumentar la tasa de garantía y exigir un cálculo separado de la subvención para los préstamos 7(a) realizados en Puerto Rico;

- Considerar la posibilidad de reducir la contribución de las pequeñas empresas y aumentar la de las Compañías de Desarrollo Certificadas ("CDC");

- Considerar el aumento de ese límite consolidado para el programa de Microcréditos en el caso de los intermediarios ubicados en Puerto Rico;

- Autorizar a un intermediario del programa de Microcréditos a utilizar más del 25 por ciento de sus subvenciones de asistencia técnica proporcionadas por la Administración de Pequeñas Empresas (la "SBA") en la asistencia previa al préstamo si el intermediario proporciona al menos el 25% de sus préstamos a pequeñas empresas de Puerto Rico;

- Establecer una preferencia de contratación para las pequeñas empresas de Puerto Rico con respecto a los contratos federales realizados en Puerto Rico; y,

- Exigir a la SBA que otorgue una subvención anual de asociación de Tecnología Federal y Estatal ("FAST") a un beneficiario de Puerto Rico, y que renuncie al requisito de contraprestación local.

o Recomendar que el sitio web del Fondo de Instituciones Financieras de Desarrollo Comunitario actualice sus mapas para representar visualmente que Puerto Rico es elegible para sus programas, alentarle a que aumente el número de Instituciones Financieras de Desarrollo Comunitario en Puerto Rico, pedirle que asista a los bancos asegurados por la Corporación Federal de Seguro de Depósitos ("FDIC") en Puerto Rico en relación con el programa Bank Enterprise Award, y alentarle a que designe a una persona con experiencia y conocimientos sobre Puerto Rico para la Junta Asesora de Desarrollo Comunitario.

o Recomendar que la Oficina del Censo, la Oficina de Estadísticas Laborales, la Oficina de Estadísticas de Justicia, la Oficina de Análisis Económico, el Centro Nacional de Estadísticas de Educación, el Centro Nacional de Estadísticas de Salud y la Administración de Servicios de Abuso de Sustancias y Salud Mental incluyan a Puerto Rico en sus respectivos programas, y recopilen y publiquen datos para Puerto Rico en el mismo grado que los estados en la mayor medida posible.

d)     **Proceso de proyectos críticos del Título V**

El 20-21 de abril de 2017, la Junta de Supervisión celebró una cumbre sobre Proyectos Críticos de P3 y Título V. A lo largo del año fiscal 2017, la Junta de Supervisión y la Coordinadora de Revitalización

179

interina desarrollaron los criterios y los procesos de selección, implementación y monitoreo de proyectos de infraestructura críticos, en especial para la industria energética.

Después de los huracanes Irma y María, la Coordinadora de Revitalización reinició el proceso de proyectos críticos, contratando el personal necesario y empresas locales para apoyo adicional y reformando el sitio web para presentación de proyectos.

El 27 de junio de 2018, la Junta de Supervisión designó al proyecto "Viewpoint at Roosevelt", un emprendimiento de construcción de viviendas públicas financiado con fondos federales, como su primer proyecto crítico. Se espera que este proyecto proporcione las viviendas que se necesitan con urgencia (más de 130 unidades de vivienda) y también aumente el número de pasajeros en el sistema ferroviario local dado que está ubicado en un "corredor de transporte público".

El 31 de julio de 2018, la Junta de Supervisión adoptó una política del Título V que ayudó a especificar más detalladamente los requisitos de procedimiento que debe cumplir la Coordinadora de Revitalización al considerar proyectos críticos potenciales. La política aclara los requisitos para proyectos que involucran hacer negocios con cualquier agencia gubernamental o corporación pública, en especial, proyectos relacionados con la energía que requieren un Acuerdo de Compra y Operación de Energía ("PPOA", por sus siglas en inglés). Todos los proyectos que requieran la adjudicación de un contrato o de una Solicitud de Propuestas (RFP, por sus siglas en inglés) de cualquier agencia gubernamental o corporación pública deben obtener dicho contrato o RFP antes de la presentación del proyecto a través del Título V. En el caso de proyectos relacionados con la energía, los proyectos que requieren un PPOA se debe asumir legítimamente en virtud del Título III de PROMESA para satisfacer el requisito de adjudicación de un contrato.

La política del Título V del 31 de julio de 2018 dio lugar a que la Coordinadora de Revitalización concentrara los esfuerzos en proyectos que habían obtenido adjudicaciones de contrato o de RFP válidas, y otros proyectos, como entre empresas privadas o con un gobierno municipal.

A comienzos del Año fiscal 2019, la Coordinadora de Revitalización evaluó 55 proyectos por un total que superaba los $9,000 millones de dólares aproximadamente. Después de la aprobación de la política del Título V a partir del 31 de julio de 2019, los proyectos activos tuvieron que ser retirados de la participación o colocados en espera (a criterio del patrocinador del proyecto) dado que aproximadamente el 80% estaban relacionados con la energía, lo que requería un PPOA válido asumido bajo el Título III y el 19% restante, aproximadamente, requería una RFP del gobierno o similar. El 1% restante de los 55 proyectos evaluados representaba un proyecto que calificó (Proyecto Viewpoint at Roosevelt) y un proyecto rechazado que no cumplía los requisitos iniciales. Sin embargo, muchos patrocinadores de proyectos relacionados con la energía continuaron negociando sus contratos con la AEEPR a través de su proceso respectivo y demostraron interés en reactivar la presentación del proyecto después de haber cumplido satisfactoriamente la política del Título V de la Junta de Supervisión.

El 26 de agosto de 2019, la Junta de Supervisión anunció que había designado la expansión del vertedero municipal Fajardo valuada en $5.3 millones como su segundo proyecto crítico. El proyecto, que desempeñará un papel significativo en la revitalización de la infraestructura de Puerto Rico, aborda la necesidad del ELA de diversificar la generación de energía y resolver la crisis del manejo de desechos sólidos después de los huracanes Irma y María.

Hay otros dos proyectos en fase de desarrollo. Uno se está estudiando actualmente y se ha recibido una petición para el otro.

e)     **Revisión de los actos legislativos y determinadas normas, reglamentos, órdenes administrativas y ejecutivas**

La sección 204(a) de PROMESA exige que el Gobierno presente a la Junta de Supervisión todas las nuevas leyes, a más tardar 7 días laborables después de que la ley esté debidamente aprobada. El Gobernador también debe presentar ciertas normas, reglamentos y órdenes ejecutivas a la Junta de Supervisión para su revisión y aprobación en virtud de las secciones 204(b) (2) y (b)(4) de PROMESA y las políticas establecidas por la Junta de Supervisión. Su único objetivo es garantizar que todas las leyes aprobadas y también cualquier norma, reglamento, orden administrativa y orden ejecutiva propuesta no tengan consecuencias negativas en el plan fiscal o presupuesto certificados. El Gobierno ha incumplido sistemáticamente sus obligaciones en virtud de la sección 204(a) de presentar leyes a más tardar siete días hábiles después de su aprobación. Más de 100 leyes firmadas y resoluciones conjuntas no fueron presentadas ante la Junta de Supervisión según lo exigido por PROMESA. Más recientemente, la Junta de Supervisión envió una carta al Gobernador Vázquez instando al gobierno a retrasar la implementación de la Orden Ejecutiva 2020-10 hasta después de que la Junta de Supervisión tenga la oportunidad de revisar la orden ejecutiva y la documentación de apoyo para garantizar el cumplimiento de la sección 204 b) (2) de PROMESA. La Orden Ejecutiva 2020-10 eximiría al Poder Ejecutivo del ELA de cumplir los requisitos de contratación en un esfuerzo por acelerar los esfuerzos de recuperación tras los continuos terremotos.

El 3 de julio de 2019, la Junta de Supervisión ha iniciado una acción conforme a los artículos 108(a)(2), 204(a)(5), 204(c), y 207 de PROMESA para impedir la implementación de la Ley 29 y numerosas resoluciones conjuntas, porque tales leyes son significativamente incompatibles con el plan fiscal certificado aplicable, reprogramar fondos sin la aprobación de la Junta de Supervisión, modificar la deuda sin la aprobación de la Junta de Supervisión, y/o no se presentaron debidamente a la Junta de Supervisión conforme a la sección 204 (a) de PROMESA. Esta es la primera acción presentada conforme a la sección 204 de PROMESA. *Vea* la sección IV.C.3.h)(iv) de esta Declaración de Divulgación para obtener un resumen de dichas acciones .

Tras el inicio de dicha acción, el 25 de octubre de 2019, el Gobernador Vázquez firmó la Orden Ejecutiva 2019-057, que crea un procedimiento con el propósito expreso de cumplir la sección 204(a) de PROMESA. El procedimiento requiere, entre otras cosas, que OGP y el Departamento de Hacienda de Puerto Rico completen y presenten a la AAFAF dentro de los siete días laborables siguientes a la firma de la nueva legislación un análisis certificado del impacto financiero y presupuestario de esa ley.

El 12 de junio de 2020, el Gobernador y la AAFAF presentaron seis demandas contenciosas en las que se solicitaban sentencias declaratorias de que determinadas Leyes y las certificaciones relacionadas satisfacen los requisitos de PROMESA en virtud de las secciones 204(a) y 108(a). *Véase* la sección IV.C.3.h)(vi) de esta Declaración de Divulgación para obtener un resumen de dicha acción.

f)     **Revisión de contratos**

El 6 de noviembre de 2017 (con modificación del 18 de junio de 2018), la Junta de Supervisión estableció una política(la "Política de Revisión de Contratos)  de acuerdo con la sección 204(b)(2) de PROMESA, para exigir la aprobación previa de contratos por la Junta de Supervisión con un valor total de $10 millones  o más celebrados por el ELA o cualquier otra instrumentalidad cubierta. Los objetivos de la política son promover la competencia en el mercado y garantizar la congruencia de un contrato gubernamental con el plan fiscal y el presupuesto certificados aplicables. Por consiguiente, la Junta de Supervisión concentra su revisión en si el contrato es congruente con el plan fiscal y, en el caso de gastos en ayuda para desastres, formular observaciones con respecto al cumplimiento de los requisitos de financiamiento federal y/o reembolso.

181

Para que la política de contratación sea más transparente, la Junta de Supervisión publica un informe del estado de cada contrato en proceso de revisión, que incluye el nombre de la parte contratante, la fecha de presentación, la fecha de cualquier respuesta de la Junta de Supervisión de la parte contratante y una copia de todas las respuestas formales de la Junta de Supervisión. La política requiere que la entidad gubernamental contratante le presente a la Junta de Supervisión una certificación por la cual su jefe o asesor jurídico certifica que ninguna persona ha intervenido indebidamente, ha ofrecido algo de valor o ha ejercido influencia alguna en relación con la celebración del contrato. La política requiere que los contratistas presenten una certificación similar a la Junta de Supervisión y divulguen cualquier participación de cualquier parte de su compensación con cualquier tercero. Desde que se estableció la Política de Revisión de Contratos, la Junta de Supervisión ha revisado 197 contratos por un valor total de más de $16,500 millones.

Además, la Junta de Supervisión incluyó en el plan fiscal un requisito para que el texto de todos los contratos gubernamentales se publique en el sitio web de la Oficina del Contralor para el 30 de septiembre de 2018, y suscribió un memorando de entendimiento con la Oficina del Contralor para promover la transparencia en la contratación estatal.

El 8 de junio de 2020, la Junta de Supervisión presentó una demanda contra el Gobernador y la AAFAF en la que se solicitaban interdictos y una orden judicial en relación con el hecho de que el Gobernador y la AAFAF no presentaran a la Junta de Supervisión determinados documentos e información relativos a la adquisición y negociación de contratos por parte del Gobierno del Estado para la compra de equipos de pruebas COVID-19 y otros suministros médicos. *Vea* la sección IV.C.3.h)(v) de esta Declaración de Divulgación para obtener un resumen de dicha acción.

g)      **Aprobaciones de operaciones de deuda**

En diciembre de 2017, la Junta de Supervisión estableció una política de acuerdo con la sección 207 de PROMESA, para exigir la aprobación previa por la Junta de Supervisión de cualquier transacción de deuda que sea suscrita por el ELA o cualquier otra instrumentalidad cubierta. Los objetivos de esta política son promover la prudencia fiscal y garantizar que las operaciones de deuda sean congruentes con el plan fiscal certificado aplicable.

Durante el Año fiscal 2018, la Junta de Supervisión aprobó diversas operaciones de deuda. La Junta de Supervisión aprobó, entre otras operaciones, un préstamo del ELA a la AEEPR. La Junta de Supervisión también aprobó la liquidación de garantías que el BGF o sus filiales emitieron para emprendimientos privados y el refinanciamiento de ciertos préstamos que el Departamento de Vivienda y Desarrollo Urbano emitió para los municipios de Camuy y San Lorenzo.

h)      **Página web de Ética de la Junta de Supervisión**

El 21 de junio de 2019, la Junta de Supervisión anunció el lanzamiento de su nueva página web de Ética,[175] una herramienta de Internet para promover la transparencia y la ética en las operaciones diarias de la Junta de Supervisión. La página contiene un gran número de documentos de gobernanza de la Junta de Supervisión, los informes trimestrales de transacciones periódicas y los informes anuales de divulgación financiera de los miembros, un blog interactivo de la Asesora de Ética y otros recursos para que los visitantes conozcan las políticas y acciones sobre ética y buena gobernanza de la Junta de Supervisión. El objetivo de esta página es continuar promoviendo la importancia de la transparencia y la ética en el trabajo que la Junta de Supervisión desarrolla para las partes interesadas de los Deudores, y para proveer una

_____

[175] http://www.oversightboard.pr.gov/ethics/

herramienta interactiva para compartir documentos, novedades y recursos importantes y para mediar para la promoción de la ética y la integridad en las políticas, gestiones y vidas diarias.

### Controversias sobre los poderes de la Junta

Ha habido litigios sobre el alcance de los poderes de la Junta de Supervisión, incluyendo cuestiones recientes con respecto al proceso de certificación de la legislación recién aprobada en virtud de PROMESA.[176] Las controversias han tenido que ver, entre otras cosas, con si la Junta de Supervisión puede imponer lo que el Gobierno considera opciones políticas y si el Gobernador y la Legislatura pueden reprogramar créditos presupuestarios de años anteriores para gastar dinero que la Junta de Supervisión no ha aprobado. Estas y otras controversias se describen a continuación.

(i)     *Rosselló Nevares contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. Cont. núm. 18-00080

El 5 de julio de 2018, el entonces gobernador Rosselló y la AAFAF presentaron una demanda [Proc. Cont. Núm. 18-00080, ECF Núm. 1] contra la Junta de Supervisión, cada miembro individual de la Junta de Supervisión y el director ejecutivo de la Junta de Supervisión, solicitando que se declare que (i) la Junta de Supervisión carece de autoridad para imponer iniciativas de políticas al gobierno del ELA a través de un plan fiscal y/o presupuesto, incluso el Plan Fiscal de junio de 2018 (como se define a continuación) y el presupuesto del ELA para el Año fiscal 2019, tal como ha sido certificado por la Junta de Supervisión el 29 de junio de 2018; (ii) los mandatos sustantivos de política contenidos en el Plan Fiscal de junio de 2018, y rechazados por el Gobernador conforme a la sección 205 de PROMESA son nulos; y (iii) los mandatos sustantivos de política contenidos en el presupuesto del Año fiscal 2019 de la Junta de Supervisión exceden los poderes de la Junta de Supervisión y son nulos. Los Demandantes también solicitaron un interdicto que prohíbe a los Demandados implementar y hacer cumplir ciertas disposiciones incluidas en el Plan Fiscal de junio de 2018 que los Demandantes califican como recomendaciones.

El 12 de julio de 2018, la Junta de Supervisión presentó una moción para desestimar la demanda [Proc. Cont. Núm. 18-00080, ECF Núm. 17]. Se presentaron todos los escritos procesales para la moción de desestimación y, el 7 de agosto de 2018, el Tribunal del Título III dictó una orden que concedía y denegaba parcialmente la moción de desestimación [Proc. Cont. Núm. 18-00080, ECF Núm. 33]. El Tribunal del Título III concedió la moción para desestimar las reclamaciones del Gobierno con respecto a (i) la consolidación de las agencias y la reducción de compensaciones/congelamiento de contrataciones dado que no hay un caso o controversia propicio y (ii) reprogramación presupuestaria porque dicha reprogramación por parte del Gobierno sería incongruente con la declaración de PROMESA de que el presupuesto certificado por la Junta se encuentra plenamente vigente y, por lo tanto, tiene prioridad conforme a la sección 4 de PROMESA. El Tribunal del Título III no desestimó las reclamaciones con respecto a las reducciones presupuestarias y medidas correctivas. En dicha sentencia, el Tribunal del Título III adoptó determinadas decisiones de fondo. Entre otras cosas, el Tribunal del Título III dictaminó que "[l]as facultades otorgadas a la Junta de Supervisión por la Sección 201(b)(1)(K) de PROMESA permiten a la Junta de Supervisión tomar decisiones normativas vinculantes para el ELA, a pesar del rechazo del Gobernador a las recomendaciones de la Sección 205". *En el caso Junta de Supervisión y Administración Financiera para Puerto Rico*, 330 F. Sup. 3d 685, 700 (D.P.R. 2018), *conf y ratificado*, 945 F.3d 3 (1er Cir. 2019). El Tribunal del Título III también rechazó el argumento del Gobierno de que los fondos no utilizados de los presupuestos de años anteriores podrían gastarse fuera de los límites del presupuesto del año en curso, pese a la prohibición de la reprogramación no aprobada de la sección 204(c). El Tribunal del

---

[176] Como se señaló anteriormente, la Junta de Supervisión ha enviado numerosas cartas al ELA buscando corregir las violaciones de PROMESA.

Título III dictaminó que: "No se entiende la razón, y sería contrario a los mandatos de confiabilidad y transparencia de PROMESA, suponer que un presupuesto para un Año fiscal podría ser diseñado para hacer algo menos que comprender todos los ingresos proyectados y los recursos financieros, y todos los gastos, para el Año fiscal. Dado que un presupuesto certificado está plenamente vigente desde el primer día del período abarcado, los medios y las fuentes de gasto público no están necesariamente disponibles si no se prevén en el presupuesto". *Id.* en 704. El 27 de agosto de 2018, el Tribunal del Título III emitió una opinión y una orden corregidas [Proc. Cont. Núm. 18-00080, ECF Núm. 40].

El 10 de septiembre de 2018, los Demandantes presentaron una moción urgente donde se solicita la certificación de la opinión y la orden de apelación inmediata del Tribunal del Título III del 7 de agosto de 2018 en virtud de las secciones 306(e)(3)–(4) de PROMESA [Proc. Cont. Núm. 18-00080, ECF Núm. 43]. El 9 de octubre de 2018, el Tribunal del Título III emitió una orden de memorando donde se certifican determinados aspectos de la opinión y la orden de apelación interlocutoria del 27 de agosto de 2018 [Proc. Cont. Núm. 18-00080, ECF Núm. 54]. La apelación se registró como Caso Núm. 18-8021. La Junta de Supervisión respondió a respondió a las reclamaciones restantes de la demanda el 2 de noviembre de 2018 [Proc. Cont. Núm. 18-00080, ECF Núm. 60].

El 20 de noviembre de 2018, el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito dictó una sentencia, que concluye que la revisión de las cuestiones certificadas está justificada. La apelación se registró el 28 de noviembre de 2018 como Caso Núm. 18-2154. Tras la presentación de información, se expuso el alegato oral el 24 de julio de 2019. El 18 de diciembre de 2019, el Primer Circuito confirmó la decisión del Tribunal de Distrito, confirmando que no hay nada en la sección 205 de PROMESA "que sugiera que, buscando primero el acuerdo del Gobernador sobre un asunto, la Junta de alguna manera pierde cualquier facultad que de otra manera tendría para actuar unilateralmente en el asunto", y la Junta de Supervisión tiene la facultad de adoptar "una recomendación rechazada si está facultada para adoptar la medida recomendada por sí sola". *Vázquez-Garced c. la Junta de Supervisión y Administración Financiera para Puerto Rico (En el caso Junta de Supervisión y Administración Financiera para Puerto Rico)*, 945 F.3d 3, 6- 7 (1er Cir. 2019). El Primer Circuito confirmó además la decisión del Tribunal del Título III sobre la reprogramación, señalando que "PROMESA prohíbe al Gobernador gastar fondos que no estén presupuestados independientemente de si la recomendación ha sido adoptada" e "independientemente de lo que digan las leyes territoriales". *Id.* en 8.

El Gobernador Vázquez Garced presentó una petición de certiorari el 15 de mayo de 2020, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 19-1305. El 20 de julio de 2020, la Junta de Supervisión presentó su oposición contra la petición del Gobernador. El 31 de julio de 2020, el Gobernador Vázquez Garced presentó una respuesta en apoyo de su petición. El 5 de octubre de 2020, la Corte Suprema emitió una orden denegando la petición.

(ii) *Rivera - Schatz y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. núm. 18-00081

El 9 de julio de 2018, los Demandantes, el Sr. Thomas Rivera-Schatz, en su carácter oficial de Presidente del Senado de Puerto Rico y en nombre del Senado de Puerto Rico, y el Sr. Carlos J. Méndez-Núñez en su carácter oficial de Presidente de la Cámara de Representantes de Puerto Rico y en nombre de la Cámara de Representantes (colectivamente, la "Legislatura"), presentaron una demanda en la que solicitaba remedio declaratorio e interdictal contra la Junta de Supervisión y cada uno de sus miembros y su director ejecutivo únicamente su carácter oficial [Proc. Cont. Núm. 18-00081 ECF Núm. 1].

La Legislatura solicitó remedio declaratorio e interdictal, argumentando que la Junta de Supervisión "excedió sus poderes" al "tratar de forzar" a la Legislatura a aprobar un proyecto de ley que deroga

retroactivamente la Ley 80 (el acto de despido improcedente de Puerto Rico) como condición para la aprobación del presupuesto del ELA aprobada por la Legislatura. La Demanda también solicitó un interdicto que prohíba a los Demandados implementar el presupuesto 2019 de la Junta de Supervisión y que ordene a la Junta de Supervisión que certifique el presupuesto 2019 aprobado por la Legislatura el 30 de junio de 2018.

El 17 de julio de 2019, los Demandados presentaron una moción de desestimación de la demanda [Proc. Cont. Núm. 18-00081, ECF Núm. 27]. Luego de la finalización de la presentación de escritos y después de una vista el 25 de julio de 2018, el Tribunal del Título III emitió una orden que desestima la denuncia en su totalidad [Proc. Cont. Núm. 18-00081, ECF Núm. 46]. El Tribunal del Título III sostuvo que carecía de jurisdicción para revisar las decisiones de certificación de la Junta de Supervisión, como se pedía en la demanda, ya que esa revisión estaba "directamente excluida por la sección 106(e)". *Rivera-Schatz c. la Junta de Supervisión y Administración Financiera para Puerto Rico (En el caso Junta de Supervisión y Administración Financiera para P.R.)*, 327 F. Sup. 3d 364, 371 (D.P.R. 2018), *conf*, 916 F.3d 98 (1er Cir. 2019). También confirmó que la Junta de Supervisión podía hacer uso de sus "facultades de manera de incentivar el asentimiento a los objetivos de política respaldados por la Junta". *Id.* en 373.

El 13 de agosto de 2018, los Demandantes presentaron una notificación de apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que se registró como Caso Núm. 18-1777. El 22 de febrero de 2019, después de la presentación de escritos, el Primer Circuito confirmó la decisión del Tribunal del Título III, dictaminando, entre otras cosas, que "[e]n virtud de la disposición de prelación de PROMESA, la concesión de autoridad a la Junta en las secciones 201 y 202 para aprobar los Planes y Presupuestos Fiscales 'prevalecerá sobre cualquier disposición especial o específica de la ley territorial', incluso las disposiciones de la Constitución de Puerto Rico que son "incompatibles con [PROMESA]", y que "[c]uando la Junta certificó el Plan Fiscal y Presupuesto 2019 … [debidamente] ejerció la autoridad que se le había otorgado en virtud de PROMESA". *Méndez-Núñez c. la Junta de Supervisión y Administración Financiera para Puerto Rico (En el caso Junta de Supervisión y Administración Fin. para Puerto Rico)*, 916 F.3d 98, 116 (1er Cir. 2019).

(iii)     *Municipio Autónomo de San Juan c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Caso núm. 19-cv-01474

El 19 de mayo de 2019, el Municipio Autónomo de San Juan ("San Juan") presentó una demanda contra la Junta de Supervisión en el Tribunal de Distrito para el Distrito de Puerto Rico donde se sostiene que (i) la designación de San Juan como una entidad cubierta para fines de supervisión en virtud de PROMESA por parte de la Junta de Supervisión no tiene base racional alguna, (ii) que PROMESA es inconstitucional dado que no proporciona límites suficientes a la facultad discrecional de la Junta de Supervisión y, por lo tanto, viola la doctrina de no delegación; y (iii) que la designación no es válida porque los miembros de la Junta de Supervisión fueron designados infringiendo la Cláusula de Designaciones [Caso Núm. 19-cv-1474, ECF Núm. 1]. El 1 de julio de 2019, la Junta de Supervisión presentó una moción para transferir el caso al Tribunal del Título III [Caso Núm. 19-cv-1474, ECF Núm. 36], que el Tribunal de Distrito concedió después de la presentación de escritos [Caso Núm. 19-cv-1474, ECF Núm. 40]. El 9 de agosto de 2019, la Junta de Supervisión presentó una moción de desestimación, en la que se presentaron todos los escritos procesales [Caso Núm. 19-cv-1474, ECF Núm. 46, 51, 52]. El 5 de diciembre de 2019, el Tribunal del Título III emitió una orden concediendo la moción para desestimar los cargos I y II de la demanda y paralizando el cargo III a la espera de la decisión de la Corte Suprema en el litigio de la Cláusula de Designaciones que se describe a continuación en la Sección V.F.1.a) [Caso Núm. 19-cv-1474, ECF Núm. 61].

El 18 de septiembre de 2020, San Juan presentó una moción para que se dicte sentencia desestimando el cargo restante con perjuicio [Caso Núm. 19-cv-1474, ECF Núm. 63]. El 21 de septiembre de 2020, el Tribunal del Título III emitió una sentencia desestimando el cargo restante con perjuicio y cerrando el caso [Caso Núm. 19-cv-1474, ECF Núm. 64].

El 25 de septiembre de 2020, San Juan presentó una notificación de apelación de la orden del Tribunal del Título III que concedía la moción de desestimación de los Demandados [Caso Núm. 19-cv-1474, ECF Núm. 65]. El 9 de octubre de 2020, la apelación fue registrada por el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito como Caso Núm. 20-1983. El 23 de noviembre de 2020, San Juan presentó su escrito inicial. El 22 de enero de 2021, la Junta de Supervisión presentó su escrito de contestación. El 27 de abril de 2021, San Juan presentó una moción para desestimar voluntariamente la apelación. El 29 de abril de 2021, el Primer Circuito dio a conocer su sentencia desestimando la apelación y su mandato.

(iv)     *Junta de Supervisión y Administración Financiera para Puerto Rico c. el Sr. Vázquez Garced y otros*, Proc. Cont. núm. 19-00393

El 3 de julio de 2019, la Junta de Supervisión presentó una demanda contra el entonces Gobernador Rosselló y AAFAF, para impugnar la Ley 29-2019 (que elimina la obligación de los municipios de reembolsar al ELA los pagos de pensiones a los jubilados municipales y de hacer pagos al plan de salud del ELA) así como 23 resoluciones conjuntas. Concretamente, la demanda alega que: i) la Ley 29-2019, incluida su aprobación y aplicación, viola las secciones 204(a), 204(c) y 207 de PROMESA; (ii) la Junta de Supervisión tiene derecho a un interdicto permanente que prohíba a los Demandados aplicar la Ley 29-2019; (iii) la Junta de Supervisión tiene derecho a un interdicto que obligue al Gobernador a presentar las certificaciones de la sección 204(a) de PROMESA para la Ley 29-2019, las nuevas leyes y las resoluciones conjuntas no certificadas aún; (iv) la Ley 29-2019 y las resoluciones conjuntas violan la sección 108(a) de PROMESA y no son ejecutables y no surten efecto porque menoscaban y/o frustran los propósitos de PROMESA, según lo determinado por la Junta de Supervisión; y (v) la supuesta política del Gobernador de no proporcionar las certificaciones requeridas en la sección 204 de PROMESA viola la sección 108(a) porque menoscaba y/o frustra los propósitos de PROMESA, según lo determinado por la Junta de Supervisión.

Los Demandados presentaron una moción de desestimación el 15 de julio de 2019 [Proc. Cont. Núm. 19-00393, ECF Núm. 17]. El 15 de agosto de 2019, después de la presentación de escritos para la moción de desestimación, el Tribunal del Título III escuchó los argumentos orales. El 22 de agosto de 2019, el Tribunal del Título III emitió una opinión y una orden denegando una moción de desestimación del Gobernador [Proc. Cont. Núm. 19-00393, ECF Núm. 66]. Los Demandados respondieron a la demanda el 10 de septiembre de 2019 [Proc. Cont. Núm. 19-00393, ECF Núm. 73]. El 13 de diciembre de 2019, la Junta de Supervisión presentó una moción de sentencia sumaria [Proc. Cont. Núm. 19-00393, ECF Núm. 77]. Luego de que se presentaran todos los escritos para la moción, se celebraron los argumentos orales ante el Tribunal del Título III el 5 de marzo de 2020.

El 15 de abril de 2020, el Tribunal del Título III concedió la moción de la Junta de Supervisión de sentencia sumaria en cinco de los ocho cargos [Proc. Cont. Núm. 19-00393, ECF Núm. 107]. El Tribunal del Título III concedió la solicitud de la Junta de Supervisión de interdictos permanentes sobre la Ley 29 y las Resoluciones Conjuntas bajo PROMESA §§ 204(c), 204(a) y 108(a)(2), sosteniendo que la Ley 29 y las Resoluciones Conjuntas efectúan reprogramaciones fuera del Plan Fiscal y el Presupuesto certificado sin la aprobación de la Junta de Supervisión, en violación de PROMESA § 204(c), y no son ejecutables y no surten efecto. El Tribunal del Título III también sostuvo que los Demandados no cumplieron con los procedimientos requeridos por PROMESA § 204(a) con respecto a la nueva legislación y la estimación

formal de los Demandados, que pretendía detallar el costo de la Ley 29, no cumplía los requisitos. El Tribunal del Título III sostuvo que la Ley 29 y las Resoluciones Conjuntas también son inválidas bajo PROMESA § 108(a)(2), determinando que la determinación de la Junta de Supervisión de que las leyes frustran y/o perjudican los propósitos de PROMESA tiene derecho a deferencia bajo un estándar de revisión arbitrario y caprichoso. El Tribunal del Título III denegó la sentencia sumaria sobre la reclamación de la Junta de Supervisión de un interdicto permanente en cuanto a las otras leyes para las que los Demandados no habían presentado certificaciones de la sección 204(a), basándose en la presentación de hechos por parte de los Demandados que demostraban que las certificaciones para la gran mayoría de estas leyes se habían presentado, después de la presentación de la demanda. El Tribunal del Título III también se negó a conceder una sentencia sumaria sobre la reclamación de la Junta de Supervisión de que el Gobernador tenía una política de incumplimiento de PROMESA § 204(a), a la luz de los hechos controvertidos planteados por los Demandados con respecto a las razones del incumplimiento anterior y los esfuerzos del entonces Gobernador Vázquez Garced para mejorar el cumplimiento. Por último, el Tribunal del Título III se negó a abordar la moción de la Junta de Supervisión para la sentencia sumaria para su reclamación de PROMESA § 207, determinando que la Causa II es irrelevante porque la reparación solicitada en esa reclamación ya se concedió en las otras decisiones del Tribunal del Título III.

El 2 de junio de 2020, San Juan presentó una moción en la que solicitaba una prórroga de la fecha de entrada en vigencia de la orden del Tribunal del Título III para permitir las negociaciones [Proc. Cont. Núm. 19-00393, ECF Núm. 111].

(v)     *La Liga de Ciudades de Puerto rico c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 21-00026

El 14 de marzo de 2021, la Liga de Ciudades de Puerto Rico ("La Liga"), una entidad sin fines de lucro que afirma tener como integrantes a alcaldes de municipios de Puerto Rico, presentó una demanda contra la Junta de Supervisión, la AAFAF, el Centro de Recaudación de Ingresos Municipales ("CRIM"), la Administración de Seguros de Salud de Puerto Rico ("ASES") y Luis M. Collazo Rodríguez, en su calidad de administrador del SRE (en conjunto, los "Demandados"). La querella alega que el CRIM, la ASES y el Sistema de Retiros está recaudando y reteniendo fondos de los municipios de Puerto Rico basándose en una interpretación incorrecta de una orden dictada por el tribunal en una querella anterior relativa a la Ley 29-2019 ("Ley 29") [Proc. Cont. Núm. 21-00393, ECF Núm. 16039] (el "Litigio de la Ley 29").

El Litigio de la Ley 29 se inició el 3 de julio de 2019, cuando la Junta de Supervisión presentó una demanda contra el entonces gobernador Rosselló y la AAFAF, objetando la Ley 29, que eliminaba la obligación de los municipios de realizar aportaciones de atención sanitaria a la ASES y aportaciones de retiro a PayGo [Proc. Cont. Núm. 19-00393, ECF Núm. 1]. Específicamente, la Junta de Supervisión sostuvo que la Ley 29 vulneraba los apartados 108(a), 204(a), 204(c) y 207 de Promesa, y solicitó un interdicto permanente. La Junta de Supervisión solicitó una sentencia sumaria, y el Tribunal del Título III aceptó la moción de sentencia sumaria de la Junta de Supervisión en 5 de las 8 imputaciones en su Orden del 15 de abril de 2020 (la "Orden del 15 de abril") [Proc. Cont. Núm. 19-00393, ECF Núm. 107]. El Tribunal del Título III admitió la petición de la Junta de Supervisión de un interdicto permanente de la Ley 29 de conformidad con los apartados 204(c), 204(a) y 108(a)(2) de PROMESA, declarando la Ley 29 "inejecutable y sin efecto". La Orden del 15 de abril entró en vigor el 6 de mayo de 2020. Puede consultarse información más detallada acerca del Litigio de la Ley 28 en la Sección IV.C.3.h)0.

Tras la entrada en vigencia de la Orden del 15 de abril, el CRIM retuvo fondos que, de otro modo, tendría que haber desembolsado a los municipios con el objeto de pagar a ASES y a SRE las aportaciones sanitarias y jubilatorias que, de no ser por la Ley 29, tendrían que haberse realizado durante el período anterior a la fecha de entrada en vigor de la Orden del 15 de abril. La Liga sostiene que dichas deudas son "inexistente", dado que la Orden del 15 de abril no es aplicable retroactivamente. En consecuencia, la Liga solicita (i) una sentencia declaratoria "decretando que las deudas reclamadas por CRIM, ASES y [SRE]... son "inexistentes". y que las retenciones practicadas por el CRIM para pretendidamente compensar dichas deudas inexistentes son "ilegales", (ii) un interdicto "prohibiendo a los Demandados recaudar a los municipios cualquiera de las cuantías que la Ley 29 los eximía" de pagar antes de la fecha de entrada en vigencia de la Orden del 15 de abril, (iii) una orden exigiendo al CRIM el desembolso inmediato de cualesquiera fondos retenidos para pagar las deudas relacionadas con la Ley 29, y (iv) una orden exigiendo a SRE y ASES la devolución al CRIM de "todas y cada una de las sumas" percibidas para pagar las presuntas deudas.

(vi)    *Hernández Montáñez c. Pierluisi,* Proc. Cont. Núm. 21-00042 (registrado en D.P.R. el 21 de abril de 2021).

El 21 de abril de 2021, el presidente de la Cámara de Representantes de Puerto Rico, actuando en nombre de la Cámara de Representantes, presentó una demanda contra el Gobernador, la AAFAF, la Junta de Supervisión, el Presidente de la Comisión Electoral del Estado de puerto Rico y el Secretario del Departamento de Hacienda de Puerto Rico (en conjunto, los "Demandados"), solicitando un interdicto declaratorio y remedio interdictal prohibiendo a los Demandados distribuir ciertos fondos relacionados con las elecciones [Proc. Cont. Núm. 21-00042, ECF Núm. 1].

Este caso se deriva de una disputa relativa a la Ley 167 de 2020, que convocó a una elección especial (la "Elección especial") el 16 de mayo de 2021, con el objeto de seleccionar a una delegación de seis miembros que sería enviada a Washington, D.C. para presionar por la admisión de Puerto Rico como estado. Dado que el presupuesto certificado de Puerto Rico para el Año fiscal 2020-2021 no asignaba fondos para dichas elecciones, el Gobernador solicitó autorización a la Junta de Supervisión para reprogramar fondos. La Junta de Supervisión informó al Gobernador que, en atención a las singulares circunstancias del caso, la solicitud de reprogramación debía enviarse tanto a la Junta de Supervisión como a la Legislatura. En consecuencia, el Gobernador solicitó una enmienda presupuestaria para asignar fondos a la Elección especial y presentó una propuesta de enmienda presupuestaria a la Junta de Supervisión de conformidad con la Sección 202 de la Ley PROMESA. La Junta de Supervisión determinó que la propuesta de enmienda presupuestaria del Gobernador constituía un presupuesto compatible, tal como lo exige la Sección 202(c)(1) de PROMESA, y lo envió a la Legislatura. Seguidamente, la Legislatura comunicó a la Junta de Supervisión que una propuesta de ley idéntica a la propuesta de enmienda presupuestaria de Gobernador había sido derrotada durante una vista pública de consideración final, y que no cumpliría con el proceso de enmienda presupuestaria. En consecuencia. la Junta de Supervisión emitió una resolución manifestando, entre otras cosas, que (i) el Gobernador y la Legislatura se encontraban en un punto muerto en cuanto a la asignación de fondos para cubrir los gastos de la Elección especial (ii) la Sección 402 de PROMESA impedía a la Junta de Supervisión adoptar una interpretación de PROMESA susceptible de restringir la Puerto Rico la determinación de su estatus

político; (iii) la Junta de Supervisión deseaba permitir al gobierno del Estado Libre Asociado adoptar o no adoptar la propuesta de enmienda presupuestaria del mismo modo en que ocurriría de no existir PROMESA; y (iv) por consiguiente, el presupuesto original del ELA se mantendría en vigor sin revisión alguna. En consecuencia, la AAFAF informó a la Junta de Supervisión que el Gobernador autorizaba el desembolso de fondos para financiar la Elección especial.

Los Demandantes solicitaron órdenes que declarasen que las disposiciones presupuestarias de PROMESA se aplicaban a todos los gastos presupuestarios, incluyendo los relacionados con los fondos relacionados con las elecciones objetadas, y que la Sección 402 no eximía a la propuesta de reasignación de fondos de las cláusulas presupuestarias de PROMESA. Además, los Demandantes solicitaron una orden prohibiendo al Gobernador y al Secretario de Hacienda supuestamente malversar y distribuir los citados fondos.

El 22 de abril de 2021, el Demandante presentó una moción para solicitar una orden de restricción temporal o un interdicto preliminar prohibiendo a los Demandados distribuir los fondos relacionados con ciertas elecciones hasta la resolución de la demanda [Proc. Cont. Núm. 21-00042, ECF Núm. 3]. El 24 de abril de 2021, el Demandante presentó una propuesta de orden de interdicto preliminar [Proc. Cont. Núm. 21-00042, ECF Núm. 6]. El 27 de abril de 2021, los Demandados presentaron escritos de oposición a la moción del Demandante [Proc. Cont. Núm. 21-00042, ECF Núm. 12 y 16], y tanto el Nuevo Partido Progresista como el Comisionado Electoral presentaron una moción de intervención [Proc. Cont. Núm. 21-00042, ECF Núm. 22]. El 27 de abril de 2021, el Tribunal del Título III expidió una orden denegando la moción de intervención [Proc. Cont. Núm. 21-00042, ECF Núm. 23]. El 28 de abril de 2021, el Demandante presentó una respuesta global en apoyo de su moción [Proc. Cont. Núm. 21-00042, ECF Núm. 26]. El 29 de abril de 2021, el Tribunal del Título III dictando una orden rechazando la moción del Demandante de obtener una orden de restricción temporal o un interdicto preliminar [Proc. Cont. Núm. 21-00042, ECF Núm. 32].

(vii)   *Junta de Supervisión y Administración Financiera para Puerto Rico c. el Hon. Vázquez Garced y otros*, Proc. Cont. núm. 20-00078

El 8 de junio de 2020, la Junta de Supervisión presentó una demanda contra el Gobernador y la AAFAF en la que se solicitaban interdictos y una orden judicial en relación con el hecho de que el Gobernador y la AAFAF no presentaran a la Junta de Supervisión determinados documentos e información relativos a la adquisición y negociación de contratos por parte del Gobierno del Estado Libre Asociado para la compra de equipos de testeo para la COVID-19 y otros suministros médicos [Proc. Cont. Núm. 20-00078, ECF Núm. 1]. El 23 de junio de 2020, el Gobernador y la AAFAF presentaron una moción de desestimación, argumentando que el Tribunal del Título III carece de jurisdicción sobre la reclamación, que la Junta de Supervisión carece de legitimación, y que la demanda no expone una reclamación de orden de desagravio [Proc. Cont. Núm. 20-00078, ECF Núm. 11]. El 24 de julio de 2020, la Junta de Supervisión presentó una notificación de desestimación voluntaria de la acción [Proc. Cont. Núm. 20-00078, ECF Núm. 18]. El 3 de agosto de 2020 se cerró el procedimiento contencioso.

(viii)   *El Hon. Vázquez Garced y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. Cont. Núm. 20-00080, 20-00081, 20-00082, 20-00083, 20-00084, 20-00085

El 12 de junio de 2020, el Gobernador y la AAFAF (el "Gobierno") presentaron seis demandas contenciosas en las que se solicitaban sentencias declarativas de que las Leyes 47, 82, 90, 138, 176 y 181 y

189

las certificaciones correspondientes satisfacen los requisitos de PROMESA. En resumen, la Ley 47 amplía el grupo de profesionales de la salud elegibles para beneficios fiscales en virtud del Código de Incentivos de Puerto Rico, reduciendo los ingresos sin ningún ahorro de costos que los compense. La Ley 82 establece una nueva oficina dentro del Departamento de Salud de Puerto Rico ("DVPR") para regular adicionalmente varias entidades que contratan servicios de farmacias en Puerto Rico. La Ley 82 también impide que los administradores de beneficios de farmacia controlen el costo de los medicamentos recetados. La Ley 138 obliga a las compañías de seguros de salud pública, como las MACO, a aceptar en sus redes a todos los proveedores médicos independientemente del precio. La Ley 138 también prohíbe a las organizaciones de seguros de salud, aseguradoras y otros planes médicos que incluyan en cualquier contrato o estipulación con un proveedor de atención médica el derecho a rescindir unilateralmente el contrato. La Ley 176 aumenta la tasa de acumulación de días de licencia por enfermedad y vacaciones para los empleados públicos. La Ley 181 prevé un aumento salarial para los bomberos que asciende a casi $3 millones al año.

El 16 de julio de 2020, el Gobierno desestimó voluntariamente la demanda contenciosa relacionada con la Ley 90 [Proc. Cont. Núm. 20-00081, ECF Núm. 5]. El 17 de julio de 2020, la Junta de Supervisión presentó respuestas y reconvenciones en relación con las cinco demandas contenciosas restantes relacionadas con las Leyes 47, 82, 138, 176 y 181 (las "Cinco Leyes") [Proc. Cont. Núm. 20-ap-00080, ECF Núm. 5; Proc. Cont. Núm. 20-ap-00082, ECF Núm. 5; Proc. Cont. Núm. 20-ap-00083, ECF Núm. 6; Proc. Cont. Núm. 20-ap-00084, ECF Núm. 5; Proc. Cont. Núm. 20-00085, ECF Núm. 5]. Las reconvenciones de la Junta de Supervisión buscaban anular y prohibir las Cinco Leyes de conformidad con las secciones 204(a) y 108(a) de PROMESA, y con respecto a la Ley 82 y la Ley 181, también de conformidad con la sección 204(c) de PROMESA. Específicamente, la Junta de Supervisión impugnó la Ley 47 basándose en que la ley es significativamente incompatible con el Plan Fiscal (ya que no es neutral en cuanto a los ingresos) y que la certificación del Gobernador carecía de la suficiente especificidad necesaria para una estimación formal del impacto de la Ley 47 en los gastos e ingresos, como lo requiere PROMESA La Junta de Supervisión impugnó la Ley 82 por considerar que la ley es significativamente incompatible con el Plan Fiscal y que reducirá el mercado competitivo de servicios de salud de calidad en Puerto Rico. La Junta de Supervisión impugnó la Ley 138 alegando que la ley es significativamente incompatible con el Plan Fiscal, inhibirá la capacidad de las MCO para controlar los costos de atención médica, y priva a Puerto Rico de un mercado competitivo para los servicios de salud de calidad y aumenta los costos de atención médica al eliminar los incentivos para que los médicos compitan en precio y calidad. La Junta de Supervisión impugnó la Ley 176 alegando que la ley es significativamente incompatible con el Plan Fiscal, entre otras cosas, porque socava las medidas de ajuste contempladas en el Plan Fiscal. La Junta de Supervisión impugnó la Ley 181 alegando que la ley es significativamente incompatible con el Plan Fiscal y que el Gobernador nunca demostró a la Junta de Supervisión cómo se financiaría o podría financiarse el aumento salarial de los bomberos mediante un nuevo impuesto

También el 17 de julio de 2020, Coopharma presentó una moción de autorización para comparecer como *amicus curiae* en nombre del Gobierno [Caso Núm. 17-bk-3283, ECF Núm. 13717]. El 20 de julio de 2020, el Tribunal del Título III emitió una orden denegando la moción de Coopharma [Caso Núm. 17-bk-3283, ECF Núm. 13739]. El 24 de noviembre de 2020, Coopharma presentó una segunda moción de autorización para comparecer como *amicus curiae* en nombre del Gobierno [Caso Núm. 17-bk-3283, ECF Núm. 15238]. El 7 de diciembre de 2020, el Gobierno presentó una declaración en apoyo a la segunda moción de Coopharma [Proc. Cont. Núm. 20-00080, ECF Núm. 63], y la Junta de Supervisión presentó una oposición [Proc. Cont. Núm. 20-00080, ECF Núm. 65]. El 10 de diciembre de 2020, Coopharma presentó una contestación en apoyo a su segunda moción de [Proc. Cont. Núm. 20-00080, ECF Núm. 66].

El 30 de julio de 2018, la Junta de Supervisión presentó una moción para unificar los cinco procedimientos contenciosos restantes [Proc. Cont. Núm. 20-00080, ECF Núm. 8], y el Tribunal del Título III emitió una orden concediendo la moción [Proc. Cont. Núm. 20-00080, ECF Núm. 9]. El Gobierno

presentó contestaciones a las reconvenciones de la Junta de Supervisión en relación con las Cinco Leyes el 3 de agosto de 2020 [Proc. Cont. Núm. 20-00080, ECF Núm. 11; Proc. Cont. Núm. 20-00082, ECF Núm. 9; Proc. Cont. Núm. 20-00083, ECF Núm. 10; Proc. Cont. Núm. 20-00084, ECF Núm. 10; Proc. Cont. Núm. 20-00085, ECF Núm. 9].

El 28 de septiembre de 2020, el Gobierno presentó mociones de sentencia sumaria en relación con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 12; Proc. Cont. Núm. 20-00083, ECF Núm. 13]. El 5 de octubre de 2020, la Junta de Supervisión presentó mociones de sentencia sumaria en relación con las Leyes 47, 82 y 181 [Proc. Cont. Núm. 20-00080, ECF Núm. 14, 16; Proc. Cont. Núm. 20-00084, ECF Núm. 13, 15; Proc. Cont. Núm. 20-00085, ECF Núm. 12, 13]. El 19 de octubre de 2020, la Junta de Supervisión presentó sus oposiciones a las mociones de sentencia sumaria del Gobierno y las mociones cruzadas para sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 28, 29; Proc. Cont. Núm. 20-00083, ECF Núm. 29, 30]. El 23 de octubre de 2020, el Gobierno presentó oposiciones a la moción de la Junta de Supervisión para la sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 47, 82 y 181, y solicitó una reparación en virtud de la Regla 56(d) [Proc. Cont. Núm. 20-00080, ECF Núm. 36; Proc. Cont. Núm. 20-00084, ECF Núm. 35; Proc. Cont. Núm. 20-00085, ECF Núm. 34]. El 4 de noviembre de 2020, el Gobierno presentó su contestación en apoyo a sus mociones de sentencia sumaria y su oposición a las mociones cruzadas para sentencia sumaria de la Junta de Supervisión en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 37; Proc. Cont. Núm. 20-00083, ECF Núm. 38]. El 5 de noviembre de 2020, la Junta de Supervisión presentó respuestas en apoyo a sus mociones de sentencia sumaria en relación con las Leyes 47, 82 y 181 [Proc. Cont. Núm. 20-00080, ECF Núm. 49; Proc. Cont. Núm. 20-00084, ECF Núm. 47; Proc. Cont. Núm. 20-00080, ECF Núm. 46]. El 11 de noviembre de 2020, la Junta de Supervisión presentó una respuesta en apoyo a su moción cruzada de sentencia sumaria en relación con todas las reclamaciones y reconvenciones de las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 40; Proc. Cont. Núm. 20-00083, ECF Núm. 41]. El 24 de noviembre de 2020, el Tribunal del Título III celebró una vista con respecto a las mociones y las mociones cruzadas de sentencia sumaria.

El 23 de diciembre de 2020, el Tribunal del Título III dictó una orden: (i) denegando la moción de sentencia sumaria del Gobierno en relación con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 52; Proc. Cont. 20-00083, ECF Núm. 53]; y (ii) concediendo parcialmente las mociones de la Junta de Supervisión (a) de sentencia sumaria en relación con las Leyes 47, 82 y 181, y (b) las mociones cruzadas de sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00080, ECF Núm. 72; Proc. Cont. Núm. 20-00084, ECF Núm. 61; Proc. Cont. Núm. 20-00085, ECF Núm. 60]. Con respecto a la Ley 47, el Tribunal del Título III desestimó la Causa II de la demanda de la Ley 47, que solicitaba un remedio declaratorio en relación con la sección 108(a)(2) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención III de la Ley 47, que solicitaba interdictos que impidieran la aplicación de las leyes pertinentes en virtud de la sección 108(a)(2) de PROMESA. El Tribunal del Título III concluyó que la determinación de la Junta de Supervisión de que la Ley 47 viola la sección 108(a)(2) de PROMESA está respaldada por una base racional y pruebas sustanciales. Con respecto a la Ley 82, el Tribunal del Título III desestimó la Causa I de la demanda de la Ley 82, que solicitaba remedio declaratorio en relación con la sección 204(a) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención II de la Ley 82, que solicitaba interdictos en virtud de la sección 104(k) de PROMESA. El Tribunal del Título III consideró que las conclusiones de la Junta de Supervisión de que debía impedirse la aplicación de la Ley 82, ya que implicaría gastos importantes que no están claramente previstos en el plan fiscal, no son arbitrarias ni caprichosas. Con respecto a la Ley 138, el Tribunal del Título III desestimó la Causa I de la demanda de la Ley 138, que solicitaba un remedio declaratorio en relación con la sección 204(a) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención II de la Ley 138, que solicitaba interdictos en virtud de la sección 104(k) de PROMESA. El

191

Tribunal del Título III razonó que las impugnaciones de la Junta de Supervisión a la Ley 138 estaban respaldadas por preocupaciones racionales dado el incumplimiento del Gobierno con las directivas de la Junta de Supervisión bajo la sección 204(a)(4)(A) de PROMESA para corregir las deficiencias con el Certificado de la Ley 138. Con respecto a la Ley 176, el Tribunal del Título III desestimó la Causa II de la demanda de la Ley 176, que solicitaba un remedio declaratorio en relación con la sección 108(a)(2) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención III de la Ley 176, que solicitaba interdictos que impidieran la aplicación de las leyes pertinentes en virtud de la sección 108(a)(2) de PROMESA. El Tribunal del Título III concluyó que la determinación de la Junta de Supervisión de que la Ley 176 perjudicaría o frustraría los propósitos de PROMESA era racional y estaba respaldada por pruebas sustanciales en el expediente. Con respecto a la Ley 181, el Tribunal del Título III concedió una sentencia sumaria sobre la Reconvención IV de la Ley 181, que solicitaba un interdicto en virtud del artículo 104(k) de PROMESA que prohibiera la aplicación de la Ley 181 en virtud del artículo 204(c) de PROMESA. El Tribunal del Título III dictaminó que la Ley 181 violaba la sección 204(c) de PROMESA porque creaba un déficit de ingresos que el Gobierno probablemente tendría que remediar mediante una reprogramación que no ha sido solicitada ni autorizada.

También el 23 de diciembre de 2020, el Tribunal del Título III dictó una orden en la que instruía a las partes que mostraran las causas por las que el Tribunal del Título III no debía desestimar las reclamaciones y reconvenciones restantes [Proc. Cont. Núm. 20-00080, ECF Núm. 73; Proc. Cont. Núm. 20-00082, ECF Núm. 53; Proc. Cont. Núm. 20-00083, ECF Núm. 54; Proc. Cont. Núm. 20-00084, ECF Núm. 62; Proc. Cont. Núm. 20-00085, ECF Núm. 61]. El 4 de enero de 2021, las partes presentaron una estipulación conjunta por la que se desestimaban las reclamaciones restantes sin perjuicio [Proc. Cont. Núm. 20-00080, ECF Núm. 74; Proc. Cont. Núm. 20-00082, ECF Núm. 54; Proc. Cont. Núm. 20-00083, ECF Núm. 55; Proc. Cont. Núm. 20-00084, ECF Núm. 63; Proc. Cont. Núm. 20-00085 ECF Núm. 62]. El 7 de enero de 2021, la Juez Swain dictó una orden de desestimación de las reclamaciones restantes sin perjuicio, y el secretario del tribunal emitió una sentencia y cerró los casos relativos a las cinco leyes: 47, 82, 181, 176 y 138 [Proc. Cont. Núm. 20-00080, ECF Núm. 75, 76; Proc. Cont. Núm. 20-00082, ECF Núm. 55, 56; Proc. Cont. Núm. 20-00083, ECF Núm. 56, 57; Proc. Cont. Núm. 20-00084, ECF Núm. 63, 64; Proc. Cont. Núm. 20-00085, ECF Núm. 63, 64]. El 4 de febrero de 2021, las partes presentaron una moción conjunta para registrar una orden que aprobara una estipulación conjunta que modificara el interdicto en relación con la Ley 181 [Proc. Cont. Núm. 20-00084, ECF Núm. 72]. Las partes acordaron que, en la medida en que los ingresos tributarios procedentes del impuesto sobre las primas de seguros y los ingresos procedentes de las inspecciones de seguridad en las propiedades comerciales cubrieran el aumento salarial de $125 al mes para los bomberos, la Junta de Supervisión no tendría ninguna otra objeción al aumento según lo dispuesto en la Ley 181. Las partes informaron al Tribunal del Título III que el aumento salarial se haría efectivo. El 5 de febrero de 2021, la Juez Swain emitió una orden aprobando la estipulación [Proc. Cont. Núm. 20-00084, ECF Núm. 73].

El 21 de enero de 2021, el Gobierno presentó una notificación de apelación en relación con las órdenes del Tribunal del Título III del 23 de diciembre de 2020 sobre las mociones de sentencia sumaria [Proc. Cont. Núm. 20-00080, ECF Núm. 78; Proc. Cont. Núm. 20-00082, ECF Núm. 58; Proc. Cont. Núm. 20-00083, ECF Núm. 60; Proc. Cont. Núm. 20-00084, ECF Núm. 67; Proc. Cont. Núm. 20-00085, ECF Núm. 66]. El 27 de enero de 2021, la apelación fue registrada por el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito como Caso Núm. 21-1071 [Pr. Cont. Núm. 20-00080, ECF Núm. 81]. El 19 de abril de 2021, los Apelantes presentaron su memorial inicial.

D.    **Adopción de los presupuestos y planes fiscales del año fiscal del ELA**

*Planes fiscales.* La Junta de Supervisión se encarga de interactuar con el Gobernador con respecto a los planes fiscales y con el Gobernador y la Legislatura con respecto a los presupuestos en el desarrollo,

la presentación, la aprobación y la certificación de los planes fiscales y los presupuestos. De ahí que, ya en septiembre de 2016, la Junta de Supervisión, junto con sus economistas, asesores municipales y asesores financieros dedicaron cientos de horas a investigar y realizar sesiones de trabajo para entender la grave situación en Puerto Rico, y para investigar las diferentes formas en que los estados y los soberanos han superado circunstancias tan difíciles. La Junta de Supervisión también celebró numerosas reuniones internas y externas con funcionarios gubernamentales y los diversos grupos de acreedores. La Junta de Supervisión analizó los numerosos retos fiscales a los que se enfrentaba Puerto Rico y en unos pocos meses estaba en condiciones de formular su propio plan fiscal o evaluar el plan fiscal propuesto por el Gobierno.

La Junta de Supervisión se encarga de determinar, a su exclusivo criterio, si los planes fiscales propuestos concuerdan con la sección 201(b) de PROMESA. Entre los objetivos de PROMESA está que el plan fiscal brinde a Puerto Rico reformas fiscales permanentes y que promuevan el crecimiento,[177] y un método a lograr la responsabilidad fiscal y acceder a los mercados de capital.

A través de un proceso colaborativo con el Gobierno del ELA, la Junta de Supervisión ha certificado planes fiscales que procuran restablecer la responsabilidad fiscal y alcanzar objetivos mensurables. Por ejemplo, las medidas fiscales en los planes fiscales certificados se centran en mejorar los procesos de pago de impuestos para que pueda mejorar la recaudación de ingresos, mejorando al mismo tiempo la experiencia del usuario. También destacan el hecho de lograr servicios públicos eficaces a través de medidas de ajuste que mejoran los servicios al tiempo que reducen los costos, y también la reducción de subsidios a entidades ajenas al Gobierno Central que actualmente dependen en exceso del apoyo prestado por el Gobierno Central. Estas medidas fiscales han sido desarrolladas cuidadosamente por y a través de la colaboración con el Gobierno, al tiempo que enfatizan la eficacia del gobierno a través de evaluaciones profundas y estudios de referencia, que generan objetivos mensurables y metas para mejoras cuantitativas y cualitativas. Los planes fiscales certificados también procuran satisfacer las necesidades de financiamiento futuras mediante la planificación y el desarrollo de iniciativas para abordar diversas cuestiones fiscales previstas, entre ellas el rápido aumento de los costos del cuidado de la salud y las pensiones.

Además de adoptar medidas fiscales, la Junta de Supervisión ha estado trabajando estrechamente con el Gobierno para contrarrestar más de una década de deterioro económico real (agravado por los devastadores daños de los huracanes) mediante la identificación de una serie de reformas estructurales para garantizar la competitividad y la reconstrucción de la economía de Puerto Rico. Esas reformas abarcan desde la facilidad para hacer negocios para facilitar la creación de nuevas empresas y las inversiones, hasta la reforma laboral, la reforma energética, la reforma de la infraestructura e inversiones en educación a largo plazo.

***Presupuestos anuales***. La sección 202(c)(1) de PROMESA establece un proceso para la aprobación de presupuestos anuales que deben cumplir el plan fiscal certificado. En una primera instancia, la sección 202(c)(1) de PROMESA brinda al Gobernador la oportunidad inicial de desarrollar y presentar a la Junta de Supervisión un presupuesto para el Año fiscal correspondiente. Luego, la Junta de Supervisión realiza una revisión detallada de las propuestas de presupuestos para garantizar que las asignaciones gubernamentales sean compatibles con el plan fiscal certificado, lo que incluye los servicios

---

[177] PROMESA § 701 ("Es el parecer del Congreso que cualquier solución duradera para la crisis económica y fiscal de Puerto Rico debe incluir reformas fiscales permanentes que fomenten el crecimiento, que tengan a su haber, entre otros elementos, un flujo de capital libre entre las posesiones de los Estados Unidos y el resto de los Estados Unidos").

gubernamentales prioritarios, como seguridad pública, educación y salud, al tiempo que implementa medidas de ahorro de costos.

La preparación de un presupuesto certificado es un proceso que dura un año, que la Junta de Supervisión ha refinado para garantizar que el presupuesto certificado contenga la transparencia y el control de gastos deseados. Como parte de ese proceso, la Junta de Supervisión instauró controles significativos sobre los gastos para restaurar la disciplina fiscal esbozando al mismo tiempo medidas específicas para promover la eficiencia y una mejor prestación de los servicios públicos. En la actualidad, esto incluye control de los desembolsos de asignaciones, de manera que un 2.5% se reserva y se retiene hasta el cuarto trimestre de cada Año fiscal, toda modificación al presupuesto certificado se debe presentar a la Junta de Supervisión para su revisión y aprobación, y límites de utilización de las asignaciones del año anterior.

La Junta de Supervisión también realiza tareas de debida diligencia en relación con las agencias individuales que requieren que el gobierno les brinde apoyo para sus presupuestos solicitados. El proceso incluye una revisión de las tendencias de gasto por concepto de gasto incorporando al mismo tiempo los requisitos presupuestarios para nuevos programas y servicios. Para el Año fiscal 2020, la Junta de Supervisión celebró decenas de reuniones con la OGP y agencias individuales para analizar sus patrones de gasto y también su gasto previsto para el Año fiscal 2020. Las reuniones permitieron que las agencias señalaran las áreas clave de riesgo, los cambios previstos en el Año fiscal 2020, la fuerza laboral requerida y su capacidad para implementar medidas según lo establecido por el plan fiscal certificado.

El presupuesto certificado agrupa agencias individuales que se espera que se consoliden según la propuesta del Gobierno y el plan fiscal. El presupuesto de cada agencia proporciona gastos detallados por concepto de gasto y por código de objeto (p. ej., salarios, horas extra, salud, arrendamientos, mantenimiento y reparaciones) para brindar mayor transparencia respecto al gasto público. La OGP y las agencias específicas perfeccionaron aún más el presupuesto por programa dentro de estos parámetros.

El presupuesto certificado que contiene las asignaciones para gastos para cada agencia especifica la manera en que se desembolsan los fondos mensualmente a diversas entidades gubernamentales, obliga al Departamento de Hacienda a brindar previsiones actualizadas de los ingresos netos, rescinde las asignaciones del año anterior (salvo en los casos en que estén específicamente exentas), exige que la AAFAF certifique las asignaciones no utilizadas del año anterior, suspende los derechos de la OGP, la AAFAF o del Departamento de Hacienda de reprogramar o prorrogar las asignaciones y reitera el requisito de cumplir los requisitos de presentación de informes en los planes fiscales certificados. Además, el presupuesto certificado requiere que el Gobernador presente un informe trimestral de ingresos y gastos a la Junta de Supervisión, de acuerdo con la sección 203 de PROMESA.

1.      Desarrollo y certificación del plan fiscal del ELA de marzo de 2017

El 14 de octubre de 2016, el entonces Gobernador, Alejandro García Padilla, presentó ante la Junta de Supervisión un plan fiscal que contemplaba un déficit presupuestario de $4,800 millones para el Año fiscal 2017, después de la implementación de medidas de gasto y mejoras en los ingresos y antes de asignar fondos para la amortización de la deuda.

El 10 de noviembre de 2016, la Junta de Supervisión hizo una invitación pública a los terceros interesados para formular comentarios sobre la presentación del plan fiscal del 14 de octubre de 2016.

La Junta de Supervisión se negó a certificar el plan fiscal de octubre de 2016 del Gobernador dado que no consideraba que el plan cumplía los requisitos de PROMESA. Entre otras cosas, la Junta de Supervisión no consideraba que el plan fiscal propuesto incluía medidas suficientes para reducir los gastos

o aumentar los ingresos. Al rechazar el plan fiscal, la Junta de Supervisión formuló observaciones y recomendaciones sustanciales, en particular mediante la enumeración de los cinco principios que guiarían a la Junta de Supervisión en su decisión de certificar o no el próximo plan fiscal propuesto. Estos cinco principios abordaron el período temporal del plan fiscal y los 14 criterios en virtud de la sección 201(b) de PROMESA, los objetivos del plan fiscal para estabilizar la situación económica e incrementar la flexibilidad, una evaluación del panorama fiscal y la hipótesis de base, la inclusión de una combinación adecuada de reformas estructurales, ajuste fiscal y reestructuración de deuda, y el acompañamiento de un plan operativo para los cambios y las reformas.

El gobierno anterior no presentó ningún plan fiscal revisado al 15 de diciembre de 2016, como había solicitado la Junta de Supervisión. Sin embargo, la Junta de Supervisión siguió proporcionando información detallada sustancial sobre los objetivos y el marco para el plan fiscal al entonces gobernador Alejandro García Padilla y al entonces gobernador Rosselló en una carta de fecha 20 de diciembre de 2016, con la esperanza de lograr un plan fiscal certificable para el 31 de enero de 2017.

El 2 de enero de 2017, la administración del recién elegido gobernador Rosselló asumió sus funciones. El nuevo gobernador solicitó inmediatamente una prórroga del plazo para la presentación del plan fiscal y mantuvo discusiones colaborativas con la Junta de Supervisión a través de reuniones presenciales y correspondencia escrita. La Junta de Supervisión respondió el 18 de enero de 2017, con la propuesta de prórroga del plazo de presentación hasta el 28 de febrero de 2017, y proporcionó información detallada sobre las metas, los objetivos y los parámetros fiscales específicos necesarios para un plan fiscal certificable.

El 28 de febrero de 2017, la nueva administración presentó el plan fiscal propuesto a la Junta de Supervisión. La Junta de Supervisión planteó sus objeciones con respecto al plan fiscal propuesto. Después de revisar el plan fiscal propuesto con los representantes del Gobernador y de analizar y deliberar sobre él, el 9 de marzo de 2017 la Junta de Supervisión informó al Gobernador sobre su determinación en el sentido de que el plan fiscal propuesto del Gobernador no cumplía los requisitos de PROMESA. La Junta de Supervisión identificó violaciones y recomendó revisiones.

El entonces gobernador Rosselló presentó una propuesta revisada del plan fiscal el 11 de marzo de 2017, y los representantes del Gobernador y de la Junta de Supervisión mantuvieron extensas discusiones el 11 y 12 de marzo de 2017. Después de que el nuevo gobierno cumplió los requisitos que había especificado la Junta de Supervisión y envió una versión revisada final el 13 de marzo de 2017, la Junta de Supervisión determinó que el plan fiscal revisado con dos enmiendas relacionadas con (i) las medidas de ajuste y el plan de implementación relacionado, plan de liquidez y generación de reserva de caja, y beneficios de pensión, cumpliría los requisitos para la certificación. La Junta de Supervisión votó unánimemente a favor de certificar el plan fiscal el 13 de marzo de 2017 (el "Plan Fiscal de marzo de 2017"). Mediante una carta de fecha 15 de abril de 2017, la Junta de Supervisión informó al Gobernador y a la Legislatura que certificaba la versión revisada del Plan Fiscal de marzo de 2017 (que había incluido las dos enmiendas impuestas por la Junta) con correcciones de determinados errores tipográficos y de formato y otros cambios menores de datos. Los cambios y las correcciones no alteraron significativamente el contenido del Plan Fiscal de marzo de 2017, ni la opinión de la Junta de Supervisión sobre dicho plan. El 31 de mayo de 2017, el Gobernador solicitó que se enmendara el Plan Fiscal certificado de marzo de 2017 con una revisión del pronóstico de ingresos, que también se incorporó en la propuesta de presupuesto del Año fiscal 2018. El 31 de mayo de 2017, la Junta de Supervisión volvió a certificar de manera unánime el Plan Fiscal de marzo de 2017 con la revisión del pronóstico de ingresos sugerida de la AAFAF.

2.      **Puntos destacados del Plan Fiscal certificado de marzo de 2017**

El Plan Fiscal de marzo de 2017 (con sus revisiones certificadas subsiguientes en abril y mayo de 2017) fue el primer plan fiscal desarrollado de acuerdo con PROMESA y marcó un logro histórico para el ELA y la Junta de Supervisión: el comprometerse con la responsabilidad y sostenibilidad fiscal para los residentes de Puerto Rico y las partes interesadas del mercado de capital. El Plan Fiscal de marzo de 2017 contemplaba significativas medidas fiscales y económicas que, se proyectaban para traducirse en una recuperación económica.

El Plan Fiscal de marzo de 2017 se basaba en dos pilares: la reforma fiscal y la reforma estructural. Las medidas de reforma fiscal estaban dirigidas a (1) mejorar los ingresos, (2) ajustar al gobierno y, al mismo tiempo, mejorar su eficiencia, (3) ajustar los gastos de salud, y (4) reestructurar el sistema de pensiones. Las medidas de reforma estructural estaban dirigidas a aumentar el crecimiento económico (a) favoreciendo la actividad comercial, (b) mejorando la eficiencia de capital, (c) implementando reformas energéticas, y (d) promoviendo el desarrollo económico a través de nuevas instituciones de inversión/turismo. En conjunto, se calculó que estas reformas mejorarían las proyecciones financieras a diez años en $39,600 millones y alcanzarían un superávit de aproximadamente $7,900 millones en diez años.

Específicamente, el Plan Fiscal de marzo de 2017 preveía alcanzar $13,900 millones de ingresos adicionales y $25,700 millones de ahorro de gastos a través de diversas medidas.

Además, el Plan Fiscal de marzo de 2017 señalaba las iniciativas del Gobierno para mejorar la eficiencia y desarrollar un nuevo modelo de salud y para reformar el sistema de pensiones y cambiar a un modelo prepagado, donde las contribuciones potenciales de los empleados se separaban del fondo existente. La Junta de Supervisión además le exigió al Gobierno que redujera un 10% los desembolsos de beneficios anuales, evitando al mismo tiempo que los jubilados caigan en la pobreza.

Por último, el Plan Fiscal de marzo de 2017 describió varias reformas estructurales que podrían mejorar la competitividad general de la economía y aumentar el crecimiento del PNB. Estas reformas estructurales se centraron en mejorar la facilidad para hacer negocios, mejorar la eficiencia de capital, aprovechar y facilitar las inversiones del sector privado de forma expedita para modernizar el sector energético y promover el desarrollo económico.

3.      **Certificación del Plan Fiscal de abril de 2018**

Después de la certificación del plan fiscal y de la certificación del presupuesto del Año fiscal 2018 en junio de 2017, la Junta de Supervisión y el Gobierno se concentraron en la implementación del Plan Fiscal de marzo de 2017. Sin embargo, el Gobierno estuvo en desacuerdo con la reforma de pensiones y las medidas de ajuste que la Junta de Supervisión impuso como parte del plan fiscal certificado en marzo. El 4 de agosto de 2017, la Junta de Supervisión celebró una reunión pública acerca de estas medidas.

Dado que el Gobierno seguía estando en desacuerdo e indicando su negativa de cumplir el requisito del plan fiscal certificado, la Junta de Supervisión presentó una demanda contra el Gobierno el 28 de agosto de 2017 con respecto a la implementación del plan fiscal.

Sin embargo, antes de que se pudieran seguir resolviendo o tramitando las cuestiones, los huracanes Irma y María arrasaron Puerto Rico en septiembre de 2017. La Junta de Supervisión adoptó decisiones de inmediato para reasignar los recursos fiscales que podrían ayudar con los esfuerzos de recuperación. El 21 de septiembre de 2017, el día después de que el huracán María tocara tierra, la Junta de Supervisión también

196

autorizó al Gobernador a implementar modificaciones de buena fe en el presupuesto certificado del Año fiscal 2018 para redistribuir hasta $1,000 millones para medidas de emergencia. El 30 de septiembre de 2017, la Junta de Supervisión exhortó al gobierno federal para que brindara el máximo apoyo a Puerto Rico, anunció su desistimiento voluntario del litigio relativo a la implementación del plan fiscal y pospuso las discusiones sobre los planes fiscales hasta el siguiente año fiscal.

La Junta de Supervisión, señalando que los huracanes "cambiaron fundamentalmente la realidad de Puerto Rico", participó con el Gobierno en un proceso extenso, iterativo y colaborativo durante los siguientes seis meses para determinar los daños del huracán y para desarrollar planes fiscales que tomaran en cuenta el panorama económico y demográfico modificado. La Junta de Supervisión también aumentó la participación pública en el desarrollo de los Planes Fiscales. La Junta de Supervisión celebró el 31 de octubre de 2017 su décima reunión pública, durante la cual propuso tres sesiones públicas para escuchar opiniones, invitando al público a participar en el debate de varias premisas y consideraciones para fines de desarrollo del plan fiscal y estableció el 22 de diciembre de 2017 como fecha límite para que el Gobierno presente una propuesta del plan fiscal con el objetivo de que la certificación final fuera el 2 de febrero de 2018. Las tres sesiones públicas para escuchar opiniones sobre los planes fiscales propuestos post huracán se celebraron el 16 de noviembre de 2017, el 30 de noviembre de 2017 y el 4 de diciembre de 2017. Los debates durante estas tres sesiones para escuchar opiniones incluyeron presentaciones de expertos y líderes de la comunidad y también comentarios de residentes de Puerto Rico.

El 20 de diciembre de 2017, la Junta de Supervisión accedió a la solicitud del gobernador Rosselló de prorrogar el plazo para la presentación del plan fiscal propuesto del ELA al 10 de enero de 2018. Por consiguiente, la Junta de Supervisión también indicó que esperaba certificar un plan fiscal a más tardar el 23 de febrero de 2018. El 10 de enero de 2018, la Junta de Supervisión otorgó otra prórroga de dos semanas para que el Gobierno presentase un plan fiscal del ELA que estuviera alineado con los planes fiscales propuestos para AEEPR y AAA a más tardar el 24 de enero de 2018. El 24 de enero de 2018, el Gobernador presentó propuestas de planes fiscales revisados para el ELA, AEEPR y AAA.

El 5 de febrero de 2018, la Junta de Supervisión emitió una notificación de violación en virtud de la sección 201(c)(3)(B)(i) de PROMESA con respecto al plan fiscal propuesto del ELA. El Gobierno presentó una propuesta revisada del plan fiscal para la fecha límite indicada en la notificación de violación, el 12 de febrero de 2018. El 16 de febrero de 2018, la Junta de Supervisión también anunció que esperaba certificar un plan fiscal para el ELA para el 30 de marzo de 2018.

Después de un amplio debate entre la Junta de Supervisión y el Gobierno, cada uno con y a través de sus asesores, se siguió revisando el plan fiscal propuesto. El 23 de marzo de 2018, el gobernador Rosselló presentó un nuevo plan fiscal revisado que preveía un superávit acumulado de $5,500 millones durante los próximos seis años. La Junta de Supervisión canceló una reunión pública que había sido programada para el 26 de marzo de 2018 para la consideración de la certificación del plan fiscal y, en cambio, comenzó a revisar la presentación del Gobierno.

El 28 de marzo de 2018, en una carta dirigida al gobernador Rosselló, la Junta de Supervisión describió los cambios que se debían realizar en el plan fiscal propuesto para que cumpliera los requisitos y los objetivos de PROMESA. Entre ellos se incluían, entre otros, cambios en las reformas laborales propuestas y reformas del plan de pensiones. La Junta de Supervisión exigió que el Gobierno presentara la siguiente revisión incorporando los cambios indicados para el 5 de abril de 2018.

El gobernador Rosselló respondió, en múltiples ocasiones, expresando públicamente su desacuerdo con los parámetros de la reforma laboral y la reforma del plan de pensiones exigidos por la Junta de

Supervisión. La siguiente presentación del Gobierno se realizó el 5 de abril de 2018; tampoco contenía todos los cambios exigidos.

El 15 de abril de 2018, la Junta de Supervisión anunció reuniones públicas el 19 y 20 de abril de 2018 para consideraciones relativas a la certificación de los planes fiscales del ELA y de diversas instrumentalidades. Antes de la reunión pública, la Junta de Supervisión también publicó su propia versión del plan fiscal el 18 de abril de 2018. Después de las presentaciones públicas y los debates del plan fiscal propuesto por el Gobierno y del plan fiscal propuesto por la Junta de Supervisión, la Junta de Supervisión certificó su plan fiscal propuesto para el ELA en virtud de la sección 201(d)(2) y (e)(2) de PROMESA durante la reunión pública del 19 de abril de 2018.

El Plan Fiscal para el ELA certificado el 19 de abril de 2018 (el "Plan Fiscal de abril de 2018") consideró que los huracanes generaron decenas de miles de millones de dólares en daños y que aproximadamente $62,000 millones de fondos de ayuda en caso de desastres provendrían de fuentes federales y privadas. También tenía previsto generar $2,300 millones de medidas relativas a los ingresos y $10,000 millones de medidas relativas a los gastos para los Años fiscales 2018 a 2023. Desde el Año fiscal 2018 hasta el Año fiscal 2048, el Plan Fiscal de abril de 2018 proyectaba generar un superávit acumulado de aproximadamente $39,000 millones antes de la amortización de la deuda.

Aunque el Plan Fiscal de abril de 2018 mantuvo e incorporó en gran medida la mayoría de las medidas fiscales desarrolladas en virtud del Plan Fiscal de marzo de 2017, el nuevo plan fiscal certificado también incluía información adicional relacionada con las diversas tendencias industriales y evaluaciones comparativas de los estados continentales para refinar estas reformas. También incluía una referencia más sólida a las condiciones en curso en el ELA y las medidas de implementación del plan de acción, sus metas y objetivos de desempeño mensurables.

Por ejemplo, en el Plan Fiscal de abril de 2018, la medida de ajuste del gobierno proporcionó un enfoque ascendente detallado para las agencias que representan más del 80% del gasto público, junto con puntos de referencia probados de concentración y eficiencia para gastos del personal y no relacionados con el personal para otras agencias. La congelación de la nómina también se prorrogó en el Plan Fiscal de abril de 2018 y se confirmaron contribuciones uniformes al seguro de salud como una medida por separado. Se identificaron iniciativas específicas para la reforma de salud, y la reforma impositiva en el Plan Fiscal de abril de 2018 también requería neutralidad de ingresos para todo cambio propuesto.

Las reformas estructurales en el Plan Fiscal de abril de 2018 también eran más sólidas que lasa del Plan Fiscal de marzo de 2017. Estas incluían evaluaciones de referencia específicas del estado corriente de la economía de Puerto Rico, y objetivos específicos para las reformas laborales, reformas para facilitar los negocios, reformas regulatorias de energía y reformas de infraestructura. El Plan Fiscal de abril de 2018 propuso reinversiones estratégicas de más de $1,000 millones en Puerto Rico para lograr la prosperidad y sostenibilidad a largo plazo, lo que sería posible si se implementaran mayores reformas estructurales. Dado que la Junta de Supervisión había señalado que el aumento de la participación laboral sería la reforma más importante para el bienestar económico a largo plazo de Puerto Rico, el Plan Fiscal de abril de 2018 proporcionó descripciones detalladas de la necesidad de una reforma laboral completa y los objetivos, entre otros, para convertirse en una jurisdicción de empleo a voluntad, reducir la licencia obligatoria pagada por la mitad, hacer que el bono de Navidad sea voluntario para los empleados del sector privado, implementar un requisito laboral para el PAN e introducir un programa de Crédito por Trabajo (EITC, por sus siglas en inglés).

4.      **Certificación del Plan Fiscal de mayo de 2018**

A pesar de las diferentes perspectivas sobre la reforma laboral, la Junta de Supervisión y el entonces gobernador Rosselló continuaron manteniendo diálogos durante abril y mayo de 2018 en un esfuerzo de buena fe para encontrar puntos en común. Después de varias rondas de negociaciones de buena fe, la Junta de Supervisión y el Gobernador anunciaron el 20 de mayo que habían alcanzado un acuerdo (con el fin de aprobar la reforma laboral y de esa manera reducir los riesgos de implementación del plan fiscal y evitar litigios costosos) para enmendar el plan fiscal de abril de 2018. Como parte del "acuerdo" que se dio a conocer públicamente el 30 de mayo de 2018, la Legislatura y el Gobernador tendrían que aprobar una ley que derogara la Ley 80 antes del 27 de junio de 2018.

A cambio de la derogación de la Ley 80, el acuerdo contemplaba la implementación de determinadas disposiciones del plan fiscal propuestas por el ELA, entre ellas: (i) la restauración del bono de Navidad para empleados públicos para los Años fiscales 2019 a 2023; (ii) una asignación anual adicional de $25 millones para la UPR para becas para estudiantes que las necesitaran para los Años fiscales 2019 a 2023; (iii) una asignación anual adicional de $50 millones para el fondo de desarrollo económico de las municipalidades para los años fiscales 2019 a 2023; y (iv) reemplazo de las iniciativas de reinversión previstas en el capítulo 11 del Plan Fiscal de abril de 2018 con la potestad del Gobierno para gastar hasta $345 millones para los Años fiscales 2019 a 2023 en la implementación de reformas, infraestructura e iniciativas de desarrollo económico en categorías especificadas.

De conformidad con los términos del acuerdo, el entonces gobernador electo Rosselló anunció el 28 de mayo de 2018 que había presentado un proyecto de ley para derogar en su totalidad la Ley 80. Además, la Junta de Supervisión presentó un informe completo de casi 2,200 páginas, de fecha 30 de mayo de 2018, donde se analizaba la reforma laboral y la publicó en su sitio web.

El 30 de mayo de 2018, la Junta de Supervisión publicó y volvió a certificar de manera unánime un Plan Fiscal revisado del ELA que incorporaba los efectos del acuerdo, incluso la derogación anticipada de la Ley 80 (el "Plan Fiscal de mayo de 2018").

En el Plan Fiscal de mayo de 2018, la Junta de Supervisión acordó revisar varias medidas fiscales e iniciativas de reinversión del Plan Fiscal de abril de 2018 y respaldar las propuestas del Gobierno sobre el bono de Navidad para empleados públicos, $25 millones para becas anuales para estudiantes en la UPR, asignaciones anuales de $50 millones para las iniciativas de desarrollo económico y un fondo plurianual de $345 millones para diversas iniciativas de desarrollo económico e implementación de reformas. El logro por parte del Gobierno de una reforma laboral y de bienestar social integral también permitiría la eliminación de recortes al presupuesto de la Legislatura y de la Rama Judicial requeridos en virtud del Plan Fiscal de abril de 2018. El Plan Fiscal de mayo de 2018 también incluía una nueva reforma estructural relacionada con la reforma del comercio transfronterizo para mejorar la facilidad para hacer negocios. Esta reforma se concentró en el transporte nacional y la congestión, y también en la cuestión de cumplimiento fronterizo y se preveía que contrarrestara la reducción del crecimiento por la exclusión de determinadas partes de la reforma laboral del acuerdo.

El Plan Fiscal de mayo de 2018 preveía generar $2,300 millones provenientes de medidas relativas a los ingresos y $9,500 millones de las medidas relativas a los gastos para los Años fiscales 2018 a 2023. También preveía que el superávit acumulado de los Años fiscales 2018 a 2048 ascendería a aproximadamente $36,000 millones antes de la amortización de la deuda.

5.       **Certificación del Plan Fiscal de junio de 2018**

El 4 de junio de 2018, el Presidente del Comité de Asuntos Gubernamentales la Cámara de Representantes, Sr. Jorge Navarro, envió una carta a la Junta de Supervisión señalando el "distinto alcance" entre la propuesta de la derogación total de la Ley 80 y el efecto de la enmienda con respecto a la protección de derechos adquiridos que ofrece la Ley 80 para los empleados existentes, e interesándose por las consecuencias del incumplimiento de los términos del acuerdo.

La Junta de Supervisión respondió ese mismo día a través de una carta que describía las consecuencias del incumplimiento del acuerdo, que esencialmente incluirían la anulación de los términos del acuerdo y, como mínimo, el retorno a los supuestos y los requisitos subyacentes del Plan Fiscal de abril de 2018.

Aunque el gobernador Rosselló expresó su apoyo a la derogación de la Ley 80 en varias ocasiones y las dos cámaras de la Legislatura contemplaron alguna derogación modificada de la Ley 80, la Legislatura finalmente no pudo aprobar ninguna derogación de las disposiciones de la Ley 80 para el 27 de junio de 2018. El 28 de junio de 2018, la Junta de Supervisión canceló la reunión pública que se había programado para el 29 de junio de 2018 con respecto a la certificación del presupuesto del Año fiscal 2019 y anunció su intención de recertificar el Plan Fiscal de abril de 2018, con algunos cambios y actualizaciones técnicas en la información macroeconómica en aquellas reformas que no fueron implementadas.

El 29 de junio de 2018, la Junta de Supervisión volvió a certificar de manera unánime su versión revisada del plan fiscal (el "Fiscal Plan de junio de 2018") que restablecía los requisitos de medidas fiscales del Plan Fiscal de abril de 2018, con algunos cambios importantes. El Plan Fiscal de junio de 2018 señaló el fracaso de la Legislatura para establecer la reforma estructural más importante de la Junta de Supervisión, la derogación de la Ley 80. Por lo tanto, el crecimiento económico proyectado derivado de la reforma laboral se redujo significativamente por debajo de los Planes Fiscales de abril y mayo de 2018. El requisito de trabajo para el PNA, el programa EITC, y el objetivo mejorado de la reforma para una mayor facilidad para hacer negocios relacionado con el comercio transfronterizo se mantuvo en el Plan Fiscal de junio de 2018. Las referencias a las iniciativas en materia de derecho tributario o cualquier reforma impositiva fueron eliminadas dado que la Junta de Supervisión entendía que ya no se estaba contemplando la verdadera reforma impositiva. Por último, los cambios relacionados con la información financiera actualizada y las estimaciones, tal como se reflejan en el Plan Fiscal de mayo de 2018 se mantuvieron en el Plan Fiscal de junio de 2018, además de los cambios necesarios para hacer que el plan fiscal certificado concordara con el presupuesto certificado del Año fiscal 2019 (p. ej., asignación de gastos de capital no asignados previamente, inclusión de redistribuciones realizadas en el Año fiscal 2018, etc.).

El Plan Fiscal de junio de 2018 destacaba la importancia de promover la integridad pública y la transparencia en todas las áreas del Gobierno. En reconocimiento a los esfuerzos del Gobernador para priorizar la supervisión y la responsabilidad fiscal, el Plan Fiscal de junio de 2018 señaló que los presupuestos para la Oficina del Contralor y la Oficina de Ética Gubernamental no se verían afectadas por las medidas de ajuste específicas de las agencias.

Además, el Plan Fiscal de junio de 2018 proyectaba aproximadamente $12,600 millones provenientes de medidas relativas a los ingresos y medidas relativas a los gastos de los Años fiscales 2018 a 2023. También preveía que el superávit acumulado de los Años fiscales 2018 a 2048 ascendería a aproximadamente $14,400 millones antes de la amortización de la deuda. El Plan Fiscal de junio de 2018 también incorporó muchas de las medidas que el Gobierno se negó a adoptar en una carta de fecha 27 de septiembre de 2018.

Los eventos que rodean a las certificaciones del plan fiscal del ELA por parte de la Junta de Supervisión en abril, mayo y junio de 2019 y las certificaciones del presupuesto del Año fiscal 2019 relacionado se convirtieron en el centro de las dos demandas contenciosas presentadas por el gobernador Rosselló y por la Legislatura en julio de 2018, como se analiza en mayor detalle en las secciones IV.C.3(h)(i) y (ii) de la Declaración de Divulgación.

6.    **Certificación del Plan Fiscal de octubre de 2018**

El 1 de agosto de 2018, la Junta de Supervisión anunció que revisaría el Plan Fiscal de junio de 2018 para incorporar nueva información importante, lo que incluía disponibilidades completas de ingresos y gastos del Año fiscal 2018, estimaciones revisadas de gastos de fondos de ayuda federal en caso de desastres y un ajuste a las proyecciones demográficas.

La Junta de Supervisión estableció un cronograma para que el ELA desarrollara y presentara un plan fiscal revisado para el 17 de agosto de 2018 y que la Junta de Supervisión certificara un nuevo plan fiscal para el 21 de septiembre de 2018. El 15 de agosto de 2018, la Junta de Supervisión aprobó la solicitud del ELA de prorrogar la fecha límite para la presentación al 20 de agosto de 2018. El ELA presentó su propuesta de plan fiscal revisado de acuerdo con la fecha límite prorrogada. El plan fiscal propuesto también incluía la consideración del debate sobre la transacción de COFINA.

El 20 de agosto de 2018, la Junta de Supervisión organizó un seminario web público para debatir los supuestos demográficos utilizados para el Plan Fiscal Certificado de junio de 2018. El seminario web incluía una presentación detallada de los principios básicos para la previsión y las fuentes de datos y solicitaba sugerencias y opiniones del público.

El 30 de agosto de 2018, la Junta de Supervisión envió una carta al gobernador Rosselló donde se formulaba una notificación de violación en virtud de la sección 201(c)(3)(B) de PROMESA con respecto al plan fiscal propuesto del ELA. La carta indicaba que el plan fiscal propuesto no reflejaba toda la información más reciente de las proyecciones de referencia e incluía varias nuevas políticas que eran incompatibles con el mandato de PROMESA y las reformas y medidas identificadas en el Plan Fiscal anterior de junio de 2018. La Junta de Supervisión estableció el 7 de septiembre de 2018 como la fecha límite para que el ELA presentara una propuesta de plan fiscal revisado que debía incluir todos los modelos financieros y de ajuste.

El 7 de septiembre de 2018, el ELA presentó su propuesta de plan fiscal revisado en respuesta a la carta de notificación de violación de la Junta de Supervisión. Este plan propuesto incorporaba los términos del acuerdo de reestructuración de deuda de COFINA.

La fecha inicial fijada para la certificación, que era el 21 de septiembre de 2018, se prorrogó basándose en las negociaciones en curso entre la Junta de Supervisión y el gobierno del ELA. La Junta de Supervisión programó una vista pública para el 23 de octubre de 2018 para revisar el plan fiscal propuesto.

El 19 de octubre, la Junta de Supervisión presentó el plan de ajuste propuesto para COFINA que era congruente con el plan fiscal para COFINA certificado el 18 de octubre de 2018, la declaración de Divulgación y la moción de transacción relacionadas.

El 22 de octubre de 2018, la Junta de Supervisión publicó un borrador del plan fiscal propuesto para el ELA que incorporaba la reestructuración de COFINA. Durante la vista pública celebrada el 23 de octubre de 2018, la Junta de Supervisión certificó de manera unánime su versión del plan fiscal ("Plan Fiscal de octubre de 2018").

El Plan Fiscal de octubre de 2018 revisó el financiamiento estimado de ayuda en caso de desastres en aproximadamente $82,000 millones de fuentes federales y privadas y la implementación actualizada y proyectada de este gasto basándose en la información de FEMA y otras fuentes. También desarrolló distintas tasas de transferencia para el impacto del financiamiento en la economía en vista de nuevos datos relacionados con el impacto de diversos tipos de gasto. Se actualizaron los detalles de las proyecciones demográficas, y se utilizaron las disponibilidades de ingresos y gastos del Año fiscal 2018 para actualizar las proyecciones. El Plan Fiscal de octubre de 2018 indicaba una cantidad menor de pequeños incrementos de crecimiento del PNB derivados de las reformas estructurales en comparación con aquellos observados en el Plan Fiscal de junio de 2018. Esto se debió a un progreso inferior al esperado en la implementación de la reforma estructural, relacionado especialmente con el requisito de trabajo del PAN y la reforma del comercio transfronterizo (esta última fue eliminada del plan fiscal). Otros cambios incluyeron la actualización de las proyecciones de ingresos basadas en resultados reales, que fueron superiores a lo previsto y actualizaciones de gastos reales, específicamente relacionadas con la nómina que ha mostrado evidencias de presupuestación excesiva histórica.

Aunque diversas iniciativas y objetivos del Plan Fiscal de octubre de 2018 siguieron siendo congruentes en gran medida con el Plan Fiscal de junio de 2018, el plan fiscal revisado también incorporó los términos de la transacción de COFINA y preveía $12,400 millones de superávit adicional provenientes de medidas relativas a los ingresos y medidas relativas a los gastos de los Años fiscales 2018 a 2023. El Plan Fiscal de octubre de 2018 también proyectaba un desempeño acumulado en punto de equilibrio antes de la amortización de la deuda para el Año fiscal 2018 al Año fiscal 2058.

Poco después de la certificación del Plan Fiscal de octubre de 2018, la Junta de Supervisión lanzó un tablero de información interactivo, basado en la web, para verificar el cumplimiento de los planes fiscales certificados.

7.      **Certificación del Plan Fiscal de mayo de 2019**

A partir de octubre de 2018, la Junta de Supervisión siguió evaluando y respondiendo a los distintos sectores con respecto a los objetivos, los supuestos y las proyecciones del Plan Fiscal de octubre de 2018. Los esfuerzos de la Junta de Supervisión incluyeron conversaciones permanentes con el Gobierno.

Durante la vista de la declaración de divulgación de COFINA realizada el 20 de noviembre de 2018, la Junta de Supervisión reveló que había descubierto un error de cálculo en el pronóstico del pago de pensiones en el Plan Fiscal de octubre de 2018. El 30 de noviembre de 2018, la Junta de Supervisión anunció que había llegado a la conclusión de que el error en el pronóstico de pensiones dio como resultado una subestimación de los pronósticos de pensiones y las proyecciones de pago de PayGo de $3,350 millones.

El 18 de enero de 2019, la Junta de Supervisión envió una carta al Gobierno presentando el cronograma para desarrollar, presentar, aprobar y certificar un plan fiscal revisado para el ELA y el presupuesto del Año fiscal 2020 para el ELA. La carta de fecha 18 de enero de 2019 contemplaba que el Gobernador presentara una propuesta de plan fiscal para el 22 de febrero de 2019 y que la Junta de Supervisión debía esperar la certificación para el 26 de abril de 2019. A pedido del Gobernador, la Junta de Supervisión otorgó una prórroga para que el Gobierno presentara un plan fiscal propuesto del 22 de febrero de 2019 al 8 de marzo de 2019. La fecha de certificación prevista permaneció sin cambios en el 26 de abril de 2019.

El 10 de marzo de 2018, el Gobierno presentó un borrador del plan fiscal revisado. El 15 de marzo de 2019, la Junta de Supervisión envió una carta al gobernador Rosselló donde se formulaba una notificación de violación en virtud de la sección 201(c)(3)(B) de PROMESA con respecto al plan fiscal

propuesto del ELA. La carta indicaba que el plan fiscal propuesto requería determinadas revisiones significativas (p. ej., dentro de la reforma de pensiones y la reforma de salud) e información complementaria adicional. La carta también destacaba que la propuesta del Gobierno incluía varias políticas nuevas que eran incompatibles con el mandato de PROMESA y carecía de iniciativas de reforma estructural detalladas y críticas y la información más reciente para las proyecciones de referencia. La Junta de Supervisión estableció el 22 de marzo de 2019 como la fecha límite para que el Gobierno presente una propuesta de plan fiscal revisado.

A pedido del Gobierno, la fecha límite para la presentación de un borrador revisado se prorrogó al 27 de marzo de 2019. El 27 de marzo de 2019, el Gobierno presentó un borrador revisado junto con una carta en respuesta a la notificación de violación de la Junta de Supervisión del 15 de marzo de 2019.

La Junta de Supervisión también celebró una vista el 28 de marzo de 2019 con el Departamento de Seguridad Pública de Puerto Rico sobre la implementación del plan fiscal certificado, incluso las medidas de ajuste y presentación de informes. En ella se destacaron varias deficiencias en el enfoque del departamento con respecto a los esfuerzos en materia de eficiencia.

El 21 de abril de 2019, la Junta de Supervisión envió una carta al Gobierno, que incluía un nuevo cronograma para la certificación dadas las demoras del cronograma inicial y el proceso iterativo de solicitar información complementaria adicional. La Junta de Supervisión estableció la nueva fecha de certificación prevista para el 9 de mayo de 2019. El 6 de mayo de 2019, la Junta de Supervisión anunció que se celebraría una vista pública el 9 de mayo de 2019, según lo planificado, para considerar la certificación del plan fiscal.

El 9 de mayo de 2019, la Junta de Supervisión publicó un borrador del plan fiscal propuesto para el ELA. Durante la vista pública de ese mismo día, la Junta de Supervisión certificó su versión del plan fiscal.[178] El Plan Fiscal de mayo de 2019 incorpora una serie de actualizaciones importantes para obtener nueva información y datos, como un despliegue más lento del financiamiento para la recuperación en casos de desastre; previsiones actualizadas en materia de población; menores mejoras momentáneas en el crecimiento del PNB de la reforma estructural debido a demoras en la aplicación o aplicación inadecuada del trabajo y el bienestar, facilidad para hacer negocios y reforma del sector de la energía; un pronóstico de gastos de pensiones revisado; datos actualizados de inscripción en Medicaid; datos actualizados de inscripción en Medicaid y medidas de reforma sanitaria; y financiamiento adicional para gastos de capital del Fondo de Ingresos Especiales. Además, el Plan Fiscal de mayo de 2019 perfeccionó las hipótesis relacionadas con el gasto de fondos de ayuda en caso de desastres y medidas fiscales, estimando que se produciría en cinco en lugar de en diez años; esto significa que las tasas de crecimiento del PNB se contraerían más rápido, la emigración aumentaría más rápidamente y la población disminuiría más que lo previsto anteriormente. Lo que es más importante, el Plan Fiscal de mayo de 2019 también incorporó las decisiones presupuestarias del Año fiscal 2020.

Además de incorporar nueva información, el Plan Fiscal de mayo de 2019 instaba al Gobierno a tomar medidas para abordar las metas incumplidas y acelerar el ritmo del cambio basándose en el progreso inadecuado de la implementación en el Año fiscal 2019. Además, como parte de su enfoque en la transparencia del gasto, el Plan Fiscal de mayo de 2019 (y el presupuesto del Año fiscal 2020) redujo el gasto en áreas de baja transparencia, como servicios profesionales y "artículos con gastos sumados", e incluía inversiones en áreas prioritarias. Estas áreas de inversión incluyen compensación de la policía (que se llevó a los promedios del continente) y equipo, personal de la salud y gastos de capital, compensación

---

[178] A pesar del progreso sustancial que se ha realizado entre el Gobierno del ELA y la Junta de Supervisión para reducir sus diferencias, el Plan Fiscal de mayo de 2019 se certificó con medidas a pesar de las objeciones del gobierno del ELA.

educativa adicional y becas, salarios y equipos de bombero, nómina y equipo del Instituto de Ciencias Forenses y financiamiento de gastos de capital adicional.

El Plan Fiscal de mayo de 2019 tiene previsto generar $2,500 millones provenientes de medidas relativas a los ingresos y $11,000 millones provenientes de medidas relativas a los gastos del Año fiscal 2019 al Año fiscal 2024. También prevé aproximadamente $23,000 millones de superávit acumulado antes de la amortización de la deuda del Año fiscal 2018 al 2048. Además, el Plan Fiscal de mayo de 2019 destaca que el Gobierno ha tenido problemas para implementar e informar oportunamente acerca del progreso en reformas y medidas hasta la fecha. Por ejemplo, el Gobierno no presentó muchos planes de implementación requeridos en virtud de planes fiscales certificados anteriores para ser presentados antes del 30 de junio de 2018 hasta septiembre de 2018, y algunos planes de implementación se presentaron en una fecha tan tardía como abril de 2019. Como resultado de ello, el progreso ha sido inconstante e incompleto. Por lo tanto, el Plan Fiscal de mayo de 2019 agrega requisitos de informes de desempeño mensuales para garantizar el progreso y el monitoreo de la implementación.[179] Además, en muchas agencias en las que el Gobierno ha conseguido objetivos presupuestarios establecidos en el Plan Fiscal de mayo de 2019, esto ha sido a través de la dependencia excesiva de las políticas de transición voluntaria en lugar de políticas mejor adaptadas, lo que puede tener el efecto de reducir la eficacia del Gobierno en el mediano a largo plazo.

8.     **Puntos destacados de las inversiones prioritarias**

A lo largo del desarrollo de cada plan fiscal certificable, la Junta de Supervisión ha tenido en cuenta las necesidades de los habitantes de Puerto Rico y ha realizado inversiones prioritarias en áreas como seguridad pública, salud y educación. Más recientemente, el Plan Fiscal de mayo de 2019 continuó y amplió estas inversiones que apuntan a mejorar la calidad de los servicios públicos.

De enorme importancia entre estos proyectos es un esfuerzo para mejorar la seguridad pública. En primer lugar, el Plan Fiscal de mayo de 2019 invierte en compensación de oficiales de policía para mejorar la competitividad dada la conflictividad significativa que ha experimentado el Negociado de la Policía de Puerto Rico (NPPR). Por lo tanto, se han incluido un aumento de salarios y beneficios obligatorios del 30% (aproximadamente $11,500) durante dos años y $250 por oficial juramentado por año para seguro de vida y discapacidad. Las inversiones adicionales incluyen contribuciones al Seguro Social para oficiales juramentados, $122 millones por año desde el Año fiscal 2019 hasta el Año fiscal 2021 para oficiales de policía a los que se les adeuda el pago por servicios prestados y $42 millones en financiamiento de gastos de capital en el Año fiscal 2020.

Más allá de la inversión en el NPPR, la Junta de Supervisión también incluyó más de $5 millones en financiamiento de personal y $15 millones en financiamiento no relacionado con el personal para otras agencias de seguridad pública. Específicamente, estas inversiones permitirán aumentos de compensación de $500 por empleado para los bomberos y adquisición de nuevos vehículos y equipo de seguridad para el

---

[179] La GAO indicó en su Informe de la GAO de 2019 que los expertos, y también los funcionarios del gobierno de Puerto Rico, han expresado su preocupación porque la reestructuración de deuda del BGF a través del Título VI y la reestructuración de COFINA a través del Título III se basan en una expectativa excesivamente optimista del crecimiento económico del ELA. Sin embargo, la GAO informó que el Plan Fiscal de mayo de 2019 contiene proyecciones mucho más conservadoras para el crecimiento económico que los planes fiscales anteriores. La GAO también planteó preocupaciones acerca de la viabilidad de las reformas estructurales propuestas del Plan Fiscal de mayo de 2019 para generar los beneficios económicos proyectados, y que la Junta de Supervisión sobreestimó el volumen y la puntualidad de los fondos federales para ayuda frente a huracanes.

Cuerpo de Bomberos de Puerto Rico. El Instituto de Ciencias Forenses recibirá fondos para contratar más de 90 nuevos empleados e invertir en suministros del laboratorio forense. [180]

La Junta de Supervisión también incluyó inversiones en varias agencias que brindan servicios de salud. En primer lugar, el Plan Fiscal de mayo de 2019 provee una suma adicional de $1.4 millones para financiar el programa Medicaid desde el Año fiscal 2019 hasta el Año fiscal 2024 para mejorar la estabilidad del sistema de salud. Además, se han invertido más de $15 millones en concepto de financiamiento anual para mantener los niveles de personal de enfermería, y se han proporcionado $12 millones al Hospital Psiquiátrico para que pueda obtener su certificación de Medicare. Por último, más de $25 millones en gastos en el Fondo de Ingresos Especiales han sido aprobados en el Año fiscal 2020 para permitir que el Centro Oncológico Integral esté en pleno funcionamiento.

La educación de los niños de Puerto Rico y su ingreso con éxito a la fuerza laboral es también un objetivo fundamental del Departamento de Educación de Puerto Rico y de la Junta de Supervisión, dado que se ha demostrado que estos resultados impulsan el crecimiento económico a largo plazo. Teniendo presente ese objetivo, la Junta de Supervisión ha ampliado las inversiones anteriores en salarios de los docentes y directores y libros de texto para incluir un aumento de compensación adicional de $500 por empleado para todos los docentes y directores en el Plan Fiscal de mayo de 2019. Esta inversión aumenta la compensación de los docentes más de $2000 desde que se estableció la Junta de Supervisión, que representa el único aumento recibido por los docentes en la última década.

El conjunto de inversiones destacado anteriormente representa el compromiso de la Junta de Supervisión con la reforma exitosa del Gobierno. Aunque no es una lista exhaustiva, las inversiones mejorarán los niveles de servicio en áreas que afectan el éxito económico a largo plazo del ELA.

9.      **Proceso de certificación del Plan Fiscal de mayo de 2020**

Tras la certificación del Plan Fiscal de mayo de 2019 y del Presupuesto del Año fiscal 2020, la Junta de Supervisión implementó una frecuencia de seguimiento e información periódica para las agencias gubernamentales (y agrupaciones de agencias). Además de los informes mensuales, la Junta de Supervisión celebró una serie de Vistas Públicas a lo largo del Año fiscal 2020 para aumentar aún más la transparencia sobre la aplicación de las reformas estructurales y fiscales esbozadas en el Plan Fiscal de mayo de 2019. Estas incluyeron Vistas Públicas centradas en el progreso de la implementación para el (a) Departamento de Desarrollo Económico y Comercio (DDEC) y Facilidad para hacer negocios, (b) Departamento de Educación (DEPR), y (c) Departamento de Corrección y Rehabilitación (DCR).

El 12 de diciembre de 2019, la Junta de Supervisión anunció que llevaría a cabo su proceso anual para certificar un Plan Fiscal revisado y envió una carta al Gobierno estableciendo un calendario actualizado para desarrollar y certificar un Plan Fiscal revisado para el Estado Libre Asociado, de acuerdo con PROMESA. Poco después, Puerto Rico se vio afectado por una serie de terremotos que causaron importantes daños en la parte suroeste de Puerto Rico.

A petición del Gobierno, la Junta de Supervisión concedió una prórroga para que el Gobierno presentara una propuesta de Plan Fiscal y el 30 de enero de 2020, solicitó al Gobernador que presentara una propuesta de Plan Fiscal antes del 28 de febrero de 2020, para su consideración por la Junta de Supervisión.

---

[180] El presupuesto del Año fiscal 2020 incluye un aumento salarial de $1,500/año por bombero (en comparación con $500/año en el plan fiscal). El presupuesto del Año fiscal 2020 del EMS aumentó $4.8 millones con respecto al presupuesto del Año fiscal 2019.

La carta indicaba que la Junta de Supervisión esperaba completar la certificación antes del 30 de abril de 2020.

El 28 de febrero de 2020, el Gobierno presentó un borrador del Plan Fiscal. El 13 de marzo de 2020, la Junta de Supervisión envió una carta al gobernador Vázquez donde se formulaba una notificación de violación de la sección 201(c)(3)(B) de PROMESA en relación con la presentación del borrador del ELA. La carta indicaba que el Plan Fiscal propuesto por el Gobierno era incompatible con PROMESA por varias razones. Entre ellas: posiciones políticas incompatibles con el mandato de PROMESA (por ejemplo, la defensa de la estadidad), la inclusión de disposiciones de la Ley 29 que se consideraron incompatibles con PROMESA, la paralización de las reformas de salud, la reducción de los objetivos de los ingresos fiscales de derecho, la reducción de los ahorros que deben lograrse a través de la eficiencia de las agencias y la eliminación de las reformas que deben llevarse a cabo para las agencias clave, y la falta de hitos concretos para la aplicación. La carta establecía el 23 de marzo de 2020 como la fecha límite para que el Gobierno presentara una propuesta de plan fiscal revisado.

En marzo de 2020, la pandemia de COVID-19 alcanzó a Puerto Rico, requiriendo que la Junta de Supervisión y el Gobierno se ocuparan urgentemente de acciones de salud pública y fiscales para mitigar el impacto de la pandemia en los residentes. En respuesta a una solicitud del Gobierno, el plazo para la presentación de una propuesta revisada de Plan Fiscal se amplió hasta el 3 de mayo de 2020. El 3 de mayo de 2020, el Gobierno presentó un Plan Fiscal revisado junto con una carta de respuesta a la Notificación de Violación de la Junta de Supervisión del 13 de marzo de 2020. El 23 de mayo de 2020, la Junta de Supervisión anunció que se celebraría una reunión pública de la Junta (por videoconferencia) el 27 de mayo de 2020, para considerar la certificación de un nuevo Plan Fiscal del ELA.

El 27 de mayo de 2020, la Junta de Supervisión publicó un borrador del Plan Fiscal para el ELA. Durante la reunión pública de la Junta, la Junta de Supervisión certificó el Plan Fiscal 2020.

10.    **Descripción general del Plan Fiscal Certificado de mayo de 2020**

El Plan Fiscal 2020 incorporaba una serie de modificaciones de las hipótesis debido a nueva información o eventos, como el previsto desembolso de fondos federales para la recuperación de desastres y el impacto de las reformas estructurales. Con el estallido de la pandemia COVID-19, el Plan Fiscal 2020 incluyó actualizaciones de las previsiones macroeconómicas para reflejar el impacto de esta crisis mundial, como el menor crecimiento del continente estadounidense y el efecto neto de la pérdida de ingresos prevista por el desempleo y el estímulo federal y local para el alivio de COVID-19. Además, el Plan Fiscal 2020 incorporó otras actualizaciones, como las proyecciones de gasto actualizadas, datos de inscripción de Medicaid y proyecciones actuariales de pensiones.

Al igual que los planes fiscales anteriores, el Plan Fiscal 2020 incluyó importantes reformas estructurales para restaurar la competitividad y permitir el crecimiento, como por ejemplo reformas del capital humano y del bienestar para avanzar en la participación exitosa en el mercado laboral formal, reformas para agilizar la facilidad de hacer negocios en Puerto Rico y estimular la creación de empleo, propuestas para permitir una potencia fiable y una infraestructura energética estable, y reformas dentro del sistema educativo. Además, el Plan Fiscal 2020 se centró en las reformas fiscales destinadas a mejorar la capacidad de respuesta y la eficiencia del Gobierno, reduciendo al mismo tiempo los gastos administrativos innecesarios y mitigando el creciente crecimiento de los costos de salud. El Plan Fiscal previó un superávit de $2,200 millones procedentes de medidas relativas a los ingresos y $6,000 millones provenientes de medidas relativas a los gastos para el Año fiscal 2020 hasta el Año fiscal 2025. El Plan Fiscal 2020 también proyectó aproximadamente $22,000 millones de déficit acumulado desde el Año fiscal 2020 hasta el año

fiscal 2049, lo que incluía $24,000 millones de superávit por las reformas estructurales, que aumentan el crecimiento del PNB.

El Plan Fiscal 2020 también ponía énfasis en la mejora de las capacidades del Gobierno en la prestación digital para lograr beneficios críticos a través del PRITS, que fue creado en 2017 pero que no avanzó significativamente hacia el cumplimiento de las responsabilidades que se le otorgaron. Al igual que los planes fiscales anteriores, el Plan Fiscal 2020 ponía el acento en la creación de una Oficina del CFO sólida y centralizada, y en la aceleración de la finalización de los CAFR de los años anteriores.

El Plan Fiscal 2020 siguió reflejando la necesidad de reducir la asignación del ELA a los municipios y a la UPR en el transcurso del tiempo. El Plan Fiscal 2020 fomentó la consolidación de los servicios en todos los municipios e instó al CRIM a aplicar medidas para captar los ingresos no percibidos del impuesto sobre la propiedad.

En cuanto a la UPR, el Plan Fiscal 2020 reflejó tanto el descenso de las matriculaciones universitarias como la gran oportunidad de diversificar las fuentes de ingresos y transformar las operaciones a través de una mayor utilización de los servicios compartidos y otras racionalizaciones administrativas en sus 11 campus.

La Junta de Supervisión era consciente de que, dadas las circunstancias actuales de la pandemia de COVID-19 y los recientes terremotos, el Gobierno necesitaba invertir tiempo y esfuerzo en la consecución de las medidas previamente requeridas y aún no implementadas, dando apoyo al mismo tiempo a los residentes de Puerto Rico. Por lo tanto, el Plan Fiscal 2020 hizo una pausa en las medidas incrementales de eficiencia de las agencias hasta el Año fiscal 2022. Esta pausa redujo las expectativas de ahorro en la mayoría de las categorías de racionalización de las agencias, así como los objetivos de ahorro de la reforma sanitaria, para que el Gobierno pudiera centrarse en su implementación. También redujo las expectativas de las medidas de la reforma de salud en los años futuros, al tiempo que incorporó un financiamiento federal incremental en los Años fiscales 2020-2022 debido a la reciente legislación federal. Además, el plan mantuvo los subsidios a la UPR y a los municipios en los niveles del Año fiscal 2020 para el Año fiscal 2021. En cuanto a la UPR, tras la pausa del 2021, la disminución gradual de sus asignaciones continuó como estaba previsto previamente, hasta llegar a los $452 millones en el Año fiscal 2025.

El Plan Fiscal 2020 también incorporó ciertas disposiciones del Plan de Ajuste del 28 de febrero de 2020. Estas disposiciones se referían principalmente a las medidas de reforma de las pensiones, incluida una disminución de la propuesta de reducción de los beneficios de las pensiones y el tratamiento específico de los miembros del Sistema 2000 en el marco del Plan de Ajuste propuesto. En concreto, el Plan Fiscal 2020 incorporó una disminución de las reducciones de los beneficios de las pensiones del 10% al 8.5% (con protecciones para los participantes cercanos al nivel de pobreza), con el objetivo de tener un enfoque equilibrado para restaurar la salud fiscal de Puerto Rico.

Por último, para garantizar el éxito de las reformas necesarias y asignar los recursos a las áreas más necesitadas, el Plan Fiscal 2020 incluía las inversiones detalladas a continuación. El Plan Fiscal 2020 también incluía plazos y objetivos detallados que requerían medidas urgentes en el transcurso de varios años por parte del Gobierno para lograr avances. La Junta de Supervisión aprobó inversiones incrementales en el programa de Medicaid para los Años fiscales 2020-2022 con el fin de ampliar las prestaciones (p.ej., la cobertura de medicamentos contra la hepatitis C), lo cual fue posible gracias al aumento del financiamiento federal. Por último, el Plan fiscal 2020 incorporó las decisiones presupuestarias preliminares del Año fiscal 2021.

11.    **Inversión en respuesta a la COVID-19 y otras inversiones prioritarias básicas**

A lo largo del desarrollo de cada plan fiscal certificado, la Junta de Supervisión ha tenido en cuenta las necesidades de los habitantes de Puerto Rico y ha realizado inversiones prioritarias en áreas como seguridad pública, salud y educación. Más concretamente, el Plan Fiscal 2020 incluía $5,500 millones en inversiones a lo largo de los Años fiscales 2020-2025 para acelerar la recuperación de Puerto Rico ante los desastres naturales y la pandemia de COVID-19, asignando fondos para fortalecer el sistema público de salud de Puerto Rico, el capital humano y la infraestructura de telecomunicaciones, entre otros.

El apoyo inmediato a la respuesta a la pandemia de COVID-19 incluía incentivos para las nóminas de los trabajadores de primera línea (incluidos los enfermeros, técnicos públicos y privados, y policía, suministros médicos y de seguridad pública y gastos de capital, aprendizaje a distancia en el sistema de educación pública, y $100 millones de apoyo a los municipios que se enfrentan a reducciones de ingresos debido a la pandemia.

Más allá de la respuesta inmediata a la pandemia de COVID-19, el Plan Fiscal 2020 incluyó $313 millones de inversión para abordar las brechas de infraestructura crítica en los hospitales públicos, instituyendo y ampliando el uso de los programas de Registro Electrónico de Salud, ampliando el acceso a la atención a través del desarrollo de la infraestructura de telesalud. Además, la Junta de Supervisión destinó $586 millones a mejorar la disponibilidad y la calidad de la atención en el sistema de Medicaid, mantener los niveles de dotación de personal de enfermería y de profesionales de la salud, aumentar la capacidad de los hospitales mediante grandes proyectos de capital, poner en funcionamiento el Centro Oncológico Integral y permitir la eficiencia operativa.

Además, el Plan Fiscal 2020 se sumó a las inversiones anteriores para salvaguardar la seguridad pública al permitir $1,300 millones en financiamiento de la seguridad pública, incluyendo la provisión de salarios y beneficios más competitivos a los oficiales juramentados, el apoyo a los aumentos salariales de los bomberos, el financiamiento para proporcionar equipos de seguridad pública, materiales y vehículos, entre otros.

Para impulsar los resultados educativos, el Plan Fiscal 2020 incluía más de $760 millones para reforzar la formación de los docentes en el aprendizaje de la lengua inglesa, incorporar psicólogos a la plantilla para ofrecer terapias basadas en la evidencia a los alumnos de Educación Especial, contratar más enfermeras para las escuelas públicas, impulsar la digitalización para mejorar la gestión y los informes, y compensar a los docentes y directores transitorios.

Del mismo modo, con el fin de fortalecer el sector tecnológico y hacer frente a la brecha digital en Puerto Rico, el Plan Fiscal 2020 incluyó $400 millones para ampliar el acceso a la banda ancha de los residentes de Puerto Rico, mejorando así las oportunidades económicas de los habitantes de las zonas rurales. También incluyó $50 millones en fondos para invertir en el desarrollo de la fuerza laboral, específicamente enfocados en disciplinas relacionadas con los negocios y la tecnología.

Otras inversiones prioritarias incluían $43 millones en el Año fiscal 2021 para el fondo de becas de la UPR, $179 millones en los Años fiscales 2020-2025 para atender las necesidades de los estudiantes más vulnerables económicamente y $94 millones para transformar los servicios gubernamentales mediante la contratación de personal adicional en programas básicos. Por último, el Plan Fiscal 2020 también incluía facilidades de liquidez, como $185 millones a disposición de los municipios hasta el 31 de julio de 2020 para garantizar que se puedan seguir adelantando las remesas mensuales de impuestos sobre la propiedad, y $750 millones en capital circulante que se pondrán a disposición para facilitar las tareas de reconstrucción aprobadas por la FEMA.

12.      **El proceso de certificación del Plan fiscal 2021**

Tras la certificación del Plan fiscal de mayo de 2020 y el presupuesto del Año fiscal 2021, la Junta de Supervisión continuó vigilando e informando periódicamente la cadencia de las agencias gubernamentales (y de las agrupaciones de agencias), y organizó 9 reuniones públicas para tratar una serie de temas, desde la necesidad de una reforma de transportes más sólida y la necesidad del Gobierno de escalar su proyecto de horarios y asistencia con el objeto de reducir las remuneraciones pagadas a los empleados ausentes o no existentes hasta la situación de la implementación de las reformas estructurales en Puerto Rico. EL 19 de enero de 2021, la Junta de Supervisión anunció que realizará su procedimiento anual de certificación de un Plan fiscal revisado, y envió una carga al Gobierno proponiendo un calendario para el desarrollo y la certificación de un Plan fiscal revisado para el ELA, de conformidad con PROMESA. Mediante dicha carta, se solicitó al Gobierno que presentase a la Junta de Supervisión una propuesta de Plan fiscal actualizado como más tardar el 20 de febrero de 2021.

A petición del Gobierno, el 19 de febrero de 2021 la Junta de Supervisión otorgó una prórroga para la presentación de una propuesta de Plan Fiscal, y pidió al Gobernador que lo enviase como más tardar el 8 de marzo de 2021. La carta manifestaba que la Junta de Supervisión esperaba concluir el procedimiento de certificación hasta el 23 de abril de 2021.

El 8 de marzo de 2021, el Gobierno presentó un borrador de Plan fiscal. El 15 de marzo de 2021, la Junta de Supervisión envió una carta al Gobernador Pierluisi formulando una Notificación de vulneración de la Sección 201(c)(3)(B) de PROMESA con respecto a la presentación del borrador del ELA. La carta señalaba que la propuesta de Plan fiscal del Gobierno era incompatible con PROMESA por diversas razones, entre ellas: posiciones políticas incompatibles con el mandato de PROMESA (por ejemplo, referencias a la estatalidad), la inclusión de los niveles de financiamiento federal de Medicaid que no se ajustaban a la legislación actualmente vigente, la eliminación de nuevas reducciones de asignaciones a los municipios y a la UPR, y la ausencia de hitos concretos para implementar las medidas fiscales y reformas estructurales. La carta estableció el 26 de marzo de 2021 como plazo final para la presentación por el Gobierno de una propuesta revisada del Plan fiscal.

El 26 de marzo de 2021, el Gobierno envió un Plan fiscal revisado, conjuntamente con una carta en la que respondía a la Notificación de vulneración del 15 de marzo de 2021 de la Junta de Supervisión. El 21 de abril de 2021, la Junta de Supervisión anunció que se celebraría una reunión pública (por videoconferencia) el 23 de abril de 2021, para considerar la certificación del nuevo Plan Fiscal del ELA.

El 22 de abril de 2021, la Junta de Supervisión publicó un borrador del Plan fiscal del ELA. Durante la reunión pública del 23 de abril de 2021, la Junta de Supervisión certificó el Plan Fiscal 2021.

13.      **La certificación del Plan fiscal de abril de 2021**

El Plan fiscal 2021 incorpora una serie de modificaciones en las hipótesis como consecuencia de nuevos datos o eventos. Por ejemplo, las proyecciones macroeconómicas se

actualizaron con las perspectivas más recientes de la economía estadounidense publicadas por la Oficina Presupuestaria del Congreso. También se actualizaron varias otras variables macroeconómicas para reflejar los datos más recientes aportados por las agencias federales y las instituciones macroeconómicas internacionales, como el Banco Mundial y el Fondo Monetario internacional. Se actualizó la proyectada aportación de fondos federales para la recuperación de desastres en función de los desembolsos efectivos hasta la fecha, que han sido más lentos de lo inicialmente previsto. Las repercusiones de las reformas estructurales se ajustaron como consecuencia del incumplimiento de los hitos y/o la ausencia de las medidas necesarias para ejecutar las reformas.

Un año después del brote de la pandemia de la COVID-19, el Plan fiscal 2021 incluye actualizaciones de las previsiones macroeconómicas para reflejar el impacto de esta crisis global. Incluyen una estimación actualizada del efecto neto de la pandemia en los ingresos y el crecimiento basada en los datos reales y en las proyecciones del desempleo, estimaciones sobre las repercusiones positivas de los programas de sustitución de rentas, una estimación actualizada de las asignaciones a Puerto Rico procedentes de otros programas de estímulos incluidos en las cinco rondas de estímulos federales (la Ley de Asignaciones Suplementarias de Preparación y Respuesta al Coronavirus, la Ley Familias Primero de Respuesta al Coronavirus, la Ley CARES (Ley de Asistencia, Alivio y Seguridad Económica por el Coronavirus, la Ley de Asignaciones Suplementarias de Respuesta y Alivio al Coronavirus (CRRSA) y la Ley ARP (Plan de Rescate estadounidense). Además, el Plan Fiscal 2021 incorpora varias otras actualizaciones, como las de flujos de renta y proyecciones de gastos, datos de afiliación a Medicaid y proyecciones actuariales de pensiones.

El Plan Fiscal 2021 sigue incluyendo importantes reformas estructurales para restablecer la competitividad y posibilitar el crecimiento de Puerto Rico. Incorpora reformas del capital humano y del bienestar para promover la participación en el mercado de trabajo formal, medidas para reforzar el entorno empresarial de Puerto Rico (por ejemplo, simplificar el pago de impuesto, el registro de propiedades y las solicitudes de permisos), estimular la atracción de inversiones y la creación de puestos de trabajo. También iniciativas para posibilitar una infraestructura eléctrica y energética confiable y estable para empresas y particulares, y reformas dentro del sistema educativo para mejorar los resultados académicos. Por otra parte, el Plan fiscal 2021 incorpora una versión ampliada de la reforma de infraestructuras, con una serie de iniciativas para transformar más ampliamente el sistema de transporte público mediante, por ejemplo, la integración de todos los activos de tráfico dentro de la ATI para que pueda actuar como autoridad de tráfico unitaria.

Asimismo, el Plan fiscal 2021 hace hincapié en reformas fiscales que apuntan a mejorar la capacidad de respuesta y la eficacia de las administraciones públicas y, al mismo tiempo, reducir los gastos administrativos innecesarios y mitigar la escalada de los costos sanitarios. El Plan fiscal 2021 prevé un superávit de $2,200 millones como consecuencia de las medidas en materia de recaudación y de $7,600 millones de medidas de contención de gasto entre los Años fiscales 2022 y 2026. El Plan fiscal 2021 proyecta también un déficit acumulado de unos $5,400 millones entre los Años fiscales 2022 y 2051, que incluyen un superávit de $30,700 millones por las reformas estructurales, situación que reforzará el crecimiento del PNB.

El Plan fiscal 2021 sigue haciendo hincapié en (a) la importancia de mejorar la capacidad digital de las administraciones públicas para obtener ventajas críticas a través del PRITS, (b) la creación de una Oficina del CFO (Oficial principal de Finanzas Públicas) robusta y centralizada, y (c) la agilización de la conclusión de los informes ACER de los años recientes.

El Plan fiscal 2021 sigue reflejando la necesidad de reducir las asignaciones del ELA a los municipios en el transcurso del tiempo. Los municipios han conseguido escasos avances en la implementación de al disciplina fiscal necesaria como consecuencia del descenso demográfico en muchas zonas. También propicia la consolidación de servicios entre los municipios, e insta al CRIM a adoptar medidas para recaudar los impuestos a los bienes inmuebles reforzando el cumplimiento tributario y mejorando los índices generales de recaudación.

Por otra parte, el Plan fiscal 2021 refleja la necesidad de reducir gradualmente la asignación del ELA a la UPR. Ello refleja tanto la disminución de las matriculaciones universitarias como la oportunidad de diversificar las fuentes de ingresos y transformar operaciones a través de la utilización de servicios compartidos y otras medidas de racionalización administrativas en sus 11 campus. El Plan fiscal 2021 mantiene los niveles de asignaciones a la UPR en aproximadamente $466 millones para el Año fiscal 2022. A partir de entonces continuará una disminución gradual de las asignaciones a la UPR, tal como estaba previsto, hasta dejarlas en unos $455 millones en el Año fiscal 2025. En abril de 2021, el Departamento de Educación de EE.UU. publicó una directriz formal adicional sobre cómo calcular los requisitos de Mantenimiento del esfuerzo (MDE) asociados con los fondos ESSER (Alivio de Emergencia para Escuelas Primarias y Secundarias) y GEER (Alivio de Emergencia para la Educación del Gobernador), también previstos en las leyes CARES y CRRSA/ARP. La directriz explica cómo los estados y territorios deben determinar qué nivel de gasto estatal en la educación primaria, secundaria y superior (por ejemplo, para DEPR y UPR) es necesario para cumplir los requisitos de MDE de estos paquetes de ayuda, así como los procedimientos para tramitar excepciones. La Junta de Supervisión está analizando la directriz para determinar qué implicaciones pudiesen tener los requisitos de MDE en el financiamiento del ELA, de la UPR y del DEPR previsto en el Plan fiscal 2021 y en futuros presupuestos.

El Plan Fiscal 2021 incorpora también las hipótesis revisadas para la reducción de beneficios jubilatorios. Aunque la reducción se mantiene en el 8.5%, como en el Plan fiscal 2020, no se aplicará a quienes perciban pensiones inferiores a los $1,500 mensuales, ni se reducirá ninguna prestación por debajo de dicho nivel. Esto representa una mejora del umbral original de $1,200 mensuales convenido en el Acuerdo de apoyo al Plan con el Comité de Jubilados, que era ya una reducción inferior a los términos originales propuestos por la Junta de Supervisión. Por otra parte, el Plan fiscal 2021 también asume que la congelación de devengos de beneficios del SRM y el SRJ entrará en vigor el 1 de enero de 2022, un retraso de seis meses en relación a la iniciativa estipulada en el Plan fiscal 2020.

Por otra parte, el Plan fiscal 2021 reconoce las intenciones de Puerto Rico de incorporarse al Programa de Reembolso de Medicamentos de Medicaid (MDRP) en el Año fiscal 2022. A partir del 1 de abril de 2022, el Secretario de Salud y Servicios Humanos de EE.UU. ha dispuesto que Puerto Rico —al igual que otros territorios— deberá incorporarse al MDRP federal, o bien optar por una dispensa. El MDRP es un programa regido por el Centro de Servicios de Medicare y Medicaid que negocia 'descuentos' con más de 600 farmacéuticas para reducir el precio de los

medicamentos recetados para los gobiernos federal y estatales. Históricamente, Puerto Rico no ha participado en el MDRP, optando por operar su propia lista de fármacos bajo receta preferidos con descuentos territoriales específicos y acuerdos de compra con los fabricantes. Tras considerar las alternativas con asesores externos (Milliman & Mercer), ASES ha decidido incorporarse al MDRP. Para ello será necesario actualizar su metodología de solicitud de reembolsos (CMS-64) para ajustarla mejor a los requisitos de información federales. Hacerlo requerirá nuevos gastos administrativos. Puerto Rico también puede esperar acceder a los más elevados porcentajes de descuento negociados a nivel federal. La Junta de Supervisión está trabajando con el Gobierno para estimar el impacto financiero neto y la transición al MDRP, lo cual incluye solicitar asesoramiento del CMS sobre qué fondos, en su caso, deben devolverse al gobierno federal.

En un momento en que Puerto Rico intenta atravesar la pandemia de la COVID-19 y reconstruirse tanto económica como fiscalmente, el Plan fiscal 2021 se estructura sobre lo que ha sido un programa de inversiones estratégicas multianual para mejorar los servicios gubernamentales, incrementar la competitividad y crear condiciones de crecimiento que puedan beneficiar a todos los residentes. Los diversos Planes fiscales han contemplado inversiones en los servicios de primera línea de los cuales dependen la salud, la seguridad y las oportunidades económicas de los ciudadanos. Esto ha incluido inversiones para apoyar a las administraciones públicas, a particulares y a empresas, en la lucha contra la COVID-19. El Plan fiscal 2021 mantiene inversiones incluidas en Planes fiscales anteriores y las complementa en áreas prioritarias, como la infraestructura de banda ancha, el desarrollo de trabajadores orientados hacia la tecnología y la implementación de una sólida reforma del servicio civil. El gobierno deberá distribuir estos fondos de manera eficiente y efectiva para maximizar los beneficios para la gente y la economía de la isla.

14.     **Avances en la implementación**

El Gobierno se ha esforzado por informar sobre los avances de la reforma de manera oportuna y exhaustiva. La Junta de Supervisión seguirá colaborando con la AAFAF (como Oficina de Gestión de Proyectos para las acciones de implementación del Gobierno) para supervisar la implementación de las reformas. Cuando sea necesario, la Junta de Supervisión también seguirá celebrando vistas públicas para examinar los avances en la implementación. En caso de que los ahorros de eficiencia de la agencia sean inferiores a los previstos para cualquier agrupación, la Junta de Supervisión puede basarse en sus poderes y derechos en virtud de PROMESA para tomar medidas que obliguen a reducir el importe de los ahorros no realizados.

15.     **Certificación del presupuesto del Año fiscal 2018**

Sobre la base de la certificación del Plan Fiscal de marzo de 2017 (y las revisiones posteriores), la Junta de Supervisión fijó inicialmente el 30 de abril de 2017 como fecha límite de conformidad con la sección 202(a) de PROMESA para la presentación del Gobernador a la Junta de Supervisión de su proyecto de presupuesto para el Año fiscal 2018 que cumpla con el Plan Fiscal de marzo de 2017, un plan de implementación detallado de las medidas contenidas en el Plan Fiscal de marzo de 2017 y un plan de liquidez revisado para el ELA, incluidas medidas para generar una reserva de efectivo de $200 millones antes del 30 de junio de 2017 por encima de los balances reflejados en el Plan Fiscal de marzo de 2017. La Junta de Supervisión también proporcionó el pronóstico de ingresos para el Año fiscal 2018 conforme a la sección 202(b) de PROMESA. El Gobierno realizó las presentaciones requeridas el 30 de abril de 2017.

El proceso de elaboración del presupuesto para el Año fiscal 2018 fue un esfuerzo conjunto entre el Gobierno y la Junta de Supervisión.

El 2 de junio de 2017, la Junta de Supervisión aprobó la presentación ante la Legislatura de la propuesta de presupuesto del Gobernador para el Año fiscal 2018 conforme a la sección 202(c)(1)(A)(i) de PROMESA, pero también tomó nota de problemas importantes con respecto a las asignaciones del presupuesto para ciertos programas y actividades y preguntas pendientes significativas con respecto a los planes de implementación de las reducciones en los gastos. La Junta de Supervisión también fijó al 19 de junio de 2017 como fecha límite para que la Legislatura presente su presupuesto adoptado para la revisión de la Junta de Supervisión.

El 27 de junio de 2017, la Junta de Supervisión emitió una notificación de violación de la presentación del presupuesto del 26 de junio de 2017 de la Legislatura conforme a la sección 202(d)(1)(B) de PROMESA, basándose en los siguientes análisis: (i) la sobreasignación de $16 millones para gastos legislativos; (ii) la sobreasignación de $78 millones para gastos no legislativos; (iii) la necesidad de reducciones adicionales por $25 millones sobre fondos designados y asignaciones de gastos especiales adicionales; (iv) necesidad de implementaciones específicas relacionadas con por lo menos $200 millones de ahorros potenciales sobre el tamaño del gobierno; y (v) corrección del error técnico relacionado con la asignación del Poder Judicial. La Junta de Supervisión solicitó una versión adoptada revisada del presupuesto de la Legislatura para el 29 de junio de 2017. Cuando la Legislatura no pudo adoptar un presupuesto en regla para el 29 de junio de 2017, la Junta de Supervisión revisó el presupuesto del Año fiscal 2018 para cumplir el Plan Fiscal certificado de marzo de 2017 y lo presentó al Gobernador y a la Legislatura conforme a la sección de PROMESA 202(e)(3) el 30 de junio de 2017.

Como se observó, dos meses después de la certificación del presupuesto en regla para el Año fiscal 2018, la Junta de Supervisión autorizó al Gobierno a implementar modificaciones de buena fe al presupuesto certificado del Año fiscal 2018 de hasta $1,000 millones para medidas de emergencia debido al impacto devastador de los huracanes Irma y María sobre Puerto Rico.

16.    **Certificación de presupuesto del Año fiscal 2019**

La revisión y la certificación por parte de la Junta de Supervisión del presupuesto del Año fiscal 2019 conforme a la sección 202 de PROMESA también pasó por varias extensiones de la fecha límite y propuestas de modificación según los cambios en el proceso de certificación del plan fiscal. En el Año fiscal 2019, la Junta de Supervisión estuvo guiada por diversos objetivos clave, congruentes con los objetivos del plan fiscal:

a.    Mejora del crecimiento a largo plazo a través de reformas estructurales;

b.    Mejora del entorno de negocios para empresas y emprendedores en Puerto Rico;

c.    Promoción de la seguridad pública en Puerto Rico;

d.    Mejora de los resultados educativos para los niños de Puerto Rico;

e.    Inversión en cuidado preventivo de la salud y cuidado de la salud de mejor calidad;

f.    Mejora de la transparencia a través de un enfoque sobre los controles y los informes fiscales; y

213

g.       Aumento de la flexibilidad de la infraestructura crítica a través de la modernización.

El 12 de diciembre de 2017, la Junta de Supervisión envió una carta al entonces gobernador Rosselló que proponía seis principios guía y establecía un cronograma de presentación a partir del 22 de diciembre de 2017 hasta el 29 de junio de 2018 como la fecha prevista para que la Junta de Supervisión certifique el presupuesto del Año fiscal 2019. Estos seis principios guía estipulaban que: (i) todos los presupuestos debían cumplir su plan fiscal aplicable y estar desarrollados de acuerdo con los principios modificados de contabilidad en valores devengados; (ii) la Junta de Supervisión debía proporcionar pronósticos de ingresos al Gobernador, la Legislatura y los Directorios para usarse en el desarrollo de los presupuestos correspondientes; (iii) los gastos presupuestados debían estar debidamente justificados; (iv) debían acordarse plantillas de informes entre el Gobernador y la Junta de Supervisión y el Gobierno debía presentar informes conforme a estas plantillas; (v) la responsabilidad clara de la aplicación de todos los elementos del presupuesto y los informes se consideraría crítica; y (vi) todos los gastos, incluso los gastos de capital, del ELA y las instrumentalidades debían hacerse únicamente conforme a un presupuesto certificado por la Junta de Supervisión.

El 21 de diciembre de 2017, basándose en la extensión de la fecha límite de presentación para el plan fiscal propuesto, la Junta de Supervisión también revisó los plazos de revisión del presupuesto para el Año fiscal 2019. De manera similar, el entonces gobernador Rosselló presentó una propuesta de plan fiscal el 12 de febrero de 2018 y la Junta de Supervisión extendió la fecha límite para la certificación del plan fiscal del 23 de febrero de 2018 al 30 de marzo de 2018, y la Junta de Supervisión revisó nuevamente el cronograma de revisión del presupuesto del Año fiscal 2019 en consecuencia.

Después de que se certificó el Plan Fiscal de abril de 2018, el entonces gobernador Rosselló presentó un borrador de presupuesto recomendado para el Año fiscal 2019 el 4 de mayo de 2018. El 10 de mayo de 2018, la Junta de Supervisión emitió una notificación de violación en virtud de la sección 202(c)(1)(B) de PROMESA con respecto al borrador de presupuesto para el Año fiscal 2019 y solicitó que se hicieran revisiones para el 15 de mayo de 2018. El 14 de mayo de 2018, el entonces gobernador Rosselló anunció que estaba en discusiones con la Junta de Supervisión con respecto al plan fiscal y por lo tanto no presentaría una propuesta de revisión del presupuesto para la fecha límite de 15 de mayo. La Junta de Supervisión también concedió una extensión para la presentación y el 18 de mayo de 2018, la administración presentó un presupuesto revisado recomendado para el Año fiscal 2019.

Después de que el Plan Fiscal de mayo de 2018 se certificó de acuerdo con los términos del acuerdo, la Junta de Supervisión estipuló las revisiones necesarias para los ingresos presupuestados el 31 de mayo de 2018, para que fueran congruentes con el nuevo plan fiscal certificado. El Gobernador presentó otro borrador de resolución para el presupuesto del Año fiscal 2019 al día siguiente.

El 5 de junio de 2018, la Junta de Supervisión determinó que la propuesta de presupuesto del 1ero de junio del Gobernador no cumplía el nuevo plan fiscal certificado y publicó su propia versión de un presupuesto revisado para el Año fiscal 2019 que cumplía el Plan Fiscal de mayo de 2018.

Después de que el Gobernador y la Legislatura revisaron la propuesta de presupuesto para el Año fiscal 2019 y realizaron vistas públicas, la Legislatura consideró su propia versión del presupuesto que estaba basada en proyecciones de ingresos más elevadas y con mayor margen para gastos que lo proyectado por la Junta de Supervisión.

Aunque la Junta de Supervisión programó una reunión pública para el 29 de junio de 2018, con el fin de analizar la certificación del presupuesto del Año fiscal 2019, esta reunión se canceló después de que la Legislatura no derogó la Ley 80 para el 27 de junio de 2018 como se había acordado.

214

El 29 de junio de 2018, la Legislatura aprobó un presupuesto del Fondo General para el ejercicio fiscal 2019 de $8,710 millones, para su presentación ante la Junta de Supervisión. Sin embargo, el 30 de junio de 2018 la Junta de Supervisión certificó de manera unánime un presupuesto en regla para el Año fiscal 2019 para el ELA y las instrumentalidades. La versión de la Junta de Supervisión del presupuesto tenía previstos gastos por $8,760 millones del Fondo General y de $20,660 millones para los fondos consolidados. Se consideró que este presupuesto certificado cumplía los planes fiscales certificados y fue considerado aprobado por el Gobernador y la Legislatura de acuerdo con la sección 202(e)(3) de PROMESA.

17.     **Certificación de presupuesto del Año fiscal 2020**[181]

La revisión y la certificación por parte de la Junta de Supervisión del presupuesto del Año fiscal 2020 conforme a la sección 202 de PROMESA también pasó por varias extensiones de la fecha límite y propuestas de modificación como resultado de los cambios en el proceso de certificación del plan fiscal.

Después de consultas con el Gobernador y la Legislatura, la Junta de Supervisión estableció un cronograma razonable para el desarrollo de los presupuestos del Año fiscal 2020. El 18 de enero de 2019, la Junta de Supervisión envió una carta al Gobierno donde se detallaba el cronograma acordado para el desarrollo, la presentación y la certificación del presupuesto para el Año fiscal 2020 para el ELA (que complementaba el cronograma de certificación del Plan Fiscal).

El 30 de enero de 2019, la Junta de Supervisión envió una carta al entonces gobernador Rosselló, en la que se describían los requisitos para un presupuesto en regla para el año fiscal, y de acuerdo con la sección 202(b) de PROMESA, un pronóstico de ingresos, objetivos de gastos de las agencias y otros requisitos. La Junta de Supervisión proporcionó objetivos de gastos para el Año fiscal 2020 por agencia. En particular, la Junta de Supervisión proporcionó parámetros para la nómina de las agencias y gastos de operación según el ajuste de los presupuestos del Año fiscal 2019. Los ajustes y las reinversiones se propusieron en un esfuerzo para facilitar ahorros adicionales contemplados por el plan fiscal certificado y para reducir áreas de gastos que requerían más transparencia. La Junta de Supervisión solicitó que en el presupuesto los contratos de servicio profesional fueran identificados en una de las siguientes categorías: Contabilidad/Finanzas, Legal, Tecnología de la Información u Otros. La categoría "Otros" solo se utilizaría si el contrato no estuviera mejor categorizado en una de las tres categorías distintas o las categorías "Médico" o "Educación", que se agregaron durante el proceso de revisión de presupuestos para agencias específicas. También se estipuló que la categoría "Otros" no representaría más del 10% del presupuesto de servicios profesionales. El mismo nivel de detalle se aplicó a otras categorías de personal y no relacionadas con el personal para permitir el seguimiento de los ahorros y la transparencia general.

El 23 de marzo de 2019, la Junta de Supervisión proporcionó un cronograma actualizado para la certificación del presupuesto del Año fiscal 2020 a pedido del Gobierno. El cronograma revisado requería que el ELA presentara una propuesta de presupuesto para el Año fiscal 2020 basado en los objetivos del 28 de enero de 2019. El 8 de abril de 2019, el ELA dio a conocer públicamente su propuesta de presentación de presupuesto en el sitio web de AAFAF. Además, se revisó el cronograma de presentación y revisión del presupuesto el 21 de abril de 2019, con el fin de proporcionar tiempo suficiente para permitir el proceso iterativo de intercambio de información e incorporar la información más actualizada disponible.

---

[181] Puede accederse a una presentación sobre el presupuesto del Año fiscal 2020 en el sitio web de la Junta de Supervisión, https://oversightboard.pr.gov/.

El 11 de mayo de 2019, la Junta de Supervisión proporcionó objetivos revisados para el Año fiscal 2020 con el fin de incorporar datos proporcionados por las agencias, riesgos identificados por las agencias, inversiones focalizadas y prioridades fiscales. Los objetivos revisados cumplían con el Plan Fiscal de mayo de 2019. La presentación original del presupuesto del Año fiscal 2020 del Gobierno no cumplía el Plan Fiscal de mayo de 2019 y necesitó volver a presentarse. La Junta de Supervisión estipuló en detalle las áreas donde era necesario revisar el presupuesto propuesto para el Año fiscal 2020, así como proporcionar una revisión del pronóstico de ingresos. La carta de la Junta de Supervisión también incluía requisitos específicos para las agencias y revisiones del lenguaje de la resolución del presupuesto.

El 13 de mayo de 2019, el gobernador Rosselló anunció la intención del Gobierno de presentar la propuesta revisada de presupuesto para la fecha límite del 17 de mayo. El 17 de mayo de 2019, el gobierno solicitó una prórroga de la fecha límite de presentación para el 22 de mayo de 2019. El 20 de mayo de 2019, la Junta concedió la prórroga a la vez que reiteró los requisitos de información adicional que respaldaban la presentación del presupuesto, que incluían que los contratos de servicios profesionales se identificaran en categorías específicas; asignación de utilidades de gastos de capital, primas de seguro y PayGo por agencia, conforme al plan fiscal certificado; y el nivel de detalle requerido por la Junta de Supervisión en la resolución de presupuesto.

Aunque el Gobierno presentó una revisión del presupuesto para el 22 de mayo de 2019, la presentación del presupuesto por parte del Gobierno siguió estando incompleta y no estando en regla; el presupuesto propuesto seguía superando los objetivos de gasto del Plan Fiscal de mayo de 2019, al mismo tiempo que carecía de detalle y documentación suficientes. El 28 de mayo de 2019, la Junta de Supervisión presentó un presupuesto en regla a la Legislatura junto con una carta al gobernador Rosselló, el presidente Rivera Schatz y el vocero Méndez para notificarles sobre el presupuesto en regla para el Año fiscal 2020. El presupuesto se presentó después de una revisión de la presentación por parte del Gobernador el 28 de marzo de 2019 del Presupuesto del ELA para el Año fiscal 2020.

El 3 de junio de 2019, la Junta de Supervisión envió una carta al presidente Rivera Schatz, Presidente del Senado de Puerto Rico, donde se detallaban los motivos por los que la Junta de Supervisión determinó que la más reciente presentación del presupuesto del Gobernador no se encontraba en regla PROMESA. Específicamente, la propuesta de presupuesto para el Año fiscal 2020 del Gobierno superaba los objetivos presupuestarios en $573 millones.

El 9 de junio de 2019, el gobernador Rosselló hizo un discurso sobre el presupuesto donde se sostenía que el ELA tenía recursos suficientes para financiar el presupuesto de $9,624 millones que se había propuesto y no se encontraba en regla. La propuesta de presupuesto para el Año fiscal 2020 se presentó subsecuentemente ante la Legislatura el 11 de junio de 2019. Estaba previsto que el Comité de Hacienda, Presupuesto y PROMESA de la Cámara realizara vistas públicas abiertas sobre el paquete de gastos el 12 de junio de 2019.

El 12 de junio de 2019, la Junta de Supervisión envió una carta al gobernador Rosselló, al presidente Rivera Schatz y al vocero Méndez con respecto a la Certificación de Cumplimiento de fecha 3 de junio de 2019 que se presentó en relación con la Ley 29. La certificación se consideró deficiente en dos aspectos: (1) carecía de la estimación formal exigida por la sección 204(a)(2)(A) de PROMESA para conocer el "impacto, si lo hubiera, que la ley tendría sobre gastos e ingresos"; y (2) no proporcionaba un análisis del impacto que la Ley 29 tendría sobre el Plan Fiscal de mayo de 2019. Sobre la base de la sección 204(a)(4)(A) de PROMESA, la Junta de Supervisión ordenó al ELA que proporcionara (1) la estimación faltante dentro de siete días hábiles y (2) una certificación enmendada de cumplimiento que reflejara dichas estimaciones.

Se envió una segunda carta el 12 de junio de 2019, donde se extendió la fecha límite para que la Legislatura presentara un presupuesto en regla. La Junta de Supervisión reiteró sus preocupaciones debido a que la Junta de Supervisión había presentado un presupuesto en regla al Gobierno el 28 de mayo de 2019, pero el Gobierno no lo había presentado a la Legislatura.

La Legislatura no envió un presupuesto para el Año fiscal 2020 a la Junta de Supervisión para su revisión en cuanto al cumplimiento del Plan Fiscal de mayo de 2019. De esta manera, el 30 de junio de 2019 la Junta de Supervisión certificó su propio presupuesto para el Año fiscal 2020 para el ELA.

El presupuesto del Año fiscal 2020 del Gobierno Central era de $20,210 millones, de los cuales $9,050 millones correspondían a gastos del Fondo General.

El presupuesto certificado del Año fiscal 2020 también tomaba en cuenta asignaciones previamente no presupuestadas, para aumentar la transparencia y la visibilidad del gasto global. La mayor parte del costo adicional relativo al Año fiscal 2019 procedió de gastos locales de Medicaid debido a la expiración de la contribución equivalente de fondos federales del 100% para esos costos. Los gastos totales locales de Medicaid en el Año fiscal 2020 aumentaron a $917 millones desde $15 millones en el Año fiscal 2019.

El presupuesto certificado del Año fiscal 2020 también proporcionó un mayor nivel de transparencia para el público en general sobre cómo el gobierno gasta sus recursos. Las resoluciones de presupuesto se combinaron en un mismo documento, e incluían conceptos específicos sobre el gasto para cada agencia, minimizaron los fondos en cuentas agrupadas en custodia y limitaron los gastos en asignaciones no identificadas y servicios profesionales identificados. El presupuesto también intentó cubrir todos los gastos del ELA.

El presupuesto también incluía mecanismos significativos de cumplimiento del presupuesto para controlar los gastos.

Eventos posteriores

El 3 de marzo de 2020, la Junta de Supervisión anunció que pondría a disposición una cantidad inicial de $5 millones del Fondo de Reserva de Emergencia para la prevención y cura de la COVID-19. El 18 de marzo de 2020, la Junta de Supervisión aprobó una exención temporal del Impuesto sobre Ventas y Uso de Alimentos Preparados y el 21 de marzo de 2020, la Junta de Supervisión presentó una moción en el tribunal para aplazar la consideración de la vista de la declaración de divulgación del Plan de Ajuste propuesto hasta nuevo aviso.

El 25 de marzo de 2020, la Junta de Supervisión aprobó el apoyo presupuestario urgente a Puerto Rico para un Paquete de Apoyo de Medidas de Emergencia por valor de $787 millones y el 26 de marzo de 2020, el Gobierno presentó una propuesta de presupuesto conforme para el Paquete de Apoyo de Medidas de Emergencia. El paquete de $787 millones se financió con una enmienda presupuestaria de $500 millones certificada el 2 de abril de 2020, una reasignación de $157 millones dentro del presupuesto del Año fiscal 2020 y $131 millones procedentes de fondos federales. La mayor parte de la enmienda presupuestaria de $500 millones se destinó a pagos directos a trabajadores autónomos ($100 millones) y pequeñas empresas ($60 millones), primas al personal médico ($126 millones), primas a determinados empleados del Departamento de Seguridad Pública ($68 millones), inversiones en hospitales para materiales y suministros ($30 millones) y ayudas a los municipios ($100 millones).

En el Año fiscal 2020, el Departamento de Educación de los Estados Unidos impuso condiciones específicas al Departamento de Educación de Puerto Rico para garantizar una gestión fiscal adecuada de

los fondos de las subvenciones, el cumplimiento de los requisitos de las subvenciones federales y la responsabilidad fiscal. El gobierno federal ha "congelado" más de $1,500 millones en fondos educativos federales asignados a Puerto Rico hasta que el Departamento de Educación de Puerto Rico contrate a un administrador externo para gestionar los fondos concedidos a la agencia y se cumplan otras condiciones.

18.    **Certificación de presupuesto del Año fiscal 2021**[182]

La revisión y la certificación por parte de la Junta de Supervisión del presupuesto del Año fiscal 2021 conforme a la sección 202 de PROMESA también pasó por varias prórrogas de la fecha límite motivadas por las incertidumbres que afectan al ELA como consecuencia de los terremotos de 2020 y la pandemia de COVID-19.

Después de consultas con el Gobernador y la Legislatura, la Junta de Supervisión estableció un cronograma razonable para el desarrollo de los presupuestos del Año fiscal 2021. El 16 de noviembre de 2019, la Junta de Supervisión envió una carta al gobernador Vázquez donde se detallaba el cronograma acordado de la fecha de desarrollo, la presentación y la certificación del presupuesto para el Año fiscal 2021 para el ELA (que complementaba el cronograma de certificación del Plan Fiscal). El proceso presupuestario del Año fiscal 2021 comenzó dos meses antes que el proceso del Año fiscal 2020 para dar al Gobierno más tiempo para analizar las necesidades de la agencia y reunir información de apoyo detallada.

La carta enviada al gobernador Vázquez describía los requisitos para un presupuesto en regla para el año fiscal, y de acuerdo con la sección 202(b) de PROMESA, incluía un pronóstico de ingresos, objetivos de gastos de las agencias y otros requisitos. La Junta de Supervisión proporcionó objetivos específicos para los gastos a nivel de agencia tras aplicar medidas fiscales basadas en el Plan Fiscal 2019. La Junta de Supervisión también proporcionó una lista de solicitudes de información para apoyar la presentación del presupuesto del Gobierno. La lista de solicitudes del Año fiscal 2021 amplió la información solicitada en el año anterior para incluir detalles adicionales en torno a los decretos de consentimiento, los servicios profesionales y las compras con ciclos de contratación anormales.

El 14 de febrero, el 28 de febrero y el 8 de mayo de 2020, el Gobernador presentó las propuestas de presupuestos para el ELA para el Año fiscal 2021. La Junta de Supervisión y sus asesores mantuvieron amplios debates con los representantes del Gobernador sobre la propuesta de presupuesto. A lo largo de varios meses, la Junta y sus asesores se reunieron con más de 30 organismos para examinar los importes propuestos y los detalles de apoyo.

Tras importantes análisis y deliberaciones, el 1 de junio de 2020, la Junta de Supervisión emitió una Notificación de Violación al presupuesto. La Notificación de Violación incluyó objetivos revisados de las agencias para el Año fiscal 2021 con el fin de incorporar el impacto de COVID-19, los datos proporcionados por las agencias, los riesgos propuestos por las agencias, las inversiones focalizadas y las prioridades fiscales. En consonancia con el Plan Fiscal 2020, los objetivos revisados reflejan una pausa de un año en la mayoría de las medidas para que el Gobierno pueda centrarse en la aplicación de las reformas de la eficiencia. La Junta de Supervisión estipuló en detalle las áreas que era necesario revisar el presupuesto del Gobierno para el Año fiscal 2021, así como proporcionar una revisión del pronóstico de ingresos. Los incumplimientos más significativos, que infringían el Plan Fiscal 2020 de la Junta de Supervisión y las directrices sobre los objetivos presupuestarios, incluían $169 millones por encima del presupuesto, escasas explicaciones sobre la clasificación de "otros servicios profesionales", ausencia de consolidación de agencias y datos incompletos e incoherentes.

El 7 de junio de 2020, el Gobernador presentó un presupuesto revisado para el ELA para el Año fiscal 2021 que era de $169 millones más que el Plan Fiscal 2020. Tras la revisión de la presentación del Gobernador del 7 de junio, la Junta de Supervisión determinó que el presupuesto seguía estando incompleto y sin estar en regla. El 10 de junio de 2020, la Junta de Supervisión presentó un presupuesto en regla a la Legislatura junto con una carta al gobernador Vázquez, el presidente Rivera Schatz y el vocero Méndez para notificarles sobre el presupuesto en regla para el Año fiscal 2021.

---

[182] Puede accederse a una presentación sobre el presupuesto del Año fiscal 2021 en el sitio web de la Junta de Supervisión, https://oversightboard.pr.gov/.

El 24 de junio de 2020, a petición de la Legislatura, la Junta de Supervisión acordó un cronograma revisado que permitía a la Legislatura presentar un presupuesto conforme a la Junta de Supervisión hasta el 25 de junio de 2020. La Legislatura no envió un presupuesto para el Año fiscal 2021 a la Junta de Supervisión para su revisión en cuanto al cumplimiento del Plan fiscal 2020. De esta manera, el 30 de junio de 2020, la Junta de Supervisión certificó su propio presupuesto para el Año fiscal 2021 para el ELA.

Como se demuestra a continuación, en total, el presupuesto del Año fiscal 2021 del Gobierno Central es de $22,230 millones, de los cuales $10,050 millones son gastos del Fondo General.



| Inglés | Español |
|---|---|
| $ in millions | En millones de $ |
| General Fund ("GF")[2] (see Section 3) | Fondo General ("FG")[2] (ver Sección 3) |
| Federal Funds ("FF") | Fondos Federales ("FF") |
| Special Revenue Funds (SRF")[3] | Fondos de Ingresos Especiales ("SRF")[3] |
| Central Government (including PayGo) | Gobierno Central (incluyendo PayGo) |
| Puerto Rico Electric Power Authority ("PREPA") | Autoridad de Energía Eléctrica ("AEE") |
| Puerto Rico Aqueduct and Sewer Authority ("PRASA") | Autoridad de Acueductos y Alcantarillado ("AAA") |
| UPR (excludes GF appropriations) | UPR (Excluye asignaciones del FG) |
| Puerto Rico Highway and Transportation Authority ("ACT") (excludes GF appropriations) | Autoridad de Carreteras y Transportación ("ACT") (Excluye asignaciones del FG) |
| Puerto Rico Industrial Development Company | Compañía Puerto Rico para el Desarrollo Industrial |
| Municipal Revenue Collections Center ("CRM") | Centro de Recaudación de Ingresos Municipales ("CRIM") |
| Public Corp for the Supervision and Deposit Insurance of Puerto Rico ("COSSEC") | Corporación Pública para la Supervisión y Seguros de Cooperativas de Puerto Rico("COSSEC") |
| Puerto Rico Sales Tax Financing Corp. ("COFINA") | Corporación del Fondo de Interés Apremiante. ("COFINA") |
| Instrumentalities | Instrumentalidades |
| Emergency Reserve Replenishment | Recobro de reservas de emergencia |
| Garcia-Garcia Settlement | Transacción García |
| Special Resolution Items | Items de resoluciones especiales |
| Total Public sector spending | Gastos totales del sector público |
| PayGo | PayGo |
| Instrumentalities | Instrumentalidades |
| Special Resolution Items | Ítems de resoluciones especiales |
| Central Government | Gobierno Central |

Nota: Debido al redondeo la suma de los números presentados pueden no dar el total previsto

Fuente: Presupuesto certificado del Año fiscal 2021 y Plan fiscal 2020
1 Excluye presupuestos de municipios individuales
2 Incluye tarifas de PayGo del Fondo General para el Sistema de Retiro de los Empleados ("SRE"), Sistema de Retiro de Maestros ("SRM") y Sistema de Retiro de Judiciales ("SRJ"). Vea los apéndices para un desglose más detallado de las tarifas PayGo de pensiones
3 Incluye $500 millones en tarifas PayGo de ciertas instrumentalidades y municipios incluidos en SRE de acuerdo con el Plan Fiscal certificado. El ELA procesa los pagos PayGo en nombre de los municipios y ciertas instrumentalidades. Todos los municipios y otras instrumentalidades contribuyentes fuera del ELA presupuestan toda la tarifa PayGo. Como resultado, los reembolsos de las tarifas PayGo se muestran en el presupuesto del Gobierno Central.
4 Los ítems de resoluciones especiales son financiados usando efectivo sobrante de años anteriores



| Inglés | Español |
|---|---|
| $ in millions | En millones de $ |
| Special Resolution Items | Artículos de resolución especial |
| Emergency Reserve Replenishment | Recobro de la reserve de emergencia |
| Garcia-Garcia Settlement | Transacción García-García |
| Major Investments in FY21 | Principales inversiones del Año fiscal 2021 |
| Broadband Expansion | Expansión de banda ancha |
| Healthcare System | Sistema de Salud |
| Business Education Fund | Fondo de Educación Económica |
| UPR Scholarship | Becas de la UPR |
| Infrastructure Investments | Inversiones en infraestructura |
| Major Changes in SRF from FY20 | Cambios principales en los SRF con respecto al Año fiscal 2020 |
| Gaming Commission | Comisión de Juegos |
| SIFC Distributons and Reserve | Distribuciones y reserva de SIFC |
| ASEM | ASEM |
| Tourism | Turismo |
| Removal of PRIDCO from CW | Eliminación de PRIDCO del ELA |
| Reduced ACT Capex Approximation | Aproximación reducida Capex de ACT |
| Decrease in SRF Appropriation | Reducción en asignaciones de SRF |
| Major Changes in GF from FY20 | Cambios principales en el FG en relación con el Año fiscal 2020 |
| Rum Distributions, Economic | Distribuciones de ron, económicas |
| Incentives and FAM | Incentivos y FAM |
| Reduced ACT Capex Approximation | Aproximación incrementada Capex de ACT |
| FEMA Cost Share | Participación en los costos de FEMA |
| Public Safety | Seguridad Pública |
| Department of Health | Departamento de Salud |
| Corrections Grouping | Agrupamiento de Correcciones |
| State Elections | Elecciones del estado |

| FY | Año fiscal |
| --- | --- |

1 Los años fiscales 2016 y 2017 incluyen pagos de la deuda y contribuciones del SRE que ascienden a $2.149 y $918 millones respectivamente
2 Después de la certificación del presupuesto, el presupuesto del Año fiscal 2020 se enmendó para agregar $500 millones para alivio relacionado con COVID 19. SRF del Año fiscal 2020 incluye aproximadamente $820 millones de ítems no presupuestados anteriormente
3 Los años fiscales 2016-2021 excluye las instrumentalidades con la excepción de UPR y las asignaciones del Fondo General de ACT y las asignaciones de SRF de COFIM. PayGo incluye montos de municipios y ciertas instrumentalidades dentro del ELA. Los montos de FG y SRF que se muestran excluyen los montos respectivos de PayGo y Medicaid.

El presupuesto certificado del Año fiscal 2021 proporcionó un nivel sin precedentes de transparencia para el público en general sobre cómo el gobierno gasta sus recursos. Además de los mayores niveles de transparencia del presupuesto certificado para el Año fiscal 2020, las resoluciones del presupuesto certificado para el Año fiscal 2021 incluyen la elaboración de presupuestos a nivel de programas, un mayor detalle de la nómina para mejorar la visibilidad de los salarios de los empleados del Fideicomiso, un mayor detalle de los servicios profesionales para mostrar más visibilidad en "otras" categorías, la consolidación de varias agrupaciones de agencias, las distribuciones a los Casinos, la UPR y la Compañía de Turismo incluidas en los ingresos de las máquinas tragamonedas de la Comisión de Juegos, y un financiamiento adecuado y segregado para cumplir con los requisitos federales del decreto de consentimiento.

Las inversiones críticas incluidas en el presupuesto certificado del Año fiscal 2021 comprenden el desarrollo económico para mejorar la infraestructura de banda ancha, las inversiones sanitarias en instalaciones y tecnología, las inversiones en seguridad pública en personal y equipos, las inversiones en educación para mejorar los resultados de los estudiantes y las inversiones en infraestructuras para mejorar las zonas rurales y el mantenimiento de las carreteras.

El presupuesto certificado para el Año fiscal 2021 también incluye $83 millones de incentivos en el Fondo General y $7 millones en los Fondos de Ingresos Especiales para las agencias que alcancen ciertos objetivos específicos. Los $90 millones se destinan a fomentar la implementación de iniciativas críticas de reforma, incluyendo $36 millones para la implementación del ERP y la finalización de los estados financieros, $22 millones para que los municipios incentiven la consolidación de los servicios compartidos, $17 millones para que el Departamento de Educación mejore la asistencia de los docentes y los estudiantes, fomente la innovación escolar e implemente la tecnología, y $7 millones para que el DDEC mejore la transparencia de los incentivos económicos.

El presupuesto también incluye mecanismos significativos de cumplimiento del presupuesto para controlar los gastos. Estos controles presupuestarios superan a los incorporados en los presupuestos de años anteriores.

**E.      Negociaciones con acreedores**

**1.      Negociaciones con acreedores anteriores a la aprobación de PROMESA**

Durante el año fiscal 2016, el ELA presentó diversas propuestas a los tenedores y aseguradores de bonos, intentando alcanzar un acuerdo para la reestructuración voluntaria de la deuda del ELA y la de sus corporaciones públicas.

El 1º de febrero de 2016, el ELA publicó una propuesta que buscaba el intercambio de $49,200 millones de Deuda con Garantía Impositiva por $26,500 millones en bonos de pago obligatorio y $22,700 millones en bonos de pago variable (pagaderos únicamente en caso de que el ELA supere ciertas proyecciones de ingresos). La propuesta no contemplaba el pago de intereses hasta el Año fiscal 2018, ni el pago de capital hasta el Año fiscal 2021, la amortización de la deuda anual máximo de $1,700 millones a partir del Año fiscal 2021 y un vencimiento final en el año fiscal 2051. Varios grupos de bonistas,

especialmente aseguradoras de bonos monolínea, emitieron declaraciones después de que el ELA publicó esta propuesta donde se mostraban críticos de esta propuesta.

El 21 de junio de 2016, el ELA publicó una segunda propuesta donde se disponía una amortización de la deuda pagadero obligatoriamente incremental de $52,700 millones a los acreedores, en comparación con la oferta del 1 de febrero de 2016 del ELA. La propuesta contemplaba además asistencia para el flujo de caja durante los primeros cuatro años pero mayores pagos de intereses en efectivo durante dicho período y agregaba una parte de intereses no en efectivo (pago en especies). La amortización de la deuda anual máximo se estipuló en $2,050 millones a partir del año fiscal 2031, con un vencimiento final en el año fiscal 2071. Ciertos bonistas GO respondieron con una contrapropuesta que habría intercambiado los Bonos GO existentes (un monto nominal aproximado de $18,000 millones) por nuevos Bonos GO a 89% del monto nominal existente y nuevos bonos contingentes para el 11% restante del monto del capital original, proporcionaba asistencia de liquidez a lo largo de los primeros cinco años, requería nuevas garantías y validación a través del Título III o el Título IV de PROMESA si dicha legislación fuera sancionada por el Congreso. Un grupo *ad hoc* de bonistas prioritarios de COFINA también desarrolló una contrapropuesta que incluía recortes en el capital, asistencia de liquidez e implementación requerida a través de PROMESA con validación bajo el Título III o VI.

Las propuestas del ELA buscaban garantizar que la amortización de la deuda nunca superara un 15% de los ingresos consolidados proyectados (tal como se definieron en la presentación pública donde se explicó la propuesta) para el ELA y sus instrumentalidades con garantía impositiva. Ambas propuestas también dependían de una serie de suposiciones clave (muchas de las cuales no se encuentran bajo el control del ELA), entre ellas: (i) una tasa de participación del 100%, (ii) que el Congreso continuara con el nivel actual de financiamiento del cuidado de la salud provista a Puerto Rico de acuerdo con la Ley de Cuidado de Salud Asequible, (iii) que el ELA extendiera el arbitrio de la Ley 154 y el IRS siguiera permitiendo que ese impuesto se acreditara contra los impuestos federales al ingreso de EE. UU. (junto con ninguna erosión adicional de la base tributable de la Ley 154), (iv) la implementación de todas las medidas contempladas por el Plan de Crecimiento Fiscal y Económico de fecha 9 de septiembre de 2015, y (v) que el ELA alcanzara una tasa de crecimiento nominal del 2%.

## 2.   Negociaciones con acreedores antes de las presentaciones del Título III

El ELA también realizó amplios esfuerzos para lograr una reestructuración consensuada con los acreedores antes de su presentación del Título III. Desde diciembre de 2016 hasta marzo de 2017, la Junta de Supervisión y el ELA realizaron más de treinta reuniones con representantes de los acreedores para obtener una reestructuración consensuada de la deuda del ELA. Además, antes de la finalización de la paralización del Título IV de PROMESA, la Junta de Supervisión y el ELA se reunieron en una mediación el 13 de abril de 2017 para encontrar puntos en común y una resolución consensuada. Antes de la presentación de los Casos de Título III, la AAFAF hizo una propuesta bajo el Título VI de PROMESA que habría reestructurado los Bonos GO, los bonos COFINA y los bonos de ciertas instrumentalidades que históricamente han recibido ciertos fondos del ELA de manera condicional, y un grupo de bonistas GO hicieron una contrapropuesta. Estos esfuerzos finalmente no tuvieron éxito.

*[El resto de la página se deja intencionalmente en blanco]*

## V.     Descripción de los Casos de Título III de los Deudores

### A.     Inicio de los Casos de Título III de los Deudores

### 1.     Presentación de las Peticiones de Título III

Después de las negociaciones con los integrantes del grupo de acreedores, el ELA determinó que no podía (ni vio posibilidad de) de negociar una resolución extrajudicial que solucionara su situación financiera y sentara las bases para su futura recuperación económica y prosperidad, sin la previa renegociación de sus deudas pendientes. De acuerdo con la sección 405 de PROMESA, el establecimiento de la Junta de Supervisión operó como una paralización temporal de todas las acciones, reclamaciones y procedimientos en cualquier corte o tribunal con respecto a toda responsabilidad, como se define en la sección 405(a) de PROMESA, del ELA y sus instrumentalidades territoriales. En cuanto expiró la paralización de la sección 405 de PROMESA, se permitiría la continuación de varios juicios pendientes contra el ELA y sus instrumentalidades territoriales, y decenas de acreedores amenazaron con presentar o impulsar juicios contra el ELA y sus instrumentalidades territoriales. Como consecuencia, el 3 de mayo de 2017, la Junta de Supervisión dictó una certificación de reestructuración de acuerdo con las secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para el ELA de acuerdo con la sección 304(a) de PROMESA, iniciando el Caso de Título III de ELA. El 21 de mayo de 2017, la Junta de Supervisión dictó certificaciones de reestructuración de SRE y ACT de acuerdo con las secciones 104(j) y 206 de PROMESA y presentó peticiones voluntarias de reparación para SRE y ACT de acuerdo con la sección 304(a) de PROMESA ante el Tribunal del Título III. El 26 de septiembre de 2017, la Junta de Supervisión dictó una certificación de reestructuración de acuerdo con las secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para AEP de acuerdo con la sección 304(a) de PROMESA, iniciando el Caso de Título III de AEP. El 29 de junio de 2017, el Tribunal del Título III registró una orden donde se concedía la administración conjunta de los casos del Título III del ELA, ACT y SRE para fines de procedimiento solamente [ECF Núm. 537]. El 9 de octubre de 2017, el Tribunal del Título III registró una orden que concede la administración conjunta del Caso de Título III inicial y el nuevo Caso de Título III para AEP, solo para fines de procedimiento [ECF 8829].

*Designación de Comités establecidos por ley.* El 15 de junio de 2017, se designó a los miembros del CANA y el Comité Oficial de Retirados [ECF Núm. 338, 340]. Los miembros actuales del CANA son (i) la Federación Americana de Maestros ("AFT"), (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) la Unión Internacional de Empleados de Servicio ("SEIU"), (v) Unitech Engineering, (vi) Baxter Sales and Distribution Puerto Rico Corp. y (vii) Tradewinds Energy Barceloneta, LLC [ECF Núm. 3947]. Los miembros actuales del Comité Oficial de Retirados son (i) Blanca E. Paniagua, (ii) Carmen Haydee Núñez, (iii) Juan Ortiz Curet, (iv) Lydia R. Pellot, (v) Marcos A López Reyes, (vi) Miguel J. Fabre Ramírez, (vii) Milagros Acevedo Santiago y (viii) Rosario Pacheco Fontán [ECF Núm. 340].

*Equipo de Mediación.* El 23 de junio de 2017, el Tribunal del Título III registró la *Orden de Nombramiento de un Equipo de Mediación* [ECF Núm. 430] "en pos de lograr el objetivo de llegar a una resolución satisfactoria y consensuada de las cuestiones planteadas en estos procedimientos de ajuste de deuda". Los actuales miembros del Equipo de Mediación son los siguientes: (1) juez Barbara Houser (Tribunal de Quiebras, Distrito Norte de Texas); (2) juez Thomas Ambro (3er Circuito); (3) juez Nancy Atlas (Distrito Sur de Texas); y (4) juez Roberta Colton (Tribunal de Quiebras, Distrito Medio de Florida). La Junta de Supervisión y los Deudores les están muy agradecidos a los mediadores, que son jueces federales en ejercicio y que, sin mediar compensación alguna, han trabajado de manera incansable e infatigable para promover un consenso cada vez mayor y el progreso hacia un Puerto Rico revitalizado.

B.    **Los huracanes Irma, María y Dorian, los terremotos de enero de 2020, la COVID-19, el ciclón tropical 9, la tormenta tropical Laura y el huracán Isaías, y la respuesta de la Junta de Supervisión**

*Los huracanes Irma y María.* Poco después del inicio de los Casos de Título III, en septiembre de 2017, los huracanes Irma y María azotaron Puerto Rico. Los huracanes causaron daños generalizados en todo Puerto Rico y exacerbaron los desafíos económicos que se describen anteriormente. El huracán María tocó tierra en Puerto Rico el 20 de septiembre de 2017, con vientos sostenidos de 155 millas por hora e importantes lluvias durante un período de más de 30 horas. El huracán María atravesó Puerto Rico en diagonal, ingresando por el sudeste y saliendo por la región noroeste de Puerto Rico. El huracán causó una destrucción catastrófica en Puerto Rico, dejando a Puerto Rico por completo sin energía eléctrica e inundando muchas calles y carreteras. Solo dos semanas antes del huracán María, el huracán Irma, uno de los huracanes más fuertes que se hayan registrado en el Atlántico, atravesó la costa norte de Puerto Rico. Como resultado del impacto masivo de los huracanes, el Gobierno y la Junta de Supervisión tomaron una serie de medidas para abordar la crisis.

El 21 de septiembre de 2017, la Junta de Supervisión autorizó al Gobierno a "reasignar" hasta $1,000 millones de su presupuesto para financiamiento de emergencia para recuperarse de los efectos del huracán y para asegurarse de contar con recursos para comenzar de inmediato con la respuesta de emergencia y los esfuerzos de recuperación en espera de los fondos federales. Esto le permitiría al Gobierno actuar con rapidez para reasignar (reprogramar) fondos según sea necesario, sin necesidad de obtener la aprobación de la Junta de Supervisión antes del movimiento de fondos.

En una carta dirigida a los líderes del Congreso de fecha 3 de octubre de 2017, la Junta de Supervisión solicitó ayuda federal en las siguientes áreas: cantidad máxima de ayuda federal, acceso a un programa de liquidez de emergencia, trato equitativo en el financiamiento del programa Medicaid y exenciones de topes y requisitos de participación locales para recibir ayuda federal. [183]

En una carta de fecha 6 de octubre de 2017 dirigida al Presidente Trump, la Junta de Supervisión reiteró el pedido de apoyo a la solicitud del gobernador Rosselló y esos pedidos se describen en la carta dirigida a los líderes del Congreso de fecha 3 de octubre de 2017. [184]

En una carta de fecha 10 de octubre de 2017 al Secretario Mnuchin, la Junta de Supervisión exhortó al Departamento del Tesoro a considerar la propuesta que la Junta de Supervisión desarrolló con el Gobierno para abordar las necesidades urgentes de liquidez del ELA y sus instrumentalidades. [185]

La Junta de Supervisión colaboró con el Gobierno para proporcionar las estimaciones de liquidez a corto plazo y a mediano plazo más pesimistas en vista del déficit de ingresos que podría experimentar el ELA, y para abordar el tema de los fondos que se necesitarían para promover los esfuerzos de

---

[183] Carta de José B. Carrión a los líderes del Congreso de Estados Unidos, 3 de octubre de 2017, https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view.

[184] Carta de José B. Carrión al Presidente de los Estados Unidos, Donald Trump, 6 de octubre de 2017, https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view.

[185] Carta de Jose B. Carrión al Secretario del Tesoro Mnuchin, 10 de octubre de 2017, https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0IkLR1tCih6/view; comunicado de prensa "El Gobernador y la Junta de Supervisión y Administración Financiera le piden al Gobierno de Trump que aborde los problemas de liquidez luego del paso del huracán María", 10 de octubre de 2017, https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

reconstrucción. La Junta de Supervisión mantuvo varias reuniones con el Departamento del Tesoro de Estados Unidos para discutir el acceso por parte de Puerto Rico a los Préstamos Comunitarios en casos de Desastre.

La Junta de Supervisión certificó el plan de recuperación ordenado por el Congreso en la Ley de Presupuesto Bipartidista el 28 de agosto de 2018. Sin embargo, hizo dos salvedades a su certificación. En primer lugar, la Junta de Supervisión expresó su preocupación por la falta de detalles y la elevada cantidad de fuentes de financiamiento federal estimadas en comparación con los valores del plan fiscal entonces certificado para los proyectos de Puerto Rico En segundo lugar, la Junta de Supervisión indicó que el plan de recuperación no abordaba la supervisión de fondos federales y el proceso de recuperación. Además, la Junta de Supervisión no recibió el plan de recuperación para su consideración hasta después de que el Gobierno se lo había proporcionado al Congreso.

El 4 de octubre de 2017, para concentrarse mejor en restaurar los servicios para los residentes, que se habían visto reducidos debido a la naturaleza de la destrucción en todo Puerto Rico, la Junta de Supervisión retiró el litigio que había iniciado para hacer valer el cumplimiento de determinadas medidas del plan fiscal certificado y pospuso la implementación de cualquier permiso o medida durante al menos un año.

Durante este período, los miembros y el personal ejecutivo de la Junta de Supervisión estuvieron activos en Washington D.C. abogando por los recursos necesarios para apoyar la recuperación de Puerto Rico, los importantes esfuerzos de reconstrucción y la liquidez necesaria para mantener los servicios. La Junta de Supervisión se unió al Gobernador para solicitar exenciones de eliminación de los costos de financiamiento, mejor asistencia financiera y respuestas expeditas a pedido del Gobernador. La Junta de Supervisión participó en numerosas reuniones con miembros del Congreso, personal del Congreso, agencias federales (entre ellas la Oficina de Gerencia y Presupuesto y el Departamento del Tesoro de los EE.UU.), y decenas de reuniones informativas con periodistas, grupos de reflexión e universidades.

Los funcionarios de la Junta de Supervisión se presentaron ante varias comisiones del Congreso para prestar testimonio. El 7 de noviembre de 2017, la Sra. Natalie A. Jaresko (Directora Ejecutiva de la Junta de Supervisión) y el Sr. Noel Zamot (personal ejecutivo de la Junta de Supervisión) prestaron testimonio ante la Comisión de Recursos Naturales de la Cámara de Representantes de EE.UU. sobre "Examinando los desafíos en la recuperación de Puerto Rico y el papel de la Junta de Supervisión y Administración Financiera". El 14 de noviembre de 2017, la Sra. Natalie A. Jaresko prestó testimonio ante la Comisión de Energía y Recursos Naturales del Senado de EE.UU. sobre "Esfuerzos de recuperación de huracanes en Puerto Rico y las Islas Vírgenes de EE.UU.".

***Tormenta tropical Dorian.*** El 27 de agosto de 2019, el presidente Trump emitió una declaración de emergencia sobre la Tormenta Tropical Dorian. La declaración autorizó la categoría B de la FEMA en el marco del programa de asistencia pública, limitada a la asistencia federal directa para el apoyo necesario en la coordinación de los esfuerzos de ayuda en caso de desastres. El 28 de agosto de 2019, la Junta de Supervisión autorizó el uso de $260 millones de los fondos totales de la reserva de emergencia del Año fiscal 2019 y el Año fiscal 2020 para hacer frente a la Tormenta Tropical Dorian.

***Terremotos de enero de 2020.*** A partir del 28 de diciembre de 2019, una serie de terremotos y réplicas sacudieron Puerto Rico. Desde entonces, Puerto Rico ha experimentado aproximadamente 300 terremotos con una magnitud superior a tres. Los terremotos causaron daños significativos en viviendas y edificios en la costa sur de Puerto Rico y también daños significativos en la planta de energía eléctrica Costa Sur de AEE, que habitualmente genera aproximadamente el 21% de la energía eléctrica de Puerto Rico. En respuesta a un terremoto de magnitud 6 que sacudió a Puerto Rico el 7 de enero de 2020, el

Presidente aprobó una declaración de emergencia para los 78 municipios de categoría B, limitada a la asistencia federal directa para complementar los esfuerzos de respuesta del Estado Libre Asociado y los gobiernos locales, a raíz de una solicitud de la gobernadora Vázquez. La Junta de Supervisión autorizó el uso del balance de $160 millones de los fondos de la Reserva de Emergencia para responder a los terremotos. Este fondo de Reserva de Emergencia estaba en el plan fiscal certificado y se financia con $130 millones anuales, y entre el Año fiscal 2019 y el Año fiscal 2020, la Junta de Supervisión apartó $260 millones en reservas; $100 millones de los cuales se utilizaron para responder a la tormenta tropical Dorian y a los recientes terremotos. Estos fondos de la reserva de emergencia fueron incluidos y certificados por la Junta de Supervisión en los presupuestos de los años fiscales 2019 y 2020 para asegurar que el ELA estuviera preparado para financiar las necesidades de emergencia en caso de que se produjera otro desastre natural. El 16 de enero de 2020, el presidente Trump firmó una declaración de catástrofe grave que autorizaba los programas de asistencia individual, asistencia pública y mitigación de riesgos, lo que permitía una serie de ayudas federales en virtud de la Ley Stafford. Esta declaración complementa los esfuerzos de recuperación del ELA y los gobiernos locales después de la seguidilla de terremotos. La declaración (y sus posteriores modificaciones) designó a 34 municipios para recibir asistencia individual y a 14 municipios para las categorías A-G en el marco de la asistencia pública, con una tasa de reembolso del 75% de la parte federal y el 25% de la parte local, así como a todas las zonas que pueden recibir asistencia en el marco del Programa de Subvenciones para la Mitigación de Riesgos. Los municipios designados para la Asistencia Pública incluyen: Adjuntas, Guanica, Guayanilla, Jayuya, Juana Díaz, Lajas, Las Marías, Mayagüez, Peñuelas, Ponce, Sabana Grande, San Germán, Utuado y Yauco.

*COVID-19* E13 de marzo de 2020, el entonces presidente Trump emitió una declaración de emergencia sobre la pandemia mundial, que comenzó en Estados Unidos el 20 de enero de 2020. El 27 de marzo de 2020, el presidente Trump aprobó la declaración de catástrofe grave de Puerto Rico para COVID-19, que autorizó la Asistencia Individual (limitada al Programa de Asesoramiento de Crisis) y la Asistencia Pública (medidas de protección de emergencia de categoría B) a Puerto Rico. El período de incidentes para la respuesta a COVID-19 continúa, debido a las prórrogas de la Emergencia de Salud Pública.

*Ciclón tropical 9.* El 29 de julio de 2020, el presidente Trump emitió una declaración de emergencia sobre el potencial Ciclón Tropical 9. La declaración autorizó medidas de protección de emergencia (Categoría B) en el marco del programa de Asistencia Pública y se limita a la asistencia federal directa y al reembolso de la atención masiva, incluida la evacuación y el apoyo en materia de refugios, con un 75% de financiamiento federal.

*Tormenta tropical Laura.* El 22 de agosto de 2019, el presidente Trump aprobó una declaración de emergencia en respuesta a la Tormenta Tropical Laura. La declaración autorizó medidas de protección de emergencia (Categoría B) en el marco del programa de Asistencia Pública y se limita a la asistencia federal directa conforme al programa de Asistencia Pública y al reembolso de la atención masiva, incluida la evacuación y el apoyo a los refugios, con un 75% de financiamiento federal.

*Huracán Isaías.* El 9 de septiembre de 2020, el presidente Trump aprobó una declaración de catástrofe grave en respuesta al huracán Isaías. Cuatro municipios puertorriqueños fueron designados para recibir asistencia individual.

*Tormenta severa e inundaciones.* El 5 de noviembre de 2020, el presidente Trump aprobó una declaración de catástrofe grave en respuesta a una tormenta severa e inundaciones. Un municipio fue designado para recibir asistencia individual.

226

1.      **Fondos de ayuda federal para desastres**

a)      **Alcance de los daños**

Hay muchos puntos de vista sobre cómo evaluar el impacto y la magnitud de los daños causados por los huracanes Irma y María, los terremotos de enero de 2020 y los acontecimientos posteriores, desde evaluar solo el daño causado en los activos fijos productivos hasta el costo de toda la reconstrucción que es necesaria para el ELA. Las siguientes fuentes proveen diversos métodos para evaluar el impacto y la magnitud de los daños causados por los huracanes Irma y María:

- El plan Build Back Better ("BBB") de Puerto Rico, publicado en noviembre de 2017 calcula un costo de reconstrucción de $94,400 millones, que esto incluye los costos relacionados con la salud y gastos de recuperación, entre otros.[186]

- "Transformación e innovación luego de la devastación" de Puerto Rico, certificado por la Junta de Supervisión en agosto de 2018, describe la perspectiva del Gobierno de Puerto Rico sobre el conjunto completo de inversiones de capital necesarias para que Puerto Rico se recupere de los huracanes Irma y María. El financiamiento total para estas casi 270 acciones, requeriría aproximadamente $139,000 millones durante los años calendario 2018-2028.[187]

- La estimación de los daños de la NOAA en Puerto Rico y las Islas Vírgenes de EE.UU. debido al Huracán María es de $90,000 millones, con un intervalo de confianza del 90% de +/- $25,000 millones, o $65,000 a $115,000 millones.[188]

- En diciembre de 2018, la Junta de Planificación de Puerto Rico publicó un informe que mencionaba que el impacto de la tormenta en la economía era de $43,135 millones,[189] cifra que incluyó los daños físicos y la interrupción de la actividad comercial (p. ej., pérdidas debido a que los sistemas habían dejado de funcionar, etc.).

Al 2 de febrero de 2021, se siguen formulando proyectos del programa de Asistencia Pública por los daños causados por los terremotos y las tormentas, con 8,033 proyectos obligados con fondos por un total de $23,627,169,083. A medida que los proyectos continúen a través del proceso de desembolso, el plan fiscal certificado se actualizará para reflejar cualquier cambio en el financiamiento total.

---

[186]   Gobernador de Puerto Rico, *Build Back Better Puerto Rico* (nov. 2017), *disponible en* http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[187]   Oficina Central de Recuperación, Reconstrucción y Resiliencia, *Transformación e innovación luego de la devastación: Un plan de recuperación económica y de desastres para Puerto Rico* (8 de agosto de 2017), *disponible en* https://recovery.pr/tpbackend_prod/api/document/download/566.

[188]   Richard J. Pasch, Andrew B. Penny, & Robbie Berg, *National Hurricane Center Tropical Cyclone Report: Hurricane Maria* (Centro Nacional de Huracanes) (14 de febrero de 2019), *disponible en* https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf.

[189] Consulte Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, 4 de diciembre de 2018.

b) **Ayuda federal proporcionada y esperada**

El Plan Fiscal de mayo de 2021 prevé que se desembolsarán aproximadamente $84,000 millones de fondos de ayuda para desastres de fuentes federales y privadas en el esfuerzo de reconstrucción. Dicha cantidad se utilizará para una mezcla de financiamiento para particulares (*p. ej.*, reconstrucción de viviendas, gastos personales relacionados con los huracanes, como ropa y suministros), financiamiento para el sector público (*p. ej.*, reconstrucción de infraestructuras importantes, carreteras y escuelas) y para cubrir la parte que le corresponde al ELA del costo del financiamiento de ayuda para desastres (los destinatarios a menudo deben hacerse cargo de una parte del gasto en asistencia pública federal).[190]

Del total de $84,000 millones, se estima que $48,000 millones proceden del Fondo de Ayuda para Desastres ("DRF") de FEMA para asistencia pública, mitigación de riesgos, asignación de misiones y asistencia individual. Se estima que $7,400 millones provendrán de indemnizaciones de seguros privados y comerciales percibidas, y $7,700 millones están relacionados con otros fondos federales. El Plan Fiscal de mayo de 2021 incluye aproximadamente $20,000 millones del programa CDBG-DR/ CDBG-MIT.

Las principales fuentes de financiamiento de ayuda para desastres se detallan a continuación:

- **Fondo de Ayuda para Desastres (DRF) de FEMA:** FEMA proporciona asistencia individual a las personas y familias que han sufrido daños sostenidos por un evento declarado y en una zona de desastre declarada. FEMA también proporciona asistencia pública tanto para trabajos de emergencia (retirada de escombros y medidas de protección de emergencia) como para trabajos permanentes (asistencia para reparar o sustituir infraestructuras). El programa de Asistencia Pública también fomenta la protección de estas instalaciones dañadas frente a futuros eventos mediante medidas de mitigación para los elementos dañados de la infraestructura. También existen oportunidades de mitigación a través del Programa de Subvenciones para la Mitigación de Riesgos de FEMA, que ofrece mayores oportunidades para financiar proyectos que reduzcan o eliminen los riesgos a largo plazo.

  - **Sección 428 - Programa piloto de procedimientos alternativos.** El Programa Piloto de Procedimientos Alternativos (el "Programa 428"), autoriza un conjunto de procedimientos alternativos para el programa de Asistencia Pública de FEMA. El Programa 428 hace posible la consolidación de múltiples proyectos en una única subvención de costo fijo, lo que permite una mayor flexibilidad en la reconstrucción o restauración de los daños causados por los desastres. Los objetivos del Programa 428 incluyen: (1) reducir los costos para el gobierno federal derivados de la asistencia pública, (2) aumentar la flexibilidad en la administración de dicha asistencia, (3) agilizar la ayuda al gobierno estatal, tribal o local o al propietario de una entidad sin fines de lucro, y (4) proporcionar incentivos y desincentivos financieros para proyectos de asistencia pública oportunos y rentables.

    El 18 de septiembre de 2020, funcionarios del Estado Libre Asociado y del gobierno de los Estados Unidos anunciaron la aprobación de $12,800 millones en fondos relacionados con la ayuda del huracán María bajo el Programa 428. El acuerdo consistía en $10,500 millones para la AEE y casi $2,300 millones para el DEPR. Aproximadamente $11,500 millones corresponden a la participación federal en los costos y el resto se cubre con fondos complementarios de participación en los costos.

---

[190] La responsabilidad del financiamiento equitativo de los gastos de Puerto Rico se estimó usando datos provistos por FEMA, ajustados por categoría según sea necesario para las exenciones y excepciones.

El financiamiento federal de los $10,500 millones permitirá a la AEE reparar y/o reemplazar las líneas de transmisión y distribución, las subestaciones eléctricas, los sistemas de generación de energía, los edificios de oficinas, junto con las mejoras generales de la red eléctrica. Hubo 2,300 millones destinados a la reparación o sustitución de las infraestructuras dañadas del Departamento de Educación.

En enero de 2021, se llegó a un acuerdo sobre el costo estimado de $3,600 millones para que la AAA reparara los daños en los sistemas de agua.

Aunque el Programa 428 proporciona una fuente de financiamiento flexible, no está exento de riesgos. El Programa 428 es una subvención con un límite de costo fijo y hace recaer todo el riesgo de la gestión de los excesos de costos en el ELA. Por otro lado, el programa ofrece orientación sobre el uso de los fondos procedentes de costos inferiores a lo previsto. Actualmente, la fecha límite para que los solicitantes lleguen a un consenso sobre las subvenciones del programa 428 es el 31 de diciembre de 2021.

- **Programa de Subvención en Bloque para el Desarrollo Comunitario para la Recuperación ante Desastres (CDBG-DR) de HUD:** Basándose en el plan de acción presentado por el Departamento de Vivienda de Puerto Rico ("DVPR"),191 el HUD provee fondos del programa CDBG-DR que se pueden utilizar para asistencia individual (p. ej., reparación de viviendas) y asistencia pública (p. ej., desarrollo de infraestructura), o por el Gobierno para determinados costos operativos (p. ej., para cubrir el financiamiento equitativo del costo de ayuda en caso de desastres). El plan de acción fue aprobado por el HUD el 29 de julio de 2018. Sin embargo, se presentan enmiendas al HUD por diversas razones, como cambios en el financiamiento aprobado, cambios de orientación, cambios presupuestarios y otros cambios en el programa. El primer plan de acción esbozó los usos de los aproximadamente $1,500 millones del programa CDBG-DR puestos a disposición por el Congreso el 1 de febrero de 2018. Las modificaciones posteriores del plan de acción han asignado otros 8,200 millones para Puerto Rico, incluyendo $277 millones adicionales en necesidades de infraestructura no cubiertas. El 10 de abril de 2018, después de que se anunciaran los $1,500 millones iniciales, el Congreso puso a disposición $18,500 millones adicionales en fondos de recuperación, incluyendo fondos destinados a la red eléctrica y a actividades de mitigación. El HUD y el DVPR han acordado los parámetros dentro de los cuales se pueden gastar los fondos restantes. Se ha iniciado el desembolso de los $1,500 millones comprometidos en el primer tramo de financiamiento. A 31 de diciembre de 2020, el DVPR ha utilizado $150,256,275.37.

---

[191] El Gobernador de Puerto Rico designó al DSPR como la entidad responsable de administrar el programa de subvención CDBG-DR en estrecha colaboración con la COR3. La 2da enmienda no sustancial fue enviada al HUD en agosto de 2019. El plan de acción y las sucesivas enmiendas están *disponibles en* https://www.cdbg-dr.pr.gov/en/action-plan/.

- **Fondos de seguros privados:** Se generaron importantes pérdidas en víctimas y bienes personales después del huracán María. Un primer análisis de los datos de la Oficina del Comisionado de Seguros de Puerto Rico, ajustado por autoasegurados y otros tipos de cobertura, fue utilizado para determinar el monto que se pagará a los particulares y las empresas por daños importantes.

- **Fondo Rotatorio de Ayuda para Desastres:** En noviembre de 2020, el Gobernador aprobó la Ley 139-2020 para crear una línea de crédito rotativo de $750 millones y autorizar al Secretario de Hacienda, en nombre del Gobierno, a proporcionar o prorrogar préstamos, líneas de crédito o adelantos a las agencias del gobierno central, corporaciones públicas, instrumentalidades y municipios para financiar proyectos de reurbanización hasta que se remitan los reembolsos de FEMA.

  - La intención general del fondo es adelantar el financiamiento a los solicitantes con proyectos aprobados para obtener liquidez a corto plazo y acelerar la recuperación. La Junta de Supervisión ha colaborado recientemente con el COR3 y la AAFAF para aprobar las directrices del programa.

- **Otros fondos federales complementarios:** Se han asignado fondos federales adicionales a diversas agencias y proyectos en Puerto Rico. Este dinero se dedicará a una amplia gama de esfuerzos de recuperación, desde la reconstrucción de edificios dañados (*p. ej.*, fondos para reparar los daños en los centros Job Corps en Puerto Rico) hasta fondos para programas de salud y gestión ambiental (*p. ej.*, fondos del USDA para reparar los sistemas de agua en zonas rurales).

2.     **Respuesta a la pandemia de COVID-19**

       a)     **Antecedentes de la pandemia de COVID-19 e impacto económico previsto**

*Antecedentes.* La enfermedad por coronavirus 2019 ("COVID-19") es una enfermedad viral infecciosa por la que la mayoría de las personas infectadas por el virus COVID-19 experimentan una enfermedad respiratoria de leve a moderada y se recuperan sin necesidad de tratamiento especial. Las personas mayores y quienes padecen enfermedades subyacentes como enfermedades cardiovasculares, diabetes, enfermedades respiratorias crónicas y cáncer parecen más propensas a desarrollar enfermedades graves y, en algunos casos, a morir. Al 29 de abril de 2021 se han autorizado y recomendado tres vacunas para su uso en los Estados Unidos.

El 11 de marzo de 2020, la Organización Mundial de la Salud declaró pandemia el brote de COVID-19, que se está extendiendo rápidamente. Hasta abril de 2021 se han confirmado más de 150 millones de casos en todo el mundo, detectados en más de 190 países, incluidos los 50 estados de Estados Unidos, y ha provocado más de 3.1 millones de muertes.

*Impacto económico en Puerto Rico.* Los confinamientos obligatorios en todo el Estado Libre Asociado y las restricciones temporales han tenido un impacto crítico y adverso en toda la actividad económica del Estado Libre Asociado. El mercado laboral fue testigo de una dislocación sin precedentes, con tasas de desempleo que alcanzaron niveles muy superiores a los de Estados Unidos y que fueron seguidas por una recuperación más lenta del empleo en el caso de Puerto Rico. Del mismo modo, la educación K-12 se enfrentó a importantes retos que han suscitado preocupación por los resultados de los estudiantes. Estos factores sugieren que la pandemia puede dejar profundas cicatrices en la economía puertorriqueña a través de múltiples canales, incluyendo una menor inversión, la erosión del capital humano y una menor productividad. El verdadero impacto cuantificable en Puerto Rico aún no se conoce del todo y, aunque se sigue de cerca, la situación aún está en curso.

b) **Respuesta federal e impacto en Puerto Rico y el Estado Libre Asociado**

Para mitigar el impacto económico de COVID-19, el gobierno federal emitió una serie de proyectos de ley de estímulo de emergencia para disminuir la carga de las empresas y los individuos en los Estados Unidos.

*Proyecto de ley de emergencia 1.* El 6 de marzo de 2020, el presidente Trump firmó un proyecto de ley de gastos de $8,300 millones, denominado "Ley de Asignaciones Suplementarias de Preparación y Respuesta al Coronavirus", para financiar los esfuerzos de lucha contra la pandemia.

*Proyecto de ley de emergencia 2.* El 18 de marzo de 2020, el presidente Trump firmó un proyecto de ley de estímulo con más de $100,000 millones de financiamiento, llamado "Ley de Respuesta al Coronavirus Familias Primero".

*Proyectos de ley de emergencia 3 y 3.5.* El 27 de marzo de 2020, el presidente Trump firmó el proyecto de ley de estímulo de 2.2 billones de dólares, conocido como la "Ley de Ayuda, Alivio y Seguridad Económica por Coronavirus" (la "Ley CARES"). La Ley CARES se subdividió en dos divisiones, la División A titulada "Mantener a los trabajadores pagados y empleados, mejoras en el sistema de atención sanitaria y estabilización económica" (aproximadamente $1.9 billones), y la División B titulada "Asignaciones de emergencia para la respuesta sanitaria al coronavirus y operaciones de la agencia" (aproximadamente $350,000 millones). El 24 de abril de 2020, el presidente Trump firmó una ampliación de la Ley CARES, conocida como "Programa de Protección de Pago de Nómina y Ley de Mejora de la Atención Médica" (la "PPHCEA", por sus siglas en inglés) para proporcionar dinero adicional para testeos, hospitales e instalaciones de atención médica, y los préstamos del Programa de Protección de Pago de Nómina ("PPP") de la Administración de Pequeñas Empresas (la "SBA").

El Plan Fiscal 2021 incluye una estimación de la porción de estos fondos federales que se asignarán a Puerto Rico, basándose en una combinación de fuentes directas del gobierno federal y anuncios de las agencias, y, en algunos casos, basándose en una analogía histórica (por ejemplo, la Ley de Recuperación y Reinversión de Estados Unidos de 2009). El Plan Fiscal 2021 estima que Puerto Rico recibiría $17,200 millones de los $2.9 billones de dólares de estímulo federal aprobados hasta la fecha por medio de los proyectos de ley 1 a 3.5. Aunque esta suma incluye los pagos de seguro de desempleo cubiertos por el gobierno federal, no incluyen los pagos normales del seguro de desempleo cubiertos por el gobierno local, que se estiman en $800 millones durante el período cubierto por la Ley CARES.

*Proyecto de ley de emergencia 4.* El 27 de diciembre de 2020, el presidente Trump firmó la Ley de Asignaciones Consolidadas, 2021, que combina $900,000 millones de dólares de ayuda de estímulo para la pandemia de COVID-19 en los Estados Unidos con un proyecto de ley de gasto ómnibus de 1.4 billones de dólares para el Año fiscal federal 2021. Las disposiciones de ayuda de estímulo estaban contenidas en dos divisiones, la División M, titulada "Ley de Asignaciones Suplementarias en Respuesta y Alivio al Coronavirus, 2021," y la División N, titulada "Respuesta y Alivio Adicionales al Coronavirus".

La Ley de Asignaciones Consolidadas también prorrogó el plazo en el que los estados podían gastar los $350,000 millones de los Fondos de Ayuda para el Coronavirus (creados por la Ley CARES) del 30 de diciembre de 2020 al 31 de diciembre de 2021.

De los aproximadamente $900,000 millones de ayuda de estímulo de la Ley de Asignaciones Consolidadas, se estima que Puerto Rico recibirá $7,300 millones, y la mayor parte de esos fondos se destinarán a particulares y empresas. De manera similar a los Proyectos de ley de emergencia 3 y 3.5, esta cuantía incluye solamente la cuota federal de los pagos de seguro de desempleo. Además, el Plan fiscal

2021 estima $100 millones de prestaciones de desempleo financiadas por el gobierno federal a través del programa normal de seguro de desempleo.

*Proyecto de ley de emergencia 5.* El 11 de marzo de 2021, el presidente Biden firmó la Ley de Plan de Rescate Estadounidense de 2021. Este instrumento prevé $1,900 millones en financiamiento, cambios de programas y políticas fiscales orientados a mitigar los continuos efectos de la pandemia. Los principales componentes de esta ley incluyen una tercera ronda de Pagos de impacto económico de hasta $1,400 por contribuyente elegible, el incremento de las desgravaciones fiscales por hijo y rentas del trabajo para los puertorriqueños, la ampliación del seguro de desempleo y $350,000 millones en fondos de emergencia para los gobiernos estatales, locales, territoriales y tribales. Otros programas significativos incluyen $122,700 millones para la educación primaria y secundaria, $47,800 millones para pruebas de la COVID-19, $24,000 millones para estabilización del cuidado infantil, $21,600 millones para asistencia de emergencia al alquiler, $15,000 millones para financiamiento vinculado a vacunas y $28,600 millones para el Fondo de Revitalización de Restaurantes.

De los $1.9 billones que desembolsará el plan de rescate, se estima que a Puerto Rico le corresponderán $17,500 millones. Al igual que en los Proyectos de ley de emergencia 3, 3.5 y 4, esta suma incluye las prestaciones de desempleo financiadas por el gobierno federal, y excluye el tramo financiado localmente que, según el Plan fiscal 2021, se estima en $200 millones. Por otra parte, se prevé que llegarán a Puerto Rico crecientes fondos federales como consecuencia de los programas EITC y CTC aprobados en el marco de la Ley de Plan de Rescate Estadounidense.

c)      **Respuestas aprobadas por la Junta de Supervisión por parte del ELA**

Además de las respuestas emitidas por el Gobierno Federal, la Junta de Supervisión aprobó una serie de medidas de emergencia, así como órdenes ejecutivas y acciones gubernamentales emitidas por la gobernadora Vázquez, para aminorar el impacto de la COVID-19 en su economía, empresas y ciudadanos.

*Fondo de Reserva de Emergencia.* El 5 de marzo de 2020, la Junta de Supervisión puso a disposición una cantidad inicial de $5 millones del Fondo de Reserva de Emergencia para la prevención y preparación frente a la COVID-19.

El 13 de marzo de 2020, la Junta de Supervisión autorizó la utilización de Fondos de Reserva de Emergencia adicionales de los Años fiscales 2019 y 2020 según lo necesite el Gobierno de Puerto Rico. Se autorizó el uso de aproximadamente $160 millones para los gastos de emergencia del ELA relacionados con la pandemia de COVID-19, incluyendo la preparación y detección, la sensibilización de la población y la mejora de la capacidad del sector de la salud pública. Este fondo de Reserva de Emergencia se estableció en el Plan Fiscal Certificado del ELA.

Al 4 de diciembre de 2020, se han gastado $70 millones.

*Paquete de Apoyo de Medidas de Emergencia.* El 23 de marzo de 2020, la Junta de Supervisión concedió un apoyo presupuestario urgente en forma de un Paquete de Apoyo de Medidas de Emergencia, autorizando al Gobierno de Puerto Rico a utilizar $787 millones para combatir la emergencia por COVID-19. Este paquete incluye:

- $237 millones en bonificaciones únicas para enfermeras públicas y privadas, técnicos, personal de servicios médicos de emergencia, oficiales correccionales y otro personal en primera línea de la lucha contra el COVID-19;

- $50 millones para inversiones en hospitales y seguridad pública, con el fin de reponer los suministros médicos e invertir en equipos durante un periodo de al menos dos meses;

- $160 millones en concepto de pago directo único a los trabajadores autónomos y pequeñas empresas cuyos ingresos se han visto afectados por la suspensión de su trabajo e ingresos;

- $240 millones para que el Departamento de Educación apoye y permita el aprendizaje en línea mientras las escuelas están cerradas, para comprar tabletas para cada estudiante y docente, y proporcionar software y formación a los docentes y estudiantes; y

- $100 millones para los municipios, que proporcionan apoyo para la pérdida de ingresos como resultado de las medidas de emergencia aplicadas para luchar contra la COVID-19.

Al 30 de abril de 2021 se habían desembolsado $519 millones en los Años fiscales 2020 y 2021.

***Órdenes ejecutivas y acciones gubernamentales.*** Desde marzo de 2020, la Gobernadora ha emitido una serie de órdenes ejecutivas en respuesta a la pandemia de COVID-19. Las órdenes ejecutivas han incluido la declaración del estado de emergencia, la activación de la Unidad Médica de la Guardia Nacional, el establecimiento y la prórroga del toque de queda, la compra de emergencia de equipos de protección personal, la cuarentena obligatoria de 14 días para los viajeros y otras restricciones de viaje, y el cierre de negocios y otras medidas de confinamiento. Las órdenes ejecutivas relativas a las restricciones de viaje, el cierre de negocios, los toques de queda y otras medidas de confinamiento han tenido un impacto negativo importante en la actividad económica de Puerto Rico.

### d)    Otras medidas de estímulo y ayuda del Gobierno

El 14 de abril de 2020, la gobernadora Vázquez convirtió en ley las Resoluciones Conjuntas 26-2020 y 27-2020, que exigen a los acreedores financieros de Puerto Rico establecer una moratoria voluntaria en los pagos a los préstamos personales, préstamos de automóviles, préstamos hipotecarios y tarjetas de crédito (de uso personal, familiar o doméstico) correspondientes a los meses de marzo a agosto de 2020. Tras la aprobación, la fecha de finalización del préstamo se prorrogará por un periodo igual al número de pagos no efectuados. El deudor podrá solicitar que el importe adeudado por los pagos no efectuados se distribuya entre los pagos restantes adeudados en virtud del préstamo.

El 16 de abril de 2020, la gobernadora Vázquez promulgó la Ley No. 40-2020, que enmienda varias disposiciones importantes del Código de Rentas Internas de Puerto Rico de 2011, entre otras leyes especiales, como parte de las medidas tomadas para proporcionar ayuda durante la pandemia de COVID-19 en curso. Vea la sección **Error! Reference source not found.** de esta Declaración de Divulgación para obtener un resumen de la Ley 40-2020.

El 26 de abril de 2020, la Junta de Supervisión proporcionó al ELA recomendaciones sobre las formas de utilizar los fondos recibidos en el marco del Fondo de Alivio del Coronavirus ("CRF") creado en virtud de la Ley CARES, sugiriendo que los $2,200 millones se utilicen en las siguientes áreas:

- Sistema de seguimiento y evaluación: aumentar significativamente el suministro de kits de pruebas COVID-19 y adquirir redes de alta tecnología para el seguimiento de la infección;

233

- Infraestructura de los servicios de salud: poner en marcha un plan de almacenamiento y distribución para gestionar el inventario, y racionar los suministros y equipos como el equipo de protección personal, los respiradores y las pruebas de detección de virus;

- Aprendizaje a distancia y resultados de los estudiantes: potenciar el aprendizaje a distancia para recuperar el aprendizaje perdido, y prepararse para una posible reaparición de COVID-19;

- Pequeñas empresas: formación y asesoramiento para ayudar a encarar la nueva realidad económica;

- Desempleados de larga duración: invertir en el fortalecimiento del desarrollo laboral; y

- Reembolso al ELA: una parte de los $500 millones de fondos incrementales que forman parte del Paquete de Apoyo de Medidas de Emergencia de $787 millones pueden ser gastos reembolsables en virtud de la Ley CARES

El 15 de mayo de 2020, la gobernadora Vázquez Garced emitió la Orden Ejecutiva 2020-040, adoptando un plan de gastos para los $2,200 millones que Puerto Rico está recibiendo a través del CRF creado bajo la Ley CARES. Esta orden proporcionaría $990 millones a las entidades públicas y unos $811 millones al sector privado. Además, el Gobierno mantendría $440 millones en un fondo de reserva que se utilizaría en función de las necesidades futuras de Puerto Rico y del estado de la emergencia sanitaria por COVID-19.

*Préstamos de ayuda de emergencia.* En noviembre de 2020, el Gobernador promulgó la Resolución Conjunta 82, que autorizaba al Gobierno a proporcionar Ayuda de Emergencia (como se define en la resolución) en forma de uno o más préstamos o líneas de crédito a las Entidades Prestatarias del Gobierno (como se define en la resolución) para hacer frente a los problemas de liquidez de dichas entidades en relación con la emergencia por COVID-19 y con las medidas necesarias adoptadas como resultado de dicha emergencia. Esta Ayuda de Emergencia estaría disponible hasta el 30 de junio de 2021. Para financiar la Ayuda de Emergencia, la Resolución Conjunta 82 autoriza el uso de fondos no comprometidos del Tesoro del Estado, si es necesario, o el uso de fondos reasignados de otras agencias según lo determine la Oficina de Gerencia y Presupuesto. La resolución establece que el reembolso podría estructurarse a través de un mecanismo indefinido de compensación, así como de reembolsos de fondos estatales o federales distribuidos para tales fines. Esta legislación aún está sujeta a la aprobación de la Junta de Supervisión de conformidad con la Sección 204 de PROMESA y el fondo aún no se ha establecido.

**C.        Proceso de reclamaciones y fecha límite**

1.        **Listas de la sección 924/925**

La sección 924 del Código de Quiebras exige que los deudores presenten una lista de acreedores. La sección 925 del Código de Quiebras establece que "[la] evidencia de reclamaciones se tendrá por presentada" para aquellas reclamaciones incluidas en la lista de acreedores prevista en la sección 924 del Código de Quiebras, excepto por reclamaciones "enumeradas como litigiosas, contingentes o no liquidadas". 11 U.S.C. § 925.[192]

---

[192] Consulte *Notificación de presentación de la lista de acreedores del Estado Libre Asociado de Puerto Rico*, [ECF Núm. 1215]; *Notificación de enmiendas a la lista de acreedores del Estado Libre Asociado de Puerto Rico*, [ECF Núm. 2582]; *Notificación de presentación de la lista de acreedores del Sistema de Retiro de los Empleados del*

2.     **Resoluciones sobre fecha límite (los Deudores, excepto AEP)**

De acuerdo con la *Orden que (A) establece fechas límite y procedimientos para presentar evidencias de reclamaciones y (B) aprueba la forma y el modo para su notificación* [ECF Núm. 2521] (la "Orden sobre Fecha Límite Inicial") y la *Orden que (A) extiende las fechas límite para presentar evidencias de reclamaciones y (B) aprueba la forma y el modo para su notificación* [ECF Núm. 3160] (junto con la Orden sobre la Fecha Límite Inicial, las "Resoluciones sobre Fecha Límite"), el Tribunal del Título III estableció las siguientes fechas límite para presentar evidencias de reclamaciones en los Casos de Título III para el ELA y SRE:

- el 29 de junio 2018 a las 4:00 p.m., Hora Estándar del Atlántico, como fecha límite general para presentar todas evidencias de reclamaciones (la "Fecha Límite General"), salvo por lo indicado más adelante;

- (a) la Fecha Límite General o (b) las 4:00 p.m., Hora Estándar del Atlántico, en la fecha que caiga el primer día laborable 35 días después de la fecha de registro de la orden aplicable que rechaza un contrato a otorgarse o un arrendamiento no vencido como fecha límite para presentar Reclamaciones emergentes de dicho contrato a otorgarse o arrendamiento no vencido, lo que ocurra más tarde;

- (a) la Fecha Límite General o (b) las 4:00 p.m., Hora Estándar del Atlántico, en la fecha que caiga a los 35 días de la fecha de notificación al reclamante de enmienda de la Lista de Acreedores como fecha límite para presentar Reclamaciones relacionadas con dicha enmienda a la Lista de Acreedores, lo que ocurra más tarde.

Las Órdenes sobre Fecha Límite autorizaron a las siguientes partes a presentar evidencias de reclamaciones globales en nombre de los siguientes interesados:

- los síndicos nombrados en el contrato de fideicomiso, agentes fiscales, o cualquier otro agente similar o sus personas designadas (individualmente, un "Representante de Bonos") de cada una de las respectivas series de bonos emitidos por un deudor o no deudor (en tanto exista dicho Representante de Bonos) podrán presentar evidencias de reclamaciones globales contra el deudor pertinente en nombre propio y en el de todos los tenedores de reclamaciones de bonos de la respectiva serie surgidas en virtud de los respectivos contratos de fideicomiso, resoluciones o documento similar relacionado con los bonos;

- cada sindicato puede presentar evidencias de reclamaciones globales en nombre de sus respectivos afiliados contra el Deudor pertinente de todas las obligaciones en virtud de sus respectivos Contratos de Negociación Colectiva o leyes aplicables; y

- cada agente en virtud de un acuerdo de crédito podrá presentar evidencias de reclamaciones globales aparte contra el deudor pertinente en nombre propio y en el de todos los acreedores en virtud de ese contrato de crédito.

---

*Gobierno del Estado Libre Asociado de Puerto Rico*, [17-BK-3567-LTC ECF Núm. 207]; *Notificación de presentación de la lista de acreedores de la Autoridad de Edificios Públicos de Puerto Rico*, [19-bk-5523 ECF Núm. 33].

3.        **Procedimientos previos a la convocatoria del SRE**

El 11 de febrero de 2020, los Deudores presentaron una moción[193] para establecer procedimientos para obtener información completa o actualizada de los tenedores de Reclamaciones de Beneficios de Pensión de los Empleados Activos y Jubilados (Clase 48), que ayudará a los Deudores a reducir el número de paquetes de convocatoria que hayan sido devueltos por no poderse entregar, y garantizar que los montos de las reclamaciones para los tenedores de reclamaciones en las Reclamaciones de Beneficios de Pensión de los Empleados Activos y Jubilados (Clase 48) del Plan se calculen con exactitud. Se han presentado todos los escritos procesales para ello. El 6 de marzo de 2020, el 9 de marzo de 2020 y el 11 de junio de 2020, los deudores presentaron propuestas de órdenes revisadas. El 11 de junio de 2020, el Tribunal del Título III aceptó la moción y dictó una orden que establecía los procedimientos [ECF Núm. 13402].

A tenor con la *Orden (A) que establece procedimientos previos a la convocatoria para determinados tenedores de Reclamaciones de Beneficios de Pensión, (B) que establece los procedimientos y las fechas límite para la presentación de la información que sea necesaria para la convocatoria de aceptación o rechazo del Plan de Ajuste, y (C) que aprueba la forma y el modo para su notificación* [Caso Núm. 17-3566, ECF Núm. 837] (la "Orden sobre Procedimientos previos a la convocatoria del SRE") y la *Orden  que concede la moción del Estado Libre Asociado de Puerto Rico y el Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico para que se apruebe una orden que (A) prorroga la fecha límite para la presentación de formularios de información y (B) aprueba la forma y el modo para su notificación* [ECF Núm. 918], el Tribunal del Título III estableció los siguientes Procedimientos Previos a la Convocatoria en el Caso de Título III del SRE:

- El 29 de julio de 2020 es la Fecha Límite en la cual los empleados Reclamantes deben presentar el Formulario de Información con la Información Solicitada a Prime Clerk;

- todos los Formularios de Información deben: (i) estar escritos en inglés o español; (ii) incluir una firma original o electrónica del Empleado Reclamante o de un representante autorizado del Empleado Reclamante; y  (iii) cumplir sustancialmente con el Formulario de Información; y

- todos los Formularios de Información se deben enviar a y ser recibidos por Primer Clerk a más tardar a las 4:00 p.m. (Hora Estándar del Atlántico) en la Fecha Límite

4.        **Orden sobre fecha límite de AEP**

De acuerdo con la *Orden (A) que establece fechas límite y procedimientos para presentar evidencias de reclamaciones y (B) aprueba la forma y el modo para su notificación* [Caso Núm. 19-05523-LTS, ECF Núm. 55] (la "Orden sobre fecha límite de AEP") y la *Orden que concede la moción de la Autoridad de Edificios Públicos de Puerto Rico para que se apruebe una orden (A) que prorroga las fechas límite para presentar evidencias de reclamaciones y (B) aprueba la forma y el modo para su notificación* [ECF Núm. 88], el Tribunal del Título III estableció las siguientes fechas límite para presentar evidencias de reclamaciones en el Caso de Título III de AEP:

---

[193] *Moción del Estado Libre Asociado de Puerto Rico y del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico para que se dicte una Orden (A) que establezca los procedimientos previos a la convocatoria para determinados tenedores de Reclamaciones de Beneficios de Pensión, (B) que establezca los procedimientos y las fechas límite para la presentación de la información que sea necesaria para la convocatoria de aceptación o rechazo del Plan de Ajuste por parte de dichos acreedores, y (C) que apruebe la forma y el modo para su notificación*, [ECF Núm. 10839].

- el 29 de julio de 2020 a las 4:00 p.m., Hora Estándar del Atlántico como Fecha Límite General, salvo por lo indicado más adelante;

- la Fecha Límite General o (b) las 4:00 p.m., Hora Estándar del Atlántico, en la fecha que caiga el primer día laborable 35 días después de la fecha de registro de la orden aplicable que rechaza un contrato a otorgarse o un arrendamiento no vencido como fecha límite para presentar Reclamaciones de AEP emergentes de dicho contrato a otorgarse o arrendamiento no vencido, lo que ocurra más tarde;

- la Fecha Límite General o (b) las 4:00 p.m., Hora Estándar del Atlántico, en la fecha que caiga a los 35 días de la fecha de notificación al reclamante de enmienda de la Acreedores de AEP como fecha límite para presentar Reclamaciones de AEP relacionadas con dicha enmienda a la Acreedores de AEP, lo que ocurra más tarde.

La Orden sobre Fecha Límite de AEP autoriza a las siguientes partes a presentar evidencias de reclamaciones globales en nombre de los siguientes interesados:

- Los Representantes de Bonos para cada una de las respectivas series de bonos emitidos por AEP (en tanto exista dicho Representante de Bonos) podrán presentar evidencias de reclamaciones globales contra AEP en nombre propio y en el de todos los tenedores de reclamaciones de bonos de la respectiva serie surgidas en virtud de los respectivos contratos de fideicomiso, resoluciones o documento similar relacionado con los bonos; y

- cada sindicato puede presentar evidencias de reclamaciones globales en nombre de sus respectivos afiliados contra AEP de todas las obligaciones en virtud de sus respectivos Contratos de Negociación Colectiva o leyes aplicables.

5.      **Procedimientos de resolución alternativa de disputas**

El 5 de junio de 2019, los Deudores presentaron la *Moción para el registro de una orden (A) que autorice procedimientos de resolución alternativa de disputas, (B) apruebe los formularios de notificación adicionales, (C) apruebe el envío de correspondencia propuesto, y (D) otorgue la reparación relacionada* [ECF Núm. 7224], para obtener una orden que establece un procedimiento de resolución alternativa de disputas ("Procedimientos RAD") para resolver determinadas reclamaciones generales no garantizadas, lo que incluye reclamaciones no liquidadas, formuladas contra el ELA, AEP o SRE (así como también otros Deudores de Título III), y aprobar un envío de correspondencia propuesto a los acreedores cuyas reclamaciones no brindaron suficiente información como para permitir que los Deudores concilien sus reclamaciones.

En la vista ómnibus de 24 de julio de 2019, el Tribunal del Título III solicitó determinadas modificaciones a los procedimientos RAD propuestos. Para el 13 de agosto de 2019, el Tribunal del Título III aprobó el envío propuesto, y suspendió la consideración de los Procedimientos RAD y las formas de notificación supeditadas a la presentación de procedimientos propuestos y revisados y las formas de notificación compatibles con las directrices proporcionadas por el Tribunal del Título III [ECF Núm. 8453].

El 7 de enero de 2020, los Deudores presentaron su *Moción enmendada para el registro de una orden (A) que autorice procedimientos de resolución alternativa de disputas, (B) apruebe los formularios de notificación adicionales, (C) apruebe el envío de correspondencia propuesto, y (D) otorgue la reparación relacionada* [ECF Núm. 9718] (la "Moción RAD enmendada"). La Moción RAD Enmendada solicita la aprobación de los procedimientos RAD enmendados (los ""Procedimientos RAD Enmendados")

237

que permitirían que el ELA, SRE, ACT, AEE, y AEP, a través de la Junta de Supervisión, y/o el Tribunal del Título III identifiquen cuáles son las reclamaciones que se resolverán a través de la RAD. Los procedimientos RAD enmendados establecen un proceso para que los Deudores y los reclamantes intenten resolver cuál es el monto de la reclamación a través de un intercambio de ofertas y contraofertas y, si no llegan a una resolución, un procedimiento simplificado de mediación. Si la reclamación continúa sin resolverse luego de estos procesos, los Procedimientos RAD Enmendados establecen además que el reclamante elija si desea resolver la reclamación utilizando uno de estos tres métodos: (1) litigio ante los tribunales del ELA (sujeto a ciertas restricciones); (2) arbitraje vinculante; o (3) litigio ante la Corte Título III. En la vista ómnibus del 29 de enero de 2020, el Tribunal del Título III aprobó la Moción RAD Enmendada, sujeto a la presentación de procedimientos revisados y formas de notificación compatibles con las observaciones del Tribunal del Título III con respecto al registro durante la vista. El 24 de marzo de 2020, la Junta de Supervisión presentó un aviso de presentación de una propuesta de orden revisada de acuerdo con las instrucciones del Tribunal del Título III. El 1 de abril de 2020, el Tribunal del Título III emitió una orden autorizando los procedimientos modificados de ADR y aprobando las formas adicionales de notificación [ECF Núm. 12576]. El 29 de diciembre de 2020, el Tribunal del Título III dictó una orden que establecía los procedimientos de ADR [ECF Núm. 15505]. Hasta la fecha, los deudores han presentado diez notificaciones de transferencia, transfiriendo 249 reclamaciones a los procedimientos de ADR.

6.    **Conciliación de Reclamaciones Administrativas**

El 8 de octubre de 2019, los Deudores presentaron su *Moción para el registro de una orden que (A) autorice la transacción administrativa de ciertas reclamaciones, (B) apruebe los formularios de notificación adicionales, (C) apruebe el envío de correspondencia propuesto, y (D) otorgue la reparación relacionada* [ECF Núm. 8827] (la "Moción ACR"). La Moción ACR Enmendada solicita la aprobación de los procedimientos de ACR (los "Procedimientos ACR Enmendados") que permitirían que el ELA, SRE, ACT, AEE, y AEP, a través de la Junta de Supervisión, y/o el Tribunal del Título III determinen cuáles son las reclamaciones que se resolverán a través de ACR. Los Procedimientos ACR establecen un proceso para que el Tribunal del Título III permita determinados tipos de reclamaciones que son administrativas por naturaleza (entre ellos, reclamaciones de reintegro de contribuciones, reclamaciones relacionadas con querellas sindicales, reclamaciones de empleados públicos y reclamaciones de pensión) que serán resueltas mediante los procesos administrativos existentes del ELA.

En la vista ómnibus del 30 de octubre de 2019, el Tribunal del Título III aprobó provisionalmente la Moción ACR, supeditada a la presentación de los procedimientos ACR revisados propuestos. El 12 de marzo de 2020, el Tribunal del Título III emitió una orden que aprueba la propuesta de orden revisada [ECF Núm. 12274]. Hasta la fecha, los Deudores han presentado ocho notificaciones de transferencia, transfiriendo 20,179 reclamaciones a los procedimientos de ACR.

7.    **Objeciones significativas a reclamaciones presentadas hasta la fecha**

Hasta la fecha de esta Declaración de Divulgación, se han presentado aproximadamente 115,958 evidencias de reclamaciones en el Caso de Título III contra el ELA, por un total aproximado de $33.2 billones en pasivos declarados más montos por liquidar. Se han presentado aproximadamente 52,928 evidencias de reclamaciones en relación con, o se han reclasificado para ser formuladas contra, SRE, por un total aproximado de $10.2 billones en pasivos declarados, más montos por liquidar. Se han presentado aproximadamente 381 evidencias de reclamaciones en relación con, o se han reclasificado para ser formuladas contra, AEP, por un total aproximado de $6.8 billones en reclamaciones presentadas, además de los montos por liquidar presentados. De acuerdo con los términos de las Órdenes sobre Fecha Límite, los Deudores consideran que posiblemente muchas de estas reclamaciones no necesiten presentarse en absoluto, o que tengan algún otro defecto, como haber sido enmendadas subsecuentemente o que sean

238

duplicaciones de otras evidencias de reclamaciones, incluso las evidencias de reclamaciones globales presentadas contra los Deudores en nombre de determinados bonistas.

A tenor con la *Orden que (A) aprueba los procedimientos de objeción ómnibus limitada, (B) suprime el requisito de la Regla de Quiebras 3007(e)(6), y (c) otorga la reparación relacionada* [ECF Núm. 4230, 4230-1] (los "Procedimientos de Objeción Inicial"), y la *Orden que (A) aprueba los procedimientos de la objeción ómnibus enmendada, (B) suprime el requisito de la Regla de Quiebras 3007(e)(6), (C), aprueba los formularios de notificación adicionales, y (D) otorga la reparación relacionada* [ECF Núm. 7440], el ELA, ACT, SRE y COFINA, a través de la Junta de Supervisión han presentado doscientas noventa y siete objeciones ómnibus y cincuenta y tres objeciones ómnibus a las reclamaciones. Estas objeciones ómnibus buscaban rechazar ciertas reclamaciones sobre la base de que carecían de información suficiente como para permitir que la Junta de Supervisión transigiera la reclamación, estaban formuladas contra el deudor incorrecto, habían sido enmendadas subsecuentemente, eran duplicaciones de otras evidencias de reclamaciones, o de otra manera declaraban montos por los cuales la entidad del deudor declarado no era responsable. SRE y el ELA también han presentado objeciones individuales y objeciones ómnibus a las evidencias de reclamaciones presentadas por el Agente Fiscal de SRE y determinados bonistas de SRE contra SRE y el ELA. Hasta la fecha, más de 50,000 reclamaciones han sido eliminadas, retiradas o resueltas, o se han registrado por error.

También se presentaron objeciones significativas a reclamaciones a algunas reclamaciones de bonistas, que se describen en la sección **Error! Reference source not found.** de esta Declaración de Divulgación.

**D.    Rechazo o aceptación de arrendamientos vigentes de bienes inmuebles no residenciales**

El ELA es parte en cientos de arrendamientos de bienes inmuebles no residenciales (los "Arrendamientos de Bienes Inmuebles"). La decisión de aceptar o rechazar los Arrendamientos de Bienes Inmuebles implica la consideración varios factores, no todos los cuales se pueden abordar de manera expedita. El 21 de julio de 2017, el Deudor del ELA presentó una moción solicitando la aprobación de una prórroga temporal para aceptar o rechazar cualquier Arrendamiento no vencido de Bienes Inmuebles de acuerdo con la sección 365(d)(4) del Código de Quiebras (la "Fecha límite 365(d)(4)"), que es aplicable a estos casos en virtud de la sección 301(a) de PROMESA [ECF Núm. 705]. El 10 de agosto de 2017, el Tribunal del Título III dictó una orden que extiende la fecha límite hasta el 29 de noviembre de 2017 [ECF Núm. 994]. Luego de la presentación del caso de Título III de AEP, el Tribunal del Título III prorrogó la orden emitida en el caso del ELA a AEP, y siempre y cuando la fecha límite de AEP para aceptar o rechazar arrendamientos se extienda al 23 de abril de 2020, con todos los derechos reservados para que AEP solicite nuevas extensiones [Caso Núm. 19-05523-LTS, ECF Núm. 13].

El Deudor del ELA solicitó nuevas extensiones de la Fecha Límite 365(d)(4) con el consentimiento de los arrendadores de acuerdo con la sección 365(d)(4)(B)(ii) del Código de Quiebras. Para ello, el Deudor del ELA dividió sus solicitudes de prórroga de fechas límite en (i) Arrendamientos de AEP y (ii) arrendamientos con otras entidades como arrendadoras.

(i)    Arrendamientos de AEP. El 13 de febrero de 2018, el Deudor del ELA solicitó prorrogar la Fecha Límite 365(d)(4) para los Arrendamientos de AEP hasta el 25 de septiembre de 2018 inclusive, con el consentimiento del Deudor de AEP [ECF Núm. 2494]. El 28 de febrero de 2019, QTCB Noteholder Group presentó la *Reserva de derechos de QTCB Noteholder Group para una moción para el registro de una tercera orden para prorrogar el tiempo para aceptar o rechazar arrendamientos vigentes de Bienes Inmuebles no residenciales de acuerdo con la sección 365(d)(4) del Código de Quiebras* [ECF Núm. 2602]. Después de una vista, se concedió una orden revisada

que extiende la Fecha Límite 365(d)(4) para Arrendamientos de AEP hasta el 27 de julio de 2018 inclusive, y que preserva expresamente los derechos de los bonistas.[194] De allí en adelante, el Deudor del ELA, con el consentimiento de AEP, ha seguido prorrogando la Fecha Límite 365(d)(4) para Arrendamientos de AEP. La Fecha Límite 365(d)(4) actual para Arrendamientos de AEP es el 29 de julio de 2021 [ECF Núm. 15770].

(ii) Arrendamientos con otras entidades. El 22 de noviembre de 2017, el Deudor del ELA solicitó prorrogar la Fecha Límite 365(d)(4) para arrendamientos con otras entidades hasta (i) el 1 de enero de 2019; (ii) la fecha de expiración o vencimiento de dichos arrendamientos de acuerdo con sus propios términos, o (iii) la fecha en la que un plan de ajuste es confirmado por cada Deudor, lo que ocurra primero [ECF Núm. 1852]. El ELA es parte en arrendamientos con cientos de arrendadores. A pesar de ponerse en contacto con cada arrendador, era poco probable que el Deudor del ELA pudiera recibir el consentimiento afirmativo de cada arrendador como una consecuencia directa de la destrucción generalizada y los cortes masivos de energía en la Isla de Puerto Rico luego del huracán María, lo que ha hecho que sea extremadamente difícil que las partes se comuniquen entre sí. A su vez, los Deudores y sus asesores no han podido obtener el consentimiento escrito de todos los propietarios para conceder la prórroga solicitada para que los Deudores acepten o rechacen el Arrendamiento de Bienes Inmuebles. En consecuencia, el Deudor del ELA solicitó prorrogar la Fecha Límite 365(d)(4) para los arrendamientos con otras entidades que o bien brindaron su consentimiento afirmativo o que no rechazaron expresamente dicho consentimiento. Se preservaron los derechos de las partes cuyo consentimiento se consideró "presunto" porque el consentimiento no se denegó expresamente [ECF Núm. 2292]. Ninguna de las partes negó explícitamente su consentimiento.

El Tribunal del Título III prorrogó la Fecha Límite 365(d)(4) en varias ocasiones. *Consulte* ECF Núm. 4977 y 9670. la Fecha Límite 365(d)(4) actual para los Deudores, excepto AEP, es (i) el 1 de enero de 2019; (ii) la fecha de expiración o vencimiento de dichos arrendamientos conforme a sus propios términos, o (iii) la fecha en la que un plan de ajuste es ratificado por cada Deudor, lo que ocurra primero [ECF Núm. 15574].

E.    **Aspectos de paralización de Título III**

1.    **Generalidades**

En el inicio de un caso de Título III, la sección 362(a) del Código de Quiebras, que es aplicable de acuerdo con la sección 301(a) de PROMESA, contempla una paralización automática de ciertas acciones por parte de terceros no deudores (la "Paralización de Título III"). El 29 de junio de 2017, el Tribunal del Título III confirmó la aplicabilidad de la sección 362(a) del Código de Quiebras a los Casos de Título III de acuerdo con la *Orden de acuerdo con la Sección 301(a) de PROMESA y a las Secciones 105(a), 362(a), 365 y 922 del Código de Quiebras que confirma (I) la aplicación de la paralización automática a los funcionarios, agentes y representantes del Gobierno, (II) la paralización de juicios anteriores a la petición*

---

[194] "Excepto por lo expresamente establecido en esta Orden, nada de lo dispuesto en la Moción o en esta Orden (a) menoscabará o modificará los derechos y las reclamaciones de AEP en virtud de o relacionados con los Arrendamientos de AEP conforme a PROMESA o una ley aplicable; ni (b) menoscabará o modificará los derechos y las reclamaciones de cualquier tenedor de bonos emitidos por AEP, ya sea directamente o como terceros beneficiarios, en virtud de o relacionado con los Arrendamientos de AEP conforme a PROMESA o una ley aplicable". *Orden que concede la moción para el registro de una tercera orden que extiende el plazo para aceptar o rechazar arrendamientos vigentes de Bienes Inmuebles según los cuales la Autoridad de Edificios Públicos de Puerto Rico es la Arrendadora conforme a la sección 365(d)(4) del Código de Quiebras* [ECF Núm. 2689].

*y (III) la aplicación de protecciones del contrato* [ECF Núm. 543]. Desde la Fecha de Petición aplicable, los Deudores han tomado medidas para preservar el importante "período de respiro" que proporciona la Paralización de Título III, abordar la condición financiera de los Deudores y desarrollar un plan de ajuste de manera expedita.

2.      **Protocolo de levantamiento de la paralización**

Para reducir la carga que pesa sobre el Tribunal del Título III, y para abordar eficientemente las peticiones de reparación de la Paralización de Título III en estos Casos de Título III sin precedentes, los Deudores desarrollaron un protocolo por el cual las partes pueden solicitar reparación de la Paralización de Título III, y por el cual los Deudores pueden resolver dichas peticiones de manera consensuada. El 17 de agosto de 2017, el Tribunal del Título III dictó una orden que implementa un protocolo para presentar mociones de reparación de la Paralización de Título III [ECF Núm. 1065-1] (el "Protocolo de Levantamiento de la Paralización"). De acuerdo con el Protocolo de Levantamiento de la Paralización, el solicitante debe (a) enviar una notificación al abogado, a la Junta de Supervisión y a AAFAF para notificarles la intención del solicitante de solicitar reparación de la Paralización de Título III al menos quince (15) días hábiles antes de presentar una moción que solicite dicha reparación, y (b) reunirse y consultar con los Deudores durante dicho período de 15 días. El 24 de octubre de 2017, se enmendó el Protocolo de Levantamiento de la Paralización (a) para permitir que los Deudores (i) suscriban estipulaciones que modifiquen o levanten la Paralización de Título III sin otra orden del Tribunal del Título III, y (ii) a su criterio, modificar o levantar la Paralización de Título III con respecto a cualquier acción civil de curso ordinario anterior a la petición contra un deudor sin la presentación de una notificación u orden del Tribunal del Título III, y (b) exigir que los Deudores radiquen una moción ómnibus para levantar la paralización cada sesenta (60) días, identificando cada modificación a la Paralización de Título III acordada por los Deudores durante el período pertinente y solicitando la aprobación retroactiva del Tribunal de dichas modificaciones a partir de la fecha de modificación pertinente [ECF Núm. 1512-1].

3.      **Mociones ómnibus de levantamiento de la paralización**

Desde la implementación del Protocolo de Levantamiento de la Paralización, los Deudores han presentado veinte mociones ómnibus de levantamiento de la paralización, que involucran aproximadamente 2,342 acciones, solicitando la aprobación retroactiva del Tribunal de las modificaciones a la Paralización de Título III.

4.      **Aspectos significativos de la paralización**

a)      ***Gracia-Gracia y otros c. el Estado Libre Asociado de Puerto Rico*, Caso Núm. 18-1463 (1er Cir.)**

Una clase de propietarios de vehículos que adquirieron seguros privados después de pagar primas obligatorias ("Gracia-Gracia") presentaron una acción ante el Tribunal de Primera Instancia del ELA solicitando el reembolso de las primas de seguro de automóviles duplicadas abonadas al ELA (colectivamente, la "Acción Anterior a la Petición Gracia-Gracia"). Gracia-Gracia alegó que la transferencia de primas duplicadas al Secretario de Hacienda violaba la Cláusula sobre Expropiaciones, la Cláusula del Debido Proceso y la Cláusula sobre Protección Igualitaria de la Constitución de los Estados Unidos. Luego de una serie de apelaciones y decisiones en devolución, el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito determinó que el debido proceso exigía que el ELA brindara a los reclamantes por lo menos un año para realizar reclamaciones de reembolso después de haber sido debidamente notificados.

En 2016, después de la decisión del Primer Circuito, las partes de la Acción Anterior a la Petición Gracia-Gracia llegaron a acuerdos que exigen que el ELA notifique a los miembros de la clase acerca de los procedimientos de tramitación de las reclamaciones para el reembolso de las primas duplicadas, el procesamiento de reclamaciones para el reembolso y el pago de los honorarios de abogados.

El 7 de febrero de 2018, Gracia-Gracia presentó una moción para modificar la paralización automática y permitir la aplicación de las transacciones celebradas [ECF Núm. 2434]. El Tribunal del Título III concedió la petición en parte, modificando la paralización automática para permitir la notificación y presentación de reclamaciones y el proceso de revisión, pero denegó la petición en los demás aspectos, incluso el pago de reembolsos y la adjudicación de honorarios de abogados [ECF Núm. 2858].

Los Demandantes apelaron la decisión y argumentaron que las primas duplicadas retenidas en la cuenta de reserva del ELA, y sujetas a la paralización automática, pertenecen a los miembros de la clase y no son propiedad de los Deudores. Los Deudores no estuvieron de acuerdo con esta afirmación. La apelación se argumentó en el Primer Circuito el 5 de junio de 2019.

Según la opinión de fecha 25 de septiembre de 2019, el Primer Circuito confirmó la parte la decisión del Tribunal del Título III que deniega la reparación por paralización con respecto a las primas de seguro no segregadas y, con respecto a las primas segregadas, remitió esta parte para una nueva determinación sobre la reparación por paralización basándose en una determinación preliminar sobre si los fondos de las primas eran propiedad del ELA o propiedad de los demandantes.[195]  El 16 de octubre de 2019, el Primer Circuito dictó un mandato en relación con la sentencia de fecha 25 de septiembre de 2019. El 15 de octubre de 2020, Gracia-Gracia y el ELA informaron al Tribunal del Título III que habían finalizado una estipulación para resolver la petición de los Demandantes Gracia-Gracia para la reparación por paralización [ECF Núm. 14588].

Conforme a la estipulación, el ELA presentó la *Moción del Estado Libre Asociado de Puerto Rico conforme a la Sección 365 del Código de Quiebras para el registro de una orden que apruebe la aceptación de los acuerdos de resolución con los Demandantes colectivos García Rubiera* [ECF Núm. 15171] (la "Moción de Aceptación Gracia-Gracia"). El 11, 25 de noviembre de 2020, CANA presentó su objeción limitada a la Moción de Aceptación de Gracia-Gracia [ECF Núm. 15275]. Gracia Gracia presentó su respuesta el 2 de diciembre de 2020 [ECF Núm. 15307], y el ELA presentó su respuesta el 3 de diciembre de 2020 [ECF Núm. 15325]. El Tribunal del Título III atendió los argumentos orales sobre la Moción de Aceptación de Gracia-Gracia el 9 de diciembre de 2020. El 16 de diciembre de 2020, el ELA y CANA presentaron su informe complementario conjunto en el que se exponen las "respectivas posiciones de las partes con respecto a si el Tribunal debe aplicar el estándar Countryman, u otro estándar para el que exista precedente, al resolver la [Moción de Aceptación Gracia-Gracia]". [ECF Núm. 15457].

b)  *Municipio Autónomo de Ponce c. el Estado Libre Asociado de Puerto Rico*, **Caso Núm. 18-2194 (1er Cir.)**

El 4 de mayo de 2018, el Municipio Autónomo de Ponce ("MAP") presentó una moción [ECF Núm. 3019] para modificar la paralización automática para permitir que MAP haga cumplir una sentencia en una acción anterior; *Municipio de Ponce v. Autoridad de Carreteras y Transportación,* Caso Núm. AC93-0485. La sentencia anterior exigía que el ELA, ACT y AEE completaran determinados proyectos municipales de mejoras a tenor con un acuerdo entre el ELA y MAP. El 2 de noviembre de 2018, el Tribunal

---

[195] Las reclamaciones de los reclamantes Gracia-Gracia no se ven afectadas de acuerdo con el Plan porque el Plan propone asumir los acuerdos de resolución.

del Título III denegó la petición del MAP para modificar la paralización porque el MAP no pudo demostrar causa [ECF Núm. 4157]. El MAP apeló.

La apelación del MAP fue registrada por el Primer Circuito el 27 de diciembre de 2018, como Núm. 18-2194. El MAP presentó su documento inicial el 18 de marzo de 2019, y la Junta de Supervisión presentó un documento en oposición el 1 de mayo de 2019. El 5 de junio de 2019, el MAP presentó su respuesta. Los alegatos orales se presentaron el 11 de septiembre de 2019. Mediante una opinión de fecha 25 de septiembre de 2019, el Primer Circuito confirmó la decisión del Tribunal del Título III denegando la reparación por paralización y dictaminó que el derecho del MAP a un cumplimiento específico era una "reclamación" sujeta a la paralización porque la indemnización por daños podía ser sustituida por desempeño específico. El 16 de octubre de 2019, el Primer Circuito dictó su mandato.

c)  ***PFZ Properties, Inc. c. el Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 18-00056**

El ELA inició acciones de expropiación en 2008 contra PFZ Properties, Inc. ("PFZ") con respecto a determinados terrenos frente al mar que abarcan aproximadamente 1,300 acres en el Municipio de Loiza. El ELA voluntariamente desestimó los procedimientos sin perjuicio debido a una falta de recursos para litigar o pagarle a PFZ.

El 14 de mayo 2018, PFZ inició un procedimiento contencioso para solicitar (i) una declaración de que el ELA efectuó una expropiación de la propiedad para lo cual la Cláusula sobre Expropiaciones de la Quinta Enmienda de la Constitución de Estados Unidos exige una compensación justa por un monto de $75.55 millones, e (ii) intereses más honorarios de abogados a cuenta de determinada conducta del ELA que PFZ alega que ha causado una demora indebida, y por cualquier daño que pudiera haber sufrido por causa de la expropiación de los bienes y del posterior desistimiento voluntario de los procedimientos.

PFZ y el ELA celebraron una estipulación por la cual PFZ aceptó desestimar el procedimiento contencioso sin perjuicio y el ELA aceptó levantar parcialmente la paralización de Título III con el propósito limitado de determinar el monto, si lo hubiera, de las reclamaciones de PFZ. El 30 de julio de 2018, el Tribunal del Título III desestimó la acción sin perjuicio [Proc. Cont. Núm. 18-00056, ECF Núm. 16].

d)  ***Mandry-Mercado c. el Estado Libre Asociado de Puerto Rico y col.*, 17-2168, 18-2035, 19-1208**

El demandante *pro se* Javier Mandry-Mercado ("Mandry-Mercado") presentó una moción combinada para revocar y reconsiderar una orden que otorga reparación limitada de la paralización automática el 25 de julio de 2017 [ECF Núm. 822]. La orden del Tribunal del Título III permitía que las partes involucradas en una controversia de larga data sobre indemnización por expropiación inversa continuaran el litigio en Tribunal de Primera Instancia del ELA [ECF Núm. 600]. El Demandante presentó su moción sobre la base de una alegación de que el abogado que había presentado la moción de paralización proporcionó información engañosa al Tribunal del Título III. El 2 de agosto de 2017, el Tribunal del Título III denegó la moción de Mandry-Mercado de revocación y reconsideración [ECF Núm. 844]. Presentó un aviso de apelación, que fue registrado por el Primer Circuito como Caso Núm. 17-2168.

El 19 de noviembre de 2018, la apelación se presentó a un Panel del Primer Circuito. El 30 de enero de 2019, el Panel confirmó sumariamente por falta de una cuestión sustancial. Mandry-Mercado presentó una petición para una nueva vista el 11 de febrero de 2019, que fue denegada por el Primer Circuito el 16 de mayo de 2019. El 23 de mayo de 2019, el Primer Circuito dictó un mandato.

El 6 de julio de 2018, Mandry-Mercado presentó una moción para solicitar legitimación para formular ciertas reclamaciones en nombre del ELA [ECF Núm. 3475]. El 11 de julio de 2020, el Tribunal del Título III denegó la moción [ECF Núm. 3489]. Mandry-Mercado apeló la decisión, y el 22 de octubre de 2018, la notificación de apelación fue registrada por el Primer Circuito como Caso Núm. 18-2035. El 13 de noviembre de 2018, el Primer Circuito emitió una notificación de incumplimiento porque Mandry-Mercado no había presentado a tiempo un formulario de orden de transcripción. El 17 de enero de 2019, el Primer Circuito ordenó a Mandy-Mercado que mostrara las razones por las que el recurso de apelación no debía ser desestimado por ser extemporáneo. Después de que Mandry-Mercado no respondiera a la orden para mostrar causa del Primer Circuito, el Primer Circuito desestimó la apelación el 5 de febrero de 2019. El 6 de febrero de 2019, Mandry-Mercado pidió una reconsideración y solicitó una nueva vista del panel. El 7 de abril de 2020, el Primer Circuito denegó la moción y la petición. El 7 de mayo de 2020, el Primer Circuito dictó su mandato.

El 27 de agosto de 2018, Mandry-Mercado envió un correo electrónico al Tribunal del Título III indicando que deseaba presentar una demanda contenciosa en los casos del Título III del ELA y la ACT. La AAFAF y Mandry-Mercado se reunieron para deliberar y presentaron un informe de situación conjunto el 19 de septiembre de 2018 [ECF Núm. 3948]. El 20 de septiembre de 2018, el Tribunal del Título III denegó todas las medidas de reparación solicitadas por Mandry-Mercado [ECF Núm. 3952]. El 19 de noviembre de 2018, Mandry-Mercado solicitó una reconsideración [ECF Núm. 4362], que el Tribunal del Título III denegó el 7 de diciembre de 2018 [ECF Núm. 4429].

El 28 de febrero de 2019, Mandry Mercado apeló la decisión ante el Primer Circuito. La apelación se registró como Núm. 19-1208. El 5 de marzo de 2019, el Primer Circuito emitió una notificación de incumplimiento por no presentar un formulario de orden de transcripción. El 8 de abril de 2019, el Primer Circuito ordenó a Mandy-Mercado que mostrara las razones por las que el recurso de apelación no debía ser desestimado por falta de jurisdicción. Mandry-Mercado respondió a la orden de mostrar causa el 17 de abril de 2019, argumentando que su apelación era en realidad una petición de mandamus. El 7 de abril de 2020, el Primer Circuito denegó la petición de mandamus de Mandry-Mercado por falta de una cuestión sustancial y desestimó la apelación. El 28 de mayo de 2020, el Primer Circuito dictó su mandato.

e)   **Moción de *levantamiento* de la paralización de las partes de ARD**

El 25 de junio de 2019, Cantor-Katz Collateral Monitor LLC, monitor de la Autoridad de Recuperación de Deuda ("ARD") del Banco Gubernamental de Fomento para Puerto Rico y AmeriNational Community Services LLC, administrador de los bonos de ARD del BGF emitidos conforme a una modificación calificada bajo el Título VI de PROMESA del BGF (colectivamente, las "Partes de ARD"), presentaron una moción de reparación de la paralización automática para ejercer remedios contra las garantías reales de ACT validadas de ARD, entre ellos impuestos a la gasolina, impuestos sobre el gas oil y el diésel oil, tarifas de licencia y de vehículos automotores, ingresos por peaje, impuestos a los productos derivados del petróleo e impuestos al tabaco [ECF Núm. 7643]. Para garantizar las obligaciones contraídas con ARD en virtud de los bonos de ARD del BGF, las partes de ARD alegaron que el BGF transfirió, entre otras cosas, sus activos de préstamos y bonos de ACT y las garantías reclamadas a ARD.

Las Partes de ARD argumentaron que (i) el supuesto agotamiento del ELA y ACT de las garantías reales de ACT sin brindar una protección adecuada proporciona un motivo para levantar la paralización, y (ii) el ELA y ACT carecen de participación patrimonial o participación en las garantías reales de ACT, que son innecesarios para una reorganización efectiva.

En la alternativa, las Partes de ARD solicitaron que el Tribunal del Título III le exija al ELA y ACT que brinden protección adecuada mediante el pago de interés actual en préstamos y bonos de ACT. De

244

acuerdo con una estipulación entre las Partes de ARD, AAFAF y la Junta de Supervisión, el Tribunal del Título III ordenó que el calendario de presentaciones y vistas con respecto a la moción se dividiera para considerar en primer lugar el problema de la legitimación de las Partes de ARD para obtener la reparación solicitada en la moción [ECF Núm. 7832].

El 15 de agosto de 2019, AAFAF, la Junta de Supervisión, y las partes de ARD presentaron una estipulación conjunta para la Orden de Paralización, que sometió la Moción de Levantamiento de la Paralización de ARD a la Orden de Paralización, como se describe a continuación en la sección **Error! Reference source not found.** de esta Declaración de Divulgación. El Tribunal del Título III aprobó la estipulación conjunta el 16 de agosto de 2019 [ECF Núm. 8481]. Como se describe con más detalle en la sección V.I.2, el Informe Provisional del Equipo de Mediación incluía un cronograma propuesto para el litigio de la moción de levantamiento de la paralización de ARD.

El 18 de diciembre de 2019, AAFAF, la Junta de Supervisión y las Partes de ARD presentaron una estipulación conjunta enmendada con respecto a la moción de reparación de la paralización de las Partes de ARD [ECF Núm. 9615], que el Tribunal del Título III aprobó mediante orden de fecha 19 de diciembre de 2019 [ECF Núm. 9622]. Conforme a la estipulación conjunta enmendada y la orden, el calendario de presentaciones y vistas con respecto a la moción de levantamiento de la paralización seguirá estando dividida para determinar en primer lugar la legitimación de las Partes de ARD para presentar la moción de paralización.

El 19 de febrero de 2020, las partes presentaron otra estipulación conjunta en la que se establecía que la moción de levantamiento de la paralización de las Partes de ARD se suspendería hasta que el Tribunal del Título III se pronunciara sobre ciertas cuestiones de la moción de levantamiento de la paralización de ACT [ECF Núm. 11285], estipulación conjunta que el Tribunal del Título III aprobó por orden de fecha 20 de febrero de 2020 [ECF Núm. 11346]. *Consulte* la sección V.E.4.h. En relación con esto, el 3 de marzo de 2020, el Tribunal del Título III emitió una orden que, entre otras cosas, concedía a las Partes de ARD el derecho a participar en la moción de levantamiento de la paralización de ACT bajo ciertas condiciones [ECF Núm. 12005]. Hay más información disponible sobre la moción de levantamiento de la paralización de ACT en la sección **Error! Reference source not found.** que aparece a continuación.

El 25 de septiembre de 2020, las Partes Gubernamentales y las Partes de ARD presentaron otra estipulación conjunta que modificaba adicionalmente el calendario de presentación de escritos para la Moción de Levantamiento de la Paralización de las Partes de ARD [ECF Núm. 14407]. El 28 de septiembre de 2020, el Tribunal del Título III emitió una orden que aprueba la estipulación conjunta enmendada [ECF Núm. 14417]. El 31 de marzo de 2021, las Partes de ARD presentaron una moción enmendada de levantamiento de la paralización (ECF Núm. 16276). Todas las cuestiones relativas al fondo de la moción enmendada de levantamiento de la paralización de ARD se paralizarán hasta que se resuelva la cuestión de la legitimación. El 21 de abril de 2021, las Partes Gubernamentales presentaron un escrito de oposición a la moción enmendada de levantamiento de la paralización con respecto a la cuestión de la legitimación [Caso Núm. 17-bk-3567, ECF Núm. 1009], y la UCC se adhirió a la oposición [Caso Núm. 17-bk-3567, ECF Núm. 1010]. La respuesta de las Partes de ARD se espera para el 5 de mayo de 2021, y la respuesta de las Partes del Gobierno para el 12 de mayo de 2021.

f)      **Moción de levantamiento de la paralización de ADCC**

El 16 de enero de 2020, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation y FGIC (las "Aseguradoras Monolínea") junto con The Bank of New York Mellon, como el agente fiscal (colectivamente, los "Solicitantes"), presentaron una moción para (i) una orden para que la paralización automática no se aplique a sus acciones propuestas para hacer valer los derechos de los

tenedores de bonos de ADCC de percibir ingresos de los impuestos de hotelería, o, con carácter subsidiario, (ii) reparación de la paralización automática para hacer valer la acción propuesta, o, con carácter subsidiario de segundo grado, (iii) protección adecuada para sus garantías (la "<u>Moción de Levantamiento de la Paralización de ADCC</u>") [ECF Núm. 10104] .

Los solicitantes alegaron que las Aseguradoras Monolínea aseguran bonos emitidos por ADCC, que están garantizados por los ingresos impositivos generados en virtud de la Ley de Impuesto a la Ocupación Hotelera. Los solicitantes también alegaron que la paralización automática no se aplica a su acción propuesta porque el ELA no tiene una participación patrimonial en los ingresos, que alegan que son propiedad de los tenedores de bonos de ADCC. Los solicitantes además afirmaron que, si se aplica la paralización automática, la deberían levantar porque (i) el ELA no posee participación alguna en los impuestos de hotelería y son innecesarios para una reorganización eficaz en virtud de la sección 362(d)(2) del Código de Quiebras; (ii) los solicitantes carecen de la protección adecuada en virtud de la sección 362(d)(1) del Código de Quiebras; y (iii) el ELA ha violado PROMESA, la ley del ELA y la Constitución al apropiarse de los bienes de los tenedores de bonos.

El 31 de enero de 2020, el Tribunal del Título III dictó una Orden Provisoria de Manejo de Casos Enmendada [ECF Núm. 10595] que establece fechas límite para los escritos de oposición y contestación limitada a los temas de legitimación y condición garantizada y programa una vista preliminar el 5 de marzo de 2020 con respecto a la Moción de Levantamiento de la Paralización de ADCC para determinar si los solicitantes tienen legitimación para presentar demandas y garantías u otras participaciones patrimoniales en los ingresos pertinentes.

El 12 de febrero de 2020, las Aseguradoras Monolínea presentaron una moción urgente solicitando el aplazamiento de la vista sobre la Moción para Levantar la Paralización de ADCC, y también otras mociones para el levantamiento de la paralización que involucraban bonos asegurados por ACT y AFI, que se analizan más adelante (la "<u>Moción de levantamiento de la paralización de ACT</u>" y la "<u>Moción de levantamiento de la paralización de AFI</u>") hasta el 22 de abril de 2020 y la extensión de la fecha límite para las contestaciones en apoyo de sus mociones de levantamiento de la paralización hasta el 6 de abril de 2020 [ECF Núm. 10841]. Según los solicitantes, en las tres mociones de levantamiento de la paralización, este aplazamiento fue necesario para disponer de tiempo para la obtención de pruebas. El 14 de febrero de 2020, el Tribunal del Título III dictó una orden que concede la moción y aplaza la vista preliminar hasta el 2 de abril de 2020, y permitió que los solicitantes obtuvieran ciertas pruebas [ECF 11057]. El Tribunal del Título III también dictó una orden que somete cualquier controversia sobre la obtención de pruebas (asociada con dicha obtención de pruebas) a la magistrada Dein, y fija una vista sobre cualquier controversia sobre la obtención de pruebas para los días 4 y 5 de marzo de 2020 [ECF Núm. 11058]. El 24 de febrero de 2020, Ambac, Assured y FGIC presentaron una moción conjunta para exigir la presentación de documentos en relación con la Moción de Levantamiento de la Paralización de ADCC y la Moción de Levantamiento de la Paralización de AFI [ECF Núm. 11687]. El 5 de marzo de 2020, la magistrada Dein dictó una orden que concedía parcialmente la moción conjunta para exigir la presentación de documentos [ECF Núm. 12080]. El 12 de marzo de 2020, la Magistrada Dein emitió una orden de presentación de pruebas complementaria [ECF Núm. 12275].

El 3 de febrero de 2020, el ELA presentó una oposición a la Moción de Levantamiento de la Paralización de ADCC [ECF Núm. 10615]. CANA y AAFAF presentaron acumulaciones parciales a la oposición del ELA [ECF Núm. 10636, 10640].

El 30 de abril de 2020, los Solicitantes presentaron su respuesta a la Moción de Levantamiento de la Paralización de ADCC [ECF Núm. 12997]. El 18 de mayo de 2020, el ELA presentó tríplica en oposición

a la Moción de Levantamiento de la Paralización de ADCC [ECF Núm. 13160]. El 26 de mayo de 2020, los Solicitantes presentaron una respuesta a la tríplica del ELA [ECF Núm. 13225].

El 2 de julio de 2020, el Tribunal del Título III emitió su *Opinión y Orden en relación con la Vista Preliminar sobre la Moción relativa a la Aplicación de la Paralización Automática a los Ingresos que Garantizan los Bonos ADCC* [ECF Núm. 13540] sosteniendo que: (i) la Acción de Ejecución de ADCC está sujeta a la paralización automática, (ii) los Solicitantes tienen una reclamación aparentemente válida sobre los fondos depositados en la Cuenta de Transferencia (definido en el presente), y (iii) han demostrado una probabilidad razonable de que la cuenta bancaria de la Compañía de Turismo en Scotiabank Puerto Rico con un número de cuenta que termina en "5142" ("Scotiabank -5142") es la Cuenta de Transferencia y, por lo tanto, los Solicitantes tienen una reclamación aparentemente válida de un derecho de garantía sobre los fondos que han sido depositados allí, y (iv) los Solicitantes no han podido demostrar que tengan una reclamación aparentemente válida sobre ningún fondo más allá de los depositados en la Cuenta de Transferencia. El Tribunal del Título III denegó la Moción de Levantamiento de la Paralización de ADCC en la medida en que solicita una reparación de la paralización con respecto a los Impuestos de Hotelería distintos de las que se han depositado en la Cuenta de Transferencia. El Tribunal del Título III también ordenó a las partes que se reunieran y deliberaran y presentaran un informe conjunto sobre sus posiciones en cuanto a la naturaleza, el alcance y la programación de los procedimientos posteriores en relación con la Moción de Levantamiento de la Paralización de ADCC, incluyendo cualquier procedimiento relativo a la reparación de la paralización con respecto a la afirmación de los Solicitantes de las reclamaciones no garantizadas.

Las partes presentaron su *Informe de situación conjunto con respecto a los procedimientos adicionales en relación con las mociones de reparación de la paralización de bonos de ingresos* [ECF Núm. 13601] el 9 de julio de 2020. El 10 de julio de 2020, el Tribunal del Título III emitió su *Orden de Programación de Procedimientos Adicionales en Relación con las Mociones de Reparación de la Paralización de los Bonos de Ingresos* [ECF Núm. 13607] ordenando a las partes que presentaran información complementaria que abordara, para la Moción de Levantamiento de la Paralización de ADCC, la Moción de Levantamiento de la Paralización de ACT y la Moción de Levantamiento de la Paralización de AFI, si existe una "causa" que justifique el levantamiento de la paralización automática y, en el caso de la Moción de Levantamiento de la Paralización de ADCC, (i) si se justifica el levantamiento de la paralización en virtud de 11 U.S.C. § 362(d)(2), y (ii) si el litigio en el Procedimiento Contencioso sobre Bonos de Ingresos de ADCC (Proc Cont. 20-00004) sobre la identidad de la Cuenta de Transferencia obviaría la necesidad de una reparación de la paralización.

Los Solicitantes presentaron su escrito complementario [ECF Núm. 13744] el 20 de julio de 2020 y, el 31 de julio de 2020, la Junta de Supervisión y la AAFAF presentaron una respuesta conjunta al escrito complementario de los Solicitantes [ECF Núm. 13906]. Además, el 31 de julio de 2020, CANA presentó una acumulación limitada a la respuesta conjunta de la Junta de Supervisión y la AAFAF [ECF Núm. 13906]. El 6 de agosto de 2020, los Solicitantes presentaron una respuesta consolidada en apoyo de la Moción de levantamiento de la paralización de ADCC, la Moción de levantamiento de la paralización de CTA y la Moción de levantamiento de la paralización de AFI [ECF Núm. 13992].

El 9 de septiembre de 2020, el Tribunal del Título III emitió su *Orden de Memorando con respecto a la Moción de Reparación de la Paralización de los Bonos de Ingresos ADCC* [ECF Núm. 14187] denegando la Moción de Reparación de la Paralización de los Bonos de Ingresos ADCC en la medida en que buscaba la reparación de la paralización automática para interponer remedios con respecto a los fondos que no sean los fondos de la supuesta Cuenta de Transferencia. El Tribunal del Título III aplazó la vista final con respecto al resto de la Moción de Levantamiento de la Paralización de ADCC de conformidad con 11 U.S.C. § 362(e), y sostuvo que se consideraría que la vista final había ocurrido cuando el Tribunal del

Título III emitiera sus decisiones finales en el Procedimiento Contencioso de ADCC (Proc. Cont. Núm. 20-00004)[196] sobre la identidad de la Cuenta de Transferencia y los derechos respectivos de las partes sobre los fondos de la supuesta Cuenta de Transferencia.

g)      **Moción de levantamiento de la paralización de ACT**

El 23 de agosto de 2019, Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. y National (colectivamente, los "Solicitantes"), presentaron una moción para (i) la reparación de la paralización automática para permitirles asegurar la aplicación de los ingresos pignorados en concepto de peaje y arbitrio al pago de los bonos emitidos por ACT, o, con carácter subsidiario, (ii) la protección adecuada de sus supuestos intereses en las ganancias pignoradas [ECF Núm. 8536].

Los solicitantes alegaron que aseguran los bonos emitidos por ACT que están garantizados por los ingresos en concepto de peaje recaudados directamente por ACT y los arbitrios recaudados en nombre de ACT por el ELA. Los solicitantes afirman que tienen un derecho de retención preferencial sobre esos ingresos pignorados, que según ellos han sido desviados indebidamente de ACT al ELA. Los solicitantes afirmaron que el Tribunal del Título III debía levantar la paralización porque (i) los ingresos son innecesarios para una reorganización efectiva porque el ELA no tiene participación patrimonial en ellos, y (ii) los solicitantes carecen de una protección adecuada en virtud de la sección 362(d)(1) del Código de Quiebras.

El 24 de julio de 2019, el Tribunal del Título III dictó la Orden de Paralización, cuya paralización se extendió hasta el 4 de marzo de 2020. Independientemente de la Orden de Paralización, el 19 de diciembre de 2019, el Tribunal del Título III dictó una orden provisoria de gestión de casos con respecto a ciertos temas relacionados con bonos de ingresos [ECF Núm. 9620] (la "CMO Provisoria Inicial de Bonos de Ingresos"), que exigía que toda enmienda a la Moción de Levantamiento de la Paralización se debía presentar antes del 16 de enero de 2020.

El 16 de enero de 2020, Assured, National, Ambac y FGIC presentaron una Moción de Levantamiento de la Paralización enmendada [ECF Núm. 10102] la "Moción de Levantamiento de la Paralización de ACT"), que incluye los alegatos mencionados anteriormente y alega además que el Tribunal del Título III debe levantar la paralización automática porque, de lo contrario, se violaría el derecho al debido proceso de los solicitantes. La Moción de Levantamiento de la Paralización de ACT busca obtener la misma reparación que la Moción de Levantamiento de la Paralización original de los Solicitantes.

El 31 de enero de 2020, el Tribunal del Título III dictó una Orden Provisoria de Manejo de Casos Enmendada [Caso Núm. 17-bk-3567, ECF Núm. 678] que establece fechas límite para los escritos de oposición y contestación limitada sobre el tema de si los solicitantes tienen legitimación para presentar la Moción de Levantamiento de la Paralización de ACT y demandas y garantías u otras participaciones patrimoniales en los ingresos pertinentes, y programa una vista preliminar sobre esos temas para el 5 de marzo de 2020. El 3 de febrero de 2020, la Junta de Supervisión presentó una oposición a la Moción de Levantamiento de la Paralización de ACT [Caso Núm. 17-bk-3567, ECF Núm. 680]. CANA y AAFAF presentaron acumulaciones parciales a la oposición del ELA.

El 11 de febrero de 2020, las Partes de ARD presentaron una notificación que señala que ARD es una parte interesada y puede participar en la Moción de Levantamiento de la Paralización de ACT, o, con carácter subsidiario, una moción para permitir su intervención en la Moción de Levantamiento de la

---

[196] Para más información sobre el Procedimiento Contencioso de ADCC, véase **Error! Reference source not found.**.

Paralización de ACT [ECF Núm. 10835]. El 19 de febrero de 2020, las partes suscribieron una estipulación conjunta con respecto a la participación de las Partes de ARD en la Moción de Levantamiento de la Paralización de ACT [ECF Núm. 11285-1]. El 3 de marzo de 2020, la Magistrada Dein emitió una orden que aprueba la estipulación conjunta [ECF Núm. 12005].

El 12 de febrero de 2020, los Solicitantes presentaron una moción urgente que solicita el aplazamiento de la vista preliminar sobre la Moción de Levantamiento de la Paralización de ACT, la Moción de Levantamiento de la Paralización de ADCC, y la Moción de Levantamiento de Paralización de AFI hasta el 22 de abril de 2020 y la extensión de la fecha límite para contestaciones en apoyo de las tres mociones de levantamiento de la paralización hasta el 6 de abril de 2020. Según los Solicitantes, el aplazamiento solicitado fue necesario para disponer de tiempo para la obtención de pruebas. El 14 de febrero de 2020, el Tribunal del Título III dictó una orden que concede la moción y aplaza la vista preliminar hasta el 2 de abril de 2020, y permitiendo que los solicitantes obtuvieran ciertas pruebas [ECF Núm. 11057]. El Tribunal del Título III también dictó una orden que somete cualquier controversia sobre la obtención de pruebas (asociada con dicha obtención de pruebas) a la Magistrada Dein, y fija una vista sobre cualquier controversia sobre la obtención de pruebas para los días 4 y 5 de marzo de 2020 [ECF Núm. 11058]. El 24 de febrero de 2020, Ambac, Assured y FGIC presentaron mociones conjuntas para exigir la presentación de documentos en relación con la Moción de Levantamiento de la Paralización de ACT, la Moción de Levantamiento de la Paralización de ADCC y la Moción de Levantamiento de la Paralización de AFI [ECF Núm. 11686, 11687].

El 16 de marzo de 2020, las Partes de ARD presentaron una contestación inicial a la Moción de Levantamiento de la Paralización de ACT y a la objeción de la Junta de Supervisión a la Moción de Levantamiento de la Paralización de ACT [Caso Núm. 17-bk-3567, ECF Núm. 741]. El 23 de marzo de 2020, los Solicitantes presentaron una contestación y reserva de derechos [Caso Núm. 17-bk-3567, ECF Núm. 748]. También el 23 de marzo de 2020, la Junta de Supervisión presentó una contestación a la contestación inicial de las Partes de ARD [Caso Núm. 17-bk-3567, ECF Núm. 749], y CANA presentó una acumulación limitada a la contestación de la Junta de Supervisión.

El 30 de abril de 2020, los Solicitantes presentaron una contestación en apoyo a la Moción de Levantamiento de la Paralización de ACT [Caso Núm. 17-bk-3567, ECF Núm. 777]. También el 30 de abril de 2020, las Partes de ARD presentaron una contestación en apoyo de su respuesta inicial a la Moción de Levantamiento de la Paralización de ACT [Caso Núm. 17-bk-3567, ECF Núm. 779]. El 18 de mayo de 2020, la Junta de Supervisión presentó una tríplica en oposición a la Moción de Levantamiento de la Paralización de ACT [Caso Núm. 17-bk-3567, ECF Núm. 807]. El 26 de mayo de 2020, los Solicitantes y las Partes de ARD presentaron sus respectivas contestaciones a la tríplica de la Junta de Supervisión [Caso Núm. 17-bk-3567, ECF Núm. 819, 821].

El 2 de julio de 2020, el Tribunal del Título III emitió su *Opinión y Orden en relación con la Vista Preliminar sobre la Moción de Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation y Financial Guaranty Insurance Company de Reparación de la Paralización Automática o, en su defecto, Protección Adecuada (Núm. de entrada en el registro 10102)* [Caso Núm. 3:17-bk-03283, ECF Núm. 13541] (la "Opinión y Orden de la Moción de Levantamiento de la Paralización de ACT"), sosteniendo que los Solicitantes no habían hecho la demostración preliminar necesaria para permitir que la Moción de Levantamiento de la Paralización de ACT procediera a una audiencia final en la medida en que la Moción de Levantamiento de la Paralización de ACT solicita la reparación de la paralización o protección adecuada con respecto a gravámenes u otras participaciones patrimoniales en los ingresos que no sean los que han depositado en los Fondos de la Resolución (definidos en el presente, como ciertos fondos especiales con subcuentas enumeradas creadas por la Sección 401 de cada una de las Resoluciones de Bonos). El Tribunal del Título III denegó la Moción

249

de Levantamiento de la Paralización de ACT en la medida en que solicita una reparación de la paralización o protección adecuada con respecto a los gravámenes u otras participaciones patrimoniales en los ingresos distintos de los que se han depositado en los Fondos de la Resolución. El Tribunal del Título III ordenó a las partes que se reunieran y deliberaran y, a más tardar el 9 de julio de 2020, presentaran un escrito conjunto sobre sus posiciones en cuanto a la naturaleza, el alcance y la programación de otros procedimientos que consideren necesarios en relación con la Moción de Levantamiento de la Paralización de ACT, incluyendo cualquier procedimiento relativo a la reparación de la paralización con respecto a la afirmación de los Solicitantes de las reclamaciones no garantizadas. El Tribunal del Título III comunicó a las partes que, de no ser necesario ningún otro procedimiento, el Tribunal del Título III dictaría una orden por la que se daría por terminada la Moción de Levantamiento de la Paralización de la ACT, tal y como se había denegado por las razones expuestas en la Opinión y Orden de Levantamiento de la Paralización de ACT.

El 20 de julio de 2020, los Solicitantes presentaron un escrito complementario en el que argumentaban que existía una causa para levantar la paralización a pesar de la decisión del Tribunal de Distrito sobre sus gravámenes u otras participaciones patrimoniales afirmados. La Junta de Supervisión presentó una respuesta complementaria el 30 de julio de 2020, y los Solicitantes presentaron una respuesta complementaria el 5 de agosto de 2020.

El 9 de septiembre de 2020, el Tribunal del Título III emitió su *Opinión y Orden de Memorando denegando las Mociones de Levantamiento de la Paralización de ACT y AFI* [ECF Núm. 14186] (la "Opinión de Memorando") denegando la Moción de Levantamiento de la Paralización de ACT y Levantamiento de la Paralización de AFI. El Tribunal del Título III determinó que: (i) los Solicitantes no habían demostrado que la sección 305 de PROMESA creara algún impedimento del debido proceso que proporcionara "causa" para el levantamiento de la paralización automática; (ii) no existía causa para el levantamiento de la paralización en virtud de la sección 362(d)(1) del Código de Quiebras; y (iii) no existía causa para levantar la paralización automática en virtud de los factores de *Sonnax* (*En el caso Sonnax Industries, Inc.,* 907 F.2d 1280, 1285 (2do Cir. 1990)).

El 23 de septiembre de 2020, los Solicitantes presentaron una notificación de apelación de la orden de la Opinión del Memorando del Tribunal del Título III [ECF Núm. 14389]. El 24 de septiembre de 2020, el Tribunal de Apelaciones de los Estados Unidos para el Tribunal de Apelaciones del Primer Circuito registró la apelación como Caso Núm. 20-1930. El 28 de octubre de 2020, los Solicitantes (en calidad de apelantes) presentaron su escrito inicial  Los solicitantes sostenían que la decisión del Tribunal del Título III debía ser revocada porque (i) tenían un derecho de garantía contractual sobre los arbitrios y los ingresos en concepto de peaje; (ii) los estatutos de los arbitrios los convierten a ellos y a la ACT, no al ELA, en propietarios equitativos de los arbitrios; y (iii) las leyes de los arbitrios imponen un gravamen legislativo sobre los arbitrios. El 4 de diciembre de 2020, las Partes de ARD presentaron un escrito como "Partes contrarias a la apelación". En su escrito, las Partes de ARD afirmaron que no adoptaron una posición sobre lo que describieron como la cuestión de la apelación (si los Solicitantes habían "demostrado una reclamación aparentemente válida sobre los ingresos en concepto de arbitrio") y manifestaron que se habían sumado a la presentación de escritos de la apelación para solicitar que cualquier decisión "se redactara de una manera que preservara" los intereses reclamados por las Partes de ARD. El 7 de diciembre de 2020, la Junta de Supervisión presentó su escrito de contestación. La Junta de Supervisión sostuvo que el Tribunal del Título III no abusó de su poder discrecional al denegar la Moción de Levantamiento de la Paralización de ACT sobre la base de que el Tribunal del Título III ya estaba resolviendo las reclamaciones de los Solicitantes sobre los méritos en la Acción de Impugnación de Reclamaciones del ELA-ACT que se describe más adelante en la sección **Error! Reference source not found.** de esta Declaración de Divulgación. El ELA sostuvo además que la decisión del Tribunal del Título III debía ser confirmada porque, entre otras razones, (i) el lenguaje claro de las Resoluciones otorga a los Solicitantes un derecho de garantía solo sobre el dinero depositado ante el Agente Fiscal, y (ii) las leyes sobre arbitrios no otorgan a

los Solicitantes la titularidad real de, o cualquier derecho de propiedad sobre, los arbitrios. Además, el 7 de diciembre de 2020, AAFAF y CANA presentaron acumulaciones parciales al escrito de contestación de la Junta de Supervisión. El 21 de diciembre de 2020, los Solicitantes presentaron su escrito de contestación. El 20 de enero de 2021, los Apelantes presentaron una carta 28(j) en la que presentaban una autoridad complementaria en relación con la decisión del Tribunal del Título III que concedía una presentación de pruebas limitada en relación con la moción de sentencia sumaria parcial de la Junta de Supervisión. El 22 de enero de 2021, la Junta de Supervisión presentó una contestación a la carta 28(j) de los Solicitantes. Los alegatos orales se atendieron el 4 de febrero de 2021 y se tomó en consideración la apelación. El 3 de marzo de 2021, el Primer Circuito emitió una opinión combinada para este caso y en el Caso Núm. 20-1931, confirmando la denegación del Tribunal del Título III de las mociones de levantamiento de la paralización de la AFI y la ACT. El Primer Circuito dictaminó que el Tribunal del Título III no abusó de sus poderes discrecionales al rechazar el levantamiento de la paralización automática. En particular, el Primer Circuito sostuvo que la paralización automática no serviría a los intereses de economía judicial y podría interferir en el procedimiento de quiebra. El 24 de marzo de 2021, el Primer Circuito expidió su mandato.

Mientras estaba pendiente la Moción de Levantamiento de la Paralización de ACT, el 17 de julio de 2020, los Solicitantes, junto con FGIC (los "Solicitantes de ACT de la Sección 926"), presentaron una moción para que se dictara una orden que los nombrara como cosíndicos en virtud de la sección 926 del Código de Quiebras, con el fin de presentar ciertas reclamaciones de anulación de conformidad con las secciones 549, 544 y 548 del Código de Quiebras en nombre de ACT contra el ELA [Caso Núm. 17-bk-3567, ECF Núm. 871] (la "Moción de la Sección 926"). Según los Solicitantes de ACT de la Sección 926, ACT tiene reclamaciones de anulación contra el ELA que la Junta de Supervisión se ha negado injustificadamente a tramitar, y la Junta de Supervisión tiene un conflicto de intereses irresoluble porque representa simultáneamente a ACT y al ELA en sus respectivos procedimientos del Título III. El plazo de prescripción de esas reclamaciones de anulación expiraba el 14 de agosto de 2020. Los Solicitantes de la Sección 926 de la ACT declaran además que no están de acuerdo con la Opinión y Orden de Levantamiento de la Paralización de ACT y presentan la Moción de la Sección 926 para preservar sus derechos bajo la sección 926. Además, el 17 de julio de 2020, las partes de ARD presentaron una acumulación a la Moción de la Sección 926 [Caso Núm. 17-bk-3567, ECF Núm. 873]. Se presentaron todos los escritos procesales para la moción. El 11 de agosto de 2020, el Tribunal del Título III emitió una orden denegando la Moción de la Sección 926 [Caso Núm. 17-bk-3567, ECF Núm. 912]. El Tribunal del Título III señaló en la orden que gozaba de amplias facultades discrecionales para decidir si se debía nombrar un síndico, en particular a la luz de las preocupaciones constitucionales y de federalismo inherentes a los procedimientos de quiebra municipal, y la autoridad única de la Junta de Supervisión para proponer planes de ajuste bajo PROMESA. El Tribunal del Título III sostuvo que la Moción de la Sección 926 se basaba en una teoría legal (que ciertos ingresos tributarios sobre propiedad del ACT, y no del ELA) que la Junta de Supervisión se había negado a adoptar y que el Tribunal consideró insuficiente. El Tribunal del Título III también señaló que el Primer Circuito ya había concluido que la representación de la Junta de Supervisión de múltiples deudores no creaba un conflicto automático e irreconciliable.

El 25 de agosto de 2020, los Solicitantes de ACT de la Sección 926 presentaron una notificación de apelación [Caso Núm. 17-bk-3567, ECF Núm. 914]. El 16 de septiembre de 2020, el Tribunal de Apelaciones del Primer Circuito registró la apelación como Caso Núm. 20-1847. El 30 de septiembre de 2020, los Solicitantes presentaron una moción para dejar en suspenso la apelación a la espera de una decisión sobre la apelación de los Solicitantes de la Opinión de Memorando del Tribunal del Título III. El 13 de octubre de 2020, las Partes contrarias a la apelación presentaron una oposición a la moción de los Apelantes de dejar en suspenso la apelación y una moción cruzada para desestimar la apelación por ser irrelevante. Se presentaron todos los escritos procesales para las mociones. El 22 de diciembre de 2020, el Primer Circuito emitió una orden denegando la moción de los Apelantes de dejar en suspenso la apelación. El 17 de febrero de 2021, los Apelantes presentaron descrito inicial y las Partes de ARD presentaron una

adhesión parcial al escrito inicial de los Apelantes. El 23 de febrero de 2021, las Partes de ARD presentaron una moción de autorización para presentar una adhesión al escrito inicial de los Apelantes. El 1 de abril de 2021, el Primer Circuito dictó una orden rechazando la moción de las Partes de ARD de archivar la adhesión al escrito inicial de los Apelantes. El 12 de abril de 2021, las Partes de ARD presentaron una moción de intervención. El 19 de abril de 2021, los Apelados presentaron sus escritos de respuesta. El escrito de respuesta de los Apelantes está previsto para el 24 de mayo de 2021.

h)     **Moción de levantamiento de paralización de AFI**

El 30 de mayo de 2019, Ambac presentó una moción de (i) una orden de que la paralización automática no se aplica a su acción contra el Departamento del Tesoro de Estados Unidos para un gravamen equitativo sobre el impuesto pignorado sobre el ron antes de que sea transferido al ELA y su acción contra el ELA para hacer cumplir el gravamen sobre el impuesto pignorado sobre el ron, o, con carácter subsidiario, (ii) reparación de la paralización automática para proseguir las acciones, o, con carácter subsidiario de segundo grado, (iii) protección adecuada para sus garantías. Ambac alega que la paralización automática no se aplica al ELA porque el ELA no tiene participación patrimonial en el impuesto pignorado sobre el ron. Ambac también alegó que el ELA había violado PROMESA y la ley del ELA al desviar el impuesto pignorado sobre el ron [ECF Núm. 7176].

El 6 de junio de 2019, la Junta de Supervisión presentó una moción urgente para desestimar la moción de Ambac, alegando, entre otras cosas, que únicamente el síndico del bono tiene capacidad legal para ejercitar una acción relacionada con los bonos emitidos por AFI [ECF Núm. 7262]. El 7 de junio de 2019, el Tribunal del Título III denegó la moción urgente de la Junta de Supervisión sin perjuicio a la Junta de Supervisión presentando los mismos argumentos en su oposición a la moción de Ambac [ECF Núm. 7324]. El 3 de julio de 2019, la Junta de Supervisión y AAFAF presentaron oposiciones a la moción de levantamiento de la paralización [ECF Núm. 7827, 7829]. La oposición de la Junta de Supervisión incorporó el argumento de su moción de desestimación que Ambac carece de legitimación para instituir la moción. El 16 de julio de 2019, Ambac y FGIC presentaron una réplica [ECF Núm. 8022]. El 19 de julio de 2019, la Junta de Supervisión presentó una tríplica [ECF Núm. 8164].

El 24 de julio de 2019, a pedido de Ambac y con el consentimiento de la Junta de Supervisión, el Tribunal del Título III incluyó la Moción de Levantamiento de la Paralización de la AFI en la Orden de Paralización, cuya paralización se extendió hasta el 11 de marzo de 2020. Conforme a la Orden de Gestión de Casos Provisoria Enmendada para Bonos de Ingresos, toda moción de permiso para enmendar la Moción de Levantamiento de la Paralización se debía presentar antes del 16 de enero de 2020.

El 16 de enero de 2020, Ambac, FGIC, Assured Guaranty Corp., Assured Guaranty Municipal Corp. y U.S. Bank Trust National Association (los "Solicitantes") presentaron una moción de permiso para enmendar la moción de levantamiento de la paralización radicada previamente por Ambac [ECF Núm. 10109], que proponía agregar (i) al síndico como la parte actora, (ii) debate sobre la decisión adoptada por el Primer Circuito en el caso *Gracia-Gracia c. Junta de Supervisión y Administración Financiera*, 939 F.3d 340 (1er Cir. 2019), y (iii) debate sobre la evolución de los hechos con respecto al impuesto pignorado sobre el ron.

En la moción enmendada propuesta, los Solicitantes eliminaron el argumento según el cual la paralización automática no se aplica, y sostuvieron que la paralización se debía levantar porque (i) el ELA carece de participación en las remesas del impuesto sobre ron depositadas en la TSA, y (ii) el impuesto sobre el ron es innecesario para una reorganización efectiva porque el ELA carece de participación patrimonial en él.

El 22 de enero de 2020, la Junta de Supervisión presentó su oposición a la moción para enmendar [ECF Núm. 10274] y la AAFAF y Destilería Serrallés Inc. presentaron una acumulación limitada a la oposición de la Junta de Supervisión [ECF Núm. 10275, 10277]. El 25 de enero de 2020, los Solicitantes presentaron una respuesta en apoyo a la moción de enmendar [ECF Núm. 10400]. El 31 de enero de 2020, el Tribunal del Título III concedió la moción de Ambac de permiso para enmendar [ECF Núm. 10591]. También el 31 de enero de 2020, el Tribunal del Título III dictó una Orden Provisoria de Gestión de Casos Enmendada [ECF Núm. 10595] que limita las presentaciones de información sobre el levantamiento de la paralización a temas de legitimación y garantía prendaria de los solicitantes, y fija una vista preliminar para el 5 de marzo de 2020 con respecto a si los solicitantes tienen legitimidad para presentar demandas y garantías prendarias u otras participaciones patrimoniales en los ingresos pertinentes.

El 31 de enero de 2020, los Solicitantes presentaron la Moción de levantamiento de la paralización de AFI [ECF Núm. 10602].

El 3 de febrero de 2020, el ELA presentó una oposición complementaria a la moción de levantamiento de la paralización de AFI [ECF Núm. 10611]. CANA y AAFAF presentaron una acumulación limitada a la oposición del ELA [ECF Núm. 10635, 10641]. Bacardi International Limited y Bacardi Corporation (junto con Bacardi International Limited, "Bacardi") presentaron su propia oposición a la moción de AFI [ECF Núm. 10609]. Destilería Serrallés Inc. se unió a las oposiciones del ELA y de Bacardi [ECF Núm. 10612].

El 12 de febrero de 2020, Assured, Ambac, National y FGIC presentaron una moción urgente que solicita el aplazamiento de la vista sobre la moción de levantamiento de la paralización de ADCC, la moción de levantamiento de la paralización de ACT y la moción de levantamiento de la paralización de AFI hasta el 22 de abril de 2020 y la prórroga de la fecha límite para las contestaciones en apoyo de sus mociones de levantamiento de la paralización hasta el 6 de abril de 2020 [ECF Núm. 10841]. Según los solicitantes, este aplazamiento fue necesario para disponer de tiempo para la obtención de pruebas. El 14 de febrero de 2020, el Tribunal del Título III dictó una orden que concede la moción y aplaza la vista preliminar hasta el 2 de abril de 2020, y permitió que los solicitantes obtuvieran ciertas pruebas [ECF 11057]. El Tribunal del Título III también dictó una orden que somete cualquier controversia sobre la obtención de pruebas (asociada con dicha obtención de pruebas) a la Magistrada Dein, y fija una vista sobre cualquier controversia sobre la obtención de pruebas para los días 4 y 5 de marzo de 2020 [ECF Núm. 11058]. El 24 de febrero de 2020, Ambac, Assured y FGIC presentaron una moción conjunta para exigir la presentación de documentos en relación con las mociones de levantamiento de la paralización de ACT, AFI y ADCC [ECF Núm. 11687]. El 5 de marzo de 2020, la magistrada Dein emitió una orden que concedía parcialmente la moción conjunta de Assured, Ambac y FGIC para exigir la presentación de documentos en relación con las mociones de levantamiento de la paralización de ADCC y AFI [ECF Núm. 12080].

El 30 de abril de 2020, Ambac, FGIC, Assured y U.S. Bank presentaron una respuesta en apoyo a la Moción de Levantamiento de la Paralización de AFI [ECF Núm. 12995]. El 18 de mayo de 2020, el ELA presentó una tríplica en oposición a la Moción de Levantamiento de la Paralización de AFI [ECF Núm. 13159]. El 26 de mayo de 2020, Ambac, FGIC, FGIC y U.S. Bank presentaron una respuesta a la tríplica del ELA en oposición a la Moción de Levantamiento de la Paralización de AFI [ECF Núm. 13228].

El 2 de julio de 2020, el Tribunal del Título III emitió la *Opinión y Orden en relación con la Vista Preliminar sobre la Moción de Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., y U.S. Bank Trust National Association, Relativa a la Aplicación de la Paralización Automática a los Ingresos que Garantizan los Bonos de Impuestos sobre el Ron de AFI* [ECF Núm. 13542] (la "Opinión y Orden de Levantamiento de la Paralización de AFI"), sosteniendo que los Solicitantes no habían hecho la demostración preliminar

necesaria para permitir que la Moción de Levantamiento de la Paralización de ACT procediera a una vista final porque no habían podido demostrar que tenían una reclamación aparentemente válida  sobre una garantía prendaria o interés económico sobre las Remesas del Impuesto sobre Ron (tal como se define en este documento) que no sean las Remesas del Impuesto sobre Ron depositadas en un determinado Fondo de Amortización. El Tribunal del Título III denegó la Moción de Levantamiento de la Paralización de AFI en la medida en que solicita una reparación de la paralización o protección adecuada con respecto a las Remesas del Impuesto sobre Ron que no sean las Remesas del Impuesto sobre Ron que se han depositado en el Fondo de Amortización. El Tribunal del Título III ordenó a las partes que se reunieran y deliberaran y, a más tardar el 9 de julio de 2020, presentaran un informe conjunto sobre sus posiciones en cuanto a la naturaleza, el alcance y la programación de otros procedimientos que consideren necesarios en relación con la Moción de Levantamiento de la Paralización de AFI, incluyendo cualquier procedimiento relativo al levantamiento de la paralización con respecto a la afirmación de los Solicitantes de las reclamaciones no garantizadas. El Tribunal del Título III comunicó a las partes que, de no ser necesario ningún otro procedimiento, el Tribunal del Título III dictaría una orden por la que se daría por terminada la Moción de Levantamiento de la Paralización de AFI, tal y como se había denegado por las razones expuestas en la Opinión y Orden de Levantamiento de la Paralización de AFI.

Las partes presentaron su *Informe de situación conjunto con respecto a los procedimientos adicionales en relación con las mociones de levantamiento de la paralización de bonos de ingresos* [ECF Núm. 13601] el 9 de julio de 2020. El 10 de julio de 2020, el Tribunal del Título III emitió su *Orden de Programación de Procedimientos Adicionales en Relación con las Mociones de Reparación de la Paralización de los Bonos de Ingresos* [ECF Núm. 13607] ordenando a las partes que presentaran información complementaria que abordara, para la Moción de Levantamiento de la Paralización de AFI, la Moción de Levantamiento de la Paralización de ACT y la Moción de Levantamiento de la Paralización de ADCC, si existe una "causa" que justifique el levantamiento de la paralización automática.

Los Solicitantes presentaron su escrito complementario [ECF Núm. 13744] el 20 de julio de 2020 y, el 31 de julio de 2020, la Junta de Supervisión y la AAFAF presentaron una respuesta conjunta al escrito complementario de los Solicitantes [ECF Núm. 13906]. Además, el 31 de julio de 2020, CANA presentó una acumulación limitada a la respuesta conjunta de la Junta de Supervisión y la AAFAF [ECF Núm. 13906]. El 6 de agosto de 2020, los Solicitantes presentaron una respuesta consolidada en apoyo de la Moción de levantamiento de la paralización de AFI, la Moción de levantamiento de la paralización de ACT y la Moción de levantamiento de la paralización de ADCC [ECF Núm. 13992].

El 9 de septiembre de 2020, el Tribunal del Título III emitió su *Opinión y Orden de Memorando denegando las Mociones de Levantamiento de la Paralización de ACT y AFI* [ECF Núm. 14186] (la "Opinión de Memorando") denegando la Moción de Levantamiento de la Paralización de AFI y Levantamiento de la Paralización de ACT. El Tribunal del Título III determinó que: (i) los Solicitantes no habían demostrado que la sección 305 de PROMESA creara algún impedimento del debido proceso que proporcionara "causa" para el levantamiento de la paralización automática; (ii) no existía causa para el levantamiento de la paralización en virtud de la sección 362(d)(1) del Código de Quiebras; y (iii) no existía causa para levantar la paralización automática en virtud de los factores de *Sonnax* (*En el caso Sonnax Industries, Inc.,* 907 F.2d 1280, 1285 (2do Cir. 1990)).

El 23 de septiembre de 2020, los Solicitantes presentaron una notificación de apelación de la orden de la Opinión del Memorando del Tribunal del Título III [ECF Núm. 14390]. El 24 de septiembre de 2020, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito registró la apelación como Caso Núm. 20-1931. El 28 de octubre de 2020, los Apelantes presentaron su escrito inicial sobre la apelación. Los Apelantes argumentaron que la decisión del Tribunal del Título III era incorrecta porque (i) los tenedores de bonos tienen una garantía prendaria en los primeros $117 millones de las Remesas del

254

Impuesto sobre Ron, (ii) las leyes pertinentes crearon un fideicomiso a favor de AFI y sus bonistas, y (iii) las leyes y acuerdos pertinentes crearon un interés constitucionalmente protegido. El 7 de diciembre de 2020, la Junta de Supervisión presentó su escrito de contestación. La Junta de Supervisión sostuvo que el Tribunal del Título III no abusó de sus poderes discrecionales porque las reclamaciones de los Apelantes están siendo resueltas de manera definitiva por el Tribunal del Título III y que la decisión del Tribunal del Título III era correcta, entre otras razones, porque (i) el lenguaje claro del Contrato de Fideicomiso limita la garantía prendaria de los Apelantes a los fondos depositados en el Fondo de Amortización, (ii) la legislación pertinente contiene simplemente la promesa del ELA de asignar ciertos fondos a la AFI para sus fines empresariales, con sujeción a su capacidad de retener los fondos de conformidad con la sección 8 del artículo VI de la Constitución del ELA, y (iii) las reclamaciones de los Apelantes no están garantizadas y son liquidables en virtud de PROMESA. Además, el 7 de diciembre de 2020, AAFAF y CANA presentaron acumulaciones parciales al escrito de contestación de la Junta de Supervisión. El 21 de diciembre de 2020, los Solicitantes presentaron su escrito de contestación. El 20 de enero de 2021, los Apelantes presentaron una carta 28(j) en la que presentaban una autoridad complementaria en relación con la decisión del Tribunal del Título III que concedía una presentación de pruebas limitada en relación con la moción de sentencia sumaria parcial de la Junta de Supervisión. El 22 de enero de 2021, la Junta de Supervisión presentó una respuesta a la carta 28(j) de los Apelantes. Los alegatos orales se atendieron el 4 de febrero de 2021 y se tomó en consideración la apelación. El 3 de marzo de 2021, el Primer Circuito emitió una opinión combinada sobre este caso y en el Caso Núm. 20-1930, confirmando la denegación del Tribunal del Título III de las mociones de levantamiento de la paralización de AFI y ACT. El Primer Circuito dictaminó que el Tribunal del Título III no abusó de sus facultades discrecionales al denegar el levantamiento de la paralización automática. Asimismo, el Primer Circuito dictaminó que el levantamiento de la paralización automática no serviría a los intereses de la economía judicial y podría interferir con el procedimiento de quiebra. El 24 de marzo de 2021, el Primer Circuito expidió su mandato.

i)   **Mociones de Levantamiento de la Paralización de los Centros de Salud Federalmente Calificados**

Varios centros de salud federalmente calificados ("FQHC") han presentado mociones para levantar la paralización automática, que se resumen a continuación

(i)   ***Moción de SIM***

Salud Integral en la Montaña, Corporación de Servicios de Salud y Medicina Avanzada, NeoMed Center, Migrant Health Center, HPM Foundation (d/b/a HealthproMed), Morovis Community Health Center y Concilio de Salud Integral de Loiza (colectivamente los "Solicitantes SIM") presentaron su *Moción de Salud Integral en la Montaña, Corporación de Servicios de Salud y Medicina Avanzada, Neomed Center, Migrant Health Center, HPM Foundation, Morovis Community Health Center y Concilio de Salud Integral de Loiza para la asignación y el pago de la reclamación de gastos administrativos o, con carácter subsidiario, levantamiento de la paralización automática* [ECF Núm. 13582] ("Moción de SIM") el 7 de julio de 2020. Los Solicitantes de SIM solicitaban la asignación de una reclamación administrativa conforme a la sección 503(b)(1) del Código de Quiebras o, como alternativa, el levantamiento de la paralización automática a la sección 362(d)(1) del Código de Quiebras.

Los Solicitantes de SIM y otros son demandantes en una acción civil denominada *Rio Grande Community Health Center, Inc. y otros c. el Sr. Rafael Rodríguez Mercado, Secretario, Departamento de Salud del Estado Libre Asociado de Puerto Rico*, Caso Núm. 03-1640 (Unificado con los Casos Núm. 06-1291, 06-1524) (la "Acción Federal"), en el Tribunal de Distrito para el Distrito de Puerto Rico. Los solicitantes de la Acción Federal piden un remedio interdictal que ordene al ELA realizar determinados

255

pagos a los demandantes en relación con su prestación de servicios médicos a los residentes del ELA que son beneficiarios de Medicaid.

En su moción levantamiento de paralización, los Solicitantes de SIM afirman la condición de gastos administrativos para los pagos "wraparound" (suplementarios) estimados trimestrales supuestamente no pagados que, a través de una estipulación, se permitió que el Estado Libre Asociado realizara de conformidad con una fórmula ("Pagos trimestrales permitidos"). (Los pagos "Wraparound" son un término común para ciertos tipos de pagos suplementarios que un estado o territorio puede adeudar a un FQHC en relación con la administración de un modelo de atención gestionada de Medicaid.[197]) Como alternativa a un gasto administrativo permitido, los Solicitantes de SIM pidieron al Tribunal que levantara la paralización automática para permitir que el Tribunal de Distrito en la Acción Federal hiciera cumplir las obligaciones de pago del ELA.

El ELA y los Solicitantes de SIM acordaron aplazar la vista y las fechas límite asociadas para la reconvención a la Moción de SIM en varias ocasiones [ECF Núm. 13996, 14032, 14074]. El 21 de agosto de 2020, el ELA y los Solicitantes de SIM presentaron una estipulación en la que acordaron resolver la Moción de SIM; en ella, el ELA acordó, entre otras cosas, pagar a los Solicitantes SIM un déficit de $11,699,116.70 en pagos "wraparound" (suplementarios) adeudados. La estipulación fue aprobada por el Tribunal el 25 de agosto de 2020. [ECF Núm. 14093]. A tenor con los términos de la estipulación del 21 de agosto de 2020, los Solicitantes de SIM retiraron la Moción de SIM el 3 de septiembre de 2020, aprobada por el Tribunal el 16 de septiembre de 2020. [ECF Núm. 14322].

(ii) <strong><em>Moción Atlantic</em></strong>

Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc. (colectivamente, los "Solicitantes de Atlantic") presentaron su *Moción de Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc. Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castaner, Inc. solicitando (I) la ejecución de la orden judicial anterior y (II) el levantamiento de la paralización automática* [ECF Núm. 12918] (la "Moción de Atlantic") del 21 de abril de 2020. Los Solicitantes de Atlantic solicitan una orden (i) para hacer cumplir una estipulación entre el ELA y los Solicitantes de Atlantic de fecha 19 de julio de 2019, y para obligar al ELA a realizar los Pagos Trimestrales Permitidos, incluido el pago inmediato de un supuesto déficit; (ii) para levantar la paralización automática y permitir que continúe la Acción Federal; y (iii) para hacer cumplir el pago de los pagos en curso adeudados de conformidad con 42 U.S.C. § 1396a (bb).

El ELA y los Solicitantes de Atlantic acordaron aplazar las fechas límite para la reconvención y la vista sobre la Moción Atlantic en virtud de una estipulación, que fue aprobada por el Tribunal. [ECF Núm. 13279, 13303]. Posteriormente, el ELA presentó, y el Tribunal aprobó, otras mociones consensuadas de prórroga de fechas límite. La última de estas mociones consensuadas se concedió el 13 de enero de 2021 [ECF Núm. 15608]. El 24 de febrero de 2021, el ELA presentó su oposición [ECF Núm. 15883], señalando que, aunque el ELA y los Solicitantes de Atlantic (junto con otros FQHC) estaban entablando negociaciones

---

[197] La metodología de cálculo de dichos pagos, entre otras cosas, es un problema pendiente de controversia entre algunos FQHC y el ELA.

para resolver sus reclamaciones, el ELA presentaba una oposición para preservar sus derechos de conformidad con la Moción de Atlantic. Los Solicitantes de Atlantic presentaron su contestación el 3 de marzo de 2021. La vista está prevista para el 10 de marzo de 2021.

(iii) <strong><em>Moción Med Centro</em></strong>

Med Centro, Inc. ("<u>Med Centro</u>") presentó su *Moción de Levantamiento de la Paralización Automática de Med Centro Inc.* [ECF Núm. 13748] (la "<u>Moción de Med Centro</u>") el 4 de agosto de 2020. Med Centro solicita el levantamiento de la orden de paralización automática para proseguir con una acción previa a la petición en el Tribunal de Distrito para solicitar (1) la ejecución de un acuerdo de resolución confidencial previo a la petición de fecha 7 de octubre de 2011 (el "<u>CSA</u>"); (2) el cumplimiento de 42 U.S.C. § 1396a(bb)(3), a partir del primer trimestre de 2018; y (3) que el Tribunal de Distrito prorrogue su jurisdicción de ejecución del CSA más allá del 7 de octubre de 2020.

El ELA presentó una objeción a la moción de Med Centro el 4 de agosto de 2020 y Med Centro presentó una respuesta el 11 de agosto de 2020. Al ser informado de que el ELA y Med Centro estaban de acuerdo en que el Tribunal decidiera sobre la Moción de Med Centro en el momento de su presentación, el Tribunal ordenó a las partes, en el ECF Núm. 14251, que presentaran un informe sobre el estado de la cuestión en cuanto a si seguía existiendo la necesidad de presentar alegatos orales sobre ciertas cuestiones que el Tribunal identificó y deseaba que se escucharan. Después de que las partes presentaran un informe de situación, el Tribunal canceló la vista para considerar la moción de Med Centro [ECF Núm. 14313] y tomó la moción para su presentación. El 17 de septiembre de 2020, el Tribunal emitió una orden [ECF Núm. 14330] por la que se levanta la paralización automática con el único fin de permitir a Med Centro 1) solicitar una prórroga de la jurisdicción de ejecución del Tribunal de Distrito sobre el CSA, sin perjuicio de las respectivas posiciones de las partes en cuanto a si dicha prórroga debe ser concedida 2) invocar y seguir el proceso de resolución de litigios establecido en la sección III.D del CSA, siempre y cuando la paralización siga en vigencia, y el Tribunal conserve la jurisdicción con respecto a la ejecución y el cumplimiento de cualquier decisión dictada a través de ese proceso.[198]

j) <strong><em>Ambac Assurance Corp. c. Autopistas Metropolitanas de Puerto Rico, LLC</em>,
Caso Núm. 20-cv-1094</strong>

El 19 de febrero de 2020, Ambac presentó una demanda contra Autopistas Metropolitanas de Puerto Rico, LLC ("<u>Metropistas</u>") en el Tribunal de Distrito para el Distrito de Puerto Rico, alegando que Metropistas actuó de mala fe al acordar pagar a ACT solo 115 millones de dólares a cambio de una prórroga de diez años de un acuerdo de concesión a tenor con el cual Metropistas operaba dos autopistas de Puerto Rico, PR-5 y PR-22 [3:20-cv-01094; ECF Núm. 1]. Ambac argumentó que Metropistas pagó mucho menos que el valor razonablemente equivalente por los derechos de explotación de la autopista. Ambac pretendía reclamar mediante la rescisión, el enriquecimiento injusto, el valor de la concesión otorgada a Metropistas para garantizar el pago de las obligaciones adeudadas por ACT a Ambac, y una declaración de que Ambac tiene un gravamen válido y continuado sobre determinados ingresos de peaje recaudados por Metropistas.

---

[198] Según el párrafo 6 de la *Undécima Orden Omnibus que concede la exención de la paralización automática* (ECF Núm. 8499 en el Caso Núm. 17-3283), el "Tribunal mantendrá la jurisdicción para conocer y determinar todos los asuntos... en relación con la ejecución o el cumplimiento en los casos del Título III de cualquier sentencia dictada en una acción civil de curso ordinario anterior al concurso, cuando los Deudores acordaron modificar o levantar la paralización del Título III para permitir que la acción prosiguiera hasta su resolución por el tribunal subyacente".

257

El 2 de marzo de 2020, Metropistas presentó una moción para reasignar el caso a la juez Swain y solicitó una paralización en espera de la reasignación [3:20-cv-01094; Núm. 10]. El 16 de marzo de 2020, Ambac respondió a la moción de Metropistas, oponiéndose a la moción de paralización pendiente de reasignación, pero sin oponerse a la moción de reasignación del caso [3:20-cv-01094; ECF Núm. 20].

El 31 de marzo de 2020, la Junta de Supervisión, en nombre del Estado y de ACT, presentó una moción solicitando una orden que instruyera a Ambac para retirar su demanda, argumentando que el litigio viola la Sección 362 del Código de Quiebras porque, entre otras cosas, (i) interfiere con los derechos de propiedad de ACT; (ii) busca una sentencia declaratoria con respecto al gravamen de Ambac; y (iii) busca recuperar una reclamación contra ACT [17-bk-3567-LTS; ECF Núm. 757]. El 1 de abril de 2020, Metropistas presentó una acumulación a la moción de la Junta de Supervisión [17-bk-3567-LTS, ECF Núm. 759].

El 18 de abril de 2020, Metropistas y Ambac presentaron una moción conjunta para prorrogar el plazo para responder a la demanda y para paralizar el caso en espera de la resolución de la moción de la Junta de Supervisión [ECF Núm. 21]. El 20 de abril de 2020, el juez Delgado-Hernández emitió una orden de paralización del caso [3:20-cv-01094; ECF Núm. 22].

El 28 de abril de 2020, Ambac presentó una oposición a la moción de la Junta de Supervisión, argumentando que el litigio no interfería con los derechos de propiedad de ACT y que Ambac tenía capacidad para presentar reclamaciones contra Metropistas porque, entre otras cosas, (i) ACT había abandonado las reclamaciones de la Sección 544(b) contra Metropistas; y (ii) la conducta de Ambac no violaba la paralización automática [17-bk-3282-LTS; ECF Núm. 12964]. El 27 de mayo de 2020, la Junta de Supervisión presentó una contestación [17-bk-3567-LTS; ECF Núm. 822], y el 29 de mayo de 2020, la Junta de Supervisión presentó una moción informativa en relación con su contestación [17-bk-3567-LTS; ECF Núm. 824]

El 16 de junio de 2020, la juez Swain emitió una orden concediendo la moción de la Junta de Supervisión y ordenó a Ambac que retirara su demanda. La juez Swain dictaminó que la demanda violaba la paralización automática (y en concreto la sección 362(a)(1), (3), (4) y (6)) porque, entre otras cosas, las demandas de Ambac (i) intentaban ejercer control sobre los derechos de propiedad de ACT, y (ii) pretendían ejecutar un gravamen contra la propiedad de ACT [17-bk-3567-LTS; ECF Núm. 845]. El 23 de junio de 2020, y en cumplimiento de la orden de la juez Swain, Ambac presentó una notificación de retiro de su demanda [3:20-cv-01094; ECF Núm. 23].

El 30 de junio de 2020, Ambac presentó una notificación de apelación en cuanto a la orden de la juez Swain que concedía la moción de la Junta de Supervisión que ordenaba a Ambac retirar su demanda [17-bk-3567-LTS; ECF Núm. 850]. El 20 de julio de 2020, el juez Delgado-Hernández emitió una orden por vía electrónica en la que concedía la notificación de Ambac de retirar su demanda, y emitió una sentencia que cerraba el caso [3:20-cv-01094; ECF Núm. 24 y 25].

El 30 de julio de 2020, la apelación se registró como *Ambac c. el Estado Libre Asociado*, Caso Núm. 20-1657. El 19 de octubre de 2020, Ambac presentó su escrito inicial, argumentando que el Tribunal del Título III se había equivocado al considerar que su demanda violaba la paralización automática.

El 18 de diciembre de 2020, la Junta de Supervisión presentó su escrito de contestación en la apelación, reafirmando sus argumentos de que la demanda de Ambac violaba múltiples aspectos de la paralización automática bajo la Sección 362. Entre otros puntos, la Junta de Supervisión argumentó que Ambac intentó ejercer control sobre la propiedad de ACT y trató de ejecutar un gravamen contra la propiedad de ACT. Metropistas presentó una acumulación al escrito de contestación de la Junta de

Supervisión. El 21 de diciembre de 2020, el Tribunal emitió una orden relativa a la acumulación de Metropistas al escrito de la Junta de Supervisión. El 12 de febrero de 2019, el Apelante presentó su escrito de contestación. La apelación fue defendida ante el Primer Circuito el 8 de marzo de 2021.

     k)     ***Yashei Rosario c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, Caso Núm. 20-cv-01307**

El 27 de noviembre de 2017, Yashei Rosario, por sí misma y en su carácter de Presidenta de la organización sin fines de lucro Fideicomiso de Desarrollo Socioeconómico Sustentable de Vieques, CODESU, Inc. ("CODESU, Inc.") (colectivamente la "Demandante"), presentó una demanda *pro se* ante el Tribunal de Distrito de Puerto Rico contra el Estado Libre Asociado, el Presidente de la Cámara de Representantes de Puerto Rico, Carlos Johnny Méndez, el Presidente del Senado de Puerto Rico, Thomas Rivera-Schatz, y el entonces Gobernador Ricardo Rosselló. La demanda afirmaba que el Estado Libre Asociado había administrado históricamente de manera incompetente el municipio de Vieques y no había representado sus intereses. En la demanda se alegaba además que el ELA había violado la Ley del Derecho al Voto, 52 U.S.C. § 10301 y ss. y que había violado los derechos de la Primera Enmienda de la Demandante, al "coart[ar] su voz en el Congreso". Para remediar estas supuestas violaciones, la demanda solicitaba una orden que obligara al Estado Libre Asociado a celebrar un referéndum sobre la situación política del municipio de Vieques. La demanda también solicitaba ciertas medidas para facilitar el referéndum propuesto, así como una reparación monetaria. La demandante alegó que la reparación solicitada no estaba relacionada con los casos de Título III porque la Demandante "pagaría a la Comisión Electoral de Puerto Rico" por los costos del referéndum.

El 8 de diciembre de 2017, la Demandante presentó una moción solicitando al Tribunal de Distrito que emitiera una orden que prohibiera a las agencias del Estado Libre Asociado "que tuvieran propiedades en terrenos en Vieques" vender esos terrenos. Según los Demandantes, la orden solicitada era necesaria para evitar que el Estado Libre Asociado vendiera tierras que, de otro modo, serían propiedad del propuesto y separado territorio estadounidense de Vieques. Si así se ordenaba, los Demandantes solicitaban que las autoridades federales "se hicieran cargo" de los terrenos hasta que se pudiera celebrar el referéndum solicitado. El Tribunal de Distrito no se pronunció sobre esta petición.

El 29 de diciembre de 2017, la Demandante presentó una moción para la certificación de clase (aunque la demanda no fue calificada como una acción colectiva). El 20 de abril de 2018, y sin ninguna oposición presentada, el Tribunal de Distrito denegó la moción de la Demandante para la certificación de la clase porque los Demandantes no podían proporcionar información suficiente para llevar a cabo el análisis de certificación.

El 29 de junio de 2018, el Tribunal de Distrito desestimó la demanda sin prejuicio por no presentar acreditación de notificación.

Posteriormente, la Demandante apeló la desestimación ante el Primer Circuito [No. 18-1782]. El 24 de septiembre de 2018, el Primer Circuito emitió una orden instruyendo a la Demandante a fundamentar si la paralización automática se aplicaba a todo o parte de la apelación. El 9 de octubre de 2018, la Demandante respondió a la orden de fundamentar la demanda, afirmando que la paralización automática no se aplicaba a la demanda subyacente y a la apelación porque la reparación solicitada "no implica ninguna solicitud presupuestaria ni financiera del Estado Libre Asociado". El 16 de octubre de 2018, el Estado Libre Asociado y el Gobernador Rosselló presentaron su respuesta, argumentando que la paralización automática sí se aplicaba porque, aunque la Demandante enmarcó la demanda como si solo buscara una orden para realizar un referéndum, la causa de la acción era en realidad para remedio equitativo e interdictal, y la

demandante buscaba ejercer al menos algún grado de control sobre los recursos del Estado Libre Asociado, y el litigio de las alegaciones en la Demanda obligaría al Estado Libre Asociado a gastar fondos.

El 27 de noviembre de 2018, el Primer Circuito ordenó sumariamente la paralización de la apelación "[e]n vista de la petición de reestructuración de sus deudas presentada por el Estado Libre Asociado de Puerto Rico…." Tras el dictado de la orden de paralización, los Solicitantes presentaron una serie de informes de situación y mociones de reconsideración que pedían al Primer Circuito que levantara la paralización. El Primer Circuito denegó varias solicitudes de reconsideración de la Demandante. En su orden más reciente denegando la reconsideración, ingresada el 26 de marzo de 2020, el Primer Circuito remitió a la Solicitante al "Tribunal del Título III para solicitar el levantamiento de la paralización si se desea dicha reparación".

El 30 de junio de 2020, y presumiblemente en respuesta a la directiva del Primer Circuito, la Demandante presentó una demanda ante el Distrito de Puerto Rico, que se tituló "Moción de Levantamiento de la Paralización Basada en el Genocidio Legal Moderno". [Caso Núm. 20-cv-01307, ECF Núm. 3]. El 9 de julio de 2020, el juez principal Gelpí emitió una orden en la que declaraba que el Tribunal de Distrito "interpretaría la solicitud de paralización de la demanda [20-1307] como una moción para la paralización automática" y "la transferiría al Caso Núm. 17-3283 para su consideración como un asunto impugnado en el caso del Título III del ELA". La moción de paralización se registró posteriormente en el caso de Título III del ELA, y el Tribunal del Título III emitió un calendario de presentación de escritos. El 23 de julio de 2020, la Junta de Supervisión, en nombre del ELA, presentó una oposición a la solicitud de paralización [ECF Núm. 13816]. El ELA argumentó que la paralización automática era aplicable, y que la moción debía ser denegada porque (i) la Demandante no había establecido, ni siquiera intentado demostrar, que existiera una "causa" para levantar la paralización automática, y (ii) los factores de *Sonnax*, que la Demandante no abordó, pesaban fuertemente en contra del levantamiento de la paralización. El 24 de julio de 2020, Yashei Rosario presentó una respuesta en apoyo de su moción de levantamiento de la paralización automática [ECF Núm. 13864]. El 5 de agosto de 2020, el Tribunal del Título III emitió una orden denegando la moción [ECF Núm. 13990].

A pesar de la denegación de la moción de levantamiento de la paralización, el 15 de diciembre de 2020, Yashei Rosario presentó una moción relativa a la orden del Tribunal del Título III [Caso Núm. 20-cv-01307, ECF Núm. 11]. El 23 de diciembre de 2020, el juez principal Gelpí emitió una orden y una sentencia en la que se desestimaba el caso por falta de presentación de una reclamación [Caso Núm. 20-cv-01307, ECF Núm. 13, 15]. El 29 de diciembre de 2020, el caso se cerró. El 26 de enero de 2021, la Demandante presentó una moción de reconsideración de la orden del juez principal Gelpí de desestimar el caso [Caso Núm. 20-cv-01307, ECF Núm. 16], que el juez principal Gelpí denegó en una orden por vía electrónica el 27 de enero de 2021 [Caso Núm. 20-cv-01307, ECF Núm. 17]. El 2 de febrero de 2021, la Demandante presentó una moción para un interdicto preliminar [Caso Núm. 20-cv-01307, ECF Núm. 18], que el juez principal Gelpí denegó en una orden por vía electrónica el 19 de febrero de 2021 [Caso Núm. 20-cv-01307, ECF Núm. 19]. El 9 de marzo de 2021, la Demandante presentó una moción de reconsideración de las órdenes del juez principal Gelpí del 27 de enero y del 19 de febrero [Caso Núm. 20-cv-01307, ECF Núm. 20], que el juez principal Gelpi rechazó en una orden de solo texto el 15 de marzo de 2021 [Caso Núm. 20-cv-01307, ECF Núm. 21].

## F.    Procedimientos contenciosos significativos y litigios relacionados

A lo largo de los casos de Título III, la Junta de Supervisión ha representado los intereses de los Deudores en numerosos procedimientos contenciosos por valor de miles de millones de dólares, cuestiones controvertidas y demandas presentadas principalmente por acreedores, pero también por el gobierno o la legislatura en algunas instancias. Hasta la fecha, se han presentado 95 procedimientos contenciosos contra

la Junta de Supervisión, el ELA y las instrumentalidades, y también se han presentado más de 300 acciones de impugnación contra los acreedores.

Como se mencionó anteriormente, entre estas acciones, además de los casos presentados por acreedores, se incluían acciones iniciadas por el Gobierno y los municipios en los esfuerzos por prohibir que la Junta de Supervisión cumpla con las que considera son sus obligaciones, *véase* sección IV.C.3.h). La Junta de Supervisión ha tratado de defender y reafirmar el funcionamiento de PROMESA como una herramienta para reestructurar la deuda de Puerto Rico y, hasta la fecha, los tribunales no han concedido ninguna reparación para evitar que la Junta de Supervisión continúe con su misión establecida por ley.

1.      **Litigio sobre la Cláusula de Designaciones**

a)      ***Aurelius Investments, LLC y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Casos Núm. 18-1671; 18-8014 (1er Cir.)**

El 7 de agosto de 2017, los Apelantes, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (colectivamente, "Aurelius"), presentaron una moción para que se desestimara la petición de Título III del ELA [ECF Núm. 913]. Aurelius alegó que la Junta de Supervisión carecía de autoridad para iniciar el caso de Título III porque sus miembros habían sido designados infringiendo la Cláusula de Designaciones de la Constitución de los Estados Unidos, art. II, § 2 de la Constitución de EE.UU., y el principio de división de poderes. En respuesta, la Junta de Supervisión argumentó que sus miembros no eran "Funcionarios de los Estados Unidos" en virtud de la Cláusula de Designaciones, y que los poderes de la Junta de Supervisión eran puramente locales, y no federales, y por lo tanto la Cláusula de Designaciones no se aplica [ECF Núm. 1622]. La Junta de Supervisión también argumentó que, incluso si sus miembros fueran funcionarios federales, la Cláusula de Designaciones no se había violado porque los miembros de la Junta ejercían autoridad en Puerto Rico, donde la Cláusula Territorial le otorga al Congreso plenos poderes. Con carácter subsidiario, la Junta de Supervisión argumentó que la designación de sus miembros no requiere la recomendación y el consentimiento del Senado porque son "funcionarios de rango inferior".

El 13 de julio de 2018, el Tribunal del Título III denegó la moción de Aurelius para desestimar la petición de Título III del ELA [ECF Núm. 3503]. Aurelius apeló la decisión. El 7 de septiembre de 2018, el Primer Circuito unificó la apelación de Aurelius con apelaciones similares que implican desafíos de la Cláusula de Designaciones a la Junta de Supervisión (que se discuten a continuación) presentados por la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) y Assured Guaranty Corp.

El 15 de febrero de 2019, el Primer Circuito dictaminó que el nombramiento de los miembros de la Junta de Supervisión era inconstitucional. Sin embargo, el Primer Circuito ratificó la decisión del Tribunal del Título III de rechazar las peticiones de Título III, sosteniendo que las acciones tomadas por la Junta de Supervisión antes del fallo del Primer Circuito eran válidas bajo la doctrina de funcionario *de facto*. El Primer Circuito paralizó su fallo durante 90 días para permitir al Presidente y al Senado subsanar los nombramientos defectuosos.

La Junta de Supervisión presentó una petición de elevación de causa a un tribunal superior (*certiorari*) el 23 de abril de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1334. El 24 de abril de 2019, la Junta de Supervisión solicitó al Primer Circuito paralizar el mandato supeditado a la disposición de su petición de *certiorari*. El 6 de mayo de 2019, el Primer Circuito extendió la paralización del mandato por 60 días hasta el 15 de julio de 2019.

El 24 de mayo de 2019, Aurelius presentó una petición de certiorari para impugnar el fallo del Primer Circuito sobre los funcionarios *de facto*, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1475. CANA, que compareció como parte contraria a la apelación en el recurso ante el Primer Circuito, presentó una petición de certiorari el 28 de mayo de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1496. Estados Unidos presentó una petición de certiorari el 28 de mayo de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1514. UTIER presentó una petición de certiorari el 5 de junio de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1521.

El 18 de junio de 2019, la Junta de Supervisión presentó una moción al Primer Circuito que prorrogara la paralización el mandato hasta la resolución de los casos anteriores en la Suprema Corte. El 19 de junio de 2019, la Corte Suprema concedió todas las peticiones de certiorari y unificó los casos. El caso Núm. 18-1334 de la Corte Suprema de EE.UU. fue designado como caso principal. El 2 de julio de 2019, el Primer Circuito concedió la moción de la Junta de Supervisión para paralizar el mandato supeditado a una decisión sobre los méritos de la Corte Suprema.

El 25 de julio de 2019, la Junta de Supervisión, la AAFAF, el Comité de Retirados, los Estados Unidos y CANA presentaron escritos ante la Corte Suprema impugnando la sentencia de la Cláusula de Designaciones del Primer Circuito. El 22 de agosto de 2019, la UTIER y Aurelius presentaron sus escritos iniciales unificados, en respaldo de la sentencia del Primer Circuito sobre la Cláusula de Designaciones e impugnando su sentencia sobre la doctrina de funcionario *de facto*. Anthony Michael Sabino (profesor de derecho constitucional), Alan Mygatt Tauber (académico de derecho constitucional), Aníbal Acevedo-Vilá (ex gobernador de Puerto Rico) y las Partes de ARD presentaron escritos *amicus curiae*. Sabino y Acevedo-Vilá recomendaron que la Corte Suprema confirmara la decisión del Primer Circuito sobre la cuestión de la Cláusula de Designaciones, mientras que Tauber recomendó una revocación sobre esa cuestión. Las Partes de ARD recomendaron lo mismo que Tauber y también argumentaron que la Corte Suprema debería confirmar el fallo del Primer Circuito sobre los funcionarios *de facto*. El 19 de septiembre de 2019, la Junta de Supervisión, la AAFAF, el Comité de Retirados, los Estados Unidos y CANA presentaron contestaciones en apoyo de sus impugnaciones a la sentencia de la Cláusula de Designaciones del Primer Circuito y en apoyo de la sentencia del Primer Circuito sobre la doctrina de los funcionarios *de facto*. La Coalición de Bonistas COFINA prioritarios (senior) presentó un escrito que se limitó a apoyar el fallo del Primer Circuito sobre la doctrina de funcionario *de facto*. El 4 de octubre de 2019 y el 8 de octubre de 2019, UTIER y Aurelius presentaron sendos escritos de contestación. Los alegatos orales se presentaron el 15 de octubre de 2019.

El 1 de junio de 2020, la Corte Suprema de EE.UU. revocó la decisión del Primer Circuito del 15 de febrero de 2019. La Corte sostuvo que la Cláusula de Designaciones no se aplica al nombramiento de los miembros de la Junta de Supervisión. Dado que las responsabilidades legales de la Junta de Supervisión consisten en "deberes principalmente locales" (a saber, representar a Puerto Rico "en los procedimientos de quiebra y supervisar los aspectos de las políticas fiscales y presupuestarias de Puerto Rico") los miembros de la Junta de Supervisión no son "funcionarios de los Estados Unidos" y, por tanto, no están sujetos a la Cláusula de Designaciones. La Corte Suprema se negó a considerar la aplicación de la doctrina de funcionario *de facto* ya que sostuvo que los miembros de la Junta de Supervisión fueron nombrados válidamente. Los jueces Sotomayor y Thomas emitieron opiniones concurrentes en la sentencia. La juez Sotomayor coincidió "a regañadientes" con la sentencia, pero escribió para subrayar la autonomía de Puerto Rico. El juez Thomas coincidió en que la designación de los miembros de la Junta de Supervisión no violó la Constitución de los Estados Unidos, pero discrepó con la prueba "amorfa" de la mayoría que distingue entre las obligaciones locales y federales de un funcionario.

b)     ***Assured Guaranty Corp. y otros c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros***, **Proc. Cont. Núm. 18-00087**

El 23 de julio de 2018, los Demandantes Assured Guaranty Corp. y Assured Guaranty Municipal Corp., al igual que Aurelius, presentaron una demanda donde se cuestionaba la constitucionalidad de la designación de los miembros de la Junta de Supervisión. Assured solicitó que se declarara que la designación de los miembros de la Junta de Supervisión viola la Cláusula de Designaciones y que las acciones de la Junta de Supervisión eran nulas. Assured también solicitó que se prohibiera a la Junta de Supervisión y a sus miembros con derecho a voto que realicen cualquier otra acción hasta que sus miembros fueran designados lícitamente.

El 3 de agosto de 2018, el Tribunal del Título III dictó una sentencia estipulada [Proc. Cont. Núm. 18-00087, ECF Núm. 14] para la Junta de Supervisión sobre la base de que las cuestiones planteadas en la demanda de Assured ya habían sido declaradas defectuosas por el Tribunal del Título III en el caso *Aurelius*. *En el caso Junta de Supervisión y Administración Financiera para P.R.*, 318 F. Sup. 3d 537 (D.P.R. 2018). Assured presentó una notificación de apelación ante el Primer Circuito, que se registró como Caso Núm. 18-1746.

Esta apelación se consolidó con la apelación de *Aurelius* (que se analiza anteriormente) y se resolvió por los mismos motivos.

c)     ***UTIER c. la Autoridad de Energía Eléctrica de Puerto Rico y otros***, **Proc. Cont. Núm. 17-00228**

El 6 de agosto de 2017, el Demandante UTIER presentó una impugnación casi idéntica de la Cláusula de Designaciones a la designación de los miembros de la Junta que Aurelius y Assured. UTIER solicitó (i) una sentencia declaratoria que determine que PROMESA viola la Cláusula de Designaciones y que todos los actos de la Junta de Supervisión son inválidos, y (ii) una orden que prohíba que la Junta de Supervisión ejerza la autoridad que le sea concedida por PROMESA. El 10 de noviembre de 2017, UTIER modificó su demanda [Proc. Cont. Núm. 17-00228, ECF Núm. 75].

El 20 de noviembre de 2017, la Junta de Supervisión solicitó la desestimación de la demanda enmendada [ECF Núm. 88].

El 15 de agosto de 2018, el Tribunal del Título III concedió la moción de la Junta de Supervisión por considerar que no se había violado la Cláusula de Designaciones. *En el caso Junta de Supervisión y Administración Financiera para P.R.*, 318 F. Sup. 3d 537, 557 (D.P.R. 2018).

El 16 de agosto de 2018, UTIER apeló la decisión ante el Primer Circuito, que se registró como Caso Núm. 18-1787. El 7 de septiembre de 2018, el Primer Circuito unificó la apelación de UTIER con las apelaciones presentadas por Aurelius y Assured que se analizaron anteriormente. La apelación de UTIER se resolvió de la misma manera que las apelaciones de Aurelius y Assured. *Consulte* la sección V.F.1.a) que aparece anteriormente.

d)     ***Hernández-Montañez y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros***, **Proc. Cont. Núm. 18-00090**

El 25 de julio de 2018, ciertos miembros del minoritario Partido Popular Democrático que sirven en la Cámara de Representantes y el Senado de Puerto Rico presentaron una demanda en la que se solicitaban sentencias declaratorias de que (i) los miembros de la Junta de Supervisión fueron designados

263

de una manera que viola la Cláusula de Designaciones de la Constitución de EE.UU., (ii) la delegación de la autoridad ejecutiva y legislativa a la Junta de Supervisión constituye una violación de la doctrina de la división de poderes, y (iii) el uso que haga la Junta de Supervisión de sus facultades de control sobre el presupuesto para la adopción supuestamente forzosa de sus políticas preferidas constituye una "interferencia inadmisible" de la autonomía de Puerto Rico. Los Demandantes también solicitaron órdenes que prohíban que la Junta de Supervisión ejerza su autoridad en virtud de PROMESA, y que prohíban la supuesta interferencia de la Junta de Supervisión en el proceso legislativo.

El 27 de agosto de 2018, las partes presentaron un informe conjunto sobre la situación en el que los Demandantes aceptaron (1) paralizar sus reclamaciones con respecto a la Cláusula de Designaciones mientras la apelación de Aurelius con respecto a la Cláusula de Designaciones estuviera pendiente y (2) desestimar su reclamación de autonomía legislativa [Proc. Cont. Núm. 18-00090, ECF Núm. 18]. Las partes discreparon en cuanto a si la reclamación restante de los Demandantes de que PROMESA viola la doctrina de la división de poderes debería quedar en suspenso a la espera de la resolución de la apelación de la Cláusula de Designaciones de Aurelius. El 20 de noviembre de 2018, la magistrada Dein dictó una orden [Proc. Cont. Núm. 18-00090, ECF Núm. 32] paralizando el caso en espera de una resolución de las apelaciones unificadas en *Aurelius Investments, LLC c. el Estado Libre Asociado de Puerto Rico*, Núm. 18-1671, *Assured Guaranty Corp. c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, Núm. 18-1746 y *UTIER c. la Autoridad de Energía Eléctrica de Puerto Rico y otros,* Núm. 18-1787. Para obtener más información sobre estas apelaciones, consulte la sección V.F.1.a) que aparece anteriormente.

El 19 de agosto de 2020, tras la decisión de la Corte Suprema en el caso Aurelius, los Demandantes solicitaron una moción de levantamiento de la paralización [Proc. Cont. Núm. 18-00090, ECF Núm. 33]. El 11 de septiembre de 2020, los Estados Unidos y la Junta de Supervisión presentaron notificaciones de no oposición a la moción de los Demandantes [Proc. Cont. Núm. 18-00090, ECF Núm. 35, 36]. El 14 de septiembre de 2020, el Tribunal del Título III levantó la paralización [Proc. Cont. Núm. 18-00090, ECF Núm. 37]. El 30 de noviembre de 2020, la Junta de Supervisión solicitó la desestimación de la demanda del Demandante, afirmando que no expone una reclamación de reparación. [Proc. Cont. Núm. 18-00090, ECF Núm. 45]. Además, el 30 de noviembre de 2020, Estados Unidos presentó un escrito en apoyo de la constitucionalidad de PROMESA [Proc. Cont. Núm. 18-00090, ECF Núm. 47]. El 26 de febrero de 2021, los Demandantes presentaron una oposición a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00090, ECF Núm. 52]. El 29 de marzo de 2021, la Junta de Supervisión presentó su respuesta en apoyo de su moción [Proc. Cont. Núm. 18-00090, ECF Núm. 53]. El 7 de mayo de 2021, el Tribunal del Título III dictó una orden aceptando la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00090, ECF Núm. 54].

2.      **Litigios de bonistas**

a)      ***Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 17-00155; 17-00156**

El 3 de junio de 2017, Assured y algunos otros Demandantes que aseguran bonos emitidos por ACT presentaron acciones contra el ELA, ACT y otros Demandados, que alegan que los Demandados desviaron ilícitamente lo que los Demandantes describieron como ciertos ingresos especiales de ACT al Fondo General del ELA. Los Demandantes solicitaron remedio declaratorio e interdictal, con el argumento de que los Demandados habían violado las disposiciones sobre ingresos especiales del Código de Quiebras (secciones 902, 922(d) y 928(a)), que eximen de la paralización automática a los ingresos especiales pignorados posteriores a la petición. Los Demandantes argumentaron que los bonos en cuestión eran bonos de ingresos especiales según la sección 902 y no estaban sujetos a la suspensión automática según la sección

922(d). Los Demandantes solicitaron la aplicación de estas disposiciones bajo la forma de un interdicto que ordena a los Demandados pagar estos ingresos especiales.

El 23 de julio de 2017, los Demandantes presentaron demandas enmendadas según las cuales AAFAF indebidamente instruyó a BNYM que se abstuviera de destinar o aportar fondos depositados en las Cuentas de Reserva del Servicio de la Deuda de ACT a los Bonos ACT existentes [Proc. Cont. Núm. 17-00155, ECF Núm. 39; Proc. Cont. Núm. 17-00156, ECF Núm. 41]. Según los Demandantes, los fondos en esas cuentas son propiedad de los tenedores de bonos, no del Deudor.

El 28 de julio de 2017, los Demandados presentaron mociones de desestimación, con el argumento, entre otras cosas, que (i) los Demandantes no presentaron ninguna reclamación en virtud de las secciones 922(d) y 928(a) del Código de Quiebras porque no adujeron hechos que demostraran que tenían un derecho de garantía perfeccionado sobre los ingresos de ACT; (ii) la secciones 922(d) y 928(a) no exigen que los ingresos especiales pignorados, si se alegara que los hubiere, sean devueltos; (iii) los Demandantes no alegaron hechos que establezcan un gravamen ejecutable sobre los ingresos de ACT; (iv) el Tribunal del Título III carecía de jurisdicción sobre la materia para atender la reparación solicitada en la Demanda conforme a la sección 305 de PROMESA, que limita la jurisdicción y las facultades del Tribunal del Título III; y (v) los Demandantes no presentaron ninguna reclamación con respecto a los fondos de las Cuentas de Reserva, dado que no son dueños de las cuentas [Proc. Cont. Núm. 17-00155, ECF Núm. 46; Proc. Cont. Núm. 17-00156, ECF Núm. 48].

El 30 de enero de 2018, el Tribunal del Título III concedió las mociones de desestimación [Proc. Cont. Núm. 17-00155, ECF Núm. 125; Proc. Cont. Núm. 17-00156, ECF Núm. 121]. El 9 de febrero de 2018, los Demandantes presentaron una apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. La apelación se registró como Caso Núm. 18-1165 y 18-1166. El 26 de marzo de 2019, el Primer Circuito ratificó la decisión del Tribunal del Título III, al decidir que no había cometido un error al desestimar la demanda enmendada sobre la base de que ni la sección 922(d) del Código de Quiebras ni la sección 928(a) le dan derecho a los demandantes a la reparación que solicitan. El Primer Circuito sostuvo que estas secciones "permiten, pero no exigen, el pago continuado mientras los procesos de quiebra continúen pendientes" y "representan la premisa de que cualquier gravamen consensual anterior a la petición garantizado por ingresos especiales sobrevivirá al período de quiebra municipal, y, en consecuencia, los municipios pueden elegir continuar pagando voluntariamente estas deudas durante el transcurso de los procesos de quiebra para no atrasarse y, de este modo, correr el riesgo de no poder obtener financiamiento en el futuro". *Assured Guar. Corp.*, 919 F.3d en 132-33. El 20 de septiembre de 2019, los Apelantes presentaron una petición de certiorari ante la Corte Suprema, que se registró como Caso Núm. 19-391. Se presentaron todos los escritos para la petición y, el 13 de enero de 2020, la Corte Suprema denegó la petición.

b) ***Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 18-00059**

El 23 de mayo de 2018, Assured Guaranty Corp. y FGIC presentaron acciones contra el ELA, AAFAF, el gobernador Rosselló y otros Demandados, que alegaban que el Plan Fiscal del ELA de abril de 2018 y los actos y las órdenes relacionados violan PROMESA y la Constitución de Estados Unidos. Los Demandantes aseguran los bonos GO para el pago de los cuales, según alegan, tienen derecho de prioridad de primera clase en virtud de la Constitución del ELA. Los Demandantes también aseguran bonos emitidos por ACT, ADCC y AFI que, según alegan, están asegurados por gravámenes ejecutables y perfeccionados contra ingresos especiales. Los Demandantes alegan que el Plan Fiscal no tiene en cuenta estas prioridades. Los Demandantes solicitan una sentencia declaratoria que determine que (i) el Plan Fiscal de abril de 2018 del ELA violaba las secciones 201(b) de PROMESA (que define los requisitos para la aprobación de los

265

planes fiscales), 303, (que reserva los derechos de los territorios cubiertos de controlar sus propios
territorios e instrumentalidades e impide leyes de moratorias y órdenes ejecutivas ilícitas), y 407 (que
prohíbe, entre otras cosas, las transferencias de bienes de cualquier instrumentalidad territorial de Puerto
Rico "en violación de la ley aplicable en virtud de la cual cualquier acreedor tiene una pignoración válida,
derecho de garantía o gravamen sobre dicho bien.") y la sección 928(a) del Código de Quiebras (que
establece que los ingresos especiales adquiridos por el deudor después del inicio del caso seguirán estando
sujetos a cualquier gravamen que resulte de cualquier acuerdo de garantía celebrado por el deudor antes del
inicio del caso); (ii) la Junta de Supervisión carecía de autoridad para certificar el Plan Fiscal; (iii) el Plan
Fiscal de abril de 2018 no constituía un "Plan Fiscal" en virtud de la sección 5 de PROMESA; (iv) un plan
de ajuste no se podía confirmar basándose en el Plan Fiscal de abril de 2018 y el Tribunal del Título III no
debe celebrar una vista de confirmación basada en el Plan Fiscal del ELA de abril de 2018; (v) las acciones
impugnadas violan las Cláusulas sobre Contratos, Expropiaciones y Debido Proceso y el Artículo I, Sección
1 de la Constitución de Estados Unidos; y (vi) las acciones impugnadas violan la sección 303(1) de
PROMESA (que se refiere a la aplicabilidad de las secciones de PROMESA a los casos), y la sección
303(3) de PROMESA (que reserva los derechos de los territorios cubiertos a controlar sus propios territorios
e instrumentalidades).

Los Demandados presentaron una moción urgente para paralizar el litigio el 25 de junio de 2018
[Proc. Cont. Núm. 18-00059, ECF Núm. 14], con el argumento de que las cuestiones planteadas en este
procedimiento contencioso son sustancialmente similares a las planteadas en *Ambac Assurance Corp. c. el
Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 17-00159 (que se describe en la sección
V.F.2.b) a continuación). La magistrada Dein concedió la moción para paralizar este litigio a la espera de
una decisión del Primer Circuito en *Ambac*, determinando que muchas de las cuestiones en apelación en
*Ambac* se superponen con las cuestiones de este caso y que la paralización solicitada no retrasa
significativamente el litigio [Proc. Cont. Núm. 18-00059, ECF Núm. 23]. El 27 de agosto de 2018, los
Demandantes presentaron una objeción contra la orden de la magistrada Dein [Proc. Cont. Núm. 18-00059,
ECF Núm. 24] y, el 18 de septiembre de 2018, los Demandados presentaron una respuesta [Proc. Cont.
Núm. 18-00059, ECF Núm. 28]. El 2 de noviembre de 2018, el Tribunal del Título III dictó una orden de
confirmación de la paralización [Proc. Cont. Núm. 18-00059, ECF Núm. 32]. El 20 de agosto de 2019,
CANA presentó una moción para intervenir en esta acción [Proc. Cont. Núm. 18-00059, ECF Núm. 38]. El
28 de febrero de 2019, las partes presentaron una moción conjunta [Proc. Cont. Núm. 18-00059, ECF Núm.
41] que solicitó que el litigio fuera objeto de una Orden de Paralización, y dicha paralización se extendió
hasta el 11 de marzo de 2020, como se describe en la sección V.I de esta Declaración de Divulgación. El
10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado, recomendando que este
litigio se mantuviera paralizado hasta después de la decisión del Tribunal sobre la confirmación del Plan
Fiscal del ELA de abril de 2018.[199] El 10 de marzo de 2020, el Tribunal dictó una Orden Final, que
determinó que se mantuviera la paralización de este litigio [Proc. Cont. Núm. 18-00059 ECF Núm. 51].[200]

      c)   ***Ambac Assurance Corp.*** *c. el Estado Libre Asociado de Puerto Rico y otros*,
          Proc. Cont. **Núm. 17-00159**

El 6 de junio de 2017, Ambac presentó una demanda contra el ELA, ACT, la Junta de Supervisión,
AAFAF y varios funcionarios gubernamentales donde se alegaba que los Demandados violaron los
derechos constitucionales y legales de Ambac como aseguradora de los Bonos de Ingresos ACT. Ambac

---

[199] Consulte la Sección V.I.3 para obtener una descripción detallada del Equipo de Mediación y del Informe
Enmendado.

[200] Consulte la Sección V.I.3 para obtener una descripción detallada del Equipo de Mediación, el Informe Enmendado,
y de la Orden Definitiva del 10 de marzo de 2020.

sostuvo que había emitido pólizas de seguros con garantía financiera que cubren el pago de capital e intereses de aproximadamente $494 millones en valor neto a la par acumulado de los bonos ACT y además alegaron que poseían directamente aproximadamente $16 millones en dichos bonos. Ambac afirmó que los Bonos ACT están asegurados por gravámenes sobre (i) ingresos de instalaciones de peaje; (ii) gasolina, gasoil, petróleo crudo y otros impuestos indirectos especiales; e (iii) arbitrios que constan de cargos por licencia de vehículos automotores (colectivamente, los "Ingresos Especiales Pignorados").

Ambac sostuvo que los Demandados desviaron los supuestos Ingresos Especiales Pignorados de manera tal que se les dio prioridad a las deudas subordinadas (junior) no aseguradas sobre la deuda prioritaria (senior) asegurada. Estas acciones, argumentó Ambac, provocaron incumplimientos de pago innecesarios sobre los Bonos de Ingresos ACT. Debido a estos supuestos incumplimientos, Ambac pagó reclamaciones por un total de aproximadamente $52 millones a los tenedores de bonos.

Ambac solicitó remedio declaratorio e interdictal, donde se afirma que (i) la Ley de Moratoria y las Órdenes de Moratoria, el Plan Fiscal y la Ley de Cumplimiento con el Plan Fiscal, de conformidad con los cuales ACT actuó supuestamente para desviar los Ingresos Especiales Pignorados, eran inconstitucionales, violaban la Cláusula sobre Contratos, y son nulos; (ii) la desviación violaba las Cláusulas sobre Expropiaciones y Debido Proceso; (iii) la presunta privación del acceso de Ambac al Tribunal del Título III de las Órdenes de Moratoria era inconstitucional; y (iv) los Demandados violaron las secciones 303 y 407 de PROMESA y las secciones 922 y 928 del Código de Quiebras.

Los Demandados argumentaron que el Tribunal del Título III carecía de jurisdicción para pronunciarse sobre las cuestiones planteadas en la demanda de Ambac. Específicamente, los Demandados afirmaron que (i) Ambac no tenía legitimidad para presentar la demanda porque no había sufrido ningún perjuicio concreto, y (ii) no podrán determinarse todos los derechos hasta que se radique un plan de ajuste propuesto [Proc. Cont. Núm. 17-00159, ECF Núm. 48].

El Tribunal del Título III desestimó la demanda, al sostener que (i) Ambac tenía legitimidad para presentar la demanda, pero (ii) el Tribunal del Título III carecía de jurisdicción sobre la materia con respecto al derecho de garantía real del Demandante y dictaminó que Ambac no había presentado ninguna reclamación sobre la cual se pudiera conceder una reparación [Proc. Cont. Núm. 17-00159, ECF Núm. 156]. Ambac presentó una apelación ante el Primer Circuito, que se registró como Caso Núm. 18-1214. El 24 de junio de 2019, el Primer Circuito emitió una opinión y una orden que confirma la decisión del Tribunal del Título III, con el argumento de que, conforme a las secciones 106(e) y 305 de PROMESA, el Tribunal del Título III carece de autoridad para conceder el remedio declaratorio e interdictal solicitado por Ambac. El 23 de septiembre de 2019, los Apelantes presentaron una petición de certiorari, que se registró como Caso Núm. 19-387. El 13 de enero de 2020, una vez concluidas las presentaciones de información, la Corte Suprema denegó la petición.

d)   ***Peaje Investment, LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico y otros*, Proc. Cont. Núm. 17-00151; 17-00152**

El 31 de mayo de 2017, Peaje Investment, LLC ("Peaje"), un tenedor de más de $64 millones en bonos 1968 emitidos por ACT, interpuso una acción para remedio declaratorio e interdictal con respecto a (i) la validez de su gravamen y (ii) el uso supuestamente indebido de los ingresos de peaje por parte de ACT para financiar otras obligaciones de deuda. Peaje alegó que los ingresos de peaje de ACT depositados en BNYM habían sido desviados de forma ilícita por ACT para pagar otras obligaciones de deuda u otros gastos desde mayo de 2016, dejando la cuenta de los tenedores de bonos prácticamente vacía. Además, el Demandante alegó que tiene un derecho legal de retención preferencial sobre los ingresos de peaje. Según Peaje, este presunto gravamen establecido por ley protege los "ingresos especiales pignorados" sobre los

bonos de las restricciones aplicadas a la paralización en virtud de ciertas disposiciones del Código de Quiebras. En consecuencia, Peaje solicitó una sentencia que ordenara a los Demandados que reanudaran el depósito de los ingresos de peaje en BNYM como agente fiscal. Además, el Demandante afirmó que la desviación ilícita de los ingresos de peaje para pagar los "gastos operativos necesarios" de ACT viola la Cláusula sobre Expropiaciones en virtud de la Quinta Enmienda de la Constitución de los Estados Unidos. De forma alternativa, el Demandante argumentó que sus gravámenes preferenciales solo pueden estar subordinados a gastos para preservar un "proyecto o sistema" que genere una garantía específica que asegure los bonos. Peaje también presentó una moción para una orden de restricción temporal e interdicto preliminar para (i) que se prohíba a ACT seguir recaudando los ingresos de peaje para otros fines que no sean el pago de bonos, y (ii) solicitar protección adecuada para sus presuntas garantías [Proc. Cont. Núm. 17-00151, ECF Núm. 2; Proc. Cont. Núm. 17-00152, ECF Núm. 2].

Los argumentos del Demandante en su moción para solicitar interdictos preliminares y permanentes fueron objeto de una vista probatoria completa. El Tribunal del Título III emitió una decisión que denegó la petición de interdictos del Demandante basándose en que Peaje no había demostrado que (1) tiene un gravamen establecido por ley válido y (2) sufriría un daño irreparable sin un interdicto [Proc. Cont. Núm. 17-00151, ECF Núm. 240; Proc. Cont. Núm. 17-00152, ECF Núm. 228]. Además, la decisión concluía que, incluso si se hubiera llegado a la conclusión de que el gravamen era válido, el testimonio pericial había demostrado que Peaje disponía de la protección adecuada. Inmediatamente después de la decisión, el Demandante presentó una notificación de apelación ante el Primer Circuito, que se registró como Caso Núm. 17-2165; 17-2166. El 8 de agosto de 2018, el Primer Circuito emitió una decisión que ratificó la conclusión del Tribunal del Título III con respecto a la ausencia de un gravamen establecido por ley.

Poco después de la radicación de la notificación de apelación ante el Primer Circuito, Peaje presentó reclamaciones enmendadas en las acciones de Título III que solicitan una declaración de que su gravamen es válido y perfeccionado y un interdicto para garantizar que ACT reanude el depósito de los ingresos de peaje [Proc. Cont. Núm. 17-00151, ECF Núm. 246; Proc. Cont. Núm. 17-00152, ECF Núm. 234]. Esta vez, Peaje incluye referencias a los estados financieros de CANA para probar el perfeccionamiento, Peaje también amplió la afirmación contenida en su demanda original acerca de que está exenta de cualquier paralización. En la demanda enmendada, declaró que no está sujeta a las diversas medidas de emergencia adoptadas por el ELA y que no está obligada por PROMESA y la certificación del plan fiscal, que permite que el gobierno asigne fondos para saldar las obligaciones generales de deuda. La demanda enmendada de Peaje también contenía numerosas reclamaciones similares al procedimiento contencioso de *Ambac* que se describe anteriormente.

La Junta de Supervisión presentó una contestación a la demanda enmendada y rechazó los hechos en que se funda la demanda [Proc. Cont. Núm. 17-00151, ECF Núm. 256; Proc. Cont. Núm. 17-00152, ECF Núm. 242]. ACT también opuso varias defensas afirmativas contra la demanda enmendada. ACT argumentó, entre otras cosas, que los estados financieros de CANA no llevan el nombre correcto del Deudor, lo que hace que sean insuficientes para perfeccionar un derecho de garantía como cuestión de derecho. Los Demandados también cuestionaron la afirmación de Peaje acerca de que el Tribunal del Título III podría resolver ciertas reclamaciones, con el argumento de que el Tribunal del Título III carece de jurisdicción sobre la materia en virtud de las disposiciones de PROMESA que prohíben que el Tribunal del Título III revise las certificaciones del plan fiscal e impide que interfiera con los poderes políticos y gubernamentales del deudor, cualquiera de sus propiedades o ingresos, o el uso y goce por parte del deudor de cualquier bien que genere ingresos. Además, ACT afirmó que la reclamación con respecto a la Cláusula sobre Expropiaciones del Demandante no es viable porque el Demandante no posee ningún derecho sobre la propiedad "reconocible".

El 26 de octubre de 2018, Peaje presentó una petición de *certiorari* con respecto a la denegación de su reclamación a un derecho legal de retención ante la Corte Suprema de Estados Unidos, que se registró como Caso Núm. 18-560 el 30 de octubre de 2018. El 19 de febrero de 2019, la Corte Suprema de Estados Unidos denegó la petición de *certiorari*.

El 16 de diciembre de 2019, las partes presentaron un informe de estado conjunto donde se informa al Tribunal del Título III que (i) Assured y Ambac presentaron peticiones de *certiorari* ante la Corte Suprema de Estados Unidos que fueron distribuidas para conferencia el 10 de enero de 2020, y (ii) la Corte Suprema de Estados Unidos atendió los argumentos orales en los casos sobre la Cláusula de Designaciones el 15 de octubre de 2019. La Corte Suprema de Estados Unidos posteriormente denegó ambas peticiones. El 14 de febrero de 2020, las partes presentaron un informe de estado conjunto, señalando que la Junta de Supervisión había presentado demandas que objetan las evidencias de reclamaciones radicadas por Peaje contra el ELA y ACT [Proc. Cont. Núm. 17-00151, ECF Núm. 298; Proc. Cont. Núm. 17-00152, ECF Núm. 286]. El 20 de abril 2020, las partes presentaron un informe de estado conjunto, donde se indica que pronto se iniciaría el trámite de sentencia sumaria en el procedimiento contencioso sobre los Bonos de Ingresos de ACT y ELA, en el cual Peaje es parte. El 20 de julio de 2020, las partes presentaron un informe de estado conjunto, donde se indica que la Corte Suprema de Estados Unidos ha resuelto el litigio sobre la Cláusula de Designaciones a favor de la Junta de Supervisión, y que la presentación de escritos sobre el procedimiento contencioso entre el ELA y ACT estaba en curso [Proc. Cont. Núm. 17-00151, ECF Núm. 303; Proc. Cont. Núm. 17-00152, ECF Núm. 291]. El 19 de febrero de 2021, las partes presentaron un informe de estado conjunto, donde se determina que la presentación de pruebas en el procedimiento contencioso sobre Bonos de Ingresos del ELA y ACT estaba en curso, y la apelación al rechazo por parte del Tribunal del Título III de la Moción de levantamiento de la paralización de AFI y la Moción de levantamiento de la paralización de ACT había sido presentada ante el Tribunal del Primer Circuito [Proc. Cont. Núm. 17-00151, ECF Núm. 314; Proc. Cont. Núm. 17-00152, ECF Núm. 302].

e)       ***Cooperativa de Ahorro y Crédito Abraham Rosa y otros c. el Estado Libre Asociado de Puerto Rico y otros***, **Proc. Cont. Núm. 18-00028**

El 22 de marzo de 2018, varias cooperativas de crédito constituidas bajo la ley de Puerto Rico presentaron una demanda contenciosa contra el ELA, la Junta de Supervisión y sus miembros y otras instrumentalidades del ELA (entre ellas COFINA, ACT, SRE, AEE y BGF), con el fin de obtener una sentencias declaratorias que determinen que sus títulos de deuda de Puerto Rico no son liquidables y se solicita una indemnización monetaria por supuesto fraude en relación con la compra por parte de las cooperativas de crédito locales de instrumentos de deuda de Puerto Rico. El 6 de agosto de 2018, la Junta de Supervisión, en nombre propio y como representante de los Deudores, solicitó la desestimación de la demanda [Proc. Cont. Núm. 18-00028, ECF Núm. 29]. También el 6 de agosto de 2018, BGF presentó una moción de desestimación por separado [Proc. Cont. Núm. 18-00028, ECF Núm. 32]. Además, varias partes presentaron acumulaciones contra las mociones de desestimación o se les concedió licencia del Tribunal del Título III para presentar acumulaciones.

El 16 de abril de 2019, los Demandantes presentaron una demanda enmendada, que eliminó las reclamaciones basadas en leyes de títulos valores y agregó reclamaciones por fraude, negligencia, declaración fraudulenta, violación de la Ley de Crimen Organizado de Puerto Rico y de la Cláusula sobre Expropiaciones de las Constituciones de Estados Unidos y del ELA [Proc. Cont. Núm. 18-00028, ECF Núm. 79].

El 5 de febrero de 2019, el Tribunal del Título III presentó una Orden de Ratificación que ratifica el Tercer Plan de Ajuste Enmendado de COFINA [Caso Núm. 17-bk-3284, ECF Núm. 561]. El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado de COFINA se perfeccionó sustancialmente y entró

en vigencia. Conforme al párrafo 30 de la Orden de Confirmación Enmendada, "los demandantes en ese determinado procedimiento contencioso ante el Tribunal del Título III, caratulado *Cooperativa de Ahorro y Crédito Abraham Rosa y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Caso Núm. 18-00028, tendrán derecho a proseguir el litigio contra todas las partes salvo COFINA y COFINA Reorganizada, con sujeción a todos los derechos y defensas con respecto a las reclamaciones y causas de acción declaradas en él".

El 22 de julio de 2019, los Demandados presentaron mociones para desestimar la demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 88, 91-94, 97]. El 6 de diciembre de 2019, los Demandantes presentaron una moción de autorización para presentar una segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 116]. Se presentaron todos los escritos para la moción, y el 14 de abril de 2020, el Tribunal del Título III dictó una orden que concedió la moción de permiso de los Demandantes para presentar y establecer un cronograma de presentación de escritos [Proc. Cont. Núm. 18-00028 ECF Núm. 125].

El 16 de abril de 2020, los Demandantes presentaron su segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 126]. También el 16 de abril de 2020, el Tribunal del Título III desestimó sin prejuicio las mociones de la Junta de Supervisión, el BGF y el ARD del BGF y las acumulaciones de CANA, AAFAF y COSSEC a las mociones para desestimar la primera demanda enmendada. [Proc. Cont. Núm. 18-00028, ECF Núm. 127]. El 20 de abril de 2020, conforme al cronograma de presentación de escritos del Tribunal del Título III, la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 128], BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 129], y las Partes de la ARD [Proc. Cont. Núm. 18-00028, ECF Núm. 130] volvieron a presentar sus mociones para desestimar la primera demanda enmendada como mociones para desestimar la segunda demanda enmendada. También el 20 de abril, COSSEC [Proc. Cont. Núm. 18-00028, ECF Núm. 131], y las Partes de CANA [Proc. Cont. Núm. 18-00028, ECF Núm. 132] presentaron acumulaciones a la moción de desestimación de la Junta de Supervisión. El 24 de abril, AAFAF presentó una acumulación a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 138].

El 11 de mayo de 2020, la Juez Swain dictó una orden por la que remitía las mociones de desestimación de la segunda demanda enmendada a la juez federal Dein para un informe y recomendación [Proc. Cont. Núm. 18-00028 ECF Núm. 142]. El 21 de mayo de 2020, la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 143], BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 145], y las Partes del ARD [Proc. Cont. Núm. 18-00028; ECF Núm. 146] presentaron escritos complementarios en respaldo de sus mociones de desestimación. El AAFAF presentó una acumulación a los escritos de la Junta de Supervisión y el BGF [Proc. Cont. Núm. 18-00028 ECF Núm. 147]. El 22 de mayo de 2020, COSSEC presentó una acumulación a las mociones de desestimación de la Junta de Supervisión y el BGF [Proc. Cont. Núm. 18-00028 ECF Núm. 148]. También el 22 de mayo, CANA presentó una acumulación limitada a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00028 ECF Núm. 151]. El 11 de agosto de 2020, los Demandantes presentaron una oposición a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 166-1]. El 11 de agosto de 2020, los Demandantes presentaron oposiciones a las mociones de desestimación del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 167], y el ARD del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 168], de AAFAF [Proc. Cont. Núm. 18-00028, ECF Núm. 169], y COSSEC [Proc. Cont. Núm. 18-00028, ECF Núm. 170]. El 20 de octubre de 2020, los Demandantes presentaron una respuesta en apoyo de las mociones para desestimar la segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 178]. El BGF- GDRA también presentó una respuesta en apoyo de su moción para desestimar la segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 179]. AAFAF y el BGF presentaron una contestación en apoyo a su moción de desestimación [Proc. Cont. Núm.

18-00028, ECF Núm. 180]. COSSEC presentó una contestación en apoyo a su moción de desestimación [Proc. Cont. Núm. 18-00028, ECF Núm. 181]. El 5 de marzo de 2021, el ARD del BGF presentaron una moción informativa para presentar fundamentos adicionales en relación con su contestación [Proc. Cont. Núm. 18-00028, ECF Núm. 186]. El 17 de marzo de 2021, los Demandantes presentaron un escrito de oposición a la moción informativa del ARD del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 187].

f) ***Puerto Rico BAN (VL) LLC, y otros, c. Estados Unidos de Norteamérica*, Caso Núm. 19-482C**

El 1 de abril de 2019, ciertos tenedores de BAN de la AFI (los "Tenedores de BAN de la AFI") presentaron una demanda [Caso Núm. 19-482C, ECF Núm. 1] ante el Tribunal de Reclamaciones Federales de Estados Unidos contra el gobierno de Estados Unidos por supuestas violaciones a la Cláusula sobre Expropiaciones. Según los Tenedores de BAN de la AFI, el gobierno de Estados Unidos, actuando a través de la Junta de Supervisión, "planificó, dirigió e implementó acciones legislativas" que reasignaban fondos de AFI, lo que significaba una expropiación de la propiedad de los Tenedores de BAN de la AFI. Los Tenedores de BAN de la AFI piden una compensación justa por la supuesta expropiación.

El 29 de julio de 2019, el gobierno de Estados Unidos presentó una moción de desestimación [Caso Núm. 19-482C, ECF Núm. 12] donde se sostenía que (i) el Tribunal de Reclamaciones Federales de Estados Unidos carece de jurisdicción sobre la reclamación; (ii) AFI había incumplido los BAN incluso antes de que la Junta de Supervisión, la entidad supuestamente responsable de expropiar la propiedad de los Tenedores de BAN de la AFI, existiera, de manera tal que no existía expropiación, y (iii) el hecho de que se haya frustrado una expectativa contractual no resulta suficiente para establecer que hubo una expropiación. Conforme a la orden que concedió la más reciente moción de prórroga de los Tenedores de BAN de la AFI, su respuesta a la moción de desestimación debe recibirse el 24 de mayo de 2021 [Caso Núm. 19-482C, ECF Núm. 37].

3. **Litigios sindicales**

a) ***Federación Americana de Empleados Estatales, del Condado y Municipales c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. Cont. Núm. 17-00242; 17-00243**

El 22 de agosto de 2017, AFSCME, un representante para los asuntos de negociación colectiva para ciertos empleados del ELA, presentaron dos demandas idénticas donde se argumentaba que la Junta de Supervisión violaba PROMESA al adoptar e implementar enmiendas a un Plan Fiscal propuesto por el Gobernador que la Junta de Supervisión ya había aprobado. El Demandante alegó que las enmiendas al Plan Fiscal violaban la Cláusula sobre Expropiaciones de la Constitución de Estados Unidos y las Cláusulas sobre Expropiaciones y Debido Proceso de la Constitución del ELA supuestamente por expropiar los balances de las cuentas de retiro individual de los empleados. El Demandante también alegó violaciones de la sección 201 de PROMESA, que delinea los requisitos para la aprobación de los Planes Fiscales y la sección 203, que describe las facultades de la Junta de Supervisión en caso de que descubra incumplimiento del presupuesto, incumplimiento del deber fiduciario y enriquecimiento injusto.

Antes de que los Demandados contestaran, AFSCME presentó una moción para paralizar los procedimientos, y el Tribunal del Título III paralizó ambos casos el 23 de octubre de 2017 [Proc. Cont. Núm. 17-00242, ECF Núm. 32; Proc. Cont. Núm. 17-00243, ECF Núm. 21]. El 13 de diciembre de 2018, en Proc. Cont. Núm. 17- 00242, AFSCME presentó una notificación de desestimación y, el 14 de diciembre de 2018, el Tribunal del Título III dictó una sentencia sin perjuicio [Proc. Cont. Núm. 17-00242, ECF Núm.

41]. El 3 de abril de 2019, AFSCME presentó una moción de desestimación, Proc. Cont. Núm. 17-00243 sin perjuicio. El Tribunal del Título III dictó una orden de desestimación del caso sin perjuicio el 5 de abril de 2019 [Proc. Cont. Núm. 17-00242, ECF Núm. 31].

b) ***Hermandad de Empleados del Fondo del Seguro del Estado, Inc. y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 18-00091**

El 25 de julio de 2018, dos sindicatos, (i) Hermandad de Empleados del Fondo del Seguro del Estado, Inc., también denominado Unión de Empleados de la Corporación del Fondo del Seguro del Estado ("UECFSE"), un sindicato de empleados de la CFSE y (ii) Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. ("UMCFSE"), un sindicato de médicos que son responsables de brindar servicios médicos a los trabajadores lesionados, presentaron una acción contra el ELA, la Junta de Supervisión y el proveedor exclusivo de cobertura de seguros relacionada con el trabajo, Corporación de Fondos de Seguro del Estado ("CFSE"). Los Demandantes, que participaron en el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y que se autodescriben como acreedores del ELA, solicitan reparación al declarar que (i) CFSE es un servicio público esencial protegido; (ii) diversas legislaciones relacionadas con la reforma laboral (Leyes 66-2014, 3-2017, 8-2017, y 26-2017) violan la Cláusula sobre Contratos de la Constitución de Estados Unidos y el derecho a la negociación colectiva de la Constitución del ELA; y (iii) el Plan Fiscal de junio de 2018 es inconstitucional y solicitan que la Junta de Supervisión presente un plan de ajuste hasta que el Plan Fiscal de junio de 2018 cumpla con PROMESA, la Constitución de Estados Unidos y la Constitución del ELA.

El 3 de agosto de 2018, el Tribunal del Título III presentó una orden [Proc. Cont. Núm. 18-00091, ECF Núm. 10] que aplaza la fecha límite de los Demandados para responder hasta después de que se resuelva la moción de desestimación pendiente en *UTIER c. Autoridad de Energía Eléctrica de Puerto Rico*, Proc. Cont. Núm. 17-00229, donde otro sindicato (UTIER) declaró violaciones similares de la Cláusula de Contratos sobre la base de las mismas leyes de reforma laboral. Esta otra moción se resolvió el 26 de septiembre de 2018, cuando el Tribunal del Título III concedió parcialmente las mociones de desestimación de los Demandados de *UTIER* [Proc. Cont. Núm. 17-00229, ECF Núm. 62]. Los Demandados, tanto la Junta de Supervisión como los Funcionarios del Gobierno (Rosselló Nevares y otros) presentaron una moción de desestimación de la demanda del UECFSE el 25 de enero de 2019, basándose en los principios constitucionales y en la opinión del Tribunal del Título III en el caso *UTIER*, Proc. Cont. Núm. 17-00229 [Proc. Proc. Cont. Núm. 18-00091, ECF Núm. 22, 25]. Los Demandantes presentaron su oposición ómnibus el 7 de marzo de 2019 [Proc. Cont. Núm. 18-00091, ECF Núm. 31]. La Junta de Supervisión y los Funcionarios del Gobierno presentaron ambos sus contestaciones el 5 de abril de 2019 [Proc. Cont. Núm. 18-00091, ECF Núm. 36-37]. El 27 de septiembre de 2019, el Tribunal del Título III dictó una orden que concedía las mociones de desestimación de los Demandados por falta de jurisdicción en la materia y por falta de establecimiento de una reclamación [Proc. Cont. Núm. 18-00091, ECF Núm. 39].

El 4 de octubre de 2019, los Demandantes presentaron una apelación ante el Primer Circuito, que se registró como Caso Núm. 19-2028. Los apelantes presentaron su escrito inicial el 17 de diciembre de 2019. Las partes contrarias a la apelación presentaron su escrito de contestación el 18 de febrero de 2020, y el Director Ejecutivo de AAFAF presentó una acumulación para esta el 19 de febrero de 2020. El 17 de marzo de 2020, la Corporación de Fondos de Seguro del Estado ("CFSE") presentó una acumulación al escrito de contestación de las partes contrarias a la apelación. El 27 de mayo de 2020, las partes contrarias a la apelación presentaron una carta para presentar fundamentos adicionales. El 3 de junio de 2020, UECFSE presentó una contestación a la carta de las partes contrarias a la apelación. Se presentaron los argumentos del caso el 27 de julio de 2020.

El 28 de octubre de 2020, el Primer Circuito emitió una opinión y una sentencia que ratifican la orden del Tribunal del Título III. El Tribunal determinó en primer lugar que la petición de interdictos con respecto a ciertas leyes impugnadas no era irrelevante y que los Apelantes tenían legitimidad porque sus reclamaciones se limitaban a daños, mientras que las leyes impugnadas estaban en vigencia. A continuación, el Tribunal rechazó las reclamaciones de los Apelantes sobre la Cláusula de Contratos porque los Apelantes no habían presentado hechos suficientes para establecer que las leyes impugnadas no eran razonables o necesarias para servir a un interés de importancia. Finalmente, el Tribunal sostuvo que las reclamaciones de los Apelantes conforme a la Cláusula de Negociaciones Colectivas de la Constitución del ELA tenían limitaciones temporales porque las reclamaciones habían devengado en el momento de la promulgación de las leyes y no eran violaciones en curso. El 11 de noviembre de 2020, los Apelantes presentaron una petición de nueva vista en sesión plenaria ("*en banc*"). El 11 de diciembre de 2020, el Primer Circuito emitió una orden denegando la petición de los Apelantes. El 18 de diciembre de 2020, el Primer Circuito dictó su mandato. El 16 de abril de 2021, los Apelantes presentaron una petición de certiorari, que quedó registrada como Caso Núm. 20-1466 a la Corte Suprema de EE.UU.

c)   *Unión de Empleados de la Corporación del Fondo del Seguro del Estado c. el Gobierno de los Estados Unidos de Norteamérica y otros*, Proc. Cont. Núm. 18-00066

El 30 de mayo de 2018, UECFSE, UMCFSE y dos miembros del sindicato presentaron una acción contra los Estados Unidos, el Gobernador, el ELA y la Junta de Supervisión. En su segunda demanda enmendada, radicada el 5 de octubre de 2018, los Demandantes alegaron que PROMESA viola la Constitución de Estados Unidos y diversos tratados y cartas. Las reclamaciones de los Demandantes se basan principalmente en sus puntos de vista sobre los *Casos Insulares*, que le otorgaron a los Estados Unidos autoridad unilateral sobre sus territorios, y el supuesto tratamiento de Estados Unidos hacia Puerto Rico como una colonia. Los Demandantes procuran obtener sentencias declaratorias que determinen que (i) PROMESA viola la Primera, Quinta, Decimotercera, Decimocuarta y Decimoquinta Enmiendas; y (ii) los actos de la Junta de Supervisión hasta la fecha son inconstitucionales y nulos. Los Demandantes también solicitan que el Tribunal del Título III (i) desestime el *Caso Insular*; (ii) prohíba a los Demandados actuar conforme a la autoridad concedida por PROMESA; e (iii) instruya al Congreso a descolonizar Puerto Rico.

El 19 de diciembre de 2018, la Junta de Supervisión y los Estados Unidos presentaron mociones de desestimación, con el argumento de que (i) los Demandantes carecen de legitimidad; (ii) las reclamaciones de los Demandantes con respecto a la descolonización de Puerto Rico y el derecho internacional exigen que se obtengan opiniones consultivas; (iii) los tratados internacionales no crean derechos judicialmente exigibles; (iv) los Demandantes no presentaron reclamaciones por las violaciones de la Primera, Quinta, Decimotercera, Decimocuarta y Decimoquinta Enmiendas; y (v) la solicitud de los Demandantes de que el Tribunal del Título III anule los *Casos Insulares* no establece una reclamación [Proc. Cont. Núm. 18-00066, ECF Núm. 46, 48].

El 1 de marzo de 2019, los Demandantes presentaron un escrito de oposición ómnibus que argumenta que (i) los Demandantes tienen legitimidad; y (ii) los Demandantes han hecho reclamaciones por violaciones de la Primera, Quinta, Decimotercera, Decimocuarta y Decimoquinta Enmiendas, y también por violaciones del derecho internacional [Proc. Cont. Núm. 18-00066, ECF Núm. 59]. El Gobierno de los Estados Unidos presentó su contestación en apoyo a su moción de desestimación el 5 de abril de 2019 [Proc. Cont. Núm. 18-00066, ECF Núm. 64]. La Junta de Supervisión presentó su contestación en apoyo a su moción de desestimación el 8 de abril de 2019 [Proc. Cont. Núm. 18-00066, ECF Núm. 65].

El 15 de noviembre de 2019, el Tribunal del Título III emitió una opinión y una orden que concede las mociones de los Demandados para desestimar la segunda demanda enmendada [Proc. Cont. Núm. 18-

00066, ECF Núm. 66]. El 26 de noviembre de 2019, los Demandantes presentaron una notificación de apelación ante el Primer Circuito, que se registró como Caso Núm. 19-2243. El 27 de enero de 2020, la Junta de Supervisión presentó una moción que señala que rechaza los argumentos con respecto a los méritos de la apelación presentados en la moción de los Apelantes. El 23 de marzo de 2020, los Apelantes presentaron su escrito inicial. El 4 de mayo de 2020, las partes contrarias a la apelación, la Junta de Supervisión y los Estados Unidos presentaron sus escritos de contestación. El 26 de mayo de 2020, los Solicitantes presentaron su escrito de contestación. El 3 de junio de 2020, los Estados Unidos presentaron una carta para presentar fundamentos adicionales. Se presentaron los argumentos del caso el 27 de julio de 2020. El 16 de abril de 2021, el Primer Circuito expidió una opinión y sentencia confirmando la orden del Tribunal del Título III desestimando la demanda de los Demandantes por falta de legitimación.

d) *Federación Americana de Maestros y otros c. el Estado Libre Asociado de Puerto Rico y otros, Proc. Cont. Núm. 18-00134*

El 15 de noviembre de 2018, dos sindicatos de trabajadores que representan a los empleados del Gobierno de Puerto Rico presentaron una acción contra el ELA, la Junta de Retiro del Gobierno de Puerto Rico, AAFAF y sus respectivos funcionarios. Los Sindicatos afirman haber sido agraviados porque (i) el ELA no ha implementado la transición a cuentas de retiro individual con contribución definida dentro del plazo supuestamente previsto por la Ley 106-2017 de Puerto Rico, que reestructuró el pago de pensiones; (ii) la Junta de Supervisión no lo obligó a hacerlo; y (iii) el Banco Popular de Puerto Rico se ha enriquecido porque las contribuciones de los empleados correspondientes se han mantenido en una cuenta del Banco Popular que genera poco o ningún interés. Basándose en estas acusaciones, los Demandantes solicitan (i) una reparación por la violación de la Ley 106 (contra todos los Demandados, excepto la Junta de Supervisión y el Banco Popular); (ii) una reparación por incumplimiento del deber fiduciario o instigación o complicidad en el incumplimiento del deber fiduciario (contra todos los Demandados); (iii) una reparación por enriquecimiento injusto (contra el ELA y el Banco Popular); y (iv) una contabilización (contra el ELA y el Banco Popular).

El 8 de enero de 2019, la Junta de Supervisión presentó una moción de desestimación [Proc. Cont. Núm. 18-00134, ECF Núm. 11]. Las partes presentaron varias mociones conjuntas para extender las fechas límite de las presentaciones para continuar con el debate con respecto a la implementación de la Ley 106, y el Tribunal del Titulo III concedió las mociones [Proc. Cont. Núm. 18-00134 Núm. 16, 18, 20, 22, 24]. El 29 de octubre de 2019, el Tribunal del Título III emitió una orden que instruye a las partes a presentar un informe de estado conjunto [Proc. Cont. Núm. 18-00134, ECF Núm. 25]. Ese mismo día, los Demandantes presentaron un informe de estado según el cual no hay necesidad inminente de continuar con el litigio porque aunque el ELA todavía tiene que implementar las cuentas de retiro individual que ordena la Ley 106, el ELA había tomado ciertas medidas preliminares necesarias para hacerlo [Proc. Cont. Núm. 18-00134, ECF Núm. 26].

El 24 de enero de 2020, las partes presentaron un informe conjunto sobre la situación en el que se indicaba que el ELA seguía tomando medidas para establecer las cuentas de retiro [Proc. Cont. Núm. 18-00134, ECF Núm. 31]. El 1 de mayo de 2020, las partes presentaron un nuevo informe conjunto sobre la situación. La juez Dein dictó una orden que ordena a las partes que presenten un nuevo informe conjunto sobre la situación el 15 de julio de 2020 [Proc. Cont. Núm. 18-00134, ECF Núm. 35]. El 24 de junio de 2020, la AAFAF presentó un informe de estado sobre los avances en la aplicación del plan de aportaciones definidas de la Ley 106 [Proc. Cont. Núm. 18-00134, ECF Núm. 36]. El 15 de julio de 2020, las partes presentaron una moción para aplazar todas las fechas límites y fechas de respuesta hasta el 28 de agosto de 2020 [Proc. Cont. Núm. 18-00134, ECF Núm. 38]. El 25 de agosto de 2020, los Demandantes presentaron una notificación de desestimación voluntaria de la acción [Proc. Cont. Núm. 18-00134, ECF Núm. 40]. El

11 de septiembre de 2020, el Tribunal del Título III dictó una orden de desestimación del caso sin perjuicio [Proc. Cont. Núm. 18-00134, ECF Núm. 41].

  e)  ***Asociación de Profesoras y Profesores del Recinto c. el Estado Libre Asociado de Puerto Rico y otros,* Proc. Cont. Núm. 17-00197**

  El 9 de julio de 2017, la Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. ("APRUM"), una organización de docentes de la Universidad de Puerto Rico ("UPR"), presentó una demanda contra el ELA, la Junta de Supervisión, el Gobernador, Gerardo Portela Franco, el Sr. Raúl Maldonado Gautier, José Iván Marrero Rosado y Natalie A. Jaresko. Se presentó una segunda demanda enmendada el 11 de mayo de 2018 [Proc. Cont. Núm. 17-00197, ECF Núm. 57]. La APRUM alegó que el ELA y los planes fiscales y presupuestos de la UPR no cumplían los requisitos de la sección 201 de PROMESA, que delinea los requisitos para la aprobación de Planes Fiscales porque redujeron los subsidios presupuestados del ELA a la UPR. El Demandante alegó que las asignaciones para la UPR eran más bajas que las establecidas anteriormente por la Ley 3-2017 de Puerto Rico, que se aprobó para adaptar el marco jurídico y legal para que se cumpla el Plan Fiscal, y que si no se promulgan nuevas leyes, dicha reducción era "ilegal".

  El 2 de julio de 2018, los Demandados presentaron su moción de desestimación de la segunda demanda enmendada [Proc. Cont. Núm. 17-00197, ECF Núm. 63]. Los Demandados argumentaron que (i) el Tribunal del Título III carece de jurisdicción sobre la materia porque las reclamaciones no surgieron en virtud del Título III; (ii) el Tribunal del Título III carece de jurisdicción sobre la materia para revisar los planes fiscales certificados y presupuestos en virtud de la sección 106(e), que impide que los tribunales de distrito de EE.UU. revisen las impugnaciones a las determinaciones de certificación tomadas por la Junta de Supervisión; (iii) el Demandante carece de legitimidad constitucional o prudencial y no es parte interesada en virtud de la sección 1109 del Código de Quiebras; (iv) PROMESA prohíbe que el Tribunal del Título III interfiera con las decisiones del ELA con respecto al uso de sus bienes e ingresos; y (v) las secciones 4 y 108 de PROMESA, que incluyen definiciones y garantizan la autonomía de la Junta de Supervisión, establecen que PROMESA, y la certificación de planes fiscales y presupuestos en virtud de esta, prevalecen sobre cualquier ley territorial incompatible e impiden la ejecución de cualquier ley que perjudicaría o frustraría el propósito del Título III.

  El 27 de julio de 2018, la APRUM presentó una moción urgente para dejar en suspenso el procedimiento contencioso y para enmendar el calendario de presentaciones, para que la APRUM pueda evaluar cómo o bajo que condición continuar con esta acción [Proc. Cont. Núm. 17-00197, ECF Núm. 69]. La magistrada Dein dictó una orden que concede la moción de la APRUM [Proc. Cont. Núm. 17-00197, ECF Núm. 71].

  El 21 de agosto de 2018, la APRUM presentó una moción de desestimación voluntaria de la demanda enmendada, y el Tribunal del Título III se la concedió [Proc. Cont. Núm. 17-00197, ECF Núm. 74].

  f)  ***Asociación Puertorriqueña de Profesores Universitarios y otros c. la Universidad de Puerto Rico y otros*, Proc. Cont. Núm. 19-00034**

  El 16 de abril de 2019, Asociación Puertorriqueña, una organización de profesores activos y retirados de la UPR, y varios beneficiarios del plan de retiro de la UPR presentaron una demanda contra la UPR, su junta de gobierno, los miembros de la junta de gobierno, el presidente de la universidad y la Junta de Supervisión. La demanda solicitaba, entre otras cosas, remedio declarativo e interdictal que establezcan que los actos de supervisión de la Junta de Supervisión en relación con el Sistema de Retiro son "nulos",

supuestamente porque el sistema de retiro de la UPR es un fideicomiso que no es una instrumentalidad cubierta y está fuera de la competencia de la Junta de Supervisión, y que la Junta de Gobierno de la UPR no puede cumplir los planes fiscales y presupuestos de la Junta de Supervisión que afectan el sistema de retiro. La demanda también solicitó (i) una orden que instruya a la Junta de Gobierno a cumplir ciertos requisitos de financiamiento para el sistema de retiro y la UPR, (ii) una orden que instruya a la UPR a pagar los supuestos daños relacionados con los bienes del fideicomiso al sistema de retiro, (iii) órdenes que eliminen a la Junta de Gobierno de la UPR como síndico del sistema de retiro y lo reemplacen por la junta del sistema de retiro.

Los Demandantes presentaron una demanda enmendada el 10 de julio de 2019, que incluía la denuncia adicional de que la Junta de Supervisión indujo a la Junta de Gobierno a incumplir su deber fiduciario con el sistema de retiro [Proc. Cont. Núm. 19-00034, ECF Núm. 13]. La demanda enmendada también agregó una petición de reparación adicional solicitando indemnización por daños y perjuicios. El 23 de agosto de 2019, la Junta de Supervisión y la UPR presentaron mociones para desestimar la demanda enmendada [Proc. Cont. Núm. 19-00034, ECF Núm. 17, 18]. Se presentaron todos los escritos procesales para las mociones y, el 1 de noviembre de 2019, la magistrada Swain dictó una orden por la que remitía las mociones de desestimación a la magistrada Dein para un informe y recomendación [Proc. Cont. Núm. 19-00034, ECF Núm. 26].

El 10 de junio de 2020, la magistrada Dein emitió un informe y recomendación, permitiendo las mociones de los Demandados para desestimar por la falta de legitimación de los Demandantes y la falta de jurisdicción del Tribunal de Título III sobre la materia [Proc. Cont. Núm. 19-00034, ECF Núm. 27]. La magistrada Dein también se negó a ejercer la jurisdicción suplementaria sobre las reclamaciones de la ley estatal contra la UPR. El 24 de junio de 2020, los Demandantes presentaron una objeción al informe y las recomendaciones de la Magistrada Dein [Proc. Cont. Núm. 19-00034, ECF Núm. 28]. El 10 de julio de 2020, los Demandantes presentaron una moción de autorización para presentar una segunda demanda enmendada [Proc. Cont. Núm. 19-00034, ECF Núm. 32]. El 10 de agosto de 2020, la Junta de Supervisión y la UPR presentaron oposiciones a la objeción de los demandantes al informe y recomendación de la jueza Dein y a la moción de autorización para presentar una demanda enmendada [Proc. Cont. Núm. 19-00034, ECF Núm. 33, 34]. El 31 de agosto de 2020, los Demandantes presentaron una contestación a las oposiciones de los Demandados a la objeción de los Demandantes al informe y las recomendaciones de la Magistrada Dein [Proc. Cont. Núm. 19-00034, ECF Núm. 36].

4. **Litigio de Centros de Salud**

a) *Asociación de Salud Primaria de Puerto Rico y otros c. el Estado Libre Asociado de Puerto Rico y otros*, **Proc. Cont. Núm. 17-00227**

Antes del inicio del Caso de Título III del ELA, diversas corporaciones sin fines de lucro que proveen servicios integrales de atención primaria y preventiva de la salud en todo el ELA a pacientes que carecen de seguro de salud presentaron una acción ante el Tribunal de Primera Instancia de Puerto Rico, San Juan (el "Tribunal del ELA") contra el ELA y oficinas y funcionarios del ELA relacionados donde se solicitaba una indemnización pecuniaria por pagos suplementarios que el ELA debería haber realizado por servicios de Medicaid proporcionados por los Demandantes. El 2 de agosto de 2017, otros acreedores de los Demandantes llevaron la acción al Tribunal del Título III, afirmando que el Tribunal del Título III tiene jurisdicción en la acción porque surge "bajo", surge "en" o está "relacionada con" el Caso de Título III del ELA.

El 14 de noviembre de 2017, el Departamento de Justicia de Puerto Rico, en nombre del ELA, presentó una moción de abstención que solicita la remisión del caso al Tribunal de Primera Instancia de

Puerto Rico [Proc. Cont. Núm. 17-00227, ECF Núm. 29]. El 8 de diciembre de 2017, el Tribunal del Título III dictó una orden enmendada que remite el caso a la magistrada Dein para un informe y recomendaciones con respecto a la moción de abstención del ELA [Proc. Cont. Núm. 17-00227, ECF Núm. 43]. El 2 de abril de 2018, la Magistrada Dein recomendó que el Tribunal del Título III remitiera el procedimiento contencioso al Tribunal de Primera Instancia de Puerto Rico [Proc. Cont. Núm. 17-00227, ECF Núm. 55]. Los Demandantes presentaron una objeción al informe y las recomendaciones de la Magistrada Dein [Proc. Cont. Núm. 17-00227, ECF Núm. 58, 60]. El 10 de julio de 2018, el Tribunal del Título III desestimó estas objeciones y adoptó el informe y recomendación de la magistrada Dein de abstenerse del procedimiento [Proc. Cont. Núm. 17-00227, ECF Núm. 64]. El 16 de febrero de 2019, los Demandantes presentaron una apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. La apelación se registró como Caso Núm. 19-1189. El ELA presentó una moción de desestimación de la apelación por carecer de jurisdicción el 23 de septiembre de 2019. El 3 de octubre de 2019, los Apelantes presentaron una oposición a la moción de desestimación de la apelación. El 8 de octubre de 2019, el ELA presentó su contestación en apoyo a su moción de desestimación de la apelación. El 28 de octubre de 2019, los Apelantes presentaron su escrito inicial sobre la apelación. La parte contraria a la apelación presentó su escrito de contestación el 16 de diciembre de 2019. El escrito de réplica con respecto a la apelación de los Apelantes debía presentarse el 3 de enero de 2020, pero los Apelantes no presentaron ninguno. El 1 de abril de 2020, el Primer Circuito dictó una sentencia desestimando la apelación por no ser el foro competente. El 22 de abril de 2020, el Primer Circuito dictó su mandato.

b)   ***Atlantic Medical Center, Inc. y otros c. el Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 17-00278**

El 17 de noviembre de 2017, diversas entidades sanitarias sin fines de lucro (los "Demandantes de Atlantic Medical") presentaron una demanda donde se solicitaban sentencias declaratorias que determinaran que sus reclamaciones por pagos de servicios de Medicaid adeudados por el ELA no se pueden ver relevados o afectados en un caso de Título III porque PROMESA exige que el ELA satisfaga cualquier obligación en virtud de los programas federales de subsidios.

Los Demandantes solicitan una sentencia declaratoria que determine que sus reclamaciones por todos los pagos suplementarios por servicios de Medicaid adeudados por el ELA desde el año 1997, y que son objeto del Procedimiento contencioso Núm. 17-00227 (LTS) no son liquidables en virtud de PROMESA y no se ven afectados por el caso de Título III del ELA. Los Demandantes se basan en la sección 7 de PROMESA (48 U.S.C. § 2016), que establece que "no podrá interpretarse que PROMESA impide, o en forma alguna, releva al gobierno territorial de cumplir las leyes o requisitos federales o leyes territoriales y requisitos que implementan un programa autorizado por el gobierno federal o delegado por este, para la protección de la salud, la seguridad, y el medio ambiente de las personas de dicho territorio", la sección 204(d) de PROMESA, que prohíbe a la Junta de Supervisión tomar medidas que interfieran con la capacidad del Estado para cumplir con los programas federales, y la sección 304(h) de PROMESA, que impide la exoneración de las obligaciones emergentes de la política federal o las leyes reglamentarias, entre ellas aquellas relacionadas con la seguridad pública.

El 2 de febrero de 2018, el Tribunal del Título III dictó una orden [Proc. Cont. Núm. 17-00278, ECF Núm. 25] que unifica este caso con un procedimiento contencioso por separado que solicita la misma reparación, presentado por Corporación de Servicios Integrales de Salud del área de Barranquitas, Comerio, Corozal, Naranjito y Orocovis ("CST"). *Consulte Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerio, Corozal, Naranjito y Orocovis c. el Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 17-00292   La orden de consolidación especifica que todas las mociones se deben presentar bajo Atlantic Medical Center, que es el caso principal.

El ELA presentó una moción de desestimación de las reclamaciones consolidadas el 22 de febrero de 2018, con el argumento de que las reclamaciones se habían presentado en una etapa demasiado temprana, dado que exigen que el Tribunal del Título III determine el grado de condonación de ciertas deudas pero todavía no se había propuesto un plan de ajuste [Proc. Cont. Núm. 17-00278, ECF Núm. 26].

El 7 de agosto de 2018, la magistrada Dein publicó un informe y una recomendación sobre la moción de desestimación del ELA que recomendaba que se concediera la moción de desestimación y que ambas demandas fueran desestimadas sin perjuicio por haberse presentado en una etapa demasiado temprana [Proc. Cont. Núm. 17-00278, ECF Núm. 57]. El 27 de noviembre de 2018, el Tribunal del Título III dictó una orden que desestima las objeciones y adopta el informe y la recomendación [Proc. Cont. Núm. 17-00278, ECF Núm. 66].

El 10 de diciembre de 2018, los Demandantes de Atlantic Medical presentaron una notificación de apelación ante el Primer Circuito que se registró como Caso Núm. 18-2228. El 13 de diciembre de 2018, CSI presentó una notificación de apelación ante el Primer Circuito, que se registró como Caso Núm. 19-1202, donde se apela la Orden que invalidaba las objeciones y adoptaba el informe y recomendación y la sentencia que desestimaba el caso subyacente. El 6 de marzo de 2019, este caso se unificó con la apelación que habían presentado los Demandantes de Atlantic Medical (Caso Núm. 18-2228).

Los Demandantes de Atlantic Medical, como apelantes, presentaron su escrito inicial el 18 de abril de 2019, y CSI presentó su escrito inicial el 10 de mayo de 2019. El ELA, como parte contraria a la apelación, presentó su escrito de contestación unificado el 11 de julio de 2019. Los Demandantes de Atlantic Medical presentaron su escrito de contestación el 5 de agosto de 2019 y CSI presentó su escrito de contestación el 13 de agosto de 2019. El 4 de marzo de 2020, a petición del Tribunal, las partes presentaron escritos complementarios sobre el efecto que el plan de ajuste propuesto por el ELA tenía sobre el estado de las demandas unificadas. El caso se argumentó en el Primer Circuito el 6 de marzo de 2020. El 23 de marzo de 2020, el Primer Circuito emitió una opinión y una sentencia en la que devolvía el caso al Tribunal del Título III para que reconsiderara la cuestión del estado a la luz de la presentación del plan de ajuste propuesto. El 13 de mayo de 2020, el Primer Circuito dictó su mandato.

Tras la presentación por las partes de un informe de situación conjunto el 1 de junio de 2020 [Proc. Cont. Núm. 17-00278, ECF Núm. 79], el Tribunal del Título III emitió una orden el 5 de junio de 2020 [Proc. Cont. Núm. 17-00278, ECF Núm. 80] en el que se establece un calendario de presentación de escritos para una nueva moción de desestimación de las demandas unificadas. El 1 de julio de 2020, el Demandado presentó una moción de desestimación [Proc. Cont. Núm. 17-00278, ECF Núm. 81], en la que se presentaron todos los escritos procesales. Los Demandantes de Atlantic Medical presentaron una oposición a la moción de desestimación del ELA el 3 de agosto de 2020, y el ELA presentó una respuesta el 1 de septiembre de 2020. En la contestación, el ELA declaró que estaba llevando a cabo negociaciones con los Demandantes de Atlantic Medical y otros FQHC, y que no se opondría a la paralización del procedimiento contencioso de los Demandantes de Atlantic Medical para continuar dichas negociaciones [Proc Cont. Núm. 17-00278, ECF Núm. 84]. El 20 de enero de 2021, en respuesta a esta propuesta, el Tribunal del Título III emitió una orden que denegaba sin perjuicio la moción de desestimación del ELA y paralizaba el procedimiento a la espera de una nueva orden del Tribunal [Proc. Cont. Núm. 17-00278, ECF Núm. 85]. La orden del Tribunal del Título III permitía a las partes objetar el contenido de la orden hasta el 3 de febrero de 2021. Ninguna de las partes se opuso. El 5 de febrero de 2021, el Tribunal del Título III dictó una orden que confirmaba las fechas límite en la orden del 20 de enero de 2021 [Proc. Cont. Núm. 17-00278, ECF Núm. 86].

c) ***Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerio, Corozal, Naranjito y Orocovis c. el Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 17-00298**

El 28 de diciembre de 2017, Corporación de Servicios Integrales de Salud del Área de Barranquitas, Comerio, Corozal, Naranjito, y Orocovis ("CSI") presentó una demanda que solicita una sentencia declaratoria contra el ELA que determine que las secciones 28 y 29 de la Ley 66-2014, que establece planes de pago para las sentencias contra el ELA y establece que el ELA no podrá ser obligado a pagar sentencias si no dispone de los fondos, violan (i) las Cláusulas sobre Debido Proceso y Contratos de la Constitución de Estados Unidos y se ven impedidas por la ley federal de Medicaid, (ii) la sección 903 del Código de Quiebras, que se reserva el poder de un estado para controlar los municipios, y (iii) la sección 303 de PROMESA, que se reserva el poder de un territorio cubierto para controlar las instrumentalidades y su propio territorio. En una acción anterior a la petición, el Demandante obtuvo una sentencia de $51 millones contra el ELA por no hacer los pagos de Medicare en un tribunal del ELA.

El 28 de marzo de 2018, el ELA presentó una moción de desestimación de la demanda, que argumentó que las objeciones del Demandante a la Ley 66-2014 no se sostienen porque, (i) desde que el ELA presentó su caso de Título III, es la paralización automática, y no la Ley 66-2014, la que obstruye el cobro de lo dispuesto en la sentencia; (ii) el plazo de prescripción de un año para impugnar la ley, que se aprobó en 2014, ha expirado; (iii) la sentencia no es un "contrato" que está protegido por la Cláusula sobre Contratos; y (iv) PROMESA tiene por objeto exigir el cumplimiento continuo de la ley federal, y no obligar a que el ELA subsane sus incumplimientos pasados con respecto a los pagos de Medicaid [Proc. Cont. Núm. 17-00298, ECF Núm. 10].

El 25 de septiembre de 2018, la Magistrada Dein dictó de oficio una orden [Proc. Cont. Núm. 17-00298, ECF Núm. 22] que paraliza la moción de desestimación a la espera de una resolución del Primer Circuito relacionada con *Asociación de Salud Primaria de Puerto Rico c. el Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 17-00227, y una resolución sobre las objeciones al informe y recomendaciones de la Magistrada Dein que desestiman la demanda en *Atlantic Medical Center c. el Estado Libre Asociado de Puerto Rico*, Proc. Cont. Núm. 17-00278. El 2 de octubre de 2019, los Demandantes plantearon una objeción a la orden del Tribunal del Título III que paraliza el caso [Proc. Cont. Núm. 17-00298, ECF Núm. 24]. El 5 de abril de 2019, la Juez Swain dictó una orden que ratifica la orden de la juez Dein que paralizaba el caso e invalidaba las objeciones de los Demandantes [Proc. Cont. Núm. 17-00298, ECF Núm. 31].

5.     **Litigios sobre Bonos de Ingresos**

El 24 de julio de 2019, el Tribunal del Título III presentó la Orden de Paralización, que paralizó parcialmente ciertos procedimientos contenciosos y cuestiones controvertidas identificadas en ellos, incluyendo ciertas cuestiones relacionadas con los bonos de ingresos. Como parte de la paralización, el Tribunal del Título III ordenó a las partes que ingresaran a un período de mediación obligatoria, entre otras cosas, para facilitar la preparación y radicación del orden de programación de vistas propuesto con respecto a ciertos procedimientos contenciosos y cuestiones controvertidas relacionados con bonos de ingresos emitidos por ciertas instrumentalidades del ELA. El ELA, la Junta de Supervisión y ciertos acreedores se reunieron en numerosas ocasiones con el Equipo de Mediación y redactaron y presentaron órdenes de planificación propuestas con respecto a ciertas "cuestiones prioritarias", incluidas las relacionadas con los bonos de ingresos. El 27 de noviembre de 2019, el Equipo de Mediación presentó un *Informe y Recomendaciones Provisionales* con órdenes provisionales propuestas, incluida una orden provisional propuesta para la planificación preliminar del litigio de cuestiones relacionadas con los bonos de ingresos [ECF Núm. 9365]. El 19 de diciembre de 2019, el Tribunal del Título III presentó una Orden Provisional

de Manejo de Casos para Bonos de Ingresos [ECF Núm. 9620] (la "<u>Orden de Gestión de Casos Provisoria para Bonos de Ingresos</u>") y estableció el 10 de enero de 2020 como fecha límite para que el Equipo de Mediación presentara un Informe Enmendado (que posteriormente se extendió al 10 de febrero de 2010). Para obtener más información con respecto al Equipo de Mediación y al Informe Enmendado, consulte la sección V.I.3. La Orden de Gestión de Casos Provisoria para Bonos de Ingresos se enmendó el 31 de enero de 2020 [ECF Núm. 10595]. El 10 de marzo de 2020, el Tribunal del Título III emitió la orden de gestión del caso actualmente operativa [ECF Núm. 12186], que, frente a la objeción de algunos acreedores, preveía la determinación de determinadas cuestiones mediante la presentación de mociones de sentencia sumaria parcial sobre determinadas reclamaciones. Todas las partes pudieron presentar dichas mociones.

La Orden de Gestión de Casos Provisoria para Bonos de Ingresos indicaba, entre otras cosas, la radicación y el litigio preliminar de cuatro demandas contenciosas relacionadas con la evidencia de reclamaciones radicada por ciertos acreedores de bonos de ingresos y aseguradoras monolínea contra el ELA y/o ACT con respecto a los bonos ACT, AFI y ADCC. Cada uno de estos procedimientos se describe a continuación.

a)   ***Junta de Supervisión y Administración Financiera para Puerto Rico y otros c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00007**

El 16 de enero de 2020, los Demandantes, la Junta de Supervisión, actuando exclusivamente en carácter de representante de ACT, y CANA[201] presentaron una acción contra Ambac, Assured, National, FGIC, Peaje y BNYM, como agente fiscal para bonos emitidos por ACT (colectivamente, los "<u>Demandados de ACT</u>"), donde se impugnan las evidencias de reclamaciones presentadas contra ACT y otras reclamaciones de gravámenes formuladas por los Demandados de ACT como aseguradoras, síndicos y/o tenedores de ciertos bonos emitidos por ACT (los "<u>Bonos ACT</u>") (la "<u>Acción de Impugnación de Reclamaciones de ACT</u>"). Los Demandados de ACT presentaron evidencias de reclamaciones (u otras supuestas reclamaciones de gravámenes) en el caso de Título III de ACT donde se afirma, entre otras cosas, (i) que los Bonos ACT están asegurados por gravámenes establecidos por ley contra determinados bienes de ACT, (ii) los Demandados de ACT tienen participación de propiedad sobre determinados bienes de ACT, (iii) los Demandados tienen participaciones de garantía perfeccionados con derecho de prelación de primera clase sobre los bienes de ACT, más allá de los derechos de garantía (si los hubiera) concedidos en los documentos que rigen los Bonos ACT, (iv) incumplimientos de contrato y reclamaciones extracontractuales que surgen de la retención que hace el ELA de los ingresos procedentes de los impuestos sobre la gasolina y los cigarrillos y las tarifas sobre licencia de vehículos gravados y recaudados por el ELA que históricamente fueron asignados y transferidos condicionalmente a ACT, (v) violaciones a las Constituciones del Estado Libre Asociado y de Estados Unidos, y (vi) sus participaciones de garantía siguen vinculadas a los ingresos que recibe ACT luego de la petición.

Los Demandantes alegan que las supuestas reclamaciones de Bonos ACT asegurados de los Demandados de ACT se deben rechazar, excepto aquellos montos depositados y conservados en determinadas cuentas de depósito especificadas por el agente fiscal de acuerdo con la Ley Orgánica de ACT y los documentos que rigen los Bonos ACT. Además, los Demandantes solicitan la desestimación de todas las evidencias de reclamaciones (u otras reclamaciones de gravámenes) de los Demandados de ACT relacionadas con los Bonos ACT debido a que, entre otras cosas, (i) las evidencias de reclamaciones de los Demandados de ACT exceptuando las de BNYM son duplicaciones de las evidencias de reclamaciones

---

[201] CANA es co-demandante con respecto a ciertas reclamaciones formuladas en este procedimiento contencioso que son sustancialmente similares a las causas formuladas en los procedimientos contenciosos de impugnación de gravámenes de la ACT pendientes presentados el 20 de mayo de 2019 [Proc. Cont. Núm. 19-362, 19-363, 19-364 y 19-365].

globales presentadas por BNYM, como agente fiscal, (ii) la Ley Orgánica de ACT y los documentos que rigen los Bonos ACT no crean gravámenes establecidos por ley, (iii) los Demandados de ACT no tienen participación de propiedad sobre los ingresos de ACT, (iv) los derechos de garantía frente a cualquier otro fondo no mantenido por el agente fiscal son fondos no perfeccionados y evitables de acuerdo con las secciones 544 y 551 del Código de Quiebras, (v) los ingresos de ACT no son ingresos especiales como se define en la sección 902(2) del Código de Quiebras, (vi) las reclamaciones por ingresos e intereses posteriores a la petición se deben rechazar de acuerdo con las secciones 502(b)(2) y 552 del Código de Quiebras, (vii) los Demandados de ACT no tienen una reclamación admisible en virtud de las Cláusulas sobre Contratos, Debido Proceso y Expropiaciones de las Constituciones del ELA y de Estados Unidos, (viii) los Demandados de ACT no tienen una reclamación admisible en virtud de la sección 407 de PROMESA, y (ix) los Demandados de ACT no alegan adecuadamente ninguna reclamación extracontractual contra ACT.

El 11 de febrero de 2020, CANA presentó una moción para intervenir en esas causas en la Acción de Impugnación de Reclamaciones de ACT en las que CANA no es codemandante [Proc. Cont. Núm. 20-00007 ECF Núm. 15]. El 18 de febrero de 2020, la Junta de Supervisión presentó su oposición limitada a la moción de CANA, al afirmar que la Junta de Supervisión: (i) no se opone a que CANA intervenga con los mismos derechos de intervención limitada que CANA ha aceptado (y que se le han concedido) en el pasado, en al menos diez instancias anteriores a la intervención en virtud de 11 U.S.C. § 1109; y (ii) se opone a que CANA intente intervenir con mayores derechos que los que se conceden a CANA como coadyuvante en virtud de la sección 1109, incluso el derecho a apelar las decisiones en este procedimiento contencioso y potencialmente bloquear la transacción [Proc. Cont. Núm. 20-00007 ECF Núm. 20]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción de CANA [Proc. Cont. Núm. 20-00007 ECF Núm. 22]. El 26 de febrero de 2020, CANA presentó una contestación en apoyo a su moción de intervención [Proc. Cont. Núm. 20-00007 ECF Núm. 31]. El 2 de marzo de 2020, la magistrada Dein dictó una orden que concedía parcialmente la moción de intervención de CANA [Proc. Cont. Núm. 20-00007, ECF Núm. 39]. El 16 de marzo de 2020, CANA presentó una objeción limitada a la orden de la magistrada Dein [Proc Cont. Núm. 20-00007, ECF Núm. 46]. El 17 de marzo de 2020, el Tribunal del Título III emitió una orden que dejaba en suspenso la objeción limitada de CANA [Proc. Cont. Núm. 20-00007, ECF Núm. 47].

También el 11 de febrero de 2020, las Partes de ARD presentaron una moción para intervenir en la Acción de Impugnación de Reclamaciones de ACT [Proc. Cont. Núm. 20-00007 ECF Núm. 14]. El 18 de febrero de 2020, la Junta de Supervisión presentó su contestación con una objeción a la moción de las Partes de ARD [Proc. Cont. Núm. 20-00007 ECF Núm. 23]. El 25 de febrero de 2020, las Partes de ARD presentaron una contestación en apoyo a su moción [Proc. Cont. Núm. 20-00007, ECF Núm. 28]. El 10 de marzo de 2020, el Tribunal del Título III dictó una orden que concedía parcialmente la moción de intervención [Proc. Cont. Núm. 20-00007, ECF Núm. 44]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción [Proc. Cont. Núm. 20-00007, ECF Núm. 21]. El 27 de febrero de 2020, Assured, Ambac, National, FGIC y BNYM presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 20-00007 ECF Núm. 35]. Peaje presentó una acumulación a la moción [Proc. Cont. Núm. 20-00007, ECF Núm. 36]. El 28 de febrero de 2020, el Grupo Ad Hoc de Tenedores de Notas de FGIC presentó una moción de intervención. [Proc. Cont. Núm. 20-00007, ECF Núm. 37]. El 7 de abril de 2020, ACT presentó una contestación a la moción de intervención del Grupo Ad Hoc de Tenedores de Notas de FGIC [Proc. Cont. Núm. 20-00007, ECF Núm. 49]. El 13 de abril de 2020, la magistrada Dein dictó una orden que denegaba sin perjuicio la moción de intervención [Proc. Cont. Núm. 20-00007, ECF Núm. 50].

El 10 de marzo de 2020, el Tribunal del Título III emitió una Orden de Gestión de Casos modificada en relación con las reclamaciones de bonos de ingresos, que paralizó este procedimiento contencioso [Proc. Cont. Núm. 20-00007, ECF Núm. 43].

b) ***Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00005**

El 16 de enero de 2020, el Demandante, (la Junta de Supervisión, actuando exclusivamente en carácter de representante del ELA), presentó una acción contra los Demandados de ACT donde se impugnan las evidencias de reclamaciones presentadas contra el ELA y otras reclamaciones de gravámenes formuladas por los Demandados de ACT como aseguradoras y/o tenedores de ciertos bonos emitidos por ACT (la "Acción de Impugnación de Reclamaciones de ELA-ACT"). Los Demandados de ACT presentaron evidencias de reclamaciones (u otras supuestas reclamaciones de gravámenes) en el caso de Título III del ELA donde se afirma, entre otras cosas, (i) que el ELA tiene responsabilidad legal por no asignar ni transferir determinados ingresos procedentes de los impuestos sobre la gasolina y los cigarrillos y las tarifas sobre licencia de vehículos gravados y recaudados por el ELA que históricamente fueron asignados y transferidos condicionalmente a ACT, (ii) violaciones a las Constituciones del Estado Libre Asociado y de Estados Unidos, y (iii) diversas teorías de ley y contractuales para que sus evidencias de reclamación sean admisibles.

La Junta de Supervisión alega que los Bonos ACT son bonos solo cubiertos por el valor de la garantía, y que el ELA no tiene responsabilidad alguna con respecto a los Bonos ACT dado que no es ni emisor ni garante de los Bonos ACT de acuerdo con la Ley Orgánica de ACT y los documentos que rigen los Bonos ACT. La Junta de Supervisión solicita la desestimación de todas las evidencias de reclamaciones (u otras reclamaciones de gravámenes) de los Demandados de ACT relacionadas con los Bonos ACT y del ELA al sostener que, entre otras cosas, (i) las evidencias de reclamaciones de los Demandados de ACT exceptuando las de BNYM son duplicaciones de las evidencias de reclamaciones globales presentadas por BNYM, como agente fiscal, (ii) los Demandados de ACT carecen de legitimidad para formular una reclamación en relación con los Bonos, (iii) Los supuestos derechos de garantía de los Demandados de ACT se limitan a aquellos fondos recibidos por ACT y depositados en cuentas de depósito especificadas mantenidas por el agente fiscal, (iv) los Demandados de ACT carecen de derechos de subrogación, reembolso o contribución, (v) la retención de los ingresos de ACT anterior a PROMESA por parte del ELA estaba permitida por la ley del ELA, la Ley Orgánica de ACT y los documentos que rigen los Bonos ACT, (vi) la retención de ingresos de ACT por parte del ELA no constituye un incumplimiento de contrato ni extracontractual contra el ELA, (vii) PROMESA tiene prioridad sobre cualquier supuesta obligación del ELA para asignar y transferir fondos a ACT, (viii) los Demandados de ACT no tienen ninguna reclamación admisible en virtud de las Cláusulas sobre Contratos, Debido Proceso o Expropiaciones de las Constituciones del ELA y de Estados Unidos, (ix) Los Demandados de ACT no tienen una reclamación asegurada, reclamación prioritaria, derechos de garantía perfeccionados o reclamación posterior a la petición, (x) los Demandados de ACT no tienen participación de propiedad sobre los ingresos de ACT, y (xi) los Demandados de ACT no tienen una reclamación admisible de acuerdo con la sección 407 de PROMESA.

El 11 de febrero de 2020, CANA presentó una moción para intervenir en la Acción de Impugnación de Reclamaciones del ELA-ACT [Proc. Cont. Núm. 20-00005 ECF Núm. 9]. El 18 de febrero de 2020, la Junta de Supervisión presentó su oposición limitada a la moción de CANA donde se afirma que la Junta de Supervisión: (i) no se opone a que CANA intervenga con los mismos derechos de intervención limitada que CANA ha aceptado (y que se le han concedido) en el pasado, en al menos diez instancias anteriores a la intervención en virtud de 11 U.S.C. § 1109; y (ii) se opone a que CANA intente intervenir con mayores derechos que los que se conceden a CANA como coadyuvante en virtud de la sección 1109, incluso el

derecho a apelar las decisiones en este procedimiento contencioso y posiblemente bloquear la transacción [Proc. Cont. Núm. 20-00005 ECF Núm. 16]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción de CANA [Proc. Cont. Núm. 20-00005 ECF Núm. 19]. El 26 de febrero de 2020, CANA presentó una contestación en apoyo a su moción de intervención [Proc. Cont. Núm. 20-00005 ECF Núm. 30]. El 2 de marzo de 2020, la magistrada Dein dictó una orden que concedía parcialmente la moción de intervención de CANA [Proc. Cont. Núm. 20-00005, ECF Núm. 37].

También el 11 de febrero de 2020, las Partes de ARD presentaron una moción para intervenir en la Acción de Impugnación de Reclamaciones de ELA-ACT [Proc. Cont. Núm. 20-00005 ECF Núm. 11]. El 18 de febrero de 2020, la Junta de Supervisión presentó su contestación con una objeción a la moción de las Partes de ARD [Proc. Cont. Núm. 20-00005 ECF Núm. 17]. El 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción [Proc. Cont. Núm. 20-00005 ECF Núm. 18]. El 25 de febrero de 2020, las Partes de ARD presentaron una contestación en apoyo a su moción [Proc. Cont. Núm. 20-00005, ECF Núm. 26]. El 10 de marzo de 2020, la Magistrada Dein dictó una orden que concedía parcialmente la moción de intervención [Proc. Cont. Núm. 20-00005, ECF Núm. 41]. El 27 de febrero de 2020, Assured, Ambac, National, FGIC y BNYM presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 20-00005, ECF Núm. 34]. El 25 de febrero de 2020, la Junta de Supervisión y Peaje presentaron una moción conjunta para prorrogar la fecha límite para que Peaje contestara la demanda contenciosa. El 26 de febrero de 2020, el Tribunal del Título III dictó una orden para conceder la moción [Proc. Cont. Núm. 20-00005 ECF Núm. 29]. El 19 de marzo de 2020, la Junta de Supervisión y Peaje presentaron una moción conjunta para paralizar y prorrogar las fechas límite en relación con ciertos cargos alegados contra Peaje [Proc. Cont. Núm. 20-00005, ECF Núm. 45], y el Tribunal del Título III concedió la moción conjunta [Proc. Cont. Núm. 20-00005, ECF Núm. 46].

El 28 de abril de 2020, la Junta de Supervisión presentó una moción de sentencia sumaria parcial para desestimar ciertas reclamaciones descritas en la *Demanda en la que se objeta a las reclamaciones del demandado y se busca una reparación relacionada* [Proc. Cont. Núm. 20-00005, ECF Núm. 55]. Específicamente, la Junta de Supervisión presentó: (i) los Cargos 5, 9, 10, 11, 15, 17, 18 y 22 contra Ambac; (ii) los Cargos 28, 32, 33, 34, 38, 40, 41 y 45 contra AGC; (iii) los Cargos 51, 55, 56, 57, 61, 63, 64 y 68 contra AGMC; (iv) los Cargos 74, 78, 79, 80, 84, 86, 87 y 91 contra National; (v) los Cargos 97, 101, 102, 103, 107, 109, 110 y 114 contra FGIC; y (vi) los Cargos 162, 166, 167, 168, 172, 174, 175, 183, 187, 188, 189, 193, 195, 196 y 200 contra BNYM. También el 28 de abril, CANA presentó una acumulación limitada a la moción de la Junta de Supervisión para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00005, ECF Núm. 64]. El 16 de julio de 2020, las Aseguradoras Monolínea y las Partes de ARD presentaron respuestas a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 94, 99]. Las Aseguradoras Monolínea también presentaron una declaración de Casey Servais, en la que se solicitaba la presentación de pruebas antes de que se resolviera la moción pendiente, a tenor con Fed. R. Civ. P. 56(d) [Proc. Cont. Núm. 20-00005, ECF Núm. 97]. El 31 de agosto de 2020, la Junta de Supervisión presentó una respuesta en apoyo de su moción de sentencia sumaria parcial y una oposición a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia sumaria a tenor con la Regla 56(d) [Proc. Cont. Núm. 20-00005, ECF Núm. 102, 103, 104, 105]. También el 31 de agosto de 2020, CANA presentó una acumulación a la moción de la Junta de Supervisión en apoyo de su moción para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00005, ECF Núm. 106]. El 13 de septiembre de 2020, las partes de la ARD presentaron una tríplica en apoyo a su oposición a la moción de la Junta de Supervisión para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00005, ECF Núm. 112]. El 31 de septiembre de 2020, las Aseguradoras Monolínea presentaron una tríplica en apoyo a su oposición a la moción de sentencia sumaria parcial de la Junta de Supervisión y una contestación a la oposición de la Junta de Supervisión a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia sumaria a tenor con la Regla 56(d) [Proc.

Cont. Núm. 20-00005, ECF Núm. 113, 114]. El 23 de septiembre de 2020 se celebró una vista sobre las mociones de sentencia sumaria.

El 20 de enero de 2021, el Tribunal del Título III emitió una Orden sobre la presentación de pruebas en relación con las mociones del Estado Libre Asociado de Puerto Rico, por y a través de la Junta de Administración y Supervisión Financiera, a tenor con la Regla 7056 de la Ley de Quiebras, para obtener una sentencia sumaria parcial que rechace las reclamaciones [Proc. Cont. Núm. 20-00005, ECF Núm. 129] (la "Orden de la Regla 56(d)"). La Orden de la Regla 56(d) autorizó la presentación de pruebas sobre algunos de los temas tratados en la declaración de la Regla 56(d) que los Demandados habían presentado el 26 de julio de 2020.

El Tribunal ordenó a las partes que se reunieran y deliberaran en relación con una propuesta de calendario y presentaran un informe de situación conjunto antes del 3 de febrero de 2021. De acuerdo con la Orden de la Regla 56(d), las partes se reunieron y deliberaron y presentaron un Informe de Situación Conjunto en el que exponían sus respectivas posturas respecto a la programación [Proc. Cont. Núm. 20-00005, ECF Núm. 132]. El 5 de febrero de 2021, el Tribunal emitió su Orden de Fijación del Calendario de Presentación de Pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 133] (la "Orden de Calendario de Presentación de Pruebas"). Tras la admisión de la moción conjunta de las partes para modificar el calendario de presentación de pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 157], la Orden de Calendario de Presentación de Pruebas requiere que la presentación de pruebas autorizada en la Orden de la Regla 56(d) concluya antes del 19 de mayo de 2021, a menos que el Tribunal ordene lo contrario. La presentación de pruebas en virtud de la Orden de la Regla 56(d) comenzó el 8 de febrero de 2021 y está en curso. El 3 de marzo de 2021, los Demandados presentaron una moción de obligación de presentación de pruebas, en la que se solicitaba una orden que ordenara a los Demandantes (1) ampliar el alcance de su búsqueda de documentos adicionales y (2) presentar cierta información relativa a las prácticas contables [Proc. Cont. Núm. 20-00005, ECF Núm. 137]. La moción de obligación de presentación de pruebas fue expuesta plenamente [Proc. Cont. Núm. 20-00005, ECF Núm. 141 y 144], y fue defendida el 17 de marzo de 2021. El 26 de marzo de 2021, la magistrada Dein dictó una orden admitiendo parcialmente la moción [Proc. Cont. Núm. 20-00005, ECF Núm. 153]. El 23 de abril de 2021, la magistrada Dein dictó una orden convocando a las partes a presentar pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 179]. El 30 de abril de 2021, los Demandados presentaron una moción para que se ordenase la presentación de pruebas, y las Partes gubernamentales plantearon una moción de orden de protección [Proc. Cont. Núm. 20-00005, ECF Núm. 185 y 186]. El 3 de mayo de 2021, las Partes gubernamentales presentaron un escrito de oposición a la moción de orden de presentación de pruebas de los Demandados [Proc. Cont. Núm. 20-00005, ECF Núm. 191]. Ese mismo día, 3 de mayo de 2021, los Demandantes presentaron una opción a la moción de orden de protección de las Partes gubernamentales [Proc. Cont. Núm. 20-00005, ECF Núm. 190]. El 6 de mayo de 2021, Assured y National presentaron una moción informativa comunicando al Tribunal del Título III que suspendían su participación en las mociones de presentación de pruebas pendientes [Proc. Cont. Núm. 20-00005, ECF Núm. 193]. También el 6 de mayo, las Partes gubernamentales presentaron una respuesta en apoyo de su moción de orden de protección, y los Demandados presentaron una respuesta en apoyo de su moción de ordenar la presentación de pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 194 y 195]. El 7 de mayo de 2021, la magistrada Dein dictó una orden admitiendo las mociones para su valoración.

El 6 de abril de 2021, la Junta de Supervisión presentó una moción de emisión de una orden modificando el Protocolo de gestión del caso para permitir a la Junta de Supervisión presentar mociones de sentencia sumaria parcial con respecto a determinados cargos [Proc. Cont. Núm. 20-

00005, ECF Núm. 154 y 155]. El 13 de abril de 2021, Ambac, BNYM, U.S. Bank y los Acreedores de plantearon objeciones a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 158; Caso Núm. 17-bk-3283, ECF Núm. 16401]. También el 13 de abril de 2021, la UCC presentó una respuesta en apoyo de la moción de la Junta de Supervisión, y una moción cruzada para la emisión de una orden modificando el Protocolo de gestión del caso para permitir a UCC plantear objeciones limitadas para desestimar ciertas pruebas de la demanda [Proc. Cont. Núm. 20-00005, ECF Núm. 159]. El 14 de abril de 2021, FGIC presentó una objeción a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 161]. El 19 de abril de 2021, Assured y National presentaron una reserva de derechos en relación con la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 169]. El 21 de abril de 2021, las aseguradoras monolínea y la Junta de Supervisión plantearon objeciones a la moción cruzada de UCC [Proc. Cont. Núm. 20-00005, ECF Núm. 173, 176 y 177]. También el 21 de abril de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su moción y una respuesta a la objeción de los Acreedores del AAP [Proc. Cont. Núm. 20-00005, ECF Núm. 174 y 175]. El 24 de abril de 2021, la UCC presentó una respuesta en apoyo de su moción cruzada [Proc. Cont. Núm. 20-00005, ECF Núm. 180]. El 5 de mayo de 2021, el Tribunal del Título III dictó una orden rechazando la moción de la Junta de Supervisión y la moción cruzada de UCC [Proc. Cont. Núm. 20-00005, ECF Núm. 192].

c) ***Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00003**

El 16 de enero de 2020, el Demandante, la Junta de Supervisión, actuando exclusivamente en carácter de representante del ELA, presentó una acción contra Ambac, Assured,[202] FGIC y el U.S. Bank Trust National Association ("U.S. Bank"), como síndico para bonistas AFI (colectivamente, los "Demandados de AFI"), donde se impugnan las evidencias de reclamaciones presentadas contra el ELA y otras reclamaciones de gravámenes formuladas por los Demandados de AFI como aseguradoras y/o tenedores de ciertos bonos emitidos por AFI (los "Bonos AFI") (la "Acción de Impugnación de Reclamaciones de AFI"). Los Demandados de AFI presentaron evidencias de reclamaciones (u otras supuestas reclamaciones de gravámenes) en el caso de Título III del ELA donde afirman, entre otras cosas, (i) que el ELA tiene responsabilidad legal por no asignar ni transferir determinados ingresos procedentes de los arbitrios sobre el ron que se produce en Puerto Rico y se vende en los EE.UU. continentales, gravados y recaudados por el ELA que históricamente fueron asignados y transferidos condicionalmente a AFI, (ii) violaciones a las Constituciones del Estado Libre Asociado y de Estados Unidos, y (iii) diversas teorías de ley y contractuales para que sus evidencias de reclamación sean admisibles.

La Junta de Supervisión alega que los Bonos AFI son bonos solo cubiertos por el valor de la garantía, y que el ELA no tiene responsabilidad alguna con respecto a los Bonos AFI dado que no es ni emisor ni garante de los Bonos AFI de acuerdo con la Ley Orgánica de AFI y los documentos que rigen los Bonos AFI. La Junta de Supervisión solicita la desestimación de todas las evidencias de reclamaciones (u otras reclamaciones de gravámenes) de los Demandados de AFI relacionadas con los Bonos AFI y del ELA aduciendo que, entre otras cosas, (i) las evidencias de reclamaciones de los Demandados de AFI exceptuando las del U.S. Bank son duplicaciones de las evidencias de reclamaciones globales presentadas por el U.S. Bank, como síndico, (ii) los Demandados de AFI carecen de legitimidad para formular una reclamación contra el ELA en relación con los Bonos AFI, (iii) la Ley Orgánica de AFI y los documentos

---

[202] Únicamente Assured Guaranty Corp., no Assured Guaranty Municipal Corp. ni ninguna otra filial, es el demandado.

que rigen los Bonos AFI no crean gravámenes legales, (iv) los Demandados de AFI no tienen una participación de propiedad sobre los ingresos procedentes de los arbitrios sobre el ron, (v) los supuestos derechos de garantía de los Demandados de AFI se limitan a aquellos fondos recibidos por AFI y depositados en cuentas de depósito especificadas mantenidas por el agente fiscal, (vi) los ingresos de AFI no son ingresos especiales como se definen en la sección 902(2) del Código de Quiebras, (vii) los Demandados de AFI carecen de derechos de subrogación, reembolso o contribución, (viii) la retención de los ingresos procedentes de los arbitrios sobre el ron por parte del ELA estaba permitida por la ley del ELA, la Ley Orgánica de AFI y los documentos que rigen los Bonos AFI, (ix) la retención de ingresos procedentes de los arbitrios sobre el ron por parte del ELA no constituye un incumplimiento de contrato ni extracontractual contra el ELA, (x) PROMESA tiene prioridad sobre cualquier supuesta obligación del ELA para asignar y transferir fondos a AFI, (xi) los Demandados de AFI no tienen ninguna reclamación admisible en virtud de las Cláusulas sobre Contratos, Debido Proceso o Expropiaciones de las Constituciones del ELA y de Estados Unidos, (xii) los demandados de AFI no tienen una reclamación permisible de acuerdo con la sección 407 de PROMESA, y (xiii) los Demandados de AFI no tienen una reclamación asegurada, reclamación prioritaria, derechos de garantía perfeccionados o reclamación por ingresos posteriores a la petición.

El 11 de febrero de 2020, CANA presentó una moción para intervenir en la Acción de Impugnación de Reclamaciones de AFI [Proc. Cont. Núm. 20-00003 ECF Núm. 9]. El 18 de febrero de 2020, la junta de Supervisión presentó su oposición limitada a la moción de CANA afirmando que la Junta de Supervisión: (i) no se opone a que CANA intervenga con los mismos derechos de intervención limitada que CANA ha aceptado (y que se le han concedido) en el pasado, en al menos diez instancias anteriores a la intervención en virtud de 11 U.S.C. § 1109; y (ii) se opone a que CANA intente intervenir con mayores derechos que los que se conceden a CANA como coadyuvante en virtud de la sección 1109, incluso el derecho a apelar las decisiones en este procedimiento contencioso y posiblemente bloquear la transacción [Proc. Cont. Núm. 20-00003 ECF Núm. 14]. También el 18 de febrero de 2020, Assured, Ambac y FGIC presentaron una oposición a la moción de CANA [Proc. Cont. Núm. 20-00003 ECF Núm. 15]. El 26 de febrero de 2020, CANA presentó una contestación en apoyo a su moción de intervención [Proc. Cont. Núm. 20-00003 ECF Núm. 18]. El 2 de marzo de 2020, la magistrada Dein dictó una orden que concedía parcialmente la moción de intervención [Proc. Cont. Núm. 20-00003, ECF Núm. 27].

El 27 de febrero de 2020, Ambac, Assured y FGIC presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 20-00003, ECF Núm. 21] la Acción de Impugnación de Reclamaciones de AFI. El U.S. Bank presentó una acumulación a la moción [Proc. Cont. Núm. 20-00003, ECF Núm. 20]. La moción sigue paralizada a tenor con la Orden de Gestión de Casos modificada descrita anteriormente [ECF Núm. 10595]

El 28 de abril de 2020, la Junta de Supervisión presentó una moción de sentencia sumaria parcial para desestimar ciertas reclamaciones descritas en la *Demanda en la que se objeta a las reclamaciones del demandado y se busca una reparación relacionada* [Proc. Cont. Núm. 20-00003, ECF Núm. 43]. Específicamente, la Junta de Supervisión presentó los: (i) Cargos 5, 7, 11, 16, 17, 18, 22 y 24 contra Ambac; (ii) Cargos 31, 33, 37, 42, 43, 44, 48 y 50 contra AGC; (iii) Cargos 57, 59, 63, 68, 69, 70, 74 y 76 contra FGIC; y los (iv) Cargos 82, 84, 87, 92, 93, 94, 98 y 100 contra U.S. Bank. También el 28 de abril de 2020, CANA presentó una acumulación limitada a la moción de la Junta de Supervisión para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00003, ECF Núm. 52]. El 16 de julio de 2020, las Aseguradoras Monolínea presentaron su respuesta a la moción de la Junta de Supervisión [ECF Núm. 80] y una declaración de John Hughes, en la que se solicitaba la presentación de pruebas antes de que se resolviera la moción pendiente, a tenor con la norma Fed R. Civ. P. 56(d) [Proc. Cont. Núm. 20-00003, ECF Núm. 82]. El 31 de agosto de 2020, la Junta de Supervisión presentó una respuesta en apoyo de su moción de sentencia sumaria parcial y una oposición a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la

286

sentencia sumaria a tenor con la Regla 56(d) [Proc. Cont. Núm. 20-00003, ECF Núm. 88, 89, 90, 91].
También el 31 de agosto de 2020, CANA presentó una acumulación a la moción de la Junta de Supervisión
en apoyo de su moción para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00005, ECF Núm. 92]. El
13 de septiembre de 2020, las Aseguradoras Monolínea presentaron una tríplica en apoyo a su oposición a
la moción de sentencia sumaria parcial de la Junta de Supervisión y una contestación a la oposición de la
Junta de Supervisión a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia
sumaria a tenor con la Regla 56(d) [Proc. Cont. Núm. 20-00003, ECF Núm. 96, 98]. También el 13 de
septiembre de 2020, U.S. Bank presentó una acumulación para la tríplica y la contestación de las
Aseguradoras Monolínea [Proc. Cont. Núm. 20-00003, ECF Núm. 100]. El 23 de septiembre de 2020 se
celebró una vista sobre las mociones de sentencia sumaria.

El 20 de enero de 2021, el Tribunal del Título III emitió la Orden de la Regla 56(d) [Proc. Cont.
Núm. 20-00003, ECF Núm. 115]. La Orden de la Regla 56(d) autorizó la presentación de pruebas sobre
algunos de los temas tratados en la declaración de la Regla 56(d) que los Demandados habían presentado
el 26 de julio de 2020.

El Tribunal ordenó a las partes que se reunieran y deliberaran en relación con una propuesta de
calendario y presentaran un informe de situación conjunto antes del 3 de febrero de 2021. De acuerdo con
la Orden de la Regla 56(d), las partes se reunieron y deliberaron y presentaron un Informe de Situación
Conjunto en el que exponían sus respectivas posturas respecto a la programación [Proc. Cont. Núm. 20-
00003, ECF Núm. 118]. El 5 de febrero de 2021, el Tribunal emitió la Orden de Calendario de Presentación
de Pruebas [Proc. Cont. Núm. 20-00003, ECF Núm. 119]. Tras la admisión de la moción conjunta de las
partes para modificar el calendario de presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm.
136], la Orden de Calendario de Presentación de Pruebas requiere que la presentación de pruebas
autorizada en la Orden de la Regla 56(d) se complete antes del 7 de mayo de 2021, a menos que el Tribunal
ordene lo contrario. La presentación de pruebas en virtud de la Orden de la Regla 56(d) comenzó el 8 de
febrero de 2021 y está en curso. El 3 de marzo de 2021, los Demandados presentaron una moción de
obligación, en la que se solicitaba una orden que ordenara a los Demandantes (1) ampliar el alcance de su
búsqueda de documentos adicionales y (2) presentar cierta información relativa a las prácticas contables
[Proc. Cont. Núm. 20-00003, ECF Núm. 126]. La moción de obligación de presentación de pruebas
fue expuesta plenamente [Proc. Cont. Núm. 20-00003, ECF Núm. 129 y 132], y fue defendida el
17 de marzo de 2021. El 26 de marzo de 2021, el juez Dein dictó una orden admitiendo
parcialmente la moción [Proc. Cont. Núm. 20-00003, ECF Núm. 141]. El 23 de abril de 2021, la
magistrada Dein dictó una orden señalando una fecha para que las partes presentasen las pruebas
[Proc. Cont. Núm. 20-00003, ECF Núm. 167]. El 30 de abril de 2021, los Demandados
presentaron una moción para obligar a presentar pruebas, y las Partes gubernamentales presentaron
una moción de orden de protección [Proc. Cont. Núm. 20-00003, ECF Núm. 173 y 174]. El 3 de
mayo de 2021, las Partes gubernamentales presentaron una objeción a la moción de obligación de
presentar pruebas de los Demandados [Proc. Cont. Núm. 20-00003, ECF Núm. 179]. También el
3 de mayo de 2021, los Demandados presentaron su oposición a la moción de una orden de
protección de las Partes gubernamentales [Proc. Cont. Núm. 20-00003, ECF Núm. 178] El 6 de
mayo de 2021, Assured y National presentaron una moción informativa comunicando al Tribunal
del Título III que suspendían su participación en las mociones de presentación de pruebas
pendientes [Proc. Cont. Núm. 20-00003, ECF Núm. 181]. También el 6 de mayo de 2021, las
Partes gubernamentales presentaron una respuesta en apoyo de su moción de orden de protección,
y los Demandados presentaron una respuesta en apoyo de su moción de obligación de presentación
de pruebas [Proc. Cont. Núm. 20-00003, ECF Núm. 182 y 183]. El 7 de mayo, la magistrada Dein
dictó una orden admitiendo las mociones para su valoración.

287

El 6 de abril de 2021, la Junta de Supervisión presentó una moción para que se dicte una orden modificando el Protocolo de gestión del caso para permitir a la Junta de Supervisión presentar mociones de sentencia sumaria de determinados cargos [Proc. Cont. Núm. 20-00003, ECF Núm. 142 y 143]. El 13 de abril de 2021, Ambac, BNYM, U.S. Bank y los Acreedores del AAP presentaron objeciones a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00003, ECF Núm. 146; Caso Núm. 17-bk-3283, ECF Núm. 16401]. También el 13 de abril de 2021, la UCC presentó una respuesta en apoyo de la moción de la Junta de Supervisión y una moción cruzada para que se dicte una orden modificando el Protocolo de gestión del caso para permitir a UCC presentar objeciones limitadas para no permitir ciertas evidencias de reclamación [Proc. Cont. Núm. 20-00003, ECF Núm. 147]. El 14 de abril de 2021, FGIC presentó una objeción a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00003, ECF Núm. 149]. El 19 de abril de 2021, Assured y National presentaron una reserva de derechos en relación con la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00003, ECF Núm. 157]. El 21 de abril de 2021, las aseguradoras monolínea y la Junta de Supervisión plantearon objeciones a la moción cruzada de UCC [Proc. Cont. Núm. 20-00003, ECF Núm. 161, 164 y 165]. También el 21 de abril de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su moción y una respuesta a la objeción de los Acreedores del AAP [Proc. Cont. Núm. 20-00003, ECF Núm. 162, 163]. El 24 de abril de 2021, UCC presentó una respuesta en apoyo de su moción cruzada [Proc. Cont. Núm. 20-00003, ECF Núm. 168]. El 5 de mayo de 2021, el Tribunal del Título III dictó una orden desestimando la moción de la Junta de Supervisión y la moción cruzada de UCC [Proc. Cont. Núm. 20-00003, ECF Núm. 180].

      d)       ***Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00004**

El 16 de enero de 2020, el Demandante, la Junta de Supervisión, actuando en carácter de representante del ELA, presentó una acción (la "Acción de impugnación de reclamaciones contra ADCC") contra Ambac, Assured,[203] FGIC y BNYM, como agente fiscal (colectivamente, los "Demandados de ADCC"), donde se impugnan las evidencias de reclamaciones presentadas contra el ELA y otras reclamaciones de gravámenes formuladas por los Demandados de ADCC como aseguradoras y/o tenedores de ciertos bonos emitidos por ADCC (los "Bonos ADCC"). Los Demandados de ADCC presentaron evidencias de reclamaciones (u otras supuestas reclamaciones de gravámenes) en el caso de Título III del ELA afirmando, entre otras cosas, (i) que el ELA tiene la responsabilidad legal por asignar ni transferir determinados ingresos procedentes de los impuestos a la ocupación hotelera, que históricamente fueron asignados y transferidos por la Compañía de Turismo de Puerto Rico a ADCC, (ii) violaciones a las Constituciones del Estado Libre Asociado y de Estados Unidos, y (iii) diversas teorías de ley y contractuales para que sus evidencias de reclamación sean admisibles.

La Junta de Supervisión alega que los Bonos ADCC son bonos solo cubiertos por el valor de la garantía, y que el ELA no tiene responsabilidad alguna con respecto a los Bonos ADCC dado que no es ni emisor ni garante de los Bonos ADCC de acuerdo con la Ley Orgánica de ADCC y los documentos que rigen los Bonos ADCC. La Junta de Supervisión solicita la desestimación de todas las evidencias de reclamaciones (u otras reclamaciones de gravámenes) de los Demandados de ADCC relacionadas con los Bonos ADCC contra el ELA sobre la base de que, entre otras cosas, (i) las evidencias de reclamaciones de los Demandados de ADCC exceptuando las de BNYM son duplicaciones de las evidencias de

---

[203] Únicamente Assured Guaranty Corp., no Assured Guaranty Municipal Corp. ni ninguna otra filial, es el demandado.

reclamaciones globales presentadas por BNYM, como agente fiscal, (ii) la Ley Orgánica de ADCC y los documentos que rigen los Bonos ADCC exoneran expresamente al ELA de responsabilidad legal, (iii) los Demandados de ADCC carecen de derechos de subrogación, reembolso o contribución, (iv) la retención de los ingresos previos a PROMESA procedentes de los impuestos de ocupación hotelera por parte del ELA estaba permitida por la ley del ELA y los documentos que rigen los Bonos ADCC, (v) PROMESA tiene prioridad sobre todas las leyes que supuestamente asignaban los ingresos procedentes de los impuestos de ocupación hotelera a ADCC, (vi) la retención de ingresos procedentes de los impuestos de ocupación hotelera por parte del ELA no constituye un incumplimiento de contrato ni extracontractual contra el ELA, (vii) los Demandados de ADCC no tienen ninguna reclamación admisible en virtud de las Cláusulas sobre Contratos, Debido Proceso o Expropiaciones de las Constituciones del ELA y de Estados Unidos, (viii) los demandados de ADCC no tienen una reclamación permisible de acuerdo con la sección 407 de PROMESA, (ix) los Demandados de ADCC no tienen una reclamación asegurada, reclamación prioritaria, derechos de garantía perfeccionados o reclamación por ingresos posteriores a la petición, y (x) los Demandados de la ADCC no tienen participación de propiedad sobre los ingresos procedentes de la ocupación hotelera.

El 11 de febrero de 2020, CANA presentó una moción para intervenir en la Acción de Impugnación de Reclamaciones de ADCC [Proc. Cont. Núm. 20-00004 ECF Núm. 11]. El 18 de febrero de 2020, la Junta de Supervisión presentó su oposición limitada a la moción de CANA sobre la base de que la Junta de Supervisión: (i) no se opone a que CANA intervenga con los mismos derechos de intervención limitada que CANA ha aceptado (y que se le han concedido) en el pasado, en al menos diez instancias anteriores a la intervención en virtud de 11 U.S.C. § 1109; y (ii) se opone a que CANA intente intervenir con mayores derechos que los que se conceden a CANA como coadyuvante en virtud de la sección 1109, incluso el derecho a apelar las decisiones en este procedimiento contencioso y posiblemente bloquear la transacción [Proc. Cont. Núm. 20-00004 ECF Núm. 16]. También el 18 de febrero de 2020, Assured, Ambac y FGIC presentaron una oposición a la moción de CANA [Proc. Cont. Núm. 20-00004 ECF Núm. 17]. El 26 de febrero de 2020, CANA presentó una contestación en apoyo a su moción de intervención [Proc. Cont. Núm. 20-00004 ECF Núm. 20]. El 2 de marzo de 2020, la Magistrada Dein dictó una orden que concedía parcialmente la moción [Proc. Cont. Núm. 20-00004, ECF Núm. 25].

El 27 de febrero de 2020, Ambac, Assured, FGIC y BNYM presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 20-00004, ECF Núm. 22]. La moción sigue paralizada a tenor con la Orden de Gestión de Casos modificada descrita anteriormente [ECF nº 10595]

El 28 de abril de 2020, la Junta de Supervisión presentó una moción de sentencia sumaria parcial [Proc. Cont. Núm. 20-00004, ECF Núm. 40]. También el 28 de abril, CANA presentó una acumulación limitada a la moción de la Junta de Supervisión para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00004, ECF Núm. 51]. El 16 de julio de 2020, las Aseguradoras Monolínea presentaron respuestas a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00004, ECF Núm. 78] y una declaración de John Hughes, en la que se solicitaba la presentación de pruebas antes de que se resolviera la moción pendiente, a tenor con la norma Fed R. Civ. P. 56(d) [Proc. Cont. Núm. 20-00004, ECF Núm. 80]. El 31 de agosto de 2020, la Junta de Supervisión presentó una respuesta en apoyo de su moción de sentencia sumaria parcial y una oposición a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia sumaria a tenor con la Regla 56(d) [Proc. Cont. Núm. 20-00004, ECF Núm. 84]. También el 31 de agosto, CANA presentó una acumulación a la contestación de la Junta de Supervisión [Proc. Cont. Núm. 20-00004, ECF Núm. 87]. El 31 de septiembre de 2020, las Aseguradoras Monolínea presentaron una tríplica en apoyo a su oposición a la moción de sentencia sumaria parcial de la Junta de Supervisión y una contestación a la oposición de la Junta de Supervisión a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia sumaria a tenor con la Regla 56(d) [Proc. Cont. Núm. 20-00004, ECF Núm. 91]. El 23 de septiembre de 2020 se celebró una vista sobre la moción.

El 20 de enero de 2021, el Tribunal del Título III emitió la Orden de la Regla 56(d) [Proc. Cont. Núm. 20-00004, ECF Núm. 108].

La Orden de la Regla 56(d) autorizó la presentación de pruebas sobre algunos de los temas tratados en la declaración de la Regla 56(d) que los Demandados habían presentado el 26 de julio de 2020.

El Tribunal ordenó a las partes que se reunieran y deliberaran en relación con una propuesta de calendario y presentaran un informe de situación conjunto antes del 3 de febrero de 2021. De acuerdo con la Orden de la Regla 56(d), las partes se reunieron y deliberaron y presentaron un Informe de Situación Conjunto en el que exponían sus respectivas posturas respecto a la programación [Proc. Cont. Núm. 20-00004, ECF Núm. 111]. El 5 de febrero de 2021, el Tribunal emitió la Orden de Calendario de Presentación de Pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 112]. Tras admitir la moción conjunta de las partes para modificar el calendario de presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 136], la Orden de Calendario de Presentación de Pruebas requiere que la presentación de pruebas autorizada en la Orden de la Regla 56(d) se complete antes del 19 de mayo de 2021, a menos que el Tribunal ordene lo contrario. La presentación de pruebas en virtud de la Orden de la Regla 56(d) comenzó el 8 de febrero de 2021 y está en curso. El 3 de marzo de 2021, los Demandados presentaron una moción de obligación, en la que se solicitaba una orden que ordenara a los Demandantes (1) ampliar el alcance de su búsqueda de documentos adicionales y (2) presentar cierta información relativa a las prácticas contables [Proc. Cont. Núm. 20-00004, ECF Núm. 117]. ]. La moción de obligación de presentación de pruebas fue expuesta plenamente [Proc. Cont. Núm. 20-00004, ECF Núm. 120, 123], y fue defendida el 17 de marzo de 2021. El 26 de marzo de 2021, la magistrada Dein dictó una orden admitiendo parcialmente la moción [Proc. Cont. Núm. 20-00004, ECF Núm. 132]. El 23 de abril de 2021, la magistrada Dein dictó una orden señalando la fecha de presentación de las mociones de presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 158]. El 30 de abril de 2021, los Demandados presentaron una moción para obligar a la presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 164]. El 3 de mayo de 2021, las Partes gubernamentales plantearon una objeción a la moción de los Demandados obligando a la presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 168]. El 6 de mayo de 2021, Assured y National presentaron una moción informativa para comunicar al Tribunal del Título III que suspendían su participación en la moción obligando a la presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 170]. También el 6 de mayo, los Demandados presentaron su respuesta en apoyo de la moción obligando a la presentación de pruebas [Proc. Cont. Núm. 20-00004, ECF Núm. 171]. El 7 de mayo de 2021, la magistrada Dein dictó una orden admitiendo las mociones para su valoración.

El 6 de abril de 2021, la Junta de Supervisión presentó una moción para que se dictase una orden enmendando el Protocolo de gestión del caso para permitir a la Junta de Supervisión presentar mociones de sentencia sumaria en relación con ciertos cargos [Proc. Cont. Núm. 20-00004, ECF Núm. 133, 134]. El 13 de abril de 2021, Ambac, BNYM, U.S. Bank y los Acreedores del AAP presentaron objeciones a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00004, ECF Núm. 137; Caso Núm. 17-bk-3283, ECF Núm. 16401]. También el 13 de abril de 2021, la UCC presentó una respuesta en apoyo de la moción de la Junta de Supervisión y una moción cruzada para que se dictase una orden modificando el Protocolo de gestión del caso para permitir a UCC presentar objeciones limitadas para desestimar ciertas evidencias de reclamaciones [Proc. Cont. Núm. 20-00004, ECF Núm. 138]. El 14 de abril de 2021, FGIC presentó una objeción a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00004, ECF Núm. 140]. El 19 de abril de 2021, Assured y National presentaron una reserva de derechos en relación con la moción

de la Junta de Supervisión [Proc. Cont. Núm. 20-00004, ECF Núm. 148]. El 21 de abril de 2021, las aseguradoras monolínea y la Junta de Supervisión presentaron objeciones a la moción cruzada de UCC [Proc. Cont. Núm. 20-00004, ECF Núm. 152, 155, 156]. También el 21 de abril de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su moción, y respondió a la objeción de los Acreedores del AAP [Proc. Cont. Núm. 20-00004, ECF Núm. 153, 154]. El 24 de abril de 2021, UCC presentó una respuesta en apoyo de su moción cruzada [Proc. Cont. Núm. 20-00004, ECF Núm. 159]. El 5 de mayo de 2021, el Tribunal del Título III dictó una orden desestimando la moción dela Junta de Supervisión y la moción cruzada de UCC [Proc. Cont. Núm. 20-00004, ECF Núm. 169].

### 6. **Litigios varios**

#### a) *Pinto-Lugo y otros c. Estados Unidos y otros*, Proc. Cont. Núm. 18-00041

Varios sindicatos de trabajadores y organizaciones sin fines de lucro presentaron una acción el 24 de abril de 2018 contra los Estados Unidos, la Junta de Supervisión y el Gobernador. El 27 de julio de 2018, la Magistrada Dein concedió la moción de los Demandantes de autorización para presentar una demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 30]. También el 27 de julio, los Demandantes presentaron su demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 29]. La Demanda Enmendada alega que PROMESA es inconstitucional porque supuestamente viola la Primera, Quinta y Decimocuarta Enmiendas de la Constitución de los Estados Unidos, tratados internacionales y la Declaración de la Independencia. Los Demandantes primariamente basan su argumento en los *Casos Insulares* y el supuesto tratamiento de Estados Unidos hacia Puerto Rico como una colonia. Los Demandantes solicitan (i) una declaración de que PROMESA viola las disposiciones constitucionales a las que se hace referencia anteriormente, y varias disposiciones de derechos humanos en la Declaración de la Independencia, la Carta de las Naciones Unidas, la Declaración de Derechos Humanos de las Naciones Unidas y el Pacto Internacional de Derechos Civiles y Políticos; (ii) la remoción de dos miembros de la Junta de Supervisión; (iii) una paralización de los Casos de Título III y la adopción de planes fiscales hasta que se pueda realizar una auditoría de la deuda del ELA y cualquier persona que se involucre en conducta ilícita con respecto a la venta de los bonos es responsable; (iv) los Estados Unidos asumen la deuda pública del ELA; y (v) una orden para prohibir cualquier interferencia con AEE o UPR.

El 23 de agosto de 2018, los Estados Unidos, la Junta de Supervisión y el Gobernador, cada uno por separado, presentaron una moción de desestimación el caso [Proc. Cont. Núm. 18-00041, ECF Núm. 34-36, 38]. En esta moción de desestimación el caso, la Junta de Supervisión argumentó que (i) los Demandantes carecen de legitimidad, (ii) ciertas reclamaciones están prohibidas por las secciones 4 de PROMESA, que concede a los deudores la facultad de vender y también tiene prioridad sobre cualquier disposición incompatible en la Constitución del ELA, 105, que exime a la Junta de Supervisión, sus miembros y empleados de la responsabilidad legal por las acciones ejecutadas para la aplicación de PROMESA y 210(a), que establece que los Estados Unidos no es responsable del pago de capital e intereses sobre las obligaciones emitidas por Puerto Rico, (iii) los tratados no crean obligaciones legales vinculantes a nivel nacional, (iv) la Declaración de la Independencia no puede formar la base de una reclamación y no da origen a una causa de acción privada, (v) el Congreso no está limitado por el principio de división de los poderes cuando legisla de acuerdo con la Cláusula sobre Territorios, (vi) el Tribunal del Título III no posee la potestad como para remover a los miembros de la Junta de Supervisión, y (vii) la Junta de Supervisión no está obligada a realizar una auditoría en virtud de PROMESA.

El 24 de octubre de 2018, los Demandantes presentaron una oposición a la moción de desestimación y solicitaron una sentencia declaratoria parcial [Proc. Cont. Núm. 18-00041, ECF Núm.

48]. El 29 de octubre de 2018, los Demandados presentaron una moción para revocar la oposición de los Demandantes aduciendo que no se encontraba en regla [Proc. Cont. Núm. 18-00041, ECF Núm. 49]. El Tribunal del Título III concedió la moción urgente de los Demandados el 27 de noviembre de 2018, con autorización para que los Demandantes presentaran una oposición en cumplimiento el 21 de diciembre de 2018 [Proc. Cont. Núm. 18-00041, ECF Núm. 54] (cuya fecha límite se prorrogó posteriormente al 4 de enero de 2019 [Proc. Cont. Núm. 18-00041, ECF Núm. 58]).

El 4 de enero de 2019, los Demandantes presentaron su oposición a las mociones de desestimación, con la afirmación de que (i) la demanda enmendada satisface el estándar de alegatos; (ii) la Junta de Supervisión viola la Declaración de la Independencia en el sentido que los puertorriqueños no han consentido otorgarle facultades; (iii) el Congreso no dispone de facultades plenarias sobre los residentes de los territorios en virtud de la Cláusula sobre Territorios; (iv) las regulaciones aprobadas en virtud de la Cláusula sobre Territorios deben ser necesarias; (v) la Junta de Supervisión viola la Primera Enmienda, la Cláusula de Debido Proceso y ciertos tratados internacionales; (vi) los Demandantes tienen legitimidad; y (vii) los Estados Unidos están obligados a asumir la deuda pública de Puerto Rico [Proc. Cont. Núm. 18-00041, ECF Núm. 89].

Los Demandados presentaron sus contestaciones en apoyo a sus mociones de desestimación el 18 de marzo de 2019 [Proc. Cont. Núm. 18-00041, ECF Núm. 71-72, 73]. El 20 de abril de 2019 se presentó la tríplica de los Demandantes, con la venia del Tribunal [Proc. Cont. Núm. 18-00041, ECF Núm. 79]. El 7 de agosto de 2019, el Tribunal del Título III dictó una orden que concede la moción de desestimación de los Demandados porque los Demandantes carecían de legitimidad para hacer valer sus reclamaciones y les concedió a los Demandantes autorización para presentar una moción para solicitar permiso para presentar una demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 80].

El 7 de octubre de 2019, los Demandantes plantearon una moción de autorización para presentar una segunda demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 90]. El 11 de octubre de 2019, los Demandados presentaron una moción conjunta para desestimar la solicitud de autorización de los Demandantes porque no adjuntaba la propuesta de segunda demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 91]. El 14 de octubre de 2019, los Demandantes presentaron su segunda demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 92]. Los Demandantes presentaron una oposición a la moción de eliminación conjunta de los Demandados el 18 de octubre de 2019 [Proc. Cont. Núm. 18-00041, ECF Núm. 95]. La Magistrada Dein dictó una orden que rechaza la moción de eliminación de los Demandados el 22 de octubre de 2019 [Proc. Cont. Núm. 18-00041, ECF Núm. 97]. El 15 de noviembre de 2019, la gobernadora Vázquez Garced y la Junta de Supervisión presentaron oposiciones a la moción de autorización de los Demandantes para presentar una segunda demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 99, 100]. El 9 de diciembre de 2020, los Demandantes presentaron una respuesta en apoyo de su moción de permiso para presentar una segunda demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 106]. El 25 de mayo de 2020, los Demandantes presentaron una moción para solicitar la adjudicación de la moción de permiso de los Demandados para presentar una segunda demanda enmendada [Proc. Cont. Núm. 18-00041, ECF Núm. 110]. El 3 de junio de 2020, la Junta de Supervisión presentó una respuesta a la moción de los Demandantes [Proc. Cont. Núm. 18-00041, ECF Núm. 111]. El 13 de julio de 2020, la Magistrada Dein emitió un informe y una recomendación sobre la moción de los Demandantes, recomendando que se denegara la moción porque las enmiendas de la segunda demanda enmendada propuesta no demostraban la legitimidad de los Demandantes [Proc Cont. Núm. 18-00041, ECF Núm. 112]. El 27 de julio de 2020, los Demandantes presentaron una objeción al informe y la recomendación de la Magistrada Dein [Proc. Cont. Núm. 18-00041, ECF Núm. 113]. La objeción fue plenamente expuesta [Proc. Cont. Núm. 18-00041, ECF Núm. 117,118, 119 y 123]. El 22 de marzo de 2021, la juez Swain dictó una orden de memorando desestimando la objeción de los Demandados y adoptando el informe y la recomendación de la magistrada Dein, tras lo cual la secretaría del juzgado dictó sentencia y cerró el caso

292

[Proc. Cont. Núm. 18-00041, ECF Núm. 124 y 125]. El 4 de abril de 2021, los Demandantes presentaron un aviso de apelación a la orden de memorando de la juez Swain [Proc. Cont. Núm. 18-00041, ECF Núm. 126]. La apelación quedó registrada como Caso Núm. 21-1283.

.

        b)     ***Cooperativa de Ahorro y Crédito Abraham Rosa y otros c. Corporación Pública para Supervisión y Seguro de Cooperativas de Puerto Rico y otros*, Proc. Cont. Núm. 19-00389**

El 1 de julio de 2019, los Demandantes, un grupo de sindicatos de trabajo, presentaron una demanda contra la Corporación Pública para Supervisión y Seguro de Cooperativas de Puerto Rico ("COSSEC"), el ELA y la Junta de Supervisión solicitando remedio declaratorio e interdictal en relación con la capacidad de COSSEC de proveer un seguro de acciones y depósitos al Demandante y otras cooperativas de crédito. Los Demandantes argumentaron que habían cumplido los requisitos para contar con la cobertura proporcionada por COSSEC, que según ellos alegaron se ha descapitalizado. Los Demandantes solicitaron un interdicto preliminar y permanente que ordena que COSSEC recurra a los recursos del Departamento de Hacienda de Puerto Rico para que COSSEC pudiera proveer un seguro de acciones y depósitos adecuado a los Demandantes. También el 1 de julio, los Demandantes presentaron una moción para que el procedimiento quede sellado [Proc. Cont. Núm. 19-00389, ECF Núm. 2]. El 2 de julio de 2019, el Tribunal del Título III dictó una orden que indica que los Demandantes expliquen las razones por las cuales el procedimiento debería sellarse [Proc. Cont. Núm. 19-00389, ECF Núm. 4]. Los Demandantes presentaron una contestación en apoyo a su moción para sellar el expediente el 9 de julio de 2019 [Proc. Cont. Núm. 19-00389, ECF Núm. 6]. El 15 de julio de 2019, los Demandantes presentaron una moción para una orden para mostrar causa y solicitar un interdicto preliminar [Proc. Cont. Núm. 19-00389, ECF Núm. 11]. El 18 de julio de 2019, la Junta de Supervisión (en su nombre y en el del ELA) y COSSEC presentaron respuestas a la solicitud de los demandantes de un interdicto preliminar [Proc. Cont. Núm. 19-00389, ECF Núm. 14, 15]. El 19 de julio de 2019, la Junta de Supervisión presentó una respuesta a la moción para sellar de los Demandantes, indicando que no tomó ninguna posición con respecto a la moción para sellar [Proc Cont. Núm. 19-00389, ECF Núm. 16]. El 24 de julio de 2019, los Demandados presentaron una moción para paralizar todas las contestaciones a la demanda hasta 30 días después de que el Tribunal del Título III emita una opinión sobre la moción de los Demandantes para una vista para un interdicto preliminar [Proc. Cont. Núm. 19-00389, ECF Núm. 20]. El 26 de julio de 2019, el Tribunal del Título III dictó una orden que deniega (i) la moción para sellar de los Demandantes, y (ii) la moción para una vista para un interdicto preliminar de los Demandantes [Proc. Cont. Núm. 19-00389, ECF Núm. 24]. El 29 de julio, los Demandantes presentaron una notificación de apelación de la orden [Proc Cont. Núm. 19-00389, ECF Núm. 26].

El 6 de agosto de 2019, en el Primer Circuito, los Demandantes presentaron una moción para paralizar la orden que deniega su moción para sellar en el Caso Núm. 19-1755. El 7 de agosto de 2019, los Demandados (y partes contrarias a la apelación) presentaron su respuesta. El 9 de agosto de 2019, el Primer Circuito dictó una orden que paraliza temporalmente la orden del Tribunal del Título III para hacer público el procedimiento contencioso. El 14 de agosto de 2019, el Primer Circuito dictó una orden que revoca la paralización provisoria para hacer público el procedimiento contencioso a partir del 16 de agosto de 2019. El 16 de agosto de 2019, en el Tribunal del Título III, los Demandantes presentaron una moción para prorrogar temporalmente la paralización, que el Tribunal denegó [Proc. Cont. Núm. 19-00389, ECF Núm. 37]. El 15 de enero de 2020, en el Primer Circuito, los Apelantes presentaron una moción de desestimación voluntaria de la apelación sin perjuicio. El 3 de febrero de 2020, el Primer Circuito dictó su mandato y sentencia desestimando la apelación sin perjuicio.

El 30 de octubre de 2020, los Demandantes presentaron su demanda enmendada [Proc. Cont. Núm. 19-00389, ECF Núm. 55]. El 5 de febrero de 2021, la Junta de Supervisión presentó una moción para desestimar la demanda enmendada de los Demandantes [Proc. Cont. Núm. 19-00389, ECF Núm. 57]. También el 5 de febrero de 2021, COSSEC presentó una moción de desestimación y acumulación a la moción de la Junta de Supervisión [Proc. Cont. Núm. 19-00389, ECF Núm. 59]. El 8 de febrero de 2021, la magistrada Dein emitió una orden de programación de presentación de escritos en relación con la moción de la Junta de Supervisión para desestimar la demanda enmendada de los Demandantes [Proc. Cont. Núm. 19-00389 ECF Núm. 60]. El 23 de abril de 2021, los Demandantes presentaron escritos de objeción a las mociones de desestimación de la Junta de Supervisión y de COSSEC [Proc. Cont. Núm. 19-00389, ECF Núm. 64 y 66]. Los Demandados deben responder como más tardar el 7 de julio de 2021.

c) ***Puerto Rico Horse Owners Association, Inc. c. el Estado Libre Asociado de Puerto Rico y otros.,* Proc. Cont. Núm. 19-00392**

El 2 de julio de 2019, una organización sin fines de lucro, Puerto Rico Horse Owners Association, presentó una acción contra el ELA, la Junta de Supervisión y su directora ejecutiva (en su carácter oficial), la Gobernadora de Puerto Rico y algunos funcionarios del gobierno (en su carácter oficial) solicitando remedio declaratorio de que los fondos de los boletos ganadores no cobrados apostados en carreras de caballos no son propiedad del ELA, y deben ser pagados al Administrador de Carreras para ser distribuidos a algunos criadores de caballos de Puerto Rico. El 3 de julio de 2019, el Demandante presentó una demanda enmendada que pretende corregir un error administrativo [Proc. Cont. Núm. 19-00392, ECF Núm. 3]. El 3 de septiembre de 2019, el ELA, la Junta de Supervisión y Natalie Jaresko; los demandados individuales del gobierno; y la AAFAF presentaron mociones para desestimar la demanda enmendada [Proc. Cont. Núm. 19-00392, ECF Núm. 13, 14, 15]. El 15 de octubre de 2019, el Demandante presentó una oposición ómnibus a las mociones de desestimación [Proc. Cont. Núm. 19-00392, ECF Núm. 20].

El 3 de noviembre de 2019, el Demandante presentó una segunda demanda enmendada [Proc. Cont. Núm. 19-00392, ECF Núm. 29]. El 4 de noviembre de 2019, los Demandados presentaron mociones de desestimación de la segunda demanda enmendada [Proc. Cont. Núm. 19-00392, ECF Núm. 30-31, 32]. El 18 de noviembre de 2019, el Demandante presentó una oposición a las mociones de desestimación [Proc. Cont. Núm. 19-00392, ECF Núm. 33]. El 2 de diciembre de 2019, la Junta de Supervisión y AAFAF presentaron contestaciones en apoyo de sus mociones de desestimación [Proc. Cont. Núm. 19-00392 ECF Núm. 34, 35]. El 28 de febrero de 2020, los Demandantes presentaron una moción para una orden que instruye a los Demandados a expresar su posición en relación con las mociones de desestimación [Proc. Cont. Núm. 19-00392, ECF Núm. 36]. En ella, los Demandantes afirmaban que los fondos que habían sido objeto de la demanda habían sido desembolsados, y solicitaban el pago de los honorarios de sus abogados. El 16 de marzo de 2020, Wanda Vázquez Garced, Francisco Parés-Alicea y José Alberto Maymó-Azize presentaron una oposición a la moción de los Demandantes [Proc. Cont. Núm. 19-00392, ECF Núm. 38]. El 20 de marzo de 2020, la Junta de Supervisión y AAFAF presentaron oposiciones a la Moción de los Demandantes [Proc. Cont. Núm. 19-00392, ECF Núm. 39, 40]. El 23 de marzo de 2020, los Demandantes presentaron una respuesta en apoyo de su moción para que se ordene a los Demandados que presenten una declaración más definitiva [Proc. Cont. Núm. 19-00392, ECF Núm. 41]. El 25 de marzo de 2020, el Tribunal del Título III emitió una orden y sentencia desestimando el caso por ser irrelevante [Proc. Cont. Núm. 19-00392, ECF Núm. 42, 43].

d) **Objeción de CANA a las reclamaciones basadas en las garantías del ELA**

El 15 de julio de 2019, CANA presentó una objeción a la reclamación del BGF contra el ELA basándose en (i) la sección 502(d) del Código de Quiebras, que instruye a los tribunales a rechazar reclamaciones de cesionarios de una transferencia anulable si el cesionario no ha pagado la cantidad o

entregado los bienes recibidos como lo disponen las secciones en virtud de las cuales surge la responsabilidad legal del cesionario, y (ii) la sección 502(b)(1), que establece que no se pueden permitir las reclamaciones inaplicables [ECF Núm. 8000] (la "Objeción del BGF de CANA"). CANA argumentó que el BGF recibió transferencias realmente fraudulentas o interpretadas como tales, del ELA en forma de Bonos GO 2014 porque, entre otras cosas, las transferencias fueron hechas para beneficiar al BGF, el ELA estaba descapitalizado, el ELA no recibió un valor razonablemente equivalente a cambio de las transferencias, y que el BGF recibió transferencias preferenciales. CANA hizo referencia al informe Kobre & Kim, que establecía que el BGF abusó de su posición como prestamista de los Deudores de Título III al aumentar la carga de la deuda de una manera que beneficiaba al BGF como acreedor en relación con otros acreedores. CANA alegó además que el BGF no podía sustanciar sus reclamaciones. El 9 de septiembre de 2019, el Tribunal del Título III dictó una orden que sometía la Objeción del BGF de CANA a la Orden de Paralización, y dicha paralización se prorrogó hasta el 10 de marzo de 2020.[204] El 10 de marzo de 2020, el Tribunal del Título III emitió la Orden Final de Paralización y Mediación, que ordenó que la Objeción del BGF de CANA permaneciera suspendida hasta que se tomara una decisión sobre la confirmación del Plan Enmendado [ECF Núm. 12189].

El 8 de enero de 2020, CANA presentó una objeción general a las evidencias de reclamaciones presentadas por el BGF y Scotiabank y a todas las reclamaciones contra el ELA basándose en su garantía de algunos pagarés de AFI [ECF Núm. 9735]. La objeción de CANA incorporó su objeción anterior a las reclamaciones hechas valer por ciertos bonistas GO [ECF Núm. 4784] y a las reclamaciones presentadas o hechas valer contra el ELA basadas en ciertos bonos AEP emitidos en 2011 y 2012 [ECF Núm. 8141]. Argumentó que la Constitución del ELA impedía que ésta garantizara bonos o pagarés si se había superado el Límite de Amortización de la Deuda. CANA argumentó que, dado que el Límite de Amortización de la Deuda ya se había superado cuando se emitieron determinadas garantías del Estado, dichas garantías eran inválidas. Para un análisis de la historia del procedimiento y del estado actual de esta objeción, *véase* la sección **Error! Reference source not found.Error! Reference source not found.** ("Impugnación de la Validez de los bonos GO y de las garantías del Estado").

e)   ***Ambac Assurance Corporation c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. núm. 20-00068**

El 26 de mayo de 2020, Ambac Assurance Corp. presentó una demanda contra la Junta de Supervisión y sus miembros [Proc. Cont. Núm. 20-00068, ECF Núm. 1] alegando que PROMESA es una ley de quiebras no uniforme que viola el requisito de la Cláusula de Quiebras de que el Congreso "establezca… leyes uniformes en materia de quiebras en todos los Estados Unidos". Const. EE.UU. art. I, § 8, cl. 4. Ambac alegó que PROMESA no es uniforme porque solo se aplica a las reestructuraciones municipales que se producen en Puerto Rico, mientras que las reestructuraciones en otras partes de Estados Unidos se rigen por el Capítulo 9. Como remedio, Ambac solicitó (1) una declaración de que los Títulos I, II y III de PROMESA son inconstitucionales e inaplicables por violar el requisito de uniformidad de la Cláusula de Quiebras; y (2) un interdicto que prohíba a la Junta de Supervisión y a sus miembros implementar o hacer efectivos los Títulos I, II y III de PROMESA.

El 28 de mayo de 2020, el Tribunal del Título III certificó el recurso de inconstitucionalidad de Ambac ante el Fiscal General de los Estados Unidos [Proc. Cont. Núm. 20-00068 ECF Núm. 4-1]. El 10 de julio de 2020, Estados Unidos solicitó la prórroga de su fecha límite para decidir si intervenía en el asunto [Proc. Cont. Núm. 20-00068, ECF Núm. 20]. El 13 de julio de 2020, la magistrada Dein ordenó a las partes que se reunieran y deliberaran y que presentaran un informe de situación conjunto en relación con la

---

[204] Consulte la sección V.L. de esta Declaración de Divulgación para obtener un resumen detallado del Informe de Mediación.

moción de prórroga de los Estados Unidos [Proc. Cont. Núm. 20-00068, ECF Núm. 22]. El 14 de julio de 2020, las partes presentaron un informe de situación conjunto [Proc. Cont. Núm. 20-00068, ECF Núm. 25]. El 15 de julio de 2020, la juez Dein concedió la moción de prórroga [Proc. Cont. Núm. 20-00068, ECF Núm. 26]. El 14 de agosto de 2020, Estados Unidos presentó una notificación de participación en el asunto [Proc. Cont. Núm. 20-00068, ECF Núm. 35].

El 25 de junio de 2020, el Comité de Retirados presentó una solicitud de intervención [Proc Cont. Núm. 20-00068, ECF Núm. 12]. El 9 de julio de 2020, AAFAF presentó una solicitud de intervención [Proc. Cont. Núm. 20-00068, ECF Núm. 16]. El 11 de julio de 2020, el Comité de Retirados presentó una moción informativa en relación con su moción de intervención [Proc. Cont. Núm. 20-00068, ECF Núm. 21]. El 17 de julio de 2020, Ambac presentó una objeción limitada a la moción de intervención del Comité de Retirados [Proc. Cont. Núm. 20-00068, ECF Núm. 27]. El 31 de julio de 2020, la magistrada Dein dictó una orden que concedía parcialmente las mociones de intervención del Comité de Retirados y AAFAF [Proc. Cont. Núm. 20-00068, ECF Núm. 31].

El 17 de agosto de 2020, la Junta de Supervisión solicitó la desestimación de la demanda de Ambac [Proc. Cont. Núm. 20-00068, ECF Núm. 37]. En apoyo, la Junta de Supervisión argumentó que (i) el requisito de uniformidad del Artículo I no se aplica a PROMESA porque el Congreso promulgó PROMESA de acuerdo con su poder del Artículo IV para "hacer todas las reglas y reglamentos necesarios con respecto al Territorio... que pertenece a los Estados Unidos", Constitución de los Estados Unidos de América, art. IV, § 3, cl. 2; (ii) incluso si se aplicara el requisito de uniformidad, PROMESA es una ley uniforme; (iii) la sección 3(b) de PROMESA prohíbe los recursos de invalidación solicitados por Ambac; y (iv) Ambac está impedida contractual y equitativamente de presentar su demanda. El 18 de agosto de 2020, AAFAF y el Comité de Retirados presentaron escritos en apoyo de la moción de desestimación de la Junta de Supervisión [Proc Cont. Núm. 20-00068, ECF Núm. 38, 39]. El 2 de octubre de 2020, Estados Unidos presentó un memorando de derecho en apoyo de la constitucionalidad de PROMESA [Proc. Cont. Núm. 20-00068, ECF Núm. 45]. El 23 de octubre de 2020, Ambac se opuso a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 20-00068, ECF Núm. 49]. El 23 de noviembre de 2020, Junta de Supervisión, AAFAF y el Comité de Retirados presentaron contestaciones en apoyo de la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 20-00068, ECF Núm. 52-53, 54]. El 12 de enero de 2021, la moción fue argumentada. El Tribunal del Título III tomó la moción *sub judice*.

f)   ***Finca Matilde, Inc. c. el Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 20-00124**

El 13 de octubre de 2020, Finca Matilde, Inc. presentó una demanda contenciosa contra el ELA, la AAFAF y la Junta de Supervisión [Proc. Cont. Núm. 20-00124, ECF Núm. 1]. El Demandante afirmó que tenía una sentencia pendiente contra el ELA a causa de una expropiación legislativa, que supuestamente se produjo antes de la petición en virtud de la Ley 227-2008 del ELA. El Demandante alegó que había presentado una evidencia de reclamaciones basada en la sentencia. El Demandante alegó que el Plan presentado por la Junta de Supervisión el 28 de febrero de 2020 no proporcionaba una clasificación para los titulares de sentencias de dominio eminente y que la reclamación del Demandante estaba clasificada de manera que liberaba indebidamente su reclamación. La demanda afirmaba cuatro causas de acción, todas ellas relacionadas con la supuesta inaplicabilidad de lo que, según afirmaba, era una reclamación de la Cláusula sobre Expropiaciones en virtud de la Quinta Enmienda de la Constitución de los Estados Unidos. La primera y la segunda causa de acción del Demandante solicitaban una sentencia declaratoria, respectivamente, de que (1) su supuesta reclamación de la Cláusula sobre Expropiaciones no se puede dar por cumplida por el Plan de Ajuste de la Junta de Supervisión; y (2) su reclamación de la Cláusula sobre Expropiaciones debe ser incluida en el Plan y debe ser pagada en su totalidad de acuerdo con el Plan. La tercera causa de acción del Demandante alegaba que el hecho de que la Junta de Supervisión no tomara en

cuenta la reclamación de que la Cláusula sobre Expropiaciones violaba el artículo 42 U.S.C. § 1983 y
solicitaba una indemnización contra el ELA de "más de $11 millones por daños y perjuicios". La cuarta
causa de acción del Demandante solicitaba una sentencia declaratoria de que la Sección 105 de PROMESA
es inconstitucional. En particular, el Demandante sostuvo que al proponer un plan de ajuste bajo el cual la
reclamación del Demandante no sería pagada en su totalidad, permitir la inmunidad de la Junta de
Supervisión bajo la Sección 105 "proporcionaría mecanismos para anular las obligaciones impuestas al
Deudor [sic] por la Quinta Enmienda".

El 14 de diciembre de 2020, la Junta de Supervisión y AAFAF presentaron sus mociones de
desestimación [Proc. Cont. Núm. 20-00124, ECF Núm. 24, 27]. La Junta de Supervisión argumentó que
(1) las reclamaciones del Demandante eran improcedentes, y (2) el Demandante carecía de legitimación
constitucional. La AAFAF argumentó, entre otras cosas, que la demanda del Demandante no establecía una
reclamación contra la AAFAF porque no incluía ningún hecho específico relacionado con la AAFAF. El 4
de enero de 2021, el Demandante presentó una demanda enmendada [Proc. Cont. Núm. 20-00124 ECF
Núm. 31]. El 19 de enero de 2021, AAFAF y la Junta de Supervisión presentaron mociones para desestimar
la demanda enmendada [Proc. Cont. Núm. 20-00124, ECF Núm. 36 y 38], presentando sustancialmente los
mismos argumentos que presentaron al solicitar la desestimación de la demanda original. Las mociones de
desestimación fueron plenamente expuestas [Proc. Cont. Núm. 20-00124, ECF Núm. 41 y 42, 43,44]. El
13 de abril de 2021, el Tribunal del Título III dictó una orden pidiendo una exposición suplementaria en
relación con las mociones de desestimación [ECF Núm. 46]. El 19 de abril de 2021, la AAFAF, Finca
Matilde y la Junta de Supervisión presentaron exposiciones suplementarias en relación con las mociones
de desestimación [Proc. Cont. Núm. 20-00124, ECF Núm. 47, 48 y 49]. El 26 de abril de 2021, Finca
Matilde presentó una respuesta a la exposición suplementaria de la Junta de Supervisión [Proc. Cont. Núm.
20-00124, ECF Núm. 51], y la Junta de Supervisión presentó una respuesta a la exposición suplementaria
de Finca Matilde [Proc. Cont. Núm. 20-00124, ECF Núm. 52].

## G. Mociones bajo la Regla 2004

### 1. Moción bajo la Regla 2004 para Bonistas GO/Aseguradoras Monolínea relativa al desarrollo del Plan Fiscal

El 25 de agosto de 2017, National presentó una moción bajo la Regla 2004 para solicitar documentos con
respecto a la situación financiera del ELA y su plan fiscal [ECF Núm. 1177]. Ese mismo día, el Grupo Ad
Hoc de Bonistas GO, Assured, y el Mutual Fund Group presentaron una moción de Regla 2004 conjunta
[ECF Núm. 1178]. El 12 de septiembre de 2017, Ambac presentó una moción de Regla 2004 para solicitar
información financiera similar [ECF Núm. 1283]. El 19 de septiembre de 2017, FGIC [ECF Núm. 1334,
1335] y los Bonistas de SRE [ECF Núm. 1340] se unieron a las mociones de National y del Grupo GO
(definido en el presente), mientras que el Comité Oficial de Jubilados se unió a los tres [ECF Núm. 1353].
Asimismo, el 19 de septiembre, CANA presentó una respuesta [ECF Núm. 1344], y la Junta de Supervisión
objetó las tres mociones de Regla 2004 [ECF Núm. 1345]. AAFAF se unió a la objeción ómnibus de la
Junta de Supervisión el 31 de octubre de 2017 [ECF Núm. 1582]. El 2 de noviembre de 2017, CANA se
unió a las tres mociones de Regla 2004 [ECF Núm. 1603]. El 7 de noviembre de 2017, el Grupo GO [ECF
Núm. 1665], National [ECF Núm. 1667] y Ambac [ECF Núm. 1668] presentaron contestaciones en apoyo
de sus respectivas mociones y los Bonistas de SRE presentaron una contestación en apoyo de la
acumulación [ECF Núm. 1670]. El 17 de noviembre de 2017, el Tribunal del Título III emitió una orden
que deniega las mociones sin perjuicio [ECF Núm. 1824].

El 28 de noviembre de 2017, el Grupo Ad Hoc de Bonistas GO presentó una moción renovada para solicitar
una orden para autorizar la presentación de pruebas con respecto a la situación financiera del ELA y su plan
fiscal, en el que varias partes se unieron, entre ellas CANA, algunos bonistas SRE, Ambac, Assured y
National [ECF Núm. 1870]. El ELA presentó una objeción a la moción conjunta renovada el 6 de diciembre

297

de 2017 con la afirmación, entre otras cosas, de que los privilegios del interés común y del proceso deliberativo impidieron la presentación de pruebas en el desarrollo del plan fiscal [ECF Núm. 1928]. El 26 de febrero de 2018, la magistrada Dein dictó una orden que sostenía la afirmación de los privilegios del interés común y del proceso deliberativo, pero ordenaba a las partes que prepararan registros de privilegio [ECF Núm. 2590]. El 21 de mayo de 2018, la magistrada Dein celebró una vista sobre las controversias de las partes con respecto a la afirmación de privilegios sobre los materiales de desarrollo del plan fiscal [ECF Núm. 3136]. Posteriormente, las partes entablaron conversaciones para resolver sus controversias.

2.    **Moción bajo la Regla 2004 de Ambac relativa a los impuestos sobre el ron de AFI**

El 7 de junio de 2019, Ambac presentó una moción bajo la Regla 2004 relativa a los impuestos sobre el ron de AFI [ECF Núm. 7328] (la "Moción 2004 relativa a impuestos sobre el ron de AFI"), a la que FGIC [ECF Núm. 7676] y CANA [ECF Núm. 7881] se unieron posteriormente. La Moción 2004 relativa a los impuestos sobre el ron de AFI solicita presentación de pruebas con respecto a la identificación y cuantificación de los ingresos del impuesto sobre el ron, y también cualquier transferencia de dichos ingresos impositivos. La Junta de Supervisión se opuso a la moción el 9 de julio de 2019, acompañada por AAFAF [ECF Núm. 7891, 7896]. Bacardi también presentó una objeción el 9 de julio de 2019 [ECF Núm. 7897]. Ambac contestó en apoyo a su moción el 16 de julio de 2019 [ECF Núm. 8029]. Otros procedimientos con respecto a la Moción 2004 relativa a los impuestos sobre el ron de AFI se paralizaron en virtud de la Orden de Paralización del Tribunal del Título III. El 10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado, con la recomendación de que la Moción 2004 relativa a los impuestos sobre el ron de AFI se deniegue sin perjuicio. El 10 de marzo de 2020, el Tribunal del Título III emitió la Orden Final de Paralización y Mediación que deniega la moción sin perjuicio [ECF Núm. 12189].

3.    **Mociones bajo la Regla 2004 y sobre cumplimiento de Ambac relativas a obligaciones de pensión**

El 18 de junio de 2019, Ambac presentó una moción para obligar al cumplimiento de órdenes anteriores [ECF Núm. 7505] y una moción bajo la Regla 2004 (junto con ECF Núm. 7505, las "Mociones sobre Obligaciones de Pensión") [ECF Núm. 7507] relativas a obligaciones de pensión. El Grupo Ad Hoc de Tenedores de Deuda Constitucional [ECF Núm. 7531], Assured [ECF Núm. 7588], el Grupo Ad Hoc de Bonistas de Obligación General [ECF Núm. 7714] y CANA [ECF Núm. 7883] se unieron a la Moción bajo la Regla 2004; FGIC se unió a ambas [ECF Núm. 7674]. El 9 de julio de 2019, la Junta de Supervisión presentó una oposición ómnibus [ECF Núm. 7895] a la moción para obligar y la Moción bajo la Regla 2004. Ambac contestó el 23 de julio [ECF Núm. 8230]. Al mismo tiempo, las partes se reunieron para deliberar y acordaron la presentación de ciertos documentos en respuesta a las Mociones sobre Obligaciones de Pensión.  Como resultado de esos esfuerzos, las partes solicitaron de forma conjunta varios aplazamientos de cualquier vista sobre mociones de obligaciones de pensión. El 29 de mayo de 2020, la magistrada Dein emitió una orden que denegaba sin perjuicio las mociones de presentación de pruebas de pensiones de Ambac [ECF Núm. 13265]. Posteriormente, las partes entablaron negociaciones consensuales para resolver sus controversias.

El 4 de diciembre de 2020, Ambac presentó una moción bajo la Regla 2004 en la que solicitaba autorización para entregar una citación a Milliman,  Inc., un consultor actuarial del ELA, en la que se pedía que se aportaran pruebas sobre el cálculo de las obligaciones de pensión del ELA [ECF Núm. 15342]. El 7 de diciembre de 2020, CANA presentó una acumulación a la moción bajo la Regla 2004 de Ambac [ECF Núm. 15358]. El 8 de diciembre de 2020, Assured y National presentaron acumulaciones a la moción bajo la Regla 2004 de Ambac [ECF Núm. 15381]. El 9 de diciembre de 2020, FGIC, los Acreedores de AAP y algunos bonistas SRE presentaron acumulaciones a la moción bajo la Regla 2004 de Ambac [ECF Núm. 15389, 15401, 15403]. El 30 de diciembre de 2020, la Junta de Supervisión y la AAFAF presentaron una notificación de no oposición a la moción bajo la Regla 2004 de Ambac en relación con la divulgación de

las obligaciones de pensiones [ECF Núm. 15518]. El 13 de enero de 2021, la magistrada Dein emitió una orden que concedía moción bajo la Regla 2004 de Ambac [ECF Núm. 15589]

4. **Mociones bajo la Regla 2004 relativas a activos del ELA y restricción de dinero en efectivo del ELA**

El 28 de octubre de 2019, Ambac presentó dos mociones bajo la Regla 2004: una para solicitar pruebas con respecto a los activos del ELA [ECF Núm. 9022] ("Moción sobre activos del ELA"), y la otra para solicitar pruebas con respecto al dinero en efectivo disponible del ELA y análisis con respecto al efectivo restringido comparado con el efectivo disponible ("Moción sobre efectivo del ELA") [ECF Núm. 9023]. El 8 de noviembre de 2019, la Junta de Supervisión presentó una moción urgente para eliminar las mociones bajo la Regla 2004 de Ambac y para solicitar sanciones, con el argumento de que la Moción sobre Activos del ELA y la Moción sobre Efectivo del ELA violaban la paralización obligatoria impuesta por el Tribunal del Título III en julio de 2019 [ECF Núm. 9131]. El 3 de diciembre de 2019, Ambac presentó una oposición a la moción urgente de la Junta de Supervisión [ECF Núm. 9404]. El 10 de diciembre de 2019, la Junta de Supervisión presentó una contestación en apoyo a su moción [ECF Núm. 9531].

El 23 de enero de 2020, el Tribunal del Título III denegó la moción de eliminación de la Junta de Supervisión. ECF Núm. 10332. Sin embargo, el Tribunal del Título III sostuvo que los pedidos de presentación de pruebas en la Moción sobre Activos del ELA y la Moción sobre Efectivo del ELA eran "excesivamente amplios" y "objetivamente irrazonables". *Id.* El Tribunal del Título III ordenó a las partes que deliberaran y presentaran un informe conjunto sobre la situación antes del 12 de febrero de 2020. *Id.* Varias partes, entre ellas CANA, Servicios Integrales de la Montana, Assured, National y FGIC presentaron acumulaciones, donde solicitan participar en reuniones y deliberaciones y recibir las pruebas solicitadas presentadas de conformidad con la Moción de Efectivo del ELA y la Moción de Activos del ELA. El 3 de febrero de 2020, FGIC presentó una acumulación para la Moción de Efectivo del ELA y la Moción de Activos del ELA [ECF Núm. 10605]. El 6 de febrero de 2020, la magistrada Dein dictó una orden que exige a las partes que respondan a las acumulaciones en su informe conjunto sobre la situación [ECF Núm. 10727].   El 12 de febrero de 2020, las partes presentaron un informe conjunto sobre la situación, donde declaran que continúan reuniéndose y deliberando para resolver controversias relativas al alcance de las solicitudes [ECF Núm. 10875]. Las partes señalaron además que no se oponen a los pedidos de las entidades de la acumulación para participar en reuniones y deliberar y para recibir documentos, pero se reservan el derecho de oponerse a pedidos futuros. El 26 de febrero de 2020, las partes presentaron un nuevo informe conjunto sobre la situación [ECF Núm. 11787]. El 10 de abril de 2020, las partes presentaron otro informe conjunto sobre la situación, donde declaran que las partes estaban presentando pruebas y continuaban reuniéndose y deliberando para resolver controversias relativas al alcance de las solicitudes [ECF Núm. 12711]. Las partes también declararon que la presentación de ciertos materiales se retrasaría a causa de la pandemia de la COVID-19. El 21 de abril de 2020, las partes presentaron una orden de protección estipulada [ECF Núm. 12911]. Además el 21 de abril de 2020, la magistrada Dein emitió una orden que aprueba la orden de protección [ECF Núm. 12920].

El 12 de junio de 2020, algunos tenedores de bonos SRE presentaron una acumulación para la moción de Ambac [ECF Núm. 13414]. El 19 de junio de 2020, Ambac presentó una respuesta a la acumulación de los Tenedores de Bonos [ECF Núm. 13468]. El 24 de junio de 2020, la magistrada Dein emitió una orden en la que denegaba parcialmente la acumulación, pero señalaba que los tenedores de bonos SRE podían ser incluidos en cualquier discusión relativa a la presentación de pruebas [ECF Núm. 13488]. El 26 de junio de 2020, la Junta de Supervisión y algunos bonistas SRE presentaron una estipulación que vinculaba a los bonistas SRE con la orden de protección existente [ECF Núm. 13505], que la magistrada Dein aprobó el mismo día [ECF Núm. 13507].

El 1 de septiembre de 2020 [ECF Núm. 14150] y el 30 de septiembre de 2020 [ECF Núm. 14438], las partes presentaron otros informes de situación, indicando que las partes habían llegado a un punto muerto en ciertas cuestiones, pero que seguían deliberando productivamente sobre otras. El 12 de noviembre de 2020, el Tribunal del Título III emitió una orden denegando las Mociones sobre Efectivo del ELA y sobre Activos del ELA sin perjuicio y ordenó a Ambac que presentara una nueva moción de 2004, limitada a las cuestiones controvertidas [ECF Núm. 15093].

El 20 de noviembre de 2020, Ambac presentó una nueva moción bajo la Regla 2004 en la que solicitaba que se presentara información sobre el efectivo disponible del ELA y los análisis relativos al efectivo restringido frente al no restringido ("Nueva moción sobre efectivo del ELA") [ECF Núm. 15220]. El 23 de noviembre de 2020, Assured presentó una acumulación a la nueva Moción sobre Efectivo del ELA de Ambac [ECF Núm. 15225]. El 24 de noviembre de 2020, los Bonistas SRE, la FGIC y National presentaron acumulaciones a la Nueva Moción sobre Efectivo del ELA de Ambac [ECF Núm. 15239, 15266, 15268]. El 25 de noviembre de 2020, CANA presentó una acumulación a la nueva Moción sobre Efectivo del ELA de Ambac [ECF Núm. 15279]. El 4 de diciembre de 2020, Ambac y las partes del Gobierno presentaron un informe conjunto sobre la situación con respecto a la nueva Moción sobre Efectivo del ELA de Ambac [ECF Núm. 15350]. Además el 7 de diciembre de 2020, las partes de ARD presentaron una acumulación a la nueva Moción sobre Efectivo del ELA de Ambac [ECF Núm. 15366]. El 16 de diciembre de 2020, la magistrada Dein emitió una orden en la que denegaba parcialmente las diversas acumulaciones, pero señalaba que las partes debían incluir a las partes adheridas en las discusiones relativas a la presentación de pruebas y que las acumulaciones permanecerían pendientes para que el tribunal pudiera abordar cualquier controversia [ECF nº 15454]. El 23 de diciembre de 2020, la Junta de Supervisión presentó una objeción a la nueva Moción sobre Efectivo del ELA de Ambac [ECF Núm. 15495]. El 8 de enero de 2021, Ambac presentó una contestación en apoyo a su moción [ECF Núm. 15567]. El 29 de enero de 2021, con la autorización del tribunal, la Junta de Supervisión presentó una tríplica en contestación a la moción [ECF Núm. 15783].

El 4 de febrero de 2021, Ambac presentó una nueva moción bajo la Regla 2004 en la que solicitaba que se presentaran pruebas relativas a determinados activos propiedad de varias entidades del ELA ("Nueva moción sobre activos del ELA") [ECF Núm. 15802]. El 18 de febrero de 2021, Assured, FGIC y National presentaron una acumulación a la nueva Moción sobre Activos del ELA de Ambac [ECF Núm. 15859]. El 2 de marzo de 2021, CANA presentó una acumulación a la nueva Moción sobre Activos del ELA de Ambac [ECF Núm. 15899]. El 4 de marzo de 2021, Ambac y las partes del Gobierno presentaron un informe conjunto sobre la situación con respecto a las solicitudes relacionadas con los activos y el efectivo de Ambac [ECF Núm. 15930]. El 5 de marzo de 2021, la Junta de Supervisión, la AAFAF y GoldenTree Asset Management presentaron oposiciones a la Nueva Moción sobre Activos del ELA de Ambac [ECF Núm. 15956, 15959, 15965]. El 16 de marzo de 2021, Ambac presentó una respuesta en apoyo de su moción [ECF Núm. 6085].

## H.   Investigación de la Junta de Supervisión sobre potenciales causas de acción

La Junta de Supervisión dispone de amplios poderes de investigación. Conforme a la sección 104(o) de PROMESA, que faculta a la Junta de Supervisión para investigar las prácticas de divulgación y venta en relación con la adquisición de bonos emitidos por los Deudores, y la sección relacionada, la Junta de Supervisión, a través de su Comité Especial de Investigación, investigó potenciales causas de acción relacionadas con la crisis fiscal de Puerto Rico.

1. **Informe del Investigador Independiente**

   a) **Proceso y mandato**

El 1 de septiembre de 2017, la Junta de Supervisión, por y a través del Comité Especial de Investigación, contrató a Kobre & Kim LLP (el "Investigador Independiente") para que llevara a cabo una investigación sobre ciertos asuntos relacionados con la crisis fiscal de Puerto Rico en cumplimiento del mandato de la Junta de Supervisión conforme a PROMESA.

Específicamente, se le pidió al Investigador Independiente que investigara: (i) los factores que contribuyen a la crisis fiscal de Puerto Rico, entre ellos cambios en la economía, expansión de los compromisos de gasto y los programas de prestaciones, cambios en el financiamiento federal y la dependencia de la deuda para financiar un déficit presupuestario estructural; (ii) la deuda de Puerto Rico, el uso general de los ingresos, la relación entre la deuda y el déficit presupuestario estructural de Puerto Rico, la gama de sus instrumentos de deuda y la manera en que se comparan las prácticas de la deuda de Puerto Rico con las prácticas de deuda de los estados y las grandes jurisdicciones municipales; y (iii) las prácticas de emisión, divulgación y venta de deuda de Puerto Rico, incluida su interpretación del Límite Constitucional de la Deuda de Puerto Rico. En consulta con el Comité Especial de Investigación y el Consejero General de la Junta de Supervisión, el Investigador Independiente centró su investigación en los siguientes ámbitos específicos: BGF; Servicios Públicos de Puerto Rico; COFINA; SRE; Funciones de Elaboración de presupuestos de Puerto Rico, Presentación de informes externos y Contabilidad de Puerto Rico; cálculo del Límite Constitucional de la Deuda; las agencias de calificación crediticia; prácticas de venta de bonos relacionados con Puerto Rico; el marco de ética del gobierno de Puerto Rico; uso de swaps de tipo de interés por parte del emisor; falta de un mecanismo claro en Puerto Rico para validar los bonos relacionados con Puerto Rico antes de que se emitan; y el crédito fiscal por posesión.

Los objetivos principales de la investigación del Comité Especial de Investigación fueron: (i) identificar políticas (o falta de salvaguardias) que contribuyeron a la crisis de deuda de Puerto Rico, entre ellas factores que permitieron que Puerto Rico y algunas de sus instrumentalidades ("Emisores") emitieran cantidades significativas de deuda sin fuentes adecuadas de reembolso; e (ii) identificar posibles recuperaciones de valor de partes culpables y determinar las cuestiones que requieren atención reglamentaria, todo ello para ayudar a la Junta de Supervisión en su misión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el acceso de Puerto Rico a los mercados de capitales.

   b) **Procedimientos de investigación**

En mayo de 2017, la Junta de Supervisión adoptó los Procedimientos de Investigación de PROMESA para establecer el marco procesal de la investigación.[205] Los procedimientos de investigación de PROMESA autorizan a la Junta de Supervisión a iniciar una "Investigación Informal" y una "Investigación Formal" para investigar las actividades o conductas que la Junta de Supervisión tiene autoridad para investigar en virtud de PROMESA. La principal diferencia de procedimiento entre los dos tipos de investigaciones es que la Junta de Supervisión solo está autorizada a ordenar la tramitación de la presentación de testigos y material de investigación tras el inicio de una Investigación Formal.[206]   El

---

[205] Los Procedimientos de Investigación de PROMESA están disponibles en
https://oversightboard.pr.gov/documents/.

[206] Procedimientos de investigación de PROMESA, §§ 3.1(b), 3.2(b)(2). La sección 104 de PROMESA confiere a la
Junta de Supervisión la facultad de emitir citaciones legales que "exigen la comparecencia y el testimonio de los

Investigador Independiente utilizó técnicas de investigación tanto formales como informales para cumplir el mandato establecido por el Comité Especial de Investigación.

El 18 de octubre de 2017, el Comité Especial de Investigación, en nombre de la Junta de Supervisión, aprobó una resolución de inicio de una investigación formal con el fin de emitir citaciones legales de investigación (la "Resolución de Citaciones Legales de Investigación").[207] En términos generales, en virtud de la Resolución sobre Citaciones Legales de Investigación, una Investigación Formal se considera iniciada con el fin de autorizar al Investigador Independiente a emitir Citaciones Legales de Investigación[208] en determinadas circunstancias.[209]

A partir de septiembre de 2017, en el marco de la Investigación Informal, el Investigador Independiente envió cartas a más de 90 entidades (colectivamente, las "Cartas de Conservación y Solicitud de Documentos"). Las Cartas de Conservación y Solicitud de Documentos identificaron diversas categorías de documentos que el Investigador Independiente consideró pertinentes para la Investigación Informal y pidió que los destinatarios de las cartas preserven y presenten cualquier documento de respuesta que esté en su posesión, custodia o bajo su control. Después de que se enviaron las Cartas de Conservación y Solicitud de Documentos, el Investigador Independiente programó y llevó a cabo conferencias con los destinatarios (la mayoría por teléfono, algunas en persona) para reiterar las solicitudes y discutir un proceso de identificación y entrega de documentos al Investigador Independiente.

Los testigos, en general, cooperaron con el Investigador Independiente, y el Investigador Independiente utilizó las herramientas disponibles a través de la Investigación Informal. Esa cooperación, que se vio facilitada por el uso del poder citatorio del Investigador Independiente solo cuando fue necesario, permitió al Investigador Independiente completar la investigación de manera eficiente y oportuna, coherente con los objetivos de PROMESA y según lo solicitado por el Comité Especial de Investigación. El Investigador Independiente fue especialmente cuidadoso de evitar la demora y el costo de litigar citaciones legales.

En el curso de la investigación, el Investigador Independiente recibió un total de aproximadamente 260,800 documentos de aproximadamente 2,740,000 páginas, de 32 partes. Esas partes incluyen, entre otras, varias entidades, instituciones financieras, agencias de calificación, asesores financieros, profesionales y reguladores de Puerto Rico.

---

testigos y la presentación de libros, registros, correspondencia, memorandos, documentos, documentos, archivos electrónicos, metadatos, cintas, y materiales de cualquier naturaleza relacionados con cualquier asunto investigado por la Junta de Supervisión". 48 U.S.C. § 2124(f)(1).

[207] La Resolución de Citaciones Legales de Investigación está disponible en https://oversightboard.pr.gov/documents/.

[208] Una "Citación Legal de Investigación" se define en la sección 1.3(a)(16) de los Procedimientos de Investigación de PROMESA y se refiere a una citación legal emitida por la Junta de Supervisión o su agente autorizado de conformidad con la sección 104(f)(i) de PROMESA, sustancialmente en forma de anexo adjunto a la Resolución sobre Citaciones Legales de Investigación.

[209] Esas circunstancias se producirían cuando un testigo no hubiera cooperado voluntariamente con las solicitudes de documentos del Investigador Independiente o un interrogatorio, cuando el testigo haya comunicado que no puede cooperar voluntariamente con las solicitudes del Investigador Independiente, o cuando el testigo haya respondido un interrogatorio, pero el Investigador Independiente, en consulta con el Consejero General de la Junta de Supervisión determina que sería apropiado que el testigo ofrezca su testimonio bajo juramento.

El Investigador Independiente también obtuvo acceso directo, de solo lectura a los archivos de custodia de correo electrónico de decenas de empleados y ex empleados del BGF a través de su representante, AAFAF.[210]  En nombre del BGF, AAFAF  presentó al Investigador Independiente unos 36,000 documentos de esa base de datos.

De conformidad con la Resolución sobre Citaciones Legales de Investigación, el Investigador Independiente emitió 12 citaciones legales de investigación (cinco de las cuales se desistieron tras la expedición sobre la base del acuerdo posterior de los beneficiarios de cooperar voluntariamente con el Investigador Independiente).[211] Sin excepción, los destinatarios de las Citaciones Legales de Investigación presentaron documentos al Investigador Independiente en respuesta a esas citaciones legales.

Desde diciembre de 2017 hasta agosto de 2018, el Investigador Independiente realizó un total de aproximadamente 120 entrevistas voluntarias a testigos, sondeando una amplia gama de temas relevantes para la investigación. Entre las personas entrevistadas se encontraban cuatro ex gobernadores de Puerto Rico, antiguos y actuales altos funcionarios del Gobierno, suscriptores de seguros, agencias de calificación crediticia, auditores, profesionales externos y asesores.

A lo largo de la investigación, el Investigador Independiente colaboró estrechamente y mantuvo consultas con CANA  y el Comité de Jubilados. A partir de noviembre de 2017, el Investigador Independiente mantuvo contactos periódicos con CANA y el Comité de Retirados en relación con la investigación. En concreto, además de la cooperación y la comunicación mediante llamadas y correos electrónicos cuando fuera necesario, el Investigador Independiente participó en conferencias telefónicas semanales con el abogado de CANA y del Comité de Jubilados, respectivamente. Durante esas conferencias, el Investigador Independiente proporcionó información sobre los testigos que serían entrevistados en la semana siguiente, solicitó información sobre preguntas a los testigos, proporcionó asesoramiento a CANA y al Comité de Jubilados con sus observaciones preliminares sobre los resultados de la investigación en ámbitos en los que CANA y el Comité de Jubilados habían expresado interés, y también proporcionó a CANA y al Comité de Jubilados acceso a los materiales proporcionados al Investigador Independiente.

c)   **Principales conclusiones de la investigación independiente sobre los Deudores**

El 20 de agosto de 2018, el Investigador Independiente publicó su Informe Final de Investigación. Esta Declaración de Divulgación incluye un resumen de las principales conclusiones del Investigador Independiente relacionadas únicamente con cada uno de los Deudores cubiertos por el Plan. El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de

---

[210] Este acceso se obtuvo a través de la sección 104(c)(2) de PROMESA, que establece lo siguiente: "Sin perjuicio de cualquier otra disposición legal, la Junta de Supervisión tendrá derecho a obtener copias protegidas, impresas o electrónicas, de dichos registros, documentos, información, datos o metadatos del gobierno territorial que necesarias para que la Junta de Supervisión pueda desempeñar sus funciones en virtud de la presente Ley. A petición de la Junta de Supervisión, la Junta de Supervisión tendrá acceso directo a dichos sistemas de información, registros, documentos, información o datos que permitan a la Junta de Supervisión cumplir sus responsabilidades en virtud de la presente Ley". 48 U.S.C. § 2124(c)(2).

[211] Los destinatarios de las Citaciones Legales de Investigación (aparte de las que fueron desistidas) fueron Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp y Santander Securities LLC.

informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.[212]

(i)      *Estado Libre Asociado de Puerto Rico*

El Informe Final de Investigación incluye conclusiones relacionadas con la elaboración de presupuestos y la contabilidad, el papel del BGF y el Límite Constitucional de la Deuda, todo lo cual afectó a la deuda emitida por el ELA.

(ii)     *Elaboración de presupuestos y contabilidad*

Con respecto a la elaboración de presupuestos, la presentación de informes externos y las funciones de contabilidad del ELA, que se examinan en la parte VIII del Informe Final de Investigación, el Investigador Independiente determinó que el ELA no había: (i) desarrollado presupuestos basados en estimaciones correctas de crecimiento e ingresos, a los que podría adherirse; (ii) desarrollar la infraestructura y los recursos necesarios para apoyar funciones contables eficientes; and (iii) optimizar el uso de auditores independientes. Estas fallas a menudo hicieron que los informes financieros externos del ELA se retrasaran, que, a su vez, dio lugar a una pérdida de confianza de los inversores y la capacidad de las partes interesadas de adquirir suficiente transparencia en los asuntos de que se trate, o que de otro modo estén estrechamente vinculados con, la salud fiscal del ELA. Los fracasos presupuestarios y la dependencia de suposiciones erróneas sobre el crecimiento económico y proyecciones de ingresos irrazonables también dieron lugar a déficits sustanciales.

(iii)    *El papel del BGF*

Como se indica en la parte IV del Informe Final de Investigación, el doble rol del BGF como agente fiscal y prestamista para algunas instrumentalidades y corporaciones públicas del ELA estaba en tensión, y esa tensión se hizo insostenible con el tiempo. La tensión se vio agravada por deficiencias estructurales que permitieron que las consideraciones políticas de varias administraciones del Gobierno afectaran la toma de decisiones del BGF en su calidad de prestamista y agente fiscal.

En relación con las emisiones de bonos GO, la tensión entre los papeles duales del BGF influyó en las decisiones del BGF de aprobar nuevas emisiones de deuda con el fin de "sacar y tirar" obligaciones antiguas o como alternativa a la imposición de determinadas instrumentalidades del ELA y las corporaciones públicas para aplicar medidas que las hubieran hecho menos dependientes de la liquidez prestada, pero que podrían haber aumentado los costos de vida para los votantes.

Los aproximadamente $3,500 millones de Bonos GO que el BGF, en su calidad de agente fiscal, autorizó a emitir en 2014 (la "Emisión de Bonos GO 2014") es un ejemplo específico de emisión de bonos de "sacar y tirar". Aproximadamente 1,900 millones de dólares de esa emisión se utilizarían para reembolsar préstamos que Puerto Rico y PBA habían obtenido del BGF. Según un testigo que trabajó primero en el BGF y posteriormente en un suscriptor de seguros para bonos relacionados con Puerto Rico, la razón misma de la emisión de bonos GO 2014 fue ayudar a "reliquidificar" al BGF para que pudiera retomar su papel como proveedor de préstamos puente al gobierno.

---

[212] Puede consultarse una visión general de todo el Informe Final de Investigación en el Resumen Ejecutivo, que está disponible en el sitio web de la Junta de Supervisión https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

Según el Informe Final de Investigación, la emisión de bonos GO 2014 también ilustra varios aspectos en los que las consideraciones de políticas influyeron en la toma de decisiones del BGF. La investigación reveló que el BGF consideró por primera vez la emisión a principios de 2013. En ese momento, la emisión se contempló como una manera de reunir capital que ACT podría utilizar para satisfacer una deuda pendiente de alrededor de $ 2,000 millones. La ACT debía la deuda al BGF como resultado de préstamos a los que ACT había recurrido para ayudar a superar sus déficits operativos. Los préstamos databan de 2008. Sin embargo, para implementar la emisión, ACT tuvo que aumentar sus ingresos. Funcionarios del BGF alentaron al Gobernador a aumentar el impuesto a la gasolina para lograr esto, pero el Gobernador se negó a hacerlo. En cambio, el 25 de junio de 2013, Puerto Rico aumentó la parte del arbitrio que ACT recibió sobre los productos petrolíferos de $3.00 por barril a $9.25 por barril, y transfirió a ACT la parte de los ingresos por tarifas sobre licencia de vehículos automotores que se adeudaba originalmente al Departamento de Hacienda. Los ingresos previstos fueron insuficientes para ejecutar la oferta de ACT prevista. Debido al efecto combinado de la falta de voluntad para aumentar el impuesto sobre la gasolina, sobrecostos presupuestarios anteriores de ACT y déficit en los ingresos previstos, una oferta de ACT ya no era viable. El BGF se preparó para ir al mercado con la Emisión de Bonos GO 2014, de la cual una parte significativa de los ingresos de los bonos estaban reservados para reembolsar las líneas de crédito del BGF.

El Investigador Independiente también reunió información de testigos de que para aproximadamente marzo de 2014, la Junta del BGF se había dado cuenta de que Puerto Rico no podría publicar sus estados financieros correspondientes al Año fiscal terminado en 2013 antes del 1 de mayo de 2014, plazo que establece la Regla 15c2-12 de la Comisión de Valores y Bolsa ("SEC") y acuerdos pertinentes de divulgación continua, *a menos* que el BGF pudiera obtener primero los ingresos de la emisión de Bonos GO de 2014. En esencia, el BGF necesitaba esos ingresos para que el BGF pudiera demostrar doce meses de liquidez en sus estados financieros y, como resultado, parecer seguir siendo una "empresa solvente" a efectos contables. Esto se debió a que ACT no podía pagar la deuda de $ 2,000 millones que tenía con el BGF, y el BGF no disponía de efectivo suficiente para que pareciera objetivamente probable que siguiera siendo solvente en el futuro previsible.

(iv)    *El Límite Constitucional de la Deuda*

En la Parte IX del Informe Final de Investigación, el Investigador Independiente examinó la interpretación de Puerto Rico del Límite Constitucional de la Deuda que figura en la sección 2 del artículo VI de la Constitución del ELA y los procesos y procedimientos históricos con arreglo a los cuales realizó el cálculo del Límite Constitucional de la Deuda durante el período pertinente.

El Investigador Independiente determinó que Puerto Rico históricamente ha interpretado que el Límite Constitucional de Deuda requiere que se incluya solo lo siguiente en el Cálculo del Límite de Deuda: (i) las obligaciones directas para las que se ha pignorado su fe y crédito y poder impositivo; y ii) ciertos pagos del servicio de la deuda de bonos o notas que ha garantizado. En otras palabras, la deuda emitida por las corporaciones públicas (a menos que esa deuda esté garantizada por Puerto Rico) no está incluida en el Cálculo del Límite de Deuda y no está limitada por el Límite Constitucional de Deuda.

La evidencia revisada apoya la conclusión de que Puerto Rico empleó un proceso razonablemente robusto para estos Cálculos de Límite de Deuda. Además, el Investigador Independiente determinó que varias obligaciones contingentes, aunque previsibles, de Puerto Rico estaban excluidas del Cálculo del Límite Constitucional de la Deuda por ley o sobre la base de opiniones jurídicas externas. Por ejemplo, mediante la Ley Núm. 39 del 1 de agosto de 2005 ("Ley 39"), Puerto Rico pignoró la "fe, el crédito y el poder impositivo del ELA" para los importes a pagar (los intereses, en particular) en virtud de los acuerdos de swaps suscritos por el ELA y AEP. Sin embargo, la Ley 39 excluye expresamente del Cálculo del Límite

de la Deuda todo monto pagadero o por pagar por el ELA en concepto de tarifas de terminación para los swaps de base del ELA y los swaps de AEP.

El Investigador Independiente no encontró ninguna prueba de que el personal del gobierno de Puerto Rico pensara que Puerto Rico había malinterpretado la disposición constitucional pertinente o calculado la deuda de manera inexacta. El Investigador Independiente no se pronunció sobre si se había violado el Límite Constitucional de la Deuda o si se deberían haber incluido ciertas obligaciones en los Cálculos del Límite de la Deuda.

(v)     *ACT*

Como se indicó en la Parte IV del Informe Final de Investigación, la investigación reveló que la ACT dependía históricamente del BGF para cubrir los gastos operativos, en particular cuando no podía acceder a los mercados de capitales. Muchos de esos préstamos fueron, según ex funcionarios del BGF, utilizados para cubrir los déficits presupuestarios de ACT. Con respecto a ACT en particular, el BGF evaluó y aprobó sus préstamos muy rápidamente, a veces en cuestión de horas, después de la presentación de una solicitud. Según los testigos, esto era para evitar posibles consecuencias adversas derivadas de la falta de salud fiscal de ACT, como que ACT hubiera tenido que cerrar el Tren Urbano si no se hubiera pagado a su operador. También hay pruebas de que, en algunos casos, el BGF puede haber aprobado solicitudes de financiamiento de ACT a pesar de circunstancias que, si el BGF y los beneficiarios hubieran sido agentes privados, podrían haber dado lugar a una diligencia debida adicional.

La voluntad gubernamental de todos los gobiernos también afectó la toma de decisiones del BGF con respecto a la carga de la deuda de la ACT. Por ejemplo, durante el gobierno del gobernador Fortuño, el BGF aumentó la línea de crédito de la ACT a aproximadamente $2,000 millones. En ese momento, el total de los préstamos por cobrar del BGF era de aproximadamente $9,000 millones. [213] El BGF hizo esto, según un testigo, para que ACT no tuviera que aumentar las tasas de registro de vehículos, el transporte público, los peajes, o el impuesto a la gasolina; todos los cuales habrían aumentado los costos para los votantes comunes.

Luego, a principios de 2013, el gobierno del gobernador García Padilla decidió que el BGF ya no debería apoyar a las corporaciones públicas a través de asignaciones. Al mismo tiempo, sin embargo, los testigos informaron que el Gobernador seguía reacio a aumentar las tasas de los Servicios Públicos o los impuestos conexos o no aceptaría aumentarlos tanto como la administración del BGF había recomendado.

(vi)     *SRE*

En la parte VII del Informe Final de Investigación se presentan los resultados de la investigación sobre su SRE, y concretamente su decisión de emitir bonos de obligaciones de pensión del deudor de SRE en 2008 por un monto total aproximado de $3,000 millones.

SRE tuvo dificultades perennes con pasivos no financiados: para el 30 de junio de 2005, SRE tenía un pasivo actuarial de $12,284 millones, de los cuales sólo el 19% estaban financiados. Para hacer frente a la falta de financiamiento, un banco de inversiones propuso que SRE emitiera bonos asegurados por la

---

[213] En cuanto al contexto, el ELA tenía un presupuesto previsto de aproximadamente $9,000 millones en 2013. Consulte Estado Libre Asociado de P.R., *Estados financieros básicos e información suplementaria requerida: Año fiscal cerrado el 30 de junio de 2013*, 246 (30 de junio de 2014).

corriente de Contribuciones Patronales, que incluía una recomendación de que SRE "emitiera al menos $7,000 millones" en bonos, realizar pagos a corto plazo e invertir el resto en una estrategia de arbitraje.

En el primer semestre de 2008, SRE emitió casi $3,000 millones de bonos exclusivamente en el mercado local de bonos (es decir, no se pusieron a disposición bonos para su compra por personas o fondos residentes fuera de Puerto Rico). Las pruebas indican que no se emitieron bonos SRE adicionales en el segundo semestre de 2008 debido a un comportamiento imprevisto de mercado. Luego, en 2009, incluso cuando los mercados de crédito comenzaron a reabrirse, no se emitieron bonos SRE adicionales como cuestión de política.

Sin fondos adicionales más allá de los $3,000 millones iniciales, la estrategia de arbitraje tenía pocas posibilidades de éxito. La estrategia de arbitraje podría haber tenido éxito si las predicciones razonables hubieran sido ciertas, pero no lo fueron.

Para 2017, las prestaciones de retiro de los sistemas de retiro para empleados públicos como SRE habían cambiado a PayGo, lo que significa que todos los pagos de las prestaciones saldrían de los ingresos impositivos.

(vii)   *AEP*

Como se discutió en la Parte IX del Informe Final de Investigación, el Investigador Independiente no encontró evidencia de que los funcionarios de Puerto Rico creyeran que la práctica de Puerto Rico con respecto al pago del servicio de la deuda de los bonos AEP violó el límite constitucional de la deuda. El Investigador Independiente no se pronunció sobre si los bonos AEP deberían haberse incluido en los Cálculos del Límite de la Deuda.

AEP posee y arrienda varios edificios que arrienda o subarrienda a diversas agencias gubernamentales. AEP ha emitido bonos AEP, unos $ 4,100 millones en circulación a principios de 2017, que los Tenedores de Bonos AEP consideran pagadores y asegurados por una pignoración de los pagos de alquileres adeudados a AEP por los arrendatarios. Cada mes, la tesorería remitió fondos al BGF para pagos de alquiler de AEP, que fueron depositados en una cuenta de la AEP.

El Investigador Independiente determinó que Puerto Rico tiene una práctica de larga data de tratar la deuda directa y la deuda asegurada de manera diferente a los efectos del cálculo del límite de la deuda. Además, varios testigos declararon que no tenían conocimiento de que nadie hubiera expresado la opinión de que los bonos AEP deberían haberse incluido en el cálculo del límite de la deuda. Por último, los auditores independientes opinaron en 2013 que no se había superado el límite de la deuda.

d)   **Resumen de potenciales causas de acción pertinentes para los Deudores**

En su Informe Final de Investigación, el Investigador Independiente evaluó si sus hallazgos fácticos apoyan la opinión de que cualquiera de las partes involucradas en la crisis fiscal de Puerto Rico cometió acciones que pueden ser objeto de procesos legales bajo ciertas leyes federales, estatales y locales de EE.UU. El Investigador Independiente discutió su consideración de ciertas, pero no todas, potenciales reclamaciones disponibles para Deudores de Título III (o sus patrimonios) e inversores, entre otros interesados, bajo la ley federal aplicable de los EE.UU. (incluso las leyes de valores y el Código de Quiebras, tal como son hechas aplicables por PROMESA), la ley en Puerto Rico, y la ley de otras jurisdicciones de EE.UU. como se indica por análisis de elección de ley. Esta discusión se llevó a cabo con los propósitos legales esbozados en PROMESA y no para ayudar a ningún litigante específico. Su visión

general y la aplicación de la ley no es asesoramiento jurídico y sus conclusiones fácticas no constituyen pruebas admisibles en ningún litigio pendiente o futuro.

A continuación figura un resumen de las potenciales causas de acción por deudor identificadas por el Investigador Independiente en el Informe Final de Investigación.[214] El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.

(i)      ***Estado Libre Asociado de Puerto Rico***

El Investigador Independiente identificó varias posibles causas de acción en relación con la emisión de bonos GO de 2014. En primer lugar, en el Informe Final de Investigación se examinan posibles reclamaciones (y posibles defensas) basadas en una violación de los requisitos de divulgación de la ley de valores en la Declaración Oficial y documentos relacionados con la posibilidad en el momento en que Puerto Rico intente reestructurar su endeudamiento después de la emisión de los bonos GO de 2014. Concretamente, el Investigador Independiente presentó pruebas disponibles de que Puerto Rico no había revelado que había contratado a asesores financieros y jurídicos con prácticas de reestructuración de buena reputación hasta después de que se emitieran los bonos GO de 2014.

En segundo lugar, el Informe Final de Investigación discute posibles reclamaciones (y posibles defensas) basadas en una violación de los requisitos de divulgación continuos impuestos por la ley de valores aplicable a ciertas entidades que trabajan en nombre de Puerto Rico específicamente, si Puerto Rico, sus suscriptores de seguros y/o auditores podrían ser considerados responsables por el hecho de que Puerto Rico, a pesar de repetidas declaraciones en contrario, no completó ni divulgó sus estados financieros auditados de 2013 antes de la emisión de los bonos GO de 2014.

En tercer lugar, el Informe Final de Investigación examina potenciales reclamaciones de "common law" y quiebra, como el enriquecimiento injusto y la subordinación equitativa contra uno de los suscriptores de seguros de los bonos GO de 2014, basándose en la decisión del suscriptor de seguros de suscribir después de haber recomendado no realizar la emisión y de cobrar honorarios por hacerlo.

Por último, el Investigador Independiente identificó potenciales reclamaciones contra el BGF derivadas de ciertos swaps de base de GO con Goldman y Morgan Stanley, que se iniciaron en 2006. Específicamente, el Informe Final de Investigación discute que los swaps de base pueden haber violado las leyes de Puerto Rico si su ejecución no fue "en el mejor interés del Estado Libre Asociado." Las reclamaciones potenciales de responsabilidad contra el BGF pueden existir solo sobre esa base. Además, si los miembros de la junta directiva del BGF tenían obligaciones fiduciarias con Puerto Rico, también pueden existir reclamaciones por incumplimiento de esas obligaciones en relación con el Swap de base. Como se menciona en el Informe, también pueden existir fuertes defensas contra esas reclamaciones.

(ii)      ***SRE***

Entre enero y junio de 2008, al comienzo de la Gran Recesión, SRE emitió tres series de bonos de obligaciones de pensiones por un monto total de casi $3,000 millones. Los ingresos de los bonos se emitieron para hacer frente a los problemas de flujo de caja a corto plazo de SRE, y el resto se invertiría con la expectativa de que la inversión crecería y daría a la pensión un rendimiento adicional después de

---

[214] La discusión de las potenciales causas de acción abarca casi 100 páginas del informe final de investigación. El resumen que figura en el presente está limitado en su totalidad por el Informe Final de Investigación, que las partes deben consultar en caso de ambigüedad o conflicto.

pagar el servicio de la deuda sobre los bonos, mejorando así la importante insuficiencia de financiamiento de SRE. En los años posteriores a la emisión, varias partes interesadas cuestionaron públicamente la inteligencia de esta estrategia de arbitraje, la autoridad legal del SRE para emitir los bonos en primer lugar, y la validez del supuesto derecho de garantía de los tenedores de bonos en la corriente entrante del SRE de contribuciones establecidas por ley de los empleadores públicos participantes de Puerto Rico. En este contexto, el Investigador Independiente identificó varias reclamaciones potenciales y examinó si estaban respaldadas por la evidencia disponible.

En primer lugar, el Informe Final de Investigación analiza posibles reclamaciones (y posibles defensas) basadas en una violación de los requisitos de divulgación de la ley de valores en la Declaración Oficial y documentos relacionados. Según el Investigador Independiente, las pruebas indican que la divulgación de información abordaba los riesgos de la estrategia de arbitraje, pero puede haber omitido detalles materiales sobre la autoridad del SRE para emitir los bonos, la capacidad de Puerto Rico para eliminar la contribución de los empleadores a SRE y/o el uso de los ingresos de los bonos SRE.

En segundo lugar, en el Informe Final de Investigación se examinan las posibles reclamaciones (y posibles defensas) de que las personas de control pertinentes de SRE y el BGF incumplieron sus obligaciones fiduciarias con SRE. Según el Investigador Independiente, estas reclamaciones no están firmemente respaldadas por la evidencia disponible y es improbable que den lugar a ninguna recuperación para las partes interesadas en el SRE. Además, si esas reclamaciones pudieran sostenerse, en el Informe Final de Investigación se examinan las posibles denuncias de complicidad en el incumplimiento de obligaciones fiduciarias que podrían estar disponibles contra varios suscriptores de seguros y asesores de SRE y el BGF.

Por último, en el Informe Final de Investigación se examinan las posibles reclamaciones basadas en las prácticas de venta en relación con las emisiones de bonos SRE. En particular, algunos suscriptores de seguros y asesores de bonos y sus subsidiarias fueron contratados por SRE en múltiples capacidades de generación de comisiones, lo que dio lugar a posibles conflictos de intereses. El Investigador Independiente observó que las pruebas no indicaban que esos conflictos dieran lugar a ventajas o beneficios indebidos para esas entidades o perjudicaran a SRE y sus otros interesados. Sin embargo, si esas pruebas salen a la luz, el Investigador Independiente examinó la posibilidad de presentar reclamaciones de "common law" y quiebra contra el suscriptor de seguros o asesor pertinente por negligencia profesional, enriquecimiento injusto o subordinación equitativa.[215]

---

[215] Aunque no se menciona en el Informe Final de Investigación, SRE inició un litigio contra UBS Financial Services antes del inicio de los casos de Título III, con reclamaciones de la naturaleza de, entre otras cosas, negligencia profesional en relación con sus servicios de asesoramiento al SRE y suscripción de las operaciones de bonos SRE. Ese litigio está en curso en el tribunal de primera instancia de Puerto Rico. Consulte *Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico y Otros v. UBS Financial Services y Otros*, Civil Núm. K AC2011-1067. El 30 de marzo de 2020, UBS Financial Services presentó una moción renovada de levantamiento de la paralización automática [ECF Núm. 853]. El 1 de abril de 2020, varios Demandantes individuales presentaron una oposición a la moción [ECF Núm. 12577]. El 14 de abril de 2020, la Junta de Supervisión, a través del Comité de Reclamaciones Especiales, presentó una oposición a la moción [Caso Núm. 17-bk-3566, ECF Núm. 859]. El 19 de abril de 2020, UBS presentó una contestación en apoyo a su moción [Caso Núm. 17-bk-3566, ECF Núm. 869]. El 22 de abril de 2020, el Tribunal del Título III emitió una orden denegando la moción sin perjuicio [Caso Núm. 17-bk-3566, ECF Núm. 879].

(iii)     *AEP*

El Informe Final de Investigación no identificó posibles causas de acción contra AEP, y no encontró evidencia de que los funcionarios puertorriqueños creyeran que la práctica de Puerto Rico con respecto al pago del servicio de la deuda de los Bonos AEP violara el Límite Constitucional de Deuda.

e)     **Resumen de las recomendaciones relativas a los Deudores**

El Informe Final de Investigación incluye recomendaciones relativas a cada uno de los temas investigados por el Investigador Independiente. Esta Declaración de Divulgación incluye un resumen de las recomendaciones del Investigador Independiente relativas únicamente a cada uno de los deudores (a la luz de los litigios en curso, el Investigador Independiente no proporcionó recomendaciones específicas relacionadas con SRE y AEP). El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.

(i)     *Estado Libre Asociado de Puerto Rico*

(1)     **Elaboración de presupuestos y contabilidad**

El Investigador Independiente recomendó las siguientes reformas a los sistemas de elaboración de presupuestos y contabilidad de Puerto Rico:

- Adoptar un proceso presupuestario más riguroso;

- Continuar la transición a la elaboración de presupuestos conforme a los PCGA;

- Estudiar la viabilidad de crear una junta centralizada y con dedicación exclusiva con la función de:

  o   Reunir datos críticos; y

  o   Preparar y publicar informes externos consolidados.

- Adoptar un sistema modernizado de contabilidad y presupuestación;

- Crear una junta para acelerar la preparación de informes externos;

- Reconfigurar las responsabilidades del Departamento de Hacienda;

- Exigir que OGP y la Junta de Planificación se subordinen a Hacienda;

- Adoptar un mecanismo para sancionar a las entidades que incumplan el sistema de contabilidad y presupuestación;

- Limitar la rotación de personal entre los empleados contables;

- Prohibir la rotación de personal sin causa de los auditores;

- Centralizar y racionalizar las funciones de presupuestación, contabilidad y presentación de informes financieros;

- Proporcionar acceso público en línea a los datos sobre gastos; y

- Adoptar una fecha límite oficial para la publicación de informes financieros externos.

310

(2)     **El papel del BGF**

El Investigador Independiente recomendó que las ramas políticas de Puerto Rico evalúen medidas para separar el agente fiscal y las funciones de préstamo para el sucesor del BGF, y consideraran reformas para cada rol. El Investigador Independiente recomendó que el nuevo agente fiscal:

- Implemente mandatos escalonados, o mandatos que abarquen varios cambios de gobierno, para los miembros de la junta;

- Condicione los desembolsos del Departamento de Hacienda al examen y aprobación del agente fiscal;

- Caracterice al agente fiscal como un canal imparcial de información hacia sus clientes y hacia el público inversionista;

- Mejore la supervisión de las instrumentalidades del ELA y las corporaciones públicas a las que asesora con acceso a los sistemas de contabilidad conjuntos e integrados; y

- Cree un departamento o división separado que se encargue específicamente de supervisar todas las instrumentalidades pertinentes del ELA y las corporaciones públicas y supervise o incluso audite sus finanzas.

El Investigador Independiente también recomendó que la nueva entidad de crédito:

- Implemente mandatos escalonados, o mandatos que abarquen varios cambios de gobierno, para los miembros de la junta;

- Adopte políticas y procedimientos para reevaluar trimestralmente la posibilidad de recaudación y otros riesgos asociados con el financiamiento del sector público existente;

- Considere el papel de cualquier garantía legal de reembolso, pero ese no debe ser el único factor, o el factor principal, para informar el análisis de la posibilidad de cobro; y

- Armonice más estrechamente las políticas crediticias con el marco que aplicaría un banco privado para evaluar los riesgos de su propia cartera de préstamos.

(3)     **Límite Constitucional de Deuda**

El Investigador Independiente recomendó que el ELA considerara la posibilidad de que su poder judicial examine el significado de la sección 2 del artículo VI de la Constitución del ELA, así como los métodos con arreglo a los cuales el ELA determina los tipos de pagos del servicio de la deuda que deben incluirse en el cálculo del límite de la deuda.

2.     **Nombramiento del Comité de Reclamaciones Especiales y contratación de abogados**

En los pocos días siguientes a la recepción del Informe Final de Investigación publicado, la Junta de Supervisión emitió un consentimiento unánime por escrito por el que nombraba al Comité de Reclamaciones Especiales independiente para que tramitara las reclamaciones resultantes de las conclusiones de la Investigación.[216]  A continuación, la Junta de Supervisión realizó una Solicitud de Propuestas para asesorar al comité recién constituido.

---

[216] Los actuales miembros del Comité de Reclamaciones Especiales son Andrew G. Biggs, Arthur J. González y David A. Skeel, Jr.

El 28 de noviembre de 2018, la Junta de Supervisión, actuando por y a través de su Comité de Reclamaciones Especiales, contrató a Brown Rudnick LLP como asesor del Comité de Reclamaciones Especiales para ayudar al Comité de Reclamaciones Especiales en la investigación, el inicio de la negociación y/o el enjuiciamiento de posibles reclamaciones que puedan surgir de la conducta descrita en el Informe Final de Investigación ("Asesor de reclamaciones"). Además, en febrero de 2019, el Comité de Reclamaciones Especiales  contrató a una empresa de servicios de asesoramiento financiero para que ayudara al Asesor de Reclamaciones en la investigación de potenciales reclamaciones.

En el Informe Final de Investigación no se abordaban las Acciones de Revocación[217] y no se determinaban las reclamaciones o causas concretas que el ELA y sus instrumentalidades podían tener contra las personas y entidades que participaban en sus transacciones financieras. Por el contrario, en el Informe Final de Investigación se esbozaban los antecedentes informativos y analíticos necesarios que servirían de base para que el Comité de Reclamaciones Especiales identifique las reclamaciones judiciales que el ELA y sus instrumentalidades podrían tener en relación con la crisis financiera del Deudor el ELA.

Así, inmediatamente después de su retención, el Abogado de Reclamaciones comenzó a investigar y analizar las conclusiones del Informe Final de Investigación para determinar y recomendar si había causas viables de acción que la Junta de Supervisión pudiera alegar en beneficio de los contribuyentes y acreedores legítimos del ELA.

3.     **Investigación del abogado y cuestiones de prescripción**

El Abogado de Reclamaciones examinó los documentos relacionados con el Informe Final de la Investigación para determinar las causas de acción que tuvieran mérito. Además, como se describe más adelante, el Comité de Reclamaciones Especiales realizó frecuentes y numerosas investigaciones a otros profesionales involucrados en los Casos de Título III, así como a posibles Demandados y otras partes para obtener informes, datos financieros, presentaciones, y otros materiales necesarios para que la Junta de

---

[217] Causas de acción derivadas de los artículos 544, 545, 547 y 548 del Código de Quiebras. Existen esencialmente dos teorías jurídicas diferentes para estas acciones de reintegración: la preferencia y la transferencia fraudulenta. Una *preferencia* es un pago en los 90 días previos a la quiebra a un acreedor "preferido", es decir, alguien que recibió un pago más de lo habitual cuando otros en situaciones similares no estaban siendo pagados debido a la insolvencia de Puerto Rico. (Para las partes con relaciones familiares con funcionarios electos, y otros con relaciones "internas" con el gobierno, el período pertinente es de un año, no de 90 días). 11 U.S.C. § 547. Una *transferencia fraudulenta* es, lo más importante, un pago hecho por el cual Puerto Rico no recibió "valor razonablemente equivalente" a cambio. Si no es así, incluso si la transferencia no fue intencionalmente errónea o fraudulenta, Puerto Rico puede recuperar los fondos porque el dinero debe beneficiar por derecho a todos los acreedores y ciudadanos. 11 U.S.C. §§ 544, 548. Las preferencias y transferencias fraudulentas pueden ser "evitadas" y los fondos recuperados por Puerto Rico de los cesionarios; de la misma manera o como alternativa, la responsabilidad de reintegración puede causar que las reclamaciones del cesionario contra Puerto Rico puedan ser compensadas o denegadas. Consulte 11 U.S.C. §§ 502, 545, 550, 553.

Las acciones de reintegración son muy comunes en los grandes procedimientos de quiebra, incluidos los que afectan a entidades públicas. Permiten a los deudores garantizar que el dinero transferido a terceros en el período anterior a la quiebra se gastó de manera adecuada y justa, y si no, recuperar ese dinero en beneficio de los acreedores y los contribuyentes. Es importante señalar que las acciones de reintegración de este tipo no tienen por objeto transmitir que un tercer proveedor haya cometido una infracción. Por el contrario, las acciones de reintegración garantizan que ningún acreedor se vea favorecido por los pagos efectuados antes de la declaración de quiebra y que la distribución justa de los bienes de un deudor se haga de conformidad con la ley aplicable. Como con cualquier otra demanda civil, el Demandante (es decir, la Junta de Supervisión, en algunos casos junto con CANA) tiene la carga de probar cada elemento de la acción de reintegración por una preponderancia de las pruebas para que el tercero vendedor sea declarado responsable y tenga que devolver el dinero al estado.

Supervisión haga valer sus causas de acción. En suma, el Abogado de Reclamaciones revisó, entre otras cosas:

- El Informe Final de Investigación de 600 páginas;

- Aproximadamente 100,000 documentos presentados hasta la fecha en apoyo de los hechos y el análisis jurídico que figuran en el Informe Final de Investigación;

- Registro de millones de transferencias efectuadas por los Deudores del Título III a terceros durante el período de reintegración de cuatro años anterior a la fecha de la petición;

- Miles de documentos que identifican a los receptores de supuestos pagos de capital e intereses sobre bonos supuestamente inválidos, mediante registros de decenas de miles de transacciones; y

- Más de 1,600 notificaciones de participación presentadas en relación con la Objeción de Reclamación Conjunta (que se definen a continuación) que identifican a los tenedores actuales de los bonos supuestamente inválidos.

La actividad de investigación de la Junta de Supervisión y el inicio de los litigios se han basado en gran medida en los plazos de prescripción aplicables. En particular, el plazo de prescripción para Acciones de Revocación conforme al artículo 11 de U.S.C. 546(a)(1) expiró el 2 de mayo de 2019 para acciones interpuestas en nombre del ELA, el 20 de mayo de 2019 para ACT y SRE, y el 1 de julio de 2019 para AEE. La expiración del plazo de prescripción podría, en muchos casos, impedir que la Junta de Supervisión enjuicie muchas de las reclamaciones descritas en el presente.

La Junta de Supervisión ha adoptado una serie de medidas para proteger sus reclamaciones contra defensas por prescripción. La principal de estas es que la Junta de Supervisión inició cientos de procedimientos contenciosos antes de que expirara el plazo de prescripción aplicable. En algunos casos que se describen con más detalle a continuación, la Junta de Supervisión ha iniciado litigios con la intención explícita de preservar derechos, a pesar de que el enjuiciamiento de sus reclamaciones no sería una asignación óptima de recursos en el momento actual, y, en consecuencia, ha solicitado que se suspendan los litigios por el momento.

Entre las medidas adicionales para preservar las reclamaciones figuran los esfuerzos por suspender la prescripción de manera consensuada mediante acuerdos en este sentido con las partes potencialmente responsables ante el Deudor del ELA.

4.    **Causas de acción contra profesionales y personal externos**

La investigación de la Junta de Supervisión sugirió que de 2008 a 2014 (la emisión final de bonos por el ELA hasta la fecha), numerosos profesionales externos participaron a sabiendas en emisiones de bonos que podrían haber sido ilegales, que profundizaron la insolvencia del ELA, y que resultaron en otros daños al ELA y sus instrumentalidades, incluso daños al crédito del ELA. En consecuencia, la Junta de Supervisión investigó y comenzó a presentar reclamaciones contra numerosas partes por hechos ilícitos relacionados con la emisión de deuda por el ELA y algunas de sus instrumentalidades y corporaciones públicas. Las partes incluyen:

- Suscriptores de seguros de deudas declaradas inválidas o emitidas indebidamente;

313

- Bufetes de abogados que asesoraron sobre transacciones de deuda;

- Auditores de las finanzas del ELA; y

- Contrapartes en acuerdos de swaps de tasas de interés.

Algunas de estas transacciones de deuda se describen con mayor detalle a continuación. En suma, estos "terceros demandados" prestaron servicios que en muchos casos dieron lugar a obligaciones fiduciarias de actuar en el interés superior del ELA. Los Terceros Demandados cobraron honorarios sustanciales al facilitar más y más transacciones de deuda, permitir que el ELA y sus instrumentalidades emitan supuestos instrumentos de deuda a pesar de la insolvencia del ELA y de las limitaciones constitucionales y legales de las emisiones de deuda.

La Junta de Supervisión presentó el Proc. Cont. Núm. 19-00280[218] contra los Terceros Demandados. La demanda de la Junta de Supervisión articula reclamaciones sobre la naturaleza de la violación del deber fiduciario y la complicidad en el incumplimiento del deber fiduciario,[219] mala praxis profesional, transferencias fraudulentas y enriquecimiento injusto. Además de presentar su demanda, la Junta de Supervisión ha negociado acuerdos de suspensión de la prescripción con varios posibles Demandados y resolverá sus reclamaciones fuera de los tribunales o iniciará un litigio contra esas partes tras una investigación ulterior.

En conjunto, estas varias docenas de Terceros Demandados ganaron casi $300 millones en honorarios por servicios que supuestamente dañaron al ELA. Las contrapartes de swaps recibieron otros $90 millones = en concepto de comisión de terminación de swaps. Aunque la Junta de Supervisión está tratando de obtener una indemnización por daños y perjuicios por un monto por determinar, es probable que esos pagos de honorarios constituyan la indemnización mínima. En virtud de otras teorías sobre daños y perjuicios, la Junta de Supervisión puede tratar de recuperar miles de millones de dólares transferidos ilícitamente por el ELA y/o sus instrumentalidades a otras partes como resultado de las actividades ilícitas cometidas por terceros. El Plan prevé que este litigio continúe después de la confirmación.

5.      **Acciones de revocación contra proveedores**

El Informe Final de Investigación se centró en transacciones de financiamiento de la deuda a gran escala y no se refería a posibles acciones de revocación relativas a los miles de millones de dólares en pagos de los Deudores del Título III a partes que presuntamente proveen bienes y servicios a los Deudores conforme a supuestos contratos (los "Pagos de Proveedores" a los "proveedores").[220]  En consecuencia, el

---

[218] *El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de sus miembros, el Comité Oficial de Acreedores No Garantizados del Estado Libre Asociado de Puerto Rico c. Barclays Capital y otros*, 19-AP-00280 (el "Litigio de Suscriptores de Seguros").

[219] La Junta de Supervisión ha alegado que algunas partes fueron cómplices del BGF en el incumplimiento de su obligación fiduciaria hacia el ELA y sus instrumentalidades. Las reclamaciones contra el propio BGF han sido exoneradas conforme a la modificación del Título VI de PROMESA del BGF. Consulte la sección V.J.1 de esta Declaración de Divulgación para una breve descripción de los procedimientos de modificación del Título VI del BGF.

[220] Por "Proveedores" y "Pagos a los Proveedores" se entienden los contratistas y los pagos efectuados con arreglo al contrato, respectivamente, en contraposición a los destinatarios de pagos efectuados conforme a asignaciones legislativas.

Comité de Reclamaciones Especiales comenzó a investigar los Pagos a los Proveedores para asegurarse de que esos pagos se ajustaran al derecho aplicable.

En concertación con CANA, la Junta de Supervisión obtuvo de AAFAF registros de todos los pagos a los proveedores en los cuatro años anteriores al comienzo de los respectivos casos del Título III. El Comité de Reclamaciones Especiales, en colaboración con CANA, examinó los registros de millones de pagos individuales a cientos de miles de proveedores únicos, por un total de más de $12,000 millones. Tras examinar los contratos registrados y excluir a los órganos gubernamentales y las organizaciones sin fines de lucro, entre otros, la Junta de Supervisión identificó los pagos a unos 345 proveedores por valor de más de $4,000 millones como potencialmente recobrables con arreglo a las teorías de reintegración. [221]

a) **Acuerdos de suspensión de la prescripción y litigios**

Después de concluir su examen y de identificar a las partes potencialmente responsables, la Junta de Supervisión ofreció a los proveedores la oportunidad de suspender el plazo de prescripción para la presentación de acciones de revocación del proveedor, es decir, extender por acuerdo el plazo previsto para que la Junta de Supervisión presente una acción de reintegración. Como tal, en las semanas previas a la respectiva prescripción, el Abogado de Reclamaciones envió a cada proveedor una carátula y un acuerdo de suspensión de la prescripción que los proveedores podían firmar y devolver para evitar la presentación de una demanda y preservar los derechos de los Deudores del Título III con respecto a sus reclamaciones de reintegración. Esta iniciativa dio lugar a la negociación de aproximadamente 85 acuerdos de suspensión de la prescripción con proveedores que supuestamente tenían contratos con el ELA (y ninguno con proveedores de ACT o SRE).

Después de excluir a las partes de los acuerdos de suspensión de la prescripción, la Junta de Supervisión presentó aproximadamente 250 acciones de revocación para recobrar aproximadamente $3,000 millones en pagos a proveedores. [222] La Junta de Supervisión ha anunciado su preferencia por transigir estas acciones, y las posibles reclamaciones sujetas a acuerdos de suspensión de la prescripción, conforme a un procedimiento voluntario de resolución de litigios extrajudicial que se describe en el sitio web de la notificación en los Casos de Título III y que se describe más detalladamente a continuación.

b) **Procedimientos informales de resolución**

El 7 de junio de 2019, la Junta de Supervisión y CANA presentaron una moción ómnibus en los casos de Título III del Deudor del ELA, ACT, el Deudor del SRE, y AEE, solicitando la aprobación de procedimientos de gestión de casos en el procedimiento de reintegración interpuesto contra proveedores. [223] La Moción de Procedimientos de Acción para los Proveedores solicitó específicamente la aprobación de los procedimientos que rigen: (i) los procedimientos y fechas límite de los litigios, (ii) la mediación

---

[221] Aproximadamente 335 de los proveedores identificados tenían contratos con el ELA, uno con SRE y el resto con ACT. La gran mayoría de los daños reclamados, más de $4,000 millones, se refieren a supuestos contratos con el ELA.

[222] CANA se unió a algunas, pero no todas estas acciones de reintegración.

[223] Consulte *Notificación de Vista de la Moción Ómnibus de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de gestión de casos de litigio y (II) Establecer procedimientos para la aprobación de transacciones*, [ECF Núm. 7325] (la "Moción de Procedimientos de Acción para los Proveedores").

voluntaria y (iii) la transacción (los "Procedimientos de Acción para los Proveedores"). El 12 de julio de 2019, el Tribunal del Título III dictó una orden de aprobación de los Procedimientos de Acción para los Proveedores, que luego se notificaron a todos los Demandados de las acciones de revocación del proveedor junto con la citación y la demanda.[224]

Con respecto a los procedimientos de litigio y las fechas límite, los Procedimientos de Acción para los Proveedores disponen que los documentos judiciales deben presentarse de conformidad con las órdenes de gestión de casos dictadas por el Tribunal en el caso de Título III del ELA. *Consulte Decimotercera Notificación Enmendada, Gestión de Casos y Procedimientos Administrativos* [ECF Núm. 13512-1]. Los procedimientos requieren además la notificación de los procedimientos y la orden de aprobación a los Demandados, y especificar formas y domicilios de notificación compatibles con las normas aplicables. Además, los Procedimientos de Acción para los Proveedores disponen la aplicación menos estricta de las fechas límite para la presentación de escritos de contestación y de disposición, la presentación de pruebas y otras presentaciones, sujeto a que se modifiquen a petición de cualquiera de las partes.

Estas fechas límite previstas en los Procedimientos de Acción para los Proveedores por lo general continúan todas las fechas límite de litigio. Durante el período de aplazamiento, prorrogado desde entonces por órdenes judiciales, la Junta de Supervisión y CANA han participado en un proceso de resolución informal que se describe como el "Intercambio de información" por el que la Junta de Supervisión y los proveedores actúan con diligencia adicional dentro de los parámetros especificados y luego comenzarán las negociaciones para llegar a una transacción.

Los Procedimientos de Acción para los Proveedores describen un proceso de mediación por el cual la Junta de Supervisión y cualquier Demandado(s) pueden seleccionar mediadores, programar la mediación y mantener informado al tribunal sobre el progreso de la mediación. El proceso de mediación es por sus propios términos totalmente voluntario y no vinculante y ajustable por acuerdo de las partes; los Procedimientos de Acción para los Proveedores simplemente esbozan el proceso de mediación y proporcionarían su aprobación anticipada, evitando la necesidad de que las partes soliciten la aprobación judicial de una paralización del litigio mientras la mediación esté en curso.

Desde la presentación de la Moción de Procedimientos de Acción para los Proveedores, el Comité de Reclamaciones Especiales y CANA han estado trabajando para resolver los acuerdos de suspensión de la prescripción y las acciones de revocación concertadas con los proveedores o presentadas contra ellos. Al 19 de febrero de 2021, ciento sesenta y siete procedimientos contenciosos han sido desestimados como resultado de la participación de un proveedor-demandado en el proceso de resolución informal y/o los continuos esfuerzos del Comité de Reclamaciones Especiales para obtener documentación de las agencias del ELA que justifiquen los pagos solicitados que recibieron los proveedores antes de la petición. Del mismo modo, al 19 de febrero de 2021, cincuenta y tres acuerdos de suspensión de la prescripción con proveedores han dado lugar a que el Comité de Reclamaciones Especiales y CANA no hayan adoptado ninguna otra medida por las mismas razones.

En este momento, se han identificado varias decenas de demandados en acciones de revocación y partes con acuerdos de suspensión de la prescripción para su potencial transacción monetaria debido a los

---

[224] *Consulte la Orden que otorga la Moción Ómnibus de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de gestión de casos de litigio y (II) Establecer procedimientos para la aprobación de las transacciones,* [ECF Núm. 7941] (orden con Procedimientos de Acción para los Proveedores revisados adjuntos).

intercambios de información que sugieren responsabilidad de reintegración. El Comité de Reclamaciones Especiales y CANA están preparando, celebrando y/o finalizando conversaciones sobre transacción con esas partes. El Comité de Reclamaciones Especiales y CANA también han solicitado que se dicten sentencias en rebeldía contra diez proveedores. Las reclamaciones adicionales se paralizan indefinidamente debido a que el proveedor ha iniciado un procedimiento de quiebra y ha obtenido la protección de la paralización automática, o debido a paralizaciones de litigios similares impuestas por orden judicial[225].

En noviembre de 2019, el Comité de Reclamaciones Especiales y CANA presentaron una moción para modificar los Procedimientos de Acción para los Proveedores, y el Tribunal del Título III concedió la moción, para seguir facilitando la resolución informal y extrajudicial de las acciones de revocación.[226] La Orden de Procedimientos de Acción para los Proveedores Modificada prorroga las fechas límite de presentación de pruebas y litigio varios meses para permitir que las partes tengan más tiempo para resolver informalmente las demandas antes de que sea necesario un litigio formal. Esas fechas límite se prorrogaron hasta abril de 2021 para dar más tiempo a la resolución informal de las demandas, especialmente a la luz de los desafíos planteados por la COVID-19 [ECF Núm. 14489].

6.    **Reclamaciones sobre la validez de Bonos SRE**

Durante el análisis del SRE y su endeudamiento pendiente realizado por el Abogado de Reclamaciones, se determinó que había posibles deficiencias jurídicas con respecto a los bonos SRE que habían llevado a la conclusión de que los bonos podían no haber sido válidos o jurídicamente vinculantes. En consonancia con la determinación del Abogado de Reclamaciones, AAFAF ha alegado en un litigio conexo que los bonos SRE son nulos y sin valor,[227] y las múltiples partes han objetado las reclamaciones presentadas contra SRE con respecto a los bonos.[228]

---

[225] Por ejemplo, ciertas reclamaciones alegadas por el Comité de Reclamaciones Especiales son posiblemente coextensivas con las reclamaciones alegadas por el Comité de Reclamaciones Especiales y CANA en *El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de sus Miembros, y otros c. Altol Chemical Environmental Laboratory Inc. d/b/a Alchem Laboratory y otros*, Proc. Cont. Núm. 19-388 (LTS) (el "Litigio sobre el Fuel Oil"). El Tribunal ha impuesto una paralización general sobre el Litigio sobre el Fuel Oil. Consulte ECF Núm. 85 (orden de paralización). Aunque los fundamentos de hecho y de derecho de las acciones de reintegración y de las partes del Litigio sobre el Fuel Oil son distintos, existe una importante posibilidad de redundancia tanto en la presentación de pruebas como en los daños y perjuicios solicitados, por lo que la tramitación de las acciones de reintegración podría violar los derechos de terceros demandantes y demandados. Por lo tanto, las partes superpuestas han optado por tratar las acciones de reintegración como efectivamente paralizadas junto con el Litigio sobre Fuel Oil.

[226] Consulte *Orden de Concesión de Moción Ómnibus para la extensión de fechas límite para otorgar la Moción Ómnibus por La Junta de Supervisión y Administración Financiera para Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de gestión de casos de litigio y (II) Establecer procedimientos para la aprobación conciliaciones,* [ECF Núm. 9476] (la "Orden de Procedimientos de Acción para los Proveedores Modificada").

[227] Proc. Cont. Núm. 17-00219, [ECF Núm. 44] (moción para desestimar la demanda relativa a supuestos derecho de garantía sobre los bienes de SRE).

[228] Consulte *Objeción Ómnibus del Comité Oficial de Acreedores No Asegurados a Reclamaciones aseveradas por Tenedores de Bonos Emitidos por el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico*, Caso Núm. 17-03283, [ECF Núm. 5580]; *Objeción Ómnibus del Comité Oficial de Empleados Retirados del Estado Libre Asociado de Puerto Rico, de conformidad con la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007,*

La Junta de Supervisión inició además un litigio para recuperar los pagos efectuados respecto de supuestas obligaciones de capital e intereses a las partes que poseen bonos SRE por un valor superior a los $2.5 millones.[229]

La Orden de Paralización del Tribunal del Título III emitida el 24 de julio de 2019 paralizó todos los litigios relativos a la validez de bonos SRE hasta el 30 de noviembre de 2019. Tras una mediación ordenada por el Tribunal, la Junta de Supervisión y otras partes que formulan objeciones llegaron a un acuerdo con grupos de tenedores de bonos SRE sobre un calendario para litigar sobre cuestiones de validez de la deuda hasta una sentencia sumaria, cuyo calendario fue aprobado por orden del Tribunal del Título III.[230] La orden de programación de litigios de validez de la deuda SRE del Tribunal del Título III establece que las "Acciones de Invalidez" para evitar pagos pasados con respecto a los bonos SRE se paralizan en todos los aspectos sustantivos, siempre que los demandados tengan la oportunidad de participar en la forma limitada de litigio de validez de la deuda permitida por la orden.

Como se ha descrito más arriba en la sección III.B.1, la Junta de Supervisión también ha impugnado la validez y el alcance de la garantía de los tenedores de bonos SRE. El 27 de junio de 2019, el Tribunal del Título III dictaminó que los tenedores de bonos SRE no tienen un derecho de garantía perfeccionado sobre las contribuciones patronales posteriores a la petición conforme a la sección 552 del Código de Quiebras, y el Primer Circuito lo ratificó el 30 de enero de 2020.[231] Anteriormente, el Tribunal del Título III había dictaminado que los tenedores de bonos SRE nunca habían perfeccionado adecuadamente ninguno de sus derechos de garantía, pero esto fue revocado por el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito. El resto del litigio relativo a los bonos SRE descrito en la sección III.B.1 sigue pendiente. La presentación de escritos ha concluido y el Tribunal ha programado las mociones de sentencia sumaria en relación con la validez de los Bonos SRE y el alcance de los gravámenes para los alegatos orales el 11 de marzo de 2021[232].

7.    **Disputas a transigirse conforme al Plan**

Como se describió anteriormente, las disputas en relación con los bonos GO, los bonos AEP y los BAN de AFI se acordarán y transigirán de acuerdo con la confirmación del Plan, que incluye disputas sobre la validez, prioridad y estado asegurado de los bonos GO y bonos AEP.

---

*a Reclamaciones presentadas o aseveradas por Tenedores de Bonos SRE contra SRE y el Estado Libre Asociado*, [ECF Núm. 6482].

[229] Consulte Proc. Cont. Núm. 19-00355 a 19-00361.

[230] Consulte la *Orden que otorga Moción conjunta urgente para modificar la Orden relacionada con Paralización y Mediación Obligatoria con respecto a ciertas cuestiones mencionadas en ciertos temas objetados y procedimientos contenciosos relacionados con los bonos emitidos por el Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico* [ECF Núm. 8899].

[231] *Opinión y orden por la que se concede la moción del Demandante de que se dicte sentencia sumaria en relación con la Causa III y las Reconvenciones II y III, y se deniega la moción de los Demandados de sentencia sumaria*, de fecha 27 de junio de 2019 [Caso Núm. 17-03566, ECF Núm. 251], 385 F. Sup. 3d 138 (D.P.R. 2019), *afirmado En el caso Junta de Sup. y Admin. Fin. para P.R.*, 948 F.3d 457 (1er Cir. 2020).

[232] *Orden que otorga Moción urgente para programar los alegatos orales relativos a mociones pendientes en ciertos temas objetados y procedimientos contenciosos relacionados con los bonos emitidos por el Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico* [ECF Núm. 15697].

a)   **Objeciones vinculadas a la deuda**[233]

Durante el análisis de la aplicación por el ELA de la disposición sobre el límite de la deuda de la Constitución del ELA realizado por el Abogado de Reclamaciones, se determinó que había posibles deficiencias jurídicas con respecto a varios bonos AEP y GO que habían llevado a la conclusión de que los bonos podían no haber sido válidos o jurídicamente vinculantes.

En suma, el Comité de Reclamaciones Especiales, sobre la base del asesoramiento de su Abogado de Reclamaciones, determinó que el ELA había emitido deuda en violación del Límite Constitucional de la Deuda contenido en la Constitución del ELA. La Constitución del ELA impide de forma manifiesta que el ELA imponga a sus ciudadanos un nivel de deuda que no se pueda reembolsar sin impuestos opresivos y sin sacrificar los servicios necesarios para mantener la salud, la seguridad y el bienestar de Puerto Rico. El Comité de Reclamaciones Especiales determinó que el ELA y sus financistas y profesionales afines habían calificado la deuda de miles de millones de dólares como una obligación de una entidad, AEP, mientras que la deuda se caracterizó más apropiadamente como obligaciones de deuda directa del Deudor del ELA.

(i)   *Cuestiones sobre el Límite Constitucional de la Deuda*

Los aproximadamente $13,000 millones en bonos GO en circulación del ELA es uno de los mayores componentes de la carga de la deuda de Puerto Rico. Los Bonos GO son bonos respaldados por la fe y crédito y poder impositivo del ELA, en lugar de los ingresos de cualquier fuente en particular. Dada su capacidad de vincular al ELA a pasivos a largo plazo que en gran medida, si no exclusivamente, pueden ser reembolsados aplicando impuestos a ciudadanos y empresas del ELA, las emisiones de bonos GO están restringidas por la Constitución de Puerto Rico de varias maneras, entre ellas un límite monetario calculado en relación con los ingresos impositivos disponibles.

Como se indica a continuación, la Junta de Supervisión ha alegado, entre otras cosas, que ciertas emisiones de bonos GO violaron el Límite Constitucional de la Deuda y, en consecuencia, fueron nulas y sin valor.[234]   Los tenedores de bonos han impugnado las afirmaciones de la Junta de Supervisión, presentando reclamaciones y defensas afirmativas en respuesta a las reclamaciones de la Junta de Supervisión. A continuación se analizan estas controversias. Varias otras partes se han sumado, complementado, o de otra manera han planteado objeciones adicionales a las reclamaciones de los presuntos tenedores de bonos GO y AEP (tales objeciones juntas, las "Objeciones de Reclamaciones de Bonos").[235]

---

[233] Además, el Plan contempla una transacción global de las cuestiones planteadas por la *Objeción Ómnibus del Comité Oficial de Acreedores No Asegurados, de conformidad con la Sección 502 del Código de Quiebras y la Regla 3007 de Quiebras, a Reclamaciones presentadas o aseveradas por Tenedores de Bonos de Obligaciones Generales que aseveran prioridad sobre otros Acreedores No Garantizados del ELA, de fecha 3 de febrero de 2020*, [ECF Núm. 10638], y *Objeción del Comité Oficial de Acreedores sin Garantía a la Reclamación del Banco de Fomento del Gobierno de Puerto Rico contra el Estado Libre Asociado de Puerto Rico (Reclamación Núm. 29,485)* [Caso Núm. 17-3283-LTS, ECF Núm. 8000], exclusivamente en lo relativo a las Reclamaciones de Bonos ELA y de Bonos garantizados del ELA, que se describe en la sección **Error! Reference source not found.** de esta Declaración de Divulgación.

[234] Consulte Objeción de Reclamación Conjunta.

[235] Para evitar dudas, las Objeciones de Reclamaciones de Bonos incluyen la Objeción de Reclamación Conjunta, la Objeción Expandida, la Objeción de Bono AEP, la Objeción Condicional, la Objeción Ómnibus de CDCL y la Objeción de CANA 2020, como se describen y definen a continuación. El término "Objeciones de Reclamaciones

(1)      **Disposición y cálculo de límite de deuda**

En 1961 se enmendó la Constitución del ELA para limitar el endeudamiento del ELA sobre la base del servicio de la deuda que el ELA tendría que pagar en relación con sus ingresos históricos, estableciendo el Límite Constitucional de la Deuda. Concretamente, la sección 2 del artículo VI de la Constitución del ELA establece que:

> [N]inguna obligación directa del Estado Libre Asociado de Puerto Rico por dinero tomado a préstamo directamente por el Estado Libre Asociado de Puerto Rico evidenciada mediante bonos o pagarés para el pago de la cual la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico fueren empeñados será emitida por el Estado Libre Asociado de Puerto Rico si el total de (i) el monto del principal de e intereses sobre dichos bonos y pagarés, junto con el monto del principal de e intereses sobre la totalidad de tales bonos y pagarés hasta entonces emitidos por el Estado Libre Asociado y en circulación, pagaderos en cualquier Año fiscal y (ii) cualesquiera cantidades pagadas por el Estado Libre Asociado en el Año fiscal inmediatamente anterior al Año fiscal corriente en concepto de principal e intereses correspondientes a cualesquiera obligaciones evidenciadas mediante bonos o pagarés garantizadas por el Estado Libre Asociado, excediere el 15% del promedio del monto total de las rentas anuales obtenidas de acuerdo con las disposiciones de las leyes del Estado Libre Asociado e ingresadas en la Hacienda de Puerto Rico en los dos años económicos inmediatamente anteriores al Año fiscal corriente; y ninguno de dichos bonos o pagarés emitidos por el Estado Libre Asociado para cualquier fin que no fuere facilidades de vivienda vencerá con posterioridad a un término de 30 años desde la fecha de su emisión y ningún bono o pagaré emitido para fines de vivienda vencerá con posterioridad a un término de 40 años desde la fecha de su emisión; y el Estado Libre Asociado no garantizará obligación alguna evidenciada mediante bonos o pagarés si el total de la cantidad pagadera en cualquier Año fiscal en concepto de principal e intereses sobre la totalidad de las antes referidas obligaciones directas hasta entonces emitidas por el Estado Libre Asociado y en circulación y las cantidades a que se hace referencia en la cláusula (ii) excediere el 15 por ciento del promedio del monto total de dichas rentas anuales.

El tipo de obligación descrito en la primera frase, que hace referencia a las obligaciones del ELA respaldadas por su fe y crédito y poder impositivo, se denomina coloquialmente "obligación general" o deuda "constitucional". Los ingresos anuales "recaudados en virtud de las disposiciones de la legislación del ELA y cubiertos por el Departamento de Hacienda de Puerto Rico" se conocen como "ingresos internos" del ELA y consisten principalmente en ingresos procedentes de impuestos al ingreso, impuestos a la propiedad, impuestos sobre ventas y uso y arbitrios (con algunas excepciones).

---

de Bonos" tiene por objeto incluir todas las objeciones ómnibus a los bonos AEP y GO relativas a la validez de dichos bonos.

(2)     Presuntas violaciones del límite de la deuda

Como se describe con mayor detalle más adelante en la subparte V.H.7.d, los bonos AEP presentan indicios que sugieren que son obligaciones generales del ELA respaldadas por la fe y crédito y poder impositivo del ELA.[236]  Por otra parte, los términos de los bonos AEP (incluidos determinados pactos que rigen los arrendamientos subyacentes) se hicieron públicos en todo momento pertinente. Sin embargo, al calcular el Límite Constitucional de la Deuda, el ELA no incluyó los $4,000 millones en bonos AEP como "dinero pedido prestado directamente por el ELA evidenciado por bonos o notas para el pago del cual la fe y crédito y poder impositivo del ELA serán pignorados".

CANA ha afirmado que, cuando los bonos AEP se incluyen en los cálculos del Límite Constitucional de la Deuda, algunas emisiones de bonos AEP y GO violaron el Límite Constitucional de la Deuda a partir de 2011.[237]  Hasta la fecha, la Junta de Supervisión ha incluido en su "Objeción a la

---

[236]Los tribunales han sostenido que la emisión de una deuda puede reconocerse como una obligación general de una entidad pública sobre la base de esas características, incluso cuando la deuda es supuestamente emitida por un tercero. Consulte, *p. ej.*, *Winkler c. Autoridad de Constr. de Escuelas del Estado*, 189 W.Va. 748, 760-63 (1993); *Cerajewski c. McVey*, 225 Ind. 67, 72 (1947); *Rankin c. Love*, 125 Mont. 184, 189-90 (1951); *Ciudad de Phoenix c. Phoenix Civic Auditorium & Convention Ctr. Ass'n, Inc.*, 99 Ariz. 270, 282 (1965); *Montano c. Gabaldon*, 766 P.2d 1328, 1329 (N.M. 1989); *Ayer c. Comm'r*, 340 Mass.586, 593-98 (1960); *consulte también* consulte *Suppl. Op. con respecto a la confirmación del plan, la aprobación de las conciliaciones y la aprobación del financiamiento de salida*, págs. 60 a 68, *En el caso Ciudad de Detroit*, Caso Núm. 13-53846 (Bankr. E.D. Mich. 31 de dic., 2014), ECF Núm. 8993 (que sostiene que la transacción que proporciona distribuciones reducidas a los tenedores de bonos a la luz de cuestiones similares de validez de bonos era razonable).

[237] Dos grupos de oponentes cuestionan la fecha de cualquier incumplimiento del Límite Constitucional de la Deuda. El Grupo GO ha alegado que el límite de la deuda puede haberse incumplido antes de 2011. Consulte *la Objeción Condicional Ómnibus del Grupo Ad Hoc de Tenedores de Bonos de Obligación General a las reclamaciones presentadas o aseveradas por la Autoridad de Edificios Públicos, los tenedores de bonos de la Autoridad de Edificios Públicos y los tenedores de ciertos bonos de Obligación General del ELA, (la "Objeción Condicional"),* [ECF Núm. 6099] (la "Objeción Condicional"); *consulte también* la subparte 7.a. iii a continuación. El Grupo GO argumenta que, en la medida en que el Tribunal del Título III determine que las objeciones de la Junta de Supervisión y CANA tienen mérito, el Tribunal del Título III también debe considerar que los bonos anteriores a 2012 son inválidos según una o más teorías, entre otras, que (a) si el ELA participó en una operación simulada al caracterizar falsamente la deuda de AEP, entonces toda la deuda de AEP es inválida, y/o (b) que no necesita aplicarse una legislación que regule el cálculo de los costos de servicio de la deuda para los fines del Límite Constitucional de la Deuda. El Grupo GO argumenta que, en la medida en que la reparación solicitada en la Objeción a la Reclamación Conjunta y el litigio conexo se basan en la conclusión de que la deuda del PBA estaba erróneamente descrita en relación con el Límite Constitucional de la Deuda, no es que el propio AEP o sus supuestos empréstitos fueran ilegales, a pesar de ciertos alegatos que describen al AEP como una "operación simulada" en términos coloquiales. Del mismo modo, el Grupo GO argumenta de manera efectiva que si el Tribunal del Título III hace caso omiso de una práctica de cálculo del Límite Constitucional de la Deuda, debe descartar a otros también. Sin embargo, el Grupo GO no ofrece justificación para su metodología preferida, que ignoraría el propósito y el efecto de las transacciones de swap de tasas de interés que efectivamente limitaban los costos del servicio de la deuda, y fueron reconocidas por ley como tales. Por estas razones, entre otras, la Junta de Supervisión considera que la Objeción Condicional no está justificada, y el Plan no refleja ninguna disminución en las distribuciones a los tenedores de antiguos bonos Vintage sujetos a la Objeción Condicional.

CDCL se ha opuesto a los bonos GO y AEP con el argumento de que los bonos AEP deben ser tratados bajo el Límite Constitucional de Deuda no como obligaciones directas y generales del ELA sino como obligaciones de garantía del ELA. Consulte *Objeción Ómnibus de la Coalición de Deuda Constitucional Legítima, Conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a Reclamaciones presentadas o aseveradas por Tenedores de Ciertos Bonos Emitidos o Garantizados por el ELA*, [ECF Núm. 9730] ("Objeción Ómnibus de

Reclamación Conjunta" únicamente los bonos GO emitidos en 2012 y 2014, reservándose el derecho de expandir su objeción a series adicionales de bonos emitidos anteriormente.[238] La Junta de Supervisión reconoce que los bonos GO de 2011 están sujetos a riesgo de litigio en relación con presuntas violaciones del Límite Constitucional de la Deuda, como se refleja en la objeción de CANA a las reclamaciones de bonos GO de 2011. A partir de febrero de 2021, la Junta de Supervisión seguía analizando cuestiones relativas a los bonos GO de 2011 y se había reservado previamente su determinación en cuanto a cualquier ajuste del plan propuesto para las reclamaciones de bonos GO de 2011. Las opiniones de la Junta de Supervisión se reflejan en el AAP y en el Plan, que prevén el tratamiento con descuento de los bonos GO de 2011 a la luz de presuntas violaciones del límite de la deuda.

(3)     **Cuestiones especiales sobre los Bonos 2014**

En su objeción a los bonos GO de 2012 - 2014, la Junta de Supervisión y CANA afirman que, a pesar de la caracterización de la deuda de bonos AEP, el ELA violó el Límite Constitucional de la Deuda en 2014 al no contabilizar $425 millones en los costos del servicio de la deuda pagados mediante retenciones con cargo al producto de la emisión.

Los bonos GO de 2014 se emitieron por un monto de capital total de $3,500 millones. Sin embargo, el ELA tomó prestados efectivamente $3,100 millones, reteniendo aproximadamente $425 millones del producto porque entendía que de lo contrario carecería de recursos o ingresos para pagar los primeros años de intereses de los bonos. Aunque este tipo de financiamiento con intereses retenidos no es infrecuente en el financiamiento de proyectos municipales, en el que un proyecto puede tardar años en empezar a generar ingresos para el pago del servicio de la deuda, no es común con respecto a los préstamos de obligaciones generales, y pone de manifiesto la incapacidad del ELA para pagar sus deudas en el momento de la emisión de los bonos.

Los $425 millones de pagos de intereses capitalizados fueron excluidos del cálculo del Límite Constitucional de la Deuda. Ninguno de los documentos de emisión explica por qué los pagos no deben incluirse en el cálculo del Límite Constitucional de la Deuda de "capital de e intereses sobre los bonos y notas de [obligación general]". Cuando se incluyen adecuadamente en el cálculo del límite de la deuda, los bonos GO de 2014 violan el límite de la deuda, incluso sin incluir las obligaciones de la deuda AEP.

Algunos tenedores de bonos han argumentado que los pagos de intereses capitalizados fueron adecuadamente excluidos de los cálculos del Límite Constitucional de la Deuda.[239] El principal argumento de los tenedores de bonos es que la restricción del Límite Constitucional de la Deuda a las cantidades

---

CDCL"). Como tal, CDCL sostiene que los bonos AEP deben ser contabilizados hacia el límite constitucional de la deuda en la medida en que los pagos fueron hechos por el ELA en lugar de cualquier otro supuesto arrendador. Así, aproximadamente el 80-98% del importe nominal de las obligaciones pendientes se aplicaría al límite en virtud de las prácticas de pago recientes, frente al 100% que afirma la Junta de Supervisión, y, en consecuencia, CDCL afirma que se ha infringido el Límite Constitucional de la Deuda en una fecha relativamente posterior a la de la Junta de Supervisión.

[238] Consulte *Objeción Ómnibus de la (I) Junta de Supervisión y Administración Financiera, actuando a través del Comité de Reclamaciones Especiales, y (II) el Comité Oficial de Acreedores No Asegurados, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebra 3007, a reclamaciones presentadas o aseveradas por los tenedores de ciertos bonos de obligaciones generales del ELA*, ECF Núm. 4784 (la "Objeción de Reclamación Conjunta").

[239] Consulte Moción del Grupo Ad Hoc, 37-41.

"pagaderas en cualquier Año fiscal" no puede aplicarse cuando existe un fondo de amortización reservado y pignorado para el pago de las obligaciones existentes. Los tenedores de bonos sostienen que, dado que el ELA se obligó a utilizar el fondo de amortización para pagar los bonos, los fondos eran efectivamente propiedad de los tenedores de bonos y, por tanto, los pagos que debían hacerse utilizando esos fondos no eran "pagaderos" en el sentido de la Constitución del ELA.

(ii)     *Validez de los bonos emitidos por encima del límite de la deuda y defensas*

La Junta de Supervisión argumenta que las obligaciones de bonos supuestamente incurridas en incumplimiento de la autoridad expresa de un emisor público son nulas.[240] En consecuencia, las Objeciones de Reclamaciones de Bonos alegan que las violaciones del Límite Constitucional de la Deuda hacen que algunos bonos GO y AEP sean nulos.

En y a partir del 5 de febrero de 2020, de conformidad con la orden de programación del Tribunal del Título III que rige estos asuntos, los tenedores de bonos solicitaron que se desestimaran las Objeciones de Reclamaciones de Bonos. Los tenedores de bonos sostienen que, entre otras cosas, los bonos AEP no deben considerarse obligaciones directas a efectos del Límite Constitucional de la Deuda, y que incluso si el ELA violó el Límite Constitucional de la Deuda el remedio apropiado es o bien no invalidar los bonos en absoluto, o bien invalidar solo una parte de los bonos.

Hasta la fecha, varios tenedores de bonos y grupos de ellos han presentado mociones para desestimar las Objeciones de Reclamación de Bonos y memorandos conexos (las "Mociones de Desestimación de Objeciones de Bonos").[241]

---

[240] Consulte, *p. ej.*, *Estado c. Spring City*, 123 Utah 471, 475 (1953); *State ex rel. Nuveen c. Greer*, 88 Fla. 249, 260 (1924); *Eaton c. Shiawassee Cty.*, 218 F. 588, 591 (6to Cir. 1914); *McCurdy c. Shiawassee Cty.*, 154 Mich. 550, 556 (1908).

[241] Las Mociones de Desestimación de Objeciones de Bonos incluyen, hasta la fecha, *la Moción del Grupo Ad Hoc de Tenedores de Bonos de Obligación General, Grupo Ad Hoc de Tenedores de Deuda Constitucional, Assured Guaranty Corp. y Assured Guaranty Municipal Corp., y los Fondos de Invesco para desestimar las Objeciones a las reclamaciones ómnibus para reclamaciones presentadas o aseveradas por tenedores de ciertos bonos de obligaciones generales del ELA y bonos de la Autoridad de Edificios Públicos* [ECF Núm. 10702] (la "Moción del Grupo Ad Hoc"); *Memorando Complementario del Grupo Ad Hoc de Tenedores de Bonos de Obligaciones Generales, Grupo Ad Hoc de Tenedores de Deuda Constitucional, y Assured Guaranty Corp. y Assured Guaranty Municipal Corp. en apoyo de la Moción de Desestimación* [ECF Núm. 10704] (el "Suplemento AHG"); *la Respuesta de QTCB Noteholder Group' a ciertas Objeciones Ómnibus y Litisconsorcio Limitado a la Moción del Grupo Ad Hoc de Tenedores de Bonos de Obligaciones Generales, el Grupo Ad Hoc de Tenedores de Deuda Constitucional, Assured Guaranty Corp. y Assured Guaranty Municipal Corp., y Fondos de Invesco para desestimar Objeciones a las a las reclamaciones ómnibus a las reclamaciones presentadas o aseveradas por los tenedores de ciertos bonos de Obligaciones Generales del ELA y bonos de la Autoridad de Edificios Públicos* (la "Respuesta de QTCB") [ECF Núm. 10705]; *Moción individual de los tenedores de bonos GO y AEP del ELA para desestimar Objeciones a reclamaciones por tenedores de Bonos GO y AEP del ELA* [sic] [ECF Núm. 11148] (la "Moción de Hein"); *Respuesta y litisconsorcio de Kenneth Kirschenbaum y Kenneth Kirschenbaum Faily Trust a las mociones de desestimación de Objeciones a las reclamaciones ómnibus a reclamaciones presentadas o aseveradas por los tenedores de ciertos bonos de obligaciones Generales del ELA y bonos de la Autoridad de Edificios Públicos* [ECF Núm. 11149]; la "Moción Cooperativa"; *Moción de las Partes de ARD para desestimar (I) la Objeción del Comité Oficial de Acreedores No Asegurados sobre el Límite Constitucional de la Deuda a la reclamación del Banco Nacional de Fomento para Puerto Rico [Reclamación Número 29485] Basado en ciertas notas emitidas por el ELA y en la garantía del ELA de ciertos bonos emitidos por la Autoridad del Puerto de las Américas [Leg. Núm. 9735] y (II) Objeción Ómnibus de la Coalición de Deuda Constitucional Legítima, de*

323

En las Mociones de Desestimación de Objeciones de Reclamaciones de Bonos, los tenedores de bonos plantean una serie de argumentos en el sentido de que los bonos GO y AEP no violaron el Límite Constitucional de Deuda o no deberían ser considerados inválidos por otros motivos. Estos argumentos se resumen a continuación.

- Los tenedores de bonos argumentan que la constitución de Puerto Rico excluye la caracterización de los bonos AEP como obligación general o deuda constitucional porque el Límite Constitucional de Deuda se aplica al "dinero pedido prestado directamente por el ELA" y no al dinero pedido prestado por AEP.[242]

- Los tenedores de bonos argumentan que la existencia legal y la historia de AEP confirman su legitimidad de tal manera que las obligaciones de AEP no pueden ser consideradas como obligaciones del ELA.[243]

- Los tenedores de bonos argumentan que ciertos bonos GO emitidos en julio de 2011, denominados y contabilizados como bonos 2011, fueron de hecho emitidos en el Año fiscal 2012 y deben considerarse bonos 2012 que no violaron el límite constitucional de deuda incluso bajo los métodos contables de la Junta de Supervisión.[244]

- Los tenedores de bonos cuestionan el método de la Junta de Supervisión de contabilizar la validez de los bonos y los remedios solicitados, con el argumento de que algunas emisiones

---

conformidad con la Sección 502 del Código de Quiebras y la Regla 3007 de Quiebras, a Reclamaciones Presentadas o Aseveradas por Tenedores de Ciertos Bonos Emitidos o Garantizados por el ELA [Leg. Núm. 9730] [ECF Núm. 11260].

Varias partes han presentado declaraciones que se suman a las anteriores mociones de desestimación y, en algunos casos, buscan extender la reparación solicitada a litigios conexos relativos a reclamaciones extracontractuales y reclamaciones de reintegración relativas a la extensión de las garantías del ELA a deudas emitidas por otras entidades. Consulte, p. ej., ECF Núm. 11153, 11241, 11247, 11251, 11261, 11264, 11267, 11281, 11292.

Además, CDCL ha presentado la *Moción Ómnibus de desestimación de la Coalición de Deuda Constitucional Legítima, conforme a la Regla de Quiebras 7012, de reclamaciones presentadas o aseveradas por la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados* [sic] [ECF Núm. 10697] (la "Moción de CDCL"). La moción de CDCL pide que se desestimen las objeciones presentadas por la Junta de Supervisión y otros, pero no la Objeción Ómnibus de CDCL. En otras palabras, CDCL cuestiona las teorías jurídicas afirmadas en las otras Objeciones de Reclamación de Bonos, pero pide una reparación similar.

[242] Consulte, p. ej., Moción del Grupo Ad Hoc, 13-18.

[243] *Id.* en 18-23. Este argumento se basa en parte en pruebas fácticas, que la Junta de Supervisión cuestiona tanto en cuanto al fondo como en cuanto a los motivos procesales de que el Tribunal no pueda examinar esas pruebas en el marco de una petición presentada en virtud de Fed. R. Bankr. Pro. 7012.

[244] Consulte *id.* en 41. El año fiscal del ELA comienza el 1 de julio; los bonos introducidos después del 1 de julio de 2011 se considerarían normalmente como el Año fiscal 2012. La Junta de Supervisión ha contabilizado estos bonos (denominados Bonos GO de 2011 Serie D/E) en el año fiscal 2011 porque el ELA parece haber realizado los cálculos pertinentes del Límite Constitucional de Deuda sobre la base de los bonos que se emitieron en el año fiscal 2011. De hecho, la información necesaria para calcular el Límite Constitucional de la Deuda para los bonos y estipular su cumplimiento jurídico no existía en el momento en que la Asamblea Legislativa del ELA aprobó y emitió los bonos junto con las consideraciones preliminares.

de bonos deben ser parcialmente válidas y que las emisiones consideradas inválidas no deben tenerse en cuenta en los cálculos con respecto a emisiones posteriores.[245]

Los tenedores de bonos han planteado argumentos adicionales específicos a las afirmaciones planteadas por el CDCL y otras partes. Por ejemplo, un grupo de tenedores de bonos argumentó que si el AEP es efectivamente una "operación simulada diseñada para eludir" el Límite Constitucional de la Deuda, sus bonos deberían ser considerados totalmente inválidos.[246]  Otros han argumentado que sostener que los bonos son inválidos violaría la Constitución de EE.UU. entre otras razones porque sería un despojo ilegal bajo la 5ª Enmienda.[247]

(1)  **Defensas derivadas del régimen de "equity"**

Las Mociones de Desestimación de Objeciones de Reclamaciones de Bonos articulan además defensas a las Objeciones de Reclamaciones de Bonos basadas en teorías del "equity", como la teoría del "estoppel" (similar a la de "actos propios") y enriquecimiento injusto.[248]  En suma, los tenedores de bonos sostienen que el ELA recibió los productos de las emisiones de bonos, y que sería injusto permitir que el ELA eluda sus obligaciones simplemente porque no se aseguró de apegarse al derecho aplicable antes de emitir los bonos. Además, los tenedores de bonos sostienen que las consideraciones preliminares del ELA en relación con la Emisión de los Bonos Impugnados, que certifican la potestad del ELA y de AEP para contraer préstamos, impiden cualquier impugnación sobre la validez de los bonos. De forma conexa, los tenedores de bonos sostienen que deberían aplicarse los principios de prudencia judicial para limitar la decisión del Tribunal del Título III sobre estos temas al efecto eventual, con el fin de evitar situaciones significativas de adversidad para los tenedores de bonos.[249]  Ciertos tenedores de bonos también sostienen que el Límite Constitucional de la Deuda constituye un impedimento sobre la acción legislativa y no sobre los derechos o remedios de los tenedores de bonos.[250]

La Junta de Supervisión considera que estas defensas tienen escasa probabilidad de éxito. La Corte Suprema de Puerto Rico ha "rechazado de manera inequívoca" la aplicación del "equitable estoppel" tal como se desarrolló en el "common law" para su uso en el sistema de derecho civil, y de la misma forma no reconoce las defensas por enriquecimiento injusto que involucran cuestiones de política pública constitucional.[251]  La jurisprudencia sugiere que una parte privada que realiza transacciones con el ELA asume el riesgo de que, si la transacción entra en conflicto con una política pública clara formulada en una ley o en la Constitución, no habrá ningún remedio disponible contra el ELA. Los tribunales han resaltado

---

[245] Consulte *id.* en 59-64.

[246] Consulte Suplemento AHG.

[247] Moción de Hein, 6.

[248] Consulte, *p, ej.,* Moción del Grupo Ad Hoc; Moción de Hein; Respuesta de QTCB; Moción Cooperativa.

[249] Consulte Moción del Grupo Ad Hoc, 50-54.

[250] Consulte Respuesta de QTCB.

[251] Consulte *CMI Capital Mkt. Inv., LLC c. Municipio de Bayamon*, 410 F. Sup. 2d 61, 76 (D.P.R. 2006) (rechazo del reconocimiento de la defensa del "estoppel"); *Hatton c. Municipio de Ponce*, 134 D.P.R. 1001, 1010 (1994) (no se acepta la defensa de enriquecimiento injusto en los casos donde un contrato del gobierno viola políticas públicas claras; *consulte también Vicar Builders Dev., Inc. c. ELA*, 192 D.P.R. 256, 267-70 (2015) (el gobierno no puede confirmar un contrato ilícito a través de una conducta posterior).

que, si bien esto produce sin duda una adversidad considerable para la contraparte en una transacción ilícita, el resultado opuesto causa una adversidad considerable a ciudadanos y contribuyentes y constituye una ofensa para los principios de justicia y el imperio de la ley.[252]

(2)     **Defensas basadas en el Código Comercial Uniforme**

Si bien no se han planteado en ninguna Moción de Desestimación de Objeciones de Reclamaciones de Bonos, la Junta de Supervisión ha previsto que los tenedores de bonos pueden presentar defensas conforme al Artículo 8 del Código Comercial Uniforme, adoptado en Puerto Rico como el Artículo 8 de la Ley de Transacciones Comerciales y codificado en el Título 19 de las Leyes anotadas de Puerto Rico. El Código Comercial Uniforme contiene dos disposiciones que tratan la emisión de títulos valores inválidos. La Sección 8-202 dispone la validación de títulos valores inválidos bajo condiciones específicas como defensa para la aseveración de invalidez de un emisor. La Sección 8-210 dispone un remedio para los tenedores de títulos valores emitidos que superan las facultades del emisor.[253]

La Junta de Supervisión considera que es improbable que estas defensas basadas en el Código tengan éxito por una serie de motivos, de los cuales el más importante es que la legislación que de por sí se plantea como por encima de la Constitución del ELA es en sí misma ilícita.[254]  Los principios de ley consagrados en una constitución no pueden ser desestimados por la acción legislativa o judicial.[255]  La Junta de Supervisión articula defensas adicionales dentro de su Objeción de Reclamación Conjunta.

---

[252] Consulte *Buchanan c. Ciudad de Litchfield*, 102 U.S. 278, 293 (1880) (denegación de reparación para la parte agraviada que posee bonos que violan los límites de la deuda y declara que "los principios establecidos de la ley no pueden, con seguridad para el público, desestimarse para remediar las adversidades de casos especiales"); *Ciudad de Litchfield c. Ballou*, 114 U.S. 190, 822-23 (1885) (denegación de reparación para la misma parte sobre la teoría del "equity", observando que "[e]l dinero recibido por los bonos ya se ha gastado. . . imponer el monto de estos como gravamen sobre [los bienes públicos] construiría de la misma forma una violación de la prohibición constitucional [de deuda] . . . Los tenedores de los bonos y los agentes del municipio son partícipes en un delito por el acto de violación de esa prohibición, y el "equity" no generará una confianza resultante a favor de los tenedores de bonos en mayor grado que la ley puede generar un *assumpsit* implícito contra una política pública declarada con tanta firmeza".).

[253] Las disposiciones del Código Comercial Uniforme que más probablemente se planteen en defensa de los Bonos GO son las secciones 8-202 y 8-210.  Para un análisis más detallado de las disposiciones pertinentes del Código Comercial Uniforme, consulte la Objeción de Reclamación Conjunta, ¶¶ 106-128.

[254] Si bien este hecho es inherente al sistema legal constitucional, se ha considerado verdadero reiteradas veces, cuando las partes hacen valer defensas establecidas por ley sobre supuestas violaciones del límite constitucional de deuda y defectos relacionados en los gastos del gobierno. Consulte, *p. ej.*, *Weinberger c. Junta de Instrucción Pub. de Ciudad de St. Johns.*, 93 Fla. 470, 481-82 (1927) ("[C]uando se emiten bonos en violación de una disposición obligatoria de la Constitución, como, por ejemplo, cuando superan los límites de la deuda fijados en la Constitución. . . tales bonos son inválidos desde un principio, y no pueden recuperar su validez mediante una legislación subsanante".); *Ciudad de Nolan c. el Estado*, 83 Tex. 182, 200 (1891) ("En los casos en que un contrato que una corporación municipal ha intentado celebrar resulta inválido meramente por falta de potestad legislativa para celebrarlo, una ley posterior puede hacerlo válido. Sin embargo, si en el momento de su celebración tentativa, la legislatura no podría haberlo autorizado, es dudoso que la legislatura lo pueda convertir en válido, aunque en el medio tiempo [sic], mediante un cambio en la constitución, la restricción sobre su propio poder puede haber sido eliminada").

[255] Consulte las fuentes antes citadas; *McPherson c. Foster Bros.*, 43 Iowa 48, 69-70 (1876) ("L[a] visión [de que los compradores de bonos inconstitucionales deberían tener un remedio] presenta la sugerencia de un plan ingenioso

(iii)    *Objeciones a las reclamaciones de bonos y procedimientos*

Con el asesoramiento del Abogado de Reclamaciones, la Junta de Supervisión, actuando por y a través del Comité de Reclamaciones Especiales, se unió a CANA en un litigio que asevera que varias de las emisiones de 2012 y 2014 de los Bonos GO violaban el Límite Constitucional de Deuda de Puerto Rico, y que las reclamaciones de capital e intereses de presuntos tenedores de los Bonos GO deben desestimarse.[256]

La provisión de debido proceso en los procedimientos (lo que incluye, entre otros, notificación adecuada) a todos los potenciales presuntos tenedores de Bonos GO con respecto a la Objeción de Reclamación Conjunta requería que CANA y la Junta de Supervisión propusieran un procedimiento sólido mediante el cual se pudiera notificar a todos los presuntos tenedores de Bonos GO de 2012 y 2014 y que tuvieran la oportunidad de responder a la Objeción de Reclamación Conjunta. *Consulte Moción Urgente de (I) la Junta de Supervisión y Administración Financiera para Puerto Rico, actuando a través de su Comité de Reclamaciones Especiales, y (II) el Comité Oficial de Acreedores No Asegurados, conforme a las Secciones 105(a) y 502 del Código de Quiebras y la Regla de Quiebras 3007, para establecer procedimientos con respecto a una objeción ómnibus a las Reclamaciones presentadas o aseveradas por tenedores de ciertos Bonos de Obligaciones Generales del ELA y solicitar Reparación relacionada* [ECF Núm. 4788] (la "Moción de Procedimientos Iniciales" y los procedimientos contenidos en ellos, los "Procedimientos").

El Tribunal del Título III concedió la Moción de Procedimientos Iniciales con modificaciones a los Procedimientos inicialmente propuestos.[257] De conformidad con los Procedimientos aprobados, (1) la Depository Trust and Clearing Corporation ("DTCC") publicó una notificación de la Objeción de Reclamación Conjunta en su sistema de notificaciones legales; (2) se publicó una notificación de la Objeción de Reclamación Conjunta en diversos periódicos de habla inglesa e hispana; y (3) los presuntos tenedores afectados de Bonos GO impugnados fueron identificados por los treinta y siete (37) números

---

de anular por completo la disposición de la Constitución del Estado bajo consideración. Es notable debido a que, si se aplica la Constitución de manera tal que subsane el mal contra el que se intenta proteger al pueblo del estado, funcionaría para engañar y defraudar a aquellos que tratan con corporaciones políticas. En tal caso, según el sentimiento de la cita anterior, la Constitución se convierte en un instrumento de fraude, y por ese motivo se permite su violación. Debe confesarse que este es un pensamiento novedoso, el de desestimar la ley suprema del Estado porque funciona para engañar y defraudar a personas inocentes. El error de la cita se basa en una visión parcial de los derechos de aquellos que son considerados compradores inocentes, y la falta de atención al objeto y el propósito de la restricción constitucional en cuestión").

[256] Consulte Objeción de Reclamación Conjunta. CANA sostiene además que los bonos eran inválidos porque violaban el Artículo VI, sección 7 de la Constitución del ELA, que dispone que "[l]as asignaciones hechas para cualquier año fiscal no deben superar las rentas totales, incluso el superávit disponible, estimado para dicho año fiscal, a menos que la imposición de impuestos suficientes para cubrir dichas asignaciones se disponga por ley". La Junta de Supervisión no asumió una posición con respecto a si los Bonos GO violan esta disposición constitucional, pero se reserva el derecho de plantear esa u otras objeciones relacionadas con los Bonos GO. Consulte Objeción de Reclamación Conjunta, p. 32 n. 18.

[257] Consulte *Orden, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, que establece procedimientos iniciales con respecto a la Objeción Ómnibus de (I) la Junta de Supervisión y Administración Financiera para Puerto Rico, actuando a través de su Comité de Reclamaciones Especiales, y (II) el Comité Oficial de Acreedores No Asegurados, a las Reclamaciones presentadas o aseveradas por tenedores de ciertos Bonos de Obligaciones Generales del ELA y se concede Reparación relacionada*, ECF Núm. 5143 (la "Orden de Procedimientos").

CUSIP identificados en la Objeción de Reclamación Conjunta. Además, los Procedimientos establecieron que los presuntos tenedores habían tenido sesenta (60) días a partir de la fecha de la Orden de Procedimientos que concedió la Moción de Procedimientos Iniciales para presentar una Notificación de Participación, que debía disponer, entre otros hechos, si el presunto tenedor se oponía a la Objeción de Reclamación Conjunta. Los presuntos tenedores de bonos presentaron más de mil Notificaciones de Participación.

Posteriormente a la Objeción de Reclamación Conjunta y como se describe con más detalle a continuación, la Junta de Supervisión y CANA presentaron litigios que buscaban evitar y recobrar pagos de capital e intereses con respecto a las presuntas obligaciones de bonos, entre ellas los Bonos GO y AEP emitidos a partir de marzo de 2011. Posteriormente, CANA presentó una objeción a reclamaciones contra el Deudor del ELA por cuenta de Bonos GO emitidos en y después de marzo de 2011 y de Bonos AEP emitidos en y después de marzo de 2011.[258]

En tándem con la Objeción de Reclamación Conjunta y la Objeción Expandida, un grupo de tenedores de Bonos GO, el Grupo GO, presentó lo que se describe como una "objeción condicional" a ciertos bonos emitidos antes de 2012.[259]  El Grupo GO sostuvo que, en la medida en que el tribunal debía determinar si las objeciones de la Junta de Supervisión y CANA tenían mérito, el tribunal también debería determinar que los bonos emitidos antes de 2012 eran inválidos conforme a una o más teorías, incluso, entre otras, que (a) si el ELA participó en una operación simulada al caracterizar falsamente la deuda de AEP, entonces toda la deuda de AEP es inválida, y/o (b) que no necesita aplicarse una legislación que regule el cálculo de los costos de servicio de la deuda para los fines del Límite Constitucional de la Deuda. Independientemente de esto, el Grupo GO asumió la postura de que ninguna objeción a los Bonos GO tiene mérito, incluso su propia Objeción Condicional. Por este motivo, entre otros, el Tribunal del Título III denegó la moción del Grupo GO para la aprobación de procedimientos para litigar la Objeción Condicional sobre la base de que no era el momento justo para hacerlo [ECF Núm. 6891]. Sin embargo, el Grupo GO posteriormente renovó su moción de aprobación, sobre la base de que el AAP, el Plan y la Declaración de Divulgación hacen que sea el momento justo para la Objeción Condicional.[260]

---

[258] Consulte *la Objeción Ómnibus del Comité Oficial de Acreedores No Asegurados, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas por los tenedores de ciertos Bonos Generales del ELA de 2011* [ECF Núm. 7057] (la "Objeción Expandida"); *Objeción Ómnibus del Comité Oficial de Acreedores No Asegurados, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas contra el ELA por los tenedores de ciertos Bonos de la Autoridad de Edificios Públicos de Puerto Rico*, ECF Núm. 8141 (la "Objeción a los Bonos de AEP"). La Junta de Supervisión y CANA solicitaron entonces la aprobación de procedimientos similares para regir la Objeción Expandida y para litigar la Objeción de Reclamación Conjunta y la Objeción Expandida en un trámite ómnibus. Consulte *la Moción Enmendada de (I) la Junta de Supervisión y Administración Financiera para Puerto Rico, actuando a través de su Comité de Reclamaciones Especiales, y (II) el Comité Oficial de Acreedores No Asegurados, conforme a las Secciones 105(a) y 502 del Código de Quiebras y la Regla de Quiebras 3007 para (A) Extender las fechas límite y (B) Establecer procedimientos revisados con respecto a las Objeciones Ómnibus a las Reclamaciones de los tenedores de ciertos Bonos de Obligaciones Generales del ELA emitidos en 2011, 2012 y 2014, y para Reparación relacionada*, [ECF Núm. 7154].

[259] Consulte Objeción Condicional.

[260] Consulte *Notificación de Vista sobre Moción Renovada del Grupo Ad Hoc de tenedores de bonos de Obligaciones Generales, conforme a las Secciones 105(a) y 502 del Código de Quiebras y la Regla de Quiebras 3007, que establecen procedimientos con respecto a la Objeción Condicional Ómnibus presentada o aseverada por la*

CDCL también presentó una declaración en respuesta a la Objeción de Reclamación Conjunta, apoyándola en parte y recusándola en parte.[261] La Declaración de CDCL apoya la invalidación de los Bonos Go Vintage tardíos pero recusa las impugnaciones a la validez de la estructura de AEP. Como alternativa, la Declaración de CDCL establece que es irrelevante si el grupo de tenedores de bonos GO tiene una reclamación permisible, dado que no tienen derecho a ninguna distribución sobre la reclamación, porque los bonos GO de 2012 y 2014 violaron términos expresos del Límite Constitucional de la Deuda.

El 24 de julio de 2019, el Tribunal del Título III dictó la Orden de Paralización, que paraliza, entre otras cosas, la Objeción de Reclamación Conjunta, la Objeción Expandida y la Objeción Condicional renovada, cuya paralización se extendió hasta el 11 de marzo de 2020. Conforme a la Orden de Gestión de Casos de GO/AEP, tanto CANA como CDCL presentaron objeciones de reclamaciones que suplementan la información previamente presentada.[262] CANA reiteró los argumentos de sus objeciones anteriores y los complementó con impugnaciones a los siguientes bonos y notas como inválidos: Notas del BGF emitidas en o cerca de julio de 2012, julio de 2013 y junio de 2016; Bonos de AEP de 2004 y 2006 que fueron refinanciados en un mismo bono garantizado del ELA en poder del BGF en 2015; la Evidencia de Reclamaciones del ScotiaBank presentada el 13 de junio de 2018 para reclamaciones sobre una "Nota de Scotiabank" presuntamente inválida; y Notas de AFI emitidas en 2015. CANA asevera que ciertas notas del BGF, ciertas garantías de bonos de AEP, la Nota de ScotiaBank, y ciertas garantías de AFI deberían desestimarse porque las notas y garantías fueron todas emitidas en violación del Límite Constitucional de la Deuda, y por lo tanto son nulas y sin valor.

Si bien la Objeción Ómnibus de CDCL renovó el argumento anterior de que los Bonos Vintage de 2012 y 2014 son nulos y sin valor, aclaró su postura y, con nuevos argumentos, aseveró que los bonos de AEP posteriores a 2012 también se habían emitido en violación del Límite Constitucional de la Deuda, junto con los BAN de AFI y los bonos de Puertos. CDCL adoptó la postura de interpretar que la Constitución del ELA establece dos límites diferenciados para la deuda, uno para (i) "obligaciones directas para bonos emitidos por el ELA", y otro para (ii) "obligaciones para bonos garantizados por el ELA siempre que el ELA haya hecho pagos del servicio de la deuda por cuenta de dichas obligaciones de garantía". Sin embargo, la Objeción Ómnibus de CDCL aseveraba que los pagos de alquileres del ELA constituyen pagos por cuenta de la garantía del ELA, que por lo tanto deben incluirse en el cálculo del servicio de la deuda para bonos emitidos directamente por el ELA.[263]

El 5 de febrero de 2020, conforme a las fechas límite estipuladas en la orden de gestión de casos provisional del Tribunal del Título III con respecto a los litigios de bonos AEP y GO, ciertos tenedores de

---

Autoridad de Edificios Públicos, los tenedores de bonos de la Autoridad de Edificios Públicos y los tenedores de ciertos bonos de Obligaciones Generales del ELA, [ECF Núm. 7814].

[261] Consulte la Declaración de Postura de la Coalición de Deuda Constitucional Legítima con respecto a la Objeción a reclamaciones presentadas o aseveradas por los tenedores de ciertos Bonos de Obligaciones Generales del ELA [ECF Núm. 6180] ("Declaración de CDCL").

[262] Objeción Ómnibus de CDCL; Objeción Ómnibus del Comité Oficial de Acreedores No Asegurados por motivos del Límite Constitucional de la Deuda a (I) la Reclamación del Banco Nacional de Fomento para Puerto Rico (Número de Reclamación 29485) en base a ciertas Notas emitidas por el ELA y ciertas Garantías del ELA sobre ciertos bonos emitidos por la Autoridad del Puerto de las Américas, (II) Reclamación de Scotiabank de Puerto Rico (Número de Reclamación 47658) basada en la Nota de Plena Fe y Crédito emitida por la Administración de Servicios Generales de Puerto Rico, y (III) Reclamaciones presentadas o aseveradas contra el ELA sobre la base de la garantía del ELA de ciertas notas emitidas por la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, [ECF Núm. 9735] ("Objeción de CANA 2020").

[263] Objeción Ómnibus de CDCL, [ECF Núm. 9730], ¶ 2.

bonos presentaron mociones para desestimar las objeciones de los bonos AEP y GO. Las partes solicitantes incluían ciertos grupos de tenedores de bonos que habían participado activamente en la mediación con respecto a la orden de programación y la validez de AEP y GO en general, y también las aseguradoras monolínea que habían asegurado los bonos GO y AEP. A tenor con la orden de programación, se presentaron mociones de desestimación adicionales en o antes del 19 de febrero de 2020. [264]

Como se indicó anteriormente, el 9 de febrero de 2020, la Junta de Supervisión celebró el AAP, que propone resolver los litigios sobre la validez de los bonos que se mencionaron anteriormente.

El 10 de febrero de 2020, después de la divulgación del AAP, el Equipo de Mediación presentó un informe revisado y la recomendación de que los litigios posteriores conforme a la orden de programación de litigios de GO/AEP deberían paralizarse para facilitar la confirmación del Plan. La Junta de Supervisión y los tenedores de bonos que lo consintieron, igualmente, han acordado buscar una paralización general de todos los litigios de este tipo hasta que se confirme el Plan.

(iv) *Cuestiones adicionales planteadas en presentaciones relacionadas*

Las subpartes V.H.7.a)(i)-(iii) del presente describen aseveraciones de que los bonos GO y AEP eran inválidos como resultado de incumplimientos del Límite Constitucional de la Deuda. La Junta de Supervisión se reservó el derecho de expandir sus objeciones a series adicionales de bonos y ha presentado hechos y cuestiones de derecho aplicables adicionales que plantean dudas en cuanto a la validez de los bonos GO y sus transferencias relacionadas. A continuación se discuten estas dudas adicionales.

(1) **Violaciones de la cláusula del presupuesto equilibrado**

La Junta de Supervisión considera que, así como el Límite Constitucional de la Deuda limita la capacidad del ELA para emitir deuda que viole las políticas públicas al superar la capacidad del ELA de pagar según lo evidenciado por sus ingresos históricos, disposiciones constitucionales adicionales restringen la capacidad del ELA de emitir deuda y usar el producto de esa deuda para fines que de manera similar no sirven al bien público. El Artículo VI, sección 7 de la Constitución del ELA (la "Cláusula del Presupuesto Equilibrado"), dispone que "[l]as asignaciones hechas para cualquier año fiscal no deben superar las rentas totales, incluso el superávit disponible, estimado para dicho año fiscal, a menos que la imposición de impuestos suficientes para cubrir dichas asignaciones se disponga por ley".

CANA ha alegado en la Objeción de Reclamación Conjunta que ciertos Bonos GO violan la Cláusula del Presupuesto Equilibrado porque el propósito documentado y declarado del endeudamiento era el de financiar déficits estructurales en el presupuesto del ELA. La Junta de Supervisión se ha reservado el derecho de participar en este argumento. [265]

Los productos de la deuda de Obligaciones Generales en muchas jurisdicciones solo pueden usarse para financiar proyectos de capital, como la adquisición de tierras y el desarrollo de infraestructura. La práctica de "financiamiento deficitario", que alivia los déficits de presupuesto pidiendo dinero prestado en lugar de reducir gastos o aumentar impuestos, se considera como fiscalmente endeble y no recomendable para la deuda de Obligaciones Generales. De hecho, el BGF en algún momento recomendó la venta de Bonos GO observando el "hecho evidente y fundamental, de que el financiamiento deficitario está

---

[264] Las mociones descritas en este párrafo incluyen las "Mociones de Desestimación de Objeciones de Reclamaciones de Bonos" que se mencionan anteriormente en la subparte V.H.7.a)(ii).

[265] Objeción de Reclamación Conjunta, p. 32 n. 18. 18.

específicamente prohibido por la Constitución del ELA". Publicidad del BGF, Revista *Barron's*, febrero de 1974.

No obstante las afirmaciones pasadas del BGF, hay algunas controversias con respecto a la interpretación correcta de la Constitución. En la versión en lengua inglesa (traducida al español) de la Constitución del ELA que se aprobó en el Congreso de EE.UU. se dispone que "[l]as asignaciones hechas para cualquier Año fiscal no deben superar las **rentas totales**, incluso el superávit disponible, estimado para dicho año fiscal, a menos que la imposición de impuestos suficientes para cubrir dichas asignaciones se disponga por ley". Dado que los productos de los bonos no son "ingresos", la Junta de Supervisión sostiene que se entiende mejor que este lenguaje prohíbe el financiamiento deficitario.

En cambio, el texto de la versión en español de la Constitución del ELA adoptado por la Legislatura dice: "Las asignaciones hechas para un Año fiscal no podrán exceder de los recursos totales calculados para dicho Año fiscal, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones", usando el término "**recursos** totales", en lugar de "**rentas** totales". La historia legislativa sugiere que el término "recursos totales" fue utilizado intencionalmente por los redactores para abarcar la emisión de bonos; sin embargo, la ley federal que dispone la vigencia de la Constitución del ELA indica que la versión en inglés es la que debe considerarse oficial.

Ningún tribunal ha dictado una decisión sobre si la Constitución del ELA prohíbe el financiamiento deficitario. Ciertos tenedores de bonos han aseverado que la interpretación de CANA sobre la Cláusula del Presupuesto Equilibrado es incorrecta,[266] al afirmar que CANA inventa una lectura basada en límites establecidos en diversas constituciones de los estados pero no en el texto de la Constitución del ELA. Además, aunque numerosos tribunales han sostenido que la violación de un límite de servicio de la deuda lleva a la conclusión de que los bonos son nulos y sin valor, pocos tribunales han abordado el remedio adecuado para las violaciones de las restricciones del financiamiento deficitario;[267] tenedores de bonos han sostenido que la Cláusula de Presupuesto Equilibrado rige las asignaciones, no la facultad de contraer préstamos y que un remedio de invalidación de la deuda para una violación de asignaciones no sería coherente con el significado y el propósito de la Constitución.[268]

b)      **Acciones de Invalidez**

Como se describe anteriormente, las diversas objeciones a la validez de los Bonos GO y AEP buscan la desestimación de las reclamaciones presentadas contra el ELA con respecto a estos. Otra consecuencia potencial de la invalidez de los bonos sería que los montos pagados por el ELA por cuenta de

---

[266]  Moción del Grupo Ad Hoc, 42-46.

[267]  Diversos tribunales han sostenido que los bonos son inválidos en los casos en que el lenguaje de la constitución pertinente prohíbe explícitamente el contraer préstamos por montos que no puedan pagarse con los ingresos del presupuesto. Consulte, *p. ej., Ciudad de Winchester c. Winchester Bank*, 306 Ky. 45, 46-47 (1947); *Austin Western Road Mach. Co. c. Ciudad de New Madrid*, 185 S.W.2d 850, 855 (Mo. Ct. Ap. 1945); *el Estado c. Spring City*, 123 Utah 471, 476-78 (Utah 1953).

[268]  Consulte Moción del Grupo Ad Hoc, 46-48. Un tribunal ha sostenido que el remedio para una violación de la cláusula de asignaciones era requerir el equilibrio del presupuesto sobre una base eventual. Consulte *Lance c. McGreevey*, 180 N.J. 590, 599 (NJ 2004) (citando Const. N.J. art. VIII, § 2). En tal caso no se aseveraba que el emisor fuera insolvente y el tribunal expresó sus dudas con respecto a la "alteración del gobierno del Estado". *Id.* Asimismo, no está claro que las cuestiones de hecho y de derecho del caso sean aplicables a las circunstancias que nos ocupan.

dichos presuntos bonos (i) sean de por sí ilícitos y sean recobrables conforme a la ley de Puerto Rico, y (ii) sean evitables como transferencias fraudulentas conforme al Código de Quiebras y la ley de Puerto Rico.

De conformidad, la Junta de Supervisión entabló un litigio para la "recuperación" del pago de capital e intereses sobre los bonos que se habían pagado a presuntos tenedores de bonos en los cuatro años anteriores al inicio del Caso de Título III del ELA.[269], [270]  La Junta de Supervisión limitó estos litigios (lo mejor posible después de reunir información, como se describe a continuación) a los tenedores que superan los $2.5 millones sobre los bonos en cuestión durante el período retroactivo, en otras palabras, con la exclusión de los inversionistas de cartera diversificada a pequeña escala y buscando reparación solo contra inversionistas sofisticados que deberían haber entendido las debilidades de los bonos antes de invertir. En caso de que se sostenga la pretensión buscada en la Acción de Invalidez, se puede solicitar que los destinatarios de pagos de capital e intereses por cuenta de los Bonos Impugnados devuelvan dichos pagos a los respectivos emisores.

A diferencia de las objeciones a las reclamaciones que se describen anteriormente, las Acciones de Invalidez requieren que la Junta de Supervisión emprenda un proceso complicado de presentación de pruebas para identificar a los Demandados correspondientes.[271]  La Junta de Supervisión obtuvo varias órdenes del Tribunal del Título III que requieren que numerosos bancos que tenían en su poder bonos en nombre de ellos mismos y de su clientela de "tenedores beneficiarios" presenten registros de transferencias de pagos de capital e intereses a tenedores beneficiarios.[272]  La Junta de Supervisión recibió entonces de los bancos una gran cantidad de información confidencial que identifica a los presuntos tenedores de bonos y las transferencias en cuestión.[273]  Conforme a las restricciones estrictas sobre la confidencialidad, la Junta de Supervisión identificó entonces a las partes así reveladas como Demandados mediante pseudónimos en un litigio pertinente y presentó al Tribunal del Título III de manera confidencial un documento de "clave" donde se identificaba a las partes por su nombre.

El 30 de abril y el 1 de mayo de 2019, la Junta de Supervisión y CANA presentaron las Acciones de Invalidez ante el Tribunal del Título III, iniciando ocho procedimientos contenciosos en total.[274]  Hasta la fecha, los Demandados de los Litigios de Invalidez incluyen aproximadamente 450 presuntos propietarios beneficiarios de los bonos, identificados por pseudónimo. Es posible que se presenten litigios adicionales y/o que se agreguen nuevos Demandados al litigio, a medida que los bancos continúen

---

[269] Estas "Acciones de Invalidez" son Proc. Cont. Núm. 19-00281 a 19-00288, inclusive.

[270] PROMESA y la ley de Puerto Rico, entre otros, permiten que la Junta de Supervisión haga una "retrospección" y evite las transferencias hechas durante los cuatro años anteriores al inicio de los casos.

[271] Para evitar dudas: las objeciones a reclamaciones se presentaron contra tenedores *actuales* de Bonos GO y AEP y se relacionan con obligaciones a futuro. La Acción de Invalidez se presenta contra las partes que mantuvieron los mismos bonos entre 2013 y 2017. La superposición puede ser limitada debido a la negociación activa.

[272] Consulte ECF Núm. 6384, 6493, 6967.

[273] Hasta la fecha, no todos los bancos han cumplido las órdenes de presentación de pruebas. Con respecto al posible motivo de dichos incumplimientos, la Junta de Supervisión ha supuesto que los bancos, como tenedores registrados de los bonos, eran asimismo los tenedores beneficiarios de dichos bonos y por lo tanto, serían Demandados cubiertos por la Acción de Invalidez.

[274] Por motivos de logística relacionados con los conflictos de intereses de las firmas legales y las capacidades de procesamiento de documentos del Tribunal del Título III, la Junta de Supervisión debió presentar las demandas contra los Demandados en tramos.

proporcionando información que identifique a los tenedores beneficiarios de los bonos, no obstante que las fechas límite para la presentación de pruebas ya hayan transcurrido.

Después de presentar las Acciones de Invalidez, la Junta de Supervisión y CANA solicitaron que el Tribunal del Título III paralice el litigio y extienda las fechas límite de notificación.[275] En la Moción de Paralización del Litigio, la Junta de Supervisión y CANA observaron que las Acciones de Invalidez se habían presentado para preservar derechos antes de la expiración de la prescripción aplicable, pero que la promoción agresiva del litigio podría no ser posible bajo las circunstancias de los Casos del Título III (incluso la oportunidad de transigir disputas mediante la confirmación de un plan de ajuste). El Tribunal del Título III concedió parcialmente la moción, extendiendo las fechas límite de notificación y litigio al 1 de septiembre de 2019, y solicitando a la Junta de Supervisión que comparezca y delibere con las partes interesadas y presente una orden de gestión de casos conjunta para dirigir las acciones a más tardar el 17 de julio de 2019.[276] La Junta de Supervisión ha notificado las demandas y las citaciones de las Acciones de Invalidez.

A tenor con la Orden de Paralización posteriormente modificada, las Acciones de Invalidez se paralizan hasta la confirmación del plan.[277]

El AAP y el Plan disponen la desestimación de las Acciones de Invalidez después de la confirmación.

      c)      **Acciones de Impugnación de Gravámenes**

Para una descripción de las Acciones de Impugnación de Gravámenes[278] que deben transigirse conforme al Plan, *consulte* la sección **Error! Reference source not found.** de esta Declaración de Divulgación.

      d)      **Litigio de AEP**

Históricamente, al calcular las Obligaciones Generales conforme a la subsección (i) del Límite Constitucional de la Deuda, el ELA incluyó dentro de su contabilidad de las Obligaciones Generales solo aquellos bonos emitidos directamente por el ELA y específicamente denominados como Bonos GO. Como se dispone a continuación, sin embargo, la Junta de Supervisión asevera que el ELA ha creado y emitido

---

[275] Consulte *la Moción Ómnibus del Comité Oficial de Acreedores No Asegurados, la Junta de Supervisión y Administración Financiera para Puerto Rico y su Comité de Reclamaciones Especiales para extender el plazo de notificación de citaciones y demandas y para paralizar ciertos procedimientos contenciosos relacionados con ciertos Bonos GO Impugnados*, [ECF Núm. 6857] (la "Moción de Paralización de Litigio").

[276] Consulte *la Orden sobre la Moción Ómnibus del Comité Oficial de Acreedores No Asegurados, la Junta de Supervisión y Administración Financiera para Puerto Rico y su Comité de Reclamaciones Especiales para extender el plazo de notificación de citaciones y demandas y paralizar ciertos procedimientos contenciosos relacionados con ciertos Bonos GO Impugnados*, [ECF Núm. 7426].

[277] Consulte *la Orden final relativa a (A) el período de paralización, (B) la mediación obligatoria y (C) ciertas fechas límite relacionadas con la misma*, [ECF Núm. 12189].

[278] Estas acciones fueron entabladas por la Junta de Supervisión (no por su Comité de Reclamaciones Especiales).

simultáneamente bonos que eran Obligaciones Generales pero que no eran denominados como tales ni se incluyeron en el cálculo del Límite Constitucional de la Deuda.

AEP existe con el propósito manifiesto de adquirir, desarrollar y administrar bienes inmuebles para beneficio del ELA. Sin embargo, en algunos casos AEP adquiere sus propiedades del ELA mismo a través de arrendamientos; dichas propiedades entonces se arriendan de nuevo al ELA y sus agencias. La Junta de Supervisión y otras partes han sostenido que la función real de AEP ha sido emitir bonos respaldados por la fe y crédito y poder impositivo del ELA, utilizando las supuestas obligaciones de subarrendamiento antes descritas para pasar fondos del ELA a los tenedores de bonos sin involucrar en efecto al Límite Constitucional de la Deuda.

La Junta de Supervisión ha sostenido que los Arrendamientos de AEP no son verdaderos arrendamientos, no deberían tener derecho a prioridad administrativa, y deberían caracterizarse como Obligaciones Generales del ELA para fines del límite Constitucional de la Deuda [Proc. Cont. Núm. 18-00149 ECF Núm. 1].[279]  Como se describe con más detalle en la Demanda de Arrendamientos de AEP, entre otras presentaciones en tribunales, la Junta de Supervisión argumenta que los Arrendamientos de AEP presentan varios indicios de no ser verdaderos arrendamientos, sino pagos de bonos disimulados. Estos incluyen:

- Los pagos del "alquiler" se calculan de acuerdo con los requisitos de servicio de la deuda, en lugar de los costos o precios comparativos de alquiler del mercado.

- Ajuste de las obligaciones de alquiler hacia arriba o hacia abajo según sea necesario en relación con los costos de financiamiento de los Bonos de AEP.

- Las obligaciones de Arrendamiento de AEP vencen en las fechas de vencimiento de los Bonos AEP.

- Disposiciones de "obligación absoluta e incondicional" que requieren que los presuntos arrendatarios paguen el "alquiler" en su totalidad en todo momento y bajo todas las circunstancias durante el resto del plazo del arrendamiento (es decir, la duración de los Bonos de AEP), incluso si la propiedad se ha vendido o destruido, incluso cuando esto es culpa de AEP.

- Componentes de "alquiler operativo" diseñados para hacer que todos los gastos de mantenimiento y operación de los edificios pasen desde AEP a los arrendatarios, de manera que los costos de propiedad son pagados por los arrendatarios, además del servicio de la deuda.

De conformidad con los términos de los Arrendamientos de AEP, los tenedores de Bonos AEP son terceros beneficiarios de estos. El ELA ha pagado históricamente una porción significativa de las presuntas obligaciones de arrendamiento a AEP, un 80-98% estimado en años recientes.

Como resultado, la Junta de Supervisión y CANA han concluido que ya sea que estos fluyan a través de presuntos arrendamientos o provengan directamente del tesoro del ELA, el ELA hace los pagos de los Bonos AEP, independientemente de cualquier presunta operación o actividades de AEP. Las

---

[279] Se suministran detalles adicionales con respecto a esta acción en la Sección III.B.1.c.

Objeciones a las Reclamaciones de Bonos[280] aseveran que los Bonos AEP son, en todos los aspectos relevantes, respaldados por la fe y crédito y poder impositivo del ELA, no por ingresos de los presuntos Arrendamientos u otras operaciones de AEP.

El litigio descrito en el presente relacionado con las debilidades de los Bonos AEP debe transigirse conforme al Plan, bajo términos descritos en él y en el AAP, como se describe anteriormente.

e)   **Revocación de las garantías de deuda (entre ellas el litigio de los BAN de AFI)**

Entre 2013 y 2017, el ELA pignoró su fe y crédito y poder impositivo para garantizar aproximadamente $830 millones en deuda emitida por ciertas instrumentalidades, entre ellas AAA, APLA, el BGF y AFI (la "Deuda garantizada"). La investigación del Abogado de Reclamaciones identificó diversas causas de acción potenciales con respecto a la Deuda Garantizada.

En primer lugar, por motivos similares a aquellos articulados anteriormente con respecto a los Bonos GO y AEP, la investigación del Abogado de Reclamaciones sugiere que la Deuda Garantizada puede haber violado el límite de la deuda aceptado por la Constitución del ELA. La Constitución del ELA limita la capacidad del ELA no solo de contraer préstamos sino también de extender garantías una vez que sus deudas pendientes superan una cierta proporción con respecto a sus ingresos históricos.

En segundo lugar, las garantías de un deudor insolvente de la obligación de un tercero pueden evitarse como transferencias interpretadas como fraudulentas si el deudor no recibió un valor razonablemente equivalente a cambio. En algunos casos, el ELA no recibió un valor razonablemente equivalente a cambio de su extensión de una garantía porque las partes obligadas de la deuda no usaron los productos de la deuda de una manera que haya redundado en beneficio del ELA y debido a que la garantía del ELA solo sirve para agregarle la carga de obligaciones onerosas.

Hasta la fecha, la Junta de Supervisión ha presentado una acción de revocación y ha negociado acuerdos de suspensión de la prescripción con ARD relacionados con la Deuda Garantizada. La acción presentada es Proc. Cont. Núm. 19-00269.[281] La Junta de Supervisión prevé que esta acción será desestimada al confirmarse el Plan.

I.   **La orden de paralización y los informes del Equipo de Mediación**

1.   **La Orden de Paralización**

El 24 de julio de 2019, el Tribunal del Título III emitió la Orden de Paralización [ECF Núm. 8244]. La Orden de Paralización paralizaba hasta el 30 de noviembre de 2019 los siguientes procedimientos contenciosos y temas objetados.

---

[280] Las Objeciones a las Reclamaciones de Bonos incluyen las objeciones a la validez de los Bonos AEP y GO presentadas por la Junta de Supervisión, CANA y otras partes. Consulte la sección V.H.7.a.

[281] *El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de sus miembros, y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico como síndicos, respectivamente, del Estado Libre Asociado de Puerto Rico, c. BNY Mellon, y otros*, 19-AP-00269 (la "Acción de Reintegración de las Obligaciones de Garantía").

- la objeción ómnibus de la Junta de Supervisión y CANA a las reclamaciones presentadas por ciertos Tenedores de Bonos GO, que se describen en las secciones III.B.1(a)(ii) y V.F.5(a) de esta Declaración de Divulgación;

- los siete procedimientos contenciosos iniciados por la Junta de Supervisión y CANA contra más de 450 Demandados con el objeto de obtener declaraciones de que los tenedores de bonos emitidos o garantizados por el ELA tenían reclamaciones totalmente no garantizadas, descritos en la sección III.B.1.a**Error! Reference source not found.** de esta Declaración de Divulgación;

- las ocho acciones de recuperación presentadas por el Comité de Reclamaciones Especiales de la Junta de Supervisión y CANA para recuperar los pagos de capital e intereses contra aproximadamente 600 supuestos propietarios beneficiarios de bonos y 50 bancos revelados como tenedores de registros, descritos en las secciones III.B.1.a**Error! Reference source not found.** y V.F.5(b) de esta Declaración de Divulgación;

- la moción de levantamiento de la paralización de Ambac con respecto a los bonos impositivos del ron de AFI (es decir, la Moción de levantamiento de la paralización de AFI), descrita en la sección 0 de esta Declaración de Divulgación;

- la objeción ómnibus de CANA a las reclamaciones contra el ELA presentadas por tenedores de ciertos Bonos de AEP, que se describen en la sección III.B.1(c)(iii) de esta Declaración de Divulgación;

- el procedimiento contencioso iniciado por la Junta de Supervisión contra la AEP con el objeto de obtener una declaración de que los arrendamientos de la AEP no son verdaderos arrendamientos y obligaciones supuestamente en virtud de ellos sino simplemente obligaciones generales erróneamente caracterizadas del ELA que se describen en la sección III.B.1(c)(ii) de esta Declaración de Divulgación;

- la objeción de CANA a las reclamaciones de tenedores de ciertos Bonos de SRE, que se describen en la sección III.B.1(b)(iv) de esta Declaración de Divulgación;

- los dos procedimientos contenciosos presentados por el SRE y CANA contra ciertos Tenedores de Bonos de SRE, que impugnan la validez de ciertos supuestos intereses de los Tenedores de Bonos de SRE, que se describen en la sección III.B.1(b)(i) de esta Declaración de Divulgación;

- la objeción de CANA a la reclamación del BGF contra el ELA;

- y la objeción de CANA a las reclamaciones de tenedores de ciertos Bonos GO 2011, que se describe en la sección III.B.1(a)(ii) de esta Declaración de Divulgación;

A tenor con la Orden de Paralización, esta paralización tenía por objeto "evitar el litigio fragmentario de cuestiones clave potencialmente superpuestas, y en un esfuerzo por identificar de manera eficiente las cuestiones que deben ser litigadas o resueltas de otra manera para lograr la confirmación de un plan de ajuste para el ELA (y otros deudores y potenciales deudores en los procedimientos del Título III),

así como para priorizar dichas cuestiones y desarrollar enfoques eficientes para la resolución de dichas cuestiones". *Véase* Orden de Paralización en 1.

Mientras la paralización seguía pendiente, la Orden de Paralización ordenó a la Junta de Supervisión, a la AAFAF, a CANA, al Comité Oficial de Empleados Jubilados y a las partes en los procedimientos contenciosos suspendidos y las cuestiones controvertidas, según las indicaciones de la Honorable Barbara J. Houser, la Jefa del Equipo de Mediación para los procedimientos del Título III (la "Jefa del Equipo de Mediación"), que participaran en las discusiones y comunicaciones facilitadas por la Jefa del Equipo de Mediación para abordar las preocupaciones identificadas por el Tribunal en la Orden de Paralización (citada en el párrafo anterior).

Durante la mediación, las partes activas en el litigio de SRE acordaron acelerar la consideración de temas relacionados con SRE. Informe Provisorio en 3; *consulte Moción conjunta urgente para modificar la Orden relacionada con Paralización y Mediación Obligatoria con respecto a ciertas cuestiones mencionadas en ciertos temas objetados y procedimientos contenciosos relacionados con los bonos emitidos por el Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico* [ECF Núm. 8899] ("Moción Conjunta Urgente"). Una moción para la aprobación de procedimientos acordados para objeciones a reclamaciones por tenedores de bonos emitidos por SRE fue negociada por las partes y registrada por el Tribunal del Título III [ECF Núm. 8761, 8818]. Además, las partes del litigio de SRE acordaron una orden de programación para abordar ciertas cuestiones pendientes ante el Tribunal del Título III que se relacionan con la validez de los bonos de SRE y el alcance de los gravámenes en poder de tenedores de bonos de SRE. La orden propuesta fue presentada ante el Tribunal del Título III el 18 de octubre de 2019, y fue registrada por el Tribunal del Título III el 24 de octubre de 2019. Moción Conjunta Urgente; ECF Núm. 8962.

## 2. Informe provisorio y recomendación del Equipo de Mediación

El 27 de noviembre de 2019, el Equipo de Mediación presentó su *Informe Provisorio y la Recomendación del Equipo de Mediación* [ECF Núm. 9365] (el "Informe Provisorio"). El Informe Provisorio describía dos tareas realizadas simultáneamente por el Equipo de Mediación. En primer lugar, el Equipo de Mediación abordó la programación y secuenciamiento de cuestiones identificadas en la Orden de Paralización o identificadas por las partes como cuestiones pertinentes para la ratificación del plan de ajuste para uno o más deudores de Título III. *Consulte el Informe Provisorio*. En segundo lugar, el Equipo de Mediación hizo que las partes participaran en sustanciales sesiones de mediación como lo indicaba la Orden de Paralización. Id. en 2.

El Informe Provisorio estableció (en 4) que, debido a que un plan de ajuste enmendado podría hacer que las recomendaciones de programación del Equipo de Mediación fueran irrelevantes, el Informe Provisorio abordaba únicamente la programación de cuestiones en disputa que deberían ejecutarse en el corto plazo: la programación y secuenciación de litigios respecto de (i) la validez de ciertas series impugnadas de bonos GO y AEP, (ii) la situación de garantizada o no garantizada de reclamaciones sobre bonos GO y AEP, (iii) y los derechos contra el ELA de tenedores de "Bonos de Ingresos" y otras deudas emitidas por ciertas instrumentalidades de Puerto Rico. El Informe Provisorio describía que estas cuestiones están entre las más fundamentales y centrales de los casos de Título III, y recomendaba que el litigio de dichas cuestiones debería iniciarse lo antes posible. *Id.* en 5. El Informe Provisorio adjuntaba órdenes de programación propuestas para los litigios relativos a (i) los bonos GO y PBA; (ii) los bonos de ingresos emitidos por ACT, AFI y ADCC; y (iii) la moción de remedio de la paralización presentada por las partes de ARD.

El 6 de diciembre de 2019, numerosas partes, entre ellas la Junta de Supervisión, Ambac, National, FGIC, Assured, CANA, las Partes de ARD y Peter C. Hein, presentaron respuestas al Informe Provisorio del Equipo de Mediación [ECF Núm. 9493, 9504, 9440, 9485, 9505, 9503, 9508].

El 11 de diciembre de 2019, el Tribunal del Título III realizó una vista para analizar el Informe Provisorio, las órdenes de programación propuestas y las objeciones de las partes y las respuestas a estas.

El 19 de diciembre de 2019, el Tribunal del Título III presentó la orden de programación propuesta para el litigio relativo a los bonos de ingresos [ECF Núm. 9620]. El Tribunal también emitió una orden que prorrogaba la duración de la paralización hasta el 31 de enero de 2020, prorrogando la fecha límite para que el Equipo de Mediación presentase su Informe Enmendado al 10 de enero de 2020, y programando una vista para analizar el Informe Emendado para el 29 de enero de 2020 [ECF Núm. 9618].

El 23 de diciembre de 2019, en respuesta a una solicitud del Equipo de Mediación, el Tribunal del Título III registró una orden por la que se prorrogaba un mes la fecha límite anterior del 10 de enero de 2020 hasta el 10 de febrero de 2020, se aplazaba la vista hasta el 4 de marzo de 2020 y se prorrogaba la paralización hasta el 11 de marzo de 2020 [ECF Núm. 9639].

Numerosas partes presentaron objeciones u otras respuestas a la orden del tribunal del 23 de diciembre de 2019, incluyendo a Assured, National, Ambac, FGIC, las Partes de ARD y CANA. [ECF Núm. 9655, 10251, 10249, 10421, 9505 y 10424]. En la vista general del 29 de enero de 2020, el Tribunal del Título III, entre otras cosas, consideró cuestiones relacionadas con la orden de gestión de casos para litigar cuestiones relacionadas con los bonos de ingresos. Con respecto a la Moción de Levantamiento de la Paralización de ACT, la Moción de Levantamiento de la Paralización de AFI y la Moción de Levantamiento de la paralización de ADCC, el tribunal dividió las cuestiones de legitimidad y estado garantizado, permitió presentación limitada de pruebas sobre temas preliminares y programó una vista sobre las Mociones de Levantamiento de la Paralización divididas para el 5 de marzo de 2020. El 31 de enero de 2020, el Tribunal del Título III registró una Orden de Gestión de Casos provisoria enmendada para los Bonos de Ingresos [ECF Núm. 10595], que reflejaba las modificaciones analizadas en la vista ómnibus del 29 de enero.

3. Informe **enmendado** y recomendación del Equipo de Mediación

a) **Informe enmendado del 10 de febrero de 2020**

El 10 de febrero de 2020, el Equipo de Mediación presentó su *Informe Enmendado y Recomendación del Equipo de Mediación* [ECF Núm. 10756] (el "Informe Enmendado"). El Informe Enmendado señaló que desde la presentación del Informe Provisorio, el AAP 2020 había sido firmado por la Junta de Supervisión y los tenedores de unos $8,000 millones en reclamaciones de bonos GO/AEP, y que esto se había notificado públicamente el 9 de febrero de 2020. Informe Enmendado en 8.

En el Informe Enmendado, el Equipo de Mediación hizo varias recomendaciones sobre los calendarios de los litigios relacionados con los bonos GO y PBA, los bonos de ingresos y los bonos SRE, así como la programación propuesta para otros litigios sujetos a la paralización.

El Equipo de Mediación también propuso un calendario potencial para el período de vista previo a la Declaración de Divulgación, la vista de la Declaración de Divulgación y la vista de confirmación *consulte id.* en 20-26.

Varias partes presentaron respuestas al Informe Enmendado del Equipo de Mediación, entre ellas Peter C. Hein, AAFAF, Ambac, Assured, National, FGIC, CANA y las partes de ARD. [ECF Núm. 11284, 11159, 11482, 11493, 11496, 11497, 11498, and 11495]. También el 21 de febrero de 2020, la Junta de Supervisión y las Partes del AAP presentaron declaraciones en apoyo al Informe Enmendado. [ECF Núm. 11492, 11499].

b)      **Orden Definitiva del 10 de marzo de 2020**

El Tribunal del Título III celebró una vista sobre el Informe Enmendado y las objeciones y contestaciones el 4 de marzo de 2020. El 10 de marzo de 2020, el Tribunal del Título III emitió la *Orden Final relativa a (A) el período de paralización, (B) la mediación obligatoria y (C) ciertas fechas límite relacionadas con la misma*, [ECF Núm. 12189] (la "Orden Final de Paralización y Mediación"). La Orden Final de Paralización y Mediación adoptó las recomendaciones del Equipo de Mediación con ciertas modificaciones, y ordenó lo siguiente:

- El Tribunal paralizó todas las cuestiones controvertidas y los procedimientos contenciosos relacionados con la validez y la prioridad de las obligaciones de los GO hasta la decisión del Tribunal sobre la confirmación del Plan Enmendado.

- El Tribunal modificó la Orden Provisional Enmendada de Bonos de Ingresos en consonancia con la propuesta de Orden Final de Programación de Bonos de Ingresos, incluyendo los horarios para la presentación de mociones de sentencia sumaria parcial y el tratamiento de los posibles conflictos de intereses intradeudores, las disposiciones para presentación limitada de pruebas con respecto a la Moción de Levantamiento de la Paralización de ACT, la Moción de Levantamiento de Paralización de AFI o la Moción de levantamiento de paralización de ADCC; y una disposición que permite a las partes solicitar la certificación de las decisiones sobre las Mociones de Paralización de Bonos de Ingresos para su inmediata apelación.

El Tribunal del Título III ordenó además que, a menos que posteriormente ordenara lo contrario, las cuestiones controvertidas o los procedimientos contenciosos identificados en el Apéndice A de la Orden Final de Paralización y Mediación, así como las cuestiones controvertidas o los procedimientos contenciosos que (i) abordaran cuestiones resueltas por el Plan Enmendado, o (ii) abordaran cuestiones acumuladas en cualquiera de los litigios que se suspendieran a la espera de una decisión sobre la confirmación, se paralizarían a la espera de la decisión del Tribunal sobre la confirmación del Plan Enmendado.

Tras la emisión de la Orden Final de Paralización y Mediación, y en respuesta a la propagación de la COVID-19 por todo Puerto Rico, y sus efectos sobre el pueblo y la economía de Puerto Rico, la Junta de Supervisión solicitó el aplazamiento de cualquier vista para considerar la aprobación de la Declaración de Divulgación y las fechas límite relacionadas. Consulte la sección I.A.B.1. de esta Declaración de Divulgación para obtener un resumen de los términos del AAP y del desarrollo del Plan.

J.    **Reestructuraciones relacionadas de la deuda**

1.    **Caso de Título VI del BGF**

a)    **Antecedentes**

El BGF es una corporación pública e instrumentalidad gubernamental del ELA, cuyas funciones principales son las de actuar como agente fiscal, agente pagador, asesor financiero, fuente de finanzas y depositario de fondos para el Gobierno y sus instrumentalidades, corporaciones públicas y municipios.

El 6 de abril de 2016, el ex gobernador, Alejandro García Padilla, dictó una serie de órdenes ejecutivas conforme a la Ley de Moratorias para: (i) declarar el estado de emergencia en el BGF, (ii) imponer restricciones sobre el retiro de los fondos depositados en el BGF y otros desembolsos del BGF, y (iii) implementar una moratoria sobre el pago del servicio de la deuda sobre las notas en circulación del BGF.

b)    **Acuerdo en apoyo a la reestructuración del BGF**

Después de muchos meses de negociaciones, el 15 de mayo de 2017, AAFAF, el BGF y ciertos otros acreedores del BGF celebraron un Acuerdo en Apoyo a la Reestructuración del BGF (con sus enmiendas, modificaciones y suplementos, el "RSA del BGF") para ejecutar una reestructuración consensuada (una "Modificación Calificatoria") de ciertos otros acreedores de la deuda del BGF a través de un caso de Título VI de PROMESA. El severo daño y la devastación sufridos por Puerto Rico debido a los huracanes Irma y María hicieron necesarias ciertas modificaciones al RSA del BGF y prolongaron los plazos para el perfeccionamiento de la Modificación Calificatoria. Como resultado, el RSA del BGF tuvo seis enmiendas. El 8 de mayo de 2018, la Junta de Supervisión certificó el RSA del BGF, con sus enmiendas.

c)    **Inicio del procedimiento de Título VI**

El 10 de agosto de 2018, el BGF inició una acción conforme al Título VI de PROMESA, mediante la presentación de una petición de aprobación de la Modificación Calificatoria ante el Tribunal de Distrito de EE.UU. para el Distrito de Puerto Rico (la "Acción de Título VI"). La Acción de Título VI estaba pendiente ante la juez Swain y se le dio la carátula de Caso Núm. 18-cv-1561 (LTS).

d)    **Convocatoria de votación y aprobación de la Modificación Calificatoria.**

El día anterior al inicio de la Acción de Título VI, el 9 de agosto de 2018, el BGF y AAFAF iniciaron un proceso de convocatoria de votación para aprobar o rechazar la Modificación Calificatoria. La Modificación Calificatoria fue masivamente aprobada por los acreedores del BGF, con acreedores que representaban el 74.8% de todas las reclamaciones elegibles que participaron en la votación y acreedores que representaban el 97.4% de dichas reclamaciones participantes que votaron para aprobar la Modificación Calificatoria. Además, la Junta de Supervisión, como Supervisor Administrativo de Título VI, proporcionó todas las certificaciones necesarias, según lo dispuesto por la sección 601 de PROMESA. El Tribunal de Distrito aprobó la Modificación Calificatoria el 7 de noviembre de 2018 [Caso Núm. 18-cv-1561, ECF Núm. 269].

e)        **Términos de la Modificación Calificatoria**

La Modificación Calificatoria entró en vigencia el 29 de noviembre de 2018 (la "Fecha de cierre"). Los términos clave de la Modificación Calificatoria son los que se describen a continuación.

(i)        *Bonos de la Autoridad de Recuperación*

Los tenedores de los bonos públicos en circulación del BGF, depositarios netos de fondos del BGF, y ciertos reclamantes de reclamaciones contingentes y no liquidadas presentaron reclamaciones por un valor total de aproximadamente $4,230 millones en la Fecha de Cierre (dichas reclamaciones totales, las "Reclamaciones de los Bonos Participantes"). Los tenedores de las Reclamaciones de los Bonos Participantes, recibieron a cambio de sus reclamaciones nuevos bonos ("Bonos de la Autoridad de Recuperación") emitidos por una nueva instrumentalidad gubernamental y fideicomiso público establecidos por ley del ELA (la "Autoridad de Recuperación") creada conforme a la Ley de Reestructuración del BGF el 24 de agosto de 2017 y enmendada el 18 de julio de 2018 (la "Ley de Reestructuración del BGF"). Los tenedores de ciertas reclamaciones contingentes y no liquidadas que constituían Reclamaciones de Bonos Participantes solo recibirán los Bonos de la Autoridad de Recuperación si sus reclamaciones se materializan en el futuro.

Los siguientes son los términos principales del intercambio y los Bonos de la Autoridad de Recuperación:

- Por cada $1,000 en reclamaciones, los tenedores de las Reclamaciones de Bonos Participantes recibieron $550 de Bonos de la Autoridad de Recuperación.

- Los únicos activos de la Autoridad de Recuperación son los que el BGF transfirió a la Autoridad de Recuperación en la Fecha de Cierre (los "Bienes de Reestructuración"). Los Bienes de Reestructuración incluyen la cartera de préstamos municipales del BGF, parte de su cartera de préstamos a entidades públicas, ciertos bienes inmuebles, derechos de usufructo en causas de acción y efectivo. Los tenedores de Bonos de la Autoridad de Recuperación recibirán pagos de intereses y capital únicamente sobre los resultados de los Bienes de Reestructuración. No hay recurso contra el ELA o el BGF con respecto al pago de las obligaciones conforme a los Bonos de la Autoridad de Recuperación.

- Los Bonos de la Autoridad de Recuperación tienen un cupón de 7.5% y vencen en 2040. Sobre la base de las proyecciones de flujo de caja, es improbable que los tenedores de Bonos de la Autoridad de Recuperación reciban todo el interés adeudado en efectivo o que el monto del capital de los Bonos de la Autoridad de Recuperación se pague en su totalidad.

- Conforme a la Ley de Reestructuración del BGF, al establecer el monto neto de reclamaciones o de activos, los préstamos adeudados al BGF por los municipios fueron compensados individualmente con depósitos del BGF por los mismos municipios.

(ii)        *Condiciones del intercambio*

Al mismo tiempo, y como condición del intercambio de reclamaciones para los Bonos de la Autoridad de Recuperación, las reclamaciones que el ELA y otras entidades públicas tenían en contra el BGF se resolvieron conforme a la Ley de Restructuración y la creación de un fideicomiso por separado, el Fideicomiso de Entidad Pública (el "FEP"). El objetivo principal del FEP es proporcionar cualquier distribución disponible a ciertos depositarios de corporaciones públicas, además de administrar la

restauración de fondos federales depositados en el BGF. Conforme a la Ley de Restructuración de BGF, en la Fecha de Cierre el saldo de los pasivos adeudados entre el ELA y sus agentes, instrumentalidades y subsidiarias (cada una de ellas una "Entidad Gubernamental No Municipal") y BGF se determinaron mediante la aplicación del saldo pendiente de cualquier depósito en el BGF en nombre de la Entidad Gubernamental No Municipal realizado individualmente contra el balance pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o cualquier bono o nota de dicha Entidad Gubernamental No Municipal en poder de BGF a dicha fecha. Las Entidades Gubernamentales No Municipales que tengan reclamaciones netas contra el BGF, después de dar lugar al ajuste antes mencionado, recibieron su participación prorrateada de intereses en el FEP, que se consideraron como la satisfacción plena de toda y cualquier reclamación que dicha Entidad Gubernamental No Municipal pueda tener contra el BGF. Como resultado de la transacción de FEP, las reclamaciones de depósitos del ELA contra el BGF se compensaron contra las deudas no garantizadas del ELA al BGF, con el resultado de que el BGF tiene una reclamación neta contra el ELA por el monto de aproximadamente $926.9 millones a la Fecha de Cierre.

Los activos del FEP (los "Activos del FEP") consisten en la reclamación contra el ELA, que fue el tema de una evidencia de reclamaciones presentada en el caso de Título III del ELA, y $20 millones en efectivo (a la Fecha de Cierre).

(iii)     *Pago del producto de impuestos superavitarios*

En la Fecha de Cierre, el BGF pagó, en efectivo, a cada municipio que había desembolsado depósitos en efectivo en el BGF por cuenta del producto de un impuesto adicional especial que el BGF certificó como superávit del Fondo de Redención de Deuda Municipal Pública (tal como se define en la Ley de Financiamiento Municipal) antes del 1 de enero de 2017 (dicho superávit, el "Exceso CAE"), un monto equivalente a 55% de dicho Exceso CAE desembolsado. La parte restante de dicho Exceso CAE se exoneró y ningún municipio con Exceso CAE tiene ningún derecho o reclamación adicional contra el BGF o cualquier otra parte con respecto a dicho Exceso CAE.

f)     **Impugnaciones al RSA del BGF y Modificación Calificatoria**

Una serie de partes en diferentes oportunidades presentaron impugnaciones en litigios a diferentes aspectos del proceso de Título VI del BGF. Algunos municipios, tenedores de bonos y ciertos otros acreedores del BGF impugnaron, directa e indirectamente, la convocatoria y la Modificación Calificatoria basándose en uno o más de los siguientes argumentos:

- los fondos comunes de los reclamantes deberían haber incluido un fondo común separado para municipios con sus propios requisitos de votación;

- sus depósitos en el BGF no constituyen "Bonos" tal como se definen en PROMESA y por lo tanto el Título VI de PROMESA no se aplica;

- algunos depósitos no eran bienes del BGF, sino que se mantenían en fideicomiso y por lo tanto pertenecían a sus respectivos depositarios;

- la venta de bonos del BGF se ofreció de manera malintencionada y bajo argumentos falsos y por lo tanto, dichos tenedores de bonos deberían haber recibido un tratamiento diferente; y/o

- PROMESA y las acciones de la Junta de Supervisión eran inconstitucionales.

Además, CANA procuró obtener legitimidad derivativa para representar al ELA en el proceso de Título VI del BGF, lo que se denegó.

Todas estas impugnaciones fueron finalmente desestimadas, desistidas o conciliadas.

g) **Modificación Calificatoria del BGF**

La reestructuración del BGF contemplada en el RSA del BGF requería la aprobación de la Junta de Supervisión y una orden del Tribunal del Título III. El 12 de julio de 2017, la Junta de Supervisión autorizó al BGF a aplicar el Título VI de PROMESA, conforme a la sección 601(e) de PROMESA. El 8 de mayo de 2018, la Junta de Supervisión certificó el RSA del BGF. La Junta de Supervisión concedió su aprobación final conforme a la sección 601(m)(1)(B) de PROMESA el 2 de noviembre de 2018 (sujeto a la aprobación de la Modificación Calificatoria por parte del Tribunal). El 7 de noviembre de 2018, el Tribunal del Título III dictó una orden que estipulaba que los requisitos de la sección 601(m)(1)(D) de PROMESA habían sido satisfechos. La Fecha de Cierre tuvo lugar el 29 de noviembre de 2018, cuando se firmaron todos los documentos definitivos, se transfirieron los activos del BGF a la Autoridad de Recuperación y al Fideicomiso de Entidad Pública, se cancelaron las Reclamaciones de Bonos Participantes, se exoneraron las reclamaciones vinculadas, la garantía provista por el ELA con respecto al total de $110 de bonos del BGF se extinguieron y se emitieron los Bonos de la Autoridad de Recuperación.

2. **Caso de Título III de ACT**

a) **Antecedentes**

ACT es una corporación pública e instrumentalidad gubernamental del ELA establecida en 1965 conforme a la Ley Núm. 74-1965 (con sus enmiendas, la "Ley de ACT") y que tiene la responsabilidad de la construcción y el mantenimiento de carreteras y autopistas y otros sistemas de transporte en Puerto Rico.

ACT está dirigida por una junta de siete miembros compuesta por el Secretario del DTOP (que actúa como Presidente de la junta), el Presidente de la Junta de Planificación, el Secretario de Hacienda, el Director Ejecutivo de AAFAF, y otros tres miembros del sector privado designados por el Gobernador con la recomendación y el consentimiento del Senado. ACT tiene amplias facultades para llevar adelante sus responsabilidades de conformidad con las políticas globales de transporte de DTOP. Estas facultades incluyen, entre otras cosas, el control completo y la supervisión de las carreteras construidas, de propiedad de u operadas por ACT, la facultad de establecer peajes para el uso de las carreteras y la facultad de emitir bonos, notas u otras obligaciones. ACT planifica y administra la construcción de todos los proyectos importantes relacionados con el sistema de carreteras con peaje del ELA, emprende reparaciones importantes y mantiene las rutas con peaje.

b) **Inicio del Caso de Título III de ACT**

El 21 de mayo de 2017, la Junta de Supervisión dictó certificaciones de reestructuración de ACT conforme a las secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para ACT conforme a la sección 304(a) de PROMESA ante el Tribunal del Título III, iniciando casos bajo el Título III de PROMESA.

El 29 de junio de 2017, el Tribunal del Título III registró una orden donde se concedía la administración conjunta de los casos del Título III del ELA, ACT y SRE para fines de procedimiento solamente [ECF Núm. 537].

3.      **Caso de Título III de AEE**

a)      **Inicio del Caso de Título III de AEE**

El 2 de julio de 2017, la Junta de Supervisión dictó una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para AEE, conforme a la sección 304(a) de PROMESA, iniciando el Caso de Título III de AEE.

El 6 de octubre de 2017, el Tribunal del Título III registró una orden donde se concedía la administración conjunta de los casos de Título III del ELA, ACT, SRE y COFINA, y el Caso de Título III de AEE, para fines de procedimiento solamente [Caso Núm. 17-4780 ECF Núm. 340].

b)      **Acontecimientos significativos en el Caso de Título III de AEE**

(i)     *Las Mociones del Síndico*

El 18 de julio de 2017, ciertos tenedores y aseguradoras monolínea de bonos emitidos por AEE presentaron una moción para levantar la paralización para la designación de un síndico [Caso Núm. 17-4780, ECF Núm. 74] ("Moción Inicial del Síndico"). El 14 de septiembre de 2017, el Tribunal del Título III denegó la Moción Inicial del Síndico porque, entre otras cosas, consideraba que la reparación solicitada por los solicitantes estaba prohibida por la sección 305 de PROMESA, que limita la jurisdicción y las facultades del tribunal sobre ciertas cuestiones. Consulte [Caso Núm. 17-4780, ECF Núm. 299] ("Opinión sobre Síndico del Tribunal de Distrito").

El 8 de agosto de 2018, el Tribunal de Primer Circuito anuló y devolvió las actuaciones de la Opinión del Síndico del Tribunal de Distrito, con el argumento de que la sección 305 de PROMESA no prohíbe que el Tribunal del Título III levante la paralización para permitir que los tenedores de bonos de AEE designen a un síndico. *Consulte Junta de Sup. y Admin. Financ. para P.R. c. Grupo Ad Hoc de Tenedores de bonos de AEE (en el caso de Junta de Sup. y Admin. Financ. para P.R.)*, 899 F.3d 13 (1er Cir. 2018) (la "Decisión de Devolución").

El 3 de octubre de 2018, ciertas aseguradoras monolínea de bonos emitidos por AEE—Assured, National, Syncora—presentaron una nueva moción para levantar la paralización para designar un síndico. [Caso Núm. 17-4780, ECF Núm. 975] ("Moción Renovada del Síndico"). Conforme a varias órdenes del Tribunal del Título III, consulte [Caso Núm. 17-4780, ECF Núm. 1176, 1183, 1204], el calendario de las sesiones información para la Moción Renovada del Síndico se extendió por varios meses. El 9 de mayo de 2019, el Tribunal del Título III presentó una orden donde se paralizaba la Moción Renovada del Síndico hasta después de que el Tribunal del Título III emitiera su decisión sobre (i) la Moción 9019 de AEE (como se define a continuación) y (ii) una moción relacionada de desestimación de la Moción Renovada del Síndico. Consulte [Caso Núm. 17-4780, ECF Núm. 1230].

El 3 de mayo de 2019, Assured se unió al RSA Definitivo (como se define a continuación). El 10 de mayo de 2019, la Junta de Supervisión y AAFAF presentaron una moción para desestimar la Moción Renovada del Síndico. [Caso Núm. 17-4780, ECF Núm. 1233] (la "Moción de Desestimación"). El 19 de septiembre de 2019, National y Syncora se unieron al RSA Definitivo. Conforme al RSA Definitivo con sus enmiendas hasta el 9 de septiembre de 2019, al registrarse una orden que aprueba ciertas transacciones

y disposiciones de la Moción 9019 de AEE, Assured, National y Syncora desistirán de la Moción Renovada del Síndico. El 13 de septiembre de 2019, el Tribunal del Título III dictó una orden donde se paraliza la sesión de información sobre la Moción de Desestimación [Caso Núm. 17-4780, ECF Núm. 1638].

(ii) <i><b>Moción de Financiamiento Posterior a la Petición de AEE</b></i>

El 27 de enero de 2018, la Junta de Supervisión y AAFAF presentaron una moción conjunta urgente para que AEE obtenga financiamiento posterior a la petición de $1,300 millones garantizados por un gravamen privilegiado de primer rango. Consulte [Caso Núm. 17-4780, ECF Núm. 549](«Moción de Financiamiento de AEE»). El Tribunal del Título III determinó que no concedería la Moción de Financiamiento de AEE, pero que mantendría la moción en suspenso sin prejuicio hasta que se presentara una enmienda en el corto plazo limitada a un monto de extracción más pequeño y superioridad administrativa, y sin prejuicio de una posible solicitud futura de financiamiento y/o gravámenes privilegiados adicionales. 15 de febrero de 2018 Hr'g Tr. en 232:10-14.

El 16 de febrero de 2018, la Junta de Supervisión y AAFAF presentaron una solicitud conjunta urgente [Caso Núm. 17-4780, ECF Núm. 722] (la "<u>Solicitud Conjunta Urgente</u>"), donde se pedía el registro de una orden propuesta revisada que aprobara un crédito de $300 millones y se concediera al prestamista una reclamación de Gastos Administrativos superprioritaria (el "<u>Financiamiento Revisado</u>"). El 19 de febrero de 2018, el Tribunal del Título III registró una orden que aprobaba el Financiamiento Revisado [Caso Núm. 17-4780, ECF Núm. 744] (la "<u>Orden de Financiamiento de AEE</u>"). El 8 de marzo de 2019, AEE reembolsó todos los montos pendientes conforme al Financiamiento Revisado.

(iii) <i><b>RSA Definitivo de AEE</b></i>

Después de meses de negociaciones, el 30 de julio de 2018, la Junta de Supervisión y AAFAF anunciaron que habían celebrado un Acuerdo en Apoyo a la Restructuración preliminar con miembros del Grupo Ad Hoc de Tenedores de Bonos de AEE (el "<u>RSA Preliminar</u>"). El RSA Preliminar contemplaba la inclusión de una serie de términos de reestructuración en un futuro plan de ajuste, y también contemplaba la negociación y ejecución de un acuerdo final en apoyo a la reestructuración.

Después del RSA Preliminar, la Junta de Supervisión y AAFAF continuaron negociando con el Grupo Ad Hoc de Tenedores de Bonos de AEE con respecto a los términos de un Acuerdo en Apoyo a la Reestructuración definitivo. Finalmente, Assured se unió a las negociaciones. El 3 de mayo de 2019, estos esfuerzos para alcanzar una resolución consensuada culminaron con la firma de un Acuerdo en Apoyo a la Reestructuración definitivo ("<u>RSA Definitivo</u>"), que dispone la resolución de las reclamaciones y derechos del Grupo Ad Hoc de tenedores de bonos de AEE, Assured, y otros tenedores de bonos no garantizados de AEE que celebran el RSA Definitivo. Entre otras cosas, el RSA Definitivo dispone que la parte de los tenedores de bonos y las aseguradoras monolínea del RSA Definitivo apoyarán un plan de ajuste para AEE donde se les otorga un cierto nivel de recuperación económica. Las partes que no firmaron el RSA Definitivo no están obligadas por el trato. El 9 de septiembre de 2019, las partes del RSA acordaron enmendar el RSA Definitivo para disponer el litisconsorcio de Assured y National.

El 10 de mayo de 2019, la Junta de Supervisión y AAFAF presentaron una moción conforme a la Regla de Quiebras 9019 [Caso Núm. 17-bk-4780, ECF Núm. 1235] (la "<u>Moción 9019 de AEE</u>") que solicitaba la aprobación de algunas de las transacciones y acuerdos mutuos incorporados al RSA Definitivo. A tenor con varias órdenes del Tribunal, la sesión de información sobre la Moción 9019 de la AEE se prorrogó hasta 2020. Consulte, p. ej., [Caso Núm. 17-4780, ECF Núm. 1250, 1361, 1513, 1573, 1636, 1671, 1683, 1713, 1858, 1914]. El 27 de marzo de 2020, en respuesta a la amenaza emergente de COVID-19 y sus efectos sobre el pueblo y la economía de Puerto Rico, la Junta de Supervisión, la AEE y la AAFAF

345

presentaron conjuntamente una moción urgente que buscaba aplazar indefinidamente todas las fechas límite relacionadas con la Moción 9019 de la AEE. [Caso Núm. 17-4780, ECF Núm. 1947] (la "Moción de Aplazamiento"). El 2 de abril de 2020, el Tribunal concedió la Moción de Aplazamiento. [Caso Núm. 17-4780, ECF Núm. 1954]. A tenor con la orden del Tribunal, la Junta de Supervisión, la AEE y la AAFAF continúan proporcionando informes periódicos sobre la condición de la AEE y el estado de la Moción 9019 de la AEE. *Consulte, p. ej.*, [Caso Núm. 17-4780, ECF Núm. 1992, 2111, 2220].

El 16 de mayo de 2020, el Comité de Acreedores No Asegurados presentó una respuesta a un informe de situación de la Junta de Supervisión y la AAFAF en el que solicitaban al Tribunal que diera por terminada la Moción de la AEE 9019 sobre la base afirmada de que el RSA definitivo ya no existe en su forma actual. *Consulte* [Caso Núm. 17-4780, ECF Núm. 1996]. El Tribunal denegó la solicitud del Comité de Acreedores No Asegurados. *Consulte* [Caso Núm. 17-4780, ECF Núm. 2006]. El 18 de agosto de 2020, el Comité de Acreedores No Asegurados presentó una moción solicitando nuevamente al Tribunal que diera por terminada la Moción 9019 de la AEE. *Consulte* [Caso Núm. 17-4780, ECF Núm. 2144] (la "Moción Renovada para Terminar"). El 4 de noviembre de 2020, el Tribunal denegó la Moción Renovada para Terminar, sin perjuicio de la renovación después del 21 de abril de 2021. [ECF Núm. 2287]. El 4 de diciembre de 2020, el Comité de Acreedores No Asegurados apeló la denegación del Tribunal de su Moción Renovada para Terminar. [ECF Núm. 2320 (notificación de apelación)]. Esta apelación está pendiente ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que ha ordenado al Comité de Acreedores No Asegurados que exponga las razones por las que la apelación no debe ser desestimada por falta de jurisdicción. *Consulte* Caso Núm. 21-2162 (1er. Cir. 2020).

Las fechas límite relacionadas con la Moción 9019 de la AEE permanecen paralizadas indefinidamente.

(iv)    *La Moción de Gastos Administrativos de LUMA*

El 14 de abril de 2020, tras un proceso de más de dos años, la Junta de Supervisión aprobó un contrato (el "Contrato de LUMA Energy") entre la AEE, la Autoridad para las Alianzas Público-Privadas de Puerto Rico (la "Autoridad P3"), LUMA Energy, LLC ("ManagementCo") y LUMA Energy ServCo, LLC (junto con ManagementCo, "LUMA Energy"), que establece que LUMA Energy asumirá la operación y gestión del sistema de transmisión y distribución de la AEE (el "Sistema de T&D"). El Contrato de Energía de LUMA es un acontecimiento clave en la revitalización y transformación de la AEE. Su propósito es transferir la administración del Sistema de T&D a una entidad privada formada por un consorcio altamente calificado de empresas líderes en la industria, para asegurar que el Sistema de T&D sea administrado eficientemente para el beneficio de todas las partes interesadas de la AEE. El 7 de julio de 2020, la Junta de Supervisión, la AEE y la AAFAF presentaron una moción para permitir ciertas tarifas que pueden acumularse y que no se pagan en el curso ordinario a LUMA Energy bajo el Contrato de LUMA Energy como gastos administrativos. *Consulte* [Caso Núm. 17-4780, ECF Núm. 2053] (la "Moción de Gastos Administrativos de LUMA"). La Moción de Gastos Administrativos de LUMA recibió una serie de objeciones y contestaciones. *Consulte* [Caso Núm. 17-4780, ECF Núm. 2128, 2132, 2133, 2134, 2138, 2146]. El 19 de octubre de 2020, el Tribunal emitió una opinión y una orden en la que concedía la moción de gastos administrativos de LUMA (pero la denegaba sin perjuicio únicamente en lo que respecta a ciertas "tarifas tardías" que pueden adeudarse a LUMA si la AEE no le paga puntualmente a LUMA). *Consulte* [Caso Núm. 17-4780, ECF Núm. 2258]. El 26 de octubre de 2020, UTIER y SREAEE presentaron una notificación de apelación en cuanto a la orden y la opinión de la juez Swain que concedía parcialmente la moción de gastos administrativos de LUMA [Caso Núm. 17-4780, ECF Núm. 2269]. La apelación se registró como Caso Núm. 20-2041 en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. El proceso de presentación de escritos en relación con la apelación sigue en curso.

346

4.        **Caso de Título III de COFINA**

a)        **Inicio del Caso de Título III de COFINA**

El 5 de mayo de 2017, la Junta de Supervisión dictó una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para COFINA, conforme a la sección 304(a) de PROMESA, iniciando el Caso de Título III de COFINA.

El 1 de junio de 2017, el Tribunal del Título III registró una orden que concede la administración conjunta del Caso de Título III del ELA y el Caso de Título III de COFINA, solo para fines de procedimiento. [ECF Núm. 242].

b)        **Confirmación del plan de ajuste de COFINA**

El 16 y el 17 de enero de 2019, el Tribunal del Título III consideró la confirmación del plan de ajuste de COFINA con la moción de transacción para la transacción y el acuerdo mutuo de la Disputa ELA-COFINA, que se describe a continuación. El 4 de febrero de 2019, el Tribunal del Título III confirmó el plan de ajuste de COFINA mediante la aprobación de un registro en el acuerdo de transacción con respecto a COFINA [ECF Núm. 5047, 5048, 5053, 5055, 5104]. En el mismo día, el Tribunal del Título III aprobó la Moción de Transacción.

El 5 de febrero de 2019, el Tribunal del Título III registró la *Orden enmendada y sentencia de confirmación del Plan de Ajuste de Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico [ECF Núm. 5055]* y el *Memorando Enmendado de Averiguación de Hechos y Conclusiones de Derecho en relación con la confirmación del Tercer Plan de Ajuste Enmendado de Título III de la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF Núm. 5053]. El 12 de febrero de 2019, el plan de ajuste de COFINA se perfeccionó de forma sustancial y entró en vigencia (la "<u>Fecha de Entrada en vigencia del Plan de Ajuste de COFINA</u>").

Como se explica adicionalmente en la sección V.J.9. de esta Declaración de Divulgación, la confirmación del Plan de Ajuste de COFINA aprobó la celebración por parte de COFINA del acuerdo de transacción que disponía los términos de la transacción y el acuerdo mutuo de la Disputa ELA-COFINA y la asignación de los Impuestos sobre Ventas y Uso en Disputa.

c)        **Impugnaciones a la confirmación del Plan de Ajuste de COFINA**

Después de transcurrida la Fecha de Entrada en vigencia del Plan de Ajuste de COFINA, diversas partes presentaron impugnaciones a la confirmación del Plan de Ajuste de COFINA y el mutuo acuerdo y transacción de la Disputa ELA-COFINA contenidos en él.

***Apelaciones de la orden de confirmación del Plan de Ajuste de COFINA.*** El 22 de febrero de 2019, los apelantes (i) Rene Pinto-Lugo, Manuel Natal-Albelo, VAMOS, una organización sin fines de lucro y seis sindicatos de empleados públicos (los "Apelantes Pinto-Lugo") (*Pinto-Lugo c. Estado Libre Asociado de P.R.*, Caso Núm. 19-1181 (1er Cir.)) (la "Apelación Pinto-Lugo"), (ii) Mark Elliott, Lawrence B. Dvores y Peter C. Hein (los "Apelantes Elliott") (*Elliott c. Estado Libre Asociado de P.R.*), Caso Núm. 19-1182 (1er Cir.)) (la "Apelación Elliott"), y (iii) Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía, Cooperativa de Ahorro y Crédito de Juana Díaz y Cooperativa de Ahorro y Crédito de Rincón (las "Cooperativas") (*Cooperativas c. COFINA*, Caso Núm. 19-1391 (1er Cir.)) ("la Apelación Cooperativas") presentaron apelaciones por separado de la orden que ratifica el Plan de Ajuste de COFINA. El 12 de abril de 2019, con respecto a las apelaciones de Pinto-Lugo y Elliott, y el 28 de junio de 2019 con respecto a la

347

apelación de las Cooperativas, la Junta de Supervisión presentó una moción de desestimación de cada una de las apelaciones como legalmente irrelevantes, argumentando, entre otras cosas, que (i) los apelantes no habían actuado con diligencia para paralizar la implementación del Plan de Ajuste de COFINA, (ii) el Plan de Ajuste de COFINA se había perfeccionado totalmente, y (iii) terceros inocentes habían confiado en el Plan de Ajuste de COFINA. Por lo tanto, la Junta de Supervisión sostuvo que conceder la reparación a los apelantes anulando la confirmación del Plan de Ajuste de COFINA no sería práctico ni justo y sería casi imposible. En particular, las obligaciones de COFINA conforme a sus antiguos bonos se habían cancelado, se habían emitido nuevos bonos que se habían negociado en mercados públicos, se habían hecho distribuciones a los acreedores y se habían desestimado litigios sin derecho a nueva acción. En particular, las obligaciones de COFINA conforme a sus antiguos bonos se han cancelado, se han emitido nuevos bonos que se han negociado en mercados públicos, se han hecho distribuciones a los acreedores y se han desestimado litigios con prejuicio.

También el 12 de abril de 2019, la Coalición de Tenedores de Bonos Prioritarios (Senior) de COFINA presentó una moción para intervenir en las apelaciones de Pinto-Lugo y Elliot en apoyo a la Junta de Supervisión, que el Primer Circuito concedió el 26 de agosto de 2019.

Con respecto a las apelaciones de Pinto-Lugo y Elliot, el 15 de mayo de 2019, los Apelantes de Pinto-Lugo y los Apelantes de Elliot presentaron oposiciones a la moción de desestimación, con la aseveración de que la doctrina de irrelevancia legal no es aplicable a las apelaciones. Los Apelantes de Elliott también sostuvieron que sus objeciones constitucionales tienen prioridad sobre la doctrina de irrelevancia legal y, por lo tanto, su apelación no debe ser desestimada.

El 29 de mayo de 2019, la Junta de Supervisión presentó respuestas en apoyo de sus mociones de desestimación de las apelaciones de Pinto-Lugo y Elliot. En su respuesta a la oposición de Pinto-Lugo, la Junta de Supervisión sostuvo que, entre otras cosas, dado que la doctrina de irrelevancia legal se aplica en los casos presentados conforme al Capítulo 9 del Código de Quiebras, es aplicable a la apelación de Pinto-Lugo. En su respuesta a la oposición de Elliott, la Junta de Supervisión observó que los Apelantes de Elliott no habían citado fuentes en respaldo de su argumento de que los tribunales son reacios a aplicar la doctrina de irrelevancia legal en casos que involucran reclamaciones constitucionales. Los Apelantes de Pinto-Lugo presentaron una tríplica el 26 de julio de 2019. El 7 de agosto de 2019, el Primer Circuito denegó las mociones de la Junta de Supervisión para desestimar sin perjuicio de la reconsideración por el panel que decide las apelaciones. El 29 de agosto de 2019, el Primer Circuito emitió una orden para consolidar las apelaciones de Pinto-Lugo y Elliott (la "Apelación Pinto-Lugo/Elliott").

También el 29 de agosto de 2019, con respecto a la apelación de las Cooperativas, los Apelantes de las Cooperativas presentaron una oposición a la moción de desestimación, argumentando que la doctrina de irrelevancia legal no debería aplicarse a su apelación y, si lo hiciera, violaría los derechos del debido proceso de los Apelantes de las Cooperativas. Los Apelantes de las Cooperativas alegaron además que la naturaleza equitativa y constitucional de sus reclamaciones merece ser considerada en cuanto a los méritos. El 16 de septiembre de 2019, la Junta de Supervisión presentó una respuesta en apoyo a su moción de desestimación de la apelación de las Cooperativas. En su respuesta, la Junta de Supervisión argumentó que se aplica la doctrina de irrelevancia legal y que los fundamentos de la apelación son irrelevantes. El 4 de octubre de 2019, el Primer Circuito denegó la moción de la Junta de Supervisión para desestimar sin perjuicio de la reconsideración por el panel que decide las apelaciones.

El 25 de octubre de 2019, los Tenedores de Bonos Prioritarios (Senior) de COFINA presentaron una moción de autorización para presentarse como partes contrarias a la apelación en la apelación de las Cooperativas, que el Primer Circuito concedió el 10 de enero de 2020.

En la apelación Pinto-Lugo/Elliott, los Apelantes Pinto-Lugo y Elliott (colectivamente, los "Apelantes Pinto-Lugo/Elliott") presentaron sus escritos iniciales el 7 de noviembre de 2019, argumentando que la decisión del Tribunal del Título III que desestimó sus objeciones al Plan de Ajuste de COFINA y sus impugnaciones legales y constitucionales a la Nueva Legislación de Bonos violó sus derechos al debido proceso. En la apelación de las Cooperativas, los Apelantes de las Cooperativas presentaron su escrito inicial el 4 de diciembre de 2019, argumentando que el Tribunal del Título III se equivocó al no ajustar el lenguaje de su orden de confirmación para permitir que el Procedimiento Contencioso Núm. 18-00028 siga su curso. La Junta de Supervisión y los Tenedores de Bonos Prioritarios (Senior) de COFINA presentaron cada uno un escrito de contestación en la apelación de Pinto-Lugo/Elliott el 14 de febrero de 2020 y cada uno presentó un escrito de contestación en la apelación de Cooperativas el 21 de febrero de 2020. El 13 de marzo de 2020, la Junta de Supervisión presentó una carta donde solicitaba que se programaran los alegatos orales en relación con la apelación de Pinto-Lugo/Elliot y la de Cooperativas el mismo día.

En la apelación de Pinto-Lugo/Elliott, los Apelantes de Pinto-Lugo/Elliott presentaron sus escritos de contestación el 1 de mayo de 2020. En la apelación de Cooperativas, los Apelantes de Cooperativas presentaron su escrito de contestación el 30 de abril de 2020.

En la apelación de Elliot, los Apelantes de Elliott presentaron una carta 28(j) presentando fundamentos complementarios el 8 de junio de 2020. El 16 de junio de 2020, la Junta de Supervisión presentó una carta en respuesta a la carta 28(j) de los Apelantes de Elliott.

El 31 de julio de 2020, se celebró un alegato oral unificado. Después de los alegatos orales, la Junta de Supervisión presentó cartas 28(j) presentando fundamentos complementarios el 2 y 4 de agosto y el 31 de diciembre de 2020, tanto en las apelaciones de Pinto-Lugo/Elliott como de Cooperativas.

El 8 de febrero de 2021, el Primer Circuito emitió una opinión y una sentencia que desestimaba las apelaciones de Pinto-Lugo/Elliott en su totalidad por motivos de irrelevancia legal. El Primer Circuito aplicó los tres factores siguientes para determinar si debía desestimar las apelaciones: (1) si el apelante ejerció con diligencia todos los recursos disponibles para obtener la paralización de la ejecución de la orden impugnable; (2) si el Plan de Ajuste de COFINA impugnado procedió hasta un punto mucho más allá de cualquier anulación practicable de la apelación, y (3) si la concesión del remedio perjudicaría a terceros inocentes. El Primer Circuito determinó que los Apelantes no buscaron diligentemente todos los remedios disponibles, que no hay manera práctica de volver al "status quo anterior a la confirmación", y que hacerlo perjudicaría a terceros inocentes. El 1 de marzo de 2021, el Primer Circuito dictó su mandato. El 7 de abril de 2021, los Apelantes de Elliott presentaron una petición de certiorari. El 13 de abril de 2021, la Junta de Supervisión presentó una carta solicitando una prórroga del plazo para responder a la petición.

El 2 de marzo de 2021, el Primer Circuito emitió una opinión y una sentencia en la que desestimaba la apelación de Cooperativas que impugnaba la confirmación del Tribunal del Título III del Plan de Ajuste de COFINA como legalmente irrelevante y devolvía el caso al Tribunal del Título III. El Primer Circuito aplicó los tres factores siguientes para determinar si debía desestimar la apelación: (1) si el apelante ejerció con diligencia todos los recursos disponibles para obtener la paralización de la ejecución de la orden impugnable; (2) si el Plan de Ajuste de COFINA impugnado procedió hasta un punto mucho más allá de cualquier anulación practicable de la apelación, y (3) si la concesión de la reparación perjudicaría a terceros inocentes. El Primer Circuito consideró que las Cooperativas Apelantes "fueron cualquier cosa menos diligentes en la búsqueda de una paralización o en la prevención de la demora", y concluyó que la anulación del Plan de Ajuste de COFINA, que ya se ha aplicado durante más de dos años, causaría daños a terceros. El 23 de marzo de 2021, el Primer Circuito dictó su mandato.

Uno de los Apelantes Elliot, Peter Hein, también presentó una apelación por separado en relación con ciertas cuestiones relativas a la desestimación de su evidencia de reclamación presentada en el procedimiento del Título III de COFINA y a la presentación de pruebas relacionadas a las que creía tener derecho, pero que le fueron denegadas. En este sentido, el 17 de septiembre de 2019, Peter Hein presentó una notificación de apelación conjunta suplementaria y enmendada con respecto a la orden de ratificación del Plan de Ajuste de COFINA (la "Apelación Elliott II"). La Apelación Elliott II se registró como Caso Núm. 19-1960. El 28 de octubre de 2019, el Primer Circuito dictó una orden que unifica la Apelación Elliott II con Pinto-Lugo y Elliott. El 2 de enero de 2020, el Apelante presentó su escrito inicial sobre las cuestiones planteadas en su apelación por separado. La Junta de Supervisión presentó su escrito de contestación preliminar el 14 de febrero de 2020. El 30 de abril de 2020, el Apelante presentó su escrito de réplica. El 31 de julio de 2020, el caso se argumentó ante el Primer Circuito. El 8 de febrero de 2021, el Primer Circuito emitió una opinión y una sentencia confirmando la desestimación de la solicitud de presentación de pruebas de Hein y la desestimación de su evidencia de reclamación contra COFINA.

***Natal-Albelo c. Junta de Supervisión y Administración Financiera para Puerto Rico, Proc. Cont. Núm. 19-00003***. Originalmente presentada el 6 de diciembre de 2018 en el Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico por los demandantes Manuel Natal-Albelo, miembro de la Cámara de Representantes de Puerto Rico, Rene Pinto-Lugo, bonista individual, VAMOS, una organización sin fines de lucro, y seis sindicatos, la Junta de Supervisión transfirió este caso al Tribunal del Título III el 14 de enero de 2019. La demanda solicita remedios declaratorios e interdictales que dispongan que (1) la aprobación del Proyecto de Ley de la Cámara de Representantes 1837 ("Proyecto de Ley 1837"), que se convirtió más tarde en la Ley 241-2018, es inconstitucional, y (2) la Ley 91-2006 ("Ley 91"), que originalmente creó COFINA, es inconstitucional. Los Demandantes argumentan, entre otras cosas, que las acciones de la Cámara de Representantes durante la aprobación del Proyecto de Ley 1837: (i) fueron inconstitucionales y violatorias de la dignidad del demandante Natal-Albelo porque trataron con ligereza las peticiones del demandante Natal-Albelo para hablar; (ii) violaron los derechos del demandante Natal-Albelo, un Representante independiente, a ser escuchado conforme a las cláusulas de protección equitativa de las Constituciones Federal y del ELA; (iii) violaron los derechos de dignidad, protección igualitaria de las leyes, el derecho a la libertad de expresión, votación y debido proceso del demandante Natal-Albelo conforme a las Constituciones federal y del ELA; y (iv) se tomaron con mala fe. Los Demandantes sostienen además que la Ley 91, conforme a la cual se creó COFINA en 2006, es inconstitucional porque: (a) dispone la emisión de deuda que supera los límites constitucionales de la deuda pública dispuestas en las secciones 2 y 7 del Artículo VI de la Constitución del ELA y (b) permite el refinanciamiento de la deuda pública inconstitucional.

El 21 de marzo de 2019, la Junta de Supervisión presentó una moción de paralización del procedimiento contencioso hasta que se obtuviera una resolución final en la apelación de Pinto-Lugo del Plan de Ajuste Enmendado de Título III de COFINA [Proc. Cont. Núm. 19-00003, ECF Núm. 21].

En el mismo día, los Demandantes presentaron una moción de transferencia por falta de jurisdicción en razón de la materia, [Proc. Cont. Núm. 19-00003, ECF Núm. 24, 25], que el Tribunal eliminó del expediente debido a cuestiones de procedimiento de la moción. [Proc. Cont. Núm. 19-00003, ECF Núm. 36]. El Tribunal del Título III permitió que los Demandantes tuvieran la oportunidad de volver a presentar una moción de transferencia y paralizaron todas las demás sesiones de información, incluso la sesión de información sobre la moción de paralización de la Junta de Supervisión, a la espera de la resolución de la moción de transferencia renovada. Los Demandantes presentaron su moción renovada de transferencia el 10 de mayo de 2019. [Proc. Cont. Núm. 19-00003, ECF Núm. 40]. El 31 de mayo de 2019, AAFAF presentó una moción de intervención [Proc. Cont. Núm. 19-00003, ECF Núm. 43], que el Tribunal del Título III concedió [Proc. Cont. Núm. 19-00003, ECF Núm. 51]. El 31 de julio de 2019, el Tribunal del Título III dictó una orden que denegó la moción de transferencia de los Demandantes [Proc. Cont. Núm. 19-00003,

ECF Núm. 57]. El 13 de agosto de 2019, el Tribunal del Título III dictó una orden para continuar la paralización del procedimiento hasta la resolución de la apelación Pinto Lugo [Proc. Cont. Núm. 19-00003, ECF Núm. 59]. El 9 de abril de 2021, los Demandantes presentaron una notificación de desestimación voluntaria de la acción [Proc. Cont. Núm. 19-00003, ECF Núm. 66]. El 3 de mayo de 2021 se cerró el procedimiento contencioso.

5.     **Antecedentes generales**

Una cuestión dominante del Caso de Título III del ELA fue la disputa sobre los derechos de propiedad de los Impuestos sobre Ventas y Uso supuestamente transferidos por el ELA a COFINA para garantizar el reembolso de ciertas deudas de COFINA (la "Disputa ELA-COFINA"). Si dichos ingresos eran de propiedad de COFINA, entonces habría unos $750 millones menos disponibles por año (cuyo monto anual aumentaría con el tiempo) para pagar los pasivos y gastos de los Deudores del ELA.

6.     **La Disputa ELA-COFINA y el litigio de Lex Claims**

El 20 de julio de 2016, ciertos tenedores de los Bonos GO iniciaron una acción en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico contra el ELA y varios de sus funcionarios, entre ellos el Gobernador. *Lex Claims, LLC c. García-Padilla*, Caso Núm. 16-2374-FAB (D.P.R. 20 de junio de 2016).[282] Los Demandantes sostuvieron, entre otras cosas, que (i) la Constitución del ELA exige que el ELA pague la Deuda GO antes que cualquier otro gasto, y (ii) los Impuestos sobre la Venta y el Uso supuestamente transferidos a COFINA son un "recurso disponible" conforme al artículo VI, sección 8 de la Constitución del ELA, que dispone que si los "recursos disponibles" de Puerto Rico fueran insuficientes para satisfacer todas sus asignaciones, "se deben pagar en primer lugar los intereses sobre la deuda pública y la amortización de estos, y se harán otros desembolsos en adelante de acuerdo con el orden de prioridades establecido por la ley". Const. P.R. art. VI, sección 8.

7.     **Estipulación y procedimiento de aprobación de órdenes para resolver la Disputa ELA-COFINA**

El 10 de agosto de 2017, el Tribunal del Título III registró una orden (la "Orden de Procedimientos") [ECF Núm. 996], que, entre otras cosas, dispuso que (a) la Junta de Supervisión autorizaba a CANA a actuar como agente de la Junta de Supervisión, como representante del ELA en el Caso de Título III del ELA, para litigar y/o transigir la Disputa ELA-COFINA en nombre del ELA (el "Agente del ELA"); y (b) la Junta de Supervisión autorizó a Bettina Whyte a actuar como agente de la Junta de Supervisión, como representante de COFINA en su Caso de Título III, para litigar y/o transigir la Disputa ELA-COFINA en nombre de COFINA (la "Agente de COFINA" y junto con el Agente del ELA, los "Agentes").[283] La Orden de Procedimientos también reconoce expresamente que la Junta de Supervisión conserva su autoridad para desarrollar por separado una transacción de la Disputa ELA-COFINA y proponer planes de ajuste para el ELA y COFINA. Orden de Procedimientos ¶ 4(n). La Orden de Procedimientos fue acordada por todas las principales partes interesadas después de que los mediadores trabajaron incansablemente para llegar a un consenso.

---

[282] El Litigio Lex Claims fue desestimado conforme al acuerdo mutuo y transacción de la Disputa ELA-COFINA y la confirmación del Plan de Ajuste de COFINA.

[283] Después del registro de la Orden de Procedimientos, los Agentes, junto con ciertas partes acreedoras, participaron en una mediación confidencial con el Líder del Equipo de Mediación.

8. *Comité Oficial de Acreedores no Asegurados c. Whyte, Proc. Cont. Núm. 17-00257*[284]

El 8 de septiembre de 2017, CANA,[285] como Agente del ELA, inició un procedimiento contencioso para litigar la Disputa ELA-COFINA, Proc. Cont. Núm. 17-00257. El 15 de septiembre de 2017, la Agente de COFINA presentó su respuesta a la Demanda (la "Respuesta y Reconvenciones") [Proc. Cont. Núm. 17-00257. ECF Núm. 27].

Además de las reclamaciones aseveradas por el Agente del ELA y la Agente de COFINA, varios grupos de tenedores de bonos de COFINA y GO, además de otras partes a las que se les había permitido intervenir en el procedimiento contencioso, presentaron reconvenciones y demandas cruzadas con respecto a la propiedad de la parte aplicable del Impuesto sobre la Venta y el Uso  El 21 de febrero de 2018, el Agente del ELA, la Agente de COFINA y varias de las partes intervinientes presentaron mociones cruzadas para sentencia sumaria.

Simultáneamente con el litigio en el procedimiento contencioso, los Agentes participaron en la mediación promovida por el Tribunal para transigir la Disputa ELA-COFINA. A través de los auspicios del Equipo de Mediación, los Agentes alcanzaron un entendimiento que se estipuló en el Acuerdo en Principio sobre una transacción de la Disputa ELA-COFINA. El 7 de junio de 2018, los Agentes anunciaron los términos de su Acuerdo en Principio, que contempla, entre otras cosas, que a partir del Año fiscal 2019, el ELA y COFINA compartirán el Monto base del Impuesto a las Ventas Pignorado, con 46.35% y 53.65%, respectivamente. [Proc. Cont. Núm. 17-00257, ECF Núm. 486].

El 27 de septiembre de 2018, a la luz de los acuerdos y conciliaciones estipulados en el Plan de Ajuste de COFINA y su transacción vinculada, el Tribunal del Título III, dictó de oficio una orden de extinción de las mociones de sentencia sumaria pendientes, sin prejuicio de restauración de las mociones en o después del 3 de octubre de 2018. [Proc. Cont. Núm. 17-00257, ECF Núm. 544].

El 20 de febrero de 2019, una vez transcurrida la fecha de entrada en vigencia del Plan de Ajuste de COFINA, las partes del procedimiento contencioso presentaron una estipulación conjunta para desestimar el caso sin derecho a nueva acción, lo que fue aprobado por el Tribunal del Título III [Proc. Cont. Núm. 17-00257, ECF Núm. 596].

9. **Acuerdos y *transacciones***

El 4 de febrero de 2019, el Tribunal del Título III registró el *Memorando de opinión y orden de aprobación de la transacción entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF Núm. 5045] (la "Orden de transacción"). En el mismo día, el Tribunal del Título III confirmó el Plan de Ajuste de COFINA, aprobando la celebración de un acuerdo de transacción con respecto a COFINA. [ECF Núm. 5047, 5048, 5053, 5055]. El 12 de febrero de 2019, el plan de ajuste de COFINA se perfeccionó de forma sustancial y entró en vigencia [ECF Núm. 5104].

---

[284] Conforme al acuerdo mutuo y transacción de la Disputa ELA-COFINA y la confirmación del Plan de Ajuste de COFINA, el 20 de febrero de 2019, las partes presentaron una estipulación conjunta de desestimación sin derecho a nueva acción, que se registró el 21 de febrero de 2019.

[285] CANA es el comité establecido por ley de acreedores no asegurados designados en el Caso de Título III de ELA, el Caso de Título III de SRE y el Caso de Título III de ACT.

A tenor con la Orden de Transacción y la sección 2.1 del Plan de Ajuste de COFINA, se acordó mutuamente y concilió la Disputa ELA-COFINA de la siguiente manera:

a) **Intereses de COFINA**

Se concedió a COFINA una participación propietaria en los Impuestos Pignorados de COFINA y todos los derechos sobre ellos, incluso el derecho a cobrar los Impuestos Pignorados de COFINA conforme al Financiamiento de los Primeros Ingresos[286] por un monto de hasta cincuenta y tres y sesenta y cinco centésimos por ciento (53.65%) de un cierto monto fijo mínimo de los ingresos del Impuesto sobre las Ventas y el Uso ("Ingresos Fijos") en cualquier año fiscal dado hasta que los Bonos de COFINA se hayan pagado o satisfecho en su totalidad de acuerdo con sus términos (la "Parte de COFINA").

b) **Intereses del ELA**

Se concedió al ELA una participación propietaria que es segunda en prioridad de pago, financiamiento y cobros, sobre los Impuestos Pignorados de COFINA y todos los derechos sobre ellos, sujeto al Financiamiento de los Primeros Ingresos. Esta participación propietaria incluye el derecho de recibir (a) el monto residual de los Impuestos Pignorados de COFINA por el monto, de haberlo, que supere la Parte de COFINA en cualquier año fiscal dado del ELA, y (b) todos los Impuestos Pignorados de COFINA después de que los Bonos de COFINA hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos. El ELA no tendrá una participación propietaria sobre la Parte de COFINA, y la Parte del ELA[287] excluirá la Parte de COFINA.

---

[286] El "Financiamiento de los primeros fondos" se define, para los fines del Orden de transacción y el plan de ajuste de COFINA, como la asignación de los "primeros fondos" cobrados de los Impuestos Pignorados de COFINA, que incluyen, entre otros, los criterios estipulados en la sección 16.5 del Plan de COFINA que deben satisfacerse para permitir, entre otras cosas, depósitos trimestrales de "primeros fondos" cobrados de los Impuestos Pignorados de COFINA.

[287] La "Parte del ELA" se define colectivamente, para los fines del Orden de transacción y el plan de ajuste de COFINA, como un interés que es segundo en prioridad de pago, financiamiento y cobros, en todas las circunstancias, sujeto y conforme al Financiamiento de los Primeros ingresos, sobre los Impuestos Pignorados de COFINA y todos los derechos sobre ellos, incluso el derecho a recibir (a) el monto residual de los Impuestos Pignorados de COFINA por el monto, de haberlo, que supere la Parte de COFINA en cualquier año fiscal dado, y (b) todos los Impuestos Pignorados de COFINA después de que los Bonos de COFINA hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos; salvo que, bajo cualquier circunstancia la Parte del ELA excluye en su totalidad la Parte de COFINA, y el ELA no tendrá una participación propietaria sobre la Parte de COFINA; y, salvo que (y) sujeto a las disposiciones con respecto a la Prueba de Bonos Adicional y el Financiamiento de los Primeros fondos estipulado en las secciones 16.3 y 16.5 del Plan de COFINA, respectivamente, el ELA no tendrá derecho a recibir ningún ingreso o cobro generado por los Impuestos Pignorados de COFINA para un año fiscal dado a menos que y hasta que COFINA haya recibido la parte de COFINA y (z) el ELA no tendrá derecho a recibir Ahorros del Servicio de la Deuda en ningún año fiscal a menos que y hasta que se hayan hecho todos los pagos del servicio de la deuda sobre los Bonos de COFINA que deban hacerse o reservarse en dicho año fiscal, incluso cualquier pago de servicio de la deuda en mora de todos los años fiscales anteriores, según lo requerido, conforme a las disposiciones con respecto a la Prueba de Bonos Adicional estipulada en la sección 16.3 del Plan de COFINA; y, salvo que, la Parte de COFINA no será, ni ahora ni en el futuro, propiedad del ELA, y, en caso de cualquier Caso de Título III futuro o similar u otros procedimientos del ELA en cualquier foro, la parte de COFINA no estará sujeta a la paralización automática en cualquier procedimiento del ELA de ese tipo.

c) **Distribución de los montos depositados en las cuentas de BNYM de servicio de la deuda, reserva y otras**

(i) *Depósitos previos al Año fiscal 2019 en BNYM*

De los $78,355,837.63 de fondos en depósito anteriores al 1 de julio de 2018 en las cuentas de servicio de la deuda, reserva y otras cuentas y cualquier ganancia sobre ellas en poder de BNYM, como síndico de Bonos Existentes de COFINA, para beneficio de los tenedores de bonos (colectivamente, los "Depósitos previos al Año fiscal 2019 en BNYM") de acuerdo con el procedimiento contencioso, se distribuyeron $33,355,837.63 al ELA.

(ii) *Depósitos del Año fiscal 2019 en BNYM*

A la Fecha de Entrada en vigencia del Plan de Ajuste de COFINA, COFINA recibió, para fines de distribución de acuerdo con el Plan de Ajuste, cien por ciento (100%) de los fondos depositados en o después del 1 de julio de 2018 a las cuentas de servicio de la deuda, reserva y de otro tipo (colectivamente, los "Depósitos del Año fiscal 2019 en BNYM"), como primeros ingresos hasta el monto de cincuenta y tres y sesenta y cinco centésimos por ciento (53.65%) de los Ingresos Fijos, más cualquier ganancia sobre ellos (colectivamente, los "Depósitos de COFINA del Año fiscal 2019 en BNYM") en poder de BNYM de acuerdo con el Procedimiento contencioso.

(iii) *Depósitos residuales del Año fiscal 2019 en BNYM*

Cualquier depósito remanente en BNYM del Año fiscal 2019 de los Depósitos de COFINA del Año Fiscal 2019 en BNYM debía distribuirse al ELA.

d) **Financiamiento de los primeros ingresos**

La Parte de COFINA se financiará anualmente a partir de los "primeros ingresos" cobrados de los Impuestos Pignorados de COFINA hasta que los Bonos de COFINA hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos.

A partir del Año fiscal 2024 del ELA, si (i) para cualquier fecha de determinación en cuyo momento la Junta de Supervisión o cualquier superior siga existiendo, (1) los presupuestos del Año fiscal anterior y en curso están equilibrados, según lo determine la Junta de Supervisión (o su sucesor en interés), y (2) el ELA está al día con sus requisitos permanentes de divulgación relacionados con sus estados financieros auditados; (ii) resulta necesario reunir trimestralmente veinticinco por ciento (25%) de la Parte de COFINA asociada con el entonces Año fiscal en curso del ELA para evitar el préstamo mediante notas de anticipación de ingresos impositivos intra-Año fiscal; y (iii) el cobro de los Impuestos Pignorados de COFINA del Año fiscal anterior proporciona una cobertura de dos veces (2x) la Parte de COFINA, entonces, en cada trimestre, hasta que los Bonos de COFINA se hayan pagado o satisfecho en su totalidad de acuerdo con sus términos:

(a) los "primeros ingresos" cobrados de los Impuestos Pignorados de COFINA de hasta veinticinco por ciento (25%) de la Parte de COFINA asociada con el Año fiscal entonces en curso del ELA se depositarán en el Fondo de Ingresos para su

transferencia al Fondo de Servicio de la Deuda[288] (los "Depósitos posteriores al Año fiscal 2024"); y

(b) en adelante, el cobro trimestral restante de los Impuestos Pignorados de COFINA se depositará de acuerdo con el "Flujo de Fondos" establecido en la Escritura de los Bonos de COFINA.

Sin embargo, en cualquier trimestre donde haya un déficit en los montos que deben depositarse en los Depósitos Posteriores al Año fiscal 2024, entonces se agregará dicho déficit al monto que debe pagarse de acuerdo con los Depósitos Posteriores al Año fiscal 2024 el trimestre siguiente hasta que se haya depositado el monto total del déficit acumulativo en el "Fondo de Servicio de la Deuda" en poder del síndico para beneficio y pago del servicio de la deuda con respecto a los Bonos de COFINA.

e) **Términos adicionales de acuerdo mutuo y transacción**

El ELA no tendrá derecho a recibir ingresos o cobros generados por los Impuestos Pignorados de COFINA para un Año fiscal del ELA, salvo y hasta que COFINA haya recibido la Parte de COFINA. El ELA no tendrá derecho a recibir Ahorros de Servicio de la Deuda[289] en ningún Año fiscal del ELA a menos que y hasta que se hayan hecho según lo requerido todos los pagos del servicio de la deuda sobre los Bonos de COFINA que deban hacerse o reservarse en dicho Año fiscal del ELA, incluso cualquier pago en mora del servicio de la deuda de Años fiscales anteriores del ELA. La Parte de COFINA no será propiedad del ELA, y si hay algún Caso de Título III o similar futuro, u otro procedimiento del ELA, ante cualquier foro, no estará sujeto a la paralización automática.

f) **Fecha del acuerdo**

La fecha de entrada en vigencia del acuerdo mutuo y transacción es retroactiva al 1 de julio de 2018 y, además de la recepción de los Depósitos netos Previos al Año fiscal 2019 en BNYM y los Depósitos en BNYM del Año Fiscal 2019 de COFINA en la Fecha de Entrada en vigencia del Plan de Ajuste de COFINA, COFINA tiene la propiedad y el derecho de recibir la Parte de COFINA en el Año fiscal 2019.

[*El resto de la página se deja intencionalmente en blanco*]

---

[288] El "Fondo de Amortización de la Deuda" se define, para los fines del Orden de transacción y el plan de ajuste de COFINA, como la cuenta establecida conforme a la Escritura de los Nuevos Bonos en nombre del síndico de los Bonos de COFINA, que debe tener el propósito de recibir, retener y distribuir fondos para beneficio y pago de la amortización de la deuda con respecto a los Bonos de COFINA.

[289] "Ahorros de amortización de la deuda" se definen, para los fines del Orden de transacción y el plan de ajuste de COFINA y para cada año fiscal, como la diferencia entre (a) el capital y los intereses adeudados sobre los Bonos COFINA y los Bonos de Refinanciamiento COFINA, entonces en circulación, antes de la emisión de los bonos de refinanciamiento de COFINA y/o la compra por parte de COFINA Reorganizada de los Bonos COFINA y los Bonos de Refinanciamiento de COFINA en el mercado abierto y (b) el capital y los intereses adeudados sobre los Bonos de COFINA y Bonos de Refinanciamiento de COFINA que permanezcan en circulación después de la emisión de dichos Bonos de Refinanciamiento COFINA y/o la compra por parte de COFINA Reorganizada de los Bonos COFINA y los Bonos reorganizados de COFINA.

# VI.   Plan de ajuste del Título III

## A.   Generalidades

### 1.   Presentación del plan de ajuste

Un plan de ajuste dispone el tratamiento y el relevo de las obligaciones de deuda del Deudor de Título III. Únicamente la Junta de Supervisión puede presentar un plan de ajuste, ya sea con la petición o para el tiempo estipulado por el tribunal, y solo puede hacerlo si determina, en ejercicio de sus facultades discrecionales, que el Plan es coherente con el plan fiscal certificado aplicable.[290]   La Junta de Supervisión puede modificar el Plan en cualquier momento antes de la confirmación, siempre que el plan modificado cumpla los requisitos del Título III de PROMESA.[291]

### 2.   Contenido de un plan de ajuste

No obstante la ley no vinculada a Quiebras aplicable de otro modo, entre otras cosas, un plan de ajuste (i) designa clases de reclamaciones (las reclamaciones en una clase deben ser "sustancialmente similares"),[292] (ii) especifica cualquier clase de reclamación que no esté afectada por el plan de ajuste y especifica el tratamiento asignado a clases de reclamaciones o intereses que están afectados, (iii) dispone el mismo tratamiento para cada reclamación de una clase particular a menos que el tenedor de una reclamación de una reclamación particular acepte un tratamiento menos favorable, y (iv) dispone medios adecuados para la implementación del plan de ajuste, a través de, por ejemplo, la retención de bienes por parte del Deudor de Título III, la transferencia o venta de bienes a otra entidad, la satisfacción o modificación de cualquier gravamen o escritura, y la subsanación o renuncia a cualquier incumplimiento.[293]

Una clase de reclamaciones se ve afectada bajo un plan de ajuste, a menos que el plan de ajuste (i) deje sin cambios los derechos legales y contractuales a los cuales dicha reclamación o interés da derecho al tenedor de dicha reclamación o dicho interés; o (ii) no obstante la ley no vinculada a Quiebras aplicable que conceda derechos al tenedor de la reclamación o interés a exigir o recibir el pago acelerado después del incumplimiento el plan de ajuste subsana el incumplimiento, reinstaura la fecha de vencimiento de la reclamación o interés, compensa al tenedor por daños incurridos como resultado de una confianza razonable por parte de dicho tenedor en dicha ley no vinculada a Quiebras aplicable y (para el incumplimiento de obligaciones no monetarias) compensa al tenedor por cualquier pérdida pecuniaria real incurrida por dicho tenedor y no altera de otra manera los derechos legales o contractuales de los que goza el tenedor en virtud de dicha reclamación o dicho interés.[294]

---

[290] PROMESA §§ 312(a)-(b), 104(j)(3).

[291] PROMESA § 313.

[292] Al determinar si las reclamaciones son "sustancialmente similares", la Junta de Supervisión debe considerar si dichas reclamaciones son garantizadas y si dichas reclamaciones tienen prioridad sobre otras reclamaciones. PROMESA § 301(e).

[293] 11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

[294] 11 U.S.C. § 1124.

356

3.        **Aceptación de un plan de ajuste**

El tenedor de una reclamación permitida puede votar para aceptar o rechazar un plan de ajuste. PROMESA excluye específicamente de la definición de "tenedor de una reclamación o un interés" para tales fines a cualquier "Emisor" o "Instrumentalidad autorizada del Emisor del Gobierno del Territorio", tal como lo define el Título VI de PROMESA) o una corporación, fideicomiso u otra entidad legal que esté controlada por el Emisor o una Instrumentalidad Territorial Autorizada del Emisor del Gobierno del Territorio, siempre que los demás beneficiarios de dichas reclamaciones no se excluyan, y siempre que, con respecto a los bonos asegurados, dicho "tenedor de una reclamación o un interés" sea la aseguradora monolínea que asegura dichos bonos, en la medida en que se conceda a dicha aseguradora el derecho al voto de los bonos asegurados para fines de aplicar remedios o consentir a las enmiendas o modificaciones propuestas, según se dispone en los documentos aplicables.[295]

Se presume de manera concluyente que una clase que no se ve afectada conforme al plan de ajuste ha aceptado el plan, y se considera que una clase que no tiene derecho conforme al plan de ajuste a recibir o retener cualquier bien por cuenta de las reclamaciones de los tenedores no ha aceptado el plan de ajuste.[296] Una clase de reclamaciones acepta un plan de ajuste si este ha sido aceptado por acreedores que poseen por lo menos dos tercios del monto y más de la mitad del número de las reclamaciones permitidas de dicha clase (salvo las que se designan como reclamaciones que no son de buena fe de conformidad a la sección 1126(e)) del Código de Quiebras.[297]

4.        **Solicitación de aceptaciones del plan de ajuste**

Antes de solicitar aceptaciones o rechazos de los tenedores de reclamaciones, la Junta de Supervisión debe emitir, y hacer que el tribunal apruebe, una declaración de divulgación que proporcione información adecuada a los tenedores de reclamaciones e intereses con el fin de solicitar aceptaciones al Plan.[298] El tipo de información adecuada provista debe permitir que un hipotético inversionista de la clase pertinente realice un juicio informado acerca del Plan. La misma declaración de divulgación debe ser transmitida a cada tenedor de una reclamación de una clase particular, pero pueden transmitirse declaraciones de divulgación alternativas con diferentes montos o tipos de información a diferentes clases.[299]

B.        **Descripción general del plan de ajuste**

EL SIGUIENTE RESUMEN RESALTA CIERTAS DISPOSICIONES SUSTANTIVAS DEL PLAN, Y NO ES, NI ESTÁ DESTINADO A SER, UNA DESCRIPCIÓN COMPLETA O UNA SUSTITUCIÓN DE UNA VERSIÓN COMPLETA DEL PLAN. LOS DEUDORES EXHORTAN A TODOS LOS TENEDORES DE RECLAMACIONES A QUE LEAN Y ESTUDIEN ATENTAMENTE EL PLAN, UNA COPIA DEL CUAL SE ADJUNTA AL PRESENTE COMO **ANEXO A**.

---

[295] PROMESA § 301(c)(3).

[296] 11 U.S.C. §§ 1126(f)-(g).

[297] 11 U.S.C. § 1126(c).

[298] 11 U.S.C. §§ 1125, 1126(b).

[299] 11 U.S.C. § 1126(c).

La sección 1123 del Código de Quiebras, que se hace aplicable al Caso de Título III conforme a PROMESA, dispone que, salvo en el caso de reclamaciones administrativas, un plan de ajuste debe categorizar las reclamaciones contra un deudor en clases individuales. Si bien PROMESA y el Código de Quiebras conceden a los Deudores una flexibilidad significativa a la hora de clasificar reclamaciones, la sección 1122 del Código de Quiebras determina que un plan de ajuste solo puede colocar una reclamación en una clase que contenga reclamaciones que son sustancialmente similares a ella.

El Plan identifica 65 Clases de Reclamaciones (ciertas de las cuales abarcan numerosas series individuales de la deuda pertinente, como se estipula en los Anexos del Plan). Dichas Clases tienen en cuenta la naturaleza y prioridad diversa de las Reclamaciones contra los Deudores. Las Reclamaciones Administrativas no se clasifican para los fines de votación o de recepción de distribuciones conforme al Plan (como lo requiere la sección 1123(a)(1) del Código de Quiebras) sino que se tratan por separado como Reclamaciones no clasificadas.

El Plan dispone un tratamiento específico para cada Clase de Reclamaciones. Únicamente ciertos tenedores de Reclamaciones que están afectadas conforme al Plan tienen derecho a votar y a recibir Distribuciones conforme al Plan.

Para los fines del Plan, lo que incluye, entre otros, para fines de distribuciones conforme a los términos y disposiciones del Artículo LXXIII del Plan, el "tenedor" de una Reclamación es cualquier Entidad que, directa o indirectamente, tiene poder de inversión con respecto a cualquier Reclamación, lo que incluye el poder de disponer o de dirigir la disposición de dicha Reclamación. Únicamente para los fines del Artículo LXXVI del Plan y la sección 1126 del Código de Quiebras, el "tenedor" de cualquier Reclamación de Bonos será determinado de conformidad con la Sección 301(c)(3) de PROMESA y cualquier ley o documento aplicable a dichas Reclamaciones de Bonos.

A menos que se disponga de otra manera en el Plan o en la Orden de Confirmación, el tratamiento de cualquier Reclamación conforme al Plan deberá satisfacer, transigir, exonerar y dar por cumplida en su totalidad dicha Reclamación, y deberá intercambiarse por dicha Reclamación. En el momento de la Confirmación, el plan será vinculante para todos los tenedores de una Reclamación, independientemente de que dichos tenedores hayan votado en el Plan o hayan votado para aceptar el Plan.

La siguiente discusión establece la clasificación y el tratamiento de todas las Reclamaciones contra los Deudores. Se califica en su totalidad conforme a los términos del Plan, que se adjunta al presente como <u>Anexo A</u>, y que debe ser leído atentamente por usted al considerar si debe votar para aceptar o rechazar el Plan.

## C.    Acuerdo mutuo y transacción de disputas / Reestructuración de entidades

### 1.    Resolución de litigios

El Plan estipula los términos y condiciones del acuerdo mutuo global y la transacción integrada de las siguientes disputas:

- Las Objeciones Vinculadas a la Deuda que impugnan, entre otras cosas, la validez, prioridad, estado garantizado y derechos relacionados de las Reclamaciones de Bonos 2011 del ELA, las Reclamaciones de Bonos 2011 del ELA Serie D/E/PIB, las Reclamaciones de Bonos Garantizados 2011 del ELA, las Reclamaciones de Bonos 2012 del ELA, las Reclamaciones de Bonos 2014 del

ELA, las Reclamaciones de Bonos 2011 de AEP, las Reclamaciones de Bonos 2012 de AEP, las Reclamaciones de Bonos Garantizados 2014 del ELA y los BAN de la AFI.[300]

- Las Acciones de Invalidez[301]

- Las Acciones de Impugnación de Gravámenes [302]

- Disputas planteadas por ciertos tenedores de Reclamaciones de Bonos del ELA, las Reclamaciones de Bonos Garantizados del ELA y los Préstamos del BGF a la ACT que pretenden hacer valer derechos a recibir ingresos asignados históricamente de forma condicional a ADCC, ACT, AMA, y AFI, según corresponda [303]

- Disputas relativas a la validez, idoneidad, situación de garantía y derechos relacionados pertinentes de los Préstamos del BGF a la ACT.

- Disputas planteadas en el litigio del SRE, las Acciones de recuperación del SRE y la Acción de expropiaciones del SRE.[304]

- Disputas entre el ELA y AEP con respecto a (i) el Litigio de AEP, (ii) el monto de la Reclamación de Alquiler, de haberlo, y (iii) la titularidad de los Bienes de la AEP y las reclamaciones que AEP puede hacer valer contra el ELA de conformidad con arrendamientos, acuerdos y el derecho aplicable[305]

- Las mociones de levantamiento de paralización y las acciones de recuperación relativas a las Reclamaciones del ELA/Centro de convenciones, las Reclamaciones del ELA/ACT y las Reclamaciones del ELA/Impuesto al ron de AEFPR (solamente relacionadas con Assured y National)[306]

- El Litigio de los BAN de la AFI[307]

---

[300] Consulte la sección III.B.1.a) de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[301] Consulte la sección V.H.7.b) de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[302] Consulte la sección III.B.1.a) de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[303] Consulte la sección .VF.5 de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

[304] Consulte las secciones III.B.1.b), V.H.1 y V.H.6 de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

[305] Consulte la sección **Error! Reference source not found.**(ii) de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[306] Consulte las secciones V.E.4.e), V.E.4.f), V.E.4.g, V.E.4.h y V.F.5 de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

[307] Consulte la sección V.H.7 de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

2.        **Asignación de reclamaciones de bonos**

Para fines de confirmación y consumación del Plan, y las distribuciones a realizarse conforme al Plan, en la Fecha de Entrada en vigencia, se permitirán o disputarán las siguientes reclamaciones por los siguientes montos:[308]

- Se permitirán las Reclamaciones de Bonos AEP Vintage, las Reclamaciones de Bonos AEP Vintage (Assured), las Reclamaciones de Bonos AEP Vintage (National), las Reclamaciones de Bonos AEP Vintage (Otros asegurados) y las Reclamaciones de Bonos AEP Vintage (Syncora) por el monto total de $2,661,239,877.05

- Se permitirán las Reclamaciones de Bonos AEP 2011 por el monto total de $1,335,422,892.78

- Se permitirán las Reclamaciones de Bonos AEP 2012 por el monto total de $674,308,470.06

- Se permitirán las Reclamaciones de Bonos ELA Vintage, las Reclamaciones de Bonos ELA Vintage (Assured), las Reclamaciones de Bonos ELA Vintage (National), las Reclamaciones de Bonos ELA Vintage (Otros asegurados) y las Reclamaciones de Bonos ELA Vintage (Syncora) por el monto total de $5,843,252,912.91

- Se admitirán las Reclamaciones de Bonos SRE por el monto total de $3,168,698,776.55

- Se permitirán las Reclamaciones de Bonos ELA 2011 y las Reclamaciones de Bonos ELA 2011 (Assured) por el monto total de $498,325.06

- Se permitirán las Reclamaciones de Bonos ELA 2011 Serie D/E/PIB y las Reclamaciones de Bonos ELA 2011 Serie D/E/PIB (Assured) por el monto total de $645,673,111.48

- Se permitirán las Reclamaciones de Bonos ELA 2012 y las Reclamaciones de Bonos ELA 2012 (Assured) por el monto de $2,934,427,459.40

- Se permitirán las Reclamaciones de Bonos 2014 del ELA por el monto de $3,836,611,111.11

- Se permitirán las Reclamaciones de Bonos 2014 del ELA Garantizados por el monto de $346,242,219.86

3.        **Relevos, interdictos y exculpación**

Los relevos, interdictos y exculpación provistos en el Artículo LXXXVIII del Plan forman parte integral de la obtención del valor provisto conforme a las transacciones del Plan. Los relevos, interdictos y exculpación conforme al Plan y los Acuerdos de Soporte al Plan constituyen un componente esencial de los acuerdos mutuos alcanzados y no pueden separarse de las demás disposiciones del Plan.

4.        **Compra y venta de ciertos activos de SRE**

En la Fecha de Entrada en vigencia, el ELA adquirirá todo el derecho, título e interés de SRE sobre los activos de SRE, sujeto a un gravamen válido y perfeccionado o interés de garantía por un precio de compra total por un monto equivalente a la suma de $373,000,000.00, y de acuerdo con los términos y cláusulas de la Sección

---

[308] Los montos a continuación incluyen el capital y los intereses devengados e impagados hasta la Fecha de, entre otros, la Petición del ELA, la Petición de ACT, la Petición de SRE o la Petición de la AEP, según corresponda.

66.2 del Plan, (i) al ELA se le ofrecerá una opción de compra de la Cartera de inversiones del SRE o de las participaciones en el Fideicomiso del SRE, y (ii) si el ELA declina ejercitar dicha opción, de conformidad con la Elección del bonistas, los bonistas del SRE tendrán la opción de comprar la Cartera de inversiones del SRE o las participaciones en el Fideicomiso del SRE, según proceda, por $70,500,000.00, más aquella cantidad que pudiese ser necesaria para reembolsar al ELA cualesquiera mermas en relación con la Cartera de inversiones del SRE, y (iii) si no se ejercita la Elección de los bonistas, el ELA adquirirá la Cartera de inversiones del SRE por $70,750,000.00.

**D.**   **Disposiciones para el pago de reclamaciones de gastos administrativos**

Las Reclamaciones de Gastos Administrativos y Reclamaciones Profesionales no están clasificadas y por lo tanto se excluyen de las clases estipuladas en el Artículo IV del Plan.

1.   **Reclamaciones de gastos administrativos**

En la Fecha de Entrada en vigencia o en la fecha en que una Reclamación de Gastos Administrativos se convierte en una reclamación permitida, lo que ocurra más tarde, los Deudores pagarán en su totalidad la Reclamación de Gastos Administrativos o satisfarán la Reclamación de Gastos Administrativos Permitida con un acuerdo entre los Deudores y el reclamante. Sin embargo, si la Reclamación de Gastos Administrativos Permitida fuera incurrida en el curso ordinario por los Deudores antes de la Fecha de Entrada en vigencia, la reclamación se pagará en su totalidad y será ejecutada por los Deudores de acuerdo con los términos de cualquier acuerdo o documentos que rijan las transacciones. Además, si cualquier gasto en el curso ordinario no se factura, o si no se hace una solicitud por escrito de pago, dentro de ciento cincuenta (150) días después de la Fecha de Entrada en vigencia, el gasto del curso ordinario será prohibido y el tenedor de la reclamación no tendrá derecho a recibir pago por el gasto.

2.   **Reclamaciones de compensación profesional y reembolsos**

Todas las entidades a las que se les adjudican compensaciones o reembolsos recibirán el pago por el monto total permitido por el Tribunal del Título III ni bien resulte razonablemente factible en (i) la Fecha de Entrada en vigencia y (ii) la fecha de la Orden Final del Tribunal que permita las reclamaciones o bajo términos mutuamente acordados, lo que ocurra más tarde. Sin embargo, para calificar para el reembolso, cada profesional debe presentar una solicitud para ser compensado por los servicios profesionales prestados y los gastos cobrados dentro de los 120 días después de la Fecha de Entrada en vigencia. Los Deudores pagarán compensación por servicios profesionales y reembolso de gastos incurridos después de la Fecha de Entrada en vigencia en el curso ordinario y sin la necesidad de la aprobación del Tribunal del Título III.

3.   **Costos de consumación de GO/AEP**

Con el fin de compensar a ciertas partes por el costo de la negociación, confirmación y consumación del AAP y el Plan, el Acreedor Inicial de AAP tendrá derecho a recibir una participación prorrateada en efectivo, bajo la forma de una Reclamación de Gastos Administrativos Permitida, por un monto equivalente al 1.50% del monto total de las Reclamaciones de Bonos de AEP, Reclamaciones de Bonos del ELA y Reclamaciones de Bonos del ELA Garantizados (asegurados o de otro modo), sin duplicación. La participación prorrateada de dicho tenedor se basará en la posición respectiva del tenedor a las 5:00 p.m. (hora del Este de EE.UU.) el 22 de febrero de 2021.

4.   **Honorarios profesionales de AFSCME**

En la Fecha de Entrada en vigencia, se reembolsarán a AFSCME sus honorarios profesionales razonables y gastos incurridos para compensar a AFSCME por el costo de la negociación, confirmación y consumación del Pliego de Términos de AFSCME y el Plan, y la resolución de cuestiones correspondientes a

pensiones. El reembolso se producirá en la Fecha de Entrada en vigencia y se tratará como una reclamación de gastos administrativos permitida.

5.    **Derechos de restricción de GO/AEP del AAP**

A cambio de la firma y presentación del AAP (o el Acuerdo de Litisconsorcio o el Acuerdo Anexo, según corresponda) y de acordar todos los términos y condiciones, incluso el acuerdo de "lock-up" de sus bonos, cada uno de los Acreedores del Derecho de Restricción de AAP tendrá derecho a recibir el Derecho de Restricción de AAP en forma de una reclamación de gastos administrativos permitida, pagadera en efectivo, en el momento de la consumación del Plan. El Derecho de Restricción disponible para cada Acreedor de Derechos de Restricción de AAP será igual al Porcentaje del Derecho de Restricción <u>veces</u> el monto total de las Reclamaciones de Bonos de AEP, las Reclamaciones de Bonos del ELA, y las Reclamaciones de Bonos del ELA Garantizados (sin duplicación, y siempre que dichas Reclamaciones tengan seguro Monolínea, exclusivamente en caso de que un Acreedor de Derechos de Restricción de AAP esté autorizado a votar por dicha Reclamación) en poder de y/o garantizado por dicho Acreedor de Derechos de Restricción de AAP al momento de la expiración del Período del Derecho de Restricción de AAP.

Cada Acreedor de Derechos de Restricción de AAP que adquirió Reclamaciones de Bonos AEP, Reclamaciones de Bonos del ELA o Reclamaciones de Bonos del ELA Garantizados (sin duplicación, y siempre que dichas Reclamaciones tengan seguro Monolínea, exclusivamente en caso de que un Acreedor de Derechos de Restricción de AAP esté autorizado a votar por dicha Reclamación de acuerdo con la Sección 301(c)(3) de la ley PROMESA, documentos de seguro definitivo y el derecho aplicable) después de la Fecha de Vencimiento del Litisconsorcio tendrá derecho a recibir dicho Derecho de Restricción de AAP equivalente a: el Porcentaje del Derecho de Restricción <u>multiplicado por</u> el monto total de Reclamaciones de Bonos del ELA, Reclamaciones de Bonos AEP o Reclamaciones de Bonos del ELA Garantizados (sin duplicación, y siempre que dichas Reclamaciones tengan seguro Monolínea, exclusivamente en caso de que un Acreedor de Derechos de Restricción de AAP esté autorizado a votar por dicha Reclamación de acuerdo con la Sección 301(c)(3) de la ley PROMESA, documentos de seguro definitivo y el derecho aplicable) en poder de dicho Acreedor de Derechos de Restricción de AAP, al producirse el Umbral de AAP o el registro de la Orden de Confirmación, lo que ocurra primero.

Si un Acreedor de Derechos de Restricción de AAP vendió cualquier Reclamación de Bonos AEP, Reclamación de Bonos del ELA o Reclamación de Bonos del ELA Garantizados (sin duplicación, y siempre que dichas Reclamaciones tengan seguro Monolínea, exclusivamente en caso de que un Acreedor de Derechos de Restricción de AAP esté autorizado a votar por dicha Reclamación de acuerdo con la Sección 301(c)(3) de la ley PROMESA, documentos de seguro definitivo y el derecho aplicable) por la cual hubiera tenido derecho a recibir un Derecho de Restricción de AAP, la parte compradora tendrá derecho a recibir el Derecho de Restricción de AAP por cuenta de dichos bonos vendidos.

El Derecho de Restricción de AAP total y los Costos de Consumación no pueden superar los $350,000,000.00

Si el AAP se rescinde a tenor con las Secciones 7.1(b)(iii) (sujeto a prórroga, 7.1(c)(i), o 7.1(c)(ii) del AAP o si la Junta de Supervisión rescinde el AAP por cualquier motivo (que no sea (i) un incumplimiento del AAP por una Parte No Gubernamental, o (ii) la denegación de la confirmación del Plan (o si el Tribunal del Título III decide o declara que no confirmará el Plan en ausencia de una modificación que tuviese efectos sustancialmente adversos para las posibilidades de la Junta de Supervisión o para los Acreedores de GO/AEP del AAP de consumar el Plan en condiciones congruentes con el AAP) (iii) que la Nueva Legislación de Bonos GO, la Legislación del CVI y la Ley de Responsabilidad de la Deuda no se aprueben antes del comienzo de la Vista de Confirmación, o (iv) del registro de una orden con respecto a uno o más asuntos establecidos en la Sección 7.1(b)(ii) del AAP), el Derecho de Restricción de AAP total y los Costos de Consumación de hasta

$100,000,000.00 se pagarán, proporcionalmente, en efectivo, como reclamación de gasto administrativo permitida conforme al plan de ajuste para el ELA a los Acreedores del AAP Inicial a la fecha de finalización.

En todas las demás circunstancias, al rescindirse el AAP, ningún Costo de consumación u Derecho de Restricción de AAP será pagadero a la parte que rescinde el AAP.

6.   Honorarios de apoyo al minorista

Si una Clase de Inversionistas Minoristas (Clases 6, 8, 10, 15, 28, 35, 38 y 44) vota para aceptar al Plan, los miembros de dicha Clase tendrán derecho a recibir su participación prorrateada de la participación asignable de dicha Clase del Derecho de Apoyo al Minorista de hasta $50,000,000.00 por el monto equivalente a: el Porcentaje del Derecho de Restricción veces el monto total de Reclamaciones de Bonos del ELA Minoristas y Reclamaciones de Bonos AEP Minoristas (sin duplicación, y siempre que dichas Reclamaciones tengan seguro Monolínea, exclusivamente en caso de que un Inversionista Minorista esté autorizado a votar por dicha Reclamación de acuerdo con la Sección 301(c)(3) de la ley PROMESA, los documentos de seguro definitivo y el derecho aplicable) y, en la medida en que dichas Reclamaciones tengan seguro Monolínea, únicamente en caso de que un Inversionista Minorista esté autorizado a votar por dicha Reclamación, de acuerdo con los documentos de emisión final y el derecho aplicable en poder de dicha Clase de Inversionistas Minoristas aceptante.

**Si el monto total de $50,000,000.00 del Honorario de Apoyo al Minorista no se asigna en su totalidad, el balance del Honorario de Apoyo al Minorista se reasignará a los Acreedores de Derechos de Restricción de AAP y aquellos Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.**

7.   Derechos de restricción del SRE

Como contraprestación por la ejecución y otorgamiento de la Estipulación del SRE, y de aceptar todos sus términos y condiciones, incluyendo el "bloqueo" de los Bonos SRE de conformidad con los términos de la Estipulación del SRE, cada bonista del SRE que sea parte de la Estipulación del SRE tendrá derecho a percibir, sin compensaciones ni deducciones de impuestos, su participación proporcional (basada en las Reclamaciones de Bonos SRE permitidas netas mantenidas a 2 de abril de 2021) en la cuantía de $75,000,000.00.

8.   Costos de consumación de la ADCC

Con el objeto de compensar a ciertas partes por los costos de negociación, confirmación y consumación del AAP de ACT/ADCC y del Plan, cada Acreedor del AAP inicial de ACT/ADCC, en la medida en que sea tenedor o asegurador de bonos de ADCC, tendrá derecho a percibir, en la Fecha de entrada en vigencia o en cuanto resulte viable, aunque en ningún caso más de 10 días laborables tras la Fecha de entrada en vigencia, un importe equivalente al 1.00% de las Reclamaciones de bonos de ADCC de Acreedores del AAP inicial de ACT/ADCC, a pagar en concepto de reclamación de gastos administrativos, por un importe total no superior a los $15,000,000.00.

9.   Derechos de restricción de la ADCC

Como contraprestación por la ejecución del AAP de ACT/ADCC y por aceptar todos sus términos y condiciones, incluyendo el acuerdo para "bloquear" sus bonos de conformidad con el

AAP de ACT/ADCC, con sujeción a la opinión de la Orden de confirmación, cada acreedor de derechos de restricción de la ADCC que mantenga o garantice Bonos ADCC (incluyendo (i) un tenedor de bonos ADCC asegurado por una Monolínea (salvo los Bonos ADCC asegurados por las aseguradoras monolínea garantizados por Assured o National, según proceda), en la medida en que dicho acreedor de derechos de restricción de ADCC esté autorizado para votar la reclamación con respecto a los Bonos ADCC garantizados por las aseguradoras monolínea, de conformidad con la Sección 301(c)(3) de PROMESA, con la documentación de aseguramiento definitiva y con la legislación aplicable, y que (ii) Assured y National, en la medida en que Assured o National, según proceda, esté autorizada para votar dichas Reclamaciones de Bonos ADCC garantizados de conformidad con la Sección 301(c)(3) de PROMESA, con la documentación de aseguramiento definitiva y con la legislación aplicable) tendrá derecho a percibir los Derechos de restricción de ADCC en forma de reclamación de gastos administrativos permitida, a abonar en efectivo, en el momento de la consumación del Plan, por una cuantía equivalente al Porcentaje de los derechos de restricción de ADCC multiplicado por el importe global de las Reclamaciones de Bonos ADCC (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por las aseguradoras monolínea, solo en la medida en que el Acreedor de los derechos de restricción de ADCC esté autorizado para votar dicha reclamación de conformidad con la Sección 301(c)(3) de PROMESA, con la documentación de aseguramiento definitiva y con la legislación aplicable) mantenida o, en el caso de Assured o National, mantenida o asegurada, por dicho Acreedor de derechos de restricción de ADCC al extinguirse el Período de derechos de restricción del AAP de ACT/ADCC.

Cada Acreedor de derechos de restricción de ADCC que adquiera Bonos ADCC tras agotarse el plazo del Litisconsorcio (incluyendo (i) un tenedor de Bonos ADCC asegurados por las aseguradoras monolínea (salvo los Bonos ADCC asegurados por las aseguradoras monolínea garantizados por Assured o por National, según proceda), en la medida en que dicho Acreedor de derechos de restricción de ADCC esté autorizado para votar la reclamación con respecto a dichos Bonos ADCC asegurados por las aseguradoras monolínea, de conformidad con la Sección 301(c)(3) de PROMESA, con la documentación de aseguramiento definitiva y con la legislación aplicable, y (ii) Assured y National en la medida en que Assured o National, según corresponda, esté autorizada a votar dichas Reclamaciones de Bonos ADCC asegurados de conformidad con la Sección 301(c)(3) de PROMESA, con la documentación de aseguramiento definitiva y con la legislación aplicable), tendrá derecho a percibir aquellos Derechos de restricción de ADCC equivalentes al porcentaje de los derechos de restricción de ADCC multiplicado por el importe global de las Reclamaciones de Bonos ADCC (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por las aseguradoras monolínea, solamente en la medida en que un Acreedor de AAP esté autorizado para votar dicha reclamación de conformidad con la Sección 301(c)(3) de PROMESA, con la documentación de aseguramiento definitiva y con la legislación aplicable) mantenidos por dicho Acreedor de derechos de restricción de ADCC al alcanzarse el umbral del AAP de ACT/ADCC o en el momento de dictarse la Orden de confirmación, lo que antes se produzca.

Si un Acreedor de derechos de restricción de ADCC vendiese Bonos ADCC en concepto de los cuales hubiese tenido derecho a percibir los Derechos de restricción de ADCC, la parte compradora no tendrá derecho a percibir los Derechos de restricción de ADCC, derecho que mantendrá la parte vendedora.

Bajo ninguna circunstancia la suma de los Derechos de restricción del AAP más los Costos de consumación atribuibles a las reclamaciones de tenedores de Bonos ADCC excederá de los $15,000,000.00.

En caso de resolución del AAP de ACT/ADCC de conformidad con la Sección 7.1 del mismo, no serán exigibles ni pagadores Costos de consumación ni Derechos de restricción de ADCC a un tenedor de Bonos ADCC o asegurado con respecto a Reclamaciones de Bonos ADCC.

10.  **Sin divisibilidad**

La asignación y el pago de los Costos de consumación y los Derechos de Restricción de AAP dispuestos en el Plan compensan a los Acreedor de Derechos de Restricción de AAP por el valor recibido y constituyen un componente esencial de los acuerdos mutuos y transacciones incorporados al Plan y no son divisibles de los demás términos y disposiciones estipulados en el Plan.

E.  **Clasificación y tratamiento de las reclamaciones**

| Clase 1:<br><br>Reclamaciones de Bonos AEP Vintage | *Clasificación:*  La Clase 1 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos Vintage de AEP que (a) <u>no</u> son asegurados por Ambac, Assured, FGIC, National o Syncora, y (b) <u>no</u> están en poder de un Inversionista Minorista[309] por el monto total igual a o menor que $1,000,000.00.<br><br>Los Bonos Vintage de AEP incluyen lo siguiente: |
|---|---|

| | Fecha de emisión |
|---|---|
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie C | 30/01/2002 |
| Bonos de ingresos de instalaciones del Gobierno, Serie D | 30/01/2002 |
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie F | 24/10/2002 |
| Bonos de ingresos de instalaciones del Gobierno, Serie G | 24/10/2002 |
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie H | 03/04/2003 |
| Bonos de ingresos de instalaciones del Gobierno, Serie I | 10/06/2004 |
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie K | 27/05/2004 |
| Bonos de ingresos de instalaciones del Gobierno, Serie I | 01/06/1993 |
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie M-1 | 20/12/2007 |
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie M-2 | 20/12/2007 |

---

[309] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

| | | |
|---|---|---|
| | Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie M-3 | 20/12/2007 |
| | Bonos de ingresos de instalaciones del Gobierno, Serie N | 20/12/2007 |
| | Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie P | 01/07/2009 |
| | Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie Q | 28/10/2009 |

*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage de AEP recibirá su Participación Prorrateada del Recobro de Bonos Vintage de AEP,[310] que consiste en $611,331,186.05 en efectivo.

*Votación*: La Clase 1 está afectada por el Plan. La Clase 1 y cada tenedor de una Reclamación de Bonos Vintage de AEP Permitida tienen derecho a votar por la aceptación o rechazo del Plan.

*Montos permitidos de reclamaciones*: $2,049,817,786.66[311]

*Recobros proyectados de AEP*: 23.0%

El recobro total por cuenta tanto de (i) una Reclamación de Bonos AEP Vintage Permitida, como de (ii) una Reclamación de Bonos Garantizados ELA Vintage, o una Reclamación de Bonos Garantizados ELA Vintage Permitida (Elección Tributable), según corresponda, es de aproximadamente el 80.4%

---

**Clase 2:**

Reclamaciones de Bonos AEP Vintage (Assured)

*Clasificación: La* Clase 2 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos Vintage de AEP, de los cuales el pago de capital e intereses ha sido asegurado por Assured, incluso a tenor con una póliza de seguro del mercado secundario.

*Tratamiento:* Con sujeción a los términos y condiciones de la Sección 71.1 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage de AEP (Assured) Permitida tendrá derecho a percibir su Participación Prorrateada del Recobro de Bonos Vintage de AEP,[312] que consiste en $611,331,186.05 en efectivo.

---

[310] El Recobro de Bonos Vintage de AEP se comparte entre las Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National), Reclamaciones de Bonos Vintage de AEP (Otros asegurados), Reclamaciones de Bonos Vintage de AEP (Syncora) y Reclamaciones de Bonos Vintage de AEP Minoristas.

[311] Incluye Reclamaciones de Bonos Vintage de AEP Minoristas.

[312] El Recobro de Bonos Vintage de AEP se comparte entre las Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National), Reclamaciones de Bonos Vintage de AEP (Otros asegurados), Reclamaciones de Bonos Vintage de AEP (Syncora) y Reclamaciones de Bonos Vintage de AEP Minoristas.

| | *Votación*: La Clase 2 está afectada por el Plan. Tiene derecho a votar por aceptar o rechazar el Plan por cuenta de las Reclamaciones de Bonos AEP Vintage Permitida (Assured). |
|---|---|
| | *Montos permitidos de reclamaciones*: $ 207,035,580.89 |
| | *Recobros proyectados de AEP*: 23.0% |
| | El recobro total del ELA y AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (Assured) y una Reclamación de Bonos Vintage del ELA Garantizados (Assured) Permitida, es de aproximadamente el 80.4% |

| | |
|---|---|
| **Clase 3:**<br><br>Reclamaciones de Bonos AEP Vintage (National) | ***Clasificación: La*** Clase 3 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos Vintage de AEP, de los cuales el pago de capital e intereses ha sido asegurado por National.<br><br>***Elección de distribución****: Los tenedores de Reclamaciones de Bonos Vintage de AEP Permitidas (National) pueden elegir recibir en plena satisfacción, liberación y canje de dicha Reclamación y sus derechos bajo la Póliza de Seguro de National aplicable, (1) el Tratamiento de Conmutación de National o (2) el Tratamiento de No Conmutación de National.<br><br>***Tratamiento:*** Con sujeción a los términos y condiciones de la Sección 71.2 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage de AEP (National) Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage de AEP,[313] que consiste en $611,331,186.05 en efectivo.<br><br>***Votación****: La Clase 3 está afectada por el Plan. National tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage de AEP (National) Permitidas.<br><br>***Montos permitidos de reclamaciones****: $218,888,864.87<br><br>***Recobros proyectados de AEP***: 23.0%<br><br>El recobro total con cargo al ELA y a AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (National) y una Reclamación de Bonos Vintage del ELA Garantizados (National) Permitida, es de aproximadamente el 80.4% |
| **Clase 4:**<br><br>Reclamaciones de Bonos AEP Vintage (Otros asegurados) | ***Clasificación: La*** Clase 4 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos Vintage de AEP, de los cuales el pago de capital e intereses ha sido asegurado por Ambac o FGIC.<br><br>***Tratamiento:*** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage de AEP (Otros asegurados) Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage de AEP,[314] que consiste en $611,331,186.05 en efectivo. |

---

[313] El Recobro de Bonos Vintage de AEP se comparte entre las Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National), Reclamaciones de Bonos Vintage de AEP (Otros asegurados), Reclamaciones de Bonos Vintage de AEP (Syncora) y Reclamaciones de Bonos Vintage de AEP Minoristas.

[314] El Recobro de Bonos Vintage de AEP se comparte entre las Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National), Reclamaciones de Bonos Vintage de AEP (Otros asegurados) y Reclamaciones de Bonos Vintage de AEP Minoristas.

| | |
|---|---|
| | *Votación*: La Clase 4 está afectada por el Plan.  La Clase 4 y cada tenedor de una Reclamación de Bonos Vintage de AEP (Otros asegurados) Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: $166,398,746.29<br><br>*Recobros proyectados de AEP*:  23.0%<br><br> El recobro total con cargo al ELA y a AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (Otros asegurados) y una Reclamación de Bonos Vintage del ELA Garantizados Permitida (Otros asegurados), es de aproximadamente el 80.4% |
| **Clase 5:**<br><br>Reclamaciones de Bonos Vintage de AEP (Syncora) | *Clasificación: La* Clase 5 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos Vintage de AEP, de los cuales el pago de capital e intereses ha sido asegurado por Syncora.<br><br>*Elección de distribución*:  Los tenedores de Reclamaciones de Bonos Vintage de AEP Permitidas (Syncora) pueden elegir recibir en plena satisfacción, liberación y canje de dicha Reclamación y sus derechos bajo la Póliza de Seguro de Syncora aplicable, (1) el Tratamiento de Conmutación de Syncora o (2) el Tratamiento de No Conmutación de Syncora.<br><br>*Tratamiento:*  Con sujeción a los términos y condiciones de la Sección 71.3 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage de AEP (Syncora) Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage de AEP,[315] que consiste en $611,331,186.05 en efectivo.<br><br>*Votación*: La Clase 5 está afectada por el Plan. Syncora tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage de AEP (Syncora) permitidas.<br><br>*Montos permitidos de reclamaciones*: $19,098,898.35<br><br>*Recobros proyectados de AEP*: 23.0%. El recobro total con cargo al ELA y a AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (Syncora) y una Reclamación de Bonos Vintage del ELA Garantizados (Syncora) Permitida, es de aproximadamente el 80.4% |

---

[315] El  Recobro de Bonos  Vintage de AEP se comparte entre las Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National), Reclamaciones de Bonos Vintage de AEP (Otros asegurados), Reclamaciones de Bonos Vintage de AEP (Syncora) y Reclamaciones de Bonos Vintage de AEP Minoristas.

| Clase 6:<br><br>Reclamaciones de Bonos AEP Vintage minoristas | **Clasificación:** La Clase 6 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos Vintage de AEP en poder de un Inversionista Minorista[316] por el monto total igual a o menor que $1,000,000.00.<br><br>**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage de AEP Permitida recibirá su Participación Prorrateada de (a) el Recobro de Bonos Vintage de AEP,[317] que consiste en $611,331,186.05 en efectivo, y (b) el Honorario de Apoyo al Minorista,[318] que consiste en $50,000,000.00 en efectivo.<br><br>Si la Clase 6 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos Vintage de AEP Minoristas de la Clase 6 no recibirán el Honorario de Apoyo al Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>**Votación**: La Clase 6 está afectada por el Plan.  La Clase 6 y cada tenedor de una Reclamación de Bonos de AEP Minorista Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>**Montos permitidos de reclamaciones**: (Monto incluido en las Reclamaciones de Bonos Vintage de AEP)<br><br>**Recobros proyectados de AEP**: 23.0% .[319]  El recobro total por cuenta tanto de (i) una Reclamación de Bonos AEP Vintage Minorista como de (ii) una Reclamación de Bonos Garantizados ELA Vintage Permitida o (y) una Reclamación de Bonos Garantizados ELA Vintage Permitida (Elección Tributable), según corresponda, es de aproximadamente el 80.4% |

---

[316] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[317] El Recobro de Bonos Vintage de AEP se comparte entre las Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National), Reclamaciones de Bonos Vintage de AEP (Otros asegurados), Reclamaciones de Bonos Vintage de AEP (Syncora) y Reclamaciones de Bonos Vintage de AEP Minoristas.

[318] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP 2011 Minoristas, las Reclamaciones de Bonos AEP 2012 Minoristas, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA 2011 Minoristas, las Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas y las Reclamaciones de Bonos ELA 2012 Minoristas, siempre que la Clase para dichas Reclamaciones vote por aceptar el Plan.

[319] No se tiene en cuenta el Honorario de Apoyo al Minorista.

| Clase 7: Reclamaciones de Bonos AEP 2011 | **Clasificación:** La Clase 7 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos 2011 de AEP que <u>no</u> están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00. |
|---|---|

Los Bonos 2011 de AEP incluyen lo siguiente:

|  | Fecha de emisión |
|---|---|
| Bonos de ingresos de instalaciones del Gobierno, Serie R | 24/08/2011 |
| Bonos de ingresos de instalaciones del Gobierno, Serie S | 24/08/2011 |
| Bonos de ingresos de instalaciones del Gobierno, Serie T | 22/12/2011 |

**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 de AEP Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2011 de AEP,[320] que consiste en $306,768,911.72 en efectivo.

**Votación**: La Clase 7 está afectada por el Plan. La Clase 7 y cada tenedor de una Reclamación de Bonos 2011 de AEP Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.

**Montos permitidos de reclamaciones**: $1,335,422,892.78

**Recobros proyectados de AEP**: 23.0% El recobro total por cuenta tanto de (i) una Reclamación de Bonos AEP 2011 Minorista como de (ii) una Reclamación de Bonos Garantizados ELA 2011 Permitida o (y) una Reclamación de Bonos Garantizados ELA 2011 Permitida (Elección Tributable), según corresponda, es de aproximadamente el 79.6%

| Clase 8: Reclamaciones de Bonos AEP 2011 minoristas | **Clasificación:** La Clase 8 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos 2011 de AEP en poder de un Inversionista Minorista[321] por el monto total igual a o menor que $1,000,000.00.

**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 de AEP Permitida recibirá su Participación Prorrateada de (a) el Recobro de Bonos 2011 de AEP,[322] que consiste en |
|---|---|

---

[320] El Recobro de Bonos 2011 de AEP se comparte entre las Reclamaciones de Bonos 2011 de AEP y las Reclamaciones de Bonos 2011 de AEP Minoristas.

[321] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[322] El Recobro de Bonos 2011 de AEP se comparte entre las Reclamaciones de Bonos 2011 de AEP y las Reclamaciones de Bonos 2011 de AEP Minoristas.

|  | $306,768,911.72 en efectivo, y (b) el Honorario de Apoyo al Minorista,[323] que consiste en $50,000,000.00 en efectivo.<br><br>Si la Clase 8 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos 2011 de AEP Minoristas de la Clase 8 no recibirán el Honorario de Apoyo al Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>*Votación*: La Clase 8 está afectada por el Plan.  La Clase 8 y cada tenedor de una Reclamación de Bonos 2011 de AEP Minoristas Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: (Monto incluido en las Reclamaciones de Bonos 2011 de AEP)<br><br>*Recobros proyectados de AEP*: 23.0%.[324]  El recobro total por cuenta tanto de (i) una Reclamación de Bonos AEP 2011 Minorista como de (ii) una Reclamación de Bonos Garantizados ELA 2011 Permitida o de una Reclamación de Bonos Garantizados ELA 2011 Permitida (Elección Tributable), según corresponda, es de aproximadamente el 79.6% |
|---|---|
| **Clase 9:**<br><br>Reclamaciones de Bonos AEP 2012 | *Clasificación:*  La Clase 9 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos 2012 de AEP que <u>no</u> están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00.<br><br>Los Bonos 2012 de AEP incluyen lo siguiente:<br><br>*tabla*<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2012 de AEP Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2012 de AEP,[325] que consiste en $154,899,902.23 en efectivo. |

Tabla de Bonos 2012 de AEP:

|  | Fecha de emisión |
|---|---|
| Bonos de refinanciamiento de ingresos de instalaciones del Gobierno, Serie U | 21/06/2012 |

---

[323] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP Minoristas 2011, las Reclamaciones de Bonos AEP Minoristas 2012, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA Minoristas 2011, las Reclamaciones de Bonos Serie D/E/PIB ELA Minoristas 2011 y las Reclamaciones de Bonos ELA Minoristas 2012.

[324] No se tiene en cuenta el Honorario de Apoyo al Minorista.

[325] El Recobro de Bonos 2012 de AEP se comparte entre las Reclamaciones de Bonos 2012 de AEP y las Reclamaciones de Bonos 2012 de AEP Minoristas.

Case:17-03283-LTS   Doc#:16897-1   Filed:06/07/21   Entered:06/07/21 20:17:31   Desc:
Disclosure Statement   Page 385 of 578

| | |
|---|---|
| | ***Votación***: La Clase 9 está afectada por el Plan.  La Clase 9 y cada tenedor de una Reclamación de Bonos 2012 de AEP Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>***Montos permitidos de reclamaciones***: $674,308,470.06<br><br>***Recobros proyectados de AEP***:  23.0%  El recobro total por cuenta de tanto de (i) una Reclamación de Bonos AEP 2012 Minorista como de (ii) una Reclamación de Bonos Garantizados ELA 2012 Permitida y una Reclamación de Bonos Garantizados ELA 2012 Permitida (Elección Tributable), según corresponda, es de aproximadamente el 74.8% |
| **Clase 10:**<br><br>Reclamaciones de Bonos AEP 2012 minoristas | ***Clasificación:***  La Clase 10 consiste en todas las reclamaciones contra AEP por cuenta de los Bonos 2012 de AEP en poder de un Inversionista Minorista[326] por el monto total igual a o menor que $1,000,000.00.<br><br>***Tratamiento:*** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2012 de AEP Permitida recibirá su Participación Prorrateada de (a) el Recobro de Bonos 2012 de AEP,[327] que consiste en $154,899,902.23 en efectivo, y (b) el Honorario de Apoyo al Minorista,[328] que consiste en $50,000,000.00 en efectivo.<br><br>Si la Clase 10 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos 2012 de AEP Minoristas de la Clase 10 no recibirán el Honorario de Apoyo al Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>***Votación***: La Clase 10 está afectada por el Plan.  La Clase 10 y cada tenedor de una Reclamación de Bonos 2012 de AEP Minorista Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>***Montos permitidos de reclamaciones***: (Monto incluido en las Reclamaciones de Bonos 2012 de AEP)<br><br>***Recobros proyectados de AEP***:  23.0%  El recobro total por cuenta tanto de (i) una Reclamación de Bonos AEP 2012 Minorista como de (ii) una Reclamación |

[326] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[327] El Recobro de Bonos 2012 de AEP se comparte entre las Reclamaciones de Bonos 2012 de AEP y las Reclamaciones de Bonos 2012 de AEP Minoristas.

[328] El Honorario de Apoyo al Minorista de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP Minoristas 2011, las Reclamaciones de Bonos AEP Minoristas 2012, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA Minoristas 2011, las Reclamaciones de Bonos Serie D/E/PIB ELA Minoristas 2011 y las Reclamaciones de Bonos ELA Minoristas 2012.

| | |
|---|---|
| | de Bonos Garantizados ELA 2012 Permitida o una Reclamación de Bonos Garantizados ELA 2012 Permitida (Elección Tributable), según corresponda, es de aproximadamente el 74.8% |
| **Clase 11:**<br><br>Reclamaciones garantizadas AEP/ARD | *Clasificación: La* Clase 11 consta de todas las reclamaciones contra AEP por cuenta del préstamo supuestamente hecho por el BGF a AEP, que, a la fecha de Petición de AEP, tenía un monto de capital pendiente de $66,222,028.00, cuyo reembolso se declara garantizado por el producto de la venta o disposición de ciertos Bienes de AEP y subordinado a todos los derechos y recobros con respecto a los Bonos AEP.<br><br>*Tratamiento:* Las Reclamaciones Garantizadas AEP/ARD no recibirán una distribución conforme al Plan.<br><br>*Votación*: La Clase 11 está afectada por el Plan.  Se considera que la Clase 11 y el tenedor de la Reclamación Garantizada AEP/ARD han rechazado el Plan.<br><br>*Montos permitidos de reclamaciones*: $66,222,028.00<br><br>*Recobros proyectados de AEP*: 0% |
| **Clase 12:**<br><br>Reclamaciones de AEP generales no garantizadas | *Clasificación:*  La Clase 12 consiste en todas las reclamaciones contra AEP que no sean Reclamaciones de Bonos Vintage de AEP, Reclamaciones de Bonos Vintage de AEP (Assured), Reclamaciones de Bonos Vintage de AEP (National),  Reclamaciones de Bonos Vintage de AEP (Otros asegurados), Reclamaciones de Bonos Vintage de AEP (Syncora), Reclamaciones de Bonos Vintage de AEP Minoristas, Reclamaciones de Bonos 2011 de AEP, Reclamaciones de Bonos 2011 de AEP Minoristas, Reclamaciones de Bonos 2012 de AEP, Reclamaciones de Bonos 2012  de AEP Minoristas, Reclamaciones Garantizadas AEP/ARD o Reclamaciones de AEP/ARD no garantizadas.<br><br>Las Reclamaciones Generales no Garantizadas de AEP incluyen Reclamaciones en poder de un empleado de AEP relacionadas con cuestiones del curso ordinario del empleo, incluso una reclamación vinculada a despido, feriados, vacaciones, licencia por enfermedad, sueldos atrasados y otras reclamaciones similares, pero no incluyen reclamaciones vinculadas a beneficios de retiro.<br><br>*Tratamiento:*  En la Fecha de Entrada en vigencia, las Reclamaciones Generales no Garantizadas de AEP Permitidas no estarán afectadas, y cada tenedor de una Reclamación General no Garantizada de AEP Permitida tendrá derecho a recibir:<br><br>(a)   replanteamiento de la reclamación, incluso los pagos en efectivo necesarios para satisfacer el requisito de replanteamiento conforme a la sección 1124(2) del Código de Quiebras. |

(b) pago del monto permitido de la reclamación de dicho tenedor, en su totalidad, en efectivo, o ni bien resulte factible después de (1) la Fecha de Entrada en vigencia, (2) la fecha en que dicha Reclamación General no Garantizada de AEP se convierta en permitida, (3) la fecha en que dicha Reclamación General no Garantizada de AEP Permitida pase a ser pagadera de otra manera, y (4) cualquier otra fecha que sea acordada mutuamente por dicho tenedor y AEP Reorganizado, lo que ocurra más tarde, o

(c) cualquier otro tratamiento que pueda ser mutuamente acordado por y entre dicho tenedor y AEP Reorganizado.

*Votación*: La Clase 12 no está Afectada por el Plan. Se considera que la Clase 12 y cada tenedor de una Reclamación General no Garantizada de AEP Permitida han aceptado el Plan.

*Montos permitidos de reclamaciones*: [____]

*Recobros proyectados de AEP*: 100%

| | |
|---|---|
| **Clase 13:**<br><br>Reclamaciones no garantizadas de AEP/ARD | **Clasificación:** La Clase 13 consiste en todas las reclamaciones contra AEP por cuenta de los préstamos subordinados supuestamente hechos por el BGF a AEP, que a la Fecha de la Petición de AEP, eran de un monto de capital pendiente de $134,357,497.00.<br><br>**Tratamiento:** Las Reclamaciones no Garantizadas de AEP/ARD no recibirán una distribución conforme al Plan.<br><br>*Votación*: La Clase 13 está afectada por el Plan. Se considera que la Clase 13 y el tenedor de la Reclamación no Garantizada de AEP/ARD han rechazado el Plan.<br><br>*Montos permitidos de reclamaciones*: $134,357,498.00<br><br>*Recobros proyectados de AEP*: 0% |
| **Clase 14:**<br><br>Reclamaciones de Bonos ELA Vintage | **Clasificación:** La Clase 14 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA Vintage que (a) <u>no</u> son asegurados por Ambac, Assured, FGIC, National o Syncora, y (b) <u>no</u> están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00.<br><br>Los bonos ELA Vintage incluyen lo siguiente:<br><br>

| | Fecha de emisión |
|---|---|
| Bonos para Mejoras Públicas de 1998 | 15/03/1998 |
| Bonos para Mejoras Públicas de 1999 | 01/12/1998 |
| Bonos para Mejoras Públicas de 2001, Serie A | 07/06/2001 |

|

| | | |
|---|---|---|
| | Bonos para Mejoras Públicas de 2002, Serie A | 25/10/2001 |
| | Bonos para Mejoras Públicas de 2003, Serie A | 08/08/2002 |
| | Bonos para Mejoras Públicas de 2004, Serie A | 16/10/2003 |
| | Bonos para Mejoras Públicas de 2005, Serie A | 07/10/2004 |
| | Bonos para Mejoras Públicas de 2006, Serie A | 10/08/2006 |
| | Bonos para Mejoras Públicas de 2006, Serie B | 30/08/2006 |
| | Bonos para Mejoras Públicas de 2007, Serie A | 04/10/2007 |
| | Bonos para Mejoras Públicas de 2008, Serie A | 18/09/2008 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 1998 | 29/01/1998 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 1998 | 01/15/1998 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2000 | 05/04/2000 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2001 | 07/06/2001 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2002A | 25/10/2001 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2003A | 08/08/2002 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2003C-7 | 06/05/2003 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2006A | 23/06/2006 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2006B | 10/08/2006 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A | 16/10/2007 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2007A-4 | 16/10/2007 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2008A | 07/05/2008 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2008C | 07/05/2008 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009A | 17/09/2009 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009B | 17/11/2009 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2009C | 16/12/2009 |
| | Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011A | 17/02/2011 |
| | Notas de Ahorro emitidas por el ELA antes de 2011 por una cuantía total circulante de $242,650,00 en virtud de la Ley Núm. 7 de la Legislatura de Puerto Rico | |

***Tratamiento:*** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA,[329] que

---

[329] El Recobro de Bonos Vintage del ELA se comparte entre las Reclamaciones de Bonos Vintage del ELA, Reclamaciones de Bonos Vintage del ELA (Assured), Reclamaciones de Bonos Vintage del ELA (National),

| | consiste en $1,940,413,572.68 en efectivo, $2,336,226,830.00 en Nuevos CIB de GO, $154,683,070.25 en Nuevos CAB de GO al 5.375%, $100,758,182.95 en Nuevos CAB de GO al 5.0% y 32.244% de CVI de GO.<br><br>**Elección Tributable**: Cada tenedor de una Reclamación de Bonos ELA Vintage Permitida que sea un Inversionista de Puerto Rico[330] puede elegir que su Reclamación de Bonos ELA Vintage Permitida reciba el tratamiento de una Reclamación de Bonos ELA Vintage (Elección Tributable) en la Clase 20 y que se modifique su distribución conforme a la Distribución de Bonos Tributables Vintage Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Recomendamos a los residentes de Puerto Rico leer la sección VIII de la Declaración de divulgación, titulada "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU.: personas físicas y jurídicas de Puerto Rico", que expone algunas importantes limitaciones de esta norma general. .<br><br>**Votación**: La Clase 14 está afectada por el Plan. La Clase 14 y cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>**Montos permitidos de reclamaciones**: $3,495,194,571.99<br><br>**Recobro Proyectado Fijo de ELA – Elección Tributable:** 77.6%<br><br>**Recobro Proyectado Fijo de ELA – Sin Elección Tributable**: 77.6% |
|---|---|
| **Clase 15:**<br><br>Reclamaciones de Bonos ELA Vintage minoristas | **Clasificación:** La Clase 15 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA Vintage en poder de un Inversionista Minorista[331] por el monto total igual a o menor que $1,000,000.00.<br><br>**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida recibirá su |

---

Reclamaciones de Bonos Vintage del ELA (Otros asegurados), Reclamaciones de Bonos Vintage del ELA (Syncora) y Reclamaciones de Bonos Vintage del ELA Minoristas.

[330] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o el único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio). No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[331] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

| | |
|---|---|
| | Participación Prorrateada del (a) Recobro de Bonos Vintage del ELA,[332] que consiste en $1,940,413,572.68 en efectivo, $2,336,226,830.00 en Nuevos CIB de GO, $154,683,070.25 en Nuevos CAB de GO al 5.0% y 32.244% de CVI de GO, y (b) el Honorario de Apoyo al Minorista,[333] que consiste en $50,000,000.00 en efectivo.<br><br>Si la Clase 15 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos ELA Vintage Minoristas de la Clase 15 no recibirán el Honorario de Apoyo Minorista, que se reasignará a los Acreedor de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>*Elección Tributable*: Cada tenedor de una Reclamación de Bonos ELA Vintage Minoristas Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos ELA Vintage Minoristas Permitida reciba el tratamiento de una Reclamación de Bonos ELA Vintage (Elección Tributable) en la Clase 20 y que se modifique su distribución conforme a la Distribución de Bonos Tributables Vintage Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Recomendamos a los residentes de Puerto Rico leer la sección VIII de la Declaración de divulgación, titulada "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU.: personas físicas y jurídicas de Puerto Rico", que expone algunas importantes limitaciones de esta norma general.<br><br>*Votación*: La Clase 15 está afectada por el Plan. La Clase 15 y cada tenedor de una Reclamación de Bonos ELA Minorista Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: (Monto incluido en las Reclamaciones de Bonos ELA Vintage)<br><br>*Recobros fijos proyectados del ELA*: 77.6% |
| **Clase 16:**<br><br>Reclamaciones de Bonos ELA Vintage (Assured) | *Clasificación: La* Clase 16 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos Vintage del ELA que son asegurados por |

---

[332] El Recobro de Bonos Vintage del ELA se comparte entre las Reclamaciones de Bonos Vintage del ELA, Reclamaciones de Bonos Vintage del ELA (Assured), Reclamaciones de Bonos Vintage del ELA (National), Reclamaciones de Bonos Vintage del ELA (Otros asegurados), Reclamaciones de Bonos Vintage del ELA (Syncora) y Reclamaciones de Bonos Vintage del ELA Minoristas.

[333] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP 2011 Minoristas, las Reclamaciones de Bonos AEP 2012 Minoristas, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA 2011 Minoristas, las Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas y las Reclamaciones de Bonos ELA 2012 Minoristas, siempre que la Clase para dichas Reclamaciones vote por aceptar el Plan.

| | |
|---|---|
| | Assured, incluso a tenor con una póliza de seguro del mercado secundario.<br><br>***Tratamiento:*** Con sujeción a los términos y condiciones de la Sección 71.1 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA,[334] que consiste en $1,940,413,572.68 en efectivo, $2,336,226,830.00 en Nuevos CIB de GO, $154,683,070.25 en Nuevos CAB de GO al 5.375%, $100,758,182.95 en Nuevos CAB de GO al 5.0% y 32.244% de CVI de GO.<br><br>***Votación:*** La Clase 16 está afectada por el Plan y tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage de ELA (Assured) Permitidas.<br><br>***Montos permitidos de reclamaciones:*** $1,129,725,670.51<br><br>***Recobros fijos proyectados del ELA:*** 77.6% |
| **Clase 17:**<br><br>Reclamaciones de Bonos ELA Vintage (National) | ***Clasificación: La*** Clase 17 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos Vintage del ELA que son asegurados por National.<br><br>***Elección de distribución:*** Los tenedores de Reclamaciones de Bonos Vintage del ELA Permitidas (National) pueden elegir recibir en plena satisfacción, liberación y canje de dicha Reclamación y sus derechos bajo la Póliza de Seguro de National aplicable, (1) el Tratamiento de Conmutación de National o (2) el Tratamiento de No Conmutación de National.<br><br>***Tratamiento:*** Con sujeción a los términos y condiciones de la Sección 71.2 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA,[335] que consiste en $1,940,413,572.68 en efectivo, $2,336,226,830.00 en Nuevos CIB de GO, $154,683,070.25 en Nuevos CAB de GO al 5.375%, $100,758,182.75 en Nuevos CAB de GO al 5.0% y 32.235% de CVI de GO. |

---

[334] El Recobro de Bonos Vintage del ELA se comparte entre las Reclamaciones de Bonos Vintage del ELA, Reclamaciones de Bonos Vintage del ELA (Assured), Reclamaciones de Bonos Vintage del ELA (National), Reclamaciones de Bonos Vintage del ELA (Otros asegurados), Reclamaciones de Bonos Vintage del ELA (Syncora).

[335] El Recobro de Bonos Vintage del ELA se comparte entre las Reclamaciones de Bonos Vintage del ELA, Reclamaciones de Bonos Vintage del ELA (Assured), Reclamaciones de Bonos Vintage del ELA (National), Reclamaciones de Bonos Vintage del ELA (Otros asegurados), Reclamaciones de Bonos Vintage del ELA (Syncora).

| | |
|---|---|
| | *Votación*: La Clase 17 está afectada por el Plan. National tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage de ELA (National) Permitidas.<br><br>*Montos permitidos de reclamaciones*: $897,708,496.22<br><br>*Recobros fijos proyectados del ELA*: 77.6% |
| **Clase 18:**<br>Reclamaciones de Bonos ELA Vintage (Otros asegurados) | *Clasificación: La* Clase 18 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos Vintage del ELA que son asegurados por Ambac o FGIC.<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida (Otros asegurados) recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA,[336] que consiste en $1,940,413,572.68 en efectivo, $2,336,226,830.00 en Nuevos CIB de GO, $154,683,070.25 en Nuevos CAB de GO al 5.375%, $100,758,182.95 en Nuevos CAB de GO al 5.0% y 32.244% de CVI de GO.<br><br>*Votación*: La Clase 18 está afectada por el Plan. La Clase 18 y cada tenedor de una Reclamación de Bonos Vintage de ELA (Otros asegurados) Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: $293,269,428.20<br><br>*Recobros fijos proyectados del ELA:* 77.6% |
| **Clase 19:**<br>Reclamaciones de Bonos ELA Vintage (Syncora) | *Clasificación: La* Clase 19 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos Vintage del ELA que son asegurados por Syncora.<br><br>*Elección de distribución*: Los tenedores de Reclamaciones de Bonos Vintage del ELA Permitidas (Syncora) pueden elegir recibir en plena satisfacción, liberación y canje de dicha Reclamación y sus derechos bajo la Póliza de Seguro de Syncora aplicable, (1) el Tratamiento de Conmutación de Syncora o (2) el Tratamiento de No Conmutación de Syncora.<br><br>*Tratamiento:* Con sujeción a los términos y condiciones de la Sección 71.3 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Permitida (Syncora) recibirá su |

---

[336] El Recobro de Bonos Vintage del ELA se comparte entre las Reclamaciones de Bonos Vintage del ELA, Reclamaciones de Bonos Vintage del ELA (Assured), Reclamaciones de Bonos Vintage del ELA (National), Reclamaciones de Bonos Vintage del ELA (Otros asegurados), Reclamaciones de Bonos Vintage del ELA (Syncora).

| | Participación Prorrateada del Recobro de Bonos Vintage del ELA,[337] que consiste en $1,940,413,572.68 en efectivo, $2,336,226,830.00 en Nuevos CIB de GO, $154,683,070.25 en Nuevos CAB de GO al 5.375%, $100,758,182.95 en Nuevos CAB de GO al 5.0% y 32.244% de CVI de GO.

*Votación*: La Clase 19 está afectada por el Plan. Syncora tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage del ELA (Syncora) Permitidas.

***Montos permitidos de reclamaciones***: $27,354,745,97

***Recobros fijos proyectados del ELA***: 77.6% |
|---|---|
| **Clase 20:**<br><br>Reclamos de Bonos ELA Vintage (elección tributable) | *Clasificación:* La Clase 20 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos ELA Vintage o una Reclamación de Bonos ELA Vintage Minoristas Permitida que elige, se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.

Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos ELA Garantizados superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos ELA Vintage o Reclamación de Bonos ELA Vintage Minoristas será una Reclamación de Bonos ELA Vintage (Elección Tributable) hasta la participación proporcional Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos ELA Vintage o Reclamación de Bonos ELA Vintage Minoristas, según sea aplicable, y el balance será una Reclamación de Bonos ELA Vintage o Reclamación de Bonos ELA Vintage Minoristas (según sea aplicable).

*Tratamiento: En* la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Elección Tributable ELA Vintage Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables Vintage.

*Votación*: La Clase 20 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 20 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.

***Montos permitidos de reclamaciones***: El monto de las Reclamaciones en la Clase 20 con derecho a una distribución dependen de cómo varios tenedores de Reclamaciones de Bonos ELA Vintage en las Clase 14 y 15 eligen ser tratados bajo la Clase 20. |

---

[337] El Recobro de Bonos Vintage del ELA se comparte entre las Reclamaciones de Bonos Vintage del ELA, Reclamaciones de Bonos Vintage del ELA (Assured), Reclamaciones de Bonos Vintage del ELA (National), Reclamaciones de Bonos Vintage del ELA (Otros asegurados), Reclamaciones de Bonos Vintage del ELA (Syncora).

| | |
|---|---|
| | *Recobros fijos proyectados del ELA*: 77.6% |
| **Clase 21:**<br><br>Reclamaciones de Bonos Garantizados ELA Vintage | *Clasificación:* La Clase 21 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía del ELA de los Bonos AEP Vintage, incluso cualquier obligación por la cual el ELA haya pignorado su buena fe, y el crédito autorizado por la Legislatura en o antes del 31 de diciembre de 2012 (pero sin incluir ninguna Reclamación de Bonos Vintage del ELA Garantizados (Assured), Reclamación de Bonos Vintage del ELA Garantizados (National), Reclamación de Bonos Vintage del ELA Garantizados (Otros asegurados) y Reclamación de Bonos Vintage del ELA Garantizados (Syncora).<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Garantizados recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA Garantizados,[338] que consiste en $653,782,173.81 en efectivo, $787,143,256.00 en Nuevos CIB de GO, $52,117,257.50 en Nuevos CAB de GO al 5.375%, $33,948,383.17 en Nuevos CAB de GO al 5.0% y 15.194% de CVI de GO.<br><br>*Elección Tributable*: Cada tenedor de una Reclamación de Bonos Garantizados ELA Vintage Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos Garantizados ELA Vintage Permitida reciba el tratamiento de una Reclamación Garantizados de Bonos ELA Vintage (Elección Tributable) en la Clase 26 y que se modifique su distribución conforme a la Distribución de Bonos Tributables Vintage Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>*Votación*: La Clase 21 está afectada por el Plan. La Clase 21 y cada tenedor de una Reclamación de garantía Bonos Garantizados ELA Vintage Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: $1,578,940,452.56<br><br>*Recobros fijos proyectados del ELA*: 74.5% |

---

[338] El Recobro de Bonos Vintage del ELA Garantizados se comparte entre las Reclamaciones de Bonos Vintage del ELA Garantizados, Reclamaciones de Bonos Vintage del ELA Garantizados (Assured), Reclamaciones de Bonos Vintage del ELA Garantizados (National), Reclamaciones de Bonos Vintage del ELA Garantizados (Otros asegurados), Reclamaciones de Bonos Vintage del ELA Garantizados (Syncora).

| | |
|---|---|
| | El recobro total por cuenta de una Reclamación de Bonos AEP Vintage Permitida y una Reclamación de Bonos Garantizados ELA Vintage Permitida es de aproximadamente el 80.4% |
| **Clase 22:**<br><br>Reclamaciones de Bonos Garantizados ELA Vintage (Assured) | *Clasificación:*  La Clase 22 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía del ELA de los Bonos Vintage del ELA que son asegurados por Assured, incluso a tenor con una póliza de seguro del mercado secundario.<br><br>*Tratamiento:*  Con sujeción a los términos y condiciones de la Sección 71.1 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Garantizados (Assured) recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA Garantizados,[339] que consiste en $653,782,173.81 en efectivo, $787,143,256.00 en Nuevos CIB de GO, $52,117,257.50 en Nuevos CAB de GO al 5.375%, $33,948,383.17 en Nuevos CAB de GO al 5.0% y 15.194% de CVI de GO.<br><br>*Votación:* La Clase 22 está afectada por el Plan y tiene derecho a votar por la aceptación o rechazo del Plan por cuenta de las Reclamaciones de Bonos Garantizados ELA Vintage (Assured).<br><br>*Montos permitidos de reclamaciones:* $159,476,054.86<br><br>*Recobros fijos proyectados del ELA:* 74.5%.<br><br>El recobro total con cargo al ELA y AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (Assured) y una Reclamación de Bonos Vintage del ELA Garantizados (Assured) Permitida es de aproximadamente el 80.4% |
| **Clase 23:**<br><br>Reclamaciones de Bonos Garantizados ELA Vintage (National) | *Clasificación: La* Clase 23 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía del ELA de los Bonos Vintage de AEP que son asegurados por National.<br><br>*Tratamiento:*  Con sujeción a los términos y condiciones de la Sección 7.2 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Garantizados recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA Garantizados,[340] que consiste en $653,782,173.81 en efectivo, |

[339] El Recobro de Bonos Vintage del ELA Garantizados se comparte entre las Reclamaciones de Bonos Vintage del ELA Garantizados, Reclamaciones de Bonos Vintage del ELA Garantizados (Assured), Reclamaciones de Bonos Vintage del ELA Garantizados (National), Reclamaciones de Bonos Vintage del ELA Garantizados (Otros asegurados), Reclamaciones de Bonos Vintage del ELA Garantizados (Syncora).

[340] El Recobro de Bonos Vintage del ELA Garantizados se comparte entre las Reclamaciones de Bonos Vintage del ELA Garantizados, Reclamaciones de Bonos Vintage del ELA Garantizados (Assured), Reclamaciones de Bonos Vintage del ELA Garantizados (National), Reclamaciones de Bonos Vintage del ELA Garantizados (Otros asegurados), Reclamaciones de Bonos Vintage del ELA Garantizados (Syncora).

|  | $787,143,256.00 en Nuevos CIB de GO, $52,117,257.50 en Nuevos CAB de GO al 5.375%, $33,948,383.17 en Nuevos CAB de GO al 5.0% y 15.194% de CVI de GO.

*Elección de distribución*: Los tenedores de Reclamaciones de Bonos Vintage del ELA Permitidas (National) pueden elegir recibir en plena satisfacción, liberación y canje de dicha Reclamación y sus derechos bajo la Póliza de Seguro de National aplicable, (1) el Tratamiento de Conmutación de National o (2) el Tratamiento de No Conmutación de National.

*Votación*: La Clase 23 está afectada por el Plan. National tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage del ELA Garantizados (National) Permitidas.

*Montos permitidos de reclamaciones*: $168,606,441.80

*Recobros fijos proyectados del ELA*: 74.5%.
El recobro total con cargo al ELA y a la AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (National) y una Reclamación de Bonos Vintage del ELA Garantizados (National) Permitida es de aproximadamente el 80.4% |
|---|---|
| **Clase 24:**<br><br>Reclamaciones de Bonos Garantizados ELA Vintage (Otros asegurados) | *Clasificación: La* Clase 24 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía del ELA de los Bonos Vintage de AEP que son asegurados por Ambac o FGIC.

*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Garantizados (Otros asegurados) Permitida recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA Garantizados,[341] que consiste en $653.782,173,81 en efectivo, $787,143,256.00 en Nuevos CIB de GO, $52,117,257.50 en Nuevos CAB de GO al 5.375%, $33,948,383.17 en Nuevos CAB de GO al 5.0% y 15.194% de CVI de GO.

*Votación*: La Clase 24 está afectada por el Plan. La Clase 24 y cada tenedor de una Reclamación de Bonos Vintage del ELA Garantizados (Otros asegurados) Permitida tienen derecho a votar por la aceptación o rechazo del Plan.

*Montos permitidos de reclamaciones*: $128,174,178.94 |

---

[341] El Recobro de Bonos Vintage del ELA Garantizados se comparte entre las Reclamaciones de Bonos Vintage del ELA Garantizados, Reclamaciones de Bonos Vintage del ELA Garantizados (Assured), Reclamaciones de Bonos Vintage del ELA Garantizados (National), Reclamaciones de Bonos Vintage del ELA Garantizados (Otros asegurados), Reclamaciones de Bonos Vintage del ELA Garantizados (Syncora).

| | |
|---|---|
| | ***Recobros fijos proyectados del ELA:*** 74.5%. El recobro total por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (Otros asegurados) y una Reclamación de Bonos Vintage del ELA Garantizados Permitida (Otros asegurados) es de aproximadamente el 80.4% |
| **Clase 25:**<br><br>Reclamaciones de Bonos Garantizados ELA Vintage (Syncora) | ***Clasificación:*** La Clase 25 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía del ELA de los Bonos Vintage de AEP que son asegurados por Syncora.<br><br>***Elección de distribución:*** Los tenedores de Reclamaciones de Bonos Vintage del ELA Garantizados Permitidas (Syncora) pueden elegir recibir en plena satisfacción, liberación y canje de dicha Reclamación y sus derechos bajo la Póliza de Seguro de Syncora aplicable, (1) el Tratamiento de Conmutación de Syncora o (2) el Tratamiento de No Conmutación de Syncora.<br><br>***Tratamiento:*** Con sujeción a los términos y condiciones de la Sección 71.3 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Vintage del ELA Garantizados permitida (Syncora) recibirá su Participación Prorrateada del Recobro de Bonos Vintage del ELA Garantizados,[342] que consiste en $653.782.173,81 en efectivo, $787,143,256.00 en Nuevos CIB de GO, $52,117,257.50 en Nuevos CAB de GO al 5.375%, $33,948,383.17 en Nuevos CAB de GO al 5.0% y 15.194% de CVI de GO.<br><br>***Votación:*** La Clase 25 está afectada por el Plan. Syncora tiene derecho a votar por la aceptación o el rechazo del Plan por cuenta de las Reclamaciones de Bonos Vintage del ELA Garantizados (Syncora) Permitidas.<br><br>***Montos permitidos de reclamaciones:*** $14,711,562.85<br><br>***Recobros fijos proyectados del ELA:*** 74.5%<br> El recobro total con cargo al ELA y a la AEP por cuenta de una Reclamación de Bonos Vintage de AEP Permitida (Syncora) y una Reclamación de Bonos Vintage del ELA Garantizados (Syncora) Permitida es de aproximadamente el 80.4% |
| **Clase 26:**<br><br>Reclamaciones de Bonos Garantizados ELA Vintage (tributables) | ***Clasificación:*** La Clase 26 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos Garantizados ELA Vintage Permitida que elige, se considera que elige o de otra |

---

[342] El Recobro de Bonos Vintage del ELA Garantizados se comparte entre las Reclamaciones de Bonos Vintage del ELA Garantizados, Reclamaciones de Bonos Vintage del ELA Garantizados (Assured), Reclamaciones de Bonos Vintage del ELA Garantizados (National), Reclamaciones de Bonos Vintage del ELA Garantizados (Otros asegurados), Reclamaciones de Bonos Vintage del ELA Garantizados (Syncora).

| | |
|---|---|
| | manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.

Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos Garantizados ELA Vintage será una Reclamación de Bonos Garantizados ELA Vintage (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos Garantizados ELA Vintage, y el saldo será una Reclamación de Bonos Garantizados ELA Vintage.

***Tratamiento: En*** la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA Vintage Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables Vintage.

***Votación***: La Clase 26 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 26 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.

***Montos permitidos de reclamaciones***: El monto de las Reclamaciones en la Clase 26 con derecho a una distribución dependen de cómo varios tenedores de Reclamaciones de Bonos Garantizados ELA Vintage en la Clase 21 eligen ser tratados bajo la Clase 26.

***Recobros fijos proyectados del ELA***: 74.5%

El recobro total por cuenta de una Reclamación de Bonos AEP Vintage Permitida y una Reclamación de Bonos Garantizados ELA Vintage Permitida (Elección Tributable) es de aproximadamente el 80.4% |
| **Clase 27:**

Reclamaciones de Bonos ELA 2011 | ***Clasificación:*** La Clase 27 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2011 que (a) <u>no</u> son asegurados por Assured, y (b) <u>no</u> están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00.

Los Bonos 2011 del ELA incluyen lo siguiente:

| | Fecha de emisión |
|---|---|
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011C | 17/03/2011 |
| Notas de Ahorro emitidas por el ELA antes de 2011 por una cuantía total circulante de $53,800,000 en virtud de la Ley Núm. 7 de la Legislatura de Puerto Rico | |

***Tratamiento:*** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA Permitida recibirá su Participación |

| | |
|---|---|
| | Prorrateada del Recobro de Bonos 2011 del ELA,[343] que consiste en $148,833,730.95 en efectivo, $179,193.425.00 en Nuevos CIB de GO, $11,864,510.95 en Nuevos CAB de GO al 5.375%, $7,728,360.35 en Nuevos CAB de GO al 5.0% y 2.479% de CVI de GO.<br><br>***Elección Tributable***: Cada tenedor de una Reclamación de Bonos ELA 2011 Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos ELA 2011 Permitida reciba el tratamiento de una Reclamación de Bonos ELA 2011 (Elección Tributable) en la Clase 30 y que se modifique su distribución conforme a la Distribución de Bonos Tributables 2011.  Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU.  Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>***Votación***: La Clase 27 está afectada por el Plan.  La Clase 27 y cada tenedor de una Reclamación de Bonos ELA 2011 Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>***Montos permitidos de reclamaciones***: $250,580,732.35<br><br>***Recobro Proyectado Fijo de ELA – Elección Tributable:*** 73.0%<br><br>***Recobro Proyectado Fijo de ELA – Sin Elección Tributable***: 73.0% |
| **Clase 28:**<br><br>Reclamaciones de Bonos ELA 2011 minoristas. | ***Clasificación:***  La Clase 28 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2011 en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00.<br><br>***Tratamiento:***  En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA Minoristas Permitida recibirá su Participación Prorrateada del (a) Recobro de Bonos 2011 del ELA,[344] que consiste en $148,833,730.95 en efectivo, $179,193.425.00 en Nuevos CIB de GO, $11,864,510.95 en Nuevos CAB de GO al 5.375%, $7,728,360.35 en Nuevos CAB de GO al 5.0% y 2.479% de CVI de GO, y (b) el Honorario de Apoyo al Minorista,[345] que consiste en $50,000,000.00 en efectivo. |

---

[343] El Recobro de Bonos 2011 del ELA se comparte entre las Reclamaciones de Bonos 2011 del ELA, Reclamaciones de Bonos 2011 del ELA (Assured) y Reclamaciones de Bonos 2011 del ELA Minoristas.

[344] El Recobro de Bonos 2011 del ELA se comparte entre las Reclamaciones de Bonos 2011 del ELA, Reclamaciones de Bonos 2011 del ELA (Assured) y Reclamaciones de Bonos 2011 del ELA Minoristas.

[345] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP 2011 Minoristas, las Reclamaciones de Bonos AEP 2012 Minoristas, las

| | |
|---|---|
| | Si la Clase 28 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos ELA 2011 Minoristas de la Clase 28 <u>no</u> recibirán el Honorario de Apoyo Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>***Elección Tributable***: Cada tenedor de una Reclamación de Bonos ELA 2011 Minoristas Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos ELA 2011 Minorista Permitida reciba el tratamiento de una Reclamación de Bonos ELA 2011 (Elección Tributable) en la Clase 30 y que se modifique su distribución conforme a la Distribución de Bonos Tributables 2011. Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>***Votación***: La Clase 28 está afectada por el Plan. La Clase 28 y cada tenedor de una Reclamación de Bonos ELA 2011 Minorista Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>***Montos permitidos de reclamaciones***: (Monto incluido en las Reclamaciones de Bonos ELA 2011)<br><br>***Recobro Proyectado Fijo de ELA – Elección Tributable:*** 73.0%<br><br>***Recobro Proyectado Fijo de ELA – Sin Elección Tributable***: 73.0% |
| **Clase 29:**<br>Reclamaciones de Bonos ELA 2011 (Assured) | ***Clasificación: La*** Clase 29 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2011 que son asegurados por Assured.<br><br>***Tratamiento:*** Con sujeción a los términos y condiciones de la Sección 71.1 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA (Assured) Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2011 del ELA,[346] que consiste en $148,833,730.95 en efectivo, $179,193.425.00 en Nuevos |

---

Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA 2011 Minoristas, las Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas y las Reclamaciones de Bonos ELA 2012 Minoristas, siempre que la Clase para dichas Reclamaciones vote por aceptar el Plan.

[346] El Recobro de Bonos 2011 del ELA se comparte entre las Reclamaciones de Bonos 2011 del ELA, Reclamaciones de Bonos 2011 del ELA (Assured) y Reclamaciones de Bonos 2011 del ELA Minoristas.

| | CIB de GO, $11,864,510.95 en Nuevos CAB de GO al 5.375%, $7,728,360.35 en Nuevos CAB de GO al 5.0% y 2.479% de CVI de GO. |
|---|---|
| | ***Votación***: La Clase 29 está afectada por el Plan y tiene derecho a votar por la aceptación o rechazo del Plan por cuenta de las Reclamaciones de Bonos ELA 2011 (Assured) Permitidas. |
| | ***Montos permitidos de reclamaciones***: $225,917,592.71 |
| | ***Recobros fijos proyectados del ELA***: 73.0% |
| **Clase 30:**<br><br>Reclamaciones de Bonos ELA 2011 (tributables) | ***Clasificación: La*** Clase 30 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos ELA 2011 Permitida o una Reclamación de Bonos ELA 2011 Minoristas Permitida que elige, se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.<br><br>Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos ELA 2011 o Reclamación de Bonos ELA 2011 Minoristas será una Reclamación de Bonos ELA 2011 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos ELA 2011 o Reclamación de Bonos ELA 2011 Minoristas, según sea aplicable, y el saldo será una Reclamación de Bonos ELA 2011 o Reclamación de Bonos ELA 2011 Minoristas según sea aplicable.<br><br>***Tratamiento: En*** la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA 2011 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables 2011.<br><br>***Votación***: La Clase 30 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 30 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.<br><br>***Montos permitidos de reclamaciones***: El monto de las Reclamaciones en la Clase 30 con derecho a una distribución depende de cómo varios tenedores de Reclamaciones de Bonos ELA 2011 en la Clase 27 y que Reclamaciones de Bonos ELA 2011 en la Clase 28 eligen ser tratados bajo la Clase 30.<br><br>***Recobros fijos proyectados del ELA***: 73.0% |
| **Clase 31:** | ***Clasificación: La*** Clase 31 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía de plena fe, crédito y poder impositivo del ELA de (a) el endeudamiento de una filial, entidad o instrumentalidad, |

| | |
|---|---|
| Reclamaciones de Bonos ELA 2011 garantizados | siendo dicha garantía ejecutada, presentada o aplicada conforme a la legislación o resolución durante el período entre el 1 de enero de 2011 hasta el 31 de diciembre de 2011, inclusive, y (b) los Bonos de AEP de 2011.<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA Garantizados Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2011 del ELA Garantizados, que consiste en $323,523,902.50 en efectivo, $389,517,592.00 en Nuevos CIB de GO, $25,790,208.46 en Nuevos CAB de GO al 5.375%, $16,799,346.77 en Nuevos CAB de GO al 5.0% y 7.552% de CVI de GO.<br><br>*Elección Tributable*: Cada tenedor de una Reclamación de Bonos 2011 del ELA Garantizados Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos Garantizados ELA 2011 Permitida reciba el tratamiento de una Reclamación de Bonos Garantizados ELA 2011 (Elección Tributable) en la Clase 32 y que se modifique su distribución conforme a la Distribución de Bonos Garantizados ELA Tributables 2011. Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>*Votación*: La Clase 31 está afectada por el Plan. La Clase 31 y cada tenedor de una Reclamación de garantía Bonos Garantizados ELA 2011 Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: $1,028,653,981.06<br><br>*Recobros fijos proyectados del ELA*: 73. 5%<br><br> El recobro total por cuenta de una Reclamación de Bonos AEP 2011 Permitida y una Reclamación de Bonos Garantizados ELA 2011 Permitida es de aproximadamente el 79.6% |
| **Clase 32:**<br><br>Reclamaciones de Bonos Garantizados ELA 2011 (tributables) | *Clasificación:* La Clase 32 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos Garantizados ELA 2011 Permitida que elija, se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.<br><br>Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos Garantizados ELA |

390

| | |
|---|---|
| | 2011 será una Reclamación de Bonos Garantizados ELA 2011 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos Garantizados ELA 2011, y el saldo será una Reclamación de Bonos Garantizados ELA 2011.<br><br>**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos Garantizados ELA 2011 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Garantizados ELA Tributables 2011.<br><br>**Votación:** La Clase 32 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 32 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.<br><br>**Montos permitidos de reclamaciones:** El monto de las Reclamaciones en la Clase 32 con derecho a una distribución dependen de cómo varios tenedores de Bonos Garantizados ELA 2011 en la Clase 31 eligen ser tratados bajo la Clase 32.<br><br>**Recobros fijos proyectados del ELA:** 73.5%<br><br>El recobro total por cuenta de una Reclamación de Bonos AEP 2011 Permitida y una Reclamación de Bonos Garantizados ELA 2011 Permitida (Elección Tributable) es de aproximadamente el 79.6% |
| **Clase 33:**<br><br>Reclamaciones de Bonos ELA 2011 Series D/E/PIB | **Clasificación:** La Clase 33 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA Serie D/E/ ELA 2011 que (a) <u>no</u> son asegurados por Assured, y (b) <u>no</u> están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00.<br><br>Los bonos ELA Serie D/E/PIB 2011 incluyen lo siguiente: |

|  | Fecha de emisión |
|---|---|
| Bonos para Mejoras Públicas de 2011 | 12/07/2011 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011D | 12/07/2011 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2011E | 12/07/2011 |

| | |
|---|---|
| | **Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA Serie D/E/PIB Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2011 del ELA Serie D/E/PIB,[347] que consiste en $211,355,035.74 en efectivo, $254,468,074.00 en Nuevos CIB de GO, $16,848,493.84 en Nuevos |

---

[347] El Recobro de Bonos ELA Serie D/E/PIB 2011 se comparte entre las Reclamaciones de Bonos Serie D/E/PIB 2011, Reclamaciones de Bonos ELA Serie D/E/PIB 2011 (Assured) y Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas.

| | |
|---|---|
| | CAB de GO al 5.375%, $10,974,850.30 en Nuevos CAB de GO al 5.0% y 3.514% de CVI de GO. |
| | ***Elección Tributable***: Cada tenedor de una Reclamación de Bonos ELA Serie D/E/PIB 2011 Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos ELA Serie D/E/PIB 2011 Permitida reciba el tratamiento de una Reclamación de Bonos ELA Serie D/E/PIB 2011 (Elección Tributable) en la Clase 36 y que se modifique su distribución conforme a la Distribución de Bonos ELA Serie D/E/PIB Tributables 2011. Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general. |
| | ***Votación***: La Clase 33 está afectada por el Plan. La Clase 33 y cada tenedor de una Reclamación de Bonos ELA Serie D/E/PIB 2011 Permitida tienen derecho a votar por la aceptación o rechazo del Plan. |
| | ***Montos permitidos de reclamaciones***: $634,719,627.45 |
| | ***Recobro Proyectado Fijo de ELA – Elección Tributable:*** 76.5% |
| | ***Recobro Proyectado Fijo de ELA – Sin Elección Tributable***: 76.5% |
| **Clase 34:**<br><br>Reclamaciones de Bonos ELA 2011 Series D/E/PIB (Assured) | ***Clasificación: La*** Clase 34 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA Serie D/E/PIB 2011 que son asegurados por Assured.<br><br>***Tratamiento:*** Con sujeción a los términos y condiciones de la Sección 71.1 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA Serie D/E/PIB Permitida (Assured) recibirá su Participación Prorrateada del Recobro de Bonos 2011 del ELA Serie D/E/PIB, que consiste en $211,355,035.74 en efectivo, $254,468,074.00 en Nuevos CIB de GO, $16,848,493.84 en Nuevos CAB de GO al 5.375%, $10,974,850.30 en Nuevos CAB de GO al 5.0% y 3.514% de CVI de GO.<br><br>***Votación***: La Clase 34 está afectada por el Plan y tiene derecho a votar por la aceptación o rechazo del Plan por cuenta de las Reclamaciones de Bonos ELA 2011 Series D/E/PIB (Assured).<br><br>***Montos permitidos de reclamaciones***: $10,953,484.03<br><br>***Recobros fijos proyectados del ELA -*** 76.5% |
| **Clase 35:** | ***Clasificación: La*** Clase 35 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA Serie D/E/PIB 2011 en poder de un |

| Reclamaciones de Bonos ELA 2011 Series D/E/PIB minoristas | Inversionista Minorista por el monto total igual a o menor que $1,000,000.00. |
|---|---|
| | ***Tratamiento:*** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2011 del ELA Serie D/E/PIB Minoristas Permitida recibirá su Participación Prorrateada del (a) Recobro de Bonos 2011 del ELA Serie D/E/PIB,[348] que consiste en $211,355,035.74 en efectivo, $254,468,074.00 en Nuevos CIB de GO, $16,848,493.84 en Nuevos CAB de GO al 5.375%, $10,974,850.30 en Nuevos CAB de GO al 5.0% y 3.514% de CVI de GO, y (b) el Honorario de Apoyo al Minorista,[349] que consiste en $50,000,000.00 en efectivo. |
| | Si la Clase 35 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas de la Clase 35 <u>no</u> recibirán el Honorario de Apoyo Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan. |
| | ***Elección Tributable***: Cada tenedor de una Reclamación de Bonos ELA Serie D/E/PIB Minoristas 2011 Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos ELA Serie D/E/PIB Minoristas 2011 Permitida reciba el tratamiento de una Reclamación de Bonos ELA Serie D/E/PIB 2011 (Elección Tributable) en la Clase 36 y que se modifique su distribución conforme a la Distribución de Bonos ELA Serie D/E/PIB Tributables 2011. Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general. |
| | ***Votación***: La Clase 35 está afectada por el Plan. La Clase 35 y cada tenedor de una Reclamación de Bonos ELA Serie D/E/PIB Minoristas 2011 Permitida tienen derecho a votar por la aceptación o rechazo del Plan. |

[348] El Recobro de Bonos ELA Serie D/E/PIB 2011 se comparte entre las Reclamaciones de Bonos Serie D/E/PIB 2011, Reclamaciones de Bonos ELA Serie D/E/PIB 2011 (Assured) y Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas.

[349] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP 2011 Minoristas, las Reclamaciones de Bonos AEP 2012 Minoristas, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA 2011 Minoristas, las Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas y las Reclamaciones de Bonos ELA 2012 Minoristas, siempre que la Clase para dichas Reclamaciones vote por aceptar el Plan.

| | |
|---|---|
| | *Montos permitidos de reclamaciones*: (Monto incluido en Reclamaciones de Bonos ELA Serie D/E/PIB 2011)<br><br>*Recobro Proyectado Fijo de ELA – Elección Tributable:* 76.5%<br><br>*Recobro Proyectado Fijo de ELA – Sin Elección Tributable*: 76.5% |
| **Clase 36:**<br><br>Reclamaciones de Bonos ELA 2011 Series D/E/PIB (Elección tributable) | *Clasificación:* La Clase 36 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos ELA Serie D/E/PIB 2011 Permitida o una Reclamación de Bonos ELA Serie D/E/PIB 2011 Minoristas Permitida que elige, se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.[350]<br><br>Si las Distribuciones de Bonos Tributables elegidos por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos ELA Serie D/E/PIB 2011 o Reclamación de Bonos ELA Serie D/E/PIB 2011 Minoristas será una Reclamación de Bonos ELA Serie D/E/PIB 2011 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos ELA Serie D/E/PIB 2011 o Reclamación de Bonos ELA Serie D/E/PIB 2011 Minoristas, según sea aplicable, y el saldo será una Reclamación de Bonos ELA 2011 o Reclamación de Bonos ELA 2011 Minoristas (según sea aplicable).<br><br>*Tratamiento: En* la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA Serie D/E/PIB 2011 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos ELA Serie D/E/PIB Tributables 2011.<br><br>*Votación*: La Clase 36 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 36 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.<br><br>*Montos permitidos de reclamaciones*: El monto de las Reclamaciones en la Clase 36 con derecho a una distribución depende de cómo varios tenedores de Reclamaciones de Bonos ELA Serie D/E/PIB 2011 en la Clase 33 y que Reclamaciones de Bonos ELA Serie D/E/PIB 2011 en la Clase 35 eligen ser tratados bajo la Clase 36.<br><br>*Recobros fijos proyectados del ELA*: 76.5% |

---

[350] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o del único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio). No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

| Clase 37: | **Clasificación:**  La Clase 37 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2012 que (a) no son asegurados por Assured, y (b) no están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00. |
|---|---|
| Reclamaciones de Bonos ELA 2012 | |

Los Bonos 2012 del ELA incluyen lo siguiente:

| | Fecha de emisión |
|---|---|
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012A | 03/04/2012 |
| Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012B | 29/03/2012 |
| El préstamo extendido conforme a cierto Acuerdo de Crédito de fecha 26 de diciembre de 2013, entre la Administración de Servicios Generales del ELA y Scotiabank de Puerto Rico, que, a la fecha de la Petición del ELA, era de un monto de capital pendiente total de aproximadamente $23,764,607.00. | |
| Préstamos de Hacienda (Id. de Préstamo Núm. 200017-215-001-003-53 y 200017-215-001-003-56), que, a la Fecha de la Petición del ELA, eran de un monto de capital pendiente total de aproximadamente $169,438,037.76 | |
| Notas de Ahorro emitidas por el ELA en 2012 por una cuantía total circulante de $2,533,050.00 en virtud de la Ley Núm. 7 de la Legislatura de Puerto Rico | |

**Tratamiento:**  En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2012 del ELA  Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2012 del ELA,[351] que consiste en $909,912,679.00 en efectivo, $1,095,520.277.00 en Nuevos CIB de GO, $72,535,096.96 en Nuevos CAB de GO al 5.375%, $47,248,251.00 en Nuevos CAB de GO al 5.0%, y 15.157% de CVI de GO.

**Elección Tributable**:  Cada tenedor de una Reclamación de Bonos ELA 2012 Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos 2012 Permitida reciba el tratamiento de una Reclamación de Bonos ELA 2012 (Elección Tributable) en la Clase 40 y que se modifique su distribución conforme a la Distribución de Bonos ELA Tributables 2012.  Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU.  Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.

---

[351] El Recobro de Bonos 2012 del ELA se comparte entre las Reclamaciones de Bonos 2012 del ELA, Reclamaciones de Bonos 2012 del ELA (Assured) y Reclamaciones de Bonos 2012 del ELA Minoristas.

| | |
|---|---|
| | *Votación*: La Clase 37 está afectada por el Plan. La Clase 37 y cada tenedor de una Reclamación de Bonos ELA 2012 Permitida tienen derecho a votar por la aceptación o rechazo del Plan. |
| | *Montos permitidos de reclamaciones*: $2,540,851,157.04 |
| | *Recobro Proyectado Fijo de ELA – Elección Tributable:* 72.4% |
| | *Recobro Proyectado Fijo de ELA – Sin Elección Tributable*: 72.4% |
| **Clase 38:**<br><br>Reclamaciones de Bonos ELA 2012 minoristas. | *Clasificación:* La Clase 38 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2012 en poder de un Inversionista Minorista[352] por el monto total igual a o menor que $1,000,000.00.<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2012 del ELA Minoristas Permitida recibirá su Participación Prorrateada del (a) Recobro de Bonos 2012 del ELA,[353]que consiste en $909,912,679.73 en efectivo, $1,095,520,277.00 en Nuevos CIB de GO, $72,535,096.96 en Nuevos CAB de GO al 5.375%, $47,248,251.00 en Nuevos CAB de GO al 5.0% y 15.157% de CVI de GO, y (b) el Honorario de Apoyo al Minorista,[354] que consiste en $50,000,000.00 en efectivo.<br><br>Si la Clase 38 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos ELA 2012 Minoristas de la Clase 38 <u>no</u> recibirán el Honorario de Apoyo Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>*Elección Tributable*: Cada tenedor de una Reclamación de Bonos ELA 2012 Minoristas Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos 2012 Minoristas Permitida reciba el tratamiento de una Reclamación de Bonos ELA 2012 (Elección Tributable) en la Clase 40 y que se modifique su distribución conforme a la Distribución de Bonos ELA Tributables 2012. Como una cuestión |

---

[352] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[353] El Recobro de Bonos 2012 del ELA se comparte entre las Reclamaciones de Bonos 2012 del ELA, Reclamaciones de Bonos 2012 del ELA (Assured) y Reclamaciones de Bonos 2012 del ELA Minoristas.

[354] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP 2011 Minoristas, las Reclamaciones de Bonos AEP 2012 Minoristas, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA 2011 Minoristas, las Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas y las Reclamaciones de Bonos ELA 2012 Minoristas, siempre que la Clase para dichas Reclamaciones vote por aceptar el Plan.

| | |
|---|---|
| | general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>*Votación*: La Clase 38 está afectada por el Plan. La Clase 38 y cada tenedor de una Reclamación de Bonos ELA 2012 Minoristas Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: (Monto incluido en las Reclamaciones de Bonos ELA 2012)<br><br>*Recobro Proyectado Fijo de ELA – Elección Tributable:* 72.4%<br><br>*Recobro Proyectado Fijo de ELA – Sin Elección Tributable*: 72.4% |
| **Clase 39:**<br>Reclamaciones de Bonos ELA 2012 (Assured) | *Clasificación: La* Clase 39 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos 2012 del ELA que son asegurados por Assured, incluso a tenor con una póliza de seguro del mercado secundario.<br><br>*Tratamiento:* Con sujeción a los términos y condiciones de la Sección 71.1 del Plan, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2012 del ELA (Assured) Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2012 del ELA,[355] que consiste en $909,912,679.73 en efectivo, $1,095,520.277.00 en Nuevos CIB de GO, $72,535,096.96 en Nuevos CAB de GO al 5.375%, $47,248,251.00 en Nuevos CAB de GO al 5.0%, y 15.157% de CVI de GO.<br><br>*Votación*: La Clase 39 está afectada por el Plan. La Clase 39 y tiene derecho a votar por la aceptación o rechazo del Plan por cuenta de las Reclamaciones de Bonos ELA 2012 (Assured).<br><br>*Montos permitidos de reclamaciones*: $393,576,302.36<br><br>*Recobros fijos proyectados del ELA:* 72.4% |
| **Clase 40:**<br>Reclamaciones de Bonos ELA 2012 (tributables) | *Clasificación: La* Clase 40 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos ELA 2012 Permitida o una Reclamación de Bonos ELA 2012 Minoristas Permitida que elige, se considera que elige o de otra manera, recibir una |

---

[355] El Recobro de Bonos 2012 del ELA se comparte entre las Reclamaciones de Bonos 2012 del ELA, Reclamaciones de Bonos 2012 del ELA (Assured) y Reclamaciones de Bonos 2012 del ELA Minoristas.

| | Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.[356] |
|---|---|
| | Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos ELA 2012 o Reclamación de Bonos ELA 2012 Minoristas será una Reclamación de Bonos ELA 2012 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos ELA 2012 o Reclamación de Bonos ELA 2012 Minoristas, según sea aplicable, y el saldo será una Reclamación de Bonos ELA 2012 o Reclamación de Bonos ELA 2012 Minoristas (según sea aplicable). |
| | *Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA 2012 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables 2012. |
| | *Votación*: La Clase 40 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 40 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan. |
| | *Montos permitidos de reclamaciones*: El monto de las Reclamaciones en la Clase 40 con derecho a una distribución depende de cómo varios tenedores de Reclamaciones de Bonos ELA 2012 en la Clase 37 y que Reclamaciones de Bonos ELA 2012 en la Clase 38 eligen ser tratados bajo la Clase 40. |
| | *Recobros fijos proyectados del ELA*: 72.4% |
| **Clase 41:** Reclamaciones de Bonos ELA 2012 garantizados | *Clasificación:* La Clase 41 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía de plena fe, crédito y poder impositivo del ELA, según esté autorizado por acción, legislación o resolución de la Legislatura, de (a) el endeudamiento de una filial, agencia o instrumentalidad, siendo dicha garantía ejecutada, presentada o aplicada conforme a la legislación o resolución en el período entre el 1 de enero 2012 el 31 de diciembre de 2013, inclusive, y (b) los Bonos de AEP de 2012 (pero sin incluir ninguna Reclamación de Bonos 2012 del ELA Garantizados (Assured)). |
| | *Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2012 del ELA Garantizados Permitida recibirá su |

---

[356] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o del único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio). No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

| | |
|---|---|
| | Participación Prorrateada del Recobro de Bonos 2012 del ELA Garantizados, que consiste en $149,700,027.24 en efectivo, $180,236,434.00 en Nuevos CIB de GO, $11,933,569.54 en Nuevos CAB de GO al 5.375%, $7,773,344.30 en Nuevos CAB de GO al 5.0% y 3.594% de CVI de GO.

***Elección Tributable***: Cada tenedor de una Reclamación de Bonos Garantizados ELA 2012 Permitida que sea un Inversionista de Puerto Rico[357] puede elegir que su Reclamación de Bonos Garantizados ELA 2012 Permitida reciba el tratamiento de una Reclamación de Bonos Garantizados ELA 2012 (Elección Tributable) en la Clase 42 y que se modifique su distribución conforme a la Distribución de Bonos Garantizados ELA Tributables 2012.  Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU.  Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones  a esta regla general.

***Votación***: La Clase 41 está afectada por el Plan.  La Clase 41 y cada tenedor de una Reclamación de garantía Bonos Garantizados ELA 2012 Permitida tienen derecho a votar por la aceptación o rechazo del Plan.

***Montos permitidos de reclamaciones***: $519,408,567.83

***Recobros fijos proyectados del ELA***:  67.3%

El recobro total por cuenta de una Reclamación de Bonos AEP 2012 Permitida y una Reclamación de Bonos Garantizados ELA 2012 Permitida es de aproximadamente el 74.8% |
| **Clase 42:**

Reclamaciones de Bonos Garantizados ELA 2012 (tributables) | ***Clasificación:***  La Clase 42 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos Garantizados ELA 2012 Permitida que elige,  se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.[358] |

---

[357] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o el único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio). No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[358] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o del único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio).

| | |
|---|---|
| | Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos Garantizados ELA 2012 será una Reclamación de Bonos Garantizados ELA 2012 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos Garantizados ELA 2012, y el saldo será una Reclamación de Bonos Garantizados ELA 2012.

***Tratamiento: En*** la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA 2012 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables 2012.

***Votación***: La Clase 42 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 42 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.

***Montos permitidos de reclamaciones***: El monto de las Reclamaciones en la Clase 42 con derecho a una distribución dependen de cómo varios tenedores de Bonos Garantizados ELA 2012 en la Clase 41 eligen ser tratados bajo la Clase 42.

***Recobros fijos proyectados del ELA***: 67.3%

El recobro total por cuenta de una Reclamación de Bonos AEP 2012 Permitida y una Reclamación de Bonos Garantizados ELA 2012 Permitida (Elección Tributable) es de aproximadamente el 74.8% |
| **Clase 43:**

Reclamaciones de Bonos ELA 2014 | ***Clasificación:*** La Clase 43 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2014 que <u>no</u> están en poder de un Inversionista Minorista por el monto total igual a o menor que $1,000,000.00.

Los Bonos 2014 del ELA incluyen lo siguiente:

| | **Fecha de emisión** |
|---|---|
| Bonos para Obligaciones Generales de 2014, Serie A | 17/03/2014 |

***Tratamiento:*** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2014 del ELA Permitida recibirá su Participación Prorrateada del Recobro de Bonos 2014 del ELA,[359] que |

---

No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[359] El Recobro de Bonos ELA 2014 se comparte entre las Reclamaciones de Bonos ELA 2014, Reclamaciones de Bonos ELA 2011 Minoristas y Reclamaciones de Bonos Garantizados ELA 2014.

| | |
|---|---|
| | consiste en $1,213,478,877.35 en efectivo, $1,461,009,112.00 en Nuevos CIB de GO, $96,734,346.00 en Nuevos CAB de GO al 5.375%, $63,011,270.91 en Nuevos CAB de GO al 5.0% y 20.266% de CVI de GO.<br><br>***Elección Tributable***: Cada tenedor de una Reclamación de Bonos ELA 2014 Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos 2014 Permitida reciba el tratamiento de una Reclamación de Bonos ELA 2014 (Elección Tributable) en la Clase 45 y que se modifique su distribución conforme a la Distribución de Bonos ELA Tributables 2014.  Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU.  Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>***Votación***: La Clase 43 está afectada por el Plan.  La Clase 43 y cada tenedor de una Reclamación de Bonos ELA 2014 Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>***Montos permitidos de reclamaciones***: $3,836,611,111.11[360]<br><br>***Recobro Proyectado Fijo de ELA – Elección Tributable:*** 67.8%<br><br>***Recobro Proyectado Fijo de ELA – Sin Elección Tributable***: 67.8% |
| **Clase 44:**<br><br>Reclamaciones de Bonos ELA 2014 minoristas. | ***Clasificación:***  La Clase 44 consiste en todas las reclamaciones contra el ELA por cuenta de los Bonos ELA 2014 en poder de un Inversionista Minorista[361] por el monto total igual a o menor que $1,000,000.00.<br><br>***Tratamiento:***  En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2014 del ELA Minoristas Permitida recibirá su Participación Prorrateada del (a) Recobro de Bonos 2014 del ELA,[362] que consiste en $1,213,478,877.35 en efectivo, $1,461,009,112.00 en Nuevos CIB de GO, $96,734,346.00 en Nuevos CAB de GO al 5.375%, $63,011,270.91 en Nuevos CAB de GO al 5.0% y 20.266% de CVI de |

---

[360] Incluye Reclamaciones de Bonos ELA 2014 Minoristas.

[361] Un "Inversionista Minorista" significa una persona física que ha adquirido Bonos GO y/o Bonos AEP para su propia cuenta de corretaje, cuenta de fideicomiso, cuenta de custodia o en una cuenta administrada por separado. No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[362] El Recobro de Bonos ELA 2014 se comparte entre las Reclamaciones de Bonos ELA 2014, Reclamaciones de Bonos ELA 2011 Minoristas y Reclamaciones de Bonos Garantizados ELA 2014.

| | |
|---|---|
| | GO, y (b) el Honorario de Apoyo al Minorista,[363] que consiste en $50,000,000.00 en efectivo.<br><br>Si la Clase 44 vota por el rechazo del Plan, los tenedores de Reclamaciones de Bonos ELA 2014 Minoristas de la Clase 44 <u>no</u> recibirán el Honorario de Apoyo Minorista, que se reasignará a los Acreedores de Derechos de Restricción de AAP y a los Inversionistas Minoristas que sean miembros de Clases que votaron para aceptar el Plan.<br><br>***Elección Tributable***: Cada tenedor de una Reclamación de Bonos ELA 2014 Minoristas Permitida que sea un Inversionista de Puerto Rico puede elegir que su Reclamación de Bonos 2014 Minoristas Permitida reciba el tratamiento de una Reclamación de Bonos ELA 2014 (Elección Tributable) en la Clase 45 y que se modifique su distribución conforme a la Distribución de Bonos ELA Tributables 2014. Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU. Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general.<br><br>***Votación***: La Clase 44 está afectada por el Plan. La Clase 44 y cada tenedor de una Reclamación de Bonos ELA 2014 Minoristas Permitida tienen derecho a votar por la aceptación o rechazo del Plan.<br><br>***Recobro Proyectado Fijo de ELA – Elección Tributable:*** 67.8%<br><br>***Recobro Proyectado Fijo de ELA – Sin Elección Tributable***: 67.8% |
| **Clase 45:**<br><br>Reclamaciones de Bonos ELA 2014 (tributables) | ***Clasificación:*** La Clase 45 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos ELA 2014 Permitida o una Reclamación de Bonos ELA 2014 Minoristas Permitida que elige, se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.[364] |

---

[363] El Honorario de Apoyo al Minorista se comparte entre las Reclamaciones de Bonos AEP Vintage Minoristas, las Reclamaciones de Bonos AEP 2011 Minoristas, las Reclamaciones de Bonos AEP 2012 Minoristas, las Reclamaciones de Bonos ELA Vintage Minoristas, las Reclamaciones de Bonos ELA 2011 Minoristas, las Reclamaciones de Bonos ELA Serie D/E/PIB 2011 Minoristas y las Reclamaciones de Bonos ELA 2012 Minoristas, siempre que la Clase para dichas Reclamaciones vote por aceptar el Plan.

[364] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o el único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio).

| | Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos ELA 2014 o Reclamación de Bonos ELA 2014 Minoristas será una Reclamación de Bonos ELA 2014 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos ELA 2014 o Reclamación de Bonos ELA 2014 Minoristas, según sea aplicable, y el saldo será una Reclamación de Bonos ELA 2014 o Reclamación de Bonos ELA 2014 Minoristas (según sea aplicable).

*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA 2014 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables 2014.

*Votación:* La Clase 45 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 45 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.

*Montos permitidos de reclamaciones:* El monto de las Reclamaciones en la Clase 45 con derecho a una distribución depende de cómo varios tenedores de Reclamaciones de Bonos ELA 2014 en la Clase 43 y que Reclamaciones de Bonos ELA 2014 en la Clase 44 eligen ser tratados bajo la Clase 45.

*Recobros fijos proyectados del ELA:* 67.8% |
|---|---|
| **Clase 46:**<br><br>Reclamaciones de Bonos ELA 2014 garantizados | *Clasificación:* La Clase 46 consiste en todas las reclamaciones contra el ELA por cuenta de la garantía de plena fe, crédito y poder impositivo del ELA, según esté autorizado por acción, legislación o resolución de la Legislatura del ELA, de (a) el endeudamiento de una filial, agencia o instrumentalidad, siendo dicha garantía ejecutada, presentada o aplicada conforme a la legislación o resolución en el período entre el 1 de enero 2014 y, pero no inclusive, la Fecha de Petición del ELA, (b) el bono de la Autoridad del Puerto de las Américas, que, a la Fecha de Petición del ELA correspondía al monto de capital pendiente de $225,533,700.45, y (c) las Notas de Adelantos del Bono de la AFI, Serie 2015, que, a la Fecha de Petición del ELA, correspondían al monto de capital pendiente de $78,145,000.00.

*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos 2014 del ELA Permitida recibirá su |

---

No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

|  | Participación Prorrateada del Recobro de Bonos 2014 del ELA,[365] que consiste en $1,213,478,877.35 en efectivo, $1,461,009,112.00 en Nuevos CIB de GO, $96,734,346.00 en Nuevos CAB de GO al 5.375%, $63,011,270.91 en Nuevos CAB de GO al 5.0% y 20.266% de CVI de GO. |
|  | ***Elección Tributable***: Cada tenedor de una Reclamación de Bonos Garantizados ELA 2014 Permitida que sea un Inversionista de Puerto Rico[366] puede elegir que su Reclamación de Bonos Garantizados ELA 2014 Permitida reciba el tratamiento de una Reclamación de Bonos Garantizados ELA 2014 (Elección Tributable) en la Clase 47 y que se modifique su distribución conforme a la Distribución de Bonos Garantizados ELA Tributables 2014.  Como una cuestión general, los residentes de Puerto Rico no están sujetos a los impuestos federales a la renta de EE.UU.  Los residentes de Puerto Rico deben consultar la Sección IX de la Declaración de Divulgación, bajo el título "Consideraciones Materiales sobre Impuestos Federales a la Renta de Estados Unidos—Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico" para obtener una discusión sobre importantes limitaciones a esta regla general. |
|  | ***Votación***: La Clase 46 está afectada por el Plan.  La Clase 46 y cada tenedor de una Reclamación de garantía Bonos Garantizados ELA 2014 Permitida tienen derecho a votar por la aceptación o rechazo del Plan. |
|  | ***Montos permitidos de reclamaciones***: $346,242,219.86 |
|  | ***Recobros fijos proyectados del ELA***:  67.8% |
| **Clase 47:**<br><br>Reclamaciones de Bonos Garantizados ELA 2014 (tributables) | ***Clasificación:***  La Clase 47 consiste en todas las reclamaciones contra el ELA por parte del tenedor de una Reclamación de Bonos Garantizados ELA 2014 Permitida que elige, se considera que elige o de otra manera, recibir una Distribución de Bonos Tributables y el tenedor es un Inversionista de Puerto Rico.[367] |

---

[365] El Recobro de Bonos ELA 2014 se comparte entre las Reclamaciones de Bonos ELA 2014, Reclamaciones de Bonos ELA 2011 Minoristas y Reclamaciones de Bonos Garantizados ELA 2014.

[366] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o el único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio).  No incluye a ningún titular de un Bono GO u un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

[367] Un "Inversionista de Puerto Rico" es una entidad que es, o que es de propiedad absoluta de o del único propietario beneficiario de lo que es, una persona(s) física(s) y residente(s) del ELA para fines de pago de los impuestos a la renta personal de Puerto Rico (según lo determine la Junta de Supervisión en ejercicio de su exclusivo criterio).  No incluye a ningún titular de un Bono GO o un Bono AEP, cuyo pago del capital y los intereses esté asegurado por Assured, National o Syncora.

|  | Si las Distribuciones de Bonos Tributables elegidas por Inversionistas de Puerto Rico que poseen Reclamaciones de Bonos ELA y Reclamaciones de Bonos Garantizados ELA superan el Monto Máximo de Elección de Bonos Tributables, dicha Reclamación de Bonos Garantizados ELA 2014 será una Reclamación de Bonos Garantizados ELA 2014 (Elección Tributable) hasta la participación proporcional del Monto Máximo de Elección de Bonos Tributables de dicha Reclamación de Bonos Garantizados ELA 2014, y el saldo será una Reclamación de Bonos Garantizados ELA 2014.<br><br>*Tratamiento: En* la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos ELA 2014 Permitida (Elección Tributable) recibirá su Participación Prorrateada de la Distribución de Bonos Tributables 2014.<br><br>*Votación*: La Clase 47 está afectada por el Plan. Sin embargo, los tenedores de Reclamaciones de la Clase 47 eligen ser tratados en dicha Clase y, por lo tanto, se considera que aceptan el Plan.<br><br>*Montos permitidos de reclamaciones*: El monto de las Reclamaciones en la Clase 47 con derecho a una distribución dependen de cómo varios tenedores de Bonos Garantizados ELA 2014 en la Clase 46 eligen ser tratados bajo la Clase 47.<br><br>*Recobros fijos proyectados del ELA*: 67.8% |
|---|---|
| **Clase 48A:**[368]<br><br>Reclamaciones de retirados | *Clasificación:* La Clase 48A consiste en:<br><br>(a)    Todas las reclamaciones contra SRE por cuenta de ser o haber sido participante en SRE para obtener beneficios de retiro devengados a la fecha de aplicación de la Ley 106.<br><br>(b)    Todas las reclamaciones contra el SRJ por cuenta de haber sido participante en el SRJ para (i) beneficios de pensión devengados al 4 de mayo de 2017, y (b) cualquier beneficio adicional para retirados en SRJ que dicho participante tendría derecho a recibir ante el retiro futuro del participante, y<br><br>(c)    Todas las reclamaciones contra el SRM por cuenta de haber sido participante en el SRM para (i) beneficios de pensión devengados al 4 de mayo de 2017, y (b) cualquier beneficio adicional para retirados |

[368] El 3 de marzo de 2020, CANA presentó una moción 3013 para que se dictara una orden de reclasificación de las reclamaciones de la Clase 48A (Reclamaciones de Jubilado) y de la Clase 55 (Reclamaciones Generales no Garantizadas del ELA) bajo el entonces propuesto plan de ajuste (la "Moción 3013") [ECF Núm. 11989]. En la Moción 3013, CANA argumentó que el esquema de clasificación en el plan enmendado no puede ser aprobado bajo el precedente del Primer Circuito que requiere un "enfoque estricto" para la clasificación del plan. Después de la presentación de escritos sobre la Moción 3013, el 23 de abril de 2020, el Tribunal del Título III emitió una orden denegando la moción [ECF Núm. 12952].

en SRM que dicho participante tendría derecho a recibir ante el retiro futuro del participante,

en poder de una persona que, según conste en los registros de SRE, SRJ o SRM a 1 de abril de 2021, recibe una pensión o anualidad como participante o beneficiario de un participante en SRE, SRJ o SRM y cualquier ex empleado del Gobierno de Puerto Rico que haya dejado el servicio público y no haya sido reembolsado por las contribuciones de dicha persona y/o cualquier beneficio devengado hasta la fecha de separación inclusive).

***Tratamiento:***

<u>Ajuste de beneficios</u>. Cada tenedor de una Reclamación de Retirado Permitida recibirá, a partir de la Fecha de Reducción del Beneficio (como se define a continuación),[369] pagos mensuales modificados por la Modificación de los Beneficios Mensuales establecida en el Plan y como se detalla a continuación.

*Beneficios devengados antes del 4 de mayo de 2017*: Todos los beneficios de pensión devengados obtenidos por los participantes antes del 4 de mayo de 2017 estarán sujetos a reducción de la manera siguiente:

El Beneficio Mensual Total (que incluye la Pensión Básica Mensual, la Bonificación de Navidad Mensual, la Bonificación de Verano Mensual y la Bonificación de Medicamentos Mensual) no puede reducirse por debajo de $1,500.00 por mes y cualquier participante que reciba $1,500.00 o menos por mes no se verá afectado. El umbral mínimo de beneficios seguirá siendo de $1,500. Los montos de pensión devengados y de umbral no se indexarán por ningún motivo en el futuro, salvo para disposiciones de Restauración de Beneficios de Pensión.

El Beneficio Mensual Total se reducirá hasta uno de los siguientes, el que sea menor (la "<u>Reducción Máxima</u>"):

   (a) 8.5% del Beneficio Mensual Total se ha reducido; o

   (b) el Beneficio Mensual Total ha alcanzado $1,500.00 por mes.

El Beneficio Mensual Total se reducirá en el orden siguiente:

   (a) <u>Reducción de la Bonificación de Navidad</u>: En primer lugar, se reducirá la Bonificación de Navidad Mensual hasta que el Beneficio Mensual Total alcance la Reducción Máxima o la Bonificación de Navidad Mensual se haya eliminado;

---

[369] La Fecha de Reducción del Beneficio es (a) 1 de julio de 2021, y (b) el primer 1 de julio después de la Fecha de Entrada en vigencia, la que ocurra más tarde. Sin embargo, si el primer 1 de julio después de la Fecha de Entrada en vigencia fuera menos de 180 días después de la Fecha de Entrada en vigencia, la "Fecha de Reducción del Beneficio" será el primer día del mes que sea 180 días después de la Fecha de Entrada en vigencia.

(b) Reducción de la Bonificación de Verano:  Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en segundo lugar, la Bonificación de Verano Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación Mensual de Verano se haya eliminado;

(c) Reducción de la Bonificación de Medicamentos: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en tercer lugar, la Bonificación de Medicamentos Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación de Medicamentos Mensual se haya eliminado;

(d) Reducción de la Pensión Básica:  Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en cuarto lugar, la Pensión Básica Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima.

La recepción de beneficios del Seguro Social y el Beneficio de Medicamentos Mensual no afectará las reducciones anteriores.

*Beneficios adquiridos en o después del 4 de mayo de 2017*: Los beneficios de pensión devengados adquiridos por los participantes en o después del 4 de mayo de 2017 no se reducirán.

Los beneficios devengados después del 1 de enero de 2013 a tenor con la Ley 3-2013 para los participantes activos de SRE contratados antes del 1 de enero de 2000 incluirán el valor total de la contribución acumulada con intereses hasta, pero sin incluir, la Fecha de Petición del ELA.

Restauración de beneficios.  Durante el período desde la Fecha de Reducción de Beneficios hasta la conclusión del Año fiscal 2033 inclusive, si en un Año fiscal en particular, el Superávit en efectivo es igual o mayor que Cien Millones de Dólares ($100,000,000.00), entonces el diez por ciento (10%) de dicho Superávit en efectivo será (a) asignado y aplicado de manera prorrateada a cada participante sobre la base del monto de reducciones totales experimentadas por cada participante durante dicho Año fiscal, y (b) pagado a cualquier participante en o antes del 1 de octubre después de la conclusión de dicho Año fiscal.  Sin embargo, dicha Restauración de Beneficios tendrá como tope la Reducción de Beneficios Mensuales veces doce (12) por cada participante para un Año fiscal en particular.

*Prioridad:* PROMESA tiene prioridad sobre todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, reglas, reglamentos y políticas en vigencia a la Fecha de Confirmación que creen, requieran o apliquen beneficios de pensión para los empleados y otros beneficios que sean modificados por el Plan, y se los considerará incompatibles con PROMESA en caso de que estos sean incompatibles con el tratamiento de las Reclamaciones de Retirados Permitidas.

| | |
|---|---|
| | *Votación*: La Clase 48A está afectada por el Plan.  La Clase 48A y cada tenedor de una Reclamación de Retirados Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*:  [___]<br><br>*Recobros proyectados del ELA*:  [___] |
| **Clase 48B:**<br>Reclamaciones de Participantes Activos de SRE | *Clasificación:*  La Clase 48B consiste en todas las reclamaciones contra SRE por parte de empleados contratados antes del 1 de enero de 2000 por cuenta de ser o haber sido participante en SRE para recibir beneficios de retiro devengados hasta la fecha de aplicación de la Ley 106, en poder de una persona que, según conste en los registros de SRE, SRJ o SRM, según proceda, a 1 de abril de 2021 <u>no</u> recibe una pensión o anualidad como participante en SRE (ya sea activa o como una anualidad diferida).  Las Reclamaciones de Participantes Activos de SRE no incluyen Reclamaciones en poder de un participante cuya fecha de contratación fue en o después del 1 de enero de 2000, sobre la base de la participación en el Sistema 2000.<br><br>*Tratamiento:*<br><br><u>Ajuste de beneficios</u>.  Cada tenedor de una Reclamación de Participantes Activos de SRE recibirá, a partir de la Fecha de Reducción de Beneficios[370] o el primer pago de beneficios de retiro después de la fecha de inicio de la pensión de dicho tenedor, lo que ocurra más tarde, pagos mensuales con las modificaciones que se detallan a continuación.<br><br>*Beneficios devengados antes del 4 de mayo de 2017*:  Todos los beneficios de pensión devengados obtenidos por los participantes antes del 4 de mayo de 2017 conforme a la Ley 1 y a la Ley 477 estarán sujetos a reducción de la manera siguiente:<br><br>El Beneficio Mensual Total (que incluye la Pensión Básica Mensual, la Bonificación de Navidad Mensual, la Bonificación de Verano Mensual y la Bonificación de Medicamentos Mensual) no puede reducirse por debajo de $1,500.00 por mes y cualquier participante que reciba $1,500.00 o menos por mes no se verá afectado.  El umbral mínimo de beneficios seguirá siendo de $1,500.  Los montos de pensión devengados y de umbral no se indexarán por ningún motivo en el futuro, salvo para disposiciones de Restauración de Beneficios de Pensión.<br><br>El Beneficio Mensual Total se reducirá hasta uno de los siguientes, el que sea menor (la "<u>Reducción Máxima</u>"): |

[370] La Fecha de Reducción del Beneficio es (a) 1 de julio de 2021, y (b) el primer 1 de julio después de la Fecha de Entrada en vigencia, la que ocurra más tarde. Sin embargo, si el primer 1 de julio después de la Fecha de Entrada en vigencia fuera menos de 180 días después de la Fecha de Entrada en vigencia, la "Fecha de Reducción del Beneficio" será el primer día del mes que sea 180 días después de la Fecha de Entrada en vigencia.

408

(a) 8.5% del Beneficio Mensual Total se ha reducido; o

(b) el Beneficio Mensual Total ha alcanzado $1,500.00 por mes.

El Beneficio Mensual Total se reducirá en el orden siguiente:

(a) Reducción de la Bonificación de Navidad: En primer lugar, se reducirá la Bonificación de Navidad Mensual hasta que el Beneficio Mensual Total alcance la Reducción Máxima o la Bonificación de Navidad Mensual se haya eliminado;

(b) Reducción de la Bonificación de Verano: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en segundo lugar, la Bonificación de Verano Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación Mensual de Verano se haya eliminado;

(c) Reducción de la Bonificación de Medicamentos: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en tercer lugar, la Bonificación de Medicamentos Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación de Medicamentos Mensual se haya eliminado;

(d) Reducción de la Pensión Básica: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en cuarto lugar, la Pensión Básica Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima.

La recepción de beneficios del Seguro Social y el Beneficio de Medicamentos Mensual no afectará las reducciones anteriores.

*Beneficios adquiridos en o después del 4 de mayo de 2017*: Los beneficios de pensión devengados adquiridos por los participantes en o después del 4 de mayo de 2017 no se reducirán.

*Exención de la fórmula de corte:* La parte de la pensión calculada relacionada con contribuciones anualizadas de la Ley 3 más intereses devengados a la tasa dispuesta para dicho fin por la ley de Puerto Rico sobre dichas contribuciones hasta el 3 de mayo de 2017 estará exenta de la fórmula de reducción de beneficios. Las Reclamaciones de Participantes Activos de SRE Permitidas que ya se hayan retirado y convertido sus contribuciones a una anualidad pagada del sistema no son elegibles para el tratamiento que se describe en esta clase, sino que estarán sujetos a la reducción de pensión aplicable a otros participantes de conformidad con la Clase 48A.

Restauración de beneficios. Durante el período desde la Fecha de Reducción de Beneficios hasta la conclusión del Año fiscal 2033 inclusive, si en un Año fiscal en particular, el Superávit en efectivo es igual o mayor que Cien Millones de Dólares ($100,000,000.00), entonces el diez por ciento (10%) de dicho Superávit en efectivo será (a) asignado y aplicado de manera prorrateada a cada

| | |
|---|---|
| | participante sobre la base del monto de reducciones totales experimentadas por cada participante durante dicho Año fiscal, y (b) pagado a cualquier participante en o antes del 1 de octubre después de la conclusión de dicho Año fiscal. Sin embargo, dicha Restauración de Beneficios tendrá como tope la Reducción de Beneficios Mensuales <u>veces</u> doce (12) por cada participante para un Año fiscal en particular. |
| | *Prioridad:* PROMESA tiene prioridad sobre todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, reglas, reglamentos y políticas en vigencia a la Fecha de Confirmación que creen, requieran o apliquen beneficios de pensión para los empleados y otros beneficios que sean modificados por el Plan, y se los considerará incompatibles con PROMESA en caso de que estos sean incompatibles con el tratamiento de las Reclamaciones de Participantes Activos de SRE Permitidas. |
| | *Votación*: La Clase 48B está afectada por el Plan. La Clase 48B y cada tenedor de una Reclamación de Participantes SRE Activos Permitida tienen derecho a votar por la aceptación o rechazo del Plan. |
| | ***Montos permitidos de reclamaciones***: [___] |
| | ***Recobro proyectado***: [___] |
| **Clase 48C:** Reclamaciones de Participantes Activos de SRJ | *Clasificación:* La Clase 48C consiste en todas las reclamaciones contra SRJ por cuenta de ser o haber sido participante en SRJ para (i) beneficios de retiro devengados al 4 de mayo de 2017, y (b) cualquier beneficio de retiro adicional en SRJ que dicho participante tendría derecho a recibir en el momento del retiro futuro de dicho participante, en poder de una persona que, según conste en los registros de SRE, SRJ o SRM, como proceda, a 1 de abril de 2021 <u>no</u> recibe una pensión o anualidad como participante en SRJ (ya sea activa o con derecho a una anualidad diferida). |
| | *Tratamiento:* |
| | <u>Ajuste de beneficios</u>. Cada tenedor de una Reclamación de Participantes Activos de SRJ recibirá, a partir de la Fecha de Reducción de Beneficios,[371] o el primer pago de beneficios de pensión después de la fecha de inicio de la pensión de dicho tenedor, lo que ocurra más tarde, pagos mensuales con las modificaciones por la Modificación de los Beneficios Mensuales establecida en el Plan y que se detallan a continuación. |
| | *Beneficios devengados antes del 4 de mayo de 2017*: Todos los beneficios de pensión devengados obtenidos por los participantes antes del 4 de mayo de 2017 estarán sujetos a reducción de la manera siguiente: |

---

[371] La Fecha de Reducción del Beneficio es (a) 1 de julio de 2021, y (b) el primer 1 de julio después de la Fecha de Entrada en vigencia, la que ocurra más tarde. Sin embargo, si el primer 1 de julio después de la Fecha de Entrada en vigencia fuera menos de 180 días después de la Fecha de Entrada en vigencia, la "Fecha de Reducción del Beneficio" será el primer día del mes que sea 180 días después de la Fecha de Entrada en vigencia.

El Beneficio Mensual Total (que incluye la Pensión Básica Mensual, la Bonificación de Navidad Mensual, la Bonificación de Verano Mensual y la Bonificación de Medicamentos Mensual) no puede reducirse por debajo de $1,500.00 por mes y cualquier participante que reciba $1,500.00 o menos por mes no se verá afectado. El umbral mínimo de beneficios seguirá siendo de $1,500.00. Los montos de pensión devengados y de umbral no se indexarán por ningún motivo en el futuro, salvo para disposiciones de Restauración de Beneficios de Pensión.

El Beneficio Mensual Total se reducirá hasta uno de los siguientes, el que sea menor (la "Reducción Máxima"):

(a) 8.5% del Beneficio Mensual Total se ha reducido; o

(b) el Beneficio Mensual Total ha alcanzado $1,500.00 por mes.

El Beneficio Mensual Total se reducirá en el orden siguiente:

(a) Reducción de la Bonificación de Navidad: En primer lugar, se reducirá la Bonificación de Navidad Mensual hasta que el Beneficio Mensual Total alcance la Reducción Máxima o la Bonificación de Navidad Mensual se haya eliminado;

(b) Reducción de la Bonificación de Verano: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en segundo lugar, la Bonificación de Verano Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación Mensual de Verano se haya eliminado;

(c) Reducción de la Bonificación de Medicamentos: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en tercer lugar, la Bonificación de Medicamentos Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación de Medicamentos Mensual se haya eliminado;

(d) Reducción de la Pensión Básica: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en cuarto lugar, la Pensión Básica Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima.

La recepción de beneficios del Seguro Social y el Beneficio de Medicamentos Mensual no afectará las reducciones anteriores.

*Beneficios adquiridos en o después del 4 de mayo de 2017*: Los beneficios adicionales por servicio en o después del 4 de mayo de 2017 se congelarán a la Fecha de Entrada en vigencia de manera que dicho participante ya no podrá devengar beneficios de pensión después de dicha fecha.

Los futuros beneficios de pensión se calcularán usando el servicio y la paga devengados hasta la Fecha de Entrada en vigencia del Plan. Los participantes

411

| | |
|---|---|
| | que no fueron elegibles para retirarse a la Fecha de Entrada en vigencia del Plan tendrán su elegibilidad de retiro postergada por hasta 3 años.  Los beneficios de retiro por servicio en o después de la Fecha de Entrada en vigencia (incluso las limitaciones sobre la transferencia de servicios, definición del beneficio devengado para quienes no lo hayan adquirido en el momento de congelamiento, eliminación del COLA, beneficios de reclamaciones de discapacidad y Seguro Social y elegibilidad / definición de beneficios para diferentes cohortes en base a la edad y el servicio) se modificarán de manera coherente con la Modificación de los Beneficios Mensuales establecida en el Plan.

Restauración de beneficios.  Durante el período desde la Fecha de Reducción de Beneficios hasta la conclusión del Año fiscal 2033 inclusive, si en un Año fiscal en particular, el Superávit en efectivo es igual o mayor que Cien Millones de Dólares ($100,000,000.00), entonces el diez por ciento (10%) de dicho Superávit en efectivo será (a) asignado y aplicado de manera prorrateada a cada participante sobre la base del monto de reducciones totales experimentadas por cada participante durante dicho Año fiscal, y (b) pagado a cualquier participante en o antes del 1 de octubre después de la conclusión de dicho Año fiscal.  Sin embargo, dicha Restauración de Beneficios tendrá como tope la Reducción de Beneficios Mensuales veces doce (12) por cada participante para un Año fiscal en particular.

*Prioridad:*  PROMESA tiene prioridad sobre todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, reglas, reglamentos y políticas en vigencia a la Fecha de Confirmación que creen, requieran o apliquen beneficios de pensión para los empleados y otros beneficios que sean modificados por el Plan, y se los considerará incompatibles con PROMESA en caso de que estos sean incompatibles con el tratamiento de las Reclamaciones de Participantes Activos de SRJ Permitidas.

*Votación*: La Clase 48C está afectada por el Plan.  La Clase 48C y cada tenedor de una Reclamación de Participantes JRS Activos Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.

*Montos permitidos de reclamaciones*: [___]

*Recobro proyectado*: [___] |
| **Clase 48D:**

Reclamaciones de Participantes Activos de SRM | *Clasificación:*  La Clase 48D consiste en todas las reclamaciones contra SRJ por cuenta de ser o haber sido participante en SRJ para (i) beneficios de retiro devengados al 4 de mayo de 2017, y (b) cualquier beneficio de retiro adicional en SRM que dicho participante tendría derecho a recibir en el momento del retiro futuro de dicho participante, en poder de una persona que, según conste en los registros de SRE, SRJ o SRM, como proceda, a 1 de abril de 2021 no recibe una pensión o anualidad como participante en SRM (ya sea activa o con derecho a una anualidad diferida).

*Tratamiento:* |

412

Ajuste de beneficios. Cada tenedor de una Reclamación de Participantes Activos de SRM recibirá, a partir de la Fecha de Reducción de Beneficios,[372] o el primer pago de beneficios de pensión después de la fecha de inicio de la pensión de dicho tenedor, lo que ocurra más tarde, pagos mensuales con las modificaciones por la Modificación de los Beneficios Mensuales establecida en el Plan y que se detallan a continuación.

*Beneficios devengados antes del 4 de mayo de 2017*: Todos los beneficios de pensión devengados obtenidos por los participantes antes del 4 de mayo de 2017 estarán sujetos a reducción de la manera siguiente:

El Beneficio Mensual Total (que incluye la Pensión Básica Mensual, la Bonificación de Navidad Mensual, la Bonificación de Verano Mensual y la Bonificación de Medicamentos Mensual) no puede reducirse por debajo de $1,500.00 por mes y cualquier participante que reciba $1,500.00 o menos por mes no se verá afectado. El umbral mínimo de beneficios seguirá siendo de $1,500.00. Los montos de pensión devengados y de umbral no se indexarán por ningún motivo en el futuro, salvo para disposiciones de Restauración de Beneficios de Pensión.

El Beneficio Mensual Total se reducirá hasta uno de los siguientes, el que sea menor (la "Reducción Máxima"):

(a) 8.5% del Beneficio Mensual Total se ha reducido; o

(b) el Beneficio Mensual Total ha alcanzado $1,500.00 por mes.

El Beneficio Mensual Total se reducirá en el orden siguiente:

(a) Reducción de la Bonificación de Navidad: En primer lugar, se reducirá la Bonificación de Navidad Mensual hasta que el Beneficio Mensual Total alcance la Reducción Máxima o la Bonificación de Navidad Mensual se haya eliminado;

(b) Reducción de la Bonificación de Verano: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en segundo lugar, la Bonificación de Verano Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación Mensual de Verano se haya eliminado;

(c) Reducción de la Bonificación de Medicamentos: Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en tercer lugar, la Bonificación de Medicamentos Mensual se reducirá hasta que el

[372] La Fecha de Reducción del Beneficio es (a) 1 de julio de 2021, y (b) el primer 1 de julio después de la Fecha de Entrada en vigencia, la que ocurra más tarde. Sin embargo, si el primer 1 de julio después de la Fecha de Entrada en vigencia fuera menos de 180 días después de la Fecha de Entrada en vigencia, la "Fecha de Reducción del Beneficio" será el primer día del mes que sea 180 días después de la Fecha de Entrada en vigencia.

Beneficio Mensual Total alcance la Reducción Máxima, o la Bonificación de Medicamentos Mensual se haya eliminado;

(d) Reducción de la Pensión Básica:  Si la reducción del Beneficio Mensual Total no ha alcanzado la Reducción Máxima, en cuarto lugar, la Pensión Básica Mensual se reducirá hasta que el Beneficio Mensual Total alcance la Reducción Máxima.

La recepción de beneficios del Seguro Social y el Beneficio de Medicamentos Mensual no afectará las reducciones anteriores.

*Beneficios adquiridos en o después del 4 de mayo de 2017*: Los beneficios adicionales por servicio en o después del 4 de mayo de 2017 se congelarán a la Fecha de Entrada en vigencia de manera que los participantes ya no podrán devengar beneficios de pensión después de dicha fecha.  Los futuros beneficios de pensión se calcularán usando el servicio y la paga devengados hasta la Fecha de Entrada en vigencia del Plan.

Los participantes que no sean elegibles para retirarse a la Fecha de Entrada en vigencia del plan pasarán a ser elegibles para retirarse con un beneficio de discapacidad al alcanzar la edad de 63 y 10 años de servicio.  Los beneficios de retiro por servicio en o después de la Fecha de Entrada en vigencia (incluso las limitaciones sobre la transferencia de servicios, beneficios de reclamaciones de discapacidad y Seguro Social y elegibilidad  / definición de beneficios para diferentes cohortes en base a la edad y el servicio) se modificarán de manera coherente con la Modificación de los Beneficios Mensuales establecida en el Plan.

Restauración de beneficios.  Durante el período desde la Fecha de Reducción de Beneficios hasta la conclusión del Año fiscal 2033 inclusive, si en un Año fiscal en particular, el Superávit en efectivo es igual o mayor que Cien Millones de Dólares ($100,000,000.00), entonces el diez por ciento (10%) de dicho Superávit en efectivo será (a) asignado y aplicado de manera prorrateada a cada participante sobre la base del monto de reducciones totales experimentadas por cada participante durante dicho Año fiscal, y (b) pagado a cualquier participante en o antes del 1 de octubre después de la conclusión de dicho Año fiscal.  Sin embargo, dicha Restauración de Beneficios tendrá como tope la Reducción de Beneficios Mensuales veces doce (12) por cada participante para un Año fiscal en particular.

*Prioridad:*  PROMESA tiene prioridad sobre todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, reglas, reglamentos y políticas en vigencia a la Fecha de Ratificación que creen, requieran o apliquen beneficios de pensión para los empleados y otros beneficios que sean modificados por el Plan, y se los considerará incompatibles con PROMESA en caso de que estos sean incompatibles con el tratamiento de las Reclamaciones de Participantes Activos de SRM Permitidas.

| | |
|---|---|
| | *Votación*: La Clase 48D está afectada por el Plan.  La Clase 48D y cada tenedor de una Reclamación de Participantes de SRM Activos Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones*: [___]<br><br>*Recobro proyectado*: [___] |
| **Clase 48E:**<br><br>Reclamaciones de Participantes del Sistema 2000 | *Clasificación: La* clase 48E consiste en las reclamaciones de los titulares de beneficios devengados en virtud del Sistema 2000 o de la Ley 3, cuya fecha de contratación fue el 1 de enero de 2000 o posterior, y que no se han jubilado ni han convertido sus contribuciones a una anualidad pagada del sistema, según conste en los registros de SRE, SRJ o SRM, como proceda, a 1 de abril de 2021.<br><br>*Tratamiento:*<br><br>Los tenedores de las Reclamaciones de Participantes del Sistema 2000 recibirán el monto de sus contribuciones a dichos planes desde 2000 hasta el 30 de junio de 2017, más intereses devengados a la tasa dispuesta para ese fin por la ley de Puerto Rico sobre dichas contribuciones hasta el 3 de mayo de 2017.  Dicho monto se depositará en las cuentas de contribuciones definidas establecidas de conformidad con la Ley 106-2017 y se invertirá por defecto en un fondo de ciclo de vida.<br><br>Si el monto total de las contribuciones a estos planes más intereses sobre dichas contribuciones hasta la Fecha de Petición es menor o igual a $1,500,000,000.00, en la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de un Participante del Sistema 2000 Permitido será la Participación Prorrateada que dicho tenedor recibirá sobre dicho monto total.<br><br>Si el monto total de las contribuciones más intereses devengados hasta la Fecha de Petición superan los $1,500,000,000.00, la Junta de Supervisión y AFSCME desarrollarán un plan de pagos mutuamente aceptable para ambas partes para abonar el saldo restante de las contribuciones que supere $1,500,000,000.00. En todo caso, el monto total de las contribuciones se pagará a todos los tenedores de Reclamaciones de Participantes del Sistema 2000 Permitidas, a más tardar el 31 de diciembre de 2025.<br><br>A la Fecha de Entrada en vigencia, los tenedores de las Reclamaciones de Participantes del Sistema 2000 Permitidas con contribuciones del Sistema 2000 desde 2000 hasta el 30 de junio de 2017 que no sean elegibles para recibir beneficios conforme a la Ley 1 y la Ley 447 ya no tendrán derecho a beneficios futuros del sistema administrado, como beneficios por muerte y discapacidad pagados o administrados por el sistema de retiros (incluso los beneficios de la Ley 127).<br><br>Las Reclamaciones de Participantes del Sistema 2000 Permitidas que ya se hayan retirado y convertido sus contribuciones a una anualidad pagada del sistema a la Fecha de Entrada en vigencia no son elegibles para el tratamiento |

<table>
<tr>
<td></td>
<td>que se describe en esta clase y no recibirán un pago en efectivo, sino que estarán sujetos a la reducción de pensión aplicable a otros participantes de conformidad con la Clase 48A.

*Prioridad:* PROMESA tiene prioridad sobre todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, reglas, reglamentos y políticas en vigencia a la Fecha de Confirmación que creen, requieran o apliquen beneficios de pensión para los empleados y otros beneficios que sean modificados y/o preservados en su totalidad o en parte por el Plan, y se los considerará incompatibles con PROMESA en caso de que estos sean incompatibles con el tratamiento las Reclamaciones de Participantes del Sistema 2000 Permitidas.

*Votación*: La Clase 48E está afectada por el Plan. La Clase 48E y cada tenedor de una Reclamación de Participantes del Sistema 2000 Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.

*Montos permitidos de reclamaciones*: [___]

*Recobro proyectado*: [___]</td>
</tr>
<tr>
<td>**Clase 49:**

Reclamaciones de empleados de AFSCME</td>
<td>*Clasificación: La* Clase 49 consiste en todas las reclamaciones contra el ELA relacionadas a ciertos contratos de negociación colectiva entre AFSCME y el ELA, que figuran en el Anexo H del Plan.

*Tratamiento:*

Rechazo de los contratos de negociación colectiva de AFSCME. En la Fecha de Entrada en vigencia, los contratos de negociación colectiva existentes entre el ELA, sus agencias e instrumentalidades aplicables, por un lado, y AFSCME y sus afiliados sindicales relacionados, por otro lado, serán rechazados conforme a la sección 365 del Código de Quiebras y se reemplazarán con contratos de negociación colectiva modificados, que se celebrarán de acuerdo con los términos y condiciones estipulados como Anexo J del Plan.[373] Dichas modificaciones incluyen (i) un plazo de cinco (5) años a partir de la Fecha de Entrada en vigencia, (ii) disposiciones con respecto a despidos y reducción de personal, (iii) términos relacionados con el Sistema 2000, y (iv) términos para compartir el Superávit en efectivo.

Cada tenedor de una Reclamación de Empleados de AFSCME Permitida recibirá lo siguiente como contraprestación, satisfacción, liberación e intercambio totales de la Reclamación de Empleados de AFSCME Permitida emergente de dicho rechazo:

Distribuciones adicionales de AFSCME: En o poco después de la Fecha de Entrada en vigencia, AFSCME y sus empleados miembros recibirán los siguientes pagos y distribuciones estipulados en el Apéndice II al Anexo H del</td>
</tr>
</table>

---

[373] Consulte la sección **Error! Reference source not found.** de esta Declaración de Divulgación para obtener un resumen de los términos del AAP de AFSCME.

| | |
|---|---|
| | Plan: (i) un pago por única vez de $500 a cada uno de los participantes representados por el Sindicato; (ii) un pago por única vez de $5,000,000.00 a AFSCME a ser distribuido como bonificación en efectivo por única vez a sus empleados miembros; y (iii) un pago por única vez de $5,000,000.00 a AFSCME como honorario de apoyo. |
| | Reclamaciones de arbitraje y agravios previos a la petición: Cualquier distribución por cuenta de Reclamaciones por montos por daños liquidados de la disposición de una acción previa a la petición presentada debido a procedimientos de agravio y arbitraje conforme al Contrato de Negociación Colectiva entre el ELA y AFSCME debe ser hecha por el ELA al reclamante, en cada caso en una fecha (i) 30 días después de la disposición y (ii) 60 días después de la Fecha de Entrada en vigencia, lo que ocurra más tarde. |
| | *Prioridad:* PROMESA tiene prioridad sobre todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, reglas, reglamentos y políticas en vigencia a la Fecha de Confirmación que creen, requieran o apliquen beneficios de pensión para los empleados y otros beneficios que sean modificados por el Plan, y se los considerará incompatibles con PROMESA en caso de que estos sean incompatibles con las Reclamaciones de empleados de AFSCME Permitidas. |
| | *Votación*: La Clase 49 está afectada por el Plan. La Clase 49 y cada tenedor de una Reclamación de Empleados AFSCME Permitida tienen derecho a votar por la aceptación o el rechazo del Plan. |
| | ***Montos permitidos de reclamaciones***: [____] |
| | ***Recobros proyectados del ELA***: [____] |
| **Clase 50:** Reclamaciones de productores de leche | *Clasificación: La* Clase 50 consiste en todas las reclamaciones Suiza Dairy, Inc. y Vaquería Tres Monjitas, Inc. que surgen de y se relacionan con el Acuerdo de Productores Lácteos, que a partir de la Fecha de Entrada en vigencia, serán (a) permitidas por un monto total de $61,999,999.00, y (b) asignadas a Suiza Dairy, Inc. y Vaquería Tres Monjitas, Inc. por un monto de $44,832,199.28 y $17,167,799.92, respectivamente. |
| | *Tratamiento:* En la Fecha de Entrada en vigencia, cada titular de una Reclamación de Productor Lechero recibirá, como contraprestación, satisfacción, liberación e intercambio totales de la Reclamación de Productor Lechero Permitida de dicho titular, una cantidad equivalente al 50% de dicha Reclamación de Productor Lechero Permitida, siendo dicha cantidad pagadera por el ELA en cinco (5) plazos iguales comenzando en la Fecha de Entrada en vigencia y realizándose cada uno de los pagos subsiguientes el 1 de julio de cada año fiscal. |
| | *Votación*: La Clase 50 está afectada por el Plan. La Clase 50 y cada tenedor de una Reclamación de Productor Lechero Permitida tienen derecho a votar por la aceptación o el rechazo del Plan. |

| | |
|---|---|
| | ***Montos permitidos de reclamaciones***: $61,999,999.00<br><br>***Recobros proyectados del ELA***:  50% |
| **Clase 51:**<br><br>Reclamaciones de dominio eminente | ***Clasificación: La*** clase 51 consiste en reclamaciones derivadas o relacionadas con una acción o procedimiento de expropiación iniciado por el Estado Libre Asociado o un organismo o entidad del mismo en el Tribunal de Primera Instancia de acuerdo con 32 L.P.R.A § 2905 para obtener el título de propiedad de un inmueble ubicado en Puerto Rico, y se ha dictado una Orden Final por una cantidad superior a la depositada por el expropiante.<br><br>***Tratamiento:***  En la Fecha de Entrada en vigencia (a) en la medida en que no haya sido modificada previamente, la paralización automática a tenor con el artículo 362 del Código de Quiebras se considerará modificada para permitir al titular de una Demanda de Dominio Eminente (i) liquidar dicha Demanda de Dominio Eminente, y (ii) hacer que el Secretario del Tribunal de Primera Instancia distribuya a dicho titular el importe de los fondos depositados en el Tribunal de Primera Instancia con respecto a la propiedad, y (b) el titular de una Reclamación de Dominio Eminente Permitida tendrá derecho a recibir, como contraprestación, satisfacción, liberación e intercambio totales de la Reclamación de Dominio Eminente Permitida de dicho titular, la Participación Prorrateada de dicho titular del Recobro de GUC del ELA.<br><br>El Recobro de GUC del ELA consta de<br><br>(A) $125,000,000.00 en efectivo, y<br><br>(B) los recobros netos por el Fideicomiso de Acciones de Reintegración asignables a las participaciones del del ELA en las Acciones de Reintegración.<br><br>***Votación***: La Clase 51 está afectada por el Plan.  La Clase 51 y cada tenedor de una Reclamación de Dominio Eminente Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>***Montos estimados permitidos de reclamaciones***: [$_____]<br><br>***Recobros proyectados del ELA***:  [___] |
| **Clase 52:**<br><br>Reclamaciones de incentivos energéticos | ***Clasificación: La*** Clase 52 consiste en todas y cada una de las reclamaciones que surgen de o están relacionadas con la Ley de Incentivos de Energía Verde de Puerto Rico, Ley Núm. 83-2010, incorporada bajo el Nuevo Código de Incentivos, Ley 60-2019 (la "Ley de Incentivos de Energía"), en relación con la promoción de la producción de energía renovable.<br><br>***Tratamiento:***  En la Fecha de Entrada en vigencia, (i) el ELA continuará con el programa de incentivos energéticos establecido en la Ley de Incentivos Energéticos, y (ii) asumirá las Reclamaciones de Incentivos Energéticos Permitidas y los instrumentos y acuerdos de reserva existentes en la Fecha de Entrada en vigencia y de manera coherente con los términos de la Ley de |

418

| | |
|---|---|
| | Incentivos Energéticos, y (b) en la medida en que los respectivos proyectos hayan sido completados de acuerdo con la Ley de Incentivos Energéticos y los instrumentos y acuerdos de reserva relacionados, los titulares de las Reclamaciones de Incentivos Energéticos Permitidas podrán ejercer y reclamar los incentivos fiscales creados por dichas reclamaciones.<br><br>*Votación*: La Clase 52 no está Afectada por el Plan. Se considera que la Clase 52 y cada tenedor de una Reclamación Incentivos Energéticos Permitida han aceptado el Plan.<br><br>***Montos estimados permitidos de reclamaciones***: [$_____]<br><br>***Recobros proyectados del ELA***: 100% |
| **Clase 53:**<br><br>Reclamaciones de centros médicos | ***Clasificación:*** La Clase 53 consiste en todas y cada una de las reclamaciones de ciertos centros de salud federalmente calificados ("Centros Médicos", según se define en el Plan) que surgen de la Ley de Medicaid, 42 U.S.C. § 1396a(bb), incluyendo, sin limitación, (a) todas las reclamaciones y causas de acción presentadas o que podrían haber sido presentadas en el Litigio del Centro Médico, (b) todos los montos declarados como adeudados, o que podrían haber sido declarados como adeudados, en la Evidencia de Reclamación del Centro Médico, y (c) todos los montos declarados como adeudados y relacionados con el período comprendido entre la Fecha de Petición del ELA y la Fecha de Entrada en vigencia, inclusive.<br><br>***Tratamiento:*** En la Fecha de Entrada en vigencia, y siempre que la Clase 53 vote para aceptar el Plan, cada titular de una Reclamación del Centro Médico (a) recibirá una Reclamación del Centro Médico Permitida en la cantidad establecida en la Columna A del Anexo I del Plan, y (b) tendrá derecho a recibir una cantidad equivalente al 50% de dicha Reclamación del Centro Médico Permitida, siendo dicha cantidad pagadera por el ELA en cinco (5) plazos iguales comenzando en la Fecha de Entrada en vigencia y cada pago subsiguiente siendo realizado el 1 de julio de cada Año Fiscal .<br><br>Sin embargo, si la Clase 53 vota para rechazar el Plan, cada titular de una Reclamación del Centro Médico recibirá una Reclamación del Centro Médico Permitida en la cantidad establecida en la Columna B del Anexo I del Plan.<br><br>***Desestimación del Litigio del Centro Médico:*** En la Fecha de Entrada en vigencia, el Litigio del Centro Médico se considerará desestimado, con prejuicio, y cada uno de los del ELA y los respectivos Centros Médicos tomarán las medidas necesarias para notificar al tribunal correspondiente dicha desestimación.<br><br>*Votación*: La Clase 53 está afectada por el Plan. La Clase 53 y cada tenedor de una Reclamación del Centro Médico Permitida tienen derecho a votar por la aceptación o el rechazo del Plan. |

| | |
|---|---|
| | *Montos permitidos de reclamaciones*: Si la Clase 53 vota para aceptar el Plan, $293,583,772.78; si la Clase 53 vota para rechazar el Plan, $145,982,458.41<br><br>*Recobros proyectados del ELA*:  50% |
| **Clase 54:**<br>Reclamaciones de créditos fiscales | *Clasificación: La* Clase 54 consiste en Reclamaciones, distintas de las Reclamaciones de Incentivos Energéticos y de las Reclamaciones relacionadas con el pago del impuesto sobre la renta de las personas físicas, que surgen en virtud del Código de 2011 o de una ley de incentivos económicos, en cada caso, y que dan lugar a acreedores, deducciones o traslados del impuesto sobre la renta de las personas jurídicas.<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, (a) el ELA asume los Créditos Fiscales Permitidos y los instrumentos y acuerdos relacionados existentes en la Fecha de Entrada en vigencia.  Los titulares de los Créditos Fiscales Permitidos podrán ejercer y reclamar los beneficios y derechos fiscales con respecto a dichos Créditos Fiscales Admitidos de acuerdo con los términos y disposiciones de dichos documentos, instrumentos y la legislación aplicable.<br><br>*Votación*: La Clase 54 no está Afectada por el Plan.  Se considera que la Clase 54 y cada tenedor de una Reclamación de Créditos Fiscales Permitida han aceptado el Plan.<br><br>*Montos estimados permitidos de reclamaciones*: [$_____]<br><br>*Recobros proyectados del ELA*:  100% |
| **Clase 55:**[374]<br>Reclamaciones Generales no Garantizadas del ELA | *Clasificación: La* Clase 55 consiste en todas las reclamaciones contra el ELA, salvo (a) cualquier Reclamación tratada en cualquier otra Clase de conformidad con el Plan, (b) una Reclamación Interinstrumentalidad, (c) cualquier Reclamación sujeta a las disposiciones de la Orden de ACR, o (d) cualquier Reclamación que el Tribunal del Título III determine que no sea una Reclamación General no Garantizada del ELA.<br><br>*Tratamiento:*  En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación General no Garantizada del ELA  recibirá su Participación Prorrateada del Recobro de GUC del ELA compuesta por:<br><br>(A) $125,000,000.00 en efectivo, y |

---

[374] El 3 de marzo de 2020, CANA presentó una moción 3013 para que se dictara una orden de reclasificación de las reclamaciones de la Clase 48A y de la Clase 55 bajo el plan de ajuste propuesto (la "Moción 3013") [ECF Núm. 11989]. En la Moción 3013, CANA argumentó que el esquema de clasificación en el plan enmendado no puede ser aprobado bajo el precedente del Primer Circuito que requiere un "enfoque estricto" para la clasificación del plan. El 23 de abril de 2020, el Tribunal del Título III emitió una orden desestimando la moción [ECF Núm. 12952]. El 13 de abril de 2021, CANA presentó una moción 3013 renovada para la emisión de una orden de reclasificación de las reclamaciones de la Clase 48A y la Clase 55 bajo el plan de ajuste propuesto [ECF No. 16396]. El 29 de abril de 2021, el Tribunal del Título III emitió una orden desestimando la moción 3013 renovada de CANA [ECF No. 16629].

| | |
|---|---|
| | (B) recobros netos por el Fideicomiso de Acciones de Reintegración asignables a la participación del ELA en las Acciones de Reintegración.

Las distribuciones a un tenedor de una Reclamación General no Garantizada del ELA no pueden superar el 100% de la Reclamación General no Garantizada del ELA Permitida. Si las Reclamaciones Generales no Garantizadas del ELA se pagaron en su totalidad, el valor en exceso del Recobro GUC del ELA se redistribuirá, de manera prorrateada, para beneficio de los tenedores de Reclamaciones de Dominio Eminente Permitidas, Reclamaciones ELA/Centro de Convenciones, las Reclamaciones ELA/ACT Permitidas, las Reclamaciones ELA/Impuesto al Ron de AFI Permitidas, y las Reclamaciones ELA/AMA Permitidas.

*Votación*: La Clase 55 está afectada por el Plan. La Clase 55 y cada tenedor de una Reclamación General no Garantizada del ELA Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.

***Montos estimados permitidos de reclamaciones***: [$_____]

***Recobros proyectados del ELA***: [___]

***Elección a tratarse como reclamación de conveniencia (Clase 66)****: Cualquier tenedor de una Reclamación General no Garantizada del ELA puede elegir (a) reducir el monto de dicha Reclamación General no Garantizada del ELA a $10,000.00, y (b) hacer que dicha reclamación reducida reciba el tratamiento correspondiente a la Clase 66 (Reclamaciones de Conveniencia), recibiendo un recobro proyectado del 100% de dicha reclamación reducida. Cualquier tenedor de una Reclamación General no Garantizada del ELA Permitida puede elegir (a) reducir el monto de dicha Reclamación General no Garantizada del ELA Permitida al monto total de $20,000.00, y (b) hacer que dichas reclamaciones reducidas reciban el tratamiento correspondiente a la Clase 66 (Reclamaciones de Conveniencia), recibiendo un recobro proyectado del 100% de dichas reclamaciones reducidas.

Dicha elección debe hacerse en la votación y debe ser recibida por los Deudores en o antes de la Fecha de la Votación. Cualquier elección recibida por los Deudores después de la Fecha de la Votación no será vinculante para los Deudores. |
| **Clase 56:**

Reclamaciones ELA/ACT | *Clasificación:* La Clase 56 consiste en todas las reclamaciones contra el ELA emergentes de o relacionadas con la retención por parte del ELA de ciertos fondos históricamente transferidos a ACT conforme a las disposiciones de la Constitución del ELA, cualquier legislación, regulación u orden ejecutiva, lo que incluye, entre otros, reclamaciones relacionadas con los derechos u obligaciones emergentes de (a) la Sección 8 del Artículo VI de la Constitución del ELA, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), y el Boletín Administrativo del Estado Libre Asociado de Puerto Rico, Núm. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30 y OE-2016-31 y (b) el endeudamiento emitido por ACT conforme a (i) la Resolución Núm. 68- |

18, adoptada el 13 de junio de 1968, y (ii) la Resolución Núm. 98-06, adoptada el 26 de febrero de 1998.

*Tratamiento:* En la Fecha de Entrada en vigencia, y con sujeción a que se hayan satisfecho las Condiciones de distribución, cada tenedor de una Reclamación ELA/ACT Permitida (incluyendo las aseguradoras monolínea) recibirá su Participación Prorrateada del Recobro de Recuperación, que consiste en el 68,6% en CVI de recuperación.

Una vez satisfechas las Condiciones de distribución, Assured y National recibirán sus respectivas participaciones en el Recobro de Recuperación de ELA/ACT por cuenta de las Reclamaciones de Bonos ELA/ACT (Assured) y de las Reclamaciones de Bonos ELA/ACT (National), respectivamente.

*Distribución del Recobro de Recuperación de ELA/ACT:* Una vez satisfechas las Condiciones de Distribución[375], el ELA adoptará aquellas medidas que fuesen necesarias para distribuir el Recobro de Recuperación de ELA/ACT a los tenedores de Reclamaciones de Bonos ELA/ACT Permitidas (incluyendo las aseguradoras monolínea) y para efectuar los pagos por cuenta de las mismas de conformidad con los términos y condiciones del Plan, la Escritura de CVI de recuperación y la sección Distribución en cascada prioritaria del CVI de recuperación de ACT del Anexo J del Plan.

Tras la recepción de la Determinación de la prioridad de préstamos del BGF. (a) el efectivo a pagar en concepto del CVI de recuperación de

---

[375] Las Condiciones de distribución son las siguientes:

(a) que se haya producido la Fecha de entrada en vigencia;

(b) que la documentación del Plan de ACT, la Orden de confirmación de ACT, la Escritura de los Nuevos Bonos de ACT, la Documentación del Fideicomiso (en su caso) y los Documentos de custodia del Fideicomiso hayan sido aceptados por la Junta de Supervisión, Assured y National;

(c) que los tenedores, o aseguradores, con derecho a voto con respecto a los Bonos ACT 68, que posean o aseguren, según proceda, al menos el 67% de la cuantía del capital pendiente de los Bonos ACT 68, hayan formalizado el Acuerdo de Apoyo al Plan de ACT/ADCC (o bien, un Acuerdo de acumulación o un Acuerdo anexo sobre el particular);

(d) que los titulares o aseguradores con derecho a voto con respecto a los Bonos ACT 98 Senior, que posean o aseguren, según proceda, al menos el 67% de la cuantía del capital pendiente de los Bonos ACT 98, hayan formalizado el Acuerdo de Apoyo al Plan de ACT/ADCC (o bien, un Acuerdo de acumulación o un Acuerdo anexo sobre el particular).

Tras el dictado de la Orden final sobre la Orden de confirmación de ACT, se considerarán satisfechas las condiciones estipuladas en las subsecciones (c) y (d) precedentes.

ACT y asignable a los Bonos ACT 98, estará sujeto a la Reserva de pagos de CVI, y (b) el Recobro de Recuperación de ELA/ACT asignable a los tenedores de Reclamaciones de ELA/ACT permitidas relacionadas con los Préstamos del BGF a la ACT no se distribuirán a los tenedores de Préstamos del BGF a la ACT.

Una vez recibida la Determinación de la prioridad de préstamos del BGF, los fondos de la Reserva de pagos de CVI y cualesquiera Recobros de Recuperación de ELA/ACT no distribuidos se librarán a los bonistas de ACT y tenedores de préstamos del BFF a la ACT, según proceda, en función de, (y) en el caso de los tenedores de Bonos ACT 98 y de Préstamos del BGFA a la ACT, los términos y condiciones de dicha Determinación de la prioridad de préstamos del BGF y, (z) en el caso de los tenedores de Bonos ACT 68 y ACT 98, de conformidad con el Apéndice 6 del Anexo J del Plan.

El CVI de recuperación de ACT se emitirá y distribuirá de conformidad con el Artículo LX del Plan, y los pagos a abonar se mantendrán en una reserva o fideicomiso, cuya forma y contenido serán razonablemente aceptables para Assured y National, hasta la fecha (incluida) en que se satisfagan las Condiciones de distribución y, en caso de que el AAP de ACT/ADCC resulte rescindido por la Junta de Supervisión, Assured y/o National, el CVI de recuperación de ACT y cualesquiera distribuciones por cuenta del mismo se librarán de dicha reserva o fideicomiso, según proceda, y se distribuirán a los acreedores según se estipula en el Anexo J del Plan.

*Votación*: La Clase 56 está afectada por el Plan. La Clase 56 y cada tenedor de una Reclamación ELA/ACT Permitida tienen derecho a votar por la aceptación o el rechazo del Plan. No obstante, Assured y National tiene derecho a votar por cuenta de las citadas Reclamaciones de ELA/ACT Permitidas aseguradas por Assured y National, respectivamente.

*Montos estimados de reclamaciones*: $6,257,585,807.42

*Recobros proyectados del ELA*: Contingente

| | |
|---|---|
| **Clase 57:**<br>Reclamaciones ELA/Centro de Convenciones | *Clasificación:* La Clase 57 consiste en todas las reclamaciones contra el ELA emergentes de o relacionadas con la retención por parte del ELA de ciertos fondos históricamente transferidos a ADCC conforme a las disposiciones de la Constitución del ELA, cualquier legislación, regulación u orden ejecutiva, lo que incluye, entre otros, reclamaciones relacionadas con los derechos u obligaciones emergentes de (a) la Sección 8 del Artículo VI de la Constitución del ELA, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), y el Boletín Administrativo del Estado Libre Asociado de Puerto Rico Núm. OE-2015-46, OE-2016-14 y OE-2016-31 y (b) el endeudamiento emitido por ADCC de conformidad con el |

| | |
|---|---|
| | Acuerdo de Fideicomiso, de fecha 24 de marzo de 2006, entre ADCC y JPMorgan Chase Bank, N.A., como síndico.

**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación ELA/Centro de Convenciones Permitida recibirá su Participación Prorrateada del Recobro de recuperación de ELA/Centro de Convenciones, que consiste en 4.0% en CVI de recuperación.

**Votación**: La Clase 57 está afectada por el Plan. La Clase 57 y cada tenedor de una Reclamación ELA/Centro de Convenciones Permitida tienen derecho a votar por la aceptación o el rechazo del Plan. No obstante, Assured tiene derecho a votar por cuenta de las Reclamaciones permitidas aseguradas por Assured.

**Montos estimados de reclamaciones**: $386,637,854.25

**Recobros proyectados del ELA**: Contingente |
| **Clase 58:**

Reclamaciones ELA/Impuesto al Ron de AFI | **Clasificación:** La Clase 58 consiste en todas las reclamaciones contra el ELA emergentes de o relacionadas con la retención por parte del ELA de ciertos fondos históricamente transferidos a AFI conforme a las disposiciones de la Constitución del ELA, cualquier legislación, regulación u orden ejecutiva, lo que incluye, entre otros, reclamaciones relacionadas con los derechos u obligaciones emergentes de (a) la Sección 8 del Artículo VI de la Constitución del ELA, 3 L.P.R.A. §1914, y el Boletín Administrativo del Estado Libre Asociado de Puerto Rico Núm. OE-2015-46, OE-2016-27 y OE-2016-30 y (b) el endeudamiento emitido por AFI de conformidad con el Acuerdo de Fideicomiso, de fecha 1 de octubre de 1988, entre AFI y U.S. Bank Trust National Association, como síndico.

**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación ELA/Impuesto al Ron de AFI Permitida recibirá su Participación Prorrateada del Recobro de recuperación de ELA/Impuesto al Ron de AFI, que consiste en el 27% de los CVI de recuperación.

Con sujeción a la Sección 71.1 del Plan, Assured recibirá su Recobro de recuperación de ELA/AFI por cuenta de las Reclamaciones ELA/Impuesto al Ron de AFI Permitidas derivada de bonos asegurados por Assured.

**Votación**: La Clase 58 está afectada por el Plan. La Clase 58 y cada tenedor de una Reclamación ELA/Impuesto al Ron de AFI Permitida tienen derecho a votar por la aceptación o el rechazo del Plan. No obstante, Assured tiene derecho a votar por cuenta de las Reclamaciones permitidas aseguradas por Assured.

**Montos estimados de reclamaciones**: $1,928,867,051.00 (en litigio) |

| | *Recobros proyectados del ELA*: Contingente |
|---|---|
| **Clase 59:**<br><br>Reclamaciones ELA/AMA | *Clasificación:* La Clase 59 consiste en todas las reclamaciones contra el ELA emergentes de o relacionadas con la retención por parte del ELA de ciertos fondos históricamente transferidos a AMA relacionados con los derechos u obligaciones conforme a las disposiciones de la Constitución del ELA, cualquier legislación, regulación u orden ejecutiva,<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación ELA/AMA Permitida recibirá su Participación Prorrateada del Recobro de recuperación de ELA/AMA, que consiste en el 0,4% del CVI de recuperación.<br><br>*Votación*: La Clase 59 está afectada por el Plan. La Clase 59 y cada tenedor de una Reclamación ELA/AMA Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos estimados de reclamaciones*: $30,106,786,87<br><br>*Recobros proyectados del ELA*: Contingente |
| **Clase 60:**<br><br>Reclamaciones por Asignaciones del ELA | *Clasificación:* La Clase 60 consiste en todas las reclamaciones contra el ELA emergentes de o relacionadas con (a) la deuda pagadera de asignaciones de la Legislatura del ELA conforme a préstamos existentes o resoluciones legislativas (lo que incluye notas en poder de PFC para el pago de deudas de PFC), y (b) préstamos pagaderos de asignaciones por la Legislatura del ELA bajo las leyes o resoluciones legislativas existentes en poder de la Autoridad de Reestructuración del BGF o el Fideicomiso de Entidades Públicas del BGF.<br><br>*Tratamiento:* Las Reclamaciones de Asignaciones del ELA Permitidas no recibirán una distribución conforme al Plan.<br><br>*Votación*: La Clase 60 está afectada por el Plan. Se considera que la Clase 60 y cada tenedor de la Reclamación de Asignaciones del ELA Permitidas han rechazado el Plan.<br><br>*Montos estimados permitidos de reclamaciones*: [____]<br><br>*Recobros proyectados del ELA*: 0% |

| Clase 61: Reclamaciones Subordinadas del ELA 510(b) | **Clasificación:**  La Clase 61 consiste en todas las reclamaciones, en la medida en que se determine conforme a una Orden Final, contra los Deudores o sus activos emergentes de o relacionados con (a) la rescisión de una compra o venta de un título valor existente de un Deudor o una filial de un Deudor, (b) la compra, venta o retención de dicho título valor, o (c) el reembolso, la indemnización o la contribución permitida conforme a la sección 502 del Código de Quiebras por cuenta de dicha reclamación. |
|---|---|
| | **Tratamiento:** Las Reclamaciones Subordinadas del ELA 510(b) Permitidas no recibirán una distribución conforme al Plan. |
| | **Votación**: La Clase 61 está afectada por el Plan.  Se considera que la Clase 61 y cada tenedor de una Reclamación Subordinada del ELA 510(b) han rechazado el Plan. |
| | **Montos estimados permitidos de reclamaciones**: $0 |
| | **Recobros proyectados del ELA**:  0% |
| Clase 62: Reclamaciones de Bonos SRE | **Clasificación: La** Clase 62 consiste en todas las reclamaciones contra el SRE emergentes de o relacionadas con los Bonos SRE, lo que incluye el interés devengado durante el período hasta, pero no inclusive, la Fecha de Petición de SRE. |
| | Los bonos SRE incluyen lo siguiente: |
| | *(ver tabla)* |
| | **Tratamiento:**  En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación de Bonos SRE Permitida recibirá su Participación Prorrateada en el Recobro de Bonos SRE, que consta de (a) 373,000,000,00, (b) el derecho de recibir el producto de la Cartera de inversiones del SRE o de su participación en el Fideicomiso del SRE, según proceda, si el ELA adquiere la Cartera de inversiones del SRE o la participación en el Fideicomiso del SRE, según proceda, de conformidad con los términos y condiciones de la Sección 66.2 del Plan, y (c) si el ELA opta por no adquirir dichos activos, la opción de compra de la Cartera de inversiones del SRE o la participación en el Fideicomiso del SRE, según proceda, por $70,750,000.00, más aquella cuantía que pudiese ser necesaria para reembolsar al ELA cualquier merma en relación con la Cartera de inversiones del SRE. |

|  | Fecha de emisión |
|---|---|
| Bonos de Financiamiento de Pensiones Prioritarios (Senior), Serie 2008A | 31/01/2008 |
| Bonos de Financiamiento de Pensiones Prioritarios (Senior) 2008B | 02/06/2008 |
| Bonos de Financiamiento de Pensiones Prioritarios (Senior), Serie 2008C | 30/06/2008 |

426

A efectos de distribución, los cálculos se basarán en el monto de las Reclamaciones de Bonos de SRE netas permitidas.

*Cartera de inversiones/Fideicomiso del SRE:* la Cartera de inversiones del SRE consta de una cartera de participaciones en renta variable mantenida por el SRE en la Fecha de Entrada en vigencia. El Fideicomiso del SRE es un fondo creado de acuerdo con los términos y condiciones de la Estipulación del SRE para mantener la participación del SRE en la Cartera de inversiones del SRE, y en virtud del cual el SRE seguirá administrando dichos activos hasta la compra de los mismos, de conformidad con la Sección 66.2 del Plan.

Elección del ELA de adquirir (Elección del ELA): desde la Fecha de Entrada en vigencia y hasta el 10 de abril de 2023 (incluido), el ELA tendrá la opción de adquirir la Cartera de inversiones del SER por $70,750,000.00, y el producto de dicha compra se distribuirá, sin compensaciones ni deducciones de impuestos, a los tenedores de Reclamaciones de Bonos SRE permitidas, de conformidad con la Sección 66.1 del Plan.

Elección de los bonistas de adquirir (Elección de los bonistas): Si el ELA optase por no adquirir a Cartera de inversiones del SRE u omitiese notificar la ejercitación de su derecho de adquirirla hasta el 10 de abril de 2023, cualesquiera tenedores de Reclamaciones de Bonos SRE permitidas tendrán la opción de ejercitar la Elección de los bonistas y comprar todas las participaciones en el Fideicomiso del SRE por $70,750,000.00 más aquella cantidad que pudiese ser necesaria para reembolsar al ELA en concepto de cualquier merma relacionada con la Cartera de inversiones del SRE durante el período que va desde el 2 de abril de 2021 y hasta la fecha de la compra de la misma (incluida) que no haya sido previamente reembolsada al ELA.

Si uno o más tenedores de Reclamaciones de Bonos SRE permitidas optasen por ejercitar la Elección de los bonistas, dichos tenedores pagarán prorrateada mente al ELA el precio de compra calculado con respecto a las Reclamaciones de Bonos SRE permitidas como más tardar el 20 de abril de 2023.

Obligación de compra del ELA: Si hasta el 25 de abril de 2023 no se ejercitasen la Elección del ELA ni la Elección de los bonistas, (i) el ELA adquirirá la Cartera de inversiones del SRE por $70,750,000.00, y (ii) el ELA distribuirá el producto del mismo, sin compensaciones ni deducciones de impuesto, a los tenedores de

| | Reclamaciones de Bonos SRE permitidas, de conformidad con la Sección 66.1 del Plan. |
|---|---|
| | **Desistimiento del pleito:** En la Fecha de Entrada en vigencia, (a) el Pleito del SRE será desistido y/o rechazado, sin perjuicio, y (b) la Junta de Supervisión, directamente o a través de sus comités, el Comité de Acreedores y los Bonistas del SRE (por su propia cuenta o en nombre de afiliados o fondos o cuentas relacionadas administrados por afiliados) adoptarán todas las medidas que fuesen razonablemente necesarias, incluyendo la presentación de aquellas notificaciones, estipulaciones u otros recursos (i) en el Tribunal del Título III para materializar dicho desistimiento y/o rechazo del Pleito del SRE, sin perjuicio, y (ii) en la Corte de Apelaciones de Estados Unidos del Circuito Federal, para materializar el desistimiento y/o rechazo de la Acción de expropiaciones del SRE, sin perjuicio.

**Votación**: La Clase 62 está afectada por el Plan. La Clase 62 y cada tenedor de una Reclamación de Bonos SRE Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.

**Montos permitidos de reclamaciones**: $3,168,698,776.55

**Recobros proyectados de SRE**: 4.0% |
| **Clase 63:**<br><br>Reclamaciones Generales no Garantizadas de SRE | **Clasificación: La** Clase 63 consiste en todas las reclamaciones contra SRE que no son una Reclamación de Bonos SRE o una Reclamación de Bonos SRE Conciliada.

**Tratamiento:** En la Fecha de Entrada en vigencia, cada tenedor de una Reclamación General no Garantizada de SRE Permitida recibirá su Participación Prorrateada del Fondo Común de GUC de SRE. El Fondo Común de GUC de SRE consiste en (a) $500,000 en efectivo más (b) los recobros netos del Fideicomiso de Acciones de Reintegración. El monto total del Fondo Común de GUC de SRE disponible para su distribución no puede superar los $5,000,000. Las distribuciones a un tenedor de una Reclamación General no Garantizada de SRE no pueden superar el 100% de la Reclamación General no Garantizada de SRE Permitida.

Los montos en el Fondo Común de GUC de SRE que superen el monto total de las Reclamaciones Generales no Garantizadas de SRE, o $5,000,000 se reasignarán, de manera prorrateada, a los tenedores de Reclamaciones Generales no Garantizadas del ELA.

**Votación**: La Clase 63 está afectada por el Plan. La Clase 63 y cada tenedor de una Reclamación General no Garantizada de SRE Permitida tienen derecho a votar por la aceptación o el rechazo del Plan.

**Montos estimados permitidos de reclamaciones**: [___] |

428

|  | *Recobros proyectados de SRE*:  [___]<br><br>***Elección a tratarse como reclamación de conveniencia (Clase 65)****: Cualquier* tenedor de una Reclamación General no Garantizada de SRE por un monto superior a $10,000.00 puede elegir (a) reducir el monto de dicha Reclamación General no Garantizada de SRE a $10,000.00, y (b) hacer que dicha reclamación reducida reciba el tratamiento correspondiente a la Clase 65 (Reclamaciones de Conveniencia), recibiendo un recobro proyectado del 100% de dicha reclamación reducida.<br><br>Cualquier tenedor de una Reclamación General no Garantizada de SRE Permitida puede elegir (a) reducir el monto de dicha Reclamación General no Garantizada de SRE Permitida al monto total de $20,000.00, y (b) hacer que dichas reclamaciones reducidas reciban el tratamiento correspondiente a la Clase 65 (Reclamaciones de Conveniencia), recibiendo un recobro proyectado del 100% de dichas reclamaciones reducidas.<br><br>Dicha elección debe hacerse en la votación y debe ser recibida por los Deudores en o antes de la Fecha de la Votación.  Cualquier elección recibida por los Deudores después de la Fecha de la Votación no será vinculante para los Deudores. |
|---|---|
| **Clase 64:**<br><br>Reclamaciones Gracia Gracia | ***Clasificación: La*** Clase 64 consiste en todas las reclamaciones contra el ELA por un miembro de la clase de propietarios de vehículos que adquirieron seguros privados después de pagar una prima de seguros obligatoria certificada en la Acción del ELA Gracia Gracia y la Acción Federal Gracia Gracia.<br><br>***Tratamiento:***  En la Fecha de Entrada en vigencia, se dará por supuesta la transacción alcanzada y aprobada en (a) la Acción del ELA Gracia Gracia conforme a cierta Moción Conjunta sobre Acuerdo Parcial y Estipulación, de fecha 29 de marzo de 2016, aprobada conforme a cierta Sentencia Parcial, de fecha 8 de julio de 2016, y (b) la Acción Federal Gracia Gracia conforme a cierta Estipulación de Medida Cautelar Permanente de fecha 29 de febrero de 2016, aprobada conforme a cierta sentencia de fecha 1 de marzo de 2016.<br><br>Los miembros de la clase certificada en la Acción del ELA Gracia Gracia y la Acción Federal Gracia Gracia, y el abogado de dichas clases, recibirán fondos de acuerdo con los términos y disposiciones de las conciliaciones antes supuestas.  Conforme a la Orden de Confirmación, todas las mociones, solicitudes, litigios y apelaciones pendientes con respecto a Acción del ELA Gracia Gracia y la Acción Federal Gracia Gracia se desistirán sin derecho a nueva acción.<br><br>***Votación***: La Clase 64 no está afectada por el Plan.  Se considera que la Clase 64 y cada tenedor de la Reclamación Gracia Gracia Permitida han aceptado el Plan.<br><br>***Montos permitidos de reclamaciones***:  [___] |

| | |
|---|---|
| | *Recobros proyectados del ELA*: 100% |
| **Clase 65:**<br><br>Reclamaciones de conveniencia | *Clasificación: La* Clase 65 consiste en (a) todas las Reclamaciones Generales no Garantizadas del ELA o Reclamaciones Generales no Garantizadas de SRE por un valor igual o menor que $10,000.00, (b) reclamaciones en poder de tenedores de Reclamaciones Generales no Garantizadas del ELA Permitidas o Reclamaciones Generales no Garantizada de SRE Permitidas, según corresponda, que hayan elegido reducir el monto de dicha Reclamación General no Garantizada del ELA Permitida a $10,000.00. Además, la Clase 52 incluye reclamaciones de varias Reclamaciones Generales no Garantizadas del ELA o Reclamaciones Generales no Garantizadas de SRE que hayan elegido reducir estas Reclamaciones a un monto total de $20,000.00.<br><br>*Tratamiento:* En la Fecha de Entrada en vigencia (o la fecha en que la Reclamación de Conveniencia se convierta en una Reclamación Permitida), cada tenedor de una Reclamación de Conveniencia Permitida recibirá el monto total de dicha Reclamación de Conveniencia Permitida, en efectivo.<br><br>*Votación*: La Clase 65 no está afectada por el Plan. Se considera que la Clase 65 y cada tenedor de una Reclamación de Conveniencia Permitida han aceptado el Plan. Se considera que los tenedores de Reclamaciones que hayan elegido que su Reclamación se reduzca y se trate como una Reclamación de Conveniencia han aceptado el Plan.<br><br>*Montos estimados permitidos de reclamaciones*: [____]<br><br>*Recobro proyectado de los Deudores*: 100% |

F.      **Disposiciones con respecto a los Nuevos Bonos GO, CVI y deudas adicionales**

**LOS NUEVOS BONOS GO SE EMITIRÁN CONFORME A LOS TÉRMINOS Y DISPOSICIONES DE LA ESCRITURA DE LOS NUEVOS BONOS GO. LA ESCRITURA DE LOS NUEVOS BONOS GO CONSTITUYE PARTE DEL SUPLEMENTO DEL PLAN Y DEBE PRESENTARSE POR SEPARADO ANTE EL TRIBUNAL DEL TÍTULO III NI BIEN RESULTE FACTIBLE (PERO EN NINGÚN CASO DESPUÉS DE LOS SIETE (7) DÍAS ANTES DE LA FECHA DE VENCIMIENTO DE LA VOTACIÓN, O EN OTRA FECHA QUE EL TRIBUNAL DEL TÍTULO III DISPONGA, DE ACUERDO CON LA ORDEN DE LA DECLARACIÓN DE DIVULGACIÓN. CONFORME AL ACUERDO DE APOYO AL PLAN, LA ESCRITURA DE LOS NUEVOS BONOS GO SERÁ CONGRUENTE CON EL ACUERDO DE APOYO AL PLAN EN TODOS LOS ASPECTOS Y DE OTRA MANERA SERÁ RAZONABLEMENTE SATISFACTORIA DE FONDO Y DE FORMA PARA CADA PARTE DEL ACUERDO DE APOYO AL PLAN. LA DESCRIPCIÓN DE LOS TÉRMINOS Y DISPOSICIONES DE LOS NUEVOS BONOS GO Y LA ESCRITURA DE LOS BONOS GO EN ESTA SECCIÓN VI.F DE LA DECLARACIÓN DE DIVULGACIÓN REPRESENTA LA MEJOR DESCRIPCIÓN DISPONIBLE DE LOS DEUDORES A LA FECHA DEL PRESENTE, Y LOS TÉRMINOS Y DISPOSICIONES REALES DE LOS NUEVOS BONOS GO Y LA ESCRITURA DE LOS NUEVOS BONOS GO ESTÁN SUJETOS A CAMBIOS MATERIALES SIN NOTIFICACIÓN ADICIONAL DE LOS DEUDORES, SALVO SEGÚN SE DISPONGA EN EL SUPLEMENTO DEL PLAN. EN CASO DE QUE HAYA ALGÚN CONFLICTO ENTRE LA DESCRIPCIÓN DE ESTA SECCIÓN VI.F DE LA**

**DECLARACIÓN DE DIVULGACIÓN Y LA ESCRITURA DE LOS NUEVOS BONOS GO, LA ESCRITURA DE LOS NUEVOS BONOS GO PREVALECERÁ EN TODOS LOS ASPECTOS.**

      1.     **Generalidades**

Los Nuevos Bonos GO se emitirán conforme a los términos y disposiciones de la Escritura de los Nuevos Bonos GO y se distribuirán como se estipula en el Plan. La documentación definitiva que rige a los Nuevos Bonos GO de modo general dispondrá los términos estipulados en este resumen, sujeto a los resultados de cualquier elección permitida por el Plan y otros ajustes permitidos o requeridos por el Plan.

Este resumen no pretende ser completo y se encuentra sujeto a, y calificado en su totalidad por referencia a, todas las disposiciones de los Nuevos Bonos GO, la Escritura de los Nuevos Bonos GO, los CVI, la Escritura de los CVI y el Plan.

      2.     **Los Nuevos Bonos GO**

En la Fecha de Entrada en vigencia, el Estado Libre Asociado Reorganizado emitirá Nuevos Bonos GO, consistentes en:

(i) $6,683,315,000.00 de monto de capital total de los Nuevos CIB de GO,

(i) $442,506,553.50 de monto de capital total de los Nuevos CAB de GO al 5.375%, y

(i) $288,241,989.75 de monto de capital total de los Nuevos CAB de GO al 5.0%,

con once (11) fechas de vencimiento distintas, con un monto de capital total original de $7,414,063,543.25. Los Nuevos Bonos GO tendrán como garantía un gravamen de primer rango establecido por ley y pignoración del Fondo de Reserva del Servicio de la Deuda y una pignoración de la plena fe, el crédito y el poder impositivo del ELA de conformidad con el Artículo VI, Sección 2 de la Constitución del ELA y las leyes aplicables del ELA a la Fecha de Entrada en vigencia. Los Nuevos Bonos GO tendrán fecha en, y devengarán intereses, según proceda, a partir de (i) el 1 de julio de 2021 y (ii) la Fecha de Entrada en vigencia, lo que ocurra primero.

***Los montos de capital, fechas de vencimiento, tasas de interés y cronogramas de amortización de los Nuevos Bonos GO son los que figuran en el Anexo J del Plan.***

Los intereses sobre los Nuevos Bonos GO se pagarán en [el 1 de julio de 2021 y cada 1 de enero y 1 de julio en adelante] hasta que los Nuevos Bonos GO se hayan pagado o satisfecho en su totalidad de conformidad con sus términos. Todo el servicio de la deuda sobre los Nuevos Bonos GO que no se pague cuando sea exigible, ya sea en o antes del vencimiento final programado, seguirá siendo pagadero y se mantendrá pendiente hasta que se abone en su totalidad y sea pagado. Se devengarán o acumularán intereses sobre dicho servicio de la deuda adeudado a la tasa regular de interés o devengo, según proceda, capitalizándose semestralmente, hasta que los Nuevos Bonos GO correspondientes se paguen o satisfagan en su totalidad de conformidad con sus términos. El interés de los Nuevos Bonos GO se calculará sobre la base de un año de 360 días compuesto por doce meses de 30 días. Los Nuevos CIB de GO no devengarán ninguna tasa de interés por mora, aunque devengarán intereses en concepto del servicio de la deuda en mora, al tipo normal de cupón o tasa de devengo, según proceda, compuesta semestralmente, hasta quedar completamente pagados o satisfechos de conformidad con sus términos y condiciones. Los Nuevos Bonos GO se emitirán como bonos totalmente registrados en denominaciones a especificarse en la Escritura de los Nuevos Bonos GO.

No obstante cualquier disposición del Plan en contrario, en la medida en que se emitan los Nuevos Bonos GO Tributables, dichos Nuevos Bonos GO Tributables se distribuirán a los tenedores de Reclamaciones Permitidas en el siguiente orden de prioridad: (1) *en primer lugar*, a los tenedores de Reclamaciones del ELA con Elección Tributable Permitidas, y (2) *en segundo lugar*, de forma prorrateada a todos los demás tenedores de Reclamaciones Permitidas que son receptoras de Nuevos Bonos GO, sin duplicación.

a)      **Disposiciones sobre opción de compra /rescate opcional**

Los Nuevos Bonos GO con vencimiento el 1 de julio de 2023, el 1 de julio de 2025, el 1 de julio de 2027, el 1 de julio de 2029 y el 1 de julio de 2031, así como los Nuevos CAB de GO al 5.000%, no están sujetos a amortización antes del vencimiento.

Los Nuevos CAB de GO al 5.375% que vencen a partir del 1 de julio de 2033 podrán ser amortizados antes del vencimiento, a elección o discreción del ELA Reorganizado, total o parcialmente y en cualquier orden de vencimiento, mediante notificación previa y por escrito con treinta (30) días de antelación, a partir del 1 de julio de 2031, a un precio de amortización equivalente al 100% del valor devengado.

Los Nuevos CIB de GO, aunque no los Nuevos CAB GO al 5.375% ni los Nuevos CAB de GO al 5.0%, están sujetos a la amortización obligatoria de fondo de amortización como se estipula en el Anexo J del Plan. Los Nuevos Bonos GO podrán amortizarse, total o parcialmente y en cualquier orden de vencimiento, a la par más los intereses devengados (o, en el caso de los CAB con vencimiento en 2033, a su valor devengado), mediante notificación previa y por escrito con treinta (30) días de antelación.

Los precios de rescate para Nuevos Bonos GO que vencen el 1 de julio de 2033, 1 de julio de 2035, 1 de julio de 2037, 1 de julio de 2041 y 1 de julio de 2046 son los siguientes: (i) 1 de julio de 2031 hasta 30 de junio de 2032 inclusive es 103% del valor Par, (ii) 1 de julio de 2032 hasta 30 de junio 2033 inclusive es 102% de valor Par, (iii) 1 de julio de 2033 hasta 30 de junio de 2034 inclusive es 101% de valor Par, y (iv) 1 de julio de 2034 en adelante es 100% de valor Par.

Si se solicita la recuperación antes de la fecha de vencimiento de menos que todos los Nuevos Bonos GO de una serie en particular, el ELA Reorganizado seleccionará el vencimiento o los vencimientos de dicha serie de los Nuevos Bonos Nuevos GO a ser rescatados y, si se rescatasen menos de todos los Nuevos Bonos GO dentro del vencimiento, la Depository Trust Company, en nombre del Síndico de los Nuevos Bonos GO, seleccionará los Nuevos Bonos GO dentro del mismo vencimiento de dicha serie a ser rescatados por medio de una lotería aleatoria.

Los Nuevos Bonos GO no están sujetos a rescate antes del vencimiento a elección de los tenedores de estos.

b)      **Asignación anual declarada**

Hasta que los Nuevos Bonos GO hayan sido pagados o se hayan satisfecho en su totalidad de acuerdo con sus términos, cada Año fiscal, el ELA Reorganizado satisfará sus obligaciones hacia los tenedores de Nuevos Bonos GO, mediante la asignación al pago de capital e intereses (o valor acumulado, según proceda) con respecto a los Nuevos Bonos GO emitidos a dichos tenedores, *en primer lugar*, el impuesto a la propiedad del 1.03% gravado conforme a la Ley 83-1991 y cobrado por el Centro de Cobros de Ingresos Municipales con respecto a los Nuevos Bonos GO hasta que se haya pagado el monto total de dichos impuestos a la propiedad a los tenedores de los Nuevos Bonos GO, *en segundo lugar*, el dinero

obtenido de la aplicación del Artículo VI, Sección 8 de la Constitución del ELA hasta que el monto total de dicho dinero haya sido pagado a los tenedores de los Nuevos Bonos GO, y *en tercer lugar*, otros recursos del ELA Reorganizado.

c) **Depósitos mensuales de intereses y capital**

A partir de la Fecha de Entrada en vigencia y hasta que los Nuevos Bonos GO hayan sido pagados o satisfechos en su totalidad de conformidad con sus términos, en el primer (1$^{er}$) Día Laborable de cada mes calendario, el ELA Reorganizado depositará Efectivo en el Fondo de Servicio de la Deuda en efectivo al Síndico de los Nuevos Bonos GO por un monto total equivalente a (i) un sexto (1/6) de la obligación semestral del ELA Reorganizado con respecto al pago de intereses a devengar sobre los Nuevos Bonos GO hasta la siguiente fecha de pago de intereses, y (ii) un doceavo (1/12) de la obligación anual del ELA Reorganizado con respecto al pago de capital (o valor acumulado) sobre los Nuevos Bonos GO. En el momento de depósito de estos, a tenor con la Legislación de los Nuevos Bonos GO, el Síndico de los Nuevos Bonos GO, en nombre de los tenedores de los Nuevos Bonos GO, tendrá un gravamen legal válido y perfeccionado e interés de garantía sobre dicho dinero depositado en el Síndico de los Nuevos Bonos G, que se conservará en fideicomiso para beneficio de los tenedores de Nuevos Bonos GO. En la Fecha de Entrada en vigencia, el ELA Reorganizado depositará en el Fondo de Servicio de la Deuda los montos adicionales que sean necesarios para contemplar la emisión de los Nuevos Bonos GO en la Fecha de Emisión Declarada.

d) **Ciertos pactos del ELA Reorganizado relacionados con los Nuevos Bonos GO**

Los Documentos Definitivos, entre ellos la Escritura de los Nuevos Bonos GO, la Legislación de los Nuevos Bonos GO y/o la Orden de Confirmación contendrán los términos, condiciones y pactos habituales, lo que incluye, entre otros, pactos del ELA Reorganizado que, entre otras cosas:

(i)      no actuará de una manera que (A) afecte los depósitos mensuales de intereses y capital a los que se hace referencia en la Sección 74.1(f) del Plan, (B) limite o altere los derechos adquiridos por los Deudores o Deudores Reorganizados de acuerdo con el Plan y la Orden de Confirmación para cumplir los términos de cualquier acuerdo con los tenedores de los Nuevos Bonos GO, o (C) afecte los derechos y remedios de los tenedores de los Nuevos Bonos GO; y

(ii)     realizará y ejecutará todos los actos y cosas permitidas por la ley y razonablemente necesarios o deseables para garantizar que el interés pagado a los tenedores de cualquier Nuevo Bono GO exento de impuestos federales sea y permanezca excluible de los ingresos brutos para fines del impuesto federal al ingreso.

e) **Fondo de reserva del servicio de la deuda**

Los Nuevos Bonos GO tendrán un Fondo de Reserva del Servicio de la Deuda en el cual el Requisito del Fondo de Reserva de Servicio de la Deuda (i) se debe financiar ya sea en su totalidad en la Fecha de Entrada en vigencia o en dos (2) cuotas anuales iguales el 1 de julio de 2025 y el 1 de julio de 2026, cuya elección deberá hacerse, a criterio conjunto y absoluto de la Junta de Supervisión y el ELA, en o antes de la Fecha de Entrada en vigencia, (ii) una vez depositados, se mantendrán en fideicomiso por el Síndico de los Nuevos Bonos GO para beneficio de los tenedores de los Nuevos Bonos GO, y (iii) estarán

433

sujetos a un gravamen establecido por ley una vez depositados al Síndico de los Nuevos Bonos GO para beneficio de los tenedores de los Nuevos Bonos GO.

f)      <strong>Derechos de aceleración</strong>

Los Nuevos Bonos GO no tendrán derechos de aceleración.

g)      <strong>Interés residual del ELA</strong>

A tenor con la Escritura de los Nuevos Bonos GO y sujeto a los derechos y obligaciones adicionales estipulados en esta, los fondos en poder del Síndico de los Nuevos Bonos GO que supere los depósitos requeridos conforme a la Escritura de los Nuevos Bonos GO serán librados por el Síndico de los Nuevos Bonos GO al, o a criterio del, ELA Reorganizado, incluso en la medida en que los fondos permanezcan en el Fondo de Reserva del Servicio de la Deuda, ante el pago o la satisfacción total de los Nuevos Bonos GO de acuerdo con sus términos, dichos montos deberán revertir y ser distribuidos al, o bajo las instrucciones del, ELA Reorganizado.

h)      <strong>Derecho directo de acción</strong>

Conforme a la Escritura de los Nuevos Bonos GO y sujeto a los derechos adicionales que se estipulan en esta, el Síndico de los Nuevos Bonos GO tendrá un derecho directo de acción para aplicar los términos de la Escritura de los Nuevos Bonos GO, lo que incluye, entre otros, con respecto a los depósitos de financiamiento del Fondo de Servicio de la Deuda y para buscar remedios de ejecución específicos en caso de cualquier incumplimiento de los pactos en la Escritura de los Nuevos Bonos GO.

i)      <strong>Escritura de los Nuevos Bonos GO</strong>

Las disposiciones que rigen, entre otras cosas, las enmiendas de o los suplementos a la Escritura de los Nuevos Bonos GO, casos de incumplimiento, remedios, prioridad de los pagos después del incumplimiento conforme a la Escritura de los Nuevos Bonos GO y la anulación conforme a la Escritura de los Nuevos Bonos GO se estipulará en la Escritura de los Nuevos Bonos GO. La Escritura de los Nuevos Bonos GO se firmará y entregará en o antes de la Fecha de Entrada en vigencia.

j)      <strong>Ley aplicable</strong>

La Escritura de los Nuevos Bonos GO y los Nuevos Bonos GO emitidos en virtud de esta estarán regidos por las leyes del Estado de Nueva York, sin dar efecto a los aspectos principales de los conflictos de leyes.

3.      <strong>Instrumentos de valor contingente (CVI)</strong>

En la Fecha de Entrada en vigencia, el Estado Libre Asociado Reorganizado emitirá (i) los CVI de GO por un monto nocional original total de $3,500,000,000.00, con vencimiento el 1 de julio de 2043 y una fecha de pago de amortización final de 1 de noviembre de 2043, y (ii) los CIV de recuperación por un monto nocional original total de $5,384,127,764.00, con fecha de vencimiento el 1 de julio de 2051 y una fecha de pago de amortización final de 1 de noviembre de 2051. Los CIV de GO y de Recuperación estarán sujetos a los términos y condiciones de la Escritura de CVI, la Legislación de CVI y la Orden de confirmación. Los CVI de GO y los CVI de Recuperación serán denominados colectivamente "los CVI".

434

a) **Estructura**

El pago de los CVI tendrá como garantía la plena fe, el crédito y el poder impositivo conforme a la Constitución del Estado Libre Asociado y las leyes aplicables del Estado Libre Asociado. Los pagos de los CVI están sujetos a los límites aplicables, incluyendo el Pago máximo anual de CVI de GO, el Límite vitalicio de los CVI de GO, el Pago máximo anual de CVI de recuperación y el Límite vitalicio de los CVI de recuperación.

Los CVI de recuperación sujetos a cascada representan una parte de los pagos a los CVI de recuperación abonados con cargo a la cuantía del superávit sujeto a cascada. Los CVI de recuperación no sujetos a cascada representan una parte de los pagos a los CVI de recuperación abonados con cargo a la cuantía del superávit no sujeto a cascada.

"Importe de superávit sujeto a cascada" significa la menor de las siguientes cuantías anuales: (i) el 50% del superávit acumulado en relación con la línea básica del IVU del 5.5% (que incluye tanto superávit como déficit) a partir del 1 de julio de 2021, menos los pagos previamente abonados a los CVI de GO y los CVI de recuperación sujetos a cascada, y (ii) el 75% del rendimiento anual (que incluye tanto superávit como déficit). A efectos de evitar cualquier duda, el Importe de superávit sujeto a cascada no será inferior a $0 en ningún año.

"Importe de superávit no sujeto a cascada" significa la menor de las siguientes cuantías anuales: (i) el 40% del superávit acumulado en relación con la línea básica del IVU del 5.5% (que incluye tanto superávit como déficit) a partir del 1 de julio de 2021, menos los pagos previamente abonados a los CVI de GO y los CVI de recuperación sujetos a cascada, y (ii) el 95% del rendimiento anual (que incluye tanto superávit como déficit) menos los importes pagados a los CVI de GO y los CVI de recuperación sujetos a cascada del año fiscal correspondiente. A efectos de evitar cualquier duda, el Importe de superávit no sujeto a casada no será inferior a $0 en ningún año. Todos los importes de superávit no sujetos a cascada están sujetos a los límites aplicables, incluyendo el Pago máximo anual y al Límite vitalicio de los CVI de recuperación.

b) **Pagos anuales**

El pago de los CVI de GO está sujeto a un límite anual de $200,000,000.00, más los importes no utilizados de años anteriores, siempre que el pago anual no sea superior a $400,000,000.00. El Pago anual máximo de los CVI de GO se calcula como la menor de las siguientes cuantías: (i) la suma del Saldo pasado a cuenta nueva de los CVI de GO *más* $200 millones, y (ii) $400 millones. En la medida en que al final del plazo del CVI de GO quedase un Saldo pasado a cuenta nueva de los CVI de GO positivo, el ELA no deberá montos adicionales a los CVI de GO. El Saldo pasado a cuenta nueva de los CVI de GO se calculará de la siguiente manera: (a) el primer año, un importe equivalente a $0, (b) en cada año posterior, el Importe anual pasado a cuenta nueva del CVI de GO se sumará al (si fuese positivo), o se restará del (si fuese negativo) el Saldo pasado a cuenta nueva de los CVI de GO. El Importe anual pasado a cuenta nueva de los CVI de GO se calculará como la diferencia entre (y) $200 millones) y (z) los pagos de los CVI (en su caso) abonados a los CVI de GO el año fiscal precedente.

435

En los años 1 a 22, del Importe del superávit sujeto a cascada, la cascada anual de pagos (la "Cascada anual de pagos") es la siguiente: (a) los primeros $100,000,000 a los tenedores de CVI de GO, (b) los siguientes $11,111,111 a los tenedores de CVI de recuperación sujetos a cascada, y (c) la parte restante prorrateada al 90% a los tenedores de tenedores de CVI de GO, y el 10% de los tenedores de CVI de recuperación sujetos a cascada, *en el bien entendido* de que, en la medida en que en el año 21, o antes, se alcanza el Límite vitalicio de los CVI de GO, el 100% del Importe del superávit sujeto a cascada lo devengarán los tenedores de CVI de recuperación sujetos a cascada el año siguiente.

Entre los años 23 a 30, el 100% del Importe del superávit sujeto a cascada se abonará a los tenedores de CVI de recuperación sujetos a cascada.

En los años 1 a 22, el Pago anual máximo de los CVI de recuperación será de $175 millones *más* los importes no utilizados de años anteriores, con sujeción a un límite, en cualquier año, del doble del límite anual aplicable (es decir, $350 millones) a los CVI de recuperación, incluyendo pagos tanto a los CVI de recuperación sujetos a cascada como no sujetos a cascada.

En los años 23 a 30, el Pago anual máximo de los CVI de recuperación será de $375 millones *más* los montos no utilizados de años anteriores, con sujeción a un límite en cualquier año del doble del límite anual aplicable (es decir, $750 millones) para los CVI de recuperación, incluyendo pagos tanto a los CVI de recuperación sujetos a cascada como a los que no están sujetos a cascada. A efectos de evitar cualquier duda, el Pago anual máximo de los CVI de recuperación durante los años 1 a 22 se calculará como la menor de las siguientes cuantías: (i) la suma del Saldo pasado a cuenta nueva de los CVI de recuperación (véase a continuación) más $175 millones, y (ii) $350 millones. Durante los años 23 a 30, el Pago anual máximo de los CVI de recuperación se calculará como la menor de las siguientes cuantías: (A) la suma del Saldo pasado a cuenta nueva de los CVI de recuperación más $375 millones, y (B) $750 millones, En la medida en que al final del período de 30 años quedase un Saldo pasado a cuenta nueva positivo de los CVI de recuperación, el ELA no deberá ninguna suma adicional a los CVI de recuperación. Si se cumpliese el límite vitalicio de los CVI de GO (es decir, un total de $350,000,000,000 pagados a los CVI de GO) en el año 21 o antes, el límite de pago anual de $375 millones — y el límite de pago anual de hasta $750 millones, en la medida en que exista un Saldo pasado a cuenta nueva suficiente de los CVI de recuperación— a los CVI de recuperación, tanto los sujetos a cascada como si no, comenzarán el año siguiente.

c) **Límites vitalicios**

El Límite vitalicio de los CVI de GO es de $350,000,000. El Límite vitalicio de los CVI de recuperación es de $3,697,668,995 en el caso de las Reclamaciones de ELA/ACT permitidas, de $217,228,391 en el caso de las Reclamaciones de ELA/Centro de Convenciones permitidas, de

$22,580,090 en el caso de las Reclamaciones de ELA/AMA permitidas, y de $1,446,650,288 en el caso de las Reclamaciones de ELA/Impuesto al ron de AFI permitidas, lo que hace un total de $5,384,127,764. El Límite vitalicio de los CVI de recuperación es aplicable al total de pagos a los CVI de recuperación, incluyendo los abonados tanto a los sujetos a cascada como no sujetos a cascada.

        d)      **Distribuciones en cascada**

Los CVI de GO están sujetos a una amortización obligatoria de conformidad con la cascada de pagos y con las cláusulas de Amortización obligatoria de CVI de GO. Los CVI de recuperación estarán sujetos a amortización obligatoria en función de la cascada de pagos y de los Prioridades de amortización obligatoria de los CVI de recuperación. Ello implica que hasta que los CVI de GO y los CVI de recuperación se hayan pagado o satisfecho en su totalidad de acuerdo con sus términos, en cada año fiscal, el ELA satisfará sus obligaciones con los tenedores de los CVI con cargo al Importe de superávit sujeto a cascada (la "Cascada anual de pagos") de la siguiente manera: (i) los primeros $100,000,000 se pagarán a los tenedores de CVI de GO, (ii) los siguientes $11,111,111 se pagarán a los tenedores de CVI de recuperación sujetos a cascada, y (iii) proporcionalmente, el 90% a los tenedores de CVI de GO y el 10% a los tenedores de CVI de recuperación. Si se ha alcanzado el límite vitalicio de CVI de GO de $3,500 millones en el año 21 o antes, el 100% del Importe del superávit sujeto a cascada lo devengarán los tenedores de CVI de recuperación sujetos a cascada a partir del año siguiente. En los años 23 a 30, el 100% del Importe del superávit sujeto a cascada se pagará a los tenedores de CVI de recuperación sujetos a cascada.

        e)      **Disposiciones sobre amortización**

Los CVI de GO se podrán rescatar en cualquier fecha a un valor total equivalente a la cantidad máxima de los pagos futuros valorados en la actualidad a una tasa de descuento sin tope de la Tasa del Tesoro + 100 puntos base, donde la Tasa del Tesoro significa el rendimiento (o rendimiento interpolado) del título o títulos valores semejantes del Tesoro de EE.UU. que tienen un vencimiento real (o vencimiento interpolado) más próximo a la vida media restante de los pagos máximos restantes del CVI de GO.

El CVI de recuperación se podrán rescatar en cualquier fecha por un valor total equivalente a la cantidad máxima de los pagos futuros valorados en la actualidad a una tasa de descuento sin tope de la Tasa del Tesoro + 100 puntos básicos, siendo la Tasa de Tesoro el rendimiento (o rendimiento interpolado) del título o títulos valores semejantes del Tesoro de EE.UU. que tienen un vencimiento real (o vencimiento interpolado) más cercano a la vida media restante de los pagos máximos restantes del CVI de GO.

        f)      **Pacto de no afectación**

El ELA Reorganizado pactará para beneficio de todos los tenedores iniciales y subsiguientes de CVI que, hasta que todas las obligaciones con respecto a los mismos se hayan pagado o satisfecho de otro modo de acuerdo con sus términos, el ELA Reorganizado no: (a) tomará ninguna medida que perjudique los derechos y remedios de los tenedores de los CVI; (b) limitará o restringirá los derechos o poderes de los funcionarios correspondientes del ELA Reorganizado para cumplir los términos de cualquier acuerdo celebrado con respecto a los CVI; o (c) perjudicará la capacidad de los titulares de los CVI de realizar un seguimiento del IVU Medido; siempre y cuando lo anterior no impida que el ELA Reorganizado ejerza su facultad, mediante un cambio de ley, de eliminar el IVU Medido, o sustituir el IVU Medido por un Impuesto

Medido Sustituto, cada uno de conformidad con la Escritura del CVI, que protegerá a los tenedores de los CVI de una eliminación o sustitución que reduzca la probabilidad de que se satisfagan las Condiciones del Exceso de Rentabilidad; y además, siempre que la Escritura del CVI incluya un mecanismo para la divulgación pública por parte del ELA Reorganizado de (x) los importes del IVU Medido, (y) las recaudaciones del IVU, y (z) el cálculo de cualquier Reducción del IVU True-Up o del IVU de referencia, como se define y refleja en el Anexo "J" del AAP.

g)   **Derecho directo de acción**

A tenor con la Escritura del CVI y sujeto a los derechos adicionales que se estipulan en esta, el Síndico del CVI tendrá un derecho directo de acción para aplicar los términos de la Escritura del CVI, lo que incluye, entre otros, con respecto a las amortizaciones obligatorias con respecto a los CVI y para plantear recursos específicos y cualesquiera otros disponibles por incumplimiento de las obligaciones pactadas en la Escritura del CVI.

h)   **Ley aplicable**

La Escritura del CVI y los CVI emitidos en virtud de esta se regirán por las leyes del Estado de Nueva York aplicables a los contratos formalizados y cumplidos íntegramente dentro de dicha jurisdicción. Las leyes del Estado de Nueva York será aplicables a las acciones o procedimientos derivados de la Escritura de los CVI y de los CVI, en el bien entendido de que la autorización de la Escritura de los CVI y la emisión de los CVI por el ELA se regirán por las leyes del Estado Libre Asociado, y en el bien entendido asimismo que a los tenedores de CVI les asistirán aquellos derechos y recursos establecidos en las Secciones 2 y 8 del Artículo VI de la Constitución del Estado Libre Asociado.

4.   **Exención de impuestos de los Nuevos Bonos GO**

Independientemente de los términos y condiciones de las Secciones 71.1 y 71.2 del Plan, si las Partes del Gobierno obtienen una determinación del IRS o una opinión del Consejo de Bonos previsto por la Sección 103, de que la relación del importe total de todos los Nuevos Bonos GO tributables que se emitan en la Fecha de Entrada en vigencia hasta el importe total de todos los Nuevos Bonos GO sea inferior al trece por ciento (13%), los titulares de las Reclamaciones que reciban Nuevos Bonos GO recibirán nuevos bonos GO exentos de impuestos emitidos a tenor con los cupones para todos los vencimientos iguales a los cupones de los correspondientes Nuevos Bonos GO exentos de impuestos que figuran en el Anexo I del Plan.

5.   **Disposiciones con respecto al endeudamiento adicional del ELA Reorganizado, sus Agencias y Corporaciones Públicas**

a)   **Tope general sobre toda la deuda neta con garantía impositiva**

Durante el Período de Política de la Deuda,[376] a tenor con la Ley de Responsabilidad de la Deuda y de acuerdo con la Nueva Escritura de Bonos GO y la Escritura de CVI, (a) el ELA (y e ELA Reorganizado, según proceda) adoptará y mantendrá una Política de Administración de la Deuda que incluya un Tope

---

[376] **Período de política de la deuda**: El período que se inicia en el primer (1er) día calendario inmediatamente posterior a la Fecha de Entrada en vigencia y que termina en la fecha donde ya no haya Nuevos Bonos GO circulantes.

General sobre toda la Deuda Neta con Garantía Impositiva[377] del Artículo IV de la Ley de Responsabilidad de la Deuda, cuyo límite se fijará en el 7.94% de los Ingresos de Política de la Deuda, medidos de acuerdo con la Ley de Responsabilidad de la Deuda, incluyendo un sublímite de deuda garantizada y/o titulizada de veinticinco centésimas por ciento (0.25%) de los Ingresos de Política de la Deuda por encima del porcentaje de los Ingresos de Política de Deuda necesarios para pagar el servicio de la deuda anual máximo de los Bonos COFINA en la Fecha de Entrada en vigencia.

Los pagos del servicio de la deuda de los Nuevos CAB de GO emitidos de conformidad con el Plan a los tenedores de Bonos GO y Bonos AEP, y los pagos por los CVI que pudiesen emitirse de acuerdo con el Plan u otros instrumentos de valor contingente previstos por, o relacionados con, el Plan de Instrumentalidades del Estado Libre Asociado, incluyendo el Plan de Instrumentalidades para ACT, ADC o AFI, para satisfacer las reclamaciones presentadas por (a) tenedores o aseguradores de bonos emitidos por dichas instrumentalidades, o bien (b) otros acreedores de tales instrumentalidades, no serán de aplicación para el Tope genera. A efectos de disipar cualquier duda, los bonos de obligaciones generales de apreciación de capital u otras obligaciones de deuda similares sostenidas por impuestos emitidas a quienes no sean tenedores o aseguradores de Bonos GO o Bonos AEP objeto del Plan, así como cualesquiera otros instrumentos de valor contingente u obligaciones de deuda sustentadas por impuestos no emitidos en virtud del, o en relación con el Plan u otro Plan de Instrumentalidades del ELA, se contabilizará para el Tope

---

[377] **Deuda neta con garantía impositiva**: Cualquier Deuda con Garantía Impositiva, salvo (a) la deuda garantizada por la fe y crédito y poder impositivo del ELA que no sea pagadera desde o garantizada por Ingresos de Política de la Deuda que requiera su pago continuo a partir de Ingresos que no son de Política de la Deuda, en la medida en que la garantía del ELA no se haya girado en los últimos cinco (5) años fiscales completados más recientemente, (b) Que la deuda se refinancia a través del producto de la emisión propuesta de bonos o notas, y (c) La deuda y las obligaciones expresamente excluidas del cálculo del Tope Global en la Sección 71.5 del Plan.

**Deuda con garantía impositiva**: Colectivamente, sin duplicación, (a) la deuda directa del ELA por el pago por el cual se ha pignorado la plena fe y crédito y poder impositivo del ELA (incluso los Nuevos Bonos GO), (b) la deuda emitida por cualquier Entidad y garantizada por la plena fe y crédito y poder impositivo del ELA, (c) la deuda emitida por cualquier Entidad (incluso los bonos de COFINA), y a sea que estén garantizados o no por el ELA, que esté garantizado por o sea pagadero a partir de (i) los Ingresos de Política de la Deuda, o (ii) acuerdos de arrendamiento con el ELA o cualquier agencia de este, y a sea que esté sujeto o no a asignaciones legislativas anuales o periódicas y (d) cualquier otra deuda identificada como Deuda con Garantía Impositiva en la Política de Administración de la Deuda; *siempre y cuando que, la siguiente no se considerará como Deuda con Garantía Impositiva*: (A) las notas con anticipación de impuestos e ingresos con un vencimiento final que ocurre en el mismo ejercicio fiscal de su emisión; y (B) la deuda emitida para responder directamente al daño o la destrucción y los riesgos asociados al riesgo para la salud, seguridad y bienestar del pueblo de Puerto Rico causado por huracanes, terremotos u otros desastres naturales, pandemias, terrorismo y emergencias similares; y, *siempre y cuando, además*, y sin limitación de lo anterior, la "Deuda con Garantía Impositiva" *excluye* (x) los bonos de ingresos de una Entidad pagaderos únicamente a partir de cargos del usuario o cargos de titulación y transición impuestos a los clientes o exclientes de un sistema de servicios públicos o transportación, incluso la deuda autorespaldadade AAA, AEE, ACT o cualquier entidad de titulación relacionada, y (y) cualquier otra deuda que no sea pagadera a partir de los Ingresos de Política de la Deuda, a tenor con la Política de Administración de la Deuda, en cada caso, siempre que dicha deuda no esté garantizada por la plena fe y crédito y poder impositivo del ELA; y, *siempre y cuando, además*, que en caso de que ninguna disposición o aclaración aumente el Tope General, incluso el sublímite de la deuda garantizada y/o titulizada por encima de los niveles estipulados en la Sección 71.4 del Plan, la Política de Administración de la Deuda puede contener disposiciones y aclaraciones adicionales con respecto a la deuda que se considera Deuda con Garantía Impositiva.

general, independientemente de si se emitieron antes como después de la Fecha de Entrada en vigencia.

La certificación del Secretario de Hacienda del cumplimiento del límite de la deuda conforme a la presente subsección (a) será concluyente y vinculante, salvo error manifiesto; siempre que, al emitir dicha certificación, con respecto al cálculo de los ingresos de las corporaciones públicas incluidos como Ingresos de Política de la Deuda, el Secretario de Hacienda puede basarse en certificaciones de funcionarios de dichas corporaciones públicas.

b)           **Adopción y mantenimiento de una Política de Administración de la Deuda**

Durante el Período de Política de la Deuda, el ELA Reorganizado deberá mantener y cumplir una Política de Administración de la Deuda diseñada para garantizar que ciertas prácticas de emisión de deuda del pasado en el ELA no se repitan. Si bien el ELA Reorganizado debe revisar y actualizar su Política de Administración de la Deuda para reflejar los cambios en las condiciones y las normas en el mercado de bonos (lo que incluye, entre otros, cambios relacionados con cobros, ingresos, impuestos, tarifas, etc.), la Política de Administración de la Deuda deberá, a no ser que la Junta de Supervisión apruebe lo contrario, por escrito, incluir en todo momento los siguientes principios y limitaciones:

(i)     Préstamos solicitados a largo plazo para mejoras de capital solamente: Para garantizar que el ELA Reorganizado logre y mantenga un presupuesto estructuralmente equilibrado congruente con el requisito de PROMESA de que Puerto Rico vuelva a la responsabilidad fiscal, la Deuda con Garantía Impositiva después de la Fecha de Entrada en vigencia solamente se puede incurrir para financiar Mejoras de Capital,[378] según lo determine el emisor de dicha deuda aprobada por AAFAF, o para refinanciar la Deuda con Garantía Impositiva de acuerdo con la Sección 71.5(d) del Plan descrita más abajo en (iv). El producto de cualquier emisión de este tipo puede usarse para cubrir cualquier gasto directo o indirecto que, a criterio razonable del emisor, sea necesario para llevar a cabo cualquier Mejoras de Capital de este tipo, incluso todo y cualquier gasto incurrido en relación con la emisión en sí misma.

(ii)     Limitación de vencimiento de 30 años sobre todos los préstamos pedidos con garantía impositiva: Ninguna Deuda con Garantía Impositiva emitida en o después de la Fecha de Entrada en vigencia puede tener un vencimiento final legal posterior a los treinta (30) años a partir de la fecha de su emisión original, y ninguna deuda de este tipo puede ser refinanciada por una deuda que extienda dicha fecha de vencimiento final legal más allá de la limitación de la fecha de vencimiento original; salvo que lo anterior no se aplica a (A) la Deuda con Garantía Impositiva emitida para financiar instalaciones públicas de vivienda, sujeto a las limitaciones establecidas en la Constitución del ELA, o (B) la Deuda con Garantía Impositiva emitida para refinanciar la deuda Pendiente anterior a la Fecha de Entrada en

---

[378] **Mejoras de Capital**: Cualquier proyecto o proyectos financiados, o que se proponga financiar, en su totalidad o en parte, por o a través de dinero público, para construir, reconstruir, restaurar, rehabilitar o adquirir cualquier equipo, propiedad o instalaciones, incluyendo, sin limitación, edificios, instalaciones en parques, infraestructura, sistemas de tecnología de la información u otros equipos financiados sobre una base necesariamente no reiterativa que deben usarse como activo público o para beneficio público.

440

vigencia y que tenga un vencimiento legal de más de treinta (30) años, con sujeción a la Sección 71.5(d) del Plan descrita más abajo en (iv)

(iii)    Amortización requerida del capital:   No se puede emitir ninguna serie de Deuda con Garantía Impositiva emitida a partir de y posteriormente a la Fecha de Entrada en vigencia a menos que su capital empiece a amortizarse dentro de dos (2) años a partir de su fecha de emisión original,  u otro período que no supere los cinco (5) años a partir de la emisión original conforme al Código de Rentas Internas de EE.UU. para financiamientos exentos de impuestos de nuevas construcciones o reconstrucciones de Mejoras de Capital,  y que continúa amortizándose en cada año, hasta que dicha deuda deje de estar pendiente.

(iv)    Refinanciamientos permitidos solamente para ahorros de flujo de caja en cada Año fiscal:   Los refinanciamientos de la Deuda con Garantía Impositiva solo se permiten si (A) no hay un aumento en el monto del capital y los intereses de los bonos pagaderos en cualquier año fiscal, y (B) dicho refinanciamiento produce ahorros de valor presente positivos, después de tener en cuenta los gastos de transacción, a los niveles especificados por el ELA Reorganizado en sus Políticas de Administración de la Deuda; salvo que, las refinanciaciones sin ahorro de flujo de caja en cada Año fiscal se permitan si el refinanciamiento se completa en respuesta directa a un huracán, terremoto, pandemia, terrorismo u otro desastre natural y emergencias similares  y el servicio de la deuda adeudado en cualquier Año fiscal futuro no aumente más de un diez por ciento (10%) y los términos del financiamiento requieran que se reembolsen en su totalidad dentro de los diez (10) años.

(v)    Servicio de la deuda del plan fiscal: Todo Plan Fiscal posterior a la Fecha de Entrada en vigencia incluirá disposiciones para el pago, en cada Año fiscal, (a) del capital y los intereses con respecto a los Nuevos Bonos GO, incluidos los pagos del fondo de amortización que venzan en dicho Año fiscal, y (b) en la medida en que se cumpla la condición de superávit en el Año fiscal anterior, todos los montos adeudados y exigibles  sobre los CVI de acuerdo con los términos de la Escritura de CVI.

No obstante lo anterior, ninguna disposición que contenga el presente prohíbe que el ELA Reorganizado adopte, mantenga o cumpla una Política de Administración de la Deuda que sea más restrictiva que los requisitos que se estipulan anteriormente. La Política de Administración de la Deuda debe ser adicional a cualquier otra limitación impuesta por la ley y no se debe interpretar que ninguna disposición del presente reemplaza, enmienda o deroga cualquier restricción adicional impuesta por la Constitución del ELA.

**G.**    **Disposiciones relativas a los bonos asegurados por Assured, los bonos asegurados por National y los bonos asegurados por Syncora**

      1.    **Tratamiento de reclamaciones de Bonos Asegurados por Assured**

Si las Clases 2, 16, 22, 29, 34 y 39 votan por aceptar el Plan y todas las Pólizas de seguro de Assured y contratos vinculados con los Bonos asegurados por Assured están en pleno  vigor y efecto, sin pagos

pendientes por parte de Assured con respecto a los citados bonos hasta la Fecha de Entrada en vigencia (incluida), los tenedores de Reclamaciones de Bonos Asegurados por Assured recibirán los siguientes tratamientos.[379]

(a) *Elección de Assured:* a discreción de Assured, Assured recibirá el efectivo y los CVI asignables a los tenedores de Bonos Asegurados por Assured, y la totalidad o cualquier parte de los Bonos Asegurados por Assured que Assured escoja se abonará en la Fecha de Entrada en vigencia, a un Precio de aceleración equivalente al importe del capital pendiente de los citados bonos, más los intereses devengados e impagados en concepto de los mismos (o, en el caso de los bonos de apreciación de capital, el monto compuesto de los mismos) a la Fecha de Entrada en vigencia, con cargo a:

a. el producto de todos o cualquier parte de los Nuevos Bonos GO de Assured asignables a los tenedores de Bonos Asegurados por Assured, Nuevos Bonos GO de Assured que estará (i) asegurados, a discreción de Assured, de conformidad con la nueva póliza de seguro expedida por Assured en términos aceptables para Assured, (ii) suscritos en una "oferta", en el sentido de la Regla 15C2-12 de la SEC, y (iii) vendidos en el mercado de manera que sean emitidos y otorgados a los citados suscriptores en la Fecha de Entrada en vigencia; y

b. en la medida en que dicho producto de los Nuevos Bonos GO de Assured no sea suficiente para pagar el Precio de Aceleración, importes equivalentes a aquel déficit pagado por Assured de conformidad con las Pólizas de seguro de Assured que cubren los Bonos Asegurados por Assured.

Los importes de capital, los vencimientos y las tasas de interés de los Nuevos Bonos GO de Assured con respecto a los cuales Assured haya ejercitado la Elección de Assured, serán determinados por Assured en consultas con los suscriptores correspondientes, de modo que las tasas de interés de los Nuevos Bonos GO de Assured serán los más bajos necesarios para que dichos Nuevos Bonos GO de Assured se emitan con importes a la par incrementados con respecto a los Nuevos Bonos GO, y que resulte que los Nuevos Bonos GO de Assured se emita con la rentabilidad global más baja;

El servicio anual de la deuda de los Nuevos Bonos GO de Assured exigible en cualquier Año fiscal no será superior al servicio anual de la deuda que habría sido exigible en dicho Año fiscal si los citados Nuevos Bonos GO de Assured se hubiesen emitido en los mismos términos y condiciones que los demás Nuevos Bonos GO. Si (i) si antes del, o en el, momento de valoración de los Nuevos Bonos GO de Assured, Assured

---

[379] [De conformidad con la Sección 71.1 del Plan, dichos tratamientos serán seleccionados por Assured a su exclusiva discreción como más tardar en la fecha de la Vista de la Declaración de divulgación, y la presente Declaración de divulgación se actualizará en consecuencia. A efectos de disipar cualquier duda, Assured no ha optado por ninguna selección prevista por la Sección 71.1 a la fecha de presentación de esta Declaración de divulgación.]

determina, evaluando de buena fe las circunstancias, que los Nuevos
Bonos GO de Assured no pueden venderse en el mercado en condiciones
aceptables para Assured, o bien (ii) dichos Nuevos Bonos GO de Assured
no se emitiesen a los suscriptores por cualquier motivo, en ambos casos
Assured (A) podrá optar, a su absoluta discreción, por ejercitar la opción
de Pago del precio de aceleración de Assured abonando dicho precio a los
tenedores de Bonos Asegurados por Assured con respecto a los cuales
Assured haya ejercitado la Elección de Assured, y (B) recibirá, en la Fecha
de Entrada en vigencia, los Nuevos Bonos GO de Assured con respecto a
los cuales se ejercite la opción del Pago del precio de aceleración de
Assured, y cualquier efectivo y otros Nuevos títulos de Assured asignados
a los Bonos Asegurados por Assured, Nuevos Bonos GO de Assured que,
a discreción de Assured, quedarán asegurados de conformidad con una
nueva póliza de seguro emitida por Assured en términos aceptables para
la                                                                                    misma.

El pago del Precio de aceleración correspondiente con respecto a
cualquiera de los Bonos Asegurados por Assured de conformidad con la
Elección de Assured o la opción del Precio de aceleración de Assured,
satisfará y extinguirá todas las obligaciones asumidas por Assured en las
Pólizas de seguro de Assured con respecto a dichos bonos.

(b) *Elecciones de los bonistas asegurados por Assured:* Si Assured declinase
adoptar la Elección de Assured con respecto a cualquiera de los Bonos
asegurados por Assured, tal como se ha expuesto anteriormente (o bien si
ejercitase la Elección de Assured pero no la opción del Pago del precio
acelerado de Assured al producirse cualquier evento que otorgase a Assured
el derecho de ejercitar tal opción, como ya se ha descrito), todo tenedor
beneficiario de un Bono Asegurado por Assured con respecto al cual Assured
no haya ejercitado la Elección de Assured, podrá optar por cualquiera de las
siguientes elecciones de Bonistas asegurados de Assured, en cada caso en
condiciones admisibles para Assured:

Elección 1 de Bonista de Assured: estos tenedores recibirán de Assured
el Precio de aceleración correspondiente en la Fecha de Entrada en
vigencia, con plena satisfacción y extinción de las obligaciones de
Assured para con dicho bonista de conformidad con las Pólizas de
seguro de Assured aplicables, y Assured recibirá el efectivo y los
Nuevos valores de Assured asignables a dicho tenedor en virtud del
Plan. A discreción de Assured, dichos Nuevos valores de Assured, en el
caso de los Nuevos Bonos GO de Assured, quedarán asegurados de
acuerdo con una nueva póliza de seguro emitida por Assured en
términos admisibles para ella;

Elección 2 del Bonista de Assured: estos tenedores podrán optar por un
mecanismo de fideicomiso, de custodia, depósito o estructura similar

443

establecida por Asssured para ofrecer a dicho tenedor una participación en (A) la Póliza de seguro de Assured correspondiente, y (B) los Nuevos valores de Assured asignables a dicho tenedor de conformidad con términos y condiciones admisibles para Assured.

Elección 3 del Bonista de Assured: dicho tenedor, en la Fecha de Entrada en vigencia, y tras haber Assured satisfecho todas las obligaciones asumidas en las Pólizas de seguro de Assured, recibirá (i) el efectivo y lo Nuevos valores de Assured que deban asignársele en virtud del Plan que, en caso de los Nuevos Bonos GO de Assured podrán, a elección de Assured, ser asegurados en el marco de una nueva póliza de seguros emitida por Assured en condiciones admisibles; y (ii) un pago en efectivo de Assured, por una cuantía a determinar o a definir por Assured antes del comienzo de la vista de la Declaración de divulgación.

Las Elecciones de los Bonistas de Assured ofrecidas incluirán al menos la Elección 1 o la Elección 2 del Bonista de Assured. Los intereses cedidos a mecanismo de fideicomiso, de custodia, depósito o estructura similar establecida de conformidad con la Elección 2, serán por el DTC. En caso de que el Bonista asegurado por Assured no eligiese ninguna opción, se considerará que habrá optado por la Elección 2 del Bonista de Assured.

(c) *Aceleración de los Bonos asegurados por Assured*. En la medida en que no existan impagos pendientes de parte de Assured con respecto a los Bonos Asegurados por Assured hasta la Fecha de Entrada en vigencia (incluida), el pago del capital de los Bonos Asegurados por Assured se acelerará a partir de la Fecha de Entrada en vigencia. Dichos Bonos Asegurados por Assured serán pagaderos, a partir de la Fecha de Entrada en vigencia, al Precio de aceleración de Assured del 100% del monto de capital de los mismos más los intereses devengados desde ese momento (o, en el caso de un bono de apreciación de capital, el monto compuesto de los mismos) hasta la fecha de pago.

(d) *Cesión de Derechos de amortización*. En la Fecha de Entrada en vigencia, se considerará que el ELA, la AEP y la ADCC han cedido a Assured todos los derechos de amortización y rescate de los Bonos Asegurados por Assured y cualquier otro derecho relacionado, de forma que dichos derechos podrán ser ejercidos directa y exclusivamente por Assured como si se tratara del ELA, la AEP y la ADCC a tal efecto. Los montos adeudados en relación con dicha amortización serán iguales al menor de los precios de amortización aplicables y el Precio de Aceleración de Assured.

2. **Tratamiento de reclamaciones de Bonos Asegurados por National**

Si las Clases 3, 17 y 23 votan para aceptar el Plan y todas las Pólizas de seguros de National y todas las Pólizas de seguro de National y contratos vinculados con los Bonos asegurados por National están en pleno vigor y efecto, sin pagos pendientes por parte de National con respecto a los citados bonos hasta la

Fecha de Entrada en vigencia (incluida), los tenedores de Reclamaciones de Bonos Asegurados por National recibirán los siguientes tratamientos.[380]

(a) ***Tratamiento de Conmutación de National:*** cada tenedor de una Reclamación de Bonos asegurados por National permitida tendrá en la Fecha de Entrada en vigencia, la opción de elegir, en la urna o en el formulario de elección, la Contraprestación de Conmutación de National, distribuible por, o siguiendo las instrucciones de, National, y, si así lo elige, (i) el tenedor beneficiario del mismo no tendrá otros derechos, ni derechos adicionales, de conformidad con o con respecto a la Póliza de seguro de National o cualquier Fideicomiso o Cuenta de custodia de National; y (ii) National recibirá la Contraprestación del Plan de National que, de otro modo, se asignaría o distribuiría a dicho tenedor de una Reclamación de Bonos asegurados por National.

Se considerará que el tenedor de una Reclamación de Bonos asegurados por National permitida que, en la Fecha de Entrada en vigencia o con posterioridad a la misma, no opte válidamente por recibir el Tratamiento de No conmutación de National, tiene o ha tenido Bonos Asegurados por National, quedando canceladas las Reclamaciones, incluyendo las obligaciones asumidas por National en las Pólizas de seguros de National.

(b) ***Tratamiento de No conmutación de National:*** si el tenedor de una Reclamación de Bonos Asegurados por National opta puntual y válidamente por no recibir el Tratamiento de Conmutación de National, dicho tenedor recibirá uno o más de los tratamientos descritos con mayor detalle en la Sección 71.2 del Plan, a discreción de National, que será ejercitada por National antes del comienzo de la vista de la Declaración de divulgación.

(c) ***Aceleración de los Bonos Asegurados por National***. En la medida en que no existan impagos pendientes de parte de National con respecto a los Bonos Asegurados por National hasta la Fecha de Entrada en vigencia (incluida), el pago del capital de los Bonos Asegurados por National se acelerará a partir de la Fecha de Entrada en vigencia. Dichos Bonos Asegurados por National serán pagaderos, a partir de la Fecha de Entrada en vigencia, al Precio de aceleración de National del 100% del monto de capital de los mismos más los intereses devengados desde ese momento (o, en el caso de un bono de apreciación de capital, el monto compuesto de los mismos) hasta la fecha de pago..

(d) ***Cesión y Derechos de Amortización***. En la Fecha de Entrada en vigencia, en la medida en que lo permitan los documentos definitivos aplicables y no sean incompatibles con los respectivos derechos previstos en la Póliza de Seguro de

---

[380] [De conformidad con la Sección 71.2 del Plan, dichos tratamientos serán seleccionados por National a su exclusiva discreción como más tardar en la fecha de la Vista de la Declaración de divulgación, y la presente Declaración de divulgación se actualizará en consecuencia. A efectos de disipar cualquier duda, National no ha optado por ninguna selección prevista por la Sección 71.2 a la fecha de presentación de esta Declaración de divulgación.]

445

National, se considerará que el ELA y la AEP ceden a National todos y cada uno de los derechos de amortización y recuperación de los Bonos Asegurados por National y cualquier otro derecho relacionado, de forma que dichos derechos puedan ser ejercidos directa y exclusivamente por National como si se tratara del ELA o AEP, según proceda, a tal efecto. Los montos adeudados en relación con dicha amortización serán iguales al menor de los precios de amortización aplicables y el Precio de Aceleración de National.

3.    **Tratamiento de reclamaciones de Bonos Asegurados por Syncora**

Si las Clases 5, 19 y 25 votan para aceptar el Plan, los tenedores de Reclamaciones de Bonos Asegurados por Syncora recibirán los siguientes tratamientos.[381]

(a) *Aceleración de los Bonos Asegurados por Syncora*. En la medida en que lo permitan los documentos definitivos aplicables y no sean incompatibles con los respectivos derechos previstos en la Póliza de Seguro de Syncora, el pago del capital de los Bonos Asegurados por Syncora se considerará acelerado a partir de la Fecha de Entrada en vigencia. Los Bonos Asegurados por Syncora se considerarán pagaderos a partir de la Fecha de Entrada en vigencia a un precio de aceleración igual al monto de capital de los mismos a la Fecha de Entrada en vigencia más los intereses devengados hasta la fecha de pago.

(b) *Cesión y Derechos de Amortización*. En la Fecha de Entrada en vigencia, se considerará que el ELA y la AEP han cedido a Syncora todos los derechos de amortización y recuperación de los Bonos Asegurados por Syncora y cualquier otro derecho relacionado, de forma que dichos derechos podrán ser ejercidos directa y exclusivamente por Syncora como si se tratara del ELA y la AEP a tal efecto. Los montos adeudados en relación con dicha amortización serán iguales al menor de los precios de amortización aplicables y el Precio de Aceleración de Syncora.

4.    **Creación del Fideicomiso de FGIC**

Como más tardar en la Fecha de Entrada en vigencia, y salvo que se convenga algo distinto con los tenedores del 50.1% de los Bonos Asegurados por FGIC, se constituirán los Fideicomisos de FGIC en nombre de, y para beneficio exclusivo de los tenedores beneficiarios de, los Bonos Asegurados por FGIC. El síndico del, o de los, Fideicomisos de FGIC, será una entidad reconocida con institución financiera con domicilio fiscal en EE.UU., y fiduciaria que actúe normalmente como síndico en el mercado de las finanzas municipales.

En la Fecha de Entrada en vigencia, los Activos del Fideicomiso de FGIC, consistentes en (a) los Bonos Asegurados por FGIC, (b) las distribuciones previstas en el Plan con respecto a

---

[381] [De conformidad con la Sección 71.3 del Plan, dichos tratamientos serán seleccionados por Syncora a su exclusiva discreción como más tardar en la fecha de la Vista de la Declaración de divulgación, y la presente Declaración de divulgación se actualizará en consecuencia. A efectos de disipar cualquier duda, Syncora no ha optado por ninguna selección prevista por la Sección 71.3 a la fecha de presentación de esta Declaración de divulgación.]

dichos Bonos Asegurados por FGIC, y (c) las Pólizas de seguros de FGIC, se depositarán en el Fideicomiso de FGIC. Los costos, incluyendo las tarifas y gastos, así como cualesquiera obligaciones derivadas del Plan, asociadas con la constitución y funcionamiento del Fideicomiso de FGIC, se pagarán con cargo a los Activos del Fideicomiso de FGIC, y el ELA no tendrá ninguna obligación al respecto.

Los Bonos Asegurados por FGIC depositados en el Fideicomiso del FGIC no serán cancelados, y todos los derechos y recursos que asistan a dichos Bonos Asegurados por FGIC, así como la Resolución de bonos (salvo con respecto a las obligaciones de pago del ELA) y las Pólizas de seguro de FGIC se mantendrán en pleno vigor y efecto. Tras depositar los Activos del Fideicomiso de FGI, y sobre una base de prorrateo, el Fideicomiso de FGIC emitirá una o más series de Certificados de FGIC a los tenedores beneficiarios de los Bonos de FGIC cuyas participaciones asignables en la Distribución de bonos del Fideicomiso de FGIC hayan sido depositadas en el Fideicomiso del FGIC. Los Certificados del FGIC darán a sus tenedores el derecho a una participación prorrateada en el valor de cualquier distribución de efectivo del Fideicomiso de FGIC correspondiente, distribución que (i) en todos los casos se producirá a la mayor brevedad tras su recepción por el Fideicomiso de FGIC, y (ii) reducirá automáticamente las obligaciones pendientes de conformidad con las Pólizas de seguro de FGIC a la fecha de dicha distribución a los tenedores de Certificados de FGIC en la cuantía de dicha distribución.

La obligación de FGIC de pagar los importes programados en concepto de los Bonos GO subyacente cuando resulten exigibles, no se acelerará sin el consentimiento de una mayoría en valor nominal de los tenedores de Certificados de FGIC que voten. Una mayoría en valor nominal de los tenedores de Certificados de FGIC que vote podrá instar al síndico del Fideicomiso de FGIC para que adopte cualesquiera medidas relativas a los Activos del Fideicomiso de FGIC, incluyendo (i) votar, modificar, acelerar, eventos de incumplimiento, elección y derechos y recursos (incluyendo, entre otros, los relacionados con procedimientos de insolvencia), y (ii) la venta u otra distribución de cualquiera de los Activos del Fideicomiso de FGIC. En la fecha de vencimiento de los Bonos GO del Fideicomiso de FGIC, los Activos del Fideicomiso de FGIC se distribuirán de manera prorrateada a los tenedores de Certificados de FGIC. Dichas distribuciones reducirán automáticamente las obligaciones estipuladas en las Pólizas de seguro de FGIC en la cuantía del monto de capital de dichos Bonos GO a la fecha de dicha distribución. Cada serie de Certificados de FGIC llevará un CUSIP municipal único, y serán libremente negociables a través de la entidad depositaria del Fideicomiso.

El Fideicomiso de FGIC será un fideicomiso con responsabilidad fiscal del otorgante, constituido de conformidad con las leyes de Delaware, sujeto a un tratamiento fiscal "trasladable", sujeto a la opinión de un asesor fiscal especializado en finanzas municipales. Todo el efectivo distribuido por el Fideicomiso de FGIC reducirá las obligaciones estipuladas en las Pólizas de seguro de FGIC vigentes, acreditándose en primer lugar al abono de los intereses debidos en concepto de los Bonos GO hasta su pago íntegro, y en segundo lugar a la devolución del capital de los Bonos GO. En cada fecha de pago prevista en las Pólizas de Seguro de FGIC, el Fideicomiso de FGIC recibirá el efectivo al CCP a la sazón vigente, y derechos de OPD por el importe del déficit (cada uno definido en el Tercer Plan de Rehabilitación Enmendado de FGIC). El efectivo se distribuirá a los tenedores de Certificados de FGIC como se ha descrito, y el derecho de recibir pagos en concepto de OPD quedará reservado para el Fideicomiso de FGIC.

H.      Tratamiento de contratos condicionales y arrendamientos no vencidos

**Todos los contratos condicionales y arrendamientos de bienes inmuebles no residenciales con cualquier Deudor se tratarán de la manera siguiente:**

| Categoría | Tratamiento |
|---|---|
| **Contrato condicional o arrendamiento no vencido rechazado o asumido y cedido por una orden del Tribunal del Título III registrados antes de la Fecha de Confirmación** | *Tratamiento.* No se verán afectados por el Plan. La orden del Tribunal del Título III con respecto a dicho contrato condicional o arrendamiento no vencido continuará rigiendo. |
| **Contrato condicional o arrendamiento no vencido que figura en el cronograma del suplemento del Plan** | *Tratamiento.* El Suplemento del Plan incluirá un cronograma de contratos pendientes de ejecución y arrendamientos no vencidos que serán asumidos, o asumidos y cedidos a la Fecha de Entrada en vigencia. El cronograma puede enmendarse en cualquier momento antes de la Fecha de Confirmación. Conforme al Código de Quiebras, como condición de la asunción de un contrato condicional, el deudor debe subsanar de inmediato cualquier incumplimiento, y si hay un incumplimiento, proporcionar una garantía adecuada de que el deudor continuará actuando de conformidad con el contrato. <br><br> *Notificación y subsanación de incumplimientos.* Por lo menos 20 días antes de la Vista de Confirmación, los Deudores presentarán y entregarán una notificación a las partes de dichos contratos o arrendamientos. La notificación incluirá el monto a ser pagado por los Deudores para subsanar cualquier incumplimiento para cada contrato condicional o arrendamiento no vencido. <br><br> *Objeciones.* Cualquier parte de dicho contrato condicional o arrendamiento no vencido dispondrá de 20 días a partir de la fecha de notificación para presentar y presentar cualquier objeción a los montos de subsanación enumerados y a cualquier garantía adecuada de futuro cumplimiento que el deudor pueda proporcionar. Si hay objeciones presentadas, el Tribunal del Título III realizará una vista sobre la objeción. |
| **Contratos de negociación colectiva** | Salvo según lo dispuesto en los Artículos LII y LIII del Plan (Disposiciones para el tratamiento de reclamaciones de empleados activos), ninguno de los contratos de negociación colectiva de los Deudores serán (a) tratados como contratos pendientes de ejecución, o (b) asumidos o rechazados o tratados de otra manera conforme al Plan. |

| Categoría | Tratamiento |
|---|---|
|  | Los contratos de negociación colectiva de los Deudores permanecerán en vigencia sujeto a la Ley de Puerto Rico y los Artículos LII y LIII del Plan con respecto al pago y el tratamiento de pensiones en curso y las reclamaciones y obligaciones relacionadas. |
| **Contratos condicionales y arrendamientos no vencidos de AEP y relacionados con el arrendamiento o subarrendamiento de bienes de AEP** | ***Tratamiento.*** No se verá afectado por el Plan. |
| **Contratos condicionales y arrendamientos no vencidos que se hayan registrado ante la Oficina de Contralor de Puerto Rico o han sido aprobados por la Junta de Supervisión o autorizados por el Tribunal del Título III** | ***Tratamiento.*** No se verá afectado por el Plan. |
| **Todos los demás contratos condicionales y arrendamientos no vencidos** | ***Tratamiento.*** Serán rechazados por los Deudores a la Fecha de Entrada en vigencia.<br><br>***Notificación.*** Se notificará cualquier contrato condicional o arrendamiento no vencido a rechazarse a las partes de dicho contrato o arrendamiento.<br><br>***Daños debido a rechazo.*** Cualquier parte que busque presentar una reclamación por daños resultantes del rechazo de un contrato condicional o arrendamiento no vencido debe presentar una evidencia de reclamaciones en o antes de los 30 días antes de (i) la Fecha de Confirmación, o (ii) la fecha del registro de una orden por el Tribunal del Título III donde se apruebe el rechazo de dicho contrato condicional o arrendamiento no vencido, lo que ocurra más tarde.<br><br>Si una parte no presenta una evidencia de reclamaciones de daños emergentes del rechazo de un contrato condicional o arrendamiento no vencido dentro de la fecha límite anterior, dicha reclamación será prohibida para siempre y no será aplicable contra los Deudores. |

*Pólizas de Seguros.* Cada una de las pólizas de seguros de los Deudores y cualquier acuerdo, documentos o instrumentos relacionados se tratarán como contratos condicionales conforme al Plan. Sin embargo, dicho tratamiento no exonerará ni relevará a Ambac, Assured, FGIC, National o Syncora de sus

obligaciones respectivas hacia los tenedores de reclamaciones conforme a las pólizas de seguro y el derecho aplicable y los documentos que rigen con respecto a tal.

***Obligaciones de indemnización y reembolso***   Cualquier obligación de los Deudores de indemnizar y reembolsar a sus directivos o funcionarios que fueron directivos o funcionarios en o antes de la fecha de petición pertinente (incluso las pólizas de seguro de cualquier directivo o funcionario) serán asumidas a la Fecha de Entrada en vigencia.

Cualquier obligación de indemnización de los Deudores emergente de la conducta de funcionarios y directivos a partir de y después de la fecha de petición pertinente se tratará como Reclamaciones de Gastos Administrativos. Bajo ninguna circunstancia los Deudores o los Deudores Reorganizados, según sea el caso, serán responsables de cualquier obligación de indemnización, costo o gasto asociado con negligencia grave, fraude intencional o conducta dolosa de sus respectivos funcionarios o directivos. *Consulte* la sección VI.D de esta Declaración de Divulgación para obtener un resumen de las Reclamaciones de Gastos Administrativos.

***Disputas con respecto a contratos condicionales y arrendamientos no vencidos***.   Si existe una disputa con respecto a si un contrato o arrendamiento es o era pendiente de cumplimiento o no vencido en el momento de la asunción, los Deudores tendrán 45 días a partir del registro de una Orden Final que resuelva dicha disputa o altere su tratamiento de dicho contrato o arrendamiento.

**I.      Derechos y facultades del agente pagador**

El agente pagador será el ELA o una entidad o entidades designadas por la Junta de Supervisión y AAFAF en o antes de la Fecha de Entrada en vigencia para hacer o facilitar distribuciones de acuerdo con el Plan.

***Facultades del agente pagador***.   El agente pagador estará facultado para (a) tomar todas las medidas y ejecutar todos los instrumentos y documentos necesarios para aplicar el Plan, (b) hacer distribuciones contempladas por el Plan, (c) cumplir el Plan y las obligaciones del Plan, y (d) ejercer cualquier otra facultad atribuida al agente pagador por una orden del Tribunal del Título III, conforme al Plan o según sea considerado por el agente pagador como necesario y correcto para implementar el Plan.

***Tarifas y gastos incurridos a partir de y después de la Fecha de Entrada en vigencia.***   Las tarifas y gastos razonables incurridos por el Agente Pagador a partir de y después de la Fecha de Entrada en vigencia, y cualquier compensación razonable y reclamaciones de reembolso de gastos (*por ej.*, tarifas y gastos razonables de asesoramiento jurídico) incurridos por el Agente Pagador se pagarán en efectivo sin orden adicional del Tribunal del Título III.

***Exculpación***.   El Agente Pagador será exculpado por todas las entidades (incluso los tenedores de reclamaciones y otras partes en interés) de toda y cualquier reclamación, causas de acción, y otras aseveraciones de responsabilidad legal emergentes del relevo de las facultades u deberes conferidos al Agente Pagador, salvo por acciones u omisiones emergentes de negligencia grave o conducta dolosa del Agente Pagador. Ningún tenedor de una reclamación u otra parte en interés puede tener o llevar adelante una reclamación o causa de acción contra el Agente Pagador por hacer pagos de acuerdo con el Plan o por implementar las disposiciones del Plan.

J.      **Disposiciones que rigen las distribuciones**

*Tiempo y forma de las distribuciones.*

*Distribuciones a tenedores de reclamaciones.*  El Agente Pagador hará distribuciones a los tenedores de las siguientes reclamaciones dentro de diez (10) días laborables después de la Fecha de Entrada en vigencia.  *Consulte* la sección VI.E de la Declaración de Divulgación para conocer las distribuciones aplicables a ser hechas a tenedores de dichas reclamaciones.

- Reclamaciones de Bonos AEP Permitidas

- Reclamaciones de Bonos ELA Permitidas

- Reclamaciones de Bonos ELA Garantizados Permitidas

- Reclamaciones de Bonos SRE Permitidas

- Reclamaciones Generales no Garantizadas del ELA Permitidas

- Reclamaciones Generales no Garantizadas de SRE Permitidas

La distribución de un Derecho de Apoyo al Minorista, de haberlo, a un tenedor de una Reclamación de Bonos AEP Permitida o Reclamación de Bonos del ELA Permitida está sujeto a la presentación, en o antes de la Fecha Límite de Votación, de los bonos aplicables de dicho tenedor a través del Programa de Oferta de Licitación Automática en The Depository Trust Company con una certificación de que dicho tenedor es un Inversionista Minorista.

*Distribuciones de tenedores de Reclamaciones Generales no Garantizadas de AEP Permitidas.* El Agente Pagador hará distribuciones a tenedores de Reclamaciones Generales no Garantizadas de AEP Permitidas en el tratamiento dispuesto para tenedores de Reclamaciones Generales no Garantizadas de AEP Permitidas en la Clase 12.

*Distribuciones de efectivo a tenedores de ciertas otras reclamaciones.*  Las distribuciones a tenedores de Reclamaciones de Gastos Administrativos Permitidas se harán en efectivo ni bien resulte factible después de (i) la Fecha de Entrada en vigencia, o (ii) la fecha en que la reclamación se convierta en una reclamación permitida.

*Oportunidad de los pagos.*  Cualquier pago o distribución hechos dentro de los diez (10) días laborables después de la fecha especificada en el Plan se considerará hecho puntualmente.  Cuando una distribución se adeuda en un día que no sea un día laborable, dicha distribución se hará en el siguiente día laborable, sin interés, y se considerará hecho en la fecha de vencimiento.

*Distribuciones por el Agente Pagador.*  Todas las distribuciones conforme al plan serán hechas por el Agente Pagador, a menos que se especifique lo contrario.  El Agente Pagador retendrá todos los bienes a ser distribuidos conforme al Plan en fideicomiso para todas las entidades con derecho a recibir dichos bienes. El Agente Pagador no retendrá un interés económico o beneficioso sobre dichos bienes.

*Forma de pago conforme al Plan.*  Los pagos en efectivo se harán por cheque o transferencia bancaria.  Sin embargo, no se hará ningún pago hasta que el monto pagadero sea igual o mayor a los diez dólares ($10.00).

451

*Entrega de distribuciones*.  Las distribuciones y entregas hechas a tenedores de reclamaciones permitidas se harán (a) en el domicilio del tenedor correspondiente que figure en los cronogramas presentados ante el Tribunal del Título III, a menos que el tenedor haya presentado una evidencia de reclamaciones con un domicilio actualizado, o los Deudores hayan sido notificados por escrito sobre un cambio de domicilio, o (b) a través de la Depository Trust Company.

Sin embargo, las distribuciones iniciales de tenedores de las siguientes reclamaciones pueden ser hechas por el síndico o agente fiscal, según sea aplicable, para dicha obligación de acuerdo con los documentos aplicables que rigen para Reclamaciones de Bonos Permitidos.

Las distribuciones de los Derechos de Restricción de AAP, Derecho de Apoyo al Minorista, Rendimiento de Derecho de Apoyo al Minorista y Costos de Consumación en efectivo se harán a las partes correspondientes de una manera mutuamente acordada entre dicha parte y el Agente Pagador.  El síndico o agente fiscal para cada una de dichas obligaciones, por su parte, entregará la distribución a los tenedores de la manera dispuesta en los documentos aplicables que rigen.

Los Deudores, sus agentes y notificadores, y el Agente Pagador no tienen obligación de reorganizar ninguna transferencia de Reclamaciones de Bonos después de la Fecha de Registro de Distribución.  Sin embargo, los Nuevos Bonos GO y los CVI serán transferibles y reconocidos si se hacen de acuerdo con los términos y condiciones de la Escritura de los Nuevos Bonos GO y la Escritura de CVI, respectivamente.

*Cancelación de notas, instrumentos, certificados y otros documentos.*  En la Fecha de Entrada en vigencia, los Bonos AEP, los Bonos SRE, los Bonos GO y todos los demás instrumentos y documentos relacionados con estos se cancelarán, rescindirán y no tendrán efecto adicional contra los Deudores.  Los Deudores y el síndico correspondiente, agente de pago o agente fiscal no tendrán obligaciones o deberes y responsabilidades posteriores conforme a los Bonos AEP, Bonos SRE y Bonos GO.  Las obligaciones de las partes hacia los Deudores conforme a los Bonos AEP y los Bonos GO y todos los instrumentos y documentos se darán por cumplidas.

Sin embargo, los Bonos AEP, los Bonos SRE y los Bonos GO e instrumentos y documentos relacionados continuarán en vigencia para los fines limitados a continuación:

(i)     permitir que el agente pagador haga cualquier distribución según se estipule en el Plan y ejecutar todas las funciones administrativas o de otro tipo que sean necesarias,

(ii)    permitir a los tenedores de Reclamaciones de Bonos Permitidos para recibir distribuciones de acuerdo con los términos y disposiciones del Plan,

(iii)   para cualquier síndico, agente, administrador de contrato o entidad similar conforme a los instrumentos y documentos relacionados para ejecutar funciones necesarias, incluso hacer distribuciones, de acuerdo con el Plan y tener el beneficio de todos los derechos y protecciones y otras disposiciones de dichos instrumentos y documentos, según sea aplicable, y todos los demás acuerdos relacionados,

(iv)    establecer los términos y condiciones aplicables a las partes de dichos documentos e instrumentos que no sean los Deudores, o

(v)     según sea necesario para preservar las reclamaciones conforme a las respectivas pólizas de seguros y documentos relacionados por una aseguradora monolínea.

La Junta de Supervisión solicitará que el ELA y AEP usen esfuerzos razonables para (1) mantener los números existentes de CUSIP para los Bonos GO y Bonos AEP asegurados por monolínea, respectivamente, y (2) tomar todas las demás medidas razonables que puedan ser necesarias para preservar y efectuar dichas Reclamaciones.

### Distribuciones no entregables/reservadas.

*Retención de Distribuciones No Entregables por el Agente Pagador.* Si alguna distribución a cualquier tenedor se devuelve al Agente Pagador como no entregable, no se harán distribuciones adicionales mientras no se notifique al Agente Pagador, por escrito, sobre el domicilio actualizado del tenedor. Las distribuciones no entregables permanecerán en poder del Agente Pagador hasta que la distribución pueda entregarse. Todas las entidades que en definitiva reciben efectivo no entregable no tendrán derecho a ningún interés o devengo de ningún tipo sobre ellas. El Agente Pagador no tiene la obligación de ubicar al tenedor de una reclamación permitida.

*Falta de reclamación de distribuciones no entregables.* El Agente Pagador presentará una lista ante el Tribunal del Título III donde se indiquen los nombres de cualquier entidad a la que se hayan emitido cheques que no hayan sido cobrados, o cualquier otra distribución que se haya devuelto como no entregable. Dicha lista será presentada dentro de los 180 días después de la Fecha de Entrada en vigencia (o dentro de 180 días después de que se permita una reclamación, lo que ocurra más tarde).

Cualquier tenedor de una reclamación permitida en dicha lista tendrá seis (6) meses a partir de la fecha en que se presente la lista para identificarse y afirmar su derecho a recibir una distribución. Después de seis (6) meses, dicho tenedor estará prohibido de hacer valer cualquier derecho a la distribución no entregable.

*Requisitos de retención e informe.* Cualquier distribución conforme al Plan estará sujeta a cualquier requisito de retención e informe impuesto por las leyes o autoridades impositivas federales, estatales o locales de Estados Unidos. Cada tenedor de una reclamación permitida que reciba una distribución conforme al Plan será responsable del pago de cualquier impuesto gravado sobre dicho tenedor por cuenta de dicha distribución, incluso obligaciones de ingresos, retenciones y otras obligaciones impositivas.

Cualquier parte que emita un instrumento o haga alguna distribución conforme al Plan tiene el derecho, pero no la obligación de no hacer una distribución hasta que el tenedor de una reclamación permitida haya hecho arreglos para el pago de cualquier obligación de retención de impuestos. Si la parte que emite un instrumento o hace una distribución conforme al Plan no realiza una retención o distribución y se considera posteriormente responsable por el monto de dicha retención, el tenedor deberá reembolsar a dicha parte.

El Agente Pagador puede requerir, como condición para recibir una distribución, que el tenedor complete el Formulario W-8 o el Formulario W-9 correspondiente. Si el tenedor no cumple dicha solicitud dentro de un año, la distribución será considerada como una Distribución No Reclamada.

*Límite de tiempo para el pago en efectivo.* Los cheques emitidos por el Agente Pagador serán nulos si no se cobran dentro de ciento veinte días (120) desde y a partir de la fecha de emisión. Los pedidos de reemisión de cualquier cheque deben hacerse directamente al Agente Pagador.

453

Cualquier reclamación relacionada con un cheque invalidado debe hacerse en o antes de (i) el primer (1er) aniversario de la Fecha de Entrada en vigencia o (ii) noventa (90) días después de la fecha de emisión del cheque, si el cheque representa una distribución final, lo que ocurra después. Después de dicha fecha, todas las reclamaciones relacionadas con cheques invalidados se desestimarán y prohibirán a perpetuidad y el Agente Pagador retendrá todo el dinero de dicho cheque para su redistribución entre los tenedores de reclamaciones permitidas de acuerdo con los términos y disposiciones del Plan.

*Distribuciones después de la Fecha de Entrada en vigencia.* Las distribuciones hechas después de la Fecha de Entrada en vigencia a los tenedores de reclamaciones que no son reclamaciones permitidas a la Fecha de Entrada en vigencia, pero que se convierten más tarde en reclamaciones permitidas se considerarán hechas de acuerdo con los términos y disposiciones del Plan.

*Compensaciones.* El Agente Pagador puede compensar contra cualquier reclamación permitida y las distribuciones a hacerse conforme al Plan, las reclamaciones, derechos y causas de acción de cualquier naturaleza que los Deudores o los Deudores Reorganizados pueden presentar contra el tenedor de dicha reclamación permitida.

Sin embargo, ni la falta de efectivización de dicha compensación ni la asignación de cualquier reclamación constituirá una renuncia o relevo por parte de los Deudores o Deudores Reorganizados de dichas reclamaciones, derechos y causas de acción que los Deudores o los Deudores Reorganizados puedan poseer contra dicho tenedor.

*Asignación de distribuciones del Plan entre capital e interés.* En la medida en que alguna reclamación permitida que tenga derecho a una distribución conforme al Plan consista en endeudamientos y otros montos (como interés devengado pero no pagado sobre ellos), las distribuciones se asignarán en primer lugar, al interés devengado y no pagado a la fecha inmediatamente anterior a la Fecha de Petición del ELA, la Fecha de Petición del SRE, o la Fecha de Petición del AEP, según corresponda, en segundo lugar, al monto del capital de la reclamación (según se determine para fines de impuestos federales al ingreso), y luego siempre que la contraprestación supere el monto del capital de la reclamación a otros montos (como intereses devengados pero no pagados).

Sin embargo, el tratamiento por parte de los Deudores o Deudores Reorganizados de cualquier distribución para sus fines impositivos no será vinculante para ningún acreedor con respecto al tratamiento de dichas distribuciones para cualquier fin regulatorio, impositivo u otros.

*Pago de tarifas y gastos del síndico.* Las distribuciones a realizar de conformidad con el Plan tienen por objeto incluir las tarifas y gastos de todos y cada uno de los síndicos y agentes de pago que se suponen que corren por cuenta del ELA, el SRE y la AEP con respecto a los montos liquidados de acuerdo con el Plan, El Plan no limita, ni podrá interpretarse como que limita, los derechos de dichos síndicos y agentes de pago al abono de dichos importes con cargo a las distribuciones a realizar de conformidad con el Plan, incluyendo la imposición por parte de un síndico o agente de pago de un gravamen sobre dicha distribución.

*Propietario beneficiario.* Para todos los fines del Plan, lo que incluye, para fines de distribuciones conforme al Plan, salvo con respecto a Reclamaciones emergentes de bonos asegurados por Syncora, el "tenedor" de una Reclamación es cualquier Entidad que, directa o indirectamente, tiene poder de inversión con respecto a cualquier Reclamación, lo que incluye el poder de disponer o de dirigir la disposición de dicha Reclamación.

Sin embargo, únicamente para los fines del Artículo LXXIII del Plan y la sección 1126 del Código de Quiebras, el "tenedor" de cualquier Reclamación de Bonos será determinado de conformidad con la Sección 301(c)(3) de PROMESA y cualquier ley o documento aplicable a dichas Reclamaciones de Bonos.

*Valor de las distribuciones*. Para fines de cálculo del valor de las distribuciones hechas a tenedores de Reclamaciones Permitidas, (a) el Efectivo será valorado por el monto distribuido y (b) los Nuevos Bonos GO y los CVI se valorarán por el monto del capital original de estos.

**K.   Fideicomiso de Acciones de Revocación**

    1.   **Celebración del Contrato de Fideicomiso de Acciones de Revocación**

En o antes de la Fecha de Entrada en vigencia, los Deudores y el Síndico de Acciones de Revocación celebrarán el Contrato de Fideicomiso de Acciones de Revocación y establecerán el Fideicomiso de Acciones de Revocación y los Intereses del Fideicomiso de Acciones de Revocación. El Fideicomiso de Acciones de Revocación y los Intereses del Fideicomiso de Acciones de Revocación serán para beneficio de los Beneficiarios del Fideicomiso de Acciones de Revocación, ya sea que sus reclamaciones se permitan antes o después de la Fecha de Entrada en vigencia.

El Contrato de Fideicomiso de Acciones de Revocación puede disponer facultades, deberes y potestades adicionales a las que se estipulan en el Plan, pero solo si no afectan el estado del Fideicomiso de las Acciones de Revocación como "fideicomiso de liquidación" para fines de impuestos al ingreso federales.

    2.   **Propósito del Fideicomiso de Acciones de Revocación**

El Fideicomiso de Acciones de Revocación se establecerá con el único fin de litigar o transigir las Acciones de Revocación y distribuir sus activos de acuerdo con la sección 301.7701-4(d) de la Regulación de Hacienda.

    3.   **Activos del Fideicomiso de Acciones de Revocación**

Los Activos del Fideicomiso de Acciones de Reintegración consisten en las Acciones de Reintegración, los fondos retenidos en depósito a la Fecha de Entrada en vigencia en relación con el compromiso y la liquidación de ciertas acciones de reintegración anteriores a la Fecha de Entrada en vigencia (netos de los gastos incurridos por el agente custodio), y aquellas otras acciones que han sido presentadas por o en nombre de los Deudores en busca de recuperaciones afirmativas, y cuyas acciones se establecen en el Anexo E del Plan.

En la Fecha de Entrada en vigencia, los Deudores transferirán todos los Activos del Fideicomiso de Acciones de Revocación al Fideicomiso de Acciones de Revocación. Los Activos del Fideicomiso de Acciones de Revocación pueden transferirse sujeto a ciertos pasivos según se disponga en el Plan o en el Contrato de Fideicomiso de Acciones de Revocación. La transferencia estará exenta de impuestos de sellos, transferencia de bienes inmuebles, informes hipotecarios, ventas, uso u otros Impuestos similares conforme a la sección 1146(a) del Código de Quiebras. Al entregarse los Activos del Fideicomiso de Acciones de Revocación al Fideicomiso de Acciones de Revocación, los Deudores y sus predecesores, sucesores y cesionarios y cada una de las demás Entidades serán exonerados conforme a la Sección 89.2 del Plan, y se relevará y exonerará de cualquier responsabilidad con respecto a la entrega.

4.       **Administración del Fideicomiso de Acciones de Revocación**

El Fideicomiso de Acciones de Revocación será administrado por el Síndico de Acciones de Revocación conforme al Contrato de Fideicomiso de Acciones de Revocación y el Plan. Si hay incongruencias entre el Plan y el Contrato de Fideicomiso de Acciones de Revocación, el Contrato de Fideicomiso de Acciones de Revocación tendrá preferencia.

5.       **El Síndico de Acciones de Revocación y la Junta de Fideicomiso de Acciones de Revocación**

En caso de fallecimiento, despido o renuncia por cualquier motivo del Síndico de Acciones de Revocación, la Junta de Fideicomiso de Acciones de Revocación designará a un sucesor. El Síndico de Acciones de Revocación no puede ser un directivo o funcionario de alguna subsidiaria del Fideicomiso de Acciones de Revocación.

La Junta de Fideicomiso de Acciones de Revocación estará compuesta por tres (3) miembros designados a la Fecha de Entrada en vigencia para dirigir el Fideicomiso de Acciones de Revocación, con dos (2) directivos seleccionados por el CANA y un (1) directivo seleccionado por la Junta de Supervisión.

6.       **Funciones del síndico de acciones de revocación**

El Síndico de Acciones de Revocación tendrá los derechos, facultades y obligaciones de:

a)       retener, administrar, convertir en efectivo y distribuir los Activos del Fideicomiso de Acciones de Revocación, lo que incluye la resolución de las reclamaciones que pertenecen al Fideicomiso de Acciones de Revocación;

b)       retener los Activos del Fideicomiso de Acciones de Revocación para beneficio de los Beneficiarios del Fideicomiso de Acciones de Revocación, independientemente de cuándo se permitan sus reclamaciones;

c)       investigar, enjuiciar, transigir y/o abandonar derechos, causas de acción o litigios del Fideicomiso de Acciones de Revocación;

d)       presentar todos los formularios, declaraciones, informes impositivos y regulatorios y otros documentos requeridos con respecto al Fideicomiso de Acciones de Revocación;

e)       controlar, enjuiciar y/o transigir objeciones a reclamaciones en nombre del Fideicomiso de Acciones de Revocación; y

f)       retener, administrar y distribuir Activos del Fideicomiso de Acciones de Revocación en efectivo y no en efectivo, obtenidos a través de ejercicio de sus facultades y su potestad.

El Síndico de Acciones de Revocación actuará teniendo en cuenta lo mejor para los intereses de los Beneficiarios del Fideicomiso de Acciones de Revocación y con el fin de promover el propósito del Fideicomiso de Acciones de Revocación.

7.    **Potestad impositiva del Síndico de Acciones de Revocación para los Deudores**

En y a partir de la Fecha de Entrada en vigencia, el Síndico de Acciones de Revocación preparará y presentará todas las declaraciones impositivas que deban presentarse o que el Síndico de Acciones de Revocación considere adecuadas en nombre de los Deudores.

8.    **Transferibilidad de intereses del Fideicomiso de Acciones de Revocación**

Los Intereses del Fideicomiso de Acciones de Revocación no podrán transferirse ni cederse salvo por testamento, sucesión intestada o de pleno derecho.

9.    **Efectivo**

El Síndico de Acciones de Revocación puede invertir efectivo tal como lo permite la sección 345 del Código de Quiebras. Las inversiones deben ser inversiones que se permita hacer a un fideicomiso de liquidación tal como se define en la sección 301.7701-4(d) de las Reglamentaciones de Hacienda, o conforme a las pautas, decisiones u otras potestades de control del IRS.

10.    **Distribución de activos del Fideicomiso de Acciones de Revocación**

El Síndico de Acciones de Revocación distribuirá a los tenedores de reclamaciones permitidas por cuenta de sus Intereses del Fideicomiso de Acciones de Revocación, con frecuencia semestral, todo el efectivo disponible que no tenga restricciones. Esto incluye cualquier efectivo recibido de los Deudores en la Fecha de Entrada en vigencia y el tratamiento de cualquier inversión permitida como efectivo para los fines de distribución.

Sin embargo, la distribución semestral no incluirá:

a)    Efectivo reservado conforme al Contrato de Fideicomiso de Acciones de Revocación para financiar las actividades del Fideicomiso de Acciones de Revocación;

b)    Montos retenidos en relación con las Reclamaciones en Disputa de conformidad con la Sección 79.3 del Plan para pagar gastos incurridos o previstos razonables (p. ej., impuestos gravados sobre o pagaderos por el Fideicomiso de Acciones de Revocación con respecto a los Activos del Fideicomiso de Acciones de Revocación).

El Síndico de Acciones de Revocación no estará obligado a hacer una distribución semestral si (i) el monto neto total del efectivo sin restricciones disponible para distribución (teniendo en cuenta las exclusiones anteriores) haría que la distribución sea impracticable según lo determine razonablemente el Síndico de Acciones de Revocación, con el consentimiento de la Junta del Fideicomiso de Acciones de Revocación, de acuerdo con el derecho aplicable, y (ii) dicho monto total es de menos de Veinticinco Millones de Dólares ($25,000,000.00). El Síndico de Acciones de Revocación, con el consentimiento de la Junta del Fideicomiso de Acciones de Revocación, puede decidir renunciar a la primera distribución trimestral a los tenedores de Intereses del Fideicomiso de Acciones de Revocación si el Síndico de Acciones de Revocación no está preparado para hacer la distribución. Si esto ocurre, la distribución se hará a dichos tenedores ni bien resulte factible después de que el Síndico de Acciones de Revocación esté administrativamente preparado para hacerlo.

11.      **Financiamiento, costos y gastos del Fideicomiso de Acciones de Revocación**

En la Fecha de Entrada en vigencia, el Fideicomiso de Acciones de Revocación se financiará por única vez con un monto de $10,000,000.00.

Los costos y gastos razonables del Fideicomiso de Acciones de Revocación, que incluyen las tarifas y gastos del Síndico de Acciones de Revocación y los profesionales que contrate, se pagará con fondos obtenidos de los Activos del Fideicomiso de Acciones de Revocación.  Las tarifas y gastos incurridos en relación con el enjuiciamiento y transacción de cualquier reclamación se considerarán costos y gastos del Fideicomiso de Acciones de Revocación.

12.      **Compensación del Síndico de Acciones de Revocación**

El Síndico de Acciones de Revocación tendrá derecho a una compensación razonable congruente con la de funcionarios similares en funciones similares, cuyo pago estará sujeto a la aprobación del Tribunal del Título III, pero sujeta a la aprobación y el consentimiento de la Junta del Fideicomiso de Acciones de Revocación.

13.      **Contratación de profesionales/empleados por el Síndico de Acciones de Revocación**

El Síndico de Acciones de Revocación puede contratar y compensar abogados, otros profesionales y empleados para brindar asistencia al Síndico de Acciones de Revocación, si el Síndico de Acciones de Revocación lo considera apropiado, sin la aprobación del Tribunal del Título III y sujeto al consentimiento de la Junta del Fideicomiso de Acciones de Revocación.

14.      **Tratamiento del impuesto federal al ingreso aplicable al Fideicomiso de Acciones de Revocación**

a)      **Activos del Fideicomiso de Acciones de Revocación tratado como de propiedad de los Acreedores.**

Para los fines del impuesto federal al ingreso, todas las partes tratarán la transferencia de los Activos del Fideicomiso de Acciones de Revocación al Fideicomiso de Acciones de Revocación como

(i)      una transferencia de los Activos del Fideicomiso de Acciones de Revocación directamente a los Beneficiarios del Fideicomiso de Acciones de Revocación y, en la medida en que se pueden asignar Activos del Fideicomiso de Acciones de Revocación a las Reclamaciones en Disputa, a la Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación, seguido de

(ii)      la transferencia de los Activos del Fideicomiso de Acciones de Revocación (salvo los Activos del Fideicomiso de Acciones de Revocación asignables a la Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación) por parte de los beneficiarios al Fideicomiso de Acciones de Revocación a cambio de Intereses del Fideicomiso de Acciones de Revocación.

Los Beneficiarios del Fideicomiso de Acciones de Revocación recibirán el mismo tratamiento que el de los concedentes y propietarios de su participación respectiva de los Activos del Fideicomiso de

458

Acciones de Revocación para fines del impuesto federal al ingreso (que no sean los Activos del Fideicomiso de Acciones de Revocación que son asignables a la Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación). Esto también se aplicará a los impuestos estatales y locales al ingreso, dentro de lo permitido por la ley.

b)   **Informes de impuestos.**

(i)   El Síndico de Acciones de Revocación presentará Declaraciones Impositivas para el Síndico de Acciones de Revocación, tratando al Síndico de Acciones de Revocación como fideicomiso concedente conforme a la sección 1.671-4(a) de la Regulación de Hacienda y conforme a la Sección 74.14 del Plan. El Síndico de Acciones de Revocación también enviará anualmente una declaración por separado con respecto a los fondos recibidos y gastos del Síndico de Acciones de Revocación según corresponda para los fines del impuesto federal al ingreso de EE.UU. a cada tenedor de un Interés en el Fideicomiso de Acciones de Revocación. La declaración instruirá a todos los tenedores que usen la declaración en la preparación de sus declaraciones de impuestos federales al ingreso de EE.UU. o que reenvíen la información correspondiente a los tenedores beneficiarios del tenedor, con instrucciones para usar la declaración en la preparación de sus declaraciones del impuesto federal al ingreso de EE.UU. El Síndico de Acciones de Revocación también presentará (o hará que se presente) cualquier otra declaración o divulgación relacionada con el Fideicomiso de Acciones de Revocación que sea requerida por cualquier unidad gubernamental.

(ii)   Conforme al Plan, el Síndico de Acciones de Revocación, en consulta con la Junta de Acciones de Revocación, tasará de buena fe los Activos de Acciones de Revocación. El Síndico de Acciones de Revocación dará a conocer periódicamente los respectivos valores de los Activos de las Acciones de Revocación, dentro de lo que sea pertinente y todas las partes del Fideicomiso de Acciones de Revocación (lo que incluye, entre otros, los Deudores, el Síndico de Acciones de Revocación y los Beneficiarios del Fideicomiso de Acciones de Revocación) deben usar de manera congruente el valor de los activos transferidos al Fideicomiso de Acciones de Revocación provistos por los Deudores o el Síndico de Acciones de Revocación conforme al Plan para todos los fines del impuesto federal al ingreso de EE.UU.

(iii)     Las asignaciones del Fideicomiso de Acciones de Revocación que sean
ingresos tributables entre los Beneficiarios del Fideicomiso de Acciones
de Revocación (que no sean otros ingresos tributables asignables a la
Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación)
serán determinadas por: referencia a la forma en que se distribuya un
monto de efectivo que represente el ingreso tributable (en caso de que el
efectivo fuera distribuible en ese momento) si, inmediatamente antes de la
distribución, el Fideicomiso de Acciones de Revocación hubiera
distribuido todos sus activos asignables a la Reserva de Reclamaciones del
Fideicomiso de Acciones de Revocación) a los tenedores de los Intereses
del Fideicomiso de Acciones de Revocación). El valor se ajustará según
los ingresos y las pérdidas tributables anteriores y tendrá en cuenta todas
las distribuciones anteriores y concurrentes del Fideicomiso de Acciones
de Revocación. La pérdida tributable del Fideicomiso de Acciones de
Revocación se asignará por: referencia a la manera en que una pérdida
económica será soportada inmediatamente después de una hipotética
distribución de liquidación de los Activos remanentes del Fideicomiso de
Acciones de Revocación. El valor impositivo en libros de los Activos del
Fideicomiso de Acciones de Revocación será equivalente a su valor justo
de mercado en la Fecha de Entrada en vigencia, ajustada según los
principios contables impositivos del Código de Rentas Internas, las
Regulaciones del Tesoro y otras autoridades según corresponda.

(iv)     Sujeto a la orientación del IRS o un tribunal con jurisdicción competente
que disponga lo contrario (lo que incluye la recepción por parte del Síndico
de Acciones de Revocación de una declaración del IRS sobre un tema de
legislación impositiva ("private letter ruling") si el Síndico de Acciones de
Revocación solicita una, o la recepción de una decisión adversa del IRS
en una auditoría si no es objetada por el Síndico de Acciones de
Revocación), el Síndico de Acciones de Revocación

(1)     elegirá tratar cualquier Reserva de Reclamación del Fideicomiso
de Acciones de Revocación como un "fondo de propiedad en
disputa" regido por la sección 1.468B-9 de la Regulación del
Tesoro.

(2)     dentro de lo permitido por la ley aplicable, las declaraciones de
impuestos estatales y locales al ingreso deben seguir las
indicaciones anteriores. Todas las demás partes (lo que incluye,
entre otros, los Deudores y los Beneficiarios del Fideicomiso de
Acciones de Revocación) deben hacer declaraciones de impuestos
federales, estatales y locales sobre el ingreso de Estados Unidos
de manera congruente con lo anterior.

(v)     El Síndico de Acciones de Revocación será responsable del pago de cualquier Impuesto gravado sobre el fideicomiso o sus activos, lo que incluye la Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación, sobre los Activos del Fideicomiso de Acciones de Revocación. Si cualquier Efectivo retenido por cuenta de las Reclamaciones en Disputa en la Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación fuera insuficiente para pagar la parte de los Impuestos atribuible a los ingresos tributables emergentes de los activos asignables a, o retenidos por cuenta de, las Reclamaciones en Disputa (lo que incluye cualquier ingreso que pueda surgir ante la distribución de los activos de la Reserva de Reclamaciones del Fideicomiso de Acciones de Revocación), los Impuestos pueden (i) reembolsarse a partir de cualquier monto en efectivo subsiguiente, o (ii) en caso de que las Reclamaciones en Disputa se hayan resuelto, deducirse de los montos que de otra manera serían distribuibles por el Síndico de Acciones de Revocación como resultado de la resolución de las Reclamaciones en Disputa.

c)     **Retenciones impositivas del Síndico de Acciones de Revocación.**

El Síndico de Acciones de Revocación puede retener y pagar impuestos sobre todos los montos que deban retenerse conforme al Código de Rentas Internas o cualquier ley extranjera, estatal o local con respecto al pago o la distribución a los tenedores de los Intereses del Fideicomiso de Acciones de Revocación. Todos los montos retenidos y pagados (o colocados en custodia ("escrow") pendientes de resolución de la necesidad de la retención) serán tratados como montos distribuidos a los tenedores de los Intereses del Fideicomiso de Acciones de Revocación para todos los fines del Contrato de Fideicomiso de Acciones de Revocación. El Síndico de Acciones de Revocación estará autorizado a reunir información impositiva de los tenedores de los Intereses del Fideicomiso de Acciones de Revocación (incluso sus números del seguro social u otros números de identificación impositiva) que considere necesario para ejecutar el Plan, la Orden de Confirmación, y el Contrato del Fideicomiso de Acciones de Revocación. Para recibir distribuciones de conformidad con el Plan, todos los tenedores de Intereses del Fideicomiso de Acciones de Revocación deberán identificarse ante el Síndico de Acciones de Revocación y proporcionar información impositiva y los aspectos específicos de sus propiedades dentro de lo que el Síndico de Acciones de Revocación considere pertinente. Este requisito de identificación se aplica a todos los tenedores, incluso aquellos que tienen sus títulos valores depositados en formato electrónico en las cuentas de sus corredores. El Síndico de Acciones de Revocación puede rehusarse a distribuir a cualquier tenedor de un Interés del Fideicomiso de Acciones de Revocación que no le proporcione la información de manera oportuna, y hasta que se proporcione la información, puede tratar los Intereses del Fideicomiso de Acciones de Revocación como en disputa. Si el Síndico de Acciones de Revocación no recibe la información dentro de los seis (6) meses de la petición original para entregarla, no se harán distribuciones adicionales al tenedor del Interés del Fideicomiso de Acciones de Revocación. Ante la entrega de la información por parte de un tenedor de un Interés del Fideicomiso de Acciones de Revocación, el Síndico de Acciones de Revocación hará una distribución a la que el tenedor del Interés del Fideicomiso de Acciones de Revocación tenga derecho, sin interés adicional ocasionado por la demora en la entrega de la información impositiva. Si el Síndico de Acciones de Revocación no retiene montos recibidos o distribuibles con respecto al tenedor y el Síndico de Acciones de Revocación más tarde es hallado responsable del monto de la retención, dicho tenedor reembolsará al Síndico de Acciones de Revocación en caso de que los montos hayan sido realmente distribuidos a dicho tenedor.

461

d) **El Síndico de Acciones de Revocación y el Fideicomiso de Acciones de Revocación serán relevados o disueltos, cuando ocurra una de las siguientes opciones, la que ocurra primero:**

(i) todos los Activos del Fideicomiso de Acciones de Revocación hayan sido distribuidos conforme al Plan y el Contrato de Fideicomiso de Acciones de Revocación;

(ii) el Síndico de Acciones de Revocación determina, con el consentimiento de la Junta Asesora del Fideicomiso, que es improbable que la administración de cualquier Activo del Fideicomiso de Acciones de Revocación restante rinda productos adicionales suficientes del Fideicomiso de Acciones de Revocación para justificar trámites adicionales; o

(iii) todas las distribuciones que deban ser hechas por el Síndico de Acciones de Revocación conforme al Plan y el Contrato de Fideicomiso de Acciones de Revocación han sido hechas. El Fideicomiso de Acciones de Revocación no puede disolverse después de tres (3) años después de la Fecha de Entrada en vigencia, a menos que el Tribunal del Título III, con una moción presentada seis meses antes del tercer (3er) aniversario (o dentro del período de seis meses antes del final del período de extensión), determina que una extensión de un período fijo es necesaria para facilitar o completar el recobro y la liquidación de los Activos del Fideicomiso de Acciones de Revocación. La extensión no debe superar los tres (3) años, junto con cualquier extensión anterior, sin una "private letter ruling" favorable del IRS o una opinión de abogados que sea satisfactoria para el Síndico de Acciones de Revocación y la Junta Asesora del Fideicomiso de que cualquier extensión adicional no afectaría adversamente la situación del fideicomiso como un Fideicomiso de Acciones de Revocación para los fines del impuesto federal al ingreso de Estados Unidos. Si en cualquier momento el Síndico de Acciones de Revocación determina, según el consejo de sus profesionales contratados, que el gasto de la administración del Fideicomiso de Acciones de Revocación para hacer una distribución final a sus beneficiarios probablemente supere el valor de los activos remanentes en el Fideicomiso de Acciones de Revocación, el Síndico de Acciones de Revocación puede peticionar ante el Tribunal del Título III para tener la potestad de

(1) (i) reservar cualquier monto necesario para disolver el Fideicomiso de Acciones de Revocación, (ii) donar el balance a una organización de caridad (A) del tipo que se describe en la sección 501(c)(3) del Código de Rentas Internas

(2) exenta del impuesto federal al ingreso de Estados Unidos conforme a la sección 501(a) del Código de Rentas Internas, y

(3) disolver el Fideicomiso en Liquidación.

462

15. **Indemnización del Síndico de Acciones de Revocación**

El Síndico de Acciones de Revocación y sus empleados, agentes y profesionales (i) no serán legalmente responsables ante los Beneficiarios del Fideicomiso de Acciones de Revocación por acciones ejecutadas u omitidas en su carácter de, o en nombre de, el Síndico de Acciones de Revocación, salvo actos emergentes de su propia negligencia grave o conducta dolosa, y (ii) tendrá derecho a indemnización y reembolso de tarifas y gastos emergentes de la defensa de acciones u omisiones en su carácter de, o en nombre del Síndico de Acciones de Revocación, salvo acciones u omisiones que involucren negligencia grave o conducta dolosa. Cualquier reclamación de indemnización de las partes con derecho a indemnización será pagada únicamente a partir de los Activos del Fideicomiso de Acciones de Revocación y tendrá derecho a una distribución prioritaria, antes de los Intereses del Fideicomiso de Acciones de Revocación y cualquier otra reclamación o interés. El Síndico de Acciones de Revocación tendrá derecho a confiar, de buena fe, en las recomendaciones de sus profesionales contratados.

**L.      Enjuiciamiento y extinción de reclamaciones de los Deudores**

Desde y a partir de la Fecha de Entrada en vigencia, el Síndico de Acciones de Revocación tendrá el derecho y la potestad exclusivos de (a) litigar cualquier reintegración, recobro, subordinación u otras acciones o remedios identificados en el Plan en las secciones 510, 544, 545, 547, 548, 549, 550, 551, 552 y 553 del Código de Quiebras, de conformidad con la ley no relacionada con Quiebras, y (b) acordar y transigir dichas reclamaciones con la aprobación del Tribunal del Título III. Los resultados netos de cualquier litigio o transacción se transferirán al Fideicomiso de Acciones de Revocación para su distribución conforme al Plan y al Contrato de Fideicomiso de Acciones de Revocación.

**M.      Aceptación o rechazo del Plan, efecto del rechazo por una o más Clases de Reclamaciones**

*Clases afectadas para votar.*  A la Fecha de Registro de la Votación (3 de junio de 2020), cada tenedor de una reclamación de las clases afectadas siguientes tendrá derecho a votar por separado para aceptar o rechazar el Plan.

*Aceptación por una Clase de Acreedores.*  Una clase afectada acepta el Plan si (i) por lo menos dos tercios (2/3) del monto en dólares de las Reclamaciones Permitidas de dicha clase que hayan votado para aceptar el Plan, (ii) más de la mitad (1/2) del número de las Reclamaciones Permitidas de dicha clase que hayan votado para aceptar el plan.

*Imposición de Plan Concursal por el Tribunal.*  Si una clase de reclamaciones afectadas rechaza, o no acepta el Plan, los Deudores pueden (i) solicitar al Tribunal del Título III que confirme el Plan de acuerdo con las disposiciones del Código de Quiebras que rigen la Imposición de Plan Concursal, o (ii) sujeto al consentimiento de los Acreedores de AAP, enmiende el Plan. Para un resumen de las disposiciones de Imposición de Plan Concursal por el Tribunal conforme al Código de Quiebras, *consulte* la sección VII.C.1 de esta Declaración de Divulgación.

**N.      Derechos y facultades del agente pagador**

El agente pagador será el ELA o una entidad o entidades designadas por la Junta de Supervisión y el ELA en o antes de la Fecha de Entrada en vigencia para hacer o facilitar distribuciones de acuerdo con el Plan.

*Facultades del agente pagador.*  El Agente Pagador estará facultado para (a) tomar todas las medidas y ejecutar todos los instrumentos y documentos necesarios para aplicar el Plan, (b) hacer

463

distribuciones contempladas por el Plan, (c) cumplir el Plan y las obligaciones del Plan, y (d) ejercer cualquier otra facultad atribuida al Agente Pagador por una orden del Tribunal del Título III, conforme al Plan o según sea considerado por el Agente Pagador como necesario y correcto para implementar el Plan.

***Tarifas y gastos incurridos a partir de y después de la Fecha de Entrada en vigencia.*** Las tarifas y gastos razonables incurridos por el Agente Pagador a partir de y después de la Fecha de Entrada en vigencia, y cualquier compensación razonable y reclamaciones de reembolso de gastos (*por ej.*, tarifas y gastos razonables de asesoramiento jurídico) incurridos por el Agente Pagador se pagarán en efectivo sin orden adicional del Tribunal del Título III.

***Exculpación.*** El Agente Pagador será exculpado por todas las entidades (incluso los tenedores de reclamaciones y otras partes en interés) de toda y cualquier reclamación, causas de acción, y otras aseveraciones de responsabilidad legal emergentes del relevamiento de las facultades y deberes conferidos al Agente Pagador, salvo por acciones u omisiones emergentes de negligencia grave o conducta dolosa del Agente Pagador. Ningún tenedor de una reclamación u otra parte en interés puede tener o llevar adelante una reclamación o causa de acción contra el Agente Pagador por hacer pagos de acuerdo con el Plan o por implementar las disposiciones del Plan.

**O.      Procedimientos de tratamiento de reclamaciones bajo disputa**

***Objeciones a reclamaciones; enjuiciamiento de reclamaciones bajo disputa.*** Los Deudores Reorganizados, por y a través de la Junta de Supervisión, y en consulta con AAFAF, presentarán y notificarán cualquier objeción a las reclamaciones a más tardar 180 días después de la Fecha de Entrada en vigencia, o en una fecha posterior aprobada por el Tribunal del Título III. Todas las objeciones, defensas afirmativas y reconvenciones se litigarán hasta la orden final. Los Deudores Reorganizados, por y a través de la Junta de Supervisión, y en consulta con AAFAF, tendrán la autoridad para presentar, transigir, acordar o desistir de cualquier objeción a las reclamaciones, sin que sea necesaria la aprobación del Tribunal del Título III.

Cualquier Reclamación de Bonos presentada por cualquier entidad por montos adeudados conforme a títulos valores existentes será denegada, eliminada y borrada del registro de reclamaciones en la Fecha de Entrada en vigencia.

Las reclamaciones sujetas a resolución conforme a los procedimientos de resolución alternativa de disputas y la orden de procedimiento de resolución alternativa de disputas se abordarán de conformidad con dichos procedimientos.

***Estimación de reclamaciones.*** En o a partir de la Fecha de Entrada en vigencia, los Deudores Reorganizados pueden solicitar al Tribunal del Título III que estime para fines de distribución final cualquier reclamación contingente, no liquidada o en disputa, independientemente de si los Deudores habían previamente objetado o solicitado la estimación de dicha reclamación.

El Tribunal del Título III retendrá la jurisdicción para considerar cualquier solicitud para estimar cualquier reclamación.

Si el Tribunal del Título III estima cualquier reclamación contingente, no liquidada o en disputa, el monto estimado será el monto permitido de dicha reclamación, o una limitación máxima de dicha reclamación, según lo determine el Tribunal del Título III. Si la estimación constituye la limitación máxima de dicha reclamación, los Deudores Reorganizados pueden en el futuro objetar la asignación definitiva de dicha reclamación.

*Retención de reclamaciones en disputa.* Los Deudores Reorganizados retendrán, en beneficio de cada tenedor de una reclamación en disputa, la distribución que dichos tenedores recibirían si la reclamación en disputa fuera permitida, hasta que se concilie la reclamación en disputa, estimada por el Tribunal del Título III, o se permita. El monto de la distribución retenida será (i) el monto liquidado estipulado en la evidencia de reclamaciones presentada relacionada con dicha reclamación en disputa, (ii) el monto de la reclamación en disputa estimada por el Tribunal del Título III como el monto máximo en el que dicha reclamación se convertirá en final en una reclamación permitida, o (iii) cualquier otro monto acordado por el tenedor de dicha reclamación en disputa y los Deudores Reorganizados, lo que sea menor. El recobro de cualquier tenedor de una reclamación en disputa no puede superar la cantidad que sea menor en (i), (ii) o (iii) anteriores.

En caso de que los Deudores Reorganizados retengan los Nuevos Bonos GO o los CVI en nombre de los tenedores de reclamaciones en disputa, los Deudores Reorganizados ejercerán los derechos al voto o al consentimiento con respecto a dichos bonos hasta que dichos bonos sean distribuidos.

*Permisibilidad de reclamaciones en disputa.* Cuando una reclamación en disputa se convierte en una reclamación permitida (en su totalidad o en parte), los Deudores Reorganizados harán distribuciones conforme al tratamiento específico de conformidad con el Plan o el tenedor de dicha reclamación, en la medida que se permita esta reclamación. Dicha distribución se hará no más de 90 días después de que se determine que dicha reclamación ha sido permitida. Con respecto a la Distribución de Bonos AEP, Distribución de Bonos ELA Vintage, y los Nuevos Bonos GO retenidos, cualquier ganancia devengada sobre dicha distribución también se distribuirá.

*Sin devengo de intereses.* Ningún tenedor de una reclamación (permitida o de otro tipo) tendrá derecho a intereses devengados en o después de la fecha de petición pertinente sobre cualquier reclamación o derecho. No se devengarán ni pagarán intereses sobre cualquier reclamación en disputa con respecto al período a partir de la Fecha de Entrada en vigencia hasta la fecha de la distribución final, si dicha reclamación en disputa se convierte en una reclamación permitida.

*Denegación de reclamaciones.* Si (a) una entidad es responsable de entregar cualquier bien o dinero a los Deudores, y (b) dicha entidad no ha entregado dicho bien o dinero a los Deudores para la fecha límite correspondiente, todas las reclamaciones de dicha entidad serán denegadas.

*Potestad para enmendar la lista de acreedores.* Salvo con respecto a las Reclamaciones de Bonos, los Deudores pueden enmendar la Lista de Acreedores con respecto a cualquier reclamación y hacer distribuciones basadas en dicha Lista enmendada de Acreedores sin que sea necesaria la aprobación del Tribunal del Título III. Si alguna enmienda reduce el monto de una reclamación o cambia la naturaleza o la prioridad de una reclamación, los Deudores notificarán al tenedor de dicha reclamación sobre la enmienda. Dicho tenedor tendrá 20 días para presentar una objeción a la enmienda ante el Tribunal del Título III. Si no se presenta ninguna objeción, se harán distribuciones sobre la base de dicha Lista de Acreedores enmendada sin que sea necesaria la aprobación del Tribunal del Título III.

**P.     Gobernanza y disposiciones sobre la reserva de pensiones.**

*Formación y responsabilidades de la reserva de pensiones.* En o antes de la Fecha de Entrada en vigencia, el ELA tomará las medidas necesarias para establecer el Fideicomiso de Reserva de Pensiones, un fideicomiso de reserva que se usará para garantizar las obligaciones de pensión del ELA en virtud de la Ley 106.

*Financiamiento de la Reserva de Pensiones.*   En la Fecha de Entrada en Vigencia, el ELA contribuirá a la Reserva de Pensiones Cinco Millones de Dólares ($5,000,000.00) para financiar las tarifas administrativas iniciales, costos y gastos del Fideicomiso de Reserva de Pensiones.  A partir del año fiscal de la Fecha de Entrada en vigencia hasta el Año fiscal que finaliza siete (7) años después del final de dicho Año fiscal, el ELA Reorganizado hará contribuciones anuales antes del 1 de octubre por un monto igual a (a) la Contribución de base, (b) un monto adicional calculado como el más bajo del superávit primario para el Año fiscal y el superávit primario del Plan Fiscal proyectado para dicho año fiscal, menos la suma de (i) la Contribución de base para el año fiscal, más (ii) la obligación de servicio de la deuda del ELA conforme al Plan para el Año fiscal, más (iii) Doscientos Millones ($200,000,000); salvo que, el monto adicional no puede ser inferior a cero dólares, y (c) sujeto a las leyes aplicables (incluso los Títulos I y II de PROMESA), dichos montos adicionales que el ELA Reorganizado, a su criterio, elija depositar en el Fideicomiso de Reserva de Pensiones. El Fideicomiso de Reserva de Pensiones será administrado por una entidad independiente cuyos miembros deben satisfacer los estándares de independencia, profesionalismo, experiencia y calificación estipulados en la Escritura del Fideicomiso de la Reserva de Pensiones, y estarán sujetos a todas las leyes y normas de contratación gubernamental, ética y conflictos de intereses.

*Pacto de no afectación.*   El ELA pacta en la Escritura del Fideicomiso de Reserva de Pensiones para beneficio de todos los participantes que los pagos y otras obligaciones adeudadas a los participantes conforme al Plan (incluso las obligaciones PayGo y todos los componentes del Beneficio Mensual Total de Retiro después de cualquier ajuste conforme al Plan) permanecerán implementados e inalterados hasta que todas las obligaciones hayan sido satisfechas en su totalidad de acuerdo con las disposiciones del Plan y los Documentos Definitivos y la Legislación de los Nuevos Bonos GO.  Dichas obligaciones son aplicables por la Junta de Supervisión, y cualquier Participante de SRE, Participante de SRJ o Participante de SRM. Con respecto a dichas disposiciones, la Escritura del Fideicomiso de Reserva de Pensiones no puede ser enmendada ni modificada por el ELA (i) sin el consentimiento previo expreso por escrito de la Junta de Supervisión (si existiera), y una mayoría numérica del Participante del SRE, Participante del SRJ o Participante del SRM que reciba beneficios conforme al Plan, los Documentos Definitivos y la Legislación de los Nuevos Bonos GO en el momento de la modificación propuesta o (ii) conforme a un nuevo caso del Título III para el ELA y un plan de ajuste confirmado y efectivo.

**Q.   Condiciones precedentes a la confirmación del Plan**

*Condiciones precedentes a la confirmación del Plan.*   Se deben satisfacer las siguientes condiciones antes de que el Plan pueda confirmarse:

1.   *Certificación del Plan Fiscal*: La Junta de Supervisión debe certificar que un Plan Fiscal sea congruente con el Plan, y certificar la presentación del Plan (incluso cualquier modificación al Plan hasta la Fecha de Confirmación).

2.   *Órdenes requeridas*: El Tribunal del Título III debe haber registrado órdenes que dispongan lo siguiente:

a)   Aprobación de que la Declaración de Divulgación contenga "información adecuada" conforme a la sección 1125 del Código de Quiebras;

b)   Autorización de la solicitud de votos y elecciones con respecto al Plan;

c)   Determinación de que todos los votos y elecciones o elecciones declaradas sean vinculantes y se haya realizado el recuento de votos de forma adecuada;

466

d)      Confirmación y aplicación de los términos y disposiciones del Plan, incluso los relevos que se estipulan en el Artículo LXXXVIII del Plan;

e)      Determinación de que los acuerdos y transacciones estipulados en el Plan sean adecuados, razonables y aprobados y que autoricen las transacciones contempladas en ellos;

f)      Determinación de que la Junta de Supervisión, los Deudores y el Plan hayan satisfecho y cumplido todas las pruebas, estándares y cargas en relación con el Plan;

g)      Aprobación de los documentos del Suplemento del Plan, que no sean la Legislación de los Nuevos Bonos GO y la Legislación de CVI (en caso que se incluyan en el Suplemento del Plan) y los Estatutos de los Deudores Reorganizados, y determinación de que dichos documentos son válidos y vinculantes para las partes;

h)      Determinación de que la Legislación de los Nuevos Bonos GO y la Legislación de CVI, dentro de lo que se haya aprobado, son un medio válido para la implementación del Plan y la emisión de los Nuevos Bonos GO y los CVI, respectivamente; y

i)      Autorización para que los Deudores Reorganizados firmen, celebren y entreguen los documentos en el Suplemento del Plan, y que firmen, implementen y ejecuten todas las acciones necesarias o adecuadas para que tengan efecto las transacciones contempladas por el Plan, y los documentos en el Suplemento del Plan.

3.      *Forma de las órdenes:* La Orden de Confirmación y el Plan deben ser razonablemente aceptables de forma y de fondo para la Junta de Supervisión, los Deudores y los Acreedores Iniciales de AAP.

4.      *Orden de Confirmación:* La Orden de Confirmación debe incluir (i) determinaciones de que todas las transacciones y acuerdos contenidos en el Plan deben satisfacer las normas aplicables conforme a las secciones 365, 1123(b)(3) y 1129 del Código de Quiebras, y la Regla de Quiebras 9019, (ii) los relevos, exculpaciones e interdictos estipulados en el Artículo LXXXVIII del Plan y (ii) las disposiciones estipuladas en la Sección 81.1(b) del Plan.

***Renuncia a las condiciones precedentes a la Confirmación.*** Sujeto a las disposiciones de los Acuerdos de Soporte al Plan, la Junta de Supervisión puede renunciar a cada una de las condiciones anteriores, en su totalidad o en parte, notificando al Tribunal del Título III en cualquier momento.

**R.      Condiciones precedentes a la Fecha de Entrada en vigencia**

***Condiciones precedentes a la Fecha de Entrada en vigencia.*** Se deben satisfacer las siguientes condiciones antes de que se produzca la Fecha de Entrada en vigencia y la consumación sustancial del Plan:

1.  *Certificación del Plan Fiscal*: La Junta de Supervisión debe determinar que un Plan Fiscal sea congruente con el Plan Fiscal de los Deudores, y certificar la presentación del Plan (incluso cualquier modificación al Plan hasta la Fecha de Confirmación). El Plan Fiscal certificado en la Fecha de Entrada en vigencia debe incluir disposiciones para el pago de capital e intereses con respecto a los Nuevos Bonos GO, incluidos los pagos del fondo de amortización, así como los mecanismos y procedimientos para el pago de los CVI en caso de satisfacerse la Condición de superávit y el pago deba abonarse de conformidad con la Escritura de CVI.

2.  *Registro de la Orden de Confirmación*: El Tribunal del Título III debe haber registrado la Orden de Confirmación que disponga lo siguiente:

    a)  Autorizar a los Deudores y los Deudores Reorganizados para ejecutar todas las acciones necesarias para celebrar, implementar y perfeccionar los contratos, instrumentos, relevos, arrendamientos, escrituras y otros acuerdos o documentos creados en relación con el Plan;

    b)  Decretar que las disposiciones de la Orden de Confirmación y el Plan no son divisibles y son mutuamente dependientes;

    c)  Autorizar a los Deudores y a los Deudores Reorganizados a (1) hacer todas las distribuciones y emisiones requeridas por el Plan, y (2) celebrar todos los acuerdos y transacciones que se estipulan en el Suplemento del Plan;

    d)  Determinar que los Nuevos Bonos GO y los CVI y los pactos del ELA, para beneficio de los tenedores de los Nuevos Bonos GO y los CVI, según lo dispuesto en la Legislación de los Nuevos Bonos GO, la Escritura de los Nuevos Bonos GO, La Legislación de los CVI, la Escritura de los CVI o la Orden de Ratificación, según proceda, constituyen obligaciones válidas, vinculantes, legales y aplicables del ELA, conforme a la ley federal, de Nueva York y de Puerto Rico**;**

    e)  Determinar que el ELA habrá pignorado su plena fe, crédito y poder impositivo conforme a la Constitución del ELA y la ley aplicable de Puerto Rico para el pago de capital e intereses sobre los Nuevos Bonos GO y los CVI;

    f)  Determinar que, conforme a la Legislación de los Nuevos Bonos GO, así como a cualesquiera leyes vigentes, al depositarse el dinero del Fondo de Servicio de la Deuda, y el Fondo de Reserva de Servicio de la Deuda, habrá gravámenes establecidos por ley sobre dicho dinero para los fines de garantizar el pago de los Nuevos Bonos GO, y dichos gravámenes establecidos por ley sobre dicho dinero permanecerán en pleno vigor y efecto hasta que los Nuevos Bonos GO se hayan pagado o satisfecho en su totalidad de acuerdo con sus términos;

    g)  Determinar que la Orden de Confirmación es completa, definitiva, plena, concluyente y vinculante y no estará sujeta a impugnación de garantías u otras impugnaciones en ningún tribunal u otro foro por parte de (1) los Deudores, (2) los Deudores Reorganizados, (3) el ELA y sus instrumentalidades, (4) cada entidad que presente reclamaciones u otros derechos oponibles al ELA o cualquiera de sus instrumentalidades, incluidos los tenedores de bonos y los tenedores de derechos

468

de usufructo sobre los bonos emitidos por los Deudores, COFINA, o cualquier agencia del ELA o con respecto a cualquier síndico, cualquier agente de garantía, cualquier síndico designado por escritura, cualquier agente fiscal y cualquier banco que reciba o mantenga fondos relacionados con esos bonos, ya sea que dicha reclamación u otros derechos se vean afectados en virtud del Plan, y en caso de ser afectados, ya sea que dicha persona o entidad hubiere aceptado o no el Plan, (5) cualquier otra entidad; y (6) los herederos, sucesores y cesionarios, agentes u otras partes similares de dichas personas o entidades;

h)      Siempre que el Plan Fiscal, certificado a partir de la Fecha de Entrada en vigencia, y todo Plan Fiscal posterior a la Fecha de Entrada en vigencia incluya disposiciones para el pago, en cada año fiscal, (a) del capital y los intereses con respecto a los Nuevos Bonos GO o los CVI, según sea el caso, incluidos los pagos del fondo de amortización que venzan en dicho año fiscal, y (b) en la medida en que se cumpla la Condición de Exceso de Rentabilidad en el año fiscal anterior, todos los montos adeudados y exigibles sobre los CVI de acuerdo con los términos de la Escritura de CVI;

i)      Determinar que el gravamen de primer rango establecido por ley sobre los fondos una vez depositados en el Fondo del Servicio de la Deuda y el Fondo de Reserva del Servicio de la Deuda, según lo dispuesto en la Legislación de los Nuevos Bonos GO, y todas las demás disposiciones para pagar los Nuevos Bonos GO son válidas, vinculantes, legales y aplicables, lo que incluye, entre otros, pactos para no afectar dichos bienes, mantener la exención impositiva disponible y disponer las condiciones con respecto a la sustitución de la garantía (lo que incluye, entre otros, el gravamen establecido por ley sobre ellos como protección adecuada para los derechos a la propiedad tal como se estipulan aquí y en la Orden de Confirmación;

j)      Disponer que la paralización automática sobre cualquier procedimiento futuro de insolvencia iniciado en nombre del ELA (ya sea bajo el Título III de PROMESA o de otra manera) se considerará renunciado con respecto al dinero en depósito en el Fondo del Servicio de la Deuda y el Fondo de Reserva del Servicio de la Deuda a la fecha de inicio de estos;

k)      Determinar que para los fines de la Sección 209 de PROMESA, el cumplimiento de las obligaciones de deuda a ocurrir en la Fecha de Entrada en vigencia es necesario para que la Junta de Supervisión certifique que los gastos no deben superar los ingresos para el ELA según se determinen de acuerdo con los estándares de contabilidad en valores devengados modificados;

l)      Disponer que los acuerdos y transacciones estipulados en el Plan y la Orden de Confirmación con respecto a la prioridad de los Nuevos Bonos GO y los CVI conforme a PROMESA, la Constitución del ELA o cualquier otra ley aplicable no serán vinculantes sobre cualquier parte con interés (incluso cualquier sucesor de la

Junta de Supervisión) en un procedimiento subsiguiente de Título III (u otro procedimiento de insolvencia);

m) Determinar que el Plan es congruente con los Planes Fiscales de los Deudores y satisface la sección 314(b)(7) de PROMESA;

n) Siempre que, como contraprestación por los acuerdos pactados en el AAP de ACT/ADCC, y se satisfagan las Condiciones de distribución, ACT podrá realizar una distribución provisional en efectivo a los tenedores de *Bonos ACT 68 y Bonos Preferentes ACT 98*, por importes de $184,800,000.00 y $79,200,000.00, respectivamente, distribuciones que reducirán la cuantía de capital de los citados Bonos ACT 68 y Bonos Preferentes ACT 98, respectivamente, así como las Reclamaciones de Bonos ACT correspondientes; y

o) Siempre que, como contraprestación por la estructuración de los pagos a abonar a los tenedores de Reclamaciones de ELA/ACT, ELA/Centro de Convenciones, ELA/Impuestos de AFI y ELA/AMA, y se satisfacan las Condiciones de distribución de conformidad con los términos y condiciones de la Sección 6.1(d) del AP de ACT, ADCC, el ELA abonará a Assured y a National pagos por importes de $39,300,000.00 y $19,300,000.00, respectivamente.

3. *Sin interdictos:* La Orden de Confirmación no debe paralizarse en ningún aspecto.

4. *Autorizaciones:* La totalidad de (1) las autorizaciones, los consentimientos, las aprobaciones regulatorias, las decisiones o los documentos que son necesarios para implementar y ejecutar el Plan (incluso la Legislación de los Nuevos Bonos GO y la Legislación de CVI han sido obtenidos o aprobados o celebrados y no se han revocado o anulado, y (2) se han completado todas las demás acciones requeridas legislativas u otras acciones gubernamentales requeridas para perfeccionar el Plan.

5. *Firma de Documentos; Otras acciones: Los* Documentos Definitivos y todas las acciones y todos los contratos, instrumentos, transacciones, relevos y otros acuerdos o documentos necesarios para implementar los términos y disposiciones del Plan se ejecutan y entregan y tienen pleno vigor y efecto.

6. *Opiniones:* Las opiniones legales usuales y consuetudinarias sobre emisiones de un tipo similar a los Nuevos Bonos GO y los CVI por abogados ajenos a los Deudores abarcando cuestiones a las que no se hace referencia expresamente en la Orden de Confirmación, razonablemente aceptables de fondo y de forma para los Acreedores Iniciales de AAP, deben entregarse al síndico correspondiente o a otras partes con respecto a los Documentos Definitivos y el Plan.

7. *Reclamaciones constitucionales:* El Tribunal del Título III debe haber registrado una orden que determine que cualquier Reclamación presentada contra los Deudores, los Deudores Reorganizados y cualquier otra corporación o instrumentalidad pública del ELA basada en cualquiera de los bonos emitidos o garantizados por o los préstamos

hechos a o garantizados por cualquier entidad de este tipo será una Reclamación emergente antes de la Fecha de Petición y clasificada en las Clases 56 a 59 (salvo las Reclamaciones de Bonos SRE Permitidas en la medida que estén garantizadas) y serán extinguibles y extintas conforme al Plan o la Orden de Confirmación y los Deudores, los Deudores Reorganizados y cualquier otra corporación o instrumentalidad del ELA no tendrán responsabilidad legal por cuenta de dicha reclamación.

8.    *Mociones de Levantamiento de la Paralización y Acciones de Recuperación (Clawback):* El Tribunal del Título III ha determinado que los fondos recuperados en las Mociones de Paralización y las Acciones de Recuperación son propiedad del ELA.

*Renuncia a las condiciones precedentes.*  Sujeto a las disposiciones del Acuerdo de Apoyo al Plan, la Junta de Supervisión puede renunciar a cada una de las condiciones anteriores en cualquier momento sin notificar a ninguna parte, salvo los Acreedores de AAP y las Partes del Gobierno, y sin notificación adicional ni acción del Tribunal del Título III.

*Efecto de que no se cumplan las condiciones en la Fecha de Entrada en vigencia.*  Si la Orden de Confirmación es anulada por una orden final antes de la Fecha de Entrada en vigencia, el plan será nulo y sin valor en todos los aspectos, salvo que la orden que anule la Orden de Confirmación disponga lo contrario.

## S.    Modificación, revocación o desistimiento del Plan

*Modificación del Plan.*  La Junta de Supervisión puede alterar, enmendar o modificar el Plan o los Anexos en cualquier momento antes o después de la Fecha de Confirmación, pero antes de la Fecha de Entrada en vigencia.[382] Se considerará que el tenedor de una reclamación que ha aceptado el Plan con sus alteraciones, enmiendas o modificaciones, siempre que la alteración, enmienda o modificación no cambie de manera material y adversa el tratamiento de la reclamación de dicho tenedor.

*Revocación o desistimiento del Plan.*  Sujeto a los términos y disposiciones de los Acuerdos de Apoyo al Plan, la Junta de Supervisión puede revocar o desistir del Plan en cualquier momento antes de la Fecha de Confirmación.

Si se revoca o se desiste del Plan antes de la Fecha de Confirmación, o si el Plan no entra en vigencia por cualquier motivo, entonces el Plan será nulo y sin valor, y ninguna disposición del Plan constituirá una renuncia o un relevo de dicha reclamación por parte de los Deudores o cualquier otra entidad, ni perjudicará los derechos de los Deudores o de cualquier otra entidad en cualquier procedimiento adicional que involucre a los Deudores.

*Enmienda de los documentos del Plan.*  Desde y a partir de la Fecha de Entrada en vigencia, el derecho a hacer cualquier enmienda, modificación o suplemento al Suplemento del Plan, los Anexos al Suplemento del Plan o los Anexos al Plan estarán regidos por los términos de dicho documento.

*Sin admisión de responsabilidad.*  La presentación del Plan no está destinada a ser y no se interpretará como una admisión o evidencia en cualquier acción legal, juicio, procedimiento o disputa pendientes o posteriores con respecto a cualquier responsabilidad legal, acto ilícito u obligación de ninguna

---

[382] Cualquier alteración, enmienda o modificación de este tipo estará sujeta a los requisitos de las secciones 104(j) y 313 de PROMESA, las secciones 942 y 1127(d) del Código de Quiebras y los términos de los Acuerdos de Apoyo al Plan.

clase (lo que incluye los méritos de cualquier reclamación o defensa) por cualquier entidad con respecto a cualquiera de las cuestiones abordadas en el Plan.

El Plan y cualquier transacción celebrada, acto desempeñado o documento firmado en relación con el Plan (i) no podrán ser usados como una admisión o prueba de la validez de cualquier reclamación, o cualquier afirmación hecha en cualquiera de las Acciones Relacionadas o de cualquier acto ilícito o responsabilidad legal de cualquier entidad; (ii) no podrán ser usadas como admisión o prueba de cualquier responsabilidad legal, falta u omisión de cualquier entidad en cualquier procedimiento civil, penal o administrativo en cualquier tribunal, agencia administrativa u otro tribunal; y (iii) no podrán ser usadas como admisión o prueba contra los Deudores Reorganizados, los Deudores o cualquier otra persona o entidad con respecto a la validez de cualquier Reclamación.

El Plan y cualquier transacción celebrada, acto desempeñado o documento firmado en relación con el Plan no serán admisibles en ningún procedimiento para cualquier propósito, salvo para ejecutar los términos del Plan. Sin embargo, una vez que el Plan se confirme, cualquier entidad puede presentar el Plan en cualquier acción para cualquier propósito, lo que incluye, entre otros, para apoyar una defensa o reconvención basada en los principios de cosa juzgada, impedimento de garantía, relevo, transacción de buena fe, prohibición de sentencia o reducción o cualquier otra teoría de preclusión de reclamaciones o cuestiones o defensa similar en reconvención.

**T.    Gobernanza corporativa y manejo de deudores reorganizados**

*Acción corporativa.* En la Fecha de Entrada en vigencia, todas las cuestiones conforme al Plan que requerirían la aprobación de los directivos de los Deudores o de los Deudores Reorganizados (lo que incluye la autorización para emitir los Nuevos Bonos GO, los CVI, la autorización para celebrar los Documentos Definitivos, la adopción de los Estatutos de los Deudores Reorganizados, y la elección o designación de los directivos y los funcionarios de los Deudores Reorganizados conforme al Plan) serán autorizados y aprobados de acuerdo con la Legislación de los Nuevos Bonos GO, la Legislación de CVI y los nuevos documentos de gobernanza corporativa y sin acción adicional por cualquier entidad conforme a cualquier otra ley, regulación orden o regla aplicable.

Las cuestiones dispuestas conforme al Plan que involucren la estructura corporativa de los Deudores Reorganizados o la acción corporativa de los Deudores Reorganizados serán autorizadas y en efecto de acuerdo con la Legislación de los Nuevos Bonos GO y la Legislación de CVI y los nuevos documentos de gobernanza corporativa. Después de la Fecha de Confirmación, los Deudores y los Deudores Reorganizados ejecutarán toda y cualquier acción considerada adecuada para perfeccionar las transacciones contempladas en el Plan conforme a la Legislación de los Nuevos Bonos GO, la Legislación de CVI y los nuevos documentos de gobernanza corporativa, según sea aplicable.

*Disolución de SRE.* Ni bien resulte factible después de la Fecha de Entrada en vigencia, SRE será disuelto y todos los directivos y funcionarios existentes de SRE se verán relevados de deberes y obligaciones adicionales. Ante dicha disolución, todos los activos remanentes de SRE serán transferidos al ELA.

*Funcionarios de los Deudores Reorganizados.* En la medida en que resulte aplicable, el Directorio de los Deudores Reorganizados elegirá funcionarios de los Deudores Reorganizados en o después de la Fecha de Entrada en vigencia.

*Estructura de Gobernanza de AEP*.   No se implementarán cambios en la estructura de gobernanza de AEP o en los contratos de negociación colectiva de AEP durante o después el Caso de Título III de AEP, a menos que dichos cambios sean aprobados por la Junta de Supervisión y la AAFAF.

**U.      Disposiciones con respecto a la Junta de Supervisión y el cumplimiento de PROMESA**

*Efecto de la confirmación.*   Ninguna disposición del Plan o de la Orden de Confirmación liberará, reemplazará, alterará o modificará de otra manera las potestades y responsabilidades de la Junta de Supervisión conforme a PROMESA o las obligaciones de cada Deudor Reorganizado conforme a PROMESA. A partir de la Fecha de Entrada en vigencia, los Deudores Reorganizados deberán cumplir todos los términos y condiciones de PROMESA, lo que incluye el Título III de PROMESA.

*Función continua de la Junta de Supervisión.*   Ninguna disposición del Plan o de la Orden de Confirmación exonerará ninguna de las obligaciones de cada Deudor conforme a PROMESA.  Desde y a partir de la Fecha de Entrada en vigencia, la potestad y las responsabilidades de la Junta de Supervisión conforme a PROMESA continuarán y los deberes y las obligaciones de los Deudores continuarán y no se verán afectados por el Plan y la Consumación de Plan.

*Prioridad de las leyes*.   A tenor con la sección 4 de PROMESA, todas las leyes del ELA, que no sean el presupuesto certificado por la Junta de Supervisión, que sean incompatibles con PROMESA, tendrán derecho de prioridad.   Dichas leyes desplazadas incluyen, entre otras, las leyes aprobadas antes del 30 de junio de 2016 que transfieren, asignan o requieren asignaciones del ELA o una de sus instrumentalidades a cualquier agencia o instrumentalidad, ya sea para permitir que dicha agencia o instrumentalidad pague o satisfaga su endeudamiento o para cualquier otro fin, y dichas leyes no serán aplicables para facilitar el pago de dichas deudas, y no serán aplicables si la aplicación de dichas deudas no fuera congruente con cualquier disposición de PROMESA que tenga una aplicabilidad y efectividad continuas.   Una lista no exclusiva de las leyes del ELA desplazadas por PROMESA se adjunta como Anexo K al Plan.   Ciertos litigios relacionados con algunas de las leyes o disposiciones de la Constitución del ELA enumerados en dicho anexo desplazadas por PROMESA serán desestimados, sin derecho a nueva acción, a la Fecha de Entrada en vigencia.   La lista de leyes del ELA en el Anexo K al Plan pueden no incluir todas las leyes del ELA desplazadas por PROMESA.   En el futuro las partes pueden litigar cuestiones relacionadas con la prioridad de PROMESA sobre las leyes del ELA que no figuran específicamente en el Anexo K del Plan o la Sección 71.3 del Plan. Las leyes y los reglamentos del ELA con derecho de prioridad tendrán prioridad permanente.

**V.      Disposiciones sobre comités**

*Disolución de los comités.*   En la Fecha de Entrada en vigencia, el CANA y el Comité de Retirados se disolverán y habrán satisfecho todos sus respectivos deberes y obligaciones.   Los comités serán exonerados y relevados de cualquier acción o actividad realizada, o que se requiera realizar, en relación con los Casos de Título III.

En la medida en que, si la fecha inmediatamente anterior a la Fecha de Entrada en vigencia, el CANA o el Comité de Retirados fuera una parte para una cuestión controvertida o procedimiento contencioso en relación con los Casos de Título III, lo que incluye, el Litigio Relacionado con la Deuda, el Litigio de AEP, las Acciones de Impugnación, las Acciones de Impugnación de Gravámenes, el Litigio de SRE, el Litigio de la Cláusula de Designaciones, el Litigio de Uniformidad, las Acciones de recuperación, las Mociones de levantamiento de paralización y cualquier objeción a las reclamaciones, a partir de la Fecha de Entrada en vigencia, se considerará que los Deudores Reorganizados o el Síndico de Acciones de Revocación han asumido dicha función y responsabilidad en relación con la cuestión controvertida.   Al

473

asumir, el CANA o el Comité de Retirados serán relevados de cualquier función, responsabilidad u obligación con respecto a la cuestión controvertida. Para evitar dudas, el Síndico de Acciones de Reintegración no puede asumir ninguna función con respecto a las Objeciones relacionadas con la Deuda, el Litigio de AEP, las Acciones de Impugnación, las Acciones de Impugnación de Gravámenes, litigios que se resolverán a tenor con el Plan y la Orden de Confirmación.

*Retención de jurisdicción.* El Tribunal del Título III retendrá jurisdicción exclusiva sobre cualquier cuestión emergente de PROMESA o relacionada con los Casos de Título III y el Plan, o lo siguiente:

1.  Cuestiones para permitir, no permitir, determinar, liquidar, clasificar, estimar o establecer la prioridad, situación garantizada o no garantizada o monto de cualquier reclamación no acordada o conciliada conforme al Plan (lo que incluye cuestiones que abordan la resolución de la petición de pago de cualquier reclamación y objeciones a la situación garantizada o no garantizada, prioridad, monto o concesión de reclamaciones);

2.  Cuestiones relacionadas con contratos condicionales o arrendamientos no vencidos. Esto incluye (i) la asunción o asunción y cesión de cualquier Contrato Condicional o Arrendamiento no Vencido; (ii) cualquier obligación contractual potencial conforme a cualquier Contrato Condicional o Arrendamiento no Vencido que se asuma o se asuma y ceda; y (iii) cualquier disputa con respecto a si un contrato o arrendamiento es o fue condicional o vencido;

3.  Garantizar que las distribuciones a los tenedores de reclamaciones permitidas se logren conforme a las disposiciones del Plan y adjudiquen todas y cualquier disputa emergente de o relacionada con las distribuciones conforme al Plan;

4.  Adjudicar, decidir y resolver cualquier moción, procedimiento contencioso, cuestiones controvertidas o litigadas, y cualquier otra cuestión, y conceder o denegar cualquier solicitud que involucre a los Deudores o los Deudores Reorganizados que pueda estar pendiente en la Fecha de Entrada en vigencia o que se presente después de la Fecha de Entrada en vigencia;

5.  Decidir y resolver todas las cuestiones relacionadas con la concesión y denegación de cualquier solicitud para la concesión de compensación o reembolso de gastos a profesionales autorizados conforme a PROMESA, el Plan o las ordenes registradas por el Tribunal del Título III;

6.  Registrar e implementar órdenes que son necesarias o adecuadas para ejecutar, implementar, perfeccionar o aplicar las disposiciones de (i) contratos, instrumentos, relevos, escrituras y otros acuerdos o documentos aprobados por la orden final en los Casos de Título III y (ii) el Plan, la Orden de Confirmación, los Documentos Definitivos y cualquier otro contrato, instrumento, títulos valores, relevos, escrituras y otros acuerdos o documentos creados en relación con el Plan;

7.  Resolución de casos, controversias, juicios, disputas o cualquier otra impugnación que pueda surgir en relación con la consumación, la interpretación o la aplicación del Plan, la Orden de Confirmación, los Documentos Definitivos o cualquier otro contrato, instrumento, título valor, relevo o cualquier otro acuerdo o documento celebrado o

entregado conforme al Plan o los derechos de cualquier entidad emergentes de o las obligaciones incurridas en relación con el Plan o dichos documentos;

8. Aprobar cualquier modificación del Plan, la Orden de Confirmación, o cualquier contrato, instrumento, título valor, relevo u otro acuerdo o documento creado en relación con el Plan o la Orden de Confirmación;

9. Subsanar cualquier defecto u omisión o transigir cualquier incongruencia en cualquier orden, el Plan, la Orden de Confirmación o cualquier contrato, instrumento, título valor, relevo o cualquier acuerdo o documento creado en relación con el Plan o la Orden de Confirmación, o registrar cualquier orden en apoyo de la confirmación conforme a las secciones 945 y 1142(b) del Código de Quiebras, de una manera según sea necesario o adecuado para perfeccionar el Plan;

10. Adjudicar, decidir o resolver cualquier cuestión relacionada con el cumplimiento por parte de los Deudores del Plan y la Orden de Confirmación de conformidad con la sección 945 del Código de Quiebras;

11. Determinar cuestiones que puedan surgir en relación con o relacionadas con el Plan, la Declaración de Divulgación, la Orden de Confirmación, la Documentación definitiva o cualesquiera contratos, instrumentos, títulos valores, descargos u otros acuerdos o documentos creados, formalizados u otorgados en relación con el Plan, la Declaración de Divulgación o la Orden de Confirmación. El Tribunal del Título III solo tendrá jurisdicción en la medida en que cualquier documento relacionado no disponga que otro tribunal o tribunales tienen jurisdicción exclusiva;

12. Adjudicar todas las controversias, juicios o cuestiones que puedan surgir con respecto a la validez de cualquier acción ejecutada por cualquier entidad conforme a o para promover el Plan o la Orden de Confirmación, incluso la emisión de Nuevos Bonos GO y los CVI, y registrar cualquier orden o medida que sea necesaria o apropiada en relación con dicha adjudicación;

13. Registrar e implementar órdenes que sean necesarias o adecuadas para aplicar el Plan y los Documentos Definitivos registrados para promover los pactos de tarifas y otros pactos de no afectación a los que se hace referencia en el Artículo LV del Plan;

14. Registrar e implementar cualquier orden según sea necesario o adecuado si la Orden de Confirmación se modifica, paraliza, revierte, revoca o anula por cualquier motivo;

15. Registrar una orden o decreto final que concluya o cierre los Casos de Título III conforme a la sección 945(b) del Código de Quiebras;

16. Aplicar y aclarar cualquier orden previamente registrada por el Tribunal del Título III en los Casos de Título III; y

17. Atender cualquier otra cuestión sobre la cual el Tribunal del Título III tenga jurisdicción conforme a las Secciones 305 y 306 de PROMESA.

W.    **Disposiciones misceláneas**

1.    **Titularidad de los activos**

En la Fecha de Entrada en vigencia, la titularidad de todos los activos y bienes de los Deudores enumerados en el Plan se adjudicarán a los Deudores Reorganizados.  Dichos activos y bienes estarán libres de cualquier gravamen, salvo según lo dispuesto en el Plan y la Orden de Confirmación.

2.    **Liberación y relevo de reclamaciones y causas de acción**

a)    Las distribuciones estipuladas conforme al Plan serán a cambio de, y para satisfacción completa, transacción, exoneración y relevo de todas las reclamaciones o causas de acción (incluso cualquier interés sobre dichas reclamaciones o causas de acción a partir de y posteriormente a la Fecha de Petición) contra las Partes Exoneradas que se presenten antes de la Fecha de Entrada en vigencia en relación con los Casos del Título III, Deudores o Deudores Reorganizados o cualquiera de sus respectivos activos o intereses de cualquier naturaleza, ya sea que dichos bienes se distribuyan o no o se retengan conforme al Plan.

b)    En la Fecha de Entrada en vigencia, los Deudores y los Deudores Reorganizados serán liberados de toda y cualquier reclamación, causas de acción y cualquier otra deuda emergente antes de la Fecha de Entrada en vigencia (lo que incluye antes de la Fecha de Petición), y todas las Reclamaciones del tipo especificado en las secciones 502(g), 502(h) o 502(i) del Código de Quiebras, ya sea o no (a) una prueba de reclamación basada en la cual se presenta dicha Reclamación, (b) dicha reclamación se permite conforme a la sección 502 del Código de Quiebras (o se resuelve de otro modo), o (c) el tenedor de una reclamación votada para aceptar el Plan.

c)    La Orden de Confirmación será una determinación judicial, a la Fecha de Entrada en vigencia, de la liberación y el relevo de todas las reclamaciones, causas de acción o deuda de o contra de los Deudores y los Deudores Reorganizados conforme a las secciones 524 y 944 del Código de Quiebras. La liberación de la Orden de Confirmación anulará cualquier sentencia obtenida contra los Deudores o los Deudores Reorganizados y sus respectivos activos y bienes en cualquier momento, en la medida en que dicha sentencia esté relacionada con una reclamación, deuda o pasivo liberado.  A la Fecha de Entrada en vigencia, cada tenedor de una reclamación en cualquier Clase conforme al Plan relevará, renunciará y exonerará contra los Deudores y Deudores Reorganizados y sus respectivos activos, a todas esas reclamaciones.

    d)       Cada uno de los acreedores de AAP y sus respectivas Personas Vinculadas, únicamente en su capacidad como Acreedores de los Deudores:

        (i)      se considerará que ha exonerado y acepta no iniciar acciones legales o buscar recuperar daños u otro tipo de medida contra cualquiera de los Descargos del Gobierno basados en, emergentes de o relacionados con las Reclamaciones Exoneradas del Gobierno o cualquiera de las reclamaciones o causas de acción establecidas o que se puedan haber establecido en las Acciones de recuperación y las Mociones de levantamiento de paralización;

        (ii)     no ayudará a ninguna persona a ejecutar ninguna acción con respecto a las Reclamaciones Exoneradas del Gobierno que estén prohibidas por la sección 88.2 del Plan.

3.       **Interdicto sobre reclamaciones**

Salvo según lo dispuesto en el Plan, la Orden de Confirmación u otra orden final del Tribunal del Título III, cualquier parte que haya tenido, tenga o pueda tener reclamaciones o cualquier otra deuda o pasivo que se exonere conforme al Plan queda permanentemente prohibido de:

    a)       iniciar o continuar cualquier acción sobre cualquier Reclamación u otra deuda o pasivos que se exonere conforme al Plan contra cualquiera de las Partes Exoneradas o cualquiera de sus activos o bienes;

    b)       aplicar, embargar, cobrar o recobrar cualquier sentencia, laudo, decreto u orden contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes por cuenta de cualquier Reclamación u otra deuda o pasivo que se exonere conforme al Plan;

    c)       crear, perfeccionar o aplicar cualquier gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes por cuenta de cualquier Reclamación u otra deuda o pasivo que se exonere conforme al Plan; y

    d)       hacer valer cualquier derecho de compensación, subrogación o recuperación de cualquier tipo contra cualquier obligación debida de cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes, con respecto a cualquier Reclamación y otra deuda o pasivo que se exonere conforme al Plan, salvo en la medida en que se disponga, permita o preserve en las secciones 553, 555, 556, 559 o 560 del Código de Quiebras o conforme al derecho de recuperación del "common law". Esta medida cautelar se extiende a todos los sucesores y cesionarios de las Partes Exoneradas y sus respectivos activos y bienes.

4.       **Integral al Plan**

El relevo, interdicto, exculpación y exoneraciones en el Artículo LXXXVIII del Plan es esencial para la implementación del Plan. Cada una de las Partes Exoneradas puede buscar independientemente la aplicación de cada disposición del Artículo LXXXVIII.

5.        **Relevos de los Deudores y Deudores Reorganizados**

En la Fecha de Entrada en vigencia, cada uno de los Deudores, Deudores Reorganizados y el Agente Pagador, de manera irrevocable e incondicional, plenamente, definitivamente y a perpetuidad renuncian, exoneran y relevan a las Partes Exoneradas de toda y cualquier reclamación y causas de acción que los Deudores, Deudores Reorganizados y el Agente Pagador tengan o puedan reclamar en el futuro.  Esto se aplica a cualquiera que reclame a través de los Deudores, Deudores Reorganizados y el Agente Pagador, en su nombre o en su beneficio e incluye causas de acción por daños, indemnización, contribución, costos, honorarios o cualquier motivo en ley o equidad.

6.        **Interdictos relacionados con relevos**

A la Fecha de Entrada en vigencia, todas las entidades que hayan tenido, tengan actualmente o puedan tener una Reclamación Exonerada se verán permanentemente impedidas de las siguientes acciones con respecto a dicha Reclamación Exonerada:

a)        iniciar, realizar o continuar de cualquier manera, ya sea directa o indirecta, cualquier juicio, acción u otro procedimiento (lo que incluye cualquier procedimiento judicial, arbitral, administrativo o de otro tipo) en cualquier foro;

b)        aplicar, embargar (lo que incluye cualquier embargo previo a la sentencia), cobrar o intentar de cualquier manera recobrar cualquier sentencia, laudo, decreto u otra orden;

c)        crear, perfeccionar o de cualquier manera aplicar en cualquier cuestión, directa o indirectamente, cualquier gravamen;

d)        compensar, buscar reembolsos o contribuciones de o subrogación contra, o recuperar de cualquier otra manera, directa o indirecta, cualquier monto contra cualquier pasivo u obligación adeudados a cualquier entidad exonerada conforme a la sección 88.5 del Plan; o

e)        continuar de cualquier manera, en cualquier lugar de cualquier procedimiento judicial, de arbitraje o administrativo en cualquier foro que no cumpla o no sea congruente con las disposiciones del Plan o de la Orden de Confirmación.

Las siguientes estipulaciones se darán por terminadas con el registro de la Orden de Confirmación:

a)        *la Cuarta Estipulación Enmendada entre el Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico con respecto a la Suspensión de la Prescripción y Orden de Consentimiento* [Caso Núm. 173283-LTS, ECF Núm. 15854], según enmendada; y

b)        *la Tercera Estipulación Enmendada y Orden de Consentimiento entre los Deudores del Título III (excepto COFINA) y la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico en nombre de las Entidades Gubernamentales que se enumeran en el Apéndice "B" con respecto a la Suspensión de la Prescripción* [Caso Núm. 17-3283-LTS, ECF Núm. 15795], según enmendada.

478

7.     **Exculpación**

*Partes del Gobierno.*  La Junta de Supervisión, AAFAF, los Deudores y cada una de las respectivas Personas Vinculadas, actuando exclusivamente en su capacidad como tales en cualquier momento hasta la Fecha de Entrada en vigencia inclusive, no tendrá ni incurrirá en cualquier responsabilidad legal ante cualquier entidad por cualquier acto ejecutado en relación con:

a)     los Casos de Título III;

b)     la formulación, preparación, difusión, implementación, confirmación o aprobación del Plan o de cualquier acuerdo o transacción contenido en él;

c)     la Declaración de Divulgación; y

d)     cualquier contrato, instrumento, publicación u otro acuerdo o documento dispuesto en relación con el perfeccionamiento de las transacciones establecidas en el Plan.

La disposición de exculpación de la sección 88.8 del Plan no afecta la responsabilidad legal de cualquier entidad sobre cualquier acto u omisión que constituya fraude intencional o conducta dolosa.  La disposición de exculpación de la sección 88.8(a) del Plan no será en perjuicio del derecho de ninguna de las Partes del Gobierno, ni de los funcionarios y directivos de las Partes del Gobierno que cumplan funciones en cualquier momento hasta la Fecha de Entrada en vigencia, inclusive, ni de cada uno de sus profesionales respectivos respecto a recurrir al asesoramiento de un abogado como defensa legal.

*Acreedores de AAP.*  Cada uno de los Acreedores de AAP en su calidad de parte de los Acuerdos de Apoyo al Plan y Acreedor y/o asegurador, desde la Fecha de Petición hasta la Fecha de Entrada en vigencia, inclusive y cada una de las Personas Vinculadas respectivas no tendrá ninguna responsabilidad legal ante ninguna entidad por cualquier acto adoptado u omitido en relación con:

a)     los Casos de Título III;

b)     la mediación;

c)     la negociación, formación, preparación, difusión, implementación, confirmación o aprobación del Plan o de cualquier acuerdo o transacción contenido en él;

d)     la Declaración de Divulgación;

e)     los Acuerdos de Apoyo al Plan;

f)     los Documentos Definitivos; y

g)     cualquier contrato, instrumento, publicación u otro acuerdo o documento dispuesto o contemplado en relación con el perfeccionamiento de la transacción establecida en el Plan.

Las disposiciones de la sección 88.8(b) del Plan no afectan la responsabilidad de cualquier entidad que sea resultado de cualquier fraude intencional o conducta dolosa.

**Comité de Jubilados.**   Los miembros del Comité de Jubilados, exclusivamente en su carácter de miembro del Comité de Jubilados, y cada una de las Personas Vinculadas del Comité de Jubilados no tendrán responsabilidad legal ante cualquier entidad por cualquier acto u omisión, a partir de la Fecha de Petición, inclusive, y a partir de la Fecha de Entrada en vigencia, inclusive, en relación con:

h)   los Casos de Título III;

i)   la formación, preparación, difusión, implementación, confirmación o aprobación del Plan o de cualquier compromiso o transacción contenido en el presente;

j)   la Declaración de Divulgación;

k)   el Acuerdo de Respaldo al Plan del Comité Oficial de Retirados; y

l)   cualquier contrato, instrumento, publicación u otro acuerdo o documento previsto o contemplado en relación con el perfeccionamiento de la transacción establecida en el Plan y en el Acuerdo de Transacción.

Las disposiciones de la sección 88.8(c) del Plan no afectan la responsabilidad de cualquier entidad que sea resultado de cualquier fraude intencional o conducta dolosa.

**AFSCME.**   Cada una de las partes de AFSCME en su calidad de parte del Acuerdo de Respaldo al Plan de la AFSCME y Acreedor, desde la Fecha de Petición hasta la Fecha de Entrada en vigencia, y cada una de las Personas Vinculadas respectivas no tendrá ninguna responsabilidad con ninguna entidad por cualquier acto adoptado u omitido en relación con:

m)   los Casos de Título III;

n)   la formación, preparación, difusión, implementación, confirmación o aprobación del Plan o de cualquier compromiso o transacción contenido en el presente;

o)   la Declaración de Divulgación;

p)   el Acuerdo de Transacción; y

q)   cualquier contrato, instrumento, publicación u otro acuerdo o documento previsto o contemplado en relación con el perfeccionamiento de la transacción establecido en el Plan y el Acuerdo de Transacción.

Las disposiciones de la sección 88.8(d) del Plan no afectan la responsabilidad de cualquier entidad que sea resultado de cualquier fraude intencional o conducta dolosa.

**Aseguradores monolínea.**   Assured, National, Syncora y sus Personas relacionadas no tendrán ni incurrirán en ninguna responsabilidad frente a ninguna entidad por acciones u omisiones realizadas de conformidad con el Plan o en relación con la formulación, preparación, difusión, implementación, aceptación, confirmación o aprobación del Plan, incluyendo lo relativo con el tratamiento de las Reclamaciones de Bonos Asegurados por Assured, National o Syncora, los procedimientos de votación y elecciones, y cualquier extinción de las obligaciones asumidas en las Pólizas de seguro de Assured, National o Syncora.

480

Los términos y condiciones del Plan no eximirán ni exculparán (ni se interpretarán en tal sentido) a ningún tenedor beneficiario de Bonos Asegurados por Assured, National o Syncora, de las obligaciones de pago estipuladas por las Pólizas de seguro vigentes de Assured, National o Syncora, de conformidad con sus términos, exclusivamente en la medida en que dicho tenedor no reciba el Tratamiento de Assured, el Tratamiento de National o el Tratamiento de Syncora, según proceda (o las reclamaciones que Assured, National o Syncora pudiesen tener contra un tenedor beneficiario de Bonos Asegurados por Assured, National o Syncora con respecto a las respectivas pólizas de seguro, según corresponda).

8.    **Litigios relacionados con las designaciones / Litigio de Uniformidad**

Si se dicta una Orden Final en relación con los litigios relacionados con las designaciones o el Litigio de Uniformidad posteriores al registro de una Orden de Confirmación, cualquier entidad que reciba distribuciones conforme al Plan acepta que dicha Orden Definitiva no anulará, afectará o modificará de manera alguna las transacciones contempladas en el Plan y la Orden de Confirmación, incluso las exoneraciones, exculpaciones e interdictos establecidos en el Artículo LXXXVIII del Plan.

9.    **Orden de prohibición**

En la medida de lo previsto en el Plan, todas las entidades tienen, de manera permanente, la prohibición de interponer o presentar por vía judicial de cualquier manera cualquier reclamación, demanda, derecho, responsabilidad o causa de acción, de cualquier y todo tipo, contra cualquiera de las Partes Exoneradas en relación con cualquiera de las Reclamaciones Exoneradas, la confirmación y consumación del Plan, la negociación y perfeccionamiento del AAP, o cualquier reclamación, acto, hecho, transacción, evento, declaración u omisión en relación con o supuesta o que se podría haber supuesto en los Casos de Título III. Esta prohibición incluye cualquier reclamación, demanda, derecho, responsabilidad legal o causa de acción para obtener una indemnización, contribución o cualquier otro motivo legal por daños, costos u honorarios incurridos emergentes de los Casos de Título III, en los que haya incurrido cualquier persona, ya sea directa o indirectamente, para el beneficio de cualquiera de las Partes Exoneradas que surjan de las reclamaciones, actos, hechos, transacciones, eventos, declaraciones u omisiones que hay o que podría haber en los Casos de Título III o cualquier otra acción iniciada en nombre de cualquiera de las Partes Exoneradas (ya sea que deriven de la ley federal, estatal o extranjera e independientemente de dónde se hagan valer).

10.    **Sin renuncia**

Las exoneraciones y los interdictos de las secciones 88.5 y 88.6 del Plan no limitarán, acotarán o afectarán de otro modo los derechos de la Junta de Supervisión, la AAFAF, los Deudores Reorganizados o los Acreedores del AAP de hacer valer, entablar acciones legales, transigir o acordar los derechos, reclamaciones y otros asuntos expresamente retenidos por cualquiera de ellos.

11.    **Medida cautelar complementaria**

Todas las entidades que han tenido o han hecho valer, que actualmente tienen o hacen valer, o que pueden tener o hacer valer, cualquier Reclamación Exonerada contra cualquiera de las Partes Exoneradas basada en o relacionada con los Casos del Título III, cualquier reclamación contra los Deudores, donde quiera y cuando quiera que se haga valer, en cualquier parte del mundo, basada en cualquier teoría del derecho, estará permanentemente paralizada, restringida y prohibida de iniciar cualquier acción contra cualquiera de las Partes Exoneradas con el fin de cobrar, recuperar o recibir cualquier pago con respecto a

Case:17-03283-LTS   Doc#:16897-1   Filed:06/07/21   Entered:06/07/21 20:17:31   Desc:
Disclosure Statement   Page 494 of 578

cualquier Reclamación Exonerada que surja con anterioridad a la Fecha de Entrada en Vigencia (incluso con anterioridad a la Fecha de Petición) incluso:

    a)    Iniciar o continuar de cualquier manera acciones u otros procedimientos de cualquier clase con respecto a dichas Reclamaciones Exoneradas contra cualquiera de las Partes Exoneradas o los activos o los bienes de cualquier Parte Exonerada;

    b)    Aplicar, embargar, cobrar o recobrar, de cualquier manera y por cualquier medio, sentencias, laudos, decretos u órdenes en contra de cualquiera de las Partes Exoneradas o los activos o los bienes de estas, con relación a dichas Reclamaciones Exoneradas;

    c)    Crear, perfeccionar o ejecutar un gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada;

    d)    Hacer valer, implementar o efectuar cualquier compensación, contribución o recuperación de cualquier tipo contra cualquier obligación exigible a cualquiera de las Partes Exoneradas o contra los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada; y

    e)    Tomar cualquier medida que no cumpla las disposiciones del Plan o la Orden de Confirmación.

## 12.    Tarifas y gastos posteriores a la Fecha de Entrada en vigencia

Después de la Fecha de Entrada en vigencia, los Deudores Reorganizados pueden contratar profesionales y pagar tarifas y gastos profesionales razonables en que incurran en relación con la implementación y consumación del Plan sin requerir una aprobación adicional del Tribunal del Título III. Sin perjuicio de lo anterior, desde y a partir de la Fecha de Entrada en vigencia, los Deudores Reorganizados deberán, en el curso ordinario de sus negocios y sin necesidad de ninguna aprobación del Tribunal del Título III, pero en ningún caso más de cuarenta y cinco (45) días después de haber presentado las facturas o liquidaciones con respecto a las tarifas y gastos incurridos a los Deudores Reorganizados, abonar las tarifas y reembolsar los gastos a la Junta de Supervisión y sus profesionales relacionados con la implementación y consumación del Plan y en relación con sus deberes y responsabilidades conforme a PROMESA y los términos y las disposiciones del Plan.

## 13.    Exención en virtud de la Ley de Valores

La oferta, emisión y distribución de los Nuevos Bonos GO y los CVI conforme a los términos del presente estarán exentas del registro en virtud de:

    a)    la Ley de Valores;

    b)    cualquier ley estatal o local que exija el registro para la oferta, emisión o distribución de valores, lo que incluye, entre otros, los requisitos de registro de la sección 5 de la Ley de Valores; y

c) cualquier otra ley estatal o federal aplicable que exija el registro y/o la entrega o calificación del folleto antes de la oferta, emisión, distribución o venta de valores.

### 14. Divisibilidad

Sujeto a los términos y las disposiciones del AAP y del Plan, si el Tribunal del Título III determina antes de la Fecha de Confirmación que cualquiera de los términos o las disposiciones del Plan son inválidos, nulos o no aplicables, el Tribunal del Título III puede modificar o interpretar dicho término o disposición para que sea válido o aplicable en la mayor medida posible. La modificación del Tribunal del Título III será coherente con el propósito original del término o de la disposición que se declaran inválidos, nulos o no aplicables, y dicho término o disposición será entonces aplicable conforme a las modificaciones o interpretaciones realizadas.

Sujeto a los términos y las disposiciones del AAP, si antes de la Fecha de Confirmación la Junta de Supervisión determina modificar o enmendar el Plan, incluyendo la eliminación de un Deudor (que no sea el ELA y la AEP) de los tratamientos establecidos en el Plan, las disposiciones del Plan aplicables a dicha modificación o enmienda se considerarán eliminadas y no tendrán validez ni vigencia.

### 15. Derecho aplicable

Los derechos, los deberes y las obligaciones emergentes del Plan se regirán por PROMESA (incluso las disposiciones del Código de Quiebras aplicables en virtud de la sección 301 de PROMESA) y las leyes del ELA (en la medida que no sean incompatibles con PROMESA), a menos que otra ley federal sea aplicable o se indique expresamente lo contrario.

### 16. Cierre del caso

La Junta de Supervisión presentará ante el Tribunal del Título III todos los documentos exigidos por la Regla 3022 del Código de Quiebras y cualquier orden aplicable del Tribunal del Título III inmediatamente después de la administración completa de los Casos de Título III. El Tribunal del Título III seguirá conservando la jurisdicción en todos los asuntos del Artículo LXXVII del Plan después del cierre de Casos de Título III.

### 17. Discrepancias

Si hay alguna discrepancia entre la información contenida en la Declaración de Divulgación y los términos del Plan, regirán los términos del Plan.

Si hay alguna discrepancia entre los términos del Plan y los términos de la Orden de Confirmación, regirán los términos de la Orden de Confirmación y se la considerará una modificación del Plan, a menos que la Orden de Confirmación modifique los términos económicos del Plan.

### 18. Conservación de documentos

Desde y a partir de la Fecha de Entrada en vigencia, los Deudores pueden conservar documentos de acuerdo con su política estándar de conservación de documentos, que puede ser alterada, enmendada, modificada o complementada por los Deudores.

19.     **Efecto vinculante inmediato**

En la Fecha de Entrada en vigencia, los términos del Plan y el Suplemento del Plan se harán efectivos y ejecutables de inmediato y se considerarán vinculantes para cualquiera y todos los tenedores de reclamaciones y sus respectivos sucesores y cesionarios (independientemente de que la reclamación de dicho tenedor se vea menoscabada en virtud del Plan o que dicho tenedor haya aceptado el Plan). Las exenciones de responsabilidad, exculpaciones y transacciones realizadas en virtud del Plan serán aplicables y estarán sujetos a la aplicación por parte del Tribunal del Título III a partir de la Fecha de Entrada en vigencia.

Una vez aprobados por el Tribunal del Título III, los acuerdos y las transacciones contenidos en el Plan, junto con el tratamiento de cualquier reclamación permitida asociada, no estarán sujetos a impugnación de garantías u otra impugnación por parte de cualquier entidad en ningún tribunal u otro foro. Como tal, cualquier entidad que se oponga a los términos de cualquier acuerdo y transacción establecidos en el Plan debe (a) impugnar dicho acuerdo y transacción antes de que el Plan se confirme, y (b) demostrar una capacidad adecuada con respecto al objeto y que el acuerdo y la transacción del asunto no cumplen las normas que rigen las transacciones en virtud de la Regla 9019 del Código de Quiebras y otras leyes aplicables.

20.     **Documentos adicionales**

En o antes de la Fecha de Entrada en Vigencia, la Junta de Supervisión puede presentar acuerdos y otros documentos para demostrar los términos y las condiciones del Plan. Los Deudores y todos los tenedores de reclamaciones que reciben distribuciones conforme al Plan y todas las otras partes interesadas pueden preparar, ejecutar y entregar cualquier acuerdo o documento y tomar cualquier otra medida que pueda ser necesaria para implementar estas disposiciones y la intención del Plan.

21.     **Reserva de derechos**

El Plan no tendrá validez ni vigencia a menos que el Tribunal del Título III registre la Orden de Confirmación. La presentación del Plan, cualquier declaración o disposición contenida en el Plan, o la adopción de cualquier medida por parte de los Deudores con respecto al Plan, la Declaración de Divulgación, o el Suplemento del Plan no se considerarán como una admisión de o una renuncia a cualquier derecho de los Deudores con respecto al tenedor de reclamaciones antes de la Fecha de Entrada en Vigencia. Los derechos y las facultades del Gobierno en virtud de la Constitución del ELA y PROMESA, incluso las secciones 303 y 305 de PROMESA, quedan expresamente reservados (sujeto a cualquier limitación impuesta por la Constitución del ELA, la Constitución de EE.UU. o PROMESA), y ninguna disposición de este Plan se considerará una renuncia a ninguno de dichos derechos y facultades, excepto como se establece expresamente en el Plan.

22.     **Sucesores y cesionarios**

Los derechos, los beneficios y las obligaciones de cualquier entidad designada o a la que se haga referencia en el Plan o la Orden de Confirmación tendrá carácter vinculante para cualquier heredero, albacea, administrador, sucesor o cesionario, filial, funcionario, directivo, agente, representante, abogado, beneficiarios o custodio, si lo hubiere, de dicha entidad, salvo según se disponga en contrario en el Plan.

23.     **Plazo de los interdictos o paralizaciones**

Todos los interdictos o paralizaciones en vigencia en los Casos de Título III y que existan en la Fecha de Confirmación (salvo los interdictos o paralizaciones contenidas en el Plan o la Orden de Confirmación) permanecerán en pleno vigor y efecto hasta la Fecha de Entrada en Vigencia, o que el Plan o la Orden de Confirmación dispongan lo contrario.  Todos los interdictos o las paralizaciones incluidas en el Plan o en la Orden de Confirmación continuarán plenamente vigentes de conformidad con sus términos.

24.     **Suplemento del Plan**

Todos los documentos en el Suplemento del Plan se incorporan en el Plan y forman parte de él, como si estuvieran incluidos en el Plan.  Cuando se presente el Suplemento del Plan, copias de los documentos estarán a disposición (1) mediante pedido por escrito al abogado de la Junta de Supervisión al domicilio que figura en la carátula de la Declaración de Divulgación, (2) mediante descarga de estos documentos de https://cases.primeclerk.com/puertorico/, o (3) en el sitio web del Tribunal del Título III, disponible a través de PACER.  Los términos del Plan prevalecerán sobre los términos de cualquier documento en el Suplemento del Plan en la medida en que haya incongruencias.  Con respecto a las cuestiones regidas por la Escritura de los Nuevos Bonos GO o la Escritura de CVI, en la medida en que cualquier disposición del Plan sea incongruente con la Escritura de los Nuevos Bonos GO o la Escritura de CVI, la Legislación de los Nuevos Bonos GO o la Legislación de CVI, según sea el caso, será la que prevalezca.

*[El resto de la página se deja intencionalmente en blanco]*

# VII. Confirmación del Plan de Ajuste

## A. Vista de confirmación

PROMESA y el Código de Quiebras requieren que el Tribunal del Título III, tras notificarlo, celebre una Vista de confirmación en la cual oirá los argumentos en apoyo al Plan y cualesquiera objeciones al mismo, y considerará las pruebas que fundamenten si el Plan debe o no confirmarse. En la Vista de confirmación, el Tribunal del Título III confirmará el Plan solamente si se satisfacen todos los requisitos de la sección 314 de la Ley PROMESA.

El _____, el Tribunal del Título III aprobó la _____ [ECF Núm. ___] (la "Orden de Señalamiento"). Entre otras cosas, la Orden de Señalamiento estipula que la Vista de confirmación comenzará el _____ a las _____ (Hora estándar del Atlántico) ante la Honorable Laura Taylor Swain, Juez de Distrito de los Estados Unidos en el Tribunal del Título III, sitio en el Tribunal Clemente Ruiz Nazario, Avenida Carlos Chardón 150, San Juan de Puerto Rico, P.R. 00918, en la sala que se determinará oportunamente o a través de una vista virtual. La Vista de confirmación podrá ser aplazada de tiempo en tiempo por el Tribunal del Título III o por los Deudores sin previo aviso, salvo el anuncio de la fecha de reanudación durante la Vista de Confirmación.

## B. Fechas límite para objetar la Confirmación

La Orden de Declaración de Divulgación establece que la fecha límite para objetar la confirmación del Plan será el _____ a las _____ (Hora estándar del Atlántico). Las objeciones a la confirmación del Plan: (1) serán por escrito e irán firmados; (2) indicarán el nombre y dirección de la parte objetora y la naturaleza de la Reclamación de dicha parte; (3) expondrán en detalle los fundamentos y la naturaleza de cada objeción, y (4) se presentarán ante el Tribunal del Título III y se cursarán al Síndico de los Estados Unidos en la siguiente dirección, de modo que se reciban como más tarde en la fecha límite indicada anteriormente:

- Oficina del Síndico de los Estados Unidos para el Distrito de Puerto Rico, Edificio Ochoa, Calle Tanca 500, Suite 301, San Juan, PR 00901 (ref: En el asunto de: Commonwealth of Puerto Rico);

A efectos de presentar objeciones en estos casos, la dirección del Tribunal del Título III es:
United States District Court, Clerk's Office
Tribunal de Distrito de EE.UU., Oficina de Secretaría
Avenida Carlos Chardón 150, Suite 150
San Juan, Puerto Rico 00918-1767.

## C. Requisitos para la confirmación del Plan de Ajuste

En la Vista de Confirmación, el Tribunal del Distrito III determinará si el Plan satisface o no los requisitos de la sección 314 de la Ley PROMESA. Los Deudores consideran que el Plan satisfará todos los requisitos legales aplicables de la Ley PROMESA y del Código de Quiebras. Entre los requisitos para la confirmación se incluyen que el Plan (1) sea aceptado por los Tenedores de las Clases de Reclamaciones afectadas o, en caso de no ser aceptado, que sea "justo y equitativo" y que no discrimine indebidamente a la clase que no lo acepte, (2) defienda los "mejores intereses" de los acreedores, (3) sea viable, y (4) se ajuste a las cláusulas aplicables de la Ley PROMESA y del Código de Quiebras.

1.      **Aceptación o imposición del plan concursal por el tribunal**

Un plan se considerará aceptado por una clase de reclamaciones afectada si los tenedores de los dos tercios de la cuantía monetaria y una mayoría de las reclamaciones admitidas de dicha clase votan por aceptarlo. Solo aquellos tenedores de las reclamaciones que voten efectivamente por aceptar o rechazar el plan serán incluidos en la contabilización de votos. Las clases afectadas deberán aceptar el plan para que este sea confirmado sin que se aplique la prueba de "imposición" (cramdown) contenida en las secciones 1129(b)(1), (b)(2)(A) y (b)(2)(B) del Código de Quiebras.

a)      **Imposición del plan concursal por el tribunal**

La Ley PROMESA y el Código de Quiebras estipulan que el Tribunal del Título III puede confirmar un plan de ajuste que no sea aceptado por todas las clases afectadas si al menos una de ellas acepta el plan, y se satisfacen las disposiciones del así llamado "cramdown" (la autoridad de tribunal de imponer un plan) previstas por las secciones 1129(b)(l), (b)(2)(A) y (b)(2)(B) del Código de Quiebras. El plan de ajuste podrá ser confirmado de acuerdo con las cláusulas correspondientes si, además de satisfacer los demás requisitos de la sección 943(b) del Código de Quiebras, (i) es "justo y equitativo", y (ii) no discrimina indebidamente a las clases de reclamaciones afectadas que no hayan aceptado el plan. Los Deudores consideran que el Plan y el tratamiento de todas las Clases de Reclamaciones por el mismo satisfacen los requisitos de confirmación no consensuada del Plan.

b)      **"Justo y equitativo"**

Existe incertidumbre en cuanto a la interpretación del requisito de ser "justo y equitativo" del Título III. Fuera del contexto del Título III, en general el requisito de "justo y equitativo" estipula, entre otras cosas, que salvo que una clase de reclamaciones no garantizadas discrepante perciba el pago íntegro de sus reclamaciones admitidas, ningún tenedor de reclamaciones permitidas de una clase inferior a aquella podrá recibir o conservar bienes por cuenta de esas reclamaciones. Esta es la conocida como "regla de prioridad absoluta". Pocas opiniones publicadas han abordado el significado del requisito de "justicia y equidad" de los casos a tenor del Capítulo 9. Los tribunales que han abordado este requisito en el contexto de un caso del Capítulo 9 han indicado que, dado que en estos casos no hay partícipes (que, en teoría, estarían en un nivel inferior de prioridad con respecto a los acreedores generales de un deudor que carecen da garantía), no es posible aplicar la regla de prioridad absoluta. Por tanto, en estas situaciones, el requisito de "justo y equitativo" no podría interpretarse como sinónimo de la regla de prioridad absoluta. En su lugar, los tribunales han sostenido que el requisito de "justo y equitativo" del Capítulo 9 debería entenderse como especificando que, si un deudor busca la confirmación no consensuada de un plan de ajuste, los acreedores afectados de dicho deudor, bajo el plan propuesto, deberán recibir todo lo que podrían esperar razonablemente considerando las circunstancias.

Los Deudores consideran que el Plan es "justo y equitativo" con respecto a los Tenedores de Reclamaciones contra los Deudores porque les proporciona todo lo que podrían esperar razonablemente considerando las circunstancias de los Casos del Título III. El inicio de los Casos del Título III se precipitó debido a la insostenible carga de la deuda de los Deudores, una grave iliquidez, la desaceleración económica y la emigración, que erosionaron las rentas de los Deudores. Los Deudores consideran que el Plan es "justo y equitativo" porque los recobros de los acreedores allí propuestos han sido calculados —y, en ciertos casos, negociados— para compensar razonablemente a los Tenedores de Reclamaciones y al mismo tiempo, permitir a los Deudores (A) evitar la recurrencia de las dificultades financieras que conllevaron el inicio de los Casos del Título III, e (B) instituir unas desesperadamente necesarias iniciativas de reinversión para garantizar la continuidad de las operaciones de los Deudores.

c) **Discriminación indebida**

Se entenderá que un plan de ajuste no "discrimina indebidamente" si una clase discrepante es tratada sustancialmente en pie de igualdad con otras clases en la misma situación, y ninguna de ellas recibe más de lo tiene legalmente derecho a obtener por sus reclamaciones. Los Deudores no consideran que el Plan discrimine indebidamente a ninguna de las Clases de Reclamaciones afectadas.

**EN CASO DE RECHAZO DEL PLAN POR UNA O MÁS CLASES AFECTADAS, LA JUNTA DE SUPERVISIÓN SE RESERVA EL DERECHO DE SOLICITAR AL TRIBUNAL DEL TÍTULO III QUE CONFIRME EL PLAN DE CONFORMIDAD CON LA LEY PROMESA Y CON LAS SECCIONES 1129(b)(1), (b)(2)(A) Y (b)(2)(B) DEL CÓDIGO DE QUIEBRAS. LA JUNTA DE SUPERVISIÓN SE RESERVA EL DERECHO DE MODIFICAR EL PLAN, EN SU CASO, EN LA MEDIDA EN QUE LA SECCIÓN 314 DE LA LEY PROMESA Y LA SECCIÓN 1129(b) DEL CÓDIGO DE QUIEBRAS LO REQUIERA.**

d) **La prueba de "los mejores intereses de los Acreedores"**

No obstante la aceptación del Plan por cada una de las Clases de Reclamaciones afectadas, el Tribunal del Título III también debe determinar que el Plan defiende los mejores intereses de los acreedores, de conformidad con la sección 314(b)(6) de la Ley PROMESA. Para comprobar los "mejores intereses de los acreedores" previstos por la Ley PROMESA, "el tribunal deberá considerar si existen disponibles recursos bajo las leyes no de quiebras, y si la constitución del territorio podría conllevar para los acreedores un recobro superior al previsto por dicho plan". Para decirlo de manera más sencilla, la prueba exige que el tribunal considere los recobros de todos los acreedores colectivamente, y no los recobros individuales.[383] En la mayoría de los casos, si el plan no fuera confirmado y se desestimase el caso del Título III de un deudor, se produciría una avalancha hacia los juzgados cuyo resultado sería que muchos acreedores se quedarían sin nada que recobrar.

Los análisis de las comprobaciones de mejores intereses (los "Informes de las pruebas de mejores intereses") que considera el Tribunal del Título III —es decir, los recobros que los acreedores pueden esperar de cada Deudor sobre la base de los recursos disponibles en las leyes no de quiebra y en la Constitución del Estado Libre Asociado— sobre los que se basó el Plan fiscal 2021, se adjuntan a este documento en forma de Anexo N. Los Deudores consideran que el Plan satisface la prueba de los mejores intereses de los acreedores establecida por la sección 314(b)(6) de la Ley PROMESA.

La Junta de Supervisión certifica anualmente un nuevo plan fiscal.[384] En consecuencia, en la medida en que sea necesario, los Deudores presentarán informes revisados de las pruebas de mejores intereses que reflejen los datos del nuevo plan fiscal, si procede.

---

[383] Esta interpretación es congruente con el criterio adoptado por los tribunales de caso del Capítulo 9, ya que la sección 943(b)(7) del Código de Quiebra requiere que el plan defienda "los mejores intereses de los acreedores" utiliza del mismo modo el plural "acreedores", Consulte *En el asunto: Municipalidad de Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014). Consulte *asimismo En el asunto; Municipalidad de Estocolmo*, 542 B.R. 261, 283 (B.A.P. 9° Cir. 2015) (Por definición, la prueba de los "mejores intereses" del Capítulo 9 es colectiva y no singularizada).

[384] Se certificó un nuevo Plan fiscal del Estado Libre Asociado el 23 de abril de 2021. Consulte el Anexo G.

e) **Viabilidad**

La sección 314(b)(6) de la Ley PROMESA requiere que un plan de ajuste que defienda los mejores intereses de los acreedores sea viable. Si bien la norma legal explica que el requisito de mejores intereses de los acreedores significa que el tribunal considerará qué acreedores se beneficiarán de recobros en virtud de los recursos disponibles fuera del Título III, no incluye una orientación sobre qué se entiende por "viable", fuera del significado inherente del propio término. El Capítulo 9 del Código de Quiebras es el que está disponible para los municipios de los Estados. En su sección 943(b)(7) también impone un requisito de viabilidad, aunque sin entrar en detalles. Los tribunales han interpretado que el requisito de viabilidad del Capítulo 9 significa que el municipio vaya a ser viable, y que el plan ofrezca perspectivas razonables de tener éxito y de ser factible. El deudor debe demostrar que su plan puede satisfacer las obligaciones. A diferencia del Capítulo 9, el Título III también contiene un requisito que un Plan de Ajuste a tenor del Título III debe ser congruente con el plan fiscal certificado. Es de destacar que, en virtud de la sección 201(b)(1)(I) de la Ley PROMESA, el plan fiscal certificado debe contener un análisis de la sostenibilidad de la deuda. En consecuencia, la viabilidad del Plan de Ajuste del Título III puede determinarse, al menos parcialmente, estableciendo si se contempla o no un volumen de deuda dentro del ámbito del análisis de sostenibilidad de la deuda del plan fiscal certificado.

*Estado Libre Asociado.* Sobre la base del análisis y las proyecciones de sostenibilidad de la deuda del Plan Fiscal de mayo de 2019, el Estado Libre Asociado Reorganizado debería poder pagar sus deudas cuando sean exigibles, y el Estado Libre Asociado debería ser viable. Si fuera necesario, los Deudores actualizarán el análisis cuando el nuevo plan fiscal sea certificado, aunque esperan que, en el marco del mismo, el Estado Libre Asociado pueda pagar sus deudas incluidas en el Plan en sus fechas de vencimiento.

*SRE.* De conformidad con el Plan, SRE dejará de ser responsable de las obligaciones de pensiones o del servicio de la deuda. Las obligaciones de pensiones de SRE están incorporadas como gastos en el Plan Fiscal del Estado Libre Asociado de mayo de 2019, a través del sistema PayGo, que se financiará con las fuentes de ingresos del Estado Libre Asociado y las aportaciones municipales. El SRE sigue teniendo unos gastos operativos de aproximadamente $70 millones al año, cantidades que se prevé que disminuyan. Sobre la base de la cantidad de activos del SRE que no están gravados por los intereses de seguridad de los Bonistas SRE o que están restringidos de otra manera, el SRE será capaz de pagar sus gastos operativos y cumplir sus obligaciones a medida que venzan. Por consiguiente, según el Plan, SRE no tendrá que realizar en el futuro pagos sustanciales.

*AEP.* De acuerdo con el Plan, AEP no tendrá que realizar en el futuro pagos sustanciales.

Por ende, los Deudores consideran que el Plan satisface el requisito de viabilidad de la sección 314(b)(6) de la Ley PROMESA.

f) **Cumplimiento de las disposiciones aplicables de la Ley PROMESA y del Código de Quiebras**

Además de lo anteriormente expuesto, el Plan deberá cumplir con otras disposiciones aplicables de la Ley PROMESA y del Código de Quiebras, a saber:

- El Plan deberá cumplir con lo estipulado en el Código de Quiebras aplicable en virtud de la sección 301 de la Ley PROMESA (PROMESA § 314(b)(1));

- El Plan deberá cumplir con lo dispuesto en el Título III de la Ley PROMESA (PROMESA § 314(b)(2));

- Los Deudores no podrán tener prohibido por ley emprender ninguna actuación necesaria para la implementación del Plan (PROMESA § 314(b)(3));

- Salvo en la medida en que el tenedor de una determinada reclamación haya aceptado un tratamiento distinto para la suya, el Plan deberá estipular que, en la Fecha de entrada en vigencia, cada tenedor de una reclamación del tipo especificado en la sección 507(a)(2) del Código de Quiebras perciba, a cuenta de su reclamación, una suma equivalente al importe admitido de dicha reclamación (PROMESA § 314(b)(4));

- Deberán obtenerse todas las aprobaciones legislativas, reglamentarias o electorales necesarias, a tenor de la legislación vigente, para ejecutar cualquier disposición del Plan, o bien dicha cláusula deberá condicionarse expresamente a dicha aprobación (PROMESA § 314(b)(5));

- El Plan deberá ser congruente con el Plan Fiscal certificado por la Junta de Supervisión a tenor del Título III (PROMESA § 314(b)(7));

- Los Deudores, en calidad de proponentes del Plan por y a través de la Junta de Supervisión, deberán haber cumplido todas las disposiciones del Código de Quiebras (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); y

- El Plan deberá haberse propuesto de buena fe y de ningún modo podrá estar legalmente prohibido (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

2.      **Alternativas a la confirmación y consumación del Plan**

Los Deudores han evaluado numerosas alternativas al Plan, incluyendo estructuras y condiciones alternativas, así como el aplazamiento de su adopción. Aunque han llegado a la conclusión de que el Plan es la mejor alternativa y que maximizará los recobros de los tenedores de Reclamaciones permitidas contra los Deudores, si el Plan no es confirmado los Deudores podrían intentar formular y proponer un plan de ajuste diferente. Los Deudores (o cualquier otra parte interesada) también podrían obrar para conseguir que los casos del Título III sean desestimados de conformidad con 11 U.S.C. § 930 (incorporada en PROMESA § 301(a)).

El Plan fue formulado tras meses de difíciles negociaciones entre numerosos grupos de acreedores, incluyendo numerosas sesiones de mediación ordenadas por el Tribunal del Título III (*véase* la sección VI.E de esta Declaración de divulgación). En tales circunstancias, los Deudores consideran que el Plan ofrece los mayores recobros, y a la mayor brevedad, a los Acreedores, y que la aceptación y confirmación del mismo defiende los mejores intereses de los Deudores y de todos los Acreedores. Asimismo, los Deudores creen que cualquier alternativa al Plan conllevaría retrasos innecesarios, incertidumbre, pleitos y gastos, cuyo resultado sería que los recobros de los Acreedores sean menores que las distribuciones previstas por el Plan. Por ello, los Deudores manifiestan que la confirmación y la consumación del Plan son preferibles a posibles alternativas.

[*El resto de la página se ha dejado intencionadamente en blanco*]

## VIII.   Ciertos factores de riesgo a considerar

**AL IGUAL QUE CUALQUIER INVERSIÓN, LOS RECOBROS DE LOS NUEVOS BONOS GO Y CVI IMPLICAN RIESGOS. RECOMENDAMOS CONSIDERAR DETENIDAMENTE LOS FACTORES DE RIESGOS RELATIVOS AL PLAN, A LOS NUEVOS BONOS GO Y A LOS CVI AQUÍ EXPUESTOS, ASÍ COMO EL RESTO DE LA INFORMACIÓN CONTENIDA EN, O INCORPORADA POR REFERENCIA AL, ESTA DECLARACIÓN DE DIVULGACIÓN. LOS SIGUIENTES FACTORES DE RIESGO NO SON LOS ÚNICOS QUE DEBERÁN ENFRENTAR LOS DEUDORES. NO TIENEN POR OBJETO SER UNA LISTA EXHAUSTIVA DE TODOS LOS RIESGOS ASOCIADOS CON EL PLAN, CON LOS NUEVOS BONOS GO O CON LOS CVI, Y NO REFLEJAN NECESARIAMENTE LA RELATIVA IMPORTANCIA DE LOS DIVERSOS RIESGOS. LOS RIESGOS E INCERTIDUMBRES ADICIONALES ACTUALMENTE DESCONOCIDOS PARA LOS DEUDORES, O QUE ESTOS EN ESTE MOMENTO NO CONSIDERAN SUSTANCIALES, O BIEN QUE SON APLICABLES EN GENERAL A TODOS LOS ORGANISMOS GUBERNAMENTALES, TAMBIÉN PUEDE PERJUDICAR A LOS DEUDORES Y A SU CAPACIDAD DE CONSUMAR EL PLAN Y EFECTUAR LOS PAGOS CORRESPONDIENTES A LOS NUEVOS BONOS GO Y LOS CVI. SE RECOMIENDA CONSIDERAR, ENTRE OTROS, LOS SIGUIENTES FACTORES DE RIESGO, ASÍ COMO REVISAR OTROS DATOS CONTENIDOS EN, INCORPORADOS POR REFERENCIA A, ESTA DECLARACIÓN DE DIVULGACIÓN ANTES DE ADOPTAR CUALQUIER DECISIÓN RELATIVA AL PLAN, A LOS NUEVOS BONOS GO O A LOS CVI. UNO O MÁS DE LOS FACTORES AQUÍ EXPUESTOS, ASÍ COMO OTROS NO DESCRITOS EN ESTE DOCUMENTO, PODRÍAN AFECTAR A LOS RECOBROS PREVISTOS POR EL PLAN O CONLLEVAR UN DESCENSO DEL VALOR DE MERCADO Y DE LA LIQUIDEZ DE LOS NUEVOS BONOS GO O LOS CVI. NO PODEMOS GARANTIZAR QUE OTROS FACTORES DE RIESGO NO TRATADOS A CONTINUACIÓN NO LLEGUEN A SER SUSTANCIALES EN EL FUTURO.**

**NI LOS DEUDORES NI NINGUNA COMISIÓN DE VALORES O AUTORIDAD REGULADORA FEDERAL, ESTATAL O DEL ESTADO LIBRE ASOCIADO HAN APROBADO NI DEJADO DE APROBAR LOS NUEVOS BONOS GO O LOS CVI Y OTROS VALORES A EMITIR EN VIRTUD DEL PLAN, NI EVALUADO LA IDONEIDAD O EXACTITUD DE ESTA DECLARACIÓN DE DIVULGACIÓN.**

A.   Riesgos relacionados con los Casos del Título III

*Es posible que el Tribunal del Título III no confirme el Plan.*

La sección 314(b) de la Ley PROMESA y la sección 1129 del Código de Quiebras (en sus partes incorporadas) establece los requisitos para la confirmación de los planes de ajuste a tenor del Título III, y requiere que los Tribunales del Título III efectúen una serie de comprobaciones específicas e independientes. No se puede garantizar que el Tribunal del Título III llegue a la conclusión de que el Plan satisface todos esos requisitos y lo confirme. Si el Plan no es confirmado, existe incertidumbre sobre qué recobros, si acaso, recibirán los tenedores con respecto a sus Reclamaciones en el marco de un plan de ajuste alternativo u otra ley vigente en caso de que el Tribunal desestime los Casos del Título III. Consulte información adicional en la sección VII.C de esta Declaración de divulgación, titulada "Requisitos para la confirmación del Plan de ajuste".

491

***El Tribunal del Título III considera que el plan de ajuste es incongruente con el plan fiscal certificado correspondiente.***

Según la sección 314(b)(7) de la Ley PROMESA, el Plan debe ser congruente con el Plan Fiscal del Estado Libre Asociado, certificado por la Junta de Supervisión. Aunque la Junta de Supervisión ha certificado, de conformidad con la sección 104(j)(3) de la Ley PROMESA es congruente con el Plan Fiscal del Estado Libre Asociado,[385] la sección 314(b) de la citada ley establece que el Tribunal del Título III determine de manera independiente si el Plan es o no congruente con el Plan Fiscal. Por consiguiente, no está garantizado que el Tribunal del Título III vaya a dictaminar que el Plan es congruente con el Plan Fiscal del Estado Libre Asociado. Para ser congruente con los planes fiscales certificado, el Plan no puede estipular más deuda de la que —según los análisis de sostenibilidad de la deuda de los planes fiscales— pueda asumir cada entidad reorganizada.

***Si algún demandante consigue enjuiciar y obtener (i) una reclamación de gastos administrativa admitida, (ii) una reclamación prioritaria admitida, (iii) una reclamación garantizada admitida, o bien (iv) una reclamación no cancelable admitida, y el Plan no contempla pagar dicha reclamación, el Plan no podrá ser confirmable.***

Diversas partes han incoado reclamaciones contra los Deudores alegando que se trata de reclamaciones de gastos administrativos, reclamaciones con prioridad, reclamaciones aseguradas o reclamaciones no descargables que el Plan no contempla pagar. Si en última instancia estas reclamaciones, y similares, son admitidas, el Plan puede que no sea confirmable sin modificaciones que cambien sustancialmente sus distribuciones propuestas.

***Es posible que el Tribunal de Título III no apruebe las transacciones y compromisos del Plan.***

Los Deudores consideran que los significativos compromisos y transacciones reflejados en el Plan son justos, equitativos y razonables. Dichos compromisos y transacciones son parte integral del Plan, y aportan valor y certidumbre a los Deudores y a todos los Acreedores al eliminar ciertos significativos riesgos y gastos de pleitos, y establecen un marco para que los Deudores puedan salir a la mayor brevedad del Título III.

Mientras que las partes de los Acuerdos de Apoyo al Plan incluyen tenedores de Reclamaciones contra algunos de los Deudores valoradas en miles de millones de dólares, otras partes interesadas en los Caso del Título III podrían objetar dichos compromisos y transacciones tal y como están incorporados en el Plan. Si los compromisos y transacciones de los Acuerdos de Apoyo al Plan no son aprobados en los Casos del Título III, los Deudores no podrán confirmar el Plan.

Además, el Plan puede estar condicionado a la aprobación de otros acuerdos y transacciones resueltos en el marco del Plan. Si las transacciones contenidas en el Plan necesitan aprobación pero no lo son, existirá la posibilidad de que los Deudores no puedan confirmar el Plan.

***Puede que no se produzca la Fecha de entrada en vigencia.***

El Artículo LVIII del Plan estipula una serie de condiciones que deben satisfacerse (o dispensarse) antes de que pueda producirse la Fecha de entrada en vigencia. Muchas de estas condiciones están fuera del

---

[385] Se certificó un nuevo Plan fiscal del Estado Libre Asociado el 23 de abril de 2021.  Consulte el Anexo G.

control de los Deudores. A la fecha de publicación de esta Declaración de divulgación, no es posible garantizar que alguna o todas las condiciones para la entrada en vigencia del Plan vayan a satisfacerse (o dispensarse). En consecuencia, incluso si el Plan fuera confirmado por el Tribunal del Título III, no existen garantías de que vaya a consumarse ni que se materialice el ajuste de las deudas de los Deudores. *Véase* la sección VI.R. de esta Declaración de divulgación, titulada "Condiciones precedentes para la Fecha de entrada en vigencia" (descripción de las condiciones para la entrada en vigencia del Plan). Además, ciertos acuerdos contemplados en el Plan imponen condiciones que deberán satisfacerse a partir de la Fecha de entrada en vigencia. No es posible garantizar que dichas condiciones puedan eventualmente satisfacerse o dispensarse.

***Si los Acuerdos de Apoyo al Plan no se materializan, las posibilidades del Deudor de confirmar el Plan podrán quedarse seriamente perjudicadas.***

Cada uno de los Acuerdos de Apoyo al Plan contiene una serie de eventos de resolución que, en caso de producirse, algunas partes de dichos Acuerdos podrán resolverlos o retirarse de los mismos. Por ejemplo, las partes acreedoras podrán dar por terminados sus Acuerdos de Apoyo al Plan si los Deudores retiran el mismo, la Declaración de divulgación o la moción pidiendo su aprobación, o bien si se presentase alguna moción o instancia ante el Tribunal del Título III, en cada caso, incompatible con el objeto del Acuerdo de Apoyo al Plan en cualquier aspecto sustancial, y dicha moción o instancia no se retirarse dentro de un plazo especificado. Si los respectivos Acuerdos de Apoyo al Plan no se materializan, cada una de las partes de los mismos quedará dispensada de las obligaciones asumidas en virtud de los mismos, incluida la obligación de votar en apoyo del Plan. La retirada del apoyo de los acreedores a un Acuerdo de Apoyo al Plan, o la cancelación del mismo, pueden tener sustanciales efectos perjudiciales para la capacidad de los Deudores de confirmar el Plan.

**B.      Riesgos relacionados con los Deudores**

***La información financiera contenida en este documento está basada en los libros y registros de los Deudores y en la información de dominio público a día de la fecha o en la fecha indicada en dichos datos, según proceda. No se ha realizado ninguna auditoría ni inspección independiente de dicha información.***

La información financiera aquí contenida no ha sido, ni será, auditada ni revisada por ninguna firma contable independiente ni por terceros, y su alcance es limitado. Aunque los Deudores consideran que han hecho todos los esfuerzos razonables para garantizar la exactitud de la información financiera aquí contenida, no pueden asegurar que esté libre de inexactitudes materiales ni incongruencias. En consecuencia, se advierte que no debe confiar indebidamente en la información financiera contenida en este documento.

***Los Deudores no están obligados a actualizar las manifestaciones contenidas en esta Declaración de divulgación.***

Las manifestaciones contenidas en esta Declaración de divulgación son válidas a la fecha de su redacción, salvo que se especifique algo distinto, y el hecho de que esta Declaración se publique con posterioridad no implica que no se haya producido ninguna variación en dichos datos desde dicha fecha. Los Deudores no están obligados a actualizar esta Declaración de divulgación, salvo que así se lo ordene el Tribunal del Título III o lo requieran el Código o las Reglas de Quiebras.

*No se autoriza ninguna representación no contenida en esta Declaración de divulgación.*

Ninguna representación relacionada con los Deudores, los Casos del Título III o el Plan ha sido autorizada por el Tribunal del Título III, la Ley PROMESA o el Código de Quiebras, con la excepción de los aquí contenidos y en cualquier otro material de solicitud adjunto. Para llegar a su decisión tendrá que fiarse, a su propio riesgo, de las manifestaciones o compromisos dirigidos a obtener su aceptación o rechazo del Plan que no estén contenidos, o incluidos como referencia, en esta Declaración de divulgación.

*Es posible que la Junta de Supervisión quede disuelta antes de que se cumplan plenamente las obligaciones del Plan.*

El mandato de la Junta de Supervisión concluirá tras cinco años de presupuestos equilibrados. Esto puede ocurrir muchos años antes de que se cumplan plenamente las obligaciones estipuladas por el Plan. En tal situación, ya no habrá planes fiscales anuales, presupuestos y vigilancia a cargo de una organización como la Junta de Supervisión, que está estructurada para ser ampliamente independiente del Gobierno.

*Cuando la Junta de Supervisión concluya su mandato, el Gobierno podrá eliminar los controles, protecciones y transparencia establecidos por la Junta de Supervisión.*

Con ciertas limitaciones constitucionales, toda legislatura puede cambiar leyes anteriores. No existe la seguridad de que las protecciones y sistemas de la Junta de Supervisión sean mantenidos por futuras administraciones. Además, las autoridades podrán objetar las medidas impuestas por la Junta de supervisión, y continuar haciéndolo cuando esta ya no esté presente para hacer valer las reformas que ha implementado. No obstante, los convenios y obligaciones contenidos en el Plan, la Legislación de Nuevos Bonos GO, la Legislación de CVI y los Documentos definitivos (incluyendo las obligaciones que repercuten en los poderes gubernamentales o políticos de conformidad con la sección 305 de la Ley PROMESA, podrán ser ejecutados por partes interesadas en que se mantengan.

*Es posible que los futuros informes financieros no puedan prepararse oportunamente.*

Los estados financieros básicamente auditados preparados por el Estado Libres Asociado, SRE y AEP corresponden al Año fiscal 2017. No es posible garantizar la disponibilidad de los estados financieros auditados actuales ni la capacidad de los Deudores de preparar los informes financieros puntualmente.

C.      Riesgos relacionados con los Nuevos Bonos GO

*Es posible que los Nuevos Bonos GO no coticen a su valor nominal y que su limitada liquidez no los haga atractivos para los inversionistas.*

Como consecuencia de la inquietud por las actuales circunstancias financieras del Estado Libre Asociado, es posible que los tenedores de los Nuevos Bonos GO se encuentren con una aceptación limitada en el mercado cuando intenten venderlos, lo cual dificultará su negociación a su valor nominal o en torno al mismo. Es posible que, después de la Fecha de entrada en vigencia, los tenedores de los Nuevos Bonos GO se encuentren con que, durante un tiempo, no puedan venderlos a ningún precio. Alternativamente, los potenciales compradores podrán exigir descuentos sobre el valor nominal antes de mostrarse dispuestos a adquirir los Nuevos Bonos GO. No es seguro que pueda existir algún mercado secundario para los Nuevos Bonos GO. La ausencia de un mercado secundario para estos bonos, o la falta de liquidez en los mercados

494

secundarios, podría limitar las posibilidades de los tenedores de revender los bonos, o bien perjudicar su valor de mercado.

Los Nuevos Bonos GO y las transacciones descritas en este documento estarán sujetos a las exenciones de registro previstas por la Ley de Valores de 1933, con sus correspondientes enmiendas. Los Nuevos Bonos GO no han sido aprobados, ni desaprobados, por la Securities and Exchange Commission (Comisión del Mercado de Valores) de EE.UU. ni organismos homólogos de Estado Libre Asociado o de ningún estado, ni por otras autoridades reguladoras. Estas entidades tampoco han evaluado la exactitud o idoneidad de esta Declaración de divulgación. Toda afirmación en sentido contrario constituye un delito. Por consiguiente, es posible que el mercado secundario para los Nuevos Bonos GO sea limitado y que sus tenedores no puedan venderlos cuando deseen, u obtener el precio que deseen recibir por los mismos, con las consiguientes pérdidas significativas.

Considerando la naturaleza única del Plan, ciertas condiciones y resultados (incluyendo opiniones jurídicos) con respecto al Plan podrán ser diferente, en tipo ámbito, de los normalmente requeridos en transacciones de oferta de deuda municipal que se producen fuera de un proceso de reestructuración con supervisión judicial. Al adoptar sus decisiones de inversión, los inversionistas deberían considerar que ciertas actuaciones, procedimientos o requisitos de asesores jurídicos u otros terceros en relación con el Plan pueden ser sustancialmente diferentes, y mucho más limitados, que los requisitos típicos.

En los últimos años, varios trastornos importantes en los mercados financieros globales han conllevado una significativa reducción de la liquidez de los mercados secundarios de valores. Aunque las condiciones de los mercados financieros y de los mercados secundarios han mejorado, los períodos de iliquidez pueden volver a producirse y afectar a estos últimos, perjudicando sustancialmente el valor de los Nuevos Bonos GO y limitando las posibilidades de su venta. También la preocupación por la crisis fiscal del Estado Libre Asociado puede perjudicar el valor de mercado y la liquidez de los Nuevos Bonos GO.

**Naturaleza limitada de los recursos.**

Tras cualquier declaración de impago de conformidad con el Contrato de los Nuevos Bonos GO, no será posible agilizar los pagos de los nuevos Bonos GO por parte del Estado Libre Asociado Reorganizado. Sin embargo, los Nuevos Bonos GO están diseñados para ser garantizados por un gravamen estatutario en primer rango en el Fondo de Reserva del Servicio de la Deuda (suponiendo que se obtenga la legislación que conceda dicho gravamen legal), que mantendrá los importes correspondientes en fideicomiso para beneficio de los Tenedores de los Nuevos Bonos GO y, si se obtiene la legislación, estarán respaldados por la buena fe, el crédito y el poder impositivo del Estado Libre Asociado, de acuerdo con el Artículo VI, Sección 2 de la Constitución del Estado y las leyes aplicables del Estado en la Fecha de Entrada en Vigencia, pero no por otros activos del Estado Libre Asociado.

**Naturaleza limitada de las calificaciones; rebaja, suspensión o retirada de una calificación.**

En la medida en que las Partes del Gobierno, cada una de ellas actuando a su exclusiva y absoluta discreción, decidan solicitar la calificación crediticia de los Nuevos Bonos GO, deberán hacer todos los esfuerzos comercialmente razonables para obtenerla a la mayor brevedad, según lo determinen dichas Partes, a su absoluta discreción, tras consultarlo con al menos dos (2) Acreedores iniciales del AAP, designados conjuntamente por el Grupo de Deuda Constitucional, el Grupo GO, LCDC, el Grupo QTCB, Assured (únicamente en la medida en que no haya rescindido el AAP en lo que respecta a sí mismo), National (únicamente en la medida en que no haya rescindido el AAP en lo que respecta a sí mismo) y Syncora, cada uno de los cuales deberá formalizar un acuerdo de confidencialidad, de forma y contenido satisfactorios para la Junta de Supervisión, y que restringirá que los Acreedores iniciales del AAP negocien

495

Nuevos Bonos GO, y se esforzarán por obtener la mejor calificación posible. El Contrato de los Nuevos Bonos GO no incluirá un convenio de las Partes del Gobierno de mantener una calificación crediticia específica para los Nuevos Bonos GO en circulación.

Toda futura calificación asignada a los Nuevos Bonos GO por una agencia de calificación reflejará la evaluación de dicha agencia de la probabilidad de pago de los intereses y del capital de los Nuevos Bonos GO en sus respectivas fechas de vencimiento. Una calificación de Nuevos Bonos GO no es una recomendación de comprar, mantener o vender los Nuevos Bonos GO, y dicha calificación no abordará la comerciabilidad de los mismos, su precio en el mercado ni su idoneidad para inversionistas específicos. No existe garantía de que alguna calificación se mantendrá durante un determinado período de tiempo, ni que no vaya a ser rebajada, suspendida o totalmente retirada por una agencia si, en opinión de esta, las circunstancias lo justifican, basándose en los factores prevalecientes en cada momento, incluyendo, entre otros, las perspectivas financieras de la economía del Estado Libre Asociado Reorganizado en opinión de la agencia. Si se produjese dicha rebaja, suspensión o retirada podría perjudicar a la disponibilidad de mercados o a los precios de los Nuevos Bonos GO.

***Una calificación adversa de los Nuevos Bonos GO podría perjudicar su precio de mercado.***

No obstante el hecho de que inicialmente las Partes del Gobierno no podrán solicitar una calificación, una agencia de calificación podrá publicar una calificación no solicitada de los Nuevos Bonos GO, empleando factores cuantitativos y cualitativos, como por ejemplo la solvencia financiera real o percibida del Estado Libre Asociado Reorganizado, las perspectivas de pago del capital y de los intereses de los Nuevos Bonos GO, las repercusiones de la crisis fiscal del Estado Libre Asociado y otras condiciones macroeconómicas reinantes en el país. Asimismo, las calificaciones reflejan las diversas metodologías e hipótesis empleadas por las agencias de calificación, que están sujetas a modificación sin previo aviso. Las medidas adoptadas por las agencias de calificación pueden incluir el inicio, la subida, la rebaja o la retirada de una calificación de la deuda del Estado Libre Asociado, o bien ponerla en vigilancia negativa para una posible rebaja futura. Estas actuaciones pueden ser llevadas a cabo en cualquier momento, y están fuera del control del Estado Libre Asociado. La rebaja o retirada de una calificación crediticia de la deuda del Estado Libre Asociado Reorganizado, incluyendo los Nuevos Bonos GO, o ponerla en vigilancia negativa para una posible futura rebaja pueden tener efectos negativos para el valor de los Nuevos Bonos GO.

***Los Nuevos Bonos GO no estarán sujetos a la Ley de Contrato de Fideicomiso.***

Los Nuevos Bonos GO no se emitirán, ni se requerirá que se emitan, en virtud de un contrato calificado según la Ley de Contrato de Fideicomisos de 1939, con sus correspondientes modificaciones (la "LCF"). En consecuencia, los tenedores de los Nuevos Bonos GO no estarán amparados por las protecciones previstas por la LCF con respecto a sus inversiones en dichos bonos.

**D.      Riesgos relacionados con los CVI**

Cada pago anual correspondiente a los CVI está supeditado a que la recaudación del 5.5% del IVU supere el Plan Fiscal Certificado del ELA en el correspondiente. Dicho superávit dependerá del cumplimiento de ciertos objetivos (cuya materialización está fuera del control del ELA), incluyendo, entre otros, la ocurrencia de la Fecha de Entrada en vigencia, la reorganización exitosa de la economía del ELA de tal manera que las recaudaciones del Impuesto sobre Ventas y Uso del 5.5% superen el Plan Fiscal Certificado de 2020. La rentabilidad histórica de la recaudación de IVU del 5.5% no es indicativa de futuros resultados, por lo cual no es seguro que las condiciones de pago a cuenta de las recaudaciones del IVU del 5.5% en algún año o en todos. Además, los cambios en las leyes relacionadas con el IVU del 5.5% podrían afectar negativamente al importe de dicho impuesto recaudado en un año determinado. No se puede

asegurar que dicho umbral se supere en un año determinado (o que se supere alguna vez) antes de la expiración de los CVI, momento en el que los CVI expirarán sin valor y la Escritura de CVI se extinguirá y no se adeudarán más pagos a los tenedores de los CVI. Además, si se alcanza dicho umbral en un año determinado, los pagos de cada año fiscal en el marco de los CVI tienen un límite de (i) $200,000,000.00 anuales en el caso de los CVI de GO en el correspondiente año fiscal, más los montos no utilizados de Años fiscales anteriores, con sujeción a un límite anual acumulativo de $400,000,000.00 para los CVI de GO, y un límite vitalicio de $3,500,000.00, y (ii) en el caso de los CVI de recuperación, $175,000,000.00 (más los montos no utilizados de años anteriores, con sujeción a un límite en cualquier año del doble del límite anual aplicable; es decir, $350 millones) entre los años 2021 y 2043, y de $375,000,000.00 (más los montos no utilizados de años anteriores, con sujeción a un límite en cualquier año del doble del límite anual aplicable; es decir, $750 millones) en los años desde 2044 hasta 2051, en el bien entendido de que si en el año 2042 o antes se alcanza el límite de $3,500,000,000.00 de los CVI de GO, el límite anual de $250,000,000 comenzará el año siguiente.

Algunos de los riesgos relacionados con los Nuevos Bonos GO descritos anteriormente, incluida la liquidez limitada, la naturaleza limitada de los recursos y la ausencia de protecciones en virtud de la LCF, también pueden aplicarse a los tenedores de los CVI y podrían presentar riesgos más significativos para los tenedores de los CVI. Por ejemplo, es probable que la liquidez y la actividad del mercado secundario sean más limitadas para los CVI que para los Nuevos Bonos GO, dado que los importantes trastornos de los mercados financieros globales en los últimos años han causado una significativa reducción de la liquidez en los mercados secundarios de valores. Además, la naturaleza contingente de los pagos anuales en el marco de los CVI dificultan que los mercados puedan predecir con precisión los futuros flujos de pagos debidos a los tenedores de CVI. En consecuencia, es posible que los CVI se negocien a precios considerablemente inferiores al valor de futuros flujos de pagos, y que los precios en el mercado secundario de los CVI podrían no correlacionarse directamente con los resultados de la recaudación del IVU del 5.5%.

**E.     Riesgos relacionados con la Elección de Assured**

Assured podrá optar por recibir el efectivo y los CVI asignables a los tenedores de Bonos asegurados por Assured, y podrá optar por pagar la totalidad o parte de los Bonos asegurados por Assured, tal como se describe en la Sección 72.1(a) del Plan. Según la Elección de Assured, los tenedores de Bonos asegurados por Assured a los que se les pague recibirán el Precio de aceleración, que es un importe equivalente al capital pendiente más los intereses devengados e impagados a la Fecha de entrada en vigencia. Dicho pago satisfará y extinguirá plenamente las obligaciones asumidas por Assured en las Pólizas de seguro de Assured con respecto a tales Bonos asegurados por Assured.

Los tenedores de Bonos asegurados por Assured a quienes se les pague en el marco de la Elección de Assured dependerán de que Assured cuente con suficientes fondos para satisfacer sus obligaciones de pago. En general, dichos bonos se pagarán con el producto de la venta de Nuevos Bonos GO de Assured, y Assured pagará cualquier déficit de acuerdo con las Pólizas de seguro de Assured. No obstante, no existe certeza de que Assured será solvente o dispondrá de suficientes fondos para pagar el Precio de aceleración. Además, los tenedores de Bonos asegurados por Assured que se paguen en el marco de la Elección de Assured no tendrán derecho a futuros pagos de intereses sobre los Bonos asegurados por Assured, ni tendrán derechos adicionales ni participaciones en las Pólizas de seguros de Assured, los Nuevos Bonos GO de Assured y los CVI de Assured, ni tampoco tendrán derechos a recibir pagos adicionales con cargo a los CVI de Assured.

**F. Riesgos relacionados con las elecciones de los bonistas de Assured**

Si Assured declinase adoptar la Elección de Assured con respecto a cualquiera de los Bonos asegurados por Assured, cada tenedor beneficiario tendrá derecho a elegir una de tres opciones para el tratamiento de dichos Bonos asegurados por Assured, como se describe en la Sección 72.1(b) del Plan. La Elección 1 conllevará que el tenedor de Bonos asegurados por Assured recibirá un pago en efectivo equivalente al capital pendiente más los intereses devengados e impagados de los Bonos asegurados por Assured a la Fecha de entrada en vigencia. Según la Elección 2, el tenedor podría optar por un fideicomiso, un mecanismo de custodia o una estructura similar establecida por Assured, que proporcionará al tenedor una participación en la Póliza de seguro de Assured y en los Nuevos valores de Assured asignables a dicho tenedor. Con la Elección 3, el tenedor recibirá el efectivo y los Nuevos valores de Assured asignables a dicho tenedor de conformidad con el Plan, más un pago en efectivo de Assured por la cantidad que Assured determine.

Los tenedores de Bonos asegurados por Assured que opten por la Elección 1 no tendrán derecho a recibir nuevos pagos de intereses en Bonos asegurados por Assured y no tendrían ninguna participación en los Nuevos valores de Assured. Si optan por la Elección 2, los tenedores de Bonos asegurados por Assured dependerán del síndico, agente de custodia o intermediario similar para ejercitar sus derechos de bonista en el marco de la Póliza de seguro de Assured y los Nuevos valores de Assured correspondientes. Además, la inversión del tenedor dependerá (en una parte significativa) de las perspectivas comerciales y financieras de Assured. En los últimos años, muchas aseguradoras de bonos se han debilitado significativamente desde una perspectiva financiera. Por otra parte, se considerará que los tenedores de Bonos asegurados por Assured que no elijan ninguna opción habrán elegido la Elección 2. Según la Elección 3, los Nuevos valores de Assured no estarán asegurados, salvo que Assured opte por asegurar los Nuevos Bonos GO de Assured. Así, es posible que los intereses de los tenedores que opten por la Elección 3 no estén asegurados, y dependerán de la capacidad del ELA de pagar los Nuevos valores de Assured.

**G. Riesgos relacionados con la elección del Tratamiento de conmutación de National**

Cada tenedor de una Reclamación de Bonos asegurados por National permitida tendrá la opción de optar por recibir la Consideración de conmutación de National (el "Tratamiento de conmutación de National". National se reserva a su absoluta discreción la selección de la forma de contraprestación a distribuir de conformidad con el Tratamiento de conmutación de National. Además, aquel tenedor que opte por el Tratamiento de conmutación de National no tendrá ninguna participación en la Póliza de seguro de National pertinente, cualquier cuenta y fideicomiso o de custodia de National, o la Contraprestación del Plan de National que, de otro modo, podría asignársele o distribuírsele a una Reclamación de Bonos asegurados por National permitida.

**H. Riesgos relacionados con el tratamiento de no conmutación de National**

Cada tenedor de una Reclamación de Bonos asegurados por National permitida podrá optar por no recibir el Tratamiento de conmutación de National. En el momento de dicha elección, esos tenedores no sabrán cómo serán tratadas sus reclamaciones. National tendrá derecho a elegir entre los tratamientos descritas en la Sección 72.2(b) del Plan, que incluyen fideicomisos y cuentas de

custodia, o pagos en efectivo de importes acelerados. En la media en que National opte por fideicomisos de custodia, los tenedores que reciban este tratamiento no tendrán más recursos frente a National o a las Pólizas de seguro de National, con excepción de los previstos en las condiciones del Fideicomiso de National. En la medida en que National opte por pagos en efectivo, sus obligaciones para con dichos tenedores quedarán plenamente extinguidas mediante el pago en la Fecha de entrada en vigencia. Además, National y la Junta de Supervisión podrán formular una elección u opción de implementación alternativa no identificada en el Plan con respecto a los Bonos asegurados por National antes del comienzo de la vista de la Declaración de divulgación. Todo tenedor de una Reclamación de bonos asegurados por National permitida que no opte puntual y válidamente por recibir el Tratamiento de no conmutación de National, o que presente una elección por menos de todas sus Reclamaciones de Bonos asegurados por National, se considerará que ha optado por recibir el Tratamiento de conmutación de National.

I.      **Riesgos relacionados con hacer u omitir hacer una elección de conmutación de National**

El Plan de ajuste ofrece a los tenedores de Reclamaciones de Bonos asegurados por National permitidas la opción de elegir un tratamiento de conmutación o de no conmutación. Se considerará que el tenedor de una Reclamación de Bonos asegurados por National permitida que no elija de manera válida el Tratamiento de no conmutación de National, tiene o ha tenido Bonos Asegurados por National, quedando canceladas las Reclamaciones, incluyendo las obligaciones asumidas por National en las Pólizas de seguros de National.

J.      **Riesgos relacionados con los Certificados de National**

El tenedor de una Reclamación de Bonos asegurados por National permitida que opte por no recibir el Tratamiento de conmutación de National podrá, a discreción de National, ser considerado como receptor de su participación prorrateada en la Contraprestación del Plan de National, y Certificados de National como contraprestación por el depósito de tal participación prorrateada del tenedor en la Contraprestación del Plan de National y los Bonos de seguros de National asignables a cada tenedor. Los tenedores que reciban Certificados de National estarán expuestos a riesgos adicionales, incluyendo, entre otros, los siguientes:

- No se espera que los Certificados de National sean líquidos. No habrá mercado para los Certificados de National antes de la emisión de los Certificados de National, y no existen garantías de que se cree un mercado secundario para ellos, aunque si se crease, tampoco hay seguridad que aporte liquidez a la inversión o que esta continúe durante la vida útil de los Certificados de National;

- Cada distribución de los Certificados de National reducirá las obligaciones correspondientes de National estipuladas en las Pólizas de seguro de National. No obstante, los impuestos que deba pagar un tenedor de los Certificados de National por cuenta de distribuciones del Fideicomiso de National, el monto bruto de la distribución asignable a dicho tenedor (sin ninguna reducción por los impuestos que deba pagar) reducirá las obligaciones de National de conformidad con la Póliza de seguro de National;

- Los pagos adelantados podrán conllevar que el tenedor de Certificados de National no pueda reinvertir en inversiones semejantes;

- Ningún tenedor de Certificados de National tendrá derecho a instar al síndico para que adopte alguna medida con respecto a los activos del Fideicomiso de National. El acuerdo de fideicomiso estipulará que National tendrá derecho de indicar al síndico que enajene los Bonos asegurados por National o adopte cualesquiera otras medidas con respecto a los activos del Fideicomiso de National, incluyendo acciones permitidas al tenedor de Bonos asegurados por National. En consecuencia, el Fideicomiso de National podrá no adoptar medidas con respecto a los Bonos asegurados por National (como, por ejemplo, su venta, o implementar los recursos que dichos bonos permitan) que un inversionista podría tomar si tuviera directamente los Bonos asegurados por National;

- Con las excepciones previstas por la Póliza de seguro de National, los tenedores de Certificados de National no podrán recurrir al síndico de los Certificados de National a National ni a ninguna de las Personas relacionadas. Además, los tenedores no podrán recurrir contra dichas personas o activos para pagos vinculados con los Certificados de National, salvo según se estipula en la Póliza de seguro de National y en el contrato de fideicomiso;

- No habrá obligación de obtener calificación de solvencia de los Certificados de National. No obstante, una agencia calificadora podrá publicar una calificación no solicitada de los Certificados de National. Esto podría producirse en cualquier momento y está fuera del control de National y de los tenedores de Certificados de National. Tal calificación podría tener un efecto negativo en el valor de los Certificados de National; y

- Si National experimentase dificultades financieras en el futuro, es posible que no pueda abonar los pagos correspondientes a las pólizas de seguro pertinentes. Además, en el futuro podrían producirse eventos susceptibles de conllevar riesgos de pago u otros riesgos de contraprestación con respecto a National. Dichos riesgos podrían afectar al Fideicomiso de National, y la Junta de Supervisión no puede garantizar que todo tenedor podrá materializar alguna recuperación en particular de National. El valor de los Certificados de National dependerá, en parte, de las perspectivas comerciales y financieras de National. Los tenedores de Certificados de National, además de evaluar la capacidad del ELA Reorganizado de cumplir sus obligaciones vinculadas con los Bonos asegurados por National, deberían también evaluar la capacidad de National de cumplir las obligaciones asumidas en las Pólizas de seguro de National.

K.    **Riesgos relativos a la Cuenta de custodia de National**

Al tenedor de una Reclamación de Bonos asegurados por National permitida que opte por recibir el Tratamiento de conmutación de National podrá requerírsele, a discreción de National, que deposite, o que se considere que ha depositado, entre otras cosas, la citada participación prorrateada de la Contraprestación del Plan de National en la Cuenta de custodia de National.

**L.**     **Riesgos relativos a la elección del Tratamiento de conmutación de Syncora**

Cada tenedor de una Reclamación de Bonos asegurados por Syncora permitida tiene la posibilidad de optar por recibir la Contraprestación de conmutación de Syncora (el "Tratamiento de conmutación de Syncora"). Syncora se reserva a su absoluta discreción la selección de la forma de contraprestación a distribuir en virtud del Tratamiento de conmutación de Syncora. Además, todo tenedor que por el Tratamiento de conmutación de Syncora no tendrá más derechos sobre la Póliza de seguro de Syncora correspondiente, cualquier Fideicomiso, Cuenta de custodia o Contraprestación de plan de Syncora que pudiese asignarse o distribuirse a dicho tenedor de una Reclamación de Bonos asegurados por Syncora permitida.

**M.**     **Riesgos relacionados con el Tratamiento de no conmutación de Syncora**

Todo tenedor de una Reclamación de Bonos asegurados por Syncora permitida podrá optar por no recibir el Tratamiento de conmutación de Syncora. En el momento de esa elección, esos tenedores no sabrán cómo serán tratadas sus reclamaciones. Syncora tendrá derecho a elegir entre los tratamientos descritos en la Sección 72.3(b) del Plan, entre los cuales se incluyen fideicomisos, cuentas de custodia o pagos en efectivo de Montos acelerados. En la medida en que Syncora opte por fideicomisos, a los tenedores que reciban ese tratamiento no les asistirán más recursos de cara a Syncora o a las Pólizas de seguro de Syncora, salvo los estipulados en las condiciones del Fideicomiso de Syncora, En la medida en que Syncora opte por pagos en efectivo, las obligaciones de Syncora para con dichos montos quedarán plenamente extinguidas tras el pago en la Fecha de entrada en vigencia. Además, Syncora y la Junta de Supervisión podrán formular una elección o una opción de implementación alternativa no contemplada en el Plan con respecto a los Bonos asegurados por Syncora antes del inicio de la vista de la Declaración de divulgación. Todo tenedor de una Reclamación de Bonos asegurados por Syncora permitida que no opte puntual y válidamente por recibir el Tratamiento de no conmutación de Syncora, o que presente una elección por menos de todos sus Reclamaciones de Bonos asegurados por Syncora, se considerará que ha optado por recibir el Tratamiento de conmutación de Syncora.

**N.**     **Riesgos relacionados con hacer u omitir hacer una elección de conmutación de Syncora**

El Plan de ajuste ofrece a los tenedores de Reclamaciones de Bonos asegurados por Syncora permitidas la opción de elegir el tratamiento de conmutación o de no conmutación. El tenedor de una Reclamación de Bonos asegurados por Syncora permitida que no elija válidamente recibir el Tratamiento de no conmutación de Syncora se considerará que ha tenido cancelados a la Fecha de entrada en vigencia o con posterioridad a la misma, los Bonos asegurados por Syncora, incluyendo las obligaciones de Syncora estipuladas en las Pólizas de seguro de Syncora subyacentes de dichas Reclamaciones de Bonos asegurados por Syncora permitidas.

**O.**     **Riesgos relacionados con los Certificados de Syncora**

Se podrá considerar, a discreción de Syncora, que el tenedor de una Reclamación de Bonos asegurados por Syncora permitida que opte por no recibir el tratamiento de conmutación ha recibido su participación prorrateada en la Contraprestación del Plan de Syncora y Certificados de Syncora a cambio del depósito de dicha participación y de los Bonos de seguro de Syncora

asignables a dicho tenedor. Los tenedores que reciban Certificados de Syncora se exponen a riesgos adicionales como, entre otros, los siguientes:

- No está previsto que los Certificados de Syncora tengan liquidez. No habrá un mercado para los Certificados de Syncora antes de la emisión de los Certificados de Syncora, y no puede garantizarse que vaya a existir un mercado secundario para ellos. O, si se desarrolla, que proporcionará liquidez o que esta continuará durante la vida útil de los Certificados de Syncora;

- Cada distribución de los Certificados de Syncora reducirá las obligaciones correspondientes de Syncora estipuladas en las Pólizas de seguro de Syncora. No obstante, los impuestos que deba pagar un tenedor de los Certificados de Syncora por cuenta de distribuciones del Fideicomiso de Syncora, el monto bruto de la distribución asignable a dicho tenedor (sin ninguna reducción por los impuestos que deba pagar) reducirá las obligaciones de National de conformidad con la Póliza de seguro de Syncora;

- Los pagos adelantados podrán conllevar que el tenedor de Certificados de Syncora no pueda reinvertir en inversiones semejantes;

- Ningún tenedor de Certificados de Syncora tendrá derecho a instar al síndico para que adopte alguna medida con respecto a los activos del Fideicomiso de Syncora. El acuerdo de fideicomiso estipulará que Syncora tendrá derecho a indicar al síndico que enajene los Bonos asegurados por Syncora o adopte cualesquiera otras medidas con respecto a los activos del Fideicomiso de Syncora, incluyendo acciones permitidas al tenedor de Bonos asegurados por Syncora. En consecuencia, el Fideicomiso de Syncora podrá no adoptar medidas con respecto a los Bonos asegurados por Syncora (como, por ejemplo, su venta, o implementar los recursos que dichos bonos permitan) que un inversionista podría tomar si tuviera directamente los Bonos asegurados por Syncora;

- Con las excepciones previstas por la Póliza de seguro de Syncora, los tenedores de Certificados de Syncora no podrán recurrir al síndico de los Certificados de Syncora, a Syncora ni a ninguna de las Personas relacionadas. Además, los tenedores no podrán recurrir contra dichas personas o activos para pagos vinculados con los Certificados de Syncora, salvo según se estipula en la Póliza de seguro de Syncora y en el contrato de fideicomiso;

- No habrá obligación de obtener calificación de solvencia de los Certificados de Syncora. No obstante, una agencia calificadora podrá publicar una calificación no solicitada de los Certificados de Syncora. Esto podría producirse en cualquier momento y está fuera del control de National y de los tenedores de Certificados de Syncora. Tal calificación podría tener un efecto negativo en el valor de los Certificados de Syncora; y

- Si Syncora experimentase dificultades financieras en el futuro, es posible que no pueda abonar los pagos correspondientes a las pólizas de seguro pertinentes. Además, en el futuro podrían producirse eventos susceptibles de conllevar riesgos de pago u otros riesgos de

502

contraprestación con respecto a Syncora. Dichos riesgos podrían afectar al Fideicomiso de Syncora, y la Junta de Supervisión no puede garantizar que todo tenedor podrá materializar alguna recuperación en particular de Syncora. El valor de los Certificados de Syncora dependerá, en parte, de las perspectivas comerciales y financieras de Syncora. Los tenedores de Certificados de Syncora, además de evaluar la capacidad del ELA Reorganizado de cumplir sus obligaciones vinculadas con los Bonos asegurados por Syncora, deberían también evaluar la capacidad de Syncora de cumplir las obligaciones asumidas en las Pólizas de seguro de Syncora.

P.      **Riesgos relacionados con la cuenta de custodia de Syncora**

Al tenedor de una Reclamación de Bonos asegurados por Syncora permitida que opte por recibir el Tratamiento de conmutación de Syncora podrá requerírsele, a discreción de Syncora, que deposite, o que se considere que ha depositado, entre otras cosas, la citada participación prorrateada de la Contraprestación del Plan de Syncora en la Cuenta de custodia de Syncora. En tal caso, la inversión del titular dependerá de las perspectivas comerciales y financieras de Syncora. En los últimos años, muchas aseguradoras de bonos se han debilitado considerablemente desde el punto de vista financiero.

Q.      **Riesgos relativos a las proyecciones de ingresos y gastos del Plan Fiscal del Estado Libre Asociado**

El Plan fiscal 2021[386], con sus correspondientes proyecciones financieras subyacentes, es el resultado de años de sesiones de trabajo, diálogo, participación de involucrados u profundos estudios y análisis (así como de la colaboración entre la Junta de Supervisión y el Gobierno del Estado Libre Asociado). De esta manera se generó una amplia base de datos fundamentada en las actuales tendencias macroeconómicas y en las previsiones de ingresos y gastos. Sin embargo, todo esto se fundamenta en una serie de hipótesis y factores que están sujetos a riesgos externos e internos susceptibles de repercutir sustancialmente en los resultados previstos. Para reconocer tales riesgos, a continuación se exponen los factores que podrían afectar a las proyecciones macroeconómicas y financieras a 30 años contenidas en el Plan fiscal 2021.

Las citadas proyecciones financieras contienen afirmaciones prospectivas. Algunas de estas afirmaciones se basan en eventos futuros, resultados futuros de operaciones o futura evolución financiera. En algunos casos, el uso del potencial o de conceptos como "debería", "podría", "pudiera", "pretende", "prevé", "espera"; "planifica", "objetivos", "pronósticos"; "cree", "estima", "potencial", "continuar", así como los negativos de estas palabras u otra terminología semejante.

Estas afirmaciones prospectivas están basadas en hipótesis, son dudosas e involucran sustanciales riesgos conocidos y desconocidos, así como otros factores susceptibles de causar que los resultados, reales, así como la actividad o evolución de la economía y la capacidad de

---

[386] La Junta de Supervisión podrá certificar en cualquier momento un plan fiscal revisado. 'Se certificó un nuevo plan fiscal del Estado Libre Asociado el 23 de abril de 2021. Consulte el Anexo G.

recaudación tributaria de Puerto Rico sean sustancialmente diferentes de cualesquiera futuros resultados, niveles de actividad o rentabilidad explícitos o implícitos en dichas afirmaciones.

No es posible garantizar resultados, niveles de actividad ni rentabilidades futuras. No debería fiarse indebidamente en estas afirmaciones prospectivas, que pueden ser válidas solamente en la fecha en que se manifiestan. No tenemos intenciones de actualizar ninguna de estas afirmaciones prospectivas e ilustrativas para que reflejen resultados reales, eventos o circunstancias posteriores, o que reflejen la aparición de eventos imprevistos.

Las hipótesis subyacentes de estos datos financieros son necesariamente subjetivas. No podemos garantizar que sean correcta en este momento, ni que vayan a serlo o sigan siéndolo en el futuro. En consecuencia, no podemos garantizar que esta información refleje plena o correctamente las relaciones entre los factores económicos tratados en esta información financiera. Declinamos todo compromiso o garantía de que las proyecciones carezcan de defectos lógicos o mecánicos, aunque hacemos todo lo posible por diseñar y estructurar estos datos financieros con el objeto de demostrar las operaciones financieras previstas y los resultados financieros basados en las afirmaciones expuestas. Además de las limitaciones inherentes a cualquier pronóstico, también las proyecciones están sujetas a incertidumbres adicionales asociadas con su preparación, como consecuencia de las repercusiones en el transcurso de la pandemia de la COVID-19 y en el contexto de la evolución de la respuesta sanitaria.

***El modelo del Plan Fiscal descansa en datos históricos para proyectar el PIB y la inflación, y no toma en cuenta potenciales trastornos externos todavía no experimentados.***

El modelo del Plan Fiscal está basado en datos históricos sobre una serie de variables económicas importantes (por ejemplo, los precios del crudo y de los alimentos, la brecha de producción, el crecimiento de capital y las transferencias federales netas) para proyectar el PIB y la inflación, y toma en cuenta tanto los efectos de los huracanes María e Irma, los terremotos de 2020 y la pandemia de COVID-19 como los fondos de ayuda en caso de desastres y otros estímulos federales que se prevé que recibirá Puerto Rico. Sin embargo, no toma en cuenta potenciales trastornos externos futuros, como crisis económicas imprevistas, desastres naturales u otras alteraciones de la actividad económica global (o local) no proyectadas actualmente. Dado que las proyecciones económicas se basan en resultados históricos, si el crecimiento económico (o la inflación) de Estados Unidos o Puerto Rico fueran sustancialmente mayores o menores de lo previsto, ello podría afectar significativamente las consiguientes proyecciones del PIB y de la inflación del Plan Fiscal y, por consiguiente, la exactitud de las previsiones de ingresos y gastos. Por otra parte, el retraso o la implementación o ineficaz de reformas estructurales en los mercados de trabajo, energía, empresas, educación y facilidad de abrir empresas —que se considera que representan un 0.9% del PIB— podrían impactar en el crecimiento del PIB y, en consecuencia, en el total de los ingresos.

***El modelo del Plan Fiscal no incorpora importantes variaciones demográficas que en este momento no son evidentes.***

Las proyecciones demográficas del Plan Fiscal están basadas en las previsiones de futuro crecimiento económico y en diversos factores demográficos, como las tasas de fertilidad y mortalidad y la emigración neta, derivadas de los datos más recientes (a la fecha de certificación) de CDC, Estadísticas de la Oficina de Transportes y la Oficina del Censo de EE.UU. Las variaciones demográficas importantes que en este momento no son evidentes (como, por ejemplo, cambios notables en las tasas de fertilidad, la pirámide de población y los patrones migratorios) podrían alterar significativamente las estimaciones sobre las que se basó el modelo del Plan Fiscal. Dado que la población constituye un factor determinante para la

504

elaboración de estimaciones de ingresos y gastos (por ejemplo, impuestos al tabaco, gastos sanitarios y educativos), los cambios en las proyecciones demográficos afectarían a la precisión de las previsiones de superávit. Tras la certificación del Plan fiscal 2021, la Oficina del Censo de EE.UU. publicó las cifras del censo de población de 2020. Aunque todavía el Censo no ha presentado proyecciones detalladas por edad y otros factores, las diferencias entre las cifras de población de Puerto Rico y las actuales proyecciones del Plan fiscal pueden conllevar sustanciales variaciones en las proyecciones del superávit.

***Las proyecciones en materia de atención médica se basan en las leyes y políticas médicas federales y puertorriqueñas vigentes, así como en las proyecciones más recientes de gasto médico.***

Las estimaciones de gastos médicos del Plan Fiscal están basadas en las leyes y políticas públicas vigentes adoptadas por los gobiernos federal y del Estado Libre Asociado. En consecuencia, todo cambio en la política podría repercutir en la precisión de las estimaciones del gasto médico y el financiamiento. Por ejemplo, si se revisasen los criterios de Medicaid de tal manera que hubiera más gente de lo previsto con derecho a la cobertura sanitaria de esta entidad, el Gobierno podría tener que incurrir en gastos adicionales. Las proyecciones del Plan Fiscal para los ingresos de Medicaid también se verían afectadas si el financiamiento federal de Medicaid variase significativamente.

De manera similar, las proyecciones de gastos sanitarios toman en cuenta las actuales estimaciones a largo plazo debido tanto al crecimiento del CPI-U médico como a los cambios en los niveles de precios, la utilización y la combinación de poblaciones para los gastos cubiertos por Medicaid. Si las proyecciones nacionales de la inflación de la atención sanitaria (por ejemplo, como consecuencias de cambios estructurales en este mercado) cambiasen drásticamente, también las proyecciones de gasto se verían afectadas.

***El Plan Fiscal se basa en los datos y políticas actuales para proyectar la magnitud y desembolso de fondos federales para ayuda a catástrofes y otros importantes programas federales.***

Las proyecciones del Plan Fiscal se fundamentan en la implementación eficiente y puntual de la recepción y desembolso de fondos federales y privados para ayuda a catástrofes. En este sentido, se basan en el supuesto de que los procesos de solicitud y desembolso de fondos de las autoridades federales y locales continuarán acelerándose después del Año fiscal 2021, y que las estimaciones federales más recientes en cuanto a la magnitud de los fondos y del desembolso son exactas. Asimismo, las proyecciones se han elaborado en función de las políticas y leyes federales que rigen la aplicación de estos fondos. Si los niveles de eficiencia o los procesos federales o locales cambiasen, o si se produjesen variaciones en las políticas de asignación y gestión (por ejemplo, cambios aprobados por el Congreso o por FEMA, HUD, USDA u otros organismos federales), ello podría repercutir directamente en la exactitud de las proyecciones de ingresos y gastos, considerando el impacto que los fondos de ayuda sobre el crecimiento del PIB (que, a su vez, repercute en las previsiones demográficas) y en las estimaciones relativas a la participación en los gastos del gobierno local.

Los niveles previstos de financiamiento de los programas y transferencias federales estándar (por ejemplo, TANF, NAP, Dotación del Título 1) están basados en la legislación federal más recientes, y en las respectivas fórmulas de financiamiento de cada programa. De manera similar a lo que ocurre con los fondos de ayuda para catástrofes y el financiamiento federal de la sanidad, si cambian las fórmulas federales o los niveles de dotación de otros importantes programas sociales, también puede variar sustancialmente la exactitud de las previsiones de ingresos y gastos.

Además, varios organismos gubernamentales de Puerto Rico están clasificadas como entidades de alto riesgo, lo cual impone normas de cumplimiento y controles adicionales para la obtención de fondos

federales. El objeto de estas condiciones adicionales es garantizar una implementación efectiva de los programas federales mediante medidas adecuadas de gestión y responsabilidad fiscal. Sin embargo, esto también tiene como consecuencia un retraso en la materialización de proyectos financiados con fondos federales. La falta de avances sustanciales en la reforma, por ejemplo, a nivel del Departamento de Educación, conllevó que los funcionarios federales retuviesen el desembolso de fondos federales hasta la implementación de reformas sustanciales de eficacia financiera. La imposibilidad de acceder puntualmente a los fondos federales tomados en cuenta en las proyecciones del Plan Fiscal podría menoscabar la posibilidad de cumplir los objetivos de este.

***El Plan Fiscal se basa en la legislación tributaria vigente de Puerto Rico y EE.UU., y en la implementación de medidas efectivas en materia de ingresos.***

Las proyecciones del Plan Fiscal toman en cuenta la legislación tributaria actual de EE.UU. y Puerto Rico, y parte del supuesto de que las medidas en materia de ingresos se implementarán de manera puntual y eficaz. Por ejemplo, el establecimiento de nuevos flujos de ingresos procedentes de impuestos y tasas, y de un mejor cumplimiento de las obligaciones impositivas.

Por ello, cualquier variación de la legislación tributaria puertorriqueña y estadounidense repercutirá en los ingresos, al igual que las decisiones adoptadas por las empresas (incluyendo las multinacionales) con respecto a su presencia en Puerto Rico y a su planificación tributaria global. Además, si no se implementan eficazmente medidas tributarias, o si se superan las previsiones, podrían resultar muy diferentes de las proyecciones del Plan Fiscal.

***El Plan Fiscal parte del supuesto de que se implementarán medidas eficaces para conseguir ahorros sin afectar negativamente la prestación de los servicios públicos.***

Las medidas de gasto suponen que, en general, se conseguirán los objetivos de ahorro mediante reformas que mejoren la eficiencia gubernamental, aunque manteniendo un nivel de servicios acorde con las necesidades de la población y que faciliten el crecimiento económico. No obstante, si dicho ahorro se consigue mediante simple desgaste u onerosos programas de compras, existe el riesgo de que las no se consigan dichas eficiencias y que el menor nivel de gasto comprometa la prestación de los servicios del Gobierno, repercutiendo negativamente en la sostenibilidad económica y en los niveles de pobreza.

***El Plan Fiscal parte del supuesto de una implementación efectiva y puntual de medidas relativas a los ingresos y gastos.***

Las proyecciones del Plan Fiscal se basan en una implementación efectiva y puntual de medidas relativas a los ingresos y gastos. Se presume que cualquier posterior cambio o desviación de las metas y objetivos del Plan Fiscal se atendrán a los límites de neutralidad de ingresos y gastos generales contemplados en el Plan Fiscal y los Presupuestos certificado pertinentes. Para garantizar una efectiva implementación y credibilidad de los objetivos y proyecciones del Plan Fiscal, la Junta de Supervisión requiere que el Gobierno presente informes periódicos de los resultados financieros y de los progresos de la implementación. Además, la Junta de Supervisión ha desarrollado en su sitio web un mecanismo de monitorización, que incrementará la transparencia y reforzará la rendición de cuentas de las iniciativas del Gobierno en cuanto a los hitos y logros del Plan Fiscal. Los retrasos o desviaciones de los objetivos, hitos e información de las medidas de ingresos y gastos pueden alterar sustancialmente las proyecciones del Plan Fiscal.

***El Plan Fiscal supone que el gobierno cooperará plenamente en la aplicación de todas las reformas estructurales y medidas fiscales.***

El Plan Fiscal incorpora una serie de reformas necesarias para que la Isla se acerque a una realidad en la que disponga de energía fiable y de bajo costo, de infraestructuras sólidas, de más incentivos para entrar en el mercado laboral formal, de un mejor entorno normativo y de permisos, y de un sector público más eficaz y eficiente. Sin embargo, existe el riesgo de que la Legislatura o el Gobernador se nieguen a aplicar estas reformas, lo que podría poner en peligro la capacidad de lograr el ahorro y el superávit previstos en el Plan Fiscal.

***El Plan Fiscal supone que los beneficios previstos de las reformas estructurales y las medidas fiscales se materializarán según las previsiones.***

Existe el riesgo de que las reformas estructurales y las medidas fiscales incluidas en el Plan Fiscal no generen la totalidad de los beneficios previstos, incluso si dichas medidas son aplicadas en su totalidad por el Gobierno en el momento oportuno. Si los beneficios previstos de estas reformas no se materializan como se proyecta, se reduciría el superávit disponible.

***Se necesitarán medidas adicionales para compensar los déficits a largo plazo que se prevé que vuelvan a aparecer. Sin estas acciones adicionales, es posible que Puerto Rico no pueda atender todas sus obligaciones financieras en el futuro.***

Se estima que las reformas estructurales y las medidas fiscales proyectadas en el Plan Fiscal son insuficientes para permitir a Puerto Rico evitar futuros déficits, que se prevé que vuelvan a surgir en el Año fiscal 2036. Así, en un futuro próximo, el Gobierno podría verse obligado a tomar medidas adicionales, como mejorar la flexibilidad del mercado laboral mediante la derogación de leyes restrictivas y llevar a cabo una reforma fiscal significativa para ampliar la base de recaudación y reducir las tasas. Estas reformas estructurales incrementales van más allá del marco quinquenal del Plan Fiscal 2021 y son necesarias para poder tener presupuestos equilibrados en el futuro. Muchas de estas reformas -que reducirían los déficits y, por lo tanto, harían que los fondos estuvieran disponibles para una variedad de usos potenciales, sobre todo para invertir en el pueblo de Puerto Rico- han sido propuestas por la Junta de Supervisión, pero la Junta de Supervisión no puede implementarlas sin el apoyo del Gobierno elegido de Puerto Rico.

***El modelo del Plan Fiscal está basado en los datos históricos del Estado Libre Asociado, muchos de los cuales no han sido auditados ni revisados de manera independiente.***

El modelo del Plan Fiscal está basado en la aportación de datos históricos macroeconómicos, de ingresos y de datos aportados por el Estado Libre Asociado. En el pasado, el Gobierno ha tenido dificultades para comunicar datos completos y exactos, y gran parte de la información financiera facilitada por el Gobierno nunca ha sido auditada ni revisada por una firma contable independiente ni por terceros. Todas las incongruencias o inexactitudes de los datos pueden perjudicar la precisión de las proyecciones basadas en los mismos.

***El modelo del Plan Fiscal está basado en datos e información actuales para proyectar las necesidades y repercusiones de las necesidades del programa de plusvalías.***

Las proyecciones del Plan Fiscal incorporan inversiones de capital basadas en la evaluación actual y futura de las necesidades del programa de plusvalías. Es posible que los planes de inversión de capital tengan que ser revisados periódicamente debido a varios factores, incluyendo, entre otros, cambios en la política legislativa y en las actividades del sector público, necesidad de acelerar o aplazar mejoras planificadas, interacción con otras agencias gubernamentales, organismos, municipios, inversionistas

privados, fuentes de financiamiento y otros factores macroeconómicos. También las necesidades de cuantificación o incremento de las reformas estructurales de las infraestructuras públicas pueden afectar a las proyecciones de inversión de capital del Plan Fiscal. Las variaciones de estas proyecciones de inversiones, así como cualquier desviación de las repercusiones proyectadas de esas plusvalías también podrían repercutir en la puntualidad y cumplimiento de otras proyecciones financieras interdependientes del cumplimiento efectivo y de la existencia de un marco y de infraestructuras subyacentes.

***El Plan Fiscal no prevé cambios importantes en el clima político actual en Puerto Rico o en Estados Unidos con posterioridad a esta certificación.***

Las políticas y proyecciones financieras del Plan Fiscal están impulsadas por el compromiso del Ejecutivo y por las políticas legislativas de EE.UU. y de Puerto Rico existentes en el momento de la certificación del Plan Fiscal. Gran parte de las proyecciones financieras están estrechamente vinculadas con la disponibilidad de fondos federales y con el compromiso político local. El Plan Fiscal no toma en cuenta futuros cambios el entorno político, como los de la administración, el Poder Legislativo ni la orientación reguladora de Puerto Rico, como tampoco la organización y estructura de la prestación de servicios en las entidades gubernamentales a nivel del Estado Libre Asociado y municipal, las asignaciones, políticas de financiamiento y exenciones tributarias federales, o el estado de las relaciones de Puerto Rico con el gobierno federal.

***El Plan Fiscal se ha elaborado a partir de los últimos datos disponibles proporcionados por el Gobierno y se basa en hipótesis para proyectar los futuros gastos en pensiones***.

El Plan Fiscal se basa en los datos proporcionados por los pensionados individuales, los beneficiarios y los empleados con derecho a futuros beneficios de pensión, junto con los niveles actuales de gastos administrativos, tal como los proporciona el Gobierno. Estos datos son utilizados por los actuarios del sistema de retiro para elaborar los costos contables, tal como lo exige la Junta de Normas de Contabilidad Gubernamental (GASB), y se someten a un proceso por el cual el actuario revisa los datos proporcionados por el Gobierno. En este proceso se identifican las brechas en los datos de los registros individuales. Las deficiencias de datos identificadas incluyen problemas relacionados con los registros en papel que están incompletos, retrasos en la disponibilidad de las actualizaciones de datos y los requisitos del plan que no siempre se administran según lo dispuesto por la ley. Se elaboran hipótesis para tratar de proporcionar una proyección direccionalmente fiable de los costos del plan y son supervisadas por el actuario del sistema. El Plan Fiscal 2021 se basó en los últimos datos disponibles que habían sido revisados y eran datos del censo al 30 de junio de 2017.

Para proyectar las futuras obligaciones de PayGo, el modelo del Plan Fiscal 2021 proyectó hacia adelante los datos del 30 de junio de 2017 con hipótesis demográficas generalmente congruentes con las utilizadas por el actuario del sistema para fines de información de la GASB en los informes de valoración actuarial más recientes disponibles públicamente. Se trata de hipótesis sobre la tasa a la cual las personas se jubilan, dejan de trabajar, quedan incapacitadas y mueren, junto con las hipótesis relativas a los posibles beneficiarios. En la medida en que la experiencia real sea diferente a la prevista, los costos proyectados del plan podrían variar significativamente.

***El Plan Fiscal se basa en las disposiciones prescritas por la ley actual, modificadas por las medidas propuestas. Los futuros cambios en la política de pensiones podrían afectar significativamente a los costos proyectados***.

El Plan Fiscal prevé los beneficios adeudados a los particulares basándose en las disposiciones actualmente vigentes, modificadas por las medidas propuestas. En la medida en que el Gobierno apruebe leyes que modifiquen estas disposiciones, los costos previstos de PayGo cambiarán.

El Gobierno ha mostrado su propensión a querer modificar los beneficios de las pensiones a través de una serie de leyes a lo largo de los últimos años. Entre ellas se encuentran, entre otras, la Ley 40-2020 (que prevé la creación de un fideicomiso que podría utilizarse para mejorar las pensiones de la policía), la Ley 80-2020 (que prevé una ventana de retiro incentivado), la Ley 81-2020 (que prevé la mejora de los beneficios para los empleados de alto riesgo) y la Ley 82-2020 (que prevé la conversión adicional de las licencias por enfermedad en la fórmula de las pensiones para los docentes). Además, a principios de 2021 se introdujeron varias leyes adicionales para modificar aún más los beneficios de las pensiones, incluida la H.B. 120, que pretende crear un sistema de pensiones totalmente nuevo financiado por un fideicomiso.

### *El Plan Fiscal parte de la base de que las facturas de PayGo a los municipios y a las empresas públicas no incluidas en el plan fiscal se pagan íntegramente al ELA*

La Ley 106-2017 exige que el ELA pague a los pensionados sus beneficios de retiro bajo el SRE, el SRM y el SRJ, y que los municipios y las corporaciones públicas reembolsen al Estado los costos de PayGo. El Plan Fiscal parte de la base de que estos costos de PayGo son pagados y reembolsados en su totalidad al ELA. Si no se cobran totalmente estos importes facturados, se produciría un aumento de los costos netos de PayGo del ELA.

### *El Plan Fiscal incluye las hipótesis relativas a la Fecha de Entrada en vigencia del plan y a las fechas de vigencia de los recortes y la congelación de las pensiones del Sistema de Retiro de los Maestros (SRM) y del Sistema de Retiro de la Judicatura (SRJ), así como las disposiciones específicas relativas a cada uno de estos cambios*.

El Plan Fiscal asume que las congelaciones del SRM y del SRJ entrarán en vigencia el 1 de enero de 2022 y que la fórmula de reducción de los beneficios acordada en el Acuerdo de Apoyo al Plan del Comité de Jubilados, ajustada a un umbral de beneficios de $1,500, entrará en vigencia el 1 de julio de 2022. Los cambios en estas fechas de vigencia o en los términos relacionados con la congelación y el recorte repercutirían y aumentarían potencialmente los costos de PayGo del ELA.

R.   **Riesgos relacionados con la recaudación de los ingresos necesarios para el pago de los Nuevos Bonos GO**

*Recientemente, el Estado Libre Asociado ha aprobado una nueva legislación tributaria que tendrá una repercusión incierta en los futuros ingresos fiscales.*

En diciembre de 2018, el Estado Libre Asociado aprobó la Ley 257-2018, que implementó numerosas enmiendas al Código de 2011, incluyendo la modificación del régimen del IVU y del impuesto básico alternativo y el impuesto mínimo alternativo. Además, la Ley 257-2018 eliminaba ciertas categorías de compras de la base del IVU, y reducía los tipos de otras categorías. La Ley 257-2018 legalizó también ciertas categorías de máquinas de apuestas. Por otra parte, el Estado Libre Asociado aprobó la Ley 60-2019, el Código de Incentivos de Puerto Rico, que estipulaba cambios adicionales que afectaban a personas que se beneficiaban de las tasas impositivas más bajas, las deducciones aceleradas, las subvenciones y créditos fiscales previstos por la Ley 60-2019. Más recientemente, el Gobierno aprobó la Ley 40-2020 y la Ley 57-2020, que ajustaron aún más ciertos elementos del Código de 2011. Estos cambios incluían una nueva reducción del impuesto sobre la renta de las personas físicas y mayores exenciones en el impuesto sobre actividades económicas, compensadas por un aumento de otras tasas de declaración anual y una limitación

509

de otros créditos fiscales. El Estado Libre Asociado no consiguió certificar que la Ley 257-2018 se ajusta al Plan Fiscal. Con respecto a la Ley 60-2019, el Estado Libre Asociado certificó, de conformidad con la sección 204 de la Ley PROMESA es que no es "significativamente incongruente" con el Plan Fiscal. En consecuencia, ambas leyes carecen de certificación de cumplimiento del Plan Fiscal, lo cual suscita incertidumbre en cuanto a los ingresos impositivos previstos. Más recientemente, el Gobierno aprobó la Ley 40-2020 y la Ley 57-2020, que ajustaron aún más ciertos elementos del Código de 2011. Aunque están concebidos para compensar cualquier disminución de los ingresos, los aumentos de los ingresos destinados a hacer que estos ajustes fiscales sean neutrales desde el punto de vista de los ingresos pueden no ser suficientes para compensar la reducción de los ingresos aprobados mediante estas leyes.

### *Iniciativas de recaudación del Área de Rentas Internas del Departamento de Hacienda*

El Área de Rentas Internas del Departamento de Hacienda es responsable de administrar el Código de Rentas Internas de Puerto Rico (el "Código"). El Área de Rentas Internas incluye diversas oficinas involucradas en la administración del Código, como por ejemplo la Oficina del Secretario Auxiliar, el Negociado de Auditoría Fiscal, el Negociado de Impuestos al Consumo, el Negociado de Procesamiento de Planillas, el Negociado de Servicio al Contribuyente, el Sistema de Servicio y Atención al Contribuyente y el Negociado de Recaudaciones. Estas dependencias son responsable de diversas actividades, como por ejemplo (i) realizar auditorías o investigaciones de las declaraciones de impuestos de los contribuyentes (ii) desarrollo, administración y evaluación de los procedimientos, funciones y actividades necesarios para ejecutar la aplicación del Impuesto sobre las ventas y el uso, (iii) desarrollo, administración y evaluación del programa tributario sobre bebidas alcohólicas, y (iv) atender a los contribuyentes y a los representantes que acuden a los Centros de Servicios para actividades relacionadas con devoluciones, errores matemáticos, reintegros acreditados a deudas, impuestos de empleadores y todo tipo de asuntos relacionados con las declaraciones de particulares y empresas. Cualquier reducción de los recursos del Área de Rentas Internas podría afectar a su capacidad de calcular y recaudar impuestos.

### *El Estado Libre Asociado podrá aprobar nuevas leyes tributarias, cuyos efectos se desconocen.*

El Estado Libre Asociado podrá aprobar otras leyes susceptibles de perjudicar los ingresos fiscales. Por ejemplo, el Estado Libre Asociado recientemente aprobó varias leyes que modificaban el código de 2011, entre ellas la Ley 81-2019, para legalizar las apuestas deportivas presenciales y por Internet, y establecer un impuesto sobre los ingresos del juego sobre dichas actividades, y la ya citada Ley 60-2019. El Estado Libre Asociado también aprobó la Ley 40-2020, que modificó múltiples disposiciones del Código de 2011, incluida una nueva reducción del impuesto sobre la renta de las personas físicas al aumentar del 5% al 8% el crédito fiscal no reembolsable para determinadas personas físicas, modificaciones de los umbrales para la presentación de estados financieros auditados y cambios en la base del IVU. Además, en junio de 2020 se aprobó la Ley 57-2020, que establece medidas de reducción de impuestos para hacer frente al impacto de la COVID-19. El Estado Libre Asociado no ha certificado el cumplimiento del plan fiscal con respecto a algunas de estas leyes. En consecuencia, existe incertidumbre en cuanto a que estas leyes pudiesen tener efectos negativos en los futuros ingresos tributarios.

### *El Estado Libre Asociado genera significativos ingresos de un pequeño conjunto de personas no residentes a través de los impuestos indirectos y retenciones de la Ley 154 que, según las previsiones, están llamados a disminuir.*

El Departamento de Hacienda de Puerto Rico ha proyectado históricamente una descenso de la recaudación de los arbitrios de la Ley 154 y retenciones a no residentes (RNR) como resultados de los

inminentes vencimientos de las patentes farmacéuticas, de la diversificación de las cadenas de suministro y de variaciones en los impuestos federales de EE.UU. Este descenso comenzó a materializarse en el Año fiscal 2020 y, a marzo de 2021, continúa en línea con las proyecciones. El Plan fiscal parte del supuesto de que seguirán retrocediendo en los próximos años. No queda claro con qué rapidez, ni en qué grado, estos u otros riesgos afectarán a los impuestos pagados por este pequeño grupo de contribuyentes.

***Hasta la fecha, la agencia tributaria de Estados Unidos (Internal Revenue Service, IRS) no ha objetado posibilidad de desgravar los impuestos indirectos de la Ley 154 pagados a Puerto Rico de los impuestos federales sobre el ingreso. No obstante, esta cuestión todavía no se ha resuelto completamente.***

Los contribuyentes extranjeros a efectos del impuesto sobre el ingreso de Puerto Rico que, por lo demás, son contribuyentes de Estados Unidos, se han beneficiado al desgravar los arbitrios de la Ley 154 pagados a Puerto Rico como impuestos en lugar de impuestos sobre el ingreso contra sus impuestos federales sobre el ingreso de Estados Unidos. El IRS publicó la Notificación 2011-29 para articular su opinión sobre que, en la medida en que las cuestiones de desgravación estén pendientes, toda resolución sobre el particular será solo tentativa. Dicha resolución todavía está pendiente y no se sabe cuándo, o cómo, el IRS abordará la cuestión y qué contribuyentes se verán materialmente afectados por el resultado. Una resolución contraria a la desgravación podría conllevar que ciertos contribuyentes reestructurasen sus operaciones en Puerto Rico, lo cual repercutirá en las perspectivas económicas a largo plazo de los impuestos puertorriqueños.

***Un proyecto de reglamento recientemente presentado en relación con el Impuesto sobre Servicios Digitales puede tener un efecto importante en la capacidad de solicitar créditos de la Ley 154 y, por tanto, en sus previsiones de recaudación a largo plazo***.

El 29 de septiembre de 2020, el Departamento del Tesoro de EE.UU. y el IRS publicaron una propuesta de reglamento para los ingresos intangibles de servicios digitales derivados del extranjero, restringiendo el uso de los créditos fiscales extranjeros y la asignación y el prorrateo de ciertos gastos. No existe ninguna garantía, a pesar de las peticiones realizadas por el Gobierno, de que Puerto Rico quede exento de la normativa final o se le conceda un periodo de transición. Es posible que las empresas extranjeras controladas por Puerto Rico y otras empresas que operan en Puerto Rico con filiales en los Estados Unidos se encuentren en última instancia con que los pagos atribuibles al impuesto de la Ley 154 ya no son acreditables debido a la nueva normativa, afectando así a las operaciones comerciales y reduciendo materialmente las recaudaciones y contribuciones de la Ley 154. Además, no hay ninguna garantía de que cualquier régimen fiscal que sustituya a la Ley 154 genere suficientes ingresos para compensar la pérdida de la posible recaudación de la Ley 154.

***No existen garantías de que el Gobierno pueda sustituir la pérdida de los ingresos de la Ley de 154 de manera puntual o sustantiva.***

En septiembre de 2019, el entonces Secretario del Tesoro de EE.UU., Steve Mnuchin, pidió a la Gobernadora Wanda Vázquez que presentase un plan de transición para eliminar el crédito temporal que permitía a las empresas extranjeras acreditar íntegramente el arbitrio del 4% establecido por la Ley 154. Tras la reunión, el Gobierno de Puerto Rico anunció que se formaría un grupo de trabajo constituido por representantes del Gobierno y del sector privado para identificar potenciales alternativas al impuesto. No es seguro que estas iniciativas conlleven el desarrollo e implementación adecuados de un proceso de reforma que sustituya de manera puntual o sustantiva los ingresos procedentes de la Ley 154.

***La reciente transacción con un importante contribuyente podría reducir sustancialmente la futura recaudación del Impuesto de Sociedades y de otros impuestos.***

En julio de 2019, uno de los mayores contribuyentes de Puerto Rico formalizó una transacción corporativa única, que resultó en un ingreso no recurrente de $488 millones en el Año fiscal 2020. El Departamento de Hacienda de Puerto Rico también proyectó una reducción de $39 millones en el impuesto de sociedades como resultado de esta transacción a partir del Año fiscal 2021. El Departamento de Hacienda de Puerto Rico sigue evaluando la proyección del impacto a largo plazo y la reducción estimada a futuro está sujeta a cambios.

***Los desastres naturales pueden perjudicar la capacidad de recaudación del Gobierno.***

Puerto Rico está situado en una región que experimenta frecuentes huracanes, tormentas tropicales y otros fenómenos meteorológicos. Estos eventos, así como otros desastres naturales (terremotos, por ejemplo), han provocado significativos daños a las instalaciones e infraestructuras del país, incluyendo sus sistemas de agua y electricidad, desanimando el turismo, alentando la emigración y perjudicando severamente el funcionamiento de las administraciones públicas y de la economía nacional. El relativamente pequeño tamaño de Puerto Rico, así como la concentración de muchas empresas y reparticiones públicas, implica que es posible que un desastre natural pudiese afectar simultáneamente numerosos negocios y actividades gubernamentales. Es posible que los fenómenos meteorológicos y otros desastres naturales (terremotos, deslizamientos de tierras o subidas del nivel del mar) perjudiquen la capacidad de conseguir la recaudación prevista y que contribuyan a incrementar la emigración, otro factor con potencial de reducir los ingresos y el crecimiento económico.

### Brote de la pandemia de COVID-19.

El impacto que la pandemia de COVID-19 está causando y causará en el comercio, los mercados financieros y Puerto Rico, así como la naturaleza de sus repercusiones, seguramente evolucionará en el transcurso de los próximos años. El Gobierno ha experimentado reducciones de las fuentes de ingresos. La información contenida en esta Declaración de divulgación describe las repercusiones actuales que la pandemia y sus consecuencias han tenido para las finanzas y actividades del país, y describe algunas de las medidas de respuesta adoptadas Puerto Rico. No es posible predecir la duración ni el alcance de la emergencia sanitaria de la COVID-19, ni la magnitud de su impacto en Puerto Rico, la economía regional o la recaudación de impuestos. Sus consecuencias son continuas y su naturaleza dinámica provoca incertidumbre, como por ejemplo (i) la propagación geográfica del virus; (ii) la gravedad de la enfermedad; (iii) la duración del brote; (iv) las medidas que las autoridades pueden adoptar para contener o mitigar la pandemia; (v) el desarrollo y distribución de terapias médicas y vacunas; (vi) restricciones de movilidad adicionales o cambiantes; (vii) el impacto de la pandemia en la economía local o global o, en general, en el sector aeronáutico; (viii) probabilidades, y en qué medida, que Puerto Rico pueda ordenar medidas de salud pública adicionales; y (ix) consecuencia de la pandemia y acciones de respuesta emprendidas en materia de recaudación de impuestos, gasto y situación financiera. Es más que probable que las restricciones y limitaciones vinculadas con la COVID-19 van a continuar, al igual que los trastornos de las economías y mercados financieros nacionales y globales, al menos a corto y medio plazo, y que la recuperación puede ser prolongada. Pueden producirse epidemias o pandemias locales adicionales, y hacerlo con mayor frecuencia considerando las tendencias de globalización.

***El Plan fiscal incluye ingresos tributarios derivados de asociaciones, y diversos arbitrios sobre los cuales los datos históricos son limitados como para elaborar proyecciones.***

La Ley 60-219 incorporó una elección tributaria alternativa para que los contribuyentes pagasen los impuestos sobre la renta a nivel de asociación, a tipos tributarios preferentes. Este cambio en la administración tributaria conllevó una nueva categoría de recaudaciones del orden de los $205 millones en el Año fiscal 2021 (a febrero de 2021, sin incluir impuestos diferidos del Año fiscal 2020 recadados en el Año fiscal 2021). Estos pagos reflejan en gran medida impuestos que los asociados de estas entidades de otro modo hubiesen declarado como impuestos sobre la renta de personas físicas o jurídicas. Por otra parte, cuando el Departamento de Hacienda de Puerto Rico trasladó la recaudación de ciertos impuestos a su plataforma SURI, la recaudación de la categoría "otros arbitrios") se incrementó (en más de $200 millones entre los Años fiscales 2018 y 2021). El Departamento todavía no ha podido conciliar que parte de este incremento es consecuencia de cuestiones de clasificación o de un aumento de la recaudación. Dado que estos flujos de ingresos son nuevos y existen datos empíricos muy limitados como para poder preparar pronósticos, las proyecciones del Plan fiscal podrían ser inferiores o superiores a la realidad.

**S.      Factores de riesgo relacionados con futuras acciones judiciales**

***Los bonos emitidos en conexión con el Plan están sujetos a confirmación de acuerdo con el Título III de la Ley PROMESA, un instrumento reciente que nunca antes se utilizó para la reestructuración financiera y sobre cuya estructura existen sustanciales incertidumbres, incluyendo las relativas a la falta de opiniones judiciales que interpreten ese Título.***

El Plan se efectúa de conformidad con el Título III de la Ley PROMESA. PROMESA es un nuevo estatuto federal aprobado en 2016, y todavía ningún tribunal ha confirmado ningún plan de ajuste con arreglo a su Título III, ni ha sido consumado por ninguna parte. En consecuencia, existen incertidumbres sobre la confirmación y consumación de un plan de ajuste en virtud del Título III de la Ley PROMESA. Por ejemplo, no queda claro en qué medida una orden confirmando el Plan del Tribunal del Título III podrá ser apelada, o su entrada en vigencia retrasada. Mientras que a los tribunales posiblemente recurran a precedentes existentes de los capítulos 9 y 11 del Código de Quiebras, no existen garantías de que vayan a hacerlo o que no consideren otros factores a la hora de interpretar las cláusulas de la Ley PROMESA. Dichas incertidumbres podrían afectar, entre otros, a la percepción del mercado y, por consiguiente, al valor comercial de los Bonos.

Además, existe incertidumbre en cuanto a la consumación de un plan de ajuste en virtud del Título III de la Ley PROMESA, por cuanto no hay experiencia judicial relativa a la interpretación de un plan de este tipo y estas características. Las interpretaciones judiciales de un plan de ajuste confirmado de conformidad con el Título III de la Ley PROMESA, incluyendo las vinculadas a la consumación satisfactoria del mismo, podrían afectar al valor de los bonos emitidos al amparo del Plan.

***La Ley PROMESA está sujeta a objeciones de constitucionalidad.***

Por ejemplo, ciertas partes han objetado la constitucionalidad de la Ley PROMESA alegando que el nombramiento de los miembros de la Junta de Supervisión vulnera la Cláusula de Nombramientos y el principio de separación de poderes de la Constitución de Estados Unidos, ya que sus integrantes no fueron designados por el Presidente con el asesoramiento y la anuencia del Senado de EE.UU. Estas partes pretenden que se desestime el Caso del Título III del Estado Libre Asociado, y han solicitado una sentencia declarativa manifestando que la Ley PROMESA vulnera la Cláusula de Nombramientos y que todos los actos de la Junta de Supervisión hasta la fecha carecen de validez. Además, dichas partes pretenden prohibir

a la Junta de Supervisión ejercitar cualquier autoridad que le otorgue la Ley PROMESA. El Tribunal del Título III emitió una opinión y una orden sosteniendo que no existe ningún defecto de constitucionalidad en el método de nombramiento [ECF Núm. 3503]. Las partes que objetan la Ley PROMESA apelaron ante el Primer Circuito, que revocó la decisión del Tribunal de Título III y sostuvo que el método de nombramiento fue defectuoso. La Corte Suprema dictó un auto de *cerciorari* sobre el particular, y la vista oral tuvo lugar el 15 de octubre de 2019. Consulte información adicional en la sección V.F de esta Declaración de divulgación, titulada "Procedimientos de contradicción significativos y pleitos relacionados".

***Los Deudores pueden estar expuestos a futuras demandas y reclamaciones judiciales.***

Los Deudores pueden estar sujetos a diversas demandas y reclamaciones judiciales derivadas del transcurso ordinario de sus actividades después de la Fecha de entrada en vigencia. Los Deudores no pueden predecir la naturaleza y alcance de dichas demandas y reclamaciones, y no pueden garantizar que la sentencia final de las mismas no vaya a tener efectos perjudiciales para los Deudores después de salir del procedimiento del Título III.

***La tutela de los derechos de conformidad con los Nuevos Bonos GO, la Escritura de los Nuevos Bonos GO y la Legislación de los Nuevos Bonos GO puede estar limitada en la medida en que el Estado Libre Asociado Reorganizado esté sujeto a nuevos casos al amparo del Título III de la Ley PROMESA.***

Existe la posibilidad de que los tenedores de los Nuevos Bonos GO puedan ejercitar los derechos que les otorgan los Nuevos Bonos GO, la Escritura de los Nuevos Bonos GO y la Legislación de los Nuevos Bonos GO en la medida en que el Estado Libre Asociado Reorganizado esté sujeto a nuevos casos al amparo del Título III de la Ley PROMESA a consecuencia de la aplicación de la paralización automática de la aplicación de recursos que entraría en vigencia tras la presentación de la petición al amparo del Título III.

***Ciertas condiciones y resultados de formalización con respecto al Plan pueden diferir, en tipo y alcance, de los aquí descritos.***

Ciertas condiciones y resultados de formalización con respecto al Plan pueden diferir, en tipo y alcance, de los aquí descritos si el Tribunal del Título III dicta una Orden de Confirmación diferente de la prevista.

**T.     Factores de riesgo relacionados con la acción legislativa**

El Plan contempla que, como más tardar en la Fecha de entrada en vigencia, el Gobierno apruebe legislación que autorice las transacciones contempladas en el Plan, incluyendo la emisión de los Nuevos Bonos GO. No existe certidumbre en cuanto a que vaya a aprobarse dicha legislación y, de no ser así, la Junta de Supervisión solicitará interdictos de conformidad con la Sección 305 de la Ley PROMESA, permitiendo que el Tribunal del Título III interfiera con los poderes gubernamentales y políticos de un plan de ajuste, o con el consentimiento de la Junta de Supervisión, y estipule la emisión de los Nuevos Bonos GO. No existe certidumbre en cuanto a si el Tribunal del Título III otorgará los citados interdictos o que estos puedan sostenerse en una apelación.

Además, la emisión de títulos municipales sin apoyo legislativo podría afectar negativamente al valor de mercado de dichos títulos. Si se aprueba la legislación que autoriza las transacciones contempladas en el Plan, las futuras actuaciones de la Legislatura podrían modificar la legislación pertinente de maneras que afecten a los Nuevos Bonos GO. Aunque la Junta de Supervisión tratará de incluir en la legislación que autorice los Nuevos Bonos GO, entre otras cosas, un convenio de no impedimento, cualquier actuación del

Gobierno para modificar la legislación, así como cualquier pleito que pudiera entablarse, podrían perjudicar al valor de los Nuevos Bonos GO y a los recobros previstos en virtud de los mismos. Además, la cualquier ejercitación de derechos contra el Estado Libre Asociado a tenor del convenio de no impedimento podrá estar sujeta a la ejercitación de la discreción judicial y a las limitaciones de recursos legales contra el Estado Libre Asociado o la ejercitación del convenio de no impedimento.

Asimismo, también otras futuras actuaciones de la Legislatura podrían perjudicar sustancialmente al valor de los Nuevos Bonos GO y a los recobros previstos por los mismos.

**U.     Factores de riesgo relacionados con el tratamiento fiscal de los Nuevos Bonos GO**

***Es incierta la proporción de los Nuevos Bonos GO que estarán exentos a efectos del impuesto federal sobre el ingreso de EE.UU.***

Los Nuevos Bonos GO se emitirán como Nuevos Bonos GO exentos de impuestos (tal y como se define en "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU."), o bien como Nuevo Bonos GO tributables (tal y como se define en "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU."), según proceda. El estatus tributario de los Nuevos Bonos GO todavía no ha sido determinado a la fecha de esta Declaración de divulgación, incluyendo (i) si algún tramo de los intereses sobre los Nuevos Bonos GO tendrán o no derecho a ser excluidos a efectos de los ingresos brutos del Impuesto federal sobre el ingreso de EE.UU., o bien (ii) la relación de la cuantía total de todos los Nuevos Bonos GO tributables que se emitirán en la Fecha de Entrada en vigencia y la cuantía total de todos los Nuevos Bonos GO. Véase "*Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU.—Tenedores de EE.UU.—Tratamiento tributario de las Reclamaciones admitidas—Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage (Assured) garantizados (Clase 22), Reclamaciones de Bonos ELA Vintage (National) garantizados (Clase 23), Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados (Clase 24), Reclamaciones de Bonos ELA Vintage (Syncora) garantizados (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 26), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI*".

***[Es incierta la manera en que se calcularán los devengos de intereses de los Nuevos Bonos GO a efectos de tributación del Impuesto sobre el ingreso de EE.UU.***

Los Deudores no pretenden dar a los Nuevos Bonos GO el tratamiento de "instrumentos de deuda de pago contingente" a efecto del Reglamento del Tesoro vigente (como se define en "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU."). No obstante, la autoridad para el tratamiento de los Nuevos Bonos GO es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acera del tratamiento de los Nuevos Bonos GO en calidad de instrumentos de deuda de pago contingente, incluyendo las limitaciones que pudiesen aplicarse a la cuantía de los intereses exentos de impuestos de los Nuevos Bonos GO exentos de impuestos exentos de impuestos que podrán excluirse de los ingresos brutos a efectos del Impuesto sobre el ingreso federal de EE.UU. Véase "*Consideraciones materiales a efectos del Impuesto*

*federal sobre el ingreso de EE.UU. —Tenedores de EE.UU.—Tratamiento tributario de las Reclamaciones admitidas— Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage (Assured) garantizados (Clase 22), Reclamaciones de Bonos ELA Vintage (National) garantizados (Clase 23), Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados (Clase 24), Reclamaciones de Bonos ELA Vintage (Syncora) garantizados (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI".*

***Es posible que, en algunos años, se exija a los tenedores estadounidenses declarar sus ingresos superiores al dinero en efectivo que hayan percibido en esos años, lo cual supondría "ingresos fantasma" para propósitos tributarios de Estados Unidos.***

Si para propósitos tributarios federales estadounidenses, los Nuevos Bonos GO tributables (tal como se define en "Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU.") se emiten con más de un importe *de minimis* de descuento original de emisión (generalmente, el 0.25% del precio de amortización estipulado al vencimiento, multiplicado por el número de años enteros hasta el vencimiento), entonces un Tenedor de EE.UU. de dichos bonos deberá incluir el descuento de emisión original en sus ingresos cuando lo devengue (independientemente del método habitual de contabilización tributaria del tenedor) utilizando un método de rentabilidad constante de conformidad con las reglas de devengo. Si en algún año los devengos de intereses superasen los pagos de efectivo en concepto de los Nuevos Bonos GO tributables, un Tenedor estadounidense habrá percibido ese año una "renta fantasma", Es decir, ingresos tributables por encima del efectivo recibido, que podría ser sustancial.

En caso de venta u otra enajenación tributable de un Nuevo Bono GO con el descuento de mercado devengado, un Tenedor de EE.UU. deberá declararlo como renta ordinaria (en lugar de rentas de capital) en función del descuento de mercado devengado, salvo que previamente haya optado por incluir el descuento de mercado del ingreso en el momento de devengarlo. Véase "*Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU. —Tenedores de EE.UU.—Tratamiento tributario de las Reclamaciones admitidas— Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage (Assured) garantizados (Clase 22), Reclamaciones de Bonos ELA Vintage (National) garantizados (Clase 23), Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados (Clase 24), Reclamaciones de Bonos ELA Vintage (Syncora) garantizados (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI".*

***El tratamiento de los CVI como contratos de capital nocional sujetos a las normas que rigen los topes a efectos del impuesto sobre la renta federal de Estados Unidos es incierto***.

El tratamiento de los CVI en el impuesto sobre la renta federal de Estados Unidos es incierto. Los Deudores tienen la intención de tratar los CVI como contratos de principio nocional sujetos a las normas que rigen los topes. No obstante, la autoridad para el tratamiento de los CVI es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acera del tratamiento de los CVI en calidad de contratos de capital nocional. Véase "*Consideraciones materiales a efectos del Impuesto federal sobre el ingreso de EE.UU. —Tenedores de EE.UU.—Tratamiento tributario de las Reclamaciones admitidas—Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage (Assured) garantizados (Clase 22), Reclamaciones de Bonos ELA Vintage (National) garantizados (Clase 23), Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados (Clase 24), Reclamaciones de Bonos ELA Vintage (Syncora) garantizados (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 28), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI*".

TODOS LOS TENEDORES SUJETOS A LA TRIBUTACIÓN ESTADOUNIDENSE DEBERÍAN LEER LA EXPLICACIÓN DE LAS CONSECUENCIAS, A EFECTO DEL IMPUESTO FEDERAL SOBRE INGRESOS DE ESTADOS UNIDOS, DE LA COMPRA, POSESIÓN Y ENAJENACIÓN DE LOS NUEVOS BONOS GO Y LOS CVI CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN, BAJO EL ENCABEZADO "CONSIDERACIONES MATERIALES A EFECTOS DEL IMPUESTO FEDERAL SOBRE INGRESOS DE EE.UU.".

[*El resto de la página se ha dejado intencionadamente en blanco*]

## IX.  Consideraciones materiales a efectos del Impuesto federal sobre ingresos de EE.UU.

**A.  Aspectos generales**

A continuación, se presenta una descripción general de ciertas consecuencias materiales del Plan a efectos del Impuesto federal sobre ingresos de EE.UU. Esta descripción está basada en el código tributario (Internal Revenue Code) de 1986, con sus correspondientes modificaciones (el "IRC"), las reglas (incluyendo las temporales y propuestas) aprobadas de conformidad con el IRC (el "Reglamento del Tesoro"), las sentencias judiciales y decisiones administrativas, tal y como estén vigentes en la fecha de esta Declaración de divulgación, y sujetos a cambios, posiblemente con efectos retroactivos. Los cambios de cualquiera de estas potestades o de su interpretación podría provocar que algunas, o todas, las consecuencias tributarias del Plan a efectos del Impuesto sobre ingresos de EE.UU. resulten sustancialmente distintas de las aquí descritas.

Las consecuencias tributarias del Plan a efectos del Impuesto sobre ingresos de EE.UU. son complejas, y pueden variar en función de la Clase de la Reclamación de un tenedor. A la fecha de esta Declaración de Divulgación, no se ha solicitado al Internal Revenue Service ("IRS", la agencia tributaria de EE.UU.) ninguna opinión acerca de algún aspecto del Plan; no se ha solicitado ninguna opinión a los abogados de los Deudores sobre las consecuencias fiscales del Plan, salvo las específicamente aquí expuestas, y esta Declaración de divulgación no presenta ninguna opinión tributaria.

La siguiente descripción no cubre todos los aspectos de la tributación federal estadounidense que pudiera ser relevante para los tenedores de Reclamaciones. Por ejemplo, la descripción no aborda cuestiones de especial inquietud para determinados tipos de contribuyentes (por ejemplo, compañías de inversiones reguladas, fondos de inversión inmobiliaria, bancos y algunas otras instituciones financieras, aseguradoras, entidades exentas de impuestos, planes de pensiones, cuentas individuales de retiro y otras sujetas a tributación diferida, tenedores que son, o que canalizan sus Reclamaciones a través de, sociedades mercantiles de tratamiento fiscal simplificado, asociaciones u otras entidades interpuestas a efectos tributarios federales estadounidenses, personas cuyas monedas funcionales no sean el dólar estadounidense, intermediarios de valores o de divisas, intermediarios que ajustan sus títulos al mercado, personas sujetas al impuesto mínimo alternativo, personas perceptoras de beneficios del Seguro Social o del Sistema de Retiro para Ferroviarios, y personas cuyas reclamaciones sean parte de transacciones de compraventa simultánea, cobertura, venta constructiva o conversión). Además, la descripción no aborda otros impuestos federales de los impuestos sobre ingresos, ni se aplica a las personas que adquieran Nuevos Bonos GO o CVI en el mercado secundario. Además, la descripción no entra en las consecuencias tributarias relativas a otros impuestos estatales, territoriales (incluido Puerto Rico), locales o no estadounidenses (incluyendo los impuestos patrimoniales o a las donaciones). Por último, este documento no aborda las consecuencias a efectos del Impuesto federal de Estados Unidos sobre ingresos para los titulares de reclamaciones que se considere que han rechazado el Plan.

Por estos motivos, esta descripción no sustituye a una detenida planificación tributaria ni a un asesoramiento fiscal profesional basado en las circunstancias individuales de cada tenedor de una Reclamación. Los tenedores de Reclamaciones deberían consultar a sus propios asesores fiscales acerca de las consecuencias tributarias de los impuestos federales, estatales, territoriales (Puerto Rico incluido), locales y no estadounidenses.

**Esta sección no aborda las consecuencias fiscales del Plan en Puerto Rico para los titulares residentes de buena fe del Estado Libre Asociado ni para otros que pudieran estar sujetos a impuestos, sobre una base bruta o neta, del Estado Libre Asociado. Recomendamos a estas personas**

518

consultar la sección "Consideraciones materiales a efectos del Impuesto sobre ingresos de Puerto Rico", más adelante.

**B.     Tenedores de EE.UU.**

      **1.     Definición de Tenedor de EE.UU.**

Salvo que se indique algo distinto, lo siguiente es de aplicación solamente a Tenedores de EE.UU. Tal como se utiliza aquí, por "Tenedor de EE.UU." se entenderá a un tenedor beneficiario de Bonos GO, Bonos SRE y/o Bonos AEP (en conjunto, los "Valores Existentes") a la Fecha de entrada en vigencia del Plan, a efectos del impuesto federal sobre ingresos de EE.UU.:

- un particular que es ciudadano o residente de los Estados Unidos;

- una corporación u otra entidad sujeta a impuestos federales sobre ingresos de EE.UU., constituida u organizada en, o de acuerdo con, las leyes de los Estados Unidos, cualquiera de sus estados o el Distrito de Columbia;

- una sucesión, cuyos ingresos están sujetos al impuesto federal sobre ingresos de EE.UU., independientemente de su procedencia; o bien

- un fideicomiso, si un tribunal de los Estados Unidos puede ejercitar su competencia sobre su administración y una o más personas estadounidenses tienen la facultad de controlar todas sus decisiones sustanciales, o bien si el fideicomiso tiene en vigencia una elección válida, de conformidad con el reglamento del Tesoro de EE.UU., para ser tratado como persona estadounidense.

Si una asociación u otra entidad o concierto que paga impuestos como asociación a efectos del impuesto federal sobre ingresos de EE.UU. es tenedor de Valores Existentes, el tratamiento fiscal de un socio de dicha asociación dependerá en general de la situación del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad tenedores de Valores Existentes que consulten a sus asesores fiscales.

El término "Tenedor de EE.UU." no incluye a personas físicas ni jurídicas de Puerto Rico, cada una de ellas definida a continuación, bajo "Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico". Las personas físicas y jurídicas de Puerto Rico deberían consultar las consecuencias fiscales del Plan a efectos del impuesto federal sobre ingresos de EE.UU. que se explican en "Personas físicas y jurídicas de Puerto Rico".

Además, solamente a efectos de tenedores de (i) Reclamaciones de beneficios de empleados en activo y retirados (Clase 48A – 48E), y (ii) Reclamaciones de empleados de AFSCME (Clase 40), el término "Tenedor de EE.UU." no incluye a ningún particular que fuera persona natural de Puerto Rico y ahora es ciudadano o residente de Estados Unidos.

Un Tenedor de EE.UU. que sea tenedor de Reclamaciones permitidas de más de una Clase podría tener consecuencias tributarias diferentes para cada clase de Reclamaciones permitidas. Los Tenedores de EE.UU. deberían consultar detenidamente las secciones de esta exposición aplicables a cada Clase de Reclamaciones permitidas de las que fueran tenedores y deberían consultar a sus asesores fiscales acerca de la potencial interacción de las potenciales interacciones de consecuencias tributarias estadounidenses de cada una de las Reclamaciones permitidas de las que pudiera ser tenedor.

En general, a ciertos Tenedores de EE.UU. que utilizan el método contable en valores devengados a efectos del impuesto federal sobre ingresos se les exigirá que reconozcan determinadas cantidades como parte de los ingresos percibidos en concepto de las Reclamaciones permitidas no más tarde del momento en que las mismas aparezcan reflejadas en sus estados financieros. Dichos Tenedores de EE.UU. deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias del Plan a efectos tributarios en EE.UU., en función de sus circunstancias personales.

    2.    **Tratamiento fiscal de Reclamaciones permitidas**

    a)    **Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage (Assured) garantizados (Clase 22), Reclamaciones de Bonos ELA Vintage (National) garantizados (Clase 23), Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados (Clase 24), Reclamaciones de Bonos ELA Vintage (Syncora) garantizados (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)**

Se prevé que, a tenor con el Plan, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos ELA Vintage, (ii) Reclamaciones de Bonos ELA Vintage (Assured), (iii) Reclamaciones de Bonos ELA Vintage (National), (iv) Reclamaciones de Bonos ELA Vintage (Otros asegurados), (v) Reclamaciones de Bonos ELA Vintage (Syncora), (vi) Reclamaciones de Bonos ELA Vintage garantizados, (vii) Reclamaciones de Bonos ELA Vintage (Assured) garantizados, (viii) Reclamaciones de Bonos ELA Vintage (National) garantizados, (ix) Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados, (x) Reclamaciones de Bonos ELA Vintage (Syncora) garantizados, (xi) Reclamaciones de Bonos ELA 2011, (xii) Reclamaciones de Bonos ELA 2011 (Assured), (xiii) Reclamaciones de Bonos ELA 2011 garantizados, (xiv) Reclamaciones de Bonos ELA 2011 (Assured) garantizados, (xv) Reclamaciones de Bonos ELA 2011 Series D/E/PIB, (xvi) Reclamaciones de Bonos ELA 2011 Series D/E/PIB (Assured), (xvii) Reclamaciones de Bonos ELA 2012, (xviii) Reclamaciones de Bonos ELA 2012 (Assured), (xix) Reclamaciones de Bonos ELA 2012 garantizados, (xx) Reclamaciones de Bonos ELA 2014, y (xxi) Reclamaciones de Bonos ELA 2014 garantizados serán tratados como canjeadores de los Bonos GO de los Tenedores de EE.UU. sujetos a estas Clases de Reclamaciones permitidas por Nuevos Bonos GO, CVI y Efectivo, a efectos tributarios estadounidenses. Los Deudores pretenden declarar la transacción de manera congruente con su tratamiento por el IRS, y en el resto de esta exposición se parte del supuesto de que cada Tenedor de EE.UU. seguirá el tratamiento previsto.

(i)     *Tratamiento fiscal del canje*

La oferta de Bonos GO por Nuevos Bonos GO, CVI y efectivo, según proceda, prevista por el Plan será considerada un canje, de conformidad con la Sección 1001 del IRC. Un Tenedor de EE.UU. declarará resultados por una cantidad equivalente a la diferencia entre (i) la suma de cualquier efectivo percibido (salvo el atribuible a intereses devengados e impagados en concepto de los Bonos GO) más el "precio de emisión" a efectos tributarios federales estadounidenses (que se determinará de la manera descrita a continuación bajo el epígrafe "—Precio de emisión") en concepto de cualesquiera Nuevos Bonos GO y el valor razonable de mercado de los CVI recibidos, y (ii) la base tributable ajustada del Tenedor de EE.UU. sobre los Bonos GO así ofrecidos (base tributable ajustada esta que se describe más adelante). En general, y con sujeción a lo expuesto en "—Descuento de mercado", todo beneficio o pérdida que un Tenedor de EE.UU. declare en concepto del canje de los Bonos GO por los Nuevos Bonos GO, los CVI y efectivo, según proceda, de conformidad con el canje, se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de mantenimiento de Bonos GO del Tenedor de EE.UU. es superior a un año. Normalmente, las plusvalías de capital a largo plazo de los Tenedores de EE.UU. no corporativos se gravan a tipos preferentes. Las deducciones de minusvalías de capital están sujetas a limitaciones.

El período de mantenimiento por parte de un Tenedor de EE.UU. de cualesquiera Nuevos Bonos GO y CVI comenzará a contabilizarse al día siguiente del canje. En general, la base tributaria de los Nuevos Bonos GO y CVI recibidos en el canje por el Tenedor de EE.UU. será equivalente al precio de emisión de los Nuevos Bonos GO y los CVI (que se determinará como se explica más adelante en el epígrafe "—Precio de emisión"), y el valor razonable de mercado de los CVI a la fecha del canje.

(ii)    *Tratamiento fiscal de la percepción de efectivo*

(1)     **Efectivo**

Está previsto que, a efectos tributarios federales estadounidenses, el efectivo se trate como pago por los Bonos GO, salvo el efectivo percibido atribuible a los intereses devengados e impagados. El Plan prevé que, en la medida de lo posible, las distribuciones al tenedor de una Reclamación se aplicarán en primer lugar a los intereses devengados e impagados a la fecha inmediatamente anterior a la Fecha de petición del Estado Libre Asociado, la Fecha de petición de SRE o la Fecha de petición de AEP, según proceda; en segundo lugar, al importe del capital de la Reclamación (tal como se determine a efectos tributarios federales) y, a continuación, en la medida en que la contraprestación supere al capital de la Reclamación, a aquellas otras cantidades (como intereses devengados e impagados distintos de los descritos en las cláusulas precedentes). La historia legislativa de la Ley de Tributación en casos de Quiebra de 1980 indica que el Congreso pretendía que la diferenciación entre capital e intereses en ciertas reorganizaciones efectuadas en virtud del Código de Quiebras de EE.UU. fuera vinculante a efectos del Impuesto federal sobre ingresos estadounidense. Congruentes con dicha distribución en el marco del Plan, en general el Reglamento del Tesoro considera que los pagos en concepto de endeudamiento deben asignarse primero a los intereses devengados pero impagados. Aunque se cree que la declaración de distribuciones a un Tenedor de EE.UU. de conformidad con el Plan, es congruente con la legislación vigente y las intenciones de los legisladores, no existen garantías de que el IRS vaya a respetarlas en lo que respecta a los pagos por los Bonos GO. Recomendamos a los Tenedores de EE.UU. consultar a sus asesores fiscales para determinar la caracterización correcta de los pagos percibidos.

Con sujeción a lo tratado en el apartado precedente, si parte del efectivo percibido fuera atribuible a los intereses devengados e impagados de los Bonos GO, el tratamiento de ese monto abonado a un Tenedor de EE.UU. dependerá de si dichos intereses por su reclamación están o no exentos de pago a efectos tributarios federales. En general, un Tenedor de EE.UU. que anteriormente no hubiera estado

obligado a incluir en sus ingresos tributables los intereses devengados pero impagados de una Reclamación no exentos de impuestos posiblemente deba declarar el efectivo percibido como ingreso por intereses a efectos tributarios federales estadounidenses en caso de recibir una distribución de tales intereses. Un Tenedor de EE.UU. que anteriormente estuviera obligado a incluir en los ingresos tributables intereses devengados pero no pagados de una Reclamación no exenta de impuestos tendrá derecho a que se le reconozca una pérdida desgravable, en la medida en que dichos intereses no sean satisfechos de conformidad con el Plan. Sin embargo, el Tenedor de EE.UU. de una Reclamación exenta de impuestos no tendrá derecho a deducir las pérdidas por intereses impagados si nunca antes había incluido dichos intereses en sus ingresos brutos en EE.UU. Por otra parte, un Tenedor de EE.UU. que perciba una distribución de intereses devengados e impagos en concepto de una Reclamación exenta de impuestos no tendrá que incluir esa cantidad como ingresos financieros a efectos tributarios federales estadounidenses por percibir dicha distribución en concepto de intereses. Aunque en general los Tenedores de EE.UU. no estarán obligados a incluir las mencionadas sumas en el cálculo de su ingreso tributable en EE.UU., lo más probable es que tengan que declararlas al IRS.

En el caso de los Bonos GO que sean bonos de apreciación de capital, en los cuales el devengo del descuento de emisión original está tratado como intereses exentos de impuestos, la cantidad de dicho devengo podría haber incrementado la base tributable de la inversión de un tenedor en dicho bono de apreciación de capital. En general, tal aumento de la base tributable se considera un incremento del principal del bono de apreciación de capital. Los Tenedores de Reclamaciones de EE.UU. que hayan devengado dichos intereses deberían consultar a sus asesores fiscales acerca del tratamiento tributario de las distribuciones previstas por el Plan y sobre las deducciones de los impuestos devengados pero no pagados a efectos del impuesto federal sobre ingresos.

### (2)    Costos de consumación y Derechos de restricción del AAP

El tratamiento tributario federal estadounidense de los Costos de consumación y de los Derechos de restricción del AAP no queda claro. Se cree que es adecuado tratar el pago de los Costos de consumación y de los Derechos de restricción del AAP como un costo separado que debería declararse como ingreso ordinario, en lugar de una cantidad percibida de conformidad con los Bonos GO. En general, dicho ingreso ordinario no estaría exenta de impuestos a efectos tributarios federales de EE.UU., independientemente de si los Bonos GO subyacentes lo estuvieran. No obstante, es posible que los Costos de consumación y los Derechos de restricción de la AAP pudiesen ser en cambio tratados de la misma manera en que se ha descrito en "Efectivo". Estos derechos también podrían ser considerados contraprestaciones adicionales pagadas a los tenedores que deberían tenerse en cuenta a la hora de calcular los beneficios o pérdidas de los Tenedores de EE.UU. Se recomienda a estos consultar a sus propios asesores fiscales sobre el tratamiento tributario federal de los Costos de consumación y los Derechos de restricción del AAP.

### (iii)    *Descuento de mercado*

Si un Tenedor de EE.UU. adquirió los Bonos GO por menos del "precio de emisión ajustado" de los mismos, y la diferencia entre el coste para dicho Tenedor y el "precio de emisión ajustado" excediera de un umbral *de minimis* (equivalente al 0.25% de la suma del total de los pagos pendientes a abonar por el instrumento de deuda, excluyendo los intereses declarados cualificados, multiplicado por el número de años completos hasta el vencimiento), en general dicha diferencia será tratada como "descuento de mercado".

En general, toda ganancia declarada en el canje será tratada como ingreso ordinario en la medida de cualquier descuento de mercado no devengado no incluido en el ingreso ordinario con respecto a los Bonos GO. Si se reconociera el beneficio en virtud del canje de los Bonos GO por Nuevos Bonos GO, el Tenedor de EE.UU. deberá incluir como ingreso ordinario todo beneficio que, de otra manera, hubiera sido

tratado como plusvalía de capital derivada del descuento de mercado devengado por los Bonos GO, salvo que dicho Tenedor de EE.UU. previamente hubiera optado por incluir el descuento de mercado en el ingreso en el momento de devengarlo. Véase más adelante, bajo el epígrafe "—Tributación de los Nuevos Bonos GO y CVI—Venta, retiro y otras enajenaciones de los Nuevos Bonos GO y los CVI", una exposición más detallada acerca de la opción de incluir el descuento de mercado en el ingreso en el momento de su devengo. Recomendamos a los Tenedores de EE.UU. consultar a sus asesores acerca del tratamiento tributario del descuento de mercado derivado del canje, incluyendo la interacción entre el descuento de mercado, el descuento de emisión original ("DEO") y las normas de primas de adquisición.

(iv) <strong><em>Tributación de los Nuevos Bonos GO y los CVI</em></strong>

Los Nuevos Bonos GO se emitirán como bonos cuyos intereses estarán excluidos del ingreso bruto para propósitos tributarios federales de EE.UU. (los "<u>Nuevos Bonos GO exentos de impuestos</u>", bonos cuyos intereses no estarán excluidos del ingreso bruto por dicha normativa fiscal (los "<u>Nuevos Bonos GO tributables</u>"). El estatus tributario de los Nuevos Bonos GO todavía no ha sido determinado a la fecha de esta Declaración de divulgación, incluyendo (i) si algún tramo de los intereses sobre los Nuevos Bonos GO tendrán o no derecho a ser excluidos a efectos de los ingresos brutos del Impuesto federal sobre ingresos de EE.UU., o bien (ii) la relación entre la cantidad total de todos los Nuevos Bonos GO tributables que se emitirán en la Fecha de entrada en vigencia y la cantidad total de todos los Nuevos Bonos GO.

(1) <strong>Precio de emisión</strong>

Se prevé que el precio de emisión de los Nuevos Bonos GO sea equivalente al valor justo de mercado de los mismos a la fecha de su canje. Esta determinación está basada en las conclusiones de los Deudores de que tanto los Bonos GO como los Nuevos Bonos GO deberían ser tratados como "cotizados en Bolsa", con el significado de este concepto según las Reglas del Tesoro. El valor justo de mercado de los Nuevos Bonos GO se determinará según el "precio de cotización" de los mismos en la fecha del canje o en torno a ella. No existen directrices específicas sobre cómo determinar el precio de cotización en un determinado momento. Sin embargo, las Reglas del Tesoro pertinentes sugieren que un contribuyente podrá utilizar un método razonable y aplicado de manera congruente para determinar el justo valor de mercado si existe más de un precio de venta o precio cotizado. La determinación de los Deudores de que los Bonos GO "coticen en Bolsa" será vinculante para todos los tenedores, salvo que alguno exprese su posición en sentido contrario en la manera requerida por las Reglas del Tesoro. La normativa en materia de determinación del precio de emisión es compleja, y los Tenedores de EE.UU. deberían consultar a sus propios asesores fiscales acerca de la determinación del precio de compra de los Nuevos Bonos GO a efectos tributarios federales estadounidenses.

(2) <strong>Intereses, incluyendo el DEO</strong>

La normativa tributaria federal estadounidense empleada para determinar qué fondos son tratados como intereses es compleja. Se recomienda a los Tenedores de EE.UU. consultar a sus propios asesores fiscales acerca de los importes que serán tratados como intereses a efectos tributarios en función de sus circunstancias individuales.

i. <strong>Nuevos Bonos GO exentos de impuestos</strong>

El IRC impone ciertos requisitos que deben satisfacerse tras la emisión y entrega de los Nuevos Bonos GO exentos de impuestos, con el objeto de que los intereses que generen estén, y sigan estando, excluidos de los ingresos brutos para propósitos tributarios federales estadounidenses, de conformidad con la Sección 103 del IRC. El incumplimiento de dichos requisitos podría conllevar que los intereses de los

523

Nuevos Bonos GO exentos de impuestos queden incluidos en el ingreso bruto a efectos tributarios con retroactividad a la fecha de emisión de los Nuevos Bonos GO exentos de impuestos. Cuando los Nuevos Bonos GO exentos de impuestos se emitan en la Fecha de entrada en vigencia, el Estado Libre Asociado Reorganizado, con arreglo a los Documentos definitivos (y a las Legislaciones de los Nuevos Bonos GO), se compromete a hacer todo lo posible que la ley permita y que fuera razonablemente necesario deseable para garantizar que los intereses pagados a los tenedores de Nuevos Bonos GO exentos de impuestos estén, y sigan estando excluidos, del ingreso bruto para propósitos tributarios federales estadounidenses, a tenor de la Sección 103 del IRC. Sin embargo, como se ha indicado anteriormente, el estatus tributario de los Nuevos Bonos GO todavía no se ha determinado a fecha de esta Declaración de divulgación.

Las cantidades asignables a los intereses devengados antes de la emisión de los Nuevos Bonos GO exentos de impuestos no serán tratadas como intereses exentos de impuestos de conformidad con la Sección 103 del IRC.

ii.     **Nuevos Bonos GO tributables @@@**

Si los intereses devengados por los Nuevos Bonos GO (o parte de los mismos) no son tratados como exentos del ingreso bruto a efectos de la tributación federal estadounidense, los pagos o devengos de "intereses pactados" (según se define más adelante) sobre dichos Nuevos Bonos GO tributables (o un tramo relevante de los mismos) serán tributables a dicho Tenedor de EE.UU. en calidad de ingresos financieros ordinarios en el momento de percibirlos o devengarlos, de acuerdo con el método habitual de contabilización del Tenedor de EE.UU. a efectos tributarios federales estadounidenses. En general, el concepto "intereses pactados" significa aquellos intereses declarados que se pagarán incondicionalmente en efectivo o en especie (salvo instrumentos de deuda del emisor) al menos anualmente durante el plazo de dicho instrumento, a un tipo fijo de interés simple o, con sujeción a ciertas condiciones, sobre la base de uno o más índices de intereses. Está previsto que [en general] los pagos de los intereses pactados sobre los Nuevos Bonos GO se consideren intereses pactados a estos efectos.

iii.     **DEO**

El importe del DEO de los Nuevos Bonos GO, si lo hay, será equivalente al excedente de la suma de todo el capital [y de los pagos de intereses (salvo el interés pactado)] de dichos Nuevos Bonos GO (tomando inicialmente en cuenta el calendario de pagos descrito más adelante) sobre el precio de emisión (determinado de la manera descrita previamente bajo el epígrafe "—Precio de emisión") de los citados Nuevos Bonos GO. Además, los Nuevos Bonos GO tributables devengarán DEO solamente si el precio de emisión de los Nuevos Bonos GO tributables, según proceda, fuera menor que el importe del capital en más de la cantidad *de minimis*. El DEO se considerará *de minimis* si es menos del 0.25% del precio de amortización pactado al vencimiento multiplicado por el número de años enteros restante hasta el vencimiento de tales Nuevos Bonos GO tributables, Los Tenedores de EE.UU., tanto si fuera en efectivo o aplicando el método contable de devengo a efectos tributarios federales estadounidense, deberán incluir el DEO de los Nuevos Bonos GO tributables como ingreso ordinario al devengo, sobre una base de rendimiento constante hasta el vencimiento, tanto si la cantidad atribuible a dicho DEO se percibe en ese momento como si no. Sin embargo, los Nuevos Bonos GO tributables pueden estar sujetos a las normas de prima de adquisición (descritas más adelante bajo el epígrafe "—Prima de adquisición"), lo cual podría reducir la cantidad de DEO incluible en el ingreso bruto.

En el caso de los Nuevos Bonos GO tributables, la cantidad del DEO susceptible de inclusión en el ingreso bruto por un Tenedor de EE.UU. en cualquier año fiscales, en general, la suma de los tramos diarios de DEO con respecto a un Nuevo Bono GO tributable, según proceda, por cada día de ese año o parte de

ese año en que el Tenedor de EE.UU. mantenga el Nuevo Bono GO tributable. El tramo diario se determina asignando a cada día de un período de devengo un tramo proporcional del DEO asignable a dicho período. El período de devengo de un Nuevo Bonos GO tributable podrá tener cualquier duración durante el plazo, y podrá variar en el plazo del Nuevo Bono GO, siempre y cuando cada período de devengo no sea superior a un año, y cada pago programado de capital o de intereses se produzca el primer o el último día de un período de devengo. El importe del DEO asignable a cualquier período de devengo, con sujeción a los posibles ajustes descritos más adelante, será una cantidad equivalente al producto del precio de emisión ajustado del Nuevo Bonos GO tributable al principio del período de devengo y su rendimiento al vencimiento (salvo los pagos de los intereses pactados asignables a dicho período). El rendimiento hasta el vencimiento de los Nuevos Bonos GO es el tipo de descuento que, cuando se utiliza para calcular el valor actual (a la fecha de emisión) del total de pagos de capital e intereses en concepto de los mismos, según proceda, genera una cantidad equivalente al precio de emisión de dichos bonos. El importe del DEO asignable al período de devengo final es la diferencia entre el importe a pagar al vencimiento (salvo el pago de los intereses pactados) y el precio de emisión ajustado al principio del último período de devengo. El precio de emisión ajustado de un Nuevo Bono GO al principio de cualquier período de devengo es equivalente a su precio de emisión, incrementado por el DEO devengado en cada período de devengo anterior, y reducido por los pagos efectuados sobre el Nuevo Bono GO, según proceda, durante los períodos de devengo anteriores (excepto los pagos de los intereses pactados).

En cuanto a los Nuevos Bonos GO exentos de impuestos, el importe del DEO se excluye del ingreso bruto a efectos tributarios federales estadounidense en la misma medida que se prevé que se excluyan los intereses de los Nuevos Bonos GO. Los devengos del DEO se calculan de la misma manera antes descrita para los Nuevos Bonos GO tributables, aunque dichos devengos se sumarán a la base tributable del Tenedor de los Nuevos Bonos GO. Es posible que el devengo del DEO se considere como un incremento de la cantidad del ingreso exento de impuestos a efectos de determinar varias otras consecuencias fiscales de poseer Nuevos Bonos GO exentos de impuestos, aunque no se produzca el pago en efectivo correspondiente. Los Tenedores de los Nuevos Bonos GO exentos de impuestos con DEO deberían consultar a sus asesores fiscales con respecto a las consecuencias tributarias de poseer dichos instrumentos.

Las normas relativas al DEO son complejas, y las anteriormente descritas pueden no aplicarse en todos los casos. Si se aplicase otra normativa, los Tenedores de EE.UU. que reciban los Nuevos Bonos GO podrían ser tratados de manera diferente de la descrita anteriormente. Los Tenedores de EE.UU. que reciban Nuevos Bonos GO deberían consultar a sus asesores fiscales acerca de la potencial aplicación del DEO y de la normativa tributaria federal de EE.UU. a los Nuevos Bonos GO.

Esta Declaración de divulgación parte del supuesto de que los Nuevos Bonos GO no serán considerados instrumentos de deuda de pago contingente de conformidad con la definición del Reglamento del Tesoro aplicable. No obstante, la autoridad para el tratamiento de los Nuevos Bonos GO es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acera del tratamiento de los Nuevos Bonos GO en calidad de instrumentos de deuda de pago contingente, incluyendo las limitaciones que pudieran aplicarse a la cantidad de los intereses exentos de impuestos de los Nuevos Bonos GO exentos de impuestos que podrán excluirse de los ingresos brutos a efectos del Impuesto sobre el ingreso federal de EE.UU.

(3)     **Prima de adquisición**

Un Nuevo Bono GO será tratado como adquirido con una prima de adquisición si la base inicial del Tenedor de EE.UU. en el Nuevo Bono GO es (a) igual o menor que la suma de todos los importes a

pagar en concepto del Nuevo Bono GO (salvo los pagos de los intereses pactados), y (b) mayor que el precio de emisión ajustado de dicho bono a efectos tributarios federales de EE.UU. Si un Nuevo Bono GO tributable fue adquirido con una prima de adquisición, en general un Tenedor de EE.UU. podría reducir el importe del DEO que, de otro modo, se incluiría en el ingreso de cada período de devengo en una cantidad equivalente a (i) el monto del DEO que de otro modo se incluiría en el ingreso, multiplicado por (ii) una fracción cuyo numerador es el excedente de la base tributaria ajustada del Nuevo Bono GO tributable, según proceda, inmediatamente después de su adquisición por el Tenedor de EE.UU. sobre el precio de emisión ajustado de dicho bono, según proceda, y cuyo denominador es el excedente de la suma de todos los importes a pagar sobre el Nuevo Bono GO tributable, según corresponda, tras la fecha de compra, salvo los pagos de los intereses pactados, sobre el precio de emisión ajustado de dicho bono. Si el Nuevo Bono GO tributable se hubiera adquirido con una prima de adquisición, el Tenedor de EE.UU. reduciría la base tributaria del Nuevo Bono GO exento de impuestos durante cada período de devengo utilizando el mismo método descrito anteriormente para los Nuevos Bonos GO tributables.

Como alternativa para reducir el importe del DEO que, de otro modo, se incluiría en el ingreso durante un período de devengo, o para reducir la base tributaria del Nuevo Bono GO exento de impuestos, el Tenedor de EE.UU. podrá optar por calcular los devengos del DEO aplicando el método de rentabilidad constante ya descrito. No obstante, si opta por ello, su decisión también se aplicará a todos los demás bonos que obren en su poder al comienzo del año fiscal en el cual se aplique su elección, así como a todos los bonos que adquiera a partir de ese momento. Normalmente, esta elección no podrá ser revocada. Los Tenedores de EE.UU. que adquieran Nuevos Bonos GO con prima de adquisición deberían consultar a sus asesores fiscales las consecuencias de dicha elección en función de sus circunstancias personales.

### (4)   CVI

El tratamiento de los CVI en el impuesto sobre la renta federal de Estados Unidos es incierto. En particular, no está claro qué normas de ingresos federales de EE.UU. se aplican correctamente a los intereses en un fideicomiso, o participaciones en el *corpus* de un fideicomiso, que no tienen un monto de capital establecido, sin reembolso de capital garantizado, y los pagos periódicos vinculados a los ingresos del gobierno, tales como los impuestos sobre las ventas. Pueden existir métodos alternativos razonables de declarar el tratamiento tributario federal de los CVI. No se ha emitido ni se solicitará ninguna resolución del Servicio de Rentas Internas (IRS) de EE.UU. con respecto a los CVI, ni ningún abogado se ha pronunciado sobre el tratamiento de los CVI en el impuesto federal sobre la renta de Estados Unidos, y no se puede garantizar que el IRS no afirme o que un tribunal no dictamine que el tratamiento fiscal de los CVI deba ser distinto al descrito en este documento. Se recomienda encarecidamente a los tenedores de CVI que consulten a sus propios asesores fiscales sobre las consecuencias fiscales, federales y de otro tipo, de la recepción, tenencia y enajenación de los CVI en función de sus circunstancias personales.

Ante la ausencia de cualquier autoridad específica que rija específicamente el tratamiento de los CVI en el impuesto federal sobre la renta de Estados Unidos, y debido a que los CVI prevén pagos a intervalos anuales que, sin perjuicio de lo que se expone a continuación, pueden describirse como calculados por referencia a un índice específico (el recibo de los Impuestos sobre las ventas y sobre el uso por el gobierno de Puerto Rico, los "Recibos de los Impuesto sobre las Ventas") sobre un importe nocional a cambio de una contraprestación específica (una parte de los Títulos Elegibles ofrecidos en la Oferta), sería razonable tratar los CVI como instrumentos financieros generalmente sujetos a las normas del impuesto federal sobre la renta de EE.UU. que rigen los contratos de capital nocional   ("NPC"). Para que un instrumento financiero se caracterice adecuadamente como NPC, la determinación del importe de los pagos del instrumento debe basarse en información económica actual y objetivamente determinable que no esté bajo el control del emisor (un "índice específico"). No queda claro si los ingresos por impuestos sobre las ventas se tratarían adecuadamente como un índice específico a efectos de las normas del NPC. En ausencia de orientación administrativa o judicial en sentido contrario, es razonable tratar la fórmula vinculada a los ingresos por impuestos sobre las ventas como un índice específico a efectos de las normas del NPC, y tratar los pagos a los tenedores de CVI a efectos del impuesto federal sobre la renta de los Estados Unidos como pagos realizados en relación con un NPC.

Las normas del NPC tienen un régimen específico aplicable a los NPC que se caracterizan propiamente como "topes". Para recibir el pago con respecto a los CVI, los ingresos por impuestos sobre las ventas deben superar el Plan Fiscal Certificado del ELA (el "Activador de los impuestos sobre las ventas"). Si se cumple la cláusula del Activador del Impuesto sobre las Ventas, los pagos se harán sujetos a, entre otras restricciones, límites nocionales y vitalicios, diferentes para los CVI de GO y los CVI de recuperación; consulte *Marco para el tratamiento de las Reclamaciones de bonos del Estado Libre Asociado y las Reclamaciones de garantía - Estructura de CVI* para obtener una descripción completa. Si en un determinado año no se alcanza el Activador de los impuestos sobre las ventas, la cuantía que de otra manera debería pagarse en concepto de ese año puede pasarse al año siguiente, aunque con sujeción a un límite de pago en ese año posterior de $400,000,000 en el caso de los CVI de GO, y de $350,000,000 para los CVI de recuperación. Existe el riesgo de que, incluso si se cumple la cláusula del Activador del Impuesto sobre las Ventas, el fondo de obligaciones generales de Puerto Rico del que deben realizarse los pagos no tenga fondos suficientes con los que realizar el pago de ese año. Aunque la cuestión no está exenta de dudas, los deudores tienen la intención de declarar los pagos efectuados a los tenedores de los CVI como pagos realizados en relación con un NPC sujeto a las normas que regulan los topes.

Sobre la base de la explicación precedente, el valor razonable de mercado de los CVI (como se ha descrito anteriormente) debería tratarse como el precio de compra o la prima pagada para recibir los pagos en virtud de los CVI. En ese caso, el tenedor tendría que asignar el precio de compra o la prima de los CVI cada año en que se efectúen pagos durante el plazo de los CVI. Para ello, un tenedor generalmente asignaría el precio de compra o la prima a cada pago en concepto de los CVI basándose en los precios de una serie de contratos de opciones liquidados en efectivo con respecto a cada uno de esos pagos. Por lo tanto, el importe realizado por un titular de cada pago de un CVI que posea debe ser, por lo general, igual al importe de dicho pago, reducido por la parte del precio de compra asignada a cada uno de dichos pagos. Los cálculos e imputaciones descritos en este párrafo son extremadamente complejos. Los titulares de los Nuevos Títulos y de los CVI deben consultar a sus propios asesores fiscales sobre las implicaciones de estos cálculos e imputaciones en sus circunstancias individuales.

Independientemente del método de contabilización del tenedor a efectos del impuesto federal sobre la renta de los Estados Unidos, el tenedor de un CVI tratado como un NPC sujeto a las normas de "tope" debe incluir generalmente en el ingreso bruto el último día del año fiscal en el que el tenedor posee dicho CVI la parte diaria proporcional de todos los pagos en virtud de dicho CVI, reducida por cualquier parte pertinente del precio de compra o de la prima, como se ha descrito anteriormente, asignable a dicho año fiscal. Si el importe de un pago aún no es determinable al final de su año fiscal, el tenedor generalmente debe reconocer la parte diaria proporcional de dicho pago (si lo hay), calculada en función de si se ha cumplido o superado el Activador del Impuesto sobre las Ventas, y en qué medida, en el último día de dicho año fiscal. Si un tenedor de dicho CVI determina que el método en la oración anterior no proporciona una estimación razonable de si se cumplirá o se superará, y en qué medida, el Activador del Impuesto sobre las Ventas en la siguiente fecha de pago de dicho CVI, entonces dicho tenedor podrá optar por utilizar una estimación razonable de los Impuestos sobre las Ventas recaudados, siempre que utilice el mismo método para estimar razonablemente los Impuestos sobre las Ventas recaudados de forma coherente cada año y utilice dicha estimación a todos los efectos, incluso a efectos de los informes financieros a los accionistas y acreedores de dicho tenedor. Los tenedores de CVI deben consultar a sus asesores individuales sobre las consecuencias de hacer la elección descrita en la frase anterior.

Cualquier diferencia entre el pago real recibido sobre un CVI y el importe de pago estimado determinado por un tenedor según lo descrito en el párrafo anterior se tendría en cuenta, por lo general, como un ajuste de la renta o la pérdida de los CVI en el año fiscal durante el cual se fija el importe real del pago (independientemente de que sea el año fiscal en el que se recibe realmente dicho pago, en su totalidad o en parte). En determinadas circunstancias, es posible que la diferencia entre el importe estimado de un pago sobre un CVI en uno o más años fiscales, el importe real de un pago recibido sobre un CVI en uno o más años fiscales, y el año fiscal en el que se fija el importe real de cualquier pago sobre un CVI pueda dar lugar a la aceleración de los ingresos, o a la inclusión de ingresos en un año fiscal que finalmente se compensan con una pérdida en un año fiscal posterior. Independientemente del momento en que se produzca cualquier pago en virtud de los CVI o del año fiscal en el que deban reconocerse los ingresos o las pérdidas a efectos del impuesto federal sobre la renta de los Estados Unidos, dichos ingresos o pérdidas se tratarán generalmente como ingresos o pérdidas ordinarios, según el caso, y dichos ingresos se tratarán generalmente como ingresos fijos o determinables, anuales o periódicos (FDAP) para un tenedor que no sea una persona estadounidense y que no posea los CVI en relación con una actividad comercial o empresarial en los Estados Unidos.

Si los CVI se trataran, en cambio, como NPC que no están sujetos a las normas de "tope", las normas para determinar el importe exacto de un pago que debe incluirse en el ingreso bruto a efectos del impuesto federal sobre la renta de EE.UU. serían algo diferentes; sin embargo, cualquier importe de ingresos o pérdidas que deba reconocerse generalmente seguiría tratándose como ingresos o pérdidas ordinarios. Los tenedores de CVI deben consultar a sus asesores individuales sobre posibles aplicaciones alternativas de las normas del NPC a los CVI en sus circunstancias personales.

Como ya se ha mencionado, pueden existir otros métodos razonables de declarar los pagos abonados en concepto de los CVI a efectos tributarios federales. Por ejemplo, podría ser adecuado utilizar un método de recuperación de costos que asigne el precio de compra del CVI (es decir, el valor razonable de mercado) a los tenedores iniciales. Dicho método podría implicar la determinación del tramo de cada pago sobre los CVI asignable al precio de compra, sobre la base de la aplicación de ciertas normas de imputación de intereses a cada pago, en función del período desde la fecha del canje hasta la fecha de pago, empleando las tasas federales aplicables publicadas.

Es posible que el IRS pueda considerar que los CVI no cumplan los requisitos de contratos principales nocionales bajo las normas del NPC, lo que podría afectar el calendario y la naturaleza de los ingresos reconocidos con respecto a los CVI. Si el IRS afirmara con éxito que los CVI fueron tratados correctamente como deuda a efectos del impuesto sobre la renta federal de EE.UU., los CVI probablemente serían tratados como instrumentos de deuda de pago contingente, lo que tendría consecuencias fiscales significativamente diferentes a las comentadas en el presente, incluyendo la necesidad de que los tenedores reconozcan cantidades sustanciales de ingresos en virtud de las normas de descuento de la emisión original antes de la recepción de dichos ingresos en efectivo. Alternativamente, si el IRS afirmara con éxito que los CVI fueron tratados correctamente como capital a efectos del impuesto sobre la renta federal de EE.UU., los tenedores de los CVI estarían sujetos a consecuencias del impuesto sobre la renta federal de EE.UU. sustancialmente distintas a las que aquí se comentan. Se insta a los tenedores a que consulten a sus propios asesores fiscales sobre el tratamiento del impuesto sobre la renta federal de la adquisición, la posesión y la enajenación de los CVI.

(4)     **Venta, retiro u otras enajenaciones de Nuevos Bonos GO y CVI**

En general, un Tenedor de EE.UU. declarará un beneficio o pérdida tributable sobre la venta, canje, retirada (incluyendo recuperación) u otra enajenación tributable de un Nuevo Bono GO o CVI equivalente a la diferencia, en su caso, de (i) el importe materializado por dicha enajenación (salvo el efectivo percibido atribuible a intereses devengados e impagados), y (ii) la base tributable ajustada de dicho Nuevo Bono GO o CVI. En general, la base tributable ajustada de un Tenedor de EE.UU. sobre un Nuevo Bono GO o CVI será equivalente a la base tributable de dicho Tenedor sobre el citado Nuevo Bono GO o CVI en la fecha en que el Tenedor de EE.UU. haya adquirido ese instrumento, incrementada en cualquier DEO previamente adquirido por él, y disminuida en la cantidad de los pagos de efectivo (salvo los pagos de los intereses pactados) previamente percibidos en concepto de aquel Nuevo Bono GO o CVI por ese Tenedor de EE.UU. Recomendamos a estos consultar con sus asesores fiscales sobre la base tributable de sus Nuevos Bonos GO o CVI en la fecha de adquisición.

Con sujeción a lo expuesto más adelante sobre el descuento de mercado, en general todo beneficio o pérdida que un Tenedor de EE.UU. declare por la venta u otra enajenación tributable de un Nuevo Bono GO o CVI constituirá una plusvalía o una minusvalía de capital a largo plazo si dicho Tenedor mantiene el Nuevo Bono GO o el CVI durante más de un año. El período de mantenimiento por parte de un Tenedor de EE.UU. de cualesquiera Nuevos Bonos GO y CVI recibidos en virtud del canje comenzará a contabilizarse al día siguiente del canje. Normalmente, las plusvalías de capital a largo plazo de los Tenedores de EE.UU.

no corporativos se gravan a tipos preferentes. Las deducciones de minusvalías de capital están sujetas a limitaciones. Tras una enajenación tributable del Nuevo Bono GO, un Tenedor de EE.UU. deberá declarar un ingreso ordinario (en lugar de una plusvalía) equivalente al descuento de mercado devengado, salvo que previamente haya potado por incluir el descuento de mercado en el ingreso al devengarlo. Un Tenedor de EE.UU. podrá optar por incluir el descuento de mercado en el ingreso en el momento de devengarlo, en cuyo caso dicha renta será tratada como ingresos financieros ordinarios en el momento de declararlos, incrementando de este modo su base en los Nuevos Bonos GO, según proceda, en la cantidad del descuento de mercado declarado. Dicha elección se realiza incluyendo el descuento de mercado en el ingreso en una declaración de impuestos sobre el ingreso federales presentada puntualmente, y adjuntando una declaración señalando la opción elegida.

Si se opta por esa elección, esta se aplicará a todos los bonos con descuento de mercado adquiridos por el Tenedor de EE.UU. durante el año en que hizo esa elección, y en todos los años siguientes.

b) **Tenedores de Reclamaciones de Bonos ELA Vintage minoristas (Clase 15), Reclamaciones de Bonos ELA 2011 minoristas (Clase 28), Reclamaciones de Bonos ELA 2011 Series D/E/PIB minoristas (Clase 35), Reclamaciones de Bonos ELA 2012 minoristas (Clase 38) y Reclamaciones de Bonos ELA 2014 minoristas (Clase 44)**

Se prevé que, en virtud del Plan, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos ELA Vintage minoristas; (ii) Reclamaciones de Bonos ELA 2011 minoristas; (iii) Reclamaciones de Bonos ELA 2011 Series D/E/PIB minoristas; (iv) Reclamaciones de Bonos ELA 2012 minoristas; y (v) Reclamaciones de Bonos ELA 2014 minoristas, será tratada como canje de dicho Tenedor de EE.UU. de Bonos GO sujeto a estas Clases de Reclamaciones permitidas, por Nuevos Bonos GO, CVI y efectivo, a efectos tributarios federales estadounidenses. En el resto de esta exposición se parte del supuesto de que será así.

(i) *Tratamiento fiscal del canje*

En general, se prevé que las consecuencias tributarias federales estadounidenses para cada uno de los Tenedores de EE.UU. antes mencionados en concepto del canje de un tramo de los citados Bonos GO por Nuevos Bonos GO y CVI y efectivo serán las descritas anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje".*

(ii)       *Tratamiento fiscal de la percepción de efectivo*

Se prevé que, en la medida en que alguno de los antes mencionados Tenedores de EE.UU. percibiera su parte proporcional de efectivo en virtud del Plan, las consecuencias tributarias federales estadounidenses serían las mismas descritas anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal de la percepción de efectivo*". En la medida en que ese Tenedor de EE.UU. haya votado por aceptar el Plan, recibiendo así su parte proporcional de las Comisiones por apoyo a minoristas, se prevé (aunque no sin dudas) que, en general, dichos derechos serán tratados de manea similar a como se ha descrito con respecto a los Costos de consumación, bajo el epígrafe "—*Tratamiento fiscal de la percepción de efectivo—Costos de consumación y Derechos de restricción del AAP*".

(iii)      *Tributación de los Nuevos Bonos GO y los CVI*

Se prevé que los Nuevos Bonos GO y los CVI tendrán el mismo tratamiento tributario federal estadounidense descrito bajo el epígrafe  "*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI*".

c)       **Tenedores de Reclamaciones de Bonos ELA Vintage (elección tributable) (Clase 20), Reclamaciones de Bonos garantizados ELA Vintage (elección tributable) (Clase 26), Reclamaciones de Bonos ELA garantizados 2011 (elección tributable) (Clase 30), Reclamaciones de Bonos ELA garantizados 2011 (elección tributable) (Clase 32), Reclamaciones de Bonos ELA 2011 Series D/E/PIB (elección tributable) (Clase 36), Reclamaciones de Bonos ELA 2012 (elección tributable) (Clase 40), Reclamaciones de Bonos ELA garantizados 2012 (elección tributable) (Clase 42), Reclamaciones de Bonos**

### ELA 2014 (elección tributable) (Clase 45) y Reclamaciones de Bonos ELA garantizados 2014 (Clase 47)

En general, esta exposición no es de aplicación a los tenedores de: (i) Reclamaciones de Bonos ELA Vintage (elección tributable), (ii) Reclamaciones de Bonos garantizados ELA Vintage (elección tributable), (iii) Reclamaciones de Bonos ELA 2011 (elección tributable), (iv) Reclamaciones de Bonos ELA garantizados 2011 (elección tributable), (v) Reclamaciones de Bonos ELA 2011 Series D/E/PIB (elección tributable) (vi) Reclamaciones de Bonos ELA 2012 (elección tributable), (vii) Reclamaciones de Bonos ELA garantizados 2012 (elección tributable), (viii) Reclamaciones de Bonos ELA 2014 (elección tributable) y (ix) Reclamaciones de Bonos ELA garantizados 2014 (elección tributable.). Todo tenedor de alguna de esas Reclamaciones que presente una declaración de impuestos federales estadounidense debería consultar a su asesor fiscal acerca de las consecuencias tributarias federales de mantener dicha reclamación y de optar por bonos tributables. Como ya se ha descrito, el concepto "Tenedores de EE.UU." aquí descrito no incluye a personas físicas y jurídicas de Puerto Rico, tal como se definen más adelante bajo el epígrafe "*Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico*". Las Personas Físicas y las Personas Jurídicas de Puerto Rico deberían consultar lo expuesto en "*Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico*".

d) **Tenedores de Reclamaciones de Bonos SRE (Clase 62)**

Se prevé que, en virtud del Plan, cada Tenedor de EE.UU. de una Reclamación de Bonos SRE tendrá el mismo tratamiento que un homólogo que canjee por efectivo Bonos SRE sujetos a esta Clase de Reclamaciones en efectivo permitidas, que se depositará en las Reservas de SRE como si hubiera sido una Reclamación permitida de Bonos SRE a la Fecha de entrada en vigencia, pendiente del registro de una orden final e inapelable que resuelva o concilie el Litigio de SRE. En el resto de esta exposición se parte del supuesto de que será así.

Todas las distribuciones efectivas o constructivas de las Reservas de SRE a los Tenedores de EE.UU. de Reclamaciones permitidas serán tratadas, a efectos tributarios federales estadounidenses, como si las hubiesen recibido directamente de los Deudores en nombre de la Reclamación original del Tenedor.

No se asignarán partidas de rentas gravables, ganancias, pérdidas o deducciones a tenedores de Reclamaciones de Bonos del SRE permitidos hasta que dichos tenedores no hayan adquirido su participación en el Fideicomiso de SRE de acuerdo con la Elección del tenedor, como se ha descrito en *Reclamaciones de Bonos de SRE (Clase 62) — Cartera de inversiones del SRE.*

En general, se prevé que las consecuencias del impuesto federal sobre los ingresos de EE.UU. para los Tenedores de EE.UU. de Reclamaciones de Bonos SRE permitidas para los intercambios de Bonos SRE por Dinero en efectivo en Garantía de Bonos SRE sean las descritas anteriormente bajo el epígrafe "*— Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage  garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41),*

*Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal de la percepción de efectivo*".

  e)  **Tenedores de Reclamaciones generales de SRE no aseguradas (Clase 63)**

    Se prevé que, en virtud del Plan, se considerará que cada Tenedor de EE.UU. de una Reclamación general no asegurada de SRE habrá canjeado dichos bonos sujetos a Reclamaciones permitidas de esta Clase por efectivo, para propósitos tributarios federales de Estados Unidos. En el resto de esta exposición se parte del supuesto de que será así.

    La oferta de Bonos SRE a cambio de la Distribución de Transacción de Bonos SRE, que comprende la Garantía en efectivo de los Bonos SRE, será tratada como canje tributable de los Bonos SER por efectivo para propósitos tributarios federales estadounidenses. Se prevé que las consecuencias del impuesto federal sobre los ingresos de EE.UU. para los Tenedores de EE.UU. de Reclamaciones de Bonos SRE conciliadas del citado canje serán las mismas que se describen anteriormente bajo el epígrafe *"—Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal de la percepción de efectivo*".

  f)  **Tenedores de Reclamaciones de Bonos AEP Vintage (Clase 1), Reclamaciones de Bonos AEP Vintage (Assured) (Clase 2), Reclamaciones de Bonos AEP 2011 (Clase 4) y Reclamaciones de Bonos AEP 2012 (Clase 9)9)**

    Se prevé que, en virtud del Plan, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos AEP Vintage (Clase 1); (ii) Reclamaciones de Bonos AEP Vintage (Assured); (iii) Reclamaciones de Bonos AEP 2011; y (iv) Reclamaciones de Bonos AEP 2012 serán tratadas, para propósitos tributarios federales de EE.UU., como un canje de Bonos AEP por efectivo de parte del Tenedor de EE.UU.

    En general, se prevé que las consecuencias del impuesto federal sobre los ingresos de EE.UU. de la percepción de efectivo serán las mismas que se describen anteriormente e bajo el epígrafe *"—Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA*

*2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal de la percepción de efectivo"*.

g)   **Tenedores de Reclamaciones de Bonos AEP Vintage minoristas (Clase 6), Reclamaciones de Bonos AEP 2011 minoristas (Clase 8) y Reclamaciones de Bonos AEP 2012 minoristas (Clase 10)**

Se prevé que, en virtud del Plan, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos AEP Vintage minoristas; (ii) Reclamaciones de Bonos AEP 2011 minoristas; y (iii) Reclamaciones de Bonos AEP 2012 minoristas serán tratadas, para propósitos tributarios federales de EE.UU., como un canje de Bonos AEP por efectivo de parte del Tenedor de EE.UU.

En general, se prevé que las consecuencias del impuesto federal sobre los ingresos de EE.UU. de la percepción de efectivo serán las mismas que se describen anteriormente bajo el epígrafe *"—Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal de la percepción de efectivo"*. En la medida en que ese Tenedor de EE.UU. haya votado por aceptar el Plan, recibiendo así su parte proporcional de las Comisiones por apoyo a minoristas, se prevé que (aunque no sin dudas), en general, dichos derechos serán tratados de manera similar a como se ha descrito con respecto a los Costos de consumación, bajo el epígrafe *"—Tratamiento fiscal de la percepción de efectivo—Costos de consumación y Derechos de restricción del AAP"*.

h)   **Tenedores de Reclamaciones de AEP generales no garantizadas (Clase 12), Reclamaciones de Productores Lácteos (Clase 50), Reclamaciones de Dominio Eminente (Clase 51), Reclamaciones de Centro Médico (Clase 53), Reclamaciones de ELA generales no garantizadas (Clase 55), Reclamaciones de ELA/ACT (Clase 56), Reclamaciones ELA/Centro de Convenciones (Clase 57), Reclamaciones ELA/Impuesto al Ron de AFI (Clase 58), Reclamaciones de ELA/MBA (Clase 59)  Reclamaciones de conveniencia (Clase 65)**

Se prevé que, en virtud del Plan, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de AEP generales no garantizadas; (ii) Reclamaciones Productores Lácteos; (iii) Reclamaciones de Dominio Eminente; (iv) Reclamaciones de Centro Médico; (v) Reclamaciones de ELA generales no garantizadas; (vi) Reclamaciones de ELA/ACT; (vii) Reclamaciones ELA/Centro de Convenciones; (viii) Reclamaciones ELA/Impuesto al Ron de AFI ; (ix) Reclamaciones de ELA/MBAy ( x) Reclamaciones de conveniencia, recibirán el mismo tratamiento que si se percibiera una contraprestación, en plena consideración, satisfacción, liberación y canje de las reclamaciones de dicho

Tenedor que son objeto de estas Clases de Reclamaciones permitidas. Las consecuencias de la percepción de la citada distribución variarán en función de las circunstancias particulares de los Tenedores de EE.UU. Se insta a los Tenedores de bonos de EE.UU. a consultar a sus asesores fiscales las consecuencias tributarias de la percepción de esa distribución considerando sus circunstancias individuales.

i) **Tenedores de Reclamaciones de beneficios de empleados activos y jubilados (Clase 48A-48E) y de Reclamaciones de empleados de AFSCME (Clase 49)**

En general, esta exposición no se aplica a los tenedores de (i) Reclamaciones de beneficios de empleados activos y jubilados (Clase 48A-4E) y de Reclamaciones de empleados de AFSCME (Clase 49). Todo tenedor de alguna de esas Reclamaciones que presente una declaración de impuestos federales estadounidense debería consultar asesor fiscal acerca de las consecuencias tributarias federales de mantener dicha reclamación.

j) **Reclamaciones de incentivos energéticos (Clase 52)**

Se espera que, a tenor del Plan, a partir de la Fecha de Entrada en vigencia, (i) el ELA continuará con el programa de incentivos energéticos establecido en la Ley de Incentivos Energéticos, y (ii) en relación con el mismo, asumirá las Reclamaciones de Incentivos Energéticos Permitidas y los instrumentos y acuerdos de reserva existentes en la Fecha de Entrada en vigencia y en consonancia con los términos de la Ley de Incentivos Energéticos, y (b) en la medida en que los respectivos proyectos se hayan completado de acuerdo con la Ley de Incentivos Energéticos y los términos y disposiciones de los instrumentos y acuerdos de reserva celebrados en relación con la misma, se permitirá a los titulares de las Reclamaciones de Incentivos Energéticos Permitidas ejercer y reclamar los incentivos fiscales creados en virtud de la misma.

Por lo tanto, la determinación en virtud del Plan no constituye un hecho imponible y los titulares estadounidenses de Reclamaciones de Incentivos Energéticos no reconocerán ninguna ganancia o pérdida a efectos del impuesto federal sobre la renta de Estados Unidos como resultado de la adopción del Plan.

3. **Deducción por deudas incobrables y/o títulos sin valor**

Un Tenedor de EE.UU. que, en virtud del Plan, percibiera con respecto a una Reclamación permitida una cantidad inferior a la base tributable de dicho Tenedor en concepto de tal Reclamación, tendrá derecho, en el año de la percepción (o en un año fiscal anterior o posterior) a practicar una deducción por deudas incobrables o por títulos sin valor. Las normas que rigen el carácter, la oportunidad y el importe de las deducciones por incobrables o por títulos sin valor ponen considerable énfasis en las realidades y circunstancias del Tenedor de EE.UU., del deudor y del instrumento con respecto al cual se aplica la deducción. Los Tenedores de EE.UU. de Reclamaciones permitidas deberían consultar a sus asesores fiscales con respecto a las posibilidades de practicar tales deducciones y en qué año.

4. **Impuesto de Medicare**

Un Tenedor de EE.UU. de Nuevos Bono GO y CVI tributables que sea persona natural, sucesión o fideicomiso no incluido en una clase especial de fideicomisos exenta de dicho impuesto, está sujeto al recargo por Medicare del 3.8% sobre la menor de las siguientes cantidades (1) las "renta de inversión neta" del Tenedor de EE.UU. (o "el ingreso de inversión neta no distribuida" en el caso de una sucesión o

fideicomiso) correspondiente al año fiscal tributable, lo cual incluye, entre otros, intereses (incluyendo el descuento de emisión original) sobre la deuda y las plusvalías de la venta u otra enajenación tributable de deuda, y (2) el excedente del ingreso bruto ajustado modificado del Tenedor de EE.UU. (o del ingreso bruto ajustado en el caso de una sucesión o fideicomiso) del año fiscal tributable por encima de determinado umbral (que, en el caso de las personas físicas se sitúa entre los $125,000 y los $250,000, en función de las circunstancias individuales). Un Tenedor de EE.UU. que sea persona natural, sucesión o fideicomiso debería consultar a su asesor fiscal acerca de la aplicabilidad del recargo de Medicare a sus rentas y beneficios con respecto a los canjes y titularidad de los Nuevos Bonos GO y CVI.

5.      **Declaración de información y retención adicional de impuestos**

En general, la declaración de información se aplicará a (i) los pagos en concepto del canje; (ii) los pagos de capital, intereses y DEO, en su caso, en concepto de los Nuevos Bonos GO; (iii) los pagos de los CVI; y (iv) los pagos del producto de la venta u otra enajenación de los Nuevos Bonos GO y los CVI.

Además, es posible que sea de aplicación la retención adicional de impuestos a los pagos si dicho Tenedor de EE.UU. (a) omite aportar un número de identificación de contribuyente correcto, (b) proporciona un número de identificación de contribuyente incorrecto, (c) recibe una notificación del IRS indicando que no ha declarado todos los intereses y dividendos que deben reflejarse en las declaraciones de impuestos federales estadounidenses, o bien (d) omite certificar, bajo pena de perjurio, que el Tenedor de EE.UU. ha facilitado un número de identificación de contribuyente correcto y que el IRS no le ha notificado que está sujeto a la retención adicional de impuestos). La solicitud de exención puede solicitarse aportando un Formulario W-9 del IRS debidamente rellenado (o el formulario que lo sustituya).

La retención adicional de impuestos no es un impuesto adicional. En general, un Tenedor de EE.UU. podrá obtener un reintegro de las cantidades retenidas de conformidad con la normativa específica, que exceda de su responsabilidad tributaria federal mediante la presentación puntual de una solicitud de reintegro ante el IRS.

Ciertos Tenedores de EE.UU. no están sujetos en ciertos casos la obligación de presentar información y de retención adicional de impuesto, siempre y cuando se identifiquen debidamente como exentos. Los Tenedores de EE.UU. deberían consultar a sus asesores fiscales si cumplen estos requisitos de exención y cuáles son los procedimientos para obtenerla.

C.      **Personas naturales y jurídicas de Puerto Rico**

1.      **Definición de personas físicas y jurídicas de Puerto Rico**

Tal como se utiliza aquí, por "persona natural de Puerto Rico" se entenderá al tenedor usufructuario de una Reclamación de bonos, de Nuevos Bonos GO y de CVI que sea un particular y residente de buena fe del Estado Libre Asociado, a tenor con la definición de la Sección 937 del IRC y de las Reglas del Tesoro, durante la totalidad todos los intereses y dividendos que incluya a la Fecha de entrada en vigencia. Tal como se utiliza aquí, por "persona jurídica de Puerto Rico" se entenderá al tenedor usufructuario de Reclamación de bonos, de Nuevos Bonos GO y de CVI que sea una corporación constituida de conformidad con las leyes del Estado Libre Asociado.

La siguiente exposición incluye solo algunas consecuencias tributarias federales estadounidenses del Plan para personas naturales y jurídicas de Puerto Rico. No obstante, no incluye consideraciones tributarias no estadounidense (incluyendo las de Puerto Rico). Recomendamos a toda persona natural o

jurídica de Puerto Rico consultar en la sección "Consideraciones materiales a efectos del Impuesto sobre el ingreso de Puerto Rico" las consecuencias tributarias del Plan en Puerto Rico.

Las normas que rigen las consecuencias tributarias federales estadounidenses para las personas naturales y jurídicas de Puerto Rico son complejas. Recomendamos a las personas naturales y jurídicas de Puerto Rico que consulten a sus asesores fiscales acerca de las consecuencias tributarias federales, estatales, locales y extranjeras de la consumación del Plan en función de sus circunstancias particulares.

2.      **Tratamiento fiscal del canje**

En general, una persona natural de Puerto Rico no estará sujeta a tributación federal estadounidense con respecto a los beneficios materializados por el canje de una Reclamación permitida en virtud del Plan. En general, una persona jurídica de Puerto Rico no estará sujeta a tributación federal estadounidense con respecto a los beneficios materializados por el canje de una Reclamación permitida en virtud del Plan, salvo que dichos beneficios estén efectivamente relacionados con las actividades comerciales o los negocios de la persona jurídica de Puerto Rico en Estados Unidos, en cuyo caso los beneficios estarán sujetos a gravamen de la misma manera que el ingreso correspondiente como se describe más adelante en el epígrafe "—      *Venta, retiro u otras enajenaciones de Nuevos Bonos GO y CVI*".

3.      **Tributación de los Nuevos Bonos GO y CVI**

a)      **Tratamiento de los intereses**

En general, los pagos de intereses en concepto de un Nuevo Bono GO, incluyendo el DEO, a una persona natural o jurídica de Puerto Rico no están sujetos a impuestos federales sobre el ingreso estadounidenses salvo que, en el caso de una persona jurídica de Puerto Rico, se considere que esta ha realizado actividades comerciales o hecho negocios en EE.UU., y dicho ingreso esté efectivamente relacionado con ello.

Si se considera que una corporación de Puerto Rico se dedica a actividades comerciales o hace negocios en Estados Unidos, y los intereses (incluyendo el DEO) de los Nuevos Bonos GO están "efectivamente conectados" con dichas actividades o negocios, la persona jurídica de Puerto Rico estará sujeta al impuesto federal sobre el ingreso estadounidense en concepto de dichos intereses (incluyendo el DEO), normalmente sobre una base de ingreso neta, de la misma manera que un Tenedor de EE.UU. Además, la persona jurídica de Puerto Rico podrá estar sujeta a los impuestos de beneficios de sucursales con respecto a dicho ingreso.

b)      **Tratamiento de los pagos de los CVI**

El tratamiento en el impuesto sobre la renta de los pagos del CVI no está claro. Los pagos de un CVI a un individuo de Puerto Rico o a una corporación de Puerto Rico, por lo general, no estarían sujetos al impuesto federal sobre la renta de los Estados Unidos, a menos que, en el caso de una corporación de Puerto Rico, se considere que la corporación de Puerto Rico se dedica a una actividad comercial o empresarial en los Estados Unidos y que dichos ingresos estén efectivamente conectados con la realización de una actividad comercial o empresarial dentro de los Estados Unidos.

Si se considera que una corporación de Puerto Rico se dedica a una actividad comercial o empresarial en los Estados Unidos y los pagos de los CVI están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, la corporación de Puerto Rico estará sujeta al impuesto federal sobre la renta de los Estados Unidos por dichos pagos sobre la base de los ingresos netos,

generalmente de la misma manera que si fuera un titular de los Estados Unidos. Además, una corporación de Puerto Rico puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente conectados.

c)     **Venta, retiro u otras enajenaciones de Nuevos Bonos GO y CVI**

La ganancia obtenida por la venta, retiro u otra enajenación de un Nuevo Bono GO o los CVI por una persona natural o jurídica de Puerto Rico no están sujetos a los impuestos federales sobre los ingresos de EE.UU. salvo que, en el caso de una persona jurídica de Puerto Rico, se considere que esta ha realizado actividades comerciales o hecho negocios en EE.UU., y dicho ingreso esté efectivamente relacionado con ello.

Si se considera que una corporación de Puerto Rico se dedica a una actividad comercial o empresarial en los Estados Unidos y la ganancia obtenida por la venta, retiro u otra enajenación de un Nuevo Bono GO o los CVI por la corporación de Puerto Rico están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, la corporación de Puerto Rico estará sujeta al impuesto federal sobre los ingresos de los Estados Unidos por esa ganancia sobre la base de los ingresos netos, generalmente de la misma manera que si fuera un titular de los Estados Unidos. Además, una corporación de Puerto Rico puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente conectados.

**No existe certeza acerca de las consecuencias tributarias del Plan para personas naturales y jurídicas de Puerto Rico. Las personas naturales de Puerto Rico y las personas jurídicas de Puerto Rico deben consultar a sus asesores fiscales en relación con las consecuencias fiscales específicas de las transacciones contempladas en el Plan.**

4.     **Declaración de información y retención adicional de impuestos**

En general, la declaración de información se aplicará a (i) los pagos en concepto del canje; (ii) los pagos de capital, intereses y DEO, en su caso, en concepto de los Nuevos Bonos GO y los CVI; (iii) los pagos de los CVI; y (iv) los pagos del producto de la venta u otra enajenación de los Nuevos Bonos GO y los CVI.

En general, una persona natural de Puerto Rico no estará sujeta a retenciones adicionales de impuestos con respecto a los pagos derivados de los Nuevos Bonos GO y los CVI si presenta el Formulario W-9 del IRS debidamente rellenado (o un documento de sustitución adecuado), salvo si dicha persona natural de Puerto Rico (a) omite aportar un número de identificación de contribuyente correcto, (b) proporciona un número de identificación de contribuyente incorrecto, (c) recibe una notificación del IRS indicando que no ha declarado todos los intereses y dividendos que deben reflejarse en las declaraciones de impuestos federales estadounidenses, o bien (d) omite certificar, bajo pena de perjurio, que el Tenedor de EE.UU. ha facilitado un número de identificación de contribuyente correcto y que el IRS no le ha notificado que el Tenedor de EE.UU. está sujeto a la retención adicional de impuestos.

En general, una persona jurídica de Puerto Rico no estará sujeta a retención adicional de impuestos con respecto a los pagos del canje, capital e intereses (DEO incluido), en su caso, vinculados a los Nuevos Bonos GO y los pagos de los CVI, siempre y cuando haya presentado un Formulario W-8BEN-E del IRS debidamente rellenado (u otro formulario pertinente), manifestando que no es una persona estadounidense tal como lo define el IRC (o si satisface ciertos requisitos de pruebas documentales para demostrar que no lo es). La declaración de información y, según las circunstancias, la retención adicional de impuestos será

538

de aplicación al producto de la venta u otra enajenación de los Nuevos Bonos GO y los CVI realizada dentro de Estados Unido o a través de ciertos intermediarios financieros relacionados con Estados Unidos, salvo que la persona natural de Puerto Rico manifieste, bajo pena de perjurio, que no es una persona de EE.UU. (y que el pagador no sepa, o tuviera motivos para saber, que dicha persona jurídica de Puerto Rico es una persona de EE.UU.), o bien que pueda demostrar una exención.

La retención adicional de impuestos no es un impuesto adicional. En general, una persona natural o jurídica de Puerto Rico, según proceda, podrá obtener un reintegro de las cantidades retenidas de conformidad con la normativa específica, que exceda de su responsabilidad tributaria federal mediante la presentación puntual de una solicitud de reintegro ante el IRS.

Ciertas personas naturales y jurídicas de Puerto Rico no están sujetas a las obligaciones de declaración y retención adicional de impuestos en circunstancias específicas, siempre y cuando pueda establecer debidamente que están exentas. Recomendamos a las personas naturales y jurídicas de Puerto Rico que consulten a sus asesores fiscales sobre si están exentos de las obligaciones de retención adicional de impuestos y sobre los o procedimientos para obtener dicha exención.

**D.     Tenedores no de EE.UU.**

     **1.     Definición de Tenedor no estadounidense.**

Salvo que se estipule algo distinto, la siguiente exposición se aplica exclusivamente a Tenedores no de EE.UU. Tal como se utiliza aquí, por "Tenedor no estadounidense" se entenderá al Tenedor usufructuario de Valores Existentes o de Nuevos Bonos que no sea (i) Tenedor de EE.UU., o bien (ii) una asociación u otra entidad considerada como tal o bajo tratamiento fiscal simplificado a efectos tributarios de Estados Unidos, o bien (iii) una persona natural o jurídica de Puerto Rico.

La siguiente descripción incluye solamente ciertas consecuencias tributarias federales estadounidenses del Plan para Tenedores no estadounidenses, y ninguna consideración fiscal no estadounidense Las normas que rigen las consecuencias tributarias federales estadounidenses para Tenedores no de EE.UU. son complejas. Los Tenedores no estadounidenses deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias federales, estatales, locales del Plan, en Estados Unidos y en el extranjero, en función de sus circunstancias personales.

     **2.     Tratamiento del canje**

En general, un Tenedor no estadounidense no estará sujeto a los impuestos federales estadounidense con respecto a los beneficios obtenidos por el canje en el marco de una Reclamación permitida en virtud del Plan, salvo que (i) dicho beneficio esté efectivamente relacionado con el hecho de que el Tenedor no estadounidense realice actividades comerciales o haga negocios en Estados Unidos (y, si fuera de aplicación un tratado para evitar la doble imposición, dicho beneficio sea atribuible a un establecimiento permanente o a una base fija en Estados Unidos del Tenedor no de EE.UU.), en cuyo caso estará sujeto al impuesto de la misma manera que los ingresos efectivamente conectados, ya descritos para los Nuevos Bonos GO y los CVI, bajo el epígrafe "—*Venta, retiro u otras enajenaciones de Nuevos Bonos GO o CVI*", o bien (ii) si ese Tenedor no estadounidense es una persona natural extranjera no residente que mantiene los Nuevos Bonos GO y los CVI como activos de capital y está presente en Estados Unidos durante más de 183 días del año fiscal del canje, y dichos beneficios se derivan de fuentes de dentro de Estados Unidos.

3.        **Tributación de los Nuevos Bonos GO y los CVI**

a)        *Tratamiento de los intereses*

En general, los pagos de intereses de los Nuevos Bonos GO y los pagos de los CVI, incluyendo el DEO, a un Tenedor no estadounidense, que se consideran fuente de ingresos extranjera a efectos tributarios federales de EE.UU., no están sujetos a impuestos federales estadounidenses toda vez que se considere que el Tenedor no estadounidense no se dedica a actividades comerciales o hace negocios en EE.UU., y dichos ingresos no estén efectivamente conectados a las citadas actividades o negocios.

Si se considera que un Tenedor no estadounidense se dedica a una actividad comercial o empresarial en los Estados Unidos y los intereses (incluidos los DEO) de los nuevos bonos GO imponibles o pagos de los CVI están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, el Tenedor no estadounidense estará sujeto al impuesto federal sobre los ingresos de los Estados Unidos por esos intereses (incluidos los DEO) sobre la base de los ingresos netos, generalmente de la misma manera que si fuera un Tenedor de EE.UU. Además, si el Tenedor no estadounidense es una persona jurídica, podrá estar sujeto a los impuestos de beneficios de sucursales con respecto al ingreso efectivamente conectado, a menos que un tratado de doble imposición permita reducir el porcentaje.

b)        *Venta, retiro u otras enajenaciones de Nuevos Bonos GO y CVI*

En general, los beneficios materializados por la venta, retiro u otra enajenación de Nuevos Bonos GO o CVI por un Tenedor no estadounidense no estarán sujetos a impuestos federales estadounidenses, toda vez que se considere que el Tenedor no estadounidense no se dedica a actividades comerciales o hace negocios en EE.UU., y dichos ingresos no estén efectivamente conectados a las citadas actividades o negocios.

Si se considera que un Tenedor no estadounidense se dedica a actividades comerciales o hace negocios en Estados Unidos y que los beneficios obtenidos por la venta, retiro u otra enajenación de los Nuevos Bonos GO o CVI de los Tenedores no estadounidenses están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, el Tenedor no estadounidense estará sujeto al impuesto federal sobre los ingresos de los Estados Unidos por esos beneficios sobre la base de los ingresos netos, generalmente de la misma manera que si fuera un Tenedor de EE.UU., salvo si algún tratado de doble imposición estipule algo distinto. Además, si el Tenedor no estadounidense es una persona jurídica, podrá estar sujeto a los impuestos de beneficios de sucursales con respecto al ingreso efectivamente conectado, a menos que un tratado de doble imposición permita reducir el porcentaje.

No existen certidumbres acerca de las consecuencias tributarias del Plan para Tenedores no estadounidenses. Recomendamos a estas personas consultar a sus asesores fiscales acerca de las consecuencias tributarias específicas de las transacciones previstas por el Plan.

4.        **FATCA (Ley de Cumplimiento Tributario de Cuentas en el Extranjero)**

De conformidad con la FATCA, en general las instituciones financieras extranjeras (concepto que incluya a la mayoría de fondos de cobertura, fondos de capital riesgo, fondos de inversión, vehículos de titulización y otros vehículos de inversión), así como ciertas otras entidades extranjeras deben cumplir obligaciones de declaración con respecto a sus Tenedores de cuentas e inversionistas estadounidenses, o bien practicar retenciones impositivas a los pagos de fuentes estadounidenses que se les abonan (tanto si son Tenedores usufructuarios como intermediarios de terceros). En general, la institución financiera u otra entidad extranjera que no cumpla las obligaciones de declaración de la FATCA estarán sujetas a retenciones

540

con respecto a cualesquiera "pagos sujetos a retención". Para tales efectos, por "pagos sujetos a retención" se entenderán todos los pagos fijos o determinables, anuales o periódicos de ingresos, beneficios y ciertos "pagos subrogados extranjeros" procedentes de fuentes estadounidenses. En general, las retenciones estipuladas por la FATCA no se aplicarán a los pagos de intereses (incluyendo el DEO) de los Nuevos Bonos GO y el pago de los CVI porque normalmente se tratará de ingresos generados en el extranjero. Las instituciones financieras extranjeras presentadas en jurisdicciones con las que existen acuerdos intergubernamentales con Estados Unidos en relación con la FATCA pueden estar sujetas a una normativa diferente. Los Tenedores deberían consultar a sus asesores fiscales si la FATCA se aplica a sus circunstancias específicas.

*[El resto de la página se ha dejado intencionadamente en blanco]*

### X. Consideraciones materiales a efectos del impuesto sobre el ingreso de Puerto Rico

#### A. Aspectos generales

A continuación, se presenta una descripción general de ciertas consecuencias materiales del Plan a efectos del impuesto sobre el ingreso de Puerto Rico. Esta descripción está basada en el Código de Impuestos Internos de Puerto Rico de 2011, con sus correspondientes enmiendas (el "Código de P. R."), en la normativa aprobada de conformidad con el Código de P.R., en los pronunciamientos administrativos y en las sentencias judiciales en vigencia al a fecha de esta Declaración de divulgación, todo lo cual está sujeto a modificaciones, posiblemente con efectos retroactivos (colectivamente, la "Legislación tributaria vigente de P.R."). Los cambios de la Legislación tributaria vigente de P.R. o de su interpretación podría provocar que algunas de las consecuencias tributarias del Plan a efectos del Impuesto sobre el ingreso de Puerto Rico resulten sustancialmente distintas de las aquí descritas.

Las consecuencias del Plan a efectos del Impuesto sobre el Ingreso de Puerto Rico son complejas. A la fecha de esta Declaración de Divulgación, el Departamento de Hacienda de Puerto Rico ("Hacienda de P.R.") no ha solicitado formalmente ninguna opinión acerca de algún aspecto del Plan; no se ha solicitado ninguna opinión a los abogados de los Deudores sobre las consecuencias fiscales del Plan, salvo las específicamente aquí expuestas, y esta Declaración de divulgación no presenta ninguna opinión tributaria.

La siguiente descripción no cubre todos los aspectos de la tributación federal puertorriqueña que pudieran ser relevantes para los Tenedores de Reclamaciones. Por ejemplo, la descripción no aborda cuestiones de especial preocupación para determinados tipos de contribuyentes (es decir, compañías de inversiones reguladas, fondos de inversiones inmobiliarios, bancos y algunas otras instituciones financieras, aseguradoras, entidades exentas de impuestos, planes de pensiones, cuentas individuales de retiro y otras sujetas a tributación diferida, tenedores que son, o que canalizan sus Reclamaciones a través de, sociedades mercantiles de tratamiento fiscal simplificado, asociaciones u otras entidades interpuestas a efectos tributarios de Puerto Rico, y personas cuyas reclamaciones sean parte de transacciones de compraventa simultánea, cobertura, venta constructiva o conversión). Además, la descripción parte del supuesto de que el Tenedor posee Valores Existentes, Nuevos Bonos GO y CVI solamente como "activos de capital", tal como los mismos están definidos en la Sección 1034.01(a)(1) del Código de P.R. La descripción no aborda más impuestos puertorriqueños distintos de los del Estado Libre Asociado que gravan los ingresos, ni se aplica a ninguna persona que adquiera Nuevos Bonos GO o CVI en el mercado secundario. Por último, este documento no aborda las consecuencias a efectos del Impuesto sobre el ingreso de Puerto Rico para los Tenedores de Reclamaciones que se considere que han rechazado el Plan.

Por estos motivos, esta descripción no sustituye a una detenida planificación tributaria ni a un asesoramiento fiscal profesional basado en las circunstancias individuales de cada Tenedor de una Reclamación. Se insta a los Tenedores de Reclamaciones a consultar a sus propios asesores fiscales en relación con las consecuencias tributarias puertorriqueñas del Plan.

#### B. Tenedores de P.R.

##### 1. Definición de Tenedor de P.R.

Salvo que se estipule algo distinto, la siguiente explicación es aplicable solamente a Tenedores de P.R. Tal como se utiliza aquí, por "Tenedor de P.R." se entenderá al tenedor usufructuario de Valores Existentes a la Fecha de entrada en vigencia del Plan a efectos del Impuesto sobre el ingreso de P.R.:

542

- Una persona natural que durante todo el año fiscal sea residente de buena fe de Puerto Rico para propósitos de la Sección 933 del Código de Rentas Internas (Internal Revenue Code) estadounidense de 1986, con sus correspondientes modificaciones (como lo determina la Sección 937(a) del mismo), y residente de Puerto Rico para propósitos del Código de P.R.;

- una sociedad u otra entidad constituida con arreglo a las leyes de Puerto Rico con tratamiento de corporación para propósitos tributarios de Puerto Rico, excluyendo las corporaciones u otros tipos de entidades sujetas a transparencia fiscal u otro tratamiento fiscal especial de acuerdo con el Código de P.R.;

- una sucesión, cuyas rentas están sujetas al impuesto federal sobre el ingreso de Puerto Rico, independientemente de su procedencia; o bien

- un fideicomiso (salvo un fideicomiso comercial), todos cuyos beneficiarios sean personas naturales residentes de Puerto Rico, como ya se ha descrito.

Si una asociación u otra entidad o concierto que tributa como asociación a efectos del impuesto sobre el ingreso de Puerto Rico es tenedor de Valores Existentes, el tratamiento fiscal de un socio de dicha asociación dependerá en general del estatus del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad tenedores de Valores Existentes consultar a sus asesores fiscales.

Un Tenedor de Puerto Rico que sea tenedor de Reclamaciones permitidas de más de una Clase podría tener en Puerto Rico consecuencias tributarias diferentes para cada clase de Reclamaciones permitidas. Los Tenedores de Puerto Rico deberían consultar detenidamente las secciones de esta exposición aplicables a cada Clase de Reclamaciones permitidas de las que fueran tenedores y deberían consultar a sus asesores fiscales acerca de la potencial interacción de las potenciales interacciones de consecuencias tributarias puertorriqueñas de cada una de las Reclamaciones permitidas de las que pudiera ser tenedor.

    2.    **Tratamiento fiscal de Reclamaciones permitidas**

        a)    **Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage (Assured) garantizados (Clase 22), Reclamaciones de Bonos ELA Vintage (National) garantizados (Clase 23), Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados (Clase 24), Reclamaciones de Bonos ELA Vintage (Syncora) garantizados (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones**

**de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014
garantizados (Clase 46)**

Los Deudores prevén que, en virtud del Plan, Cada Tenedor de P.R. de cualquiera de las siguientes: (i) Reclamaciones de Bonos ELA Vintage, (ii) Reclamaciones de Bonos ELA Vintage (Assured), (iii) Reclamaciones de Bonos ELA Vintage (National), (iv) Reclamaciones de Bonos ELA Vintage (Otros asegurados), (v) Reclamaciones de Bonos ELA Vintage (Syncora), (vi) Reclamaciones de Bonos ELA Vintage garantizados, (vii) Reclamaciones de Bonos ELA Vintage (Assured) garantizados, (viii) Reclamaciones de Bonos ELA Vintage (National) garantizados, (ix) Reclamaciones de Bonos ELA Vintage (Otros asegurados) garantizados, (x) Reclamaciones de Bonos ELA Vintage (Syncora) garantizados, (xi) Reclamaciones de Bonos ELA 2011, (xii) Reclamaciones de Bonos ELA 2011 (Assured), (xiii) Reclamaciones de Bonos ELA 2011 garantizados, (xiv) Reclamaciones de Bonos ELA 2011 (Assured) garantizados, (xv) Reclamaciones de Bonos ELA 2011 Series D/E/PIB, (xvi) Reclamaciones de Bonos ELA 2011 Series D/E/PIB (Assured), (xvii) Reclamaciones de Bonos ELA 2012, (xviii) Reclamaciones de Bonos ELA 2012 (Assured), (xix) Reclamaciones de Bonos ELA 2012 garantizados, (xx) Reclamaciones de Bonos ELA 2014, y (xxi) Reclamaciones de Bonos ELA 2014 serán tratados como canjeadores de los Bonos GO de los Tenedores de P.R. sujetos a estas Clases de Reclamaciones permitidas por Nuevos Bonos GO, CVI y Efectivo.

(i)     *Tratamiento fiscal del canje*

Los Deudores esperan, y pretenden asumir la posición, de que el canje no tendrá la consideración de recapitalización, porque ni los Deudores ni los Deudores Reorganizados tendrían que ser clasificados como corporación para propósitos tributarios puertorriqueños. Si de conformidad con las expectativas de los Deudores el canje de un tramo de los Bonos GO por los Nuevos Bonos GO y CVI en virtud del Plan no se califique como recapitalización, el canje será considerado tributable según el Código de P.R. Por consiguiente, un Tenedor de P.R. declarará un resultado equivalente a la diferencia entre el importe materializado en el canje y la base tributable ajustada del Tenedor de P.R. en concepto de los Bonos GO a la fecha del canje. La cuantía materializada al canjear los Bonos GO será equivalente al valor de mercado de cada Nuevo Bono GO, CVI más el Efectivo percibido (salvo cualquier tramo atribuible a intereses devengados e impagados). Consulte en la siguiente exposición lo relativo a los pagos en efectivo en concepto de Costes de consumación y los Derechos de restricción del AAP.

Las ganancias o pérdidas por el canje de Bonos GO por Nuevos Bonos GO y CVI se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de mantenimiento de Bonos GO del Tenedor de P.R. es superior a un año. Las plusvalías de capital a largo plazo declaradas por Tenedores de P.R. que sean personas naturales, sucesiones y fideicomisos podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, el 15% (o bien, un máximo del 24% si fuera aplicable el impuesto básico alternativo). Las plusvalías de capital a largo plazo de Tenedores de P.R. que tributen como personas jurídicas podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, del 20%.

Los Tenedores de P.R. podrán deducir las minusvalías de capital sufridas en el canje de los Bonos GO por Nuevos Bonos GO y CVI de las plusvalías de capital obtenidas durante el año, y los Tenedores de P.R. no corporativos podrán deducir los excedentes netos de minusvalías de hasta $1,000 de los ingresos ordinarios. Estas minusvalías podrán pasarse a cuenta nueva como pérdidas a corto plazo durante siete años tributables, y aplicarse a la compensación de hasta el 90% de las plusvalías de capital generadas durante dichos años.

En la medida en que alguna contraprestación (por ejemplo, Nuevos Bonos GO y CVI o tramos de los mismos, más pagos de efectivo) percibida por algún Tenedor de P.R. al canjear los Bonos GO sea

544

atribuible a intereses devengados e impagados de dichos bonos, el monto de dicha contraprestación se considerará ingreso de capital exento a efectos tributarios puertorriqueños. En tal caso, el tramo asignado a los intereses devengados e impagados reducirá el importe materializado por el Tenedor de P.R. para calcular el resultado del canje.

El Plan prevé que, en la medida que sea posible, las distribuciones al tenedor de una Reclamación se aplicarán en primer lugar a los intereses devengados e impagados a la fecha inmediatamente anterior a la Fecha de petición del Estado Libre Asociado, la Fecha de petición de SRE o la Fecha de petición de AEP, según proceda; en segundo lugar, al importe del capital de la Reclamación (tal como se determine a efectos tributarios federales) y, a continuación, en la medida en que la contraprestación supere al capital de la Reclamación, a aquellas otras cuantías (como intereses devengados e impagados distintos de los descritos en las cláusulas precedentes). La historia legislativa de la Ley de Tributación en casos de Quiebra de 1980 indica que el Congreso pretendía que la diferenciación entre capital e intereses en ciertas reorganizaciones efectuadas en virtud del Código de Quiebras de EE.UU. fuera vinculante a efectos del Impuesto federal sobre el ingreso estadounidense. Congruentes con dicha distribución en el marco del Plan, en general el Reglamento de la Hacienda considera que los pagos en concepto de endeudamiento deben asignarse primero a los intereses devengados no pagados. No existe ninguna ley tributaria de P.R. vigente que considere cómo deben aplicarse los pagos en nuestra situación. Aunque los Deudores pretenden asignar las distribuciones a un Tenedor de P.R. de conformidad con el Plan, y consideran que ello es congruente con la legislación vigente y las intenciones de los legisladores, no existen garantías de que el Departamento de Hacienda de Puerto Rico vaya a respetarlas en lo que respecta a los pagos por los Bonos GO.

Recomendamos a los Tenedores de P.R. consultar a sus asesores fiscales acerca del tratamiento fiscal de las distribuciones percibidas de conformidad con el Plan.

(ii)   *Tributación de los Nuevos Bonos GO y los CVI*

<u>*Intereses de los Nuevos Bonos GO*</u>. Los intereses pagados a, o devengados por, los Tenedores de P.R. en concepto de los Nuevos Bonos no estarán sujetos al impuesto puertorriqueño sobre el ingreso, incluyendo el impuesto básico alternativo. La plusvalía de capital de los Nuevos Bonos GO a pagar en el vencimiento por encima de su precio de emisión inicial, si la hubiese, no estará sujeta al impuesto puertorriqueño sobre el ingreso, incluyendo el impuesto básico alternativo.

La titularidad de los Nuevos Bonos GO podría conllevar que un tramo de los intereses pagados a, o devengados por, un Tenedor de P.R., así como otros gastos incurridos por el Tenedor de P.R. y atribuibles a los intereses sobre los Nuevos Bonos GO, no fueran permitidos como deducciones a efectos tributarios de Puerto Rico.

*Pagos de los CVI*. El tratamiento fiscal de los ingresos de los pagos de los CVI en Puerto Rico no está claro. A menos que se disponga lo contrario en la legislación sobre CVI, los pagos pueden tratarse como ingresos ordinarios a efectos del impuesto sobre la renta de Puerto Rico a los tipos impositivos ordinarios. Los Tenedores de P.R. deben consultar a sus propios asesores fiscales sobre las consecuencias del impuesto sobre la renta de Puerto Rico al recibir cualquier pago de los CVI.

<u>*Venta, canje o retiro de los Nuevos Bonos GO o los CVI*</u>. Las ganancias o pérdidas por la venta o canje de Nuevos Bonos GO se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de mantenimiento de los Nuevos Bonos GO del Tenedor de P.R. es superior a un año. Las plusvalías de capital a largo plazo declaradas por Tenedores de P.R. que sean personas naturales, sucesiones y fideicomisos podrán estar sujetas a la tasa máximo de impuestos de Puerto Rico, el 15% (o bien, un máximo del 24% si fuera aplicable el impuesto básico alternativo). Las plusvalías de capital a largo plazo

545

de Tenedores de P.R. que tributen como personas jurídicas podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, del 20%.

Los Tenedores de P.R. podrán deducir las minusvalías de capital sufridas en el canje de los Bonos GO por Nuevos Bonos GO de las plusvalías de capital obtenidas durante el año fiscal, y los Tenedores de P.R. no corporativos podrán deducir los excedentes netos de minusvalías de hasta $1,000 de los ingresos ordinarios. Estas minusvalías podrán pasarse a cuenta nueva como pérdidas a corto plazo durante siete años tributables, y aplicarse a la compensación de hasta el 90% de las plusvalías de capital generadas durante dichos años.

b)    **Tenedores de Reclamaciones de Bonos ELA Vintage minoristas (Clase 15), Reclamaciones de Bonos ELA 2011 minoristas (Clase 28), Reclamaciones de Bonos ELA 2011 Series D/E/PIB minoristas (Clase 35), Reclamaciones de Bonos ELA 2012 minoristas (Clase 38) y Reclamaciones de Bonos ELA 2014 minoristas (Clase 44)**

Los Deudores prevén que en virtud del Plan, cada Tenedor de P.R. de (i) Reclamaciones de Bonos ELA Vintage, (ii) Bonos ELA 2011 minoristas, (iii) Bonos ELA 2011 Series D/E/PIB minoristas, (iv) Bonos ELA 2012 minoristas, y (v) Bonos ELA 2014 minoristas serán considerados como canjeadores de los Bonos GO objeto de estas Clases de Reclamaciones permitidas por Nuevos Bonos GO, CVI y efectivo. Estos Tenedores de P.R. también podrán percibir pagos en efectivo del Honorario de apoyo a minoristas.

(i)    *Tratamiento fiscal del canje*

En general, los Deudores prevén que las consecuencias tributarias puertorriqueñas para los Tenedores de P.R. de Reclamaciones de (i) Bonos ELA Vintage minoristas, (ii) Bonos ELA 2011 minoristas, (iii) Bonos ELA 2011 Series D/E/PIB minoristas, (iv) Bonos ELA 2012 minoristas, y (v) Bonos ELA 2014 minoristas que canjeen Bonos GO por Nuevos Bonos GO y efectivo tendrían que ser las mismas descritas anteriormente bajo el epígrafe "(i) Reclamaciones de Bonos ELA Vintage minoristas; (ii) Reclamaciones de Bonos ELA 2011 minoristas; (iii) Reclamaciones de Bonos ELA 2011 Series D/E/PIB minoristas; (iv) Reclamaciones de Bonos ELA 2012 minoristas; y (v) Reclamaciones de Bonos ELA 2014 minoristas al canjear los Bonos GO por Nuevos Bonos GO y efectivo sean las descritas anteriormente en el bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje*".

Por consiguiente, un Tenedor de P.R. declarará un resultado equivalente a la diferencia entre el importe materializado en el canje y la base tributable ajustada del Tenedor de P.R. en concepto de los Bonos GO a la fecha del canje. La cuantía materializada al canjear los Bonos GO será equivalente al valor de

mercado de cada Nuevo Bono más el Efectivo percibido (salvo cualquier tramo atribuible a intereses devengados e impagados).

(1) **Honorario de apoyo a minoristas**

El tratamiento fiscal puertorriqueño del Honorario de apoyo a minoristas no queda claro. Los Deudores pretenden tratar la percepción del Honorario de apoyo a minoristas de manera similar a la adoptada a efectos tributarios federales de EE.UU.; es decir, que sea parte del importe materializado en el canje y sujeto a los impuestos sobre el ingreso de Puerto Rico, ya expuesto anteriormente en el epígrafe "— *Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje*". Sin embargo, es posible que la Hacienda de P.R. no lo acepte y que considere dichos pagos (o algunos de ellos) como pagos separados tributables como renta ordinaria.

Los Tenedores de P.R. de Reclamaciones de (i) Bonos ELA Vintage minoristas, (ii) Bonos ELA 2011 minoristas, (iii) Bonos ELA 2011 Series D/E/PIB minoristas, (iv) Bonos ELA 2012 minoristas, y (v) and Bonos ELA 2014 minoristas deberían consultar a sus asesores fiscales acerca del tratamiento fiscal puertorriqueño de las distribuciones percibidas en el marco del Plan, incluyendo el Efectivo recibido en concepto de Honorario de apoyo a minoristas.

(ii) *Tributación de los Nuevos Bonos y los CVI*

Los Deudores prevén que los Nuevos Bonos GO y los CVI tendrán el mismo tratamiento tributario puertorriqueño descrito bajo el epígrafe *"Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clases 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI"*.

c) **Tenedores de Reclamaciones de Bonos ELA Vintage (elección tributable) (Clase 20), Reclamaciones de Bonos garantizados ELA Vintage (elección**

**tributable) (Clase 26), Reclamaciones de Bonos ELA garantizados 2011
(elección tributable) (Clase 30), Reclamaciones de Bonos ELA garantizados
2011 (elección tributable) (Clase 32), Reclamaciones de Bonos ELA 2011
Series D/E/PIB (elección tributable) (Clase 36), Reclamaciones de Bonos
ELA 2012 (elección tributable) (Clase 40), Reclamaciones de Bonos ELA
garantizados 2012 (elección tributable) (Clase 42), Reclamaciones de Bonos
ELA 2014 (elección tributable) (Clase 45) y Reclamaciones de Bonos ELA
garantizados 2014 (Clase 47)**

Los Deudores prevén que, en virtud del Plan, Cada Tenedor de P.R. de cualquiera de las siguientes:
(i) Reclamaciones de Bonos ELA Vintage (elección tributable), (ii) Reclamaciones de Bonos garantizados
ELA Vintage (elección tributable), (iii) Reclamaciones de Bonos ELA 2011 (elección tributable), (iv)
Reclamaciones de Bonos ELA garantizados 2011 (elección tributable), (v) Reclamaciones de Bonos ELA
2011 Series D/E/PIB (elección tributable), (vi) Reclamaciones de Bonos ELA 2012 (elección tributable),
(vii) Reclamaciones de Bonos ELA garantizados 2012 (elección tributable), (viii) Reclamaciones de Bonos
ELA 2014 (elección tributable) y (ix) Reclamaciones de Bonos ELA garantizados 2014 (elección tributable)
serán tratados como que canjean los Bonos GO de los Tenedores de P.R. sujetos a estas Clases de
Reclamaciones permitidas por Nuevos Bonos GO, CVI y Efectivo.

(i)    *Tratamiento fiscal del canje*

En general, los Deudores prevén que las consecuencias tributarias puertorriqueñas para los
Tenedores de P.R. de las (i) (i) Reclamaciones de Bonos ELA Vintage (elección tributable), (ii)
Reclamaciones de Bonos garantizados ELA Vintage (elección tributable), (iii) Reclamaciones de Bonos
ELA 2011 (elección tributable), (iv) Reclamaciones de Bonos ELA garantizados 2011 (elección tributable),
(v) 2011 Reclamaciones de Bonos ELA 2011 Series D/E/PIB (elección tributable), (vi) Reclamaciones de
Bonos ELA 2012 (elección tributable), (vii) Reclamaciones de Bonos ELA garantizados 2012 (elección
tributable)), (viii) Reclamaciones de Bonos ELA 2014 (elección tributable) y (ix) Reclamaciones de Bonos
ELA garantizados 2014 (elección tributable) por los canjes de Bonos GO por Nuevos Bonos GO, CVI y
efectivo serán las mismas que las descritas anteriormente en el epígrafe "—*Tenedores de Reclamaciones
de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16),
Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros
asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de
Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados
(Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23),
Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de
Bonos ELA Vintage  garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27),
Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados
(Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA
2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones
de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41),
Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase
46)—Tratamiento fiscal del canje*".

Los Tenedores de P.R. de (i) Reclamaciones de Bonos ELA Vintage (elección tributable), (ii)
Reclamaciones de Bonos garantizados ELA Vintage (elección tributable), (iii) Reclamaciones de Bonos
ELA 2011 (elección tributable), (iv) Reclamaciones de Bonos ELA garantizados 2011 (elección tributable),
(v) Reclamaciones de Bonos ELA 2011 Series D/E/PIB (elección tributable) (vi) Reclamaciones de Bonos
ELA 2012 (elección tributable), (vii) Reclamaciones de Bonos ELA garantizados 2012 (elección
tributable), (viii) Reclamaciones de Bonos ELA 2014 (elección tributable) y (ix) Reclamaciones de Bonos

ELA garantizados 2014 (elección tributable) que tengan derecho a la opción de tributación deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias en Puerto Rico de elegir dicha opción y de las distribuciones percibidas en virtud del Plan.

(ii)     *Tributación de los Nuevos Bonos y los CVI*

Los Deudores prevén que los Nuevos Bonos GO y los CVI tendrán el mismo tratamiento tributario puertorriqueño descrito bajo el epígrafe  "*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tributación de los Nuevos Bonos GO y los CVI*".

d)     **Tenedores de Reclamaciones de Bonos SRE (Clase 62)**

De conformidad con el Plan, cada Tenedor de P.R. de Reclamaciones de Bonos SRE tendrá derecho a percibir la parte proporcional la Garantía en efectivo de dichos Bonos SRE, que pasará a las Reservas de SRE como si dicha Reclamación fuera una Reclamación de Bonos SRE permitida a la fecha de entrada en vigencia, pendiente de una orden final e inapelable  que resuelva o liquide dicha reclamación.

Todas las distribuciones efectivas o constructivas de las Reservas de SRE a los Tenedores de P.R. de Reclamaciones permitidas  serán tratadas, a efectos tributarios de Puerto Rico, como si las hubiesen recibido directamente de los Deudores en nombre de la Reclamación original del Tenedor.

En consecuencia, los Deudores prevén que las consecuencias tributarias en Puerto Rico para los Tenedores de P.R. de las Reclamaciones de Bonos SRE permitidas en concepto de los canjes de Bonos SRE en concepto de Garantía en efectivo de Bonos SRE para distribuciones efectivas o constructivas con cargo a las Reservas de SRE serán las mismas descritas bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje*". Por consiguiente, un Tenedor de P.R. declarará un resultado equivalente

a la diferencia entre el efectivo percibido por los Bonos SRE (salvo aquel tramo atribuible a intereses devengados e impagados) y la base tributable ajustada del Tenedor de P.R. sobre los Bonos SER a la fecha de canje.

e) **Tenedores de Reclamaciones de Bonos SRE conciliadas (Clase 63)**

Los Deudores prevén que, en virtud del Plan, se considerará que cada Tenedor de P.R. de una Reclamación de Bonos SRE conciliada habrá canjeado dichos bonos sujetos a Reclamaciones permitidas de esta Clase por efectivo, para propósitos tributarios de Puerto Rico. En el resto de esta exposición parte del supuesto de que será así.

La oferta de Bonos SRE a cambio de la Distribución de Transacción de Bonos SRE, que comprende la Garantía en efectivo de los Bonos SRE, será tratada como canje tributable de los Bonos SER por efectivo a efectos tributarios puertorriqueños. Los Deudores prevén que las consecuencias tributarias puertorriqueñas para los Tenedores de P.R. de las Reclamaciones de Bonos SRE conciliadas del citado canje por efectivo serán las mismas descritas anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje*".

f) **Tenedores de Reclamaciones de Bonos AEP Vintage (Clase 1), Reclamaciones de Bonos AEP Vintage (Assured) (Clase 2), Reclamaciones de Bonos AEP Vintage (National) (Clase 3), Reclamaciones de Bonos AEP Vintage (Otros asegurados) (Clase 4), Reclamaciones de Bonos AEP Vintage (Syncora) (Clase 5), Reclamaciones de Bonos AEP Vintage minoristas (Clase 6), Reclamaciones de Bonos AEP 2011 (Clase 7), Reclamaciones de Bonos AEP 2011 minoristas (Clase 8), Reclamaciones de Bonos AEP 2012 (Clase 9) y Reclamaciones de Bonos AEP 2012 minoristas (Clase 10)**

Los Deudores prevén que, en virtud del Plan, cada Tenedor de P.R. de cualquiera de las siguientes: (i) Reclamaciones de Bonos AEP Vintage, (ii) Reclamaciones de Bonos AEP Vintage (Assured), (iii) Reclamaciones de Bonos AEP Vintage (National), (iv) Reclamaciones de Bonos AEP Vintage (Otros asegurados), (v) Reclamaciones de Bonos AEP Vintage minoristas, (vi) Reclamaciones de Bonos AEP 2011, (vii) Reclamaciones de Bonos AEP 2011 minoristas, (viii) Reclamaciones de Bonos AEP 2012, y (ix) Reclamaciones de Bonos AEP 2012 minoristas, serán tratadas como un canje por Efectivo de la Reclamación permitida más el Honorario de apoyo a minoristas, en el caso de Tenedores de P.R. de (i) Reclamaciones de Bonos AEP Vintage minoristas, (ii) Reclamaciones de Bonos AEP 2011 minoristas, y (iii) Reclamaciones de Bonos AEP 2012 minoristas.

En general, los Deudores prevén que las consecuencias tributarias puertorriqueñas de la percepción de efectivo (véase más adelante el tratamiento del Honorario de apoyo a minoristas) serán las mismas descritas anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured) (Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje*".

En general, los Deudores prevén que el tratamiento fiscal puertorriqueño de la percepción del Honorario de apoyo a minoristas será el descrito anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage minoristas (Clase 15), Reclamaciones de Bonos ELA 2011 minoristas (Clase 28), Reclamaciones de Bonos ELA 2011 Series D/E/PIB minoristas (Clase 35), Reclamaciones de Bonos ELA 2012 minoristas (Clase 38) y Reclamaciones de Bonos ELA 2014 minoristas (Clase 44)—Tratamiento fiscal del canje—Honorario de apoyo a minoristas*".

Por consiguiente, un Tenedor de P.R. declarará un resultado equivalente a la diferencia entre la cuantía materializada (salvo aquel tramo atribuible a intereses devengados e impagados) y la base tributable ajustada del Tenedor de P.R. sobre los Bonos AEP a la fecha de canje.

g) **Tenedores de Reclamaciones de AEP generales no garantizadas (Clase 12), Reclamaciones de Productores Lácteos (Clase 50), Reclamaciones de Dominio Eminente (Clase 51), Reclamaciones de Centro Médico (Clase 53), Reclamaciones de ELA generales no garantizadas (Clase 55), Reclamaciones de ELA/ACT (Clase 56), Reclamaciones ELA/Centro de Convenciones (Clase 57), Reclamaciones ELA/Impuesto al Ron de AFI (Clase 58), Reclamaciones de ELA/MBA (Clase 59) y Reclamaciones de conveniencia (Clase 65)**

Los Deudores prevén que, en virtud del Plan, Cada Tenedor de P.R. de cualquiera de las siguientes: (i) Reclamaciones de AEP generales no garantizadas; (ii) Reclamaciones Productores Lácteos; (iii) Reclamaciones de Dominio Eminente; (iv) Reclamaciones de Centro Médico; (v) Reclamaciones de ELA generales no garantizadas; (vi) Reclamaciones de ELA/ACT; (vii) Reclamaciones ELA/Centro de Convenciones; (viii) Reclamaciones ELA/Impuesto al Ron de AFI ; (ix) Reclamaciones de ELA/MBA; (x) Reclamaciones de SRE generales no garantizadas; y (xi) Reclamaciones de conveniencia, recibirán el mismo tratamiento que si se percibiera una contraprestación, en plena consideración, satisfacción, liberación y canje de las reclamaciones de dicho Tenedor que son objeto de estas Clases de Reclamaciones permitidas. Las consecuencias de tales distribuciones variarán en función de las circunstancias individuales de los Tenedores de P.R. y de la naturaleza de los activos distribuidos. Se recomienda a los Tenedores de P.R. consultar a sus asesores fiscales acerca de las consecuencias tributarias de la percepción de dichas distribuciones según sus circunstancias personales.

551

h) **Reclamaciones de beneficios de empleados activos y jubilados (Clase 48A-48E) y de Reclamaciones de empleados de AFSCME (Clase 49)**

Los Deudores prevén que, en virtud del Plan, cada Tenedor de P.R. de una Reclamación de beneficios de empleados activos y retirados y de una Reclamación de empleados de AFSCME percibirá pagos mensuales modificados de conformidad con los términos y condiciones del Plan. La reducción de las cuantías de los pagos mensuales de conformidad con el Plan no constituye un evento tributable y los Tenedores de P.R. no tendrán que declarar beneficios ni pérdidas a efectos tributarios como resultado de dichas reducciones.

El tratamiento tributario de Puerto Rico de los pagos mensuales modificados no se verá afectado por los ajustes previstos por el Plan. Los Tenedores de P.R. de i) Reclamaciones de beneficios de empleados activos y retirados, y de ii) Reclamaciones de empleados de AFSCME que deban declarar impuestos en Puerto Rico deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias de la percepción de algún pago en concepto de dichas reclamaciones.

i) **Reclamaciones de incentivos energéticos (Clase 52)**

Los Deudores esperan que, a tenor con el Plan, a partir de la Fecha de Entrada en vigencia, (i) el ELA continuará con el programa de incentivos energéticos establecido en la Ley de Incentivos Energéticos, y (ii) en relación con el mismo, asumirá las Reclamaciones de Incentivos Energéticos Permitidas y los instrumentos y acuerdos de reserva existentes en la Fecha de Entrada en vigencia y en consonancia con los términos de la Ley de Incentivos Energéticos, y (b) en la medida en que los respectivos proyectos se hayan completado de acuerdo con la Ley de Incentivos Energéticos y los términos y disposiciones de los instrumentos y acuerdos de reserva celebrados en relación con la misma, se permitirá a los titulares de las Reclamaciones de Incentivos Energéticos Permitidas ejercer y reclamar los incentivos fiscales creados en virtud de la misma.

Por lo tanto, la determinación bajo el Plan no constituye un hecho imponible y no se reconocerá ninguna ganancia o pérdida por parte de los Titulares de Reclamaciones de Incentivos Energéticos de P.R. a efectos del impuesto sobre la renta de Puerto Rico como resultado de la adopción del Plan.

3. **Tratamiento fiscal de los Costos de consumación y Derechos de restricción del AAP**

Ciertos Tenedores de Reclamaciones podrán percibir pagos en efectivo de los Costos de consumación y/o de los Derechos de restricción del AAP. El tratamiento tributario de Puerto Rico de los pagos en efectivo de los Costos de consumación y de los Derechos de restricción del AAP no queda claro. Los Deudores pretenden tratar la percepción de los Costos de consumación y los Derechos de restricción del AAP de manera similar a la adoptada a efectos tributarios federales de EE.UU.; es decir, que sea parte del importe materializado en el canje y sujeto a los impuestos sobre el ingreso de Puerto Rico, ya expuesto anteriormente en el epígrafe "—*Tenedores de Reclamaciones de Bonos ELA Vintage (Clase 14), Reclamaciones de Bonos ELA Vintage (Assured) (Clase 16), Reclamaciones de Bonos ELA Vintage (National) (Clase 17), Reclamaciones de Bonos ELA Vintage (Otros asegurados) (Clase 18), Reclamaciones de Bonos ELA Vintage (Syncora) (Clase 19), Reclamaciones de Bonos ELA Vintage garantizados (Clase 21), Reclamaciones de Bonos ELA Vintage garantizados (Assured) (Clase 22), Reclamaciones de Bonos ELA Vintage garantizados (National) (Clase 23), Reclamaciones de Bonos ELA Vintage garantizados (Otros asegurados) (Clase 24), Reclamaciones de Bonos ELA Vintage garantizados (Syncora) (Clase 25), Reclamaciones de Bonos ELA 2011 (Clase 27), Reclamaciones de Bonos ELA 2011 (Assured) (Clase 29), Reclamaciones de Bonos ELA 2011 garantizados (Clase 31), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Clase 33), Reclamaciones de Bonos ELA 2011 series D/E/PIB (Assured)*

*(Clase 34), Reclamaciones de Bonos ELA 2012 (Clase 37), Reclamaciones de Bonos ELA 2012 (Assured) (Clase 39), Reclamaciones de Bonos ELA 2012 garantizados (Clase 41), Reclamaciones de Bonos ELA 2014 (Clase 43) y Reclamaciones de Bonos ELA 2014 garantizados (Clase 46)—Tratamiento fiscal del canje".* Sin embargo, es posible que la Hacienda de P.R. no lo acepte y que considere dichos pagos (o algunos de ellos) como pagos separados tributables como ingreso ordinario.

Recomendamos a los Tenedores de P.R. consultar a sus asesores fiscales acerca del tratamiento tributario de las distribuciones percibidas en el marco del Plan, incluyendo el efectivo cobrado en concepto de Costos de consumación y de los Derechos de restricción del AAP

**C.      Tenedores no de P.R.**

**1.      Definición de Tenedor no de P.R.**

Salvo que se estipule algo distinto, la siguiente exposición se aplica exclusivamente a Tenedores no de P.R. Tal como se utiliza aquí, por "Tenedor no de P.R" se entenderá al tenedor usufructuario de valores existentes, Nuevos Bonos o CVI que no sea (i) Tenedor de P.R., o bien (ii) una asociación u otra entidad considerada como tal o bajo tratamiento fiscal simplificado a efectos tributarios de Puerto Rico.

Si una asociación u otra entidad o concierto que tributa como asociación a efectos del impuesto sobre el ingreso de Puerto Rico es tenedor de Valores Existentes, Nuevos Bonos GO o CVI, el tratamiento fiscal de un socio de dicha asociación dependerá en general del estatus del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad que consulten a sus asesores fiscales.

La siguiente descripción incluye solamente ciertas consecuencias tributarias puertorriqueñas del Plan para Tenedores no de P.R. La descripción no incluye ninguna consideración tributaria no puertorriqueña. Los Tenedores no de P.R. deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias del Plan, en Puerto Rico y en el extranjero, en función de sus circunstancias personales.

**2.      Tratamiento fiscal del canje**

Un Tenedor no de P.R. que no realice actividades económicas ni haga negocios en Puerto Rico no estaría sujeto al impuesto sobre el ingreso de Puerto Rico con respecto a cualquier beneficio materializado por el canje de una Reclamación permitida en virtud del Plan, incluyendo aquellas cuantías asignadas a intereses devengados y no pagados. Por otra parte, los Tenedores no de P.R. que sean corporaciones (o estén tratados como tales por el Código de P.R.) y extranjeros no residentes dedicados a actividades comerciales o que hagan negocios en Puerto Rico, estarán sujetos a los impuestos sobre el ingreso de P.R. igual que un Tenedor de P.R., en concepto de cualquier beneficio relacionado con sus actividades o negocios en Puerto Rico.

**3.      Tributación de los Nuevos Bonos y los CVI**

**a)      Tratamiento de los intereses**

Los intereses pagados a, o devengados por, los Tenedores no de P.R. en concepto de los Nuevos Bonos no estarán sujetos al impuesto puertorriqueño sobre el ingreso, incluyendo el impuesto básico alternativo. La plusvalía de capital de los Nuevos Bonos a pagar en el vencimiento por encima de su precio de emisión inicial, si la hubiese, no estará sujeta al impuesto puertorriqueño sobre el ingreso, incluyendo el impuesto básico alternativo.

553

Es posible que, a efectos tributarios puertorriqueños, no se admitan las deducciones de un Tenedor no de P.R. que se dedique a actividades comerciales o haga negocios en Puerto Rico, relacionadas con los intereses pagados o devengados y otros gastos incurridos atribuibles a los citados Nuevos Bonos GO.

b)      **Tratamiento de los pagos de los CVI**

El tratamiento fiscal de los ingresos de los pagos del CVI no está claro. A menos que se disponga lo contrario en la legislación sobre el CVI, los pagos pueden tratarse como ingresos ordinarios a efectos del impuesto sobre la renta de Puerto Rico. En ese caso, los tenedores que no son de P.R. que realicen actividades comerciales o empresariales en Puerto Rico a efectos del impuesto sobre la renta pueden estar sujetos al impuesto sobre la renta de Puerto Rico a los tipos impositivos ordinarios. Por otro lado, los tenedores que no son de P.R. y que son corporaciones (o que son tratados como corporaciones bajo el Código de P.R. y los extranjeros no residentes que no se dedican al comercio o negocios en Puerto Rico pueden estar sujetos a una retención del 29% del impuesto sobre la renta de Puerto Rico en origen. Los tenedores que no son de P.R. deben consultar a sus propios asesores fiscales sobre las consecuencias del impuesto sobre la renta de Puerto Rico al recibir cualquier pago de los CVI.

c)      **Venta, retiro u otras enajenaciones de Nuevos Bonos GO y CVI**

Los beneficios materializados en concepto del ingreso, retirada u otras enajenaciones de Nuevos Bonos por un Tenedor no de P.R. que no se dedique a actividades comerciales ni haga negocios en Puerto Rico no estarán sujetos al impuesto sobre el ingreso de Puerto Rico, sea mediante retenciones o de otras maneras.  Por otra parte, los Tenedores no de P.R. que sean corporaciones (o estén tratados como corporaciones bajo el Código de P.R.) y extranjeros no residentes dedicados a actividades comerciales o hagan negocios en Puerto Rico estarán sujetos a los impuestos sobre el ingreso de Puerto Rico si dichos beneficios están efectivamente conectados con dichas actividades o negocios del mismo modo que un Tenedor de P.R. Además, una corporación puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente conectados.

[*El resto de la página se deja intencionalmente en blanco*]

554

## XI.    Aplicabilidad de ciertas leyes de valores federales y estatales

A.    **Nuevos Bonos GO**

1.    **Registro de los valores**

En general, los valores emitidos por el Estado Libre Asociado Reorganizado, como los Nuevos Bonos GO, están exentos de los requisitos de registro estipulados por la sección 3(a)(2) de la Ley de Valores.

Además de las exenciones que la Ley de Valores otorga a las entidades y organismos gubernamentales, como el Estado Libre Asociado Reorganizado y a las agencias e instrumentalidades gubernamentales del mismo, la sección 1145(a)(1) del Código de Quiebras, aplicable a los Casos de Título III de conformidad con la sección 301 de la Ley PROMESA, prevé una exención de los requisitos de registro de la Ley de Valores y de todos los requisitos derivados de leyes homólogas estatales para la oferta o venta en el marco de un plan de ajustes de títulos del deudor, una filial del deudor participante en un plan de ajuste conjunto con el deudor, o un sucesor del deudor. El Código de Quiebras estipula que ciertos acreedores, denominados "suscriptores" en el lenguaje del Código de Quiebras, no podrán revender dichos valores sin registrarlos de acuerdo con la Ley de Valores o de una exención de la misma. Dado que las obligaciones del Estado Libre Asociado están exentas de registro bajo las leyes de valores generalmente aplicables, esta excepción no es relevante para los valores del Estado Libre Asociado Reorganizado, aunque es posible que lo dispuesto por la sección 1145 del Código de Quiebras (que suspende la vigencia de las leyes de valores) no surta efecto para los "suscriptores" a tenor del Código de Quiebras. Los acreedores de los Deudores que consideren que satisfacen la definición de "suscriptores" de conformidad con el Código de Quiebras deberían consultar a un profesional calificado acerca de las obligaciones que les imponen las leyes de valores federales y estatales.

Al igual que la exención de registro prevista para el Estado Libre Asociado según la sección 3(a)(2) de la Ley de Valores, en general los instrumentos legales de esta índole admiten exenciones de calificación de ciertas escrituras de fideicomiso formalizadas por entidades gubernamentales. Por consiguiente, cada escritura, ordenanza, resolución y otros instrumentos escritos del Estado Libre Asociado o del Estado Libre Asociado Reorganizado relacionados con los Nuevos Bonos GO estarán exentos de la calificación prevista por la sección 304(a)(4) de la LCF.

2.    **Información al mercado**

a)    **Oferta inicial y venta**

Aunque están exentos de registro, los valores emitidos por el Estado Libre Asociado Reorganizado están sujetos a las disposiciones antifraude de las leyes federales sobre valores. En general, las secciones 10(b) y 17(a) de la Ley del Mercado de Valores de 1934 (la "Ley del Mercado de Valores") y la Regla 10b-5 promulgada por la SEC en el marco de la Ley de Valores prohíben el fraude en la compraventa de títulos. Por lo tanto, cada una de las ofertas públicas de venta de obligaciones del Estado Libre Asociado Reorganizado suele ir acompañada de un documento de oferta que se denomina "Declaración Oficial" y que contiene información importante sobre el emisor y los títulos que se venden para que los inversores puedan tomar una decisión de inversión informada sobre la compra de los títulos ofrecidos. La sección 1125(d) del Código de Quiebras, que ha sido adoptada por PROMESA, establece que la adecuación de cualquier divulgación a los acreedores y a los inversores hipotéticos típicos de los titulares de Reclamaciones en este caso no está sujeta a los principios de cualquier ley, norma o reglamento no concursal que sea aplicable, lo que incluye las leyes federales de valores. En cambio, la sección 1125(b) del Código

555

de Quiebras, que ha sido adoptada por PROMESA, regula la divulgación exigiendo que se proporcione información adecuada a las diversas clases de acreedores de los Deudores y a los hipotéticos inversores en obligaciones de los Deudores a través de una declaración de divulgación como esta Declaración de Divulgación.

### b)   Divulgación continua

Los valores que el Estado Libre Asociado Reorganizado ofrece a la venta pública generalmente están sujetos a los requisitos de la Regla 15c2-12 de la Ley del Mercado de Valores (la "Regla"), salvo que dichos títulos se ajusten a ciertas excepciones previstas por la Regla.  Entre otras condiciones, la Regla requiere que los suscriptores que participan en una oferta obtengan un acuerdo que imponga los requisitos de divulgación continua a las emisiones de títulos municipales, como los del Estado Libre Asociado Reorganizado.

La entrega de los Nuevos Bonos GO a tenor con el Plan no está cubierta por la Regla, ya que la propuesta es que estos instrumentos se emitan a cambio de la Reclamación de un demandante sin la participación de un suscriptor, como lo define la Regla.

Normalmente, los valores emitidos por los estados están exentos de registro para posibilitar posteriores transferencias por un tenedor de buena fe a su propia cuenta, y transferencias subsiguientes a inversionistas institucionales o acreditados.  Generalmente, está previsto que estas exenciones se apliquen a posteriores transferencias de los Nuevos Bonos GO.

## B.   CVI

### 2.   Registro de los valores

En general, los valores emitidos por el Estado Libre Asociado Reorganizado, como los Nuevos Bonos CVI están exentos de los requisitos de registro estipulados por la sección 3(a)(2) de la Ley de Valores.

Además de las exenciones que la Ley de Valores otorga a las agencias e instrumentalidades gubernamentales, como el Estado Libre Asociado Reorganizado, la sección 1145(a)(1) del Código de Quiebras, aplicable a los Casos de Título III a tenor con la sección 301 de la Ley PROMESA, prevé una exención de los requisitos de registro de la Ley de Valores y de todos los requisitos derivados de leyes homólogas estatales para la oferta o venta en el marco de un plan de ajustes de títulos del deudor, una filial del deudor participante en un plan de ajuste conjunto con el deudor, o un sucesor del deudor.  El Código de Quiebras estipula que ciertos acreedores, denominados "suscriptores" en el lenguaje del Código de Quiebras, no podrán revender dichos valores sin registrarlos de acuerdo con la Ley de Valores o de una exención de la misma. Dado que las obligaciones del Estado Libre Asociado Reorganizado están exentas de registro bajo las leyes de valores generalmente aplicables, esta excepción no es relevante para los valores del Estado Libre Asociado Reorganizado, aunque es posible que lo dispuesto por la sección 1145 del Código de Quiebras (que suspende la vigencia de las leyes de valores) no surta efecto para los "suscriptores" a tenor con el Código de Quiebras. Los acreedores de los Deudores que consideren que satisfacen la definición de "suscriptores" de conformidad con el Código de Quiebras deberían consultar a un profesional calificado acerca de las obligaciones que les imponen las leyes de valores federales y estatales.

Al igual que la exención de registro prevista para el Estado Libre Asociado Reorganizado según la sección 3(a)(2) de la Ley de Valores, en general los instrumentos legales de esta índole admiten exenciones de calificación de ciertas escrituras de fideicomiso formalizadas por entidades gubernamentales.  Por

consiguiente, cada escritura, ordenanza, resolución y otros instrumentos escritos del Estado Libre Asociado Reorganizado relacionados con los CVI estarán exentos de la calificación prevista por la sección 304(a)(4) de la Ley de Contrato de Fideicomiso.

### 3.   Información al mercado

#### (a)   Oferta inicial y venta

Aunque están exentos de registro, los valores emitidos por el Estado Libre Asociado Reorganizado están sujetos a las disposiciones antifraude de las leyes federales sobre valores. Las secciones 10(b) y 17(a) de la Ley de Valores y la Regla 10b-5 promulgada por la SEC en el marco de la Ley de Valores prohíben el fraude en la compraventa de títulos. Por lo tanto, cada una de las ofertas públicas de venta de obligaciones del Estado Libre Asociado Reorganizado suele ir acompañada de un documento de oferta que se denomina "Declaración Oficial" y que contiene información importante sobre el emisor y los títulos que se venden para que los inversores puedan tomar una decisión de inversión informada sobre la compra de los títulos ofrecidos. La sección 1125(d) del Código de Quiebras, que ha sido adoptada por PROMESA, establece que la adecuación de cualquier divulgación a los acreedores y a los inversores hipotéticos típicos de los titulares de Reclamaciones en este caso no está sujeta a los principios de cualquier ley, norma o reglamento no concursal que sea aplicable, lo que incluye las leyes federales de valores. En cambio, la sección 1125(b) del Código de Quiebras, que ha sido adoptada por PROMESA, regula la divulgación exigiendo que se proporcione información adecuada a las diversas clases de acreedores de los Deudores y a los hipotéticos inversores en obligaciones del Estado Libre Asociado Reorganizado a través de una declaración de divulgación como esta Declaración de Divulgación.

#### (b)   Divulgación continua

Los valores que el Estado Libre Asociado Reorganizado ofrece a la venta pública generalmente están sujetos a los requisitos de la Regla (es decir, la Regla 15c2-12 de la Ley de Valores (como se define anteriormente)), salvo que dichos títulos se ajusten a ciertas excepciones previstas por la Regla. Entre otras condiciones, la Regla requiere que los suscriptores que participan en una oferta obtengan un acuerdo que imponga los requisitos de divulgación continua a un emisor de títulos municipales, como el Estado Libre Asociado Reorganizado.

La entrega de los CVI a tenor con el Plan no está cubierta por la Regla, ya que la propuesta es que estos instrumentos se emitan a cambio de la Reclamación de un demandante sin la participación de un suscriptor, como lo define la Regla.

Normalmente, los valores emitidos por los estados están exentos de registro para posibilitar posteriores transferencias por un tenedor de buena fe a su propia cuenta, y transferencias subsiguientes a inversionistas institucionales o acreditados. Generalmente, está previsto que estas exenciones se apliquen a posteriores transferencias de los CVI.

557

## XII.    Información Financiera y Proyecciones

**A.    Información Financiera Histórica**

1.    **Estados Financieros del Estado Libre Asociado**

El Estado Libre Asociado ha asumido varios compromisos de divulgación en conformidad con la Regla 15c2-12 del SEC en conexión con sus emisiones de bonos. En conformidad con dicha Regla, el Estado Libre Asociado ha pactado presentar ante el MSRB por medio de EMMA, dentro de 305 días después del cierre de cada Año fiscal, datos operativos e información financiera clave del Año fiscal anterior, incluyendo: (1) estados financieros auditados y (2) un Informe sobre Información y Datos Operativos (el "Informe del Estado Libre Asociado"), que proporciona información financiera sobre ingresos, gastos, operaciones financieras y endeudamiento del tipo que generalmente se encuentra en las Declaraciones Oficiales del Estado Libre Asociado que se preparan en conexión con sus emisiones de bonos.

Los estados financieros básicos auditados más recientes preparados por el Estado Libre Asociado corresponden al Año fiscal 2017. Estos estados financieros fueron presentados por el Estado Libre Asociado con la Junta de Reglamentación de Títulos Municipales (Municipal Securities Rulemaking Board, "MSRB"), por medio de su Sistema Electrónico de Acceso al Mercado Municipal (Electronic Municipal Markets Access System, "EMMA"), el 1 de septiembre de 2020. El Informe del Estado Libre Asociado más reciente tiene fecha del 18 de diciembre de 2016 y recoge información financiera no auditada al 30 de junio, 2016.[387]

Los estados financieros para el Año fiscal 2017 fueron auditados por KPMG LLP; éste no auditó los estados financieros de determinadas actividades, fondos y Unidades componentes identificadas por separado en su informe de fecha 31 de agosto de 2020, en los cuales se informan y se expresan opiniones calificadas y no modificadas[388] y que incluyen párrafos que enfatizan temas pertinentes con respecto al principio contable del supuesto de empresa en funcionamiento ("going concern") relacionados con el Estado Libre Asociado, los Sistemas de Retiro, BGF, ACT, la AEE, AAA y la UPR.

En una carta de fecha 26 de febrero de 2021 dirigida al Gobernador Pierluisi, la Junta de Supervisión proporcionó el calendario estimado por el Gobierno para la finalización de los estados financieros de los años fiscales 2018, 2019, 2020 y 2021. Basándose en la última información disponible en el momento de la carta, el Estado Libre Asociado espera finalizar los estados financieros del Año fiscal 2018 en abril de 2021, los de los Años fiscales 2019 y 2020 en mayo de 2022 y los del Año fiscal 2021 en abril de 2023

Al 20 de junio de 2019, en relación con una solicitud de información por parte de las agencias federales de orden público, el gobierno anunció la cancelación de ciertos contratos que el Departamento de

---

[387] La Oficina de Contabilidad General (General Accounting Office, GAO), en su Informe de 2019, determinó que la divulgación oportuna de información financiera auditada ha sido un problema para Puerto Rico durante mucho tiempo. Tanto el estado financiero de Puerto Rico para el año 2015 como el de 2016 fueron publicados más de 1,000 días después del cierre de dichos años fiscales.

[388] Una opinión calificada es una declaración emitida después de completar una auditoría, en la que se sugiere que la información que se aporta es de alcance limitado; una opinión no modificada es una declaración en la que el auditor opina que los estados financieros se presentan, en todo aspecto material, de conformidad con el marco aplicable de presentación de informes financieros.

Hacienda o el OCFO había otorgado a la firma contable BDO Puerto Rico, incluido un contrato para asistir al Estado Libre Asociado a completar los estados financieros del Estado Libre Asociado para los años 2017 y 2018.  El 24 de junio de 2019, el Secretario de Hacienda y Director Financiero, el oficial encargado de preparar los estados financieros del Estado Libre Asociado, fue destituido de su cargo.[389] Desde entonces, el cargo ha sido ocupado por otras dos personas.  Es probable que estos acontecimientos y la rotación de directivos ocasionen demoras en la fecha anticipada de finalización de los estados financieros.

      **Presentación Tardía de Informes Financieros.** Como se menciona anteriormente, el Estado Libre Asociado no ha presentado sus estados financieros para los años 2019 o 2018, ni su Informe del Estado Libre Asociado para los años fiscales 2019, 2018 y 2017. Si bien el Estado Libre Asociado ha presentado todos los estados financieros e Informes del Estado Libre Asociado que tiene obligación de presentar para años anteriores, algunos de estos estados e informes se presentaron después del vencimiento del plazo límite para el Estado Libre Asociado, que normalmente es el 1 de mayo.[390]

      A continuación se presenta un breve resumen de las razones que causaron demoras en la presentación del Informe del Estado Libre Asociado o los estados financieros para el año fiscal 2008 en adelante.

---

[389] El 24 de junio de 2019, tras la destitución de hasta entonces CFO (Principal Oficial de Finanzas Públicas) Raúl Maldonado, el Gobernador designó al Director Ejecutivo de la AAFAF, Christian Sobrino, como nuevo CFO del Estado Libre Asociado. El 13 de julio de 2019, el Sr. Sobrino dimitió de sus cargos como CFO y Director Ejecutivo de a AAFAF. El 31 de julio de 2019, el a la sazón Gobernador Rosselló nombró a Omar Marrero como nuevo CFO del Estado Libre Asociado y Director Ejecutivo de la AAFAF. En febrero de 2021, el Gobernador Pedro Pierluisi designó al Secretario de Hacienda de Puerto Rico, Francisco Parés Alicea, como nuevo CFO del Estado Libre Asociado. El 9 de marzo de 2021, el Gobernador Pierluisi dictó la Orden Ejecutiva 2021-018 para crear el cargo de CFO y describir las funciones y facultades del mismo. Además, la orden detallaba la política de su administración de priorizar los estados financieros anuales auditados

[390] La demora fue causada por varias razones. Los estados financieros auditados y el Informe del Estado Libre Asociado para el año 2017 fueron demorados principalmente debido a las revisiones de los planes fiscales para el Estado Libre Asociado y ciertas instrumentalidades solicitadas por la Junta de Supervisión después de que los Huracanes Irma y María devastaron Puerto Rico, cuyos planes fiscales eran necesarios en su forma final para completar el Informe del Estado Libre Asociado. La causas principales de la demora de los estados financieros auditados y del Informe del Estado Libre Asociado para el año 2015 fueron: (a) una demora importante en la contratación de la firma de auditoría del Estado Libre Asociado debido a un aumento significativo en la responsabilidad y riesgo de auditoría de la firma en cuestión, (b) la implementación de GASB 68, GASB 69 y GASB 72, (c) problemas de liquidez y consideraciones respecto al principio contable del supuesto de empresa en funcionamiento ("going concern") del Estado Libre Asociado y sus Unidades componentes, (d) un análisis mejorado respecto a la insolvencia de los Sistemas de Retiro, (e) varios análisis de deterioro de los depósitos en el BFG y los balances de las cuentas por cobrar del Gobierno Primario y sus Unidades componentes, (f) demoras en la emisión de estados financieros auditados para Unidades componentes importantes, tales como el BFG, AEE, ACT, la Administración de Compensaciones por Accidentes de Automóviles, el Fideicomiso de Comunidades Especiales, el Fideicomiso de la Guardia Nacional de PR, la Corporación de Seguros Agrícolas y los Sistemas de Retiro, entre otros, (g) cambios importantes en la composición de la unidad de información del Estado Libre Asociado, resultado de la inclusión de aproximadamente 10 entidades como Unidades componentes mixtas en vez de Unidades componentes presentadas individualmente y (h) una demora en la emisión de los estados financieros de la AEE relacionados con los informes actuariales y estados financieros del sistema de retiro de la corporación de servicios básicos, lo cual a su vez demoró los estados financieros del Estado Libre Asociado. La causas principales de la demora de los estados financieros auditados y del Informe del Estado Libre Asociado para el año 2014 fueron: (a) consideraciones sobre liquidez y el supuesto de empresa en funcionamiento ("going concern") del Estado Libre Asociado y sus Unidades componentes, (b) la necesidad de un análisis complejo y mejorado con respecto a una reserva de préstamos del BFG, (c) la implementación de GASB 67 en los Sistemas de Retiro, (d) un análisis mejorado sobre la fecha de agotamiento de los Sistemas de Retiro, (d) demoras en la emisión de ciertas Unidades componentes, (e) procedimientos de auditoría mejorados y extendidos realizados por los auditores del Estado Libre Asociado y (f) ajustes y modificaciones importantes requeridos en los estados financieros relacionados con consideraciones respecto al supuesto de empresa en funcionamiento ("going concern") del Estado Libre Asociado y sus instrumentalidades.

*Año fiscal 2019.* El 30 de abril de 2020, el Estado Libre Asociado informó que sus estados financieros auditados para el Año fiscal 2019 no se presentarían para el plazo límite del 30 de abril de 2020. Según la notificación presentada ante EMMA, el Estado Libre Asociado presentará dichos documentos tan pronto como la información esté disponible.

*Año fiscal 2018.* El 1 de mayo de 2019, el Estado Libre Asociado informó que sus estados financieros auditados para el Año fiscal 2018 no se presentarían para el plazo límite del 1 de mayo de 2019. Según la notificación presentada ante EMMA, el Estado Libre Asociado presentará dichos documentos tan pronto como la información esté disponible.

*Año fiscal 2017.* El 1 de mayo de 2018, el Estado Libre Asociado informó que sus estados financieros auditados para el Año fiscal 2017 no se presentarían para el plazo límite del 1 de mayo de 2018. Según la notificación presentada ante EMMA, la causa principal de la demora fueron las revisiones de los planes fiscales del Estado Libre Asociado y ciertas instrumentalidades solicitadas por la Junta de Supervisión después de que los Huracanes Irma y María devastaran Puerto Rico. Era necesario contar con estos planes fiscales en su formato final para completar el Informe del Estado Libre Asociado. Los estados financieros auditados del Estado Libre Asociado correspondientes al Año fiscal 2017 se presentaron el 1 de septiembre de 2020.

*Año fiscal 2016.* El 28 de abril de 2018, el Estado Libre Asociado informó que sus estados financieros auditados para el año fiscal 2016 no se presentarían para el plazo límite del 1 de mayo de 2017. Los estados financieros auditados del Estado Libre Asociado correspondientes al Año fiscal 2016 se presentaron el 6 de mayo de 2019.

*Año fiscal 2015*. Los estados financieros auditados del Estado Libre Asociado correspondientes al Año fiscal 2015 se presentaron después de la fecha límite para presentación del Estado Libre Asociado. La demora fue causada principalmente por: (a) una demora importante en la contratación de la firma de auditoría del Estado Libre Asociado debido a un aumento significativo en la responsabilidad y riesgo de auditoría de la firma en cuestión, (b) la implementación de GASB 68, GASB 69 y GASB 72, (c) problemas de liquidez y consideraciones respecto al principio contable del supuesto de empresa en funcionamiento ("going concern") del Estado Libre Asociado y sus Unidades componentes, (d) un análisis mejorado respecto a la insolvencia de los Sistemas de Retiro, (e) varios análisis de deterioro de los depósitos en el BFG y los balances de las cuentas por cobrar del Gobierno Primario y sus Unidades componentes, (f) demoras en la emisión de estados financieros auditados para Unidades componentes importantes, tales como el BFG, AEE, ACT, la Administración de Compensaciones por Accidentes de Automóviles, el Fideicomiso de Comunidades Especiales, el Fideicomiso de la Guardia Nacional de PR, la Corporación de Seguros Agrícolas y los Sistemas de Retiro, entre otros, (g) cambios importantes en la composición de la unidad de información del Estado Libre Asociado, resultado de la inclusión de aproximadamente 10 entidades como Unidades componentes mixtas en vez de Unidades componentes presentadas individualmente y (h) una demora en la emisión de los estados financieros de la AEE relacionados con los informes actuariales y estados financieros del sistema de retiro de la corporación de servicios básicos, lo cual a su vez demoró los estados financieros del Estado Libre Asociado.

*Año fiscal 2014.* Los estados financieros auditados del Estado Libre Asociado correspondientes al Año fiscal 2014 se presentaron después de la fecha límite para presentación del Estado Libre Asociado. La demora fue causada principalmente por: (a) consideraciones sobre liquidez y el supuesto de empresa en funcionamiento ("going concern") del Estado Libre Asociado y sus Unidades componentes, (b) la necesidad de un análisis complejo y mejorado con respecto a una reserva de préstamos del BFG, (c) la implementación de GASB 67 en los Sistemas de Retiro, (d) un análisis mejorado sobre la fecha de agotamiento de los Sistemas de Retiro, (d) demoras en la emisión de ciertas Unidades componentes, (e) procedimientos de

auditoría mejorados y extendidos realizados por los auditores del Estado Libre Asociado y (f) ajustes y modificaciones importantes requeridos en los estados financieros relacionados con consideraciones respecto al supuesto de empresa en funcionamiento ("going concern") del Estado Libre Asociado y sus instrumentalidades.

**Año fiscal 2013.** Los estados financieros auditados del Estado Libre Asociado correspondientes al Año fiscal 2013 se presentaron después de la fecha límite para presentación del Estado Libre Asociado. Inicialmente, las cusas principales de la demora fueron: (i) una demora en el inicio del proceso de auditoría y cierre financiero para el año fiscal 2013, el cual no comenzó sino hasta la finalización del estado financiero para el Año fiscal 2012 el 16 de septiembre de 2013 (las demoras en la auditoría de los estados financieros del 2012 fueron causadas principalmente por el proceso de transición de gobierno después de las elecciones de noviembre de 2012)), (ii) demoras relacionadas con el cambio de los auditores externos del Estado Libre Asociado y (iii) la implementación de Declaración GASB Núm. 61, *La Entidad de Información Financiera*, lo cual cambió la entidad de información financiera del Estado Libre Asociado. Si bien el Estado Libre Asociado abordó estos asuntos dedicando recursos adicionales al proceso de auditoría y cierre financiero del Año fiscal 2013, el Estado Libre Asociado no pudo finalizar los estados financieros del 2013 debido a demoras adicionales no previstas, atribuibles a (i) procedimientos adicionales requeridos como parte de la auditoría, (ii) demoras en las emisiones de estados financieros auditados de los tres Sistemas de Retiros del Estado Libre Asociado, como resultado de la legislación de reforma de pensiones promulgada en el Año 2013 y la modificación judicial subsiguiente de dichas reformas; y (iii) demoras en las emisiones de los estados financieros auditados de ciertos otras Unidades componentes mixtas y presentadas individualmente.

**Año fiscal 2012.** Los estados financieros auditados del Estado Libre Asociado para el Año fiscal que terminó el 30 de junio de 2012 fueron presentados después de la fecha límite para presentación del Estado Libre Asociado, debido a demoras en la auditoría de dichos estados financieros como resultado del proceso de transición del gobierno, con la entrada en funciones de una nueva administración en enero de 2013 y el incumplimiento de ciertos Unidades componentes presentadas independientemente de finalizar sus estados financieros auditados. El Informe del Estado Libre Asociado para el Año fiscal 2012 también fue presentado después de la fecha límite para presentación del Estado Libre Asociado.

**Año fiscal 2009.** Los estados financieros auditados del Estado Libre Asociado para el Año fiscal que terminó el 30 de junio de 2009 fueron presentados después de la fecha límite para presentación del Estado Libre Asociado, debido a demoras en la contratación de auditores externos nuevos y la transición a los mismos, la implementación de nuevas declaraciones contables del gobierno, y la expresión de los estados financieros de ciertas Unidades componentes del Estado Libre Asociado presentados independientemente.

**Año fiscal 2008.** Los estados financieros auditados del Estado Libre Asociado para el Año fiscal que terminó el 30 de junio de 2008 (y ciertos años anteriores) fueron presentados después de la fecha límite para presentación del Estado Libre Asociado, debido a que varias agencias gubernamentales no presentaron a tiempo sus estados financieros auditados a los auditores externos del Gobierno Central, lo que resultó en la demora de la presentación de los estados financieros auditados del Estado Libre Asociado. El Informe del Estado Libre Asociado para el Año fiscal 2008 también fue presentado después de la fecha límite para presentación del Estado Libre Asociado.

2. **Estados Financieros del SRE**

En conformidad con la Regla 15c2-12 del SEC en relación con sus emisiones de bonos, el SRE ha pactado presentar ante el MSRB por medio de EMMA, dentro de 305 días después del cierre de cada Año fiscal, información financiera y operativa clave del año fiscal anterior, incluyendo: (1) estados financieros

auditados y (2) un Informe Anual sobre Información Financiera y Operativa, el cual proporciona información financiera sobre ingresos, gastos, operaciones financieras y endeudamiento del tipo que generalmente se encuentra en las Declaraciones Oficiales preparadas en relación con sus emisiones de bonos.

Los estados financieros básicos auditados más recientes preparados por el SRE corresponden al Año fiscal 2017. Estos estados financieros fueron presentados por el SRE ante el MSRB por medio de EMMA el 1 de julio de 2020. Los estados financieros de SRE para el Año fiscal 2018 y Año fiscal 2019 aún no se han finalizado. El Informe Anual de Información Financiera y Datos Operativos del SRE fue publicado el 1 de mayo de 2019 y recoge información financiera no auditada al 30 de junio de 2018

Los estados financieros para el Año fiscal 2017 fueron auditados por KPMG LLP, cuyo informe incluye un párrafo de énfasis[391] concerniente a la incertidumbre sobre la capacidad del SRE de continuar como empresa en funcionamiento.

**Presentación Tardía de Informes Financieros.** Como se mencionó anteriormente, el SRE no ha presentado sus estados financieros para los años 2019 o 2018, los cuales aún no se han finalizado. Por otra parte, si bien el SRE ha presentado todos los estados financieros e informes que se le requiere presentar para años anteriores, algunas de esas presentaciones fueron hechas después de la fecha límite para presentación del SRE, que normalmente es el 1 de mayo.

3.    **Estados Financieros de la AEP**

En conformidad con la Regla 15c2-12 del SEC y en relación con sus emisiones de bonos, la AEP ha pactado presentar ante el MSRB por medio de EMMA, dentro de 305 días después del cierre de cada Año fiscal, información financiera y operativa clave del Año fiscal anterior, incluyendo: (1) estados financieros auditados y (2) un Informe Anual sobre Información Financiera y Operativa, el cual proporciona información financiera sobre ingresos, gastos, operaciones financieras y endeudamiento del tipo que generalmente se encuentra en las Declaraciones Oficiales preparadas en relación con sus emisiones de bonos.

Los estados financieros básicos auditados más recientes preparados por la AEP corresponden al Año fiscal 2017. Estos estados financieros fueron presentados por la AEP ante el MSRB por medio de EMMA el 23 de junio de 2020. El Informe Anual de Información Financiera y Datos Operativos de la AEP fue publicado el 28 de agosto de 2020 y recoge información financiera no auditada al 30 de junio de 2017

Los estados financieros para el Año fiscal 2017 fueron auditados por Ramírez Flores and Co, PSC. El informe de los auditores incluye un párrafo de énfasis sobre la reedición de los estados financieros del 30 de junio de 2017 y la incertidumbre sobre la capacidad de la AEP para continuar con sus actividades.

---

[391] Un párrafo de énfasis es un párrafo que dirige la atención de los usuarios de estados financieros a un asunto que el auditor considera es fundamental para el entendimiento de los estados financieros por parte del usuario.

*Presentación Tardía de Informes Financieros de la AEP.*  La AEP no ha presentado sus estados financieros auditados para los años fiscales 2018 o 2017, los cuales aún no se han finalizado.

**B.      Plan Fiscal del Estado Libre Asociado y Proyecciones**

Se adjunta a esta Declaración de Divulgación, como el <u>Anexo G</u>, una copia del Plan Fiscal del Estado Libre Asociado, certificado por la Junta de Supervisión el 23 de abril de 2020.   El Plan Fiscal del Estado Libre Asociado detalla las operaciones proyectadas del Estado Libre Asociado y SRE en virtud del Plan, sujeto a los supuestos y calificaciones que constan en el Plan Fiscal certificado del Estado Libre Asociado.[392]

Es importante notar que las proyecciones que se describen en el Plan Fiscal del Estado Libre Asociado pueden diferir de los resultados reales y que dependen en gran medida de hipótesis importantes con respecto a la futura condición económica y financiera del Estado Libre Asociado y sus instrumentalidades, incluyendo el SRE, los cuales son afectados por una diversidad de factores legales, financieros, sociales, económicos, ambientales, gubernamentales y políticos.  Estos factores pueden ser muy complejos, pueden variar de un Año fiscal al otro y, por otra parte, frecuentemente son el resultado de acciones tomadas o no tomadas, no solamente por el Gobierno y la Junta de Supervisión, sino también por otras entidades externas, como el Gobierno de los Estados Unidos.

Las proyecciones financieras que se incluyen en el Plan Fiscal del Estado Libre Asociado operan bajo el supuesto de la implementación exitosa del Plan.  Las proyecciones financieras que se incluyen en el Plan Fiscal del Estado Libre Asociado deben ser evaluadas junto con los supuestos, notas, y calificaciones que se incluyen en el Plan Fiscal del Estado Libre Asociado y los supuestos, calificaciones, y explicaciones que constan en esta Declaración de Divulgación, incluidas las secciones tituladas "Descripción general de los Deudores", "El Plan de Ajuste Título III", "Ciertos Factores de Riesgo a Considerar", "Ciertas Consideraciones Materiales Relacionadas con el Impuesto sobre el ingreso Federal de los Estados Unidos", "Ciertas Consideraciones Relacionadas con el Impuesto sobre el ingreso de Puerto Rico" y "Aplicabilidad de Ciertas Leyes Federales y Estatales sobre Valores".

El Plan Fiscal del Estado Libre Asociado no constituye una auditoría realizada en conformidad con los principios generalmente aceptados de auditoría, una inspección de los controles internos u otros servicios de certificación o de evaluación en conformidad con las normas establecidas por el American Institute of Certified Public Accountants o cualquier otra organización.  Por consiguiente, la Junta de Supervisión no puede expresar una opinión o cualquier otra forma de garantía sobre los estados financieros

---

[392]  El propósito del Análisis de Sostenibilidad de Deuda ("<u>ASD</u>") en el Plan Fiscal del Estado Libre Asociado era proporcionar un marco para evaluar la capacidad a largo plazo del Gobierno para pagar el servicio de deuda sobre sus deudas en bonos. El ASD incluyó una comparación de los niveles existentes de deuda entre Puerto Rico y los estados de los EE.UU. y halló que los niveles de deuda existentes de Puerto Rico son mucho más elevados que los de sus estados pares en los EE.UU. El ASD también incluyó una comparación de los niveles de deuda entre Puerto Rico y ciertos elementos soberanos de la Unión Europea ("<u>UE</u>"), y asimismo, halló que los niveles de deuda existentes de Puerto Rico son mucho más elevados que los de los elementos soberanos seleccionados de la UE. Por otra parte, el ASD realizó un análisis adicional de las razones de deuda claves de los diez estados menos endeudados, los diez estados más endeudados, y la media para todos los estados de los EE.UU. para determinar un rango de capacidad implícita de deuda, en base a parámetros de deuda y costos fijos. El ASD concluyó que Puerto Rico debe elaborar y adherirse a presupuestos estructuralmente balanceados que reflejan disciplina permanente, divulgar sus estados financieros auditados oportunamente, y reestructurar la carga de la deuda a un nivel sostenible.

o sobre cualquier información financiera o de otra índole, o sobre los controles internos del gobierno o SRE y la información contenida en el presente.

Al decidir si les conviene votar para aceptar o rechazar el Plan, los tenedores de Reclamaciones deberán hacer sus propias determinaciones sobre la razonabilidad de los supuestos y la confiabilidad de las proyecciones financieras, y deben consultar sus propios asesores.

### XIII.   **Información Adicional**

Toda manifestación en esta Declaración de Divulgación con respecto a las disposiciones de cualquier documento no necesariamente será completa, y en cada instancia se hace referencia a dicho documento para que se pueda consultar el texto integral del mismo.   Ciertos documentos descritos y mencionados en esta Declaración de Divulgación no se han anexado en calidad de Anexos, debido a la impracticabilidad de proporcionar ejemplares a todos los destinatarios de esta Declaración de Divulgación. Todos los Anexos adjuntos al plan se presentarán ante el Tribunal del Título III y estarán a la vista, sin costo alguno, en el Sitio Web en https://cases.primeclerk.com/puertorico previo a la Fecha Límite de Votación. También se pueden obtener ejemplares de todos los Anexos del plan, sin costo alguno, comunicándose con el Agente de Solicitación, Prime Clerk LLC, por teléfono al (844) 822-9231 (llamada gratuita para EE.UU.  y Puerto Rico) o (646) 486-7944 (para llamadas internacionales), disponibles entre las 10:00 a.m. y las 7:00 p.m. (Zona Horaria Atlántica) (disponible en español), o por correo electrónico en puertoricoballots@primeclerk.com haciendo referencia a "Anexos del Plan de Ajuste del Estado Libre Asociado" en la línea de asunto.  Tenga en cuenta que Prime Clerk LLC no está autorizado a proporcionar, y no proporcionará, asesoría legal.

565

# XIV.   Conclusión

La Junta de Supervisión y los Deudores consideran que el Plan redunda en beneficio de todos los acreedores e instan a los Tenedores de Reclamaciones Afectadas con derecho a votar sobre el plan a que voten para aceptar el plan, dando constancia de su aceptación al remitir sus Papeletas marcadas oportunamente, para aceptar el plan antes de la Fecha Límite de Votación.