# **ANEXO  M**

ÚLTIMOS  ESTADOS  FINANCIEROS  AUDITADOS  DE LOS DEUDORES

**ELA DE PUERTO RICO**

Estados Financieros Básicos
e Información Adicional Requerida

30 de junio de 2017

(Con el Informe de los Auditores Independientes sobre los mismos)

*ESTADOS FINANCIEROS BÁSICOS E INFORMACIÓN ADICIONAL REQUERIDA*

*Año Fiscal Finalizado el 30 de junio de 2017*



***ELA de Puerto Rico***

***Honorable Wanda Vázquez Garced***
***Gobernadora***

*Preparado por:*

***Departamento de Hacienda de Puerto Rico***

**Francisco *Parés* Alicea, Contador Público Certificado**
*Secretario de Hacienda*

**Angel *Pantoja* Rodríguez**
*Subsecretario de Hacienda*

**Alfonso *Rossy* Raíces, Contador Público Certificado**
*Subsecretario de Contabilidad Central*

**ELA DE PUERTO RICO**

**Índice**

|  | Página(s) |
|---|---|
| Informe de los Auditores Independientes | 1–5 |
| Debate y Análisis de la Gerencia (No Auditado) | 6–28 |
| Estados Financieros Básicos: | |
| Estados Financieros de todo el Gobierno: | |
| Estado de Resultados Netos | 29-30 |
| Estado de Actividades | 31-32 |
| Estados Financieros de Fondos: | |
| Fondos del Gobierno: | |
| Balance | 33 |
| Conciliación del Balance de los Fondos Gubernamentales con el Estado de Resultados Netos | 34 |
| Estado de Ingresos, Gastos y Cambios en el Balance de Fondos | 35 |
| Conciliación del Estado de Ingresos, Gastos y Cambios en el Balance de Fondos Gubernamentales en el Estado de Actividades | 36 |
| Fondos de Propiedad Exclusiva: | |
| Estado de Resultados Netos | 37 |
| Estado de Ingresos, Gastos y Cambios en los Resultados Netos de los Fondos | 38 |
| Estado de Flujos de Efectivos | 39 |
| Fondos Fiduciarios: | |
| Estado de Resultados Netos Fiduciarios | 40 |
| Estado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensión (y otros Beneficios del Empleado) | 41 |
| Unidades de Componentes de Presentación Discreta: | |
| Estado Combinado de Resultados Netos | 42–43 |

**ELA DE PUERTO RICO**

**Índice**

| | Página(s) |
|---|---|
| Estado Combinado de Actividades | 44 |
| Notas a los Estados Financieros Básicos | 45–277 |
| Información Adicional Requerida (No Auditada): | |
| Esquema de Cambios en el Pasivo Neto de Pensiones para Planes de Pensión de un Solo Patrono - SRM | 278 |
| Esquema de Cambios en los Pasivos Netos de Pensiones para Planes de Pensión de un Solo Patrono - IRS | 279 |
| Esquema de Participación Proporcional de los Pasivos Netos de Pensiones de un Plan de Pensión de Patronos Múltiples de Costos Compartidos - SRE | 280 |
| Esquema de Contribuciones de los Patronos - Todos los Planes de Pensión | 281 |
| Esquema de Progreso de los Fondos para los Planes de Salud Posteriores al Empleo | 282 |
| Esquema de Contribuciones de los Patronos para los Planes de Salud Posteriores al Empleo | 283 |
| Esquema de Ingresos y Gastos – Presupuesto y Real - Base Presupuestaria – Fondo General | 284 |
| Notas de la Información Adicional Requerida | 285-289 |
| Estados Financieros Combinados y de Fondo Individuales y Esquemas del Fondo General: | |
| Fondo General | 290 |
| Esquema de Gastos por Agencia – Presupuesto y Real - Base Presupuestaria – Fondo General | 291–293 |
| Fondos No Mayores del Gobierno: | |
| Fondos No Mayores del Gobierno | 294–296 |
| Balance Combinado | 297–298 |
| Estado Combinado de Ingresos, Gastos y Cambios en el Balance de Fondos | 299–300 |
| Fondos Exclusivos No Mayores: | |
| Fondos Exclusivos No Mayores | 301 |

**ELA DE PUERTO RICO**

**Índice**

|  | **Página(s)** |
|---|---|
| Estado Combinado de Resultados Netos | 302 |
| Estado Combinado de Ingresos, Gastos y Cambios en los Resultados Netos de Fondos | 303 |
| Estado Combinado de Flujos de Efectivos | 304 |
| Fondos Fiduciarios: | |
| Fondos Fiduciarios | 305–306 |
| Declaración Combinada de Resultados Fiduciarios Netos - Fondos Fiduciarios de Pensiones | 307 |
| Estado Combinado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios (y otros Beneficios del Empleado) | 308 |
| Estado Combinado de Cambios en Activos y Pasivos - Fondos de Agencias | 309 |
| Unidades de Componentes No Mayores de Presentación Discreta: | |
| Unidades de Componentes No Mayores de Presentación Discreta | 310 |
| Estado Combinado de Resultados Netos | 311-317 |
| Estado Combinado de Actividades | 318 |



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

### Informe de los Auditores Independientes

El Honorable Gobernador y Legislatura del Estado Libre
Asociado de Puerto Rico
San Juan, Puerto Rico

Hemos auditado los estados financieros adjuntos de las actividades gubernamentales, las actividades de tipo comercial, las unidades de componentes agregados de presentación discreta, cada fondo mayor y la información del fondo agregado restante del Estado Libre Asociado de Puerto Rico (el ELA) a partir de y para el año finalizado el 30 de junio de 2017, y las notas relacionadas con los estados financieros que, en conjunto, comprenden los estados financieros básicos del Estado Libre Asociado que figuran en el índice

**Responsabilidad de la Gerencia sobre los Estados Financieros**

La gerencia es responsable de la preparación y presentación justa de estos estados financieros de acuerdo con los principios contables generalmente aceptados de los Estados Unidos; esto incluye el diseño, la implementación y el mantenimiento del control interno relevante para la preparación y presentación justa de estados financieros libres de errores materiales, ya sea debido a fraude o error.

**Responsabilidad de los Auditores**

Nuestra responsabilidad es expresar opiniones sobre estos estados financieros con base en nuestra auditoría. No auditamos los estados financieros de las siguientes entidades y fondos:

- *Actividades del Gobierno*
  - Corporación de Industrias de Ciegos, Personas Mentalmente Retardadas y Otras Personas Incapacitadas de Puerto Rico, Oficina de Servicios Legislativos, Oficina para el Mejoramiento de las Escuelas Públicas, Superintendencia del Capitolio, Cámara de Representantes de Puerto Rico, Senado de Puerto Rico, Administración de Vivienda Pública de Puerto Rico, Departamento de Financiamiento de la Vivienda de Puerto Rico: Fondo de Compras y Ventas, y el Departamento de Desarrollo Económico y Comercio de Puerto Rico, que en conjunto representan el 11.71% y el 2.49% del total de activos e ingresos, respectivamente, del Fondo General.
  - Autoridad de Transporte Marítimo de Puerto Rico, Fondos Especiales para el Fideicomiso Perpetuo de las Comunidades Especiales, fondos de amortización de la deuda, Autoridad de Edificios Públicos, Centro Comprensivo de Cáncer de la Universidad de Puerto Rico, Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, Fideicomiso de los Niños, Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, y Autoridad de Ponce que son fondos no mayores del gobierno, que representan el 12.39% y el 1.86% de los activos e ingresos totales, respectivamente, de la información del fondo acumulado restante

  Estas entidades y fondos representan colectivamente el 49.90% y el 2.61% de los activos e ingresos totales, respectivamente, de las actividades del gobierno

- *Actividades-de Tipo Comerciales*
  - Fondo de Seguro por Desempleo, que es un fondo empresarial mayor.
  - Administración de Seguros de Salud de Puerto Rico, que es un fondo empresarial mayor.
  - Administración de Servicios Médicos de Puerto Rico, que es un fondo empresarial mayor.

KPMG LLP es una sociedad de responsabilidad limitada de Delaware y una empresa miembro en EE. UU. de la red KPMG de empresas miembro independientes afiliadas a KPMG International Cooperative ("KPMG International"), una entidad suiza



– El Sistema de Lotería Adicional, el Fondo Recurrente de Control de Contaminación del Agua de Puerto Rico, el Fondo del Préstamo Recurrente para el Tratamiento del Agua Potable Segura de Puerto Rico, la Junta de Gobierno del Servicio 9-1-1, el Fondo de Seguro por Discapacidad, el Fondo de Seguro de Conductores y la Autoridad de Puertos de Ponce, que son fondos empresariales no mayores que representan colectivamente 15.07% y 34.11% del total de activos e ingresos, respectivamente, de la información del fondo acumulado restante.

Estas entidades y fondos representan colectivamente el 87.05% y el 89.72% de los activos e ingresos totales, respectivamente, de las actividades de tipo comercial.

- *Otras Entidades y Fondos*

  – El Sistema de Anualidades y Pensiones para Maestros de Puerto Rico, que representa el 14.48% y el 16.07% de los activos e ingresos totales, respectivamente, de la información del fondo acumulado restante.

- *Unidades de Componentes Acumulados de Presentación Discreta*

  Las unidades de componentes de presentación discreta que se enumeran en la nota 1(c) de los estados financieros básicos, con excepción del Banco Gubernamental de Fomento para Puerto Rico. Estas entidades representan colectivamente el 91.66% y el 97.08% de los activos e ingresos totales, respectivamente, de las unidades de componentes de presentación discreta.

Esos estados financieros fueron auditados por otros auditores cuyos informes nos han sido proporcionados, y nuestras opiniones, en la medida en que se relacionan con los montos incluidos para las entidades y los fondos indicados anteriormente, se basan únicamente en los informes de los otros auditores. Realizamos nuestra auditoría de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América. Dichas normas exigen que planifiquemos y ejecutemos la auditoría con el fin de obtener una seguridad razonable sobre si los estados financieros están libres de desviaciones materiales.

Una auditoría incluye ejecutar procedimientos para obtener evidencia de auditoría acerca de los montos y revelaciones en los estados financieros. Los procedimientos seleccionados dependen del juicio de los auditores, que incluye la evaluación de los riesgos de declaraciones erróneas significativas en los estados financieros, ya sea debido a fraude o a error. Al efectuar esas evaluaciones de riesgos, el auditor considera el control interno existente en la entidad, en lo que sea relevante para la preparación y presentación razonable de los estados financieros, a fin de diseñar procedimientos de auditoría que sean apropiados en las circunstancias, pero no con el propósito de expresar una opinión sobre la efectividad del control interno de la entidad. En consecuencia, no expresamos tal opinión. Una auditoría también incluye evaluar lo apropiado de las políticas contables utilizadas y la razonabilidad de los estimados contables significativos realizados por la gerencia, y evaluar la presentación de los estados financieros tomados en su conjunto.

Consideramos que la evidencia de auditoría que hemos obtenido es suficiente y apropiada para proporcionar una base para nuestra opinión de auditoría.

**Opiniones**

En nuestra opinión, según nuestra auditoría y los informes de los otros auditores, los estados financieros mencionados anteriormente presentan razonablemente, en todos los aspectos materiales, la situación financiera respectiva de las actividades gubernamentales, las actividades de tipo empresarial, las unidades de componente acumulado de presentación discreta, cada fondo principal y la información del fondo acumulado restante del ELA de Puerto Rico al 30 de junio de 2017, y los cambios respectivos en la posición financiera y, cuando corresponda, los flujos de efectivo de los mismos para el año finalizado en ese momento a tenor con los principios contables generalmente aceptados de los EE. UU.

**Énfasis de Cuestiones**

Incertidumbre sobre la Capacidad de Continuar como una Empresa en Marcha - Gobierno Primario

Los estados financieros básicos adjuntos se han preparado asumiendo que el ELA continuará como una



empresa en marcha. Como se analiza en la nota 2(a) de los estados financieros básicos, el ELA se encuentra en medio de una crisis fiscal, económica y de liquidez, una recesión económica, una alta tasa de desempleo, una disminución de la población, altos niveles de deuda y obligaciones relacionadas con las pensiones, y ha declarado que existen dudas sustanciales sobre la capacidad del ELA para continuar como una empresa en marcha. Adicionalmente, el 3 de mayo de 2017, la Junta de Supervisión y Administración Financiera (la Junta de Supervisión) a solicitud del Gobernador, radicó una solicitud de reparación en virtud del Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico del Congreso de los Estados Unidos (PROMESA) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La evaluación de la gerencia de los eventos y condiciones y los planes de la gerencia con respecto a estos asuntos también se describen en la nota 2(a). Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de esta incertidumbre. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a este asunto.

Incertidumbre sobre la Capacidad de Continuar como una Empresa en Marcha - Sistemas de Retiro

Los estados financieros básicos adjuntos se han preparado asumiendo que los sistemas de retiro del ELA continuarán como una empresa en marcha. Tal como se analizó en la nota 2(b) de los estados financieros básicos, el Sistema de Retiro de los Empleados del ELA de Puerto Rico, el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico y el Sistema de Anualidades y Pensiones para Maestros de Puerto Rico carecen de fondos suficientes. En el año fiscal 2018, cada uno de los sistemas de retiro vendió la mayor parte de sus inversiones y comenzó a operar sobre la base de pago por uso. Asimismo, el 3 de mayo de 2017 y el 21 de mayo de 2017, la Junta de Supervisión inició casos para el ELA y el Sistema de Retiro de los Empleados del ELA de Puerto Rico, respectivamente, mediante la radicación de solicitudes de reparación en virtud del Título III de PROMESA. En consecuencia, el ELA ha declarado en la nota 2(b) de los estados financieros básicos que existe una duda sustancial sobre la capacidad de cada uno de los sistemas de retiro para continuar como una empresa en marcha. Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de estas incertidumbres. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a estos asuntos.

Incertidumbre sobre la Capacidad de Continuar como una Empresa en Marcha - Unidades de Componentes Mayores de Presentación Discreta

Los estados financieros básicos adjuntos han sido preparados asumiendo que las unidades de componentes mayores de presentación discreta del ELA seguirán siendo una empresa en marcha. Tal como se analizó en la nota 2(c) de los estados financieros básicos, el ELA ha declarado que existen dudas sustanciales para las siguientes unidades de componentes mayores de presentación discreta como una empresa en marcha. La evaluación de la gerencia de los eventos y condiciones y los planes de la gerencia con respecto a estas cuestiones también se describen en la nota 2(c) de los estados financieros básicos. Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de estas incertidumbres. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a estos asuntos.

- *Banco Gubernamental de Fomento para Puerto Rico (BGF)*

  El ELA y sus unidades de componentes no han podido pagar sus préstamos del BGF, lo que ha afectado significativamente la liquidez y la capacidad del BGF para pagar sus obligaciones. Además, el 23 de marzo de 2018, el BGF cesó sus operaciones y actualmente se está liquidando de manera ordenada en virtud del Título VI de PROMESA.

- *Autoridad de Carreteras y Transportación de Puerto Rico (ACT)*

  Los estados financieros de la ACT al 30 de junio de 2017 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 14 de diciembre de 2018, incluía un párrafo sobre asunto relevante relacionado con la capacidad de la ACT para continuar como empresa en marcha. Tal como se indica en el informe de los auditores independientes de la ACT, la ACT ha tenido pérdidas recurrentes significativas de las operaciones, no tiene suficientes fondos disponibles para pagar completamente sus diversas obligaciones al momento de su vencimiento y se encuentra en estado de mora en los pagos de capital e intereses de múltiples series de bonos y líneas de crédito. Asimismo, el 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso para ACT al presentar una solicitud de radicación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

3



- *Autoridad de Energía Eléctrica de Puerto Rico (AEE)*

  Los estados financieros de la AEE al 30 de junio de 2017 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 28 de junio de 2019, excepto por varios documentos, los cuales tienen fecha del 30 de junio de 2020, incluía un párrafo sobre asunto relevante relacionado con la capacidad de la AEE para continuar como empresa en marcha. Como se indica en el informe de los auditores independientes de la AEE, la AEE tiene un déficit acumulado de $6,200 millones al 30 de junio de 2017 y debido a restricciones de liquidez, durante el año finalizado el 30 de junio de 2017, la AEE no realizó los depósitos necesarios al Fondo de Amortización de Deudas, pagos a líneas de crédito de combustible vigentes, documentos por pagar y la porción completa de la aportación patronal requerida al Sistema de Jubilación de Empleados de la Autoridad de Energía Eléctrica de Puerto Rico. Asimismo, el 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, presentó una petición de alivio en representación de la AEE en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

- *Autoridad de Acueductos y Alcantarillados de Puerto Rico (AAA)*

  Los estados financieros de la AAA al 30 de junio de 2017 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 30 de septiembre de 2019, incluía un párrafo sobre asunto relevante relacionado con la capacidad de la AAA para continuar como empresa en marcha. Tal como se indica en el informe de los auditores independientes de la AAA, la relación de la AAA con el ELA, las rebajas de crédito, grandes requisitos de gastos de capital no discrecionales, y la falta de acceso a los mercados de capital aumentaron la duda sustancial sobre su capacidad de continuar como una empresa en marcha.

- *Universidad de Puerto Rico (UPR)*

  Los estados financieros de la UPR al 30 de junio de 2017 y para el año finalizado fueron auditados por otros auditores, cuyo informe al respecto, con fecha del 14 de enero de 2019, incluía un párrafo sobre asunto relevante relacionado con la capacidad de la UPR para continuar como empresa en marcha. Tal como se indica en el informe de los auditores independientes de la UPR, la UPR depende en gran medida de las asignaciones del ELA para financiar sus operaciones y los acontecimientos recientes han generado inquietud en cuanto al posible retiro de la acreditación de la UPR.

Replanteamiento de Resultados Netos y Balance del Fondo

Tal como se analizó en la nota 4 de los estados financieros básicos, los resultados netos/balance del fondo de las actividades gubernamentales, las actividades de tipo comercial, el Fondo de Administración de Servicios Médicos de Puerto Rico, las unidades de componentes acumulados de presentación discreta y los fondos acumulados restantes se han reformulado al 1 de julio de 2016 para corregir errores. Nuestras opiniones sobre los estados financieros básicos no se modifican con respecto a estos asuntos.

**Otras Cuestiones**

Información Adicional Requerida

Los principios contables generalmente aceptados en los Estados Unidos requieren que el debate y el análisis de la gerencia en las páginas 6 a 28; los esquemas de cambios en los pasivos netos de pensiones del ELA para los planes de pensión de un solo patrono en las páginas 278 y 279; el esquema de la participación proporcional del ELA en los pasivos netos de pensiones del plan de pensiones de patronos múltiples de costo compartido en la página 280; el esquema de las contribuciones de los patronos para todos los planes de pensiones en la página 281; el esquema de progreso de financiamiento para los planes de atención médica posteriores al empleo en la página 282; el esquema de las contribuciones de los patronos para los planes de atención médica posteriores al empleo en la página 283; y el esquema de ingresos y gastos - presupuesto y base presupuestaria real - Fondo General en la página 284, se presenten para complementar los estados financieros básicos. Tal información, aunque no forma parte de los estados financieros básicos, es requerida por la Junta de Normas de Contabilidad del Gobierno, que considera que es una parte esencial de la información financiera para ubicar los estados financieros básicos en un contexto operativo, económico o histórico apropiado. Nosotros y los demás auditores



hemos aplicado ciertos procedimientos limitados a la información complementaria requerida de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América, que consistieron en consultas a la gerencia sobre los métodos de preparar la información y compararla para que sea coherente con las respuestas de la gerencia a nuestras consultas, los estados financieros básicos y otros conocimientos que obtuvimos durante nuestra auditoría de los estados financieros básicos. No expresamos una opinión ni brindamos ninguna garantía sobre la información porque los procedimientos limitados no nos brindan evidencia suficiente para expresar una opinión o brindar alguna garantía.

Información Adicional

Nuestra auditoría se realizó con el propósito de formar opiniones sobre los estados financieros que colectivamente comprenden los estados financieros básicos del ELA. Los estados financieros y esquemas de fondos combinados e individuales que figuran en el índice adjunto se presentan con el propósito de un análisis adicional y no son una parte requerida de los estados financieros básicos.

Los estados financieros y esquemas de fondos combinados e individuales son responsabilidad de la gerencia y se derivaron y se relacionan directamente con los registros contables subyacentes y otros registros utilizados para preparar los estados financieros básicos. Tal información ha sido sometida a los procedimientos de auditoría aplicados en la auditoría de los estados financieros básicos y ciertos procedimientos adicionales, incluida la comparación y conciliación de dicha información directamente con la contabilidad subyacente y otros registros utilizados para preparar los estados financieros básicos o con los estados financieros básicos y otros procedimientos adicionales de acuerdo con los estándares de auditoría generalmente aceptados en los Estados Unidos de América. En nuestra opinión, los estados financieros y anexos de los fondos combinados e individuales se presentan razonablemente, en todos los aspectos materiales, en relación con los estados financieros básicos en su conjunto.

KPMG LLP

San Juan, Puerto Rico
31 de agosto de 2020

El sello Núm. E419633 de la Sociedad de Contadores Públicos Certificados de Puerto Rico se colocó en la copia registrada de este informe



**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

La sección de debate y análisis de la gerencia (MD&A) proporciona una descripción general y un análisis narrativo de las actividades financieras del Estado Libre Asociado de Puerto Rico (el ELA) para el año fiscal que finalizó el 30 de junio de 2017. El MD&A está destinado a servir como una introducción a los estados financieros básicos del ELA, que tienen los siguientes componentes: (1) estados financieros de todo el Gobierno, (2) estados financieros de fondos y (3) notas a los estados financieros básicos. El MD&A está destinado a (a) ayudar al lector a enfocarse en asuntos importantes, (b) proporcionar una visión general de las actividades financieras del ELA, (c) presentar una visión general de los resultados para el Fondo General sobre una base presupuestaria, y (d) resaltar asuntos de fondos individuales. La siguiente presentación está, por necesidad, muy resumida y, por lo tanto, para obtener una comprensión profunda de la condición financiera del ELA, los estados financieros básicos, las notas y la información complementaria requerida deben revisarse en su totalidad.

**Aspectos financieros destacados**

- El Gobierno Primario del ELA, que abarca las actividades del Gobierno y de tipo comercial del ELA, informó en los estados financieros de todo el gobierno, un déficit neto de aproximadamente $71,100 millones al 30 de junio de 2017, compuesto por aproximadamente $16,000 millones en activos totales y aproximadamente $8,000 millones en salidas diferidas de recursos, menos aproximadamente $94,000 millones en pasivos totales y aproximadamente $1,100 millones en entradas diferidas de recursos.

- El déficit neto del Gobierno Primario del ELA aumentó en aproximadamente $391.5 millones durante el año fiscal 2017. El déficit neto para Actividades del Gobierno aumentó en aproximadamente $981.3 millones y los resultados netos para actividades de tipo comercial aumentaron en aproximadamente $589.8 millones durante el año fiscal 2017.

- Las Actividades del Gobierno del ELA tuvieron ingresos totales de aproximadamente $18,000 millones para el año fiscal 2017, un valor inferior a los gastos totales de aproximadamente $18,300 millones. Las actividades de tipo del ELA tuvieron ingresos totales de aproximadamente $3,200 millones para el año fiscal 2017, lo que representó una reducción de aproximadamente $191.2 millones en comparación con el año 2016.

- El Gobierno Primario del ELA tuvo gastos totales de aproximadamente $21,600 millones en el año fiscal 2017, que incluyen gastos por aproximadamente $3,300 millones incurridos por las actividades de tipo comercial, lo que representó una reducción de aproximadamente $2,600 millones en comparación con los gastos totales incurridos durante el año fiscal 2016 (según la actualización).

- Para el año fiscal 2017, el exceso total de ingresos sobre los gastos en el Fondo General (base presupuestaria) fue de aproximadamente $577.2 millones. Consistió en la diferencia entre los ingresos reales totales de aproximadamente $9,200 millones (sin incluir otras fuentes de financiamiento), menos los gastos reales totales de aproximadamente $8,600 millones. La variación entre los principios contables generalmente aceptados de los EE. UU. (PCGA de EE. UU.) y los déficits de la base presupuestaria son el resultado de las diferencias de contabilidad, entidad y diferencias de perspectiva entre los informes presupuestarios frente a los establecidos por los PCGA de EE. UU. y seguidos en estos estados financieros básicos.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

La gerencia del ELA cree que al 30 de junio de 2017 existen dudas sustanciales sobre la capacidad del Gobierno Primario para continuar como empresa en marcha de acuerdo con la Declaración Núm. 56 de la Junta de Normas de Contabilidad Gubernamental (GASB), la *Codificación de la Guía de Contabilidad e Información Financiera Contenida en la Declaración de AICPA Sobre Normas de Auditoría*. Asimismo, los fondos del fideicomiso de pensión del ELA, incluidos como parte de los fondos fiduciarios, tienen fondos severamente deficientes. Como resultado de las dificultades fiscales que enfrenta el ELA, el 3 de mayo de 2017, la Junta de Supervisión y Administración Financiera para Puerto Rico (Junta de Supervisión), por solicitud del ELA, presentó una solicitud de reparación conforme al Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA). Para obtener información adicional sobre la empresa en marcha, incertidumbres y riesgo de liquidez, consulte la Nota 2 y la Nota 3.

**Informe del ELA en su totalidad**

El ELA consta de todos los departamentos, agencias, fondos, funciones y corporaciones públicas que se ha determinado que cumplen con los requisitos para su inclusión en la entidad de informes financieros del ELA. El ELA ha considerado todas las unidades de componentes potenciales de presentación discreta de las que es financieramente responsable y otras organizaciones cuya naturaleza y significado de su relación con el ELA es tal que la exclusión causaría que los estados financieros básicos del ELA sean engañosos o incompletos. Como se señaló anteriormente, los estados financieros básicos del ELA constan de cuatro componentes: (i) estados financieros de todo el gobierno, (ii) estados financieros de fondos (iii) estados financieros de unidades de componentes de presentación discreta y (iv) notas a los estados financieros básicos. Los estados financieros del fondo incluyen tipos de fondos del gobierno, de propiedad exclusiva y fiduciarios que se describirán más adelante en este MD&A. Las notas a los estados financieros básicos proporcionan explicaciones o detalles adicionales para todos los tipos de estados financieros anteriores y se consideran parte integral de los estados financieros básicos.

La siguiente tabla resume las principales características de los estados financieros básicos.

| | Estados Financieros de todo el Gobierno | Estados Financieros del Fondo | | |
| | | Fondos del Gobierno | Fondos de Propiedad Exclusiva | Fondos Fiduciarios |
|---|---|---|---|---|
| Alcance | Actividades del gobierno, actividades de tipo comercial y unidades de componentes de presentación discreta: | Las actividades del ELA que no son de propiedad exclusiva ni fiduciarias, incluidas recursos, educación, salud, seguridad pública, servicios, entre otras. | Actividades del ELA que operan similar a empresas privadas, incluidas Loterías. | Instancias en que el ELA es fideicomisario o agente de otro como los planes de retiro de empleados públicos. |
| Estados financieros requeridos | Declaración de resultados netos y estado de actividades. | Balance y estado de ingresos, gastos y cambios en fondos de saldos. | Estado de resultados netos; estado de ingresos, gastos y cambios en resultados netos del fondo; y estado de flujo de efectivo. | Estado de resultados netos fiduciarios y estado de cambios resultados netos fiduciarios. |

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

| | Estados Financieros todo el Gobierno | Estados financieros del fondo | | |
| | | Fondos Del Gobierno | Fondos Propiedad Exclusiva | Fondos Fiduciarios |
|---|---|---|---|---|
| Base de devengo y enfoque de medición | Base de devengo y enfoque de medición de recursos económicos. | Base modificada de devengo y enfoque de medición de recursos financieros corrientes. | Base de devengo y enfoque en medición de recursos económicos. | Base de devengo y enfoque en medición de recursos económicos. |
| Tipo de información del activo/pasivo | Todos los activos y pasivos, tanto financieros como de capital, a corto y a largo plazo. | Solo los activos que se espera que se utilicen y los pasivos que vencen durante el año o poco tiempo después; no se incluyen activos de capital ni obligaciones a largo plazo. | Todos los activos y pasivos, tanto financieros como de capital, a corto y a largo plazo. | Todos los activos y pasivos, tanto financieros como de capital, a corto y a largo plazo. |
| Tipo de información de entrada/salida | Todos los ingresos y gastos durante el año, independientemente de cuándo se reciba o se pague el efectivo. | Ingresos por los que se recibe efectivo durante el año o poco después del final del año; gastos cuando se han recibido bienes o servicios y el pago vence durante el año o poco después. | Todos los ingresos y gastos durante el año, independientemente de cuándo se reciba o se pague el efectivo. | Todos los ingresos y gastos durante el año, independientemente de cuándo se reciba o se pague el efectivo. |

**Estados Financieros de todo el Gobierno**

Los estados financieros de todo el gobierno brindan a los lectores una visión amplia de las operaciones del ELA de manera similar a una empresa del sector privado. Los estados proporcionan información de corto y largo plazo sobre los resultados financieros del ELA, que ayuda a evaluar la condición económica del ELA al final del año fiscal. Estos estados se preparan utilizando el enfoque de medición de recursos económicos y la base contable de devengo completo. Esto significa que siguen métodos similares a los utilizados por la mayoría de las empresas privadas. Toman en cuenta todos los ingresos y gastos relacionados con el año fiscal, incluso si el efectivo involucrado no ha sido recibido o pagado.

Los estados financieros de todo el gobierno incluyen dos estados:

- ***Estado de resultados netos:*** este estado presenta todos los activos, pasivos y salidas y entradas de recursos diferidos del gobierno. Los resultados netos son la diferencia entre (a) activos y salidas diferidas de recursos y (b) pasivos y entradas diferidas de recursos. Con el paso del tiempo, los aumentos o disminuciones en los resultados netos del ELA pueden servir como un indicador útil de si la posición financiera del ELA está mejorando o empeorando.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

- *Estado de actividades:* estos estados presentan información que muestra cómo cambiaron los resultados netos del Gobierno Primario y sus unidades de componentes de presentación discreta durante el año fiscal más reciente. Todos los cambios en los resultados netos se informan tan pronto como se produce el evento subyacente que da lugar al cambio, independientemente del momento de los flujos de efectivo relacionados. Por lo tanto, los ingresos y gastos se informan en este estado para algunas partidas que no generarán flujos de efectivo hasta períodos fiscales futuros (como impuestos no cobrados y vacaciones devengadas pero no utilizadas). Estos estados también presentan una comparación entre los gastos directos y los ingresos del programa para cada función del ELA.

El resultado neto del ELA es una forma de medir si la condición financiera del ELA está mejorando o deteriorándose, pero otros factores no financieros, como cambios en la estructura tributaria del ELA, población, empleo, niveles de deuda, condiciones fiscales, factores económicos, disponibilidad para los mercados externos y la condición de las carreteras, puentes y edificios del ELA, también deben tenerse en cuenta para evaluar la condición general del ELA.

En el estado de resultados netos y el estado de actividades, las operaciones del ELA se dividen en las siguientes actividades:

- *Actividades del Gobierno:* aquí se informa sobre la mayoría de los servicios básicos del ELA, como educación, salud, vivienda pública y bienestar, seguridad pública, desarrollo económico, gobierno general e intereses sobre la deuda a largo plazo. Las subvenciones federales (intergubernamentales), los impuestos sobre ingresos personales y corporativos, los impuestos sobre las ventas y el uso, comerciales y otros impuestos, las transferencias de los ingresos de la lotería y los ingresos de los bonos o préstamos financian la mayoría de estas actividades. Las Actividades del Gobierno también incluyen doce unidades integradas combinadas, que son entidades que, aunque están legalmente separadas del ELA, cumplen con los criterios de combinación según la GASB para ser informadas como parte del Gobierno Primario.

- *Actividades de tipo comercial:* normalmente, estas actividades están destinadas a recuperar la totalidad o una parte significativa de sus costos a través de tarifas de usuario y cargos a usuarios externos de bienes y servicios. Estas actividades de tipo comercial del ELA incluyen las operaciones de los siguientes fondos mayores: el Fondo Fiduciario de Seguro por Desempleo, la Administración de Seguros de Salud de Puerto Rico (ASES) y la Administración de Servicios Médicos de Puerto Rico (PRMeSA).

- *Unidades de componentes de presentación discreta:* aunque legalmente separadas del ELA, las unidades de componentes de presentación son importantes para el ELA porque el ELA es financieramente responsable de ellas o la naturaleza y la importancia de su relación con el ELA son tales que su exclusión causaría que los estados financieros básicos del ELA sean engañosos o incompletos. Las unidades de componentes de presentación discreta, presentadas en una columna separada en los estados financieros básicos, se presentan de forma discreta principalmente debido a la naturaleza de los servicios que prestan, la capacidad del ELA para imponer su voluntad (principalmente a través del nombramiento de sus autoridades de gobierno) y porque dichas unidades de componentes de presentación discreta proporcionan beneficios financieros específicos o imponen cargas financieras al ELA. El ELA clasifica 45 entidades legales separadas como unidades de componentes de presentación discreta, como se indica en la Nota 1 de los estados financieros básicos

Los estados financieros de todo el gobierno se pueden encontrar inmediatamente después de este MD&A.

**Estados Financieros de Fondos del Gobierno y de Propiedad Exclusiva**

Los estados financieros preparados a nivel del fondo brindan detalles adicionales sobre los resultados financieros y las actividades del ELA. Un fondo es una agrupación de cuentas relacionadas que se utiliza para mantener el control sobre los recursos que se han segregado para actividades u objetivos específicos. El ELA utiliza la contabilidad de fondos para ayudar a garantizar y demostrar el cumplimiento de los requisitos legales relacionados con las finanzas. Los estados financieros del fondo se centran en partes individuales del gobierno del ELA, e

9

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

informan las operaciones del ELA con más detalle que los estados financieros de todo el gobierno. La información presentada en los estados financieros del fondo difiere de la información presentada en los estados financieros de todo el Gobierno porque la perspectiva y la base de contabilidad utilizada para preparar los estados financieros del fondo son diferentes de la perspectiva y la base de contabilidad utilizada para preparar los estados financieros de todo el Gobierno. Los tipos de fondos gubernamentales y de propiedad exclusiva del ELA utilizan diferentes perspectivas y bases contables. Los fondos presentados en los estados financieros del fondo se clasifican como fondos mayores o no mayores, según los requisitos de las GAAP de los EE. UU. Todos los fondos del ELA se pueden dividir en las siguientes categorías:

- *Fondos del gobierno:* la mayoría de los servicios básicos provistos por el ELA se financian con fondos del gobierno. Los fondos del gobierno se utilizan para dar cuenta esencialmente de las mismas funciones informadas como Actividades del Gobierno en los estados financieros de todo el gobierno. Sin embargo, a diferencia de los estados financieros de todo el gobierno que utilizan la base contable de devengo completo, los estados financieros de fondos del gobierno utilizan una base contable modificada de devengo (también conocida como enfoque en la medición de recursos financieros actuales), que se centra en las entradas y salidas de recursos prescindibles de corto plazo. Esta información puede ser útil para evaluar los requisitos de financiamiento de corto plazo del gobierno. Estos estados proporcionan una visión detallada de corto plazo de las finanzas del ELA y ayudan a determinar si habrá recursos financieros adecuados disponibles para cumplir con las necesidades actuales del ELA. Dado que el enfoque de los fondos del gobierno es más estrecho que el de los estados financieros de todo el gobierno, es útil comparar la información presentada para los fondos del gobierno con información similar presentada para las Actividades del Gobierno en los estados financieros de todo el gobierno. Al comparar los estados financieros de los fondos del gobierno con las Actividades del Gobierno en los estados financieros de todo el gobierno, los lectores pueden comprender mejor el impacto a largo plazo de las decisiones financieras a corto plazo del gobierno. Tanto el balance de fondos del gobierno como el estado de ingresos, gastos y cambios en los balances de fondos del fondo del gobierno proporcionan una conciliación para facilitar esta comparación entre los fondos el gobierno y las Actividades del Gobierno. Estas conciliaciones se presentan en la página inmediatamente posterior a cada estado financiero de los fondos del gobierno.

El ELA tiene cuatro fondos mayores del gobierno. Es decir, cada fondo mayor se presenta en una columna separada en el balance de fondos del gobierno y en el estado de ingresos, gastos y cambios en el balance de fondos de los fondos del gobierno. Los cuatro fondos mayores del gobierno del ELA son:

- Fondo General [1]
- Fondo de Amortización de la Deuda
- Fondo de Ingresos Especiales de COFINA
- Fondo de Amortización de la Deuda de COFINA

---

El resto de los fondos no mayores del gobierno, que consisten en fondos de la combinación de la Autoridad de Ponce (AP), la Autoridad de Edificios Públicos (AEP), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, la Autoridad de Asesoría Financiera y Agencia Fiscal de

---

[1] El Fondo General es el fondo principal de operación del ELA. Los recursos financieros recibidos y utilizados en el Fondo General incluyen principalmente: los recursos presupuestados del Fondo General, según lo aprobado por la Legislatura de Puerto Rico (la Legislatura) y ajustados por el tiempo y la base de las diferencias contables, y otros recursos financieros fuera del presupuesto de Fondos Generales tales como: fondos federales, costos pignorados, recursos que de otro modo se contabilizarían en fondos de ingresos especiales y agencias con tesorerías independientes.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

Puerto Rico (AAFAF), la Autoridad de Transporte Marítimo de Puerto Rico (ATM), el Fondo a Perpetuidad de Comunidades Especiales (SCPT), el Fideicomiso de los Niños, el Centro Comprensivo de Cáncer de la Universidad de Puerto Rico (UPRCCC), las unidades de componentes combinados y los fondos de proyectos de capital del ELA, se agrupan y presentan en una sola columna en los estados financieros de los fondos del gobierno. Los estados financieros de fondos básicos del gobierno se pueden encontrar inmediatamente después de los estados financieros de todo el gobierno.

- ***Fondos de propiedad exclusiva:*** estos fondos se utilizan para mostrar actividades que operan de forma más similar a las empresas comerciales. Como estos fondos cobran tarifas por los servicios prestados a los clientes externos, que incluyen los gobiernos locales, también se conocen como fondos empresariales. Los fondos de propiedad exclusiva proporcionan el mismo tipo de información que las actividades de tipo empresarial en los estados financieros de todo el gobierno, pero con mayor detalle. Al igual que con los estados financieros de todo el gobierno, los estados financieros de fondos de propiedad exclusiva utilizan la base contable de devengo completo. No es necesaria una conciliación entre los estados financieros de todo el gobierno para las actividades de tipo comercial y los estados financieros de los fondos de propiedad exclusiva.

El ELA tiene tres fondos mayores de propiedad exclusiva:

- Fondo de Seguro por Desempleo
- Administración de Seguros de Salud de Puerto Rico (ASES)
- Administración de Servicios Médicos de Puerto Rico (PRMeSA)

Otros fondos no mayores de propiedad exclusiva consisten en el Fondo del Seguro por Discapacidad, el Fondo del Seguro de Conductores, el Fondo de Loterías, que incluye la Lotería de Puerto Rico y el Sistema Adicional de Loterías, el Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico (PRWPCRF) el Fondo del Préstamo Recurrente para el Tratamiento del Agua Potable Segura de Puerto Rico (PRSDWTRLF), la Autoridad de Puertos de Ponce (PPA) y el Departamento del Servicio de Emergencias 9-1-1 que se agrupan y presentan en una columna separada en los estados financieros de los fondos de propiedad exclusiva. Los estados financieros básicos de los fondos de propiedad exclusiva se pueden encontrar inmediatamente después de los estados financieros de los fondos del gobierno.

**Fondos Fiduciarios**

El ELA es un fideicomisario o fiduciario para los planes de pensiones de sus empleados. También es responsable por otros activos que, debido a un contrato de fideicomiso, se pueden usar solo para los beneficiarios del fideicomiso. Todas las actividades fiduciarias del ELA se informan en una declaración separada de los resultados netos fiduciarios y de los cambios en los resultados netos fiduciarios. El ELA excluyó estas actividades de sus estados financieros de todo el gobierno del ELA porque no puede usar estos activos para financiar sus operaciones. El ELA es responsable de garantizar que los activos informados en estos fondos se utilicen para los fines previstos.

*Nuevo Plan de Aportaciones Definidas para Empleados Públicos*

El 23 de agosto de 2017, se promulgó la Ley Núm. 106-2017 para garantizar el pago a los pensionados por parte del ELA y establecer un nuevo plan de aportaciones definidas para los empleados públicos, se reformaron las pensiones del ELA mediante el reemplazo de las juntas de gobierno de los Sistemas de Retiro por una sola Junta de Retiro del Estado Libre Asociado de Puerto Rico (Junta de Retiro) y se estableció una "cuenta para el pago de las pensiones devengadas" para implementar un método de "pago por uso" (PayGo) mediante el cual el ELA pagaría los beneficios de la pensión. La Ley Núm. 106-2017 creó el marco legal para que el ELA pueda garantizar los pagos a los pensionados a través del sistema PayGo.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

**Notas a los Estados Financieros Básicos**

Las notas proporcionan información adicional que es esencial para una comprensión completa de los datos proporcionados en los estados financieros de todo el gobierno y del fondo. Las notas a los estados financieros básicos se pueden encontrar inmediatamente después de la combinación de los estados financieros combinados de las unidades de componentes mayores de presentación discreta.

**Información Adicional Requerida/Información Adicional y Otra Información (Sin Auditar)**

Los estados financieros básicos incluyen una sección de información adicional requerida y otra información que sigue inmediatamente a sus notas. Esta sección incluye información sobre el progreso del financiamiento y las contribuciones del patrono para los tres sistemas de retiro separados del ELA, que incluyen los beneficios de atención médica posteriores al empleo, el esquema de ingresos y gastos -presupuesto y base presupuestaria real- Fondo General, esquema complementario de gastos por agencia -presupuesto y base presupuestaria real- Fondo General, y esquemas combinados de fondos no mayores del gobierno, fondos no mayores de propiedad exclusiva, fondos fiduciarios y unidades de componentes no mayores de presentación discreta.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

**Posición Financiera General y Resultados de Operaciones (estados de todo el Gobierno)**

A continuación, se incluye un análisis de la posición financiera y los cambios en la posición financiera de las Actividades del Gobierno y las Actividades de tipo comercial del ELA para el año fiscal 2017.

*Resultados Netos*

La información financiera condensada del estado resultados netos al 30 de junio de 2017 y 2016 es la siguiente (en miles):

| | Actividades del Gobierno | | Actividades de tipo comercial | | Gobierno primario | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 (Según la reformulación) | 2017 | 2016 (Según la reformulación) | 2017 | 2016 (Según la reformulación) |
| **Activos:** | | | | | | |
| Activos no pertenecientes al capital: | | | | | | |
| Efectivo e inversiones | $ 3,349,971 | 1,650,464 | 973,603 | 793,954 | 4,323,574 | 2,444,418 |
| Cuentas por cobrar, netas | 2,234,363 | 2,366,880 | 721,738 | 332,490 | 2,956,101 | 2,699,370 |
| Otros | 99,943 | 103,161 | 46,800 | 46,877 | 146,743 | 150,038 |
| Total de activos no pertenecientes al capital | 5,684,277 | 4,120,505 | 1,742,141 | 1,173,321 | 7,426,418 | 5,293,826 |
| Activos de capital | 8,474,221 | 8,701,952 | 89,255 | 93,170 | 8,563,476 | 8,795,122 |
| Activos totales | 14,158,498 | 12,822,457 | 1,831,396 | 1,266,491 | 15,989,894 | 14,088,948 |
| **Salidas diferidas de recursos** | 7,753,769 | 4,806,271 | 197,866 | 153,265 | 7,951,635 | 4,959,536 |
| **Pasivos:** | | | | | | |
| Pasivos a largo plazo | 87,087,621 | 82,929,108 | 1,661,943 | 1,659,087 | 88,749,564 | 84,588,195 |
| Otros pasivos | 4,861,044 | 3,652,882 | 282,552 | 268,610 | 5,143,596 | 3,921,492 |
| Total de pasivos | 91,948,665 | 86,581,990 | 1,944,495 | 1,927,697 | 93,893,160 | 88,509,687 |
| **Entradas diferidas de recursos** | 1,093,202 | 1,195,046 | 15,498 | 12,550 | 1,108,700 | 1,207,596 |
| **Resultados netos:** | | | | | | |
| Inversión neta en activos de capital | 2,614,500 | 3,204,827 | 69,993 | 75,020 | 2,684,493 | 3,279,847 |
| Restringidos | 343,550 | 346,399 | 1,025,530 | 536,152 | 1,369,080 | 882,551 |
| No restringidos (déficit) | (74,087,650) | (73,699,534) | (1,026,254) | (1,131,663) | (75,113,904) | (74,831,197) |
| **Resultados Netos Totales (déficit)** | $ (71,129,600) | (70,148,308) | 69,269 | (520,491) | (71,060,331) | (70,668,799) |

Las GAAP de EE. UU. requieren que las entidades del gobierno informen sus resultados netos. El estado de resultados netos presenta el valor de todos los activos del ELA y las salidas diferidas de recursos, pasivos y entradas diferidas de recursos, con la diferencia entre ellos informada como resultados netos.

Los resultados netos (déficit) pueden servir con el tiempo como un indicador útil de la posición financiera de un gobierno. El total de activos más las salidas diferidas de recursos y los pasivos totales más las entradas diferidas de recursos del Gobierno Primario al 30 de junio de 2017 ascendieron a aproximadamente $24,000 millones y $95,100 millones, respectivamente, para un déficit neto de aproximadamente $71,100 millones a partir de 30 de junio de 2017, en comparación con un déficit neto de aproximadamente $70,700 millones al 30 de junio de 2016 (según la reformulación).

13

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

Los resultados netos (déficit) para las Actividades del Gobierno aumentó en aproximadamente $981.3 millones durante el año fiscal 2017, a aproximadamente $71,100 millones al 30 de junio de 2017 de aproximadamente $70,100 millones al 30 de junio de 2016 (según la reformulación). El déficit sin restricciones para las Actividades del Gobierno, la porción de los resultados netos que se pueden utilizar para financiar las operaciones diarias del gobierno sin las restricciones establecidas por los convenios de deuda, la legislación habilitadora u otros requisitos legales, tenía un déficit de aproximadamente $74,100 millones al 30 de junio de 2017. El déficit sin restricciones en las Actividades del Gobierno, que aumentó en aproximadamente $388.1 millones, existe principalmente debido a gastos operativos excesivos que no corresponden a los ingresos reales. Se puede esperar que este déficit continúe mientras el ELA continúe teniendo obligaciones pendientes para fines distintos a la adquisición de activos de capital del gobierno. El estado de resultados netos en Actividades del Gobierno refleja bonos y pagarés en circulación por aproximadamente $40,800 millones y pasivos netos por pensiones por aproximadamente $42,500 millones al 30 de junio de 2017, en comparación con los bonos y pagarés en circulación que ascienden aproximadamente a $40,300 millones y pasivos netos por pensiones que ascienden a aproximadamente a $36,900 millones al 30 de junio de 2016.

Una parte de los resultados netos del ELA refleja su inversión en activos de capital como tierras, edificios y equipos, menos cualquier deuda relacionada utilizada para adquirir esos activos. El ELA utiliza estos activos de capital para proporcionar servicios a sus residentes; en consecuencia, estos activos no están disponibles para gastos futuros y, a excepción de activos de tipo Comercial, no generan ingresos directos para el ELA. Sin embargo, representan una obligación por parte del ELA de mantener estos activos en el futuro. Aunque la inversión del ELA en sus activos de capital se informa neta de la deuda relacionada, debe tenerse en cuenta que los recursos necesarios para pagar esta deuda deben ser provistos de otras fuentes, ya que la mayoría de los activos de capital en sí no pueden utilizarse para liquidar estos pasivos.

Los resultados netos en las actividades de tipo comercial ascendieron aproximadamente a $589.8 millones en el año fiscal 2017 en comparación con el año fiscal 2016 (según la reformulación), de un déficit neto de aproximadamente $520.5 millones al 30 de junio de 2016 a resultados netos de aproximadamente $69.3 millones al 30 de junio de 2017. La razón principal del aumento de los resultados netos se relaciona con el reconocimiento de una recuperación de una provisión de pérdida por préstamos de aproximadamente $434.4 millones de los Fondos Recurrentes del Estado.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

## Estado de Actividades y Resultados de Operaciones

La información financiera condensada de los estados de actividades para los años terminados el 30 de junio de 2017 y 2016 es la siguiente (en miles):

| | Actividades del Gobierno | | Actividades de tipo comercial | | Gobierno primario | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 (según la reformulación) | 2017 | 2016 (según la reformulación) | 2017 | 2016 (según la reformulación) |
| **Ingresos:** | | | | | | |
| Ingresos del Programa: | | | | | | |
| Cargos por servicios | $ 798,924 | 821,092 | 1,288,849 | 1,621,440 | 2,087,773 | 2,442,532 |
| Subsidios y contribuciones operativas | 6,238,213 | 6,446,731 | 1,874,790 | 1,739,479 | 8,113,003 | 8,186,210 |
| Subsidios y contribuciones de capital | 84,033 | 73,189 | — | — | 84,033 | 73,189 |
| | 7,121,170 | 7,341,012 | 3,163,639 | 3,360,919 | 10,284,809 | 10,701,931 |
| Ingresos generales: | | | | | | |
| Impuestos | 10,498,158 | 10,314,767 | — | — | 10,498,158 | 10,314,767 |
| Ingresos del acuerdo global de liquidación del tabaco | 72,266 | 70,665 | — | — | 72,266 | 70,665 |
| Ingresos de unidades de componentes | 75,118 | 265,357 | — | — | 75,118 | 265,357 |
| Otros, incluidas las (pérdidas) de inversión | 277,600 | 302,569 | 22,999 | 16,956 | 300,599 | 319,525 |
| | 10,923,142 | 10,953,358 | 22,999 | 16,956 | 10,946,141 | 10,970,314 |
| **Ingresos totales** | 18,044,312 | 18,294,370 | 3,186,638 | 3,377,875 | 21,230,950 | 21,672,245 |
| **Gastos:** | | | | | | |
| Gobierno General | 2,324,564 | 3,697,913 | — | — | 2,324,564 | 3,697,913 |
| Seguridad pública | 1,889,296 | 2,071,961 | — | — | 1,889,296 | 2,071,961 |
| Salud | 2,704,463 | 3,080,551 | — | — | 2,704,463 | 3,080,551 |
| Vivienda pública y bienestar | 3,464,039 | 3,314,500 | — | — | 3,464,039 | 3,314,500 |
| Educación | 4,285,123 | 3,724,041 | — | — | 4,285,123 | 3,724,041 |
| Desarrollo económico | 815,469 | 1,026,935 | — | — | 815,469 | 1,026,935 |
| Intergubernamental | 397,993 | 554,429 | — | — | 397,993 | 554,429 |
| Intereses y otros | 2,420,007 | 2,086,720 | — | — | 2,420,007 | 2,086,720 |
| Seguro por desempleo | | | 122,642 | 139,993 | 122,642 | 139,993 |
| Administración de Seguros de Salud de Puerto Rico | — | — | 2,791,508 | 2,860,076 | 2,791,508 | 2,860,076 |
| Administración de Servicios Médicos de Puerto Rico | — | — | 232,589 | 279,976 | 232,589 | 279,976 |
| Fondos No Mayores de Propiedad Exclusiva | — | — | 174,789 | 1,356,139 | 174,789 | 1,356,139 |
| **Gastos Totales** | 18,300,954 | 19,557,050 | 3,321,528 | 4,636,184 | 21,622,482 | 24,193,234 |
| Aumento (reducción) en los resultados netos antes de transferencias | (256,642) | (1,262,680) | (134,890) | (1,258,309) | (391,532) | (2,520,989) |
| Transferencias | (724,650) | (673,258) | 724,650 | 673,258 | — | — |
| **Cambios en los resultados netos** | (981,292) | (1,935,938) | 589,760 | (585,051) | (391,532) | (2,520,989) |
| Resultados netos (déficit), comienzo del año, según reformulación (nota 4) | (70,148,308) | (68,212,370) | (520,491) | 64,560 | (70,668,799) | (68,147,810) |
| Resultados netos (déficit), fin de año | $ (71,129,600) | (70,148,308) | 69,269 | (520,491) | (71,060,331) | (70,668,799) |

15

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

Como se describió anteriormente, los resultados netos del déficit de las Actividades del Gobierno aumentaron de aproximadamente $70,100 millones al 30 de junio de 2016 (según la reformulación) a aproximadamente $71,100 millones al 30 de junio de 2017, un aumento de aproximadamente $981.3 millones. El aumento en los resultados netos del déficit total se debe principalmente a un aumento en los gastos de pensión relacionados con los cambios en los pasivos netos de pensiones, la entrada y salida diferida de recursos de aproximadamente $600 millones en comparación con los gastos relacionados del año anterior. Aproximadamente el 58% de los ingresos de las Actividades del gobierno provino de impuestos, mientras que aproximadamente el 35% resultó de subsidios y contribuciones (principalmente asistencia financiera federal). Los cargos por servicios representaron aproximadamente el 4% de los ingresos totales. Los gastos de las actividades del gobierno cubren una variedad de servicios del gobierno. Los mayores gastos fueron para educación, 23% de los gastos totales; vivienda pública y bienestar, 18% de los gastos totales; gobierno general, 12% de los gastos totales; salud, 14% de los gastos totales y seguridad pública, 10% de los gastos totales. En el año fiscal 2017, los gastos de las Actividades del Gobierno, que ascendieron a aproximadamente $18,300 millones, fueron financiados por aproximadamente $11,000 millones en ingresos generales y aproximadamente $7,100 millones en ingresos del programa (compuestos principalmente de asistencia financiera federal). Asimismo, la implementación de la Ley Núm. 66-2014, conocida como "Ley de Sostenibilidad Fiscal y Operacional del ELA de Puerto Rico", contribuyó a la reducción de gastos en áreas tales como:

- Reducción en los gastos de nómina y gastos relacionados con la nómina.

- Congelar las asignaciones basadas en fórmulas a la Universidad de Puerto Rico, el Poder Judicial del ELA y los Municipios.

- Reducción de los gastos en educación, tales como una reducción en los servicios de transporte escolar, ahorros en la nómina a causa del sistema de retiro para maestros y no contratación para cubrir vacantes.

- Reducción de las asignaciones especiales.

- Eliminación de ciertos subsidios a programas u operaciones de unidades componentes de presentación discreta.

Los ingresos totales de las Actividades del Gobierno para el año fiscal 2017 se redujeron en aproximadamente $250 millones en comparación con el año fiscal 2016. Esta reducción se relaciona principalmente con una disminución en las subvenciones y contribuciones operativas y los ingresos de las unidades componentes de presentación discreta. El ELA sufre una crisis fiscal, económica y de liquidez, una recesión económica (que comenzó en 2006), una alta tasa de desempleo, una disminución de la población y un alto nivel de deuda y obligaciones relacionadas con las pensiones.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

### Ingresos - Actividades del Gobierno



### Gastos - Actividades del Gobierno



17

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

Los resultados netos totales de las actividades de tipo comercial aumentaron en aproximadamente $589.8 millones con respecto a los resultados netos totales al 30 de junio de 2016. Aproximadamente el 40% de los ingresos totales de las actividades de tipo comercial provino de cargos por servicios, mientras que aproximadamente el 59% resultó de subsidios y contribuciones (principalmente asistencia financiera federal). Los gastos de las actividades de tipo comercial cubren una variedad de servicios. Los mayores gastos fueron para loterías y Administración de Seguros de Salud. En el año fiscal 2017, los gastos totales de las Actividades de tipo comercial excedieron los ingresos en aproximadamente $134.9 millones. El exceso de gastos sobre los ingresos en el año fiscal 2017 se redujo por transferencias netas de otros fondos, principalmente de las Actividades del Gobierno, que ascendieron a aproximadamente $724.7 millones. Los gastos totales disminuyeron aproximadamente $1,300 millones en comparación con los gastos del año anterior principalmente por el reconocimiento de una pérdida crediticia de custodia y un deterioro de las cuentas por cobrar de aproximadamente $630 millones en el año fiscal 2016.

**Fondos del Gobierno**

Los estados financieros de los fondos del gobierno proporcionan información sobre entradas, salidas y balances a corto plazo de recursos prescindibles. Esta información es útil para evaluar los requisitos de financiamiento del ELA. En particular, el balance de fondos no asignados puede servir como una medida útil de los recursos netos de un gobierno disponibles para gastar al final del año fiscal. Al 30 de junio de 2017, los fondos del gobierno del ELA, que incluyen el Fondo General, el Fondo de Amortización de la deuda, el Fondo de Ingresos Especiales COFINA, el Fondo de Amortización de la deuda COFINA y fondos no mayores del gobierno, informaron un déficit final combinado de aproximadamente $558.3 millones. En el año fiscal 2017, los ingresos de estos fondos gubernamentales excedieron los gastos en aproximadamente $463.1 millones. Sin embargo, este exceso de ingresos sobre los gastos fue compensado por otros usos de financiamiento por un total de aproximadamente $716.7 millones en fondos del gobierno. Para el año fiscal 2017, el exceso de gastos sobre los ingresos disminuyó en aproximadamente $983.5 millones en comparación con el año anterior, principalmente como resultado de una disminución en los ingresos del impuesto a la renta y los ingresos intergubernamentales de aproximadamente $646.3 millones.

El Fondo General es el principal fondo de operación del ELA. Al final del año fiscal 2017, el Fondo General, que abarca otros recursos financieros fuera del presupuesto del Fondo General, como fondos federales, fondos pignorados, fondos de ingresos especiales y agencias con tesorerías independientes, tenía un déficit total de fondos de aproximadamente $100.6 millones. El saldo del fondo (déficit) del Fondo General del ELA disminuyó en aproximadamente $1,100 millones como resultado del cambio en la posición financiera del año fiscal. La falta de pago de los bonos de obligación general con vencimiento durante el año fiscal 2017 de aproximadamente $ 1,200 millones es la razón principal del aumento en el saldo del fondo (déficit).

El Fondo de Amortización de la Deuda es el fondo en el que el ELA acumula los recursos para el pago de la deuda de obligaciones generales a largo plazo. El cambio neto en el balance del fondo de la amortización de la deuda disminuyó en aproximadamente $1,100 millones en el año fiscal 2017, y el déficit del fondo al final del año disminuyó a aproximadamente $866.9 millones al 30 de junio de 2017. Los bonos e intereses pagaderos durante el año fiscal 2017 aumentaron aproximadamente en $1,200 millones en comparación con el año fiscal 2016 como resultado de la falta de pago de los bonos de obligación general con vencimiento durante el año fiscal 2017. Sin embargo, a partir del inicio del caso del Título III del ELA el 3 de mayo de 2017, dejaron de devengar intereses sobre los bonos del ELA y otras deudas. Por lo tanto, es posible que el tratamiento contable de los intereses devengados del ELA tenga que cambiar después de que las deudas del ELA se ajusten, según un plan de ajuste del Título III.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

El Fondo de Ingresos Especiales de COFINA se utiliza para contabilizar y reportar todos los recursos financieros de la Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA). El saldo de fondos del Fondo de Ingresos Especiales de COFINA aumentó aproximadamente $6.4 millones en el año fiscal 2017, a un saldo de fondos de aproximadamente $6.3 millones al 30 de junio de 2017. El Fondo de Amortización de la deuda de COFINA se utiliza para contabilizar los ingresos del impuesto sobre las ventas del ELA que se depositan en el Fondo Dedicado del Impuesto a las Ventas para el pago de intereses y capital de las obligaciones a largo plazo de COFINA. El saldo de fondos del Fondo de Amortización de la Deuda de COFINA disminuyó aproximadamente $6.1 millones durante el año fiscal 2017, a aproximadamente $441.8 millones al 30 de junio de 2017. Las deudas de COFINA se ajustaron, según el Plan de Ajuste de COFINA a tenor con el Título III de PROMESA.

**Fondos de Propiedad Exclusiva**

Los fondos empresariales del ELA proporcionan el mismo tipo de información que se presenta en las actividades de tipo empresarial en los estados financieros de todo el gobierno, pero con más detalle. El saldo total de los resultados netos del Fondo del Seguro por Desempleo aumentó de aproximadamente $480.6 millones al 30 de junio de 2016 a aproximadamente $536.5 millones al 30 de junio de 2017, un aumento de aproximadamente $55.9 millones en un año. Los gastos del fondo para beneficios por desempleo disminuyeron aproximadamente $17.3 millones, en comparación con el año fiscal 2016.

Los resultados netos totales del fondo empresarial de ASES disminuyeron de un déficit de aproximadamente $139.7 millones al 30 de junio de 2016 (según la reformulación) a un déficit de aproximadamente $7.3 millones al 30 de junio de 2017, una disminución de aproximadamente $132.4 millones. Los gastos del fondo para primas médicas y reclamaciones disminuyeron aproximadamente $73 millones, en comparación con el año fiscal 2016.

Los resultados netos del fondo empresarial de PRMeSA aumentaron de un déficit de aproximadamente $873.2 millones al 30 de junio de 2016 a un déficit de aproximadamente $943.4 millones al 30 de junio de 2017, un aumento de aproximadamente $70.2 millones. Durante los años fiscales 2016 y 2017, el fondo ha experimentado pérdidas operativas de aproximadamente $126.1 millones y $86.4 millones, respectivamente.

**Fondos Fiduciarios**

Los fondos fiduciarios del ELA representan los recursos que se mantienen en beneficio de partes ajenas al Gobierno. Los resultados netos de los fideicomisos de pensiones (y otros beneficios para empleados) disminuyeron aproximadamente de $1,200 millones a $1,600 millones al 30 de junio de 2017. Para obtener más información sobre los planes de retiro del ELA y otros planes de beneficios posteriores al empleo, consulte la Nota 18 y la Nota 19 de los estados financieros básicos.

**Aspectos Destacados Presupuestarios del Fondo General**

La Constitución del ELA requiere que el Gobernador de Puerto Rico (el Gobernador) presente un presupuesto equilibrado que contenga un plan de gastos para el año fiscal siguiente e identifique los ingresos anticipados y otros recursos suficientes para cubrir los gastos propuestos. El ELA adopta un presupuesto anual de asignaciones para su Fondo General. Se ha proporcionado un esquema de comparación presupuestaria en la página 284 como información adicional requerida para que el Fondo General demuestre el cumplimiento de este presupuesto. El esquema de ingresos y gastos-presupuesto y base presupuestaria real-Fondo General presenta solo la información para el Fondo General para la que existe un presupuesto legalmente adoptado, según lo requerido por las GAAP de EE. UU.

Los ingresos reales totales del Fondo General sobre una base presupuestaria para el año fiscal 2017 fueron de aproximadamente $9,200 millones (sin incluir otras fuentes de financiamiento), lo que representa un aumento de aproximadamente $222.8 millones, o 2.5%, de los ingresos presupuestados originales, y un aumento de aproximadamente $183 millones o 2% de ingresos reales de aproximadamente $9,000 millones para el año fiscal 2016.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

Los gastos reales totales del Fondo General sobre una base presupuestaria para el año fiscal 2017 fueron de aproximadamente $8,600 millones, lo que representa una disminución de $361.4 millones o 4% de los gastos presupuestados originales y un aumento de aproximadamente $331.8 millones o 4% de los gastos reales de aproximadamente $8,300 millones para el año fiscal 2016.

Para el año fiscal 2017, el exceso presupuestado de ingresos sobre gastos (base presupuestaria) fue de aproximadamente $577 millones, que consiste en la diferencia entre los ingresos reales totales de aproximadamente $9,200 millones y los gastos reales totales de aproximadamente $8,600 millones. Para el año fiscal 2016, el exceso de ingresos sobre gastos (base presupuestaria) fue de aproximadamente $726 millones, que consiste en la diferencia entre los ingresos reales totales de aproximadamente $9,000 millones y los gastos reales totales de aproximadamente $8,300 millones. El exceso presupuestado de ingresos sobre gastos (base presupuestaria) para el año fiscal 2017 disminuyó aproximadamente $149 millones en comparación con el superávit del año fiscal 2016 y aumentó en aproximadamente $451 millones en comparación con el exceso de ingresos contra los gastos (base presupuestaria) de aproximadamente $126 millones en el año fiscal 2015.

Para el año fiscal 2017, el exceso total de ingresos sobre los gastos en el Fondo General (base presupuestaria) fue de aproximadamente $577 millones. Consistió en la diferencia entre los ingresos reales de aproximadamente $9,200 millones (sin incluir otras fuentes de financiamiento), menos los gastos totales de aproximadamente $8,600 millones. Este superávit de aproximadamente $577 millones en el Fondo General (base presupuestaria) difiere del exceso de ingresos sobre los gastos en el Fondo General sobre una base devengada modificada (GAAP de EE. UU.) de aproximadamente $2.3 millones, que fue compensado por aproximadamente $1,100 millones en otros usos de financiamiento, que consisten principalmente en transferencias a otros fondos, para un aumento neto resultante en los balances de fondos de aproximadamente $1,100 millones para el año fiscal 2017 . La variación entre las GAAP de EE. UU. y la deficiencia de la base presupuestaria resulta de las diferencias en la base contable y las diferencias de perspectiva entre los informes presupuestarios versus los establecidos por las GAAP de EE. UU. y seguidos en estos estados financieros básicos. Algunos ejemplos de tales diferencias incluyen: (i) reconocimiento del producto de la deuda a largo plazo emitida como otras fuentes de financiamiento, (ii) reconocimiento de cuentas por cobrar (ingresos) para reintegros de gastos asignados a fondos federales, (iii) reconocimiento de ingresos y gastos de entidades con tesorerías independientes, (iv) gastos incurridos en fondos no presupuestarios (fondos de ingresos especiales, fondos de ingresos internos y otros fondos) que no se incluyeron en el Presupuesto del Fondo General, y (v) diferencias de tiempo en la base de la contabilidad, tales como (a) el reconocimiento de cuentas por cobrar sobre la renta y los impuestos corporativos y (b) el reconocimiento de los gastos devengados. En la página 289 se presenta una conciliación en las notas a la sección de información adicional requerida. La capacidad del ELA para continuar reduciendo el déficit dependerá en parte de su capacidad para continuar aumentando los ingresos y reduciendo los gastos y las obligaciones de deuda frente a las incertidumbres económicas.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

La siguiente información se presenta para ayudar al lector a comparar el presupuesto final modificado y los resultados reales.

**Ingresos Reales – Fondo General**

Base Presupuestaria del

Año terminado el 30 de junio de 2017

(en miles)



**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

**Gastos Reales – Fondo General**

Base Presupuestaria del Año

terminado el 30 de junio de 2017

(en miles)



Durante más de una década, el ELA tuvo importantes deficiencias en los ingresos por concepto de gastos (incluidos los servicios de la deuda) que se financiaron principalmente mediante la emisión de bonos y líneas de crédito.

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

**Activos de Capital y Administración de la Deuda**

*Activos de Capital*

A continuación, se incluye un esquema resumido de los activos de capital del Gobierno Primario (en miles):

| | Actividades del gobierno | | Actividades tipo comercial | | Total Gobierno primario | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 (según la reformulación) | 2017 | 2016 | 2017 | 2016 (según la reformulación) |
| Terrenos | $ 932,913 | 936,891 | 36,005 | 36,005 | 968,918 | 972,896 |
| Construcción en progreso | 1,092,712 | 1,345,319 | — | 3,339 | 1,092,712 | 1,348,658 |
| Edificios y mejoras en edificios, neto | 5,864,631 | 5,862,562 | 40,320 | 39,081 | 5,904,951 | 5,901,643 |
| Equipos, muebles, accesorios, vehículos y software, neto | 176,146 | 149,544 | 12,930 | 14,745 | 189,076 | 164,289 |
| Infraestructura, neto | 407,819 | 407,636 | — | — | 407,819 | 407,636 |
| Total de activos de capital | $ 8,474,221 | 8,701,952 | 89,255 | 93,170 | 8,563,476 | 8,795,122 |

La inversión del ELA en activos de capital para sus actividades del gobierno y actividades de tipo comercial al 30 de junio de 2017 ascendía a aproximadamente $14,000 millones, menos la depreciación y amortización acumuladas de aproximadamente $5,400 millones, lo que resulta en un valor registrado de aproximadamente $8,600 millones. Los activos de capital incluyen terrenos, construcciones en progreso, edificios, mejoras de edificios, equipos e infraestructura. Los activos de capital incluidos en la columna de Actividades del Gobierno son principalmente propiedad de unidades de componentes combinados (por ejemplo, AEP y AAFAF) y son principalmente de valor solo para el ELA, como escuelas públicas, carreteras y edificios utilizados para los servicios del gobierno. El gasto de depreciación y amortización del ELA para sus Actividades del Gobierno y actividades de tipo comercial ascendió a aproximadamente $319 millones para el año finalizado el 30 de junio de 2017.

Otros activos de infraestructura, como autopistas, puentes, instalaciones de peajes, sistemas de agua y alcantarillado, sistemas de producción, transmisión y distribución de electricidad, y activos similares, son propiedad de las unidades de componentes de presentación discreta.

Se puede encontrar información adicional sobre los activos de capital del ELA en la Nota 11 de los estados financieros básicos que acompañan a este informe.

*Administración de la Deuda - Gobierno Primario*

El ELA ha incurrido en financiamiento de deuda a largo plazo y otras obligaciones, incluidas las de arrendamiento/compra y obligaciones contractuales donde la obligación legal del Estado de realizar pagos generalmente está sujeta y es pagada por las asignaciones anuales establecidas por la Legislatura de Puerto Rico (la Legislatura) del ELA. Por ejemplo, las deudas informadas por la mayoría de las unidades combinadas integradas, por Actividades de tipo comercial y ciertas unidades de componentes de presentación discreta están respaldadas, directa o indirectamente, por pagos de recursos de las Actividades del Gobierno del ELA.

Al 30 de junio de 2017, el monto total de los bonos y pagarés en circulación del Gobierno Primario ascendía a aproximadamente $40,800 millones, los bonos y pagarés en circulación de las unidades de componentes de presentación discreta ascendían a aproximadamente $24,100 millones, y los bonos en circulación de los fondos fiduciarios ascendieron a aproximadamente $3,200 millones.

Los bonos de obligación general están respaldados por la plena fe, crédito y poder impositivo del ELA. La Constitución del ELA autoriza la contratación de deudas según lo determine la Legislatura. Sin embargo, la Sección 2, Artículo VI de la Constitución del ELA establece que las obligaciones directas del ELA evidenciadas por bonos o pagarés y respaldadas por la plena fe, crédito y poder impositivo del ELA no deben emitirse si las

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

cantidades del capital e intereses sobre dichos bonos y pagarés y sobre todos los bonos y pagarés emitidos a partir de entonces, pagaderos en cualquier año fiscal, junto con cualquier cantidad pagada por el ELA en el año fiscal anterior de dicha emisión propuesta a cuenta de bonos o pagarés garantizados por el ELA, exceda el 15% de los ingresos anuales promedio recaudados a tenor con las disposiciones de la legislación del ELA y depositados en Hacienda (en adelante, los ingresos internos) en los dos años fiscales anteriores al año fiscal de dicha emisión propuesta. La Sección 2, Artículo VI de la Constitución del ELA no limita el monto de la deuda que el ELA puede garantizar siempre que el ELA cumpla con la limitación del 15% al momento de la emisión de dicha deuda garantizada. Los ingresos internos consisten principalmente en impuestos sobre ingresos, impuestos sobre ventas y uso, impuestos sobre la propiedad y arbitrios. La validez y prioridad de los bonos de obligación general del ELA es objeto de litigio real y posible en el caso presentado conforme al Título III de PROMESA por la Junta de Supervisión (tal como se define en el presente) en nombre del ELA.

Ciertos ingresos, como impuestos federales especiales sobre envíos afuera de la Isla de bebidas alcohólicas y productos de tabaco y aranceles aduaneros, que son recaudados por el Gobierno de los Estados Unidos y devueltos al ELA, y los impuestos sobre el combustible de vehículos de motor, el petróleo crudo y los productos derivados, arbitrios y licencias las tarifas, que se asignan condicionalmente a la Autoridad de Transporte de Carreteras de Puerto Rico (ACT), una unidad de componentes de presentación discreta, no se incluyen como ingresos para el cálculo del límite de la deuda, aunque pueden estar disponibles para el pago de la amortización de la deuda. Algunos de estos ingresos están sujetos a litigios en curso. Para obtener información adicional relacionada con litigios en curso, consulte la Nota 17. Además, la porción del impuesto sobre Ventas y Uso asignada condicionalmente a COFINA no se incluye como rentas internas a tenor con la legislación que crea COFINA, que transfiere la propiedad de dicha porción del impuesto sobre Ventas y Uso a COFINA y establece que dicha porción no es un "recurso disponible" en virtud de las disposiciones constitucionales relativas al pago de la amortización de la deuda. Las cuestiones relacionadas con este asunto se resolvieron, según el Plan de Ajuste de COFINA.

El 13 de septiembre de 2017, la Junta de Supervisión anunció que un comité especial de la Junta de Supervisión (el Comité Especial) contrató a un investigador independiente para realizar una revisión de la deuda del ELA y su conexión con la crisis financiera actual. El Comité Especial asesoró que considera que esta investigación es una parte integral de la misión de la Junta de Supervisión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el reingreso del ELA a los mercados de capitales. El 20 de agosto de 2018, el informe final fue publicado y presentó una serie de hallazgos y recomendaciones en las siguientes áreas:

- Banco Gubernamental de Fomento (BGF)

- Servicios Públicos de Puerto Rico (Autoridad de Energía Eléctrica de Puerto Rico (AEE) y Autoridad de Acueductos y Alcantarillados de Puerto Rico (AAA))

- COFINA

- Sistema de Retiro de los Empleados

- Presupuesto, Informes Externos y Funciones Contables de Puerto Rico

- Cálculo del Límite Constitucional de la Deuda

- Agencias de Calificación Crediticia (CRA)

- Prácticas de Venta para Bonos Relacionados con Puerto Rico

- Marco de Ética del Gobierno de Puerto Rico

- Uso de Intercambio de Tasa de Interés de los Emisores

- Falta de un Mecanismo Claro de Puerto Rico para Validar los Bonos Relacionados con Puerto Rico Antes de su Emisión

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

- Crédito Fiscal a la Posesión

Sobre la base de su investigación independiente, el Comité Especial inició una variedad de procedimientos contra varios acusados. Para obtener una descripción de este litigio, consulte la Nota 17.

La deuda de ciertas unidades de componentes de presentación discreta (distintas de las notas de anticipación de bonos) como la AEE y la AAA está respaldada por los ingresos operativos. Sin embargo, la deuda de ciertas unidades combinadas de componentes y de presentación discreta está respaldada, en todo o en parte, directa o indirectamente, por asignaciones o impuestos del ELA repartidos de manera condicional.

Se puede encontrar información adicional sobre la deuda a largo plazo del ELA en la Nota 13 de los estados financieros básicos.

Como resultado directo de la crisis económica que enfrenta el ELA, se promulgó la Ley Núm. 21-2016, conocida como la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico (según enmienda, la Ley de Moratoria) el 6 de abril de 2016. A tenor con la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas declarando un período de emergencia, una moratoria del pago de la deuda y varias otras medidas con respecto a ciertas obligaciones del ELA y varios de sus organismos. A tenor con estas órdenes ejecutivas, ciertas entidades del ELA: (i) no realizaron pagos de la amortización de la deuda, (ii) realizaron pagos de la amortización de la deuda con fondos depositados en los fideicomisarios de sus bonos, o (iii) no recibieron ni transfirieron ciertos ingresos. Después de la presentación del caso del Título III del ELA el 3 de mayo de 2017, tales pagos no se realizaron debido a las disposiciones aplicables de PROMESA. El litigio con respecto a estos ingresos está en curso en el caso del Título III del ELA.

Los siguientes párrafos detallan el monto de la amortización de la deuda no pagado:

*Bonos de CFP*

El 15 de julio de 2015, la Corporación para el Financiamiento Público de Puerto Rico (CFP) presentó una notificación ante el Acceso Electrónico al Mercado Municipal (EMMA) indicando que la Legislatura no había incluido en el presupuesto aprobado para el año fiscal 2016 los fondos necesarios para pagar el capital y los intereses de todos los bonos pendientes de CFP. Tal asignación es la única fuente de pago del capital e intereses sobre los bonos de CFP. El primer pago de la amortización de la deuda de los bonos de CFP para el año fiscal 2016 venció el 3 de agosto de 2015, fecha en que CFP realizó un pago parcial de intereses por un monto de $628,000 (del pago de aproximadamente $58 millones adeudado en esa fecha) de los fondos en poder de CFP que representa fondos restantes de asignaciones legislativas anteriores. Desde el 3 de agosto de 2015 hasta el 31 de julio de 2020, CFP no realizó varios pagos de la amortización de la deuda de sus bonos por un monto total agregado de aproximadamente $436 millones.

*Bonos de Obligación General (GO)*

El 1 de julio de 2016, se adeudaban aproximadamente $1,100 millones en pagos de capital e intereses sobre los bonos de obligación general del ELA. De este monto, el ELA pagó aproximadamente $351.9 millones (dejando aproximadamente $778.8 millones sin pagar). El pago de $351.9 millones consistió en fondos mantenidos en cuentas de plica ($314.4 millones en montos de capital más $37.5 millones de intereses capitalizados existentes al respecto). Desde el 1 de julio de 2016 hasta el 31 de julio de 2020, el ELA no realizó varios pagos de la amortización de la deuda de sus bonos de obligación general por un monto total agregado de aproximadamente $5,200 millones.

*Bonos de AEP*

El 1 de julio de 2016, de los aproximadamente $186.9 millones en pagos de la amortización de la deuda vencidos en los bonos de ingresos pendientes de la AEP (que consisten en aproximadamente $86.1 millones en capital y $100.9 millones en intereses), todos fueron pagados, con excepción del capital de $25.2 millones. De los requisitos de amortización de la deuda de bonos en circulación a partir del 1 de agosto de 2016 hasta

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

el 31 de julio de 2020, AEP no realizó varios pagos de la amortización de la deuda de sus bonos por un monto total agregado de $1,100 millones.

*Bonos de AFI*

El 1 de enero de 2016, de los pagos de la amortización de la deuda de aproximadamente $35.9 millones (todos los intereses) adeudados por los bonos AFI, casi todos quedaron sin pagar, excepto $14,400. Desde el 1 de enero de 2016, AFI no realizó varios pagos de amortización de la deuda por sus bonos por un monto total agregado de aproximadamente $693.4 millones, con excepción del capital de $100,000 y los intereses de $1.1 millones.

*Acuerdo de compra de bonos del Puerto de las Américas (PAA) con el BGF*

El Acuerdo de Compra de Bonos de PAA con el BGF permanece sin pagar por un monto total acumulado de capital e intereses de aproximadamente $116.6 millones.

**Empresa en Marcha, Riesgo de Liquidez y Plan Fiscal**

*Empresa en Marcha y Riesgo de Liquidez*

El ELA se encuentra en medio de una crisis fiscal, económica y de liquidez, la culminación de muchos años de déficits gubernamentales, una recesión económica (que comenzó en 2006), una elevada tasa de desempleo, un descenso de la población y altos niveles de deuda y obligaciones relacionadas con las pensiones. A medida que la base imponible del ELA se reduce y sus ingresos se han visto afectados por las condiciones económicas imperantes, los costos de la atención médica, las pensiones y la amortización de la deuda se han convertido en una parte cada vez mayor del presupuesto del Fondo General, lo que ha resultado en una reducción de los fondos disponibles para otros servicios esenciales. El nivel de deuda y pasivos de pensiones no financiados del ELA y la asignación de ingresos requerida como resultado del pago de la deuda y las obligaciones de pensiones contribuyeron a déficits presupuestarios en los últimos años, déficit que el ELA ha financiado, aumentando aún más el monto de su deuda. Estos asuntos, y las restricciones de liquidez del ELA, entre otros factores, han afectado sus calificaciones crediticias y su capacidad para obtener financiamiento a tasas de interés razonables. Como resultado, el ELA había dependido de financiamientos a corto plazo y préstamos provisionales del BGF, y otros organismos del ELA, cuya dependencia ha limitado la liquidez del ELA en general y del BGF y ha aumentado el riesgo de refinanciamiento a corto plazo. Estos factores también resultaron en demoras en el reintegro por parte del ELA y sus unidades de componentes de presentación discreta de líneas de crédito pendiente del BGF, lo que retrasó la capacidad limitada del BGF para continuar proporcionando financiamiento al ELA y ocasionó que el BGF no hiciera un pago del capital de sus obligaciones de deudas. Del mismo modo, y a tenor con una serie de legislaciones y órdenes ejecutivas emitidas durante el año fiscal 2016 y 2017, el ELA y algunas otras corporaciones públicas tampoco realizaron los pagos de la amortización de la deuda de algunas de sus deudas al vencimiento, incluidos los bonos de obligación general del ELA. El BGF cesó sus operaciones el 23 de marzo de 2018 y, en 2018, se sometió a una reestructuración consensuada de sus deudas conforme al Título VI de PROMESA, y está cerrando sus operaciones.

En respuesta a la crisis fiscal actual del ELA, el Congreso de los Estados Unidos promulgó la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (codificada en 48 U.S.C.§§ 2101-2241) (PROMESA) el 30 de junio de 2016. En términos generales, PROMESA busca proporcionar al ELA disciplina fiscal y económica a través de, entre otras cosas: (i) el establecimiento de la Junta de Supervisión, cuyas responsabilidades incluyen la certificación de planes y presupuestos fiscales para el ELA y sus entidades relacionadas; (ii) una paralización temporal de todas las demandas de acreedores; y (iii) dos métodos alternativos para ajustar la deuda insostenible: (a) un proceso voluntario de modificación de deuda en virtud del Título VI de PROMESA, que establece un proceso de reestructuración de la deuda en gran medida extrajudicial mediante la que una supermayoría de acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento de quiebra en virtud del Título III de PROMESA, que establece un proceso de reestructuración de la deuda en la corte sustancialmente basado en las disposiciones incorporadas del Código de Quiebras de los EE. UU. (11 U.S.C.§§ 101, et seq.). Para obtener

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

información adicional sobre los elementos clave de PROMESA y los casos del Título III, consulte la Nota 23. Para obtener información adicional sobre las acciones civiles relacionadas con los casos del Título III y otras contingencias de litigios, consulte la Nota 17.

Los riesgos e incertidumbres que enfrenta el ELA, junto con otros factores, han llevado a la administración a concluir que existen dudas sustanciales en cuanto a la capacidad del ELA para continuar como una empresa en marcha.

*Plan Fiscal*

De acuerdo con PROMESA y los requisitos impuestos por la Junta de Supervisión, el 27 de mayo de 2020, la Junta de Supervisión certificó el Plan Fiscal de la Junta para el ELA. El Plan Fiscal de la Junta de Supervisión se compromete con la responsabilidad fiscal e implementa mejoras específicas en los ingresos y reducciones específicas de gastos para devolver a Puerto Rico a la estabilidad fiscal y al crecimiento económico. Para obtener información adicional relacionada con el Plan Fiscal de la Junta, consulte la Nota 2.

**Hechos Conocidos Actualmente**

A continuación, se incluye una descripción resumida de los hechos, debates y condiciones actualmente conocidos que han tenido, o se espera que tengan un impacto en la posición financiera y los resultados de las operaciones del ELA. Para obtener información adicional y más detalles, consulte la Nota 23.

*Plan Conjunto de Ajuste Propuesto para el Título III*

El 27 de septiembre de 2019, la Junta de Supervisión presentó una propuesta de plan de ajuste de la deuda del ELA que reduciría las obligaciones de deuda del ELA en aproximadamente un 70% y establece una hoja de ruta para salir de la quiebra. A la fecha de estos estados financieros básicos, la Declaración de Divulgación que acompaña al plan de ajuste propuesto aún no ha sido aprobada por el Tribunal del Título III y no se ha aprobado ninguna solicitud del plan propuesto. No se sabe si los acreedores elegibles votarán a favor o si el Tribunal del Título III finalmente confirmará el plan de ajuste propuesto por la Junta de Supervisión.

El 5 de febrero de 2019, el plan de ajuste de COFINA fue confirmado por el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico y entró en vigencia el 12 de febrero de 2019. De acuerdo con la aprobación del plan de ajuste, COFINA emitió nuevos bonos de ingresos por impuestos a las ventas por un monto total de aproximadamente $12,000 millones, y su deuda pendiente total se redujo en aproximadamente un 32 por ciento.

*Reducción de la Calificación Crediticia de los Bonos*

Poco después de los pagos omitidos del 1 de julio de 2016, impuestos por la Ley de Moratoria y las órdenes ejecutivas relacionadas, S&P redujo al nivel más bajo de "D" los bonos de obligación general del ELA, los Bonos de Ingresos Fiscales Especiales de AFI y los bonos de la AEP, mientras que Fitch también lo hizo con los bonos de obligación general del ELA y los bonos de la AEP. El 6 de abril de 2017, Moody's redujo la calificación de los Bonos de Ingresos Fiscales Especiales y los bonos SRE de AFI a una calificación de nivel C de sus calificaciones anteriores de Ca y Ca, respectivamente. En esa misma fecha, Moody's reafirmó la calificación de Caa3 de los bonos de obligación general del ELA. El 7 de junio de 2017, S&P redujo la calificación de los bonos de gravámenes sénior y junior de COFINA a la calificación de incumplimiento de D, en respuesta a la orden de la Juez Swain en virtud del Título III de no realizar el pago programado de la deuda de COFINA, pero de mantener dichos fondos en una cuenta de fideicomiso hasta que el juez decida el caso. El 8 de febrero de 2019, Moody's actualizó los bonos de ingresos por impuestos sobre las ventas con gravamen senior de COFINA de Ca a Caa3. La mejora refleja las expectativas de recuperación en línea con la calificación Caa3 basada en los detalles del plan de ajuste de COFINA. A la fecha de vigencia del Plan de Ajuste de COFINA el 12 de febrero de 2019, los bonos de gravamen senior y junior de COFINA se extinguieron y los bonistas recibieron Nuevos Bonos de COFINA según lo dispuesto en el Plan de Ajuste de COFINA. Los Nuevos Bonos COFINA no están calificados actualmente.

27

**ELA DE PUERTO RICO**

Debate y Análisis de la Gerencia (No Auditado)

30 de junio de 2017

*Consecuencias del Huracán María*

El 20 de septiembre de 2017, Puerto Rico fue golpeado directamente por el huracán María y dejó a su paso daños económicos y relacionados con la infraestructura, lo que trastornó la vida cotidiana de los más de 3 millones de residentes de Puerto Rico. Miles de residentes quedaron sin hogar, los servicios básicos se interrumpieron por completo y las escuelas, hospitales y negocios fueron destruidos. Decenas de miles de portorriqueños huyeron de la Isla. Como resultado del impacto del huracán, el Gobierno local y federal ha tomado una serie de acciones y eventos para mejorar la condición de la Isla. El Plan Fiscal revisado del ELA proyecta que se pagarán aproximadamente $83,000 millones en fondos para ayuda en casos de desastre, de fuentes federales y privadas, en el esfuerzo de reconstrucción. Se utilizará para una combinación de asistencia individual (p. ej., reconstrucción de casas, gastos personales relacionados con el huracán, como ropa y suministros), asistencia pública (p. ej., reconstrucción de infraestructura principal, carreteras y escuelas) y para cubrir parte de la participación del ELA en el costo del financiamiento de la ayuda en casos de desastre.

*Terremotos*

El 7 de enero de 2020, Puerto Rico fue golpeado por un terremoto de magnitud 6.4 que causó daños a la infraestructura, un corte de energía en toda la Isla, escasez de agua y amenazó la vida de su gente. El 11 de enero de 2020, el Gobernador autorizó la apropiación de aproximadamente $12 millones del Fondo de Emergencia para ser distribuidos equitativamente entre los municipios de Guánica, Guayanilla, Peñuelas, Ponce, Utuado y Yauco para ser utilizados exclusivamente para daños y mitigación relacionados con la emergencia.

Una evaluación preliminar de los daños causados por el terremoto y las réplicas posteriores, calculada por el Servicio Geológico de los Estados Unidos, estimó los daños económicos totales en aproximadamente $838 millones.

*Pandemia de COVID-19*

El 11 de marzo de 2020, la Organización Mundial de la Salud declaró la enfermedad por coronavirus ("COVID-19") como una pandemia mundial. Como resultado de la amenaza para la salud y para contener el virus propagado por la Isla, el Gobernador Vázquez-Garced emitió una orden ejecutiva el 12 de marzo de 2020 en la que se declaró el estado de emergencia en Puerto Rico para concentrar todos los esfuerzos e implementar las medidas necesarias para salvaguardar la salud, bienestar y seguridad pública de los ciudadanos de Puerto Rico. La orden ejecutiva autoriza al Secretario de Hacienda del ELA y al Director de la Oficina de Administración y Presupuesto del ELA (OGP) a establecer un presupuesto especial, con los fondos disponibles, incluido el Fondo de Emergencia, para cubrir todos los costos necesarios para la contención del virus en toda la Isla y el intercambio de información con los municipios. El impacto se ha estimado preliminarmente en aproximadamente $4,000 millones. Como resultado directo de la pandemia de COVID-19, la Administración del ELA ha estimado una reducción de la recaudación de ingresos de aproximadamente $ 1,600 millones.

**Solicitudes de Información**

Este informe financiero está destinado para proporcionar una visión general de las finanzas del ELA para todos los residentes, contribuyentes, clientes, inversores y acreedores del ELA. Este informe financiero busca demostrar la rendición de cuentas del ELA por el dinero que recibe. Las preguntas relacionadas con la información proporcionada en este informe o las solicitudes de información adicional deben dirigirse a: Departamento de Hacienda del Estado Libre Asociado de Puerto Rico, Área de Contabilidad Central, P.O. Box 9024140, San Juan, PR 00902.

**ELA DE PUERTO RICO**

Estado de Resultados

Netos 30 de junio de

2017

(en miles)

| | Gobierno primario | | | |
| | Actividades gobierno | Actividades-tipo comercial | Totales Gobierno primario | Unidades de componente |
|---|---|---|---|---|
| Activos: | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 2,048,108 | 362,000 | 2,410,108 | 1,532,768 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 2,256 | 2 | 2,258 | 41,858 |
| Inversiones | 11,917 | | 11,917 | 1,343,964 |
| Garantía de transacciones de préstamos de valores | | | | 13,842 |
| Cuentas por cobrar, netas: | | | | |
| Impuestos a la renta y arbitrios | 1,255,037 | | 1,255,037 | |
| Impuesto a las ventas y al uso por cobrar | 82,638 | | 82,638 | |
| Prima de seguros | | 3,921 | 3,921 | 42,410 |
| Intergubernamental | 282,474 | 54,192 | 336,666 | 87,369 |
| Cuentas | 26,212 | 86,477 | 112,689 | 626,667 |
| Préstamos | 2 | | 2 | 2,686,922 |
| Interés devengado | 2,884 | 1,062 | 3,946 | 58,895 |
| Otros | 142,559 | 1,584 | 144,143 | 44,452 |
| Adeudado de - neto: | | | | |
| Gobierno primario | | | | 119,339 |
| Unidades de componentes | 10,700 | | 10,700 | 469,510 |
| Otras entidades del gobierno | 370,783 | 1,142 | 371,925 | 432,164 |
| Saldos internos | (71,931) | 71,931 | | |
| Inventarios | 12,562 | | 12,562 | 258,474 |
| Gastos pagados por adelantado | 29,294 | | 29,294 | 35,914 |
| Otros activos | 13,384 | 24,922 | 38,306 | 21,571 |
| Activos restringidos: | 652,045 | 27,781 | 679,826 | 545,329 |
| Efectivo y equivalentes al efectivo en bancos comerciales | | | | |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 279 | 28 | 307 | 4,666 |
| Equivalentes al efectivo en PRGITF | 49,976 | | 49,976 | |
| Efectivo y equivalentes de efectivo en custodia de Hacienda de los EE. UU. | | 557,540 | 557,540 | |
| Impuesto a las ventas y al uso por cobrar | 99,934 | | 99,934 | |
| Primas de seguro - neto | | 53,253 | 53,253 | |
| Intergubernamental por cobrar | 21,324 | | 21,324 | |
| Interés devengado | 11,747 | | 11,747 | |
| Préstamos por cobrar de unidades de componentes | | 448,176 | 448,176 | |
| Inversiones | 585,390 | 26,252 | 611,642 | 1,388,455 |
| Otros | 492 | 21,878 | 22,370 | 45,776 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | 44,211 | | 44,211 | 240,595 |
| Activos de capital: | 2,025,625 | 36,005 | 2,061,630 | 4,693,267 |
| Terrenos y otros no depreciables | | | | |
| Depreciables, neto | 6,448,596 | 53,250 | 6,501,846 | 22,922,565 |
| Activos Totales | 14,158,498 | 1,831,396 | 15,989,894 | 37,656,772 |
| Salidas diferidas de recursos: | | | | |
| Disminución acumulada del valor de mercado de derivados de cobertura | 72,460 | | 72,460 | 48,132 |
| Pérdida por reintegro de bonos | 385,020 | | 385,020 | 176,251 |
| Otros beneficios relacionados posteriores al empleo | | | | 6,815 |
| Relacionado con pensiones | 7,296,289 | 197,866 | 7,494,155 | 3,056,515 |
| Total de flujos salientes diferidos de recursos | 7,753,769 | 197,866 | 7,951,635 | 3,287,713 |

(Continuaci

**ELA DE PUERTO RICO**

Estado de Resultados Netos

30 de junio de 2017

(en miles)

| | Gobierno primario | | | Total del Gobierno primario |
|---|---|---|---|---|
| | Actividades gobierno | Actividades tipo comercial | Unidades de componentes | |
| **Pasivos:** | | | | |
| Cuentas por pagar y pasivos devengados | 1,247,457 | 91,342 | 1,338,799 | 2,130,649 |
| Depósitos y pasivos en custodia | | | | 3,772,411 |
| Reembolsos de impuestos a pagar | 576,848 | | 576,848 | |
| Adeudado a: | | | | |
| Gobierno primario | | | | 727,520 |
| Unidades de componentes | 162,723 | 77,578 | 240,301 | 3,476,521 |
| Otras entidades del gobierno | 573,266 | 107 | 573,373 | 175,329 |
| Obligaciones de préstamo de valores y acuerdos de recompra inversa | | | | 13,842 |
| Interés pagadero | 1,735,735 | 81,614 | 1,817,349 | 1,343,249 |
| Adelantos de subsidios | 6,496 | | 6,496 | |
| Ingresos no obtenidos | 84,359 | 31,911 | 116,270 | 111,454 |
| Instrumentos derivados de cobertura - intercambios de tasas de interés | 72,460 | | 72,460 | 48,132 |
| Pagarés adeudados al BGF | 1,700 | | 1,700 | |
| Notas de anticipación de ingresos fiscales | 400,000 | | 400,000 | |
| Pasivos pagaderos dentro de un año: | | | | |
| Bonos de asignación del ELA | 68,074 | | 68,074 | 27,992 |
| Obligaciones generales y bonos de ingresos | 1,138,456 | | 1,138,456 | 936,883 |
| Pagarés adeudados a las unidades de componentes | 393,281 | 62,000 | 455,281 | |
| Pagarés pagaderos a la institución financiera | 9,505 | | 9,505 | 1,703,050 |
| Arrendamiento de capital | 8,614 | | 8,614 | 1,401 |
| Ausencias compensadas | 232,819 | 11,851 | 244,670 | 124,926 |
| Obligación por premios no pagados de lotería | | 61,543 | 61,543 | |
| Beneficios de rescisión voluntaria | 87,564 | 1,287 | 88,851 | 33,530 |
| Pasivos netos de pensiones | 170,259 | | 170,259 | |
| Pasivos por beneficios de seguro | | 90,213 | 90,213 | 774,781 |
| Otros pasivos a largo plazo | 220,573 | 99,578 | 320,151 | 99,480 |
| Pasivos pagaderos después de un año: | | | | |
| Bonos de asignación del ELA | 501,672 | | 501,672 | 500,145 |
| Obligaciones generales y bonos de ingresos | 36,031,935 | | 36,031,935 | 17,635,794 |
| Acuerdo de compra de bonos con el BGF | 225,534 | | 225,534 | |
| Pagarés adeudados a las unidades de componentes | 1,994,330 | 424,559 | 2,418,889 | |
| Notas pagaderas a instituciones financieras | 14,259 | | 14,259 | 3,264,915 |
| Pasivos en virtud de obligaciones garantizadas | 374,596 | | 374,596 | |
| Arrendamiento de capital | 327,000 | | 327,000 | 26,504 |
| Ausencias compensadas | 318,974 | 7,074 | 326,048 | 373,648 |
| Obligación por premios no pagados de lotería | | 86,074 | 86,074 | |
| Beneficios de rescisión voluntaria | 696,442 | 5,905 | 702,347 | 131,604 |
| Obligación de pensiones netas | | | | 21,546 |
| Pasivos netos de pensiones | 42,374,732 | 809,666 | 43,184,398 | 12,573,963 |
| Otra obligación de beneficios posteriores al empleo | 270,187 | | 270,187 | |
| Otros pasivos a largo plazo | 1,628,815 | 2,193 | 1,631,008 | 761,699 |
| Pasivos Totales | 91,948,665 | 1,944,495 | 93,893,160 | 50,790,968 |
| **Entradas diferidas de recursos:** | | | | |
| Acuerdos de concesión de servicio | | | | 1,819,811 |
| Ganancia por reintegro de bonos | 114,548 | | 114,548 | |
| Otros beneficios relacionados posteriores al empleo | | | | 7,794 |
| Relacionado con pensiones | 978,654 | 15,498 | 994,152 | 411,848 |
| Entradas totales diferidas de recursos | 1,093,202 | 15,498 | 1,108,700 | 2,239,453 |
| **Resultados Netos:** | | | | |
| Inversión neta en activos de capital | 2,614,500 | 69,993 | 2,684,493 | 4,855,431 |
| Restringido para | | | | |
| Proyectos de capital | 81,606 | | 81,606 | 76,577 |
| Pago de la deuda | 152,408 | | 152,408 | 156,488 |
| Servicios de emergencia | | 6,268 | 6,268 | |
| Actividades de préstamos | | 454,918 | 454,918 | |
| Pago de beneficios del seguro | | 564,344 | 564,344 | |
| Vivienda Pública y Bienestar | | | | 32,223 |
| Préstamos estudiantiles y otros propósitos educativos | | | | 110,640 |
| Otros | 109,536 | | 109,536 | 242,891 |
| No restringidos (déficit) | (74,087,650) | (1,026,254) | (75,113,904) | (17,560,186) |
| Resultados netos totales | $ (71,129,600) | 69,269 | (71,060,331) | (12,085,936) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Actividades del

año finalizado el 30 de

junio de 2017 (en miles)

| Funciones | Gastos | Cargos por servicios | Ingresos del programa Subsidios y contribuciones operativas | Subsidios y contribuciones de capital | Ingresos (gastos) netos y cambios en los resultados netos Gobierno primario Actividades del gobierno | Actividades de tipo comercial | Total | Unidades de componentes |
|---|---|---|---|---|---|---|---|---|
| Gobierno primario: | | | | | | | | |
| Actividades del gobierno: | | | | | | | | |
| Gobierno General | $ 2,324,564 | 233,825 | 641,252 | | (1,449,487) | | (1,449,487) | |
| Seguridad Pública | 1,889,296 | 136,885 | 60,673 | | (1,691,738) | | (1,691,738) | |
| Salud | 2,704,463 | 292,184 | 2,109,958 | | (302,321) | | (302,321) | |
| Vivienda Pública y Bienestar | 3,464,039 | 17,111 | 2,485,611 | 84,033 | (877,284) | | (877,284) | |
| Educación | 4,285,123 | 1,058 | 939,530 | | (3,344,535) | | (3,344,535) | |
| Desarrollo Económico | 815,469 | 117,861 | 1,189 | | (696,419) | | (696,419) | |
| Intergubernamental | 397,993 | | | | (397,993) | | (397,993) | |
| Intereses y otros | 2,420,007 | | | | (2,420,007) | | (2,420,007) | |
| Total de actividades del gobierno | 18,300,954 | 798,924 | 6,238,213 | 84,033 | (11,179,784) | | (11,179,784) | |
| Actividades de tipo comercial: | | | | | | | | |
| Seguro por desempleo | 122,642 | 209,454 | 1,394 | | | 88,206 | 88,206 | |
| Administración de Seguros de Salud de Puerto Rico | 2,791,508 | 157,732 | 1,866,583 | | | (767,193) | (767,193) | |
| Administración de Servicios Médicos de Puerto Rico | 232,589 | 121,045 | | | | (111,544) | (111,544) | |
| Fondos No Mayores de Propiedad Exclusiva | 174,789 | 800,618 | 6,813 | | | 632,642 | 632,642 | |
| Total de Actividades de tipo comercial: | 3,321,528 | 1,288,849 | 1,874,790 | | | (157,889) | (157,889) | |
| Total del gobierno primario | $ 21,622,482 | 2,087,773 | 8,113,003 | 84,033 | (11,179,784) | (157,889) | (11,337,673) | |

(Continuaci

**ELA DE PUERTO RICO**

Estado de Actividades del

año finalizado el 30 de

junio de 2017 (en miles)

| Funciones | Gastos | Ingresos del programa | | | Ingresos (gastos) netos y cambios en los resultados netos | | | Unidades de componentes |
| | | | | | Gobierno primario | | | |
| | | Cargos por servicios | Subsidios y contribuciones operativas | Subsidios y contribuciones de capital | Actividades de gobierno | Actividades de tipo comercial | Total | |
|---|---|---|---|---|---|---|---|---|
| Unidades de componentes: | | | | | | | | |
| Banco Gubernamental de Fomento para Puerto Rico | $ 628,272 | 269,499 | 176,665 | | | | | (182,108) |
| Autoridad de Carreteras y Transportación de Puerto Rico | 1,031,188 | 226,641 | 33,038 | 93,102 | | | | (678,407) |
| Autoridad de Energía Eléctrica de Puerto Rico | 4,514,243 | 3,264,748 | | 7,317 | | | | (1,242,178) |
| Autoridad de Acueductos y Alcantarillados de Puerto Rico | 1,247,589 | 1,032,003 | | 4,016 | | | | (211,570) |
| Universidad de Puerto Rico | 1,311,984 | 197,410 | 295,822 | | | | | (818,752) |
| Corporación del Fondo del Seguro del Estado | 986,144 | 584,134 | | | | | | (402,010) |
| Unidades de componentes no mayores | 1,623,028 | 702,876 | 185,410 | 5,876 | | | | (728,866) |
| Total de unidades de componentes | $ 11,342,448 | 6,277,311 | 690,935 | 110,311 | | | | (4,263,891) |
| Ingresos generales: | | | | | | | | |
| Impuestos a la renta | | | | | $ 4,450,645 | | 4,450,645 | |
| Impuesto sobre Ventas y Uso | | | | | 2,413,628 | | 2,413,628 | |
| Arbitrios | | | | | 3,521,787 | | 3,521,787 | 211,489 |
| Otros impuestos | | | | | 112,098 | | 112,098 | |
| Ingreso del acuerdo global de liquidación del tabaco | | | | | 72,266 | | 72,266 | |
| Ingresos de la Corporación del Fondo del Seguro del Estado | | | | | 49,011 | | 49,011 | |
| Ingreso de la Compañía de turismo de Puerto Rico | | | | | 20,742 | | 20,742 | |
| Ingresos de la Administración de Compensaciones por Accidentes de Automó | | | | | 5,365 | | 5,365 | |
| Subvenciones y contribuciones no restringidas a programas específicos | | | | | 115,663 | | 115,663 | 3,084 |
| Ingreso del gobierno primario | | | | | | | | 1,170,982 |
| Ganancias (pérdidas) de inversiones no restringidas - netas | | | | | 18,221 | 16,897 | 35,118 | 135,668 |
| Otros | | | | | 143,716 | 6,102 | 149,818 | |
| Transferencias | | | | | (724,650) | 724,650 | | |
| Ingresos generales y transferencias totales | | | | | 10,198,492 | 747,649 | 10,946,141 | 1,521,223 |
| Cambios en los resultados netos | | | | | (981,292) | 589,760 | (391,532) | (2,742,668) |
| Resultados Netos: | | | | | | | | |
| Al comienzo del año, según la información anterior | | | | | (69,821,688) | (473,117) | (70,294,805) | (6,247,812) |
| Corrección de errores y adopción de nuevos pronunciamientos contables (nota 4) | | | | | (326,620) | (47,374) | (373,994) | (3,095,456) |
| Resultados netos (déficit) – comienzo del año, según ajuste y reformulación | | | | | (70,148,308) | (520,491) | (70,668,799) | (9,343,268) |
| Resultados netos (déficit) - fin de año | | | | | $ (71,129,600) | 69,269 | (71,060,331) | (12,085,936) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Balance – Fondos del Gobierno al

30 de junio de 2017

(en miles)

| | General | Pago de la deuda | Ingresos especiales de COFINA | Pago de la deuda de COFINA | Gubernamentales no mayores | Total gubernamentales |
|---|---|---|---|---|---|---|
| Activos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 1,941,790 | | 6,373 | | 99,945 | 2,048,108 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 2,170 | | | | 86 | 2,256 |
| Inversiones | | | 167 | | 11,750 | 11,917 |
| Cuentas por cobrar, netas: | | | | | | |
| Impuestos a la renta  arbitrios | 1,255,037 | | | | | 1,255,037 |
| Impuesto sobre Ventas y Uso por cobrar | 82,638 | | | | | 82,638 |
| Intergubernamental | 281,548 | | | | 926 | 282,474 |
| Cuentas | 23,109 | | | | 3,103 | 26,212 |
| Préstamos | | | | | 2 | 2 |
| Interés devengado | 2,841 | | | 42 | 1 | 2,884 |
| Otros | 103,474 | | | 659 | 38,426 | 142,559 |
| Adeudado de - neto: | | | | | | |
| Otros fondos | 7,147 | | | | 113 | 7,260 |
| Unidades de componentes | 8,441 | | | | 2,259 | 10,700 |
| Otras entidades del gobierno | 369,391 | | | | 1,392 | 370,783 |
| Otros activos | 12,358 | | | | 1,026 | 13,384 |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 222,118 | 297,916 | | 55,429 | 76,582 | 652,045 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | 279 | 279 |
| Equivalentes al efectivo en PRGITF | 2,547 | | | | 47,429 | 49,976 |
| Impuesto sobre Ventas y Uso por cobrar | | | | 99,934 | | 99,934 |
| Intergubernamental por cobrar | | 21,324 | | | | 21,324 |
| Inversiones | 31,548 | | | 443,725 | 110,117 | 585,390 |
| Deudas de otros fondos | | | | | 158,040 | 158,040 |
| Adeudado a otras entidades del gobierno | | | | | 11,747 | 11,747 |
| Otros activos | | | | | 492 | 492 |
| Bienes inmuebles mantenidos para la venta o desarrolo futu | | | | | 1,854 | 1,854 |
| Activos Totales | $ 4,346,157 | 319,240 | 6,540 | 599,789 | 565,569 | 5,837,295 |
| Pasivos, entrada diferida de recursos y saldos de fondos | | | | | | |
| (déficit): Pasivos: | | | | | | |
| Cuentas por pagar y pasivos devengados | $ 1,130,085 | | 196 | 105 | 117,071 | 1,247,457 |
| Reembolsos de impuestos por pagar | 576,848 | | | | | 576,848 |
| adeudados a: | | | | | | |
| Otros fondos | 91,673 | | | 141,562 | 3,996 | 237,231 |
| Unidades de componentes | 155,798 | | | | 6,925 | 162,723 |
| Otras entidades del gobierno | 567,386 | | | | 5,880 | 573,266 |
| Interés pagadero | 47,026 | 733,241 | | 16,298 | 241,288 | 1,037,853 |
| Adelantos de subsidios | 6,496 | | | | | 6,496 |
| Ingresos no obtenidos | 82,781 | | | | 1,578 | 84,359 |
| Pagarés adeudados al BGF | 114,231 | | | | 46,257 | 160,488 |
| Notas de anticipación de ingresos fiscales | 400,000 | | | | | 400,000 |
| Bonos de asignación del ELA | 46,328 | | | | | 46,328 |
| Obligaciones generales y bonos de ingresos | | 448,340 | | | 144,533 | 592,873 |
| Ausencias compensadas | | | | | 767 | 767 |
| Beneficios pagaderos por rescisión voluntaria | 713 | | | | | 713 |
| Pasivos netos de pensiones | 170,259 | | | | | 170,259 |
| Otros pasivos | 61,000 | | | | | 61,000 |
| Pasivos Totales | 3,450,624 | 1,181,581 | 196 | 157,965 | 568,295 | 5,358,661 |
| Entradas diferidas de recursos: | | | | | | |
| Impuestos sobre ingresos no disponibles | 878,930 | | | | | 878,930 |
| Subsidios y contribuciones intergubernamentales | 29,983 | 4,511 | | | | 34,494 |
| Honorarios de desarrolladores | 87,184 | | | | | 87,184 |
| Acuerdo global de liquidación del tabaco | | | | | 36,344 | 36,344 |
| Entradas totales diferidas de recursos | 996,097 | 4,511 | | | 36,344 | 1,036,952 |
| Saldos del fondo: | | | | | | |
| No gastable | 151 | | | | | 151 |
| Gastable: | | | | | | |
| Restringido | 75,848 | | | 441,824 | 286,393 | 804,065 |
| Comprometido | | | | | 17,059 | 17,059 |
| Asignado | | | | | 4,006 | 4,006 |
| No asignado (déficit) | (176,563) | (866,852) | 6,344 | | (346,528) | (1,383,599) |
| Saldos totales del fondo (déficit) | (100,564) | (866,852) | 6,344 | 441,824 | (39,070) | (558,318) |
| Pasivos totales, entradas diferidas de recursos y saldos totales del fondo (déficit) | $ 4,346,157 | 319,240 | 6,540 | 599,789 | 565,569 | 5,837,295 |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Conciliación del Balance de los Fondos Gubernamentales
con el Estado de Resultados Netos

30 de junio de 2017

(en miles)

| | |
|---|---:|
| Saldos totales del fondo (déficit) de fondos del gobierno | $ (558,318) |
| Los montos informados para actividades del gobierno en el estado de resultados neos son diferentes a los montos informados en los fondos del gobierno porque: | |
| Inventarios y gastos prepagos que no se informan en fondos del gobierno y se informan en el estado de resultados netos | 41,856 |
| Salidas diferidas de recursos informados en actividades del gobierno pero no en fondos del gobierno | |
| Disminución acumulada del valor de mercado de derivados de cobertura | 72,460 |
| Pérdida por reintegro de bonos | 385,020 |
| Relacionado con pensiones | 7,296,289 |
| Los activos de capital utilizados en actividades del gobierno no son recursos financieros y, por lo tanto, no se informan en los fondos | 8,474,221 |
| Los bienes inmuebles mantenidos para la venta o el desarrollo futuro no son recursos financieros actuales y, en consecuencia, no se informan en los fondos del gobierno | 42,357 |
| Las entradas diferidas de recursos informadas en los fondos del gobierno se reconocen como ingresos en las actividades del gobierno | 1,036,952 |
| Entradas diferidas de recursos informados en actividades del gobierno pero no en fondos del gobierno | |
| Ganancia por reintegro de bonos | (114,548) |
| Relacionado con pensiones | (978,654) |
| Los pasivos a largo plazo no deben pagarse en el período actual y, por lo tanto, no se informan en los fondos: | |
| Interés pagadero | (697,882) |
| Bonos de asignación del ELA | (523,418) |
| Obligaciones generales y bonos de ingresos | (36,577,518) |
| Acuerdo de compra de bonos con el BGF | (225,534) |
| Pagarés adeudados a las unidades de componentes | (2,228,823) |
| Notas pagaderas a instituciones financieras | (23,764) |
| Obligación garantizada | (374,596) |
| Arrendamientos de capital | (335,614) |
| Ausencias compensadas | (551,026) |
| Beneficios de rescisión voluntaria | (783,293) |
| Pasivos netos de pensiones | (42,374,732) |
| Instrumentos derivados de cobertura - intercambios de tasas de interés | (72,460) |
| Otra obligación de beneficios posteriores al empleo | (270,187) |
| Otros pasivos a largo plazo | (1,788,388) |
| Resultados netos totales (déficit) de actividades del gobierno | $ (71,129,600) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Ingresos, Gastos y Cambios en los Saldos de Fondos - Fondos del Gobierno

Año finalizado el 30 de

junio de 2017 (en miles)

| | General | Pago de la deuda | Ingresos especiales de COFINA | Pago de la deuda de COFINA | Gubernamentales no mayores | Total gubernamentale |
|---|---|---|---|---|---|---|
| Ingresos: | | | | | | |
| Impuestos: | | | | | | |
| Impuestos a la renta | $ 4,295,313 | | | | | 4,295,313 |
| Impuesto sobre Ventas y Uso | 1,697,868 | | | 715,760 | | 2,413,628 |
| Arbitrios | 3,521,787 | | | | | 3,521,787 |
| Impuesto a los bienes | 7,404 | | | | | 7,404 |
| Otros impuestos | 104,694 | | | | | 104,694 |
| Cargos por servicios | 798,923 | | | | | 798,923 |
| Ingresos del acuerdo global | | | | | | |
| de liquidación del tabaco | 72,687 | | | | | 72,687 |
| Ingresos de unidades de componentes | 75,118 | | | | | 75,118 |
| Intergubernamental | 6,303,608 | 111,152 | | | 29,921 | 6,444,681 |
| Ganancias por intereses e inversiones | 8,015 | 1,218 | | 4,322 | 4,666 | 18,221 |
| Otros | 21,696 | | | | 16,378 | 38,074 |
| Ingresos totales | 16,907,113 | 112,370 | | 720,082 | 50,965 | 17,790,530 |
| Gastos: | | | | | | |
| Corrientes: | | | | | | |
| Gobierno General | 1,415,470 | | | 1,524 | 164,272 | 1,581,266 |
| Seguridad Pública | 2,072,961 | | | | 256 | 2,073,217 |
| Salud | 2,770,545 | | | | 17,979 | 2,788,524 |
| Vivienda Pública y Bienestar | 3,264,644 | | | | 1,429 | 3,266,073 |
| Educación | 3,615,574 | | | | 180 | 3,615,754 |
| Desarrollo Económico | 812,338 | | | | 5,277 | 817,615 |
| Intergubernamental | 391,245 | | | | 7,329 | 398,574 |
| Desembolsos de capital | 103,959 | | | | 62,916 | 166,875 |
| Pago de la deuda: | | | | | | |
| Capital | 55,175 | 448,340 | | 38,295 | 225,209 | 767,019 |
| Intereses y otros | 162,327 | 733,243 | | 670,464 | 286,435 | 1,852,469 |
| Total de gastos | 14,664,238 | 1,181,583 | | 710,283 | 771,282 | 17,327,386 |
| Exceso (deficiencia) de ingresos sobre (bajo) gastos( | 2,242,875 | (1,069,213) | | 9,799 | (720,317) | 463,144 |
| Otras fuentes de financiamiento (usos): | | | | | | |
| Transferencias entrantes | 219,028 | | 6,373 | | 397,790 | 623,191 |
| Transferencias salientes | (1,331,957) | | | (15,884) | | (1,347,841) |
| Ganancias de la deuda emitida a largo plazo | 6,475 | | | | | 6,475 |
| Ganancias de la venta de activos de capital | 1,446 | | | | | 1,446 |
| Total de otras fuentes de financiamiento (usos) | (1,105,008) | | 6,373 | (15,884) | 397,790 | (716,729) |
| Cambio neto en los saldos del fondo | 1,137,867 | (1,069,213) | 6,373 | (6,085) | (322,527) | (253,585) |
| Saldos del fondo (déficit) – comienzo del año, según reformulación (nota 4) | (1,238,431) | 202,361 | (29) | 447,909 | 283,457 | (304,733) |
| Saldos del fondo (déficit) – fin de año | $ (100,564) | (866,852) | 6,344 | 441,824 | (39,070) | (558,318) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Conciliación del Estado de Ingresos, Gastos y Cambios en los Saldos de
Fondos del Gobierno con el Estado de Actividades

Año finalizado el 30 de

junio de 2017 (en miles)

| | | |
|---|---:|---:|
| Cambio neto en los saldos de los fondos: fondos del gobierno totales | $ | (253,585) |
| Los montos informados para las actividades del gobierno en el estado de actividades son diferentes porque: | | |
| Los fondos del gobierno informan los desembolsos de capital como gastos. Sin embargo, en el estado | | |
| de actividades, el costo de esos activos se asigna a lo largo de sus vidas útiles estimadas y | | |
| se informan como gastos de depreciación y amortización. En el período actual, estos montos son: | | |
| Desembolsos de capital | $ 166,875 | |
| Menos gastos de depreciación y amortización | (312,225) | |
| Pérdida por disposición de activos | (69,185) | |
| Subtotal | | (214,535) |
| La emisión de deuda a largo plazo (por ejemplo, bonos y pagarés) proporciona recursos | | |
| financieros actuales a fondos del gobierno, mientras que el reintegro del capital de la deuda | | |
| a largo plazo | | |
| consume los recursos financieros actuales de los fondos del gobierno. Sin embargo, ninguna | | |
| de las transacciones tiene ningún efecto en los resultados netos. Además, los fondos del | | |
| gobierno informan el efecto de las primas, descuentos y partidas similares cuando se emite | | |
| la deuda por primera vez, mientras que estos montos se difieren y amortizan en el estado de | | |
| actividades. Este monto es el efecto neto | | |
| de estas diferencias en el tratamiento de la deuda a largo plazo y los elementos relacionados: | | |
| Pagos del capital de la deuda a largo plazo | 767,019 | |
| Ganancias de la deuda emitida a largo plazo | (6,475) | |
| Subtotal | | 760,544 |
| Algunos ingresos en el estado de actividades no proporcionan recursos financieros actuales y, por lo | | |
| tanto, se difieren en fondos del gobierno. Además, los ingresos relacionados con períodos | | |
| anteriores que estuvieron disponibles durante el período actual se informan en los fondos del | | |
| gobierno pero se eliminan | | |
| en el estado de actividades. Este monto es el ajuste neto. | | 253,782 |
| Algunos gastos informados en el estado de actividades no requieren el uso de recursos financieros corrientes y, | | |
| en consecuencia, no se informan como gastos en los fondos del gobierno. | | (1,524,972) |
| Por lo general, el inventario y los pagos previos se registran como gastos en los fondos del | | |
| gobierno cuando se compran en lugar de capitalizarse como un activo. Sin embargo, estos | | |
| activos se capitalizan en el estado de resultados netos. Este monto es la disminución neta en | | |
| los inventarios totales y | | |
| gastos pagados por adelantado. | | (2,526) |
| Cambio en los resultados netos de las actividades del gobierno | $ | (981,292) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Resultados Netos - Fondos de Propiedad Exclusiva

30 de junio de 2017

(en miles)

| | Seguro de desempleo | Administración del Seguro de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | No mayores de Propiedad Exclusiva | Total de Propiedad Exclusiva |
|---|---|---|---|---|---|
| **Actividades de tipo comercial - Fondos Empresariales** | | | | | |
| **Activos:** | | | | | |
| Activos Corrientes: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ | 199,075 | 1,345 | 161,580 | 362,000 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | 2 | | | 2 |
| Cuentas por cobrar, netas: | | | | | |
| Primas de seguros | | | | 3,921 | 3,921 |
| Intergubernamental | | 49,789 | 4,403 | | 54,192 |
| Cuentas | | 61,647 | 19,051 | 5,779 | 86,477 |
| Intereses devengados por cobrar | | 860 | | 202 | 1,062 |
| Otros | | | 77 | 805 | 882 |
| Deudas de otros fondos | | 1,931 | 34,449 | 3,996 | 40,376 |
| Adeudado a otras entidades del gobierno | | | 1,142 | | 1,142 |
| Otros activos | | 21,305 | 3,582 | 35 | 24,922 |
| Activos restringidos | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 1,678 | 1,321 | | 14,856 | 17,855 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | 28 | 28 |
| Efectivo y equivalentes de efectivo en custodia de | | | | | |
| Hacienda de los EE. UU. | 557,540 | | | | 557,540 |
| Primas de seguro por cobrar | 53,253 | | | | 53,253 |
| Otros | 43 | | | 133 | 176 |
| Préstamos de unidades de componentes | | | | 1,000 | 1,000 |
| Total de activos corrientes | 612,514 | 335,930 | 64,049 | 192,335 | 1,204,828 |
| Activos no corrientes: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales - restringido | | | 9,926 | | 9,926 |
| Cuentas por cobrar, netas: | | | | | |
| Préstamos de unidades de componentes - restringido | | | | 447,176 | 447,176 |
| Deudas de otros fondos | | | | 38,702 | 38,702 |
| Otros | | 702 | | | 702 |
| Inversiones restringidas | | | | 26,252 | 26,252 |
| Otros activos restringidos | | | | 21,702 | 21,702 |
| Terrenos y otros no depreciables | | | 6,872 | 29,133 | 36,005 |
| Depreciables, neto | | 2,287 | 45,181 | 5,782 | 53,250 |
| **Activos Totales** | 612,514 | 338,919 | 126,028 | 761,082 | 1,838,543 |
| Salidas diferidas de recursos: | | | | | |
| Relacionado con pensiones | | 6,795 | 159,631 | 31,440 | 197,866 |
| **Pasivos:** | | | | | |
| Pasivos corrientes: | | | | | |
| Cuentas por pagar y pasivos devengados | | 68,924 | 12,069 | 10,349 | 91,342 |
| Deudas a otros fondos | 7,147 | | | | 7,147 |
| Adeudado a unidades de componentes | | | 77,578 | | 77,578 |
| Adeudado a otras entidades del gobierno | | | | 107 | 107 |
| Interés pagadero | | 30,708 | 47,038 | 3,868 | 81,614 |
| Ingresos no obtenidos | 19,405 | | | 12,506 | 31,911 |
| Pagarés adeudados a las unidades de componentes | | 62,000 | | | 62,000 |
| Ausencias compensadas | | 666 | 10,504 | 681 | 11,851 |
| Obligación por premios no pagados de lotería | | | | 61,543 | 61,543 |
| Beneficios pagaderos por rescisión voluntaria | | 834 | | 453 | 1,287 |
| Pasivos por beneficios de seguro | 49,431 | 40,137 | | 645 | 90,213 |
| Otros pasivos a largo plazo | | | 99,578 | | 99,578 |
| Total de pasivos corrientes | 75,983 | 203,269 | 246,767 | 90,152 | 616,171 |
| Pasivos no corrientes: | | | | | |
| Pagarés adeudados a las unidades de componentes | | 121,251 | 282,445 | 20,863 | 424,559 |
| Ausencias compensadas | | 426 | 3,885 | 2,763 | 7,074 |
| Obligación por premios no pagados de lotería | | | | 86,074 | 86,074 |
| Beneficios pagaderos por rescisión voluntaria | | 3,143 | | 2,762 | 5,905 |
| Pasivos netos de pensiones | | 24,449 | 680,775 | 104,442 | 809,666 |
| Otros pasivos a largo plazo | | | 2,193 | | 2,193 |
| **Pasivos Totales** | 75,983 | 352,538 | 1,216,065 | 307,056 | 1,951,642 |
| Entradas diferidas de recursos: | | | | | |
| Relacionado con pensiones | | 468 | 13,030 | 2,000 | 15,498 |
| Resultados Netos: | | | | | |
| Inversión neta en activos de capital | | 2,287 | 52,053 | 15,653 | 69,993 |
| Restringido para servicios de emergencia | | | | 6,268 | 6,268 |
| Restringido para actividades de préstamos | | | | 454,918 | 454,918 |
| Restringido para el pago de beneficios de seguro | 536,531 | 1,321 | | 26,492 | 564,344 |
| No restringido (déficit) | | (10,900) | (995,489) | (19,865) | (1,026,254) |
| **Resultados netos totales (déficit)** | $  536,531 | (7,292) | (943,436) | 483,466 | 69,269 |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Ingresos, Gastos y Cambios en los Resultados Netos de los Fondos - Fondos de Propiedad Exclusiva

Año finalizado el 30 de

junio de 2017 (en miles)

| | Seguro por desempleo | Administración de Seguros de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | No Mayores de Propiedad Exclusiva | Total de Propiedad Exclusiva |
|---|---|---|---|---|---|
| **Actividades de tipo comercial - Fondos Empresariales** | | | | | |
| Ingresos Operativos: | | | | | |
| Administración de Seguros de Salud | $ | 157,732 | | | 157,732 |
| Primas de seguros | 209,454 | | | 18,663 | 228,117 |
| Ventas de boletos de lotería | | | | 757,686 | 757,686 |
| Servicio al paciente, neto de la provisión para deudas incobrables | | | 120,353 | | 120,353 |
| Cargos del servicio telefónico de emergencias | | | | 22,680 | 22,680 |
| Intereses | | | | 1,538 | 1,538 |
| Otros | | | 692 | 51 | 743 |
| Ingresos operativos totales | 209,454 | 157,732 | 121,045 | 800,618 | 1,288,849 |
| Gastos operativos: | | | | | |
| Beneficios del seguro | 122,642 | | | 2,236 | 124,878 |
| Primas y reclamaciones médicas | | 2,756,139 | | | 2,756,139 |
| Premios de lotería | | | | 487,325 | 487,325 |
| Servicios al paciente | | | 152,995 | | 152,995 |
| Gastos generales, administrativos y otros gastos operativos | | 24,372 | 54,419 | 116,651 | 195,442 |
| Descargo de provisión para pérdidas de créditos | | | | (434,362) | (434,362) |
| Gastos operativos totales | 122,642 | 2,780,511 | 207,414 | 171,850 | 3,282,417 |
| Ingresos (pérdidas) de operación | 86,812 | (2,622,779) | (86,369) | 628,768 | (1,993,568) |
| Ingresos (gastos) no operativos | | | | | |
| Subsidios del gobierno de los EE. UU. | 1,394 | 1,866,583 | | 6,813 | 1,874,790 |
| Contribuciones a unidades de componentes | | | | (1,441) | (1,441) |
| Ganancias por intereses e inversiones | 11,559 | 2,032 | | 3,306 | 16,897 |
| Gastos por intereses | | (10,997) | (25,175) | (1,498) | (37,670) |
| Otros | | 5,614 | | 488 | 6,102 |
| Ingresos (gastos) no operativos totales | 12,953 | 1,863,232 | (25,175) | 7,668 | 1,858,678 |
| Utilidad (pérdida) antes de transferencias | 99,765 | (759,547) | (111,544) | 636,436 | (134,890) |
| Transferencias de otros fondos | | 891,942 | 41,350 | 10,386 | 943,678 |
| Transferencias a otros fondos | (43,854) | | | (175,174) | (219,028) |
| Cambio neto en los resultados netos | 55,911 | 132,395 | (70,194) | 471,648 | 589,760 |
| Resultados netos (déficit), comienzo del año, según ajuste (nota 4) | 480,620 | (139,687) | (873,242) | 11,818 | (520,491) |
| Resultados netos (déficit) - fin de año | $  536,531 | (7,292) | (943,436) | 483,466 | 69,269 |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Flujos de Efectivo - Fondos de Propiedad Exclusiva

Año finalizado el 30 de

junio de 2017 (en miles)

| | | Actividades de tipo comercial - Fondos Empresariales | | | |
|---|---|---|---|---|---|
| | Seguro por desempleo | Administración de Seguros de Salud de Puerto Rico | Administración de Servicios Médicos de Puerto Rico | No Mayores de Propiedad Exclusiva | Total de Propiedad Exclusiva |
| **Flujos de efectivo de actividades operativas:** | | | | | |
| Recibos de clientes y usuarios | $ 221,611 | 77,908 | 100,748 | 802,574 | 1,202,841 |
| Otros recibos | | | 692 | 51 | 743 |
| Pagos a organizaciones de atención médica y terceros administradores | | (2,764,643) | | | (2,764,643) |
| Pagos a proveedores | | (11,466) | (15,989) | (86,054) | (113,509) |
| Pagos a empleados | | (4,207) | (101,777) | (27,350) | (133,334) |
| Pagos de premios de loterías | | | | (511,869) | (511,869) |
| Pagos de beneficios del seguro | (126,499) | | | (2,392) | (128,891) |
| Efectivo neto provisto por (utilizado en) actividades de operación | 95,112 | (2,702,408) | (16,326) | 174,960 | (2,448,662) |
| **Flujos de efectivo de actividades de financiamiento no relacionadas con el capital:** | | | | | |
| Subsidios del gobierno de los EE. UU. | 1,394 | 1,933,391 | | 6,813 | 1,941,598 |
| Contribuciones a unidades de componentes | | | | (1,441) | (1,441) |
| Intereses pagados | | (2) | (8,228) | | (8,230) |
| Transferencias de otros fondos | | 900,229 | 33,151 | 6,996 | 940,376 |
| Transferencias a otros fondos | (46,796) | | | (196,026) | (242,822) |
| Efectivo neto provisto por (utilizado en) actividades no relacionadas con el capital y actividades relacionadas de financiamiento | (45,402) | 2,833,618 | 24,923 | (183,658) | 2,629,481 |
| **Flujos de efectivo de actividades de capital y actividades relacionadas de financiamiento** | | | | | |
| Transferencias de otros fondos | | | | 3,390 | 3,390 |
| Transferencias a otros fondos | | | | (2,328) | (2,328) |
| Pago del capital | | | | (50) | (50) |
| Gastos de capital | | (1,906) | (1,223) | (108) | (3,237) |
| Efectivo neto provisto por (usado en) las actividades de capital y actividades relacionadas de financiamiento | | (1,906) | (1,223) | 904 | (2,225) |
| **Flujos de efectivo de actividades de inversión:** | | | | | |
| Intereses cobrados sobre depósitos, inversiones y préstamos | 11,512 | 1,479 | | 8,395 | 21,386 |
| Préstamos originados | | | | (21,133) | (21,133) |
| Capital cobrado en préstamos | | | | 131 | 131 |
| Ingresos por ventas y vencimientos de inversiones | | | | 4,964 | 4,964 |
| Compra de inversiones | | | | (6,000) | (6,000) |
| Efectivo neto provisto por (utilizado en) actividades de inversión | 11,512 | 1,479 | | (13,643) | (652) |
| Variación neta de efectivo y equivalentes de efectivo | 61,222 | 130,783 | 7,374 | (21,437) | 177,942 |
| Efectivo y equivalentes de efectivo al inicio del año | 497,996 | 69,615 | 3,897 | 197,901 | 769,409 |
| Efectivo y equivalentes de efectivo a fin del año | $ 559,218 | 200,398 | 11,271 | 176,464 | 947,351 |
| **Conciliación de los ingresos (pérdidas) operativos con el efectivo neto provisto por (utilizado en) actividades de operación:** | | | | | |
| Ingresos (pérdidas) de operación | $ 86,812 | (2,622,779) | (86,369) | 628,768 | (1,993,568) |
| **Ajustes para conciliar los ingresos (pérdidas) operativos con efectivo neto provisto por (utilizado en) actividades de operación:** | | | | | |
| Intereses devengados por depósitos, préstamos e inversiones | | | | (1,538) | (1,538) |
| Depreciación | | 194 | 5,444 | 1,405 | 7,043 |
| Provisión por deudas incobrables | | 90,677 | 18,643 | | 109,320 |
| Ganancia por enajenación de activos de capital | | | 8 | | 8 |
| Descargo de provisión para pérdidas de créditos | | | | (434,362) | (434,362) |
| **Cambios en activos y pasivos operativos:** | | | | | |
| Disminución (aumento) de cuentas y préstamos por cobrar | 9,195 | (79,824) | (20,492) | 9,437 | (81,684) |
| Aumento de la deuda de las unidades componentes | | | (1,142) | | (1,142) |
| Reducción en la deuda de otras entidades del gobierno | | | 1,533 | | 1,533 |
| Disminución (aumento) de otros activos | | 258 | 496 | (840) | (86) |
| Disminución (aumento) de la salida diferida de recursos | | (1,479) | (37,899) | 2,811 | (36,567) |
| Disminución en cuentas por pagar y pasivos devengados | | (16,461) | (30,444) | (7,448) | (54,353) |
| Aumento de la deuda a las unidades componentes | | | 36,110 | | 36,110 |
| Reducción en la deuda a otras entidades del gobierno | | | (2,120) | (1) | (2,121) |
| Aumento de los ingresos no obtenidos | 2,962 | | | 4,050 | 7,012 |
| Aumento (disminución) de las ausencias compensadas | | 272 | (734) | (3,201) | (3,663) |
| Aumento de la entrada diferida de recursos | | 90 | 2,465 | 132 | 2,687 |
| Aumento en pasivos netos de pensiones | | 2,671 | 71,698 | 2,001 | 76,370 |
| Disminución en la obligación por premios no pagados de lotería | | | | (24,544) | (24,544) |
| Disminución en los beneficios pagaderos por rescisión voluntaria | | (203) | | (1,553) | (1,756) |
| Reducción en los pasivos por el seguro por desempleo, discapacidad y seguro de salud | (3,857) | (75,824) | | (157) | (79,838) |
| Aumento en otros pasivos a largo plazo | | | 26,477 | | 26,477 |
| Total de ajustes | 8,300 | (79,629) | 70,043 | (453,808) | (455,094) |
| Efectivo neto provisto por (utilizado en) actividades de operación | $ 95,112 | (2,702,408) | (16,326) | 174,960 | (2,448,662) |
| **Capital no monetario y actividades de financiamiento:** | | | | | |
| Retiro de activos de capital | $ | 82 | 1,648 | | 1,730 |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Resultados Netos Fiduciarios - Fondos Fiduciarios

30 de junio de 2017

(en miles)

| | Fondo de pensión (y otros beneficios del empleado) | Agencia |
|---|---|---|
| Activos: | | |
| Efectivo y equivalentes al efectivo en bancos comerciales: | | |
| No restringido | $ 323,650 | 629,861 |
| Restringido | 216,483 | |
| Efectivo y equivalentes al efectivo en bancos del gobierno: | | |
| No restringido | | 50 |
| Cuentas por | | |
| cobrar, netas: | 36,172 | |
| Patronos - neto | | |
| Intereses y dividendos devengados | 183 | |
| Inversiones vendidas | 406 | |
| Otros | 20,544 | |
| Garantía de operaciones de préstamo de | 8,218 | |
| valores Inversiones a valor de mercado: | | |
| Bonos y pagarés | 184,655 | |
| Fondos de fideicomisos mixtos no cotizados en bolsa | 385,718 | |
| Inversiones en asociaciones limitadas | 90,591 | |
| Préstamos a miembros e intereses por cobrar - netos | 839,660 | |
| Activos de capital - neto | 24,923 | |
| Otros activos | 1,234 | |
| Activos Totales | 2,132,437 | 629,911 |
| Pasivos: | | |
| Cuentas por pagar y pasivos devengados | 291,551 | 629,911 |
| Interés pagadero | 14,076 | |
| Cuentas a paga por títulos comprados de inversiones | 205 | |
| Obligaciones de préstamos de títulos | 8,218 | |
| # | 162,197 | |
| Otros pasivos | 55,352 | |
| Bonos por pagar | 3,166,472 | |
| Pasivos Totales | 3,698,071 | 629,911 |
| Resultados Netos: | | |
| Restringidos para pensiones a ser provistos por el SRM | 516,966 | |
| Restringidos para pensiones a ser provistos por el SRJ | 26,252 | |
| No restringido (déficit) SRE | (2,108,852) | |
| Resultados netos totales (déficit) | $ (1,565,634) | |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensiones
(y otros beneficios del empleado)

Año finalizado el 30 de junio de 2017

(en miles)

| | | |
|---|---|---:|
| **Agregados:** | | |
| Contribuciones: | | |
| Contribuciones patronales: | | |
| Beneficios básicos, netos de provisiones para la asignación de $442,861 | $ | 887,481 |
| Beneficios especiales | | 444,440 |
| Contribuciones de los miembros | | 419,040 |
| Total de contribuciones | | 1,750,961 |
| Ingresos por inversiones y gastos en inversiones: | | |
| Apreciación neta en el valor de mercado de las inversiones | | 3,592 |
| Intereses | | 74,355 |
| Dividendos | | 536 |
| Gastos de inversión, que no sean préstamos de títulos | | (2,578) |
| Ingresos netos de inversiones, distintos de los préstamos de títulos | | 75,905 |
| Ingresos de préstamos de títulos | | 31 |
| Ingresos netos por préstamos de títulos | | 31 |
| Ingresos de inversión neta | | 75,936 |
| Otros ingresos | | 58,861 |
| Total de agregados | | 1,885,758 |
| **Descuentos:** | | |
| Beneficios pagados a los participantes | | 2,432,868 |
| Reembolsos de contribuciones | | 48,849 |
| Intereses sobre bonos a pagar | | 198,084 |
| Gastos generales y administrativos | | 48,934 |
| Otros gastos | | 387,057 |
| Total de descuentos | | 3,115,792 |
| Reducción neta en los resultados netos | | (1,230,034) |
| **Resultados Netos:** | | |
| Comienzo del año | | (335,600) |
| Fin de año | $ | (1,565,634) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado Combinado de Resultados Netos – Unidades de Componentes de
Presentación Discreta

30 de junio de 2017

(en miles)

| | Banco Gubernamental de Fomento para Puerto Rico | Autoridad de Carreteras y Transporte de Puerto Rico | Autoridad de Energía Eléctrica de Puerto Rico | Autoridad de Acueductos y Alcantarillados de Puerto Rico | Universidad de Puerto Rico | Corporación del Fondo del Seguro del Estado | Totales unidades de componentes mayores | Totales unidades de componentes no mayores | Totales todas las unidades de componentes |
|---|---|---|---|---|---|---|---|---|---|
| **Activos:** | | | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 209,609 | 33,071 | 532,943 | 85,718 | 307,322 | 41,073 | 1,209,736 | 323,032 | 1,532,768 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | | | | 41,858 | 41,858 |
| Inversiones | 133,388 | | | | 3,030 | 731,581 | 867,999 | 475,965 | 1,343,964 |
| Garantía de transacciones de préstamos de títulos | | | | | | 13,842 | 13,842 | | 13,842 |
| Cuentas por cobrar, netas: | | | | | | | | | |
| Primas de seguros | | | | | | 42,410 | 42,410 | | 42,410 |
| Intergubernamental | | 19,683 | 5,747 | 1,509 | 34,598 | | 61,537 | 25,832 | 87,369 |
| Cuentas | | 6,604 | 360,037 | 153,979 | 27,991 | | 548,611 | 78,056 | 626,667 |
| Préstamos y adelantos | 2,560,206 | | | | 5,125 | | 2,565,331 | 121,591 | 2,686,922 |
| Interés devengado | 50,163 | 1,255 | 153 | | | 1,540 | 53,111 | 5,784 | 58,895 |
| Otros | 3,068 | | 26,554 | | 1,809 | 6,546 | 37,977 | 6,475 | 44,452 |
| Adeudado de - neto: | | | | | | | | | |
| Gobierno primario | | 12,717 | 39,274 | 17,794 | 3,837 | | 73,622 | 45,717 | 119,339 |
| Unidades de componentes | 380,203 | | 61,687 | 2,973 | 5,026 | | 449,889 | 19,621 | 469,510 |
| Otras entidades del gobierno | | | 384,050 | 23,899 | 11,506 | | 419,455 | 12,709 | 432,164 |
| Inventarios | | | 212,928 | 27,842 | 3,543 | 2,883 | 247,196 | 11,278 | 258,474 |
| Gastos pagados por adelantado | | 10,412 | 878 | 4,652 | 2,793 | | 18,735 | 17,179 | 35,914 |
| Otros activos | 943 | 574 | | | | | 1,517 | 20,054 | 21,571 |
| Activos restringidos | | | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 41,345 | 46,535 | 53,950 | 316,322 | 22,714 | | 480,866 | 64,463 | 545,329 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | 4,636 | | | 4,636 | 30 | 4,666 |
| Inversiones | 167,026 | 78,560 | | | 241,929 | | 487,515 | 900,940 | 1,388,455 |
| Otros activos restringidos | 6,362 | | | | | | 6,362 | 39,414 | 45,776 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | 59,940 | | | | | | 59,940 | 180,655 | 240,595 |
| Activos de capital: | | | | | | | | | |
| Terrenos y otros no depreciables | 23,453 | 2,396,084 | 621,870 | 408,323 | 60,814 | 54,844 | 3,565,388 | 1,127,879 | 4,693,267 |
| Depreciables - neto | 1,013 | 7,628,814 | 5,675,112 | 6,590,247 | 815,449 | 69,030 | 20,779,665 | 2,142,900 | 22,922,565 |
| Activos Totales | 3,636,719 | 10,234,309 | 7,975,183 | 7,637,894 | 1,547,486 | 963,749 | 31,995,340 | 5,661,432 | 37,656,772 |
| | | | | | | | | | |
| Salidas diferidas de recursos: | | | | | | | 48,132 | | 48,132 |
| | | | | | | | | | |
| Disminución acumulada del valor de mercado de derivados de cobertura | 48,132 | | | | | | | | |
| Pérdida por reintegro de bonos | 2,151 | 93,315 | 40,994 | 23,027 | 1,943 | | 161,430 | 14,821 | 176,251 |
| Otros beneficios relacionados posteriores al empleo | | | - | 6,815 | | | 6,815 | | 6,815 |
| Relacionado con pensiones | 51,404 | 105,238 | 1,541,743 | 338,868 | 220,168 | 393,366 | 2,650,787 | 405,728 | 3,056,515 |
| Total de flujos salientes diferidos de recursos | 53,555 | 198,553 | 1,630,869 | 368,710 | 222,111 | 393,366 | 2,867,164 | 420,549 | 3,287,713 |

(Continuación)

**ELA DE PUERTO RICO**

Estado Combinado de Resultados Netos – Unidades de Componentes de Presentación Discreta

30 de junio de 2017

(en miles)

| | Banco Gubernamental de Fomento para Puerto Rico | Autoridad de Carreteras y Transportación de Puerto Rico | Autoridad de Energía Eléctrica de Puerto Rico | Autoridad de Acueductos y Alcantarillados de Puerto Rico | Universidad de Puerto Rico | Corporación del Fondo del Seguro del Estado | Totales de unidades de componentes mayores | Totales unidades de componentes no mayores | Totales todas las unidades de componentes |
|---|---|---|---|---|---|---|---|---|---|
| **Pasivos:** | | | | | | | | | |
| Cuentas por pagar y pasivos devengados | 102,405 | 123,088 | 1,023,826 | 274,002 | 87,401 | 79,987 | 1,690,709 | 439,940 | 2,130,649 |
| Depósitos y pasivos en custodia | 3,215,122 | | 246,831 | 88,371 | | | 3,550,324 | 222,087 | 3,772,411 |
| Adeudado a: | | | | | | | | | |
| Gobierno primario | | 1,321 | 2,259 | 581,276 | | 7,200 | 592,056 | 135,464 | 727,520 |
| Unidades de componentes | | 1,990,380 | 39,858 | 93,483 | 98,835 | 1,300 | 2,223,856 | 1,252,665 | 3,476,521 |
| Otras entidades del gobierno | | | | 5,610 | 18,186 | 20,533 | 44,329 | 131,000 | 175,329 |
| Obligaciones de préstamo de valores y acuerdos de recompra inversa | | | | | | 13,842 | 13,842 | | 13,842 |
| Interés pagadero | 214,509 | 535,657 | 228,265 | 186,151 | | | 1,164,582 | 178,667 | 1,343,249 |
| Ingresos no obtenidos | 3,032 | | 11,976 | 20,123 | | 14,852 | 49,983 | 61,471 | 111,454 |
| Pasivos pagaderos dentro de un año: | | | | | | | | | |
| Bonos de asignación del ELA | 170 | | | 19,390 | | | 19,560 | 8,432 | 27,992 |
| Bonos de ingresos | 30,414 | 130,725 | 584,582 | 68,852 | 24,455 | | 839,028 | 97,855 | 936,883 |
| Notas pagaderas a instituciones financieras | 946,685 | | 696,897 | 1,610 | 226 | 7,148 | 1,652,566 | 50,484 | 1,703,050 |
| Arrendamientos de capital | | | | | 1,039 | | 1,039 | 362 | 1,401 |
| Ausencias compensadas | | 5,657 | 55,367 | 10,868 | 27,003 | | 98,895 | 26,031 | 124,926 |
| Beneficios de rescisión voluntaria | | 11,569 | | | | | 11,569 | 21,961 | 33,530 |
| Pasivos por beneficios de seguro | | | | | | 708,492 | 708,492 | 66,289 | 774,781 |
| Otros pasivos a largo plazo | 27,775 | 13,217 | | 3,925 | 1,170 | 44,679 | 90,766 | 8,714 | 99,480 |
| Pasivos pagaderos después de un año: | | | | | | | | | |
| Bonos de asignación del ELA | 3,166 | | | 396,668 | | | 399,834 | 100,311 | 500,145 |
| Bonos de ingresos | 86,063 | 4,202,478 | 7,771,732 | 3,910,974 | 466,700 | | 16,437,947 | 1,197,847 | 17,635,794 |
| Notas pagaderas a instituciones financieras | 2,891,850 | | 20,569 | | 647 | 2,231 | 2,915,297 | 349,618 | 3,264,915 |
| Arrendamientos de capital | | | | | 25,690 | | 25,690 | 814 | 26,504 |
| Ausencias compensadas | | 14,438 | 88,232 | 103,056 | 119,431 | 34,181 | 359,338 | 14,310 | 373,648 |
| Beneficios de rescisión voluntaria | | 50,898 | | | | | 50,898 | 80,706 | 131,604 |
| Obligación de pensiones netas | | | | | | | | 21,546 | 21,546 |
| Pasivos netos de pensiones | 203,367 | 550,824 | 4,666,535 | 1,575,926 | 2,006,703 | 1,713,281 | 10,716,636 | 1,857,327 | 12,573,963 |
| Instrumentos derivados de cobertura - intercambios de tasas de interés | | | 48,132 | | | | 48,132 | | 48,132 |
| Otros pasivos a largo plazo | 169,636 | 91,406 | 247,222 | | 120,835 | 47,248 | 676,347 | 85,352 | 761,699 |
| Pasivos Totales | 7,894,194 | 7,721,658 | 15,732,283 | 7,340,285 | 2,971,592 | 2,721,703 | 44,381,715 | 6,409,253 | 50,790,968 |
| **Entradas diferidas de recursos:** | | | | | | | | | |
| Acuerdos de concesión de servicio | | 1,138,103 | | | | | 1,138,103 | 681,708 | 1,819,811 |
| Otros beneficios relacionados posteriores al empleo | | | | 7,794 | | | 7,794 | | 7,794 |
| Relacionado con pensiones | 3,892 | 20,257 | 47,343 | 30,162 | 172,913 | 32,791 | 307,358 | 104,490 | 411,848 |
| Entradas totales diferidas de recursos | 3,892 | 1,158,360 | 47,343 | 37,956 | 172,913 | 32,791 | 1,453,255 | 786,198 | 2,239,453 |
| **Resultados Netos:** | | | | | | | | | |
| Inversión neta en activos de capital | 15,815 | 2,621,106 | (2,075,907) | 2,195,602 | 390,707 | 87,765 | 3,235,088 | 1,620,343 | 4,855,431 |
| Restringido para | | | | | | | | | |
| proyectos de capital | | 13,725 | | | 18,360 | | 32,085 | 44,492 | 76,577 |
| Pago de la deuda | 5,705 | 35,410 | | 32,631 | | | 73,746 | 82,742 | 156,488 |
| Programas de vivienda accesible y seguros de préstamos relacionados | 32,223 | | | | | | 32,223 | | 32,223 |
| Préstamos estudiantiles y otros propósitos educativos | | | | | 105,596 | | 105,596 | 5,044 | 110,640 |
| Otros | | | | | 79,606 | 17,642 | 97,248 | 145,643 | 242,891 |
| No restringidos (déficit) | (4,261,555) | (1,117,397) | (4,097,667) | (1,646,845) | (1,939,944) | (1,485,144) | (14,548,452) | (3,011,734) | (17,560,186) |
| Resultados netos totales (déficit) | $  (4,207,812) | 1,552,844 | (6,173,574) | 628,363 | (1,374,908) | (1,397,379) | (10,972,466) | (1,113,470) | (12,085,936) |

Ver las notas adjuntas a los estados financieros básicos.

**ELA DE PUERTO RICO**

Estado Combinado de Actividades – Unidades de Componentes de
Presentación Discreta

Año finalizado el 30 de
junio de 2017 (en miles)

| Unidades de componentes mayores: | Gastos | Cargos por servicios | Subsidios y contribuciones de capital | Ingresos (gastos) netos y cambios en resultados netos | Pagos del (al) gobierno primario | Pagos de (a) otras unidades de Componentes | Subsidios y Contribuciones no restringidas a programas específicos | Intereses y ganancias por inversión | Impuestos especiales y otros | Cambio en Resultados netos | Resultados netos (déficit) – comienzo del año informados anteriormente | Corrección de errores y adopción de nuevas pronunciamientos (nota 4) | Resultados netos (déficit) – comienzo del año ajustados y reformulados | Resultados netos (déficit) fin de año |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Banco Gubernamental de Fomento para Puerto Rico | $ 828,272 | 269,499 | 176,885 | (182,108) | | (821) | | | | (182,929) | (3,733,711) | (291,172) | (4,024,883) | (4,207,812) |
| Autoridad de Carreteras y Transportación de Puerto Rico | 1,031,188 | 226,641 | 33,038 | 93,102 | 140,339 | | | 24,019 | 3,355 | (510,694) | 2,569,883 | (506,345) | 2,063,538 | 1,552,844 |
| Autoridad de Energía Eléctrica de Puerto Rico | 4,514,243 | 3,264,748 | | 7,317 | (1,242,178) | (8,300) | | 37,117 | | (1,211,361) | (4,836,066) | (124,147) | (4,962,213) | (6,173,574) |
| Autoridad de Acueductos y Alcantarillados de Puerto Rico | 1,247,589 | 1,032,003 | | 4,016 | (211,570) | | | 2,329 | 4,681 | (204,560) | 2,054,488 | (1,221,545) | 832,943 | 628,363 |
| Universidad de Puerto Rico | 1,311,984 | 197,410 | 295,822 | | (818,752) | 972,190 | 62,225 | 6,491 | 10,895 | 133,012 | (1,507,920) | | (1,507,920) | (1,374,906) |
| Corporación del Fondo del Seguro del Estado | 986,144 | 584,134 | | | (402,010) | (49,011) | | | 99,877 | (351,144) | (1,117,067) | 71,132 | (1,046,235) | (1,397,379) |
| Unidades de componentes no mayores | 1,623,028 | 702,876 | 185,410 | 5,876 | (728,866) | 207,461 | (55,104) | 3,084 | 65,712 | 92,741 | (414,972) | 324,881 | (1,023,379) | (698,498) | (1,113,470) |
| | $ | 6,277,311 | 690,935 | 110,311 | (4,263,891) | 1,170,982 | | 3,084 | 135,668 | 211,489 | (2,742,668) | (8,247,812) | (3,095,456) | (9,343,268) | (12,085,936) |

Ver las notas adjuntas de los estados financieros básicos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(1) Resumen de las Principales Políticas Contables**

El Estado Libre Asociado de Puerto Rico (el ELA) fue constituido el 25 de julio de 1952, conforme a las disposiciones de la Constitución del ELA, aprobada por el pueblo de Puerto Rico y el Congreso de los EE. UU. La Constitución del ELA establece la separación de facultades de la rama ejecutiva, legislativa y judicial del gobierno. El ELA asume la responsabilidad del gobierno general, la seguridad pública, la salud, la vivienda pública y el bienestar, la educación y el desarrollo económico. El 30 de junio de 2016, como resultado de la actual crisis fiscal que afecta al ELA (como se describe más adelante en la Nota 2 y la Nota 3), se estableció la Junta de Supervisión y Administración Financiera para Puerto Rico (la Junta de Supervisión), según el Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) con amplias facultades para ejercer controles presupuestarios y financieros sobre los asuntos fiscales del ELA, incluida la revisión y aprobación de ciertas funciones gubernamentales.

Los estados financieros básicos adjuntos del ELA se presentan a tenor con los Principios Contables Generalmente Aceptados de los EE. UU. (GAAP de EE. UU.) para los gobiernos según las indicaciones de la Junta de Estándares Contables del Gobierno (GASB).

Los estados financieros básicos adjuntos presentan la posición financiera del ELA y sus diversos fondos y unidades de componentes de presentación discreta, los resultados de las operaciones del ELA y sus diversos fondos y unidades de componentes de presentación discreta, y los flujos de efectivo de los fondos de propiedad exclusiva.

*(a) Entidad de Informes Financieros*

Tal como lo requieren las GAAP de los EE. UU., la entidad de informes financieros del ELA incluye todos los departamentos, agencias, fondos, funciones y corporaciones públicas que se ha determinado que cumplen con los requisitos para su inclusión en la entidad de informes financieros del ELA. El ELA ha considerado todas las unidades potenciales de componentes de presentación discreta de las que es financieramente responsable y otras organizaciones cuya naturaleza y significado de su relación con el ELA es tal que la exclusión causaría que los estados financieros básicos del ELA sean engañosos o incompletos. La GASB ha establecido criterios para su consideración al determinar la rendición de cuentas financiera. Estos criterios incluyen cuando el ELA designa una mayoría con derecho a voto del órgano de gobierno de una organización y tiene (i) la capacidad de imponer su voluntad a esa organización o (ii) la posibilidad de que la organización brinde beneficios financieros específicos o imponga cargas sobre el ELA. En situaciones donde el ELA no ha designado a la mayoría con derecho a voto del órgano de gobierno de una organización, la GASB ha proporcionado, como criterio para la rendición de cuentas financieras, la dependencia fiscal de dichas organizaciones del ELA y cuándo existe la posibilidad de que la organización brinde beneficios financieros específicos o imponga cargas financieras específicas al ELA.

*(b) Unidades de componentes*

Los estados financieros básicos de las unidades de componentes que se analizan a continuación se han incluido en la entidad de información financiera como unidades de componentes combinadas o como unidades componentes de presentación discreta de acuerdo con las Declaraciones Estados de GASB Núm. 14, *Entidad de Información Financiera*, según enmienda por las Declaraciones de GASB Núm. 39, *Determinar si ciertas organizaciones son unidades de componentes, una enmienda de la Declaración de GASB Núm. 14 y Núm. 61, Entidad de Información Financiera. Ómnibus—una enmienda de las Declaraciones de GASB Núm. 14 y Núm. 34.*

*(i) Unidades Mixtas de Componentes*

Las siguientes entidades, aunque están legalmente separadas del ELA, cumplen con los criterios de combinación que se informarán como parte del Gobierno Primario de la siguiente manera:

la *Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF)* - El 6 de abril de 2016 se aprobó la Ley Núm. 21 (Ley Núm. 21-16) creando la AAFAF como una corporación pública

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

independiente y agencia gubernamental con existencia legal separada, autonomía fiscal y administrativa e independencia del ELA. La AAFAF se creó con el propósito de actuar como agente fiscal, asesor financiero y agente de informes del ELA, sus agencias, organismos, subdivisiones, corporaciones públicas o municipios, y para ayudar a dichas entidades a enfrentar la emergencia fiscal y económica que Puerto Rico está experimentando. La AAFAF asumió las responsabilidades de agencia fiscal y asesoría financiera que anteriormente tenía el Banco Gubernamental de Fomento (BGF). El 18 de enero de 2017, el Gobernador de Puerto Rico (el Gobernador) promulgó la Ley de habilitación de la Agencia Fiscal y la Autoridad de Asesoramiento Financiero, Ley Núm. 2-2017. Esta nueva ley modificó y reemplazó secciones de la ley anterior que estableció la AAFAF. La Ley Núm. 2-2017 amplió las facultades de la AAFAF para incluir, entre otras cosas, la responsabilidad exclusiva de renegociar, reestructurar o llegar a un acuerdo con los acreedores sobre todo o parte de la deuda pública o cualquier otra deuda emitida por cualquier entidad del gobierno. Además, la AAFAF es la entidad a cargo de los esfuerzos de colaboración, comunicación y cooperación entre el ELA y la Junta de Supervisión, creada de acuerdo con PROMESA.

La Junta de Directores de la AAFAF estaba compuesta inicialmente por un solo miembro designado por el Gobernador, pero tras la promulgación de la Ley Núm. 2-2017, la Junta ahora está compuesta por cinco miembros:
(1) El Director Ejecutivo de la AAFAF designado por el Gobernador, (2) un representante del Senado de Puerto Rico, (3) un representante de la Cámara de Representantes de Puerto Rico que será designado por el Presidente de cada Cuerpo Legislativo, y (4) dos miembros nombrados por el gobernador. Los miembros solo pueden ser reemplazados o removidos por la entidad que los nombró. Los miembros de la Junta Directiva seleccionarán un Presidente, un Vicepresidente y un Secretario entre ellos. La AAFAF no tiene autoridad legal para emitir bonos, pagarés o cualquier otro instrumento de deuda; sin embargo, será el principal asesor financiero en futuras emisiones de deuda de cualquier instrumento del ELA. El presupuesto anual de la AAFAF será asignado por la Legislatura de Puerto Rico (la Legislatura) con fondos disponibles del Fondo General, asignaciones especiales o cualquier otro ingreso identificado.

*Autoridad de Puertos de Ponce (PPA)* - El 12 de diciembre de 2011 se aprobó la Ley Núm. 240 (Ley Núm. 240-2011) que crea la PPA, con una junta de siete miembros compuesta por (1) el Secretario del Departamento de Desarrollo Económico y Comercio (DDEC), (2) el director del puerto de Ponce, (3) tres miembros serán nombrados por el Gobernador con el consentimiento del Senado y (4) dos miembros serán nombrados por el Alcalde de Ponce con el consentimiento de la Legislatura Municipal de Ponce. La PPA se creó para continuar el desarrollo de la terminal de contenedores que antes realizaba la Autoridad de Ponce (AP) y para implementar las operaciones futuras de las instalaciones. Por lo tanto, todos los activos, derechos y deberes de la AP (con la excepción de su deuda existente) serían transferidos a la PPA. A partir del año fiscal 2015, se formó la junta de la PPA y comenzaron las operaciones. Sin embargo, al 30 de junio de 2017, los activos de la AP no se han transferido a la PPA. El 19 de diciembre de 2013 se aprobó la Ley Núm. 156 que modifica la Ley Núm. 240-2011 que, entre otras cosas, autoriza a la PPA a solicitar una línea de crédito de hasta $60 millones al BGF y establece que el pago de dicha deuda sería satisfecho con las asignaciones legislativas anuales del ELA a partir del año fiscal 2015. Como el total de la deuda pendiente de la PPA se paga mediante las asignaciones legislativas del ELA, los estados financieros básicos de la PPA se combinan con los estados financieros de los fondos del ELA como un fondo empresarial.

*Autoridad de Ponce (AP) (Anteriormente conocida como Autoridad del Puerto de las Américas):* El 12 de agosto de 2016 el Gobernador promulgó la Ley Núm. 176-2016, conocida como "Ley de la Autoridad de Ponce", para enmendar varios artículos de la Ley Núm.171-2002. La Ley 176-2016 renombró la Autoridad del Puerto de las Américas como Autoridad de Ponce, cambió la estructura de gobierno de la AP y amplió sus propósitos, facultades y poderes, incluso a través de la creación de un nuevo Plan Maestro de Infraestructura Coordinado para la Ciudad de Ponce. Luego de la

46

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

promulgación de la Ley Núm. 176-2016, la AP ahora está gobernada por una junta de siete miembros copresidida por el Secretario de la DDEC y el Director de la Oficina de Orden Territorial de Ponce. Los otros miembros incluyen (1) el Secretario del Departamento de Recursos Naturales y Ambientales (DRNA), (2) un arquitecto o planificador certificado, que sea residente de Ponce y designado por el Gobernador con el consentimiento del Senado, (3 ) un economista, que sea residente de Ponce y designado por el Gobernador con el consentimiento del Senado, (4) un ingeniero civil, que debe ser residente de Ponce y designado por el Alcalde de Ponce con el consentimiento de la Legislatura Municipal y (5) un representante de pequeñas empresas, quien debe ser residente de Ponce y designado por el Alcalde de Ponce con el consentimiento de la Legislatura Municipal. El objetivo principal de la AP es la promoción, desarrollo, mejora y operación de la terminal de contenedores a gran escala en la ciudad de Ponce, Puerto Rico. La AP también debe preparar un plan maestro coordinado para la Infraestructura de Ponce. El ELA proporciona apoyo financiero a la AP mediante asignaciones legislativas, y su deuda corriente actual está garantizada por el ELA de acuerdo con las disposiciones de la Ley Núm. 409 del 22 de septiembre de 2004 (Ley Núm. 409-2004). El ELA continúa brindando apoyo financiero a esta nueva entidad AP. Por lo tanto, los estados financieros básicos de la AP se combinan con los estados financieros de los fondos del ELA como un fondo de ingresos especiales.

*Autoridad de Edificios Públicos (AEP):* la AEP está gobernada por una junta de siete miembros compuesta por el Secretario del Departamento de Transporte y Obras Públicas (DTOP), el Secretario del Departamento de Educación (DE) del Estado Libre Asociado, el Presidente del BGF y cuatro miembros nombrados por el Gobernador con el asesoramiento y aprobación del Senado. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF desde el 18 de enero de 2017. La AEP es una entidad legalmente separada, cuyas actividades se combinan dentro del Gobierno Primario porque existe con el propósito de construir, comprar o arrendar oficinas, escuelas, centros de salud, correccionales, bienestar social y otras instalaciones a los departamentos, unidades de componentes y organismos del ELA. Los bonos emitidos por la AEP para financiar tales instalaciones son pagaderos a partir de los ingresos de alquileres de ciertas instalaciones del gobierno arrendadas por la AEP y están respaldados por una garantía del ELA. Por lo tanto, los estados financieros básicos de la AEP se combinan en los estados financieros de los fondos del ELA como un fondo especial de ingresos, amortización de la deuda y proyecto de capital. El 27 de septiembre de 2019, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEP al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal del Título III.

*Administración de Seguros de Salud de Puerto Rico (ASES):* La ASES está gobernada por una junta directiva que, por ley, está compuesta por once miembros (seis miembros obligatorios y cinco miembros optativos). Los miembros obligatorios son el Secretario del Departamento de Salud (PRDOH) del ELA, el Secretario del Departamento de Hacienda (DOT) del ELA, el Director de la Oficina de Administración y Presupuesto del ELA (OGP), el Presidente del BGF, el Comisionado de Seguros de Puerto Rico y el Administrador de la Administración de Servicios de Salud Mental y Adicciones. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF desde el 18 de enero de 2017. Los cinco miembros optativos son nombrados por el Gobernador, con el asesoramiento y aprobación del Senado. El gobernador designa al presidente de la junta directiva y todos los miembros opcionales de la junta son ejecutivos en una posición confiable. La ASES se creó para implementar, administrar y negociar un sistema de seguros de salud mediante contratos con reaseguradores de seguros para proporcionar atención médica y hospitalaria de calidad a personas de bajos ingresos (a través del programa Medicaid administrado y financiado principalmente por los Centros de Servicios de Medicare y Medicaid a través de un memorando de entendimiento con el PRDOH); y también a los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

empleados del ELA, municipios y policías que se suscriben voluntariamente al plan médico de seguros de salud de Puerto Rico a cambio de una tarifa que ellos pagan mediante deducciones de nómina. La ASES también recupera sus costos operativos a través de los cargos realizados a los municipios y un programa de reintegro con farmacias donde la ASES retiene el 100 % de los ingresos derivados de este programa. Desde 2015, el ELA asigna fondos anualmente de su presupuesto de fondos generales para proporcionar recursos para el pago del capital y los intereses de la obligación de la línea de crédito de la ASES, que es la deuda total pendiente de la ASES. Por lo tanto, los estados financieros básicos de la ASES se combinan con los estados financieros de los fondos del ELA como un fondo empresarial.

*Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI)*: La AFI está gobernada por una junta de siete miembros compuesta por cinco miembros nombrados por la junta de directores del BGF, el Secretario del DOT y un miembro designado por el Gobernador. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF desde el 18 de enero de 2017. Los miembros de la junta de directores de la AFI son ejecutivos en puestos de confianza, nombrados y supervisados por el gobernador. El Presidente es designado por el Gobernador entre sus miembros. La AFI es una autoridad financiera cuyas responsabilidades son proporcionar asistencia financiera, administrativa, de consultoría, técnica, asesoría y de otro tipo a otras unidades de componentes y organismos del gobierno del ELA, autorizados para desarrollar instalaciones de infraestructura y establecer medios alternativos para su financiamiento. El total de la deuda pendiente de pago de la AFI, en su mayoría Bonos de ingresos fiscales especiales que comprenden más del 95 % de su deuda total, se paga con los arbitrios federales gravados sobre el ron y otros artículos producidos en Puerto Rico y vendidos en los Estados Unidos, cuyos impuestos son recaudados por el Departamento de Hacienda de los EE. UU. y regresados al ELA. Estos ingresos son objeto de un litigio pendiente en el caso del Título III del ELA. La deuda restante de AFI, aparte de los Bonos de Ingresos Fiscales Especiales, se paga con las asignaciones legislativas del ELA. Por lo tanto, los estados financieros básicos de la AFI se combinan con los estados financieros de los fondos del ELA como un fondo especial de ingresos, amortización de la deuda y proyecto de capital.

*Autoridad de Transporte Marítimo de Puerto Rico (ATM):* la ATM está gobernada por el Presidente del BGF. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF desde el 18 de enero de 2017. Las operaciones de la ATM se han limitado al procesamiento de los requisitos legales restantes resultantes de la venta de ciertas operaciones marítimas que anteriormente eran propiedad y operadas por la ATM. Dichos requisitos legales consisten exclusivamente en pagar la deuda a largo plazo de la ATM después de la venta. El ELA debe asignar fondos anualmente en su presupuesto operativo general para el pago del capital y los intereses de dicha deuda, que es la deuda total pendiente. Por lo tanto, los estados financieros básicos de la ATM se combinan con los estados financieros de los fondos del ELA como un fondo para la amortización de la deuda.

*Administración de Servicios Médicos de Puerto Rico (PRMeSA):* la PRMeSA está gobernada por una junta de diez miembros que comprende el Secretario del PRDOH (que se desempeña como Presidente), el Decano de la Facultad de Ciencias Médicas de la Universidad de Puerto Rico (UPR), el presidente de la junta directiva de la Liga contra el Cáncer de Puerto Rico, el alcalde de la municipalidad de San Juan, el administrador de la Corporación del Fondo del Seguro del Estado, el administrador de la Administración de Servicios de Salud Mental y Adicciones, el presidente del Comité de Política y Administración Médica, el Secretario del Departamento de Familia y dos miembros nombrados por el Secretario del PRDOH. El propósito de la PRMeSA es planificar, organizar, operar y administrar los servicios de salud centralizados del ELA, y proporcionar apoyo al

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

hospital y otras funciones, ofrecidos por las instituciones miembros y los usuarios del complejo médico conocido como el Centro Médico de Puerto Rico. El ELA debe asignar fondos anualmente de su presupuesto operativo general para el pago del capital y los intereses de su deuda, que es la deuda total pendiente de la PRMeSA. Por lo tanto, los estados financieros básicos de la PRMeSA se combinan con los estados financieros de los fondos del ELA como un fondo empresarial.

*Corporación del Fondo de Interés Apremiante de Puerto Rico (conocida como COFINA, su sigla en español):* COFINA fue creada por la Ley Núm. 91-2006, enmendada por la Legislatura. COFINA se creó originalmente con el propósito de financiar el pago, la jubilación o la anulación de ciertas obligaciones de deuda del ELA pendientes al 30 de junio de 2006 (la deuda de asignación de 2006). Durante 2009, la Legislatura amplió los propósitos de COFINA para ayudar a financiar los gastos operativos del ELA para 2009 hasta 2012, en la medida incluida en el presupuesto anual del ELA. Al 30 de junio de 2017, el directorio de COFINA estaba compuesto por los mismos miembros que el directorio del BGF. Como consecuencia de la Ley Núm. 241-2018 y la efectividad del Plan de Ajuste de COFINA como se describe en la Nota 17(c), la junta de directores de COFINA está compuesta actualmente por tres miembros nombrados por el Gobernador. Debido a que las obligaciones de los Bonos de Impuesto sobre las Ventas sobre los Ingresos de COFINA se han pagado históricamente con los impuestos sobre las ventas y el uso del ELA como se describe en la Nota 13, sus estados financieros básicos se combinan en los estados financieros de fondos del ELA como un fondo especial de servicio de ingresos y deudas. Como se analiza en la Nota 3 y la Nota 17, COFINA ha completado con éxito su reestructuración a tenor con un plan de ajuste confirmado por el tribunal en virtud del Título III de PROMESA, que entró en vigencia el 12 de febrero de 2019.

*Fideicomiso Perpetuo de Comunidades Especiales (SCPT):* el SCPT está gobernado por una junta de directores compuesta por once miembros: el Secretario del Departamento de Vivienda del ELA (el DOH del ELA), el Secretario de DTOP del ELA, el Coordinador para el Financiamiento Social y Económico de las comunidades especiales, un alcalde de un municipio de Puerto Rico, un líder comunitario residente en una comunidad especial, cuatro ciudadanos privados que representan el interés público y dos empleados públicos. Todos los miembros de la junta de directores son designados por el Gobernador. El objetivo principal del SCPT es financiar proyectos de desarrollo que aborden las necesidades de infraestructura y vivienda de las comunidades marginadas. A lo largo de los años desde su creación, el SCPT ha visto disminuir sus fuentes de ingresos a medida que sus activos principales, los préstamos hipotecarios, son completamente reservados. SCPT ha acumulado deuda con el BGF, que se paga con las asignaciones legislativas del ELA. En consecuencia, los estados financieros básicos del SCPT se combinan con los estados financieros de los fondos del ELA como un fondo especial de ingresos y amortización de la deuda.

*El Fideicomiso de los Niños:* el Fideicomiso de los Niños está gobernado por una junta de siete miembros compuesta por el Gobernador, que designa al presidente de la junta, el Presidente del BGF, el Director de la OGP, el Secretario de Justicia del ELA y tres ciudadanos privados designados por el Gobernador con el asesoramiento y aprobación del Senado. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF desde el 18 de enero de 2017. La única operación del Fideicomiso de los Niños consiste en proporcionar asistencia financiera principalmente a los departamentos del ELA para realizar proyectos destinados a promover el bienestar de las familias, niños y jóvenes de Puerto Rico, especialmente en las áreas de educación, recreación y salud. La operación del fideicomiso de los Niños se financia con el dinero que recibe el ELA de un acuerdo global de transacción (GSA) del 23 de noviembre de 1998 entre ciertas compañías tabacaleras y ciertos estados, territorios y otras jurisdicciones de los Estados Unidos de América, que incluyen el ELA. El GSA exige pagos anuales hasta el año 2025, que variarán debido a ajustes inflacionarios y de volumen. Después de 2025, las compañías tabacaleras deberían continuar haciendo contribuciones a perpetuidad. Como el Fideicomiso de los Niños brinda asistencia financiera total o casi total a los departamentos del ELA y su deuda total pendiente se está pagando

49

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

con los recursos del GSA recibidos por el ELA, sus estados financieros básicos se combinan con los estados financieros de los fondos del ELA como un fondo especial de ingresos y amortización de la deuda.

*Centro Integral del Cáncer de la Universidad de Puerto Rico (UPRCCC)*: el UPRCCC está gobernado por una junta de nueve miembros que consta de cuatro miembros ex officio: el Presidente de la UPR, el Canciller de Ciencias Médicas del Campus de la UPR, el Secretario del PRDOH y el decano de la Escuela de Medicina de la UPR. Los cinco (5) miembros restantes deben ser ciudadanos de Puerto Rico que hayan demostrado su compromiso con la lucha contra el cáncer y sean nombrados por el Gobernador con la aprobación del Senado del ELA con los siguientes criterios: dos miembros de los estudios de investigación o la comunidad de tratamiento del cáncer; un miembro con experiencia en administración, finanzas o administración de empresas, o con experiencia previa en la administración de hospitales o clínicas de investigación médica; un miembro que sea un paciente con cáncer; y un miembro que forme parte de la "Liga contra el Cáncer de Puerto Rico". El ELA brinda apoyo financiero al UPRCCC mediante asignaciones legislativas. El UPRCCC se creó por la Ley Núm. 230 del 26 de agosto de 2004 (Ley Núm. 230-2004), para ser la entidad gubernamental principalmente responsable de ejecutar las políticas públicas relacionadas con la prevención, orientación, investigación y tratamiento del cáncer en Puerto Rico. El 31 de octubre de 2013, se aprobó la Ley Núm. 128 (Ley Núm. 128-2013) que modifica la Ley Núm. 230-2004 para establecer específicamente que a partir del año fiscal 2015, las asignaciones legislativas anuales del ELA de $15 millones podrían estar disponibles para cubrir la amortización de la deuda de las obligaciones contraídas por el UPRCCC en sus proyectos relacionados con el capital, particularmente la construcción de sus instalaciones médicas y hospitalarias. Antes de la Ley Núm. 128-2003, la Ley Núm. 230-2004 no era concluyente en cuanto a la fuente de ingresos para el pago de la deuda que se menciona anteriormente. Como el total de la deuda pendiente se paga mediante las asignaciones legislativas del ELA, los estados financieros básicos del UPRCCC se combinan con los estados financieros de los fondos del ELA como un fondo de ingresos especiales.

El Fondo de amortización de la deuda de COFINA y el Fondo de ingresos especiales de COFINA se presentan como los principales fondos del gobierno, mientras que PRMeSA y ASES se presentan como los principales fondos empresariales. Todas las demás unidades de componentes combinados se informan en la columna de fondos no mayores del gobierno, con excepción de la PPA, que se informa en la columna de fondos empresariales no mayores. Los estados financieros básicos completos de las unidades de componentes combinados se pueden obtener directamente contactando a sus respectivas oficinas administrativas en:

Autoridad de Puertos de Ponce
P.O. Box 7051
Ponce, PR 00752

Autoridad de Edificios Públicos
P.O. Box 41029 – Minillas Station
San Juan, PR 00940-1029

Administración de Seguros de Salud de Puerto Rico
P.O. Box 195661
San Juan, PR 00919-5661

Autoridad de Envíos Marítimos de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Corporación del Fondo de Interés Apremiante
P.O. Box 42001
San Juan, PR 00940-2001

Centro Integral contra el Cáncer de la Universidad de Puerto Rico
PMB 711, 89 De Diego Ave., Suite 105
San Juan, PR 00927-6346

Autoridad de Ponce (anteriormente conocida como Autoridad del Puerto de las Américas)
P.O. Box 195534
San Juan, PR 00919-5534

Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Autoridad para el Financiamiento de la Infraestructura de Puerto
P.O. Box 41207 Minillas Station
San Juan, PR 00940

Administración de Servicios Médicos de Puerto Rico
P.O. Box 2129
San Juan, PR 00922-2129

Fondo Perpetuo de Comunidades Especiales
P.O. Box 42001
San Juan, PR 00940-2001

El Fideicomiso de los Niños
P.O. Box 42001
San Juan, PR 00940-2001

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(ii)   Unidades de Componentes de Presentación Discreta*

Las unidades de componentes de presentación discreta que se describen a continuación, todas las entidades legalmente separadas, a tenor con la Declaración GASB Núm. 14, enmendada por las Declaraciones GASB Núm. 39 y Núm. 61, se presentan de forma discreta en los estados financieros básicos principalmente debido a la naturaleza de los servicios que prestan, la capacidad del ELA de imponer su voluntad, principalmente a través del nombramiento de sus autoridades de gobierno, y porque las unidades de componentes de presentación discreta proporcionan beneficios financieros específicos o imponen cargas financieras al ELA (con la excepción de la Autoridad de Conservación y Desarrollo de Culebra y el Fideicomiso de Ciencia, Tecnología e Investigación de Puerto Rico, que no cumplen con todos estos criterios, pero el ELA ha determinado que sería engañoso excluirlos de la entidad de información financiera del ELA). Estas unidades de componentes de presentación discreta no se combinan con el Gobierno Primario porque no brindan servicios por completo, o casi por completo, al Gobierno Primario, su junta de gobierno no es sustancialmente igual a la del Gobierno Primario, el Gobierno Primario no tiene ninguna responsabilidad operativa sobre ellos, y no tienen una deuda total pendiente de reintegro total o casi total con recursos del Gobierno Primario. Estas unidades de componentes de presentación discreta han sido clasificadas por la administración entre unidades componentes mayores y no mayores de presentación discreta. El ELA determina una unidad de componentes mayores de presentación discreta en función de la naturaleza y la importancia de su relación con el Gobierno Primario. Esta determinación se basa en la evaluación de los siguientes factores: a) los servicios proporcionados por la unidad de componentes de presentación discreta a la ciudadanía son tales que la presentación de informes separados como una unidad de componentes mayores de presentación discreta se considera esencial para los usuarios de los estados financieros, b) hay transacciones importantes con el Gobierno Primario, o c) existe una relación de carga o beneficio financiero significativo con el Gobierno Primario. Si se espera que una unidad de componentes de presentación discreta cumpla con algunas de estas consideraciones para su inclusión como unidad de componente mayores de presentación discreta en un año futuro, el ELA puede optar por informarla como tal.

*Unidades de Componentes Mayores de Presentación Discreta*

*Banco Gubernamental de Fomento para Puerto Rico (BGF)*: antes de su decisión, el 23 de marzo de 2018, de suspender las operaciones y cerrar en virtud del Título VI de PROMESA, el BGF estaba gobernado por una junta de siete miembros nombrados por el Gobernador. Los miembros de la junta de directores del BGF eran ejecutivos en una posición confiable, nombrados y supervisados por el Gobernador. En sus operaciones hasta el 23 de marzo de 2018, el BGF actuó como agente fiscal, depositario de fondos, agente de desembolso, inversor y asesor financiero del ELA, sus corporaciones públicas y municipios en relación con la emisión de bonos y pagarés; y también emitió garantías de terceros, otorgó préstamos y adelantó fondos principalmente a los departamentos, unidades de componentes y municipios del ELA.

La Ley Núm. 21-2016, conocida como la "Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico" (la Ley de Moratoria), creó la AAFAF para asumir el papel del BGF como agente fiscal, asesor financiero y agente de informes para el ELA, sus organismos y municipios. Esta nueva agencia fiscal y autoridad asesora comenzó sus funciones como se describe anteriormente inmediatamente después de la promulgación de la Ley de Moratoria. La Ley de Moratoria no tuvo un impacto en la designación del BGF como una unidad de componentes mayores de presentación discreta para el año fiscal 2017. El alcance de las facultades de la AAFAF se amplió sustancialmente en virtud de la Ley Núm. 2-2017, como se analiza en la Nota 3 y la Nota 23. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23.

*Autoridad de Acueductos y Alcantarillados de Puerto Rico (AAA)*: la AAA está gobernada por una junta de nueve miembros compuesta por seis miembros nombrados por el Gobernador con el asesoramiento y aprobación del Senado (incluido el Presidente de la Junta de Planificación de Puerto

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Rico), el Presidente Ejecutivo de la AEE, el Director Ejecutivo de la Federación de Alcaldes y el Director Ejecutivo de la Asociación de Alcaldes. La AAA posee y opera el sistema de suministro público de agua y alcantarillado sanitario del ELA. La AAA está autorizada, entre otras cosas, a tomar dinero en préstamo y emitir bonos de ingresos para cualquiera de sus propósitos corporativos. El ELA garantiza los pagos de capital e intereses de ciertos bonos en circulación y de todos los bonos futuros emitidos para refinanciar esos bonos en circulación en la fecha del refinanciamiento. La Ley Núm. 45-1994 fue enmendada posteriormente para incluir otros préstamos en virtud del Programa de Fondos Recurrentes para Aguas Limpias del Estado (SRFP) y el Programa de Desarrollo Rural del USDA. El ELA históricamente proporcionó cierto apoyo financiero a la AAA a mediante asignaciones legislativas para la amortización de la deuda de sus notas de la Corporación para el Financiamiento Público de Puerto Rico (CFP).

*Autoridad de Energía Eléctrica (AEE) de Puerto Rico*: Con la promulgación de la Ley 37-2017, la AEE se rige por una junta de siete miembros, seis de los cuales son nombrados por el Gobernador y un miembro es un representante electo de los consumidores. La AEE es responsable de conservar, desarrollar y utilizar los recursos de energía para promover el bienestar general de Puerto Rico y posee y opera el sistema de generación, transmisión y distribución de energía eléctrica del ELA. El ELA tiene derecho a recibir contribuciones en lugar de impuestos de la AEE.

*Autoridad de Carreteras y Transportación (ACT) de Puerto Rico*: La ACT está gobernada por una junta de siete miembros que comprende el Secretario del DTOP (que actúa como Presidente de la junta), el Presidente de la Junta de Planificación (JP), el secretario del DOT, el presidente del BGF y otros tres miembros del sector privado nombrados por el Gobernador con el asesoramiento y aprobación del Senado. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF desde el 18 de enero de 2017. La ACT tiene amplias facultades para cumplir con sus responsabilidades de acuerdo con las políticas generales de transporte de DTOP. Estas facultades incluyen, entre otras cosas, el control y la supervisión completa de las instalaciones de autopistas construidas, de propiedad u operación de la ACT (incluida la capacidad de establecer peajes por el uso de las instalaciones de autopistas y sujeto al cumplimiento de ciertos requisitos de vista pública) y la facultad de emitir bonos, pagarés u otras obligaciones. La ACT planifica y gestiona la construcción de todos los proyectos importantes relacionados con el sistema de autopistas de peaje del ELA, realiza reparaciones importantes y mantiene las vías de peaje.

*Corporación de Fondos de Seguros del Estado (CFSE):* La CFSE está gobernada por una junta de siete miembros nombrados por el Gobernador con el asesoramiento y aprobación del Senado. La junta está compuesta por el Comisionado de Seguros de Puerto Rico, un funcionario del Departamento de Trabajo y Recursos Humanos (DTRH) del ELA, un funcionario del PRDOH, un representante de los intereses de los patronos, un representante de los intereses de los empleados y dos miembros sin ninguno de estos intereses. El Gobernador nombra a uno de estos miembros como presidente de la junta por un período de seis años. Los tres funcionarios públicos son nombrados por un período de cinco años, y el resto de los miembros por cuatro, tres, dos y un año, respectivamente. La CFSE proporciona compensación de trabajadores y seguro de discapacidad a empleados públicos y privados. El ELA tiene acceso a los recursos de la CFSE.

*Universidad de Puerto Rico (UPR):* la UPR está gobernada por una Junta de Gobierno de trece miembros, nueve de los cuales son nombrados por el Gobernador y confirmados por el Senado de Puerto Rico. Los miembros restantes de la Junta de Gobierno consisten en dos profesores titulares y dos estudiantes de tiempo completo. El Secretario del DE es miembro ex officio de la junta de gobierno. El ELA brinda apoyo financiero a la UPR mediante asignaciones legislativas.

*Unidades de Componentes No Mayores de Presentación Discreta*

*Administración para el Desarrollo de Empresas Agropecuarias (ADEA)*: La ADEA está gobernada por

53

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

el Secretario de Agricultura del ELA. El propósito de la ADEA es proporcionar una amplia variedad de servicios e incentivos al sector agrícola. El ELA puede imponer su voluntad a la ADEA. El ELA brinda apoyo financiero a la ADEA mediante asignaciones legislativas.

*Administración de Compensación de Accidentes de Automóviles (ACAA):* La ACAA está gobernada por un miembro del gabinete y una junta de cuatro miembros nombrados por el Gobernador con el asesoramiento y aprobación del Senado. La ACAA opera un sistema de cobertura de seguro obligatorio para todos los vehículos motorizados registrados y compensa a los ciudadanos por las lesiones derivadas de accidentes automovilísticos. El ELA tiene la capacidad de influir significativamente en las tarifas cobradas por la ACAA. El ELA tiene acceso a los recursos de la ACAA.

*Corporación de Centros Cardiovasculares de Puerto Rico y el Caribe (CCCPRC):* la CCCPRC está gobernada por una junta de siete miembros que comprende el Secretario del PRDOH, el Director del Campus de Ciencias Médicas de la UPR, el Director Ejecutivo de PRMeSA y cuatro miembros adicionales nombrados por el Gobernador con el asesoramiento y aprobación del Senado, uno de los cuales debe ser de la Sociedad de Cardiología de Puerto Rico y otro miembro de una fundación de cardiología debidamente registrada en el Departamento de Estado del ELA. El propósito de la CCCPRC es proporcionar un tratamiento especial a los pacientes que padecen enfermedades cardiovasculares. El ELA brinda apoyo financiero a la CCCPRC mediante asignaciones legislativas.

*Centro de Diabetes para Puerto Rico (CDPR)*: El CDPR está gobernado por una junta de nueve miembros, que incluyen al Secretario del PRDOH, el decano de la Facultad de Ciencias Médicas de la UPR, los otros siete miembros son nombrados por el Gobernador. El CDPR se creó para ser responsable de la planificación, organización, operación y administración de los servicios de investigación, orientación, prevención y tratamientos de la diabetes en Puerto Rico. El ELA brinda apoyo financiero al CDPR mediante asignaciones legislativas.

*Compañía para el Desarrollo Integral de la "Península de Cantera" (CDIPC):* la CCIPC está gobernada por una junta de once miembros, de los cuales seis son nombrados por el Gobernador y cinco miembros son nombrados por el Alcalde de la Municipalidad de San Juan. La CDIPC fue creada para establecer e implementar un plan integral de desarrollo para el área de la Península de Cantera. Su función principal es supervisar y coordinar los esfuerzos del gobierno y también promover y gestionar iniciativas del sector privado para las mejoras y la rehabilitación del área antes mencionada. El ELA en general proporciona asistencia financiera a la CDIPC.

*Corporación para el Proyecto ENLACE del "Caño Martín Peña" (CPECMP):* la CPECMP se creó con el propósito de coordinar la política pública relacionada con la rehabilitación del área del Caño Martín Peña. La CPECMP está gobernada por una junta de directores de trece miembros, de los cuales siete son nombrados por el gobernador y seis miembros nombrados por el Alcalde de la municipalidad de San Juan. El ELA en general brinda apoyo financiero a la CPECMP mediante asignaciones legislativas.

*Autoridad de Conservación y Desarrollo de Culebra (ACDEC)*: la ACDEC se creó para formular y administrar el programa y el plan para la conservación, el uso y el desarrollo de los recursos naturales de la Municipalidad de Culebra. La ACDEC se administra a través de una junta de directores compuesta por cinco miembros, incluido el Alcalde del municipio de Culebra y cuatro miembros adicionales nombrados por el Alcalde del municipio de Culebra y confirmados por la legislatura municipal. La administración y las operaciones de la ACDEC están a cargo de un director ejecutivo elegido por la junta de directores. El ELA brinda apoyo financiero a la ACEDEC mediante asignaciones legislativas. Aunque la junta de directores de la ACEDEC no es nombrada por el ELA y no depende fiscalmente del ELA, el ELA cree que sería engañoso excluirla de su entidad de informe, debido al apoyo financiero proporcionado por el ELA.

53

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Banco de Desarrollo Económico para Puerto Rico (BDE):* el BDE está gobernado por una junta de nueve miembros que comprende el Presidente del BGF, quien es el Presidente, el Secretario de Agricultura del ELA, el Secretario del DDEC, el Director Ejecutivo de la Compañía de Fomento Industrial de Puerto Rico (PRIDCO), el Director Ejecutivo de la PRTC (Compañía de Turismo de Puerto Rico) y cuatro miembros que representan al sector privado y nombrados por el Gobernador con el asesoramiento y aprobación del Senado. Los miembros del sector privado son nombrados por un período máximo de tres años. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF.  El BDE es responsable de la promoción y el desarrollo de la economía del sector privado del ELA. Este propósito se debe cumplir mediante el otorgamiento de préstamos directos, garantías de préstamos, participación en préstamos o inversiones directas a cualquier persona u organización comercial dedicada a la manufactura, agricultura, comercio, turismo u otras empresas de servicios con preferencia, entre otras, por actividades económicas que pueden tener el efecto de sustituir importaciones. El ELA puede imponer su voluntad al BDE.

*Corporación de Seguros Agrícolas de Puerto Rico (CSAPR):* la CSAPR está gobernada por una junta de cinco miembros que consiste en el Secretario de Agricultura del ELA, el Decano de la Facultad de Ciencias Agrícolas del Campus Mayagüez de la UPR, un representante del BGF y dos agricultores de buena fe designados por el Gobernador con el asesoramiento y aprobación del Senado. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF.  El propósito de la CSAPR es proporcionar un seguro a los agricultores contra las pérdidas en sus granjas causadas por los desastres naturales. El ELA puede imponer su voluntad a la CSACPR.

*Corporación del Centro de Bellas Artes (CBA):* la CBA está gobernada por una junta de nueve miembros que comprende el Presidente de la Corporación de las Artes Musicales (CAM) y ocho miembros nombrados por el Gobernador. La fue se creó con el propósito de administrar el Centro de Bellas Artes. El ELA brinda apoyo financiero a la CBA mediante asignaciones legislativas.

*Oficina Independiente de Protección al Consumidor (OIPCPR):* el Director designado por el Gobernador supervisa a la OIPCPR con el asesoramiento y aprobación del Senado. La OPICPR también es administrado por un director ejecutivo que trabaja junto con la Administración de Asuntos Energéticos de Puerto Rico y brinda asesoramiento técnico a los comisionados. La OIPCPR es el componente clave para la ejecución fiel y transparente de la Reforma Energética de Puerto Rico. La Comisión de Energía de Puerto Rico, una entidad incluida en el gobierno primario del ELA, brinda apoyo financiero a la OIPCPR, equivalente al 10 % de las contribuciones recibidas de la AEE.

*Instituto de Cultura Puertorriqueña (IPCP):* el ICP está gobernado por una junta de nueve miembros que comprende el Presidente de MAC  y ocho miembros nombrados por el Gobernador con el asesoramiento y aprobación del Senado. El ICP es responsable de implementar la política pública relacionada con el desarrollo de las artes, las humanidades y la cultura de Puerto Rico. El ELA brinda apoyo financiero al ICP mediante asignaciones legislativas.

*Fideicomiso Institucional de la Guardia Nacional de Puerto Rico (FIGNA):* el FIGNA está gobernado por una junta de siete miembros que comprende el Ayudante General de la Guardia Nacional de Puerto Rico, el Presidente del BGF, el Secretario de Justicia del ELA, tres miembros de las fuerzas armadas de la Guardia Nacional de Puerto Rico y un representante de la comunidad designado por el Gobernador. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF.  El propósito del FIGNA es proporcionar un seguro de vida, beneficios de retiro y asistencia económica a los miembros activos de la Guardia Nacional de Puerto Rico y sus familias. El ELA en general brinda apoyo financiero al FIGNA mediante asignaciones legislativas y

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

puede imponer su voluntad al FIGNA.

*Autoridad de Tierras de Puerto Rico (ATPR)*: la ATPR está gobernada por una junta de cinco miembros compuesta por el Secretario de Agricultura del ELA y cuatro miembros nombrados por el Gobernador. La ATPR se creó para cumplir con las disposiciones de la Ley de Tierras de Puerto Rico, principalmente orientada al desarrollo agrícola de Puerto Rico. La ATPR mantiene una deuda pagadera de las asignaciones y fondos del ELA generados por las operaciones de la ATPR.

*Autoridad para el Redesarrollo de los Terrenos y Facilidades de la Estación Naval Roosevelt Roads (LRA):*
La LRA se está gobernada una junta de nueve miembros que comprende el Secretario de Desarrollo Económico y Comercio del ELA, que es el Presidente, dos miembros nombrados por el Alcalde del Municipio de Ceiba, un miembro designado por el Alcalde del Municipio de Naguabo, un miembro designado por el Presidente del Senado, un miembro designado por el Presidente de la Cámara de Representantes y tres miembros adicionales nombrados por el Gobernador, todos con interés y experiencia reconocida en las áreas de planificación; desarrollo comercial, turístico, residencial e institucional; bienes raíces; administración de instalaciones turísticas y recreativas; y gestión de proyectos de infraestructura. La LRA es responsable de la implementación del plan de reutilización y reurbanización de la antigua Estación Naval de Roosevelt Roads ubicada en Ceiba, Puerto Rico. Algunas de las actividades involucradas en estos planes de reurbanización incluyen la dirección, supervisión, regulación y mantenimiento del desarrollo económico en la tierra y las instalaciones anteriormente ocupadas por la Marina de los EE. UU. El ELA en general brinda apoyo financiero a la LRA mediante asignaciones legislativas.

*Corporación de las Artes Musicales (MAC):* la MAC está gobernada por una junta de siete miembros nombrados por el Gobernador con el asesoramiento y aprobación del Senado. La MAC se creó para promover el desarrollo de los programas artísticos y culturales del ELA. El ELA brinda apoyo financiero a la MAC mediante asignaciones legislativas.

*Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico (COSSEC):* la COSSEC está gobernada por una junta de nueve miembros que comprende el Administrador de la Comisión de Desarrollo Cooperativo, el Comisionado de Instituciones Financieras de Puerto Rico, el Secretario del DOT, el Inspector de Cooperativas, tres ciudadanos que representan al movimiento cooperativo, un representante de la Liga de Cooperativas de Puerto Rico y un ciudadano privado que representa el interés público. La COSSEC es responsable de proporcionar a todas las cooperativas y a la Federación de Cooperativas de Puerto Rico una cobertura de seguro sobre las existencias y depósitos, y de supervisar la situación financiera de las cooperativas aseguradas y las cooperativas no aseguradas cuando así lo solicite el Inspector de Cooperativas. El ELA puede imponer su voluntad a la COSSEC.

*Corporación del Conservatorio de Música de Puerto Rico (CCM):* la CCM está gobernada por una junta de siete miembros nombrados por el Gobernador, con el asesoramiento y aprobación del Senado. La CCM es responsable de proporcionar a la comunidad de Puerto Rico y, especialmente a sus jóvenes, las instalaciones necesarias para educar y perfeccionar sus habilidades musicales, que incluyen los programas de educación secundaria para el desarrollo de las artes musicales. Prepara el elemento artístico que nutre a la Orquesta Sinfónica de Puerto Rico y otras organizaciones musicales, y coordina los esfuerzos del gobierno para las industrias interesadas, empresas privadas y ciudadanos privados. El ELA ocasionalmente brinda apoyo financiero a la CCM mediante asignaciones legislativas.

*Autoridad del Distrito del Centro de Convenciones de Puerto Rico (ADCCPR):* la ADCCPR está gobernada por una junta de directores de nueve miembros compuesta por tres miembros del sector

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

público y seis miembros del sector privado. Los miembros del sector público comprenden el Secretario de Desarrollo Económico y Comercio del ELA, quien es el Presidente, el Director Ejecutivo de la PRTC y el presidente del BGF. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. Los miembros del sector privado son personas que tienen experiencia en las áreas de operaciones hoteleras, turismo, bienes raíces, centros de convenciones, y al menos un miembro con experiencia financiera, y son nombrados por el Gobernador con el asesoramiento y aprobación del Senado. La ADCCPR se creó para mejorar, desarrollar, administrar y operar la propiedad y las mejoras dentro del área geográfica del Distrito de Centros de Convenciones de Puerto Rico (el Distrito). La ADCCPR tiene la facultad de financiar todas las mejoras que se desarrollarán mediante la emisión de bonos y la imposición de evaluaciones contra los propietarios o arrendatarios de tierras dentro del Distrito que se benefician del Centro de Convenciones y otras mejoras. Asimismo, la ADCCPR promueve el desarrollo, la construcción, la expansión y la mejora del Centro de Convenciones de Puerto Rico (Centro de Convenciones), la Bahía Urbana y el Coliseo José Miguel Agrelot (el Coliseo). La administración, operación y gestión del Centro de Convenciones y el Coliseo están a cargo de una entidad privada independiente, bajo la responsabilidad de la ADCCPR. La gerencia de la ADCCPR administra Bahía Urbana. El ELA brinda apoyo financiero a la ADCCPR mediante asignaciones legislativas.

*Consejo de Educación de Puerto Rico (CEPR):* el CEPR está gobernado por una junta compuesta por nueve miembros nombrados por el Gobernador con el consentimiento del Senado. Su propósito es desarrollar la educación superior, administrar la licencia y certificación de instituciones de educación superior y administrar fondos de becas. El ELA brinda apoyo financiero al CEPR mediante asignaciones legislativas.

*Comisión de Energía de Puerto Rico (CEPR):* la CEPR está gobernada por una junta de directores compuesta por un comisionado Presidente y dos comisionados asociados, todos nombrados por el Gobernador con el asesoramiento y aprobación del Senado. El primer presidente comisionado y dos comisionados asociados nombrados ocuparán sus cargos durante seis años, cuatro años y dos años, respectivamente, y los comisionados siguientes serán nombrados por un período de seis años. La CEPR se creó el 27 de mayo de 2014 a tenor con la Ley Núm. 57, también conocida como la Ley de Transformación y Alivio Energético de Puerto Rico. A tenor con las disposiciones de la Ley Núm. 57-2014, la CEPR funciona como una entidad independiente del gobierno encargada de regular, supervisar y garantizar el cumplimiento de la política pública sobre energía del ELA y con la facultad de aprobar las tarifas eléctricas propuestas por la AEE, entre otras responsabilidades. La Ley Núm. 57-2014 requiere que la AEE asigne anualmente $5.8 millones para las operaciones de la PREC, que se remitirán a la CEPR a través de cuentas especiales establecidas en el DOT. El ELA puede imponer su voluntad a la CEPR. A tenor con una reestructuración de la CEPR en 2018, la CEPR ahora se conoce como la Oficina de Energía de Puerto Rico (PREB).

*Fondo Fiduciario de Inversión del Gobierno de Puerto Rico (PRGITF):* el PRGITF está gobernado por el Secretario del DOT. Antes de la decisión del BGF del 23 de marzo de 2018 de cesar sus operaciones y cerrar en virtud del Título VI de PROMESA, el BGF era el fideicomisario, custodio y administrador del PRGITF, una función que la AAFAF asume actualmente. El principal objetivo del PRGITF es proporcionar oportunidades de inversión en una cartera de mercado monetario administrada profesionalmente invirtiendo en títulos de alta calidad con un mínimo riesgo de crédito. Los inversores calificados incluyen el gobierno central del ELA, sus corporaciones públicas, organismos y agencias, y los municipios de Puerto Rico. A tenor con la Declaración GASB Núm. 31, *Informes contables y financieros para ciertas inversiones y para grupos de inversiones externas,* los estados financieros básicos del PRGITF no se incluyen en los estados financieros básicos adjuntos porque el Gobierno Primario y cada inversionista de la unidad de componentes ya se presenta como

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

efectivo o inversión su parte correspondiente de los activos del PRGITF.

*Compañía de Fomento Industrial de Puerto Rico (PRIDCO):* la PRIDCO está gobernada por una junta de siete miembros que comprende el Secretario de Desarrollo Económico y Comercio del ELA, que es el Presidente, el Secretario del DOT, el Presidente del BGF, el Presidente de la Junta de Planificación de Puerto Rico (JP), y tres miembros del sector privado designados por el Gobernador con el asesoramiento y aprobación del Senado. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. Los miembros del sector privado son nombrados por un período máximo de cuatro años. La PRIDCO administra el programa de desarrollo económico patrocinado por el ELA mediante la provisión de instalaciones, asistencia general y subsidios de incentivos especiales a las empresas manufactureras que operan en Puerto Rico. La PRIDCO ha emitido pagarés provisionales y bonos de ingresos para financiar plantas de fabricación y otras instalaciones. Los alquileres derivados del arrendamiento de instalaciones específicas de la PRIDCO se utilizan para el pago de los bonos de ingresos de la PRIDCO. La PRIDCO mantiene la deuda pagadera de las asignaciones del ELA. El ELA en general brinda apoyo financiero a la PRIDCO mediante asignaciones legislativas y puede imponer su voluntad a la PRIDCO.

*Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental de Puerto Rico (conocida como AFICA):* AFICA está gobernada por una junta de siete miembros que comprende el Director Ejecutivo de la PRIDCO, el Presidente del BGF, el Director Ejecutivo de la AFI, el Director Ejecutivo de la Compañía de Turismo de Puerto Rico (PRTC), el Presidente de la Junta de Calidad Ambiental y dos ciudadanos privados designados por el Gobernador. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. La AFICA está autorizada a emitir bonos de ingresos para financiar instalaciones industriales, turísticas, de control ambiental, médicas y educativas en Puerto Rico y los Estados Unidos de América para su uso por empresas privadas, entidades sin fines de lucro o agencias gubernamentales. Los bonos son pagaderos exclusivamente de cobros de estas compañías privadas, entidades sin fines de lucro o agencias del gobierno, y no constituyen deuda del ELA o de cualquiera de sus otras unidades de componentes. El ELA puede imponer su voluntad a la AFICA.

*Autoridad de Transporte Integrado de Puerto Rico (ATI):* la ATI está gobernada por una junta de nueve miembros que comprende el Secretario de DTOP, que se desempeña como Presidente, el Director Ejecutivo de la ACT, el Presidente de la JP, el Director de la OGP, el Presidente del BGF, dos miembros adicionales del sector privado nombrados por el Gobernador con el asesoramiento y aprobación del Senado y otros dos miembros que representan a las entidades dentro de la Organización de Planificación Metropolitana, que son seleccionados mediante el voto de su propia Junta de Directores. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. La ATI se creó por la Ley N. 123 del 3 de agosto de 2014 (Ley Núm. 123-2014) con el propósito de implementar una política pública uniforme en materia de transporte colectivo, terrestre y marítimo, y la integración de las operaciones, activos, derechos, obligaciones y fondos del tren urbano de la ACT, la Autoridad Metropolitana de Autobuses de Puerto Rico (AMA) y la Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio (ATM). Al 30 de junio de 2017, la ATI aún estaba en proceso de obtener las aprobaciones requeridas de las autoridades locales y federales para integrar y oficializar la fusión del tren urbano, AMA y ATM en ATI. El ELA generalmente proporciona asistencia financiera a la ATI mediante asignaciones legislativas y la ATI transferirá los fondos necesarios a la ACT, AMA y ATM, cuando se dediquen a la construcción, operaciones y mantenimiento de instalaciones de transporte masivo, ferroviario y marítimo.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Administración de Terrenos de Puerto Rico (ATPR):* la ATPR está gobernada por una junta de once miembros que comprende el Secretario de Desarrollo Económico y Comercio del ELA, que se desempeña como Presidente, el Presidente de la JP, que se desempeña como Vicepresidente, el Secretario del DOT, el Secretario de Agricultura del ELA, el Secretario de DTOP del ELA, el Secretario de Vivienda del ELA, el Director Ejecutivo de la PRIDCO y cuatro miembros designados por el Gobernador con el asesoramiento y aprobación del Senado. La ATPR adquiere parcelas de tierra en nombre de los organismos del gobierno a través de la negociación o expropiación para el desarrollo futuro o para la reserva. El ELA brinda apoyo financiero a la ATPR mediante asignaciones legislativas.

*Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipios (ATM):* la ATM está gobernada por una junta de cinco miembros que comprende el Secretario de DTOP, que se desempeña como Presidente, el Director Ejecutivo de la Autoridad de los Puertos de Puerto Rico, los Alcaldes de Vieques y Culebra, y un miembro adicional designado por el Gobernador. Las operaciones de la ATM consisten en administrar y operar los servicios de transporte marítimo entre San Juan, Fajardo, Vieques y Culebra. El ELA en general brinda apoyo financiero a la ATM mediante asignaciones legislativas. La Ley Núm. 123-2014, que creó la ATI, establecía la integración de las operaciones de la ATM en la ATI; sin embargo, al 30 de junio de 2017, las operaciones, activos, derechos, obligaciones y fondos de la ATM no habían sido transferidos.

*Autoridad Metropolitana de Autobuses de Puerto Rico (AMA):* la AMA está gobernada por el Secretario de DTOP del ELA. La AMA ofrece transporte en autobús a los pasajeros dentro del área metropolitana de San Juan. El ELA brinda asistencia financiera a la AMA mediante la transferencia de ciertos impuestos al consumo de gasolina y diésel recaudados por el ELA. La Ley Núm. 123-2014, que creó la ATI, y establecía la integración de las operaciones de la AMA en la ATI; sin embargo, al 30 de junio de 2017, las operaciones, activos, derechos, obligaciones y fondos de la AMA no habían sido transferidos.

*Agencia de Financiamiento Municipal de Puerto Rico (AFM):* la AFM está gobernada por una junta de cinco miembros que comprende el Presidente del BGF, que es el Presidente, el Comisionado de Asuntos Municipales y tres miembros adicionales nombrados por el Gobernador, uno de los cuales debe ser ya sea el alcalde o el director financiero de un municipio. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. La AFM se organizó para crear un mercado de capital para ayudar a los municipios de Puerto Rico a financiar sus programas de mejora pública. El ELA debe cubrir cualquier deficiencia potencial que pueda existir en las cuentas de reserva de la AFM establecidas para la amortización de la deuda.

*Corporación de Financiamiento Municipal de Puerto Rico (conocida como COFIM):* la COFIM está gobernada por una junta de siete miembros que comprende tres miembros de la Junta de Directores del BGF, tres alcaldes de municipios en Puerto Rico (dos de ellos del partido político que controla la mayoría de los municipios y el restante elegido por el resto de los municipios) y un miembro que representa el interés público recomendado por todos los alcaldes de los municipios y ratificado por el Gobernador. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. La COFIM se creó por la Ley Núm. 19-2014 para emitir bonos y usar otros mecanismos de financiamiento para pagar o refinanciar, directa o indirectamente, todas o una parte de las obligaciones de deuda de los municipios pagaderas del impuesto municipal sobre las ventas y el uso. El ELA debe cubrir cualquier deficiencia potencial que pueda existir en las cuentas de reserva de la COFIM establecidas para la amortización de la deuda.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Autoridad de los Puertos de Puerto Rico (PRPA):* la PRPA está gobernada por una junta de cinco miembros que consiste en el Secretario de DTOP del ELA, que es el Presidente, el Secretario de DDEC, el Director Ejecutivo del PRTC, el Director Ejecutivo de la PRIDCO y un ciudadano privado designado por el Gobernador con el consentimiento del Senado. El propósito de la PRPA es administrar todos los puertos de propiedad y las instalaciones de transporte de aviación del ELA y prestar otros servicios relacionados, incluida la supervisión y el control del acuerdo de concesión de servicios del Aeropuerto Internacional Luis Muñoz Marín, como se describe en la Nota 17. El ELA en general brinda apoyo financiero a la PRPA mediante asignaciones legislativas.

*Corporación de Puerto Rico para la Difusión Pública (WIPR):* la WIPR está gobernada por una junta de directores de once miembros que comprende el Secretario del DE, el Presidente de la UPR, el Director Ejecutivo del ICP y ocho ciudadanos privados nombrados por el Gobernador con el asesoramiento y aprobación del Senado. Al menos tres de estos ciudadanos privados deben haber demostrado interés, conocimiento y experiencia en educación, cultura, arte, ciencia o radio y televisión. La WIPR se creó con el propósito de integrar, desarrollar y operar las instalaciones de radio, televisión y comunicación electrónica que pertenecen al ELA. El ELA brinda apoyo financiero a la WIPR mediante asignaciones legislativas.

*Autoridad para Alianzas Público-Privadas de Puerto Rico (AAPPPR):* la AAPPPR está gobernada por una junta de directores de cinco miembros que comprende el Presidente del BGF, el Secretario del DOT, el Presidente de la JP y dos miembros nombrados por el Gobernador, un miembro seleccionado por el Presidente del Senado de Puerto Rico y otro miembro, por el Presidente de la Cámara de Representantes de Puerto Rico. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. La AAPPPR es la única entidad del gobierno autorizada y responsable de implementar políticas públicas sobre alianzas público-privadas establecidas por la Ley Núm. 29-2009, según enmienda, y determinar las funciones, servicios o instalaciones para las cuales se establecerán dichas asociaciones. El ELA en general brinda apoyo financiero a la AAPPPR mediante asignaciones legislativas.

*Escuela de Artes Plásticas y Diseño de Puerto Rico (EAPD):* la EAPD está gobernada por una junta de siete miembros. La junta de directores de la ICP designa a cuatro miembros, que representan los intereses públicos educativos y culturales. Los miembros de la junta no pueden ser empleados de la EAPD. Los tres miembros restantes son elegidos entre los miembros de la junta de directores de la ICP, uno de los cuales se desempeña como presidente. La EAPD se creó para desarrollar, promover, planificar y coordinar programas de estudio en educación superior orientados a las artes plásticas, la enseñanza, las técnicas artísticas y para ayudar a los estudiantes a desarrollar valores humanísticos. El ELA en general brinda apoyo financiero a la EAPD mediante asignaciones legislativas.

*Fideicomiso de Ciencia, Tecnología e Investigación de Puerto Rico (PRSTRT):* el PRSTRT está gobernado por una junta de fideicomisarios de once miembros que comprende cinco miembros ex officio que representan a ciertas agencias del Gobierno Primario y corporaciones públicas: el Secretario del DDEC, el Presidente de la UPR, el Director del OGP, el Presidente del BGF y el Director Ejecutivo de la PRIDCO; y seis fideicomisarios adicionales nombrados por la junta de fideicomisarios. Según las disposiciones de la Ley Núm. 2-18, 2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. El PRSTRT se creó por la Ley Núm. 214-2004, según enmienda, para fomentar y financiar proyectos de investigación, desarrollo e infraestructura relacionados con la ciencia y la tecnología para promover el desarrollo económico, social o educativo del ELA y operar exclusivamente para fines caritativos, educativos y científicos. Inicialmente, el PRSTRT recibió apoyo financiero a través de diversas fuentes, incluido el dinero de ciertos fondos del UPR, donaciones privadas y asignaciones

59

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

legislativas que no se han repetido durante los últimos años. Pero recientemente, la mayoría de los fondos provienen indirectamente de las contribuciones del ELA a varios fondos gestionados y administrados por la PRIDCO, lo que a su vez pone dichos fondos a disposición del PRSTRT. La junta de fideicomisarios del PRSTRT no es nombrada por el ELA. El ELA cree que sería engañoso excluirlo de su entidad informante, dado el apoyo financiero indirecto sustancial proporcionado por el ELA y el hecho de que el PRSTRT se creó por ley para implementar y ejecutar la misión de investigación científica del ELA y puede eliminarse mediante acciones del ELA. El ELA en general brinda apoyo financiero a la PRSTRT mediante asignaciones legislativas.

*Autoridad Telefónica de Puerto Rico (PRTA):* La PRTA está gobernada por una junta de cinco miembros que comprende el Presidente del BGF y cuatro miembros que son nombrados por la junta de directores del BGF de entre los miembros de la junta del BGF, todos nombrados por el Gobernador. Según las disposiciones de la Ley Núm. 2-2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF. La PRTA es la entidad legal responsable de contabilizar la participación accionaria en Telecommunications de Puerto Rico, Inc. Actualmente, la PRTA está inactiva y en espera de un proceso legislativo para organizar su liquidación. El ELA en general brinda apoyo financiero a la PRTA mediante asignaciones legislativas.

*Compañía de Turismo de Puerto Rico (PRTC):* la PRTC se rige por una junta de siete miembros compuesta por representantes de diferentes sectores relacionados con el turismo designados por el Gobernador con el consentimiento del Senado. Al menos un miembro debe representar al turismo interno y dos no deben ser residentes del área metropolitana. Su propósito es promover la industria turística de Puerto Rico. El ELA en general brinda apoyo financiero a la PRTC mediante asignaciones legislativas.

*Compañía de Comercio y Exportación de Puerto Rico (CCE)* - CCE está gobernada por una junta de nueve miembros compuesta por el Secretario de la DDEC, quien es el Presidente, el Director Ejecutivo de la PRPA, el Secretario del Departamento de Agricultura (DOA), el Presidente de la BDE, el Director Ejecutivo de PRIDCO, el Director de la División Jurídica del CCE y tres ciudadanos particulares. La CCE tiene la responsabilidad de promover la más alta eficiencia en los servicios prestados al sector comercial, con énfasis en las pequeñas y medianas empresas, al tiempo que promueve la exportación de productos y servicios de Puerto Rico a otros países. El ELA puede imponer su voluntad a la CCE.

*Autoridad de Desperdicios Sólidos (ADS):* La ADS está gobernada por una junta nombrada por el Secretario del DNER, donde el Secretario y el Director Ejecutivo de la ADS se reúnen periódicamente. La ADS ofrece alternativas para el procesamiento de desperdicios sólidos y fomenta el reciclado, la reutilización y la recuperación de los recursos de los residuos. El ELA brinda apoyo financiero a la ADS mediante asignaciones legislativas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los estados financieros básicos completos de las unidades de componentes de presentación discreta se pueden obtener directamente contactando a sus oficinas administrativas:

Desarrollo de Empresas Agropecuarias
P.O. Box 9200
Santurce, PR 00908-0200
Corporación del Centro Cardiovascular de
Puerto Rico y del Caribe
P.O. Box 366528
San Juan, PR 00936-6528

Administración de Compensación de Accidentes de Automóviles
P.O. Box 364847
San Juan, PR 00936-4847
Centro de Diabetes para Puerto Rico
P.O. Box 70344 PMB-87
San Juan, PR 00936

Compañía para el Desarrollo Integral de
la "Península de Cantera"
P.O. Box 7187
Santurce, PR 00916-7187

Corporación para el Proyecto ENLACE
del "Caño Martín Peña"
P.O. Box 41308
San Juan, PR 00940-1308

Autoridad para la Conservación
y el Desarrollo de Culebra
P.O. Box 217
Culebra, PR 00775-0217

Banco de Desarrollo Económico para Puerto Rico
P.O. Box 2134
San Juan, PR 00922-2134

Corporación de Seguros Agrícolas de Puerto Rico
P.O. Box 9200
Santurce, PR 00908

Corporación del Centro de Bellas Artes
P.O. Box 41287 – Minillas Station
San Juan, PR 00940-1287

Banco Gubernamental de Fomento para
P.O. Box 42001
San Juan, PR 00940-2001

Oficina Independiente de Protección del Consumidor de Puerto Rico
524 Ponce de León Ave.
San Juan, PR 00918-1314

Instituto de Cultura Puertorriqueña
P.O. Box 9024184
San Juan, PR 00902-4184

Fideicomiso Institucional de la Guardia Nacional de
Puerto Rico
P.O. Box 9023786
San Juan, PR, 00902-3786

Autoridad de Tierras de Puerto Rico
P.O. Box 9745
Santurce, PR 00908-9745

Autoridad para el Redesarrollo de los Terrenos y Facilidades de
la Estación Naval Roosevelt Roads
Calaf Street, PMB 456
San Juan, PR, 00918-1314

Corporación de las Artes Musicales
P.O. Box 41227
San Juan, PR 00940-1227

Corporación Pública para la Supervisión y
Seguros de Cooperativas de Puerto Rico C
P.O. Box 195449
San Juan, PR 00919-5449

Autoridad de Acueductos y Alcantarillados de Puerto Rico
P.O. Box 7066
San Juan, PR 00916-7066

Corporación del Conservatorio de Música de Puerto Rico
951 Ponce de León Ave.
San Juan, PR 00907-3373

Autoridad del Distrito del Centro de Convenciones de
Puerto Rico
P.O. Box 19269,
San Juan, Puerto Rico, 00910-1269

Consejo de Educación de Puerto Rico
P.O. Box 19900
San Juan, PR 00910-1900

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Comisión de Energía de Puerto Rico
268 Munoz Rivera Avenue
San Juan, PR 00918

Autoridad de Energía Eléctrica de Puerto Rico
P.O. Box 364267
San Juan, PR 00936-4267

Fondo Fiduciario de Inversión del Gobierno de Puerto Rico
P.O. Box 42001, Millas Station
San Juan, Puerto Rico 00940-2001

Autoridad de Carreteras y Transportación de Puerto Rico
P.O. Box 42007
San Juan, PR 00940-2007

Compañía de Fomento Industrial de Puerto Rico
P.O. Box 362350
San Juan, PR 00936-2350

Autoridad para el Financiamiento de
  Facilidades Industriales, Turísticas, Educativas, Médicas y de Control y
  Ambiental de Puerto Rico
  P.O. Box 42001
San Juan, PR 00940-2001

Autoridad de Transporte Integrado de Puerto Rico
P.O. Box 41267
San Juan, PR 00940

Administración de Tierras de Puerto Rico
P.O. Box 363767
San Juan, PR 00936-3767

Autoridad de Transporte Marítimo de Puerto Rico y
  las Islas Municipio
P.O. Box 4305
Puerto Real, PR 00740

Autoridad Metropolitana de Autobuses
P.O. Box 195349
San Juan, PR 00919-5349

Agencia de Financiamiento Municipal de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Corporación de Financiamiento Municipal de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Autoridad de los Puertos de Puerto Rico
P.O. Box 362829
San Juan, PR 00936-2829

Corporación de Puerto Rico para la Difusión Pública
P.O. Box 190909
San Juan, PR 00919-0909

Autoridad para Alianzas Público-Privadas de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Escuela de Artes Plásticas de Puerto Rico
P.O. Box 9021112
San Juan, PR 00902-1112

Fideicomiso de Ciencia, Tecnología e Investigación de
  Puerto Rico
P.O. Box 363475
San Juan, PR 00936-3475

Autoridad Telefónica de Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Compañía de Turismo de Puerto Rico
Calle Tanca # 500, Edificio Ochoa, 3er Piso
Old San Juan, PR 00902-3960

Compañía de Comercio y Exportación de Puerto Rico
P.O. Box 195009
San Juan, PR 00919-5009

Autoridad de Desperdicios Sólidos
P.O. Box 40285
San Juan, PR 00940-0285

Corporación del Fondo del Seguro del Estado
P.O. Box 365028
San Juan, PR 00936-5028

Universidad de Puerto Rico
Jardín Botánico Sur
1187 Street Flamboyán
San Juan, PR 00916-1117

62

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los estados financieros básicos de las unidades de componentes de presentación discreta finalizan su año fiscal el 30 de junio de 2017.

*Fondos Fiduciarios de Pensiones*

Los tres sistemas de retiro de empleados que se describen en los siguientes párrafos (los Sistemas de Retiro) administraron los fondos de pensiones y otros beneficios de atención médica posteriores al empleo para el ELA y sus subdivisiones políticas hasta la promulgación de la Ley 106-2017 del 23 de agosto de 2017. Estos sistemas de retiro están sujetos a controles legislativos y ejecutivos, y sus gastos administrativos están sujetos a controles presupuestarios legislativos de la Junta de Supervisión en la medida autorizada por PROMESA. Cumplen los criterios de las unidades de componentes y se combinan en los fondos fiduciarios del ELA. Se han omitido de los estados financieros de todo el gobierno, ya que sus recursos anteriores al 23 de agosto de 2017 no estaban disponibles para financiar las operaciones del ELA. Los Sistemas de Retiro, como planes de retiro del gobierno, están excluidos de las disposiciones de la Ley de Seguridad de Ingresos de Retiro de Empleados de 1974 (ERISA) de acuerdo con la Ley 106-2017.

*Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (SRE): el* SRE es un plan de pensiones de beneficios definidos por múltiples patronos con costos compartidos, que cubre a todos los empleados regulares del ELA y sus instrumentos y de ciertos municipios y unidades de componentes que no están cubiertos por sus propios sistemas de retiro. Antes de la promulgación de la Ley 106-2017 el 23 de agosto de 2017, el SRE estaba gobernado por una junta de fideicomisarios de once miembros, compuesta por el Secretario del DOT (que se desempeñaba como Presidente del SRE), el Presidente del BGF, el Comisionado de Asuntos Municipales, el Director de la Oficina de Recursos Humanos del ELA, tres empleados y dos jubilados, que fueron nombrados por el Gobernador. Los otros dos miembros fueron el Presidente de la Federación de Alcaldes y el Presidente de la Asociación de Alcaldes. Antes del 23 de agosto de 2017, el SRE fue administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico (la Administración del SRE y el SRJ) que también administró la aportación al Plan de Seguro de Salud del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades (ERS MIPC). El ERS MIPC es un plan de beneficios de atención médica posterior al empleo, sin financiamiento, de costos compartidos, de patronos múltiples, y de otros beneficios definidos proporcionado por el ELA a los miembros jubilados del plan.

*Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico (SRJ)*: el SRJ es un plan de beneficios definidos de un solo patrono que cubre a todos los jueces activos o jueces jubilados de la rama judicial del ELA. Antes de la promulgación de la Ley 106-2017 el 23 de agosto de 2017, el SRJ estaba gobernado por el mismo consejo de fideicomisarios del SRE y era administrado por la Administración del SRE y el SRJ.

*Sistema de Anualidades y Pensiones para Maestros de Puerto Rico (SRM)* - El SRM es un fideicomiso de un solo patrono creado por la Legislatura con el propósito de proporcionar pensión y otros beneficios a todos los maestros del DE, todos los maestros pensionados, todos los maestros transferidos a un puesto administrativo en el DE, y aquellos que ejercen en instituciones privadas acreditadas por el DE que eligen convertirse en miembros. El SRM proporciona beneficios de retiro, muerte e incapacidad. Antes de la promulgación de la Ley 106-2017 el 23 de agosto de 2017, el SRM estaba gobernado por una junta de nueve miembros formada por tres miembros *ex oficio*, el Secretario del DE, el Secretario del DOT, el Presidente del BGF y un miembro que era representante de una organización de maestros designada por el Gobernador; tres maestros nombrados por el Gobernador, uno de los cuales representaba a maestros certificados en servicio activo, y dos que representaban a maestros retirados; un miembro que era un representante de la entidad de acuerdo con la Ley Núm. 45-1998, según enmienda; y un miembro adicional, como representante del interés público, con conocimiento y experiencia en la administración y operación de sistemas financieros, designado por el Gobernador. Según las disposiciones de la Ley Núm. 2-

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

2017, el cargo de miembro de la junta que anteriormente ocupaba el Presidente del BGF actualmente es ocupado por el Director Ejecutivo de la AAFAF.  El SRM fue administrado por el Sistema de Retiro de Maestros (Administración del SRM) que también administró el Sistema de Anualidades y Pensiones de Puerto Rico para la Aportación del Plan de Seguro de Salud de los Maestros (TRS MIPC). El TRS MIPC es un plan de beneficios no financiado, de costos compartidos, de beneficios definidos por patronos múltiples, otro plan de beneficios de atención médica posterior al empleo proporcionado por el ELA a maestros retirados del DE y empleados jubilados de la Administración del SRM.

El 23 de agosto de 2017, el Gobernador promulgó la Ley Núm. 106-2017, que reformó el SRE, el SRJ y el SRM sustituyendo las juntas directivas de los Sistemas de Retiro por la Junta de Retiro del Gobierno de Puerto Rico (la Junta de Retiro) y estableciendo una "Cuenta para el Pago de Pensiones Acumuladas" separada para implementar un Método de "pago por uso" (PayGo) para el pago de los beneficios de pensión del ELA.  Para obtener información adicional sobre la transición al método PayGo, consulte la Nota 23.

Los estados financieros básicos completos de estas unidades de componentes combinados se pueden obtener directamente contactando a sus respectivas oficinas administrativas en:

Sistema de Retiro de Empleados del
   Gobierno del Estado Libre Asociado de Puerto Rico,
P.O. Box 42003 – Minillas Station
San Juan, PR 00940-2203

Sistema de Retiro de la Judicatura del
Estado Libre Asociado de Puerto Rico
P.O. Box 42003 – Minillas Station
San Juan, PR 00940-2203

Sistema de Anualidades y Pensiones para Maestros de
   Puerto Rico
P.O. Box 191879
San Juan, PR 00919-1879

*(c)  Unidades de Componentes Auditadas Por Separado*

Los estados financieros básicos del ELA incluyen los estados financieros básicos de las siguientes unidades de componentes que fueron auditadas por otros auditores:

*(i)  Unidades Mixtas de Componentes*

Autoridad de Puertos de Ponce

Autoridad de Ponce (antes conocida como Autoridad del Puerto de las América)

Autoridad de Edificios Públicos

Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico

Administración de Seguros de Salud de Puerto Rico

Autoridad para el Financiamiento de la Infraestructura de Puerto Rico

Autoridad de Transporte Marítimo de Puerto Rico

Administración de Servicios Médicos de Puerto Rico

Fideicomiso Perpetuo para las Comunidades Especiales

Fideicomiso de los Niños

Centro Comprensivo del Cáncer de la Universidad de Puerto Rico

*(ii)  Unidades de Componentes de Presentación Discreta*

Administración para el Desarrollo de Empresas Agropecuarias

64

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Administración de Compensación por Accidentes de Automóviles

Corporación del Centro Cardiovascular de Puerto Rico y el Caribe

Centro de Diabetes para Puerto Rico

Compañía para el Desarrollo Integral de la "Península de Cantera"

Corporación para el Proyecto ENLACE del "Caño Martín Peña"

Autoridad de Conservación y Desarrollo de Culebra

Banco de Desarrollo Económico para Puerto Rico

Corporación de Seguros Agrícolas de Puerto Rico

Corporación del Centro de Bellas Artes

Oficina de Protección al Consumidor Independiente

Instituto de Cultura de Puerto Rico

Fideicomiso Institucional de la Guardia Nacional de Puerto Rico

Autoridad de Tierras de Puerto Rico

Autoridad para el Redesarrollo de los Terrenos y Facilidades de la Estación Naval Roosevelt Roads

Corporación de las Artes Musicales

Corporación Pública para la Supervisión y Seguro de Depósitos de las Cooperativas de Puerto Rico

Autoridad de Acueductos y Alcantarillados de Puerto Rico

Corporación del Conservatorio de Música de Puerto Rico

Autoridad del Distrito del Centro de Convenciones de Puerto Rico

Consejo de Educación de Puerto Rico

Autoridad de Energía Eléctrica de Puerto Rico

Comisión de Energía de Puerto Rico

Fondo Fiduciario de Inversión del Gobierno de Puerto Rico

Autoridad de Carreteras y Transportación de Puerto Rico

Compañía de Fomento Industrial de Puerto Rico

Autoridad de Financiamiento de Instalaciones de Control Industrial, Turístico, Educativo, Médico y Ambiental de Puerto Rico

Autoridad de Transporte Integrado de Puerto Rico

Administración de Tierras de Puerto Rico

Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio

Autoridad de Transporte Metropolitano de Puerto Rico

Agencia de Financiamiento Municipal de Puerto Rico

Corporación de Financiamiento Municipal de Puerto Rico

Autoridad de los Puertos de Puerto Rico

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Corporación de Puerto Rico para la Difusión Pública

Autoridad para Alianzas Público-Privadas de Puerto Rico

Escuela de Artes Plásticas de Puerto Rico

Fideicomiso de Ciencia, Tecnología e Investigación de Puerto Rico

Autoridad Telefónica de Puerto Rico

Compañía de Turismo de Puerto Rico

Compañía de Comercio y Exportación de Puerto Rico

Autoridad de Desperdicios Sólidos

Corporación del Fondo del Seguro del Estado

Universidad de Puerto Rico

(iii) *Fondos Fiduciarios de Pensiones*

Sistema de Anualidades y Pensión para Maestros de Puerto Rico

**(d) *Bases de Presentación***

(i) *Estados Financieros de Todo el Gobierno*

Los estados financieros de todo el gobierno (el estado de resultados netos y el estado de actividades) presentan información de todas las actividades no fiduciarias del ELA y sus unidades de componentes de presentación discreta. En su mayor parte, el efecto de la actividad entre fondos se ha eliminado de estos estados financieros de todo el gobierno. Las Actividades del Gobierno, que normalmente están respaldadas por impuestos e ingresos intergubernamentales, se informan por separado de las actividades de tipo comercial, que dependen en gran medida de las tarifas y cargos por servicios o que se financian y operan de manera similar a las empresas comerciales privadas. Del mismo modo, el Gobierno Primario se informa por separado de las unidades de componentes legalmente separadas y de presentación discreta, de las que el Gobierno Primario es financieramente responsable. El estado de posición resultados netos presenta los activos no fiduciarios de las entidades informadas, las salidas diferidas de recursos, los pasivos y las entradas diferidas de recursos, con la medida residual informada como resultados netos. Los resultados netos se informan en tres categorías:

- *Inversión Neta en Activos de Capital:* Este componente de los resultados netos consiste en activos de capital netos de depreciación acumulada y reducidos por el saldo pendiente de cualquier bono, hipoteca, pagarés u otros préstamos que sean directamente atribuibles a la adquisición, construcción o mejora de esos activos. Las salidas diferidas de recursos y las entradas diferidas de recursos que son atribuibles a la adquisición, construcción o mejora de esos activos o deuda relacionada también deben incluirse en este componente de los resultados netos. Si al finalizar el año hay importantes ingresos de deuda no gastados relacionados, la porción de la deuda atribuible al monto no gastado no se incluye en el cálculo de este componente de los resultados netos. Por el contrario, esa porción de la deuda se incluye en el mismo componente de los resultados netos (restringidos o no restringidos) que el monto no gastado.

- *Resultados Netos Restringidos:* este componente de los resultados netos consiste en activos restringidos y salidas diferidas de recursos reducidos por pasivos relacionados y entradas diferidas de recursos. En general, un pasivo se relaciona con activos restringidos si el activo resulta de un flujo de recursos que también resulta en el reconocimiento de un pasivo o si el pasivo se liquidará con los activos restringidos informados. Los activos restringidos resultan cuando las restricciones impuestas al uso de esos activos son impuestas externamente por

66

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

acreedores, otorgantes, contribuyentes y similares, o son impuestas por ley a través de disposiciones constitucionales o la legislación habilitante

- Resultados Netos No restringidos: este componente de los resultados netos es el monto neto de los activos, las salidas diferidas de recursos, los pasivos y las entradas diferidas de recursos que no se incluyen en la determinación de la inversión neta en activos de capital o el componente restringido de los resultados netos.

  Cuando los recursos restringidos y no restringidos están disponibles para su uso, por lo general, es política del ELA utilizar primero los recursos restringidos y luego los recursos no restringidos según se necesiten.

El estado de actividades demuestra el grado en que los gastos directos de una determinada función, segmento o unidad de componente se compensan con los ingresos del programa. Los gastos directos son aquellos que son claramente identificables con una función específica, segmento o unidad de componentes. El ELA no asigna gastos del gobierno general (indirectos) a otras funciones. Los ingresos del programa incluyen cargos a los clientes que compran, usan o se benefician directamente de los bienes o servicios proporcionados por una función, segmento o unidad de componente determinada. Los ingresos del programa también incluyen subsidios y contribuciones que se limitan a cumplir con los requisitos operativos o de capital de una función, segmento o unidad de componente en particular. Los ingresos que no se clasifican como ingresos del programa, incluidos todos los impuestos, se presentan como ingresos generales. Los recursos que se dedican internamente se informan como ingresos generales en lugar de como ingresos del programa.

*(ii)* *Estados Financieros del Fondo*

El ELA informa su posición financiera y los resultados de las operaciones en fondos, que se consideran entidades contables separadas, incluidas las unidades de componentes, que deben combinarse. Las operaciones de cada fondo se contabilizan dentro de un conjunto de cuentas de equilibrio automático. La contabilidad de fondos segrega los fondos de acuerdo con su propósito previsto y se utiliza para ayudar a la administración a demostrar el cumplimiento de las disposiciones legales, financieras y contractuales.

Los fondos principales se determinan utilizando un porcentaje predefinido de los activos, salidas diferidas de recursos, pasivos, entradas diferidas de recursos, ingresos o gastos/gastos de la categoría del fondo o de los fondos del gobierno y de propiedad exclusiva combinados. Los fondos no mayores se combinan en una sola columna en los estados financieros del fondo.

*(iii)* *Fondos del Gobierno:*

Los fondos del gobierno se centran en las fuentes y usos de los fondos y proporcionan información sobre las entradas, salidas y saldos a corto plazo de los recursos disponibles. El ELA informa los siguientes fondos del gobierno:

- *Fondo General:* el Fondo General es el principal fondo operativo del ELA. Se utiliza para contabilizar e informar todos los recursos financieros recibidos y utilizados para aquellos servicios tradicionalmente proporcionados por un gobierno, excepto aquellos que deben contabilizarse e informarse en otro fondo. El Fondo General incluye transacciones para servicios tales como gobierno general, seguridad pública, salud, vivienda pública y bienestar, educación y desarrollo económico. Los recursos financieros recibidos y utilizados en el Fondo General incluyen principalmente: recursos presupuestados (recursos presupuestados (como impuestos y cargos por servicios), según lo aprobado por la Legislatura y ajustados por el tiempo y la base de las diferencias contables, y otros recursos financieros fuera del presupuesto del Fondo General tales como: fondos federales, fondos pignorados, otros ingresos especiales y fondos de tipo general, y agencias con tesorerías independientes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

- *Fondo de Amortización de la Deuda:* el fondo de amortización de la deuda contabiliza e informa los recursos financieros que están restringidos, comprometidos o asignados a gastos para el capital, los intereses y los costos relacionados de los bonos generales y los bonos pagaderos de las operaciones de tipos de fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes, ya sea combinadas o de presentación discreta.

- *Fondo de Ingresos Especiales de COFINA:* el fondo de ingresos especiales de la Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA) se utilizó para contabilizar e informar todos los recursos financieros de COFINA, excepto aquellos que deben contabilizarse e informarse en el fondo de la amortización de la deuda de COFINA.

- *Fondo de Amortización de la Deuda de COFINA:* el fondo de amortización de la deuda de COFINA se utilizó para contabilizar los ingresos por impuestos a las ventas del ELA que se depositaban en el Fondo Dedicado de Impuestos a las Ventas para el pago de intereses y capital sobre obligaciones a largo plazo.

- *Fondos No Mayores del Gobierno:* el ELA informa las siguientes unidades de componentes combinados dentro de los fondos no mayores del gobierno: AEP, AAFAF, el Fideicomiso de los Niños, AFI, ATM, AP, SCPT y UPRCCC. Los fondos no mayores del gobierno también incluyen el fondo del proyecto de capital del ELA.

Si una unidad de componentes se combina, debe combinarse con esos fondos del Gobierno Primario e incluirlos en la categoría de fondos asignados del Gobierno Primario. Aunque el Fondo General del Gobierno Primario suele ser el principal fondo operativo de la entidad que informa, el Fondo General de una unidad de componentes combinados debe informarse como un fondo especial de ingresos. Los fondos de ingresos especiales se utilizan para contabilizar e informar los ingresos de fuentes de ingresos específicos que están restringidos o comprometidos a gastos para fines específicos distintos a la amortización de la deuda o proyectos de capital.

Los fondos del proyecto de capital se utilizan para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos para desembolsos de capital, incluida la adquisición o construcción de instalaciones de capital y otros activos de capital. Estos gastos de capital pueden estar destinados al Gobierno Primario directamente o a las unidades de componentes de presentación discreta y organizaciones y gobiernos externos como los municipios del ELA y otras entidades correspondientes. Los fondos de proyectos de capital excluyen esos tipos de salidas relacionadas con capital financiadas por fondos de propiedad exclusiva o por activos que se mantendrán en fideicomiso para individuos, organizaciones privadas u otros gobiernos.

De acuerdo con la Declaración GASB Núm. 54, *Informes de Saldos de Fondos y Definiciones de Tipo de Fondo del Gobierno*, la clasificación del saldo del fondo se basa en la medida en que el ELA tiene la obligación de observar las restricciones impuestas sobre el uso de recursos en los fondos del gobierno. Las clasificaciones son las siguientes:

- *No Gastable:* montos que no están en una forma gastable o que deben mantenerse intactos por una obligación legal o contractual.

- *Restringido:* montos que están restringidos legalmente por terceros, disposiciones constitucionales o legislación habilitante para un propósito específico.

- *Comprometido:* montos que están restringidos para fines específicos que son impuestos internamente por la acción formal del gobierno al más alto nivel de autoridad para tomar decisiones. El nivel más alto de autoridad de toma de decisiones para el ELA es la Legislatura y el Gobernador, y la acción formal es la aprobación de una ley que especifica los propósitos para los cuales se pueden usar los montos.

- *Asignado:* incluye los importes de saldo de fondos que están restringidos por el ELA y están destinados a ser utilizados para fines específicos que no se consideran restringidos o comprometidos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El Director de OGP está autorizado a asignar un monto para un propósito específico mediante la aprobación de certificados de presupuesto según lo requerido por el estatuto.

- *No asignado:* es la clasificación residual para el Fondo General. En un fondo del gobierno que no sea el Fondo General, un monto negativo indica que los gastos incurridos para un propósito específico excedieron los montos en el fondo que están restringidos, comprometidos y asignados a ese propósito.

El ELA utiliza montos restringidos primero cuando hay disponibles saldos de fondos restringidos y no restringidos, a menos que existan documentos/contratos legales que prohíban hacerlo, como un acuerdo de subvención que requiera un gasto dólar por dólar. Además, a menos que la ley o el acuerdo, el ELA utilizaría primero los montos comprometidos, luego asignados y, por último, no asignados de saldo de los fondos sin restricciones cuando se realicen gastos.

El ELA no tiene una política formal de saldo mínimo de fondos.

(iv)  *Fondos de Propiedad Exclusiva*

Estos fondos representan esas actividades, que se financian y operan de manera similar a las empresas comerciales privadas. La gerencia tiene la intención de recuperar, principalmente a través de los cargos de los usuarios, el costo de proporcionar bienes o servicios al público en general.

El ELA informa los siguientes fondos mayores de propiedad no exclusiva:

- *Fondo del Seguro por Desempleo:* este fondo representa los montos solicitados para el Fondo Fiduciario del Seguro por Desempleo de Puerto Rico en poder de Hacienda de los Estados Unidos para el pago de beneficios por desempleo y cargos aplicados a patronos individuales.

- *ASES:* Este fondo, una unidad de componentes combinados, da cuenta de un sistema de seguro de salud operado a través de contratos con suscriptores de seguros para brindar atención médica y hospitalaria de calidad a personas de bajos ingresos, empleados del ELA y policías que voluntariamente se suscriban al plan del seguro médico de Puerto Rico.

- *PRMeSA:* Este fondo, una unidad de componentes combinados, representa las operaciones de los servicios de salud centralizados, prestados en apoyo de hospitales y otras funciones ofrecidas por las instituciones miembros y los consumidores del complejo conocido como Centro Médico de Puerto Rico.

El ELA informa los siguientes fondos no mayores de propiedad exclusiva: Fondo de Seguro de Discapacidad, Fondo de Seguro de Conductores, Fondo de Loterías, Fondo Recurrente para el Control de la Contaminación del Agua de Puerto Rico (PRWPCRF), Fondo de Préstamos Recurrentes para el Tratamiento de Agua Potable Segura de Puerto Rico (PRSDWTRLF), PPA y el Departamento de Servicios de Emergencia 9-1-1.

(v)  *Fondos Fiduciarios*

Los fondos fiduciarios se utilizan para contabilizar los fondos mantenidos por el ELA en calidad de fideicomisario, o como agente para individuos, organizaciones y otras unidades del gobierno. Los siguientes son los fondos fiduciarios del ELA:

- *Fondos Fiduciarios de Pensiones (y Otros Beneficios para Empleados)*: se utilizan para contabilizar los activos, pasivos y los resultados netos mantenidos en fideicomiso para los beneficios de pensión y los beneficios de atención médica posteriores al empleo en fideicomiso para los sistemas de retiro de los empleados públicos.

- *Fondos de Agencia:* son de naturaleza de custodia (activos igual a pasivos) y no implican la medición de los resultados de las operaciones.

69

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(e) Enfoque de Medición y Bases de Contabilidad*

*Estados Financieros de Todo el Gobierno:* los estados financieros de todo el gobierno se informan utilizando el enfoque de medición de recursos económicos y la base contable de devengo. Los ingresos se registran cuando se ganan y los gastos se registran cuando se incurre en un pasivo, independientemente del momento de los flujos de efectivo relacionados.

*Estados Financieros de Fondos del Gobierno:* los estados financieros de los fondos del gobierno se informan utilizando el enfoque actual de medición de recursos financieros y la base contable acumulada modificada. Los ingresos se reconocen tan pronto como son medibles y están disponibles, y netos de los pagos excesivos estimados (según corresponda) y los montos considerados no cobrables. Se considera que los ingresos están disponibles cuando son cobrables dentro del período actual o lo suficientemente pronto para pagar los pasivos del período actual (consulte la Nota 1 (j) para obtener una descripción más detallada sobre el período de disponibilidad para las principales fuentes de ingresos en las Actividades del Gobierno).

Las principales fuentes de ingresos consideradas susceptibles de devengo incluyen impuestos sobre ingresos personales y corporativos (reconocidos cuando los contribuyentes obtienen los ingresos subyacentes), impuestos sobre las ventas y el uso (reconocidos cuando se realizan las ventas subyacentes), arbitrios (cuando se realiza la importación subyacente o la actividad relacionada) , impuestos sobre la propiedad (impuestos sobre el valor de las propiedades inmobiliarias, según su definición), ingresos intergubernamentales (generalmente, cuando se incurre en gastos relacionados) y otros impuestos y cargos por servicios (generalmente, cuando se recibe el efectivo).

Los gastos generalmente se registran cuando se incurre en un pasivo, según la base contable de devengo. Las modificaciones a la base contable de devengo incluyen lo siguiente:

- Las vacaciones anuales conferidas por los empleados se registran como gastos en su vencimiento. El monto no vencido de vacaciones anuales acumuladas al 30 de junio de 2017 se informa solo en los estados financieros de todo el gobierno.

- Los intereses y el capital sobre las obligaciones generales a largo plazo y los intereses sobre los acuerdos de intercambio de tasas de interés se registran cuando vencen, con excepción de los intereses y el capital que vencen el 1 de julio del siguiente año fiscal, si hay recursos disponibles para su pago al 30 de junio.

- Los requisitos de la amortización de la deuda, las desestimaciones de costos de los fondos federales, otras obligaciones a largo plazo y los montos sujetos a juicios por litigio se registran en los fondos del gobierno solo cuando se vence el pago; y en el caso de sentencias en litigio, cuando se ha llegado a un acuerdo y están en espera de pago. Hasta que se cumplan estos criterios, estos pasivos se han registrado solo en los estados financieros de todo el gobierno.

Una conciliación resumida de la diferencia entre el saldo total de fondos (déficit) tal como se refleja en el saldo de fondos del gobierno y los resultados netos de las Actividades del Gobierno tal como se muestra en el estado de resultados netos de todo el gobierno se presenta en una conciliación del saldo de fondos del gobierno con el estado de resultados netos.

Una conciliación resumida de la diferencia entre el cambio neto en los saldos de los fondos (déficit) tal como se refleja en el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit) de los fondos del gobierno y el cambio en los resultados netos en el estado de actividades de todo el gobierno se presenta en la conciliación del estado de ingresos, gastos y cambios en los saldos de fondos (déficit) de fondos del gobierno que acompañan al estado de actividades.

*Estados Financieros Básicos de Fondos de Propiedad Exclusiva, Fondos Fiduciarios y Unidades de Componentes de Presentación Discreta:* Los estados financieros básicos de los fondos de propiedad exclusiva, los fondos fiduciarios y las unidades de componentes de presentación discreta se informan

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

utilizando el enfoque de medición de los recursos económicos y la base acumulativa de contabilidad, similar a los estados financieros a nivel del gobierno que se describen anteriormente.

Los fondos de propiedad exclusiva distinguen los ingresos y gastos operativos de los elementos no operativos. Los ingresos y gastos operativos generalmente resultan de la prestación de servicios y la producción y entrega de bienes en relación con las principales operaciones continuas de un fondo de propiedad exclusiva. Los ingresos y gastos que no cumplen con esta definición se informan como ingresos y gastos no operativos. Las principales fuentes de ingresos de los principales fondos de propiedad exclusiva del ELA son las siguientes:

- *Fondo del Seguro por Desempleo:* primas de seguro cobradas a patronos individuales.

- *ASES:* montos recibidos a través del PRDOH que representan pagos del Programa Medicaid en virtud del Título XIX de la Ley de Seguro Social y el Plan Estatal, contribuciones del ELA para cubrir la participación local para cumplir con los requisitos de correspondencia del Programa Medicaid y montos aplicados y cobrados a los patronos y municipios por servicios de salud directos prestados a sus miembros.

- *PRMeSA:* montos aplicados y cobrados a ciudadanos particulares, instituciones miembro y municipios por los servicios prestados a los pacientes.

**(f)** *Efectivo, Equivalentes al Efectivo e Inversiones a Corto Plazo*

El ELA sigue la práctica de agrupar efectivo. Los saldos en efectivo de los fondos mantenidos en Hacienda del ELA se combinan en una cuenta corriente general y varias cuentas bancarias con saldo cero para fines especiales. El saldo de efectivo disponible en la cuenta corriente general más allá de la necesidad inmediata se agrupa en cuentas que devengan intereses en bancos comerciales asegurados por la Corporación Federal de Seguros de Depósito (FDIC).

El efectivo y sus equivalentes incluyen inversiones con vencimientos originales de 90 días o menos desde la fecha de adquisición. Las inversiones a corto plazo se registran al costo.

El Comisionado de Instituciones Financieras de Puerto Rico exige que las instituciones financieras privadas de Puerto Rico depositen valores en garantía para cubrir los depósitos del ELA y todas las demás entidades gubernamentales en cada una de estas instituciones. El monto de los valores en garantía a ser pignorados para la seguridad de los depósitos públicos debe ser establecido por las reglas y regulaciones promulgadas por el Comisionado de Instituciones Financieras.

El Fondo Fiduciario del Seguro por Desempleo de Puerto Rico se mantiene para cubrir la recaudación de las contribuciones al seguro por desempleo de los patronos y el pago de los beneficios por desempleo a los reclamantes elegibles. Como lo exige la ley federal, todos los recursos que no sean necesarios para el pago de los beneficios actuales se depositan en el Departamento de Hacienda de los EE. UU. Los intereses ganados sobre dicho depósito se retienen en el fondo.

El efectivo y las inversiones a corto plazo y los equivalentes de efectivo de las unidades de componentes y ciertos fondos del Gobierno Primario se mantienen en cuentas bancarias, separadas de las del resto del Gobierno Primario, en sus propios nombres. Una parte de estos instrumentos financieros se invierte en depósitos del BGF. Para obtener información adicional sobre el efectivo depositado en el BGF al 30 de junio de 2017, consulte la Nota 6.

El ELA evalúa continuamente el riesgo de crédito de custodia, la disponibilidad y la capacidad de recuperación del efectivo y las inversiones a corto plazo. Consulte la Nota 6 para ver la pérdida de crédito de custodia registrada en ciertas inversiones en efectivo y a corto plazo. La pérdida de crédito de custodia de efectivo y las inversiones a corto plazo mantenidas al 30 de junio de 2017 se determinaron sobre la base de la utilización real posterior de dichos activos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(g) Valores Comprados/Vendidos en virtud de Acuerdos de Reventa/Recompra*

Ciertas unidades de componentes del ELA realizan compras de títulos con acuerdos simultáneos para revenderlos (acuerdos de reventa) y realizan la venta de títulos mediante acuerdos de recompra (acuerdos de recompra). Los montos adelantados o recibidos en virtud de estos acuerdos generalmente representan préstamos a corto plazo y se reflejan como un activo en el caso de los acuerdos de reventa y como un pasivo en el caso de los acuerdos de recompra. Los valores subyacentes a estos acuerdos consisten principalmente en obligaciones del gobierno de EE. UU., valores respaldados por hipotecas y depósitos que devengan intereses con otros bancos. Los acuerdos de reventa y recompra son transacciones autorizadas en virtud de su respectiva legislación habilitadora o autorizadas por el agente fiscal del ELA.

*(h) Transacciones de Préstamos de Títulos*

Ciertas unidades de componentes y fondos fiduciarios de pensiones del ELA realizan transacciones de préstamos de títulos donde las entidades del gobierno (prestamistas) transfieren sus títulos a corredores de bolsa y otras entidades (prestatarios) para obtener garantías con un acuerdo simultáneo para devolver la garantía de los mismos valores en el futuro. El efectivo recibido como garantía en las transacciones de préstamos de títulos y las inversiones realizadas con ese efectivo se reflejan como inversiones. Los valores recibidos como garantía se informan como inversiones si la unidad de componentes tiene la capacidad de comprometerse o venderlos sin incumplimiento del prestatario. Los pasivos resultantes de estas transacciones de préstamo de títulos también se informan en el estado de resultados netos. Las transacciones de préstamos de títulos garantizadas mediante cartas de crédito o valores que la unidad de componentes no tiene la capacidad de comprometer o vender, salvo en caso de incumplimiento del prestatario, no se informan como activos y pasivos en el estado de resultados netos.

*(i) Inversiones*

Las inversiones incluyen principalmente las obligaciones del gobierno y las agencias de los EE. UU, valores respaldados por hipotecas, obligaciones del gobierno local y obligaciones corporativas de deuda y capital. Las inversiones y los contratos de inversión se registran a valor de mercado, excepto las inversiones en el mercado monetario con un vencimiento remanente al momento de la compra de un año o menos, que se registran al costo. El valor de mercado se determina en función de los precios de mercado cotizados y las cotizaciones recibidas de corredores/distribuidores independientes u organizaciones de servicios de fijación de precios. Los ingresos por inversiones, incluidos los cambios en el valor de mercado de las inversiones, se presentan como ganancias de inversiones en el estado de actividades, el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit) - fondos del gobierno, y el estado de ingresos, gastos, y cambios en los resultados netos - fondos de propiedad exclusiva. Las ganancias y pérdidas realizadas por la venta de inversiones y los cambios no realizados en el valor de mercado de las inversiones pendientes se incluyen dentro de las ganancias por intereses e inversiones.

El PRGITF se considera como un grupo de inversión externa y, como tal, informa sus inversiones o inversiones a corto plazo a costo amortizado. Para obtener información adicional, consulte la Nota 5.

La Declaración GASB Núm. 72, *Medición y Aplicación del Valor de mercado*, define el valor de mercado como el precio que se recibiría por vender un activo o se pagaría por transferir un pasivo en una transacción ordenada entre participantes del mercado en la fecha de medición. Esta declaración requiere que un gobierno utilice técnicas de valoración que sean apropiadas bajo las circunstancias y para las cuales haya suficientes datos disponibles para medir el valor de mercado. Las técnicas deben ser consistentes con uno o más de los siguientes enfoques: (i) el enfoque del mercado, (ii) el enfoque de costos, o (iii) el enfoque de ingresos. Esta Declaración también establece una jerarquía de entradas para las técnicas de valoración utilizadas para medir el valor de mercado. La divulgación de las estimaciones del valor de mercado en la jerarquía se basa en si las entradas significativas en las valoraciones son observables.

Al determinar el nivel de jerarquía en el que se revela la estimación, el nivel más alto, el Nivel 1, se otorga a los precios cotizados no ajustados en los mercados activos y el nivel más bajo, el Nivel 3, a los insumos

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

no observables.

Nivel 1: insumos cuyos valores de basan en precios cotizados (sin ajustar) en mercados activos para activos o pasivos idénticos.

Nivel 2: insumos cuyos valores se basan en precios cotizados para instrumentos similares en mercados activos; precios cotizados para instrumentos idénticos o similares en mercados no activos; y valoraciones derivadas del modelo en las que todas las entradas significativas son observables.

Nivel 3: los insumos son insumos no observables para activos o pasivos y pueden requerir cierto grado de juicio profesional.

En los casos en que las entradas utilizadas para medir el valor de mercado caen en diferentes niveles en la jerarquía del valor de mercado, las mediciones del valor de mercado en su totalidad se clasifican en función del nivel de entrada más bajo que sea significativo para la valoración. La evaluación del ELA sobre la importancia de los aportes particulares a estas mediciones del valor de mercado requiere juicio y considera factores específicos de cada inversión. Las inversiones medidas al valor del activo neto (VAN) para el valor de mercado no están sujetas a clasificación de nivel.

**(j)**  *Cuentas por Cobrar, Préstamos, Ingresos Generales e Ingresos No Obtenidos*

Los impuestos a las ganancias por cobrar, tanto en el Fondo General como en el estado de resultados netos, incluyen predominantemente una estimación de los montos adeudados por los contribuyentes por los impuestos a las ganancias individuales y corporativas, netos de las cantidades incobrables estimadas. Los impuestos a las ganancias por cobrar en el Fondo General se reconocen como ingresos cuando son medibles y están disponibles en función de los cobros reales durante los 120 días posteriores al final del año fiscal actual y cuando están relacionados con años imponibles de períodos anteriores. Los impuestos a las ganancias por cobrar también incluyen los montos adeudados por los contribuyentes sobre los ingresos obtenidos antes del 30 de junio de 2017, que se estima que son cobrables pero que actualmente no están disponibles y, por lo tanto, se informan como entradas diferidas de recursos en el Fondo General; tales entradas diferidas se consideran ingresos en el estado de actividades ya que los criterios de disponibilidad no son aplicables en los estados financieros a nivel del gobierno para el reconocimiento de ingresos.

La Ley Núm. 44 del 30 de marzo de 2016 permitió a los ciudadanos pagar por adelantado los impuestos sobre su retiro individual, cuentas de ahorro educativo, contratos de anualidades y sobre el valor incremental de los bienes sujetos a ganancias de capital. Los impuestos sobre la renta cobrados por adelantado se reconocen como ingresos no obtenidos en los fondos gubernamentales del balance y se reconocerán como ingresos cuando se produce la transacción subyacente.

Las cuentas por cobrar del impuesto sobre Ventas y Uso se reconocen como ingresos en los fondos del gobierno cuando son medibles y están disponibles en función de las recaudaciones reales durante los 30 días posteriores al final del año fiscal actual relacionado con las transacciones de ventas y uso que vencen antes o al final del año. El mismo tratamiento se aplica a los estados financieros de todo el gobierno.

Los arbitrios por cobrar se reconocen como ingresos en los fondos del gobierno cuando son medibles y están disponibles en función de las recaudaciones reales durante los 30 días posteriores al final del año fiscal actual en relación con las transacciones que ocurrieron antes de que finalice el año. El mismo tratamiento se aplica a los estados financieros de todo el gobierno. La Ley 154-2010 aplicó un arbitrio temporal sobre la adquisición de ciertos bienes muebles fabricados o producidos total o parcialmente en Puerto Rico y sobre la adquisición de ciertos servicios de manufactura realizados en Puerto Rico por personas físicas extranjeras no residentes, corporaciones extranjeras, y asociaciones extranjeras. La Ley Núm. 154-2010 se aplica a los ingresos realizados y las adquisiciones ocurridas después del 31 de diciembre de 2010. Inicialmente, el arbitrio se aplicaría hasta el año 2017. El arbitrio se basa en el valor de los bienes personales o los servicios adquiridos, y fue del 4 % para el año calendario 2011, del 3.75 % en 2012 y del 2.75 % para porciones de 2013 hasta el 28 de febrero de 2013. El 28 de febrero de 2013, se promulgó la Ley Núm. 2 que aumentó la tasa de arbitrio vigente del 2.75 % al 4 %, vigente de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

inmediato, y mantuvo dicha tasa fija en 4 %, hasta el año 2017. El 23 de enero de 2017, se promulgó la Ley Núm. 3-2017 que prorrogó la tasa fija del 4% por diez años adicionales. Para obtener información adicional sobre la Ley Núm. 3-2017, consulte la Nota 2 y la Nota 23.

Para los fines de los estados financieros del fondo del gobierno, los ingresos por impuestos a la propiedad representan los pagos recibidos durante el año y los pagos recibidos (contra el año fiscal actual y los gravámenes de años anteriores) dentro de los primeros 90 días del siguiente año fiscal, reducidos por reintegros de impuestos, si corresponde. Además, los estados financieros de todo el gobierno reconocen los ingresos por impuestos sobre bienes inmuebles (netos de reintegros), que no están disponibles para los fondos del gobierno en el año fiscal para el que se recaudan los impuestos. La Ley Núm. 7-2009, según enmienda, aplicó un impuesto a los bienes inmuebles, además de la ya establecido para los municipios del ELA a través del Centro de Recaudación de Ingresos Municipales (CRIM), sobre bienes inmuebles residenciales y comerciales con propiedades por un valor tasado superior a aproximadamente $210,000. Este impuesto se aplicó durante los años fiscales 2010 a 2012 y ascendió a 0.591 % del valor de tasación de tales propiedades según lo determinado por el CRIM. La Ley Núm. 1-2011 eliminó este impuesto adicional sobre bienes inmuebles que comenzó con el trimestre finalizado el 30 de junio de 2011. Las recaudaciones de este impuesto, que vencieron el 1 de septiembre de 2012 y el 1 de marzo de 2013, se siguieron recibiendo durante el año fiscal 2017, como resultado de que los contribuyentes morosos actualicen sus cuentas o aprovechen los programas de amnistía ofrecidos por el DOT. El ELA aplica un período de disponibilidad de 90 días, en lugar del período tradicional de 60 días después del final del año, para cubrir un período en el que se realizan la mayoría de los pagos de extensión de impuestos. Esto se ha aplicado constantemente a lo largo de los años.

Las cuentas por cobrar entre gobiernos se declaran netas de las previsiones estimadas para cuentas incobrables, que se determinan en función de la experiencia de cobro pasada y las condiciones económicas actuales. Las cuentas por cobrar entre gobiernos representan principalmente montos adeudados al ELA por el reintegro de los gastos incurridos a tenor con los programas financiados por el gobierno federal. Estas cuentas por cobrar entre gobiernos se reconocen como ingreso en los fondos del gobierno cuando son medibles y están disponibles en función de los cobros reales durante un año después del final del año fiscal relacionado con las transacciones que ocurrieron antes de que finalice el año. Las cuentas por cobrar entre gobiernos que no se esperan cobrar dentro del período de un año antes mencionado se registran como entradas diferidas de recursos. Al aplicar el concepto susceptible de acumulación a las subvenciones federales, los ingresos se reconocen cuando se cumplen todos los requisitos de elegibilidad de aplicación (por lo general, cuando se incurre en gastos relacionados) y los recursos están disponibles. Los recursos recibidos antes de que se cumplan los requisitos de elegibilidad, aparte del tiempo, se consideran ingresos no obtenidos. Los recursos recibidos antes de que se cumplan los requisitos de tiempo se consideran entradas de recursos diferidos.

Las cuentas por cobrar entre gobiernos también incluyen impuestos que el CRIM está obligado a remitir al ELA para ser utilizados en el fondo de amortización de la deuda del ELA para el pago de la amortización de la deuda de las obligaciones generales del ELA. El monto por remitir se basa en el arbitrio del 1.03 % del valor tasado de todos los bienes inmuebles y personales no eximidos de impuestos, que se aplica por el CRIM, a tenor con la Ley Núm. 83-1991. Estas cuentas por cobrar del CRIM se reconocen como ingreso en los fondos del gobierno cuando son medibles y están disponibles en base a cobros reales durante 180 días posteriores al final del año fiscal actual que en relación con las transacciones que ocurrieron antes de que finalice el año. Los montos del CRIM que no se espera cobrar dentro del período de 180 días antes mencionado se registran como entradas diferidas de recursos.

Las cuentas por cobrar por desempleo, discapacidad, seguro de conducir y otros servicios reconocidos en los fondos de propiedad exclusiva se declaran netos de las asignaciones estimadas para cuentas incobrables.

Las cuentas por cobrar a clientes no gubernamentales de las unidades de componentes son netas de los montos incobrables estimados. Estas cuentas por cobrar surgen principalmente de los cargos por servicio

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

a los usuarios. Las cuentas por cobrar del Gobierno primario y otras unidades de componentes que surgen de los cargos por servicios se evalúan para su cobro.

Los préstamos netos del Fondo General son netos de los montos incobrables estimados. Estas cuentas por cobrar surgen de montos adeudados por corporaciones públicas y municipios por seguros públicos y alquileres pagados por el Fondo General en su nombre.

Los préstamos de los fondos fiduciarios de pensiones se presentan netos de las previsiones estimadas para ajustes y pérdidas en la realización. Sin embargo, la mayoría de los préstamos están garantizados por títulos hipotecarios, contribuciones de los miembros del plan y cualquier monto no restringido que quede en custodia. Los préstamos de las unidades de componentes consisten principalmente en préstamos al Gobierno Primario, otras unidades de componentes y municipios, y se presentan netos de las provisiones para cuentas incobrables. Los préstamos restantes de las unidades de componentes son para pequeñas y medianas empresas, agrícolas y préstamos para viviendas de bajos ingresos de clientes no gubernamentales, y se presentan netos de pérdidas estimadas en tales carteras.

**(k)  Inventarios**

En general, los inventarios se valoran al costo y predominantemente por orden de entrada. Los inventarios de fondos del gobierno se registran como gastos cuando se compran en lugar de capitalizarse como un activo. Solo los montos importantes de inventario al final del año se capitalizan en los fondos del gobierno. Sin embargo, los inventarios siempre se capitalizan en el estado de resultados netos de las actividades del gobierno.

**(l)  Activos Restringidos**

Los fondos apartados para el pago y la garantía de pagarés e intereses pagaderos y para otros fines específicos se clasifican como activos restringidos, ya que su uso está limitado para este propósito por los acuerdos aplicables o requerido por la ley. Los activos restringidos en los fondos de propiedad exclusiva incluyen principalmente montos reservados para el pago de beneficios de seguros y actividades de préstamo.

**(m) Bienes inmuebles en Venta o Desarrollo Futuro**

Los bienes inmuebles mantenidos para la venta o desarrollo futuro se contabilizan al menor valor de mercado o costo, que se establece mediante la evaluación profesional de un tercero o en base a una tasación, menos los costos estimados de venta. Las disminuciones posteriores en el valor de los bienes inmuebles disponibles para la venta se cargan a gastos/salidas.

**(n)  Activos de Capital**

Los activos de capital incluyen terrenos, edificios, mejoras en la construcción, equipos (incluido el software), vehículos, construcción en proceso y activos de infraestructura, y se informan en las Actividades del Gobierno correspondientes, actividades de tipo comercial y columnas de unidades de componentes de presentación discreta en los estados financieros de todo el gobierno y en los estados financieros de fondos de propiedad exclusiva. El Gobierno Primario del ELA define los activos de capital como activos que (i) tienen un costo inicial individual de $25,000 o más en la fecha de adquisición y (ii) tienen una vida útil de más de un año. Los activos de capital se registran al costo histórico o al costo histórico estimado, si el costo histórico real no está disponible.

Los activos de capital donados por terceros se registran al valor de mercado en el momento de la donación. Los activos de capital donados por partes relacionadas se registran al valor nominal existente en los registros del cedente. Los desembolsos mayores para bienes de capital y mejoras se capitalizan a medida que se construyen los proyectos. Los costos por intereses se capitalizan durante el período de construcción solo para actividades de tipo comercial y la mayoría de las unidades de componentes. Los costos de mantenimiento y reparaciones normales que no agregan valor a los activos o extienden materialmente la vida útil de los activos no se capitalizan.

75

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los activos de capital utilizados en los fondos del gobierno se registran como gastos en los estados financieros de los fondos del gobierno. Los gastos de depreciación se registran en los estados financieros de todo el gobierno, así como en los estados financieros básicos de fondos de propiedad exclusiva y unidades de componentes de presentación discreta.

Los activos de capital del Gobierno Primario se deprecian por el método lineal durante la vida útil estimada de los activos. No hay depreciación registrada para terrenos y construcción en progreso. La vida útil estimada de los activos de capital es la siguiente:

|  | Años |
|---|---|
| Edificios y mejoras de edificios | 20–50 |
| Equipos, muebles, accesorios, | |
|    Vehículos y software | 5–15 |
| Infraestructura | 50 |

Los activos de capital de las unidades de componentes de presentación discreta se registran de acuerdo con los estándares aplicables de las unidades de componentes de presentación discreta y según sus propios umbrales de capitalización individual, que incluyen la capitalización de intereses. La depreciación se ha registrado cuando lo requieren estos estándares en función de los tipos de activos, el uso y la vida útil estimada de los respectivos activos, y de la naturaleza de cada una de las operaciones de la unidad de componentes de presentación discreta.

Las vidas útiles estimadas de los activos de capital informados por las unidades de componentes de presentación discreta son las siguientes:

|  | Años |
|---|---|
| Edificios y mejoras de edificios | 3–50 |
| Equipos, muebles, accesorios, | |
|    Vehículos y software | 3-20 |
| Intangibles, que no sean software | 3–5 |
| Infraestructura | 10–50 |

En el caso de activos de capital en virtud de acuerdos de concesión de servicios a tenor con la Declaración GASB Núm. 60, *Informes Contables y Financieros para acuerdos de Concesión de Servicios* (principalmente atribuido a la PRPA y la ACT), se mantienen en sus libros y también se presentan al costo o al costo histórico estimado. La construcción en progreso realizada por los operadores externos en virtud de estos acuerdos de concesión de servicios no se registra en las unidades de componentes de presentación discreta antes mencionadas mientras dicha construcción aún está en progreso y no está lista para su uso y operación; en ese momento dichos activos construidos y mejoras serán reconocidos a su valor de mercado correspondiente. Estos activos de capital no se deprecian después de la fecha de cierre de sus respectivos acuerdos de concesión de servicios porque dichos acuerdos requieren que los operadores externos devuelvan las instalaciones relacionadas a estas unidades de componentes de presentación discreta en su condición original o mejorada. Dichos activos de capital continúan aplicando la guía de activos de capital existente, incluida la depreciación hasta la fecha de cierre de los respectivos acuerdos de concesión de servicios. A tenor con estos acuerdos de concesión de servicios, las unidades de componentes de presentación discreta antes mencionadas han recibido del operador externo una tarifa de compensación inicial o activos de capital (o el compromiso de construirlos según el acuerdo) o ambos. Estos recursos, netos de cualquier obligación contractual de las unidades de componentes de presentación discreta, se consideran una entrada diferida de recursos, que se reconoce en ingresos bajo el método de línea recta durante el plazo de los respectivos acuerdos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El ELA sigue las disposiciones de la Declaración GASB Núm. 42, *Informes Contables y Financieros por Deterioro de Activos de Capital y por Recuperaciones de Seguros*, una enmienda a la Declaración GASB Núm. 34. Esta declaración establece una guía para contabilizar e informar el deterioro de los activos de capital y las recuperaciones de seguros. De acuerdo con estas disposiciones, los gobiernos deben evaluar eventos importantes o cambios en las circunstancias que afectan los activos de capital para determinar si ha ocurrido un deterioro de un activo de capital. Tales eventos o cambios en circunstancias que pueden ser indicativos de deterioro incluyen evidencia de daño físico, promulgación o aprobación de leyes o reglamentaciones u otros cambios en factores ambientales, cambios tecnológicos o evidencia de obsolescencia, cambios en la manera o duración del uso de un activo de capital y detención en la construcción, entre otros. El ELA y sus unidades de componentes evaluaron sus activos de capital según lo requerido por la Declaración GASB Núm. 42 y se identificó deterioros de aproximadamente $15.1 millones y $6.2 millones a nivel del Gobierno Primario y unidades de componentes de presentación discreta, respectivamente, durante el año terminado el 30 de junio. 2017. Los deterioros a nivel del Gobierno Primario están compuestos por $13.3 millones relacionados con las escuelas públicas identificadas para el cierre y $1.8 millones relacionados con ciertas unidades de vivienda identificadas para la demolición. A nivel de las unidades de componentes de presentación discreta, un deterioro de aproximadamente $2.3 millones se debió a la obsolescencia de dos turbinas eléctricas de la AEE, y la APRP identificó $3.9 de los activos de capital como totalmente deteriorados.

**(o) Devoluciones de Impuestos sobre la Renta a Pagar**

Durante el año calendario, el ELA recauda impuestos sobre ingresos individuales y corporativos a través de retenciones y pagos de los contribuyentes. Al 30 de junio de cada año, el ELA estima el monto adeudado a los contribuyentes por sobrepagos de impuestos sobre la renta durante la primera mitad del año calendario. Estos montos estimados y los reintegros reales de impuestos sobre ingresos individuales y corporativos reclamados por años anteriores, pero no pagados al final del año se registran como reintegros por impuestos sobre la renta a pagar y como una reducción de los ingresos fiscales tanto en los Fondos del Gobierno como en las Actividades del Gobierno.

**(p) Salidas/Entradas Diferidas de Recursos**

Además de los activos, el estado de resultados netos en ocasiones informa una sección separada para las salidas diferidas de recursos. Este elemento de estado financiero separado, salidas diferidas de recursos, representa un consumo de resultados netos que se aplica a un período o períodos futuros y, por lo tanto, no se reconocerá como una salida de recursos (gastos/salidas) hasta entonces. El Gobierno Primario y las unidades de componentes de presentación discreta tienen tres epígrafes principales que califican para informar en esta categoría: (i) el saldo no amortizado de pérdidas en el reintegro de bonos, (ii) la disminución acumulada en el valor de mercado de los derivados de cobertura y (iii) varias partidas relacionadas con pensiones y otros beneficios posteriores al empleo, las tres informaron en el estado de resultados netos de todo el gobierno. Una pérdida en el reintegro de bonos resulta de la diferencia en el valor nominal de la deuda reembolsada y su precio de readquisición. Este monto se capitaliza y amortiza a lo largo de la vida útil de la deuda reembolsada o reembolsada. Puede encontrar más información sobre los saldos de las pérdidas por reintegro diferido no amortizadas en la Nota 13. Con respecto a los derivados de cobertura, las pérdidas acumuladas en sus valores razonables también se difieren y amortizan a medida que el instrumento cubierto subyacente (en este caso, la deuda) se paga o reembolsa, o cuando finaliza el derivado de cobertura. Puede encontrar más información sobre los instrumentos derivados del Gobierno Primario en la Nota 21 De las partidas relacionadas con las pensiones (que se describen más adelante en la Nota 1(s) y la Nota 18), los cambios en la parte proporcional de las contribuciones y las diferencias entre la experiencia esperada y la experiencia real, se capitalizan y reconocen durante un período igual a la vida útil restante de participantes activos e inactivos. Las diferencias netas entre las ganancias proyectadas y las reales de las inversiones del plan de pensiones se difieren y reconocen durante un período de cinco años. Las contribuciones de pensiones realizadas con posterioridad a la fecha de medición se reconocerán como una reducción del pasivo neto de pensiones después de la próxima fecha de medición. No hubo salidas diferidas de recursos a nivel de fondos del gobierno.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Además de los pasivos, el estado de resultados netos y el balance de los fondos del gobierno en ocasiones informan una sección separada para las entradas diferidas de recursos. Este elemento de estado financiero separado, entradas diferidas de recursos, representa una adquisición de resultados netos y recursos que se aplica a un período o períodos futuros y, por lo tanto, no se reconocerá como una entrada de recursos (ingresos) hasta ese momento. El Gobierno Primario solo tiene un tipo de epígrafe que surge en virtud de la base contable acumulada modificada que reúne los requisitos para informar en esta categoría, y es el ingreso no disponible. Los ingresos diferidos de recursos a nivel de fondos del gobierno surgen cuando los ingresos potenciales no cumplen con los criterios "disponibles" para el reconocimiento de ingresos en el período actual bajo la base contable de devengo acumulado. En períodos posteriores, cuando los recursos aplicables estén disponibles, la entrada diferida de recursos se elimina del balance general y se reconocen los ingresos. El Gobierno Primario y las unidades de componentes de presentación discreta también tienen dos epígrafes elegibles para informar en esta categoría en el estado de resultados netos de todo el gobierno, que son el saldo no amortizado de ganancias en el reintegro de bonos y varios elementos relacionados con las pensiones. Se obtiene una ganancia en el reintegro de un bono cuando el valor nominal de la deuda reembolsada es mayor que su precio de readquisición. Este monto se capitaliza y amortiza a lo largo de la vida útil de la deuda reembolsada o reembolsada. Puede encontrar más información sobre los saldos de las ganancias por reintegro diferido no amortizadas en la Nota 13. De las partidas relacionadas con las pensiones (que se describen más adelante en la Nota 1(s) y la Nota 18), los cambios en la parte proporcional de las contribuciones, las diferencias entre la experiencia esperada y real y los cambios en los supuestos actuariales se difieren y reconocen durante un período igual al resto esperado vida laboral de los participantes activos e inactivos. Las diferencias netas entre las ganancias proyectadas y las reales de las inversiones del plan de pensiones se difieren y reconocen durante un período de cinco años. Las unidades de componentes de presentación discreta también tienen un elemento adicional elegible para informar en esta categoría en el estado de resultados netos de todo el gobierno, que son los saldos no amortizados de los montos iniciales recibidos y los ajustes relacionados con los Acuerdos de Concesión de Servicios de la PRPA y la ACT, que se describen más detalladamente en la Nota 17.

*(q)  Deuda a Largo Plazo*

Los pasivos informados en los estados financieros de todo el gobierno incluyen la obligación general del ELA y bonos de ingresos y pagarés a largo plazo, pasivos en virtud de obligaciones garantizadas, obligaciones en virtud de contratos de arrendamiento/compra, obligaciones por beneficios de rescisión voluntaria, ausencias compensadas devengadas, pasivos a largo plazo con otras entidades del gobierno, pasivo neto por pensiones, reclamaciones legales y desestimaciones de costos de fondos federales no corrientes relacionadas con gastos de subvenciones federales. Las obligaciones a largo plazo financiadas por tipos de fondos de propiedad exclusiva y unidades de componentes de presentación discreta se registran como pasivos en esos fondos y en la columna de unidades de componentes de presentación discreta.

En los estados financieros de todo el gobierno, las primas y los descuentos en la deuda a largo plazo y otras obligaciones a largo plazo se presentan en las columnas para Actividades del Gobierno y de tipo Comercial. Lo mismo se presenta en los estados financieros del fondo de propiedad exclusiva. Las primas y descuentos de bonos y pagarés se difieren y amortizan durante la vida de la deuda mediante el método de interés efectivo. Los bonos y pagarés se informan netos de la prima o descuento de bonos aplicable. Los costos de emisión de bonos, distintos del seguro prepago, se informan como gastos.

En los estados financieros de fondos del gobierno, los fondos del gobierno reconocen las primas y descuentos de bonos, así como los costos de emisión de bonos, durante el período actual. El monto nominal de la deuda emitida se informa como otras fuentes de financiamiento. Las primas recibidas por la emisión de deuda se informan como otras fuentes de financiamiento, mientras que los descuentos se informan como otros usos de financiamiento. Los costos de emisión, retenidos o no de los ingresos reales de la deuda recibidos, se informan como gastos.

*(r)  Instrumentos Derivados*

El ELA contabiliza los instrumentos derivados de acuerdo con la Declaración GASB Núm. 53, *Informes*

78

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Contables y Financieros para Instrumentos Derivados*. Los gobiernos suscriben los instrumentos como inversiones; como coberturas de riesgos financieros identificados asociados con activos o pasivos, o transacciones esperadas (es decir, partidas con cobertura); para reducir los costos de los préstamos; para fijar efectivamente los flujos de efectivo o fijar sintéticamente los precios; o para compensar los cambios en el valor de mercado de las partidas cubiertas. Ciertos instrumentos derivados, con la excepción de los contratos de inversión garantizados sintéticos que responden plenamente a los beneficios, se informan al valor de mercado en los estados financieros de todo el gobierno. Los cambios en el valor de mercado de los instrumentos derivados de cobertura efectivos se informan como entradas diferidas o salidas diferidas de recursos. Los cambios en el valor de mercado de los instrumentos derivados de inversión (que incluyen instrumentos derivados de cobertura ineficaces) se informan como parte de los ingresos de inversión en el período de presentación actual. La efectividad se determina considerando si los cambios en los flujos de efectivo o los valores razonables del instrumento derivado de cobertura potencial compensan sustancialmente los cambios en los flujos de efectivo o los valores razonables de la partida con cobertura. Para obtener información adicional sobre la cobertura y los instrumentos derivados de inversión, consulte la Nota 21.

**(s) Contabilización de los Costos de Pensión**

El ELA contabiliza los costos de pensión según las disposiciones de la Declaración GASB Núm. 68, *Informes Contables y Financieros para Pensiones, una enmienda de la Declaración GASB Núm. 27*, y la Declaración GASB Núm. 71, *Transiciones de Pensiones para Contribuciones Posteriores a la Fecha de Medición, una enmienda de la Declaración GASB Núm. 68*. La Declaración GASB Núm. 68 reemplazó la Declaración GASB Núm. 27, *Contabilización de las Pensiones de los Patronos de los Gobiernos Estatales y Locales*, y requiere que los patronos informen un pasivo neto por pensiones y cuentas de pensiones relacionadas, como gastos de pensiones y salidas/entradas diferidas de recursos según lo determinado por los Sistemas de Retiro, según corresponda, según los requisitos contenidos en la Declaración GASB Núm. 67, *Informes Financieros para Planes de Pensiones, una enmienda de la Declaración GASB Núm. 25*. El cambio fundamental más importante en la Declaración GASB Núm. 67 fue cambiar del modelo contable "basado en fondos" existente en ese momento, donde la Aportación Anual Requerida (ARC) se comparó con los pagos efectuados y esa diferencia determinó la obligación de pensión neta; a un modelo de "base acumulativa", donde la obligación de pensión total (determinada actuarialmente) se compara con los resultados netos del plan y la diferencia representa el pasivo de pensión neto. En esencia, la Declaración GASB Núm. 68 aplica el efecto de la Declaración GASB Núm. 67 en los registros contables del Gobierno Primario y cada una de las unidades componentes y municipios, cuyos empleados participan en los Sistemas de Retiro.

El Gobierno Primario del ELA, así como sus unidades de componentes y las municipalidades, se consideran patronos de "costo compartido" del SRE; por lo tanto, informan su participación asignada en el pasivo por pensiones neto del SRE y los montos de pensiones relacionados teniendo en cuenta lo siguiente, al 30 de junio de 2017:

- La proporción individual del pasivo colectivo neto de pensiones de todos los patronos de gobierno participantes.

- La parte proporcional de cada patrono del gobierno participante fue consistente con la forma en que se determinaron las contribuciones y debe reflejar el esfuerzo de aportación proyectado a largo plazo del patrono del gobierno participante en relación con el de todos los patronos del gobierno participante. Las contribuciones que financiaron por separado pasivos específicos de un patrono individual participante del gobierno al SRE (tales como los incentivos de retiro anticipado de patrono del gobierno participante local) no se incluyeron en la determinación de la parte proporcional del esfuerzo de aportación global a largo plazo proyectado.

- Las contribuciones que reflejan el esfuerzo de aportación a largo plazo proyectado de cada patrono del gobierno participante son la Ley Núm. 116-2011 aportación legal basada en nómina, la Ley Núm. 3-2013 de aportación suplementaria, otras contribuciones especiales y la Ley Núm. 32 de -2013

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Aportación Uniforme Adicional (AUA). Otras contribuciones que no reflejaron el esfuerzo de aportación a largo plazo proyectado por el patrono del gobierno participante fueron excluidas del cálculo proporcional de la participación.

- La AUA requirió una aportación que se determina en conjunto y el SRE luego asignó el monto total a cada patrono del gobierno participante en función de la nómina de dicho patrono del gobierno participante. Sin embargo, debido a un historial de falta de pago de las AUA por parte de muchos patronos gubernamentales participantes y la falta de pago contínua prevista de dichas contribuciones, se determinó que las cantidades de AUA recaudadas se excluirían de la determinación de participación proporcional, a fin de evitar una sobreasignación de la obligación neta de pensión para los patronos gubernamentales participantes que pagaron su AUA y una subasignación de la obligación neta de pensión asciende a para los patronos gubernamentales participantes que no pagaron su AUA.

El SRM es un plan de pensión de un solo patrono para los fines de la declaración GASB Núm. 68, ya que cubre a aquellos participantes elegibles que son maestros dentro del sistema de educación pública del ELA y están empleados por el DE, que es un patrono del gobierno único. Del mismo modo, el SRJ es un plan de pensión de un solo patrono para los fines de la declaración GASB Núm. 68, ya que cubre a aquellos participantes elegibles que son jueces dentro del sistema judicial del ELA y están empleados por la Oficina de Administración de Tribunales del ELA.

Ni las Declaraciones GASB Núm. 68 ni Núm. 71 afectan la forma en que el ELA puede elegir financiar sus obligaciones de pensión.

Par los fines de los estados financieros básicos independientes de las unidades de componentes de presentación discreta, cuyos informes de auditoría para el año fiscal 2017 ya se habían emitido antes de la emisión de los estados financieros básicos adjuntos del ELA, el SRE no proporcionó oportunamente información necesaria para aplicar las Declaraciones GASB Núm. 68 y Núm. 71. Por lo tanto, una unidad de componentes no mayores de presentación discreta no pudo aplicar estos pronunciamientos contables, y ciertas unidades de componentes de presentación discreta los aplicaron en base a información no auditada. Como resultado, esta unidad de componentes no mayores de presentación discreta mantuvo la contabilidad de los costos de pensión de acuerdo con la Declaración GASB Núm. 27, también desde el punto de vista de un participante en un plan de costos compartidos de múltiples patronos. En consecuencia, los costos de pensión reconocidos para esta unidad de componentes de presentación discreta fueron principalmente iguales a las contribuciones requeridas por ley o contractualmente, con un pasivo registrado por cualquier aportación requerida no pagada. Algunas unidades de componentes de presentación discreta no registraron activos o pasivos relacionados con las pensiones porque contribuyeron con las contribuciones requeridas por ley. Para obtener información adicional, consulte la Nota 18 (g) y la Nota 18 (h).

*(t)* *Otros Beneficios Posteriores al Empleo*

Además de los beneficios de pensión descritos en la Nota 18, el ELA proporcionó, antes del 23 de agosto de 2017, otros beneficios de retiro, como bonos de verano y de Navidad, y beneficios de atención médica posteriores al empleo (denominados colectivamente otros beneficios postempleo u OPEB) para sus empleados jubilados de acuerdo con la ley local. Sustancialmente, todos los empleados pueden ser elegibles para estos beneficios si alcanzan la edad normal de retiro mientras trabajan para el ELA. El ELA contabiliza los OPEB en virtud de las disposiciones de la Declaración GASB Núm. 45, *Informes Contables y Financieros de Patronos para Beneficios Posteriores al Empleo que no sean Pensiones*. Esta declaración requiere una medición sistemática y basada en el devengo y el reconocimiento del costo (gasto) de OPEB durante un período que se aproxima a los años de servicio de los empleados y proporciona información sobre los pasivos acumulados actuariales asociados con OPEB y si se está progresando en el financiamiento del plan. El costo de los beneficios anuales posteriores al empleo debe ser igual a la aportación anual requerida a los planes, calculada de acuerdo con ciertos parámetros. Para obtener información adicional sobre OPEB, consulte la Nota 19.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El bono de Navidad y los beneficios del bono de verano se establecen en los estatutos del ELA. El bono de Navidad y el bono de verano pagado por el ELA a los empleados jubilados durante el año que finalizó el 30 de junio de 2017 fue de $600 por persona retirada, excepto para los jubilados del SRE, para quienes se eliminó el bono de verano y el bono de Navidad se redujo de $600 por persona retirada a $200 por persona retirada a tenor con la Ley Núm. 3-2013, que reformó el SRE. El monto total de los bonos de Navidad y verano pagados durante el año fiscal 2017 fue de aproximadamente $62.7 millones. Estos beneficios se registran como gastos en el Fondo General cuando se pagan.

Los estatutos del ELA también otorgan bonificaciones por medicamentos a los jubilados. La cantidad total de este bono pagado durante el año fiscal 2017 fue de aproximadamente $15 millones. Estos beneficios se registran como gastos en el Fondo General cuando se pagan.

*(u) Ausencias Compensadas*

La política de vacaciones del ELA generalmente prevé la acumulación de 1.25 días por mes hasta un máximo anual de 15 días, a excepción de los maestros que acumulan 4 días por mes, hasta un máximo anual de 40 días y policías y bomberos, que devengan 2.5 días al mes. El tiempo de vacaciones acumulado es totalmente otorgado a los empleados desde el primer día de trabajo hasta un máximo de 60 días. Los empleados generalmente acumulan licencia por enfermedad a razón de 1 día por mes hasta un máximo anual de 12 días y un máximo acumulado de 90 días. Antes de la promulgación de la Ley 26-2017, en el momento del retiro, un empleado recibía una compensación por todas las vacaciones acumuladas no pagadas a la tasa actual, independientemente de los años de servicio; y para todas las licencias por enfermedad no pagadas acumuladas si el empleado estuvo empleado por el ELA durante, al menos, 10 años. La Ley 26-2017 se promulgó para modificar el marco legal y judicial existente para poder dar cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión. Además de las modificaciones de devengo, la Ley 26-2017 también modificó los términos de liquidación. Después de la promulgación de la Ley 26-2017, solo se paga la compensación de la licencia de vacaciones acumulada, hasta 60 días, al finalizar el empleo. Para ser elegible para recibir compensación, un empleado debe haber estado empleado durante, al menos, tres meses. Los días de enfermedad acumulados no pagados ya no se liquidan al terminar el empleo. El impacto financiero del cambio de política resultante de la promulgación de la Ley 26-2017 fue reconocido y contabilizado como un cambio en la estimación contable en los estados financieros del gobierno. La responsabilidad por las ausencias compensadas informadas en los estados financieros de fondos privados y de propiedad exclusiva del gobierno se ha calculado utilizando el método de adquisición de derechos (excepto para los empleados del Negociado de la Policía de Puerto Rico), donde se incluyen los montos de licencia para los empleados que actualmente son elegibles para recibir pagos de rescisión y otros empleados que se espera que sean elegibles en el futuro para recibir dichos pagos al finalizar. La responsabilidad se ha calculado en función del nivel salarial actual de los empleados e incluye los costos relacionados con la nómina (por ejemplo, seguro social e impuestos de Medicare). La responsabilidad por las ausencias compensadas de los empleados del Negociado de la Policía de Puerto Rico (PRPOB) se estima en función de los pagos de rescisión reales realizados y proyectados estadísticamente, que es un híbrido entre los métodos de adquisición de derechos y rescisión. Los estados financieros de los fondos del gobierno registran los gastos cuando a los empleados se les paga por la licencia, o cuando el saldo adeudado se acumula a partir del despido del empleado. Las políticas de acumulación de ausencias compensadas para las unidades de componentes de presentación discreta varían por entidad, según los acuerdos negociados y otros factores acordados entre la administración de estas entidades y sus empleados.

*(v) Beneficios de Rescisión*

El ELA contabiliza los beneficios por rescisión de acuerdo con la Declaración GASB Núm. 47, *Contabilización de los Beneficios por Rescisión*. A tenor con las disposiciones de la Declaración GASB Núm. 47, en los estados financieros preparados sobre la base contable de devengo, los patronos deben reconocer un pasivo y gasto por beneficios de rescisión voluntaria (por ejemplo, incentivos de retiro anticipado) cuando se acepta la oferta y se puede estimar el monto. Se deben reconocer pasivos y gastos por beneficios de rescisión involuntaria (por ejemplo, beneficios por indemnización) en los estados

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

financieros de todo el gobierno cuando: (i) un plan de rescisión se ha aprobado por las personas con autoridad para comprometer al gobierno con el plan, (ii) el plan ha sido comunicado a los empleados, y (iii) el monto puede estimarse. En los estados financieros preparados sobre la base contable modificada de devengo, los pasivos y los gastos por beneficios por rescisión deben reconocerse en la medida en que normalmente se espera que los pasivos se liquiden con los recursos financieros disponibles prescindibles.

*(w) Actividades entre Fondos y Transacciones dentro de la Entidad*

El ELA tenía las siguientes actividades entre fondos y transacciones dentro de la entidad:

*Transferencia entre Fondos:* las transferencias legalmente requeridas se informan cuando el fondo receptor incurre en ellas y el fondo que desembolsa, con las cuentas por cobrar y por pagar presentadas como montos adeudados y pagaderos de otros fondos. Los anticipos entre fondos también se presentan como importes adeudados y pagaderos de otros fondos. Sin embargo, estos anticipos, transferencias y montos relacionados por cobrar y pagar se consideran saldos internos y actividades que se han eliminado en los estados financieros de todo el gobierno. Las cuentas por cobrar entre fondos se declaran netas de las previsiones estimadas para cuentas incobrables, que se determinan en función de la experiencia de cobro pasada y las condiciones económicas actuales.

*Transacciones dentro de la Entidad:* hay dos tipos de transacciones dentro de la entidad: Primero, el flujo de recursos entre el Gobierno Primario y sus unidades de componentes de presentación discreta, y entre las unidades de componentes de presentación discreta. Este flujo de recursos y los saldos pendientes relacionados se informan como si fueran transacciones externas. Sin embargo, el flujo de recursos entre el Gobierno Primario y las unidades de componentes combinados se clasifican como actividad entre fondos, como se describió anteriormente. En segundo lugar, los saldos dentro de la entidad entre el Gobierno Primario y las unidades de componentes de presentación discreta son equivalentes al financiamiento de deuda a largo plazo. Los pasivos del Gobierno Primario se informan en el estado de resultados netos, los ingresos en el estado de ingresos, gastos y cambios en los fondos del gobierno del saldo de fondos del Gobierno Primario, y el activo en el estado de resultados netos de las unidades de componentes de presentación discreta. Los montos adeudados de las unidades de componentes de presentación discreta se declaran netos de las provisiones estimadas para cuentas incobrables, que se determinan según la experiencia de cobro pasada y las condiciones económicas actuales.

*(x) Ingresos y Premios de Lotería*

Los ingresos, gastos y premios otorgados por la Lotería Tradicional de Puerto Rico y el Sistema de Lotería Adicional, informados dentro del fondo empresarial de loterías, se reconocen a medida que se llevan a cabo los sorteos. Los fondos recaudados antes del 30 de junio para boletos relacionados con sorteos que se realizarán después del 30 de junio se informan como ingresos no ganados. Los premios impagos otorgados al 30 de junio se informan como obligación por los premios de lotería impagos. Los premios no reclamados caducan después de seis meses y se transfieren al Fondo General.

*(y) Gestión del riesgo*

El ELA adquiere un seguro comercial que cubre siniestros, robos, demandas por daños y otras pérdidas para el Gobierno Primario, la mayoría de las unidades de componentes y los municipios. El ELA recibe un reintegro por pagos de primas realizados en nombre de las unidades de componentes y los municipios. Las pólizas de seguro actuales no se han cancelado ni rescindido. Para la compensación de los trabajadores, el ELA tiene una unidad componente presentada discretamente, la CFSE , que proporciona la compensación del trabajador a los empleados públicos y privados. Las unidades de componentes combinados del ELA son responsables de garantizar que su propiedad esté debidamente asegurada. Anualmente, estas unidades de componentes combinados compilan la información de todas las propiedades y su respectivo valor de reemplazo y adquieren sus pólizas de seguro de propiedad y accidentes. La cobertura de seguro para el año fiscal 2017 se mantuvo similar a la de años anteriores. En los últimos tres años, los acuerdos de seguro del ELA o de las unidades de componentes no han excedido el monto de la cobertura.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Ciertas unidades de componentes de presentación discreta y combinados utilizan seguros comerciales y fondos internos de autoseguro que cubren riesgos específicos relacionados con sus operaciones especializadas. Los fondos de autoseguro más importantes residen en el nivel de la unidad de componentes de presentación discreta y se describen en detalle en la Nota 16.

**(z) Acuerdo sobre Tabaco**

El ELA sigue el Boletín Técnico GASB Núm. 2004-1, *Problema de Reconocimiento de Acuerdo de Tabaco y Entidad de Informe Financiero*, según enmienda de la Declaración GASB Núm. 48, *Ventas y Promesas de Cuentas por Cobrar e Ingresos Futuros y Transferencias dentro de la Entidad de Activos e Ingresos Futuros*, (el **TB**), que proporciona orientación contable para las entidades creadas para obtener los derechos de todos o una parte de los recursos futuros de acuerdos del tabaco y para los gobiernos que crean dichas entidades.

El TB indica que la entidad creada para obtener los derechos, generalmente conocida como Autoridad de Acuerdo del Tabaco (en el caso del ELA, el Fideicomiso de los Niños), debe considerarse una unidad de componentes combinados del gobierno que la creó. El TB también establece que el gobierno que recibe los pagos de las compañías tabacaleras en virtud del acuerdo, denominado "gobierno del acuerdo", debe reconocer una cuenta por cobrar e ingresos por los recursos de liquidación de tabaco cuando ocurre un evento. El evento que resulta en el reconocimiento de un activos e ingresos por parte del gobierno del acuerdo es el envío nacional de cigarrillos. El TB indica que el gobierno del acuerdo y las autoridades del acuerdo del tabaco deben realizar devengos para los envíos estimados desde el 1 de enero hasta el final de su año fiscal respectivo, ya que los pagos anuales se basan en un año calendario. Sin embargo, en virtud de la base contable modificada de devengo a nivel del fondo, los ingresos deben reconocerse solo en la medida en que los recursos estén disponibles.

**(aa) Uso de Estimaciones**

La preparación de los estados financieros básicos a tenor con las GAAP de EE. UU. requiere que la gerencia haga estimaciones y suposiciones que afecten los montos reportados de activos y pasivos, la revelación de activos y pasivos contingentes a la fecha de los estados financieros básicos y los montos informados de ingresos y gastos durante el período de informe. Los resultados reales pueden diferir de estas estimaciones.

**(bb) Nuevos Estándares Contables Adoptados**

El ELA adoptó los siguientes nuevos estándares contables a partir del 1 de julio de 2017:

- Declaración GASB Núm. 74, *Informes Financieros para Planes de Beneficios Posteriores al Empleo que no sean Planes de Pensiones*. Esta declaración reemplaza las declaraciones de GASB Núm. 43, *Informes Financieros para Planes de Beneficios Posteriores al Empleo que No Sean Planes de Pensiones*, según enmienda, y la Declaración GASB Núm. 57, *Mediciones de OPEB por Patronos Agentes y Planes de Múltiples Patronos Agentes*. También incluye requisitos para planes OPEB de aportación definida que reemplazan los requisitos para esos planes de OPEB en la Declaración GASB Núm. 25, *Informes Financieros para Planes de Pensiones de Beneficios Definidos y Divulgaciones de Notas para Planes de Aportaciones Definidas*, según enmienda, Declaración GASB Núm. 43, y Declaración GASB Núm. 50, *Divulgaciones de Pensiones*. El alcance de esta declaración incluye los beneficios definidos y las aportaciones definidas de los planes de OPEB y la aportación definida administrada a través de fideicomisos que cumplen con los siguientes criterios:

  – Las contribuciones de los patronos y las entidades contribuyentes que no son patronos al plan de OPEB y las ganancias de esas contribuciones son irrevocables.

  – Los activos del plan de OPEB están dedicados a proporcionar OPEB a los miembros del plan de acuerdo con los términos de los beneficios.

  – Los activos del plan de OPEB están legalmente protegidos de los acreedores de los patronos, las entidades contribuyentes que no son patronos y el administrador del plan de OPEB. Si el plan

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

plan es un plan de OPEB de beneficios definidos, los activos del plan también están legalmente protegidos de los acreedores de los miembros del plan.

Esta declaración también incluye los requisitos para abordar la información financiera para los activos acumulados con el fin de proporcionar beneficios definidos de OPEB a través de planes de OPEB que no se administran a través de fideicomisos que cumplen con los criterios especificados. Esta declaración no tuvo impacto en los estados financieros básicos. Sin embargo, se incorporaron ciertos cambios en las divulgaciones de las notas y la Información complementaria requerida (RSI) de los estados financieros auditados independientes de los Sistemas de Retiro para el año terminado el 30 de junio de 2017.

• Declaración GASB Núm. 77, *Divulgaciones de Reducción de Impuestos*. Esta declaración establece estándares de información financiera para los acuerdos de reducción de impuestos celebrados por los gobiernos estatales y locales. Las divulgaciones requeridas por esta declaración abarcan las reducciones de impuestos resultantes de (a) acuerdos suscritos por el gobierno informante y (b) acuerdos suscritos por otros gobiernos y que reducen los ingresos fiscales del gobierno informante. Las disposiciones de esta declaración deben aplicarse a todos los gobiernos estatales y locales sujetos a dichos acuerdos de reducción de impuestos. Para fines de información financiera, una reducción de impuestos se define como una reducción en los ingresos fiscales que resulta de un acuerdo entre uno o más gobiernos y una persona o entidad en la que (a) uno o más gobiernos prometen renunciar a los ingresos fiscales a los que de otra manera tienen derecho y (b) el individuo o entidad se compromete a tomar una acción específica después de que se haya firmado el acuerdo que contribuya al desarrollo económico o de otra manera beneficie a los gobiernos o los ciudadanos de esos gobiernos. La sustancia de una transacción, no su forma o título, es un factor clave para determinar si la transacción cumple con la definición de reducción de impuestos para los efectos de esta Declaración. Ver la Nota 8 para obtener más información sobre las reducciones de impuestos.

• Declaración GASB Núm. 78, *Pensiones Proporcionadas a través de Ciertos Planes de Beneficios Definidos por Múltiples Patronos*. Esta Declaración aborda un problema de práctica con respecto al alcance y la aplicación de la Declaración GASB Núm. 68. Este problema está asociado con las pensiones proporcionadas a través de ciertos planes de pensiones de beneficios definidos de patronos múltiples y con patronos de gobiernos estatales o locales cuyos empleados reciben dichas pensiones. Antes de la emisión de esta declaración, los requisitos de la Declaración GASB Núm. 68 se aplicaban a los estados financieros básicos de todos los patronos de gobiernos estatales y locales cuyos empleados reciben pensiones a través de planes de pensiones administrados a través de fideicomisos que cumplen con los criterios del párrafo 4 de esa declaración. Esta declaración modifica el alcance y la aplicación de la Declaración GASB Núm. 68 para excluir las pensiones otorgadas a los empleados de patronos gubernamentales estatales o locales a través de un plan de pensiones de beneficios definidos por costos compartidos de múltiples patronos que (1) no sea un plan de pensión de un gobierno estatal o local, (2) se utilice para proporcionar pensiones de beneficios definidos tanto a empleados de gobiernos estatales o locales como a empleados de patronos que no son patronos de gobiernos estatales o locales y (3) no tenga un patrono de un gobierno estatal o local predominante (ya sea individual o colectivamente con otros patronos de gobiernos estatales o locales que proporcionan pensiones a través del plan de pensiones). Esta declaración establece los requisitos para el reconocimiento y la medición de los gastos, salidas y pasivos de pensiones; divulgaciones de notas; y la información complementaria requerida para las pensiones que tienen las características que se describen anteriormente. Esta declaración no tuvo impacto en los estados financieros básicos.

• Declaración GASB Núm. 80, *Requisitos de Combinación para Ciertas Unidades de Componentes*. Esta declaración mejora la información financiera al aclarar los requisitos de presentación de los estados financieros para ciertas unidades de componentes. Esta declaración modifica los requisitos de mezcla establecidos en el párrafo 53 de la Declaración GASB Núm. 14, *La Entidad de Información Financiera*, según enmienda. El criterio adicional requiere la combinación de una unidad de

84

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

componentes constituida como una corporación sin fines de lucro en la cual el Gobierno Primario es el único miembro corporativo. El criterio adicional no se aplica a las unidades de componentes incluidas en la entidad de información financiera a tenor con las disposiciones de la Declaración GASB Núm. 39, *Determinar si Ciertas Organizaciones son Unidades de Componentes*. Esta declaración no tuvo impacto en los estados financieros básicos.

***(cc) Pronunciamientos Contables Emitidos pero Aún No Efectivos***

Se han emitido los siguientes nuevos estándares contables, pero aún no son efectivos:

- Declaración GASB Núm. 75, *Informes Contables y Financieros para Beneficios Posteriores al Empleo que No Sean Pensiones*. Esta Declaración reemplaza los requisitos de las Declaraciones GASB Núm. 45, *Informes Contables y Financieros de Patronos para Beneficios Posteriores al Empleo que No Sean Pensiones*, según enmienda, y la Declaración GASB Núm. 57, *Mediciones de OPEB por Patronos Agentes y el Planes de Múltiples Patronos Agentes*, para OPEB. El alcance de esta declaración aborda los informes contables y financieros para OPEB que se proporcionan a los empleados de patronos de gobiernos estatales y locales. Esta declaración establece estándares para reconocer y medir pasivos, salidas diferidas de recursos, entradas diferidas de recursos y gastos/salidas. Para el OPEB de beneficio definido, esta declaración identifica los métodos y supuestos que se requieren para proyectar los pagos de beneficios, descontar los pagos de beneficios proyectados a su valor presente actuarial y atribuir ese valor presente a los períodos de servicio a los empleados. También se incluye la divulgación de la nota al pie de página y los requisitos de información complementaria requeridos sobre el beneficio definido de OPEB. Además, esta declaración detalla los requisitos de reconocimiento y divulgación para patronos con cuentas por pagar a planes de OPEB de beneficios definidos que se administran a través de fideicomisos que cumplen con los criterios especificados y para patronos cuyos empleados reciben OPEB de aportación definida. Esta declaración también aborda ciertas circunstancias en las que una entidad que no es patrono brinda apoyo financiero para OPEB a los empleados de otra entidad. Las disposiciones de esta declaración son efectivas para los años fiscales que comienzan después del 15 de junio de 2017.

- Declaración GASB Núm. 81, *Acuerdos de Intereses Divididos Irrevocables*. Esta declaración mejora la información contable y financiera para acuerdos de intereses divididos irrevocables al proporcionar reconocimiento y guía de medición para situaciones en las que un gobierno es el beneficiario del acuerdo. Esta declaración requiere que un gobierno que recibe recursos a tenor con un acuerdo de interés dividido irrevocable reconozca los activos, pasivos y entradas diferidas de recursos al inicio del acuerdo. Además, esta declaración requiere que un gobierno reconozca los activos que representan sus intereses en beneficios de acuerdos de intereses divididos irrevocables administrados por un tercero, si el gobierno controla la capacidad de servicio actual de los intereses de beneficio. Esta declaración requiere que un gobierno reconozca los ingresos cuando los recursos se vuelvan aplicables al período de informe. Esta declaración no es efectiva hasta el año fiscal 2018.

- Declaración GASB Núm. 82, *Cuestiones de Pensiones. Enmienda de las Declaraciones GASB Núm. 67, Núm. 68 y Núm. 73*. Esta declaración aborda ciertas cuestiones que se han planteado con respecto a las Declaraciones GASB Núm. 67, Núm. 68 y Núm. 73. La declaración está destinada a mejorar la coherencia en la aplicación de los estándares de pensiones al aclarar o enmendar áreas relacionadas de la orientación existente. Específicamente, esta declaración aborda cuestiones relacionadas con (1) la presentación de medidas relacionadas con la nómina en la información complementaria requerida, (2) la selección de supuestos y el tratamiento de las desviaciones de la guía en un estándar de práctica actuarial para fines de información financiera, y (3) la clasificación de los pagos realizados por los patronos para cumplir con los requisitos de aportación de los empleados (miembros del plan). Esta declaración modifica las declaraciones GASB Núm. 67 y Núm. 68 para exigir, en cambio, la presentación de la nómina cubierta, definida como la nómina en la que se basan las contribuciones a un plan de pensiones, así como las proporciones que utilizan esa medida. Esta

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

declaración aclara que una desviación, tal como se usa el término en las Normas de Prácticas Actuariales emitidas por la Junta de Normas Actuariales, de la guía en una Norma de Prácticas Actuariales no se considera conforme a los requisitos de la Declaración GASB Núm. 67, Declaración GASB Núm. 68, o Declaración GASB Núm. 73 para la selección de supuestos utilizados para determinar el pasivo total por pensiones y las medidas relacionadas. Esta declaración aclara que los pagos realizados por un patrono para cumplir con los requisitos de aportación identificados por los términos del plan de pensiones como requisitos de aportación del miembro del plan deben clasificarse como contribuciones del miembro del plan para los fines de la Declaración GASB Núm. 67 y como contribuciones de los empleados para los fines de la Declaración GASB Núm. 68. También requiere que el gasto y las salidas de un patrono por esos montos se reconozcan en el período para el cual se evalúa la aportación y se clasifiquen de la misma manera que el patrono clasifica una compensación similar distinta de las pensiones (por ejemplo, como sueldos y salarios o beneficios marginales). Esta declaración no es efectiva hasta el año fiscal 2017, con excepción de los requisitos de esta declaración para la selección de supuestos en una circunstancia donde los pasivos de la pensión de un patrono se miden a partir de una fecha distinta al final del año fiscal más reciente del patrono. En esa circunstancia, los requisitos para la selección de supuestos son efectivos para ese patrono en el primer período de informe en el que la fecha de medición del pasivo de pensiones es el 15 de junio de 2017 o después.

- Declaración GASB Núm. 83, *Ciertas Obligaciones de Retiro de Activos*. Esta declaración aborda los informes contables y financieros para ciertas obligaciones de retiro de activos (ARO). Una ARO es un pasivo legalmente exigible asociado con el retiro de un activo de capital tangible. Un gobierno que tiene obligaciones legales para realizar futuras actividades de retiro de activos relacionadas con sus activos de capital tangible debe reconocer un pasivo basado en la guía de esta declaración. Esta declaración requiere que el reconocimiento ocurra cuando se incurre en el pasivo y es razonablemente estimable. La determinación de cuándo se incurre en el pasivo debe basarse en la ocurrencia de leyes, regulaciones, contratos o sentencias judiciales externas, junto con la ocurrencia de un evento interno que obliga a un gobierno a realizar actividades de retiro de activos. Las leyes y reglamentaciones pueden requerir que los gobiernos tomen medidas específicas para retirar ciertos activos de capital tangible al final de la vida útil de esos activos de capital, como el desmantelamiento de reactores nucleares y el desmantelamiento y desecho de plantas de tratamiento de aguas residuales. Otras obligaciones para retirar activos de capital tangible pueden surgir de contratos o sentencias judiciales. Los eventos internos obligatorios incluyen la ocurrencia de contaminación, la puesta en operación de un activo de capital tangible que debe ser retirado, el abandono de un activo de capital tangible antes de que se ponga en operación o la adquisición de un activo de capital tangible que tenga una ARO existente. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2018.

- Declaración GASB Núm. 84, *Actividades Fiduciarias*. Esta declaración establece los criterios para identificar las actividades fiduciarias de todos los gobiernos estatales y locales. El enfoque de los criterios generalmente está en (1) si un gobierno controla los activos de la actividad fiduciaria y (2) los beneficiarios con quienes existe una relación fiduciaria. Se incluyen criterios separados para identificar unidades de componentes fiduciarios y acuerdos de beneficios posteriores al empleo que son actividades fiduciarias. Una actividad que cumpla los criterios debe informarse en un fondo fiduciario en los estados financieros básicos. Los gobiernos con actividades que cumplen con los criterios deben presentar un estado de resultados netos fiduciarios y un estado de cambios en los resultados netos fiduciarios. Se proporciona una excepción a ese requisito para una actividad de tipo comercial que normalmente espera mantener activos de custodia durante tres meses o menos. Esta declaración describe cuatro fondos fiduciarios que deben informarse, si corresponde: (1) fondos fiduciarios de pensiones (y otros beneficios para empleados), (2) fondos fiduciarios de inversión, (3) fondos fiduciarios de uso privado y (4) fondos de custodia. Los fondos de custodia generalmente deben informar actividades fiduciarias que no se mantienen en un fideicomiso o acuerdo equivalente que cumpla con criterios específicos. Esta declaración también establece el reconocimiento de un

86

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

pasivo para los beneficiarios en un fondo fiduciario cuando ha ocurrido un evento que obliga al gobierno a desembolsar recursos fiduciarios. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2018.

- Declaración GASB Núm. 85, Ley *Ómnibus 2017*. El objetivo de esta declaración es abordar los problemas de práctica que se han identificado durante la implementación y aplicación de ciertas Declaraciones GASB. Esta declaración aborda una variedad de temas, que incluyen temas relacionados con las unidades de componentes combinados, el fondo de comercio, la medición y aplicación del valor de mercado y los beneficios posteriores al empleo (pensiones y otros beneficios posteriores al empleo [OPEB]). Específicamente, esta declaración aborda los siguientes temas:

  - Combinar una unidad de componentes en circunstancias en las que el Gobierno Primario es una actividad de Tipo Comercial que informa en una sola columna para la presentación de estados financieros.

  - Informar montos previamente informados como fondo de comercio y fondo de comercio "negativo".

  - Clasificar bienes inmuebles en poder de entidades aseguradoras.

  - Medir ciertas inversiones en el mercado monetario y contratos de inversión que generan intereses participantes a costo amortizado.

  - Momento de la medición de los pasivos y gastos de pensiones o de OPEB reconocidos en los estados financieros preparados utilizando el enfoque actual de medición de recursos financieros.

  - Reconocer en nombre de los pagos de pensiones o de OPEB en los estados financieros del patrono.

  - Presentar medidas relacionadas con la nómina en la información complementaria requerida para fines de informes de los planes de OPEB y los patronos que proporcionan OPEB.

  - Clasificar las contribuciones pagadas por el patrono para OPEB.

  - Simplificar ciertos aspectos del método de medición alternativo para OPEB.

  - Informes contables y financieros para OPEB proporcionados a través de ciertos planes de OPEB de beneficios definidos por múltiples patronos.

  Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2017. Se alienta la aplicación anticipada.

- Declaración GASB Núm. 86, *Ciertos Problemas con la Extinción de la Deuda*. Esta declaración mejora la consistencia en los informes contables y financieros para la defensa sustancial de la deuda al proporcionar orientación para las transacciones en las que el efectivo y otros activos monetarios adquiridos solo con recursos existentes (recursos que no sean el producto del reintegro de la deuda) se colocan en un fideicomiso irrevocable para el único propósito de extinguir la deuda. Esta declaración también mejora los informes contables y financieros para el seguro prepago de la deuda que se extingue y las divulgaciones para la deuda que se vence en sustancia. Los requisitos de esta declaración son efectivos para los años fiscales que comienzan después del 15 de junio de 2017.

- Declaración GASB Núm. 87, *Arrendamientos*. El objetivo de esta declaración es cumplir mejor las necesidades de información de los usuarios de los estados financieros mejorando la información contable y financiera para los arrendamientos de los gobiernos. Esta declaración aumenta la utilidad de los estados financieros de los gobiernos al exigir el reconocimiento de ciertos activos y pasivos de arrendamiento para arrendamientos que anteriormente se clasificaron como arrendamientos operativos y reconocidos como entradas de recursos o salidas de recursos en función de las disposiciones de pago del contrato. Establece un modelo único para la contabilidad de arrendamientos basado en el principio fundamental de que los arrendamientos son financiamientos del derecho a usar un activo subyacente. Según esta declaración, se requiere que un arrendatario reconozca un pasivo por arrendamiento y un derecho intangible a usar el activo por arrendamiento,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

y se requiere que un arrendador reconozca un crédito por arrendamiento y una entrada diferida de recursos, mejorando así la relevancia y la consistencia de la información sobre las actividades de arrendamiento de los gobiernos. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2019.

- Declaración GASB Núm. 88, *Ciertas Divulgaciones Relacionadas con la Deuda, Incluidos los Empréstitos Directos y las Colocaciones Directas*. El objetivo principal de esta declaración es mejorar la información que se divulga en las notas a los estados financieros del gobierno relacionados con la deuda, incluidos los empréstitos directos y las colocaciones directas. También aclara qué pasivos deberían incluir los gobiernos al divulgar información relacionada con la deuda. Esta declaración requiere que se divulgue información esencial adicional relacionada con la deuda en notas a los estados financieros, incluidas las líneas de crédito no utilizadas; activos pignorados como garantía de la deuda; y los términos especificados en los acuerdos de deuda relacionados con eventos de incumplimiento significativos con consecuencias relacionadas con las finanzas, eventos de rescisión significativos con consecuencias relacionadas con las finanzas y cláusulas de aceleración subjetiva significativas. Para las notas a los estados financieros relacionados con la deuda, esta declaración también requiere que se proporcione información existente y adicional para préstamos directos y colocaciones directas de deuda por separado de otras deudas. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2018.

- Declaración GASB Núm. 89, *Contabilidad de Costos de Intereses Incurridos Antes del Fin de un Período de Construcción*. Esta declaración establece los requisitos contables para los costos por intereses incurridos antes del final de un período de construcción. Tales costos de intereses incluyen todos los intereses que anteriormente se contabilizaron de acuerdo con los requisitos de los párrafos 5 a 22 de la Declaración GASB Núm. 62, *Codificación de la Guía de Informes Contables y Financieros Contenida en los Pronunciamientos FASB y AICPA Anteriores al 30 de Noviembre de 1989*, que son reemplazados por esta declaración. Esta declaración requiere que el costo de intereses incurrido antes del final de un período de construcción se reconozca como un gasto en el período en que se incurre en el costo de los estados financieros preparados utilizando el enfoque de medición de recursos económicos. Como resultado, el costo de intereses incurrido antes del final de un período de construcción no se incluirá en el costo histórico de un activo de capital informado en una actividad de tipo comercial o un fondo empresarial. Esta declaración también reitera que en los estados financieros preparados utilizando el enfoque actual de medición de recursos financieros, el costo de intereses incurrido antes del final de un período de construcción debe reconocerse como un gasto de acuerdo con los principios de contabilidad de fondos del gobierno. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2019.

- Declaración GASB Núm. 90, *Interés Mayoritario en el Capital*. Los objetivos principales de esta Declaración son mejorar la consistencia y la comparabilidad de informar la participación mayoritaria en el capital o parte de un gobierno en una organización legalmente separada y mejorar la relevancia de la información de los estados financieros para ciertas unidades de componentes. Define un interés mayoritario en el capital y especifica que un interés mayoritario en el capital en una organización legalmente separada debe informarse como una inversión si la participación de un gobierno en un interés en el capital cumple con la definición de inversión. Un interés mayoritario en el capital que cumpla con la definición de una inversión debe medirse utilizando el método de la participación, a menos que sea mantenido por un gobierno de propósito especial dedicado solo a actividades fiduciarias, un fondo fiduciario o una dotación (incluidas las dotaciones permanentes y plazo) o un fondo permanente. Esos gobiernos y fondos deben medir el interés mayoritario en el capital a valor de mercado. Para todas las demás tenencias de un interés mayoritario en el capital en una organización legalmente separada, un gobierno debe informar la organización legalmente separada como una unidad de componentes, y el gobierno o fondo que posee el interés en el capital debe informar un activo relacionado con el interés mayoritario en el capital utilizando el método del capital. Esta Declaración establece que la propiedad de un interés mayoritario en el capital de una organización legalmente separada da como resultado que

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

el gobierno sea financieramente responsable de la organización legalmente separada y, por lo tanto, el gobierno debe informar esa organización como una unidad de componentes. Esta Declaración también requiere que una unidad de componentes en la que un gobierno tenga una cuenta de interés de capital del 100 por ciento para sus activos, salidas diferidas de recursos, pasivos e ingresos de recursos diferidos al valor de adquisición en la fecha en que el gobierno adquirió un interés de capital del 100 por ciento en la unidad de componentes. Las transacciones presentadas en los estados de flujos de la unidad de componentes en esa circunstancia deben incluir solo las transacciones que ocurrieron después de la adquisición. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2018.

- Declaración GASB Núm. 91, *Obligaciones de Deudas de Conductos*. Esta Declaración requiere que los emisores divulguen información general sobre sus obligaciones de deuda de conductos, organizada por tipo de compromiso, incluido el monto del capital pendiente total de las obligaciones de deuda de conductos de los emisores y una descripción de cada tipo de compromiso. Los emisores que reconocen pasivos relacionados con el apoyo a la amortización de la deuda de las obligaciones de deuda de conductos también deben revelar información sobre el monto reconocido y cómo cambiaron los pasivos durante el período sobre el que se informa. Los requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de diciembre de 2020.

- Declaración GASB Núm. 92, *Ómnibus 2020*. Esta Declaración cubre una variedad de temas e incluye disposiciones específicas sobre lo siguiente, la fecha de vigencia de la Declaración Núm. 87, *Arrendamientos*, y la Guía de implementación Núm. 2019-3, Arrendamientos, para informes financieros intermedios; Reporte de transferencias de activos dentro de la entidad entre un patrono del gobierno primario y un plan de pensión de beneficios definidos por unidad de componente o un plan de beneficios posteriores al empleo de otros beneficios definidos (OPEB); la aplicabilidad de las Declaraciones Núm. 73, *Contabilidad e Información Financiera para Pensiones y Activos Relacionados que no están dentro del Alcance de la Declaración 68 de GASB, y Enmiendas a Ciertas Disposiciones de las Declaraciones 67 y 68 de GASB, en su forma enmendada*, y Núm. 74, *Información Financiera para los planes de beneficios posteriores al empleo distintos de los planes de pensión, según enmienda*, para informar los activos acumulados para los beneficios posteriores al empleo; la aplicabilidad de ciertos requisitos de la Declaración Núm. 84, *Actividades fiduciarias*, a los arreglos de beneficios posteriores al empleo; medición de pasivos (y activos, si los hubiera) relacionados con las obligaciones de retiro de activos (ARO) en; una adquisición del gobierno; informe por grupos de riesgo de entidades públicas por montos recuperables de reaseguradoras o aseguradoras excedentes; referencia a mediciones de valor de mercado no recurrentes de activos o pasivos en la literatura autorizada; y terminología utilizada para referirse a instrumentos derivados. La parte de esta Declaración que se relaciona con la fecha de vigencia de la Declaración 87 y su guía de implementación asociada entra en vigencia en el momento de su emisión. Las disposiciones relacionadas con las transferencias de activos dentro de la entidad y la aplicabilidad de los estados financieros 73 y 74 son efectivas para los años fiscales que comiencen después del 15 de junio de 2020. Los requisitos restantes relacionados con las obligaciones de retiro de activos son efectivos para las adquisiciones del gobierno que ocurran en los períodos de reporte que comienzan después del 15 de junio de 2020. Se recomienda la aplicación anticipada y está permitida por tema.

- Declaración de GASB Núm. 93, *Reemplazo de las Tasas de Oferta Interbancarias*. El objetivo de esta Declaración es abordar esas y otras implicaciones de información contable y financiera que resultan del reemplazo de una Tasa de Oferta Interbancaria (IBOR). Algunos gobiernos han celebrado acuerdos en los que los pagos variables realizados o recibidos dependen de un IBOR, en particular, la tasa de oferta interbancaria de Londres (LIBOR). Como resultado de la reforma de la tasa de referencia global, se espera que la LIBOR deje de existir en su forma actual a fines de 2021, lo que incitará a los gobiernos a modificar o reemplazar los instrumentos financieros con el fin de reemplazar la LIBOR con otras tasas de referencia, ya sea cambiando la tasa de referencia o agregando o cambiando disposiciones de apoyo relacionadas con la tasa de referencia. La eliminación de la LIBOR como tasa de interés de referencia

89

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

apropiada es efectiva para los períodos de reporte que terminan después del 31 de diciembre de 2021. Todos los demás requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2020. Se alienta la aplicación anticipada.

- Declaración de GASB Núm. 94, *Acuerdos de Pago de Disponibilidad y Asociaciones Público-Privadas y Público-Públicas*. El objetivo principal de esta Declaración es mejorar la información financiera abordando cuestiones relacionadas con los acuerdos de asociación público-privada y público-pública (APP). Esta Declaración también proporciona orientación para la presentación de informes contables y financieros para acuerdos de pago por disponibilidad (APA). Como se define en esta Declaración, un APA es un acuerdo en el que un gobierno compensa a un operador por servicios que pueden incluir el diseño, construcción, financiamiento, mantenimiento u operación de un activo no financiero subyacente durante un período de tiempo en un intercambio o transacción similar a un intercambio. Esta Declaración requiere que las APP que cumplan con la definición de arrendamiento apliquen la orientación contenida en la Declaración Núm. 87, *Arrendamientos*, en su forma enmendada, si los activos existentes del cedente que no deben ser mejorados por el operador como parte del acuerdo de APP son solo los activos de APP subyacentes y la APP no cumple con la definición de un acuerdo de concesión de servicios (SCA). Esta Declaración también proporciona orientación específica en los estados financieros preparados utilizando el enfoque de medición de recursos económicos para un gobierno que es un operador en una APP que (1) cumple con la definición de una SCA o (2) no está dentro del alcance de la Declaración 87, en su forma enmendada (según se aclara en esta Declaración). Esta Declaración también requiere que un gobierno contabilice los componentes PPP y no PPP de una PPP como contratos separados. Esta Declaración también requiere que una enmienda a una PPP se considere una modificación de PPP, a menos que el derecho del operador a utilizar el activo de PPP subyacente disminuya, en cuyo caso debe considerarse una terminación parcial o total de PPP. Los requisitos de esta Declaración son efectivos para los años fiscales que comienzan después del 15 de junio de 2022 y todos los informes posteriores. Se alienta la aplicación anticipada.

- Declaración GASB Núm. 95, *Aplazamientos de Fechas de Vigencia de Cierta Orientación Autorizada*. El objetivo principal de esta Declaración es brindar alivio temporal a los gobiernos y otras partes interesadas a la luz de la pandemia de COVID-19. Ese objetivo se logra posponiendo las fechas de vigencia de ciertas disposiciones en las Declaraciones y Guías de Implementación que entraron en vigencia o están programadas para entrar en vigencia para períodos que comienzan después del 15 de junio de 2018 y más adelante.

Las fechas de vigencia de ciertas disposiciones contenidas en los siguientes pronunciamientos se posponen un año después de la fecha de implementación original:

- Declaración GASB Núm. 83, *Ciertas Obligaciones de Retiro de Activos*.

- Declaración GASB Núm. 84, *Actividades Fiduciarias*.

- Declaración GASB Núm. 88, *Ciertas Divulgaciones Relacionadas con la Deuda, Incluidos los Empréstitos Directos y las Colocaciones Directas*.

- Declaración GASB Núm. 89, *Contabilidad de Costos de Intereses Incurridos Antes del Fin de un Período de Construcción*.

- Declaración GASB Núm. 90, *Interés Mayoritario en el Capital*.

- Declaración GASB Núm. 91, *Obligaciones de Deudas de Conductos*.

- Declaración GASB Núm. 92, *Ómnibus 2020*.

- Declaración de GASB Núm. 93, *Reemplazo de las Tasas de Oferta Interbancarias*.

- Guía de implementación de GASB Núm. 2017-3, *Informes contables y financieros para beneficios posteriores al empleo distintos de las pensiones (y ciertos problemas relacionados con los informes del plan OPEB)*

- Guía de Implementación de GASB Núm. 2018-1, *Actualización de la guía de implementación — 2018*

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

– Guía de implementación de GASB Núm. 2019-1, *Actualización de la guía de implementación — 2019*

– Guía de Implementación de GASB Núm. 2019-2, *Actividades Fiduciarias.*

Las fechas de vigencia de los siguientes pronunciamientos se posponen 18 meses después de la fecha de implementación original:

– Declaración GASB Núm. 87, *Arrendamientos.*

– Guía de Implementación de GASB Núm. 2019-3, *Arrendamientos.*

Se recomienda la aplicación anticipada de las disposiciones que se tratan en esta Declaración y se permite en la medida que se especifique en cada pronunciamiento emitido originalmente.

• Declaración GASB Núm. 96, *Acuerdos de tecnología de la información basados en suscripción.* El objetivo principal de esta Declaración es brindar orientación sobre la información contable y financiera para acuerdos de tecnología de la información basados en suscripción (SBITA) para usuarios finales gubernamentales (gobiernos). Esta Declaración (1) define un SBITA; (2) establece que un SBITA da como resultado un activo de suscripción de derecho de uso —un activo intangible— y un pasivo de suscripción correspondiente; (3) proporciona los criterios de capitalización para desembolsos distintos de los pagos de suscripción, incluidos los costos de implementación de un SBITA; y (4) requiere divulgaciones de notas con respecto a un SBITA. En la medida en que sea relevante, los estándares para SBITA se basan en los estándares establecidos en la Declaración Núm. 87, *Arrendamientos,* según enmienda. Los requisitos de esta Declaración son efectivos para los años fiscales que comienzan después del 15 de junio de 2022 y todos los informes posteriores. Se alienta la aplicación anticipada.

La gerencia está evaluando el impacto que estas declaraciones pueden tener en los estados financieros básicos del ELA luego de su adopción.

**(2) Empresa en Marcha, Incertidumbres y Riesgo de Liquidez**

Los riesgos e incertidumbres que enfrenta el ELA, junto con otros factores, han llevado a la administración a concluir que existen dudas sustanciales en cuanto a la capacidad del ELA para continuar como una empresa en marcha.

*(a) Empresa en Marcha: Gobierno Primario*

La gerencia cree que hay dudas sustanciales sobre la capacidad del ELA de continuar como empresa en marcha por los motivos siguientes:

• El ELA se encuentra en medio de una crisis fiscal, económica y de liquidez, la culminación de muchos años de déficits gubernamentales importantes, una recesión económica, una elevada tasa de desempleo, un descenso de la población y altos niveles de deuda y obligaciones relacionadas con las pensiones. A medida que la base impositiva del ELA se redujo y sus ingresos se vieron afectados por las condiciones económicas imperantes, una parte cada vez mayor del presupuesto del Fondo General del ELA se asignó a los costos relacionados con la atención médica y las pensiones, los requisitos de la amortización de la deuda hasta el año fiscal 2017 y el financiamiento de servicios esenciales ha sido reducido. Las restricciones de liquidez del ELA, entre otros factores, han afectado sus calificaciones crediticias y su capacidad para obtener financiamiento a tasas de interés generales.

• En respuesta a la actual crisis fiscal del ELA, el Congreso de los Estados Unidos promulgó PROMESA y estableció la Junta de Supervisión. El 1 de mayo de 2017, la paralización temporal en virtud del Título IV de PROMESA caducó, lo que permitió que se reanudara el litigio sustancial presentado por los bonistas y otros acreedores contra el ELA y sus unidades de componentes y se iniciaran nuevos juicios. Como resultado, el 3 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el ELA al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal del Título III). El Título III de PROMESA incorpora las disposiciones de paralización automática de las secciones 362 y 922 del Código de Quiebras, que se

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

aplican a los casos del Título III a tenor con la sección 301(a) de PROMESA. En consecuencia, tras la presentación del caso del Título III del ELA, inmediatamente entró en vigencia una paralización automática para suspender el litigio del acreedor.

- Desde el 30 de junio de 2014, las principales agencias de calificación bajaron su calificación de los bonos de obligaciones generales del ELA, que ya habían sido colocados en una calificación de incumplimiento de "D". También bajaron de manera similar a una calificación de incumplimiento en sus calificaciones. los bonos de la AEP y el BGF, mientras que las calificaciones de los bonos de COFINA se han reducido múltiples niveles a un nivel de grado de no inversión actual de Ca, CC y D (según la agencia de calificación particular), aunque ciertos bonos de COFINA se han colocado en perspectiva positiva como resultado de la evolución de los casos del Título III.

- El Gobierno Primario refleja un déficit neto de aproximadamente $71,100 millones al 30 de junio de 2017. El Fondo General del ELA muestra un déficit de fondos de aproximadamente $100.6 millones al 30 de junio de 2017.

- Para los años fiscales terminados el 30 de junio de 2017, la Legislatura no asignó aproximadamente $85.4 millones, para los pagos de la amortización de la deuda de los bonos CFP, que son obligaciones de ciertas unidades componentes del ELA que se pagan únicamente con dichas asignaciones.

- El 6 de abril de 2016 se promulgó la Ley de Moratoria, según la que el ELA y algunas de sus unidades de componentes suspendieron sus respectivos pagos de la amortización de la deuda. En particular, el ELA suspendió el pago de aproximadamente $1,200 millones en amortización de la deuda sobre bonos de obligación general con vencimiento el 30 de junio de 2017. Para obtener información adicional sobre la Ley de Moratoria y otra legislación relevante, consulte la Notas 3 y la Nota 23.

*Plan de Remediación: Gobierno Primario*

El 13 de marzo de 2017, la Junta de Supervisión certificó el plan fiscal inicial para el ELA. El plan fiscal ha sido objeto de varias revisiones. El 27 de mayo de 2020, la Junta de Supervisión certificó su plan fiscal más reciente para el ELA (el Plan Fiscal de la Junta de Supervisión), que incluía las siguientes categorías de reformas estructurales y medidas fiscales:

(i)     *Reforma de Capital Humano y Bienestar*

(ii)    *Reforma para Facilidad de Hacer Negocios*

(iii)   *Reforma Regulatoria de Energía y Electricidad*

(iv)    *Reforma de Inversión de Infraestructura y Capital*

(v)     *Establecimiento de la Oficina del CFO*

(vi)    *Medidas de Eficiencia de la Agencia*

(vii)   *Reforma de Atención Médica*

(viii)  *Mejora de Cumplimiento y Tarifas Fiscales*

(ix)    *Reducción en Asignaciones de UPR y la Municipalidad*

(x)     *Reforma de Pensión*

(xi)    *Controles y Transparencia Fiscal*

No hay certeza de que el Plan Fiscal de la Junta de Supervisión (tal como está certificado actualmente o se haya enmendado y recertificado posteriormente) se implementará por completo, o si se implementa en última instancia, que proporcione los resultados previstos. Todos estos planes y medidas, y la capacidad del ELA de reducir su déficit y lograr un presupuesto equilibrado en los años fiscales futuros dependen de una serie de factores y riesgos, algunos de los cuales no están totalmente bajo su control.

El 27 de septiembre de 2019, la Junta de Supervisión presentó una propuesta de plan de ajuste de la deuda del ELA que reduciría la mayoría de las obligaciones de deuda del ELA en aproximadamente un 70% y establece una hoja de ruta para salir de la quiebra. A la fecha de estos estados financieros

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

básicos, la Declaración de Divulgación que acompaña al plan de ajuste propuesto aún no ha sido aprobada por el Tribunal del Título III y no se ha aprobado ninguna solicitud del plan propuesto. No se sabe si los acreedores elegibles votarán a favor o si el Tribunal del Título III finalmente confirmará el plan de ajuste propuesto por la Junta de Supervisión.

***(b) Empresa en Marcha: Sistemas de Retiro***

El ELA ha conservado históricamente tres sistemas de retiro: (i) SRE; (ii) SRJ; y (iii) SRM, (colectivamente, los Sistemas de Retiro).

Los sistemas de jubilación han estado muy subfinanciados durante los últimos años. Posteriormente, el SRM y el SRJ liquidaron todos sus activos para fines del año fiscal 2018. El SRE aún tiene activos que están en proceso de liquidación.

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el SRE al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El 15 de junio de 2017, el Fideicomisario de los Estados Unidos nombró al Comité Oficial de Empleados Retirados de Puerto Rico (el Comité de Personas Retiradas) en los casos del Título III del ELA.

*Plan de Remediación: Sistemas de Retiro*

El 23 de agosto de 2017, el Gobernador promulgó la Ley Núm. 106-2017, conocida como la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Empleados Públicos". A partir de la fecha de vigencia de la Ley 106-2017, los participantes del plan no acumularán beneficios adicionales en los Sistemas de Retiro. La Ley 106-2017 estableció el mecanismo PayGo a partir del 1 de julio de 2017 y reformó los Sistemas de Retiro para que sus participantes activos depositaran sus contribuciones individuales en un nuevo Plan de Aportación Definida, similar a un plan 401(k), que sería administrado por una entidad privada.

La información detallada sobre los problemas de liquidez y solvencia de los Sistemas de Retiro y los planes de remediación correspondientes se revelan en las notas de los estados financieros básicos auditados independientes del Sistemas de Retiro de 2017.

***(c) Empresa en Marcha: Unidades de Componentes de Presentación Discreta***

Se ha identificado que las siguientes unidades de componentes mayores de presentación discreta tienen dudas sustanciales sobre su capacidad para continuar como empresa en marcha. A continuación, se describen las circunstancias y el plan de remediación de las unidades de componentes mayores de presentación discreta.

*(i) BGF*

Los estados financieros básicos auditados independientes del BGF revelan que hay dudas sustanciales sobre la capacidad del BGF de continuar como empresa en marcha por los motivos siguientes:

- El BGF tradicionalmente se desempeñó como prestamista interino del ELA, sus unidades de componentes y municipios en previsión de la emisión de bonos y pagarés a largo plazo por dichas entidades en el mercado de bonos municipales. El BGF también proporcionó financiamiento al ELA y sus unidades de componentes para financiar sus respectivos déficits presupuestarios, requisitos de garantía en virtud de los acuerdos de intercambio y para cumplir con los pagos obligatorios de las obligaciones. Como resultado, la liquidez y la condición financiera del BGF dependían en gran medida del pago de los préstamos otorgados al ELA y sus unidades de componentes. Las condiciones que afectan negativamente la capacidad del ELA y sus unidades de componentes para recaudar efectivo (incluido el acceso limitado a los mercados de capital) y reembolsar sus préstamos provisionales y otros préstamos al BGF tuvieron un efecto adverso sobre la liquidez y la situación financiera del BGF.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

- Según la Ley de Moratoria (enmendada por la Ley Núm. 2-2017), se creó la AAFAF, como una corporación pública independiente para asumir el papel del BGF como agente fiscal, asesor financiero y agente de informes para el ELA, sus unidades de componentes y municipios.

*Plan de Remediación: BGF*

Tras el establecimiento de la AAFAF, el papel del BGF se redujo para actuar como agente en (i) recaudar en su cartera de préstamos y (ii) desembolsar fondos de acuerdo con estrictas pautas de prioridad. En consecuencia, teniendo en cuenta el escenario descrito anteriormente, dados los servicios reducidos que el BGF estaba proporcionando y dado que no se asignaron créditos al BGF para el año fiscal 2018 y 2019, la gerencia del BGF inició un proceso de liquidación según el Título VI de PROMESA, que consiste en un acuerdo de reestructuración suscrito por la AAFAF y el BGF con una porción significativa de los principales accionistas del BGF sujetos a diferentes hitos.

Para obtener información detallada sobre el cese de operaciones del BGF, consulte las notas de los estados financieros básicos auditados independientes del BGF de 2017.

(ii) *ACT*

Los estados financieros básicos auditados independientes de la ACT revelan que hay dudas sustanciales sobre la capacidad del ACT de continuar como empresa en marcha por los motivos siguientes:

- La ACT ha experimentado importantes pérdidas recurrentes en las operaciones y enfrenta una serie de desafíos comerciales que se han visto exacerbados por la recesión económica del ELA y el hecho de que la ACT no ha aumentado sus ingresos para cubrir sus crecientes costos.

- La ACT no tiene fondos suficientes disponibles para pagar sus diversas obligaciones a su vencimiento o las que están actualmente en estado de mora. La ACT no ha podido aumentar sus ingresos, reducir sus costos y mejorar su liquidez. Los pasivos corrientes de ACT superan sus activos totales en aproximadamente $2,500 millones y tiene un déficit acumulado de aproximadamente $1,100 millones.

- Además, el ELA y sus unidades de componentes, incluido el BGF, han brindado anteriormente un apoyo y financiamiento significativos para las obligaciones de la ACT. El ELA y dichas entidades están experimentando dificultades financieras y no pueden continuar prorrogando, refinanciando o proporcionando la liquidez necesaria a la ACT cuando sea necesario. Como tal, los incumplimientos actuales pueden no subsanarse y los futuros incumplimientos de las obligaciones de la ACT no pueden evitarse.

- El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la ACT al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal del Título III. La ACT está operando actualmente bajo la protección del Tribunal del Título III.

*Plan de Remediación: ACT*

El 26 de junio de 2020, la Junta de Supervisión aprobó un plan fiscal para proporcionar una hoja de ruta para transformar no solo la ACT, sino también la infraestructura en todo Puerto Rico para fomentar el crecimiento económico. La ACT tiene cuatro objetivos alineados con esta meta: (a) implementación de proyectos de tránsito, seguridad y protección,
(b) mejorar la infraestructura de transporte existente, (c) completar los sistemas de carreteras, y
(d) reducir el tráfico.

No hay certeza de que cualquier plan fiscal certificado para ACT se implementará por completo o, si se implementa, finalmente proporcionará los resultados esperados.

La información detallada sobre las condiciones y los eventos de la ACT que generan dudas sobre su capacidad para continuar como empresa en funcionamiento y los planes de remediación

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

correspondientes se divulgan en las notas de los estados financieros básicos auditados independientes del año fiscal 2017 de la PHRTA.

*(iii)   AEE*

Los estados financieros básicos auditados independientes de la AEE revelan que hay dudas sustanciales sobre su capacidad de continuar como empresa en marcha por los motivos siguientes:

- La AEE no ha cumplido con varias obligaciones de deuda y actualmente no tiene fondos suficientes disponibles para pagar sus obligaciones a su vencimiento.

- El ELA y sus unidades de componentes también están experimentando dificultades financieras y no han podido reembolsar los montos adeudados a la AEE.

- La AEE tiene un déficit acumulado de aproximadamente $6,000 millones al 30 de junio de 2017, y durante el año terminado el 30 de junio de 2017, el déficit aumentó aproximadamente $1,200 millones.

- El 2 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEE al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal del Título III. La AEE está operando actualmente bajo la protección del Tribunal del Título III.

*Plan de Remediación: AEE*

El 29 de junio de 2020, la Junta de Supervisión aprobó un nuevo plan fiscal que marca un camino para la reorganización operativa y financiera de la AEE y la transformación del sistema energético de Puerto Rico.

No hay certeza de que cualquier plan fiscal certificado para la AEE se implementará por completo o, si llegara a implementarse, finalmente proporcionará los resultados esperados.

La información detallada sobre las condiciones y los eventos de la AEE que generan dudas sobre su capacidad para continuar como empresa en funcionamiento y los planes de remediación correspondientes se divulgan en las notas de los estados financieros básicos auditados independientes del año fiscal 2017 de la AEE.

*(iv)   AAA*

Los estados financieros básicos auditados independientes de la AAA revelan que hay dudas sustanciales sobre su capacidad de continuar como empresa en marcha por los motivos siguientes:

- La AAA ha estado experimentando dificultades recurrentes de flujo de efectivo y financiamiento. Los resultados netos de la AAA disminuyeron aproximadamente en $204 millones durante el año terminado el 30 de junio de 2017 y tenía una deficiencia de capital de trabajo de aproximadamente $426 millones al 30 de junio de 2017. Además, la AAA no había realizado los pagos trimestrales de capital e intereses del pagaré a plazo por pagar con el BGF desde diciembre de 2015.

- La AAA ha tenido pérdidas recurrentes significativas, deficiencias de capital de trabajo, rebajas de calificación crediticia y grandes gastos de capital no discrecionales.

- La AAA ha financiado históricamente su Programa de Mejora de Capital a largo plazo ("CIP") con acuerdos de financiamiento de deuda a largo plazo. La incapacidad actual de la AAA para el mercado financiero reduce su capacidad para obtener financiamiento a largo plazo en su CIP.

- El 30 de junio de 2017, la AAA, con el reconocimiento y apoyo de la Agencia de Protección Ambiental de los Estados Unidos (EPA), firmó un Acuerdo de Tolerancia con e; PRDOH, el administrador de PRSDWTRLF, la JCA, el administrador de PRSDWTRLF, y AFI, agente operativo para el SRFP, autorizado para ayudar al PRDOH y JCA con las actividades

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

administrativas, financieras y contables del SRFP. Según el Acuerdo de Tolerancia, ciertos pagos adeudados bajo los préstamos de la SRFP fueron diferidos mediante una serie de enmiendas.

- La AAA no es un deudor en un caso de Título III.

*Plan de Remediación: AAA*

El 26 de julio de 2019, la AAA y la AAFAF consumaron acuerdos definitivos (los Acuerdos) que reestructuraron las obligaciones de deuda de la AAA bajo los préstamos SRFP y los Bonos de desarrollo rural (RD Bonds) por un total de aproximadamente $1,000 millones (los préstamos SRFP y las deudas).

Los Acuerdos fueron aprobados por la Junta de Supervisión a tenor con la Sección 207 de PROMESA que puso fin a la garantía financiera de no canje existente proporcionada por el ELA sobre la Deuda Federal y redujo los pasivos contingentes del ELA en aproximadamente $1,000 millones y consolidó la deuda reestructurada en dos préstamos SRFP y un Préstamo RD, lo que amplió sus vencimientos y bajó sus tasas de interés.

El 29 de junio de 2020, la Junta de Supervisión aprobó un nuevo plan fiscal para la AAA.

No hay certeza de que cualquier plan fiscal certificado para la AAA se implementará por completo o, si llegara a implementarse, finalmente, proporcionará los resultados esperados.

La información detallada sobre las condiciones y los eventos de la AAA que generan dudas sobre su capacidad para continuar como empresa en funcionamiento y los planes fiscales correspondientes se divulgan en las notas de los estados financieros básicos auditados independientes del año fiscal 2017 de la AAA.

*(v)   UPR*

Los estados financieros básicos auditados independientes de la UPR revelan que hay dudas sustanciales sobre su capacidad de continuar como empresa en marcha por los motivos siguientes:

- La UPR tenía una posición de déficit no restringido de aproximadamente $1,900 millones al 30 de junio de 2017.

- La UPR ha tenido pérdidas operativas recurrentes, ha dependido en gran medida de las asignaciones del ELA para financiar sus operaciones e históricamente ha dependido del BGF para obtener liquidez. Aproximadamente el 68% de los ingresos totales de la UPR se derivaron de las asignaciones del ELA para el año que finalizó el 30 de junio de 2017. La capacidad de la UPR para continuar recibiendo un apoyo operativo similar del ELA y obtener financiamiento externo es incierta.

- La Ley Núm. 66-2016 congeló los beneficios de las asignaciones basadas en fórmulas de la UPR en aproximadamente $833.9 millones hasta los años fiscales terminados el 30 de junio de 2017.

- La UPR tiene una capacidad limitada para aumentar los ingresos operativos debido a los desafíos económicos y políticos de mantener la inscripción y aumentar la matrícula.

- La UPR no es un deudor en un caso de Título III.

- El 29 de junio de 2017, la UPR y el fideicomisario de los Bonos de Ingresos del Sistema UPR celebraron un acuerdo de paralización (el Acuerdo de Paralización), en virtud del cual la UPR acordó transferir a una cuenta separada, en beneficio de los tenedores de los bonos de ingresos, ciertos montos con respecto a los ingresos pignorados con la condición de que, durante el período cubierto del Acuerdo de paralización temporal el fiduciario no instituiría, comenzaría o continuaría ningún procedimiento legal contra la UPR, el Estado Libre Asociado o cualquiera de sus agencias, instrumentalidades o municipalidades de este, para hacer valer los derechos relacionados con los bonos de ingresos. El Acuerdo de Congelamiento ha sido objeto de varias ampliaciones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Plan de Remediación: UPR*

El 12 de junio de 2020, la Junta de Supervisión certificó una nueva versión del plan fiscal de la UPR.

No hay certeza de que cualquier plan fiscal certificado para la UPR se implementará por completo o, si llegara a implementarse, finalmente, proporcionará los resultados esperados.

La información detallada sobre las condiciones y los eventos de la UPR que generan dudas sobre su capacidad para continuar como empresa en funcionamiento y los planes de remediación correspondientes se divulgan en las notas de los estados financieros básicos auditados independientes del año fiscal 2017 de la UPR.

*(vi)   Otras Unidades de Componentes No Mayores de Presentación Discreta*

Hay otras unidades de componentes que no son importantes y de presentación discreta que han acumulado déficits y otras que, incluso sin déficits, tienen deuda pendiente pagadera al BGF o están sujetas a la Ley de Moratoria y órdenes ejecutivas relacionadas. De manera similar, a las razones presentadas anteriormente para el Gobierno Primario del ELA y sus principales unidades componentes de presentación discreta, existe incertidumbre en cuanto a la capacidad de otras unidades componentes no principales de presentación discreta para satisfacer sus obligaciones a medida que se vencen, lo que genera dudas sustanciales sobre su capacidad para continuar como una empresa en marcha.

Además, hay otras unidades de componentes no mayores de presentación discreta que, aunque no tienen una posición de déficit, o préstamos pendientes con el BGF al 30 de junio de 2017, y no han sido afectados por la Ley de Moratoria y las órdenes ejecutivas relacionadas, dependen en gran medida de apoyo brindado por el ELA y han dependido del BGF como su única opción para obtener financiamiento para financiar sus operaciones. El apoyo financiero proporcionado por el ELA depende de su inclusión en las asignaciones presupuestarias de su Fondo General y la aprobación de la Legislatura. Una reducción en el monto de estas contribuciones podría generar dificultades financieras para estas entidades, incluida la incertidumbre en cuanto a su capacidad para cumplir con sus obligaciones a su vencimiento, lo que genera dudas sustanciales sobre su capacidad para continuar como empresa en marcha. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23.

**(3)   PROMESA y Otra Legislación Relacionada con la Reestructuración de la Deuda**

Como se analizó en la Nota 2, el ELA y muchas de sus unidades de componentes se encuentran en medio de una profunda crisis económica y fiscal, que ha provocado, entre otras cosas, el inicio de medidas financieras dirigidas a restablecer la estabilidad fiscal y financiera, como varias leyes estatales y federales que se han aprobado en los últimos años. El 30 de junio de 2016, el Congreso de los Estados Unidos promulgó PROMESA para abordar estos problemas. Durante los años fiscales posteriores al 30 de junio de 2016, el ELA y otras entidades gubernamentales, como COFINA, ACT, SRE, AEE, AEP y BGF han iniciado procedimientos de PROMESA a solicitud del Gobernador para reestructurar o ajustar su deuda existente. A continuación, se mencionan las leyes estatales y federales más relevantes promulgadas para abordar la crisis fiscal e iniciar la recuperación económica:

**(a)   Medidas Fiscales antes de PROMESA**

*(i)   Retención por parte del gobierno de los ingresos tributarios asignados condicionalmente a ciertas corporaciones públicas y disposiciones de prioridad de pago*

El 1 de diciembre de 2015, el Gobernador firmó la Orden Ejecutiva Núm. 46 (Orden Ejecutiva Núm. 46). La Orden ejecutiva Núm. 46 ordenó al Secretario del DOT retener ciertos recursos disponibles del ELA a la luz de los estimados revisados de ingresos para el año fiscal 2016 y la situación deteriorada de liquidez del ELA. A tenor con tal orden ejecutiva, el Secretario del DOT retuvo los ingresos asignados condicionalmente a la ACT, AFI, ADCCPR y AMA para el pago de la amortización de la deuda de sus bonos durante el año fiscal 2016. Desde el año fiscal 2017, el ELA

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

retienen dichos ingresos a tenor con ciertas leyes, que incluyen, entre otras, (a) la Ley de Moratoria y Ley Núm. 5 (analizadas a continuación), y (b) la paralización automática según el Título III de PROMESA. El uso de estos ingresos es objeto de litigios en curso, como se menciona en la Nota 17.

*(ii)   Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico y órdenes ejecutivas relacionadas*

El 6 de abril de 2016, el ELA promulgó la Ley de Moratoria. A tenor con la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas declarando un período de emergencia, una moratoria y varias otras medidas con respecto a ciertas obligaciones del ELA y varios de sus organismos. A tenor con estas órdenes ejecutivas, ciertas entidades del ELA: (i) no realizaron pagos de la amortización de la deuda, (ii) realizaron pagos de la amortización de la deuda con fondos depositados en los fideicomisarios de sus bonos, o (iii) no recibieron ni transfirieron ciertos ingresos. Dichas órdenes ejecutivas también impusieron restricciones significativas al desembolso de los fondos depositados en el BGF y suspendieron el desembolso de préstamos por el BGF.

La implementación de la Ley de Moratoria y sus órdenes ejecutivas relacionadas es objeto de litigio en curso, como se analiza en la Nota 17. Tras la promulgación de PROMESA el 30 de junio de 2016, la Suspensión del Título IV (discutida a continuación) se aplicó para suspender este litigio hasta que la Suspensión del Título IV caducó el 1 de mayo de 2017. Desde el inicio del caso del Título III del ELA el 3 de mayo de 2017, se ha aplicado la paralización automática, según el Título III de PROMESA, para continuar la paralización de este litigio y evitar los pagos de la amortización de la deuda a los bonistas.

**(b)   PROMESA y Otra Legislación de Puerto Rico**

*(i)   PROMESA*

En términos generales, PROMESA busca proporcionar al ELA disciplina fiscal y económica a través de, entre otras cosas: (i) el establecimiento de la Junta de Supervisión, cuyas responsabilidades incluyen la certificación de planes y presupuestos fiscales para el ELA y sus entidades relacionadas; el Título VI de PROMEDA y (ii) dos métodos alternativos para ajustar la deuda insostenible (a) un proceso voluntario de modificación de deuda en virtud del Título VI de PROMESA, que establece un proceso de reestructuración de la deuda en gran medida extrajudicial mediante la que una supermayoría de acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento similar a la quiebra en virtud del Título III de PROMESA, que establece un proceso de reestructuración de la deuda en el tribunal sustancialmente basado en las disposiciones incorporadas Título 11 del Código de los EE. UU. (Código de Quiebras de los EE. UU.). Cada uno de estos elementos se divide entre los siete títulos de PROMESA, como se describe brevemente a continuación.

*(a)   Título I - Establecimiento de la Junta de Supervisión y Asuntos Administrativos*

Tras la promulgación de PROMESA, se estableció la Junta de Supervisión para Puerto Rico. Como se indica en PROMESA, "el propósito de la Junta de Supervisión es proporcionar un método para que un territorio cubierto logre la responsabilidad fiscal y el acceso a los mercados de capitales". El 31 de agosto de 2016, el Presidente de los Estados Unidos anunció el nombramiento de los miembros de la Junta de Supervisión. Cada miembro de la Junta de Supervisión debe tener "conocimiento y experiencia en finanzas, mercados de bonos municipales, administración, leyes u organización u operación de negocios o gobierno". La Junta de Supervisión fue "creada como una entidad dentro del gobierno territorial para el cual fue establecida" y expresamente no es una entidad del gobierno federal, pero también fue establecida para actuar independientemente del gobierno del ELA, de forma tal que ni el Gobernador ni la Legislatura pueden "(1) ejercer cualquier control, vigilancia, supervisión o revisión sobre la Junta de Supervisión o sus actividades; o (2) aprobar, implementar o exigir el cumplimiento de cualquier estatuto, resolución, política o regla que perjudique o anule los propósitos de [PROMESA], según lo determine la Junta de Supervisión.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(b)   *Título II - Plan Fiscal y Proceso de Certificación Presupuestaria y Cumplimiento*

El Título II establece los requisitos para proponer y certificar planes y presupuestos fiscales para el ELA y sus instrumentos. "Cada plan fiscal sirve como piedra angular para las reformas estructurales que la Junta de Supervisión considera necesarias para garantizar que el territorio, o la instrumentalidad, se encaminen hacia la responsabilidad fiscal y el acceso a los mercados de capitales".

Solo después de que la Junta de Supervisión haya certificado un plan fiscal, el Gobernador puede presentar a la Legislatura un presupuesto del año fiscal del ELA y presupuestos del año fiscal para ciertos instrumentos del ELA (según lo aprobado por la Junta de Supervisión).

En cumplimiento de los deberes anteriores, PROMESA contiene una disposición que otorga facultades a la Junta de Supervisión para supervisar el cumplimiento de los planes y presupuestos fiscales certificados y emprender ciertas acciones, incluidas las reducciones de gastos y la presentación de acciones recomendadas al Gobernador que promuevan el cumplimiento presupuestario. Consulte el texto de PROMESA para obtener una descripción completa de las facultades de la Junta de Supervisión relacionados con el plan fiscal y el cumplimiento presupuestario.

(c)   *Título III – Proceso de Restructuración en el Tribunal*

El Título III de PROMESA establece un proceso en el tribunal para la reestructuración de las deudas de Puerto Rico y otros territorios de los Estados Unidos que se basa en el proceso del Capítulo 9 del Código de Quiebras de los Estados Unidos.

La Junta de Supervisión tiene la autoridad exclusiva para presentar una petición voluntaria de protección en virtud del Título III de PROMESA, sujeto a sus requisitos previos.

En un caso del Título III, la Junta de Supervisión actúa como representante del deudor y está autorizada a tomar las medidas necesarias para procesar el caso del Título III. Inmediatamente después de radicar la petición del Título III, la sección 362 del Código de Quiebras (que se incorpora a los casos del Título III bajo PROMESA) se aplica para paralizar automáticamente todos los litigios contra el deudor (la Paralización del Título III). Un caso del Título III culmina en la confirmación de un plan de ajuste de las deudas del deudor. La Junta de Supervisión tiene la autoridad exclusiva de presentar y modificar un plan de ajuste antes de la confirmación.

(d)   *Título IV - Paralización Temporal de Litigios, Informes Gubernamentales y Otras Disposiciones Misceláneas*

El Título IV de PROMESA contiene varias disposiciones misceláneas, que incluyen una paralización temporal de litigios relacionados con "Reclamaciones de pasivos", alivio de ciertas leyes salariales y por hora, el establecimiento de un Grupo de trabajo del Congreso sobre crecimiento económico en Puerto Rico (el Grupo de trabajo), el requisito de que la Oficina del Contralor General de los Estados Unidos presente dos informes al Congreso sobre los niveles de deuda pública de los territorios estadounidenses y la expansión del programa HUBZone de pequeñas empresas del gobierno federal en Puerto Rico.

A tenor con la sección 405 de PROMESA, la promulgación de PROMESA impuso de forma inmediata y automática una paralización temporal (la Paralización del Título IV) desde el 30 de junio de 2016 (la fecha de promulgación de PROMESA) hasta el 15 de febrero de 2017 de todos los litigios de "Reclamación de pasivos" iniciados contra el ELA y sus instrumentos después del 18 de diciembre de 2015. Una "Reclamación de Pasivos" se define como cualquier derecho de pago o remedio equitativo por incumplimiento de desempeño relacionado con "un bono, préstamo, carta de crédito, otro título de préstamo, obligación de seguro u otra deuda financiera por dinero prestado, incluidos los derechos, derechos u obligaciones, ya sea que dichos derechos u obligaciones surjan de un contrato, estatuto o cualquier otra fuente de ley relacionada [a la

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

misma]" para la cual el ELA o uno de sus instrumentos fue el emisor, el deudor o el garante y se incurrió en tales pasivos antes del 30 de junio de 2016. La Paralización del Título IV estaba sujeta a una extensión de 75 días por la Junta de Supervisión o una extensión de 60 días por el Tribunal de Distrito de los Estados Unidos. El 28 de enero de 2017, la Junta de Supervisión prorrogó la Paralización del Título IV por 75 días hasta el 1 de mayo de 2017, momento en el cual la Paralización del Título IV caducó

El Título IV de PROMESA también requirió varios informes del gobierno federal. En primer lugar, PROMESA estableció la Fuerza de Trabajo dentro de la rama legislativa del gobierno federal de los Estados Unidos. La Fuerza de Trabajo presentó su informe al Congreso el 20 de diciembre de 2016.

En segundo lugar, PROMESA requirió que la Oficina del Contralor General de los EE. UU., a través de la Oficina de Responsabilidad del Gobierno (GAO), presente un informe a la Cámara y al Senado antes del 30 de diciembre de 2017 con respecto a: (i) las condiciones que llevaron al nivel actual de deuda de Puerto Rico; (ii) cómo las acciones del gobierno mejoraron o deterioraron su condición financiera; y (iii) recomendaciones sobre nuevas acciones o políticas fiscales que el ELA podría adoptar. La GAO publicó este informe el 9 de mayo de 2018.

En tercer lugar, PROMESA requirió que el Oficina del Contralor General de los EE. UU., a través de la GAO, presentara al Congreso antes del 30 de junio de 2017 un informe sobre la deuda pública de los territorios de los EE. UU. Además de su informe inicial, la GAO debe presentar al Congreso informes actualizados sobre la deuda pública al menos una vez cada dos años. La GAO publicó este informe el 2 de octubre de 2017. La GAO publicó su informe inicial el 2 de octubre de 2017. El 28 de junio de 2019, la GAO publicó su último informe semestral sobre la deuda pública de los territorios estadounidenses.

(e)  *Título V - Revitalización de Infraestructura*

El Título V de PROMESA establece el puesto de Coordinador de Revitalización bajo la Junta de Supervisión y proporciona un marco para la revitalización de la infraestructura a través de un proceso de autorización acelerado para "proyectos críticos" según lo identificado por el Coordinador de Revitalización.

(f)  *Título VI - Proceso de Modificación de Deuda Extrajudicial Consensual*

El Título VI de PROMESA establece un proceso extrajudicial para modificar las deudas de Puerto Rico. Según la sección 601 (d) de PROMESA, la Junta de Supervisión está autorizada a establecer "grupos" de bonos emitidos por cada emisor relacionado con el gobierno de Puerto Rico en función de las prioridades relativas. Después de establecer los grupos, el emisor del gobierno o cualquier tenedor de bonos o grupo de bonistas pueden proponer una modificación a una o más series de bonos del emisor del gobierno. Si existe un acuerdo voluntario, la Junta de Supervisión debe emitir una certificación y ejecutar una serie de procesos adicionales para calificar la modificación.

Finalmente, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico debe emitir una orden para aprobar la Modificación Calificante y otorgar al emisor todos los bienes libres de cargas y gravámenes de reclamaciones con respecto a cualquier bono.

El proceso del Título VI se implementó con éxito para reestructurar las deudas del BGF. El proceso del Título VI del BGF se trata a continuación en unidades de componentes de presentación discreta: BGF, modificación de calificación y proceso de aprobación del Título VI.

(g)  *Título VII: Sentido del Congreso*

El Título VII de PROMESA establece el sentido del Congreso de que "cualquier solución duradera para la crisis fiscal y económica de Puerto Rico debe incluir reformas fiscales permanentes y favorables al crecimiento que presenten, entre otros elementos, un flujo libre de capital entre los territorios de los Estados Unidos y el resto de los Estados Unidos".

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(ii)     *Legislación de Puerto Rico y Otras Medidas Fiscales*

La Ley Núm. 2-2017), la Ley de la Autoridad Fiscal y de Asesoramiento Financiero de Puerto Rico, se promulgó para ampliar las facultades y la autoridad de la AAFAF (como se estableció inicialmente en virtud de la Ley de Moratoria) para que la AAFAF tenga la responsabilidad exclusiva de negociar, reestructurar y llegar a acuerdos con los acreedores sobre la totalidad o parte de la deuda pública o cualquier otra deuda emitida por cualquier entidad del ELA La AAFAF también es responsable de los esfuerzos de colaboración, comunicación y cooperación entre el ELA y la Junta de Supervisión en virtud de PROMESA. Además, la Ley Núm. 2-2017 estableció a la AAFAF como la entidad del ELA responsable de llevar a cabo las funciones heredadas del BGF junto con deberes y facultades adicionales, que incluyen, entre otras actividades: (i) supervisión del presupuesto del ELA; (ii) una presencia administrativa en cada junta o comité donde el presidente del BGF es actualmente miembro; (iii) autoridad para realizar auditorías e investigaciones; y (iv) autoridad para congelar partidas presupuestarias, nombrar fideicomisarios, redistribuir recursos humanos y cambiar los procedimientos.

La Ley Núm. 3-2017, la Ley de Gestión de Crisis Fiscal, se promulgó para prorrogar la mayoría de las medidas fiscales que se habían adoptado en virtud de la Ley Núm. 66-2014 hasta el 1 de julio de 2021, incluida una extensión de 10 años del arbitrio sobre las adquisiciones de corporaciones extranjeras en virtud de la Ley Núm. 154-2010.

La Ley Núm. 5-2017, la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico, le permitió al ELA segregar fondos que eventualmente se utilizarían para financiar el pago de la deuda pública. La Ley Núm. 5-2017 establece que el Gobernador puede pagar la amortización de la deuda siempre que el ELA pueda continuar financiando servicios esenciales, como la salud, la seguridad y el bienestar de la gente de Puerto Rico, incluido el suministro de su educación y asistencia a los residentes. La Ley Núm. 5-2017 continuó la declaración del ELA en estado de emergencia y aumentó las facultades del Gobernador para administrar las finanzas del ELA. El período de emergencia en virtud de la Ley Núm. 5-2017, expiraba el 1 de mayo de 2017 para coincidir con el vencimiento de la paralización del Título IV (como se explicó anteriormente), a menos que se extienda por tres meses adicionales por orden ejecutiva. El 30 de abril de 2017, el Gobernador emitió la orden ejecutiva OE-2017-031, que prorrogó el período de emergencia de la Ley Núm. 5-2017 hasta el 1 de agosto de 2017. El 19 de julio de 2017, la Legislatura promulgó la Ley Núm. 46-2017, que extendió aún más el período de emergencia de la Ley Núm. 5-2017 hasta el 31 de diciembre de 2017. La Ley Núm. 46-2017 permitió al Gobernador firmar órdenes ejecutivas para extender el período de emergencia por períodos sucesivos de seis meses, siempre que la Junta de Supervisión permanezca establecida para Puerto Rico en virtud de PROMESA El 27 de junio de 2019, el Gobernador emitió la orden ejecutiva OE-2019-030, que extendió el período de emergencia hasta el 31 de diciembre de 2019. El 31 de diciembre de 2019, el Gobernador emitió la orden ejecutiva OE-2019-066, que extendió el período de emergencia hasta el 30 de junio de 2020.

La Ley Núm. 106-2017, la Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Empleados Públicos, reformó las pensiones del ELA reemplazando las juntas de gobierno de los Sistemas de Retiro con una sola Junta de Retiro del Estado Libre Asociado de Puerto Rico (Junta de jubilación) y estableció una "Cuenta separada para el Pago de las Pensiones Acumuladas" para implementar un método PayGo mediante el que el ELA pague los beneficios de pensiones móviles a los jubilados del gobierno. La Ley Núm. 106-2017 creó el marco legal para que el ELA pueda realizar los pagos a los pensionados a través del sistema PayGo.

La Ley Núm. 109-2017, la Ley de Reestructuración de la Deuda del Banco Gubernamental de Fomento para Puerto Rico (Ley de Reestructuración del BGF [RSA]), efectuó el Plan Fiscal del BGF y proporcionó un camino para la implementación del RSA del BGF para cubrir las reclamaciones del ELA y sus organismos contra el BGF. La Ley Núm. 109-2017 creó dos entidades de propósito especial, la Autoridad de Recuperación de la Deuda del BGF y el Fideicomiso de Entidades Públicas, donde el BGF dividiría y transferiría irrevocablemente sus activos. Como se analiza a continuación, estas entidades se utilizaron para completar las transacciones en la Modificación de Calificación del

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

BGF, según lo aprobado por el Tribunal de Distrito en virtud del Título VI de PROMESA.

La Ley Núm. 241-2018, la Ley de la Corporación del Fondo de Interés Apremiante de Puerto Rico, modificó y reformuló la Ley Núm. 91-2006 para establecer el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA mediante, entre otras cosas, autorizar la emisión de nuevos bonos de COFINA necesarios para completar las transacciones contempladas en el Plan de Ajuste de COFINA, como se analiza a continuación y en la Nota 17(c).

La Ley Núm.29-2019, Ley de Reducción de Cargas Administrativas de los Municipios, abordó la severa crisis financiera y la escasez de liquidez de los municipios de Puerto Rico al aliviarlos de sus obligaciones de realizar pagos PayGo al ELA y otros pagos a la ASES, según la Ley 106-2017. La Junta de Supervisión apeló la implementación y ejecución de la Ley Núm. 29-2019, según se analiza a continuación en la Nota 17(c). El 15 de abril de 2020, el Tribunal del Título III emitió una orden en la que determinó que la Ley Núm. 29-2019 es inaplicable y prohíbe permanentemente al ELA su implementación y aplicación a partir del 6 de mayo de 2020. La AAFAF y la Junta de Supervisión continúan discutiendo alternativas a la Ley Núm. 29-2019.

**(c) Casos del Título III de PROMESA**

*(i) Inicio de Casos del Título III de la Junta de Supervisión*

El 1 de mayo de 2017, la Paralización del Título IV expiró, lo que permitió que se reanudaran los litigios sustanciales presentados por los bonistas y otros acreedores contra el ELA y sus organismos. El 3 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el ELA al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal del Título III). El 5 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso para COFINA en virtud del Título III al presentar una solicitud de reparación similar en virtud del Título III de PROMESA en el Tribunal del Título III.

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició casos del Título III para ACT y el SRE radicando peticiones similares de alivio en virtud del Título III de PROMESA en el Tribunal del Título III. El 5 de mayo de 2017, el presidente de la Corte Suprema de los Estados Unidos, John Roberts, emitió una orden en la que se designaba a la jueza del Tribunal de Distrito de los Estados Unidos, Laura Taylor Swain, del Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Nueva York, como juez que presidía los casos del Título III a tenor con la sección de PROMESA 308(a). El 7 de junio de 2017, la Juez Principal del Tribunal de Distrito de los Estados Unidos Aida M. Delgado-Colón del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico emitió una orden en la que designaba a la Jueza Magistrada de los Estados Unidos Judith Gail Dein del Tribunal de Distrito de los Estados Unidos para el Distrito de Massachusetts para ayudar a la juez Swain en asuntos previos al juicio, vistas probatorias y otros asuntos autorizados por 28 USC § 636(a)-(c). El 15 de junio de 2017, el Fideicomisario de los Estados Unidos nombró un Comité Oficial de Empleados Jubilados (el Comité de Jubilados) en los casos del Título III del Estado Libre Asociado y nombró un Comité Oficial de Acreedores No Garantizados para todos los deudores del Título III que no sean COFINA (el Comité de Acreedores).

El 3 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso para AEE en virtud del Título III al presentar una solicitud de reparación similar en virtud del Título III de PROMESA en el Tribunal del Título III. El 27 de septiembre de 2019, la Junta de Supervisión, a solicitud del Gobernador, inició un caso para la AEP en virtud del Título III al presentar una solicitud de reparación similar en virtud del Título III de PROMESA en el Tribunal del Título III. Todos los casos anteriores del Título III se han consolidado solo con fines de procedimiento y se administran conjuntamente en virtud del Caso Núm. 17-3283-LTS en el Tribunal del Título III.

Los casos del Título III comenzaron en parte debido a la expiración del 1 de mayo de 2017 de la Paralización del Título IV. El Título III de PROMESA incorpora las disposiciones de paralización automática de las secciones 362 y 922 del Código de Quiebras, que se aplican a los casos del Título

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

III a tenor con la sección 301(a) de PROMESA. En consecuencia, tras la radicación de los casos del Título III, la Paralización del Título III entró en vigencia inmediatamente para paralizar el litigio de acreedores. Todas las reclamaciones contra cualquier deudor en virtud del Título III que surgieron antes de la radicación de su respectivo caso del Título III (ya sea discutidas o no en este documento) pueden estar sujetas a las leyes que rigen el Título III.

El 7 de agosto de 2017, un grupo de bonistas GO liderados por Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (colectivamente, Aurelius) radicaron una moción para desestimar las peticiones del Título III. En la moción, Aurelius argumentó que el nombramiento de los miembros de la Junta de Supervisión violó la "Cláusula de Nombramientos" de la Constitución de los Estados Unidos, que requiere que los "funcionarios principales" de los Estados Unidos sean nombrados por el Presidente y confirmados por el Senado. El Tribunal del Título III negó la moción de desestimación de Aurelius, y Aurelius apeló ante el Tribunal de Apelaciones del Primer Circuito. El 15 de febrero de 2019, el Primer Circuito revocó el Tribunal del Título III, sosteniendo que el proceso de nombramiento de los miembros de la Junta de Supervisión violó la Cláusula de Nombramientos. El Primer Circuito paralizó su decisión durante 90 días para permitir que el Presidente y el Senado designen a la Junta de Supervisión de acuerdo con la Constitución de los Estados Unidos. También validó expresamente todas las acciones pasadas de la Junta de Supervisión, incluidas las acciones tomadas por la Junta de Supervisión durante el período de paralización de 90 días.

El 23 de abril de 2019, la Junta de Supervisión apeló la decisión del Primer Circuito ante la Corte Suprema de los Estados Unidos mediante la presentación de una petición para un auto de certiorari. El 24 de abril de 2019, la Junta de Supervisión presentó una moción en el Primer Circuito solicitando una extensión de la paralización de 90 días de su decisión del 15 de febrero hasta la disposición final del caso por parte de la Corte Suprema. El 6 de mayo de 2019, el Primer Circuito concedió en parte la moción de extensión de la Junta de Supervisión al prorrogar la paralización de su decisión del 15 de febrero hasta el 15 de julio de 2019, pero denegó la solicitud de extender la paralización indefinidamente hasta la disposición final del caso por parte de la Corte Suprema.

El 30 de mayo de 2019, Aurelius presentó una petición cruzada para un auto de certiorari en la Corte Suprema de los Estados Unidos para impugnar la validación del Primer Circuito de las acciones pasadas de la Junta de Supervisión según la doctrina de oficial de facto. El 6 de junio de 2019, el Procurador General de los Estados Unidos y el Comité de Acreedores presentaron cada uno peticiones separadas de autos de certiorari en la Corte Suprema de los Estados Unidos para determinar si los miembros de la Junta de Supervisión son "Oficiales de los Estados Unidos" dentro del significado de la Cláusula de Nombramientos. El 14 de junio de 2019, la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER), el demandante en un proceso contradictorio relacionado bajo los Casos Nos. 17-00228-LTS, como se discute en mayor detalle en la Nota 17(c), presentó su propia petición de un auto de certiorari en la Corte Suprema de los Estados Unidos para impugnar la aplicación del Primer Circuito de la doctrina de los oficiales de facto.

El 18 de junio de 2019, el presidente de los Estados Unidos volvió a nominar a los siete miembros originales de la Junta de Supervisión para completar el resto de sus mandatos, y estas nominaciones están actualmente pendientes de confirmación por parte del Senado de los Estados Unidos.

El 20 de junio de 2019, la Corte Suprema de los Estados Unidos otorgó a la Junta de Supervisión, Aurelius, el Procurador General, el Comité de Acreedores y la UTIER solicitudes de autos de certiorari y suspendió la decisión del Primer Circuito en espera de su determinación final. El argumento oral sobre la apelación se presentó a la Corte Suprema de los Estados Unidos el 15 de octubre de 2019. A la fecha de estos estados financieros básicos, la Corte Suprema aún no se ha pronunciado sobre la apelación.

*(ii)   Mediación en los Casos del Título III*

El 23 de junio de 2017, el Tribunal del Título III designó un equipo de cinco jueces federales, dirigido por la Juez Principal de Quiebras Barbara Houser del Tribunal de Quiebras de los Estados Unidos para el Distrito Norte de Texas, para facilitar las negociaciones de solución de todos los asuntos y procedimientos que surjan en los casos del Título III. La mediación de varias disputas relacionadas

103

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

con los casos del Título III sigue en curso.

El 24 de julio de 2019, el Tribunal del Título III emitió una orden (la Orden de paralización del 24 de julio) que mantiene ciertas objeciones de reclamaciones clave y litigios relacionados que involucran gravámenes superpuestos y problemas de validez de reclamaciones, entre otras cosas, hasta el 30 de noviembre de 2019 y requiere la mediación obligatoria de los problemas durante el período de paralización. El 28 de octubre de 2019, el Tribunal del Título III emitió una orden que extiende la paralización hasta el 31 de diciembre de 2019 y requiere un informe de mediación o una orden de programación antes del 27 de noviembre de 2019 para los asuntos paralizados. El 27 de noviembre de 2019, el equipo de mediación designado por el tribunal presentó un informe de estado provisional, que proporcionaba la programación y la secuencia recomendadas de ciertos asuntos clave del litigio, incluida (i) la validez de ciertas series impugnadas de bonos GO y AEP; (ii) el estado garantizado o no garantizado de las reclamaciones sobre bonos GO y AEP; y (iii) los derechos, frente al ELA, de los bonistas tributarios y otras deudas emitidas por ciertos organismos de Puerto Rico. Según la orden de programación propuesta que figura en el informe de situación provisional, el equipo de mediación ha propuesto que una sesión informativa inicial sobre estos temas comience en febrero de 2020 con vistas programadas para el 30 de abril de 2020 y en junio de 2020. A la fecha de estos estados financieros básicos, el Tribunal del Título III aún no ha dictado la orden de programación. El 27 de diciembre de 2019, el Tribunal del Título III emitió una orden enmendada que extiende la paralización hasta el 11 de marzo de 2020. El 10 de febrero de 2020, el equipo de mediación presentó un informe enmendado, que el Tribunal del Título III consideró en una vista celebrada el 4 de marzo de 2020. El 10 de marzo de 2020, el Tribunal del Título III emitió una orden final sobre el período de paralización, autorizando ciertas mociones de levantamiento de la paralización y demandas de fianza de ingresos para que procedieran, pero de lo contrario mantuvo la paralización en asuntos *no ultra vires* y de alcance de gravamen en su lugar en espera de la decisión del Tribunal del Título III sobre la confirmación del Plan Enmendado del ELA (tal como se analiza a continuación).

*(iii)* *Caso del Título III del ELA*

El 3 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el ELA al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamación contra el ELA venció el 29 de junio de 2018. Se presentaron aproximadamente 107,500 reclamaciones contra el ELA por un monto total declarado de aproximadamente $33.2 billones. De esta cantidad, aproximadamente 10,325 reclamaciones en el monto agregado total declarado de aproximadamente $32.9 billones han sido retiradas o eliminadas por una orden de objeción general emitida por el Tribunal del Título III. Como resultado, aproximadamente 97,100 reclamaciones en el monto agregado total declarado de aproximadamente $157,200 millones permanecen pendientes. La validez de estas reclamaciones restantes aún no se ha determinado y dichas reclamaciones siguen sujetas al proceso de conciliación de reclamaciones, que se describe en la sección (ix) a continuación.

El 27 de septiembre de 2019, la Junta de Supervisión, como representante del ELA, SRE y AEP en sus respectivos casos del Título III, presentó su plan de ajuste inicial conjunto del Título III para el ELA, SRE y AEP [ECF Núm. 8765] (el Plan Inicial) junto con una Declaración de Divulgación relacionada con el mismo [ECF Núm. 8765] (la Declaración de Divulgación inicial), que se basó en los supuestos económicos anteriores a COVID-19 contenidos en el Plan Fiscal de la Junta del 9 de mayo de 2019. El Plan Inicial incorporó los términos de un acuerdo de apoyo a la reestructuración con el Comité de Jubilados (el Comité de Jubilados de RSA), en el cual el Comité de Jubilados acordó un recorte de pensión máximo del 8.5% que solo sería aplicable a los jubilados con beneficios de jubilación mensuales de más de $1,200, así como congelaciones en los beneficios de pensión para maestros y jueces.

El 9 de febrero de 2020, la Junta de Supervisión anunció que celebró un acuerdo de apoyo al plan (el PSA) con ciertos bonistas de obligación general del ELA y bonistas de AEP, que requerirían revisiones del Plan Inicial. El 28 de febrero de 2020, la Junta de Supervisión presentó su

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Título III Enmendado Plan Conjunto de Ajuste del Estado Libre Asociado de Puerto Rico, et al.* [ECF Núm. 11946] (el Plan Enmendado) y una Declaración de Divulgación Enmendada relacionada con el mismo [ECF Núm. 11947] (la Declaración de Divulgación Enmendada), que revisó el Plan Inicial para cumplir con el PSA mientras conserva los términos del RSA del Comité de Jubilados.

Desde la presentación del Plan Inicial y la Declaración de Divulgación Inicial, el Gobernador y la AAFAF evaluaron y consideraron cuidadosamente sus términos y consecuencias para el pueblo de Puerto Rico. Durante el proceso, el Gobernador tuvo claro que, si los bonistas recibían un mejor trato en virtud de cualquier acuerdo, entonces un grupo de los ciudadanos más vulnerables de Puerto Rico, sus pensionados, también deberían recibir mejores beneficios como cuestión de justicia. Según el PSA, los pensionados no recibirían beneficios mejorados en comparación con su tratamiento en el Plan Inicial. En cambio, la Junta de Supervisión acordó un PSA que mejora el paquete legal y de seguridad para los bonistas sin mejorar el tratamiento de los pensionistas a través del proceso del Título III. Como resultado, el Gobernador concluyó que el ELA no podía apoyar el Plan Enmendado basado en el PSA porque sus términos actuales no están en el mejor interés de Puerto Rico. Es importante destacar que el Plan Enmendado no se puede confirmar sin el apoyo del Gobierno para aprobar y hacer cumplir todas las medidas legislativas y de política pública necesarias para implementar el plan.

El Plan enmendado y la Declaración de Divulgación Enmendada tampoco reflejan el impacto económico potencial del brote en curso de COVID-19. Como resultado, el 23 de marzo de 2020, la Junta de Supervisión presentó una moción urgente solicitando aplazar la consideración de la Declaración de Divulgación Enmendada, que había sido programada para el 3 y 4 de junio de 2020, hasta nuevo aviso. El Tribunal del Título III concedió la moción el 27 de marzo de 2020 y requirió que la Junta de Supervisión presente un informe de estado el 1 de mayo de 2020. La Junta de Supervisión presentó su informe de estado el 1 de mayo de 2020, pero a la luz de las incertidumbres en curso relacionadas con COVID-19 no ha tomado ninguna determinación sobre el estado del Plan Enmendado y proporcionará una actualización de estado adicional el 15 de julio de 2020. El 3 de mayo de 2020, el Gobernador presentó una propuesta de plan fiscal revisada para el Estado Libre Asociado, en la que señalaba que el Plan Enmendado (incluidos los términos del PSA y el Comité de Jubilados RSA) probablemente no sea factible y debería estar sujeta a reevaluación y potencialmente sustancial revisión porque los supuestos económicos en los que se basa el Plan Enmendado no reflejan los efectos negativos sustanciales de COVID-19 (particularmente con respecto a la sostenibilidad de la deuda y el impacto económico de ciertas medidas de reducción de costos).

El Plan Enmendado y la Declaración de Divulgación Enmendada siguen sujetos a enmiendas futuras (particularmente dados los impactos económicos negativos de la pandemia COVID-19) y la aprobación del Tribunal del Título III, y no es seguro que el Tribunal del Título III finalmente confirme el Plan Enmendado.

Para obtener información adicional, consulte la Nota 23 y el Plan enmendado y la Declaración de Divulgación Enmendada disponibles públicamente en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

*(iv)   Casos del Título III de COFINA*

El 5 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para COFINA al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamación contra COFINA venció el 29 de junio de 2018. Estas reclamaciones contra COFINA fueron resueltas a través del Plan de Ajuste de COFINA, el cual entró en vigencia el 12 de febrero de 2019. Para obtener información adicional sobre el Plan de Ajuste de COFINA, consulte la Nota 17 (c) y los estados financieros básicos auditados independientes de COFINA.

Ciertas partes cuyas objeciones fueron anuladas al confirmar el Plan de Ajuste de COFINA presentaron Avisos de Apelación en el Tribunal del Título III. Las apelaciones se han archivado en el Tribunal de Apelaciones de los Estados Unidos del Primer Circuito con los números de caso 19-1181

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(también discutido en relación con el proceso contradictorio titulado *Manuel Natal-Albelo, et al. v. Junta de Supervisión y Administración Financiera para Puerto Rico, et al.*) y 19-1182. Para obtener información adicional, consulte la Nota 17(c).

*(v)   Caso del Título III de la ACT*

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la ACT al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamación contra la ACT venció el 29 de junio de 2018. Se presentaron aproximadamente 2,350 reclamaciones contra la ACT por un monto total declarado de aproximadamente $83,100 millones. De esta cantidad, aproximadamente 735 reclamaciones en el monto agregado total declarado de aproximadamente $6,400 millones han sido retiradas o eliminadas por una orden de objeción general emitida por el Tribunal del Título III. Como resultado, aproximadamente 1,600 reclamaciones en el monto agregado total declarado de aproximadamente $76,700 millones permanecen pendientes. La validez de estas reclamaciones restantes aún no se ha determinado y dichas reclamaciones siguen sujetas al proceso de conciliación de reclamaciones, que se describe en la sección (ix) a continuación.

Después del comienzo del caso del Título III de la ACT, se radicaron numerosas mociones y procedimientos adversos tanto por y contra la ACT con respecto a los derechos de los acreedores sobre los activos de la ACT. El resultado de estos procedimientos y su impacto en cualquier plan de ajuste para la ACT no se puede determinar en este momento. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 17.

*(vi)   (i) Caso del Título III del SRE*

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para el SRE al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamación contra el SRE venció el 29 de junio de 2018. Se presentaron aproximadamente 55,100 reclamaciones contra el SRE por un monto total declarado de aproximadamente $10.2 billones. De esta cantidad, aproximadamente 4,800 reclamaciones en el monto agregado total declarado de aproximadamente $10.1 billones han sido retiradas o eliminadas por una orden de objeción general emitida por el Tribunal del Título III. Como resultado, aproximadamente 50,300 reclamaciones en el monto agregado total declarado de aproximadamente $69,500 millones permanecen pendientes. La validez de estas reclamaciones restantes aún no se ha determinado y dichas reclamaciones siguen sujetas al proceso de conciliación de reclamaciones, que se describe en la sección (ix) a continuación.

El 28 de febrero de 2020, la Junta de Supervisión, como representante del ELA, SRE y AEP en sus respectivos casos del Título III, presentó su Plan Enmendado para el ELA, SRE y AEP, junto con una Declaración de Divulgación Enmendada relacionada con este. Para obtener más información sobre el Plan Enmendado (incluido el PSA y el Comité de Jubilados RSA), consulte la Nota 3(c)(iii) anterior. El Plan Enmendado y la Declaración de Divulgación Enmendada siguen sujetos a enmiendas futuras (particularmente dados los impactos económicos negativos de la pandemia COVID-19) y la aprobación del Tribunal del Título III, y no es seguro que el Tribunal del Título III finalmente confirme el Plan Enmendado.

Para obtener información adicional, consulte la Nota 23 y el Plan enmendado y la Declaración de Divulgación Enmendada disponibles públicamente en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

Después del comienzo del caso del Título III del SRE, se radicaron numerosas mociones y procedimientos adversos tanto por y contra el SRE en relación con los derechos de los acreedores sobre los activos del SRE. El resultado de estos procedimientos y su impacto en cualquier plan de ajuste para el SRE no se puede determinar en este momento. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 17.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(vii)  *Caso del Título III de la AEE*

El 3 de julio de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEE al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamación contra la AEE venció el 29 de junio de 2018. Se presentaron aproximadamente 4,300 reclamaciones contra la AEE por un monto total declarado de aproximadamente $23,800 millones. La validez de estas reclamaciones presentadas aún no se ha determinado y dichos reclamaciones siguen sujetos al proceso de conciliación de reclamaciones, que se describe en la sección (ix) a continuación.

El 18 de julio de 2017, un grupo ad hoc de acreedores de la AEE y ciertas aseguradoras de línea única de bonos de la AEE radicaron una moción para levantar la paralización automática en el caso del Título III de la AEE, para permitir que las aseguradoras de línea única soliciten el nombramiento de un síndico para la AEE para supervisar las operaciones de la empresa de servicios públicos y buscar un aumento en las tarifas. El 15 de septiembre de 2017, el Tribunal del Título III negó la moción que buscaba levantar la paralización automática. El 8 de agosto de 2018, el Tribunal de Apelaciones del Primer Circuito de los Estados Unidos revocó la determinación del Tribunal del Título III de que PROMESA prohibía el nombramiento de un síndico y, en cambio, sostuvo que el Tribunal del Título III puede levantar la paralización automática para permitir que un tribunal estatal designe un síndico, si corresponde. El 18 de octubre de 2018, las aseguradoras de línea única presentaron una moción (la Moción del Síndico) buscando nombrar a un síndico para la administración en la AEE, pero no buscaron autoridad para que un síndico aumentara las tarifas o ejerciera control sobre la planificación o los presupuestos energéticos. El 3 de mayo de 2019, la Junta de Supervisión, la AAFAF y la AEE llegaron a un Acuerdo de Reestructuración Definitiva (AEE RSA) con una parte sustancial de los bonistas de la AEE y con Assured Guaranty Corp. y Assured Guaranty Municipal Corp., quienes eran partes de la Moción del Síndico. El 9 de septiembre de 2019, las partes restantes de la Moción del Síndico, la Corporación Nacional de Finanzas Públicas (Nacional) y Syncora Guarantee Inc. (Syncora) se unieron al AEE RSA.

El 10 de mayo de 2019, la Junta de Supervisión y la AAFAF presentaron una moción en la que se solicitaba la aprobación del Tribunal del Título III para ciertas disposiciones del AEE RSA (la Moción 9019). Si el Tribunal concede la Moción 9019, la Moción del Síndico será desestimada. El litigio sobre la Moción del Síndico está actualmente paralizado en espera de una decisión sobre la moción 9019.

(viii)  *Caso del Título III de la AEP*

El 27 de septiembre de 2019, la Junta de Supervisión, a solicitud del Gobernador, inició un caso en virtud del Título III para la AEP al presentar una solicitud de reparación en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo para la presentación por parte de los acreedores de sus comprobantes de reclamación contra la AEP aún no se ha establecido.

El 28 de febrero de 2020, la Junta de Supervisión, como representante del ELA, SRE y AEP en sus respectivos casos del Título III, presentó su Plan Enmendado para el ELA, SRE y AEP, junto con una Declaración de Divulgación Enmendada relacionada con este. Para obtener más información sobre el Plan Enmendado (incluido el PSA y el Comité de Jubilados RSA), consulte la Nota 3(c)(iii) anterior. El Plan Enmendado y la Declaración de Divulgación Enmendada siguen sujetos a enmiendas futuras (particularmente dados los impactos económicos negativos de la pandemia COVID-19) y la aprobación del Tribunal del Título III, y no es seguro que el Tribunal del Título III finalmente confirme el Plan Enmendado.

Para obtener información adicional, consulte la Nota 23 y el Plan enmendado y la Declaración de Divulgación Enmendada disponibles públicamente en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

(ix)  *Proceso de Conciliación de Reclamaciones para Casos del Título III*

Al 4 de diciembre de 2019, se han presentado aproximadamente 169,000 evidencias de reclamaciones contra los deudores del Título III (excluyendo COFINA y AEP) en el monto agregado

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

total declarado de aproximadamente $43,500 millones. De esta cantidad, aproximadamente 15,800 reclamaciones en el monto agregado total declarado de aproximadamente $43,200 millones han sido retirados o eliminados por una orden de objeción general emitida por el Tribunal del Título III. Como resultado, aproximadamente 153,200 reclamaciones en el monto agregado total declarado de aproximadamente $326 millones permanecen pendientes contra todos los deudores del Título III.

El 16 de octubre de 2018, la Junta de Supervisión presentó una moción en la que se solicitaba la aprobación de ciertos procedimientos de objeción de reclamaciones limitadas diseñadas para completar el proceso de conciliación de reclamaciones de manera oportuna, eficiente y rentable. En su moción, la Junta de Supervisión solicitó autoridad, entre otras cosas, para presentar objeciones generales a reclamaciones sobre las bases no sustantivas expresamente establecidas en la Regla de Quiebras 3007(d)(1)-(7), que incluyen objeciones a la duplicación o Reclamaciones presentadas fuera de plazo, con la limitación de que cada objeción general solo puede objetar hasta 500 reclamaciones (los Procedimientos de Objeción Inicial de Reclamaciones). El 14 de noviembre de 2018, el Tribunal del Título III emitió una orden en la que se aprobaba los Procedimientos de Objeción Inicial de Reclamaciones. El 21 de mayo de 2019, la Junta de Supervisión presentó una moción que busca enmendar los Procedimientos de Objeción de Inicial de Reclamaciones al permitir que se presenten objeciones generales sobre bases tanto sustantivas como no sustantivas, y permitir que se incluyan hasta 1,000 reclamaciones en cada objeción general (los Procedimientos Modificados de Objeción de Reclamaciones). El 14 de junio de 2019, el Tribunal del Título III emitió una orden en la que se aprobaban los Procedimientos Modificados de Objeción de Reclamaciones. Se han presentado objeciones generales a casi 33,000 reclamaciones en el monto agregado total declarado de aproximadamente $43,200 millones a tenor con los Procedimientos Enmendados de Objeción de Reclamaciones. A la fecha del presente, las objeciones generales relacionadas con aproximadamente 17,000 reclamaciones por un monto agregado total declarado de aproximadamente $3,100 millones permanecen pendientes, y se pueden presentar objeciones generales adicionales a las reclamaciones en el futuro.

El 5 de junio de 2019, la Junta de Supervisión presentó una moción para que el Tribunal del Título III autorizara procedimientos de resolución alternativa de disputas (ADR) para resolver ciertas reclamaciones generales no garantizadas. En la vista general celebrada el 24 de julio de 2019, el Tribunal del Título III indicó que apoyaba un proceso de ADR, pero que los procedimientos de ADR propuestos incluían una serie de barreras prácticas para la implementación, incluida la falta de detalles sobre qué tipos de reclamaciones serían sujeto a los procedimientos ADR, y el incumplimiento de los procedimientos ADR propuestos con las reglas federales y los requisitos del debido proceso. El 7 de enero de 2020, la Junta de Supervisión presentó una moción enmendada para aprobar los procedimientos ADR (los Procedimientos ADR), que el Tribunal del Título III aprobó el 1 de abril de 2020. La Junta de Supervisión y el ELA se encuentran actualmente en el proceso de revisar las reclamaciones que se resolverán a través de los Procedimientos de ADR.

Después del comienzo del caso del Título III del ELA, se han presentado numerosas peticiones y procedimientos contrarios por el ELA y en su contra con respecto a los derechos de los acreedores sobre los activos del ELA. En este momento, existe una incertidumbre significativa con respecto a qué recuperación, si la hubiera, recibirán los acreedores a cuenta de las reclamaciones contra el ELA según el Título III de PROMESA. La recuperación, si la hubiera, se determinará en el caso del Título III del ELA y no se puede estimar en este momento. Por lo general, a menos que se disponga lo contrario en el plan de ajuste u lo ordene el Tribunal de Distrito, la recuperación que un acreedor reciba a causa de su reclamación en el caso del Título III del ELA será una satisfacción completa de dicha reclamación y, de lo contrario, dicha reclamación será liberada y desestimada por los términos del plan de ajuste. Una vez desestimado, el ELA no tendrá más responsabilidad u obligación relacionada con dicha reclamación, excepto en la medida establecida en el plan de ajuste aprobado o por orden del Tribunal de Distrito. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 17.

*(x)  Modificación de Calificación del BGF y Proceso de Aprobación del Título VI*

El 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento a tenor con una Modificación de Calificación en virtud del Título VI de PROMESA (la Modificación de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

Calificación). Conforme a la Modificación de Calificación, los tenedores de ciertos bonos y reclamaciones de depósitos contra el BGF intercambiaron sus reclamaciones por bonos emitidos por un organismo público recientemente creado, la Autoridad de Recuperación de la Deuda del BGF (la DRA del BGF), y el BGF transfirió a dicha entidad su cartera de préstamos municipales, una parte de la cartera de préstamos de entidades públicas, sus activos inmobiliarios y su efectivo no gravado. Además, a tenor con la Ley de Reestructuración del BGF, las reclamaciones a cuenta de depósitos mantenidos por el ELA y otras entidades públicas se canjearon por intereses en un fideicomiso recién creado a tenor con la Ley de Reestructuración del BGF, denominado Fideicomiso de Entidad Pública (PET).

A tenor con la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y sus agentes, organismo y filiales (cada una de las Entidades Gubernamentales No Municipales) y el BGF se determinaron aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Las Entidades Gubernamentales No Municipales que tienen reclamaciones netas contra el BGF, después de dar efecto al ajuste anterior, recibieron su parte proporcional de intereses en el PET, lo que se consideró como la plena satisfacción de todas y cada una de las reclamaciones que tal Entidad Gubernamental No Municipal pueda tener contra el BGF.

Los activos del PET (los Activos del PET) consisten, entre otros elementos, en una reclamación no garantizada contra el ELA de aproximadamente $578 millones, que es el sujeto de una evidencia de reclamación radicada en el caso del Título III del ELA. El Comité Oficial de Acreedores No Garantizados designado en los casos del Título III se ha opuesto a esta Reclamación del PET y, a la fecha del presente, el Tribunal del Título III no ha determinado si la Reclamación del PET es una reclamación permitida que tendrá derecho a una distribución. Las recuperaciones de las Entidades Gubernamentales No Municipales por sus participaciones en el PET dependerán de la recuperación que finalmente reciba el PET por los Activos de PET. Las reclamaciones que el ELA y otras entidades gubernamentales pueden haber tenido contra el BGF se han liberado a tenor con la Modificación de Calificación y la Ley de Reestructuración del BGF (excepto por lo que se establece en este).

El 6 de noviembre de 2018, el Tribunal de Distrito aprobó la Modificación de Calificación del BGF según el Título VI de PROMESA y la Modificación de Calificación entró en vigencia a partir del 29 de noviembre de 2018.

*(xi)  Canje AFI-Puertos*

El 27 de diciembre de 2019, la AFI completó un canje privado que resultó en la resolución de más del 92% de ciertos bonos de la Serie 2011 emitidos por la AFI (Proyecto de Autoridad Portuaria) (los Bonos AFI-Puertos). Al momento del canje, los Bonos AFI-Puertos se encontraban en circulación por un monto aproximado de $190.6 millones. Los bonistas que poseían aproximadamente $177.2 millones participaron en el canje privado y recibieron su parte prorrateada (basada en el monto total de los Bonos AFI-Puertos en circulación) de un pago en efectivo de aproximadamente $82.4 millones, lo que resultó en la resolución total de dichos Bonos AFI-Puertos participantes. La recuperación que recibieron los tenedores de bonos de AFI-Puertos en el canje se suma a los Bonos DRA del BGF recibidos por los bonistas de AFI-Puertos en relación con una liquidación de las reclamaciones de cartas de crédito de los bonistas contra el BGF, que se celebró como parte de la Modificación de Calificación del Título VI del BGF. Después del canje, los Bonos de AFI-Puertos permanecen en circulación por un monto aproximado de $13.5 millones.

**(d)  Mora del Pago del Capital e Intereses de los Bonos**

Debido a la retención por parte del ELA de ciertos ingresos asignados condicionalmente a las corporaciones públicas y las disposiciones de prioridad de pago, así como a la situación financiera general del ELA, el ELA y dichas corporaciones públicas no pudieron realizar los pagos de la amortización de la deuda a su vencimiento antes del inicio de los casos del Título III. Después del inicio de tales casos, la paralización automática y otras disposiciones de la ley han impedido el pago de tales montos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La naturaleza de las obligaciones del ELA Asociado y su corporación pública para realizar dichos pagos es actualmente objeto de litigio en curso, como se analiza en la Nota 17.

La siguiente tabla resume el saldo vencido del capital y los intereses de los bonos al 31 de julio de 2020 (en miles):

| | | Capital | Intereses | Saldo vencido |
|---|---|---|---|---|
| Actividades del gobierno: | | | | |
| ELA | $ | 1,997,586 | 3,207,570 | 5,205,156 |
| COFINA | | 66.695 | 1,325,429 | 1,392,124 |
| AEP | | 322.733 | 817,842 | 1,140,575 |
| AFI | | 310.190 | 383,168 | 693,358 |
| AP | | 31,151 | 85,490 | 116,641 |
| Total de actividades del gobierno | | 2,728,355 | 5,819,499 | 8,547,854 |
| Bonos de asignación del CFP | | 160,615 | 275,502 | 436,117 |
| Fondos Fiduciarios: | | | | |
| SRE | | — | 444,051 | 444,051 |
| Unidades de componentes mayores: | | | | |
| ACT | | 479.988 | 788,165 | 1,268,153 |
| AEE | | 1.304.356 | 1,415,792 | 2,720,148 |
| AAA | | 20.325 | 39,629 | 59,954 |
| Total de unidades de componentes mayores | | 1,804,669 | 2,243,586 | 4,048,255 |
| Unidades de componentes no mayores | | 80,392 | 76,242 | 156,634 |
| Total | $ | 4,774,031 | 8,858,880 | 13,632,911 |

**(4) Corrección de Errores**

Durante 2017, el ELA identificó varios errores relacionados con los estados financieros básicos del año anterior, incluido el hecho de que algunas de sus unidades de componentes combinadas aplicaron la guía en las Declaraciones GASB Núm. 68 y Núm. 71, lo que resultó en la reexpresión de los resultados netos iniciales de los estados financieros de todo el gobierno del ELA. El impacto de los ajustes relacionados a los resultados netos iniciales/saldo del fondo es el siguiente:

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**Actividades del Gobierno y de Tipo Comercial**

La siguiente tabla resume los cambios en los resultados netos al comienzo del año como se informó anteriormente para las actividades del Gobierno y de tipo Comercial en los estados financieros de todo el gobierno (en miles):

| | Actividades del Gobierno | Actividades de tipo Comercial |
|---|---|---|
| Resultados netos (déficit) - 1 de julio de 2016, como se informó anteriormente | $ (69,821,688) | (473,117) |
| Aplicación de las declaraciones GASB Núm. 68 y Núm. 71: (a) | | |
| Reconocimiento de pasivos netos de pensiones | (389,209) | (71,835) |
| Reconocimiento de la salida diferida de recursos para contribuciones de pensiones hechas después de la fecha de medición (1 de julio de 2016) | 69,360 | 17,147 |
| Reconocimiento de entrada diferida de recursos | (2,349) | (1,246) |
| Sobreexpresión de pasivos (b) | 939 | 8,560 |
| Sobreexpresión de cuentas por cobrar (c) | (4,985) | — |
| Subexpresión de activos de capital (d) | 841 | — |
| Sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales (e) | (1,217) | — |
| Resultados netos (déficit) - 1 de julio de 2016, según la reformulación | $ (70,148,308) | (520,491) |

*Corrección de Errores Materiales: Actividades del Gobierno*

La corrección de errores materiales en los resultados netos iniciales de las actividades del gobierno incluye una combinación de lo siguiente:

(a) El impacto de aplicar la guía en las Declaraciones GASB Núm. 68 y Núm. 71. La corrección de errores consistió en reconocer los efectos netos de la participación proporcional de AEP, AFI y PRMSA en el pasivo de pensión neto inicial del SRE, las salidas diferidas de recursos para contribuciones de pensión realizadas después de la fecha de medición del pasivo de pensión neto inicial y las entradas diferidas de recursos debido a las diferencias entre las proyecciones y las ganancias reales de inversión del plan de pensiones en diferentes períodos de medición.

(b) Una sobreexpresión de otros pasivos por aproximadamente $1.2 millones corregidos por el DDEC y una subexpresión de las cuentas por pagar corregidas por la Superintendencia del Capitolio (SCB) por aproximadamente $200,000. Además, se corrigió una sobreexpresión en las cuentas por pagar de aproximadamente $8.6 millones en ASES.

(c) DDEC corrigió una sobreexpresión de las cuentas por cobrar de agencias federales por aproximadamente $5 millones.

(d) Una subexpresión de los activos de capital corregidos por el Senado y la DDEC por aproximadamente $327,000 y $ 514,000, respectivamente.

(e) Una sobreexpresión de efectivo en bancos gubernamentales corregida por SCPT por una pérdida crediticia de custodia sobre depósitos mantenidos en el BGF.

*Corrección de Errores Materiales: Actividades de Tipo Comercial*

La corrección de errores materiales en los resultados netos iniciales de las actividades de tipo comercial incluye una combinación de lo siguiente:

(f) El impacto de aplicar la guía en las Declaraciones GASB Núm. 68 y Núm. 71. La corrección de errores consistió en que el Departamento de Servicios de Emergencia 9-1-1, ASES y Loterías reconocieran los efectos netos de su participación proporcional en el pasivo de pensión neto inicial del SRE, las salidas

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

diferidas de recursos para contribuciones de pensión realizadas después de la fecha de medición del pasivo de pensión neto inicial y las entradas diferidas de recursos debido a las diferencias entre las proyecciones y las ganancias reales de inversión del plan de pensiones en diferentes períodos de medición.

(g) Una sobreexpresión de los pasivos de aproximadamente $8.6 millones corregida por ASES.

**Fondos del Gobierno**

La siguiente tabla resume los cambios en los saldos de fondos (déficit) al comienzo de los años previamente informados para los fondos del gobierno (en miles):

| | Fondo General | Fondos no mayores del gobierno |
|---|---|---|
| Saldos de fondos (déficit) - 1 de julio de 2016, según se informó anteriormente | $ (1,234,385) | 284,674 |
| Sobreexpresión de otros pasivos (a) | 939 | — |
| Sobreexpresión de cuentas por cobrar (b) | (4,985) | |
| Sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales (c) | — | (1,217) |
| Saldos del fondo (déficit) – 1 de julio de 2016, según reformulación | $ (1,238,431) | 283,457 |

*Corrección de error no material*

(a) Una sobreexpresión de otros pasivos por aproximadamente $1.2 millones corregidos por DDEC y una subexpresión de las cuentas por pagar corregidas por la SCB por aproximadamente $200,000.

(b) Una sobreexpresión de las cuentas por cobrar de agencias federales por aproximadamente $5 millones corregida por DEEC.

(c) Una sobreexpresión de efectivo en bancos gubernamentales corregida por SCPT por una pérdida crediticia de custodia sobre depósitos mantenidos en el BGF.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**Fondos de Propiedad Exclusiva**

La siguiente tabla resume los cambios en los resultados netos al comienzo del año como se informó anteriormente para los fondos de propiedad exclusiva (en miles):

| | | ASES | Loterías | PRWPCRF | Fondos No Mayores de Propiedad Exclusiva |
|---|---|---|---|---|---|
| Resultados netos (déficit) - 1 de julio de 2016, como se informó anteriormente | $ | (131,407) | (85,819) | 5,843 | 130,888 |
| Cambios en la presentación de fondos mayores | | | 85,819 | (5,843) | (79,976) |
| Aplicación de la Declaración de GASB Núm. 68 y Núm. 71: (a) | | (21,778) | — | — | (50,057) |
| Reconocimiento del pasivo por pensiones neto | | | | | |
| Reconocimiento de salida diferida de recursos para las contribuciones a la pensión realizadas después de la fecha de medición (1 de julio de 2016) | | 5,316 | — | — | 11,831 |
| Reconocimiento de entrada diferida de recursos | | (378) | — | — | (868) |
| Sobreexpresión de pasivos (b) | | 8,560 | — | —_ | |
| Resultados netos (déficit) - 1 de julio de 2016, según la reformulación | $ | (139,687) | — | — | 11,818 |

Los cambios en la presentación de los fondos mayores se debieron a que las Loterías y el PRWPCRF no cumplieron con los umbrales cuantitativos de los fondos principales proporcionados por la Declaración de GASB Núm. 34 en 2017.

*Corrección de errores materiales*

La corrección de errores materiales en los resultados netos iniciales de fondos no mayores de propiedad exclusiva incluye una combinación de lo siguiente:

(a) El impacto de aplicar la orientación contenida en la Declaración de GASB N.° 68 y N.° 71 de GASB al reconocer los efectos netos de la participación proporcional de Loterías, ASES y del Departamento de Servicios de Emergencia 9-1-1 en el pasivo por pensión neto inicial, salidas diferidas de recursos para aportes de pensiones efectuados después de la fecha inicial de medición del pasivo por pensiones neto y entradas diferidas de recursos debido a diferencias entre las ganancias de inversión proyectadas y reales del plan de pensiones en diferentes períodos de medición.

Se corrigió una sobreexpresión en las cuentas por pagar de aproximadamente $8.6 millones en ASES.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**Unidades de Componentes de Presentación Discreta**

La siguiente tabla resume los cambios en los resultados netos iniciales para ciertas unidades de componentes de presentación discreta (en miles):

| | |
|---|---:|
| Déficit neto – 1 de julio de 2016, según se informó anteriormente $ | (6,247,812) |
| Adopción inicial de la Declaración de GASB Núm. 75 | |
| AAA | (33,940) |
| Aplicación de las declaraciones de | |
| GASB Núm. 68 y Núm. 71: (a) | |
| Reconocimiento de pasivos netos de pensiones | (3,241,659) |
| Reconocimiento de flujos de salida diferidos para las contribuciones a la pensión realizadas después de la fecha de medición (1 de julio de 2016) | 710,869 |
| Reconocimiento de entrada diferida de recursos | (108,930) |
| Sobreexpresión de activos de capital (b) | (67,380) |
| Subexpresión de los bonos por pagar (c) | (85,963) |
| Subexpresión de contingencia por pérdidas (d) | (129,625) |
| Sobreexpresión de efectivo y equivalentes de efectivo (e) | (100,865) |
| Corrección de errores no materiales (f) - (i) | (37,963) |
| Déficit neto - 1 de julio de 2016, según la reformulación $ | (9,343,268) |

*Adopción Inicial de la Declaración de GASB Núm. 75*

La Declaración de GASB Núm. 75 "Informes contables y financieros para los beneficios posteriores al empleo distintos de las pensiones (OPEB)", que reemplaza la Declaración de GASB Núm. 45 *"Informes contables y financieros de los patronos para los beneficios posteriores al empleo que no sean las pensiones"*, es efectiva para los años fiscales que comienzan después del 15 de junio de 2017. Sin embargo, el 15 de diciembre de 2017, la dirección de la AAA eligió una implementación inicial. Como resultado de la implementación de la Declaración de GASB Núm. 75, la AAA ajustó sus resultados netos iniciales al 1 de julio de 2016 por aproximadamente ($33.9) millones.

*Corrección de errores materiales*

La corrección de errores materiales en los resultados netos iniciales de las unidades de componentes de presentación discreta incluye una combinación de lo siguiente:

(a) El impacto de aplicar la orientación contenida en las Declaraciones de GASB N.° 68 y N.° 71 mediante el reconocimiento de los efectos netos de la participación proporcional de las unidades de componentes de presentación discreta del pasivo por pensiones neto inicial y las salidas diferidas de recursos para las contribuciones a las pensiones realizadas después de la medición del pasivo por pensiones neto inicial fecha, contra los resultados netos iniciales. Estas unidades de componentes de presentación discreta aplicaron las disposiciones de las Declaraciones de GASB N.° 68 y N.° 71 basadas en información no auditada, mientras que el resto de las unidades componentes no mayores de presentación discreta no adoptaron las Declaraciones de GASB N.° 68 y N.° 71, como se menciona en la Nota 1(s) y la Nota 18(g).

(b) Una sobreexpresión de los activos de capital por aproximadamente $59.8 millones en los estados financieros básicos de la AEE, y una sobreexpresión identificada por la PRPA para la depreciación no aplicada a los proyectos completados de aproximadamente $7.5 millones, y una subexpresión de los

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

activos de capital de aproximadamente $44,000 corregida por PRTC.

(c) Una subexpresión de aproximadamente ($85.9) millones en relación con los bonos en circulación no registrados del contrato de concesión del servicio del puente Teodoro Moscoso en los estados financieros básicos auditados de la PRHTA.

(d) Una subexpresión de aproximadamente ($77.4) millones de reclamaciones legales y reserva de sentencia corregida que incluye reclamaciones laborales de años anteriores que se omitieron de los estados financieros básicos auditados de la AEE del año anterior; una subexpresión de aproximadamente ($52.3) millones para ajustar su reserva para reclamaciones corregida por COSSEC; y una sobreexpresión de aproximadamente $1.3 millones relacionada con otros ajustes corregida por la PRPA.

(e) Una sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales de aproximadamente ($4.8) millones, ($12) millones, ($66),000 y ($707),000 corregida por CEPR, ATPR, COSSEC y CCE respectivamente, por una pérdida crediticia de custodia sobre depósitos mantenidos en BGF. Una sobreexpresión de efectivo y equivalentes de efectivo en bancos gubernamentales de aproximadamente ($83.2) millones corregida por el BGF por una pérdida crediticia de custodia sobre los depósitos mantenidos en el BDE.

(f) La inclusión por $1.8 millones en 2017 de la CDPR, una unidad de componentes no mayores de presentación discreta que fue excluida de los estados financieros básicos del año anterior porque los estados financieros básicos independientes no estaban disponibles y no se consideraron materiales, individualmente o en conjunto, para los estados financieros básicos del ELA.

(g) Una subexpresión de las cuentas por cobrar como resultado de una sobreexpresión de la reserva para cuentas incobrables de la AEE de aproximadamente $13 millones, y una subexpresión de las cuentas por cobrar del BGF en aproximadamente ($67.3) millones.

(h) Una sobreexpresión de las cuentas por pagar por aproximadamente $747,000 en los estados financieros básicos de CDIPC; $3.3 millones en estados financieros básicos de ATPR; $5,7 millones en estados financieros básicos de AMA; $2.1 millones en estados financieros básicos de la PRPA; y $899,000 en estados financieros básicos de PRTC.

(i) Otros errores no materiales corregidos por varias unidades de componentes no mayores de presentación discreta, CSAPR por aproximadamente $439,000, PRIDCO por aproximadamente $97,000 y por PRPA por aproximadamente $1.3 millones.

**(5) Fondo Fiduciario de Inversión del Gobierno de Puerto Rico (PRGITF)**

El PRGITF se creó por la Ley Núm. 176-1995, y comenzó a funcionar el 4 de diciembre de 1995. El PRGITF es un fideicomiso de inversión colectiva diversificado sin carga administrado por el BGF, y creado para proporcionar a los inversores gubernamentales elegibles de Puerto Rico una forma conveniente y económica de invertir en una cartera del mercado monetario administrada profesionalmente. El PRGITF no es una compañía de inversión o un fondo mutuo y no está sujeto a regulación o registro según la Ley de Compañía de Inversión de 1940. Las unidades emitidas por el PRGITF no están sujetas a regulación o registro según la Ley de Valores e Intercambio de 1933, según enmienda, porque las unidades son emitidas por una entidad gubernamental. Los depósitos disponibles y las inversiones compradas no están garantizados, avalados o cubiertas por el ELA o cualquiera de sus agencias, organismo o subdivisiones políticas.

El PRGITF se considera un grupo de inversión externa similar a 2a7 y, como tal, informa su inversión al costo amortizado, que se aproxima al valor de mercado. Además, el Fondo Fiduciario de Inversión del Gobierno de Puerto Rico sigue la Declaración GASB Núm. 31, *Informes contables y financieros para ciertas inversiones y para fondos de inversiones externas*; sin embargo, como se indica en la Nota (1)(b), dichos estados financieros básicos no se incluyen en los estados financieros básicos adjuntos porque el Gobierno Primario

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

y cada Unidad de Componente ya presentan su parte correspondiente de los activos del PRGITF como equivalentes de efectivo o inversiones.

Los valores de inversión disponibles al 30 de junio de 2017 consistían en certificados de depósito y depósitos a plazo, fondos del mercado monetario, valores adquiridos en virtud de acuerdos de reventa, obligaciones corporativas, papel comercial y obligaciones del gobierno de EE. UU. y agencias patrocinadas, que pueden considerarse altamente líquidos. Sin embargo, las inversiones de los participantes están sujetas a la capacidad del PRGITF de recibir el pago del emisor de los valores cuando vencen. La liquidez de ciertas inversiones y los cambios en las tasas de interés pueden afectar el rendimiento de PRGITF y el valor de mercado de sus inversiones.

El ELA clasificó aproximadamente $50 millones de inversiones presentadas en el PRGITF (ver Nota 6) como efectivo y equivalentes de efectivo. Las inversiones en el PRGITF con un vencimiento original de 90 días o menos desde la fecha de adquisición se consideran equivalentes de efectivo.

El monto en dólares de las inversiones al 30 de junio de 2017 a $1.00 por unidad de participación se informó en los estados financieros básicos individuales de cada uno de los participantes, y se combinó en los estados financieros básicos de la siguiente manera (en miles):

|  | Saldo pendiente | Porcentaje del total |
|---|---|---|
| Gobierno primario: | | |
| Fondo General y Fondo de Proyectos de Capital | $ 49,976 | 25.37 % |
| Fideicomiso de los Niños (1) | 11,750 | 5.96 |
| COFINA (1) | 475 | 0.24 |
| Total del gobierno primario | 62,201 | 31,57 |
| Unidades de componentes mayores de presentación discreta: | 104,013 | 52.81 |
| BGF (1) | | |
| CFSE (1) | 1,050 | 0.53 |
| Total de unidades de componentes mayores de presentación discreta | 105,063 | 53,34 |
| Unidades de componentes no mayores (1) | 22,917 | 11,63 |
| Otros participantes | 6,843 | 3,46 |
| Total de todos los participantes | $ 197,024 | 100.00 % |

(1)   Se informa como inversiones en el estado de resultados netos adjunto.

Los depósitos al 30 de junio de 2017 se invirtieron en valores con un costo que se aproxima al valor de mercado, más los intereses devengados, por aproximadamente $197 millones. La porción externa del PRGITF no se consideró significativa para informes separados en los estados financieros básicos adjuntos.

Al 30 de junio de 2017, Standard & Poor's calificó las inversiones del PRGITF como "A1" o "AA". Los valores del gobierno de los Estados Unidos tienen la garantía explícita del gobierno de los Estados Unidos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

A continuación, se presenta una tabla de las inversiones mantenidas por el PRGITF al 30 de junio de 2017, presentada al costo amortizado (en miles):

| | | |
|---|---|---:|
| Papeles comerciales | $ | 87,908 |
| Obligaciones del gobierno de los EE. UU. agencias patrocinadas | | 59,921 |
| Certificados de depósitos y depósitos a plazo | | 35,004 |
| Mercado monetario | | 14,003 |
| Otros | | 188 |
| | $ | 197,024 |

**(6)  Depósitos e Inversiones**

**Gobierno Primario**

El Gobierno Primario puede invertir en diferentes tipos de valores, incluidos valores nacionales, internacionales y de renta fija, entre otros.

El Gobierno Primario mantiene un fondo de efectivo e inversión que está disponible para el uso de todos los fondos, incluidos algunos de los fondos fiduciarios. La porción de cada fondo de este grupo se informa en el estado de resultados netos como efectivo y equivalentes de efectivo. Las inversiones de los fondos fiduciarios se mantienen y administran por separado de las de otros fondos del Gobierno Primario.

*Efectivo y Equivalentes de Efectivo*

El riesgo de crédito de custodia para depósitos es el riesgo de que, en caso de quiebra bancaria, el depósito del ELA no se pueda recuperar. El ELA exige que los fondos públicos depositados en bancos comerciales en Puerto Rico estén totalmente garantizados por la cantidad depositada en exceso del seguro de depósito federal. Todos los valores pignorados como garantía son mantenidos por los bancos a nombre del ELA. No existe una política formal de riesgo de crédito de custodia para cuentas de efectivo abiertas con bancos comerciales fuera de Puerto Rico.

Los depósitos en bancos gubernamentales representan el saldo de intereses y cuentas sin intereses en el BGF y BDE. La obligación de depósito en el BGF y el BDE está sustancialmente relacionada con los depósitos del Departamento de Hacienda del ELA, sus unidades de componentes y sus municipios. Sin embargo, cualquier depósito en el BGF al 30 de junio de 2017 se transfirió posteriormente al PET el 29 de noviembre de 2018 a tenor con la Modificación de Calificación del BGF y la Ley de Reestructuración del BGF.

Los depósitos mantenidos en el BGF, BDE y bancos comerciales establecidos fuera de Puerto Rico están exentos del requisito de garantía establecido por el ELA y, por lo tanto, representan un riesgo de crédito de custodia, porque en el caso de que estas instituciones financieras quiebren, el ELA no podrá recuperar estos depósitos. El 29 de noviembre de 2018, todas las reclamaciones que el ELA y otras entidades gubernamentales pudieran haber tenido contra el BGF, incluidos sus depósitos del BGF, fueron liberados a tenor con la Modificación de Calificación y la Ley de Reestructuración del BGF. El importe registrado de los depósitos del Gobierno Primario al 30 de junio de 2017 consiste en lo siguiente (en miles):

| | | Monto registrado | | | Saldo |
|---|---|---|---|---|---|
| | | No restringido | Restringido | Total | bancario |
| Actividades del gobierno: | | | | | |
| Bancos comerciales | $ | 2,048,108 | 652,045 | 2,700,153 | 3,816,975 |
| Bancos gubernamentales | | 2,256 | 279 | 2,535 | 889,126 |
| Total | $ | 2,050,364 | 652,324 | 2,702,688 | 4,706,101 |

117

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | Monto registrado | | | Saldo |
|---|---|---|---|---|
| | No restringido | Restringido | Total | bancario |
| Actividades de tipo comercial: | | | | |
| Bancos comerciales | $   362,000 | 27,781 | 389,781 | 404,129 |
| Bancos gubernamentales | 2 | 28 | 30 | 229,040 |
| En custodia de | | | | |
| Hacienda de los EE. UU. | — | 557,540 | 557,540 | 557,654 |
| Total | $   362,002 | 585,349 | 947,351 | 1,190,823 |

Al 30 de junio de 2017, el monto total agregado del saldo bancario de depósitos del Gobierno Primario en bancos comerciales era de aproximadamente $4,200 millones, cubierto por la FDIC o por una garantía del agente del ELA a nombre del ELA. Los depósitos de aproximadamente $558 millones con Hacienda de los Estados Unidos representan las primas de seguro por desempleo cobradas a los patronos que se transfieren al Fondo Fiduciario de Seguro por Desempleo Federal en la Hacienda de los Estados Unidos. Estos depósitos no tienen seguro o garantía. El saldo bancario de depósitos del Gobierno Primario en bancos gubernamentales que, al 30 de junio de 2017, sumaba aproximadamente $1,100 millones, tampoco está asegurado ni garantizado.

El Gobierno Primario clasificó aproximadamente $50 millones de inversiones en el PRGITF como equivalentes de efectivo, no presentados en la tabla anterior; pero incluido en una partida separada en el estado de resultados netos adjunto (Nota 5).

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y BDE*

El BGF enfrentó una situación crítica y económica al 30 de junio de 2017 como se describe en la Nota 2. Por lo tanto, los depósitos mantenidos en el BGF estaban sujetos a restricciones y limitaciones estrictas durante el año fiscal y los períodos posteriores. El BGF sirvió como el principal agente depositario del ELA, sus instrumentos y fondos municipales; el efectivo y los equivalentes de efectivo de los depositantes con el BGF estaban sujetos al riesgo de crédito de custodia. En el caso del BDE, debido a la espiral de deterioro económico que afecta al ELA, las rebajas en las calificaciones crediticias de los bonos del ELA llevaron al sector privado a retirar depósitos del BDE. Además, la crisis financiera y de liquidez del BGF hizo que las agencias y corporaciones gubernamentales públicas trasladaran sus depósitos del BDE al BGF, reduciendo la capacidad del BDE para emitir préstamos comerciales o realizar inversiones en instrumentos financieros. Además de estas situaciones, las inversiones mantenidas por BDE habían disminuido en valor y el BDE solo se ejecutaba con los ingresos por intereses generados por la cartera de su préstamo. Debido a la alta tasa de incumplimiento en su cartera de préstamos, la capacidad de recaudar efectivo a través de los reintegros de préstamos fue limitada. La gerencia determinó que existía una pérdida crediticia de custodia al 30 de junio de 2017 para los depósitos mantenidos en el BGF y el BDE. Basado en una evaluación de la disponibilidad y recuperabilidad de tales depósitos, una pérdida de crédito de custodia en estos depósitos se ha registrado en los estados financieros del Gobierno Primario de la siguiente manera (en miles):

| | Monto |
|---|---|
| Actividades del gobierno: | |
| Valor registrado antes de la pérdida | $   889,126 |
| Pérdida de créditos en custodia | (886,591) |
| Valor registrado neto | $   2,535 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | Monto |
|---|---|
| Actividades de tipo comercial: | |
| Valor registrado antes de la pérdida | $ 229,040 |
| Pérdida de créditos en custodia | (229,010) |
| Valor registrado neto | $ 30 |

Una pérdida de crédito de custodia de aproximadamente $227.9 millones fue reconocida en 2017 como gastos del gobierno general de las Actividades del Gobierno y pertenece sustancialmente a las cuentas del DOT y a las unidades o agencias combinadas que emitieron sus estados financieros básicos independientes considerando el impacto de la pérdida de créditos en custodia. El saldo realizable de los depósitos mantenidos en el BGF al 30 de junio de 2017 con base en los cobros reales correspondientes recibidos del BGF sobre dichos depósitos después del cierre del año 30 de junio de 2017.

Se reconoció una pérdida de créditos en custodia de aproximadamente $1.5 millones en 2017 como gastos operativos de las actividades de tipo comercial.

Como se señala en la Nota 2(c), el 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento a tenor con una Modificación de Calificación en virtud del Título VI de PROMESA. A tenor con la Modificación de Calificación y la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y cada Entidad Gubernamental No Municipal y el BGF, se determinó aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Como resultado de este ajuste anterior, todos los depósitos del ELA en el BGF se extinguieron como resultado de la Modificación de Calificación.

El BDE está en proceso de desarrollar una estrategia para reestructurar sus obligaciones y operaciones. Tras la eventual reestructuración de las obligaciones y operaciones del BDE, la pérdida crediticia de custodia registrada registrada y no registrada en el efectivo y equivalentes de efectivo revelados anteriormente puede cambiar.

*Inversiones*

*Riesgo de créditos en custodia:* el riesgo de créditos en custodia para inversiones es el riesgo de que, en caso de incumplimiento de la contraparte de la transacción, el ELA no pueda recuperar el valor de la inversión o los valores colaterales que están en posesión de un tercero externo.

*Riesgo de crédito:* es el riesgo de pérdida del capital o de una recompensa financiera derivada del incumplimiento por parte del prestatario de pagar un préstamo o de no cumplir con una obligación contractual. Los inversores reciben una compensación por asumir el riesgo de crédito por medio de pagos de intereses del prestatario o emisor de una obligación de deuda.

El riesgo de crédito está estrechamente relacionado con el rendimiento potencial de una inversión, siendo el más notable que los rendimientos de los bonos se correlacionan fuertemente con su riesgo de crédito percibido.

La política general de inversión del ELA es aplicar la regla del "inversor prudente", que establece que las inversiones deben realizarse con criterio y cuidado en las circunstancias prevalecientes, que las personas prudentes, discrecionales y de inteligencia ejercen en la gestión de sus propios asuntos, no para especulación, pero para la inversión, y considerando la seguridad probable de su capital, así como los ingresos probables que se derivarán. La regla del inversor prudente debe aplicarse en el contexto de la gestión de una cartera general.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los fondos a corto plazo de las agencias, incluidos los fondos operativos, pueden invertirse en letras de Hacienda de los Estados Unidos; Bonos de Hacienda de EE. UU. o bonos con vencimientos a corto plazo; obligaciones a corto plazo de agencias e instrumentos del gobierno de EE. UU. clasificados dentro de la categoría de calificación más alta de Standard & Poor's Rating Services (S&P) y Moody's Investors Service (Moody's); certificados de depósito totalmente asegurados o garantizados de instituciones financieras elegibles designadas por el Comisionado de Instituciones Financieras y el Secretario del DOT; papel comercial principal calificado como A1/P1 por S&P y Moody's o garantizado por una línea de crédito irrevocable de una institución calificada dentro de la categoría de calificación más alta de S&P y Moody's o garantizada por valores gubernamentales; aceptaciones bancarias (como alternativas a los certificados de depósito) de instituciones financieras elegibles que hacen negocios en Puerto Rico siempre que se hayan pignorado garantías adecuadas; el PRGITF; obligaciones del ELA y sus organismos con una tasa de rendimiento esperada similar a otros valores con el mismo perfil de riesgo.

Los fondos a más largo plazo también pueden invertirse en valores del gobierno y de agencias de EE. UU. en la categoría de calificación más alta de S&P y Moody's. Esto incluye los Bonos Municipales Tributables de los gobiernos estatales y locales en los Estados Unidos clasificados dentro de las tres (3) categorías más altas de al menos dos de los principales servicios de calificación; obligaciones municipales imponibles del Gobierno Primario y sus unidades de componentes; inversiones estructuradas (pagarés y otros tipos de valores en el balance emitidos por una Agencia del Gobierno de EE. UU. u otras instituciones financieras en la categoría de calificación más alta de al menos dos de los principales servicios de calificación); y cualquier instrumento respaldado por hipotecas emitido por una agencia del gobierno de EE. UU. en la categoría de calificación más alta de S&P y Moody's.

*Riesgo de concentración de crédito:* es el riesgo de pérdida atribuido a la magnitud de la inversión de un gobierno en un solo emisor. La política del ELA sobre carteras más grandes con posiciones en valores que tienen un riesgo potencial de incumplimiento es limitar el tamaño de las inversiones para que, en caso de incumplimiento, el ingreso anual de la inversión de la cartera supere una pérdida en los valores de un solo emisor.

*Riesgo de tasa de interés:* es la política del ELA que un mínimo del 10% de la cartera total se mantenga en letras de Hacienda de EE. UU. altamente negociables o instrumentos de inversión a un día. Las carteras más grandes no deberían contener más del 30% de la cartera en instrumentos comercializables con vencimientos superiores a un mes. Esta política debe seguirse siempre que no reduzca los rendimientos de inversión.

**Actividades del Gobierno**

Las inversiones de Actividades del Gobierno consistieron en aproximadamente $84.9 millones en contratos de inversión no participativos (contratos de inversión garantizados) que estuvieron expuestos al riesgo de custodia como no asegurados, no registrados y mantenidos por las contrapartes o por sus departamentos o agentes fiduciarios, pero no a nombre del Gobierno Primario.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, el valor de mercado de las inversiones de las Actividades del Gobierno basadas en la jerarquía de insumos era el siguiente (en miles):

| Tipo de inversión | | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ | — | 35,730 | — | 35,730 |
| Bonos corporativos y pagarés de los EE. UU. | | | 368,198 | — | 368,198 |
| Grupos de inversión interna - títulos de ingresos fijos: PRGITF | | | | | |
| Grupos de inversión externa - títulos de ingresos fijos: | | — | 12,224 | — | 12,224 |
| Contratos de inversión no participativos del mercado monetario de bancos de los EE. UU.: | | 25,216 | — | — | 25,216 |
| UniCredit Bank AG - Garantizado Contrato de inversión | | — | — | 83,684 | 83,684 |
| Total de inversiones medidas a valor de mercado | $ | 25,216 | 416,152 | 83,684 | 525,052 |
| Inversiones medidas al costo amortizado o VAN: | | | | | |
| Gestión de Dreyfus de Efectivo del Gobierno | | | | | 39,490 |
| Fondos del mercado de dinero | | | | | 28,327 |
| Certificado de depósitos negociables | | | | | 1,629 |
| Contratos de inversiones no participantes | | | | | 1,217 |
| Otros | | | | | 1,592 |
| Total de inversiones | | | | $ | 597,307 |

121

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las Actividades del Gobierno al 30 de junio de 2017 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| | | Vencimiento (en años) | | |
|---|---|---|---|---|
| Tipo de inversión | En un año | Después de uno a cinco años | Después de diez años | Total |
| Títulos del gobierno de los EE. UU. | $ 35,730 | — | — | 35,730 |
| Bonos corporativos y pagarés de los EE. UU. | 368,198 | — | — | 368,198 |
| Fondos del mercado monetario | 12,315 | 16,012 | — | 28,327 |
| Certificado de depósitos negociables | 1,629 | — | — | 1,629 |
| Otros | — | 1,592 | — | 1,592 |
| Grupos de inversión interna | | | | |
| - títulos de ingresos fijos: | | | | |
| PRGITF | 12,224 | — | — | 12,224 |
| Grupos de inversión externa | | | | |
| - títulos de ingresos fijos: | | | | |
| Gestión de Dreyfus de Efectivo del | | | | |
| Gobierno | 39,490 | — | — | 39,490 |
| Mercado monetario de bancos de los EE. UU. | — | — | 25,216 | 25,216 |
| Contratos de inversiones no | | | | |
| participantes: | | | | |
| UniCredit Bank AG - Garantizado | | | | |
| Contrato de inversión | — | — | 83,684 | 83,684 |
| Calyon | — | — | 1,217 | 1,217 |
| Total de títulos de deuda y contratos de inversiones de ingresos fijos | $ 469,586 | 17,604 | 110,117 | 597,307 |
| Reconciliación con el estado de resultados netos de todo el Gobierno: | | | | |
| Inversiones no restringidas | | | $ | 11,917 |
| Inversiones restringidas | | | | 585,390 |
| Total | | | $ | 597,307 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Las calificaciones de calidad crediticia (S&P) y el valor de mercado por tipo de inversión para las inversiones informadas por las Actividades del Gobierno al 30 de junio de 2017 consistieron en lo siguiente (en miles):

| Tipo de inversión | | AAA | Calificación | | Total |
|---|---|---|---|---|---|
| | | | A+ a A- | BBB+ a B- | |
| Bonos corporativos y pagarés de los EE. UU. | $ | — | 368,198 | — | 368,198 |
| Fondos del mercado monetario | | 28,327 | — | — | 28,327 |
| Certificados de depósitos negociables | | 1,629 | — | — | 1,629 |
| Otros | | 1.592 | — | — | 1,592 |
| Grupos de inversión interna - títulos de ingresos fijos: | | | | | |
| PRGITF | | 12,224 | — | — | 12,224 |
| Grupos de inversión externa - títulos de ingresos fijos: | | | | | |
| Gestión de Dreyfus de Efectivo del Gobierno | | 39,490 | — | — | 39,490 |
| Contratos de inversión no participativos del mercado monetario de bancos de los EE. UU.: | | — | 25,216 | — | 25,216 |
| Contratos de inversiones no participantes: | | | | | |
| UniCredit Bank AG - Garantizado Contrato de inversión | | — | | 83,684 | 83,684 |
| Calyon | | — | 1,217 | | 1,217 |
| Total de títulos de deuda y contratos de inversiones de ingresos fijos | $ | 83,262 | 394.631 | 83,684 | 561.577 |

Aproximadamente $35.7 millones del total de las inversiones de Actividades del Gobierno consisten en instrumentos de Hacienda de los Estados Unidos, que no conllevan riesgo de crédito y, por lo tanto, no están incluidos en la tabla anterior.

**Actividades de Tipo Comercial**

Al 30 de junio de 2017, el valor de mercado de las inversiones de las Actividades de tipo comercial basadas en la jerarquía de insumos era el siguiente (en miles):

| Tipo de inversión | | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. y agencias patrocinadas | $ | — | 4,852 | — | 4,852 |
| Hipotecas y títulos respaldados por activos: | | | | | |
| Asociación Nacional de Hipotecas del Gobierno (GNMA) | | — | 2,895 | — | 2,895 |
| Hipotecas comerciales | | — | 681 | — | 681 |
| Títulos respaldados por activos | | — | 816 | — | 816 |
| Bonos corporativos y pagarés de los EE. UU. | | — | 7,239 | — | 7,239 |
| Bonos y pagarés corporativos y de gobiernos extranjeros | | — | 653 | — | 653 |
| Grupos de inversión externa - títulos de capital | | — | 9,116 | — | 9,116 |
| Total de inversiones medidas a valor de mercado | $ | — | 26.252 | — | 26.252 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las actividades de tipo comercial al 30 de junio de 2017 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| Tipo de inversión | En un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
|---|---|---|---|---|---|
| | | **Vencimiento (en años)** | | | |
| Títulos del gobierno de los EE. UU. y agencias patrocinadas | $ — | 1,390 | 1,711 | 1,751 | 4,852 |
| Hipotecas y títulos respaldados por activos: | | | | | |
| Asociación Nacional de Hipotecas del Gobierno (GNMA) | — | 26 | 684 | 2,185 | 2,895 |
| Hipotecas comerciales | — | — | — | 681 | 681 |
| Títulos respaldados por activos | — | 816 | — | — | 816 |
| Bonos corporativos y pagarés de los EE. UU. | — | 3,687 | 2,619 | 933 | 7,239 |
| Bonos y pagarés corporativos y de gobiernos extranjeros | — | 424 | 229 | — | 653 |
| Total de títulos de deuda | $ — | 6,343 | 5,243 | 5,550 | 17,136 |
| Grupos de inversión externa - títulos de capital | | | | | |
| SPDR S&P 500 ETF Trust | | | | | 7,203 |
| MFC ISHARES TR Russell 2000 Index Fund | | | | | 982 |
| MFC Vanguard FTSE Developed | | | | | 926 |
| MFC Vanguard FTSE Emergency MKTS ETF | | | | | 5 |
| Total | | | | $ | 26,252 |
| Reconciliación con el estado de resultados netos de todo el gobierno: | | | | | |
| Inversiones restringidas | | | | $ | 26,252 |
| Total | | | | $ | 26,252 |

Las calificaciones de calidad crediticia (S&P) y el valor de mercado por tipo de inversión para las inversiones informadas por las actividades de tipo comercial al 30 de junio de 2017 consisten en lo siguiente (en miles):

| Tipo de inversión | AAA | AA+ a AA- | A+ a A- | BBB+ a BBB- | BB+ a BB- | B+ a B- | No calificado | Total |
|---|---|---|---|---|---|---|---|---|
| | | | **Calificación** | | | | | |
| Hipotecas y títulos respaldados por activos: | | | | | | | | |
| Hipotecas comerciales | $ 266 | — | — | — | — | — | 415 | 681 |
| Títulos respaldados por activos | 805 | — | — | — | — | — | 11 | 816 |
| Bonos corporativos y pagarés de los EE. UU. | 614 | 961 | 3,309 | 2,297 | — | 58 | — | 7,239 |
| Bonos y pagarés corporativos y de gobiernos extranjeros | — | — | 596 | — | 57 | — | — | 653 |
| Total de títulos de deuda | $ 1,685 | 961 | 3,905 | 2,297 | 57 | 58 | 426 | 9,389 |

Aproximadamente $7.8 millones del total de las inversiones de actividades de tipo comercial consisten en $2.9 millones en los valores de la Asociación Nacional de Hipotecas del Gobierno de los Estados Unidos (GNMA) y $4.9 millones en instrumentos de Hacienda de los Estados Unidos, que no conllevan riesgo de crédito y, por lo tanto, no están incluidos en la tabla anterior.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**Fondos Fiduciarios**

*Efectivo y Equivalentes de Efectivo*

El efectivo y equivalentes de efectivo de los Fondos Fiduciarios al 30 de junio de 2017 consistió en lo siguiente (en miles):

| | | Monto registrado | | | Saldo bancario |
|---|---|---|---|---|---|
| | | No restringido | Restringido | Total | |
| Bancos comerciales | $ | 953,511 | 216,483 | 1,169,994 | 1,148,359 |
| Bancos gubernamentales (todos con el BGF), neto | | 50 | — | 50 | 30,077 |
| Total | $ | 953,561 | 216,483 | 1,170,044 | 1,178,436 |

El efectivo y equivalentes de efectivo consisten en depósitos en bancos comerciales, depósitos en el BGF e inversiones a corto plazo. Las inversiones a corto plazo incluyen fondos del mercado monetario y otros equivalentes de efectivo. El efectivo en bancos comerciales y bancos gubernamentales también incluye fondos depositados en bancos privados (aproximadamente $629.9 millones) y el BGF (aproximadamente $600,000) en poder del fondo de la agencia del ELA en nombre de terceros fuera de la entidad de informe del ELA.

El monto total de efectivo restringido y equivalentes de efectivo ascendió a aproximadamente $216 millones al 30 de junio de 2017 y consistió en lo siguiente:

- Aproximadamente $1.9 millones en fondos restringidos para la amortización de la deuda de los bonos del SRE pagaderos, de los cuales el 100% de dichos fondos fueron depositados en un fideicomisario en fondos del mercado monetario.

- Aproximadamente $214 millones en fondos restringidos para reintegros de préstamos hipotecarios y personales, para cheques vencidos no reclamados por los miembros del plan y para otros fines, de los cuales aproximadamente se depositaron $11 millones en un fideicomisario en cuentas del mercado monetario, aproximadamente $126,000 se depositaron en el BGF y aproximadamente $202 millones se depositaron en bancos comerciales.

La garantía recibida para las transacciones de préstamo de valores de los fondos fiduciarios de pensiones al 30 de junio de 2017 que ascendieron a aproximadamente $7.2 millones se invirtió en fondos de inversión a corto plazo patrocinados por el banco depositario de los fondos fiduciarios de pensiones (ver Nota 7).

*Riesgo de créditos en custodia:* al 30 de junio de 2017, los fondos fiduciarios tenían aproximadamente $64 millones en efectivo y equivalentes de efectivo y garantías de transacciones de préstamos de títulos, que estaban expuestos al riesgo de créditos en custodia como no asegurados y sin garantía. La garantía en efectivo recibida de las transacciones de préstamo de valores invertidas en fondos de inversión a corto plazo patrocinados por el banco custodio de los fondos fiduciarios de pensiones también están exentos del cumplimiento del requisito de garantía.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y el BDE*

Basado en una evaluación de la disponibilidad y recuperabilidad de los depósitos, se ha registrado una pérdida de créditos en custodia en los estados financieros básicos de los fondos fiduciarios dentro de otros gastos de la siguiente manera (en miles):

| | Depósitos mantenidos en el BGF al 30 de junio de 2017 | | |
|---|---|---|---|
| | Valor registrado antes de la pérdida de créditos en custodia | Pérdida de créditos en custodia | Valor registrado |
| Efectivo y Equivalentes de Efectivo | $ 30,077 | (30,027) | 50 |

La pérdida de crédito de custodia anterior pertenece a los Sistemas de Retiro que emitieron sus estados financieros básicos independientes considerando el impacto de la pérdida de créditos en custodia. El saldo realizable de los depósitos mantenidos en el BGF al 30 de junio de 2017 se determinó con base en los cobros reales correspondientes recibidos del BGF sobre dichos depósitos después del cierre del año 30 de junio de 2017. No había fondos depositados en el BDE al 30 de junio de 2017.

*Inversiones*

Al 30 de junio de 2017, el valor de mercado de las inversiones de los fondos fiduciarios de pensiones basadas en la jerarquía de insumos era el siguiente (en miles):

| Tipo de inversión | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ 14,192 | — | — | 14,192 |
| Pagarés de agencias patrocinadas por el gobierno de los EE. UU. | 16,668 | — | — | 16,668 |
| Hipotecas y títulos respaldados por activos: GNMA | 3.058 | — | — | 3,058 |
| FNMA | 2.581 | — | — | 2,581 |
| FHLMC | 1.420 | — | — | 1,420 |
| Bonos corporativos y pagarés de los EE. UU. | — | 71,936 | — | 71,936 |
| Bonos y pagarés corporativos no pertenecientes a los EE. UU. | — | 16,576 | — | 16,576 |
| Bonos de COFINA | — | 58,224 | — | 58,224 |
| Inversiones a valor de mercado | $ 37,919 | 146,736 | — | 184,655 |
| Inversiones medidas en VAN: | | | | |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | | | |
| Fondos de ingresos fijos | | | | 385,718 |
| Inversiones en asociaciones limitadas | | | | 90,591 |
| Total de inversiones | | | | $ 660,964 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por los fondos fiduciarios de pensiones al 30 de junio de 2017 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| Tipo de inversión | Vencimiento (en años) | | | | |
| --- | --- | --- | --- | --- | --- |
| | En un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años | Total |
| Títulos del gobierno de los EE. UU.: | | | | | |
| Pagarés de Hacienda de los EE. UU. | $     2,105 | 3,368 | 3,602 | — | 9,075 |
| Letras de Hacienda de los EE. UU. | — | — | — | 2,353 | 2,353 |
| Bonos de Hacienda de los EE. UU. | — | 560 | — | — | 560 |
| Títulos de Hacienda de los EE. UU. Protegidos contra inflación (TIPS) | — | 2,204 | — | — | 2,204 |
| Pagarés de agencias patrocinadas por el gobierno de EE. UU.: | — | 1,053 | 1,884 | — | 2,937 |
| Federal Home Loan Bank (FHLB) | | | | | |
| FNMA | — | 4,807 | 4,249 | — | 9,056 |
| FHLMC | — | 2,999 | — | — | 2,999 |
| Federal Farm Credit Bank (FFCB) | — | 1,676 | — | — | 1,676 |
| Hipotecas y títulos respaldados por activos: | | | | | |
| GNMA | — | 519 | — | 2,539 | 3,058 |
| FNMA | — | — | — | 2,581 | 2,581 |
| Títulos respaldados por activos | — | — | — | 1,420 | 1,420 |
| Bonos corporativos y pagarés de los EE. UU. | 9,854 | 36,527 | 25,478 | 77 | 71,936 |
| Bonos corporativos y pagarés no pertenecientes a los EE. UU. | 1,098 | 7,324 | 7,115 | 1,039 | 16,576 |
| Bonos de COFINA | — | — | — | 58,224 | 58,224 |
| Total bonos y pagarés | 13,057 | 61,037 | 42,328 | 68,233 | 184,655 |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | | | | |
| Fondo de ingresos fijos - SSgA y otros fondos fiduciarios de ingresos fijos | | | | | |
| Fondo intermedio: fondos fiduciarios mixtos EE. UU. | 230 | 125,858 | 65,798 | — | 191,886 |
| Total de bonos y pagarés y fondos mixtos no cotizados en bolsa | | | | | |
| no cotizados en bolsa | $     13,287 | 186,895 | 108,126 | 68,233 | 376,541 |
| Acciones y capital y otros fondos fiduciarios mixtos no cotizados en bolsa | | | | | |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | | | | |
| Fondos de capital y de otro tipo: | | | | | |
| EE. UU. – Fondo SSgA Russell 3000 | | | | | 120,498 |
| EE. UU. – Fondo SSgA S&P 500 | | | | | 8,981 |
| Fuera de EE. UU. – SSgA MSCI | | | | | 61,201 |
| Fondo ACWI Ex USA | | | | | 3,152 |
| Total de acciones y capital | | | | | 193,832 |
| Inversiones en asociaciones limitadas | | | | | 90,591 |
| Total | | | | | $     660,964 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Las inversiones del fondo fiduciario de pensiones están expuestas al riesgo de créditos en custodia, riesgo de crédito, concentración de riesgo de crédito, riesgo de moneda extranjera y riesgo de tasa de interés. A continuación, se incluye una descripción de estos riesgos al 30 de junio de 2017:

*Riesgo de crédito de custodia:* al 30 de junio de 2017, las inversiones en valores se registraron a nombre del fondo fiduciario de pensiones y se mantuvieron en posesión de los bancos custodios del fondo fiduciario de pensiones, State Street Bank and Trust y Bank of New York Mellon, con excepción de los títulos en préstamo. Los títulos en préstamo no están expuestos al riesgo de crédito de custodia (ver Nota 7).

*Riesgo de crédito:* todos los valores de renta fija en el momento de la compra deben ser de calidad de grado de inversión. Todas las emisiones deben ser calificadas como grado de inversión por al menos dos de las agencias de calificación reconocidas a nivel nacional. Se espera que la cartera mantenga una calidad crediticia promedio ponderada mínima de "A" o mejor utilizando las calificaciones crediticias de S&P o Moody's. Las pautas de inversión del SRM prohíben las inversiones en títulos con fechas esperadas de vencimiento posteriores a 30 años. Las posiciones por debajo del grado de inversión deben informarse a un representante de la gerencia del SRM y monitorearse cuidadosamente. No se espera que la cartera del SRM tenga más del 5% invertido en valores que se han desviado después de la compra por debajo de la calidad de grado de inversión. La política de inversión del SRJ limita la inversión en valores de deuda corporativa a las calificaciones más altas emitidas por organizaciones de calificación estadística reconocidas a nivel nacional.

Las calificaciones de calidad crediticia para las inversiones mantenidas por los fondos fiduciarios de pensiones al 30 de junio de 2017 son las siguientes (en miles):

| Tipo de inversión | AAA | AA+ a AA- | A+ a A- | BBB+ a BBB- | BB+ a BB- | CCC- | No calificado | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Calificación (1) | | | | |
| Bonos y pagarés: | | | | | | | | |
| Obligaciones de agencias del gobierno de los EE. UU.: | | | | | | | | |
| FHLB | $            — | 2,937 | — | — | — | — | — | 2,937 |
| FNMA | — | 9,056 | — | — | — | — | — | 9,056 |
| FHLMC | — | 2,999 | — | — | — | — | — | 2,999 |
| FFCB | — | 1,676 | — | — | — | — | — | 1,676 |
| Hipotecas y títulos respaldados por activos: | | | | | | | | |
| FNMA | — | 2,581 | — | — | — | — | — | 2,581 |
| FHLMC | — | 1,420 | — | — | — | — | — | 1,420 |
| Bonos corporativos y pagarés de los EE. UU. | 2,065 | 11,374 | 14,054 | 40,197 | 682 | — | 3,554 | 71,936 |
| Bonos corporativos y pagarés no pertenecientes a los EE. UU. | — | 502 | 4,596 | 7,707 | 857 | — | 2,914 | 16,576 |
| Bonos de COFINA | — | — | — | — | — | 58,224 | — | 58,224 |
| Total bonos y pagarés | 2,065 | 32,545 | 18,650 | 47,904 | 1,549 | 58,224 | 6,468 | 167,405 |
| Fondos de fideicomisos mixtos no cotizados en bolsa: | | | | | | | | |
| Fondo de ingresos fijos – SSgA | | | | | | | | |
| Fondo intermedio | 123,210 | 10,727 | 25,367 | 32,582 | — | — | — | 191,886 |
| Total de títulos de deuda y fondo fideicomisario mixto no cotizado en bolsa de ingresos fijos | $ 125,275 | 43,272 | 44,017 | 80,486 | 1,549 | 58,224 | 6,468 | 359,291 |

(1) Calificación obtenida de Standard and Poor's o calificación equivalente de Moody's Investor Service o Fitch Ratings.

Aproximadamente $17.3 millones del total de las inversiones de los fondos fiduciarios al 30 de junio de 2017 consisten en GNMA y títulos de Hacienda de EE. UU., que no conllevan ningún riesgo y, por lo tanto, no están incluidos en la tabla anterior.

*Riesgo de concentración de crédito:* al 30 de junio de 2017, ninguna de las inversiones del SRE y SRJ en valores negociables en ninguna organización representaba el 5% o más de los activos netos del SRE y SRJ en fideicomiso para beneficios de pensión. No hubo inversiones del SRM en ningún emisor que representara

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

el 5% o más de las inversiones totales al 30 de junio de 2017. Las pautas de inversión del SRM especifican que no más del 5% de los activos de un administrador en el mercado pueden invertirse en los valores de un solo emisor.

Riesgo de tasa de interés: de acuerdo con su política de inversión, el SRE y SRJ manejan su exposición a la disminución de los valores razonables al estructurar la cartera de inversiones de modo que los valores caduquen para cumplir con los requisitos de efectivo para el pago de beneficios, evitando así la necesidad de vender valores en el mercado abierto antes del vencimiento. Se espera que el Fondo Fiduciario de Pensiones logre la preservación del capital y la generación de ingresos invirtiendo en una cartera diversificada de valores de renta fija básicos de grado de inversión comercializables. Las pautas de inversión del SRM especifican que se espera que la duración de la cartera varíe no más de entre 75% y 125% de la duración del punto de referencia respectivo.

Al 30 de junio de 2017, los vencimientos de inversión como porcentaje del total de los títulos de deuda y los fondos mutuos negociados de renta fija que no se intercambian fueron los siguientes:

| Vencimiento | Vencimiento máximo |
|---|---|
| Dentro de un año | 4% |
| Después de uno a cinco años | 50 |
| Después de cinco a diez años | 29 |
| Después de diez años | 17 |
| Total | 100% |

*Riesgo de moneda extranjera:* es el riesgo de que los cambios en los tipos de cambio afecten negativamente el valor de mercado de una inversión o un depósito. El SRE, SRJ y SRM no tienen inversiones con exposición al riesgo cambiario.

*Fondos de fideicomisos mixtos no cotizados en bolsa:*

Los fondos fiduciarios de pensiones invierten en acciones de los siguientes fondos de capital de State Street Global Advisor: SsgA S&P Fondo de Préstamo de Títulos 500 Flagship (el Fondo SsgA S&P 500), el Fondo sin Préstamo SsgA Russell 3000 1q Index (Fondo SsgA Russell 3000), y el Fondo sin Préstamo SsgA MSCI ACWI Ex USA (Fondo SsgA MSCI ACWI Ex USA). Los objetivos de inversión del Fondo SsgA S&P 500, el Fondo SsgA Russell 3000 y el Fondo SsgA MSCI ACWI Ex USA son coincidir con el rendimiento del Índice Standard & Poor's 500, el Índice Russell 3000 y el Índice MSCI ACWI Ex USA, respectivamente, a largo plazo. Las acciones del Fondo SsgA S&P 500 y del Fondo SsgA Russell 3000 pueden canjearse diariamente al valor liquidativo (VAN) y no tienen restricciones de reintegro. Las acciones del Fondo SsgA MSCI ACWI Ex USA pueden canjearse semestralmente en VAN y no tienen restricciones de canje. La inversión de los fondos fiduciarios de pensiones en estos fondos se incluye como parte de los fondos fiduciarios mixtos no cotizados en bolsa.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, las inversiones subyacentes al Fondo Ssg A S&P 500, el Fondo SsgA Russell 3000 y el Fondo SsgA MSCI ACWI Ex USA tenían las siguientes asignaciones sectoriales:

| Sector | SSgA S&P 500 Fondo | SSgA Russell 3000 Fondo | SSgA MSCI ACWI Fondo Ex USA |
|---|---|---|---|
| Tecnología de la información | 20% | 21% | 12% |
| Financiero | 16 | 15 | 22 |
| Atención médica | 15 | 14 | 8 |
| Productos no esenciales | 12 | 12 | 11 |
| Productos industriales | 10 | 11 | 12 |
| Productos esenciales | 10 | 8 | 9 |
| Energía | 7 | 5 | 8 |
| Bienes Raíces | — | 4 | 3 |
| Materiales | 3 | 3 | 8 |
| Servicios públicos | 4 | 3 | 3 |
| Servicios de telecomunicaciones | 3 | 2 | 4 |
| No clasificado | — | 2 | — |
| Total | 100% | 100% | 100% |

Además, los fondos fiduciarios de pensiones invierten en acciones del fondo no crediticio del índice de crédito intermedio de State Street Global Advisor (el fondo intermedio SsgA). El objetivo de inversión del Fondo Intermedio SsgA es replicar el Índice de Bonos de Crédito Intermedio de Barclays a largo plazo invirtiendo exclusivamente en títulos de renta fija. Las acciones del Fondo Intermedio SsgA pueden canjearse diariamente en su VAN y no tienen restricciones de canje. La inversión de los fondos fiduciarios de pensiones en el Fondo Intermedio SsgA se incluye como parte de los fondos fiduciarios mixtos sin intercambio.

Al 30 de junio de 2017, las inversiones subyacentes al Fondo Intermedio SsgA tenían las siguientes asignaciones sectoriales:

| Sector | Porcentaje |
|---|---|
| Hacienda | 57% |
| Corporativo - Industrial | 12 |
| Corporativo - Finanzas | 19 |
| No corporativo | 7 |
| Agencia | 3 |
| Corporativo - Servicios | 2 |
| Total | 100% |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, la composición de las inversiones subyacentes en el Fondo SsgA MSCI ACWI Ex USA y en el Fondo Intermedio Ssg A por país era la siguiente:

| País | SSgA MSCI ACWI Fondo Ex USA |
|------|---------|
| Japón | 16% |
| Reino Unido | 11 |
| Canadá | 7 |
| Francia | 7 |
| Alemania | 7 |
| Suiza | 6 |
| Australia | 5 |
| Hong Kong | 5 |
| China | 4 |
| Corea | 4 |
| Taiwán | 3 |
| Países Bajos | 3 |
| España | 2 |
| India | 2 |
| Otros | 18 |
| Total | 100% |

**Inversiones en asociaciones limitadas**

A tenor con la Política general de inversión del ELA, los fondos fiduciarios de pensiones invirtieron aproximadamente $42.3 millones en asociaciones limitadas durante el año terminado el 30 de junio de 2017.

El valor de marcado de las inversiones en sociedades limitadas al 30 de junio de 2017 ascendía a aproximadamente $90.6 millones. Las asignaciones de ganancias y pérdidas netas a socios limitados se basan en ciertos porcentajes, según lo establecido en los acuerdos de asociación limitada. Las inversiones en asociaciones limitadas no son calificadas por una organización de calificación estadística reconocida a nivel nacional. El riesgo de crédito relacionado se mide a través de análisis de crédito, revisiones periódicas de los resultados de las operaciones y reuniones de la administración de las compañías sujetas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, los fondos fiduciarios de pensiones tenían compromisos de capital con asociaciones limitadas y contribuciones relacionadas de la siguiente manera (en miles):

| | Compromisos del sector público | Contribuciones año fiscal | Contribuciones acumuladas | Valor de mercado |
|---|---|---|---|---|
| **Guayacán Fund of Funds II, L.P.:** | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | $ 25,000 | — | 23,681 | 919 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 25,000 | — | 23,681 | 918 |
| Subtotal | 50,000 | — | 47,362 | 1,837 |
| **Guayacán Private Equity Fund, L.P.:** | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | 5,000 | — | 4,645 | 2,162 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 5,000 | — | 4,645 | 2,148 |
| Subtotal | 10,000 | — | 9,290 | 4,310 |
| **Guayacán Private Equity Fund II, L.P.:** | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | 25,000 | — | 24,547 | 22,638 |
| Subtotal | 25,000 | — | 24,547 | 22,638 |
| **Otros fondos:** | | | | |
| Sistema de Retiro de los Empleados del Gobierno del ELA de Puerto Rico | 98,300 | 42,383 | 87,970 | 61,350 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 13,714 | — | 12,001 | 456 |
| Subtotal | 112,014 | 42,383 | 99,971 | 61,806 |
| Total | $ 197,014 | 42,383 | 181,170 | 90,591 |

132

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**Unidades de Componentes de Presentación Discreta**

*Depósitos*

El efectivo y sus equivalentes consisten en depósitos a la vista, cuentas que devengan intereses, certificados de depósito y contratos de inversión bancaria. El efectivo y equivalentes de efectivo de las unidades de componentes de presentación discreta al 30 de junio de 2017 consistían en (en miles):

*Unidades de Componentes Mayores de Presentación Discreta*

| | | Monto registrado | | | Saldo |
| --- | --- | --- | --- | --- | --- |
| | | No restringido | Restringido | Total | bancario |
| Bancos comerciales | $ | 1,209,736 | 480,866 | 1,690,602 | 1,693,106 |
| Bancos gubernamentales | | — | 4,636 | 4,636 | 371,246 |
| Total | $ | 1,209,736 | 485,502 | 1,695,238 | 2,064,352 |

Al 30 de junio de 2017, las unidades de componentes mayores de presentación discreta tenían aproximadamente $371 millones de efectivo y equivalentes de efectivo que estaban expuestos al riesgo de crédito de custodia como no asegurados y sin garantía

*Unidades de Componentes No Mayores de Presentación Discreta*

| | | Monto registrado | | | Saldo |
| --- | --- | --- | --- | --- | --- |
| | | No restringido | Restringido | Total | bancario |
| Bancos comerciales | $ | 323,032 | 64,463 | 387,495 | 399,431 |
| Bancos gubernamentales | | 41,858 | 30 | 41,888 | 444,581 |
| Total | $ | 364,890 | 64,493 | 429,383 | 844,012 |

Al 30 de junio de 2017, las unidades de componentes no mayores de presentación discreta tenían aproximadamente $444.6 millones de efectivo y equivalentes de efectivo que estaban expuestos al riesgo de crédito de custodia como no asegurados y sin garantía.

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y el BDE*

La gerencia determinó que existía una pérdida crediticia de custodia al 30 de junio de 2017 para los depósitos mantenidos en el BGF y el BDE. Según una evaluación de la disponibilidad y recuperabilidad de dichos depósitos, se ha registrado una pérdida de crédito de custodia en estos depósitos en los estados financieros básicos de las unidades de componentes de presentación discreta dentro de los gastos generales de la siguiente manera (en miles):

| | | Monto |
| --- | --- | --- |
| Unidades de componentes mayores: | | |
| Valor registrado antes de la pérdida de créditos en custodia | $ | 371,246 |
| Pérdida de créditos en custodia | | (366,610) |
| Valor neto registrado | $ | 4,636 |

133

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | Monto |
|---|---|
| Unidades de componentes no mayores: | |
| Valor registrado antes de la pérdida de créditos en custodia | $  444,581 |
| Pérdida de créditos en custodia | (402,693) |
| Valor registrado neto | $  41,888 |

Las pérdidas de créditos en custodia antes mencionadas se relacionaron con las unidades de componentes de presentación discreta que emitieron sus estados financieros básicos independientes considerando el impacto de la pérdida de créditos en custodia. El saldo realizable de los depósitos mantenidos en el BGF al 30 de junio de 2017 se determinó con base en los cobros reales correspondientes recibidos del BGF sobre dichos depósitos después del cierre del año 30 de junio de 2017.

Se reconoció una pérdida crediticia de custodia de aproximadamente $108.5 millones como gastos generales y administrativos de las unidades de componentes de presentación discreta durante el año fiscal 2017.

Como se señala en la Nota 2(c), el 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento a tenor con una Modificación de Calificación en virtud del Título VI de PROMESA. A tenor con la Modificación de Calificación y la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y cada Entidad Gubernamental No Municipal y el BGF, se determinó aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Como resultado de este ajuste anterior, todos los depósitos del ELA en el BGF se extinguieron como resultado de la Modificación de Calificación.

El BDE está en proceso de desarrollar una estrategia destinada a reestructurar sus obligaciones y operaciones. Tras la eventual reestructuración de las obligaciones y operaciones del BDE.

*Riesgo de crédito:* además de las inversiones permitidas para el Gobierno Primario, las políticas de inversión de las unidades de componentes de presentación discreta permiten a la gerencia invertir en lo siguiente: certificados de depósito o billetes en euros emitidos por instituciones financieras en los EE. UU. donde el emisor se clasifica en el nivel más alto categoría de calificación para obligaciones a corto plazo y en la categoría de calificación más alta para obligaciones a largo plazo clasificadas por S&P y Moody's: pagarés corporativos y bonos clasificados en las categorías más altas de al menos dos de los principales servicios de calificación; deuda corporativa imponible emitida a través de AFICA dentro de las dos (2) categorías de calificación más altas de al menos dos de los principales servicios de calificación; certificados de confianza (sujeto a consulta previa por escrito con el BGF); y títulos respaldados por hipotecas y activos calificados como AAA por S&P o Aaa por Moody's que no deben exceder el 5% de los activos de un administrador a valor de mercado se invertirá en los valores de un solo emisor.

Las políticas de inversión de las unidades de componentes de presentación discreta establecen limitaciones y otras pautas sobre los montos a invertir en las categorías de inversión antes mencionadas y por emisor/contraparte y sobre la exposición por país. Además, dichas políticas proporcionan pautas sobre las instituciones con las que se pueden realizar transacciones de inversión.

Las políticas de inversión de las unidades de componentes de presentación discreta estipulan que las transacciones de inversión deben realizarse con contrapartes que tengan una calificación BBB+/A1 o mejor según S&P's o una calificación equivalente de Fitch Ratings o Moody's, dependiendo del tipo y vencimiento de la inversión y la contraparte de transacción.

*Riesgo de concentración de crédito:* asimismo, la política de inversión especifica que no más del 5% de los activos de un administrador en el mercado deben invertirse en los valores de un solo emisor. La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las unidades de componentes de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

presentación discreta al 30 de junio de 2017 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

**Unidades de Componentes de Presentación Discreta**

Al 30 de junio de 2017, el valor de mercado de las inversiones de las unidades de componentes de presentación discreta basadas en la jerarquía de insumos era el siguiente:

| Tipo de inversión | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|
| Títulos del gobierno de los EE. UU. | $ 20,459 | 10,792 | — | 31,251 |
| Pagarés de agencias del gobierno de EE. UU.: | | | | |
| por GNMA | 19,367 | 3,621 | — | 22,988 |
| FNMA | — | 13,570 | — | 13,570 |
| FHLMC | — | 1,152 | — | 1,152 |
| FFCB | — | 1,035 | — | 1,035 |
| Otros | — | 1,872 | — | 1,872 |
| Hipotecas y títulos respaldados por activos: | | | | |
| GNMA | 77.928 | 6,371 | — | 84,299 |
| FNMA | 3.375 | 15,989 | — | 19,364 |
| FHLMC | — | 8,477 | — | 8,477 |
| Hipotecas comerciales | 15,690 | 4,107 | — | 19,797 |
| Títulos respaldados por activos | — | 4,895 | — | 4,895 |
| Otros | 170 | 221 | — | 391 |
| Bonos corporativos y pagarés de los EE. UU. | 24,989 | 86,661 | — | 111,650 |
| Bonos y pagarés de gobiernos extranjeros | 2,898 | 1,511 | — | 4,409 |
| Pagarés municipales de los EE. UU. | — | 51,150 | — | 51,150 |
| Bonos y pagarés de agencias del ELA | — | 59,559 | — | 59,559 |
| Grupos de inversión externa - títulos de renta fija | 50,689 | — | — | 50,689 |
| Grupos de inversión externa - títulos de capital | 118,260 | 12,160 | 60,450 | 190,870 |
| Acciones corporativas de los EE. UU. | 278,455 | — | — | 278,455 |
| Otros | 547 | — | — | 547 |
| Inversiones a valor de mercado | $ 612,827 | 283,143 | 60,450 | 956,420 |
| Inversiones valuadas en VAN o costo amortizado | | | | |
| Equivalente de efectivo - fondo del mercado monetario | | | | 64,049 |
| Certificado de depósito negociable | | | | 309 |
| Fondos mutuos | | | | 63,884 |
| PRGITF | | | | 105.063 |
| Contratos de inversiones garantizadas | | | | 64,685 |
| Grupos de inversión externa - títulos de capital | | | | 101,104 |
| Total de unidades de componentes mayores | | | | 1,355,514 |
| Total de unidades de componentes no mayores | | | | 1,376,905 |
| Total de inversiones | | | | $ 2,732,419 |

135

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La siguiente tabla resume el tipo y los vencimientos de las inversiones mantenidas por las unidades de componentes mayores de presentación discreta al 30 de junio de 2017 (en miles). Las inversiones por tipo en cualquier emisor que represente el 5% o más de las inversiones totales se informan por separado. Los vencimientos esperados diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho de llamar o pagar obligaciones con o sin penalización por llamada o pago anticipado.

| Tipo de inversión | | Vencimiento (en años) | | | |
| --- | --- | --- | --- | --- | --- |
| | Dentro de un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez a años | Total |
| Títulos del gobierno de los EE. UU. | $ 4,298 | 8,930 | 15,209 | 2,814 | 31,251 |
| Pagarés de agencias patrocinadas por el gobierno de los | | | | | |
| EE. UU.: FHLB | 10,584 | 9,985 | 2,419 | — | 22,988 |
| FNMA | 5.621 | 6,945 | 1,004 | — | 13,570 |
| FHLMC | — | 1,152 | — | — | 1,152 |
| FFCB | — | 1,035 | — | — | 1,035 |
| Otros | — | 742 | 1,130 | — | 1,872 |
| Hipotecas y títulos respaldados por activos: | | | | | |
| GNMA | — | — | 38,964 | 45,335 | 84,299 |
| FNMA | — | 351 | 10,629 | 8,384 | 19,364 |
| FHLMC | — | 3 | 3,423 | 5,051 | 8,477 |
| Hipotecas comerciales | — | — | 615 | 19,182 | 19,797 |
| Títulos respaldados por activos | 9 | 4,545 | 341 | — | 4,895 |
| Otros | — | — | — | 391 | 391 |
| Bonos corporativos y pagarés de los EE. UU. | 10,509 | 58,461 | 38,018 | 4,662 | 111,650 |
| Bonos y pagarés de gobiernos extranjeros | — | 1,879 | 2,397 | 133 | 4,409 |
| Pagarés municipales de los EE. UU. | 43,821 | 4,745 | 1,338 | 1,246 | 51,150 |
| Bonos y pagarés de agencias del ELA | — | 59,559 | — | — | 59,559 |
| Fondos del mercado monetario | 39,810 | 24,239 | — | — | 64,049 |
| Certificado de depósito negociable | 309 | — | — | — | 309 |
| PRGITF | 104.013 | — | — | — | 104,013 |
| Grupos de inversión externa - títulos de renta fija | 2 | 37,404 | 74 | 13,694 | 51,174 |
| Contratos de inversiones no participantes | — | 56,781 | — | 50,731 | 107,512 |
| Otros | 64,431 | — | — | — | 64,431 |
| Total de títulos de deuda y contratos de inversión de renta fija | $ 283,407 | 276,756 | 115,561 | 151,623 | 827,347 |
| Títulos de capital: | | | | | |
| Acciones corporativas de los EE. UU. | | | | | 278,455 |
| Acciones corporativas no pertenecientes a los EE. UU. | | | | | — |
| Grupos de inversión externa - títulos de capital | | | | | 186,088 |
| Capital de asociaciones limitadas/privado | | | | | 63,624 |
| Total de unidades de componentes mayores | | | | | 1,355,514 |
| Total de unidades de componentes no mayores | | | | | 1,376,905 |
| Total | | | | | $ 2,732,419 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | Vencimiento (en años) | | | |
|---|---|---|---|---|
| Tipo de inversión | Dentro de un año | Después de uno a cinco años | Después de cinco a diez años | Después de diez años  Total |
| Reconciliación con el estado de resultados netos de todo el gobierno: | | | | |
| Inversiones no restringidas | | | | $    1,343,964 |
| Inversiones restringidas | | | | $    1,388,455 |
| Total | | | | $    2,732,419 |

*Riesgo de crédito de custodia:* las unidades de componentes de presentación discreta tenían aproximadamente $72.7 millones (aproximadamente $300,000 y $72.4 millones en unidades de componentes mayores y no mayores de presentación discreta, respectivamente) en varios tipos de valores del gobierno y de agencias de EE. UU., valores respaldados por hipotecas y otras inversiones que estaban expuestas al riesgo de créditos en custodia como no aseguradas, no registradas y retenidas por las contrapartes o por sus departamentos o agentes de confianza, pero no a nombre de las unidades de componentes de presentación discreta.

*Riesgo de moneda extranjera:* la CFSE (una unidad de componentes mayores de presentación discreta) limita su exposición al riesgo de moneda extranjera al limitar el monto total invertido al 10% de la cartera. Al 30 de junio de 2017, la CFSE tenía las siguientes inversiones denominadas en moneda extranjera (en miles):

| Descripción | Moneda | Valor de mercado |
|---|---|---|
| Acciones comunes | Dólar australiano | $    999 |
| | Peso argentino | 493 |
| | Franco suizo | 2,550 |
| | Corona danesa | 1,230 |
| | Euro | 8,425 |
| | Libra británica | 4,138 |
| | Dólar de Hong Kong | 1,063 |
| | Rupia de Indonesia | 529 |
| | Yen japonés | 6,415 |
| | Peso mexicano | 394 |
| | Corona noruega | 611 |
| | Corona sueca | 1,010 |
| | Dólar de Singapur | 534 |
| | Rand sudafricano | 550 |
| | Real brasilero | 198 |
| Acciones preferidas y otros títulos | Euro | 1,735 |
| Total | | $    30,874 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Pérdida de Crédito de Custodia en Depósitos Mantenidos en el BGF y el BDE*

Ciertos certificados de depósitos negociables presentados en las tablas de inversión anteriores eran depósitos en el BGF. Como el BGF sirvió como agente depositario de estos depósitos, dichos certificados de depósitos en el BGF estaban sujetos a riesgo de créditos en custodia. La gerencia determinó que existía una pérdida crediticia de custodia al 30 de junio de 2017 para los depósitos mantenidos en el BGF. Con base en una evaluación de la disponibilidad y la capacidad de recuperación de dichos depósitos, se ha registrado una pérdida de créditos en custodia en estos depósitos en los estados financieros de las unidades de componentes de presentación discreta correspondientes de la siguiente manera (en miles):

| | Certificados de depósitos mantenidos en bancos gubernamentales al 30 de junio de 2017 | | |
| --- | --- | --- | --- |
| | Valor registrado antes de la pérdida de créditos en custodia | Pérdida de créditos en custodia | Valor registrado neto |
| Unidades de componentes mayores: | | | |
| UPR | $          92,147 | (92,147) | — |
| Unidades de componentes no mayores | 185,635 | (137,615) | 48,020 |
| Total de unidades de componentes | $        277,782 | (229,762) | 48,020 |

Las pérdidas de créditos en custodia antes mencionadas se relacionaron con las unidades de componentes de presentación discreta que emitieron sus estados financieros básicos independientes de 2017 considerando el impacto de la pérdida de créditos en custodia. El saldo realizable de los depósitos mantenidos en el BGF al 30 de junio de 2017 se determinó con base en los cobros reales correspondientes recibidos del BGF sobre dichos depósitos después del cierre del año 30 de junio de 2017. No había certificados de depósitos en el BDE al 30 de junio de 2017.

Como se señala en la Nota 2(c), el 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su endeudamiento a tenor con una Modificación de Calificación en virtud del Título VI de PROMESA. A tenor con la Modificación de Calificación y la Ley de Reestructuración del BGF, el saldo de los pasivos adeudados entre el ELA y cada Entidad Gubernamental No Municipal y el BGF, se determinó aplicando el saldo pendiente de los depósitos mantenidos en el BGF en el nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Como resultado de este ajuste anterior, todos los depósitos del ELA en el BGF se extinguieron como resultado de la Modificación de Calificación.

El BDE está en proceso de desarrollar una estrategia destinada a reestructurar sus obligaciones y operaciones. Tras la eventual reestructuración de las obligaciones y operaciones del BDE.

*Reducción posterior en las calificaciones crediticias de los bonos del ELA*

Como se explica en la Nota 23, comenzando en el año fiscal 2015, varios bonos del ELA y sus organismos recibieron una reducción en su calificación en múltiples ocasiones y por segmentos por las principales agencias de calificación crediticia en los Estados Unidos. Sin embargo, la mayoría de las inversiones existentes en las tablas anteriores no se vieron afectadas En general, las políticas de inversión del ELA requieren que sus agencias y organismo mantengan solo títulos de deuda con calificación de grado de inversión en su cartera de inversiones. Con más del 85% y el 81% de las inversiones a nivel del Gobierno Primario y de la unidad de componentes de presentación discreta, respectivamente, con calificaciones crediticias no inferiores a "A" o sin inversiones al 30 de junio de 2017, las calificaciones crediticias promedio generales en toda la cartera de inversiones se han mantenido dentro de las políticas de inversión requeridas del ELA, incluso después de la reducción en la calificación. El porcentaje restante de las inversiones se califica

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

en todo el espectro B o no se califica, a excepción de una inversión CFSE (unidad de componentes mayores de presentación discreta) en bonos del BGF de aproximadamente $59.6 millones y las inversiones de cuatro unidades de componentes no mayores de presentación discreta en el BGF, Bonos del Gobierno Primario y Bonos de Municipios del ELA de aproximadamente $511 millones, que sufrieron una reducción en su calificación a D después del 30 de junio de 2017.

**(7) Préstamo de valores y transacciones de acuerdos de recompra**

Durante el año fiscal que finalizó el 30 de junio de 2017, los fondos fiduciarios de pensiones (incluidos dentro de los fondos fiduciarios), el BGF y la CFSE (todas las unidades de componentes de presentación discreta) realizaron transacciones que involucran préstamos de títulos y la venta de valores con acuerdos de recompra. Estas transacciones se explican a continuación:

*Fondos Fiduciarios de Pensiones*

Los Sistemas de Retiro participan en un programa de préstamo de valores, mediante el cual los valores de inversión se transfieren a un corredor o agente independiente a cambio de garantías en forma de efectivo, valores gubernamentales o cartas de crédito bancarias irrevocables equivalentes a aproximadamente el 102% del valor de mercado de los valores nacionales en préstamo y el 105% del valor de mercado de los valores internacionales en préstamo, con un acuerdo simultáneo para devolver la garantía de los mismos valores en el futuro. La garantía está marcada para comercializarse diariamente, y el agente hace una solicitud de garantía adicional de los corredores, si es necesario. El banco custodio es el agente del programa de préstamo de valores.

Al final del año, los Sistemas de Retiro no tenían exposición al riesgo de crédito a los prestatarios porque los montos que los Sistemas de Retiro debían a los prestatarios (la garantía) excedían los montos que los prestatarios debían a los Sistemas de Retiro. Al 30 de junio de 2017, la garantía recibida representaba el 102.7% del valor de mercado de los valores nacionales en préstamo. Los valores en préstamo para los cuales se recibió garantía al 30 de junio de 2017 consistían en lo siguiente (en miles):

| Descripción | Valor de mercado de los valores subyacentes |
|---|---|
| Títulos del gobierno de los EE. UU.: | |
| Letras de Hacienda de los EE. UU. | $        657 |
| Pagarés de Hacienda de los EE. UU. | 892 |
| Pagarés de agencias patrocinadas por el gobierno de EE. UU. | 752 |
| Bonos corporativos y pagarés de los EE. UU. | 5,058 |
| Total | $     7,359 |

La garantía subyacente para estos valores tenía un valor de mercado de aproximadamente $7.4 millones al 30 de junio de 2017. La garantía recibida se invirtió en un fondo de inversión de mercado de dinero patrocinado por el banco custodio. Al 30 de junio de 2017, el fondo de inversión a corto plazo consistía en valores comprados bajo acuerdos de reventa.

Bajo los términos del contrato de préstamo de valores, los Sistemas de Retiro están totalmente indemnizados contra la falta de devolución de los valores prestados por los prestatarios (en la medida en que la garantía sea inadecuada para reemplazar los valores prestados) o la falta de pago a los Sistemas de Retiro por las distribuciones de ingresos por emisores de los valores mientras los valores están en préstamo. Además, los Sistemas de Retiro están indemnizados contra pérdidas en caso de que el agente crediticio no exija garantías adecuadas y apropiadas de manera oportuna.

*Unidades de Componentes de Presentación Discreta*

BGF: el Banco realiza ventas de valores en virtud de acuerdos de recompra. Estos acuerdos generalmente

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

representan préstamos a corto plazo y se reflejan como un pasivo. Los valores subyacentes a estos acuerdos suelen estar en manos del corredor o su agente con el que se negocia el acuerdo. Todas las ventas de inversiones, según acuerdos de recompra, son por plazos fijos. Al invertir las ganancias de los valores vendidos según acuerdos de recompra, la política del banco establece que el plazo hasta el vencimiento de las inversiones fuera igual o anterior al vencimiento de los acuerdos de recompra relacionados. En y durante el año terminado el 30 de junio de 2017, no se vendieron valores bajo contrato de recompra.

CFSE: los estatutos del ELA y las políticas de la junta directiva de la CFSE le permiten a la CFSE utilizar sus inversiones para realizar transacciones de préstamo de valores, mediante las cuales los valores se transfieren a un corredor o agente independiente a cambio de garantías en forma de efectivo, valores o carta de crédito bancaria irrevocable.

El custodio de valores de la CFSE, JP Morgan Chase Bank, N.A., como agente de la CFSE, administra el programa de préstamos de títulos y recibe garantías en efectivo, valores o cartas de crédito bancarias irrevocables como garantía. Los valores en garantía no pueden ser pignorados ni vendidos por la CFSE a menos que el prestatario no cumpla. El requisito de garantía es igual al 102% para los valores emitidos en los Estados Unidos de América y el 105% para los valores emitidos fuera de los Estados Unidos de América, del valor de mercado de los valores prestados. La garantía debe complementarse con el siguiente día hábil si su valor de mercado cae a menos del 100% del valor de mercado de los valores en préstamo. Todos los préstamos de seguridad pueden rescindirse a pedido de la CFSE o del prestatario. En los préstamos de títulos, el plazo hasta el vencimiento de los préstamos de títulos se corresponde con el plazo hasta el vencimiento de la inversión de la garantía en efectivo. Tal correspondencia existía a fin de año.

Al final del año, la CFSE no tiene exposición al riesgo de crédito a los prestatarios porque los montos que la CFSE adeuda a los prestatarios exceden los montos que los prestatarios adeudan a la CFSE. Los contratos con los agentes de crédito requieren que indemnicen al CFSE si los prestatarios no devuelven los valores (y si la garantía es inadecuada para reemplazar los valores en préstamo) o no pagan a la CFSE por la distribución de ingresos por parte de los emisores de valores mientras los valores están en calidad de préstamo.

Los valores en préstamo al 30 de junio de 2017 tenían un valor de mercado de aproximadamente $13.5 millones y estaban garantizados con garantías por un valor de mercado de aproximadamente $13.8 millones Los valores en préstamo para los que se recibió dinero efectivo como garantía al 30 de junio de 2017 consisten en lo siguiente (en miles):

| Tipo de inversión | | Valor de mercado de los valores subyacentes |
|---|---|---|
| Títulos de capital | $ | 5,276 |
| Bonos y pagarés corporativos | | 6,237 |
| Bonos corporativos y de gobiernos extranjeros | | 2,003 |
| Total | $ | 13,516 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

La garantía en efectivo recibida al 30 de junio de 2017 ascendió a aproximadamente $13.8 millones y se invirtió de la siguiente manera (en miles):

| Tipo de inversión | Valor de mercado de los valores subyacentes |
|---|---|
| Certificados de depósito en otros bancos | $ 1,850 |
| Acuerdos de reventa | 11,992 |
| Total | $ 13,842 |

Además, la CFSE tenía las siguientes obligaciones crediticias al 30 de junio de 2017 por las cuales los valores se recibían como garantía (en miles):

| Descripción | Valor de mercado | |
|---|---|---|
| | Valores en préstamo | Garantía de inversión recibida |
| Bonos y pagarés del Hacienda de los EE. UU. | $ 1,396 | 1,425 |
| Bonos y pagarés de agencias patrocinadas por los EE. UU. FHLMC | 198 | 203 |
| Títulos de capital | 353 | 362 |
| | $ 1,947 | 1,990 |

## (8) Cuentas por cobrar y a pagar

*Fondos del gobierno y de propiedad exclusiva*

Las cuentas por cobrar en los fondos gubernamentales incluyen aproximadamente $1,400 millones de ingresos acumulados, arbitrios, impuestos sobre ventas y uso. Las cuentas por cobrar entre gobiernos incluyen aproximadamente $282.5 millones del gobierno federal y $21.3 millones del CRIM. Además, los fondos de propiedad exclusiva incluyen $57.2 millones en cuentas por cobrar por desempleo, discapacidad y primas de seguro de conductor; aproximadamente $23.5 millones de cuentas por cobrar de ciudadanos privados, instituciones miembros y municipios por servicios para pacientes proporcionados por PRMeSA [sic]; y aproximadamente $111.4 millones por cobrar del Departamento de Salud de los EE. UU. (USDOH), municipios y ciudadanos privados y farmacias para los servicios de cobertura de seguro de salud proporcionados por las operaciones de ASES. Las cuentas por pagar en los fondos del gobierno incluyen aproximadamente $1,200 millones de cuentas comerciales adeudadas a proveedores por la compra de mercancías y servicios prestados, aproximadamente $381.5 millones en beneficios salariales adeudados a agentes policiales elegibles por aumentos salariales anuales, premios y otros beneficios monetarios otorgados a través de varias leyes que datan de 1954, y aproximadamente $576.8 millones en reintegros de impuestos por pagar.

De acuerdo con el Boletín Técnico GASB Núm. 2004 1, *Emisión de Reconocimiento de Tabaco y Emisión de Entidades de Información Financiera*, según enmendada (TB), se registró una cuenta por cobrar de $36.3 millones como otra cuenta por cobrar en los estados financieros de todo el gobierno y en los fondos no mayores del gobierno para envíos estimados del 1 de enero al 30 de junio de 2017, que se aplicarán a la amortización de la deuda al momento del cobro. Además, el TB indicó que el fideicomiso designado como la Autoridad de Liquidación de Tabaco (el Fideicomiso de los Niños en el caso del ELA) debería reconocer pasivos por los bonos pagaderos y un gasto (y pasivos si no se paga) en el mismo período en los estados financieros básicos independientes. El gasto (y el pasivo si no se paga) reconoce la obligación contractual de remitir el producto de los bonos vendidos al gobierno que realiza el pago (el ELA). Dado que Fideicomiso

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

de los Niños se informa como una unidad de componentes combinados, el TB indica que estas remesas deben informarse como transferencias al fondo que recibe los ingresos y transferencias del fondo que representa las actividades de la Autoridad de Liquidación de Tabaco. Como el Fideicomiso de los Niños no tiene la obligación contractual, a tenor con su legislación habilitadora o en cualquier otro lugar, de remitir todos los ingresos de los bonos o activos relacionados con la Autoridad de Liquidación de Tabaco al gobierno que realiza el pago (el ELA), el Fideicomiso de los Niños no ha reconocido un gasto y pasivos por ganancias impagas de los bonos, ya que registra el gasto a medida que los montos se desembolsan como subvenciones al gobierno que realiza el pago (incluidos sus organismos) o terceros.

*Fondos Fiduciarios de Pensiones*

Antes de la promulgación de la Ley Núm. 106-2017, el 23 de agosto de 2017, los préstamos por cobrar a los miembros del plan estaban garantizados por las contribuciones de los miembros del plan y por otras fuentes, incluidas las escrituras hipotecarias y cualquier cantidad no restringida restante en los fondos de garantía. Además, los cobros de préstamos por cobrar se recibieron mediante retenciones de nómina. Los orígenes de préstamos hipotecarios se congelaron en diciembre de 2013 y las relacionadas con préstamos personales y culturales se congelaron en noviembre de 2016. La última cantidad máxima de préstamos para miembros del plan para préstamos hipotecarios fue de $ 100,000 para el SRE y SRJ y $125,000 para SRM, y $5,000 para préstamos para viajes personales y culturales para los tres sistemas. Durante el año finalizado el 30 de junio de 2014 y 2013, se vendieron préstamos personales del SRE con saldos de capital de aproximadamente $100 millones y $88 millones, respectivamente, a dos instituciones financieras. Según el acuerdo de servicio, el SRE estará a cargo del servicio, administración y cobro de préstamos y saldos de capital pendientes al final de la fecha de cierre por una tarifa de servicio del 2%. Después del 23 de agosto de 2017, los beneficios de pensión se pagarán del Fondo General del Gobierno Primario (como se menciona en la Nota 23), y a partir de la fecha del presente, los fondos fiduciarios de pensión ya no existen.

La reserva para ajustes y pérdidas en la realización se considera una reserva general para todas las categorías de préstamos e intereses por cobrar, excepto los préstamos hipotecarios, que es una reserva específica para los saldos de préstamos del proyecto especial de cobranza.

Al 30 de junio de 2017, la composición de los préstamos e intereses por cobrar a los miembros del plan se resume de la siguiente manera (en miles):

| Préstamos por cobrar de los miembros del plan: | |
|---|---:|
| Personal | $ 455,038 |
| Hipotecas | 321,246 |
| Viajes culturales | 39,174 |
| Total de préstamos a miembros del plan | 815,458 |
| Intereses devengados por cobrar | 29,092 |
| Total de préstamos e intereses por cobrar a los miembros del plan | 844,550 |
| Menos margen para ajustes y pérdidas en la realización | (4,890) |
| Total de préstamos e intereses por cobrar a los miembros del plan - neto | $ 839,660 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, las cuentas por cobrar a los patronos, incluidas las cuentas por cobrar de los estados de resultados netos fiduciarios adjuntos, consistían en lo siguiente (en miles):

| | | |
|---|---|---:|
| Programa de retiro temprano | $ | 1,865 |
| Contribuciones del patrono según leyes especiales | | 80,689 |
| Contribuciones del patrono y del empleado | | 924,757 |
| Intereses por pagos retrasados | | 95,862 |
| Total de cuentas por cobrar a patronos | | 1,103,173 |
| Menos reserva para cuentas por cobrar dudosas | | (1,067,001) |
| Cuentas por cobrar a patronos - neto | $ | 36,172 |

Conforme a la Ley Núm. 447-1991, cada patrono debe pagar, mensualmente, los montos correspondientes a contribuciones y reintegros de préstamos, a más tardar el decimoquinto día del mes siguiente. Después de esa fecha, los intereses se cobran según lo establecido por los Sistemas de Retiros.

El ELA y muchos de sus organismos y municipios, que son patronos a los efectos del SRE y SRJ, han enfrentado a importantes desafíos fiscales y económicos. Asimismo, la reducción en la calificación y la ampliación de los diferenciales de crédito para la deuda del sector público de Puerto Rico, incluidas las corporaciones públicas, ha puesto más presión sobre la liquidez y las fuentes de financiamiento para los patronos. En consecuencia, la mayoría de las cuentas por cobrar de los patronos están atrasadas con fechas de pago establecidas o fechas de vencimiento del plan de pagos. En otros casos, los importes vencidos se siguen renegociando para fechas posteriores.

Al 30 de junio de 2017, el SRE y SRJ registraron una asignación de aproximadamente $1,030 millones y $37 millones respectivamente, para ajustes y pérdidas en la realización relacionado con la cobranza incierta de las contribuciones adeudadas por el ELA, corporaciones públicas y municipios.

Si bien se tomaron ciertas medidas para mejorar el cobro de dichas cuentas por cobrar, el momento en que se cobran a los patronos afecta las necesidades de liquidez del SRE y SRJ. La gerencia dictamina que, a excepción de las contribuciones uniformes adicionales del ELA de aproximadamente $1,030 millones adeudados al SRE para los años fiscales 2016 y 2017 y aproximadamente $37 millones adeudados al SRJ para el año fiscal 2017, se pueden cobrar otros montos adeudados por los patronos; sin embargo, esta situación podría afectar en última instancia el pago de beneficios a los miembros o el reintegro de los bonos por pagar del SRE, en caso de que dichos montos se vuelvan incobrables en el futuro.

Al 30 de junio de 2017, las cuentas por cobrar a los patronos incluyen montos adeudados por PRMeSA de aproximadamente $99.6 millones (registrados dentro del SRE), de la siguiente manera (en miles):

| | | |
|---|---|---:|
| Contribuciones del patrono y del empleado | $ | 57,764 |
| Retenciones de préstamos de empleados | | 7 |
| Intereses | | 41,807 |
| Total de cuentas por cobrar de PRMeSA | $ | 99,578 |

Los montos adeudados por PRMeSA al 30 de junio de 2017 consisten principalmente en costos de pensiones devengados correspondientes a los años fiscales 2012 a 2017 por aproximadamente $99.6 millones. No se ha acordado ningún plan de pago para el pago de esta deuda.

El 1 de noviembre de 2011, PRMeSA y el SRE celebraron un acuerdo de plan de pago (el Acuerdo) para el reintegro de una deuda que asciende a aproximadamente $15.3 millones, correspondiente al año fiscal 2011.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

A partir del 15 de noviembre de 2011, el acuerdo exige sesenta (60) cuotas mensuales de $255,677 sin intereses. Los pagos por mora de menos de un año en estado de mora devengarán intereses al 9% y 12% para los que excedan de un año. El contrato se pagó en su totalidad en octubre de 2016.

*Unidades de Componentes de Presentación Discreta - BGF*

Al 30 de junio de 2017, los préstamos del BGF a corporaciones públicas y agencias del ELA (excluyendo municipios) por un monto de aproximadamente $6,400 millones fueron reembolsables de las siguientes fuentes (en miles):

|  | Monto |
|---|---|
| Fuente de devolución: |  |
| Ganancias de futuras emisiones de bonos | $ 1,504,300 |
| Asignaciones del fondo general o legislativas | 3,372,180 |
| Ingresos operativos | 1,132,986 |
| Otros | 347,740 |
| Total | $ 6,357,206 |

Para el año fiscal terminado el 30 de junio de 2017, no hubo desembolsos ni cobros de principal de préstamos del sector público con emisiones futuras de bonos como fuente de pago. Los préstamos del sector público pagaderos por el Fondo General del ELA o asignaciones tuvieron recaudaciones de capital por aproximadamente $23 millones, pero no tuvieron desembolsos durante el año terminado el 30 de junio de 2017. Los préstamos del sector público pagaderos a ser reembolsados por los ingresos operativos y otras fuentes de pago tuvieron desembolsos y cobros de capital por aproximadamente $4.3 millones y $9.2 millones, respectivamente, durante el año terminado el 30 de junio de 2017.

El 23 de mayo de 2016, el exgobernador Alejandro García Padilla propuso un presupuesto de $9,100 millones para el año fiscal 2017. El presupuesto propuesto incluía una consignación para el pago de las deudas del ELA con el Banco por un monto de $375 millones. Sin embargo, dicha asignación no fue aprobada por la Legislatura. Por el contrario, el presupuesto aprobado incluyó asignaciones por un monto total de aproximadamente $235 millones, distribuidas en varios rubros, segregadas entre aproximadamente $132.5 millones de asignaciones en efectivo que debían aplicarse como pago de capital e intereses de las deudas del ELA con el Banco, lo que explica el cobro de préstamos del sector público a que se refiere el párrafo anterior; y aproximadamente $102.5 millones asignados para las necesidades operativas y programáticas de diferentes unidades componentes del ELA y desembolsados a esas unidades de componentes, pero, al mismo tiempo, para ser aplicados como una aplicación no monetaria al capital de algunas de las líneas de deuda del ELA con el Banco (tratado a efectos contables como una cancelación en el año fiscal 2017 de préstamos que ya habían sido reservados en su totalidad en años anteriores).

Al 30 de junio de 2017, aproximadamente $3,400 millones de los préstamos del sector público eran pagaderos de asignaciones legislativas o ingresos fiscales futuros del ELA. En consecuencia, el pago de estos préstamos puede verse afectado por restricciones presupuestarias y la situación fiscal general que impacta a Puerto Rico.

Al 30 de junio de 2017, la ACT tenía un máximo autorizado de aproximadamente $2,000 millones en financiamiento con el BGF, con un saldo pendiente de aproximadamente $1,700 millones de capital. Históricamente, estas facilidades se reembolsaban con el producto de la emisión de bonos. Todas estas facilidades se han ampliado repetidamente y no se han pagado según lo programado. El 1 de diciembre de 2015, el ELA anunció su intención de retener ciertos impuestos e ingresos que fueron asignados condicionalmente a ciertas corporaciones y agencias públicas, incluida la ACT.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La ACT se encuentra actualmente en un proceso de reestructuración de la deuda según el Título III de PROMESA y actualmente no tiene suficientes fondos disponibles para pagar completamente sus diversas obligaciones, incluidas las adeudadas al BGF, a medida que vencen o que están actualmente en estado de mora.

Al 30 de junio de 2017, la mayoría de los préstamos a corporaciones y agencias públicas por un total aproximado de $6,400 millones se clasificaron como de no devengo. Los ingresos por intereses que se habrían registrado si el plazo original de estos préstamos ascendiera a aproximadamente $400 millones en el año fiscal 2017.

El BGF considera que la cartera de préstamos del sector público está deteriorada según la información y los eventos actuales, incluidas las demoras significativas en la recepción del pago programado de la amortización de la deuda mencionado anteriormente. La gerencia dictamina que es muy probable que el BGF no pueda cobrar todos los montos adeudados de acuerdo con los términos contractuales originales del préstamo, particularmente a la luz de los casos del Título III de ciertos prestatarios. La evaluación de los préstamos deteriorados por parte del BGF consistió en identificar qué préstamos del sector público tienen fuentes de pago confiables o poco confiables, respectivamente. Los préstamos con fuentes confiables de reintegro con buen cumplimiento se evaluaron colectivamente. Los préstamos con fuentes de pago poco confiables se evaluaron individualmente para clasificar su deterioro. Los préstamos deteriorados se miden individualmente con base en el valor presente de los flujos de efectivo futuros esperados descontados a la tasa de interés efectiva del préstamo, o si el préstamo depende de la garantía, el valor de mercado de la garantía.

Durante el año fiscal 2017, el BGF reconoció una provisión para pérdidas crediticias de aproximadamente $5.7 millones en su cartera de préstamos de corporaciones y agencias públicas. Al 30 de junio de 2017, la cartera de préstamos del sector público tenía una reserva para pérdidas crediticias por un monto de aproximadamente $5,800 millones. Antes del año fiscal 2014, el BGF no había registrado ninguna cancelación en su cartera de préstamos del sector público.

Los préstamos a los municipios ascendían a aproximadamente $2,200 millones al 30 de junio de 2017. Para el año finalizado el 30 de junio de 2017, los desembolsos y cobros de préstamos del sector municipal ascendieron a aproximadamente $1 millón y $110.4 millones, respectivamente. Estos préstamos incluyen aproximadamente $1,300 millones al 30 de junio de 2017, que están garantizados por una parte de las tasaciones de impuestos a la propiedad de cada municipio. Los préstamos pignorados con las evaluaciones del impuesto a la propiedad incluyen bonos y pagarés emitidos por municipios de Puerto Rico que son originados por el BGF como financiamiento puente. Aproximadamente $487 millones en préstamos a municipios al 30 de junio de 2017 están garantizados por una prenda de una porción del impuesto municipal sobre las ventas depositado en cuentas especialmente designadas con el BGF. Los fondos disponibles en dichas cuentas aumentan la capacidad de endeudamiento del municipio correspondiente. Se otorgaron aproximadamente $408 millones en préstamos a municipios al 30 de junio de 2017, principalmente como préstamos provisionales para financiar gastos de capital pagaderos de ingresos que se generarán a partir de un proyecto generador de ingresos específico asociado con el préstamo o para cubrir pérdidas operativas. Una vez que se aprueban los préstamos operativos y si el municipio no paga la deuda con sus propios fondos, el BGF informa al CRIM para retener los ingresos por impuestos a la propiedad y remitirlos directamente al BGF antes de que se distribuyan a los municipios. Se identificaron aproximadamente $36.5 millones en préstamos municipales como morosos al 30 de junio de 2017. No se cobraron intereses por estos préstamos durante el año finalizado el 30 de junio de 2017.

Durante el año fiscal 2017, el BGF reconoció un descargo en la provisión para pérdidas crediticias de aproximadamente $4 millones en su cartera de préstamos municipales para terminar con una reserva para pérdidas crediticias de aproximadamente $73.3 millones al 30 de junio de 2017.

Los préstamos al sector privado incluyen el saldo del capital pendiente de las líneas de crédito otorgadas por el BGF y sus diferentes subsidiarias a empresas privadas en Puerto Rico, cuyas actividades se considera que fomentan el desarrollo económico y turístico de Puerto Rico. Los préstamos al sector privado también incluyen el saldo del capital pendiente de préstamos hipotecarios otorgados a familias de ingresos bajos y moderados para la adquisición de unidades de vivienda unifamiliar y para desarrolladores de unidades de vivienda multifamiliar de ingresos bajos y moderados en Puerto Rico. Estas facilidades crediticias, netas de la reserva para pérdidas crediticias, ascendieron aproximadamente a $228 millones al 30 de junio de 2017, de los

145

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

cuales aproximadamente $193 millones son préstamos hipotecarios para unidades de viviendas de ingresos bajos y moderados, aproximadamente $34 millones son para proyectos turísticos y aproximadamente $1 millón está destinado a préstamos para fabricación. Los préstamos del sector privado clasificados como no acumulados ascendieron aproximadamente a $158.6 millones al 30 de junio de 2017 y tenían una provisión correspondiente por pérdidas crediticias de aproximadamente $128.6 millones al 30 de junio de 2017. Los ingresos por intereses que se habrían registrado si estos préstamos hubieran estado funcionando de acuerdo con sus términos originales fueron de aproximadamente $19.6 millones en 2017.

*Reducciones de impuestos*

El ELA implementó la Declaración GASB Núm. 77, *Divulgaciones de Reducción de Impuestos*. Esta Declaración define una reducción de impuestos y requiere que los gobiernos que celebren acuerdos de reducción de impuestos divulguen cierta información sobre los acuerdos. El ELA celebra acuerdos de reducción de impuestos con empresas locales con el fin de atraer o retener empresas dentro del ELA. Cada acuerdo se negoció bajo una ley local, que permite al ELA reducir los impuestos sobre la propiedad o los ingresos para una variedad de propósitos de desarrollo económico. Las reducciones pueden otorgarse a empresas locales ubicadas dentro del ELA o que prometan reubicarse dentro del ELA. Dependiendo de los términos del acuerdo y la ley, los impuestos reducidos pueden estar sujetos a recuperación en caso de incumplimiento de la entidad. El ELA no está sujeto a ningún acuerdo de reducción de impuestos celebrado por otras entidades gubernamentales. No hubo cantidades recibidas ni por cobrar de otros gobiernos; el gobierno no asumió compromisos distintos a la reducción de impuestos; no hubo reducciones divulgadas por separado, y no se omitió ninguna información si así lo requiere la Declaración de GASB N.° 77. La siguiente tabla representa los ingresos reducidos para el año terminado el 30 de junio de 2017:

| Nombre del programa | Estipendios recibidos por ciertos médicos durante su pasantía | Crédito para inversión en construcción en núcleos urbanos | Crédito para inversión en desarrollo turístico | Compra: Desarrollo del turismo | Ley 135-1997, Ley de Incentivos Fiscales de 1998 |
|---|---|---|---|---|---|
| Propósito del programa | Exención fiscal de estipendios a médicos residentes para mantenerlos en el servicio público. | Reducción de impuestos para promover e incentivar la revitalización de los núcleos urbanos mediante la construcción de espacios habitables. Promover el aumento del valor de la propiedad y crear puestos de trabajo. | El monto del crédito para inversión en turismo. Todo inversor puede reclamar un crédito por inversión turística equivalente al 50% de su inversión elegible. | La Ley 78 establece una exención del 90% sobre los ingresos de las actividades turísticas elegibles, incluidos los beneficios y dividendos distribuidos del negocio exento a sus accionistas o socios, así como las distribuciones en caso de liquidación. | Brindar los mejores intereses económicos y sociales de Puerto Rico a través de las tasas de renta fija de la industria manufacturera. |
| Impuesto reducido | Impuesto individual | Impuesto individual | Impuesto individual | Impuesto corporativo | Impuesto corporativo |
| Estatuto/ordenanza autorizante | Código de Ingresos Internos de PR, Sección 1031.02 (a) 9 | Código de Ingresos Internos de PR, Sección 1051.09(b) (5) y Ley 212 de 2002 | Art. 5(f) Ley 78-1993 Art. 14 Ley 225-1995 Anexo B Parte II Línea 12 y Ley 78 de 1993 | Art. 5 Ley 78 -1993 | Ley 135-1997 |
| Requisito de elegibilidad | Capacitación de médicos residentes en un hospital gubernamental | Proyecto certificado por el Director de Urbanismo del Departamento de Transporte | La empresa debe establecer un proyecto calificado certificado por la PRTC. | Todo inversor (incluido un participante) tendrá derecho a un crédito por inversión turística en valores de un fondo. | Decreto de Tasa de Renta Fija firmado con la recomendación favorable del Secretario de Hacienda y el Director Ejecutivo |
| Tipo de compromiso asumido por el receptor del impuesto reducido | Completar la pasantía en un hospital público. | Prestar servicios de construcción directamente relacionados con la revitalización de núcleos urbanos. | Invertir en el desarrollo de la industria turística local. | Invertir en el desarrollo de la industria turística local. | Invertir en el desarrollo de la industria de fabricación local. |
| Cómo se reduce el impuesto | Crédito del impuesto sobre ingresos | Crédito del impuesto sobre ingresos | Crédito del impuesto sobre ingresos | Crédito por inversión turística equivalente al 50% de su inversión elegible o su inversión en valores de un fondo, a tomarse en 2 términos: La primera mitad de dicho crédito en el año en que se obtiene la exención y el saldo de dicho crédito, en el año siguiente. | Reducción del impuesto |
| Determinación del impuesto reducido | Importe del impuesto reducido determinado por la ley | Porcentaje del impuesto reducido determinado por la ley | Porcentaje del impuesto reducido determinado por la ley | Porcentaje del impuesto reducido determinado por la ley | Tasa impositiva reducida establecida por decreto |
| Acuerdo de recuperación | ninguno | ninguno | ninguno | ninguno | ninguno |
| Monto bruto en dólares del impuesto reducido | $          2,300,000 | $          1,200,000 | $        11,100,000 | $          2,500,000 | $        15,691,500,000 |

146

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| Nombre del programa | Ley 225-1995, Ley de Incentivos Contribuyentes Agrícolas a las Relaciones Públicas | Ley 22 - 2012 Transferencias de inversionistas a Puerto Rico | Crédito por compras de productos fabricados en Puerto Rico | Crédito por inversión en desarrollo de la industria cinematográfica (Ley 27-2011). | Ley 20 - 2012, Servicios de Exportación |
|---|---|---|---|---|---|
| del programa | La Ley establece los requisitos para calificar a las aplicaciones "bona fide" y eximirlos del pago de todo tipo de impuestos sobre bienes muebles e inmuebles, impuesto de licencia municipal, impuestos, impuestos sobre la renta, arbitrios y todos los impuestos o tasa municipales o estatales. | Atraer nuevos residentes a Puerto Rico proporcionando una exención total de los impuestos sobre la renta de Puerto Rico sobre todos los ingresos pasivos realizados o acumulados después de que dichas personas se conviertan en residentes de buena fe de Puerto Rico. | Incentivar la industria manufacturera y los proveedores locales | Fomentar el uso del estado como un sitio para filmar, para la producción digital de películas y para desarrollar y sostener la fuerza laboral y la infraestructura para la producción de películas, medios digitales y entretenimiento. | Actuar para promover la exportación de servicios, brinda atractivos incentivos fiscales para las empresas que establecen y amplíen sus negocios de servicios de exportación en la Isla. Además, la ley promueve inversiones en investigación y desarrollo e iniciativas del sector académico y privado al otorgar créditos y exenciones para estas actividades. |
| Impuesto reducido | Impuesto corporativo | Impuesto corporativo | Impuesto corporativo | Impuesto individual | Impuesto individual |
| Estatuto/ordenanza autorizante | Ley 225 - 1995 | Ley 22-2012 | Sección 5(a)(1), Ley 73 - 2008 | Sección 7.3 Ley 27-2011 | Ley 20-2012 |
| Requisito de elegibilidad | Certificación de operación agrícola de buena fe por parte del Departamento de Agricultura | Reubicación a Puerto Rico y residente de tiempo completo según lo define la ley. | Los negocios exentos que tengan un decreto otorgado bajo esta Ley o bajo las leyes de incentivos anteriores, deberán comprar productos fabricados en Puerto Rico, incluyendo componentes y accesorios. | Inversión certificada por el Auditor como desembolsada en relación con los Gastos de Producción de Puerto Rico, sin incluir los pagos realizados a Talento No Residente | Reubicar las operaciones en Puerto Rico |
| Tipo de compromiso asumido por el receptor del impuesto reducido | El 50% o más de sus ingresos debe provenir de la industria agrícola. | Transferencia de las operaciones a Puerto Rico | Compra materias primas de negocios locales. | Invertir en el desarrollo de la industria cinematográfica local. | Mantener operaciones y servicios de exportación operando desde Puerto Rico |
| Cómo se reduce el impuesto | Reducción del impuesto | Reducción del impuesto | El veinticinco por ciento (25%) de las compras de dichos productos, durante el año contributivo en que se tome el referido crédito, hasta un máximo del cincuenta por ciento (50%) del aquí antes mencionado. | del impuesto | Reducción de la tasa impositiva |
| Determinación del impuesto reducido | Porcentaje del impuesto reducido determinado por la ley | Porcentaje del impuesto reducido determinado por la ley | Tasa impositiva reducida establecida por decreto | Porcentaje del impuesto reducido determinado por la ley | Impuesto reducido determinado por ley y aprobación de decreto |
| Acuerdo de recuperación | ninguno | ninguno | ninguno | ninguno | ninguno |
| Monto bruto en dólares del impuesto reducido | $       11,100,000 | $       29,000,000 | $       33,300,000 | $       6,000,000 | $       111,300,000 |

**(9) Cuentas por cobrar asignadas condicionalmente e ingresos futuros**

*(a) Ingresos de COFINA*

Antes de la promulgación de la Ley Núm. 241-2018 y la confirmación del Plan de Ajuste de COFINA en febrero de 2019, la Ley Núm. 91-2006 estableció el Fondo Dedicado de Impuestos a las Ventas, un fondo de ingresos especiales en poder de COFINA. La Ley Núm. 91-2006 requirió que el mayor de los siguientes montos se depositara en el Fondo Dedicado del Impuesto sobre Ventas cada año fiscal para el pago de los bonos de COFINA: (i) un monto fijo mínimo, denominado Monto Base del Impuesto sobre las Ventas Pignoradas y (ii) los ingresos generados por hasta el 2.75% del impuesto sobre Ventas y Uso del ELA. El 9 de octubre de 2013, se promulgó una enmienda a la Ley Núm. 91-2006 que aumentó del 2.75% al 3.50% la porción del Impuesto sobre las Ventas Pignoradas depositado en el Fondo Dedicado de Impuestos a las Ventas.

El 5 de febrero de 2019, el Tribunal del Título III confirmó el Plan de Ajuste de COFINA (como se comenta en la Nota 17), que entró en vigencia el 12 de febrero de 2019. El Plan de Ajuste de COFINA junto con la Ley 241-2018 ajustaron las deudas de COFINA, lo que resultó en que COFINA emitiera nuevos bonos (los Nuevos Bonos de COFINA). El Plan de Ajuste de COFINA también incorporó un acuerdo de transacción entre el ELA y COFINA que, entre otras cosas, asignó el 53.65% del Monto Base del Impuesto sobre las Ventas Pignoradas original (según se define en el Plan de Ajuste de COFINA) a COFINA (los Ingresos de COFINA) y 46.35% al ELA, lo que redujo así la porción asignada a un fondo segregado o fondos propiedad de COFINA en los que se depositan los Ingresos de COFINA (Fondo de Ingresos de COFINA). Los Nuevos Bonos COFINA de emitidos, según el Plan de Ajuste COFINA, están garantizados por un gravamen estatutario sobre los Ingresos de COFINA. Además, la consumación del Plan de Ajuste de COFINA apaciguó el título de COFINA sobre los Ingresos de COFINA y resolvió definitivamente, como asunto legal, todas las cuestiones de título sobre esos ingresos y la propiedad única y exclusiva de COFINA sobre estos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El Monto base del impuesto sobre las ventas pignorado en el año fiscal terminado el 30 de junio de 2017 ascendió aproximadamente a $724.1 millones. Para el año fiscal 2017, la amortización de la deuda pagada por COFINA ascendió aproximadamente a $708.8 millones.

**(b) Ingresos asignados de la PRIFA**

Los siguientes ingresos (colectivamente, los Ingresos Asignados de la PRIFA) han sido asignados condicionalmente por el ELA a la PRIFA, sujeto a las disposiciones del Artículo VI, Sección 8, de la Constitución del ELA. Tal como se analiza con mayor detalle en la Nota 2 y la Nota 23, los Ingresos Asignados de la PRIFA están siendo retenidos actualmente por el ELA.

(i)   *Impuesto Federal Especial*

El ron fabricado en Puerto Rico está sujeto a impuestos federales a las ventas una vez exportado a los Estados Unidos; sin embargo, dichos arbitrios son devueltos por el Servicio de Impuestos Internos (IRS) al ELA. La Ley Núm. 44-1988, según enmienda (la Ley PRIFA), asigna, de manera condicional, los primeros $117 millones de estos impuestos federales a las ventas recibidos por el ELA se transfieran a la PRIFA, una unidad de componentes combinados del ELA, cada año fiscal. Históricamente, una parte de estos primeros $117 millones de arbitrios federales se usaron para el reembolso de los Bonos de ingresos fiscales especiales de PRIFA. La recepción de los impuestos federales especiales está sujeta a una serie de factores, que incluyen la imposición continua y el envío de dichos impuestos al ELA y las condiciones que afectan a la industria del ron de Puerto Rico. Actualmente se espera que el monto de los impuestos federales a las ventas que recibe el ELA disminuya, aunque no se puede determinar la cantidad exacta. Si los impuestos federales especiales recibidos por el ELA en cualquier año fiscal son inferiores a $117 millones, la Ley PRIFA requiere que la solicitud de PRIFA y el Director del OGP del ELA incluyan en el presupuesto del ELA para el año fiscal correspondiente, un crédito suficiente para cubrir dicha deficiencia. Sin embargo, la Legislatura no tiene la obligación de realizar tal asignación. Para el año terminado el 30 de junio de 2017, los $117 millones asignados condicionalmente por la Ley Núm. 44-1988 no fueron asignados a PRIFA.

(ii)   *Impuesto a Productos del Petróleo*

La Ley PRIFA y el Código de Ingresos Internos de Puerto Rico de 2011, según enmendado (el Código de Puerto Rico) impone un impuesto a los productos petrolíferos sobre los productos no diésel ($6.25 por barril inicialmente) y para asignar los ingresos de los mismos a PRIFA para ser utilizados para el pago de ciertos de sus bonos y pagarés, en particular, los pagarés de anticipación de bonos de ingresos de fondos tributarios dedicados (los PRIFA BAN) emitidos el 16 de marzo de 2015 para redimir ciertos PRHTA BAN. Para el año fiscal 2017, la amortización de la deuda pagado por los PRIFA BAN ascendió a $13.3 millones, compuesto por $12.7 millones de capital y $625,000 de intereses.

**(c) Ingresos asignados de la PRHTA**

Los siguientes ingresos (colectivamente, los Ingresos Asignados a la PRHTA) han sido asignados condicionalmente por el ELA a la PRHTA, sujeto a las disposiciones del Artículo VI, Sección 8 de la Constitución del ELA. Como se analizó con mayor detalle en la Nota 2 y la Nota 23, antes del 3 de mayo de 2017, el ELA retuvo los Ingresos Asignados a la PRHTA a tenor con el Artículo VI, Sección 8 de la Constitución del ELA. Después de la presentación del caso del Título III del ELA el 3 de mayo de 2017,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

los Ingresos Asignados a la PRHTA fueron retenidos por el ELA debido a la paralización automática, según el Título III de PROMESA.

(i)  *Impuestos a la Gasolina y el Gasoil*

El Código de Puerto Rico actualmente impone un impuesto de $0.16 por galón a la gasolina y un impuesto de $0.04 por galón al gasoil y el combustible diésel. Por ley, el ELA ha asignado condicionalmente el impuesto total de $0.16 a la gasolina y el impuesto de $0.04 al gasoil y el combustible diésel a la PRHTA como fuente de ingresos.

(ii)  *Aranceles de Licencia*

Según la Ley Núm. 22-2000, según enmienda, conocida como la "Ley de Vehículos y Tráfico", el ELA impone tarifas anuales de licencia a varias clases de vehículos automotores. Se asignaron quince dólares ($15) de cada arancel de licencia anual condicionalmente a la PRHTA para ser utilizados como fuente de ingresos. La Ley Núm. 30-2013 asignó condicionalmente los restantes veinticinco dólares ($25) de cada uno de dichos aranceles de la licencia anual a la PRHTA.

(iii)  *Impuesto a Productos del Petróleo*

El Código de Puerto Rico también asigna a la PRHTA $9.50 por barril o fracción del arbitrio de productos derivados del petróleo (que incluyen petróleo crudo, petróleo sin terminar y productos derivados). El impuesto se aplica a cualquier producto de petróleo introducido, consumido, vendido o transferido en el ELA.

(iv)  *Impuesto a los Cigarrillos*

Una parte de los ingresos del impuesto al cigarrillo impuesto por la Sección 3020.05 del Código de Puerto Rico (aproximadamente $20 millones) se ha asignado condicionalmente a la PRHTA.

**(d)  Ingresos asignados a la ADCCPR**

El Artículo 24 de la Ley Núm. 272-2003, según enmienda, aplica un impuesto de ocupación hotelera a todos los hoteles y alojamientos de motel en la Isla (el Impuesto de Ocupación Hotelera). Una parte de los ingresos del Impuesto de Ocupación Hotelera (los Ingresos asignados a la ADCCPR) se ha asignado condicionalmente a la ADCCPR para el pago de los bonos de la ADCCPR, sujeto a las disposiciones del Artículo VI, Sección 8 de la Constitución del ELA. Tal como se analiza con mayor detalle en la Nota 2 y la Nota 23, los Ingresos Asignados de la ADCCPR están siendo retenidos actualmente por el ELA.

**(e)  Ingresos asignados a la AMA**

Una parte de los ingresos del impuesto al cigarrillo impuesto por la Sección 3020.05 del Código de Puerto Rico (los Ingresos Asignados a la AMA) se ha asignado condicionalmente a la AMA para el pago de ciertas obligaciones de deuda de la AMA, sujeto a las disposiciones del Artículo VI, Sección 8, de la Constitución del ELA. Tal como se analiza con mayor detalle en la Nota 2 y la Nota 23, los Ingresos Asignados de la AMA están siendo retenidos actualmente por el ELA.

**(f)  Ingresos del Fideicomiso de los Niños**

El fideicomiso de los Niños es un fideicomiso público adscrito al BGF, creado a tenor con la Ley Núm. 173-1999. Mediante la Ley Núm. 173-1999, el ELA asignó y transfirió condicionalmente al Fideicomiso de los Niños todos sus derechos, títulos e intereses en un acuerdo de transacción suscrito por el ELA, los 46 estados y varios fabricantes de cigarrillos (el Acuerdo de Liquidación del Tabaco), inclui do el derecho del ELA a recibir ciertos pagos anuales de dichos fabricantes de cigarrillos (los TSR). Los TSR, que de otro modo se entregarían al Fondo General, se asignaron condicionalmente al Fideicomiso de los Niños en consideración de la emisión de bonos por parte del Fideicomiso de los Niños y la aplicación del producto de estos para financiar ciertos programas sociales.

149

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(g) Orden Ejecutiva OE–2015 046 (Recuperación)**

El 1 de diciembre de 2015, se firmó la Orden Ejecutiva Núm. 46, que ordenaba al Secretario del DOT retener ciertos ingresos en base a las estimaciones de ingresos revisadas para el año fiscal 2017 y el deterioro de la situación de liquidez del ELA. A tenor con la Orden Ejecutiva Núm. 46, ciertos recursos disponibles del ELA asignados condicionalmente a la PRIFA, la PRHTA, la AMA y la ADCCPR para el pago de la deuda de sus obligaciones y proporcionar apoyo operativo continúan siendo retenidos por el ELA (comúnmente conocido como "recuperación"), a tenor con el Artículo VI, Sección 8 de la Constitución del ELA y las disposiciones legales en virtud de las cuales dichos ingresos se asignaron a las corporaciones públicas aplicables.

**(10) Actividad Entre Fondos y Dentro de la Entidad**

Las cuentas por cobrar y a pagar entre fondos al 30 de junio de 2017 se resumen de la siguiente manera (en miles):

| Fondo por cobrar | Fondo por pagar | |
|---|---|---|
| Gubernamental no mayor | Pago de la deuda de COFINA | $ 141,562 |
| No mayor de propiedad exclusiva | General | 38,702 |
| PRMeSA | General | 34,449 |
| Gubernamental no mayor | General | 16,591 |
| General | Seguro por desempleo | 7,147 |
| No mayor de propiedad exclusiva | Gubernamental no mayor | 3,996 |
| ASES | General | 1,931 |
| | | $ 244,378 |

Las transferencias de (a) otros fondos para el año finalizado el 30 de junio de 2017 se resumen de la siguiente manera (en miles):

| Fondo de destino | Fondo de origen | |
|---|---|---|
| ASES (a) | General | $ 891,942 |
| Gubernamental no mayor (b) | General | 388,279 |
| General (c) | No mayor de propiedad exclusiva | 175,174 |
| General (d) | Seguro por desempleo | 43,854 |
| PRMeSA (e) | General | 41,350 |
| No mayor de propiedad exclusiva (f) | General | 10,386 |
| Gubernamental no mayor (g) | Pago de la deuda de COFINA | 9,511 |
| Ingresos Especiales de COFINA (h) | Pago de la deuda de COFINA | 6,373 |
| | | $ 1,566,869 |

Los propósitos principales de las transferencias entre fondos son (en miles):

(a) Transferencia de $891,942 del Fondo General a la ASES para proporcionar fondos para cubrir los gastos operativos.

(b) Reconocer como transferencias los pagos de alquiler efectuados por las agencias del ELA sobre propiedades arrendadas por la AEP, una unidad de componentes combinados del ELA por valor de ($167,708); ($72,687) en relación con los ingresos recibidos del Acuerdo de Liquidación del tabaco administrado por el Fideicomiso de los Niños, una unidad de componentes combinados del ELA; ($25,850) a PRIFA para el pago de deuda y proyectos de capital; ($65,717) a UPRCCC y ($38,814) a la AAFAF para proporcionar fondos para cubrir gastos operativos y ($17,503) al Fondo de Proyectos de Capital para cubrir gastos de capital relacionados.

(c) Transferencia de ($171,446) de las Loterías, un fondo de propiedad no mayor, al Fondo General para distribuir el aumento en los activos netos de las Loterías para el uso del Fondo General, como lo requiere la legislación habilitante de Loterías; ($1,400) relacionado con la distribución del excedente de efectivo al Fondo General de los Fondos de Discapacidad y Seguro del Conductor y ($2,328) para reembolsar al

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Fondo General los gastos de asistencia proporcionados en los servicios de llamadas de emergencia de la Oficina de Servicios de Emergencia 9-1-1.

(d) Transferencia de $43,854 del Fondo de Seguro por Desempleo relacionado con la distribución del excedente de efectivo correspondiente al Fondo General para el pago de gastos administrativos.

(e) Transferencia de $41,350 del Fondo General a la PRMeSA, un fondo mayor de propiedad exclusiva, para poner a disposición fondos para el pago de la deuda, proyectos de capital y gastos operativos.

(f) Transferencia del Fondo General al P WPCRF y al PRSDWTRLF, fondos de propiedad exclusiva no mayores, para proporcionar fondos de contrapartida locales ($4,638 y $2,358, respectivamente) y del Fondo General a la Autoridad de Puertos de Ponce, un fondo de propiedad exclusiva no mayoritaria, para proporcionar fondos para cubrir gastos operativos ($3,390).

(g) Reconoce como transferencias de $9,511, los ingresos por intereses devengados por la PRIFA, una unidad de componentes combinados, en su inversión en bonos emitidos por COFINA, otra unidad de componentes combinados, donde se incurre en un gasto de intereses por la misma cantidad.

(h) Transferencia de $6,373 del Fondo de Amortización de la Deuda de COFINA al Fondo de Ingresos Especiales de COFINA que se transferirá al Fondo General para que los fondos estén disponibles para los pagos de la deuda.

Las cuentas por cobrar y a pagar entre fondos representan las liquidaciones pendientes de las transferencias o transacciones antes mencionadas de años actuales y anteriores.

Los montos adeudados al Gobierno Primario de las unidades de componentes de presentación discreta fueron los siguientes (en miles):

| | | Entidad Receptora | | |
| Entidad pagadora | Fondo General | Gubernamental no mayor | Propiedad exclusiva no mayor | Total adeudado de unidades de componentes |
| --- | --- | --- | --- | --- |
| Unidades de componentes mayores: | | | | |
| AAA | $          — | — | 581,276 | 581,276 |
| AEE | — | 2.259 | — | 2,259 |
| PRHTA | 1,321 | — | — | 1,321 |
| CFSE | 7,200 | — | — | 7,200 |
| Unidades de componentes no mayores | 108,479 | 26,985 | — | 135,464 |
| Subtotal adeudado de Unidades de componentes | 117,000 | 29,244 | 581,276 | 727,520 |
| Reserva para saldos incobrables | (108,559) | (26,985) | (133,100) | (268,644) |
| | $          8,441 | 2,259 | 448,176 | 458,876 |

El monto adeudado por la AAA de aproximadamente $581.3 millones representa préstamos de construcción otorgados por el PWPCRF y el PRSDWTRLF, fondos de propiedad exclusiva no mayores, para financiar la construcción de activos de capital para la AAA. La AAA no ha realizado los pagos requeridos según el acuerdo de deuda relacionado con esta deuda (ver Nota 2).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los montos adeudados a las unidades de componentes de presentación discreta del Gobierno Primario fueron los siguientes (en miles):

| Entidad de destino | Fondo general | Entidad de origen | | | | |
|---|---|---|---|---|---|---|
| | | Fondos Gubernamentales no mayores | PRMeSA | Total adeudado a unidades de componentes | Reserva incobrables | Total adeudado a unidad de componentes (neto) |
| Unidades de componentes mayores: | | | | | | |
| AEE | $ 35,506 | 3,342 | 29,217 | 68,065 | (28,791) | 39,274 |
| AAA | (29,110) | — | 3,706 | 32,816 | (15,022) | 17,794 |
| UPR | 20,095 | 3,583 | 44,655 | 68,333 | (64,496) | 3,837 |
| PRHTA | 14,370 | — | — | 14,370 | (1,653) | 12,717 |
| Unidades de componentes no mayores | 56,717 | — | — | 56,717 | (11,000) | 45,717 |
| Total adeudado a unidades de componentes | $ 155,798 | 6,925 | 77,578 | 240,301 | (120,962) | 119,339 |

Los montos adeudados de (a) las unidades de componentes de presentación discreta fueron los siguientes (en miles):

| Entidad pagadera | BGF | PRHTA | Entidad de destino Unidades de componentes mayores | | | Unidades de componentes no mayores | Total adeudado a unidades de comp. |
|---|---|---|---|---|---|---|---|
| | | | AEE | AAA | UPR | | |
| Unidades de componentes mayores: ACT | $ 1,933,698 | — | 47,154 | — | — | 9,528 | 1,990,380 |
| UPR | 87,166 | — | 11,669 | — | — | — | 98,835 |
| AAA | 65,550 | — | 27,933 | — | — | — | 93,483 |
| AEE | 35,846 | — | — | 4,012 | — | — | 39,858 |
| CFSE | — | — | 1,300 | — | — | — | 1,300 |
| Unidades de componentes no mayores | 1,082,751 | 32,526 | 58,258 | 17,682 | 5,026 | 56,422 | 1,252,665 |
| Subtotal adeudado de unidades de componentes | 3,205,011 | 32,526 | 146,314 | 21,694 | 5,026 | 65,950 | 3,476,521 |
| Reserva para saldos incobrables | (2,824,808) | (32,526) | (84,627) | (18,721) | — | (46,329) | (3,007,011) |
| Total adeudado de unidades de componentes (neto) | 380,203 | — | 61,687 | 2,973 | 5,026 | 19,621 | 469,510 |

El monto adeudado por las unidades componentes de presentación discreta presentadas por el BGF de aproximadamente $3,200 millones (antes de la reserva para cuentas incobrables) representa los saldos de préstamos adeudados al BGF por otras unidades de componentes de presentación discreta del ELA. El resto de los préstamos por cobrar informados por el BGF se compone de lo siguiente (en miles):

| | | |
|---|---|---|
| Gobierno Primario - actividades del gobierno | $ | 2,512,845 |
| Gobierno Primario - actividades de tipo comercial | | 486,559 |
| Otras entidades y municipios del gobierno | | 2,355,617 |
| Sector privado neto de reserva para pérdidas de préstamos | | 228,214 |
| Total de préstamos por cobrar informados por el BGF | | 5,583,235 |
| Menos reserva para préstamos del sector público | | (3,023,029) |
| | $ | 2,560,206 |

Los préstamos al Gobierno Primario son presentados por el ELA en pagarés en el estado de resultados netos.

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los gastos del Gobierno Primario incluyen contribuciones de capital y operativas realizadas por el Gobierno Primario a las unidades de componentes de presentación discreta durante el año finalizado el 30 de junio de 2017 fueron los siguientes (en miles):

| | | |
|---|---|---:|
| UPR | $ | 872,193 |
| ACT | | 140.339 |
| Unidades de componentes no mayores | | 235,333 |
| Total de contribuciones realizadas por el gobierno primario a las unidades de componentes | $ | 1,247,865 |

## (11) Activos de Capital

La actividad de los activos de capital para el año finalizado el 30 de junio de 2017 fue la siguiente (en miles):

*Gobierno Primario*

| | Saldo inicial (según la reformulación) | Aumenta | Disminuye | Saldo final |
|---|---:|---:|---:|---:|
| Actividades del gobierno: | | | | |
| Terrenos y otros activos no depreciables | | | | |
| activos: | | | | |
| Terrenos | $ 936,891 | 1,155 | 5,133 | 932,913 |
| Construcción en progreso | 1,345,319 | 99,798 | 352,405 | 1,092,712 |
| Total de terrenos y otros activos no depreciables | 2,282,210 | 100,953 | 357,538 | 2,025,625 |
| Edificios y mejoras en edificios | 10,104,676 | 273,021 | 91,379 | 10,286,318 |
| Equipos, muebles, accesorios, vehículos y software | 766,030 | 71,455 | 8,458 | 829,027 |
| Infraestructura | 599,682 | 13,258 | — | 612,940 |
| Total de otros activos de capital, depreciados y amortizados | 11,470,388 | 357,734 | 99,837 | 11,728,285 |
| Menos depreciación y amortización acumulada para: | | | | |
| Edificios y mejoras en edificios | 4,242,114 | 255,321 | 75,748 | 4,421,687 |
| Equipos, muebles, accesorios, vehículos y software | 616,486 | 43,828 | 7,433 | 652,881 |
| Infraestructura | 192,046 | 13,075 | — | 205,121 |
| Total depreciación y amortización acumulada | 5,050,646 | 312,224 | 83,181 | 5,279,689 |
| Total de otros activos de capital, neto de depreciación y amortización | 6,419,742 | 45,510 | 16,656 | 6,448,596 |
| Activos de capital de actividades gubernamentales, neto | $ 8,701,952 | 146,463 | 374,194 | 8,474,221 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | | Saldo inicial | Aumenta | Disminuye | Saldo final |
|---|---|---|---|---|---|
| Actividades de tipo comercial: | | | | | |
| Terrenos y otros activos no depreciables: | | | | | |
| Terrenos | $ | 36,005 | — | — | 36,005 |
| Construcción en progreso | | 3,339 | — | 3,339 | — |
| Total de activos de capital, no depreciados | | 39,344 | — | 3,339 | 36,005 |
| Edificios y mejoras en edificios | | 108,560 | 3,448 | — | 112,008 |
| Equipos | | 94,768 | 3,078 | 2,327 | 95,519 |
| Total de otros activos de capital, depreciados y amortizados | | 203,328 | 6,526 | 2,327 | 207,527 |
| Menos depreciación y amortización acumulada para: | | | | | |
| Edificios y mejoras en edificios | | 69,479 | 2,415 | 206 | 71,688 |
| Equipos | | 80,023 | 4,513 | 1,947 | 82,589 |
| Total depreciación y amortización acumulada | | 149,502 | 6,928 | 2,153 | 154,277 |
| Total de otros activos de capital de actividades de tipo comercial, neto de depreciación y amortización | | 53,826 | (402) | 174 | 53,250 |
| Total de activos de capital de actividades de tipo comercial, neto | $ | 93,170 | (402) | 3,513 | 89,255 |

Los gastos de depreciación y amortización se cargaron a las funciones/programas del Gobierno Primario para el año finalizado el 30 de junio de 2017 de la siguiente manera (en miles):

Actividades del gobierno:

| | | |
|---|---|---|
| Gobierno General | $ | 111,692 |
| Seguridad Pública | | 31,559 |
| Salud | | 10,290 |
| Vivienda Pública y Bienestar | | 117,105 |
| Educación | | 23,783 |
| Desarrollo Económico | | 17,795 |
| Total gastos de depreciación y amortización - actividades del gobierno | $ | 312,224 |

154

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El ELA realiza anualmente un análisis de deterioro de sus activos de capital de acuerdo con las disposiciones de la Declaración GASB Núm. 42. El análisis del año actual identificó aproximadamente $2.4 millones de activos deteriorados, una pérdida fue reconocida por las Actividades Gubernamentales en el Estado de Actividades para el año terminado el 30 de junio de 2017.

Los activos de infraestructura general incluyen aproximadamente $427 millones que representan los costos de los activos transferidos al DNER del ELA (al costo) en 1997 al finalizar la presa y el embalse de Cerrillos y los proyectos del río Portugués y el río Bucana (Proyecto de represas y embalses de Cerrillos) por el Cuerpo de Ingenieros del Ejército de los Estados Unidos (EE. UU.). Estos activos de infraestructura se informan dentro de las actividades gubernamentales e incluyen presas, instalaciones de admisión y artículos similares construidos para el control de inundaciones, el suministro de agua y fines recreativos. La depreciación se calcula utilizando el método de línea recta durante una vida útil estimada de 50 años a partir de la fecha de transferencia de la propiedad. A fines de abril de 2011, el ELA recibió un acuerdo de deuda final del Cuerpo de Ingenieros del Ejército de los EE. UU. que estableció un cronograma de reintegro para su parte asignada de los costos de construcción asociados con el Proyecto de Presa y Embalse de Cerrillos, excluyendo aquellos costos para artículos construidos con fines recreativos, por un valor aproximado de $214 millones. El 21 de marzo de 2014, el acuerdo de deuda con el Cuerpo de Ingenieros del Ejército de EE. UU. se modificó para reducir la tasa de interés y el pago anual por el plazo restante de la deuda. (Ver la Nota 13 [o]).

El 24 de febrero de 2012, la PRIFA, una unidad de componentes combinados, celebró un Acuerdo de Asistencia con el Departamento de Justicia de Puerto Rico (DJ) y el BGF para adquirir, renovar y operar una propiedad que se utilizará para la reubicación de las oficinas principales del DJ. En relación con el Acuerdo de Asistencia, el BGF proporcionó una línea de crédito de $35 millones a la PRIFA para la adquisición y administración de esta propiedad y administrar la fase inicial de la rehabilitación y restauración de la propiedad. El 8 de marzo de 2012, la PRIFA adquirió la propiedad por aproximadamente $27 millones. La reubicación de las oficinas principales del DJ nunca se materializó, pero la PRIFA ha estado trabajando para asegurar gradualmente acuerdos de arrendamiento con otras entidades gubernamentales y terceros. La línea de crédito está asegurada por un gravamen hipotecario sobre la propiedad, y se paga a partir de las futuras asignaciones del ELA y de la asignación de contratos de arrendamiento actuales y futuros.

La PRIFA también ha emitido ciertos bonos y pagarés para financiar la construcción de ciertos proyectos de capital en beneficio de la AAA, los municipios y otras agencias y organismos del ELA. Los proyectos de capital incluyen la construcción de infraestructura y edificios para ser utilizados en las operaciones y ser administrados por la AAA, los municipios y otras agencias en sus respectivas operaciones. Los proyectos de capital, incluidos los terrenos adquiridos, se incluyen como parte de los activos de capital de la PRIFA hasta que se complete la construcción y se cumplan las condiciones para las transferencias a los beneficiarios finales. Durante el año finalizado el 30 de junio de 2017, la PRIFA incurrió en aproximadamente $2.5 millones en costos de construcción en beneficio de otros organismos del ELA.

En octubre de 2010, la PRIFA celebró un memorando de entendimiento con la AAPPPR, la AEP, el DE, el DTOP y el BGF para la administración de las Escuelas para el Programa del siglo XXI (el Programa del siglo XXI). La construcción en proceso al 30 de junio de 2017 incluye aproximadamente $0.06 millones relacionados con este programa. El programa consiste en la remodelación de más de 100 escuelas en todo Puerto Rico. Para financiar el programa, la AEP emitió bonos de ingresos de instalaciones gubernamentales por un monto de $878 millones durante el año fiscal que finalizó el 30 de junio de 2012, de los cuales $10.7 millones se depositan en fondos de construcción, dentro del fondo de proyecto de capital de la AEP, al 30 de junio de 2017.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Unidades de Componentes de Presentación Discreta*

La actividad de los activos de capital de las unidades de componentes de presentación discreta para el año finalizado el 30 de junio de 2017 fue la siguiente (en miles):

| | Saldo inicial (según la reformulación) | Aumenta | Disminuye | Saldo final |
|---|---|---|---|---|
| Terrenos y otros activos no depreciables: | | | | |
| Terrenos | $ 2,230,964 | 2,591 | 2,939 | 2,230,616 |
| Construcción en progreso | 1,273,356 | 387,087 | 325,671 | 1,334,772 |
| Total de activos de capital, no depreciados/ amortizados | 3,504,320 | 389,678 | 328,610 | 3,565,388 |
| Activos depreciables: | | | | |
| Edificios y mejoras en edificios | 1,613,763 | 32,367 | 15,501 | 1,630,629 |
| Equipos, muebles, accesorios, vehículos y software | 2,264,166 | 78,686 | 65,885 | 2,276,967 |
| Infraestructura | 40,898,402 | 344,927 | 96,014 | 41,147,315 |
| Total de otros activos de capital, depreciados y amortizados | 44,776,331 | 455,980 | 177,400 | 45,054,911 |
| Menos depreciación y amortización acumulada para: | | | | |
| Edificios y mejoras en edificios | 3,667,311 | 315,908 | 5,426 | 3,977,793 |
| Equipos, muebles, accesorios, vehículos y software | 969,967 | 80,149 | 8,713 | 1,041,403 |
| Infraestructura | 18,377,707 | 918,557 | 40,214 | 19,256,050 |
| Total de depreciación y amortización acumulada | 23,014,985 | 1,314,614 | 54,353 | 24,275,246 |
| Total de otros activos de capital, neto de depreciación y amortización | 21,761,346 | (858,634) | 123,047 | 20,779,665 |
| Unidades de componentes no mayores | 3,338,610 | 134,976 | 202,807 | 3,270,779 |
| Activos de capital (neto) | $ 28,604,276 | (333,980) | 654,464 | 27,615,832 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(12) Obligaciones a corto plazo**

Las obligaciones a corto plazo al 30 de junio de 2017 y los cambios para el año finalizado fueron los siguientes (en miles):

| | Saldo al 30 de junio de 2016 | Deuda emitida | Deuda pagada | Saldo al 30 de junio de 2017 |
|---|---|---|---|---|
| Actividades del gobierno: | | | | |
| Pagarés adeudados al BGF $ | 1,700 | — | — | 1,700 |
| Pagarés por anticipación de ingresos por impuestos | — | 400,000 | — | 400,000 |
| $ | 1,700 | 400,000 | — | 401,700 |

**(a)  Pagarés adeudados al BGF**

El ELA ha celebrado una línea de crédito a corto plazo con el BGF (todo dentro de Actividades Gubernamentales) que consiste en lo siguiente al 30 de junio de 2017 (en miles):

| Agencia | Propósito | Tasa de interés | Línea de crédito | Saldo pendiente |
|---|---|---|---|---|
| AP | Financiar los términos del acuerdo del decreto de consentimiento | 150 bp sobre PRIME con piso del 6% y techo del 12% | $ 1,700 | 1,700 |
| | | | $ 1,700 | 1,700 |

**(b)  Pagarés por anticipación de ingresos por impuestos**

La Ley Núm. 1-1987 autoriza al Secretario del DOT a emitir pagarés a instituciones privadas o gubernamentales, en previsión de impuestos e ingresos (Pagarés por anticipación de ingresos fiscales o TRAN) como un medio alternativo de proporcionar liquidez para cubrir cualquier escasez temporal de efectivo proyectada para un año fiscal. La Ley Núm. 139-2005, modificó la Sección 2(g) de la Ley Núm. 1-1987 para establecer que el monto total principal de los pagarés emitidos según las disposiciones de la Ley Núm. 1-1987 y pendientes en cualquier momento por cualquier año fiscal no puede exceder el menor de dieciocho por ciento (18 %) de los ingresos netos del Fondo General para el año fiscal anterior al año fiscal en el que se emiten los pagarés o $1,500 millones.

El 6 de septiembre de 2016, el ELA renovó las TRAN "intragubernamentales" para el año fiscal 2017, por un monto total de capital de $400 millones con la CFSE, la ACAA y el Fondo del Seguro por Incapacidad, también a una tasa de interés del 6 %. El 28 de abril de 2017, el ELA reconoció que no podría realizar los pagos de capital e intereses por las notas de TRAN en el momento de su vencimiento, y firmó un acuerdo de indulgencia con la CFSE, la ACAA y el Fondo del Seguro por Discapacidad. El período de tolerancia finalizó el 30 de junio de 2018. El reintegro no se ha realizado y el período de tolerancia no se ha prorrogado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

## (13) Obligaciones a largo plazo

*Gobierno Primario*

Las obligaciones a largo plazo al 30 de junio de 2017 y los cambios para el año finalizado fueron los siguientes (en miles):

| | Saldo al 30 de junio de 2016 según reformulación | Deuda emitida | Deuda pagada | Otros aumentos | Otras (reducciones) | Saldo al 30 de junio de 2017 | Adeudado dentro de un año |
|---|---|---|---|---|---|---|---|
| Actividades del gobierno: | | | | | | | |
| Bonos de apropiación del ELA $ | 570,164 | — | — | — | (418) | 569,746 | 68,074 |
| Bonos de obligación general y ingresos | 36,996,849 | — | (154,176) | 372,353 | (44,635) | 37,170,391 | 1,138,456 |
| Acuerdo de compra de bonos con el BGF | 225,534 | — | — | — | — | 225,534 | — |
| Notas pagaderas a las unidades componentes: | | | | | | | |
| BGF | 2,411,310 | — | (23,245) | — | (102,454) | 2,285,611 | 393,281 |
| Otros | 102,000 | — | — | — | — | 102,000 | — |
| Pagaré a institución financiera | 23,764 | — | — | — | — | 23,764 | 9,505 |
| Pasivo por obligación garantizada | 360,739 | — | — | 13,857 | — | 374,596 | — |
| Arrendamientos de capital | 344,095 | 364 | (8,956) | 111 | — | 335,614 | 8,614 |
| Ausencias compensadas | 1,339,221 | — | — | — | (787,428) | 551,793 | 232,819 |
| Beneficios pagaderos por rescisión | 682,750 | — | — | 175,476 | (74,220) | 784,006 | 87,564 |
| voluntaria Pasivos netos de pensiones | 36,850,153 | — | — | 6,403,680 | (708,842) | 42,544,991 | 170,259 |
| Otra obligación de beneficios posteriores al empleo | 265,012 | — | — | 131,450 | (126,275) | 270,187 | — |
| Otros pasivos a largo plazo | 2,414,814 | 64,234 | (210,001) | — | (419,659) | 1,849,388 | 220,573 |
| Total de actividades del gobierno | 82,586,405 | 64,598 | (396,378) | 7,096,927 | (2,263,931) | 87,087,621 | 2,329,145 |
| Actividades de tipo comercial: | | | | | | | |
| Pagarés adeudados al BGF | 486,559 | — | — | — | — | 486,559 | 62,000 |
| Ausencias compensadas | 22,588 | — | — | 8,203 | (11,866) | 18,925 | 11,851 |
| Obligación de premios de lotería impagos | 172,161 | — | — | 486,662 | (511,206) | 147,617 | 61,543 |
| Beneficios de rescisión voluntaria | 8,948 | — | — | — | (1,756) | 7,192 | 1,287 |
| Pasivos netos de pensiones | 713,957 | — | — | 142,898 | (47,189) | 809,666 | — |
| Otra obligación de beneficios posteriores al empleo | 1,834 | — | — | — | (1,834) | — | — |
| Pasivos por el seguro por desempleo, invalidez y de salud | 170,051 | — | — | 124,877 | (204,715) | 90,213 | 90,213 |
| Otros pasivos a largo plazo | 73,460 | — | — | 28,311 | — | 101,771 | 99,578 |
| Total de Actividades de tipo comercial: | 1,649,558 | — | — | 790,951 | (778,566) | 1,661,943 | 326,472 |
| Total del gobierno primario $ | 84,235,963 | 64,598 | (396,378) | 7,887,878 | (3,042,497) | 88,749,564 | 2,655,617 |

Cada una de las obligaciones a largo plazo descritas en esta sección no toma en cuenta el impacto de los casos del Título III sobre la prioridad o el momento de los pagos que se puedan adeudar a los acreedores del ELA, sus instrumentalidades o sus corporaciones públicas. El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos de los casos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

El saldo del capital de la obligación general y los bonos de ingresos pagados se informan como gastos en el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit); los fondos del gobierno no coinciden con los montos informados como deuda pagada en la tabla anterior. El saldo pagado incluye el capital pagado el primero de julio de cada año, que se devengó al 30 de junio del año anterior, como pasivo del fondo. Las GAAP de los EE. UU. permiten la acumulación de pasivos y gastos de la amortización de la deuda si un gobierno ha proporcionado recursos financieros a un fondo de amortización de la deuda para el pago de pasivos que vencerán dentro de un mes en el siguiente año fiscal. Como resultado de los desafíos

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

económicos y de liquidez que enfrentó el ELA durante los dos últimos años fiscales, el ELA no tenía fondos disponibles al 30 de junio de 2017 para el pago de la amortización de la deuda que vence el 1 de julio de 2017. Según lo anterior, aproximadamente $733 millones relacionados con intereses se acumularon como pasivo del fondo al 30 de junio de 2017 y $448 millones de capital se devengaron como pasivo del fondo al 30 de junio de 2017.

Consulte la Nota 13(e) y la Nota 14(a) para obtener información detallada sobre los pasivos de obligación garantizada. El saldo restante de los otros aumentos (disminuciones) en bonos y pagarés consiste en la capitalización de intereses en bonos de apreciación de capital (aumentos) y la amortización de primas (disminuciones) y la acumulación de descuentos (aumentos) en bonos. Estos ajustes no requirieron ninguna fuente o uso de efectivo.

Los ajustes devengados para el año fiscal 2017 se realizaron para conciliar varias obligaciones con los nuevos saldos estimados al 30 de junio de 2017, y otras disminuciones resultantes de los pagos de estas obligaciones realizados durante el año fiscal. Estas obligaciones incluyen ausencias compensadas, pasivos por pensiones netos, otras obligaciones por beneficios posteriores al empleo, beneficios por rescisión voluntaria, otros pasivos a largo plazo, obligaciones por premios de lotería impagos y pasivos por reclamaciones por beneficios de seguros. Estos pagos, en relación con las actividades gubernamentales, se incluyen no como pagos del capital en el estado de ingresos, gastos y cambios en los saldos de los fondos (déficit) - fondos del gobierno, sino como gastos dentro de sus funciones correspondientes.

*(a) Limitación de la deuda y arbitraje*

La Constitución del ELA autoriza la contratación de deudas según lo determine la Legislatura. Sin embargo, la Sección 2, Artículo VI de la Constitución del ELA establece que las obligaciones directas del ELA evidenciadas por bonos o pagarés y respaldadas por la plena fe, crédito y poder impositivo del ELA no deben emitirse si las cantidades del capital e intereses sobre dichos bonos y pagarés y sobre todos los bonos y pagarés emitidos a partir de entonces, pagaderos en cualquier año fiscal, junto con cualquier cantidad pagada por el ELA en el año fiscal anterior de dicha emisión propuesta a cuenta de bonos o pagarés garantizados por el ELA, exceda el 15 % de los ingresos anuales promedio recaudados a tenor con las disposiciones de la legislación del ELA y depositados en Hacienda (en adelante, los ingresos internos) en los dos años fiscales anteriores al año fiscal de dicha emisión propuesta. La Sección 2, Artículo VI de la Constitución del ELA no limita el monto de la deuda que el ELA puede garantizar siempre que el ELA cumpla con esta limitación del 15 % al momento de la emisión de dicha deuda garantizada. Durante el período finalizado el 30 de junio de 2017, el ELA no emitió obligaciones directas.

El litigio sobre si ciertas emisiones de bonos del ELA y la AEP violaron la limitación constitucional de deuda del ELA está en curso en el caso del Título III del ELA. Para obtener información adicional sobre el caso del Título III del ELA, consulte la Nota 3. Para obtener información adicional sobre el litigio en curso relacionado con el caso del Título III del ELA (incluido el litigio iniciado por la Junta de Supervisión contra algunos de los bonistas de obligación general del ELA), consulte la Nota 17.

Los bonos pagaderos del ELA están sujetos a las regulaciones de arbitraje emitidas por el Servicio de Ingresos Internos de los Estados Unidos de América, que requieren un reintegro al gobierno federal de las ganancias por inversiones excesivas sobre los ingresos de la deuda exenta de impuestos si el rendimiento de esas ganancias excede el rendimiento efectivo de la deuda exenta de impuestos relacionada emitida. Las ganancias excedentes deben reembolsarse cada cinco años o al vencimiento de la deuda, lo que ocurra primero. Los cálculos de arbitraje no generaron pasivos al 30 de junio de 2017.

*(b) Bonos por pagar*

La Constitución del ELA establece que la deuda pública constituirá una primera reclamación sobre los ingresos disponibles del ELA. La deuda pública incluye bonos de obligación general y deuda garantizada

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

por el ELA. La plena fe, crédito y poder impositivo del ELA se compromete irrevocablemente para el pago inmediato del capital y los intereses de los bonos de obligación general. El 6 de abril de 2016, el Gobernador promulgó la Ley de Moratoria. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3. Para obtener información adicional sobre las contingencias de litigios relacionados con la Ley de Moratoria, consulte la Nota 17. Los desarrollos en los casos del Título III, tal como se analiza en la Nota 3, han afectado la aplicación de la Ley de Moratoria y pueden afectar las prioridades que cualquier parte reclame con respecto a su derecho al reintegro de la deuda.

La Ley Núm. 83-1991, según enmienda, establece el gravamen de un arbitrio anual del 1.03 % del valor tasado de todos los bienes muebles e inmuebles no exentos de impuestos. El gravamen es aplicado por CRIM, una corporación municipal, no una unidad de componentes de presentación discreta del ELA. Se requiere que CRIM remita el 1.03 % del impuesto a la propiedad recaudado por el ELA para el pago de la deuda de los bonos de obligación general. Durante el año finalizado el 30 de junio de 2017, los ingresos totales y las cuentas por cobrar informadas por el ELA ascendieron a aproximadamente $111.2 millones y $21.3 millones, respectivamente, que se incluyen en el fondo de la amortización de la deuda.

Para fines de información financiera, el monto pendiente de los bonos representa el monto total del capital pendiente, más las primas no amortizadas y los intereses acumulados en los bonos de apreciación de capital, menos los descuentos no acumulados. Los bonos por pagar al 30 de junio de 2017, incluidos los intereses acumulados en bonos de apreciación de capital, fueron los siguientes (en miles):

| | Bonos de obligaciones generales | Bonos de ingresos | Total |
|---|---|---|---|
| Bonos a plazo pagaderos hasta 2042; interés pagadero mensual o semestralmente a tasas que varían del 3.00% al 8.00% | $   8,252,118 | 8,189,172 | 16,441,290 |
| Bonos en serie pagaderos hasta 2042; interés pagadero mensual o semestralmente a tasas que varían del 3.00% al 6.75% | 4,169,825 | 1,589,135 | 5,758,960 |
| Bonos de tasa fija pagaderos hasta 2057; intereses pagaderos a tasas que van del 3.38 % al 6.50 % | — | 6,203,929 | 6,203,929 |
| Bonos de apreciación de capital pagaderos hasta 2056; sin tasa de interés, el rendimiento va del 4.93 % al 7.48 %. (1) | 124,188 | 5,460,338 | 5,584,526 |
| Bonos de ingresos fiscales especiales pagaderos hasta 2045; interés pagadero o acumulado mensual y semestralmente a tasas que varían del 4.00% al 8.25% | — | 1,878,195 | 1,878,195 |
| Bonos de Ingresos de Infraestructura de Salud Mental pagaderos hasta 2038; intereses a pagar semestralmente a tasas que van del 5.60% al 6.50% | — | 34,900 | 34,900 |
| Los bonos respaldados por activos del Acuerdo del Tabaco del Fondo Fiduciario de los Niños pagaderos hasta 2057; intereses pagaderos o acumulados semestralmente a tasas que varían del 5.38% al 8.38% | — | 1,453,665 | 1,453,665 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | Bonos de obligaciones generales | Bonos de ingresos | Total |
|---|---|---|---|
| Bonos del Programa de Fondos de Capital, con vencimiento en varias fechas pagaderas hasta 2025; intereses pagaderos semestralmente a tasas que van del 2.00% al 5.00% | — | 117,630 | 117,630 |
| Bonos de tasa ajustable basados en LIBOR con vencimiento el 1 de agosto de 2057; interés pagadero trimestralmente (1.74% al 30 de junio de 2017) | — | 136,000 | 136,000 |
| Total | 12,546,131 | 25,062,964 | 37,609,095 |
| Prima no amortizada | 46,610 | 167,975 | 214,585 |
| Descuento no amortizado | (256,748) | (145,541) | (402,289) |
| Subtotal de bonos a pagar | 12,335,993 | 25,085,398 | 37,421,391 |
| Eliminación de la entrada de bonos de COFINA emitidos a la PRIFA | | (251,000) | (251,000) |
| Total de bonos por pagar | $ 12,335,993 | 24,834,398 | 37,170,391 |

(1)   Los bonos de ingresos incluyen bonos de apreciación de capital de $969 millones convertibles en bonos de interés a tasa fija el 1 de agosto de 2031; 1 de agosto de 2032; y el 1 de agosto de 2033.

Al 30 de junio de 2017, los requisitos de amortización de la deuda para obligaciones generales y bonos de ingresos pendientes, incluidos los intereses acumulados de los bonos de apreciación de capital son los siguientes (en miles):

| Año que finaliza el 30 de junio | Capital | Interés | Interés subsidio (1) | Total |
|---|---|---|---|---|
| 2018 | $ 1,138,456 | 2,580,590 | 3,835 | 3,722,881 |
| 2019 | 525,116 | 1,720,578 | 3,835 | 2,249,529 |
| 2020 | 603,500 | 1,701,597 | 3,835 | 2,308,932 |
| 2021 | 677,940 | 1,695,153 | 3,835 | 2,376,928 |
| 2022 | 622,590 | 1,665,107 | 3,835 | 2,291,532 |
| 2023-2027 | 4,146,430 | 7,723,330 | 19,172 | 11,888,932 |
| 2028-2032 | 7,334,246 | 6,617,222 | 19,172 | 13,970,640 |
| 2033-2037 | 8,993,495 | 4,253,441 | 19,172 | 13,266,108 |
| 2038-2042 | 10,676,663 | 2,177,508 | 19,172 | 12873,343 |
| 2043-2047 | 7,819,676 | 466,739 | 959 | 8,287,374 |
| 2048-2052 | 6,132,872 | 313,365 | — | 6,446,237 |
| 2053-2057 | 5,406,579 | 313,100 | — | 5,719,679 |
| 2058-2062 | 9,672,340 | 24,107 | — | 9,696,447 |
| Total | 63,749,903 | $ 31,251,837 | 96,822 | 95,098,562 |

| | |
|---|---|
| Menos interés no acumulado | (26,140,808) |
| Más primas no amortizadas | 214,585 |
| Menos descuento no amortizado | (402,289) |
| Subtotal | 37,421,391 |
| Eliminación de bonos de COFINA emitidos a la PRIFA | (251,000) |
| Total | $ 37,170,391 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

(1)  Los Bonos de Impuesto a las Ventas, Primera Serie Subordinada 2010D y 2010E se emitieron como Bonos Build America. COFINA recibirá un pago de subsidio del gobierno federal equivalente al 35 % y al 45 %, respectivamente, del monto de cada pago de intereses. El 24 de junio de 2013, el IRS envió un aviso de que el 8.7 % del pago del subsidio en los Bonos Build America será confiscado debido a ajustes del presupuesto del gobierno federal.

El 16 de marzo de 2015, la PRIFA emitió $245.9 millones en notas de anticipación de bonos (divulgadas como Bonos de Ingresos Fiscales Especiales) pagaderos por el aumento en el impuesto a los productos derivados del petróleo aplicado por la Ley Núm. 1-2015 (los BAN PRIFA), cuyo producto fue usado para refinanciar notas de anticipación de bonos de la PRHTA pendientes y gastos relacionados con los pagos. Originalmente, se esperaba que los BAN PRIFA fueran refinanciados mediante una emisión de bonos a largo plazo por parte de la PRIFA. Sin embargo, esta transacción propuesta fue descartada. Los BAN PRIFA tenían una fecha de vencimiento del 1 de mayo de 2017 (que no se cumplió), con una tasa de interés del 8.25 % pagadera mensualmente el primer día hábil de cada mes, a partir del 1 de abril de 2015. Los ingresos mencionados que respaldan el pago de los BAN PRIFA podrían aplicarse para pagar la deuda de obligación general del Estado si sus recursos disponibles no son suficientes para cubrir todos los créditos aprobados. Los BAN PRIFA están garantizados por la buena fe, el crédito y el poder impositivo del ELA (ver la Nota 14(a)). El 24 de junio de 2016, el Gobernador firmó una orden ejecutiva, EO 2016 027, que suspendió todas las obligaciones de transferir dinero a la PRIFA con el fin de realizar los pagos de BAN PRIFA.

La tabla siguiente presenta los pagos de la amortización de la deuda de Actividades del Gobierno de ciertos bonos de tasa variable de ingresos y los pagos netos de los instrumentos derivados de cobertura asociados (ver Nota 21) al 30 de junio de 2017 (todos relacionados con COFINA). Aunque las tasas de interés sobre la deuda a tasa variable y las tasas de referencia actuales de los instrumentos derivados de cobertura cambian con el tiempo, los cálculos incluidos en la tabla siguiente se basan en el supuesto de que la tasa variable y las tasas de referencia actuales de los instrumentos derivados de cobertura al 30 de junio, 2017 se mantendrán constantes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | Bonos de tasa variable | | Instrumentos derivados de cobertura, neto | Total |
|---|---|---|---|---|
| | Capital | Interés | | |
| | (en miles) | | | |
| Año que termina el 30 de junio: | | | | |
| 2018 | $ — | 2,333 | 4,358 | 6,691 |
| 2019 | — | 2,333 | 4,358 | 6,691 |
| 2020 | — | 2,333 | 4,358 | 6,691 |
| 2021 | — | 2,333 | 4,358 | 6,691 |
| 2022 | | 2,333 | 4,358 | 6,691 |
| 2023-2027 | — | 11,665 | 21,791 | 33,456 |
| 2028-2032 | — | 11,665 | 21,791 | 33,456 |
| 2033-2037 | — | 11,665 | 21,791 | 33,456 |
| 2038-2042 | — | 11,665 | 21,791 | 33,456 |
| 2043-2047 | — | 11,665 | 21,791 | 33,456 |
| 2048-2052 | — | 11,665 | 21,791 | 33,456 |
| 2053-2057 | — | 11,665 | 21,791 | 33,456 |
| 2058 | 136,000 | 195 | 364 | 136,559 |
| Total | $ 136,000 | 93,515 | 174,691 | 404,206 |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos de los casos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

Los bonos en circulación de COFINA antes de la consumación del Plan de Ajuste de COFINA III se pagaban de las cantidades depositadas en el Fondo Dedicado del Impuesto a las Ventas en cada año fiscal. El monto mínimo que se depositará fue el Monto base del impuesto sobre las ventas pignoradas, que, para el año fiscal que finalizó el 30 de junio de 2017, fue de aproximadamente $724.1 millones. El monto base del impuesto sobre las ventas pignoradas aumenta cada año fiscal a partir de entonces a una tasa legal del 4 % hasta aproximadamente $1.9 millones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, el Monto base del impuesto sobre las ventas pignoradas, por año, era el siguiente (en miles):

| | Monto |
|---|---|
| Año que termina el 30 de junio: | |
| 2018 | $ 753,074 |
| 2019 | 783,197 |
| 2020 | 814,525 |
| 2021 | 847,106 |
| 2022 | 880,990 |
| 2023-2027 | 4,962,597 |
| 2028-2032 | 6,037,758 |
| 2033-2037 | 7,345,858 |
| 2038-2042 | 8,850,885 |
| 2043-2047 | 9,250,000 |
| 2048-2052 | 9,250,000 |
| 2053-2057 | 9,250,000 |
| 2058 | 1,850,000 |
| Total | $ 60,875,990 |

El cronograma anterior ha sido presentado de acuerdo con los términos originales de los bonos pagaderos y no refleja los efectos del Plan de Ajuste de COFINA como se confirmó en el caso del Título III de COFINA. Consulte la Nota 3 y la Nota 23 para obtener información adicional sobre el Plan de Ajuste de COFINA.

**(c) Acuerdo de Asociación con el Departamento de Vivienda del ELA**

Vivienda Modernization 1, LLC (la LLC) es una compañía de responsabilidad limitada creada según las leyes del ELA cuyo único miembro es Vivienda Modernization Holdings 1, S.E. (la Asociación), una sociedad civil creada según las leyes del ELA y a tenor con un Acuerdo de Asociación relacionado. La Asociación se creó el 1 de agosto de 2008 con el DOH, como socio general (el Socio General) y Hudson SLP XL LLC, una compañía de responsabilidad limitada de Delaware (el Socio Limitado Especial) y Hudson Housing Tax Credit Fund XL LP, una sociedad limitada de Delaware (la Sociedad de Inversión); como socios limitados (colectivamente, los socios limitados). La asociación se organizó para adquirir, desarrollar, rehabilitar, poseer, mantener y operar treinta y tres des arrollos residenciales de viviendas de alquiler destinados a inquilinos de ingresos bajos y moderados. Las ganancias, pérdidas y créditos fiscales se asignan de acuerdo con el Acuerdo de Asociación. Las ganancias y pérdidas de las operaciones y los créditos impositivos para viviendas de bajos ingresos en cualquier año deben asignarse 99.98 % a la Asociación de Inversión, 0.01 % al Socio Limitado Especial y 0.01 % al Socio General. Como se define en el Acuerdo de Asociación, ciertas transacciones y sucesos justifican asignaciones especiales de ganancias y pérdidas. Todas las demás pérdidas deben asignarse en la medida permitida por la Sección 704(b) del Código de Ingresos Internos de los EE. UU.

A tenor con el Acuerdo de Asociación, los Socios Limitados deben proporcionar contribuciones de capital por un total de aproximadamente $235 millones a la Asociación (el Patrimonio Inicial Proyectado), sujeto a ajustes basados en la cantidad de créditos de vivienda de bajos ingresos finalmente asignados a los desarrollos, además de otros sucesos potenciales como se explica con mayor detalle en el Acuerdo de Asociación. Al 30 de junio de 2017, los Socios Limitados han proporcionado contribuciones de capital por un total de aproximadamente $126.6 millones.

## ELA DE PUERTO RICO

Notas a los Estados Financieros Básicos

30 de junio de 2017

A tenor con el Acuerdo de Asociación, el Socio General debe proporcionar contribuciones de capital por un total de aproximadamente $10 millones a la Asociación. En caso de que la Asociación no tenga suficientes fondos disponibles para pagar el saldo pendiente de la tarifa del desarrollador de esta, según se define, el Socio General debe proporcionar contribuciones de capital adicionales a la Sociedad por un monto suficiente para que la Sociedad pague dicho saldo en su totalidad. El Socio General no debe tener derecho u obligación de hacer ninguna otra aportación de capital. Al 30 de junio de 2017, el Socio General no había proporcionado contribuciones de capital. Además, el DOH como Socio General debe establecer el Fondo de Reserva de Garantía al cierre inicial por el monto de la aportación de capital inicial menos aproximadamente $4 millones (más cualquier aportación de capital inicial con respecto a los complejos de apartamentos). Los montos en el Fondo de Reserva de Garantía deben ser utilizados, (i) a solicitud del Socio General, sujeto al consentimiento del Socio Limitado Especial o (ii) según las instrucciones del Socio Limitado Especial, para cumplir con las obligaciones financieras del General Socio, aparte de los costos de desarrollo excesivos, según lo dispuesto en el Acuerdo de Asociación. Al 30 de junio de 2017, dicha reserva se mantuvo en la Asociación.

El 7 de agosto de 2008, la LLC celebró un Acuerdo Maestro de Desarrolladores con el DOH para realizar servicios en relación con el desarrollo, rehabilitación y modernización de ciertos proyectos de vivienda (el Acuerdo Maestro de Desarrolladores). A tenor con el Acuerdo Maestro de Desarrolladores, el DOH recibirá una tarifa de desarrollador por un monto de aproximadamente $75.1 millones por dichos servicios. El pago de la tarifa del desarrollador debe estar sujeto a los términos y condiciones de la Sección 6(a)(iv) del Acuerdo Maestro de Desarrolladores. Al 30 de junio de 2017, se registraron aproximadamente $73.3 millones en otras cuentas por cobrar en el Fondo General relacionadas con el Acuerdo Maestro de Desarrollo (incluyendo aproximadamente $16.6 millones relacionados con el Fondo de Reserva de Garantía). Además, el 7 de agosto de 2008, la LLC y el DOH celebraron un Acuerdo de Compra y Venta por el que la LLC adquirió los derechos de superficie de una propiedad (la Propiedad) y la mejora erigida en dicha propiedad que consiste en edificios y construcción en progreso con un valor nominal neto y un costo de aproximadamente $45.9 millones y $110 millones, respectivamente, del DOH. Esta compra está sujeta a ciertas escrituras de la Constitución de Derechos de Superficie y Transferencia de Mejoras con fecha del 7 de agosto de 2008, que requieren que la LLC rehabilite o construya en la Propiedad 4,132 unidades residenciales de alquiler (las Unidades o colectivamente el Desarrollo), que recibirán el beneficio de un subsidio operativo y créditos fiscales para viviendas de bajos ingresos según la Sección 42 del Código de Ingresos Internos de los Estados Unidos de 1986, según enmienda. Ochenta y cuatro (84) de las unidades, que ubicarán en el sitio Brisas de Cayey II, serán de nueva construcción. Las unidades restantes serán modernizadas.

Además, el 7 de agosto de 2008, el DOH celebró un acuerdo de préstamo con la LLC por un monto de aproximadamente $102.9 millones para la adquisición de las 33 propiedades de alquiler residencial (la nota de precio de compra diferida). La LLC debe realizar pagos equivalentes al monto de las contribuciones netas de capital disponibles, según lo definido, para el trimestre calendario anterior.

Los siguientes son los términos de la nota de precio de compra diferida: compromiso de aproximadamente $102.9 millones; tasa de interés 3.55%; y fecha de vencimiento posterior a (i) el financiamiento de la última cuota del aporte de capital o (ii) el 7 de agosto de 2013. La nota debe ser un pasivo de recurso total de la LLC; sin embargo, ninguno de los miembros de la LLC tiene pasivos personales. Al 30 de junio de 2017, el saldo de capital pendiente en la nota de precio de compra diferida fue de aproximadamente $8.8 millones y el interés acumulado fue de aproximadamente $1.9 millones, y ambos montos se registraron dentro de la entrada diferida de recursos - aranceles de desarrolladores en el Fondo General.

La Administración de la Vivienda Pública de Puerto Rico (PHA) ha celebrado un Acuerdo Interagencial con fecha del 7 de agosto de 2008, con el DOH, según la capacidad del DOH de socio general de la Asociación, para delegar las tareas administrativas y operativas relacionadas con el Desarrollo a PHA según lo establecido en el Acuerdo Interagencial. La LLC y la PHA también tienen la intención de que las

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

unidades se desarrollen, operen y administren para asegurar que la LLC reciba los beneficios económicos y fiscales antes mencionados en toda la extensión disponible para la LLC.

**(d) Bonos de asignación del ELA**

A lo largo de los años, el BGF, como agente fiscal y banco del ELA, había prorrogado líneas de crédito, anticipos y préstamos a varias agencias y unidades componentes del ELA para financiar sus proyectos de mejora de capital y cubrir sus déficits operativos en el tiempo. En diferentes momentos, estos préstamos se reembolsaron mediante la emisión de bonos de asignación del ELA emitidos por la CFP, una unidad de componentes combinados del BGF, que sirve solo como un conducto para la emisión de los bonos. El ELA ha reconocido un efecto espejo de estos reintegros de CFP a lo largo de los años en su propia deuda en proporción a la parte de los pagarés del ELA incluidos en dichos reintegros de CFP. Además, durante los últimos años, COFINA, a través de la emisión de bonos, se ha utilizado para pagar otros préstamos y bonos de asignación existentes. COFINA es una unidad de componentes combinados del ELA creada en 2007 con la capacidad de emitir bonos para pagar o reembolsar anticipos del BGF, los bonos de asignación mencionados anteriormente y otras obligaciones de deuda, colectivamente denominadas deuda constitucional adicional. No hubo nuevas actividades de bonos de asignación del ELA durante el año fiscal 2017, aparte de la amortización anual de las primas correspondientes y sus entradas y salidas diferidas de recursos relacionadas en forma de ganancias y pérdidas por reintegro diferido.

Al 30 de junio de 2017, el saldo pendiente de los bonos de asignación del ELA pertenecientes al Gobierno Primario (es decir, excluyendo el saldo perteneciente a unidades de componentes de presentación discreta), consistía en las siguientes obligaciones (en miles):

|  |  |
|---|---|
| La Ley Núm. 164 que reestructura la ATM | $ 438,052 |
|  | 131,694 |
| Total de bonos de asignación del ELA | $ 569,746 |

**Ley Núm. 164 de Reestructuración** - El 17 de diciembre de 2001, se aprobó la Ley Núm. 164, que autorizó a ciertas agencias gubernamentales y unidades componentes de presentación discreta a reembolsar aproximadamente $2,400 millones de sus obligaciones pendientes con el BGF, para las cuales no existía una fuente de pago, durante un período que no más de 30 años, y se reembolsará con asignaciones anuales del ELA que no excedan los $225 millones. Este reintegro se ejecutó originalmente con bonos de asignación del ELA a través de varias series de bonos emitidos por CFP durante el período comprendido entre diciembre de 2001 y junio de 2002.

Posteriormente, se realizaron reintegros adicionales (actuales y anticipados) o reintegros de la reestructuración de la Ley Núm. 164-2001 a través de emisiones de bonos CFP y COFINA.

Aproximadamente $438 millones de los bonos de apropiación del ELA en circulación al 30 de junio de 2017, pertenecen al Gobierno Primario según la Ley Núm. 164-2001, que consiste en el PRDOH (financiamiento de la reforma de salud y otros costos), el DOT (originalmente el financiamiento deficitario del año fiscal 2001 y la obligación asumida por gravámenes tributarios defectuosos), y la PRIFA, una unidad de componentes combinados del ELA. El saldo pendiente de los bonos de asignación del ELA relacionados con la Ley Núm. 164-2001 devenga intereses a tasas que van del 3.10% al 6.50%.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los requisitos de la amortización de la deuda, sujetos a asignaciones legislativas, en años futuros fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Año que termina el 30 de junio: |  |  |  |
| 2018 | $ 68,074 | 65,140 | 133,214 |
| 2019 | 22,361 | 19,374 | 41,735 |
| 2020 | 23,257 | 18,421 | 41,678 |
| 2021 | 24,219 | 17,382 | 41,601 |
| 2022 | 25,274 | 16,248 | 41,522 |
| 2023-2027 | 64,190 | 69,705 | 133,895 |
| 2028-2031 | 208,856 | 18,809 | 227,665 |
| Total | 436,231 | 225,079 | 661,310 |
| Más prima no amortizada | 1,821 |  |  |
| Total | $ 438,052 |  |  |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

**ATM:** El ELA asumió un pagaré pagadero por la ATM al BGF en relación con la venta de las operaciones marítimas de ATM. Los bonos de asignación del ELA, Serie B 2003 y Serie B 2004 se emitieron para reembolsar este pasivo, que se reembolsó más recientemente en junio de 2012 con la emisión de bonos CFP Serie A de 2012. El saldo de los bonos devenga intereses a una tasa variable que varía de 3.10 % a 5.35 %. Los requisitos de la amortización de la deuda en años futuros fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Año que termina el 30 de junio: |  |  |  |
| 2018 | $ — | 6,837 | 6,837 |
| 2019 | — | 6,837 | 6,837 |
| 2020 | — | 6,837 | 6,837 |
| 2021 | — | 6,837 | 6,837 |
| 2022 | — | 6,837 | 6,837 |
| 2023-2027 | 83,384 | 23,777 | 107,161 |
| 2028–2032 | 48,310 | 10,769 | 59,079 |
| Total | $ 131,694 | 68,731 | 200,425 |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(e)  Acuerdo de compra de bonos con el BGF**

En varios momentos durante los años fiscales que terminaron en 2005 y 2006, la AP, una unidad de componentes combinados del ELA, celebró acuerdos de compra de bonos con el BGF, por lo que el BGF acordó desembolsar a la AP, cada cierto tiempo, anticipos hasta un monto total máximo de capital de $70 millones (Bono de la Serie A de la Autoridad del Puerto de las Américas 2005), $40 millones (Bono de la Serie B de la Autoridad del Puerto de las Américas 2005) y $140 millones (Bono de la Autoridad del Puerto de las Américas Serie C de 2005). Estos bonos están garantizados por el ELA mediante la Ley Núm. 409-2004, que autorizó la emisión de estos arreglos de financiamiento. El ELA había estado pagando la amortización de la deuda de estos bonos con garantía a tenor con la Ley Núm. 409-2004. Para obtener información adicional, consulte la Nota 14(a).

Las ganancias de los bonos se utilizaron para financiar el costo de desarrollo y construcción de las instalaciones de la AP. Estos bonos, con un vencimiento original de enero de 2015, se refinanciaron el 31 de diciembre de 2014 en un solo bono por un período de 30 años, con el primer pago de capital e intereses que comenzará el 1 de agosto de 2015, con tasas de interés basadas en las tasas asumidas por la obligación general del ELA. Estas tasas deben revisarse trimestralmente, siempre que el interés nunca sea inferior al 7 % ni superior al 12 %. El saldo total del capital pendiente del monto principal del bono será pagadero en su totalidad el 1 de enero de 2045. El capital y los intereses del bono refinanciado continúan cubiertos por la garantía del ELA. Al 30 de junio de 2017, el capital pendiente del contrato de compraventa de Bonos ascendía a aproximadamente $225.5 millones.

La deuda de la AP puede pagarse de cualquiera de las siguientes formas: (i) una emisión de bonos a largo plazo, una vez que se completen los proyectos o (ii) asignaciones legislativas, según lo establecido por la Ley Núm. 409-2004, que cumple el acuerdo mencionado anteriormente.

La Ley Núm. 409-2004, según enmienda, no indica si hay arreglos establecidos para recuperar cualquier pago potencial de la AP por pagos de garantía realizados; sin embargo, no existe intención del ELA de solicitar una recuperación de posibles pagos.

**(f)  Reembolso Anticipado, Defensa y Reembolso de Bonos del ELA**

En años anteriores, el ELA anuló ciertas obligaciones generales y otros bonos al colocar las ganancias de los bonos en un fideicomiso irrevocable para proporcionar todos los pagos futuros de la deuda de los bonos reembolsados. En consecuencia, los activos y pasivos de la cuenta fiduciaria para los bonos anulados no se incluyen en los estados financieros básicos. Para el año terminado el 30 de junio de 2017, el ELA no tenía obligaciones canceladas.

La AEP, una unidad de componentes combinados, ha diferido ciertos bonos de ingresos en años anteriores al colocar los ingresos de los nuevos bonos en un fideicomiso irrevocable para proporcionar todos los pagos futuros de la deuda de las antiguas deudas. En consecuencia, los activos y pasivos de las cuentas fiduciarias para los bonos anulados no se incluyen en el estado de resultados netos. Al 30 de junio de 2017, aproximadamente $659.9 millones de bonos de AEP se consideran anulados.

Durante años anteriores, COFINA, una unidad de componentes combinados, emitió ciertos bonos de reintegro, cuyo producto se colocó en un fideicomiso irrevocable para proporcionar todos los pagos futuros de la deuda de los bonos reembolsados de COFINA de la serie 2009A y 2009B. El saldo pendiente de los bonos reembolsados por adelantado era de aproximadamente $41.9 millones al 30 de junio de 2017.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(g) *Pagarés pagaderos al BGF, otras unidades de componentes de presentación discreta e institución financiera***

El ELA financió ciertos pasivos a largo plazo a través del BGF y otras unidades de componentes de presentación discreta, tanto en actividades del gobierno como de tipo comercial. El saldo pendiente al 30 de junio de 2017 sobre el financiamiento provisto por el BGF y otras unidades de componentes de presentación discreta presentadas dentro de los pagarés en el estado de resultados netos -Actividades del Gobierno, comprende lo siguiente (en miles):

Pagarés adeudados al BGF:

| | | |
|---|---|---:|
| DOT | $ | 761,212 |
| SCPT | | 345,841 |
| OGP | | 265,471 |
| AEP | | 182,160 |
| DE | | 106,308 |
| DTOP | | 82,870 |
| Administración de Correcciones | | 82,489 |
| UPRCCC | | 120,482 |
| DOA | | 65,225 |
| JCA | | 2,225 |
| DJ | | 49,846 |
| PRDOH | | 44,158 |
| PRIFA | | 49,338 |
| PRPOB | | 31,679 |
| DOH | | 16,617 |
| SCB | | 27,489 |
| Oficina de Administración de Tribunales | | 34,033 |
| DRS | | 18,168 |
| | $ | 2,285,611 |

Pagarés adeudados a las unidades de componentes: CFSE

| | | |
|---|---|---:|
| CFSE | $ | 100,000 |
| ACAA | | 2,000 |
| | $ | 102,000 |

| | | |
|---|---|---:|
| Pagarés adeudados a la institución financiera | $ | 23,764 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Pagarés adeudados al BGF*

(i)  *Actividades del Gobierno*

El ELA ha celebrado la siguiente línea de acuerdos de crédito con el BGF (todos dentro de Actividades del Gobierno) que vencen y se registran como un pasivo del fondo en el Fondo General al 30 de junio de 2017 (en miles):

| Agencia | Propósito | Tasa de interés | Vencimiento | Línea de crédito | Saldo pendiente |
|---|---|---|---|---|---|
| DOT | Pagar la deuda de varias agencias del gobierno central | 125 bp sobre 3 meses LIBOR (7%) | 30 de septiembre de 2012 | $  100,000 | 57,597 |
| DOT | Cubrir necesidades adicionales de fondos para desastres catastróficos | 125 bp sobre tres meses LIBOR (7%) | 30 de septiembre de 2013- 30 de septiembre de 2015 | 79,930 | 35,655 |
| DOT | Financiar el proyecto de tecnología de la información | 125 bp sobre la tasa comercial del BGF documento comercial (7%) | 30 de junio de 2008 | 14,782 | 11,652 |
| DOT | Compra de máquinas móviles de rayos X | 125 bp sobre tres meses LIBOR (7%) | 30 de junio de 2008 | 12,000 | 2,104 |
| Oficina del Defensor de veteranos | Para mejoras de fondos para instalaciones de veteranos | 6% | 31 de marzo de 2015 | 7,500 | 292 |
| | | | | $  214,212 | 107,300 |

Al 30 de junio de 2017, el DOT había celebrado varias líneas de acuerdos de crédito con el BGF por aproximadamente $2,800 millones para diferentes propósitos, con tasas de interés fijas y variables, y varias fechas de vencimiento como se resume a continuación (en miles):

| Propósito | Tasa de interés | Vencimiento | Líneas de crédito | Saldo pendiente |
|---|---|---|---|---|
| Financiar la nómina y los gastos operativos del ELA para el año fiscal 2006 Pagar demandas contra el ELA y asignar $15.3 millones al Programa de Desarrollo del Trabajo para gastos operativos | 7.00% | 30 de junio de 2040 | $  741,000 | 141,211 |
| | 6.00% | 30 de junio de 2018 | 160,000 | 113,685 |
| Recursos para cumplir con las asignaciones créditos en el presupuesto anual del ELA (año fiscal 2004) y gastos de programas federales | 7.00% | 30 de junio de 2040 | 640,000 | 92,370 |

170

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

| Propósito | Tasa de interés | Vencimiento | Líneas de crédito | Saldo pendiente |
|---|---|---|---|---|
| Financiar proyectos de mejoras de capital de agencias y municipalidades | 7.00% | 30 de junio de 2019 | $  130,000 | 71,578 |
| Financiar mejoras de capital de varias agencias del gobierno | 7.00% | 30 de junio de 2040 | 105,000 | 58,973 |
| Financiar parcialmente los depósitos mensuales de capital e intereses requeridos para el pago de la deuda de 2013 de bonos generales de obligaciones e ingresos | 150 bp sobre PRIME, pero no menos del 6% | 30 de junio de 2042 | 384,496 | 63,135 |
| Financiar los depósitos mensuales de capital e intereses requeridos para la amortización de la deuda de 2014 de los bonos de obligación general e ingresos | 6.00% | 30 de junio de 2043 | 319,645 | 50,419 |
| Financiar determinados proyectos de mejora de capital | 150 bp sobre PRIME, pero no menos del 6% | 30 de junio de 2043 | 100,000 | 34,789 |
| Financiar determinados proyectos de mejora de capital | 150 bp sobre PRIME, pero no menos del 6% | 30 de junio de 2041 | 215,000 | 21,096 |
| Adquisición del Centro Correccional de Salinas | 125 bp sobre 3 meses LIBOR | 30 de junio de 2040 | 15,000 | 6,118 |
| Pagar las facturas presentadas al Departamento de Hacienda relacionadas con la Ley Núm. 171 "Ley de Manejo de Neumáticos" | 7.00% | 30 de junio de 2019 | 22,100 | 538 |
| Total | | | $  2,832,241 | 653,912 |

Durante el año fiscal 2017, el ELA realizó contribuciones por aproximadamente $102.5 millones a varias de sus organismos, que incluyen unidades componentes, y otras entidades gubernamentales de acuerdo con la Resolución Núm. 60 de la Legislatura. Los pagarés del ELA pagaderos al BGF se han reducido por dichos montos. La siguiente tabla resume las contribuciones hechas por el ELA a dichas entidades (en miles):

| | |
|---|---|
| AP | 3,190 |
| ADEA | 25,000 |
| UPRCCC | 40,000 |
| Autoridad de Financiamiento de la Vivienda de Puerto Rico | 5,733 |
| SCB | 6,000 |
| Otras entidades del gobierno | 19,395 |
| Total de contribuciones | $  102,454 |

El 21 de noviembre de 2002, la Resolución Núm. 1028 de la Legislatura autorizó al BGF a proporcionar una línea de crédito por $500 millones al SCPT para la construcción y rehabilitación de viviendas, construcción y mejoras de sistemas eléctricos, de agua y alcantarillado; reparación y mejoras de calles y aceras; construcción y mejora de instalaciones recreativas, y para desarrollar iniciativas de autosuficiencia económica para los residentes de un grupo seleccionado de comunidades desplazadas y económicamente desfavorecidas, todo incluido en el Programa de Comunidades Especiales iniciado con la creación del SCPT por la Ley Núm. 271-2002. Esta línea de crédito no recurrente, originalmente por un plazo de diez años, se prorrogó el 30 de junio de 2012 hasta la fecha de vencimiento del 30 de junio de 2040.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

A partir de octubre de 2009, la tasa de interés en esta línea se estableció en 7%. Los pagos anuales en la línea se determinan utilizando una tabla de amortización de 30 años basada en el saldo de capital e intereses al 31 de diciembre de cada año, y se aplica una multa de interés del 4% por pagos atrasados. La Resolución Legislativa Núm. 1762 del 18 de septiembre de 2004 estableció que el capital más los intereses devengados de esta línea se pagarían con las asignaciones legislativas del ELA según lo establecido por la OGP. El saldo pendiente de esta línea al 30 de junio de 2017 ascendió a aproximadamente $345.8 millones.

El 23 de mayo de 2012, la OGP celebró un acuerdo de línea de crédito de $100 millones (modificado durante el año fiscal 2016 a un máximo de $178 millones) con el BGF para cubrir los costos de la implementación de la tercera fase de la Ley Núm. 70-2010. Los préstamos según esta línea de crédito devengan intereses a tasa preferencial más 1.50 % con un piso de 6%. La línea de crédito modificada vence el 31 de julio de 2037. Al 30 de junio de 2017, aproximadamente $115.5 millones estaban pendientes. El 5 de junio de 2006, la OGP celebró un acuerdo de línea de crédito de $150 millones con el BGF para proporcionar asistencia económica en caso de desastres y emergencias. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a tasas variables basadas en 125 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento original de la línea de crédito el 30 de septiembre de 2011. El 22 de julio de 2011, la OGP y el BGF modificaron el acuerdo de línea de crédito de $150 millones para extender su fecha de vencimiento al 30 de julio de 2022. Además, el acuerdo se convirtió en una línea de crédito recurrente con intereses a 150 puntos básicos sobre la tasa preferencial, pero en ningún caso dicha tasa puede ser inferior al 6 % anual. Al 30 de junio de 2017, aproximadamente $150 millones estaban pendientes. Las dos líneas de crédito por el saldo pendiente agregado de aproximadamente $265.5 se pagan con las asignaciones legislativas del ELA.

El 18 de agosto de 2010, el BGF proporcionó a la AEP una línea de crédito no recurrente por un monto máximo de capital de aproximadamente $93.6 millones con una tasa de interés anual fluctuante igual a la tasa Prime más 150 puntos básicos, siempre que dicho interés no pueda ser inferior al 6 % u otra tasa determinada por el BGF. Los ingresos de la instalación se utilizaron para el desarrollo de proyectos de construcción. La línea vence el 30 de junio de 2044 y se paga con el producto de la futura emisión de bonos de reintegro de ingresos de AEP. Al 30 de junio de 2017, aproximadamente $51 millones estaban pendientes. El AEP también mantiene un acuerdo de línea de crédito de $75 millones con el BGF para el pago de gastos operativos. Los préstamos según esta línea de crédito generan intereses a una tasa fija del 7 % y son pagaderos al vencimiento el 30 de junio de 2018. Al 30 de junio de 2017, aproximadamente $64.7 millones estaban pendientes. Además, el 2 de mayo de 2008, AEP ejecutó dos Acuerdos de Préstamo con el BGF para el financiamiento provisional de su Programa de Mejora de Capital por un monto que no exceda aproximadamente $226 millones, con intereses del 6 %. Los préstamos y los intereses devengados vencen el 30 de junio de 2044 y se pagarán con el producto de la futura emisión de bonos de reintegro de ingresos de AEP. Los préstamos se dividen en aproximadamente $209 millones exentos de impuestos y aproximadamente $16.9 millones con base imponible. Al 30 de junio de 2017, aproximadamente $66.4 millones según pendientes.

El 6 de febrero de 2003, el DE celebró un acuerdo de línea de crédito de $25 millones con el BGF para la compra de equipos y mejoras escolares. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2017, aproximadamente $4.6 millones estaban pendientes. El 4 de agosto de 2002, el DE celebró un acuerdo de línea de crédito adicional de $140 millones con el BGF para reembolsar al DOT los pagos realizados en su nombre por los fondos estatales utilizados para financiar los gastos del programa federal. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, aproximadamente $101.7 millones estaban pendientes. Las dos líneas de crédito por el saldo total pendiente de aproximadamente $106.3 millones se pagan con las asignaciones legislativas del ELA.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El DTOP del ELA celebró cinco acuerdos de línea de crédito con el BGF por un monto $104 millones para mejoramiento y mantenimiento de carreteras alrededor de la Isla. Los préstamos bajo estas líneas de crédito devengan intereses a una tasa del 7% y se pagan al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, había aproximadamente $82.9 millones pendientes, pagaderos con las asignaciones legislativas del ELA.

El 12 de mayo de 2004, la Administración de Corrección del ELA (CA) celebró un acuerdo de línea de crédito de $60 millones con el BGF para mejorar ciertas instalaciones correccionales. Los préstamos bajo este acuerdo de línea de crédito devengan intereses a una tasa fija del 7 % y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2017, había aproximadamente $18.1 millones pendientes, pagaderos con las asignaciones legislativas del ELA. Además, el 24 de noviembre de 2010, la CA celebró un acuerdo de línea de crédito de $80 millones con el BGF para la construcción de un nuevo centro médico correccional. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a una tasa anual igual a la tasa preferencial, más 150 puntos básicos, pero en ningún caso dicha tasa puede ser inferior al 6 % anual ni superior al 12 % anual y se pagan en el vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, había aproximadamente $64.4 millones pendientes, pagaderos con las asignaciones legislativas del ELA.

El 22 de agosto de 2007, UPRCCC celebró un acuerdo de línea de crédito no renovable de $18 millones con el BGF para construir las oficinas administrativas y las instalaciones de investigación de UPRCCC. El 29 de mayo de 2008, se modificó el acuerdo, principalmente para aumentar el monto máximo del préstamo a $75 millones, para extender la fecha de vencimiento hasta el 31 de octubre de 2021 y para financiar la construcción del hospital y las instalaciones de radioterapia. El saldo se pagará a partir del año fiscal 2015. La línea no recurrente genera intereses a una tasa fija del 6 %. Al 30 de junio de 2017, aproximadamente $31.9 millones estaban pendientes. El 18 de noviembre de 2013, la UPRCCC celebró otra línea de crédito no recurrente con el BGF por hasta un monto de capital agregado que no excederá $196 millones, para la construcción y el desarrollo de un hospital de noventa y seis camas, una clínica ambulatoria multidisciplinaria, un centro de diagnóstico por imágenes y una unidad de infusión de oncología médica en un terreno de UPRCCC ubicado en San Juan. La línea de crédito, que incluye intereses a una tasa fija de 6.5 %, se paga en 28 cuotas anuales consecutivas, a partir del último día hábil de diciembre de 2016. Al 30 de junio de 2017, aproximadamente $88.5 millones estaban pendientes. Las dos líneas de crédito por el saldo total pendiente de aproximadamente $120.4 millones se pagan con las asignaciones legislativas del ELA.

El 9 de agosto de 1999, el DOA celebró un acuerdo de línea de crédito no recurrente $125 millones con el BGF para proporcionar asistencia económica al sector agrícola, que sufrió daños severos causados por el huracán Georges en 1998. Al 24 de febrero de 2004, la línea de crédito aumentó en $50 millones resultando en un monto total de $175 millones. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, había aproximadamente $65.2 millones pendientes, pagaderos con las asignaciones legislativas del ELA.

El 2 de octubre de 2002, DJ celebró un acuerdo de línea de crédito de $90 millones con el BGF para financiar 12 proyectos de mejora pública para el Municipio de Ponce a tenor con una orden judicial. Los préstamos bajo este acuerdo de línea de crédito devengan intereses a una tasa variable y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. El 8 de agosto de 2005, el DJ celebró un acuerdo modificado para aumentar la línea de crédito antes mencionada de $90 millones a $110 millones para cubrir varios proyectos adicionales en Ponce, a tenor con la misma orden judicial. Los préstamos según el nuevo acuerdo de línea de crédito modificado generan intereses a una tasa del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, el saldo agregado pendiente, según este acuerdo de línea de crédito enmendado

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

ascendió a $49.8 millones, que se paga con las asignaciones legislativas del ELA.

El 18 de febrero de 2005, la PRIFA celebró un acuerdo de crédito de $40 millones con el BGF para la construcción de un auditorio para el Centro de Bellas Artes Luis A. Ferré. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7 % y son pagaderos al vencimiento del acuerdo de crédito el 30 de junio de 2040. Al 30 de junio de 2017, aproximadamente $4.8 millones relacionados con este acuerdo de crédito estaban pendientes. El 1 de junio de 2009, PRIFA celebró un acuerdo de línea de crédito recurrente adicional por $7.8 millones con el BGF para proporcionar financiamiento para los costos incurridos por la PRIFA según ciertos Programas de la Ley de Recuperación y Reinversión de América (los programas ARRA). Los préstamos según esta línea de crédito generan intereses a tasas variables basadas en 150 puntos básicos sobre la tasa preferencial y son pagaderos al vencimiento de la línea de crédito el 31 de enero de 2016. Al 30 de junio de 2017, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $7.1 millones. El 8 de marzo de 2012, la PRIFA también celebró un acuerdo de línea de crédito de $35 millones con el BGF para la adquisición, remodelación y mantenimiento de ciertas propiedades inmobiliarias que en su mayoría están ocupadas por varias agencias gubernamentales. Esta línea de crédito está garantizada por un gravamen hipotecario sobre la propiedad Esta línea de crédito vence el 30 de junio de 2017 y devenga intereses a 150 puntos básicos sobre la tasa preferencial, con una tasa de interés mínima del 6 %. Al 30 de junio de 2017, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $37.4 millones Las tres líneas de crédito por el saldo total pendiente de aproximadamente $49.3 millones se pagan con las asignaciones legislativas del ELA.

En agosto de 2003, el PRDOH celebró un acuerdo de línea de crédito de $30 millones con el BGF para pagar ciertas deudas pendientes que PRMeSA tenía con otras agencias y proveedores. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, aproximadamente $21.3 millones relacionados con este acuerdo de línea de crédito estaban pendientes. El 8 de noviembre de 2004, el PRDOH celebró un acuerdo adicional de línea de crédito de $58.5 millones con el BGF para el financiamiento de un proyecto del PRDOH y PRMeSA. Los préstamos bajo esta línea de crédito generan intereses a tasas variables basadas en 150 puntos básicos sobre la tasa de documentos comerciales del BGF y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $19.6 millones, que se paga con los créditos legislativos del ELA. El 14 de febrero de 2008, el PRDOH celebró un acuerdo de línea de crédito adicional de $8 millones con el BGF para cubrir los costos de tratamiento, diagnóstico y gastos complementarios durante el año fiscal 2008 a tenor con la Ley Núm. 150-1996. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a tasas variables basadas en 125 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, el saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $3.3 millones, que se paga con las asignaciones legislativas del ELA.

El 29 de julio de 2004, el PROB celebró un acuerdo de línea de crédito de $45 millones con el BGF para la adquisición de vehículos y equipos de alta tecnología. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. El saldo pendiente de este acuerdo de línea de crédito ascendía a aproximadamente $31.7 millones al 30 de junio de 2017, que se paga con los créditos legislativos del ELA.

El 15 de febrero de 2002, la SCB celebró un acuerdo de línea de crédito de $35 millones con el BGF para la construcción de un estacionamiento de la SCB. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, quedaban pendientes

174

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

aproximadamente $15.5 millones del acuerdo de línea de crédito, que se paga con las asignaciones legislativas del ELA. El 9 de febrero de 2012, la SCB celebró un acuerdo adicional de línea de crédito de $15 millones con el BGF para mejoras permanentes de los edificios existentes. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a 150 puntos básicos sobre la tasa preferencial y no pueden ser inferiores al 6 % ni superiores al 12 % anual y son pagaderos al vencimiento de la línea de crédito el 31 de julio de 2018. Al 30 de junio de 2017, había aproximadamente $6.5 millones pendientes, pagaderos con las asignaciones legislativas del ELA. El 17 de diciembre de 2014, la SCB celebró un acuerdo adicional de línea de crédito de $15 millones con el BGF para mejoras permanentes en el Distrito del Capitolio. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 5.8 % y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2024. Al 30 de junio de 2017, aproximadamente $5.5 millones estaban pendientes.

El 8 de marzo de 2007, el DOH celebró un acuerdo de línea de crédito de $19 millones con el BGF, para reembolsar a la Autoridad de Financiamiento de la Vivienda de Puerto Rico (PRHFA), una unidad de componentes combinados del BGF, por ciertos avances realizados para un proyecto de revitalización. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa variable LIBOR a tres meses más 1.25 %, sin exceder el 5 %, y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, la línea de crédito tiene un saldo pendiente de aproximadamente $5.2 millones, que se paga con el producto de la venta de propiedades. El 3 de diciembre de 2007, el DOH celebró un acuerdo de línea de crédito adicional de $30 millones con el BGF para la compra del edificio con Juan C. Cordero Dávila. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses basados en 75 puntos básicos durante la tasa LIBOR a tres meses y se pagan al vencimiento de la línea de crédito el 28 de febrero de 2038. Al 30 de junio de 2017, aproximadamente $11.4 millones relacionados con este acuerdo de línea de crédito estaban pendientes de pago, que se pagarán con los ingresos por alquileres futuros.

El 18 de enero de 2005, el DRS celebró un acuerdo de línea de crédito de $17.2 millones con el BGF para el desarrollo de una serie de proyectos recreativos en diferentes municipios. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa fija del 7% y son pagaderos al vencimiento de la línea de crédito el 30 de junio de 2040. Al 30 de junio de 2017, aproximadamente $500,000 estaban pendientes. Además, el 9 de febrero de 2004, el DRS celebró un acuerdo de línea de crédito de $16 millones con el BGF para el desarrollo y mejora de instalaciones recreativas. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses sobre el monto del principal impago de cada anticipo a una tasa fija del 7 % y se pagan al vencimiento de la línea de crédito el 30 de junio de 2018. Al 30 de junio de 2017, había aproximadamente $600,000 pendientes, pagaderos con las asignaciones legislativas del ELA. Se suscribió un acuerdo de línea de crédito adicional entre el BGF y el DRS por un monto máximo de capital de aproximadamente $13 millones con intereses sobre el monto de capital impago de cada adelanto a una tasa fija del 7 % y se paga al vencimiento de la línea de crédito en 30 de junio de 2040. Los ingresos de la línea de crédito se utilizaron para el desarrollo y la mejora de las instalaciones recreativas. Al 30 de junio de 2017, había aproximadamente $8.2 millones pendientes, pagaderos con las asignaciones legislativas del ELA.

El 23 de julio de 2014, se aprobó la Ley Núm. 107, que crea el Programa de Parques Nacionales del ELA (NPP), que, entre otras disposiciones, fusionó la Corporación de Parques Nacionales de Puerto Rico (NPCPR), luego una unidad componente presentada discretamente, en un programa dentro del DRS. NPCPR luego cesó de existir como una entidad legal separada. Con esta transacción, el programa generó tres acuerdos de línea de crédito separados entre el BGF y el DRS. El 17 de agosto de 2007, la NPP celebró un acuerdo de línea de crédito de $10 millones para financiar un programa de retiro anticipado en respuesta a la Ley Núm. 70-2007. Los préstamos bajo esta línea de crédito generan intereses basados en una tasa fija del 7 %, y el principal y los intereses se pagan el 31 de octubre de cada año hasta el 31 de diciembre de 2018. La fuente del reintegro proviene de los

175

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

ingresos recaudados por NPP durante los primeros cuatro meses del año y posteriormente hasta 2018. Al 30 de junio de 2017, aproximadamente $3.2 millones estaban pendientes. El 6 de febrero de 2003, NPP ingresó una línea de crédito de $9.3 millones para financiar las mejoras de ciertos parques, instalaciones costeras y edificios de NPP. Los préstamos según esta línea de crédito generan intereses basados en una tasa variable (7% al 30 de junio de 2017). El capital y los intereses se pagan anualmente hasta el 30 de junio de 2040 y la fuente del reintegro proviene de los créditos legislativos. Al 30 de junio de 2017, aproximadamente $1.1 millones estaban pendientes. Durante 2003, NPP suscribió una línea de crédito de $12 millones para financiar la adquisición de un terreno. Los préstamos según esta línea de crédito generan intereses basados en una tasa variable (7% al 30 de junio de 2017). El capital y los intereses se pagan anualmente hasta el 30 de junio de 2040 y la fuente del reintegro proviene de los créditos legislativos futuros del ELA. Al 30 de junio de 2017, aproximadamente $4.5 millones estaban pendientes.

El 27 de febrero de 2014, la Oficina de Administración de Tribunales celebró un acuerdo de línea de crédito adicional de $50 millones con el BGF para el desarrollo de varios proyectos prioritarios a tenor con su plan estratégico y para financiar compromisos operativos adicionales. Los préstamos en virtud de este acuerdo de línea de crédito devengan intereses a 150 puntos básicos sobre la tasa preferencial y no pueden ser inferiores al 6 % ni superiores al 12 % anual y son pagaderos al vencimiento de la línea de crédito el 31 de julio de 2027. Al 30 de junio de 2017, había aproximadamente $34 millones pendientes, pagaderos con los impuestos de aranceles aduaneros futuros.

El 18 de septiembre de 2003, la JCA celebró un acuerdo de línea de crédito de $11 millones con el BGF para los requisitos de igualación de fondos federales relacionados con los Fondos Recurrentes de Agua Limpia del Estado. Los préstamos según este acuerdo de línea de crédito devengan intereses a una tasa variable de 150 puntos básicos sobre la tasa preferencial calculada trimestralmente con un piso del 6 % y se pagan anualmente hasta el 31 de marzo de 2017. Si hay algún monto de capital impago después de la fecha de vencimiento, la tasa de interés aumentará un 200 % de la tasa de interés aplicable en dicha fecha. Los intereses pagaderos se devengarán diariamente. Al 30 de junio de 2017, quedaban pendientes aproximadamente $2.2 millones del acuerdo de línea de crédito, que se paga con las asignaciones legislativas del ELA.

*Pagarés Por Pagar a las Unidades de Componentes de Presentación Discreta*

La Ley Núm. 80-2015 fue aprobada con el objetivo de abordar las deficiencias de flujo de efectivo proyectadas por el ELA para el año fiscal 2015. Esta Ley, entre otras disposiciones, autorizó específicamente a la CFSE, PRTC, ACAA, BDE, PRIDCO y al DDEC para otorgar préstamos o contribuciones especiales al DOT, por un monto total de $125 millones. El 5 y 9 de junio de 2015, la CFSE y la ACAA otorgaron préstamos al DOT en virtud de las disposiciones de esta Ley por un monto de $100 millones y $2 millones, respectivamente, que se pagan con las asignaciones legislativas del ELA. Estos préstamos devengan intereses a una tasa del 1 %, y el principal y los intereses se pagarán anualmente, a partir del 31 de julio de 2017. El préstamo otorgado por la ACAA vence el 31 de julio de 2022 y el otorgado por la CFSE vence el 31 de julio de 2032. Al 30 de junio de 2017, aproximadamente $102 millones seguían pendientes.

*Pagarés adeudados a instituciones financieras*

El 26 de diciembre de 2013, la Administración de Servicios Generales celebró un acuerdo de línea de crédito no recurrente de $33.3 millones con una institución financiera para la compra de cuatro helicópteros para ser utilizados por el PRPOB, a través de un contrato de arrendamiento entre ambas agencias del gobierno. Dicho contrato de arrendamiento se ha asignado como la fuente de pago de la línea de crédito, que a su vez se sostendrá con futuras asignaciones legislativas del ELA en los montos necesarios para cubrir la amortización de la deuda requerido de la línea de crédito. Esta obligación se paga en siete cuotas iguales, anuales y consecutivas que comienzan el 15 de julio de 2014, más intereses pagaderos el 15 de julio y el 15 de enero de cada año a una tasa de interés basada en el costo de los fondos de la institución financiera, tal como se define, más 0.25 puntos básicos. La tasa de interés al 30 de junio de 2017 fue de 3.0204%. La buena fe, el crédito y el poder

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

impositivo del ELA están irrevocablemente pignorados para el pronto pago del capital e intereses sobre esta obligación. Al 30 de junio de 2017, aproximadamente $23.8 millones estaban pendientes. Los requisitos de la amortización de la deuda en años futuros fueron los siguientes (en miles):

|  | | Capital | Interés | Total |
|---|---|---|---|---|
| Año que termina el 30 de junio: | | | | |
| 2018 | $ | 9,505 | 1,165 | 10,670 |
| 2019 | | 4,753 | 363 | 5,116 |
| 2020 | | 4,753 | 218 | 4,971 |
| 2021 | | 4,753 | 73 | 4,826 |
| Total | $ | 23,764 | 1,819 | 25,583 |

*(ii)*  Actividades de tipo comercial: Al 30 de junio de 2017, los documentos por pagar al BGF (en miles) se componen de lo siguiente:

| | | |
|---|---|---|
| PRMeSA | $ | 282,445 |
| ASES | | 183,251 |
| PPA | | 20,863 |
| Pagarés adeudados al BGF | $ | 486,559 |

El 14 de octubre de 2010, la Legislatura aprobó un nuevo artículo 9A de la Ley Núm. 66-1978, mediante el cual autorizó a PRMeSA, una unidad de componentes combinados, a incurrir en una obligación de hasta $285 millones para depositar en una cuenta especial del BGF y para asignar al pago de deudas a proveedores, agencias y un fondo de reserva para el seguro propio de PRMeSA, y para proporcionar liquidez operativa para aliviar la situación fiscal de PRMeSA. El BGF fue nombrado agente fiscal para administrar y supervisar el uso de estos fondos. Se requiere que el ELA cumpla con el pago de esta obligación con futuras asignaciones legislativas que se realizarán cada año hasta el año fiscal 2041-2042. Los préstamos según esta línea de crédito generan intereses a tasas variables basadas en 150 puntos básicos sobre la tasa preferencial. Desde 2015 no se han realizado créditos legislativos para cubrir los pagos del capital a su vencimiento. Al 30 de junio de 2017, aproximadamente $282.4 millones estaban pendientes.

El 14 de marzo de 2011, la ASES, una unidad de componentes combinados, celebró un acuerdo de crédito con el BGF para pagar sus obligaciones a las aseguradoras de atención médica contraídas antes del año fiscal 2010. El monto del capital agregado de la línea de crédito no renovable fue de $186 millones. Esta línea se paga en nueve pagos de $ 20.7 millones cada uno con vencimiento el 14 de marzo de los años 2015 a 2023, a través de futuras asignaciones legislativas anuales del ELA Los intereses se devengan a una tasa de interés anual fluctuante igual al mayor de 150 puntos básicos sobre la tasa preferencial o 6%. No se realizaron asignaciones legislativas en 2016 y 2017 para cubrir los pagos de capital programados para el 14 de marzo de 2016 y 2017. Al 30 de junio de 2017, el saldo del capital pendiente era de aproximadamente $183.3 millones

El 29 de agosto de 2014, la PPA, una unidad de componentes combinados, celebró un acuerdo de línea de crédito de $60 millones con el BGF para cubrir los costos operativos, de mantenimiento, adquisición de equipos y mejoras permanentes de los Puertos de las Américas Rafael Cordero Santiago, a tenor con las disposiciones de la Ley Núm. 240-2011, que creó la PPA (los activos son propiedad de PA al 30 de junio de 2017). Los préstamos según esta línea de acuerdo de crédito devengan intereses basados en las tasas asumidas por la obligación general del ELA. Estas tasas deben revisarse trimestralmente, siempre que el interés no sea inferior al 7 % ni superior al 12 %. Los intereses durante el año fiscal 2017 fueron del 7.78%. La línea de crédito tiene un vencimiento al

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

30 de junio de 2044, y sus pagos de capital e intereses se realizan mediante asignaciones legislativas anuales. Al 30 de junio de 2017, el saldo pendiente del capital ascendía a aproximadamente $20.9 millones, que se paga con los créditos legislativos del ELA.

*(h)* ***Obligaciones según acuerdos de arrendamiento de capital***

Las Actividades del Gobierno del ELA tienen obligaciones en virtud de arrendamientos de capital con terceros que vencen hasta 2044 para terrenos, edificios y equipos. El valor presente de los pagos futuros de arrendamiento de capital mínimo al 30 de junio de 2017 informados en el estado de resultados netas adjunto a nivel gubernamental fue el siguiente (en miles):

Año que termina el 30 de junio:

| | | |
|---|---|---:|
| 2018 | $ | 35,077 |
| 2019 | | 33,996 |
| 2020 | | 33,881 |
| 2021 | | 33,487 |
| 2022 | | 33,354 |
| 2023-2027 | | 166,669 |
| 2028-2032 | | 157,004 |
| 2033-2037 | | 108,463 |
| 2038-2042 | | 88,048 |
| 2043-2044 | | 24,947 |
| Pagos mínimos de arrendamiento futuros totales | | 714,926 |
| Menos cantidad que representa costos de intereses | | (379,312) |
| Valor presente de los pagos mínimos de arrendamiento | $ | 335,614 |

Los terrenos, edificios y equipos arrendados, según los arrendamientos de capital incluidos en los activos de capital al 30 de junio de 2017, incluyen lo siguiente (en miles):

| | | |
|---|---|---:|
| Terrenos | $ | 7,960 |
| Edificios | | 438,784 |
| Equipos | | 4,302 |
| Subtotal | | 451,046 |
| Menos amortización acumulada | | (103,929) |
| Total | $ | 347,117 |

La amortización aplicable a los arrendamientos de capital e incluida dentro del gasto de depreciación de los activos de capital ascendió a aproximadamente $12.9 millones en 2017.

*(i)* ***Pasivos netos de pensiones***

El monto informado como pasivo de pensión neto en los estados financieros de todo el gobierno de aproximadamente $43,400 millones de los cuales aproximadamente $170.3 millones se vencen dentro de un año al 30 de junio de 2017, representa la parte proporcional del Gobierno Primario en el cálculo de SRE del pasivo de pensión neto medido como el pasivo de pensión total menos el monto de los resultados netos fiduciarios del SRE, más la suma de la medida completa del SRM y SRJ de su pasivo de pensión

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

total menos el monto de sus resultados netos fiduciarios correspondientes (ver Nota 18).

*(j)* *Otra obligación de beneficios posteriores al empleo*

El monto informado como otra obligación de beneficios posteriores al empleo en las Actividades del Gobierno de aproximadamente $270.2 millones al 30 de junio de 2017 representa el monto acumulado adeudado por el ELA por los años actuariales requeridos no financiados otras contribuciones de beneficios posteriores al empleo al ERS MIPC, JRS MIPC y TRS MIPC (ver Nota 19).

*(k)* *Ausencias Compensadas*

Los pasivos a largo plazo incluyen aproximadamente $551.8 millones y $18.9 millones de ausencias compensadas acumuladas registradas como actividades del Gobierno y de tipo Comercial, respectivamente, al 30 de junio de 2017.

*(l)* *Obligación por premios no pagados de lotería*

El monto informado como premios no pagados de lotería representa los premios de lotería pagaderos de la Lotería de Puerto Rico (comúnmente conocida como Lotería Tradicional) y el Sistema de Lotería Adicional (comúnmente conocido como Lotto) conjuntamente conocidos como las Loterías al 30 de junio de 2017. Los pagos anuales mínimos relacionados con los premios impagos de ambas loterías fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Año que termina el 30 de junio: | | | |
| 2018 | $ 61,543 | 9,698 | 71,241 |
| 2019 | 13,062 | 8,941 | 22,003 |
| 2020 | 11,363 | 8,315 | 19,678 |
| 2021 | 9,725 | 7,457 | 17,182 |
| 2022 | 8,606 | 6,952 | 15,558 |
| 2023–2027 | 28,726 | 23,539 | 52,265 |
| 2028–2032 | 12,918 | 9,282 | 22,200 |
| 2033–2034 | 1,674 | 1,275 | 2,949 |
| Total | $ 147,617 | 75,459 | 223,076 |

Los pagos mínimos anuales relacionados con los premios impagos de Lotto incluyen un pasivo por premios no reclamados (no caducados) de aproximadamente $5.6 millones al 30 de junio de 2017, que se informa como premios pagaderos - porción actual.

Los pasivos por los premios no pagados de lotería se informan en las actividades de tipo comercial del estado de resultados netos adjunto y el estado de resultados netos de los fondos de propiedad exclusiva.

*(m)* *Beneficios pagaderos por rescisión voluntaria*

El 2 de julio de 2010, el ELA promulgó la Ley Núm. 70 para establecer un programa que proporcione beneficios de retiro anticipado o incentivos económicos para la rescisión del empleo a los empleados elegibles, según se define. La Ley Núm. 70-2010 se aplica a las agencias y unidades de componentes cuyos presupuestos están financiados total o parcialmente por el Fondo General.

La Ley Núm. 70-2010 estableció que los beneficios de retiro anticipado (programa de retiro anticipado) se proporcionarán a los empleados elegibles que hayan completado entre 15 y 29 años de servicios acreditados en el Sistema de Retiro y que consistirán en beneficios quincenales que van del 37.5 % al 50 % del salario de cada empleado, según su definición. A tenor con la Ley Núm. 70-2010, el ELA, como patrono, continuará haciendo las contribuciones correspondientes del patrono al Sistema de Retiro, así

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

como también cubrirá los pagos de anualidades a los empleados que opten por el retiro anticipado, hasta los años de servicio y los requisitos de edad para se habría producido una adquisición de derechos total, en cuyo momento el Sistema de Retiro aplicable continuará haciendo los pagos de la anualidad.

Los incentivos económicos están disponibles para los empleados elegibles que tienen menos de 15 años de servicio acreditado en el Sistema de Retiro (programa de renuncia incentivada) o que tienen al menos 30 años de servicio acreditado en el Sistema de Retiro y que tienen la edad de retiro (programa de retiro incentivado). Los incentivos económicos consistirán en un pago global que oscilará entre un mes y seis meses de salario basado en años de empleo.

Además, los empleados elegibles que deciden participar en el programa de retiro anticipado o en el programa de renuncia incentivada son elegibles para recibir cobertura del plan de salud por hasta 12 meses en un plan de salud seleccionado por la administración del ELA.

La Ley Núm. 70 permite que ciertas unidades de componentes del ELA que operan con sus propios recursos implementen un programa similar que brinde beneficios para el retiro anticipado o incentivos económicos para la rescisión voluntaria del empleo a los empleados elegibles, según su definición. Los beneficios y los requisitos son los mismos que establece la Ley Núm. 70, excepto lo siguiente: en el programa de beneficios de retiro anticipado, la unidad de componente realizará las contribuciones del empleado y del patrono al Sistema de Retiro y pagará la pensión correspondiente hasta que el empleado cumpla con los requisitos de edad y 30 años de servicio acreditado en el Sistema de Retiro; y en el programa de retiro incentivado, la unidad de componentes exigirá al empleado y el patrono que contribuyan al Sistema de Retiro por un período de cinco años.

El 8 de diciembre de 2015 se aprobó la Ley 211, denominada "Programa de Retiro Voluntario Anticipado" (el "Programa"). Fue creado para establecer un programa que identifica a los empleados elegibles, que pueden ser separados voluntariamente e incentivados de su empleo antes de que cumplan con los requisitos para el retiro.

El propósito de este programa es ofrecer incentivos para el personal que haya estado contribuyendo al Sistema de Retiro (el "Sistema") antes del 1 de abril de 1990 bajo la Ley Núm. 447-1951 o que comenzó a cotizar en una fecha posterior, y realizaron todos los pagos correspondientes antes del 1 de abril de 1990, sin haber recibido devolución de sus aportes y que tengan, al menos, 20 años de servicio registrados.

Para asegurar que este programa no afecte los servicios a la ciudadanía o el funcionamiento de las agencias, solo los empleados de carrera que ocupen puestos que no brinden servicios directos, que no sean esenciales para el funcionamiento de la agencia o cuyos puestos puedan ser ocupados por las transferencias dentro de las agencias y entre las agencias pueden participar en el programa. Los cargos de servicio esencial son aquellos cuyas funciones son especializadas, esenciales o indispensables para el funcionamiento efectivo de la agencia, de modo que pueda servir al propósito público para el cual fue creada como organismo gubernamental.

Al 30 de junio de 2017, los beneficios a largo plazo no pagados otorgados en la Ley Núm. 70-2010 y la Ley Núm. 211-2015 se descontaron a tasas de interés que oscilaron entre 0.15% y 3.60% a nivel del Gobierno Primario y de 1% a 2.9% a nivel de unidades de componentes.

*(n) Pasivos por el seguro por desempleo, invalidez y de salud*

El ELA ofrece compensación por desempleo, discapacidad laboral y cobertura de seguro para conductores a empleados públicos y privados a través de diversos programas de seguros administrados por el DTRH. Estos programas de seguro cubren a los trabajadores contra el desempleo, la incapacidad temporal o la muerte por accidentes laborales o relacionados con el empleo o por enfermedades sufridas como consecuencia de su empleo.

Además, el ELA, a través de ASES (una unidad de componentes combinados), es responsable de implementar, administrar y negociar un sistema de seguro médico, a través de contratos con

180

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

reaseguradoras, para brindar atención médica y hospitalaria de calidad a los residentes del ELA, independientemente de su situación financiera y capacidad de pago. La ASES paga una prima mensual a dichos reaseguradores de seguros en función de una prima contratada y el número de miembros suscritos en el plan de salud. Los fondos para pagar dichas primas se solicitan al ELA, neto de los fondos disponibles para tales fines de todas las demás fuentes.

A tenor con las disposiciones de la Ley Núm. 105-2002, que modifica la Ley Núm. 72-1993, la ASES estaba autorizada a negociar directamente con los proveedores de salud en un programa piloto. Desde entonces, la ASES ha celebrado diferentes contratos directos para cubrir a la población asegurada de diferentes regiones y municipios. Desde el 1 de noviembre de 2006 hasta el 1 de septiembre de 2010, la ASES contrató directamente a proveedores que atendieron aproximadamente 190,000 vidas de la región metropolitana del norte. Al 30 de junio de 2011, la ASES tiene proyectos de contratación directa con los municipios de Vieques y Guaynabo, y a partir del 1 de octubre de 2011, los proyectos se expandieron para cubrir el oeste, el metro norte, el norte, San Juan, el noreste y las regiones virtuales según un nuevo acuerdo con un nuevo suscriptor de seguros como administrador externo. Además, la ASES implementó ciertas estrategias de contención de costos para controlar los costos, como establecer un copago que se aplica por el uso injustificado de salas de emergencia, detección y control del uso excesivo de medicamentos recetados, implementación de un programa de manejo de enfermedades para afecciones respiratorias, modificación de tarifas de proveedores y una mejor coordinación de beneficios para los miembros de la población que tienen otro seguro médico.

La ASES establece una responsabilidad para cubrir el monto estimado a pagar a los proveedores en función de la experiencia y los datos estadísticos acumulados. Las estimaciones de reclamaciones médicas incurridos, pero no informados y otros pagos de gastos médicos se desarrollan utilizando métodos actuariales y supuestos basados en patrones de pago, inflación de costos médicos, desarrollos históricos y otros factores relevantes.

La siguiente tabla proporciona una conciliación de los pasivos iniciales y finales de los gastos de beneficios y ajuste de beneficios incurridos, pero no pagados para el período terminado el 30 de junio de 2017 (en miles):

| | ASES | Seguro de desempleo | Fondos exclusivos no mayores | Totales |
|---|---|---|---|---|
| Pasivos por gastos de beneficios y ajustes de beneficios incurridos pero no pagados al 1 de julio | $ 115,961 | 53,288 | 802 | 170,051 |
| Beneficios totales incurridos | — | 122,642 | 2,235 | 124,877 |
| Total de pagos de beneficios | (75,824) | (126,499) | (2,392) | (204,715) |
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 30 de junio | $ 40,137 | 49,431 | 645 | 90,213 |

Los pasivos por las reclamaciones de beneficios se informan como pasivos por el seguro por desempleo, discapacidad y salud en las actividades de tipo comercial del estado de resultados netos adjunto y el estado de resultados netos de los fondos de propiedad exclusiva. Los pasivos al 30 de junio de 2017 ascienden a aproximadamente $90.2 millones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(o) Otros pasivos a largo plazo**

Los pasivos a largo plazo restantes de las Actividades del Gobierno al 30 de junio de 2017 incluyen (en miles):

| | |
|---|---:|
| Pasivos por reclamaciones legales y juicios (nota 17) | $ 1,303,768 |
| Pasivos con el Cuerpo del Ingenieros del Ejército de EE. UU. (nota 11) | 212,637 |
| Pasivos por pérdida de riesgo de créditos en custodia y préstamos por cobrar incobrables de fondos recurrentes estatales | 188,965 |
| Bono de Navidad devengado de los empleados | 63,614 |
| Pasivos por desestimaciones de costos federales (nota 17) | 56,526 |
| Otros | 23,878 |
| Total | $ 1,849,388 |

Como se describe en la Nota 11, el ELA tiene una obligación de deuda con el Cuerpo de Ingenieros del Ejército de los EE. UU. en relación con su parte asignada estimada de los costos de construcción asociados con el Proyecto de Presa y Embalse de Cerrillos. A fines de abril de 2011, el ELA recibió un acuerdo final de deuda del Cuerpo de Ingenieros del Ejército de los EE. UU. que establece un cronograma de reintegro para su parte asignada de los costos de construcción asociados con el Proyecto de Presa y Embalse de Cerrillos, que asciende a $214 millones, sin incluir los costos para artículos construidos con fines recreativos. El 10 de octubre de 2012, el Cuerpo de Ingenieros del Ejército de EE. UU. colocó dicha deuda en el Programa de Compensación del Departamento del Tesoro de EE. UU. (El Programa de Compensación) hasta mayo de 2013 (el mes en que se paralizó el Programa de Compensación). El 21 de marzo de 2014, el Cuerpo de Ingenieros del Ejército de EE. UU. otorgó ciertas concesiones sobre esta obligación del ELA al condonar el saldo adeudado y pagadero por un monto de $35.4 millones y aprobar un nuevo plan de pago propuesto por el Secretario del DOT para la obligación de deuda restante. Este nuevo plan de pago redujo la tasa de interés de 6.063% a 1.50% y renunció a todas las multas e intereses acumulados, lo que redujo el pago anual de aproximadamente $ 12.9 millones a aproximadamente $7.1 millones por el plazo restante de la deuda. El nuevo plan de pago consta de 33 pagos anuales de $7,1 millones, incluidos los intereses, desde el 7 de junio de 2014 hasta el 7 de junio de 2046. Estas concesiones calificaron como una reestructuración de la deuda problemática, donde el total de los pagos futuros en efectivo especificados por los nuevos términos excedieron el valor nominal de la deuda anterior, incluido el saldo acumulado vencido y pagadero de $35.4 millones. En tales circunstancias, los efectos de los nuevos términos se contabilizan prospectivamente sin modificar el importe nominal de la deuda en el estado de resultados netos.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La parte asignada no pagada de los costos de construcción asociados con el Proyecto Cerrillos ascendía a aproximadamente $165 millones al 30 de junio de 2017. Los requisitos de la amortización de la deuda de esta obligación de deuda al 30 de junio de 2017 fueron los siguientes (en miles):

| | | Capital | Interés | Total |
|---|---|---|---|---|
| Año(s) que termina(n) el 30 de junio: | | | | |
| 2018 | $ | 4,595 | 2,481 | 7,076 |
| 2019 | | 4,664 | 2,412 | 7,076 |
| 2020 | | 4,734 | 2,342 | 7,076 |
| 2021 | | 4,805 | 2,271 | 7,076 |
| 2022 | | 4,877 | 2,199 | 7,076 |
| 2023–2027 | | 25,507 | 9,878 | 35,385 |
| 2028–2032 | | 27,478 | 7,907 | 35,385 |
| 2033–2037 | | 29,601 | 5,783 | 35,384 |
| 2038–2042 | | 31,889 | 3,495 | 35,384 |
| 2043–2047 | | 27,277 | 1,031 | 28,308 |
| Total | $ | 165,427 | 39,799 | 205,226 |

Además, el ELA tiene una obligación de deuda de aproximadamente $47.2 millones con el Cuerpo de Ingenieros del Ejército de los EE. UU. en relación con su parte asignada estimada de los costos de construcción asociados con la parte recreativa del Proyecto de la Presa y Embalse de Cerrillos, incluidos los intereses acumulados de aproximadamente $6.8 millones, al 30 de junio de 2017. El acuerdo de deuda final con el Cuerpo de Ingenieros del Ejército de EE. UU. para la parte recreativa del Proyecto de Presa y Embalse de Cerrillos no se ha finalizado y, por lo tanto, los términos y condiciones podrían diferir de los estimados. Se espera que la deuda relacionada se pague en cuotas anuales durante un período de 35 años. Sin embargo, la deuda se ha presentado como un pasivo pagadero a largo plazo después de un año en el estado de resultados netos adjunto desde la fecha de inicio del reintegro aún no se ha determinado.

El ELA registró un pasivo contingente por la pérdida por riesgo crediticio de custodia en los depósitos mantenidos en el BGF por los Fondos Recurrentes del Estado de Agua Limpia que asciende a aproximadamente $189 millones al 30 de junio de 2017.

Los otros pasivos a largo plazo restantes dentro de las actividades de tipo comercial al 30 de junio de 2017 están compuestos por los costos de pensión acumulados y una reserva de seguro propio por aproximadamente $99.6 millones y $2.2 millones, respectivamente, correspondientes a la PRMeSA.

*Fondos Fiduciarios*

El 31 de enero de 2008, el SRE emitió su primera de tres series de bonos (colectivamente, Bonos SRE), que consistía en aproximadamente $1,600 millones de monto total de capital de Bonos Senior de Fondos de Pensiones, Serie A (los Bonos de la Serie A). El 2 de junio de 2008, el SRE emitió su segunda serie de Bonos SRE, que consistía en un monto total de capital de aproximadamente $1,059 millones de Bonos Senior de Fondos de Pensiones, Serie B (los Bonos de la Serie B). Finalmente, el 30 de junio de 2008, el SRE emitió su tercera y última serie de Bonos SRE, que consistía en un monto de capital de aproximadamente $300 millones de Bonos de Financiamiento de Pensiones Senior, Serie C (los Bonos de la Serie C).

Los Bonos del SRE son obligaciones limitadas y sin recurso del SRE, pagaderos únicamente de las contribuciones del patrono realizadas después de la fecha de emisión de la primera serie de Bonos SRE, y de los fondos depositados en el Banco de Nueva York Mellon (el Agente Fiscal). Los Bonos del SRE no se pagan por las contribuciones realizadas al SRE por los empleados participantes, o por los activos adquiridos con los ingresos de los Bonos del SRE, o por las contribuciones del patrono liberadas por el Agente Fiscal

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

al SRE después del financiamiento de las reservas requeridas, o de cualquier otro activo del SRE. El SRE invirtió los ingresos de los Bonos del SRE y utilizó estas inversiones y las ganancias obtenidas para proporcionar beneficios de pensión a sus beneficiarios. La validez de los Bonos de SRE y el alcance de los gravámenes de los Bonistas de SRE son objeto de litigio en curso, como se analiza en la Nota 17.

El 23 de agosto de 2017, el ELA promulgó la Ley 106-2017 que instituyó un sistema PayGo en el que los beneficios de pensión para los participantes de SRE serían pagados por el ELA. Para obtener información adicional sobre el sistema PayGo, consulte las Notas 2 y 3.

Para obtener información adicional sobre las reclamaciones contra SRE y la fuente de reintegro de los bonos SRE, consulte la Nota 3.

Al 30 de junio de 2017, el saldo de capital pendiente de los Bonos del SRE es el siguiente (en miles):

| Descripción | | |
|---|---|---|
| Bonos de la serie A: | | |
| Bonos de Apreciación de Capital, con vencimiento en 2028, con intereses al 6.20% | $ | 80,042 |
| Bonos a plazo, con vencimiento en 2023, con intereses al 5.85% | | 200,000 |
| Bonos a plazo, con vencimiento desde 2031 hasta 2038, con intereses al 6.15% | | 679,000 |
| Bonos a plazo, con vencimiento desde 2039 hasta 2042, con intereses al 6.20% | | 332,770 |
| Bonos a plazo, con vencimiento desde 2055 hasta 2058, con intereses al 6.45% | | 332,000 |
| Total de Bonos de la Serie A en circulación | | 1,623,812 |
| Bonos de la serie B: | | |
| Bonos de Apreciación de Capital, con vencimiento desde 2028 hasta 2030, con Intereses al 6.40 % | | 198,959 |
| Bonos de Apreciación de Capital, con vencimiento desde 2031 hasta 2034, con Intereses al 6.45 % | | 231,597 |
| Bonos a plazo, con vencimiento en 2031, con intereses al 6.25% | | 117,100 |
| Bonos a plazo, con vencimiento desde 2036 hasta 2039, con intereses al 6.30% | | 270,000 |
| Bonos a plazo, con vencimiento desde 2055 hasta 2058, con intereses al 6.55% | | 429,000 |
| Total de Bonos de la Serie B en circulación | | 1,246,656 |
| Bonos de la serie C: | | |
| Bonos de Apreciación de Capital, con vencimiento en 2030, con intereses al 6.50% | | 3,919 |
| Bonos a plazo, con vencimiento en 2028, con intereses al 6.15% | | 110,000 |
| Bonos a plazo, con vencimiento en 2038, con intereses al 6.25% | | 45,000 |
| Bonos a plazo, con vencimiento en 2043, con intereses al 6.30% | | 143,000 |
| Total de Bonos de la Serie C en circulación | | 301,919 |
| Total de Bonos en circulación | | 3,172,387 |
| Menos descuento de bonos | | (5,915) |
| Bonos por pagar - neto | $ | 3,166,472 |

**Bonos de la Serie A**: el monto del capital total de los Bonos de la Serie A emitidos ascendió a aproximadamente $ 1,589 millones de los cuales aproximadamente $ 1,544 millones se emitieron como bonos a plazo (los Bonos a Plazo de la Serie A) y $ 45 millones se emitieron como bonos de apreciación de capital (los Bonos de Apreciación del Capital de la Serie A). Los intereses de los Bonos a plazo de la Serie A se pagan mensualmente el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital de la Serie A no se pagan de forma actual, pero se agregan al capital de los Bonos de Apreciación de Capital cada

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

1 de enero y 1 de julio (Fechas de capitalización), y se tratan como si se acumularan en cantidades diarias iguales entre Fechas de capitalización, hasta que se paguen al vencimiento o al momento del canje. Los intereses deben calcularse en función de un año de 360 días que consta de doce meses de 30 días. Los Bonos de la Serie A están sujetos a amortización a opción del SRE de cualquier fuente, en su totalidad o en parte en cualquier momento a partir del 1 de julio de 2018, a un precio de redención igual al monto del capital (en el caso de la Serie A Capital Bonos de reconocimiento, el monto acumulado) de los Bonos de la Serie A, más los intereses acumulados a la fecha de amortización y sin prima.

Además, los siguientes Bonos a Plazo de la Serie A están sujetos a amortización obligatoria, comenzando en parte a partir del 1 de julio de 2021 en la medida del requisito del fondo de amortización para dichos bonos establecidos a continuación a un precio de amortización igual al 100% del monto del capital más intereses devengados de la siguiente manera (en miles):

| Período de amortización | Bonos sujetos | Monto |
|---|---|---|
| 1 de julio de 2021 | Bonos a plazo con vencimiento el 1 de julio de 2023 | $       50,000 |
| 1 de julio de 2022 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 70,000 |
| 1 de julio de 2023 | Bonos a plazo con vencimiento el 1 de julio de 2023 | 80,000 |
| | | 200,000 |
| 1 de julio de 2031 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 3,000 |
| 1 de julio de 2032 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 4,500 |
| 1 de julio de 2033 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 4,000 |
| 1 de julio de 2034 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 133,500 |
| 1 de julio de 2035 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 133,500 |
| 1 de julio de 2036 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 133,500 |
| 1 de julio de 2037 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 133,500 |
| 1 de julio de 2038 | Bonos a plazo con vencimiento el 1 de julio de 2038 | 133,500 |
| | Subtotal | 679,000 |
| | Total | $       879,000 |

**Bonos de la Serie B** - el monto del capital total de los Bonos de la Serie B emitidos ascendió a aproximadamente $ 1,059 millones de los cuales aproximadamente $ 816 millones se emitieron como bonos a plazo (los Bonos a plazo de la Serie B) y se emitieron $ 243 millones como bonos de apreciación de capital (los Bonos de Apreciación de Capital Serie B). Los intereses de los Bonos a plazo de la Serie B se pagan mensualmente el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital de la Serie B no se pagan de forma actual, pero se agregan al principal de los Bonos de Apreciación de Capital cada 1 de enero y 1 de julio (Fechas de capitalización), y se tratan como si se acumularan en cantidades diarias iguales entre Fechas de capitalización, hasta que se paguen al vencimiento o en el momento del canje. Los intereses deben calcularse en función de un año de 360 días que consta de doce meses de 30 días. Los Bonos de la Serie B están sujetos a amortización a opción del SRE de cualquier fuente, en su totalidad o en parte en cualquier momento a partir del 1 de julio de 2018, a un precio de amortización igual al monto del capital (en el caso de los Bonos de Apreciación de Capital de la Serie B de reconocimiento, el monto acumulado) de los Bonos de la Serie B, más los intereses acumulados a la fecha de amortización y sin prima.

**Bonos de la Serie C** - el monto del capital total de los Bonos de la Serie C emitidos ascendió a aproximadamente $300 millones de los cuales aproximadamente $298 millones se emitieron como bonos a plazo (los Bonos a plazo de la Serie C) y Se emitieron $2 millones como bonos de apreciación de capital (los Bonos de Apreciación de Capital de la Serie C). Los intereses de los Bonos a Plazo de la Serie C se pagan mensualmente el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital de la Serie C no se pagan de forma actual, pero se agregan al principal de los Bonos de Apreciación de Capital cada 1 de enero y 1 de julio (Fechas de capitalización), y se tratan como si se acumularan en cantidades

diarias iguales entre Fechas de capitalización, hasta que se paguen al vencimiento o en el momento del canje. Los intereses deben calcularse en función de un año de 360 días que consta de doce meses de 30 días. Los Bonos de la Serie C están sujetos al canje a opción del SRE de cualquier fuente, en su totalidad o en parte en cualquier momento a partir del 1 de julio de 2018, a un precio de amortización igual al monto del capital (en el caso de los Bonos de Apreciación de Capital de la Serie C de reconocimiento, el monto acumulado) de los Bonos de la Serie C, más los intereses acumulados a la fecha de amortización y sin prima.

Además, los siguientes Bonos a Plazo de la Serie C están sujetos a amortización obligatoria, comenzando en parte a partir del 1 de julio de 2024 en la medida del requisito del fondo de amortización para dichos bonos establecidos a continuación a un precio de canje igual al 100% del monto del capital más intereses devengados de la siguiente manera (en miles):

| Período de amortización | Bonos sujetos | | Monto |
|---|---|---|---|
| 1 de julio de 2024 | Bono a plazo con vencimiento el 1 de julio de 2028 | $ | 18,700 |
| 1 de julio de 2025 | Bono a plazo con vencimiento el 1 de julio de 2028 | | 22,000 |
| 1 de julio de 2026 | Bono a plazo con vencimiento el 1 de julio de 2028 | | 29,150 |
| 1 de julio de 2027 | Bono a plazo con vencimiento el 1 de julio de 2028 | | 36,300 |
| 1 de julio de 2028 | Bono a plazo con vencimiento el 1 de julio de 2028 | | 3,850 |
| | Subtotal | | 110,000 |
| 1 de julio de 2029 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 100 |
| 1 de julio de 2030 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 540 |
| 1 de julio de 2031 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 100 |
| 1 de julio de 2032 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 3,420 |
| 1 de julio de 2033 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 4,320 |
| 1 de julio de 2034 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 100 |
| 1 de julio de 2035 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 11,940 |
| 1 de julio de 2036 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 2,160 |
| 1 de julio de 2037 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 7,920 |
| 1 de julio de 2038 | Bono a plazo con vencimiento el 1 de julio de 2038 | | 14,400 |
| | Subtotal | | 45,000 |
| 1 de julio de 2039 | Bono a plazo con vencimiento el 1 de julio de 2043 | | 28,600 |
| 1 de julio de 2040 | Bono a plazo con vencimiento el 1 de julio de 2043 | | 28,600 |
| 1 de julio de 2041 | Bono a plazo con vencimiento el 1 de julio de 2043 | | 28,600 |
| 1 de julio de 2042 | Bono a plazo con vencimiento el 1 de julio de 2043 | | 28,600 |
| 1 de julio de 2043 | Bono a plazo con vencimiento el 1 de julio de 2043 | | 28,600 |
| | Subtotal | | 143,000 |
| | Total | $ | 298,000 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los requisitos de la amortización de la deuda en los años futuros de los bonos del SRE al 30 de junio de 2017 fueron los siguientes (en miles):

| Año(s) que termina(n) el 30 de junio: | Capital | Interés | Total |
|---|---|---|---|
| 2018 | $            — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2021 | — | 166,519 | 166,519 |
| 2023-2027 | — | 166,519 | 166,519 |
| 2028–2032 | 200,000 | 751,232 | 951,232 |
| 2033-2037 | 1,036,595 | 702,754 | 1,739,349 |
| 2038–2042 | 452,745 | 695,887 | 1,148,632 |
| 2043–2047 | 1,210,220 | 407,702 | 1,617,922 |
| 2048–2052 | 180,550 | 256,577 | 437,127 |
| 2053–2057 | — | 247,568 | 247,568 |
| 2058-2062 | 362,800 | 212,062 | 574,862 |
| | 398,200 | 14,041 | 412,241 |
| | 3,841,110 | $    4,120,418 | 7,961,528 |
| Menos interés no acumulado | (668,723) | | |
| Menos descuento no amortizado | (5,915) | | |
| Total | $    3,166,472 | | |

*Unidades de Componentes de Presentación Discreta*

Los bonos de asignaciones, los bonos y los pagarés pagaderos son aquellos pasivos que se pagan con los recursos propios de las unidades de componentes de presentación discreta. Estas obligaciones no constituyen un pasivo o deuda del Gobierno Primario.

*(a) Bonos de asignación del ELA*

Los bonos de asignación del ELA pagaderos al 30 de junio de 2017 fueron los siguientes (en miles):

| Unidad de componente | Tasas de interés | Vencimiento al | Saldo al 30 de junio de 2016 | Agregados | Reducciones | Saldo al 30 de junio de 2017 | Importes Vencimiento en un año |
|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: | | | | | | | |
| AAA | 3.10% - 6.50% | 2032 | $    416,320 | — | 262 | 416,058 | 19,390 |
| BGF | 3.10% - 6.50% | 2032 | 3,334 | 2 | — | 3,336 | 170 |
| Subtotal | | | 419,654 | 2 | 262 | 419,394 | 19,560 |
| Unidades de componentes no mayores | 3.10% - 6.50% | 2032 | 108,814 | — | 71 | 108,743 | 8,432 |
| Total | | | $    528,468 | 2 | 333 | 528,137 | 27,992 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los requisitos de la amortización de la deuda de los bonos de asignación del ELA pagaderos con vencimientos fijos al 30 de junio de 2017 fueron los siguientes (en miles):

| Año(s) que termina(n) el 30 de junio: | Capital | Interés | Total |
|---|---|---|---|
| 2018 | $ 27,992 | 85,774 | 113,766 |
| 2019 | 9,229 | 27,940 | 37,169 |
| 2020 | 9,598 | 27,554 | 37,152 |
| 2021 | 9,996 | 27,134 | 37,130 |
| 2022 | 10,431 | 26,604 | 37,035 |
| 2023-2027 | 89,337 | 128,692 | 218,029 |
| 2028-2032 | 366,125 | 45,323 | 411,448 |
| | 522,708 | $ 369,021 | 891,729 |
| Prima | 5,490 | | |
| Descuento | (61) | | |
| Total | $ 528,137 | | |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos por pagar y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

**(b) Bonos de ingresos**

Los bonos pendientes al 30 de junio de 2017 fueron los siguientes (en miles):

| Unidades de componentes | Tasas de interés | Vencimiento a | Saldo al 30 de junio 2016 | Agregados | Reducciones | Saldo al 30 de junio 2017 | Vencimiento en un año |
|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: BGF | 2.96%-6.56% | 2040 | $ 151,797 | — | 35,320 | 116,477 | 30,414 |
| ACT | 2.25%-6.50% | 2046 | 4,487,343 | 6,796 | 160,936 | 4,333,203 | 130,725 |
| AEE | 4.00%-10.00% | 2043 | 8,366,753 | — | 10,439 | 8,356,314 | 584,582 |
| AAA | 2.00%-6.125% | 2056 | 4,030,103 | — | 50,277 | 3,979,826 | 68,852 |
| UPR | 5.00%-5.63% | 2036 | 516,172 | — | 25,017 | 491,155 | 24,455 |
| Subtotal | | | 17,552,168 | 6,796 | 281,989 | 17,276,975 | 839,028 |
| Unidades de componentes no mayores | 2.75%-6.75% | 2036 | 1,405,363 | 562 | 110,223 | 1,295,702 | 97,855 |
| Total | | | $ 18,957,531 | 7,358 | 392,212 | 18,572,677 | 936,883 |

La AEE, una unidad de componentes mayores de presentación discreta, y PRIDCO, una unidad de componentes no mayores de presentación discreta, tienen bonos que pueden tener disposiciones de aceleración contenidas en los Acuerdos de Fideicomiso. Debido al hecho de que la AEE es actualmente deudora en un procedimiento del Título III según PROMESA, cualquier acción que se tome para acelerar los bonos está sujeta a la paralización automática de dicho procedimiento. Por lo tanto, la disposición de

188

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

aceleración no es relevante a pesar del hecho de que posiblemente exista un evento de incumplimiento según el Contrato de Fideicomiso. En cuanto a PRIDCO, el Fideicomisario no ha enviado un aviso de incumplimiento ni ha declarado el capital impago de todos los bonos pendientes y pagaderos inmediatamente sujetos a las disposiciones de aceleración aplicables.

Los requisitos del pago de la deuda de los bonos de ingresos de las unidades de componentes de presentación discreta adeudados con vencimientos fijos al 30 de junio de 2017 fueron los siguientes (en miles):

|  | Capital | Interés | Total |
|---|---|---|---|
| Años que terminan el 30 de junio: |  |  |  |
| 2018 | $      936,883 | 4,976,737 | 5,913,620 |
| 2019 | 741,721 | 3,217,641 | 3,959,362 |
| 2020 | 699,925 | 2,860,396 | 3,560,321 |
| 2021 | 691,953 | 2,530,085 | 3,222,038 |
| 2022 | 676,097 | 2,210,620 | 2,886,717 |
| 2023-2027 | 3,788,454 | 7,001,051 | 10,789,505 |
| 2028-2032 | 3,544,767 | 2,738,009 | 6,282,776 |
| 2033-2037 | 3,217,948 | 1,532,153 | 4,750,101 |
| 2038-2042 | 2,862,930 | 674,995 | 3,537,925 |
| 2043-2047 | 911,301 | 147,222 | 1,058,523 |
| 2048-2052 | 155,123 | 6,110 | 161,233 |
| 2053-2057 | 3,090 | 80 | 3,170 |
| Total | 18,230,192 | $   27,895,099 | 46,125,291 |
| Prima | 391,113 |  |  |
| Descuento | (48,628) |  |  |
|  | $      18,572,677 |  |  |

El cronograma anterior se presentó de acuerdo con los términos originales de los bonos de ingresos y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

Los cambios en las salidas diferidas de recursos relacionados con pérdidas en el reintegro de algunos de los bonos mencionados en la tabla anterior son los siguientes (en miles):

| Unidad de componentes | Saldo al 30 de junio de 2016 | Reducciones | Saldo al 30 de junio de 2017 |
|---|---|---|---|
| Unidades de componentes mayores: |  |  |  |
| ACT | $      104,284 | 10,969 | 93,315 |
| AEE | 48,423 | 7,429 | 40,994 |
| AAA | 27,452 | 4,425 | 23,027 |
| UPR | 2,225 | 282 | 1,943 |
| BGF | 2,376 | 225 | 2,151 |
| Unidades de componentes no mayores | 16,929 | 2,108 | 14,821 |
| Total | $      201,689 | 25,438 | 176,251 |

189

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La siguiente tabla presenta los pagos de la amortización de la deuda de los bonos de tasa variable de la AEE y los pagos netos de los instrumentos derivados de cobertura asociados al 30 de junio de 2017. Dichos bonos de tasa variable se incluyen dentro de los bonos pagaderos en la columna de unidades de componentes de presentación discreta. Aunque las tasas de interés sobre la deuda a tasa variable y la tasa de referencia actual de los instrumentos derivados de cobertura cambian con el tiempo, los cálculos incluidos en la tabla a continuación se basan en el supuesto de que la tasa variable y la tasa de referencia actual del instrumento derivado de cobertura al 30 de junio de 2017 seguirán siendo iguales para su mandato (en miles).

| Año(s) que termina(n) el 30 de junio: | Bonos de tasa variable | | Instrumentos derivados de cobertura, neto | Total |
|---|---|---|---|---|
| | Capital | Interés | | |
| 2018 | $ — | 2,374 | 7,943 | 10,317 |
| 2019 | — | 2,374 | 7,943 | 10,317 |
| 2020 | — | 2,374 | 7,943 | 10,317 |
| 2021 | — | 2,374 | 7,943 | 10,317 |
| 2022 | — | 2,374 | 7,943 | 10,317 |
| 2023-2027 | — | 11,870 | 39,716 | 51,586 |
| 2028-2029 | 252,875 | 4,748 | 15,887 | 273,510 |
| Total | $ 252,875 | 28,488 | 95,318 | 376,681 |

Varias unidades de componentes de presentación discreta han diferido ciertos bonos de ingresos colocando los ingresos de los nuevos bonos en fideicomisos irrevocables para proporcionar todos los pagos futuros de la amortización de la deuda de las deudas antiguas. En consecuencia, los activos y pasivos de las cuentas fiduciarias para los bonos anulados no se incluyen en el estado de resultados netos. Al 30 de junio de 2017, los siguientes bonos se consideran anulados (en miles):

| | Monto pendiente |
|---|---|
| AEE | $ 71,300 |
| ACT | 200,840 |
| Unidades de componentes no mayores | 170,900 |
| Total | $ 443,040 |

Desde 2014, la AEE ha celebrado ciertos acuerdos de indulgencia con ciertas aseguradoras y ciertos propietarios beneficiarios de los bonos Power Revenue, bancos que proporcionan líneas de crédito de combustible y el BGF (colectivamente, los Acreedores Tolerantes). Según lo dispuesto en los Acuerdos de Tolerancia, los Acreedores Tolerantes acordaron no ejercer ciertos derechos y recursos en virtud de sus acuerdos de financiamiento. Según los Acuerdos de Tolerancia, continuaron las obligaciones de la AEE de realizar todos los pagos de capital e intereses de los bonos Power Revenue. El Acuerdo de Tolerancia caducó el 5 de noviembre de 2015, pero el acuerdo de los Acreedores Tolerantes de abstenerse de ejercer ciertos derechos y recursos se prorrogó según el RSA de la AEE, que actualmente está pendiente de la aprobación del Tribunal del Título III tal como se describe en la Nota 3. Los Acreedores Tolerantes consintieron en permitir que la AEE no realizara transferencias al Fondo de Ingresos o al Fondo de Amortización, demorando la realización de ciertos pagos que se debieron a los Prestamistas de la Línea de Combustible, que usara aproximadamente $280 millones en su fondo de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

construcción para el pago de gastos corrientes además de mejoras de capital, aumentara los umbrales requeridos para el ejercicio de recursos según el Contrato de Fideicomiso, permitió la emisión de $130.7 millones en Bonos a las Aseguradoras de Bonos de Línea Única (los Bonos 2015A) que vencieron el 1 de enero de 2016 y se pagaron de acuerdo con sus términos.

Desde enero de 2016 hasta enero de 2017, la AEE pudo realizar el pago de capital e intereses de sus Bonos en el momento de su vencimiento. Posteriormente, la AEE no cumplió con pagos de capital e intereses adeudados por los Bonos el 3 de julio de 2017, el 1 de enero de 2018 y en fechas posteriores.

*(c) Pagarés adeudados a instituciones financieras*

El saldo pendiente de pagarés adeudados a instituciones financieras al 30 de junio de 2017 es el siguiente (en miles):

| Unidad de componentes | Tasas de interés | Vencimiento al | Saldo al 30 de junio de 2016 | Agregados | Reducciones | Saldo al 30 de junio de 2017 | Vencimiento en un año |
|---|---|---|---|---|---|---|---|
| Unidades de componentes mayores: | | | $3,839,903 | | | | |
| BGF | 3.375%–8.00% | 2042 | | — | 1,368 | 3,838,535 | 946,685 |
| AEE | 2.00%–7.25% | 2023 | 715,569 | 4,614 | 2,717 | 717,466 | 696,897 |
| AAA | 8.75 % | 2018 | 4,153 | — | 2,543 | 1,610 | 1,610 |
| UPR | 5.95% | 2022 | 713 | 720 | 560 | 873 | 226 |
| CFSE | 6.31%–6.84% | 2019 | 15,345 | — | 5,966 | 9,379 | 7,148 |
| Subtotal | | | 4,575,683 | 5,334 | 13,154 | 4,567,863 | 1,652,566 |
| Unidades de componentes no mayores | 4.12%–7.50% | 2031 | | | | | |
| Variable | | | 423,748 | 4,081 | 27,727 | 400,102 | 50,484 |
| Total | | | $4,999,431 | 9,415 | 40,881 | 4,967,965 | 1,703,050 |

Los requisitos de pago de los pagarés pagaderos de las unidades de componentes de presentación discreta adeudados con vencimientos fijos al 30 de junio de 2017 fueron los siguientes (en miles):

| | Capital | Interés | Total |
|---|---|---|---|
| Año(s) que termina(n) el 30 de junio: | | | |
| 2018 | $ 1,703,050 | 331,158 | 2,034,208 |
| 2019 | 862,855 | 145,690 | 1,008,545 |
| 2020 | 445,102 | 101,473 | 546,575 |
| 2021 | 457,172 | 77,209 | 534,381 |
| 2022 | 156,680 | 68,340 | 225,020 |
| 2023-2027 | 1,096,791 | 183,322 | 1,280,113 |
| 2028-2032 | 189,663 | 42,637 | 232,300 |
| 2033-2037 | 32,587 | 13,104 | 45,691 |
| 2038-2042 | 24,065 | 4,181 | 28,246 |
| Total | $ 4,967,965 | 967,114 | 5,935,079 |

El cronograma anterior se ha presentado de acuerdo con los términos originales de los pagarés adeudados y no refleja los efectos, si los hay, que puedan resultar de los procedimientos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda, incluido el efecto de la

**EL ESTADO LIBRE ASOCIADO DE
PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

Modificación de Calificación del BGF. En consecuencia, los efectos del Título III de PROMESA o cualquier otro procedimiento de reestructuración de la deuda pueden afectar los importes nominales, las tasas de interés y los términos de reintegro. Consulte la Nota 3 y la Nota 23 para obtener información adicional.

**(14) Deuda garantizada y de asignación**

**(a) Deuda garantizada**

El ELA puede proporcionar garantías para el reintegro de ciertos préstamos de unidades de componentes para llevar a cabo proyectos designados. Las garantías están respaldadas por la plena fe y crédito del ELA. Las garantías se contabilizan siguiendo la orientación proporcionada por la Declaración GASB Núm. 70, *Informes Contables y Financieros para Garantías Financieras No Cotizadas en Bolsa*. La Declaración GASB Núm. 70 requiere que las garantías financieras no cotizadas en bolsa se registren cuando los factores cualitativos y los datos históricos, si los hay, indiquen que es más probable que el ELA tenga que pagar la garantía. El monto del pasivo a reconocer debe ser el valor presente descontado de la mejor estimación de las salidas futuras que se espera incurrir como resultado de la garantía.

La siguiente tabla representa los montos garantizados por el ELA y el monto relacionado que se ha registrado en los estados financieros básicos al 30 de junio de 2017 (en miles):

| | | Garantía máxima | Saldo pendiente | Obligación registrada garantizada del ELA |
|---|---|---|---|---|
| Unidades Mixtas de Componentes: | | | | |
| AEP | $ | 4,721,000 | 3,993,314 | N/A |
| PA | | 250,000 | 225,534 | N/A |
| PRIFA | | 245,955 | 78,145 | N/A |
| Unidades de componentes de presentación discreta | | | | |
| BGF | | 2,000,000 | 110,000 | 118,066 |
| AAA | | 1,258,978 | 1,258,677 | 256,530 |
| Total | $ | 8,475,933 | 5,665,670 | 374,596 |

AEP- la AEP, una unidad de componentes combinados, utiliza los pagos de alquileres de ciertas instalaciones gubernamentales como departamentos, agencias, organismos y municipios del ELA en virtud de varios contratos de arrendamiento ejecutados a tenor con la Ley de habilitación que lo creó (Ley Núm. 56-1958, según enmienda) para el pago del capital e intereses sobre su propia deuda. La Ley Núm. 56-1958 también establece que el DOT realizará adelantos a la AEP por cualquier porción impaga de la renta pagadera a la AEP por parte de cualquier departamento, agencia, organismo o municipalidad del ELA en virtud de un contrato de arrendamiento con la AEP. Dichos anticipos se registran como reducciones de las cuentas por cobrar de alquiler, ya que la responsabilidad del reintegro corresponde a la agencia u organismo correspondiente de acuerdo con la Ley de habilitación.

El 21 de diciembre de 2018, la Junta de Supervisión y el Comité de Acreedores comenzaron un proceso adverso denominado *The Fin. Oversight and Mgmt. Bd. for Puerto Rico v. Puerto Rico Public Building Auth.*, Caso Núm. 18-00149-LTS (D.P.R. 21 de diciembre de 2018), solicitando un remedio declaratorio y el rechazo de reclamaciones administrativas de alquiler. El procedimiento de oposición alega que los arrendamientos de la AEP no son verdaderos arrendamientos, sino más bien "transacciones financieras encubiertas". Múltiples partes han presentado mociones para intervenir. El 28 de enero de 2019, la AEP respondió a la demanda.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La deuda de la AEP está respaldada por una garantía del ELA de que si los ingresos o las ganancias de la AEP no son suficientes para el pago del capital y los intereses cuando vencen, el DOT los retirará de los fondos disponibles según sea necesario para cubrir la deficiencia. La deuda de la AEP está respaldada por una garantía del ELA. La Ley Núm. 56-1958 no indica si existen arreglos establecidos para recuperar los pagos de la AEP si se ejerce la garantía; sin embargo, no existe intención del ELA de solicitar una recuperación de dichos pagos eventuales.

Los ingresos por alquileres de los fondos de la AEP ascendieron a aproximadamente $364 millones durante el año finalizado el 30 de junio de 2017, que se utilizaron para cubrir las obligaciones de la amortización de la deuda.

A partir del 1 de julio de 2016, una parte de la amortización de la deuda de la AEP que vence en esa fecha y programada para el servicio en períodos posteriores hasta la fecha de estos estados financieros básicos no se pagó, incluidos los pagos de intereses. Algunos de los intereses que se pagaron después del 1 de julio de 2016 reflejaron los montos recibidos de los programas de subsidios aplicables.

**AP:** En varios momentos durante los años fiscales que terminaron en 2005 y 2006, la AP, una unidad de componentes combinados del ELA, celebró acuerdos de compra de bonos con el BGF, por lo que el BGF acordó desembolsar al AP oportunamente, el capital de los bonos avanza hasta un monto total máximo de capital de $70 millones (Bono de la Autoridad del Puerto de las Américas Serie A de 2005), $40 millones (Bono de la Serie B de la Autoridad del Puerto de las Américas 2005) y $140 millones (Bono de la Autoridad del Puerto de las Américas Serie C de 2005). Estos bonos están garantizados por el ELA mediante la Ley Núm. 409-2004, que autorizó la emisión de estos acuerdos de financiamiento y el ELA en consideró como un pasivo, según el acuerdo de compra de bonos con el BGF. Las ganancias de los bonos se utilizaron para financiar el costo de desarrollo y construcción de las instalaciones de AP. El ELA había estado pagando la amortización de la deuda de estos bonos con garantía a tenor con la Ley Núm. 409-2004.

**PRIFA:** El 17 de marzo de 2015, la PRIFA, una unidad de componentes combinados del ELA, emitió $245.9 millones de bonos de anticipación de bonos de ingresos de fondos de impuestos dedicados (los PRIFA BAN o los BAN de la serie 2015A), cuyos ingresos se utilizaron para refinanciar ciertos pagarés de anticipación de bonos PRHTA pendientes y pagar gastos relacionados. Los BAN PRIFA son pagaderos y están respaldados por un Patrimonio Fiduciario que comprende ciertos activos e ingresos de PRIFA, que incluyen: (i) un impuesto de $6.25/barril a los productos derivados del petróleo sobre productos que no sean diésel; (ii) cualquier fondo recibido por la PRIFA a tenor con los términos de un acuerdo de asistencia financiera entre la PRIFA y la PRHTA; y (iii) cualquier ingreso adicional pignorado a la PRIFA a tenor con el Contrato de Fideicomiso. Los BAN PRIFA están garantizados por el ELA. El acuerdo de BAN PRIFA y el Contrato de Fideicomiso subyacente no mencionan si existen acuerdos establecidos para recuperarlos pagos de la PRIFA si la garantía fuera reclamada; sin embargo, no existe intención del ELA de solicitar una recuperación de dichos pagos eventuales. A la fecha de estos estados financieros básicos, todavía no se han realizado pagos en cumplimiento de la garantía antes mencionada.

Todos los pagos de la deuda mensual vencida en los BAN PRIFA desde el 1 de agosto de 2016 permanecen pendientes.

**BGF**: El 13 de febrero de 2014, el ELA promulgó la Ley Núm. 24 que, entre otras disposiciones, aumentó de $500 millones a $2,000 millones la cantidad de obligaciones del BGF que pueden garantizarse con la plena fe y crédito del ELA.

El 13 de diciembre de 2013, el BGF emitió los Pagarés Senior Garantizados de 2013 Serie B (garantizados por el ELA). Los Pagarés de la Serie B de 2013 consisten en pagarés a plazo con vencimiento en varias fechas del 1 de diciembre de 2017 al 1 de diciembre de 2019, y tienen una tasa de interés del 8% pagadera mensualmente el primer día de cada mes. Al 30 de junio de 2017, el saldo pendiente de estas notas ascendía a $ 110 millones. La CFSE, una unidad componentes mayores de presentación discreta del ELA, es el único titular de estos bonos. Según los riesgos de liquidez e incertidumbre discutidos en la Nota 2, el BGF ha mostrado todos los indicadores para concluir que

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

existen dudas sustanciales en cuanto a la capacidad del BGF para continuar como empresa en marcha. Estos riesgos y eventos que afectan al BGF causaron que la gerencia del ELA reconozca un pasivo por esta obligación garantizada por un monto de aproximadamente $118 millones basado en el valor presente descontado de la mejor estimación de las salidas futuras esperadas en ese momento, como un resultado de la garantía. La Ley Núm. 24-2014, mencionada anteriormente, no dice nada sobre si hay arreglos establecidos para recuperar cualquier pago potencial del BGF por pagos de garantía realizados; sin embargo, no existe intención del ELA de solicitar una recuperación de posibles pagos. A la fecha de estos estados financieros básicos, todavía no se han realizado pagos en cumplimiento de la garantía antes mencionada. El BGF realizó sus pagos mensuales de intereses hasta julio de 2016, pero a partir del 1 de agosto de 2016, el BGF no realizó dichos pagos.

Como se analizó en la Nota 2, el BGF ha realizado un cierre ordenado de sus operaciones y ha entrado en una Modificación de Calificación de sus deudas a tenor con el Título VI de PROMESA.

**AAA:** La Ley Núm. 45-1994, según enmienda, establece que el ELA garantiza el pago del capital e intereses de todos los bonos en circulación en la fecha en que se promulgó la ley y de todos los bonos futuros emitidos para refinanciar los bonos en circulación de la AAA, una unidad de componentes de presentación discreta. La Ley Núm. 140-2000 enmendó la Ley Núm. 45-1994 para prorrogar la garantía del ELA para incluir los pagos de capital e intereses de los Bonos Seriales de Desarrollo Rural y los préstamos del SRFP pendientes en la fecha de vigencia de la Ley Núm. 140-2000, y de todos los futuros bonos y préstamos que emita el SRFP hasta el 30 de junio de 2005. La Ley Núm. 386-2004 extendió la garantía del ELA al 30 de junio de 2010. La Ley Núm. 75-2010 modificó la Sección 1 de la Ley Núm. 45-1994 para extender la garantía del ELA sobre los bonos emitidos según el Programa de Desarrollo Rural del Departamento de Agricultura de los Estados Unidos (USDA) y los préstamos del SRFP hasta el 30 de junio de 2015. A tenor con la Ley Núm. 96-2015, la garantía del ELA sobre el pago de capital e intereses sobre la mayoría de los préstamos pendientes de la fecha en que se otorgó la garantía, bajo los Fondos Recurrentes del Estado para Agua Limpia otorgados a la AAA se extendió para cubrir dichos préstamos emitidos hasta el 30 de junio de 2020. Cada una de estas leyes, según enmienda, no menciona si existen acuerdos establecidos para recuperar los posibles pagos de la AAA si se ejecuta la garantía; sin embargo, no existe intención del ELA de solicitar una recuperación de dichos pagos eventuales.

El Programa de Desarrollo Rural de la USDA ayuda a la AAA en el financiamiento y construcción de instalaciones de acueductos y alcantarillados en áreas rurales mediante la compra de bonos de ingresos de la AAA, cuyos beneficios son utilizados por la AAA para financiar tales proyectos. Al 30 de junio de 2017, los Bonos del Programa de Desarrollo Rural de la USDA consistían en veintisiete (27) series separadas, emitidas desde 1983 hasta 2016 y que devengan intereses del 2 % al 5 % en cuotas semestrales hasta 2055. El saldo pendiente de los Bonos en Serie del Programa de Desarrollo Rural de la USDA al 30 de junio de 2017 fue de aproximadamente $92.6 millones. Los Bonos en Serie del Programa de Desarrollo Rural de la USDA están garantizados por el ELA a tenor con la Ley Núm. 140-2000, según enmienda, y los ingresos netos de la AAA se comprometen realizar el pago de la deuda de los Bonos del Programa de Desarrollo Rural de la USDA. Los Bonos del Programa de Desarrollo Rural de la USDA están subordinados a todas las deudas sénior y subordinadas sénior.

El PRWPCRF y el PRSDWTRLF (colectivamente, los Fondos Recurrentes del Estado para Agua Limpia) fueron creados por la Ley Núm. 44-1988 y la Ley Núm. 32-1997, respectivamente, del ELA. El PRWPCRF se administra, a tenor con la Ley Núm. 44-1988 y la Ley Núm. 9-1970, según enmienda, por la JCA. El PRSDWTRLF es administrado, a tenor con la Ley Núm. 5-1977, según enmendada, por el PRDOH. A tenor con estas leyes, la JCA y el PRDOH, en nombre del ELA, están autorizados a celebrar acuerdos operativos y acuerdos de subvención de capitalización con la EPA. La PRIFA, la AAA y el BGF suscribieron un memorando de entendimiento según el cual cada parte acordó asumir responsabilidades específicas en relación con las operaciones de los Fondos Recurrentes del Estado para Agua Limpia. La AAA ha celebrado acuerdos de préstamos recurrentes para financiar ciertas mejoras de capital. Al 30 de junio de 2017, la AAA tenía pendientes aproximadamente $581.3 millones en virtud de estos acuerdos

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

de préstamo, que devengan intereses a una tasa anual del 2 % pagadera semestralmente y deben pagarse en su totalidad dentro de los 20 años posteriores a la fecha de finalización del proyecto. La AAA ha pignorado sus ingresos netos sobre una base subordinada en todos los aspectos a los bonos en circulación de la AAA.  Si los ingresos pignorados de la AAA no son suficientes para el pago del capital y los intereses, los pagos están garantizados por el ELA según la Ley Núm. 45-1994, según enmienda, que obliga al ELA a pagar el capital y los intereses sobre los pagarés.

El 18 de marzo de 2008, la AAA  emitió aproximadamente $284.8 millones en Bonos de Reembolso de Ingresos, Serie A y B (los Bonos de Reembolso de Ingresos de 2008) que fueron garantizados por el ELA y utilizados principalmente para reembolsar los Bonos de Reembolso de Ingresos pendientes de la AAA, Serie 1995 (que también fueron garantizado por el ELA) por un monto aproximado de $262.8 millones. Los Bonos de refinanciamiento de Ingresos de 2008 devengan intereses a tasas del 5.80 % al 6.10 % anual con fechas de vencimiento que van del 1 de julio de 2021 al 1 de julio de 2034. El saldo pendiente de los Bonos de Reembolso de Ingresos de 2008 al 30 de junio de 2017 ascendió a $ 284.8 millones.

Como resultado de la Declaración de Divulgación voluntaria emitida por la AAA el 4 de marzo de 2016 con respecto a la expectativa de que podría no tener fondos suficientes para financiar completamente el pago de la deuda de algunas de sus deudas garantizadas del ELA, la gerencia concluyó que sería más probable que el ELA deba realizar un pago solo en la garantía de los Bonos en Serie del Programa de Desarrollo Rural de la USDA. Como resultado, al 30 de junio de 2017 se reconoció un pasivo sobre la obligación garantizada de los Bonos de Desarrollo Rural por un monto de aproximadamente $256.5 millones. Esta medición se basó en el valor presente descontado de la mejor estimación de las salidas futuras que se espera incurrir, en ese momento, como resultado de la garantía. A la fecha de estos estados financieros básicos, todavía no se han realizado pagos en cumplimiento de la garantía antes mencionada. Los Bonos de Reembolso de Ingresos de 2008 y los préstamos de SRFP se excluyeron de esta conclusión porque: (a) los Bonos de Reembolso de Ingresos de 2008 se consideran deuda subordinada sénior y no se verán afectados por los apartados mencionados anteriormente; y (b) los Fondos Recurrentes del Estado para Agua Limpia son fondos de propiedad exclusiva del ELA y no una entidad legal separada, y por lo tanto no hay pasivos de garantía separada.

*Acuerdo de Tolerancia*

El 30 de junio de 2016, la AAA celebró un Acuerdo de indulgencia (el "Acuerdo de indulgencia de SRFP") con el PRDOH y la JCA, administradores del Programa de Fondos Recurrentes del Estado para Agua Limpia y PRIFA,  una unidad de componentes combinados del ELA, como agente operativo de los SRFP, autorizados para ayudar al PRDOH y la JCA en las actividades administrativas, financieras y contables de los SRFP. A tenor con el Acuerdo de Tolerancia de la SRFP, enmendado adicionalmente en varias ocasiones, los pagos vencidos hasta el 1 de julio de 2019, inclusive, en virtud de los Préstamos de la SRFP fueron diferidos y las partes acordaron abstenerse de ejercer, o consentir en el ejercicio de, cualquier ejecución de derechos o recursos disponibles para cada uno bajo los Préstamos SRFP sujetos a ciertas condiciones y pagos parciales.

La AAA  también solicitó que el Programa de Desarrollo Rural del USDA proporcione un período de tolerancia a corto plazo, que incluía el aplazamiento de los pagos que vencen el 1 de julio de 2016; 1 de enero de 2017; 1 de julio de 2017; 1 de enero de 2018; 1 de julio de 2018; 1 de enero de 2019 y 1 de julio de 2019 durante el cual se abstendrían de ejercer sus derechos y recursos en virtud de los documentos de Desarrollo Rural ("Bono RD") o subvenciones o acuerdos de préstamo relacionados con los bonos del programa de Servicios de Servicios Públicos Rurales de Desarrollo Rural del USDA de la AAA (los "Bonos RD"), sujetos a determinadas condiciones y pagos parciales. A tal efecto, la  AAA  y el  Programa de Desarrollo Rural de la USDA celebraron un documento de tolerancia al 30 de junio de 2016. Posteriormente, el período de tolerancia se extendió aún más en varias ocasiones hasta el 31 de julio de 2019.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El 26 de julio de 2019, la AAA y la AAFAF celebraron acuerdos definitivos (los "Acuerdos") reestructurando las obligaciones de deuda de la AAA en virtud de préstamos SRFP y bonos RD por un total de casi $1,000 millones (los préstamos SRFP y los bonos RD se denominan colectivamente la "Deuda Federal").

Los Acuerdos fueron aprobados por la Junta de Supervisión a tenor con la Sección 207 de PROMESA. Los Acuerdos incluyen la terminación de las garantías del ELA existentes de la Deuda Federal, reduciendo así los pasivos contingentes del gobierno en aproximadamente $1,000 millones y la consolidación de toda la deuda reestructurada en dos préstamos SRFP y un préstamo RD para reemplazar los préstamos SRFP existentes y los Bonos RD con vencimientos extendidos y tasas de interés más bajas de la siguiente manera:

- Préstamos RD: plazo de 40 años a una tasa de interés del 2%, con una amortización de la deuda anual de $10 millones del año 1 al 10 y una amortización de la deuda anual de $17 millones a partir de entonces

- Préstamos SRFP: plazo de 30 años a una tasa de interés del 0% y pago anual de capital de $10 millones únicamente del año 1 al 10 y una tasa de interés del 1% y amortización de la deuda anual de $27 millones a partir de entonces.

La Deuda Federal reestructurada fue designada Deuda de Otro Sistema en paridad con otra deuda senior bajo el Acuerdo Maestro de Fideicomiso de la AAA.

**(b) Deuda respaldada por asignaciones del ELA**

Al 30 de junio de 2017, los saldos de capital pendientes de deuda pagaderos por las asignaciones del ELA y los impuestos a las ventas y al uso (bonos CFP y pagarés, como se describe en la Nota 13 (d), y pagarés al BGF y otros, como se describe en la Nota 13(e)), que se incluyen en los estados financieros básicos independientes de las siguientes unidades de componentes de presentación discreta, fueron las siguientes (en miles):

| | Bonos de CFP y pagarés | Pagarés por pagar al BGF y otros | Total |
|---|---|---|---|
| Unidades de Componentes Mayores | | | |
| AAA | $ 416,058 | — | 416,058 |
| BGF | 3,336 | — | 3,336 |
| UPR | — | 48,286 | 48,286 |
| AEE | — | 713 | 713 |
| Subtotal | 419,394 | 48,999 | 468,393 |
| Unidades de componentes no mayores | 108,743 | 388,252 | 496,995 |
| Total | $ 528,137 | 437,251 | 965,388 |

**(c) Otras garantías**

Seguro de préstamo hipotecario: la PRHFA, una unidad de componentes combinados del BGF, proporciona seguro de crédito hipotecario a familias de ingresos bajos y moderados a través de su programa de seguro de préstamo hipotecario. El ELA garantiza hasta $75 millones del capital asegurado por el programa de seguro de préstamos hipotecarios. Al 30 de junio de 2017, el programa de seguro de préstamos hipotecarios cubría préstamos que sumaban aproximadamente $571 millones. Actualmente, no se ha solicitado al ELA que realice ningún pago directo a tenor con estas garantías y no hay eventos desencadenantes que indiquen

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

que es más probable que sea necesario que realice los pagos de estas garantías.

**(15)  Obligaciones de deuda de conducto y deuda sin compromiso**

Oportunamente, algunas de las unidades de componentes del ELA emiten bonos de ingresos para proporcionar asistencia financiera a entidades del sector privado para la adquisición y construcción de instalaciones de transporte, ambientales, industriales, turísticas, educativas y comerciales, que se consideran de interés público y que se espera que brinden beneficios a los ciudadanos de Puerto Rico. Estos bonos son respaldados por la propiedad financiada y son pagaderos únicamente de los pagos recibidos en los préstamos hipotecarios subyacentes. Tras el reintegro de los bonos, la propiedad del servicio adquirido queda retenida por la entidad del sector privado que atiende la emisión de los bonos. Ni el ELA ni ninguna subdivisión política o unidad de componentes de esta están obligadas de ninguna manera a pagar estos bonos. En consecuencia, los bonos no se informan como pasivos a largo plazo en los estados financieros básicos auditados independientes de las entidades emisoras. Al 30 de junio de 2017, las obligaciones de deuda de conducto consistían en los siguientes bonos emitidos por varias unidades de componentes de presentación discreta del ELA (en miles):

| Entidad de emisión | Emitido desde creación hasta la fecha | Monto pendiente |
|---|---|---|
| Unidades de componentes mayores: | | |
| BGF | $ 1,047,500 | 385,600 |
| ACT | 270,000 | 120,200 |
| Subtotal | 1,317,500 | 505,800 |
| Unidades de componentes no mayores | 1,176,855 | 881,340 |
| Total | $ 2,494,355 | 1,387,140 |

**(a)  BGF**

En diciembre de 2003, el BGF, a través de la PRHFA, una unidad de componentes combinados del BGF, emitió aproximadamente $663 millones en la Serie de Bonos del Programa del Fondo de Capital de 2003 para prestar los ingresos de esta a la PHA, un fondo del ELA, en su financiamiento de mejoras a varios bajos públicos y proyectos de vivienda de ingresos moderados La Serie de Bonos del Programa del Fondo de Capital de 2003 son obligaciones limitadas de la PRHFA, que se pagarán únicamente de una asignación anual de fondos de capital de vivienda pública cuando se reciban del Departamento de Vivienda y Desarrollo Urbano de los EE. UU. (HUD de EE. UU.) y otros fondos disponibles según el contrato de fianza. En consecuencia, estos bonos se consideran deuda de conducto y se excluyen, junto con los activos relacionados en fideicomiso, de los estados financieros básicos auditados adjuntos. El saldo pendiente de estos bonos ascendía a aproximadamente $117.6 millones al 30 de junio de 2017.

El 1 de agosto de 2008, la PRHFA emitió los Bonos Subordinados del Programa de Modernización del Fondo de Capital por aproximadamente $ 384.5 millones. Los ingresos de la emisión se utilizaron principalmente para financiar un préstamo a una compañía de responsabilidad limitada y pagar los costos de la emisión. Los bonos de $384.5 millones son obligaciones limitadas de la PRHFA, pagaderos principalmente mediante una prenda y asignación de pagos federales de asistencia para la vivienda puestos a disposición por el HUD de los EE. UU., con un saldo pendiente de aproximadamente $268 millones al 30 de junio de 2017. El pago del capital de los Bonos de Ingresos de Vivienda también se garantizó mediante una carta de crédito standby irrevocable emitida por el BGF.

**(b)  ACT**

En marzo de 1992, la ACT emitió Bonos de Ingresos de Instalaciones Especiales, Series A, B y C de 1992 por aproximadamente $ 117 millones para la construcción de un puente de peaje. Las ganancias

**ELA DE PUERTO RICO**

Notas a los Estados Financieros
Básicos 30 de junio de 2017

de la venta de estos bonos fueron transferidos por la PRHTA a una entidad privada, Autopistas de Puerto Rico & Compañía, S.E. (Autopistas), a tenor con un acuerdo de concesión firmado para el diseño, construcción, operación y mantenimiento del puente. El 30 de octubre de 2003, la PRHTA emitió Bonos de Reembolso de Ingresos de Instalaciones Especiales, Serie A de 2004, por un monto aproximado de $153 millones con el propósito de reembolsar los Bonos de Ingresos de Instalaciones Especiales de la PRHTA, Series A, B y C de 1992, que se emitieron para financiar la construcción del puente, y para pagar el costo de emisión de los bonos. Los beneficios de la venta de los bonos fueron transferidos por la PRHTA a Autopistas a tenor con un nuevo acuerdo de préstamo entre Autopistas y la PRHTA. Los bonos deben pagarse con los ingresos recibidos por Autopistas de la operación del puente.

En determinadas circunstancias, el acuerdo de concesión puede rescindirse y la PRHTA está obligada a asumir la obligación total de Autopistas de pagar el capital y los intereses de los bonos en circulación, que, a tenor con el acuerdo firmado, se pagarán de los ingresos netos de uso y operación del puente. La PRHTA actualmente no espera que el acuerdo de concesión termine. Los bonos en circulación (incluidos los intereses devengados) al 30 de junio de 2017 ascendían a aproximadamente a $120.2 millones.

**(16) Gestión del riesgo**

*Gobierno Primario*

Las políticas de gestión de riesgos del Gobierno Primario se analizan en la Nota 1(y).

*Unidades de Componentes de Presentación Discreta*

A continuación, se describen los programas de gestión de riesgos administrados por separado por ciertas unidades de componentes de presentación discreta, incluidas todas las unidades de componentes mayores de presentación discreta y ciertas unidades de componentes no mayores que tienen reservas de riesgo autofinanciadas:

**(a) BGF**

Como se señaló anteriormente, el BGF cesó sus operaciones a partir del 23 de marzo de 2018 y completó una reestructuración de la deuda a tenor con una Modificación de Calificación según el Título VI de PROMESA, que entró en vigencia el 29 de noviembre de 2018. Para obtener información adicional sobre la modificación de calificación del BGF según el Título VI de PROMESA, consulte la Nota 3(c)(x).

Antes de estos desarrollos y durante el año fiscal 2017, para minimizar el riesgo de pérdida, el BGF compró cobertura de seguro para responsabilidad civil, riesgo, automóvil, crimen y fianza, así como seguro de compensación para trabajadores para empleados. La selección de la aseguradora debía ser aprobada por la Oficina de Seguros Públicos del DOT. La cobertura de seguro se actualizó anualmente para tener en cuenta los cambios en el riesgo operativo. Durante los tres años anteriores al 30 de junio de 2017, los acuerdos de seguro no excedieron el monto de la cobertura. Otras políticas de gestión de riesgos del BGF involucraban sus servicios de hipotecas y préstamos y actividades de seguros. Ciertas carteras de préstamos de la PRHFA fueron administradas por administradores privados que debían mantener una póliza de seguro de errores y omisiones. La PRHFA tenía un programa para administrar el riesgo de pérdida en sus actividades de préstamos y seguros de préstamos hipotecarios.

**(b) ACT**

La PRHTA cuenta con un seguro comercial para cubrir siniestros, robos, reclamaciones y otras pérdidas. La PRHTA no ha resuelto ninguna reclamación que exceda su cobertura de seguro en ninguno de los últimos tres años.

**(c) AEE**

La AEE compra seguros comerciales que cubren siniestros, robos, demandas por daños, desastres naturales y otras reclamaciones que cubren todos los bienes de riesgo (excluyendo las líneas de transmisión y distribución), calderas y maquinaria y responsabilidad pública. Además, la AEE cuenta con

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

un fondo autoasegurado para pagar el costo de reparar, reemplazar o reconstruir cualquier propiedad dañada o destruida, o gastos extraordinarios incurridos como resultado de una causa.

La AEE tiene un programa de seguro de salud con costo adicional que cubre sustancialmente a todos los empleados. La AEE contrató a un administrador para el procesamiento, aprobación y pago de reclamaciones más una tarifa administrativa. La acumulación para el plan de salud de los empleados incluye pasivos por las reclamaciones procesadas y una estimación de las reclamaciones incurridas pero no informadas.

Los cambios en los saldos del programa de seguro de salud y otros riesgos de autoseguro durante el año fiscal 2017 fueron los siguientes (en miles):

| | | |
|---|---|---|
| Reclamaciones por pagar - 1 de julio | $ | 4,116 |
| Reclamaciones incurridas | | 50,582 |
| Reclamaciones pagadas | | (50,577) |
| Reclamaciones por pagar - 30 de junio | $ | 4,121 |

Estas reclamaciones por pagar se presentan como un componente de las cuentas por pagar y los pasivos acumulados en el estado combinado adjunto de resultados netos de las unidades de componentes de presentación discreta.

*(d) AAA*

La AAA ha adquirido un seguro comercial para mitigar su exposición a ciertas pérdidas que involucran bienes inmuebles y personales (incluidos los daños por tormentas de viento, inundaciones y terremotos) y reclamaciones generales y de automóviles. La AAA también tiene un Programa de Seguro controlado por el Propietario (OCIP) en virtud del cual la cobertura por responsabilidad general comercial, responsabilidad general excedente, riesgo del constructor y responsabilidad de contaminación de los contratistas se obtiene o proporciona según el proyecto para los contratistas y subcontratistas de cualquier nivel, que están debidamente inscritos, mientras realizan operaciones en el sitio del proyecto correspondiente. Cada póliza de seguro comercial mantenida por la AAA contiene límites y deducibles específicos de la póliza. Las reclamaciones liquidadas que resultan de estos riesgos no han excedido la cobertura de seguro comercial en ninguno de los últimos tres años fiscales.

*(e) UPR*

La UPR está expuesta a varios riesgos de pérdida relacionados con daños; robo, daño y destrucción de activos; errores y omisiones; lesiones a los empleados; y desastres naturales. Hasta enero de 1993, la UPR estaba asegurado por pólizas de seguro de reclamaciones con respecto a riesgos de negligencia médica por $250,000 por ocurrencia hasta un total anual de $500,000. Con posterioridad a dicha fecha, la UPR no pudo obtener un seguro a un costo que se considerar económicamente justificable; en consecuencia, la UPR ahora está autoasegurada para tales riesgos. Según la Ley Núm. 98-1994, la responsabilidad de la UPR se limita a una cantidad máxima de $75,000 por persona, o $150,000 si involucra acciones por daños a más de una persona o cuando una sola persona lesionada tiene derecho a varias causas radicadas Los pasivos de riesgo autoasegurados se informan cuando es probable que se haya producido una pérdida y el monto de la pérdida pueda estimarse razonablemente. Los pasivos incluyen un monto por reclamaciones que se han incurrido pero que no se informaron. El proceso utilizado en el cálculo de los pasivos por reclamaciones no necesariamente resulta en una cantidad exacta porque los pasivos por reclamaciones reales dependen de factores tan complejos como la inflación, los cambios en las doctrinas legales y las indemnizaciones por daños. Los pasivos por reclamaciones se reevalúan periódicamente para tener en cuenta las reclamaciones recientemente liquidadas, la frecuencia de las reclamaciones y otros factores económicos y sociales.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los cambios en el monto de los pasivos por reclamaciones por negligencia médica en el año fiscal 2017 fueron los siguientes (en miles):

| | |
|---|---|
| Reclamaciones por pagar - 1 de julio | $8,939 |
| Reclamaciones incurridas y cambios en estimaciones | (304) |
| Pagos por reclamaciones y gastos por gastos | (460) |
| Reclamaciones por pagar– 30 de junio | $    8,175 |

Además, la UPR ha sido demandada en varios juicios por negligencia médica que surgen del curso normal de los negocios. La gerencia ha registrado una acumulación de aproximadamente $3.3 millones al 30 de junio de 2017 para cubrir reclamaciones y demandas que pueden ser exigidas contra la UPR.

Estas reclamaciones por pagar se presentan como un componente de las cuentas por pagar y los pasivos acumulados en el estado combinado adjunto de resultados netos de las unidades de componentes de presentación discreta.

**(f)  CFSE**

La CFSE proporciona compensación de trabajadores y seguro a empleados públicos y privados. Este seguro cubre a los trabajadores contra lesiones, discapacidad o muerte causadas por accidentes laborales o relacionados con el empleo, o por enfermedades sufridas como consecuencia de su empleo. La CFSE establece pasivos por los beneficios incurridos pero no pagados y los gastos por ajuste de beneficios basados en el costo final de liquidar los beneficios. Los pasivos incluyen estimaciones para casos informados que no han sido adjudicados y casos incurridos pero no informados. La siguiente tabla proporciona una conciliación de los pasivos iniciales y finales de los gastos de beneficios y ajuste de beneficios incurridos pero no pagados para el año fiscal terminado el 30 de junio de 2017 (en miles):

| | |
|---|---|
| Pasivos por beneficios incurridos pero no pagados y pagos por ajuste de beneficios al 1 de julio | $    727,998 |
| Beneficios totales incurridos | 359,319 |
| Total de pagos de beneficios | (378,825) |
| Pasivos por beneficios incurridos pero no pagados y gastos por ajuste de beneficios al 30 de junio | $    708,492 |

Los pasivos por los beneficios incurridos pero no pagados y los gastos de ajuste de beneficios se basan en datos históricos de experiencia de reclamaciones, supuestos y proyecciones en cuanto a eventos futuros, que incluyen la frecuencia, gravedad, persistencia y tendencias inflacionarias de las reclamaciones determinadas por un estudio actuarial independiente. Este pasivo ha sido descontado al 3.80% en 2017. La gerencia de la CFSE cree que descontar tal pasivo resulta en una mejor correspondencia de costos e ingresos ya que los beneficios de compensación tienen un ciclo de pago largo. Los supuestos utilizados para estimar y establecer el pasivo se revisan anualmente en función de las circunstancias y tendencias actuales.

La gerencia de la CFSE cree que los pasivos por beneficios incurridos pero no pagados y los gastos de ajuste de beneficios, determinados actuarialmente al 30 de junio de 2017, son una estimación razonable del costo neto final de la liquidación de los beneficios y gastos de beneficios incurridos. Debido a que los costos reales de los beneficios dependen de factores tales como la duración de la incapacidad del

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

trabajador, las tendencias de los costos médicos, las enfermedades profesionales, la inflación y otros factores sociales y económicos, el proceso utilizado para calcular el costo final de liquidar los beneficios y los gastos para administrar los beneficios se basa necesariamente en estimaciones. El monto finalmente pagado puede ser superior o inferior a dichas estimaciones. Los ajustes resultantes de los cambios en las estimaciones de estos pasivos se cargan o acreditan a las operaciones en el período en que ocurren.

El pasivo por beneficios incurridos, pero no pagados y gastos de ajuste de beneficios se informa como pasivo por beneficios de seguro en el estado combinado de resultados netos adjunto - unidades de componentes de presentación discreta.

**(17) Compromisos y contingencias**

*Gobierno Primario*

*Contingencias legales*

**(a) *Litigios previos al inicio de los casos del Título III relacionados con operaciones gubernamentales***

El ELA ha sido demandado en numerosos procedimientos legales relacionados con asuntos relacionados con el desempeño de operaciones gubernamentales de rutina. A tenor con la Ley Núm. 104-1955, según enmienda, las personas están autorizadas a demandar al ELA solo por causas de acciones establecidas en dicha Ley hasta un monto máximo de $75,000 o $150,000 si involucra acciones por daños a más de una persona o cuando una sola parte lesionada tiene derecho a varias causas de acción. En ciertas circunstancias, según lo dispuesto en la Ley Núm. 9-1975, según enmienda, el ELA podrá brindar representación legal a sus funcionarios y empleados, así como asumir el pago de cualquier sentencia que se dicte en su contra. No hay limitación en el pago de dichas sentencias. En la medida en que las reclamaciones surgieron antes del comienzo del caso del Título III del ELA, su estado y prioridad pueden verse afectados por el caso del Título III.

Con respecto a los litigios pendientes y amenazados que involucran las Actividades del Gobierno del ELA, sin incluir los litigios mencionados en los párrafos siguientes, el ELA informó aproximadamente $447 millones como un monto que para cubrir las sentencias desfavorables adjudicadas y anticipadas al 30 de junio de 2017. Este monto se incluyó como otros pasivos a largo plazo en el estado adjunto de resultados netos, y representa el monto estimado como un pasivo probable o un pasivo con una fecha de vencimiento fija o esperada que requerirá recursos financieros futuros disponibles para este pago. La gerencia cree que los pasivos finales que excedan los montos provistos, si los hubiera, no serían significativos.

Los montos registrados como contingencias legales por el ELA no reflejan el valor en dólares que el ELA podría tener que pagar a cuenta de cualquier reclamación. Cualquier pago hecho a cuenta de dichas reclamaciones reflejará el impacto del caso del ELA según el Título III de PROMESA, y el efecto que dicha presentación tiene sobre la prioridad y la admisibilidad de dicha reclamación, y las recuperaciones que se proporcionarán a los titulares de dichas reclamaciones. Para más información sobre el Título III de PROMESA, consulte la Nota 3.

Del total de la responsabilidad por reclamaciones legales y juicios reconocidos en las Actividades del Gobierno, aproximadamente $149.8 millones se consideran pagaderos dentro de un año, según los pagos realizados posteriores al 30 de junio de 2017 al 30 de junio de 2018.

El ELA ha sido demandado en procedimientos paralelos relacionados con una supuesta retención inapropiada de fondos de Medicaid, un caso presentado en el tribunal estatal y dos en el tribunal federal. Los demandantes son varios centros de atención primaria de la salud que buscan recuperar del ELA aproximadamente $800 millones de fondos de Medicaid retenidos por el PRDOH desde 1997. En febrero de 2005, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito determinó que el ELA debe devolver los fondos retenidos debido al incumplimiento de una ley federal. El ELA todavía está apelando varias disposiciones de esta determinación, y los montos a devolver y los métodos del plan de pago aún están en proceso de estimación. Al 30 de junio de 2017, el ELA acumuló aproximadamente $137 millones para esta contingencia legal.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El ELA ha sido demandado en un procedimiento colectivo presentado por padres de estudiantes de educación especial en las áreas de educación y atención médica. En octubre de 2006, el Tribunal de Apelaciones del Estado decidió a favor de la solicitud de los padres de incluir reclamaciones por daños a tenor con el mismo caso de acción colectiva, aunque no como un remedio en la acción colectiva en sí. El tribunal ahora puede otorgar daños a los miembros de la demanda colectiva y, para hacerlo, puede examinar las reclamaciones dividiéndolas en grupos o considerar cada caso individualmente. Esto requerirá que los padres prueben los daños sufridos de manera individual. El 26 de junio de 2016, el tribunal ordenó la publicación de un edicto público que describiera en detalle el proceso a seguir para presentar reclamaciones por daños sufridos. Dicho edicto se publicó y abrió un período de reclamaciones efectivo desde el 14 de agosto de 2016 hasta el 31 de octubre de 2016. El ELA planea defender vigorosamente cada caso individual. El ELA ha acumulado aproximadamente $ 650 millones para esta contingencia legal al 30 de junio de 2017.

En el caso *Vaquería Tres Monjitas, Inc. et al v. Ramírez et al*., algunos demandantes alegaron que las tarifas establecidas por el Administrador de la Oficina de Regulación de la Industria Láctea (ORIL) no permitían a los procesadores locales de lácteos de Suiza Dairy y Vaquería Tres Monjitas tuvieron la oportunidad de obtener el beneficio razonable al que tenían derecho constitucional. Las partes llegaron a un acuerdo de transacción el 29 de octubre de 2013. Entre otras cosas, el ELA, a través de algunos de sus organismos, acordó contribuir con los siguientes montos a ciertos pagos de acumulación regulatoria que se realizarán a tenor con el acuerdo de transacción: $ 50 millones al 31 de diciembre de 2014, $ 15 millones al 31 de diciembre de 2015, $ 15 millones al 31 de diciembre de 2016 y $ 15 millones al 31 de diciembre de 2017, con un monto original total acumulado por el ELA durante el año fiscal 2014 de $ 95 millones. El caso ahora está cerrado, pero el tribunal mantendrá la jurisdicción para atender cualquier asunto de cumplimiento o incumplimiento del acuerdo de transacción. Durante el año fiscal 2015, el ELA pagó $ 16 millones, de los $ 50 millones requeridos que vencen el 31 de diciembre de 2014. Al 30 de junio de 2017, el ELA ha acumulado $70 millones para esta contingencia legal, de los cuales $55 millones, correspondientes a las porciones no pagadas al 31 de diciembre de 2016, 2015 y 2014, se registran como vencidas y pagaderas dentro del fondo general.

El 21 de diciembre de 2012, el gobierno federal, a través del Departamento de Justicia de los Estados Unidos (USDOJ), presentó una demanda para exigir al ELA y su PRPOB el cumplimiento de la acción y el plan de remediación presentado el 8 de septiembre de 2011 por el División de Derechos Civiles del USDOJ a tenor con una investigación que reveló un patrón de violaciones de derechos civiles por parte del PRPOB. De acuerdo con esta investigación y el informe resultante, el patrón o la práctica de actividad ilegal es el producto de una falla continua por parte del ELA y su PRPOB para proporcionar a los oficiales la orientación, capacitación y herramientas necesarias para participar en la aplicación de la ley constitucional y efectiva. El gobierno federal buscaba un remedio declaratorio y equitativo para eliminar este patrón ilegal y al solicitar al ELA y su PRPOB que adoptaran e implementaran políticas y procedimientos en las áreas de reclutamiento, contratación, promociones, políticas, capacitación, supervisión, investigación, disciplina y para evitar que los oficiales de policía priven a las personas de los derechos, privilegios o inmunidades garantizados y protegidos por la Constitución o las leyes de los Estados Unidos. Aunque la reclamación no incluye daños, el plan de acción y remediación propuesto requeriría una inversión de aproximadamente $ 600 millones, que se espera incurrir en un período de 10 años, a partir del año fiscal 2015. El Secretario de Justicia del ELA todavía está negociando las determinaciones finales de las medidas que implementará el PRPOB en términos de costos finales y plazos. El 17 de julio de 2013, se llegó a un acuerdo definitivo entre el USDOJ y el ELA, que se presentó ante el Tribunal. Según el acuerdo de transacción, el tribunal desestimó la reclamación, pero retuvo la jurisdicción para garantizar el cumplimiento del acuerdo, mediante el nombramiento de un Asesor de Cumplimiento Técnico. No se requiere ninguna provisión por pasivos en este momento para este plan de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

remediación. Los gastos y pasivos relacionados se reconocerán como costos durante la ejecución del plan de remediación que comenzó en el año fiscal 2015.

El ELA recibe asistencia financiera del gobierno federal en forma de subvenciones y derechos. La recepción de subvenciones generalmente está condicionada al cumplimiento de los términos y condiciones de los acuerdos de subvención y las leyes y reglamentaciones federales aplicables, incluido el gasto de recursos para fines elegibles. Básicamente, todas las subvenciones están sujetas a auditoría según los Requisitos administrativos uniformes, los principios de costos y los requisitos de auditoría para las adjudicaciones federales, la regla final (orientación uniforme), generalmente denominada "Súper Circular" de OGP, todas las cuales se llevan a cabo en el departamento individual o nivel de agencia. La anulación como resultado de estas auditorías puede convertirse en responsabilidad del ELA. Al 30 de junio de 2017, con base en una evaluación de las desestimaciones federales pendientes, el ELA ha registrado aproximadamente $56.5 millones como otros pasivos a largo plazo en el estado adjunto de resultados netos. Los gastos que aún están sujetos a auditoría podrían no ser permitidos, pero la gerencia cree que dichas futuras no serán importantes para los estados financieros básicos.

**(b) Acciones civiles presentadas por varios grupos de bonistas y otros acreedores contra el ELA antes del comienzo de los casos del Título III.**

Varios grupos de bonistas, aseguradoras de línea única y fideicomisarios han presentado reclamaciones que impugnan la constitucionalidad de la Ley de Moratoria. Sin embargo, estas demandas se paralizaron desde el 30 de junio de 2016 hasta el 1 de mayo de 2017 según la paralización del Título IV y se paralizaron al comienzo de los casos del Título III. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3 y la Nota 23. Los casos clave que siguen sujetos a la paralización automática de PROMESA y no han sido desestimados incluyen, entre otros:

- *Assured Guar. Corp. v. Garcia Padilla*, Caso Núm. 16-1037-FAB (D.P.R. 7 de enero de 2016)

- *Fin. Guar. Ins. Co. v. Garcia Padilla*, Case No. 16-1095-FAB (D.P.R. 19 de enero de 2016)

- *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia Padilla*, Case No. 16-1610-FAB (D.P.R. 4 de abril de 2016)

- *Ambac Assurance Corp. v. Puerto Rico Highways and Trans. Auth.*, Caso Núm. 16-1893-FAB (D.P.R. 10 de mayo de 2016)

- *Nat'l Pub. Fin. Guar. Corp. v. Garcia Padilla*, Caso Núm. 16-2101-FAB (D.P.R. 15 de junio de 2016)

- *Jacana Holdings I LLC v. Puerto Rico*, Caso Núm. 16-4702-GHW (S.D.N.Y. 21 de junio de 2016)

- *U.S. Bank Trust Nat'l Ass'n v. Garcia Padilla*, Caso Núm. 16-2510-FAB (D.P.R. 19 de agosto de 2016)

- *Scotiabank de Puerto Rico v. Garcia Padilla*, Caso Núm. 16-2736-FAB (D.P.R. 28 de septiembre de 2016)

- *Servidores Públicos Unidos v. Fin. Oversight and Mgmt. Bd. for Puerto Rico*, Caso Núm. 17-1483-FAB (D.P.R. 12 de abril de 2017)

- *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Caso Núm. 17-1567 (D.P.R., 1 de mayo de 2017)

- *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Caso Núm. 17-1568 (D.P.R. 2 de mayo de 2017)

- *Ambac Assurance Corp. v. U.S. Dept. of the Treasury*, Caso Núm. 17-0809 (D.D.C. 2 de mayo de 2017)

- *Aurelius Investment, LLC v. Commonwealth of Puerto Rico*, Índice Núm. 652357/2017 (N.Y. Sup. Ct. 2 de mayo de 2017)

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(c)  Acciones civiles clave presentadas contra el ELA después del comienzo de los casos del Título III*

Se ha iniciado un número significativo de acciones civiles contra el ELA, COFINA, PRHTA, SRE, AEE y AEP después del inicio de sus Casos del Título III en busca de determinaciones judiciales sobre el alcance de varias garantías reales de los acreedores en los activos de los deudores del Título III, entre otros alivios que podrían afectar las prioridades de los acreedores en un plan de ajuste del Título III. Las acciones clave que probablemente tendrán el mayor impacto en los casos del Título III se resumen a continuación.

- *Employees Ret. Sys. of the Gov't of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC, et al.,* Caso Núm. 17-00213 (D.P.R. 21 de julio de 2017)

  El 21 de julio de 2017, la Junta de Supervisión, como representante de SRE en su caso del Título III, inició un procedimiento de oposición e impugnó los intereses de seguridad de los bonistas de SRE en varios activos del sistema a través de un remedio declaratorio (la Acción de alivio declaratoria de SRE). Durante la Acción de Reparación Declaratoria del SRE, la Junta de Supervisión, como representante del SRE en el caso del Título III, solicitó un remedio declaratorio que cuestionara la validez, prioridad, alcance y exigibilidad de los gravámenes previos y posteriores a la petición y los intereses de seguridad afirmados por los demandados con respecto a los bonos emitidos por el SRE. La demanda sostiene que los supuestos gravámenes e intereses de seguridad de los bonistas de SRE no se perfeccionaron porque las declaraciones de financiamiento del Código de Comercio Uniforme requeridas y las enmiendas posteriores eran defectuosas y, por lo tanto, los gravámenes podrían evitarse en el caso del Título III. La Acción de Reparación Declaratoria del SRE también cuestionó, entre otras cosas, el supuesto derecho de garantía de los tenedores de bonos del SRE en las contribuciones de los patronos al SRE posteriores a la petición.

  El 17 de agosto de 2018, el Tribunal del Título III dicto una sentencia ejecutiva parcial a favor de SRE. El Tribunal del Título III sostuvo, entre otras cosas, que los gravámenes de los bonistas de SRE no se perfeccionan y sus intereses de seguridad son evitables según la sección 544 del Código de Quiebras. El 5 de septiembre de 2018, el Tribunal del Título III emitió una orden desestimando las acusaciones restantes y las contrademandas. Esta decisión fue apelada ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito.

  El 30 de enero de 2019, el Primer Circuito (i) afirmó que el Tribunal del Título III sostenía que las declaraciones de financiamiento de 2018 relacionadas con los bonos del SRE no perfeccionaban el derecho de garantía de los tenedores de bonos del SRE en bienes pignorados, (ii) afirmaban la desestimación de la reclamación de los tenedores de bonos del SRE sobre una estipulación de enero de 2017, y (iii) revirtió el Tribunal del Título III al encontrar que los tenedores de bonos del SRE cumplieron con el requisito de perfección a partir del 17 de diciembre de 2015. Además, el Primer Circuito remitió ciertas contrademandas al Tribunal del Título III para su consideración adicional. El 30 de abril de 2019, la Junta de Supervisión, en nombre de SRE, presentó una petición de certiorari ante la Corte Suprema de los Estados Unidos, buscando revertir la decisión del Primer Circuito. La petición fue denegada el 7 de octubre de 2019.

  En su apelación, SRE solicitó que el Tribunal del Título III (i) determine la cuestión indecisa de si las garantías reales de los bonistas de SRE se unen a los ingresos recibidos por SRE después del comienzo de su caso del Título III (la Emisión de ingresos posteriores a la petición) y (ii) otorgarle permiso para presentar una demanda contraria enmendada para plantear cuestiones relativas a la naturaleza o el alcance de las garantías reales de los bonistas de SRE. El 6 de mayo de 2019, el Tribunal del Título III acordó determinar el problema de ingresos posteriores a la petición, pero denegó la solicitud de SRE de permiso para enmendar su demanda. El 27 de junio de 2019, el Tribunal del Título III otorgó un juicio sumario a favor de SRE sobre la cuestión de los ingresos posteriores a la petición, sosteniendo que la sección 552 del Código de Quiebras evita que los intereses de seguridad de los bonistas de SRE se adhieran a los ingresos recibidos por SRE después de la petición, y encontrar que las contribuciones de los patronos no son "ingresos especiales" en el sentido de la sección 902 del Código de Quiebras. El 18 de julio de 2019, los bonistas de SRE apelaron la decisión del Tribunal del Título III ante el Tribunal de Apelaciones del Primer Circuito de los Estados Unidos. El 30 de enero de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

2020, el Primer Circuito emitió una opinión y afirmó la decisión del Tribunal del Título III. El 3 de marzo de 2020, el Primer Circuito denegó la petición de los bonistas de SRE para una nueva vista *en banc.*

- *Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.,* Proc. Con. Núm. 17-00219-LTS, 17-00220-LTS (D.P.R. 27 de julio de 2017)

El 27 de julio de 2017, un grupo de bonistas de SRE inició un procedimiento contencioso contra el ELA y SRE en los casos inicialmente caratulados como *Altair Global Credit Opp. Fund (A), LLC, et al. v. Commonwealth of Puerto Rico, et al.*, Proc. Con. Núm. 17-00219-LTS, 17-00220-LTS (D.P.R. 27 de julio de 2017) (colectivamente, el Litigio PayGo), buscando una declaración de que la Resolución Conjunta 188 y la Ley 106-2017 (colectivamente, el Estatuto PayGo), que requiere que SRE liquide sus activos para su distribución al Fondo General, sean nulas *ab initio* porque violan la paralización automática del Título III y la Cláusula de Contratos y Cláusula sobre Expropiaciones de la Constitución de los Estados Unidos.

El 17 de noviembre de 2017, la Junta de Supervisión, como representante de SRE en su caso del Título III y junto con la AAFAF y el Comité de Jubilados, presentó una moción para desestimar el Litigio PayGo. El 2 de febrero de 2018, el Tribunal del Título III emitió una orden e informó a las partes que la moción de desestimación sería aceptada. El 9 de septiembre de 2018, el Tribunal del Título III suspendió el caso a la espera del Tribunal de Apelaciones de los Estados Unidos por la decisión del Primer Circuito sobre la apelación de sentencia sumaria en la Acción de Exención Declaratoria de SRE, cuya decisión fue emitida el 30 de enero de 2019 (como se discutió anteriormente). A la luz de la paralización, el 27 de septiembre de 2018, el Juzgado de Título III dio por terminada la moción de desestimación sin perjuicio de su restitución previa solicitud tras el fin de la paralización. Ninguna de las partes solicitó la anulación de la paralización.

El 1 de marzo de 2019, el Tribunal del Título III desestimó este caso sin perjuicio de Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. Como resultado, el caso se denominó *Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.*, Proc. Con. Núm. 17-00219-LTS, 17-00220-LTS (D.P.R.).El 5 de marzo de 2019, el Tribunal del Título III emitió una orden que permite las cuentas administradas por Crown (para y en nombre de Crown / PW SP), LMA SPC (para y en nombre de Map 98 Segregated Portfolio), Oceana Master Fund Ltd., Pentwater Merger Arbitrage Master Fund Ltd. y PWCM Master Fund Ltd. para intervenir en el procedimiento de oposición.

El 25 de octubre de 2019, estos bonistas de SRE presentaron una moción para informar la presentación de una respuesta a ciertos argumentos sobre la validez de los bonos emitidos por SRE en las objeciones de reclamaciones ómnibus del Comité de Acreedores y el Comité de Jubilados, así como en la moción de desestimación. A la fecha de estos estados financieros básicos, no ha habido más actividad en el expediente.

- *Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) v. Puerto Rico Elec. Power Auth., et al.,* Caso Núm. 17-00229-LTS (D.P.R. 7 de agosto de 2017)

El demandante UTIER cuestiona la constitucionalidad de cuatro estatutos del ELA y los Planes y Presupuestos Fiscales del ELA y la AEE de 2017 que supuestamente "adoptan" y "implementan" esos estatutos, argumentando que violan los términos de un acuerdo de negociación colectiva entre UTIER y la AEE. La moción para desestimar se informó por completo al 28 de marzo de 2018. El 26 de septiembre de 2018, el Tribunal del Título III emitió una orden otorgando en parte y negando en parte las mociones para desestimar la demanda enmendada. El 17 de diciembre de 2018, los demandados restantes respondieron la demanda enmendada. La UTIER presentó una segunda demanda enmendada el 30 de agosto de 2019, a la que los acusados respondieron el 15 de octubre de 2019. El 10 de diciembre de 2019, el Tribunal del Título III emitió una orden de programación enmendada para el descubrimiento y la presentación de mociones dispositivas hasta el 21 de agosto de 2020. A la fecha de estos estados financieros básicos, este litigio sigue en curso.

- *The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as Agent of The Commonwealth of Puerto Rico v. Bettina Whyte as Agent of COFINA (En la causa: The Financial*

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Oversight and Management Board for Puerto Rico)*, Proc. Con. Núm. 17-00257-LTS (D. P.R. 8 de septiembre de 2017) v Confirmación del Tercer Plan de Ajuste del Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico.

El 8 de septiembre de 2017, un agente de la Junta de Supervisión como representante del ELA en su Caso Título III (el Agente del Estado Libre Asociado) presentó una demanda (la Disputa ELA-COFINA) contra un agente de COFINA (el Agente de COFINA) en la que afirmaba que los ingresos del IVU comprometidos por COFINA para asegurar su deuda en bonos (los Antiguos Impuestos a las Ventas Pignoradas) son "propiedad exclusiva del ELA" y que la Ley Núm. 91-2006 "no transfirió a [COFINA] la propiedad actual de los futuros ingresos del IVU" y no asignó a COFINA el derecho del ELA a recibir tales ingresos. Simultáneamente con el litigio en el proceso de oposición, los agentes participaron en una mediación sancionada por el tribunal para resolver la disputa ELA-COFINA que resultó en un acuerdo de principio el 5 de junio de 2018. A tenor con el Acuerdo de Principio, una parte de los ingresos del 5.5% del IVU que antes se asignaba a COFINA, a la que se hace referencia como "Renta Fija", se compartiría entre COFINA y el ELA. El Acuerdo de Principio propuso, entre otras cosas, dividir la Renta Fija para que COFINA reciba el 53.65% de la Renta Fija a partir del año fiscal 2019 mientras que el ELA recibe el otro 46.35%, sujeto a ciertas restricciones y excepciones.

El 4 de febrero de 2019, el Tribunal del Título III emitió una orden en la que se aprobó un acuerdo de transacción consistente con el Acuerdo de Principio que resuelve la Disputa ELA-COFINA (el Acuerdo de conciliación). El 5 de febrero de 2019, el Tribunal del Título III confirmó el Tercer Plan de Ajuste del Título III Enmendado de la Corporación del Fondo de Interés Apremiante de Puerto Rico [Caso Núm. 17-3283, Causa Núm. 4652] (el Plan de Ajuste de COFINA), que fue sustancialmente consumado y entró en vigencia el 12 de febrero de 2019. El Plan de Ajuste de COFINA, entre otras cosas, implementó los términos del Acuerdo de Conciliación y resolvió acciones de petición anticipada previamente suspendidas que desafían la constitucionalidad de la Ley de Moratoria relacionada con la deuda de bonos de previa a la petición de COFINA, incluyendo *Lex Claims, LLC v. Garcia Padilla*, Caso Núm. 16-2374 FAB (D.P.R. Jul. 20, 2016) y *Rodríguez Perelló v. Rosselló Nevares*, Caso Núm. 17-1566 (D.P.R. May 1, 2017).

- Ciertas partes cuyas objeciones fueron anuladas al confirmar el Plan de Ajuste de COFINA han apelado la confirmación del Acuerdo del Plan de Ajuste y Arreglo de COFINA en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito bajo los números de caso 19-1181, 19-1182 y 19-1391. A la fecha de estos estados financieros, estos recursos permanecen pendientes. En consecuencia, existen desafíos legales en curso al Plan de Ajuste de COFINA que, si se resuelven adversamente a COFINA, podrían, entre otras cosas, afectar la validez del Acuerdo de conciliación y otras disposiciones del plan.

- *Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.* Proc. Con. Núm. 18-00028-LTS (D. P.R. 22 de marzo de 2018)

El 22 de marzo de 2018, varias cooperativas de crédito constituidas según la ley de Puerto Rico conocida como las cooperativas (las Cooperativas), presentaron una demanda contra el ELA, la Junta de Supervisión y otros organismos del ELA (incluidos COFINA, PRHTA, SRE y AEE), en busca de una sentencia declaratoria de que su Puerto Rico las tenencias de deuda se pueden desestimar y en busca de daños monetarios por presunto fraude en la emisión y alientan a las cooperativas de crédito locales a comprar instrumentos de amortización de la deuda de Puerto Rico. El 6 de agosto de 2018, la Junta de Supervisión, por sí misma y como representante de COFINA, el ELA y ciertos otros organismos, presentaron una moción para desestimar la demanda. También, el 6 de agosto de 2018, el BGF presentó una moción separada para desestimar. Además, varias partes presentaron solicitudes de desestimación o se les otorgó permiso del Tribunal del Título III para presentar solicitudes.

El 5 de febrero de 2019, el Tribunal del Título III confirmó el Plan de Ajuste de COFINA. La orden de confirmación establece que "los demandantes en ese procedimiento de oposición ante el Tribunal del Título III, denominado *Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v.*

206

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Commonwealth of Puerto Rico, et al.*, Adv. Proc. Núm. 18-00028, tendrá derecho a continuar la búsqueda de dicho litigio contra todas las partes que no sean COFINA y COFINA reorganizada, sujeto a todos los derechos y defensas disponibles con respecto a las reclamaciones y causas de acción afirmadas en este".

Las Cooperativas presentaron una Notificación de Apelación en el Tribunal del Título III y enmendaron su demanda contraria presentada anteriormente en respuesta a la confirmación del Plan de Ajuste de COFINA y luego de que su moción para reconsiderar la confirmación del Plan de Ajuste de COFINA fuera denegada por el Tribunal del Título III. La apelación está registrada en el Primer Circuito con el número de caso 19-1391.

El 22 de julio de 2019, los acusados presentaron mociones para desestimar la demanda enmendada. El 6 de diciembre de 2019, los demandantes presentaron su Moción de permiso para presentar la segunda demanda modificada, a la que los demandados objetaron el 4 de febrero de 2020. El 5 de febrero de 2020, la Junta de Supervisión, la Autoridad de Recuperación de la Deuda del BGF y sus fideicomisarios, y el BGF presentaron oposiciones a la moción de los demandantes de autorización para presentar una segunda demanda enmendada. COSSEC y AAFAF presentaron acumulaciones a las oposiciones presentadas por la Junta de Supervisión y el BGF. El 21 de febrero de 2020, los demandantes presentaron una respuesta general a las oposiciones a la moción de autorización para presentar una segunda demanda enmendada. Los demandantes presentaron su respuesta a la objeción de los demandados el 21 de febrero de 2020. El Tribunal del Título III consideró la moción de autorización para enmendar en el momento de la presentación, y el 14 de abril de 2020 emitió una orden en la que se concedió la moción de los demandantes. El 16 de abril de 2020, los demandantes presentaron su Segunda Demanda Modificada. El 20 de abril de 2020, la Junta de Supervisión y el BGF presentaron mociones por separado para desestimar la Segunda Demanda Enmendada, y la AAFAF se unió a la moción de la Junta de Supervisión el 24 de abril de 2020. A tenor con el cronograma que ingresó el Tribunal del Título III el 14 de abril de 2020, la sesión informativa sobre las mociones de desestimación se completó el 5 de junio de 2020. El Tribunal del Título III ha tomado la moción de desestimación sometida, pero aún no ha emitido una decisión.

- *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Caso Núm. 18-00059-LTS (D.P.R. 23 de mayo de 2018)

El 23 de mayo de 2018, los demandantes presentaron una demanda contra el ELA, la Junta de Supervisión, la AAFAF, el Gobernador, el Director Ejecutivo de la AAFAF y Raúl Maldonado Gautier (en su capacidad oficial) en la que se solicitaban catorce formas diferentes de remedio declaratorio, que buscan sentencias que (1) el Plan Fiscal Revisado y la Ley de Cumplimiento violan varias secciones de PROMESA; (2) el Plan Fiscal Revisado viola la sección 928 del Código de Quiebras; (3) no se puede confirmar ningún plan de ajuste basado en el Plan Fiscal Revisado y el tribunal no celebrará una vista de confirmación; (4) la Ley de Moratoria, las Órdenes de Moratoria, el Plan Fiscal Revisado y la Ley de Cumplimiento son nulas porque (a) violan la Cláusula del Contrato, (b) violan las cláusulas de Expropiación y Debido Proceso, y (c) son sustituidos por las Secciones 303(1) y 303(3) de PROMESA; y (5) en la medida en que el tribunal determine que PROMESA prohíbe la revisión del plan fiscal del ELA, PROMESA viola la Cláusula del Debido Proceso y constituye una delegación inconstitucional del poder legislativo. Los demandados aún no han respondido a la demanda. El 13 de agosto de 2018, el tribunal suspendió el litigio y ordenó que la fecha límite para presentar una moción de desestimación sea 30 días después de que el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito emita una opinión en la apelación de *Ambac Assurance Corporation v. Commonwealth of Puerto Rico, et al.*, Núm. 17-00159-LTS (D.P.R. 8 de junio de 2017). El 6 de septiembre de 2019, el Tribunal del Título III emitió una orden que suspendía este procedimiento de oposición hasta el 30 de noviembre de 2019 y requería mediación en la forma establecida en la Orden de Paralización del 24 de julio del Tribunal del Título III. Mediante órdenes emitidas el 28 de octubre de 2019, 27 de diciembre de 2019 y 10 de marzo de 2020, el Tribunal del Título III ha suspendido aún más esta acción a la espera de su decisión sobre la confirmación del Plan Enmendado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

- *Hermandad de Empleados del Fondo del Seguro del Estado, Inc. et al. v. Commonwealth of Puerto Rico*, Caso Núm. 18-00091-LTS (D.P.R. 25 de julio de 2018)

  El 25 de julio de 2018, Hermandad de Empleados del Fondo del Seguro del Estado, Inc. (UECFSE) y Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. (UMCFSE) presentaron una demanda contra el ELA, la Junta de Supervisión, la Corporación del Fondo del Seguro del Estado, Jesús M. Rodríguez Rosa, el Gobernador, el Director Ejecutivo de la AAFAF, Hon. Raúl Maldonado Gautier, José Iván Marrero Rosado y Natalie A. Jaresko buscan una orden de que la CFSE es un servicio público esencial protegido, que cuatro leyes de la Legislatura del ELA violan la Cláusula contractual de la Constitución de los Estados Unidos, que cuatro leyes de la Legislatura del ELA violan los Derechos de negociación colectiva de la Constitución del ELA y una orden que declara inconstitucional el plan fiscal del ELA (según lo certificado el 29 de junio de 2018) y en violación de la Cláusula contractual de la Constitución de los Estados Unidos y el ELA. Los Demandantes presentaron una Demanda Enmendada el 29 de octubre de 2018, buscando reparación solo en lo que se refiere a las cuatro Leyes de la Legislatura del ELA (Leyes 66-2014, 3-2017, 8-2017 y 26-2017) por supuestamente violar las Constituciones de los Estados Unidos y del ELA.

  El 25 de enero de 2019, los demandados presentaron respuestas a la primera demanda enmendada. El 7 de marzo de 2019, los demandantes presentaron una objeción general a las mociones de los demandados para desestimar. Las mociones para la desestimación se informaron por completo al 5 de abril de 2019. El 27 de septiembre de 2019, el Tribunal del Título III emitió una opinión y orden, y concedió la moción para desestimar la primera demanda enmendada y cerró el caso.

  El 4 de octubre de 2019, la Hermandad de Empleados del Fondo del Seguro del Estado, Inc. y la Unión de Médicos de la Corporación del Fondo del Estado Corp. presentaron una apelación (Caso Núm. 19-2028). Los Demandantes-Apelantes presentaron su escrito de apertura el 16 de diciembre de 2019. Los apelados presentaron su escrito el 18 de febrero de 2020. Los apelantes presentaron su escrito de respuesta el 9 de marzo de 2020.

- *The Fin. Oversight and Mgmt. Bd. for Puerto Rico v. Puerto Rico Public Building Auth.*, Caso Núm. 18-00149-LTS (D.P.R. 21 de diciembre de 2018).

  El 21 de diciembre de 2018, la Junta de Supervisión y el Comité de Acreedores presentaron un procedimiento de oposición contra la AEP para solicitar un remedio declaratorio y el rechazo de las reclamaciones administrativas de renta, alegando que los arrendamientos de AEP no son verdaderos arrendamientos, sino más bien "transacciones financieras encubiertas". Múltiples partes han presentado mociones para intervenir. El 28 de enero de 2019, la AEP respondió a la demanda. El 27 de junio de 2019, la Junta de Supervisión presentó una moción de paralización de este procedimiento de oposición en espera de la confirmación del plan de ajuste del Título III del ELA. El 24 de julio de 2019, el Tribunal del Título III emitió una Orden de Paralización, que suspende este procedimiento de oposición (entre otros asuntos en los casos de Título III) hasta el 30 de noviembre de 2019. Mediante órdenes emitidas el 28 de octubre de 2019, 27 de diciembre de 2019 y 10 de marzo de 2020, el Tribunal del Título III ha suspendido aún más esta acción a la espera de su decisión sobre la confirmación del Plan Enmendado.

- *Manuel Natal-Albelo, et al. v. The Fin. Oversight and Mgmt. Bd. for Puerto Rico*, Caso Núm. 19-00003-LTS (D.P.R. 14 de enero de 2019)

  El 6 de diciembre de 2018, Manuel Natal Albelo, representante general independiente en la Cámara de Representantes de Puerto Rico y varios sindicatos, presentó una demanda contra el ELA de Puerto Rico y Carlos Méndez Núñez, en su calidad oficial de Presidente de la Cámara de Representantes. Representantes de Puerto Rico en el Tribunal de Primera Instancia del ELA de Puerto Rico, Tribunal Superior de San Juan (el Tribunal Superior) (Civil Núm. SJ2018cv01569). La demanda solicita un remedio declaratorio que indique que (i) el proceso legislativo que condujo a la promulgación de la Ley Núm. 241-2018, que creó la estructura legal necesaria para ejecutar la reestructuración de COFINA, fue defectuoso, violó los reglamentos de la Cámara de Puerto Rico y,

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

por lo tanto, fue inconstitucional; y (ii) Ley Núm. 91-2006 (la legislación de COFINA, según enmienda) y la Ley Núm. 241-2018 (que es una enmienda a la legislación de COFINA), violan las disposiciones de límite de deuda y presupuesto equilibrado de la Constitución del ELA.

El 14 de enero de 2019, la Junta de Supervisión, en nombre del ELA y COFINA, presentó un aviso de remoción de la Acción Civil ante el Tribunal del Título III, donde se convirtió en el Procedimiento de Oposición Núm. 19-00003-LTS (D.P.R.), denominado *Manuel Natal-Albelo, et al. v. Financial Oversight and Management Board for Puerto Rico, et al*. (El Procedimiento de Oposición). El 5 de febrero de 2019 el Tribunal del Título III confirmó el Plan de Adecuación de COFINA, lo que hizo que la Ley Núm. 241-2018 se encontrara debidamente promulgada. El 18 de febrero de 2019, los demandantes en el Proceso de Oposición presentaron una apelación de la orden de confirmación del Plan de Ajuste de COFINA ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito bajo el número de caso 19-1181 (la Apelación). A la fecha de estos estados financieros, la apelación sigue pendiente.

El 21 de marzo de 2019, los demandantes presentaron mociones para devolver el Proceso de Oposición al Tribunal Superior, afirmando que (i) el Tribunal del Título III carece de jurisdicción sobre la materia sobre la demanda porque se refiere únicamente a violaciones de la Constitución del ELA y de las leyes de Puerto Rico. leyes — no leyes federales — que no involucran derechos creados por el Título III de PROMESA, y (ii) el Tribunal del Título III carece de jurisdicción sobre la materia sobre la queja porque la Junta de Supervisión en sí es inconstitucional. El 13 de agosto de 2019 se suspendió el Proceso de Oposición hasta la resolución final del Recurso.

- *SRE Clawback Litigation*, Caso Núm. 19-00355, 19-00356, 19-00357, 19-00358, 19-00359, 19-00360 y 19-00361-LTS (D.P.R. 19 de mayo de 2019)

El 19 de mayo de 2019, el Comité de Acreedores y la Junta de Supervisión, actuando a través de su Comité de Reclamaciones Especiales, iniciaron siete procedimientos de oposición (colectivamente, el Litigio de Reclamación de SRE) contra aproximadamente 230 demandados que poseían o poseen actualmente bonos de SRE. Los demandantes buscan un remedio declaratorio relacionado con los bonos SRE y la recuperación de ciertos pagos de capital e intereses sobre los bonos SRE. El 21 de mayo de 2019, los demandantes presentaron una moción, en la que se solicitaba que el Tribunal del Título III dicte una orden (i) que prorrogara el período para notificar a los demandados nacionales en el Litigio de Reclamación de SRE hasta el 18 de noviembre de 2019, y (ii) de lo contrario suspender la Reclamación de SRE Litigio pendiente de una solicitud conjunta de ambos demandantes para reanudar un procedimiento en particular o una orden adicional del Tribunal del Título III.

El 24 de julio de 2019, el Tribunal del Título III emitió la Orden de paralización, que suspendió el Litigio de Reclamación de SRE hasta el 30 de noviembre de 2019 y requirió la mediación obligatoria de los problemas durante el período de paralización. El 18 de octubre de 2019, las partes del Litigio de Reclamación de SRE presentaron conjuntamente una moción y una orden estipulada para modificar la Orden de Paralización al permitir que procedieran los problemas *ultra vires* relacionados con los bonos del Sistema. El 24 de octubre de 2019, el Tribunal del Título III otorgó la moción para modificar la Orden de Paralización y estableció un calendario de pruebas y reuniones informativas relacionadas con las cuestiones *ultra vires* hasta mayo de 2020. El 1 de noviembre de 2019, los bonistas demandados iniciaron el descubrimiento contra varias partes y no partes, incluido SRE, en relación con las cuestiones *ultra vires*. A la fecha del presente, el proceso de presentación de pruebas están en curso.

El 28 de octubre de 2019, el Tribunal del Título III emitió una orden que requería un informe de mediación o una orden de programación en cuanto a los asuntos restantes suspendidos antes del 27 de noviembre de 2019 y extendió la paralización en cuestiones no *ultra vires* hasta el 31 de diciembre de 2019. El 27 de diciembre de 2019, el Tribunal del Título III emitió una orden enmendada que extiende la paralización en cuestiones no *ultra vires* hasta el 11 de marzo de 2020. El 10 de marzo de 2020, el Tribunal del Título III emitió una orden final sobre el período de paralización, en la que se autorizaba que procedieran ciertas mociones de levantamiento de la paralización y demandas sobre

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

bonos de ingresos, pero mantuvo la paralización para cuestiones no *ultra vires* o sobre los gravámenes pendientes de la decisión del Tribunal del Título III para confirmar el Plan Enmendado. El 17 de abril de 2020, el Tribunal del Título III emitió una orden con respecto al programa de presentación de evidencia y escritos.

- *The Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Blackrock Fin. Mgmt., Inc., et al.*, Caso Núm. 19-00297 (D.P.R. 2 de mayo de 2019)

  El 2 de mayo de 2019, el ELA y la Junta de Supervisión iniciaron un procedimiento de oposición contra varios bonistas de GO que buscaban un remedio declaratorio de que los demandados bonistas de GO no tienen gravámenes legales o consensuales sobre ciertos Recursos Disponibles del ELA, Ingresos por Impuestos a la Propiedad e Ingresos Asignables. El ELA y la Junta de Supervisión también argumentan que, incluso si los demandados tienen gravámenes legales, el Tribunal del Título III debe dictar sentencias que eviten los gravámenes, según la sección 545 del Código de Quiebras. El 11 de junio de 2019, los demandados presentaron una moción de desestimación. El 24 de julio de 2019, el Tribunal del Título III suspendió el procedimiento de oposición hasta el 30 de noviembre de 2019 y requirió una mediación obligatoria. Mediante órdenes emitidas el 28 de octubre de 2019, 27 de diciembre de 2019 y 10 de marzo de 2020, el Tribunal del Título III ha suspendido aún más esta acción a la espera de su decisión sobre la confirmación del Plan Enmendado.

- *The Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Cortland Capital Mkt. Servs. LLC, et al.*, Caso Núm. 19-00396-LTS (D.P.R. 9 de julio de 2019)

  El 9 de julio de 2019, Cortland Capital Market Services, LLC, como agente administrativo y SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD y Ultra NB, LLC (los prestamistas de la línea de combustible) presentaron un procedimiento de oposición (el litigio de los prestamistas de la línea de combustible) contra la Junta de Supervisión, la AEE, la AAFAF y el US Bank NA como Fideicomisario de ciertos bonistas (el Fideicomisario). Los prestamistas de la línea de combustible alegan que los bonos de la AEE no están asegurados y los bonistas de la AEE no tienen derecho a ninguna recuperación hasta que los prestamistas de la línea de combustible y otros gastos corrientes de la AEE se paguen en su totalidad. El 30 de septiembre de 2019, los prestamistas de la línea de combustible presentaron una demanda, que agregó a Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corp y Syncora Guarantee Inc. como demandados (colectivamente, los Demandados de los tenedores de bonos). El 11 de noviembre de 2019, la AEE, la AAFAF y la Junta de Supervisión presentaron una moción conjunta de desestimación y los Demandados Bonistas y el Fiduciario presentaron una moción conjunta separada de desestimación. Las partes presentaron sus objeciones a cada una de las mociones conjuntas de desestimación el 5 de diciembre de 2019. El 3 de febrero de 2020, la Junta de Supervisión, los Demandados Bonistas y el Fideicomisario de Bonos de la AEE presentaron respuestas en apoyo de la moción para desestimar la demanda enmendada. La AAFAF presentó una acumulación limitada a la respuesta de la Junta de Supervisión. El 2 de abril de 2020, el Tribunal del Título III emitió una orden para postergar todos los plazos y vistas en este procedimiento a la luz de la crisis de COVID-19.

- *Sistema de Retiro de los Empleados de la Autoridad v. The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, Caso Núm. 19-00405-LTS (D.P.R. 6 de agosto de 2019)

  El 6 de agosto de 2019, el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (SREAEE) presentó una demanda contra la Junta de Supervisión, la AEE, la AAFAF, el ELA, el Gobernador, el Director Ejecutivo de la AAFAF y el Banco de los EE. UU., en busca de un remedio declaratorio en el que (a) todos los montos adeudados a la SREAEE son gastos corrientes para los fines del Contrato de Fideicomiso; (b) los bonistas de la AEE no tienen gravamen sobre los ingresos recibidos por la AEE, a menos que y hasta que todos los gastos corrientes hayan sido pagados en su totalidad; y (c) la SREAEE debe ser pagada en su totalidad toda la responsabilidad actual y heredada antes de pagar o acordar pagar a cualquier tenedor de bonos de la AEE. El 17 de septiembre de 2019, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corp y Syncora Guarantee Inc. (colectivamente, los Demandados Bonistas)

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

presentaron una moción para intervenir, que el Tribunal otorgó el 7 de noviembre de 2019. El 30 de octubre de 2019, la SREAEE presentó una demanda modificada. El 13 de noviembre de 2019, la AEE, la AAFAF, la Junta de Supervisión, el ELA y el Gobernador (En su capacidad oficial) presentaron una moción conjunta de desestimación y los Demandados Bonistas y el Fiduciario presentaron una moción conjunta separada de desestimación. Las partes presentaron sus objeciones a cada una de las mociones conjuntas de desestimación el 4 de diciembre de 2019. El 3 de febrero de 2020, las Partes gubernamentales presentaron respuestas en apoyo de la moción para desestimar la demanda enmendada del demandante. El 2 de abril de 2020, el Tribunal del Título III emitió una orden para postergar todos los plazos y vistas en este procedimiento a la luz de la crisis de COVID-19.

- *The Fin. Oversight & Mgmt. Bd. for Puerto Rico, as representative of the Commonwealth of Puerto Rico v. Ambac Assurance Corp., et al.*, Proc. Con. Núm. 20-00003-LTS (D.P.R. 16 de enero de 2020)

  El 16 de enero de 2020, la Junta de Supervisión presentó una demanda de oposición para impugnar las evidencias de reclamaciones y gravámenes presentados contra el ELA por bonistas emitidos por PRIFA. La Junta de Supervisión afirma que el ELA "no es ni un emisor ni un garante" de los bonos y, por lo tanto, no es responsable según la ley de habilitación de PRIFA o los documentos de los bonos de PRIFA.

- *The Fin. Oversight & Mgmt. Bd. for Puerto Rico, as representative of the Commonwealth of Puerto Rico v. Ambac Assurance Corp., et al.*, Proc. Con. Núm. 20-00004-LTS (D.P.R. 16 de enero de 2020)

  El 16 de enero de 2020, la Junta de Supervisión presentó una demanda de oposición para impugnar las evidencias de reclamaciones y gravámenes presentados contra el ELA por bonistas emitidos por la Autoridad del Distrito del Centro de Convenciones de Puerto Rico. La Junta de Supervisión afirma que las evidencias de reclamaciones de los acusados "deben rechazarse en su totalidad" porque "el ELA no es parte de ningún acuerdo relacionado con los Ingresos por Impuestos de Ocupación, los Demandados no tienen ningún derecho a recibir pagos del ELA en relación con los Bonos de la ADCCPR, y no posee una reclamación permisible contra el ELA".

- *The Fin. Oversight & Mgmt. Bd. for Puerto Rico, as representative of the Commonwealth of Puerto Rico v. Ambac Assurance Corp., et al.*, Proc. Con. Núm. 20-00005-LTS (D.P.R. 16 de enero de 2020)

  El 16 de enero de 2020, la Junta de Supervisión presentó una demanda de oposición para impugnar las evidencias de reclamaciones y gravámenes presentados contra el ELA por bonistas emitidos por la Autoridad de Carreteras y Transportación de Puerto Rico. La Junta de Supervisión afirma que el ELA "no es un emisor ni un garante de los Bonos y, como lo establecen la Ley de Habilitación y los Materiales de Bonos de la ACT, el ELA no tiene ninguna responsabilidad con respecto a los Bonos".

- *The Fin. Oversight & Mgmt. Bd. for Puerto Rico, as Representative of Puerto Rico Highways and Transportation Authority, et al. v. Ambac Assurance Corp., et al.,* Proc. Con. Núm. 20-00007-LTS (D.P.R. 16 de enero de 2020)

  El 16 de enero de 2020, la Junta de Supervisión y la UCC presentaron una demanda de oposición para impugnar las evidencias de reclamaciones y gravámenes presentados contra la ACT por bonistas emitidos por la ACT. La Junta de Supervisión y la UCC argumentan que las reclamaciones por bonos garantizados de los demandados "deberían rechazarse, excepto en lo que respecta a las cantidades depositadas al crédito del Fondo de amortización de 1968 y los Fondos de resolución de 1998". Además, los demandantes argumentan que las reclamaciones de los acusados basados en violaciones constitucionales y estatutarias afirmadas "deberían rechazarse en su totalidad".

- *Mociones clave de los bonistas para levantar la paralización, Caso Núm. 17-3283-LTS (D.P.R. 16 de enero de 2020)*

  El 16 de enero de 2020, las aseguradoras de línea única de bonos emitidos por PRIFA, ADCCPR y PRHTA presentaron tres mociones separadas para levantar la paralización automática, o en la alternativa, para la protección adecuada de sus supuestos intereses de seguridad en los ingresos pignorados aplicables. En la moción de la PRIFA, las aseguradoras de línea única afirman que el ELA no tiene derecho a utilizar los ingresos generados por los impuestos al ron, que, según afirman, fueron pignorados a los bonistas de la PRIFA como garantía. La moción de la PRIFA solicita una reparación

211

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

de la paralización para solicitar la ejecución de los supuestos embargos de los bonistas de PRIFA contra los ingresos fiscales del ron en dos procedimientos fuera de los casos del Título III. En la moción de la ADCCPR, las aseguradoras de línea única argumentan que los bonistas de la ADCCPR tienen un gravamen contra ciertos impuestos de ocupación hotelera recaudados por la Compañía de Turismo y buscan un levantamiento de la paralización automática para iniciar una acción para exigir la aplicación de sus presuntos gravámenes. En la moción de la PRHTA, las aseguradoras de línea única afirman que los bonistas de la PRHTA están asegurados por (i) los ingresos de peaje recaudados por la PRHTA y (ii) los arbitrios recaudados por el ELA. La moción de la PRHTA busca una reparación de la paralización porque la PRHTA y el ELA supuestamente no tienen equidad en los ingresos por peajes o los arbitrios.

El 4 de febrero de 2020, la Junta de Supervisión (junto con la AAFAF) objetó cada una de las mociones de paralización. Las aseguradoras de línea única presentaron sus respuestas el 30 de abril de 2020. El 4 de junio de 2020 se realizó a cabo una vista preliminar sobre las mociones de levantamiento de la paralización. Estos casos siguen pendientes.

*Compromisos y otras contingencias*

El 23 de noviembre de 1998, ciertas compañías tabacaleras y ciertos estados, territorios y otras jurisdicciones de los Estados Unidos de América, incluido el ELA, celebraron un acuerdo de transacción global (el Acuerdo Global). El Acuerdo Global exige pagos anuales hasta el año 2025, que variarán debido a ajustes inflacionarios y de volumen. Los pagos estimados que se recibirán en virtud del Acuerdo Global hasta el año que finaliza el 30 de junio de 2025 ascienden a aproximadamente $884 millones. Después de 2025, las compañías tabacaleras continuarán haciendo contribuciones a perpetuidad. A tenor con la Ley Núm. 173-1999, que creó el Fideicomiso de los Niños (una unidad de componentes combinados), el ELA asignó y transfirió condicionalmente al Fideicomiso de los Niños las contribuciones que el ELA tiene derecho a recibir en virtud del Acuerdo Global. Los pagos recibidos en virtud del Acuerdo Global y reconocidos como ingresos durante el año finalizado el 30 de junio de 2017 ascendieron a aproximadamente $72.7 millones. Todos los ingresos que se recibirán en virtud del Acuerdo Global y las ganancias de inversión en ciertas cuentas bajo contratos de bonos se comprometen como garantía para los Bonos respaldados por activos del acuerdo del tabaco, Series 2002, 2005 y 2008. Al 30 de junio de 2017, el monto aproximado de la prenda es de $1,400 millones, lo que representa el capital restante aproximado y los intereses de las emisiones de bonos antes mencionadas, que se comprometen hasta el 15 de mayo de 2057. En consecuencia, hasta el 15 de mayo de 2057, dichos ingresos no están disponibles para otros fines.

La industria del cuidado de la salud, bajo la cual opera PRMeSA, está sujeta a numerosas leyes y regulaciones, que incluyen, entre otros, asuntos tales como los requisitos de participación del gobierno en el cuidado de la salud, varias licencias y acreditaciones, reintegros por servicios a pacientes y fraude y abuso de Medicare y Medicaid. La acción del gobierno ha aumentado con respecto a las investigaciones o demandas sobre posibles violaciones de fraude y abuso y estatutos o regulaciones de reclamaciones falsas por parte de los proveedores de atención médica. Los proveedores que hayan violado estas leyes y regulaciones pueden estar sujetos a multas o sanciones. Si bien la gerencia de PRMeSA cree que sus políticas, procedimientos y prácticas cumplen con las regulaciones gubernamentales, no se puede garantizar que la Administración no estará sujeta a consultas o acciones gubernamentales.

La Ley de Tecnología de la Información de Salud para la Salud Económica y Clínica estableció el uso significativo de la adopción interoperable de Registros Electrónicos de Salud (EHR) en el sistema de salud como un objetivo nacional crítico e incentivó la adopción de EHR. Su objetivo no es solo la adopción, sino el uso significativo de los EHR, es decir, su uso por parte de los proveedores para lograr mejoras significativas en la atención. Se requiere un cumplimiento de uso significativo antes del año fiscal federal 2016, de lo contrario, el hospital incurrirá en sanciones por incumplimiento que pueden reducir los pagos futuros de Medicare y posiblemente los pagos del programa Medicare Advantage. Los Centros de Servicios de Medicare y Medicaid (CMS) administran y han implementado un programa de incentivos para aquellos hospitales que implementan EHR y cumplen con ciertos requisitos específicos. Los programas de incentivos de EHR de CMS

212

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

brindan pagos de incentivos a los hospitales elegibles a medida que adoptan, implementan, actualizan o demuestran el uso significativo, según lo definido por CMS, de la tecnología de EHR certificada. Al 30 de junio de 2016, PRMeSA está bajo la implementación de su sistema EHR.

El SCPT tiene acuerdos de asistencia financiera con varios municipios del ELA para proporcionar fondos para la construcción, mejora y rehabilitación de ciertos proyectos de las Comunidades Especiales. Al 30 de junio de 2017, los saldos presupuestados acumulados por el SCPT en estos acuerdos ascendían a aproximadamente $1,100 millones, de los cuales se había desembolsado un total de aproximadamente $1,000 millones.

Al 30 de junio de 2017, las siguientes unidades de componentes combinados mantuvieron varios compromisos de construcción y asistencia no gastados de la siguiente manera (en miles):

| Entidad | Monto |
|---|---|
| UPRCCC | $ 3,836 |
| PRIFA | 3,285 |
| Total | $ 7,121 |

El ELA también está comprometido en virtud de numerosos contratos de arrendamiento operativo no cancelables a largo plazo, que caducan hasta 2032, que cubren terrenos, instalaciones de oficinas y equipos. Los gastos de alquiler dentro de los fondos gubernamentales para el año terminado el 30 de junio de 2017 en virtud de dichos arrendamientos operativos fueron de aproximadamente $141 millones.

Los pagos mínimos de arrendamiento futuros para estos arrendamientos fueron los siguientes (en miles):

| Años que terminan el 30 de junio: | |
|---|---|
| 2018 | $ 72,647 |
| 2019 | 57,775 |
| 2020 | 42,122 |
| 2021 | 29,649 |
| 2022 | 16,108 |
| 2023-2027 | 41,973 |
| 2028-2032 | 4,972 |
| Pagos mínimos de arrendamiento futuros totales | $ 265,246 |

*Compromisos y contingencias ambientales*

El ELA contabiliza las obligaciones de remediación de la contaminación de acuerdo con la Declaración GASB Núm. 49, *Informes Contables y Financieros para las Obligaciones de Remediación de la Contaminación*. Esta Declaración aborda los estándares de informes contables y financieros para las obligaciones de remediación de la contaminación (incluida la polución), que son obligaciones para abordar los efectos perjudiciales actuales o potenciales de la contaminación existente al participar en actividades de remediación de la contaminación, tales como evaluaciones del sitio y limpiezas. El alcance excluye la prevención de la contaminación o las obligaciones de control con respecto a las operaciones actuales y las futuras actividades de remediación de la contaminación que se requieren al retirar un activo, como el cierre de vertederos y la atención posterior al cierre.

Una vez que ocurra cualquiera de los cinco eventos obligatorios especificados, se requiere que un gobierno calcule los componentes de los desembolsos esperados de remediación de contaminación y determine si los desembolsos para esos componentes deben acumularse como un pasivo o, si corresponde, capitalizarse

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

cuando se adquieren bienes y servicios. Los eventos obligatorios incluyen lo siguiente:

- El gobierno se ve en la obligación de tomar medidas para remediar la contaminación debido a un peligro inminente.

- El gobierno viola un permiso o licencia relacionado con la prevención de la contaminación.

- El gobierno es nombrado, o la evidencia indica que será nombrado por un regulador como parte responsable o parte potencialmente responsable (PRP) de la remediación, o como un gobierno responsable de compartir los costos.

- Se nombra al gobierno, o la evidencia indica que se nombrará, en una demanda para obligar a la participación en la reparación de la contaminación.

- El gobierno comienza o se obliga legalmente a comenzar la remediación de la contaminación.

El 16 de junio de 2014, el USDOJ, actuando en nombre de la EPA, presentó una demanda alegando descargas no autorizadas de contaminantes de los sistemas de alcantarillado pluvial propiedad u operados por el Municipio de San Juan (MSJ), el DTOP y la PRHTA. a través de ciertas estaciones de bombeo de control de inundaciones que pertenecen y son operadas por el DRNA, en las aguas de los Estados Unidos, en violación de la Ley Federal de Agua Limpia. La demanda busca la evaluación de sanciones civiles contra MSJ, DTOP / PRHTA, DNER y el ELA (colectivamente, los Demandados de Puerto Rico) por violaciones pasadas y presentes de hasta $32,500 por día por violación, por aquellas violaciones que ocurrieron entre el 5 de febrero, 2007 y 12 de enero de 2009; y $37,500 por día por violación, para aquellas violaciones que ocurrieron desde el 13 de enero de 2009 hasta el presente. La demanda solicita además remedios interdictales para que los acusados cumplan con el Permiso municipal de sistemas separados de alcantarillado pluvial. MSJ, DNER y DTOP / PRHTA resolvieron individualmente la demanda mediante la firma de tres decretos de consentimiento por separado con USDOJ/EPA. A tenor con las negociaciones del acuerdo, y teniendo en cuenta el impacto económico de una sanción civil y la incapacidad documentada de los Demandados de Puerto Rico de pagar una sanción, el USDOJ/EPA acordó renunciar a la sanción civil monetaria asociada con las disposiciones alegadas en la demanda. Por lo tanto, los tres decretos de consentimiento se centran en remedios interdictales para permitir que los Demandados de Puerto Rico cumplan con las disposiciones legales y reglamentarias aplicables. El decreto de consentimiento de MSJ fue presentado ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (Tribunal de Distrito) el 26 de octubre de 2015. Los decretos de consentimiento de DNER y DTOP / PRHTA fueron presentados ante el Tribunal de Distrito el 23 de diciembre de 2015. En este momento, el USDOJ aún no ha presentado una moción ante el Tribunal de Distrito para la emisión de los decretos de consentimiento, ya que el USDOJ/EPA está evaluando los comentarios públicos recibidos durante el período público obligatorio a tenor con 28 C.F.R. s 50.7.

**Fondos Fiduciarios**

El SRE es el demandado en un procedimiento que cuestiona la constitucionalidad de la Ley Núm. 3-2013 y en otra demanda que cuestiona la constitucionalidad de la Ley Núm. 3-2013 y la Ley Núm. 32-2013. En la primera demanda, los demandantes solicitaron al SRE otorgar a los participantes de un patrono del SRE, los beneficios disponibles para ellos en virtud de la Ley Núm. 447 que fueron afectados por la Ley Núm. 3-2013, con las consecuencias económicas que esto conllevaría. El 13 de febrero de 2015, la Corte Suprema de Puerto Rico negó el recurso del demandante. El 6 de marzo de 2014, los demandantes presentaron una demanda enmendada, que incluyó a la Junta de Síndicos del SRE como demandada e incluyó una reclamación de agravio contra la Administración del SRE y su Junta de Síndicos. En la segunda demanda, los demandantes solicitaron la anulación de las disposiciones de la ley que imponen obligaciones económicas a los municipios a favor del SRE. La Ley Núm. 3-2013 impuso una aportación de $2,000 a todos los municipios y corporaciones públicas para cada persona retirada al 30 de junio de 2013 y la Ley Núm. 32-2013 impuso una aportación uniforme adicional de acuerdo con la proporción correspondiente de las contribuciones del patrono. El 5 de mayo de 2015, el Tribunal de Primera Instancia de Puerto Rico emitió una sentencia desestimando el caso. El 27 de julio de 2015 los demandantes presentaron recurso de apelación en el

214

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Tribunal de Apelaciones de Puerto Rico. El 5 de enero de 2016, el Tribunal de Apelaciones de Puerto Rico confirmó la decisión sobre la desestimación del caso. El 5 de abril de 2016, los demandantes presentaron un documento de Certiorari ante la Corte Suprema de Puerto Rico. La Corte Suprema de Puerto Rico aún tiene que emitir una sentencia al respecto. Si bien no se solicitó compensación económica en este segundo caso, si la Corte Suprema de Puerto Rico emite una sentencia que declara la invalidez de los artículos cuestionados, el SRE no recibirá los pagos impuestos por la Ley Núm. 3-2013 y la Ley Núm. 32-2013 al municipio y el SRE probablemente tendrá que devolver los pagos ya realizados en virtud de esas disposiciones legales. Con respecto a estas demandas, el SRE, en consulta con un asesor legal, ha informado que en esta etapa del procedimiento no pueden ofrecer una opinión sobre el resultado probable. En consecuencia, la gerencia no considera necesario incluir ninguna disposición en sus libros para estos casos y tiene la intención de impugnarlos enérgicamente.

El 29 de septiembre de 2011, dos beneficiarios de SRE presentaron una demanda derivada en el Tribunal de Primera Instancia del ELA de Puerto Rico, Parte de San Juan (el Tribunal del ELA) en el caso denominado *Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico, et. al v. UBS Fin. Servs. Inc. of Puerto Rico, et al.*, Tribunal Núm. KAC-2011-1067 (803) (P.R. Civil de Primera Instancia, 29 de septiembre de 2011) (la Acción UBS), que alega el incumplimiento de deberes fiduciarios e incumplimiento de contrato contra los suscriptores en la emisión y suscripción de $3,000 millones de bonos SRE en 2008. El 7 de diciembre de 2016, el Tribunal del ELA permitió que SRE interviniera y ordenó a los demandantes, que ahora incluyen a SRE y siete demandantes individuales (colectivamente, los Demandantes), que presenten una tercera demanda enmendada contra las aseguradoras, incluido UBS Financial Services Inc. de Puerto Rico (UBS) y entidades relacionadas (colectivamente, los Demandados de UBS). UBS se había desempeñado como reaseguradora principal de los bonos SRE de 2008.

Entre otras cosas, los Demandantes alegan que al participar como suscriptor principal de los Bonos SRE 2008, UBS violó sus obligaciones contractuales, no contractuales y fiduciarias con SRE. Los Demandantes buscan que UBS sea responsable ante SRE por más de $800 millones por el reaseguro de los Bonos SRE 2008.

El 6 de marzo de 2019, los Demandantes presentaron la Cuarta Demanda Enmendada contra los Demandados de UBS, que fue aceptada por el Tribunal del ELA el 15 de abril de 2019. El 29 de abril de 2019, UBS presentó su respuesta y una moción informativa sobre su intención de presentar una reconvención si se levantara la paralización automática del Título III de SRE. La reconvención propuesta adjunta a la moción informativa alega el incumplimiento del contrato y la indemnización que surgen de la emisión de SRE de los Bonos SRE 2008.

El 25 de junio de 2019, la Junta de Supervisión presentó una moción de paralización de ciertas cuestiones en disputa en espera de la elaboración de un plan de ajuste para el ELA. El 24 de julio de 2019, el Tribunal del Título III emitió una orden de paralización hasta el 30 de noviembre de 2019, varios procedimientos en oposición y objeciones de reclamaciones ante él con cuestiones superpuestas, incluidas las relacionadas con la validez de las emisiones de Bonos SRE. Debido a que estos temas superpuestos también están en juego en la Acción de UBS, UBS sostiene que la Acción de UBS en el Tribunal del ELA debe paralizarse hasta que el Tribunal del Título III resuelva estos problemas legales comunes.

UBS también ha presentado dos evidencias de reclamaciones contra SRE relacionadas con la Acción de UBS, así como dos evidencias de reclamaciones relacionadas con *Casasnovas Balado v. UBS Fin. Servs., Inc.*, No. KAC-2014-0072 (905) (Tribunal de Primera Instancia de P.R. 29 de enero de 2016), una acción presentada por un grupo de demandantes individuales que surge de las emisiones de bonos SRE.

**Unidades de Componentes de Presentación Discreta**

En el curso normal de sus operaciones, varias unidades de componentes de presentación discreta también están sujetas a garantías y otras acciones iniciadas por terceros que buscan daños o contraen compromisos. Dichas acciones se divulgan en los informes emitidos por separado de las unidades de componentes mayores de presentación discreta, que se incluyen a continuación. Respecto a los compromisos relacionados con garantías. Estos compromisos y garantías se resumen a continuación:

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

### (a) BGF

Al 30 de junio de 2017, el BGF tenía garantías financieras para el sector privado de aproximadamente $284 millones. Además, al 30 de junio de 2017, las cartas de crédito standby para el sector público eran de aproximadamente $1,300 millones. Los compromisos para ofrecer crédito al sector público fueron de aproximadamente $1,400 millones, mientras que no hubo compromisos para extender el crédito al sector privado.

El 24 de julio de 2013, Aerostar Airport Holdings, LLC (Aerostar) y PRPA celebraron un contrato de arrendamiento del Aeropuerto Internacional Luis Muñoz Marín (LMMIA), por un período de 40 años. En relación con el arrendamiento de LMMIA, el BGF ejecutó una garantía de pago a favor de Aerostar por los daños por terminación debidos y pagaderos en efectivo por PRPA en virtud del contrato de arrendamiento. De acuerdo con la garantía de del BGF, Aerostar tiene el derecho de rescindir el contrato de arrendamiento principalmente en tres escenarios diferentes de incumplimiento por parte de PRPA. El monto de los Daños por Rescisión consiste principalmente, entre otros componentes, en el Valor de Arrendamiento de la Instalación LMMIA y la Compensación de Arrendamiento tal como se define en el acuerdo.

El 22 de septiembre de 2011, Autopistas Metropolitanas de Puerto Rico, LLC (Metropistas) y PRHTA celebraron un acuerdo de concesión (el Acuerdo de Concesión) para la administración de las autopistas PR-22 y PR-5, que la PRHTA recibió a cambio de un pago global $1,100 millones y un compromiso para realizar mejoras inmediatas en las carreteras de peaje que ascienden a $56 millones y cumplir con los estándares operativos de clase mundial, lo que puede requerir invertir más de $600 millones durante la vigencia de la concesión. En relación con el cierre del Contrato de Concesión, el BGF ejecutó una garantía de pago a favor de Metropistas según la que el BGF actúa como garante de los Daños por Rescisión, según se define en el Contrato de Concesión, debidos y pagaderos en efectivo por PRHTA en virtud del Contrato de Concesión. El monto de los Daños por Rescisión consiste, entre otros componentes, en el valor de mercado del interés de Metropistas sobre las autopistas con peaje. Al mismo tiempo, en relación con la garantía de pago, el BGF y la PRHTA también celebraron un Acuerdo de Reembolso por el cual la PRHTA acordó reembolsar al BGF cualquier monto pagado en virtud de la garantía.

La PRHFA actúa como administrador de una serie de préstamos hipotecarios de otros inversores. El servicio generalmente se subcontrata con un tercero. Al 30 de junio de 2017, el saldo del capital de los préstamos hipotecarios cobrados por terceros es aproximadamente el siguiente (en miles):

| Entidad | | Monto |
|---|---|---|
| Desarrollo de la Comunidad de Puerto Rico Fondo I | $ | 29,302 |
| Oficina de Administración de los Activos de la Corporación de Renovación Urbana y Vivienda o su sucesor sin pagos garantizados de préstamos hipotecarios | | 19 |
| Total | $ | 29,321 |

El BGF y algunas de sus unidades de componentes están sujetos a varias demandas que surgen del curso normal de los negocios. La gerencia, con base en el asesoramiento de un asesor legal, es de la opinión de que la responsabilidad final, si la hubiera, resultante de estos procedimientos pendientes no tendrá un efecto material adverso en la posición financiera y los resultados de las operaciones de del BGF o sus unidades de componentes.

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(b) ACT*

La PRHTA es demandada o codemandada en varios juicios por supuestos daños en casos relacionados principalmente con proyectos de construcción. Estos generalmente están total o parcialmente cubiertos por el seguro. Los contactores están obligados, a tenor con los términos de los acuerdos de construcción, a contratar un seguro de responsabilidad civil adecuado y a eximir de responsabilidad a la PRHTA de los juicios presentados a causa de los daños relacionados con la construcción de los proyectos. Al 30 de junio de 2017, la PRHTA, de acuerdo con la asesoría legal, ha registrado un pasivo de aproximadamente $105 millones por pérdidas probables en aquellas reclamaciones no cubiertas completamente por el seguro. En opinión del asesor legal, cualquier responsabilidad que exceda la responsabilidad registrada que pueda surgir por tales reclamaciones no será significativa para la posición financiera o los resultados de las operaciones de la PRHTA. A partir del 21 de mayo de 2017, la PRHTA es deudora en un caso de Título III según PROMESA y, como resultado, estos casos se suspenden durante la tramitación del caso de Título III de PRHTA.

*(c) AEE*

En 2009, un gran incendio en una granja de tanques propiedad de APECO causó daños importantes en las áreas circundantes. La AEE almacenaba parte de su combustible en esta instalación. A raíz del incendio, se presentaron numerosas reclamaciones contra CAPECO. Algunos de los demandantes incluyeron a la AEE como demandada en estas demandas, alegando que la AEE no cumplió con su deber (como propietario del combustible almacenado en el sitio) de supervisar adecuadamente las operaciones de CAPECO en el depósito de tanques. El 12 de agosto de 2010, CAPECO se declaró en quiebra. Como resultado, se paralizaron todos los procedimientos contra CAPECO. Posteriormente, finalizó el procedimiento de quiebra de CAPECO. Posteriormente, la AEE también inició un procedimiento de quiebra. El caso puede reactivarse, si se declara ha lugar el levantamiento de la paralización en el procedimiento de quiebra de la AEE.

En 2011, varios consumidores presentaron demandas separadas contra la AEE en reclamación de daños supuestamente causados por prácticas de facturación incorrectas e ilegales. Las demandas han sido consolidadas y certificadas como litigios complejos, según lo solicitado por la AEE. Los consumidores reclaman daños por más de $100 millones y solicitaron que el caso sea certificado como una demanda colectiva. La AEE presentó su respuesta en oposición a la solicitud de certificación de demanda colectiva. Todavía se están llevando a cabo procedimientos de descubrimiento en aquellos casos que aún no se han desestimado. El 7 de diciembre de 2016, se celebró una Conferencia sobre el estado y se asignó un nuevo juez. El 23 de marzo de 2017, se realizó una conferencia y, como resultado, se programó una vista para la certificación de demanda colectiva el 16 de agosto de 2017. Sin embargo, el 3 de julio de 2017, la AEE se declaró en quiebra según el Título III de PROMESA. La AEE presentó el aviso de paralización ante el tribunal estatal el 12 de julio de 2017 y la sentencia correspondiente para suspender el caso se presentó el 11 de agosto de 2017. La AEE defenderá enérgicamente estos casos y sos tiene que no hay causas de acción radicadas contra la AEE.

En 2011, ocho personas privadas y una corporación privada local presentaron una demanda civil contra la AEE y sus directores en un tribunal federal de Puerto Rico, alegando violaciones de la Ley de Organizaciones Corruptas e Influenciadas por Asociación Ilícita (Ley RICO), que incluye el uso ilegal de una empresa para lavar dinero generado por un patrón de actividad de crimen organizado, la manipulación ilegal de una empresa con el fin de participar, ocultar o beneficiarse de un patrón de actividad de crimen organizado, conspiración ilegal para violar la Ley RICO y conspiración para avanzar en un plan de lavado de dinero. Ni el gobierno de los Estados Unidos ni el ELA forman parte en esta demanda civil. No se ha especificado el monto reclamado. Los demandantes también han solicitado al tribunal federal que les permita ser representantes de una demanda colectiva formada por todos los consumidores de la electricidad vendida por la AEE desde 2007 hasta el presente. La AEE se opuso a la certificación de la demanda colectiva y recibió el rechazo del tribunal. El 25 de septiembre de 2012, el tribunal federal desestimó todas las reclamaciones anteriores, excepto aquellos relacionados con la conspiración para avanzar en un esquema de lavado de dinero y conspiración para adquirir un interés en una empresa. La AEE cree que las reclamaciones no rechazadas de la Ley RICO carecen de fundamento

217

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

porque los demandantes no podrán probar los elementos necesarios de esas reclamaciones, en particular que pretenden demostrar que la AEE conspiró a través de sus empleados para violar la Ley RICO, o que sus directores o Junta los miembros obtuvieron algún interés en la AEE (que no sea su puesto en la Junta). La AEE continuará defendiendo enérgicamente este caso.

En 2009, la AEE presentó una demanda en el tribunal del ELA contra Vitol, Inc. y algunas de sus afiliadas y subsidiarias que buscaban un juicio declarativo sobre la nulidad de un acuerdo de suministro de combustible de $2,000 millones debido a que Vitol no divulgó ciertos casos de corrupción por los cuales aceptó responsabilidad. Vitol retiró esta demanda ante un tribunal federal y presentó una reconvención alegando que la AEE le debía aproximadamente $45 millones para combustible entregado y arbitrios relacionados. El 28 de noviembre de 2012, la AEE presentó una segunda demanda contra Vitol en el Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico buscando esencialmente los mismos remedios solicitados en la primera acción, pero en cuanto a otros cuatro contratos, después del descubrimiento reveló la fecha en que Vitol se tomó conocimiento de las investigaciones en los casos de corrupción. Vitol también retiró esta acción ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La AEE reclama aproximadamente $3,500 millones en total. Vitol ha resuelto la reclamación por los $17 millones en impuestos a las ventas y ha declarado que modificará su reconvención para desestimar esa reclamación. Se ha cerrado el descubrimiento en el caso. Las partes han presentado mociones de juicio sumario entre ellas y están en proceso de presentar sus respectivas oposiciones a las mismas. Las mociones están pendientes de adjudicación por el tribunal. El 16 de marzo de 2016, el Tribunal de Distrito concedió las solicitudes de prisión preventiva de la AEE y remitió ambos casos al Tribunal del Estado. El 8 de abril de 2016, Vitol apeló ante el Tribunal de Apelaciones del Primer Circuito de los Estados Unidos (el Primer Circuito) la orden de remitir los casos al Tribunal Estatal. El Primer Circuito confirmó la orden de remitir el caso al Tribunal del Estado. Vitol solicitó una nueva vista ante el pleno de dicha sentencia y el Primer Circuito denegó la solicitud de nueva vista sobre las reclamaciones de la AEE, pero dejó pendiente su decisión sobre la reconvención debido a que dicha reconvención fue suspendida como resultado de la petición de la AEE, según el Título III de PROMESA. Vitol una vez más trasladó el caso del Tribunal Estatal al Tribunal de Distrito, pero esta vez a tenor con las disposiciones del Título III.

Cincuenta y cuatro demandantes, antiguos y actuales empleados de la AEE, afirman que tienen problemas de salud debido al incumplimiento intencional de la AEE de las leyes federales y locales con respecto a los materiales con asbesto. En particular, los demandantes afirman que, durante un período de tiempo determinado, en el que la AEE tenía la obligación de tomar medidas con respecto a los materiales con asbesto en sus instalaciones, la AEE no cumplió con su deber de proteger a los demandantes contra la exposición al asbesto. Los demandantes reclaman aproximadamente $321 millones en daños. La AEE alega la inmunidad del patrono según la Ley de Compensación de Trabajadores. Se llevó a cabo una vista probatoria sobre el tema. Después del juicio, el Tribunal emitió una sentencia desestimando las reclamaciones en su totalidad. Los demandantes presentaron una apelación ante el Tribunal de Apelaciones de Puerto Rico. La AEE presentó una moción para desestimar la apelación. El Tribunal de Apelaciones negó la moción de la AEE para desestimar y la AEE presentó su escrito de apelación. El caso está pendiente de resolución por parte del Tribunal de Apelaciones.

El 21 de noviembre de 2013, Tropical Solar Farms, LLC; Nuevo Horizon Solar, LLC; Jonas Solar Energy, LLC; y Roberto Torres (colectivamente, los Demandantes) presentaron una demanda en el Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico, Sección Ponce, contra 29 demandados y varias personas desconocidas. La demanda contiene una gran cantidad de reclamaciones contra múltiples demandados que surgen de una supuesta multiplicidad de fuentes de obligaciones: contractuales, extracontractuales y en incumplimiento de los deberes fiduciarios y la ley. Abarca entidades privadas, una corporación pública, la AEE y ex funcionarios públicos, entre otros. La demanda reclama una compensación monetaria superior a $705 millones. La demanda alega que los demandados negociaron varios Acuerdos de Compra de Energía Renovable para suministrar hasta 40 megavatios a la AEE, que fueron asignados por los demandantes a otros demandados. Los Demandantes alegan que los demandados nunca tuvieron la intención de cumplir con sus obligaciones según los acuerdos, y solo estaban comprando tiempo para avanzar en sus otros proyectos de energía renovable con la AEE.

218

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

La AEE presentó una moción para desestimar y el 2 de octubre de 2015, se emitió una sentencia parcial desestimando todas las reclamaciones en el caso contra la AEE con perjuicio. Tropical Solar apeló la desestimación ante el Tribunal de Apelaciones de Puerto Rico. En la apelación, los Tribunales de Apelaciones de Puerto Rico modificaron la desestimación de las reclamaciones contra la AEE de una desestimación con perjuicio a una desestimación sin perjuicio. Cualquier reclamación posterior presentada por Tropical Solar contra AEE se abordará en el procedimiento de Título III de AEE.

Además de estos casos, la AEE forma parte de otros litigios típicos para una empresa de energía eléctrica, pero la gerencia estima que los montos de tales reclamaciones no son materiales y no afectarán negativamente las operaciones de la AEE. Estos otros casos permanecen en etapas de descubrimiento y la AEE los defenderá enérgicamente.

*Investigación de la Comisión de Mercados y Valores*

La SEC solicitó información sobre la emisión de bonos de la AEE desde 2012 y 2013. La AEE está cooperando en la investigación, lo que incluye proporcionar a la SEC documentos e información. La SEC también envió lo que se conoce como notificaciones de cartas de Wells a la AEE, y a los banqueros de inversión, asesores financieros y asesores legales que ayudaron a estructurar todas las emisiones de bonos relacionadas bajo el alcance de su investigación. Las cartas de Wells notifican al destinatario que está siendo investigado por la SEC y presentan una oportunidad para que todos los destinatarios de dichas notificaciones respondan a cualquier demanda de la SEC. La SEC ha informado que las solicitudes de información no deben interpretarse como una indicación de que se ha producido una violación de las leyes federales de valores. La AEE continúa cooperando con la SEC con respecto a su investigación de estas emisiones de bonos. Este asunto está en curso y no se puede predecir cuándo se concluirá o su resultado.

La AEE es demandada o codemandada en varios juicios relacionados con su negocio, algunos con montos sustanciales. En esos casos, la gerencia y el asesor legal creen que el resultado del litigio será desfavorable para la PREPRA, se ha establecido una provisión para cubrir los pasivos estimados. La administración de la AEE, basada en las consultas con el asesor legal, cree que los pasivos adicionales, si los hubiere, que resulten de la resolución final de estos asuntos no tendrá un efecto material en la posición financiera o los resultados de las operaciones de la AEE. Al 3 de julio de 2017, la AEE es deudora en un caso del Título III, según PROMESA y, como resultado, estos casos se suspenden durante la tramitación del caso del Título III de la AEE.

*(d) AAA*

La AAA es demandada en un juicio presentado por los clientes alegando que la AAA ha facturado en exceso debido a la metodología utilizada para estimar el consumo. Hay un caso en el que los demandantes solicitaron una certificación de la demanda como demanda colectiva y solicitan daños por recuperación y un interdicto que prohíbe a la AAA continuar facturando con la metodología actual. La vista de certificación de demanda colectiva se realizó en junio de 2011, se emitió una certificación para una demanda colectiva. La AAA apeló la certificación de demanda colectiva y espera la decisión del Tribunal sobre la solicitud. La exposición potencial de la AAA de estas demandas es poco probable y, como tal, no se informan pasivos en los estados financieros básicos auditados de la AAA.

La AAA es demandada o codemandada en varios otros juicios. El resultado final de las demandas no se puede determinar actualmente. Sin embargo, la gerencia de la AAA, basada en el asesoramiento de los asesores legales, es de la opinión de que estas demandas no tendrán un impacto material en sus estados financieros básicos auditados independientes.

*(e) UPR*

La UPR participa en varios programas federales de asistencia financiera. Estos programas están sujetos a auditorías de acuerdo con las disposiciones de la "Súper Circular" de OGP, Auditorías de Estados, Gobiernos Locales y Organizaciones Sin Fines de Lucro; o auditorías de cumplimiento por parte de las agencias otorgantes. El monto, si corresponde, de los gastos que las agencias otorgantes pueden rechazar no se puede determinar en este momento. La gerencia cree que el impacto no será material para los estados financieros básicos de la UPR.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Se han presentado reclamaciones por negligencia médica contra el hospital de la UPR y actualmente se encuentran en varias etapas de litigio. El asesor legal y la gerencia del hospital la UPR creen que las acumulaciones registradas son adecuadas para proporcionar pérdidas potenciales resultantes de litigios pendientes o amenazados, así como reclamaciones de incidentes desconocidos que pueden afirmarse como resultado de los servicios prestados a los pacientes. Según la Ley Núm. 98-1994, la pérdida máxima por reclamaciones contra el hospital de la UPR está limitada a $75,000 por persona, o $150,000 si involucra acciones por daños a más de una persona o cuando una sola parte lesionada tiene derecho a varias causas de acción. La gerencia del hospital la UPR y su asesor legal creen que el resultado de estas reclamaciones no tendría un efecto material en la UPR o las operaciones del hospital.

*Compromisos y contingencias ambientales*

Las siguientes operaciones de unidades de componentes de presentación discreta realizan cabo actividades específicas que están sujetas a las regulaciones ambientales estatales y federales:

**(a) AEE**

Las instalaciones y operaciones de la AEE están sujetas a regulaciones de numerosas leyes ambientales federales y del ELA, que incluyen la Ley de Aire Limpio, la Ley de Agua Limpia, la Ley de Contaminación por Petróleo (OPA), la Ley de Recuperación de Conservación de Recursos (RCRA), la Ley de Respuesta Ambiental Integral, Compensación y Responsabilidad (CERCLA), y Tanques de Almacenamiento Subterráneos, entre otras.

En febrero de 1992, la EPA realizó una inspección multimedia de las instalaciones de la AEE e identificó varios supuestos casos de incumplimiento relacionados con el control de prevención de derrames de aire, agua y petróleo de la AEE y los programas de cumplimiento de contramedidas. La AEE y la EPA negociaron para resolver los problemas relacionados con las deficiencias observadas durante la inspección y para garantizar el cumplimiento futuro de todas las leyes y regulaciones aplicables. Como resultado de las negociaciones, la AEE y la EPA llegaron a un acuerdo que resultó en un decreto de consentimiento (el Decreto de Consentimiento) aprobado por el tribunal federal de los Estados Unidos en marzo de 1999. Según los términos y condiciones del Decreto de Consentimiento, la AEE pagó una multa civil de $1.5 millones e implementó medidas de cumplimiento adicionales por un valor de $4.5 millones. Asimismo, el Decreto de Consentimiento requiere que la AEE mejore e implemente programas y operaciones de cumplimiento para asegurar el cumplimiento de las leyes y regulaciones ambientales.

En 2004, el tribunal federal de los Estados Unidos aprobó una modificación al Decreto de Consentimiento en el cual la AEE redujo el contenido de azufre en el aceite combustible Núm. 6 usado en ciertas unidades generadoras de sus Centrales Eléctricas Costa Sur, Aguirre, Palo Seco y San Juan. Además, la AEE ha completado un programa de reducción de emisiones de óxido de nitrógeno y modificado los rangos óptimos de operación para todas sus unidades según el Decreto de Consentimiento.

La AEE cree estar en cumplimiento sustancial con los programas del Decreto de Consentimiento. El 22 de julio de 2014, representantes de la Autoridad, la EPA y el Departamento de Justicia de los Estados Unidos ("DOJ") se reunieron para analizar la terminación de algunos de los Programas. Como resultado, la EPA y el DOJ solicitaron a la AEE que envíe información sobre el cumplimiento de la Autoridad con los Programas para su revisión y evaluación. El 25 de septiembre de 2014, la AEE se reunió nuevamente con representantes de la EPA y el DOJ y presentó la información solicitada, junto con una carta en la que AEE solicitó formalmente a la EPA que revise y apruebe la finalización de las disposiciones de dichos programas del Decreto de Consentimiento y su Modificación presentada en 2004, y comenzó el proceso para presentar conjuntamente en el Tribunal una estipulación para la rescisión parcial de dichos programas.

Para lograr este objetivo, la AEE sugirió nombrar un grupo de trabajo compuesto por representantes de la EPA y la AEE para programar y reunirse para abordar los detalles, lo que fue aceptado por la EPA. Para mayo de 2018, se realizaron cabo reuniones del grupo de trabajo entre la AEE y la EPA, y la EPA y el DOJ están revisando un borrador del documento. Una vez que el documento sea definitivo, debe pasar por un proceso público para su aprobación final.

En 2002, la AEE recibió un "Aviso especial sobre investigación de recuperación/Estudio de viabilidad del suelo"

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

en el sitio del Superfondo de eliminación de desperdicios sólidos de Vega Baja. La EPA ha identificado a la AEE y otras seis entidades como "partes potencialmente responsables", tal como se define en la CERCLA.

El 25 de abril de 2013, se presentó el Decreto de Consentimiento (CD) Acción Civil Núm. 12-1988 (ADC) en el Tribunal de los Estados Unidos, Distrito de Puerto Rico. Un Acuerdo de Depósito Ambiental (EEA) fue celebrado por y entre el BGF, como agente de plica, ATPR, el Departamento de Vivienda de Puerto Rico (PRHD) y la AEE y la EPA. El EEA se creó para servir como garantía financiera para el cumplimiento de la obligación bajo el decreto de consentimiento. El 24 de junio de 2013, la AEE depositó $400,000 en la cuenta de plica del BGF, según lo dispuesto en el decreto de consentimiento. Las cuentas y los pagos en el BGF se retienen debido al proceso de reestructuración. La cuenta de plica ahora está depositada en un banco comercial. Si el saldo de la cuenta de plica se reduce por debajo de $250,000, la AEE, ATPR y PRHD establecerán y mantendrán una garantía de cumplimiento para el beneficio de la EPA equivalente a la diferencia del saldo de la cuenta de plica y $250,000. Las Agencias Públicas pueden optar por cumplir este requisito de garantía de cumplimiento, ya sea individualmente, proporcionando garantías de cumplimiento por separado que sumen el monto requerido a mantenerse como se establece anteriormente, o colectivamente.

La AEE, en representación de ATPR y PRHD, ha solicitado los desembolsos con cargo a esta cuenta y se han procesado los pagos. Todos los pagos que deben cargarse contra esta cuenta son para cubrir proyectos requeridos por el decreto de consentimiento. Si los pagos no se cumplen, los servicios pueden ser suspendidos por los contratistas, lo que resultará en la aplicación de multas por incumplimiento, según lo acordado por las partes.

La AEE pagará a la EPA todos los costos de respuesta futuros que no sean incompatibles con el Plan Nacional de Contingencia. No se informó a la AEE informada sobre estos costos y no puede determinar un monto estimado, por lo que no hay monto registrado en los estados financieros.

Este Decreto de Consentimiento puede rescindirse mediante la moción de cualquiera de las partes, siempre que todos los demandados públicos hayan cumplido con sus obligaciones de pago de Costo de Respuesta y Sanciones Estipuladas. La rescisión de este Decreto de Consentimiento no afectará los Pactos de No Demandar, incluidas todas las reservas relacionadas con esos pactos y no afectará ninguna obligación continua de los Demandados en Acuerdo.

La AEE continúa desarrollando e implementando un programa integral para mejorar el cumplimiento ambiental en todos los medios ambientales aplicables. Este programa ha sido y continúa siendo actualizado para cumplir con los nuevos requisitos reglamentarios.

*(b)* *AAA*

Las instalaciones y operaciones de los sistemas de agua y alcantarillado de la AAA están sujetas a las regulaciones de las leyes ambientales federales y del ELA. La AAA está sujeta a dos (2) acuerdos aprobados por el tribunal para exigir el cumplimiento de dichas leyes ambientales, uno con el Departamento de Salud del Gobierno de Puerto Rico ("PRDOH") relacionado con violaciones a la Ley de Agua Potable Segura ("SDWA") y el otro con el Gobierno de los Estados Unidos, actuando en nombre de la EPA, en relación con violaciones de la Ley de Agua Limpia ("CWA").

El 15 de diciembre de 2006, se firmó un Acuerdo (Caso Civil Núm. KPE 2006-0858) entre la AAA y Vivienda (el Acuerdo Vivienda) para abordar el cumplimiento de la SDWA. El Acuerdo de Vivienda finalmente fue aprobado por el tribunal el 20 de junio de 2008. La AAA acordó implementar un plan de trabajo para remediar las violaciones de la SDWA y un procedimiento para abordar las violaciones futuras que puedan surgir, establecer medidas preventivas y de mitigación y ejecutar un programa de mantenimiento preventivo con el propósito de cumplir con los requisitos de la SDWA. La SDWA Ley requiere el cumplimiento de los parámetros de calidad del agua y técnicas de tratamiento en los sistemas de agua de la AAA. Como parte del Acuerdo de Vivienda, la AAA pagó una multa civil de $1 millón durante el año fiscal que finalizó el 30 de junio de 2007 por supuestos incumplimientos de la SDWA. El Acuerdo de Vivienda requiere que la AEE se autoevalúe y pague las sanciones estipuladas por no cumplir con los plazos de las medidas correctivas, no presentar los entregables o exceder los niveles máximos de contaminantes.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Además, según el Acuerdo de Vivienda, la AAA invocó la protección de fuerza mayor por demoras e incumplimientos incurridos atribuibles al impacto devastador de los huracanes Irma y María que azotaron a Puerto Rico en septiembre de 2017. Vivienda ha proporcionado el alivio solicitado por la AAA en cada caso en particular.

El 15 de septiembre de 2015, el Departamento de Justicia (DOJ), por solicitud del Administrador de la EPA, presentó una demanda (la Demanda) contra la AAA y el ELA, como parte requerida (a tenor con la Sección 309[e]) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal de Distrito). La Demanda solicitaba remedios interdictales y la evaluación de sanciones civiles contra la AAA por presuntas violaciones de la CWA. Específicamente, la Demanda alega que la AAA violó la Sección 301(a) de la CWA al descargar contaminantes, por no cumplir con los términos de los permisos del Sistema Nacional de Eliminación de Descargas de Contaminantes (NPDES) emitidos a las instalaciones de la AAA según la Sección 402 de la CWA, por no informar des cargas no autorizadas requeridas por tales permisos, y no cumplir requisitos de operación y mantenimiento para ciertas plantas de tratamiento de agua y plantas de tratamiento de aguas residuales.

Simultáneamente con la presentación de la Demanda, el DOJ presentó el 15 de septiembre de 2015 un Decreto de Consentimiento entre la EPA, la AAA y el ELA que resolvió los asuntos cubiertos en la Demanda, en los términos acordados por la AAA, el DOJ y la EPA. El Decreto de Consentimiento de la EPA es el resultado de un extenso proceso de negociación dirigido, entre otras cosas, a resolver las reclamaciones cubiertas en la Demanda y los requisitos de los decretos de consentimiento previos relacionados con las alegaciones incluidas en la Demanda, específicamente con el objetivo de implementar un Plan de cumplimiento de permisos de NPDES en todo el sistema, continuar con la implementación de planes operativos y de mantenimiento en todas las instalaciones de la AAA, implementando medidas correctivas para abordar las descargas y las presuntas violaciones a la CWA que ocurren dentro del sistema de recolección de aguas residuales de la AAA en la Planta de Tratamiento de Aguas Residuales de Puerto Nuevo ("WWTP") en el municipio de San Juan.

La AAA comenzó las negociaciones que condujeron a la celebración del Decreto de Consentimiento de la EPA para mitigar los y consolidar en un decreto de consentimiento los costos elevados del programa de mejora de capital elevado exigido por los decretos de consentimiento existentes. A pesa r de estar en cumplimiento material con los requisitos del proyecto de mejoras de capital de los decretos de consentimiento existentes, la AAA inició conversaciones con el DOJ, en nombre de la EPA, la EPA y Vivienda, buscando que se reconozca un sistema de priorización del programa de mejoras de capital para, entre otras cosas: (i) reducir los gastos anuales requeridos del proyecto y extender los plazos de cumplimiento, (ii) incorporar otros proyectos regulatorios incluidos en el programa de mejora de capital de la AAA no cubiertos actualmente por un decreto de consentimiento, e (iii) incluir los requisitos del programa de operación, mantenimiento y mejora de capital relacionados con el sistema de alcantarillado de la PTAR Puerto Nuevo, incluyendo supuestos desbordamientos combinados de alcantarillado. El 23 de mayo de 23,2016, el Tribunal de Distrito emitió una sentencia aprobando el Decreto de Consentimiento consolidado de la EPA. Se desestimó la demanda y se cerró el caso civil número 15-2283. En diciembre de 2016, la AAA solicitó una extensión de tiempo a la EPA a tenor con la Sección XIII - Modificación/Priorización de medidas correctivas para ciertos proyectos del Decreto de Consentimiento que incluye las medidas correctivas para abordar las descargas de aguas residuales en plantas de tratamiento de agua y aguas residuales.

Además, según el Decreto de Consentimiento de la EPA, la AAA invocó la protección de fuerza mayor por demoras e incumplimientos incurridos atribuibles al impacto de los huracanes Irma y María en septiembre de 2017.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Compromisos de construcción*

Al 30 de junio de 2017, las siguientes unidades de componentes de presentación discreta mantuvieron varios acuerdos de construcción no gastados, a saber (en miles):

|  |  | **Monto** |
|---|---|---|
| Mayor: |  |  |
| AEE |  | $ 178,000 |
| ACT |  | 151,300 |
| UPR |  | 62,600 |
| CFSE |  | 36,000 |
|  | Subtotal | 427,900 |
| No mayor |  | 39,619 |
|  |  | $ 467,519 |

*Acuerdos de concesión de servicio (SCA)*

**(c) ACT**

El 22 de septiembre de 2011, la PRHTA celebró un acuerdo de concesión de autopistas con peaje (el Contrato de concesión de servicios de autopistas) con Autopistas Metropolitanas Puerto Rico, LLC (el Concesionario), donde la PRHTA otorgó al Concesionario el derecho a financiar, operar y mantener las autopistas PR-5 y PR-22 (las autopistas con peaje) por un período de 40 años. Durante el plazo de 40 años, el Concesionario tendrá derecho a cobrar y recaudar los peajes impuestos en las Autopistas con Peaje. La PRHTA recibió un pago inicial de la tarifa de concesión de aproximadamente $1,100 millones, de los cuales se usaron aproximadamente $873 millones para canjear o cancelar ciertos bonos emitidos y pendientes asociados con las autopistas. A tenor con las disposiciones de la Declaración GASB Núm. 60, *Informes Contables y Financieros para Acuerdos de Concesión de Servicios*, la PRHTA reconoció una entrada diferida de recursos de aproximadamente $1,100 millones, que se amortizarán y reconocerán como ingresos durante el plazo de 40 años del acuerdo. La PRHTA reconocerá aproximadamente $28.4 millones anualmente hasta el año fiscal 2052 como resultado de la amortización de la entrada diferida de recursos reconocidos. Las Autopistas con Peaje continuarán presentándose como un activo de la PRHTA, que al 30 de junio de 2017 ascendía a aproximadamente $139.4 millones, pero no se deprecian desde el 22 de septiembre de 2011 hasta el final del acuerdo en 2052, como el acuerdo de concesión requirió que el Concesionario devolviera las Autopistas con Peaje a la PRHTA en su estado original o mejorado. Las mejoras en las Concesiones de Autopistas con Peaje se reconocen en los registros de la PRHTA en cuanto se completan y se ponen en funcionamiento.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El 19 de abril de 2016, la PRHTA celebró una enmienda al Acuerdo de Concesión de Servicios de Autopistas con Peaje para extender el plazo original por 10 años adicionales y crear cinco puntos de peaje bidireccionales en las autopistas PR-5 y PR-22. La PRHTA recibió un pago inicial de la tarifa de concesión de aproximadamente $100 millones, que se utilizó para pagar aproximadamente $18.2 millones de las deudas actuales de la PRHTA y aproximadamente $79.8 millones de las deudas del ELA en el año fiscal 2016. Además, en junio de 2017, la Autoridad recibió aproximadamente un pago adicional de $15 millones al mismo tiempo que el inicio del sistema bidireccional descrito anteriormente.

El 20 de diciembre de 1992, la PRHTA y Autopistas de Puerto Rico y Compañía S.E. (Autopistas) celebró un acuerdo de concesión de servicios (modificado en 2004 y 2009, el Acuerdo de Concesión de Servicios de Puente, y junto con el Acuerdo de Concesión de Servicios de Autopistas, el Acuerdo de Concesión de Servicios) para el diseño, construcción, operación y mantenimiento del Puente Teodoro Moscoso (el Puente), un puente de peaje que cruza la laguna de San José entre los municipios de San Juan y Carolina. El plazo inicial de este acuerdo fue de 35 años, que caduca el 3 de abril de 2027, pero se ha modificado posteriormente al 9 de septiembre de 2009 para extender el plazo a 50 años hasta 2044. Además, a tenor con las disposiciones de GASB Núm. 60, al 30 de junio de 2013, la PRHTA reconoció el Puente a su valor justo de mercado estimado de aproximadamente $109.5 millones, amortizado durante una vida útil estimada de 59 años, y una entrada diferida de recursos, también de aproximadamente $109.5 millones que se amortizarán y reconocerán como ingresos durante el plazo restante del acuerdo.

Las concesiones de autopistas con peaje y puentes en virtud de los acuerdos de concesión de servicios, netas al 30 de junio de 2017, consistieron en (en miles):

|  |  |  |
|---|---|---|
| Concesión de autopistas con peaje | $ | 90,740 |
| Mejoras en la concesión de autopistas con peaje | | 48,646 |
| Concesión de puentes | | 60,102 |
| Total | $ | 199,488 |

Las entradas diferidas de recursos al 30 de junio de 2017 consistieron en aproximadamente $1,100 millones relacionados con el Contrato de Concesión de Carreteras de Peaje.

**(18) Sistemas de retiro**

Los Sistemas de Retiro emiten estados financieros básicos auditados independientes, que están disponibles públicamente e incluyen la información complementaria requerida y cualquier otra información complementaria requerida. Cada sistema es independiente; por lo tanto, sus activos o pasivos no pueden transferirse de un sistema a otro ni usarse para ningún otro propósito que no sea beneficiar a los participantes de cada sistema.

**(a) SRE**

Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Descripción del plan:* antes del 23 de agosto de 2017, el SRE implementó un plan de pensión de beneficios definidos, de patronos múltiples y de beneficios definidos administrado por los empleados del gobierno de Puerto Rico y la Administración de Sistemas Judiciales de Retiro (SRE y Administración del SRJ). Es un fideicomiso creado por la Ley Núm. 447-1951, según enmienda, para proporcionar pensiones y otros beneficios a los empleados jubilados del ELA, sus corporaciones públicas y los municipios de Puerto Rico. El SRE comenzó a operar el 1 de enero de 1952, cuando comenzaron las contribuciones de los patronos y los empleados participantes. El SRE es un fondo fiduciario de pensiones del ELA.

Antes del 23 de agosto de 2017, el SRE administraba diferentes estructuras de beneficios a tenor con la Ley Núm. 447-1951, que incluía un programa de beneficios definidos y de patronos múltiples, un programa de aportación definida (programa System 2000) y un programa de contribuciones híbridas. Las disposiciones de beneficios varían según la fecha de contratación del miembro. Sustancialmente, todos los empleados de tiempo completo del ELA y sus organismos (73 agencias del ELA, 78 municipios y 55 corporaciones públicas, incluido el SRE) estaban cubiertos por el SRE. La membresía era obligatoria para todos los empleados regulares, nombrados y temporales del ELA en la fecha de empleo. La membresía es opcional para el Gobernador del ELA, los secretarios del ELA, el jefe de las agencias y organismos públicos, entre otros.

Los beneficios proporcionados a los miembros del SRE fueron establecidos mediante un estatuto del ELA y solo pueden ser modificados por la Legislatura con la aprobación del Gobernador. La Ley Núm. 3-2013, junto con otros cambios recientes de financiamiento y diseño, estableció una reforma integral del SRE. Este resumen detalla las disposiciones de la Ley Núm. 3-2013, que estaban vigentes antes del 23 de agosto de 2017.

Ciertas disposiciones son diferentes para los tres grupos de miembros que ingresaron al SRE antes del 1 de julio de 2013 como se describe a continuación:

- Los miembros de la Ley Núm. 447-1951 son generalmente los miembros contratados antes del 1 de abril de 1990 (programa contributivo de beneficios definidos).

- Los miembros de la Ley Núm. 1-1990 son generalmente los miembros contratados a partir del 1 de abril de 1990 o antes del 31 de diciembre de 1999 (programa contributivo de beneficios definidos).

- Los miembros de la Ley Núm. 305-1999 o Sistema 2000 son generalmente los miembros contratados a partir del 1 de enero de 2000 o antes del 30 de junio de 2013 (programa de aportación definida).

Todos los empleados regulares contratados por primera vez el 1 de julio de 2013 o después, y los exempleados que participaron en el programa de beneficios definidos y el programa System 2000, y fueron recontratados a partir del 1 de julio de 2013, se unieron al Programa de contribuciones híbridas como condición para su empleo. Asimismo, los empleados que al 30 de junio de 2013 participaban en programas anteriores se unieron al Programa de Contribuciones Híbridas el 1 de julio de 2013.

Cada miembro tenía un derecho firme sobre el valor de su cuenta. Los miembros tenían tres opciones para invertir sus contribuciones. Los ingresos por inversiones se acreditaban en la cuenta del miembro semestralmente. El ELA no garantizó los beneficios a la edad del retiro.

El SRE reunió e invirtió los activos del programa de beneficios definidos, el programa de aportaciones definidas y el Programa de contribuciones híbridas. Los pagos de beneficios futuros se pagaron del mismo grupo de activos.

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Este resumen de las disposiciones del plan del SRE está destinado a describir las características esenciales del plan. Todos los requisitos de elegibilidad y los montos de los beneficios deben determinarse estrictamente de acuerdo con el documento del plan.

*(i)   Retiros de Servicio*

    *(a)   Elegibilidad para los miembros de la Ley Núm. 447-1951:* Los miembros de la Ley Núm. 447-1951 que eran elegibles para el retiro al 30 de junio de 2013 continuarían siendo elegibles para el retiro en cualquier momento. Antes del 1 de julio de 2013, los miembros de la Ley Núm. 447-1951 podían retirarse cuando (1) cumplieran 55 años con 25 años de servicio acreditado, (2) cumplieran 58 años con 10 años de servicio acreditado, (3) cualquier edad con 30 años de servicio acreditado, (4) para funcionarios públicos en puestos de alto riesgo (el PRPOB y el Cuerpo de Bomberos del ELA, Cuerpo de Policía y Bomberos Municipales y Cuerpo de la Oficina de Custodia), al cumplir 50 años con 25 años de servicio acreditado, y (5 ) para alcaldes de municipios, que cumplen 50 años con 8 años de servicio acreditado como alcalde. Asimismo, los miembros de la Ley Núm. 447-1951 que alcanzarían 30 años de servicio acreditado antes del 31 de diciembre de 2013 serían elegibles para el retiro en cualquier momento.

    Los miembros de la Ley Núm. 447-1951 que no eran elegibles para retirarse al 30 de junio de 2013 y que no cumplieron 30 años de servicio acreditado antes del 31 de diciembre de 2013 son elegibles para el retiro al alcanzar la edad de elegibilidad para el retiro que se muestra en la tabla a continuación con 10 años de servicio acreditado.

| Fecha de nacimiento | Edad cumplida al 30 de junio de 2013 | Edad elegible para el retiro |
|---|---|---|
| 1 de julio de 1957 o más tarde | 55 o menos | 61 |
| 1 de julio de 1956 al 30 de junio de 1957 | 56 | 60 |
| Antes del 1 de julio de 1956 | A partir de 57 | 59 |

    Además de los requisitos en la tabla anterior, la Ley Núm. 447-1951 de Funcionarios Públicos en Puestos de Alto Riesgo que no eran elegibles el retiro retirarse al 30 de junio de 2013 y que no alcanzaron 30 años de servicio acreditado al 31 de diciembre de 2013 son elegibles para el retiro directamente del servicio activo al cumplir 55 años con 30 años de servicio acreditado.

    *(b)   Elegibilidad para los miembros de la Ley Núm. 1-1990:* Los miembros de la Ley Núm. 1-1990 que eran elegibles para el retiro al 30 de junio de 2013 continuarían siendo elegibles para el retiro en cualquier momento. Antes del 1 de julio de 2013, los miembros de la Ley Núm. 1-1990 podían jubilarse al (1) cumplir 55 años con 25 años de servicio acreditado;
(2) al cumplir 65 años con 10 años de servicio acreditado; (3) para funcionarios públicos en puestos de alto riesgo, cualquier edad con 30 años de servicio acreditado; y (4) para los alcaldes, al cumplir 50 años con 8 años de servicio acreditado como alcalde.

    Los miembros de la Ley Núm. 1-1990 que no eran elegibles para el retiro al 30 de junio de 2013 son elegibles para el retiro al cumplir los 65 años con 10 años de servicio acreditado. Asimismo, los funcionarios públicos de la Ley Núm. 1-1990 en puestos de alto riesgo que no eran elegibles para el retiro al 30 de junio de 2013 son elegibles para el retiro directamente del servicio activo al cumplir los 55 años con 30 años de servicio acreditado.

    *(c)   Elegibilidad para los miembros de System 2000:* Los miembros de System 2000 que eran elegibles para el retiro al 30 de junio de 2013 continúan siendo elegibles para el retiro en cualquier momento. Antes del 1 de julio de 2013, los miembros del Sistema 2000 podían retirarse al cumplir los 55 años para funcionarios públicos en puestos de alto riesgo o, de otro modo, al cumplir 60 años.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los miembros de System 2000 que no eran elegibles para el retiro al 30 de junio de 2013 son elegibles para el retiro al cumplir 55 años para los funcionarios públicos en puestos de alto riesgo y al alcanzar la edad de elegibilidad para el retiro que se muestra en la tabla a continuación.

| Fecha de nacimiento | Edad cumplida al 30 de junio de 2013 | Edad elegible para el retiro |
|---|---|---|
| 1 de julio de 1957 o más tarde | 55 o menos | 65 |
| 1 de julio de 1956 al 30 de junio de 1957 | 56 | 64 |
| 1 de julio de 1955 al 30 de junio de 1956 | 57 | 63 |
| 1 de julio de 1954 al 30 de junio de 1955 | 58 | 62 |
| Antes del 1 de julio de 1954 | A partir de 59 | 61 |

(d) *Elegibilidad para los miembros contratados después del 30 de junio de 2013:* Al cumplir 58 años si es funcionario público en un puesto de alto riesgo o, de otro modo, al cumplir 67 años.

(ii) *Beneficios de anualidades de retiro del servicio*

Una anualidad pagadera durante la vida del miembro igual al valor anualizado del saldo en la cuenta de contribuciones híbridas al momento del retiro, más, para los miembros de la Ley Núm. 447-1951 y la Ley Núm. 1-1990, el beneficio acumulado determinado al 30 de junio 2013. Si el saldo en la cuenta de aportación híbrida es de $10,000 o menos, se pagaría como un pago global en lugar de una anualidad.

(a) *Beneficio acumulado al 30 de junio de 2013 para los miembros de la Ley Núm. 447-1951:* El beneficio acumulado al 30 de junio de 2013 se determinó con base en la compensación promedio, según su definición, para los miembros de la Ley Núm. 447-1951, los años de servicio acreditado y la edad del miembro al 30 de junio de 2013. Para los Alcaldes, la mayor compensación como alcalde para los miembros de la Ley Núm. 447-1951, determinada al 30 de junio de 2013.

Si el miembro de la Ley Núm. 447-1951 tenía al menos 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivale al 65 % de la compensación promedio si el miembro tenía menos de 55 años al 30 de junio de 2013 o el 75 % de la compensación promedio si el miembro tenía al menos 55 años al 30 de junio de 2013. Para los participantes que seleccionaron el Plan de Coordinación, el beneficio se recalculó en la Edad de Retiro del Seguro Social (SSRA), según su definición, como 1.5 % de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado, hasta 30 años, más 65 % (75 % si el miembro tenía al menos 55 años al 30 de junio de 2013) de una compensación promedio superior a $6,600.

Si el miembro de la Ley Núm. 447-1951 tenía menos de 30 años de servicio acreditado al 30 de junio de 2013 y cumplió 30 años de servicio acreditado al 31 de diciembre de 2013, el beneficio acumulado equivalía al 55 % de la compensación promedio si el miembro era menor de 55 años. al 30 de junio de 2013 o el 60 % de la compensación promedio si el miembro tenía 55 años al 30 de junio de 2013. Para los participantes que seleccionaron el Plan de Coordinación, el beneficio se recalculó en la SSRA, como 1.5 % de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado, hasta 30 años, más 55% (60% si el miembro tenía al menos 55 años al 30 de junio de 2013) de una compensación promedio superior a $6,600. Las contribuciones de los miembros recibidas de la Ley Núm. 447-1951 miembros elegibles para este beneficio transitorio durante el período que comienza el 1 de julio de 2013 y que finaliza al cumplir 30 años de servicio acreditado se consideraron contribuciones anteriores al 1 de julio de 2013; Las contribuciones a la cuenta de aportación híbrida comienzan después de que el miembro alcanza los 30 años de servicio acreditado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Si el miembro de la Ley Núm. 447-1951 tenía menos de 30 años de servicio acreditado al 31 de diciembre de 2013, el beneficio acumulado equivalía al 1.5 % de la compensación promedio multiplicado por años de servicio acreditado hasta 20 años, más el 2 % de la compensación promedio multiplicado por años de servicio acreditado en exceso de 20 años. El beneficio máximo es el 75 % de la compensación promedio. A excepción de los policías del PRPOB del ELA y los Bomberos del ELA, el beneficio se redujo actuarialmente por cada año que comienza el pago antes de los 58 años. Para los participantes que seleccionan el Plan de Coordinación, el beneficio básico se recalcula en la SSRA como 1 % de la compensación promedio hasta $6,600 multiplicado por años de servicio acreditado hasta 20 años, más 1.5 % de la compensación promedio hasta $6,600 multiplicado por años de servicio acreditado en exceso de 20 años, más el 1.5 % de la compensación promedio en exceso de $6,600 multiplicado por años de servicio acreditado hasta 20 años, más el 2.0 % de la compensación promedio en exceso de $6,600 multiplicado por años de servicio acreditado en exceso de 20 años. A excepción de la policía y los bomberos, el beneficio se redujo actuarialmente por cada año que comienza el pago antes de los 58 años.

Según la Ley Núm. 447-1951, para los Alcaldes con al menos 8 años de servicio acreditado como Alcalde, el beneficio acumulado no debía ser inferior al 5 % de la compensación más alta, según su definición, como Alcalde por cada año de servicio acreditado como Alcalde hasta 10 años, más el 1.5 % de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde hasta 20 años, más el 2.0 % de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde en exceso de 20 años. El servicio acreditado no como alcalde incluyó el servicio prestado como Alcalde por más de 10 años. El beneficio máximo fue del 90 % de la mayor compensación como Alcalde.

(b) *Beneficio acumulado al 30 de junio de 2013 para los miembros de la Ley Núm. 1-1990:* El beneficio acumulado al 30 de junio de 2013 se determina con base en la compensación promedio para los miembros de la Ley Núm. 1-1990, los años de servicio acreditado y la edad del miembro al 30 de junio de 2013. Para los Alcaldes de la Ley Núm. 1-1990, la mayor compensación como alcalde determinada al 30 de junio de 2013.

Si el miembro de la Ley Núm. 1-1990 es un oficial de policía o bombero que tenía al menos 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivale al 65 % de la compensación promedio si el miembro tenía menos de 55 años al 30 de junio de 2013 o el 75 % de la compensación promedio si el miembro tenía al menos 55 años al 30 de junio de 2013.

Para todos los demás miembros de la Ley Núm. 1-1990, el beneficio acumulado equivalía al 1.5 % de la compensación promedio multiplicado por años de servicio acreditado. El beneficio se redujo actuarialmente por cada año que comienza el pago antes de los 65 años.

Según la Ley Núm. 1-1990, para los Alcaldes con al menos 8 años de servicio acreditado como Alcalde, el beneficio acumulado no debía ser inferior al 5 % de la compensación más alta como Alcalde por cada año de servicio acreditado como Alcalde hasta 10 años, más el 1.5 % de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde hasta 20 años, más el 2.0 % de la compensación más alta como Alcalde por cada año de servicio acreditado no como Alcalde en exceso de 20 años. El servicio acreditado no como alcalde incluyó el servicio prestado como Alcalde por más de 10 años. El beneficio máximo es del 90 % de la mayor compensación como Alcalde.

(iii) *Retiro Obligatorio*

Todos los funcionarios públicos de la Ley Núm. 447-1951 y la Ley Núm. 1-1990 en puestos de alto riesgo debían retirarse al cumplir 58 y 30 años de servicio acreditado. El miembro del Superintendente del PRPOB, el Jefe del Cuerpo de Bomberos o la autoridad supervisora puede solicitar una extensión de dos años, según corresponda.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(iv) *Beneficios de Rescisión*

    (a) *Retiro a precio alzado*

        *Elegibilidad:* Un miembro era elegible al finalizar el servicio antes de 5 años de servicio o si el saldo en la cuenta de contribuciones híbridas es de $10,000 o menos.

        *Beneficio:* El beneficio era equivalente a un pago global del saldo en la cuenta de contribuciones híbridas a la fecha de la rescisión permanente del servicio.

    (b) *Retiro Diferido*

        *Elegibilidad:* Un miembro era elegible después de la rescisión del servicio con 5 o más años de servicio (10 años de servicio acreditado para los miembros de la Ley Núm. 447-1951 y la Ley Núm. 1-1990) antes de la elegibilidad para el retiro correspondiente, siempre que el miembro no haya retirado un pago global de las contribuciones acumuladas de la cuenta de contribuciones híbridas.

        *Beneficio:* Una anualidad pagadera durante la vida del miembro a partir de la edad de elegibilidad para el retiro correspondiente igual al valor anualizado del saldo en la cuenta de contribuciones híbridas al momento del retiro, más, para los miembros de la Ley Núm. 447-1951 y la Ley Núm. 1-1990, el beneficio acumulado determinado al 30 de junio 2013.

(v) *Beneficios por Fallecimiento*

    (a) *Beneficio por Fallecimiento Previo al Retiro*

        *Elegibilidad:* Cualquier miembro actual no retirado era elegible.

        *Beneficio:* Un reintegro de la cuenta de contribuciones híbridas, más las contribuciones acumuladas para los miembros de la Ley Núm. 447-1951 y la Ley Núm. 1-1990.

    (b) *Beneficio por Muerte de Alto Riesgo según la Ley Núm. 127-1958*

        *Elegibilidad:* La policía, los bomberos y otros empleados en puestos específicos de alto riesgo que mueren en la línea de trabajo debido a razones especificadas en la Ley Núm. 127-1958, según enmienda.

        *Beneficio del Cónyuge:* 50% de la compensación del participante en la fecha de fallecimiento, pagadera como una anualidad hasta la muerte o el nuevo matrimonio.

        *Beneficio de los Hijos:* 50% de la compensación del participante en la fecha de fallecimiento, pagadera como una anualidad y asignada de forma prorrateada entre los hijos elegibles. La anualidad era pagadera de por vida para un hijo discapacitado, hasta los 18 años para un hijo no discapacitado que no está estudiando, y hasta los 25 años para un hijo no discapacitado que está estudiando.

        *Beneficio en Ausencia de Cónyuge o Hijos:* Los padres del miembro deben recibir cada uno el 50% de la compensación del participante en la fecha de fallecimiento, pagadera como una anualidad de por vida.

        *Aumentos Posteriores al Fallecimiento:* A partir del 1 de julio de 1996 y posteriormente cada tres años, los beneficios anteriores al fallecimiento se incrementan en un 3% siempre que el(los) beneficiario(s) haya(n) recibido pagos durante al menos tres años.

        El costo de estos beneficios era pagado por el ELA.

    (c) *Beneficio por Fallecimiento Posterior al Retiro para Miembros que se Retiraron antes del 1 de julio de 2013*

        *Elegibilidad:* Cualquier miembro retirado o discapacitado que reciba un beneficio mensual que no haya elegido una anualidad reversible y cuyos beneficios comenzaron antes del 1 de julio de 2013.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Beneficio:* El beneficio es el siguiente (Ley Núm. 105, según enmienda por la Ley Núm. 4):

(i) Para los miembros casados o con hijos dependientes al momento del fallecimiento, el ingreso anual para una viuda, viudo o hijos dependientes es igual al 60 % (50 % si está en el Plan de Coordinación - 30 %, antes del 1 de enero de 2004) del beneficio de retiro pagadero de por vida para un cónyuge supérstite o hijos discapacitados y pagadero hasta los 18 años (25 años si cursa estudios) para hijos no discapacitados. Si en el Plan de Coordinación, el beneficio para el cónyuge supérstite no comienza hasta que el cónyuge cumple 60 años y el cónyuge supérstite debe haber estado casado con el miembro durante al menos 10 años para ser elegible para este beneficio. El aumento en el porcentaje del 30 % al 50 % si pertenece al Plan de Coordinación es pagado por el ELA para ex empleados del gobierno o por la empresa pública o municipalidad para sus exempleados.

(ii) El beneficio, cuando no existe una relación como se indicó anteriormente, es igual al saldo restante de las contribuciones acumuladas en el momento del retiro después de la deducción del ingreso anual pagado de por vida y se paga a un beneficiario o a la sucesión del Miembro. En ningún caso el beneficio puede ser inferior a $ 1,000. El ELA para los ex empleados del gobierno o la empresa pública o el municipio para sus exempleados paga la diferencia, hasta $ 250, entre (1) las contribuciones acumuladas menos el ingreso anual pagado de por vida y (2) $1,000. El SRE paga el resto.

(d) *Beneficio por Fallecimiento Posterior al Retiro para Miembros que se Retiraron después del 30 de junio de 2013*

Elegibilidad: Cualquier miembro retirado o discapacitado que comenzó a recibir un beneficio mensual después del 30 de junio de 2013.

*Beneficio:* Si el miembro eligió al momento del retiro transferir una parte de la anualidad a un beneficiario seleccionando una forma opcional de pago actuarialmente equivalente, el beneficio del sobreviviente correspondiente.

Para todos los miembros, el exceso, si lo hubiera, de la cuenta de aportación híbrida, más las contribuciones acumuladas para los miembros de la Ley Núm. 447-1951 y la Ley Núm. 1-1990, al momento de la jubilación sobre el total de los pagos de anualidad pagados al miembro. y cualquier beneficiario según los términos de la forma de pago opcional debe ser pagadero a un beneficiario o al patrimonio del miembro.

(e) *Los beneficiarios que reciben beneficios por muerte ocupacional al 30 de junio de 2013 continúan siendo elegibles para recibir dichos beneficios*

(vi) *Beneficios por discapacidad*

(a) *Elegibilidad por*

*discapacidad:* Todos los miembros son elegibles al ocurrir una discapacidad.

*Beneficio:* El saldo de la cuenta de contribuciones híbridas pagadera como distribución de pago global, una anualidad inmediata o una anualidad diferida a elección del participante. Los miembros de la Ley Núm. 447-1951 y la Ley Núm. 1-1990 siguen siendo elegibles para recibir el beneficio acumulado al 30 de junio de 2013 a partir de la edad de elegibilidad para el retiro correspondiente.

(b) *Discapacidad de Alto Riesgo según la Ley Núm. 127-1958*

Elegibilidad: La policía, los bomberos y otros empleados en puestos específicos de alto riesgo que sufren una discapacidad en la línea de trabajo debido a razones especificadas en la Ley Núm. 127-1958, según enmienda.

*Beneficio:* 80% (100 % para los miembros de la Ley Núm. 447-1951) de compensación a partir de la fecha de incapacidad, pagadera como una anualidad. Si el miembro falleció mientras aún

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

estaba discapacitado, este beneficio de anualidad continúa para sus beneficiarios. Los beneficiarios incluyen el cónyuge sobreviviente o los hijos discapacitados (de por vida), niños sin discapacidades hasta los 18 años (25 años si están realizando estudios), y los padres si no hay otros beneficiarios. A partir del 1 de julio de 1996 y, posteriormente, cada tres años, el beneficio por discapacidad se incrementó en un 3 % siempre que el miembro (o beneficiario) haya recibido pagos durante al menos tres años (Ley Núm. 127-1958, según enmienda). El costo de estos beneficios era pagado por el ELA.

(c) Los miembros elegibles calificaron para beneficios por discapacidad ocupacional o no ocupacional al 30 de junio de 2013 continúan siendo elegibles para recibir dichos beneficios

(vii) *Beneficios especiales*

(a) *Beneficios mínimos*

(i) *Aumentos anteriores ad hoc:* La Legislatura, de vez en cuando, aumentó las pensiones para ciertos jubilados según se describe en la Ley Núm. 124-1973 y la Ley Núm. 23-1983. Los beneficios se pagaron en un 50 % del ELA y el 50 % del SRE.

(ii) Beneficio mínimo para los miembros que se retiraron antes del 1 de julio de 2013 (Ley Núm. 156-2003, Ley Núm. 35-2007 y Ley Núm. 3-2013): El ingreso mínimo mensual de por vida para los miembros que se retiraron o quedaron discapacitados antes del 1 de julio de 2013 es de $500 por mes a partir del 1 de julio de 2013 ($400 por mes a partir del 1 de julio de 2007 y $300 por mes hasta el 30 de junio de 2007). El aumento en el beneficio mensual mínimo de $200 por mes a $300 por mes fue pagado por el ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propios empleados de Hacienda o por ciertas corporaciones públicas con sus propias haciendas o municipios para sus exempleados. El aumento del beneficio mínimo mensual de $300 por mes a $400 por mes debía ser pagado por el SRE para el gobierno anterior y ciertas corporaciones públicas sin sus propios empleados de Hacienda o por ciertas corporaciones públicas con sus propias haciendas o municipios para sus exempleados.

(iii) *Beneficio mínimo del plan de coordinación:* Se pagaba un beneficio mensual mínimo al obtener la SSRA, de modo que el beneficio, cuando se agregó al Beneficio del Seguro Social, no fue inferior al beneficio pagadero antes de la SSRA.

(b) *Ajustes del costo de vida (COLA) a los beneficios de pensión:* La Legislatura, oportunamente, aumenta las pensiones en un 3 % para los miembros jubilados y discapacitados. Los beneficiarios no tenían derecho a una COLA otorgados después del fallecimiento de la persona retirada. El primer aumento fue otorgado por la Ley Núm. 10-1992. Se otorgaron aumentos posteriores del 3 % cada tres años desde 1992, con el último aumento del 3 % establecido el 24 de abril de 2007 y efectivo el 1 de julio de 2007 (retroactivo al 1 de enero de 2007) para los miembros jubilados y discapacitados que recibían un beneficio mensual el 1 de enero de 2004 o antes (Ley Núm. 35-2007). Asimismo, a partir del 1 de julio de 2008, cualquier miembro retirado o discapacitado que recibiera una anualidad mensual antes del 1 de enero de 2004 de menos de $1,250 por mes recibió un aumento de hasta el 3 % sin exceder el límite de $1,250 por mes (Ley Núm. 35-2007). SRE pagará los COLA otorgados en 1992 a todos los miembros jubilados y en 1998 a los miembros jubilados que hayan sido empleados gubernamentales o municipales. Todos los demás COLA otorgados en 1995 y posteriores debían ser pagados del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propios empleados de tesorería o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus exempleados.

(c) *Beneficios de "bonos" especiales*

(i) *Bono de Navidad (Ley Núm. 144-2005, enmendada por la Ley Núm. 3-2013):* Un bono anual de $200 por cada miembro retirado, beneficiario y discapacitado, siempre que el miembro se haya retirado antes del 1 de julio de 2013. Los beneficios pagados de las contribuciones

231

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

complementarias recibidas del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías, o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus exempleados.

(ii) *Bono por Medicación (Ley Núm. 155-2003, enmendada por la Ley Núm. 3-2013):* Un bono anual de $100 por cada miembro retirado, beneficiario y discapacitado para cubrir los costos de salud, pagado en julio, siempre que el miembro se haya retirado antes del 1 de julio de 2013. No se requiere evidencia de cobertura. El monto se prorratea si existen múltiples beneficiarios. Este beneficio se paga de las contribuciones complementarias recibidas del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus exempleados.

Las contribuciones de beneficios especiales de aproximadamente $194.6 millones en el año fiscal 2017 representan principalmente contribuciones del ELA, corporaciones públicas y municipios para los beneficios especiales identificados anteriormente otorgados por leyes especiales. Antes del 23 de agosto de 2017, el financiamiento de los beneficios especiales fue proporcionado al SRE a través de asignaciones legislativas cada 1 de julio por el ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías y por ciertas corporaciones públicas con sus propias tesorerías y municipios para sus exempleados. Las asignaciones legislativas se consideraron estimaciones de los pagos que debe realizar el SRE por los beneficios especiales. Las deficiencias en las asignaciones legislativas se cubrieron con fondos propios del SRE hasta que se recuperaron mediante futuras asignaciones legislativas. Cualquier excedente de los créditos legislativos recaudados sobre los beneficios especiales pagados se combinó con los activos en fideicomiso para el pago de otros beneficios de pensión.

(viii) *Contribuciones*

El requisito de aportación al SRE está establecido por ley y no se determina actuarialmente.

(a) *Contribuciones de los miembros:* A partir del 1 de julio de 2013, las contribuciones de los miembros representan el 10 % de la compensación. Sin embargo, para los miembros de la Ley Núm. 447-1951 que seleccionaron el Plan de Coordinación, las contribuciones de los miembros son el 7 % de la compensación hasta $6,600 más el 10 % de la compensación que exceda los $6,600 durante el año fiscal 2013-14 y el 8.5 % de la compensación hasta $6,600 más 10 % de compensación superior a $6,600 durante el año fiscal 2014-15. Los miembros pueden hacer contribuciones adicionales voluntariamente a su cuenta de contribuciones híbridas.

Antes del 1 de julio de 2013, las contribuciones de los miembros de la Ley Núm. 447-1951 que seleccionaron el Plan de Coordinación fueron del 5.775 % de la compensación hasta $6,600 más el 8.275 % de la compensación en exceso de $6,600. Las contribuciones de todos los demás miembros fueron del 8.275 % de la compensación. Los miembros de System 2000 también podrían haber realizado contribuciones voluntarias de hasta el 1.725 % de la compensación antes del 1 de julio de 2013.

(b) *Contribuciones de los patronos (Artículo 2 116, según enmienda por la Ley Núm. 116-2010 y la Ley Núm. 3-2013):* Antes del 1 de julio de 2011, las contribuciones del patrono representaban el 9.275 % de la compensación. A partir del 1 de julio de 2011, las contribuciones del patrono representan el 10.275 % de la compensación. Durante los próximos cuatro años fiscales efectivos a partir del 1 de julio de 2012, las contribuciones de los patronos aumentarán anualmente en un 1 % de la compensación. Durante los próximos cinco años fiscales, las contribuciones del patrono aumentarán anualmente en un 1.25 % de la compensación, alcanzando una tasa de aportación del patrono del 20.53 % de la compensación a partir del 1 de julio de 2020. Según la Ley Núm. 106-2017, se eliminaron todas las obligaciones de los patronos de contribuir al SRE.

(c) *Contribuciones complementarias del ELA, ciertas corporaciones públicas y municipios (Ley Núm. 3-2013):* A partir del 1 de julio de 2013, el SRE recibirá una aportación complementaria de $2,000

232

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

cada año por cada pensionado (incluidos los beneficiarios que reciben Beneficios de cónyuge supérstite) que anteriormente beneficiaba a un miembro de la Ley Núm. 447-1951 o la Ley Núm. 1-1990 mientras era un empleado activo. Esta aportación complementaria se pagará del Fondo del ELA para el gobierno anterior y ciertas corporaciones públicas sin sus propias tesorerías o por ciertas corporaciones públicas con sus propias tesorerías o municipios para sus exempleados.

(d) *Aportación Uniforme Adicional (Ley Núm. 32-2013, según enmienda):* La aportación uniforme adicional (AUA) será certificada por el actuario externo del SRE cada año fiscal desde el año fiscal 2015 hasta 2033 según sea necesario para evitar que los activos brutos proyectados del SRE caigan por debajo de $1,000 millones durante cualquier año fiscal posterior. La AUA debe pagarse del ELA, corporaciones públicas con sus propias tesorerías y municipios. El SRE recibió solo una fracción del AUA de años anteriores. El AUA total adeudado al Sistema de los años fiscales 2015, 2016 y 2017 fue de aproximadamente $776 millones en total. El AUA determinado para el año fiscal 2018 es de $685 millones pagaderos al final del año. Como se describe con más detalle en la Nota 2, todas las contribuciones de los patronos, incluida la aportación uniforme adicional, fueron eliminadas efectivamente el 1 de julio de 2017 por la Ley 106-2017.

(ix) *Programa de retiro anticipado*

La JCA implementó un programa de retiro anticipado para sus empleados en virtud de la Ley 224 Ley Núm. 7-2008. La JCA ya realizó el pago inicial y reembolsaría el saldo restante de las anualidades y otros beneficios pagados por el SRE en cuatro cuotas cada 31 de julio a partir de 2009 hasta 2012. La JCA estaba en estado de mora en el pago del plan de retiro, por lo que solicitó un nuevo plan de pago. La Junta de Fideicomisarios del SRE aprobó un plan de pago para el saldo de la deuda del programa de retiro por 24 meses a partir de marzo de 2014.

El 2 de julio de 2010, el ELA promulgó la Ley Núm. 70 que establece un programa que brinda beneficios para el retiro anticipado o incentivos económicos para la rescisión voluntaria del empleo para los empleados elegibles, según su definición. La Ley Núm. 70-2010 también estableció que los beneficios de retiro anticipado se proporcionarán a los empleados elegibles que hayan completado entre 15 y 29 años de servicios acreditables y consistirán en beneficios mensuales que van del 37.5 % al 50% del salario mensual de cada empleado. Los beneficios de este programa serán pagados por el Fondo General del ELA (el Fondo General) y por las corporaciones públicas, cubriendo a sus respectivos empleados hasta que el miembro del plan cumpla más de 55 años para los miembros de la Ley Núm. 447-1951 o 65 años para miembros de la Ley Núm. 1-1990, o la fecha en que el miembro del plan habría completado 30 años de servicio si el miembro hubiera continuado su empleo. Asimismo, las corporaciones públicas también deberán continuar haciendo las contribuciones requeridas de los empleados y patronos al SRE. El Fondo General deberá continuar realizando las contribuciones requeridas por el patrono. El SRE posteriormente será responsable de los pagos de beneficios.

**(b) SRJ:**

*Descripción del plan:* Antes del 23 de agosto de 2017, el SRJ implementó un plan de pensiones de beneficios definidos para un solo patrono administrado por el SRE y la Administración del SRJ. Se trata de un fideicomiso creado por la Ley Núm. 12-1954, según enmienda, para proporcionar beneficios de pensiones y otros beneficios a los jueces jubilados de la Rama Judicial del ELA, a través de la Oficina de la Administración de Instalaciones Judiciales (el Patrono). El SRJ es un fondo fiduciario de pensiones del ELA. Y no es un patrono

El SRE y la Administración del SRJ asignaron el 98.56% y el 1.44% de sus gastos generales y administrativos durante el año fiscal que terminó el 30 de junio de 2017 a los sistemas del SRJ y SRE, respectivamente. La metodología utilizada para determinar la asignación de los gastos del SRE y la Administración del SRJ se basa en el total de las contribuciones de los patronos y los participantes al SRE y al SRJ, combinadas.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Antes del 23 de agosto de 2017, el SRJ consistía en dos estructuras de beneficios a tenor con la Ley Núm. 12-1954, según enmienda por la Ley Núm. 162-2013. Las disposiciones de beneficios varían según la fecha de contratación del miembro, a saber:

- Jueces contratados el 30 de junio de 2014 o antes, con ciertas distinciones para los jueces contratados del 24 de diciembre de 2013 al 30 de junio de 2014 (programa de aportación de beneficios definidos).

- Los jueces contratados el 1 de julio de 2014 o posteriormente (programa de contribuciones híbridas).

Todos los jueces de la rama judicial del ELA son miembros del SRJ. Los miembros incluyen a todas las personas que ocupan un puesto como Juez de la Corte Suprema de Puerto Rico, Juez del Tribunal de Apelaciones, Jueces Superiores del Tribunal de Primera Instancia y Jueces Municipales del Tribunal de Primera Instancia del ELA.

Los beneficios proporcionados a los miembros del SRJ fueron establecidos mediante un estatuto del ELA y solo pueden ser modificados por la Legislatura con la aprobación del Gobernador.

Este resumen de las disposiciones del plan del SRJ está destinado a describir las características esenciales del plan. Todos los requisitos de elegibilidad y los montos de los beneficios deben determinarse estrictamente de acuerdo con el documento del plan.

**Disposiciones del plan de pensión aplicables a los jueces contratados el 30 de junio de 2014 o antes (miembros anteriores a la Ley Núm. 162-2013)**

*(1) Beneficios de anualidades de retiro del servicio*

Una anualidad pagadera durante la vida del miembro igual al beneficio aplicable que se detalla a continuación.

*(a) Retiro normal*

*Elegibilidad básica:* 60 años con 10 años de servicio acreditado.

*Beneficio básico:* 25 % del salario más alto, según su definición, más 5 % del salario más alto, según su definición, por cada año de servicio acreditado en exceso de 10 años, sujeto a un máximo del 75 % del salario más alto si es contratado antes del 24 de diciembre de 2013 y 60 % del salario más alto si es contratado entre el 24 de diciembre de 2013 y el 30 de junio de 2014.

*Elegibilidad para los jueces que desempeñan funciones sin un cargo fijo:* 10 años de servicio acreditado. Esta elegibilidad mejorada no está disponible para los jueces designados después del 28 de junio de 2007 por un período ilimitado.

*Beneficio para los jueces que desempeñan funciones sin un cargo fijo:* 25 % del salario correspondiente al cargo durante el período de retiro, más 5 % de dicho salario por cada año de servicio acreditado que exceda los 10 años, sujeto a un máximo del 100 % de dicho salario. Si el juez ocupó un puesto sin un cargo fijo durante un total de al menos 8 años, el 25 % aumenta al 50 % en la fórmula anterior. Este beneficio mejorado no está disponible para los jueces designados después del 28 de junio de 2007 por un período ilimitado.

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Elegibilidad opcional:* Edad y servicio acreditado como se muestra en la tabla a continuación, siempre que se hayan cumplido al menos 8 años de servicio acreditado en el cargo como juez.

| Edad | Años de servicios acreditados |
|------|-------------------------------|
| Menos de 60 | 30 |
| 62 | 20 |
| 61 | 21 |
| 60 | 22 |
| 59 | 23 |
| 58 | 24 |
| 57 | 25 |
| 56 | 26 |
| 55 | 27 |

*Beneficio opcional:* 75 % del salario más alto si se contrata antes del 24 de diciembre de 2013 y 60 % del salario más alto si se contrata entre el 24 de diciembre de 2013 y el 30 de junio de 2014.

*Elegibilidad mejorada:* Cualquier juez que haya desempeñado funciones sin un cargo fijo durante al menos 3 años y tenga al menos 25 años de servicio acreditado. Este beneficio mejorado no está disponible para los jueces designados después del 28 de junio de 2007 por un período ilimitado.

*Beneficio mejorado:* 75 % del salario obtenido en el momento del retiro.

*Retiro obligatorio:* Todos los jueces deben retirarse antes de los 70 años. Si el juez tiene menos de 10 años de servicio acreditado, puede elegir un reintegro de las contribuciones acumuladas o una parte proporcional del beneficio básico en función de los años y meses de servicio acreditado.

(b) *Retiro anticipado:*

*Elegibilidad básica:* 20 años de servicio acreditado antes de los 60 años.

*Beneficio básico:* El beneficio básico pagadero en virtud del Retiro normal, reducido en una base actuarial equivalente por cada mes que la fecha de retiro anticipado precede a los 60 años. Sin embargo, no se aplica ninguna reducción actuarial a los jueces que desempeñan funciones sin un cargo fijo.

*Elegibilidad opcional:* 20 años de servicio acreditado, siempre que se hayan cumplido al menos 8 años de servicio acreditado en el cargo como juez.

*Beneficio opcional:* 75 % del salario más alto si es contratado antes del 24 de diciembre de 2013 y 60 % del salario más alto si es contratado entre el 24 de diciembre de 2013 y el 30 de junio de 2014, reducido en una base actuarial equivalente por cada mes en que la fecha de retiro anticipado precede a la edad especificada en la tabla en la sección Elegibilidad opcional en Retiro normal para los años aplicables de servicio acreditado.

(2) *Beneficios de Rescisión*

(a) *Retiro a precio alzado*

*Elegibilidad:* Un miembro es elegible en el momento de rescisión del servicio.

*Beneficio:* El beneficio es equivalente a un reintegro de las contribuciones acumuladas.

(b) *Retiro Diferido*

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Elegibilidad:* Un miembro es elegible al finalizar el servicio antes de los 60 años y después de 10 años de servicio acreditado, siempre que el miembro no haya realizado un retiro de suma global.

*Beneficio:* El beneficio, que comienza a los 60 años, es igual al beneficio pagadero al Retiro normal.

(3) *Beneficios por Fallecimiento*

(a) *Beneficio por fallecimiento ocupacional*

*Elegibilidad:* Los beneficiarios de cualquier participante activo que fallezca por una causa relacionada con el empleo según la Ley de Compensación de Accidentes Laborales.

*Beneficio del Cónyuge:* 50 % del salario del participante en la fecha de fallecimiento, pagadera como una anualidad hasta la muerte o el nuevo matrimonio.

*Beneficio de los Hijos:* $10 ($20 si es está completamente huérfano) por cada niño pagadero mensualmente hasta que cumple 18 años o la finalización de los estudios, si es posterior. El beneficio familiar máximo es el 75 % del salario del participante en la fecha de fallecimiento.

*Beneficio en Ausencia de Cónyuge o Hijos:* Reembolso de las contribuciones acumuladas, más un monto igual a un año de compensación, según su definición, vigente al momento del fallecimiento.

(b) *Beneficio por Fallecimiento Previo al Retiro*

*Elegibilidad:* Cualquier miembro actual no retirado es elegible, siempre que no sea elegible para el Beneficio por Muerte Ocupacional.

*Beneficio:*

(i) Durante el servicio activo, el beneficio equivale a un reintegro de las contribuciones acumuladas, más un monto igual a un año de compensación vigente al momento del fallecimiento.

(ii) Mientras no se encuentra en servicio activo, el beneficio equivale a un reintegro de las contribuciones acumuladas.

(c) *Beneficio por Fallecimiento Previo al Retiro*

*Elegibilidad:* Un participante activo que era elegible para retirarse en la fecha del fallecimiento con un cónyuge supérstite o hijos dependientes.

*Beneficio:* Los beneficios por fallecimiento posteriores al retiro se describen a continuación suponiendo que el participante activo se retiró el día anterior a la fecha de fallecimiento.

(d) *Beneficio por Fallecimiento Posterior al Retiro*

*Elegibilidad:* Cualquier miembro retirado o discapacitado que recibe un beneficio mensual.

*Beneficio:*

(i) Para los miembros casados o con hijos dependientes al momento del fallecimiento, un ingreso anual igual al 60 % del beneficio de retiro al momento del fallecimiento, pagadero de por vida para un cónyuge supérstite o hijos discapacitados, y pagadero hasta los 18 años o hasta la finalización de estudios, si son posteriores, para hijos no discapacitados.

(ii) El beneficio, cuando no existe una relación como se indicó anteriormente, es igual al saldo restante de las contribuciones acumuladas en el momento del retiro después de la deducción del ingreso anual pagado de por vida y se paga a un beneficiario o a la sucesión del Miembro. En ningún caso el beneficio puede ser inferior a $ 1,000. El ELA paga la diferencia, hasta $500, entre (1) las tarifas acumuladas, según se definen, con intereses menos el ingreso anual de por vida pagado y (2) $1,000. El SRJ paga el resto.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(4) *Beneficios por discapacidad*

   (a) *Discapacidad no ocupacional*

     *Elegibilidad:* Todos los miembros son elegibles para discapacidad no ocupacional luego de 10 años de servicio acreditado y la ocurrencia de discapacidad.

     *Beneficio:* 30 % de la compensación promedio, más 1 % de la compensación promedio por cada año de servicio acreditado en exceso de 10 años, pagadero como una anualidad; sujeto a un máximo del 50 % de la compensación promedio.

   (b) *Discapacidad ocupacional*

     *Elegibilidad:* Todos los miembros discapacitados durante el curso y como consecuencia de su trabajo, según la certificación de dos médicos designados por el Administrador del Plan, y siempre que el miembro reciba una compensación de la Ley de Compensación de Accidentes Laborales.

     *Beneficio:* 50 % del salario a la fecha de discapacidad, pagadero como una anualidad, reducido por cualquier pago recibido de la Corporación del Fondo del Seguro del Estado en virtud de la Ley de Compensación de Accidentes Laborales.

(5) *Beneficios especiales*

   (a) *Ajustes del costo de vida (COLA) a los beneficios de pensión:* A partir del 1 de enero de 2001, comenzando el 1 de enero de 2002 y posteriormente cada tres años a partir de entonces, el beneficio anual se incrementa en un 3 % para los miembros jubilados y los miembros discapacitados, siempre que el miembro haya estado recibiendo pagos durante al menos tres años.

     Estos COLA se pagan del ELA. Asimismo, se otorgó un COLA ad hoc del 3 % a partir del 1 de enero de 1999, pagado por el SRJ.

   (b) *Beneficios de "bonos" especiales*

     (i) *Bono de Navidad (Ley Núm. 144-2005):* Un bono anual de $600 por cada miembro retirado, beneficiario y miembro discapacitado pagado en diciembre, siempre que el juez haya sido contratado antes del 24 de diciembre de 2013. El SRJ paga $150 por miembro retirado, beneficiario y miembro discapacitado y el saldo es pagado por el ELA.

     (ii) *Bono de Verano (Ley Núm. 37-2001):* Un bono anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado pagado en julio, siempre que el juez haya sido contratado antes del 24 de diciembre de 2013. El monto se prorratea si existen múltiples beneficiarios. Este beneficio se paga del ELA.

     (iii) *Bono por Medicación (Ley Núm. 155-2003):* Un bono anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado para cubrir los costos de atención médica, pagado en julio, siempre que el juez haya sido contratado antes del 24 de diciembre de 2013. No se requiere evidencia de cobertura. El monto se prorratea si existen múltiples beneficiarios. Este beneficio se paga del ELA

   Los jueces contratados el 24 de diciembre de 2013 y posteriormente no son elegibles para estos beneficios de "bonos" especiales.

   Las contribuciones de beneficios especiales de aproximadamente $1.9 millones en el año fiscal 2017 representan contribuciones del ELA para los beneficios especiales identificados anteriormente otorgados por leyes especiales. Antes del 23 de agosto de 2017, los fondos para los beneficios especiales se entregaban al SRJ a través de asignaciones legislativas cada 1 de julio. Las asignaciones legislativas se consideraron estimaciones de los pagos que debe realizar el SRJ por los beneficios especiales. Las deficiencias en las asignaciones legislativas se cubrieron con fondos propios del SRJ hasta que se recuperaron mediante futuras asignaciones legislativas. Cualquier excedente de los créditos legislativos recaudados sobre los beneficios especiales pagados se combinó con los activos en fideicomiso para el pago de otros beneficios de pensión.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**Disposiciones del plan de pensión aplicables a los jueces contratados el 1 de julio de 2014 o posteriormente (miembros de la Ley Núm. 162-2013)**

Antes del 23 de agosto de 2017, los miembros contratados a partir del 1 de julio de 2014 estaban cubiertos por un plan de contribuciones híbridas con beneficios definidos y componentes de aportación definidos de la siguiente manera:

(1) *Beneficios de anualidades de retiro del servicio*

Una anualidad pagadera durante la vida del miembro igual al beneficio aplicable que se detalla a continuación.

    (a) *Retiro normal*

    *Elegibilidad*: 65 años con 12 años de servicio acreditado.

    *Beneficio básico*: 1.5 % de la compensación promedio, según su definición, por cada año de servicio acreditado, más el valor anualizado del saldo en la cuenta del programa de contribuciones híbridas al momento del retiro.

    *Retiro obligatorio*: Todos los jueces deben retirarse antes de los 70 años. Si el juez tiene menos de 12 años de servicio acreditado, recibirá un reintegro de la cuenta del programa de contribuciones híbridas.

    (b) *Retiro anticipado*:

    *Elegibilidad básica*: 55 años con 12 años de servicio acreditado antes de los 65 años.

    *Beneficio básico*: 1.5 % de la compensación promedio, según su definición, por cada año de servicio acreditado, reducido en 1/180 por cada uno durante los primeros 60 meses y en 1/360 por cada mes durante los próximos 60 meses en los que la fecha de retiro anticipado precede a los 65 años, más el valor anualizado del saldo en la cuenta del programa de contribuciones híbridas al momento del retiro.

(2) *Beneficios de Rescisión*

    (a) *Retiro a precio alzado*

    *Elegibilidad*: Un miembro es elegible al finalizar el servicio con menos de 12 años de servicio acreditado.

    *Beneficio*: El beneficio es equivalente a un reintegro de la cuenta del programa de contribuciones híbridas.

    (b) *Retiro Diferido*

    *Elegibilidad*: Un miembro es elegible al finalizar el servicio antes de los 65 años y después de 12 años de servicio acreditado, siempre que el miembro no haya realizado un retiro de suma global.

    *Beneficio*: El beneficio, que comienza a los 65 años, es igual al beneficio pagadero al Retiro normal. El beneficio puede comenzar a partir de los 55 años, sujeto a las reducciones descritas en el retiro anticipado.

(3) *Beneficios por Fallecimiento*

    (a) *Beneficio por Fallecimiento Previo al Retiro*

    *Elegibilidad*: Cualquier miembro actual no retirado es elegible.

    *Beneficio*: El beneficio es equivalente a un reintegro de la cuenta del programa de contribuciones híbridas.

    (b) *Beneficio por Fallecimiento Posterior al Retiro*

    *Elegibilidad*: Cualquier miembro retirado o discapacitado.

    *Beneficio*: Si un miembro eligió al momento del retiro transferir una parte de la anualidad a un beneficiario seleccionando una forma opcional de pago actuarialmente equivalente, los beneficios correspondientes del sobreviviente.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Para todos los miembros, el excedente, si corresponde, de la cuenta del programa de contribuciones híbridas al momento del retiro sobre el total de los pagos de la anualidad del programa híbrido entregados al miembro y a cualquier beneficiario según los términos de la forma opcional de pago, se paga a un beneficiario o a la sucesión del miembro.

*(4) Beneficios por discapacidad*

*Elegibilidad*: Todos los miembros son elegibles después de 5 años de servicio acreditado y la ocurrencia de discapacidad antes de los 65 años.

*Beneficio:* 1.5 % de la compensación promedio, según su definición, por cada año de servicio acreditado más el valor anualizado del saldo en la cuenta del programa de contribuciones híbridas en el momento de la discapacidad, pagadero como una anualidad; sujeto a un máximo del 33 % de la compensación promedio, según su definición.

*(5) Beneficios especiales*

(a) *Ajustes del costo de vida (COLA) a los beneficios de pensión*

A partir del 1 de enero de 2017 y posteriormente cada tres años a partir de entonces, el beneficio anual se incrementa en un 3 % para los miembros jubilados y los miembros discapacitados, siempre que el miembro haya estado recibiendo pagos durante al menos tres años.

Estos COLA se pagan del ELA.

**Contribuciones**

El requisito de aportación al SRJ está establecido por ley y no se determina actuarialmente.

*(1) Contribuciones de los miembros:* Las contribuciones de los miembros representan el 8% de la compensación si son contratados antes del 24 de diciembre de 2013, el 10% de la compensación si son contratados entre el 24 de diciembre de 2013 y el 30 de junio de 2014 y el 12% de la compensación si son contratados a partir del 1 de julio de 2014.

*(2) Contribuciones del patrono:*

(a) Contribuciones patronales basadas en nómina: Las contribuciones del ELA son el 30.34 % de la compensación. Antes del 1 de julio de 2008, la tasa de las contribuciones del patrono era del 20.0 % de la compensación.

(b) Aportación Uniforme Adicional (Ley Núm. 162-2013): A partir del año fiscal 2015, el SRJ recibirá una aportación uniforme adicional según sea necesario para evitar que los activos brutos proyectados del SRJ, durante cualquier año fiscal posterior, caigan por debajo de $20 millones. La Aportación Adicional Anual será financiada por el ELA desde el año fiscal 2015 hasta el año fiscal 2046. Las contribuciones uniformes adicionales determinadas para los años fiscales 2015, 2016 y 2017 fueron de aproximadamente $11.6 millones, $12.1 millones y $13.5 millones, respectivamente. La aportación uniforme adicional se paga al final del año fiscal correspondiente. Para obtener información adicional sobre el estado de las contribuciones, consulte la Nota 2.

*(c) SRM:*

Descripción del plan: antes del 23 de agosto de 2017, el SRM era un plan de pensión de beneficios definidos por un solo patrono administrado por el Sistema de Retiro de Maestros de Puerto Rico. Se trataba de un fideicomiso creado por la Ley Núm. 218-1951, derogada por la Ley Núm. 91-2004, para brindar pensiones y otros beneficios principalmente a los maestros jubilados del DE y los empleados del SRM.

Antes del 23 de agosto de 2017, el SRM administró dos estructuras de beneficios a tenor con la Ley Núm. 160-2013, enmendada por la decisión del 11 de abril de 2014 de la Corte Suprema de Puerto Rico. Las disposiciones de beneficios varían según la fecha de contratación del miembro, a saber:

Miembros contratados el 31 de julio de 2014 o antes, con ciertas distinciones para los miembros que se retiran el 1 de agosto de 2014 o posterior (programa de aportación de beneficios definidos).

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Miembros contratados el 1 de agosto de 2014 o posteriormente (programa de contribuciones híbridas).

Todos los maestros activos del DE y los empleados del SRM se convirtieron en miembros del plan del SRM en la fecha de su empleo. Los maestros con licencia que trabajan en escuelas privadas u otras organizaciones educativas tenían la opción de convertirse en miembros del SRM siempre que se cumplieran las contribuciones requeridas del patrono y del empleado.

Los beneficios proporcionados a los miembros del SRM fueron establecidos mediante un estatuto del ELA y solo pueden ser modificados por la Legislatura con la aprobación del Gobernador.

Este resumen de la descripción del plan del SRM está destinado a describir las características esenciales del plan. Todos los requisitos de elegibilidad y los montos de los beneficios deben determinarse estrictamente de acuerdo con el documento del plan.

Como parte de la información de descripción del plan, los aspectos más importantes de la Ley Núm. 160-2013, enmendada por la decisión del 11 de abril de 2014 de la Corte Suprema de Puerto Rico, son los siguientes: (i) los participantes activos al 31 de julio de 2014 continuarán participando en el programa de pensión de beneficios definidos; (ii) a partir del 1 de agosto de 2014, el programa de pensiones de beneficios definidos se cerrará para futuros participantes y contribuirán a un programa de contribuciones híbridas; (iii) la edad de retiro de los empleados contratados a partir del 1 de agosto de 2014 aumentará a 62 años; (iv) la aportación de los empleados contratados a partir del 1 de agosto de 2014 aumentará al 10 % del 1 de agosto de 2014 al 30 de junio de 2017, 13.12 % a partir del 1 de julio de 2017 al 30 de junio de 2020 y 14.02 % a partir del 1 de julio de 2020 en adelante; (v) se reducirán los beneficios especiales pagaderos a los participantes activos que se jubilen el 31 de julio de 2014 o antes, y (vi) se eliminarán los beneficios especiales y los beneficios de atención médica posterior al empleo para los futuros jubilados.

**Programa de pensión de beneficios definidos**

Antes del 23 de agosto de 2017, los miembros del SRM contratados el 31 de julio de 2014 o antes eran elegibles para los beneficios que se describen a continuación:

*(1) Anualidad de retiro*

Los miembros eran elegibles para pagos de beneficios mensuales determinados por la aplicación de las proporciones de beneficios estipuladas a la compensación promedio del miembro. La compensación promedio se calculó con base en los 36 meses más altos de compensación reconocidos por el SRM. La anualidad mensual para la que un miembro era elegible se limitó a un mínimo de $400 por mes y un máximo del 75 % de la compensación promedio.

Los miembros eran elegibles para los beneficios de anualidad de retiro al cumplir con lo siguiente:

| Edad | Años de servicios acreditables | Compensación de la anualidad de retiro |
|---|---|---|
| 55 | 30 o más | 75% de la compensación promedio |
| 50 | 30 o más | 75% de la compensación promedio (1) |
| Menos de 50 | 30 o más | 65% de la compensación promedio |
| 50 | Al menos 25, pero menos de 30 | 1.8% de la compensación promedio por años de servicio |
| 47, pero menos de 50 | Al menos 25, pero menos de 30 | 95% de 1.8% de la compensación promedio por años de servicio |
| 60 o más | Al menos 10, pero menos de 25 | 1.8% de la compensación promedio por años de servicio |

(1) Consulte la subsección (g) del Programa de Retiro Anticipado.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(2) *Anualidad de retiro diferida*

Un empleado participante que finalizó el servicio antes de los 60 años, después de haber acumulado un mínimo de 10 años de servicio acreditable, es elegible para una anualidad de retiro diferida pagadera a partir de los 60 años. Un empleado participante que completó 25 o más años de servicio acreditable y tiene menos de 47 años en el momento de la rescisión es elegible calificó para una anualidad de retiro diferida pagadera a partir de los 47 años. Los derechos adquiridos descritos anteriormente se proporcionaron si sus contribuciones al SRM se dejan en el SRM hasta la edad de retiro respectiva.

(3) *Anualidad por discapacidad ocupacional*

Un empleado participante, que como resultado directo del desempeño de su ocupación quedó discapacitado, era elegible para una anualidad del 1.8 % de la compensación promedio basada en los 60 meses más altos o la cantidad de meses de servicio acreditable, si es inferior a 5 años, reconocido por el SRM, multiplicado por años de servicio acreditable, pero no menos de $400 por mes.

(4) *Beneficios por Fallecimiento*

Antes del retiro: Los beneficiarios reciben las contribuciones de los miembros realizadas más el 2 % de interés acumulado a la fecha del fallecimiento (después de descontar las deudas con SRM). Adicionalmente, para los beneficiarios de miembros que fallecieron el 31 de julio de 2014 o antes, recibirán una cantidad igual a la compensación anual del miembro al momento del fallecimiento.

Después del retiro: Para miembros que se retiran el 31 de julio de 2014 o antes: El cónyuge supérstite recibe el 50 % de la pensión del miembro y el otro 50 % se comparte entre los hijos del miembro (si corresponde) y solo si dichos hijos son menores de 22 años o están discapacitados (hasta que cese la discapacidad). Si no hay un cónyuge supérstite o hijos elegibles, los beneficiarios reciben el excedente, si lo hay, de las contribuciones acumuladas al momento del retiro sobre los beneficios de anualidades totales recibidos antes del fallecimiento. El beneficio incluye la pensión completa por el mes en que falleció el pensionado más un período de pago adicional de quince días pagadero a los beneficiarios elegibles del miembro, pero en ningún caso, el beneficio puede ser inferior a $1,000 por mes SRM).

Después del retiro: Para miembros que se retiran después del 1 de agosto de 2014: Si el miembro eligió al momento del retiro transferir una parte de la anualidad a un beneficiario seleccionando una forma opcional de pago actuarialmente equivalente, se otorgará el beneficio del sobreviviente correspondiente. De lo contrario, el excedente, si lo hubiera, de las contribuciones acumuladas al momento del retiro sobre los beneficios de la anualidad total recibidos antes del fallecimiento se pagará a los beneficiarios o a la sucesión del miembro.

(5) *Reembolsos*

Un empleado participante que cesa su empleo en el ELA el 31 de julio de 2014 o antes sin derecho a una anualidad de retiro tiene derecho a un reintegro de las contribuciones de los empleados pagadas al SRM, más cualquier interés devengado al respecto.

(6) *Programa de retiro anticipado*

El 27 de enero de 2000, se aprobó la Ley Núm. 44, que disponía que, a partir del 9 de marzo de 2000, los miembros eran elegibles para el retiro anticipado al cumplir los 50 y 28 años de servicio en el primer año de implementación y a los 50 y 25 años de servicio en los años siguientes. Aquellos que seleccionaron el retiro anticipado en estas condiciones reciben beneficios mensuales equivalentes al 75 % de su compensación promedio, que se calculó con base en los 36 meses más altos de compensación reconocida por el SRM. A partir del 31 de julio de 2001, se cerró la opción de retiro anticipado. El 27 de enero de 2001, se aprobó la Ley Núm. 45, que estableció 50 años como requisito de edad mínima para obtener un beneficio de pensión equivalente al 75 % de la compensación promedio con 30 años de servicio. En estos casos, el miembro retirado paga la aportación del empleado

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

participante hasta los 55 años. La Ley Núm. 160-2013 impuso la misma obligación al patrono.

**Programa de contribuciones híbridas**

Un plan híbrido, como un plan de saldo de efectivo, (i) determina el monto del beneficio basado en una fórmula que utiliza contribuciones y gana créditos, (ii) tiene cuentas individuales nocionales para los miembros y (iii) proporciona beneficios de anualidades de por vida. Antes del 23 de agosto de 2017, cada miembro tenía una cuenta de aportación definida que se acreditaba con las contribuciones de los miembros y el rendimiento de la inversión. En el momento del retiro, el saldo en la cuenta se pagó como una anualidad de por vida. El programa se definió como híbrido porque contenía algunas características que se encuentran comúnmente en los planes de beneficios definidos y otras características que se encuentran comúnmente en los planes de aportación definida, como:

- Los miembros contribuyen con un porcentaje fijo de nómina a su cuenta. En los planes de beneficios definidos, el porcentaje generalmente es fijo. En los planes de aportación definida, el porcentaje generalmente es elegido por el miembro.

- La cuenta de aportación definida se acredita cada semestre con la tasa neta de rendimiento de la cartera de inversiones del SRM. El rendimiento fue determinado por la Junta y no será inferior al 80 % de la tasa neta de rendimiento de la cartera de inversiones del SRM. El crecimiento de la cuenta mediante la aplicación de ganancias de inversión es una característica común de los planes de aportación definida.

- El SRM invierte activos. Esta característica se observa con mayor frecuencia en los planes de beneficios definidos. Por el contrario, los planes de aportación definida comúnmente permiten a los miembros elegir sus inversiones de manera individual y las contribuciones de los miembros se invierten en las opciones seleccionadas por el miembro.

- En el momento del retiro, el saldo de la cuenta se paga al miembro en forma de una anualidad de por vida con beneficios opcionales para sobrevivientes. El SRM era responsable del riesgo de inversión y longevidad durante el retiro. Esta característica anual es común en los planes de beneficios definidos.

Antes del 23 de agosto de 2017, los miembros del SRM contratados el 1 de agosto de 2014 o posteriormente eran elegibles para los beneficios que se describen a continuación:

*(1) Anualidad de retiro*

Los miembros con cinco o más años de servicio y $10,000 o más en contribuciones a la edad de 62 años calificarán para una anualidad del porcentaje adquirido por contribuciones basado en la fórmula actuarial.

La pensión de cada miembro se calcula al momento del retiro de la siguiente manera: (i) el saldo acumulado de las contribuciones de los miembros a la cuenta de aportación definida en la fecha de retiro, dividido por (ii) un factor, establecido por la Junta del SRM en consulta con sus actuarios y que se determinará en función de la esperanza de vida actuarial de el participante y una tasa de interés específica.

*(2) Anualidad de retiro diferida*

Los miembros con cinco o más años de servicio y $10,000 o más en contribuciones serán elegibles para una anualidad calculada con base en el saldo de la cuenta de aportación definida. Si deja el servicio con los requisitos, pero con menos de 62 años, la anualidad se diferirá hasta que cumpla 62 años.

*(3) Anualidad por discapacidad*

Cualquier miembro que se inscribió en el SRM después del 1 de agosto de 2014 y después de cinco años en el servicio público sufre una discapacidad, ya sea relacionada con el trabajo o no, el SRM le otorga una pensión por discapacidad calculada sobre la base de las contribuciones individuales de dichos miembros, según lo determinado por el SRM a través de las regulaciones.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(4)  Beneficios por Fallecimiento*

Antes del 23 de agosto de 2017, había dos opciones de beneficios por fallecimiento para los beneficiarios de nuevos miembros que se unieran a partir del 1 de agosto de 2014 después del retiro y fallecimiento de dichos miembros:

(a)  continuar recibiendo los pagos mensuales de la anualidad hasta que se agote el saldo, si corresponde, de las contribuciones a la cuenta de aportación definida o

(b)  solicitar el reintegro en un pago total del saldo, si lo hubiera.

*(5)  Reembolsos*

Antes del 23 de agosto de 2017, un miembro con menos de cinco años de servicio o menos de $10,000 en contribuciones era elegible para un reintegro. Específicamente, un reintegro de contribuciones y ganancias en la cuenta de aportación definida de dicho miembro.

**Beneficios especiales**

La Ley Núm. 160-2013 establece una reducción en las leyes especiales para los pensionados al 31 de julio de 2014 y la eliminación de leyes especiales para futuros pensionados que se retiren a partir del 1 de agosto de 2014. Los beneficios especiales incluyen:

*(1)  Bono de Navidad*

Un bono anual de $600 por cada miembro retirado y discapacitado pagado cada diciembre. El SRM paga $150 por miembro retirado y miembro discapacitado y el bono restante es pagado por el ELA. Después del 1 de agosto de 2014, para los participantes activos que se retiraron el 31 de julio de 2014 o antes, el bono será de $200 y se pagará del ELA.

*(2)  Bono por medicamentos*

Un bono anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado pagado cada julio para cubrir los costos de atención médica; no se requiere evidencia de cobertura. Este beneficio se paga del ELA. La Ley Núm. 160-2013 mantuvo este beneficio para los participantes activos que se retiraron el 31 de julio de 2014 o antes.

*(3)  Bono de verano*

Antes de la Ley Núm. 160-2013, se pagaba un bono anual de $100 por cada miembro retirado, beneficiario y miembro discapacitado cada julio. Este beneficio se prorrateó si había múltiples beneficiarios y se paga del ELA. La Ley Núm. 160-2013 eliminó este beneficio para todos los miembros jubilados.

*(4)  Ajustes del costo de vida*

La Ley Núm. 62-1992 preveía, sujeto a la aprobación de la Legislatura, aumentos del 3 % cada tres años en las pensiones a aquellos miembros con tres o más años de retiro. En los años 1995, 1998, 2001, 2004 y 2007, la Legislatura replicó el beneficio otorgado por la Ley Núm. 62-1992. Este beneficio se paga del ELA. La Ley Núm. 160-2013 no alteró este beneficio.

*(5)  Otras leyes para el aumento de la pensión*

La Ley Núm. 128-1967 y la Ley Núm. 124-1973, establecieron un aumento de la pensión (del 2% al 10%) en función de la pensión mensual. La Ley Núm. 47-1984 preveía un aumento de las pensiones basado en el servicio acreditado trabajado. Estos aumentos se pagan del ELA. La Ley Núm. 160-2013 no alteró este beneficio.

*(6)  Préstamos culturales*

La Ley Núm. 22-1965 establece un reintegro del 50 % de los intereses que pagarían los maestros activos y los miembros jubilados. Este beneficio se paga del ELA. La Ley Núm. 160-2013 no alteró este beneficio.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(7) Beneficio por Fallecimiento*

La Ley Núm. 272-2004 aumentó el beneficio por fallecimiento de $500 a $1,000. Este aumento de $500 se paga del ELA. Según la Ley Núm. 160-2013, este beneficio se aplicará solo a la muerte de los miembros que se unieron al SRM el 31 de julio de 2014 o antes.

Las contribuciones de beneficios especiales de aproximadamente $157 millones en 2017 representan contribuciones del Fondo General del ELA para los beneficios especiales otorgados por leyes especiales. Los fondos para los beneficios especiales se entregaban al SRM a través de asignaciones legislativas cada 1 de enero y 1 de julio. Las asignaciones legislativas se consideran estimaciones de los pagos que debe realizar el SRM por los beneficios especiales. Las deficiencias en las asignaciones legislativas se cubren con fondos propios del SRM hasta que se recuperaron mediante futuras asignaciones legislativas. Cualquier excedente de los créditos legislativos recaudados sobre los beneficios especiales pagados se combina con los activos en fideicomiso para el pago de otros beneficios de pensión.

**Contribuciones**

El requisito de aportación al SRM está establecido por ley y no se determina actuarialmente.

*(1) Contribuciones de los miembros:*

(a) Las contribuciones de los miembros contratados el 31 de julio de 2014 o antes representan el 9 % de la compensación.

(b) Las contribuciones de los miembros contratados a partir del 1 de agosto de 2014 son las siguientes: (i) 10 % de la compensación para los años fiscales 2015 a 2017, (ii) 13.12 % de la compensación para los años fiscales 2018 a 2020, y (iii) 14.02 % de la compensación para el año fiscal 2021 y cada año posterior.

*(2) Contribuciones del patrono*

(a) Contribuciones patronales basadas en nómina: Las contribuciones del ELA y el SRM, según corresponda, representan el 9.5 % de la compensación para el año fiscal que comienza el 1 de julio de 2011. Para los próximos cuatro años fiscales (1 de julio de 2012 hasta el 1 de julio de 2015), las contribuciones de los patronos aumentarán anualmente en un 1 %. Para los próximos cinco años fiscales, (1 de julio de 2016 a 1 de julio de 2020) las contribuciones de los patronos aumentarán anualmente en un 1.25 %, alcanzando una tasa de aportación patronal de 19.75 % a partir del 1 de julio de 2020. A partir del 1 de julio de 2021 y años fiscales posteriores, la tasa de aportación patronal será del 20.53%.

(b) Contribuciones complementarias: Desde el año fiscal 2015 y cada año fiscal posterior, el Fondo General del ELA proporcionará al SRM una aportación complementaria de $1,675 por pensionado, independientemente de si el pensionista se retiró antes o después del 1 de agosto de 2014, para pagar beneficios especiales (es decir, bonos de Navidad y medicamentos) y aportación al plan de seguro médico.

(c) Aportación Uniforme de Justicia de Maestros La aportación anual a realizar al SRM es igual a $30 millones en el año fiscal 2017, $30 millones en el año fiscal 2018 y $60 millones en cada año fiscal desde el año fiscal 2019 hasta el año fiscal 2042. La aportación uniforme de justicia de maestros se paga del ELA.

(d) Aportación anual adicional: La aportación anual certificada por el actuario externo del SRM según sea necesario para evitar que el valor de los activos brutos proyectados del SRM caiga por debajo de $300 millones durante cualquier año fiscal posterior. La aportación anual adicional se paga del ELA para cada año fiscal desde el año fiscal 2019 hasta el año fiscal 2042. Para obtener información adicional sobre el estado de estas contribuciones, consulte la Nota 2.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*(d) Membresía al 1 de julio de 2015*

|  | SRJ | SRM |
|---|---|---|
| Miembros retirados, beneficiarios y miembros discapacitados que actualmente reciben beneficios | 448 | 41,751 |
| Empleados participantes actuales | 371 | 37,684 |
| Participantes con contrato terminados que aún no reciben beneficios | 39 | 750 |
| Total | 858 | 80,185 |

*(e) Pasivos netos de pensiones*

El pasivo por pensiones neto del ELA al 30 de junio de 2017 se midió al 30 de junio de 2016, y el pasivo por pensiones total utilizado para calcular el pasivo por pensiones neto se determinó mediante una valoración actuarial con datos del censo al inicio del año al 1 de julio de 2015 que se actualizó para adelantar el pasivo total de pensiones al 30 de junio de 2016, suponiendo que no haya ganancias ni pérdidas. Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

*(i) Métodos y supuestos actuariales*

El total de pasivos por pensiones en las valoraciones actuariales del 30 de junio de 2016 se determinó utilizando los siguientes métodos y supuestos actuariales, aplicados a todos los períodos incluidos en la medición:

|  | SRE | SRJ | SRM |
|---|---|---|---|
| Método de costo actuarial | Edad de ingreso normal | Edad de ingreso normal | Edad de ingreso normal |
| Método de valuación de activos | Valor de mercado de los activos | Valor de mercado de los activos | Valor de mercado de los activos |
| Supuestos actuariales |  |  |  |
| Inflación | 2.5% | 2.5% | 2.5% |
| Tasa de rendimiento de la inversión, neta de gastos de inversión, incluida la inflación | 6.5 | 5.5 | 6.7 |
| Índice de bonos municipales | 3.8 | 3.8 | 3.8 |
| Tasa de descuento | 2.85 | 2.86 | 2.86 |
| Incrementos salariales proyectados por año | 3.0% por año. No del costo de vida hasta el 1 de julio de 2021 como consecuencia de la Ley Núm. 66 y la economía general actual. | 3.0% por año. No Se asumen aumentos de compensación hasta el 1 de julio de 2021 como consecuencia de la Ley Núm. 66 y la economía general actual. | 2.5% por año general inflación salarial más aumentos por mérito basados en el servicio. No se asumen aumentos de compensación hasta el 1 de julio de 2021 como consecuencia de la Ley Núm. 66 y la economía general actual. |
| Se asumen aumentos de compensación ajustes. | No se asume ninguno. | No se asume ninguno. | No se asume ninguno. |

Las tablas de mortalidad utilizadas en las valoraciones actuariales del 30 de junio de 2016 fueron las siguientes:

- Mortalidad previa al retiro: Para los empleados generales del SRE no cubiertos por la Ley Núm. 127-1958 y para los miembros del SRM, las tasas de mortalidad de empleados RP-2014 para hombres y mujeres ajustadas para reflejar la Escala de mejora de la mortalidad MP-2016 desde el año base 2006 y proyectadas hacia el futuro mediante MP-2016 en una base generacional. Para miembros de SRE cubiertos por la Ley 127-1958, RP 2014

245

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Se asumen las tasas de mortalidad del empleado con ajustes de cuello blanco para hombres y mujeres, ajustados para reflejar la Escala de Mejora de Mortalidad MP-2016 desde el año base 2006, y proyectados hacia adelante usando MP-2016 sobre una base generacional. Como tablas generacionales, reflejan las mejoras de mortalidad tanto antes como después de la fecha de medición.

- Para el SRE, se supone que el 100 % de las muertes durante el servicio activo son ocupacionales solo para los miembros cubiertos por la Ley Núm. 127-1958. Para el SRJ, entre los fallecimientos durante el servicio activo, se supone que el 50 % son ocupacionales y el 50 % son no ocupacionales.

- Mortalidad de miembros saludables después del retiro Para el SRE y el SRM, se supone que las tasas que varían según el género para los miembros jubilados y beneficiarios saludables se basan en un estudio de la experiencia del plan de 2007 a 2012 igual al 92 % de las tasas de la Tabla de Mortalidad para Hombres UP 1994 y el 95 % (SRE) u 87 % (SRM) de las tasas de la Tabla de Mortalidad UP 1994 para Mujeres. Las tasas se proyectan sobre una base generacional utilizando la Escala de Mejora de Mortalidad MP-2016 sobre una base generacional. Como tabla generacional, refleja las mejoras de mortalidad tanto antes como después de la fecha de medición.

- Para el SRJ, se asumen las tasas de mortalidad anual saludable de RP 2014 con ajustes de cuello blanco para hombres y mujeres, ajustados para reflejar la Escala de Mejora de Mortalidad MP-2016 desde el año base 2006, y proyectados hacia adelante usando MP-2016 sobre una base generacional. Como tablas generacionales, refleja las mejoras de mortalidad tanto antes como después de la fecha de medición.

- Mortalidad de miembros discapacitados después del retiro: Para el SRE, se supone que las tasas que varían según el género para los miembros jubilados discapacitados se basan en un estudio de la experiencia del plan de 2007 a 2012 igual al 105 % de las tasas de la Tabla de Mortalidad de UP 1994 para Hombres y 115 % de las tasas de la UP 1994 Tabla de mortalidad para mujeres. Las tasas base se proyectan utilizando la Escala de Mejora de la Mortalidad MP-2016 sobre una base generacional. No se establecieron previsiones para mejorar la mortalidad futura de los miembros jubilados discapacitados.

- Para el SRM, se supone que las tasas que varían según el género para los miembros jubilados discapacitados se basan en un estudio de la experiencia del plan de 2007 a 2012 igual a las tasas en la Tabla de Mortalidad UP 1994 para Hombres y Mujeres. Las tasas base se proyectan utilizando la Escala de Mejora de la Mortalidad MP-2016 sobre una base generacional. No se establecieron previsiones para mejorar la mortalidad futura de los miembros jubilados discapacitados.

- Para el SRJ, las Tasa de mortalidad anual de personas discapacitadas de RP 2014 para hombres y mujeres se asumen ajustadas para reflejar la Escala de mejora de la mortalidad MP-2016 del año base 2006 y se proyecta hacia el futuro mediante MP-2016 con una base generacional. No se establecieron previsiones para mejorar la mortalidad futura de los miembros jubilados discapacitados.

*(ii)    Tasa esperada a largo plazo de retorno sobre la inversión*

La tasa de rendimiento esperada a largo plazo de las inversiones en beneficios de pensiones se determinó de acuerdo con la asignación de activos de cartera adoptada por las juntas correspondientes de los Sistemas de Retiro durante diciembre de 2013 para el SRE, enero de 2016 para el SRM y octubre de 2016 para el SRJ y los supuestos actuariales del mercado de capital al 30 de junio de 2016. La tasa de rendimiento esperada a largo plazo de las inversiones en beneficios de pensiones al 30 de junio de 2016 era del 6.55% para el SRE, del 5.85% para SRM y del 5.70% para el SRJ. En el caso del SRE, la tasa de rendimiento esperada a largo plazo de las inversiones en beneficios de pensiones fue ligeramente mayor que la amortización de la deuda de los bonos de fondos de pensiones senior pagaderos, que oscilaron entre 5.85 % por año y 6.55 % por año. Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios y administración de pensión gestionados por el SRE y el SRM. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

Las políticas de los Sistemas de Retiro con respecto a la asignación de activos invertidos están

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

establecidas y pueden ser modificadas por la Junta del Sistema de Retiro correspondiente. Los activos del plan se administran sobre una base de rendimiento total con el objetivo a largo plazo de lograr y mantener un impacto positivo en cada una de las condiciones financieras de los Sistemas de Retiro para los beneficios proporcionados a través de los programas de pensiones. A continuación, se incluyen siguientes son las políticas de asignación de activos adoptadas por la Junta del Sistema de Retiro al 30 de junio de 2016:

| | SRE | | SRM | | SRJ | |
|---|---|---|---|---|---|---|
| | Asignación objetivo | Tasa de retorno esperada a lago plazo | Asignación objetivo | Tasa de retorno esperada a largo pazo | Asignación objetivo | Tasa de retorno esperada a largo plazo |
| Clase de activo: | | | | | | |
| Capital nacional | 25% | 6.4% | 14% | 6.8% | 15% | 6.8% |
| Capital internacional | 10 | 6.7 | 6 | 7.6 | 10 | 6.6 |
| Ingresos fijos | 64 | 6.3 | 79 | 3.9 | 74 | 5.5 |
| Dinero en efectivo | 1 | 3.0 | 1 | 2.9 | 1 | 2.3 |
| Total | 100% | | 100% | | 100% | |

Las tasas de rendimiento esperadas a largo plazo de las inversiones en beneficios de pensiones se determinaron utilizando un método básico en el que se desarrollaron los mejores rangos estimados de las tasas de rendimiento reales futuras esperadas (rendimientos esperados, neto del gasto de inversión del plan de pensiones e inflación) para cada activo importante clase. Estos rangos se combinaron para producir la tasa de rendimiento esperada a largo plazo al ponderar las tasas de rendimiento reales futuras esperadas por el porcentaje de asignación de activos objetivo y al agregar la inflación esperada.

*(iii)   Fecha de agotamiento y tasa de descuento*

La base del activo para la fecha de proyección de agotamiento es cada uno de los resultados netos fiduciarios de los Sistemas de Retiro (los activos brutos más las salidas diferidas de recursos menos los pasivos brutos, incluidos los bonos de fondos de pensiones sénior pagaderos, más las entradas diferidas de recursos). Sobre esta base, los resultados netos fiduciarios del SRE se agotaron en el año fiscal 2015. Se espera que los resultados netos fiduciarios del SRM y SRJ se agoten en los años fiscales 2019 y 2018, respectivamente. Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de la administración de pensiones gestionadas por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

La tasa de descuento utilizada para medir el pasivo total por pensiones disminuyó del 3.8% anual al 30 de junio de 2015 al 2.85% anual al 30 de junio de 2016 para el SRE, y del 3.8% anual al 30 de junio de 2015 para SRM y SRJ al 2.86% anual, al 30 de junio de 2016.

No se proyectó que los resultados netos fiduciarios del SRE estuvieran disponible para realizar todos los pagos de beneficios futuros proyectados de los empleados activos e inactivos actuales. La fecha de proyección de agotamiento en el informe actuarial no incluye ningún monto de la aportación uniforme adicional requerida por la Ley Núm. 32-2013 debido a dificultades financieras fiscales y presupuestarias reales, déficits presupuestarios continuos y riesgos de liquidez del ELA y sus municipios, y el riesgo que la situación financiera del ELA y sus municipios no mejora a corto plazo. En consecuencia, se aplicó el índice de bonos municipales libres de impuestos (Obligación General del Comprador de Bonos 20 - Índice de Bonos Municipales) a todos los períodos de pagos de beneficios proyectados para determinar el pasivo total por pensiones. La tasa de descuento para el SRE era del 2.85% al 30 de junio de 2016.

No se espera que los resultados netos fiduciarios del SRM y SRJ estén disponibles para realizar todos los pagos de beneficios futuros proyectados de los miembros activos e inactivos actuales. Por lo tanto, la tasa de descuento para calcular el pasivo de pensión total es igual a la tasa equivalente única que resulta en el mismo valor presente actuarial que la tasa de rendimiento esperada a largo plazo aplicada a los pagos de beneficios, en la medida en que los resultados netos fiduciarios del plan de pensiones se proyecta que sean suficientes para realizar los pagos de beneficios

247

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

proyectados, y la tasa de índice de bonos municipales libres de impuestos (Obligación General del Comprador de Bonos 20 - Índice de Bonos Municipales de Bonos) se aplica a los pagos de beneficios, en la medida en que no se proyecte que los resultados netos fiduciarios del plan de pensiones sean suficientes. La tasa de descuento del SRM y el SRJ era de 2.86% al 30 de junio de 2016.

*(iv)   Cambios en los pasivos netos de pensiones del SRM y SRJ*

Los cambios en los pasivos netos de pensiones del ELA del SRM y el SRJ al período del 30 de junio de 2017 (usando una fecha de medición del 30 de junio de 2016) fueron los siguientes (en miles):

| | | SRM | | | JRS | |
|---|---|---|---|---|---|---|
| | Total pasivos pensiones | Resultados netos fiduciarios del plan | Pasivos pensiones netos | Total pasivos pensiones | Resultados netos fiduciarios del plan | Pasivos pensiones netos |
| Saldo al 1 de julio de 2015 | $   16,307,731 | 1,311,081 | 14,996,650 | 585,312 | 40,172 | 545,140 |
| Cambios para el año: | | — | 294,692 | 19,155 | — | 19,155 |
| Costo de servicio | 294,692 | | | | | |
| Intereses sobre pasivos totales de Pensiones | 648,407 | — | 648,407 | 22,625 | — | 22,625 |
| Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 43,202 | — | 43,202 | (2,826) | — | (2,826) |
| Cambios en los supuestos | 1,621,712 | — | 1,621,712 | 51,960 | — | 51,960 |
| Contribuciones - patronales | — | 213,724 | (213,724) | — | 15,223 | (15,223) |
| Contribuciones - empleados | — | 99,557 | (99,557) | — | 3,190 | (3,190) |
| Contribuciones - transferencias | — | 1,804 | (1,804) | — | — | — |
| Ingresos de inversiones netas del plan de pensiones | — | 45,060 | (45,060) | — | 1,751 | (1,751) |
| Otros ingresos | — | 1,350 | (1,350) | — | — | — |
| Pagos de beneficios, que incluyen reintegros de contribuciones | (750,172) | (751,245) | 1,073 | (24,560) | (24,560) | — |
| Gastos administrativos netos del plan de pensión | — | (25,876) | 25,876 | — | (946) | 946 |
| Cambios netos | 1,857,841 | (415,626) | 2,273,467 | 66,354 | (5,342) | 71,696 |
| Saldo al 30 de junio de 2016 | $   18,165,572 | 895,455 | 17,270,117 | 651,666 | 34,830 | 616,836 |

Los pasivos netos de pensiones para el SRM y el SRJ de aproximadamente $17,300 millones y $616.8 millones, respectivamente, al 30 de junio de 2016 se incluyen como parte de las Actividades Gubernamentales del Gobierno Primario en el estado de resultados netos.

Los supuestos actuariales se revisan periódicamente para reflejar más de cerca tanto la experiencia futura real como la anticipada. Debido al cambio en la fecha de recopilación del censo al comienzo del año fiscal en lugar del final del año fiscal, la ganancia/pérdida demográfica durante el año se limita a la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en la rescisión y actividad de retiro y mortalidad frente a las expectativas.

La valoración actuarial del 30 de junio de 2016 para SRM refleja los aumentos en el total de pasivos por pensiones de la siguiente forma: (i) pérdida de aproximadamente $1,600 millones como resultado de los cambios en los supuestos, y (ii) pérdida de aproximadamente $73 millones como resultado de la actualización de los datos del censo para reflejar una actividad de retiro no común durante el año fiscal 2016, más la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en la actividad de retiro y la mortalidad real frente a las expectativas.

La valuación actuarial del 30 de junio de 2016 para el SRJ refleja un aumento de aproximadamente $66 millones en el pasivo total de pensiones debida los cambios en los supuestos relacionados con el cambio en la tasa de descuento como lo requiere la Declaración GASB Núm. 67 de 3.82% en 2015

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

a 2.86% en 2016 y una disminución de aproximadamente $3 millones en el pasivo total por pensiones debido a las diferencias entre la experiencia esperada y real. No se suponen aumentos de compensación hasta el 1 de julio de 2021 como resultado de la Ley Núm. 66-2014.

*(v)   Sensibilidad de los pasivos de resultados netos a los cambios en la tasa de descuento*

La siguiente tabla presenta el pasivo neto por pensiones del ELA para el SRM y el SRJ calculado de la siguiente manera (en miles): (i) utilizando la tasa de descuento del 2.86%, así como cuál sería dicha tasa si se calculara utilizando una tasa de descuento del 1 % menos (1.86%) o 1 % porcentual más (3.86%) que la tasa actual:

|  | SRM | | | SRJ | | |
|---|---|---|---|---|---|---|
|  | Reducción del 1 % | Tasa actual de descuento | Aumento del 1 % | Reducción del 1 % | Tasa actual de descuento | Aumento del 1 % |
|  | (1.86%) | (2.86%) | (3.86%) | (1.86%) | (2.86%) | (3.86%) |
| Pasivos de pensiones netos | $   20,095,291 | 17,270,117 | 14,982,985 | 715,586 | 616,836 | 537,054 |

La siguiente tabla presenta la participación proporcional del ELA en el pasivo por pensiones neto para el SRE calculada utilizando la tasa de descuento del 2.85%, así como también cuál sería la participación proporcional del ELA en el pasivo por pensiones neto si se calculara utilizando una tasa de descuento del 1 % menos (1.85%) o 1 % más (3.85%) que la tasa actual (en miles):

|  | Reducción del 1 % (1.85%) | Tasa de descuento (2.85%) | Aumento del 1 % (3.85) |
|---|---|---|---|
| Participación proporcional del ELA en los pasivos de pensiones netos | $   29,210,451 | 25,467,704 | 22,420,351 |

*(vi)   Proporción del ELA en los pasivos de pensiones netos del SRE*

La siguiente tabla presenta la participación proporcional del ELA en los pasivos por pensiones netos del SRE al 30 de junio de 2017, y el porcentaje proporcional del pasivo por pensiones neto agregado del SRE asignado al ELA (en miles):

|  | Actividades del gobierno | Actividades de tipo comercial | Total Gobierno primario |
|---|---|---|---|
| Participación proporcional del ELA en los pasivos por pensiones netos | 65.41% | 2.15% | 67.56% |
| Participación proporcional del ELA en los pasivos de pensiones netos | $   24,658,038 | 809,666 | 25,467,704 |

La proporción del ELA en los pasivos por pensiones netas del SRE se basó en las contribuciones requeridas reales de cada uno de los patronos participantes que reflejan el esfuerzo de aportación a largo plazo proyectado de cada patrono. Las contribuciones que reflejan el esfuerzo de aportación a largo plazo proyectado de cada patrono incluido en el cálculo de la participación proporcional son: (1) Ley Núm. 116-2010 sobre aportación legal basada en la nómina, (2) Ley Núm. 3-2013 sobre

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

aportación complementaria, y (3) otras contribuciones de la ley especial. Se requirieron contribuciones al SRE de aproximadamente $464 millones durante el período posterior a la fecha de medición o durante el período finalizado el 30 de junio de 2017. Otras contribuciones al SRE que no reflejan el esfuerzo de aportación a largo plazo proyectado de un patrono, como las contribuciones que financian por separado las responsabilidades específicas de un patrono individual al SRE (es decir, incentivos de retiro anticipado del patrono local), se excluyeron del cálculo proporcional de la participación.

Asimismo, la Ley Núm. 32-2013 Aportación Uniforme Adicional (AUA), que es una aportación que refleja el esfuerzo de aportación a largo plazo proyectado de cada patrono, fue excluida del cálculo proporcional de la participación porque su cobro de varios patronos, incluido el ELA, es incierto. Esto evita una sobreasignación de la Declaración GASB Núm. 68 a los patronos que han pagado su AUA (o se espera que lo hagan) y una subasignación de la Declaración GASB Núm. 68 a los patronos que no han pagado su AUA (o no esperaba que lo hagan).

*(vii)  Cambios en los supuestos*

Los supuestos actuariales se revisan periódicamente para reflejar más de cerca tanto la experiencia futura real como la anticipada. Debido al cambio en la fecha de recopilación del censo al comienzo del año fiscal en lugar del al final del año fiscal, la ganancia/pérdida demográfica durante el año se limita a la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en la rescisión y actividad de retiro y mortalidad frente a las expectativas.

La valuación actuarial del 30 de junio de 2016 para el SRE refleja un aumento de aproximadamente $3,900 millones en el pasivo total de pensiones debido a los cambios en los supuestos relacionados con el cambio en la tasa de descuento como lo requiere la Declaración GASB Núm. 67 y una reducción de aproximadamente $250 millones en el pasivo total por pensiones debido a las diferencias entre la experiencia esperada y la real. Con la promulgación de la Ley Núm. 3-2013, se agregaron las tasas de rescisión, retiro y discapacidad para los nuevos miembros de la Ley Núm. 3. Además, el supuesto de aumento de la compensación fue revisado debido a la Ley Núm. 66-2014.

Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

**(f)  *Gastos de pensiones y salidas diferidas de recursos y entradas diferidas de recursos de actividades de pensiones***

Los gastos de pensión reconocidos por el ELA para el año terminado el 30 de junio de 2017 relacionados con los Sistemas de Retiro fueron los siguientes (en miles):

| Sistemas de retiro | | Actividades del gobierno | Actividades de tipo comercial | Total Gobierno primario |
|---|---|---|---|---|
| SRE | $ | 1,674,448 | 69,983 | 1,744,431 |
| SRM | | 1,227,648 | — | 1,227,648 |
| SRJ | | 66,459 | — | 66,459 |
| Total | $ | 2,968,555 | 69,983 | 3,038,538 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Las salidas diferidas y las entradas diferidas de recursos de las actividades de pensiones por fuente informada por el ELA en el estado de resultados netos al 30 de junio de 2017 para cada uno de los Sistemas de Retiro fueron los siguientes (en miles):

| Sistema de retiro | Fuente | Actividades del gobierno | | Actividades de tipo comercial | |
|---|---|---|---|---|---|
| | | Salidas diferidas de recursos | Entradas diferidas de recursos | Salidas diferidas de recursos | Entradas diferidas de recursos |
| SRE | Diferencias entre la experiencia esperada y real en la medición total de pasivos de pensiones | $ 20,160 | 338,517 | 662 | 11,116 |
| | Cambios en los supuestos | 3,760,647 | — | 123,499 | — |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 133,421 | — | 4,382 |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 92,551 | 498,325 | 48,062 | — |
| | Contribuciones del patrono realizadas después de la fecha de medición | 494,558 | — | 25,643 | — |
| | Total SRE | 4,367,916 | 970,263 | 197,866 | 15,498 |
| SRM | Diferencias entre la experiencia esperada y real en la medición total de pasivos de pensiones | 222,699 | — | — | — |
| | Cambios en los supuestos | 2,320,636 | — | — | — |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | 11,990 | — | — | — |
| | Contribuciones del patrono realizadas después de la fecha de medición | 270,302 | — | — | — |
| | Total SRM | 2,825,627 | — | — | — |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| Sistema de retiro | Fuente | Actividades del gobierno | | Actividades de tipo comercial | |
|---|---|---|---|---|---|
| | | Salidas Diferidas de recursos | Entradas diferidas de recursos | Salidas diferidas de recursos | Entradas diferidas de recursos |
| SRJ | Diferencias entre la experiencia esperada y real en la medición total de pasivos de pensiones $ | — | 6,020 | — | — |
| | Cambios en los supuestos | 77,273 | — | — | — |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | — | 2,371 | — | — |
| | Contribuciones del patrono realizadas después de la fecha de medición | 25,473 | — | — | — |
| | Total | 102,746 | 8,391 | — | — |
| | SRE | | | | |
| Total | Diferencias entre la experiencia esperada y real | 242,859 | 344,537 | 662 | 11,116 |
| | Cambios en los supuestos | 6,158,556 | — | 123,499 | — |
| | Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones | 11,990 | 135,792 | — | 4,382 |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 92,551 | 498,325 | 48,062 | — |
| | Contribuciones del patrono realizadas después de la fecha de medición | 790,333 | — | 25,643 | — |
| | Total $ | 7,296,289 | 978,654 | 197,866 | 15,498 |

252

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los montos reportados como salidas/entradas diferidas de recursos de actividades de pensiones al 30 de junio de 2017 se reconocerán en los gastos de pensiones de la siguiente manera (en miles):

| Año que termina el 30 de junio: | | SRE | SRM | SRJ | Total |
|---|---|---|---|---|---|
| 2018 | $ | 657,903 | 463,929 | 28,939 | 1,150,771 |
| 2019 | | 657,903 | 463,929 | 27,454 | 1,149,286 |
| 2020 | | 686,693 | 480,809 | 12,435 | 1,179,937 |
| 2021 | | 694,083 | 473,313 | 54 | 1,167,450 |
| 2022 | | 363,238 | 431,296 | — | 794,534 |
| Posteriormente | | — | 242,049 | — | 242,049 |
| Total | $ | 3,059,820 | 2,555,325 | 68,882 | 5,684,027 |

Las salidas diferidas de recursos relacionados con las pensiones resultantes de las contribuciones requeridas por el ELA posteriores a la fecha de medición fueron de aproximadamente $520.2 millones, $270.3 millones y $25.5 millones al 30 de junio de 2017 para la parte proporcional correspondiente del SRE, para el SRM y para el SRJ, respectivamente, y se reconocerá como una reducción del pasivo neto por pensiones en el año finalizado el 30 de junio de 2018. Este monto no se incluye en la tabla anterior

Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

**(g)** ***Información de pasivos de pensiones netos para unidades de componentes de presentación discreta***

Tal como se menciona en la Nota 1(s) para los fines de los estados financieros básicos independientes de cada una de las unidades de componentes de presentación discreta, cuyos informes de auditoría para el año fiscal 2017 ya se habían emitido antes de la emisión de los estados financieros básicos adjuntos del ELA, el SRE no proporcionó oportunamente información necesaria para aplicar las Declaraciones GASB Núm. 68 y Núm. 71. En consecuencia, la ATM, una unidad de componentes no mayor de presentación discreta, no pudo aplicar estos pronunciamientos contables.

*(i)* *Descripción y membresía del plan*

**Sistema de retiro de la Universidad de Puerto Rico**

El Sistema de Retiro de la Universidad de Puerto Rico (Sistema de Retiro de UPR) es un plan de pensión de beneficios definidos para un solo patrono que cubre a todos los empleados de la UPR con la excepción de los empleados por hora, temporales, a tiempo parcial, con contrato y sustitutos, y profesores visitantes. Es elegible y está exento de los impuestos sobre ingresos de Puerto Rico y Estados Unidos. El Sistema de Retiro de UPR no está sujeto a los requisitos de la Ley de Seguridad de Ingresos de Retiro de los Empleados de 1974 (ERISA). El Sistema de Retiro de UPR emite un informe financiero disponible públicamente que incluye información financiera adicional, otras divulgaciones requeridas e información complementaria requerida para el plan. Ese informe puede obtenerse escribiendo al Sistema de Retiro de la Universidad de Puerto Rico en P.O. Box 21769, San Juan, Puerto Rico 00931-1769.

**Sistema de Retiro de la Autoridad de Energía Eléctrica de Puerto Rico**

El Sistema de Retiro de la Autoridad de Energía Eléctrica de Puerto Rico (Sistema de Retiro de la AEE) es un plan de pensión de beneficios definidos para un solo patrono que cubre a todos los empleados permanentes de la AEE a tiempo completo administrados por el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica de Puerto Rico.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Es elegible y está exento de los impuestos sobre la renta de Puerto Rico y Estados Unidos. El Sistema de Retiro de la AEE no está sujeto a los requisitos de la Ley de Seguridad de Ingresos de Retiro de los Empleados de 1974 (ERISA). El Sistema de Retiro de la AEE emite un informe financiero disponible públicamente que incluye información financiera adicional, otras divulgaciones requeridas e información complementaria requerida para el plan. Puede obtener ese informe escribiendo al Sistema de Retiro de la Autoridad de Energía Eléctrica de Puerto Rico, PO Box 13978, San Juan, Puerto Rico 00908-3978.

*(ii)   Reconocimiento de importes de pensión*

Para aquellas unidades de componentes de presentación discreta que sí aplicaron las Declaraciones GASB Núm. 68 y Núm. 71, a continuación se incluye el pasivo neto de pensiones y el gasto de pensión reconocido en los estados financieros básicos auditados adjuntos bajo la unidad de opinión de unidades de componentes de presentación discreta (en miles):

| | Pasivos Netos de pensiones | Gastos de pensiones |
|---|---|---|
| Unidades de componentes mayores: | | |
| BGF | $        203,367 | 20,805 |
| AEE | 4,666,535 | 812,100 |
| AAA | 1,575,926 | 126,647 |
| ACT | 550,824 | 28,800 |
| UPR | 2,006,703 | 42,650 |
| CFSE | 1,713,281 | 137,503 |
| No mayor | 1,857,327 | 125,032 |
| Total de unidades de componentes | $      12,573,963 | 1,293,537 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

A continuación, se incluyen las salidas diferidas y las entradas diferidas de recursos de las actividades de pensiones por fuente informadas al 30 de junio de 2017 por las unidades de componentes de presentación discreta mencionadas (en miles):

| Unidad de componentes mayores | Fuente | Salidas diferidas de de recursos | Entradas diferidas de de recursos |
|---|---|---|---|
| BGF | Contribuciones del patrono realizadas después de la fecha de medición | $    6,853 | — |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la la participación proporcional | 13,365 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 166 | 2,300 |
| | Cambios en los supuestos | 31,020 | — |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | — | 1,592 |
| | Total BGF | 51,404 | 3,892 |
| AEE | Contribuciones del patrono realizadas después de la fecha de medición | 120,272 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 23,380 | — |
| | Cambios en los supuestos | 1,360,576 | 32,482 |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | 37,515 | 14,861 |
| | Total AEE | 1,541,743 | 47,343 |
| AAA | Contribuciones del patrono realizadas después de la fecha de medición | 97,203 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 1,288 | 21,635 |
| | Cambios en los supuestos | 240,377 | — |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | — | 8,527 |
| | Total AAA | 338,868 | 30,162 |

255

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| Unidad de componentes mayores | Fuente | Salidas diferidas de de recursos | Entradas diferidas de de recursos |
|---|---|---|---|
| PHRTA | Contribuciones del patrono realizadas después de la fecha de medición | $ 20,770 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | — | 9,715 |
| | Cambios en los supuestos | 84.018 | 7,562 |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | 450 | 2,980 |
| | Total PRHTA | 105,238 | 20,257 |
| UPR | Contribuciones del patrono realizadas después de la fecha de medición | 78,775 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | — | 172,913 |
| | Cambios en los supuestos | 138,627 | — |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | 2,766 | — |
| | Total UPR | 220,168 | 172,913 |
| CFSE | Contribuciones del patrono realizadas después de la fecha de medición | 63,947 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | — | 32,791 |
| | Cambios en los supuestos | 329,419 | — |
| | Total CFSE | 393,366 | 32,791 |
| Total | Contribuciones del patrono realizadas después de la fecha de medición | 387,820 | — |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la la participación proporcional | 13,365 | — |
| | Diferencias entre la experiencia esperada y real en la medición de los pasivos totales de pensiones | 24,834 | 239,354 |
| | Cambios en los supuestos | 1,854,618 | 40,044 |
| | Diferencia neta entre las ganancias proyectadas y reales en inversiones del plan de pensión | 370,150 | 27,960 |
| | Total de unidades de componentes mayores | $ 2,650,787 | 307,358 |

256

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| Unidades de componentes no mayores | Fuente | Salidas de recursos | Entradas de recursos |
|---|---|---|---|
| | Contribuciones del patrono realizadas después de la fecha de medición | $ 61,238 | — |
| | Diferencias entre la experiencia esperada y real | 1,519 | 25,516 |
| | Cambios en los supuestos | 283,480 | — |
| | Diferencia neta entre las ganancias proyectadas y reales de las inversiones en planes de pensiones | — | 10,056 |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 59,491 | 68,918 |
| | | 405,728 | 104,490 |
| Total | Contribuciones del patrono realizadas después de la fecha de medición | 449,058 | — |
| | Diferencias entre la experiencia esperada y real | 26,353 | 264,870 |
| | Cambios en los supuestos | 2,138,098 | 40,044 |
| | Diferencia neta entre las ganancias proyectadas y reales de las inversiones en planes de pensiones | 370,150 | 10,056 |
| | Cambios en la proporción y diferencias entre las contribuciones reales y la participación proporcional | 72,856 | 96,878 |
| | | $ 3,056,515 | 411,848 |

(iii)  *Montos de pensión no registrados*

Los siguientes montos de pensión (en miles) de la Declaración de GASB Núm. 68 y Núm. 71 deberían haber sido reconocidos al 30 de junio de 2017 y se consideran no auditados porque se relacionan con una unidad de componentes de presentación discreta del Estado Libre Asociado que fue auditada por otros auditores, que no implementó los requisitos de las Declaraciones de GASB Núm. 68 y Núm. 71 en sus estados financieros básicos auditados independientes.

| | Pasivos netos de pensiones | Gastos de pensiones | Salidas diferidas de recursos | Entradas diferidas de recursos |
|---|---|---|---|---|
| Unidades acumuladas de componentes de presentación discreta | $ 63,436 | 4,616 | 13,027 | 1,214 |

**(h)  *Pagadero a los sistemas de retiro***

Los montos pagaderos a los Sistemas de Retiro informados por el ELA al 30 de junio de 2017 relacionados con contribuciones no pagadas para cada uno de los Sistemas de Retiro fueron los siguientes (en miles):

| Sistemas de retiro | Monto |
|---|---|
| SRE | $ 661,137 |
| SRJ | 37,262 |
| Total | $ 698,399 |

257

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Al 30 de junio de 2017, el SRE tenía una obligación con el ELA de aproximadamente $361.5 millones. Las cuentas por cobrar y las cuentas por pagar al SRE se presentan en el estado de resultados netos como parte del vencimiento de otras entidades gubernamentales. Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por el SRE. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

**(19) Otros beneficios posteriores al empleo**

Como se describe con más detalle en la Nota 1(t), el ELA ofrece beneficios de atención médica posteriores al empleo a través de los siguientes planes de beneficios definidos que son administrados por la Administración del SRE y del SRJ o por la Administración del SRM:

- Aportación al Plan de Seguro de Salud del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades (ERS MIPC)

- Sistema de Retiro para la Rama Judicial del Aporte del Plan de Seguro Médico del Estado Libre Asociado de Puerto Rico (JRS MIPC)

- Sistema de Anualidades y Pensiones para Maestros de Puerto Rico para la Aportación al Plan de Seguro de Salud (TRS MIPC)

Después del 30 de junio de 2017, el ELA promulgó una legislación que cambió la estructura de los beneficios de pensión administrados por la Administración del SRE y el SRJ. Para obtener más información sobre dicha legislación de pensiones, consulte la Nota 3 y la Nota 23.

*(a) Descripciones de los planes*

ERS MIPC es un plan posterior al empleo de costos compartidos y patronos múltiples de beneficios definidos (OPEB) patrocinado por el ELA. JRS MIPC y TRS MIPC son planes OPEB de beneficios definidos por un solo patrono y sin fondos patrocinados por el ELA. Estos planes OPEB se crearon por Ley Núm. 95-1963. Los beneficios de atención médica se ofrecen a través de compañías de seguros cuyas primas son pagadas por el miembro retirado y el ELA aporta una parte correspondiente. ERS MIPC cubre sustancialmente a todos los empleados a tiempo completo del (1) el Gobierno Primario y (2) ciertos municipios de Puerto Rico y ciertas unidades de componentes del ELA que no tienen sus propios planes de beneficios posteriores al empleo. El JRS MIPC cubre a todos los jueces de la Rama Judicial del ELA. TRS MIPC cubre a todos los maestros activos del DE y a los empleados de la Administración del SRM.

Para ERS MIPC y TRS MIPC, los empleados del ELA se unieron al plan a partir de su fecha de empleo. Los miembros del plan eran elegibles para beneficios al alcanzar la edad de retiro para los beneficios de pensión correspondientes. La Ley Núm. 3-2013 eliminó este beneficio de atención médica para los miembros de ERS MIPC retirados después del 30 de junio de 2013. La Ley Núm. 160-2013 eliminó este beneficio de atención médica para los miembros de TRS MIPC retirados después del 31 de julio de 2014.

Para el JRS MIPC, los jueces de la Rama Judicial del ELA se unen al plan a partir de su fecha de empleo. Los miembros del plan son elegibles para los beneficios al cumplir 60 años con 10 años de servicio.

Política de fondos: el requisito de aportación de ERS MIPC, JRS MIPC y TRS MIPC se establece en la Ley Núm. 95-1963. Su beneficio consiste en un máximo de $100 por mes por miembro retirado o miembro discapacitado. Cada uno de estos planes OPEB es financiado por el ELA y sus corporaciones públicas y municipios sobre la base de un pago por uso. El financiamiento de los beneficios de la OPEB se proporciona a ERS MIPC, JRS MIPC y TRS MIPC a través de asignaciones legislativas cada 1 de julio por (i) el ELA para exempleados del gobierno; (ii) determinadas corporaciones públicas sin sus propias

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

tesorerías; y (iii) ciertas corporaciones públicas con sus propias tesorerías o municipios para sus exempleados. Las asignaciones legislativas se consideran estimaciones de los pagos que deben realizar ERS MIPC, JRS MIPC y TRS MIPC para los beneficios de atención médica durante todo el año. No existe un requisito de aportación para los miembros del plan durante el empleo activo.

Los miembros jubilados contribuyen con el monto de la prima de seguros de salud no cubiertos por la aportación del ELA.

**(b) Membresía al 1 de julio de 2016**

| | SRE | SRJ | SRM | Total |
|---|---|---|---|---|
| Miembros retirados, discapacitados y que actualmente reciben beneficios | 108,793 | 414 | 39,884 | 149,091 |

**(c) Costos anuales de OPEB y obligación neta de OPEB**

El costo anual de OPEB y la aportación anual requerida (ARC) se calcularon como parte de una valoración actuarial de acuerdo con los parámetros de la Declaración GASB Núm. 45 con base en los datos del censo (demográfico) de inicio de año al 1 de julio de 2015, según el ajuste. Las evaluaciones actuariales del año anterior se realizaron utilizando datos del censo de fin de año.

El costo anual de OPEB del ELA y la obligación neta de OPEB para los planes de beneficios de atención médica posteriores al empleo a partir del 30 de junio de 2017 fueron los siguientes (en miles):

| | SRE MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|
| Costo anual de OPEB: | | | | |
| ARC | $        105,859 | 1,023 | 37,490 | 144,372 |
| Intereses sobre la obligación neta de OPEB | 6,186 | 81 | 1,742 | 8,009 |
| Ajuste sobre la aportación anual requerida | (16,415) | (295) | (4,221) | (20,931) |
| Costo anual de OPEB | 95,630 | 809 | 35,011 | 131,450 |
| Contribuciones legales realizadas por el patrocinador | (91,280) | (336) | (36,493) | (128,109) |
| Aumento (reducción) en la obligación neta de OPEB | 4,350 | 473 | (1,482) | 3,341 |
| Obligación neta de OPEB al comienzo del año | 206,184 | 2,606 | 58,056 | 266,846 |
| Obligación neta de OPEB a fin del año | $        210,534 | 3,079 | 56,574 | 270,187 |

La obligación neta de OPEB al 30 de junio de 2017 para ERS MIPC, JRS MIPC y TRS MIPC era de aproximadamente $ 270 millones registrados en Actividades del Gobierno en el estado de resultados netos adjunto.

259

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

**(d)  *Métodos y supuestos actuariales***

El estado financiado por OPEB al 30 de junio de 2017 se determinó mediante la valoración actuarial con datos del censo al inicio del año a partir del 1 de julio de 2016, que se actualizó para adelantar el estado financiado al 30 de junio de 2017 y no asumió ganancias o pérdidas por pasivos.

Los siguientes son los métodos y supuestos actuariales más significativos utilizados para estimar la obligación neta de OPEB al 30 de junio de 2017 y la aportación anual requerida de OPEB para el año finalizado el 30 de junio de 2017:

|  | **ERS MIPC** | **JRS MIPC** | **TRS MIPC** |
|---|---|---|---|
| Método de costo actuarial | Edad de ingreso normal | Edad de ingreso normal | Edad de ingreso normal |
| Método de amortización | 18 años cerrado (a partir del 1 de julio de 2014), nivel dólar | 30 años cerrado, porcentaje de nivel de nómina | 20 años cerrado (a partir del 1 de julio de 2014), nivel dólar |
| Período de amortización restante | 16 años | 10 años | 18 años |
| Tasa de descuento | 2.90% | 3.00% | 2.90% |
| Crecimiento proyectado de la nómina | N/A | 0 % hasta el 30 de junio de 2021; Posteriormente 3 % | N/A |
| Aumentos salariales proyectados | N/A | 0 % hasta el 30 de junio de 2021; | N/A |
| Inflación | N/A | N/A | N/A |

N/A = No corresponde.

Las contribuciones legales de ERS MIPC, JRS MIPC y TRS MIPC como porcentaje de la aportación anual requerida para el año en curso y cada uno de los dos años anteriores fueron las siguientes:

|  | **ERS MIPC** | **JRS MIPC** | **TRS MIPC** |
|---|---|---|---|
| Año finalizado el 30 de junio de 2017 | 98.0% | 36.0% | 99.4% |
| Año finalizado el 30 de junio de 2016 | 89.5 | 34.4 | 98.5 |
| Año finalizado el 30 de junio de 2015 | 93.7 | 36.3 | 104.1 |

Las valoraciones actuariales de un plan en curso implican estimaciones del valor neto de los montos informados sobre la probabilidad de que ocurran eventos en el futuro lejano; incluyendo, por ejemplo, supuestos sobre el empleo y la mortalidad futuros. Los montos determinados con respecto al estado financiado del plan y el ARC del patrono están sujetos a una revisión continua porque los resultados reales se comparan con las expectativas pasadas y se realizan nuevas estimaciones sobre el futuro.

Los cálculos se basan en los tipos de beneficios proporcionados según los términos del plan sustantivo en el momento de cada valoración y el patrón de distribución de costos entre el patrono y los miembros del plan en el momento de cada valoración. Las proyecciones de beneficios para fines de información financiera no incorporan explícitamente los efectos potenciales de las limitaciones de financiamiento legales o contractuales en el patrón de costos compartidos entre el patrono y los miembros del plan en el futuro.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Los cálculos actuariales reflejan una perspectiva a largo plazo. De acuerdo con esa perspectiva, los métodos y supuestos actuariales utilizados incluyen técnicas diseñadas para reducir la volatilidad a corto plazo en los pasivos acumulados actuariales y el valor actuarial de los activos.

*(e)   Información de tendencias de tres años*

La información de tendencias de tres años es la siguiente (en miles):

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Costo anual de OPEB: |  |  |  |
| Año finalizado el 30 de junio de 2017 | $        95,630 | 809 | 35,011 |
| Año finalizado el 30 de junio de 2016 | 98,565 | 783 | 35,689 |
| Año finalizado el 30 de junio de 2015 | 95,267 | 745 | 33,946 |
| Porcentaje aportado del costo anual de OPEB |  |  |  |
| Año finalizado el 30 de junio de 2017 | 95.5% | 41.5% | 104.2% |
| Año finalizado el 30 de junio de 2016 | 95.1 | 40.5 | 105.0 |
| Año finalizado el 30 de junio de 2015 | 102.2 | 41.2 | 111.3 |
| Obligación neta de OPEB: |  |  |  |
| Al 30 de junio de 2017 | $       210,534 | 3,079 | 56,574 |
| Al 30 de junio de 2016 | 206,184 | 2,606 | 58,056 |
| Al 30 de junio de 2015 | 201,347 | 2,140 | 59,848 |

El estado de los fondos de los planes de beneficios de atención médica posteriores al empleo al 30 de junio de 2017, la fecha de valoración actuarial más reciente, es el siguiente (en miles):

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Pasivos actuariales devengados (AAL) | $   1,138,309 | 7,429 | 501,655 |
| Valor actuarial de los activos | — | — | — |
| Pasivos devengados actuariales no financiados | $   1,138,309 | 7,429 | 501,655 |
| Relación de financiamiento | —% | —% | —% |
| Nómina cubierta | $   3,344,197 | 31,829 | 1,033,224 |
| Pasivos devengados actuariales no financiados como porcentaje de la nómina cubierta | 34.0% | 23.3% | 48.6% |

El esquema del progreso de financiamiento presentado como información complementaria requerida después de las notas a los estados financieros básicos, presenta información de tendencias de varios años sobre si el valor actuarial de los activos del plan aumenta o disminuye con el tiempo en relación con el pasivo actuarial acumulado por los beneficios.

**(20)  Acuerdos de depósito de amortización de la deuda**

El 26 de mayo de 2005, el ELA, el CFP y el BGF (conjuntamente las Entidades del ELA) y Lehman Brothers Special Financing Inc. (Lehman) celebraron Acuerdos de Depósito de la amortización de la deuda (Acuerdos DSD) vigentes el 1 de julio de 2005. El objetivo del Acuerdo DSD era que las entidades del ELA obtuvieran un pago por adelantado a cambio de otorgarle a Lehman los derechos sobre las ganancias generadas por

## ELA DE PUERTO RICO

Notas a los Estados Financieros Básicos

30 de junio de 2017

ocho de sus fondos de la amortización de la deuda. El 25 de septiembre de 2008, como resultado de que Lehman iniciara un caso en el Tribunal de Quiebras de los Estados Unidos para el Distrito Sur de Nueva York bajo el Capítulo 11 del Título 11 del Código de los Estados Unidos, Lehman seleccionó a Hexagon Securities LLC para actuar como el Distribuidor Calificado según los acuerdos DSD y los valores calificados entregados según lo permitido por el acuerdo DSD. Siete de los fondos están asociados con los bonos CFP del ELA, presentados en los estados financieros básicos adjuntos como bonos de asignación del ELA, y un fondo está asociado con los bonos de obligación general del ELA. El 26 de mayo de 2005, las Entidades del ELA recibieron el pago inicial de aproximadamente $82.7 millones, lo que representa el valor presente de los ingresos de ganancias proyectadas ajustados por los riesgos de tiempo crediticio, así como una cantidad adecuada de compensación para Lehman.

Con el pago por adelantado realizado como se explicó anteriormente, las Entidades del ELA entregaron a Lehman los depósitos de pago de la deuda requeridos y programados y Lehman entregó obligaciones gubernamentales calificadas, que vencerán antes de la próxima fecha de pago de la amortización de la deuda por un monto aproximado al próximo pago de la amortización de la deuda. Lehman intentará obtener fondos suficientes sobre los montos de depósito de la amortización de la deuda, menos su costo para las obligaciones gubernamentales calificadas, para recuperar los $82.7 millones con el tiempo. Al mismo tiempo, las Entidades del ELA administrarán sus préstamos e inversiones aumentando la previsibilidad de sus flujos de efectivo a partir de las ganancias de sus inversiones y no con fines de especulación. Las Entidades del ELA reconocen que, a cambio del pago inicial recibido, renuncian a sus derechos de recibir ganancias de inversión sobre los montos de depósito mencionados anteriormente en el futuro y que, al aceptar el pago inicial, las Entidades del ELA han minimizado los riesgos resultantes debido a las fluctuaciones en las tasas de interés durante la vigencia de los Acuerdos DSD, pero también se ha renunciado a la posibilidad de recibir mayores rendimientos de dichos montos por dichas fluctuaciones.

Según los Acuerdos DSD, las Entidades del ELA estarán expuestas al pago a Lehman de un Monto de Rescisión, como se define en el acuerdo, principalmente cuando ocurra la amortización o la anulación de los bonos relacionados en la fecha de depósito programada o antes. El importe del Monto de Rescisión variará dependiendo de las diversas condiciones del mercado, tal como se define en los acuerdos DSD. En ciertas condiciones del mercado, el Monto de Rescisión a Lehman por el ELA puede exceder el monto del pago inicial original recibido.

El pago inicial de $82.7 millones recibido por las Entidades del ELA fue reconocido como otros ingresos para propósitos presupuestarios en 2005; sin embargo, según los GAAP de EE. UU., dicho pago inicial se aplazó y se reconoce proporcionalmente en los períodos futuros que las Entidades del ELA de otro modo habrían devengado tales intereses. El saldo no amortizado ascendió a aproximadamente $13.2 millones y es un componente de los ingresos no obtenidos al 30 de junio de 2017. Durante el año fiscal 2017, aproximadamente $2.7 millones se amortizaron en otros ingresos en las Actividades del Gobierno del estado de actividades adjunto. Para obtener información adicional sobre posibles reclamaciones con respecto a los acuerdos de depósito de la amortización de la deuda, consulte la Nota 23.

## (21) Instrumentos Derivados

### Instrumentos Derivados de Cobertura

El único instrumento derivado de cobertura en el Gobierno Primario al 30 de junio de 2017 residía en COFINA, que ha celebrado un acuerdo de intercambio de tasa de interés (swap) con una contraparte en relación con la emisión de bonos de tasa ajustable basados en LIBOR de $136 millones dentro de las Ventas Serie de Bonos de Ingresos Fiscales 2007A (los Bonos de Tasa Ajustable) con vencimiento el 1 de agosto de 2057. Los Bonos de Tasa Ajustable exponen a COFINA a la variabilidad en los pagos de intereses debido a cambios en las tasas de interés. La gerencia cree que es prudente limitar la variabilidad de los pagos de intereses sobre los Bonos de Tasa Ajustable. Para cumplir con este objetivo, la gerencia celebró un acuerdo de intercambio de tasa de interés de $136 millones para gestionar las fluctuaciones en los flujos de efectivo

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

resultantes del riesgo de tasa de interés. Este canje cambia efectivamente la exposición de flujo de efectivo de tasa variable en los Bonos de tasa ajustable a flujos de efectivo fijos. Según los términos del canje de tasas de interés, COFINA recibe pagos de tasa de interés variable igual al pago de intereses de los Bonos de tasa ajustable, y realiza pagos de tasa de interés fija en 4.92 % hasta el 1 de agosto de 2057, creando así el equivalente de una deuda de tasa fija. Al 30 de junio de 2017, la calificación crediticia de la contraparte de este acuerdo de intercambio era BBB+ de Standard & Poor's.

COFINA rechazó el Acuerdo de Swap en su caso Título III, y la reclamación por rescisión del pago fue desestimado bajo el Plan de Ajuste de COFINA durante el año fiscal 2020.

El valor de mercado y el monto nocional del instrumento derivado (pagar swap de tasa de interés fija) al 30 de junio de 2017, designado como cobertura de flujo de efectivo, fue el siguiente (en miles):

| Monto teórico | Valor de mercado 2016 | Cambio en el valor de mercado del 30 de junio de 2016 | Fecha de vigencia | Indicador de tasa flotante | Fecha de vencimiento | Recibe | | Paga | | Calificación crediticia contraparte Moody's |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Tipo | Tasa | Tipo | Tasa | |
| $ 136,000 | 72,460 | (13,185) | 7/31/2007 | 67% de 3 m LIBOR +0.93% | 8/1/2057 | Variable | 1.716% | Fija | 4.92% | Ba3 |

El valor de mercado del swap de tasa de interés se clasifica en el Nivel 2 de la jerarquía del valor de mercado y se estimó utilizando el método de cupón cero. Este método calcula los pagos netos futuros de liquidación requeridos por el swap, suponiendo que la tasa a plazo actual implícita en la curva de rendimiento anticipa correctamente las tasas de interés spot futuras. Luego, estos pagos se descuentan utilizando las tasas spot implícitas en la curva de rendimiento actual para bonos hipotéticos de cupón cero con vencimiento en la fecha de cada liquidación neta futura de los swaps.

*Riesgos de Instrumentos Derivados de Cobertura*

Al utilizar un instrumento financiero derivado para cubrir la exposición a cambios en las tasas de interés, COFINA se expone al riesgo de tasa de interés, riesgo de crédito y riesgo de rescisión.

Riesgo de crédito o de contraparte: el riesgo de crédito es el incumplimiento de la contraparte (o su garante) a tenor con los términos del contrato de derivados. Cuando el valor de mercado de un contrato de derivados es positivo, la contraparte le debe a COFINA, lo que crea un riesgo de crédito para COFINA. Cuando el valor de mercado de un contrato de derivados es negativo, COFINA adeuda a la contraparte y, por lo tanto, no posee riesgo de crédito. COFINA minimiza el riesgo de crédito en instrumentos derivados al realizar transacciones con contrapartes cuya calificación crediticia es aceptable bajo las políticas de inversión de COFINA. Al 30 de junio de 2017, no existía riesgo de crédito porque el valor de mercado del instrumento derivado era negativo.

Riesgo de tasa de interés: el riesgo de tasa de interés es el efecto adverso sobre el valor de un instrumento financiero que resulta de un cambio en las tasas de interés. COFINA está expuesta al riesgo de tasa de interés en su pago fijo, recibe swap variable; a medida que disminuye la tasa LIBOR, aumenta el pago neto de COFINA en el swap. Al mismo tiempo, disminuyen los pagos de intereses sobre los bonos de tasa ajustable cubiertos. El riesgo de tasa de interés asociado con los contratos de swap de tasa de interés se gestiona mediante el establecimiento y monitoreo de parámetros que limitan los tipos y el grado de riesgo de tasa de interés que se puede emprender.

Riesgo de rescisión: el riesgo de rescisión es la posibilidad de que el final no programado de un instrumento derivado de cobertura afecte la estrategia de pasivos de COFINA o presente a COFINA con pagos de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

rescisión no programados potencialmente significativos a la contraparte. COFINA o su contraparte pueden rescindir un instrumento derivado si la otra parte no cumple con los términos del contrato. COFINA está en riesgo de que la contraparte rescinda un swap en un momento en que COFINA adeude un pago de rescisión. COFINA ha mitigado este riesgo al especificar que la contraparte tiene el derecho de rescindir solo como resultado de ciertos eventos, incluido un incumplimiento de pago por parte de COFINA; insolvencia de COFINA (o eventos similares); o una reducción en la calificación crediticia de COFINA por debajo de BBB+ o Baa1. Si al momento de la rescisión, un instrumento derivado de inversión se encuentra en una posición de pasivo, COFINA será responsable ante la contraparte por un pago igual al pasivo, sujeto a acuerdos de compensación.

*Instrumentos Derivados de Inversión*

En relación con el acuerdo de intercambio de COFINA, el 1 de julio de 2014, Moody's informó una reducción en los Bonos LIBOR 2007A a una calificación de Ba3. El 24 de septiembre de 2014, en lugar de rescindir el Acuerdo de Swap, COFINA y la contraparte firmaron un nuevo anexo crediticio (el Anexo de Apoyo Crediticio 2014), así como una Enmienda al Acuerdo Maestro ISDA (la Enmienda ISDA 2014) para permitir a COFINA Garantizar sus obligaciones en virtud del Acuerdo de swap y modificar sus eventos de rescisión. El impacto del nuevo acuerdo fue que COFINA registró $12 millones en garantía a la contraparte, y creó una cuenta restringida en la que una parte de la garantía se depositaría en beneficio de la contraparte. Además, COFINA se ha comprometido a registrar hasta $15 millones anuales en garantías adicionales antes del 15 de marzo de cada año hasta el año fiscal 2018. Con el tiempo, la cantidad máxima que COFINA tendría que registrar es de $60 millones. En diciembre de 2016, COFINA registró $15 millones en garantías adicionales con vencimiento el 31 de marzo de 2017. Al 30 de junio de 2017, el monto de la garantía de la contraparte es de $48.6 millones.

**(22) Saldos del fondo (déficit)**

A continuación se incluye el detalle incluido en las clasificaciones de saldo de fondos (déficit) para los fondos gubernamentales al 30 de junio de 2017 (en miles):

| | Pago de deuda | Ingresos especiales COFINA | Pago deuda COFINA | No mayores gubernamentales | Total General gubernamentales |
|---|---|---|---|---|---|
| No gastable: | | | | | |
| Inventario | $ 151 | — | — | — | — | 151 |
| Subtotal | 151 | — | — | — | — | 151 |
| Gastable: | | | | | |
| Restringido para: | | | | | |
| Gobierno General | 9,707 | — | — | — | — | 9,707 |
| Vivienda pública y bienestar | 65,736 | — | — | — | — | 65,736 |
| Educación | 405 | — | — | — | — | 405 |
| Proyectos de capital | — | — | — | — | 177,012 | 177,012 |
| Pago de la deuda | — | — | — | 441,824 | 109,381 | 551,205 |
| Subtotal | 75,848 | — | — | 441,824 | 286,393 | 804,065 |
| Comprometido a: | | | | | |
| Vivienda pública y bienestar | — | — | — | — | 11,751 | 11,751 |
| Proyectos de capital | — | — | — | — | 5,308 | 5,308 |
| Subtotal | — | — | — | — | 17,059 | 17,059 |
| Asignado a: | | | | | |
| Proyectos de capital | — | — | — | — | 4,006 | 4,006 |
| Subtotal | — | — | — | — | 4,006 | 4,006 |

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

| | General | Pago de deuda | Ingresos especiales COFINA | Pago Deuda COFINA | No mayores gubernamentales | Total gubernamentales |
|---|---|---|---|---|---|---|
| No asignado | (176,563) | (866,852) | 6,344 | — | (346,528) | (1,383,599) |
| Saldo total fondo (déficit) | | | | | | |
| $ | (100,564) | (866,852) | 6,344 | 441,824 | (39,070) | (558,318) |

## (23) Eventos posteriores

Los eventos posteriores se evaluaron hasta el 31 de agosto de 2020 para determinar si dichos eventos deberían reconocerse o divulgarse en los estados financieros básicos de 2017. Los eventos posteriores que se divulgan a continuación están principalmente relacionados con actividades de deuda, incluidos los eventos de reducción en calificación crediticia, otros asuntos relacionados con ingresos o presupuesto y eventos fiscales y legislación relacionada, tanto local como federal, que la gerencia cree que son de interés público para la divulgación.

*Gobierno Primario*

### (a) *Informe de Investigación de la Deuda*

El 2 de agosto de 2017, la Junta de Supervisión anunció su intención, a tenor con su autoridad en virtud de PROMESA, de realizar una investigación para revisar la crisis fiscal y sus contribuyentes, y examinar la deuda de Puerto Rico y su emisión, incluidas las prácticas de divulgación y venta. Con ese fin, la Junta de Supervisión nombró un comité especial de investigación (el Comité Especial de Investigación) y para seleccionar una empresa independiente para realizar la investigación. El 13 de septiembre de 2017, la Junta de Supervisión anunció que el Comité Especial de Investigación contrató a un investigador independiente para realizar una revisión de la deuda del ELA y su conexión con la crisis financiera actual. El Comité de Investigación Especial considera que esta investigación es una parte integral de la misión de la Junta de Supervisión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el reingreso del ELA a los mercados de capitales. La Junta de Supervisión publicó el informe final del investigador independiente el 20 de agosto de 2018 (el Informe de Investigación de Deuda). El Informe de Investigación de Deuda proporciona un análisis de los factores macroeconómicos y políticos históricos y más recientes que contribuyen directa e indirectamente a la crisis fiscal y económica del ELA, el proceso de emisión de bonos municipales del ELA y los esfuerzos legislativos para reestructurar la deuda, así como los hallazgos de investigación de la Junta de Supervisión, recomendaciones de políticas e identificación de posibles reclamaciones y asuntos para atención regulatoria.

El Informe de Investigación de Deuda presentó hallazgos y recomendaciones en las siguientes áreas:

- BGF
- Servicios Públicos de Puerto Rico (AEE y AAA)
- COFINA
- SRE
- Presupuesto, Informes Externos y Funciones Contables de Puerto Rico
- Cálculo del Límite Constitucional de la Deuda
- Agencias de Calificación Crediticia (CRA)
- Prácticas de Venta para Bonos Relacionados con Puerto Rico

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

- Marco de Ética del Gobierno de Puerto Rico
- Uso de Intercambio de Tasa de Interés de los Emisores
- Falta de un Mecanismo Claro de Puerto Rico para Validar los Bonos Relacionados con Puerto Rico Antes de su Emisión
- Crédito Fiscal a la Posesión

Finalmente, el Investigador Independiente presentó una visión general de las posibles causas radicadas. El informe de investigación de deuda se puede encontrar en el sitio web de la Junta de Supervisión.

El 28 de agosto de 2018, la Junta de Supervisión designó a su Comité de Reclamaciones Especiales y delegó en el Comité de Reclamaciones Especiales cualquier autoridad de la Junta de Supervisión para revisar los hallazgos en el Informe de Investigación de Deuda y tomar las medidas apropiadas, incluyendo, entre otras, recomendar o iniciar la negociación o el enjuiciamiento de reclamaciones con base en los hallazgos en el Informe de Investigación de Deuda en nombre de los deudores del Título III para el beneficio de todos los acreedores y participantes en los casos del Título III. El Comité de Reclamaciones Especiales tiene derecho, a su exclusivo criterio, a determinar el alcance de cualquier acción adicional, que incluye, entre otras, la investigación adicional, así como las reclamaciones a seguir, y contratar a los asesores, consultores, abogados u otros asesores como lo considere conveniente a su exclusivo criterio. El 25 de octubre de 2018, la Junta de Supervisión solicitó propuestas de asesoramiento para ayudar al Comité de Reclamaciones Especiales con respecto a la consideración de posibles reclamaciones descritas en el Informe de Investigación de Deuda. El 28 de noviembre de 2018, el Comité de Reclamaciones Especiales firmó el contrato con la empresa que proporcionará esos servicios. El ELA está cooperando con esta investigación.

El 14 de enero de 2019, el Comité de Reclamaciones Especiales y el Comité de Acreedores presentaron una objeción general conjunta (la Objeción de Reclamaciones de GO) solicitando la anulación de más de $6,000 millones de reclamaciones relacionados con los bonos de obligación general del ELA emitidos a partir de marzo de 2012, incluyendo (a) Bonos de Refinanciamiento de Mejoras Públicas de $2,300 millones, Serie 2012 A emitidos en abril de 2012; (b) $415.27 millones en Bonos de Refinanciamiento de Mejoras Públicas, Serie 2012 B emitidos en marzo de 2012; y (c) $3,500 millones en bonos de obligación general de 2014, Serie A emitidos en marzo de 2014 (colectivamente, los Bonos de obligación general [GO] impugnados). De acuerdo con la Objeción de reclamaciones de GO, los Bonos de GO impugnados son "inválidos" porque, entre otras cosas, se emitieron en violación de: (i) el límite de la amortización de la deuda de la Constitución del ELA, que debería haber incluido la amortización de la deuda de los bonos emitidos por la AEP que la Objeción de Reclamaciones de GO caracteriza como una estructura "falsa"; (ii) la cláusula de presupuesto equilibrado constitucional del ELA, que debería haber incluido $425 millones de intereses excluidos; y (iii) la cláusula del presupuesto constitucional equilibrado del ELA porque las ganancias de los Bonos GO impugnados se utilizaron para financiar el gasto deficitario. El 15 de febrero de 2019, el Tribunal del Título III emitió una orden de procedimientos relacionada con la Objeción de reclamaciones de GO, que otorgaba a las partes hasta el 16 de abril de 2019 para notificar su participación en los procedimientos relacionados con la Objeción de reclamaciones de GO. El 22 de abril de 2019, el Comité de Reclamaciones Especiales presentó una moción informativa notificando al Tribunal del Título III de todas las partes que notificaron su participación. Esta lista de participación fue actualizada por última vez mediante moción informativa presentada el 23 de julio de 2019. El 24 de julio de 2019, el Tribunal del Título III emitió una orden que suspendía varios litigios complejos en los casos del Título III, incluida la Objeción de reclamaciones de GO, hasta el 30 de noviembre de 2019 y ordenaba la mediación para resolver problemas superpuestos. Mediante orden dictada el 28 de octubre de 2019, el Tribunal del Título III prorrogó su orden de paralización hasta el 31 de diciembre de 2019.

Entre el 30 de abril de 2019 y el 20 de mayo de 2019, el Comité de Reclamaciones Especiales y el Comité de Acreedores presentaron 272 acciones de evasión separadas para evitar y recuperar ciertas transferencias realizadas por el Estado Libre Asociado a sus acreedores antes de la fecha de la petición del Título III del ELA. De estas acciones de evasión, aproximadamente 254 acciones buscan recuperar fondos de los proveedores del ELA (colectivamente, las Acciones de evasión de proveedores). El 12 de

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

julio de 2019, el Tribunal del Título III emitió una orden para establecer procedimientos de litigio para las acciones de evasión de proveedores. Según estos procedimientos, todos los acusados pueden participar en un intercambio de información voluntario y negociar con el Comité de Reclamaciones Especiales para resolver sus respectivas Acciones de Evitación de Proveedores de forma consensuada antes del litigio. Si las negociaciones fracasan o un acusado elige no participar en el intercambio de información, todos los demandados deben responder a la demanda en sus respectivas Acciones de evasión de proveedores a más tardar el 13 de enero de 2020.

Estos asuntos siguen en curso y el ELA no puede predecir cuándo concluirán o su resultado.

**(b) Renuncia y transición de gobierno del exgobernador Rosselló bajo la gobernadora Wanda Vázquez Garced**

El 24 de julio de 2019, el entonces Gobernador Ricardo Rosselló Nevares anunció su renuncia como Gobernador del ELA a partir del 2 de agosto de 2019 a las 5 p. m., hora estándar del Atlántico. Antes de que su renuncia se hiciera efectiva, el Gobernador Rosselló nombró al excomisionado residente Pedro Pierluisi como Secretario de Estado. Después de ser confirmado por la Cámara de Representantes (pero no el Senado), el Señor Pierluisi prestó juramento como Gobernador interino. El 7 de agosto de 2019, la Corte Suprema de Puerto Rico determinó por unanimidad que el señor Pierluisi juró ilegalmente como Gobernador. Como resultado, la Secretaria de Justicia, Wanda Vázquez Garced, juró como Gobernadora el 7 de agosto de 2019 para completar el mandato del exgobernador Rosselló hasta 2020. A la fecha de estos estados financieros básicos, Wanda Vázquez Garced se desempeña actualmente como Gobernadora del ELA.

**(c) Ciertos exámenes del Servicio de Ingresos Internos de los EE. UU.**

El Servicio de Ingresos Internos de los Estados Unidos (el IRS) emitió varias cartas fechadas del 7 de febrero de 2019 al 28 de marzo de 2019 a la AEP, AEE, COFINA y AFM para informar que el IRS está realizando ciertas investigaciones. Las investigaciones están relacionadas con ciertos Formularios 8038-CP (devolución de pagos de crédito a emisores de bonos calificados, según lo define el IRS) y algunas emisiones de bonos.

En abril de 2019, el IRS presentó una reclamación de gastos administrativos contra COFINA por la devolución de pagos de subsidio directo posteriores a la petición con respecto a ciertos bonos de COFINA. El 12 de junio de 2019, con el permiso de la Junta de Supervisión, la AAFAF presentó una objeción a la reclamación del IRS en nombre de COFINA. El 25 de octubre de 2019, el IRS presentó una respuesta a la objeción de COFINA El plazo de respuesta de COFINA finalizó el 26 de noviembre de 2019. COFINA y el IRS han entablado negociaciones para llegar a un acuerdo, pero no se ha llegado a un acuerdo a la fecha del presente.

La AEP, AEE, COFINA y AFM tienen la intención de responder a todas las correspondencias del IRS y tienen la intención de seguir cooperando con el IRS en relación con los exámenes mencionados anteriormente y están trabajando con sus representantes para responder a estos exámenes del IRS de manera oportuna.

**(d) Consecuencias del Huracán María**

El 20 de septiembre de 2017, Puerto Rico se vio directamente afectado por el huracán María, dejando a su paso la destrucción de miles de hogares, cortando el suministro eléctrico en toda la Isla e inundando muchas calles y caminos. Como resultado del impacto masivo del huracán, se han tomado una serie de acciones y eventos. Algunas de estas acciones, eventos y consideraciones se analizan en los párrafos siguientes.

El 20 de septiembre de 2017, el mismo día en que el huracán María tocó tierra en Puerto Rico, el gobernador solicitó fondos de las categorías A y B del programa de asistencia pública de FEMA para abordar el estado de emergencia, que fueron aprobados de inmediato. Poco después, el Gobernador solicitó fondos de las categorías C a G del programa de asistencia pública de FEMA, que son las categorías que se ocupan de proyectos de infraestructura permanente como carreteras, puentes, infraestructura de electricidad y agua, edificios públicos, parques y espacios de recreación.

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

Después del procesamiento de FEMA de las solicitudes de financiamiento de las categorías C a G, el 1 de noviembre de 2017, el Presidente de los EE. UU. aprobó el uso de dichos fondos para proyectos permanentes el 1 de noviembre de 2017. Al hacerlo, la participación federal en estos fondos también aumentó del 75 % al 90 %, dado el gran desastre causado por el huracán María en Puerto Rico.

El 21 de septiembre de 2017, a tenor con su autoridad según PROMESA y la sección 3 de las resoluciones presupuestarias del año fiscal 2018, la Junta de Supervisión anunció su aprobación para que el ELA reasigne hasta $1,000 millones de su presupuesto del año fiscal 2018 para ser utilizados para fondos de emergencia a raíz del huracán María.

El 23 de octubre de 2017, el Gobernador emitió la orden ejecutiva EO 2017-065, para crear la Oficina Central de Recuperación y Reconstrucción de Puerto Rico (CRRO) a tenor con la Ley Núm. 211-1999, la Ley Núm. 5-2017 y la Ley Núm. 20-2017. La CRRO se crea como una división dentro de la AAPPPR con el propósito de (i) identificar, obtener y administrar recursos para invertir en la recuperación de Puerto Rico, (ii) coordinar y canalizar los esfuerzos del ELA en relación con la recuperación de Puerto Rico, (iii) financiamiento, ejecución o ejecución de obras y proyectos de infraestructura relacionados con la recuperación de Puerto Rico, y (iv) asesorar al Gobernador y proporcionar asistencia técnica y asesoramiento a otras entidades gubernamentales con respecto a cualquier asunto relacionado a la recuperación de Puerto Rico. El 10 de noviembre de 2017, el Gobernador emitió la orden ejecutiva EO 2017-069, que enmendó la EO 2017-065 para aclarar la creación de la CRRO y su aplicabilidad.

El 26 de octubre de 2017, el Presidente de los Estados Unidos promulgó la Ley de Asignaciones Adicionales para los Requisitos de Socorro en Desastres de 2017, que proporcionaba aproximadamente $36,500 millones de fondos de socorro en casos de desastre para Texas, Florida, Puerto Rico y las Islas Vírgenes de los Estados Unidos (USVI) relacionadas al daño de los huracanes Harvey, Irma y María. La ley incluyó $4,900 millones en préstamos directos de asistencia por desastre para mantener la liquidez para Puerto Rico y las Islas Vírgenes de los Estados Unidos.

El 8 de noviembre de 2017, el Gobernador emitió la orden ejecutiva EO 2017 -066 a tenor con su autoridad en virtud de la Ley Núm. 5-2017. EO 2017 -066 delega las facultades de la sindicatura del gobernador bajo la Sección 206 (a) de la Ley Núm. 5-2017 a AAFAF para que pueda actuar como síndico de la división de adquisiciones de la AEE y cualquier otra división u oficina cuyas obligaciones afecten los procesos de adquisición de bienes y servicios de la AEE para supervisar y reformar los procesos de adquisición. EO 2017 -066 también creó dentro de la AEE la Oficina de Cumplimiento de Contratos y Adquisiciones, que depende de la AAFAF.

El 8 de noviembre de 2017, el Gobernador también emitió la orden ejecutiva EO 2017 -068, que estableció un reintegro del 10 % para ciertas pequeñas y medianas empresas en sus declaraciones de impuestos sobre las ventas del año 2017 y el uso desde agosto de 2017 hasta noviembre de 2017.

El 9 de febrero de 2018, el Congreso de los EE. UU. aprobó y el Presidente de los EE. UU. firmó una enmienda de la Ley de Asignaciones Continuas de 2018 para proporcionar asignaciones continuas para el año fiscal 2018 a la mayoría de las agencias federales hasta el 23 de marzo de 2018. La Ley de Asignaciones Continuas asignó asignaciones presupuestarias adicionales de aproximadamente $15,000 millones al Cuerpo de Ingenieros de los EE. UU. para los gastos necesarios para abordar proyectos de situaciones de emergencia y para construir, rehabilitar y reparar daños causados por desastres naturales. Del monto total de $15,000 millones, no menos de $10,400 millones estarán disponibles para tales proyectos dentro de los estados y áreas insulares que fueron impactados por los huracanes Harvey, Irma y María y todas las reparaciones, rehabilitación, estudio, diseño y construcción de los proyectos del Cuerpo de Ingenieros de los EE. UU. en Puerto Rico y las Islas Vírgenes de los Estados Unidos se llevarán a cabo con fondos federales. La Ley también asignó aproximadamente $28,000 millones para el Fondo de Desarrollo Comunitario para cubrir los gastos necesarios relacionados con el alivio de desastres, la recuperación a largo plazo, la restauración de la infraestructura y la vivienda, la revitalización económica y la mitigación en las áreas más afectadas y afectadas como resultado de un desastre declarado importante que ocurrió en 2017 de los montos disponibles bajo esta disposición, no

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

menos de $11,000 millones se asignarán a los estados y unidades de gobierno local afectados por el huracán María, y de dichos montos asignados a los beneficiarios afectados por el huracán María, $2,000 millones se utilizarán para proporcionar sistemas de energía eléctrica mejorados. Además, la asignación presupuestaria incluye $4,800 millones en fondos de Medicaid para Puerto Rico, $39 millones para actividades de Aduanas y Protección Fronteriza en el año fiscal 2018 en Puerto Rico y las Islas Vírgenes de los Estados Unidos, $30.9 millones para construcción, rehabilitación y adquisición de Centros de Cuerpos de Trabajo en Puerto Rico, $64 millones para reparar las instalaciones del Servicio de Inmigración y Control de Aduanas (ICE) en Puerto Rico, USVI, Texas y Florida, $1,370 millones para el Programa de Recuperación de Emergencia de la Administración Federal de Carreteras del cual Puerto Rico recibirá una aportación federal del 100 por ciento para reparar los daños causados por los huracanes Irma y María, $14 millones para el Programa Especial de Nutrición Suplementaria para Mujeres, Bebés y Niños (conocido como PAN en español) para subvenciones de infraestructura a Puerto Rico y las Islas Vírgenes de EE. UU. para ayudar en la reparación y restauración de edificios, equipos, tecnología y otras infraestructuras dañadas como consecuencia de los huracanes Irma y María y $24 millones para el Programa de Asistencia de Productos Básicos para el programa de asistencia alimentaria de emergencia para cubrir los gastos necesarios relacionados con las consecuencias de los huracanes Harvey, Irma y María o debido a incendios forestales en 2017.

### (e) Terremotos

El 7 de enero de 2020, Puerto Rico fue golpeado por un terremoto de magnitud 6.4 que causó daños devastadores a la infraestructura, un corte de energía en toda la Isla, escasez de agua y amenazó la vida de su gente. Con el fin de salvaguardar la salud y la seguridad pública de sus ciudadanos, el Gobernador emitió las órdenes ejecutivas EO 2020-01 y EO 2020-02 y declaró el estado de emergencia para activar el protocolo de compras de emergencia que permite a las agencias de gestión de emergencias adquirir los suministros y servicios esenciales necesarios, dar una respuesta oportuna y eficaz y activar la Guardia Nacional para brindar apoyo durante la gestión de emergencias.

Además, la Junta de Supervisión autorizó la utilización de los fondos de la Reserva de Emergencia de los años fiscales 2019 y 2020, según lo requiera el ELA, sin la aprobación previa de las redistribuciones hasta el 31 de enero de 2020.

El presidente Trump también aprobó una declaración de emergencia que permite la asistencia federal directa para medidas de emergencia para proteger vidas, propiedades y salud pública después de la serie de terremotos.

El 11 de enero de 2020, el Gobernador emitió la orden ejecutiva EO 2020-07 mediante la cual autorizó la asignación de $12 millones del Fondo de Emergencia para ser distribuidos equitativamente entre los municipios de Guánica, Guayanilla, Peñuelas, Ponce, Utuado y Yauco, para ser utilizados exclusivamente para daños y mitigación relacionados con la emergencia.

Una evaluación preliminar de los daños causados por el terremoto y las réplicas posteriores (sin incluir el terremoto del 2 de mayo de 2020 que se analiza a continuación), calculada por el Servicio Geológico de los Estados Unidos, estimó los daños económicos totales ascendentes a aproximadamente $838 millones.

Puerto Rico continúa experimentando réplicas que no se espera que se detengan pronto. Según un informe del 29 de enero de 2020 publicado por el Servicio Geológico de los Estados Unidos, Puerto Rico corre el riesgo de sufrir muchos terremotos potencialmente catastróficos en el corto plazo. De hecho, el 2 de mayo de 2020, un terremoto de magnitud 5.4 sacudió la costa sur de Puerto Rico. El evento sísmico, que cortó brevemente la energía en algunas áreas, golpeó cerca de la ciudad de Ponce, donde cientos de estructuras, incluidas casas y lugares de culto, permanecen dañadas o destruidas por los devastadores terremotos de principios de 2020. Estos continuos terremotos son un poderoso recordatorio de que, aunque la pandemia mundial de COVID-19 está controlando actualmente la atención pública, la amenaza física y psicológica de las catástrofes naturales no ha disminuido para Puerto Rico y sus residentes.

269

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

### (f) *Pandemia de COVID-19*

#### (i) *Órdenes Ejecutivas*

El 11 de marzo de 2020, la Organización Mundial de la Salud declaró la enfermedad causada por un nuevo ("COVID-19") una pandemia mundial. Como resultado de la amenaza para la salud y para contener el virus propagado por la Isla, el gobernador Vázquez-Garced emitió una orden ejecutiva EO 2020-020 el 12 de marzo de 2020, en la cual declaró el estado de emergencia en Puerto Rico para concentrar todos los esfuerzos e implementar las medidas necesarias para salvaguardar el salud, bienestar y seguridad pública de los ciudadanos de Puerto Rico. La orden ejecutiva autoriza al Secretario del DOT y al Director Ejecutivo del OGP a establecer un presupuesto especial, con los fondos disponibles, incluido el Fondo de Emergencia, para cubrir todos los costos necesarios para la contención del virus en toda la Isla y compartir información con los municipios.

El 15 de marzo de 2020, el Gobernador emitió la orden ejecutiva EO 2020-023 y ordenó un toque de queda para todos los ciudadanos y se requería que se quedaran en casa a partir de las 9 p. m. hasta las 5 a. m., pero se les permitía utilizar la vía pública, dentro de este plazo, en circunstancias específicas, como las siguientes: (1) compra de productos alimenticios, farmacéuticos y de primera necesidad; (2) acudir a las citas médicas o visitar un hospital, laboratorio o centro de atención médica; (3) desplazamientos, para empleados públicos y privados que brindan servicios esenciales; (4) regresar al lugar de residencia de una actividad permitida; (5) proporcionar asistencia, cuidado, transporte de personas mayores, niños, dependientes, personas con discapacidades o que requieran atención médica o profesional; y (6) visitar instituciones financieras, siempre que se tomen todas las precauciones necesarias para prevenir el riesgo de propagación de la enfermedad. Además, la orden ejecutiva ordenaba que cualquier persona con sospecha razonable de estar expuesta al COVID-19 permaneciera en cuarentena durante catorce (14) días, a partir de la emisión de la orden, para evitar que representen un riesgo para la salud pública y la transmisión a personas no infectadas. Además, ordenó el cierre de todas las operaciones gubernamentales, excepto las relacionadas con los servicios esenciales, y el cierre de todos los negocios en Puerto Rico desde el 15 de marzo de 2020, a las 6 p. m., hasta el 30 de marzo de 2020, salvo disposición en contrario.

El 23 de marzo de 2020, el Gobernador emitió la orden ejecutiva EO 2020-026 para crear y establecer el Comité Ejecutivo de Asesoramiento Médico, también conocido como Grupo de Trabajo Médico de COVID-19, que desempeñará funciones en conjunto con el PRDOH y estará a cargo de estudios, investigación y desarrollo de planes estratégicos para manejar la emergencia de la pandemia de coronavirus y brindar una respuesta coordinada a los ciudadanos de Puerto Rico.

El 27 de marzo de 2020, el Gobernador emitió la orden ejecutiva EO 2020-028 para activar la Unidad Médica de la Guardia Nacional, para brindar apoyo al DOH y a cualquier otra agencia que brinde servicios durante la emergencia de la pandemia.

El 30 de marzo de 2020, el Gobernador emitió las órdenes ejecutivas EO 2020-029 y EO 2020-030 y ordenó un cierre en Puerto Rico. Se ordena a los ciudadanos de Puerto Rico a permanecer en sus residencias las 24 horas del día durante los 7 días de la semana desde el 31 de marzo de 2020 al 12 de abril de 2020 y solo se les permitirá usar la vía pública, durante las horas entre las 5 a. m. y 7 p. m., en las circunstancias previamente permitidas por EO 2020-023. Además, la orden ejecutiva estableció una orden de tránsito, con base en el último número de placas de los vehículos para que sus ciudadanos usen sus autos para comprar alimentos, productos farmacéuticos y de primera necesidad, visitar instituciones financieras y recibir cualquiera de los servicios permitidos. Además, la orden proporciona una descripción de los servicios y negocios que pueden operar durante la emergencia; informa a sus ciudadanos que el cobro de peajes se restablecerá después del 31 de marzo de 2020; proporciona una ventana limitada para que los empleados relacionados con la nómina visiten las oficinas de su patrono para procesar los pagos de la nómina para el mes de marzo; ordena al DRNA cerrar todos los muelles para desalentar el tráfico marítimo de embarcaciones de recreo y autoriza a la agencia a establecer un plan de vigilancia de las costas de la Isla, en

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

coordinación con la policía estatal y municipal, para hacer cumplir las instrucciones de la orden ejecutiva; estableció una cuarentena obligatoria de 14 días para todos los pasajeros que arriben al aeropuerto internacional Luis Muñoz Marín a partir de la fecha de emisión de la orden ejecutiva.

El 12 de abril de 2020, el Gobernador emitió la orden ejecutiva EO 2020-033 que extiende el toque de queda impuesto a los ciudadanos de Puerto Rico y las medidas de control implementadas para contener la propagación del COVID-19 por la Isla hasta el 3 de mayo de 2020. El 1 de mayo de 2020, el Gobernador emitió la orden ejecutiva EO 2020-038, que extendió el toque de queda y otras medidas de control de COVID-19 hasta el 25 de mayo de 2020, pero también eliminó ciertas restricciones comerciales para permitir aperturas limitadas de ciertas industrias, tiendas y servicios. en momentos específicos sin dejar de observar las reglas de distanciamiento social. Esta reapertura inicial se limita a médicos y dentistas primarios y especialistas, refugios para animales, servicios de reparación y repuestos de vehículos, lavanderías, inspecciones de ascensores, servicios a puertos y aeropuertos, servicios de reparación y mantenimiento de aire acondicionado, servicios notariales y servicios de infraestructura crítica, entre otros. A medida que el Gobierno observe y evalúe los resultados de esta reapertura limitada, reevaluará y enmendará aún más las restricciones comerciales, según sea necesario, para promover la recuperación económica y, al mismo tiempo, preservar la salud, el bienestar y la seguridad del pueblo de Puerto Rico. El 21 de mayo de 2020, el Gobernador emitió la orden ejecutiva EO 2020-041, que prorrogó el toque de queda hasta el 15 de junio de 2020 y para continuar con la reapertura paulatina de varios sectores económicos. Desde el 12 de junio hasta el 20 de agosto de 2020 se han aprobado diversas órdenes ejecutivas con la intención de minimizar la propagación del COVID-19, ya que se notó un repunte de nuevos casos entre la población luego de intentar reabrir la economía. La orden ejecutiva EO-2020-062 emitida el 20 de agosto de 2020 prorrogó el toque de queda hasta el 11 de septiembre de 2020.

*(ii) Medidas de estabilización económica*

El 23 de marzo de 2020, la Junta de Supervisión acordó con el ELA brindar apoyo al pueblo puertorriqueño, a los trabajadores de primera línea, a los educadores y estudiantes, y a las pequeñas empresas. El Paquete de apoyo para medidas de emergencia de $787 millones consiste en $500 millones que debían ser autorizados como una asignación incremental para el presupuesto del Fondo General del año fiscal 2020 a tenor con el proceso presupuestario de PROMESA, $157 millones de redistribución dentro del presupuesto del Fondo General del ELA del año fiscal actual 2020 y $131 millones de fondos federales. Este Paquete de Apoyo para Medidas de Emergencia se suma a la disponibilidad de $ 160 millones del Fondo de Reserva de Emergencia de Puerto Rico que la Junta de Supervisión ya había autorizado.

El 27 de marzo de 2020, el presidente Trump promulgó la *Ley de Coronavirus, Ayuda, Alivio y Seguridad Económica* (Ley CARES), comúnmente conocida como la "Fase Tres" del alivio económico del coronavirus. La Ley CARES proporciona un estímulo a las personas, las empresas y los hospitales en respuesta a la angustia económica causada por la pandemia de COVID-19; crea un programa de préstamos de $349,000 millones para pequeñas empresas, incluidas las organizaciones sin fines de lucro y consultorios médicos 501(c)(3); asigna $500,000 millones para asistencia a empresas, estados y municipios; amplía los servicios de telesalud en Medicare, incluidos los servicios no relacionados con los tratamientos de COVID-19; amplía la elegibilidad para el seguro por desempleo y proporciona a las personas $600 adicionales por semana además del monto por desempleo determinada por cada estado; amplía la Ley de Producción de Defensa, la cual permite un período de dos años en el que el Gobierno puede corregir cualquier déficit de recursos sin tener en cuenta el límite actual de gastos de 50 millones de dólares estadounidenses; otorga al Secretario del Tesoro de los EE. UU. la autoridad para otorgar préstamos o garantías de préstamos a estados, municipios y empresas elegibles y flexibiliza una variedad de regulaciones legislación previa impuesta a través de la Ley de Reforma y Protección al Consumidor Dodd-Frank Wall Street, la Ley de Estabilización Económica de 2008, y otros; y autoriza asignaciones suplementarias para ayudar al Gobierno a responder a la emergencia de la pandemia de COVID-19.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

*Unidades de Componentes de Presentación Discreta*

El 30 de septiembre de 2016, la Junta de Supervisión designó algunas de las unidades componentes de presentación discreta del Estado como entidades cubiertas sujetas a PROMESA. Estas entidades cubiertas incluyen, entre otras, AAA, UPR, AEE y PR ACT.

A continuación, se detallan eventos posteriores específicos para las unidades de componentes mayores de presentación discreta:

**(a)** *ACT*

El 3 de julio de 2017, el fideicomisario de los bonos emitidos por la PRHTA notificó a la PRHTA que no realizó el pago del capital los intereses por aproximadamente $107.2 millones y $116.9 millones, respectivamente, según las Resoluciones de Bonos de 1968 y 1998. Del monto total en estado de mora de PRHTA, aproximadamente $76.5 millones y $66.7 millones de capital e intereses, respectivamente, fueron pagados por las aseguradoras de bonos de línea única por las pólizas de seguro de garantía financiera de la PRHTA.

Durante septiembre de 2017, los huracanes Irma y María azotaron la Isla de Puerto Rico y causaron daños generalizados en toda la Isla. La administración de la PRHTA está en el proceso de determinar la cantidad de daños sufridos por los caminos, puentes, sistema de transporte público y otros activos de capital de la PRHTA. La gerencia de la PRHTA no ha podido determinar la cantidad de daños, pero una evaluación preliminar de los daños físicos a sus caminos y puentes asciende aproximadamente a $437 millones. La PRHTA también está en proceso de evaluar los daños físicos sufridos por su sistema de tren urbano. Además, el huracán María causó una interrupción en el sistema de peaje electrónico de la PRHTA y la operación del tren, lo que resultó en una pérdida de ingresos. La PRHTA tiene pólizas de seguro vigentes en el momento de ambos huracanes y espera recuperar parte de dichos daños con la asistencia de la Agencia Federal para el Manejo de Emergencias (FEMA).

El 5 de junio de 2019, la Junta de Supervisión aprobó y revisó un plan fiscal de seis años para proporcionar una hoja de ruta para transformar no solo la PRHTA, sino también la infraestructura en todo Puerto Rico para fomentar el crecimiento económico. La PRHTA tiene cuatro objetivos alineados con esta meta: (a) proyectos de seguridad de tránsito, (b) mejora de la infraestructura de transporte existente, (c) completar sistemas de caminos y (d) reducción de tráfico.

**(b)** *AEE*

**(i)** *Órdenes de la Oficina de Energía*

Como se revela en los estados financieros de la AEE, el 1 de mayo de 2019 la AEE comenzó a cobrar la Tarifa Permanente de $0.9948 centavos/kWh. Además, en julio de 2019, la AEE comenzó a facturar/cobrar los ajustes de la cláusula adicional ordenados el 27 de junio de 2019. Las revisiones adicionales de las cláusulas y los procesos de reconciliación se llevan a cabo periódicamente, según lo ordena la Oficina de Energía.

**(ii)** *Acuerdo de Préstamo de Crédito Recurrente de Superprioridad Posterior a la Petición*

El 22 de febrero de 2018, la AEE (como prestatario) y el ELA (como prestamista) celebraron un Acuerdo de Préstamo de Crédito Recurrente, en el que el ELA acordó otorgar un préstamo recurrente a la AEE (el Préstamo de Crédito Recurrente) consistente en facilidad de crédito de superprioridad posterior a la petición por un monto de capital total que no exceda los $300 millones disponibles para la AEE hasta el 30 de junio de 2018, a menos que se extienda por acción gubernamental necesaria por parte del ELA. El Préstamo de Crédito Recurrente tendrá un interés del 5%, siempre que, en el caso de que el ELA financie o refinancie el Préstamo de Crédito Recurrente con el producto de un financiamiento del ELA, la tasa de interés de dicho Préstamo de Crédito Recurrente financiado o refinanciado automáticamente acumulará intereses la tasa igual a la tasa de interés del Préstamo de Crédito Recurrente no financiado o refinanciado, sin financiamiento del ELA. El 8 de marzo de 2019, la AEE canceló el Préstamo de Crédito Recurrente.

272

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

(iii)  *Impacto de los Huracanes Irma y María*

El sistema eléctrico de la AEE sufrió daños significativos como resultado de los huracanes Irma y María. A junio de 2020, la AEE había incurrido en aproximadamente $2,100 millones en gastos de restauración y reconstrucción y había recuperado aproximadamente $1,400 millones de FEMA.

(iv)  *Reducción en la calificación de los bonos*

El 6 de julio de 2017, Moody's redujo su calificación para los bonos de la AEE a Ca de Caa3, con una perspectiva negativa. Esta última reducción refleja que la AEE ha comenzado un procedimiento en virtud del Título III de PROMESA. En la misma fecha, Fitch también bajó su calificación para los bonos de la AEE de C a D. El 9 de febrero de 2018, S&P retiró su calificación D y ahora no tiene calificación (NR).

(v)  *Transformación*

El 22 de enero de 2018, el Gobernador anunció que el ELA comenzará la transformación de la AEE. De acuerdo con el Plan Fiscal certificado el 1 de agosto de 2018, el proceso de transformación y privatización tomará varios meses en preparación, proceso de mercado y aprobaciones. Se establecerá un Grupo de Trabajo entre el Gobernador, la Junta de Supervisión y los equipos asesores para coordinar y liderar el proceso de transacción para la venta de activos de generación de energía y una concesión para los activos y actividades de Transmisión y Distribución. El 20 de junio de 2018, el Gobernador aprobó la Ley 120, que establece un marco legal para la disposición, transferencia y venta de los activos, operaciones, funciones y servicios de la AEE.

El 31 de octubre de 2018, el Gobernador anunció la solicitud de calificaciones (RFQ) de las entidades interesadas en administrar y operar el sistema de transmisión y distribución de energía eléctrica de la AEE, conforme a un acuerdo de asociación público-privada de largo plazo.

El objetivo de la RFQ es identificar a los encuestados calificados que son elegibles para recibir la Solicitud de propuestas (RFP) de la AAPPPR. El 16 de abril de 2019, el AAPPPR, en colaboración con la AEE, solicitó Declaraciones de Cualificaciones (SOQ) a empresas y consorcios interesados en rehabilitar, mejorar, administrar y operar dieciséis unidades de generación hidroeléctrica y sus respectivas turbinas, patios de distribución, presas y embalses instalaciones (cada una de las cuales es una Instalación Hidroeléctrica del Proyecto y, en conjunto, el Sistema Hidroeléctrico del Proyecto) ubicadas en toda la Isla de Puerto Rico, incluida la administración de fondos federales de recuperación ante desastres, si los hubiera, a tenor con un contrato a largo plazo. Pueden incluirse instalaciones adicionales. Las respuestas a las SOQ vencen el 3 de junio de 2019. Al 28 de junio de 2019, la fecha en que se emitieron los estados financieros básicos de la AEE, los encuestados calificados participaron en la AAPPPR en un proceso de preguntas y respuestas.

El 22 de junio de 2020, la AAPPPR anunció que Luma Energy, LLC (LUMA) ha sido seleccionada para operar, mantener y modernizar el sistema de transmisión y distribución de energía (T&D) de la AEE durante quince años a través de un acuerdo de asociación público-privada.

LUMA es una empresa de Puerto Rico establecida por ATCO Ltd. (ATCO) y Quanta Services, Inc. (Quanta). LUMA también está trabajando en conjunto con Innovative Emergency Management, Inc. (IEM) por su experiencia en financiamiento federal. Seleccionados a través de un proceso de licitación competitivo, LUMA y su socio principal, IEM, están compuestos por líderes de la industria en: (i) entregar energía segura y confiable a millones de clientes; (ii) construcción de infraestructura confiable y sustentable; (iii) proporcionar la mejor formación de mano de obra calificada en artesanía; (iv) obtención e implementación de fondos federales; (v) ayudar a los sectores público y privado a mejorar la preparación, mitigar los riesgos y responder y recuperarse eficazmente de los desastres; y (vi) gestión de alianzas público-privadas.

273

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

En el transcurso de esta alianza público-privada, LUMA brindará los siguientes servicios y beneficios:

- aumentar la confiabilidad del servicio para mejorar el bienestar del cliente y fomentar el desarrollo económico;

- infundir una cultura centrada en la seguridad en toda la organización para ayudar a garantizar la seguridad de los empleados de LUMA y del público;

- ofrecer la mejor organización de servicio al cliente de su clase;

- mejorar la eficiencia operativa y la estabilidad financiera para ayudar a que el servicio eléctrico sea más asequible para todos los clientes a largo plazo; y

- aprovechar el aliento de su mano de obra calificada para satisfacer las necesidades de respuesta de emergencia en Puerto Rico cuando se le solicite.

(c) *AAA*

El 12 de julio de 2016, el Gobernador promulgó la Ley Núm. 68-2016, que establece la creación de una nueva corporación pública que se conocerá como la Corporación para la Revitalización de la Autoridad de Acueductos y Alcantarillados de Puerto Rico (AAA) como una entidad remota de quiebra de propósito único. La AAA está autorizada a fijar y cobrar los cargos de titulización con el propósito de emitir bonos cuyos beneficios pueden ser utilizados por la AAA para su Programa de Mejora de Capital (CIP), el refinanciamiento de las notas de anticipación de bonos y la cancelación, anulación y refinanciamiento de sus bonos, entre otros costos financieros aprobados. La Ley Núm. 68-2016 limita el cargo de titulización que puede imponer a la AAA a un monto equivalente al 20 % de los ingresos de la AAA y establece que la AAA puede emitir hasta un máximo de $900 millones en bonos con el fin de financiar el desarrollo del CIP de la AAA. La diferencia entre los $900 millones que se pueden usar para financiar el CIP y el monto máximo que se puede financiar con el 20 % de los ingresos de la AAA se puede usar para retirar, cancelar (cancelar) o refinanciar los bonos de la AAA, sujeto a ciertas condiciones.

El 18 de diciembre de 2018, se celebró una Escritura de Fideicomiso entre PRIFA, el DRNA como sucesor de la JCA y el Banco Popular de Puerto Rico, como fideicomisario del Fondo de Agua Limpia (la Escritura de Fideicomiso del Fondo de Agua Limpia) para crear un fideicomiso para mantener todos los fondos relacionados con el Fondo de Agua Limpia en un fideicomiso separado de los activos del ELA, sus agencias e instrumentalidades (el Fondo de Agua Limpia). Además, se celebró una Escritura de Fideicomiso, por y entre PRIFA, Vivienda y Banco Popular de Puerto Rico, como fideicomisario del Fondo de Agua Potable (la Escritura de Fideicomiso del Fondo de Agua Potable), para mantener todos los fondos relacionados con el Agua Potable. Fondo en fideicomiso separado de los activos del ELA, sus agencias e instrumentalidades (el Fondo Fiduciario de Agua Potable y, junto con el Fondo Fiduciario de Agua Limpia, los Fideicomisos SRFP).

Durante febrero de 2019, el ELA transfirió aproximadamente $194.5 millones a los Fideicomisos SRFP. Específicamente, se transfirieron aproximadamente $141.2 millones al Fondo de Agua Limpia y aproximadamente $53.3 millones al Fondo de Agua Potable. Estos fondos fueron transferidos a los Fideicomisos SRFP para proteger la viabilidad futura de los Fondos Recurrentes del Estado de Agua Limpia para garantizar la asistencia continua a las comunidades con problemas críticos de infraestructura de agua y aguas residuales.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El 25 de junio de 2019, la Junta de Supervisión certificó su propio plan fiscal de 6 años para la AAA (el Plan Fiscal de la AAA) a tenor con PROMESA y los requisitos impuestos por la Junta de Supervisión. El Plan Fiscal de la AAA incluye una serie de nuevas iniciativas, que incluyen, entre otras cosas: (i) aumentos de tarifas; (ii) proyectos de AAPPPR para servicios comerciales; (iii) incrementos en la recaudación de cuentas gubernamentales; (iv) reducción de las pérdidas físicas de agua; y (v) nuevo financiamiento federal a partir del año fiscal 2020.

*(g) UPR*

El 5 de agosto de 2016, el fideicomisario de los Bonos AFICA de Desarrollos Universitarios Inc. (DUI) notificó a la UPR que no realizó el pago básico del arrendamiento al administrador el 25 de julio de 2016 y que un incumplimiento en el contrato de arrendamiento con DUI constituye un evento de incumplimiento, según los DUI Acuerdo de fideicomiso de bonos de AFICA. En este momento, el fiduciario no buscó cobrar ni recuperar ningún endeudamiento de, hacer cumplir ningún juicio contra, u obtener la posesión, o ejercer control sobre, cualquier propiedad de ELA o cualquiera de sus organismos, incluidos el DUI y la UPR o ejercer cualquier acto suspendido por PROMESA, la Ley de Moratoria o cualquier Orden Ejecutiva relacionada con esta. Para obtener información adicional sobre la Ley de Moratoria, consulte la Nota 3. Alrededor de la fecha en que caducó el Título IV de PROMESA, el fideicomisario notificó nuevamente a la UPR que estaba en incumplimiento por no haber realizado los pagos de arrendamiento pendientes. En mayo de 2017, la UPR realizó los pagos de arrendamiento pendientes y siguió haciéndolo hasta julio de 2018. El 19 de diciembre de 2018, DUI notificó al administrador de sus Bonos AFICA que la UPR asumió la posición de que su Contrato de Gestión y Operaciones Calificadas (el "Contrato de Gestión y Operaciones") con la UPR para la operación, mantenimiento y administración de Plaza Universitaria las instalaciones ya no existen. Según DUI, la UPR no ha realizado un pago a DUI a tenor con el Acuerdo de Operaciones y Gestión desde julio de 2018, lo que ahora constituye un caso de incumplimiento en virtud del contrato de arrendamiento, el contrato de préstamo y el contrato de fideicomiso. El 3 de enero de 2019, el administrador de los Bonos AFICA del DUI notificó a la UPR que su incumplimiento de los términos del Acuerdo de Operaciones y Administración puede constituir un incumplimiento del contrato de arrendamiento, y que un incumplimiento del contrato de arrendamiento podría conducir a un evento de incumplimiento en virtud del contrato de préstamo, que provoca un caso de incumplimiento en el contrato de fideicomiso. El 11 de enero de 2019, la UPR y la AAFAF notificaron al administrador de los Bonos AFICA de DUI que disputan varias de las declaraciones establecidas en la carta de DUI, incluida la obligación de la UPR de satisfacer ciertos pagos que DUI alega que están pendientes bajo la Acuerdo de Operaciones y Gestión. La UPR y la AAFAF se reunirán con DUI para resolver estos asuntos de manera consensuada.

El 19 de agosto de 2016, la Asociación Nacional de Fideicomisos del Banco de los EE. UU., en su calidad de Fiduciario para los Bonos de Ingresos del Sistema de la UPR, presentó una demanda civil ante el Tribunal de los Estados Unidos, el Distrito de Puerto Rico contra el ELA, el Gobernador, la UPR y el Presidente de la UPR. La moción solicitaba el alivio de la paralización del Título IV en virtud de PROMESA para reclamaciones relacionadas con la Ley de Moratoria y las órdenes ejecutivas relacionadas con esta, y un interdicto preliminar contra la desviación y expropiación de ingresos pignorados del ELA, que el fiduciario alega que constituyen una garantía que respalda los bonos de ingresos del sistema de la UPR. El 1 de mayo de 2017, caducó el Título IV Paralización según PROMESA. Sin embargo, a tenor con el Acuerdo de Paralización (definido a continuación), la demanda no está actualmente activa.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros Básicos

30 de junio de 2017

El 29 de junio de 2017, el Fiduciario de los Bonos de Ingresos del Sistema de la UPR celebró un acuerdo de paralización (el Acuerdo de Paralización) con la UPR, según el que la UPR acordó transferir a una cuenta segregada, en beneficio de los tenedores de los bonos de ingresos ciertos montos con respecto a los ingresos pignorados con la condición de que, durante el período cubierto del Acuerdo de Paralización, el fiduciario no instituya, inicie o continúe ningún procedimiento legal contra la UPR, el ELA o cualquier otra agencia, organismo o municipio del mismo para exigir los derechos relacionados con los bonos de ingresos. Según el Acuerdo de paralización inicial, que expiró el 31 de agosto de 2017, la UPR realizó dos pagos de $20 millones a la cuenta segregada. La UPR y el Fideicomisario acordaron prorrogar el Acuerdo de Paralización en varias ocasiones, y el período de suspensión actualmente vence el 31 de marzo de 2020. Durante el plazo en que el Acuerdo de Paralización permanezca vigente, la UPR acordó transferir aproximadamente $3.65 millones al mes (el monto aproximado requerido para cubrir los pagos de la amortización de la deuda durante dicho período) a una cuenta segregada a cambio de que el acuerdo del fideicomisario no comience o continúe procedimiento legal relacionado con los bonos de ingresos. Los ingresos pignorados incluyen principalmente los aranceles de matrícula de los estudiantes.

La UPR, como muchas otras instituciones en Puerto Rico y en todo el mundo, enfrenta un impacto significativo en sus sistemas y operaciones relacionado con la propagación del virus COVID-19. A la luz de la evolución de la crisis del COVID-19, el 3 de abril de 2020, la AAFAF, en nombre de UPR, y el fideicomisario bajo la dirección de los tenedores de la mayoría del monto principal pendiente total de los Bonos, firmaron una enmienda a la Acuerdo de moratoria que difiere (i) el pago de marzo de 2020 al primero en ocurrir de (a) la ejecución de un acuerdo de indulgencia revisado que se extiende más allá del 29 de mayo de 2020 o (b) el 25 de mayo de 2020; y (ii) el Pago de abril al 25 de mayo de 2020.

La UPR y la AAFAF proporcionarán al Fiduciario planes detallados y especificaciones para reparar, reemplazar o reconstruir su propiedad que fue dañada o destruida por el huracán María a medida que se aprueban estos planes. La UPR depositará todas las ganancias de las pólizas de seguro de accidentes en una cuenta separada y de ayuda federal directa (los Fondos de Reparación) en una o más cuentas separadas en un banco comercial para facilitar la auditoría del gasto de dichas cuentas. Todos los fondos de reparación en exceso de $1 millón se utilizarán a tenor con una solicitud por escrito. La UPR presentará las solicitudes del mes anterior al Fiduciario en o antes del decimoquinto día calendario de cada mes. A tenor con el acuerdo de carta extendida, los bonistas mayoritarios ampliaron su dirección para indicarle al Fiduciario que no llame a un incumplimiento durante la pendencia del nuevo Período de Cumplimiento si la UPR envía al Fiduciario copias de las solicitudes del mes anterior, como se establece anteriormente. La UPR y la AAFAF proporcionarán, o harán que las agencias relevantes proporcionen, al Fiduciario con todas las solicitudes de proyectos, avances u otros informes proporcionados por FEMA o cualquier compañía de seguros contra accidentes con respecto al gasto de los Fondos de Reparación durante el mes anterior.

El 5 de junio de 2019, la Junta de Supervisión aprobó un plan fiscal revisado de la UPR. La UPR desempeña un papel esencial como motor de la Isla para el desarrollo económico y laboral. En muchos sentidos, el futuro de Puerto Rico depende de una UPR vibrante y sostenible. El plan fiscal de la UPR devuelve el sistema a un modelo de "centro" de tres campus, por el cual se reduce la huella de los campus secundarios y se confía cada vez más en los servicios compartidos para reducir los gastos operativos. Asimismo, el plan fiscal de la UPR intenta minimizar el aumento de la matrícula y las tarifas que podrían poner en peligro la accesibilidad y el acceso a una educación superior de calidad en la Isla. Lo hace maximizando primero las oportunidades para aumentar los ingresos de fuentes que no son de matrícula, tales como: (i) subvenciones y premios federales, (ii) propiedad intelectual y monetización de patentes, y (iii) tarifas de servicios auxiliares para proporcionar capacitación a instituciones externas. El plan fiscal de la UPR se encuentra actualmente en un proceso de recertificación, que se ha retrasado debido a la actual crisis del COVID-19.

**ELA DE PUERTO RICO**

Notas a los Estados Financieros

Básicos 30 de junio de 2017

El 29 de noviembre de 2018, la AAFAF  y el BGF anunciaron la consumación de la reestructuración financiera del BGF  a tenor con una Modificación de calificación según el Título VI de PROMESA (la Modificación de calificación). Como resultado de la Modificación de Calificación, las líneas de crédito que la UPR debía al BGF (aproximadamente $87.3 millones, incluidos los intereses devengados, al 29 de noviembre de 2018) se compensaron en su totalidad dólar por dólar por el monto de los depósitos de la UPR mantenidos en el BGF (aproximadamente $94.4 millones, incluidos los intereses devengados, al 29 de noviembre de 2018) y tales facilidades se extinguieron. El resto de la recuperación de UPR a cuenta de sus depósitos mantenidos en el BGF (aproximadamente $7.1 millones) dependerá, en última instancia, de la recuperación recibida del Fideicomiso de Entidad Pública (PET) a cuenta de los Activos de PET.

*(i) Impacto de los Huracanes Irma y María*

Como resultado del huracán María, los once campus de la UPR sufrieron daños que oscilaron entre aproximadamente $130 y $140 millones. Se espera que una parte de los costos de reparación sea cubierta por los fondos del seguro y por los fondos de ayuda en caso de desastre otorgados por FEMA.  Las coberturas de seguros de propiedad comercial y bellas artes de la UPR tienen un límite total de pérdidas de $100 millones cada una. El 28 de septiembre de 2018, la aseguradora fue intervenida por el Comisionado de Seguros de Puerto Rico por insolvencia bajo una "orden de rehabilitación" de la aseguradora ante el Tribunal de Primera Instancia, Tribunal Superior de San Juan. La orden designa al Comisionado de Seguros de Puerto Rico, como "rehabilitador" y le ordena tomar posesión de los bienes de la aseguradora, en protección de los intereses de los asegurados con reclamaciones, acreedores del asegurador y del público en general. El 8 de noviembre de 2018, la UPR resolvió la reclamación con la compañía de seguros por una contraprestación total de aproximadamente $40 millones. El 15 de noviembre de 2018, los negocios de la aseguradora fueron vendidos a terceros y se encuentra en proceso de liquidación. La UPR solo ha recibido fondos anticipados de la compañía de seguros de aproximadamente $38.8 millones y de FEMA de aproximadamente $1 millón.

**INFORMACIÓN ADICIONAL REQUERIDA**

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Cambios en el Pasivo Neto de Pensiones para Planes de Pensión de un Solo Patrono - SRM

(Montos en miles)

El esquema de cambios en los pasivos de pensiones netos para planes de pensión de un solo patrono presenta los cambios en la responsabilidad de pensión neta para el Sistema de Anualidades y Pensiones para Maestros (SRM) al 30 de junio de 2017:

| | | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| Total de pasivos de pensiones: | | | | | |
| Costo de servicio | $ | 335,237 | 294,692 | 273,754 | 354,159 |
| Interés | | 518,214 | 648,407 | 637,849 | 690,742 |
| Cambios en los términos de beneficios | | | | | (599,560) |
| Diferencias entre la experiencia esperada y anual | | 131,134 | 43,202 | 88,544 | 169,851 |
| Cambios en los supuestos | | (1,964,234) | 1,621,712 | 1,235,988 | 83,560 |
| Pagos de beneficios, que incluyen el reintegro de contribuciones | | (768,279) | (750,172) | (736,107) | (683,698) |
| Cambio neto en los pasivos totales de pensiones | | (1,747,928) | 1,857,841 | 1,500,028 | 15,054 |
| Pasivos totales de pensiones - inicial | | 18,165,572 | 16,307,731 | 14,807,703 | 14,792,649 |
| Pasivos totales de pensiones - final (a) | | 16,417,644 | 18,165,572 | 16,307,731 | 14,807,703 |
| Resultados netos fiduciarios del plan: | | | | | |
| Contribuciones - patronos, neto de provisión | | 270,302 | 213,724 | 194,541 | 189,367 |
| Contribuciones - empleados participantes | | 95,217 | 99,557 | 105,120 | 115,461 |
| Contribuciones - transferencias | | 644 | 1,804 | 2,345 | 4,131 |
| Ingresos de inversión neta | | 36,489 | 45,060 | 59,921 | 190,023 |
| Otros ingresos | | 1,925 | 1,350 | 1,057 | 1,416 |
| Pagos de beneficios, que incluyen las contribuciones de los miembros | | (768,279) | (751,245) | (736,300) | (683,698) |
| Gastos administrativos | | (14,787) | (25,876) | (19,382) | (19,803) |
| Cambios netos en los resultados netos fiduciarios del plan | | (378,489) | (415,626) | (392,698) | (203,103) |
| Resultados netos fiduciarios del plan - inicial | | 895,455 | 1,311,081 | 1,703,779 | 1,906,882 |
| Resultados netos fiduciarios del plan - final (b) | | 516,966 | 895,455 | 1,311,081 | 1,703,779 |
| Pasivos de pensiones netos del patrono - final (a)-(b) | $ | 15,900,678 | 17,270,117 | 14,996,650 | 13,103,924 |
| Resultados netos fiduciarios como porcentaje de los pasivos totales de pensiones | | 3.15% | 4.93% | 8.04% | 11.51% |
| Nómina de empleados cubiertos | $ | 1,033,224 | 1,101,896 | 1,127,500 | 1,171,154 |
| Pasivos de pensiones netos del patrono como porcentaje de su nómina de empleados cubiertos | | 1538.94% | 1567.31% | 1330.08% | 1118.89% |

Notas:

El pasivo por pensiones neto del ELA al 30 de junio de 2017 se midió al 30 de junio de 2016, y el pasivo por pensiones total utilizado para calcular el pasivo por pensiones neto se determinó mediante una valoración actuarial con datos del censo al inicio del año al 1 de julio de 2015 que se actualizó para adelantar el pasivo total de pensiones al 30 de junio de 2016, suponiendo que no haya ganancias ni pérdidas.

Los esquemas están destinados a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

278

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Cambios en los Pasivos Netos de Pensiones para Planes de Pensión de un Solo Patrono - JRS

(Montos en miles)

El esquema de cambios en los pasivos de pensiones netos para planes de pensión de un solo patrono presenta los cambios en los pasivos de pensiones netos para el Sistema de Retiro de la Judicatura (SRJ) al 30 de junio de 2017:

|  | | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| Total de pasivos de pensiones: | | | | | |
| Costo de servicio | $ | 25,917 | 19,155 | 16,375 | 16,764 |
| Intereses | | 19,018 | 22,625 | 21,861 | 22,620 |
| Cambios en los términos de beneficios | | (408) | | | |
| Diferencias entre la experiencia esperada y anual | | 10,872 | (2,826) | (6,970) | (1,658) |
| Cambios en los supuestos | | (66,464) | 51,960 | 72,805 | 7,601 |
| Pagos de beneficios, que incluyen el reintegro de contribuciones | | (25,405) | (24,560) | (23,134) | (22,667) |
| Cambio neto en los pasivos totales de pensiones | | (36,470) | 66,354 | 80,937 | 22,660 |
| Pasivos totales de pensiones - inicial | | 651,666 | 585,312 | 504,375 | 481,715 |
| Pasivos totales de pensiones - final (a) | | 615,196 | 651,666 | 585,312 | 504,375 |
| Resultados netos fiduciarios del plan: | | | | | |
| Contribuciones - patronos, neto de provisión | | 11,973 | 15,223 | 12,337 | 11,992 |
| Contribuciones - empleados participantes | | 3,084 | 3,190 | 3,676 | 3,804 |
| Ingresos de inversión neta | | 2,074 | 1,751 | 899 | 9,713 |
| Otros ingresos | | 310 | | 873 | 59 |
| Pagos de beneficios, que incluyen las contribuciones de los miembros | | (25,405) | (24,560) | (23,134) | (22,667) |
| Gastos administrativos | | (614) | (946) | (546) | (2,150) |
| Cambios netos en los resultados netos fiduciarios del plan | | (8,578) | (5,342) | (5,895) | 751 |
| Resultados netos fiduciarios del plan - inicial | | 34,830 | 40,172 | 46,067 | 45,316 |
| Resultados netos fiduciarios del plan - final (b) | | 26,252 | 34,830 | 40,172 | 46,067 |
| Pasivos de pensiones netos del patrono - final (a)-(b) | $ | 588,944 | 616,836 | 545,140 | 458,308 |
| Resultados netos fiduciarios como porcentaje de los pasivos totales de pensiones | | 4.27% | 5.36% | 6.86% | 9.17% |
| Nómina de empleados cubiertos | $ | 31,829 | 32,204 | 31,917 | 31,707 |
| Pasivos de pensiones netos del patrono como porcentaje de su nómina de empleados cubiertos | | 1850.34% | 1915.40% | 1707.99% | 1445.45% |

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información complementaria requerida (sin auditar) Esquema de la parte

proporcional de los pasivos de pensiones netos de un

Plan de Pensión de Costos Compartidos para Patronos Múltiples - SRE

(Montos en miles)

El siguiente Cuadro de la Participación Proporcional del Pasivo Neto por Pensiones presenta la participación proporcional de los montos de pensión del ELA para el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (SRE) Plan de Pensión de Costos Compartidos para Patronos Múltiples, al 30 de junio:

| | | SRE | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Proporción del pasivo de pensiones netos del ELA | 67.56% | 65.87% | 64.74% |
| Participación proporcional del ELA en los pasivos de pensiones netos | $ 25,467,704 | 21,960,015 | 19,512,798 |
| Nómina de empleados cubiertos del ELA | 2,259,464 | 2,186,540 | 2,258,946 |
| Participación proporcional del ELA en los pasivos de pensiones netos como porcentaje de su nómina de empleados cubiertos | 1.127.16% | 1,000.32% | 864.00% |
| Resultados netos fiduciarios como porcentaje de los pasivos totales de pensiones | (3.47) | (2.05) | 0.27 |

Notas:

El pasivo por pensiones neto del ELA al 30 de junio de 2017 se midió al 30 de junio de 2016, y el pasivo por pensiones total utilizado para calcular el pasivo por pensiones neto se determinó mediante una valoración actuarial con datos del censo al inicio del año al 1 de julio de 2015 que se actualizó para adelantar el pasivo total de pensiones al 30 de junio de 2016, suponiendo que no haya ganancias ni pérdidas.

Los esquemas están destinados a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información complementaria requerida (sin auditar)

Lista de contribuciones de los patronos para todos los

planes de pensiones (cantidades en miles)

| | | 2017 (fecha de medición 30 de junio de 2016) | 2016 (fecha de medición 30 de junio de 2015) | 2015 (fecha de medición 30 de junio de 2014) |
|---|---|---|---|---|
| SRE: | | | | |
| Contribuciones legales obligatorias | $ | 515,234 | 535,664 | 492,972 |
| Contribuciones (a) | | 497,019 | 460,659 | 415,933 |
| Deficiencia de aportación | $ | 18,215 | 75,005 | 77,039 |
| Nómina de empleados cubiertos (b) | $ | 2,186,540 | 2,258,946 | 2,307,688 |
| Contribuciones como porcentaje de la nómina de empleados cubiertos (a)/(b) | | 22.73% | 20.39% | 18.02% |
| SRM: | | | | |
| Contribuciones legales obligatorias | $ | 213,675 | 194,541 | 189,367 |
| Contribuciones (a) | | 213,675 | 194,541 | 189,367 |
| Deficiencia de aportación | $ | | | |
| Nómina de empleados cubiertos (b) | $ | 1,101,896 | 1,127,500 | 1,171,154 |
| Contribuciones como porcentaje de la nómina de empleados cubiertos (a)/(b) | | 19.40% | 17.25% | 16.17% |
| JRS: | | | | |
| Contribuciones legales obligatorias | $ | 26,823 | 24,437 | 23,592 |
| Contribuciones (a) | | 15,223 | 12,337 | 1,992 |
| Deficiencia de aportación | $ | 11,600 | 12,100 | 11,600 |
| Nómina de empleados cubiertos (b) | $ | 32,204 | 31,917 | 31,707 |
| Contribuciones como porcentaje de la nómina de empleados cubiertos (a)/(b) | | 47.27% | 38.65% | 37.82% |

Notas:

El requisito de aportación a cada sistema de retiro está establecido por ley y no se determina actuarialmente.

Los esquemas están destinados a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Progreso de los Fondos para los Planes de Salud Posteriores

al Empleo (cantidades en miles)

El Programa de Progreso de Financiamiento para los Planes de Atención Médica Posterior al Empleo del ELA presenta los resultados de las valoraciones distintas a las prestaciones de pensiones posteriores al empleo (OPEB) de los últimos diez años. El esquema proporciona una tendencia de información de diez años sobre si los valores actuariales de los activos del plan aumentan o disminuyen con el tiempo en relación con los pasivos actuariales acumulados por los beneficios. Toda la información determinada actuarialmente se ha calculado de acuerdo con los supuestos actuariales y los métodos reflejados en las valoraciones actuariales a la fecha de valoración actuarial indicada.

**SRE:**

| Fecha valuación actuarial (1) | Valor actuarial de activos | Pasivos devengados actuariales (AAL) | Pasivos devengados actuariales no financiados (UAAL) | Proporción financiada | Nómina cubierta | UAAL como porcentaje de nómina Cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2017 | $ | 1,138,309 | 1,138,309 | % $ | 3,344,197 | 34% |
| 30 de junio de 2016 | | 1,349,503 | 1,349,503 | | 3,344,382 | 40 |
| 30 de junio de 2015 | | 1,428,788 | 1,428,788 | | 3,319,280 | 43 |
| 30 de junio de 2014 | | 1,438,475 | 1,438,475 | | 3,489,096 | 41 |
| 30 de junio de 2013 | | 1,482,879 | 1,482,879 | | 3,489,096 | 43 |
| 30 de junio de 2012 | | 2,120,970 | 2,120,970 | | 3,570,339 | 59 |
| 30 de junio de 2011 | | 1,758,389 | 1,758,389 | | 3,666,402 | 48 |
| 30 de junio de 2010 | | 1,699,373 | 1,699,373 | | 3,818,332 | 45 |
| 30 de junio de 2009 | | 1,633,159 | 1,633,159 | | 4,292,552 | 38 |
| 30 de junio de 2008 | | N/D | N/D | | N/D | N/D |

**SRM:**

| Fecha valuación actuarial (1) | Valor actuarial de activos | Pasivos devengados actuariales (AAL) | Pasivos devengados actuariales no financiados (UAAL) | Proporción financiada | Nómina cubierta | UAAL como porcentaje de nómina cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2017 | $ | 501,655 | 501,655 | % | 1,033,224 | 49% |
| 30 de junio de 2016 | | 523,300 | 523,300 | | 1,101,896 | 48 |
| 30 de junio de 2015 | | 548,518 | 548,518 | | 1,127,500 | 49 |
| 30 de junio de 2014 | | 543,205 | 543,205 | | 1,171,154 | 46 |
| 30 de junio de 2013 | | 792,875 | 792,875 | | 1,248,674 | 64 |
| 30 de junio de 2012 | | 797,332 | 797,332 | | 1,292,975 | 62 |
| 30 de junio de 2011 | | 706,069 | 706,069 | | 1,320,400 | 54 |
| 30 de junio de 2010 | | 694,230 | 694,230 | | 1,370,344 | 51 |
| 30 de junio de 2009 | | 750,382 | 750,382 | | 1,418,304 | 53 |
| 30 de junio de 2008 | | N/D | N/D | | N/D | N/D |

**SRJ:**

| Fecha valuación actuarial (1) | Valor actuarial de activos | Pasivos devengados actuariales (AAL) | Pasivos devengados actuariales no financiados (UAAL) | Proporción financiada | Nómina cubierta | UAAL como porcentaje de nómina cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2017 | $ | 7,429 | 7,429 | % | 31,829 | 23% |
| 30 de junio de 2016 | | 6,985 | 6,985 | | 32,204 | 22 |
| 30 de junio de 2015 | | 6,917 | 6,917 | | 31,917 | 22 |
| 30 de junio de 2014 | | 6,540 | 6,540 | | 31,707 | 21 |
| 30 de junio de 2013 | | 6,705 | 6,705 | | 32,138 | 21 |
| 30 de junio de 2012 | | 6,592 | 6,592 | | 33,066 | 20 |
| 30 de junio de 2011 | | 5,810 | 5,810 | | 31,811 | 18 |
| 30 de junio de 2010 | | 5,808 | 5,808 | | 32,061 | 18 |
| 30 de junio de 2009 | | 5,643 | 5,643 | | 30,587 | 19 |
| 30 de junio de 2008 | | N/D | N/D | | N/D | N/D |

N/D=No determinado.

(1) El estado financiado por OPEB del Sistema al 30 de junio de 2017 y 2016 se determinó mediante la valoración actuarial al comienzo del año que se actualizó para adelantar el estado de financiamiento al 30 de junio de 2017 y 2016 y suponiendo que no haya ganancias o pérdidas por pasivos. Las valoraciones actuariales del año anterior se realizan utilizando datos del censo de fin de año.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información Adicional Requerida (No Auditada):

Esquema de Contribuciones de los Patronos para los Planes de Salud Posteriores al Empleo

(Montos en miles)

El Esquema de contribuciones de patronos para los planes de atención médica posteriores al empleo del ELA proporciona información sobre las contribuciones requeridas (ARC) para OPEB y la medida en que se hicieron contribuciones para cubrir el ARC para OPEB durante los últimos diez años. La ARC es la aportación anual requerida para el año calculada de acuerdo con ciertos parámetros, que incluyen métodos actuariales y supuestos.

| Año fiscal finalizado (1) | SRE | | SRM | | SRJ | |
|---|---|---|---|---|---|---|
| | Aportación Anual requerida | Porcentaje aportado | Aportación Anual requerida | Porcentaje aportado | Aportación Anual requerida | Porcentaje aportado |
| 30 de junio de 2017 | 105,859 | 86% | 37,490 | 97% | 1,023 | 33% |
| 30 de junio de 2016 | 107,739 | 87 | 38,049 | 99 | 923 | 34 |
| 30 de junio de 2015 | 103,878 | 94 | 36,292 | 104 | 847 | 36 |
| 30 de junio de 2014 | 88,508 | 115 | 46,403 | 77 | 684 | 44 |
| 30 de junio de 2013 | 154,999 | 59 | 45,669 | 75 | 643 | 45 |
| 30 de junio de 2012 | 133,654 | 71 | 41,069 | 84 | 554 | 53 |
| 30 de junio de 2011 | 129,395 | 73 | 39,925 | 84 | 529 | 48 |
| 30 de junio de 2010 | 128,294 | 69 | 42,487 | 71 | 488 | 53 |
| 30 de junio de 2009 | 111,683 | 77 | 38,015 | 77 | 425 | 55 |
| 30 de junio de 2008 | 110,650 | 72 | 36,836 | 77 | 408 | 55 |

(1) El estado financiado por OPEB del Sistema al 30 de junio de 2017 y 2016 se determinó mediante la valoración actuarial al comienzo del año que se actualizó para adelantar el estado de financiamiento al 30 de junio de 2017 y 2016 y suponiendo que no haya ganancias o pérdidas por pasivos. Las valoraciones actuariales del año anterior se realizaron utilizando datos del censo de fin de año.

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Información complementaria requerida - Programa de

ingresos y gastos no auditados - Presupuesto y real -

Base presupuestaria - Fondo general

Año finalizado el 30 de junio

de 2017 (En miles)

| | Presupuesto original | Presupuesto modificado | Real |
|---|---|---|---|
| Ingresos: | | | |
| impuestos sobre la renta | $ 4,288,000 | 4,288,000 | 4,235,961 |
| Impuestos a las ventas y el uso | 1,608,000 | 1,608,000 | 1,692,373 |
| Arbitrios | 2,679,000 | 2,679,000 | 2,897,994 |
| Impuesto a la propiedad | 5,000 | 5,000 | 7,223 |
| Otros impuestos | 24,000 | 24,000 | 10,355 |
| Cargos por servicios | 90,000 | 90,000 | 92,427 |
| Ingresos de unidades de componentes | 18,000 | 18,000 | 18,832 |
| Intergubernamental | 206,000 | 206,000 | 187,518 |
| Otros | 62,000 | 62,000 | 60,118 |
| Ingresos totales | 8,980,000 | 8,980,000 | 9,202,801 |
| Gastos - corriente: | | | |
| Gobierno general | 1,606,454 | 1,602,679 | 1,325,476 |
| Seguridad Pública | 1,969,808 | 1,942,761 | 1,930,593 |
| Salud | 1,392,322 | 1,410,568 | 1,382,233 |
| Vivienda Pública y Bienestar | 431,179 | 423,170 | 400,758 |
| Educación | 2,689,326 | 2,698,976 | 2,752,561 |
| Desarrollo Económico | 481,331 | 467,600 | 442,641 |
| Intergubernamental | 416,580 | 441,246 | 391,361 |
| Total de gastos | 8,987,000 | 8,987,000 | 8,625,623 |
| Excedente de ingresos sobre gastos | (7,000) | (7,000) | 577,178 |
| Otras fuentes de financiamiento: | | | |
| Transferencia desde el Fondo de Loterías | 120,000 | 120,000 | 75,515 |
| Total otras fuentes de financiamiento | 120,000 | 120,000 | 75,515 |
| Exceso de ingresos y gastos en exceso de otras fuentes de financiamiento y otros usos de financiamiento | $ 113,000 | 113,000 | 652,693 |

Consulte las notas adjuntas a la información complementaria requerida y el informe de los auditores independientes.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2017

**(1) Esquema del progreso de financiamiento: Planes de atención médica posteriores al empleo**

El esquema del progreso del financiamiento proporciona información sobre el estado financiado de los Planes de atención médica posteriores al empleo y el progreso realizado en la acumulación de activos suficientes para pagar los beneficios cuando vencen. La información se obtuvo del último informe actuarial al 30 de junio de 2017.

**(2) Esquema de las contribuciones del patrono: Planes de atención médica posteriores al empleo**

El esquema de las contribuciones de los patronos proporciona información sobre las contribuciones anuales requeridas (ARC) y la medida en que las contribuciones se hicieron para cubrir la ARC. La ARC es la aportación anual requerida para el año calculada de acuerdo con ciertos parámetros, que incluyen métodos actuariales y supuestos.

El esquema de las contribuciones de los patronos de los Sistemas de Retiro y los Planes de Atención Médica Posterior al Empleo incluye las contribuciones del ELA y de los empleados participantes porque, en última instancia, las contribuciones del ELA deberían cubrir cualquier deficiencia entre las contribuciones de los empleados participantes, los beneficios de pensión y los costos de administración de los Sistemas de Retiro

La información se obtuvo del último informe actuarial al 30 de junio de 2017.

**(3) Cambios de términos y supuestos de beneficios**

*(a) SRE*

Para los fines de la valoración actuarial de 2016 del SRE, la escala de mejora de mortalidad proyectada se actualizó de la Escala MP-2015 a la Escala MP-2016, que fue publicada por la Sociedad de Actuarios en octubre de 2016.

El supuesto de rendimiento de la inversión del 6.55% anual no refleja ningún cambio para los propósitos de la Declaración de GASB Núm. 67. El supuesto del 6.55% refleja la asignación de activos para la porción de la cartera que no es de préstamo que fue adoptada por el SRE durante el año finalizado el 31 de diciembre de 2013 y los supuestos del mercado de capital al 30 de junio de 2016. Tenga en cuenta que este nuevo supuesto de tasa de interés del 6.55% por año es igual a la amortización de la deuda más alto de los Bonos de Obligación de Pensión del SRE. La deuda de los Bonos de Obligaciones por Pensiones oscila entre el 5.85% y el 6.55%. Además, el supuesto refleja que los préstamos a los miembros comprenden aproximadamente el 20% de la cartera y tienen un rendimiento aproximado del 9.1% sin volatilidad.

*(b) SRJ*

La escala de mejora de mortalidad proyectada se actualizó de la Escala MP-2015 a la Escala MP-2016, que fue publicada por la Sociedad de Actuarios en octubre de 2016.

El supuesto de retorno de la inversión se incrementó de 5.50 % por año en el año fiscal 2015 a 5.70 % por año en el año fiscal 2016. En consecuencia, el rendimiento de la inversión asumido en la cuenta de aportación del programa de contribuciones híbridas y aportaciones definidas (80 % del supuesto de rendimiento de inversión neto) se incrementó de 4.40 % por año en el año fiscal 2015 a 4.56 % por año en el año fiscal 2016.

*(c) SRM*

La escala de mejora de mortalidad proyectada se actualizó de la Escala MP-2015 a la Escala MP-2016, que fue publicada por la Sociedad de Actuarios en octubre de 2016.

La valoración refleja un supuesto de retorno de la inversión del 5.85% al 30 de junio de 2016.

El índice seleccionado para el Sistema es el índice de bonos municipales del Bono 20 de Obligaciones generales del comprador de bonos. La tasa de índice disminuyó de 3.80% al 30 de junio de 2015 a 2.85% al 30 de junio de 2016. Por lo tanto, las tasas de descuento utilizadas para determinar las contribuciones

285

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2017

anuales requeridas y el pasivo total por pensiones disminuyó de 3.82% al 30 de junio de 2015 a 2.86% al 30 de junio de 2016, de acuerdo con la Declaración de GASB Núm. 67.

**(4) Control presupuestario**

El Gobernador tiene la obligación constitucional de presentar a la Legislatura un presupuesto anual equilibrado del ELA para el año fiscal subsiguiente. El presupuesto anual es elaborado por el OGP y toma en consideración el asesoramiento brindado por la JP (proyecciones de crecimiento económico anual y plan de mejoras de capital de cuatro años), el DOT (estimaciones de ingresos, registros contables y el informe financiero anual integral), AAFAF (el agente fiscal) y otras oficinas y agencias gubernamentales. La Sección 7 del Artículo VI de la Constitución de Puerto Rico establece que "las asignaciones realizadas cualquier año fiscal no excederán los ingresos totales, incluido el excedente disponible, estimado para dicho año fiscal, a menos que la imposición de impuestos sea suficiente para cubrir dichas asignaciones está previsto por la ley".

El presupuesto anual, que se desarrolla utilizando elementos del presupuesto del programa, incluye una estimación de ingresos y otros recursos para el año fiscal siguiente en: (i) las leyes existentes en el momento en que se presenta el presupuesto y (ii) las medidas legislativas propuestas por el Gobernador y presentadas con el presupuesto propuesto, así como las recomendaciones del Gobernador en cuanto a los créditos que a su juicio son necesarios, convenientes y conformes con el plan de cuatro años de mejoras de capital adoptado por la JP.

La Legislatura puede enmendar el presupuesto presentado por el Gobernador pero no puede aumentar ninguna partida para causar un déficit sin imponer impuestos o identificar otras fuentes de ingresos para cubrir dicho déficit. Una vez aprobado por la Legislatura, el presupuesto se remite al Gobernador, quien puede disminuir o eliminar cualquier línea de pedido pero no puede aumentar o insertar ninguna línea de pedido nueva en el presupuesto. El Gobernador también puede vetar el presupuesto en su totalidad y devolverlo a la Legislatura con sus objeciones. La Legislatura, por mayoría de dos tercios en cada cámara, puede anular el veto del gobernador. Si no se adopta un presupuesto antes del final del año fiscal, el presupuesto anual para el año fiscal anterior, según lo aprobado por la Legislatura y el Gobernador, se renueva automáticamente para el año fiscal siguiente hasta que la Legislatura apruebe un nuevo presupuesto y el gobernador Esto permite que el ELA continúe realizando pagos por sus gastos operativos y otros hasta que se apruebe el nuevo presupuesto. El presupuesto anual apropiado durante el año fiscal 2017 (incluidos otros usos de financiamiento) ascendió a aproximadamente $9,000 millones, incluidas varias asignaciones presupuestarias especiales al Fondo General realizadas por la Legislatura durante todo el año que ascendieron a aproximadamente a $4,800 millones.

La OGP tiene autoridad para enmendar el presupuesto dentro de un departamento, agencia o unidad gubernamental sin aprobación legislativa.

PROMESA ha cambiado significativamente el proceso de aprobación del presupuesto del fondo general del ELA. A partir del año fiscal 2018, el proceso de aprobación del presupuesto será controlado por la Junta de Supervisión. La Junta de Supervisión presentará al Gobernador un aviso en el que se delineará un cronograma para el desarrollo, presentación, aprobación y certificación de los presupuestos propuestos que el Gobernador y la Legislatura presentarán a la Junta de Supervisión para su aprobación. La Junta de Supervisión, a su criterio, sería responsable de determinar el número de años fiscales que cubrirá la presentación del presupuesto.

La Junta de Supervisión será responsable de presentar estimaciones de ingresos para el período cubierto por los presupuestos propuestos al Gobernador y a la Legislatura para que el Gobernador los utilice en la elaboración de presupuestos que se someterán a revisión y aprobación de la Junta de Supervisión. El proyecto de ley describe tres medios por los cuales se podría aprobar un presupuesto propuesto.

- **Presentación del presupuesto por parte del gobernador.** Si la Junta de Supervisión determina que el presupuesto propuesto cumple con el plan fiscal aplicable, entonces, el proyecto de ley permitiría a la Junta de Supervisión aprobar el presupuesto propuesto y presentarlo a la Legislatura para su aprobación. Si se determina que el presupuesto propuesto no cumple con el plan fiscal aplicable, entonces, el

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2017

proyecto de ley permitiría a la Junta de Supervisión emitir un "aviso de infracción" que incluiría recomendaciones para corregir las deficiencias.

- **Presupuesto de la Junta de Supervisión.** Si el Gobernador no presenta un presupuesto conforme, el proyecto de ley permitiría a la Junta de Supervisión desarrollar y presentar al Gobernador y la Legislatura un presupuesto conforme revisado para el territorio, y solo al Gobernador en el caso de un organismo territorial.

- **Presupuesto adoptado por la Legislatura.** El proyecto de ley ordena a la Legislatura que adopte un presupuesto propuesto para presentarlo a la Junta de Supervisión. Si se determina que el presupuesto propuesto no cumple con el plan fiscal aplicable, entonces, la Junta de Supervisión puede emitir un "aviso de infracción" que incluye recomendaciones para corregir las deficiencias.

- **Presupuesto de la Junta de Supervisión.** Si la Legislatura no presenta un presupuesto conforme, el proyecto de ley permitiría a la Junta de Supervisión desarrollar y presentar al Gobernador y la Legislatura un presupuesto conforme revisado para el territorio.

- **Certificación del presupuesto como conforme.** Según las disposiciones del proyecto de ley, si el Gobernador y la Legislatura aprueban un presupuesto territorial conforme, o si el Gobernador desarrolla un presupuesto para el ELA que cumple con el plan fiscal aplicable, la Junta de Supervisión podría emitir un certificado de cumplimiento. Si el Gobernador y la Legislatura no desarrollan y aprueban un presupuesto que cumpla con los requisitos, entonces, la Junta de Supervisión podría desarrollar y presentar un presupuesto al Gobernador y la Legislatura y dicho presupuesto se consideraría aprobado por el Gobernador y la Legislatura. En el caso de un organismo territorial, solo el Gobernador podría presentar una propuesta de presupuesto para que sea revisada por la Junta de Supervisión.

- **Presupuesto elaborado conjuntamente por la Junta de Supervisión, el Gobernador y la Legislatura.** El proyecto de ley permitiría a la Junta de Supervisión, el Gobernador y la Legislatura trabajar en colaboración para desarrollar un presupuesto de consenso para el gobierno territorial. En el caso de un organismo territorial, el proyecto de ley permitiría a la Junta de Supervisión y al Gobernador trabajar en colaboración para desarrollar un presupuesto.

Para fines presupuestarios, se utiliza la contabilidad de gravámenes. Los gravámenes (es decir, órdenes de compra y contratos) se consideran gastos cuando se establece un compromiso. Par los fines de la presentación de informes GAAP de los EE. UU., los gravámenes pendientes al final del año se informan dentro de las clasificaciones de saldo de fondos restringidos, comprometidos, asignados y no asignados y no constituyen gastos o pasivos según los GAAP de los EE. UU. porque los compromisos se cumplirán durante el año siguiente. El saldo no gravado de cualquier apropiación del Fondo General al final del año fiscal caduca inmediatamente. Las asignaciones, que no sean del Fondo General, son cuentas continuas para las cuales la Legislatura ha autorizado que un saldo no gastado del año anterior se transfiera y esté disponible para gastos corrientes. Asimismo, para fines presupuestarios, los ingresos se registran cuando se recibe efectivo.

Durante cualquier año fiscal en el que los recursos disponibles para el ELA sean insuficientes para cubrir las asignaciones aprobadas para dicho año, el Gobernador puede tomar medidas administrativas para reducir los gastos y presentar a ambas cámaras de la Legislatura un informe detallado de cualquier ajuste necesario para equilibrar el presupuesto, o hacer recomendaciones a la Legislatura para nuevos impuestos o autorizar préstamos bajo las disposiciones de la legislación vigente o tomar cualquier otra medida necesaria para cubrir la deficiencia estimada. Cualquier ajuste propuesto debe dar efecto a las "normas de prioridad" establecidas por ley para el desembolso de fondos públicos en el siguiente orden de prioridad: (i) el pago de los requisitos de intereses y amortización de la deuda pública (obligaciones generales del ELA y deuda garantizada para la cual se ha ejercido la garantía del ELA); (ii) el cumplimiento de las obligaciones derivadas de contratos legalmente vinculantes, decisiones judiciales sobre el dominio eminente y otras obligaciones inevitables para proteger el nombre, el crédito y la plena fe del ELA; (iii) gastos corrientes en las áreas de salud, protección de personas y propiedad, educación, bienestar y sistemas de retiro; y (iv) todos los demás fines.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2017

Además, la Legislatura puede ordenar que ciertos ingresos se retengan y estén disponibles para gastos dentro de una cuenta de apropiación específica. En general, los gastos no pueden exceder el nivel de gasto autorizado para un departamento individual. Sin embargo, el ELA está legalmente obligado a la deuda, independientemente de si tales cantidades son asignadas. Se consignan asignaciones para ciertos Departamentos, agencias y unidades gubernamentales incluidas en el Fondo General.

Para estos fondos, se incluye un cronograma de ingresos y gastos - presupuesto y base presupuestaria real - Fondo general. Las asignaciones para proyectos de capital se hacen para cada emisión de bonos y la autorización continúa para el período de construcción esperado.

La OGP tiene la responsabilidad de garantizar que el control del gasto presupuestario se mantenga por departamento individual. La OGP puede transferir parte o la totalidad de cualquier saldo no gravado dentro de un departamento a otro departamento sujeto a aprobación legislativa. El control presupuestario se ejerce a través del Sistema de Contabilidad Central de Puerto Rico (PRIFAS). El PRIFAS asegura que los gravámenes o gastos no se procesen si exceden la autorización de gasto total disponible del departamento, que se considera su presupuesto. El nivel legal de control presupuestario es a nivel de departamento individual para gastos del Fondo General, capital e intereses adeudados para el año para el fondo de amortización de la deuda, y mediante autorización de bonos para gastos de capital.

No obstante lo anterior, la promulgación de PROMESA (como se analiza en la Nota 3) creó una Junta de Supervisión con el poder de revisar y aprobar los presupuestos del ELA y sus organismos. Según PROMESA, la Junta de Supervisión debe certificar un plan fiscal para cada entidad cubierta antes de que el ELA pueda proponer cualquier presupuesto para el año fiscal. Todos los presupuestos propuestos después de la promulgación de PROMESA deben ser certificados por la Junta de Supervisión como consistentes con el plan fiscal certificado aplicable. Para obtener información adicional sobre el proceso de certificación presupuestaria según PROMESA, consulte la Nota 3.

**(5) Contabilidad estatutaria (presupuestaria)**

El presupuesto del ELA se adopta de acuerdo con una base legal de contabilidad, que no está de acuerdo con las GAAP de los EE. UU. Los ingresos generalmente se reconocen cuando se recibe efectivo. Los ingresos del impuesto sobre ingresos se reducen por la cantidad de reintegros del impuesto sobre la renta pagados durante el año y reclamados pero no pagados al final del año. Los préstamos a corto y largo plazo pueden utilizarse para financiar el exceso presupuestario de los gastos sobre los ingresos. Los gastos generalmente se registran cuando se incurre o grava el gasto relacionado. Los gravámenes generalmente caducan el año siguiente al final del año fiscal en que se estableció el gravamen, según lo establecido por la Ley Núm. 123-2001. Las asignaciones sin gravámenes caducan al final del año. Los montos requeridos para resolver reclamaciones y juicios contra el ELA y otros pasivos determinados no se reconocen hasta que se gravan o se procesen para el pago.

Según la base legal de la contabilidad, el ELA utiliza la contabilidad de gravámenes para registrar la cantidad total de órdenes de compra, contratos y otros compromisos de recursos asignados como deducciones de la asignación antes del gasto real. En los fondos gubernamentales, la contabilidad de gravámenes es un aspecto importante del control presupuestario.

El esquema de ingresos y gastos - presupuesto y real - base presupuestaria - Fondo General solo presenta la información para el Fondo General para la que existe un presupuesto legalmente adoptado, según lo requerido por GAAP de los EE. UU. Para una conciliación del estado de ingresos y gastos - presupuesto y actual - base presupuestaria - Fondo General con el estado de ingresos, gastos y cambios en los saldos (déficit) del fondo general, consulte la Nota 6 a la información complementaria requerida. Los Fondos de Ingresos Especiales no tienen un presupuesto legalmente obligatorio.

**ELA DE PUERTO RICO**

Notas a la información complementaria requerida (sin auditar)

30 de junio de 2017

**(6) Reconciliación entre el presupuesto/GAAP de los EE. UU.**

Debido a que los principios contables aplicados con el propósito de desarrollar datos sobre una base presupuestaria difieren significativamente de los utilizados para presentar los estados financieros a tenor con los US GAAP, una conciliación de la entidad, el momento y las diferencias básicas en el exceso (deficiencia) de ingresos y otras fuentes de financiamiento sobre los gastos y otros usos de financiamiento para el año terminado el 30 de junio de 2017 se presenta a continuación para el Fondo General (en miles):

| | |
|---|---:|
| Exceso de ingresos y otras fuentes de financiamiento bajo gastos y otros usos de financiamiento - base presupuestaria | $ 652,693 |
| Diferencias de entidad - exceso de ingresos y otras fuentes de financiamiento sobre gastos y otros usos de financiamiento para: | |
| Fondos no presupuestados | 692,996 |
| Inclusión de agencias con tesorerías independientes | (295) |
| Diferencias de tiempo: | |
| Ajuste por gravámenes | 208,925 |
| Gastos del año actual contra gravámenes del año anterior | (176,132) |
| Base de las diferencias contables: | |
| Ajuste devengado de ingresos | (98,661) |
| Ajustes de gastos devengados | (141,659) |
| Exceso de ingresos y otras fuentes de financiamiento. sobre gastos y otros usos de financiamiento - GAAP de EE. UU. | $ 1,137,867 |

Ver el informe de los auditores independientes adjunto.

**ESTADOS FINANCIEROS Y ESQUEMAS DE
FONDOS COMBINADOS E INDIVIDUALES**

**ELA DE PUERTO RICO**

Fondo General

Año finalizado el

30 de junio de 2017 (en miles)

El Fondo General es el principal fondo operativo del ELA. El Fondo General se utiliza para contabilizar e informar todos los recursos financieros recibidos y utilizados para aquellos servicios tradicionalmente proporcionados por un gobierno, que no están obligados legalmente o por una buena gestión financiera a contabilizarse en otro fondo. Se incluyen transacciones de servicios como gobierno general, seguridad pública, salud, vivienda pública y bienestar, educación y desarrollo económico. A continuación se incluye el esquema suplementario de gastos - presupuesto y real - Fondo General (base presupuestaria).

**ELA DE PUERTO RICO**

Esquema Adicional de Gastos por Agencia – Presupuesto y Base
Presupuestaria Real – Fondo General

Año finalizado el 30 de junio de 2017

(en miles)

| | Presupuesto original | Presupuesto modificado | Real |
|---|---|---|---|
| Gastos - corrientes: | | | |
| Gobierno general | | | |
| Senado de Puerto Rico | $ 41,704 | 43,112 | 43,112 |
| Cámara de Representantes de Puerto Rico | 47,696 | 50,362 | 50,361 |
| Oficina del Síndico | 39,690 | 39,690 | 39,690 |
| Oficina del Gobernador | 20,567 | 20,891 | 16,828 |
| Oficina de Administración y Presupuesto (1) | 243,131 | 309,391 | 58,783 |
| Junta de Planificación | 11,601 | 11,900 | 12,597 |
| Departamento de Estado | 5,681 | 6,610 | 4,624 |
| Departamento de Hacienda (1) | 201,527 | 239,447 | 214,263 |
| Oficina Central de Administración de Personal | 3,580 | 3,551 | 3,511 |
| Comisión de Elecciones del ELA | 73,116 | 72,168 | 70,093 |
| Administración de Asuntos Federales | 3,336 | 3,957 | 3,630 |
| Administración de Servicios Generales | 3,765 | 3,765 | 5,664 |
| Comisión Municipal de Vistas de Demandas | 9,835 | 11,766 | 12,505 |
| Comisión de Derechos Civiles | 1,089 | 1,087 | 1,040 |
| Oficina del Procurador del Ciudadano | 4,000 | 4,000 | 4,061 |
| Junta de Ética del Gobierno | 9,278 | 9,278 | 9,278 |
| Oficina de Asuntos Legislativos | 36,393 | 13,013 | 13,013 |
| Oficina del Superintendente del Capitolio | 31,518 | 29,174 | 29,174 |
| Comisión Conjunta de Informes Especiales del Síndico | 662 | 812 | 743 |
| Comisión de Donación Legislativa | 2,747 | 24,247 | 22,282 |
| Corporación para el Proyecto "Enlace" del Caño Martín Peña | 6,274 | 6,258 | 6,258 |
| Instituto de Estadística de Puerto Rico | 2,292 | 2,165 | 2,135 |
| Oficina de Gerencia de Permisos | 11,038 | 10,007 | 5,649 |
| Sistema de Retiro de Empleados del Gobierno del ELA de Puerto Rico | 492,788 | 401,962 | 425,784 |
| Junta de Supervisión y Administración Financiera para Puerto Rico | | 31,000 | 27,000 |
| Sistema de Anualidades y Pensiones para Maestros de Puerto Rico | 206,290 | 156,290 | 156,290 |
| Autoridad de Edificios Públicos | 90,200 | 90,200 | 80,605 |
| Síndico de la Oficina de Elecciones | 3,574 | 3,570 | 3,564 |
| Junta de Apelaciones de la Administración del Sistema de Personal | 3,082 | 3,006 | 2,939 |
| Total Gobierno General | 1,606,454 | 1,602,679 | 1,325,476 |
| Seguridad Pública: | | | |
| Tribunal General de Justicia de Puerto Rico | 323,967 | 323,967 | 322,685 |
| Defensa Civil | 7,898 | 7,663 | 7,741 |
| Comisión de la Junta de Investigación, Procesamiento y Apelaciones | 407 | 398 | 352 |
| Departamento de Justicia | 166,500 | 161,361 | 169,375 |
| Departamento de Policía de Puerto Rico | 817,029 | 812,783 | 792,301 |
| Cuerpo de Bomberos de Puerto Rico | 65,066 | 64,511 | 65,842 |
| Guardia Nacional de Puerto Rico | 11,451 | 10,965 | 10,900 |
| Comisión de Servicios Públicos | 5,073 | 4,922 | 4,888 |
| Departamento de Asuntos del Consumidor | 7,192 | 6,995 | 7,361 |
| Administración de Recursos Naturales | 29,879 | 29,786 | 29,766 |
| Oficina del Bosque Modelo | 300 | 300 | 355 |
| Departamento de Corrección y Rehabilitación | 415,547 | 405,925 | 402,433 |
| Junta de Libertad Condicional | 2,366 | 2,342 | 2,285 |
| Instituto de Ciencias Forenses | 18,025 | 17,891 | 17,611 |
| Panel de Fiscales Especiales | 2,614 | 2,604 | 2,604 |
| Salud Correccional | 74,527 | 68,421 | 69,025 |
| Servicio de Emergencias Médicas | 21,967 | 21,927 | 25,069 |
| Total Seguridad Pública | 1,969,808 | 1,942,761 | 1,930,593 |

(Continuaci

**ELA DE PUERTO RICO**

Esquema Adicional de Gastos por Agencia – Presupuesto y Base
Presupuestaria Real – Fondo General

Año finalizado el 30 de junio de 2017

(en miles)

| | Presupuesto original | Presupuesto modificado | Real |
|---|---|---|---|
| Salud: | | | |
| Junta de Calidad Ambiental | $ 14,690 | 14,573 | 14,460 |
| Departamento de Salud | 268,420 | 284,923 | 276,156 |
| Administración de Servicios Médicos de Puerto Rico | 52,169 | 51,700 | 42,350 |
| Administración de Servicios de Salud Mental y Contra la Adicción | 90,012 | 92,397 | 86,867 |
| Autoridad de Desperdicios Sólidos de Puerto Rico | 7,540 | 7,496 | 4,429 |
| Administración de Seguros de Salud de Puerto Rico | 892,383 | 892,371 | 892,254 |
| Centro Integral de Cáncer de la Universidad de Puerto Rico | 67,108 | 67,108 | 65,717 |
| | 1,392,322 | 1,410,568 | 1,382,233 |
| Vivienda Pública y Bienestar: | | | |
| Departamento de Trabajo y Recursos Humanos | 13,969 | 14,964 | 15,560 |
| Junta de Relaciones Laborales | 805 | 802 | 800 |
| Departamento de Vivienda | 14,899 | 14,701 | 14,485 |
| Departamento de Recreación y Deportes | 47,962 | 45,861 | 44,117 |
| Administración para el Deporte e Industria de las Carreras de Caballos | 1,769 | 1,735 | 2,037 |
| Comisión de Asuntos de la Mujer | 4,932 | 4,503 | 3,684 |
| Administración de Vivienda Pública | 450 | 450 | 449 |
| Oficina del Defensor de los Veteranos | 2,504 | 2,388 | 2,592 |
| Departamento de Familia | 28,489 | 28,694 | 30,571 |
| Administración de Familias y Niños | 188,860 | 184,204 | 175,246 |
| Administración de Asistencia a Menores | 12,964 | 12,473 | 11,884 |
| Administración de Rehabilitación Vocacional | 16,216 | 15,449 | 15,448 |
| Administración de Desarrollo Económico Social | 72,885 | 70,965 | 61,628 |
| Oficina del Defensor de Personas con Discapacidades | 1,495 | 1,457 | 1,692 |
| Oficina de Asuntos de la Tercera Edad | 2,940 | 2,897 | 2,698 |
| Compañía para el Desarrollo Integral de la "Península de Cantera" | 479 | 461 | 761 |
| Defensor del Paciente | 2,366 | 2,253 | 2,113 |
| Administración para el Cuidado y Desarrollo de la Infancia | 14,169 | 15,134 | 12,068 |
| Fideicomiso de Comunidades Especiales | 3,026 | 3,779 | 2,925 |
| | 431,179 | 423,170 | 400,758 |
| Educación: | | | |
| Departamento de Educación | 1,755,984 | 1,765,977 | 1,822,011 |
| Instituto de Cultura de Puerto Rico | 18,862 | 18,444 | 16,862 |
| Escuela de Artes Plásticas de Puerto Rico | 2,242 | 2,239 | 2,204 |
| Oficina Estatal de Preservación Histórica | 1,694 | 1,683 | 1,230 |
| Universidad de Puerto Rico | 872,432 | 872,432 | 872,432 |
| Corporación de las Artes Musicales | 7,727 | 7,584 | 7,514 |
| Corporación del Centro de Bellas Artes | 3,896 | 3,896 | 3,776 |
| Corporación de Puerto Rico para la Difusión Pública | 10,897 | 11,038 | 11,038 |
| Corporación del Conservatorio Musical de Puerto Rico | 6,021 | 5,951 | 5,857 |
| Consejo de Educación de Puerto Rico | 9,571 | 9,732 | 9,637 |
| | 2,689,326 | 2,698,976 | 2,752,561 |

(Continuaci

**ELA DE PUERTO RICO**

Esquema Adicional de Gastos por Agencia – Presupuesto y Base
Presupuestaria Real – Fondo General

Año finalizado el 30 de junio de 2017

(en miles)

| | Presupuesto original | Presupuesto modificado | Real |
|---|---|---|---|
| Desarrollo Económico | | | |
| Departamento de Transporte y Obras Públicas | $ 45,339 | 52,100 | 47,902 |
| Departamento de Recursos Naturales y Ambientales | 11,322 | 9,039 | 9,487 |
| Departamento de Agricultura | 52,463 | 53,510 | 48,361 |
| Administración de Desarrollo de Empresas Cooperativas | 2,444 | 2,323 | 1,914 |
| Departamento de Desarrollo Económico y Comercio | 3,814 | 3,809 | 3,434 |
| Administración para el Desarrollo de Empresas Agropecuarias | 111,237 | 108,419 | 101,772 |
| Banco de Desarrollo Económico de Puerto Rico | 3,000 | 3,000 | |
| Administración de Asuntos Energéticos | 991 | 885 | 1,033 |
| Compañía de Comercio y Exportación de Puerto Rico | 4,410 | 4,410 | 4,233 |
| Autoridad de Puertos de Ponce | 3,300 | 3,300 | 3,190 |
| Banco Gubernamental de Fomento para Puerto Rico | 132,500 | 132,500 | 132,500 |
| Autoridad para el Financiamiento de la Infraestructura de Puerto Rico | 19,000 | 4,000 | 4,000 |
| Autoridad de Financiamiento de la Vivienda de Puerto Rico | 11,000 | 11,000 | 10,511 |
| Autoridad de Transporte Integrado de Puerto Rico | 33,000 | 33,000 | 29,000 |
| Administración de Tierras de Puerto Rico | 1,000 | 1,000 | 900 |
| Centro de Diabetes de Puerto Rico | 450 | 450 | 657 |
| Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico | 40,020 | 38,814 | 38,814 |
| Autoridad de Autobuses Metropolitanos de Puerto Rico | 722 | 722 | |
| Autoridad de Asociación Pública de Puerto Rico | 2,353 | 2,353 | 3,517 |
| Autoridad de Conservación y Desarrollo de Culebra | 252 | 252 | 241 |
| Autoridad del Puerto de las Américas | 1,247 | 1,247 | |
| Autoridad para el Redesarrollo de los Terrenos y Facilidades de la Estación Naval Roosevelt Roads | 1,215 | 1,215 | 1,175 |
| Autoridad de Transporte Marítimo de Puerto Rico | 252 | 252 | |
| Total Desarrollo Económico | 481,331 | 467,600 | 442,641 |
| Intergubernamental - Administración de Servicios Municipales | 416,580 | 441,246 | 391,361 |
| Gastos Totales | $ 8,987,000 | 8,987,000 | 8,625,623 |

(1)    Como departamento y agente fiscal.

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Fondos gubernamentales no mayores

Año finalizado el 30 de junio de 2017

(en miles)

**Fondos de ingresos especiales**

Los fondos de ingresos especiales se utilizan para contabilizar e informar los ingresos de fuentes de ingresos específicas que están restringidas o comprometidas a gastos para fines específicos distintos a la amortización de la deuda o proyectos de capital. Otros recursos (ganancias de inversión y transferencias de otros fondos, por ejemplo) también pueden informarse en el fondo si esos recursos están restringidos, comprometidos o asignados al propósito especificado del fondo.

**(1) Fondo de Ingresos Especiales de la Autoridad de Edificios Públicos**

El fondo operativo de la Autoridad de Edificios Públicos, una unidad de componentes combinados, utilizada para contabilizar la operación, mantenimiento, reemplazo de equipos y otros costos extraordinarios de operación y mantenimiento de los edificios e instalaciones que, cuando se construyen, se arriendan a agencias del Gobierno Primario del ELA.

**(2) Fondo de Ingresos Especiales de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico**

El fondo de ingresos especiales de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, una unidad de componentes combinados, se utiliza para contabilizar el dinero recibido del ELA con el propósito de supervisar el cumplimiento del presupuesto y plan fiscal certificado a tenor con la Ley PROMESA de 2016; revisar asuntos que incluyen, entre otros, acuerdos, transacciones y regulaciones de las agencias y organismos del ELA; suscribir un contrato de acreedores o renegociar o reestructurar la deuda pública, total o parcialmente, o cualquier otra deuda emitida por cualquier organismo gubernamental.

**(3) Fondo de Ingresos Especiales de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico**

El fondo especial de ingresos de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, una unidad de componentes combinados, se utiliza para contabilizar principalmente el dinero recibido por el ELA, hasta $117 millones, de ciertos arbitrios federales gravados sobre el ron y otros artículos producidos en Puerto Rico y vendido en los Estados Unidos, que son recaudados por Hacienda de los Estados Unidos y devueltos al ELA. Según la Ley Núm. 44-1988, según enmienda, el ELA asigna condicionalmente a este fondo los primeros $117 millones de estos impuestos federales reembolsables, que posteriormente se transfieren al Fondo de Amortización de la Deuda de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico para proporcionar amortización de la deuda de sus bonos fiscales especiales.

**(4) Fondo de Ingresos Especiales de la Autoridad de Ponce**

El fondo especial de ingresos de la Autoridad de Ponce, una unidad de componentes combinados, se utiliza para dar cuenta de los requisitos legales y otros requisitos administrativos restantes que resultan de la transferencia de todos los derechos y deberes a la Autoridad de Puertos de Ponce. El objetivo principal de la Autoridad de Ponce fue la planificación, desarrollo y construcción de una terminal de contenedores a gran escala en la ciudad de Ponce, Puerto Rico.

**(5) Fondo de ingresos especiales del Fideicomiso perpetuo de comunidades especiales**

El fondo de ingresos especiales del Fideicomiso perpetuo de comunidades especiales, una unidad de componentes combinados, se utiliza para contabilizar el dinero recibido del Banco Gubernamental de Fomento, a través de una línea de financiamiento crediticio y contribuciones en efectivo, al inicio del Fideicomiso perpetuo de comunidades especiales. Los recursos financieros recibidos por este fondo se utilizan para llevar a cabo proyectos de desarrollo que abordan las necesidades de infraestructura y vivienda de ciertas comunidades desfavorecidas.

**(6) Fondo de ingresos especiales del Fideicomiso de los Niños**

El fondo de ingresos especiales del Fideicomiso de los Niños, una unidad de componentes combinados, se

**ELA DE PUERTO RICO**

Fondos gubernamentales no importantes

Año finalizado el 30 de junio de 2017

(En miles)

utiliza para contabilizar el dinero recibido por el ELA de un acuerdo global de transacción de fecha 23 de noviembre de 1998 entre ciertas compañías tabacaleras y ciertos estados, territorios y otras jurisdicciones de Estado unido de América, incluido el ELA. Los recursos financieros recibidos por este fondo se utilizan para llevar a cabo proyectos destinados a promover el bienestar de los niños y jóvenes de Puerto Rico.

**(7) Fondo de Ingresos Especiales del Centro Integral de Cáncer de la Universidad de Puerto Rico**

El fondo especial de ingresos del Centro Integral de Cáncer de la Universidad de Puerto Rico, una unidad de componentes combinados, se utiliza para contabilizar el dinero recibido del ELA y ciertas otras subvenciones tanto del sector privado como del gobierno federal, para ejecutar políticas públicas relacionadas con la prevención, orientación e investigación. y tratamiento del cáncer en Puerto Rico.

**Fondo de Pago de la Deuda**

Los fondos de pago de la deuda se utilizan para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos de capital e intereses, y costos relacionados que no sean bonos pagaderos de operaciones de tipos de fondos de propiedad exclusiva, fondos fideicomisarios de pensiones y unidades de componentes de presentación discreta. La deuda e intereses a largo plazo con vencimiento el 1 de julio del año siguiente se contabilizan como un pasivo del fondo si los recursos están disponibles al 30 de junio para su pago.

**(1) Fondo de Pago de la Deuda de la Autoridad de Edificios Públicos**

Una unidad de componentes combinados dedicada a la construcción o adquisición de instalaciones de edificios para arrendar principalmente a las agencias del gobierno primario. Su fondo de amortización de la deuda se utiliza para contabilizar los recursos financieros que están restringidos, comprometidos o asignados a gastos para el pago de bonos de ingresos y otros pasivos incurridos para financiar la construcción de los edificios e instalaciones.

**(2) Fondo de Ingresos Especiales de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico**

El fondo de pago de la deuda de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico representa los recursos financieros que están restringidos a los gastos para el pago de intereses y capital en sus bonos especiales de ingresos fiscales. Estos recursos se reciben de transferencias operativas del Fondo de Ingresos Especiales de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico.

**(3) Fondo de Pago de la Deuda de la Autoridad Marítima de Puerto Rico**

Este es el resto de una antigua compañía naviera propiedad del ELA. Su fondo de pago de la deuda se utiliza para contabilizar los recursos financieros que están restringidos para el pago de pasivos a largo plazo resultantes de la venta de sus operaciones marítimas. Este fondo está subsidiado principalmente por asignaciones y transferencias operativas del Fondo General.

**(4) Fondo de Ingresos Especiales del Fideicomiso de los Niños**

El fondo de pago de la deuda del Fideicomiso de los Niños representa los recursos financieros que están restringidos, comprometidos o asignados a gastos para el pago de intereses y capital sobre obligaciones a largo plazo financiadas con dinero que recibirá el ELA del acuerdo de transacción global firmado por ciertas compañías tabacaleras.

295

**ELA DE PUERTO RICO**

Fondos gubernamentales no mayores

Año finalizado el 30 de junio de 2017

(en miles)

**Fondos de proyectos de capital**

Los fondos de proyectos de capital se utilizan para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos para desembolsos de capital, incluida la adquisición o construcción de instalaciones de capital y otros activos de capital que no están financiados por el Fondo de Proyectos de Capital de la Autoridad de Edificios Públicos, el Fondo para Proyectos de Capital de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación discreta.

**(1) Fondo de Proyectos de Capital del Estado Libre Asociado de Puerto Rico**

Estos fondos presentan las actividades del programa de mejoras de capital del ELA, financiado con el producto de los bonos de obligación general.

**(2) Fondo de Pago de la Deuda de la Autoridad de Edificios Públicos**

El fondo de proyectos de capital de la Autoridad de Edificios Públicos se utiliza para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados a gastos para desembolsos de capital, incluida la adquisición o construcción de instalaciones de capital y otros activos de capital no financiados por fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación.

**(3) Fondo de Ingresos Especiales de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico**

El fondo de proyectos de capital de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico se utiliza para contabilizar e informar recursos financieros que están restringidos, comprometidos o asignados para la adquisición o construcción de activos de capital y mejoras de capital, no financiados por fondos de propiedad exclusiva, fondos fiduciarios de pensiones y unidades de componentes de presentación discreta.

**ELA DE PUERTO RICO**

Balance general combinado - Fondos gubernamentales no mayores

30 de junio de 2017

(en miles)

| | Autoridad Edificios Públicos | Autoridad Agencia Fiscal y Asesoría Financiera P.R. | Autoridad Financiamiento Infraestructura Puerto Rico | Autoridad Ponce | Fideicomiso Perpetuo Comunidades Especiales | Fideicomiso de los Niños | Centro Integral para el Cáncer Universidad de Puerto Rico |
|---|---|---|---|---|---|---|---|
| | | | Ingresos Especiales | | | | |
| **Activos:** | | | | | | | |
| Efectivo y equivalentes de efectivo en bancos comerciales | $ 58,669 | 16,067 | 5,425 | | | | 19,784 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | 2 | 9 | | 67 | |
| Inversiones | | | | | | 11,750 | |
| Cuentas a cobrar netas: | | | | | | | |
| Intergubernamental | | | 82 | | | | 844 |
| Cuentas | | | 633 | | | | 1,463 |
| Préstamos | | | | | | | |
| Interés devengado | | | | | | 1 | |
| Otras | 1,985 | 12 | 23 | | | | 62 |
| Deudas de: | | | | | | | |
| Otros fondos | | | | | | | |
| Unidades de componentes | | 2,259 | | | | | |
| Otras entidades del gobierno | | 902 | | | 490 | | |
| Otros activos | 985 | | | | 5 | | 36 |
| Activos restringidos: | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | | | | 404 | | 4,018 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | | | 207 |
| Equivalentes al efectivo en PRGITF | | | | | | | |
| Inversiones | | | | | | | |
| Deudas de otros fondos | | | 151,408 | | | | |
| Otros | | | | | | | |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | | | |
| Activos Totales | $ 61,639 | 19,240 | 157,573 | 9 | 899 | 11,818 | 26,414 |
| | | | | | | | |
| **Pasivos, salida diferida de recursos y saldos de fondos (déficit):** | | | | | | | |
| Cuentas por pagar y pasivos devengados | $ 17,536 | 14,212 | 1,662 | 442 | 20,605 | 203 | 6,993 |
| Adeudado a: | | | | | | | |
| Otros fondos | | | | 3,996 | | | |
| Unidades de componentes | 3,342 | | | | | | 3,583 |
| Otras entidades del gobierno | 3,425 | 373 | | 26 | 32 | | |
| Interés pagadero | | | 10,027 | | | | |
| Ingresos no obtenidos | 1,578 | | | | | | |
| Pagarés adeudados al BGF | | | 44,557 | 1,700 | | | |
| Obligaciones generales y bonos de ingresos | | | | | | | |
| Ausencias compensadas | | 287 | | | | | 480 |
| Pasivos Totales | 25,881 | 14,872 | 56,246 | 6,164 | 20,637 | 203 | 11,056 |
| | | | | | | | |
| Entradas diferidas de recursos: | | | | | | | |
| Acuerdo global de liquidación del tabaco | | | | | | | |
| Entradas totales diferidas de recursos | | | | | | | |
| | | | | | | | |
| Saldos de fondos: | | | | | | | |
| Restringido para: | | | | | | | |
| Pago de la deuda | | | | | | | |
| Proyectos de capital | | | 101,327 | | | | |
| Comprometido a: | | | | | | | |
| Vivienda Pública y Bienestar | | | | | | 11,751 | |
| Proyectos de capital | | | | | | | 5,308 |
| Asignado a: | | | | | | | |
| Proyectos de capital | | | | | | | 4,006 |
| No asignado (déficit) | 35,758 | 4,368 | | (6,155) | (19,738) | (136) | 6,044 |
| Saldos totales del fondo (déficit) | 35,758 | 4,368 | 101,327 | (6,155) | (19,738) | 11,615 | 15,358 |
| Pasivos totales, entrada diferida de recursos y saldos de fondos (déficit) | $ 61,639 | 19,240 | 157,573 | 9 | 899 | 11,818 | 26,414 |

Ver el informe de los auditores independientes adjunto.

(Continuación)

**ELA DE PUERTO RICO**

Balance general combinado - Fondos gubernamentales no mayores

30 de junio de 2017

(en miles)

| | Pago de la deuda | | | | Proyectos de capital | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fideicomiso de los Niños | Autoridad de Edificios Públicos | Autoridad de Financiamiento Infraestructura de Puerto Rico | Autoridad de Envíos Marítimos Puerto Rico | ELA de Puerto Rico | Autoridad de Edificios Públicos | Autoridad de Financiamiento Infraestructura Puerto Rico | Eliminaciones | Total Fondos Gubernamentale no Mayores |
| **Activos:** | | | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ | | | | | | | | 99,945 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | 8 | | | | | 86 |
| Inversiones | | | | | | | | | 11,750 |
| Cuentas por cobrar, netas: | | | | | | | | | |
| Intergubernamental | | | | | | | | | 926 |
| Cuentas | | | | | 707 | | 300 | | 3,103 |
| Préstamos | | | | | 2 | | | | 2 |
| Interés devengado | | | | | | | | | 1 |
| Otras | 36,344 | | | | | | | | 38,426 |
| Adeudados de: | | | | | | | | | |
| Otros fondos | | | | | 113 | | | | 113 |
| Unidades de componentes | | | | | | | | | 2,259 |
| Otras entidades del gobierno | | | | | | | | | 1,392 |
| Otros activos | | | | | | | | | 1,026 |
| Activos restringidos: | | | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | 4,704 | 131 | | 8,780 | 21,482 | 37,063 | | 76,582 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | 37 | | | 35 | | 279 |
| Equivalentes al efectivo en PRGITF | | | | | 47,429 | | | | 47,429 |
| Inversiones | 108,900 | | 1,217 | | | | | | 110,117 |
| Deudas de estos fondos | | | 3,073 | | | | 3,559 | | 158,040 |
| Adeudado a otras entidades del gobierno | | | | | | | 11,747 | | 11,747 |
| Otros | 481 | | | | | | 11 | | 492 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | 1,854 | | | | 1,854 |
| **Activos Totales** | $ 145,725 | 4,704 | 4,421 | 45 | 58,885 | 21,482 | 52,715 | | 565,569 |
| **asivos, salda diferida de recursos y saldos de fondos (déficit):** | | | | | | | | | |
| Cuentas por pagar y pasivos devengados | $ | | | 45 | 5,619 | 11,598 | 38,156 | | 117,071 |
| Adeudado a: | | | | | | | | | |
| Otros fondos | | | | | | | | | 3,996 |
| Unidades de componentes | | | | | | | | | 6,925 |
| Otras entidades del gobierno | | | | | 1 | 2,023 | | | 5,880 |
| Interés pagadero | | 104,155 | 113,432 | 13,674 | | | | | 241,288 |
| Ingresos no obtenidos | | | | | | | | | 1,578 |
| Pagarés adeudados al BGF | | | | | | | | | 46,257 |
| Obligaciones generales y bonos de ingresos | | 25,273 | 119,260 | | | | | | 144,533 |
| Ausencias compensadas | | | | | | | | | 767 |
| **Pasivos Totales** | | 129,428 | 232,692 | 13,719 | 5,620 | 13,621 | 38,156 | | 568,295 |
| Entradas diferidas de recursos: | | | | | | | | | |
| Acuerdo global de liquidación del tabaco | 36,344 | | | | | | | | 36,344 |
| **Entradas totales diferidas de recursos** | 36,344 | | | | | | | | 36,344 |
| Saldos de fondos: | | | | | | | | | |
| Restringido para: | | | | | | | | | |
| Pago de la deuda | 109,381 | | | | | | | | 109,381 |
| Proyectos de capital | | | | | 53,265 | 7,861 | 14,559 | | 177,012 |
| Comprometido a: | | | | | | | | | |
| Vivienda Pública y Bienestar | | | | | | | | | 11,751 |
| Proyectos de capital | | | | | | | | | 5,308 |
| Asignado a: | | | | | | | | | |
| Proyectos de capital | | | | | | | | | 4,006 |
| No asignado (déficit) | | (124,724) | (228,271) | (13,674) | | | | | (346,528) |
| **Saldos totales del fondo (déficit)** | 109,381 | (124,724) | (228,271) | (13,674) | 53,265 | 7,861 | 14,559 | | (39,070) |
| **Pasivos totales, entrada diferida de recursos y saldos de fondos (déficit)** | $ 145,725 | 4,704 | 4,421 | 45 | 58,885 | 21,482 | 52,715 | | 565,569 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estado Combinado de Ingresos, Gastos y Cambios en los Saldos de Fondos - Fondos No Mayores del Gobierno

Año finalizado el 30 de junio de 2017

(en miles)

| | | | | Ingresos epeciales | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Autoridad** | **Autoridad Asesoría Financiera Y Agencia Fiscal Puerto Rico** | **Autoridad Financiamiento** | | | **Fideicomiso Perpetuo** | | **Centro Integral para el Cáncer** |
| | **Edifícios Públicos** | | **Infraestructura Puerto Rico** | **Autoridad de Ponce** | | **Comunidades Especiales** | **Fideicomiso de los Niños** | **Universidad de Puerto Rico** |
| Ingresos: | $ | | | | | | | |
| Intergubernamental | | | | | | | | 2,252 |
| Ganancias por intereses e inversiones | 354 | 15 | 338 | | | 1 | 104 | 28 |
| Otros | 357 | 679 | 6,906 | 53 | | 214 | 12 | 4,171 |
| Ingresos totales | 711 | 694 | 7,244 | 53 | | 215 | 116 | 6,451 |
| Gastos: | | | | | | | | |
| Corrientes: | | | | | | | | |
| Gobierno general | 118,604 | 35,087 | 1,683 | | | | 387 | |
| Seguridad pública | | | | | | | | |
| Salud | | | | | | | 2,479 | 15,500 |
| Vivienda Pública y Bienestar | | | | | | 552 | 69 | |
| Educación | | | | | | | | |
| Desarrollo Económico | | | | 71 | | | | |
| Intergubernamental | | | | | | | 129 | |
| Desembolsos de capital | | 53 | 37 | | | | | 34,416 |
| Pago de la deuda | | | | | | | | |
| Capital | | | 37,361 | | | | | |
| Intereses y otros | | | 10,027 | | | | | |
| Gastos totales | 118,604 | 35,140 | 49,108 | 71 | | 552 | 3,064 | 49,916 |
| Deficiencia de ingresos bajo gastos | (117,893) | (34,446) | (41,864) | (18) | | (337) | (2,948) | (43,465) |
| Otras fuentes de financiamiento (usos): | | | | | | | | |
| Transferencias entrantes | 167,708 | 38,814 | 13,949 | | | | 165 | 65,717 |
| Transferencias salientes | (11,575) | | (5,738) | | | | | |
| Total otras fuentes de financiamiento | 156,133 | 38,814 | 8,211 | | | | 165 | 65,717 |
| Cambio neto en los saldos del fondo | 38,240 | 4,368 | (33,653) | (18) | | (337) | (2,783) | 22,252 |
| Saldos del fondo (déficit) – comienzo del año (según reformulación) (nota 4 a los estados financieros) | (2,482) | | 134,980 | (6,137) | | (19,401) | 14,398 | (6,894) |
| Saldos del fondo (déficit) – fin de año | $ 35,758 | 4,368 | 101,327 | (6,155) | | (19,738) | 11,615 | 15,358 |

Ver el informe de los auditores independientes adjunto.

(Continuación)

**ELA DE PUERTO RICO**

Estado Combinado de Ingresos, Gastos y Cambios en los Saldos de Fondos - Fondos No Mayores del Gobierno

Año finalizado el 30 de junio de 2017

(en miles)

| | Pago de la deuda | | | | Proyectos de capital | | | | Total Fondos Gubernamentales No Mayores |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Fideicomiso de los Niños | Autoridad Edificios Públicos | Autoridad Financiamiento Infraestructura Puerto Rico | Autoridad Env íos Marítimos Puerto Rico | ELA de Puerto Rico | Autoridad Edificios Públicos | Autoridad Financiamiento Infraestructura Puerto Rico | Eliminaciones | |
| **Ingresos:** | | | | | | | | | |
| Intergubernamental | $ | 27,669 | | | | | | | 29,921 |
| Ganancias por intereses e inversiones | 3,493 | | 133 | 1 | | | 199 | | 4,666 |
| Otros | | | 3,840 | 3 | 4 | | 139 | | 16,378 |
| Ingresos totales | 3,493 | 27,669 | 3,973 | 4 | 4 | | 338 | | 50,965 |
| **Gastos:** | | | | | | | | | |
| Corrientes: | | | | | | | | | |
| Gobierno General | | | | | 5,786 | | 2,725 | | 164,272 |
| Seguridad Pública | | | | | 7 | | 249 | | 256 |
| Salud | | | | | | | | | 17,979 |
| Vivienda Pública y Bienestar | | | | | 246 | | 562 | | 1,429 |
| Educación | | | | | | | 180 | | 180 |
| Desarrollo Económico | | | | 94 | 3,589 | | 1,523 | | 5,277 |
| Intergubernamental | | | | | 7,200 | | | | 7,329 |
| Desembolsos de capital | | | | | 15,023 | | 13,387 | | 62,916 |
| Pago de la deuda: | | | | | | | | | |
| Capital | 29,815 | 25,273 | 132,760 | | | | | | 225,209 |
| Intereses y otros | 46,656 | 142,232 | 80,683 | 6,837 | | | | | 286,435 |
| Total de gastos | 76,471 | 167,505 | 213,443 | 6,931 | 31,851 | | 18,626 | | 771,282 |
| Deficiencia de ingresos bajo gastos | (72,978) | (139,836) | (209,470) | (6,927) | (31,847) | | (18,288) | | (720,317) |
| **Otras fuentes de financiamiento (usos)** | | | | | | | | | |
| Transferencias entrantes | 72,687 | 9,598 | 990 | | 17,503 | 1,977 | 26,954 | (18,272) | 397,790 |
| Transferencias salientes | (165) | | | | | | (794) | 18,272 | |
| Total otras fuentes de financiamiento | 72,522 | 9,598 | 990 | | 17,503 | 1,977 | 26,160 | | 397,790 |
| Cambio neto en los saldos del fondo | (456) | (130,238) | (208,480) | (6,927) | (14,344) | 1,977 | 7,872 | | (322,527) |
| Saldos del fondo (déficit) – comienzo del año (según reformulación) (nota 4 de los estados financieros) | 109,837 | 5,514 | (19,791) | (6,747) | 67,609 | 5,884 | 6,687 | | 283,457 |
| Saldos del fondo (déficit) – fin de año | $ 109,381 | (124,724) | (228,271) | (13,674) | 53,265 | 7,861 | 14,559 | | (39,070) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Fondos propietarios no mayores

Año finalizado el 30 de junio de 2017

Los fondos de propiedad exclusiva se utilizan para contabilizar las operaciones que se financian y operan de manera similar a las empresas comerciales privadas donde la intención del gobierno es que los costos de proporcionar bienes o servicios al público en general de manera continua se financien o recuperen principalmente a través de cargos de usuario.

### Departamento de Servicios de Emergencia 9-1-1

Este fondo se creó mediante la Ley Núm. 144-1994. El Departamento de Servicios de Emergencia 9-1-1 es responsable de proporcionar un servicio eficiente de respuesta rápida a las llamadas de emergencia a través del número 9-1-1 y transferirlos a las agencias de respuesta apropiadas.

### Seguro de Discapacidad

Este fondo se creó mediante la Ley Núm. 139-1968. Se utiliza para contabilizar los beneficios por discapacidad para remediar temporalmente la pérdida de ingresos como resultado de la discapacidad causada por enfermedad o accidente no relacionado con el empleo.

### Seguro de Conducir

Este fondo se creó mediante la Ley Núm. 428-1950. Se utiliza para contabilizar las contribuciones realizadas por los conductores y sus patronos para proporcionar un plan del seguro social en beneficio de los conductores en Puerto Rico. El plan también incluye el pago de beneficios para el seguro de salud y de vida.

### Fondo de Loterías

Este fondo representa los activos y las operaciones de dos sistemas de lotería administrados por el ELA.

### Autoridad de Puertos de Ponce

Este fondo se creó mediante la Ley Núm. 240-2011. Se utiliza para dar cuenta del desarrollo de la terminal de contenedores anteriormente realizada por la Autoridad de Ponce y administrar tales instalaciones en futuras operaciones.

### Fondo de Préstamo Recurrente para el Tratamiento de Agua Potable Segura de Puerto Rico

Este fondo se creó mediante la Ley Núm. 32-1997. Es administrado, a tenor con la Ley Núm. 9-1970, según enmendada, por el PRDOH. A tenor con dicha ley, el PRDOH, en nombre del ELA, está autorizado a celebrar acuerdos de subvención de operación y capitalización con la EPA para actividades de préstamo.

### Fondo Recurrente de Control de Contaminación del Agua de Puerto Rico

Este fondo, administrado por la JCA, está autorizado para celebrar acuerdos operativos y acuerdos de subvención de capitalización con la EPA, principalmente para proyectos de infraestructura de agua, bajo un acuerdo de cooperación conjunta entre la JCA, la PRIFA, la AAA y la AAFAF, donde cada entidad acordó asumir sus responsabilidades correspondientes.

**ELA DE PUERTO RICO**

Declaración combinada de resultados netos - Fondos de propiedad exclusiva no mayores

30 de junio de 2017

(en miles)

| | Actividades de tipo comercial - Fondos empresariales no mayores | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Junta Administración Servicio 9-1-1 | Seguro Discapacidad | Seguro Conductor | Loterías | Autoridad Puertos Ponce | Fondo Préstamos Recurrentes Tratamiento Agua Potable Segura Puerto Rico | Fondo Recurrente Control Contaminación de Agua Puerto Rico | Total |
| **Activos:** | | | | | | | | |
| Activos corrientes: | | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 52,981 | | 9,851 | 97,861 | 887 | | | 161,580 |
| Cuentas por cobrar - neto: | | | | | | | | |
| Primas de seguros | | 2,911 | 1,010 | | | | | 3,921 |
| Cuentas | 1,844 | | | 3,935 | | | | 5,779 |
| Interés devengado | | 202 | | | | | | 202 |
| Otros | 55 | 750 | | | | | | 805 |
| Deudas de otros fondos | | | | | 3,996 | | | 3,996 |
| Otros activos | 35 | | | | | | | 35 |
| Activos restringidos: | | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 7,963 | 240 | | | | 2,444 | 4,209 | 14,856 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 14 | | | | | 2 | 12 | 28 |
| Otros activos | | | | | | | 133 | 133 |
| Préstamos de unidades de componentes | | | | | | 333 | 667 | 1,000 |
| Total de activos corrientes | 9,911 | 57,084 | 10,861 | 101,796 | 4,883 | 2,779 | 5,021 | 192,335 |
| Activos no corrientes: | | | | | | | | |
| Cuentas por cobrar - neto: | | | | | | | | |
| Préstamos de unidades de componentes - restringido | | | | | | 143,460 | 303,716 | 447,176 |
| # Deudas de otros fondos | | 15,000 | 9,139 | 14,563 | | | | 38,702 |
| Inversiones restringidas | | 26,252 | | | | | | 26,252 |
| Otros activos restringidos | | | | 21,212 | | | 490 | 21,702 |
| Terrenos y otros activos no depreciables: | 490 | | | | 28,643 | | | 29,133 |
| Activos depreciables: | 5,202 | 5 | | 575 | | | | 5,782 |
| Activos Totales | 15,603 | 98,341 | 20,000 | 138,146 | 33,526 | 146,239 | 309,227 | 761,082 |
| Salidas diferidas de recursos: | | | | | | | | |
| Relacionado con pensiones | 15,353 | | | 16,087 | | | | 31,440 |
| **Pasivos y valor neto** | | | | | | | | |
| Pasivos circulantes: | | | | | | | | |
| Cuentas por pagar y pasivos devengados | 2,457 | 1,175 | 460 | 5,701 | 8 | 213 | 335 | 10,349 |
| Adeudado a otras entidades del gobierno | 101 | 1 | 5 | | | | | 107 |
| Interés pagadero | | | | | 3,868 | | | 3,868 |
| Ingresos no obtenidos | | 1,599 | 14 | 10,893 | | | | 12,506 |
| Ausencias compensadas | | 385 | 224 | 72 | | | | 681 |
| Obligación por premios no pagados de lotería | | | | 61,543 | | | | 61,543 |
| Beneficios pagaderos por rescisión voluntaria | | | | 453 | | | | 453 |
| Pasivos por beneficios de seguro | | 544 | 101 | | | | | 645 |
| Total de pasivos corrientes | 2,558 | 3,704 | 804 | 78,662 | 3,876 | 213 | 335 | 90,152 |
| Pasivos no corrientes: | | | | | | | | |
| Pagarés adeudados a las unidades de componentes | | | | | 20,863 | | | 20,863 |
| Ausencias compensadas | 930 | 577 | 337 | 919 | | | | 2,763 |
| Obligación por premios no pagados de lotería | | | | 86,074 | | | | 86,074 |
| Beneficios pagaderos por rescisión voluntaria | 299 | | | 2,463 | | | | 2,762 |
| Pasivos netos de pensiones | 50,338 | | | 54,104 | | | | 104,442 |
| Pasivos Totales | 54,125 | 4,281 | 1,141 | 222,222 | 24,739 | 213 | 335 | 307,056 |
| Entradas diferidas de recursos: | | | | | | | | |
| Relacionado con pensiones | 964 | | | 1,036 | | | | 2,000 |
| Resultados Netos: | | | | | | | | |
| Inversión neta en activos de capital | 5,692 | 5 | | 575 | 9,381 | | | 15,653 |
| Restringido para servicios de emergencia | 6,268 | | | | | | | 6,268 |
| Restringido para actividades de préstamos | | | | | | 146,026 | 308,892 | 454,918 |
| Restringido para el pago de beneficios de seguro | | 26,492 | | | | | | 26,492 |
| No restringido | (36,093) | 67,563 | 18,859 | (69,600) | (594) | | | (19,865) |
| Resultados netos totales | $ (24,133) | 94,060 | 18,859 | (69,025) | 8,787 | 146,026 | 308,892 | 483,466 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estado Combinado de Ingresos, Gastos y Cambios en los Resultados Netos de los Fondos - Fondos No Mayores de
Propiedad Exclusiva

Año finalizado el 30 de junio de 2017

(en miles)

**Actividades de tipo comercial - Fondos empresariales no mayores**

| | Junta Administración Servicio 9-1-1 | Seguro Discapacidad | Seguro Conductor | Loterías | Autoridad Puertos Ponce | Fondo Préstamos Recurrentes Tratamiento Agua Potable Segura Puerto Rico | Fondo Recurrente Control Contaminación de Agua Puerto Rico | Total |
|---|---|---|---|---|---|---|---|---|
| **Ingresos operativos:** | | | | | | | | |
| Primas de seguro | $ | 14,261 | 4,402 | | | | | 18,663 |
| Cargos del servicio telefónico de emergencias | 22,680 | | | | | | | 22,680 |
| Ventas de boletos de lotería | | | | 757,686 | | | | 757,686 |
| Intereses | | | | | | 399 | 1,139 | 1,538 |
| Otros | | | | 51 | | | | 51 |
| Ingresos operativos totales | 22,680 | 14,261 | 4,402 | 757,737 | | 399 | 1,139 | 800,618 |
| **Gastos operativos:** | | | | | | | | |
| Beneficios del seguro | | 1,580 | 656 | | | | | 2,236 |
| Ventas de boletos de lotería | | | | 487,325 | | | | 487,325 |
| Operaciones generales, administrativas y otros gastos operativos | 24,472 | 6,802 | 3,509 | 77,235 | 2,023 | 928 | 1,682 | 116,651 |
| Descargo de provisión para pérdidas de créditos | | | | | | (140,094) | (294,268) | (434,362) |
| Total de gastos operativos | 24,472 | 8,382 | 4,165 | 564,560 | 2,023 | (139,166) | (292,586) | 171,850 |
| Ingresos (pérdidas) de operación | (1,792) | 5,879 | 237 | 193,177 | (2,023) | 139,565 | 293,725 | 628,768 |
| **Ingresos (gastos) no operativos:** | | | | | | | | |
| Subvenciones del gobierno de EE. UU. | | | | | | 686 | 6,127 | 6,813 |
| Contribuciones a unidades de componentes | | | | | | | (1,441) | (1,441) |
| Ganancias por intereses e inversiones | 12 | 2,844 | 205 | 245 | | | | 3,306 |
| Gastos por intereses | | | | | (1,498) | | | (1,498) |
| Otros | 488 | | | | | | | 488 |
| Total de ingresos no operativos | 500 | 2,844 | 205 | 245 | (1,498) | 686 | 4,686 | 7,668 |
| Utilidad (pérdida) antes de transferencias | (1,292) | 8,723 | 442 | 193,422 | (3,521) | 140,251 | 298,411 | 636,436 |
| Transferencias de otros fondos | | | | | | 3,390 | 2,358 | 4,638 | 10,386 |
| Transferencias a otros fondos | (2,328) | (1,400) | | (171,446) | | | | (175,174) |
| Cambio neto en los resultados netos | (3,620) | 7,323 | 442 | 21,976 | (131) | 142,609 | 303,049 | 471,648 |
| Resultados netos - comienzo de año, según ajuste (ver nota 4 del estado financiero) | (20,513) | 86,737 | 18,417 | (91,001) | 8,918 | 3,417 | 5,843 | 11,818 |
| Resultados netos - fin de año | $ (24,133) | 94,060 | 18,859 | (69,025) | 8,787 | 146,026 | 308,892 | 483,466 |

Ver el informe de los auditores independientes adjunto.

303

**ELA DE PUERTO RICO**

Declaración combinada de flujos de efectivo - Fondos no mayores de propiedad exclusiva

Año finalizado el 30 de junio de 2017

(en miles)

Actividades de tipo comercial - Fondos empresariales no mayores

| | Junta Administración Servicio 9-1-1 | Seguro Discapacidad | Seguro Conductor | Loterías | Autoridad Puertos Ponce | Fondo Préstamos Recurrentes Tratamiento Agua Potable Segura Puerto Rico | Fondo Recurrente Control Contaminación De Agua Puerto Rico | Total |
|---|---|---|---|---|---|---|---|---|
| **Flujos de efectivo de actividades operativas:** | | | | | | | | |
| Recibos de clientes y usuarios | $ 21,311 | 12,547 | 4,454 | 764,262 | | | | 802,574 |
| Otros recibos | | | | 51 | | | | 51 |
| Pagos a proveedores | (4,760) | (1,149) | (726) | (73,491) | (2,444) | (1,082) | (2,402) | (86,054) |
| Pagos a empleados | (10,723) | (5,971) | (2,760) | (7,837) | (59) | | | (27,350) |
| Pagos de premios de loterías | | | | (511,869) | | | | (511,869) |
| Pagos de beneficios del seguro | | (1,589) | (803) | | | | | (2,392) |
| Efectivo neto provisto por (utilizado en) actividades operativas | 5,828 | 3,838 | 165 | 171,116 | (2,503) | (1,082) | (2,402) | 174,960 |
| **Flujos de efectivo de actividades de financiamiento no relacionadas con el capital:** | | | | | | | | |
| Subvenciones del gobierno de EE. UU. | | | | | | 686 | 6,127 | 6,813 |
| Contribuciones a unidades de componentes | | | | | | | (1,441) | (1,441) |
| Transferencias a otros fondos | | | | | | 2,358 | 4,638 | 6,996 |
| Transferencias a otros fondos | | (1,400) | (1,378) | (193,248) | | | | (196,026) |
| Efectivo neto provisto por (utilizado en) actividades de financiamiento no relacionadas con el capital | | (1,400) | (1,378) | (193,248) | | 3,044 | 9,324 | (183,658) |
| **Flujos de efectivo de actividades de capital y actividades relacionadas de financiamiento** | | | | | | | | |
| Transferencias de otros fondos | | | | | 3,390 | | | 3,390 |
| Transferencias a otros fondos | (2,328) | | | | | | | (2,328) |
| Pago del capital | (50) | | | | | | | (50) |
| Gastos de capital | (71) | | | (37) | | | | (108) |
| Efectivo neto provisto (utilizado) por capital y actividades relacionadas de financiamiento | (2,449) | | | (37) | 3,390 | | | 904 |
| **Flujos de efectivo de actividades de inversión:** | | | | | | | | |
| Intereses cobrados sobre depósitos, inversiones y préstamos | 542 | 2,164 | 3,637 | 245 | | 484 | 1,323 | 8,395 |
| Préstamos originados | | (15,000) | | | | (1,518) | (4,615) | (21,133) |
| Capital cobrado en préstamos | | | | | | | 131 | 131 |
| Ingresos por ventas y vencimientos de inversiones | | 4,964 | | | | | | 4,964 |
| Compra de inversiones | | (6,000) | | | | | | (6,000) |
| Efectivo neto provisto por (utilizado en) inversión | 542 | (13,872) | 3,637 | 245 | | (1,034) | (3,161) | (13,643) |
| Aumento neto (disminución) en efectivo y equivalentes de efectivo | 3,921 | (11,434) | 2,424 | (21,924) | 887 | 928 | 3,761 | (21,437) |
| Efectivo y equivalentes de efectivo - inicio del año | 4,056 | 64,655 | 7,427 | 119,785 | | 1,518 | 460 | 197,901 |
| Efectivo y equivalentes de efectivo - fin del año | $ 7,977 | 53,221 | 9,851 | 97,861 | 887 | 2,446 | 4,221 | 176,464 |
| **Conciliación del ingreso (pérdida) operativo con el efectivo neto provisto por (utilizado en) las actividades operativas:** | | | | | | | | |
| Ingresos (pérdidas) operativos | $ (1,792) | 5,879 | 237 | 193,177 | (2,023) | 139,565 | 293,725 | 628,768 |
| **Ajustes para conciliar el ingreso (pérdida) operativo con el efectivo neto provisto por (utilizado en) las actividades operativas:** | | | | | | | | |
| Intereses devengados por depósitos, préstamos e inversiones | | | | | | (399) | (1,139) | (1,538) |
| Depreciación | 773 | 34 | | 598 | | | | 1,405 |
| Descargo de provisión para pérdidas de créditos | | | | | | (140,094) | (294,268) | (434,362) |
| **Cambios en activos y pasivos operativos:** | | | | | | | | |
| Disminución (aumento) en cuentas por cobrar | 7,737 | (621) | 51 | 2,270 | | | | 9,437 |
| Disminución (aumento) de otros activos | (5) | | | (835) | | | | (840) |
| Disminución (aumento) de la salida diferida de recursos Aumento (disminución) en cuentas a pagar | | | | 2,811 | | | | 2,811 |
| y pasivos devengados | (76) | (192) | 97 | (5,923) | (480) | (154) | (720) | (7,448) |
| Aumento (disminución) adeudado a otras entidades gubernamentales | | | | (1) | | | | (1) |
| Aumento (disminución) en ingresos no obtenidos | | (1,003) | 2 | 5,141 | | | | 4,050 |
| Aumento (disminución) de las ausencias compensadas | (699) | (160) | (73) | (2,269) | | | | (3,201) |
| Aumento de la entrada diferida de recursos | | | | 132 | | | | 132 |
| Aumento en pasivos netos de pensiones | | | | 2,001 | | | | 2,001 |
| Aumento en la obligación por premios no pagados de lotería | | | | (24,544) | | | | (24,544) |
| Disminución en los beneficios pagaderos por rescisión voluntaria | (110) | | | (1,443) | | | | (1,553) |
| Aumento (disminución) de los pasivos por beneficios a pagar por discapacidad | | (9) | (148) | | | | | (157) |
| Total de ajustes | 7,620 | (2,041) | (72) | (22,061) | (480) | (140,647) | (296,127) | (453,808) |
| Efectivo neto provisto por (utilizado en) actividades operativas | $ 5,828 | 3,838 | 165 | 171,116 | (2,503) | (1,082) | (2,402) | 174,960 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Fondos Fiduciarios

Año finalizado el 30 de junio de 2017

Los fondos fiduciarios se utilizan para contabilizar los fondos mantenidos por el ELA en calidad de fideicomisario, o como agente para individuos, organizaciones y otras unidades gubernamentales. Los siguientes son los fondos fiduciarios del ELA:

**Fondos Fiduciarios de Pensiones**

Antes de la promulgación de la Ley Núm. 106-2017, los fondos fiduciarios de pensiones se usaban para contabilizar los activos, pasivos y activos netos disponibles para los beneficios de pensión en fideicomiso para los empleados públicos del ELA. Después del 23 de agosto de 2017, todos los beneficios de pensión se pagarán del Fondo General del Gobierno Primario (como se menciona en la Nota 23).

**(1) Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (SRE)**

SRE es un plan de pensiones de beneficios definidos de patronos múltiples de costo compartido que, antes del 23 de agosto de 2017, fue administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico y fue creado por la Ley Núm. 447-1951. El SRE está patrocinado por el ELA, corporaciones públicas y municipios de Puerto Rico. Sustancialmente, todos los empleados de tiempo completo del ELA y sus organismos están cubiertos por el SRE. Todos los empleados regulares nombrados y temporales del ELA se convierten en miembros del plan en la fecha de empleo. Antes del 23 de agosto de 2017, SRE fue administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico (la Administración SRE y SRJ) que también administró la aportación al Plan de Seguro de Salud del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades (ERS MIPC). El ERS MIPC es un plan de beneficios de atención médica posterior al empleo, sin financiamiento, de costos compartidos, de patronos múltiples y otros beneficios definidos proporcionado por el ELA a los miembros jubilados del plan.

**(2) Sistema de Anualidades y Pensiones para Maestros de Puerto Rico (SRM)**

SRM es un plan de pensión de beneficios definidos de patronos únicos de costo compartido que, antes del 23 de agosto de 2017, fue administrado por el Sistema de Retiro de Maestros de Puerto Rico y fue creado por la Ley Núm. 91-2004, que reemplazó la Ley Núm. 218-1951. El SRM está patrocinado por el ELA. Todos los maestros activos del DE están cubiertos por el SRM. Los maestros con licencia que trabajan en escuelas privadas u otras organizaciones educativas tienen la opción de unirse al SRM siempre que se realicen las contribuciones requeridas del patrono y del empleado. Los empleados del SRM también son miembros del plan. Antes del 23 de agosto de 2017, SRM fue administrado por el Sistema de Retiro de Maestros de Puerto Rico (la Administración del SRM) que también administró el Sistema de Anualidades y Pensiones de Puerto Rico para la Aportación del Plan de Seguro de Salud de los Maestros (TRS MIPC), un costo compartido no financiado. , plan de beneficios de atención médica de un solo patrono con beneficios definidos y otro empleo proporcionado por el ELA a maestros jubilados del DE y empleados jubilados de la Administración SRM.

**ELA DE PUERTO RICO**

Fondos Fiduciarios

Año finalizado el 30 de junio de 2017

**(3) Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico (SRJ)**

El SRJ es un plan de pensiones de beneficios definidos para un solo patrono que, antes del 23 de agosto de 2017, fue administrado por la Administración de Sistemas de Retiro Judicial y de Empleados del Gobierno de Puerto Rico y fue creado por la Ley Núm. 12-1954. El SRJ está patrocinado por el ELA. Todos los jueces de la rama judicial del ELA son miembros del plan. El SRJ brinda beneficios de retiro a los empleados de la rama judicial del ELA mediante la oficina de la Administración de Instalaciones Judiciales. Antes del 23 de agosto de 2017, el SRJ fue administrado por el SRE y la Administración del SRJ que también administró el Sistema de Retiro de la Judicatura del Aporte del Plan de Seguro Médico del Estado Libre Asociado de Puerto Rico (JRS MIPC), un beneficio no financiado, de un solo patrono y otro plan de beneficios de atención médica posterior al empleo proporcionado por el ELA a los jueces jubilados de la Rama Judicial del ELA.

**Fondo de agencia**

El fondo de agencia se utiliza para contabilizar los activos mantenidos por el ELA como agente para individuos, organizaciones privadas y otros gobiernos. Este fondo es de naturaleza de custodia (activos equivalentes a pasivos) y no implica la medición de los resultados de las operaciones.

**Depósitos Especiales**

Este fondo actúa en calidad de fideicomisario para dar cuenta del dinero recibido con fines específicos para los cuales la ley no especifica su registro en ningún otro fondo. Incluye principalmente depósitos bajo la custodia de los tribunales de justicia para pagos de pensión alimenticia, depósitos en garantía, recaudación de ingresos y cuentas de agencias para las que el ELA actúa en calidad de agente.

**ELA DE PUERTO RICO**

Estado Combinado de Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensiones

30 de junio de 2017

(en miles)

| | Fondos Fiduciarios de Pensiones | | | | | | |
|---|---|---|---|---|---|---|---|
| | (SRE) | | (SRM) | | (SRJ) | | |
| | Pensión | Benefícios de atención médica después del empleo | Pensión | Benefícios de atención médica después del empleo | Pensión | Benefícios de atención médica después del empleo | Total |
| **Activos:** | | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales: | | | | | | | |
| No restringido | $ 260,219 | | 62,387 | | 1,044 | | 323,650 |
| Restringido | 216,483 | | | | | | 216,483 |
| Cuentas por cobrar, netas: | | | | | | | |
| Patronos | 36,172 | | | | | | 36,172 |
| Intereses y dividendos devengados | | | 14 | | 169 | | 183 |
| Inversiones vendidas | 401 | | 5 | | | | 406 |
| Otros | 17,259 | | 3,223 | | 62 | | 20,544 |
| Adeudado del JRS (Adeudado al SRE) | 628 | | | | (628) | | |
| Garantía de operaciones de préstamo de valores | 7,359 | | | | 859 | | 8,218 |
| Inversiones a valor de mercado: | | | | | | | |
| Bonos y pagarés | 163,187 | | | | 21,468 | | 184,655 |
| Fondos de fideicomisos mixtos no cotizados en bolsa | 181,699 | | 191,886 | | 12,133 | | 385,718 |
| Inversiones en asociaciones limitadas | 87,069 | | 3,522 | | | | 90,591 |
| Préstamos a miembros e intereses por cobrar - netos | 523,443 | | 315,732 | | 485 | | 839,660 |
| Activos de capital - neto | 9,902 | | 15,021 | | | | 24,923 |
| Otros activos | 816 | | 418 | | | | 1,234 |
| Activos Totales | 1,504,637 | | 592,208 | | 35,592 | | 2,132,437 |
| **Pasivos:** | | | | | | | |
| Cuentas por pagar y pasivos devengados | 279,907 | | 11,644 | | | | 291,551 |
| Interés pagadero | 14,076 | | | | | | 14,076 |
| Cuentas a paga por títulos comprados de inversiones | | | 5 | | 200 | | 205 |
| Obligaciones de préstamos de títulos | 7,359 | | | | 859 | | 8,218 |
| Adeudado al Estado Libre Asociado de Puerto Rico | 98,044 | | 56,443 | | 7,710 | | 162,197 |
| Otros pasivos | 47,631 | | 7,150 | | 571 | | 55,352 |
| Bonos por pagar | 3,166,472 | | | | | | 3,166,472 |
| Pasivos Totales | 3,613,489 | | 75,242 | | 9,340 | | 3,698,071 |
| Resultados netos (déficit) restringidos para pensiones | $ (2,108,852) | | 516,966 | | 26,252 | | (1,565,634) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estado Combinado de Cambios en los Resultados Netos Fiduciarios - Fondos Fiduciarios de Pensiones

Año finalizado el 30 de

junio de 2017 (En miles)

| | Fondos Fiduciarios de Pensiones | | | | | | |
|---|---|---|---|---|---|---|---|
| | (SRE) | | (SRM) | | (SRJ) | | |
| | Pensión | Beneficios de atención médica después del empleo | Pensión | Beneficios de atención médica después del empleo | Pensión | Beneficios de atención médica después del empleo | Total |
| Agregados: | | | | | | | |
| Contribuciones: | | | | | | | |
| Contribuciones del patrono: | | | | | | | |
| Beneficios básicos, netos de provisión a asignación de $405,661 para el SRE y $37,200 para el JRS | $ 726,911 | | 150,505 | | 10,065 | | 887,481 |
| Beneficios especiales | 194,626 | 91,280 | 119,797 | 36,493 | 1,908 | 336 | 444,440 |
| Contribuciones de los miembros | 320,095 | | 95,861 | | 3,084 | | 419,040 |
| Total de contribuciones | 1,241,632 | 91,280 | 366,163 | 36,493 | 15,057 | 336 | 1,750,961 |
| Ingresos por inversiones y gastos en inversiones: | | | | | | | |
| Apreciación (depreciación) neta en el valor de mercado del interés | (7,856) | | 10,102 | | 1,346 | | 3,592 |
| Inversiones | 46,800 | | 26,828 | | 727 | | 74,355 |
| Dividendos | 253 | | 283 | | | | 536 |
| Gastos de inversión, que no sean préstamos de títulos | (1,854) | | (724) | | | | (2,578) |
| Ingresos netos de inversiones, distintos de los préstamos de títulos | 37,343 | | 36,489 | | 2,073 | | 75,905 |
| Ingresos de préstamos de títulos | 30 | | | | 1 | | 31 |
| Ingresos netos por préstamos de títulos | 30 | | | | 1 | | 31 |
| Ingresos de inversión neta | 37,373 | | 36,489 | | 2,074 | | 75,936 |
| Otros ingresos | 56,626 | | 1,925 | | 310 | | 58,861 |
| Total de agregados | 1,335,631 | 91,280 | 404,577 | 36,493 | 17,441 | 336 | 1,885,758 |
| Descuentos: | | | | | | | |
| Beneficios pagados a los participantes | 1,524,695 | 91,280 | 754,751 | 36,493 | 25,313 | 336 | 2,432,868 |
| Reembolsos de contribuciones | 35,229 | | 13,528 | | 92 | | 48,849 |
| Intereses sobre bonos a pagar | 198,084 | | | | | | 198,084 |
| Gastos generales y administrativos | 33,576 | | 14,787 | | 571 | | 48,934 |
| Otros gastos | 387,014 | | | | 43 | | 387,057 |
| Total de descuentos | 2,178,598 | 91,280 | 783,066 | 36,493 | 26,019 | 336 | 3,115,792 |
| Cambio neto en los resultados netos | (842,967) | | (378,489) | | (8,578) | | (1,230,034) |
| Resultados netos restringidos para pensiones (déficit): | | | | | | | |
| Comienzo de año | (1,265,885) | | 895,455 | | 34,830 | | (335,600) |
| Fin de año | $ (2,108,852) | | 516,966 | | 26,252 | | (1,565,634) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estado Combinado de Cambios en Activos y Pasivos - Fondos de Agencias

Año finalizado el 30 de junio de 2017

(en miles)

| Activos | | Saldo al 30 de junio 2016 | Agregados | Eliminaciones | Saldo al 30 de junio 2017 |
|---|---|---|---|---|---|
| Efectivo y equivalentes al efectivo en bancos comerciales: | $ | 664,397 | 1,698,302 | 1,732,838 | 629,861 |
| Efectivo y equivalentes al efectivo en bancos gubernamentales | | 897 | | 847 | 50 |
| Activos Totales | $ | 665,294 | 1,698,302 | 1,733,685 | 629,911 |
| **Pasivos** | | | | | |
| Cuentas por pagar y pasivos devengados | $ | 665,294 | 1,698,302 | 1,733,685 | 629,911 |
| Pasivos Totales | $ | 665,294 | 1,698,302 | 1,733,685 | 629,911 |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Unidades de Componentes No Mayores de Presentación Discreta

Año finalizado el 30 de junio de 2017

Estas entidades, todas las entidades legalmente separadas, a tenor con la Declaración GASB Núm. 14, según enmienda por las Declaraciones GASB Núm. 39 y 61, se presentan de forma discreta en una columna separada de los estados financieros básicos del Gobierno Primario principalmente debido a la naturaleza del servicios que brindan, la capacidad del ELA de imponer su voluntad, principalmente a través del nombramiento de sus autoridades gubernamentales, y debido a que estas unidades de componentes de presentación discreta proporcionan beneficios financieros específicos o imponen cargas financieras al ELA (con la excepción de la Autoridad de Conservación y Desarrollo de Culebra) y el Fideicomiso de Ciencia, Tecnología e Investigación de Puerto Rico, que no cumple con todos estos criterios, pero el ELA ha determinado que sería engañoso excluirlos de la entidad de informes financieros del ELA). Estas entidades han sido clasificadas como unidades de componentes no mayores de presentación discreta porque la gerencia cree que no cumplen con los siguientes factores para su inclusión como mayores: a) los servicios provistos por la unidad de componentes de presentación discreta a la ciudadanía son tales que los informes separados como una unidad de componentes mayores de presentación discreta se consideran esencial para los usuarios de los estados financieros, b) hay transacciones significativas con el Gobierno Primario, o c) hay una relación de beneficio o carga financiera significativa con el Gobierno Primario. Los principios contables seguidos por cada una de las unidades de componentes de presentación discreta incluidas en este documento pueden variar según el tipo de industrias en las que están participan (es decir, banca, construcción, servicios públicos, etc.). La información detallada para cada una de estas entidades puede obtenerse directamente de las oficinas administrativas de las entidades correspondientes, como se describe en la Nota 1 de los estados financieros básicos.

**EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Estados Combinados de Resultados: Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Administración Desarrollo Empresas Agropecuarias | Administración Compensaciones Accidentes de Automóviles | Corporación Centro Cardiovascular de Puerto Rico y el Caribe | Centro de Diabetes de Puerto Rico | Compañía para el Desarrollo Integral de la "Península de Cantera" | Corporación para proyecto ENLACE de "Caño Martín Peña" |
|---|---|---|---|---|---|---|
| **Activos:** | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 45,045 | 12,643 | 7,603 | 1,277 | 1,665 | 3,652 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | | |
| Inversiones | | 101,513 | | | | |
| Cuentas por cobrar, netas: | | | | | | |
| Primas de seguros | | | | | 79 | |
| Intergubernamental | | | | | | |
| Cuentas | 3,988 | | 3,483 | 26 | | |
| Préstamos y adelantos | 321 | | | | 5,728 | |
| Interés devengado | | 312 | | | | |
| Otros | 1,613 | 973 | 508 | 75 | 22 | |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | 23,455 | | | | | |
| Unidades de componentes | | | | | | |
| Otras entidades del gobierno | 887 | 911 | 432 | | | 379 |
| Inventarios | 3,452 | | 1,571 | 2 | | |
| Gastos pagados por adelantado | 461 | | 313 | 2 | 1 | |
| Otros activos | | 167 | | | | |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | 8 | | | | |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | | |
| Inversiones | | | | | | |
| Otros activos restringidos | | | | | 497 | |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | 1,061 | |
| Activos de capital: | | | | | | |
| Terrenos y otros no depredables | 3,739 | 901 | 103 | | 80 | 837 |
| Depreciables, neto | 19,463 | 4,624 | 14,778 | 494 | 3,150 | 495 |
| **Activos Totales** | 102,423 | 122,052 | 28,791 | 1,876 | 12,282 | 5,363 |
| **Salidas diferidas de recursos:** | | | | | | |
| Pérdida por reintegro de bonos | | | | | | |
| Relacionado con pensiones | 31,801 | 47,116 | 41,101 | | | 2,498 |
| Total de flujos salientes diferidos de recursos | 31,801 | 47,116 | 41,101 | | | 2,498 |
| **Pasivos:** | | | | | | |
| Cuentas por pagar y pasivos devengados | 49,980 | 3,658 | 36,186 | 75 | 1,456 | 205 |
| Depósitos y pasivos en custodia | | | | | | |
| Adeudado a: | | | | | | |
| Gobierno primario | | | 26,985 | | | |
| Unidades de componentes | 97,789 | | 12,528 | | 37,791 | |
| Otras entidades del gobierno | 237 | 5,815 | 511 | 222 | | |
| Interés pagadero | 13,921 | | | | 7,362 | |
| Ingresos no obtenidos | | 38,753 | | | | 45 |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | | | | | | |
| Bonos de ingresos | | | | | | |
| Pagarés pagaderos a instituciones financieras | | | | | | |
| Arrendamientos de capital | | | | | | |
| Ausencias compensadas | 1,493 | 960 | 3,952 | 49 | | 55 |
| Beneficios pagaderos por rescisión voluntaria | 1,950 | 10,520 | | | | |
| Pasivos por beneficios de seguro | | 66,289 | | | | |
| Otros pasivos a largo plazo | 4,387 | | 382 | | | |
| Pasivos pagaderos después de un año | | | | | | |
| Bonos de asignación del ELA | | | | | | |
| Bonos de ingresos | | | | | | |
| Pagarés pagaderos a instituciones financieras | | | | | | |
| Arrendamiento de capital | | | | | | |
| Ausencias compensadas | 1,818 | | | 66 | | 158 |
| Beneficios pagaderos por rescisión voluntaria | 11,300 | | | | | |
| Obligación de pensiones netas | | | | | | |
| Pasivos netos de pensiones | 167,554 | 176,520 | 166,823 | | | 6,812 |
| Otros pasivos a largo plazo | | 4,601 | 5,736 | | | |
| **Pasivos Totales** | 350,229 | 307,116 | 253,103 | 412 | 46,609 | 7,275 |
| **Entradas diferidas de recursos:** | | | | | | |
| Acuerdos de concesión de servicio | | | | | | |
| Relacionado con pensiones | 12,274 | 3,379 | 3,193 | | | 130 |
| Entradas totales diferidas de recursos | 12,274 | 3,379 | 3,193 | | | 130 |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 23,201 | 5,525 | 14,881 | 494 | 3,230 | 1,332 |
| Restringido para: | | | | | | |
| Proyectos de capital | | | | | | 3,237 |
| Pago de la deuda | | | | | | |
| Préstamos estudiantiles y otros propósitos educativos | | | | | | |
| Otros propósitos especificados | | | | | 497 | |
| No restringido (déficit) | (251,480) | (146,852) | (201,285) | 970 | (38,053) | (4,113) |
| **Resultados netos totales (déficit)** | $ (228,279) | (141,327) | (186,404) | 1,464 | (34,326) | 456 |

(Continuación)

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Autoridad Conservación y Desarrollo Culebra | Banco Desarrollo Económico de Puerto Rico | Corporación Seguros Agrícolas de Puerto Rico | Corporación Centro Bellas Artes | Oficina Independiente Protección Consumidor | Instituto de Cultura Puertorriqueña |
|---|---|---|---|---|---|---|
| **Bienes:** | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 54 | 38,865 | 4,047 | 2,722 | 308 | 2,895 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | 35,128 | | | | |
| Inversiones | | | | | | |
| Cuentas por cobrar, netas: | | | | | | |
| Interagubernamental | | | | | | 638 |
| Cuentas | | | | 68 | | 598 |
| Préstamos y adelantos | | 100,099 | | | | |
| Interés devengado | | 596 | | | | |
| Otros | | | 155 | | | |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | | | | | | |
| Unidades de componentes | | | 1,593 | | | |
| Otras entidades del gobierno | | 84 | 1,302 | | | 54 |
| Inventarios | | | | | | 2,062 |
| Gastos pagados por adelantado | | | 3 | 98 | | |
| Otros activos | | 13,412 | | | 3 | |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | 13,220 | | | | 1,816 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | | |
| Inversiones | | | | | | |
| Otros activos restringidos | | | | | | |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | | |
| Activos de capital: | | | | | | |
| Terrenos y otros no depreciables | 640 | 2,735 | 51 | 3,176 | | 55 |
| Depreciables, neto | 173 | 5,617 | | 11,914 | 30 | 45,282 |
| **Activos Totales** | 867 | 209,756 | 7,151 | 17,978 | 341 | 53,400 |
| **Salidas diferidas de recursos** | | | | | | |
| Pérdida por reintegro de bonos | | | | | | |
| Relacionado con pensiones | 507 | 11,033 | 2,714 | 2,351 | | 7,096 |
| **Total de flujos salientes diferidos de recusos** | 507 | 11,033 | 2,714 | 2,351 | | 7,096 |
| **Pasivos:** | | | | | | |
| Cuentas por pagar y pasivos devengados | 35 | 1,847 | 304 | 124 | 3 | 630 |
| Depósitos y pasivos en custodia | | 146,835 | | 226 | | |
| Adeudado a: | | | | | | |
| Gobierno primario | | | | | | |
| Unidades de componentes | | 7,239 | 4,692 | | | 5,041 |
| Otras entidades del gobierno | | | 981 | | 15 | |
| Interés pagadero | | 115 | | | | 660 |
| Ingresos no obtenidos | | | 1,793 | | | 85 |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | | | | | | |
| Bonos de ingresos | | | | | | |
| Pagarés pagaderos a instituciones financieras | | | | | | |
| Arrendamientos de capital | | | | | | |
| Ausencias compensadas | 65 | | 669 | 103 | | 51 |
| Beneficios pagaderos por rescisión vóluntaria | 10 | | | 261 | | 625 |
| Pasivos por beneficios de seguro | | | | | | |
| Otros pasivos a largo plazo | | | 43 | | | |
| Pasivos pagaderos después de un año | | | | | | |
| Bonos de asignación del ELA | | | | | | |
| Bonos de ingresos | | | | | | |
| Pagarés pagaderos a instituciones financieras | | | | | | |
| Arrendamientos de capital | | | | | | |
| Ausencias compensadas | | 1,261 | | 405 | 31 | 959 |
| Beneficios pagaderos por rescisión vóluntaria | 65 | 5,029 | | 1,938 | | 3,191 |
| Obligación de pensiones netas | | | | | | |
| Pasivos netos de pensiones | 2,131 | 44,849 | 11,993 | 11,470 | | 36,238 |
| Otros pasivos a largo plazo | | 4,007 | | | | |
| **Pasivos Totales** | 2,306 | 211,182 | 20,475 | 14,527 | 49 | 47,480 |
| **Entradas diferidas de recursos:** | | | | | | |
| Acuerdos de concesión de servicio | | | | | | |
| Relacionado con pensiones | 41 | 858 | 230 | 1,662 | | 694 |
| **Entradas totales diferidas de recursos** | 41 | 858 | 230 | 1,662 | | 694 |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 813 | 1,113 | 51 | 15,090 | 30 | 42,011 |
| Restringido para: | | | | | | |
| Proyectos de capital | | | | | | |
| Pago de la deuda | | | | | | |
| Préstamos estudiantiles y otros propósitos educativos | | | | | | 1,798 |
| Otros propósitos especificados | | 8,413 | | | | |
| No restringidos (déficit) | (1,786) | (777) | (10,891) | (10,950) | 262 | (31,487) |
| **Resultados netos totales (déficit)** | $ (973) | 8,749 | (10,840) | 4,140 | 292 | 12,322 |

(Continuació

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Fideicomiso Institucional de la Guardia Nacional de Puerto Rico | Autoridad de Tierras de Puerto Rico | Autoridad Redesarrollo de los Terrenos y Facilidades de la Estación Naval Roosevelt Roads | Corporación Artes Musicales | Corporación Pública para la Supervisión y Seguros de Depósito de Cooperativas de. P.R. |
|---|---|---|---|---|---|
| Activos: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 14,174 | 13,011 | 950 | 4,698 | 4,435 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | 2,945 | | | |
| Inversiones | | | | | 262,503 |
| Cuentas por cobrar, netas: | | | | | |
| Intergubernamental | | 1,022 | 58 | | |
| Cuentas | 1,693 | 18,283 | 224 | 8 | |
| Préstamos y adelantos | | | | | 3,731 |
| Interés devengado | 51 | | | | 1,506 |
| Otros | | | | | 88 |
| Adeudado de - neto: | | | | | |
| Gobierno primario | | 19,266 | | | |
| Unidades de componentes | | 8,062 | | | |
| Otras entidades del gobierno | | 1,677 | | 10 | |
| Inventarios | | | | | |
| Gastos pagados por adelantado | 46 | | 82 | | |
| Otros activos | 43 | 5,676 | | 102 | |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | 942 | | 211 | |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 16,606 | | | | |
| Inversiones | | | | | |
| Otros activos restringidos | | | | | |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | |
| Activos de capital: | | | | | |
| Terrenos y otros no depreciables | 7,887 | 88,185 | 12,137 | 578 | 35 |
| Depreciables, neto | 9,722 | 6,024 | 4,127 | 560 | 2,589 |
| Activos Totales | 50,222 | 165,093 | 17,578 | 6,167 | 274,887 |
| Salidas diferidas de recursos: | | | | | |
| Pérdida por reintegro de bonos | | | | | |
| Relacionado con pensiones | 252 | 20,126 | | 2,772 | 9,052 |
| Total de flujos salientes diferidos de recursos | 252 | 20,126 | | 2,772 | 9,052 |
| Pasivos: | | | | | |
| Cuentas por pagar y pasivos devengados | 1,478 | 4,415 | 774 | 256 | 194,160 |
| Depósitos y pasivos en custodia | | 2,648 | 145 | | |
| Adeudado a: | | | | | |
| Gobierno primario | | | | | |
| Unidades de componentes | | 30,382 | | | |
| Otras entidades del gobierno | | 16,471 | 16,916 | 294 | 50 |
| Interés pagadero | | 451 | | | |
| Ingresos no obtenidos | | 9,441 | | 203 | |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA | | 4,354 | | | |
| Bonos de ingresos | | | | | |
| Pagarés pagaderos a instituciones financieras | | | | | |
| Arrendamientos de capital | | | | | |
| Ausencias compensadas | 78 | 800 | 155 | 508 | 2,825 |
| Beneficios pagaderos por rescisión voluntaria | | | | 48 | |
| Pasivos por beneficios de seguro | | | | | |
| Otros pasivos a largo plazo | | 992 | | | |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | | 51,464 | | | |
| Bonos de ingresos | | | | | |
| Pagarés pagaderos a instituciones financieras | | | | | |
| Arrendamientos de capital | | | | | |
| Ausencias compensadas | | 938 | | | |
| Beneficios pagaderos por rescisión voluntaria | | 5,125 | | 478 | |
| Obligación de pensiones netas | | | | 21,546 | |
| Pasivos netos de pensiones | 1,065 | 107,017 | | 10,387 | 40,017 |
| Otros pasivos a largo plazo | | 36,717 | | | |
| Pasivos Totales | 2,621 | 271,225 | 17,990 | 33,720 | 237,052 |
| Entradas diferidas de recursos: | | | | | |
| Acuerdos de concesión de servicio | | | | | |
| Relacionado con pensiones | 20 | 2,268 | | 199 | 766 |
| Entradas totales diferidas de recursos | 20 | 2,268 | | 199 | 766 |
| Resultados Netos: | | | | | |
| Inversión neta en activos de capital | 17,609 | 94,209 | (115) | 1,138 | 2,624 |
| Restringido para: | | | | | |
| Proyectos de capital | | | | | |
| Pago de la deuda | | | | | |
| Préstamos estudiantiles y otros propósitos educativos | | | | | |
| Otros propósitos especificados | 29,421 | | | 211 | 92,931 |
| No restringidos (déficit) | 803 | (182,483) | (297) | (26,329) | (49,434) |
| Resultados netos totales (déficit) | $ 47,833 | (88,274) | (412) | (24,980) | 46,121 |

(Continuación)

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Corporación Conservatorio de Música Puerto Rico | Autoridad Distrito Centro Convenciones Puerto Rico | Consejo de Educación Puerto Rico | Comisión Energía Puerto Rico | Compañía de Fomento Industrial Puerto Rico | Autoridad Financiamiento, Instalaciones Turísticas, Educativas, Médicas y del, Control Ambiental de Puerto Rico |
|---|---|---|---|---|---|---|
| **Activos:** | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 1,936 | 9,503 | 295 | 3,606 | 32,926 | 144 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | 7,898 | | | 4,093 | |
| Inversiones | | | | | | |
| Cuentas por cobrar, netas: | | | | | | |
| Intergubernamental | | | | | | |
| Cuentas | | 7,824 | | 1,443 | 11,372 | |
| Préstamos y adelantos | | 1,296 | | | | |
| Interés devengado | | | | | | |
| Otros | 306 | | 804 | | | |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | | | | | | |
| Unidades de componentes | | 8,322 | | | | |
| Otras entidades del gobierno | | | | | | |
| Inventarios | | | | | | |
| Gastos pagados por adelantado | 8 | 8,435 | | | 1,252 | |
| Otros activos | | 248 | | | | |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | 1,995 | 5,271 | 642 | | | |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | 9,658 | | | 13,723 | |
| Inversiones | | | | | | |
| Otros activos restringidos | | | | | | |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | | |
| Activos de capital: | | | | | | |
| Terrenos y otros no depreciables | 5,157 | 277,437 | 27 | 444 | 236,789 | |
| Depreciables, neto | 71,022 | 374,762 | | 606 | 405,245 | |
| **Activos Totales** | **80,424** | **710,654** | **1,768** | **6,099** | **705,400** | **144** |
| **Saldos diferidos de recursos:** | | | | | | |
| Pérdida por reintegro de bonos | | | | | 522 | |
| Relacionado con pensiones | 4,726 | | 1,975 | | 40,815 | |
| **Total de flujos salientes diferidos de recursos** | **4,726** | | **1,975** | | **41,337** | |
| **Pasivos:** | | | | | | |
| Cuentas por pagar y pasivos devengados | 826 | 7,325 | 692 | 339 | 15,157 | 15 |
| Depósitos y pasivos en custodia | | 3,946 | | | 7,531 | |
| Adeudado a: | | | | | | |
| Gobierno primario | | | | | 7,159 | |
| Unidades de componentes | | 146,423 | | | 77,772 | |
| Otras entidades del gobierno | 40 | | | | | |
| Interés pagadero | | 38,248 | | | 10,138 | |
| Ingresos no obtenidos | 622 | 6,438 | | | | |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | | | | | | |
| Bonos de ingresos | | 11,780 | | | 10,250 | |
| Notas pagaderas a instituciones financieras | | | | | 19,957 | |
| Arrendamientos de capital | | | | | 117 | |
| Ausencias compensadas | 258 | | 262 | 12 | 1,539 | |
| Beneficios pagaderos por rescisión voluntaria | 55 | | 127 | | 1,530 | |
| Pasivos por beneficios de seguro | | | | | | |
| Otros pasivos a largo plazo | | | | | 141 | |
| Pasivos pagaderos después de un año: | | | | | | |
| Bonos de asignación del ELA | | | | | | |
| Bonos de ingresos | | 378,772 | | | 147,804 | |
| Notas pagaderas a instituciones financieras | | | | | 74,603 | |
| Arrendamientos de capital | | | | | 174 | |
| Ausencias compensadas | 493 | | 394 | 222 | 2,204 | |
| Beneficios pagaderos por rescisión voluntaria | | | 1,203 | | 9,420 | |
| Obligación de pensiones netas | | | | | | |
| Pasivos netos de pensiones | 22,445 | | 9,714 | | 180,808 | |
| Otros pasivos a largo plazo | | | | | 23,248 | |
| **Pasivos Totales** | **24,739** | **592,932** | **12,392** | **573** | **589,552** | **15** |
| **Entradas diferidas de recursos:** | | | | | | |
| Acuerdos de concesión de servicio | | | | | | |
| Relacionado con pensiones | 430 | | 275 | | 3,461 | |
| **Entradas totales diferidas de recursos** | **430** | | **275** | | **3,461** | |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 76,179 | 78,113 | 27 | 1,050 | 389,129 | |
| Restringido para: | | | | | | |
| Proyectos de capital | | 913 | | | | |
| Pago de la deuda | | 8,745 | | | 2,343 | |
| Préstamos estudiantiles y otros propósitos educativos | 1,995 | | 643 | | | |
| Otros propósitos especificados | | 1,325 | | | | |
| No restringido (déficit) | (18,193) | 28,626 | (9,594) | 4,476 | (237,748) | 129 |
| **Resultados netos totales (déficit)** | **$ 59,981** | **117,722** | **(8,924)** | **5,526** | **153,724** | **129** |

(Continuación)

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Autoridad Transporte Integrado Puerto Rico | Administración Tierras Puerto Rico | Autoridad Transporte Marítimo De Puerto Rico y las Islas Municipio | Autoridad Metropolitana de Autobuses Puerto Rico | Agencia Financiamiento Municipal Puerto Rico |
|---|---|---|---|---|---|
| **Activos:** | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 5,298 | 5,268 | 1,219 | 428 | |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | 3 | | 281 |
| Inversiones | | 1,130 | | | |
| Cuentas por cobrar, netas: | | | | | |
| Intergubernamental | | | | 622 | |
| Cuentas | | 1,524 | 272 | 73 | |
| Préstamos y adelantos | | 11 | | | |
| Interés devengado | | 316 | | | |
| Otros | | | | | |
| Adeudado de - neto: | | | | | |
| Gobierno primario | | | | 1,644 | |
| Unidades de componentes | | | | 797 | |
| Otras entidades del gobierno | | | 49 | 4,142 | |
| Inventarios | | | 1,185 | | 2,575 |
| Gastos pagados por adelantado | | 211 | | | |
| Otros activos | | | | | |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | | | | 13,348 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | 602,569 |
| Inversiones | | | | | 13,566 |
| Otros activos restringidos | | 176,958 | | | 36 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | |
| Activos de capital: | | | | | |
| Terrenos y otros no depreciables | | 29,990 | 93 | 2,500 | |
| Depreciables, neto | 262 | 6,947 | 54,516 | 19,583 | |
| **Activos Totales** | 5,560 | 222,355 | 57,337 | 29,789 | 632,375 |
| **Salidas diferidas de recursos:** | | | | | |
| Pérdida por reintegro de bonos | | | | | 1,572 |
| Relacionado con pensiones | | 7,498 | | 54,990 | |
| **Total de flujos salientes diferidos de recursos** | | 7,498 | | 54,990 | 1,572 |
| **Pasivos:** | | | | | |
| Cuentas por pagar y pasivos devengados | 309 | 3,073 | 8,675 | 21,345 | 598 |
| Depósitos y pasivos en custodia | | 32,601 | | | 24,292 |
| Adeudado a: | | | | | |
| Gobierno primario | | | | 19,848 | |
| Unidades de componentes | | | 71,609 | 6,256 | |
| Otras entidades del gobierno | 1,631 | | 7,877 | 57,747 | |
| Interés pagadero | | | | | 11,703 |
| Ingresos no obtenidos | | 1,816 | | | |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA | | | | | |
| Bonos de ingresos | | | | | 72,645 |
| Notas pagaderas a instituciones financieras | | | | 28,255 | |
| Arrendamientos de capital | | | | | |
| Ausencias compensadas | | 331 | 740 | 3,478 | |
| Beneficios pagaderos por recisión voluntaria | | 395 | 335 | 927 | |
| Pasivos por beneficios de seguro | | | | | |
| Otros pasivos a largo plazo | | | 487 | | |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | | | | | |
| Bonos de ingresos | | | | | 477,628 |
| Notas pagaderas a instituciones financieras | | | | | |
| Arrendamientos de capital | | | | | |
| Ausencias compensadas | 157 | | 1,566 | 2,122 | |
| Beneficios pagaderos por recisión voluntaria | | 2,022 | 2,988 | 4,858 | |
| Obligación de pensiones netas | | | | | |
| Pasivos netos de pensiones | | 34,519 | | 297,446 | |
| Otros pasivos a largo plazo | | | 3,610 | 4,188 | |
| **Pasivos Totales** | 2,097 | 74,757 | 97,887 | 446,470 | 586,866 |
| **Entradas diferidas de recursos:** | | | | | |
| Acuerdos de concesión de servicio | | | | | |
| Relacionado con pensiones | | 661 | | 26,250 | |
| **Entradas totales diferidas de recursos** | | 661 | | 26,250 | |
| **Resultados Netos:** | | | | | |
| Inversión neta en activos de capital | 262 | 5,802 | 54,609 | 22,083 | |
| Restringido para: | | | | | |
| Proyectos de capital | | | | | |
| Pago de la deuda | | | | | 71,654 |
| Préstamos estudiantiles y otros propósitos educativos | | | | | |
| Otros propósitos especificados | | | | | |
| No restringidos (déficit) | 3,201 | 148,633 | (95,159) | (410,024) | (24,573) |
| **Resultados netos totales (déficit)** | $ 3,463 | 154,435 | (40,550) | (387,941) | 47,081 |

(Continuació

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Corporación Financiamiento Municipal Puerto Rico | Autoridad Puertos Puerto Rico | Corporación Difusión Pública Puerto Rico | Autoridad Alianzas Público-Privadas Puerto Rico | Escuela Artes Plásticas Puerto Rico |
|---|---|---|---|---|---|
| **Activos:** | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 34,286 | 7,876 | 969 | 176 | 65 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 33,587 | 1,530 | | | |
| Inversiones | | | | | |
| Cuentas por cobrar netas: | | | | | |
| Intergubernamental | 22,485 | 857 | 71 | | |
| Cuentas | 201 | 16,256 | | | 51 |
| Préstamos y adelantos | | | | | |
| Interés devengado | | | | | |
| Otros | | | 23 | | |
| Adeudado de - neto: | | | | | |
| Gobierno primario | | | | | |
| Unidades de componentes | | | | | |
| Otras entidades del gobierno | | 1,512 | 173 | | |
| Inventarios | | | | | |
| Gastos pagados por adelantado | | 2,333 | | | |
| Otros activos | | | 180 | | |
| Activos restringidos: | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | 14,991 | 797 | 3,656 | |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | | | | |
| Inversiones | | | | | |
| Otros activos restringidos | | 25,351 | | | 2,406 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | | | |
| Activos de capital: | | | | | |
| Terrenos y otros no depreciables | | 343,591 | 83 | | |
| Depreciables, neto | | 920,958 | 4,371 | 7 | 7,699 |
| **Activos Totales** | 90,559 | 1,335,255 | 6,667 | 3,839 | 10,221 |
| **Salidas diferidas de recursos:** | | | | | |
| Pérdida por reintegro de bonos | 11,401 | | | | |
| Relacionado con pensiones | 48,547 | 11,699 | | 342 | 3,595 |
| **Entradas totales diferidas de recursos** | 59,948 | 11,699 | | 342 | 3,595 |
| **Pasivos:** | | | | | |
| Cuentas por pagar y pasivos devengados | | 26,416 | 3,685 | 886 | 991 |
| Depósitos y pasivos en custodia | | 1,402 | | | |
| Adeudado a: | | | | | |
| Gobierno primario | | 44,197 | | | |
| Unidades de componentes | 326,188 | 332,929 | | 6,302 | |
| Otras entidades del gobierno | 3,698 | 11,748 | | 604 | |
| Interés pagadero | | 68,134 | | | |
| Ingresos no obtenidos | | 254 | | 2,021 | |
| Pasivos pagaderos dentro de un año: | | | | | |
| Bonos de asignación del ELA | | | | | |
| Bonos de ingresos | | 3,180 | | | |
| Notas pagaderas a instituciones financieras | | 1,665 | | | |
| Arrendamientos de capital | | | | | |
| Ausencias compensadas | | 5,889 | 892 | | 40 |
| Beneficios pagaderos por rescisión voluntaria | | 2,383 | 437 | | |
| Pasivos por beneficios de seguro | | | | | |
| Otros pasivos a largo plazo | | 1,223 | | | |
| Pasivos pagaderos después de un año: | | | | | |
| Bonos de asignación del ELA | | | | | |
| Bonos de ingresos | | 193,643 | | | |
| Pagarés pagaderos a instituciones financieras | | 9,858 | | | |
| Arrendamientos de capital | | | | | |
| Ausencias compensadas | | | 1,482 | | 45 |
| Beneficios pagaderos por rescisión voluntaria | | 15,453 | 3,224 | | |
| Obligación de pensiones netas | | | | | |
| Pasivos netos de pensiones | | 253,649 | 48,953 | 793 | 14,053 |
| Otros pasivos a largo plazo | | 439 | 1,680 | | |
| **Pasivos Totales** | 329,886 | 972,462 | 60,353 | 10,606 | 15,129 |
| **Entradas diferidas de recursos:** | | | | | |
| Acuerdos de concesión de servicio | | 681,708 | | | |
| Relacionado con pensiones | | 40,895 | 937 | 104 | 269 |
| **Entradas totales diferidas de recursos** | | 722,603 | 937 | 104 | 269 |
| **Resultados Netos:** | | | | | |
| Inversión neta en activos de capital | | 584,911 | 4,454 | 7 | 7,699 |
| Restringido para: | | | | | |
| Proyectos de capital | | 40,342 | | | |
| Pago de la deuda | | | | | |
| Préstamos estudiantiles y otros propósitos educativos | | | | | 2,406 |
| Otros propósitos especificados | | | 896 | | |
| No restringidos (déficit) | (239,327) | (925,115) | (48,274) | (6,536) | (11,687) |
| **Resultados netos totales (déficit)** | $ (239,327) | (299,862) | (42,924) | (6,529) | (1,582) |

(Continuació n)

**ELA DE PUERTO RICO**

Estados Combinados de Resultados Netos de Unidades de Componentes

No Mayores de Presentación Discreta

30 de junio de 2017

(en miles)

| | Fideicomiso Ciencia, Tecnología e Investigación Puerto Rico | Autoridad Telefónica Puerto Rico | Compañía Turismo Puerto Rico | Compañía Comercio y Exportación Puerto Rico | Autoridad Desperdicios Sólidos | Total de Unidades de Componentes No Mayores |
|---|---|---|---|---|---|---|
| **Activos:** | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | $ 8,002 | | 46,742 | 4,900 | 1,349 | 323,032 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | 3,512 | | | | | 41,858 |
| Inversiones | 45,837 | | 17,863 | | | 475,965 |
| Cuentas por cobrar, netas: | | | | | | |
| Intergubernamental | | | | | | 25,832 |
| Cuentas | | | 10,544 | 125 | | 78,056 |
| Préstamos y adelantos | | | 10,416 | | | 121,591 |
| Interés devengado | | 1 | | 3,307 | | 5,784 |
| Otros | 775 | | 817 | | | 6,475 |
| Adeudado de - neto: | | | | | | |
| Gobierno primario | | | | | 2,996 | 45,717 |
| Unidades de componentes | | | | | | 19,821 |
| Otras entidades del gobierno | 3,373 | | | | 1,118 | 12,709 |
| Inventarios | | | | | | 11,278 |
| Gastos pagados por adelantado | | | 40 | 134 | | 17,179 |
| Otros activos | 90 | | | | 133 | 20,054 |
| Activos restringidos: | | | | | | |
| Efectivo y equivalentes al efectivo en bancos comerciales | | | | 7,566 | | 64,463 |
| Efectivo y equivalentes al efectivo en bancos del gobierno | | 30 | | | | 30 |
| Inversiones | 3,200 | | | 252,778 | | 900,940 |
| Otros activos restringidos | | | | | | 39,414 |
| Bienes inmuebles mantenidos para la venta o desarrollo futuro | | | 2,600 | | | 180,655 |
| Activos de capital: | | | | | | |
| Terrenos y otros no depreciables | 43,808 | | 5,053 | 40,048 | 21,798 | 1,127,879 |
| Depreciables, neto | 2,760 | | 17,256 | 44,463 | 83,324 | 2,142,900 |
| **Activos Totales** | 111,357 | 31 | 111,331 | 353,321 | 110,718 | 5,661,432 |
| **Salidas diferidas de recursos** | | | | | | |
| Pérdida por reintegro de bonos | | | 1,326 | | | 14,821 |
| Relacionado con pensiones | | | 37,648 | 12,293 | 3,181 | 405,728 |
| Total de flujos salientes diferidos de recursos | | | 38,974 | 12,293 | 3,181 | 420,549 |
| **Pasivos:** | | | | | | |
| Cuentas por pagar y pasivos devengados | 5,925 | 5 | 39,078 | 5,193 | 3,821 | 439,940 |
| Depósitos y pasivos en custodia | | | | 2,461 | | 222,087 |
| Adeudado a: | | | | | | |
| Gobierno primario | | | 36,034 | 1,241 | | 135,464 |
| Unidades de componentes | | | 13,348 | | 76,366 | 1,252,665 |
| Otras entidades del gobierno | 4 | | | 1,399 | 4,740 | 131,000 |
| Interés pagadero | | | 5,871 | 3,074 | 18,990 | 176,667 |
| Ingresos no obtenidos | | | | | | 61,471 |
| Pasivos pagaderos dentro de un año: | | | | | | |
| Bonos de asignación del ELA | | | 3,471 | | 607 | 8,432 |
| Bonos de ingresos | | | | | | 97,855 |
| Pagarés pagaderos a instituciones financieras | | | | 607 | | 50,484 |
| Arrendamientos de capital | 3 | | 180 | 62 | | 362 |
| Ausencias compensadas | | | | 632 | 195 | 26,031 |
| Beneficios pagaderos por rescisión voluntaria | | | 735 | 1,166 | 457 | 21,961 |
| Pasivos por beneficios de seguro | | | | | | 66,289 |
| Otros pasivos a largo plazo | 9 | | 1,050 | | | 8,714 |
| Pasivos pagaderos después de un año | | | | | | |
| Bonos de asignación del ELA | | | 41,654 | | 7,193 | 100,311 |
| Bonos de ingresos | | | | | | 1,197,847 |
| Pagarés pagaderos a instituciones financieras | | | | 265,157 | | 349,618 |
| Arrendamientos de capital | | | 544 | 96 | | 814 |
| Ausencias compensadas | | | | | 189 | 14,310 |
| Beneficios pagaderos por rescisión voluntaria | | | 4,427 | 5,854 | 4,131 | 80,706 |
| Obligación de pensiones netas | | | | | | 21,546 |
| Pasivos netos de pensiones | | | 143,954 | 52,222 | 15,895 | 1,857,327 |
| Otros pasivos a largo plazo | | | 1,126 | | | 85,352 |
| **Pasivos Totales** | 5,941 | 5 | 290,346 | 340,290 | 132,584 | 6,409,253 |
| **Entradas diferidas de recursos:** | | | | | | |
| Acuerdos de concesión de servicio | | | | | | 681,708 |
| Relacionado con pensiones | | | 2,755 | 999 | 1,740 | 104,490 |
| Entradas totales diferidas de recursos | | | 2,755 | 999 | 1,740 | 786,198 |
| **Resultados Netos:** | | | | | | |
| Inversión neta en activos de capital | 46,568 | | 21,585 | 71,368 | 33,261 | 1,620,343 |
| Restringido para: | | | | | | |
| Proyectos de capital | | | | | | 44,492 |
| Pago de la deuda | | | | | | 82,742 |
| Préstamos estudiantiles y otros propósitos educativos | | | | | | 5,044 |
| Otros propósitos especificados | 3,200 | 26 | | 6,925 | | 145,643 |
| No restringidos (déficit) | 55,648 | | (164,381) | (53,968) | (53,686) | (3,011,734) |
| **Resultados netos totales (déficit)** | $ 105,416 | 26 | (142,796) | 24,325 | (20,425) | (1,113,470) |

Ver el informe de los auditores independientes adjunto.

**ELA DE PUERTO RICO**

Estados Combinados de Actividades de Unidades de

Componentes No Mayores de Presentación Discreta

Año finalizado el 30 de junio

de 2017 (en miles)

| | | Ingreso del programa | | | Ingresos (gastos) netos y | | | Ingresos generales y transferencias | | | | | | Resultados netos (déficit) comienzo | Corrección de errores y adopción de nuevos pronunciamientos contables | Resultados netos (déficit) comienzo | Resultados netos (déficit) fin de año |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gastos | Cargos por servicios | Subsidios y contribuciones operativas | Subsidios y contribuciones de capital | cambios en resultados netos | Pagos gobierno primario | Pagos de (a) Unidades de componentes | Subsidios y contribuciones no restringidas a programas específicos | Ganancias de intereses e inversiones | Arbitrios y otros | Cambio en resultados netos | del año intermedios anterior mente | del año asientos y reformulados (nota 4) | | | |
| Administración para el Desarrollo de Empresas Agropecuarias | 177,877 | 96,730 | | | (81,147) | 103,669 | | | 14 | 1,921 | 24,457 | (274,349) | 21,613 | (252,736) | (228,278) |
| Administración de Compensaciones por Accidentes de Automóviles | 148,009 | 83,679 | | | (64,130) | (5,365) | | | 7,602 | | (61,893) | (82,606) | 3,172 | (79,434) | (141,327) |
| Corporación del Centro Cardiovascular de Puerto Rico y el Caribe | 97,891 | 80,936 | | | (16,955) | | | | 1 | 3 | (16,955) | (169,449) | | (169,449) | (186,404) |
| Centro de Diabetes de Puerto Rico | 1,021 | 206 | | | (815) | 450 | | | 1 | | (361) | | 1,825 | 1,825 | 1,464 |
| Compañía para el Desarrollo Integral de la "Península de Cantera" | 4,521 | | 1,210 | | (3,311) | | | 67 | 50 | | (3,194) | (31,879) | 747 | (31,132) | (34,326) |
| Corporación para el Proyecto Enlace del "Caño Martín Peña" | 10,276 | | | 1,408 | (8,868) | 9,629 | | | 10 | | 771 | 3,437 | (3,752) | (315) | 456 |
| Autoridad de Conservación y Desarrollo de Culebra | 491 | 224 | | | (267) | 241 | | | | | (26) | (647) | | (647) | (673) |
| Banco Gubernamental de Fomento para Puerto Rico | 124,936 | 11,813 | | 65 | (113,058) | | | | | 598 | (112,430) | 153,988 | | (32,939) | 121,179 | 8,740 |
| Corporación de Seguros Agrícolas de Puerto Rico | 3,918 | 1,170 | 949 | | (1,799) | | | | 3 | | (1,796) | (1,053) | (7,991) | (9,044) | (10,840) |
| Corporación del Centro de Bellas Artes | 6,643 | 2,331 | | | (4,312) | 3,775 | | | 3 | 20 | (514) | 15,496 | (10,842) | 4,654 | 4,140 |
| Oficina Independiente de Protección al Consumidor | 560 | | | | (560) | | 580 | | | | 20 | 272 | | 272 | 292 |
| Instituto de Cultura de Puerto Rico | 16,669 | | 1,683 | 88 | (14,898) | 9,841 | | | | | (5,057) | 44,939 | (27,983) | 17,379 | 12,322 |
| Fideicomiso Institucional de la Guardia Nacional de Puerto Rico | 6,119 | 5,322 | | | (797) | | | | 1,239 | | 442 | 48,188 | (797) | 47,391 | 47,833 |
| Autoridad de la Tierra de Puerto Rico | 30,510 | 8,948 | 435 | | (21,127) | 13,635 | | | | 5,031 | (2,461) | (92,871) | 7,058 | (85,813) | (88,274) |
| Autoridad para el Redesarrollo de los Terrenos y Facilidades de la Estación Naval Roosevelt Roads | 2,853 | 667 | 1,153 | | (833) | 1,175 | | | | | 342 | (754) | | (754) | (412) |
| Corporación de las Artes Musicales | 7,622 | 451 | | | (7,171) | 8,082 | | | 31 | 165 | 1,107 | (14,912) | (11,175) | (26,087) | (24,980) |
| Corporación Pública para la Supervisión y Seguro de Depósitos de las Cooperativas de Puerto Rico | 48,863 | 23,447 | 168 | | (25,248) | | | | | 1,002 | (24,246) | 152,933 | (82,586) | 70,367 | 46,121 |
| Corporación del Conservatorio Musical de Puerto Rico | 12,812 | 3,269 | | 27 | (9,496) | 6,436 | | 667 | 7 | 69 | (2,315) | 79,399 | (17,103) | 62,296 | 59,981 |
| Autoridad del Distrito del Centro de Convenciones de Puerto Rico | 75,121 | 27,373 | | | (47,748) | | 3,603 | | 317 | 1,062 | (42,766) | 160,488 | | 160,488 | 117,722 |
| Consejo de Educación de Puerto Rico | 11,229 | 418 | 1,337 | | (9,474) | 9,476 | | | 33 | 145 | 180 | 3,553 | (12,657) | (9,104) | (8,924) |
| Comisión de Energía de Puerto Rico | 4,157 | | 1,740 | | (2,417) | | 5,720 | | 9 | | 3,312 | 2,214 | | 2,214 | 5,526 |
| Corporación de Fomento Industrial de Puerto Rico | 92,281 | 57,880 | | 2,180 | (32,221) | | | | 307 | 5,944 | (25,970) | 314,200 | (134,508) | 179,694 | 153,724 |
| Autoridad de Financiamiento de Instalaciones de Control Industrial, Turístico, Educativo, Médico y Ambiental de Puerto Rico | 10 | | | | (10) | | | | 10 | 129 | 129 | | | | 129 |
| Autoridad de Transporte Integrado de Puerto Rico | 1,996 | | 283 | | (1,733) | 4,015 | | | 6 | | 2,288 | 1,175 | | 1,175 | 3,463 |
| Administración de Terrenos de Puerto Rico | 12,361 | 10,615 | 2,520 | | 774 | | | | 501 | | 1,275 | 179,468 | (26,308) | 153,160 | 154,435 |
| Autoridad Municipal de Transporte Marítimo e Islas de Puerto Rico | 42,714 | 4,811 | 13,113 | 2,108 | (22,682) | 16,003 | | | | | (6,679) | (33,871) | | (33,871) | (40,550) |
| Autoridad de Autobuses Metropolitanos de Puerto Rico | 75,079 | 2,602 | 8,770 | | (63,707) | 27,609 | | | 1 | | (36,097) | (96,254) | (255,590) | (351,844) | (387,941) |
| Agencia de Financiamiento Municipal de Puerto Rico | 32,593 | | | | (32,593) | | | | 35,642 | 128 | 3,177 | 43,904 | | 43,904 | 47,081 |
| Corporación de Financiamiento Municipal de Puerto Rico | 128,416 | | 127,521 | | (895) | | 821 | | 2,770 | 41 | 2,737 | (242,064) | | (242,064) | (239,327) |
| Autoridad de los Puertos de Puerto Rico | 142,559 | 100,291 | 7,493 | | (34,775) | 28 | | | 59 | 3,479 | (31,209) | (19,190) | (249,458) | (268,653) | (299,862) |
| Corporación de Puerto Rico para la Difusión Pública | 22,577 | 2,265 | | | (20,312) | 11,838 | | 2,350 | 106 | | (6,016) | (737) | (36,171) | (36,908) | (42,924) |
| Autoridad para Alianzas Público-Privadas de Puerto Rico | 13,089 | 3,024 | | | (10,065) | | | | 9 | 60 | (9,996) | 63 | 3,404 | 3,467 | (8,529) |
| Escuela de Artes Plásticas de Puerto Rico | 8,734 | 568 | 1,791 | | (4,375) | 2,726 | | | 269 | | (1,378) | (1,226) | 1,022 | (204) | (1,582) |
| Fideicomiso de Ciencia, Tecnología e Investigación de Puerto Rico | 54,762 | 9 | 9,927 | | (44,826) | | | | 3,870 | 629 | (40,327) | 145,743 | | 145,743 | 105,416 |
| Autoridad Telefónica de Puerto Rico | 76 | | | | (76) | | | | 17 | 84 | 25 | 1 | | 1 | 26 |
| Compañía de Turismo de Puerto Rico | 146,076 | 157,165 | 1,150 | | 10,189 | (20,742) | (65,828) | | | 70,024 | (6,357) | (36,919) | (99,520) | (136,439) | (142,796) |
| Compañía de Comercio y Exportación de Puerto Rico | 40,554 | 14,830 | 4,237 | | (21,487) | | | | 12,420 | 1,982 | (7,085) | 70,675 | (39,285) | 31,410 | 24,325 |
| Autoridad de Desperdicios Sólidos | 17,283 | 1,813 | | | (15,470) | 4,336 | | | 406 | 1,210 | (9,108) | 3,601 | (14,193) | (10,319) | (20,426) |
| **Total de unidades de componentes no mayores** | 1,623,034 | 707,478 | 185,410 | 5,876 | (728,066) | 207,461 | (65,104) | 3,084 | 95,213 | 92,241 | (414,972) | 104,981 | (1,029,379) | 898,298 | (1,113,470) |

Ver el informe de los auditores independientes adjunto.



# SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO

(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estados financieros básicos e información suplementaria requerida

30 de junio de 2017

(con informe de auditores independientes al respecto)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

**Índice**

|  | **Página(s)** |
|---|---|
| Informe de los auditores independientes | 1–2 |
| Análisis y examen de la gerencia (sin auditar) | 3–14 |
| Estados financieros básicos: | |
| Estado de posición fiduciaria neta | 15–16 |
| Estado de cambios en la posición fiduciaria neta | 17 |
| Notas a los estados financieros básicos | 18–74 |
| **Información suplementaria obligatoria (sin auditar)** | |
| Beneficios de pensiones: | |
| Anexo de cambios en la obligación neta por pensiones de los patronos e índices relacionados | 75 |
| Anexo de retorno sobre la inversión | 76 |
| Otros beneficios de cuido de salud post-empleo: | |
| Anexo de aportaciones de los empleados | 77 |
| Anexo de evolución del financiamiento | 78 |
| Notas a la información suplementaria obligatoria | 79–81 |



KPMG LLP
American International Plaza
Oficina 1100
Avenida Muñoz Rivera 250
San Juan, PR 00918-1819

**Informe de los auditores independientes**

A la Junta de Retiro del Sistema de Retiro de los
Empleados del Gobierno del Estado Libre Asociado de
Puerto Rico:

Hemos auditado los estados financieros adjuntos, pertenecientes al Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "Sistema"), que constan del estado de situación fiduciaria neta al 30 al 30 de junio de 2017, el estado relacionado de cambios en la posición fiduciaria neta para el año terminado en esa fecha y las correspondientes notas a los estados financieros, que en su conjunto constituyen los estados financieros básicos del Sistema.

*Responsabilidad de la gerencia con respecto a los estados financieros*

Corresponde a la gerencia elaborar los estados financieros y presentarlos de manera honesta, de conformidad con los principios de contabilidad generalmente aceptados de los Estados Unidos; esto incluye diseñar, aplicar y mantener los controles internos necesarios para elaborar y presentar estados financieros honestos que no tengan declaraciones erróneas sustanciales, sea por motivo de fraude o error.

*Responsabilidad de los auditores*

Nuestra responsabilidad es expresar una opinión sobre dichos estados financieros sobre la base de nuestra auditoría. Realizamos nuestras auditorías de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América. Esas normas requieren que planifiquemos y realicemos la auditoría para obtener una seguridad razonable de que los estados financieros están libres de errores materiales.
.

Una auditoría involucra realizar procedimientos para obtener pruebas sobre los montos y las divulgaciones en los estados financieros. Los procedimientos elegidos dependen del criterio de los auditores, lo que incluye evaluar el riesgo de que los estados financieros contengan declaraciones erróneas materiales, sea debido a fraude o error. Al realizar tales evaluaciones de riesgos, y con el objetivo de diseñar procedimientos de auditoría que sean apropiados en función de las circunstancias, el auditor toma en cuenta los controles internos que aplica la entidad al preparar y presentar con honestidad los estados financieros, pero no con el propósito de expresar una opinión sobre la eficacia de tales controles. En consecuencia, no expresamos ninguna opinión en ese sentido. Una auditoría también incluye evaluar lo apropiado de las políticas contables utilizadas y lo razonable de las principales estimaciones contables hechas por la gerencia, así como analizar la presentación general de los estados financieros.

Consideramos que las pruebas de auditoría que hemos obtenido son suficientes y apropiadas como fundamento para nuestra opinión de auditoría.

*Opinión*

En nuestra opinión, los estados financieros a que se hace referencia en este informe reflejan de manera honesta, en todos los aspectos principales, la posición fiduciaria neta del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico al 30 de junio de 2017 y los cambios en su posición fiduciaria neta para el año terminado en esa fecha, de conformidad con los principios de contabilidad generalmente aceptados en los Estados Unidos.

KPMG LLP, una sociedad colectiva de responsabilidad limitada constituida en Delaware, es una empresa que forma parte de la red de empresas independientes de KPMG afiliadas con KPMG International Cooperative ("KPMG International"), una entidad suiza.



*Cuestiones fundamentales*

Incertidumbre sobre la capacidad de seguir funcionando en el futuro

Los estados financieros adjuntos han sido elaborados en el entendido de que el Sistema seguirá funcionando en el futuro. Como se analiza en las notas 3 y 14 a los estados financieros básicos, el Sistema está gravemente subfinanciado, vendió las inversiones que le quedaban por monto global de unos $297 millones, y en el año fiscal 2018 comenzó a funcionar en una modalidad de reparto (*pay as you go*). Además, el 3 de mayo y el 22 de mayo de 2017, la Junta de Supervisión y Administración Financiera para Puerto Rico interpuso ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico causas en nombre del Estado Libre Asociado de Puerto Rico y el Sistema, respectivamente, solicitando remedios al amparo del Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico. En vista de ello, la gerencia del Sistema ha expresado que existen dudas sustanciales sobre la capacidad del Sistema para continuar como empresa en función. La evaluación de la gerencia respecto de los hechos y las condiciones, y sus planes relacionados con dichos asuntos, también se describen en la nota 3. Los estados financieros no incluyen ningún ajuste que pudiera surgir del resultado de dicha incertidumbre. Nuestra opinión no se modifica en relación con este asunto.

*Otros asuntos*

Información suplementaria requerida

Los principios de contabilidad generalmente aceptados en los Estados Unidos requieren que se presenten como suplemento a los estados financieros básicos el análisis y el examen de la gerencia que figuran en las páginas 3 a 14 y los anexos que figuran en las páginas 75 a 81. Si bien dicha información no forma parte de los estados financieros básicos, la Junta Gubernamental de Normas Contables requiere su inclusión, por cuanto la considera parte fundamental de la elaboración de informes financieros para ubicar los estados financieros básicos en el contexto operativo, económico e histórico apropiado. Hemos aplicado determinados procedimientos limitados a la información suplementaria que se requiere en las normas de auditoría generalmente aceptadas en los Estados Unidos de América, a saber, consultar con la gerencia sobre los métodos para elaborar la información, y cotejar la información para determinar si es congruente con las respuestas de la gerencia a nuestras consultas, los estados financieros básicos y otros datos que obtuvimos al auditarlos. No expresamos ninguna opinión ni brindamos ninguna garantía con respecto a la información debido a que los procedimientos, que son limitados, no nos aportan suficientes pruebas para hacerlo.

KPMG LLP

San Juan (Puerto Rico)
29 de junio de 2020

Se estampó el sello núm. E403599 del Colegio de Contadores Públicos Autorizados de Puerto Rico a la copia de este informe.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

**Introducción**

El siguiente análisis y examen del rendimiento financiero del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "Sistema") brinda información general sobre sus actividades para el año fiscal terminado el 30 de junio de 2017. Tiene por objeto explicar y ayudar a comprender mejor los datos presentados en los estados financieros básicos y en la información suplementaria requerida. Este análisis y examen debe leerse junto con los estados financieros del Sistema.

El Sistema es un fideicomiso que la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico (la "Asamblea Legislativa") creó en 1951 de conformidad con la Ley núm. 447 del 15 de mayo de 1951, según enmendada, para pagar pensiones y otros beneficios a los empleados retirados del Estado Libre Asociado de Puerto Rico (el "ELA") y de sus empresas públicas y municipios. Hasta el 23 de agosto de 2017, la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (la "Administración del SRE y del SRJ") administró el Sistema, que fue gobernado por una junta de fideicomisarios (la "Junta de Fideicomisarios ").

Antes de 23 de agosto de 2017, el Sistema administraba un plan de pensiones de múltiples patronos y reparto de costos que constaba de tres estructuras de pago de beneficios: i) un programa de pago de beneficios de patronos múltiples y de reparto de costos, ii) un programa de aportaciones definidas (el programa "Sistema 2000") y iii) un programa de aportaciones híbrido. El Sistema también administraba los beneficios de cuido de salud post-empleo que el ELA brindaba a los miembros retirados del plan (programa de Aportaciones al Plan de Seguro Médico del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, o el programa "MIPC del SRE").

El Sistema es un componente fundamental de los informes financieros del ELA, y se incluye en sus estados financieros básicos como un fondo de fideicomiso de pensiones.

**Información general sobre los estados financieros básicos**

El análisis y examen a continuación tienen por objeto presentar los estados financieros básicos del Sistema. Los estados financieros básicos se elaboran de conformidad con los principios de contabilidad generalmente aceptados de los Estados Unidos (los "GAAP", por sus siglas en inglés), según se apliquen a las organizaciones gubernamentales en virtud de los pronunciamientos de la Junta Gubernamental de Normas Contables (la "GASB", por sus siglas en inglés), e incluyen lo siguiente:

- El Estado de Posición Fiduciaria Neta presenta la posición financiera del Sistema a final del año fiscal. Brinda información sobre i) la naturaleza y las cantidades de recursos y la capacidad actual de prestación de servicios del Sistema (activos); ii) los activos netos que el Sistema consume y que corresponden a un ejercicio futuro (salida diferida de recursos); iii) las obligaciones de utilizar recursos que el Sistema tiene poca o ninguna posibilidad de evitar (pasivo) y iv) los activos netos que el Sistema adquiere y que corresponden a un ejercicio futuro (ingreso diferido de recursos); la diferencia entre los activos/salida diferida de recursos y los pasivos/ingreso diferido de recursos se consigna como la posición neta. Las inversiones se registran según su valor razonable. Todos los demás activos y pasivos se determinan según el criterio de lo devengado.

- El Estado de Cambios en la Posición Fiduciaria Neta presenta los resultados de las actividades durante el año fiscal. Todos los cambios que afectan a los activos/salidas diferidas de recursos y los pasivos/entradas diferidas de recursos del Sistema se registran según el criterio de lo devengado, es decir, reflejando cuándo ocurrió la actividad, independientemente de cuándo se produjeron los flujos de caja relacionados. Los cambios en los valores razonables de las inversiones se incluyen en la actividad del ejercicio como apreciación (depreciación) neta en el valor razonable de las inversiones.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

- Las notas a los estados financieros básicos brindan información adicional que es fundamental para entender a plenitud los datos consignados en los estados financieros. Las notas presentan información sobre las políticas contables del Sistema y sobre los principales balances y actividades de las cuentas, los riesgos más importantes, las obligaciones, las contingencias y los eventos subsecuentes, de haberlos.

La información suplementaria requerida se presenta luego de las notas a los estados financieros básicos. Si bien no es parte de los estados financieros básicos, la Junta Gubernamental de Normas Contables requiere dicha información. Presenta datos relativos a los métodos actuariales y los supuestos que utiliza el Sistema y sobre los cambios en las obligaciones netas de los patronos con respecto a las pensiones y los índices relacionados, las aportaciones de los patronos a los beneficios por pensiones, y el retorno de las inversiones de los beneficios por pensiones, así como datos sobre otros beneficios posteriores al empleo que ofrece el Sistema.

*Aspectos financieros destacados*

Hasta el 23 de agosto de 2017, el Sistema pagó beneficios por retiro a los empleados del ELA, sus empresas públicas y municipios. El total de activos del Sistema al 30 de al 30 de junio de 2017 y 2016 ascendía, respectivamente, a unos $1,505 millones y $2,284 millones.

A 30 de junio de 2017, los activos totales del Sistema constaban de lo siguiente:

- $345 millones en inversiones en bonos, acciones y fondos de fideicomiso colectivos sin contraprestación
- $87 millones en inversiones en sociedades limitadas
- $523 millones en préstamos a miembros e intereses por cobrar
- $539 millones en efectivo y equivalentes de efectivo, cuentas por cobrar y garantías por transacciones de préstamo de títulos
- $11 millones en capital y otros activos

Los activos totales del Sistema al 30 de al 30 de junio de 2017 se presentan en la gráfica que sigue (cifras en millones):



(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

A 30 de junio de 2016, los activos totales del Sistema constaban de lo siguiente:

- $667 millones en inversiones en bonos, acciones y fondos de fideicomiso colectivos sin contraprestación

- $47 millones en inversiones en sociedades limitadas

- $597 millones en préstamos a miembros e intereses por cobrar

- $963 millones en efectivo y equivalentes de efectivo, cuentas por cobrar y garantías por transacciones de préstamo de títulos

- $10 millones en capital y otros activos

Los activos totales del Sistema al 30 de junio de 2016 se presentan en la gráfica que sigue (cifras en millones):



- El Sistema viene arrastrando un déficit desde el año fiscal 2015. El total de pasivos del Sistema excedió sus activos totales, y representó un déficit neto fiduciario de unos $2,109 millones al 30 de al 30 de junio de 2017, frente a un déficit neto fiduciario de unos $1,266 millones al 30 de junio de 2016.

- El déficit fiduciario neto del plan como porcentaje del total de sus obligaciones por las pensiones fue de -7.01% al 30 de junio de 2017 y de -3.47% al 30 de junio de 2016.

- La aportación al plan de seguro médico, que constituye otro programa de beneficios de salud posteriores al empleo, es financiada por el ELA en una modalidad de "PayGo" (*pay-as-you-go*) y, por ende, carece de fondos.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

Las siguientes tablas brindan un resumen comparativo de los estados financieros de la posición fiduciaria neta del Sistema y los cambios en la posición fiduciaria neta para los años fiscales 2017 y 2016:

**Resumen comparativo de la posición fiduciaria neta: Beneficios por pensiones**

| | 2017 | 2016 | Cambio Total en dólares | Porciento total de cambio |
|---|---|---|---|---|
| | | (En miles de dólares) | | |
| **Activos:** | | | | |
| Efectivo y equivalentes de efectivo, cuentas por cobrar netas y garantías por transacciones de préstamo de títulos | $ 538,520 | 962,706 | (424,186) | (44.1)% |
| Inversiones | 431,955 | 714,214 | (282,259) | (39.5) |
| Préstamos a miembros e intereses por cobrar - neto | 523,443 | 596,997 | (73,554) | (12.3) |
| Activos de capital y otros | 10,718 | 10,487 | 231 | 2.2 |
| Total activos | 1,504,636 | 2,284,404 | (779,768) | (34.1) |
| **Pasivos:** | | | | |
| Cuentas por pagar y pasivos acumulados | 279,366 | 104,315 | 175,051 | 167.8 |
| Intereses a pagar sobre bonos | 14,076 | 14,094 | (18) | (0.1) |
| A pagar por títulos de inversión comprados | | 1,609 | (1,609) | (100.0) |
| Obligaciones por préstamo de títulos | 7,359 | 19,754 | (12,395) | (62.7) |
| Adeudado al Estado Libre Asociado de Puerto Rico | 98,044 | 91,474 | 6,570 | 7.2 |
| Fondos de plica por préstamos hipotecarios y reserva de seguros de garantía para préstamos a miembros del plan | 11,018 | 10,467 | 551 | 5.3 |
| Gastos por inversiones acumulados | 541 | | 541 | 100.0 |
| Bonos por pagar | 3,166,472 | 3,134,902 | 31,570 | 1.0 |
| Otros pasivos | 36,613 | 173,674 | (137,061) | (78.9) |
| Obligaciones totales | 3,613,489 | 3,550,289 | 63,200 | 1.8 |
| Posición neta (déficit) | $ (2,108,853) | (1,265,885) | (842,968) | 66.6% |

6                                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

**Resumen comparativo de cambios en la posición fiduciaria neta: Beneficios por pensiones**

| | | 2017 | 2016 | Cambio total en dólares | Porciento total de cambio |
|---|---|---|---|---|---|
| | | | (En miles de dólares) | | |
| Adiciones: | | | | | |
| Aportaciones: | | | | | |
| Aportaciones de patronos: | | | | | |
| Beneficios básicos | $ | 726,911 | 582,803 | 144,108 | 24.7% |
| Beneficios especiales | | 194,626 | 196,674 | (2,048) | (1.0) |
| Aportaciones de los miembros | | 320,095 | 333,633 | (13,538) | (4.1) |
| Ingresos netos por inversiones | | 28,155 | 37,345 | (9,190) | (24.6) |
| Otros ingresos | | 56,626 | 52,791 | 3,835 | 7.3 |
| Total adiciones | | 1,326,413 | 1,203,246 | 123,167 | 10.2 |
| Deducciones: | | | | | |
| Beneficios pagados a los participantes | | 1,524,695 | 1,532,640 | (7,945) | (0.5) |
| Reembolsos de aportaciones | | 35,229 | 34,937 | 292 | 0.8 |
| Intereses sobre bonos por pagar | | 198,084 | 196,211 | 1,873 | 1.0 |
| Aspectos generales y administrativos | | 24,358 | 27,670 | (3,312) | (12.0) |
| Otros gastos | | 387,015 | 9,401 | 377,614 | 4,016.7 |
| Total deducciones | | 2,169,381 | 1,800,859 | 368,522 | 20.5 |
| Disminución neta en la posición neta | | (842,968) | (597,613) | (245,355) | 41.1 |
| Posición neta (déficit): | | | | | |
| Principio de año | | (1,265,885) | (668,272) | (597,613) | 89.4 |
| Fin de año | $ | (2,108,853) | (1,265,885) | (842,968) | 66.6% |

**Empresa en marcha**

El análisis en la nota 3 a los estados financieros brinda información sobre la incertidumbre en cuanto a si el Sistema podrá seguir funcionando.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

Al 30 de junio de 2017, el Sistema era un sistema de retiro maduro con una población significante de retirados. Al 30 de junio de 2017, las obligaciones netas por pensiones del Sistema y su situación fiduciaria neta deficitaria como porcentaje de sus obligaciones totales por pensiones (el "índice de capitalización") ascendían a unos $32,201 millones y –7.01%, respectivamente. El Sistema venía arrastrando un déficit desde el año fiscal 2015. Frente a los requisitos de financiamiento que establece la ley, los beneficios pagados por el Sistema y sus gastos administrativos anuales fueron considerablemente más elevados que las aportaciones que recibió de miembros y patronos. Debido a la reducida base de activos, los ingresos por concepto de inversiones fueron insuficientes para cubrir el flujo de caja negativo. Los activos ilíquidos (las cuentas por cobrar, los préstamos netos a miembros y los intereses por cobrar correspondientes, las inversiones en COFINA y las inversiones en sociedades limitadas) constituían aproximadamente $723 millones (48%) del total de activos del Sistema al 30 de junio de 2017.

Como se analiza en las notas 3 y 14 a los estados financieros, en julio de 2017 el Sistema vendió inversiones por $297 millones aproximadamente y transfirió aproximadamente $190 millones de los ingresos netos al Departamento de Hacienda, conforme a lo requerido por la Resolución conjunta 188.

El 30 de junio de 2016, el Congreso de los Estados Unidos aprobó la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA), que paralizó provisionalmente, de forma automática, todos los litigios relacionados con la deuda contra el ELA y sus instrumentalidades pertinentes, incluido el Sistema, conforme a la sección 405 de PROMESA (la "Paralización conforme al Título IV"). El 1 de mayo de 2017, la Paralización conforme al Título IV venció, lo que permitió retomar sustancialmente los litigios contra el ELA y sus instrumentalidades pertinentes, incluido el Sistema. El 3 de mayo de 2017, a solicitud del Gobernador de Puerto Rico (el "Gobernador"), la Junta de Supervisión y Administración Financiera para Puerto Rico, creada en virtud de PROMESA (la "Junta de Supervisión"), presentó ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal del Título III") un caso conforme al Título III en nombre del ELA, en el marco del cual presentó una solicitud de remedio al amparo de dicho Título. El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició un caso de Título III a nombre del Sistema mediante la presentación de una solicitud de remedio similar bajo el Título III de PROMESA en el Tribunal de Título III.

El 23 de agosto de 2017, el ELA aprobó la Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos (Ley núm. 106 de 2017), que reformó completamente el Sistema al, entre otras cosas, i) reemplazar la junta directiva del Sistema, el Sistema de Retiro para la Judicatura del Estado Libre Asociado de Puerto Rico (el "SRJ") y el Sistema de Anualidades y Pensiones de los Maestros de Puerto Rico (el "SRM", y conjuntamente con el Sistema y el SRJ, los "Sistemas de Retiro") por una única Junta de Retiro del Estado Libre Asociado de Puerto Rico (la "Junta de Retiro") e ii) implementar un método "pay-as-you-go" (PayGo) para el pago de los beneficios de pensiones por el ELA en lugar de por el Sistema. La Ley núm. 106 de 2017 creó el marco jurídico que permite al ELA garantizar los pagos a los pensionados a través del sistema PayGo.

**Resumen comparativo del análisis de la posición fiduciaria neta: beneficios de pensiones**

Los estados financieros básicos del Sistema para el año fiscal terminado el 30 de junio de 2017 presentan una reducción en la posición neta de aproximadamente $843 millones, lo que resulta en un déficit en la posición neta de unos $2,109 millones al 30 de junio de 2017, frente a un déficit en la posición neta de unos $1,266 millones al 30 de junio de 2016. La reducción en la posición neta (es decir, el aumento en el déficit) en el año fiscal 2017 fue el resultado de que los excesos en deducciones, principalmente debido a otros gastos y beneficios pagados a los participantes superaron a los ingresos, (principalmente en aportaciones de los patronos y empleados participantes. La reducción en la posición neta responde principalmente a una disminución en las aportaciones de los patronos por cobrar de unos $204 millones en el año fiscal 2017.

8                                                                                              (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

Las aportaciones totales de los patronos participantes y de los miembros aumentaron en unos $129 millones, de $1,113 millones durante el año fiscal 2016 a unos $1,242 millones durante el año fiscal 2017. El total neto de ingresos en concepto de inversiones y transacciones de préstamo de títulos disminuyó en unos $9 millones, de unos $37 millones durante el año fiscal 2016 a unos $28 millones durante el año fiscal 2017. El Sistema reconoció una depreciación neta en el valor razonable de las inversiones de unos $8 millones durante el año fiscal 2017, frente a una apreciación neta en el valor razonable de las inversiones de unos $900,000 reconocida en el año fiscal de 2016. Además, el Sistema reconoció una pérdida por deterioro con respecto a depósitos en un banco gubernamental por unos $21 millones durante el año fiscal 2016, y unos $9 millones en el año fiscal 2017 (véase nota 6 en los estados financieros).

El total de deducciones incrementó por unos $369 millones durante el año fiscal 2017, principalmente a raíz de un aumento de unos $378 millones en otros gastos y una disminución de unos $8 millones en beneficios pagados a los participantes. Los beneficios pagados a los participantes ascendieron a unos $1,525 millones en el año fiscal 2017 y a unos $1,533 millones en el año fiscal 2016. Los gastos generales y administrativos fueron de unos $24 millones en el año fiscal 2017, frente a unos $28 millones en el año fiscal 2016.

Durante el año fiscal 2007, la Junta de Fideicomisarios aprobó la emisión de bonos pagaderos a fin de aumentar los fondos disponibles para el pago de los beneficios de pensiones a ciertos beneficiarios y reducir el total de pasivos actuariales acumulados no financiados. Al 30 de junio de 2017, el monto total por los bonos pagaderos era de unos $3,166 millones.

**Otros beneficios por cuidados de salud posteriores al empleo**

Otros beneficios de cuido de salud post-empleo pagados durante el año fiscal 2017 fueron de unos $91.2 millones, una disminución de aproximadamente $2.8 millones (3%) frente a los $93.7 millones pagados durante el año fiscal 2016. Según establece la Ley núm. 3 de 2013, a partir del 1 de julio de 2013 no se pagan beneficios a los nuevos retirados.

**Análisis financiero del Sistema**

Para el 30 de junio de 2017 y 2016, el Sistema tenía unos $523 millones y $597 millones, respectivamente, en préstamos e intereses por cobrar a miembros del plan, lo que representa un 55% y un 46%, respectivamente, del total de la cartera de inversiones, préstamos incluidos. Para el 30 de junio de 2017, los préstamos e intereses por cobrar a miembros se componían de $161 millones en préstamos hipotecarios, $299 millones en préstamos personales, $37 millones en préstamos para viajes culturales y $29 millones en intereses por cobrar, menos una proyección de $3 millones para ajustes y pérdidas por realización. Para el 30 de junio de 2016, los préstamos e intereses por cobrar a miembros se componían de $170 millones en préstamos hipotecarios, $351 millones en préstamos personales, $45 millones en préstamos para viajes culturales y $34 millones en intereses por cobrar, menos una proyección de $3 millones para ajustes y pérdidas por realización. Para el 30 de junio de 2017 y de 2016, el valor razonable de las inversiones del Sistema en sociedades limitadas ascendía a unos $87 millones y $47 millones, respectivamente, que representaban alrededor del 9% y 4% de la cartera de inversiones al 30 de junio de 2017 y de 2016, respectivamente.

El Sistema recibe ingresos adicionales en concepto de inversiones al otorgar en préstamo títulos de inversión a corredores a través de su programa de préstamo de títulos en custodia. Los corredores constituyen garantías a favor del Sistema y en general utilizan los títulos obtenidos en préstamo para cubrir ventas al descubierto y transacciones fallidas. Las garantías en efectivo recibidas de los corredores se invierten en fondos de inversión a corto plazo para ganar intereses. Para los años fiscales terminados el 30 de junio de 2017 y 2016, el ingreso neto generado por las actividades de préstamo de títulos ascendió a unos $30,000 y $113,000, respectivamente.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

**Información general sobre la cartera de inversiones y los mercados de capital**

El total de activos de inversión del Sistema, incluidos los préstamos otorgados a miembros, las garantías constituidas en el marco de las transacciones de préstamo de títulos y el efectivo y los equivalentes de efectivo (cartera de inversiones, préstamos incluidos) al 30 de al 30 de junio de 2017 era de unos $979 millones. A 30 de junio de 2017, los préstamos otorgados a miembros ascendían a $523 millones.

Al 30 de junio de 2017, la conformación de la cartera de inversiones del Sistema, préstamos a miembros incluidos, era de 70% en inversiones de renta fija, incluidos los préstamos por cobrar, 27% en títulos de renta variable, 2% en efectivo e inversiones a corto plazo, y 1% en otras inversiones, como puede verse en la gráfica que sigue:



Equivalentes de efectivo y garantías por transacciones de préstamo de títulos 2%

Otras inversiones 1%

Títulos de renta variable 27%

Ingresos fijos, incluidos préstamos 70%

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

*Información general sobre la economía y los mercados de capital*

*Resumen general de los mercados de renta variable estadounidenses en el año fiscal 2017*: al 30 de junio de 2017, el índice S&P 500 se aproximó a máximos históricos, arrojando un incremento de casi un 15%, desde que se celebraron las elecciones presidenciales en noviembre de 2016. Fue el vigésimo nuevo máximo en el año natural de 2017. En dicho período, el crecimiento del mercado fue impulsado por acciones de las empresas tecnológicas y financieras. En los Estados Unidos, la mayoría de los indicadores económicos se mantuvieron boyantes, con tendencias de mejora en todo el mundo. El año fiscal 2017 finalizó con una subida de un cuarto de punto aplicada por la Reserva Federal que se mantuvo fiel a su plan de normalizar la política monetaria.

*Resumen general de los mercados de renta variable internacionales en el año fiscal 2017*: los mercados de renta variable internacionales mostraron su mejor rendimiento durante el año fiscal 2017. El índice ACWI ex US se incrementó por un 20.5% expresado en dólares estadounidenses, y los mercados emergentes experimentaron un crecimiento de un 24% en los últimos 12 meses. Todas las regiones del mundo participaron en este crecimiento, liderado por un crecimiento superior al 26% entre las empresas desarrolladas de pequeña capitalización y con muy pocos países por debajo del 10%. A diferencia de los Estados Unidos, el índice de crecimiento de los mercados desarrollados estuvo en rezago del índice de valor de mercado desarrollado durante el año anterior.

*Resumen general de la renta fija en los Estados Unidos en el año fiscal 2017*: los Títulos del Tesoro estadounidense, los Títulos del Tesoro estadounidense protegidos de la inflación (TIPS) y las posiciones municipales mostraron una ligera caída en el año fiscal 2017. Solo los títulos de alta rentabilidad arrojaron valores positivos extremos (más de un 12%). Los gestores de grado de inversiones con una participación más intensa en los sectores de crédito obtuvieron unos resultados positivos, a medida que las horquillas se iban reduciendo en la totalidad de las clasificaciones crediticias. Muchas posiciones de deuda no expresadas en dólares se beneficiaron gracias a la debilidad del dólar, lo cual se tradujo en rendimientos extraordinarios en una cartera de renta fija con una mayor diversificación global.

**Rendimiento total del fondo**

En el año fiscal 2017, el fondo (excluido el efectivo del BGF) tuvo un retorno neto del 6.5% de las comisiones de los gerentes de inversiones. Los resultados fueron decepcionantes, ya que el mercado mostró un rendimiento boyante desde las elecciones presidenciales estadounidenses celebradas en noviembre de 2016, pero el Sistema no fue capaz de participar plenamente. Menos de un tercio de los activos restantes eran líquidos. La mayor parte de los activos (unos $523 millones) correspondían a programas de préstamos a empleados actuales y retirados. El plan de asignación de activos, adoptado en el año fiscal 2016, no llegó a implementarse plenamente. Con los cambios acaecidos en la administración del Sistema, se tomó la decisión de utilizar los activos líquidos restantes para financiar el pago de beneficios.

Durante el año fiscal, el fondo de inversiones tuvo unos egresos netos de efectivo de unos $416 millones. Dichos egresos fueron utilizados principalmente para el pago de beneficios y representan un 33% del balance inicial del año.

Aunque el Sistema no pudo aprovechar al máximo los excelentes retornos de los mercados de renta variable durante dicho año fiscal en cuanto a la necesidad de obtener importantes fondos en efectivo, el fondo logró obtener un retorno de un 6.5% que aportaron unos $69 millones de ganancias adicionales a la cartera. Si excluimos los activos líquidos, tendremos un doble enfoque. Por un lado, ¿cuál es la mejor forma de gestionar las inversiones no líquidas para maximizar los beneficios del plan? Y por el otro, ¿cuál es la forma en la que la entidad debe continuar para atender a sus miembros?

*Otras inversiones y transacciones de préstamos a miembros*

Al 30 de junio de 2017, el Sistema tenía unos $523 millones en préstamos otorgados a los miembros, que representaban un 55% del total de la cartera de inversiones, incluidos los préstamos. Los balances de los préstamos a los miembros al 30 de junio de 2017 estaban $74 millones por debajo del año anterior.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

(continuación)

(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

A finales del año fiscal 2017, el Sistema tuvo una exposición a sociedades limitadas de inversiones en capital riesgo de valorado en unos $87 millones, que representaban un 9% de la cartera total de inversión en el Sistema, incluidos los préstamos a los miembros.

**Situación de financiamiento**

El Sistema fue creado en virtud de la Ley núm. 447, de 15 de mayo de 1951 (la "Ley núm. 447"), y desde el comienzo careció de planificación y financiamiento adecuados. Frente al nivel de beneficios, los niveles de aportaciones fueron relativamente bajos. A medida que más personas ingresaban a la administración pública y luego se retiraban amparándose en las numerosas estructuras de beneficios del Sistema, la brecha entre los activos disponibles para pagar los beneficios y las obligaciones actuariales comenzó a aumentar.

Durante el año fiscal 2007, la Junta de Fideicomisarios aprobó la emisión de bonos a fin de aumentar los fondos disponibles para el pago de los beneficios de pensiones y reducir el total de obligaciones actuariales de pensiones sin financiamiento acumuladas. Referente a los Bonos, el Sistema pignoró las aportaciones de los patronos (según se define en la Resolución del SRE relativa a los Bonos, adoptada luego de la fecha de emisión de la primera serie de Bonos) para el pago de los Bonos, invirtió las sumas recaudadas de los Bonos, y utilizó esas inversiones (y la rentabilidad que produjeron) para pagar las pensiones a los beneficiarios. Específicamente, el 31 de enero de 2008, el Sistema emitió la primera serie de los Bonos, que ascendían aproximadamente a un total de $1,589 millones de capital correspondiente a Bonos Prioritarios para Financiar Pensiones Serie A. El 2 de junio de 2008, el Sistema emitió la segunda serie de los Bonos, que ascendían aproximadamente a un total de $1,059 millones de capital correspondiente a Bonos Prioritarios para Financiar Pensiones Serie B. Por último, el 30 de junio de 2008, el Sistema emitió la tercera y la última serie de los Bonos, que ascendían aproximadamente a un total de $300 millones de capital correspondiente a Bonos Prioritarios para Financiar Pensiones Serie C.

A pesar de estos esfuerzos, las obligaciones actuariales del Sistema continuaron en su senda ascendente a raíz del aumento en el número y la longevidad de pensionados, y por el hecho de que los pensionados que se afiliaron al Sistema tenían derecho a unas anualidades mayores por haber recibido unos salarios más altos.

Con anterioridad al año fiscal 2017, el ELA aprobó una serie de leyes para enfrentar los problemas de financiamiento experimentados por el Sistema. Por ejemplo, en 2011 el ELA aprobó la Ley núm. 116, en virtud de la cual se aumentó la aportación de los patronos de 9.275% a 10.275% de la remuneración pagada a los empleados para el año fiscal 2011-2012, un 1% anual para cada uno de los siguientes cuatro años, y un 1.25% anual para cada uno de los cinco años después de eso, con lo que la aportación total al 1 de julio de 2020 fue 20.525%. Otras medidas adoptadas para mejorar la situación financiera del Sistema fueronn: 1) mejorar el cobro de las aportaciones atrasadas recibiéndolas directamente del Centro de Recaudación de Ingresos Municipales (CRIM) cuando un municipio no envíe sus aportaciones en un plazo de 30 días tras la fecha de vencimiento del pago, o del Departamento de Hacienda del ELA en el caso de las empresas públicas; 2) aplicar la Ley núm. 70, que estableció los incentivos para el retiro anticipado; 3) revisar la Política de Préstamos Personales para Empleados reduciendo los préstamos para fines personales y culturales a un máximo de $5,000 cada uno, frente a los montos anteriores de $15,000 y $10,000, respectivamente, y 4) recibir aproximadamente $162.5 millones en bonos emitidos por la Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA).

En 2013, el ELA aprobó la Ley núm. 3 para reformar el Sistema, que entre otras cosas, redujo los beneficios, aumentó las aportaciones de los empleados y, en el caso de los empleados en actividad que tuvieran derecho al programa de beneficios definidos, reemplazó la mayoría de los aspectos de beneficios definidos del sistema con un sistema de aportaciones definidas. Los requisitos de financiamiento que establecía la ley antes de esta reforma hacían que los pagos anuales de beneficios

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

y los gastos administrativos del Sistema fueran considerablemente más elevados que las aportaciones que recibía de los miembros y los patronos.

Ley núm. 3 de 2013 enmendó la Ley núm. 447, la Ley núm. 1 de 1990 (la "Ley núm. 1") y la Ley núm. 305 a fin de establecer, entre otras cosas, un programa de aportaciones definidas similar al programa Sistema 2000 (el "Programa Híbrido de Aportaciones") que sería administrado por el Sistema. Todos los empleados regulares contratados por primera vez a partir del 1 de julio de 2013 ingresaron al Programa Híbrido de Aportaciones. Además, la Ley núm. 3 congeló todos los beneficios por retiro acumulados hasta el 30 de junio de 2013 en el marco del Programa de Beneficios Definidos, y con posterioridad a ello, todos los beneficios futuros acumulados según la fórmula de aportación definida utilizada para los participantes del programa Sistema 2000. Paralizar las acumulaciones futuras de beneficios definidos que establecían la Ley núm. 447 y la Ley núm. 1 y convertirse en un plan híbrido financiado por los miembros se tradujo en menos pagos de beneficios.

El 27 de junio de 2017, el Departamento de Hacienda emitió la Carta Circular núm. 1300-46-17 para transmitir a las agencias del Gobierno Central del ELA, a las empresas públicas y a los municipios los nuevos procedimientos de ejecución que se adoptarían a partir del 1 de julio de 2017, a saber, un nuevo sistema "pay-as-you-go" (PayGo). Con el comienzo del año fiscal 2018, se eliminaron las aportaciones de los patronos, las aportaciones ordenadas por leyes especiales y la Aportación Uniforme Adicional. Se implementó uno cargo mensual de PayGo para cubrir los costos reales de los pagos de pensiones, que las entidades gubernamentales arriba mencionadas remiten para pagar a sus respectivos retirados. El Sistema ayuda a determinar y a administrar el monto del pago por cada retirado que exista en todo momento. Dicho monto se cobra al Gobierno Central del ELA, a la empresa pública y al municipio que corresponda.

El 23 de agosto de 2017, el Gobernador autorizó la aprobación de la Ley núm. 106 de 2017, la cual creó el marco jurídico que permite al ELA garantizar los pagos a los pensionados a través del sistema PayGo. Entre otras cosas, la Ley 106 de 2017 también dio origen a un Plan de Aportaciones Definidas destinado a los empleados actuales. Conforme a dicho plan, los beneficios futuros no se acumularán.

A 30 de junio de 2017, el plan de pensiones del Sistema constaba de tres estructuras de beneficios distintas, que se administraban según las especificaciones establecidas en cada ley aplicable en materia de beneficios de pensiones. Para todos los miembros del plan, las aportaciones de los empleados van de 8.275 % a 10 % del salario del empleado, según lo especifique este. En todas las estructuras, las aportaciones de los patronos durante el ejercicio terminado el 30 de junio de 2017 ascendieron al 15.275 % del salario del empleado. Sobre la base de la última valuación actuarial, al 30 de junio de 2017 el total de la obligación neta por pago de pensiones correspondiente a los patronos ascendía a unos $32,201 millones, con un déficit en la posición fiduciaria neta del plan de pensiones (como porcentaje de la obligación total por pago de pensiones) de -7.01%. La obligación relativa a beneficios para beneficios de cuido de salud posterior al empleo ascendía a unos $1,138 millones al 30 de junio de 2017 y carecía completamente de financiamiento.

**Activos de capital**

El total de las inversiones del Sistema en activos de capital (sin incluir la depreciación acumulada) era de unos $9.9 millones y $9.7 millones al 30 de junio de 2017 y al 30 de junio de 2016, respectivamente. Los activos de capital incluyen terrenos, edificaciones y mejoras, construcciones en progreso y equipos. Las edificaciones y las mejoras se refieren a las instalaciones en que el Sistema desarrolla sus operaciones.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Análisis y examen de la gerencia (sin auditar)
30 de junio de 2017

**Administración de la deuda**

Las obligaciones de deuda a largo plazo incluyen bonos de financiamiento prioritarios del Sistema por unos $3,166 millones y $3,135 millones al 30 de junio de 2017 y de 2016, respectivamente. El Sistema ha emitido tres series de bonos de renta denominados "Bonos Prioritarios para Financiar Pensiones", el producto de los cuales se ha utilizado principalmente para aumentar los fondos actualmente disponibles para pagar las pensiones a ciertos beneficiarios y reducir el total de sus obligaciones actuariales no financiadas. Los Bonos son obligaciones limitadas del Sistema sin derecho a interponer recursos , que se pagan (y se garantizan) únicamente a partir de las aportaciones (según se define en la Resolución del SRE relativa a los Bonos) que los patronos pignoraron tras la fecha de emisión de la primera serie de Bonos y de fondos mantenidos en depósito en el Bank of New York Mellon (el Agente Fiscal). Los Bonos no se pagan de las aportaciones que los empleados participantes realizan al Sistema, ni de los activos adquiridos con el producto de los Bonos ni de las aportaciones de los patronos que el Agente Fiscal envía al Sistema tras satisfacer los requisitos de reservas, ni a partir de ningún otro de los activos del Sistema. Actualmente, los bonos tienen la calificación "C" de Moody's Investors Service y de "CC" de Standard & Poor's Ratings Services. Para información adicional referente a las obligaciones a largo plazo del Sistema, consulte la nota 10 a los estados financieros básicos. Para información adicional referente la suspensión de los pagos mensuales al fiduciario de los bonos del Sistema, consulte la nota 14 a los estados financieros básicos.

**Solicitudes de información**

Este informe financiero e tiene como objetivo brindar un panorama general de las finanzas del Sistema, cumplir con las leyes y normas relacionadas y demostrar el compromiso existente con la rendición pública de cuentas. Las preguntas con respecto a la información provista en este informe o las solicitudes de información adicional deberán remitirse a la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura del Estado Libre Asociado de Puerto Rico, Avenida José de Diego, Parada 22 Centro Gubernamental Minillas, Edificio Torre Norte, Piso 11, San Juan, Puerto Rico, 00940.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Estado de Posición Neta Fiduciaria
## 30 de junio de 2017

| | | Pensión | Beneficios de salud posteriores al empleo | Total |
|---|---|---|---|---|
| **Activos:** | | | | |
| Efectivo y equivalentes de efectivo: | | | | |
| Depósitos en bancos comerciales: | | | | |
| Sin restricciones | $ | 257,879 | — | 257,879 |
| Restringido | | 202,295 | — | 202,295 |
| Fondos del mercado monetario: Sin restricciones | | 2,340 | — | 2,340 |
| Restringido | | 13,279 | — | 13,279 |
| Letra del Tesoro de EE. UU. - restringido | | 909 | — | 909 |
| Total efectivo y equivalentes de efectivo | | 476,702 | — | 476,702 |
| Cuentas por cobrar netas: | | | | |
| Patronos: sin incluir previsión para cuentas incobrables de $1,029,739 | | 36,172 | — | 36,172 |
| A recibir del Sistema de Retiro para la Judicatura del | | 627 | — | 627 |
| Estado Libre Asociado de Puerto Rico | | | | |
| Inversiones vendidas | | 401 | — | 401 |
| Otros | | 17,259 | — | 17,259 |
| Total cuentas por cobrar, neto | | 54,459 | — | 54,459 |
| Garantías por transacciones de préstamo de títulos | | 7,359 | — | 7,359 |
| Inversiones: Bonos y pagarés | | 163,187 | — | 163,187 |
| Fondos de fideicomiso colectivos sin contraprestación | | 181,699 | — | 181,699 |
| Inversiones en sociedades limitadas | | 87,069 | — | 87,069 |
| Total de inversiones | | 431,955 | — | 431,955 |
| Préstamos a miembros e intereses por cobrar - neto | | 523,443 | — | 523,443 |
| Activos de capital - neto | | 9,902 | — | 9,902 |
| Otros activos | | 816 | — | 816 |
| Total activos | | 1,504,636 | — | 1,504,636 |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Estado de Posición Neta Fiduciaria
## 30 de junio de 2017

| | | Pensión | Beneficios de salud posteriores al empleo | Total |
|---|---|---|---|---|
| Pasivos: | | | | |
| Cuentas por pagar y pasivos acumulados | $ | 279,366 | — | 279,366 |
| Intereses a pagar sobre bonos | | 14,076 | — | 14,076 |
| Obligaciones por préstamo de títulos | | 7,359 | — | 7,359 |
| Adeudado al estado Libre Asociado de Puerto Rico | | 98,044 | — | 98,044 |
| Fondos de plica por préstamos hipotecarios y reserva de seguros de garantía para préstamos de miembros | | 11,018 | — | 11,018 |
| Gastos por inversiones acumulados | | 541 | — | 541 |
| Bonos por pagar | | 3,166,472 | — | 3,166,472 |
| Otros pasivos | | 36,613 | — | 36,613 |
| Obligaciones totales | | 3,613,489 | — | 3,613,489 |
| Contingencias (nota 13) | | — | — | — |
| Posición deficitaria neta sin restricciones | $ | (2,108,853) | — | (2,108,853) |

Véase notas adjuntas a los estados financieros básicos.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Estado de cambios en la posición fiduciaria neta
Ejercicio terminado el 30 de junio de 2017
(cifras en miles)

| | | Pensión | Beneficios de salud posteriores al empleo | Total |
|---|---|---|---|---|
| **Adiciones:** | | | | |
| Aportaciones: | | | | |
| Aportaciones de patronos: | | | | |
| Beneficios básicos, netos de previsión para aportaciones incobrables de $405,661 | $ | 726,911 | — | 726,911 |
| Beneficios especiales | | 194,626 | 91,280 | 285,906 |
| Aportaciones de los miembros | | 320,095 | — | 320,095 |
| Total aportaciones | | 1,241,632 | 91,280 | 1,332,912 |
| Ingresos por inversiones: | | | | |
| Depreciación neta en el valor razonable de las inversiones | | (7,856) | — | (7,856) |
| Pérdida por deterioro sobre depósitos en bancos gubernamentales (nota 6) | | (9,218) | — | (9,218) |
| Intereses | | 46,800 | — | 46,800 |
| Dividendos | | 253 | — | 253 |
| Menos gastos de inversión distintos de los préstamos de títulos | | (1,854) | — | (1,854) |
| Ingresos netos por inversiones, distintos a préstamos de títulos | | 28,125 | — | 28,125 |
| Ingresos por préstamo de títulos | | 30 | — | 30 |
| Ingresos netos por inversiones | | 28,155 | — | 28,155 |
| Otros ingresos | | 56,626 | — | 56,626 |
| Total adiciones | | 1,326,413 | 91,280 | 1,417,693 |
| **Deducciones:** | | | | |
| Beneficios pagados a los participantes: | | | | |
| Rentas vitalicias | | 1,320,005 | — | 1,320,005 |
| Beneficios especiales | | 194,626 | 91,280 | 285,906 |
| Beneficios por fallecimiento | | 10,064 | — | 10,064 |
| Reembolsos de aportaciones | | 35,229 | — | 35,229 |
| Intereses sobre bonos por pagar | | 198,084 | — | 198,084 |
| Aspectos generales y administrativos | | 24,358 | — | 24,358 |
| Otros gastos | | 387,015 | — | 387,015 |
| Total deducciones | | 2,169,381 | 91,280 | 2,260,661 |
| Disminución neta en la posición neta | | (842,968) | — | (842,968) |
| Posición neta (déficit): Principio de año | | (1,265,885) | — | (1,265,885) |
| Fin de año | $ | (2,108,853) | — | (2,108,853) |

Véase notas adjuntas a los estados financieros básicos.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

**(1) Organización**

El Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "Sistema") es un fideicomiso que la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico (la "Asamblea Legislativa") creó el 15 de mayo de 1951 de conformidad con la Ley núm. 447 (la "Ley núm. 447), según enmiendas, para pagar pensiones y otros beneficios a los empleados retirados del ELA y de sus empresas públicas y municipios. Antes de 23 de agosto de 2017, el Sistema administraba un plan de pensiones de múltiples patronos y reparto de costos (el "Plan de Pensiones"). El Sistema también administra los beneficios de cuido de salud post-empleo que el Estado Libre Asociado de Puerto Rico (el "ELA") brinda a los miembros retirados del plan (a través del programa de Aportaciones al Plan de Seguro Médico del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, o el programa "MIPC del SRE"), un plan no financiado y reparto de costos de múltiples patronos de otros beneficios definidos posteriores al empleo.

El Sistema es parte integral de los informes financieros elaborados por el ELA, y se consigna en sus estados financieros básicos como un fondo de fideicomiso de pensiones. El Sistema es un plan gubernamental de retiro, y en este sentido está excluido de las disposiciones de la Ley de Seguridad de los Ingresos de Retiro para los Empleados de 1974 (ERISA). Los ingresos ganados por el Sistema son exentos de los impuestos federales y de Puerto Rico.

De conformidad con la Ley núm. 447, hasta el 23 de agosto de 2017, el Sistema se gobernaba por una junta de fideicomisarios de 11 miembros (la " Junta de Fideicomisarios") conformada por los siguientes i) cuatro miembros de oficio (o a quienes ellos hubiesen designado): el Secretario de Hacienda del ELA, el Presidente del Banco Gubernamental de Fomento para Puerto Rico (BGF), el Comisionado de Asuntos Municipales y el Director de la Oficina de Recursos Humanos del ELA; ii) tres miembros designados por períodos de tres años por el Gobernador del ELA (el "Gobernador"), dos de ellos miembros del Sistema y otro del Sistema de Retiro para la Judicatura del Estado Libre Asociado de Puerto Rico (SRJ), cada uno con al menos diez años de servicio acreditado; iii) dos miembros tenían que ser pensionados del Sistema y el SRJ, respectivamente; iv) el Presidente de la Federación de Alcaldes, y v) el Presidente de la Asociación de Alcaldes. Al 30 de junio de 2017, el Sistema estaba bajo la dirección de la Junta de Fideicomisarios.

El 23 de agosto de 2017, la Ley núm. 106 de 2017 disolvió la Junta de Fideicomisarios y creó una nueva Junta de Retiro del Gobierno de Puerto Rico (la "Junta de Retiro") que se encarga de dirigir todos los sistemas de retiro del ELA, incluido el Sistema. La Junta de Retiro está compuesta por 13 miembros de i) los siguientes seis miembros de oficio (o a quienes ellos hubiesen designado): el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (FAFAA), el Secretario de Hacienda del ELA, el Director de la Oficina de Gerencia y Presupuesto, el Director de la Oficina de Administración y Transformación de los Recursos Humanos del Gobierno de Puerto Rico, el Presidente de la Federación de Alcaldes y el Presidente de la Asociación de Alcaldes; ii) tres representantes para los maestros provenientes del Departamento de Educación, las empresas públicas y la Judicatura, todos ellos designados por el Gobernador; y iii) otros cuatro representantes del interés público designados por el Gobernador. A la fecha de estos estados financieros, hay dos vacantes en la Junta de Retiro. Para obtener información adicional sobre la Ley núm. 106 de 2017, consulte la nota 14 a los estados financieros básicos.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Antes del 23 de agosto de 2017, el Sistema y el Sistema de Retiro para la Judicatura del Estado Libre Asociado de Puerto Rico (SRJ), también una unidad componente del ELA, eran administrados por la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico (la "Administración del SRE y del SRJ"). Durante el ejercicio terminado el 30 de junio de 2017, la Administración del SRE y del SRJ asignó el 97.93 % de sus gastos generales y administrativos al Sistema. La metodología utilizada para determinar la asignación de gastos se basa en el total de aportaciones del Sistema de los patronos y los empleados participantes, dividido por el total global combinado de las aportaciones al Sistema y al SRJ de los patronos y los empleados participantes.

**(2) Resumen de las políticas contables más importantes**

A continuación se describen las principales políticas contables utilizadas por el Sistema en la elaboración de sus estados financieros:

*(a) Fundamentos de la presentación*

Los estados financieros adjuntos han sido elaborados según el principio de lo devengado de conformidad con los principios de contabilidad generalmente aceptados de los Estados Unidos (los "GAAP", por sus siglas en inglés), según se apliquen a las organizaciones gubernamentales en virtud de los pronunciamientos de la Junta Gubernamental de Normas Contables (la "GASB", por sus siglas en inglés). Las aportaciones de los miembros al Plan se reconocen en el período en que vencen. Las aportaciones patronales se reconocen cuando vencen y el patrono tiene la obligación legal de realizarlas. Los beneficios y los reembolsos se reconocen cuando vencen y se vuelven exigibles.

*(b) Uso de estimaciones*

La elaboración de los estados financieros básicos de conformidad con los principios de contabilidad generalmente aceptados requiere que la gerencia haga importantes estimaciones y supuestos sobre la presentación de informes sobre los activos y los pasivos y con respecto al establecimiento de contingencias. Las estimaciones más importantes del Sistema guardan relación con el total de sus obligaciones por concepto de pago de pensiones, la proyección relativa a montos incobrables de los préstamos de miembros y las cuentas por cobrar, así como la valoración de ciertas inversiones. Debido a la naturaleza inherente de las estimaciones, los resultados reales podrían ser distintos.

*(c) Efectivo y equivalentes de efectivo*

Los equivalentes de efectivo incluyen todos los instrumentos de deuda con un elevado grado de liquidez, con vencimientos originales de tres meses o menos desde la fecha de adquisición, y constan de fondos del mercado monetario, bonos del Tesoro de los Estados Unidos y certificados de depósito en el BGF (una unidad componente del ELA) y en bancos comerciales. El dinero en efectivo restringido depositado en el BGF consiste en pagos de amortización recibidos de prestatarios de préstamos hipotecarios (cuentas de plica), cheques vencidos no reclamados por los miembros del plan restringidos a reembolsos, y sumas temporeras que deban transferirse al Bank of New York Mellon (fideicomisario) restringidas para cumplir con requisitos de amortización de deudas por bonos. Los fondos restringidos del mercado monetario consisten en fondos en poder del fideicomisario para mantener los fondos para la amortización de la deuda y los fondos de reserva para el pago de los bonos pagaderos del Sistema.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

### (d) Inversiones

Las inversiones se registran según su valor razonable. El valor razonable de las inversiones se basa en los precios ofertados, si están disponibles. El Sistema tiene inversiones en sociedades limitadas y en fondos de fideicomiso colectivo sin contraprestación por un valor aproximado de $87 millones y $182 millones respectivamente, al 30 de al 30 de junio de 2017. Ante la ausencia de valores razonables que puedan determinarse fácilmente, el valor razonable de las inversiones en las sociedades limitadas se ha estimado sobre la base de la información provista por los administradores de los fondos subyacentes. Los fondos del fideicomiso colectivo sin contraprestación se informan según su valor actual neto (VAN). El VAN incluye el valor de mercado de los títulos valores en el fondo, más cualesquiera cuentas por cobrar, cuentas por pagar y gastos acumulados del fondo.

Las compras y las ventas de valores se registran según la fecha de la transacción. Las ganancias y las pérdidas realizadas por la venta de títulos valores y los cambios no realizados en el valor razonable de los títulos valores en circulación se incluyen en la apreciación (depreciación) neta en el valor razonable de las inversiones. Las ganancias y las pérdidas realizadas se computan como la diferencia entre el producido de la venta y el costo de la inversión vendida, que se determina mediante el método de promedio de costos. Los ingresos por concepto de intereses se registran como ganados según el método de lo devengado. Los ingresos por dividendos se registran en la fecha ex-dividendo.

### (e) Préstamos a los miembros

Los préstamos hipotecarios, personales y para viajes culturales a los miembros del plan se registran como el saldo de capital pendiente menos una previsión por incobrabilidad. El monto máximo que se otorgó a los miembros del plan en préstamos hipotecarios fue de $100,000 y de $5,000 para préstamos personales y para viajes culturales.

A 30 de junio de 2017, el Sistema gestionó préstamos hipotecarios por un capital total de unos $161 millones, relacionados con ciertos préstamos hipotecarios vendidos a la Asociación Federal de Hipotecas Nacionales a una tasa de 0.25 %. El acuerdo de venta estipula que el Sistema debe recomprar los préstamos que tengan atrasos de más de 90 días.

### (f) Reserva de seguros de garantía para los préstamos a los miembros

Las primas cobradas y los beneficios reclamados se registran como adiciones y deducciones, respectivamente. La reserva de garantía por seguros de vida sobre los préstamos otorgados a los miembros del plan se revisa todos los años y se ajusta en función del monto anual más alto reclamado en un período de cinco años, incrementado según un porcentaje que establece la gerencia.

### (g) Activos de capital

Los activos de capital incluyen las edificaciones, las mejoras de estas, los muebles y los equipos. El Sistema define los activos de capital como aquellos activos con un costo inicial individual de $500 o más en la fecha de adquisición y una vida útil mínima de cuatro años. Los activos de capital se registran según sus costos históricos, o sus costos históricos estimados, en caso de que los costos históricos no estén disponibles. Los activos de capital donados se registran según su valor razonable estimado al momento de la donación.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Los activos de capital se deprecian según el método lineal a lo largo de la vida útil estimada del activo. No se registra ninguna depreciación por las obras de construcción en progreso. Las vidas útiles estimadas de los activos de capital son las siguientes:

|                                              | **Años** |
| -------------------------------------------- | -------- |
| Edificaciones                                | 50       |
| Mejoras a edificaciones                      | 10       |
| Equipos, muebles, accesorios y vehículos     | 5–10     |

#### (h) *Beneficios por despido*

El Sistema contabiliza los beneficios por despido de conformidad con la Declaración núm. 47 de la Junta Gubernamental de Normas Contables, *Registro de beneficios por despido*. De conformidad con lo dispuesto por la Declaración núm. 47 de la Junta Gubernamental de Normas Contables, el Sistema, como patrono, debe reconocer una obligación y un gasto por concepto de beneficios por despido voluntario (por ejemplo, los incentivos por retiro anticipado) cuando la oferta es aceptada y el monto puede estimarse. Debe reconocerse una obligación y un gasto por concepto de beneficios por despido involuntario (por ejemplo, beneficios por mesada) cuando las personas autorizadas para obligar al Gobierno a regirse por el plan lo han aprobado, cuando el plan ha sido comunicado a los empleados y cuando el monto puede estimarse.

#### (i) *Pronunciamientos contables recientes*

Se han publicado las siguientes normas contables nuevas, si bien no estuvieron en vigor durante el año fiscal terminado el 30 de junio de 2017.

- Declaración de la Junta Gubernamental de Normas Contables núm. 75, *Elaboración de informes contables y financieros sobre beneficios posteriores al empleo diferentes de pensiones (y determinadas cuestiones relacionadas con la elaboración de informes de otros beneficios posteriores al empleo, u "OBPE")*. Esta declaración reemplaza las Declaraciones núm. 45, *Elaboración de informes contables y financieros por los patronos sobre beneficios posteriores al empleo diferentes de pensiones*, con sus modificaciones, y núm. 57, *Medidas OBPE por planes para patronos de agentes y patronos múltiples de agentes en relación con OBPE*. Dicha declaración establece nuevos requisitos de elaboración de informes contables y financieros relativos a los planes OBPE. Las disposiciones de esta declaración entraron en vigor en el año fiscal que comienza el 15 de junio de 2017. El Sistema está evaluando el impacto de esta nueva declaración.

- Declaración GASB núm. 82, *Cuestiones sobre pensiones: una enmienda a las Declaraciones GASB núms. 67, 68 y 73*. Esta Declaración se aboca a ciertas cuestiones que se han planteado respecto de las Declaraciones GASB núms. 67, 68 y 73. Esta Declaración está concebida para mejorar la coherencia en la aplicación de las normas sobre pensiones al aclarar o enmendar ámbitos relacionados de orientación existente. En particular, esta Declaración trata sobre cuestiones relacionadas con 1) la presentación de medidas relacionadas con las nóminas en la información suplementaria obligatoria, 2) la selección de supuestos y el tratamiento de las desviaciones respecto de la orientación en las Normas Actuariales de Práctica para la elaboración de informes financieros, y 3) la clasificación de los pagos realizados por los patronos para cumplir los requisitos de aportaciones para los empleados miembros del plan. Antes de la emisión del esta Declaración, las Declaraciones GASB núms. 67 y 68 exigían la presentación de la nómina de empleados cubiertos, a saber,

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

la nómina de empleados que reciben pensiones a través del plan de pensiones, así como las ratios que utilizan esa medida, en anexos de información suplementaria obligatoria. Esta Declaración modifica las Declaraciones GASB núms. 67 y 68, en el sentido de que requiere la presentación de una nómina cubierta, definida como la nómina en que se basan las aportaciones a un plan de pensiones, y las ratios que utilizan esa medida. La Declaración aclara que una desviación (de la manera que se utiliza el término en las Normas Actuariales de Práctica emitidas por la Junta de Normas Actuariales) con respecto a la orientación en una Norma Actuarial de Práctica no se considera que cumpla con los requisitos de las Declaraciones GASB núms. 67, 68 o 73 a los efectos de la selección de los supuestos que se utilizan para determinar el total de la obligación por pago de pensiones y las medidas relacionadas. Esta Declaración aclara que los pagos que realiza un patrono para cumplir con los requisitos de aportaciones que las condiciones del plan de pensiones definen como las obligaciones de aportación de los miembros del plan deben clasificarse como aportaciones de los miembros del plan a los efectos de la Declaración GASB núm. 67 y como aportaciones de empleados a los efectos de la Declaración GASB núm. 68. También requiere que los gastos y desembolsos de un patrono por dichos montos se reconozcan en el período al cual se imputa la aportación y se clasifiquen de la misma manera que el patrono clasifica las compensaciones similares distintas a las pensiones (por ejemplo, como salarios y sueldos o como beneficios marginales). Los requisitos de esta Declaración entran en vigor en relación con los ejercicios contables que comienzan el 15 de junio de 2016, a excepción de aquellos de sus requisitos referidos a la selección de supuestos cuando la obligación de un patrono por el pago de pensiones se mide a partir de una fecha distinta a la fecha de finalización de su año fiscal más reciente. En esas circunstancias, los requisitos para la selección de supuestos son aplicables a ese patrono en el primer ejercicio contable en que la fecha de determinación de la obligación por pago de pensiones sea el 15 de junio de 2017 o una fecha posterior. El Sistema ya está en cumplimiento de los requisitos contenidos en esta declaración, salvo las enmiendas que guardan relación con la selección de supuestos arriba mencionada, en relación con la cual el Sistema está evaluando las repercusiones de este nuevo requisito.

- Declaración GASB núm. 85, *Omnibus 2017*. El objetivo de esta Declaración consiste en abordar ciertas cuestiones relacionadas con las prácticas que se han constatado durante la aplicación y ejecución de determinadas Declaraciones GASB. Esta Declaración trata sobre una variedad de temas, incluidas cuestiones relacionadas con la combinación de las unidades constitutivas, fondo de comercio, la medición y aplicación del valor razonable y los beneficios posteriores al empleo (pensiones y otros beneficios posteriores al empleo, u OBPE). Las disposiciones de esta Declaración surtirán efectos en relación con estados financieros correspondientes a años fiscales que comiencen a partir del 15 de junio de 2017. El Sistema está evaluando el impacto de esta nueva declaración.

- Declaración GASB núm. 87, *Arrendamientos*. El objetivo de esta Declaración consiste en satisfacer con mayor eficacia las necesidades de información que tengan los usuarios de los estados financieros al mejorar la elaboración de informes contables y financieros de los Gobiernos en lo referido a sus arrendamientos. Esta declaración aumenta la utilidad de los estados financieros de los Gobiernos al exigirles que reconozcan determinados derechos y obligaciones por arrendamientos que anteriormente se clasificaban como arrendamientos operativos y se reconocían como entradas o salidas de recursos en función de las disposiciones de pago en el contrato. Establece un modelo único para contabilizar los arrendamientos sobre el principio fundamental de que un arrendamiento es el financiamiento del derecho de utilizar el activo en cuestión. De conformidad con esta Declaración, el arrendatario debe reconocer una obligación por el arrendamiento y un derecho intangible a utilizar el activo arrendado, y el arrendador debe reconocer un arrendamiento por cobrar y un ingreso diferido de recursos, lo que mejora la pertinencia y la coherencia de la información sobre las actividades de arrendamiento de los Gobiernos. Las disposiciones de esta Declaración surtirán efectos en relación con estados financieros correspondientes a años fiscales que comiencen a partir del 15 de diciembre de 2019. El Sistema está evaluando el impacto de esta nueva declaración.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

- Declaración GASB núm. 88, *Determinadas divulgaciones relacionadas con el endeudamiento, incluidos los préstamos directos y las colocaciones directas.* El principal objetivo de esta Declaración es mejorar la información que se consigna en las notas a los estados financieros gubernamentales con relación al endeudamiento, incluidos los préstamos directos y las colocaciones directas. También aclara qué obligaciones deben incluir los Gobiernos en la información que publican sobre su endeudamiento. A los efectos de la información que se consigna en las notas a los estados financieros, la Declaración define el endeudamiento como una responsabilidad que surge de una obligación contractual de pagar dinero en efectivo (u otros activos que puedan utilizarse en su lugar) en una o más cuotas para liquidar monto que se fija en la fecha en que se asume la obligación contractual. Esta Declaración requiere que en las notas a los estados financieros se revele información adicional esencial vinculada con la deuda, entre otras cosas, las líneas de crédito no utilizadas; los activos pignorados como garantía por la deuda; y las condiciones establecidas en los acuerdos de deuda con relación a hechos de incumplimiento grave que tengan consecuencias financieras, hechos graves que motiven la rescisión y que tengan consecuencias financieras, y las principales cláusulas de aceleración subjetiva. En cuanto a las notas a los estados financieros que se relacionan con las deudas, esta Declaración también requiere que se brinde la información existente e información adicional sobre los préstamos directos y las colocaciones de deuda directas de forma separada de otras deudas. Las disposiciones de esta Declaración surtirán efectos en relación con estados financieros correspondientes a años fiscales que comiencen a partir del 15 de junio de 2018. El Sistema está evaluando el impacto de esta nueva declaración.

**(3) Incertidumbre de la empresa en marcha**

A 30 de junio de 2017, el Sistema estaba gravemente desfinanciado, con una obligación neta por pago de pensiones de unos $32,201 millones y con un déficit en la posición fiduciaria neta de unos $2,109 millones. Como consecuencia de los desafíos de carácter fiscal y económico, el 3 de mayo de 2017 la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), a instancias del Gobernador, inició un caso de Título III del ELA al presentar una petición de remedio conforme al Título III de la Ley de Supervisión y Administración Financiera para Puerto Rico (PROMESA) ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal del Título III"). Al iniciar el caso de Título III, el ELA pudo asegurar la prestación de servicios esenciales a la ciudadanía, el pago de las obligaciones de nómina del Gobierno y el pago a los proveedores esenciales.

El 21 de mayo de 2017, la Junta de Supervisión, a solicitud del Gobernador, inició igualmente ante el Tribunal del Título III un caso de Título III en nombre del Sistema presentando una solicitud de remedio. El 15 de junio de 2017, el Fideicomisario de los Estados Unidos designó un Comité Oficial de Empleados Retirados en el marco del caso de Título III del ELA.

Como se describe con más detalle en la nota 14.a los estados financieros básicos, en julio de 2017 el Sistema vendió inversiones por un monto total de unos $297 millones, y transfirió unos $190 millones del producido neto al Departamento de Hacienda, conforme a lo requerido por la Resolución conjunta 188.

*Conclusión de la gerencia con respecto a las perspectivas de continuar funcionando*

Debido a las dificultades fiscales y financieras que tanto el ELA como el Sistema han enfrentado, la gerencia considera que existen dudas serias sobre la capacidad de Sistema de continuar funcionando.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*Plan de remediación de la gerencia*

El 27 de junio de 2017, el Departamento de Hacienda emitió la Carta Circular núm. 1300-46-17 para comunicar a los organismos del Gobierno central del ELA, las empresas públicas y los municipios los nuevos procedimientos de ejecución para adoptar, a partir del 1 de julio de 2017, un nuevo mecanismo PayGo para el pago de pensiones. Posteriormente, el 23 de agosto de 2017, el Gobernador autorizó la aprobación de la Ley núm. 106 de 2017, que estableció legalmente el mecanismo PayGo para el pago de los beneficios acumulados de pensiones por el ELA y reformó el Sistema para que los participantes activos pudieran depositar sus aportaciones individuales en un nuevo Plan de Aportaciones Definidas, entre otros cambios importantes. Para información adicional sobre el mecanismo PayGo y la Ley núm. 106 de 2017, consultar la nota 14 a los estados financieros básicos.

La Ley núm. 106 de 2017 también paralizó el programa de préstamos del Sistema, y busca reducir los gastos generales y administrativos, principalmente no reemplazando a los empleados que se retiran al alcanzar la edad de jubilación y reduciendo los contratos por servicios profesionales.

**(4) Descripción del plan**

*Beneficios de pensiones*

Con anterioridad al 23 de agosto de 2017, el Sistema administraba distintas estructuras de beneficios de conformidad con la Ley núm. 447 (con sus modificaciones), entre otras, un programa de reparto de costos y patronos múltiples con beneficios definidos, un programa de aportaciones definidas (el programa "Sistema 2000") y un programa híbrido de aportaciones. Los beneficios otorgados varían en función de la fecha de contratación del miembro. Prácticamente la totalidad de los empleados a tiempo completo del ELA y sus instrumentalidades (73 organismos del ELA, 78 municipios y 55 empresas públicas, incluido el Sistema) están afiliados en el Sistema. Todos los empleados regulares, designados y temporeros del ELA tienen la obligación de ingresar al Sistema al momento de la contratación. El Gobernador y los secretarios del ELA, así como los directores de las empresas públicas y las instrumentalidades del Gobierno, entre otros, pueden optar por no ingresar al Sistema.

A 1 de julio de 2016, los integrantes del Sistema eran:

| | |
|---|---:|
| Retirados y beneficiarios que actualmente reciben beneficios | 108,035 |
| Empleados participantes actuales - beneficio definido | 53,832 |
| Empleados participantes actuales - Sistema 2000 y Ley núm. 3 | 64,825 |
| Miembros discapacitados que reciben beneficios | 14,722 |
| Total de miembros | 241,414 |

El ELA establece por ley los beneficios provistos a los miembros del Sistema, y únicamente la Asamblea Legislativa, previa aprobación del Gobernador, puede modificarlos. La Ley núm. 3, junto con otros recientes cambios a nivel de diseño y financiamiento, introdujo profundas reformas en el Sistema. El presente resumen detalla las disposiciones de la Ley núm. 3.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Ciertas disposiciones son distintas para los tres grupos de miembros que ingresaron al sistema antes del 1 de julio de 2013, a saber:

- Los miembros conforme a la Ley núm. 447 en general son los contratados antes del 1 de abril de 1990 (programa de aportaciones de beneficios definidos).

- Los miembros conforme a la Ley núm. 1 en general son los contratados entre el 1 de abril de 1990 y el 31 de diciembre de 1999 (programa de aportaciones de beneficios definidos).

- Los miembros conforme a la Ley núm. 305 (o "Sistema de 2000") en general son los contratados entre el 1 de enero de 2000 y el 30 de junio de 2013 (programa de aportaciones definidas).

Los empleados regulares contratados por primera vez el 1 de julio de 2013 o después de esa fecha, y los exempleados que participaron en el programa de beneficios definidos y en el programa Sistema 2000 que fueron recontratados en 1 de julio de 2013 o después de esa fecha, pasaron a ser miembros del Programa Híbrido de Aportaciones como requisito de su relación laboral. Además, los empleados que al 30 de junio de 2013 estaban participando en programas anteriores pasaron a ser miembros de Programa Híbrido de Aportaciones el 1 de julio de 2013.

Todos los miembros tienen un derecho irrenunciable al valor de su cuenta. Los miembros disponen de tres opciones para invertir sus aportaciones. Los ingresos por inversiones se abonan semestralmente a la cuenta del miembro. En ELA no garantiza el pago de beneficios a la fecha de retiro.

El Sistema combina e invierte los activos del programa de beneficios definidos, el programa de aportaciones definidas y el Programa Híbrido de Aportaciones.

El presente resumen de las disposiciones del plan de pensiones del Sistema pretende describir las características esenciales del plan con anterioridad a la aprobación de la Ley 106 de 2017. Todos los requisitos para participar y los montos de los beneficios se determinarán en estricto cumplimiento con la documentación aplicable del plan.

*(a) Retiros según el servicio*

(1) *Derechos de los miembros amparados en la Ley núm. 447.* Los miembros amparados en la Ley núm. 447 con derecho a retirarse el 30 de junio de 2013 conservarán su derecho a retirarse en cualquier momento. Antes del 1 de julio de 2013, los miembros amparados en la Ley núm. 447 podían retirarse 1) con 55 años de edad y 25 años de servicio acreditado; 2) con 58 años de edad y 10 años de servicio acreditado; 3) con cualquier edad y 30 años de servicio acreditado; 4) para los empleados públicos en cargos de alto riesgo (miembros del cuerpo de policía y de bomberos del ELA, miembros del cuerpo de policía y de bomberos a nivel municipal y miembros de la oficina de custodia), 50 años de edad y 25 años de servicio acreditado, y 5) para los alcaldes de los municipios, 50 años de edad y 8 años de servicios acreditados como alcalde. Además, los miembros amparados en la Ley núm. 447 que llegaron a 30 años de servicio acreditado a 31 de diciembre de 2013 pueden retirarse en cualquier momento.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Los miembros amparados en la Ley núm. 447 que no tengan derecho a retirarse al 30 de junio de 2013 y que no alcanzaron los 30 años de servicio acreditado a 31 de diciembre de 2013 tienen derecho a retirarse una vez alcancen la edad exigida para el retiro que se indica en el cuadro a continuación, con 10 años de servicio acreditado.

| Fecha de nacimiento | Edad cumplida al 30 de junio de 2013 | Edad habilitada para el retiro |
|---|---|---|
| 1 de julio de 1957 o posterior | 55 o menos | 61 |
| 1 de julio de 1956 al 30 de junio de 1957 | 56 | 60 |
| Antes del 1 de julio de 1956 | 57 y más | 59 |

Además de los requisitos en el cuadro anterior, la Ley núm. 447 establece que los funcionarios públicos en cargos de alto riesgo que no tuvieran derecho a retirarse el 30 de junio de 2013 y que no llegaran a los 30 años de servicio acreditado a 31 de diciembre de 2013 tienen derecho a retirarse directamente del servicio activo al llegar a la edad de 55 años con 30 años de servicio acreditado.

(2)  *Derechos de los miembros amparados en la Ley núm. 1.* Los miembros amparados en la Ley núm. 1 con derecho a retirarse el 30 de junio de 2013 conservarán su derecho a retirarse en cualquier momento. Antes del 1 de julio de 2013, los miembros amparados en la Ley núm. 1 podían retirarse 1) con 55 años de edad y 25 años de servicio acreditado; 2) con 65 años de edad y 10 años de servicio acreditado; 3) para los empleados públicos en cargos de alto riesgo cualquier edad con 30 años de servicio acreditado, y 4) para los alcaldes de los municipios, 50 años de edad y 8 años de servicios acreditados como alcalde.

Los miembros amparados en la Ley núm. 1 que al 30 de junio de 2013 no tuvieran derecho a retirarse podrán hacerlo al alcanzar los 65 años de edad y 10 años de servicio acreditado. Además, los funcionarios públicos amparados en la Ley núm. 1 en cargos de alto riesgo que no tuvieran derecho a retirarse el 30 de junio de 2013 tienen derecho a retirarse directamente del servicio activo al llegar a la edad de 55 años con 30 años de servicio acreditado.

(3)  *Derechos para los miembros del Sistema 2000.* Los miembros de Sistema 2000 con derecho a retirarse el 30 de junio de 2013 conservarán su derecho a retirarse en cualquier momento. Antes del 1 de julio de 2013, los miembros de Sistema 2000 podían retirarse al alcanzar los 55 años de edad en el caso de los funcionarios públicos en cargos de alto riesgo, y los 60 en otros casos.

26                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Los miembros del Sistema 2000 que al 30 de junio de 2013 no cumplían los requisitos para retirarse podrán hacerlo al alcanzar los 55 años de edad para los funcionarios públicos en cargos de alto riesgo, y en otros casos, al alcanzar la edad de retiro que se indica en el cuadro a continuación.

| Fecha de nacimiento | Edad cumplida al 30 de junio de 2013 | Edad habilitada para el retiro |
|---|---|---|
| 1 de julio de 1957 o posterior | 55 o menos | 65 |
| 1 de julio de 1956 al 30 de junio de 1957 | 56 | 64 |
| 1 de julio de 1955 al 30 de junio de 1956 | 57 | 63 |
| 1 de julio de 1954 al 30 de junio de 1955 | 58 | 62 |
| Antes del 1 de julio de 1954 | 59 y más | 61 |

(4)  *Requisitos para los miembros contratados después del 30 de junio de 2013.* Haber alcanzado los 58 años de edad para los funcionarios públicos en cargos de alto riesgo, y los 67 años para otros casos.

**(b)  *Beneficios de la renta vitalicia por retiro***

Las rentas vitalicias se pagan durante la vida del miembro y equivalen al valor anualizado del saldo en la Cuenta Híbrida de Aportaciones Definidas al momento del retiro, más (para los miembros al amparo de la Ley núm. 447 y la Ley núm. 1) el beneficio acumulado que se determine al 30 de junio de 2013. Si el saldo en la Cuenta Híbrida de Aportaciones Definidas no supera los $10,000, se pagará como pago global en lugar de como renta vitalicia. En el caso de los participantes en el Sistema 2000, dicho beneficio de la renta vitalicia por retiro no está disponible.

(1)  *Beneficios acumulados al 30 de junio de 2013 para los miembros amparados en la Ley núm. 447.* El beneficio acumulado al 30 de junio de 2013 se determinará sobre la base de la remuneración promedio para los miembros amparados en la Ley núm. 447, los años de servicio acreditado y la edad que el miembro haya alcanzado al 30 de junio de 2013. En el caso de los alcaldes amparados en la Ley núm. 447, la remuneración más alta como alcalde se determina al 30 de junio de 2013.

Si el miembro amparado en la Ley núm. 447 tiene un mínimo de 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivaldrá al 65% de la remuneración promedio si el miembro tenía menos de 55 años al 30 de junio de 2013, o al 75% de la remuneración promedio si tenía como mínimo 55 años para esa fecha. Para los participantes que opten por coordinar con los servicios de seguro social (el "Plan de Coordinación"), el beneficio se recalcula en la Edad de Retiro de Seguro Social, según se defina, como un 1.5% de la remuneración promedio hasta $6,600, multiplicado por los años de servicio acreditado hasta 30 años, más el 65% (el 75% si el miembro tenía como mínimo 55 años al 30 de junio de 2013) de la remuneración promedio que exceda los $6,600.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Si el miembro amparado en la Ley núm. 447 tiene menos de 30 años de servicio acreditado al 30 de junio de 2013, y alcanza los 30 años de servicio acreditado a 31 de diciembre de 2013, el beneficio acumulado equivaldrá al 55% de la remuneración promedio si el miembro tenía menos de 55 años al 30 de junio de 2013, o al 60% de la remuneración promedio si tenía como mínimo 55 años para esa fecha. Para los participantes que opten por el Plan de Coordinación, el beneficio se recalcula en la Edad de Retiro de Seguro Social como un 1.5% de la remuneración promedio hasta $6,600, multiplicado por los años de servicio acreditado hasta 30 años, más el 55% (el 60% si el miembro tenía como mínimo 55 años al 30 de junio de 2013) de la remuneración promedio que exceda los $6,600. Las aportaciones de los miembros amparados en la Ley núm. 447 que tengan derecho a este beneficio transitorio durante el período comprendido entre el 1 de julio de 2013 y la fecha en que se alcancen los 30 de servicio acreditado se considerarán aportaciones previas al 1 de julio de 2013; las aportaciones a la Cuenta Híbrida de Aportaciones Definidas comienzan luego de que el miembro alcance los 30 años de servicio acreditado.

Si el miembro amparado en la Ley núm. 447 tenía menos de 30 años de servicio acreditado a 31 de diciembre de 2013, el beneficio acumulado equivaldrá a un 1.5% de la remuneración promedio multiplicada por los años de servicio acreditado hasta 20 años, más un 2% de la remuneración promedio multiplicada por los años de servicio acreditado que excedan los 20 años. El beneficio máximo es el 75% de la remuneración promedio. A excepción de los policías y bomberos del ELA, el beneficio se reduce de manera actuarial por cada año que comiencen a realizarse pagos antes de la edad de 58 años. Para los participantes que opten por el Plan de Coordinación, el beneficio básico se recalcula en la Edad de Retiro de Seguro Social como un 1% de la remuneración promedio hasta $6,600, multiplicado por los años de servicio acreditado hasta 20 años, más un 1.5% de la remuneración promedio hasta $6,600, multiplicada por los años de servicio acreditado que excedan los 20 años, más un 1.5% de la remuneración promedio que exceda los $6,600, multiplicada por los años de servicio acreditado hasta 20 años, más un 2% de la remuneración promedio que exceda los $6,600, multiplicada por los años de servicio acreditado que excedan los 20 años. A excepción de los policías y bomberos, el beneficio se reduce de manera actuarial por cada año que comiencen a realizarse pagos antes de la edad de 58 años.

En el caso de los alcaldes amparados en la Ley núm. 447 con un mínimo de 8 años de servicio acreditado como alcalde, el beneficio acumulado no será inferior al 5% de la remuneración más alta que haya recibido como alcalde por cada año de servicio acreditado hasta 10 años, más un 1.5% de la remuneración más alta como alcalde por cada año de servicio acreditado en funciones distintas a la de alcalde hasta un máximo de 20 años, más un 2% de la remuneración más alta como alcalde por cada año de servicio acreditado que exceda los 20 años en funciones distintas a la de alcalde. El servicio acreditado en funciones distintas a la de alcalde incluye los servicios acreditados como alcalde que excedan los 10 años. El beneficio máximo es el 90% de la remuneración más alta como alcalde.

(2) *Beneficios acumulados al 30 de junio de 2013 para los miembros amparados en la Ley núm. 1.* El beneficio acumulado al 30 de junio de 2013 se determinará sobre la base de la remuneración promedio para los miembros amparados en la Ley núm. 1, los años de servicio acreditado y la edad que el miembro haya alcanzado al 30 de junio de 2013. En el caso de los alcaldes amparados en la Ley núm. 1, la remuneración más alta como alcalde se determina al 30 de junio de 2013.

Si el miembro amparado en la Ley núm. 1 es un oficial de policía o un bombero con un mínimo de 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivaldrá al 65% de la remuneración promedio si el miembro tenía menos de 55 años al 30 de junio de 2013, o al 75% de la remuneración promedio si tenía como mínimo 55 años para esa fecha.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Para todos los demás miembros amparados en la Ley núm. 1, el beneficio acumulado equivaldrá a 1.5% de la remuneración promedio multiplicada por los años de servicio acreditado. El beneficio se reduce de manera actuarial por cada año que comiencen a realizarse pagos antes de la edad de 65 años.

En el caso de los alcaldes amparados en la Ley núm. 1 con un mínimo de 8 años de servicio acreditado como alcalde, el beneficio acumulado no será inferior al 5% de la remuneración más alta que haya recibido como alcalde por cada año de servicio acreditado hasta 10 años, más un 1.5% de la remuneración más alta como alcalde por cada año de servicio acreditado en funciones distintas a la de alcalde hasta un máximo de 20 años, más un 2% de la remuneración más alta como alcalde por cada año de servicio acreditado que exceda los 20 años en funciones distintas a la de alcalde. El servicio acreditado en funciones distintas a la de alcalde incluye los servicios acreditados como alcalde que excedan los 10 años. El beneficio máximo es el 90% de la remuneración más alta como alcalde.

*(c) Retiro obligatorio*

Todos los funcionarios públicos amparados en la Ley núm. 447 y la Ley núm. 1 que ocupen cargos de alto riesgo deberán retirarse al alcanzar la edad de 58 años y 30 años de servicio acreditado. El miembro podrá solicitar una prórroga de dos años al Superintendente de la Policía de Puerto Rico, al Jefe del Cuerpo de Bomberos o a la autoridad de supervisión que corresponda.

*(d) Beneficios por despido*

*(1) Retiro del pago global*

**Miembros habilitados.** Los Miembros podrán retirar la suma total si dejan su cargo antes de haber cumplido 5 años de servicio o si el saldo en la Cuenta Híbrida de Aportaciones Definidas no supera los $10,000.

**Beneficio.** El beneficio equivale a un pago global del saldo en la Cuenta Híbrida de Aportaciones Definidas a la fecha de la separación definitiva del servicio.

*(2) Retiro diferido*

**Miembros habilitados.** El miembro podrá acceder al beneficio al terminar su etapa de trabajo con 5 o más años de servicio (10 años de servicio acreditado en el caso de los miembros amparados por la Ley núm. 447 y la Ley núm. 1) antes de alcanzar la edad necesaria para retirarse, siempre y cuando no haya retirado un pago global de las aportaciones acumuladas y de la Cuenta Híbrida de Aportaciones Definidas.

**Beneficio.** Se pagará una renta vitalicia durante la vida del miembro a partir de la edad de retiro habilitada que corresponda, equivalente al valor anualizado del saldo en la Cuenta Híbrida de Aportaciones Definidas al momento del retiro, más (en el caso de los miembros amparados en la Ley núm. 447 y la Ley núm. 1) el beneficio acumulado que se determine al 30 de junio de 2013.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*(e) Beneficios por fallecimiento*

*(1) Beneficios por fallecimiento anterior al retiro*

**Miembros habilitados**. Cualquier miembro actual no retirado tiene derecho a recibir el beneficio.

**Beneficio**. Un reembolso de la Cuenta Híbrida de Aportaciones Definidas, más las aportaciones acumuladas para los miembros amparados por la Ley núm. 447 y la Ley núm. 1.

*(2) Beneficio por fallecimiento en situaciones de alto riesgo al amparo de la Ley núm. 127 de 1958, en su versión modificada (la "Ley núm. 127").*

**Miembros habilitados**. Los efectivos de la policía, los bomberos y otros empleados que ocupen determinados cargos de alto riesgo y fallezcan en el desarrollo de su tarea debido a los motivos establecidos en la Ley núm. 127.

**Beneficio para el cónyuge**. Un 50% de la remuneración del participante a la fecha de su fallecimiento, que se pagará como renta vitalicia hasta que el cónyuge fallezca o vuelva a casarse.

**Beneficio para los hijos**. Un 50% de la remuneración del participante a la fecha de su fallecimiento, que se pagará como renta vitalicia y se distribuirá de forma prorrateada entre todos los hijos con derecho a recibirlo. La renta vitalicia se pagará de por vida en el caso de los hijos con discapacidades, hasta los 18 años para los hijos sin discapacidades que no estén estudiando, y hasta los 25 años para los hijos sin discapacidades que estén estudiando.

**Beneficios en ausencia de cónyuge o hijos**. Los padres del miembro recibirán cada uno un 50% de la remuneración del participante a la fecha de su fallecimiento, que se pagará de por vida como renta vitalicia.

**Aumentos posteriores al fallecimiento**. A partir del 1 de julio de 1996, y más adelante cada tres años, los beneficios por fallecimiento descritos anteriormente tienen un aumento de un 3%, siempre y cuando los beneficiarios hubieran estado recibiendo pagos por un mínimo de tres años.

El costo de los beneficios se paga a partir del Fondo General del ELA.

*(3) Beneficios por fallecimiento posteriores al retiro para los miembros retirados antes del 1 de julio de 2013*

**Miembros habilitados**. Cualquier miembro retirado o discapacitado que reciba un beneficio mensual, que no haya elegido una pensión por supervivencia y cuyos beneficios hayan comenzado antes del 1 de julio de 2013.

**Beneficio**. El beneficio será como se indica a continuación (Ley núm. 105 de 1969, en su versión modificada por la Ley núm. 158 de 2003, y sección 2-113 de la Ley 447 de 1951, en su versión modificada por la Ley 524 de 2004):

(i)   En el caso de las personas casadas o con hijos dependientes al momento del fallecimiento, el ingreso anual para la viuda, el viudo o los hijos dependientes equivaldrá al 60% (50% para los afiliados al Plan de Coordinación; 30% antes del 1 de enero de 2004) del beneficio por retiro, que se pagará de por vida al cónyuge superviviente o a los hijos discapacitados, y hasta los 18 años (o los 25 en el caso de quienes estén cursando estudios) en el caso de los hijos no discapacitados. En caso de estar afiliado al Plan de Coordinación, el beneficio para el cónyuge superviviente no comenzará hasta que cumpla 60 años, y el cónyuge superviviente deberá haber estado casado con el miembro como mínimo diez años para tener derecho a recibirlo. El porcentaje se incrementará desde el

30                                                                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

30% hasta el 50% si el Plan de Coordinación es financiado desde el Fondo General del ELA para los exfuncionarios gubernamentales, o por las empresas públicas o los municipios para sus exempleados, conforme a lo dispuesto en la Ley 105 de 1969, en su versión modificada por la Ley 158 de 2003.

(ii) Cuando no exista la relación descrita arriba, el beneficio equivaldrá al saldo remanente de las aportaciones acumuladas al momento del retiro tras deducir los ingresos anuales vitalicios pagados, y se pagará a un beneficiario o acrecentará la masa sucesoria del miembro. Bajo ninguna circunstancia el beneficio podrá ser inferior a los $1,000. El Fondo General del ELA (en el caso de exempleados gubernamentales) o bien la empresa pública o municipio que corresponda (para sus exempleados) pagará la diferencia de hasta $250 entre 1) las aportaciones acumuladas, menos los ingresos anuales vitalicios pagados, y 2) $1,000. El Sistema pagará el resto, conforme a lo dispuesto en la sección 2-113 de la Ley 447 de 1951, en su versión modificada por la Ley 524 de 2004.

*(4) Beneficios por fallecimiento posteriores al retiro para los miembros retirados después del 30 de junio de 2013*

**Miembros habilitados.** Cualquier miembro retirado discapacitado que haya comenzado a recibir un beneficio mensual después del 30 de junio de 2013.

**Beneficio.** Si al momento del retiro el miembro optó por transferir una parte de la renta vitalicia a un beneficiario seleccionando una opción de forma de pago equivalente desde el punto de vista actuarial, el beneficio será el beneficio para el superviviente que se haya seleccionado.

Para todos los miembros, el excedente, de haberlo, de la Cuenta Híbrida de Aportaciones Definidas, más las aportaciones acumuladas para los miembros amparados en la Ley núm. 447 y la Ley núm. 1 al momento del retiro con respecto al total de pagos de rentas vitalicias recibidos por el miembro y cualquier beneficiario según los términos de la forma de pago opcional, deberá pagarse al beneficiario o acrecentar la masa sucesoria del miembro.

*(5)* Los beneficiarios que estén recibiendo beneficios por fallecimiento en el desempeño de su labor al 30 de junio de 2013 continuarán teniendo derecho a recibir dichos beneficios.

*(f)* **Beneficios por discapacidad**

*(1) Discapacidad*

**Miembros habilitados.** Todos los miembros tienen derecho a recibir los beneficios cuando sufren una discapacidad.

**Beneficio.** El saldo de la Cuenta Híbrida de Aportaciones Definidas como un pago global, una renta vitalicia inmediata o una renta vitalicia diferida, según lo elija el participante. Los miembros amparados en la Ley núm. 447 y la Ley núm. 1 seguirán teniendo derecho a recibir el beneficio acumulado al 30 de junio de 2013, comenzando a partir de la edad de retiro habilitada que corresponda.

*(2) Discapacidad por tareas de alto riesgo al amparo de la Ley núm. 127*

**Miembros habilitados.** Los efectivos de la policía, los bomberos y otros empleados que ocupen determinados cargos de alto riesgo y que queden discapacitados en el desarrollo de sus tareas debido a los motivos establecidos en la Ley núm. 127 de 1958, con sus modificaciones.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*Beneficio*. Un 80% (100% para los miembros amparados en la Ley núm. 447) de la remuneración a la fecha de la discapacidad, que se pagará como una renta vitalicia. Si el miembro fallece mientras está discapacitado, la renta se seguirá pagando a sus beneficiarios. Los beneficiarios incluyen el cónyuge superviviente o sus hijos discapacitados (de por vida), los hijos no discapacitados hasta los 18 años (25 si están cursando estudios) y los padres si no hay otros beneficiarios. A partir del 1 de julio de 1996, y más adelante cada tres años, el beneficio por discapacidad tiene un aumento de un 3%, siempre y cuando el miembro (o el beneficiario) hubieran estado recibiendo pagos por un mínimo de tres años (Ley núm. 127 de 1958, con sus modificaciones). El costo de los beneficios se paga a partir del Fondo General del ELA.

(3) Los miembros que cumplan con los requisitos para recibir beneficios por discapacidad ocupacional o no ocupacional al 30 de junio de 2013 continuarán teniendo derecho a recibir esos beneficios.

**(g)** *Beneficios especiales*

(1) *Beneficios mínimos*

(i) Aumentos anteriores necesarios

Periódicamente, la Asamblea Legislativa aumenta las pensiones para ciertos retirados, conforme a lo dispuesto en la Ley núm. 124 aprobada el 8 de junio de 1973 y la Ley núm. 23 aprobada el 23 de septiembre de 1983. Un 50% de los beneficios los paga el Fondo General del ELA y el otro 50%, el Sistema.

(ii) Beneficio mínimo para miembros que se retiraron antes del 1 de julio de 2013 (Ley núm. 156 de 2003, Ley núm. 35 de 2007 y Ley núm. 3 de 2013).

El ingreso mínimo mensual vitalicio para los miembros que se retiraron o quedaron discapacitados antes del 1 de julio de 2013 es $500 por mes a partir del 1 de julio de 2013 ($400 por mes a partir del 1 de julio de 2007 y $300 por mes hasta el 30 de junio de 2007). El aumento en el beneficio mensual mínimo de $200 por mes a $300 por mes lo paga el Fondo General del ELA en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, o determinadas empresas públicas que tienen sus propias tesorerías o los municipios para sus exempleados. El aumento en el beneficio mensual mínimo de $300 por mes a $400 por mes lo paga el Sistema en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, o determinadas empresas públicas que tienen sus propias tesorerías o los municipios para sus exempleados.

(iii) Beneficio mínimo del Plan de Coordinación

Se paga un beneficio mensual mínimo al llegar a la Edad de Retiro de Seguro Social, de forma tal que el beneficio, al sumarse al Beneficio de Seguro Social, no sea menos que el beneficio pagadero antes de la Edad de Retiro de Seguro Social.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

(2)  *Ajustes por costo de vida a los beneficios de pensiones*

De forma periódica, la Asamblea Legislativa aumenta las pensiones en un 3% para los miembros retirados y discapacitados. Los beneficiarios no tienen derecho a recibir ajustes por costo de vida una vez fallecido el retirado. El primer aumento fue otorgado por la Ley núm. 10 de 1992. Posteriormente, se han otorgado aumentos del 3% cada tres años desde 1992, el último de los cuales se decidió el 24 de abril de 2007 y entró en vigor el 1 de julio de 2007 (retroactivo al 1 de enero de 2007) para miembros retirados y discapacitados que para el 1 de enero de 2004 ya estuvieran recibiendo un beneficio mensual (Ley 35 de 2007). Además, a partir del 1 de julio de 2008, cualquier miembro retirado o discapacitado que al 1 de enero de 2004 estuviese recibiendo una renta vitalicia mensual de menos de $1,250, recibió un aumento de hasta un 3%, sin exceder el límite mensual de $1,250 (Ley 35 de 2007). Los ajustes por costo de vida otorgados en 1992 a todos los retirados y en 1998 a los retirados que sean exfuncionarios gubernamentales o municipales serán pagados por el Sistema. Todos los demás ajustes por costo de vida otorgados a partir de 1995 los pagará el Fondo General del ELA en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, o determinadas empresas públicas que tienen sus propias tesorerías o los municipios para sus exempleados.

(3)  *Beneficios por "bonos" especiales*

(i)  Bono de Navidad (Ley núm. 144, en su versión modificada por la Ley núm. 3)

Un bono anual de $200 por cada miembro retirado, beneficiario y discapacitado que se paga en diciembre, siempre y cuando el miembro se haya retirado antes del 1 de julio de 2013. El beneficio se paga a partir de las aportaciones complementarias recibidas del Fondo General del ELA en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, o determinadas empresas públicas que tienen sus propias tesorerías o los municipios para sus exempleados.

(ii)  Bono por medicación (Ley núm. 155, en su versión modificado por la Ley núm. 3)

Un bono anual de $100 por cada miembro retirado, beneficiario y discapacitado que cubre los costos de salud y se paga en julio, siempre y cuando el miembro se haya retirado antes del 1 de julio de 2013. No es necesario presentar ninguna prueba de cobertura. El monto se prorratea si hay más de un beneficiario. El beneficio se paga a partir de las aportaciones complementarias recibidas del Fondo General del ELA en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, o determinadas empresas públicas que tienen sus propias tesorerías o los municipios para sus exempleados.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*(h)* *Aportaciones*

*(1)* *Aportaciones de los miembros (sección 5-105 de la Ley 447, en su versión modificada por la Ley núm. 3 de
2013 que fue modificada por la Ley núm. 106 de 2017 y que a su vez fue modificada por la Ley 71 de 2019)*

A partir del 1 de julio de 2013 y hasta el 30 de junio de 2017, las aportaciones de los miembros equivalían a un
10% de su remuneración. Sin embargo, en el caso de los miembros amparados en la Ley núm. 447 que
seleccionaron el Plan de Coordinación, las aportaciones eran del 7% de su remuneración hasta $6,600, más un
10% de la remuneración que exceda los $6,600 durante el año fiscal 2013-2014, y del 8.5% de la remuneración
hasta $6,600, más un 10% de la remuneración que exceda los $6,600 durante el año fiscal 2014-2015. A partir
del 1 de julio de 2015, en el caso de los miembros que optaron por el Plan de Coordinación la aportación de los
miembros aumentó hasta un 10% de la remuneración. Los miembros pueden realizar, de forma voluntaria,
aportaciones adicionales a su Cuenta Híbrida de Aportaciones Definidas.

Hasta el 1 de julio de 2013, las aportaciones de los miembros amparados en la Ley núm. 447 que habían
seleccionado el Plan de Coordinación eran del 5.775% de la remuneración hasta $6,600, más el 8.275% de la
remuneración que excediese de los $6,600. Las aportaciones de todos los demás miembros eran de un 8.275%
de su remuneración. Los miembros del Sistema 2000 también podían hacer aportaciones voluntarias de hasta un
1.725% de su remuneración antes del 1 de julio de 2013.

A partir del 1 de julio de 2017, las aportaciones de los miembros equivale a un 8.5% de su remuneración. Sin
embargo, en el caso de los miembros del sistema de rangos del Negociado de la Policía de Puerto Rico, la
aportación obligatoria es del 2.3% de su remuneración. En el caso de los miembros del sistema de rangos del
Negociado de la Policía de Puerto Rico que tengan menos de diez años para cumplir con los requisitos de
retiro, conforme a lo dispuesto en la Ley núm. 447, la reducción en el porcentaje de la aportación se aplicará de
forma voluntaria.

*(2)* *Aportaciones de los patronos (sección 2-116 de la Ley 447, en su versión modificada por la Ley núm. 116
de 2011 y la Ley núm. 3 de 2013) eliminadas a partir del 1 de julio de 2017 por la Ley núm. 106 de 2017*

Antes del 1 de julio de 2011, las aportaciones patronales eran de un 9.275% de la remuneración. A partir del 1 de
julio de 2011, las aportaciones pasaron a ser de un 10.275% de la remuneración. Para los siguientes cuatro años
fiscales con fecha de vigencia 1 de julio, se programó que las aportaciones patronales aumentaran un 1% de la
remuneración todos los años. Para los siguientes cinco años fiscales, las aportaciones patronales aumentarán un
1.25% de la remuneración todos los años. La Ley 106 de 2017 eliminó las aportaciones patronales al Sistema a
partir del 1 de julio de 2017.

*(3)* *Aportaciones complementarias del Fondo General del ELA, ciertas empresas públicas y los municipios (Ley
núm. 3 de 2013) eliminadas el 1 de julio de 2017 por la Ley núm. 106 de 2017*

A partir del 1 de julio de 2013, el Sistema recibirá una aportación suplementaria de $2,000 en cada año fiscal
por cada pensionado (incluidas las personas que reciban beneficios de supervivencia) que anteriormente,
mientras era empleado activo, estuviera amparado en la Ley núm. 447 o la Ley núm. 1. Esta aportación
suplementaria la pagará el Fondo General del ELA en el caso de los exfuncionarios del Gobierno y de
determinadas empresas públicas sin sus propias tesorerías, o determinadas empresas públicas que tienen
sus propias tesorerías o los municipios para sus exempleados.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El requisito de la aportación de beneficios especiales al Sistema se establece por ley, por lo que no se determina de manera actuarial. Las aportaciones de beneficios especiales de unos $195 millones en 2017 se integran principalmente por unas aportaciones procedentes del Fondo General del ELA, las empresas públicas y los municipios en el caso de los beneficios especiales identificados anteriormente que son otorgados por leyes especiales. El Sistema recibe el financiamiento de los beneficios especiales a través de las consignaciones legislativas del Fondo General del ELA cada 1 de julio en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, y determinadas empresas públicas que tienen sus propias tesorerías y los municipios para sus exempleados. Las consignaciones legislativas son consideradas estimaciones de los pagos que el Sistema debe realizar en el caso de los beneficios especiales. Los déficits en las consignaciones legislativas se cubren con los fondos del propio Sistema hasta que queden cubiertas a través de las consignaciones legislativas futuras. Cualquier superávit en las consignaciones legislativas que se genere tras realizar los pagos de los beneficios especiales se suma a los recursos que se mantienen en fideicomiso y se destina al pago de otros beneficios de pensiones. Durante el año fiscal correspondiente al 30 de junio de 2017, el Sistema transfirió al Fondo General del ELA el monto de $56,7 millones mensualmente para cubrir cualquier déficit que afectase el pago de los beneficios especiales y las pensiones.

*(4)   Aportación Uniforme Adicional (Ley núm. 32, con sus modificaciones)*

El actuario externo del Sistema certificará la Aportación Uniforme Adicional en cada año fiscal a partir de 2015-2016, de forma tal de evitar que la previsión de los activos brutos del Sistema, durante cualquier año fiscal posterior, caiga por debajo de los $1,000 millones. La Aportación Uniforme Adicional la pagarán el Fondo General del ELA, las empresas públicas con sus propias tesorerías y los municipios. El total de la Aportación Uniforme Adicional en el año fiscal que finaliza el 30 de junio de 2017 fue de $776 millones. Como se describe con mayor detalle en la nota 14(b), la Ley 106 de 2017 eliminó la Aportación Uniforme Adicional.

*(i)   Programas de retiro anticipado*

La Junta de Calidad Ambiental (JCA) de Puerto Rico puso en marcha un programa de retiro anticipado para sus empleados al amparo de la Ley núm. 224 del 9 de agosto de 2008. La JCA ya ha hecho el pago inicial y reembolsaría el saldo remanente sobre las rentas vitalicias y otros beneficios pagados por el Sistema en cuatro cuotas, cada 31 de julio desde 2009 hasta 2012. La JCA tenía retrasos en el pago del plan de retiro, por lo que solicitó un nuevo plan de pagos. La Junta de Fideicomisarios del Sistema aprobó un plan de pagos de 24 meses, a partir de marzo de 2014, para el saldo adeudado por el programa de retiro.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El 2 de julio de 2010, el ELA aprobó la Ley núm. 70, en virtud de la cual estableció un programa que otorga beneficios de retiro anticipado o incentivos económicos para la renuncia voluntaria a los empleados que cumplan los requisitos, según se los defina. La Ley núm. 70 de 2010 (la "Ley núm. 70) también estableció que los beneficios por retiro anticipado se brindarán a los empleados habilitados que tengan entre 15 y 29 años de servicio acreditado, y que consistirán en beneficios mensuales que irán del 37.5% al 50% del salario mensual del empleado. Los beneficios de conformidad con este programa los pagarán el Fondo General del ELA y las empresas públicas, que cubrirán a sus respectivos empleados hasta que el miembro del plan alcance lo que ocurra primero de: i) cumplir 55 años para los miembros amparados en la Ley núm. 447 o 65 años en el caso de los miembros amparados en la Ley núm. 1, o ii) la fecha en que el miembro del plan hubiera alcanzado los 30 años de servicio de haber seguido trabajando. Además, las empresas públicas también tendrán la obligación de continuar efectuando al Sistema las aportaciones de los patronos y empleados que correspondan. El Fondo General del ELA deberá seguir realizando las aportaciones patronales que le correspondan. Posteriormente, el Sistema será responsable por el pago de los beneficios. A 30 de junio de 2017, el Sistema registró obligaciones por unos $15 millones por su responsabilidad como patrono según la Ley núm. 70.

El 8 de diciembre de 2015, el ELA aprobó la Ley del Programa de Pre-retiro Voluntario, Ley núm. 211 de 2015 (la "Ley núm. 211), que creó un programa voluntario para brindar beneficios de pre-retiro a los empleados que cumplan con los requisitos, según se los defina. La Ley núm. 211 es de aplicación a los empleados de las agencias y unidades componentes que cumplen con los requisitos, cuyos presupuestos se financian total o parcialmente a través del Fondo General del ELA, los municipios, las unidades constitutivas que funcionan con sus propios recursos (salvo aquellas que cuenten con sus propios sistemas de retiro), la Judicatura (excepto los jueces) y la Asociación de Empleados del ELA. La Ley núm. 211, entre otras disposiciones, estableció que los beneficios de pre-retiro se brindarán a los empleados que cumplan con los requisitos y que hayan empezado a efectuar aportaciones al Sistema antes del 1 de abril de 1990 con al menos 20 años de servicio, y que consistirán en unos beneficios quincenales del 60% del salario de cada empleado a 31 de diciembre de 2015, según definición. Conforme a la Ley núm. 211, los patronos continuarán efectuando las correspondientes aportaciones de los empleados y patronos a los Sistemas de Retiro, así como las aportaciones patronales al Seguro Social y a Medicare sobre la base del salario promedio de los empleados, según se lo defina, a 31 de diciembre de 2015. Las aportaciones individuales al Seguro Social y a Medicare se deducirán de los beneficios quincenales que deban pagarse a los participantes. Dichos pagos se efectuarán hasta que el empleado alcance 61 años de edad. Otros beneficios incluyen el pago del plan de atención de salud del participante durante los primeros dos años del programa. Una vez que el participante alcance 61 años de edad reunirá los requisitos para recibir pagos del Sistema y tendrá derecho a una pensión mínima garantizada del 50% de su salario promedio (salvo agentes de policía, que recibirán un 60%); los costos relacionados los asumirá el patrono.

Según se explica en la nota 14, la Ley núm. 106 de 2017 derogó la Ley núm. 211 y creó un programa de incentivos, oportunidades y readiestramiento para los servidores públicos.

36                                                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*(j) Otros beneficios posteriores al empleo (OBPE) - beneficios de atención de salud*

El programa MIPC del SRE es un plan no financiado de múltiples patronos y reparto de costo de otros beneficios definidos posteriores al empleo patrocinado por el ELA. El programa MIPC del SRE paga hasta $100 por mes al plan de seguro médico elegible que selecciona el miembro, siempre y cuando este se haya retirado antes del 1 de julio de 2013 (Ley núm. 483, en su versión modificada por la Ley núm. 3). Casi todos los empleados a tiempo completo del Gobierno central del ELA, ciertos municipios de Puerto Rico y determinadas unidades constitutivas del ELA que no tenían su propio plan de beneficios posteriores al empleo quedaron amparados en el OBPE.

Los empleados del ELA ingresaron al plan al momento de comenzar a trabajar. Los miembros del plan adquirieron el derecho a recibir beneficios una vez que alcanzaron las edades de retiro para comenzar a recibir el pago de pensiones.

A 1 julio de 2016, estos eran los miembros:

| | |
|---|---|
| Miembros: | |
| Miembros retirados | 94,071 |
| Miembros discapacitados | 14,722 |
| Total de miembros | 108,793 |

El requisito de realizar aportaciones a través del programa MIPC del SRE se establece por la Ley núm. 95, aprobada el 29 de junio de 1963. Este plan OBPE lo financia el ELA. El miembro del plan no está obligado a realizar ninguna aportación durante vida laboral activa. Los retirados aportan el monto de la prima del seguro de salud que la aportación del ELA no cubre. Como resultado, estos planes OBPE carecen por completo de financiamiento. Durante el año fiscal terminado el 30 de junio de 2017, las aportaciones OBPE fueron de $91 millones.

El Sistema recibe el financiamiento de los beneficios OBPE a través de las consignaciones legislativas del Fondo General del ELA cada 1 de julio en el caso de los exfuncionarios del Gobierno y de determinadas empresas públicas sin sus propias tesorerías, y determinadas empresas públicas que tienen sus propias tesorerías y los municipios para sus exempleados. Las asignaciones legislativas se consideran estimaciones de los pagos que el Sistema debe realizar por los beneficios de atención de salud a lo largo del ejercicio.

*(5) Obligación neta por pensiones*

Los componentes de la obligación neta por pensiones al 30 de al 30 de junio de 2017 fueron los siguientes (en miles de dólares):

| | | |
|---|---|---|
| Obligación total por pensiones | $ | 30,091,826 |
| Déficit fiduciario neto del plan | | (2,108,853) |
| Obligación neta por pensiones | $ | 32,200,679 |
| Déficit fiduciario neto del plan como porcentaje de la obligación total por pensiones | | (7.01)% |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO**
**DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*(a) Métodos actuariales y supuestos*

La fecha de recopilación de los datos del censo es a principios del año fiscal. El cálculo de los resultados de las obligaciones al 30 al 30 de junio de 2017 se basan en las previsiones de las obligaciones del Sistema a partir de la fecha de recopilación de los datos del censo (1 de julio de 2016) por un año, usando métodos prospectivos y sobre la base del supuesto de que no se producirán ni pérdidas ni ganancias por las obligaciones.

La valuación actuarial se basó sobre los siguientes supuestos actuariales:

| | |
|---|---|
| Inflación | No aplicable |
| Índice de bonos municipales | 3.58%%, según el índice de comprador de bonos municipales 20 de obligación general. |
| Aumentos salariales previstos | 3.00% por año. No se prevén aumentos en las remuneraciones hasta el 1 de julio de 2021 como resultado de la Ley núm. 3 de 2017 y el estado actual de la economía. |
| Mortalidad | Mortalidad previa al retiro: |
| | En el caso de los empleados generales no amparados en la Ley núm. 127, se ajustaron las tasas de mortalidad de empleados RP-2014 para hombres y mujeres para reflejar la escala de mejora en la tasa de mortalidad MP-2017 a partir del año base 2006, y se realizaron previsiones utilizando la escala MP-2017 en función de las generaciones. En el caso de los miembros amparados en la Ley núm. 127, se ajustaron las tasas RP- 2014 de mortalidad de empleados para hombres y mujeres de la clase obrera (cuello azul) para reflejar la escala de mejora de la tasa de mortalidad MP-2017 a partir del año base 2006, y se realizaron previsiones utilizando la escala MP-2017 en función de las generaciones. Los cuadros generacionales reflejan las mejoras en la tasa de mortalidad tanto antes como después de la fecha de medición. |
| | Un 100% de los fallecimientos durante la vida laboral activa se consideran como fallecimientos ocupacionales para los miembros amparados en la Ley núm. 127. |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Mortalidad saludable posterior al retiro:

Se asume que los índice varían en función del género en el caso de los retirados y beneficiarios saludables sobre la base de un estudio de la experiencia del plan entre 2007 y 2012 y las nuevas expectativas con respecto a las futuras mejoras en las tasas de mortalidad. Los índices básicos de 2010 equivalen a un 92% de los índices del cuadro de mortalidad UP-1994 para los hombres y un 95% de los índices del cuadro de mortalidad UP-1994 para las mujeres; ambas previsiones se realizaron desde 1994 hasta 2010 utilizando la escala AA. Las previsiones de los índices básicos se realizan utilizando la escala MP-2017 de mejora en las tasas de mortalidad en función de las generaciones. Como cuadro generacional, refleja las mejoras en la tasa de mortalidad tanto antes como después de la fecha de medición.

Mortalidad por discapacidad posterior al retiro:

Se asume que los índice varían en función del género en el caso de los retirados discapacitados sobre la base de un estudio de la experiencia del plan entre 2007 y 2012 y las nuevas expectativas con respecto a las futuras mejoras en las tasas de mortalidad.

Los índices básicos de 2010 equivalen a un 105% de los índices del cuadro de mortalidad UP-1994 para los hombres y un 115% de los índices del cuadro de mortalidad UP-1994 para las mujeres. Las previsiones de los índices básicos se realizan utilizando la escala MP-2017 de mejora en las tasas de mortalidad en función de las generaciones. Como cuadro generacional, refleja las mejoras en la tasa de mortalidad tanto antes como después de la fecha de medición.

La mayoría de los demás supuestos demográficos utilizados en la valuación al 30 de al 30 de junio de 2017 se basaron en los resultados de un estudio de la experiencia actuarial realizado en 2009, que utilizó datos al 30 de junio de 2003, al 30 de junio de 2005 y al 30 de junio de 2007.

*(b)* *Tasa de retorno a largo plazo prevista*

La tasa de retorno a largo plazo prevista sobre las inversiones para el pago de beneficios de pensiones no fue de aplicación al 30 de al 30 de junio de 2017. Los activos netos al 30 de al 30 de junio de 2017 son negativos, por lo que no es posible determinar ninguna tasa de retorno sobre activos netos durante el año fiscal. Además, a partir del 30 de junio de 2017, gracias al mecanismo PayGo mediante el cual el ELA garantiza el pago de las pensiones, ya no es necesario que los activos del Sistema garanticen los retornos sobre inversiones para pagar los beneficios de pensiones. La tasa real de retorno sobre los activos brutos al 30 de al 30 de junio de 2017 fue del 8.74% aproximadamente.

39

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Con anterioridad al 30 de junio de 2017, la Junta de Fideicomisarios del Sistema estableció (y puede modificar) la política de asignación de los activos invertidos. Los activos del plan se gestionan de conformidad con su rendimiento global, con el objetivo a largo plazo de lograr y mantener un impacto positivo sobre la situación financiera del Sistema para los beneficios previstos a través de los programas de pago de pensiones. La Junta de Fideicomisarios del Sistema adoptó la siguiente política de asignación de activos al 30 de al 30 de junio de 2017:

| Clase de activos: | Asignación objetivo | Tasa de retorno a largo plazo prevista |
|---|---|---|
| Títulos nacionales de renta variable | 56% | No aplicable |
| Títulos internacionales de renta variable | 15 | No aplicable |
| Renta fija | 28 | No aplicable |
| Efectivo | 1 | No aplicable |
| Total | 100% | |

En los años anteriores, la tasa de retorno a largo plazo prevista sobre las inversiones para el pago de beneficios de pensiones se determinó a través de un modelo de bloques en el que se calculan los mejores rangos estimados de tasas de retorno reales previstas para el futuro (retornos previstos, sin incluir los gastos y la inflación relacionados con las inversiones del plan de pensiones) para cada una de las principales clases de activos. Estos rangos se combinan para determinar la tasa de retorno a largo plazo prevista mediante la ponderación de las tasas de retorno reales previstas para el futuro en función del porcentaje objetivo de asignación de activos, para luego añadir la inflación prevista. Este año, la estimación de la tasa de retorno a largo plazo prevista ya no es de aplicación.

*(c) Tasa de descuento*

La base de activos para estimar la fecha de agotamiento es la posición fiduciaria neta del Sistema (el activo bruto más las salidas diferidas de recursos, menos el pasivo bruto, incluidos los bonos prioritarios para financiar pensiones por pagar, más las entradas diferidas de recursos). Según este cálculo, la posición fiduciaria neta del Sistema se agotó en el año fiscal 2015.

No se estimó que la posición fiduciaria neta del Sistema estaría disponible para realizar todos los pagos futuros previstos de beneficios a los empleados actualmente activos e inactivos. Por ende, se aplicó el índice de bonos municipales libres de impuestos (Índice de comprador de bonos municipales 20 de obligación general) a todos los períodos de pagos estimados de beneficios para determinar la obligación total por el pago de pensiones. La tasa de descuento fue de 3.58% al 30 de al 30 de junio de 2017.

La valuación actuarial al 30 de al 30 de junio de 2017 refleja una disminución de $5,498 millones en las obligaciones netas por el pago de pensiones, que se debe principalmente a un cambio por $4,179 millones en los supuestos, como consecuencia del aumento en la tasa de descuento que establece la Declaración GASB núm. 67, de un 2.85% en el año fiscal 2016 a un 3.58% en el año fiscal 2017, y como resultado del efecto de cambios en el plan por unos $2,017 millones.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

*(d) Sensibilidad de la obligación neta por el pago de pensiones a los cambios en la tasa de descuento*

A continuación se presenta la obligación neta por el pago de pensiones calculada según la tasa de descuento de 3.58%, y cuál sería dicha obligación utilizando una tasa de descuento un 1% más baja (2.58%), o un 1% más alta (4.58%) que la tasa actual (en miles de dólares):

| | | 1% de disminución (2.58%) | Descuento actual (3.58%) | 1% de aumento (4.58%) |
|---|---|---|---|---|
| Obligación neta por pensiones | $ | 36,599,444 | 32,200,679 | 28,666,953 |

**(6) Efectivo y equivalentes de efectivo, inversiones y transacciones de préstamo de títulos**

*Efectivo y equivalentes de efectivo*

El efectivo y equivalentes de efectivo al 30 de al 30 de junio 2017 consistían en lo siguiente (cifras en miles):

| | | Valor en libros | Saldo en el banco depositario | Monto no asegurado ni garantizado |
|---|---|---|---|---|
| Depósitos en el BGF | $ | | 30,027 | 30,027 |
| Depósitos en bancos comerciales de Puerto Rico | | 460,174 | 454,587 | |
| Fondos del mercado monetario | | 15,619 | No aplicable | No aplicable |
| Letras del Tesoro de los EE. UU. | | 909 | No aplicable | No aplicable |
| Total | $ | 476,702 | 484,614 | 30,027 |

El riesgo por créditos en custodia por depósitos es el riesgo de que, ante un incumplimiento de una institución financiera depositaria, el Sistema no sea capaz de recuperar los depósitos o las garantías que estén en posesión de un tercero. El ELA requiere que los fondos públicos depositados en bancos comerciales de Puerto Rico estén plenamente garantizados por el monto depositado además del seguro federal sobre los depósitos. Todas las garantías pignoradas están en poder de los bancos en nombre del ELA. Los depósitos en el BGF, en bancos comerciales no puertorriqueños y en fondos del mercado monetario no están asegurados ni garantizados, ya que estas entidades no están obligadas a cumplir con el requisito de constitución de garantías.

El efectivo y los equivalentes de efectivo restringidos ascendían a unos $216 millones al 30 de al 30 de junio de 2017 y consistían en lo siguiente:

- Aproximadamente $1.9 millones en fondos están restringidos para su uso en la amortización de la deuda de los bonos pagaderos, y un 100% de dichos fondos estaban depositados en régimen de fideicomiso en fondos del mercado monetario.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

- Unos $214 millones en fondos están restringidos para la amortización de préstamos hipotecarios y personales administrados por los gestores de hipotecas y el Sistema, para cheques vencidos no reclamados por los miembros del plan y para otros fines; alrededor de $11 millones estaban depositados en régimen de fideicomiso en cuentas de mercado monetario, unos $126,000 millones estaban depositados en el BGF, y aproximadamente $202 millones estaban depositados en bancos comerciales de Puerto Rico.

*Pérdidas por créditos en custodia sobre depósitos en el BGF*

La gerencia concluyó que la información disponible antes de la emisión de los estados financieros del Sistema para el ejercicio terminado el 30 de junio de 2017 indica que a dicha fecha existía una pérdida por créditos en custodia con respecto a los depósitos en el BGF.

A 30 de junio de 2017, el BGF sigue enfrentando una situación económica grave y actualmente no cuenta con suficientes recursos financieros líquidos para cumplir con sus obligaciones a su vencimiento. El ELA y sus entidades públicas no han podido devolver los préstamos que tomaron del BGF, lo que ha afectado considerablemente la liquidez de este último y su capacidad de honrar sus obligaciones. Debido a que el ELA no pagó la asignación al BGF, y a la incapacidad del BGF de reestructurar su deuda debido a la profunda crisis fiscal que atraviesa el ELA, el BGF cayó en mora con respecto a sus obligaciones de deuda el 1 de mayo de 2016.

De conformidad con la legislación aprobada en abril de 2016, el Gobernador del ELA impuso al BGF restricciones operativas de emergencia y una moratoria sobre sus deudas. Dichas restricciones, entre otras medidas, paralizaron los desembolsos de préstamos del BGF, impusieron limitaciones sobre la retirada y transferencia de depósitos del BGF y constituyeron una moratoria sobre las obligaciones de deuda del BGF.

El 28 de abril de 2017, la Junta de Supervisión aprobó la propuesta de liquidación incluida en el plan fiscal del BGF, según la cual la institución reducirá de forma paulatina y ordenada sus operaciones en un período de diez años.

El 23 de marzo de 2018, el BGF cesó sus operaciones y decidió reducir de forma paulatina y ordenada su actividad en virtud del Título VI de PROMESA.

Tras evaluar la disponibilidad y la posibilidad de recuperar tales fondos, en los estados financieros del Sistema se ha registrado una pérdida por créditos en custodia con respecto a tales depósitos, de la manera que se ilustra a continuación (cifras en miles):

| | Depósitos en el BGF al 30 de al 30 de junio de 2017 | | |
| | Valor en libros antes de la pérdida por deterioro | Pérdida por créditos en custodia | Valor en libros |
|---|---|---|---|
| Tipo de depósito: | | | |
| Cuentas con intereses | $      30,027 | 30,027 | |
| Total | $      30,027 | 30,027 | |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El saldo realizable sobre los depósitos mantenidos en el BGF al 30 de al 30 de junio de 2017 se determinó en función del dinero efectivamente recibido del BGF con respecto a tales depósitos tras la fecha de fin del ejercicio del 30 de junio de 2017.

*Inversiones*

Para el ejercicio terminado el 30 de junio de 2017, la tasa anual de rendimiento ponderada por dinero sobre las inversiones, sin incluir los gastos relacionados, fue de un 8.74%. La tasa de rendimiento ponderada por dinero expresa el rendimiento de la inversión, sin incluir los gastos correspondientes, ajustada según las sumas efectivamente invertidas.

*Medición del valor razonable*

El Sistema clasifica sus mediciones del valor razonable en función de la jerarquía del valor razonable estipulada en los principios de contabilidad generalmente aceptados (los "GAAP", por sus siglas en inglés). Dicha jerarquía se basa en los datos utilizados en la valuación y otorga la máxima prioridad a los precios ofertados no ajustados en los mercado activos, exigiendo además que se utilicen datos observables en la valuación, siempre que tales datos estén disponibles. La información consignada relativa a las estimaciones del valor razonable en la jerarquía se basa en si la valuación contiene datos importantes que sean observables. Al determinar el nivel de la jerarquía en el que se vaya a consignar la estimación, el nivel más alto (Nivel 1) se otorga a precios ofertados no ajustados en los mercados activos, y el nivel más bajo (Nivel 3) se asigna a datos no observables.

Nivel 1: datos cuyo valor se basa en precios ofertados no ajustados relativos a instrumentos idénticos en los mercados activos a los que el Sistema pueda acceder.

Nivel 2: datos cuyo valor se basa en precios ofertados para instrumentos similares en los mercados activos; precios ofertados para instrumentos idénticos o similares en mercados que no sean activos; y valuaciones derivadas de modelos en las que todos los datos importantes sean observables.

Nivel 3: valuaciones basadas en datos que no sean observables pero importantes en cuanto a la medición general del valor razonable.

En aquellos casos en los que los datos utilizados para medir el valor razonable corresponden a diferentes niveles en la jerarquía del valor razonable, las mediciones del valor razonable se clasifican en su totalidad sobre la base del dato del nivel más bajo que resulte importante en la valuación. La determinación por parte del Sistema de la importancia de datos concretos para dichas mediciones del valor razonable requiere juicios de valor y toma en cuenta factores específicos para cada inversión. Por razones prácticas, las inversiones medidas sobre la base del valor actual neto (VAN) no son objeto de ninguna clasificación por niveles.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El cuadro a continuación muestra la clasificación por niveles del valor razonable de las inversiones del Sistema:

| Tipo de inversión | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|
| Inversiones medidas según su valor razonable: | | | | |
| Títulos valores del Gobierno de los EE. UU. | $ 8,884 | | | 8,884 |
| Obligaciones de organismos avalados por el Gobierno estadounidense | 9,789 | | | 9,789 |
| Títulos valores garantizados con hipotecas y activos | 6,540 | | | 6,540 |
| Bonos y pagarés corporativos de los EE. UU. | | 64,939 | | 64,939 |
| Bonos corporativos no estadounidenses | | 14,811 | | 14,811 |
| Bonos de COFINA | | 58,224 | | 58,224 |
| Inversiones según el nivel del valor razonable | $ 25,213 | 137,974 | | 163,187 |
| Inversiones medidas sobre la base del VAN por razones prácticas: | | | | |
| Fondos de fideicomiso colectivo sin contraprestación: | | | | |
| Fondos de fideicomiso estadounidenses de renta variable | | | | 120,498 |
| Inversiones de fondos de fideicomiso no procedentes de los EE. UU. en sociedades limitadas | | | | 61,201 |
| | | | | 87,069 |
| Total de inversiones | | | | $ 431,955 |

Las inversiones del Sistema están expuestas al riesgo por créditos en custodia, riesgo crediticio, concentración del riesgo crediticio, riesgo cambiario y riesgo de tipo de interés. A continuación se muestra una descripción de dichos riesgos al 30 de al 30 de junio de 2017:

*(a) Riesgo por crédito en custodia*

El riesgo por créditos en custodia por inversiones es el riesgo de que, ante un incumplimiento de la contraparte en una transacción, el Sistema no sea capaz de recuperar el valor de la inversión o las garantías que estén en posesión de un tercero. Al 30 de junio de 2017, las inversiones en títulos valores estaban registradas a nombre del Sistema y estaban en poder de los bancos de custodia del Sistema, a excepción de los títulos valores otorgados en préstamo. Los títulos valores otorgados en préstamo no están expuestos a riesgos por créditos en custodia. Las garantías en efectivo recibidas en el marco de transacciones de préstamo de títulos, cuando se invierten en inversiones a corto plazo, están expuestas a riesgos por créditos por custodia.

(continuación)

SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

**(b)** *Riesgo crediticio*

El riesgo crediticio es el riesgo de que un emisor u otra contraparte en una inversión no cumplan con sus obligaciones. Todos los títulos valores de renta fija deben tener grado de inversión al momento de su compra. Al menos dos agencias calificadoras reconocidas a nivel nacional deberán calificar todas las emisiones con grado de inversión. Se espera que la cartera mantenga una calidad crediticia media ponderada mínima de "A-" o superior, según las clasificaciones crediticias de Moody's o de Standard & Poor's.

Las calificaciones de calidad crediticia de los bonos y pagarés y del fondo de fideicomiso colectivo sin contraprestación de renta fija al 30 de al 30 de junio de 2017 son las siguientes (cifras en miles):

| Tipo de inversión | AAA | AA+ a AA- | A+ a A- | BBB+ a BBB- | BB+ a BB- | B+ a B- | CCC- | No clasificado | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Calificación (1) | | | | | |
| Bonos y pagarés: | | | | | | | | | |
| Obligaciones de organismos avalados por el Gobierno estadounidense: | $ | 2,937 | | | | | | | 2,937 |
| Federal Home Loan Bank (FHLB) Federal National | | 4,249 | | | | | | | 4,249 |
| Mortgage Association (FNMA) | | 927 | | | | | | | 927 |
| Federal Home Loan | | 1,676 | | | | | | | 1,676 |
| Mortgage Corporation (FHLMC) | | 2,581 | | | | | | | 2,581 |
| Federal Farm Credit Banks (FFCB) Títulos valores garantizados | 2,065 | 1,420 10,832 | 13,245 | 34,770 | 473 | | | 3,554 | 1,420 64,939 |
| con hipotecas y activos: | | 502 | 4,094 | 6,444 | 857 | | | 2,914 | 14,811 |
| FNMA | | | | | | | 58,224 | | 58,224 |
| FHLM C | $ 2,065 | 25,124 | 17,339 | 41,214 | 1,330 | | 58,224 | 6,468 | 151,764 |
| Bonos y pagarés corporativos de los EE. UU. Bonos corporativos no estadounidenses Bonos de COFINA | | | | | | | | | |
| Total | | | | | | | | | |

(1) Calificación de Standard and Poor's o calificación equivalente de Moody's Investor Service o Fitch Ratings.

Alrededor de $11.4 millones del total de inversiones del Sistema consisten en títulos del Gobierno de los Estados Unidos y de la Asociación Nacional Gubernamental Hipotecaria (la "GNMA", por sus siglas en inglés) garantizados por hipotecas, que como no comportan riesgos no han sido incluidos en el cuadro anterior.

**(c)** *Concentración del riesgo crediticio*

La concentración del riesgo crediticio es el riesgo de pérdida para el Sistema relacionado con la magnitud de sus inversiones en un único emisor. A 30 de junio de 2017, no hay inversiones en ningún emisor que representen el 5% o más de las inversiones totales del Sistema, a excepción de sus inversiones en los Bonos de COFINA.

Conforme a la Ley núm. 96 del 16 de junio de 2011, durante el año fiscal terminado el 30 de junio de 2011 el Sistema recibió una aportación especial de unos $163 millones de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, una de las instrumentalidades del ELA. La aportación se invirtió en bonos emitidos por la Corporación del Fondo de Interés Apremiante de Puerto Rico (COFINA) con una tasa de aumento de un 7% y vencimientos entre 2043 y 2048. COFINA es una unidad componente fundamental del ELA. Como lo exige la Ley núm. 96 del 16 de junio de 2011, el Sistema no puede deshacerse voluntariamente de los Bonos de COFINA, a menos que el BGF dé su autorización. A 30 de junio de 2017, los Bonos de COFINA tenían un valor razonable de unos $58.2 millones.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

### *(d) Riesgo de tipo de interés*

El riesgo de tipo de interés es el riesgo de que cambios en los tipos de interés afecten negativamente el valor razonable de una inversión. De conformidad con su política de inversiones, el Sistema gestiona su exposición a la reducción de los valores razonables de sus inversiones estructurando su cartera de forma tal que los títulos valores venzan en el momento adecuado para cubrir las necesidades de efectivo para el pago de los beneficios, evitando de esa forma tener que venderlos en el mercado abierto antes de su vencimiento. Las inversiones en títulos de renta variable no están sujetas a la política de vencimiento máximo debido a que no tienen fecha de vencimiento. Se espera que el Sistema logre preservar su capital y generar ingresos realizando inversiones en una cartera diversificada de títulos de renta fija y de crédito a mediano plazo, de grado de inversión y comercializables.

El vencimiento contractual de las inversiones al 30 de al 30 de junio de 2017 se resume abajo (cifras en miles). Los vencimientos previstos diferirán de los vencimientos contractuales debido a que las contrapartes pueden tener el derecho a comprar o pagar de antemano las obligaciones con o sin sanciones por compra o pago anticipado.

| Tipo de inversión | Dentro de un año | Tras uno a cinco años | Tras cinco a diez años | Tras diez años | Total |
|---|---|---|---|---|---|
| Bonos y pagarés: | | | | | |
| Títulos valores del Gobierno de los EE. UU: | | | | | |
| Letras del Tesoro de los EE. UU. | $ 2,105 | 824 | 3,602 | | 6,531 |
| Bonos del Tesoro de los EE. UU. | | | | 2,353 | 2,353 |
| Obligaciones de organismos avalados por el Gobierno estadounidense: | | | | | |
| FHLBC | | 1,053 | 1,884 | | 2,937 |
| FNMA | | | 4,249 | | 4,249 |
| FHLMC | | 927 | | | 927 |
| FFCBC | | 1,676 | | | 1,676 |
| Títulos valores garantizados con hipotecas y activos: | | | | | |
| GNMA | | | | 2,539 | 2,539 |
| FNMA | | | | 2,581 | 2,581 |
| FHLMC | | | | 1,420 | 1,420 |
| Bonos y pagarés corporativos de los EE. UU. | 9,854 | 31,014 | 23,993 | 78 | 64,939 |
| Bonos corporativos no estadounidenses | 847 | 6,079 | 6,847 | 1,038 | 14,811 |
| Bonos de COFINA | | | | 58,224 | 58,224 |
| Total de bonos y pagarés | $ 12,806 | 41,573 | 40,575 | 68,233 | 163,187 |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

| Tipo de inversión | Vencimiento (en años) | | | | |
|---|---|---|---|---|---|
| | Dentro de un año | Tras uno a cinco años | Tras cinco a diez años | Tras diez años | Total |
| Fondos de fideicomiso colectivos sin contraprestación de renta variable e inversiones en sociedades limitadas: | | | | | |
| Fondos de fideicomiso colectivos sin contraprestación de renta variable: | | | | | |
| EE. UU. – Fondo SSgA Russell 3000 | | | | | 120,498 |
| No EE. UU. – Fondo SSgA MSCI ACWI Ex USA | | | | | 61,201 |
| Inversiones en sociedades limitadas | | | | | 87,069 |
| Total de Fondos de fideicomiso colectivos sin contraprestación de renta variable e inversiones en sociedades limitadas | | | | | 268,768 |
| Total de inversiones | | | | | $ 431,955 |

(1) El fondo de fideicomiso colectivo sin contraprestación de renta fija se clasificó en función de la duración efectiva.

**(e) Riesgo cambiario**

El riesgo cambiario es el riesgo de que cambios en el tipo de cambio afecten negativamente el valor razonable de una inversión o un depósito. A 30 de junio de 2017, el Fondo SSgA MSCI ACWI Ex USA es vulnerable al riesgo cambiario.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

A 30 de junio de 2017, la composición de las inversiones subyacentes en el Fondo SSgA MSCI ACWI Ex USA son las siguientes:

| País | Fondo SSgA MSCI ACWI EX USA |
|---|---|
| Japón | 16% |
| Reino Unido | 11 |
| Francia | 7 |
| Canadá | 7 |
| Alemania | 7 |
| Suiza | 6 |
| Australia | 5 |
| Hong Kong | 5 |
| China | 4 |
| Corea | 4 |
| Taiwán | 3 |
| Países Bajos | 3 |
| España | 2 |
| India | 2 |
| Otros | 18 |
| Total | 100% |

(i)  *Fondos de fideicomiso colectivos sin contraprestación*

A 30 de junio de 2017, el Sistema tenía acciones en el Fondo índice no prestatario SSgA Russell 3000 (Fondo SSgA Russelll 3000) y en el Fondo no prestatario SSgA MSCI ACWI Ex USA (Fondo SSgA MSCI ACWI Ex USA) como se ilustra a continuación (cifras en miles):

| Nombre del fondo | Acciones | | Valor |
|---|---|---|---|
| Fondo SSgA Russell 3000 | 4,619 | $ | 120,498 |
| Fondo SSgA MSCI ACWI Ex USA | 3,096 | | 61,201 |
| Total de fondos de fideicomiso colectivos sin contraprestación | | $ | 181,699 |

El objetivo de inversión del Fondo Russell 3000 es aproximarse en la máxima medida posible, antes de deducir los gastos, al rendimiento del Índice Russell 3000 a largo plazo. Las acciones pueden canjearse diariamente según su VAN, y no se imponen restricciones al canje.

48                                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El objetivo de inversión del Fondo SSgA MSCI ACWI Ex USA es aproximarse en la máxima medida posible, antes de deducir los gastos, al rendimiento del Índice MSCI ACWI Ex USA a largo plazo. Las acciones pueden canjearse dos veces por mes según su VAN, y no se imponen restricciones al canje.

A 30 de junio de 2017, las inversiones subyacentes de los fondos SSgA Russell 3000 y SSgA MSCI Ex USA estaban destinadas a los siguientes sectores:

| Sector | Fondo SSgA Russell 3000 | Fondo SSgA MSCI ACWI EX USA |
|---|---|---|
| Tecnología de la información | 21% | 12% |
| Finanzas | 15 | 22 |
| Atención de salud | 14 | 8 |
| Consumo discrecional | 12 | 11 |
| Insumos industriales | 11 | 12 |
| Productos de primera necesidad | 8 | 9 |
| Energía | 5 | 8 |
| Inmuebles | 4 | 3 |
| Materiales | 3 | 8 |
| Suministros públicos | 3 | 3 |
| Servicios de telecomunicaciones | 2 | 4 |
| Sin clasificar | 2 | |
| Total | 100% | 100% |

*(ii)  Inversiones en sociedades limitadas*

El valor razonable de las inversiones en sociedades limitadas al 30 de al 30 de junio de 2017 era de unos $87.0 millones y se presentan en el Estado básico de posición fiduciaria neta como inversiones en capital riesgo. Las asignaciones de las ganancias y las pérdidas netas a los socios de tales sociedades se basan en los porcentajes que se establecen en los acuerdos societarios. Las inversiones en sociedades limitadas no son calificadas por organizaciones calificadoras reconocidas a nivel nacional.

De conformidad con los acuerdos societarios, las inversiones del Sistema solo pueden amortizarse mediante las distribuciones de los gestores de los fondos, generalmente a través de la venta de sus tenencias o la distribución de dividendos. A 30 de junio de 2017, el Sistema no tiene la intención de vender sus inversiones en las sociedades limitadas por un monto distinto al que figura en los estados financieros.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

A 30 de junio de 2017, la fecha pactada, el total comprometido, las aportaciones de 2017, las aportaciones al costo a la fecha y el valor razonable estimado de las inversiones en las sociedades limitadas son los siguientes (cifras en miles):

| | Fecha de compromiso | Total del compromiso | Aportaciones de 2017 | Aportaciones a la fecha al costo | Valor razonable estimado |
|---|---|---|---|---|---|
| Grupo Guayacán, Inc.- | | | | | |
| Guayacán Fund of Funds II, LP | Agosto de 1999 $ | 25,000 | | 23,681 | 919 |
| Advent-Morro Equity Partner, Inc.: | | | | | |
| Guayacán Private Equity Fund, LP | Enero de 1997 | 5,000 | | 4,645 | 2,162 |
| Guayacán Private Equity Fund II, LP | Abril de 2007 | 25,000 | | 24,547 | 22,638 |
| Venture Capital Fund, Inc. | Noviembre de 1995 | 800 | | 800 | 654 |
| GF Capital Management and Advisors, LLC – GF Capital Private Equity Fund LP | Diciembre de 2006 | 25,000 | 97 | 25,890 | 19,225 |
| Chase Capital Partners Private: Equity Fund of Funds Corporate | Julio de 2000 | 20,000 | | 18,994 | |
| Courage Credit | 2017 | 5,000 | 2,254 | 2,254 | 1,857 |
| Medley Credit Opportunity | 2017 | 15,000 | 12,953 | 12,953 | 12,530 |
| MCOY Investments | 2017 | 10,000 | 10,000 | 10,000 | 9,696 |
| Phoenix | 2017 | 10,000 | 10,000 | 10,000 | 9,641 |
| MCLarty Bluhaus Capital Partner | 2017 | 5,000 | 250 | 250 | 250 |
| Terracap | 2017 | 7,500 | 6,829 | 6,829 | 7,497 |
| Total | | $ 153,300 | 42,383 | 140,843 | 87,069 |

*(iii)   Transacciones de préstamo de títulos*

El Sistema participa en un programa de préstamo de títulos valores, en virtud del cual los títulos se transfieren a un corredor o intermediario independiente a cambio de garantías en la forma de efectivo, títulos de deuda pública o cartas de crédito bancarias irrevocables, con un acuerdo simultáneo de devolver en el futuro las garantías entregadas por dichos títulos. Las garantías se valúan diariamente según su valor de mercado, y el agente envía solicitudes a los corredores para que constituyan garantías adicionales, si se necesita. El banco custodio es el agente para el programa de préstamo de títulos.

A finales del año, no había exposición por riesgo crediticio para los prestatarios debido a que los montos que el Sistema les adeuda a los prestatarios (las garantías) excedían los montos que los prestatarios se le adeudan al Sistema (los títulos valores otorgados en préstamo). A 30 de junio de 2017, las garantías recibidas representaban un 103% del valor razonable del total de títulos valores otorgados en préstamo.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Los títulos valores otorgados en préstamo para los que se recibieron garantías al 30 de al 30 de junio 2017 eran los siguientes (cifras en miles):

| Descripción | | Valor razonable de los títulos subyacentes |
|---|---|---|
| Títulos valores del Gobierno de los EE. UU.: | | |
| Letras del Tesoro de los EE. UU. | $ | 657 |
| Pagarés del del Tesoro de los EE. UU. | | 892 |
| Pagarés de organismos avalados por el Gobierno estadounidense | | 752 |
| Bonos y pagarés corporativos de los EE. UU. | | 5,058 |
| Total | $ | 7,359 |

La garantía subyacente para tales títulos tenía un valor razonable de unos $7.4 millones al 30 de al 30 de junio de 2017. Las sumas recibidas en concepto de garantía se invirtieron en un fondo del mercado monetario patrocinado por el banco custodio. A 30 de junio de 2017, el fondo de inversiones a corto plazo consistía en títulos valores comprados en virtud de acuerdos de reventa.

De conformidad con los términos del acuerdo de préstamo de títulos, el Sistema está totalmente indemnizado por eventuales incumplimientos de los prestatarios en cuanto a la devolución de títulos otorgados en préstamo (en la medida en que las garantías no sean suficientes para reemplazar los títulos prestados) o si los emisores de los títulos no pagan al Sistema distribuciones de ingresos mientras los títulos estén en préstamo. Además, el Sistema está indemnizado contra pérdidas en caso de que el agente de préstamo no tramite las garantías adecuadas y necesarias en el momento oportuno.

*(7)* **Cuentas por cobrar de los patronos**

A 30 de junio de 2017, las cuentas por cobrar de los patronos consistían en lo siguiente (cifras en miles):

| | | |
|---|---|---|
| Programas de retiro anticipado | $ | 1,865 |
| Leyes especiales | | 80,627 |
| Aportaciones de los empleados y patronos | | 887,557 |
| Intereses sobre pagos atrasados | | 95,862 |
| Total de cuentas por cobrar de los patronos | | 1,065,911 |
| Menos previsión por ajustes y pérdidas por realización | | (1,029,739) |
| Total de cuentas por cobrar de los patronos - neto | $ | 36,172 |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

De conformidad con la Ley núm. 447, los patronos deben pagar todos los meses los montos correspondientes a las aportaciones y las amortizaciones de los préstamos, como máximo el día 15 del mes siguiente. Luego de esa fecha, se cobran los intereses establecidos por el Sistema.

Como se describe con más detalle en la nota 3, el ELA y muchas de sus instrumentalidades, empresas públicas y municipios, que son los patronos del Sistema, se han enfrentado a importantes retos fiscales y económicos. Además, antes de que se iniciaran los Casos de Título III, la rebaja de la calificación y la ampliación de los diferenciales crediticios para la deuda del sector público y las empresas públicas del ELA han aumentado los problemas de liquidez y fuentes de financiamiento de los patronos. En consecuencia, la mayoría de las cuentas por cobrar provenientes de los patronos están atrasadas con respecto a las fechas de pago o las fechas de vencimiento de las cuotas del plan. En otros casos, las sumas atrasadas han sido renegociadas para pagarlas más adelante.

A 30 de junio de 2017, el Sistema registró una previsión de unos $1,030 millones por ajustes y pérdidas de realización con respecto a las aportaciones patronales basadas en salarios y las Aportaciones Uniformes Adicionales adeudadas por el ELA, las empresas públicas y los municipios en los años fiscales 2016 y 2017 debido a que, como se explica en la nota 3, existen dudas en cuanto a poder cobrarlas.

**(8)  Préstamos a miembros e intereses por cobrar**

Los préstamos por cobrar otorgados a miembros del plan están garantizados por las aportaciones de dichos miembros y por otras fuentes, incluidas escrituras hipotecarias y montos sin restricciones que se mantienen en cuentas de plica. Además, los préstamos adeudados se cobran a través de deducciones de la nómina. El monto máximo más reciente de préstamos otorgados a los miembros del plan fue de $100,000 para préstamos hipotecarios y $5,000 para fines personales y viajes culturales. En diciembre de 2013 dejaron de otorgarse préstamos hipotecarios y en noviembre de 2016, los préstamos para fines personales y viajes culturales. Durante los ejercicios terminados el 30 de junio de 2014 y 2013, se vendieron a dos instituciones financieras paquetes de préstamos personales con saldos de capital de unos $100 millones y $88 millones, respectivamente. Según los acuerdos de gestión, el Sistema se encarga de gestionar, administrar y cobrar los préstamos y los saldos pendientes de capital a partir de la fecha de cierre por un cargo de gestión de 2%.

La previsión por ajustes y pérdidas por realización es considerada una previsión general para todas las categorías de préstamos e intereses por cobrar, con la excepción de los préstamos hipotecarios, y también una previsión específica para los saldos de los préstamos del proyecto especial de cobro.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

A 30 de junio de 2017, la composición de los préstamos e intereses por cobrar a los miembros del plan es la siguiente (cifras en miles):

| | | |
|---|---|---:|
| Préstamos por cobrar: | | |
| Personales | $ | 298,879 |
| Hipotecarios | | 161,495 |
| Viajes culturales | | 36,859 |
| Total de préstamos a miembros del plan | | 497,233 |
| Intereses acumulados por cobrar | | 29,085 |
| Menos previsión por ajustes y pérdidas por realización | | (2,875) |
| Total de préstamos e intereses por cobrar a miembros del plan - neto | $ | 523,443 |

### (9) Otros activos

A 30 de junio de 2017, hay otros activos que consisten principalmente en propiedades recuperadas y ejecutadas, adquiridas mediante procesos de ejecución hipotecaria, que guardan relación con préstamos hipotecarios atrasados. El valor de las propiedades ejecutadas equivale al saldo pendiente de capital del préstamo hipotecario relacionado al momento de la ejecución. Estas propiedades se venden en subastas a través de las cuales se busca recuperar el saldo pendiente de capital con respecto al préstamo hipotecario. Al momento de la venta, se reconoce una pérdida o una ganancia.

La diferencia entre reconocer las pérdidas al momento de la venta y no al momento de la ejecución, como lo exigen los principios de contabilidad generalmente aceptados, no son sustanciales. La gerencia cree que el valor neto en libros de estas propiedades se aproxima a su valor razonable.

### (10) Bonos por pagar

Bonos Prioritarios para Financiar Pensiones. El 27 de febrero de 2007, la Administración del Sistema y el BGF, en su calidad de agente fiscal del Sistema (el "Agente Fiscal"), presentaron a la Junta de Fideicomisarios una transacción financiera para la emisión de bonos para financiar las pensiones y reducir el total de obligaciones actuariales sin financiamiento del Sistema. Los Bonos son obligaciones del Sistema limitadas y sin derecho a interponer recursos, que se pagan (y se garantizan) únicamente a partir de las aportaciones (según se define en la Resolución del SRE relativa a los Bonos) que los patronos pignoraron tras la fecha de emisión de la primera serie de Bonos y de fondos mantenidos en depósito en el Bank of New York (el "Agente Fiscal"). Los Bonos no se pagan a partir de las aportaciones que los empleados participantes realizan al Sistema, ni de los activos adquiridos con el producido de los Bonos ni de las aportaciones patronales que el Agente Fiscal envía al Sistema tras satisfacer los requisitos de reservas, ni a partir de ningún otro de los activos del Sistema. El Sistema invirtió el producido de los Bonos y utilizó esas inversiones (y la rentabilidad que produjeron) para pagar las pensiones a los beneficiarios.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El 31 de enero de 2008, el Sistema emitió la primera serie de Bonos, por un capital total de unos $1,589 millones en Bonos Prioritarios para Financiar Pensiones, serie A (los "Bonos Serie A"). El 2 de junio de 2008, el Sistema emitió la segunda serie de tales Bonos, que ascendían aproximadamente a un total de $1,059 millones de capital correspondiente a Bonos Prioritarios para Financiar Pensiones, serie B (los "Bonos Serie B"). Por último, el 30 de junio de 2008, el Sistema emitió la tercera y la última serie de los Bonos, que ascendían aproximadamente a un total de $300 millones de capital correspondiente a Bonos Prioritarios para Financiar Pensiones, serie C (los "Bonos Serie C").

A continuación figura un resumen de los cambios en el saldo de capital a pagar sobre los bonos (cifras en miles):

| | Vencimiento | Saldo a 30 de junio de 2016 | Acumulación | Saldo a 30 de junio de 2017 |
|---|---|---|---|---|
| 5.85% a 6.45% Plazo y apreciación del capital Bonos Serie A | 2021–2058 | $  1,619,072 | 4,740 | 1,623,812 |
| 6.25% a 6.55% Plazo y apreciación del capital Bonos Serie B | 2028–2058 | 1,220,285 | 26,371 | 1,246,656 |
| 6.15% a 6.50% Plazo y apreciación del capital Bonos Serie C | 2028–2043 | 301,678 | 241 | 301,919 |
| Descuento sobre los Bonos | | (6,133) | 218 | (5,915) |
| Total | | $  3,134,902 | 31,570 | 3,166,472 |

A 30 de junio de 2017, el saldo pendiente de capital sobre los Bonos es el siguiente (cifras en miles):

| Descripción | | |
|---|---|---|
| Bonos Serie A: | | |
| Bonos de Apreciación de Capital, vencimiento en 2028, intereses de un 6.20% | $ | 80,042 |
| Bonos a plazo, vencimiento de 2021 a 2023, intereses de un 5.85% | | 200,000 |
| Bonos a plazo, vencimiento de 2031 a 2038, intereses de un 6.15% | | 679,000 |
| Bonos a plazo, vencimiento de 2039 a 2042, intereses de un 6.20% | | 332,770 |
| Bonos a plazo, vencimiento de 2055 a 2058, intereses de un 6.45% | | 332,000 |
| Total de Bonos Serie A en circulación | | 1,623,812 |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

| Descripción | | |
|---|---|---|
| Bonos Serie B: | | |
| Bonos de Apreciación de Capital, vencimiento de 2028 a 2030, intereses de un 6.40% | $ | 198,959 |
| Bonos de Apreciación de Capital, vencimiento de 2031 a 2034, intereses de un 6.45% | | 231,597 |
| Bonos a plazo, vencimiento en 2031, intereses de un 6.25% | | 117,100 |
| Bonos a plazo, vencimiento de 2036 a 2039, intereses de un 6.30% | | 270,000 |
| Bonos a plazo, vencimiento de 2055 a 2058, intereses de un 6.55% | | 429,000 |
| Total de Bonos Serie B en circulación | | 1,246,656 |
| Bonos Serie C: | | |
| Bonos de Apreciación de Capital, vencimiento en 2030, intereses de un 6.50% | | 3,919 |
| Bonos a plazo, vencimiento de 2024 a 2028, intereses de un 6.15% | | 110,000 |
| Bonos a plazo, vencimiento de 2029 a 2038, intereses de un 6.25% | | 45,000 |
| Bonos a plazo, vencimiento de 2039 a 2043, intereses de un 6.30% | | 143,000 |
| Total de Bonos Serie C en circulación | | 301,919 |
| Total de Bonos en circulación | | 3,172,387 |
| Menos descuento sobre bonos | | (5,915) |
| Bonos por pagar - neto | $ | 3,166,472 |

*Bonos Serie A*: el monto global acumulado de los Bonos Serie A emitidos ascendía a unos $1,589 millones, de los cuales $1,544 millones se emitieron como bonos a plazo (los "Bonos a Plazo Serie A") y $45 millones se emitieron como bonos de apreciación de capital (los "Bonos de Apreciación de Capital Serie A"). Los intereses sobre los Bonos a Plazo Serie A se pagan de manera mensual, el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital Serie A no se pagan de manera corriente, sino que se añaden al capital de los Bonos de Apreciación de Capital cada 1 de enero y cada 1 de julio (las "Fechas de Acumulación"), y se consideran como si se acumularan en montos diarios iguales entre las Fechas de Acumulación, hasta que se pagan a su vencimiento o al momento de la amortización. Los intereses se calcularán sobre un año de 360 días, conformado por doce meses de 30 días.

A criterio del Sistema, los Bonos Serie A están sujetos a amortización de cualquier procedencia, en su totalidad o en parte, en cualquier momento a partir del 1 de julio de 2018, a un precio de amortización equivalente al monto de capital (en el caso de los Bonos de Apreciación de Capital Serie A, el monto acumulado) de los Bonos Serie A, más los intereses acumulados hasta la fecha de amortización, y sin primas.

55                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO**
**DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Además, los siguientes Bonos a Plazo Serie A están sujetos a una amortización obligatoria que en parte comienza el 1 de julio de 2021, en la medida de las necesidades del fondo de amortización para tales bonos que se establece a continuación, a un precio de amortización equivalente al 100% del monto de capital más los intereses acumulados, de la siguiente manera (cifras en miles):

| Período de amortización | Bonos afectados | Monto |
|---|---|---|
| 1 de julio de 2021 | Bonos a plazo (vencimiento final el 1 de julio de 2023) | $     50,000 |
| 1 de julio de 2022 | Bonos a plazo (vencimiento final el 1 de julio de 2023) | 70,000 |
| 1 de julio de 2023 | Bonos a plazo (vencimiento final el 1 de julio de 2023) | 80,000 |
| | Subtotal | 200,000 |
| 1 de julio de 2031 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 3,000 |
| 1 de julio de 2032 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 4,500 |
| 1 de julio de 2033 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 4,000 |
| 1 de julio de 2034 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 133,500 |
| 1 de julio de 2035 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 133,500 |
| 1 de julio de 2036 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 133,500 |
| 1 de julio de 2037 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 133,500 |
| 1 de julio de 2038 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 133,500 |
| | Subtotal | 679,000 |
| Total | | $     879,000 |

*Bonos Serie B*: el monto global acumulado de los Bonos Serie B ascendía a unos $1,059 millones, de los cuales $816 millones se emitieron como bonos a plazo (los "Bonos a Plazo Serie B") y $243 millones se emitieron como bonos de apreciación de capital (los "Bonos de Apreciación de Capital Serie B"). Los intereses sobre los Bonos a Plazo Serie B se pagan de manera mensual, el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital Serie B no se pagan de manera corriente, sino que se añaden al capital de los Bonos de Apreciación de Capital Serie B cada 1 de enero y cada 1 de julio (las Fechas de Acumulación), y se consideran como si se acumularan en montos diarios iguales entre las Fechas de Acumulación, hasta que se pagan a su vencimiento o al momento de la amortización. Los intereses se calcularán sobre un año de 360 días, conformado por doce meses de 30 días.

A criterio del Sistema, los Bonos Serie B están sujetos a amortización de cualquier procedencia, en su totalidad o en parte, en cualquier momento a partir del 1 de julio de 2018, a un precio de amortización equivalente al monto de capital (en el caso de los Bonos de Apreciación de Capital Serie B, el monto acumulado) de los Bonos Serie B, más los intereses acumulados hasta la fecha de amortización, y sin primas.

*Bonos Serie C*: el monto global acumulado de los Bonos Serie C ascendía a unos $300 millones, de los cuales $298 millones se emitieron como bonos a plazo (los "Bonos a Plazo Serie C") y $2 millones se emitieron como bonos de apreciación de capital (los "Bonos de Apreciación de Capital Serie C"). Los intereses sobre los Bonos a Plazo Serie C se pagan de manera mensual, el primer día de cada mes. Los intereses sobre los Bonos de Apreciación de Capital Serie C no se pagan de manera corriente, sino que se añaden al capital de los Bonos de Apreciación de Capital Serie C cada 1 de enero y cada 1 de julio (las "Fechas de Acumulación"), y se consideran como si

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

se acumularan en montos diarios iguales entre las Fechas de Acumulación, hasta que se pagan a su vencimiento o al momento de la amortización. Los intereses se calcularán sobre un año de 360 días, conformado por doce meses de 30 días.

A criterio del Sistema, los Bonos Serie C están sujetos a amortización de cualquier procedencia, en su totalidad o en parte, en cualquier momento a partir del 1 de julio de 2018, a un precio de amortización equivalente al monto de capital (en el caso de los Bonos de Apreciación de Capital Serie C, el monto acumulado) de los Bonos Serie B, más los intereses acumulados hasta la fecha de amortización, y sin primas.

Además, los siguientes Bonos a Plazo Serie C están sujetos a una amortización obligatoria que en parte comienza el 1 de julio de 2024, en la medida de las necesidades del fondo de amortización para tales bonos que se establece a continuación, a un precio de amortización equivalente al 100% del monto de capital más los intereses acumulados, de la siguiente manera (cifras en miles):

| Período de amortización | Bonos afectados | Monto |
|---|---|---|
| 1 de julio de 2024 | Bonos a plazo (vencimiento final el 1 de julio de 2028) | $        18,700 |
| 1 de julio de 2025 | Bonos a plazo (vencimiento final el 1 de julio de 2028) | 22,000 |
| 1 de julio de 2026 | Bonos a plazo (vencimiento final el 1 de julio de 2028) | 29,150 |
| 1 de julio de 2027 | Bonos a plazo (vencimiento final el 1 de julio de 2028) | 36,300 |
| 1 de julio de 2028 | Bonos a plazo (vencimiento final el 1 de julio de 2028) | 3,850 |
| | Subtotal | 110,000 |
| 1 de julio de 2029 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 100 |
| 1 de julio de 2030 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 540 |
| 1 de julio de 2031 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 100 |
| 1 de julio de 2032 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 3,420 |
| 1 de julio de 2033 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 4,320 |
| 1 de julio de 2034 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 100 |
| 1 de julio de 2035 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 11,940 |
| 1 de julio de 2036 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 2,160 |
| 1 de julio de 2037 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 7,920 |
| 1 de julio de 2038 | Bonos a plazo (vencimiento final el 1 de julio de 2038) | 14,400 |
| | Subtotal | 45,000 |
| 1 de julio de 2039 | Bonos a plazo (vencimiento final el 1 de julio de 2043) | 28,600 |
| 1 de julio de 2040 | Bonos a plazo (vencimiento final el 1 de julio de 2043) | 28,600 |
| 1 de julio de 2041 | Bonos a plazo (vencimiento final el 1 de julio de 2043) | 28,600 |
| 1 de julio de 2042 | Bonos a plazo (vencimiento final el 1 de julio de 2043) | 28,600 |
| 1 de julio de 2043 | Bonos a plazo (vencimiento final el 1 de julio de 2043) | 28,600 |
| | | 143,000 |
| Total | | $        298,000 |

57

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Las necesidades de amortización de la deuda en años futuros con respecto a los bonos del Sistema al 30 de al 30 de junio de 2017 son las siguientes (cifras en miles):

|  | Capital | Intereses | Total |
|---|---|---|---|
| Año terminado el 30 de junio: | | | |
| 2018 | $ — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2020 | — | 166,519 | 166,519 |
| 2021 | — | 166,519 | 166,519 |
| 2022 | — | 166,519 | 166,519 |
| 2023–2027 | 200,000 | 751,232 | 951,232 |
| 2028–2032 | 1,036,595 | 702,754 | 1,739,349 |
| 2033–2037 | 452,745 | 695,887 | 1,148,632 |
| 2038–2042 | 1,210,220 | 407,702 | 1,617,922 |
| 2043–2047 | 180,550 | 256,577 | 437,127 |
| 2048–2052 | — | 247,568 | 247,568 |
| 2053–2057 | 362,800 | 212,062 | 574,862 |
| 2058–2062 | 398,200 | 14,401 | 412,601 |
| | 3,841,110 | $ 4,120,778 | 7,961,888 |
| Menos: | | | |
| Intereses no acumulados | (668,723) | | |
| Descuento no amortizado | (5,915) | | |
| Total | $ 3,166,472 | | |

*Pignoración de aportaciones patronales de conformidad con los acuerdos de garantía.* El Sistema celebró un Acuerdo de Garantía con el Agente Fiscal para el beneficio de los bonistas, en virtud del cual el Sistema se comprometió a otorgarle al Agente Fiscal, y le otorgó, garantía prendaria con respecto a las aportaciones patronales (según se define en la Resolución del SRE relativa a los Bonos) realizadas luego del 31 de enero de 2008, la fecha de emisión de la primera serie de bonos, y con respecto a los fondos en depósito con el Agente Fiscal en varias cuentas establecidas de conformidad con la Resolución sobre Bonos para el Financiamiento de Pensiones (la "Resolución").

La Resolución y el Acuerdo de Garantía constituyen un contrato entre el Sistema y el Agente Fiscal en representación de los propietarios de los bonos. La pignoración, los convenios y los acuerdos del Sistema que figuran en la Resolución y en el Acuerdo de Garantía redundarán en los mismos beneficios, protecciones y garantías para todos los propietarios de los bonos, independientemente del momento de emisión o vencimiento, y estarán en el mismo nivel, sin preferencias, prioridades o distinciones de un bono con respecto a otro, a excepción de lo que se establezca o autorice expresamente en la Resolución. Las aportaciones patronales anuales que se realicen con posterioridad al 31 de enero de 2008, la fecha de emisión de la primera serie de bonos, de conformidad con la Ley, y los montos en depósito en las diferentes cuentas creadas de conformidad con la Resolución para el beneficio de los

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

propietarios de los bonos, se pignoran para cubrir los requisitos anuales de amortización de la deuda que correspondan. Es una pignoración irrevocable que seguirá en vigor mientras haya bonos en circulación en virtud de la Resolución.

Desde agosto de 2016, y a partir de allí todos los meses, el Agente Fiscal de conformidad con la Resolución de los bonos del Sistema notificó al Sistema que no había transferido las aportaciones patronales obligatorias en el último día hábil de cada mes. El Agente Fiscal no pretende cobrar ni recuperar ninguna deuda al ELA o sus instrumentalidades (incluido el Sistema), ni ejecutar ninguna sentencia en su contra, ni hacerse con el control o la posesión de ninguna de sus propiedades, ni tampoco busca ejercer ningún acto que PROMESA, la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico del 29 de enero de 2017 (Ley núm. 5 o la Ley de Emergencia Financiera), la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico (Ley núm. 21, o la Ley de Moratoria), o cualquier Orden Ejecutiva relacionada, hayan paralizado. Y sin embargo, el Agente Fiscal ha presentado una evidencia de reclamación contra el ELA y el Sistema en el marco de sus respectivos casos de Título III, en la que solicita cobrar el monto total de los bonos del Sistema que estén en circulación. Como se explica con más detalle en la nota 13, en la actualidad la validez de los bonos del Sistema es objeto de impugnaciones ante el Tribunal del Título III.

*Rebajas de la clasificación crediticia de los bonos*: el 24 de enero de 2016, Fitch Ratings Inc. rebajó los Bonos del Sistema de "CC" a "C", augurándoles una perspectiva "negativa". Fitch destacó "el colapso de las negociaciones entre el ELA y los principales bonistas, la sentencia reciente dictada por la Corte Suprema de los Estados Unidos sobre la legislación del ELA en materia de quiebras y el proceso lento de la legislación federal en apoyo del ELA", como indicadores de que la reestructuración, el aplazamiento o el incumplimiento de la deuda ya son inevitables. El 5 de abril de 2017, Moody's Investors Service rebajó los Bonos del Sistema de "C" a "Ca" augurándoles una perspectiva "negativa", y citó "constantes presiones sobre la economía puertorriqueña, lo cual genera una percepción de disminución en la capacidad de devolver la deuda". Standard & Poor's Ratings Services en este momento atribuye una calificación "CC" a los Bonos del Sistema.

**(11) Reserva de seguros de garantía para los préstamos a los miembros**

El Sistema brinda una cobertura de seguro de vida que garantiza el pago del saldo pendiente de capital sobre los préstamos hipotecarios, personales y para viajes culturales ante el fallecimiento de un miembro del plan. El pago de esta cobertura corre en su totalidad por cuenta de los miembros del plan que obtuvieron del Sistema dichos préstamos. El costo del seguro de vida se determina de manera actuarial, y no varía en función de la edad, el sexo o la condición de salud.

**(12) Situación y evolución del financiamiento de otros beneficios posteriores al empleo de atención de salud**

La situación de financiamiento de otros beneficios posteriores al empleo (OBPE) de atención de salud del Sistema al 30 de al 30 de junio de 2017, la fecha de valuación actuarial más reciente, es la siguiente (en miles de dólares):

| Valor actuarial de los activos del plan | Total de obligaciones actuariales (AAL) | Total de obligaciones actuariales no financiadas (UAAL) | Ratio financiado | Nómina anual cubierta | UAAL como porcentaje de la nómina anual cubierta |
|---|---|---|---|---|---|
| $                          — | 1,138,309 | 1,138,309 | — % $ | 3,344,197 | 34.0 % |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El anexo sobre la evolución del financiamiento, que se presenta como información suplementaria obligatoria luego de las notas a los estados financieros básicos, presenta datos sobre tendencias para varios años en cuanto a si el valor actuarial de los activos del plan está aumentando o disminuyendo a lo largo del tiempo frente a obligaciones actuariales acumuladas por los beneficios.

La Ley núm. 3 eliminó la aportación de $100 por mes al plan de seguro médico para quienes se retiraron a partir del 1 de julio de 2013.

La fecha de recopilación de los datos del censo es a principios del año fiscal. El cálculo de los resultados de las obligaciones al 30 de al 30 de junio de 2017 se basan en las previsiones de las obligaciones del Sistema a partir de la fecha de recopilación de los datos del censo (1 de julio de 2016) por un año, usando métodos prospectivos y sobre la base del supuesto de que no se producirán ni pérdidas ni ganancias por las obligaciones. El período de amortización para la Declaración GASB núm. 45 ha sido reducido para ajustarlo a la expectativa de vida prevista de los miembros activos actuales.

Las valuaciones actuariales se basaron en los siguientes supuestos actuariales:

| | |
|---|---|
| Método actuarial de costos | Edad normal de ingreso |
| Método de amortización | 18 años cerrado (a partir del 1 de julio de 2014), dólar constante |
| Período de amortización restante | 16 años |
| Método de valuación de activos | No aplicable |
| Supuestos actuariales: | |
| Retorno sobre la inversión | 3.00% |
| Aumentos salariales previstos | No aplicable |
| Aumento previsto de la plantilla | No aplicable |
| Inflación | No aplicable |
| Ajuste por costo de vida | No aplicable |

Las valuaciones actuariales de un plan en funcionamiento suponen estimar el valor neto de los montos comunicados y elaborar supuestos sobre la probabilidad de que ocurran determinados hechos en el futuro distante. Algunos ejemplos son los supuestos sobre las tasas de empleo y mortalidad en el futuro. Los montos determinados se revisan continuamente comparando los resultados reales con las previsiones, y se hacen nuevas estimaciones sobre el futuro.

Los cálculos se basan en los tipos de beneficios provistos según los términos del plan sustantivo al momento de cada valuación y en el patrón de reparto de costos entre el patrono y los miembros del plan hasta ese momento. La proyección de beneficios OBPE a los efectos de la elaboración de informes financieros no incluye de manera explícita los posibles efectos futuros que las limitaciones legales o contractuales al financiamiento podrían tener sobre el patrón de reparto de costos entre el patrono y los miembros del plan.

Los cálculos actuariales reflejan una perspectiva a largo plazo. En virtud de esa perspectiva, los métodos y los supuestos actuariales utilizados incluyen técnicas diseñadas para reducir la volatilidad a corto plazo en las obligaciones actuales acumuladas y en el valor actuarial de los activos.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Los supuestos sobre las tasas de mortalidad para los beneficios OBPE son los mismos que para los beneficios de pensiones. Para obtener más información consulte la nota 5.

**(13) Contingencias**

**A. Litigios presentados por acreedores contra el Sistema antes del comienzo de los Casos de Título III**

*Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico, et. al v. UBS Fin. Servs. Inc. of Puerto Rico, et al.*, proc. civ. núm. KAC-2011-1067 (803) (Tribunal de Primera Instancia de Puerto Rico, 29 de septiembre de 2011)

El 29 de septiembre de 2011, dos beneficiarios del Sistema presentaron una demanda derivada ante el Tribunal de Primera Instancia de Puerto Rico, Región Judicial de San Juan (el "Tribunal del ELA"), en la que alegaron incumplimientos contractuales y de deberes fiduciarios contra los suscriptores de la emisión y la suscripción por $3,000 millones de los Bonos del Sistema en 2008 (la "Acción de UBS"). El 7 de diciembre de 2016, el Tribunal del ELA permitió intervenir al Sistema y ordenó a los demandantes (que ahora abarcan al Sistema y a siete demandantes individuales, conjuntamente denominados, los "Demandantes") presentar una segunda demanda enmendada contra los suscriptores, incluido UBS Financial Services Inc. of Puerto Rico (UBS) y entidades relacionadas (conjuntamente, los "Demandados UBS"). UBS había actuado como el principal suscriptor de los Bonos del Sistema de 2008.

Los Demandantes alegan, entre otras cosas, que al participar como el principal suscriptor de los Bonos del Sistema de 2008, UBS incumplió sus obligaciones contractuales, extracontractuales y fiduciarias contraídas con el Sistema. Los Demandantes solicitan que se dicte una sentencia que condene a UBS al pago de más de $800 millones al Sistema por la suscripción de los Bonos del Sistema de 2008.

El 6 de marzo de 2019, los Demandantes presentaron la Cuarta Demanda Enmendada contra los Demandados UBS; el Tribunal del ELA la admitió el 15 de abril de 2019. El 29 de abril de 2019, UBS presentó su contestación y una moción informativa, en las que expresaba su intención de someter una reconvención si no se levantaba la paralización automática del Sistema aplicada conforme al Título III. En la reconvención propuesta que se adjunta a la moción informativa se alega un incumplimiento contractual y se reclama una indemnización a raíz de la emisión de los Bonos del Sistema de 2008.

El 25 de junio de 2019, la Junta de Supervisión presentó una moción de paralización de ciertos procedimientos controvertidos a la espera de que se confirmase el plan de ajuste propuesto para el ELA. El 24 de julio de 2019, el Tribunal del Título III dictó una orden por la que se paralizaron, hasta el 30 de noviembre de 2019, varios procedimientos contenciosos y objeciones a reclamaciones que contenían cuestiones que se solapaban y que estaban pendientes de resolución ante dicho Tribunal. Tales procedimientos contenciosos y objeciones a reclamaciones incluían aquellos que versaban sobre la validez de las emisiones de los Bonos del Sistema. UBS alega que la Acción de UBS que pende ante el Tribunal del ELA debe paralizarse a la espera de que dicho Tribunal se pronuncie sobre las cuestiones de derecho comunes que se plantearon.

El 8 de octubre de 2019, UBS presentó una moción de levantamiento de paralización automática para interponer reconvenciones ante el Tribunal del ELA por incumplimiento contractual e indemnización contra el Sistema en el marco de la Acción de UBS. UBS alega que en sus Declaraciones sobre la Oferta de los Bonos del Sistema de 2018, el Sistema manifestó que emitía los Bonos del Sistema de 2008 en virtud de la facultad que le confería la Ley de Retiro, y que dichos Bonos constituirían obligaciones especiales jurídicamente vinculantes del Sistema. UBS también sostiene que el Sistema manifestó en los contratos de compra suscritos con UBS que el Sistema tenía plenos derecho, facultad y potestad legal para emitir los bonos, por lo que no ha incumplido ninguna

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

ley. El 11 de diciembre de 2019, el Tribunal del Título III celebró una vista sobre la moción de levantamiento de paralización de UBS. El 16 de diciembre de 2019, el Tribunal del Título III concedió a UBS un levantamiento limitado de paralización únicamente para que UBS pudiera presentar al Tribunal del ELA sus reconvenciones propuestas. El 4 de febrero de 2020, UBS sometió al Tribunal del ELA sus reconvenciones. El 9 de marzo de 2020, la Junta de Supervisión presentó sus objeciones a las reconvenciones. El 30 de marzo de 2020, UBS volvió a someter su moción de levantamiento de paralización, alegando esta vez que la objeción a las reconvenciones presentada por la Junta de Supervisión vulneraba la orden de levantamiento limitado de paralización dictada en diciembre, por lo que el Tribunal del ELA ahora ya podía atender las objeciones de la Junta de Supervisión. El 22 de abril de 2020, el Tribunal del Título III rechazó la moción.

UBS también ha presentado dos evidencias de reclamaciones contra el Sistema en relación con la Acción de UBS, además de otras dos evidencias de reclamaciones con respecto a *Casasnovas Balado v. UBS Fin. Servs., Inc.*, procedimiento núm. K AC-2014-0072 (905) (Tribunal de Primera Instancia de Puerto Rico, 29 de enero de 2016), una acción presentada por un grupo de demandantes individuales que tiene su origen en la emisión de los Bonos del Sistema.

**B.   Litigios presentados por acreedores contra el Sistema después del comienzo de los Casos de Título III**

*Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto rico, et. al. v. Altair Global Credit Opportunities Fund (A), LLC, et al.*, procedimiento contencioso núm. 17-00213 (D.P.R. 21 de julio de 2017)

El 21 de julio de 2017, la Junta de Supervisión, como representante del Sistema en su caso de Título III, comenzó un procedimiento contencioso contra las garantías prendarias de los bonistas del Sistema sobre varios de sus activos, para lo cual presentó una acción de remedio declaratorio (la "Acción de Remedio Declaratorio del Sistema"). A través de la Acción de Remedio Declaratorio del Sistema, la Junta de Supervisión, como representante del Sistema en el caso de Título III, solicitó que se adoptaran remedios declaratorios para impugnar la validez, prioridad, alcance y exigibilidad de gravámenes y garantías prendarias anteriores y posteriores a la petición, alegados por los demandados en relación con los bonos emitidos por el Sistema. En la demanda se alega que los supuestos gravámenes y garantías prendarias de los bonistas del Sistema no están perfeccionados ya que las Declaraciones financieras conforme al UCC requeridas y las subsiguientes enmiendas adolecían de vicios, por lo que los gravámenes podían evitarse en el caso de Título III. La Acción de Remedio Declaratorio del Sistema también impugnó, entre otras cosas, la supuesta garantía prendaria que los bonistas del Sistema tenían en relación con las aportaciones patronales posteriores a la petición.

El 17 de agosto de 2018, el Tribunal del Título III otorgó una sentencia parcial sumaria a favor del Sistema. Entre otras cosas, el Tribunal del Título III sostuvo que los gravámenes de los bonistas del Sistema no están perfeccionados y que el artículo 544 del Código de Quiebras permite pasar por alto dichos gravámenes. El 5 de septiembre de 2018, el Tribunal del Título III dictó una orden desestimando el resto de las causas y reconvenciones. Dicha orden fue apelada ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito.

(continuación)

SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El 30 de enero de 2019, el Tribunal para el Primer Circuito i) confirmó la decisión del Tribunal del Título III de que las declaraciones financieras de 2018 relacionadas con los bonos del Sistema no perfeccionaron la garantía prendaria de los bonistas del Sistema en relación con los bienes pignorados, ii) confirmó la desestimación de la reclamación de los bonistas del Sistema relativa a la estipulación de enero de 2017 y iii) revocó la decisión del Tribunal del Título III al concluir que los bonistas del Sistema cumplieron con los requisitos de perfeccionamiento a partir del 17 de diciembre de 2015. Además, el Tribunal para el Primer Circuito remitió determinadas reconvenciones al Tribunal del Título III para que las examinara más a fondo. El 30 de abril de 2019, la Junta de Supervisión presentó, en nombre del Sistema, una petición de avocación (*writ of certiorari*) ante la Corte Suprema de los Estados Unidos, en la que solicitó que se revocara la decisión del Tribunal para el Primer Circuito. La petición fue rechazada el 7 de octubre de 2019.

Una vez recibidas las actuaciones, el Sistema solicitó que el Tribunal del Título III i) se pronunciara sobre la cuestión no resuelta de si las garantía prendarias de los bonistas del Sistema gravan los ingresos que el Sistema haya recibido tras el comienzo de su caso de Título III (la "Cuestión sobre Ingresos posteriores a la Petición") y ii) le autorizara a presentar una demanda contenciosa enmendada para plantear cuestiones sobre la naturaleza o el alcance de las garantías prendarias de los bonistas del Sistema. El 6 de mayo de 2019, el Tribunal del Título III aceptó pronunciarse sobre la Cuestión sobre Ingresos posteriores a la Petición, pero rechazó la solicitud del Sistema de autorizarle a enmendar su demanda. El 27 de junio de 2019, el Tribunal del Título III dictó una sentencia sumaria a favor del Sistema con respecto a la Cuestión sobre Ingresos posteriores a la Petición y sostuvo que el artículo 552 del Código de Quiebras impide que las garantías prendarias de los bonistas del Sistema graven los ingresos que el Sistema haya recibido con posterioridad a la petición, y concluyó que las aportaciones patronales no constituyen "ingresos especiales" en el sentido del artículo 902 del Código de Quiebras. El 18 de julio de 2019, los bonistas del Sistema apelaron la decisión del Tribunal del Título III ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito. El 30 de enero de 2020, el Tribunal para el Primer Circuito emitió un dictamen confirmando la decisión del Tribunal del Título III. El 3 de marzo de 2020, el Tribunal para el Primer Circuito rechazó la petición de los bonistas del Sistema de una nueva vista ante el Tribunal en pleno.

*Andalusian Global Designated Activity Co., et al. v. Estado Libre Asociado de Puerto Rico, et al.*, procedimientos contenciosos núms. 17-00219-LTS y 17-00220-LTS (D.P.R. 27 de julio de 2017)

El 27 de julio de 2017, un grupo de bonistas del Sistema iniciaron procedimientos contenciosos contra el ELA y el Sistema en el marco de los casos con epígrafe inicial *Altair Global Credit Opp. Fund (A), LLC, et al. v. Estado Libre Asociado de Puerto Rico, et al.*, procedimientos contenciosos núms. 17-00219-LTS y 17-00220-LTS (D.P.R. 27 de julio de 2017) (conjuntamente, los "Litigios PayGo"), en los que solicitaron una declaración de que tanto la Resolución Conjunta 188 como la Ley 106 de 2017 (conjuntamente, la "Ley PayGo") son nulas de pleno derecho ya que son contrarias a la paralización automática de Título III, así como a las Cláusulas sobre Contratos y Expropiación de la Constitución de los Estados Unidos.

El 17 de noviembre de 2017, la Junta de Supervisión, como representante del Sistema en su caso de Título III, junto con FAFAA y el Comité de Retirados, presentó una petición para rechazar el Litigio PayGo. El 2 de febrero de 2018, el Tribunal del Título III dictó una orden por la que informó a las partes de que la moción para rechazar quedó vista para sentencia. El 9 de septiembre de 2018, el Tribunal del Título III paralizó el caso a la espera de la decisión del Tribunal de Apelación de los Estados Unidos para el Primer Circuito sobre la apelación de la sentencia sumaria en el marco de la Acción de Remedio Declaratorio del Sistema, decisión que se dictó el 30 de enero de 2019 (como se explicó anteriormente). A la luz de la paralización, el 27 de septiembre de 2018, el Tribunal del Título III desestimó sin perjuicio la moción para rechazar en cuanto a la solicitud de levantamiento de la paralización. Ninguna de las partes pidió levantar la paralización.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El 1 de marzo de 2019, el Tribunal del Título III desestimó sin perjuicio dicho caso en relación con Altair Global Credit Opportunities Fund (A), LLC y Nokota Capital Master Fund, L.P. En consecuencia, el caso recibió un nuevo epígrafe: *Andalusian Global Designated Activity Co. et al v. Estado Libre Asociado de Puerto Rico, et al.*, procedimientos contenciosos núms. 17-00219-LTS y 17-00220-LTS (D.P.R.). El 5 de marzo de 2019, el Tribunal del Título III dictó una orden por la que permitió a determinados Bonistas del Sistema –Crow n Managed Accounts (en nombre y beneficio de Crow n/PW SP), LMA SPC (en nombre y beneficio de Map 98 Segregated Portfolio), Oceana Master Fund Ltd., Pentw ater Merger Arbitrage Master Fund Ltd. y PWCM Master Fund Ltd.– intervenir en los procedimientos contenciosos. El 25 de octubre de 2019, los Bonistas del Sistema presentaron una moción para informar sobre la presentación de una réplica a determinados argumentos relativos a la validez de los bonos emitidos por el Sistema en las objeciones globales a reclamaciones del Comité de Acreedores y el Comité de Retirados, así como en la moción para rechazar. A la fecha de estos estados financieros, no ha habido más actividad en los expedientes.

**C. Principales causas controvertidas en el Caso de Título III del Sistema**

*Litigio sobre la Cláusula de Nombramientos, Caso núm. 17-3566-LTS (D.P.R. 7 de agosto de 2017)*

El 7 de agosto de 2017, un grupo de bonistas de obligación general, liderado por Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (conjuntamente, "Aurelius"), presentó una moción para rechazar las peticiones de Título III. En su moción, Aurelius alegó que el nombramiento de los miembros de la Junta de Supervisión era contrario a la "Cláusula de Nombramientos" de la Constitución de los Estados Unidos, que requiere que los "funcionarios principales" de los Estados Unidos sean nombrados por el Presidente y confirmados por el Senado. El Tribunal del Título III desestimó la moción para rechazar presentada por Aurelius y esta última apeló ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito. El 15 de febrero de 2019, el Tribunal para el Primer Circuito revocó la decisión del Tribunal del Título III y sostuvo que el proceso de nombramiento de los miembros de la Junta de Supervisión era contrario a la Cláusula de Nombramientos. El Tribunal para el Primer Circuito paralizó su resolución durante 90 días para que el Presidente y el Senado pudieran nombrar a los miembros de la Junta de Supervisión de conformidad con la Constitución de los Estados Unidos. Dicho Tribunal también validó expresamente todas las demás acciones anteriores de la Junta de Supervisión, incluidas todas las acciones iniciadas por la Junta de Supervisión durante el período de paralización de 90 días.

El 23 de abril de 2019, la Junta de Supervisión apeló la decisión del Tribunal del Primer Circuito ante la Corte Suprema de los Estados Unidos al presentar una petición de avocación (*writ of certiorari*). El 24 de abril de 2019, la Junta de Supervisión presentó una moción ante el Tribunal del Primer Circuito solicitando una extensión de la paralización de 90 días de su decisión del 15 de febrero hasta que la Corte Suprema resolviera el caso de forma definitiva. El 6 de mayo de 2019, el Tribunal del Primer Circuito concedió parcialmente la moción de extensión presentada por la Junta de Supervisión y extendió la paralización de su decisión del 15 de febrero hasta el 15 de julio de 2019, pero rechazó la solicitud de extender indefinidamente la paralización hasta que la Corte Suprema resolviera definitivamente el caso.

El 30 de mayo de 2019, Aurelius presentó una contrapetición de avocación (*writ of certiorari*) ante la Corte Suprema de los Estados Unidos para impugnar la validación por el Tribunal del Primer Circuito de las acciones anteriores de la Junta de Supervisión, al amparo de la doctrina de funcionario *de facto*. El 6 de junio de 2019, el Fiscal General de los Estados Unidos y el Comité de Acreedores presentaron por separado peticiones de avocación (*writs of certiorari*) ante la Corte Suprema de los Estados Unidos para que esta se pronunciara sobre si los miembros de la Junta de Supervisión son "Funcionarios de los Estados Unidos" en el sentido de la Cláusula de Nombramientos. El 14 de junio de 2019, la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) –el demandante en un procedimiento contencioso en el marco del Caso núm. 17-00228 –

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

LTS– presentó aparte su propia petición de avocación (*writ of certiorari*) ante la Corte Suprema de los Estados Unidos para impugnar la aplicación de la doctrina de funcionario *de facto* por el Tribunal del Primer Circuito.

El 18 de junio de 2019, el Presidente de los Estados Unidos volvió a nombrar los siete miembros originales de la Junta de Supervisión para que cumplieran la parte restante de su mandato. Dichos nombramientos quedan a la espera de confirmación del Senado de los Estados Unidos.

El 20 de junio de 2019, la Corte Suprema de los Estados Unidos concedió las peticiones de avocación (*writs of certiorari*) de la Junta de Supervisión, Aurelius, el Fiscal General, el Comité de Acreedores y la UTIER, y paralizó la decisión del Tribunal para el Primer Circuito hasta que resolviera el caso de forma definitiva. El 15 de octubre de 2019, la Corte Suprema de los Estados Unidos atendió un alegato oral en apelación. A la fecha de estos estados financieros, la Corte Suprema todavía no ha resuelto el recurso de apelación.

*Moción de determinados acreedores asegurados del Sistema de levantamiento de paralización automática*, Caso núm. 17-3566-LTS (D.P.R. 3 de julio de 2018)

El 3 de julio de 2018, un grupo de bonistas del Sistema (incluidos Altair Global, Andalusian Global, Glendon Opportunities Fund, Mason Capital, Nokota Capital, Oaktree, Ocher Rose, SV Credit y una serie de fondos mutuos con sede en Puerto Rico) presentó una moción (la "Moción de Levantamiento de Paralización") en el marco del caso de Título III del Sistema, en la que alegó que la Cuenta Segregada anterior a la Petición quedaría sin fondos en agosto de 2018, lo cual despojaría a los bonistas de la protección adecuada en la forma de los pagos mensuales de intereses, por lo que dejaría desprotegidos las garantías prendarias constitucionalmente protegidas de los autores de la moción. Los autores de la moción alegaron que el levantamiento de la paralización acordada conforme al Título III era necesaria para mantener el *statu quo* a la espera de la resolución por el Tribunal del Título III de las contramociones de sentencia sumaria en el marco de la Acción de Remedio Declaratorio del Sistema (como se explicó anteriormente). De forma alternativa, los autores de la moción solicitaron la protección adecuada de sus gravámenes sobre los bienes del Sistema. El 21 de agosto de 2018, el Tribunal del Título III rechazó la Moción de Levantamiento de Paralización y el 29 de agosto de 2018, los bonistas del Sistema apelaron ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito.

El 21 de febrero de 2019, los autores de la moción renovaron su Moción de Levantamiento de Paralización luego de que el 30 de enero de 2019 el Tribunal para el Primer Circuito revocara en parte la orden del Tribunal del Título III del 17 de agosto de 2018 dictada en el marco de la Acción de Remedio Declaratorio del Sistema. A la luz de la decisión del Tribunal del Título III del 27 de junio de 2019 dictada en el marco de la Acción de Remedio Declaratorio del Sistema, el 8 de julio de 2019 el Tribunal del Título III desestimó sin perjuicio la Moción de Levantamiento de Paralización renovada.

*Objeción global a reclamaciones de los bonistas del Sistema*, Caso núm. 17-3566-LTS

El 12 de marzo de 2019, el Comité de Acreedores presentó una objeción global a la totalidad de las reclamaciones alegadas contra el Sistema en las que se reclaman unos $3,100 millones de bonos en circulación que el Sistema emitió en 2008 (la "Objeción del Comité de Acreedores a Reclamaciones a los Bonos del Sistema"). En la Objeción del Comité de Acreedores a Reclamaciones a los Bonos del Sistema se alega que el Sistema solo estaba autorizado a emitir una "colocación directa de la deuda", la cual, según sostiene el Comité de Acreedores, se refiere a una "colocación privada, no una oferta pública". Puesto que los Bonos del Sistema fueron emitidos mediante una oferta pública, el Comité de Acreedores alega que los Bonos del Sistema eran *ultra vires* y, por ende, "nulos de pleno derecho". En consecuencia, el Comité de Acreedores solicita que se dicte una orden que rechace en su totalidad todas las reclamaciones por bonos del Sistema. Asimismo, el 12 de marzo de 2019, el Comité de

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Acreedores presentó una moción procesal en relación con la resolución judicial de la Objeción del Comité de Acreedores a Reclamaciones a los Bonos del Sistema.

El 23 de abril de 2019, el Comité de Retirados presentó una objeción global (la "Objeción Global del Comité de Retirados a Reclamaciones a los Bonos del Sistema") a la totalidad de las reclamaciones de los bonistas del Sistema alegadas contra el Sistema y el ELA sobre la base de que los Bonos del Sistema fueron emitidos *ultra vires*, por lo que los bonistas del Sistema no tenían ninguna reclamación exigible en relación con los Bonos del Sistema.

El 24 de julio de 2019, el Tribunal del Título III dictó una orden (la "Orden de Paralización del 24 de julio") por la que paralizó la Objeción del Comité de Acreedores a Reclamaciones a los Bonos del Sistema y la Objeción del Comité de Retirados a Reclamaciones a los Bonos del Sistema (conjuntamente, las "Objeciones a Reclamaciones a los Bonos del Sistema").

El 18 de octubre de 2019, las partes en las Objeciones a Reclamaciones a los Bonos del Sistema presentaron conjuntamente una moción y orden estipulada en las que solicitaron modificar la Orden de Paralización del 24 de julio permitiendo que las cuestiones de *ultra vires* y gravamen planteadas en las objeciones prosiguieran. El 24 de octubre de 2019, el Tribunal del Título III todavía no había dictado la orden estipulada, pero concedió la moción y ordenó la exhibición documental e itinerario para los alegatos en relación con las cuestiones de *ultra vires* y de alcance de gravamen para mayo de 2020. El 28 de octubre de 2019, el Tribunal del Título III dictó una orden por la que exigió antes del 27 de noviembre de 2019 un informe de mediación y/u orden de calendario procesal con respecto al resto de las causas de paralización, y extendió la paralización hasta el 31 de diciembre de 2019 en relación con todas las demás causas que no tenían que ver con las cuestiones de *ultra vires* y el alcance de gravamen. El 27 de noviembre de 2019, el equipo de mediación designado por el Tribunal presentó un informe provisional de situación, en el que se establecía un itinerario procesal secuencial recomendado de algunas cuestiones principales objeto de litigio, lo que incluye i) la validez de determinadas series de bonos de obligación general y de la AEP; ii) la situación garantizada o no garantizada de reclamaciones relativas a los bonos de obligación general y de la AEP y iii) los derechos contra el ELA de los bonistas de renta y otra deuda emitidos por determinadas instrumentalidades de Puerto Rico. En virtud de la orden propuesta de itinerario procesal contenida en el informe provisional de situación, el equipo de mediación propuso que en febrero de 2020 comenzara una sesión para alegatos iniciales sobre dichas cuestiones y que las vistas se programaran para el 30 de abril y para junio de 2020. El 27 de diciembre de 2019, el Tribunal del Título III dictó una orden enmendada por la que extendió la paralización hasta el 11 de marzo de 2020. El 10 de febrero de 2020, el equipo de mediación presentó un informe enmendado, el cual fue examinado por el Tribunal del Título III durante la vista celebrada el 4 de marzo de 2020. El 10 de marzo de 2020, el Tribunal del Título III dictó una orden final sobre el período de paralización por la que autorizó que determinadas mociones de levantamiento de paralización y demandas sobre bonos de renta prosiguieran, pero mantuvo la paralización en relación con procedimiento que no tenían que ver con las cuestiones de *ultra vires* y el alcance de gravamen a la espera de su decisión sobre la confirmación del Plan Enmendado (según se define abajo).

El 6 de enero de 2020, la Junta de Supervisión y el Comité de Acreedores presentaron varias objeciones adicionales a la evidencia de reclamación sometida por el Agente Fiscal del Sistema y los bonistas del Sistema. La Junta de Supervisión presentó una objeción a la evidencia de reclamación del Agente Fiscal del Sistema, en la que se reclaman unos $3,800 millones de capital, $9.2 millones de intereses devengados pero no pagados, y otras tasas y gastos. Sobre las Objeciones a Reclamaciones a los Bonos del Sistema, la Junta de Supervisión solicita que la reclamación del Agente Fiscal del Sistema sea rechazada ya que los bonos fueron emitidos *ultra vires*, pero aunque la emisión no fuera *ultra vires* el Agente Fiscal solo tiene una garantía limitada, por lo que únicamente tiene derecho a aquellos activos con respecto a los cuales tiene garantías prendarias constituidas y de los que haya trazabilidad, en su caso. La Junta de Supervisión también presentó contra el Sistema objeciones a las evidencias de reclamaciones de los bonistas del Sistema, en las que alegó del mismo modo que las reclamaciones de los bonistas deben ser rechazadas por estar duplicadas con respecto a la reclamación del Agente Fiscal. Además, el Comité de

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

Acreedores presentó una objeción a reclamaciones de los bonistas del Sistema, en la que reiteró que solicita que se rechacen, por ser *ultra vires*, las reclamaciones de los bonistas o que, de forma alternativa, que las reclamaciones garantizadas de los bonistas del Sistema alegadas contra los bienes del Sistema se limiten únicamente a las aportaciones patronales en posesión del Sistema en la fecha de petición del caso de Título III y que se puedan identificar entre los demás activos del Sistema, cosa que los bonistas del Sistema no podrán mostrar.

*Litigio de Reintegración del Sistema*, procedimientos contenciosos núms. 19-355, 19-356, 19-357, 19-358, 19-359, 19-360 y 19-361-LTS (D.P.R. 19 de mayo de 2019)

El 19 de mayo de 2019, el Comité de Acreedores y la Junta de Supervisión, actuando a través de su Comité de Reclamaciones Especiales, inició siete procedimientos contenciosos (conjuntamente, el "Litigio de Reintegración del Sistema") contra unos 230 demandados que en algún momento poseyeron o actualmente poseen Bonos. Los demandantes solicitan que se adopten remedios declaratorios sobre los Bonos y la recuperación de ciertos pagos de capital e intereses sobre los Bonos. El 21 de mayo de 2019, los demandantes presentaron una moción en la que solicitaron que el Tribunal del Título III i) dicte una orden que extienda hasta el 18 de noviembre de 2019 el período de notificación a demandados nacionales en el marco de las Acciones de Evitación, y ii) paralice las Acciones de Evitación hasta que ambos demandantes presenten una solicitud conjunta al Tribunal del Título III para reanudar un procedimiento o dictar una orden concreta.

El 24 de julio de 2019, el Tribunal del Título III dictó una orden por la que paralizó el Litigio de Reintegración del Sistema hasta el 30 de noviembre de 2019 y ordenó una mediación obligatoria sobre las cuestiones durante el período de paralización.

El 18 de octubre de 2019, las partes en el Litigio de Reintegración del Sistema presentaron conjuntamente una moción y orden estipulada en las que solicitaron modificar la Orden de Paralización del 24 de julio de 2019 permitiendo que las cuestiones de *ultra vires* y gravamen relacionadas con los Bonos del SRE (el "Sistema") prosiguieran. El 24 de octubre de 2019, el Tribunal del Título III todavía no había dictado la orden estipulada, pero concedió la moción para modificar la Orden de Paralización del 24 de julio y ordenó la exhibición documental e itinerario para los alegatos en relación con las cuestiones de *ultra vires* para mayo de 2020. El 1 de noviembre de 2019, los demandados bonistas iniciaron la exhibición documental contra varias partes y no partes, incluido el Sistema, en relación con las cuestiones de *ultra vires*. A partir de esa fecha, el proceso de exhibición documental está en marcha.

El 28 de octubre de 2019, el Tribunal del Título III dictó una orden por la que exigió antes del 27 de noviembre de 2019 un informe de mediación y/u orden de calendario procesal con respecto al resto de las causas de paralización, y extendió la paralización con respecto a las cuestiones que no tienen que ver con *ultra vires* hasta el 31 de diciembre de 2019. El 27 de diciembre de 2019, el Tribunal del Título III dictó una orden enmendada por la que extendió la paralización con respecto a las cuestiones que no tienen que ver con *ultra vires* hasta el 11 de marzo de 2020. El 10 de marzo de 2020, el Tribunal del Título III dictó una orden final sobre el período de paralización por la que autorizó que determinadas mociones de levantamiento de paralización y demandas sobre bonos de renta prosiguieran, pero mantuvo la paralización en relación con procedimiento que no tenían que ver con las cuestiones de *ultra vires* y el alcance de gravamen a la espera de su decisión sobre la confirmación del Plan Enmendado (según se define abajo).

*Procedimientos contenciosos sobre el alcance de gravamen*, procedimientos contenciosos núms. 19-00366-LTS (D.P.R.) y 19-00367-LTS (D.P.R.)

El 20 de mayo de 2019, el Sistema y el Comité de Acreedores iniciaron por separado procedimientos contenciosos (conjuntamente, las "Acciones sobre el Alcance de Gravamen") contra el Agente Fiscal y determinados bonistas

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

efectivos de los Bonos, alegando que los demandados no tienen garantías prendarias válidas y exigibles con relación a ninguno de los activos remanentes del Sistema ni en sus producidos (salvo algunas cuentas por cobrar).

El 24 de julio de 2019, el Tribunal del Título III dictó una orden por la que paralizó las Acciones sobre el Alcance de Gravamen hasta el 30 de noviembre de 2019 y ordenó una mediación obligatoria sobre las cuestiones durante el período de paralización.

El 18 de octubre de 2019, las partes en las Acciones sobre el Alcance de Gravamen presentaron conjuntamente una moción y orden estipulada en las que solicitaron modificar la Orden de Paralización del 24 de julio de 2019 permitiendo que las cuestiones sobre el alcance de los gravámenes de los bonistas del Sistema planteadas en las demandas prosiguieran.

El 24 de octubre de 2019, el Tribunal del Título III todavía no había dictado la orden estipulada, pero concedió la moción y ordenó la exhibición documental e itinerario para los alegatos en relación con las cuestiones de alcance de gravamen para mayo de 2020. El 1 de noviembre de 2019, los demandados bonistas iniciaron la exhibición documental contra varias partes y no partes, incluido el Sistema. A partir de esa fecha, el proceso de exhibición documental está en marcha.

El 28 de octubre de 2019, el Tribunal del Título III dictó una orden por la que exigió antes del 27 de noviembre de 2019 un informe de mediación y/u orden de calendario procesal con respecto al resto de las causas de paralización, y extendió la paralización hasta el 31 de diciembre de 2019 en relación con todas las demás causas que no tenían que ver con las cuestiones de alcance de gravamen. El 27 de noviembre de 2019, el equipo de mediación designado por el Tribunal presentó un informe provisional de situación, en el que se establecía un itinerario procesal secuencial recomendado de algunas cuestiones principales objeto de litigio, lo que incluye i) la validez de determinadas series de bonos de obligación general y de la AEP; ii) la situación garantizada o no garantizada de reclamaciones relativas a los bonos de obligación general y de la AEP y iii) los derechos contra el ELA de los bonistas de renta y otra deuda emitidos por determinadas instrumentalidades de Puerto Rico. En virtud de la orden propuesta de itinerario procesal contenida en el informe provisional de situación, el equipo de mediación propuso que en febrero de 2020 comenzara una sesión para alegatos iniciales sobre dichas cuestiones y que las vistas se programaran para el 30 de abril y para junio de 2020. El 27 de diciembre de 2019, el Tribunal del Título III dictó una orden enmendada por la que extendió la paralización hasta el 11 de marzo de 2020. El 10 de febrero de 2020, el equipo de mediación presentó un informe y una recomendación enmendados, y el 21 de febrero de 2020 las partes presentaron sus réplicas al informe enmendado. El 10 de marzo de 2020, el Tribunal del Título III dictó una orden final sobre el período de paralización por la que autorizó que determinadas mociones de levantamiento de paralización y demandas sobre bonos de renta prosiguieran, pero mantuvo la paralización en relación con procedimiento que no tenían que ver con las cuestiones de ultra vires y el alcance de gravamen a la espera de su decisión sobre la confirmación del Plan Enmendado (para más información véase la nota 14).

*Junta de Supervisión y Administración Financiera para Puerto Rico v. Vásquez*, procedimiento contencioso núm. 19-00393 (D.P.R.) 3 de julio de 2019)

El 3 de julio de 2019, la Junta de Supervisión presentó una demanda contra el Gobernador y la FAFAA en la que solicitó un remedio interdictal para evitar la implementación y ejecución de la Ley 29 de 2019, la cual eliminó para los municipios la obligación de efectuar al ELA pagos PayGo, y de varias resoluciones conjuntas, puesto que i) la Ley 29 era contraria a las secciones 204(a) y 207 de PROMESA; ii) la Ley 29 de 2019 y las resoluciones conjuntas eran contrarias a la sección 204(c) de PROMESA; iii) la Ley 29 de 2019 y las resoluciones conjuntas eran contrarias a la sección 108(a) de PROMESA porque alteran o anulan los propósitos de PROMESA, determinados por la Junta de Supervisión y iv) la supuesta política del Gobernador de no brindar certificaciones conforme a lo requerido por la sección 204 de PROMESA era contraria a la sección 108(a) de PROMESA ya que altera o anula los propósitos de dicho cuerpo legal, determinados por la Junta de Supervisión.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El 15 de julio de 2019, el Gobernador y la FAFAA presentaron una moción para desestimar la demanda. El 22 de agosto de 2019, el Tribunal del Título III rechazó en su totalidad la moción para desestimar. El 10 de septiembre de 2019, el Gobernador y la FAFAA contestaron a la demanda. El 13 de diciembre de 2019, la Junta de Supervisión presentó una moción de una sentencia sumaria. El 5 de febrero de 2020, el Gobernador y la FAFAA presentaron su oposición a la moción de sentencias sumaria de la Junta de Supervisión. El 5 de marzo de 2020, el Tribunal del Título III atendió un argumento oral sobre la moción de sentencia sumaria. A dicha fecha, el Tribunal del Título III todavía no se ha pronunciado de manera definitiva sobre el fondo ni ha dictado su decisión.

*Moción de los bonistas del SRE para nombrar al fideicomisario, Caso núm. 17-03566-LTS (D.P.R. 19 de noviembre de 2019)*

El 19 de noviembre de 2019, determinado grupo de Bonistas (incluidos Andalusian Global, Crown Managed Accounts, Glendon Opportunities, LMA SPC, Mason Capital, Oaktree, Oceana y Pentwater) presentó una moción (la "Moción de Fideicomisario") en el marco del caso de Título III, en la que solicitaron que el Tribunal nombre un fideicomisario conforme al artículo 926 del Código de Quiebras para que se encargue de las reclamaciones de evitación contra el ELA en nombre del ELA. Los autores de la moción solicitaron específicamente que se nombrara un fideicomisario para evitar presuntas transferencias efectuadas por el Sistema al ELA, conforme a la legislación reformada en materia de pensiones aprobada por el Gobierno del ELA. Los autores de la moción alegaron que la Junta de Supervisión denegó injustificadamente seguir adelante con dichas reclamaciones de evitación y que la Junta de Supervisión tenían un conflicto de intereses porque representa tanto al ELA como al Sistema. El 7 de enero de 2020, el Tribunal del Título III rechazó la Moción de Fideicomisario y el 10 de enero de 2020 los Bonistas del Sistema apelaron ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito. El 19 de marzo de 2020, el Tribunal para el Primer Circuito emitió un dictamen confirmando la orden del Tribunal del Título III que rechazaba la Moción de Fideicomisario.

Además de las causas mencionadas anteriormente, el Sistema interviene como demandado o codemandado en varias demandas que surgen del normal desempeño de su actividad. Sobre la base del asesoramiento jurídico de los abogados y tomando en consideración las coberturas de seguro, la gerencia opina que en última instancia la responsabilidad, si la hubiere, no producirá efectos sustancias sobre la situación financiera del Sistema.

*(14)* **Acontecimientos posteriores**

Se analizaron acontecimientos posteriores hasta el 29 de junio de 2020, la fecha en la que los estados financieros podían elaborarse, para determinar si dichos acontecimientos deberían reconocerse o revelarse en los estados financieros del año 2017. Los Acontecimientos posteriores revelados a continuación son principalmente aquellos que guardan relación con las actividades de deuda, incluidos acontecimientos fiscales y vinculados con la legislación, tanto local como federal, cuya revelación obedece al interés público según la gerencia.

**A. Venta de las inversiones del Sistema**

El 23 de junio de 2017, la Asamblea Legislativa aprobó otras asignaciones para el año fiscal 2018 en virtud de la Resolución Conjunta 188 que, entre otras cosas, ordenó al Sistema, al SRJ y al SRM que liquidaran sus activos y transfirieran el producido neto al Departamento de Hacienda. El 20 de julio de 2017, el Sistema vendió inversiones por un monto global de unos $297 millones y transfirió unos $190 millones del producido neto al Departamento de Hacienda conforme a lo requerido por la Resolución Conjunta 188.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

**B.   Reforma del programa de pensiones PayGo**

El 27 de junio de 2017, el Departamento de Hacienda emitió la Carta Circular núm. 1300-46-17 para transmitir a las agencias del Gobierno Central, a las empresas públicas y a los municipios los nuevos procedimientos de ejecución que se adoptarían a partir del 1 de julio de 2017, a saber, un nuevo sistema "pay-as-you-go" (PayGo). Con el comienzo del año fiscal 2018, se eliminaron las aportaciones patronales, las aportaciones ordenadas por leyes especiales y la Aportación Uniforme Adicional.

El sistema PayGo constituía uno de los componentes de la Ley núm. 106 de 2017, cuya aprobación el Gobernador autorizó el 23 de agosto de 2017. La Ley núm. 106 de 2017 dio origen al marco jurídico que permite al ELA garantizar los pagos de beneficios a los pensionados a través del sistema PayGo. En cada uno de los presupuestos para los años fiscales 2018 y 2019 se destinaron unos $2,000 millones para el pago de los beneficios PayGo. La Ley núm. 106 de 2017 también creó un Plan de Aportaciones Definidas, similar al plan 401(k), que será gestionado por una entidad privada. Los Sistemas de Retiro no pagarán beneficios futuros.

La Ley núm. 106 de 2017, entre otras cosas, enmendó la Ley núm. 12 con respecto a la gobernanza, financiamiento y beneficios del Sistema para los miembros en activo del programa existente y miembros de nueva contratación. Conforme a la Ley núm. 106 de 2017, se eliminó la Junta de Fideicomisarios del Sistema y se creó una Nueva Junta de Retiro. Actualmente, la Junta de Retiro se encarga de gobernar tanto el Sistema como el SRJ y el SRM.

La Ley núm. 106 de 2017 canceló a partir del 30 de junio de 2017 los programas de pensiones que existían hasta ese momento para los participantes del Sistema. Los miembros de los programas anteriores y los miembros del nuevo sistema contratados a partir del 1 de julio de 2017 ingresarán a un nuevo programa de aportaciones definidas que será elegido por la Junta de Retiro. El saldo acumulado en las cuentas de los programas anteriores será transferido a las cuentas de los miembros del nuevo programa de aportaciones definidas. Los miembros en activo del programa de aportaciones definidas del Sistema conservarán sus beneficios conforme a lo dispuesto en la Ley núm. 91 del 29 de marzo de 2003.

La Ley núm. 106 de 2017 también dispuso la paralización de los programas de préstamos del Sistema. Asimismo, ordenó la fusión de las estructuras administrativas de los sistemas de retiro. La administración de los beneficios del Sistema puede externalizarse si así lo decide la Junta de Retiro. Los empleados del Sistema que no hayan ingresado en la nueva estructura administrativa serán transferidos a otros organismos públicos, de conformidad con la Ley núm. 8 del 8 de febrero de 2017.

Además, la Ley núm. 106 de 2017 derogó la Ley del Programa de Pre-retiro Voluntario, Ley núm. 211 de 2015, y creó un programa de incentivos, oportunidades y readiestramiento para los servidores públicos.

El 17 de mayo de 2019, la Asamblea Legislativa aprobó la Ley núm. 29 de 2019 (la "Ley núm. 29 de 2019") que aborda la crisis financiera grave y la falta de liquidez de los municipios de Puerto Rico al liberarles de su obligación de efectuar al ELA pagos PayGo en virtud de la Ley núm. 106 de 2017. La Junta de Supervisión impugnó la aplicación y ejecución de la Ley núm. 29 de 2019, según se explica en la nota 13 a los estados financieros básicos.

El 30 de enero de 2020, el Tribunal de Apelación de los Estados Unidos para el Primer Circuito emitió un dictamen en el marco de la Acción de Remedio Declaratorio del Sistema, en el que confirmó la postura del Tribunal del Título III de que el artículo 552 del Código de Quiebras impide que las garantías prendarias de los bonistas del Sistema graven las rentas posteriores a la petición,

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

y concluyó que las aportaciones patronales no constituyen "rentas especiales" en el sentido del artículo 902 del Código de Quiebras. En consecuencia, el Tribunal para el Primer Circuito concluyó que los bonistas del Sistema no tienen garantías prendarias sobre las aportaciones patronales recibidas después de la fecha de petición del Sistema.

Para información adicional sobre el litigio relacionado con la Ley núm. 106 de 2017 y el mecanismo PayGo consulte la nota 13 a los estados financieros básicos.

**C. Informe sobre la investigación de la deuda**

El 2 de agosto de 2017, la Junta de Supervisión anunció que, en virtud de la facultad conferida por PROMESA, tenía la intención de realizar una investigación sobre la crisis financiera y los factores que contribuyeron a esta, además de analizar la deuda de Puerto Rico y su emisión, lo que incluye las prácticas de divulgación y venta. En este sentido, la Junta de Supervisión nombró un comité especial de investigación (el "Comité Especial de Investigación") y aplicó un procedimiento competitivo para identificar y seleccionar una empresa independiente que se encargase de llevar a cabo la investigación. El 13 de septiembre de 2017, la Junta de Supervisión anunció que el Comité Especial de Investigación había contratado un investigador independiente para efectuar un análisis de la deuda de Puerto Rico y su relación con la actual crisis financiera. El 20 de agosto de 2018, la Junta de Supervisión publicó el informe final del investigador independiente (el "Informe sobre la Investigación de la Deuda"). El Informe sobre la Investigación de la Deuda brinda un análisis i) de los factores macroeconómicos y políticos históricos y más recientes que han contribuido directa o indirectamente a la crisis fiscal y económica del ELA, ii) del proceso de emisión de los bonos municipales del ELA, iii) de las medidas legislativas para reestructurar la deuda y iv) de las conclusiones, políticas y recomendaciones de investigación de la Junta de Supervisión, así como la identificación de posibles reclamaciones y cuestiones a efectos de la futura regulación.

El Informe sobre la Investigación de la Deuda proporcionó conclusiones y recomendaciones sen las siguientes materias:

- BGF

- Empresas de suministro público de Puerto Rico (la AEE y la AAA)

- COFINA

- El Sistema

- Las funciones de presupuestación, elaboración externa de informes y contabilidad de Puerto Rico

- Cálculo del límite constitucional de la deuda

- Agencias de clasificación crediticia

- Prácticas de venta de bonos relacionados con Puerto Rico

- Marco de ética del Gobierno de Puerto Rico

- Uso por los emisores de swaps de tipo de interés

- Falta por parte de Puerto Rico de mecanismos claros de validación de los bonos relacionados con Puerto Rico antes de su emisión

- Crédito contributivo de posesión

71                                    (continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

El investigador independiente también presentó un resumen de posibles causas de acción. Se puede consultar el Informe sobre la Investigación de la Deuda completo en el sitio web de la Junta de Supervisión.

El 28 de agosto de 2018, la Junta de Supervisión nombró un comité de reclamaciones especiales (el "Comité de Reclamaciones Especiales") y delegó en este la totalidad de las facultades de la Junta de Supervisión a efectos de analizar las conclusiones del Informe sobre la Investigación de la Deuda y a adoptar las medidas pertinentes, lo que incluye, entre otras cosas, recomendar o iniciar las negociaciones o el enjuiciamiento de las reclamaciones sobre la base de las conclusiones contenidas en el Informe sobre la Investigación de la Deuda en nombre de los deudores de Título III en beneficio de todos los acreedores y las partes interesadas en los casos de Título III. El Comité de Reclamaciones Especiales está legitimado para determinar, a su exclusivo criterio, el alcance de cualquier acción en el futuro, lo que incluye, entre otras, la realización de investigaciones adicionales, así como la presentación de reclamaciones o la contratación de asesores, consultores, abogados u otros profesionales que considere oportuno a su entera discrecionalidad. El 25 de octubre de 2018, el Comité de Reclamaciones Especiales suscribió un contrato con la empresa que prestará dichos servicios. El Sistema coopera con dicha investigación.

Para obtener más información sobre los procedimientos contenciosos y otras mociones presentadas en el marco de los casos de Título III que el Comité de Reclamaciones Especiales haya iniciado contra el Sistema, consulte la nota 13 a los estados financieros básicos.

**D.    Impacto de desastres naturales**

Los días 6 y 20 de septiembre de 2017, los huracanes Irma y María, respectivamente, tocaron tierra en Puerto Rico. Los huracanes causaron en la isla daños catastróficos sin precedentes a la población y a sus negocios. El huracán María causó daños graves en la sede central del Sistema. Para seguir con su actividades, el Sistema tuvo que reubicar sus oficinas y suscribir un contrato de arrendamiento con la Autoridad de Edificios Públicos de Puerto Rico. Como consecuencia de la reubicación, el Sistema canceló algunos de sus contratos que tenía suscritos sobre servicios auxiliares y negoció nuevos contratos.

El 28 de diciembre de 2019, el primero de muchos terremotos asoló la isla. A partir de entonces hubo más de 400 terremotos de magnitud 2 o más según la escala de Richter, incluido el más destructivo del siglo que alcanzó la magnitud de 6.4. Según las estimaciones iniciales, dichos terremotos causaron daños por unos $500 millones, y miles de los habitantes de Puerto Rico tuvieron que alojarse en campos de refugiados, ya que tienen miedo a dormir en sus casas que podrían derrumbarse durante los temblores secundarios. Según el informe del 29 de enero de 2020 publicado por *United States Geological Survey*, no se espera que los temblores secundarios cesen en Puerto Rico en el futuro próximo, y se prevé que unos terremotos de una magnitud de 3 o más tengan lugar a diario a lo largo de los próximos meses y a partir de allí, semanalmente durante los próximos años.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

**E.  Dimisión del exgobernador Rosselló y transición del Gobierno bajo la Gobernadora Vázquez**

El 24 de julio de 2019, el que fuera Gobernador en ese momento, Ricardo Rosselló Nevares, anunció su dimisión del cargo de Gobernador del ELA con efectos a partir del 2 de agosto de 2019, a las 5 p.m. (AST). Antes de que su dimisión entrara en vigor, el todavía Gobernador nombró al ex-Comisionado residente, Pedro Pierluisi, como Secretaria de Estado. Tras ser confirmado por la Cámara de los Representantes (pero no por el Senado), el Sr. Pierluisi juró el cargo de Gobernador interino. El 7 de agosto de 2019, la Corte Suprema de Puerto Rico declaró por unanimidad que el Sr. Pierluisi había jurado el cargo de Gobernador de manera contraria a la legalidad. En consecuencia, la Secretaria de Justicia, Wanda Vázquez, juró el cargo de Gobernadora el 7 de agosto de 2019 para el resto del mandato que le quedaba al exgobernador Rosselló hasta el año 2020 y, en la fecha de estos estados financieros, la Sra. Vázquez sigue desempeñando el cargo de Gobernadora del ELA.

**F.  La Junta de Supervisión presenta el Plan de Ajuste Conjunto para el ELA, el Sistema y la AEP**

El 27 de septiembre de 2019, la Junta de Supervisión, como representante del ELA, el Sistema y la AEP en sus respectivos casos de Título III, presentó su plan inicial de ajuste conjunto para el ELA, el Sistema y la AEP [ECF núm. 8765] (el "Plan Inicial") junto con la declaración de divulgación relacionada [ECF núm. 8765] (la "Declaración de Divulgación Inicial"). El 28 de febrero 2020, la Junta de Supervisión presentó su *Plan de Ajuste Conjunto Enmendado del Estado Libre Asociado de Puerto Rico y otros elaborado conforme al Título III* [ECF núm. 11946] (el "Plan Enmendado") y una declaración de divulgación enmendada relacionada [ECF núm. 11947] (la "Declaración de Divulgación Enmendada"), la cual actualizó el Plan Inicial para que se adaptara a la AAP.

El Plan Enmendado y la Declaración de Divulgación Enmendada no reflejan el posible impacto del actual brote de la enfermedad respiratoria causada por un nuevo coronavirus conocida como la COVID-19 identificado por primera vez en Wuhan, provincia de Hubei (China). En consecuencia, el 23 de marzo de 2020, la Junta de Supervisión presentó una moción urgente en la que solicitó aplazar el examen de la Declaración de Divulgación Enmendada (actualmente previsto para los días 3 y 4 de junio de 2020) hasta nuevo aviso.

Tanto el Plan Enmendado como la Declaración de Divulgación Enmendada quedan sujetos a futuras enmiendas, particularmente en vista del posible impacto económico de la COVID-19, y a la aprobación del Tribunal del Título III, ya que no está claro si dicho Tribunal finalmente confirmará a no el Plan Enmendado.

Para más información consulte el Plan Enmendado y la Declaración de Divulgación Enmendada, publicados en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a los estados financieros básicos
30 de junio de 2017

**G.   Ataques a la ciberseguridad**

En enero de 2020, el Sistema descubrió que un agente externo obtuvo acceso a la aplicación de Office 365 del Sistema. Parece ser que el atacante suplantó la identidad de un empleado del Departamento de finanzas y utilizando su cuenta de correo electrónico envió comunicaciones electrónicas a varias empresas públicas. En dichas comunicaciones electrónicas, el atacante dio instrucciones para cambiar cuentas bancarias de depósito. Este acontecimiento no conllevó la intromisión en el sistema contable del Sistema ni en sus cuentas bancarias o información personal de los participantes en el Sistema. El acontecimiento es objeto de una investigación estatal y federal. A fecha de elaboración de los presentes estados financieros, cuatro empresas públicas transfirieron fondos a cuentas bancarias fraudulentas por unos $4.4 millones. El Sistema sigue investigando el asunto y ha contratado los servicios de GM Security Technologies para indagar con más detalle en dicho incidente y brindar recomendaciones de cara a las políticas de seguridad informática del Sistema. El Sistema también está evaluando los efectos de dicho ciberataque y podría reflejar pérdida de ingresos, incrementos en los costos relativos a la ciberseguridad y en las primas de seguro, entre otros.

**H.   Pandemia de coronavirus**

El 15 de marzo de 2020, la Gobernadora de Puerto Rico dictó la Orden Ejecutiva núm. OE-2020-023 para decretar el cierre necesario de las empresas públicas y privadas para combatir los efectos del coronavirus (COVID-19). El cierre consiste en un confinamiento de 14 días y la adopción de distancia interpersonal desde el 16 hasta el 30 de marzo de 2020. A partir de esa fecha, se dictaron varias órdenes ejecutivas por las que se extendieron los cierres de empresas públicas y privadas. La más reciente es la Orden Ejecutiva núm. OE-2020-048, dictada el 28 de junio de 2020, por la que se elimina el confinamiento decretado previamente y se reducen las horas de toque de queda impuesto a los habitantes de Puerto Rico, así como las medidas de control implementadas para contener la propagación de la COVID-19 en la isla hasta el 22 de julio de 2020.

En virtud de la Orden Ejecutiva, el Sistema decretó el cierre de sus actividades a partir del 16 de marzo de 2020, por lo que a partir de esa fecha nuestra actividad es muy limitada. En este momento es imposible estimar, dentro de lo razonable, los efectos del cierre de nuestras actividades, pero consideramos que dicho cierre producirá un impacto limitado en nuestros estados financieros y operaciones.

74

# INFORMACIÓN COMPLEMENTARIA OBLIGATORIA

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Anexo de cambios en la obligación neta por pensiones de los patronos e índices
relacionados - beneficios de pensiones (sin auditar)

Años fiscales terminados el 30 de junio de 2017 y 2016
(En miles de dólares)

| | Monto en 2017 | Monto en 2016 |
|---|---|---|
| Obligación total por pensiones: | | |
| Costo de servicio | $ 628,025 | 496,732 |
| Intereses | 1,035,844 | 1,230,843 |
| Diferencias entre la experiencia prevista y anual | (248,414) | (252,405) |
| Cambios en supuestos | (4,179,110) | 3,853,693 |
| Cambios en el plan | (2,017,468) | — |
| Pagos de beneficios, incluidos reembolsos de aportaciones | (1,559,924) | (1,565,152) |
| Cambio neto en obligación total por pensiones | (6,341,047) | 3,763,711 |
| Obligación total por pensiones - inicio | 36,432,873 | 32,669,162 |
| Obligación total por pensiones - final (a) | 30,091,826 | 36,432,873 |
| Posición fiduciaria neta del plan (déficit): | | |
| Aportaciones patronales - neto de previsión | 921,537 | 779,477 |
| Aportaciones de los miembros | 320,095 | 333,633 |
| Ingresos netos por inversiones | 28,155 | 870 |
| Otros ingresos | 56,626 | 110,201 |
| Pagos de beneficios, incluidos reembolsos de aportaciones de los miembros | (1,559,924) | (1,565,152) |
| Gastos administrativos | (24,358) | (27,670) |
| Intereses sobre bonos por pagar | (198,084) | (196,211) |
| Otros gastos | (387,015) | (32,761) |
| Cambio neto en la posición fiduciaria neta del plan | (842,968) | (597,613) |
| Total de posición fiduciaria neta del plan (déficit) - inicio | (1,265,885) | (668,272) |
| Total de posición fiduciaria neta del plan (déficit) - final (b) | (2,108,853) | (1,265,885) |
| Obligación neta por pensiones de los patronos - final (a)-(b) | $ 32,200,679 | 37,698,758 |
| Posición fiduciaria neta del plan (déficit) como porcentaje del total de obligaciones por pensiones | (7.01)% | (3.47)% |
| Nómina de empleados cubiertos | $ 3,344,197 | 3,344,382 |
| Obligación neta por pensiones de los patronos como porcentaje de la nómina de empleados cubiertos | 962.88 % | 1127.23 % |

Nota:    el anexo muestra información para diez años. Se mostrarán años adicionales a medida que vayan a estar disponibles.

Véanse notas adjuntas a la información suplementaria obligatoria y el informe de los auditores independientes.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Anexo de retorno sobre la inversión - beneficios de pensiones (sin auditar)

| Año fiscal terminado el (1) | Tasa de retorno anual ponderada por dinero, después de deducir gastos |
|---|---|
| 30 de junio de 2017 | 6.8 % |
| 30 de junio de 2016 | 6.7 |
| 30 de junio de 2015 | 4.2 |

(1) El anexo muestra información para diez años. Se mostrarán años adicionales a medida que vayan a estar disponibles.

Véanse notas adjuntas a la información suplementaria obligatoria y el informe de los auditores independientes.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Anexo de aportaciones patronales - OBPE (sin auditar)

(En miles de dólares)

| Año fiscal terminado el (1) | Aportaciones anuales obligatorias | Aportaciones reales de los patronos | Porcentaje de la aportación |
|---|---|---|---|
| 30 de junio de 2017 | $    105,859 | 91,280 | 86.2 % |
| 30 de junio de 2016 | 107,739 | 93,728 | 87.0 |
| 30 de junio de 2015 | 103,878 | 97,374 | 93.7 |
| 30 de junio de 2014 | 88,508 | 102,085 | 115.3 |
| 30 de junio de 2013 | 154,999 | 91,823 | 59.2 |
| 30 de junio de 2012 | 133,654 | 94,664 | 70.8 |
| 30 de junio de 2011 | 129,395 | 93,851 | 72.5 |
| 30 de junio de 2010 | 128,294 | 88,599 | 69.1 |

(1) Las aportaciones anuales obligatorias del Sistema en los años fiscales terminados el 30 de junio de 2017 y 2016 se determinaron mediante la valuación actuarial al principio del año que se actualizó utilizando método prospectivo de la situación de financiamiento que se pasó al 30 de junio de 2017 y 2016, sobre la base del supuesto de que no se producirán ni pérdidas ni ganancias por las obligaciones. Las valuaciones actuariales correspondientes a años anteriores se realizaron utilizando los datos del censo del final del año.

Véanse notas adjuntas a la información suplementaria obligatoria y el informe de los auditores independientes.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Anexo de evolución del financiamiento - OBPE (sin auditar)

(En miles de dólares)

| Fecha de valuación actuarial (1) | Valor actuarial de los activos del plan | Total de obligaciones actuariales (AAL) | Total de obligaciones actuariales no financiadas (UAAL) | Ratio financiado | Nómina anual cubierta | UAAL como porcentaje de la nómina anual cubierta |
|---|---|---|---|---|---|---|
| 30 de junio de 2017 | $          — | 1,138,309 | 1,138,309 | — % $ | 3,344,197 | 34.0 % |
| 30 de junio de 2016 | — | 1,349,503 | 1,349,503 | — | 3,344,382 | 40.4 |
| 30 de junio de 2015 | — | 1,428,788 | 1,428,788 | — | 3,319,280 | 43.0 |
| 30 de junio de 2014 | — | 1,438,475 | 1,438,475 | — | 3,489,096 | 41.2 |
| 30 de junio de 2013 | — | 1,482,879 | 1,482,879 | — | 3,489,096 | 42.5 |
| 30 de junio de 2012 | — | 2,120,970 | 2,120,970 | — | 3,570,339 | 59.4 |
| 30 de junio de 2011 | — | 1,758,389 | 1,758,389 | — | 3,666,402 | 48.0 |
| 30 de junio de 2010 | — | 1,699,373 | 1,699,373 | — | 3,818,332 | 44.5 |

(1) La situación de financiamiento de otros beneficios posteriores al empleo (OBPE) del Sistema al 30 de al 30 de junio de 2017 y 2016 se determinaron mediante la valuación actuarial al principio del año que se actualizó utilizando método prospectivo de la situación de financiamiento que se pasó al 30 de junio de 2017 y 2016, sobre la base del supuesto de que no se producirán ni pérdidas ni ganancias por las obligaciones. Las valuaciones actuariales correspondientes a años anteriores se realizaron utilizando los datos del censo del final del año.

Véanse notas adjuntas a la información suplementaria obligatoria y el informe de los auditores independientes.

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a la información suplementaria obligatoria
30 de junio de 2017

**(1) Cambios en las condiciones de los beneficios**

Desde la valuación previa, no se han producido cambios en las condiciones del plan.

**(2) Cambios en los supuestos**

Los supuestos actuariales se revisan regularmente para que reflejen más fielmente la situación actual y los acontecimientos que se prevén para el futuro.

Debido al agotamiento de los activos del Sistema durante los últimos años fiscales y la puesta en marcha del mecanismo PayGo en virtud de la Ley núm. 106 de 2017, el supuesto sobre el retorno de las inversiones deja de ser aplicable al Sistema a partir del 30 de junio de 2017. Desde el 30 de junio de 2016, el supuesto sobre el retorno de las inversiones era de un 6.55% al año, sin incluir los gastos de inversión y tomando en cuenta la política de inversiones del Sistema, lo que incluye el objetivo de asignación de activos y las previsiones relativas a la cartera de préstamos, así como los supuestos del actuario con respecto a mercados de capitales al 30 de junio de 2016.

La escala de mejora prevista en los índices de mortalidad fue actualizada de la escala MP-2016 a la escala MP-2017, publicada por la Sociedad de Actuarios en octubre de 2017. Además, como la escala MP-2015 es una escala de mortalidad bidimensional, los índices básicos de mortalidad para las previsiones de mortalidad posteriores al retiro se establecieron según los índices de 2010, el año central del estudio de la experiencia del Sistema 2007-2012 sobre el que se basaron los índices. Además, los índices de mortalidad previos al retiro también se actualizaron para reflejar los cuadros de mortalidad actualizados que publicó la Sociedad de Actuarios.

La base de activos para estimar la fecha de agotamiento es la posición fiduciaria neta del Sistema (el activo bruto más las salidas diferidas de recursos, menos el pasivo bruto, incluidos los bonos prioritarios para financiar pensiones por pagar, más las entradas diferidas de recursos). Según este cálculo, la posición fiduciaria neta del Sistema se agotó en el año fiscal 2015.

Asimismo, debido a las actuales dificultades fiscales, presupuestarias y financieras, la persistencia de los déficits fiscales y los riesgos de liquidez del ELA, las empresas públicas y los municipios, y a la posibilidad de que la situación financiera no mejore en el corto plazo, la fecha de agotamiento proyectada en el informe actuarial no incluye ningún monto por la Aportación Uniforme Adicional exigida por la Ley núm. 32. Además, la Ley núm. 106 de 2017 eliminó la Aportación Uniforme Adicional.

No se estimó que la posición fiduciaria neta del Sistema estaría disponible para realizar todos los pagos futuros previstos de beneficios a los empleados actualmente activos e inactivos. Por ende, se aplicó el índice de bonos municipales libres de impuestos (Índice de comprador de bonos municipales 20 de obligación general) a todos los períodos de pagos estimados de beneficios para determinar la obligación total por el pago de pensiones.

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a la información suplementaria obligatoria
30 de junio de 2017

La tasa de descuento utilizada para determinar el total de obligaciones por pago de pensiones aumentó de un 2.85% al 30 de junio de 2016 a un 3.58% al 30 de 30 de junio de 2017, calculada según la Declaración GASB núm. 67. Según la Declaración GASB núm. 67, el supuesto sobre el retorno de las inversiones es un dato de entrada que se utiliza para calcular la tasa de interés equivalente única según la cual se descuentan estos beneficios para determinar la obligación total por pago de pensiones. De conformidad con las Declaraciones GASB núms. 25 y 27, se utilizó el supuesto sobre el retorno de las inversiones para descontar todos los Beneficios Básicos del Sistema de Pensiones y los Beneficios de Pensión Administrados por el Sistema para determinar las obligaciones actuariales acumuladas. En los años fiscales 2008 a 2010 y 2011, 2012 y 2013, las tasas de descuento calculadas según las Declaraciones GASB núms. 25 y 27 fueron de 7.50%, 6.40%, 6.00% y 6.40%, respectivamente.

Además, las valuaciones correspondientes a los años fiscales 2017 y 2016 reflejan un congelamiento de los salarios hasta el 1 de julio de 2017, situación que responde a la Ley núm. 66 y a las condiciones económicas actuales de Puerto Rico.

**(3) Cambios en los métodos actuariales desde la valuación anterior**

Desde la valuación previa, no se han producido cambios en los métodos.

En los años fiscales 2017 y 2016, la fecha de recopilación de los datos del censo es a principios del año fiscal. La obligación total por pago de pensiones a finales del ejercicio se determinó según la valuación actuarial a partir de la fecha de recopilación de los datos del censo, a principios del ejercicio, y luego se proyectó hasta finales del ejercicio, usando métodos prospectivos y sobre la base del supuesto de que no se producirán ni pérdidas ni ganancias por las obligaciones.

La valuación actuarial al 30 de 30 de junio de 2017 refleja una disminución de $5,498 millones en las obligaciones netas por el pago de pensiones, que se debe principalmente a un cambio por $4,179 millones en los supuestos, como consecuencia del aumento en la tasa de descuento que establece la Declaración GASB núm. 67, de un 2.85% en el año fiscal 2016 a un 3.58% en el año fiscal 2017, y como resultado del efecto de cambios en el plan por unos $2,017 millones.

**(4) Métodos y supuestos utilizados en la valuación actuarial del Sistema**

Se utilizaron los siguientes métodos y supuestos actuariales en la valuación actuarial del Sistema del 30 de junio de 2017:

| | |
|---|---|
| Método actuarial de costos | Edad normal de ingreso |
| Método de valuación de activos | Valor de mercado de los |
| activos Inflación | No aplicable |
| Índice de bonos municipales | 3.58%%, según el índice de comprador de bonos municipales 20 de obligación general. |
| Aumentos salariales previstos | 3.00% por año. No se prevén aumentos en las remuneraciones hasta el 1 de julio de 2021 como resultado de la Ley núm. 3 de 2017, la extensión de cuatro años de la Ley núm. 66 de 2014 y el estado actual de la economía. |

(continuación)

**SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO
DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)
Notas a la información suplementaria obligatoria
30 de junio de 2017

Mortalidad

Mortalidad previa al retiro:

En el caso de los empleados en régimen general no amparados en la Ley núm. 127, se ajustaron las tasas de mortalidad de empleados RP-2014 para hombres y mujeres para reflejar la escala de mejora en la tasa de mortalidad MP-2017 a partir del año base 2006, y se realizaron previsiones utilizando la escala MP-2017 en función de las generaciones. En el caso de los miembros amparados en la Ley núm. 127, se ajustaron las tasas de mortalidad de empleados RP-2014 para hombres y mujeres de la clase obrera (cuello azul) para reflejar la escala de mejora en la tasa de mortalidad MP-2017 a partir del año base 2006, y se realizaron previsiones utilizando la escala MP-2017 en función de las generaciones. Los cuadros generacionales reflejan las mejoras en la tasa de mortalidad tanto antes como después de la fecha de medición.

Un 100% de los fallecimientos durante la vida laboral activa se consideran como fallecimientos ocupacionales para los miembros amparados en la Ley núm. 127.

Mortalidad saludable posterior al retiro:

Se asume que los índice varían en función del género en el caso de los retirados y beneficiarios saludables sobre la base de un estudio de la experiencia del plan entre 2007 y 2012 y las nuevas expectativas con respecto a las futuras mejoras en las tasas de mortalidad. Los índices básicos de 2010 equivalen a un 92% de los índices del cuadro de mortalidad UP-1994 para los hombres y un 95% de los índices del cuadro de mortalidad UP-1994 para las mujeres; ambas previsiones se realizaron desde 1994 hasta 2010 utilizando la escala AA. Las previsiones de los índices básicos se realizan utilizando la escala MP-2017 de mejora en las tasas de mortalidad en función de las generaciones. Como cuadro generacional, refleja las mejoras en la tasa de mortalidad tanto antes como después de la fecha de medición.

Mortalidad por discapacidad posterior al retiro:

Se asume que los índice varían en función del género en el caso de los retirados discapacitados sobre la base de un estudio de la experiencia del plan entre 2007 y 2012 y las nuevas expectativas con respecto a las futuras mejoras en las tasas de mortalidad. Los índices básicos de 2010 equivalen a un 105% de los índices del cuadro de mortalidad UP-1994 para los hombres y un 115% de los índices del cuadro de mortalidad UP-1994 para las mujeres. Las previsiones de los índices básicos se realizan utilizando la escala MP-2017 de mejora en las tasas de mortalidad en función de las generaciones. Como cuadro generacional, refleja las mejoras en la tasa de mortalidad tanto antes como después de la fecha de medición.

**AUTORIDAD DE EDIFICIOS PÚBLICOS**

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)

*INFORME DE AUDITORÍA INDEPENDIENTE*
*Y*
*ESTADOS FINANCIEROS BÁSICOS Y*
*OTRA INFORMACIÓN COMPLEMENTARIA*

Para los años fiscales terminados el 30 de junio de 2017 y 2016

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ÍNDICE
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

INFORME DE AUDITORÍA INDEPENDIENTE..................................................................... 6

DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)....................................... 5

ESTADOS DE SITUACIÓN NETA ........................................................................... 20

ESTADOS DE INGRESOS, GASTOS Y CAMBIOS EN LA SITUACIÓN NETA.......................... 22

ESTADOS DE FLUJOS DE EFECTIVO.................................................................... 23

NOTAS A LOS ESTADOS FINANCIEROS .................................................................. 25

INFORMACIÓN COMPLEMENTARIA REQUERIDA ....................................................... 71

OTRA INFORMACIÓN COMPLEMENTARIA .............................................................. 74

INFORME DE AUDITORÍA INDEPENDIENTE DEL CONTROL INTERNO SOBRE INFORMES FINANCIEROS Y SOBRE EL CUMPLIMIENTO Y OTROS ASUNTOS CON BASE EN UNA AUDITORÍA DE LOS ESTADOS FINANCIEROS REALIZADA CONFORME A LAS *NORMAS DE AUDITORÍA GUBERNAMENTAL*...................................................77

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918

Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

## INFORME DE AUDITORÍA INDEPENDIENTE

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

**Informe sobre los Estados Financieros**

Hemos auditado los estados financieros adjuntos de la *Autoridad de Edificios Públicos* (la "Autoridad"), una unidad componente del Estado Libre Asociado de Puerto Rico (el "ELA") al 30 de junio de 2017, y las notas relacionadas a los estados financieros, que en conjunto comprenden los estados financieros básicos de la Autoridad, según se indican en el índice. Antes de la actualización, los estados financieros para el año terminado el 30 de junio de 2016 fueron auditados por otros auditores cuyo informe de fecha 25 de abril de 2018 expresó un dictamen calificado sobre dichos estados.

**Responsabilidad de la Administración por los Estados Financieros**

La administración es responsable de la preparación y presentación razonable de estos estados financieros de acuerdo con los principios de contabilidad generalmente aceptados en los Estados Unidos de América. Esto incluye el diseño, la implementación y el mantenimiento de controles internos relevantes para la preparación y presentación razonable de estados financieros y para que no contengan declaraciones erróneas sustanciales, ya sea debido a fraude o error.

**Responsabilidad de los Auditores**

Nuestra responsabilidad es emitir un dictamen sobre estos estados financieros básicos basado en nuestras auditorías. Realizamos nuestras auditorías de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América y las normas aplicables a las auditorías financieras contenidas en las *Normas de Auditoría Gubernamental*, emitidas por la Contraloría General de los Estados Unidos. Esas normas requieren que planifiquemos y realicemos la auditoría para obtener una seguridad razonable de que los estados financieros no contienen declaraciones erróneas de importancia.

Una auditoría comprende realizar procedimientos para obtener evidencia de auditoría sobre los montos y divulgaciones en los estados financieros. Los procedimientos seleccionados dependen del juicio del auditor e incluyen la evaluación de los riesgos de que los estados financieros no contengan declaraciones erróneas sustanciales, ya sea debido a fraude o error. Al realizar esas evaluaciones de riesgos, el auditor toma en consideración los controles internos de la entidad relevantes para la preparación y presentación razonable de los estados financieros con el fin de diseñar procedimientos de auditoría que sean apropiados para las circunstancias, pero no con el propósito de emitir un dictamen sobre la efectividad del control interno de la entidad. En consecuencia, no emitimos tal dictamen. Una auditoría también incluye la evaluación de la idoneidad de las políticas contables utilizadas y la razonabilidad de las estimaciones contables significativas realizadas por la administración, así como la evaluación de la presentación general de los estados financieros.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918

Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Página 2

Consideramos que la evidencia de auditoría que hemos obtenido es suficiente y apropiada para proporcionarnos una base para nuestro dictamen de auditoría.

**Dictamen**

En nuestra Opinión, los estados financieros antes mencionados presentan razonablemente, en todos los aspectos sustanciales, la posición financiera de la Autoridad de Edificios Públicos al 30 de junio de 2017, y los respectivos cambios en su situación financiera y flujos de efectivo para el año terminado, de acuerdo con los principios de contabilidad generalmente aceptados en los Estados Unidos de América.

**Párrafo sobre asunto relevante**

*Reemisión de los estados financieros al 30 de junio de 2017*

Como se refleja en la Nota 24, la Autoridad volvió a emitir los estados financieros emitidos el 24 de junio de 2019, porque la administración posteriormente descubrió hechos sobre los acuerdos con las aseguradoras monolínea de los bonos de la Autoridad que contienen derechos de subrogación que se limitan al monto efectivamente pagado por cada uno de los pagos atrasados sobre los bonos asegurados y reconoció dicho pasivo.

La Nota 24 también refleja que la administración de la Autoridad descubrió posteriormente hechos sobre el impacto registrado al 30 de junio de 2017 del acuerdo celebrado el 29 de noviembre de 2018 entre la Autoridad y el Banco Gubernamental de Fomento (BGF) que permite la compensación de los saldos de efectivo de la Autoridad depositados en el BGF contra las líneas de crédito adeudadas al BGF. Después de una mayor consideración de los aspectos legales del acuerdo, la administración corrigió los saldos reflejados en el Estado de Situación Neta (Déficit) al 30 de junio de 2017 y en el Estado de Ingresos, Gastos y Cambios en el Déficit para el año terminado en esa fecha.

Dado que el efectivo depositado en el BGF se consideró deteriorado al 30 de junio de 2016, la administración presentó el impacto del acuerdo en el estado financiero emitido el 24 de junio de 2019. Sin embargo, después de una mayor consideración de los aspectos legales del acuerdo, la administración decidió eliminar el impacto al 30 de junio de 2017 y dejar solo la divulgación en Acontecimientos posteriores, en las Notas.

Nuestro dictamen no se modifica con respecto a los asuntos anteriores.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918
Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Página 3

**Párrafo sobre asunto relevante (continuación)**
*Incertidumbre sobre la capacidad de la Autoridad para continuar como un negocio en marcha*

*Deterioro financiero del Estado Libre Asociado de Puerto Rico (ELA) y del Banco Gubernamental de Fomento para Puerto Rico (BGF)*

Los estados financieros básicos adjuntos se han preparado asumiendo que la Autoridad continuará como un negocio en marcha. Como se discute en las Notas 3, 6 y 11 de los estados financieros, la Autoridad es una unidad componente del ELA. Al 30 de junio de 2017, la situación financiera y la liquidez del ELA se han deteriorado. Teniendo en cuenta que la Autoridad depende en gran medida de las asignaciones del ELA, la situación financiera y la liquidez de la Autoridad se han visto igualmente afectadas. Además, el 3 de mayo de 2017, a solicitud del Gobernador, la Junta de Supervisión y Administración Financiera (la "Junta de Supervisión") presentó una petición de remedio conforme al Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) del Congreso de los Estados Unidos ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La evaluación y los planes de la administración con respecto a estos asuntos se describen en la nota 3 a los estados financieros básicos. La Autoridad ha evaluado los posibles efectos de las restricciones presupuestarias y los riesgos de liquidez que enfrenta el ELA en sus estados financieros y operaciones básicas, y ha concluido que, al 30 de junio de 2017, la Autoridad continuará operando como un negocio en marcha por un período no menor que doce meses después de dicha fecha. Nuestro dictamen no se modifica con respecto a este asunto.

**Otros asuntos**

*Información complementaria requerida*

Los principios de contabilidad generalmente aceptados en los Estados Unidos de América requieren que la discusión y el análisis de la administración en las páginas 5 a 19 y el anexo sobre la evolución del financiamiento para beneficios de atención médica posteriores al empleo en la página 73 se presenten para complementar los estados financieros básicos. Dicha información, aunque no forma parte de los estados financieros básicos, es requerida por la Junta Gubernamental de Normas Contables, que considera que es una parte esencial de la información financiera para poder ubicar los estados financieros básicos en un contexto operativo, económico o histórico apropiado. Hemos aplicado ciertos procedimientos limitados a la información complementaria requerida de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América. Dichos procedimientos consistieron en consultas hechas a la administración sobre los métodos utilizados para preparar y comparar la información a fin de asegurar que fuese consistente con las respuestas de la administración a nuestras consultas, los estados financieros básicos y otros datos que obtuvimos durante nuestra auditoría de los estados financieros básicos. No emitimos un dictamen ni brindamos garantía alguna sobre la información porque los procedimientos limitados no nos proporcionan evidencia suficiente para emitir un dictamen o brindar garantía alguna.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918
Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
Página 4

*Otra información complementaria*

Nuestras auditorías se llevaron a cabo con el propósito de emitir un dictamen sobre los estados financieros que colectivamente comprenden los estados financieros básicos de la Autoridad. El anexo de las cuentas de fondos de amortización de bonos y el anexo de ingresos operativos de alquiler en las páginas 75 y 76, respectivamente, se presentan con fines de proveer un análisis adicional y no son una parte requerida de los estados financieros básicos.

El anexo de las cuentas de fondos de amortización de bonos y el anexo de los ingresos operativos de alquiler son responsabilidad de la administración y se derivaron de y se relacionan directamente con la contabilidad subyacente y otros registros utilizados para preparar los estados financieros básicos. Dicha información ha sido sometida a los procedimientos de auditoría aplicados en la auditoría de los estados financieros básicos y ciertos procedimientos adicionales, incluida la comparación y conciliación directa de dicha información con la contabilidad subyacente y otros registros utilizados para preparar los estados financieros básicos o con los propios estados financieros, y otros procedimientos adicionales de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América. En nuestra opinión, la información complementaria se presenta razonablemente, en todos los aspectos sustanciales, en relación con los estados financieros básicos en su conjunto.

*Otra información requerida por las Normas de Auditoría Gubernamental*

De acuerdo con las Normas de Auditoría Gubernamental, también hemos emitido nuestro informe con fecha del 18 de marzo de 2020 (véase el párrafo sobre asunto relevante sobre reemisión de los estados financieros al 30 de junio de 2017) con nuestra determinación sobre el control interno de la Autoridad sobre la información financiera y sobre nuestras pruebas en cuanto a su cumplimiento con ciertas disposiciones legales, reglamentarias, contractuales y de acuerdos de subvención y otros asuntos. El propósito de ese informe es describir el alcance de nuestras pruebas de control interno sobre la información financiera y el cumplimiento, así como los resultados de esas pruebas, por lo que no consiste en proporcionar un dictamen en cuanto al control interno sobre la información financiera o sobre el cumplimiento. Ese informe es una parte integrante de una auditoría realizada conforme a las Normas de Auditoría Gubernamental al considerar el control interno de la Autoridad sobre la información financiera y el cumplimiento.

San Juan, Puerto Rico
18 de marzo de 2020
Contadores Públicos Autorizados
Licencia Núm. 231, vence el 1 de diciembre de 2021
Se ha colocado el sello núm. 381406 de la Sociedad
de Contadores Públicos Autorizados de P.R. en la copia
del archivo de este informe.




AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Introducción**

Como administración de la Autoridad de Edificios Públicos (la "Autoridad"), volvimos a emitir los estados financieros emitidos el 24 de junio de 2019, porque descubrimos posteriormente que los acuerdos con las aseguradoras monolínea de nuestros bonos contienen derechos de subrogación que se limitan al monto efectivamente pagado por cada uno de los pagos atrasados sobre los bonos asegurados y estamos reconociendo dicho pasivo. Ofrecemos a los lectores de los estados financieros de la Autoridad este resumen narrativo y análisis de las actividades financieras de la Autoridad PARA LOS AÑOS terminados el 30 de junio de 2017 y 2016. Alentamos a los lectores a considerar la información presentada aquí junto con los estados financieros básicos tomados como un todo.

**Aspectos financieros más destacados**

- El déficit de la Autoridad aumentó en $38.7 millones o un 4.5% durante el año terminado el 30 de junio de 2017. Para el año terminado el 30 de junio de 2016, el déficit aumentó en $255.8 millones o un 87.4%. Para el año terminado el 30 de junio de 2017, la Autoridad informó un aumento en los ingresos por alquiler de $158.0 millones. Para el año terminado el 30 de junio de 2016, la Autoridad informó una disminución en los ingresos por alquiler de $201.5 millones. Durante el año terminado el 30 de junio de 2016, la Autoridad redujo los ingresos por alquiler en $222.5 millones que resultaron de un estimado más conservador de los montos incobrables adeudados por el ELA, en el que todos los alquileres por cobrar, excepto por los del año en curso, se reservaron como incobrables. Durante el año terminado el 30 de junio de 2017, la administración contabilizó la compensación de los saldos de efectivo de la Autoridad, el alquiler adeudado por el BGF y la línea de crédito adeudada al BGF como resultado de un acuerdo entre las dos entidades por $42.6 millones. Durante el año terminado el 30 de junio de 2016, la Autoridad cargó el alquiler para la amortización de la deuda en $13.4 millones para el reembolso de la línea de crédito del BGF. Durante el año terminado el 30 de junio de 2017, los gastos operativos disminuyeron en $4.5 millones o un 1.9%. Durante el año terminado el 30 de junio de 2016, los gastos operativos disminuyeron en $2.6 millones o un 1.2%.

- Los ingresos operativos de la Autoridad aumentaron de una pérdida reexpresada de $31.6 millones para el año terminado el 30 de junio de 2016 a unos ingresos operativos que ascendieron a $130.8 millones para el año terminado el 30 de junio de 2017, principalmente debido a la reducción en $222.5 millones de los ingresos por alquiler del 2016, por montos incobrables estimados según se explica en el párrafo anterior.

- Los ingresos no operativos de la Autoridad disminuyeron de $243.6 millones para el año terminado el 30 de junio de 2016 a $196.6 millones para el año terminado el 30 de junio de 2017, principalmente debido al reconocimiento del mencionado acuerdo entre la Autoridad y el BGF y a la pérdida por riesgo de crédito de contraparte en depósitos mantenidos con el BGF por un monto de $40.6 millones.

**Negocio en marcha y riesgo de liquidez**

La administración de la Autoridad cree que existen dudas sustanciales en cuanto a su capacidad para continuar como un negocio en marcha conforme a la Declaración núm. 56 de la Junta Gubernamental de Normas Contables ("GASB", por sus siglas en inglés), Codificación de la Orientación de Información Contable y Financiera, contenida en las Declaraciones de AICPA sobre Normas de Auditoría.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Las operaciones de la Autoridad se han visto directamente afectadas por las limitaciones y restricciones de liquidez del ELA durante los años terminados el 30 de junio de 2017 y 2016. A medida que la base impositiva del ELA se ha reducido, sus ingresos han disminuido debido a las condiciones económicas imperantes como resultado de una recesión económica prolongada que comenzó en 2006. El alto nivel de desempleo, la disminución de la población y los altos niveles de deuda y requisitos de amortización de la deuda, así como las obligaciones de pensión y los costos de atención médica se han convertido en una parte cada vez mayor del presupuesto del Fondo General, lo que ha dado como resultado una reducción de los fondos disponibles para otros servicios esenciales y reducciones presupuestarias asignables a las unidades gubernamentales, incluida la Autoridad. El altísimo nivel de deuda del ELA y los pasivos por pensiones no financiados, la consiguiente necesidad de asignar ingresos para la amortización de la deuda y las obligaciones de pensiones contribuyeron a importantes déficits presupuestarios durante varios años, déficit que el ELA ha financiado aumentando aún más el monto de su deuda. Estos asuntos y las limitaciones de liquidez del ELA han afectado directamente la liquidez de la Autoridad, lo que ha dado como resultado el incumplimiento del reembolso de las obligaciones de deuda cuando vencieron durante los años terminados el 30 de junio de 2017 y 2016.

**Plan Fiscal**

Además, a tenor con PROMESA y a los requisitos impuestos por la Junta de Supervisión el 23 de octubre de 2018, la Junta de Supervisión certificó su propio plan fiscal para el ELA (el "Plan Fiscal de la Junta"). El Plan Fiscal de la Junta se compromete con la responsabilidad fiscal e implementa mejoras de ingresos específicas y reducciones concretas de gastos para devolver a Puerto Rico a la estabilidad fiscal y el crecimiento económico. La Autoridad se adhiere a dicho Plan Fiscal como lo exige la ley.

**Resumen de los estados financieros básicos**

Los estados financieros básicos de la Autoridad consisten en: Discusión y análisis de la administración ("DyAA"), Estados financieros básicos, Notas a los estados financieros, Información complementaria requerida y Otra información complementaria.

**Discusión y análisis de la administración**

La discusión de la administración proporciona un análisis para ayudar a los lectores a enfocarse en los asuntos y actividades financieras importantes e identificar cualquier cambio significativo en la situación financiera. Su objetivo es servir como una introducción a los estados financieros básicos de la Autoridad.

**Estados financieros básicos**

El Estado de Situación Neta presenta información financiera sobre todos los activos, salida diferida de recursos, pasivos y entradas diferidas de recursos de la Autoridad con la diferencia comunicada como situación neta. Con el tiempo, los aumentos o disminuciones en la situación neta pueden servir como un indicador útil de si la situación financiera de la Autoridad está mejorando o deteriorándose. La situación neta aumenta cuando los ingresos exceden los gastos. Los aumentos en los activos, sin un aumento correspondiente en los pasivos, dan como resultado un aumento neto de la situación, lo que también indica una mejor situación financiera.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

El Estado de Ingresos, Gastos y Cambios en la Situación Neta presenta información que muestra cómo la situación neta de la Autoridad cambió durante el período y se informa tan pronto como ocurre el acontecimiento subyacente, independientemente del momento en que ocurran los flujos de efectivo relacionados. Por lo tanto, en estos estados financieros se informan ingresos y gastos para algunos conceptos que solo darán lugar a flujos de efectivo en períodos fiscales futuros.

El Estado de Flujos de Efectivo informa sobre los recibos de efectivo, pagos en efectivo y cambios netos en el efectivo resultantes de las operaciones, actividades de financiamiento no relacionadas con el capital, actividades de financiamiento de capital y otras actividades de financiamiento relacionadas, actividades de inversión y partidas que no son en efectivo.

Las Notas a los Estados Financieros proporcionan información adicional que es esencial para la plena comprensión de los datos proporcionados en los estados financieros básicos.

**Información complementaria requerida**

La información complementaria requerida proporciona información sobre la evolución de la Autoridad en cuanto al financiamiento de los beneficios de atención médica posteriores al empleo para los empleados.

**Otra información complementaria**

Además de los estados financieros básicos, las notas adjuntas y la información complementaria requerida, varios anexos presentan cierta información sobre los cambios en las cuentas de fondos de amortización de bonos y el detalle de los ingresos operativos por alquiler.

**Análisis financiero general**

Como se señaló anteriormente, la situación neta al transcurrir el tiempo puede servir como un indicador útil de la situación financiera de un gobierno. En el caso de la Autoridad, el déficit al 30 de junio de 2017, 2016 y 2015 ascendió a unos $901.8 millones, a un monto reexpresado de $863.1 millones y a un monto reexpresado de $587.7 millones, respectivamente.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Estados de Situación Neta**

A continuación se presenta información financiera resumida de los estados de situación neta de la Autoridad:

| | 30 de junio de | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| **Activo** | | | |
| Activo corriente | $ 361,483,628 | $ 123,085,453 | $ 160,856,633 |
| Activo fijo | 3,414,144,012 | 3,509,135,717 | 3,584,774,401 |
| Otro activo no corriente | 38,234,019 | 203,911,657 | 429,907,289 |
| Activo total | 3,813,861,659 | 3,836,132,828 | 4,175,538,323 |
| Salida diferida de recursos | 206,062,037 | 166,991,114 | 175,765,103 |
| Activo total y salida diferida de recursos | 4,019,923,695 | 4,003,123,942 | 4,351,303,426 |
| **Pasivo** | | | |
| Pasivo corriente | 382,591,805 | 263,029,360 | 274,382,923 |
| Pasivo no corriente | 4,590,396,863 | 4,601,178,603 | 4,629,945,142 |
| Pasivo total | 4,972,988,669 | 4,864,207,963 | 4,904,328,065 |
| Entrada diferida de recursos | 8,507,891 | 2,053,700 | - |
| Pasivo total y entrada diferida de recursos | 4,981,496,560 | 4,866,261,663 | 4,904,328,065 |
| **Déficit** | | | |
| Inversión neta en activos fijos | (611,126,864) | (94,389,572) | 31,690,664 |
| Déficit restringido | - | - | 8,800,871 |
| Déficit | (350,446,001) | (768,748,150) | (333,205,891) |
| Déficit total | $ (961,572,865) | $ (863,137,722) | $ (292,714,356) |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Activo corriente (en millones)**



| | Efectivo | Alquiler por cobrar, neto | Otras cuentas por cobrar, netas | Otro activo corriente |
|---|---|---|---|---|
| 2017 | $58.7 | $299.8 | $2.0 | $1.0 |
| 2016 | $11.7 | $107.9 | $2.5 | $1.0 |
| 2015 | $60.4 | $97.0 | $2.1 | $1.4 |

Al comparar el 30 de junio de 2017 con el 30 de junio de 2016, el activo corriente aumentó en $238.4 millones o un 194%. Dentro del activo corriente, el efectivo al 30 de junio de 2017 fue de $47.0 millones o un 401.5% más que al 30 de junio de 2016, el alquiler por cobrar neto fue $191.1 millones más que el año anterior, lo que representa la mayor parte del aumento en el activo corriente. Este aumento en el efectivo fue principalmente el resultado de la actividad de flujos de efectivo del Departamento de Hacienda que retuvo los pagos en el año fiscal terminado el 30 de junio de 2016, como se refleja en la disminución del saldo del 30 de junio de 2015, y los recibos del Departamento de Hacienda durante el año terminado el 30 de junio de 2017 por el alquiler adeudado y no pagado en el año terminado el 30 de junio de 2016.

Al comparar el 30 de junio de 2016 con el 30 de junio de 2015, el activo corriente disminuyó en aproximadamente $37.8 millones o un 23.5%. Esta disminución estuvo principalmente relacionada con la disminución en el saldo de los certificados de depósito y la pérdida por riesgo de crédito de contraparte en depósitos mantenidos con el Banco Gubernamental de Fomento (BGF) por un monto de $40.6 millones.

AUTORIDAD DE EDIFICIOS PÚBLICOS

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)

DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)

PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Activo fijo (en millones)**



| | Terrenos | Construcción en progreso | Edificios, netos | Equipos y vehículos, netos |
|---|---|---|---|---|
| 2017 | $129.6 | $0.6 | $3,281.0 | $3.0 |
| 2016 | $129.6 | $62.1 | $3,314.1 | $3.3 |
| 2015 | $129.6 | $111.9 | $3,340.0 | $3.1 |

■ 2017  ■ 2016  ■ 2015

La construcción en progreso consiste principalmente en los costos incurridos —incluyendo los intereses capitalizados y los costos administrativos— en la construcción de nuevas instalaciones o la mejora de instalaciones existentes. Durante el año terminado el 30 de junio de 2012, la Autoridad comenzó con el Programa Escuelas para el Siglo XXI (el "Programa Escolar"), que consiste en la construcción o mejora de más de 100 escuelas públicas.

La Autoridad contrató los servicios de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI), una unidad componente del ELA, para servir como gerente de construcción. Según el contrato, la AFI es responsable de la gestión del programa, lo que incluye, entre otros, la contratación de contratistas y/o subcontratistas generales, inspección, supervisión y aceptación de las escuelas remodeladas y, en ciertos casos, proporciona mantenimiento a las escuelas. La AFI factura a la Autoridad el costo del programa, más una tarifa administrativa.

Al 30 de junio de 2017, 2016 y 2015, la construcción en curso incluye aproximadamente $0.553 millones, $62.1 millones y $11.9 [*sic*] millones, respectivamente, relacionados con el Programa Escolar.

AUTORIDAD DE EDIFICIOS PÚBLICOS

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)

DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)

PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Cuando se completan las instalaciones en construcción, el costo de la instalación se transfiere a la cuenta donde la Autoridad comienza a registrar la depreciación de la instalación y cobra el alquiler a los inquilinos de la instalación.

**Otro activo no corriente (en millones)**



| | Efectivo restringido | Pagaré por cobrar de otras agencias gubernamentales | Seguro prepagado de bonos |
|---|---|---|---|
| 2017 | $26.2 | $5.3 | $6.8 |
| 2016 | $191.1 | $5.4 | $7.4 |
| 2015 | $260.1 | $159.3 | $5.9 |

Al comparar el 30 de junio de 2017 con el 30 de junio de 2016, la partida de otro activo no corriente disminuyó en $165.9 millones o un 40.7%, principalmente debido al uso de los fondos de amortización de Bonos para hacer pagos de la amortización de la deuda sin hacer aportaciones al fondo de amortización o a los pagos de la amortización de la deuda como resultado de una moratoria declarada por el Estado Libre Asociado de Puerto Rico.

Durante los años terminados el 30 de junio de 2016 y 2015, el efectivo restringido y los equivalentes de efectivo disminuyeron en aproximadamente $68.9 millones y $78.2 millones o un 27% y un 23%, respectivamente, principalmente debido a una disminución en el fondo de construcción para el dinero utilizado para financiar el costo de las instalaciones construidas durante el año, especialmente las escuelas bajo el Programa Escolar y la pérdida por riesgo de crédito de contraparte por valor de $12.4 millones durante el año 2016.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Pasivo corriente (en millones)**



| | Cuentas por pagar | Gastos acumulados | Bonos e intereses por pagar | Alquiler cobrado por adelantado | Por pagar a contratistas |
|---|---|---|---|---|---|
| 2017 | $25.5 | $11.6 | $341.3 | $1.0 | $3.1 |
| 2016 | $21.0 | $13.4 | $221.0 | $2.2 | $5.9 |
| 2015 | $36.6 | $15.2 | $207.6 | $4.9 | $10.1 |

Al comparar el 30 de junio de 2017 con el 30 de junio de 2016, el pasivo corriente aumentó en $119.1 millones o un 45.2%, principalmente debido a la moratoria del Estado Libre Asociado de Puerto Rico en los pagos de la amortización de la deuda durante el año terminado el 30 de junio de 2017, lo que resultó en un incremento en los bonos e intereses adeudados.

Las cuentas por pagar al 30 de junio de 2017 aumentaron en $4.6 millones en comparación con el 30 de junio de 2016, principalmente debido a demoras en los pagos a los proveedores para conservar el efectivo.

Los gastos acumulados al 30 de junio de 2017 disminuyeron en $1.8 millones en comparación con el 30 de junio de 2016, principalmente debido a lo siguiente: a) una disminución en las ausencias compensadas ($3.8 millones); b) otros gastos acumulados ($2.7 millones) y c) neto de un aumento en los beneficios de terminación voluntaria ($4.7 millones).

Los bonos e intereses por pagar consisten en la porción actual de los montos adeudados al 30 de junio de 2017 y 2016. Los montos adeudados al 30 de junio de 2016 concuerdan con el cronograma de pago de la deuda. El monto adeudado al 30 de junio de 2017 cumple con el cronograma de pago de la deuda e incluye derechos de subrogación que se limitan a los montos efectivamente pagados por las aseguradoras monolínea por cada uno de los pagos atrasados de los bonos asegurados.

AUTORIDAD DE EDIFICIOS PÚBLICOS

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)

DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)

PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Las cuentas por pagar a los contratistas representan el saldo de los proyectos en construcción. Normalmente, los contratistas presentan facturas de progreso para los proyectos en proceso y la Autoridad paga estas facturas, excepto la parte de retención. Esta retención se utiliza como garantía de que el contratista completará el proyecto de acuerdo con los requisitos del contrato. Normalmente, la retención se pagará una vez completados y aceptados los proyectos, según lo determinen los ingenieros de la Autoridad.

**Pasivo no corriente (en millones)**



| | Bonos por pagar | Pasivo neto por pensiones | Línea de Crédito | Otro |
|---|---|---|---|---|
| 2017 | $3,907.4 | $444.5 | $182.2 | $56.3 |
| 2016 | $3,987.2 | $380.7 | $182.2 | $50.6 |
| 2015 | $4,284.6 | $325.0 | $178.2 | $45.8 |

La disminución de los bonos por pagar durante los años terminados el 30 de junio de 2017 y 2016, consiste en los pagos realizados durante cada año fiscal de acuerdo con el cronograma de pagos relacionado.

El aumento en el pasivo neto por pensiones en los años terminados el 30 de junio de 2017 y 2016 fue de $63.8 millones y $55.7 millones, respectivamente. En el año terminado el 30 de junio de 2017, la Autoridad implementó la declaración núm. 68 de la Junta Gubernamental de Normas Contables, Contabilidad e Informes Financieros para Pensiones, una enmienda de la declaración GASB núm. 27, con las correspondientes reexpresiones del Estado de Déficit Neto al 30 de junio de 2016 y el Estado de Ingresos, Gastos y Cambios en el Déficit para el año terminado el 30 de junio de 2016, incluida la reexpresión del déficit neto inicial. Esto resultó en un ajuste neto al déficit neto de aproximadamente $295.0 millones al 30 de junio de 2015 y $314.6 millones al 30 de junio de 2016.

La Autoridad tiene varios acuerdos de línea de crédito con el BGF. Algunos de los acuerdos son para proporcionar financiamiento provisional para la construcción de las instalaciones de la Autoridad, mientras que otros son para financiar operaciones, incluido el financiamiento de los requisitos de amortización de la deuda en virtud de los acuerdos de bonos.

**AUTORIDAD DE EDIFICIOS PÚBLICOS**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Otros pasivos no corrientes al 30 de junio de 2017 y 2016 consisten principalmente en la porción no corriente de los beneficios para empleados posteriores al retiro, reclamaciones legales, beneficios de terminación voluntaria y anticipos de otras agencias. Estos montos aumentaron principalmente en $6.0 millones en total: un aumento de $15 millones en beneficios de terminación voluntaria, una disminución de $13.2 millones en contingencias legales acumuladas, un aumento de $873,000 en otros beneficios posteriores al empleo y un aumento de $3.2 millones en ausencias compensadas.

Estado de Ingresos, Gastos y Cambios en el Déficit

A continuación se presenta información financiera resumida del Estado de Ingresos, Gastos y Cambios en el Déficit de la Autoridad:

|  | Años terminados el 30 de junio de | | |
|  | 2017 | 2016 | 2015 |
| --- | --- | --- | --- |
| **INGRESOS** | | | |
| Operativos | $ 363,794,738 | $ 205,780,405 | $ 407,268,438 |
| No operativos | 30,003,409 | 37,661,553 | 42,134,794 |
| Ingresos totales | 393,798,147 | 243,441,958 | 449,403,232 |
| **GASTOS** | | | |
| Operativos | 251,994,173 | 237,480,679 | 220,476,925 |
| No operativos | 240,239,117 | 281,348,413 | 241,173,609 |
| Gastos totales | 492,233,290 | 518,829,092 | 461,650,534 |
| Cambio en déficit neto | (98,435,143) | (275,387,135) | (12,247,302) |
| **Déficit** | | | |
| Principio del año, según reexpresado | (863,137,722) | (587,750,587) | (575,503,285) |
| Final del año | $ (961,572,865) | $ (863,137,722) | $ (587,750,587) |

AUTORIDAD DE EDIFICIOS PÚBLICOS

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)

DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)

PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Ingresos operativos**

Los ingresos operativos consisten principalmente en cargos de alquiler a agencias, corporaciones públicas y municipios del ELA. Los ingresos operativos aumentaron en $158.0 millones en 2017 en comparación con 2016, principalmente como resultado de gastos por montos incobrables reconocidos en 2016 de $222.5 por alquileres por cobrar de agencias y corporaciones públicas del ELA.

Los ingresos operativos disminuyeron en aproximadamente $201.5 millones de 2015 a 2016 como resultado de la reducción en el alquiler estimado realizado por el ELA.

**Gastos (en millones)**

La siguiente gráfica revela los principales componentes de los gastos operativos para los años terminados el 30 de junio de 2017, 2016 y 2015:



| | Salarios y beneficios | Depreciación | Suministros públicos | Reparaciones | Otros | Alquiler y seguro | Reclama-ciones legales |
|---|---|---|---|---|---|---|---|
| 2017 | $129.8 | $92.9 | $16.6 | $10.2 | $8.1 | $7.0 | ($12.6) |
| 2016 | $99.5 | $91.6 | $15.5 | $14.7 | $6.8 | $7.6 | $1.8 |
| 2015 | $81.8 | $91.0 | $21.8 | $12.9 | $7.0 | $8.7 | ($2.7) |

Durante el año terminado el 30 de junio de 2017, los gastos operativos disminuyeron en $4.5 millones o un 1.9% en comparación con el año fiscal 2016. Durante el año finalizado el 30 de junio de 2016, los gastos operativos disminuyeron en $2.6 millones o un 1.2% en comparación con el año fiscal 2015. Los salarios y beneficios aumentaron en aproximadamente $30.3 millones, principalmente debido a la implementación de la declaración GASB núm. 68 y la Ley estatal de pre-retiro núm. 211 de 2015. El gasto por depreciación aumentó en $1.3 millones debido al aumento en los proyectos transferidos cuando se completaron y comenzaron a depreciarse. Los gastos de suministros públicos aumentaron en $1.1 millones, principalmente debido a aumentos en las tarifas de los suministros públicos. Los gastos de reparación y mantenimiento disminuyeron en $4.5 millones, principalmente debido a la falta de recursos para realizar mantenimiento preventivo y reparaciones. Los otros gastos aumentaron en $1.3 millones. Los gastos de alquiler y seguro disminuyeron en $600,000. Los gastos de reserva legal disminuyeron en aproximadamente $14.4 millones en respuesta a la reevaluación de las contingencias legales hecha por la administración.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Ingresos y/o gastos no operativos**

Los gastos no operativos consisten en intereses pagados y acumulados sobre los bonos y líneas de crédito de la Autoridad con el BGF por un monto de $240.2 y $240.8 millones durante los años terminados el 30 de junio de 2017 y 2016, respectivamente.

Durante el año terminado el 30 de junio de 2016 se registró una pérdida por riesgo de crédito de contraparte de $41 millones.

La partida de intereses y otros ingresos aumentó en $19.1 millones, principalmente debido a los ingresos del seguro de la amortización de la deuda utilizados para pagar la deuda que la Autoridad incumplió.

Durante los años terminados el 30 de junio de 2017 y 2016, la Autoridad recibió un subsidio del Gobierno Federal por un monto de aproximadamente $27.7 y $36.1 millones, respectivamente, para el pago de intereses sobre los bonos de las Series R y T emitidos durante 2012.

Durante los años terminados el 30 de junio de 2017 y 2016, la Autoridad recibió subvenciones operativas del ELA para financiar gastos operativos por montos aproximados de $1.8 millones y $832,000, respectivamente.

**AUTORIDAD DE EDIFICIOS PÚBLICOS**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Activo Fijo:**

| | 30 de junio de | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **Cambio** |
| Activo fijo no sujeto a depreciación | | | |
| Terrenos | $    129,569,461 | $    129,569,461 | $         - |
| Construcción en proceso | 553,531 | 62,091,446 | (61,537,915) |
| Total | 130,122,992 | 191,660,907 | (61,537,915) |
| | | | |
| Activo fijo sujeto a depreciación | | | |
| Edificios | 3,281,040,376 | 3,314,131,540 | (33,091,164) |
| Equipos y vehículos | 2,905,503 | 3,343,270 | (437,767) |
| Total | 3,283,945,879 | 3,317,474,810 | (33,528,931) |
| | | | |
| Total activo fijo | $  3,414,068,871 | $  3,509,135,717 | $    (95,066,846) |

| | 30 de junio de | | |
| --- | --- | --- | --- |
| | **2016** | **2015** | **Cambio** |
| Activo fijo no sujeto a depreciación | | | |
| Terrenos | $    129,569,461 | $    129,550,969 | $       18,492 |
| Construcción en proceso | 62,091,446 | 111,941,071 | (49,849,625) |
| Total | 191,660,907 | 241,492,040 | (49,831,133) |
| | | | |
| Activo fijo sujeto a depreciación | | | |
| Edificios | 3,314,131,540 | 3,339,965,262 | (25,833,722) |
| Equipos y vehículos | 3,343,270 | 3,118,735 | 224,535 |
| Total | 3,317,474,810 | 3,343,083,997 | (25,609,187) |
| | | | |
| Total activo fijo | $  3,509,135,717 | $  3,584,576,037 | $    (75,440,320) |

La inversión de la Autoridad en activos fijos al 30 de junio de 2017 y 2016 ascendió a aproximadamente $3,400 y $3,500 millones, neto de depreciación acumulada, respectivamente. El activo fijo incluye terrenos, mejoras de terrenos, construcción en progreso, edificios, equipos, muebles y vehículos. La mayoría de los edificios consisten en instalaciones gubernamentales que se arriendan a las agencias y corporaciones públicas del ELA. Para obtener más información, consulte la Nota 12 a los estados financieros básicos.

Durante los años terminados el 30 de junio de 2017 y 2016, la Autoridad completó aproximadamente $61.5 millones y $49.8 millones, respectivamente, en proyectos de construcción que fueron arrendados al ELA, relacionados principalmente con el proyecto Escuelas del Siglo XXI.

**AUTORIDAD DE EDIFICIOS PÚBLICOS**

(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)

DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)

PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Administración de la Deuda**

La deuda consiste principalmente en bonos por pagar, netos de descuentos o primas de bonos no amortizados relacionados, y préstamos bajo acuerdos de línea de crédito con el BGF. Ella no incluye el saldo de los derechos de subrogación que se limitan a los montos efectivamente pagados por las aseguradoras monolínea por cada uno de los pagos atrasados sobre los bonos asegurados. La deuda se emitió principalmente para financiar activos fijos y gastos operativos, y se resume de la siguiente manera:

|  | 30 de junio de | | |
| --- | --- | --- | --- |
|  | **2017** | **2016** | **Cambio** |
| Bonos de renta | $ 37,315,000 | $ 37,315,000 | $ - |
| Instalaciones del Gobierno | 3,957,179,866 | 4,028,647,000 | (71,467,134) |
| Total | 3,994,494,866 | 4,065,962,000 | (71,467,134) |
| Agregar (descontar): |  |  |  |
| Descuentos de bonos | (23,895,255) | (25,246,416) | 1,351,161 |
| Primas de bonos | 28,293,540 | 32,598,039 | (4,304,499) |
| Total | 4,398,285 | 7,351,623 | (2,953,338) |
| Bonos por pagar netos | 3,998,893,151 | 4,073,313,623 | (74,420,472) |
| Líneas de crédito con el BGF | 182,160,106 | 182,160,106 | - |
| Deuda Total | $ 4,181,053,257 | $ 4,255,473,729 | $ (74,420,472) |

|  | 30 de junio de | | |
| --- | --- | --- | --- |
|  | **2016** | **2015** | **Cambio** |
| Bonos de renta | $ 37,315,000 | $ 37,315,000 | $ - |
| Instalaciones del Gobierno | 4,028,647,000 | 4,110,647,000 | (82,000,000) |
| Total | 4,065,962,000 | 4,147,962,000 | (82,000,000) |
| Agregar (descontar): |  |  |  |
| Descuentos de bonos | (25,246,416) | (26,597,576) | 1,351,160 |
| Primas de bonos | 32,598,039 | 37,667,809 | (5,069,770) |
| Pérdida diferida en bonos anulados | - | - | - |
| Total | 7,351,623 | 11,070,233 | (3,718,610) |
| Bonos por pagar netos | 4,073,313,623 | 4,159,032,233 | (85,718,610) |
| Líneas de crédito con el BGF | 182,160,106 | 178,183,854 | 3,976,252 |
| Deuda Total | $ 4,255,473,729 | $ 4,337,216,087 | $ (81,742,358) |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
DISCUSIÓN Y ANÁLISIS DE LA ADMINISTRACIÓN (SIN AUDITAR)
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**30 de junio de 2017 y 2016**

Durante el año finalizado el 30 de junio de 2017, los bonos por pagar disminuyeron en aproximadamente $71.5 millones antes de la amortización del descuento y primas de los bonos debido al cronograma de pagos de capital de los bonos. Los bonos por pagar no incluyen el saldo de los derechos de subrogación que se limitan a los montos efectivamente pagados por las aseguradoras monolínea por cada uno de los pagos atrasados sobre los bonos asegurados.

**30 de junio de 2016 y 2015**

Durante el año finalizado el 30 de junio de 2016, los bonos por pagar disminuyeron en aproximadamente $82.0 millones antes de la amortización del descuento y primas de los bonos debido al cronograma de pagos de capital de los bonos. Durante el año fiscal 2016, la Autoridad no realizó pagos por las líneas de crédito disponibles; se obtuvieron ingresos por $3.9 millones. Además, no se pagaron los intereses programados para el año sobre dicha línea de crédito.

**Cómo Contactar a la administración financiera de la Autoridad**

Este informe financiero está diseñado para proporcionar una visión general de las finanzas de la Autoridad para todas las partes interesadas. Preguntas relacionadas con la información proporcionada en este informe o solicitudes de información financiera adicional deben dirigirse a la Oficina del Contralor, Autoridad de Edificios Públicos, PO Box 41029, San Juan, PR 00940-1029.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ESTADO DE SITUACIÓN NETA (DÉFICIT)
AL 30 DE JUNIO DE 2017 Y 2016

| | 2017 | 2016 |
|---|---|---|
| **ACTIVO** | | |
| Activo corriente: | | |
| Efectivo y equivalentes de efectivo, incluye riesgo de crédito de contraparte de $62,025,050 en el 2017 y $28,162,468 en el 2016 | $ 58,669,361 | $ 11,698,832 |
| Alquileres por cobrar, netos de la provisión para cuentas incobrables | 299,844,011 | 107,925,407 |
| Otras cuentas por cobrar, netas de la provisión para cuentas incobrables | 1,985,242 | 2,450,986 |
| Otro activo corriente | 985,014 | 1,010,229 |
| Total activo corriente | 361,483,628 | 123,085,453 |
| | | |
| Activo no corriente: | | |
| Efectivo y equivalentes de efectivo restringidos: | | |
| Fondos de amortización de bonos | 4,492,977 | 167,231,893 |
| Fondos de construcción, incluye riesgo de crédito de contraparte de $221,232,486 en el 2017 y $8,322,926 en el 2016 | 21,692,645 | 23,903,626 |
| Pagarés por cobrar de otras agencias gubernamentales | 5,281,269 | 5,366,086 |
| Seguro prepagado de bonos | 6,767,128 | 7,410,052 |
| Activo Fijo: | | |
| Terrenos y construcción en progreso | 130,122,993 | 191,660,907 |
| Edificios, equipos y vehículos, netos | 3,284,021,019 | 3,317,474,810 |
| Total activo no corriente | 3,452,378,031 | 3,713,047,374 |
| Total activo | 3,813,861,659 | 3,836,132,828 |
| **Salidas Diferidas de Recursos -** | | |
| Pérdida diferida en bonos anulados | 90,231,166 | 98,828,558 |
| Salidas diferidas relacionadas con planes de pensiones | 115,830,871 | 68,162,556 |
| Total salidas diferidas de recursos | 206,062,037 | 166,991,114 |
| Total activo y salidas diferidas de recursos | $4,019,823,695 | $4,003,123,942 |

*Continúa*

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ESTADO DE SITUACIÓN NETA (DÉFICIT)
AL 30 DE JUNIO DE 2017 Y 2016

*Continuación*

| | 2017 | 2016 |
|---|---|---|
| **PASIVO Y SITUACIÓN NETA (DÉFICIT)** | | |
| Pasivo corriente: | | |
| Cuentas por pagar | $ 20,081,927 | $ 8,215,889 |
| Intergubernamental | 3,424,773 | 9,546,497 |
| Gastos acumulados | 797,246 | 3,090,596 |
| Alquiler cobrado por adelantado | 1,024,065 | 2,204,411 |
| Contingencias legales acumuladas | 133,749 | 480,724 |
| Ausencias compensadas | 3,999,779 | 7,833,309 |
| Otros beneficios posteriores al empleo | 400,765 | 390,278 |
| Beneficios de terminación voluntaria | 6,301,591 | 1,595,085 |
| Pasivo corriente por pagar a partir de activos restringidos: | | |
| Bonos por pagar | 100,991,226 | 86,125,000 |
| Intereses por pagar | 240,268,116 | 134,912,621 |
| Cuentas por pagar a contratistas | 3,145,518 | 5,902,448 |
| Cuentas por pagar a la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI) | 2,023,050 | 3,213,227 |
| Total pasivo corriente | 382,591,805 | 263,510,084 |
| | | |
| Pasivo no corriente: | | |
| Préstamos bajo línea de crédito | 182,160,107 | 182,160,107 |
| Bonos por pagar | 3,907,412,263 | 3,987,188,623 |
| Anticipos de otras agencias gubernamentales | 553,531 | 460,329 |
| Cuentas por pagar a contratistas | 8,451,593 | 8,904,067 |
| Contingencias legales acumuladas | 4,643,003 | 17,857,514 |
| Ausencias compensadas | 8,505,313 | 5,240,833 |
| Pasivo neto por pensiones | 444,525,548 | 380,714,914 |
| Otros beneficios posteriores al empleo | 15,890,486 | 15,017,444 |
| Beneficios de terminación voluntaria | 18,255,019 | 3,154,047 |
| Total pasivo no corriente | 4,590,396,863 | 4,600,697,879 |
| Total pasivo | 4,972,988,669 | 4,864,207,963 |
| Entrada diferida de recursos | | |
| Entradas diferidas relacionadas con el plan de pensiones | 8,507,891 | 2,053,700 |
| Total pasivo y entrada diferida de recursos | 4,981,496,560 | 4,866,261,663 |
| Déficit neto: | | |
| Inversión neta en activo fijo | (611,126,864) | (94,389,572) |
| Déficit | (350,446,001) | (768,748,150) |
| Total déficit | $(961,572,865) | $(863,137,722) |

Las notas adjuntas son parte integrante de estos estados financieros.

**AUTORIDAD DE EDIFICIOS PÚBLICOS**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ESTADO DE INGRESOS, GASTOS Y CAMBIOS EN EL DÉFICIT
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

| | 2017 | 2016 según reexpresado |
|---|---|---|
| **Ingresos operativos:** | | |
| Ingresos por alquileres de agencias gubernamentales, netos de gastos por montos incobrables de $50,980,253 en 2017 y $222,461,178 en 2016 | $ 363,794,738 | $ 205,780,405 |
| | | |
| **Gastos operativos:** | | |
| Salarios y beneficios para empleados | 129,829,984 | 99,504,950 |
| Depreciación | 92,869,207 | 91,631,886 |
| Suministros públicos | 16,601,544 | 15,486,619 |
| Reparaciones y mantenimiento | 10,189,358 | 14,720,632 |
| Beneficios de terminación voluntaria | 33,571 | 160,624 |
| Servicios de seguridad | 2,050,000 | 1,748,517 |
| Alquiler y seguro | 7,014,281 | 7,567,781 |
| Reclamaciones legales | (12,628,765) | 1,761,144 |
| Otros, netos de gastos capitalizados de $7,453 y $14,487 en 2017 y 2016, respectivamente | 6,034,993 | 4,898,527 |
| Total gastos operativos | 251,994,173 | 237,480,679 |
| | | |
| **Utilidad (pérdida) operativa** | 111,800,565 | (31,700,274) |
| | | |
| **Ingresos (gastos) no operativos:** | | |
| Subvención para el pago de bonos | 27,669,504 | 36,135,387 |
| Subvenciones operativas del Estado Libre Asociado de Puerto Rico | 1,623,015 | 831,643 |
| Intereses sobre bonos y pagarés | (240,239,117) | (240,758,111) |
| Intereses y otros ingresos | 353,860 | 347,237 |
| Cargos por servicios y otros | 247,028 | 347,286 |
| Pérdida por riesgo de crédito de contraparte | 110,002 | (40,590,302) |
| Total ingresos (gastos) no operativos | (210,235,708) | (243,686,860) |
| | | |
| **Cambio en el déficit** | (98,435,143) | (275,387,135) |
| | | |
| **Déficit:** | | |
| Al principio del año, según se informó anteriormente | - | (292,714,356) |
| Ajuste de reexpresión – Adopción de la Declaración GASB núm. 68 | - | (295,036,231) |
| Al principio del año, según reexpresado | (863,137,722) | (587,750,587) |
| | | |
| Al final del año | $ (961,572,865) | $ (863,137,722) |

Las notas adjuntas son parte integrante de estos estados financieros.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ESTADO DE FLUJOS DE CAJA
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

|  | 2017 | 2016 |
|---|---|---|
| **Actividades operativas:** | | |
| Recibos de inquilinos | $ 161,428,497 | $ 347,559,663 |
| Pagos a empleados y beneficios relacionados | (84,454,572) | (79,651,270) |
| Pagos por bienes y servicios | (26,047,420) | (50,216,553) |
| Pérdida por riesgo de crédito de contraparte | - | (28,162,468) |
| Efectivo neto proporcionado por las actividades operativas | 50,926,505 | 189,529,372 |
| | | |
| **Actividades de financiamiento no relacionadas con el capital:** | | |
| Subvenciones operativas del Estado Libre Asociado de Puerto Rico | - | 831,643 |
| Otros recibos (desembolsos) no operativos | (1,190,176) | 213,766 |
| Efectivo neto provisto por (utilizado en) actividades de financiamiento no relacionadas con el capital | (1,190,176) | 1,045,409 |
| | | |
| **Actividades de financiamiento de capital y relacionadas:** | | |
| Gastos de capital, netos de intereses capitalizados | - | (29,793,384) |
| Pérdida por riesgo de crédito de contraparte | - | (12,427,834) |
| Subsidio del gobierno federal para el pago de bonos | 27,669,504 | 36,135,387 |
| Pago de bonos | (79,776,360) | (82,000,000) |
| Fondos de préstamos bajo líneas de crédito | - | 3,976,252 |
| Intereses pagados | (134,874,622) | (238,146,359) |
| Fondos de las aseguradoras de bonos | 19,087,764 | - |
| Anticipos de agencias gubernamentales | 93,202 | 277,095 |
| Producto de la venta de bienes | - | 198,364 |
| Cambio neto en la pérdida de bonos por bonos anulados | - | 8,773,989 |
| Efectivo neto utilizado en actividades de financiamiento de capital y relacionadas | (167,800,512) | (313,006,490) |
| | | |
| **Actividades de inversión** | | |
| Cambio neto en la cantidad adeudada por el Estado Libre Asociado de Puerto Rico | 84,817 | 475,746 |
| Cobro de pagarés por cobrar | - | 500,653 |
| Ingresos por intereses e inversiones cobrados | - | 342,260 |
| Efectivo neto provisto por (utilizado en) actividades de inversión | 84,817 | 1,318,659 |
| | | |
| **Disminución neta de efectivo y equivalentes de efectivo** | (117,979,366) | (121,113,050) |
| **Efectivo y equivalentes de efectivo** | | |
| Al principio del año | 202,834,351 | 323,947,401 |
| Al final del año | $ 84,854,985 | $ 202,834,351 |

Las notas adjuntas son parte integrante de estos estados financieros.
*Continuación*

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ESTADO DE FLUJOS DE CAJA
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

|  | 2017 | 2016 |
|---|---|---|
| **Conciliación  de efectivo y equivalentes de efectivo presentados en el estado de situación neta:** | | |
| Efectivo y equivalentes de efectivo | $ 58,669,361 | $ 11,698,832 |
| Efectivo y equivalentes de efectivo restringidos: | | |
| Fondos de amortización de bonos | 4,492,977 | 167,231,893 |
| Fondos de construcción | 21,692,645 | 23,903,626 |
| Total efectivo y equivalentes de efectivo | $ 84,854,984 | $ 202,834,351 |
| **Conciliación  de los ingresos operativos con el efectivo neto proporcionado por las actividades operativas:** | | |
| Ingresos (pérdidas) operativos | $ 111,800,565 | (12,125,471) |
| Ajustes para conciliar los ingresos operativos con el efectivo neto proporcionado por las actividades operativas: | | |
| Depreciación | 92,869,207 | 91,631,886 |
| Gastos de cuentas incobrables | 50,980,253 | 222,461,178 |
| Cambio neto en activo y pasivo operativo: | | |
| Alquiler por cobrar | (240,675,970) | (77,974,960) |
| Otras cuentas por cobrar, netas | 474,155 | - |
| Otro activo corriente | 25,215 | 430,237 |
| Seguro prepagado de bonos | 642,925 | 642,924 |
| Cuentas por pagar y gastos acumulados | 9,572,686 | (4,666,994) |
| Alquiler cobrado por adelantado | (1,180,346) | (2,706,960) |
| Pérdida por riesgo de crédito de contraparte | - | (28,162,468) |
| Cuentas por pagar a contratistas | (3,209,404) | - |
| Contingencias legales acumuladas | (13,080,762) | - |
| Ausencias compensadas | (569,050) | - |
| Otros beneficios posteriores al empleo | 873,042 | - |
| Beneficios de terminación voluntaria | 19,807,479 | - |
| Pasivo neto de pensiones | 63,810,634 | - |
| Salidas diferidas relacionadas con los planes de pensión | (47,668,315) | - |
| Entradas diferidas relacionadas con los planes de pensión | 6,454,191 | - |
| Efectivo neto provisto por las actividades operativas | $ 50,926,505 | $ 189,529,372 |
| Resumen de transacciones no en efectivo: | $          - | $          - |

Las notas adjuntas son parte integrante de estos estados financieros.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

## 1. ORGANIZACIÓN

La Autoridad de Edificios Públicos (la "Autoridad") es una unidad componente fundamental del Estado Libre Asociado de Puerto Rico (el "ELA"), creada el 19 de junio de 1958 por la Ley núm. 56, según enmendada, de la Legislatura de Puerto Rico (la "Ley de Creación"). La Autoridad diseña, construye, administra y proporciona mantenimiento a edificios de oficinas, tribunales, almacenes, escuelas, centros de atención médica, centros de bienestar, tiendas e instalaciones relacionadas arrendadas al ELA o a cualquiera de sus departamentos, agencias, instrumentalidades o municipios. El alquiler anual de cada edificio arrendado se basa en los montos que necesita la Autoridad para cubrir el pago de:

    i.    Capital, intereses y otros requisitos de amortización de los pagarés y bonos emitidos para financiar los edificios;
    ii.   Gastos de operación y mantenimiento de los edificios, lo que incluye una parte proporcional razonable de los gastos administrativos, excluida la depreciación; y,
    iii.  Costo de reemplazo de equipos y reparaciones extraordinarias.

Los componentes (ii) y (iii), descritos anteriormente, están sujetos a escalada para permitir que la Autoridad recupere los costos incurridos. Los montos adeudados por los departamentos y agencias gubernamentales del ELA podrán estar sujetos a revisiones y/o ajustes periódicos basados en la disponibilidad de fondos a nivel del ELA.

La Ley de Creación establece que se da la plena fe y crédito del ELA para el pago del alquiler en virtud de cualquier contrato de arrendamiento formalizado a tenor con la Ley de Creación con cualquier departamento del ELA. La Ley de Creación también estipula que el Departamento de Hacienda del Estado Libre Asociado de Puerto Rico (el "Departamento de Hacienda") hará anticipos a la Autoridad por cualquier porción impagada del alquiler por pagar a la Autoridad por cualquier agencia o instrumentalidad del ELA que haya celebrado contratos de arrendamiento con la Autoridad. Tales anticipos se registran como una reducción de las cuentas por cobrar, ya que la responsabilidad por el reembolso recae sobre la agencia conforme a la Ley de Creación. Esta obligación fue suspendida conforme a la Ley de Moratoria de Emergencia y Rehabilitación [Financiera] de Puerto Rico y las órdenes ejecutivas emitidas en virtud de la misma, como se describe más detalladamente en la Nota 25.

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS

***a. Base contable***: los estados financieros de la Autoridad han sido preparados conforme a los principios de contabilidad generalmente aceptados en los Estados Unidos de América, según corresponde a las unidades gubernamentales. La Junta Gubernamental de Normas Contables ("GASB") es el organismo normativo aceptado para establecer los principios de contabilidad e informes financieros gubernamentales.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Las actividades de la Autoridad se contabilizan utilizando el enfoque de medición de flujo de recursos económicos y la contabilidad basada en valores devengados. Todos los activos, salidas diferidas, pasivos, posición neta, ingresos y gastos se contabilizan a través de un único fondo empresarial con ingresos registrados al momento de devengarse y gastos registrados al momento de incurrirse.

b. **Uso de estimados**: la preparación de estados financieros conforme a principios de contabilidad generalmente aceptados en los Estados Unidos de América requiere el uso de estimados y supuestos que afectan los montos comunicados de activo y pasivo y la divulgación de activos y pasivos contingentes a la fecha de los estados financieros y los montos comunicados de ingresos y gastos durante el período del informe. Los resultados reales pueden diferir de esos estimados.

c. **Valor razonable de los instrumentos financieros**: los valores en libros reflejados en los estados de situación neta de efectivo y equivalentes de efectivo y cuentas por cobrar, se aproximan al valor razonable debido a su duración a corto plazo. Los montos depositados en fondos de amortización de bonos y fondos de construcción se contabilizan según su valor razonable. El valor en libros de los bonos por pagar se aproxima al valor razonable, ya que las tasas de interés sobre dicha deuda se aproximan a las tasas actualmente disponibles en el mercado para otras deudas con plazos y vencimientos restantes similares.

d. **Efectivo y equivalentes de efectivo**: el efectivo y los equivalentes de efectivo incluyen todos los instrumentos altamente líquidos con vencimientos de tres meses o menos al momento de la adquisición. Si dichos instrumentos se incluyen en activos restringidos, se consideran equivalentes de efectivo a los efectos de los estados de flujos de efectivo.

e. **Provisión para cuentas incobrables**: la provisión para cuentas incobrables es un monto que la administración cree que será adecuado para absorber posibles pérdidas en cuentas por cobrar existentes, excluidos los alquileres para la amortización de la deuda y los cargos de mantenimiento que puedan volverse incobrables en función de las evaluaciones de la cobrabilidad de cada saldo. Debido a las incertidumbres inherentes al proceso de estimación, el estimado por parte de la administración de las pérdidas en las cuentas por cobrar pendientes y la provisión relacionada podrían cambiar en el corto plazo.

f. **Activos y pasivos restringidos por pagar a partir de activos restringidos**: los activos restringidos representan los montos depositados por la Autoridad para proporcionar el pago de capital e intereses de los bonos por pagar, los costos de intereses relacionados y el efectivo disponible en el fondo de construcción relacionado. Cuando los recursos restringidos y no restringidos están disponibles para un uso específico, es política de la Autoridad utilizar primero los recursos restringidos y luego los recursos no restringidos según se necesiten.

**AUTORIDAD DE EDIFICIOS PÚBLICOS**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

g. **Activo fijo**: el activo fijo se contabiliza al costo. Los costos de construcción incluyen costos administrativos indirectos y costos de intereses asignados durante el período de construcción. El activo fijo consiste en activos con un costo individual de más de $100 y una vida útil superior a cinco (5) años.

El costo de intereses se capitaliza como parte del costo histórico de adquirir ciertos activos mientras los activos se preparan para su uso previsto. Los intereses devengados sobre préstamos no gastados exentos de impuestos restringidos para la adquisición de activos calificados se compensan con el costo de intereses para determinar el monto neto que se capitalizará.

Los gastos para renovaciones y mejoras importantes que extienden la vida útil de los activos se capitalizan y las reparaciones y el mantenimiento normales se cargan al momento de incurrirse en ellos. La depreciación se determina utilizando el método de línea recta, sobre la vida útil estimada de los activos, de la siguiente manera:

| | |
|---|---|
| Edificios | 50 años |
| Equipos y vehículos | 5-10 años |

h. **Deterioro del activo fijo**: un activo fijo se considera deteriorado cuando su utilidad de servicio ha disminuido significativa e inesperadamente. La Autoridad evalúa acontecimientos o cambios importantes en las circunstancias que afectan los activos fijos para determinar si ha ocurrido un deterioro de un activo fijo. Tales acontecimientos o cambios en circunstancias que pueden ser indicativos de deterioro incluyen evidencia de daños físicos, promulgación o aprobación de leyes o reglamentos u otros cambios en factores ambientales, cambios tecnológicos o evidencia de obsolescencia, cambios en la manera o duración del uso de un activo fijo y paro de construcción, entre otros.

No se identificó ninguna provisión por deterioro durante los años terminados el 30 de junio de 2017 y 2016.

i. **Reclamaciones y sentencias**: el importe estimado del pasivo por reclamaciones y sentencias se contabiliza en las declaraciones adjuntas de situación neta en función de la evaluación de la Autoridad de la probabilidad de un resultado desfavorable en el litigio de dichas reclamaciones y sentencias. La Autoridad consulta con un asesor legal para determinar si se espera un resultado desfavorable. Debido a las incertidumbres inherentes al proceso de estimación, el estimado por parte de la administración del pasivo por reclamaciones y sentencias podría cambiar en el futuro.

j. **Ausencias compensadas**: las ausencias compensadas se devengan al momento en que los empleados las ganan. Los empleados pueden transferir al siguiente año sus vacaciones y licencia por enfermedad según lo permitido por el estatuto y pueden recibir un pago en efectivo de la Autoridad al finalizar el empleo.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

k. **Primas, descuentos y pérdidas por anulación de bonos**: las primas y los descuentos de bonos se amortizan como un componente de los gastos por intereses durante la vida de la emisión en cuestión utilizando el método de línea recta de una manera que se aproxima al método de intereses.

La pérdida diferida en la anulación de bonos se presenta como salidas diferidas en el estado de situación neta adjunto y la amortización relacionada se presenta como un componente del gasto por intereses.

l. **Salidas/entradas diferidas de recursos**: además del activo y el pasivo, la Autoridad reporta una sección aparte para las salidas/entradas diferidas de recursos. Este elemento aparte del estado financiero, salidas/entradas diferidas de recursos, representa un consumo de situación neta que se aplica a uno o más períodos futuros y, por lo tanto, solo hasta entonces se reconoce como una salida de recursos (gasto).

m. **Situación neta**: la diferencia entre el activo y el pasivo se presenta como "Situación Neta." Los componentes de la situación neta son los siguientes:

(1) *Inversión neta en activo fijo*: consiste en activos fijos, netos de la depreciación acumulada reducida por el saldo pendiente de cualquier bono, pagarés hipotecarios u otros préstamos que sean atribuibles a la adquisición, construcción o mejora de esos activos. Los importes importantes no gastados de la deuda relacionada a finales del año, la porción de la deuda atribuible a los importes no gastados, no se incluyen en el cálculo de la inversión en activo fijo, neto de la deuda relacionada. Más bien, esa porción de la deuda se incluye en el mismo componente de activos netos que el importe no gastado.

(2) *Restringida para la amortización de la deuda*: la situación neta restringida para la amortización de la deuda consiste en activos netos restringidos para el pago del capital y los intereses relacionados con los bonos por pagar. Esta restricción es impuesta por los bonistas a través de pactos de deuda.

(3) *Restringida para otros fines*: los otorgantes y contribuyentes imponen esta restricción.

(4) *Sin restricciones*: este componente de la situación neta consiste en una situación neta que no cumple con la definición de "restringida" o "inversión neta en activo fijo."

n. **Ingresos y gastos operativos**: la Autoridad distingue los ingresos y gastos operativos de los conceptos no operativos. Los ingresos asociados con el alquiler de los edificios y otros [*texto interrumpido*]

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Todos los arrendamientos existentes actuales cumplen con los criterios para ser tratados como arrendamientos operativos. En consecuencia, los ingresos por alquiler se reconocen como ingresos operativos durante el plazo del arrendamiento. Los ingresos por alquiler se pignoran como garantía para el reembolso de los bonos de renta de la Autoridad.

o. **Ingresos no operativos**: los ingresos no operativos incluyen actividades que tienen las características de transacciones sin contraprestación que se definen como ingresos no operativos por la Declaración GASB núm. 33, Informes Contables y Financieros para Transacciones sin Contraprestación, y la Declaración GASB núm. 34, Estados Financieros Básicos y Discusión y Análisis de la Administración para Gobiernos Estatales y Locales, tales como asignaciones estatales e ingresos por inversiones.

p. ***Financiamiento de riesgos***: la Autoridad cuenta con un seguro comercial para cubrir siniestros, robos, reclamaciones y otras pérdidas. Las pólizas de seguro actuales no han sido canceladas ni rescindidas. La Autoridad no ha resuelto ninguna reclamación que exceda su cobertura de seguro durante los últimos tres años. La Autoridad también paga las primas del seguro de compensación laboral a otra unidad componente del ELA.

q. ***Reclasificación de la presentación del año anterior***: se hicieron ciertas reclasificaciones a los estados financieros de 2016, para ajustarlos a la presentación actual.

3. **DEPENDENCIA SIGNIFICATIVA DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Negocio en marcha

Como parte de sus actividades operativas normales, y como se revela en las Notas 6, 11 y 16 a los estados financieros básicos, la Autoridad tiene saldos y transacciones importantes con el Estado Libre Asociado de Puerto Rico (ELA) y con el Banco Gubernamental de Fomento para Puerto Rico (BGF). El ELA y el BGF enfrentan incertidumbres significativas, incluido el riesgo de liquidez, que es el riesgo de no tener suficientes recursos financieros líquidos para cumplir con sus obligaciones al momento de su vencimiento. Debido a estas incertidumbres, los montos adeudados por el ELA no podrán recaudarse en un futuro cercano, y la administración de la Autoridad no puede determinar cuándo se asignarán tales montos por la Legislatura del ELA. Al mismo tiempo, estos montos adeudados por el ELA son la única fuente para el pago de los cargos de contratos de alquiler correspondientes a entidades relacionadas con el ELA y los costos de ciertos proyectos de construcción que han sido paralizados o cancelados por el ELA, tal como se revela en las Notas 6 y 11 a los estados financieros básicos.

El BGF ha servido tradicionalmente como una fuente de liquidez de emergencia para salvar el déficit del ELA y sus unidades componentes, pero ha experimentado sus propias restricciones de liquidez y no pudo continuar desempeñando ese rol (véase la Nota 25, Acontecimientos posteriores). Los préstamos otorgados por el BGF al ELA y sus unidades componentes constituyen una porción significativa de los activos del BGF. Una parte importante de estos préstamos se paga con asignaciones presupuestarias, que se han visto reducidas significativamente en los últimos años.

El 1 de mayo de 2017 venció la paralización conforme al Título IV de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (*Puerto Rico Oversight, Management, and Economic Stability Act* – PROMESA), lo que permitió que se reanudaran los litigios sustanciales presentados por los bonistas y otros acreedores contra el ELA y sus unidades componentes. En

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

consecuencia, el 3 de mayo de 2017, a solicitud del Gobernador, la Junta de Supervisión inició un caso de Título III para el ELA presentando una petición de remedio conforme al Título III de PROMESA. El Título III de PROMESA incorpora las disposiciones de paralización automática de las secciones 362 y 922 del Código de Quiebras, las cuales se hacen aplicables a los casos de Título III a tenor con la sección 301(a) de PROMESA. El plan de la gerencia de la Autoridad es adherirse al Plan de Remediación del ELA.

*Plan de Remediación – ELA*

El 13 de marzo de 2017, la Junta de Supervisión certificó el plan fiscal inicial para el ELA. El plan fiscal ha sido objeto de varias revisiones. El 23 de octubre de 2018, la Junta de Supervisión certificó su propio plan fiscal nuevo para el ELA (el "Plan Fiscal de la Junta"), que incluía las siguientes categorías de reformas estructurales y medidas fiscales:

(i)      *Reforma de capital humano y bienestar social*

(ii)     *Reforma de la facilidad para hacer negocios*

(iii)    *Reforma de la regulación energética*

(iv)     *Reforma de infraestructura e inversión de capital*

(v)      *Establecimiento de la Oficina del CFO*

(vi)     *Medidas de eficiencia de la agencia*

(vii)    *Reforma de la atención médica*

(viii)   *Cumplimiento tributario y mejora de tarifas*

(ix)     *Reducción de las asignaciones municipales y de la UPR*

(x)      *Reforma de pensiones*

(xi)     *Controles fiscales y transparencia*

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

La Autoridad ha evaluado los posibles efectos de las incertidumbres y los riesgos de liquidez que enfrentan el ELA y el BGF, sobre sus operaciones y estados financieros básicos, y ha concluido que, al 30 de junio de 2017, la Autoridad continuará operando como un negocio en marcha por un período no inferior a doce meses después de dicha fecha.

4.   RESULTADOS DE LAS OPERACIONES

Al 30 de junio de 2017 y 2016, la Autoridad tiene un déficit acumulado de $961.6 millones y $863.1 millones, respectivamente. La Autoridad enfrenta una serie de desafíos que están estrechamente relacionados con la recesión económica del ELA. Durante el año fiscal actual, la administración continuó con su política de estricto control fiscal y presupuestario y estrictas medidas económicas. Además, la Autoridad planea mejorar sus instalaciones de oficinas gubernamentales a fin de retener a los inquilinos existentes y atraer nuevas agencias e instrumentalidades.

El alquiler por cobrar incluye los montos adeudados por agencias y corporaciones públicas del ELA que se encuentran atrasadas. Además, la Autoridad tiene una cuenta por cobrar, presentada como Cuenta por Cobrar del ELA, por los costos incurridos en el desarrollo de proyectos que posteriormente fueron paralizados. Durante el año fiscal 2016, $90.5 millones fueron totalmente reservados como incobrables. La incapacidad de la Autoridad para cobrar el monto total adeudado a tiempo podría tener un efecto adverso en la situación financiera de la Autoridad y los resultados de las operaciones.

Como resultado de lo anterior, el déficit de la Autoridad aumentó en $98.4 millones durante el año terminado el 30 de junio de 2017 en comparación con el aumento reexpresado de $570.4 millones durante el año terminado el 30 de junio de 2016.

5.   EFECTIVO Y EQUIVALENTES DE EFECTIVO NO RESTRINGIDOS

El efectivo y equivalentes de efectivo al 30 de junio de 2017 y 2016 consistió en lo siguiente:

|  | 2017 | 2016 |
|---|---|---|
| Depositados en la banca comercial: |  |  |
| Efectivo en bancos | $ 57,212,238 | $ 10,250,116 |
| Certificados de depósito | 1,457,123 | 1,448,716 |
| Total efectivo y equivalentes de efectivo | 58,669,361 | 11,698,832 |
| Depositados en el Banco Gubernamental de Fomento para PR: |  |  |
| Certificados de depósito | - | 28,162,468 |
| Pérdida por riesgo de crédito de contraparte | - | (28,162,468) |
| Total efectivo y equivalentes de efectivo | $ 58,669,361 | $ 11,698,832 |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Pérdida por riesgo de crédito de contraparte sobre depósito con el Banco Gubernamental de Fomento**

El BGF enfrenta riesgos e incertidumbres importantes y actualmente no cuenta con recursos financieros líquidos suficientes para cumplir con sus obligaciones al momento de su vencimiento, como se describe en la Nota 3 a los estados financieros. A tenor con legislación recientemente aprobada, el Gobernador del ELA ordenó la paralización de desembolsos de préstamos por parte del BGF, impuso restricciones al retiro y transferencia de depósitos del BGF e impuso una moratoria sobre las obligaciones de deuda del BGF, entre otras medidas.

El ELA y sus instrumentalidades no han podido pagar sus préstamos del BGF, lo que ha afectado significativamente la liquidez y la capacidad del BGF de pagar sus obligaciones.

Como resultado, se registró una pérdida por riesgo de crédito de contraparte sobre depósitos no restringidos mantenidos en el BGF de $0.0 y $28.2 millones de dinero en efectivo depositado al 30 de junio de 2017 y 2016, respectivamente.

6. **ALQUILERES POR COBRAR**

Este saldo representa el monto adeudado por las agencias e instrumentalidades del ELA determinados de acuerdo con los contratos de alquiler correspondientes. Los alquileres mínimos de arrendamiento son aproximadamente los siguientes:

| Año fiscal terminado el 30 de junio de | Monto |
|:---:|:---:|
| 2018 | $ 423,694,740 |
| 2019 | 423,488,265 |
| 2020 | 429,372,861 |
| 2021 | 450,614,861 |
| 2022-2026 | 2,172,650,642 |
| 2027-2031 | 3,232,434,591 |
| 2031-2036 [sic] | 1,839,483,394 |
| 2037-2041 | 2,017,240,797 |

Los contratos de arrendamiento disponen la revisión de las tarifas cada 1 de julio en función de, entre otras cosas, los requisitos de la amortización de la deuda para el año en particular.

El monto total de alquileres por cobrar incluye aproximadamente $45.0 millones de más de un año de antigüedad, $51.8 millones de más de dos años de antigüedad y $91.4 millones de más de tres años de antigüedad que están completamente reservados bajo una provisión estimada para cuentas incobrables de aproximadamente $191.7 millones. Los montos más significativos incluidos en las categorías anteriores son montos adeudados por el Departamento de Educación de Puerto Rico, la Administración de Tribunales, el Departamento de Corrección, el Centro Cardiovascular y el Departamento de Policía del Estado Libre Asociado de Puerto Rico, que ascienden a aproximadamente $249.0 millones, $61.3 millones, $31.4 millones, $26.9 millones y $23.6 millones, respectivamente.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Aunque el saldo de los alquileres por cobrar al 30 de junio de 2017 y 2016 incluye facturas vencidas, y la administración ha registrado una provisión estimada para cuentas incobrables durante 2017 y 2016 como se explicó anteriormente, el artículo 15 de la Ley núm. 97 del 15 de mayo de 2006, establece que para cualquier alquiler a pagar a la Autoridad durante cualquier año fiscal por cualquier departamento, agencia o corporación pública del ELA bajo las condiciones de un contrato de alquiler de acuerdo con las disposiciones de la Ley núm. 56 del 19 de junio de 1958, según enmendada, el ELA adelantará a la Autoridad el monto no pagado. Esta ley exige que el Secretario del Departamento de Hacienda haga un adelanto de los fondos disponibles comprometidos por la plena fe y crédito del ELA. En el caso de alquileres a ser pagados a la Autoridad por cualquier municipio, esta ley requiere que el Centro de Recaudación de Ingresos Municipales realice los pagos a la Autoridad a partir de cualquier recaudación de impuestos a la propiedad. No hubo adelantos hechos por el ELA ni el Centro de Recaudación de Ingresos durante los años terminados el 30 de junio de 2017 y 2016.

Durante los años fiscales terminados el 30 de junio de 2017 y 2016, la Autoridad recibió pagos del Departamento de Hacienda en exceso de los montos poseídos por las agencias e instrumentalidades del ELA por un monto de $1.0 millones y $2.2 millones respectivamente. Este monto se incluye como alquileres cobrados por adelantado en los estados de situación neta adjuntos.

Durante el año terminado el 30 de junio de 2017 y 2016, la Autoridad redujo los ingresos por alquileres en $50.9 millones y $222.5 millones, respectivamente, por montos incobrables.

7.  **OTRAS CUENTAS POR COBRAR**

Otras cuentas por cobrar consisten en facturaciones por servicios varios prestados por la Autoridad que ascendieron a aproximadamente $21.8 millones y $22.3 millones para los años fiscales terminados el 30 de junio de 2017 y 2016, respectivamente. El monto se presenta en el estado de situación neta adjunto neto de la provisión para cuentas incobrables relacionada que asciende a $19.9 millones al 30 de junio de 2017 y 2016.

8.  **EFECTIVO Y EQUIVALENTES DE EFECTIVO RESTRINGIDOS**

El efectivo y equivalentes de efectivo restringidos al 30 de junio de 2017 y 2016 consiste en lo siguiente:

|  | 2017 | 2016 |
|---|---|---|
| Cuentas de efectivo que devengan intereses: |  |  |
| Banca comercial | $ 4,492,977 | $ 2,085,647 |
| Banco Gubernamental de Fomento para PR | - | 12,427,834 |
| Fondos mutuos | 21,692,645 | 189,049,872 |
|  | 26,185,623 | 203,563,353 |
| Menos: pérdida por riesgo de crédito de contraparte | - | (12,427,834) |
| Total efectivo y equivalentes de efectivo restringidos | $ 26,185,623 | $ 191,135,519 |

Continúa

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Continuación

Estas sumas se presentan en los estados de situación neta de la siguiente manera:

|  | 2017 | 2016 |
|---|---:|---:|
| Fondos de amortización de bonos | $ 4,492,977 | $ 167,231,893 |
| Efectivo a depositar en fondos de amortización de bonos | - | 834,145 |
| Fondos de construcción | 21,692,645 | 32,226,552 |
| Fondos para construcción de instalaciones para otras entidades gubernamentales | - | 3,270,763 |
|  | 26,185,623 | 203,563,353 |
| Menos: pérdida por riesgo de crédito de contraparte | - | (12,427,834) |
| Total efectivo y equivalentes de efectivo restringidos | $ 26,285,623 | $ 191,135,519 |

a. **Fondos de amortización de bonos**: los fondos de amortización de bonos consisten en fondos depositados bajo la Resolución núm. 468 y consisten en dos (2) cuentas separadas designadas como "Cuenta de Servicio de Bonos" y "Cuenta de Amortización." Los ingresos recibidos de alquileres para la amortización de la deuda con respecto a las instalaciones financiadas bajo la Resolución de Bonos núm. 468 se depositan con su respectivo Agente Fiscal para el crédito de dichas cuentas en el siguiente orden:

(1) A la Cuenta del Servicio de Bonos, en el monto que se requiera para hacer que el mismo sea igual al monto de intereses vencidos y pagaderos, y los intereses que vencerán dentro de los próximos 6 meses sobre todos los bonos de cada serie que se encuentren en circulación en ese momento y el capital de todos los bonos en serie, si los hay, que vencerán dentro de los próximos 12 meses; y

(2) A la Cuenta de Amortización, en el monto que se requiera para hacer que los montos así depositados en el año fiscal actual sean iguales al requisito de amortización, si corresponde, para dicho año fiscal para los bonos a plazo de cada serie que se encuentren en circulación en ese momento, más la prima, de haberla, la cual sería pagadera en una suma de capital de bonos similar si dicha suma de capital de bonos se rescatara en la próxima fecha de amortización con dinero de su Fondo de Amortización de Bonos.

La Resolución de Bonos núm. 468 requiere que el dinero se invierta y reinvierta en obligaciones gubernamentales, aceptaciones bancarias, certificados o depósitos a plazo de cualquier banco aprobado o asociación bancaria nacional del ELA; acuerdos de recompra o recompra inversa o cualquier otra inversión, que se encuentren clasificados en una de las tres categorías de calificación más altas.

En julio de 2017, la Autoridad incumplió con sus pagos de servicio de los bonos y la aseguradora comenzó a cubrir las deficiencias. Durante el año terminado el 30 de junio de 2017, los ingresos procedentes de la aseguradora fueron aproximadamente de $19.0 millones.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

b. **Efectivo a depositar en fondos de amortización de bonos**: estos fondos representan los fondos depositados para ser transferidos a las cuentas del fondo de amortización de bonos con los agentes fiscales.

c. **Fondos de construcción**: estos fondos se utilizan para el pago de la totalidad o parte del costo restante de las instalaciones iniciales, según lo definido, o para el pago de la totalidad o parte del costo para la Autoridad de cualquier instalación adicional o mejora, según lo definido, conforme a las Resoluciones de Bonos. Al 30 de junio de 2017 y 2016, la mayoría de los fondos depositados en el fondo de construcción están restringidos para el financiamiento del Programa Escuelas del Siglo XXI, como se explica a continuación, bajo los Fondos de Renovación Escolar.

9. **DEPÓSITOS**

Por ley, la Autoridad está limitada a depositar fondos solo en instituciones aprobadas por el Departamento de Hacienda del Estado Libre Asociado de Puerto Rico, y dichos depósitos deben mantenerse en cuentas separadas a nombre de la Autoridad.

La Autoridad está autorizada a invertir en obligaciones del Gobierno de Puerto Rico y de los EE.UU., o en obligaciones garantizadas por los Gobiernos de Puerto Rico o de los EE.UU. o sus agencias o instrumentalidades. La Autoridad invierte en certificados de depósito con instituciones financieras calificadas AA o AAA por Moody's Investor Services. A tenor con las Pautas de Inversión para el ELA, la Autoridad puede invertir en obligaciones del ELA, obligaciones de los Estados Unidos, certificados de depósito, instrumentos negociables, aceptaciones bancarias o en grupos de obligaciones de los municipios de Puerto Rico, entre otros. El dinero en los fondos de amortización solo puede invertirse en obligaciones directas del Gobierno de los Estados Unidos y/o depósitos a plazo que devengan intereses u otros acuerdos similares, según lo dispuesto por las Resoluciones de Bonos.

**Riesgo de crédito de contraparte**: para los depósitos, el riesgo de crédito de contraparte es el riesgo de que, en caso de quiebra bancaria, no se le devuelvan a la Autoridad sus depósitos. Según las leyes de Puerto Rico, los fondos públicos depositados en bancos comerciales deben estar totalmente garantizados por el monto depositado en exceso del seguro de depósito federal. El saldo bancario del depósito de la Autoridad al 30 de junio de 2017 y 2016 asciende a $ 83.3 millones y $15.7 millones, respectivamente.

10. **PAGARÉS POR COBRAR DE OTRAS AGENCIAS GUBERNAMENTALES**

La Autoridad celebró un acuerdo de pagaré por cobrar con el Instituto de Tecnología de Ponce, Puerto Rico, para el pago del costo de construcción, que suma aproximadamente $7.7 millones. Esta suma se recaudará en cuotas de capital variables más intereses a 2.8% hasta el año fiscal 2021.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Las futuras recaudaciones estimadas de capital e intereses durante años futuros son las siguientes:

| Año fiscal finalizado el 30 de junio de | Capital | Intereses |
|---|---|---|
| 2018 | $ 529,561 | $ 51,585 |
| 2019 | 544,635 | 36,511 |
| 2020 | 560,137 | 21,009 |
| 2021 | 3,646,936 | 1,144,810 |
| **Total** | **$ 5,281,269** | **$ 1,253,915** |

**11. TRANSACCIONES CON EL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

   **a.** **Ingresos por alquileres y alquileres por cobrar**: todos los ingresos por alquileres provienen de cargos a las entidades relacionadas con el ELA y alquileres por cobrar relacionados adeudados por dichas entidades.

   **b.** **Aportaciones**: periódicamente, el ELA realiza aportaciones no operativas a la Autoridad. Las subvenciones de capital están restringidas para financiar inversiones en activo fijo.

   **c.** **Anticipos de agencias gubernamentales para la construcción de proyectos de agencias**: representan los fondos no gastados recibidos de varias agencias federales y municipios para la construcción de proyectos. Al 30 de junio de 2017 y 2016, el saldo ascendía a aproximadamente $553,000 y 460,000, respectivamente.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

## 12. ACTIVO FIJO

El activo fijo para los años terminados el 30 de junio de 2017 y 2016 fue como sigue:

| | Año terminado el 30 de junio de 2017 | | | | |
|---|---|---|---|---|---|
| | Saldo al 30 de junio de 2016 | Ajustes | Adiciones | Deducciones o transferencias | Saldo al 30 de junio de 2017 |
| Activo fijo no sujeto a depreciación: | | | | | |
| Terrenos | $ 129,569,461 | $ | $ - | $ - | $ 129,569,461 |
| Construcción en progreso | 62,091,446 | (1,718,095) | - | (59,819,820) | 553,531 |
| Total activo fijo no sujeto a depreciación | 191,660,907 | (1,718,095) | - | (59,819,820) | 130,122,992 |
| Activo fijo sujeto a depreciación: | | | | | |
| Edificios | 4,690,627,939 | (534,877) | - | 59,819,820 | 4,749,912,882 |
| Equipos y vehículos | 13,852,178 | - | - | - | 13,852,178 |
| Total activo fijo sujeto a depreciación | 4,704,480,117 | (534,877) | | 59,819,820 | 4,763,765,060 |
| Menos depreciación acumulada: | | | | | |
| Edificios | (1,376,496,399) | (472,000) | (92,363,843) | - | (1,469,332,242) |
| Equipos y vehículos | (10,508,908) | 527,333 | (505,364) | - | (10,486,939) |
| Total depreciación acumulada | (1,387,005,307) | 55,333 | (92,869,207) | - | (1,479,819,181) |
| Activo fijo sujeto a depreciación, neto | 3,317,474,810 | (479,544) | (92,869,207) | 59,819,820 | 3,283,945,879 |
| Activo fijo, neto | $ 3,509,135,717 | $ (2,197,639) | $ (92,869,207) | $ - | $ 3,414,068,871 |

| | Saldo al 30 de junio de 2015 | Ajustes | Adiciones | Deducciones o transferencias | Saldo al 30 de junio de 2016 |
|---|---|---|---|---|---|
| Activo fijo no sujeto a depreciación: | | | | | |
| Terrenos | $ 129,550,969 | $ - | $ 45,108 | $ (26,616) | $ 129,569,461 |
| Construcción en progreso | 111,941,071 | - | 36,574,458 | (86,424,083) | 62,091,446 |
| Total activo fijo no sujeto a depreciación | 241,492,040 | - | 36,619,566 | (86,450,699) | 191,660,907 |
| Activo fijo sujeto a depreciación: | | | | | |
| Edificios | 4,624,682,349 | - | 86,424,083 | (20,478,493) | 4,690,627,939 |
| Equipos y vehículos | 14,830,134 | - | 9,342 | (987,298) | 13,852,178 |
| Total activo fijo sujeto a depreciación | 4,639,512,483 | - | 86,433,425 | (21,465,791) | 4,704,480,117 |
| Menos depreciación acumulada: | | | | | |
| Edificios | (1,284,717,087) | - | (90,810,725) | (968,587) | (1,376,496,399) |
| Equipos y vehículos | (11,711,399) | - | (821,161) | 2,023,652 | (10,508,908) |
| Total depreciación acumulada | (1,296,428,486) | - | (91,631,886) | 1,055,065 | (1,387,005,307) |
| Activo fijo sujeto a depreciación, neto | 3,343,083,997 | - | (5,198,461) | (20,410,726) | 3,317,474,810 |
| Activo fijo, neto | $ 3,584,576,037 | $ - | $ 31,421,105 | $ (106,861,425) | $ 3,509,135,717 |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

a. **Intereses capitalizados y gastos generales de construcción**: la Autoridad capitalizó la construcción en progreso durante los años fiscales terminados el 30 de junio de 2017 y 2016 con intereses por aproximadamente $0.9 millones y $3 millones, respectivamente. Además, la Autoridad capitalizó los gastos generales de construcción por aproximadamente $2.9 millones y $14,500 durante los años terminados el 30 de junio de 2017 y 2016, respectivamente.

b. **Programa Escuelas del Siglo XXI**: la construcción en progreso al 30 de junio de 2017 y 2016 incluye $0.06 millones y $39.2 millones, respectivamente, relacionados con el Programa Escuelas del Siglo XXI (el "Programa Escolar"). El programa consiste en la remodelación de más de 100 escuelas en todo Puerto Rico. Para financiar el programa, la Autoridad emitió bonos de renta de instalaciones gubernamentales por un monto de $878 millones durante el año terminado el 30 de junio de 2012, de los cuales $10.7 millones y $15.7 millones están depositados en fondos de construcción al 30 de junio de 2017 y 2016, respectivamente.

La Autoridad contrató los servicios de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI), una unidad componente del ELA, para servir como gerente de construcción. Según el contrato, la AFI es responsable de la gestión del programa, lo que incluye, entre otras cosas, la contratación de contratistas generales y/o subcontratistas, la inspección, supervisión y aceptación de las escuelas remodeladas y, en ciertos casos, proporciona mantenimiento a las escuelas. La AFI factura a la Autoridad el costo del programa más una tarifa administrativa acordada. Algunas de las escuelas bajo el programa son propiedad del Departamento de Transporte y Obras Públicas (DTOP), una agencia del ELA. La Autoridad arrienda tales escuelas del DTOP por un alquiler mínimo de $10 por año. Cuando se completen las mejoras de dichas escuelas, la Autoridad facturará el alquiler al Departamento de Educación del ELA por el pago de la amortización de la deuda de los bonos emitidos bajo indulgencia.

13. **TERRENOS Y EDIFICIOS EN CONSTRUCCIÓN PARA OTRAS AGENCIAS GUBERNAMENTALES**

La Autoridad no tuvo ninguna actividad relacionada con terrenos y edificios en construcción para otras agencias gubernamentales para el año fiscal que terminó el 30 de junio de 2017. La actividad en terrenos y edificios en construcción para otras agencias gubernamentales para el año que terminó el 30 de junio de 2017 es la siguiente:

| | Año terminado el 30 de junio de 2017 | | | |
|---|---|---|---|---|
| | Saldo inicial | Aumentos | Reducciones | Saldo al final del año |
| Construcción en progreso | $ 460,329 | $ 458,621 | $ 365,419 | $ 553,531 |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**14. CUENTAS INTERGUBERNAMENTALES POR PAGAR**

Las cuentas intergubernamentales por pagar al 30 de junio de 2017 y 2016 consisten en lo siguiente:

| | 2017 | 2016 |
|---|---|---|
| Importe por pagar a partir de activos no restringidos: | | |
| Autoridad de Energía Eléctrica de Puerto Rico | $ 2,431,025 | $ 3,045,360 |
| Autoridad de Acueductos y Alcantarillados de Puerto Rico | 370,488 | 392,336 |
| Sistema de Retiro de los Empleados | 8,267,446 | 3,458,352 |
| Administración de Servicios Generales | 247,201 | 138,089 |
| Estado Libre Asociado de Puerto Rico | 2,388,511 | 2,388,511 |
| Otro | 132,813 | 123,849 |
| Total cuentas por pagar a partir de activos no restringidos | $ 13,837,484 | $ 9,546,497 |
| Importe por pagar a partir de activos restringidos: | | |
| Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI) | $ 2,023,050 | $ 3,213,227 |

De las cuentas intergubernamentales por pagar a partir de activos no restringidos, $11.5 millones se encuentran incluidos en el saldo de cuentas por pagar al 30 de junio de 2017.

**15. PRÉSTAMOS BAJO LÍNEA DE CRÉDITO**

La actividad bajo los acuerdos de línea de crédito durante los años fiscales terminados al 30 de junio de 2017 y 2016 es como sigue:

| | Año fiscal terminado el 30 de junio de 2017 | | | | |
|---|---|---|---|---|---|
| | Saldo al 30 de junio de 2016 | Importes de préstamos | Pagos/ disminuciones | Saldo al 30 de junio de 2017 | Porción actual |
| Líneas de crédito usadas para: | | | | | |
| Actividades operativas | $ 64,718,816 | $ - | $ - | $ 64,718,816 | - |
| Actividades de construcción | 117,441,291 | - | - | 117,441,291 | - |
| Total | 182,160,107 | - | - | 182,160,107 | - |

| | Año fiscal terminado el 30 de junio de 2016 | | | | |
|---|---|---|---|---|---|
| | Saldo al 30 de junio de 2015 | Importes de préstamos | Pagos/ disminuciones | Saldo al 30 de junio de 2016 | Porción actual |
| Líneas de crédito usadas para: | | | | | |
| Actividades operativas | $ 64,718,816 | $ - | $ - | $ 64,718,816 | - |
| Actividades de construcción | 113,465,039 | 3,976,252 | - | 117,441,291 | - |
| Total | 178,183,855 | 3,976,252 | - | 182,160,107 | - |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Durante el año fiscal 2008, la Autoridad formalizó dos acuerdos de líneas de crédito con el BGF para el financiamiento provisional de su programa de mejoras de capital por un monto que no excediera los $226 millones, generando intereses a una tasa variable de 1.50% sobre la tasa preferencial o en cualesquiera otras líneas [sic] variables según lo determinara el BGF pero no menos del 6.0%. Las líneas vencen el 30 de junio de 2044 y se pagarán con los importes de la futura emisión de bonos de refinanciamiento de ingresos de la Autoridad. El saldo pendiente bajo estas líneas de crédito ascendió a aproximadamente $66.4 al 30 de junio de 2017 y 2016.

La Autoridad mantiene una línea de crédito operativa con el BGF en la cual podría pedir prestado hasta $75 millones, generando intereses a 150 puntos básicos sobre la tasa LIBOR de tres meses pero no menos del 5% en ningún momento (7% al 30 de junio de 2017 y 2016). Los importes de esta línea se utilizaron para financiar los gastos operativos de la Autoridad durante el año fiscal terminado el 30 de junio de 2006. Los pagos de capital e intereses serán a partir de las asignaciones anuales del presupuesto general del Estado Libre Asociado de Puerto Rico a tenor con las disposiciones de la Resolución núm. 387 del 21 de diciembre de 2005. La línea vence el 30 de junio de 2018. No se realizaron pagos por el monto de capital e intereses durante los años terminados el 30 de junio de 2017 y 2016. El saldo pendiente bajo esta línea de crédito ascendió a aproximadamente $64.7 millones al 30 de junio de 2017 y 2016.

Durante el año fiscal 2010, la Autoridad formalizó acuerdos de líneas de crédito con el BGF para el financiamiento provisional de su Programa de Mejora de Capital por un monto que no excediera los $93.6 millones, generando intereses a una tasa variable de 1.50% sobre la tasa preferencial o a cualquier otra tasa variable según lo determinara el BGF pero no menos del 6% en ningún momento (6% al 30 de junio de 2016 y 2015). Las líneas vencen el 30 de junio de 2044 y se pagarán con los importes de la futura emisión de bonos de refinanciamiento de ingresos de la Autoridad. El saldo pendiente bajo estas líneas de crédito ascendió a aproximadamente $51.0 millones al 30 de junio de 2017 y 2016.

El gasto total por intereses cobrado por el BGF en virtud de los acuerdos de líneas de crédito mencionados anteriormente asciende a aproximadamente $11.5 millones durante los años fiscales terminados el 30 de junio de 2017 y 2016.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**16. BONOS POR PAGAR**

Los bonos por pagar al 30 de junio de 2017 y 2016 consisten en:

|  | 2017 | 2016 |
|---|---|---|
| Bonos de Edificios de Oficinas: |  |  |
| Bonos a plazo con vencimiento hasta 2021 con tasas de interés que van desde un 5.5% hasta un 6.0% | $ 37,315,000 | $ 37,315,000 |
| Bonos de Renta de Instalaciones del Gobierno: |  |  |
| Bonos en serie con vencimiento hasta 2027, con tasas de interés que van del 3.0% al 6.75% | 1,579,048,977 | 1,651,092,000 |
| Bonos a plazo con vencimiento hasta 2042, con tasas de interés que van del 3.0% al 7.0% | 2,354,945,000 | 2,354,945,000 |
| Bonos de Apreciación de Capital, con vencimiento hasta 2031, con tasa de interés del 5.45% | 22,610,000 | 22,610,000 |
| Total Bonos de Renta de Instalaciones del Gobierno | 3,956,603,977 | 4,028,647,000 |
| Capital subrogado pagado por las aseguradoras monolínea | 10,086,227 | - |
| Total bonos en circulación | 4,004,005,204 | 4,065,962,000 |
| Agregar (deducir): |  |  |
| Descuentos de bonos | (23,895,256) | (25,246,415) |
| Primas de bonos | 28,293,541 | 32,598,038 |
| Bonos por pagar, netos | 4,008,403,489 | 4,073,313,623 |
| Menos porción actual | 100,991,226 | 86,125,000 |
| Bonos por pagar | $ 3,907,412,263 | $ 3,987,188,623 |

Los vencimientos agregados de los requisitos de amortización de los fondos de amortización sobre los bonos (excluidos descuentos y primas), el valor acumulado de los bonos y los pagos de intereses relacionados en los años futuros son los siguientes:

| Año fiscal finalizado el 30 de junio de | Capital | Intereses |
|---|---|---|
| 2018 | $ 100,991,226 | $ 181,632,621 |
| 2019 | 66,235,000 | 205,973,886 |
| 2020 | 69,645,000 | 201,710,005 |
| 2021 | 74,140,000 | 202,923,303 |
| 2022 | 99,560,000 | 197,709,522 |
| 2023-2027 | 507,165,000 | 899,630,030 |
| 2028-2032 | 1,430,981,000 | 1,026,454,873 |
| 2033-2037 | 725,715,000 | 344,364,779 |
| 2038-2043 | 924,460,925 | 149,683,200 |
| **Total** | **$ 3,998,893,151** | **$ 3,410,082,219** |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Se ha comprometido la plena fe y crédito del ELA para el pago o adelanto de dichos alquileres. El pago de capital e intereses sobre los bonos estuvo respaldado además por la garantía del ELA bajo la cual el este último se comprometió a retirar de los fondos disponibles en el Departamento de Hacienda de Puerto Rico las sumas que pudieran haber sido necesarias para cubrir cualquier deficiencia en el monto requerido para el pago del capital y los intereses de los bonos, en un monto total de capital que no excediera los $4,721 millones.

Los bonos por pagar de la Autoridad están sujetos al reglamento de reembolso de arbitraje emitido por el Servicio de Rentas Internas de los Estados Unidos de América que requiere un reembolso al gobierno federal del excedente de ganancias por inversiones sobre los importes de la deuda exento de impuestos si el rendimiento de esas ganancias excede el rendimiento efectivo en la correspondiente deuda exenta de impuestos emitida. Las ganancias excedentes deben reembolsarse cada cinco años o al vencimiento de la deuda, lo que ocurra antes. Los cálculos de arbitraje no generaron pasivo al 30 de junio de 2017 y 2016.

Los bonos por pagar de la Autoridad incluyen ciertos pactos restrictivos. Al 30 de junio de 2017 y 2016, la Autoridad no estaba cumpliendo con dichos pactos debido a restricciones financieras acarreadas por el Estado Libre Asociado de Puerto Rico.

Durante el año terminado el 30 de junio de 2017, las aseguradoras monolínea de los bonos de la Autoridad realizaron pagos de capital e intereses de aproximadamente $10.1 millones y $9.0 millones, respectivamente. Las pólizas de seguro monolínea incluyen derechos expresos de subrogación que se limitan al monto efectivamente pagado por cada uno de los pagos atrasados de los bonos asegurados. Si bien una de las pólizas de seguro monolínea no contiene derechos expresos de subrogación y otra de las pólizas establece los derechos de subrogación de una forma amplia, las leyes aplicables, no relacionadas con quiebras, limitarían los derechos de estas aseguradores monolínea a reembolsos del monto efectivamente pagado a los tenedores de bonos asegurados. Además, para cualquier bono asegurado emitido por un deudor en virtud del Título III de PROMESA, las reclamaciones de reembolso de las aseguradoras monolínea se tratarán de la misma manera que cualquier otra reclamación de bono asegurado bajo cualquier plan de ajuste confirmado del Título III, de manera que las aseguradoras monolínea podrían no recuperar el monto total pagado.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

La actividad de los bonos por pagar durante los años fiscales terminados el 30 de junio de 2017 y 2016 es como sigue:

| | Año fiscal terminado el 30 de junio de 2017 | | | | |
| | Saldo al 30 de junio de 2016 | Aumentos | Pagos/ disminuciones | Saldo al 30 de junio de 2017 | Porción actual |
|---|---|---|---|---|---|
| Bonos de Edificios de Oficinas: | | | | | |
| Bonos a plazo | $ 37,315,000 | $ - | $ - | $ 37,315,000 | $ 8,965,000 |
| Instalaciones del Gobierno: | | | | | |
| Bonos de renta | - | - | - | - | |
| Bonos en serie | 1,651,092,000 | - | (71,467,134) | 1,579,624,866 | 81,940,000 |
| Bonos a plazo | 2,354,945,000 | - | - | 2,354,945,000 | - |
| Bonos de apreciación de capital | 22,610,000 | - | - | 22,610,000 | - |
| Capital subrogado pagado por la aseguradora monolínea | - | 10,086,227 | - | 10,086,227 | 10,086,226 |
| Total | $ 4,065,962,000 | $ 10,086,227 | $ (71,467,134) | $ 4,004,581,093 | $ 100,991,226 |
| Total bonos en circulación | $ 4,065,962,000 | $ 10,086,227 | $ (71,467,134) | $ 4,004,581,093 | 100,991,226 |
| Agregar (deducir): | | | | | |
| Descuentos de bonos | (25,246,416) | - | 1,351,160 | (23,895,256) | - |
| Primas de bonos | 32,598,039 | - | (4,304,498) | 28,293,541 | - |
| Bonos por pagar, netos | $ 4,073,313,623 | $ 10,086,227 | $ (74,420,472) | $ 4,008,979,378 | 100,991,226 |
| | Año fiscal terminado el 30 de junio de 2016 | | | | |
| | Saldo al 30 de junio de 2015 | Aumentos | Pagos/ disminuciones | Saldo al 30 de junio de 2016 | Porción actual |
| Bonos de Edificios de Oficinas: | | | | | |
| Bonos a plazo | $ 37,315,000 | $ | $ - | $ 37,315,000 | - |
| Instalaciones del Gobierno: | | | | | |
| Bonos de renta | - | - | - | - | |
| Bonos en serie | 1,733,092,000 | - | (82,000,000) | 1,651,092,000 | 86,125,000 |
| Bonos a plazo | 2,354,945,000 | - | - | 2,354,945,000 | - |
| Bonos de apreciación de capital | 22,610,000 | - | - | 22,610,000 | - |
| Total | 4,110,647,000 | - | (82,000,000) | 4,028,647,000 | 86,125,000 |
| Total bonos en circulación | $ 4,147,962,000 | $ - | $ (82,000,000) | $ 4,065,962,000 | 86,125,000 |
| Agregar (deducir): | | | | | |
| Descuentos de bonos | (26,597,576) | - | 1,351,160 | (25,246,416) | - |
| Primas de bonos | 37,667,809 | - | (5,069,770) | 32,598,039 | - |
| Bonos por pagar, netos | $ 4,159,032,233 | $ - | $ (85,718,610) | $ 4,073,313,623 | 86,125,000 |

Los bonos por pagar con vencimiento al 1 de julio de 2016 fueron de $86,125,000 de capital y $100,865,721 de intereses, por un pago total adeudado de $186,990,721. El pago realizado por la Autoridad fue de $161,717,658. El incumplimiento de la Autoridad de este pago fue de $25,273,063. De este monto, las aseguradoras monolínea pagaron $10,086,277 en octubre de 2016. En enero de 2017, las aseguradoras monolínea pagaron aproximadamente $9 millones en intereses.

La Autoridad ha cancelado ciertos bonos de renta colocando los importes de nuevos bonos en un fideicomiso irrevocable para cubrir todos sus pagos futuros de la amortización de la deuda. La deuda cancelada, en esencia, y los activos relacionados colocados en fideicomiso para pagar la deuda ya no se comunican en la carátula de los estados financieros, de acuerdo con la Declaración GASB núm. 86, Ciertos Problemas de Cancelación de Deuda. Al 30 de junio de 2017 y 2016, el saldo pendiente de los bonos cancelados era de aproximadamente $659.9 millones y $660 millones, respectivamente.

43

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**17. OTROS PASIVOS A LARGO PLAZO**

Otros pasivos a largo plazo al 30 de junio de 2017 y 2016 consisten en:

| | Año fiscal terminado el 30 de junio de 2017 | | | | |
|---|---|---|---|---|---|
| | Saldo al 30 de junio de 2016 | Aumentos | Disminuciones | Saldo al 30 de junio de 2017 | Porción actual |
| Anticipos de otras agencias gubernamentales | $ 460,329 | $ 458,621 | $ (365,419) | $ 553,531 | $ - |
| Ausencias compensadas | 13,074,142 | 24,195 | (593,245) | 12,505,092 | 3,999,779 |
| Contingencias legales acumuladas | 17,857,514 | - | (13,080,762) | 4,776,752 | 134,695 |
| Otros beneficios posteriores al empleo | 15,888,446 | 402,805 | - | 16,291,251 | 400,765 |
| Beneficios de terminación voluntaria | 4,749,132 | 25,780,576 | (5,973,098) | 24,556,611 | 6,301,591 |
| Total | $ 52,029,563 | $ 26,666,197 | $ (20,012,524) | $ 58,683,237 | $ 10,836,830 |

| | Año fiscal terminado el 30 de junio de 2016 | | | | |
|---|---|---|---|---|---|
| | Saldo al 30 de junio de 2015 | Aumentos | Disminuciones | Saldo al 30 de junio de 2016 | Porción actual |
| Anticipos de otras agencias gubernamentales | $ 460,329 | $ - | $ - | $ 460,329 | $ - |
| Ausencias compensadas | 11,368,578 | 7,833,309 | (6,127,745) | 13,074,142 | 7,833,309 |
| Contingencias legales acumuladas | 17,048,154 | 1,761,143 | (951,783) | 17,857,514 | 480,724 |
| Otros beneficios posteriores al empleo | 14,143,473 | 2,269,042 | (524,069) | 15,888,446 | 390,278 |
| Beneficios de terminación voluntaria | 6,510,778 | 130,560 | (1,892,206) | 4,749,132 | 1,595,085 |
| Total | $ 49,531,312 | $ 11,994,054 | $ (9,495,803) | $ 52,029,563 | $ 10,299,396 |

a.   **Anticipos de otras agencias gubernamentales**: este monto representa el saldo de los montos adelantados por otras entidades gubernamentales, principalmente para la construcción de instalaciones que serán propiedad de estas entidades. Estos proyectos incluyen asignaciones del ELA para financiar la construcción de instalaciones por parte de estas agencias, que a su vez solicitan a la Autoridad que lleve a cabo la construcción y la administración del progreso. Tras la finalización aceptable, el proyecto se completa y la agencia correspondiente toma cargo de él. Los activos no son propiedad de la Autoridad.

b.   **Ausencias compensadas**: los empleados devengan vacaciones anuales a razón de 15 días por año hasta una acumulación máxima permitida de 30 días para empleados sindicalizados y 60 días para el personal administrativo. Los empleados acumulan licencia por enfermedad a razón de 18 días por año. La licencia por enfermedad solo se paga si el empleado regular renuncia y tiene más de 10 años de empleo. La acumulación máxima permitida de licencia por enfermedad es de 90 días para todos los empleados. La Autoridad registra como un pasivo y como un gasto las vacaciones acumuladas y la licencia por enfermedad con derechos adquiridos a medida que se acumulan beneficios para los empleados. El costo de las vacaciones y la licencia por enfermedad que se espera pagar en los próximos doce meses se clasifica como pasivo corriente y pasivo acumulado, mientras que los montos que se espera pagar después de 12 meses se clasifican como pasivo no corriente.

c.   **Contingencias legales acumuladas**: esta suma representa los estimados de la Autoridad de posibles acuerdos legales y contractuales derivados de procedimientos normales de litigio. El monto estimado se basó en el número correspondiente de casos legales actualmente en curso y sobre la base del asesoramiento y aprobación de la división legal de la Autoridad y sus asesores

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

legales externos. El monto real a liquidar podrá ser sustancialmente diferente del monto acumulado.

d. **Otros beneficios posteriores al empleo**: este monto representa el pasivo de la Autoridad por sus beneficios de atención médica para el retiro en virtud del Plan de Beneficios de Atención Médica para los Jubilados, como se describe más detalladamente en la Nota 20.

e. **Beneficios de terminación voluntaria**: esta suma representa el pasivo de la Autoridad relacionado con un programa que proporciona beneficios para el retiro anticipado o incentivos económicos para la terminación voluntaria del empleo a ciertos empleados elegibles, como se explica más detalladamente en la Nota 21.

## 18. CUENTAS POR PAGAR A CONTRATISTAS

Esta suma representa el saldo restante adeudado a los contratistas para proyectos en construcción. Normalmente, los contratistas envían facturas de progreso para proyectos en progreso y la Autoridad paga estas facturas, excepto la porción de retención. Esta retención se utiliza como garantía de que el contratista completará el proyecto de acuerdo con los requisitos del contrato. Normalmente, la retención se pagará al finalizar y aceptar los proyectos, según lo determinen los ingenieros de la Autoridad.

## 19. PLAN DE PENSIONES

*(a) Información general sobre el plan de pensiones*

La Autoridad participa en el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus instrumentalidades (SRE), un plan de retiro de costos compartidos de múltiples patronos, que cubre solo a empleados a tiempo completo elegibles. El SRE fue creado por la Ley núm. 447 del 15 de mayo de 1951 y proporciona beneficios y anualidades de retiro, muerte y discapacidad a los empleados del ELA que no estén cubiertos por sus propios sistemas.

El SRE administra diferentes estructuras de beneficios a tenor con la Ley núm. 447, según enmendada, lo que incluye un programa de beneficios definidos de costos compartidos y múltiples patronos, un programa de aportación definida (programa "Sistema 2000") y un programa híbrido de aportación. Las disposiciones sobre beneficios pueden variar según la fecha de contratación de un miembro.

Los beneficios proporcionados a los miembros del SRE están establecidos por la ley del ELA y solo pueden ser enmendados por la Legislatura con la aprobación del Gobernador. La Ley núm. 3 del 4 de abril de 2013 (la "Ley núm. 3"), en conjunto con otros cambios

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

recientes de financiamiento y diseño, dispuso una reforma integral del SRE. El ELA no garantiza beneficios a la edad de retiro.

Ciertas disposiciones son diferentes para los tres grupos de miembros que ingresaron al SRE antes del 1 de julio de 2013, como se describe a continuación:

- Los miembros conforme a la Ley núm. 447 son generalmente aquellos miembros contratados antes del 1 de abril de 1990.

- Los miembros conforme a la Ley núm. 1 del 16 de febrero de 1990 (la "Ley núm. 1") son generalmente aquellos miembros contratados a partir del 1 de abril de 1990 y a más tardar el 31 de diciembre de 1999.

- Los miembros conforme a la Ley núm. 305 del 24 de septiembre de 1999 (la "Ley núm. 305" o el "Sistema 2000") son generalmente aquellos miembros contratados a partir del 1 de enero de 2000 y a más tardar el 30 de junio de 2013.

Todos los empleados regulares contratados por primera vez el 1 de julio de 2013 o después, y los ex empleados que participaron en el programa de beneficios definidos y el programa Sistema 2000 y que fueron recontratados el 1 de julio de 2013 o después, se convierten en miembros del Programa Híbrido de Aportación como condición de empleo. Además, los empleados que al 30 de junio de 2013 eran participantes de programas anteriores pasaron a formar parte del Programa Híbrido de Aportación el 1 de julio de 2013.

El SRE agrupa e invierte los activos del programa de beneficios definidos, del programa de aportación definida y del programa híbrido de aportación. Los futuros pagos de beneficios se realizarán a partir del mismo grupo de activos.

*Beneficios proporcionados*: una anualidad pagadera durante la vida del miembro igual al valor anualizado del saldo en la cuenta de aportación híbrida al momento del retiro, más el beneficio acumulado determinado al 30 de junio de 2013 (para los miembros conforme a la Ley núm. 447 y la Ley núm. 1). Si el saldo en la cuenta de aportación híbrida es de $10,000 o menos, se pagará como una suma a precio alzado en lugar de una anualidad.

1) *Beneficio acumulado al 30 de junio de 2013 para miembros de la Ley núm. 447*: el beneficio acumulado al 30 de junio de 2013 se determinará con base en la compensación promedio (según se defina) para los miembros conforme a la Ley núm. 447, los años de servicio acreditado y la edad alcanzada del miembro al 30 de junio de 2013. Para los Alcaldes conforme a la Ley núm. 447, la compensación más alta como Alcalde, según se defina, se determina a partir del 30 de junio de 2013.

Si el miembro conforme a la Ley núm. 447 tenía al menos 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivale al 65% de la compensación promedio si el miembro tenía menos de 55 años de edad al 30 de junio de 2013, o al 75% de la compensación promedio si el miembro tenía al menos 55 años de edad al 30 de junio de 2013. Para los

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

participantes que elijan coordinarse con el seguro social (el "Plan de Coordinación"), el beneficio se vuelve a calcular a la Edad de Retiro del Seguro Social (*Social Security Retirement Age* - SSRA), según se defina, como el 1.5% de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado, hasta 30 años, más el 65% (75% si el miembro tenía al menos 55 años de edad al 30 de junio de 2013) de la compensación promedio en exceso de $6,600.

Si el miembro conforme a la Ley núm. 447 tenía menos de 30 años de servicio acreditado al 30 de junio de 2013 y alcanza los 30 años de servicio acreditado al 31 de diciembre de 2013, el beneficio acumulado equivale al 55% de la compensación promedio si el miembro tenía menos de 55 años de edad al 30 de junio de 2013, o al 60% de la compensación promedio si el miembro tenía al menos 55 años de edad al 30 de junio de 2013. Para los participantes que elijan el Plan de Coordinación, el beneficio se vuelve a calcular a la Edad de Retiro del Seguro Social como un 1.5% de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado, hasta 30 años, más el 55% (60% si el miembro tenía al menos 55 años de edad al 30 de junio de 2013) de la compensación promedio en exceso de $6,600. Las aportaciones de los miembros recibidas de los miembros conforme a la Ley núm. 447 elegibles para este beneficio transitorio durante el período que comienza el 1 de julio de 2013 y finaliza al alcanzar los 30 años de servicio acreditado se consideran aportaciones anteriores al 1 de julio de 2013; las aportaciones a la cuenta de aportación híbrida comienzan después de que el miembro alcanza los 30 años de servicio acreditado.

Si el miembro conforme a la Ley núm. 447 tenía menos de 30 años de servicio acreditado al 31 de diciembre de 2013, el beneficio acumulado equivale al 1.5% de la compensación promedio multiplicado por los años de servicio acreditado, hasta 20 años, más el 2% de la compensación promedio multiplicado por los años de servicio acreditado en exceso de 20 años. El beneficio máximo es el 75% de la compensación promedio. A excepción del Cuerpo de Policía y el Cuerpo de Bomberos del ELA, el beneficio se reduce actuarialmente por cada año en que el pago comience antes de los 58 años. Para los participantes que seleccionen el Plan de Coordinación, el beneficio básico se vuelve a calcular a la Edad de Retiro del Seguro Social como el 1% de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado hasta 20 años, más 1.5% de la compensación promedio hasta $6,600 multiplicado por los años de servicio acreditado en exceso de 20 años, más 1.5% de la compensación promedio en exceso de $6,600 multiplicado por los años de servicio acreditado hasta 20 años, más 2.0% de la compensación promedio en exceso de $6,600 multiplicado por los años de servicio acreditado en exceso de 20 años. A excepción del Cuerpo de Policía y el Cuerpo de Bomberos, el beneficio se reduce actuarialmente por cada año en que el pago comience antes de los 58 años.

Para los Alcaldes conforme a la Ley núm. 447 con al menos 8 años de servicio acreditado como alcalde, el beneficio acumulado no será menor al 5% de la compensación más alta como Alcalde, según se defina, por cada año de servicio acreditado como Alcalde hasta 10 años, más el 1.5% de la compensación más alta como Alcalde por cada año de servicio acreditado no de Alcalde hasta 20 años, más el 2.0% de la compensación más alta como Alcalde por cada año de servicio acreditado no de Alcalde en exceso de 20 años. El servicio acreditado no de Alcalde incluye el servicio devengado como alcalde durante más de 10 años. El beneficio máximo es el 90% de la compensación más alta como Alcalde.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

2) *Beneficio acumulado al 30 de junio de 2013 para los miembros conforme a la Ley núm. 1*: el beneficio acumulado al 30 de junio de 2013 se determinará con base en la compensación promedio para los miembros conforme a la Ley núm. 1, los años de servicio acreditado y la edad alcanzada del miembro, todos al 30 de junio de 2013. Para los Alcaldes conforme a la Ley núm. 1, la compensación más alta como Alcalde se determina al 30 de junio de 2013.

Si el miembro conforme a la Ley núm. 1 es un agente de policía o un bombero con al menos 30 años de servicio acreditado al 30 de junio de 2013, el beneficio acumulado equivale al 65% de la compensación promedio si el miembro era menor de 55 años de edad al 30 de junio de 2013, o al 75% de la compensación promedio si el miembro tenía al menos 55 años de edad al 30 de junio de 2013.

Para todos los demás miembros conforme a la Ley núm. 1, el beneficio acumulado equivale al 1.5% de la compensación promedio multiplicado por el número de años de servicio acreditado. El beneficio se reduce actuarialmente por cada año en que el pago comience antes de los 65 años.

*Aportaciones*

Los requisitos de aportación al SRE están establecido por la ley del ELA y no se determinan actuarialmente. Las siguientes son las aportaciones de los miembros y los patronos:

1) *Aportaciones de los miembros*

A partir del 1 de julio de 2013, las aportaciones de los miembros son el 10% de la compensación. Sin embargo, para los miembros conforme a la Ley núm. 447 que seleccionaron el Plan de Coordinación, las aportaciones de los miembros son el 8.5% de la compensación hasta $6,600, más el 10% de la compensación en exceso de $6,600 durante el año fiscal 2013-2014 y el 8.5% de la compensación hasta $6,600 más el 10% de compensación en exceso de $6,600 durante el año fiscal 2014-2015. Los miembros pueden hacer voluntariamente aportaciones adicionales a su cuenta de aportación híbrida.

2) *Aportaciones patronales (artículo 2-116, según enmendado por la Ley núm. 116 de 2010 y la Ley núm. 3)*

A partir del 1 de julio de 2011, las aportaciones patronales son el 9.275% de la compensación. Para los próximos cuatro años fiscales a partir del 1 de julio, las aportaciones patronales amentarán anualmente en un 1% de la compensación. Para los cinco años fiscales subsiguientes, las aportaciones patronales aumentarán anualmente en un 1.25% de la compensación, hasta alcanzar una tasa de aportación patronal del 20.525% de la compensación a partir del 1 de julio de 2020.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

3) *Aportaciones complementarias del Fondo General del ELA, ciertas corporaciones públicas y municipios (Ley núm. 3)*

A partir del 1 de julio de 2013, el Sistema recibirá una aportación complementaria de $2,000 (de los cuales $800 corresponden al plan de pensiones y $1,200 corresponden al plan de beneficios de atención médica posteriores al empleo) cada año fiscal por cada pensionado (incluidos los beneficiarios que reciben beneficios de sobreviviente) que anteriormente se beneficiaba como miembro conforme a la Ley núm. 447 o la Ley núm. 1 mientras era empleado activo. Esta aportación complementaria será pagada por el Fondo General del ELA para los ex empleados del Gobierno y de ciertas corporaciones públicas sin tesorería propia, o por ciertas corporaciones públicas con tesorería propia o por los municipios para sus ex empleados.

4) *Aportación Adicional Uniforme (Ley núm. 32, según enmendada)*

La aportación adicional uniforme será certificada por el actuario externo del Sistema cada año fiscal desde 2014-2015 hasta 2032-2033 según sea necesario para evitar que los activos brutos proyectados del Sistema, durante cualquier año fiscal posterior, caigan por debajo de $1,000 millones. La aportación adicional uniforme será pagada por el Fondo General del ELA, por las corporaciones públicas con tesorerías propias y por los municipios. La aportación adicional uniforme determinada para los años fiscales 2014-2016 fue de $120 millones, pagaderos al final de cada año fiscal. La aportación adicional uniforme determinada para el año fiscal 2016-2017 fue de $596 millones, pagaderos al final del año fiscal. La aportación adicional uniforme se eliminó en junio de 2017.

Se proporciona información adicional del SRE en sus estados financieros para el año terminado el 30 de junio de 2017, copia de los cuales se puede obtener del Administrador de los Sistemas de Retiro del Estado Libre Asociado de Puerto Rico, P.O. Box 42003, San Juan, Puerto Rico 00949.

**(b)** *Pasivos por pensiones, gastos por pensiones y salidas y entradas diferidas de recursos relacionados con las pensiones*

Al 30 de junio de 2017, la Autoridad registró un pasivo de $444,525,548 por nuestra parte proporcional del pasivo neto por pensiones. El pasivo neto por pensiones del plan en total se midió al 30 de junio de 2016 y se determinó mediante una valuación actuarial a esa fecha. La parte proporcional de la Autoridad en el pasivo neto por pensiones total se basó en la proporción de nuestras aportaciones reales de $9,890,191 pagadas al SRE para el año que finalizó el 30 de junio de 2016 en relación con las aportaciones reales de $779,477,001 de todos los patronos participantes. Al 30 de junio de 2016, la participación proporcional de la Autoridad era del 1.179% que aumentó en 0.037% en comparación con la parte proporcional del 1.142% al 30 de junio de 2015.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

Para el año terminado el 30 de junio de 2017, la Autoridad reconoció gastos por pensiones de $39,302,004.

Al 30 de junio de 2017, la Autoridad comunicó salidas diferidas de recursos y entradas diferidas de recursos de las siguientes fuentes relacionadas con los beneficios de pensiones del SRE:

| | Salidas diferidas de recursos | Entradas Diferidas de Recursos |
|---|---|---|
| Saldo de salidas y entradas diferidas de recursos debido a: | | |
| Diferencia entre experiencia esperada y real | $ 363,435 | $ 6,102,635 |
| Cambios de supuestos | 67,803,860 | - |
| Diferencia neta entre las ganancias proyectadas y reales sobre las inversiones en planes de pensiones | - | 2,405,256 |
| Cambios de proporción y diferencias entre las aportaciones patronales y la parte proporcional de las aportaciones | 30,958,082 | - |
| Aportaciones patronales posteriores a la fecha de medición | 16,705,494 | - |
| | $ 115,830,871 | $ 8,507,891 |

Los $16,705,494 reportados como salidas diferidas de recursos a pensiones resultantes de aportaciones posteriores a la fecha de medición se reconocerán como una reducción del pasivo neto por pensiones en el año terminado el 30 de junio de 2018. Otros montos comunicados como (entradas)/salidas diferidas de recursos colectivas a ser reconocidos en gastos por pensiones:

| Año finalizado el 30 de junio de | |
|---|---|
| 2018 | $ 19,483,985 |
| 2019 | 19,483,985 |
| 2020 | 20,336,630 |
| 2021 | 20,555,490 |
| 2022 | 10,757,396 |
| En adelante | - |
| | $ 90,617,486 |

*(c) Supuestos actuariales*

Las valuaciones actuariales del SRE implican estimados del monto reportado y supuestos sobre la probabilidad de que ocurran acontecimientos lejanos en el futuro. Los ejemplos incluyen supuestos sobre la mortalidad laboral futura y los aumentos salariales futuros. Los montos determinados con respecto al pasivo neto por pensiones están sujetos a revisión continua, a medida que los resultados reales se comparan con las expectativas pasadas y se realizan nuevos estimados sobre el futuro. Los siguientes son supuestos actuariales significativos y otros datos utilizados para medir el pasivo total por pensiones:

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

| | |
|---|---|
| Fecha de medición | 30 de junio de 2016 |
| Método de costo actuarial | Edad de entrada normal |
| Método de valuación de activos | Valor de mercado de los activos |
| Inflación | 2.50% |
| Crecimiento total de la nómina | |
| Aumentos salariales futuros | 3.00% por año. No se asumen aumentos de compensación hasta el 1 de julio de 2021, como resultado de la Ley núm. 66 y la economía general actual. |
| Aumentos en el costo de vida | |
| Supuestos de mortalidad | Mortalidad previa al retiro: para miembros cubiertos por la Ley |

127, RP-2014. Las Tasas de Mortalidad de los Empleados se asumen con ajustes de empleados obreros (cuello azul) para hombres y mujeres ajustados para reflejar la Escala de Mejora de la Mortalidad MP-2016 del año base 2006, y proyectados hacia adelante usando MP-2016 sobre una base generacional. Como tablas generacionales, reflejan las mejoras en la mortalidad tanto antes como después de la fecha de medición.

Mortalidad en Personas Saludables Después del Retiro: se asumen tasas que varían según el sexo para jubilados y beneficiarios con base en un estudio de la experiencia del Plan de 2007 a 2012 y las expectativas actualizadas con respecto a la mejora futura de la mortalidad. Las tasas base para el 2010 son iguales al 92% de las tasas de las Tablas de Mortalidad UP-1994 para Hombres y al 95% de las tasas de la Tabla de Mortalidad UP-1994 para Mujeres, ambas proyectadas de 1994 a 2010 usando la Escala AA. Como tabla generacional, refleja las mejoras en la mortalidad tanto antes como después de la fecha de medición.

Mortalidad en Personas Discapacitadas Después del Retiro: se asumen tasas que varían según el sexo para jubilados discapacitados con base en un estudio de la experiencia del Plan de 2007 a 2012 y las expectativas actualizadas con respecto a la mejora futura de la mortalidad. Las tasas base para el 2010 son iguales al 105% de las tasas de las Tablas de Mortalidad UP-1994 para Hombres y al 115% de las tasas de la Tabla de Mortalidad UP-1994 para Mujeres. Las tasas base se proyectan usando la Escala de Mejora de la Mortalidad MP-2016 sobre una base generacional. Como tabla generacional, refleja las mejoras en la mortalidad tanto antes como después de la fecha de medición.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

### (d) Cambios en supuestos

Los supuestos actuariales se revisan periódicamente para reflejar más de cerca la experiencia tanto real como la experiencia futura anticipada. Debido al cambio en la fecha de recolección del censo al comienzo del año fiscal, en lugar de al final del año fiscal, la ganancia/pérdida demográfica durante el año se limita a la diferencia entre los pagos de beneficios reales y esperados, que surgen de las diferencias en actividades de terminación y retiro y la mortalidad versus las expectativas.

La valuación actuarial para el SRE al 30 de junio de 2016 refleja un aumento de aproximadamente $3,900 millones en el pasivo total por pensiones debido a los cambios en los supuestos relacionados con el cambio en la tasa de descuento tal y como lo requiere la Declaración GASB núm. 67 y una disminución de aproximadamente $250 millones en el pasivo total por pensiones debido a las diferencias entre la experiencia esperada y la real. Con la aprobación de la Ley núm. 3 de 2013, se agregaron las tasas de terminación, retiro y discapacidad para los nuevos miembros conforme a la Ley núm. 3. Igualmente, se revisó el supuesto de aumento en la compensación debido a la Ley núm. 66 de 2014.

### (e) Tasa de retorno esperada a largo plazo

La tasa de retorno esperada a largo plazo de las inversiones de beneficios de pensiones se determinó de acuerdo con la cartera de asignación de activos adoptada por la Junta Directiva del SRE en diciembre de 2013 y los supuestos del mercado de capitales del actuario al 30 de junio de 2016. La tasa de retorno esperada a largo plazo de las inversiones de beneficios de pensiones se determinó utilizando un método de bloques de construcción en el cual se desarrollan rangos de mejor estimación de las futuras tasas de retorno reales esperadas (rendimientos esperados, netos de los gastos de inversión en el plan de pensiones y de la inflación) para cada clase principal de activos. Estos rangos se combinan para producir la tasa de retorno esperada a largo plazo ponderando las futuras tasas de retorno reales esperadas por el porcentaje de asignación objetivo de activos y agregando la inflación esperada. La asignación objetivo de activos y los estimados de las tasas de retorno esperadas para cada clase principal de activos incluida en la asignación objetivo de activos del plan de pensiones al 30 de junio de 2016 se resumen en la siguiente tabla:

| | Asignación objetivo | Tasa de retorno esperada a largo plazo |
|---|---|---|
| Clase de activo: | | |
| Valores nacionales de renta variable | 25 % | 6.4 % |
| Valores internacionales de renta variable | 10 | 6.7 |
| Valores de renta fija | 64 | 6.3 |
| Efectivo | 1 | 3.0 |
| Total | 100 % | |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

(f) *Fecha de agotamiento y tasa de descuento*

La base de activos para la proyección de agotamiento es la posición neta fiduciaria del SRE. Sobre esta base, la posición neta fiduciaria del SRE se volvió negativa en el año fiscal 2015 y, por lo tanto, no se necesita una proyección de la fecha de agotamiento. La proyección de la fecha de agotamiento del informe actuarial no incluye ningún monto de la aportación adicional uniforme requerida por la Ley núm. 32 debido a las dificultades financieras fiscales y presupuestarias actuales, los continuos déficits presupuestarios y los riesgos de liquidez del ELA y los municipios, y en caso de que su situación financiera no mejore a corto plazo.

La tasa de descuento utilizada para medir el pasivo total por pensiones del SRE fue del 2.85%.

(g) *Sensibilidad del pasivo neto por pensiones a cambios en la tasa de descuento*

La siguiente tabla muestra el pasivo neto por pensiones de la Autoridad al 30 de junio de 2016, calculado usando una tasa de descuento del 2.85%, así como cuál sería el pasivo neto por pensiones si se calculara usando una tasa de descuento que fuera 1 punto porcentual menor (1.85%) o un punto porcentual mayor (3.85%) que la tasa actual:

| | Con una disminución del 1% (1.85%) | A la tasa de descuento actual (2.85%) | Con un aumento del 1% (3.85%) |
|---|---|---|---|
| Pasivo neto por pensiones $ | 508,373,225 | 443,235,167 | 170,571,815 |

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**20. OTROS BENEFICIOS POSTERIORES AL EMPLEO**

La Autoridad ha implementado la Declaración GASB núm. 75, "Informes Contables y Financieros para Beneficios Posteriores al Empleo que No Sean Pensiones". Esta Declaración sustituye la Declaración GASB núm. 45, "Informes Contables y Financieros para Patronos para Beneficios Posteriores al Empleo que No Sean Pensiones" (GASB núm. 45). Esta Declaración establece los estándares para la medición, el reconocimiento y la visualización de los gastos/costes de Otros Beneficios Posteriores al Empleo (OBPE) y pasivos (activos) relacionados, divulgaciones de notas y, si corresponde, información complementaria requerida (ISR) en los informes financieros de patronos gubernamentales estatales y locales.

Los beneficios posteriores al empleo son parte de un intercambio de salarios y beneficios por los servicios prestados por los empleados. La mayoría de los OBPE se han financiado sobre la base de pago por uso y se han informado en los estados financieros al momento de pagar los beneficios prometidos. La Declaración GASB núm. 45 requiere que los informes financieros de los gobiernos estatales y locales reflejen la medición y el reconocimiento sistemáticos y basados en el devengo del costo (gasto) de OBPE durante un período que se aproxime a los años de servicio de los empleados y proporcione información sobre los pasivos actuariales acumulados asociados con el OBPE y si se está avanzando en el financiamiento del plan y en qué medida se está avanzando.

**a. Descripción del Plan**: la Autoridad proporciona beneficios de atención médica para el retiro en virtud del Plan de Beneficios de Atención Médica para los Jubilados (el "Plan") a tenor con los convenios colectivos. El Plan es administrado por la Autoridad. Los beneficios consisten en un pago mensual máximo (anualidad) para cubrir los gastos médicos.

Según las características y la funcionalidad del Plan, y para el propósito de la valuación actuarial, se ha identificado como un plan de atención médica de beneficios definidos para un solo patrono. Los grupos de participantes cubiertos son empleados bajo el Convenio Laboral Colectivo con la "Unión Independiente de Empleados de la Autoridad de Edificios Públicos" ("UIEAEP") y los empleados de la administración de la Autoridad.

Todos los empleados con al menos 10 años de servicios prestados dentro de la Autoridad son elegibles para el beneficio de atención médica al momento del retiro. El retiro normal es el siguiente:

- Para los empleados que fueron empleados por la Autoridad al 30 de marzo de 1990, el retiro es a los 30 años de servicio.

- Para los empleados que fueron empleados por la Autoridad después del 30 de marzo de 1990, el retiro es a los 10 años de servicio y 65 años de edad.

El beneficio se paga en caso de incapacidad permanente del jubilado hasta la muerte. Además, el beneficio se paga en caso de que un empleado activo desarrolle una discapacidad hasta la muerte. La obligación termina en caso de fallecimiento después del retiro.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

b.  **Descripción de otros beneficios posteriores al empleo proporcionados**: además de proporcionar los beneficios de pensión, la Autoridad proporciona una aportación definida en dólares para cubrir parcialmente el costo del seguro médico a los empleados jubilados elegibles. La aportación de la Autoridad se limita a $200 mensuales por empleado jubilado elegible hasta un período de 36 (12 meses para empleados gerenciales). Este beneficio está incluido en los Convenios Colectivos y se revaluará al momento de renovación de los mismos. Bajo este nivel de beneficios provistos, los aumentos en los costos médicos corresponden al jubilado y, por lo tanto, resultan en un menor pasivo de OBPE para la Autoridad.

c.  **Membresía**: al 30 de junio de 2017 y 2016, el número de empleados activos y jubilados ascendía a 1,378 y 1,449, respectivamente.

d.  **Política de financiamiento**: las obligaciones del patrono de los miembros del plan se establecen por acción de la Autoridad a tenor con los convenios de negociación colectiva y de empleo aplicables. Las tasas requeridas de aportación del patrono y los miembros varían según el convenio aplicable. La Autoridad actualmente aporta suficiente dinero al plan para satisfacer las obligaciones actuales sobre una base de pago por uso (pay-as-you-go). Los costos de administrar el plan son pagados por la Autoridad.

e.  **Costo anual de OBPE y obligación neta de OBPE**: el costo (gasto) anual de OBPE de la Autoridad se calcula con base en la aportación anual requerida del patrono (AAR). La Autoridad ha contratado a un actuario para calcular la AAR y la información relacionada según las disposiciones de la Declaración GASB núm. 45 para patronos en el Plan con más de 100 miembros del plan en total.

La AAR representa un nivel de financiamiento que, de pagarse de manera continua, se proyecta que cubra el costo normal cada año y que amortice cualquier pasivo actuarial no financiado (o exceso de financiamiento) durante un período que no exceda los 30 años.

La siguiente tabla muestra los componentes del costo anual de OBPE de la Autoridad para los años terminados el 30 de junio de 2017 y 2016:

**Obligación de OBPE**

El cambio neto en la obligación de OBPE para los años terminados el 30 de junio de 2017 y 2016 es el siguiente:

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

|  | 2017 | 2016 |
|---|---|---|
| Obligación de OBPE normal al comienzo del año | $ 15,888,446 | $ 14,143,473 |
| Costos anuales totales de OBPE | 1,174,607 | 2,269,042 |
| Cambio actuarial en la estimación | (618,748) | - |
| Pagos de beneficios actuariales |  |  |
|  | (153,054) | (524,069) |
| Pasivo de OBPE | $ 16,291,251 | $ 15,888,446 |

Los componentes de los costos de OBPE durante los años terminados el 30 de junio de 2017 y 2016 son los siguientes:

|  | 2017 | 2016 |
|---|---|---|
| Aportación anual requerida (AAR) para el año fiscal | $ - | $ 3,193,225 |
| Costo de servicio | 895,113 |  |
| Cambio actuarial en la estimación | 25,888 |  |
| Intereses u obligación neta de OBPE | 520,844 | 413,100 |
| Ajuste de amortización de AAR | (267,238) | (1,860,675) |
| Costos anuales totales de OBPE | $ 1,745,607 | $ 1,745,650 |
| Tasa de descuento actuarial | 3.60% | 2.60% |

Al 30 de junio de 2017 y 2016, el monto total agregado del pasivo actuarial acumulado por beneficios ascendió a $16.2 millones y $20.3 millones, respectivamente, los cuales no estaban financiados. La nómina cubierta (nómina anual de empleados activos cubiertos por el plan) fue de aproximadamente $53.3 millones y $49.9 millones durante los años fiscales terminados el 30 de junio de 2017 y 2016, respectivamente, y la proporción del pasivo actuarial acumulado no financiado a la nómina cubierta fue del 39.3% y 40.6%, respectivamente. Las aportaciones anuales requeridas por la Autoridad fueron de $0.0 y $2.9 millones durante los años terminados el 30 de junio de 2017 y 2016, según lo exigido por las Declaraciones GASB núm. 75 y 45, respectivamente.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

La proyección de los pagos de beneficios futuros para un plan continuo implica estimados del valor de los montos comunicados y supuestos sobre la probabilidad de ocurrencia de acontecimientos en el futuro. Ejemplos de esto incluyen supuestos sobre el empleo futuro, la mortalidad y la tendencia de los costos de atención médica. Los montos determinados con respecto al estado financiado del plan y las aportaciones anuales requeridas del patrono están sujetos a revisiones continuas a medida que los resultados reales se comparan con las expectativas pasadas y se hacen nuevos estimados sobre el futuro.

f.  **Métodos y supuestos**: las proyecciones de beneficios para fines de información financiera se basan en el plan e incluyen los tipos de beneficios proporcionados en el momento de la valuación y el patrón histórico de los costos de beneficios pagados por el patrono hasta la fecha. Los métodos y supuestos utilizados incluyen técnicas diseñadas para reducir los efectos de la volatilidad a corto plazo en el pasivo actuarial acumulado y el valor actuarial de los activos, de acuerdo con la perspectiva a largo plazo de los cálculos.

El método de amortización del pasivo actuarial acumulado inicial no financiado es el de cuota nivelada por un período de 15 años. El método de amortización para la ganancia o pérdida es el de cuota nivelada por un período de 15 años cerrado. La fecha de valuación fue el 1 de julio de 2016 y se utilizó el Método de Costo de Crédito Unitario Proyectado. Los supuestos actuariales se basaron en un conjunto de supuestos proporcionados por la Autoridad. Los índices de rotación se basaron en el servicio y la rotación relacionada con la edad. Se utilizó una tasa de descuento del 2.6%. Esta tasa es la mejor estimación actuarial de la experiencia esperada a largo plazo.

Los índices de tendencia de atención médica se basan en el conocimiento actuarial del entorno general de atención médica y la cobertura específica ofrecida por la Autoridad.

21. **BENEFICIOS DE TERMINACIÓN VOLUNTARIA**

El 2 de julio de 2010, el ELA aprobó la Ley núm. 70 para establecer un programa que brinda beneficios por retiro anticipado o incentivos económicos para la terminación voluntaria del empleo a los empleados elegibles, según se defina, lo que incluye a los empleados de la Autoridad. La Ley núm. 70 fue una selección voluntaria para las corporaciones públicas, como la Autoridad, y estableció que se proporcionarán beneficios de retiro anticipado a aquellos empleados elegibles que hayan completado entre 20 y 29 años de servicio acreditado en el Sistema de Retiro, con edades entre 48 y 55 años, y consistirá en beneficios quincenales de un 50% del salario de cada empleado, según se defina. En este programa de beneficios de retiro anticipado, la Autoridad hará las aportaciones patronales y del empleado al Sistema de Retiro y pagará la pensión correspondiente hasta que el empleado cumpla con los requisitos de edad y 30 años de servicio acreditado en el Sistema de Retiro. Hay incentivos económicos disponibles para los empleados elegibles que tengan al menos 30 años de servicio acreditado en el Sistema de Retiro que hayan alcanzado la edad de retiro. Los incentivos económicos consistirán en un pago a precio alzado de seis meses de salario basado en los años de empleo. Para los empleados elegibles que opten por los incentivos económicos y tengan por lo menos 30 años de servicio acreditado en el Sistema de Retiro y la edad de retiro, o tengan la edad de retiro, la Autoridad hará las aportaciones patronales y del empleado al Sistema de Retiro por un período de cinco años. Además, los empleados elegibles que opten por participar en el programa de beneficios de retiro anticipado o que opten por el incentivo económico y tengan por lo menos 20 años de servicio

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

acreditado en el Sistema de Retiro, son elegibles para recibir cobertura del plan médico por hasta 12 meses en un plan médico seleccionado por la administración de la Autoridad.

El impacto financiero resultante de los beneficios otorgados a los participantes en este programa fue el reconocimiento dentro de los estados financieros de la Autoridad de un pasivo de $16.3 millones y $15.8 millones en los balances generales al 30 de junio de 2017 y 2016, respectivamente, y un cargo de aproximadamente $500 y $1,700 en los estados de ingresos, gastos y cambios en la situación neta para los años terminados el 30 de junio de 2017 y 2016, respectivamente. Al 30 de junio de 2017, los beneficios a largo plazo no pagados otorgados en este programa se descontaron al 3.6% dependiendo de los beneficios de terminación voluntaria seleccionados del empleado.

## 22. COMPROMISOS Y PASIVOS CONTINGENTES

a. **Construcción**: la Autoridad ha celebrado varios contratos con contratistas externos para la construcción de edificios y otras instalaciones. La Autoridad registra la obligación de estos contratos a medida que se reciben las facturas de progreso, en función del trabajo completado. La Autoridad tiene un acuerdo con la AFI relacionado con la construcción de y mejoras a las escuelas públicas bajo el Programa Escuelas del Siglo XXI. Todo el trabajo de construcción en progreso se completó durante el año terminado el 30 de junio de 2017.

b. **Litigios**: la Autoridad es demandada o codemandada en varios juicios por presuntos daños e incumplimiento de contratos en casos relacionados con proyectos de construcción. Además, la Autoridad es demandada o codemandada en otros casos relacionados con responsabilidad civil y asuntos laborales. Algunos de los casos legales relacionados con la responsabilidad civil están cubiertos por un seguro.

Basándose en asesoramiento legal, la Autoridad ha registrado una provisión adecuada para cubrir pérdidas probables en reclamaciones que no estén cubiertas completamente por el seguro. En la opinión del asesor legal, cualquier responsabilidad legal que exceda la cobertura del seguro y/o la provisión registrada que pueda surgir de tales reclamaciones no sería significativa como para afectar la situación financiera o los resultados de las operaciones de la Autoridad.

c. **Ambientales**: durante 2012, la Autoridad identificó asbesto en el edificio de las Oficinas Centrales en Minillas, Santurce (Puerto Rico). El costo de remoción de asbesto se estimó en base a un estudio de consultoría de ingenieros ambientales. Como resultado, durante el año terminado el 30 de junio de 2012, la Autoridad registró un pasivo de $2 millones por el costo estimado de la remoción. Durante el año terminado el 30 de junio de 2015, la mayor parte del proceso de remoción de asbesto se completó a un costo total muy similar a la provisión total registrada en 2012. La Autoridad ha contratado a ingenieros ambientales para determinar si existe asbesto en otras propiedades de la Autoridad. Al 30 de junio de 2017, no se ha identificado ninguna otra propiedad, por lo tanto, no se ha registrado una reserva adicional para cualquier posible pasivo futuro.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

## 23. REEXPRESIÓN

Durante el año terminado el 30 de junio de 2017, la administración reexpresó los estados financieros del año anterior para implementar y establecer los saldos iniciales de la Declaración GASB núm. 68, Contabilidad e Informes Financieros para Pensiones, una enmienda de la declaración GASB núm. 27. La reexpresión incluye el saldo inicial del pasivo neto por pensiones, las salidas diferidas de recursos y sus aportaciones posteriores a la fecha de medición del año fiscal 2017 y entradas diferidas de recursos.

La siguiente tabla resume los cambios en la situación neta al comienzo del año como se informó anteriormente en el Estado de Ingresos, Gastos y Cambios en la Situación Neta.

|  | 2015 | 2016 | 2017 Déficit Total Neto |
|---|---|---|---|
| Déficit neto al principio del año, según lo comunicado | $ (292,714,356) | $ (548,531,664) | $ (548,531,664) |
| Ajuste de reexpresión: | | | |
| Subestimación de las salidas diferidas relacionadas con el plan de pensiones | 32,058,291 | 36,104,265 | 68,162,556 |
| Subestimación de las entradas diferidas relacionadas con el plan de pensiones | (2,053,700) | - | (2,053,700) |
| Subestimación del pasivo neto por pensiones | (325,040,822) | (55,674,092) | (380,714,914) |
| Subestimación del gasto por pensiones | 11,075,554 | 19,569,827 | 30,645,381 |
| Déficit neto al principio del año, según lo reexpresado | $ (576,675,033) | $ (548,531,664) | $ (832,492,341) |

## 24. REEMISIÓN DE LOS ESTADOS FINANCIEROS

Como administración de la Autoridad de Edificios Públicos (la "Autoridad"), volvimos a emitir los estados financieros emitidos el 24 de junio de 2019, porque posteriormente descubrimos que los acuerdos con las aseguradoras monolínea de nuestros bonos contienen derechos de subrogación que se limitan al monto efectivamente pagado por cada uno de los pagos atrasados de los bonos asegurados y estamos reconociendo dicho pasivo. Véase la Nota 16. Bonos por Pagar.

Además, la administración reevaluó el impacto al 30 de junio de 2017 del acuerdo celebrado el 29 de noviembre de 2018 entre la Autoridad y el Banco Gubernamental de Fomento (BGF) que permite la compensación de los saldos de efectivo de la Autoridad depositados en el BGF contra las líneas de crédito adeudadas al BGF. Dado que el efectivo depositado en el BGF se consideró deteriorado al 30 de junio de 2016, la administración había presentado el impacto del acuerdo en el estado financiero emitido el 24 de junio de 2019. El impacto presentado en los estados financieros emitidos el 24 de junio de 2019 redujo la línea de crédito adeudada al BGF y reconoció ingresos no operativos de otras aportaciones del Estado Libre Asociado de Puerto Rico por aproximadamente $40.0 millones. Sin embargo, después de una mayor consideración de los aspectos legales del acuerdo, la administración decidió eliminar el impacto al 30 de junio de 2017 y dejar solo la divulgación en Acontecimientos posteriores que figura a continuación.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**25. ACONTECIMIENTOS POSTERIORES**

La Autoridad ha evaluado acontecimientos posteriores hasta el 18 de marzo de 2020, que es la fecha en que los estados financieros estaban disponibles para su emisión. Los acontecimientos posteriores que se divulgan a continuación son principalmente aquellos que la administración considera de suficiente interés público para su divulgación.

**A. Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico y Órdenes Ejecutivas Relacionadas**

El 6 de abril de 2016, el ELA aprobó la Ley núm. 21 de 2016, conocida como la Ley de Moratoria de Emergencia y Rehabilitación [Financiera] de Puerto Rico (según enmendada, la "Ley de Moratoria"). A tenor con la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas declarando un período de emergencia, una moratoria y varias otras medidas con respecto a ciertas obligaciones del ELA y varias de sus instrumentalidades, incluido el Sistema.

En virtud de dichas órdenes ejecutivas, ciertas entidades del ELA: (i) no han realizado pagos de la amortización de la deuda, (ii) han realizado pagos de la amortización de la deuda con fondos depositados con los fideicomisarios de sus bonos, o (iii) no han recibido ni transferido ciertos ingresos. Dichas órdenes ejecutivas también impusieron restricciones significativas al desembolso de fondos depositados en el Banco Gubernamental de Fomento para Puerto Rico (BGF) y suspendieron el desembolso de préstamos por parte del BGF. Estas órdenes ejecutivas restringieron la capacidad del Sistema para retirar cualesquiera fondos depositados en el BGF y recibir cualesquiera desembolsos de préstamos otorgados por el BGF. Estas órdenes ejecutivas también suspendieron la obligación del ELA de transferir ciertos ingresos previamente asignados al Sistema.

El 2 de enero de 2017, el Gobernador aprobó la Ley núm. 2 de 2017, que enmendó la Ley de Moratoria para, entre otras cosas, crear la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF) como una corporación pública independiente para asumir el rol del BGF como agente fiscal, asesor financiero y agente informador para el ELA, sus unidades componentes y los municipios. A la AAFAF también se le asignaron las tareas de supervisar los asuntos relacionados con la reestructuración y el ajuste de los pasivos financieros del ELA (incluida la Autoridad), coordinar la gestión de pasivos u otras transacciones con respecto a dichas obligaciones y garantizar el cumplimiento de los planes y presupuestos fiscales aprobados por la Junta de Supervisión a tenor con PROMESA.

El 29 de enero de 2017, el Gobernador aprobó la Ley núm. 5 de 2017, conocida como la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico (según enmendada, la "Ley núm. 5"), que derogó ciertas disposiciones de la Ley de Moratoria y autorizó medidas de emergencia adicionales. Sin embargo, conforme a la Ley núm. 5, las órdenes ejecutivas emitidas en virtud de la Ley de Moratoria continuarán vigentes hasta que se modifiquen, rescindan o reemplacen. El período de emergencia en virtud de la Ley núm. 5 vencerá el 31 de diciembre de 2019, a menos que el Gobernador lo extienda. Algunas facultades adicionales otorgadas al Gobernador a través de la Ley núm. 5 incluyen: (i) ejercer facultades concursales para rectificar la emergencia financiera, (ii) ejercer el control general de supervisión sobre las funciones y actividades de todas las entidades gubernamentales dentro del Poder Ejecutivo, y (iii) emitir órdenes ejecutivas para implementar y hacer cumplir la Ley núm. 5.

**B. Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico**

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

El 30 de junio de 2016, el Presidente de los Estados Unidos aprobó la Ley PROMESA (según codificada en 48 U.S.C. §§ 2101-2241). En términos generales, PROMESA busca dotar al ELA y sus instrumentalidades cubiertas, incluida la Autoridad, de disciplina fiscal y económica mediante, entre otras cosas: (i) el establecimiento de la Junta de Supervisión, cuyas responsabilidades incluyen la certificación de planes y presupuestos fiscales para el ELA y sus entidades relacionadas; (ii) una paralización temporal de todas las demandas de acreedores en virtud del Título IV de PROMESA, que venció el 1 de mayo de 2017; y (iii) dos métodos alternativos para ajustar la deuda sostenible: (a) un proceso voluntario de modificación de deuda conforme al Título VI de PROMESA, que establece un proceso de reestructuración de la deuda en gran medida extrajudicial a través del cual una mayoría calificada de los acreedores puede aceptar modificaciones a la deuda financiera; y (b) un procedimiento de cuasi-quiebra conforme al Título III de PROMESA, que establece un proceso judicial de reestructuración de la deuda sustancialmente basado en disposiciones incorporadas del Código de Quiebras de los EE. UU. (11 U.S.C. §§ 101, *et seq*.).

El Título III de PROMESA estableció un proceso judicial para reestructurar las deudas de Puerto Rico y otros territorios de los Estados Unidos que sigue el modelo del proceso dispuesto conforme al Capítulo 9 del Código de Quiebras. Para ser un deudor en virtud del Título III, el territorio y/o sus instrumentalidades deben: (i) tener una Junta de Supervisión establecida para él o ser designado como una "entidad cubierta"; (ii) que la Junta de Supervisión emita una certificación de reestructuración conforme a la sección 206(b) de PROMESA; y (iii) tener el "deseo [] de realizar un plan para ajustar sus deudas". PROMESA § 302. La Junta de Supervisión tiene la autoridad exclusiva para presentar una petición voluntaria buscando protección conforme al Título III de PROMESA. Véase PROMESA § 304(a). A la fecha del presente, la Junta de Supervisión, a solicitud del Gobernador, ha iniciado casos de Título III para el ELA y la Autoridad, entre otros.

En los casos de Título III, la Junta de Supervisión actúa como representante del deudor y está autorizada a tomar las medidas necesarias para procesar el caso de Título III. Véase PROMESA § 315. Inmediatamente después de presentar la petición del Título III, la sección 362 del Código de Quiebras (que se incorpora a los casos de Título III conforme a PROMESA) se aplica para paralizar de forma automática sustancialmente todos los litigios en contra del deudor (la "Paralización de Título III"). Después de que se inicia el caso de Título III, el Presidente de la Corte Suprema de los Estados Unidos debe designar un juez de tribunal de distrito para que actúe por designación y presida el caso de Título III. PROMESA también establece que el inicio de un caso de Título III "no limita ni menoscaba las facultades de un territorio cubierto para controlar por medio de la legislación o de otra manera el ejercicio de los poderes políticos o gubernamentales del territorio o de la instrumentalidad territorial". PROMESA § 303.

Un caso de Título III culmina con la confirmación de un plan de ajuste de las deudas del deudor. La Junta de Supervisión tiene la autoridad exclusiva para presentar un plan de ajuste. Véase PROMESA § 312. Para ser confirmado, un plan de ajuste propuesto debe cumplir con los requisitos establecidos en la sección 314 de PROMESA.

El Título IV de PROMESA estableció la Paralización Temporal de Litigios, Informes Gubernamentales y Otras Disposiciones Misceláneas. A tenor con la sección 405 de PROMESA, la promulgación de PROMESA impuso inmediata y automáticamente una paralización temporal (la "Paralización de Título IV") desde el 30 de junio de 2016 (la fecha de promulgación de PROMESA) hasta el 15 de febrero de 2017, de todos los litigios de "Reclamación de Responsabilidad" iniciados contra el ELA y sus instrumentalidades después del 18 de diciembre de 2015. La Paralización de Título IV estuvo sujeta a una extensión única de 75 días por parte de la Junta de Supervisión o una extensión única de 60 días por parte del tribunal de distrito. El 28 de enero de 2017, la Junta de Supervisión extendió la Paralización de Título IV por 75 días hasta el 1 de mayo de 2017, momento en el cual venció la Paralización de Título IV. Cualquier parte sujeta a la Paralización de Título IV

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

podía haber presentado una moción en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico buscando un remedio de la Paralización de Título IV por "causa demostrada". PROMESA § 405(e).

**C. Inicio de los Casos de Título III**

El 1 de mayo de 2017 venció la Paralización de Título IV, lo que permitió que se reanudaran los litigios presentados por los bonistas y otros acreedores contra el ELA y sus instrumentalidades (incluida la Autoridad). El 3 de mayo de 2017, a solicitud del Gobernador, la Junta de Supervisión inició un caso de Título III para el ELA presentando una petición de remedio conforme al Título III de PROMESA ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal del Título III"). El 5 de mayo de 2017, a solicitud del Gobernador, la Junta de Supervisión inició un caso de Título III para COFINA presentando una petición de remedio similar a tenor con el Título III de PROMESA ante el Tribunal del Título III.

Ante la eventual insolvencia del Sistema y la imposibilidad de llegar a un acuerdo consensuado de reestructuración con los acreedores del Sistema, el 21 de mayo de 2017, a solicitud del Gobernador, la Junta de Supervisión inició un caso de III Título para el Sistema presentando una petición de remedio conforme al Título III de PROMESA ante el Tribunal del Título III. Ese mismo día, a solicitud del Gobernador, la Junta de Supervisión inició un caso de Título III para la Autoridad de Carreteras y Transportación de Puerto Rico (ACT) presentando una petición de remedio similar conforme al Título II [*sic*] de PROMESA ante el Tribunal del Título III. El 3 de julio de 2017, a solicitud del Gobernador, la Junta de Supervisión inició un caso de Título III para la Autoridad de Energía Eléctrica de Puerto Rico (AEE) presentando una petición de remedio similar conforme al Título III de PROMESA ante el Tribunal del Título III. El 27 de septiembre de 2019, la Junta de Supervisión inició un caso de Título III para la Autoridad presentando una petición de remedio similar conforme al Título III de PROMESA ante el Tribunal del Título III. Como tal, la Autoridad es un deudor en un procedimiento de conformidad con el Título III de PROMESA.

Todos los casos de Título III antes mencionados se han consolidado solo con fines procesales y se administran conjuntamente bajo el Caso No. 17-3283-LTS en el Tribunal del Título III. El 15 de junio de 2017, el U.S. Trustee nombró un Comité Oficial de Empleados Jubilados (el Comité de Jubilados) en los casos de Título III del ELA y nombró un Comité Oficial de Acreedores No Garantizados para todos los deudores de Título III que no sean COFINA (el Comité de Acreedores).

El caso de Título III del Sistema se inició en parte debido al vencimiento de la Paralización de Título IV el 1 de mayo de 2017. El Título III de PROMESA incorpora las disposiciones de paralización automática de las secciones 362 y 922 del Código de Quiebras, que se aplican al caso de Título III de la Autoridad a tenor con la sección 301(a) de PROMESA. En consecuencia, tras la presentación del caso de Título III de la Autoridad, la Paralización de Título III entró en vigor inmediatamente para paralizar el litigio de los acreedores. Todas las reclamaciones contra la Autoridad que surgieron antes de la presentación de su caso de Título III (ya sea que se discutan o no en este documento) pueden estar sujetas a las leyes que rigen el Título III.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

### D.  Litigio Clave de Título III

Litigio de Cláusula de Nombramientos

El 7 de agosto de 2017, un grupo de bonistas de obligación general del ELA liderado por Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (colectivamente, "Aurelius") presentó una moción para desestimar las peticiones del Título III. En la moción, Aurelius argumentó que el nombramiento de los miembros de la Junta de Supervisión violaba la "Cláusula de Nombramientos" de la Constitución de los Estados Unidos, que requiere que "funcionarios principales" de los Estados Unidos sean nombrados por el Presidente y confirmados por el Senado. El Tribunal del Título III denegó la moción de desestimación de Aurelius, y Aurelius apeló ante el Tribunal de Apelaciones del Primer Circuito de los Estados Unidos. El 15 de febrero de 2019, el Primer Circuito revocó la decisión del Tribunal del Título III, sosteniendo que el proceso de nombramiento de los miembros de la Junta de Supervisión violó la Cláusula de Nombramientos. El Primer Circuito paralizó su fallo por 90 días para permitir que el Presidente y el Senado designaran la Junta de Supervisión de conformidad con la Constitución. También validó expresamente todas las acciones pasadas de la Junta de Supervisión, incluidas cualesquiera medidas tomadas por la Junta de Supervisión durante el período de paralización de 90 días.

El 23 de abril de 2019, la Junta de Supervisión apeló la decisión del Primer Circuito ante la Corte Suprema de los Estados Unidos presentando su petición de un auto de *certiorari*. Al día siguiente, la Junta de Supervisión presentó una moción ante el Primer Circuito solicitando una extensión de la paralización de 90 días de su decisión del 15 de febrero hasta la decisión final del caso por parte de la Corte Suprema. El 6 de mayo de 2019, el Primer Circuito concedió en parte la moción de extensión de la Junta de Supervisión extendiendo la paralización de su decisión del 15 de febrero hasta el 15 de julio de 2019, pero denegó la solicitud de extender la paralización indefinidamente hasta la decisión final del caso por la Corte Suprema. El 20 de junio de 2019, la Corte Suprema de los Estados Unidos concedió la petición de la Junta de Supervisión de un auto de *certiorari* y paralizó la decisión del Primer Circuito en espera de su determinación final. La Corte Suprema de los Estados Unidos atendió el argumento oral sobre la apelación el 15 de octubre de 2019.

La Junta de Supervisión y Administración Financiera para Puerto Rico c. La Autoridad de Edificios Públicos de Puerto Rico, Caso No. 18-00149-LTS (D.P.R. 21 de diciembre de 2018).

El 21 de diciembre de 2018, la Junta de Supervisión y el Comité de Acreedores presentaron un procedimiento contencioso contra la Autoridad en busca de un remedio declaratorio y denegación de reclamaciones de alquiler administrativo, alegando que los arrendamientos de la Autoridad no son arrendamientos verdaderos, sino más bien "transacciones financieras encubiertas". Varias partes han presentado mociones para intervenir. El 28 de enero de 2019, la Autoridad respondió a la demanda. El 27 de junio de 2019, la Junta de Supervisión presentó una moción para paralizar este procedimiento contencioso en espera de la confirmación del plan de ajuste del Título III del ELA. Se celebró una vista sobre la moción de paralización ante el Tribunal del Título III el 24 de julio de 2019, pero la determinación de la moción sigue pendiente.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

El 27 de septiembre de 2019, la Junta de Supervisión y Administración Financiera presentó la Petición de Título III para Territorio Cubierto o Instrumentalidad Cubierta para incluir a la Autoridad.

**E. Reforma de Pensiones de Pago por Uso (PayGo)**

El 27 de junio de 2017, el Departamento de Hacienda emitió la Circular Núm. 1300-46-17 para transmitir a las agencias del Gobierno Central, corporaciones públicas y municipios los nuevos procedimientos de implementación para adoptar, a partir del 1 de julio de 2017, un nuevo sistema de "pago por uso" (conocido en inglés como "PayGo"). Con el inicio del año fiscal 2018, se eliminaron las aportaciones de los patronos, las aportaciones ordenadas por leyes especiales y la Aportación Uniforme Adicional.

El sistema PayGo era un componente de la Ley 106-2017, que el Gobernador aprobó el 23 de agosto de 2017. La Ley 106-2017 creó el marco legal para que el ELA pueda garantizar el pago de beneficios a los pensionados actuales a través del sistema PayGo. Aproximadamente $2,000 millones fueron asignados para estos propósitos en cada uno de los presupuestos para el año fiscal 2018 y el año fiscal 2019. La Ley 106-2017 también creó un Plan de Aportaciones Definidas, similar a un plan 401(k), que será administrado por una entidad privada. Los Sistemas de Retiro no pagarán los beneficios futuros.

Entre otras cosas, la Ley 106-2017 enmendó la Ley núm. 12 con respecto a la gobernanza, el financiamiento y los beneficios del Sistema para los miembros activos del programa actual y nuevos miembros contratados. Conforme a la Ley 106-2017, se eliminó la junta de fideicomisarios del Sistema y se creó una nueva Junta de Retiro. La Junta de Retiro es actualmente responsable de gobernar tanto el Sistema como el SRJ.

La Ley 106-2017 dio por terminados los programas de pensiones previamente existentes para los participantes del Sistema a partir del 30 de junio de 2017. Los miembros de los programas anteriores y los nuevos miembros del sistema contratados a partir del 1 de julio de 2017 serán inscritos en un nuevo programa de aportaciones definidas que será seleccionado por la Junta de Retiro. El saldo acumulado en las cuentas del programa anterior se transferirá a las cuentas de los miembros en el nuevo programa de aportaciones definidas. Los miembros activos del Sistema del programa de aportaciones definidas conservarán sus beneficios según lo establecido en la Ley 91 del 29 de marzo de 2003.

La Ley 106-2017 también ordenó la suspensión de los programas de préstamos del Sistema y ordenó la fusión de las estructuras administrativas de los sistemas de retiro. A discreción de la Junta de Retiro, la administración de los beneficios del Sistema puede ser externalizada. Los empleados del Sistema que no sean retenidos bajo la nueva estructura administrativa serán trasladados a otras agencias públicas de conformidad con la Ley núm. 8 de 8 de febrero de 2017.

Además, la Ley 106-2017 derogó la Ley de Retiro Anticipado Voluntario, Ley núm. 211 de 2015, y creó un programa de incentivos, oportunidades y readiestramiento para los servidores públicos. El 17 de mayo de 2019, la Legislatura aprobó la Ley núm. 29 de 2019 (la "Ley 29-2019"), que abordó la grave crisis financiera y escasez de liquidez de los municipios de Puerto Rico relevándolos de su obligación de realizar pagos PayGo al ELA en virtud de la Ley 106-2017. El 3 de julio de 2019, la Junta de Supervisión presentó una demanda contra el Gobernador y la AAFAF

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

solicitando remedios interdictales para evitar la implementación y ejecución de la Ley 29-2019, la cual eliminó la obligación de los municipios de realizar pagos PayGo al ELA, y varias resoluciones conjuntas porque (i) la Ley 29 violó las secciones 204(a) y 207 de PROMESA; (ii) la Ley 29-2019 y las resoluciones conjuntas violaron el artículo 204(c) de PROMESA.

La Ley 29-2019 y las resoluciones conjuntas violaron la sección 108(a) de PROMESA porque menoscaban y/o frustran los propósitos de PROMESA, según lo determinado por la Junta de Supervisión; y la supuesta política del Gobernador de no proporcionar certificaciones como lo requiere la sección 204 de PROMESA violó la sección 108(a) de PROMESA porque menoscaba y/o frustra los propósitos de PROMESA, según lo determinado por la Junta de Supervisión.

El 15 de julio de 2019, el Gobernador y la AAFAF presentaron una moción buscando desestimar la demanda. El 22 de agosto de 2019, el Tribunal del Título III denegó la moción de desestimación en su totalidad. El 10 de septiembre de 2019, el Gobernador y la AAFAF respondieron a la demanda. Este caso se encuentra actualmente en su etapa inicial y el Tribunal del Título III aún no ha tomado una determinación final sobre el fondo.

**F. Acuerdo de Pago por Cuotas con el Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico**

La Autoridad tenía una deuda con el Sistema de Retiro de los Empleados debido a leyes especiales aprobadas durante el período 2016-2017, a la aportación uniforme adicional y a intereses que ascendieron a $12.1 millones al 23 de diciembre de 2016. El 4 de enero de 2017, el Director Ejecutivo firmó un acuerdo de pago por cuotas para pagar toda la deuda. Este acuerdo de pago por cuotas le dio la oportunidad a la Autoridad de pagar la deuda vencida y aún pagar las remesas actuales. La Autoridad pagó un anticipo, seis cuotas fijas, y una suma a precio alzado final de $8,267,446 el 18 de julio de 2017, aprovechando la cláusula que permite hacer pagos adicionales y pagar la deuda por adelantado, para obtener un saldo de cero antes del cambio en el método.

El 10 de agosto de 2017, el Gobernador Ricardo Roselló Nevárez firmó una legislación que ordena que el nuevo plan de aportación definida para trabajadores activos y nuevas contrataciones sea administrado por un proveedor externo y financiar las obligaciones de pensión existentes sobre una base de "pago por uso" (pay-as-you-go), lo que significa que el Gobierno pagará beneficios a los jubilados directamente a medida que vencen, en lugar de intentar pre-financiar beneficios futuros a través de un fondo de inversión del sistema de retiro. Inscribir tanto a los empleados activos como a los trabajadores recién contratados en un verdadero sistema de retiro de aportación definida. La Autoridad adoptó el sistema de "pago por uso" y ha acumulado el monto total de la deuda en una cuenta por pagar y pagó las cantidades requeridas al Departamento de Hacienda de Puerto Rico.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**G. Acontecimientos catastróficos**

El 20 de septiembre de 2017, la isla de Puerto Rico fue devastada por el paso del huracán María. El huracán causó una destrucción catastrófica en Puerto Rico, incluidos daños severos al sistema de energía eléctrica, y dejó a la Isla completamente sin electricidad.

La Autoridad recibió fondos de recuperación por adelantado de la compañía de seguros de $35 millones de octubre de 2017 a agosto de 2018. De abril de 2018 a mayo de 2019, la Autoridad recibió $7.6 millones de la Agencia Federal para el Manejo de Emergencias (FEMA) como reembolsos por gastos pagados por la Autoridad relacionados con daños causados por el huracán María.

Como si fuera poco, a partir del 28 de diciembre de 2019, la parte suroccidental de la isla fue asolada por una serie de terremotos. El más importante se produjo el 7 de enero de 2020 y alcanzó 6.4. Varios edificios se vieron afectados. La Autoridad está cuantificando los daños.

Además, en marzo de 2020, la Organización Mundial de la Salud declaró una pandemia ocasionada por el brote de un nuevo coronavirus (COVID-19), que continúa extendiéndose por los Estados Unidos y Puerto Rico. Como resultado, y en respuesta a las órdenes ejecutivas del Presidente de los Estados Unidos y del Gobernador del Estado Libre Asociado de Puerto Rico, las órdenes ejecutivas: Ley Familias Primero de Respuesta al Coronavirus (*Families First Coronavirus Response Act,* "FFCRA"), e Implementación de los Cierres Necesarios de Operaciones Privadas y Gubernamentales para Combatir los Efectos y Propagación de COVID-19 en la Isla de Puerto Rico, emitidas el 18 de marzo de 2020 y el 15 de marzo de 2020, respectivamente, y sus enmiendas; hemos cerrado temporalmente nuestras ubicaciones operativas, hemos reducido las horas operativas y hemos visto una reducción en el tráfico de ciudadanos, todo lo cual ha tenido un impacto negativo en las operaciones gubernamentales y privadas de Puerto Rico. Si bien actualmente se espera que la interrupción sea temporal, existe incertidumbre sobre la duración. Por lo tanto, si bien esperamos que este asunto tenga un impacto negativo en nuestros resultados de operación y situación financiera, el impacto financiero relacionado no se puede estimar razonablemente en este momento.

**H. Modificación Calificadora del BGF y Proceso de Aprobación del Título VI**

El 29 de noviembre de 2018, el BGF completó una reestructuración de parte de su deuda a tenor con una Modificación Calificadora según el Título VI de PROMESA (la "Modificación Calificadora"). Según la Modificación Calificadora, los tenedores de ciertas reclamaciones por bonos y depósitos contra el BGF intercambiaron sus reclamaciones por bonos emitidos por un organismo público recién creado —la Autoridad de Recuperación de Deuda del BGF— y el BGF transfirió a dicha entidad su cartera de préstamos municipales, una parte de su cartera de préstamos para entidades públicas, sus activos de propiedad inmobiliaria y su efectivo no comprometido. Además, a tenor con la Ley de Reestructuración del BGF, las reclamaciones sobre depósitos en poder del ELA y otras entidades públicas se intercambiaron por intereses en un fideicomiso recién formado creado a tenor con la Ley de Reestructuración del BGF, titulado Fideicomiso de Entidad Pública (el "FEP").

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

El 24 de agosto de 2017, el Gobernador aprobó la Ley núm. 109, conocida como la Ley de Reestructuración de Deuda del Banco Gubernamental de Fomento para Puerto Rico (la "Ley de Reestructuración del BGF"), que efectuó el Plan Fiscal del BGF y proporcionó un camino para la implementación de un acuerdo de apoyo a la reestructuración entre el BGF y algunos de sus principales grupos de acreedores abordando las reclamaciones del ELA y sus instrumentalidades contra el BGF. La Ley de Reestructuración del BGF creó dos entidades de propósito especial —la Autoridad de Recuperación de Deuda del BGF y el FEP— en las que el BGF dividiría y transferiría irrevocablemente sus activos. Bajo la Ley de Reestructuración del BGF, el saldo de las obligaciones adeudadas entre el ELA y sus agentes, instrumentalidades y afiliadas, incluida la Autoridad (cada una de las cuales es una Entidad Gubernamental No Municipal) y el BGF se determinó aplicando el saldo pendiente de cualquier depósito mantenido en el BGF a nombre de una Entidad Gubernamental No Municipal contra el saldo pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o de cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder del BGF a esa fecha. Aquellas Entidades Gubernamentales No Municipales que tenían reclamaciones netas contra el BGF, luego de dar efecto al ajuste anterior, recibieron su participación prorrateada de los intereses en el FEP, lo cual se consideró como la plena satisfacción de todas y cada una de las reclamaciones que dicha Entidad Gubernamental No Municipal pudiera tener contra el BGF.

Entre otras cosas, los activos del FEP (los "Activos del FEP") consisten en una reclamación contra el ELA de aproximadamente $580 millones, que es objeto de una evidencia de reclamación presentada en el caso del ELA pendiente conforme al Título III de PROMESA. La recuperación de la Autoridad por su interés en el FEP dependerá de la recuperación que finalmente reciba el FEP de los Activos de FEP. Las reclamaciones que el ELA y otras entidades gubernamentales puedan haber tenido contra el BGF se han liberado a tenor con la Modificación Calificadora (excepto por lo que se establece en la misma), y el BGF ha reducido el monto de cualquier reclamación permitida contra el ELA que pueda recibir según se establece en tal Modificación Calificadora.

El 6 de noviembre de 2018, el Tribunal de Distrito aprobó la Modificación Calificadora del BGF según el Título VI de PROMESA y esta entró en vigencia a partir del 29 de noviembre de 2018.

**I.   Renuncia del exgobernador Rosselló y la transición del Gobierno bajo la Gobernadora Vázquez**

El 24 de julio de 2019, el entonces Gobernador Ricardo Rosselló Neváres anunció su dimisión como Gobernador del ELA a partir del 2 de agosto de 2019 a las 5 p.m. (AST). Antes de que su dimisión se hiciera efectiva, el entonces Gobernador Rosselló nombró al ex comisionado residente Pedro Pierluisi como Secretario de Estado. Después de ser confirmado por la Cámara de Diputados (pero no el Senado), el Sr. Pierluisi prestó juramento como Gobernador interino. El 7 de agosto de 2019, la Corte Suprema de Puerto Rico determinó por unanimidad que el Sr. Pierluisi fue juramentado ilegalmente como Gobernador. Como resultado, la Secretaria de Justicia Wanda Vázquez fue juramentada como Gobernadora el 7 de agosto de 2019 para completar el mandato del exgobernador Rosselló hasta 2020 y, a la fecha de estos estados financieros, actualmente se desempeña como Gobernadora del ELA.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**J.   La Junta de Supervisión Presenta un Plan Conjunto de Ajuste para el ELA, el Sistema y la Autoridad**

El 27 de septiembre de 2019, la Junta de Supervisión, como representante del ELA, el Sistema y la AEP en sus respectivos casos de Título III, presentó un plan conjunto de ajuste del Título III para el ELA, el Sistema y la AEP [ECF núm. 8765] (el "Plan Conjunto") junto con una declaración de divulgación relacionada con el mismo [ECF núm. 8766] (la "Declaración de Divulgación"). En términos generales, el Plan Conjunto propone una reestructuración de las deudas del ELA haciendo, entre otras cosas, lo siguiente:

- reduciendo los pasivos del ELA de aproximadamente $35,000 millones a aproximadamente $12,000 millones;

- reduciendo las reclamaciones no impugnadas de bonos GO en un 36%;

- permitiendo que los bonistas locales opten por recibir bonos sujetos a impuestos con pagos de intereses mensuales a cambio de sus reclamaciones;

- estableciendo reclamaciones de bonos GO impugnados y reclamaciones garantizadas del ELA con reducciones entre el 55% (para los bonos GO de 2012) y el 65% (para los bonos GO de 2014);

- reduciendo los bonos del Sistema en un 87%;

- reduciendo los bonos no impugnados de la Autoridad en un 28%; y

- reduciendo los bonos impugnados de la Autoridad en un 42%.

Además, el Plan Conjunto y la Declaración de Divulgación contemplan un recorte de pensiones del 8.5% en todos los Sistemas de Retiro, incluido el Sistema. Sin embargo, de confirmarse, la fórmula de recorte de pensiones del Plan Conjunto no se aplicaría a los beneficiarios que reciben beneficios mensuales de $1,200 o menos. Para obtener más información sobre los términos propuestos del recorte de pensiones, consulte la Declaración de Divulgación disponible públicamente en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

De acuerdo con el Plan Conjunto y la Declaración de Divulgación, el Plan Conjunto también contempla establecer un fondo de reserva de pensiones (el "Fondo de Reserva") que "se financiará a través del superávit proyectado que se utilizará para proporcionar fondos para PayGo" y "se mantendrá en un fideicomiso para el beneficio exclusivo de los beneficiarios de PayGo". Si se confirma el Plan Conjunto, el Fondo de Reserva se establecerá en la fecha de entrada en vigencia del Plan Conjunto y operará como "un fideicomiso de reserva que se utilizará para asegurar las obligaciones de pensiones del ELA en virtud de la Ley 106", que estableció el sistema PayGo. El Fondo de Reserva será administrado por una entidad independiente cuyos miembros deben cumplir con ciertos estándares de independencia, profesionalismo, experiencia y calificación, y estará sujeto a todas las leyes y reglamentos gubernamentales sobre contratación, ética y conflictos de intereses. El Fondo de Reserva se financiará inicialmente con una aportación de $5 millones del ELA, y luego, desde el año fiscal 2020 hasta el año fiscal 2027, el ELA hará aportaciones anuales adicionales por la cantidad de (i) $175 millones; o (ii) el 25% de cualquier superávit anual proyectado del Plan Fiscal que supere los $1,750 millones, el que sea mayor.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

El Plan Conjunto no propone cambios en la estructura de gobierno de la Autoridad ni en los convenios colectivos de la Autoridad previos a la petición durante o después del Caso de Título II (*sic*) de la Autoridad, a menos que dichos cambios sean aprobados tanto por la Junta de Supervisión como por la AAFAF. Además, todas las reclamaciones generales no garantizadas contra la Autoridad quedarían intactas bajo la propuesta del Plan Conjunto. El Plan Conjunto actualmente permanece sujeto a negociación, solicitud y aprobación final en curso por parte del Tribunal del Título III.

Para obtener más información, consulte el Plan Conjunto y la Declaración de Divulgación disponibles públicamente en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

**K.  Otros acontecimientos posteriores de importancia relacionados con la Autoridad**

El presupuesto del año fiscal 2018 incluye importantes reducciones en los gastos de las agencias, que abarcan casi todas las partidas de gastos, tales como nómina y costos relacionados, servicios adquiridos, subsidios, instalaciones de servicio público, costos de transporte, compras de equipos, materiales y suministros, publicidad en los medios y fondos federales de contrapartida local, entre otros.

La Autoridad solicitó presupuestos operativos anuales de $135 millones para los años fiscales 2016-2017, 2017-2018 y 2018-2019 de los cuales solo $90 millones fueron aprobados para los presupuestos anuales 2016-2017 y 2017-2018, por la Oficina de Gerencia y Presupuesto de Puerto Rico (OGP) y $114.7 millones para el período 2018-2019 por la Junta de Supervisión y Administración Financiera para Puerto Rico (JSAF). La administración cree que los recursos asignados para gastos operativos, incluida la nómina, son insuficientes. Esta situación limita gravemente la liquidez de la Autoridad y, además, podría afectar el funcionamiento de sus operaciones en un futuro próximo.

La mayoría de estos pagos de arrendamiento están sujetos a la asignación legislativa del Presupuesto del Fondo General del ELA. Sin embargo, los pagos de arrendamiento y bonos de la Autoridad están garantizados por la fe y crédito y el poder impositivo del ELA. Los bonos de la Autoridad, por lo tanto, constituyen Obligaciones Garantizadas por el ELA. La Autoridad está actualmente autorizada por ley a tener en circulación en cualquier momento hasta $4,700 millones en bonos garantizados por el ELA.

El 1 de julio de 2016, la Autoridad incumplió sus obligaciones de bonos. De aproximadamente $186.9 millones de amortización de la deuda ($86.1 millones en capital y $100.9 millones en intereses) adeudados sobre los bonos en circulación de la Autoridad, todo se pagó excepto el capital de $25.2 millones. En octubre de 2016, aplicable a los $25.2 millones impagos, la Autoridad pagó un monto de capital de los bonos de $10.4 millones a partir de los importes recibidos del seguro de los bonos. Desde el 1 de julio de 2018, la Autoridad no ha recibido subvenciones del IRS para el pago de los bonos.

De la amortización de los intereses de la deuda de los bonos en circulación con vencimiento en octubre de 2017 de aproximadamente $12.4 millones, aproximadamente $3.3 millones permanecen sin pagar. La suma de intereses que se pagó refleja las cantidades recibidas de los programas aplicables de subsidio de intereses. De la amortización de los intereses de la deuda de los bonos en circulación con vencimiento en enero de 2018 de aproximadamente $97.5 millones,

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
NOTAS A LOS ESTADOS FINANCIEROS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

aproximadamente $78.4 millones permanecieron sin pagar. La suma de intereses que se pagó refleja las cantidades recibidas de los programas aplicables de subsidio de intereses y de los importes del seguro. De la amortización de la deuda de los bonos en circulación con vencimiento en abril de 2018 de aproximadamente $12.4 millones, aproximadamente $3.3 millones permanecieron sin pagar. La suma de intereses que se pagó refleja las cantidades recibidas de los programas aplicables de subsidio de intereses. De la amortización de la deuda de los bonos en circulación con vencimiento en julio de 2018 de aproximadamente $164.5 millones, aproximadamente $134.5 millones quedaron sin pagar. La suma de capital e intereses que se pagó refleja las cantidades recibidas de los importes del seguro. No se cumplió con el pago de la amortización con vencimiento en octubre de 2018 de aproximadamente $12.4 millones porque la Autoridad no recibió los programas de subsidios. De la amortización de los intereses de la deuda de los bonos en circulación con vencimiento en enero de 2019 de aproximadamente $98.0 millones, aproximadamente $83.5 millones permanecieron sin pagar. La suma de intereses que se pagó refleja la cantidad recibida de los importes del seguro. No se cumplió con el pago de la amortización con vencimiento en abril de 2019 de aproximadamente $12.4 millones porque la Autoridad no recibió los programas de subsidio.

El 29 de noviembre de 2018, a tenor con el artículo 501 de la Ley núm. 109-2017, según enmendada, la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF) confirmó el saldo del préstamo posterior a la compensación del BGF de aproximadamente $137.4 millones.

**INFORMACIÓN COMPLEMENTARIA REQUERIDA**

**AUTORIDAD DE EDIFICIOS PÚBLICOS**

**(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)**

**ANEXO DE LA PARTE PROPORCIONAL DEL PASIVO NETO POR PENSIONES DE LA AUTORIDAD Y LAS APORTACIONES DE LA AUTORIDAD**

**PARA EL AÑO FISCAL TERMINADO EL 30 DE JUNIO DE 2017**

Los siguientes anexos se presentan para brindar información sobre la parte proporcional de la Autoridad del Pasivo Neto por Pensiones y las aportaciones de la Autoridad relacionadas con el Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico y sus instrumentalidades.

**Anexo de la Parte Proporcional del Pasivo Neto por Pensiones de la Autoridad de Edificios Públicos**

|  | | Año fiscal 2017 |
|---|---|---|
| Proporción de la Autoridad del pasivo neto por pensiones | | 1.17915% |
| Parte proporcional del pasivo neto por pensiones de la Autoridad | $ | 444,525,548 |
| Nómina de empleados cubiertos de la Autoridad | $ | 49,381,740 |
| Parte proporcional del pasivo neto por pensiones de la Autoridad como porcentaje de su nómina de empleados cubiertos | | 900% |
| Posición neta fiduciaria del plan como porcentaje del pasivo total por pensiones | | (3.47)% |

**Anexo de las Aportaciones de la Autoridad**

|  | | |
|---|---|---|
| Aportación patronal requerida por ley | $ | 9,890,191 |
| Monto de las aportaciones reconocidas por el plan de pensiones en relación con las aportaciones requeridas por ley | $ | 7,860,508 |
| Exceso (deficiencia) de aportación | $ | 2,029,683 |
| | | |
| Nómina de empleados cubiertos de la Autoridad | $ | 49,381,740 |
| Aportaciones reconocidas por el plan de pensiones como porcentaje de la nómina de empleados cubiertos | | 15.92% |

Los montos arriba presentados se basaron en el período de medición que finalizó el 30 de junio de 2016.

El Anexo de Aportaciones de la Autoridad tiene por objeto presentar información por 10 años. Los años adicionales se mostrarán a medida que estén disponibles.

AUTORIDAD DE EDIFICIOS PÚBLICOS
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ANEXO SOBRE LA EVOLUCIÓN DEL FINANCIAMIENTO PARA BENEFICIOS DE ATENCIÓN MÉDICA
POSTERIORES AL EMPLEO
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

| Fecha de valuación 30 de junio de | Valor actuarial de los activos | Pasivo actuarial acumulado | Pasivo actuarial no financiado | Proporción financiada | Nómina anual cubierta | Porcentaje de nómina cubierta |
|---|---|---|---|---|---|---|
| 2012 | $ - | $ 26,162,334 | $ 26,162,334 | - % | $ 52,933,339 | 49.4% |
| 2013 | $ - | $ 20,522,160 | $ 20,522,160 | - % | $ 51,120,417 | 40.2% |
| 2014 | $ - | $ 22,260,737 | $ 22,260,737 | - % | $ 58,039,372 | 38.4% |
| 2015 | $ - | $ 20,381,941 | $ 20,381,941 | - % | $ 52,832,651 | 38.6% |
| 2016 | $ - | $ 20,307,833 | $ 20,307,833 | - % | $ 49,973,803 | 40.6% |
| 2017 | $ - | $ 20,925,162 | $ 20,925,162 | - % | $ 52,717,361 | 39.7% |

**OTRA INFORMACIÓN COMPLEMENTARIA**

**AUTORIDAD DE EDIFICIOS PÚBLICOS**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ANEXO DE CUENTAS DE FONDOS DE AMORTIZACIÓN DE BONOS
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

|  | Cuenta de amortización de bonos |
|---|---|
| **Bonos de Instalaciones del Gobierno** | |
| Saldo al 1 de julio de 2016 | $ 166,205,731 |
| Ingresos: | |
| Alquiler para la amortización de la deuda | 47,544,108 |
| Ingresos de inversiones | 4,420 |
| Depósitos de otras cuentas | 484 |
| Desembolsos: | |
| Pago de intereses sobre bonos | (146,230,079) |
| Pago de capital sobre bonos | (64,057,849) |
| Saldo al 30 de junio de 2017 | 3,466,815 |
| | |
| **Bonos de Edificios de Oficinas** | |
| Saldo al 1 de julio de 2016 | 1,026,162 |
| Ingresos: | |
| Transferencias de otras cuentas | 2,052,324 |
| Desembolsos: | |
| Pago de intereses de bonos | (2,052,324) |
| Saldo al 30 de junio de 2017 | 1,026,162 |
| | |
| Total Fondos de Amortización de Bonos | $ 4,492,977 |

**AUTORIDAD DE EDIFICIOS PÚBLICOS**
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico)
ANEXO DE INGRESOS OPERATIVOS DE ALQUILER
PARA LOS AÑOS FISCALES TERMINADOS EL 30 DE JUNIO DE 2017 Y 2016

**Edificios de Oficinas**

| | | |
|---|---|---:|
| Alquiler para la amortización de la deuda – bonos y pagarés | $ | 80,590,716 |
| Operativos y administrativos | | 53,573,435 |
| Alquiler de reserva de equipo | | 4,702,303 |
| Total edificios de oficinas | | 138,866,455 |

**Edificios de Educación Pública**

| | |
|---|---:|
| Alquiler para la amortización de la deuda – bonos y pagarés | 189,612,944 |
| Operativos y administrativos | 55,805,553 |
| Alquiler de reserva de equipo | 17,499,822 |
| Total edificios de educación pública | 262,918,319 |

**Instalaciones de Salud**

| | |
|---|---:|
| Alquiler para la amortización de la deuda – bonos y pagarés | 10,581,714 |
| Operativos y administrativos | 1,596,082 |
| Alquiler de reserva de equipo | 812,423 |
| Total instalaciones de salud | 12,990,218 |
| | |
| Ingresos operativos de alquiler | 414,774,992 |
| | |
| Montos incobrables | 50,980,253 |
| | |
| Total ingresos operativos de alquiler, netos | $ 363,794,739 |

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918

Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

---

INFORME DE AUDITORÍA INDEPENDIENTE DEL CONTROL INTERNO SOBRE INFORMES FINANCIEROS Y SOBRE EL CUMPLIMIENTO Y OTROS ASUNTOS CON BASE EN UNA AUDITORÍA DE LOS ESTADOS FINANCIEROS REALIZADA CONFORME A LAS *NORMAS DE AUDITORÍA GUBERNAMENTAL*

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

Hemos auditado, conforme a las normas de auditoría generalmente aceptadas en los Estados Unidos de América y las normas aplicables a las auditorías financieras contenidas en las Normas de Auditoría Gubernamental emitidas por la Contraloría General de los Estados Unidos, los estados financieros de la Autoridad de Edificios Públicos (la "Autoridad"), una unidad componente del Estado Libre Asociado de Puerto Rico, para el año terminado el 30 de junio de 2017, y las notas relacionadas a los estados financieros, que colectivamente comprenden los estados financieros básicos de la Autoridad, y hemos emitido nuestro informe al respecto con fecha 18 de marzo de 2020. A continuación presentamos los siguientes párrafos sobre asuntos relevantes:

**Párrafos sobre asuntos relevantes**

*Reemisión de los estados financieros al 30 de junio de 2017*

Como se refleja en la Nota 24, la Autoridad volvió a emitir los estados financieros emitidos el 24 de junio de 2019, porque la administración posteriormente descubrió hechos sobre los acuerdos con las aseguradoras monolínea de los bonos de la Autoridad que contienen derechos de subrogación que se limitan al monto efectivamente pagado por cada uno de los pagos atrasados sobre los bonos asegurados y reconoció dicho pasivo.

La Nota 24 también refleja que la administración de la Autoridad posteriormente descubrió hechos sobre el impacto registrado al 30 de junio de 2017 del acuerdo celebrado el 29 de noviembre de 2018 entre la Autoridad y el Banco Gubernamental de Fomento (BGF) que permite la compensación de los saldos de efectivo de la Autoridad depositados en el BGF contra las líneas de crédito adeudadas al BGF. Después de una mayor consideración de los aspectos legales del acuerdo, la administración corrigió los saldos reflejados en el Estado de Situación Neta (Déficit) al 30 de junio de 2017 y en el Estado de Ingresos, Gastos y Cambios en el Déficit para el año terminado en esa fecha.

Dado que el efectivo depositado en el BGF se consideró deteriorado al 30 de junio de 2016, la administración había presentado el impacto del acuerdo en el estado financiero emitido el 24 de junio de 2019. Sin embargo, después de una mayor consideración de los aspectos legales del acuerdo, la administración decidió eliminar el impacto al 30 de junio de 2017 y dejar solo la divulgación en Acontecimientos posteriores, en las notas.

Nuestro dictamen no se modifica con respecto a los asuntos anteriores.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918
Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

### Párrafos sobre asuntos relevantes (continuación)

*Incertidumbre sobre la capacidad de la Autoridad para continuar como un negocio en marcha*

*Deterioro financiero del Estado Libre Asociado de Puerto Rico (ELA) y del Banco Gubernamental de Fomento para Puerto Rico (BGF)*

Los estados financieros básicos adjuntos se han preparado asumiendo que la Autoridad continuará como un negocio en marcha. Como se discute en las Notas 3, 6 y 11 a los estados financieros, la Autoridad es una unidad componente del ELA. Al 30 de junio de 2017, la situación financiera y la liquidez del ELA se han deteriorado. Teniendo en cuenta que la Autoridad depende en gran medida de las asignaciones del ELA, la situación financiera y la liquidez de la Autoridad se han visto igualmente afectadas. Además, el 3 de mayo de 2017, a solicitud del Gobernador, la Junta de Supervisión y Administración Financiera (la "Junta de Supervisión") presentó una petición de remedio conforme al Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) del Congreso de los Estados Unidos ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La evaluación y los planes de la administración con respecto a estos asuntos se describen en la nota 3 a los estados financieros básicos. La Autoridad ha evaluado los posibles efectos de las restricciones presupuestarias y los riesgos de liquidez que enfrenta el ELA en sus estados financieros y operaciones básicas, y ha concluido que, al 30 de junio de 2017, la Autoridad continuará operando como un negocio en marcha por un período no menor a 12 meses después de dicha fecha. Nuestro dictamen no se modifica con respecto a este asunto.

### Control interno sobre los informes financieros

Al planificar y realizar nuestra auditoría de los estados financieros, consideramos el control interno de la Autoridad sobre la información financiera (control interno) para determinar los procedimientos de auditoría que son apropiados en las circunstancias con el fin de emitir un dictamen sobre los estados financieros, pero no con el fin de emitir un dictamen sobre la efectividad del control interno de la Autoridad. En consecuencia, no emitimos un dictamen sobre la efectividad del control interno de la Autoridad.

Nuestra consideración del control interno fue para el propósito limitado descrito en el párrafo anterior y no fue diseñada para identificar todas las deficiencias en el control interno que pudieran ser debilidades sustanciales o deficiencias significativas y, por lo tanto, podrían existir debilidades sustanciales o deficiencias significativas que no fueron identificadas. Sin embargo, identificamos ciertas deficiencias en el control interno que consideramos debilidades esenciales y deficiencias significativas.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918

Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

**Control interno sobre los informes financieros (continuación)**

Existe una deficiencia en el control interno cuando el diseño u operación de un control no permite que la administración o los empleados, en el curso normal de realizar sus funciones asignadas, eviten, o detecten y corrijan declaraciones erróneas oportunamente. Una debilidad sustancial es una deficiencia, o una combinación de deficiencias, en el control interno, de modo que existe una posibilidad razonable de que no se prevenga, detecte y corrija oportunamente una declaración errónea importante de los estados financieros de la entidad.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918
Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

Consideramos que las siguientes deficiencias en los controles internos son debilidades sustanciales:

1. **Desarrollar un cronograma de cierre de fin de año**

   El proceso de cierre de este año se retrasó porque ciertos procedimientos importantes no se realizaron a tiempo. Los resultados fueron demoras en la producción de asientos de cierre, balances de prueba precisos, cronogramas, conciliaciones, análisis de cuentas, divulgaciones requeridas y otros informes financieros necesarios para la administración y los auditores. Creemos que el cierre de fin de año podría realizarse más rápidamente si se desarrolla un cronograma de cierre que indique quién realizará cada procedimiento y para cuándo se debe lograr y completar cada procedimiento. El plazo de procedimientos específicos podría coordinarse con la fecha para cuando la administración o de los auditores necesiten la información. Las fechas de entrega podrían monitorearse para determinar que se estén cumpliendo.

   Durante la auditoría, recomendamos ocho asientos de ajuste de diario. El efecto de dichos asientos fue un aumento en los ingresos netos y una disminución en la situación neta de $61,161,900 y $7,517,756, respectivamente. Básicamente, todos los asientos fueron para hacer acumulaciones y otros ajustes, incluida la implementación de la Declaración GASB núm. 68, Contabilidad e Informes Financieros para Pensiones, una enmienda de la Declaración de GASB núm. 27, y el acuerdo con el BGF que debieron haber sido realizados por el departamento de contabilidad. Creemos que una revisión y evaluación de las transacciones y los procedimientos adecuados de cierre mensual acelerarían el cierre de fin de año y reducirían el tiempo que toma la auditoría y los honorarios profesionales.

   **Respuesta de la administración:**

   El cronograma de cierre mensual se prepara al comienzo del año fiscal. Los módulos de software de contabilidad financiera están a cargo de empleados de contabilidad que generan informes de contabilidad financiera para conciliar las cuentas del libro mayor. El proceso de cierre es supervisado por gerentes de contabilidad que informan al nivel ejecutivo de la Autoridad cuando el proceso ha sido completado. El departamento de contabilidad sigue sin contar con el personal necesario y no puede atender a tiempo los deberes requeridos.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918
Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

**2. Conciliaciones bancarias**

Observamos que los saldos bancarios no se conciliaron a tiempo. Se debe preparar mensualmente una conciliación de efectivo que concilie el saldo bancario con el saldo del libro mayor para determinar que todas las transacciones en efectivo se hayan registrado correctamente y descubrir errores bancarios.

**Respuesta de la administración:**

La administración ya envió a los empleados una comunicación con las fechas de cierre. Como resultado de la falta de empleados, la Autoridad no pudo ejecutarlo correctamente.

Consideramos que las siguientes deficiencias en los controles internos son deficiencias significativas:

**3. Activo Fijo**

Durante nuestra auditoría, observamos que los saldos de activo fijo no se traspasaron y conciliaron correctamente del año finalizado el 30 de junio de 2016 al 30 de junio de 2017. Recomendamos que la Corporación concilie mensualmente el registro de traspaso. Esto dará como resultado un tratamiento más eficiente de la propiedad y el equipo y también eliminará trabajo innecesario para el personal de contabilidad y reducirá el tiempo de auditoría y los honorarios profesionales.

**Respuesta de la administración:**

La dirección del departamento de contabilidad está monitoreando el sistema de contabilidad y comunicándose con el personal de contabilidad con el objetivo de obtener un cierre mensual preciso y enviar informes a la alta dirección.

RAMIREZ FLORES AND CO, PSC
CONTADORES PÚBLICOS AUTORIZADOS
Coliseum Tower, Suite 101, 576 Arterial B
San Juan, PR 00918
Miembro de la Sociedad de Contadores Públicos Autorizados de Puerto Rico

A la Junta Directiva de la
Autoridad de Edificios Públicos
(Una Unidad Componente del Estado Libre Asociado de Puerto Rico):

**Cumplimiento y otros asuntos**

Como parte de la obtención de una seguridad razonable sobre si los estados financieros de la Autoridad están libres de errores sustanciales, realizamos pruebas de su cumplimiento con ciertas disposiciones legales, reglamentarias, contractuales y de acuerdos de subvención, cuyo incumplimiento podría tener un efecto directo y sustancial en la determinación de los importes de los estados financieros. Sin embargo, proporcionar un dictamen sobre el cumplimiento de esas disposiciones no era un objetivo de nuestra auditoría y, en consecuencia, no emitimos tal dictamen. Los resultados de nuestras pruebas no revelaron casos de incumplimiento u otros asuntos que deban ser comunicados según las Normas de Auditoría Gubernamental.

**Objeto de este informe**

El objeto de este informe es únicamente describir el alcance de nuestras pruebas de control interno y cumplimiento y los resultados de esas pruebas, y no proporcionar un dictamen sobre la efectividad del control interno o el cumplimiento de la Autoridad. Este informe es una parte integrante de una auditoría realizada de acuerdo con las Normas de Auditoría Gubernamental al considerar el control interno y el cumplimiento de la entidad. En consecuencia, esta comunicación no es adecuada para ningún otro propósito.

San Juan, Puerto Rico
18 de marzo de 2020



Contadores Públicos Autorizados



Licencia Núm. 231, vence el 1 de diciembre de 2021
Se ha colocado el sello núm. 381407 de la Sociedad
de Contadores Públicos Autorizados de P.R. en la copia
del archivo de este informe.