# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br>PUERTO RICO ELECTRIC POWER<br>AUTHORITY ("PREPA")<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |

## COBRA ACQUISITIONS LLC'S REPLY
## IN SUPPORT OF MOTION TO LIFT THE STAY ORDER

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Cobra Acquisitions LLC ("Cobra"), by and through its counsel, respectfully submits this reply (the "Reply") to the *Opposition of the Oversight Board, AAFAF, and PREPA to Cobra Acquisitions LLC's Motion to Lift the Stay Order* [Case No. 17-BK-4780, ECF No. 2507] (the "Opposition") to *Cobra Acquisitions LLC's Motion to Lift the Stay Order* [Case No. 17-BK-3283, ECF No. 16328] (the "Motion").[1] In support of this Reply, Cobra respectfully states as follows:

## REPLY

1. By the Motion, Cobra asked this Court to lift the Stay Order applicable to the Administrative Expense Motion because the balance of harms no longer support its continuance. The Stay Order, now in place for *over 19 months*, has morphed from the original contemplation of a "limited stay" to an open-ended stay that not only is extremely prejudicial to Cobra, but is ultimately saddling all of PREPA's creditors with significant additional interest expense. Contrary to the Government Parties' view that lifting the Stay Order would be "wasteful," Opp'n ¶ 6, Cobra repeatedly acknowledged that the parties could formulate a "sensible approach to discovery and litigating the Administrative Expense Motion." Mot. ¶ 5; *see also id.* ¶ 25. Lifting the Stay Order, in other words, would not result in a deluge of litigation, but instead focus the parties on identifying and narrowing the issues, thereby facilitating the possibility of a consensual resolution and limiting the scope of any remaining disputes that this Court may ultimately need to determine. The alternative—continuing to do nothing to progress this matter toward resolution and instead "wait and see" indefinitely—has long since ceased to be just, fair or reasonable.

2. Cobra has sat in limbo for over two years since the successful completion of its work in March 2019 without any effective means of redress to resolve the over $200 million in

---

[1] Unless otherwise specified, capitalized terms have the same meaning as in the Motion or the Opposition, as applicable.

1

unpaid invoices.[2] Those unpaid invoices continue to accrue substantial amounts of interest (approximately $3 million per month), far in excess of the expenses that PREPA would incur by lifting the stay and putting this dispute on a track to resolution. When the Initial Stay Order was entered in October 2019, the parties expected a resolution of the FEMA Analysis and the Criminal Matter within months, not years. The original delivery date of the FEMA Analysis was May 29, 2020, and trial in the Criminal Matter was scheduled for December 9, 2019. While the Government Parties argue that Cobra fails to "point to any material change in circumstance since the Court last extended the stay at the December 2020 omnibus hearing," Opp'n ¶ 6, the Government Parties ignore that, at that hearing, a status conference in the criminal matter was scheduled for March 23, 2021, when it was expected that the criminal court might enter a trial schedule. Instead, at that status conference, the criminal court determined to hold "setting Jury trial in abeyance" based on pending, but unidentified, issues in the case. *United States v. Tribble*, No. 19-CR-541 (FAB), ECF No. 193 (D.P.R. Mar. 23, 2021), at 3. There have been no further public developments since. Simply put, with the passage of time, the substantial harm to Cobra only increases in proportion to any countervailing factors, such as the alleged hardship on PREPA.

3. The Government Parties' principal response is that the Stay Order should remain in place because nothing material has changed in the interim period. *See* Opp'n ¶ 12; *Status Report Pursuant to December 9, 2020 Order Setting Deadline for Further Status Report Regarding Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claim* [Case No. 17-BK-3283, ECF No. 16893] (the "June 7 Status Report") at 6. This is wrong both legally and factually. First, the case law disfavors immoderate or indefinite stays and acknowledges that the

---

[2] Not, of course, for lack of trying. Cobra has gone out of its way at its own expense to assist PREPA and its officials, providing, among other things, additional documentation that PREPA did not have but needed in order to respond to FEMA's information requests and offering repeatedly to go to Puerto Rico and help PREPA with any documentation issues. *See, e.g.*, Opp'n ¶ 17.

