# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**REPLY OF AMBAC ASSURANCE CORPORATION AND FINANCIAL GUARANTY INSURANCE COMPANY IN FURTHER SUPPORT OF URGENT MOTION TO COMPEL DISCOVERY FROM THE GOVERNMENT PARTIES IN CONNECTION WITH THE DISCLOSURE STATEMENT**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.      WHETHER OR NOT MOVANTS WILL VOTE TO ACCEPT THE PLAN IS
        NOT A PROPER GROUND FOR DENYING DISCOVERY. ........................................... 2

II.     THE DISCOVERY MOVANTS SEEK IS NECESSARY FOR A PROPER
        EVALUATION OF THE DISCLOSURE STATEMENT. ................................................. 4

        A.     Documents Underlying the Fiscal Plan Are Necessary. ......................................... 4

        B.     Documents Relating to the Best Interests Analysis Should Be Produced. .............. 6

        C.     An Independent Evaluation of the Financial Information Underlying the
               Plans and Disclosure Statements Is Necessary. ..................................................... 7

        D.     The Government Parties Have Not Produced Documents Regarding the
               Pension Reserve Trust, Which Are Crucial to Assessing the Adequacy of
               the Disclosure Statement ....................................................................................... 8

        E.     Information Regarding Significant Non-Cash Assets Should Be Produced ........... 9

        F.     Movants Cannot Assess the Adequacy of the Disclosure Statement Without
               an Understanding of the Bases for the Board's Vast and Vague Definition
               of Essential Services. ......................................................................................... 10

        G.     Information Regarding Cash Assets Should Be Produced. .................................. 11

III.    DISCLOSURE STATEMENT DISCOVERY MAY BE SOUGHT FROM
        AAFAF. ............................................................................................................. 12

IV.     BOARD MEMBERS SHOULD BE MADE AVAILABLE FOR DEPOSITIONS. ........ 14

CONCLUSION ..................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*,
319 F.R.D. 422 (D.P.R. 2016) .............................................................................14

*Bogan v. City of Boston*,
489 F.3d 417 (1st Cir. 2007) ...............................................................................15

*Fish v. Kobach*,
320 F.R.D. 566 (D. Kan. 2017)............................................................................15

*In re ACEMLA De P.R. Inc.*,
2019 WL 311008 (Bankr. D.P.R. Jan. 22, 2019).................................................5

*In re Bath Bridgewater S., LLC*,
2012 WL 4325650 (Bankr. E.D.N.C. Sept. 20, 2012)...........................................4

*In re Brandon Mill Farms, Ltd.*,
37 B.R. 190 (Bankr. N.D. Ga. 1984) .....................................................................7

*In re Catholic Bishop of N. Alaska*,
2009 WL 8412170 (Bankr. D. Alaska July 20, 2009) ..........................................13

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) ...................................................................2

*In re DeVos*,
2021 WL 2000277 (N.D. Cal. May 19, 2021) ......................................................15

*In re Main St. AC, Inc.*,
234 B.R. 771 (Bankr. N.D. Cal. 1999) ..................................................................3

*In re Price Funeral Home, Inc.*,
2008 WL 5225845 (Bankr. E.D.N.C. Dec. 12, 2008)............................................4

*In re Skin Sense, Inc.*,
2017 WL 2773521 (Bankr. E.D.N.C. June 26, 2017)............................................3

*In re Vega*,
2010 WL 3282656 (Bankr. D.P.R. Aug. 17, 2010) ........................................12, 13

*Karnoski v. Trump*,
2020 WL 5231313 (W.D. Wash. Sept. 2, 2020).................................................15

*Kirk v. Texaco, Inc.*,
   82 B.R. 678 (S.D.N.Y. 1988)...........................................................................................7

*St. Fleur v. City of Linden, NJ*,
   2017 WL 3448106 (D.N.J. Aug. 10, 2017) .................................................................15

*Stalcup v. CIA*,
   768 F.3d 65 (1st Cir. 2014)..........................................................................................12

**Statutes**

11 U.S.C. § 1125(a)(1)......................................................................................................5

Movants[2] respectfully submit this reply in further support of their *Urgent Motion to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* (ECF No. 16812) (the "Motion" or "Mot.") and in response to the objections thereto filed by the Board (ECF No. 16882) ("Board Obj.") and AAFAF (ECF No. 16878) ("AAFAF Obj.").

