**Objection deadline for Debtors' motion: June 15, 2021 (AST)**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.,*

         Debtors.

------------------------------------------------------------------x

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)


**[Response to Docket #16741 and #16742 as well as #16756 and #16758 (to the extent such filings seek approval of the Disclosure Statement)]**

**RESPONSE AND OBJECTION OF INDIVIDUAL BONDHOLDER TO DEBTORS' APPLICATION FOR APPROVAL OF DISCLOSURE STATEMENT**

Dated:  June 9, 2021

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

I.      SPECIFIC OBJECTIONS TO DOCKET #16741 AND PROPOSED CHANGES...........2

     A.     The proposed Disclosure Statement does not provide "adequate information" that would enable a typical investor in the eight retail classes to make an informed judgment about the Plan. ....................................2

          1.     The proposed Disclosure Statement will not be comprehensible to the typical bondholder in the Retail Investor classes....................................2

          2.     A summary, in plain language, should appear at the outset........................3

     B.     A clear summary quantification and comparison of recoveries under the proposed Plan is required to provide adequate information to bondholders who did not participate in the negotiation of the Plan. ................................5

          1.     Quantification and comparison of recoveries of bondholders versus public employees versus public employee retirees and retirement system participants versus general unsecured creditors............................6

               a.     Other necessary information concerning quantification and comparison of recoveries of bondholders versus public employees. ....................................9

               b.     Other necessary information concerning quantification and comparison of recoveries of bondholders versus public employee retirees and retirement system participants. ................12

               c.     Disclosure of annual New GO Bond debt service amounts and FOMB projections that bear upon a risk of re-default on New GO debt. ....................................14

          2.     Quantification and comparison of recoveries of Retail Investors in the 50 states versus recoveries of bondholders entitled to elect the Taxable Election available only to Puerto Rico Investors. .......................14

          3.     Quantification and comparison of recoveries of bondholders entitled to "Consummation Costs" and/or "PSA Restriction Fees" versus bondholders who may (or may not) receive "Retail Support Fees." ....................................17

     C.     Information that should be added to the Disclosure Statement sections on "Classification and Treatment of Claims" and "Provisions Regarding the New GO Bonds, CVIs and Additional Indebtedness."..........................................20

1.   Clear tabular disclosure of specific securities to be issued, and their terms, including coupons and accretion rates. ............................................20

2.   Disclosure regarding rights of Government Parties and Initial PSA Creditors to modify coupon rates and par amounts of bonds. ..................21

D.   Disclosure of material federal tax consequences, as required by 11 U.S.C. §1125(a). ....................................................22

E.   Disclosure of other information pertinent to recoveries by Retail Investors, with appropriately descriptive headers....................................24

1.   Disclosures concerning splintered distribution of securities. ...................24

2.   Disclosures concerning how CVIs are to be allocated..............................24

3.   Reconciliation of SUT Baseline Metrics with Commonwealth 2020 and 2021 Certified Fiscal Plans. ...........................................25

4.   Disclosure of limited Commonwealth revenues covered by CVIs. ...........26

F.   Current audited financial information for Debtors must be disclosed..................26

G.   Disclosure of facts bearing on whether the Plan complies with the requirement of 48 U.S.C. §2174(b)(6) that the Plan be in the "best interests" of creditors. ....................................................28

H.   References to confidential mediation-negotiation process. ...................................28

I.   Information pertinent to Commonwealth's ability to pay.....................................29

1.   1.03% property tax...................................................................................29

2.   Debt service as percent of Commonwealth revenues ...............................29

3.   Debt per capita, including state, local and federal debt ...........................29

4.   Disclose, with appropriately descriptive section headers, other information pertinent to whether any adjustment of Commonwealth Constitutional "first claim" debt is both reasonable and necessary ...............................................................................................29

J.   Consequences of objecting (or not), and of voting yes versus no. ......................32

K.   My standing to object to the adequacy of the Disclosure Statement. ..................33

II.   ADDITIONAL MATTERS PRECLUDING A FINDING THAT THE DISCLOSURE STATEMENT IS ADEQUATE...............................................................33

III.    OBJECTION TO WAIVER OF RULE 3020(e) AUTOMATIC STAY,
        PROPOSED DISCLOSURE IF WAIVER IS RETAINED AND REQUEST FOR
        STAY OF CONSUMMATION UNTIL ANY TIMELY APPEAL IS
        ADJUDICATED. ......................................................................................................... 34

IV.     RESERVATION OF RIGHTS AND CONTINUED ASSERTION OF PRIOR
        OBJECTIONS ........................................................................................................... 34

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**Statutes**

11 U.S.C. §506(b) ..................................................................................................................8 n.4

11 U.S.C. §1123(a)(4) ...............................................................................................................22

11 U.S.C. §1125 ..................................................................................................................5, 22

11 U.S.C. §1125(a) .........................................................................................................2, 22, 33

11 U.S.C. §1125(a)(2)(C) ..........................................................................................................2

11 U.S.C. §1125(b) ....................................................................................................................2

48 U.S.C. §2141(b)(1)(N) ........................................................................................................28

48 U.S.C. §2146(a)(2)(A) .....................................................................................................1, 27

48 U.S.C. §2174(b)(6) ..............................................................................................................28

48 U.S.C. §2174(b)(7) ..............................................................................................................28

**Rules**

Bankruptcy Rule 3020(e) ..........................................................................................................34

Bankruptcy Rule 7001(2) ..........................................................................................................33

**TABLE OF ABBREVIATIONS AND CITATIONS**

| | |
|---|---|
| DS | Disclosure Statement (cited as #16741-page-__-to-__-of-__ (DS-___), with the Docket # reference being to the "ribbon" applied by the court at the top of the court-filed version, and the "DS-___" page reference being to the page number at the bottom of each page. |
| DS-Ex. __ | Disclosure Statement exhibit (cited as "DS-Ex. __") |
| #___ | Docket entries are referred to in the form of "#__" |
| Ex. __ | "Ex. __" refers to the exhibits to the Declaration of Peter C. Hein Accompanying Response and Objection of Individual Bondholder to Debtors' Application for Approval of Disclosure Statement. |

Peter C. Hein, pro se, submits this Response and Objection to the adequacy of the

Disclosure Statement (#16741).

## PRELIMINARY STATEMENT

Years before PROMESA was even in prospect, Commonwealth sold bonds to individual

investors nationwide, including the 50 states,[1] based on covenants and representations that

> **The good faith, credit and taxing power of the Commonwealth are *irrevocably*
> *pledged* for the prompt payment of the principal of and interest on the Bonds.
> The Constitution of Puerto Rico provides that public debt of the
> Commonwealth, which includes the Bonds, constitutes a *first claim* on available
> Commonwealth resources.**  (cover, Official Statement, Series 2012A, italics added)

None of the GO and PBA bonds I own have been adjudged invalid; these bonds are valid.  *See,*

*e.g.*, #11148, #10702.  GO bondholders have constitutional and statutory liens, including on the

Commonwealth's available resources and special property tax revenues; no court has invalidated

the liens, which remain in full effect.  *E.g.*, Adv.Proc.19-292-#5 & #52; Adv.Proc.19-291-#10.

PROMESA highlights the importance of "timely audited financial statements" (48 U.S.C.

§2146(a)(2)(A)), but current audited financial statements are ***not*** provided.  Even so, the Plan

**(1)** seeks to avoid payment of substantial principal and unpaid interest on Constitutional "first

claim" secured debt owed to bondholders, yet **(2)** provides for potentially billions of dollars of

"upside" bonuses and other benefits to public employees and retirees.  *See* Point I.B.1, below.

Approximately 1,700+ individual bondholders filed notices of participation.[2]  Individual

bondholders also filed proofs of claim.  Retail Investors are entitled to clear and adequate

disclosure – including ***current*** audited financial information – in order to assess, *inter alia*,

whether the Plan redirects funds to politically favored public employees, retirees and unions that

should under the law be paid to holders of Constitutional "first claim" GO debt.

---

[1] *See* Official Statements (showing 12 to 20 broker-dealer firms as underwriters) and trading
histories (showing daily number of trades) posted on MSRB EMMA website (emma.msrb.org).
*E.g.*, search on that website for CUSIP 74514LWA1 (Series 2009C) (Hein Ex. A, C),
CUSIP 74514LWM5 (Series 2011A), CUSIP 74514LB63 (Series 2012A) (Hein Ex. B, D).
[2] #7154-page-3&n.6-of-14; #7540-page-4-to-5&n.2-of-19.

I.      **SPECIFIC OBJECTIONS TO DOCKET #16741 AND PROPOSED CHANGES.**

Where feasible, I include proposed changes.  Where I do not have adequate information to propose language changes, I identify subject areas requiring additional disclosures.

A.      **The proposed Disclosure Statement does not provide "adequate information" that would enable a typical investor in the eight retail classes to make an informed judgment about the Plan.**

The Disclosure Statement must provide "adequate information" that will "enable … a hypothetical investor of the *relevant class* to make an informed judgment about the plan."  11 U.S.C. §1125(a)-(b) (emphasis added).  The proposed Disclosure Statement does *not* provide "adequate information" for Retail Investors, who comprise eight classes.  §1125(a)(2)(C).

Certain creditors were directly involved in negotiating the Plan (*e.g.*, PSA creditors) and/or are represented by committees (or other fiduciaries) and professionals being paid by Debtors directly or indirectly (*e.g.*, through administrative expense claims and/or by agreed payments to selected creditors) (*e.g.*, Retirees, Active ERS, JRS or TRS participants, AFSCME employees, CW General Unsecured claimants).  *See* Plan Art. III.  These creditors, or their representatives, are already well-informed about the Plan.  However, the Court declined to appoint a committee for individual bondholders (#6534).   Retail Investors were not represented in the negotiations by a committee (or other fiduciary).  The Disclosure Statement must be complete and written so typical Retail Investors can understand it.

1.      **The proposed Disclosure Statement will not be comprehensible to the typical bondholder in the Retail Investor classes.**

The proposed Disclosure Statement is 564 pages long; with 14 exhibits, a total of 2239 pages.  #16741, #16741-1 to #16741-16.  The proposed Plan (#16740) is 171 pages (234 pages with exhibits), and includes at least 455 separately defined terms.

The Disclosure Statement and Plan will be incomprehensible to typical Retail Investors:

a.      An individual is first confronted by seven pages of largely single-spaced ALL CAPS BOLD text (DS-i-to-vii) which is unreadable and is likely to discourage many individuals from reading further.  Unless there is a *specific* legal requirement to lead with all seven pages of

ALL CAPS BOLD text, most of this material should be relocated to follow the summary (*e.g.*, in a section entitled "IMPORTANT DISCLAIMERS, CAVEATS AND CAUTIONARY STATEMENTS") and all of this should be reformatted so it is more readable.

 **b.** The Table of Contents (DS-viii), with categories like "Preface" and "Introduction," obfuscates the fact that a purported "Summary" appears in Section II.B (beginning DS-18). There should be a readable, plain language summary, identified as such, upfront, following the cover page.

 **c.** The current purported "Summary," beginning DS-18, is incomprehensible, with literally about 69 different claims categories listed, including literally 44 different bond claim categories listed. The effort to discriminate in favor or against particular types of bondholders is not only substantively objectionable, but has resulted in an incomprehensible presentation.

  **2.** **<u>A summary, in plain language, should appear at the outset.</u>**

A plain language summary should follow the cover and include the following:

 **a.** "If you object to the Plan, you must submit an objection by [specify the date] and

-  Send it to the Court at the following address so that it is received by [specify date] [specify, in bold block-indented text, Court's mailing address], or

- [Specify alternative procedure for submission of objections to an email address, as I propose in my Response and Objection relating to Confirmation Procedures and in #16387-page-15-to-16-of-22.] *See* pages ____ - ___ of this Disclosure Statement for information on how to object."

The section "Confirmation Hearing and Deadline for Objection to Confirmation" does not appear until DS-52 (#16741-page-64-of-564) and does ***not*** specify the email or street address to which an objection to Plan confirmation should be sent. (DS-52-¶6.) Where to send objections is buried on DS-474 (#16741-page-486-of-564).

 **b.** "If you are entitled to vote on the Plan, you must submit your Ballot by [specify date]. *See* pages ___ - ___ of this Disclosure Statement for information on how to vote."

     **c.**     "The following table summarizes, for some of the principal types of creditors, (i) the amount (or range of amounts) Debtors may owe such creditors through July 1, 2021 (including accrued interest owed bondholders who assert they have constitutional and/or statutory liens), (ii) the sum of (x) amounts recoverable under the proposed plan, plus (y) amounts already paid after June 30, 2016 (when the law authorizing this bankruptcy was enacted), and (iii) the percentage recovery under the Plan, calculated as (ii) divided by (i)."  A summary table, such as described in Section I.B.1 below, should then be presented.[3]

     **d.**     A table explaining how the consideration received by Puerto Rico Investors differs from the consideration Retail Investors in the 50 states will receive should be presented, as set forth and discussed in Section I.B.2, below.

     **e.**     A table explaining the differences in economic treatment for Retail Investors as compared to the economic treatment of other bondholders should be presented, as set forth and discussed in Section I.B.3, below.

     **f.**     Specify in a table (as described in Point I.C, below) current interest bonds (including maturity and coupon rate), capital appreciation bonds (including maturity and accretion rate) and CVIs that will be issued in exchange for each 100,000 par GO or PBA position.  It appears that Retail Investors in the 50 states will be issued pieces of **19** securities for each ***one*** bond position they currently hold (*e.g.*, someone with a single 100,000 par bond will receive bits and pieces of 10 coupon bonds, 8 zero coupon bonds and one or more CVIs).  *See* Annex 1 to Exhibit B to Disclosure Statement, #16741-2-page-129-of-134 (listing 10 coupon bonds and 8 capital appreciation bonds).  Contradictory information currently appears at #16741-page-59,432-of-564 (DS-420) (refers to "eleven" different maturity dates) and is misleading.

---

[3] Some creditors, such as retirees, received payments throughout the Title III period, but bondholders did not — not withstanding that the Commonwealth has held literally billions of dollars of cash that could have been used to pay interest.  Any comparison of recoveries needs to account for post-July 1, 2016 payments that retirees received but that bondholders did not.

**g.**     State that the Court denied a motion to appoint a committee to represent individual bondholders, and that no fiduciary representing Retail Investors participated in negotiating the Plan or has reviewed, approved or recommended the Plan.

**h.**     The Disclosure Statement states that "[t]he amount a creditor may actually recover could vary materially from the estimates below." Docket#16741-page-31-of-564 (DS-page-19). Disclose what specific factors could affect the amount bondholders, public employees, public employee retirees and retirement system participants and general unsecured creditors may recover, and what the impact (or range of impacts) on recovery may be of each such factor.

**i.**     Set out FOMB's acknowledgments (i) that "[T]he Oversight Board cannot express an opinion or *any other form of assurance* on the financial statements *or any financial or other information or the internal controls of the Government* or ERS *and the information contained herein*" (now on the next to last page, #16741-page-563-of-564-DS-551) (emphasis added), and (ii) that FOMB "cannot" "vouch for the correctness" of Commonwealth's data, and that Commonwealth, too, has "not" "approved" the economic and financial information in the Disclosure Statement (*see* #16741-page-4-of-564-DS-iii). (These disclosures are necessary, but because Debtors cannot "vouch for," or provide "any" "form of assurance" on "any financial or other information" of Debtors, the requirements of 11 U.S.C. §1125 are not and cannot be met.)

**j.**     A specific explanation of **(i)** why Debtors' audited financials for fiscal 2018, 2019 and 2020 have not yet been issued, **(ii)** why the basic functions of producing timely audited financial statements and ensuring appropriate internal controls are in place have not been achieved in the over four years FOMB has been in place, and **(iii)** whether any restatement of audited financials issued to date is being or has been considered.

> **B.     A clear summary quantification and comparison of recoveries under the proposed Plan is required to provide adequate information to bondholders who did not participate in the negotiation of the Plan.**

Clear summary tables showing the comparative economics of the Plan are important. The current "Summary of Key Components" (#16741-pages-30-to-60 (DS-18-48)) is **not**

adequate: **(i)** bondholder classes are divided into 44 separate classes, which makes the presentation incomprehensible to those who were not part of the negotiations and who have no committee fiduciary or professionals to represent their interests; **(ii)** there is no apples-to-apples comparison of what is to be received by bondholders versus public employees, retirees and retirement system participants (on a present value basis, factoring in payments received during the pendency of the Title III); **(iii)** the preferential consideration received by Puerto Rico Investors must be disclosed; and **(iv)** the added consideration provided to some — but not all — bondholders in purported "fees" distributed pro rata among the recipients, yet treated as administrative expenses, must be disclosed. The description of the Plan beginning #16741-page-361 (DS-349), with a 50 page section on "Classification and treatment of claims" (#16741-pages-370-to-431 (DS-358-419), will also not be comprehensible to Retail Investors.

It is no answer that the Plan is complex — that complexity is a result of choices by those who negotiated the Plan. Multi-billion dollar payouts to public employees and public employee retirees and retirement system participants are obscured by turgid definitional frameworks. The Plan's complexity also obscures the fact each 50-states Retail Investor receives **19** or more instruments in exchange for **one** existing position (leaving them with 19 unmarketable splinters), yet special benefits are provided for other bondholders (*e.g.*, Puerto Rico Investors and participants in the confidential mediation-negotiation process). There must be a clear, tabular, step-by-step, disclosure that allows Retail Investors to understand how they are treated, and to compare their treatment to the treatment accorded to those who were involved in Plan negotiations and/or who are represented by committees in this case.

      1.        **Quantification and comparison of recoveries of bondholders versus public employees versus public employee retirees and retirement system participants versus general unsecured creditors.**

**(1)** The summary should provide an overview of the broad categories of bond claims, since the current approximately 44 classes of bond claims is bewildering. Add: "In general, bond claims fall into several basic categories:

        o   "Vintage" Public Buildings Authority (PBA) bonds, issued prior to 2011.

 ○ PBA bonds issued in 2011.
 ○ PBA bonds issued in 2012.
 ○ "Vintage" Commonwealth GO bonds, issued prior to March 2011.
 ○ Commonwealth GO bonds series 2011C, issued in March 2011.
 ○ Commonwealth GO bonds series D/E/PIB issued in July 2011.
 ○ Commonwealth GO bonds series – issued in March 2012.
 ○ Commonwealth GO bonds series – issued in 2014."

**(2)** The summary should include a table showing how (i) Constitutional "first claim" bondholder recoveries compare to (ii) recoveries of retirees (class 48A), employee retirement system participants (each of classes 48B, 48C, 48D and 48E), AFSCME employees (class 49), PBA employees (class 12) and general unsecured creditors (class 55). The quantification of recoveries to classes 48A, 48B-48E, 49 and 12 should include all monies paid to or for their benefit (including amounts referenced at #16741-page-49-to-55-of-564 (DS-37-43), appropriately allocated to members of the class thus benefitted and present valued (*see* notes to table on next page).

Simplifying assumptions can be used, such as (for bondholders) using recoveries for retail vintage PBA (class 6+21) and retail vintage CW (class 15) bonds — bonds as to which even contrived objections were not asserted. Using only classes 6+21 and 15 (rather than 44 classes of bond claims) is a way to present a more understandable comparison. The reader can be told that bondholders with bonds issued in 2011, 2012 and 2014 will receive less than vintage bondholders, and be directed to the pages in the Disclosure Statement that show the specifics. Likewise, recoveries for classes 48A-48E, 49 and 12 can use reasonable simplifying assumptions, such as assuming an average class member's recovery for public employees and each class of retirees' retirement system participants.

**[Proposed] "Table __: Quantification and comparison of recoveries by bondholders vs. public employees, public employee retirees and retirement system participants and general unsecured creditors"**

"Note: There are 44 classes of bond claims. The table that follows presents information for Retail Vintage PBA Bond claims and Retail Vintage CW (*i.e.*, General Obligation) Bond claims. Some bondholders receive greater recoveries, as shown in tables __ and __, as discussed on pages __-__ below. Classes of bonds issued in 2011, 2012 or 2014 receive smaller recoveries, as shown on pages __-__."

7

| (1)<br>Claim | (2)<br>Estimated amount of claim, including any unpaid interest[4] | (3)<br>Cash recovery as a % of column 2 | (4)<br>Total fixed recovery, including bonds and cash, as a % of column (2)[5] | (5)<br>Maximum potential recovery including contingent recoveries, as a % of column (2)[6] |
|---|---|---|---|---|
| Retail Vintage PBA Bond + Vintage CW Guarantee Claims (class 6 + 21)[7] | | | | |
| Retail Vintage CW (Commonwealth GO) Bond Claims (class 15) | | | | |
| Retiree Claims (class 48A)[8] | | | | |
| Active ERS Participant Claims (class 48B) | | | | |
| Active JRS Participant Claims (class 48C) | | | | |
| Active TRS Participant Claims (class 48D) | | | | |
| System 2000 Participant Claims (class 48E) | | | | |
| AFSCME Employee Claims (class 49) | | | | |
| PBA employees (class 12) | | | | |
| CW General Unsecured Claims (class 55) | | | | |

[4] There has been no adjudication that PBA and GO bondholders are not secured claimants entitled to post-petition interest (*see, e.g.*, 11 U.S.C. §506(b)).  Column 2 should include post-petition interest even if Debtors dispute entitlement to post-petition interest.

[5] The value of the bond component of the recovery distributed to Retail Investors should be adjusted downward to reflect the loss in value from illiquidity of splintered bonds.

[6] If "best case" scenarios were developed and exchanged in Plan negotiations, those should be disclosed and be used to calculate column (5).  If not already developed, a reasonable "best case" scenario should be developed and used to calculate column (5).  A range of possible upside contingent outcomes could also be presented.  The same underlying economic assumptions should be used for each class.  The recoveries should be present-valued (*see* note 8, below).

[7] The combined recovery is used in the simplified chart to make this more understandable.

[8] The claim and recovery amounts for all classes, including classes 48A-48E, should be present valued using a disclosed and appropriate discount rate consistently applied to all classes.
*Compare* #16884-page-21-to-24-of-26 *with* ERS FY2017 Audited Financials (6/29/2020) note 5(a) & 5(c), pp. 38-41 (Hein Ex. E); ERS FY2017 Actuarial Valuation Report (3/26/2019) pp. 11-12, 48 (Hein Ex. F)).

**(3)**  For bondholders, column 5 should include an estimate of what will be paid out on the CVIs.  (#16741-page-42-of-564)

For retiree claimants, and any other claimants who received payments during the course of the Title III — unlike bondholders, who have not been paid interest, despite multi-billion-dollar Commonwealth cash balances — the recovery amounts in columns 3, 4 and 5 should include monies paid since the date of the Title III filing.

For public employees, retirees, and retirement system participants, column 5 should include an estimate (or range of estimates) of potential additional benefits, including "benefit restoration" and "upside participation bonus" distributions and pension reserve trust payments, as further discussed below.  (#16740-page-36,109,149,209-to-210-of-234)

> a.    **Other necessary information concerning quantification and comparison of recoveries of bondholders versus public employees.**

**(1)**  The Plan provides for new payments, of monies not now owed, to a public employee union (AFSCME) and to public employees, and also allocates 25% of "Excess Cash Surplus" over $100 million to a new "Upside Participation Bonus" pool for public employees.  #16740-page-51 (§1.211),109 (§53.1(a)),209-210-of-234; #16741-6-page-64-to-65-of-65.  How "Excess Cash Surplus" is calculated must be disclosed with reference to specific line items on specific pages of the 4/23/2021 Fiscal Plan (DS-Ex. G).  Excess Cash Surplus is defined in Plan §1.211 (#16740-page-51-of-234) and Fiscal Plan Surplus is defined in Plan §1.222 (#16740-page-52-of-234).  Fiscal Plan Surplus is the "Surplus/(Deficit) Post Measures (excl. Debt Payments)" in the certified Fiscal Plan in effect on the Effective Date, and "Excess Cash Surplus" is the amount in excess thereof.  *See also* #16741-5-page-22-of-35-n.2, #16741-6-page-42-of-65-n.2.

Is "Excess Cash Surplus" measured against the "surplus post-measures/SRs" line in the fiscal plan?  That metric was $4.225 billion in fiscal 2019.  (#16741-7-page-44-of-309)  While FOMB projects this surplus number to be only $1.716 billion in FY22 and $1.320 billion in FY23, FOMB likely understates the surplus, due to the likelihood of Medicaid funding, as well as tax collections, being greater than what FOMB projects.  FOMB's fiscal plan assumes federal

Medicaid funding falls off a "cliff", dropping from $2.460 billion in FY21 to $.468 in FY23. (#16741-7-page-48-of-309)  This ignores the realities of the practice over the past 10 years (#16741-7-page-47-of-309) as well as Pres. Biden's proposed budget and Gov Pierluisi's position, both suggesting the FY23 number will be $3 to $5.2 billion.  Hein Ex. L, N.  FOMB has a history of underestimating revenues.  FOMB's 6-29-2018 fiscal plan projected FY19 "surplus post-measures/SRs" as $1.266 billion (Hein Ex. M p.16), but FY19 surplus turned out to be $4.255 billion (#16741-7-page-44-of-309).  FY19 revenues ended up $2.834 billion above FOMB's estimate issued 6-29-2018, two days before FY19 began.

Were a $4.225 billion Fiscal Plan Surplus realized (as in 2019), $1.031 billion would go to upside bonuses to public employees.  The fiscal plan refers to 145,381 active employee participants in ERS, TRS and JRS (#16741-7-page-272-of-309).  If there are 145,381 current Commonwealth employees, that would be an "upside participation bonus" of $7093 per employee.

Providing these potential multi-billion payouts to or for the benefit of public employees (as well as retirees and retirement system participants, *see* Point I.B.1.b below) is an attempt to reverse the Constitutional "first claim" of GO bondholders.  Furthermore, since these payouts come out of surplus before debt service, locking in these obligations could adversely affect Commonwealth's ability to fund debt service on New GO Bonds.  Clear disclosure is essential.

**(2)**  Payments, benefits and bonuses should be quantified and disclosed in a section titled **"Quantification and comparison of treatment of public employees versus bondholders"** (matter in brackets and "$_" information needs to be quantified and disclosed):

- "Public employees have received their salaries (aggregating $__ billion) and benefits (aggregating $__ billion) during the pendency of these Title III proceedings, since May 2017.  They have also continued to receive annual Christmas bonuses (aggregating, since July 1, 2016, $__ billion), and other bonuses (aggregating $__)."

- "Public employees continue to receive 15 paid holidays/year (16 in election years); plus 18 days/year accrued sick leave (12 days/year for those hired after 2/4/2017), up

10

to a total of 90 accrued sick days; plus 15 days/year accrued vacation leave (up to a total of 60 accrued vacation days); and will continue to receive such time-off in the future."  (*Cf.* #16741-6-page-24-to-29-of-65)

- "Under the Plan, (a) a public employee union (AFSCME) will be paid $10 million and its legal expenses will be reimbursed, and (b) each public employee union member will receive a one-time bonus of $1000 ($500 cash + $500 from a $5 million payment to the union), an aggregate of $___ million.  There was no pre-existing obligation to make these payments."  (*Cf.* #16741-6-page-18,36-of-65)

- "Public employees will share in annual Upside Participation Bonuses under the Plan. If Commonwealth outperforms the projected Fiscal Plan Surplus by $100 million or more, 25% of the Excess Cash Surplus will be allocated to the Upside Participation Bonus pool in each year.  Unlike the CVIs received by bondholders, this Upside Participation Bonus is based on all Commonwealth revenues, not just revenues from, *e.g.*, part of the SUT, and is not capped.  These "upside" bonuses are in addition to annual Christmas and other bonuses."  (#16741-6-page-21,29,35-to-36,64-to-65)

"The following table shows historical comparisons of Commonwealth's actual revenues and surpluses with amounts projected in certified fiscal plans.  Note that revenues and surplus (deficit) numbers were impacted by hurricanes in September 2017, earthquakes in December 2019-January 2020 and COVID closures beginning in March 2020."

| (1) Fiscal Plan date | (2) Fiscal year (ended June 30) | (3) Certified fiscal Plan projected revenues | (4) Actual revenues | (5) Fiscal year projected surplus (deficit) | (6) Actual surplus (deficit) post-measures |
|---|---|---|---|---|---|
| [list date of each certified fiscal Plan] | [Note:  list each fiscal year covered in the corresponding fiscal plans listed in col. (1)] | [Note:  list revenue projected in fiscal plan for each year listed in col. (2)] | [one actual revenue number for each fiscal year, even if more than one certified fiscal plan provided | [surplus post-measures (excl. debt payments) in each certified fiscal plan. *See* #16740-page-51,52-of-234; #16741- | [one actual surplus post-measures number for each fiscal year, even if more than one certified fiscal plan provided |

11

| (1) Fiscal Plan date | (2) Fiscal year (ended June 30) | (3) Certified fiscal Plan projected revenues | (4) Actual revenues | (5) Fiscal year projected surplus (deficit) | (6) Actual surplus (deficit) post-measures |
|---|---|---|---|---|---|
| | | | a projection for the year] | 7-page-44-of-309] | a projection for the year] |

- [Specify ranges of future Excess Cash Surpluses, and consequent future Upside Performance Bonuses, if Commonwealth actual surpluses in future years exceed projected surpluses by the range of percentages as in FY 2018-2021, with the range computed using the numbers in col. 6 divided by col. 5 in the above table.]

(3)  Particularize and quantify any "sacrifices" (#16741-page-53-of-564 (DS-41)) that supposedly justify the new one-time $1000 bonuses and additional un-capped "upside" bonuses.

(4)  Summarize employee attendance data, in table form, for each of fiscal 2018, 2019, 2020 and 2021 year-to-date, showing (i) percentage of government agencies reporting attendance, (ii) percentage of all agencies' employees reported as working, and (iii) percentage of employees for which attendance has not been confirmed.  (Office of Administration and Transformation of Human Resources is supposed to report this data to FOMB monthly.)  If "sacrifice" is claimed to justify new cash payments and potentially multi-billions of dollars in future bonuses, this attendance data is important to disclose.

    **b.**    **Other necessary information concerning quantification and comparison of recoveries of bondholders versus public employee retirees and retirement system participants.**

(1)  Add:  in a section titled "**Quantification and comparison of treatment of public employee retirees and retirement plan participants versus bondholders.**"

- "Retirement benefits have been paid currently throughout the entire time of these Title III proceedings (filed May 2017).  By contrast, there have been no payments of principal or interest on GO debt since January 1, 2016."

- "The plan proposes no cut to monthly retirement benefits of $1,500/month or less, and an 8.5% reduction of monthly benefits for those receiving more than $1,500/month (but no cut will reduce benefits below $1,500/month).  Any reduction

12

in monthly benefits comes first out of the annual Christmas bonus, next out of the annual summer bonus, next out of the monthly medicine bonus. Only after reductions in all of those bonus amounts have been absorbed is the monthly base pension reduced for any recipient." (*See* #16741-page-49-to-50-of-564 (DS-37-38)).

- "The current number of retirees is [specify], of whom [specify %] will not have any reduction in benefits."

- "Any benefit reductions may be partially or totally restored. If Commonwealth achieves an Excess Cash Surplus of more than $100 million, 10% of such Excess Cash Surplus will be applied pro rata to reduce any reductions. In determining whether there is an Excess Cash Surplus more than $100 million, all Commonwealth revenues will be considered, not just revenues from, *e.g.*, part of SUT." (*See* #16740-page-36,51-of-234).

- [Specify ranges of future Excess Cash Surplus, and the consequent restoration of benefits, if Commonwealth actual surpluses in future years exceed projected surpluses by the range of percentages as in FY 2018-2020.]

- "Pension Reserve Fund payments of 25% of Fiscal Plan Surplus will be made in any year the projected Fiscal Plan Surplus is $1.75 billion or more." (#16740-page-36-149-of-234)

  **(2)** The following information should be disclosed so bondholders can assess the actual bona fide liabilities of the ERS, Teachers System and Judiciary System:

- Disclose, in table form, for each of ERS, Teachers System and Judiciary System, as of July 1 of fiscal 2018-2021: [x] the number of (a) active members, (b) retirees, (c) disabled members and (d) beneficiaries; [y] the number of retirees whose benefits exceed $1500 (and thus may potentially be subject to a reduction in benefit under the Plan), and (z) the number of retirees employed by entities other than Commonwealth and PBA themselves.

- Provide and disclose the audited financial statements and actuarial valuation reports for each of ERS, Teachers System and Judiciary System for fiscal years 2018, 2019 and 2020, all of which are past-due.

- Specify (i) the amount of member loans and interest receivable as of fiscal year end 2018, 2019, 2020, and 2021, (ii) any efforts to collect such amounts owed to the retirement systems, and (iii) the magnitude of improper or fraudulent benefit claims and any efforts to protect against such claims.

    **c.**     **Disclosure of annual New GO Bond debt service amounts and FOMB projections that bear upon a risk of re-default on New GO debt.**

Under FOMB's *own* projections, over $2.1 billion of "Excess Cash Surplus" may be paid out for Upside Performance Bonuses ($1.551 billion) and Benefit Restoration ($620.6 million) in FY22-FY26.  (#16740-page-36(§1.97), 51(§1.211), 109(§53.1(a)), 209-210-of-234; #16741-7-page-44-of-309).  If the Medicaid funding "cliff" is averted, added payments for Upside Performance Bonuses, Benefit Restoration and Pension Reserve contributions will be staggering.

Yet FOMB's projections show surpluses disappearing in later years, before all New GO Bonds are paid.  (#16741-7-page-16,60,63-of-309).  There must be a clear disclosure in table form of **(i)** the amount required to be paid for debt service each year on the New GO Bonds, and **(ii)** the impact (or range of impact) of the Upside Performance Bonuses, Benefit Restoration and Pension Reserve contributions on the ability to pay debt service until all New GO Bonds mature.

    **2.**     **Quantification and comparison of recoveries of Retail Investors in the 50 states versus recoveries of bondholders entitled to elect the Taxable Election available only to Puerto Rico Investors.**

**(1)**  The proposed Disclosure Statement obfuscates the preferential benefits Puerto Rico Investors are offered.  It states that New GO Bonds will be issued with "eleven (11) different maturity dates" and "the principal amounts, maturities, interest rates, and amortization schedules for the New GO Bonds are as shown in Exhibit J to the Plan."  #16741-page-59,432-of-564.  However, the Plan annexed to the Disclosure Statement does *not* include its exhibits.  #16741-1.  One would have to locate the Plan with exhibits (#16740) to find Plan Ex. J.  Furthermore, Plan

Ex. J (#16740-1-page-218-of-234) is headed "Description of CVI Terms and Waterfall Provisions;" it does **not** have the information the Disclosure Statement says it does.

Only if one stumbles across Annex 1 to Exhibit I to Exhibit B (the PSA) to the Disclosure Statement is there a clue that Puerto Rico Investors may elect preferential distributions. Thus, per that Annex 1, whereas Retail Investors in the 50 states, for each current single bond, will receive 18 — not "11" — separate splintered fragments of New GO bonds, with various coupon or accretion rates — including a 4% coupon for the 2041 maturity (#16741-2-page-129-of-134) — Puerto Rico Investors can elect to receive a *single* 2041 maturity bond with a markedly higher, 5%, coupon (*id.*). These facts should be plainly disclosed.

**(2)** Debtors should also disclose other pertinent facts concerning the taxable election:

- Is the higher 5% coupon bond available through the taxable election available even to Puerto Rico Investors who originally had bought taxable bonds.

- Specify (separately) the amounts of (i) PBA bonds and (ii) GO bonds outstanding that are (i) tax-exempt, and (ii) federally taxable, and list the series that are tax-exempt and that are taxable, and the outstanding principal balance of each.

- Specify (i) the par amount of New GO coupon bonds to be issued, and (ii) initial principal amount of New GO capital appreciation bonds to be issued.

- Disclose the value of the bonds to be received by recipients of the taxable election, factoring in the coupon rate on the taxable bonds (5%), as compared to the coupon rate (4%) on the same 2041 maturity of the tax-exempt bonds, assuming that the 5% coupon bonds (i) are taxable, or, alternatively, (ii) become tax-exempt.

In the COFINA situation, without pre-consummation disclosure to the Court or individual bondholders, FOMB apparently argued to the IRS that since the total par amount of new bonds was less than the total amount of originally issued tax-exempt bonds, all new COFINA bonds could be tax-exempt, and the IRS agreed. The new COFINA taxable bonds then became exchangeable into tax-exempt bonds, even for Puerto Rico Investors. *E.g.*, #7211-page-5-to-9-of-24; #8427-page-12-to-16-of-20; #6283-page-3-to-7-of-13. It appears FOMB is pursuing the

same course here, issuing higher (5%) coupon taxable bonds to Puerto Rico Investors to provide
them a preferential recovery.

(3)  A table should be included explaining the differences in treatment of Puerto Rico
Investors versus 50 states Retail Investors, including how that treatment may be impacted by any
future tax determinations.

**[Proposed] "Table __:  Quantification and comparison of consideration to Retail Investors
in 50 states versus Puerto Rico Investors"**

| Question | Retail Investors in 50 States | Puerto Rico Investors |
|---|---|---|
| How many separate bonds will be issued in exchange for each existing bond position? | [The holder of a 100,000 par position will have it broken into [at least 18] pieces ranging from __ par to __ par.][9] | The holder of a 100,000 par position will receive in exchange one new bond position of __ par in amount. |
| Will liquidity (ability to sell) be impacted? | If smaller pieces are sold, this will likely result in lower prices as a percent of par, and/or higher transaction costs, than had one larger par amount bond been sold. | No significant impact on liquidity, since there will be one new bond position of approximately __ par. |
| Will fractional bonds be issued (if not, what will happen)? | [Need to describe] | [Need to describe] |
| What are the maturities of the new bonds? | Maturities range from 2023 to 2046; a complete list of maturities and the par amount of new bonds per 100,000 par of an existing bond position is described on page __ below | One 2041 maturity |
| Will all new bonds pay current interest? | 8 of the new bonds will be bonds that do not pay current interest.  10 of the new bonds will pay current interest.  The details appear on page __ below. | The new 2041 maturity bond will pay current interest |
| What is the coupon or accretion rate or the new bonds? | Coupon rates range from __% to __%.  Accretion rates on bonds that do not pay current interest range from __% to __%. | The 2041 maturity new bond will pay __% interest |
| How are the new bonds valued for purposes of the recovery | [Need to describe basis for valuation, including whether there is a discount for loss of | [Need to describe basis for valuation] |

---

[9] 16741-2-page-129-of-134 (Annex 1 to Exh. I to Exh. B to Disclosure Statement).

