# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                              Debtors,[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF FILING
### EXHIBIT N (BEST INTERESTS TEST REPORTS) TO DISCLOSURE STATEMENT FOR THE THIRD AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*

**PLEASE TAKE NOTICE** that, on May 11, 2021, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations)

*Economic Stability Act* ("PROMESA")[2] (the Oversight Board, in its capacity as representative of the Commonwealth, ERS, and PBA, is referred to as the "Debtors"), filed the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16741] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, Exhibit N (Best Interest Test Reports) to the Disclosure Statement is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.primeclerk.com/puertorico or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

Dated: June 10, 2021
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

**EXHIBIT A**

# **EXHIBIT N**

BEST INTERESTS TEST REPORTS

***Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Commonwealth of Puerto Rico***

This analysis assesses the recoveries available to creditors of the Commonwealth on the basis of available remedies under non-bankruptcy laws, including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." This analysis provides an estimated range of recoveries that would be available to creditors if the stay of debt enforcement is terminated, no Plan of Adjustment is confirmed, and the Title III case of the Commonwealth is dismissed.

This document consists of two sections. The first section provides an overview of the methodology followed in developing the analysis. The methodology outlines the approach taken to estimate the resources available for debt service, estimate the outstanding creditor obligations, and analyze the priority in which funds are disbursed and the order in which creditor claims are assumed to be paid. The second section presents the estimated likely range of recoveries available to creditors of the Commonwealth based on the resources identified.

This analysis was prepared by McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC,[1] legal advisors to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. The legal assumptions are included in Appendix 5 of this document. The financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt, perspectives on cash balances, and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico and/or its advisors.

McKinsey & Company has accepted as true, accurate, and appropriate all of the legal and financial information and assumptions provided by Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, and the Government of Puerto Rico and its advisors. McKinsey & Company has not independently verified any of the information or assumptions received from Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, or the Government of Puerto Rico and its advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico

---

[1] Proskauer Rose LLP and O'Neill & Borges LLC are collectively referred to as "FOMB's legal advisors" in this analysis.

Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company does, however, represent that the recovery range identified herein is its best estimate based on its knowledge and on the information provided to it.

## I.   Methodology

Following guidance provided by FOMB's legal advisors, this analysis assumes that the PROMESA Title III case of the Commonwealth is dismissed but that PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement is lifted and the FOMB remains in place and will continue to certify Commonwealth Fiscal Plans and enforce implementation of budgets, subject to any debt enforcement in excess of the budget that the Puerto Rico courts would order. The analysis also assumes creditors would pursue legal action against the Commonwealth to recover the amounts they claim they are owed.

The analysis is based on the revenue and expenditure projections contained in the 2021 Certified Fiscal Plan. Following guidance provided by FOMB's legal advisors, adjustments to certain Fiscal Plan projections have been made to reflect the impact of the dismissal of the Title III case and the assumption that no Plan of Adjustment occurs. Those adjustments are the following:

- The analysis assumes the reductions in pension benefits included in the Fiscal Plan will not take effect because this measure is assumed to be dependent on the confirmation of a Plan of Adjustment. The analysis includes scenarios, however, in which the Commonwealth courts require reductions in pensions when Commonwealth General Obligation (GO) debt and Commonwealth guaranteed debt that is *pari passu* with GO debt ("*pari passu* debt") are in default.
- The analysis assumes the freeze on accruals of benefits in the Judges' and Teachers' Retirement Systems (JRS/TRS) included in the Fiscal Plan will not occur. Future contributions to Social Security for judges and teachers are also assumed to be set to zero, as those payments are assumed to be dependent on the freeze of the pension benefit accrual for which confirmation of the Plan of Adjustment is necessary.
- The analysis assumes the increase in employer healthcare contribution outlined in the Fiscal Plan from $125 to $170 per employee per month for employees who are AFSCME union members, teachers, police, firefighters, UAW union members, and other non-union employees will not be implemented, as this benefit increase depends on the execution of a Plan of Adjustment.
- The analysis assumes annual PayGo contributions to System 2000 participants, which the Fiscal Plan assumes will be removed, are instead continued. The removal is assumed to be dependent on the confirmation of a Plan of Adjustment.
- The analysis assumes any incremental pension expenses related to agreements dependent on the confirmation of a Plan of Adjustment will not occur.

- The analysis adjusts legal and non-legal Title III professional fees to reflect anticipated future litigation and dismissal of the Title III case.[2,3]
- It is assumed FOMB will continue to exist as the requirements for dissolution of the Board as defined by PROMESA would not be met if the Title III case is dismissed because the Commonwealth cannot regain market access and cannot balance a budget paying all required debt service without a debt restructuring.[4] The analysis assumes the Commonwealth will fund operations of the FOMB through the period of analysis.
- The transfer of $130 million per year through FY2028 to the Reserve for Emergency Fund outlined in the Fiscal Plan is assumed not to occur. As described in Appendix 5, money set aside for emergencies is assumed to not be legally restricted in this analysis, and, therefore, it is available for debt service.

The analysis also makes further adjustments to incorporate the risks related to the implementation and execution of certain fiscal measures and structural reforms outlined in the Fiscal Plan, as the analysis assumes that the dismissal of the Title III case could create further political and economic uncertainties that would affect the implementation of such measures. Those adjustments are described in the section titled "Estimated likely range of recoveries available to creditors."

The analysis relies on the following three components to calculate the recoveries available to creditors:

- **Resource Envelope:** The money available to satisfy Commonwealth creditor obligations, including cash on hand available for debt service, certain property tax revenues ("CRIM revenues") and conditionally allocable revenues,[5] withholding of appropriations to certain Independently Forecasted Component Units (IFCUs), the annual surplus generated by the Commonwealth excluding any items just listed above, and Employee Retirement System (ERS) assets available to the Commonwealth.
- **Outstanding debt:** The principal, interest, and maturity schedule of each group of debt obligations.
- **Priorities for distribution of funds:** The allocation of resources for debt payment consistent with the priorities of use of funds and of payments according to Puerto Rico law and the terms outlined in the bond documents.

---

[2] The analysis assumes legal professional fees will increase with the dismissal of the Title III proceedings as creditors will pursue legal action to enforce their claims under Puerto Rico law. Thus, legal professional fees for the FOMB and the Government of Puerto Rico are assumed to double in FY2022 relative to FY2021 and then grow with inflation through FY2026. Beginning FY2027 legal fees are assumed to be reduced in half relative to FY2026, and then grow with inflation through FY2031.

[3] It is assumed both the FOMB and the Government of Puerto Rico will continue to require some support from non-legal advisors related to ongoing litigation activities. Non-legal professional fees are assumed to drop by 50% upon dismissal of the Title III case and then grow with inflation through FY2031. With the dismissal of the Title III proceedings, legal and non-legal professional fees related to the various creditor groups are assumed to stop.

[4] According to PROMESA, the FOMB will terminate when it finds that the territorial government has access to short-term and long-term credit markets at reasonable rates of interest and achieved balanced budgets for four consecutive years.

[5] The term conditionally allocable revenues is used herein to refer to certain revenues the Commonwealth conditionally allocates to certain Commonwealth instrumentalities (previously referred to as clawback revenues).

The effective date of this analysis is assumed to be June 30, 2021 (the "Effective Date"). The percentage recovery is calculated as the present value[6] of the total amount expected to be paid to creditors over the entire period of the analysis as a proportion of the total outstanding principal and unpaid interest as of the Commonwealth Title III petition date of May 3, 2017 (the "petition date") or as of the PBA Title III petition date of September 27, 2019 (the "PBA petition date") in the case of PBA bonds. Based on discussions with the FOMB's financial advisors, this analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments.

### i. Resource Envelope

The total amount of resources available to pay Commonwealth creditor claims in each year constitutes the Commonwealth's Resource Envelope. The Resource Envelope in any year is the sum of 1) starting cash available for debt service, 2) certain property tax revenues (CRIM revenues), 3) conditionally allocable revenues, 4) other sources available from appropriations to certain IFCUs, and 5) the annual surplus generated by the Commonwealth after payment of its operating expenses.[7] In FY2022 the resource envelope will benefit from a one time transfer of ERS assets available to the Commonwealth.

**1) Starting cash available for debt service ("starting cash"):** As described in Appendix 5, the starting cash available for debt service as of the Effective Date of this analysis consists of unrestricted cash less an assumption of the estimated minimum cash required for normal government operations ("Minimum Cash Requirements"):

- **Unrestricted cash:** Refers to Commonwealth funds that do not have legal limitations on their use. Unrestricted cash excludes funds that have any legal restriction as they are part of custodial or trust accounts and also excludes funds whose use is restricted by a secured interest or court order. Unrestricted cash is assumed to be available for debt service.
- **Assumption of the estimated Minimum Cash Requirements**: Based on the Puerto Rico Cash Analysis published by the Oversight Board and AAFAF on December 19, 2020,[8,9] the Minimum Cash Requirements of the Commonwealth is estimated to be $1,200 million to $1,700 million. This amount refers to cash on hand that the Commonwealth would need for the government's cash management system to be sufficiently funded and ensure proper functioning of government operations. See Appendix 4 for details on the Minimum Cash Requirements estimate.

---

[6] Present value as of the Effective Date of the analysis, June 30, 2021.

[7] The annual surplus generated by the Commonwealth included in this analysis is presented differently from the annual surplus generated by the Commonwealth as stated in the Fiscal Plan. In addition to the adjustments made to consider no Plan of Adjustment, this analysis accounts for the other four revenue streams described in this section as separate from the overall annual surplus generated by the Commonwealth for the purposes of debt payment.

[8] FOMB Media release: Mediation Cash Presentation (as accessed in June 2021): https://drive.google.com/file/d/1xb6fo1OEYDElnaOua09cDcgkQmEW9Tki/view?fbclid=IwAR2V6c2iLz9euKMZ0GjJSEth6S As6KN-98REOxARzAL5U_BuCjv-XRYXIT0

[9] Puerto Rico Cash Analysis (as accessed in June 2021): https://emma.msrb.org/P11450397-P11124337-P11535399.pdf

The sum of unrestricted cash less an assumption for Minimum Cash Requirements comprises the total starting cash available for debt service as of the Effective Date of this analysis.

Based upon the Puerto Rico Cash Analysis (referenced above), the analysis considers unrestricted cash to be $10,193 million as of June 30, 2020.[10] Based upon publicly available data, Fiscal Plan projections, and guidance from FOMB's legal advisors, an estimation of cash accumulation of $811 million from July 1, 2020 to June 30, 2021 is added to calculate the unrestricted cash balance as of June 30, 2021 (the Effective Date of the analysis). After incorporating these projections, the amount of unrestricted cash as of June 30, 2021 is assumed to be $11,004 million.

After adjusting for Minimum Cash Requirements of $1,200 to $1,700, cash available for debt service as of June 30, 2021 is estimated to be between $9,304 million and $9,804 million.

*Exhibit 1: Calculation of starting cash available for debt service*

**Estimated cash available for debt service as of June 30, 2021,**
USD million

| | |
|---|---|
| **Commonwealth cash balance (6/30/20)** | **15,606** |
| (-) Restricted cash | (5,413) |
| **Unrestricted CW cash balance (6/30/20)** | **10,193** |
| (+) Estimated total unrestricted cash flow between 07/01/2020 and 06/30/2021 | 811[1] |
| **Unrestricted CW cash balance (6/30/21)** | **11,004** |
| (-) Total estimated Minimum Cash Requirements FY2021 | (1,200) to (1,700)[2] |
| **Cash available for debt service (6/30/21)** | **9,304 to 9,804** |

1. Includes the following incremental cash: $480 million of FY2020 deferred taxes (corporate, individual, and SUT) collected in FY2021, $355 million of unrestricted surplus for FY2021 from 2020 Certified Fiscal Plan,$1,288 million of overperformance in revenues as of March 2021, $130 million added back for FY2021 funds that would otherwise go to the Reserve Emergency Fund,  $88 million of surplus interest, $50 million CDBG cost match reserve that would be available for creditors, and $124 million of funds at the PR Tourism Company Reserve related to CCDA conditionally allocated revenue. This is reduced by the $750 million contribution from the Commonwealth for PREPA Reserve Account funding, $34 million of FY2019 funds budgeted for UPR Scholarships but rolled forward, and $920 million in FY2020 appropriations rolled forward to FY2021
2. Range calculated based on minimum cash requirements for normal government operations and emergency reserve funds across different states. Additional details on the calculation can be found in Appendix 4

**2) Certain property tax revenues ("CRIM revenues"):** The Municipal Revenues Collection Center ("CRIM," by its Spanish acronym) collects an annual 1.03% property tax on real and personal property imposed by the Commonwealth. CRIM revenues are deposited into a State Redemption Fund and are assumed to be available to service Commonwealth GO debt, following guidance of FOMB's legal advisors. The CRIM Fiscal Plan includes measures to maximize property tax collections by improving compliance.

---

[10] This analysis considers the total Commonwealth cash balance as of June 30, 2020, and it removes only the amount that has been explicitly classified as legally restricted. Therefore, the categories of "Not Reviewed," "Potentially Unavailable Cash," and "Potentially Inaccessible cash" in the Puerto Rico Cash Analysis are assumed to be unrestricted.

3) **Conditionally allocable revenues:**[11] Certain taxes and fees are collected by the Commonwealth and then allocated to certain public corporations. Based upon guidance provided by FOMB's legal advisors as described in Appendix 5, on the basis of Article VI, Section 8 of the Puerto Rico Constitution, this analysis assumes that these conditionally allocable revenues can be used to pay Commonwealth GO bonds and *pari passu* debt when two conditions are met: 1) the Commonwealth has sufficient funds to pay its operating expenses, and 2) the rest of the Resource Envelope is not sufficient to cover GO bonds and *pari passu* debt in any given year.

The conditionally allocable revenues include specific taxes and fees collected by the Commonwealth on behalf of the Highways & Transportation Authority (HTA), the Metropolitan Bus Authority (MBA), the Puerto Rico Infrastructure Financing Authority (PRIFA), and the Puerto Rico Convention Center District Authority (CCDA).

For HTA, the revenues subject to conditional allocation are: 1) the Vehicle License Fees, 2) the Gasoline Tax, 3) the Gas Oil and Diesel Tax, 4) a portion of the Petroleum Products Tax, and 5) a portion of the Cigarette Tax. For MBA, the revenue subject to conditional allocation is the remainder of the Cigarette Tax that is not allocated to HTA. PRIFA receives the excise tax on rum and an additional excise tax on petroleum products. CCDA receives a portion of the hotel room tax paid for room occupancy. Appendix 5 describes in detail the regulation around each revenue stream subject to conditional allocation.

Certain allocable revenue statutes require the Commonwealth to reimburse the allocable revenue entities in the following year when allocable revenues are retained to pay GO bonds and *pari passu* debts, with such amount accruing in favor of the allocable revenue entity until completely reimbursed. These revenues are 1) Gasoline Tax (HTA), 2) Vehicle License Fees (HTA), and 3) Hotel Room Taxes (CCDA).

4) **Withholding of appropriations to certain Independently Forecasted Component Units (IFCUs):** IFCUs are legally separate entities that have been established by the Commonwealth. Following guidance provided by FOMB's legal advisors, this analysis assumes revenues generated by IFCUs are not available to pay Commonwealth obligations absent legislation or consent. The IFCUs in the Fiscal Plan are listed below.

*Exhibit 2: Independently Forecasted Component Units in the Certified Fiscal Plan*

| No. | IFCU acronym | IFCU name |
|-----|--------------|-----------|
| 1 | AAFAF | Fiscal Agency and Financial Advisory Authority |
| 2 | ADEA | Agriculture Enterprise Development Administration |
| 3 | ASEM | Medical Services Administration |
| 4 | ASES | Health Insurance Administration |

---

[11] The Fiscal Plan refers to these revenues as "certain Commonwealth revenues that prior to PROMESA the Commonwealth appropriated to certain instrumentalities pursuant to statutes enacted by prior legislatures."

| 5 | Cardio | Cardiovascular Center of Puerto Rico and the Caribbean |
| 6 | HFA | Housing Finance Authority |
| 7 | PBA | Puerto Rico Buildings Authority |
| 8 | Ports | Puerto Rico Ports Authority |
| 9 | CCDA | Puerto Rico Convention Center District Authority |
| 10 | PRITA | Puerto Rico Integrated Transport Authority |
| 11 | Tourism | Puerto Rico Tourism Company |
| 12 | SIFC | State Insurance Fund Corporation |

However, some of the Commonwealth's funds, which would otherwise be appropriated to IFCUs, may be available for debt service. As described in Appendix 5, this analysis assumes the Commonwealth has direct control over the funds it appropriates in its budget to the IFCUs. Some or all of the appropriation to an IFCU may be available for Commonwealth debt service.

For the IFCUs that receive an appropriation that enables the IFCU to generate a surplus, the analysis assumes the Commonwealth will reduce (or eliminate) such appropriations until the entity runs a balanced budget in order to generate more funds available for payment of Commonwealth obligations. This would apply to AAFAF, ADEA, ASEM, ASES, HFA, and PRITA, as these IFCUs have historically received annual appropriations from the Commonwealth. However, as assumed in the Fiscal Plan, IFCUs that generate operating deficits in any given year are assumed to have those operating deficits funded by the Commonwealth.

For the IFCUs that do not receive an appropriation, it is assumed that the Commonwealth does not have access to funds from that IFCU. The IFCUs that belong to this category are SIFC, Cardio, PBA, CCDA, Ports, and Tourism. However, if any of these entities run a deficit in any given year, it is assumed that the Commonwealth, as part of its operating expenses, will fund the deficit because those entities provide services needed for the proper functioning of the Commonwealth.

**5) Annual surplus generated by the Commonwealth independent of the resources described in items 1-4 above**: The total revenues received by the Commonwealth minus its total operating and capital expenses constitute the annual Commonwealth surplus.[12] Commonwealth revenues are comprised of total Commonwealth tax revenue in the Fiscal Plan as well as revenues from Federal Funds and Special Revenue Funds, excluding IFCUs.

The total Commonwealth operating expenses are comprised of the General Fund, Special Revenue Fund, and Federal Fund expenses projected in the Fiscal Plan with respect to the Commonwealth Fiscal Plan entities, excluding the IFCUs. The Fiscal Plan outlines the following expenditure categories:

---

[12] The Commonwealth surplus referred to in this section excludes starting cash, conditionally allocable revenues and CRIM revenues, as well as other sources available from withholding of appropriations to certain IFCUs.

- **General Fund payroll and non-payroll operating expenditures:** Personnel and non-personnel costs required for the Commonwealth and its agencies to function; these expenses are outlined in the annual Commonwealth budget.

- **Special Revenue Funds (SRF):** Funds used for agency and Governmental expenditures outside an entity's General Fund disbursements or Federal Fund allocations; such funds include fees and charges collected by agencies, statutory funds, intra-governmental transfers, and others.

- **Federal Funding (FF):** Funds utilized for various Federal social programs and, therefore, typically passthrough funds; in some cases, Federal Funds are also used to fund certain agency operating expenses.

- **Medicaid expenditures:**[13] Commonwealth and federally funded portions of Medicaid, Children's Health Insurance Program (CHIP), Platino dual-eligible program, and other health-related expenditures.

- **Commonwealth pension expenditures:** Pay-as-you-go (PayGo) pension benefits for participants of the Teachers' Retirement System (TRS), Judges' Retirement System (JRS), and the former Employees' Retirement System (ERS). As shown in the Fiscal Plan, the pension expenditures of the IFCUs are already considered in the operating expenses of each IFCU. Pension expenditures are treated as Commonwealth operating expenses in the analysis; therefore, pension expenditures are paid in full (like any other operating expenses) before payment of any debt.

- **Appropriations:** Commonwealth contributions to municipalities, the University of Puerto Rico, the Highways and Transportation Authority (HTA), and some public corporations, including IFCUs that run a deficit in a given year.

- **Other operating and capital expenditures:**[14] Government payments for utility costs to PREPA and PRASA, certain insurance premium costs, and capital expenditures for Commonwealth capital projects and maintenance.

- **Reconstruction and restructuring related expenditures:** Commonwealth matching funds for public assistance and hazard mitigation funding from FEMA, as well as all PROMESA-related professional fees and operating costs of the FOMB.

- **Gross-ups for tax credits and receipts of the Municipal Finance Corporation of Puerto Rico (COFIM):** Tax credits to corporations and individuals, as well as the expenses of COFIM (the public corporation that collects the 1% Municipal Sales and Use Tax for certain municipalities); it is assumed that COFIM receipts and tax credits are in balance every year as the incoming revenues are matched by outgoing expenses.

Projections for these revenue and expenditure groups take into consideration the estimated impact of fiscal measures in the Fiscal Plan. Fiscal measures are a series of actions intended to optimize revenue collection, reduce Government expenditures, and streamline and transform the Government of Puerto Rico. Actions include: improving compliance in tax collection,

---

[13] A portion of Medicaid expenditures are SRF.

[14] Comprised of GF and SRF expenditures.

implementing process changes and other operational reforms within agencies, optimizing the healthcare system to improve value for cost, improving the current pension system, and rationalizing subsidies to UPR and municipalities. The fiscal measures in the Certified Fiscal Plan are forecasted to result in an overall reduction in run rate expenditures excluding those related to federal funds of 10% between FY2022 and FY2026.

The projections of Commonwealth revenues and expenses also incorporate the impact of structural reforms as outlined in the Fiscal Plan. Structural reforms include actions to improve human capital and welfare, advance the ease of doing business in Puerto Rico, improve the education system, and enhance availability and affordability of energy. Structural reforms are designed to promote growth in the economy, which would ultimately increase Commonwealth revenue generation.

Based upon guidance provided by FOMB's legal advisors, this analysis reflects modifications to the Fiscal Plan projections of certain expenditures to account for the absence of Title III protections and a Plan of Adjustment. As previously discussed, the specific Fiscal Plan expense lines that are adjusted are:

- **Pension costs:** Total pension costs in the analysis do not include the reduction in pension benefits outlined in the Fiscal Plan. Also, pension costs in the analysis do not include the freeze in accrual of benefits in the retirement plans of judges and teachers (JRS/TRS). The analysis also sets to zero the contributions to Social Security payments for judges and teachers. In addition, the analysis assumes the continuation of PayGo contributions to System 2000 participants as well as the elimination of any additional pension expenses related to agreements dependent on the confirmation of a Plan of Adjustment. The analysis includes scenarios, however, in which the Commonwealth courts require reductions in certain pensions when GO bonds and *pari passu* debt is in default.

- **Healthcare contributions:** The analysis assumes the increase in employer healthcare contribution outlined in the Fiscal Plan from $125 to $170 per employee per month for employees who are AFSCME union members, teachers, police, firefighters, UAW union members, and other non-union employees will not be implemented, as this benefit increase depends on the execution of a Plan of Adjustment, which is assumed not to be confirmed.

- **Professional fees:** The analysis adjusts costs projections related to Title III legal and non-legal professional fees. Legal fees are assumed to double in FY2022 relative to FY2021 and then grow with inflation through FY2026; in FY2027 legal fees are assumed to be cut in half relative to FY2026 and then grow with inflation through FY2031. Non-legal fees are assumed to be halved upon the dismissal of the Title III case and then grow with inflation through FY2031. All payments related to legal and non-legal fees for the various creditor groups are assumed to be zero upon the dismissal of the Title III case.

- **FOMB expenditures:** The FOMB is assumed to continue to exist because the requirements for dissolution of the Board as defined by PROMESA would not be met if the Title III case is dismissed since market access will be unattainable without eliminating debt defaults. The analysis considers the Commonwealth will fund operations of the FOMB through the period of analysis.

