**Objection deadline for Debtors' motion: June 15, 2021 5 p.m. (AST)**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

---------------------------------------------------------------x

**[Supplemental Response to Docket #16927, #16741 and #16742 as well as #16756 and #16758 (to the extent such filings seek approval of the Disclosure Statement)]**

**SUPPLEMENTAL RESPONSE AND OBJECTION OF INDIVIDUAL BONDHOLDER TO DEBTORS' BELATED SUBMISSION OF EXHIBIT N TO DISCLOSURE STATEMENT (BEST INTERESTS TEST REPORTS)**

Dated: June 15, 2021

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL RESPONSE AND OBJECTION TO EXHIBIT N ....................................... 1

(1) Exhibit N does not provide "adequate information" because no one will "vouch" for, or take responsibility for verifying, Commonwealth's economic and financial information .............................. 1

(2) Exhibit N fails to disclose the effect on the "best interests" analysis of near term multi-billion dollar payouts under the Plan to or for the benefit of public employees and retirement system participants, and of projected future deficits before bonds are repaid............................ 2

(3) The massive destruction in value to Retail Investors occasioned by the exchange of at least 19 splintered securities for every existing bond position........................................................................................ 2

(4) There is no disclosure in Exhibit N concerning whether fractional bonds will be issued ........................................................................ 4

(5) There is no disclosure concerning whether a future exchange of taxable for tax exempt is in prospect ........................................................ 5

(6) There is no disclosure in Exhibit N of the comparative tax consequences of retaining one's current position versus the exchange pursuant to the Plan................................................................. 6

(7) Exhibit N should disclose additional information concerning the discount rate used to calculate the present value of future principal and interest payments on the bonds. ......................................................... 6

(8) Disclosure of additional financial data is required to provide proper context for data in Exhibit N......................................................................... 7

(9) There should be a prominent disclosure of applicable provisions of the Puerto Rico Constitution. ................................................................... 10

(10) There should be a disclosure in Exhibit N of what costs would have been avoided had Commonwealth simply paid its GO debt ............ 11

(11) The presentation of financial tables based on assumptions concerning validity of the bonds is misleading......................................... 11

(12) There needs to be a disclosure of the effect of HB-120 on pension expenditures and Plan feasibility ......................................................... 12

(13) Disclosure of aggregate payments to McKinsey ...................................... 12

(14) Disclosures concerning Commonwealth's willingness to pay its Constitutional "first claim" GO debt. ........................................................13

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

11 U.S.C. §1125(a) ....................................................................................................................6

48 U.S.C. §2174(b)(6) ................................................................................................................1

## TABLE OF ABBREVIATIONS AND CITATIONS

| | |
|---|---|
| DS | Disclosure Statement (cited as #16741-page-__-to-__-of-__ (DS-___), with the Docket # reference being to the "ribbon" applied by the court at the top of the court-filed version, and the "DS-___" page reference being to the page number at the bottom of each page. |
| #___ | Docket entries are referred to in the form of "#__" |

**SUPPLEMENTAL RESPONSE AND OBJECTION TO EXHIBIT N**

Peter C. Hein, pro se, submits this Supplemental Response and Objection to the adequacy of the Disclosure Statement (#16741) to address Exhibit N (Best Interests Test Reports) (#16927) belatedly filed by FOMB on June 10, 2021, the day ***after*** I filed my June 9 Response and Objection to the Motion to Approve the Disclosure Statement (#16908).

In my June 9 Objection and Response, I made the point that (1) Exhibit N was left blank, and simply stated in a note that "[t]he Best Interests Test Reports will be filed at a later date," and (2) this omission rendered the Disclosure Statement fatally deficient. #16908-page-34-of-178. A bit more than 24 hours later, FOMB filed Exhibit N.