2

passage of time, particularly when large amounts are at stake, "suggests a need for some celerity." *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 78 (1st Cir. 2004); *see also Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (upholding denial of stay where the "damage to the plaintiff would be the financial hardship of being forced to wait for an undefined but potentially lengthy period before receiving the money to which she may be entitled."). So too here. And factually, the indefinite abeyance of setting a trial in the Criminal Matter was a material change in circumstance since the last omnibus hearing. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 617 B.R. 173, 179 (D.P.R. 2020) ("[A]fter imposition of a stay for prudential reasons, 'the court retains the ability to modify or dissolve the stay . . . .'") (citing *Green v. Cosby*, 177 F. Supp. 3d 673, 681 (D. Mass. 2016)). In the intervening period since Cobra filed the Motion, moreover, FEMA has completed its long-awaited review of the First Contract.

4. For these reasons, and as further set forth herein, Cobra respectfully requests that the Court grant the Motion and lift the Stay Order.

## A. The FEMA Analysis Is Now Complete and Can No Longer Support the Continuance of the Stay Order

5. Fundamentally, the FEMA Analysis determines the amount of PREPA's costs eligible for public assistance. Cobra has done its utmost to assist PREPA in responding to FEMA's information requests and ensuring PREPA receives as much FEMA funding as possible. But Cobra's contracts are with PREPA, not FEMA, and the FEMA Analysis ultimately is not binding on this Court, which will exercise its independent judgment on what constitutes an "actual [and] necessary" expense under Bankruptcy Code section 503(b), as informed by all the evidence. *See* Mot. ¶ 4.

6. While the Government Parties write at length in the Opposition about the FEMA Analysis, they miss the forest for the trees. The FEMA Analysis is complete and, as a result, no

3

longer is grounds for a stay.[3] After a multi-year review process, FEMA and the RAND Corporation each concluded that the rates charged by Cobra were reasonable. *See* Opp'n ¶ 26. The final part of the FEMA Analysis, the Determination Memorandum, concluded that the *actual* work performed met the requirements of and was consistent with the First Contract except for certain costs for which documentation was lacking. *Id.* The Government Parties state that the Determination Memorandum results in a payment to Cobra of "roughly [the] same [] amount that Cobra has already been paid," and thus there is no prejudice to Cobra. *Id.* ¶ 24. But this is incorrect. Based on the Determination Memorandum, approximately $21 million should be payable to Cobra under the First Contract as soon as FEMA releases the funds, as set forth below:

- The costs under the First Contract amount to a total of approximately $945 million.

- Of that amount, approximately $892.9 million has been paid, inclusive of a $15 million deposit that the First Contract requires be applied to any final invoices.

- Thus, after accounting for the $15 million deposit, $878 million has been paid out of a total balance due under the First Contract (excluding interest) of $945 million, resulting in a remaining balance due of $67 million.

- If FEMA "de-obligates" $46 million of the remaining $67 million based on the FEMA Analysis, then that leaves approximately $21 million (excluding interest) that should be requested from FEMA and immediately paid to Cobra.

7. Cobra, of course, acknowledges that the parties may need time to meet and confer and understand what disputes (if any) remain outstanding under the First Contract.[4] But that is simply a prudent course of action, not grounds for a stay.

---

[3] When Cobra filed the Motion, it had no knowledge of when FEMA would complete its analysis. *See* Mot. ¶ 4. However, after filing the Motion, the Government Parties informed Cobra it would be completed imminently and, as such, Cobra agreed to adjourn the Motion from the April omnibus hearing to the June omnibus hearing. *See Joint Motion of Government Parties and Cobra Acquisitions, LLC to Adjourn Cobra Acquisitions LLC's Motion to Lift the Stay Order* [Case No. 17-BK-3283, ECF No. 16405].