## PRELIMINARY STATEMENT

1.   The Government Parties' objections to the Motion are founded on the misguided notion that because Movants may (or even are likely to) object to the Plan, they cannot obtain any discovery relating to the adequacy of the Disclosure Statement.  That position makes no logical sense and is unsupported by any legal authority.  Movants are entitled to understand the exact contours of the proposed treatment and consideration and to test the adequacy of the disclosures. The Court has an independent obligation to ensure that the Disclosure Statement contains sufficient information for ***all*** creditors to cast an informed vote on the Plan.  That is why the cases addressing discovery in connection with a disclosure statement ***do*** involve objectors—indeed, it would be odd for a creditor that intends to vote to approve a plan, or has entered into a plan support agreement ("PSA") with the debtor, to seek discovery.

2.   Thus, the fact that the party seeking the discovery is a likely objector to a plan is irrelevant.  The sole question before the Court on this Motion is whether the requested discovery would provide information necessary to allow creditors to cast an informed vote on the Plan.  As discussed in the Motion and herein, with respect to each of the categories of information sought by Movants, the answer is that it would.

3.   The Government Parties are simply wrong that rather than seeking discovery, Movants can propose additional disclosures.  With respect to many of the disclosures in the Disclosure

---

[2] Capitalized terms not defined herein have the meanings ascribed in the Motion.  Unless otherwise indicated, internal citations and quotation marks are omitted from case citations, and all emphasis is added.

Statement, Movants lack sufficient information to even assess whether the information provided is accurate or whether additional disclosures are necessary. Without additional information, Movants are unable to propose supplemental disclosures. The Government Parties' attempts to draw parallels to non-complex bankruptcies where creditors have all necessary information about the debtor's financial condition fail. This case—the largest municipal bankruptcy in U.S. history—involves the financial restructuring of a government that has not issued any financial statements (let alone audited financial statements) for the past three fiscal years. And the Board has acknowledged that financial information in the Disclosure Statement is unverified. Perhaps most remarkably, while the Disclosure Statement baldly claims that the Plan is in the best interests of creditors, with just one week until objections to the Disclosure Statement are due, the Board still has not made its best interests analysis available, continuing to leave a placeholder in the Disclosure Statement. Clearly, there are glaring information gaps. There is simply no basis for accepting the Government Parties' contention that the Disclosure Statement contains the information needed to evaluate the Plan. The Court should grant the requested discovery.

## **ARGUMENT**

## I.     **WHETHER OR NOT MOVANTS WILL VOTE TO ACCEPT THE PLAN IS NOT A PROPER GROUND FOR DENYING DISCOVERY.**

4.     The Government Parties argue that Movants' requested discovery should be denied because Movants have indicated that they are likely to object to the Plan. (Board Obj. ¶¶ 22-23; AAFAF Obj. ¶ 8.) This argument has no basis in the law or logic.

5.     As the authorities cited by the Board make clear, "[t]he purpose of requiring an approved disclosure statement is to ensure that *all* claim holders are provided with adequate information to enable them to make an informed judgment regarding whether to vote for or against a reorganization plan." *In re Clamp-All Corp.*, 233 B.R. 198, 204 (Bankr. D. Mass 1999). Thus,

the Court has an independent duty to ensure that creditors have adequate information to cast an informed vote on the Plan.  *See In re Main St. AC, Inc.*, 234 B.R. 771, 774-75 (Bankr. N.D. Cal. 1999) ("Congress imposed upon the Court an independent obligation to determine whether the disclosure statement includes adequate information . . . .").  Yet, under the Board's theory, a court can deny discovery of information indisputably relevant to all creditors merely because a potential objector seeks the discovery.  The Board, of course, cites no authority to support that proposition.

6.    The parties most likely to seek discovery are creditors likely to object to a plan, not those who are likely to accept a plan (or those who have entered into a PSA with the debtor).  Indeed, creditors who have entered into a PSA with the Board are prohibited from seeking discovery or objecting to the Plan.  (*See, e.g.*, Mot., Ex. G at §§ 4.3, 4.4, 4.5, 4.7, 4.8., 4.9.)  Were the Board correct, it would essentially mean that discovery relating to the Disclosure Statement would never be granted.  That, of course, is not correct, as evidenced by numerous cases in which courts granted disclosure statement discovery to objectors.  (*See* Mot. ¶¶ 25-26.)