16

| Question | Retail Investors in 50 States | Puerto Rico Investors |
|---|---|---|
| levels referred to in this Disclosure Statement? | liquidity of splinter bonds and if not, why not] | |
| Is it possible that taxable bonds will be exchangeable into tax-exempt bonds and, if so, will that affect the value received? | [Need to describe] | [Need to describe] |

(4)  If there is any possibility that the "taxable" bonds will later be exchangeable for tax-exempt bonds (as occurred shortly after consummation in the COFINA case), the value to those who opt for the taxable election should be shown on the alternative assumption that those persons ultimately receive tax-exempt bonds in an exchange transaction.

3.      **Quantification and comparison of recoveries of bondholders entitled to "Consummation Costs" and/or "PSA Restriction Fees" versus bondholders who may (or may not) receive "Retail Support Fees."**

(1)  Disclose (x) the estimated amount of claims by in each class held by **(i)** Retail Investors, **(ii)** Initial PSA creditors, **(iii)** PSA Restriction Fee creditors, and (y) what the amount of the Retail Support Fee (capped at $50 million, #16740-page-71-of-234) will be per $100,000 par if all Retail Classes are entitled to receive it.  If the amounts are not known, specify the range of estimated amounts and the facts and assumptions on which the estimated ranges are based.

(2)  Disclose, in a table, per $100,000 par bonds held, the aggregate amount of fees and other payments, whether denominated "Consummation Costs," "PSA Restriction Fee" or "Retail Support Fee," that will be received, respectively, by (i) an Initial PSA Creditor, (ii) an Initial PSA Creditor who is also a PSA Restriction Fee creditor, (iii) a PSA Restriction Fee creditor and (iv) a Retail Investor.  If the amount varies based on the assumptions made, then the potential range to be received on particular assumptions should be described.  Also disclose:

- Whether Consummation Costs and PSA Restriction Fees are paid pro rata, without regard to any costs or expenses incurred by a particular fee recipient.

- Whether Consummation Costs are paid to PSA participants as a percentage of the aggregate of all outstanding GO and PBA bonds (not just bonds held by the

17

institutions who receive Consummation Costs), including even GO and PBA bonds held by Retail Investors.

- Whether even an Initial PSA creditor who acquired its bonds at prices far below par after PROMESA became effective nevertheless receives cash as an allowed administrative expense claim in an amount equal to 1.50% of the aggregate par amount of all PBA Bond Claims, CW Bond Claims, CW Guaranteed Bond Claims.

(3) Provide a tabular disclosure of all benefits or consideration (however characterized) to be received by each category of bondholders, including "Consummation Costs," "PSA Restriction Fees" and "Retail Support Fees," shown as a percent of their par holdings.

**[Proposed] "Table __:  Quantification and comparison of recoveries of bondholders entitled to 'Consummation Costs,' 'PSA Restriction Fees' and 'Retail Support Fees'"**

| (1)<br>Type of bondholder | (2)<br>Added recovery | (3)<br>Estimated Percent of Par of the Added Recovery | (4)<br>Is the added recovery contingent upon decisions by others or other events | (5)<br>Does the bondholder get a fee if Plan is terminated |
|---|---|---|---|---|
| Bondholders who are both Initial PSA Creditors and PSA Restriction Fee Creditors (names are listed on page ___ below)[10] | Cash Payment equal to sum of [1] Consummation Costs, which are a pro rata share of 1.5% of the aggregate amount of all bond claims (PSA creditors' 1.5% fee is calculated based on the amount of all bonds, including bonds held by other investors),[11] plus, [2] pro rata share based upon bonds held by PSA Restriction Fee Creditors of PSA Restriction Fee (calculated as $350,000,000 less the Consummation Cost amount), plus [3] a possible share of the $50,000,000 Retail Support Fee | [NOTE- This needs to be supplied by Plan proponents, who have the data; data does not appear in the Disclosure Statement] | No | Yes, Initial PSA Creditors share a fee of $100,000,000, which amounts to ___% of par |

---

[10] These bondholders should be identified in some place in the Disclosure Statement.

[11] GO/PBA Consummation Costs are specified in the Disclosure Statement as "1.50% of the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims," and Initial PSA Creditors' pro rata share thereof is "based on the holder's respective position as of 5:00 pm (EST) on February 22, 2021." #16741-page-366-to-367-of-564.  That suggests an Initial PSA Creditor receives its share of a 1.50% of par fee computed based on bonds *other* bondholders, including retail bondholders, own.  However, Plan §3.3 (Docket#16740-page-84-of-234) suggests the 1.50% is computed only based on bond claims held by an Initial GO/PBA PSA Creditor as of 5:00 pm (EST) on February 22, 2021.  Which is it?  This should be clarified.  In addition, both the Disclosure Statement and the Plan suggest that — although the Consummation Costs are (assertedly) to compensate the cost of "negotiation, confirmation and consummation," an Initial PSA Creditor who sells its claims on February 23, 2021 — and thus who is not even involved in post-February 22, 2021 negotiations, or the confirmation process or the consummation process, still gets the fee.  Is this the case?  This should be clarified.

| (1)<br>Type of bondholder | (2)<br>Added recovery | (3)<br>Estimated Percent of Par of the Added Recovery | (4)<br>Is the added recovery contingent upon decisions by others or other events | (5)<br>Does the bondholder get a fee if Plan is terminated |
|---|---|---|---|---|
| PSA Restriction Fee Creditors (names are listed on page ____ below)[12] | Cash payment equal to sum of [1] pro rata share based upon bonds held by PSA Restriction Fee Creditor of PSA Restriction Fee (calculated as $350,000,000 less the Consummation Cost amount), plus [2] a possible share of the $50,000,000 Retail Support Fee | [NOTE- This needs to be supplied by Plan proponents, who have the data; data does not appear in the Disclosure Statement] | No | No |
| Retail Investors (individuals who purchased GO Bonds or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account) | Cash payment equal to PSA Restriction Fee Percentage times the amount of the individual's retail bond claim (subject to $50 million aggregate cap) | [NOTE- This needs to be supplied by Plan proponents, who have the data; data does not appear in the Disclosure Statement] | Yes, a member of a class of Retail Investors only receives this added amount if a majority of Retail Investors in the class votes "yes" on the Plan | No |
| Any other bondholders | | [NOTE- This needs to be supplied by Plan proponents, who have the data; data does not appear in the Disclosure Statement] | | No |

**(4)** There should be an explanation or clarification of:

- What are the asserted rationales for (i) the different recoveries of 2011 PBA and 2012 PBA bonds in comparison to each other and vintage PBA bonds, and (ii) the different recoveries of Commonwealth 2011C, 2011D/E/PIB, 2012 and 2014 bonds in comparison to each other and to vintage Commonwealth GO bonds and PBA bonds.

- Whether the recovery on PBA bond claims is the aggregate of (i) the PBA fixed cash payment, plus (ii) a combination of new bonds and cash recovered on CW guarantee claims (*cf.* #16741-page-43-to-44-of-564 (DS-31-to-32))?

- Are there any CW guarantee claims *not* associated with PBA bond claims?

- Who currently holds the GSA Helicopter loan and Hacienda loans, and why are these lumped into the same class as the 2012A and 2012B GO bonds?

---

[12] These bondholders should be identified some place in the Disclosure Statement.

C.      **Information that should be added to the Disclosure Statement sections on
        "Classification and Treatment of Claims" and "Provisions Regarding the
        New GO Bonds, CVIs and Additional Indebtedness."**

The following should be included in the sections on "Classification and Treatment of

Claims" beginning #16741-page-370-of-564 (DS-358) and "Provisions Regarding the New GO

Bonds, CVIs and Additional Indebtedness" beginning #16741-page-431-of-564 (DS-419).

1.      **Clear tabular disclosure of specific securities to be issued, and
        their terms, including coupons and accretion rates.**

Add table showing specific 18 New GO Bonds to be issued to 50-states Retail Investors.

This information is buried in Annex 1 to Exh. I to Exh. B to the Disclosure Statement and the

references to where this information may be found appear to be incorrect (Point I.B.2, above).

Currently, the Disclosure Statement provides misleading information on the number of new

bonds (#16741-page-59,432-of-564 (DS-420) (referring to 11 different maturity dates).

**"New Bonds to be issued in exchange for each existing GO and PBA bond position"**

Each holder of one GO or PBA bond position (unless a Puerto Rico Investor) will receive

pieces of the following 18 new bonds as well as [specify] CVIs:

| Securities to be distributed | Maturity | Coupon | Par amount per existing 100,000 par[13] |
|---|---|---|---|
| Pieces of 10 new coupon bonds | 2023 | 5% | [Debtors need to supply] |
| | 2025 | 5% | |
| | 2027 | 5% | |
| | 2029 | 5% | |
| | 2031 | 5% | |
| | 2033 | 4% | |
| | 2035 | 4% | |
| | 2037 | 4% | |
| | 2041 | 4% | |
| | 2046 | 4% | |

---

[13] Illustrative amounts should be provided using 100,000 par of a vintage GO term bond, such as
the 2036 maturity of Series 2009B (CUSIP 74514LVX2).

| Securities to be distributed | Maturity | Coupon | Par amount per existing 100,000 par[13] |
|---|---|---|---|
| Pieces of 8 new capital appreciation bonds | 2022 | 5% | |
| | 2023 | 5% | |
| | 2024 | 5% | |
| | 2029 | 5.375% | |
| | 2030 | 5.375% | |
| | 2031 | 5.375% | |
| | 2032 | 5.375% | |
| | 2033 | 5.375% | |
| [Describe and list the number of separate CVI instruments] | | | |

### 2. Disclosure regarding rights of Government Parties and Initial PSA Creditors to modify coupon rates and par amounts of bonds.

The Disclosure Statement states that "[t]o the extent the Government Parties and the Initial PSA Creditors determine during the period up to and including the Effective Dates to modify the coupons set forth on Exhibit J to the Plan, the amount of par New GO Bonds will either increase or decrease…subject to the amount of the maximum annual debt service provided for in Exhibit J to the Plan."  #16741-page-41-of-564 (DS-29).  However, the reference to Exhibit J appears to be wrong; Plan Ex. J is "Description of CVI Terms and Waterfall Provisions."  There is no apparent annual debt service cap in Exhibit J (just caps on CVI payments).  There is also a reference to footnote 8 to annex 2-A to exhibit I to the PSA. Docket#16741-page-41-of-564 (DS-29).  Having a cross-reference to a footnote in an annex to an exhibit to the PSA, which in turn is an exhibit to the Disclosure Statement, is very confusing.

There need to be clear disclosures and explanations of these matters, and cross references need to be correct.  The substance of footnote 8 should be reproduced, and explained.

The text suggests that the Government Parties and Initial PSA creditors will have the discretion to actually modify the coupon rates and par amount of New GO Bonds to be issued. The risk of modifications that tilt the consideration to particular bondholders and away from

other bondholders should be addressed.  There is no reason given for these parties to have that discretion.  If there is some legitimate reason for this, it should be described.

In any event, in order to provide a fair distribution and comply with 11 U.S.C. §1123(a)(4), all PBA bondholders must receive the same proportions of each maturity of New GO Bonds and cash, and all Commonwealth bondholders must receive the same proportions of each maturity of New GO Bonds and cash.  In addition, fractional bonds must be distributable and retainable by Retail Investors to ensure the proportions stay the same.  Otherwise, as occurred in the COFINA situation, some institutional bondholders will be able to gerrymander distributions to advantage themselves, and to subject Retail Investors to forced sales of fractional bonds.  *See* #6283-page-8-to-12-of-13; #7211-page-13-of-24; #8427-page-17-to-18-of-20.  These matters – to which I object – should at least be fully disclosed.

### D.    Disclosure of material federal tax consequences, as required by 11 U.S.C. §1125(a).

11 U.S.C. §1125(a) is express:  "Adequate information" includes a "discussion of the potential material Federal tax consequences of the plan to … a hypothetical investor typical of the holders of claims or interests in the case" "that would enable such a hypothetical investor *of the relevant class* to make an informed judgment."

a.  The Disclosure Statement states that "in the event a determination from the IRS or an opinion from Section 103 Bond Counsel is obtained prior to the Effective Date providing that the ratio of the aggregate amount of all taxable New GO Bonds … to the total aggregate amount of New GO Bonds is less than" 13%, "the taxable New GO Bonds determined to be tax-exempt will receive tax-exempt New GO Bonds."  Docket #16741-page-41-of-564 (DS-29).  There should be a clear explanation of the reasons for, and effect of, this provision, including why 13%.

b.  Simply asserting "[t]he tax status of the New GO Bonds has not been determined" (#16741-page-516,525-of-564) does not comply with §1125.  Also, no information is provided concerning when efforts to obtain a "determination from the IRS" or "an opinion from Section 103 Bond Counsel" began and what the status of such efforts is. The Disclosure

22

Statement should disclose these matters in a clearly identified section (*e.g.*, "**Status of communications with IRS concerning the tax treatment of bonds**,") including:

- Is there any pending or contemplated request for a determination or ruling that would allow bonds initially issued as taxable to be exchanged for tax-exempt bonds?

- If there is any possibility that "taxable" bonds will later be exchangeable for tax-exempt bonds (as occurred shortly after consummation in the COFINA case), the value to those who opt for the taxable election should be stated on the alternative assumption that tax-exempt bonds are ultimately received in an exchange transaction.

- Specify all communications with, or applications submitted to, the IRS.  Copies of all such communications and applications should be added to the data room, clearly identified so they can be found.

- Specify whether any future such communications or applications are contemplated.

Debtors should provide a declaration, brought up-to-date at the confirmation hearing, attesting to the truth of the disclosures on tax treatment.  There should not be a repeat of the COFINA situation where **(i)** on ***December 14, 2018*** — well before confirmation — FOMB (secretly) requested a private letter ruling or closing agreement with the IRS that would let all new COFINA bonds be federally tax-exempt, including bonds distributable to recipients of the "on-island" Puerto Rico preference, but **(ii)** this was ***not*** disclosed prior to Plan confirmation. #6283-2-page-3-of-24, Recital "E"; #7211-page-7-of-24.  FOMB's undisclosed request to the IRS had been in the works going back to early 2018.  #7341-page-6&n.1-of-9.[14]

c. Debtors should explain why tax treatment of holders of retail bond claims is discussed separate from that of other holders, and what is different for retail holders.  (#16741-page-521, 530-of-564)

---

[14] The pertinent facts are summarized in Docket#8487-page-14-to-16-of-20: *see also* Docket#5123-page-5-to-6-of-26-Recital-"E"; #6283-page-3-to-7-of-13;#6283-1;#6283-2-page-2-to-5-of-24; #7211-page-5-to-9-of-24;#7211-1-page-3-to-4-of-146; #8427-page-13-to-16-of-20;#8427-1-page-3-to-4,12(answering-Q11-¶2)-to-13-of-69.

E.     **Disclosure of other information pertinent to recoveries by Retail
Investors, with appropriately descriptive headers.**

1.     **Disclosures concerning splintered distribution of securities.**

In addition to an upfront table showing the number of separate instruments to be issued for every bond position currently held, and the approximate par amount thereof per each existing 100,000 par amount owned (*see* Point I.C.1, above), disclosures should address:

- Whether fractional bonds will be distributed and whether any such fractional bonds will be subject to forced sales without the Retail Investor's consent (as occurred in the COFINA situation).

- Whether there will be a liquid trading market for the 18 "splintered" bonds issued to Retail Investors for every current single CUSIP position currently held.

- What the impact on re-sale value will be of 18 "splintered" bonds being distributed for every current single CUSIP position held.

- Why "splinter" bonds are used in the Plan when that is detrimental to the interests of Retail Investors, including by reducing liquidity and increasing brokerage fees and transaction costs (as is evident from experience in the COFINA situation).

- A distribution "matrix" showing specifically what quantities of new bonds, cash and CVIs will be distributed in exchange per 100,000 par amount of each existing CUSIP holding should be disclosed.  (In COFINA, the distribution matrix was revealed only after the confirmation hearing, *see* #6283-page-8-to-12-of-13, #6283-1, #6283-3.)

- Whether any future exchange of bonds (*e.g.*, exchange of taxable for tax-exempt bonds) may result in costs or fees imposed by brokerage firms on Retail Investors, and whether any steps have been taken to avoid this from occurring.

2.     **Disclosures concerning how CVIs are to be allocated.**

Plan Ex. J has a GO CVI allocations summary (Annex 3, #16740-page-226-of-234).

- Add a third column to show "% of overall GO claims," so that one can determine whether CVIs are allocated disproportionately to some categories of GO bond claims.

- Add a statement (if true) that "for each identified type of GO bond claim or PBA
  bond claim coupled with a CW guarantee claim the allocation of GO CVIs as among
  the classes holding such claims shall be pro rata."  If not true, explain why not.

### 3. Reconciliation of SUT Baseline Metrics with Commonwealth 2020 and 2021 Certified Fiscal Plans.

To allow bondholders to evaluate potential payments under the CVIs, Debtors must
disclose (a) how the SUT baseline reconciles with the Commonwealth May 27, 2020 fiscal plan
(Ex. E to Disclosure Statement version filed 3/9/2021 (#15988-5)), and (b) how the SUT baseline
compares to the forecasts in Commonwealth's April 23, 2021 fiscal plan (#16741-7).

Plan Exhibit J provides, in Annex 5, data for the "5.5% SUT baseline" (#16740-228-of-
234).  However, it is not clear how the Annex 5 numbers tie into the forecasts presented in the
May 27, 2020 Commonwealth's fiscal plan (Docket #15988-5-page-42-of-292).  The 2020 fiscal
plan shows FY22 SUT collections "after payout of the COFINA settlement" of $1,972 million.
*Id*.  But the FY22 $1,972 million number does not tie into any of the numbers in Annex 5.  The
Annex 5 5.5% SUT baseline numbers run through 2051.  However, Commonwealth's 2020 fiscal
plan only shows forecasts of SUT revenues through fiscal 2025 (#15988-5-page-42-of-272) and
Commonwealth's 2021 fiscal plan only shows forecasts of SUT revenues through FY26
(#16741-7-page-45-of-309).  Note 5 on Annex 5 states the May 2020 fiscal plan contains
projections through 2049; the page cite for these projections should be provided.  A reader needs
to be able to follow the numbers.

Also, in the 3/8/2021 version of the Plan, there had been an Annex 5-B, which provided
"5.5% SUT forecast and reconciliation."  (#15976-1-page-55-of-61).  Why was that dropped?

In addition, Debtors should specify:

- The annual growth rate in the 5.5% SUT baseline (Annex 5) and annual percentage
  SUT growth rates assumed for Commonwealth 2020 and 2021 fiscal plans.

- Historical SUT growth rate information (so that one has some basis for judging how
  the projected growth rate from the baseline compares to historical experience).

- Any forecasts (other than forecasts set out in the 2020 or 2021 fiscal plans) should be identified and included as an exhibit to the disclosure statement.

### 4.   Disclosure of limited Commonwealth revenues covered by CVIs.

a.     Add:  "The CVI provides possible additional payments if the 5.5% component of Commonwealth's SUT exceeds certain baseline numbers in Commonwealth's 2020 certified fiscal plan.  These potential additional payments are limited in several ways:

"(i)     They are capped in an annual amount of $200 million per year for all holders of all GO or PBA bonds (for the holder of $100,000 vintage GO bonds (CUSIP _____), this would be an added payment of $_____ per year; for holders of other series of GO bonds or PBA bonds the amount per 100,000 par would vary as depicted in [cross-reference a chart to be included in the Disclosure Statement showing variances based on type of bonds held]).  There is also a $3.5 billion overall cap on CVI payments, which means the maximum total payment over the life of the bonds to the holder of 100,000 par vintage GO bonds would be $_____.

"(ii)     The upside CVI payments are not based on all Commonwealth revenues but only based on approximately 52.4% of Commonwealth's SUT revenues.  The 52.4% portion of the 5.5% SUT revenue stream on which the CVIs are based is only about [10%] of the $_____ billion of Commonwealth local revenues forecast for FY22, and only about [_____%] of Commonwealth's $21.048 billion total revenues forecast for FY 22."  [Exact percentages and amounts should be inserted by debtors.]

b.     Add:  Legal justification, if any, for sharing additional revenues from any source with public employees, retirees or retirement system participants in preference to "first claim" bondholders.

### F.   Current audited financial information for Debtors must be disclosed.

1.     The Disclosure Statement should include *current* audited financial statements for Commonwealth and PBA, but it does not.  Exhibit M "Latest Audited Financial Statements for Debtors," is for fiscal 2017, which ended almost four years ago on June 30, 2017.  (#16741-13)

26

The Disclosure Statement attaches (as Ex. G) Commonwealth's Fiscal Plan certified by FOMB on 4/23/2021 (#16741-7).  However, FOMB states that the fiscal plan "do[es] not constitute an audit" and that FOMB "cannot express an opinion *or any other form of assurance* on the financial statements *or any financial or other information or the internal controls of the Government and the information contained herein*" (emphasis added) (#16741-7-page-3-¶-2-309).

2.      One objective of PROMESA was to ensure that Commonwealth issued timely audited financial statements.  To that end, a prerequisite to FOMB issuing a restructuring certification is its determination that the entity "has … adopted procedures necessary to deliver timely audited financial statements."  48 U.S.C. §2146(a)(2)(A).

At the time of the sale of Puerto Rico's 2012A bonds in March-April 2012, Puerto Rico's audited financials were generally timely.  Its fiscal 2011 audited financials were issued 4/27/2012, about 302 days after fiscal year end.  Hein Ex. G.  The fiscal 2013 audited financials were issued within a year (on 6/30/2014).  Hein Ex. H.  It was only after Puerto Rico in 2015 sought to avoid payment of its Constitutional "first claim" debt that Puerto Rico became seriously delinquent in issuing its financials.  Commonwealth's delays in providing audited financial statements became even worse after PROMESA was enacted and FOMB was installed.  The "latest" audited financial statement, for the year ended June 30, 2017, was not issued until September 1, 2020, 1,158 days (over three years) after the fiscal year end.  Hein Decl. Exs. I, J.

The Disclosure Statement argues "timely release of audited financial information has long been a problem for Puerto Rico."  #16741-page-558-of-564-n.387.  To avoid the misimpression that systemic grossly untimely release of audited financials predates Puerto Rico's 2015 decision to avoid payment, the Disclosure Statement should specify for each Debtor:

- The days delay between the end of the fiscal year and the issuance of audited financials for each of the 5 fiscal years prior to PROMESA becoming effective.

- The days delay between the end of the fiscal year and the issuance of audited financials for each fiscal year after PROMESA became effective.

**G.     Disclosure of facts bearing on whether the Plan complies with the
requirement of 48 U.S.C. §2174(b)(6) that the Plan be in the "best interests"
of creditors.**

Exhibit N is blank; a note states "[t]he Best Interests Test Reports will be filed at a later

date."  This omission renders the Disclosure Statement fatally deficient.  48 U.S.C. §2174(b)(6)

requires Debtors to establish that "the plan is feasible and in the best interests of creditors, which

shall require the court to consider whether available remedies under the non-bankruptcy laws and

constitution of the territory would result in a greater recovery for the creditors than is provided

by such plan."  §2141(b)(1)(N) read together with §2174(b)(7) requires that the Plan "respect the

relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or

agreements of a covered territory or covered territorial instrumentality in effect prior to June 30,

2016."  Unless Constitutional "first claim" secured debt is paid in full, with accrued interest,

there is no lawful basis for Plan provisions providing distributions to other creditors, much less

for new cash payments to public employees, or for allocation of future "surplus" funds to pay

public employee bonuses or retirement benefits.  The Disclosure Statement fails to demonstrate

compliance with §§2174(b)(6), 2141(b)(1)(N) and 2174(b)(7).

**H.     References to confidential mediation-negotiation process.**

I object to any reference to the mediation-negotiation process in the Disclosure

Statement.  The mediation and litigation were supposed to be kept "entirely separate" and "not

be conflated" and no information "regarding events or actions in the mediation process" was to

be submitted (#1836-page-2-of-2; #1841).  If there nevertheless is any such reference, for

context Debtors should specify:

- Which bondholders participated in the negotiation process, identifying, for each, the
  name of the holder and the amount of holdings by class of such holder.  Investors are
  entitled to know who negotiated the Plan and what their interests were.

- Whether any Retail Investor participated in the negotiation of the Plan, identifying
  who (if anyone) participated, and the specifics of their participation.  If no Retail

Investors in the 50 states participated in the negotiation of the Plan, that should be stated.

I.    **Information pertinent to Commonwealth's ability to pay.**

    1.    **1.03% property tax**.  The Disclosure Statement refers to the 1.03% property tax that will be used as the first source of payments to bondholders, and to certain historically conditionally appropriated funds.  (#16741-page-43,128-to-129,434-of-564).  Debtors should disclose (i) annual amount collected from the 1.03% property tax since July 1, 2016; (ii) projected 1.03% collections in future years; (iii) estimated amount of 1.03% property tax if assessed based on actual current market value; and (iv) the nature of, annual amount of, and projected future collections of, the "historically conditionally appropriated" funds.

    2.    **Debt service as percent of Commonwealth revenues**.  Add a chart showing, as a percent of revenue, Commonwealth "first claim" GO debt service (x) actually paid (i) in the five fiscal years prior to enactment of PROMESA on June 30, 2016, and (ii) in each fiscal year after the enactment of PROMESA, and (y) projected for each future fiscal year the New GO Bonds will be outstanding.

    3.    **Debt per capita, including state, local and federal debt**.  Disclosure Statement Exhibit G compares Puerto Rico debt levels to U.S. states.  (#16741-7-pages-65-to-72-of-309).  The Disclosure Statement should state that, while Commonwealth was selling its debt to investors, Puerto Rico stated that "any comparison of public debt levels of Puerto Rico with the states should include state, local and federal debt" and that "[i]f one factors in the federal debt load, [Puerto Rico] would rank last in outstanding debt per capita amongst all US jurisdictions," (#4606-8-page-1,57-of-180; Hein Ex. K).

    4.    **Disclose, with appropriately descriptive section headers, other information pertinent to whether any adjustment of Commonwealth Constitutional "first claim" debt is both reasonable and necessary.**

a.    Disclose ***current*** cash positions, including the balance in (i) Commonwealth's TSA account and (ii) in other categories of Commonwealth accounts as of **6/30/2021**.

b.      Disclose, in table form, the amount of fees and compensation applied for, and FOMB and Commonwealth administrative, consulting and other costs incurred, to date in these Title III proceedings.  The table should break the total down by its principal components, such as costs of FOMB's counsel, Commonwealth's counsel, the counsel for each committee, and FOMB's and Commonwealth's own Title III-related administrative, consulting and other costs.

c.      Commonwealth issued a study in 2014 as part of its Tax Reform Assessment Project, conducted with the assistance of KPMG, that included a comparison of taxes as a percent of GDP in Puerto Rico as compared to other jurisdictions, including OECD countries. Debtors should update the data in Table 2 on #4606-8-page-84-of-180 (Hein Ex. O) and disclose that updated data.

d.      Disclose, in table form, for fiscal 2017 to present, each reduction in taxes enacted by the Commonwealth and an estimate of the revenue loss from each such reduction.

e.      Disclose the number of public employees paid by or through Commonwealth as of July 1 in each of FY 2017-2021, and at present, and the aggregate amounts paid in salary and benefits to those public employees for each of FY 2017-2021.

f.      Disclose, in one clearly labeled section regarding "Changes in public employee compensation", whether since July 1, 2016 (i) there has been any downward adjustment in the pay or benefits of public employees (if so, describe the nature and amount of such adjustments), and (ii) whether there has been any upward adjustment in pay or benefits of public employees (if so, describe the nature and amount of such adjustments).

g.      State whether since July 1, 2016 (i) there has been any downward adjustment in pension or other retirement benefits paid to retired employees (if so, describe the nature and amount of such adjustments), (ii) whether such benefits have been paid, including benefits paid on a "pay go" basis (if so, specify the aggregate amount paid, including on a "pay go" basis, in each year since the filing of this Title III), and (iii) whether there has been any upward adjustment in such benefits (if so, describe the nature and amount of such adjustments).

30

h.        State in table form for each fiscal year beginning July 1, 2015 (the year before PROMESA was adopted) the amount of:  (i) Commonwealth tax collections and other revenues from all sources (excluding monies received from federal government), (ii) monies received from federal government, and (iii)  Commonwealth total expenses.  In addition, for each such fiscal year, state and break down in such table, the amount for:  (a) Christmas, summer and other bonuses for public employees, (b) payments to or for public employee retirement systems or benefits, including "pay go" benefits; (c) compensation and benefits for public employees (other than bonuses referred to in "(a)" and "b"); (d) payment of (x) consulting services, (y) "advertising, representation or artistic services", and (z) "administrative consultancy services" (these are categories listed in the Puerto Rico contract database, contratos.ocpr.gov.pr); (e) interest paid on Commonwealth GO debt; (f) principal repaid on Commonwealth GO debt; (g) interest on Commonwealth guaranteed debt paid by Commonwealth itself; (h) principal of Commonwealth guaranteed debt repaid by Commonwealth itself.  The chart should also show the percentage increase or decrease in each category year-to-year.

i.        State whether FOMB and/or Commonwealth ever defined what expenditures are essential and which are not; if yes, specify what the definition is and where in the public record that can be located.

j.        Disclose (x) Governor Pierluisi's statement at FOMB's April 2021 public meeting that FOMB has failed to incorporate into the fiscal plan any reasonable estimate of Medicaid funding, despite the facts that Congress is committed to fund Medicaid at the present levels, and that no one is talking about reducing Medicaid for Puerto Rico from $2 billion to $400 billion per year, and (y) the effect added federal Medicaid funds for Puerto Rico in the President's budget announced in May 2021 would have on the forecasts in the FOMB fiscal plan.

k.        Disclose in table form, (x) year-by-year, for each of fiscal 2018-2021, (i) the initial certified fiscal plan assumption as to federal funding for Medicaid and other medical care, and (ii) the amount of such federal funding actually received with respect to fiscal 2018-2021, and (y) for each future fiscal year covered in FOMB's fiscal plan, the effect on the surplus (or

31

deficit) of federal Medicaid funding (i) continuing into future years at the fiscal 2021 level, and, (ii) alternatively, being received in amounts provided for in President Biden's budget announced in May 2021.

l.      Disclose in table form amounts for "Health-Agency #187" expended in fiscal 2018, 2019 and 2020, budgeted in 2021 and budgeted in 2022, from or for each of (x) the General Fund, (y) Special Revenue Funds, and (z) federal funding.

m.      Identify all assets (or categories of assets) of Commonwealth that could be sold or privatized and an estimate of the value thereof.  If this information has not been compiled, state why not.

n.      Identify each recommendation, request or direction by FOMB for adjustments in Puerto Rico budget, finances or management that has not been fully implemented, and the amounts FOMB estimated could have been saved, or could have been generated in taxes (including from economic growth), had each such recommendation, request, or direction been implemented.

o.      Identify (x) each reform relating to (i) the labor markets or employment, or (ii) the ease of doing business, that FOMB has recommended, requested or directed, and whether Commonwealth has implemented such; and (y) FOMB's estimate (or range of estimates) as to the fiscal impact on Commonwealth's finances of any such reforms Commonwealth has not implemented.

p.      Disclose the date, amount and recipient of any transfer of Commonwealth property of $100 million or more (in one or a series of related transactions) from July 1, 2017 (the date of Commonwealth's last audited financial statement) to present.

**J.      Consequences of objecting (or not), and of voting yes versus no.**

1.      I object to the Retail Support Fee being contingent on a class of Retail Investors voting "yes" to accept the Plan.  The Plan should be revised so that all consideration to the Retail Investor classes, including the so-called "Retail Support Fee," is distributed without regard to the votes of such classes or any individual bondholders themselves.

2.      The Disclosure Statement should present in table form the consequences of objecting (or not), or voting (yes, or no, or not voting), including addressing the matters identified in the following table:

| Consequences of Objecting or Voting | |
|---|---|
| Action | Consequence |
| Object | You preserve rights asserted in the objection (regardless of whether you vote yes, or no, or do not vote); objecting will not affect amount recovered. |
| Failing to object | You do not preserve rights (regardless of whether you vote yes, or no, or do not vote); failing to object will not affect amount recovered. |
| Vote Yes | Whether you receive a share of Retail Support Fee depends upon whether a majority of the par amount of the bonds in your class are voted "yes," regardless of how you vote. |
| Vote No | |
| Failing to Vote | |

**K.      My standing to object to the adequacy of the Disclosure Statement.**

1.      I am entitled to a comprehensible and complete Disclosure Statement.

2.      Under the proposed Plan, the vote of other individual bondholders in the Retail Investor classes will directly impact the consideration I receive.  *See, e.g.*, #16740-page-71-to-72,86-of-234.  11 U.S.C. §1125(a) frames the required disclosure in terms of what would "enable … a hypothetical investor of the relevant class to make an informed judgment about the plan." Even if I might be better able to understand the Disclosure Statement than the typical retail investor, the statutory test is based on adequacy for the typical retail investor.

3.      This Court in any event has a responsibility to ensure the Disclosure Statement complies with §1125(a) and is comprehensible to Retail Investors who have no committee or committee professionals to protect their interest.

**II.      ADDITIONAL MATTERS PRECLUDING A FINDING THAT THE DISCLOSURE STATEMENT IS ADEQUATE.**

1.      The validity, secured status and priority of the GO and PBA bonds must be ruled upon by the court.  Rights of bondholders cannot be compromised without an adjudication in an adversary proceeding, as Due Process and Rule 7001(2) require.

2.      The tax treatment of the New GO Bonds must first be determined and disclosed. Bondholders who bought all tax-exempt bonds should know whether they will receive all tax-exempt bonds.  Also, if FOMB plans a reprise of its COFINA gambit (Disclosure Statement first, IRS determination second) that should be nipped in the bud now.  *See* Part I.D. above.

## III.    OBJECTION TO WAIVER OF RULE 3020(e) AUTOMATIC STAY, PROPOSED DISCLOSURE IF WAIVER IS RETAINED AND REQUEST FOR STAY OF CONSUMMATION UNTIL ANY TIMELY APPEAL IS ADJUDICATED.

I object to including any waiver of the Rule 3020(e) automatic stay in the Plan (*see* Plan § 88.20) or in any order related to the plan.  If that provision remains, there should be a prominent statement in the upfront summary of the Disclosure Statement to the following effect:

> **"Under Plan § 88.20, the Plan, if approved, will result in the waiver of an otherwise automatic 14 day stay under the Bankruptcy Rules that would (if not waived) allow an appeal to be taken before the Plan is consummated.  Debtors' position is that unless someone objects specifically to this provision of Plan § 88.20, they lose their ability to seek relief in any appeal."**

I also request a stay of confirmation pending the determination of a timely-filed appeal or, in the alternative, at least until the First Circuit rules on an application for stay presented to it.

## IV.    RESERVATION OF RIGHTS AND CONTINUED ASSERTION OF PRIOR OBJECTIONS.

I reserve and preserve all objections to the Plan, including objections to proposed classification of claims.  I also continue to assert the objections asserted in Docket#16387, and the prior objections summarized in #16387 (*see* #16387-page-20-to-21-of-22).

June 9, 2021

Respectfully Submitted,

/s/ Peter C. Hein
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
petercheinsr@gmail.com
Claim 10696
GO Bonds:  500,000 par amount, plus
unpaid interest to date
[5 separate CUSIPS:   74514LVX2
                                      74514LWA1
                                      74514LWM5
                                      74514LWZ6
                                      74514LB63]
PBA Bonds:  200,000 par amount, plus
unpaid interest to date
[CUSIP:  745235M24]

## Declaration pursuant to 28 U.S.C. §1746

I declare under penalty of perjury that the foregoing statements are true and correct to the best of
my knowledge and belief.

Executed on this 9th day of June 2021.

/s/ Peter C. Hein
Peter C. Hein

**<u>Certificate of Service</u>**

I, Peter C. Hein, certify that I have caused the foregoing Response and Objection of Individual

Bondholder to Debtors' Motion to Approve Disclosure Statement to be served via the Court's

CM/ECF system.

June 9, 2021

_____/s/ Peter C. Hein_____
Peter C. Hein

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

           Debtors.

-------------------------------------------------------------------x

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)

**[Accompanying Response to Docket #16741 and #16742 as well as #16756 and 16758 (to the
extent such filings seek approval of the Disclosure Statement)]**

**DECLARATION OF PETER C. HEIN ACCOMPANYING RESPONSE AND
OBJECTION OF INDIVIDUAL BONDHOLDER TO DEBTORS' APPLICATION FOR
APPROVAL OF DISCLOSURE STATEMENT**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following

statements are true and correct to the best of my knowledge and belief:

1.      This declaration attaches certain documents, or excerpts therefrom, referred to in

my "Response And Objection of Individual Bondholder to Debtors' Application For Approval of

Disclosure Statement."  Excerpts are submitted to permit the Court to focus on the specific pages

pertinent to the points the exhibit supports without overburdening the Court with lengthy

documents.  When I submit pertinent excerpts, I refer to a public website or location in the

record where the full document can be found or I will provide full copies if requested by the

Court.  The factual statements in my "Response And Objection of Individual Bondholder to

Debtors' Application For Approval of Disclosure Statement" are true and correct to the best of

my knowledge and belief.

**Official Statements**

2.      Attached as Exhibits A and B are excerpts from the Series 2009C and

Series 2012A official statements.  Similar material appears in other Official Statements.  The full

text of the Official Statements is publicly available on the Municipal Securities Rulemaking

Board's EMMA website (emma.msrb.org).  One can simply type in a CUSIP (*e.g.*, 74514LWA1

for Series 2009C or 74514LB63 for Series 2012A) and click on "Disclosure Documents."  Links

to the full text of the two excerpted Official Statements are https://emma.msrb.org/EP366621-

EP287922-EP683174.pdf (for 2009C) and https://emma.msrb.org/EP615787-EP478117-

EP878493.pdf (for 2012A).

**Trade activity for Puerto Rico GO bonds**

3.      Trade activity for each CUSIP for each series of Puerto Rico GO bonds can be

located on the MSRB emma website, emma.msrb.org.  Just type into the search box the CUSIP,

and then click on the "Trade Activity" tab.