- **Reserve for Emergency Fund:** The transfer of $130 million per year through FY2028 to the Reserve for Emergency Fund outlined in the Fiscal Plan is assumed to be zero. Based

upon guidance provided by FOMB's legal advisors, money set aside for emergencies is assumed to be not legally restricted in this analysis.

Once Commonwealth expenditures are paid with the revenues received by the Commonwealth, any remaining revenue amounts constitute the annual Commonwealth surplus, as outlined in the Fiscal Plan. The Commonwealth surplus is assumed to be available for debt payment. As described later in the section entitled "Estimated likely range of recoveries available to creditors," certain adjustments to the Resource Envelope were incorporated to account for the risk of implementation of the Fiscal Plan should the Title III case be dismissed.

In addition, in FY2022 the resource envelope will increase from a one-time transfer of ERS assets available to the Commonwealth. Based on guidance from FOMB's legal advisors, this analysis assumes that an ERS Title III Plan of Adjustment is confirmed, which treats the claims of the ERS bondholders consistent with the terms outlined in the Disclosure Statement. Unrestricted assets remaining at ERS after required payments to ERS creditors are assumed to be transferred to the Commonwealth. An amount of $643 million of ERS unrestricted remaining assets are assumed to be transferred to the Commonwealth at the end of FY2022. For additional information, please see Appendix 5.

### ii. Outstanding debt

The analysis considers the following classes of claims and associated balances based on information provided to McKinsey & Company by FOMB's legal and financial advisors:

***Federal claims:*** Two categories of obligations are assumed to be owed by the Commonwealth to the Federal Government. These obligations are assumed to be paid in full prior to any other debt payment. Following the guidance provided by FOMB's legal advisors, the Federal Government is likely to recoup any unpaid claims by withholding certain Federal Funds earmarked for the Commonwealth to offset insufficient payment. Therefore, these claims are assumed to be paid before other debt claims:

- **Federal claims and obligations:** There are several claims that the Federal Government has filed against the Commonwealth. Such claims include liabilities related to unpaid invoices as well as penalties and related fees for violations of Federal law. Following the guidance provided by FOMB's legal advisors, such Federal claims and obligations represent a total amount of $431 million as of the petition date, which will be paid upon the removal of the current stay on debt enforcement.
- **Federal claims disallowance:** It is assumed that the Commonwealth must repay Federal Funds it spends but are later determined to be impermissible under grant criteria or requirements. It is assumed that such Federal cost disallowance represents a recurring annual expense of $65 million,[15] which must be paid in full before payment is made on

---

[15] Estimate based on the 2016 Commonwealth of Puerto Rico Comprehensive Annual Financial Report (CAFR), which shows Commonwealth recorded a liability of $65.2 million for Federal claims disallowance.

any General Obligation or other claims. The estimate above does not include any amounts for federal claims disallowance related to FEMA recovery-related funding.

***GO bonds:*** Commonwealth GO bonds were issued or guaranteed by the Commonwealth and backed by the good faith, credit, and taxing power of the Commonwealth within the meaning of the Puerto Rico constitution (collectively, the "GO bonds" or "GO debt"). These have been incorporated into this analysis with the maturity schedule as projected in the bond issuance documents. Pursuant to PROMESA section 303, it is assumed that GO debt principal accrues interest during the current stay on debt enforcement.

With respect to the value of these claims, the FOMB commenced litigation challenging the validity of GO bonds issued in or after 2012, as those might have been issued above Puerto Rico's constitutional debt limit. Following guidance provided by FOMB's legal advisors, this analysis assumes GO bonds issued in or after 2012 are invalid.

Excluding GO bonds issued in or after 2012, the total amount of principal and accrued and unpaid interest as of the Effective Date is $8,395 million. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the petition date is $6,505 million and $460 million, respectively.

As indicated in Appendix 5, there is additional litigation risk related to the validity of certain GO bonds. The statutory Unsecured Claimholders' Committee (the "UCC") has challenged the validity of all GO bonds issued in or after March 2011 on the basis that they violate the constitutional debt limit. The potential impact of this litigation on recoveries is described in the section entitled "Alternative outcomes based on ongoing litigation or litigation risks."

***Debt pari passu with GO bonds:*** Following guidance provided by FOMB's legal advisors, certain claims are assumed to receive the same priority as GO bonds as they also hold a Commonwealth guarantee. As outlined in Appendix 5, this analysis assumes bonds or loans with a Commonwealth guarantee in or after 2012 would be deemed invalid and the bondholders holding such claims would have no claim against the Commonwealth.

This *pari passu* debt is comprised of the following claims:

- **Public Buildings Authority (PBA) bonds:** Excluding PBA bonds issued in or after 2012, PBA bonds are owed through FY2041, with a total amount of principal and accrued and unpaid interest of $4,323  million as of the Effective Date of this analysis. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the PBA petition date is $3,424 million and $572 million, respectively.[16]
- **Bonds issued by the Port of Americas Authority (APLA, by its Spanish acronym)**: APLA bonds were issued in 2005 and were purchased by GDB in 2014 (which then

---

[16] Total recovery provided to PBA bondholders is the sum of recovery provided by PBA, as detailed in the "Analysis of Creditors Recoveries should the Title III Case be Dismissed for Creditors of Puerto Rico Public Buildings Authority (PBA)," and the recovery provided by the Commonwealth. PBA bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of PBA and the Commonwealth.

refinanced such bonds).[17] APLA bonds are owed through FY2048. Their total outstanding principal and accrued and unpaid interest is $308 million as the Effective Date of this analysis. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the Commonwealth petition date is $226 million and $37 million, respectively.

- **General Services Administration (GSA) loan**: GSA has a loan with an outstanding principal and accrued and unpaid interest of $24 million and $2 million, respectively. The total outstanding amount of principal and accrued and unpaid interest as of the Effective Date of this analysis is $30 million.  Following guidance provided by FOMB's legal advisors, this loan is considered *pari passu* with GO debt.

Following guidance provided by FOMB's legal advisors, there are certain Commonwealth guaranteed bonds *pari passu* with GO bonds that are not considered in this analysis because such claims received a Commonwealth guarantee in or after 2012. Those claims are the following:

- **Hacienda loans**: The total outstanding principal and accrued and unpaid interest balance is $240 million as of the Effective Date of this analysis. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the Commonwealth petition date is $169 million and $29 million.
- **Bond Anticipation Notes (BANs) for the Puerto Rico Infrastructure Financing Authority (PRIFA):** The PRIFA BANs were originally issued in 2015, with a total outstanding principal and accrued and unpaid interest balance of $108 million as of the Effective Date of this analysis. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the Commonwealth petition date is $78 million and $5 million, respectively.

Additionally, certain subordinated bonds from the Puerto Rico Aqueduct and Sewer Authority (PRASA) are guaranteed by the Commonwealth but are not considered in this analysis. As announced on August 9, 2019, PRASA restructured over $1 billion in debt that had a Commonwealth guarantee. As part of this process, this guarantee was terminated for most of the PRASA debt claims, except for $284 million of such debt, which remains guaranteed by the Commonwealth. Based upon guidance provided by FOMB's legal advisors in Appendix 5, this analysis assumes the Commonwealth would not have to pay PRASA debt claims because a PRASA default is currently unlikely to occur.

As indicated in Appendix 5, there is an additional litigation risk related to the validity of certain *pari passu* debt. The UCC has challenged claims relating to PBA bonds issued in and after March 2011. There are also arguments that certain Commonwealth guarantees issued in and after March 2011 may be invalid.

***Other eligible claims (unsecured claims)***: As described in Appendix 5, this analysis assumes unsecured claims can only be paid after the amounts owed in a given year to GO and *pari passu* debt claimholders are paid. The other eligible claims include:

---

[17] The Bonds issued by the Port of Americas Authority are not included in the Government Development Bank loans. Therefore, they are mentioned as two separate debt claims.

- **Litigation claims against the Commonwealth:** Total claims estimated to be $2,769 million.
- **Claims to be settled through the Administrative Claims Process:** Total claims estimated to be $1,009 million.
- **GDB Title VI Public Entity Trust claim:** Total claim of $600 million that would be due when the current stay on payment of Commonwealth debt is lifted.
- **Puerto Rico intragovernmental claims**: Total claims estimated to be $594 million. This includes claims filed by Commonwealth municipalities and other Puerto Rico governmental entities.
- **Critical industries claims:** Total claims estimated to be $355 million. This is comprised of 330 Health Center litigation claims estimated at $293 million and Milk Producers subsidy claims estimated at $62 million.
- **Employee union claims against the Commonwealth**: Total claims estimated to be $245 million.
- **Trade payables:** Total claims estimated to be $175 million.
- **Convenience class claims:** Total claims estimated to be $142 million.
- **Gracia – Gracia insurance overpayment litigation claims:** Total claims estimated to be $28 million.
- **Tax related claims:** Total claims estimated to be $8 million.
- **Other miscellaneous claims:** Total claims estimated to be $57 million.

Following guidance provided by FOMB's legal advisors, there are two known claims that are assumed to be set to zero in the analysis. First, Puerto Rico Public Finance Corporation bonds ("PFC bonds") are assumed to not be part of the pool of claims. PFC bond documents disclosed that the Legislature is not legally bound to appropriate funds to pay the bonds, as such bonds do not constitute an obligation that can be enforced against the Commonwealth. Second, the Commonwealth also guaranteed $110 million of additional GDB bonds, but any rights of holders of such GDB bonds with respect to the Commonwealth's guarantee were extinguished upon the exchange and cancellation of the GDB bonds pursuant to the Title VI restructuring.

### iii. Priorities for distribution of funds for debt service

The order in which claims are paid follows certain priorities. Following guidance provided by FOMB's legal advisors, this analysis assumes that the Commonwealth will pay Federal claims in full prior to any other debt payment because the Federal Government could offset unpaid claims using certain Federal Funds earmarked for the Commonwealth. Once Federal claims are paid, funds in the Resource Envelope are then allocated towards GO bonds and *pari passu* debt, such that each class receives the same percent recovery rate on their debt service payable in a given year.[18] Once the amount owed and due in a given year to GO bonds and *pari passu* debt are fully paid, remaining funds in the Resource Envelope can be used to pay other eligible claims.

Exhibit 3 summarizes the order in which funds are disbursed and claims are paid, following legal guidance outlined in Appendix 5. For the claims considered in this analysis, debt with the same

---

[18] This refers to total payment as a percentage of total principal and interest for each class of debt in any given year.

priority receives the same percentage recovery of debt owed in a given year. However, no acceleration of payments is allowed, so total recovery as a percent of outstanding debt may differ between debt with the same priority but different maturity schedules.

*Exhibit 3: Flow of funds in the analysis*



Following guidance provided by FOMB's legal advisors, the use of conditionally allocable and CRIM revenues follow certain rules set forth below:

- If the Commonwealth faces an operating deficit after using all available resources excluding conditionally allocable and CRIM revenues in any given year, the analysis assumes the Commonwealth will exercise its police power to use conditionally allocable and CRIM revenues to cover operating expenses. If the Commonwealth deficit is fully paid with a portion of conditionally allocable and CRIM revenues, any remaining CRIM revenues would be used to pay GO bonds and conditionally allocable revenues would be used to pay GO bonds and *pari passu* debt . Conditionally allocable and CRIM revenues will be distributed such that GO bonds and *pari passu* debt receive the same percentage recovery in any given year.

- If the Commonwealth achieves fiscal balance or runs a surplus when excluding conditionally allocable and CRIM revenues in any given year, CRIM revenues would be used to pay GO bonds and conditionally allocable revenues would be used to pay GO bonds

and *pari passu* debt.[19] Conditionally allocable and CRIM revenues will be distributed such that GO bonds and *pari passu* debt receive the same percentage recovery in any given year.

- If all GO bonds and *pari passu* debt owed and due in any given year is paid, any remaining conditionally allocable revenues are appropriated to the respective public corporations (i.e., HTA, MBA, PRIFA, and CCDA). Certain allocable revenue statutes require the Commonwealth to reimburse the allocable revenue entities in the following year when allocable revenues are retained to pay GO bonds and *pari passu* debts, with such amount accruing in favor of the allocable revenue entity until completely reimbursed. These revenues are 1) Gasoline Tax (HTA), 2) Vehicle License Fees (HTA), and 3) Hotel Room Taxes (CCDA).

As described in Appendix 5, funds available are first assumed to be credited against cumulative interest owed, and then to the debt principal maturing in that year or previously, if any. Unpaid principal is assumed to accrue interest according to the original rates stipulated in each of the relevant debt documents and is then added to the following year's debt. It is assumed that no interest accrues on interest balances.

## II. *Estimated likely range of recoveries available to creditors*

Under a scenario in which a Plan of Adjustment is not confirmed and the Title III case is dismissed, a number of risks exist that may impact the implementation of the Fiscal Plan. In assessing the estimated likely range of recoveries available to creditors, the analysis adjusts the projections of revenues and expenses outlined in the Fiscal Plan to incorporate the risks related to the implementation of certain structural reforms and fiscal measures.

The analysis sets forth an estimated likely range of recoveries, where the higher end of the range makes certain adjustments to Fiscal Plan projections to reflect implementation risks, and the lower end of the range adds incrementally more adjustments. Specifically, the higher end of the estimated likely range of recoveries assumes the impact of the structural reforms included in the Fiscal Plan will not materialize but that all fiscal measures will be implemented. The analysis assumes that in a situation where the Title III case has been dismissed, Puerto Rico will face greater political and financial instability, which will create significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms. In addition, the impact of any actions to introduce structural reforms will likely have less impact on growth given the overall climate of instability. Fiscal measures, however, are assumed to occur as outlined in the Fiscal Plan as the FOMB would continue to certify budgets consistent with the Fiscal Plan.

The lower end of the estimated likely range of recoveries assumes the impact of structural reforms will not materialize and further assumes that the healthcare reform fiscal measure will not be implemented. Specifically, while the FOMB has the authority to set spending levels, it might face challenges enforcing the healthcare expenditure levels included in the Fiscal Plan. The healthcare reform in the Fiscal Plan requires complex and coordinated actions across the various stakeholders

---

[19] The order of the use of funds to pay GO bonds and *pari passu* debt is as follows: CRIM revenues, starting cash, Commonwealth surplus, Commonwealth appropriations to certain IFCUs, and then conditionally allocable revenues.

in the healthcare system, which the Commonwealth may have limited incentive to undertake in the environment assumed in this analysis. Therefore, it is assumed in the lower end of the range of recoveries that the healthcare reform savings will not materialize.

In addition to adjustments to the Resource Envelope, the estimated likely range of recoveries is impacted by two key variables: a) starting cash available for debt service and b) the amount of unsecured claims. Following guidance provided by FOMB's legal advisors, the analysis assumes $5,981 million for unsecured claims.

Considering the ranges described above, in total, all assumed valid claimants[20] would receive payments in the range of $9.7 billion to $11.0 billion.[21] The implied recovery is 56% to 64% of total claims.[22,23] This range represents the estimated total recoveries for all creditors if the Title III case is dismissed and all claims were enforced under non-bankruptcy law. This case is referred as the "base case" in the following pages.

*Exhibit 4: Estimated likely range of overall recovery to Commonwealth creditors*

**Estimated likely range of recoveries available overall to Commonwealth creditors if GO bonds and *pari passu* debt obligations issued in or after 2012 are deemed invalid[1,2]**
PV of total payment in USD billion, % recovery

| | Lower end of range | Higher end of range |
|---|---|---|
| **Total Recoveries** | $9.7 *56%* | $11.0 *64%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

The following chart shows the estimated likely range of recoveries for each class of claims. As mentioned in the section 'Outstanding debt,' the calculation assumes GO bonds, PBA bonds,[24] and claims with a Commonwealth guaranty issued in or after 2012 are invalid.

---

[20] As mentioned in the "Outstanding Debt" section above, GO bonds, PBA bonds, and claims with a Commonwealth guaranty issued in or after 2012 are invalid based on legal guidance.

[21] The amount refers to the present value (as of the Effective Date) of future debt payments using an annual 5% discount rate.

[22] Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Commonwealth petition date (May 3, 2017).

[23] Pensions and ERS claims are not included in the estimation of total debt recovery. This analysis assumes that pensions are fully paid every year as part of the operating expenses. Based on guidance from FOMB's legal advisors, this analysis also assumes that an ERS Title III plan of adjustment is confirmed.

[24] Total recovery provided to PBA bondholders is the sum of recovery provided by PBA, as detailed in the "Analysis of Creditors Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Public Building Authority (PBA)," and the recovery provided by the Commonwealth. PBA bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of PBA and the Commonwealth.

*Exhibit 5: Estimated likely range of recoveries available to Commonwealth creditors by debt class*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and *pari passu* debt obligations issued in or after 2012 are deemed invalid[1,2]**

PV of total payment in USD billion, % recovery

| | Lower end of range | Higher end of range |
|---|---|---|
| **GO Bonds** | $6.2<br>89% | $6.6<br>95% |
| **Claims pari passu with GO bonds** | $2.8<br>66% | $3.3<br>76% |
| **Other eligible claims** | $0.7<br>12% | $1.2<br>20% |
| **Total** | $9.7<br>56% | $11.0<br>64% |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

See Appendix 2 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above.

### Alternative outcomes based on ongoing litigation or litigation risks

The estimated likely range of recoveries available to Commonwealth creditors is subject to the outcome of ongoing litigation as summarized in Appendix 5. The impact of certain possible litigation outcomes on creditors recovery is analyzed in the scenarios below.

### i. Scenario 1: Assumes GO bonds and pari passu debt obligations issued in or after March 2011 are deemed invalid

As described in Appendix 5, the main analysis assumes GO bonds, PBA bonds, and claims with a Commonwealth guarantee issued in or after 2012 are deemed invalid. However, the UCC has commenced litigation challenging the validity of GO bonds, PBA bonds, and other debts with a Commonwealth guarantee issued in or after March 2011. This scenario assumes the above obligations issued in or after March 2011 are deemed invalid.

Based on data provided by financial advisors, the total principal and accrued and unpaid interest outstanding for GO bonds excluding those issued in or after March 2011 is $7,025 million as of the Effective Date of this analysis. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the Commonwealth petition date is $5,462 million and $381 million, respectively.

In this scenario, the outstanding principal and accrued and unpaid interest of PBA bonds is $2,869 million as of the Effective Date of this analysis. For the calculation of recoveries, the total outstanding principal and unpaid interest as of the PBA petition date is $2,243 million and $418

million, respectively. Also, PRIFA BANs and GDB loans are considered invalid in this scenario; the value of those two claims is described in the section 'Outstanding debt' of this analysis.

The results of this scenario are shown in Exhibit 6. The estimated likely range of recoveries for the GO group increases from 89% to 95% in the base scenario to 98% to 100% when the analysis considers claims issued in or after March 2011 are invalid. The estimated likely range of recoveries for *pari passu* debt changes from 66% to 76% in the base scenario to 70% to 75% in this scenario. The result is that the estimated likely range of total payments to Commonwealth creditors, in this scenario, is $9.3 billion to $10.3 billion.

*Exhibit 6: Estimated likely range of recoveries to Commonwealth creditors if GO bonds and pari passu debt obligations issued in or after March 2011 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and *pari passu* debt obligations issued in or after March 2011 are deemed invalid[1,2]**

PV of total payment in USD billion, % recovery

| | Lower end of range | Higher end of range |
|---|---|---|
| **GO Bonds** | $5.8<br>*98%* | $6.0<br>*100%* |
| **Claims pari passu with GO bonds[1]** | $2.1<br>*70%* | $2.2<br>*75%* |
| **Other eligible claims** | $1.5<br>*24%* | $2.0<br>*33%* |
| **Total** | $9.3<br>*63%* | $10.3<br>*69%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

See Appendix 3 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above.

### ii. Scenario 2: Assumes all outstanding GO and pari passu debt obligations are deemed valid

As described in Appendix 5, it is possible that the challenges to certain claims will be unsuccessful. In this scenario, all outstanding GO bonds, PBA bonds, and claims with a Commonwealth guarantee are assumed to be valid, and therefore will receive payments following the priorities for distribution of funds described in this analysis.

In this scenario, based on data provided by financial advisors, the total principal and accrued and unpaid interest outstanding is $16,638 million as of the Effective Date of this analysis. For the calculation of GO bonds recoveries, the total outstanding principal and unpaid interest as of the

petition date is $12,548 million and $965 million, respectively. For PBA bonds, the outstanding principal and accrued and unpaid interest balance is $5,050 million as of the Effective Date of this analysis. For the calculation of recoveries, the total PBA bonds outstanding principal and unpaid interest as of the petition date is $4,001 million and $670 million, respectively. Also, PRIFA BANs and GDB loans are considered in this scenario; the value of those two claims is described in the section 'Outstanding debt' of this analysis. Exhibit 7 below shows the estimated likely range of recoveries.

In this scenario, the GO claims receive an estimated likely recovery of 75% to 84%. The estimated likely range of recoveries for debt *pari passu* with GOs is 54% to 63% in this scenario. The result is that the estimated likely range of total payments to Commonwealth creditors is $12.9 billion to $14.6 billion.

*Exhibit 7: Estimated likely range of recoveries to Commonwealth creditors if all outstanding GO bonds and pari passu debt obligations are deemed valid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if all GO bonds and *pari passu* debt obligations are deemed valid[1,2]**
PV of total payment in USD billion, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **GO Bonds** | $10.1 *75%* | $11.3 *84%* |
| **Claims pari passu with GO bonds** | $2.8 *54%* | $3.3 *63%* |
| **Other eligible claims** | $0 *0%* | $0 *0%* |
| **Total** | $12.9 *52%* | $14.6 *59%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

See Appendix 3 for additional details on recoveries based on varying levels of starting cash and litigation claims that construct the ranges described above. A summary of creditor recoveries for the base case, Scenario 1, and Scenario 2 is shown in Exhibit 8.

*Exhibit 8: Estimated likely range of recoveries to Commonwealth creditors by debt class and scenario*

**Estimated likely range of recoveries available to creditors by debt class and scenario[1,2]**
PV of total payment in USD billion, % recovery, breakdown by scenario

| | Base case: GO bonds and *pari passu* debt issued in or after 2012 is deemed invalid | | Scenario 1: GO bonds and *pari passu* debt issued in or after March 2011 is deemed invalid | | Scenario 2: All outstanding claims are deemed valid | |
| --- | --- | --- | --- | --- | --- | --- |
| | Lower end of range | Higher end of range | Lower end of range | Higher end of range | Lower end of range | Higher end of range |
| **GO Bonds** | $6.2 89% | $6.6 95% | $5.8 98% | $6.0 100% | $10.1 75% | $11.3 84% |
| **Claims pari passu with GO bonds** | $2.8 66% | $3.3 76% | $2.1 70% | $2.2 75% | $2.8 54% | $3.3 63% |
| **Other eligible claims** | $0.7 12% | $1.2 20% | $1.5 24% | $2.0 33% | $0 0% | $0 0% |
| **Total** | $9.7 56% | $11.0 64% | $9.3 63% | $10.3 69% | $12.9 52% | $14.6 59% |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

### *iii. Alternative scenarios assuming court mandated reduction to certain pension obligations to meet certain debt obligations*

Based on legal assumptions described in Appendix 5, this alternative analysis assumes the Commonwealth's prioritization of pension obligations is deemed not fully permissible and it is directed to use a portion of funds intended to pay pensions to increase the resource envelope available to pay GO bonds and *pari passu* debt. The analysis assumes pensions greater than $1,500 per month (excluding medical insurance benefits) are partially reduced by 5% or 10%, with the reduction capped such that no pension is reduced below $1,500 per month. These reductions are assumed to occur unless and until GO bonds and *pari passu* debt are paid in full, at which point no further pension reductions are required.