I am not able to conduct a detailed review and analysis of Exhibit N and its attachments (113 pages of material) in the short time available before June 15, the date set for objections to the Disclosure Statement. Yet, even with a limited review, it is apparent that Exhibit N does not meet Debtors' burden to establish that "the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." 48 U.S.C. §2174(b)(6). *See* #16908-page-34-of-178. In addition, Exhibit N highlights the need for additional disclosures:

**(1) Exhibit N does not provide "adequate information" because no one will "vouch" for, or take responsibility for verifying, Commonwealth's economic and financial information.**

As noted in my June 9 filing, FOMB said it "cannot" "vouch for the correctness" of Commonwealth's data, and Commonwealth, too, has "not" "approved" the economic and financial information in the Disclosure Statement (#16908-at-page-11-of-178, citing #16741-page-4,563-of-564-DS-iii,551).

Exhibit N states that McKinsey "prepared" the analysis in Exhibit N, but McKinsey, as well, "has not independently verified" any of the information or assumptions it is been given by FOMB or Commonwealth or their legal or other advisors and McKinsey does not "take any

independent position with respect to this information and these assumptions." #16927-page-6-of-113

The last audited financial data is for the fiscal year ended June 30, 2017 – almost four years old. #16908-page-32-to-33-of-178.

The Disclosure Statement, including Exhibit N, does not provide "adequate information" to individuals in the eight Retail Investor classes since none of FOMB, Commonwealth, FOMB and Commonwealth advisors or McKinsey will "vouch for the correctness" of the Commonwealth data included therein. The unwillingness of FOMB, Commonwealth, their advisors and McKinsey to "vouch for the correctness" of current data for Commonwealth included in Exhibit N and in the Disclosure Statement as a whole is of real concern since, despite four years of FOMB in place, Commonwealth's last audited financial statements are for the year ended June 30, 2017, almost four years ago.

**(2) Exhibit N fails to disclose the effect on the "best interests" analysis of near term multi-billion dollar payouts under the Plan to or for the benefit of public employees and retirement system participants, and of projected future deficits before bonds are repaid.**

Exhibit N does not disclose the effect on bondholders of (i) the potentially billions of dollars in payments to or for the benefit of public employees and retirement system participants in the first several years after confirmation, and (ii) the diminished surpluses and then deficits projected by FOMB in the years that follow, before all bonds are paid (#16908-page-20-of-178). Without such information, there is no basis for concluding that GO bondholders will be better off under the Plan than pursuing their available remedies under the Puerto Rico Constitution and statutes.

**(3) The massive destruction in value to Retail Investors occasioned by the exchange of at least 19 splintered securities for every existing bond position.**

One factor critical to the "bests interests" analysis but altogether ignored in Exhibit N is that individual Retail Investors in the 50 states will end up with at least **19** splintered securities in exchange for each **single** current bond position. In my June 9 filing (#16908-page-14n.5,26-to-

27,30-of-178), I urged that (i) the Disclosure Statement show exactly what securities, and in what quantities, each bondholder will receive per 100,000 par; (ii) that the value to be received by Retail Investors be appropriately discounted to reflect the lack of marketability of 19 splinters as compared to one single bond position; and (iii) that there be clear disclosure as to whether fractional bonds will be distributed or whether individual investors will be subject to a forced sale of fractional bonds, likely in a temporarily depressed market as of the time of the Effective Date, particularly since Retail Investors will be precluded from transacting from the time they vote to the Effective Date (#16909-page-25-to-26-of-44), raising the spectre of additional sale transactions on or just following the Effective Date.

None of these considerations are addressed in Exhibit N. By contrast, were bondholders to receive their entitlement under the Constitution and statutes of Puerto Rico – in addition to having at least a chance of receiving their full interest and principal – they would, importantly for Retail Investors in the 50 states, retain their existing single bond position, and not be subject to receipt of 19 splintered bonds or securities and/or be subject to forced sales of fractional bonds at an inopportune time in the market as of the Effective Date.