[4] PREPA, for instance, has a contractual obligation to reimburse Cobra for taxes it paid to Puerto Rico in excess of 8.5% of gross income. As an accrual basis taxpayer, Cobra was required to pay taxes to Puerto Rico on all the amounts for which it invoiced PREPA for work under the First Contract, even if those invoices were yet to be paid.

4

8. While Cobra believes that an appeal of the Determination Memorandum is warranted, only PREPA can (and presumably will) bring that appeal as it can only inure to PREPA's benefit. The Determination Memorandum, however, is manifestly not grounds to further the stay yet again.[5] To support PREPA's appeal, Cobra continues to offer its assistance to PREPA to compile and present the documentation that PREPA already has in its possession to support the "de-obligated" costs, which generally relate to whether Cobra had the minimum and allowable amount of personnel at certain points in time. To be clear, Cobra disagrees with the conclusions reached by FEMA about these amounts, which appear to be based on a misunderstanding of the facts and misreading of the First Contract.[6] The Government Parties and Cobra should be fully aligned in pursuing an appeal of the Determination Memorandum given that PREPA remains liable under the First Contract even if FEMA does not ultimately reimburse PREPA.

9. Remarkably, instead of acknowledging that the FEMA Analysis is complete and the parties should move forward with resolving any open issues under the First Contract, the Government Parties assert that the FEMA Analysis also includes the Second Contract and that FEMA likely will "similarly conclude that some of those contract costs should also be de-obligated." Opp'n ¶ 4; *see also id.* ¶ 7 ("In short, the FEMA reimbursement process remains

---

In other words, under the First Contract, the amount that PREPA owes Cobra in respect of the tax gross-up is fixed, regardless of FEMA's later determinations on eligibility for public funding.

[5] The Government Parties in the June 7 Status Report contend that "litigation of Cobra's Administrative Expense Motion now could prejudice PREPA's administrative appeal of the Determination Memorandum." June 7 Status Report at 6. This is merely foot-dragging. Cobra appreciates that PREPA in an appeal may have to make statements to FEMA that could contradict its positions on the Administrative Expense Motion. But the parties doubtlessly can devise a solution that preserves PREPA's rights if FEMA denies the appeal.

[6] For the Court's benefit, Cobra believes that FEMA ignored crucial facts in concluding that Cobra exceeded the maximum number of allowed personnel on 43 days without PREPA's consent. At Puerto Rico's request, and with the full knowledge and consent of PREPA and FEMA, Cobra agreed to bring on a subcontractor that had worked previously for the U.S. Army Corps of Engineers and already had personnel and equipment in Puerto Rico. The addition of these personnel was in full compliance with the First Contract. Next, FEMA's conclusion that the daily minimum payment provided for in the First Contract only applied once Cobra had a minimum number of linemen on the island has no support in the contractual language. Finally, FEMA's finding that certain lodging expenses were ineligible ignores Cobra's contractual right to reimbursement for reasonable costs necessary for performance.

5

ongoing. Its investigation . . . could reveal more [issues] under the second [contract], all of which remain subject to appeal by PREPA."). It is unclear on what basis the Government Parties make these claims, as Cobra has no knowledge that any such analysis of the Second Contract is ongoing, let alone contemplated by FEMA. As originally presented to the Court as a ground for the stay, the FEMA Analysis involved the review of the First Contract only—not, in other words, every penny that Cobra has invoiced PREPA. The Government Parties were clear on the scope of the FEMA Analysis:

- "FEMA and the Department of Homeland Security Operational Analysis Center are conducting an extensive analysis . . . into the cost reasonableness of the *First Cobra Contract* . . . ." Gov't Parties Stay Mot. [Case No. 17-3283, ECF No. 8838] ¶ 3 (emphasis added).

- "[P]ursuant to the recommendation of OIG in the OIG Report, FEMA is conducting an analysis of Cobra's contract rates *under the First Contract* to determine if Cobra's rates were reasonable and eligible for FEMA's Public Assistance Grant Program." Gov't Parties Opp'n to Tax Claims Mot. [Case No. 17-4780, ECF No. 1959] ¶ 35 (emphasis added).