7.    While the Board asserts that "no amount of disclosure will be adequate enough for a creditor who will never vote for any plan" (Board Obj. ¶ 18), the purpose of a disclosure statement is not to convince creditors to vote in favor of a plan, but rather to provide creditors sufficient information to cast an ***informed*** vote on a plan.  And the authorities upon which the Board relies are easily distinguishable in that they involve situations in which the financial condition of the debtor was uncomplicated and the party seeking discovery had access to the information necessary to evaluate the plan.  In *In re Skin Sense, Inc.*, 2017 WL 2773521, at *4 (Bankr. E.D.N.C. June 26, 2017), the creditor-entity seeking discovery was owned by a previous employee of the debtor who was the estranged husband of the debtor's owner, was "very knowledgeable" about the debtor's finances, and had a personal vendetta against the debtor due to his estrangement from its owner.

- 3 -

*In re Price Funeral Home, Inc.*, 2008 WL 5225845, at *2 (Bankr. E.D.N.C. Dec. 12, 2008), which
addressed the approval of a disclosure statement, not a discovery request, involved a debtor whose
financial condition, unlike the Commonwealth's, was "uncomplicated."   In *In re Bath
Bridgewater S., LLC*, 2012 WL 4325650, at *3 (Bankr. E.D.N.C. Sept. 20, 2012), the court found
that the creditor had "access to much of the same information available to the debtor, and ha[d] . .
. separately evaluated that information in formulating its position."

8.   As evidenced by its reliance on these cases, the Board's argument regarding the
propriety of an objecting creditor seeking information relating to the disclosure statement is
founded on a misguided premise—that information necessary to assess the Board's 2,239-page
Disclosure Statement is available to Movants and all creditors.  These Title III proceedings—the
largest municipal bankruptcy in U.S. history—involve the finances of an entire government, whose
financial information for the past three fiscal years is not only unaudited, but largely unavailable,
and whose authorized representative and fiscal agent have not verified the accuracy of the available
financial information.  It should not be surprising that some amount of discovery is appropriate.

## II.   THE DISCOVERY MOVANTS SEEK IS NECESSARY FOR A PROPER EVALUATION OF THE DISCLOSURE STATEMENT.

### A.   Documents Underlying the Fiscal Plan Are Necessary.

9.   Request Nos. 2 to 5 seek documents necessary for creditors to reach an informed
judgment as to whether they should vote to approve a plan premised in large part on the financial
analyses and projections contained in the Fiscal Plan.  These materials are critical to forming a
view as to whether the Plan complies with PROMESA section 314(b)(7), and whether the Plan is
"feasible and in the best interests of creditors[,]" as required by PROMESA section 314(b)(6).

10.  The Board makes no effort to rebut the obvious notion that insight into the economic
and financial analyses guiding the Fiscal Plan would be relevant to creditors—failing to

acknowledge that, until recently, the Board voluntarily made such materials (including earlier fiscal plan models) available to certain creditor groups.  The Board strains to argue that so long as the documents sought touch upon a plan confirmation requirement, they are out of reach.  But the purpose of a disclosure statement is to permit "a hypothetical investor of the relevant class to make an informed judgment **about the plan**[.]"  11 U.S.C. § 1125(a)(1).  Creditors are entitled to information sufficient to form an informed judgment as to whether to vote to approve the Plan and, in particular here, their treatment under the Plan.

11. The Board also suggests these materials are out of reach because they relate to the Fiscal Plan (Board Obj. ¶¶ 26-29), certification of which is insulated from direct challenges under PROMESA section 106(e).  But the Board's position ignores that creditors must be in a position to evaluate the Fiscal Plan to determine whether the Plan is "feasible and in the best interests of creditors[,]" as required by PROMESA section 314(b)(6).  Both these inquiries require that creditors be able to make an informed judgment as to the financial present, and future, of the Commonwealth.  The current disclosures are tellingly inadequate on this point.  For example, the Disclosure Statement includes a one-page summary stating that the Board believes the Plan to be feasible (Disclosure Statement at 477), without providing creditors **any** information they would require to reach an informed judgment as to the accuracy or completeness of that statement.  And as discussed previously, the Disclosure Statement is devoid of critical information a creditor needs to determine whether the Plan is in their best interests.  Without discovery needed to assess the accuracy and completeness of the economic and financial projections contained within the Fiscal Plan, creditors have nothing but the Board's *ipse dixit* to rely upon.[3]

---

[3] *See In re ACEMLA De P.R. Inc.*, 2019 WL 311008, at *17 (Bankr. D.P.R. Jan. 22, 2019) (disclosure statement held to be inadequate because "the foundation of the [financial] projections [therein] [were] not sustained by sufficient and reliable data").