4.      Attached as Exhibit C are excerpts from the Trade Activity for CUSIP

74514LWA1, 6% coupon maturing 7/1/2039, Commonwealth of Puerto Rico GO Bond series

2009C, issued December 16, 2009.  The trades in the excerpts attached as Exhibit C begin on

12/3/2009 (on the last page of Exhibit C) (the trade activity appears in reverse chronological

order) and continue through 2/4/2011 (on the first page of Exhibit C).

5.      Attached as Exhibit D are excerpts from the Trade Activity for CUSIP

74514LB63, 5.125% coupon maturing 7/1/2037, Commonwealth of Puerto Rico GO Bond series

2012A, issued April 3, 2012.  The trades in the excerpts attached as Exhibit D begin on 3/8/2012

(on the last page of Exhibit D) (the trade activity appears in reverse chronological order) and

continue through 4/17/2013 (on the first page of Exhibit D)

**Discount rate used in operation of retirement plans**

6.      Attached as Exhibit E are excerpts from the audited financial statements for the

Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, for the

fiscal year ended June 30, 2017 (dated June 29, 2020).  (The full text of this document can be

located by typing into Google "Puerto Rico employees retirement system audited financial statements dated June 30, 2017" or by using the link:  https://www.retiro.pr.gov/wp-content/uploads/ERS_2017_issued_FS.pdf or by typing into Google https://www.retiro.pr.gov/; then click on "Topics of Interest", then "Financial Statements", then for fiscal year 2016-2017 under Financial Statements – Employees click on "Watch")

7.      Attached as Exhibit F are excerpts from the Puerto Rico Government Employees Retirement System June 30, 2017 Actuarial Valuation Report (dated March 26, 2019).  (The full text can be located by typing into Google "Puerto Rico employees retirement system actuarial valuation report for fiscal year ended June 30, 2017" or by using the link: https://www.retiro.pr.gov/wp-content/uploads/PRGERS_Val_June302017.pdf or by typing into Google https://www.retiro.pr.gov/; then click on "Topics of Interest", then "Financial Statements", then for fiscal year 2016-2017 under Actuarial  Valuation – Employees click on "Watch".  In addition, a copy of this report appears in the record at #16884-2-page-2-to-70-of-70.)

**<u>Audited Financial Statements for Commonwealth</u>**

8.      Annexed as Exhibit G are excerpts from Commonwealth's audited financial statements for the fiscal year ended 6-30-2011, dated and issued 4-27-2012.  For the full text, one can go to emma.msrb.org, type in a CUSIP for a Puerto Rico GO issue, for example, 74514LVX2, click on "Disclosure Documents" tab, scroll down the web page to "Audited Financial Statements or CAFR" and click on "Document Archive" which appears at the bottom left corner of the web page.  Scroll up to "Financial Operating Filing (3.8 MB)" 4/30/2012.

9.      Attached as Exhibit H are excerpts from Commonwealth's audited financial statements for the fiscal year ended 6-30-2013 (dated 6-30-2014).  For the full text, one can also go to emma.msrb.org, type in a CUSIP for a Puerto Rico GO issue, for example, 74514LVX2, click on "Disclosure Documents" tab, scroll down the web page to "Audited Financial

Statements or CAFR" and click on "Document Archive", which appears at the bottom left corner of the web page.  Scroll up to "Financial Operating Filing (1.2 MB)" 6/30/2014.

10.    Attached as Exhibit I is the cover sheet reflecting Commonwealth's posting of its 6-30-2017 audited financial statements on emma on September 1, 2020.  For the full text, one can also go to emma.msrb.org, type in a CUSIP for a Puerto Rico GO issue, for example, 74514LVX2, click on "Disclosure Documents" tab, scroll down the web page to "Audited Financial Statements or CAFR" which appears at the bottom of the web page.

11.    Attached as Exhibit J are excerpts from Commonwealth's audited financial statements for the fiscal year ended 6-30-2017 (dated 8-31-2020 and posted on emma 9-1-2020). For the full text, go to emma.msrb.org, type in a CUSIP for a Puerto Rico GO issue, for example, 74514LB63, click on "Disclosure Documents" tab, scroll down the web page to "Audited Financial Statements or CAFR" which appears at the bottom of the web page.

**Commonwealth's representations to investors concerning the level of its debt as compared to the states.**

12.    Attached as Exhibit K are excerpts from a presentation made in a Commonwealth of Puerto Rico investor webcast on October 15, 2013.  On page 57, Puerto Rico was explicit that "any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt" and that "If one factors in the federal debt load, PR would rank **last** in outstanding debt per capita among all US jurisdictions" (emphasis added), citing to US Bureau of the Census and the Government Development Bank for Puerto Rico as the source of the data. The full presentation is available by going to "Government Development Bank of Puerto Rico – Investor Presentations," on the Internet, scroll down to 10-15-2013, click on Presentations, go to page 57.  A full copy is also in the record at #4606-8-page-1-to-73-of-180.

**Materials pertinent to Projections in FOMB certified fiscal plans for Commonwealth**

13.    Attached as Exhibit L is a June 1, 2021 Press Release from Puerto Rico Federal Affairs Administration titled "Governor Pierluisi Outlined Plan for State-Like Treatment on Puerto Rico's Medicaid Program"

14.     Attached as Exhibit M are excerpts from the June 29, 2018 certified fiscal plan for Puerto Rico.  The full text can be located by going to the FOMB website https://oversightboard.pr.gov/, click on "Fiscal Responsibilities" tab, and click on "2018-June" in the section for "Past versions of the Certified Fiscal Plan for the Commonwealth of Puerto Rico".

15.     Attached as Exhibit N are excerpts from the "Budget of the U.S. Government fiscal year 2022.  For the full text, go to https://www.govinfo.gov/content/pkg/BUDGET-2022-BUD/pdf/BUDGET-2022-BUD.pdf.  Or type into Google "Budget of the U.S. Government Joseph R. Biden Jr. Friday, May 28, 2021".

**Puerto Rico taxation levels**

16.     Attached as Exhibit O are excerpts from the "Commonwealth of Puerto Rico Tax Reform Assessment Project", Unified Tax Code of Puerto Rico: Tax Policy Implementation Options, Executive Summary, October 31, 2014".   The full text of this document appears in the record at #4606-8-page-76-to-93-of-180.

Dated:  June 9, 2021

                                                    /s/ Peter C. Hein                
                                                    Peter C. Hein

**NEW ISSUE - BOOK-ENTRY ONLY**
**See "Book-Entry Only System" under THE BONDS**

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions.  Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations and will not be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations.  See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds.  Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$210,250,000**
# COMMONWEALTH OF PUERTO RICO
**Public Improvement Refunding Bonds, Series 2009 C**
**(General Obligation Bonds)**

**Dated:  Date of Delivery**                    **Due:  July 1, as shown on the inside cover**

Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on July 1, 2010.  The Bonds are subject to redemption prior to maturity as set forth herein.

**The Bonds are general obligations of the Commonwealth of Puerto Rico.  The good faith, credit and taxing power of the Commonwealth of Puerto Rico are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds.  The Constitution of Puerto Rico provides that public debt of the Commonwealth of Puerto Rico, which includes the Bonds, constitutes a first claim on available Commonwealth of Puerto Rico resources.**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds.  See "Book Entry Only System" under THE BONDS.

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions.  Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.  It is expected that the Bonds will be available for delivery through the facilities of DTC on or about December 16, 2009.

| | | |
|---|---|---|
| **Morgan Stanley** | **Citi** | **JP Morgan** |
| **Barclays Capital** | **Goldman, Sachs & Co.** | **Merrill Lynch & Co.** |
| **Ramírez & Co., Inc.** | **UBS Financial Services Incorporated of Puerto Rico** | |
| **FirstBank Puerto Rico Securities** | **Popular Securities** | **Santander Securities** |

December 3, 2009

**$210,250,000**
**COMMONWEALTH OF PUERTO RICO**
**Public Improvement Refunding Bonds, Series 2009 C**
**(General Obligation Bonds)**

$210,250,000 6.00% Term Bonds due July 1, 2039 - Yield 6.200% - CUSIP[*] 74514LWA1

---

[*] Copyright 2009, American Bankers Association. CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP number listed above is being provided solely for the convenience of bondholders and the Commonwealth does not make any representation with respect to such number or undertake any responsibility for its accuracy now or at any time in the future. The CUSIP number is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of the Bonds.

# Commonwealth of Puerto Rico

## Governor

LUIS G. FORTUÑO

## Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

| | | |
|---|---|---|
| KENNETH D. MCCLINTOCK<br>*Secretary of State* | ANTONIO M. SAGARDÍA<br>*Secretary of Justice* | JUAN C. PUIG<br>*Secretary of the Treasury* |
| DR. EDWARD MORENO<br>*Acting Secretary of Education* | MIGUEL ROMERO<br>*Secretary of Labor and Human Resources* | DR. LORENZO GONZÁLEZ<br>*Secretary of Health* |
| JAVIER RIVERA AQUINO<br>*Secretary of Agriculture* | RUBÉN A. HERNÁNDEZ<br>*Secretary of Transportation and Public Works* | JOSÉ R. PÉREZ-RIERA<br>*Secretary of Economic Development and Commerce* |
| YANITSIA IRIZARRY<br>*Secretary of Family Affairs* | YESEF Y. CORDERO<br>*Secretary of Housing* | DANIEL J. GALÁN<br>*Secretary of Natural and Environmental Resources* |
| LUIS G. RIVERA MARÍN<br>*Secretary of Consumer Affairs* | HENRY NEWMANN<br>*Secretary of Sports and Recreation* | CARLOS M. MOLINA<br>*Secretary of Corrections and Rehabilitation* |

———————————————

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER A. GÓNZALEZ
Speaker, House of Representatives

*Fiscal Officers*

MARÍA SÁNCHEZ BRAS
Director, Office of Management and Budget

CARLOS M. GARCÍA
President and Chairman of the Board of Directors, Government Development Bank for Puerto Rico

DS Obj. 00003

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ........................................................................................................1
OVERVIEW ........................................................................................................................................3
RECENT DEVELOPMENTS ................................................................................................................4
    Revised Economic Data for Fiscal Years 2009 and 2010...........................................................4
    Results for Fiscal Year 2009........................................................................................................4
    Approved Budget for Fiscal Year 2010.......................................................................................5
    Actuarial Valuation and Cash Shortfall of the Employees Retirement System ..........................5
    Amendments to Act No. 7 ...........................................................................................................6
    Approval of Public-Private Partnerships Act................................................................................7
    Recent Bond Issues by the Commonwealth and Certain Instrumentalities .................................7
    Orders Requiring Reduction in Service Contracts and Leases.....................................................8
    Implementation of Second Round of Layoffs under Act No. 7 ....................................................8
    Progress in the Implementation of the Fiscal Stabilization Plan...................................................9
PLAN OF FINANCING.........................................................................................................................9
    Sources and Uses of Funds ..........................................................................................................9
THE BONDS .......................................................................................................................................10
    General ......................................................................................................................................10
    Book-Entry Only System...........................................................................................................10
    Authorization............................................................................................................................10
    Redemption...............................................................................................................................10
    Notice of Redemption; Effect of Redemption ...........................................................................11
    Security.....................................................................................................................................12
    Payment Record.........................................................................................................................13
    Debt Limitation.........................................................................................................................13
    Maturity Limitation ...................................................................................................................15
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ......................................................................16
    Public Sector Debt ....................................................................................................................16
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ..........17
TAX MATTERS ..................................................................................................................................18
LEGAL MATTERS ..............................................................................................................................18
LEGAL INVESTMENT........................................................................................................................19
UNDERWRITING ...............................................................................................................................19
VERIFICATION OF MATHEMATICAL COMPUTATIONS .................................................................20
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO .........................................................20
RATINGS............................................................................................................................................20
CONTINUING DISCLOSURE..............................................................................................................20
MISCELLANEOUS .............................................................................................................................23

Appendix I – Proposed Form of Opinion of Bond Counsel ............................................................... I-1

Appendix II – Description of the Book-Entry System.......................................................................II-1

Appendix III – List of Bonds with Refunded Interest .....................................................................III-1

DS Obj. 00004

**$210,250,000**
**COMMONWEALTH OF PUERTO RICO**
**Public Improvement Refunding Bonds, Series 2009 C**
**(General Obligation Bonds)**

**INTRODUCTORY STATEMENT**

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $210,250,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2009 C (the "Bonds").

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Department of Treasury of the Commonwealth (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico, Luis G. Fortuño (the "Governor"), on December 3, 2009.

Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement incorporates by reference (i) the Commonwealth's Financial Information and Operating Data Report, dated May 15, 2009 (the "Commonwealth Report"), and (ii) the Commonwealth's Comprehensive Annual Financial Report for the fiscal year ended June 30, 2008, as amended, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"). The Commonwealth Report and the Commonwealth's Annual Financial Report have been filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org).

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the estimated year-end results of fiscal year 2009, the proposed budget for fiscal year 2010, and the debt of the Commonwealth's public sector, and should be read in its entirety and in connection with the information included under RECENT DEVELOPMENTS herein. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2008, together with the independent auditor's report thereon, dated August 12, 2009, of KPMG LLP, certified public accountants. KPMG LLP did not audit the financial statements of the Puerto Rico Public Buildings Authority's ("PBA") capital project fund or The Children's Trust special revenue fund (major funds), and certain activities, funds and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The report by KPMG LLP contains an emphasis paragraph for

DS Obj. 00005

the adoption of Governmental Accounting Standards Board (GASB) Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits other than Pensions*, during the year ended June 30, 2008.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

Under its existing continuing disclosure agreements, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial and demographic information through the end of the prior fiscal year, including the Commonwealth's Annual Financial Report. In the recent past, the Commonwealth has been unable, due to accounting rules changes and other reasons (mostly related to delays in receipt of component units' audited financial statements), to file the Commonwealth's Annual Financial Report by the May 1 continuing disclosure update filing deadline. The Commonwealth's Annual Financial Report for the fiscal year ended June 30, 2008 was not filed prior to the deadline of May 1, 2009 because various component units did not submit their audited financial statements to the central government's external auditors on time. Finally, the Commonwealth Report for the fiscal year ended June 30, was filed after the Commonwealth's filing deadline of May 1, 2009.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained by visiting the Government Development Bank for Puerto Rico's (the "Government Development Bank" or the "Bank") website at www.gdbpr.com. No additional information on Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

DS Obj. 00006

## OVERVIEW

Puerto Rico is located approximately 1,600 miles southeast of New York City.  According to the U.S. Census Bureau, its population was 3,808,610 in 2000 (3,954,037 as of July 1, 2008 according to the most recent U.S. Census Bureau estimate).

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states.  It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico.  No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.  Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its dominant sectors.  Puerto Rico's economy is closely linked to the United States economy.  In fiscal year 2008 (which ended on June 30, 2008), the Commonwealth's gross national product (preliminary, in current dollars) was $60.8 billion, and personal income per capita (preliminary, in current dollars) was $14,237.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue.  The Commonwealth's policy has been and continues to be to maintain the level of such debt within a prudent range below the constitutional limitation.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury ("Treasury Department"), the Office of Management and Budget ("OMB") and Government Development Bank.   The Treasury Department is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget.  OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the estimated year-end results of fiscal year 2009, the proposed budget for fiscal year 2010, and the debt of the Commonwealth's public sector.   The Commonwealth Report should be read in its entirety.

DS Obj. 00007

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement.  The Bonds are subject to redemption at the times and at the prices set forth below in "Redemption."   Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

### Book-Entry Only System

*Appendix II* to this Official Statement contains information concerning DTC and DTC's book-entry only system.  The information contained in *Appendix II* to this Official Statement has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds:  (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

Neither the Commonwealth nor the Registrar or any agent of the Commonwealth or the Registrar will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to:  (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds.  See *Appendix II - Book-Entry Only System*.

### Authorization

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly.  Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary to issue the Bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor.  In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

### Redemption

*Optional Redemption*.  At the option of the Secretary of the Treasury and upon at least 30 days' notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2019, either in whole or in part, on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

DS Obj. 00008

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

## Security

*Provision for Payment of Public Debt*

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Treasury Department in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 allocated a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund,

DS Obj. 00009

the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund.  Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary.  As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank.  Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid.

Act No. 39 expressly relates to direct obligations of the Commonwealth.  It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues

13

DS Obj. 00010

raised under the provisions of Commonwealth legislation and deposited into the Treasury Department (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department and motor vehicle fuel taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the Constitutional provisions relating to the Bonds.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest category by Moody's and S&P), none of which is eligible to be used for a legal defeasance under Puerto Rico law ("non-eligible investments"). Since bonds refunded with proceeds of non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index, and in connection with such consumer price index floating rate bonds (said portion, the "2006 CPI Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof. In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's

DS Obj. 00011

outstanding $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of an initial fixed rate period on the 2003C Swap Bonds. In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof. In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.  Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.  In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments (1) on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap") and (2) on $850,000,000 notional amount of public improvement bonds based on the published short-term SIFMA municipal swap rate and is receiving from its counterparties payments on the same notional amount based on a published index of municipal bonds having a maturity of 10 years (the "constant maturity swap").

After giving effect to the issuance of the Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $984,688,996 in the fiscal year ending June 30, 2016 (based on the assumption that (i) the bonds refunded with non-eligible investments are treated as being outstanding, (ii) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (iii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2008 Swap Bonds, bear interest at 12% per annum and (iv) the public improvement bonds to which the basis swap and the constant maturity swap relate bear interest at their stated interest rates rather than the rates set forth in said swaps).  This amount ($984,688,996) is equal to 12.82% of $7,679,421,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2008 and the preliminary adjusted internal revenues for the fiscal year ended June 30, 2009.  If the bonds refunded with non-eligible investments were treated as not being outstanding, and the interest on the outstanding bonds described in items (i) through (iv) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 10.77%.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under PUBLIC CORPORATIONS in the Commonwealth Report. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

## Maturity Limitation

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

DS Obj. 00012

# PUBLIC SECTOR DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The following table presents a summary of the public sector debt of the Commonwealth as of June 30, 2009, as adjusted. The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report.

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in millions)

|  | June 30, 2009 | As Adjusted |
|---|---|---|
| Direct full faith and credit obligations[1] | $ 9,006 | $9,511 |
| TRANs line of credit | - | - |
| Sales Tax debt[2] | 12,880 | 12,880 |
| Municipal debt | 2,997 | 2,997 |
| Puerto Rico guaranteed debt[3] | 4,145 | 4,145 |
| Debt supported by Puerto Rico appropriations or taxes[4] | 1,455 | 1,455 |
| Public corporations and agencies | 22,496 | 22,496 |
| Sub-total | $52,979 | $53,484 |
| Limited obligation/non-recourse debt[5] | 5,435 | 5,435 |
| Total public sector debt | $58,414 | $58,919 |

---

\* Totals may not add due to rounding.

(1) Includes general obligation bonds and as adjusted to include the issuance of the Bonds and other general obligation bonds issued since June 30, 2009.

(2) Includes Public Finance Corporation and COFINA bonds.

(3) Consists of $594.6 million of bonds issued by Aqueduct and Sewer Authority, $321.2 million of State Revolving Fund Loans incurred under various federal water laws, $181.9 million of bonds issued by Port of the Americas Authority and $3.047 billion of Public Buildings Authority bonds (does not include the issuance in July 2009 of $330,935,000 Government Facilities Revenue Refunding Bonds, Series P or in October 2009 of $152,540,000 Government Facilities Revenue Refunding Bonds, Series Q). Excludes $267 million of Government Development Bank bonds payable from available moneys of Government Development Bank.

(4) Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund.

(5) Includes the following: $1.4 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $197 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $152.7 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $79.6 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; approximately $82.4 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities; $2.948 billion of Employees Retirement System Senior Pension Funding Bonds, Series A, B and C, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds; $368.6 million of Housing Finance Authority Subordinate Bonds Series 2008, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; and $100 million of Housing Finance Authority Housing Revenue Bonds Series 2008, which principal is payable primarily by the proceeds of a Permanent Loan to be made by the Authority to the Limited liability Co. The interest on the short term bonds will be paid from amounts on deposit in the Bond Debt Service Fund and the Bond Debt Service Reserve Fund which have been funded from the proceeds of the Short Term Bonds and Equity Contribution from the Limited Liability Co. Principal on the Short Term Bonds is payable from the proceeds of the Permanent Loan to be made by the Authority using moneys received as a grant from Department of Housing (DOH).

*Source*: Government Development Bank for Puerto Rico

DS Obj. 00013

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on December 16, 2009; (ii) the Bonds; and (iii) total Commonwealth general obligation bonds, adjusted for the issuance of the Bonds. The table excludes debt service on Commonwealth general obligation bonds that have been refunded with the proceeds of refunding bonds invested in non-eligible investments, notwithstanding that such bonds will be considered to be outstanding under their authorizing resolution and for purposes of calculating the Commonwealth's debt limitation. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service[1] | The Bonds | | Grand Total |
|---|---|---|---|---|
| | | Principal | Interest | |
| 2010 | $   375,970 | | $   6,833 | $   382,803 |
| 2011 | 789,185 | | 12,615 | 801,800 |
| 2012 | 795,923 | | 12,615 | 808,538 |
| 2013 | 799,004 | | 12,615 | 811,619 |
| 2014 | 786,528 | | 12,615 | 799,143 |
| 2015 | 800,603 | | 12,615 | 813,218 |
| 2016 | 800,457 | | 12,615 | 813,072 |
| 2017 | 726,136 | | 12,615 | 738,751 |
| 2018 | 710,217 | | 12,615 | 722,832 |
| 2019 | 779,081 | | 12,615 | 791,696 |
| 2020 | 814,197 | | 12,615 | 826,812 |
| 2021 | 662,093 | | 12,615 | 674,708 |
| 2022 | 572,050 | | 12,615 | 584,665 |
| 2023 | 525,149 | | 12,615 | 537,764 |
| 2024 | 502,112 | | 12,615 | 514,727 |
| 2025 | 502,237 | | 12,615 | 514,852 |
| 2026 | 491,846 | | 12,615 | 504,461 |
| 2027 | 490,163 | | 12,615 | 502,778 |
| 2028 | 490,854 | | 12,615 | 503,469 |
| 2029 | 446,408 | | 12,615 | 459,023 |
| 2030 | 442,788 | | 12,615 | 455,403 |
| 2031 | 445,125 | | 12,615 | 457,740 |
| 2032 | 263,884 | | 12,615 | 276,499 |
| 2033 | 225,925 | | 12,615 | 238,540 |
| 2034 | 171,898 | | 12,615 | 184,513 |
| 2035 | 130,398 | $ 37,300 | 12,615 | 180,313 |
| 2036 | 130,403 | 39,535 | 10,377 | 180,315 |
| 2037 | 130,400 | 41,910 | 8,005 | 180,315 |
| 2038 | 130,405 | 44,420 | 5,490 | 180,315 |
| 2039 | 130,401 | 47,085 | 2,825 | 180,311 |
| Total | $15,061,840 | $210,250 | $348,905 | $15,620,996 |

---

\*   Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1]   In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund.

Sources:  Government Development Bank and Treasury Department

DS Obj. 00014

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes.  Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations and will not be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations.  Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress.  There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds.  Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix I* to this Official Statement.  Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

DS Obj. 00015

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $1,401,755.01 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof.  The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased.  The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices.  The offering prices may be changed from time to time by the Underwriters.

Popular Securities, Inc, ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth.  Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Morgan Stanley and Citigroup Inc., the respective parent companies of Morgan Stanley & Co. Incorporated and Citigroup Global Markets Inc., each an underwriter of the Bonds, have entered into a retail brokerage joint venture.  As part of the joint venture each of Morgan Stanley & Co. Incorporated and Citigroup Global Markets Inc. will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009.  As part of this arrangement, each of Morgan Stanley & Co. Incorporated and Citigroup Global Markets Inc. will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have agreed to provide services and advice to each other related to the structuring and execution of the underwriting of the Bonds in accordance with the terms and provisions of a joint venture agreement which was entered into between SSC and Banc of America Securities LLC ("BAS") (Merrill and BAS are now affiliated broker-dealers).  SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

DS Obj. 00016

J.P. Morgan Securities Inc. has entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore Inc. will verify from the information provided to them the mathematical accuracy, as of the date of the closing on the Bonds, of the computations to determine that the anticipated receipts from the securities and cash deposits to be held in escrow, will be sufficient to pay the Refunded Interest. Causey Demgen & Moore Inc. will express no opinion on the assumptions provided to them, nor as to the exclusion from gross income of the interest on the Bonds.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

Moody's Investors Service and Standard & Poor's Rating Services have assigned the Bonds ratings of "Baa3" and "BBB-," respectively. Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1. to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2009, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data

DS Obj. 00017

(including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.  to file, in a timely manner, with the MSRB through EMMA, notice of any failure of the Commonwealth to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the Bonds, if material:

    a.    principal and interest payment delinquencies;
    b.    non-payment related defaults;
    c.    unscheduled draws on debt service reserves reflecting financial difficulties;
    d.    unscheduled draws on credit enhancements reflecting financial difficulties;
    e.    substitution of credit or liquidity facility providers, or their failure to perform;
    f.    adverse opinions or events affecting the tax-exempt status of the Bonds;
    g.    modifications to rights of the holders (including Beneficial Owners) of the Bonds;
    h.    bond calls;
    i.    defeasances;
    j.    release, substitution, or sale of property securing repayment of the Bonds; and
    k.    rating changes.

Event (c) is included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. However, event (c) may not be applicable, since the terms of the Bonds do not provide for "debt service reserves." In addition, with respect to the following events:

Events (d) and (e). The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the Bonds, see TAX MATTERS.

Event (h). The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.  The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34").  The

DS Obj. 00018

Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements.  Finally, the Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1 above, was filed after the Commonwealth's filing deadline of May 1, 2009.

As of the date of this Official Statement, there is no Commonwealth information repository.  All continuing disclosure filing must be made with the MSRB through EMMA.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if

(1)      the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

DS Obj. 00019

(2)      all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the proposed form of opinion of Bond Counsel (*Appendix I*), a description of the Book-Entry System (*Appendix II*), and a list of Bonds with Refunded Interest (*Appendix III*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents.  The information pertaining to DTC was supplied by DTC.

This Official Statement will be filed with the MSRB through EMMA.

### COMMONWEALTH OF PUERTO RICO

By:  _____  /s/ Juan C. Puig  _____
Secretary of the Treasury

23

DS Obj. 00020

APPENDIX I

### PROPOSED FORM OF OPINION OF BOND COUNSEL



[Closing Date]

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

Re:   $210,250,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
      Series 2009 C (General Obligation Bonds)

Dear Mr. Secretary:

We have acted as bond counsel to the Commonwealth of Puerto Rico in connection with the issuance of the above-captioned bonds, dated the date of delivery thereof (the "Bonds"). In such capacity we have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended (the "Act"), such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary") and approved by the Governor of the Commonwealth of Puerto Rico (the "Resolution"). We also have examined one of the Bonds as executed and authenticated.

The Bonds are issued pursuant to the Act and the Resolution. The Bonds mature on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set forth in the Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Resolution.

Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

Based on the foregoing, we are of opinion that, under existing law:

1.      The Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Act and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth of Puerto Rico for the payment of the principal of and the interest on the

GREENBERG TRAURIG, LLP • ATTORNEYS AT LAW • WWW.GTLAW.COM

One International Place • Boston, MA  02110 • Tel. 617.310.6000 • Fax 617.310.6001

DS Obj. 00021

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
[Closing Date]
Page 2

Bonds, to which the good faith, credit and taxing power of the Commonwealth of Puerto Rico
are pledged.

     4.     Under the provisions of the Acts of Congress now in force and under existing
regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to
below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the
Resolution regarding the use, expenditure and investment of Bond proceeds and the timely
payment of certain investment earnings to the Treasury of the United States, if required, interest
on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the
Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico, and local
income taxation.

     Interest on the Bonds will not be an item of tax preference for purposes of the federal
alternative minimum tax imposed on individuals and corporations.  However, interest on the
Bonds will be taken into account in determining adjusted current earnings for purposes of
computing the alternative minimum tax imposed on corporations.  The Code contains other
provisions that could result in tax consequences, upon which we express no opinion, as a result
of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded
from gross income.

     The Commonwealth of Puerto Rico has covenanted to comply with the requirements of
the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto
Rico, so that interest on the Bonds will remain exempt from federal income taxes to which it is
not subject on the date of issuance of the Bonds.  We are not aware of any provisions of the
Constitution or laws of the Commonwealth of Puerto Rico which would prevent the
Commonwealth of Puerto Rico from complying with the requirements of the Code.

     The opinions expressed herein are for the benefit of the addressees only and may not be
quoted, circulated, assigned or delivered to any other person or for any other purpose without our
prior written consent.  The opinions expressed herein are based on an analysis of existing laws,
including regulations, rulings, official interpretations of law issued by the United States Internal
Revenue Service, and court decisions on or prior to the date hereof.  Such opinions may be
adversely affected by actions taken or events occurring, including a change in law, regulation or
ruling (or in the application or official interpretation of any law, regulation or ruling) after the
date hereof.  We have not undertaken to determine, or to inform any person, whether such
actions are taken or such events occur, and we have no obligation to update this opinion in light
of such actions or events.

     Respectfully submitted,

     Greenberg Traurig, LLP

DS Obj. 00022

**NEW ISSUE - BOOK-ENTRY ONLY**

See "Book-Entry Only System" under THE BONDS

|  | RATINGS: | Moody's: | Baa1 |
|---|---|---|---|
|  | See RATINGS | Fitch: | BBB+ |
|  |  | S&P: | BBB |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$2,318,190,000**

**COMMONWEALTH OF PUERTO RICO**

**Public Improvement Refunding Bonds, Series 2012 A**

**(General Obligation Bonds)**

**Dated: Date of Delivery**                                          **Due: July 1, as shown on the inside cover**

The Public Improvement Refunding Bonds, Series 2012 A (the "Bonds") are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2013. The Bonds are subject to redemption prior to maturity as set forth herein. The Commonwealth expects to issue, on or about March 29, 2012, its $415,270,000 Public Improvement Refunding Bonds, Series 2012 B (the "Series B Bonds"). The Series B Bonds are being offered solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent on the issuance of the Series B Bonds.

The scheduled payment of principal and interest on certain of the Bonds as indicated on the inside cover (the "Insured Bonds"), when due, will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by **ASSURED GUARANTY MUNICIPAL CORP.**

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges LLC, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about April 3, 2012.

**Barclays Capital**                                          **J.P. Morgan**

**Goldman, Sachs & Co.**                                          **Jefferies**

| **BMO Capital Markets** | **BofA Merrill Lynch** | **Citigroup** | **Morgan Stanley** |
|---|---|---|---|
| **Ramirez & Co. Inc.** | **Raymond James** | **RBC Capital Markets** | **UBS FS Puerto Rico** |

**Wells Fargo Securities**

| **BBVAPR MSD** | **FirstBank PR Securities** | **Oriental Financial Services** | **Popular Securities** | **Santander Securities** | **Scotia MSD** | **VAB FINANCIAL** |
|---|---|---|---|---|---|---|

March 7, 2012

# $2,318,190,000
# COMMONWEALTH OF PUERTO RICO
# Public Improvement Refunding Bonds, Series 2012 A
# (General Obligation Bonds)

| Maturity Date July 1 | Principal Amount | Interest Rate | Price or Yield (%) | CUSIP[*] |
|---|---|---|---|---|
| 2020 | $10,000,000 | 4.000% | 100.00 | 74514LA31 |
| 2020 | 35,345,000 | 5.000% | 4.00 | 74514LC47 |
| 2021 | 49,400,000 | 4.000% | 4.24 | 74514LA49 |
| 2021 | 52,895,000 | 5.000% | 4.24 | 74514LC54 |
| 2022 | 32,110,000 | 4.125% | 4.39 | 74514LA56 |
| 2022 | 21,285,000 | 5.000% | 4.39 | 74514LC62 |
| 2022[†] | 20,000,000 | 4.000% | 4.14 | 74514LD46 |
| 2023 | 7,290,000 | 4.375% | 4.51 | 74514LC70 |
| 2023 | 68,500,000 | 5.250% | 4.51[‡] | 74514LA64 |
| 2023[†] | 5,000,000 | 4.125% | 4.26 | 74514LD53 |
| 2024 | 10,000,000 | 4.000% | 4.60 | 74514LC88 |
| 2024 | 11,050,000 | 5.250% | 4.60[‡] | 74514LA72 |
| 2024[†] | 5,000,000 | 4.125% | 4.35 | 74514LD61 |
| 2025 | 22,030,000 | 4.500% | 4.65 | 74514LA80 |
| 2025[†] | 5,000,000 | 4.250% | 4.42 | 74514LD79 |
| 2026 | 60,000,000 | 5.500% | 4.50[§] | 74514LD38 |
| 2026 | 4,455,000 | 4.500% | 4.70 | 74514LC96 |
| 2026 | 69,740,000 | 5.500% | 4.67[‡] | 74514LA98 |
| 2027 | 17,945,000 | 5.500% | 4.76[‡] | 74514LB22 |
| 2027[†] | 11,520,000 | 4.250% | 4.50 | 74514LD87 |
| 2028 | 64,795,000 | 5.750% | 4.79[‡] | 74514LB30 |
| 2029 | 6,665,000 | 5.000% | 4.85[‡] | 74514LB48 |
| 2030 | 7,000,000 | 4.750% | 4.90 | 74514LB97 |
| 2031 | 7,335,000 | 4.750% | 4.95 | 74514LB55 |
| 2032 | 7,685,000 | 5.000% | 100.00 | 74514LC21 |
| 2033 | 27,400,000 | 5.000% | 5.06 | 74514LC39 |

| | | | | | |
|---|---|---|---|---|---|
| $322,925,000[†] | 5.000% Term Bonds due July 1, 2035 | Price 100.00 | CUSIP | 74514LD20 |
| $263,540,000 | 5.125% Term Bonds due July 1, 2037 | Yield 5.250% | CUSIP | 74514LB63 |
| $459,305,000 | 5.500% Term Bonds due July 1, 2039 | Yield 5.250%[‡] | CUSIP | 74514LB71 |
| $632,975,000 | 5.000% Term Bonds due July 1, 2041 | Yield 5.320% | CUSIP | 74514LB89 |

---

[*]   Copyright, American Bankers Association.  CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc.  This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services.  CUSIP numbers are provided for convenience of reference only.  Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]   Insured by Assured Guaranty Municipal Corp.

[‡]   Priced at the stated yield to the July 1, 2022 optional redemption date at a redemption price of 100%. See "Redemption" under THE BONDS.

[§]   Priced at the stated yield to the July 1, 2018 optional redemption date at a redemption price of 100%. See "Redemption" under THE BONDS.

# Government of Puerto Rico

### Governor

LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

| | | |
|---|---|---|
| KENNETH D. MCCLINTOCK<br>*Secretary of State* | GUILLERMO SOMOZA COLOMBANI<br>*Secretary of Justice* | JESÚS F. MÉNDEZ RODRÍGUEZ<br>*Secretary of the Treasury* |
| EDWARD MORENO ALONSO<br>*Secretary of Education* | MIGUEL ROMERO LUGO<br>*Secretary of Labor and<br>Human Resources* | DR. LORENZO GONZÁLEZ<br>*Secretary of Health* |
| MIGUEL SANTIAGO CÓRDOVA<br>*Acting Secretary of Agriculture* | RUBÉN A. HERNÁNDEZ GREGORAT<br>*Secretary of Transportation<br>and Public Works* | JOSÉ R. PÉREZ-RIERA<br>*Secretary of Economic<br>Development and Commerce* |
| YANITSIA IRIZARRY MÉNDEZ<br>*Secretary of Family Affairs* | MIGUEL HERNÁNDEZ VIVONI<br>*Secretary of Housing* | DANIEL J. GALÁN KERCADÓ<br>*Secretary of Natural and<br>Environmental Resources* |
| LUIS G. RIVERA MARÍN<br>*Secretary of<br>Consumer Affairs* | HENRY NEUMANN ZAYAS<br>*Secretary of Sports and Recreation* | JESÚS GONZÁLEZ CRUZ<br>*Secretary of Corrections<br>and Rehabilitation* |

———————————

| | |
|---|---|
| *Legislative Officers* | *Fiscal Officers* |
| THOMAS RIVERA SCHATZ<br>President, Senate | JUAN CARLOS PAVÍA<br>Director, Office of<br>Management and Budget |
| JENNIFFER GÓNZALEZ COLÓN<br>Speaker, House of<br>Representatives | JUAN CARLOS BATLLE<br>President,<br>Government Development<br>Bank for Puerto Rico |

DS Obj. 00025

## TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ...................................................................................................... 1
OVERVIEW ...................................................................................................................................... 3
RECENT DEVELOPMENTS ........................................................................................................... 4
   Preliminary Results for the First Six Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit ............ 4
   Preliminary Revenues for the First Seven Months of Fiscal Year 2012 ............................................... 5
   Preliminary Results for Fiscal Year 2011 ..................................................................................... 5
   Financial Condition of Retirement Systems ................................................................................... 5
   Economy ..................................................................................................................................... 6
PLAN OF FINANCING .................................................................................................................... 7
   Sources and Uses of Funds ........................................................................................................... 7
THE BONDS ..................................................................................................................................... 8
   General ....................................................................................................................................... 8
   Book-Entry Only System .............................................................................................................. 8
   Discontinuance of the Book-Entry Only System ............................................................................. 10
   Authorization .............................................................................................................................. 10
   Redemption ................................................................................................................................. 11
   Notice of Redemption; Effect of Redemption ................................................................................. 12
   Security ...................................................................................................................................... 12
   Payment Record ........................................................................................................................... 14
   Debt Limitation ........................................................................................................................... 14
   Maturity Limitation ..................................................................................................................... 16
BOND INSURANCE ........................................................................................................................ 16
   Bond Insurance Policy .................................................................................................................. 16
   Assured Guaranty Municipal Corp. ................................................................................................ 17
   Bond Insurance Provisions under the Bond Resolution ..................................................................... 18
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ................................................................... 18
   Public Sector Debt ....................................................................................................................... 18
   Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ............ 20
LITIGATION .................................................................................................................................... 21
TAX MATTERS ............................................................................................................................... 21
   Discount Bonds ........................................................................................................................... 22
   Premium Bonds ........................................................................................................................... 22
LEGAL MATTERS ........................................................................................................................... 23
LEGAL INVESTMENT ..................................................................................................................... 23
VERIFICATION OF MATHEMATICAL COMPUTATIONS .............................................................. 23
UNDERWRITING ............................................................................................................................ 23
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ........................................................ 25
RATINGS ........................................................................................................................................ 25
CONTINUING DISCLOSURE .......................................................................................................... 26
   Continuing Disclosure Undertaking ............................................................................................... 26
   Prior Continuing Disclosure Non-Compliance ................................................................................. 28
MISCELLANEOUS .......................................................................................................................... 29

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
      dated December 6, 2011 ......................................................................................................... I-1

Appendix II – Proposed Form of Opinion of Bond Counsel ................................................................ II-1

Appendix III – Specimen Municipal Bond Insurance Policy ............................................................... III-1

Appendix IV – Table of Refunded Bonds ........................................................................................ IV-1

DS Obj. 00026

**$2,318,190,000**
**COMMONWEALTH OF PUERTO RICO**
**Public Improvement Refunding Bonds, Series 2012 A**
**(General Obligation Bonds)**

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, and the appendices, provides certain information in connection with the sale of $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012A (the "Bonds"). The Commonwealth expects to issue, on or about March 29, 2012, its $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012B (the "Series B Bonds"). The Series B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series B Bonds.