Exhibit 9 and Exhibit 10 show the estimated likely range of recoveries for the base case, Scenario 1, and Scenario 2 assuming a 5% or 10% court mandated reduction in certain pension obligations as described above.

*Exhibit 9: Estimated likely range of recoveries to Commonwealth creditors by debt class and scenario assuming a 5% court mandated reduction in certain pension obligations*

**Estimated likely range of recoveries available to creditors by debt class and scenario assuming a 5% court mandated reduction in certain pension obligations[1,2]**

PV of total payment in USD billion, % recovery, breakdown by scenario

| | Base case: GO bonds and *pari passu* debt issued in or after 2012 is deemed invalid | | Scenario 1: GO bonds and *pari passu* debt issued in or after March 2011 is deemed invalid | | Scenario 2: All outstanding claims are deemed valid | |
| | Lower end of range | Higher end of range | Lower end of range | Higher end of range | Lower end of range | Higher end of range |
|---|---|---|---|---|---|---|
| **GO Bonds** | $6.3 91% | $6.7 96% | $5.8 99% | $6.1 100% | $10.3 76% | $11.6 86% |
| **Claims pari passu with GO bonds** | $2.9 68% | $3.3 78% | $2.1 70% | $2.2 76% | $2.9 55% | $3.4 65% |
| **Other eligible claims** | $0.7 12% | $1.2 20% | $1.5 24% | $2.0 33% | $0 0% | $0 0% |
| **Total** | $9.9 58% | $11.2 65% | $9.3 63% | $10.3 70% | $13.2 54% | $15.0 61% |

1 Recoveries on this exhibit do not include ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

*Exhibit 10: Estimated likely range of recoveries to Commonwealth creditors by debt class and scenario assuming a 10% court mandated reduction in certain pension obligations*

**Estimated likely range of recoveries available to creditors by debt class and scenario assuming a 10% court mandated reduction in certain pension obligations[1,2]**

PV of total payment in USD billion, % recovery, breakdown by scenario

| | Base case: GO bonds and *pari passu* debt issued in or after 2012 is deemed invalid | | Scenario 1: GO bonds and *pari passu* debt issued in or after March 2011 is deemed invalid | | Scenario 2: All outstanding claims are deemed valid | |
| | Lower end of range | Higher end of range | Lower end of range | Higher end of range | Lower end of range | Higher end of range |
|---|---|---|---|---|---|---|
| **GO Bonds** | $6.4 92% | $6.8 97% | $5.8 100% | $6.1 100% | $10.5 78% | $11.8 87% |
| **Claims pari passu with GO bonds** | $3.0 70% | $3.4 79% | $2.1 71% | $2.3 77% | $3.0 57% | $3.5 67% |
| **Other eligible claims** | $0.7 12% | $1.2 20% | $1.5 24% | $2.0 33% | $0 0% | $0 0% |
| **Total** | $10.1 59% | $11.3 66% | $9.4 64% | $10.4 70% | $13.5 55% | $15.3 62% |

1 Recoveries on this exhibit do not include ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

*iv. Alternative scenarios assuming ERS Title III is dismissed*

This alternative analysis assumes the ERS Title III case is dismissed. As described in Appendix 5, should the ERS Title III case be dismissed, any assets remaining at ERS after debt obligations have been paid to bondholders and unsecured creditors from legally identified security sources will be transferred to the Commonwealth per Act 106-2017. Based on the "Analysis of Creditors Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Employee Retirement System (ERS)," $1,023 million of ERS unrestricted remaining assets are assumed to be transferred to the Commonwealth in FY2022 compared to $643 million in the base case.

In addition, following guidance provided by FOMB's legal advisors, this analysis assumes ERS bondholders assert an unsecured claim against the Commonwealth for remaining debt service in each year their debt service is not paid by ERS.[25] The following exhibit shows the estimated likely range of recoveries for the base case, Scenario 1, and Scenario 2 assuming ERS unrestricted assets transferred to the Commonwealth in FY2022 being $1,023 million and ERS bondholders assert an unsecured claim in each year their debt service is not paid in full by ERS.

*Exhibit 11: Estimated likely range of recoveries to Commonwealth creditors by scenario if the ERS Title III case is dismissed*

**Estimated likely range of recoveries available to creditors by debt class and scenario if the ERS Title III case is dismissed[1,2]**

PV of total payment in USD billion, % recovery, breakdown by scenario

| | Base case: GO bonds and *pari passu* debt issued in or after 2012 is deemed invalid | | Scenario 1: GO bonds and *pari passu* debt issued in or after March 2011 is deemed invalid | | Scenario 2: All outstanding claims are deemed valid | |
|---|---|---|---|---|---|---|
| | Lower end of range | Higher end of range | Lower end of range | Higher end of range | Lower end of range | Higher end of range |
| **GO Bonds** | $6.2 89% | $6.6 95% | $5.8 98% | $6.0 100% | $10.1 75% | $11.3 84% |
| **Claims pari passu with GO bonds** | $2.8 66% | $3.3 76% | $2.1 70% | $2.2 75% | $2.8 54% | $3.3 63% |
| **Other eligible claims** | $1.1 12% | $1.6 17% | $1.8 20% | $2.4 26% | $0 0% | $0 0% |
| **Total** | $10.1 49% | $11.4 56% | $9.6 54% | $10.6 59% | $12.9 46% | $14.6 52% |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

---

25 Total recovery provided to ERS bondholders is the sum of recovery provided by ERS, as detailed in the "Analysis of Creditors Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Employee Retirement System (ERS)," and the recovery provided by the Commonwealth as an unsecured claim. ERS unsecured claims against the Commonwealth account for 35% of total unsecured claims asserted against the Commonwealth in the case where the ERS Title III is dismissed in this analysis.

## *APPENDIX 1*

The following exhibits provide additional detail on the estimated likely range of recoveries available to creditors for the different scenarios, including details on payments for interest that accrued from the petition date (May 3, 2017 except for PBA, which is September 27, 2019) through the Effective Date of the analysis (June 30, 2021).

*Exhibit 12: Estimated likely range of recoveries available to all Commonwealth creditors by debt class if GO bonds and pari passu debt obligations issued in or after 2012 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and *pari passu* debt obligations issued in or after 2012 are deemed invalid[1,2]**
PV of total payment in USD billion, % recovery

| | Lower end of range | | Higher end of range | |
|---|---|---|---|---|
| | Total recovery | Payments to interest accrued post-petition[3] | Total recovery | Payments to interest accrued post-petition[3] |
| **GO Bonds** | $6.2 *89%* | 1.4 *20%* | $6.6 *95%* | 1.4 *20%* |
| **Claims pari passu with GO bonds** | $2.8 *66%* | 0.3 *7%* | $3.3 *76%* | 0.3 *7%* |
| **Other eligible claims** | $0.7 *12%* | 0.0 *0%* | $1.2 *20%* | 0.0 *0%* |
| **Total** | $9.7 *56%* | 1.7 *10%* | $11.0 *64%* | 1.7 *10%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis
3 Calculated as percentage of payments made to interest accrued post petition out of total outstanding debt as of the petition date

*Exhibit 13: Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and pari passu debt obligations issued in or after March 2011 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and *pari passu* debt obligations issued in or after March 2011 are deemed invalid[1,2]**
PV of total payment in USD billion, % recovery

| | Lower end of range | | Higher end of range | |
|---|---|---|---|---|
| | Total recovery | Payments to interest accrued post-petition[3] | Total recovery | Payments to interest accrued post-petition[3] |
| GO Bonds | $5.8 *98%* | 1.2 *20%* | $6.0 *100%* | 1.2 *20%* |
| Claims pari passu with GO bonds | $2.1 *70%* | 0.2 *6%* | $2.2 *75%* | 0.2 *6%* |
| Other eligible claims | $1.5 *24%* | 0.0 *0%* | $2.0 *33%* | 0.0 *0%* |
| Total | $9.3 *63%* | 1.3 *9%* | $10.3 *69%* | 1.3 *9%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis
3 Calculated as percentage of payments made to interest accrued post petition out of total outstanding debt as of the petition date

*Exhibit 14: Estimated likely range of recoveries available to creditors if all outstanding claims are deemed valid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if all GO bonds and *pari passu* debt obligations are deemed valid[1,2]**
PV of total payment in USD billion, % recovery

| | Lower end of range | | Higher end of range | |
|---|---|---|---|---|
| | Total recovery | Payments to interest accrued post-petition[3] | Total recovery | Payments to interest accrued post-petition[3] |
| GO Bonds | $10.1 *75%* | 3.1 *23%* | $11.3 *84%* | 3.1 *23%* |
| Claims pari passu with GO bonds | $2.8 *54%* | 0.4 *8%* | $3.3 *63%* | 0.4 *8%* |
| Other eligible claims | $0 *0%* | 0.0 *0%* | $0 *0%* | 0.0 *0%* |
| Total | $12.9 *52%* | 3.5 *14%* | $14.6 *59%* | 3.5 *14%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis
3 Calculated as percentage of payments made to interest accrued post petition out of total outstanding debt as of the petition date

*APPENDIX 2*

The following exhibits provide additional detail on the estimated likely range of recoveries available to creditors. The first exhibit shows additional details on the total recoveries to creditors and the second exhibit shows recoveries by debt class.

*Exhibit 15: Estimated likely range of recoveries available to all Commonwealth creditors by debt class if GO bonds and pari passu debt obligations issued in or after 2012 are deemed invalid*

**Estimated likely range of overall recoveries available to Commonwealth creditors if GO bonds and *pari passu* debt obligations issued in or after 2012 are deemed invalid[1,2]**

PV of total payment in USD billion, *% recovery*

|  | Lower end of range | Higher end of range | Range of recoveries |
|---|---|---|---|
| Starting cash = $9.3B | $9.7<br>*56%* | $10.6<br>*61%* | $9.7 – 11.0<br>*56 – 64%* |
| Starting cash = $9.8B | $10.2<br>*59%* | $11.0<br>*64%* | |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

*Exhibit 16: Estimated likely range of recoveries available to Commonwealth creditors by debt class and variables if GO bonds and pari passu debt obligations issued in or after 2012 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and *pari passu* debt obligations issued in or after 2012 are deemed invalid[1,2]**

PV of total payment in USD billion, *% recovery*

|  | Starting cash = $9.3B | Starting cash = $9.8B | Range of recoveries |
|---|---|---|---|
| GO Bonds | $6.2 – 6.6<br>*89-95%* | $6.2 – 6.6<br>*89-95%* | $6.2 – 6.6<br>*89 – 95%* |
| Claims pari passu with GO bonds | $2.8 – 3.3<br>*66 – 76%* | $2.8 – 3.3<br>*66 – 76%* | $2.8 – 3.3<br>*66 – 76%* |
| Other eligible claims | $0.7 – 0.7<br>*12 – 12%* | $1.1 – 1.2<br>*19 – 20%* | $0.7 – 1.2<br>*12 – 20%* |
| Total | $9.7 – 10.6<br>*56 – 61%* | $10.2 – 11.0<br>*59 – 64%* | $9.7 – 11.0<br>*56 – 64%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

## APPENDIX 3

*Exhibit 17: Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and pari passu debt obligations issued in or after March 2011 are deemed invalid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if GO bonds and pari passu debt obligations issued in or after March 2011 are deemed invalid[1,2]**

PV of total payment in USD billion, % recovery

|  | Starting cash = $9.3B | Starting cash = $9.8B | Range of recoveries |
|---|---|---|---|
| GO Bonds | $5.8 – 6.0<br>98 – 100% | $5.8 – 6.0<br>98 – 100% | $5.8 – 6.0<br>98 – 100% |
| Claims pari passu with GO bonds | $2.1 – 2.2<br>70 – 75% | $2.1 – 2.2<br>70 – 75% | $2.1 – 2.2<br>70 – 75% |
| Other eligible claims | $1.5 – 1.5<br>24 – 25% | $2.0 – 2.0<br>33 – 33% | $1.5 – 2.0<br>24 – 33% |
| Total | $9.3 – 9.8<br>63 – 66% | $9.8 – 10.3<br>66 – 69% | $9.3 – 10.3<br>63 – 69% |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

*Exhibit 18: Estimated likely range of recoveries available to Commonwealth creditors by debt class if all claims are deemed valid*

**Estimated likely range of recoveries available to Commonwealth creditors by debt class if all GO bonds and *pari passu* debt obligations are deemed valid[1,2]**

PV of total payment in USD billion, *% recovery*

|  | Starting cash = $9.3B | Starting cash = $9.8B | Range of recoveries |
|---|---|---|---|
| GO Bonds | $10.1 – 11.3<br>75 – 84% | $10.1 – 11.3<br>75 – 84% | $10.1 – 11.3<br>75 – 84% |
| Claims pari passu with GO bonds | $2.8 – 3.3<br>54 – 63% | $2.8 – 3.3<br>54 – 63% | $2.8 – 3.3<br>54 – 63% |
| Other eligible claims | $0 – 0<br>0 – 0% | $0 – 0<br>0 – 0% | $0 – 0<br>0 – 0% |
| Total | $12.9 – 14.6<br>52 – 59% | $12.9 – 14.6<br>52 – 59% | $12.9 – 14.6<br>52 – 59% |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

*APPENDIX 4*

Based on the Puerto Rico Cash Analysis published by the Oversight Board and AAFAF on December 19, 2020,  the Minimum Cash Requirements of the Commonwealth is estimated to be $1,200 million to $1,700 million. This amount refers to cash on hand that the Commonwealth would need for the government's cash management system to be sufficiently funded and ensure proper functioning of government operations. See table below for details of the analysis.

*Exhibit 19: Minimum Cash Requirements analysis[26]*



[26] Source: Puerto Rico Cash Analysis (as accessed in June 2021): https://emma.msrb.org/P11450397-P11124337-P11535399.pdf

*APPENDIX 5*

## Commonwealth Title III Plan[1]

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| **1.** | **Existence of PROMESA/Board:** Should PROMESA Titles I and II apply be assumed to apply? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: PROMESA Titles I and II apply.  The automatic stay does not apply.  The Board is in place and certifies and enforces fiscal plans and budgets.  Creditors are allowed to procure judgments for all matured claims.  Once GO creditors (including creditors holding CW-guaranteed claims) have judgments, they can claim all "available resources" and negotiate/litigate with the Commonwealth over what amount of the available resources can be applied to operating expenses pursuant to the police power.  The non-GO and non-CW guarantee creditors' only recourse is to wait for a legislative appropriation of amounts to pay their claims once GOs are paid in full.<br><br>**BASIS**: The reference to "non-bankruptcy laws" in PROMESA section 314(b)(6) would include Titles I and II of PROMESA.  There would be no automatic stay under non-bankruptcy law.  Neither the fiscal plan nor the budget discharges claims or stays actions.  Therefore, the fiscal plan and budget, as non-bankruptcy law, would apply, and the Oversight Board would continue to exist to enforce them.  It is possible that their implicit limitations (*i.e.*, budgeted amounts) will not limit how much creditors can collect by enforcing their claims.  Whether that is the case will be a function of the extent to which the police power prevents GO creditors from taking all available resources.  Non-GO creditors rely on legislative appropriations for payment.  The certified fiscal plan would limit what can be appropriated for debt service, subject to the rights of GO creditors to exercise their rights under Article VI, Sections 6 and 8 of the PR Constitution to intercept available resources.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  PROMESA Titles I and II do not apply.  The automatic stay does not apply.  The Board does not exist, and there are no certified fiscal plans and budgets. |

---

[1] The Commonwealth of Puerto Rico is referred to herein as "Commonwealth," "CW," or "PR."

| | Question | Assumption |
|---|---|---|
| | | **BASIS**: The assumption that PROMESA Titles I and II continue to apply increases the creditors' recovery due to the measures and savings the Oversight Board inserts into its certified fiscal plans. The Oversight Board's legal advisors believe it is possible that Titles I and II do not apply because Congress enacted them in tandem with Title III and it is not clear they were intended to continue in effect without Title III. On balance, however, the legal advisors recommended that this analysis be done as if PROMESA Titles I and II continue to apply**.** |
| **2.** | **Surplus**: Each year, is the cash remaining after all debts due and payable are paid, put in a lockbox for later years with deficits, or rolled over to next year's resources? | **ASSUMPTION**: To the extent there are surplus funds after payment of all matured debts in any year, the funds will be held in the Commonwealth's treasury and a court will decide the next year whether the police power justifies putting any or all of it aside for later deficit years for essential services. GO bonds and CW-guaranteed bonds do not provide for acceleration. The BIT analysis should assume the surplus is available for and used for debt service, and not saved for future deficit years or deposit into the pension system. <br><br> **BASIS**: A court may not be willing to allow the Commonwealth to set aside large amounts for future deficit years if it means cutting the creditors' nearer term recovery. |
| **3.** | **Restricted/Unrestricted Cash** | **ASSUMPTION:** Only unrestricted cash is available for debt service generally, and cash restricted for certain creditors is available solely for those creditors to the extent required by Commonwealth or other applicable law. <br><br> Unrestricted cash refers to Commonwealth funds that do not have legal limitations on their use (e.g., are in custodial or trust accounts, are bondholder collateral, or are subject to court orders, among others). Funds that do not have legal limitations on their use are considered unrestricted cash available for debt service. There is a difference between money set aside for a purpose, and money legally restricted, like federal funds or trust funds. Money set aside for emergencies and cost match reserve obligations is not legally restricted. <br><br> Additionally, the cash estimate in the BIT analysis should assume a minimum cash required for normal government operations ("Minimum Cash Requirements"), which is the minimum level of cash that the Commonwealth would need to avoid liquidity |

| Question | Assumption |
|---|---|
| | constraints that could put its operations at risk.  The Minimum Cash Requirements assumption also includes a reasonable provision for short term emergencies, consistent with how budgeting is done for municipalities and U.S. states.<br><br>Lastly, the cash analysis for FY21 should include an adjustment for funding that the Commonwealth will provide to PREPA.  These funds are related to the LUMA contract and are assumed to be advanced before the effective date of this analysis (June 30, 2021).  The preliminary estimated value of the support funds is $750 million, which are related to contractual payments funding T&D O&M Agreement operating accounts.<br><br>**BASIS:**  Cash in accounts subject to other restrictions is not available for debt service if the restrictions are in the nature of security interests, liens, or setoff or recoupment rights.  Other cash is available, even if "earmarked" for a specific purpose, with the exception of limited emergency funds which the court allows entities to retain. |
| **4.**    **Conditionally Allocable Revenues:** Can the public corporations ordinarily entitled to receive conditionally allocable revenues ("allocable revenue entities") or their bondholders assert a valid claim against the Commonwealth for any amount of conditionally allocable revenues retained by the Commonwealth?  (The "conditionally allocable revenues" refer to revenues recallable or not allocated based on Article VI, section 8 of the Puerto Rico constitution.) | **ASSUMPTION 1 [MAIN ASSUMPTION]:**  An allocable revenue entity or its bondholders may assert a claim against the Commonwealth for allocable revenues the Commonwealth has retained but not used to pay GO debt or CW-guaranteed debts, but not for allocable revenues used to pay GO bonds or CW-guaranteed debts.  This claim is an unsecured, non-priority (*i.e.*, subordinated to GO debt) claim against the Commonwealth for unauthorized failure to allocate revenues in addition to any claim the bondholders may have against the allocable revenue entity (*i.e.*, the issuer), but not for the portion used for payment of GO debt service or CW-guaranteed debt service.  The adjudication of the claim will turn on many factors including the police power, preemption, and the facts underlying each failure to allocate revenues.  The GO debt priority provisions apply on an aggregate, and not year-by-year basis.  These claims will be reduced if the Commonwealth reimburses the allocable revenue entities in the subsequent years in which the Commonwealth retained allocable revenues for purposes other than to pay GO bonds or CW-guaranteed bonds.<br><br>**BASIS**: Allocable revenues used to pay GO debt service under the plan of adjustment in which GO claims are not paid in full are not subject to the attack that allocable revenue funds were used for the wrong purpose because pursuant to Section |

| Question | Assumption |
|---|---|
| | 8 of Article VI of the PR Constitution, allocable revenues can be used for debt service on general obligations, and/or because such allocable revenues were preempted by the Board's Fiscal Plans.  Section 8, however, appears subject to the CW police power.  Bondholders will also likely contest the failure to allocate revenues (past and future) on the ground it was unnecessary because in their view there were sufficient available revenues to pay GO debt service.  Based on that argument and/or because the police power is used to deploy allocable revenues to pay operating expenses and not GO debt service, bondholders will assert claims against CW for the amount of allocable revenues allegedly unnecessarily taken to pay GO debt service or allegedly taken pursuant to the police power to pay CW operating expenses or allocable revenue entity operating expenses.  Even if no right to not allocate revenues existed, the CW police power, subject ultimately to court adjudication, could justify cessation of appropriating money to allocable revenue agencies for debt service and use of the funds for essential services at the CW or allocable revenue entities. |
| | Thus, it is assumed that as long as the Commonwealth could not afford to pay its expenses in a given year, it exercises police power to not allocate revenues and then distributes them according to need (*i.e.*, may use some to cover operating expenses for itself, instrumentalities, including allocable revenue entities, and debt service).  It is assumed that allocable revenues can be used to pay GO debt and debt *pari passu* to GO bonds when the Commonwealth has sufficient funds to pay its operating expenses.  In the event that allocable revenues are not required to be used in full to pay GO debt and debt *pari passu* to GO debt in a given year, any amount of remaining allocable revenues are returned to their corresponding public corporations. If the Commonwealth has insufficient funds to pay its operating expenses in any given year, it is assumed it can exercise police power to use allocable revenues to pay for those expenses, with the police power potentially giving rise to claims against the CW for the amount of allocable revenues used. |
| | Finally, certain allocable revenue statutes require the Commonwealth to reimburse the allocable revenue entities in the following year when allocable revenues are retained to pay GO bonds and CW-guaranteed debts, with such amount accruing in favor of the allocable revenue entity until completely reimbursed (with a claim |

| | | Question | Assumption |
|---|---|---|---|
| | | | arising only in favor of the allocable revenue entity if and when allocable revenues are unlawfully retained). |

(continuation)

arising only in favor of the allocable revenue entity if and when allocable revenues are unlawfully retained).

The taxes and fees which accrue are:  gasoline taxes – HTA (13 LPRA 31751(a)(1)); license fees – HTA; (9 LPRA 5681) and hotel taxes – CCDA (13 LPRA 2271v ).

The taxes and fees which do not accrue are:  increased license fees – HTA (9 LPRA 2021); cigarette taxes – HTA (13 LPRA 31751(a)(3)); and the PRIFA allocable revenues.

**ASSUMPTION 2 [LITIGATION RISK]**: The failure to conditionally allocate revenues to allocable revenues entities (whether pursuant to Section 8 or the police power) was permissible, so the allocable revenue entity or its bondholders cannot assert any claim as a result of the failure to allocate revenues.

**BASIS**: Unlike in Assumption 1, the Commonwealth would be allowed to use allocable revenues for operating expenses pursuant to its police power without giving rise to claims against the Commonwealth or because failure to appropriate does not give rise to an enforceable claim for the appropriation.  The Oversight  Board believes no enforceable claim would exist because (i) appropriations by prior legislatures are not binding on subsequent legislatures and (ii) appropriations and statutes providing for them are repealable at will and do not create entitlements to receive them.  To avoid disputes over this issue, the BIT analysis assumes appropriations do create enforceable claims in Assumption 1.