I have five GO bond positions of 100,000 par each and one PBA position of 200,000 par. Under the proposed Plan, I would end up with at least **114** separate splintered positions. None of these would be marketable at appropriate price levels. Any attempt to sell the "splinter" bonds or securities would subject me to significant market discounts due to the spreads, transaction fees and/or other costs involved. My positions are 100,000 par (or, in one case, 200,000 par). The impact on a bondholder with positions of only 5000 or 10,000 or 25,000 par would be even more dire.

There is nothing in Exhibit N that speaks to how or why the current Plan structure – with 19 pieces of splintered bonds being exchanged for each single current bond position for Retail Investors who are not Puerto Rico residents – could possibly be in the best interest of Retail Investors in the eight retail classes, in contrast to a situation where they retain their rights under the Constitution and laws of Puerto Rico with respect to a single bond instrument. Also, there is

no disclosure in Exhibit N concerning (i) the marketability of the 19 splintered securities to be issued to Retail Investors in the 50 states for an investor whose current positions are 100,000 par (or perhaps as little as 5,000 or 10,000 or 25,000 par) and (ii) if one attempted to sell the "splinter" bonds, what the transactional costs (including bid-ask spreads) would be on account of the small size of the positions.

Whose idea was this "splinter" bond structure — so obviously detrimental to Retail Investors? Why was this adopted for the Plan? Why are Puerto Rico Investors given the ability to elect a single bond (not 18 splinters), thereby allowing Puerto Rico Investors to avoid the detriment of the "splinter" bond structure, but Retail Investors in the 50 states are not? None of the foregoing is addressed in Exhibit N. These matters should be addressed.

**(4) There is no disclosure in Exhibit N concerning whether fractional bonds will be issued.**

Another matter critical to assessing whether the Plan is in the "best interests" of the eight classes of Retail Investors, but also nowhere addressed in Exhibit N (or the Disclosure Statement), is whether fractional bonds will be issued. Fractional bonds at least give the individual investor the ability to retain their full allotment of splintered securities rather than having their fractional securities forced sold at an adverse time and at a firesale price, resulting in complex and costly tax and tax reporting issues. But Exhibit N does not discuss whether fractional bonds will be issued; whether the policies and procedures of DTC and/or major brokerage firms will permit Retail Investors to receive and retain fractional bonds; or whether some unknown quantity of fractional bonds due to a Retail Investor will be involuntarily liquidated and, if so, on what terms. In the COFINA situation, originally fractional bonds were issued for at least some of my positions but then, as a result of decisions that I was not consulted on, all fractional bond positions that had originally been issued to me were liquidated without my consent.

**(5) There is no disclosure concerning whether a future exchange of taxable for tax exempt is in prospect.**

Exhibit N also does not address whether we will have a replay of what occurred in the COFINA situation where some securities were originally issued to 50-states investors as federally taxable and then – after confirmation – were made exchangeable to tax-exempt. In the COFINA situation, the initial issuance of some bonds as taxable, even to 50-states investors, meant that instead getting 11 splinter bonds for each single bond position (as the disclosure statement stated), an individual 50 states bondholder received 14 positions.

If what occurred with COFINA reoccurs again here, an individual may receive even more than 19 "splinters" per one existing bond position.

Moreover, in the COFINA situation FOMB waited until after FOMB began the confirmation process to – without disclosure – seek an IRS ruling on tax exempt status. That IRS ruling was received shortly after consummation, and thereafter COFINA offered to exchange the 3 (of 14) COFINA positions originally issued as taxable into tax exempt bonds, but only at a lower coupon rate than represented in the disclosure statement.

If what occurred with COFINA reoccurs, an individual who has received 19 "splinter" pieces for each single position faces the added spectre of transaction costs if – as is the case with some brokers – the broker imposes a fee for a "voluntary" exchange transaction. As discussed previously (#7211-1-page-7-to-15-of-146), in the COFINA situation this resulted in fees that made the exchange from taxable to tax-exempt (which should have been what was issued in the first place) unreasonably costly for some individual bondholders. And in the COFINA situation the "price" of the exchange to tax-exempt for all individuals was a lower coupon interest rate than what bondholders had been told (in the disclosure statement) they would receive and what bondholders would have received had the bonds originally been issued as tax-exempt: FOMB insisted on a 25 basis point reduction in the coupon as the "price" for the exchange.