10. This makes sense. None of the memoranda and reports issued by FEMA, the OIG and the Department of Homeland Security Operational Analysis Center since the OIG Audit began in 2017 concerned the Second Contract. Only now with the Opposition and the June 7 Status Report have the Government Parties changed tack and lumped the Second Contract into the FEMA Analysis. Indeed, while the Opposition implies that a review of the Second Contract by FEMA always was contemplated as part of the FEMA Analysis, or that such a review is underway, the June 7 Status Report contradicts this understanding. Asserting that the strategy of "letting the experts do their work . . . has been proven efficient and correct," the Government Parties state "PREPA *will* request FEMA to do the same with respect to the Second Contract." June 7 Status Report at 6 (emphasis added). That PREPA—almost two years after the Initial Stay Order—has not even asked FEMA to review the Second Contract belies any argument that the FEMA Analysis,

6

as originally understood and presented to this Court, included the Second Contract. This gambit by the Government Parties appears simply to be another delay tactic now that the FEMA Analysis, a key basis for the Stay Order, is complete. And if history is any guide, any analysis by FEMA of the Second Contract may not be forthcoming for years, particularly if FEMA is starting from scratch.

11. In a similar vein, the Government Parties' statements regarding the status of Cobra's invoices for the Second Contract are equally perplexing. The Government Parties in the Opposition (and repeatedly in the past) have stated that PREPA disputes "hundreds" of Cobra's invoices, with an aggregate face value in excess of $200 million. *See, e.g.*, Opp'n ¶ 21; Gov't Parties Reply Br. in Support of Stay Mot. [Case No. 17-4780, ECF No. 1662] ¶¶ 20-23; Gov't Parties Opp'n to Tax Claims Mot. [Case No. 17-4780, ECF No. 1959] ¶ 18. However, the Government Parties, for what appears to be the first time, now state that they have submitted all invoices under the Second Contract to FEMA for reimbursement (including ones PREPA may dispute). *See* Opp'n ¶ 6. Given these potentially contradictory positions, Cobra respectfully requests that the Government Parties should clarify the exact status of these disputed invoices and whether they, in fact, have been submitted to FEMA for reimbursement.

### B. The Indefinite Delay of the Criminal Matter No Longer Supports the Stay Order

12. The Government Parties' arguments on the Criminal Matter fare no better. When the Initial Stay Order was entered, the trial in the Criminal Matter was imminent. It is now subject to an indefinite abeyance. The Government Parties' arguments about the relevance of the Criminal Matter can be separated into two related concerns, neither of which have merit. First, the Government Parties have in the past and again in the Opposition raised the specter of the criminal defendants invoking their Fifth Amendment privileges, thus potentially hampering the

7

Government Parties' ability to obtain the discovery they may need. *See* Opp'n ¶ 29. Second, the Government Parties have asserted various theories of claims that they might be able to assert against Cobra based on the ultimate outcome of the Criminal Matter. *Id*. ¶ 30.

13. In respect of the potential limitations on discovery, the Government Parties' view puts the cart before the horse. The underlying assumption that the Criminal Matter will prevent the Government Parties from obtaining evidence they might need had more weight when a resolution of the Criminal Matter seemed imminent and the prejudice to Cobra less severe. Without any foreseeable conclusion to the Criminal Matter (including, of course, accounting for any appeals), the fairer path would be to allow the Administrative Expense Motion to progress and to address any issues related to the Criminal Matter if and when they actually arise. At that time, the actual circumstances rather than mere conjecture will dictate how the parties should move forward. In other words, it is far more reasonable to address discovery issues *when they arise*, rather than rely on speculation to justify interminable inaction.