**B.      Documents Relating to the Best Interests Analysis Should Be Produced.**

12.   Request Nos. 6 and 7 seek materials related to the Disclosure Statement's best interests analysis.  Remarkably, nearly one month after filing the Disclosure Statement, and with just one week before objections to the Disclosure Statement are due, the Board still has not released its report regarding the best interests analysis, leaving it as nothing more than a placeholder page in the Disclosure Statement.  (Disclosure Statement, Ex. N.)  This delay is particularly notable as the Board included a best interest test analysis with the February 2020 Disclosure Statement. (February 2020 Disclosure Statement, Ex. L.)   The best interests test speaks to a crucial confirmation requirement:  unique to PROMESA, Congress included a specific statutory mandate for the Court "to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  PROMESA § 314(b)(6).  The best interests report is essential to assessing whether the Disclosure Statement provides the information creditors need to reach an informed judgment on whether the Plan satisfies PROMESA § 314(b)(6).  Its omission—and the Board's lip service that it will make the report available "as soon as practicable" (Board Obj. ¶ 31), while at the same time having the Disclosure Statement "urge" impaired claim holders to accept the Plan because it "is in the best interests of all creditors" (Disclosure Statement at 552; *see also id*. at i, 24, 476-77, 479)— is emblematic of the Board's withholding of critical information throughout this process.

13.   The Board asserts that "factual source materials underlying the best interest analysis" have already been provided to creditors, pointing to the "Best Interests" folder in the electronic document depository, and claims that Movants "have not identified any specific deficiencies in the disclosures already provided[.]"  (Board Obj. ¶ 30.)  But the materials in that folder consist of one Excel document listing principal and interest payments due on various bonds and a single-page PDF listing estimated recoveries for certain classes.  As noted in the Motion (Mot. ¶ 37), prior

iterations of the best interests report were prepared using "legal assumptions [and] financial information [such as] schedules detailing estimates of outstanding bond debt, perspective on cash balances[,]" as well as "data published by or directly provided by the Government of Puerto Rico[.]"  These are the factual source materials underlying the best interests reports that Movants seek, and which are necessary to determine the adequacy, accuracy, and completeness of any future best interests report.  The materials produced to Movants to date are inadequate for this purpose.

### C. An Independent Evaluation of the Financial Information Underlying the Plans and Disclosure Statements Is Necessary.

14. Movants' Request No. 11 seeks materials prepared, considered, or relied upon in connection with the development of the various iterations of the Plan and the Disclosure Statement, including documents reflecting data, analyses, or assumptions that underlie such plans and disclosure statements.  (Mot. ¶¶ 38-41.)  The Board's complaints that Movants have not articulated the relevance of such materials misconstrues Movants' position.

15. *First*, contrary to the Board's assertion (Board Obj. ¶ 33), the degree to which the assumptions, opinions, and conclusions underlying various iterations of the Plan and the Disclosure Statement have changed over time is directly relevant to consideration of the adequacy of the ***current*** Disclosure Statement.   Changes in the Board's assumptions, opinions, and conclusions may demonstrate flaws in the Board's analysis, and may shed light on the Board's decision to allow material restriction and consummation fees for creditors who have entered into a PSA.  (*See* Mot. ¶ 41.)  Thus, unlike in the cases cited by the Board, Movants are not seeking discovery as to some "alternative" or "possible" plan—the information sought is necessary to evaluate the underpinnings of the Disclosure Statement.[4]

---

[4] For example, *Kirk v. Texaco, Inc.*, 82 B.R. 678, 684 (S.D.N.Y. 1988), did not concern a discovery request, but an appeal of an approved disclosure statement that creditors objected to due to its "failure to discuss some other possible plan."  *In re Brandon Mill Farms, Ltd.*, 37 B.R. 190, 192 (Bankr. N.D. Ga. 1984), also

16. *Second*, in response to Movants' contention that discovery of this information is warranted based on the Commonwealth's failure to issue audited financial statements for its 2018, 2019, and 2020 fiscal years, the Board asserts that "[f]inancial information in a disclosure statement may be unaudited."  (Board Obj. ¶ 34.)  But the issue is not simply that financial information underlying the various iterations of the Plan and the Disclosure Statement is unaudited—it is that *no* comprehensive financial information, audited or unaudited, has been made available for those fiscal years.  Indeed, Congress's findings in enacting PROMESA[5] and the history of these proceedings clearly demonstrate that an independent evaluation of such information is necessary.  For example, discovery has revealed that the pensions-related data upon which the plans and disclosure statements rely has material errors.[6]  This information should not go untested before being sent to creditors for a vote.