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on March 7, 2012.

The scheduled payment of principal and interest on the Bonds maturing July 1, 2022 bearing interest at a rate of 4.000%, July 1, 2023 bearing interest at a rate of 4.125%, July 1, 2024 bearing interest at a rate of 4.125%, July 1, 2025 bearing interest at a rate of 4.250%, July 1, 2027 bearing interest at a rate of 4.250%, and July 1, 2035 bearing interest at a rate of 5.000% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. ("AGM").

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated December 6, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the projected fiscal year 2012 deficit, the budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on December 6, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter

DS Obj. 00027

paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. Pursuant to these continuing disclosure undertakings, the Commonwealth files annual updates of the Commonwealth Report and files the Commonwealth's Annual Financial Report. Although the Commonwealth has filed all such reports, these filings were made after the May 1 deadline between 2006 and 2010 (and also in certain years before that period), and therefore did not comply with the undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertakings relating to fiscal year 2010 by filing the Commonwealth Report and the Commonwealth's Annual Financial Report before the filing deadline. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at http://www.gdbpr.com. No additional

DS Obj. 00028

information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress.  The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states.  It differs from the states, however, in its relationship with the federal government.  The people of Puerto Rico are citizens of the United States but do not vote in national elections.  They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs).  Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico.  No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.  Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors.  Puerto Rico's economy is closely linked to the United States economy.  In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue.  The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation.  See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB").  The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget.  OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures.  Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, preliminary results for fiscal year 2011 and the first three months of fiscal year 2012, the budget and projected deficit for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth.  The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS below.

DS Obj. 00029

Commonwealth expects to issue general obligation bonds to finance capital improvement projects.  In December 2011, the Legislative Assembly approved the issuance of general obligation bonds and notes in the amount of $290 million to fund such capital improvement projects.

## THE BONDS

**General**

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption."  Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds.  The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.  SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.  If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934.  DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts.  This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations.  DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies.  DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants").  DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC").  More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records.  The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase.  Beneficial Owners are, however, expected to receive written confirmations providing details of

DS Obj. 00030

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar.  Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository).  In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteenth day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Sections 25 and 37 of the Organic Act of Puerto Rico of 1917, as amended, provided that local legislative powers were vested in a Legislature (the predecessor to the current Legislative Assembly) whose authority extended to matters of a legislative character not locally inapplicable. Pursuant to this power, the Legislature enacted the Act. Section 1 of Article IX of the Constitution of the Commonwealth provides that all laws in existence at the time of its passage continue in full force and effect unless they are inconsistent with the Constitution, are amended or repealed, or expire by their own terms. Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Act was amended by Acts 6 and 10 of July 24, 1952 to authorize the Secretary of the Treasury to issue bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor.  In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

DS Obj. 00031

If the amount of the Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Security**

*Provision for Payment of Public Debt*

In accordance with the Act, the Commonwealth has pledged the good faith, credit and taxing power of the Commonwealth for the prompt payment of the principal of and interest on the Bonds. Pursuant to the Act, the Bonds constitute general obligations of the Commonwealth, payable with any funds available to the Commonwealth, which funds are appropriated as continuous appropriations, without the need to make specific appropriations for such purposes.

12

DS Obj. 00032

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund.  Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and the Commonwealth sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury.  As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39 of 1976"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its good faith and credit is pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 of 1976 provides that the obligation of the Secretary of the Treasury to

13

DS Obj. 00033

make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010, 2011 and 2012 the Commonwealth entered into loan agreements with Government Development Bank the proceeds of which were used to refinance deposits to the Redemption Fund. The Commonwealth expects to enter into a loan agreement with Government Development Bank the proceeds of which would be used to refinance deposits to the Redemption Fund during fiscal year 2013. Unless authorizing legislation permitting borrowings to finance debt service is extended, the Commonwealth will not be able to borrow from Government Development Bank to refinance deposits to the Redemption Fund after June 30, 2013. On February 15, 2012, the Redemption Fund was fully funded.

Act No. 39 of 1976 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by good faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum

DS Obj. 00034

interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.   Upon the issuance of the Bonds, the Series 2004A Bonds and the Series 2004B Bonds will no longer be outstanding. The interest rate exchange agreements entered into in connection with the Series 2004A Bonds and the Series 2004B Bonds will be terminated in connection with the issuance of the Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations.   The Secretary is also authorized to pledge the good faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements.   Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index.   In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into interest rate exchange agreements, the effect of which economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements (the "Series 2003 Swaps"), the effect of which economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds. Upon the issuance of the Bonds, approximately $431,000,000 of the 2003C Swap Bonds will remain outstanding.   A portion of the Series 2003 Swaps will be terminated in connection with the issuance of the Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into interest rate exchange agreements (the "Series 2007A Swaps"), the effect of which economically enables the Commonwealth to pay a fixed rate of interest in respect thereof. Upon the issuance of the Bonds, approximately $29,840,000 of the 2007 Swap Bonds will remain outstanding.   A portion of the Series 2007A Swaps will be terminated in connection with the issuance of the Bonds.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds (the "Series 2004B Swap").

In March 2011, the Commonwealth issued its $274,550,000 Public Improvement Refunding Bonds, Series 2011 (the "2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds. Upon the issuance of the Bonds, the 2011 Swap Bonds will no longer be outstanding.   The Series 2004B Swap will be terminated in connection with the issuance of the Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005,  interest  rate  exchange  agreements  in  which  the  Commonwealth  is  making  payments  on

DS Obj. 00035

$1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in the Commonwealth Report for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of September 30, 2011.

After giving effect to the issuance of the Bonds and the Series B Bonds (including the repayment of the GDB Lines of Credit, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series B Bonds), future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $989,231,968 in the fiscal year ending June 30, 2016, based on the assumption that (i) the outstanding 2003C Swap Bonds, 2006 CPI Bonds, and 2007 Swap Bonds bear interest at the maximum rate of 12% per annum (rather than the lower rate that the Commonwealth is required to pay under the applicable interest rate exchange agreements as permitted by law) and (ii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates, rather than the rates set forth in the basis swap. This amount ($989,231,968) plus the amount paid by the Commonwealth in fiscal year 2011 on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $1,005,751,968, is equal to 13.2% of $7,600,369,500, which is the average of the adjusted preliminary internal revenues for the fiscal year ended June 30, 2010 and preliminary internal revenues for the fiscal year ended June 30, 2011. If the interest on the outstanding bonds described in clause (i) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, as permitted by law, the percentage referred to in the preceding sentence would be 12.7%. Any potential termination payment (which is a good faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the applicable interest rate exchange agreements is not included in the calculation of the 15% constitutional debt limitation.

As of December 31, 2011, Port of the Americas Authority had issued bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), in the amount of $250 million, of which $213.2 million is currently outstanding. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to continue to make all payments on the POA Guaranteed Bonds under the good faith and credit guarantee of the Commonwealth. During fiscal year 2011 and fiscal year 2012, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $16.5 million and $17.3 million, respectively.

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

### BOND INSURANCE

**Bond Insurance Policy**

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as *Appendix III* to this Official Statement.

DS Obj. 00036

http://www.assuredguaranty.com, are incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

*Incorporation of Certain Documents by Reference*

Portions of the following document filed by AGL with the Securities and Exchange Commission (the "SEC") that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)     the Annual Report on Form 10-K for the fiscal year ended December 31, 2011 (filed by AGL with the SEC on February 29, 2012).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents.  Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.:  31 West 52nd Street, New York, New York 10019, Attention:  Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "BOND INSURANCE – Assured Guaranty Municipal Corp." or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information.  Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

*Miscellaneous Matters*

AGM or one of its affiliates may purchase a portion of the Insured Bonds or any uninsured bonds offered under this Official Statement and may hold such Insured Bonds or uninsured bonds for investment or may sell or otherwise dispose of such Insured Bonds or uninsured bonds at any time or from time to time.

AGM makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds.  In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE".

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

## PUBLIC SECTOR DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The table on the following page presents a summary of the public sector debt of the Commonwealth outstanding as of December 31, 2011.  The table also shows the public sector debt as adjusted for the effects of the issuance of the Bonds and the Series B Bonds, including the repayment of the GDB Lines of Credit, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series B

DS Obj. 00037

Bonds.  The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report.

## Commonwealth of Puerto Rico
## Public Sector Debt*
### (in millions)

|  | December 31, 2011 | As Adjusted by the issuance of the Bonds and the Series B Bonds |
|---|---|---|
| GENERAL FUND RELATED DEBT |  |  |
| Direct good faith and credit obligations | $ 9,772 | $10,793[1] |
| Puerto Rico guaranteed debt [2] | 5,466 | 5,466 |
| Debt supported by Puerto Rico appropriations or taxes [3] | 3,727 | 3,727 |
| Tax and Revenue Anticipation Notes [4] | 900 | 900 |
| Pension Obligation Bonds [5] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $22,813 | $23,834 |
| Sales and Use Tax (COFINA) debt | $15,224 | $15,224 |
| Public corporations and agencies [6] | 23,641 | 23,641 |
| Municipal Debt | 3,498 | 3,498 |
| Limited Obligations/non-recourse debt [7] | 2,263 | 2,263 |
|  | 44,626 | 44,626 |
| TOTAL PUBLIC SECTOR DEBT | $67,439 | $68,460 |

_____

\* Totals may not add due to rounding.

(1) Includes $75 million in Commonwealth bond anticipation notes issued in January 2012.  Excludes approximately $227 million of principal due July 1, 2012 that will be paid through the proceeds of the GDB Lines of Credit, which in turn will be refinanced through the issuance of the Bonds and the Series B Bonds.

(2) Consists of $666 million of bonds issued by Aqueduct and Sewer Authority, $423 million of State Revolving Fund Loans incurred under various federal water laws, $213 million of bonds issued by Port of the Americas Authority, and $4.012 billion of Public Building Authority bonds.  Excludes $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

(4) Includes related short-term financings.

(5) Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

(6) Excludes $5.4 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities.  Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included the table. Excludes $1,800,450,000 of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series 2012A (Senior Lien) and $295,245,000 of Puerto Rico Aqueduct and Sewer Authority Revenue Bonds, Series 2012B (Senior Lien) issued on February 29, 2012.  Also excludes $1,000,000,000 of Puerto Rico Government Development Bank for Puerto Rico, Senior Notes, 2012 Series A issued on February 7, 2012.

(7) Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $343.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008, and $100 million of Housing Revenue Bonds, Series 2008, issued the Puerto Rico Housing Finance Authority; $149.1 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $74.6 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $73.5 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico.

DS Obj. 00038

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on December 31, 2011 (after giving effect to the issuance of $75 million of Commonwealth general obligation bond anticipation notes in January 2012, the refunding of the Refunded Bonds, and the refunding of certain other Commonwealth general obligation bonds being refunded with a portion of the proceeds of the Series B Bonds); (ii) the Bonds; (iii) the Series B Bonds; and (iv) total debt service on Commonwealth general obligation bonds.  Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service [1] | The Bonds | | Series B Bonds Debt Service [3] | Grand Total [3] |
| | | Principal | Interest [3] | | |
|---|---|---|---|---|---|
| 2012 [2] | $  144,464 | - | | $  3,159 | $  147,623 |
| 2013 | 817,647 | - | $  29,809 | 67,966 | 915,421 |
| 2014 | 722,581 | - | 23,954 | 81,099 | 827,634 |
| 2015 | 741,401 | - | 47,030 | 76,345 | 864,776 |
| 2016 | 754,573 | - | 118,359 | 65,657 | 938,588 |
| 2017 | 711,001 | - | 118,359 | 34,822 | 864,181 |
| 2018 | 625,329 | - | 118,359 | 58,294 | 801,982 |
| 2019 | 776,849 | - | 118,359 | 24,400 | 919,608 |
| 2020 | 763,684 | $  45,345 | 118,359 | 20,508 | 947,896 |
| 2021 | 569,328 | 102,295 | 116,191 | 2,629 | 790,444 |
| 2022 | 532,097 | 73,395 | 111,571 | 2,629 | 719,692 |
| 2023 | 434,361 | 80,790 | 108,382 | 2,629 | 626,162 |
| 2024 | 478,896 | 26,050 | 104,260 | 2,629 | 611,836 |
| 2025 | 484,692 | 27,030 | 103,074 | 2,629 | 617,425 |
| 2026 | 438,682 | 134,195 | 101,870 | 2,629 | 677,377 |
| 2027 | 472,550 | 29,465 | 94,534 | 2,629 | 599,178 |
| 2028 | 443,315 | 64,795 | 93,057 | 2,629 | 603,796 |
| 2029 | 462,535 | 6,665 | 89,332 | 2,629 | 561,161 |
| 2030 | 457,805 | 7,000 | 88,998 | 2,629 | 556,432 |
| 2031 | 443,439 | 7,335 | 88,666 | 2,629 | 542,069 |
| 2032 | 339,126 | 7,685 | 88,317 | 2,629 | 437,758 |
| 2033 | 266,743 | 132,400 | 87,933 | 52,239 | 539,315 |
| 2034 | 199,490 | 188,545 | 81,313 | - | 469,348 |
| 2035 | 321,993 | 142,275 | 71,785 | - | 536,053 |
| 2036 | 321,989 | 71,030 | 64,631 | - | 457,650 |
| 2037 | 317,047 | 79,615 | 60,991 | - | 457,653 |
| 2038 | 220,404 | 223,505 | 56,911 | - | 500,820 |
| 2039 | 220,403 | 235,800 | 44,618 | - | 500,821 |
| 2040 | 220,401 | 308,770 | 31,649 | - | 560,820 |
| 2041 | 220,404 | 324,205 | 16,210 | - | 560,819 |
| Total | $13,923,229 | $2,318,190 | $2,396,879 | $516,039 | $19,154,337 |

*    Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

(1)   The amounts shown on this column (i) include $75 million in Commonwealth bond anticipation notes issued in January 2012, and (ii) exclude debt service on PRASA's bonds guaranteed by the Commonwealth, which have been paid by PRASA since 2006.  In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund. The amounts shown in this column also do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit. See THE BONDS – Debt Limitation.

(2)   Excludes approximately $685 million of principal and interest due in fiscal year 2012 paid and to be paid from the proceeds of the GDB Lines of Credit, which in turn will be refinanced through the issuance of the Bonds and the Series B Bonds.

(3)   The figures for interest on the Bonds have been reduced by the interest that was capitalized through the issuance of the Bonds in the following amounts: approximately $117.5 million due during fiscal year 2013, $94.4 million due during fiscal year 2014 and $71.3 million due during fiscal year 2015.  The figures for Series B Bonds debt service have been reduced by the interest that was capitalized through the issuance of the Series B Bonds in the following amounts: approximately $672 thousand in fiscal year 2012 and $2.6 million in each of fiscal years 2013, 2014 and 2015.

Sources:  Government Development Bank and Department of the Treasury

DS Obj. 00039

## LITIGATION

As of the date hereof, to the knowledge of the officers of the Department of the Treasury with responsibility over the issuance of the Bonds, there is no litigation of any nature pending or threatened against the Commonwealth to restrain or enjoin the issuance, sale, execution or delivery of the Bonds or the application of the proceeds thereof as described in this Official Statement, or in any way contesting or affecting the validity of the Bonds or any proceedings of the Commonwealth taken with respect to the issuance or sale of the Bonds.

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes.  Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations.  Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress.  There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds.  Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

DS Obj. 00040

other disposition of Premium Bonds and with respect to the state and local tax consequences of owning and disposing of Premium Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement.  Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges LLC, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey, Demgen & Moore, Inc., will verify, from the information provided to them, the mathematical accuracy as of the date of the delivery of the Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, if any, to be held in escrow, will be sufficient to pay, when due, the principal and interest on the Refunded Bonds, and (2) the computations of yield on both the securities, if any, and the Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $14,723,016 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof.  The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased.  The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices.  The offering prices may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities,  which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities.  Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments.  Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

The Commonwealth intends to use a portion of the proceeds of the Bonds to pay the costs of terminating an investment agreement and certain interest exchange agreements.  Affiliates of Morgan Stanley, RBC Capital Markets, and UBS Financial Services Incorporated of Puerto Rico, underwriters for

DS Obj. 00041

the Bonds, are the counterparties to some of the interest rate exchange agreements being terminated.  As a result, the affiliate of Morgan Stanley, the affiliate of RBC Capital Markets, and the affiliate of UBS Financial Services Puerto Rico will receive a portion  of the proceeds of the Bonds in connection with the termination of such interest rate exchange agreements.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells.  JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Barclays Capital Inc. and Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby.  Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth.  Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of BMO Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture.  As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009.  As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers.  For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the

DS Obj. 00042

structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth.  Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances.  SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings.  As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings.  As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities.  Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

### GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby.  As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds.  Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations.  Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

### RATINGS

The Bonds are rated "Baa1" by Moody's, "BBB+" by Fitch, and "BBB" by S&P.  For more information regarding rating action affecting the Commonwealth, see "Ratings of Commonwealth General Obligation Bonds" in "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in the Commonwealth Report.  The Insured Bonds are expected to be assigned insured ratings of "AA-" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

DS Obj. 00043

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency.  Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies, if in the judgment of any or all, circumstances so warrant.  Any such downward revision or withdrawal of such ratings, or any of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

**Continuing Disclosure Undertaking**

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1.  to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2011, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.  to file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

    a.    principal and interest payment delinquencies;

    b.    non-payment related defaults, if material;

    c.    unscheduled draws on debt service reserves reflecting financial difficulties;

    d.    unscheduled draws on credit enhancements reflecting financial difficulties;

    e.    substitution of credit or liquidity facility providers, or their failure to perform;

    f.    adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

    g.    modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

    h.    Bond calls, if material;

    i.    defeasances;

DS Obj. 00044

j.     release, substitution, or sale of property securing repayment of the Bonds, if material;

k.     rating changes;

l.     tender offers;

m.     bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

n.     the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.     the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 2 (c), (j), (m) and (n) are not applicable to the Bonds or the Commonwealth.

In addition, with respect to the following events:

Event 2 (h). The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

Event 2 (m). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no

27

such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)      the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

(2)      all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances.  Although the Commonwealth has filed all the reports and financial statements required to be filed, some of these filings have been made after the Commonwealth's May 1 filing deadline.

DS Obj. 00046

The Commonwealth's audited financial statements for the fiscal years ended June 30, 2006, 2007 and 2008 were filed after the Commonwealth's filing deadlines, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. The Commonwealth expects to be able to comply with its continuing disclosure undertaking relating to fiscal year 2011.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Commonwealth Report (*Appendix I*), the proposed form of opinion of Bond Counsel (*Appendix II*), the specimen of the municipal bond insurance policy to be issued by AGM (*Appendix III*) and the Table of Refunded Bonds (*Appendix IV*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in BOND INSURANCE and UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information continued under the heading BOND INSURANCE was obtained from the materials provided by AGM. The information pertaining to DTC was supplied by DTC.

DS Obj. 00047

The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

**COMMONWEALTH OF PUERTO RICO**

By:  _____ /s/ Jesús F. Méndez _____
Secretary of the Treasury

DS Obj. 00048

APPENDIX II

**PROPOSED FORM OF OPINION OF BOND COUNSEL**

**GT** GreenbergTraurig

[Closing Date]

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:     $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds,
        Series 2012 A (General Obligation Bonds)

Dear Mr. Secretary:

        We have acted as bond counsel to the Commonwealth of Puerto Rico (the
"Commonwealth") in connection with the issuance of $2,318,190,000 Commonwealth of Puerto
Rico Public Improvement Refunding Bonds, Series 2012 A (the "Bonds").  In such capacity we
have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7,
1942, as amended (the "Act"), and such other law and such certified proceedings and other
documents as we have deemed necessary to render this opinion, including a resolution adopted
by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the
Governor of the Commonwealth on March 7, 2012 (the "Bond Resolution").  We also have
examined one of the Bonds of each series as executed and authenticated.

        The Bonds are issued pursuant to the Act and the Bond Resolution.  The Bonds mature
on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set
forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the
manner and in accordance with the terms and conditions of the Bond Resolution.

        Regarding questions of fact material to our opinion, we have relied on representations of
the Secretary contained in the Bond Resolution, and the certified proceedings and other
certifications of public officials and others furnished to us without undertaking to verify the same
by independent investigation.

        Based on the foregoing, we are of opinion that, under existing law:

1.      The Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Act and such proceedings and certifications show lawful authority for the
issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of
the Commonwealth for the payment of the principal of and the interest on the Bonds, to which
the good faith, credit and taxing power of the Commonwealth are pledged.

DS Obj. 00049

Secretary of the Treasury
_____, 2012
Page 2

4.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Bond Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations.  However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent.  The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof.  Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof.  We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,


Greenberg Traurig, LLP

DS Obj. 00050



# EMMA®
Electronic Municipal Market Access
A service of the MSRB

| Browse Issuers | Tools and Resources | Market Activity | MyEMMA® | EMMA Dataport | A- 100% A+ |
|---|---|---|---|---|---|

<u>Click here for information on the MSRB response to COVID-19</u>

Home > Issuers By State > Puerto Rico > Issuer Homepage > Issue Details > Security Details

## Security Details

**CUSIP: 74514LWA1**ᴬ

COMMONWEALTH OF PUERTO RICO PUBLIC IMPROVEMENT REFUNDING BONDS SERIES 2009C GENERAL OBLIGATION BONDS (PR)
PUERTO RICO COMWLTH GO PUB IMPT REF BDS 2009C (PR)*

| | |
|---|---|
| Coupon: | 6 % |
| Maturity Date: | 07/01/2039 |
| Dated Date: | 12/16/2009 |
| Initial Offering Price/Yield: | 97.301% |
| Principal Amount at Issuance: | $210,250,000 |
| Closing Date: | 12/16/2009 |
| Fiscal Year End Date: | 06/30/2017 |



Trade Activity   Ratings   Disclosure Documents   Final Scale   Compare

View real-time price and yield information for trades in this security.

⇄ Trade Summary     ☰ Trade Details     🔍 Search Trades

Display [100 ▾] results   Search within list: [_____]   First  Previous  1  …  18  19  20  21  22  Next  Last

| | Trade Date | High/Low Price (%) | High/Low Yield (%) | Trade Count | Total Trade Amount ($) |
|---|---|---|---|---|---|
| ⊕ | 02/04/2011 | 100 / 96.38 | 6.274 / 5.999 | 14 | 765,000 |
| ⊕ | 02/03/2011 | 100 / 96.75 | 6.245 / 5.999 | 17 | 715,000 |
| ⊕ | 02/02/2011 | 100 / 96.697 | 6.249 / 5.999 | 25 | 720,000 |
| ⊕ | 02/01/2011 | 100 / 92.914 | 6.552 / 5.999 | 16 | 465,000 |
| ⊕ | 01/31/2011 | 100 / 97.086 | 6.219 / 5.999 | 13 | 405,000 |
| ⊕ | 01/28/2011 | 100.399 / 97 | 6.225 / 5.938 | 24 | 865,000 |
| ⊕ | 01/27/2011 | 100.399 / 96.952 | 6.229 / 5.938 | 33 | 4,140,000 |
| ⊕ | 01/26/2011 | 100.4 / 96.875 | 6.235 / 5.938 | 39 | 1,700,000 |
| ⊕ | 01/25/2011 | 100.4 / 95.248 | 6.363 / 5.938 | 73 | 10,400,000 |
| ⊕ | 01/24/2011 | 100.401 / 96.629 | 6.254 / 5.938 | 72 | 5,655,000 |
| ⊕ | 01/21/2011 | 99.337 / 96.55 | 6.26 / 6.049 | 31 | 1,960,000 |
| ⊕ | 01/20/2011 | 100 / 96.55 | 6.26 / 5.999 | 64 | 3,375,000 |
| ⊕ | 01/19/2011 | 100 / 95.924 | 6.31 / 5.999 | 44 | 9,190,000 |
| ⊕ | 01/18/2011 | 100.13 / 96.248 | 6.284 / 5.98 | 29 | 555,000 |
| ⊕ | 01/14/2011 | 100.905 / 96.248 | 6.284 / 5.862 | 63 | 3,555,000 |
| ⊕ | 01/13/2011 | 100.636 / 96.03 | 6.301 / 5.903 | 183 | 18,650,000 |
| ⊕ | 01/12/2011 | 100.905 / 96.433 | 6.27 / 5.862 | 224 | 43,200,000 |
| ⊕ | 01/11/2011 | 101.3 / 98.375 | 6.121 / 5.803 | 35 | 1,650,000 |
| ⊕ | 01/10/2011 | 101.3 / 97.02 | 6.225 / 5.803 | 23 | 12,805,000 |

Exhibit C

DS Obj. 00051

| | Date | Price | Yield | | Amount |
|---|---|---|---|---|---|
| ⊕ | 01/06/2011 | 103.25 / 99.25 | 6.059 / 5.979 | 1 | 480,000 |
| ⊕ | 01/05/2011 | 99.298 / 99.298 | 6.052 / 6.052 | 1 | 3,500,000 |
| ⊕ | 01/03/2011 | 99.998 / 99.998 | 6 / 6 | 1 | 10,000 |
| ⊕ | 12/30/2010 | 96.159 / 96.159 | 6.292 / 6.292 | 1 | 10,000 |
| ⊕ | 12/28/2010 | 102.25 / 100.535 | 5.663 / 5.663 | 3 | 150,000 |
| ⊕ | 12/22/2010 | 97.5 / 97.5 | 6.188 / 6.188 | 1 | 50,000 |
| ⊕ | 12/16/2010 | 99.726 / 99.726 | 6.02 / 6.02 | 1 | 780,000 |
| ⊕ | 12/15/2010 | 102.673 / 99.75 | 6.018 / 5.601 | 7 | 900,000 |
| ⊕ | 12/02/2010 | 105.999 / 105.999 | 5.125 / 5.125 | 1 | 25,000 |
| ⊕ | 11/30/2010 | 106 / 104.699 | 5.126 / 5.126 | 2 | 630,000 |
| ⊕ | 11/29/2010 | 107.25 / 104.521 | 5.028 / 4.952 | 5 | 475,000 |
| ⊕ | 11/26/2010 | 104.882 / 104.772 | 5.284 / 5.284 | 2 | 20,000 |
| ⊕ | 11/23/2010 | 107.149 / 104.524 | 5.14 / 4.967 | 9 | 210,000 |
| ⊕ | 11/22/2010 | 106.892 / 105.128 | 5.003 / 5.003 | 2 | 20,000 |
| ⊕ | 11/19/2010 | 99.171 / 99.171 | 6.061 / 6.061 | 1 | 25,000 |
| ⊕ | 11/12/2010 | 111.197 / 109.122 | 4.423 / 4.423 | 2 | 300,000 |
| ⊕ | 11/05/2010 | 113.262 / 110.258 | 4.157 / 4.157 | 2 | 50,000 |
| ⊕ | 11/04/2010 | 112.611 / 109.985 | 4.341 / 4.241 | 4 | 315,000 |
| ⊕ | 11/03/2010 | 110.64 / 108.979 | 4.722 / 4.5 | 2 | 95,000 |
| ⊕ | 11/02/2010 | 112.171 / 110.422 | 4.53 / 4.3 | 3 | 135,000 |
| ⊕ | 11/01/2010 | 112.475 / 110.749 | 4.487 / 4.261 | 2 | 35,000 |
| ⊕ | 10/29/2010 | 112.828 / 110.276 | 4.312 / 4.216 | 10 | 290,000 |
| ⊕ | 10/28/2010 | 108.61 / 105.5 | 5.202 / 4.774 | 2 | 80,000 |
| ⊕ | 10/27/2010 | 111.784 / 110.459 | 4.5 / 4.352 | 4 | 680,000 |
| ⊕ | 10/26/2010 | 112.942 / 110.212 | 4.482 / 4.203 | 12 | 3,610,000 |
| ⊕ | 10/25/2010 | 109.914 / 108 | 4.858 / 4.6 | 3 | 2,700,000 |
| ⊕ | 10/22/2010 | 113 / 109 | 4.723 / 4.196 | 4 | 75,000 |
| ⊕ | 10/20/2010 | 109.921 / 109.921 | 4.6 / 4.6 | 1 | 50,000 |
| ⊕ | 10/19/2010 | 106.32 / 106.32 | 5.09 / 5.09 | 1 | 50,000 |
| ⊕ | 10/14/2010 | 111.454 / 111.454 | 4.4 / 4.4 | 1 | 10,000 |
| ⊕ | 10/13/2010 | 107.728 / 107.728 | 4.897 / 4.897 | 1 | 10,000 |
| ⊕ | 10/12/2010 | 110.703 / 110.703 | 4.5 / 4.5 | 1 | 80,000 |
| ⊕ | 10/07/2010 | 107.719 / 106 | 5.136 / 4.9 | 2 | 20,000 |
| ⊕ | 10/06/2010 | 109.954 / 109.954 | 4.6 / 4.6 | 4 | 250,000 |
| ⊕ | 10/05/2010 | 108.839 / 105.54 | 5.201 / 4.75 | 3 | 360,000 |
| ⊕ | 10/01/2010 | 110.723 / 106 | 5.138 / 4.5 | 4 | 430,000 |
| ⊕ | 09/30/2010 | 108.846 / 107 | 5 / 5 | 3 | 150,000 |
| ⊕ | 09/29/2010 | 111.499 / 111.499 | 4.4 / 4.4 | 1 | 50,000 |
| ⊕ | 09/28/2010 | 108.855 / 107.73 | 4.902 / 4.902 | 3 | 150,000 |
| ⊕ | 09/22/2010 | 112.106 / 108.5 | 4.8 / 4.324 | 13 | 885,000 |
| ⊕ | 09/21/2010 | 111.158 / 107.5 | 4.833 / 4.448 | 9 | 460,000 |
| ⊕ | 09/20/2010 | 110 / 105.127 | 5.261 / 4.601 | 5 | 475,000 |
| ⊕ | 09/17/2010 | 108 / 106.425 | 5.082 / 4.868 | 4 | 350,000 |
| ⊕ | 09/15/2010 | 108.643 / 108.543 | 4.797 / 4.783 | 2 | 1,140,000 |
| ⊕ | 09/14/2010 | 111.532 / 111.499 | 4.4 / 4.4 | 2 | 50,000 |
| ⊕ | 09/13/2010 | 110.402 / 107.75 | 4.903 / 4.55 | 6 | 240,000 |

DS Obj. 00052

| | Trade Date | Price / Price | Yield / Yield | | Amount |
|---|---|---|---|---|---|
| ⊕ | 09/10/2010 | 105.625 / 105.625 | 5.124 / 5.124 | | 25,000 |
| ⊕ | 09/09/2010 | 110.707 / 110.707 | 4.511 / 4.511 | 1 | 60,000 |
| ⊕ | 09/08/2010 | 112.429 / 110.029 | 4.55 / 4.288 | 9 | 235,000 |
| ⊕ | 09/07/2010 | 111.412 / 106.92 | 5.017 / 4.421 | 5 | 315,000 |
| ⊕ | 08/27/2010 | 109.249 / 108.821 | 4.759 / 4.759 | 4 | 160,000 |
| ⊕ | 08/26/2010 | 113.602 / 109.681 | 4.144 / 4.144 | 2 | 30,000 |
| ⊕ | 08/25/2010 | 108.827 / 105.38 | 5.231 / 4.763 | 8 | 1,005,000 |
| ⊕ | 08/24/2010 | 110.73 / 110.73 | 4.514 / 4.514 | 1 | 200,000 |
| ⊕ | 08/23/2010 | 112.292 / 109.314 | 4.313 / 4.313 | 2 | 50,000 |
| ⊕ | 08/19/2010 | 108.065 / 108.065 | - | 1 | 25,000 |
| ⊕ | 08/17/2010 | 110.09 / 106.582 | 5.068 / 4.6 | 6 | 450,000 |
| ⊕ | 08/16/2010 | 107.112 / 106.612 | 5.064 / 5.011 | 3 | 225,000 |
| ⊕ | 08/13/2010 | 107 / 107 | 5.012 / 5.012 | 3 | 70,000 |
| ⊕ | 08/12/2010 | 103.643 / 103.643 | 5.475 / 5.475 | 1 | 70,000 |
| ⊕ | 08/10/2010 | 110.484 / 110.484 | 4.55 / 4.55 | 1 | 100,000 |
| ⊕ | 08/05/2010 | 108.22 / 108.16 | - | 2 | 300,000 |
| ⊕ | 08/04/2010 | 106.55 / 106.08 | 5.139 / 5.139 | 4 | 500,000 |
| ⊕ | 07/29/2010 | 105.642 / 104.75 | 5.323 / 5.2 | 3 | 1,800,000 |
| ⊕ | 07/28/2010 | 107.459 / 105.459 | 4.954 / 4.954 | 8 | 390,000 |
| ⊕ | 07/27/2010 | 104.957 / 104.457 | 5.364 / 5.364 | 2 | 390,000 |
| ⊕ | 07/22/2010 | 105.651 / 105.651 | 5.2 / 5.2 | 1 | 20,000 |
| ⊕ | 07/21/2010 | 107.128 / 107.128 | 5 / 5 | 1 | 10,000 |
| ⊕ | 07/15/2010 | 108.095 / 106.095 | 4.869 / 4.869 | 2 | 90,000 |
| ⊕ | 07/14/2010 | 107.141 / 104.548 | 5.353 / 5 | 4 | 180,000 |
| ⊕ | 07/13/2010 | 109 / 109 | 4.754 / 4.754 | 3 | 70,000 |
| ⊕ | 07/09/2010 | 109 / 104 | 5.43 / 4.755 | 4 | 155,000 |
| ⊕ | 07/08/2010 | 109 / 109 | 4.755 / 4.755 | 3 | 60,000 |
| ⊕ | 07/07/2010 | 109 / 109 | 4.755 / 4.755 | 3 | 30,000 |
| ⊕ | 07/01/2010 | 105.065 / 105.065 | - | 1 | 25,000 |
| ⊕ | 06/30/2010 | 105.067 / 102.003 | 5.712 / 5.712 | 3 | 125,000 |
| ⊕ | 06/28/2010 | 103.512 / 103.512 | 5.5 / 5.5 | 1 | 20,000 |
| ⊕ | 06/24/2010 | 103.41 / 103.41 | 5.514 / 5.514 | 1 | 145,000 |
| ⊕ | 06/23/2010 | 106.202 / 103.577 | 5.491 / 5.131 | 2 | 30,000 |
| ⊕ | 06/21/2010 | 107.94 / 107.94 | 4.9 / 4.9 | 1 | 30,000 |
| ⊕ | 06/17/2010 | 104.742 / 104.742 | 5.331 / 5.331 | 1 | 30,000 |

Displaying 2,001 to 2,100 of 2,190 results

First   Previous   1   …   18   19   20   21   22   Next   Last

NOTICE: * CUSIP numbers and certain related descriptive information are copyrighted by the American Bankers Association (ABA) and are used with permission from CUSIP Global Services managed on behalf of the ABA by Standard & Poor's. © 2021 ABA See EMMA's Terms and Conditions of Use for a description of proprietary rights in and restrictions on use of such data. "CUSIP" is a registered trademark of ABA.

About EMMA   Sitemap   Privacy Policy   Terms of Use   DMCA Policy   MSRB.org   MSRB Systems Status

© 2021 Municipal Securities Rulemaking Board (MSRB)

EMMA is a service of the Municipal Securities Rulemaking Board, which protects investors, state and local governments, and the public interest. Portions of EMMA data provided by Standard & Poor's Securities Evaluations, Inc., CUSIP Global Services & American Bankers Association.

Ratings data are provided by the following and are reprinted with permission, and copyright notices for the respective owners are as follows: Copyright © 2021, Fitch, Inc. All rights reserved. Copyright © 2021, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. Copyright © 2021, Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved. Copyright © 2021, Standard and Poor's Financial Services LLC. All rights reserved.



1.0.9120-114-P3

DS Obj. 00053



**EMMA®**
Electronic Municipal Market Access
A service of the MSRB

| Browse Issuers | Tools and Resources | Market Activity | MyEMMA® | EMMA Dataport | A- 100% A+ |
|---|---|---|---|---|---|

<u>Click here for information on the MSRB response to COVID-19</u>

Home > Issuers By State > Puerto Rico > Issuer Homepage > Issue Details > Security Details

## Security Details

**CUSIP: 74514LWA1**ᴬ
COMMONWEALTH OF PUERTO RICO PUBLIC IMPROVEMENT REFUNDING BONDS SERIES 2009C GENERAL OBLIGATION BONDS (PR)
PUERTO RICO COMWLTH GO PUB IMPT REF BDS 2009C (PR)*

| | |
|---|---|
| Coupon: | 6 % |
| Maturity Date: | 07/01/2039 |
| Dated Date: | 12/16/2009 |
| Initial Offering Price/Yield: | 97.301% |
| Principal Amount at Issuance: | $210,250,000 |
| Closing Date: | 12/16/2009 |
| Fiscal Year End Date: | 06/30/2017 |



| Trade Activity | Ratings | Disclosure Documents | Final Scale | Compare |
|---|---|---|---|---|

View real-time price and yield information for trades in this security.