**ASSUMPTION 3 [LITIGATION RISK]**:  Any failure to allocate revenues was impermissible, so the allocable revenue entity or its bondholders can assert a claim as a result of the failure to allocate revenues used for both operating expenses and GO bonds and CW-guaranteed debts.  If Titles I and II preempt the Commonwealth's preexisting statutory appropriations to HTA and the other allocable revenue entities, there are no restrictions on the Commonwealth's use of allocable revenues, but the allocable revenue entity or its bondholders might sue the Commonwealth for impairing the bond obligations to them and assert claims against the Commonwealth for that impairment.  Specifically, in each year in which the debt service on bonds of the entity that would otherwise receive allocable revenues is not paid, the FOMB

| Question | Assumption |
|---|---|
| | would assume the allocable revenue entity or such bondholders may assert an unsecured, non-priority (*i.e.*, subordinated to the GO debt) claim against the Commonwealth in addition to their claim against the allocable revenue entity (*i.e.*, the issuer). **BASIS**: Titles I and II allow for not conditionally allocating revenues by providing the Oversight Board with power over budget appropriations, but a damage claim may still be asserted as a result of that failure to allocate revenues. **ASSUMPTION 4 [LITIGATION RISK]**: The bondholders have an interest in conditionally allocable revenues as soon as the Commonwealth receives such revenues. Accordingly, they receive such revenues before they can be distributed to holders of GO bonds or CW-guaranteed debts. **BASIS**: Once the Commonwealth receives the conditionally allocable revenues, such revenues are property of bondholders of allocable revenue entities, because either the bondholders' security interest attaches upon receipt, or the Commonwealth holds the conditionally allocable revenues in trust. To date, the Title III Court has not adopted this assumption. **ASSUMPTION 5 [LITIGATION RISK]**: Bondholders from entities that receive conditionally allocable revenues (HTA, PRIFA and PRCCDA) are determined to hold an unsecured claim against the Commonwealth for the total amount of revenue not allocated, and accordingly receive distribution as members of the category of 'other eligible claims'. **BASIS**: As explained in the basis for Assumption 1, pursuant to Section 8 of Article VI of the PR Constitution, allocable revenues can be used for debt service on general obligations; however, in this assumption, each dollar withheld leads to a dollar-for-dollar unsecured claim by the bondholder of the allocable revenue entity from which it was withheld. |

| | Question | Assumption |
|---|---|---|
| **5.** | **Fiscal Plan Measures – Implementation Risk**: Is there a risk the fiscal plan measures will not be fully implemented? | **ASSUMPTION**:  Assume a range of recoveries based on high or medium implementation risk of fiscal measures and/or structural reforms.<br><br>**BASIS**:  A dismissal of the Title III case and further political and economic uncertainties could affect the implementation of fiscal plan measures.  Before and during Puerto Rico's turmoil leading to Governor Rosselló's resignation, the Oversight Board found its recommended measures and structural reforms were not being timely implemented.  After dismissal of Title III cases, it is very possible the government would cooperate less with the Oversight Board and creditors seeking to maximize their recoveries. |
| **6.** | **Operating expenses (including pensions) priority:** Will operating expenses be paid before GO and *pari passu* debt is paid? | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  Assume operating expenses outlined in the certified fiscal plan are paid before debt service.  Further assume there will be no freeze of pension benefits accrual for teachers (TRS) and for judges (JRS).  As a consequence, assume teachers and judges will not move into social security.<br><br>Furthermore, benefits and operating expenses will not be changed that depend on a confirmation of the Plan of Adjustment (e.g., pension cuts included in the Fiscal Plan, employer healthcare contributions for employees who are AFSCME union members, and PayGo contributions to System 2000 participants).<br><br>**BASIS:** The fiscal plan already projects reductions in operating expenses through a series of fiscal measures aimed at reducing government-wide expenditures to adapt the budget to a size appropriate for PR's population.  The certified fiscal plan projects savings of ~$6 billion from FY2021 to FY2025, which represents ~12% of the baseline expenses in such period.  Additionally, Puerto Rico cut public pensions significantly before PROMESA was enacted.  This sensitivity assumes additional cuts would be detrimental to the economy of Puerto Rico, but consistently with the current fiscal plan, pension levels would be frozen, which gives rise to unsecured judgment claims.<br><br>Teachers and judges currently do not receive Social Security as this group is exempt from this benefit because of the "Section 218" agreement between the Commonwealth and the Social Security Administration, which stipulates that government employees may be exempt from Social Security if they participate in a |

| | Question | Assumption |
|---|---|---|
| | | "comparable" retirement plan such as one which includes total employee and employer contributions equal to at least 7.5% of employee wages.  If there were a freeze in the accrual of benefits in their pension plan, teachers and judges may be covered under Social Security.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: Assume the Commonwealth's exercise of police power to pay pension obligations from available revenues is limited to paying in full pensions of up to $1,500 per month (excluding medical insurance benefits), and pensions in excess of $1,500 per month are reduced by 5% or 10% (subject to a floor of $1,500 per month) unless and until GO and CW-guaranteed debt due in such year is paid in full, at which point no further pension cuts are required for that year.  Retirees will have general unsecured claims against the Commonwealth for all valid pension claims not paid to them.<br><br>**BASIS**:  Police power allows the payment of essential expenses first, but a court may rule the police power does not free up available revenues for pension payments in excess of the amounts paid after taking 5% or 10% discounts provided for above, on the ground payments in excess of the discounted amounts are unnecessary to protect the public health, safety, and welfare. |
| 7. | **PFC Bonds**:  Do PFC Bonds constitute allowable claims? | **ASSUMPTION**: No.<br><br>**BASIS**: PFC Bonds do not have a right to payment, which is a requirement for claims under CW law and Bankruptcy Code § 101(5).  The payment of such promissory notes is subject to the discretionary appropriation of funds by the Legislature.  PFC Bond documents disclosed that (1) the Legislature is not legally bound to appropriate funds to pay the PFC Bonds and (2) the PFC Bonds do not constitute an obligation of the CW. |
| 8. | **PRIFA BANs:** Have PRIFA BANs been paid off using Crudita revenues since 2016? | **ASSUMPTION**: PRIFA BANs were subject to the moratorium and have not been paid.  Note that PRIFA BANs are guaranteed by the CW. Absent the automatic stay, the moratorium may be ruled a violation of PROMESA section 303 and the PRIFA BANs will be entitled to payment. |

| | Question | Assumption |
|---|---|---|
| **9.** | **Additional Interest:** Should debt (principal + interest) that remained unpaid during the stay accrue additional interest? | **ASSUMPTION**: Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>i.  **Interest on GO debt during stay**: Pursuant to PROMESA § 303, interest continues to accrue at the contract rate during any moratorium, unless the underlying contract provides for default interest, in which case the latter should be used. There is no statutory provision for interest on interest.<br>ii.  **Interest on GO *pari passu* debt during stay**: Same criteria apply as for GOs.<br>iii.  **Interest on unsecured claims during stay**: Assume no interest accrues.<br>iv.  **Interest on federal claims during stay**: Assume interest accrues during moratorium because the federal government can ultimately collect its debt and interest through setoffs against future aid. The documents underlying each federal claim may set the interest rates. The federal judgment rate as of this filing pursuant to 28 U.S.C. § 1961(a) is 0.05% per year.<br>v.  **Interest on unpaid debt**: Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2020 provided by Citi (each debt group of GO *pari passu* has its own rate).<br>vi.  **Interest on interest during FY19–58**: No. Puerto Rico law permits the payment of interest on overdue interest under certain circumstances, such as if it was expressly agreed by the parties. However, the GO debt does not provide for interest on overdue interest. |
| **10.** | **Federal Government Claims:** What is the priority for both secured and unsecured federal claims? Are the documents comprehensive? | **ASSUMPTION**: Federal claims need to be paid in full.<br><br>**BASIS**: The federal government can offset unpaid claims against federal funds otherwise to be received by the Commonwealth—the U.S. Treasury's offset program (TOP) could be engaged immediately and the total amount owed to the federal government would be withheld from future federal transfers to the CW. |

|  | Question | Assumption |
|---|---|---|
| 11. | **ERS Bondholders' Claims:**[2] What is the value of ERS bondholder claims against the Commonwealth? | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  ERS bondholders have no claims against the CW.<br><br>**BASIS**:  The ERS bondholders have reached an agreement with the Oversight Board on the treatment of their claims in the ERS Title III case , the ERS Stipulation (defined below), which may be unaffected by the dismissal of the CW's Title III Case.  If not, even if ERS bondholders had a security interest in future contribution rights, the bondholders were put on notice by the bond offering statement that those rights might be modified or adversely affected by the Commonwealth, which Act 106-2017 did by eliminating any employer contributions to ERS.  The fact that the ERS bondholders were on notice of such potential modification could also significantly diminish their chances of asserting a successful contract impairment or takings claim.  Additionally, the best interests test should assume bondholder rights and remedies are on account of their claims as they existed immediately prior to the hypothetical dismissal of the ERS case and not adjusted under the ERS plan, *i.e.*, secured only by employer contributions arising prior to the ERS petition date, but not after, as a result of the Section 552 opinion.  Thus, the ERS bondholders had no contract rights or collateral that was impaired or eliminated by operation of Act 106.  Alternatively, ERS bondholders have no claims against the CW because the ERS bonds were an *ultra vires* issuance, and the bondholders' are not entitled to any equitable remedies.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  ERS bondholders successfully assert constitutional claims (Takings and/or Contract Clauses) against the CW.  In each year their debt service is not paid, ERS bondholders may assert that amount against the Commonwealth as an unsecured claim paid after GO and *pari passu* debt.<br><br>**BASIS**:  ERS bondholders assert Act 106-2017, which eliminated employer contributions under the ERS enabling act, effected an impairment of contractual rights and a taking of their collateral, in violation of the Puerto Rico and U.S. Constitutions.  Additionally, § 552, which eliminated the security interest in employer contributions arising after the ERS petition date independent of the effect |

---

[2] For ERS bondholders' claims against ERS, see the assumptions for the ERS best interests test analysis.

| | Question | Assumption |
|---|---|---|
| | | of Act 106, would likely no longer apply after the dismissal of the ERS Title III case, which would leave Act 106 as the only basis for the elimination of their collateral and thus a violation of the Contract and/or Takings Clauses.<br><br>**ASSUMPTION 3 [LITIGATION RISK]**:  ERS bondholders have a security interest in future employer contributions, and PayGo Payments are adjudicated to be the same as or proceeds of Employers' Contributions, and thus the ERS bondholders have secured claims against the Commonwealth secured by a security interest in PayGo Payments.  Their debt service including outstanding principal and interest, is paid before GO or CW-guaranteed debt.<br><br>This assumption should be run as if the secured claims against the employer contributions have a 0%, 25%, 50%, 75%, and 100% chance of success.  If the CW runs into deficits before ERS bonds are paid in full, assume the CW can justify the use of police power for the payment of all its expenses, including pensions, in full, and there is no money left to pay ERS bonds or other debt.<br><br>**BASIS**:  ERS bondholders have asserted that PayGo Payments are the same asset as employer contributions, or proceeds thereof, and thus are subject to the ERS bondholders' security interest, making them a secured creditor of the Commonwealth.  They would also likely assert that this security interest, even if eliminated by § 552 upon ERS's petition date, would be reinstated upon the dismissal of ERS's title III case. |
| 12. | **What is the treatment of ERS assets that are not used for payment of ERS bondholders and other claims?** | **ASSUMPTION 1 [MAIN ASSUMPTION]:**  ERS's agreement with its creditors based on the terms included in the *Amended and Restated Stipulation* entered into on April 2, 2021 (the "ERS Stipulation") remains in effect irrespective of whether the Commonwealth Title III case is dismissed.  Therefore, any assets remaining at ERS after debt obligations have been paid to bondholders in accordance with the terms of the ERS Spoliation, and to ERS's unsecured creditors, will be transferred to the Commonwealth<br><br>**BASIS:** In accordance with the ERS Stipulation, any remaining assets after payment of ERS Bonds and unsecured creditors are assumed to be transferred to the Commonwealth in FY2022. |

| | Question | Assumption |
|---|---|---|
| | | **ASSUMPTION 2 [LITIGATION RISK]:**  The ERS Stipulation is no longer in effect, and the ERS Title III case is dismissed.  Any assets remaining at ERS after debt obligations have been paid to ERS Bondholders and unsecured creditors will be transferred to the Commonwealth in FY2022.<br><br>**BASIS**:  In accordance with Act 106-2017, any remaining assets at ERS after payment of valid debt obligations and unsecured creditors will be transferred to the Commonwealth. |
| 13. | **CRIM (Property Tax)** | **ASSUMPTION:**  The 1.03% special property tax collected by CRIM is used to pay GO bondholders, but the CW could exercise police power to use such revenue to cover essential services if it is running a deficit and all other funds available have been applied to necessary operating expenses and/or GO debt service.<br><br>**BASIS:** Acts 39-1976 and 83-1991 require that the 1.03% special property tax be covered into the GO Redemption Fund and used solely for the payment of GO Bonds.  In a scenario in which the CW is paying GO and GO guaranteed debt, such funds deposited in the GO Redemption Fund should be used first to pay GO bonds. As in all scenarios, the amount paid to GO and CW guaranteed debt should be *pro rata*, (*i.e.*, the allocation of the 1.03% revenue to GOs should not result in a higher recovery for GOs than CW-guaranteed debt in any given year). |
| 14. | **IFCU (Independently Forecasted Component Units):** Is their revenue "available resources"? | **ASSUMPTION 1 [MAIN ASSUMPTION]:** IFCU's are public corporations legally separate from the CW. IFCU's own revenues should be considered unavailable for CW creditors such as GO bondholders.  If the Commonwealth provides an appropriation to an IFCU running a surplus, it should be assumed that the Commonwealth reduces the appropriation until the IFCU runs a balanced budget.<br><br>**BASIS:** Revenues generated by instrumentalities legally separate from the CW are not available to the CW and it would require enabling legislation to transfer such revenues to the CW.  However, in a scenario where the CW exercises its police powers to pay for essential services, it should be expected that the CW would not grant appropriations to instrumentalities running a surplus.  Legislation proposed as part of a plan which would make surpluses available to the CW is effective only on |

12

| | Question | Assumption |
|---|---|---|
| | | the effective date of the plan; accordingly, if no plan is confirmed, such legislation will not be enacted.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: IFCU surplus can be used by the Commonwealth.<br><br>**BASIS**: PROMESA section 201(b)(1)(M) provides that a fiscal plan "shall [...] ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under subchapter III, or a Qualifying Modification approved under subchapter VI." Since a Title III plan or Title VI Qualifying Modification would not be available in the best interests test scenarios, the transfer could be accomplished based on legislation enacted in accordance with the Commonwealth Constitution. In the past, the Commonwealth has employed legislation that authorized IFCUs such as SIFC, AACA, Tourism and PRIDCO to provide liquidity support to the Commonwealth in the form of loans or contributions. Act 26-2017 also authorizes the CW to pull in resources from public corporations. Whether these laws are preempted by PROMESA would likely be litigated. |
| 15. | **Are Commonwealth tax revenues allocated to PRIDCO's Special Fund for Economic Development and the slot machine revenues of the Tourism Company available resources?** | **ASSUMPTION 1 [MAIN ASSUMPTION]**: They are not available resources (consistent with assumption 13).<br><br>**ASSUMPTION 2 [LITIGATION RISK]:** As those revenue streams belong to the Commonwealth, it can exercise its police powers to capture those funds.<br><br>**BASIS**: Act 73-2008 ordered the Treasury Secretary to create the Special Fund for Economic Development ("FEDE" by its Spanish acronym) managed by PRIDCO. FEDE receives 10% of: (1) taxes paid by businesses that receive a tax grant under Act 73 or prior industrial incentives statutes or (2) tax withholdings related to royalties of operations exempt under Act 73 or prior industrial incentives statutes, such as 13 L.P.R.A. § 10657(a). Such taxes allocated to FEDE should be considered resources available to the Commonwealth. |

| | Question | Assumption |
|---|---|---|
| | | Pursuant to Section 8 of Article VI of the CW Constitution, the Treasury Secretary may be able to withhold the transfer of tax revenues to PRIDCO and instead use it to service GO debt.  It could, subject to court approval, also be withheld by the CW pursuant to its police power.<br><br>Note that suspending transfers to FEDE would affect the economic development program supported by the fund and Puerto Rico's industrial base, which could harm economic activity.<br><br>For the slot machine revenues, Act 221-1948 provides that such revenues, collected by the Tourism Company, will be deposited in a special fund of the Tourism Company.  After deducting operational (including payroll) and amortization costs related to the slot machines, the net annual revenues are distributed to:  (1) casino operators, (2) the Commonwealth General Fund, (3) the UPR, and (4) two special funds of the Tourism Company. [3]<br><br>The two funds of the Tourism Company are: (1) a special fund used to pay he Tourism Company's corporate purposes; and (2) the Puerto Rico Tourism Industry Development Fund ("Fondo para el Desarrollo de la Industria Turística de Puerto Rico") established to strengthen and develop the tourism industry.  Act 221 sets a formula according to which a portion of the slot machine revenues is transferred to each of the funds.<br><br>The Commonwealth could use Act 26-2017 ("Fiscal Plan Compliance Act") to draw surplus revenues from the Tourism Company or pass legislation amending Act 221 and reallocating the revenues to the Commonwealth.  As noted above with respect to suspending transfers to FEDE, eliminating funds used to develop the tourism industry could harm Puerto Rico's economic activity. |
| 16. | **Should the challenges to the GO bonds and certain Commonwealth-guaranteed debt be taken into consideration?** | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  Yes.  In this main assumption, assume that certain of such challenges are successful starting in 2012, and the corresponding bonds (GO bonds and PBA bonds issued in 2012 and after) and CW guarantees issued in 2012 and after would be deemed invalid and the bondholders holding such |

[3] 15 L.P.R.A. § 74.

| Question | Assumption |
|---|---|
| | claims would have no claim against the Commonwealth (including any claim for unjust enrichment or other similar claim).<br><br>**BASIS:**  In the Commonwealth Title III case, the Oversight Board, through its Special Claims Committee, and the statutory unsecured claimholders' committee (the "UCC") commenced litigation contending GO bonds issued in 2012 and 2014 violated Puerto Rico's constitutional debt limit, and that claims by purported holders of such GO bonds for principal and interest should be disallowed.  The Oversight Board has also alleged that the PBA Leases are not true leases and obligations purportedly due thereunder, but rather, are simply mischaracterized general obligations of the Commonwealth.<br><br>**ASSUMPTION 2 [LITIGATION RISK]:**  Yes.  Assume all challenges in Assumption 1 are successful, and that, in addition, the GO bonds, PBA bonds, and CW guarantees issued in March 2011 and after would also be deemed invalid and the bondholders holding such claims would have no claim against the Commonwealth (including any claim for unjust enrichment or other similar claim).<br><br>**BASIS:**  In addition to the challenges mentioned in the basis above, the UCC also challenged claims relating to GO bonds issued in and after March 2011 and for claims relating to PBA bonds issued in and after March 2011.  There are also arguments that certain Commonwealth guarantees issued in and after March 2011 may be invalid.  This assumption assumes that the UCC objections to claims relating to GO and PBA bonds issued in and after March 2011, and claims relating to Commonwealth guarantees issued in and after March 2011, are sustained.[4]<br><br>**ASSUMPTION 3 [LITIGATION RISK]:**  No.  Assume bonds and guarantees listed in the debt stack below are valid and enforceable.<br><br>**BASIS:** The challenges explained in the bases above could be unsuccessful. |

---

[4] Please note that this assumption is for illustrative purposes only.  The Oversight Board has not joined the UCC objection as to the GO Bonds issued prior to 2012 or to the objection to the PBA bonds issued in and after March 2011.

## DEBT STACK[5]

1. **Operating Cost**
   a. April 23, 2021 Fiscal Plan, Exhibit 22: Major Operating Expenditure Categories Pre-Measures, key baseline expenditures drivers (pre-measures):

|  | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| Payroll (General Fund) | 3,134 | 3,179 | 3,228 | 3,279 | 3,330 |
| Operating expenditures (General Fund) | 1,964 | 1,893 | 1,933 | 1,965 | 1,990 |
| CW appropriations | 1,193 | 1,179 | 1,125 | 1,142 | 1,128 |
| Commonwealth Medicaid expenditures | 1,968 | 2,654 | 2,754 | 2,856 | 2,974 |
| Pension expenditures | 2,259 | 2,237 | 2,233 | 2,224 | 2,215 |
| IFCU & CW SRF Expenditures | 2,279 | 2,297 | 2,320 | 2,357 | 2,400 |
| Federally funded expenditures | 5,706 | 4,935 | 5,000 | 5,072 | 5,150 |
| Other[6] | 446 | 339 | 300 | 259 | 210 |
| **Total CW funded operating expenditures**[7] | 18,949 | 18,712 | 18,894 | 19,154 | 19,397 |

   b. **Adjustments from Fiscal Plan**
      i. No pension freeze for JRS and TRS beneficiaries, and no 8.5% cut to pensions. Additionally, future contributions to social security for judges are also eliminated, as those payments are dependent on the freeze of the pension benefit accrual. In addition, the analysis assumes the continuation of PayGo contributions to System 2000 participants, as well as

---

[5] The financial information contained herein relies on information available in the most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth's advisors. The legal advisors take no position as to the accuracy of the financial information provided herein.

In certain parts of the debt stack, only information related to the main assumption above is incorporated.

[6] Includes Disaster Recovery Cost Match, Restructuring / Title III costs, Social Programs CW funded, Reserve for emergency fund and Budget incentives.
[7] Does not include capital expenditures, enterprise funds, disbursements to entities outside the 2021 Fiscal Plan, and other non-recurring expenditures.

16

the elimination of any additional pension expenses related to agreements dependent on the confirmation of a Plan of Adjustment

ii. No increase in employer healthcare contribution outlined in the Fiscal Plan from $125 to $170 per employee per month for employees who are AFSCME union members, teachers, police, firefighters, UAW union members, and other non-union employees

iii. Legal professional fees costs recur through FY2031, assuming extensive litigation needs without Title III protections or a plan of adjustment.  Legal fees are assumed to double from FY2021 to FY2022 and then grow with inflation through FY2026, when professional fees are assumed to be cut in half, and then grow by inflation through FY2031.  Non-legal professional fees fall by 50% once the Title III cases are dismissed and grow by inflation through FY2031.  All professional fees for the creditors committee and retiree committee are assumed to be zero after the effective date of this analysis (June 30, 2021).

iv. Assume federal claims come due when the stay is lifted.  These should be included as an expense/revenue reduction to the surplus available for debt service, as the federal government can reduce transfers to Puerto Rico in the amount owed.  Assume recurring federal cost disallowance claim, which must also be paid in full.[8]  Federal claims represent a total of $431 million, while the recurring federal cost disallowance is $65 million based on based on the 2016 CAFR.

v. Assume that in years where full debt payment is not possible payment provided is first credited against interest, and then against principal.

**2.  Unsecured Debt**

a. $25,335,493.47 outstanding principal amount of loan and accrued and unpaid interest by the General Services Administration for police helicopters, bearing 3.02% interest and maturing on July 15, 2020.  This loan is *pari passu* with GO debt.