Will this problem reoccur here? If there is to be an exchange of bonds issued to Retail Investors from taxable to tax-exempt, will FOMB at least do it at the same coupon rate so that

the exchange can be done on a mandatory basis and brokerage firm fees for "voluntary" exchanges can be avoided? These subjects are not disclosed either in Exhibit N (or elsewhere in the Disclosure Statement). *See* #16908-page-28-to-29&n.14-of-178 and the prior record materials cited therein.

**(6) There is no disclosure in Exhibit N of the comparative tax consequences of retaining one's current position versus the exchange pursuant to the Plan.**

There is no discussion of the tax consequences of the proposed Plan as opposed to a bondholder retaining their existing position and rights under Commonwealth's Constitution and laws. Currently, I am entitled to tax-free interest on my single bond positions and, ultimately, return of principal (which is not taxable). If instead I receive 19 splintered securities for every single position, first, it becomes an accounting nightmare for tax purposes. That itself imposes significant costs on the individual investor. But even apart from the accounting nightmare, will what should have been all tax-exempt interest end up potentially being distributed as (at least in part) taxable interest (as occurred in the COFINA case)? If, as a result of the Plan, one will lose the ability to receive all tax-exempt interest, one may be better off retaining one's existing position and rights even if the ultimate dollar recovery is (hypothetically) a bit worse because of the difficulty of getting Puerto Rico to pay. None of this is addressed in Exhibit N (or elsewhere in the Disclosure Statement) – at least not in a way that Retail Investors can understand.

As noted in #16908-page-28-of-178, simply asserting "[t]he tax status of the new GO Bonds has not been determined" does not constitute "adequate information" and does not comply with 11 U.S.C. §1125(a).

**(7) Exhibit N should disclose additional information concerning the discount rate used to calculate the present value of future principal and interest payments on the bonds.**

Exhibit N states that a "discount rate of 5%" is being applied to present value future principal and interest payments. #16927-page-9-of-113. Neither McKinsey, nor FOMB, nor the Commonwealth take responsibility for this 5% discount rate; it is simply said to be "assume[d]

…as reasonable" "[b]ased on discussions with the FOMB's [unnamed] financial advisors". #16927-page-9-of-113.

The discount rate used is a key part of the valuation analysis. More information needs to be disclosed including (i) who these financial advisers are, (ii) what the rationale for 5% (as opposed to other potential percentages) is, and (iii) what the impact on the analysis would be if a discount rate 1, 2 or 3% higher, or 1, 2 or 3% lower, was selected.

**(8) Disclosure of additional financial data is required to provide proper context for data in Exhibit N.**

The "debt stack" on #16927-page-49-of-113 shows "pre-measure" operating expenditure categories. Additional disclosures are required to put this data in context. Thus:

(a) Commonwealth Medicaid expenditures are slated to increase from $1.968 billion in FY22 to $2.974 billion in FY26. But this presumably is premised on the misleading assumption that Medicaid funding will fall "off a cliff." As noted in my June 9 Response and Objection (#16908-page-15-to-16,37-of-178) no one believes that. In particular Governor Pierluisi does not believe that. And President Biden's budget provides substantial additional Medicaid funding for Puerto Rico.

What would be the amount available for other expenditures if a more realistic assumption as to federal support for Medicaid were utilized? That should be disclosed.

(b) The general premise of Exhibit N appears to be that all operating expenses and pensions must be paid in full first – Constitutional "first claim" GO bondholders only get what is left over, *i.e.*, what Puerto Rico doesn't spend. E.g., #16927-page-9,13,15,19-of-113. Exhibit N thus assumes a 180 degree reversal of the priorities accorded Constitutional "first claim" GO bondholders under Article VI, Section 8 (*see* Section 9 below).