14. The Government Parties' next argument assumes that the outcome of the Criminal Matter necessarily will dictate potential defenses or claims they may assert against Cobra. *See id.* ¶ 30 ("[T]here are a variety of ways in which, if the allegations in the Indictment are true, PREPA's purported liability to Cobra may be reduced or even eliminated entirely[.]"). Cobra extensively rebutted these conjectures in the past as unmoored both from reality and the actual contractual language, and this Court has acknowledged PREPA's contractual arguments "may well be strained."[7] *See, e.g.*, Cobra's Opp'n to Stay Mot. [Case No. 17-3283, ECF No. 8850] ¶¶ 12-38;

---

[7] By way of example, the Government Parties again invoke Article 68 of the First Contract, which addresses the possibility that penalties will be imposed on PREPA as a result of conduct by Cobra and for which Cobra would have to reimburse PREPA. But FEMA has never hinted that it might punish PREPA for actions allegedly taken by two individuals, one of whom is a FEMA employee (nor would such an action by FEMA make sense). Indeed, as the Government Parties acknowledge, FEMA did not even mention the Criminal Matter in either the Cost Analysis or the Determination Memorandum. *See* Opp'n ¶ 3 n. 3.

Cobra's Reply in Support of Tax Claims Mot. [Case No. 17-3283, ECF No. 12752] ¶¶ 16-25; Tax Claims Order [Case No. 17-4780, ECF No. 2004] at 10. All of the Government Parties' vague theories of potential claims against Cobra indisputably will require discovery and legal conclusions far beyond what will be produced or even considered by the criminal court. Such theories, moreover, are simply not a ground for the imposition of an endless stay. The Government Parties suffer no prejudice and waive no rights to pursue whatever legal claims they theorize might arise from the criminal proceedings if this Court lifts the stay, sets a schedule and allows discovery to begin. Requiring Cobra and the Government Parties to instead sit and wait indefinitely for a proceeding to conclude in which neither party is involved achieves nothing but severe prejudice to Cobra.

15. Cobra's request in the Motion is straightforward. The interests of justice no longer support the continuance of the stay. The FEMA Analysis is complete, and the Criminal Matter is subject to an indefinite timeline. The Administrative Expense Motion has been stayed for over 19 months, with the passage of time greatly increasing the substantial prejudice to Cobra from delay. These changed circumstances warrant lifting the Stay Order and allowing the parties to proceed with resolving the outstanding disputes. As Cobra has acknowledged repeatedly, even if the Stay Order is lifted, the parties can act prudently to develop a sensible and rational schedule that focuses the parties on identifying and narrowing the issues in dispute and determining what discovery, in fact, is needed.

## **CONCLUSION**

WHEREFORE, for the reasons set forth in the Motion and herein, Cobra respectfully requests that this Court enter an order, substantially in form attached as **Exhibit A** to the Motion, granting the relief requested therein, and granting Cobra such other relief as this Court deems just and proper.

*[Remainder of page left blank intentionally.]*

Dated: June 8, 2021

Respectfully submitted,

/s/ Alana M. Vizcarrondo-Santana
Rafael Escalera Rodríguez (No. 122609)
Sylvia M. Arizmendi (No. 210714)
Alana Vizcarrondo-Santana (No. 301614)
REICHARD & ESCALERA, LLC
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Telephone: (787) 777-8888
Email: escalera@reichardescalera.com
arizmendis@reichardescalera.com
vizcarrondo@reichardescalera.com

Ira S. Dizengoff (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
Philip C. Dublin (*pro hac vice*)
Steven M. Baldini (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Tel: (212) 872-1000
Fax: (214) 872-1002
Email: idizengoff@akingump.com
aqureshi@akingump.com
pdublin@akingump.com
sbaldini@akingump.com

--and--

Thomas P. McLish (*pro hac vice*)
Scott M. Heimberg (*pro hac vice*)
Allison Thornton (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, DC 20006
Tel: (202) 887-4000
Fax: (202) 887-4288
Email: tmclish@akingump.com
sheimberg@akingump.com
athornton@akingump.com

*Attorneys for Cobra Acquisitions LLC*

11