### D.   The Government Parties Have Not Produced Documents Regarding the Pension Reserve Trust, Which Are Crucial to Assessing the Adequacy of the Disclosure Statement.

17. The Board attempts to sidestep its failure to produce documents concerning the Pension Reserve Trust—the vehicle that the Board proposes to create to pay the Commonwealth's purported $55.6 billion pension liability—by pointing to its reproduction of pension materials previously produced in connection with Rule 2004 discovery.  (Board Obj. ¶ 36.)  But the Board effectively concedes that it has not produced any information regarding *the Pension Reserve Trust*

---

did not involve a discovery request—it addressed creditors' objection to the approval of the disclosure statement due to, *inter alia*, its failure to "indicate the existence of an alternate plan."

[5] PROMESA § 405(m)(1) & (m)(5)(B) (finding that a "lack of financial transparency" created a fiscal emergency and that a stay was necessary so "all creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority").

[6] (*See, e.g.*, *Objection of Ambac Assurance Corporation, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claim Asserted by the Official Committee of Retired Employees of the Commonwealth of Puerto Rico Appointed in the Commonwealth's Title III Case* (ECF No. 16884) ¶¶ 48-50 & n.10 (estimating an overstatement of liabilities of $56.5 million due to the inclusion of payments to deceased beneficiaries).)

*itself*, arguing that the Pension Reserve Trust is still "in its formative stages," but that regardless, disclosures in the Disclosure Statement are sufficient.  (*Id.* ¶ 35.)

18.  As a preliminary matter, any suggestion that no documents exist because the Pension Reserve Trust is still being developed is belied by the Pensions Rule 2004 record.  The Board previously represented that relevant materials exist, but refused to produce them on other grounds.

19.  Moreover, the Disclosure Statement provides no information regarding the sources of proposed contributions to the Pension Reserve Trust, including base contributions, contributions from any projected Fiscal Plan surplus, and any discretionary contributions contemplated by the Board.  (Mot. ¶ 45.)  Nor does the Disclosure Statement provide sufficient information regarding its management and terms.  (*Id.*)  This information relates to the Commonwealth's largest liability, and is vital to creditors' ability to assess the Disclosure Statement.

**E.     Information Regarding Significant Non-Cash Assets Should Be Produced.**

20.  The Board's contention that information relating to disused real property assets and illiquid investments is not relevant to assessing the adequacy of information in the Disclosure Statement (Board Obj. ¶¶ 37-38), is flatly wrong.  Indeed, the Board acknowledges that the extent to which a disclosure statement contains "[a] complete description of the available assets and their value" is a relevant consideration.  (Disclosure Statement Approval Motion at 13.)

21.  The Board's hyperbolic protestations notwithstanding, Movants are not seeking this information in an effort to compel the sale of the Commonwealth's beaches.  Rather, Movants are seeking information regarding the "countless real properties" held by the Commonwealth and Commonwealth Entities that are "in disuse[,]" which, per Commonwealth law, are to be sold to "maximiz[e] the use of available state resources[.]"  (Mot. ¶ 47.)  Additional disclosures may be necessary to ensure creditors can determine whether it is acceptable that the Commonwealth continue to leave these properties in disuse, or whether such properties are of such low value that

they would not materially change the consideration available to creditors.  Without the information

sought through Request Nos. 16 and 17, Movants are hindered in their ability to recommend

additional disclosures regarding non-cash assets.

**F.   Movants Cannot Assess the Adequacy of the Disclosure Statement Without an Understanding of the Bases for the Board's Vast and Vague Definition of Essential Services.**

22.  The Board continues to hide behind its contention that the Court has no role in

evaluating the Fiscal Plan to shield its analysis (or lack thereof) of the Commonwealth's essential

services.  (Board Obj. ¶¶ 39-40.)  The Board should not be permitted to continue this charade.