Trade Summary    Trade Details    Search Trades

Display 100 results   Search within list: [_____]   First  Previous  1  ...  18  19  20  21  22  Next  Last

| | Trade Date | High/Low Price (%) | High/Low Yield (%) | Trade Count | Total Trade Amount ($) |
|---|---|---|---|---|---|
| ⊕ | 06/11/2010 | 108.963 / 106.726 | 4.795 / 4.768 | 9 | 440,000 |
| ⊕ | 06/10/2010 | 109.212 / 106.038 | 5.156 / 4.731 | 4 | 300,000 |
| ⊕ | 06/09/2010 | 109.236 / 108.303 | 4.855 / 4.733 | 3 | 215,000 |
| ⊕ | 06/08/2010 | 108.833 / 106.323 | 4.786 / 4.786 | 5 | 530,000 |
| ⊕ | 06/02/2010 | 109.705 / 106.838 | 4.674 / 4.674 | 2 | 40,000 |
| ⊕ | 06/01/2010 | 109.897 / 105.425 | 5.24 / 4.65 | 5 | 545,000 |
| ⊕ | 05/27/2010 | 103.86 / 103.86 | 5.455 / 5.455 | 1 | 15,000 |
| ⊕ | 05/26/2010 | 109.904 / 106.312 | 5.122 / 4.65 | 5 | 435,000 |
| ⊕ | 05/25/2010 | 109.161 / 103.861 | 5.455 / 4.747 | 3 | 125,000 |
| ⊕ | 05/24/2010 | 105.65 / 105.362 | 5.25 / 5.211 | 2 | 170,000 |
| ⊕ | 05/21/2010 | 109.916 / 109.916 | 4.65 / 4.65 | 1 | 45,000 |
| ⊕ | 05/19/2010 | 109.921 / 104.75 | 5.334 / 4.65 | 5 | 400,000 |
| ⊕ | 05/18/2010 | 106.24 / 106.24 | 5.133 / 5.133 | 1 | 60,000 |
| ⊕ | 05/13/2010 | 107.245 / 104 | 5.437 / 4.998 | 3 | 160,000 |
| ⊕ | 05/04/2010 | 107.255 / 105.313 | 5 / 5 | 2 | 50,000 |
| ⊕ | 04/30/2010 | 105.316 / 105.316 | 5.26 / 5.26 | 1 | 25,000 |
| ⊕ | 04/28/2010 | 104.765 / 104.765 | 5.335 / 5.335 | 1 | 50,000 |
| ⊕ | 04/27/2010 | 106.023 / 102.054 | 5.708 / 5.166 | 2 | 30,000 |
| ⊕ | 04/26/2010 | 107.658 / 101 | 5.856 / 4.95 | 8 | 350,000 |

DS Obj. 00054

| | Trade Date | Dollar Price | Yield/Yield Price | | |
|---|---|---|---|---|---|
| ⊕ | 04/23/2010 | 107.571 / 105.981 | 4.932 / 4.932 | | 0,000 |
| ⊕ | 04/22/2010 | 107.398 / 105.175 | 4.985 / 4.985 | 3 | 45,000 |
| ⊕ | 04/21/2010 | 107.094 / 103.856 | 5.422 / 5.025 | 5 | 255,000 |
| ⊕ | 04/15/2010 | 106.5 / 106.5 | 5.104 / 5.104 | 2 | 20,000 |
| ⊕ | 04/14/2010 | 106.25 / 103.737 | 5.173 / 5.138 | 6 | 105,000 |
| ⊕ | 04/09/2010 | 104.666 / 103.566 | 5.351 / 5.351 | 2 | 60,000 |
| ⊕ | 04/08/2010 | 105.797 / 102.75 | 5.578 / 5.199 | 14 | 585,000 |
| ⊕ | 04/07/2010 | 104.5 / 102.5 | 5.647 / 5.373 | 8 | 1,665,000 |
| ⊕ | 04/06/2010 | 106 / 103.205 | 5.523 / 5.173 | 5 | 230,000 |
| ⊕ | 04/05/2010 | 106.739 / 101.15 | 5.836 / 5.075 | 5 | 245,000 |
| ⊕ | 03/25/2010 | 103.5 / 103.5 | 5.511 / 5.511 | 1 | 100,000 |
| ⊕ | 03/23/2010 | 102.777 / 102.75 | 5.61 / 5.61 | 2 | 80,000 |
| ⊕ | 03/19/2010 | 105.715 / 102.751 | 5.614 / 5.212 | 7 | 435,000 |
| ⊕ | 03/18/2010 | 103.666 / 102.711 | 5.619 / 5.55 | 5 | 230,000 |
| ⊕ | 03/17/2010 | 104.322 / 104.322 | 5.4 / 5.4 | 1 | 15,000 |
| ⊕ | 03/11/2010 | 100 / 100 | 5.998 / 5.998 | 1 | 40,000 |
| ⊕ | 03/10/2010 | 99.5 / 99.5 | 6.036 / 6.036 | 1 | 20,000 |
| ⊕ | 03/08/2010 | 105.456 / 102.24 | 5.685 / 5.25 | 4 | 200,000 |
| ⊕ | 03/04/2010 | 103.796 / 103.595 | 5.473 / 5.473 | 2 | 70,000 |
| ⊕ | 03/03/2010 | 106.746 / 103.471 | 5.081 / 5.081 | 4 | 200,000 |
| ⊕ | 03/02/2010 | 105.974 / 100 | 5.999 / 5.183 | 14 | 615,000 |
| ⊕ | 02/26/2010 | 102.25 / 101.493 | - | 4 | 270,000 |
| ⊕ | 02/25/2010 | 104.556 / 101.5 | 5.789 / 5.372 | 5 | 480,000 |
| ⊕ | 02/24/2010 | 104.375 / 100 | 5.999 / 5.396 | 5 | 220,000 |
| ⊕ | 02/23/2010 | 104.3 / 103.607 | 5.5 / 5.407 | 3 | 70,000 |
| ⊕ | 02/22/2010 | 105.225 / 103.75 | 5.481 / 5.284 | 3 | 140,000 |
| ⊕ | 02/19/2010 | 101.425 / 101.425 | 5.799 / 5.799 | 1 | 70,000 |
| ⊕ | 02/18/2010 | 105.274 / 102.616 | 5.35 / 5.277 | 3 | 65,000 |
| ⊕ | 02/17/2010 | 104 / 100.992 | 5.86 / 5.448 | 3 | 105,000 |
| ⊕ | 02/16/2010 | 102.875 / 102.25 | - | 2 | 270,000 |
| ⊕ | 02/12/2010 | 105.37 / 101.321 | 5.814 / 5.266 | 5 | 310,000 |
| ⊕ | 02/11/2010 | 105.894 / 100.1 | 5.985 / 5.197 | 16 | 600,000 |
| ⊕ | 02/10/2010 | 104.361 / 104.361 | 5.4 / 5.4 | 2 | 25,000 |
| ⊕ | 02/09/2010 | 105.967 / 101.07 | 5.849 / 5.187 | 10 | 445,000 |
| | 02/08/2010 | 105.901 / 100 | 5.999 / 5.197 | 10 | 700,000 |
| | 02/05/2010 | 104.8 / 101.932 | 5.73 / 5.342 | 4 | 260,000 |
| | 02/04/2010 | 104.75 / 101.319 | 5.815 / 5.349 | 9 | 325,000 |
| | 02/03/2010 | 103.9 / 103.9 | 5.463 / 5.463 | 2 | 150,000 |
| | 02/02/2010 | 105.052 / 101.375 | 5.807 / 5.31 | 16 | 890,000 |
| | 02/01/2010 | 102.329 / 101.348 | 5.811 / 5.676 | 6 | 235,000 |
| | 01/29/2010 | 104.375 / 101.248 | 5.825 / 5.401 | 3 | 85,000 |
| | 01/28/2010 | 104.176 / 101.05 | 5.852 / 5.427 | 4 | 270,000 |
| | 01/27/2010 | 101.692 / 101.692 | 5.764 / 5.764 | 1 | 10,000 |
| | 01/22/2010 | 101.692 / 101.692 | 5.765 / 5.765 | 1 | 5,000 |
| | 01/13/2010 | 102.83 / 102.292 | 5.608 / 5.608 | 2 | 270,000 |
| | 01/12/2010 | 104.75 / 101.801 | 5.6 / 5.353 | 12 | 1,120,000 |

DS Obj. 00055

| Trade Date | High Price / Low Price | High Yield / Low Yield | Number of Trades | Total |
|---|---|---|---|---|
| 01/11/2010 | 104.75 / 101.551 | 5.5 / 5.513 | | 6,925,000 |
| 01/08/2010 | 104.541 / 101.597 | 5.723 / 5.381 | 20 | 1,530,000 |
| 01/07/2010 | 104.544 / 101.171 | 5.647 / 5.381 | 18 | 2,595,000 |
| 01/06/2010 | 104.545 / 101.92 | 5.57 / 5.381 | 13 | 545,000 |
| 01/05/2010 | 103.554 / 100 | 6 / 5.513 | 22 | 4,765,000 |
| 01/04/2010 | 103.215 / 101.028 | 5.857 / 5.559 | 7 | 3,555,000 |
| 12/30/2009 | 103.957 / 100.5 | 5.75 / 5.46 | 19 | 1,010,000 |
| 12/29/2009 | 103.455 / 100.83 | 5.677 / 5.527 | 8 | 1,375,000 |
| 12/28/2009 | 102.856 / 100.5 | 5.835 / 5.608 | 6 | 395,000 |
| 12/24/2009 | 102 / 100 | 6 / 5.724 | 5 | 65,000 |
| 12/23/2009 | 104.5 / 100.3 | 5.913 / 5.389 | 24 | 1,620,000 |
| 12/22/2009 | 104.5 / 100.125 | 5.979 / 5.389 | 27 | 5,040,000 |
| 12/21/2009 | 104.5 / 100 | 6 / 5.389 | 48 | 11,985,000 |
| 12/18/2009 | 102.275 / 100.175 | 5.889 / 5.687 | 9 | 1,045,000 |
| 12/17/2009 | 103.12 / 99.444 | 6.02 / 5.573 | 48 | 2,980,000 |
| 12/16/2009 | 103 / 99.73 | 6.02 / 5.589 | 75 | 8,150,000 |
| 12/15/2009 | 102.497 / 99.224 | 6.057 / 5.657 | 53 | 10,495,000 |
| 12/14/2009 | 103.25 / 99 | 6.068 / 5.556 | 61 | 9,825,000 |
| 12/11/2009 | 103.5 / 99 | 6.073 / 5.523 | 165 | 23,775,000 |
| 12/10/2009 | 103.75 / 98.94 | 6.066 / 5.489 | 91 | 37,880,000 |
| 12/09/2009 | 103.75 / 99.04 | 6.07 / 5.489 | 115 | 37,220,000 |
| 12/08/2009 | 103.375 / 98.633 | 6.1 / 5.539 | 175 | 63,920,000 |
| 12/07/2009 | 103.375 / 97.301 | 6.2 / 5.539 | 190 | 15,045,000 |
| 12/04/2009 | 101.5 / 97.301 | 6.2 / - | 385 | 332,140,000 |
| 12/03/2009 | 98.375 / 97.501 | 6.185 / 6.185 | 3 | 1,500,000 |

Displaying 2,101 to 2,190 of 2,190 results

First Previous 1 … 18 19 20 21 22 Next Last

**NOTICE:** * CUSIP numbers and certain related descriptive information are copyrighted by the American Bankers Association (ABA) and are used with permission from CUSIP Global Services managed on behalf of the ABA by Standard & Poor's. © 2021 ABA See EMMA's Terms and Conditions of Use for a description of proprietary rights in and restrictions on use of such data. "CUSIP" is a registered trademark of ABA.

About EMMA | Sitemap | Privacy Policy | Terms of Use | DMCA Policy | MSRB.org | MSRB Systems Status



© 2021 Municipal Securities Rulemaking Board (MSRB)

EMMA is a service of the Municipal Securities Rulemaking Board, which protects investors, state and local governments, and the public interest. Portions of EMMA data provided by Standard & Poor's Securities Evaluations, Inc., CUSIP Global Services & American Bankers Association.

Ratings data are provided by the following and are reprinted with permission, and copyright notices for the respective owners are as follows: Copyright © 2021, Fitch, Inc. All rights reserved. Copyright © 2021, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. Copyright © 2021, Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved. Copyright © 2021, Standard and Poor's Financial Services LLC. All rights reserved.

1.0.9120-114-P3

DS Obj. 00056



**EMMA**®
Electronic Municipal Market Access
A service of the MSRB

| Browse Issuers | Tools and Resources | Market Activity | MyEMMA® | EMMA Dataport | A- 100% A+ |

<u>Click here for information on the MSRB response to COVID-19</u>

Home > Issuers By State > Puerto Rico > Issuer Homepage > Issue Details > Security Details

## Security Details

**CUSIP: 74514LB63***

COMMONWEALTH OF PUERTO RICO PUBLIC IMPROVEMENT REFUNDING BONDS, SERIES 2012 A (GENERAL OBLIGATION BONDS) (P
PUERTO RICO COMWLTH PUB IMPT REF BDS 2012A (PR)*

| | |
|---|---|
| Coupon: | 5.125 % |
| Maturity Date: | 07/01/2037 |
| Dated Date: | 04/03/2012 |
| Initial Offering Price/Yield: | 98.254% |
| Principal Amount at Issuance: | $263,540,000 |
| Closing Date: | 04/03/2012 |
| Fiscal Year End Date: | 06/30/2017 |



| Trade Activity | Ratings | Disclosure Documents | Final Scale | Compare |

View real-time price and yield information for trades in this security.

| Trade Summary | Trade Details | Search Trades |

Display 100 results   Search within list: [          ]   First Previous 1 ... 17 18 19 20 21 Next Last

| Trade Date | High/Low Price (%) | High/Low Yield (%) | Trade Count | Total Trade Amount ($) |
|---|---|---|---|---|
| 04/17/2013 | 98.05 / 91.832 | 5.754 / 5.268 | 32 | 1,510,000 |
| 04/16/2013 | 97.5 / 93 | 5.659 / 5.309 | 18 | 890,000 |
| 04/15/2013 | 96.858 / 94.042 | 5.575 / 5.358 | 6 | 1,455,000 |
| 04/12/2013 | 97 / 92.07 | 5.734 / 5.347 | 7 | 525,000 |
| 04/11/2013 | 96.301 / 92 | 5.74 / 5.4 | 5 | 290,000 |
| 04/10/2013 | 95.006 / 93.486 | 5.619 / 5.5 | 4 | 130,000 |
| 04/09/2013 | 96.375 / 90.06 | 5.901 / 5.394 | 23 | 725,000 |
| 04/08/2013 | 94.78 / 90.545 | 5.86 / 5.518 | 8 | 460,000 |
| 04/05/2013 | 93.784 / 90.955 | 5.826 / 5.596 | 5 | 340,000 |
| 04/04/2013 | 93.621 / 91.241 | 5.802 / 5.609 | 3 | 95,000 |
| 04/03/2013 | 95.125 / 89.884 | 5.915 / 5.491 | 18 | 565,000 |
| 04/02/2013 | 94.5 / 90.521 | 5.862 / 5.539 | 10 | 620,000 |
| 04/01/2013 | 94.75 / 89.613 | 5.938 / 5.52 | 16 | 1,125,000 |
| 03/28/2013 | 94.5 / 89.909 | 5.913 / 5.539 | 13 | 995,000 |
| 03/27/2013 | 94.75 / 91.125 | 5.811 / 5.52 | 13 | 1,260,000 |
| 03/26/2013 | 96.625 / 89.988 | 5.906 / 5.375 | 17 | 540,000 |
| 03/25/2013 | 96.75 / 91.182 | 5.806 / 5.366 | 12 | 355,000 |
| 03/22/2013 | 98.375 / 94.05 | 5.575 / 5.244 | 13 | 1,025,000 |
| 03/21/2013 | 98.875 / 95.285 | 5.478 / 5.207 | 10 | 180,000 |
| 03/20/2013 | 100 / 94.015 | 5.577 / 5.124 | 34 | 1,135,000 |
| 03/19/2013 | 100 / 94.51 | 5.538 / 5.124 | 16 | 720,000 |
| 03/18/2013 | 101.738 / 96.5 | 5.384 / 4.889 | 33 | 1,205,000 |
| 03/15/2013 | 100 / 93.05 | 5.654 / 5.124 | 26 | 685,000 |
| 03/14/2013 | 99.499 / 94.806 | 5.515 / 5.161 | 28 | 3,075,000 |

Exhibit D

| 03/13/2013 | 100 / 97.585 | | | |
| 03/12/2013 | 100 / 96.35 | 5.396 / 5.124 | 5 | 150,000 |
| 03/11/2013 | 101.9 / 96.03 | 5.42 / 4.867 | 9 | 205,000 |
| 03/08/2013 | 101.002 / 96.525 | 5.382 / 4.988 | 11 | 380,000 |
| 03/07/2013 | 101.9 / 99.275 | 5.177 / 4.868 | 10 | 445,000 |
| 03/06/2013 | 101.501 / 97 | 5.346 / 4.921 | 15 | 695,000 |
| 03/05/2013 | 101.502 / 96.53 | 5.382 / 4.921 | 8 | 325,000 |
| 03/04/2013 | 101.85 / 97.747 | 5.29 / 4.875 | 17 | 715,000 |
| 03/01/2013 | 101.85 / 98 | 5.271 / 4.875 | 26 | 950,000 |
| 02/28/2013 | 101.5 / 97.465 | 5.311 / 4.922 | 48 | 2,775,000 |
| 02/27/2013 | 101.75 / 97 | 5.346 / 4.888 | 19 | 1,095,000 |
| 02/26/2013 | 100.501 / 98.8 | 5.212 / 5.056 | 11 | 1,105,000 |
| 02/25/2013 | 102.3 / 97.219 | 5.33 / 4.815 | 42 | 4,175,000 |
| 02/22/2013 | 101.9 / 97.5 | 5.309 / 4.869 | 25 | 2,965,000 |
| 02/21/2013 | 101 / 97.9 | 5.279 / 4.989 | 23 | 710,000 |
| 02/20/2013 | 101.165 / 96.875 | 5.356 / 4.967 | 26 | 6,350,000 |
| 02/19/2013 | 101.375 / 97.428 | 5.314 / 4.939 | 12 | 630,000 |
| 02/15/2013 | 101.666 / 99 | 5.197 / 4.9 | 5 | 90,000 |
| 02/14/2013 | 101.667 / 97.95 | 5.275 / 4.9 | 10 | 690,000 |
| 02/13/2013 | 101.905 / 97.53 | 5.306 / 4.869 | 21 | 870,000 |
| 02/12/2013 | 101.875 / 97.5 | 5.309 / 4.873 | 17 | 955,000 |
| 02/11/2013 | 101.67 / 97.318 | 5.322 / 4.9 | 13 | 455,000 |
| 02/08/2013 | 101.875 / 96.776 | 5.363 / 4.873 | 15 | 1,010,000 |
| 02/07/2013 | 101 / 97.366 | 5.319 / 4.99 | 13 | 1,035,000 |
| 02/06/2013 | 101.669 / 97.713 | 5.293 / 4.9 | 5 | 325,000 |
| 02/05/2013 | 101.875 / 96.775 | 5.363 / 4.873 | 17 | 730,000 |
| 02/04/2013 | 101.998 / 96.05 | 5.418 / 4.857 | 17 | 515,000 |
| 02/01/2013 | 101 / 97.888 | 5.28 / 4.99 | 11 | 240,000 |
| 01/31/2013 | 101.775 / 97.286 | 5.325 / 4.887 | 7 | 335,000 |
| 01/30/2013 | 101.65 / 98.5 | 5.234 / 4.903 | 10 | 935,000 |
| 01/29/2013 | 101.9 / 97.367 | 5.319 / 4.87 | 26 | 1,110,000 |
| 01/28/2013 | 101.875 / 97.27 | 5.326 / 4.874 | 18 | 715,000 |
| 01/25/2013 | 101.875 / 97.25 | 5.327 / 4.874 | 6 | 230,000 |
| 01/24/2013 | 101.875 / 97.121 | 5.337 / 4.874 | 13 | 810,000 |
| 01/23/2013 | 101.8 / 97.125 | 5.337 / 4.884 | 41 | 2,355,000 |
| 01/22/2013 | 101.489 / 95.411 | 5.467 / 4.925 | 14 | 1,380,000 |
| 01/18/2013 | 101.748 / 97.762 | 5.289 / 4.891 | 8 | 300,000 |
| 01/17/2013 | 101.8 / 98 | 5.271 / 4.884 | 19 | 1,530,000 |
| 01/16/2013 | 101 / 96.165 | 5.409 / 4.99 | 8 | 620,000 |
| 01/15/2013 | 101.5 / 95.288 | 5.477 / 4.924 | 12 | 240,000 |
| 01/14/2013 | 100.93 / 95.58 | 5.454 / 5 | 11 | 330,000 |
| 01/11/2013 | 101 / 97.25 | 5.327 / 4.991 | 15 | 605,000 |
| 01/10/2013 | 101 / 95.56 | 5.456 / 4.991 | 10 | 370,000 |
| 01/09/2013 | 100 / 96.03 | 5.42 / 5.124 | 30 | 1,360,000 |
| 01/08/2013 | 100 / 95.796 | 5.438 / 5.125 | 24 | 4,040,000 |
| 01/07/2013 | 99.825 / 96.03 | 5.42 / 5.138 | 15 | 415,000 |
| 01/04/2013 | 100.127 / 97.286 | 5.324 / 5.108 | 9 | 110,000 |
| 01/03/2013 | 100 / 94.25 | 5.558 / 5.125 | 17 | 540,000 |
| 01/02/2013 | 99.691 / 94 | 5.577 / 5.147 | 49 | 3,000,000 |
| 12/31/2012 | 97.802 / 92.522 | 5.695 / 5.286 | 12 | 485,000 |
| 12/28/2012 | 98.375 / 92 | 5.737 / 5.244 | 66 | 4,345,000 |
| 12/27/2012 | 98.075 / 90.581 | 5.854 / 5.266 | 33 | 1,065,000 |
| 12/26/2012 | 98 / 92.015 | 5.736 / 5.271 | 19 | 1,205,000 |

DS Obj. 00058

| Date | High/Low Price | High/Low Yield | | |
|---|---|---|---|---|
| 12/24/2012 | 99.188 / 94.5 | | | |
| 12/21/2012 | 98.319 / 91.951 | 5.741 / 5.248 | 18 | 675,000 |
| 12/20/2012 | 98.983 / 91.35 | 5.79 / 5.199 | 34 | 1,790,000 |
| 12/19/2012 | 99.5 / 93.341 | 5.629 / 5.161 | 26 | 3,115,000 |
| 12/18/2012 | 99.129 / 93.53 | 5.614 / 5.188 | 39 | 3,750,000 |
| 12/17/2012 | 98.052 / 93.1 | 5.648 / 5.267 | 23 | 1,730,000 |
| 12/14/2012 | 101.964 / 93.53 | 5.614 / 4.865 | 18 | 1,025,000 |
| 12/13/2012 | 102.75 / 97 | 5.346 / 4.763 | 25 | 1,100,000 |
| 12/12/2012 | 102.75 / 99.272 | 5.178 / 4.763 | 28 | 4,560,000 |
| 12/11/2012 | 102.896 / 97.499 | 5.308 / 4.743 | 28 | 1,925,000 |
| 12/10/2012 | 103.19 / 97.84 | 5.283 / 4.706 | 20 | 1,255,000 |
| 12/07/2012 | 103.19 / 97.639 | 5.298 / 4.706 | 21 | 895,000 |
| 12/06/2012 | 103.19 / 98.1 | 5.264 / 4.706 | 23 | 1,250,000 |
| 12/05/2012 | 103.19 / 97.145 | 5.335 / 4.706 | 47 | 2,965,000 |
| 12/04/2012 | 103.65 / 97.75 | 5.289 / 4.648 | 50 | 3,605,000 |
| 12/03/2012 | 103.875 / 97.144 | 5.335 / 4.619 | 32 | 1,495,000 |
| 11/30/2012 | 104.046 / 97.2 | 5.33 / 4.597 | 39 | 1,725,000 |
| 11/29/2012 | 103.5 / 95.164 | 5.485 / 4.667 | 39 | 1,520,000 |
| 11/28/2012 | 103.699 / 97.639 | 5.298 / 4.642 | 68 | 4,715,000 |
| 11/27/2012 | 103.625 / 99.243 | 5.179 / 4.651 | 12 | 3,370,000 |
| 11/26/2012 | 103 / 101 | 4.992 / 4.732 | 7 | 310,000 |
| 11/23/2012 | 104.805 / 101.75 | 4.893 / 4.502 | 6 | 180,000 |
| 11/21/2012 | 103.375 / 100.19 | 5.099 / 4.684 | 13 | 465,000 |

Displaying 1,801 to 1,900 of 2,074 results

First  Previous  1  ...  17  18  19  20  21  Next  Last

NOTICE: * CUSIP numbers and certain related descriptive information are copyrighted by the American Bankers Association (ABA) and are used with permission from CUSIP Global Services managed on behalf of the ABA by Standard & Poor's, © 2021 ABA See EMMA's Terms and Conditions of Use for a description of proprietary rights in and restrictions on use of such data. "CUSIP" is a registered trademark of ABA.

About EMMA | Sitemap | Privacy Policy | Terms of Use | DMCA Policy | MSRB.org | MSRB Systems Status

© 2021 Municipal Securities Rulemaking Board (MSRB)



EMMA is a service of the Municipal Securities Rulemaking Board, which protects investors, state and local governments, and the public interest. Portions of EMMA data provided by Standard & Poor's Securities Evaluations, Inc., CUSIP Global Services & American Bankers Association.

Ratings data are provided by the following and are reprinted with permission, and copyright notices for the respective owners are as follows: Copyright © 2021, Fitch, Inc. All rights reserved. Copyright © 2021, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. Copyright © 2021, Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved. Copyright © 2021, Standard and Poor's Financial Services LLC. All rights reserved.

1.0.9120-114-P3

DS Obj. 00059



**EMMA**®
Electronic Municipal Market Access
A service of the MSRB

| Browse Issuers | Tools and Resources | Market Activity | MyEMMA® | EMMA Dataport | A- 100% A+ |

Click here for information on the MSRB response to COVID-19

Home > Issuers By State > Puerto Rico > Issuer Homepage > Issue Details > Security Details

## Security Details

**CUSIP: 74514LB63**ˣ

COMMONWEALTH OF PUERTO RICO PUBLIC IMPROVEMENT REFUNDING BONDS, SERIES 2012 A (GENERAL OBLIGATION BONDS) (PR)
PUERTO RICO COMWLTH PUB IMPT REF BDS 2012A (PR)ˣ

| | |
|---|---|
| Coupon: | 5.125 % |
| Maturity Date: | 07/01/2037 |
| Dated Date: | 04/03/2012 |
| Initial Offering Price/Yield: | 98.254% |
| Principal Amount at Issuance: | $263,540,000 |
| Closing Date: | 04/03/2012 |
| Fiscal Year End Date: | 06/30/2017 |



Trade Activity   Ratings   Disclosure Documents   Final Scale   Compare

View real-time price and yield information for trades in this security.

⇄ Trade Summary      ☰ Trade Details      🔍 Search Trades

Display [100 ▾] results   Search within list: [_____]   First  Previous  1 ... 17 18 19 20 21 Next Last

| Trade Date | High/Low Price (%) | High/Low Yield (%) | Trade Count | Total Trade Amount ($) |
|---|---|---|---|---|
| 11/20/2012 | 103.75 / 99.997 | 5.125 / 4.636 | 14 | 280,000 |
| 11/19/2012 | 104 / 99.95 | 5.128 / 4.604 | 25 | 880,000 |
| 11/16/2012 | 103.642 / 100 | 5.124 / 4.65 | 3 | 110,000 |
| 11/15/2012 | 102.925 / 100 | 5.124 / 4.742 | 7 | 380,000 |
| 11/14/2012 | 103.02 / 99.749 | 5.143 / 4.73 | 10 | 545,000 |
| 11/13/2012 | 102.474 / 98.557 | 5.229 / 4.8 | 6 | 330,000 |
| 11/12/2012 | 102.5 / 102.5 | 4.797 / 4.797 | 1 | 5,000 |
| 11/09/2012 | 104 / 100.333 | 5.08 / 4.605 | 18 | 3,895,000 |
| 11/08/2012 | 103.727 / 99.292 | 5.176 / 4.64 | 29 | 1,860,000 |
| 11/07/2012 | 103.7 / 99.25 | 5.179 / 4.643 | 10 | 1,085,000 |
| 11/06/2012 | 103.275 / 101.25 | 4.959 / 4.698 | 12 | 510,000 |
| 11/05/2012 | 103.364 / 97.64 | 5.297 / 4.687 | 24 | 1,595,000 |
| 11/02/2012 | 103.285 / 97.5 | 5.307 / 4.697 | 13 | 335,000 |
| 11/01/2012 | 103.047 / 100 | 5.124 / 4.727 | 17 | 885,000 |
| 10/31/2012 | 102.35 / 98.876 | 5.206 / 4.817 | 8 | 345,000 |
| 10/29/2012 | 101.813 / 99.097 | 5.19 / 4.887 | 5 | 65,000 |
| 10/24/2012 | 103.126 / 100.501 | 5.057 / 4.718 | 4 | 85,000 |
| 10/23/2012 | 103.023 / 100.463 | 5.062 / 4.731 | 8 | 185,000 |
| 10/22/2012 | 103.024 / 100.752 | 5.024 / 4.731 | 5 | 325,000 |
| 10/19/2012 | 102.5 / 99.396 | 5.168 / 4.798 | 2 | 30,000 |

DS Obj. 00060

| Date | Price | Yield | # | Volume |
|---|---|---|---|---|
| | 102.002 / 99.534 | | | |
| 10/17/2012 | 102.433 / 99 | 5.197 / 4.807 | 25 | 2,925,000 |
| 10/16/2012 | 103.193 / 98.756 | 5.215 / 4.71 | 33 | 1,935,000 |
| 10/15/2012 | 102.5 / 98.8 | 5.211 / 4.799 | 25 | 1,270,000 |
| 10/12/2012 | 103.128 / 99.35 | 5.171 / 4.719 | 6 | 1,665,000 |
| 10/11/2012 | 100.036 / 97.876 | 5.279 / 5.119 | 12 | 255,000 |
| 10/10/2012 | 103.319 / 98.637 | 5.223 / 4.695 | 16 | 500,000 |
| 10/09/2012 | 103 / 99 | 5.197 / 4.735 | 46 | 6,530,000 |
| 10/08/2012 | 102.357 / 98.459 | 5.236 / 4.818 | 9 | 460,000 |
| 10/05/2012 | 102.255 / 99.002 | 5.197 / 4.831 | 8 | 250,000 |
| 10/04/2012 | 102.89 / 99.5 | 5.16 / 4.75 | 20 | 2,490,000 |
| 10/03/2012 | 103 / 98.75 | 5.215 / 4.736 | 28 | 540,000 |
| 10/02/2012 | 103.091 / 99.052 | 5.193 / 4.724 | 53 | 3,780,000 |
| 10/01/2012 | 101.682 / 99.119 | 5.188 / 4.905 | 7 | 350,000 |
| 09/28/2012 | 103.498 / 98.375 | 5.242 / 4.673 | 12 | 505,000 |
| 09/27/2012 | 103.499 / 99.952 | 5.127 / 4.673 | 12 | 355,000 |
| 09/26/2012 | 102.925 / 98.5 | 5.233 / 4.746 | 26 | 1,230,000 |
| 09/25/2012 | 103.302 / 97.851 | 5.281 / 4.698 | 26 | 1,250,000 |
| 09/24/2012 | 102.925 / 98.051 | 5.266 / 4.746 | 13 | 270,000 |
| 09/21/2012 | 102 / 98.257 | 5.251 / 4.864 | 9 | 740,000 |
| 09/20/2012 | 101.682 / 98.052 | 5.266 / 4.905 | 14 | 555,000 |
| 09/19/2012 | 102.2 / 98 | 5.27 / 4.839 | 25 | 990,000 |
| 09/18/2012 | 102.325 / 98.05 | 5.266 / 4.823 | 10 | 1,015,000 |
| 09/17/2012 | 102.125 / 99.5 | 5.16 / 4.849 | 12 | 500,000 |
| 09/14/2012 | 102.5 / 99 | 5.197 / 4.8 | 28 | 1,440,000 |
| 09/13/2012 | 102.221 / 97.283 | 5.323 / 4.836 | 11 | 695,000 |
| 09/12/2012 | 102.863 / 98 | 5.27 / 4.755 | 44 | 2,265,000 |
| 09/11/2012 | 103.527 / 99 | 5.197 / 4.671 | 15 | 650,000 |
| 09/10/2012 | 102.825 / 97.75 | 5.288 / 4.76 | 20 | 1,630,000 |
| 09/07/2012 | 102.825 / 99.422 | 5.166 / 4.759 | 11 | 595,000 |
| 09/06/2012 | 103.5 / 97.75 | 5.288 / 4.675 | 28 | 1,560,000 |
| 09/05/2012 | 103.5 / 100 | 5.124 / 4.675 | 24 | 1,625,000 |
| 09/04/2012 | 103.8 / 98.75 | 5.215 / 4.638 | 32 | 915,000 |
| 08/31/2012 | 103.325 / 99 | 5.197 / 4.698 | 18 | 1,040,000 |
| 08/30/2012 | 103.8 / 99 | 5.197 / 4.638 | 19 | 1,410,000 |
| 08/29/2012 | 103 / 99.5 | 5.16 / 4.739 | 20 | 1,045,000 |
| 08/28/2012 | 104.602 / 99.5 | 5.16 / 4.539 | 14 | 1,820,000 |
| 08/27/2012 | 103.768 / 99.261 | 5.178 / 4.643 | 30 | 1,180,000 |
| 08/24/2012 | 102 / 99.243 | 5.179 / 4.866 | 2 | 70,000 |
| 08/23/2012 | 104.153 / 99.375 | 5.169 / 4.595 | 16 | 445,000 |
| 08/22/2012 | 103.125 / 100.5 | 5.059 / 4.724 | 7 | 490,000 |
| 08/21/2012 | 103.314 / 99.45 | 5.164 / 4.7 | 15 | 725,000 |
| 08/20/2012 | 103.2 / 99.55 | 5.157 / 4.715 | 20 | 505,000 |
| 08/17/2012 | 104 / 99.75 | 5.142 / 4.615 | 7 | 195,000 |
| 08/16/2012 | 103.692 / 99.875 | 5.133 / 4.653 | 27 | 1,710,000 |
| 08/15/2012 | 104.815 / 99.148 | 5.186 / 4.514 | 14 | 370,000 |
| 08/14/2012 | 104.5 / 99.508 | 5.16 / 4.553 | 12 | 415,000 |
| 08/13/2012 | 103.739 / 100.25 | 5.092 / 4.648 | 9 | 350,000 |

DS Obj. 00061

| Trade Date | Yield / Price Data | Yield Data | Count | Par Amount |
|---|---|---|---|---|
| 08/10/2012 | 103.953 / 101.66 | 4.979 / 4.587 | 19 | 995,000 |
| 08/09/2012 | 104.221 / 99.5 | 5.16 / 4.588 | 14 | 1,190,000 |
| 08/08/2012 | 104.338 / 101 | 4.995 / 4.574 | 13 | 605,000 |
| 08/07/2012 | 104.599 / 100.642 | 5.041 / 4.542 | 7 | 365,000 |
| 08/06/2012 | 104.669 / 101.492 | 4.931 / 4.534 | 34 | 2,355,000 |
| 08/03/2012 | 104.669 / 101.619 | 4.916 / 4.534 | 12 | 245,000 |
| 08/02/2012 | 104.456 / 99.58 | 5.154 / 4.56 | 23 | 880,000 |
| 08/01/2012 | 104.118 / 100.148 | 5.105 / 4.602 | 47 | 3,975,000 |
| 07/31/2012 | 105.7 / 99 | 5.197 / 4.408 | 14 | 2,670,000 |
| 07/30/2012 | 104.971 / 99.866 | 5.134 / 4.497 | 13 | 1,000,000 |
| 07/27/2012 | 106.901 / 103 | 4.741 / 4.264 | 24 | 1,170,000 |
| 07/26/2012 | 103.014 / 102.3 | 4.83 / 4.74 | 6 | 205,000 |
| 07/25/2012 | 106 / 102 | 4.868 / 4.373 | 26 | 2,425,000 |
| 07/24/2012 | 104.25 / 101.268 | 4.961 / 4.587 | 13 | 2,410,000 |
| 07/23/2012 | 104.242 / 100.4 | 5.073 / 4.588 | 9 | 600,000 |
| 07/20/2012 | 104.795 / 100.75 | 5.027 / 4.52 | 7 | 370,000 |
| 07/19/2012 | 104.837 / 100 | 5.125 / 4.515 | 20 | 970,000 |
| 07/18/2012 | 104.852 / 101 | 4.996 / 4.513 | 20 | 2,080,000 |
| 07/17/2012 | 104.936 / 101.355 | 4.95 / 4.504 | 18 | 1,135,000 |
| 07/16/2012 | 104.6 / 100 | 5.125 / 4.545 | 17 | 590,000 |
| 07/13/2012 | 104 / 101.752 | 4.9 / 4.619 | 14 | 330,000 |
| 07/12/2012 | 104.625 / 101.268 | 4.962 / 4.54 | 8 | 255,000 |
| 07/11/2012 | 104 / 100.2 | 5.099 / 4.619 | 18 | 2,190,000 |
| 07/10/2012 | 103 / 100.579 | 5.05 / 4.744 | 4 | 630,000 |
| 07/09/2012 | 102.501 / 101.375 | 4.948 / 4.806 | 5 | 70,000 |
| 07/06/2012 | 103.391 / 99.25 | 5.179 / 4.695 | 6 | 160,000 |
| 07/05/2012 | 100 / 99.94 | 5.129 / 5.124 | 4 | 520,000 |
| 06/29/2012 | 103.602 / 100.973 | 5 / 4.67 | 5 | 115,000 |
| 06/27/2012 | 102.125 / 100 | 5.124 / 4.854 | 5 | 55,000 |
| 06/26/2012 | 102.375 / 99 | 5.197 / 4.823 | 2 | 65,000 |
| 06/25/2012 | 102.024 / 100.024 | 5.122 / 4.866 | 2 | 50,000 |
| 06/22/2012 | 102.5 / 99.024 | 5.195 / 4.807 | 5 | 150,000 |

Displaying 1,901 to 2,000 of 2,074 results

First  Previous  1  ...  17  18  19  20  21  Next  Last

NOTICE: * CUSIP numbers and certain related descriptive information are copyrighted by the American Bankers Association (ABA) and are used with permission from CUSIP Global Services managed on behalf of the ABA by Standard & Poor's. © 2021 ABA See EMMA's Terms and Conditions of Use for a description of proprietary rights in and restrictions on use of such data. "CUSIP" is a registered trademark of ABA.