**3.  Public Debt of the Commonwealth under Article VI, Section 8 of the Commonwealth Constitution[9]**

a. **GO Bonds**
   1. Issued prior to March 2011: $5,843,252,913
   2. Issued between March and December 2011: $1,122,171,437
   3. Issued in or after 2012: $6,547,443,991

b. **Hacienda loans (Loan ID Nos. 200017-215-001-003-53 and 200017-215-001-003-56) (pari passu with GO Bonds): $198,259,086**

---

[8] Information regarding amounts of federal claims was provided by other Oversight Board advisors.

[9] Outstanding principal and unpaid interest as of the Commonwealth petition date except for PBA, which is as of the PBA petition date.

   c. **CW-guaranteed bonds (pari passu with GO Bonds)**[10]
      i. **PRASA Sub Bonds ($284,755,000)**
         1. Assumption:  Assume 0% liability paid by CW
         2. Basis:  Given PRASA's financial condition, PRASA is unlikely to default on the remaining guaranty.

      ii. **PBA Bonds ($4,670,971,240);[11] PRIFA BANs ($83,589,102); and APLA (Port of the Americas Authority) Bonds ($262,653,118)**
         1. Assumption: Holders of guarantee bonds can pursue their claims against the CW immediately
         2. Basis:  The CW guaranty (especially in the case of PRIFA) has features that make it more akin to a payment guaranty rather than a guaranty of collection

4. **Other unsecured claims**
   a. Claims to be resolved using the Administrative Claims Reconciliation Procedures, or ACR: $1,008,887,588
   b. Union claims to be settled through Plan of Adjustment: $244,517,705
   c. Gracia-Gracia insurance overpayment litigation claim: $28,000,000
   d. Intragovernmental claims (claims filed by Commonwealth municipalities, other Puerto Rico governmental entities, and the federal government): $1,024,549,014[12]
   e. Tax related claims: $8,403,934
   f. GDB Title VI/Public Entity Trust Claim: $600,000,000
   g. Litigation claims: $2,768,700,759
   h. Trade payables: $175,158,294
   i. Other miscellaneous claims: $56,750,826
   j. Critical industries: 330 Health Center litigation claims estimated at $293 million, and Milk Producers subsidy claims of $62 million
   k. Convenience class claims:  $141,945,462
   l. Claims from Employee Retirement System (ERS) bondholders**:** Assume in the base case that ERS bondholders will not assert any claims against the Commonwealth

---

[10] The CW also guaranteed $110 million of GDB bonds, but any rights of holders of such GDB bonds with respect to the Commonwealth's guarantee were extinguished upon the exchange and cancellation of the GDB bonds pursuant to the Title VI deal (GDB Title VI OM, p. 15).

[11] Total outstanding principal and interest as of PBA Petition Date is comprised of $2,661,239,877 in bonds issued before March 2011, $1,335,422,893 in bonds issued between March and December 2011, and $674,308,470 in bonds issued after 2011.

[12] This figure includes $430,540,085 in federal claims; this amount is also noted in section 1b (Adjustments to the Fiscal Plan).

m.  Allocable revenue claims: Assume in the base case that the allocable revenue entity bondholders could assert an unsecured claim for the portion of allocable revenues used for operating expenses, but not for the portion used for payment of GO debt service or CW-guaranteed debt service

**Exhibit 1**
**Allocable Revenue Statutes**

**Part I: Statutes Assigning Certain Allocable Revenues to HTA, MBA, PRIFA, PRITA, and CCDA**

| HTA | Motor Vehicle License Fees | 9 LPRA §§ 2004(l), 2021, 5681 & 5682(e) | Paid by every owner of a motor vehicle subject to annual license fees at:<br>▪ internal revenue offices; or<br>▪ official inspection stations; or<br>▪ banks; or<br>▪ any place designated by the Secretary of Treasury | ▪ All motor vehicle annual license fees are covered by Treasury into a Special Deposit in the name and for the benefit of HTA. | 9 LPRA § 2004(l):<br><br>"Subject to the provisions of sec. 2005 of this title, the Authority is hereby empowered to: […] [t]o borrow money for any of its corporate purposes and issue bonds of the Authority in evidence of such obligations and guarantee the payment of said bonds and their interests through pledge or pignoration on all their properties, income, or income, and , subject to the provisions of Sec. 8 of Art.VI of the Constitution of Puerto Rico, pledge for the payment of said bonds and their interests, the proceeds of any contributions or other funds that may be made available to the Authority for the Commonwealth."<br><br>9 LPRA § 2021:<br><br>"The total proceeds of the fifteen-dollar ($15) increase in the fees to be paid for public and private automobile licenses shall be covered into a Special Deposit in behalf and for the benefit of the Highways and Transportation Authority of Puerto Rico, to be used by the Authority for its corporate purposes. Said Authority is hereby authorized to pledge or pignorate the proceeds of the collection thus received, to the payment of the principal and interest on bonds and other obligations of the Authority, or for any other legal purpose of the Authority; and said pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, until the other resources available, referred to in said section, are insufficient for such purposes, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations." |

9 LPRA § 5681:

"Every owner of a motor vehicle subject to the payment of annual permit fees shall pay at any internal revenue collection office of any municipality, at the place designated by the Secretary of the Department of the Treasury, at official inspection stations, banks, or at the place designated by the Secretary, the rights that correspond to the vehicle for each year, as indicated in the notification that the Secretary must send to the effect. […]"

[…]

"Unless otherwise provided in this Act, the amount of the rights collected in accordance with secs. 5681 and 5682 of this title shall be entered in their entirety in a Special Deposit in the name and for the benefit of the Highway and Transportation Authority."

"The Authority is authorized to pledge or pignorate the proceeds of the collection received for the payment of the principal and the interest on bonds to other obligations or for any other lawful purpose of the Authority. Such commitment or pledge shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds of said collection will be used only for the payment of interest and amortization of the public debt, as provided in said Section 8 of Article VI of the Constitution, until the other available resources referred to in said section are insufficient for such purposes. Otherwise, the proceeds of such collection, in the amount that is necessary, will be used only for the payment of the principal and the interests of bonds and other obligations of the Authority and to comply with any stipulations agreed by it with the holders of such bonuses or other obligations."

9 LPRA § 5682(e):

| | | | | | "With regard to the rights to be paid under this chapter, the following rules will be followed: […] [t]he Special Deposit shall be maintained for the benefit of the Highway Authority to which the amount of fifteen (15) dollars will be covered into for each renewal of registration of private and public service cars." |
|---|---|---|---|---|---|
| **HTA** | Gasoline, Gas Oil and Diesel Oil Tax | 13 LPRA § 31751<br><br>9 LPRA 2004(l) | ▪ 16 cent per gallon on excise tax on gasoline and 4 cent per gallon of the excise tax on gas oil and diesel oil.<br><br>▪ Collected by Treasury, which then transfers every month, or as agreed with HTA, the amounts into a Special Deposit account in favor of HTA. | ▪ Gasoline, gas oil and diesel oil excise taxes are covered by Treasury into a special deposit in favor of HTA. | 13 LPRA 31751:<br><br>"In case the Commonwealth of Puerto Rico uses any amount of the tax collected on gasoline, of the four (4) cents of the tax on 'gas oil' or 'diesel oil' fixed in sec. 31626 of this title, or of the excise taxes on crude oil, partially manufactured products and finished products derived from petroleum and any other mixture of hydrocarbons fixed in sec. 31627 of this title for the payment of interest and amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization of the debt shall be reimbursed to the Highway and Transportation Authority for the revenues received by the Commonwealth of Puerto Rico in the next fiscal year, or in case such reimbursement is not possible in the next fiscal year, in the subsequent fiscal years, except those collections that have been committed to satisfy any obligation. The proceeds of said collections that are to be used under the provisions of this section to reimburse to the Highway and Transportation Authority the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization on the public debt, are not shall be deposited in the General Fund of the Commonwealth of Puerto Rico when they are collected, but shall be transferred to the Highway and Transportation Authority and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse such amounts to the Highway and Transportation Authority."<br><br>9 LPRA 2004(l):<br><br>"Subject to the provisions of sec. 2005 of this title, the Authority is hereby empowered to: […] To take money on |

| | | | | | loan for any of its corporate purposes and issue bonds of the Authority in evidence of such obligations and guarantee the payment of said bonds and their interests by means of pledge or other lien on all their properties, income, or income, and, subject to the provisions of Sec. 8 of Art.VI of the Constitution of Puerto Rico, pledging for the payment of said bonds and their interests, the proceeds of any contributions or other funds that may be made available to the Authority by the Commonwealth." |
|---|---|---|---|---|---|
| **HTA** | Petroleum Products Tax | 13 LPRA § 31571<br><br>9 LPRA 2004(l) | ▪ Secretary of Treasury shall transfer every month, the total amount of $12.25 per barrel or fractions are covered by the Treasury Secretary into Special Deposit in favor of HTA. | ▪ The total amount crude oil taxes and petroleum taxes are covered by Treasury into a special deposit in favor of HTA. | 13 LPRA 31571:<br><br>"In case the Commonwealth of Puerto Rico uses any amount of the tax collected on gasoline, of the four (4) cents of the tax on 'gas oil' or 'diesel oil' fixed in sec. 31626 of this title, or of the excise taxes on crude oil, partially manufactured products and finished products derived from petroleum and any other mixture of hydrocarbons fixed in sec. 31627 of this title for the payment of interest and amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization of the debt shall be reimbursed to the Highway and Transportation Authority for the revenues received by the Commonwealth of Puerto Rico in the next fiscal year, or in case such reimbursement is not possible in the next fiscal year, in the subsequent fiscal years, except those collections that have been committed to satisfy any obligation. The proceeds of said collections that are to be used under the provisions of this section to reimburse to the Highway and Transportation Authority the amounts used by the Commonwealth of Puerto Rico for the payment of interest and amortization on the public debt, are not shall be deposited in the General Fund of the Commonwealth of Puerto Rico when they are collected, but shall be transferred to the Highway and Transportation Authority and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse such amounts to the Highway and Transportation Authority."<br><br>9 LPRA 2004(l): |

| | | | | | "Subject to the provisions of sec. 2005 of this title, the Authority is hereby empowered to: […] To take money on loan for any of its corporate purposes and issue bonds of the Authority in evidence of such obligations and guarantee the payment of said bonds and their interests by means of pledge or other lien on all their properties, income, or income, and, subject to the provisions of Sec. 8 of Art.VI of the Constitution of Puerto Rico, pledging for the payment of said bonds and their interests, the proceeds of any contributions or other funds that may be made available to the Authority by the Commonwealth." |
|---|---|---|---|---|---|
| **HTA** | Cigarette Tax | 13 LPRA § 31751 | ▪ Treasury Secretary transfers $20,000,000 in cigarette revenues every fiscal year in monthly installments of up to $2,500,000. If during any month of the fiscal year the revenues from the excise tax are insufficient to make the payment, the Treasury Secretary shall cover such deficiency using any | ▪ The revenues collected from the tax on cigarettes up to $20,000,000 per fiscal year shall be covered into special deposit account in favor of the HTA. | "The amount of tax collected on cigarettes fixed by § 31625 of this title up to twenty (20) million dollars per fiscal year shall be deposited into a special deposit in favor of the Highways and Transportation Authority for its corporate powers and purposes." "The Highways and Transportation Authority is hereby authorized to commit or pledge the product of the collection thus received from the cigarette excise tax fixed by § 31625, to pay the principal and interest of bonds or other obligations, or for any other legal purpose of the Authority. Such commitment or pledge shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Government of Puerto Rico. The product of said collection shall be used solely for the payment of interest and amortization of the public debt, as established by said Section 8 of Article VI of the Constitution, until the other available resources referred to in said section are insufficient for such purposes. Otherwise, the product of said collection, in the amount that is needed, shall only be used for the payment of principal and interest of bonds and other obligations of the Authority and to comply with any stipulations agreed by it with the holders of said bonds or other obligations." |

| | | | | | |
|---|---|---|---|---|---|
| | | | excess above the $2,500,000 revenues collected on previous or subsequent months of the same fiscal year. | | |
| **MBA** | Cigarette Tax | 13 LPRA § 31751 | ▪ Treasury Secretary shall transfer $10,000,000 in cigarette revenues every fiscal year in monthly installments of up to $800,000. If during any month of the fiscal year the revenues from said excise tax do not suffice to make the monthly payment installment, the Treasury Secretary shall cover such deficiency using any | ▪ The revenues collected from the tax on cigarettes up to $10,000,000 per fiscal year are covered by Treasury into special deposit account in favor of MBA. | "The amount of tax received from cigarettes fixed by § 31625 of this title up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by § 31625 of this title that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section." |
| | | | | | [...] |
| | | | | | "The Highways and Transportation Authority is hereby authorized to commit or pledge the product of the collection thus received from the excise tax on cigarettes fixed by section 31625 for payment of the principal and interest of its debts and obligations or for any other legal purpose of the Metropolitan Bus Authority. Such commitment or pledge shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Government of Puerto Rico. The product of said collection shall be used solely for the payment of interest and amortization of the public debt, as established by said Section 8 of Article VI of the Constitution, until the other available resources referred to in said section are insufficient for such purposes. Otherwise, the product of said collection, in the amount that is needed, shall only be used for the payment of |

| | | | excess of the $800,000 revenues collected on account of excise tax on previous [or subsequent] months of the same fiscal year. | | the principal and interest of debts and other obligations of the Metropolitan Bus Authority and to comply with any stipulations agreed by it with the holders of said bonds or other obligations." |
| **PRIFA-BANs** | Petroleum Products Tax | 13 LPRA § 31751a | ▪ An additional excise tax on petroleum product in the amount of $3.25 per barrel is collected by Treasury.<br><br>▪ Secretary of Treasury transfer all revenue collected from the additional $3.25 tax to PRIFA. | ▪ Proceeds from the petroleum products excise tax are covered by Treasury into a Special Fund for Economic Assistance for the Benefit of PRIFA for the payment of its bonded debt. | "The product from the taxes collected by virtue of section 31627a shall be covered into the Economic Assistance Special Fund of the Infrastructure Financing Authority established under Article 34 of Act No. 44 of June 21, 1988, and shall be used to (i) repay the obligations incurred by the Puerto Rico Infrastructure Financing Authority in order to refinance or repay those debts or obligations of the Highways and Transportation Authority that from time to time have been assumed or paid the Puerto Rico Infrastructure Financing Authority and (ii) the other purposes authorized under Article 34 of Act No. 44 of June 21, 1988, as amended. The Secretary shall transfer the amounts of such collections monthly or as agreed with the Puerto Rico Infrastructure Financing Authority. The Secretary is hereby authorized to establish a collection mechanism through which the proceeds that shall be deposited in the Economic Assistance Special Fund of the Infrastructure Financing Authority be paid by the taxpayer directly to the Puerto Rico Infrastructure Financing Authority, to a financial institution designated by the Secretary of the Treasury or the Infrastructure Financing Authority or the financial institution that acts as trustee in the trust agreement under which the Puerto Rico Infrastructure Financing Authority bonds are issued for which such collections are the source of repayment."<br><br>"According to article 34 of Act No. 44 of June 21, 1988, as amended, and subject to the conditions established therein, the product of the collections from the excise tax fixed in section |

| | | | | | 31627a is pledged to guarantee the repayment of the "Refinancing Bonds", the "Collateralized Obligations" and the "Transferred Debt", as such terms are defined in said article. The Puerto Rico Infrastructure Financing Authority is hereby authorized, after covering in any Fiscal Year the repayment of the principal and interest and any other obligation related to said Refinancing Bonds, said Collateralized Obligations and said Transferred Debt payable in said Fiscal Year, to commit or pignorate the product of the collection of said excise tax to be deposited in the Economic Assistance Special Fund of the Infrastructure Financing Authority, for the payment of the principal and interest of other bonds or other obligations or to sustain the obligations and operations of the Highways and Transportation Authority. Such commitment or pignoration shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The product of said collection shall be used only for the payment of interest and the amortization of public debt, as established by said Section 8 of Article VI of the Constitution, to the extent that the other available resources mentioned in said section become insufficient for such purposes." |
|---|---|---|---|---|---|

| PRIFA | Federal Excise Taxes | 3 LPRA § 1914 | ▪ US Internal Revenue Code § 7652(a)(3) provides that all taxes collected on articles produced in PR (e.g., rum) and shipped to the US, or consumed on the island, shall be covered into the Treasury of Puerto Rico.<br><br>▪ The first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year shall be covered into a Special Fund to be maintained by or on behalf of PRIFA, designated as the Puerto | ▪ From FY 2007 – FY 2057, the amount of the transfer shall be $117,000,000. | "Beginning with Fiscal Year 1988-89, notwithstanding the provisions of Section 29A of Act No. 143 of June 30, 1969, as amended, the first collections of federal taxes sent to the Department of the Treasury of Puerto Rico in each year fiscal, pursuant to § 7652(a)(3) of the Internal Revenue Code of the United States of 1986, as amended, up to a maximum amount of thirty million dollars ($30,000,000), in the case of Fiscal Year 1988-89 , up to a maximum amount of forty million dollars ($40,000,000), in the case of Fiscal Years 1989-90 to 1996-97, up to a maximum amount of sixty million dollars ($ 60,000,000), in the case of Fiscal Year 1997- 98, up to a maximum amount of seventy million dollars ($ 70,000,000), in the case of Fiscal Years 1998-1999 to 2005-06,and up to a maximum amount of ninety million dollars ($ 90,000,000), in the case of Fiscal Years 2006-07 to 2008-09, and in the subsequent years until Fiscal Year 2056-57 the participation will be up to an amount of one hundred and seventeen million dollars ($ 117,000,000), which shall be paid upon receipt by the Department of the Treasury of Puerto Rico in a Special Fund to be maintained by or on behalf of the Authority, designated as the "Infrastructure Fund of Puerto Rico" and shall be will be used by the Authority for its corporate purposes, which will include the development of the necessary and convenient infrastructure for the completion of the Mayagüez 2010 Central American and Caribbean Games."<br><br>[…]<br><br>"The Authority is authorized to segregate a portion of said Funds into one (1) or more subaccounts and to pledge all or part of the funds in one (1) or more sub-accounts, subject to the provisions of Sec. 8 of Art. VI. of the Constitution of the Commonwealth of Puerto Rico, for the payment of the principal and interests of bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a beneficiary entity, or for any other legal purpose of the Authority. The funds of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided by said Sec. 8, only |

| | | | Rico Infrastructure Fund. | | when the other resources available, mentioned in said Section, are not sufficient for such purposes." |
|---|---|---|---|---|---|
| **CCDA** | Hotel Room Tax | 13 LPRA § 2271v | Paid by the guest at the time of paying the room occupancy rate to the hotelier. Every hotelier shall be obligated to collect and remit such tax to the PR Tourism Company ("<u>PRTC</u>"). | ▪ Each year GDB/AAFAF determines and certifies to the PRTC the amount necessary for CCDA to meet its debt service. PRTC makes monthly installments to GDB up to the annual amount certified by GDB. The hotel room tax revenues are deposited at a CCDA account held at [GDB] for the benefit of the CCDA bondholders. | "The [Tourism] Company shall distribute all funds collected from the tax imposed under § 2271o of this title, as follows: (a) Before the beginning of each fiscal year, the [GDB] shall determine and certify to the [Tourism] Company and to the [CCDA], the amount necessary for the [CCDA] to make, during such fiscal year and the first day of the following fiscal year: (1) Full and timely payment, or the amortization of the principal and interest on the obligations incurred by the [CCDA] with the [GDB] or the bonds, notes or other obligations issued, assumed or incurred by the [CCDA], pursuant to Act No. 142 of October 4, 2001, as amended, with the prior written authorization of the [Tourism] Company , to exclusively carry out the development and construction of a new convention center and its related infrastructure; (2) full and timely payment of the obligations of the [CCDA] under any bond related financing agreement, as this term is defined at the end of this subsection, entered into by the [CCDA] with the prior written authorization of the [Tourism] Company ; (3) the deposits required to replenish any reserves established to ensure the payment of the principal and the interest on such bonds, notes and other obligations issued, assumed or incurred by the [CCDA], or obligations under any bond related financing agreement, and (4) any other expenses incurred in connection with the issuance of such bonds, notes or other obligations assumed or incurred by the [CCDA], or with any other bond related financing agreement. The prior written approval of the [Tourism] Company  shall specifically authorize the amortization schedule of the principal of the bonds, notes or other obligations to be issued, assumed or incurred by the [CCDA] and the final terms and conditions of any bond related financing agreement to be entered into by the [CCDA]. The sum determined and certified |

by the [GDB], as indicated above, shall be deposited in a special account to be maintained by the [GDB] in the name of the [CCDA] for the benefit of the bondholders, noteholders or the holders of other obligations of the [CCDA] or for the benefit of the other contracting parties under any bond related financing agreement. The [GDB] shall transfer the amounts deposited in such special account to the trustees of the bondholders, noteholders or the holders of other obligations of the [CCDA] or to the other contracting parties under any bond related financing agreement, in accordance with the written instructions provided to the [GDB] by the [CCDA]."

[…]

"Each fiscal year, the [Tourism] Company must transfer to the Government Development Bank for deposit in said special account the amount established in the first paragraph of this subsection through monthly transfers, beginning in the month immediately following the month in which this law is approved and in the first month of each fiscal year thereafter, equivalent to one tenth of that amount that the Government Development Bank for Puerto Rico determines and certifies as necessary for the payments referred to in the introductory paragraph of this section[….]"

[…]

"The Authority is authorized, prior written consent of the [Tourism] Company, to commit or otherwise encumber the proceeds of the collection of the fixed tax that must be deposited in the special account, as required by the first paragraph of this subsection, as a guarantee, for the payment of the principal and interest on the bonds, promissory notes or other obligations issued, assumed or incurred by the Authority, as described in the first paragraph of this subsection, or the payment of its obligations under any financial agreement related to the bonuses, as described in that paragraph. Such commitment or obligation shall be subject to the provisions of Sec. 8 of Article VI of the Constitution of the Commonwealth

| | | | | | of Puerto Rico. The proceeds of the collection of the tax will be used only for the payment of interest and the amortization of the public debt, as provided in Sec. 8 of Art. VI of the Constitution, only to the extent that the other resources available to which reference is made in said Section are insufficient for such purposes. Otherwise, the proceeds of such collection in the amount that is necessary, will be used only for the payment of principal and interest on bonds, promissory notes or other obligations and obligations under any financial agreement related to the bonds contemplated herein, and to comply with any stipulations agreed upon with the holders of said bonds, promissory notes or other obligations or suppliers of financial agreements related to the bonds." |
| **PRITA**[13] | Cigarette Tax | 13 LPRA § 31751 | ▪ The Secretary shall transfer monthly or as agreed with the Integrated Transportation Authority of Puerto Rico, the amounts deposited in the special deposit, deducting therefrom such amounts reimbursed as per the provisions of section 31668 of this subtitle. | ▪ The product from said proceeds to be used under this section's provisions to reimburse to the Integrated Transportation Authority of Puerto Rico the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt shall be covered to the Integrated Transportation Authority of Puerto Rico. | "The amount of the tax that is collected on the cigarettes set out in sec. 31625 of this title up to thirty-six (36) million dollars per fiscal year, beginning with Fiscal Year 2015-2016, will be deposited in a special deposit in favor of the Integrated Transportation Authority of Puerto Rico for its purposes and corporate powers. The income of these thirty-six (36) million dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in sec. 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority, as provided in clause (3) of this subsection, and that of the ten (10) million dollars of the amount of the tax that is collected on cigarettes fixed in sec. 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority, as provided in clause (4) of this subsection. The amount of the tax that is collected on the cigarettes set forth in sec. 31625 of this title up to thirty-six (36) million dollars per fiscal year, as of the approval of the New Contributory System of Puerto Rico, will enter a special deposit in favor of the Puerto Rico Integrated Transportation Authority for its purposes and corporate powers. The income of these thirty-six (36) million |

---

[13] PRITA currently has no debt outstanding.

dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in sec. 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority as provided in clause (3) of this subsection and that of ten (10) million dollars of the amount of the tax that is collected on the cigarettes fixed in sec. 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority as provided in clause (4) of this subsection."