Numerous Commonwealth expenditures are shown as increasing over the FY22 to FY26 period, ranging from "payroll," to "operating expenditures," to "total CW funded operating expenditures." #16927-page-49-of-113.

But what if one eliminated some of the hundreds of millions of dollars spent each year on "consulting services", "advertising, representation or artistic services" and "administrative consultancy services", all categories listed in the Puerto Rico contract database, with huge expenditures associated with each category?

For example: I reviewed Puerto Rico's on-line contract database (https://contratos.ocpr.gov.pr/) on June 13, 2021 and identified the following amounts for the period July 1, 2020 to June 13, 2021 (less than a year) for the following expenditure categories:

- "Advertising, Representation of Artistic Services": $81,539,093.91;
- "Consulting Services": $492,292,752.04.

Also, one could save hundreds of millions of dollars by eliminating Christmas bonuses to public employees until Puerto Rico gets its house in order and pays its Constitutional "first claim" debt. Whatever the merits of these expenditures in the abstract, these expenditures are indefensible at a time Puerto Rico is not paying its Constitutional "first claim" GO debt.

Since FOMB is asserting that courts would permit an invocation of "police power" to pay all operating expenses and full pensions before debt service on GO bonds (*e.g.*, #16927-page-19,34-35,37-38,41-of-113), there needs to be clear, detailed disclosure of expenditures that could be challenged at a time when Commonwealth is claiming an inability to pay its Constitutional "first claim" GO debt — of which there surely are many, amounting to hundreds of millions or billions of dollars per year. "Police powers" to override Commonwealth's Constitution surely cannot mean every imaginable contract for "consulting services", "advertising, representation or artistic services" or "administrative consultancy services," or tax incentives, or "Christmas bonuses".

A first step should be to disclose information specified in my June 9 Response and Objection (#16908-page-35-to-38-of-178). Furthermore:

- It should be clearly disclosed whether expenditures (excluding pensions) have gone up since FY15.

- There should also be a simplified bar chart presentation showing, for FY15 through FY21, (i) total expenditures (excluding pensions), (ii) expenditures not covered by federal funds, (iii) expenditures covered by federal funds, (iv) debt service actually paid, and (v) pensions (including PayGo payments).
- Disclose a breakdown of the annual amount of tax incentives and identify those that could potentially be reduced. For example, if Puerto Rico has $21+ billion annual tax incentives, reducing the money not collected in tax incentives by even only 10% a year would save over $2 billion per year.
- Disclose why there is no consideration of asset sales and what analysis has been done of potential asset sales.

There should also be a disclosure of whether Commonwealth has consented to, or is subject to, suit outside of Puerto Rico.

(c) Pension expenditures are shown at over $2.2 billion a year. #16927-page-49-of-113. Why is it assumed that these expenditures will continue even while Constitutional "first claim" GO debt service is not paid in full? Pension payments to retired public employees are not payments for ongoing operating functions, since the recipients are by definition retired and not working. The retired public employees are creditors, who under the Puerto Rico Constitution rank below GO bondholders in priority. There should be an alternative presentation showing payment in accordance with Constitutional priorities, *i.e.*, all GO debt service first. (This treatment of public employee pension costs is not only what the Puerto Rico Constitution requires, but also likely does not in practice pose the adverse consequences to the retirees that may be claimed. If Puerto Rico had to pay full GO debt service, public officials would be incented to find other savings, either reduced expenditures or reduced tax incentives, or both, in order to continue to pay reasonable levels of pensions. But so long as public officials think they can get away with not paying Constitutional "first claim" GO debt, wasteful spending and unnecessary tax incentives (often driven by political favoritism) continue, since the public

officials are not required to make choices as to what expenditures to prioritize, or which of the $21+ billion in tax incentives can be dropped.)