23.  *First*, the Board contends that "[t]he expenses provided for in the certified fiscal plans

and budgets are clearly the expenses [it] believes must be paid for the economic sustainability of

the Commonwealth."  (*Id.* ¶ 39.)  In other words, "essential services" are those services that the

Board—based on undisclosed criteria—currently deems essential, and neither creditors nor the

Court are entitled to ***any*** information as to ***why*** such expenses are essential to the Commonwealth's

economic sustainability.  It is unclear, for example, how expenses related to the Puerto Rico School

of Plastic Arts fall in this category.  Yet, based on the current record, creditors and the Court have

no way of assessing that relevance.

24.  *Second*, information regarding the scope of, and criteria used to define, essential

services is clearly relevant to assessing the adequacy of the Disclosure Statement.  The Plan must

fund adequate public services to be feasible—that is, capable of putting the Commonwealth on a

path to economic sustainability.  Yet, based on the current record, not only do creditors not know

how the Board decided which services are ***currently*** essential, they have no way of knowing what

services the Board may deem essential going forward, and no way to determine what services are

provided for under the Plan.  Therefore, creditors lack the means of assessing whether the Plan

will protect the Commonwealth's economic viability following confirmation.

### G.   Information Regarding Cash Assets Should Be Produced.[7]

25.  Movants' Request Nos. 19 and 21 seek information regarding the $8.1 billion held by Commonwealth public corporations as "potentially inaccessible" and approximately $691 million held by the Commonwealth and its public corporations as "potentially unavailable[,]" respectively. (Mot. ¶¶ 57-58.)   The Board's position—that there "are no non-privileged documents or communications regarding" these monies (Board Obj. ¶ 41)—strains credulity.

26. The "potentially inaccessible" and "potentially unavailable" classifications are based on, *inter alia*, the "minimum cash requirements" and "operational or other cash needs" of the entities holding such monies.  (December 2020 Presentation at 6.)  Yet, based on the current record, creditors know little about the "minimum cash requirements" and nothing about the "operational or other cash needs" of such entities, nor do creditors know what bank accounts these monies are held in.  Information regarding these factual issues is hardly privileged, and should be produced.

27. Further, the Board does not dispute the relevance of the information Movants seek through Request Nos. 22 and 23, which seek information regarding the Commonwealth's $2.5 billion minimum unrestricted liquidity balance, $750 million Disaster Aid Revolving Fund, nearly $900 million LUMA Funding Requirement, and $1.3 billion emergency reserve.  (Mot. ¶ 59.) Instead, the Board (inaccurately) faults Movants for not explaining why the documents the Board unilaterally uploaded to its depository are insufficient (*see* Board Obj. ¶ 41), while ignoring the primary point made by Movants—the lack of information regarding any consideration given by the Board or the Commonwealth to externally financing these initiatives.

---

[7] With respect to Request No. 20, the Government Parties have agreed to produce documents relating to transfers of surplus funds from Commonwealth Entities to the Commonwealth pursuant to Act 26-2017. (Board Obj. ¶ 41; *Joint Status Report of Ambac Assurance Corporation and the Financial Oversight and Management Board for Puerto Rico, as Representative of the Commonwealth of Puerto Rico, and the Puerto Rico Fiscal Agency and Financial Advisory Authority Pursuant to the Court's May 25, 2021 Order* (ECF No. 16890), ¶ 13.)  Movants reserve all rights to the extent the production proves insufficient.

28. The Board's objection is meritless.  Through these initiatives, nearly $4 billion in Commonwealth monies would be tied up on an annual basis and unavailable as consideration for creditors.  Robust disclosures regarding the justifications for these decisions, including the consideration and merits of using external financing, are necessary if creditors are to make a fully informed decision regarding whether or not to support the Plan.  While the Board asserts, in conclusory fashion, that the materials Movants seek "are overwhelmingly (if not entirely) privileged" (Board Obj. ¶ 41), that does not come close to satisfying the Board's burden.[8]  At the very least, the Board should collect and review the relevant materials, produce those that are not privileged, and provide a general description of the purportedly privileged documents.

## III.   DISCLOSURE STATEMENT DISCOVERY MAY BE SOUGHT FROM AAFAF.

29. In meet-and-confer correspondence in response to the Requests for Production, AAFAF flatly refused to produce documents (or even serve formal responses and objections) on the basis that the discovery was purportedly improper because AAFAF "is not the party seeking approval of the disclosure statement."  (Mot., Ex. F at 1.)  While it has retreated from that position, AAFAF offers three arguments as to why it should not have to produce responsive documents.  None is persuasive.