About EMMA   Sitemap   Privacy Policy   Terms of Use   DMCA Policy   MSRB.org   MSRB Systems Status

© 2021 Municipal Securities Rulemaking Board (MSRB)



EMMA is a service of the Municipal Securities Rulemaking Board, which protects investors, state and local governments, and the public interest. Portions of EMMA data provided by Standard & Poor's Securities Evaluations, Inc., CUSIP Global Services & American Bankers Association.

Ratings data are provided by the following and are reprinted with permission, and copyright notices for the respective owners are as follows: Copyright © 2021, Fitch, Inc. All rights reserved. Copyright © 2021, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. Copyright © 2021, Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved. Copyright © 2021, Standard and Poor's Financial Services LLC. All rights reserved.

1.0.9120-114-P3

DS Obj. 00062



**EMMA**®
Electronic Municipal Market Access
A service of the MSRB

| Browse Issuers | Tools and Resources | Market Activity | MyEMMA® | EMMA Dataport | A-  100%  A+ |
|---|---|---|---|---|---|

<u>Click here for information on the MSRB response to COVID-19</u>

Home > Issuers By State > Puerto Rico > Issuer Homepage > Issue Details > Security Details

## Security Details

**CUSIP: 74514LB63**ˣ
<u>COMMONWEALTH OF PUERTO RICO PUBLIC IMPROVEMENT REFUNDING BONDS, SERIES 2012 A (GENERAL OBLIGATION BONDS) (PR)</u>
<u>PUERTO RICO COMWLTH PUB IMPT REF BDS 2012A (PR)*</u>

| | |
|---|---|
| Coupon: | 5.125 % |
| Maturity Date: | 07/01/2037 |
| Dated Date: | 04/03/2012 |
| Initial Offering Price/Yield: | 98.254% |
| Principal Amount at Issuance: | $263,540,000 |
| Closing Date: | 04/03/2012 |
| Fiscal Year End Date: | 06/30/2017 |



Trade Activity    Ratings    Disclosure Documents    Final Scale    Compare

View real-time price and yield information for trades in this security.

⇄ Trade Summary    ☰ Trade Details    🔍 Search Trades

Display [100 ▾] results    Search within list: [_____]    First  Previous  1  ...  17  18  19  20  21  Next  Last

| Trade Date | High/Low Price (%) | High/Low Yield (%) | Trade Count | Total Trade Amount ($) |
|---|---|---|---|---|
| 06/21/2012 | 102.746 / 99.5 | 5.161 / 4.777 | 10 | 215,000 |
| 06/20/2012 | 102.625 / 99.981 | 5.126 / 4.79 | 19 | 445,000 |
| 06/19/2012 | 103.565 / 98.903 | 5.204 / 4.675 | 20 | 680,000 |
| 06/18/2012 | 102.51 / 99.5 | 5.161 / 4.806 | 22 | 815,000 |
| 06/15/2012 | 102.51 / 100.5 | 5.06 / 4.806 | 20 | 1,710,000 |
| 06/14/2012 | 102.5 / 99.25 | 5.179 / 4.808 | 25 | 1,310,000 |
| 06/13/2012 | 102.562 / 98.5 | 5.233 / 4.799 | 15 | 670,000 |
| 06/12/2012 | 102.563 / 99.536 | 5.158 / 4.8 | 23 | 1,170,000 |
| 06/11/2012 | 102.926 / 98.01 | 5.269 / 4.755 | 29 | 1,540,000 |
| 06/08/2012 | 103.75 / 97.762 | 5.287 / 4.653 | 37 | 7,595,000 |
| 06/07/2012 | 103.802 / 98.256 | 5.251 / 4.647 | 46 | 3,335,000 |
| 06/06/2012 | 103.77 / 98.756 | 5.214 / 4.651 | 32 | 3,075,000 |
| 06/05/2012 | 104.25 / 100.05 | 5.118 / 4.592 | 21 | 785,000 |
| 06/04/2012 | 104.311 / 100 | 5.124 / 4.585 | 23 | 1,195,000 |
| 06/01/2012 | 103.767 / 100.818 | 5.02 / 4.652 | 15 | 2,440,000 |
| 05/31/2012 | 105 / 100.25 | 5.092 / 4.502 | 8 | 1,300,000 |
| 05/30/2012 | 103.804 / 102.167 | 4.85 / 4.647 | 4 | 180,000 |
| 05/29/2012 | 103.805 / 99.875 | 5.134 / 4.648 | 7 | 420,000 |
| 05/25/2012 | 103.929 / 100.472 | 5.064 / 4.632 | 8 | 175,000 |
| 05/24/2012 | 104 / 100.237 | 5.094 / 4.624 | 16 | 540,000 |

DS Obj. 00063

| Date | Price | Yield | Count | Amount |
|---|---|---|---|---|
| 05/23/2012 | 104.193 / 99.846 | | | 90,000 |
| 05/22/2012 | 104.758 / 100 | 5.124 / 4.532 | 19 | 720,000 |
| 05/21/2012 | 104 / 100 | 5.124 / 4.624 | 21 | 1,525,000 |
| 05/18/2012 | 104.814 / 101 | 4.997 / 4.526 | 11 | 535,000 |
| 05/17/2012 | 104.649 / 99.898 | 5.132 / 4.546 | 31 | 4,725,000 |
| 05/16/2012 | 105.375 / 100.532 | 5.056 / 4.458 | 33 | 1,300,000 |
| 05/15/2012 | 105.375 / 101.25 | 4.966 / 4.458 | 47 | 4,010,000 |
| 05/14/2012 | 105.117 / 101.253 | 4.965 / 4.49 | 17 | 675,000 |
| 05/11/2012 | 104.75 / 100.755 | 5.028 / 4.534 | 34 | 1,435,000 |
| 05/10/2012 | 105.033 / 100.755 | 5.028 / 4.5 | 56 | 2,570,000 |
| 05/09/2012 | 105.558 / 101 | 4.997 / 4.437 | 37 | 4,720,000 |
| 05/08/2012 | 104.847 / 100.9 | 5.01 / 4.523 | 57 | 10,355,000 |
| 05/07/2012 | 104.233 / 100.75 | 5.029 / 4.597 | 20 | 2,840,000 |
| 05/04/2012 | 105.032 / 101.455 | 4.94 / 4.501 | 46 | 4,470,000 |
| 05/03/2012 | 103.785 / 99.792 | 5.139 / 4.652 | 60 | 18,385,000 |
| 05/02/2012 | 102.755 / 99.689 | 5.147 / 4.778 | 61 | 17,785,000 |
| 05/01/2012 | 102.5 / 99 | 5.196 / 4.81 | 68 | 3,110,000 |
| 04/30/2012 | 102.5 / 99.25 | 5.178 / 4.809 | 57 | 4,895,000 |
| 04/27/2012 | 102.5 / 100.017 | 5.121 / 4.81 | 32 | 1,885,000 |
| 04/26/2012 | 102.5 / 98.903 | 5.203 / 4.81 | 102 | 8,880,000 |
| 04/25/2012 | 102.5 / 99.25 | 5.178 / 4.81 | 49 | 3,295,000 |
| 04/24/2012 | 102.5 / 99.75 | 5.142 / 4.811 | 74 | 4,835,000 |
| 04/23/2012 | 102.547 / 98.775 | 5.212 / 4.805 | 45 | 1,915,000 |
| 04/20/2012 | 102.75 / 100.867 | 5.014 / 4.78 | 15 | 695,000 |
| 04/19/2012 | 102.05 / 99 | 5.196 / 4.866 | 31 | 35,795,000 |
| 04/18/2012 | 102.848 / 99.002 | 5.196 / 4.768 | 58 | 6,770,000 |
| 04/17/2012 | 102.252 / 99.25 | 5.178 / 4.842 | 31 | 3,120,000 |
| 04/16/2012 | 102.45 / 99.375 | 5.169 / 4.817 | 35 | 7,965,000 |
| 04/13/2012 | 102.649 / 98.875 | 5.205 / 4.793 | 38 | 2,745,000 |
| 04/12/2012 | 102 / 98.75 | 5.214 / 4.873 | 73 | 2,865,000 |
| 04/11/2012 | 102.25 / 98.5 | 5.232 / 4.842 | 70 | 3,860,000 |
| 04/10/2012 | 102.25 / 98.625 | 5.223 / 4.842 | 101 | 14,330,000 |
| 04/09/2012 | 102.125 / 98.75 | 5.214 / 4.858 | 95 | 19,325,000 |
| 04/05/2012 | 101.5 / 98 | 5.268 / 4.935 | 92 | 7,045,000 |
| 04/04/2012 | 101.483 / 98 | 5.269 / 4.938 | 96 | 4,430,000 |
| 04/03/2012 | 101.25 / 98.125 | 5.259 / 4.967 | 106 | 10,810,000 |
| 04/02/2012 | 101.5 / 98.362 | 5.242 / 4.936 | 92 | 10,640,000 |
| 03/30/2012 | 101.2 / 97.267 | 5.322 / 4.973 | 84 | 9,295,000 |
| 03/29/2012 | 100.984 / 97.4 | 5.313 / 5 | 123 | 10,115,000 |
| 03/28/2012 | 101 / 97.95 | 5.272 / 4.998 | 117 | 17,530,000 |
| 03/27/2012 | 101.75 / 98.05 | 5.264 / 4.905 | 129 | 30,865,000 |
| 03/26/2012 | 101 / 98.065 | 5.263 / 4.998 | 120 | 7,290,000 |
| 03/23/2012 | 101.375 / 97.743 | 5.287 / 4.951 | 134 | 20,645,000 |
| 03/22/2012 | 100.625 / 97.625 | 5.296 / 5.045 | 178 | 11,805,000 |
| 03/21/2012 | 100.75 / 97.175 | 5.329 / 5.029 | 306 | 26,790,000 |
| 03/20/2012 | 100.75 / 97.02 | 5.34 / 5.029 | 338 | 26,435,000 |
| 03/19/2012 | 100.625 / 97.125 | 5.333 / 5.045 | 358 | 30,310,000 |
| 03/16/2012 | 100.75 / 97 | 5.342 / 5.029 | 297 | 32,790,000 |

| Trade Date | High/Low Price | High/Low Yield | | |
|---|---|---|---|---|
| 03/15/2012 | 100.75 / 96.94 | 5.369 / 5.030 | 478 | 99,560,000 |
| 03/14/2012 | 102 / 96.94 | 5.347 / 4.874 | 580 | 88,860,000 |
| 03/13/2012 | 102 / 98.2 | 5.254 / - | 312 | 44,105,000 |
| 03/12/2012 | 101.875 / 98.354 | 5.243 / - | 438 | 57,475,000 |
| 03/09/2012 | 102.25 / 97.938 | 5.273 / - | 687 | 86,595,000 |
| 03/08/2012 | 102.25 / 97.628 | 5.295 / - | 2183 | 805,530,000 |

Displaying 2,001 to 2,074 of 2,074 results

First  Previous  1  …  17  18  19  20  21  Next  Last

NOTICE: * CUSIP numbers and certain related descriptive information are copyrighted by the American Bankers Association (ABA) and are used with permission from CUSIP Global Services managed on behalf of the ABA by Standard & Poor's. © 2021 ABA See EMMA's Terms and Conditions of Use for a description of proprietary rights in and restrictions on use of such data. "CUSIP" is a registered trademark of ABA.

About EMMA | Sitemap | Privacy Policy | Terms of Use | DMCA Policy | MSRB.org | MSRB Systems Status



© 2021 Municipal Securities Rulemaking Board (MSRB)

EMMA is a service of the Municipal Securities Rulemaking Board, which protects investors, state and local governments, and the public interest. Portions of EMMA data provided by Standard & Poor's Securities Evaluations, Inc., CUSIP Global Services & American Bankers Association.

Ratings data are provided by the following and are reprinted with permission, and copyright notices for the respective owners are as follows: Copyright © 2021, Fitch, Inc. All rights reserved. Copyright © 2021, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. Copyright © 2021, Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved. Copyright © 2021, Standard and Poor's Financial Services LLC. All rights reserved.

1.0.9120-114-P3

DS Obj. 00065



**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements and Required Supplementary Information

June 30, 2017

(With Independent Auditors' Report Thereon)



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

**Independent Auditors' Report**

To the Retirement Board of the Government of Puerto Rico
Employees' Retirement System of
    the Government of the Commonwealth of Puerto Rico:

We have audited the accompanying financial statements of the Employees' Retirement System of the
Government of the Commonwealth of Puerto Rico (the System), which comprises the statement of fiduciary net
position as of June 30, 2017, the related statement of changes in fiduciary net position for the year then ended,
and the related notes to the financial statements, which collectively comprise the System's basic financial
statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in
accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and
maintenance of internal control relevant to the preparation and fair presentation of financial statements that are
free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our
audit in accordance with auditing standards generally accepted in the United States of America. Those
standards require that we plan and perform the audit to obtain reasonable assurance about whether the
financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the
financial statements. The procedures selected depend on the auditors' judgment, including the assessment of
the risks of material misstatement of the financial statements, whether due to fraud or error. In making those
risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation
of the financial statements in order to design audit procedures that are appropriate in the circumstances, but
not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we
express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and
the reasonableness of significant accounting estimates made by management, as well as evaluating the overall
presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our
audit opinion.

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the fiduciary net
position of the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico as of
June 30, 2017, and the changes in its fiduciary net position for the year then ended, in accordance with
U.S. generally accepted accounting principles.

KPMG LLP is a Delaware limited liability partnership and the U.S. member
firm of the KPMG network of independent member firms affiliated with
KPMG International Cooperative ("KPMG International"), a Swiss entity.

DS Obj. 00067



*Emphasis of Matters*

Uncertainty about Ability to Continue as a Going Concern

The accompanying financial statements have been prepared assuming that the System will continue as a going concern. As discussed in notes 3 and 14 to the basic financial statements, the System is severely underfunded, sold its remaining investments in the aggregate amount of approximately $297 million, and started operating on a pay as you go basis in fiscal year 2018. Additionally, on May 3, 2017 and May 22, 2017, the Financial Oversight and Management Board commenced cases for the Commonwealth of Puerto Rico and the System, respectively, by filling petitions for relief under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act with the United States District Court for Puerto Rico. Accordingly, management of the System has stated that substantial doubt exists about the System's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are also included in note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

*Other Matters*

Required Supplementary Information

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 3–14 and the schedules in pages 75-81 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

KPMG LLP

San Juan, Puerto Rico
June 29, 2020

Stamp No. E403599 of the Puerto Rico
Society of Certified Public Accountants was
affixed to the record copy of this report.

DS Obj. 00068

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### (j)  Other Postemployment Benefits (OPEB) – Healthcare Benefits

ERS MIPC is an unfunded cost-sharing, multi-employer defined benefit other postemployment benefit plan sponsored by the Commonwealth. ERS MIPC covers a payment of up to $100 per month to the eligible medical insurance plan selected by the member provided the member retired prior to July 1, 2013 (Act No. 483, as amended by Act No. 3). Substantially all full time employees of the Commonwealth's central government, certain municipalities of Puerto Rico and certain component units of the Commonwealth not having their own postemployment benefit plan, were covered by the OPEB.

Commonwealth employees became members upon their date of employment. Plan members were eligible for benefits upon reaching the pension benefits retirement ages.

At July 1, 2016, the membership consisted of the following:

| Membership: | |
|---|---|
| Retired members | 94,071 |
| Disabled members | 14,722 |
| Total membership | 108,793 |

The contribution requirement of ERS MIPC is established by Act No. 95 approved on June 29, 1963. This OPEB plan is financed by the Commonwealth. There is no contribution requirement from the plan member during active employment. Retirees contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution. As a result, these OPEB are 100% unfunded. During the year ended June 30, 2017, OPEB contributions amounted to $91 million.

The funding of the OPEB benefits is provided to the System through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees, and by certain public corporations with their own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the System for the healthcare benefits throughout the year.

### (5)  Net Pension Liability

The components of the net pension liability as of June 30, 2017 were as follows (dollars in thousands):

| | | |
|---|---|---|
| Total pension liability | $ | 30,091,826 |
| Plan's fiduciary net deficit | | (2,108,853) |
| Net pension liability | $ | 32,200,679 |
| Plan's fiduciary net deficit as a percentage of the total pension liability | | (7.01)% |

37                                                                              (Continued)

DS Obj. 00069

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

**(a) Actuarial Methods and Assumptions**

The census data collection date is at the beginning-of-the fiscal year. The liability results as of June 30, 2017 are based on projecting the System obligations determined as of the census data collection date of July 1, 2016 for one year, using roll-forward methods and assuming no liability gains or losses.

The actuarial valuation used the following actuarial assumptions:

| | |
|---|---|
| Inflation | Not applicable |
| Municipal bond index | 3.58%%, as per Bond Buyer General Obligation 20-Bond Municipal Bond Index |
| Projected salary increases | 3.00% per year. No compensation increases are assumed until July 1, 2021 as a result of Act No. 3-2017 and the current general economy. |
| Mortality | Pre-retirement Mortality: |
| | For general employees not covered under Act No. 127, RP-2014 Employee Mortality Rates for males and females adjusted to reflect Mortality Improvement Scale MP-2017 from the 2006 base year, and projected forward using MP-2017 on generational basis. For members covered under Act No. 127, RP-2014 Employee Mortality Rates with blue collar adjustments for males and females adjusted to reflect Mortality Improvement Scale MP-2017 from the 2006 base year, and projected forward using MP-2017 on generational basis. As generational tables, they reflect mortality improvements both before and after the measurement date. |
| | 100% of deaths while in active service are assumed to be occupational for members covered under Act No. 127. |

(Continued)

DS Obj. 00070

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Post-retirement Healthy Mortality:
    Rates which vary by gender are assumed for healthy retirees and
    beneficiaries based on a study of plan's experience from 2007
    to 2012 and updated expectations regarding future mortality
    improvement. The 2010 base rates are equal to 92% of the rates
    from the UP-1994 Mortality Table for Males and 95% of the rates
    from the UP-1994 Mortality Table for Females, both projected
    from 1994 to 2010 using Scale AA. The base rates are projected
    using Mortality Improvement Scale MP-2017 on a generational
    basis. As a generational table, it reflects mortality improvements
    both before and after the measurement date.

Post-retirement Disabled Mortality:
    Rates which vary by gender are assumed for disabled retirees
    based on a study of plan's experience from 2007 to 2012 and
    updated expectations regarding future mortality improvement.
    The 2010 base rates are equal to 105% of the rates from
    the UP-1994 Mortality Table for Males and 115% of the rates from
    the UP-1994 Mortality Table for Females. The base rates are
    projected using Mortality Improvement Scale MP-2017 on a
    generational basis. As a generational table, it reflects mortality
    improvements both before and after the measurement date.

Most other demographic assumptions used in the June 30, 2017 valuation were based on the results of an actuarial experience 2009 study using data as of June 30, 2003, June 30, 2005 and June 30, 2007.

*(b) Long-Term Expected Rate of Return*

The long-term expected rate of return on pension benefits investments was not applicable as of June 30, 2017. Net assets are negative as of June 30, 2017 and accordingly, it is not possible to determine a rate of return on net assets during the fiscal year. In addition, after June 30, 2017, due to the PayGo system by which the Commonwealth guarantees payment of pensions. System assets were no longer necessary to generate investment returns to pay pension benefits. The approximate actual rate of return on gross assets was 8.74% as of June 30, 2017.

(Continued)

DS Obj. 00071

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Before June 30, 2017, the pension plan's policy for allocation of invested assets has been established and may be amended by the System's Board of Trustees. Plan assets are managed on a total return basis with a long-term objective of achieving and maintaining a positive impact on the System's financial condition for the benefits provided through the pension programs. The following asset allocation policy as of June 30, 2017 was adopted by the System's Board of Trustees:

| | Target allocation | Long-term expected rate of return |
|---|---|---|
| Asset class: | | |
| Domestic equity | 56 % | N/A |
| International equity | 15 | N/A |
| Fixed income | 28 | N/A |
| Cash | 1 | N/A |
| Total | 100 % | |

In prior years, the long-term expected rate of return on pension benefits investments was determined using a building-block method in which best-estimate ranges of expected future real rates of return (expected returns, net of pension plan investment expense and inflation) are developed for each major asset class. These ranges are combined to produce the long-term expected rate of return by weighting the expected future real rates of return by the target asset allocation percentage and by adding expected inflation. This year, the long-term expected rate of return assumption is no longer applicable.

*(c)* *Discount Rate*

The asset basis for the date of depletion projection is the System's fiduciary net position (the gross assets plus deferred outflows of resources less the gross liabilities, including the senior pension funding bonds payable, plus deferred inflows of resources). On this basis, the System's fiduciary net position was exhausted in the fiscal year 2015.

The System's fiduciary net position was not projected to be available to make all projected future benefit payments of current active and inactive employees. Therefore, the tax free municipal bond index (Bond Buyer General Obligation 20-Bond Municipal Bond Index) was applied to all periods of projected benefits payments to determine the total pension liability. The discount rate was 3.58% as of June 30, 2017.

The June 30, 2017, actuarial valuation reflects a decrease of $5,498 million in the net pension liability, mainly related to changes in assumptions of $4,179 million, as a result of an increase in the discount rate as required by GASB Statement No. 67 from 2.85% in fiscal year 2016 to 3.58% in fiscal year 2017, and the effect of plan changes of approximately $2,017 million.

(Continued)

DS Obj. 00072

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

*(d)  Sensitivity of the Net Pension Liability to Changes in the Discount Rate*

The following presents the net pension liability calculated using the discount rate of 3.58%, as well as what it would be if it were calculated using a discount rate of 1%-point lower (2.58%) or 1% point higher (4.58%) than the current rate (dollars in thousands):

|  | 1% Decrease (2.58%) | Current discount rate (3.58%) | 1% Increase (4.58%) |
|---|---|---|---|
| Net pension liability | $   36,599,444 | 32,200,679 | 28,666,953 |

**(6)  Cash and Cash Equivalents, Investments and Securities Lending Transactions**

*Cash and Cash Equivalents*

Cash and cash equivalents as of June 30, 2017 consisted of the following (in thousands):

|  | Carrying amount | Depository bank balance | Amount uninsured and uncollateralized |
|---|---|---|---|
| Deposits with GDB | $            — | 30,027 | 30,027 |
| Deposits with Puerto Rico commercial banks | 460,174 | 454,587 | — |
| Money market funds | 15,619 | N/A | N/A |
| U.S. Treasury bills | 909 | N/A | N/A |
| Total | $   476,702 | 484,614 | 30,027 |

Custodial credit risk for deposits is the risk that, in an event of the failure of a depository financial institution, the System may not be able to recover deposits or collateral securities that are in the possession of an outside party. The Commonwealth requires that public funds deposited in Puerto Rico commercial banks be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by banks in the Commonwealth's name. Deposits with GDB and with non-Puerto Rico commercial banks and money market funds are uninsured and uncollateralized, as these entities are exempt from compliance with the collateralization requirement.

Restricted cash and cash equivalent amounted to approximately $216 million as of June 30, 2017 and consisted of the following:

- Approximately $1.9 million of funds are restricted for the debt service of the bonds payable, and 100% of such funds were deposited at trustee in money market funds

(Continued)

DS Obj. 00073

**PUERTO RICO GOVERNMENT EMPLOYEES RETIREMENT SYSTEM**

**June 30, 2017 Actuarial Valuation Report**

*PRGERS net assets became negative in the 2014-2015 fiscal year. PRGERS gross assets as of June 30, 2017 are less than one year of expected benefit payments.*

This report was prepared solely to provide assistance to PRGERS.  Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report.  Any distribution of this report should be made in its entirety.



1550 Liberty Ridge Drive
Suite 200
Wayne, PA 19087-5572

Tel  +1 610 687.5644
Fax +1 610.687.4236

www.milliman.com

March 26, 2019

Mr. Luis M. Collazo Rodríguez, Esq.
Administrator
Puerto Rico Government Employees and
    Judiciary Retirement System Administration
437 Ponce de León Avenue
Hato Rey, PR  00918

Dear Mr. Collazo:

This report presents the results of the actuarial valuation of the Puerto Rico Government
Employees Retirement System (PRGERS), a cost-sharing multiple employer defined
benefit pension plan, as of June 30, 2017.  Section I contains highlights of the valuation
including a general discussion.  The subsequent Sections contain schedules summarizing
the underlying calculations, asset information, participant data, plan benefits and actuarial
assumptions and methods.

Purpose

The main purposes of this report are:

- to present information pertaining to the operation of the plan for inclusion in
  financial statements based on relevant Statements of the Government
  Accounting Standards Board (GASB);

- to review the experience under the plan since the previous valuation; and

- to assess the relative funded position of the plan.

The use of this report for purposes other than those stated above may not be appropriate
and should be reviewed with Milliman.

This report was prepared solely to provide assistance to PRGERS.  Milliman and PRGERS do not intend
to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS
recommend that any third party recipient of this report be aided by its own actuary or other qualified
professional when reviewing the Milliman report.  Any distribution of this report should be made in its
entirety.

DS Obj. 00075

Mr. Luis M. Collazo Rodríguez, Esq.
March 26, 2019
Page 2

The report was prepared solely to provide assistance to the Commonwealth of Puerto Rico Government Employees Retirement System for a specific and limited purpose.  It is a complex, technical analysis that assumes a high level of knowledge concerning PRGERS' operations, and uses PRGERS' data, which Milliman has not audited.  Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report.  Any distribution of this report should be made in its entirety.

Data Reliance

In performing this analysis, we relied on the census data, asset information, and other information (both written and oral) provided by the System.  We have not audited or verified the census data, asset information, or other information.  To the extent that any of these are inaccurate or incomplete, the results of this valuation may likewise be inaccurate or incomplete.

We did not audit the data used in our analysis, but did review it for reasonableness and consistency and have not found material defects in the data.  It is possible that material defects in the data would be uncovered by a detailed, systematic review and comparison of the data to search for data values that are questionable or for relationships that are materially inconsistent.  Such a review was beyond the scope of our assignment.

The asset information used for the valuation was taken from unaudited financial statements as of June 30, 2017 provided by PRGERS on December 5, 2018 and is subject to change upon audit.

Future Measurements

This valuation report is only an estimate of the System's financial condition as of a single date.  It can neither predict the System's future condition nor guarantee future financial soundness.  Actuarial valuations do not affect the ultimate cost of System benefits.  While the valuation is based on an array of individually reasonable assumptions, other assumption sets may also be reasonable and valuation results based on those assumptions would be different.  No one set of assumptions is uniquely correct.  Determining results using alternative assumptions is outside the scope of our engagement.

This report was prepared solely to provide assistance to PRGERS.  Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report.  Any distribution of this report should be made in its entirety.

Mr. Luis M. Collazo Rodríguez, Esq.
March 26, 2019
Page 3

Future actuarial measurements may differ significantly from the current measurements presented in this report due to factors such as the following:

- Plan experience differing from the actuarial assumptions;
- Future changes in the actuarial assumptions;
- Increases or decreases expected as part of the natural operation of the methodology used for these measurements; and,
- Changes in the plan provisions or accounting standards.

Due to the limited scope of our assignment, we did not perform an analysis of the potential range of such measurements.

Certification

We hereby certify that, to the best of our knowledge, this report is complete and accurate and all costs and liabilities were determined in conformance with generally accepted actuarial principles and practices which are consistent with the Actuarial Standards of Practice promulgated by the Actuarial Standards Board and the applicable Guides to Professional Conduct, amplifying Opinions, and supporting recommendations of the American Academy of Actuaries and are based on actuarial assumptions and methods adopted by the System.  All of the actuarial assumptions were developed by Milliman in consultation with PRGERS.  We believe that the actuarial assumptions and methods used in this actuarial valuation are reasonable for the main purposes of this report as stated herein.

Actuarial computations presented in this report are for purposes of fulfilling financial accounting requirements under the GASB Statements 45 and 67.  The calculations in the enclosed report have been made on a basis consistent with our understanding of the plan provisions described in Section VII of this report, and of the applicable GASB Statements. Determinations for purposes other than meeting these requirements may be significantly different from the results contained in this report.  Accordingly, additional determinations may be needed for other purposes.

This valuation reflects the law in effect as of June 30, 2017, as required by GASB accounting.  As a known event, the impact of Act 106-2017, effective August 23, 2017 is reflected as well.  The impacts of Act 211-2015 and Act 170-2016 are not yet fully known, along with any other prospective legislative changes.

This report was prepared solely to provide assistance to PRGERS.  Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report.  Any distribution of this report should be made in its entirety.

DS Obj. 00077

# PUERTO RICO GOVERNMENT EMPLOYEES RETIREMENT SYSTEM

## SECTION I – SUMMARY

ARC for this benefit has been calculated based on an assumed investment return rate of 2.90% based on the asset allocation of the Commonwealth's general assets that are used to pay this benefit.

We note that, as a cost-sharing multiple employer plan, PRGERS is not required to report a Net OPEB Obligation. In accordance with paragraph 23 of GASB 45, the employers that participate in the plan should recognize annual OPEB expense equal to their contractually required contributions to the plan. The employers do not have an Annual Required Contribution (ARC) or a Net OPEB Obligation. (PRGERS reports an ARC for the system as a whole, not separate ARCs for the individual employers.) Any difference between contributions required and contributions made would produce an OPEB liability or asset at the employer level.

Note that GASB issued GASB 75 in June 2015 which makes changes to GASB 45 similar to how GASB 25/27 were updated by GASB 67/68. GASB 75 is effective beginning with the 2017-2018 fiscal year, unless earlier adoption occurs.

GASB 67 Projection to Determine Date of Depletion (if any)

GASB 67 requires that a projection be performed for the System to determine a date of depletion, if any, and the resulting effective discount rate. This complex projection is used to determine the point at which the System is expected to deplete assets per GASB 67. The analysis includes a projection of member and employer contributions, benefit payments, and administrative expenses attributable to current members. Amounts attributable to members hired in the future are excluded except to the extent that employer contributions exceed the cost of benefits for those future members. *Because the date of depletion projection does not incorporate all projected cash inflows to and outflows from the System, the results will differ from those in a comprehensive cash flow projection that models all inflows and outflows. In other words, the GASB 67 date of depletion is not the same as the date that the System would be expected to exhaust assets.*

Once a depletion date has been determined, it is used as an input in the determination of the accounting liability as follows:
- The present value of all future benefits for GASB 67 accounting purposes is determined as follows:
  - For projected benefit payments occurring prior to the date of depletion, the discount rate is based on the System's expected return on assets.

This report was prepared solely to provide assistance to PRGERS. Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report. Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report. Any distribution of this report should be made in its entirety.

DS Obj. 00078

**PUERTO RICO GOVERNMENT EMPLOYEES RETIREMENT SYSTEM**

**SECTION I – SUMMARY**

- o   For projected benefit payments occurring after the date of depletion, the discount rate is based on a tax-free municipal bond index.
- Based on the resulting present value of all future benefits for GASB 67 accounting purposes, a single equivalent interest rate can be imputed that yields the same present value.

GASB 67 and its implementation guide do not address the mechanics of the date of depletion projection when the retirement system is the issuer of Pension Obligation Bonds (POBs) – e.g. whether the date of depletion projection should be performed on a gross assets or net assets basis.  Typically, the governmental sponsor issues the POBs and contributes the proceeds to the retirement system.  However, PRGERS issued the POBs and is responsible for repaying the interest and principal on the bonds.  As directed by the Treasury Department, the Government Development Bank, and the System (after consultation with the auditor) at the outset of GASB 67, the asset basis for the date of depletion projection is the System's net assets (the gross assets less the Pension Obligation Bond proceeds).  On this basis, net assets were exhausted in the 2014-2015 fiscal year and no calculation needs to be performed, as the tax-free municipal bond index applies in all years, and is thus the single equivalent interest rate that is used as the discount rate in the determination of the Total Pension Liability.

This report was prepared solely to provide assistance to PRGERS.  Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report.  Any distribution of this report should be made in its entirety.

DS Obj. 00079

**PUERTO RICO GOVERNMENT EMPLOYEES RETIREMENT SYSTEM**

## SECTION VIII – SUMMARY OF ACTUARIAL ASSUMPTIONS AS OF JUNE 30, 2017

Investment Return:  Not applicable due to pay-as-you-go funding.  As of June 30, 2016 was 6.55% per annum, net of investment expenses (based on the System's investment policy, including target asset allocation and expectations regarding the loan portfolio, and Milliman's capital market assumptions as of June 30, 2016)

Municipal Bond Rate:  3.58% per annum (Bond Buyer General Obligation 20-Bond Municipal Bond Index)

GASB 67 discount rate:  3.58% per annum

GASB 45 discount rate:  2.90% per annum.  Based on the Commonwealth's asset allocation for the general assets that are used to pay this benefit and Milliman's capital market assumptions as of June 30, 2017.

Compensation Increases:  3.0% per year.  No compensation increases are assumed until July 1, 2021 as a result of the Act 3-2017 four year extension of the Act 66-2014 salary freeze and the current general economy.  Based on professional judgment and System input.

Defined Contribution Hybrid Contribution Account:  No member contributions will be made to the Defined Contribution Hybrid Contribution Account after June 30, 2017.  Based on the liquidation of System assets and move to pay-as-you-go funding under Act 106-2017, no future interest credits are assumed after June 30, 2017.  During 2016-2017, the Defined Contribution Hybrid Contribution Account as of July 1, 2016 was assumed to increase by member contributions of 10% of Compensation and 5.24% annual investment return.

Basis for demographic assumptions:  The post-retirement healthy and disabled mortality assumptions used in this valuation are based on a study of plan's experience from 2007 to 2012 and updated expectations regarding future mortality improvement.  Most other demographic assumptions used in this valuation are based on a 2009 experience study using data as of June 30, 2003, June 30, 2005, and June 30, 2007.  Certain demographic assumptions (e.g. termination and retirement) were impacted by the Act 3 pension reforms and were revised based on the new retirement eligibility and expected future experience.  All assumptions were reviewed with PRGERS staff for reasonableness and are documented in this Section.

This report was prepared solely to provide assistance to PRGERS.  Milliman and PRGERS do not intend to benefit and assume no duty or liability to other parties who receive this report.  Milliman and PRGERS recommend that any third party recipient of this report be aided by its own actuary or other qualified professional when reviewing the Milliman report.  Any distribution of this report should be made in its entirety.

DS Obj. 00080

# Commonwealth of Puerto Rico

Comprehensive Annual Financial Report
Year Ended June 30, 2011

# *COMPREHENSIVE ANNUAL FINANCIAL REPORT*

## *Fiscal Year Ended June 30, 2011*



## *Commonwealth of Puerto Rico*

### *Honorable Luis G. Fortuño Burset*
### *Governor*

*Prepared by:*

### *Puerto Rico Department of the Treasury*

### *Jesús F. Méndez Rodríguez, CPA*
*Secretary of the Treasury*

### *Jaysel D. Chevres Santiago, CPA*
*Assistant Secretary of Central Accounting*

This document is available on the Puerto Rico Department of the Treasury homepage
On the World Wide Web: http://www.hacienda.gobierno.pr



CPA JESUS F. MENDEZ RODRIGUEZ
SECRETARY OF TREASURY

April 27, 2012

The Honorable Governor of Puerto Rico,
Members of the Legislature, and People of Puerto Rico:

It is my pleasure to present the Comprehensive Annual Financial Report (CAFR) of the Commonwealth of Puerto Rico (the "Commonwealth") for the fiscal year ended June 30, 2011. This report, presented in three sections, Introductory, Financial, and Statistical, is the primary means of reporting the Commonwealth's financial activities.

The Introductory Section includes this letter of transmittal, general information about the Commonwealth, a list of the Commonwealth's principal elected and appointed officials and an organizational chart. The Financial Section includes the independent auditors' report, management's discussion and analysis (MD&A), the audited basic financial statements as listed in the table of contents and the notes thereto and the required supplementary information. The statistical section set forth selected unaudited financial and demographic information for the Commonwealth on a multiyear basis.

**Profile of the Commonwealth**

The Puerto Rico Department of the Treasury is responsible for the preparation of this report. The responsibility for the accuracy of presented data and the completeness and fairness of the presentation, including all of the disclosures, rests on the Commonwealth's management. To the best of our knowledge and belief, the following data, as presented, is accurate in all material respects and is presented in a manner designed to set forth the financial position and the results of operations of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth as of June 30, 2011 and the respective changes in financial position and cash flows, where applicable, thereof and the respective budgetary comparison for the general fund for the year then ended in conformity with accounting principles generally accepted in the United States of America. We have included all the necessary disclosures to enable the reader to gain a thorough understanding of the Commonwealth's activities.

The financial reporting entity consists of the primary government, other organizations for which the primary government is financially accountable, and other organizations for which the nature and significance of their relationship with the primary government are such that exclusion would cause the reporting entity's financial statements to be misleading or incomplete.

The definition of the reporting entity is based primarily on the notion of financial accountability. A primary government is financially accountable for the organizations that make up its legal entity. It is also financially accountable for legally separate organizations if its officials appoint a voting majority of an organization's governing body and it is able to either impose its will on that organization or there is a

DS Obj. 00083

Agency funds consist of the Special Deposits Fund. This agency fund includes deposits under the custody of the Courts of Justice, Minors Support Administration for child support payments, deposits under the custody of the Commissioner of Insurance of the Commonwealth for escheated property, and for insurance companies under liquidation and an allocated share of the sales and use tax corresponding to the municipalities.

**Cash Management Policies and Practices**

The Commonwealth maintains a cash pool for its cash and cash equivalents. The balance in the pooled cash accounts is available to meet current operating requirements and any excess is invested in various interest-bearing accounts in the Government Development Bank for Puerto Rico, a discretely presented component unit. In addition, the Puerto Rico Government Investment Trust Fund (PRGITF) was created by the Commonwealth pursuant to Act No. 176 of August 11, 1995, as a no-load diversified collective investment trust that for the purpose of providing eligible governmental investors of Puerto Rico with a convenient and economical way to invest in a professionally managed money market portfolio. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

The Commonwealth's investment policy is to minimize credit and market risk while maintaining a competitive yield on its portfolio. The cash temporarily idle during this year was invested mainly in U.S. government securities, stocks, corporate bonds, repurchase agreements, Commonwealth securities other trading securities, and short-term investments. These are primary government investments that are restricted and unrestricted.