[…]

"The transfer of the collection's product from said excise tax to the Integrated Transportation Authority of Puerto Rico shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of said collection shall be used solely for the payment of interest and the amortization of the public debt, as established in Section 8 of Article VI of the Constitution, to the extent that the other available resources mentioned in said section become insufficient for such purposes. In the event that the Commonwealth of Puerto Rico uses any amount of the excise taxes on cigarettes fixed in section 31625 for the payment of interest and the amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt shall be reimbursed to the Integrated Transportation Authority of Puerto Rico from the proceeds received by the Commonwealth of Puerto Rico in the next Fiscal Year, or in case that such reimbursement is not possible in the next Fiscal Year, in subsequent fiscal years, except for those proceeds that have been committed to satisfy any obligation. The product from said proceeds to be used under this section's provisions to reimburse to the Integrated Transportation Authority of Puerto Rico the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public

| | | | | | debt, shall not be covered into the General Fund of the Commonwealth of Puerto Rico, when collected; instead, they shall be transferred to the Integrated Transportation Authority of Puerto Rico and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Integrated Transportation Authority of Puerto Rico." |
|---|---|---|---|---|---|

**Part II: Allocable Revenue Statutes**

| ENABLING ACT | STATUTORY ALLOCABLE REVENUE CITATION |
|---|---|
| | **HTA** |
| **1. Puerto Rico Highway and Transportation Authority Act**<br><br>Entities involved:<br><br>**HTA** (Puerto Rico Highway and Transportation Authority) | 9 L.P.R.A. § 2004(l) ("Powers"):<br><br>(l) To borrow money for any of its corporate purposes, and to issue bonds of the Authority in evidence of such indebtedness and to secure payment of bonds and interest thereon by pledge of, or other lien on, all or any of its properties, revenues or other income, and subject to the provisions of § 8 of Art. VI of the Constitution of the Commonwealth, pledge to the payment of said bonds and interest thereon, the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth.<br><br>9 L.P.R.A. § 2021 ("Special Deposit for the benefit of the Highways Authority"):<br><br>The total proceeds of the fifteen-dollar ($15) increase in the fees to be paid for public and private automobile licenses shall be covered into a Special Deposit in behalf and for the benefit of the Highways and Transportation Authority of Puerto Rico, to be used by the Authority for its corporate purposes. Said Authority is hereby authorized to pledge or pignorate the proceeds of the collection thus received, to the payment of the principal and interest on bonds and other obligations of the Authority, or for any other legal purpose of the Authority; and said pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, until the other resources available, referred to in said section, are insufficient for such purposes, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations.<br><br>The Commonwealth of Puerto Rico hereby agrees and pledges itself to any person, firm or corporation, or to any agency of the United States of America or of any state, or the Commonwealth of Puerto Rico, who subscribes, or acquires bonds of the Highways and Transportation Authority of Puerto Rico, for the payment of which the proceeds from the increase in the fees paid for public and private service automobile licenses and others, is pignorated as authorized by this section, not to reduce these license fees. |

| 2. **Subtitle 17. Internal Revenue Code of 2011**<br><br>Entities Involved:<br><br>**HTA** (Highways and Transportation Authority) | 13 L.P.R.A. § 31751 ("Disposition of funds"):<br><br>(1) The amount of the tax collected on gasoline and the tax of four cents (4¢) of gas oil or diesel oil fixed in § 31626 of this title; and the total amount per fiscal year of the excise tax collected on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in § 31627 of this title, shall be covered into a special deposit in favor of the Highways and Transportation Authority for their corporate purposes.<br><br>(1)(F) The Highways and Transportation Authority is hereby authorized to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in § 31626 of this title and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in § 31627 of this title, for the payment of the principal and the interest on bonds or other obligations or for any other legal purpose of the Authority. Said commitment or pledge shall be subject to the provisions of Section 8 of Item VI of the Constitution of the Commonwealth of Puerto Rico. The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes. Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations.<br><br>(1)(E) In case the amount of the proceeds of the tax on gasoline, gas oil, or diesel oil established in § 31626 of this title or the amount of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons established in § 31627 of this title, appropriated or to be appropriated in the future to the Highways and Transportation Authority may at any time be insufficient to pay the principal of and the interest on the bonds or other obligations over money taken on a loan or issued by the Highways and Transportation Authority to defray the cost of traffic facilities and for the payment of which the proceeds of the tax imposed on gasoline, gas oil, or diesel oil established in § 31626 of this title or the amount of the excise tax assessed on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons established in § 31627 of this title, has been pledged and the reserve funds of the Highways and Transportation Authority for the payment of debt requirements are applied to cover the deficiency in the amount needed to make such payments, the amounts of said reserve fund used to cover said deficiency shall be reimbursed to the Highways and Transportation Authority from the first proceeds received on the next fiscal year or subsequent fiscal years by the Government of Puerto Rico from: (1) any other taxes in effect on any other fuel or propellant used, among other purposes, to propel road vehicles; and (2) any remaining portion of the tax on gasoline, gas oil, or diesel oil established in § 31626 of this title that are in effect. The proceeds of such other taxes and the remaining portion of the tax on gasoline and gas oil or diesel oil established in § |

31626 of this title that are to be used as provided in this section to reimburse the reserve funds for debt requirements, shall not be covered into the General Fund of the Government of Puerto Rico when collected, but shall be covered into the aforementioned special deposit for the benefit of the Highways and Transportation Authority of Puerto Rico and subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, to be used to reimburse said reserve fund for the payment of the debt requirements.

(3) The amount of tax collected on cigarettes fixed by § 31625 of this title up to twenty (20) million dollars per fiscal year shall be deposited into a special deposit in favor of the Highways and Transportation Authority for its corporate powers and purposes.

(3)(C) The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in § 31625 of this title for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations.

(4) The amount of tax received from cigarettes fixed by § 31625 of this title up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by § 31625 of this title that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section.

(4)(C) The Metropolitan Bus Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in § 31625 of this title for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Metropolitan Bus Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Metropolitan Bus

| | |
|---|---|
| | Authority and to meet any stipulation agreed on by the Metropolitan Bus Authority to the holders of its bonds and other obligations. |
| **3.  Puerto Rico Vehicles and Traffic Act**<br><br>Entities Involved:<br><br>**HTA** (Puerto Rico Highways and Transportation Authority) | "Section 23.02(c).- Fees to be Paid."<br><br>A special deposit is hereby created in benefit of the Authority in which fifteen dollars ($15) shall be covered into the same for each registration renewal of private and public service automobiles.<br><br> "Section 23.01.- Procedure for the Payment of Fees."<br><br>Unless otherwise provided in this Act, the amount of the fees collected in accordance with Articles 23.01 and 23.02 of this Act shall be fully deposited in a Special Deposit in the name and for the benefit of [HTA].<br><br>The Authority is hereby authorized to pledge or encumber the proceeds of the taxes collected for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds of the taxes collected shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section does not suffice to attain such purposes. Otherwise, the proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations. |
| **4.  Internal Revenue Code for a New Puerto Rico**<br><br>Entities Involved:<br><br>**HTA** (Puerto Rico Highways and Transportation Authority) | Subsection (a) of Section 3060.11 of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:<br><br>The amount of the tax collected on gasoline and the tax of four cents (4¢) of gas oil or diesel oil fixed in Section 3020.06 of this subtitle; and the total amount per fiscal year of the excise tax collected on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07 of this subtitle, shall be covered into a special deposit in favor of the Highways and Transportation Authority for their corporate purposes. |

| | |
|---|---|
| **MBA** (Metropolitan Bus Authority) | The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations. <br><br> The amount of tax received from cigarettes fixed by Section 3020.05 of this subtitle up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by Section 3020.05 of this subtitle that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section. <br><br> The Metropolitan Bus Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Metropolitan Bus Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Metropolitan Bus Authority and to meet any stipulation agreed on by the Metropolitan Bus Authority to the holders of its bonds and other obligations. |
| **PRIFA** | |
| 1. **Puerto Rico Infrastructure Financing Authority Act** | 3 L.P.R.A. § 1906 ("General powers"): <br><br> (m) Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority, or bonds issued by a benefited entity, and pledge all or a portion of such revenues as the Authority may receive including, but not limited to, and subject to the provisions of § 8 of Article VI of the Constitution of the |

| Entities Involved:<br><br>**PRIFA** (Puerto Rico Infrastructure Financing Authority) | Commonwealth of Puerto Rico, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority.<br><br>3 L.P.R.A. § 1907 ("Bonds of the Authority"):<br><br>(a) The bonds issued by the Authority may be payable from all or any part of the gross or net revenues and other income derived by the Authority which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth as provided in the trust agreement or resolution whereby the bonds are issued. The principal of, and interest on, the bonds issued by the Authority may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth, all as provided in the trust agreement or resolution under which the bonds are issued. Such pledge shall be valid and binding from the time it is made without the need for a public or notarized instrument. The revenues so pledged, including those subsequently received by the Authority, shall immediately be subject to said lien without the need of the physical delivery thereof or any other act, and said lien shall be valid and binding and shall prevail against any third party having any kind of claim against the Authority for damages, breach of contract or other reasons, regardless of whether such third party has been so notified. Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority. The resolution or resolutions authorizing the bond issue or the trust agreement securing the bonds may contain provisions which shall be part of the contract with the holders of the bonds issued under such resolution or resolutions or under such trust agreement regarding the pledge and creation of liens on the Authority's revenues and assets, the creation and maintenance of redemption and reserve funds, limitations concerning the purposes to which bond proceeds may be applied, limitations concerning the issuance of additional bonds, limitations concerning the introduction of amendments or supplements to such resolution or resolutions, or to the trust agreement, the granting of rights, powers and privileges and the imposition of obligations and responsibilities upon the trustee under any trust agreement or resolution, the rights, powers, obligations and liabilities that shall arise in the event of a default of any obligation under such resolution or resolutions or under such trust agreement, or in connection with any rights, powers or privileges conferred on the bondholders as security for the bonds in order to enhance their marketability.<br><br>3 L.P.R.A. § 1914 ("Special deposit"):<br><br>Beginning with Fiscal Year 1988-89, notwithstanding the provisions of Section 29A of Act No. 143 of June 30, 1969, as amended, the first collections of federal taxes sent to the Department of the Treasury of Puerto Rico in each year |

<table>
<tr><td></td><td>fiscal, pursuant to § 7652(a)(3) of the Internal Revenue Code of the United States of 1986, as amended, up to a maximum amount of thirty million dollars ($30,000,000), in the case of Fiscal Year 1988-89 , up to a maximum amount of forty million dollars ($40,000,000), in the case of Fiscal Years 1989-90 to 1996-97, up to a maximum amount of sixty million dollars ($ 60,000,000), in the case of Fiscal Year 1997- 98, up to a maximum amount of seventy million dollars ($ 70,000,000), in the case of Fiscal Years 1998-1999 to 2005-06,and up to a maximum amount of ninety million dollars ($ 90,000,000), in the case of Fiscal Years 2006-07 to 2008-09, and in the subsequent years until Fiscal Year 2056-57 the participation will be up to an amount of one hundred and seventeen million dollars ($ 117,000,000), which shall be paid upon receipt by the Department of the Treasury of Puerto Rico in a Special Fund to be maintained by or on behalf of the Authority, designated as the "Infrastructure Fund of Puerto Rico" and shall be will be used by the Authority for its corporate purposes, which will include the development of the necessary and convenient infrastructure for the completion of the Mayagüez 2010 Central American and Caribbean Games. In case the collections of said federal taxes are insufficient to cover the amounts here assigned, the Secretary of the Treasury is authorized to cover such deficiency of any available funds and the Director of the Office of Management and Budget, at the request of the Authority for the Financing of the Infrastructure, shall include in the recommended budget of the corresponding fiscal year the necessary allocations for cover those deficiencies.

The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes.</td></tr>
<tr><td colspan="2" align="center">**PRCCDA**</td></tr>
<tr><td>1.  **Puerto Rico Room Occupancy Rate Tax Act**

Entities involved:

**PRCCDA** (Puerto Rico Convention Center District Authority, a public corporation of the Commonwealth of Puerto</td><td>13 L.P.R.A. § 2271v  ("Disposition of funds")

The [Tourism] Company shall distribute all funds collected from the tax imposed under § 2271*o* of this title, as follows:
(a) Before the beginning of each fiscal year, the [GDB] shall determine and certify to the [Tourism] Company  and to the [CCDA], the amount necessary for the [CCDA] to make, during such fiscal year and the first day of the following fiscal year:
(1) Full and timely payment, or the amortization of the principal and interest on the obligations incurred by the [CCDA] with the [GDB] or the bonds, notes or other obligations issued, assumed or incurred by the [CCDA],</td></tr>
</table>

| | |
|---|---|
| Rico created by §§ 6 401 et seq. of Title 23, known as the 'Puerto Rico Convention Center District Act')<br><br>**Puerto Rico Tourism Company**, a public corporation of the Commonwealth of Puerto Rico created by §§ 671 et seq. of Title 23 | pursuant to Act No. 142 of October 4, 2001, as amended, with the prior written authorization of the [Tourism] Company , to exclusively carry out the development and construction of a new convention center and its related infrastructure;<br>(2) full and timely payment of the obligations of the [CCDA] under any bond related financing agreement, as this term is defined at the end of this subsection, entered into by the [CCDA] with the prior written authorization of the [Tourism] Company ;<br>(3) the deposits required to replenish any reserves established to ensure the payment of the principal and the interest on such bonds, notes and other obligations issued, assumed or incurred by the [CCDA], or obligations under any bond related financing agreement, and<br>(4) any other expenses incurred in connection with the issuance of such bonds, notes or other obligations assumed or incurred by the [CCDA], or with any other bond related financing agreement.<br>The prior written approval of the [Tourism] Company  shall specifically authorize the amortization schedule of the principal of the bonds, notes or other obligations to be issued, assumed or incurred by the [CCDA] and the final terms and conditions of any bond related financing agreement to be entered into by the [CCDA]. The sum determined and certified by the [GDB], as indicated above, shall be deposited in a special account to be maintained by the [GDB] in the name of the [CCDA] for the benefit of the bondholders, noteholders or the holders of other obligations of the [CCDA] or for the benefit of the other contracting parties under any bond related financing agreement. The [GDB] shall transfer the amounts deposited in such special account to the trustees of the bondholders, noteholders or the holders of other obligations of the [CCDA] or to the other contracting parties under any bond related financing agreement, in accordance with the written instructions provided to the [GDB] by the [CCDA].<br><br><br>Each fiscal year, the [Tourism] Company must transfer to the Government Development Bank for deposit in said special account the amount established in the first paragraph of this subsection through monthly transfers, beginning in the month immediately following the month in which this law is approved and in the first month of each fiscal year thereafter, equivalent to one tenth of that amount that the Government Development Bank for Puerto Rico determines and certifies as necessary for the payments referred to in the introductory paragraph of this section [….]<br><br>The Authority is hereby authorized, with the prior written consent of the Company, to pledge or otherwise encumber the revenues product of the fixed tax collected which is to be deposited in a special account as required by the first paragraph of this subsection, as security for the payment of the principal and interest on the bonds, notes or other obligations issued, assumed or incurred by the Authority, as described in the first paragraph of this subsection, or for the payment of its obligations under any bond related financing agreement, as described in said paragraph. Such a pledge or obligation shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of the collection of the tax shall be used solely for the payment of the |

| | |
|---|---|
| | interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes. Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related financing agreement contemplated herein, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements.<br><br>In case the total product of the tax presently assigned or to be assigned in the future to the Authority, in accordance with this subsection, is used to service payments of the public debt and applied to cover the deficiencies in the amounts needed to make such payments, the amounts of this tax used to cover said deficiency shall be reimbursed to the Authority out of the first revenues received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico proceeding from any remaining portion of the tax then in effect, subject to the provisions of Section 8 of Article VI, of the Constitution of the Commonwealth of Puerto Rico. |
| **MBA** ||
| **Internal Revenue Code for a New Puerto Rico**<br><br>Entities Involved:<br><br>**HTA** (Puerto Rico Highways and Transportation Authority)<br><br>**MBA** (Metropolitan Bus Authority) | Subsection (a) of Section 3060.11 of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:<br><br>The amount of tax collected on cigarettes fixed by Section 3020.05 of this subtitle up to twenty (20) million dollars per fiscal year shall be deposited into a special deposit in favor of the Highways and Transportation Authority for its corporate powers and purposes.<br><br>The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority.  Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations. |

| | The amount of tax received from cigarettes fixed by Section 3020.05 of this subtitle up to ten (10) million dollars per fiscal year shall be deposited into a special deposit in favor of the Metropolitan Bus Authority for its corporate purposes and powers. The income from these ten (10) million dollars per fiscal year to the special deposit in favor of the Metropolitan Bus Authority is in second priority and subordinated to the income of the twenty (20) million dollars of the tax amount received from cigarettes fixed by Section 3020.05 of this subtitle that is deposited into the special deposit in favor of the Highways and Transportation Authority as provided in subsection (a)(3) of this section.<br><br>The Metropolitan Bus Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Metropolitan Bus Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Metropolitan Bus Authority and to meet any stipulation agreed on by the Metropolitan Bus Authority to the holders of its bonds and other obligations. |
|---|---|
| **PRITA** | |
| **Internal Revenue Code for a New Puerto Rico**<br><br>Entities Involved:<br><br>**PRITA** (Puerto Rico Integrated Transportation Authority) | 13 L.P.R.A. § 31751 ("Disposition of funds")<br><br>The amount of the tax that is collected on the cigarettes set out in section 31625 of this title up to thirty-six (36) million dollars per fiscal year, beginning with Fiscal Year 2015-2016, will be deposited in a special deposit in favor of the Integrated Transportation Authority of Puerto Rico for its purposes and corporate powers. The income of these thirty-six (36) million dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in section 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority, as provided in clause (3) of this subsection, and that of the ten (10) million dollars of the amount of the tax that is collected on cigarettes fixed in section 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority, as provided in clause (4) of this subsection. The amount of the tax that is collected on the cigarettes set forth in section 31625 of this title up to thirty-six (36) million dollars per fiscal year, as of the approval of the New Tax System of Puerto Rico, will enter a special deposit in favor of the Puerto Rico Integrated Transportation Authority for its purposes and corporate powers. The income of these thirty-six (36) million dollars per fiscal year to the special deposit in favor of the Integrated Transportation Authority of Puerto Rico |

is in third priority and subordinated to the income of twenty (20) million dollars of the amount of the tax collected on cigarettes set out in section 31625 of this title that enters the special deposit in favor of the Highway and Transportation Authority as provided in clause (3) of this subsection and that of ten (10) million dollars of the amount of the tax that is collected on the cigarettes fixed in section 31625 of this title that enters the special deposit in favor of the Metropolitan Bus Authority as provided in clause (4) of this subsection.

The Secretary shall transfer monthly or as agreed with the Integrated Transportation Authority of Puerto Rico, the amounts deposited in the special deposit, deducting therefrom such amounts reimbursed as per the provisions of section 31668 of this subtitle.

The transfer of funds raised from the excise tax imposed on cigarettes to the Integrated Transportation Authority of Puerto Rico shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of said collection shall be used solely for the payment of interest and the amortization of the public debt, as established in Section 8 of Article VI of the Constitution, to the extent that the other available resources mentioned in said section become insufficient for such purposes. In the event that the Commonwealth of Puerto Rico uses any amount of the excise taxes on cigarettes fixed in section 31625 for the payment of interest and the amortization of the public debt as established in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt shall be reimbursed to the Integrated Transportation Authority of Puerto Rico from the proceeds received by the Commonwealth of Puerto Rico in the next Fiscal Year, or in case that such reimbursement is not possible in the next Fiscal Year, in subsequent fiscal years, except for those proceeds that have been committed to satisfy any obligation. The product from said proceeds to be used under this section's provisions to reimburse to the Integrated Transportation Authority of Puerto Rico the amounts used by the Commonwealth of Puerto Rico for the payment of interest and the amortization of the public debt, shall not be covered into the General Fund of the Commonwealth of Puerto Rico, when collected; instead, they shall be transferred to the Integrated Transportation Authority of Puerto Rico and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Integrated Transportation Authority of Puerto Rico.

**Part III: Allocable Revenue Language in Resolutions**

HTA Resolutions

**I.**      HTA 1968 Resolution

The allocable revenue language appears in three places: once in the recitals and twice in the "form of bonds" embedded in the resolution.

- Recitals – "WHEREAS, by Act No. 75, approved June 23, 1965 as supplemented by Act No. 50, approved May 22, 1968, the proceeds of six-elevenths of the eleven cents a gallon tax imposed on gasoline by Act No. 2, approved January 20, 1956, as amended, was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said six cents a gallon tax received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the tax proceeds so pledged being subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that the other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1968 Resolution, at 2).

- "Form of Bonds" – "The proceeds of the gasoline taxes so allocated to the Authority by said Act No. 75 and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose." (HTA 1968 Resolution, at 17).

- "Form of Bonds" – "The proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Excise Act of Puerto Rico, the proceeds of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico has allocated and may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Sections are insufficient for such purpose." (HTA 1968 Resolution, at 24).

II.    HTA 1998 Resolution

The allocable revenue language appears in five places: three times in the recitals and twice in the "form of bonds" embedded in the resolution.

- Recitals – "WHEREAS, by Subtitle B of Act No. 120, approved October 31, 1994, as amended, the proceeds of the sixteen cents a gallon tax imposed on gasoline and one half of the eight cents per gallon tax imposed on gas oil and diesel oil was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said sixteen cents a gallon and four cents a gallon tax received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the tax proceeds so pledged being subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that the other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1998 Resolution, at 2).

- Recitals – "WHEREAS, by Act No. 9, approved August 12, 1982, the proceeds of the $15 increase per vehicle of annual motor vehicle license fees imposed by the Commonwealth was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said $15 increase in fees received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the license fees so pledged being subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1998 Resolution, at 2-3).

- Recitals – "WHEREAS, by Act No. 34, approved July 16, 1997, as amended, the first $120 million of annual proceeds of the tax paid for the use in Puerto Rico of crude oil, unfinished oils or end products derived from oil and any other hydrocarbon mixture was allocated to the Authority for use for its corporate purposes and expressly authorized the Authority to pledge the proceeds of said tax received by it to the payment of the principal of and the interest on bonds or other obligations of the Authority or for any other lawful purpose of the Authority, the tax proceeds so pledged being subject to first being applied to the payment and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose" (HTA 1998 Resolution, at 3).

- "Form of Bonds" – "The proceeds of the taxes on crude oil and derivative products so allocated to the Authority by said Act No. 34, the proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Act No. 120, the proceeds

of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose." (HTA 1998 Resolution, at 19).

- "Form of Bonds" – "The proceeds of the taxes on crude oil and derivative products so allocated to the Authority by said Act No. 34, the proceeds of the taxes on gasoline and gas oil and diesel oil so allocated to the Authority by said Act No. 120, the proceeds of the license fees so allocated to the Authority by said Vehicle and Traffic Law of Puerto Rico and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose, but only to the extent that other available revenues of the Commonwealth referred to in said Section 8 are insufficient for such purpose." (HTA 1998 Resolution, at 24).