(d) Exhibit N is premised on the assumption FOMB will continue to exist, and thus Commonwealth will still need to fund operations of FOMB through the period of analysis. (#16927-page-8-of-113) Strangely the analysis does not show the ongoing expense for the operations of the FOMB doing much good to actually "right the ship", get timely audited financial statements disclosed, improve the ease of doing business and bring expenses down or adjust revenues as appropriate so that Puerto Rico can pay its Constitutional "first claim" GO debt, as its Constitution requires. And what exactly is the annual cost of FOMB? It does not appear on page 8 and if it is buried elsewhere in the document I could not find it. A breakdown of the costs of FOMB should be clearly disclosed.

**(9) There should be a prominent disclosure of applicable provisions of the Puerto Rico Constitution.**

There is an Exhibit of "Allocable Revenue Statutes" which has a number of references to Article VI, Section 8, yet I only found the text quoted once in Exhibit N, buried on page 85 (#16927-page-85-of-113). There should be a prominent disclosure of pertinent provisions of the Puerto Rico Constitution; in particular that the Puerto Rico Constitution states in Article VI, Section 8, that "in case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law". That is why each official statement stated "The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a *first claim* on available Commonwealth resources" (emphasis added). That is why Puerto Rico has acknowledged that "The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues." (#16927-page-82,83-of-113). As noted in my June 9 Response and Objection, there has been no adjudication that the bonds I own are invalid, or that

the Constitutional and statutory liens that provide added security for the bonds are invalid. #16908-page-7-of-178. One may understand the strong political imperative for why Puerto Rico officials would want to continue spending at current levels, but Commonwealth's Constitution requires first paying Puerto Rico's GO debt.

**(10) There should be a disclosure in Exhibit N of what costs would have been avoided had Commonwealth simply paid its GO debt.**

Had the Title III not been filed, but Puerto Rico simply continued to pay its Constitutional "first claim" GO debt, what would be the aggregate spent to date since May 2017 on paying its debt (interest and amortization of principal)? And would that be less than the sum of (i) current cash on hand, plus (ii) the massive expenditures to date, since May 2017, on these Title III proceedings, plus additional massive expenditures prior to the filing of the Title III directed at looking for ways to avoid payment of Puerto Rico's debts? It is no answer to say that that is "water over the dam". If Puerto Rico could have paid its Constitutional "first claim" GO debt and avoided the burdens and expenses of the Title III, that fact could well be instructive as to whether applicable courts would, as one should expect, apply Puerto Rico's Constitution as written to require payment of GO debt, and thereby prompt public officials to make the responsible choices that in the medium and longer-term will leave the citizens of Puerto Rico better off.

**(11) The presentation of financial tables based on assumptions concerning validity of the bonds is misleading.**

Assumptions are made in the analysis, such as the assumption that GO bonds issued in and after 2012, or in or after March 2011, will be invalidated. The stated "basis" for these assumptions is that "the Oversight Board, through its Special Claims Committee, and the statutory unsecured claimholders' committee … commenced litigation" so claiming, and that UCC "challenged claims relating to GO bonds". #16927-page-48-of-113. But that litigation and those challenges have gone nowhere. The failure to prosecute these claims to decision in the over four years FOMB has been in place speaks volumes to the fact these are contrived

challenges asserted for tactical purposes to attempt to unjustly discount Puerto Rico's Constitutional debt. Assuming allegations that have never been pressed to decision as true for purposes of a purported financial analysis is misleading.

**(12) There needs to be a disclosure of the effect of HB-120 on pension expenditures and Plan feasibility.**

I did not see any discussion in Exhibit N of HB-120, what the impact of HB-120 is likely to be on Puerto Rico's finances, FOMB's expressions of views to the Legislature and/or Governor of Puerto Rico concerning HB-120, the current status of HB-120 (as I understand it, HB-120 has been enacted into law), and the impact of HB-120 on Plan feasibility, including the ability of Puerto Rico to pay all GO debt even by the terms proposed in the Plan.