30. *First*, AAFAF asserts that none of the requested information is necessary to enable Movants and other creditors or the Court to evaluate the adequacy of the Disclosure Statement.  (AAFAF Obj. ¶ 2.)  That is wrong for reasons discussed *supra*.[9]

---

[8] *See Stalcup v. CIA*, 768 F.3d 65, 69-70 (1st Cir. 2014) ("The government carries the burden of establishing the applicability of the [deliberate process privilege] and must show:  (1) that the withheld material is an inter- or intra-agency memorandum . . . ; (2) that the document is deliberative; and (3) that it is predecisional.")

[9] AAFAF's attempts to distinguish Movants' authorities are unavailing.  AAFAF's assertion that *In re Vega*, 2010 WL 3282656 (Bankr. D.P.R. Aug. 17, 2010), "does not address the adequacy of disclosures and instead relates to plan discovery" (AAFAF Obj. ¶ 13 n.3) is plainly incorrect.  The discovery requests at issue, which were propounded through a creditor's "motions regarding discovery in support of her objection

31.  *Second*, AAFAF contends that any discovery is more appropriately sought from the Board as the proponent of the Plan, asserting that any discovery from AAFAF would be duplicative.  (*Id.* ¶ 3.)  But, like the UCC, Movants are not seeking duplicative discovery from AAFAF.  If Movants are able to obtain their requested discovery from the Board, they would not need AAFAF to make a duplicative production.  The problem is that it is not Movants, but the Government Parties—both of which are representatives of the Commonwealth in connection with its restructuring—who are in the position to know which documents are in the possession of which party.  And Movants have reason to believe that AAFAF is better positioned than the Board to respond to several of Movants' requests.  For instance, AAFAF, in conjunction with CEDBI, issued the Assets Memorandum[10] through which information regarding the real property assets of the Commonwealth and Commonwealth Entities has been (at least partially) collected, and is therefore likely in a better position than the Board to respond to Request No. 16.  Similarly, since AAFAF's Executive Director is a member of the committee established pursuant to Act 26-2017 to oversee the transfer of Commonwealth Entities' annual surpluses to the Commonwealth (Mot., Ex. Q at 18), Movants would expect AAFAF to be best positioned to respond to Request No. 20.

---

to the [d]isclosure [s]tatement[,]" *In re Vega*, 2010 WL 3282656, at *1, were litigated prior to any ruling on the disclosure statement's adequacy, and, though AAFAF misleadingly asserts that creditors in that case were "seeking discovery on being classified as an insider by [d]ebtor ***under the bankruptcy plan***" (AAFAF Obj. ¶ 13 n.3), the opinion addressed discovery regarding the creditor "being classified as an insider by [d]ebtor ***in the [d]isclosure statement.***" *In re Vega*, 2010 WL 3282656, at *1, 3 n.1.  Moreover, while AAFAF is correct that the court in *In re Catholic Bishop of N. Alaska*, 2009 WL 8412170, at *1-2 (Bankr. D. Alaska July 20, 2009), did not ultimately decide the creditor's motions to compel (AAFAF Obj. ¶¶ 10, 13 n.3), the court essentially converted the creditor's motions to compel under Bankruptcy Rule 2004 to motions to compel under Rule 37 on the basis that the creditor's objections to the disclosure statement made it a contested matter under Bankruptcy Rule 9014, and it set a briefing schedule and hearing date for those motions, clearly indicating that it did not view the creditor's efforts to seek disclosure statement discovery from third parties as improper.

[10] "<u>Assets Memorandum</u>" refers to a memorandum dated November 25, 2019, from the Executive Director of AAFAF to the heads of all Commonwealth Entities (attached hereto, along with a certified English translation, as Exhibit S).

The point is that to the extent that AAFAF has non-duplicative documents responsive to Movants' requests, they should be produced.

32. *Third*, AAFAF argues that the requested discovery is too burdensome. (AAFAF Obj. ¶ 16.) But rather than raise any specific arguments about why particular categories of documents would be burdensome to produce, and conferring with Movants on a production of reasonable scope, AAFAF has simply taken the blanket position that any production would be overly burdensome. That is insufficient.[11] AAFAF's attempts to rely on previous productions made by it or the Board in Rule 2004 discovery are unavailing (*see* AAFAF Obj. ¶ 17), as they leave unaddressed the numerous information gaps identified by Movants.