**Capital Assets**

These basic financial statements include the capital assets of the Commonwealth. A discussion of capital assets accounting is included in the MD&A that is part of the basic financial statements. More detailed information about capital assets can be found in the notes to the basic financial statements.

**Debt Administration**

The Commonwealth had a number of debt issues outstanding. The Commonwealth's general obligation and appropriation debt is currently rated "Baa1" by Moody's Investors Service, "BBB" by Standard & Poor's Ratings Services, and "BBB+" by Fitch, Inc.

Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes are backed by the full faith, credit and taxing power of the Commonwealth shall not be issued if the amount of the principal and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of the Commonwealth Legislation and deposited into the Treasury of Puerto Rico in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the commonwealth on such guaranteed debt. At June 30, 2011, the Commonwealth is in compliance with the debt limitation requirement. See the computation of the legal debt margin in the statistical section of this report. More detailed information about the long-term debt can be found in the notes to the basis financial statements.

SECRETARY OF THE TREASURY

DS Obj. 00084

In addition, the administration designed and began to implement the Strategic Model for a New Economy, a series of economic development initiatives to enhance Puerto Rico's overall economic competitiveness and strengthen specific industry sectors. The current administration is emphasizing the following initiatives to enhance Puerto Rico's competitive position: (i) overhauling the permitting process, (ii) reducing energy costs, (iii) reforming the tax system, (iv) promoting the development of various projects through public-private partnerships, (v) implementing strategic initiatives targeted at specific economic sectors, and (vi) promoting the development of certain strategic/regional projects. These economic development initiatives are intended to support the prospects of long-term and sustainable growth.

**Financial and Economic Condition**

The MD&A, which can be found immediately following the independent auditors' report, provides an overview of the Commonwealth's financial activities addressing both governmental and business activities reported in the government wide financial statements. In addition, the MD&A focuses on the Commonwealth's major funds. Component units and fiduciary activities are excluded from the MD&A. Furthermore, the MD&A provides an overview of additional economic factors affecting the Commonwealth.

**Acknowledgements**

The preparation of this report requires the collective efforts of numerous finance personnel throughout the Commonwealth and is made possible only with the cooperation and support of the Executive, Legislative, and Judicial branch agencies, and component units of the Commonwealth. I sincerely appreciate the dedicated efforts of all these individuals.

The report could not have been accomplished without the professionalism and dedication of Jaysel D. Chevres, as well as the rest of personnel of the Central Government Accounting area. This report confirms our commitment to the people of Puerto Rico, the Governor, the Legislature, and the financial community to maintain our basic financial statements in conformity with the highest standards of financial accountability.

Respectfully submitted,

Hon. Jesús F. Méndez Rodríguez, CPA
Secretary of the Treasury

SECRETARY OF THE TREASURY

DS Obj. 00085

## COMMONWEALTH OF PUERTO RICO

**PRINCIPAL OFFICIALS**

**Luis G. Fortuño Burset**
Governor

**Members of the Cabinet**

**Marcos Rodríguez Ema**
Chief of Staff

| | | |
|---|---|---|
| **Kenneth D. McClintock Hernández**<br>Secretary of State | **Guillermo A. Somoza Colombani**<br>Secretary of Justice | **Jesús F. Méndez Rodríguez**<br>Secretary of the Treasury |
| **Edward Moreno Alonso**<br>Acting Secretary of Education | **Miguel A. Romero Lugo**<br>Secretary of Labor and Human Resources | **Lorenzo González Feliciano**<br>Secretary of Health |
| **Miguel Santiago Córdova**<br>Acting Secretary of Agriculture | **Rubén A. Hernández Gregorat**<br>Secretary of Transportation and Public Works | **José R. Pérez Riera**<br>Secretary of Economic Development and Commerce |
| **Yanitsia Irizarry Méndez**<br>Secretary of Family Affairs | **Miguel B. Hernández Vivoni**<br>Secretary of Housing | **Daniel J. Galán Kercadó**<br>Secretary of Natural and Environmental Resources |
| **Luis G. Rivera Marín**<br>Secretary of Consumer Affairs | **Henry E. Neumann Zayas**<br>Secretary of Sports and Recreation | **Jesús González Cruz**<br>Secretary of Corrections and Rehabilitation |

**LEGISLATIVES OFFICERS**

**Thomas Rivera Schatz**
President, Senate

**Jenniffer González Colón**
Speaker, House of Representatives

**FISCAL OFFICERS**

**Juan Carlos Pavía**
Director, Office of Management and Budget

**Juan Carlos Batlle**
President, Government Development Bank for Puerto Rico

DS Obj. 00086



**Deloitte & Touche LLP**
Torre Chardon
350 Chardon Ave.
Suite 700
San Juan, PR 00918-2140
USA

Tel: +1 787 759 7171
Fax: +1 787 756 6340
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

To the Honorable Governor and Legislature
Commonwealth of Puerto Rico
San Juan, Puerto Rico

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth of Puerto Rico (the "Commonwealth"), as of and for the year ended June 30, 2011, which collectively comprise the Commonwealth's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Commonwealth's management. Our responsibility is to express an opinion on the respective financial statements based on our audit. We did not audit the financial statements of the following activities, funds, and component units:

- Puerto Rico Public Housing Administration, Human Resources and Occupational Development Council, the Office for the Administration of the Assets of the Urban Renovation and Housing Corporation of the Commonwealth of Puerto Rico, and the Office for the Improvements of Public Schools, which collectively represent 20% and 4%, respectively, of the assets and revenues of the governmental activities and 28% and 4%, respectively, of the assets and revenues of the general fund;

- The Unemployment Insurance Fund, which is both a major fund and 35% and 42%, respectively, of the assets and revenues of the business-type activities. The Additional Lottery System, which represents 78% and 46%, respectively, of the assets and revenues of the lotteries fund and 12% and 44%, respectively, of the assets and revenues of the business-type activities. The Disability Insurance Fund, the Drivers' Insurance Fund, the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, which represent 54% and 4%, respectively, of the assets and revenues of the business-type activities and 6% and 2%, respectively, of the assets and revenues of the aggregate remaining fund information;

- Public Buildings Authority special revenue, debt service, and capital project funds; The Children's Trust special revenue and debt service funds; and the Puerto Rico Maritime Shipping Authority debt service fund, which collectively represent 5% and .05%, respectively, of the assets and revenues of the governmental activities and 6% and .28%, respectively, of the assets and revenues of the aggregate remaining fund information;

- Entities identified in note 2 that are presented as discretely presented component units, which collectively represent 72% and 91%, respectively, of the assets and revenues of the aggregate discretely presented component units.

Member of
Deloitte Touche Tohmatsu Limited

DS Obj. 00087

Those financial statements were audited by other auditors whose reports thereon have been furnished to us, and our opinion, insofar as it relates to the amounts included for the activities, funds, and component units indicated above, is based solely on the reports of the other auditors.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the respective financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Commonwealth's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the respective financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth, as of June 30, 2011, and the respective changes in financial position and respective cash flows, where applicable, thereof and the respective budgetary comparison for the general fund for the year then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the basic financial statements, during fiscal year 2011, the Commonwealth adopted Governmental Accounting Standards Board (GASB) Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions.*

The management's discussion and analysis on pages 18 through 47 and the schedules of funding progress on pages 254 and 255 are not a required part of the basic financial statements but are supplementary information required by the Governmental Accounting Standards Board. This supplementary information is the responsibility of the Commonwealth's management. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit such information and we do not express an opinion on it.

Our audit was conducted for the purpose of forming an opinion on the Commonwealth's basic financial statements. The introductory section, combining and individual nonmajor fund financial statements and schedules, and statistical tables are presented for purposes of additional analysis and are not a required part of the basic financial statements. This supplementary information is the responsibility of the Commonwealth's management. The combining and individual nonmajor fund financial statements and schedules have been subjected to the auditing procedures applied by us and the other auditors in the audit of the basic financial statements and, in our opinion, based on our audit and the reports of other auditors, are fairly stated in all material respects in relation to the basic financial statements taken as a whole. The introductory and statistical sections have not been subjected to the auditing procedures applied by us and the other auditors in the audit of the basic financial statements and, accordingly, we express no opinion on them.

As discussed in Note 20 to the basic financial statements, the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2011, were approximately $33,115 million and 11%, respectively. In the opinion of management, based on information prepared by consulting actuaries, the Employee's Retirement System of the Government of the Commonwealth of Puerto Rico, the Commonwealth of Puerto Rico Judiciary Retirement System, and the Puerto Rico System of Annuities and Pensions for

DS Obj. 00088

Teachers, comprising the Pension Trust Funds, will not be able to fully fund pensions after the fiscal years 2014, 2019, and 2022, respectively, if measures are not taken to reduce the unfunded actuarial accrued liability and increase the funded ratio of the Pension Trust Funds.

*Deloitte & Touche LLP*

April 27, 2012

Stamp No.
affixed to original.

DS Obj. 00089

# COMMONWEALTH OF PUERTO RICO

**MANAGEMENT'S DISCUSSION AND ANALYSIS** [1]
**JUNE 30, 2011**

The following is a narrative overview and analysis of the financial activities of the Commonwealth of Puerto Rico (the "Commonwealth" or the "Government") for the fiscal year ended June 30, 2011. The management discussion and analysis ("MD&A") is intended to serve as an introduction to the basic financial statements, which have the following components: (1) government-wide financial statements; (2) fund financial statements; and (3) notes to the financial statements. The MD&A is designed to: (a) assist the reader in focusing on significant financial matters; (b) provide an overview of the Commonwealth's financial activities; (c) identify any material changes from the original budget; and (d) highlight individual fund matters. We encourage readers to review this information in conjunction with the Letter of Transmittal, which is located in the Introductory Section of this report, and the Commonwealth's basic financial statements, including the notes to the financial statements, which are located after this analysis. During fiscal year 2011, the Commonwealth implemented GASB Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions*. This Statement introduced new terms that are defined in Note 24 to the basic financial statements.

## FINANCIAL HIGHLIGHTS – Primary Government

### General Fund Highlights

- Total General Fund actual revenues on a budget basis (excluding other financing sources) for fiscal year 2011 was $8 billion, representing an increase of approximately $61.3 million, or .7%, from original budgeted revenues.

- Total actual expenditures[2] on a budget basis of $9.1 billion represented a decrease of $565 million when compared with fiscal year 2010. Furthermore, budgetary deficit as a percentage of revenues improved from 44% in 2009 to 27% in 2010 and to 14% in 2011.

- Transfers out and other payments for debt service includes lines of credits extended by GDB to the Commonwealth to refinance $490.9 million of interest accrued during such fiscal year and a portion of principal due on July 1, 2011 on the Commonwealth's general obligation bonds. These lines were repaid through the issue of PR Public Improvement Refunding Bonds Series 2011 A & C. Also, during the fiscal year 2011, PBA also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth's guaranteed bonds, which line of credit was refinanced with the proceeds of a series of

---

[1] The management's discussion and analysis is not a required part of the basic financial statements but is supplementary information required by the Governmental Accounting Standards Board. This supplementary information is the responsibility of the Commonwealth's management. The independent auditors have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. Therefore, the independent auditors did not audit such information and did not express an opinion on it.

[2] Total actual expenditures include $28.7 million paid and accrued during fiscal year 2011 as part of the early retirement benefits established by Act No 70.

DS Obj. 00090

**COMMONWEALTH'S CAPITAL ASSETS - PRIMARY GOVERNMENT**
**JUNE 30, 2011**
**(Expressed in thousands)**

|  | Governmental activities | | Business-type activities | |
|---|---|---|---|---|
| Land | $ | 867,215 | $ | - |
| Construction in progress | | 1,117,079 | | - |
| Buildings and building improvements, net | | 5,118,329 | | - |
| Equipment, furniture, fixtures, vehicles and software, net | | 189,562 | | 1,660 |
| Infrastructure, net | | 474,505 | | - |
| Total capital assets | $ | 7,766,690 | $ | 1,660 |

### Debt Administration

General obligation bonds are backed by the full faith and credit of the Commonwealth, including the Commonwealth's power to levy additional taxes to help ensure repayment of the debt.

The Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth are not to be issued if the amount of the principal of, and interest on, such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and conveyed into the treasury (internal revenues) in the two fiscal years preceding the current fiscal year. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. At June 30, 2011, the Commonwealth is in compliance with the debt limitation requirement.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department of Puerto Rico and motor vehicle fuel taxes and license fees, which are allocated to the Highways and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the sales and use tax to COFINA and provided that such portion was not available resources under the Constitutional provisions relating to full faith and credit bonds.

The Commonwealth's general obligation and appropriation debt is currently rated "Baa1" by Moody's Investors Service ("Moody's"), "BBB" by Standard & Poor's Ratings Services ("S&P"), and "BBB+" by Fitch, Inc. ("Fitch").

DS Obj. 00091

# COMMONWEALTH OF PUERTO RICO

**NOTES TO BASIC FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEAR ENDED JUNE 30, 2011**

## 1.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Commonwealth of Puerto Rico (the "Commonwealth") was constituted on July 25, 1952, under the provisions of the Commonwealth's Constitution (the "Constitution") as approved by the people of Puerto Rico and the U.S. Congress. The Constitution provides for the separation of powers of the executive, legislative, and judicial branches of the government. The Commonwealth assumes responsibility for general government, public safety, health, public housing and welfare, education, and economic development.

The accompanying basic financial statements of the Commonwealth are presented in conformity with Generally Accepted Accounting Principles (GAAP) for governments in the United States of America as prescribed by the Governmental Accounting Standards Board (GASB).

The accompanying basic financial statements present the financial position of the Commonwealth and its various funds, the results of operations of the Commonwealth and its various funds and fund types, and the cash flows of the proprietary funds. The basic financial statements are presented as of June 30, 2011 and for the year then ended. The basic financial statements include the various departments, agencies, boards, commissions, public trusts and public corporations, and any other organizational units governed by the Puerto Rico Legislature and/or officers of the Commonwealth.

### (a)    Financial Reporting Entity

The accompanying basic financial statements include all departments, agencies, and governmental entities whose funds are under the custody and control of the Secretary of the Treasury of the Commonwealth and the Commonwealth's component units pursuant to Act No. 230 of July 23, 1974, as amended, known as Commonwealth of Puerto Rico Accounting Law. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. The GASB has set forth criteria to be considered in determining financial accountability. These criteria include: (i) appointing a voting majority of an organization's governing body and the ability of the Commonwealth to impose its will on that organization or (ii) the potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth.

As required by GAAP, these basic financial statements present the Commonwealth and its component units.

### (b)    Component Units

Component units are entities that are legally separate organizations for which the Commonwealth's elected officials are financially accountable or other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. GAAP details two methods of presentation: (i) blending the financial data of the component units' balances and

DS Obj. 00092

## 15. SHORT AND LONG-TERM OBLIGATIONS

### (a) Primary Government

*Summary of Short and Long-term Obligations* — Short and long-term obligations at June 30, 2011 and changes for the year then ended are as follows (expressed in thousands):

| | Balance At June 30, 2010 | Debt Issued | Debt Paid | Original Issue (Discounts) Premiums | Other Net Increases (Decreases) | Balance At June 30, 2011 | Due Within One Year |
|---|---|---|---|---|---|---|---|
| **Short Term Obligations** | | | | | | | |
| Notes payable to GDB | $  134,687 | $  - | $  (102,508) | $  - | $  - | $  32,179 | $  32,179 |
| **Long Term Obligations** | | | | | | | |
| Governmental activities: | | | | | | | |
| General obligation and revenue bonds | $28,597,716 | $2,138,125 | $(1,765,907) | $(20,253) | $  176,455 | $29,126,136 | $  374,027 |
| Commonwealth appropriation bonds | 740,077 | - | - | - | 3,107 | 743,184 | - |
| Notes payable to component units: | | | | | | | |
| GDB | 1,426,407 | 811,948 | (589,578) | - | - | 1,648,777 | 121,779 |
| Other | 62,888 | - | (13,970) | - | 20,000 | 68,918 | 37,899 |
| Capital leases | 234,984 | 198 | (5,608) | - | - | 229,574 | 5,606 |
| Total bonds, notes payable and capital leases payable | 31,062,072 | 2,950,271 | (2,375,063) | (20,253) | 199,562 | 31,816,589 | 539,311 |
| Compensated absences | 1,506,193 | - | (740,546) | - | 664,918 | 1,430,565 | 709,810 |
| Net pension obligation | 7,963,950 | - | - | - | 1,361,402 | 9,325,352 | - |
| Net postemployment benefit obligation | 132,587 | - | - | - | 42,331 | 174,918 | - |
| Voluntary termination benefits payable | - | - | - | - | 332,170 | 332,170 | 34,386 |
| Other long-term liabilities | 2,192,554 | - | - | - | 132,909 | 2,325,463 | 258,589 |
| Total governmental activities | 42,857,356 | 2,950,271 | (3,115,609) | (20,253) | 2,733,292 | 45,405,057 | 1,542,096 |
| Business-type activities: | | | | | | | |
| Compensated absences | 4,229 | - | - | - | 583 | 4,812 | 2,512 |
| Obligation for unpaid lottery prizes | 223,901 | - | - | - | (5,415) | 218,486 | 57,324 |
| Termination benefits | - | - | (269) | - | 2,910 | 2,641 | 470 |
| Claims liability for insurance benefits | 103,269 | - | - | - | (16,931) | 86,338 | 86,338 |
| Total business-type activities | 331,399 | - | (269) | - | (18,853) | 312,277 | 146,644 |
| Total primary government | $43,188,755 | $2,950,271 | $(3,115,878) | $(20,253) | $2,714,439 | $45,717,334 | $1,688,740 |

DS Obj. 00093

The balances of general obligation and revenue bonds paid included within other financing uses and principal as reported in the statement of revenues, expenditures, and changes in fund balances (deficit) – governmental funds do not agree with amounts reported as debt paid in the above table primarily because the above table includes debt paid on general obligation and revenue bonds, which was accrued during the fiscal year 2010 as a fund liability. The prior year fund liability mentioned above amounted to approximately $408 million and was reported as a balance sheet transaction in the fund financial statements in 2010. Also, during fiscal year 2011 the amount of approximately $338 million was accrued as a fund liability. The net effect of $70 million is the difference between the debt paid on bonds and notes in the previous table and the payments in the statement of revenues, expenditures, and changes in fund balances (deficit) – governmental funds.

The other net increases in bonds and notes payable consist of deferred losses on refunding, net of amortization, and amortization of premiums and discounts on bonds and new notes payables. These adjustments did not require any source or use of cash.

Compensated absences, net pension obligation, net postemployment benefit obligation, termination benefits, other long-term liabilities, obligation for unpaid lottery prizes, and claims liability for insurance benefits reflect other net increases (decreases) resulting from adjustments and changes to agree these obligations to their new estimated balances at June 30, 2011.

**(b) Debt Limitation**

The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth shall not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, sales and use tax, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to PRHTA, a discrete component unit, are not included as revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of sales and use tax allocated to COFINA is not included as internal revenues consistent with the legislation creating COFINA, which transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the constitutional provisions relating to the payment of debt service. At June 30, 2011, the Commonwealth is in compliance with the debt limitation requirement.

DS Obj. 00094

## STATISTICAL SECTION (UNAUDITED)

This part of the Commonwealth of Puerto Rico's comprehensive annual financial report presents detailed information as a context for understanding what the information in the financial statements, note disclosures, and required supplementary information says about the Commonwealth's overall financial health. The following are the categories of the various schedules that are included in this Section:

Contents                                                                                    Pages

**Financial Trends Information**                                                             291–295

These schedules contain trend information to help the reader understand how the Commonwealth's financial performance and well-being have changed over time.

**Revenue Capacity Information**                                                             297–298

This schedule contains information to help the reader assess the Commonwealth's most significant local revenue sources.

**Debt Capacity Information**                                                                300–301

These schedules present information to help the reader assess the affordability of the Commonwealth's current levels of outstanding debt and the Commonwealth's ability to issue additional debt in the future.

**Demographic and Economic Information**                                                     303–305

These schedules offer demographic and economic indicators to help the reader understand the environment within which the Commonwealth's financial activities take place.

**Operating Information**                                                                    307

This schedule contains service data to help the reader understand how the information in the Commonwealth's financial report relates to the services the government provides and the activities it performs.

Sources: Unless otherwise noted, the information in these schedules is derived from the comprehensive annual financial reports for the relevant year.

DS Obj. 00095

**SCHEDULES OF DEBT CAPACITY INFORMATION**

DS Obj. 00096

# COMMONWEALTH OF PUERTO RICO

**LEGAL DEBT MARGIN INFORMATION (UNAUDITED)**
**LAST TEN FISCAL YEARS**
**(In thousands)**

| | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|---|---|---|---|---|
| Internal revenue average for two years | $ 7,592,395 | $ 7,333,246 | $ 7,650,006 | $ 8,233,717 | $ 8,327,744 | $ 8,061,593 | $ 7,779,987 | $ 7,564,034 | $ 7,185,660 | $ 6,748,772 |
| Legal debt limit — 15% of internal revenue average for two years | 1,138,859 | 1,099,987 | 1,147,501 | 1,235,058 | 1,249,162 | 1,209,239 | 1,166,998 | 1,134,605 | 1,077,849 | 1,012,316 |
| Maximum debt service requirement | 876,205 | 826,812 | 785,298 | 785,298 | 719,927 | 680,742 | 630,685 | 598,547 | 599,611 | 521,035 |
| Additional legal debt service requirement margin | 262,654 | 273,175 | 362,203 | 449,760 | 529,235 | 528,497 | 536,313 | 536,058 | 478,238 | 491,281 |
| Total maximum debt service requirement as a percentage of internal revenue average for two years | 11.54 % | 11.27 % | 10.27 % | 9.54 % | 8.64 % | 8.44 % | 8.11 % | 7.91 % | 8.34 % | 7.72 % |

Legal debt margin calculation for fiscal year 2011:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Internal revenue for the year ended June 30, 2010 | | | | | $ 7,363,839 | | | | | |
| Internal revenue for the year ended June 30, 2011 | | | | | 7,820,950 | | | | | |
| Total internal revenue for the years ended June 30, 2010 and 2011 | | | | | 15,184,789 | | | | | |
| Internal revenue average for the two years | | | | | 7,592,395 | | | | | |
| Legal debt limit — 15% of internal revenue average for the two years | | | | | 1,138,859 | | | | | |
| Maximum debt service requirement | | | | | 876,205 | | | | | |
| Additional legal debt service requirement as a percentage of internal revenue average for two years | | | | | $ 262,654 | | | | | |

Sources: Government Development Bank for Puerto Rico, General obligation debt service may not exceed 15% of the average of the internal revenues for the last two fiscal years.

DS Obj. 00097



# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements

and Required Supplementary Information

June 30, 2013

(With Independent Auditors' Report Thereon)

# BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION

## Fiscal Year Ended June 30, 2013



## Commonwealth of Puerto Rico

### Honorable Alejandro García Padilla
### Governor

*Prepared by:*

### Puerto Rico Department of the Treasury

### Melba Acosta Febo, CPA, Esq.
*Secretary of the Treasury*

### Karolee García Figueroa, CPA, Esq.

*Under Secretary of the Treasury*

This document is available on the Puerto Rico Department of the Treasury homepage
On the World Wide Web: http://www.hacienda.gobierno.pr

DS Obj. 00099



**KPMG LLP**
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

**Independent Auditors' Report**

The Honorable Governor and Legislature
   Commonwealth of Puerto Rico
   San Juan, Puerto Rico

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth of Puerto Rico (the Commonwealth), as of and for the year ended June 30, 2013, and the related notes to the financial statements, which collectively comprise the Commonwealth's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Commonwealth's management. Our responsibility is to express opinions on these financial statements based on our audit.

***Management's Responsibility for the Financial Statements***

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

***Auditors' Responsibility***

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of the following entities, funds and activities:

o   *Governmental Activities*

- Puerto Rico Public Housing Administration, which represents 25.65% and 2.47% of the total assets and revenues, respectively, of the General Fund.

- Office for the Administration of the Sales and Acquisition Fund of the Puerto Rico Department of Housing, which represents 0.60% and 0.00% of the total assets and revenues, respectively, of the General Fund.

- Office for the Improvements of Public Schools, which represents 0.90% and 0.00% of the total assets and revenues, respectively, of the General Fund.

- Labor Development Administration, which represents 0.33% and 0.45% of the total assets and revenues, respectively, of the General Fund.

- Public Buildings Authority special revenue, debt service, and capital projects funds, which are nonmajor governmental funds that collectively represent 7.54% and 2.67% of the total assets and revenues, respectively, of the aggregate remaining fund information.

KPMG LLP is a Delaware limited liability partnership, the U.S. member firm of KPMG International Cooperative ("KPMG International"), a Swiss entity.



*Required Supplementary Information*

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 6 through 20, the schedules of funding progress on pages 243 and 244, the schedule of employer contributions on page 245, and the schedule of revenues and expenditures –budget and actual– budgetary basis - General Fund on page 246, be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Supplementary and Other Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Commonwealth's basic financial statements. The combining and individual fund financial statements and schedules listed in the accompanying table of contents are presented for purposes of additional analysis and are not a required part of the financial statements.

The combining and individual fund financial statements and schedules are the responsibility of management and were derived from and relate directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America by us and other auditors. In our opinion, based on our audit, the procedures performed as described above, and the reports of the other auditors, the combining and individual fund financial statements and schedules are fairly stated in all material respects in relation to the financial statements as a whole.

KPMG LLP

June 30, 2014

Stamp No. E125980 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

DS Obj. 00101

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2013

The Commonwealth's investment in capital assets for its governmental and business type activities as of June 30, 2013 amounted to approximately $12.5 billion, less accumulated depreciation and amortization of $4.2 billion, leaving a book value of $8.3 billion. This investment in capital assets includes land, construction in progress, buildings, building improvements and equipment as infrastructure.

The net book value of capital assets at June 30, 2013 is distributed by function/activity in the following proportions: general government, 45%; public safety, 6%; health, 2%; public housing and welfare, 30%; education, 4%; and economic development, 13%. Capital outlays were approximately $519 million for the fiscal year. Depreciation and amortization charges for the fiscal year totaled $336 million.

The fiscal year 2013 capital asset highlights include transactions from blended component units such as Public Buildings Administration transfers from construction in progress to buildings and building improvements in the amount of approximately $644 million and the Department of Transportation and Public Works additions of approximately $64 million.

The infrastructure assets representing items that are normally immovable and of value only to the Commonwealth, such as roads, highways, bridges, toll facilities, water and sewer systems, lighting production, transmission and distribution systems, and similar items, are principally owned by the component units of the Commonwealth. Therefore, the infrastructure assets are reported within depreciable capital assets under the discretely presented component units' column. Additional information on the Commonwealth's capital assets can be found in note 10 to the basic financial statements that accompany this report.

***Debt Administration***

Long-term obligations of the governmental activities as of June 30, 2013 were approximately $56.9 billion, of which $2.4 billion are due within one year. Long-term obligations of the governmental activities increased by approximately $3.2 billion, or 6%, when compared to the prior fiscal year.

General obligation bonds are backed by the full faith and credit of the Commonwealth, including the Commonwealth's power to levy additional taxes to help ensure repayment of the debt.

The Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth are not to be issued if the amount of the principal of, and interest on, such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and conveyed into the treasury (internal revenues) in the two fiscal years preceding the current fiscal year. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. At June 30, 2013, the Commonwealth is in compliance with the debt limitation requirement.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes, municipal license taxes, and the corresponding part of the sales and use tax. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. However, certain debt of public corporations is

15

DS Obj. 00102

# COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2013

supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Department of the Treasury of the Commonwealth and motor vehicle fuel taxes and license fees, which are allocated to the Puerto Rico Highways and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the sales and use tax to COFINA and provided that such portion was not available resources under the Constitutional provisions relating to full faith and credit bonds.

Long-term obligations of the business-type activities decreased by approximately $10.8 million, or 2% due primarily to the decrease in the obligation for unpaid lottery prices.

Additional information on the Commonwealth's long term debt can be found in note 12 to the basic financial statements that accompany this report.

## General Fund Budgetary Highlights

The Commonwealth adopts an annual appropriated budget for its General Fund. A budgetary comparison schedule has been provided as required supplementary information for the General Fund to demonstrate compliance with this budget. The schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund only presents the information for the General Fund for which there is a legally adopted budget, as required by U.S. GAAP. See the notes to required supplementary information for a reconciliation of the schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund with the statement of revenues, expenditures, and changes in fund balance (deficit) for the General Fund.

Total General Fund actual revenues on a budget basis (sources) for fiscal year 2013 were $8.1 billion, (excluding other financing sources) representing a decrease of approximately $511 million, or 6%, from original budgeted revenues and a decrease of approximately $442 million from actual revenues of $8.6 billion for fiscal year 2012.

Total actual expenditures on a budget basis of approximately $8.9 billion represented a decrease of $973 million from actual expenditures of $9.9 billion for fiscal year 2012.

For fiscal year 2013, the actual budgetary deficit in the General Fund was $807 million, consisting of the difference between total actual revenues of approximately $8.1 billion and total actual expenditures for such fiscal year of $8.9 billion. For fiscal year 2012, the deficit was $1.3 billion, consisting of the difference between total actual revenues of approximately $8.6 billion and total actual expenditures for such fiscal year of approximately $9.9 billion. The deficits for fiscal year 2013 decreased by approximately $531 million or 38.5% when compared to 2012 and decreased by approximately $275 million or 25% when compared to the deficit of approximately $1.1 billion in 2011. The Government's ability to continue reducing the deficit will depend in part on its ability to continue increasing revenues and reducing expenditures, which in turn depends on a number of factors, including improvements in general economic conditions.

The following information is presented to assist the reader in comparing the final amended budget and the actual results.

DS Obj. 00103



## GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

### Municipal Secondary Market Disclosure Information Cover Sheet
### Municipal Securities Rulemaking Board (MSRB)
### Electronic Municipal Market Access System (EMMA)

**THIS FILING RELATES TO A SINGLE BOND ISSUE:**

Name of bond issue exactly as it appears on the cover of the Official Statement:

_____

Nine-digit CUSIP* numbers if available, to which the information relates:

_____

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:     **Commonwealth of Puerto Rico**_____

Other Obligated Person's Name (if any): _____

Six-digit CUSIP* number(s):   **Commonwealth of PR - 745145, 74514L; PRASA – 745160; PRHTA - 745181, 745190; PRIFA – 745220; PBA – 745235; PR Convention Center District Authority – 745266; PRMFA – 745277; PRPFC – 745291; UPR – 914811; Employees Retirement System of the Commonwealth of PR -29216M; and 74528U (PRIFA Series 2011 - PR Ports Authority Project)**

**TYPE OF INFORMATION PROVIDED:**

**A.** ☐ **Annual Financial Information and Operating Data pursuant to Rule 15c2-12**

    **Fiscal Period Covered:** _____

**B.** ☒ **Audited Financial Statements or CAFR pursuant to Rule 15c2-12**

    **Fiscal Period Covered:**  **2016-17**_____

**C.** ☐ **Notice of Failure to Provide Annual Financial Information as Required:** _____

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


*/s/ Manuel J. González del Toro*_____
Manuel J. González del Toro
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: September 1, 2020



# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements
and Required Supplementary Information

June 30, 2017

(With Independent Auditors' Report Thereon)

**BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION**

*Fiscal Year Ended June 30, 2017*



*Commonwealth of Puerto Rico*

*Honorable Wanda Vázquez Garced*
*Governor*

*Prepared by:*

*Puerto Rico Department of the Treasury*

**Francisco *Parés* Alicea, CPA**
*Secretary of the Treasury*

**Angel *Pantoja* Rodríguez**
*Under Secretary of the Treasury*

**Alfonso *Rossy* Raíces, CPA**
*Assistant Secretary of Central Accounting*

DS Obj. 00106



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

## Independent Auditors' Report

The Honorable Governor and Legislature
Commonwealth of Puerto Rico
San Juan, Puerto Rico

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the Commonwealth of Puerto Rico (the Commonwealth) as of and for the year ended June 30, 2017, and the related notes to the financial statements, which collectively comprise the Commonwealth's basic financial statements as listed in the table of contents.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of the following entities and funds:

- *Governmental Activities*

  - Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico, Office of Legislative Services, Office for the Improvement of Public Schools, Superintendence of the Capitol Building, Puerto Rico House of Representatives, Puerto Rico Senate, Puerto Rico Public Housing Administration, Puerto Rico Housing Finance Department – Sales and Acquisition Fund, and Puerto Rico Department of Economic Development and Commerce, which collectively represent 11.71% and 2.49% of the total assets and revenues, respectively, of the General Fund.

  - Puerto Rico Maritime Shipping Authority, Special Communities Perpetual Trust special revenue and debt service funds, Public Buildings Authority, University of Puerto Rico Comprehensive Cancer Center, Puerto Rico Infrastructure Financing Authority, The Children's Trust, Puerto Rico Fiscal Agency and Financial Advisory Authority, and Ponce Authority which are non-major governmental funds that represent 12.39% and 1.86% of the total assets and revenues, respectively, of the aggregate remaining fund information.

  These entities and funds collectively represent 49.90% and 2.61% of the total assets and revenues, respectively, of the governmental activities.

- *Business-Type Activities*

  - Unemployment Insurance Fund, which is a major enterprise fund.

  - Puerto Rico Health Insurance Administration, which is a major enterprise fund.

  - Puerto Rico Medical Services Administration, which is a major enterprise fund.

KPMG LLP is a Delaware limited liability partnership and the U.S. member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity.



preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

Supplementary and Other Information

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Commonwealth's basic financial statements. The combining and individual fund financial statements and schedules listed in the accompanying table of contents are presented for purposes of additional analysis and are not a required part of the basic financial statements.

The combining and individual fund financial statements and schedules are the responsibility of management and were derived from and relate directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the combining and individual fund financial statements and schedules is fairly stated, in all material respects, in relation to the basic financial statements as a whole.

KPMG LLP

San Juan, Puerto Rico
August 31, 2020

Stamp No. E419633 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

DS Obj. 00108



# The Commonwealth of Puerto Rico
## Update on Fiscal and Economic Progress

*FY 2014 Q1 Investor Webcast - October 15, 2013*

DS Obj. 00109

# GDB believes that any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt

> If one factors in the federal debt load, PR would rank last in outstanding debt per capita amongst all US jurisdictions*

## Puerto Rico Debt Per Capita vs the USA Comparison Analysis as of June 30, 2011 (in millions)

### State Level Debt(1)

US Avg: $2,390 per capita
PR: $2,805 per capita
Rank: #12 of 51

| State | | Rank (of 51) |
|---|---|---|
| HI | $5,376 | 3 |
| CT | $5,087 | 4 |
| NY | $4,976 | 5 |
| AK | $3,825 | 6 |
| RI | $3,787 | 7 |
| DE | $3,668 | 8 |
| CA | $3,122 | 9 |
| IL | $2,874 | 10 |
| NH | $2,847 | 11 |
| PR | $2,805 | 12 |

### State & Local Level Debt(2)

US Avg: $7,355 per capita
PR: $15,956 per capita
Rank: #1 of 51

| State | | Rank (of 51) |
|---|---|---|
| PR | $15,956 | 1 |
| NY | $13,552 | 2 |
| CA | $9,971 | 3 |
| NJ | $9,739 | 4 |
| NV | $9,500 | 5 |
| WA | $9,379 | 6 |
| HI | $9,340 | 7 |
| MA | $9,258 | 8 |
| IL | $8,991 | 9 |
| AK | $8,927 | 10 |

### State, Local, Federal Level Debt(3)

US Avg: $57,024 per capita
PR: $15,956 per capita
Rank: #51 of 51

| State | | Rank (of 51) |
|---|---|---|
| MS | $53,766 | 42 |
| OH | $53,690 | 43 |
| NC | $53,676 | 44 |
| SD | $53,042 | 45 |
| WV | $52,887 | 46 |
| AR | $52,819 | 47 |
| MT | $51,895 | 48 |
| ID | $51,698 | 49 |
| WY | $51,334 | 50 |
| PR | $15,956 | 51 |

*Source: US Bureau of the Census and the Government Development Bank for Puerto Rico
(1) For Puerto Rico State Debt includes GO debt.
(2) For Puerto Rico local debt includes debt of Municipalities and Public Corporations.
(3) US Federal Debt per capita is $49,669

57

DS Opp. 000108
DS Obj. 00110



**press release**

PUERTO RICO FEDERAL AFFAIRS ADMINISTRATION

**FOR IMMEDIATE RELEASE**

## Governor Pierluisi Outlined Plan for State-Like Treatment on Puerto Rico's Medicaid Program

**(June 1, 2021 – Washington, DC)** – Today, Governor Pedro R. Pierluisi held a meeting with the Puerto Rico Health Care Working Group he established via Executive Order-2021-025 to advance Puerto Rico's health initiatives in Congress. The main purpose of the meeting was to discuss the Medicaid plan for Puerto Rico that seeks to avoid the fiscal cliff by extending state-like treatment to Puerto Rico. The discussion included several long-term projections and funding scenarios of different levels of Federal Medical Assistance Percentage (FMAP). The Medicaid state-like treatment plan for Puerto Rico is in accordance with President Biden's priorities for Puerto Rico included in his budget release last Friday.

Specifically, the President's budget included language that eliminates Medicaid funding caps for Puerto Rico and the territories while aligning their matching rate with those of the states and moving towards parity in this and other federal programs. The President's budget serves as a starting point for lawmakers to determine funding levels and national spending priorities.

Historically, Puerto Rico's Medicaid program has been underfunded compared to those states with a higher per-capita income and lower populations; this has resulted in the prevalence of chronic conditions and a lack of adequate medical infrastructure for residents of the island. Today, Puerto Rico's Medicaid program serves over 1.4 million low-income U.S. citizens, with 43.5 percent of the population below the federal poverty level (FPL). Without Congressional action the island will have a funding shortfall that would result in approximately 800,000 currently enrolled beneficiaries forced off the program. It will see a reduction in covered benefits, stress on the island-wide budget, and shortfall of healthcare providers and beneficiary flight to the mainland.

Puerto Rico's Medicaid program has an annual capped federal allotment that oscillated between $300 - $380 million and an FMAP of 55 percent between 2011- 2019, without the additional funding appropriated throughout the years. Without temporary increases authorized by Congress, Puerto Rico's statutorily capped federal funding amount would have been only $360 million.