PRIFA – Official Statement dated June 2, 2005

The reference to the Constitution's allocable revenue provision appears in three places:

- Cover Page.  "Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor."

- Summary Statement; S-2.  "The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor."

- Page 10.  "*Provisions for Prior Payment*.  "The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

  Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution.  Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose.  The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt."

CCDA – Official Statement dated March 16, 2006

The reference to the Constitution's allocable revenue provision appears in three places:

- Cover Page.  "**To the extent other Commonwealth of Puerto Rico revenues are insufficient to pay for the general obligation debts and other guaranteed debts of the Commonwealth, the hotel occupancy tax revenues are subject to being applied first to the payment of such Commonwealth debts and obligations before they may be applied to pay debt service on the Bonds.**"

- Page 2.  "**If Commonwealth revenues are insufficient to pay the general obligation debt of the Commonwealth and debt guaranteed by the Commonwealth, the Occupancy Tax Act provides that pursuant to the provisions of Section 8, Article VI of the Constitution of the Commonwealth, the Hotel Occupancy Tax revenues are subject to being applied first to the payment of such Commonwealth general obligation debt or such guaranteed debt before they may be applied to pay debt service on the Bonds.**"

- Pages 21-22.  "The Constitution of the Commonwealth provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

  Hotel Occupancy Tax revenues are available revenues under the Constitution. Accordingly, if needed, they may be applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Investment earnings and monies in the Debt Service Reserve Fund are not considered available Commonwealth resources."

MBA – Refinancing Agreement dated March 30, 2012, and
Amendment dated September 4, 2013 changing the collateral to the cigarette tax

- Refinancing Agreement, Section 3.17 ("No Immunity"): "Provided, however, that Lender is aware that collection of the Diesel Tax Revenue may be preempted by the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

- Refinancing Agreement, Section 18.12 ("Operational Accounts"):  "Borrower shall immediately deliver to Lender copies of any notices received from Treasury, the Government Development Bank for Puerto Rico or any other Governmental Authority indicating the Commonwealth's decision (or the imminence thereof) to enforce the Commonwealth's preemptive power over the Diesel Tax Revenues afforded to the Commonwealth under Section 8 of Article VI of the Constitution of the Commonwealth."

- Amendment, Section 7.2: "Provided, however, that Lender is aware that collection of the Cigarette Tax Revenue may be preempted by the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

- Amendment, Section 10: "Borrower shall immediately deliver to Lender copies of any notices received from Treasury, the Government Development Bank for Puerto Rico or any other Governmental Authority indicating the Commonwealth's decision (or the imminence thereof) to enforce the Commonwealth's preemptive power over the Cigarette Tax Revenues afforded to the Commonwealth under Section 8 of Article VI of the Constitution of the Commonwealth."

Commonwealth – Section 8 of Article VI of the Puerto Rico Constitution:  Allocable Revenue Provision

- Section 8 of Article VI of the Constitution.  "In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."

*Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Employee Retirement System (ERS)*

This analysis assesses the recoveries available to creditors of ERS on the basis of available remedies under non-bankruptcy laws, including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." In this context, this analysis provides an estimated range of recoveries that would be available to creditors if the stay of debt enforcement is terminated, no ERS Plan of Adjustment agreement is consummated, and the ERS Title III case is dismissed.

This document consists of two sections. The first section provides an overview of the methodology followed in developing the analysis. The methodology outlines the approach taken to estimate the resources available for debt service, estimate the outstanding creditor obligations, and analyze the priority in which funds are disbursed and the order in which creditor claims are assumed to be paid. The second section presents the estimated likely range of recoveries available to creditors of ERS based on the resources identified.

This analysis was prepared by McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP,[1] legal advisor to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. Those assumptions are included in Appendix 1 of this document and include estimated values for categories of ERS assets. The financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico and/or its advisors.

McKinsey & Company has accepted as true, accurate, and appropriate all of the legal and financial information and assumptions provided by Proskauer Rose LLP, other FOMB advisors, and the Government of Puerto Rico and its advisors. McKinsey & Company has not independently verified any of the information or assumptions received from Proskauer Rose LLP, other FOMB advisors, or the Government of Puerto Rico and its advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company does, however,

---

[1] Proskauer Rose LLP is referred to as the "FOMB's legal advisor" in this analysis.

represent that the recovery range identified herein is its best estimate based on its knowledge and on the information provided to it.

### I.   Methodology

Following guidance provided by FOMB's legal advisor, this analysis assumes that PROMESA Title III cases are dismissed but that PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement is removed and the FOMB remains in place and will continue to certify Commonwealth Fiscal Plans and enforce implementation of budgets, subject to any debt enforcement in excess of budget that the Puerto Rico courts order. The analysis also assumes creditors would pursue legal action against the Commonwealth and ERS to recover the amounts they claim they are owed.

The analysis relies on three components to calculate the range of potential recoveries available to creditors: 1) the Resource Envelope available to satisfy ERS creditor obligations, 2) the outstanding debt, and 3) priorities for distribution of funds for debt service.

The effective date of the analysis is June 30, 2021 (the "Effective Date"). The percentage recovery is calculated as the present value[2] of the total amount expected to be paid to creditors over the entire period of the analysis as a proportion of the total outstanding principal and unpaid interest as of the ERS Title III petition date of May 21, 2017 (the "ERS petition date"). Based on discussions with the FOMB's financial advisors, this analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments.

**1) Resource Envelope:** The total amount of resources available to pay ERS creditors' claims in each year constitutes ERS's Resource Envelope. This equates to assets remaining in the Employees Retirement System ("ERS assets"). Following guidance provided by the FOMB's legal advisor, ERS bonds are considered non-recourse outside of Title III, which limits their sources of recovery to their collateral. Therefore, only the ERS assets that are collateral of ERS bonds can be used to pay ERS bondholders. ERS assets that are not collateral of ERS bonds ("unencumbered assets") are assumed to be available for unsecured claims.

There was litigation related to additional assets that could be available to pay ERS creditors. Following guidance provided by FOMB's legal advisor, this analysis only considers assets held at ERS (as presented in Appendix 1) to be part of the Resource Envelope available to ERS creditors, as the output of future potential litigations is uncertain. The litigation and possible outcomes of such uncertainties are discussed at the end of this analysis.

Following guidance provided by FOMB's legal advisor, the estimated value of ERS bondholders collateral is $142 million. According to this guidance, certain assets with a low probability of being bondholders' collateral (less than 15%) have been excluded from the collateral pool for ERS bondholders as it is expected that bondholder claims to such assets will be eliminated upon the resolution of ongoing litigation. For additional information on the assessment of bondholders' collateral, please refer to Appendix 1. McKinsey & Company has accepted these estimations related

---

2 Present value as of the Effective Date of the analysis, June 30, 2021.

to assets that are collateral of ERS bonds and provided by the FOMB's legal advisor as appropriate, but no independent legal or actuarial analysis has been performed by McKinsey & Company.

Based on guidance provided by the FOMB's financial advisors, the total market value of ERS assets as of July 2020 is estimated at $1,174 million and is assumed to remain at this value through the Effective Date of this analysis, June 30, 2021. This ERS asset value estimate excludes amounts previously paid to bondholders through a pre-petition segregated account.

**2) Outstanding debt:** Based on information provided by the financial advisors to the FOMB, the total debt outstanding as of the ERS petition date is $3,169 million. As indicated in Appendix 1, the outstanding debt also assumes an additional amount of $8 million in unsecured claims.

This analysis does not consider obligations to retirees, as those obligations were assumed by the Commonwealth under Act 106-2017 as mentioned in Appendix 1. To the extent not paid from the unencumbered assets of ERS, obligations to retirees will be satisfied to the extent set forth in the in the Commonwealth version of this analysis, which is also included in the Disclosure Statement.

**3) Priorities for distribution of funds:** Following guidance provided by FOMB's legal advisor, funds that are collateral of ERS bonds are available to pay ERS bondholders following the schedule of payments as stipulated in the ERS bond documents. Funds are first assumed to be credited against cumulative interest owed and then to the debt principal maturing in that year or previously, if any. Unpaid principal accrues interest according to the original rates stipulated in each of the relevant debt documents and is then added to the following year's debt. No interest accrues on interest balances.

Following guidance provided by FOMB's legal advisor, funds not constituting collateral of ERS bonds are assumed to be used to pay unsecured claims; any assets remaining after unsecured claims have been paid are assumed to be transferred to the Commonwealth pursuant to Act 106-2017, which addressed ERS pensions and assets. As a result, the analysis estimates that $1,023 million of remaining ERS assets will be transferred to the Commonwealth at the end of FY2022.

The following exhibit summarizes the priorities for the distribution of funds based on guidance provided by FOMB's legal advisor in Appendix 1.

*Exhibit 1: Flow of funds in the analysis*



The recoveries shown in the next section do not include additional payments ERS bondholders may receive from the Commonwealth if they successfully assert claims against it. As mentioned in Appendix 1, ERS bondholders may assert an unsecured claim against the Commonwealth for any amount owed but unpaid in any given year. This claim, to the extent valid, if any, would be paid as part of the pool of the Commonwealth's unsecured claims and it would follow the priorities and recoveries described in the Commonwealth version of this analysis, which is also included in the Disclosure Statement.

## II.   *Estimated likely recoveries available to creditors*

In assessing the estimated likely range of recoveries available to ERS bondholders, this analysis uses the estimated funds that are collateral of ERS bonds. Based on these criteria, the recovery available to ERS bondholders is $142 million. This amount implies a recovery percentage of 4%.[3]

Unsecured claims total $8 million. The resources available to unsecured claims are greater than the $8 million, which implies a recovery of 100%. An estimated $1,023 million in unrestricted assets remaining after paying unsecured claims cannot be used to pay ERS bonds and are assumed to be transferred to the Commonwealth. In total, the recovery available to both ERS bonds and unsecured claims is $151 million,[4] which implies an overall recovery of 5%.

---

[3] The recovery percentage is estimated as the present value of total debt paid (as of the Effective Date June 30, 2021) as a proportion of the total principal outstanding and unpaid interest as of ERS petition date (May 21, 2017).

[4] The amount refers to the present value of future debt payments using an annual 5% discount rate.

*Exhibit 2: Estimated likely recoveries available to ERS creditors*



**Estimated likely recoveries available to ERS creditors by debt class**
PV of total payment in USD million, % recovery

| | |
|---|---|
| ERS bonds | $142<br>*4%* |
| Unsecured claims | $8<br>*100%* |
| Total | $151<br>*5%* |

### *Alternative outcomes based on ongoing litigation or litigation risks*

The range of recoveries is subject to the outcome of ongoing litigation regarding the total size of valid claims and the pool of resources available for debt service. As the outcome is uncertain, those sensitivities are not considered in the recoveries described above.

First, there was litigation challenging the validity of ERS bonds pursuant to Puerto Rico law. If ERS bonds are ruled to be invalid, ERS bondholders would not receive any payments from assets that are currently collateral of ERS bonds. In addition, ERS bondholders might be required to return payments already made to them before the ERS petition date; those payments sum to approximately $400 million.

Second, there were legal disputes concerning whether employers' current pay-as-you-go ("PayGo") payments under Act 106-2017 should be considered the same asset as pre-Act 106-2017 employer contributions to ERS and subject to security interests of ERS bondholders. As mentioned in Appendix 1, in this case ERS bonds would be paid before Commonwealth General Obligation (GO) bonds and other Commonwealth guaranteed debt that is *pari passu* with GO bonds because ERS bondholders would have a lien against PayGo payments. Therefore, ERS bondholders would receive full recovery of their claims as the PayGo payments are greater than the ERS bond debt owed in any given year. Payments to ERS bondholders from the Commonwealth, however, might reduce the ability of the Commonwealth to cover its pension expenses. The Commonwealth would need to reduce its operating expenses in other areas to be able to pay ERS bondholders and still stay within the limits set by the annual budget.

The outcome of this litigation is uncertain; therefore, estimated recoveries based on different sensitivities are shown below. The table shows the recoveries available to ERS bondholders assuming varying amounts (e.g. 0%, 25%, 50% and 75%) of ERS claims are deemed to be secured

by PayGo payments.[5] In addition to the payments from the PayGo payment stream, ERS bondholders would also receive payments from the ERS assets that are collateral of ERS bonds.

*Exhibit 3: Estimated likely recoveries available to ERS creditors if some ERS bond debt is secured by PayGo payments*

**Estimated likely recoveries available to ERS creditors by debt class should a portion of ERS annual bond debt be classified as secured by PayGo payments**

PV of total payment in USD million, % recovery

| | | |
|---|---|---|
| **ERS bonds** | 0% of annual debt secured | $142 *4%* |
| | 25% of annual debt secured | $1,341 *42%* |
| | 50% of annual debt secured | $2,540 *80%* |
| | 75% of annual debt secured | $3,739 *100%* |
| **Unsecured claims[1]** | | $8 *100%* |

1 Recoveries of unsecured claims is 100% as those claims are fully paid with unencumbered assets

---

[5] The calculation assumes that a portion (e.g. 0%, 25%, 50% and 75%) of the total principal and interest due in any given year (based on ERS debt schedule) is secured by PayGo payments. Recoveries are calculated as the present value of total debt paid (as of the Effective Date June 30, 2021) as a proportion of the total principal outstanding and unpaid interest as of ERS petition date (May 21, 2017).

*APPENDIX 1*

# ERS Title III Plan

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| 1. | **Existence of PROMESA/Board:** Should PROMESA Titles I and II apply be assumed to apply? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: PROMESA Titles I and II apply. The automatic stay does not apply. The Board is in place and certifies and enforces fiscal plans and budgets. Creditors are allowed to procure judgments for all matured claims. Once GO creditors (including creditors holding CW-guaranteed claims) have judgments, they can claim all "available resources" and negotiate/litigate with the Commonwealth over what amount of the available resources can be applied to operating expenses pursuant to the police power. The non-GO and non-CW guarantee creditors' only recourse is to wait for a legislative appropriation of amounts to pay their claims once GOs are paid in full.<br><br>**BASIS**: The reference to "non-bankruptcy laws" in PROMESA section 314(b)(6) would include Titles I and II of PROMESA. There would be no automatic stay under non-bankruptcy law. Neither the fiscal plan nor the budget discharges claims or stays actions. Therefore, the fiscal plan and budget, as non-bankruptcy law, would apply, and the Oversight Board would continue to exist to enforce them. It is possible that their implicit limitations (*i.e.*, budgeted amounts) will not limit how much creditors can collect by enforcing their claims. Whether that is the case will be a function of the extent to which the police power prevents GO creditors from taking all available resources. Non-GO creditors rely on legislative appropriations for payment. The certified fiscal plan would limit what can be appropriated for debt service, subject to the rights of GO creditors to exercise their rights under Article VI, Sections 6 and 8 of the PR Constitution to intercept available resources.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: PROMESA Titles I and II do not apply. The automatic stay does not apply. The Board does not exist, and there are no certified fiscal plans and budgets.<br><br>**BASIS**: The assumption that PROMESA Titles I and II continue to apply increases the creditors' recovery due to the measures and savings the Oversight Board inserts into its certified fiscal plans. The Oversight Board's legal advisors believe it is possible that Titles I and II do not apply because Congress enacted them in tandem with Title III and it is not clear they were intended to continue in effect without Title III. On balance, however, the legal advisors recommended that this analysis be done as if PROMESA Titles I and II continue to apply**.** |

| | Question | Assumption |
|---|---|---|
| 2. | **ERS Bondholders' Claims Against ERS Petition Date Assets?** | **ASSUMPTION 1:**  ERS bondholders have a security interest in certain of the remaining ERS assets (see chart below) and are paid only from those certain assets.  ERS's receivables claims against the Commonwealth are treated as unsecured obligations of the Commonwealth. |

**ASSUMPTION 1:**  ERS bondholders have a security interest in certain of the remaining ERS assets (see chart below) and are paid only from those certain assets.  ERS's receivables claims against the Commonwealth are treated as unsecured obligations of the Commonwealth.

The total value of ERS assets is estimated at a book value of $1,069 million as of July 2020.  Analysis conducted by the Oversight Board's legal advisors and an FOMB expert in connection with the Lien-Scope summary judgment proceeding identified bondholder collateral as summarized in the chart below.  These assets are as of the ERS petition date, and do not include all known ERS assets today.

It is assumed that the difference between total ERS assets and assets identified as bondholder collateral is available for distributions to holders of unsecured claims.  Any assets not used to pay bondholders and unsecured claims are assumed to be transferred to the Commonwealth pursuant to Act 106-2017.

**BASIS**:  Although the First Circuit determined the ERS bondholders hold a security interest against certain assets at ERS perfected by the filing of a financing statement, the decision does not determine to which assets the security interest attaches.  The ERS bonds are nonrecourse and the bondholders lack an entitlement to assets in which they lack a security interest.

**SENSITIVITY**:  ERS petition date assets

| Asset Category | Petition Date book value (unless indicated otherwise) according to analysis performed by FOMB expert | Probability Book Value of Assets is Bondholders' Collateral |
|---|---|---|
| Employers' Contributions accounts receivable (from the CW, CRIM, and certain | $85.6M, including $31.3M from the CW, $11.7M from the municipalities paid by CRIM, and $42.6M from public corporations for | 100%<br><br>Employer contributions accrued prior to the ERS petition date as a result of employee labor, and not paid to date, constitute the right to receive revenues under the bond documents and are thus subject to the security interest on prepetition assets of ERS. |

| | Question | Assumption | | |
|---|---|---|---|---|
| | | instrument-alities) | which the CW is responsible[1, 2] | |
| | | Additional uniform contributions (AUC) accounts receivable | $716.8M, including $545.7M from the CW, $36.9M from municipalities, and $134.2M from public corporations[3] | 10%<br><br>The AUC were made pursuant to sections of the Enabling Act other than those in which ERS bondholders had a security interest, so the ERS bondholders lack an interest in them. The First Circuit's Section 552 opinion supports this argument. Further, they are not proceeds of any other bondholders' rights in collateral. |
| | | Employee loans and collections | $24.2M | 15%<br><br>Payments made on Employee Loans are not made pursuant to any of the sections of the Enabling Act in which ERS bondholders have a security interest. The Resolution likewise does not provide bondholders with a security interest in Employee Loans. To the extent Employee Loans were made with Employers' Contributions, some may be traceable, in which case proceeds thereon could be proceeds of the bondholders' collateral. |
| | | Investments and | $7.9M | 15% |

---

[1] Accounts receivable from the Commonwealth may be subject to offset.

[2] ERS bondholders have asserted a security interest in the PayGo payments mandated under Act 106-2017. Even if this is correct, PayGo payments would be property acquired after the ERS petition date and thus free and clear of any prepetition security interest under § 552 of the Bankruptcy Code, made applicable by PROMESA § 301(a), as the Court of Appeals for the First Circuit has ruled. Outside Title III, however, § 552 does not apply. Therefore, PayGo Payments to the CW could be subject to their security interest if they are treated as the pre-Act 106 employer contributions to ERS. However, this would result in a secured claim against the Commonwealth, as discussed below.

[3] AUC receivable from the Commonwealth may be subject to offset.

| | Question | Assumption | | |
|---|---|---|---|---|
| | | distribution proceeds | | Investments are not subject to any of the sections of the Enabling Act in which the ERS bondholders have a security interest.  The Resolution likewise does not provide bondholders with a security interest in Investments.  To the extent Investments were made with Employers' Contributions, some may be traceable, in which case proceeds thereon could be proceeds of the bondholders' collateral. |
| | | Cash from Released Funds | $37.4M | 10%  The bondholders authorized a release of their security interest in these funds. |
| | | Cash from AUC collections | $74.1M | 10%  As explained above, AUC are not subject to the bondholders' security interest. |
| | | Cash traceable to Employers' Contributions | $56.8M | 100% |
| | | COFINA bond holdings | $66.0M (per balance sheet as of May 31, 2017) | 10%  The source of the money that was used to buy the COFINA bonds was transferred from PRIFA and allocated specifically to buy the COFINA bonds. |
| 3. | **ERS Bondholders' Claims Against the Commonwealth?** | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  ERS bondholders successfully assert constitutional claims (Takings and/or Contract Clauses) against the CW.  In each year their debt service is not paid, ERS bondholders may assert that amount against the Commonwealth as an unsecured claim paid after GO and *pari passu* debt. | | |

| Question | Assumption |
|---|---|
| | **BASIS**:  ERS bondholders assert Act 106-2017, which eliminated employer contributions under the ERS enabling act, effected an impairment of contractual rights and a taking of their collateral, in violation of the Puerto Rico and U.S. Constitutions.  Additionally, § 552, which eliminated the security interest in employer contributions arising after the ERS petition date independent of the effect of Act 106, would likely no longer apply after the dismissal of the ERS Title III case, which would leave Act 106 as the only basis for the elimination of their collateral and thus a violation of the Contract and/or Takings Clauses.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  ERS bondholders have a security interest in future employer contributions, and PayGo Payments are adjudicated to be the same as or proceeds of Employers' Contributions, and thus the ERS bondholders have secured claims against the Commonwealth secured by a security interest in PayGo Payments.  Their debt service including outstanding principal and interest, is paid before GO or CW-guaranteed debt.<br><br>This assumption should be run as if the secured claims against the employer contributions have a 0%, 25%, 50%, 75%, and 100% chance of success.<br>If the CW runs into deficits before ERS bonds are paid in full, assume the CW can justify the use of police power for the payment of all its expenses, including pensions, in full, and there is no money left to pay ERS bonds or other debt.<br><br>**BASIS**:  ERS bondholders have asserted that PayGo Payments are the same asset as employer contributions, or proceeds thereof, and thus are subject to the ERS bondholders' security interest, making them a secured creditor of the Commonwealth.  They would also likely assert that this security interest, even if eliminated by § 552 upon ERS's petition date, would be reinstated upon the dismissal of ERS's title III case.<br><br>**ASSUMPTION 3 [LITIGATION RISK]**:  ERS bondholders have no claims against the CW.<br><br>**BASIS**:   Even if ERS bondholders had a security interest in future contribution rights, the bondholders were put on notice by the bond offering statement that those rights might be modified or adversely affected by the Commonwealth, which Act 106-2017 did by eliminating any employer contributions to ERS.  The fact that the ERS bondholders were on notice of such potential modification could also significantly diminish their chances of asserting a successful contract impairment or takings claim.  Additionally, the best interests test should assume bondholder rights and remedies are on account of their claims as they existed immediately prior to the hypothetical dismissal of the ERS case and not adjusted under the ERS plan, *i.e.*, secured only by employer contributions arising prior to the ERS petition date, but not after, as a result of the Section 552 opinion.. |

| | Question | Assumption |
|---|---|---|
| | | Thus, the ERS bondholders had no contract rights or collateral that was impaired or eliminated by operation of Act 106. |
| 4. | **Pensioners' claims against ERS and/or the Commonwealth?** | **ASSUMPTION 1 [MAIN ASSUMPTION]**:  Pensioners have a claim against ERS and the Commonwealth, jointly, for their pensions, which will be paid by the CW under Act 106-2017.<br><br>**BASIS**:  ERS is responsible for payments to pensioners, and pensioners have a claim for their pensions against ERS, subject to the limitation that pensioners cannot collect more than in full from the combination of ERS and the Commonwealth.  However, Act 106 requires ERS to transfer its assets to the Commonwealth to fund the "pay-as-you-go" pension system.  So, either the pensioners get paid from all the unencumbered assets of ERS (as the bonds are nonrecourse and have no deficiency claim payable from those assets), or these unencumbered assets are transferred to the Commonwealth to pay pensioners via PayGo.  In any case, ERS assets that are collateral to pay ERS bonds are used to pay ERS bonds.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  Pensioners have only a claim against the CW for cuts, if any, to their pensions.<br><br>**BASIS**:  Act 106 provided that the Commonwealth assumed the liability to pay pension benefits.  Accordingly, ERS was relieved of any obligation to pay pensions, and retiree claims must be asserted against the Commonwealth as the transferee of the obligation to pay pensions. |
| 5. | **Are ERS bondholders entitled to accelerate payment of their bonds?** | **ASSUMPTION**:  No, ERS bonds do not allow acceleration. |
| 6. | **Should interest on debt that remained unpaid during the stay accrue additional interest?** | **ASSUMPTION:**  Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>    i.  **Interest on ERS debt during stay:** Pursuant to PROMESA § 303, interest continues to accrue at the contract rate during any moratorium, unless the underlying contract provides for default interest, in which case the latter should be used.  There is no statutory provision for interest on interest. |

| | Question | Assumption |
|---|---|---|
| | | ii. **Interest on unsecured claims during stay:**  Assume no interest accrues. |
| | | iii. **Interest on unpaid debt:**  Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2020 (provided by Citi). |
| | | iv. **Interest on interest:**  No.  Puerto Rico law permits the payment of interest on overdue interest under certain circumstances, such as if it was expressly agreed by the parties. However, the Resolution does not provide for interest on overdue interest. |
| 7. | **Other Litigation Claims?** | **ASSUMPTION 1 [MAIN ASSUMPTION]:**  Ultra vires claim that ERS bonds were issued without authorization has no merit.<br><br>**ASSUMPTION 2 [LITIGATION RISK]:**  Ultra vires claim eliminates the remaining bond claims, although bondholders keep payments made to them so far.<br><br>**ASSUMPTION 3 [LITIGATION RISK]:**  Ultra vires claim eliminates the remaining bond claims, and bondholders must pay back approximately $400M in payments made to them as alleged in the complaint filed by the FOMB's special claims committee. |

**DEBT STACK**[4]

1. **Operating Cost**
   a. Range of $25 million to $67 million per year, as projected in the CW 2021 Fiscal Plan

2. **ERS Debt**
   a. Senior Pension Funding Bonds balance as of ERS petition date: $3,168,698,777

3. **Other unsecured claims**
   a. Litigation claims: $1,186,101
   b. Trade payables: $59,571
   c. Indemnification claim: $5,769,552
   d. Convenience class claims: $1,093,821
   e. Miscellaneous claims:  $53,840

---

[4] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors.  The legal advisors take no position as to the accuracy of the financial information provided herein.

*Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Public Buildings Authority (PBA)*

This analysis assesses the recoveries available to creditors of PBA on the basis of available remedies under non-bankruptcy laws, including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." In this context, this analysis provides an estimated range of recoveries that would be available to creditors if the stay of debt enforcement is terminated, no Plan of Adjustment agreement is consummated, and the PBA Title III case is dismissed.

This document consists of two sections. The first section provides an overview of the methodology followed in developing the analysis. The methodology outlines the approach taken to estimate the resources available for debt service, estimate the outstanding creditor obligations, and analyze the priority in which funds are disbursed and the order in which creditor claims are assumed to be paid. The second section presents the estimated likely range of recoveries available to creditors of PBA based on the resources identified.

This analysis was prepared by McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC,[1] legal advisors to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. Those assumptions are included in Appendix 1 of this document. The financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt, perspectives on cash balances, and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico and/or its advisors.

McKinsey & Company has accepted as true, accurate, and appropriate all of the legal and financial information and assumptions provided by Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, and the Government of Puerto Rico and its advisors. McKinsey & Company has not independently verified any of the information or assumptions received from Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, or the Government of Puerto Rico and its advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico

---

[1] Proskauer Rose LLP and O'Neill & Borges LLC are collectively referred to as " FOMB's legal advisors" in this analysis.

Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company does, however, represent that the recovery range identified herein is its best estimate based on its knowledge and on the information provided to it.

### I.  Methodology

Following guidance provided by FOMB's legal advisors, this analysis assumes that PROMESA Title III cases are dismissed but that PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement is lifted and the FOMB remains in place and will continue to certify Commonwealth Fiscal Plans and enforce implementation of budgets, subject to any debt enforcement in excess of budget that the Puerto Rico courts order. The analysis assumes creditors would pursue legal action against PBA to recover the amounts they claim they are owed.

The analysis is based on the revenue and expenditure projections contained in the 2021 Commonwealth Certified Fiscal Plan. The analysis relies on three components to calculate potential recoveries available to PBA creditors: 1) the Resource Envelope available to satisfy PBA creditor obligations, 2) the outstanding debt, and 3) priorities for distribution of funds for debt service.

The effective date of the analysis is June 30, 2021(the "Effective Date"). The percentage recovery is calculated as the present value[2] of the total amount expected to be paid to creditors over the entire period of the analysis as a proportion of the total outstanding principal and unpaid interest as of the PBA Title III petition date of September 27, 2019 (the "PBA petition date").  Based on discussions with the FOMB's financial advisors, this analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments.

**1) Resource Envelope:** The total amount of resources available to pay PBA creditor claims in each year constitutes PBA's Resource Envelope. The Resource Envelope in any year is the sum of starting cash available for debt service and PBA rent receipts after paying operating expenses.[3]

Based upon the "Debtors' Cash Accounts" section of the Disclosure Statement, the PBA cash balance as of  December 2020 was $114 million. From the total balance, $87 million is considered unrestricted and available for debt service.[4,5] This analysis assumes the amount of unrestricted

---

[2] Present value as of the Effective Date of the analysis June 30, 2021.

[3] PBA bondholders could receive additional payments from the Commonwealth because PBA bonds are guaranteed by the Commonwealth. However, this analysis is restricted to what PBA can pay its creditors. Any potential additional payments from the Commonwealth are calculated in the Commonwealth version of this analysis, which is also included in the Disclosure Statement. PBA bondholders cannot collect more than payment in full of contractual debt service in any given year from the combination of PBA and the Commonwealth.

[4] This analysis considers the total PBA cash balance as of December 31, 2020, and it removes only the amount that has been explicitly classified as legally restricted. Therefore, the categories of "unreviewed," "inconclusive," and "assumed unavailable" in the Debtor's Cash Accounts analysis of the Disclosure Statement are considered unrestricted in this analysis.

[5] Based upon the "Debtors' Cash Accounts" section of the Disclosure Statement, the total unrestricted cash balance available for debt service excludes $18 million of funds related to an interest refund from IRS that was erroneously paid to PBA. Upon resolution regarding the interest refund, this amount is expected to be transferred from PBA to the appropriate recipient entity.

cash remains unchanged at June 30, 2021, as the Fiscal Plan projects no surplus generated by PBA in FY2021.

Following guidance provided by FOMB's legal advisors, PBA rent receipts are available for PBA bondholders after paying PBA operating expenses. As indicated in Appendix 1, this analysis assumes the PBA will use any rent receipts to pay its operating expenses first to keep PBA functioning. No other assets, such as insurance or FEMA proceeds, are assumed to be available for bondholder payments.

As indicated in the Fiscal Plan, total PBA operating expenses are comprised of PBA payroll and personnel costs, payments for maintenance and utilities, and capital expenditures. The PBA operating expenses also include annual retirement contributions to the PayGo system. Projections for expenditure groups take into consideration the estimated impact of fiscal measures outlined in the Fiscal Plan. Fiscal measures are a series of actions intended to reduce PBA expenditures and streamline its operations.

**2) Outstanding debt:** The total debt held by PBA creditors that is considered in this analysis is the sum of the PBA bond debt plus total unsecured claims against PBA. With respect to the PBA bonds, the FOMB commenced litigation challenging the validity of PBA bonds issued in or after 2012, as those might have been issued above Puerto Rico's constitutional debt limit. Following guidance provided by FOMB's legal advisors, this analysis assumes PBA bonds issued in or after 2012 are ruled invalid.

Based on data provided by the FOMB's financial advisors and excluding bonds issued in or after 2012, PBA bond debt is comprised of the outstanding debt from the Government Facilities Revenue Bonds and Refunding Bonds, with a total outstanding principal and unpaid interest balance of $4,323 million as of the Effective Date of this analysis. The total principal and unpaid interest as of the PBA petition date is $3,424 million and $572 million, respectively. The balance of total unsecured claims against PBA is estimated to be $447 million.

As indicated in Appendix 1, there is an additional litigation risk related to the validity of certain PBA bonds. The statutory Unsecured Claimholders' Committee (the "UCC") has challenged the validity of all PBA bonds issued in or after March 2011 on the basis they violate the constitutional debt limit. The potential impact of this litigation on recoveries is described in the section entitled "Alternative outcomes based on ongoing litigation or litigation risks."

**3) Priorities for distribution of funds:** PBA bondholders are paid with starting cash available for debt service and with PBA rent receipts available after paying operating expenses. Unsecured claims are paid with the amount of starting cash that is not pledged to PBA bonds, which is assumed to be $0 based on data provided by FOMB's financial advisors. Any amount of cash remaining after PBA bond debt owed in any given year is paid would be used to pay unsecured claims.

Following guidance provided by FOMB's legal advisors, funds are first assumed to be credited against cumulative interest owed, and then to the debt principal maturing in that year or previously,

if any. Unpaid principal accrues interest according to the original rates stipulated in each of the relevant bond documents and is then added to the following year's debt. No interest accrues on interest balances.

Following guidance provided by FOMB's legal advisors shown in Appendix 1, the funds available for PBA bondholders are distributed as shown in the following exhibit.

*Exhibit 1: Flow of funds in the analysis*



This analysis does not take into consideration any additional payments PBA bondholders could receive from the Commonwealth, as it is restricted to what PBA itself pays to its bondholders. Following guidance provided by FOMB's legal advisors, PBA bonds hold a Commonwealth guarantee and therefore would have the right to seek payments from the Commonwealth Resource Envelope if its obligations are not fully paid by PBA in any given year. Such payments would follow the priorities and recoveries described in the "Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Commonwealth of Puerto Rico" document, which is also included in the Disclosure Statement.

## II.   Estimated likely range of recoveries available to creditors

Following the priority for distribution of funds described above, this analysis estimates that the likely recovery available to PBA bondholders is $258 million[6] in the "base case," which implies a recovery of 6%.[7] Based on the analysis, unsecured claims do not receive any recovery. The estimated likely overall recovery (i.e., assumed valid PBA bonds and unsecured claims), therefore, is $258 million, which implies a recovery of 6% of total claims. These recoveries consider only PBA bonds issued before 2012, as this analysis assume PBA bonds issued in or after 2012 are ruled invalid.

*Exhibit 2: Estimated likely recoveries available to PBA bonds if bonds issued in or after 2012 are deemed invalid*

**Estimated recoveries available to PBA bonds by debt class if bonds issued in or after 2012 are deemed invalid**
PV of total payment in USD million, % recovery

| | |
|---|---|
| **PBA bonds** | $258 *6%* |
| **Unsecured claims** | $0 *0%* |
| **Total** | $258 *6%* |

### Alternative outcomes based on ongoing litigation or litigation risks

The estimated likely range of recoveries available to PBA creditors is subject to the outcome of ongoing litigation regarding the total size of valid claims as summarized in Appendix 1. The impact of certain possible litigation outcomes on creditors recovery is analyzed in the scenarios below.

### i. Scenario 1: Assumes PBA bonds issued in or after March 2011 are deemed invalid

The UCC has challenged the validity of all PBA bonds issued in or after March 2011 on the basis they violate the constitutional debt limit. This scenario assesses the impact on recoveries if PBA bonds issued in or after March 2011 are ruled invalid. Based on data provided by financial advisors and excluding PBA bonds issued in or after March 2011, the total principal and unpaid interest outstanding for PBA bonds is $2,869 million as of the Effective Date of this analysis. The principal

---

[6] Represents the present value (as of the Effective Date of analysis) of debt paid discounted at a 5% rate.

[7] The recovery percentage is estimated as the present value of total debt paid (as of the Effective Date June 30, 2021) as a proportion of the total outstanding principal and unpaid interest as of PBA petition date (September 27, 2019).

and unpaid interest as of the PBA petition date is $2,243 million and $418 million, respectively. In Scenario 1, the total recovery remains at $258 million, but the recovery rate for PBA bonds deemed valid increases to 10%. Based on the analysis, unsecured claims do not receive any recovery. Exhibit 3 shows the estimated likely recoveries under this scenario.

### ii. Scenario 2: Assumes all outstanding PBA bonds are deemed valid

If all outstanding PBA bonds are deemed valid, the size of PBA bondholder claims would increase. In this scenario, based on data provided by financial advisors, the total principal and unpaid interest outstanding for PBA bonds is $5,050 million as of the Effective Date of this analysis. The outstanding principal and unpaid interest as of the PBA petition date is $4,001 million and $670 million, respectively. In Scenario 2, the total recovery remains at $258 million, and the recovery rate for PBA bonds is 6%. Based on the analysis, unsecured claims do not receive any recovery. Exhibit 3 shows the estimated likely range of recoveries under this scenario.

*Exhibit 3: Estimated likely recoveries available to PBA creditors based on scenarios related to bond validity*

**Estimated likely recoveries available to PBA creditors by debt class and scenario**
PV of total payment in USD million, % recovery

| | Base case: PBA bonds issued in or after 2012 are deemed invalid | Scenario 1: PBA bonds issued in or after March 2011 are deemed invalid | Scenario 2: All outstanding PBA bonds are deemed valid |
|---|---|---|---|
| **PBA bonds** | $258 *6%* | $ 258 *10%* | $ 258 *6%* |
| **Unsecured claims** | $0 *0%* | $0 *0%* | $0 *0%* |
| **Total** | $ 258 *6%* | $ 258 *8%* | $ 258 *5%* |

### iii. Alternative scenarios assuming PBA bonds lack perfected security

As presented in Appendix 1 as part of the legal guidance provided by FOMB's legal advisors, there is a possible perfection issue with the rent payments assignment. Under Puerto Rico law, a rent assignment must be perfected through a notarized document. FOMB's legal advisors have not found a notarized assignment agreement in the PBA bond issuance documents available to them. If PBA bonds do not hold a perfected security interest, PBA bondholders would have no priority over unsecured creditors with respect to the assigned rent payments. In this alternative analysis, the total recovery available to all PBA claims remains the same as in each of the scenarios presented in Exhibit 3, with the relative recovery for each debt class varying between the different bond validity scenarios. Exhibit 4 shows the estimated likely range of recoveries by bond validity scenario under the assumption that rent payments are not perfectly secured for PBA bonds.

*Exhibit 4: Estimated likely recoveries available to PBA creditors assuming no perfected security for PBA bonds*

**Estimated likely recoveries available to PBA creditors by debt class and scenario assuming PBA bonds lack perfected security in rent payments**

PV of total payment in USD million, % recovery

| | Base case: PBA bonds issued in or after 2012 are deemed invalid | Scenario 1: PBA bonds issued in or after March 2011 are deemed invalid | Scenario 2: All outstanding PBA bonds are deemed valid |
|---|---|---|---|
| **PBA bonds[1]** | $227<br>*5%* | $ 214<br>*8%* | $ 227<br>*5%* |
| **Unsecured claims** | $31<br>*7%* | $43<br>*10%* | $31<br>*7%* |
| **Total** | $ 258<br>*5%* | $ 258<br>*8%* | $ 258<br>*5%* |

1 PBA bonds do not have a perfected security in rent payments in this alternative analysis

*APPENDIX 1*

## PBA Title III Plan

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| 1. | **Existence of PROMESA/Board:** Should PROMESA Titles I and II be assumed to apply? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: PROMESA Titles I and II apply.  The automatic stay does not apply.  The Board is in place and certifies and enforces fiscal plans and budgets.  Creditors are allowed to procure judgments for all matured claims.  Once GO creditors (including creditors holding CW-guaranteed claims) have judgments, they can claim all "available resources" and negotiate/litigate with the Commonwealth over what amount of the available resources can be applied to operating expenses pursuant to the police power.  The non-GO and non-CW guarantee creditors' only recourse is to wait for a legislative appropriation of amounts to pay their claims once GOs are paid in full.

**BASIS**: The reference to "non-bankruptcy laws" in PROMESA section 314(b)(6) would include Titles I and II of PROMESA.  There would be no automatic stay under non-bankruptcy law.  Neither the fiscal plan nor the budget discharges claims or stays actions.  Therefore, the fiscal plan and budget, as non-bankruptcy law, would apply, and the Oversight Board would continue to exist to enforce them.  It is possible that their implicit limitations (*i.e.*, budgeted amounts) will not limit how much creditors can collect by enforcing their claims.  Whether that is the case will be a function of the extent to which the police power prevents GO creditors from taking all available resources.  Non-GO creditors rely on legislative appropriations for payment.  The certified fiscal plan would limit what can be appropriated for debt service, subject to the rights of GO creditors to exercise their rights under Article VI, Sections 6 and 8 of the PR Constitution to intercept available resources.

**ASSUMPTION 2 [LITIGATION RISK]**:  PROMESA Titles I and II do not apply.  The automatic stay does not apply.  The Board does not exist, and there are no certified fiscal plans and budgets.

**BASIS**:  The assumption that PROMESA Titles I and II continue to apply increases the creditors' recovery due to the measures and savings the Oversight Board inserts into its certified fiscal plans.  The Oversight Board's legal advisors believe it is possible that Titles I and II do not apply because Congress enacted them in tandem with Title III and it |

| | Question | Assumption |
|---|---|---|
| | | is not clear they were intended to continue in effect without Title III.  On balance, however, the legal advisors recommended that this analysis be done as if PROMESA Titles I and II continue to apply. |
| 2. | Can the PBA surplus projections from the fiscal plan be used for PBA's resource envelope? | **ASSUMPTION:** Yes, PBA surplus is an asset of PBA. |
| 3. | Is there any starting cash or other assets that should be considered to pay PBA bondholders? | **ASSUMPTION:**  Bondholders' only recourse is to the rent payments, and the CW guarantees.  No other assets (*e.g.*, insurance proceeds) should be considered as available for bondholder payments.

The Board's advisors can provide an updated figure of restricted and unrestricted starting cash at PBA's bank accounts.  A portion of the starting cash at PBA's bank account might be pledged to PBA bondholders as this cash corresponds to rent receipts.  The amount of starting cash not pledged to secure PBA bonds is assumed to be used to pay unsecured claims. |
| 4. | What is the waterfall of payments for PBA bonds? | **ASSUMPTION:**  After payment of necessary operating expenses from non-rent sources, if any, and then from rent for any property leased from PBA, the balance of the rent is used for debt service.  Any amount of cash remaining after PBA bond debt owed in any given year is paid should be used to pay unsecured claims.

When the debt is in default, the bondholders may also assert their guaranty claims against the Commonwealth; provided, however, the bondholders cannot collect more than payment in full of contractual debt service from the combination of PBA and the Commonwealth. |
| 5. | How should future PBA rents be projected? | **ASSUMPTION:**  PBA rents should track the projections in the Fiscal Plan; provided, however, the Commonwealth is unlikely to pay rent for buildings it does not need or occupy.  If that is insufficient to cover the PBA bond payments that come due, we assume PBA bondholders would seek payment from the Commonwealth based on the Commonwealth guaranty of PBA bonds. |

| | Question | Assumption |
|---|---|---|
| | | |
| 6. | How should the recovery for PBA bondholders be calculated?  Should payments from the CW and payments with PBA surplus be considered? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: Payments to PBA bondholders should first be from PBA rent revenue, including surplus revenues.  PBA bondholders' recoveries on the Commonwealth guaranty do not count in the PBA return.  However, in the aggregate, the PBA bondholders cannot collect more than payment in full of contractual debt service from their two sources of recovery.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  There is a possible perfection issue with the rent payments assignment.  Under PR law a rent assignment must be made through an authentic document with a fixed date (*i.e.*, through a notarized document).  In the PBA bond issuance documents that we have available, we have not found a notarized assignment agreement.  Nevertheless, under PR law, an unperfected security interest would still entitle PBA bondholders to their nonrecourse claim against the collateral.  In this scenario, PBA bondholders would be entitled to rent payments based on their security agreement; however, because the assignment is not perfected, PBA bondholders would have no priority over those payments vis-à-vis other PBA unsecured creditors. |
| 7. | Are the PBA bonds issued in 2011 invalid because they violated the Commonwealth's constitutional debt limit? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: No, but PBA bonds issued in 2012 and after are deemed direct obligations of the Commonwealth, and as such, violate the debt limit.  Accordingly, those bonds are invalid.<br><br>**BASIS:** The Oversight Board has alleged the PBA Leases are not true leases and obligations purportedly due thereunder, but rather, are simply mischaracterized general obligations of the Commonwealth.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**:  Yes.  In addition to the PBA bonds issued in 2012 and after, PBA bonds issued in or after March 2011 also violate the debt limit, and accordingly are invalid.<br><br>**BASIS**:  In addition to the challenge explained above, the statutory unsecured claimholders' committee has challenged PBA bonds on that account starting in March 2011. |

| | Question | Assumption |
|---|---|---|
| | | **ASSUMPTION 3 [LITIGATION RISK]**:  No.  PBA bonds issued in or after March 2011 do not violate the debt limit.<br><br>**BASIS**:  The challenges explained in the bases above could be unsuccessful. |
| 8. | Are PBA bondholders entitled to accelerate payment of their bonds? | **ASSUMPTION**:  No, PBA bonds do not allow acceleration. |
| 9. | Should interest on debt that remained unpaid during the stay accrue additional interest? | **ASSUMPTION**:  Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>    i.  **Interest on PBA debt during stay**:  Pursuant to PROMESA § 303, interest continues to accrue at the contract rate during any moratorium, unless the underlying contract provides for default interest, in which case the latter should be used.  There is no statutory provision for interest on interest.<br><br>    ii.  **Interest on unsecured claims during stay:**  Assume no interest accrues.<br><br>    iii.  **Interest on unpaid debt:**  Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2020 (provided by Citi).<br><br>    iv.  **Interest on interest:**  No.  Puerto Rico law permits the payment of interest on overdue interest under certain circumstances, such as if it was expressly agreed by the parties.  However, the PBA Bonds do not provide for interest on overdue interest. |
| 10. | Are FEMA funds available for bondholders? | **ASSUMPTION**:  No.  FEMA receipts are to fund emergency-related expenses and are not available for PBA's general expenditures. |

## DEBT STACK[1]

1.  **Operating Cost**
    a.  Projected $152 million in operating expenses in 2022 per the April 2021 Certified Fiscal Plan.

2.  **PBA Debt (outstanding principal and unpaid interest as of the PBA petition date)**
    a.  Issued prior to March 2011: $2,661,239,877
    b.  Issued between March and December 2011: $1,335,422,893
    c.  Issued in or after 2012: $674,308,470

3.  **Other unsecured claims[2]**
    a.  Claims to be transferred into the Administrative Claims Reconciliation Procedures, or ACR: $175,600
    b.  Intragovernmental claims, including claims filed by Puerto Rico government entities or the federal government: $231,866,589
    c.  Trade payables: $8,337,372
    d.  Litigation claims: $193,121,520
    e.  Other miscellaneous claims: $2,637,013
    f.  Convenience class claims: $10,710,716

---

[1] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors.  The legal advisors take no position as to the accuracy of the financial information provided herein.

[2] These numbers are based on information provided by the Board's financial advisors and have not been independently verified.