The foregoing would appear to be highly material. An April 28, 2021 letter FOMB advised Puerto Rico Senator Zaragoza that "the Oversight Board has determined the Bill [HB-120] would impair or defeat the purposes of PROMESA"; and that "HB-120 seeks to seize control over the Commonwealth's debt restructuring and usurp the exclusive power of the Oversight Board and the Court to confirm a plan of adjustment under PROMESA section 312."[1] Particularly if HB-120 has been signed by the Governor of Puerto Rico and enacted into law, as news reports suggest, there needs to be a full disclosure of this matter and the implications to the feasibility of the Plan and (even if the Plan were confirmed) the likelihood bondholders would receive full payment of even the adjusted principal and interest due them under the Plan.

**(13) Disclosure of aggregate payments to McKinsey.**

There should be a disclosure in the Disclosure Statement of the aggregate amounts paid to date by FOMB, Commonwealth and any other Commonwealth entities to McKinsey (in all of its different McKinsey entity forms, not just whatever particular McKinsey entity worked on this report). The aggregate amount paid to McKinsey entities for their work for FOMB or

[1] This letter can be located on the FOMB website, https://oversightboard.pr.gov/, click on "Documents", type "HB-120" into the search box.

Commonwealth or its other entities is pertinent to a creditor's evaluation of what might influence McKinsey's work using the unverified information and assumptions it has been provided.

**(14) Disclosures concerning Commonwealth's willingness to pay its Constitutional "first claim" GO debt.**

Exhibit N, in Exhibit 1, #16927-page-10-of-113, shows "unrestricted CW cash balance" as of 6/30/2021 of $11.004 billion. Puerto Rico's most recent TSA cash flow report as of 5/28/2021 shows TSA cash on hand of $11.636 billion (over $600 million greater), and notes that "State collections are $1,586 million ahead of plan", with a YTD net cash flow variance of $1,957. (TSA reports are available on the AAFAF website. Click on "financial documents", then "treasury single account (TSA) liquidity".) None of these amounts are unrestricted. In addition, Puerto Rico's aggregate amount in bank accounts as of 4/30/2021 was $20.9 billion, per a June 2, 2021 summary of bank account balances as of 4/30/2021 (also available on the AAFAF website; click on "summary of bank account balances"), a portion of which is restricted.

The size of the cash balances raises obvious issues as to why no interest whatsoever has been paid (not even for bonds that are unchallenged) since January 2017 (even though pensions have been paid on an ongoing basis) and whether there is a fundamental unwillingness to pay Commonwealth's Constitutional "first claim" GO debt. Yet I see no discussion in Exhibit N of why a bondholder should think Commonwealth will in fact be willing to make the future payments required on the adjusted New GO bonds.

***

In light of the limited time I have had to review and analyze the belatedly-filed Exhibit N, I reserve and preserve all rights to further supplement this objection based on additional analysis or information.

June 15, 2021

Respectfully Submitted,

/s/ Peter C. Hein

Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY 10023
petercheinsr@gmail.com
Claim 10696
GO Bonds: 500,000 par amount, plus unpaid interest to date
[5 separate CUSIPS: 74514LVX2
74514LWA1
74514LWM5
74514LWZ6
74514LB63]
PBA Bonds: 200,000 par amount, plus unpaid interest to date
[CUSIP: 745235M24]

**Declaration pursuant to 28 U.S.C. §1746**

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Executed on this 15th day of June 2021.

/s/ Peter C. Hein
Peter C. Hein

**Certificate of Service**

I, Peter C. Hein, certify that I have caused the foregoing Supplement to Response and Objection of Individual Bondholder to Debtors' Motion to Approve Disclosure Statement to be served via the Court's CM/ECF system.

June 15, 2021



/s/ Peter C. Hein
Peter C. Hein