## IV.    BOARD MEMBERS SHOULD BE MADE AVAILABLE FOR DEPOSITIONS.

33. The Board's objections to producing witnesses in response to Movants' Deposition Cross-Notices are meritless. As an initial matter, contrary to the Board's assertion, the testimony to be provided in the depositions—like the documents sought in the Requests for Production—is relevant. Board members are likely to provide context and perspectives that are critical to understanding the Board's preparation of the Plan and the Disclosure Statement, and the information contained therein.

34. The Board's "burden" complaints ring hollow. Every deposition involves burden. But any burden must be weighed against the fact that the Board is seeking to restructure over $120 billion in obligations, including more than $2 billion worth of bonds owned or insured by Movants. While preparing witnesses for these depositions would require the expenditure of resources, such expenses are far outweighed by Movants' need to obtain information necessary to assess the

---

[11] *See Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*, 319 F.R.D. 422, 427 (D.P.R. 2016) (party resisting a request for production "bears the burden of establishing . . . undue burden" and "must show specifically how each . . . request for production is overly . . . burdensome").

adequacy of the Disclosure Statement.  Indeed, the Board has no explanation as to why a Rule 30(b)(6) deposition of the Board (as well as depositions of AAFAF and PREPA) was appropriate in connection with the Rule 9019 motion in the PREPA Title III proceedings but is somehow out of bounds in connection with consideration of the Disclosure Statement for the Commonwealth.

35.  Moreover, even assuming *arguendo* that the Board's members qualify as high-ranking government officials under the apex doctrine—a questionable proposition given their part-time roles[12]—its members are the individuals likely to have first-hand knowledge of the contents of the Disclosure Statement and the bases of conclusions included therein.  *See Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (holding depositions of high-ranking officials are appropriate "where the official has first-hand knowledge related to the claim being litigated" and "other persons cannot provide the necessary information").[13]  This is not an instance in which a lower-level employee could testify to the same issues as a Board member, thus eliminating the need to depose the Board member.[14]  The Board members themselves possess the relevant information.

## CONCLUSION

For these reasons, and those set forth in the Motion, Movants respectfully request that the Court grant the Motion.

---

[12] *See St. Fleur v. City of Linden, N.J.*, 2017 WL 3448106, at *2 (D.N.J. Aug. 10, 2017) (refusing to consider a part-time state senator as a high-ranking government official because such officials "tend to be mayors of large cities or other people in full-time government positions with large responsibilities").

[13] *See also In re DeVos*, 2021 WL 2000277, at *6-7 (N.D. Cal. May 19, 2021) (allowing deposition of U.S. Secretary of Education upon finding that "discovery through [lower-level] employees [would] reveal little about the bases for [the] Department [of Education's] policy"); *Karnoski v. Trump*, 2020 WL 5231313, at *3, 5 (W.D. Wash. Sept. 2, 2020), *stayed on other grounds*, 2020 WL 6561525 (W.D. Wash. Nov. 9, 2020) (allowing deposition of U.S. Secretary of Defense upon finding that "he played a central role in each of the key events in [the] case and his testimony [was] necessary for completing the record and evaluating the [p]arties' arguments"); *Fish v. Kobach*, 320 F.R.D. 566, 578-79 (D. Kan. 2017) (allowing deposition of Kansas Secretary of State).

[14] (*Cf. Order on Motion for Protective Order* (ECF No. 8710) at 5-6 (holding that deposition of PREPA's CEO was not warranted because the UCC failed to identify any topic that could not be explored through Rule 30(b)(6) depositions of PREPA, AAFAF, or the Puerto Rico Public-Private Partnerships Authority).)

Dated:  June 8, 2021
        San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No.
    219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    Jonathan Ohring (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com
         amiller@milbank.com
         gmainland@milbank.com
         jhughes2@milbank.com
         johring@milbank.com

***Attorneys for Ambac Assurance Corporation***

**REXACH & PICÓ, CSP**

By: /s/ *María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

**BUTLER SNOW LLP**

By: /s/ *Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    2911 Turtle Creek Blvd., Suite 1400
    Dallas, TX 75219
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com

    James E. Bailey III (admitted *pro hac vice*)
    Adam M. Langley (admitted *pro hac vice*)
    6075 Poplar Ave., Suite 500
    Memphis, TN 38119
    Telephone: (901) 680-7200
    Facsimile: (901) 680-7201
    Email: jeb.bailey@butlersnow.com
         adam.langley@butlersnow.com

***Attorneys for Financial Guaranty Insurance
Company***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

<u>/s/ *Roberto Cámara-Fuertes*</u>
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email: rcamara@ferraiuoli.com