Exhibit L                                                    DS Obj. 00111

It is important to note that Congress has provided an increase in temporary funding through various different legislative vehicles like the "Affordable Care Act" (ACA) (+$6.4 billion and an increase in FMAP from 50 percent to 55 percent), the "Consolidated Appropriations Act" (+$0.3 billion and a 55 percent FMAP), "Bipartisan Budget Act" (BBA) (+3.6 billion and an increase in FMAP from 55 percent to 100 percent), the "Further Consolidated Appropriations Act of 2020" (FCA) (+5.3 billion with a 76 percent FMAP), and lastly the "Family First Coronavirus Response Act" (FFCRA), (an increase in FMAP from 76 percent to 82.2 percent). These recent temporary funding increases have provided short-term solutions to a long-term problem.

While these additional funding mechanisms are a short-term solution, they have allowed Puerto Rico to expand the quality of health care by providing beneficiaries additional services like comprehensive diabetes care, adequate control of high blood pressure, weight counseling for children, adults BMI screening, and women's timely postpartum care. Furthermore, there has been expanded eligibility with up to 200,000 new members after the increase of the Puerto Rico FPL to 85 percent. An additional increase in payments to health care providers with an expansion of telehealth, an elevation of the Medicare Part B provider reimbursement, and payments to hospitals and physicians. Moreover, an increase in covered benefits with a life-saving Hepatitis C treatment for over 14,000 individuals.

"If Puerto Rico was treated as a state for purposes of Medicaid the island would be receiving over $3 billion in FY 22 with an FMAP as high as 83 percent, meaning that Puerto Rico's burden will be as little as 13 percent. We would also be eligible for a separate annual federal allotment of Medicaid Disproportionate Share (DSH) which helps defray the unmet cost of serving Medicaid to uninsured individuals and U.S. Citizens residing in states below 150 percent of the FPL are eligible for the Low-Income Subsidy (LIS) for Medicare Part D (for copayments and deductibles)" said Governor Pierluisi.

"I have been working relentlessly to ensure that Puerto Rico's Medicaid and Medicare programs are funded at a level similar to the states. The President has prioritized Puerto Rico and now it's up to Congress to act. We must address the disparities in all federal programs that have long perpetuated the unequal treatment of the U.S. citizens of Puerto Rico." concluded Governor Pierluisi.

"We need to remove the cap the in the allotment so Puerto Rico can receive adequate, sustained funding, and apply an 83 percent FMAP according to our estimates Puerto Rico will need an allocation $5.2 billion in federal funds to be able to begin a 5-year transition to provide services to the beneficiaries similar to their counterparts in the states. We will continue working with the Puerto Rico Working Health Care Group and the Biden-Harris Administration to make sure that Congress finds a permanent fix to our Medicaid program," said PRFAA's Executive Director, Carmen M. Feliciano.

Governor Pierluisi's proposal includes several scenarios considering a baseline of a five-year projection:



- **State-like Treatment**: Funding Scenario at 83 percent FMAP at an 83 percent with a program eligibility at 85 percent FPL, this would amount to $5.0 billion for FY 2022 in federal funding.

- **State-like Treatment**: Funding Scenario at 83 percent FMAP at an 83 percent with a program eligibility at 100 percent FPL, this would amount to $5.1 billion for FY 2022 in federal funding.

- **State-like Treatment**: Funding Scenario at 83 percent FMAP at an 83 percent with a program eligibility at 133 percent FPL, this would amount to $5.2 billion for FY 2022 in federal funding.

###

Nairka Joe Treviño Müller
PRFAA
(939) 865-9009 | ntrevino@prfaa.pr.gov



**New Fiscal Plan for Puerto Rico**

# Restoring Growth and Prosperity

**As Certified by The Financial Oversight and Management Board for Puerto Rico**

June 29, 2018

EXHIBIT 11: PROJECTED POPULATION CHANGE



# Chapter 5. FISCAL PLAN FINANCIAL PROJECTIONS

Before measures and structural reforms ("baseline forecast"), there is a pre-contractual debt service surplus in FY2018-23, in part due to revenues buoyed by a positive macroeconomic trajectory resulting from the massive disaster relief funding stimulus, as well as significant Federal Medicaid funding. Over the long term, in the baseline forecast this surplus is not sustainable, as Federal disaster relief funding slows down, Supplemental Medicaid funding phases out, Act 154 and Non-Resident Withholding revenues decline, and pensions and healthcare expenditures rise. Without major Government action, the Island would suffer an annual primary deficit of over $1.9 billion starting in FY2021.

Fiscal measures and structural reforms contained in the New Fiscal Plan also help transform the deficit into a surplus for the life of the Fiscal Plan, as structural reforms will drive a 1.51% increase in growth (by FY58), and fiscal measures will drive ~$10.5 billion in savings and extra revenue by FY2023. However, even after fiscal measures and structural reforms and before contractual debt service, there is an annual deficit reflected in the projection starting in FY2036, due insufficient structural reforms, including restrictive labor policies that prevent high growth. After contractual debt service, this deficit drops to much more severe annual deficit for all years of the plan (**Exhibit 12**).

New Commonwealth Fiscal Plan

DS Obj. 00115

EXHIBIT 12: PROJECTED DEFICIT / SURPLUS PRE- AND POST-MEASURES AND STRUCTURAL REFORMS



Projected deficit / surplus pre- and post- measures and structural reforms, $M

1 Impact of measures has a contractionary effect on economy, thus pre-measures revenues less pre-measures expenses plus measures does not equal post-measures and structural reforms surplus

2 Debt service based on prepetition contractual debt obligations. Presented for illustrative purposes only and does not represent anticipated future payments on restructured debt. Excludes HTA, UPRA, PREPA, PRASA, Children's Trust

## 5.1   Baseline revenue forecast

Major tax revenue streams (**Exhibit 13**) include non-export sector General Fund revenues (including individual, corporate, and sales and use taxes) and export sector revenues (including Act 154 excise taxes paid by multinationals operating on the Island, and Non-Resident Withholdings), as well as Federal funding.

New Commonwealth Fiscal Plan

DS Obj. 00116

EXHIBIT 13: MAJOR REVENUE CATEGORIES



Key Baseline Revenue Drivers, Pre-measures and structural reforms, $M

| | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
|---|---|---|---|---|---|---|
| PIT | 1,788 | 1,926 | 1,975 | 2,030 | 2,090 | 2,149 |
| CIT | 1,340 | 1,443 | 1,480 | 1,521 | 1,566 | 1,610 |
| SUT | 2,281 | 2,458 | 2,520 | 2,590 | 2,667 | 2,742 |
| Act 154 | 1,761 | 1,683 | 1,551 | 1,303 | 1,026 | 1,026 |
| NRW | 569 | 539 | 539 | 512 | 478 | 483 |
| Other | 2,290 | 2,337 | 2,364 | 2,389 | 2,382 | 2,375 |
| Federal Funds | 6,381 | 6,921 | 5,869 | 4,881 | 4,951 | 5,020 |
| Total | 16,409 | 17,307 | 16,298 | 15,227 | 15,161 | 15,406 |

### 5.1.1 Non-export sector General Fund revenue projections

In the aftermath of the hurricanes, actual tax receipts have been closely monitored to measure the near-term fiscal impact. Using these actuals and other inputs, the New Fiscal Plan projects a drop of ~14% in General Fund revenues in FY2018, adjusted for one-off events.[12]

**Individual income taxes:** Individual income taxes are concentrated, with 78.2% of revenues coming from the 8.7% of returns reporting income above $60,000 per year. Revenues from individual income tax were down ~3% as of February, relative to FY2017 actuals.[13] This likely reflects most of the impact of the hurricane on wage earnings, but it is possible that estimated tax payments (e.g., by self-employed or high net worth individuals) are running ahead of where they will be at year end, at which point there could be large refund claims. To account for this risk, Hacienda has estimated that a marginal additional increase in deductions in FY2018 will drive a $112 million negative variance.[14] With this $112 million in extra deductions, income tax revenues for FY2018 are projected to be ~8% lower than in FY2017 when adjusted for extraordinary items.

**Corporate income taxes:** There is also concentration in tax receipts among the largest corporations operating in Puerto Rico (e.g., ~29% of corporate income tax is paid by 20 corporate taxpayers).[15] As of February, corporate tax revenues were down ~11% FYTD relative to FY2017, and are projected to continue this trend. Finally, Hacienda has projected personal

---

12   The New Fiscal Plan estimates for income taxes and SUT for FY2018 are based on actuals through February 2018, with the five-month post-storm average trend line continuing through the end of the fiscal year.  Additional adjustments are included for income taxes and corporate taxes due to the expected deductions for unreimbursed property damage

13   All actuals are adjusted to normalize for extraordinary non-recurring item

14   This calculation is based on casualty and personal property loss estimates from Hurricane Georges, and the impact is intensified (by about 4x) to account for the increased severity of Maria. Hacienda's analysis here would result in ~20% increase in tax refunds/ deductions, which is in-line with the impact seen on U.S. Federal tax refunds in 2001 and 2008, in the aftermath of two large economic recessions

15   Hacienda historical reports

New Commonwealth Fiscal Plan

DS Obj. 00117

property, casualty, and business interruption losses will result in a $102 million marginal fall in corporate tax revenues. The current trendline, in addition to these deductions, results in an adjusted year over year decline of 18.6% from FY2017.

**Sales and use taxes (SUT):**[16] As of February, SUT revenues were down ~9% FYTD relative to FY2017, but had fallen 14.3% since the hurricane – a trend that is projected to apply to the rest of the fiscal year. Unlike income taxes, where monthly cash flows can only help approximate annual tax liabilities, sales and use taxes are collected throughout the year and remitted on a regular basis (varies depending on size of taxpayer). Emergency measures taken by the Government immediately after the hurricanes account for ~$100 million in losses, while outmigration, business closures, and general disruption (e.g., due to power outages) will likely account for the rest of the drop. The application of this base trend through June 2018 results in a year-over-year decline of ~10.4% from FY2017 (inclusive of non-General Fund SUT funds such as CINE, FAM, and COFINA).

**Other General Fund Revenue (Motor Vehicles, Alcoholic Beverages, Cigarettes):** The 2018 trendline for other General Fund revenues is projected to continue in line with post-Maria actuals to date, resulting in a 2.2% increase for alcoholic beverages, a 25.4% increase for cigarettes, a 14.3% decline for motor vehicles, and a 28% decline for "other general fund revenues" which includes fees/penalties and dividend taxes (all figures are relative to 2017 actuals and adjusted for extraordinary events and Commonwealth policies on tax exemptions and holidays in response to the storm).[17]

### 5.1.2 Export sector revenue projections

Act 154 and Non-Resident Withholding (NRW) tax revenues have proven to be far less resilient than other types of revenues after the hurricane.[18] For FY2018, Act 154 is expected to decline ~15%, and NRW revenues are projected to decline ~15%. Both revenue types are concentrated in a small number of multinational corporations, and the absence of payments from large payers in previous years has had an impact on the overall trendline of these revenues. From FY2017 to FY2023, Hacienda estimates that ~51% of Act 154 and 28% of NRW revenues will erode (**Exhibit 14**) due to the combination of Federal tax reform (reducing Puerto Rico's attractiveness as a low tax jurisdiction for multinationals) and hurricane impacts (creating challenges restoring manufacturing operations and exporting). In some cases, these disruptions revealed concentration risk in Puerto Rico that manufacturers may consider in making future business continuity plans.

---

[16]  All analyses for the purposes of the New Fiscal Plan are all-inclusive of sales and use tax revenues.  Monthly and quarterly general fund SUT trends are variable due to differences in year over year timing of when COFINA and other caps are hit

[17]  While these numbers are not adjusted for deductions, they are adjusted for what Hacienda views to be "one-off events." For example, Hacienda removed $13M from cigarette taxes in Nov. 17 due to non-recurring promotions offered by gas stations and convenience stores, and removed $18.3M from motor vehicle taxes due to a spike in car sales promotions

[18]  As of February 2018

New Commonwealth Fiscal Plan

DS Obj. 00118

EXHIBIT 14: PROJECTED ACT 154 AND NON-RESIDENT WITHHOLDING (NRW) REVENUES



Projected annual Act 154 and NRW revenues, $M

### 5.1.3 Medicaid Federal funding

In the steady state, Medicaid costs are typically funded primarily by the Commonwealth, as there is a cap on available Federal funding. Yearly Federal funding streams for the Commonwealth are the following, projected based on current law and statutory growth rates:

- **Standard annual Federal Medicaid funding.** Although Puerto Rico has a 55% Federal matching assistance percentage (FMAP), this amount is capped each year at an amount that is below 10% of costs. As of FY2018, this funding stream was capped at $359.2 million, and though the cap grows each year, it does not keep pace with healthcare expenditure growth.[19]

- **Children's Health Insurance Program (CHIP) funding.** CHIP funding is not subject to a Federal cap. It also has a higher FMAP at 91.5%, though this Federal cost share is projected to decrease in FY2020 with the expiration of the Affordable Care Act's temporary increase. In FY2018, this amount totaled $172 million.

- Each year, funds are **passed directly through to the Department of Health**, totaling $200 million out of the annual Federal funds available for Medicaid. This funds Federally Qualified Health Centers (Centros 330, "FQHC") and Medicaid Operations.

In FY2018, however, the available share of Federal funds is much higher due to several Federal fund sources. Additional Federal funding is provided in FY2018 by **remaining Affordable Care Act (ACA) block grant** funds (approximately $598 million as of the beginning of the fiscal year) and supplemental FY2017 Omnibus Federal funding of $296 million.

---

19   According to the Social Security Act, the cap grows by the medical component of CPI-U as reported by BLS each year. From FY2011-FY2016, this growth averaged 2.9%. This inflation rate differs from the healthcare inflation index for Medicaid and Medicare used elsewhere in this New Fiscal Plan (7.1% from FY2018-FY2023, and 5.6-4.7% in the long-term). Instead, the medical component of CPI-U includes other factors that lower the inflation rate by approximately 3-5 percentage-points, meaning the increase in the Federal funding cap will not keep up with actual increases in expenditures

DS Obj. 00119

In addition, in February 2018 the Bipartisan Budget Act of 2018 (BBA) allocated a supplemental $4.8 billion of Federal funding to Puerto Rico Medicaid, for use between January 2018 and September 2019. Per CMS guidance, this funding is estimated to apply only as a reimbursement for eligible populations (i.e., Federally funded Medicaid expenses). The Puerto Rico Health Insurance Administration (ASES) will spend as much of the allocation as possible before drawing down any remaining ACA funds, which can resume use from September 30, 2019 until expiration in December 31, 2019.

Depending on the exact parameters of eligible spending (e.g., if Commonwealth-funded populations and/or some dual-eligible CHIP members are eligible), ASES will be able to absorb between $4.1 billion and $4.8 billion of the allocated funding for core Medicaid expenditures.[20] It will continue to receive its annual CHIP,[21] FQHC, and DOH Medicaid operations funding.

**Exhibit 15** outlines expected Medicaid Federal fund receipts. Starting in FY2020, Supplemental funding is projected to phase out. This funding cliff indicates the imperative and urgent need to implement cost-saving measures to reduce long-term Medicaid costs (Medicaid expenditures are discussed in detail in *Section 5.2.2).*

EXHIBIT 15: MEDICAID EXPECTED FEDERAL FUND RECEIPTS



Medicaid Federal funding sources, $M

*5.1.4 Other Federal Funding*

In addition to Medicaid funding, Puerto Rico receives other federal funds, which cover both social benefits and operational expenditures. In the New Fiscal Plan, these funds have been modeled based on what types of costs they cover (e.g., benefits or operations) as well as the statutory formula that defines the size of Puerto Rico's allotment. For example, while TANF funds are typically pass-through (e.g., none of these funds go to operational costs), some Title I education funds are used for operational purposes (e.g., teachers' salaries, school supplies for programs for students with special needs, etc.). For the former, federal fund inflows and outflows mirror each other (as benefit needs decline, so do funds). For the latter, though

---

[20]  Current assumption is that only Federally funded Medicaid beneficiaries (excluding all CHIP and Commonwealth members) are eligible for reimbursement using BBA funds. These beneficiaries represent approximately 80% of total MCO disbursements, 100% of Platino premiums, all administrative costs, and less any cost-saving measures *(described in Chapter 14)* that reduce reimbursable spend during the timeframe

[21]  CHIP funding will continue at 91.5% FMAP until expiration of the ACA enhanced FMAP in September 2019. At that point, FMAP will return to 68.5% pre-ACA level, according to §2101(a) of the Affordable Care Act which amended §2105(b) of the Social Security Act

New Commonwealth Fiscal Plan

DS Obj. 00120

inflows may decline, it does not necessarily mean expenditures decline as well – as expenditures are based on operations, not on benefits formulas. Meanwhile, while Head Start funds are allocated from the federal government based on the number of children living in poverty, PAN funds are provided through a block grant that is capped. The former, therefore, should change by population, while the latter should be consistent regardless of population size.

## 5.2  Baseline expenditure forecast

Over the next five years, baseline expenditures are set to increase over FY2018 due to inflation and increases in Medicaid and pensions costs (**Exhibit 16**).

EXHIBIT 16: MAJOR EXPENDITURE CATEGORIES

Key Baseline Expense Drivers (pre-measures and structural reforms), $M

Legend: General Fund | Fed Fund | Special Rev Fund | Indep. Forecasted Component Unit

| Category | | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
|---|---|---|---|---|---|---|---|
| **Payroll** | Total | 4,645 | 4,584 | 4,632 | 4,691 | 4,753 | 4,824 |
| | General Fund | 3,098 | 3,037 | 3,057 | 3,090 | 3,125 | 3,169 |
| | Special Rev Fund | 206 | 206 | 209 | 212 | 215 | 218 |
| | Fed Fund | 749 | 755 | 766 | 776 | 786 | 796 |
| | Indep. Forecasted Component Unit | 591 | 587 | 600 | 613 | 627 | 641 |
| **Direct operating expenses** | Total | 3,559 | 3,611 | 3,653 | 3,693 | 3,734 | 3,769 |
| | General Fund | 1,261 | 1,300 | 1,316 | 1,331 | 1,346 | 1,360 |
| | Fed Fund | 738 | 738 | 749 | 759 | 770 | 781 |
| | Special Rev Fund | 439 | 439 | 445 | 451 | 458 | 464 |
| | Indep. Forecasted Component Unit | 1,122 | 1,135 | 1,143 | 1,152 | 1,160 | 1,163 |
| **CW Appropriations[1]** | | 1,226 | 1,116 | 1,078 | 1,218 | 1,228 | 1,216 |
| **Commonwealth Medicaid expenditures** | | 440 | 145 | 1,409 | 2,630 | 2,781 | 2,940 |
| **Other[2]** | | 10,561 | 11,061 | 9,737 | 8,839 | 8,680 | 8,715 |
| **Total** | | 20,432 | 20,519 | 20,510 | 21,071 | 21,176 | 21,464 |

1 Includes appropriations to HTA, UPR, and municipal expenses
2 Includes appropriations to utilities, pension expenses, disaster recovery cost match, Title III, loan to PREPA, federal Medicaid and social program contributions, maintenance capex, enterprise funds, disbursements to entities outside the fiscal plan, and other non-recurring and recurring costs

### 5.2.1 Payroll expenses and non-payroll operating expenditures

**Payroll expenses:** The expenditure model holds payroll constant at the FY2018 approved budget levels based on the Fiscal Plan Compliance Act. Payroll projections do not assume reductions from either attrition or absenteeism, as reductions would need to be met with limits on rehiring to truly capture any cost savings – therefore, any workforce reductions will be captured only through fiscal measures. Further, whereas the March 2017 Fiscal Plan included a payroll freeze through FY2019 (which is reflected in the baseline), the extension of this payroll freeze is proposed by the New Fiscal Plan and will therefore be counted as a measure. After FY2019, all figures are projected to grow by Puerto Rican inflation.

**Non-Personnel Operating Expenses:** Like payroll expenses, non-personnel operating expenses are projected to be frozen FY2018-FY2019 by the March 2017 Fiscal Plan measures, with costs growing by inflation thereafter. Utility costs are based on the historical cost of government payments for utilities-related costs.

New Commonwealth Fiscal Plan

DS Obj. 00121

*5.2.2 Medicaid costs*

Medicaid costs are projected to reach over $3.6 billion annually by FY2023 (**Exhibit 17**). These costs are primarily driven by the cost per member per month (PMPM) and the number of people enrolled in Medicaid (Federal and Commonwealth), CHIP, and Platino dual eligible programs. Other categories also contribute, including health-related expenses (e.g., HIV and Pulmonary programs) and program administration, bringing total expenditures to $3.7 billion by FY2023.

In the short term, Hurricane Maria is expected to affect both PMPM and enrollment, as evidenced by historical post-disaster environments. From August (pre-Maria) to March 2018, actual enrollment data has indicated nearly a 5% increase in enrollment, as residents face higher rates of utilization and struggle to fulfill basic needs. Other post-disaster areas have exhibited a similar spike in proportion of population enrolled in Medicaid but have shown that enrollment soon declines back to trend.[22] Similarly, the proportion of Puerto Ricans enrolled in Medicaid is expected to slightly drop after a time. As the overall population of Puerto Rico decreases, the Mi Salud population will decline concurrently, but will likely lag overall outmigration trends by a year due to the time needed for individuals to switch to a new plan once they have left the Island.

**PMPM costs** are projected to grow at 7.1% annually. This rate combines normal healthcare cost inflation rate of 6.0% experienced in Puerto Rico before the storm,[23] along with an additional 1.1% observed in other post-disaster environments.[24]

EXHIBIT 17: PROJECTIONS FOR MI SALUD BASELINE PMPM AND ENROLLMENT (NOT INCLUDING PLATINO)



Medicaid projected PMPM, enrollment, and expenditures, $M total cost, M enrollees, $ PMPM

Note: Only includes Medicaid (CHIP, Commonwealth- and federally-funded). Excludes Platino dual-eligible.

---

[22] Analysis included effect of Hurricane Katrina on Medicaid population in New Orleans. Directly following the storm, the proportion of overall population on Medicaid spiked, but declined beginning a year after the hurricane. Source Louisiana Department of Health and Hospitals, Bureau of Health Services Financing. "Louisiana Medicaid Annual Report," 2005-2009, http://dhh.louisiana.gov/index.cfm/newsroom/detail/1699/

[23] From 2011-2016, the CAGR for PMPM inflation in Puerto Rico averaged about 6.6% (ASES analysis of historical PMPM rates). Milliman actuarial analysis projects a 5-7% PMPM inflation rate from FY2018-FY2020 and 4-6% PMPM inflation rate from 4-6%

[24] NBER working paper 22272 analyzing fiscal effects of hurricanes on healthcare costs. Table 7, Panel B coefficient for implied effect after 7.5 years spread year over year; Took the value of the implied effect after 7.5 years (0.085); Divided this by the number of years (7.5); Provided the change year over year = 0.085/7.5 = 0.0113; Then, interpreted the coefficient; Given the y variable is logged, the interpretation is: (change year over year) * (100%) = % change year over year, generating a 1.13% change projected year over year. Deryugina, Tatyana. "The Fiscal Cost of Hurricanes: Disaster Aid Versus Social Insurance." National Bureau of Economic Research, May 2016

New Commonwealth Fiscal Plan

DS Obj. 00122

**Other costs**, which include HIV/PDP, Health Insurance Provider Fee, Air Ambulance, MC21 Administrative Fee, Super Utilizers, and Pulmonary, among others, are projected to grow at the rate of Puerto Rico inflation.

Expenditures for the Platino dual eligible program were estimated using a consistent $10 PMPM over FY2018-FY2023, representing payment for wrap-around services supplementing main Medicare coverage. Enrollment is projected to be affected similarly to Medicaid enrollment, though with less fluctuation in actual proportion of population enrolled.[25] Platino costs are expected to total $29 million in FY2018 and decline slightly to $28 million by FY2023.

### 5.2.3 Other costs

**Appropriations:** Baseline municipal appropriations are projected to remain constant at ~$220 million from FY2018-FY2023, with the exception of a *one-time* allotment to municipalities as a result of Hurricanes Irma and Maria, which is to be provided in FY2018 for the amount of $78 million, and which will be allocated on the same basis as the existing municipality subsidies. The University of Puerto Rico appropriation baseline is $708 million in FY2018 and remains ~$717 million from FY2019-FY2023.

**Pension costs:** Projections rely on demographic estimations for Employees' Retirement System (ERS), Teachers' Retirement System (TRS), and Judicial Retirement System (JRS) populations and benefit obligations, and include updated data and actuarial projections for regular TRS and JRS benefits (extrapolated to update estimates for ERS). From FY2018-FY2023, costs are projected to grow slowly but remain approximately $2.3 billion for the New Fiscal Plan period.[26] Starting in FY2018 ERS pension benefits have been paid on a pay-as-you-go basis, given that the majority of the liquid assets in the retirement system have been depleted.

**Capital expenditures:** Centrally funded maintenance and capital expenditures of the Commonwealth (excluding PREPA, PRASA, HTA self-funded capex/one-time transfers) is expected to be $400 million annually. Of this, $124 million will be appropriated to HTA and UPR, with the remaining $276 million for use by the Commonwealth. The capital expenditure costs are lower in the short-term because of the large disaster relief funding allocations from the Federal Government and from Puerto Rican cost match. HTA's capital expenditure funds will be used to support reconstruction, maintenance, traffic reduction, completion of the strategic network, and P3-related expenditures. UPR's capital expenditure funds will support, among other projects, Phase III of the large Molecular Sciences building, building restoration at Rio Piedras, and the development of a major campus building at Mayagüez.

**Independently Forecasted Component Units (IFCUs):** IFCUs in the New Fiscal Plan include Puerto Rico Industrial Development Company, Public Buildings Authority, Ports Authority, State Insurance Fund Corporation, Medical Services Administration, Tourism Company, Health Insurance Administration, Cardiovascular Center, Housing Finance Authority, Department of Agriculture, Integrated Transport Authority, AAFAF, and Convention Center Authority. From FY2018-FY2023, IFCU payroll expenditures are projected to be ~$600 million annually. Non-payroll operating expenditures are projected to remain at ~$1.1 billion annually.

**Cost share of disaster relief funding:** Federal funds for public assistance typically require a local match from the entity receiving them (anywhere from 10-25% of funds). In the case of

---

25   Projected based on a smaller observed spike in actual enrollment from pre- to post-Maria relative to Medicaid spike
26   Projections for pension expenses are provided by Pension Trustee Advisors (PTA) calculations

New Commonwealth Fiscal Plan

DS Obj. 00123

Puerto Rico, the New Fiscal Plan projects that the Commonwealth will need to cover an estimated 10% of Federal public assistance funds, amounting to $1.1 billion from FY2018-FY2023. However, a certain portion of this is expected to be covered by CDBG funds (e.g., 25% of the initial $1.5 billion allocated from HUD in February, which would amount to ~$188 million from FY2018-FY2023, or $375 million over the 10 years of federal fund receipts). Thus, total cost share incurred by the Commonwealth is expected to be $870 million from FY2018-FY2023.

**PROMESA related costs:** Commonwealth PROMESA related expenses are projected to be $1.5 billion for FY2018 to FY2023, comprised of professional fees (approximately $1.1 billion over six years) and funding for the Oversight Board ($430 million over six years). The estimate for professional fees was developed, in conjunction with the Government, by analyzing FY2018 run-rate billings based on available information and soliciting input from certain professionals. Fees were benchmarked versus comparable restructuring situations that yield an average professional-fee-to-funded-debt ratio of 1.89% relative to 1.65% projected for the Commonwealth (**Exhibit 18**).

EXHIBIT 18: PROJECTED PROFESSIONAL FEES RELATIVE TO OTHER MAJOR RESTRUCTURINGS

| | Date filed | Outstanding debt, USD | Total fees and expenses, USD | Fees to funded debt, % |
|---|---|---|---|---|
| **City of Detroit, Michigan** | Jul. 2013 | $20,000,000,000 | $177,910,000 | 0.89% |
| **Residential Capital, LLC** | May-12 | $15,000,000,000 | $409,321,308 | 2.73% |
| **Sabine Oil & Gas Corp.** | Jul. 2015 | $2,800,000,000 | $78,553,223 | 2.81% |
| **Caesars Entertainment Operating Company** | Jan. 2015 | $18,000,000,000 | $258,278,005 | 1.43% |
| **Lehman Brothers Holdings Inc.** | Sep. 2008 | $613,000,000,000 | $956,957,469 | 0.16% |
| **Lyondell Chemical Company** | Jan. 2009 | $22,000,000,000 | $205,932,292 | 0.94% |
| **American Airlines** | Nov. 2011 | $11,000,000,000 | $391,637,858 | 3.56% |
| **Washington Mutual, Inc.** | Sep. 2008 | $8,000,000,000 | $271,085,213 | 3.39% |
| **Edison Mission Energy** | Dec. 2012 | $5,000,000,000 | $96,244,628 | 1.92% |
| **Energy Future Holdings Corp.** | Apr. 2014 | $40,000,000,000 | $450,110,233 | 1.13% |
| **Puerto Rico** | **2017** | **$64,000,000,000** | **$1,057,990,545** | **1.65%** |

Summary Statistics

| | |
|---|---|
| Avg. | 1.89% |
| Max | 3.56% |
| Min | 0.16% |
| Med | 1.68% |

» **Puerto Rico involves added complexity as the largest public sector restructuring in the history of the United States**

**Emergency reserve:** The Commonwealth must establish an emergency reserve of $1.3 billion, or ~2.0% of FY2018 GNP, by reserving $130 million per year for 10 years. The methodology supporting this reserve is informed by guidance provided to The Bahamas, another Caribbean island, by the International Monetary Fund in defining an adequate emergency reserve (2-4% of GNP, accumulated at ½% per year).[27] Restrictions on the use of this fund must ensure that it is a true emergency reserve.

---

[27]   IMF Bahamas Article IV report published March 22, 2018

DS Obj. 00124

# BUDGET
## OF THE U.S.
## GOVERNMENT

FISCAL YEAR 2022

OFFICE OF MANAGEMENT AND BUDGET



THE WHITE HOUSE
WASHINGTON

Exhibit N

DS Obj. 00125

home- and community-based services for older people and people with disabilities and strengthening the workforce that provides this vital care. The American Families Plan makes permanent the American Rescue Plan's expansion of premium tax credits and makes a historic investment to improve maternal health and mortality.

Beyond these steps, the President also calls on the Congress to take action this year to reduce prescription drug costs and to further expand and improve health coverage. The President's healthcare agenda in these areas includes the following additional policies:

**Lowering the Costs of Prescription Drugs.** The President supports reforms that would bring down drug prices by letting Medicare negotiate payment for certain high-cost drugs and requiring manufacturers to pay rebates when drug prices rise faster than inflation. These reforms would lower drug costs and save money for Medicare beneficiaries and people with job-based insurance. The reforms could also yield over half a trillion in Federal savings over 10 years, which could help pay for coverage expansions and improvements.

**Improving Medicare, Medicaid, and ACA Coverage.** Medicare, Medicaid, and the ACA marketplaces provide critical coverage to tens of millions of Americans, but should be strengthened through measures like improving access to dental, hearing, and vision coverage in Medicare, making it easier for eligible people to get and stay covered in Medicaid, and reducing deductibles

for marketplace plans. The President also supports eliminating Medicaid funding caps for Puerto Rico and other Territories while aligning their matching rate with States (and moving toward parity for other critical Federal programs including Supplemental Security Income and the Supplemental Nutrition Assistance Program). Further, evidence shows that we can reform Medicare payments to insurers and certain providers to reduce overpayments and strengthen incentives to deliver value-based care, extending the life of the Medicare Trust Fund, lowering premiums for beneficiaries, and reducing Federal costs.

**Creating Additional Public Coverage Options.** The President supports providing Americans with additional, lower-cost coverage choices by: creating a public option that would be available through the ACA marketplaces; and giving people age 60 and older the option to enroll in the Medicare program with the same premiums and benefits as current beneficiaries, but with financing separate from the Medicare Trust Fund. In States that have not expanded Medicaid, the President has proposed extending coverage to millions of people by providing premium-free, Medicaid-like coverage through a Federal public option, paired with financial incentives to ensure States maintain their existing expansions.

Healthcare is a right, not a privilege. Families need the financial security and peace of mind that comes with quality, affordable health coverage. In collaboration with the Congress, the President's healthcare agenda would achieve this promise.

**Commonwealth of Puerto Rico**

**Tax Reform Assessment Project**

*Unified Tax Code of Puerto Rico:*

*Tax Policy Implementation Options*

*Executive Summary*

*October 31, 2014*

DS Obj. 00127

# Table of Contents

1.1 Scope of Report ........................................................................................... 1

1.2 Methodology ................................................................................................ 2

1.3 Summary of Principal Findings .................................................................... 6

1.4 Options ...................................................................................................... 11

1.5 Summary of Projections ............................................................................ 14

1.6 Transition .................................................................................................. 16

KPMG's role is limited to the services and deliverables articulated in the Contract for Professional Services dated March 18, 2014 as subsequently amended (the "Engagement Contract"). It is understood that any actions taken by the Government of the Commonwealth of Puerto Rico related to these services and deliverables may involve numerous factors that are outside of the Contract's scope. KPMG's services and deliverables cannot take such factors into account and, therefore, recommendations for such actions are not implied and should not be inferred from these services and deliverables. Further, while such deliverables may include analyses of certain legislative initiatives, no service described in the Engagement Contract and/or subsequent amendments will involve advising the Department regarding lobbying or other public policy advocacy activities related to legislation or regulation, including evaluating the likelihood of enactment of any proposed initiative or providing advice to the Department as to methodologies to ensure enactment. KPMG cannot undertake any role in connection with the Contract services that could be deemed lobbying, public policy advocacy, or impair the independence of KPMG as an auditor for the Department of the Treasury such as drafting legislation and engaging in implementation assistance.

DS Obj. 00128

# 1. Executive Summary

## 1. 1 Scope of Project

On August 17, 2013, the Governor of the Commonwealth of Puerto Rico issued an Executive Order creating a Tax Reform Advisory Group to analyze the current tax system, its rules and administration and report its conclusions and recommendations to build an effective and fair tax system. The Executive Order explicitly recognized the need to take measures to address the fiscal crisis facing the Commonwealth. It also implied that those measures should not have an adverse impact on the working class or consumers.

The Executive Order enumerated a number of specific factors to be considered:

- The interaction of the components of the state and local tax system and its impact on individuals and businesses;
- The need to restructure, eliminate or extend these components to achieve the desired revenue objectives and simultaneously facilitate economic development
- Analysis of existing tax preferences to determine their effectiveness, elimination or restructuring to align them with the Commonwealth's economic development plan
- Analysis of the current system's promotion of equity in the distribution of the tax burden between the working class and the business and industrial base of the economy
- Evaluation of the current structure of tax administration to improve compliance and efficiency
- Comparison of the tax structure of Puerto Rico with successful tax structures of countries with similar economic and social priorities, and
- The views of diverse interest groups.

On March 18, 2014, KPMG contracted with the Treasury to make a full assessment of the Puerto Rican tax structure and to develop a full report and set of alternative scenarios for Treasury to evaluate for a simplified tax system that will provide the desired revenues through a more streamlined and effective system that should also result in more effective oversight. Analysis of the individual income tax was specifically excluded from the scope this contract. Analysis of the property tax was not included.

On May 6, 2014, KPMG contracted with the Treasury to expand the scope of the engagement to include the individual income tax.

Subsequent meetings with the Secretary of the Treasury and her colleagues refined the goals of the project to include the following:

- Produce adequate revenue
- Distribute the burden of taxation fairly
- Promote economic growth
- Increase international competitiveness of products, workers and businesses
- Minimize interference with private decision making
- Streamline compliance and administration

DS Obj. 00129

## 1.3 Summary of Principal Findings

### 1.3.1 High Level Observations

The current income and consumption tax structures are inordinately complex, due principally to a plethora of special provisions that for the most part were adopted in a haphazard manner over time generally to provide incentives for particular forms of economic activity. These special provisions have never been subjected to a cost benefit analysis. As shown in Tables 1 and 2, revenue from consumption and income taxes are below peer jurisdictions.

**Table 1: Taxes as a Percentage of GDP in Puerto Rico Compared to Selected Jurisdictions[4]**



---

[4] (*) While Table 1 uses GDP as the measure of comparison across countries, the results are similar when using GNP as the measure of comparison. Puerto Rico taxes as a percentage of GNP is closer to 15% but still substantially lower than the tax liability of the peer countries shown.

DS Obj. 00130

**Table 2: Tax Collections as Percent of GDP -- Comparison of Puerto Rico to OECD Countries**

|  | Puerto Rico | Average | Range |
|---|---|---|---|
| Personal Income | 2.2% | 8.3% | 2.2 - 24.2% |
| Corporate Income | 2.7% | 3.0% | 1.2 - 10.70% |
| SS Contributions | 2.75% | 9.00% | 0.00 - 16.70% |
| Payroll/Workforce | 0.21% | 0.41% | 0.00 - 4.44% |
| Property | 0.75% | 1.76% | 0.29 - 4.16% |
| Goods/Services | 2.216% | 10.77% | 2.06 - 15.91% |
| Total | 10.66% | 33.19% | |

Table 3 presents data on the distribution of income and tax liability and shows that less than 10 percent of filers are responsible for almost 78 percent of income tax receipts.

**Table 3: 2013 Income Tax Liability by Income Class (In Millions of USD)[5]**

| Income Level | Filers | Tax Liability (Excluding SS & Medicare) | Share of Tax (Excluding SS & Medicare) | Tax Liability (Including Social Security and Medicare) | Share of Tax (Including Social Security and Medicare) |
|---|---|---|---|---|---|
| Less than $20,000 | 538,026 | $4 | .2% | $368 | 9.6% |
| Between $19,999 and $40,000 | 319,108 | $191 | 9.2% | $791 | 20.6% |
| Between $39,999 and $60,000 | 107,107 | $270 | 13.0% | $604 | 15.7% |
| Greater than $59,999 | 89,459 | $1,614 | **77.6%** | $2,079 | 54.1% |
| **Total** | **1,053,700** | **$2,079** | **100.0%** | $3,842 | **100.0%** |

---

[5] Distributional analysis based on 2012 individual tax returns provided by Department of Treasury.

DS Obj. 00131