## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

        Debtors.[1]

PROMESA
Title III

Case No. 17-03283 (LTS)

(Jointly Administered)

**OBJECTION OF U.S. BANK AS TRUSTEE FOR THE PUERTO RICO
PUBLIC FINANCE CORPORATION BONDS TO THE AMENDED JOINT MOTION
OF THE COMMONWEALTH OF PUERTO RICO,  ET AL. FOR AN ORDER (I)
APPROVING THE DISCLOSURE STATEMENT FOR THE THIRD AMENDED TITLE
III JOINT PLAN OF ADJUSTMENT, (II) FIXING VOTING RECORD DATE, (III)
APPROVING CONFIRMATION HEARING NOTICE AND CONFIRMATION
SCHEDULE,  (IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION
PROCEDURES, (V) APPROVING FORMS OF BALLOTS, AND VOTING AND
ELECTION PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING STATUS,
(VII) FIXING VOTING, ELECTION, AND CONFIRMATION
DEADLINES, AND (VIII) APPROVING VOTE TABULATION PROCEDURES**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III Case numbers are listed as Bankruptcy Case numbers due to software limitations) (collectively the "**Debtors**").

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ...................................................................................1
II.     JURISDICTION AND VENUE ..................................................................................3
III.    BACKGROUND FACTS RELATING TO THE BONDS AND DISCLOSURE
        INADEQUACIES...........................................................................................................3
        a.      Public Finance Corporation Is Created And Issues Bonds ....................................3
        b.      The Trust Agreement ..........................................................................................5
        c.      The Public Finance Corporation's Statutory Structure............................................9
        d.      PROMESA and the Debt Moratorium Acts.........................................................10
        e.      The GDB Letters of Credit and Bank Deposit Claims ...........................................12
        f.      The GDB Claims Against the Commonwealth.......................................................15
        g.      The Trustee's Proof of Claim. ..........................................................................16
        h.      Preemption of Appropriation Rights..................................................................17
        i.      Releases and Exculpations................................................................................22
        j.      Liquidation and wind-down or other disposition of Public Finance Corporation. 23
        k.      Solicitation and Voting Procedures/Payment of Trustee Fees and Costs. ............23
IV.     LEGAL ARGUMENT..................................................................................................25
        a.      The Proposed Disclosure Statement Does Not Provide Adequate Information as
                Required by Section 1125 of the Bankruptcy Code................................................25
        b.      The Disclosure Statement Does Not Provide Adequate Information on the scope of
                Releases under the Plan, and the Parties to be Released/Exculpated ...................27

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re ACEMLA De Puerto Rico Inc.*,
   2019 WL311008 (Bankr. D.P.R. Jan. 22, 2019) ....................................................25

*In re Clamp-All Corp.*,
   233 B.R. 198 (Bankr. D. Mass. 1999) ...........................................................25, 26

*In re E. Maine Elec. Co-op., Inc.*,
   125 B.R. 329 (Bankr. D. Me. 1991)......................................................................26

*In re Ferguson*,
   474 B.R. 466 (Bankr. D.S.C. 2012) ......................................................................26

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) ................................................................25, 26

*In re Lower Bucks Hosp.*,
   471 B.R. 419 (Bankr. E.D. Pa. 2012) ...................................................................27

*In re M.J.H. Leasing, Inc.*,
   328 B.R. 363 (Bankr. D. Mass. 2005) ..................................................................27

*In re Oxford Homes, Inc.*,
   204 B.R. 264 (Bankr. D. Me. 1997)......................................................................26

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996)....................................................................................26

**Statutes**

7 L.P.R.A § 552 ...............................................................................................................3

23 L.P.R.A. § 104 ...........................................................................................................21

11 U.S.C § 105(a) ...........................................................................................................27

11 U.S.C. § 1125(a)(1)....................................................................................................25

11 U.S.C. 1125(b) ...........................................................................................................25

Debt Moratorium Act (Act No. 21 of 2016) ..................................................................10

PROMESA § 301(a) ..................................................................................................25, 27

PROMESA § 306(a) ................................................................................................3

PROMESA §307(a) ................................................................................................3

PROMESA §405 ..................................................................................................11

Puerto Rico Constitution Article VI, Section 8 ........................................................21

UCC 1 ..................................................................................................................6

**Other Authorities**

Fed. R. Bankr. P. 3016(c) ......................................................................................27

iii

U.S. Bank Trust National Association ("**USBT**") and U.S. Bank National Association ("**USBNA**") (collectively, "**U.S. Bank**" or the "**Trustee**"), solely in their capacity as Trustees for bonds issued by the Puerto Rico Public Finance Corporation ("**PFC**" or **Public Finance Corporation**"), assert the following Objections ("**Objection**") to the Disclosure Statement (the "**Disclosure Statement**") for the Third Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al. (the "**Plan**"), and to the Solicitation Procedures Motion with respect to the Plan and Disclosure Statement (the "**Solicitation Procedures Motion**").

## I.    PRELIMINARY STATEMENT

1.    The Trustee objects to the adequacy of the Disclosure Statement on the following grounds:

- Class 60 of the Plan, as described in the Disclosure Statement "consists of all claims against the Commonwealth arising from or related to (a) indebtedness payable from appropriations of the Legislature of Puerto Rico (the "**Legislature**") under existing loans or legislative resolutions (including notes held by the Public Finance Corporation for the repayment of the Public Finance Corporation indebtedness), and (b) loans payable from appropriations by the Legislature under existing laws or legislative resolutions held by the GDB Restructuring Authority or the GDB Public Trust." *See* Disclosure Statement at. 414. Class 60 receives no distribution under the Plan, and the claims (which are not identified in any detail and are not quantified in the Disclosure Statement) are impaired and deemed to reject the Plan.

- The Disclosure Statement fails to adequately explain and justify (i) the elimination under the Plan of not just the claim filed by the Trustee against the Commonwealth, but apparently all of the liabilities of the Public Finance Corporation on its bonds (the "**Bonds**" as further defined below) and the various governmental affiliates and instrumentalities more fully described below as the Authorized Debtors which issued the Notes (the "**Notes**") pledged to the Trustee to secure the Bonds (none of whom are Debtors in these Title III cases), and (ii) the related GDB Claims (as defined below) in which Public Finance Corporation bondholders have a beneficial economic interest, for no consideration, thereby wiping out the rights of institutional and retail bondholders who hold over $1 billion of funded debt claims on account of the Bonds. The Disclosure Statement is inadequate both as a source of information to holders of the Bonds who may wish to object to the Plan, and as

1

a source of information for other classes of creditors who may be led to believe that the obligations under the Bonds and the notes pledged as security for the Bonds to the Trustee cannot impact their own recoveries.

- Thus, the Plan appears to eliminate any source of recovery whatsoever for the holders of the Bonds, many of whom are, on information and belief, retail investors located in Puerto Rico. The Disclosure Statement fails to explain the legal and factual justification for this wholesale eradication.

- Among other things, the Disclosure Statement fails to explain (i) the basis for the abrogation of the contractual obligations of the Public Finance Corporation and the Office of Management and Budget (the "**OMB**") to seek legislative appropriations (as defined below) to pay the Notes (defined below) issued by both independent public corporations and instrumentalities of the government and pledged to secure the Bonds, (ii) the treatment to be provided to the GDB Claims in which the Public Finance Corporation and its bondholders have a financial interest, (iii) the intention of the FOMB or the Commonwealth with respect to the disposition of the Public Finance Corporation entity and any of its other assets or liabilities, including the Defeasance Fund defined below, and (iv) the broad release and discharge under the Plan of claims by or against Debtor and non-debtor Puerto Rican governmental affiliates and instrumentalities, and by and between unspecified third parties and entities that are not debtors in these Title III Cases (as defined below), and what the impact on the rights of the Public Finance Corporation, the Trustee and the Public Finance Corporation bondholders, including in connection with the GDB Claims, would be.

- The information provided in the Disclosure Statement is inadequate for any party in interest to understand what the intended disposition is of the Public Finance Corporation, whether and how it is to be liquidated, and what provision, if any, is made for the disposition of Public Finance Corporation assets and liabilities, and the funding of the Trustee's ongoing duties including maintenance of the Defeasance Fund described below, and indemnity and compensation rights for the Trustee under the Public Finance Corporation Trust Agreement.

- The Disclosure Statement is inadequate with respect to the mandatory disclosures regarding the scope and purpose of the Plan releases generally, including third-party releases, which may impact the Public Finance Corporation, the Trustee and the Bonds, and must be amended to make the existence and the scope of these releases clear. The Disclosure Statement fails to disclose whether the Trustee is exculpated and released under the Plan, and if not, why not.

- The Solicitation Procedures Motion fails to specify the duties and role of the Trustee in providing notices ("**Notices**") or other distributions to holders of the

Bonds, and fails to make provision for the payment of costs of the Trustee in administering the Bonds and implementing the Plan if it is confirmed.

## II.    JURISDICTION AND VENUE

2.    The United States District Court for the District of Puerto Rico (the "**Court**") has subject matter jurisdiction over this Objection pursuant to PROMESA section 306(a).

3.    Venue is proper in this district pursuant to PROMESA section 307(a).

## III.    BACKGROUND FACTS RELATING TO THE BONDS AND DISCLOSURE INADEQUACIES

### a.    Public Finance Corporation Is Created And Issues Bonds

4.    Pursuant to Art. 2 of Act 17 of September 23 1948, 7 L.P.R.A § 552, and Resolution 5044 of 1984, the board of directors of the Puerto Rico Government Development Bank (the "**GDB**") created the Puerto Rico Public Finance Corporation as a subsidiary of the GDB to issue funded debt, such as the Bonds, in order to provide government agencies and instrumentalities of Puerto Rico with alternate means of meeting their financing requirements.  The Public Finance Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico separate and apart from the GDB.  Trust Agreement, Preamble, Second Paragraph.

5.    In 2011 and 2012, the Public Finance Corporation issued corporate bonds in the public and retail markets of the U.S. and Puerto Rico pursuant to a Trust Agreement between the Public Finance Corporation and USBT dated June 1, 2004 (the "**Trust Agreement**").  USBT is Trustee for the Series 2011A (Commonwealth Appropriation Bonds) and Series 2011B (Commonwealth Appropriation Bonds), and USBNA is Trustee for the Series 2012A

(Commonwealth Appropriation Bonds) (the foregoing collectively, the "**Bonds**").[2] As of June 30, 2016, the outstanding principal balances of the Series 2011A, 2011B and 2012A Bonds are approximately $242.4 million, $437.6 million, and $410.7 million, respectively.

6.      The total principal amount outstanding on the Bonds is approximately $1,090,740,000.00 (One billion ninety million seven hundred forty thousand dollars).  Interest, fees and costs and other amounts due and payable under the Trust Agreement, including the Trustee's fees, costs and expenses including reasonable fees and costs of outside counsel, have also accrued and remain unpaid as of the date hereof.

7.      The Bonds, pursuant to various Supplemental Debt Restructuring and Assignment Agreements executed on June 1, 2004, essentially funded the refunding and restructuring of prior indebtedness incurred in connection with loans by the GDB to the various Authorized Debtors for the build-out of infrastructure projects and other economic development projects by various government agencies and public corporations around Puerto Rico.

8.      The Public Finance Corporation is not a Debtor under the Plan, and no Title III or Title VI case has been commenced for it by the FOMB.

9.      The outstanding Bonds – Series 2011A, 2011B and 2012A – were backed by Letters of Credit (each an "**LOC**") issued by the GDB (collectively, the "**GDB Letters of Credit**"), which could be drawn by the Trustee according to their specified terms and timing, if

---

[2] Capitalized Terms used herein include defined terms set forth in the Trust Agreement.

the amounts due under the Bonds and the Authorized Debtors' Notes were not funded when due. Specifically:

> (a) The 2011A LOC provides for a potential draw in 2028 of $142,473,913.00.
>
> (b) The 2011B LOC provides for a potential draw in 2025 of $24,250,000.00; 2028 of $10,481,350.00; 2029 of $63,187,100.00; and in 2031 of $3,375.00.
>
> (c) The 2012A LOC provides for a potential draw in 2023 of $1,648.00; in 2024 of $422.00; in 2025 of $1,825.00; in 2027 of $1,504,155.00; in 2028 of $1,510,580.00; and in 2032 of $48,310,000.00.

**b.    The Trust Agreement**

10.    The Trust Agreement recites in the Preamble the following legislative foundations for the Public Finance Corporation and its liabilities, and recites the various pledges and covenants made in furtherance of the issuance of the Bonds:

> (i)    By Act Number 17 approved 1948, as amended, the GDB was created with the powers to create subsidiaries whenever in the opinion of its Board such creation was advisable or desirable or necessary to carry out the functions or the purposes of GDB; by Resolution 5044, 1984, as amended, of the Board of GDB, the Public Finance Corporation was created as a subsidiary of the GDB, constituting an independent governmental instrumentality of Puerto Rico separate and apart from the GDB, which Resolution further authorized  the Public Finance Corporation to borrow money for its corporate purposes, including by issuing bonds, and "by the authority of the Government of Puerto Rico" issue its notes in the form and secure them in the manner determined by its Board of Directors. Additional "**Legislative Acts**" as defined in the Trust Agreement, included Act 164 (2001); Act 85 (1998); Joint Resolution 523 (2000); Act 113 (1994); and any other Act or Joint Resolution of the Legislature which authorizes the issuance of bonds which are refunded in whole or in part with the proceeds of the Bonds issued by Public Finance Corporation.
>
> (ii)    Pursuant to the Acts, the Authorized Debtors were required to execute Notes evidencing the obligations of such Authorized Debtors to the GDB.  Each Act provides that the OMB "shall" include in the annual budget of the Commonwealth the amount necessary to make payments of the debt obligations of the Authorized Debtors relating to the GDB loans, as restructured from time to time.  Prior Debt Restructuring and Assignment Agreements between the GDB, the Authorized Debtors and the Public Finance Corporation had created the Notes and provided for payment of the

5

bonds issued by the Public Finance Corporation from time to time to finance the purchase of the Existing Notes from the GDB.  A further such restructuring was entered into simultaneously with the Trust Agreement, providing for restructuring and refunding of certain of the Existing Notes which together with all other Notes executed by the Authorized Debtors are referred to as the Parity Notes ("**Parity Notes**"), and are payable from the proceeds of annual appropriations to be made by the Legislature.

11.    The Bonds were issued as limited obligations of the Public Finance Corporation, and the Parity Notes were assigned by the GDB and the Authorized Debtors to the Trustee as Pledged Revenues ("**Pledged Revenues**") to secure payment of the Notes.[3] Numerous other Puerto Rican agencies and instrumentalities received the benefits of the financing to which the Bonds related, and issued Notes reflecting loans from the GDB which were funded or refinanced by Bond proceeds.  Under the Trust Agreement, these entities are designated as the "**Authorized Debtors**."[4] The Notes stated that they were payable solely from payments of principal of and interest from legislative appropriations.  In addition, the GDB issued the Letters of Credit to the Trustee as further security for the Bonds and a source of payment apart from legislative appropriations.[5]

12.    Article IV, Section 401 of the Trust Agreement provides that "[the Public Finance Corporation] shall cause the Secretary of the Treasury of the Commonwealth to transfer to the

---

[3] As defined in the Trust Agreement, the "Pledged Revenue" for the Bonds means "all of [the Public Finance Corporation's] right, title and interest in and to (i) all amounts paid and to be paid in respect of the Notes, (ii) all moneys and Investment Obligations on deposit to the credit of the Sinking Fund, (iii) Hedge Counterparty Swap Payments, if any, and (iv) all investment earnings on the foregoing.

[4] The Authorized Debtors include (i) the Department of Health of the Commonwealth of Puerto Rico, (ii) the Department of the Treasury of the Commonwealth of Puerto Rico, (iii) the Puerto Rico Infrastructure Authority,  (iv) the Puerto Rico Solid Waste Authority, (v) the Puerto Rico Aqueduct and Sewer Authority, (vi) the Puerto Rico Land Authority, (vii) the Puerto Rico Sugar Corporation, (viii) the Office for the Improvement of Public Schools, (ix) the Puerto Rico Maritime Shipping Authority, (x) the Housing Bank and Finance Agency of Puerto Rico and its successor in interest, the Puerto Rico Housing Finance Authority, (xi) the Hotel Development Corporation, and (xii) any other debtor of the Public Finance Corporation or the GDB for which the Corporation has issued prior bonds. Trust Agreement at 7.

[5] In 2015, 2018 and 2020, the Trustee filed UCC 1 Statements, amendments, and continuation statements against Public Finance Corporation relating to the Pledged Revenues.

6

Trustee, no later than July fifteen (15) of each Fiscal Year while the Bonds are Outstanding, funds representing the entire Legislative Appropriation for such Fiscal Year."

13.     Article VI, Section 601 of the Trust Agreement provides in relevant part that "[the Public Finance Corporation] covenants that it will promptly pay the principal of and interest on every Bond issued hereunder and secured hereby…. Such principal, interest and premium, if any, … are payable solely from the payments received in respect of the Notes and the Pledged Revenues…." That section goes on to state that "Nothing in the Bonds or in this Agreement shall be deemed to constitute the Bonds a debt or obligation of the Commonwealth or any of its instrumentalities (other than the Public Finance Corporation or political subdivisions… ." However, this provision ignores the obligations of the GDB under the Letters of Credit, and the obligations of the Authorized Debtors under the Notes.

14.     Article VI, Section 602 provides that "[the Public Finance Corporation] covenants and agrees that, so long as any of the Bonds shall be Outstanding … none of the Pledged Revenues will be used for any purpose other than as provided in this Agreement, and that no contract … will be entered into or any action taken by which the rights of the Trustee, [or] the Holders… secured by this Agreement to such Pledged Revenues might be impaired or diminished. …"

15.     Article VI, Section 603 of the Trust Agreement provides that "Each year while any Bonds are Outstanding, [the Public Finance Corporation] shall file a timely request with the Director of the Office of Management and Budget of Puerto Rico to include in the annual budget of capital improvements and operating expenses of Puerto Rico for the next Fiscal Year the necessary Legislative Appropriation so that payments in respect of the Notes shall be sufficient to

7

cover the principal and interest payable with respect to the Bonds and all other amounts payable

in respect of the Bonds or payable under this Agreement during the next Bond Year…."[6]

16.     Sections 604 and 605 contain additional covenants by the Public Finance

Corporation to take all actions available under the laws of the Commonwealth to ensure that all

amounts due and payable under the Notes are timely paid, and to take any action available under

the laws of the Commonwealth to enforce such payment, and to faithfully perform all covenants

contained in the Trust Agreement.  To the extent the Commonwealth used its powers of control

over the Public Finance Corporation to abrogate these covenants, the Trustee asserted a protective

claim for damages.

17.     In Article VIII, Section 802, the Public Finance Corporation agrees to indemnify

the Trustee for any fees and expenses, loss or liability including fees and expenses of its agents

and counsel incurred without negligence on its part, arising out of or in connection with the

administration of the trust or in connection with the exercise or performance of any of its powers

and duties, all such obligations being payable solely from Pledged Revenues.  Under Section 804,

the Public Finance Corporation is to pay the Trustee compensation as agreed in writing between

the Public Finance Corporation and the Trustee for all services rendered thereunder and all

reasonable expenses, charges and other disbursements and those of its attorneys, agents and

employees incurred in the administration and execution of the trusts, and the performance of its

powers and duties.  The provisions of Section 802 survive the termination of the Trust Agreement.

---

[6] Upon information and belief, Public Finance Corporation made those requests until its obligation was allegedly
abrogated by the Moratorium Orders discussed below.

18.     Article XIII of the Trust Agreement addresses the Trustee's rights to draw on the GDB Letters of Credit, as discussed below.

19.     Article III of the Trust Agreement addresses the redemption of Bonds.   In connection with the execution of the Trust Agreement, the Trustee and Public Finance Corporation entered into an Escrow Agreement relating to the Series B – Act 164 Bonds providing for refunding or defeasance of various bonds outstanding at that time.  Of the funds deposited with the Trustee, approximately $35 million remains in escrow held in trust for the benefit of holder of the 2001 Series E bonds, which mature or are redeemable on August 1, 2026 and August 1, 2027 (the "**Defeasance Funds**").  The Trustee is obligated to maintain, invest and distribute these funds in future years.

### c.   **The Public Finance Corporation's Statutory Structure**

20.     The legislation adopted by the Legislature of Puerto Rico as described above (the "**Appropriation Acts**") require the OMB, an agency of the central government, to include in the annual operating budget of the Commonwealth certain [Legislative Appropriations] required to enable the Authorized Debtors to pay debt service on the Notes.[7]

21.     These "**Legislative Appropriations**" are the "Budgetary Appropriations appropriated by the Legislature of Puerto Rico for the payment of the Notes pursuant to the provisions of the Acts or, in the case such budget of the Commonwealth for any Fiscal Year has not been approved by the commencement of such Fiscal Year, until such budget is approved, the funds representing the Budgetary Appropriations for the previous Fiscal Year for the payment of

---

[7]  The Department of Health and the Department of the Treasury are departments of the Commonwealth.

the Notes pursuant to the provisions of the Act in accordance with Article VI, Section 6 of the Constitution of the Commonwealth."

22.     The failure of the legislature to make a Legislative Appropriation in an existing budget would cause such obligation to roll over into subsequent budget years unless new budgets were enacted which appropriated the amounts needed to fund the Notes and the Bond payments. Any deficiency in particular years is backed by the GDB Letters of Credit described above.

     **d.   PROMESA and the Debt Moratorium Acts.**

23.     On or about April 6, 2016, the Government of Puerto Rico adopted the Debt Moratorium Act (Act No. 21 of 2016) (the "**Debt Moratorium Act**").  Section 201 of the Debt Moratorium Act authorized the Governor of Puerto Rico to declare an "emergency period" for a government entity, which automatically created a stay against actions for the recovery of any covered obligation, subject to certain carve-outs or exceptions, or the exercise of any claims or other rights by a Trustee that receives or holds funds from an entity subject to the stay as a result of the non-payment of any obligation arising under or related to a covered obligation.  Section 201 of the Debt Moratorium Act also authorized the Governor to suspend or modify any statutory or other obligation to transfer money to pay or secure any covered obligation during an emergency period.  Reference is made to the Debt Moratorium Act for a full statement of its provisions, and the relevant definitions contained therein.

24.     On or about June 30, 2016, the Governor of Puerto Rico issued Executive Order 2016-030, which among other actions, suspended the obligations of the OMB to include appropriations in the budget presented to the Legislative Assembly for payment of the Bonds. Subsequently, Section 10 of Executive Order 2016-031 declared an emergency for the Public

Finance Corporation and suspended any obligation to request inclusion of an appropriation in the

proposed budget for the payment of the Bonds issued by the Public Finance Corporation and any

obligation to cause the Secretary of the Treasury to transfer such appropriation to the Trustee.

25.     Reference is made to Executive Orders 2016-030 and 2016-031 for a full statement

of their provisions, and the relevant definitions contained therein.  The Moratorium Orders, which

declared an emergency for the Public Finance Corporation and purported to relieve the Public

Finance Corporation and the OMB of their obligations to seek payment of the Notes pledged as

collateral for the Bonds ("**Moratorium Orders**"), are presently set to expire on June 30, 2021.

26.     On or about June 30, 2016, President Obama signed into law the Puerto Rico

Oversight, Management, and Economic Stability Act ("**PROMESA**").  Section 405 of PROMESA

provided for a stay with respect to enforcement of Liability Claims as defined therein, on the terms

set forth in PROMESA.  The PROMESA stay expired in May 2017 as to any entity that is not in

a Title III or Title VI proceeding under PROMESA.  Title I of PROMESA established the FOMB

which was given the mandate to "provide a method for a covered territory to achieve fiscal

responsibility and access to the capital markets."  Reference is made to PROMESA for a full

statement of its provisions, and the relevant definitions contained therein.

27.     Cases were commenced under Title III of PROMESA by the FOMB for (a) the

Commonwealth of Puerto Rico (b) the Puerto Rican Sales Tax Financing Corporation; (c) the

Puerto Rico Highways and Transportation Authority; (d) the Employees Retirement System of the

Government of the Commonwealth of Puerto Rico; and (e) the Puerto Rico Electric Power

Authority in the United States District Court for the District of Puerto Rico (the "**Court**").[8]  On

September 27, 2019, a Title III Case was commenced in the Court for the Puerto Rico Public

Buildings Authority ("**PBA**").  The Title III Cases are referred to collectively herein as the "**Title**

**III Cases**."

### e.   The GDB Letters of Credit and Bank Deposit Claims

28.    As noted above, Article XIII of the Trust Agreement provided the Trustee's rights

to draw on the GDB Letters of Credit.

- Section 1301 states that: "If (i) the Trustee has not received by the close of business

  on the third [b]usiness [d]ay preceding August 1 of any Fiscal Year during the term

  of the Bonds written notice signed by the President that an operating budget for the

  Commonwealth for such Fiscal Year has been duly adopted by the Legislature of

  Puerto Rico and approved by the Governor of Puerto Rico and is then in effect, and

  (ii) the Trustee has not otherwise received funds representing the full amount of the

  principal and interest due with respect to the Bonds for the Bond Year commencing

  within such Fiscal Year, the Trustee shall draw, before 5:00 pm on the second

  [b]usiness [d]ay preceding   August 1, under the GDB Letters of Credit in

  accordance with the respective terms thereof an amount which … is sufficient to

  pay the principal of or interest on the Bonds due during such Bond Year …."

- Section 1303 states that "The Trustee shall comply with the procedures set forth in

  the GDB Letters of Credit."

---

[8] Information on the Title III Cases can be found at https://cases.primeclerk.com/puertorico/Home-Index. Information
regarding the FOMB and the actions it has taken can be found at https://juntasupervision.pr.gov/index.php/en/home.

29.     In accordance with the Trust Agreement, the GDB issued three letters of credit relating to the Series 2011A, 2011B and 2012 Bond series the Drawing provisions of which cited below are substantially the same in each LOC, stating as follows:

> 2. Drawing. Subject to the terms and conditions set forth herein, the Bank hereby irrevocably authorizes the Trustee to draw on the Bank on or before the Termination Date, by means of a duly signed and completed certificate in the form of Exhibit 2 hereto (the "Drawing Certificate"), an aggregate amount not to exceed in any Fiscal Year the Stated Amount for such Fiscal Year as set forth in Schedule A hereto (the "Stated Amount") if (i) the Trustee has not received by the close of business on the third Business Day preceding August 1 of any Fiscal Year (as defined in the Trust Agreement) during the term of the 2012 Series A Bonds written notice signed by the President or any Executive Vice President of the Corporation that an operating budget for the Commonwealth of Puerto Rico for such Fiscal Year has been duly adopted by the Legislature of Puerto Rico and approved by the Governor of Puerto Rico and is then in effect, and (ii) the Trustee has not otherwise received funds representing the full amount of the principal and interest due with respect to the 2012 Series A Bonds for the Bond Year (as defined in the Trust Agreement) commencing within such Fiscal Year. The delivery of such Drawing Certificate hereunder which is honored by the Bank is referred to herein as a "Drawing." Upon the payment to the Trustee or the Trustee's account of the amount specified in a Drawing hereunder, the Bank shall be fully discharged of the Bank's obligation under this Letter of Credit with respect to such Drawing, and the Bank shall not be obligated thereafter to make any further payments under this Letter of Credit in respect of such Drawing to the Trustee or to any other person who may have made to the Trustee or who makes to the Trustee a demand for payment under the 2012 Series A Bonds. 2012 Letter of Credit at A-2.

30.     The Public Finance Corporation has not made any payments of debt service on the Bonds to the Trustee since August 2015.

31.     Under the Commonwealth's Constitution, if the annual budget of capital expenditures and operating expenses of the Commonwealth for a fiscal year has not been adopted

13

by the last day of the preceding fiscal year (June 30), the budget for the preceding fiscal year is

automatically renewed for the ensuing fiscal year, until a new budget for such succeeding fiscal

year is approved by the Legislature and the Governor.

32.    The FOMB argues that the GDB Letters of Credit are not intended to and do not

cover the risk that no appropriation is made by the Legislature under any Appropriation Act for

any particular fiscal year, or that an appropriation is made in an amount lower than the amount of

debt service on the Notes due with respect to any fiscal year.  The FOMB contends that, if the

budget for any fiscal year is adopted but no appropriation for the payment of the Notes is included

in such budget, or an appropriation is made in an amount lower than the amount of debt service on

the Notes, the Trustee may not make a drawing under the LOC's.

33.    However, the FOMB's argument is directly undercut by the controlling terms of

the Letters of Credit, which, as noted above, have two unequivocal requirements for a draw: (1)

the failure of the Legislature to adopt an operating budget; and (2) a shortfall in the payment of

principal and interest to the Trustee.  Nothing more is required under the Letters of Credit.

Moreover, Section 1303 of the Trust Agreement states that "[t]he Trustee shall comply with the

procedures set forth in the GDB Letters of Credit."  Therefore, in the event of a conflict with any

other documents, it is clear that the terms and procedures of the Letters of Credit prevail.

34.    In the event that the Legislature fails to adopt an operating budget and there is no

other provision for payment of the Notes or the Bonds, the Trustee has an irrevocable right to draw

under the Letters of Credit and thus should not be precluded from making such a draw.  These

rights were reflected in the provisions of the GDB Restructuring Act, which established two

governmental instrumentalities to effectuate the wind-down of the GDB on behalf of creditors and

to implement the debt modifications contained in its Title VI proceeding (the "**Restructuring Act**").  Non-municipal government entities (such as the Public Finance Corporation) had their claims in respect of funds on deposit at GDB exchanged for interests in the GDB Public Entity Trust (the "**Public Entity Trust**"), and contingent Letter of Credit rights which are being treated as participating Bond claims are entitled to receipt of new GDB Bonds upon establishment of their claims.

### f.   The GDB Claims Against the Commonwealth

35.     The GDB consummated a Title VI Qualifying Modification ("**Qualifying Modification**") in respect of its bonds on or around August 10, 2018,  pursuant to the Restructuring Act, which authorized the establishment of a Public Entity Trust to receive certain specified assets of GDB for the benefit of certain non-municipal government entities having net claims against GDB for unreturned bank deposits.  The Public Finance Corporation is one such non-municipal government entity, with a net claim of approximately $28 million against the GDB.  Currently, the Public Entity Trust's assets consist in the main part of a claim against the Commonwealth in its Title III proceeding.  There is no discussion in the Disclosure Statement  of the value of that Claim, or how it is to be treated by the Commonwealth, and what impact any allowance would have on other creditor recoveries.  It is unclear if this claim is to be released and discharged as being part of Class 60 under the Plan. The Disclosure Statement does not even attempt to explain the basis for releasing the GDB Claim without any consideration to the Trustee for the benefit of the Public Finance Corporation bondholders.

36.     The contingent GDB Letter of Credit claims of the Trustee against the GDB are entitled to a distribution of new bonds issued to GDB bondholders if the criteria are met for a draw on the Letters of Credit.  It is at best unclear from the Disclosure Statement whether there is an

effort to abrogate, release or discharge such claims pursuant to the Plan, and if so, the basis for such release or discharge without any consideration.

37.     If the treatment of Class 60 under the Plan purports to discharge the GDB Claim (the "**GDB Claim**") for no consideration, there is inadequate disclosure as to the legal or factual basis for doing so.  The GDB Claim has not been objected to by the Commonwealth, and reflects a negotiated resolution reflected in legislation and court rulings approving the GDB Title VI Plan. Included in the resolution was the recognition and preservation of rights of government entities including the Public Finance Corporation which deposited funds with the GDB which were not returned to them, and from which the Commonwealth presumably benefitted.[9]

g.   **The Trustee's Proof of Claim.**

38.     On May 18, 2018, in accordance with the Bar Date Order entered by the Court on February 15, 2018 in the Title III Cases, U.S. Bank, solely in its capacity as Trustee, filed a Proof of Claim (the "**Proof of Claim**") against the Commonwealth and the FOMB on behalf of itself and the holders of the Bonds.  Claim No. 13374.

39.     The Trustee asserted contingent, unliquidated claims against the Commonwealth, the FOMB and any of the Commonwealth's divisions which have issued Notes which are Pledged Revenues for any and all rights and entitlement that the Trustee has or may have of whatever nature or kind set forth in the Trust Agreement, or pursuant to other applicable documents or law,

---

[9] In the Disclosure Statement, there is a brief discussion of the objection filed by the Unsecured Creditors' Committee to the GDB Claim on various grounds of avoidability and lack of evidentiary support.  This objection has been stayed pending confirmation of the Plan.  There is no dispute, however, that the Public Finance Corporation has a net claim for approximately $28 million in deposits with the GDB which were never returned and for which it is entitled to receive new notes issued by the GDB.  If the Plan purports to release these claims, it should explain why it is doing that and on what basis. Disclosure Statement at 287-88.

including for breach of covenants and for the potential diversion of revenues pledged for the payment of the Bonds whether in the past or in the future.

40.     The Trustee further asserted claims for any and all amounts owed on account of any and all claims the Trustee has or may have relating to the outstanding Bond obligations, whether known or unknown, against the Commonwealth and all those purporting to act on the Commonwealth's behalf, whether presently asserted or to be asserted, including without limitation claims for or based upon the breach or violation of the Trust Agreement or any covenants or other contractual obligations contained therein, or claims arising from the improper diversion of the Pledged Revenues or any other property securing the payment of the Bonds, as a matter of relevant state law or federal law, including without limitation constructive trust, fraudulent conveyance or fraudulent transfer, failure to fulfill contractual and fiduciary obligations and duties, breach of implied covenants of good faith and fair dealing, or other legal or equitable claim.

41.     The Trustee further asserted a claim for all amounts due in respect of any pre-petition or post-petition fees and costs of the Trustee, including legal or other professional fees and expenses, and pre-petition and post-petition interest.

42.     There is no discussion in the Disclosure Statement of the existence of the Trustee's claim or the reason why it appears to be deemed released and discharged for no consideration or on what ground, or the consequences to other creditors if in fact some or all of the claim is allowed.

### h.  Preemption of Appropriation Rights

43.     As stated in the Disclosure Statement, "[o]ther public corporations, such as the [Public Finance Corporation], have been created *as financing vehicles for the Commonwealth* and have issued debt backed by appropriations as their sole source of repayment."   Disclosure

17

Statement at 56 (emphasis added).[10]  The Disclosure Statement says that "The Oversight Board

believes PROMESA section 4 preempts inconsistent Commonwealth laws, which includes laws

enacted prior to PROMESA that historically conditionally appropriated certain Commonwealth

monies to its instrumentalities.  The Oversight Board believes that *even if the Commonwealth*

*statutes are not preempted*, they allow for these historically conditionally appropriated monies to

be used by the Commonwealth to pay GO debt and Commonwealth-guaranteed debt."  Disclosure

Statement at 56 (emphasis added).

44.     These assumptions have been hotly debated and disputed during the Title III Cases,

and are resolved essentially by settlement agreements with major creditor groups, but there has

been no settled enunciation of applicable law.  Disclosure Statement at 63-64  ("The historically

conditionally appropriated monies were retained, and continue to be retained, by the

Commonwealth during the Title III Cases because the certified fiscal plans and budgets did not

appropriate those monies to the respective instrumentalities, and the Oversight Board believes

PROMESA preempted the existing statutes conditionally appropriating such monies to the

respective instrumentalities.  Moreover, the Oversight Board believes the existing statutes were

enacted by prior legislatures and are not binding on the current legislature, whether preempted or

not.")[11]

---

[10]Other entities that have relied on subsidies in the form of appropriations from the general fund of the Commonwealth
include the Puerto Rico Health and Insurance Administration, the Puerto Rico Medical Services Administration, the
Puerto Rico Integrated Transit Authority, the Puerto Rico Maritime Transport Authority, the Metropolitan Bus
Authority, HTA, the University of Puerto Rico, AAFAF, PRIFA, the Puerto Rico Public Private Partnerships
Authority, the Puerto Rico Ports Authority, the Puerto Rico Tourism Company, the Puerto Rico Convention Center
District Authority, PRIDCO and others. Disclosure Statement at 55-56.

[11] The Plan states in the most cursory manner in a footnote to Ex. K that "any statute providing for an appropriation
not included in the budget certified by the FOMB is preempted."  The application of this extraordinary remedy to the
Bonds, not to mention other appropriation debt of Puerto Rico, is imposed by fiat and without adequate explanation
in the Disclosure Statement. Disclosure Statement at K-2, FN 7. None of the Acts relevant to the Public Finance
Corporation or the Authorized Debtors are specifically listed on Ex. K.

45.     In a few brief paragraphs in the Disclosure Statement, the Authorized Debtors purport to sweep away years of legislative determinations and statutory enactments made on behalf of the people of Puerto Rico by their representatives, which authorized the issuance of the Bonds, which facilitated the funding of infrastructure and other projects assisting the growth and development of Puerto Rico.  Instead, the FOMB apparently selectively picks and chooses those "sizeable subsidies from the Commonwealth" that the FOMB seems to find palatable, and wipes out those it does not without addressing the precise basis for its determination in the Disclosure Statement.

46.     However, in its own delineation of risk factors to the Plan, the FOMB indicates the possibility that the Plan concepts will not be achieved as filed, including as a result of legislation to the contrary in Puerto Rico:

> i.   The FOMB will terminate before the Plan obligations are fully satisfied, and there will no longer be annual budgets and monitoring by the FOMB. Disclosure Statement at 483.

> ii.  When the FOMB terminates, the Government can eliminate controls, protections and transparency the FOMB has created.  "Subject to certain constitutional limitations, every legislature can change prior laws.  The Government may object to measures the Oversight Board imposes." Disclosure Statement at 483.

> iii. Risk factors related to future judicial actions – PROMESA Title III "is newly enacted legislation that has not been previously used for financial restructuring, and substantial uncertainties relating to its construction exist, including uncertainties due to the lack of judicial decisions interpreting PROMESA Title III."  Disclosure Statement at 502.

> iv.  PROMESA is subject to challenges regarding its constitutionality. Disclosure Statement at 502.

19

v. Risk factors relating to legislative action: "The Plan contemplates legislation will be enacted by the Government on or prior to the Effective Date authorizing  the transactions contemplated by the Plan.  There is no certainty such legislation will be enacted …. In addition, other future actions by the Legislature could also materially adversely affect the value of the New GO Bonds and the recoveries on such bonds."  Disclosure Statement at 503.[12]

47.     Billions of dollars of GO and PBA debt that FOMB contends were incurred in violation of Puerto Rico's constitutional debt limits, and other special funding debt supported by revenues the Commonwealth/FOMB find it more convenient to re-purpose,  are simply wiped away under the Plan, without any showing that the particular contractual commitments of the Commonwealth's instrumentalities, the Authorized Debtors, and the Public Finance Corporation (which clearly has not been given any ability to act independently to perform its obligations) are properly invalidated, or that the *de facto* discharge of those commitments through the lack of any distribution is justified under a liquidation analysis.  No showing is made of who is harmed by these unilateral determinations, including potentially numerous Puerto Rico residents who are retail holders of the bonds.

48.     The Trustee does not dispute that the Bonds and the Notes issued by various other public entities that were pledged as security for the Bonds state, in part, that their principal and interest are payable only from the proceeds appropriated by the Legislature and contained in the annual budgets of the Commonwealth of Puerto Rico. But the Disclosure Statement does not disclose that the Bonds are also payable, in part, from amounts that may be recoverable under the

---

[12] *See* Disclosure Statement at 156: "Puerto Rico's House of Representatives is currently evaluating bills, which would, among other things, amend the Legislature's current role in the Commonwealth budget processes and amend Act 5, or the Financial Emergency and Fiscal Responsibility Act, effectively reducing several of the Governor's fiscal emergency powers under the law.  The statement of motives in one of the bills says proposed amendments to Act 5 target 'excesses' in fiscal emergency powers granted to the Governor including the 'unilateral' authority to set payment priorities via executive order and 'issue debt, redirect funds, sell assets, and carry out other actions by decree, without intervention of the legislative assembly, as required by our constitutional system."  The Oversight Board has expressed opposition to this legislation."

20

GDB Title VI Plan with respect to (i) contingent rights under Letters of Credit issued by the GDB which under the GDB Title VI Plan are entitled to receive new GDB bonds; or (ii) under the GDB's substantial claim against the Commonwealth, held by the Public Entity Trust, for among other items, approximately $28 million net amount of bank deposits owed to Public Finance Corporation and payable under the GDB Title VI Qualifying Modification.

49.     In addition, the Disclosure Statement fails to disclose other breaches of contract, including those embodied in the Appropriation Acts, committed by the Commonwealth and its instrumentalities, such as OMB's failure to include the Legislative Appropriations in the budgets proposed to the Puerto Rico legislature since 2015. The Disclosure Statement should disclose where these direct claims against the Commonwealth fit into the priority scheme established in Article VI, Section 8 of the Puerto Rico Constitution and defined in Puerto Rico statutes. *See* 23 L.P.R.A. § 104 (defining to include as a second-priority obligation, subordinate only to public debt, "binding obligations to safeguard the credit, reputation, and good name of the Government of the Commonwealth of Puerto Rico.").

50.     The Moratorium Orders, the delinquency of the Commonwealth in effectuating appropriate budgets, and the diversion by the Commonwealth of funds intended by the Legislature and the issuers to be dedicated to repayment of public bond debt to other uses of, at times, dubious priority, combined with the acquiescence of the OMB and the supposedly independent Board of the Public Finance Corporation in the abrogation of their responsibilities, constitute a violation of the Legislative Acts which provided for such payments to be made, and a breach of contractual obligations to pursue such payments, as well as a breach of good faith and fair dealing as reflected in the Proof of Claim filed by the Trustee, which a future legislatures may wish to rectify, as a prior legislature attempted to do in 2015.

21

51.     The Commonwealth's Disclosure Statement ignores these obligations, fails to explain the basis and decisionmaking, or the factual and legal basis upon which they have been abrogated, fails to address the Commonwealth's obligations under the GDB Claim, and fails to address the OMB's obligations to the Trustee described above.  In addition, the Disclosure Statement fails to disclose any information whatsoever regarding the appropriate disposition of the Public Finance Corporation entity and its remaining obligations including a $35 million Defeasance Fund held by the Trustee for redemption of 2001E Bonds in 2026 and 2027. Leaving the Public Finance Corporation in limbo may increase future borrowing costs and foreclose a common financing structure for the Island – appropriation-backed debt – which is used to fund public infrastructure and other capital needs of municipalities throughout the United States.[13]

### i.  **Releases and Exculpations**

52.     Section IV.W of the Disclosure Statement discusses the releases and exculpations of certain parties pursuant to the confirmation of the Plan.  The Plan provides for extremely broad releases, including releases of "all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth."  *See* Plan, Art. I 1.248.  The Disclosure Statement does not provide sufficient information regarding the claims by or against these entities that are being released.  The Release sections of the Disclosure Statement do not provide specific information as to which entities are beneficiaries of the releases, or the claims against these entities that are being released.  Without this crucial information, it is impossible for bondholders to understand how their rights are impacted by the releases, which is the whole purpose of a Disclosure Statement.

---

[13] *Lease, Appropriation, Moral Obligation and Comparable Debt of US State and Local Governments*, Moody's Investor Service 2 (July 26, 2016), https://www.ncsl.org/Portals/1/Documents/fiscal/LAMethodologyfiscal2016.pdf (noting that out of a universe of 3,500 state and local government obligations rated by Moody's, 35% were structured as annual appropriation obligations).

While holders of the Bonds are proposed to receive no distribution under the Plan, as interested parties they are entitled to know the scope of the releases that the Commonwealth is proposing, as those releases potentially affects their rights.

53.    The Disclosure Statement fails to clearly state whether the Trustee is obtaining releases and exculpations, or whether the Trustee or any holders of Bonds are deemed to grant any releases.

### j.   Liquidation and wind-down or other disposition of Public Finance Corporation.

54.    Further, unlike the provision described in the Disclosure Statement relating to the dissolution of ERS upon satisfaction of its debt and transfer of all remaining assets to the Commonwealth, no provision is made with respect to the Public Finance Corporation relating to the wind-down or dissolution of the entity, and termination of the Trust and the Trustee's obligations.  There is no discussion of provision for the Defeasance Fund and the costs associated with its maintenance and ultimate distribution, nor is there any disclosure whatsoever as to any other assets, liabilities or possible claims that Public Finance Corporation might have against the Commonwealth or any other persons.  Disclosure Statement at 360.  Accordingly, the Disclosure Statement fails to contain adequate information in respect of the foregoing matters.

### k.   Solicitation and Voting Procedures/Payment of Trustee Fees and Costs.

55.    The Solicitation Procedures Motion does not sufficiently explain what is expected from the Trustee in terms of distribution of Notices of the Disclosure Statement Hearing, the Non-Voting Notices to holders of the Bonds, or other Notices that may be required in connection with implementation of the Plan.  The Solicitation Procedures Motion states that with respect to publicly traded securities, securities that are not issued to a specific party are generally held in the name of

Cede & Company, which holds the Bonds on behalf of the Nominees ("**Nominees**") of DTC. The Nominees, in turn, hold the securities in "street name" on behalf of the Beneficial Owners ("**Beneficial Owner**") (and other brokerage institutions that hold them on behalf of Beneficial Owners). It further states that the Debtors intend to obtain from DTC a listing of the Nominees and, as described further below, cause the mailing of solicitation packages (as applicable) to the Nominees with instructions to cause the solicitation packages to be forwarded immediately to the Beneficial Owners of the bonds. The Trustee is not aware of any communications with DTC regarding the Debtors delivering such Notices to DTC and whether such delivery will require the participation of the Trustee.

56.     There is no discussion of the payment of costs associated with the proposed distribution procedures in respect of the Bonds, although there are provisions in the Disclosure Statement pertaining to the payment of costs associated with distributions to holders of other bonds impacted under the Plan. Disclosure Statement at 440-43. For those bonds, the Disclosure Statement says that: "The distributions to be made pursuant to the Plan are intended to be inclusive of any and all trustee and paying agent fees and expenses which may be allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts discharged pursuant to the Plan. The Plan does not, nor shall it be construed to, limit the rights of such trustees and paying agents to payment of such amounts from the distributions to be made pursuant to the Plan, including the imposition of any trustee or paying agent lien upon such distributions." Disclosure Statement at 442-43 . No such provisions are set forth with respect to the Trustee notwithstanding the apparent full discharge of the Bond claims under the Plan. Accordingly, the Disclosure Statement does not contain adequate information in respect of the foregoing matters.

24

## IV.   LEGAL ARGUMENT

### a.   The Proposed Disclosure Statement Does Not Provide Adequate Information as Required by Section 1125 of the Bankruptcy Code

57.    Section 1125(b) of the Bankruptcy Code (incorporated by PROMESA § 301(a)) conditions the solicitation of votes on a proposed plan upon the proponent's disclosure of "adequate information," which is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information

11 U.S.C. § 1125(a)(1).

58.    The statutory obligation to provide adequate information in a disclosure statement to parties in interest "is a key feature of the reorganization provisions of Chapter 11." *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999).  To be "adequate," information included in a disclosure statement must be "clear and comprehensible"—that is, designed to succinctly inform a creditor "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  Therefore, a disclosure statement cannot be approved if it does not contain adequate information. *In re ACEMLA De Puerto Rico Inc.*, 2019 WL311008 *17-18 (Bankr. D.P.R. Jan. 22, 2019) (denying approval of disclosure statement because statement failed to meet adequate information requirement).

25

59.     One of the purposes of the disclosure statement is to provide creditors with sufficient information to cast an informed vote on the proposed plan of reorganization.  *In re Ferretti*, 128 B.R.at 18.  For this reason, it is crucial that the debtor provide a disclosure statement that is truthful and comprehensive in its scope.  *In re Ferguson*, 474 B.R. 466, 471 (Bankr. D.S.C. 2012) (internal citations omitted).  Additionally, it is of the utmost importance that the debtor's disclosures be clear and understandable to the average creditor.  *In re Ferretti*, 128 B.R. at 19.  "Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated."  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).  If a disclosure statement is not honest or provided in good faith, or "displays factual facial deficiencies," it should not be approved.  *In re E. Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991).

60.     The standard for what constitutes adequate disclosure is flexible and determined on a case-by-case basis by the bankruptcy court*, In re Oxford Homes, Inc.*, 204 B.R. 264, 269 (Bankr. D. Me. 1997), however the disclosure must provide sufficient information that enables all claim holders to make "an informed judgment regarding whether to vote for or against a reorganization plan." *In re Clamp-All Corp.*, 233 B.R. at 204.  At a minimum, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti*, 128 B.R. at 19.  Additionally, such disclosures often facilitate the negotiation process between the debtor and its creditors.  *See Century Glove*, 860 F.2d at 100.

26

61.    As described above, the proposed Disclosure Statement cannot be approved by this

Court, as it lacks crucial information concerning the treatment of the Bonds and the GDB Claims

under the Plan, and therefore fails the requirements of section 1125.

**b.    The Disclosure Statement Does Not Provide Adequate Information on the scope of
Releases under the Plan, and the Parties to be Released/Exculpated**

62.    A third party release, which discharges non-debtors from liability is not an act

expressly provided for in the Bankruptcy Code or PROMESA.  Although section § 105(a) of the

Bankruptcy Code, made applicable by section 301(a) or PROMESA, provides the Court the power

to issue any order that is appropriate or necessary to carry out the plan, using this section to grant

releases must "involve an extraordinary exercise of discretion" by the court. *In re M.J.H. Leasing,*

*Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005).

63.    Bankruptcy Rule 3016(c) states that "[i]f a plan provides for an injunction against

conduct not otherwise enjoined under the [Bankruptcy] Code, the plan and disclosure statement

shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be

enjoined and identify the entities that would be subject to the injunction."  Fed. R. Bankr. P.

3016(c). These requirements are meant "to alert parties in interest that the plan proposes to restrict

their rights in ways that ordinarily would not result from confirmation of a plan."  *In re Lower*

*Bucks Hosp.*, 471 B.R. 419, 460, n.62 (Bankr. E.D. Pa. 2012) (citing Advisory Committee Note to

Bankruptcy Rule 3016(c)).

64.    In addition to being overly broad and non-specific, the releases contained in the

Plan are difficult to understand and do not meet the requirements of Rule 3016.  The release

provisions are not bolded, underlined, italicized, or emphasized in any manner.  There is also no

reference to the releases in the table of contents in either the Disclosure Statement or the Plan.

27

Instead, the releases are included in the "Miscellaneous Provisions" section of the Disclosure Statement.  Also, to fully understand the substance of the release provisions, a reader must also consult numerous defined terms of the Plan, not the Disclosure Statement, making the provisions difficult to parse.

65.     As currently presented, these releases are overly broad, convoluted, and fail to provide adequate information regarding the treatment of the claims against these entities. Therefore, the Disclosure Statement does not provide adequate disclosure as required by section 1125 with respect to the releases, and must be amended.

66.     This Objection is submitted without prejudice to, and with a full reservation of rights by the Trustee to supplement or amend the Objection, and to submit further relevant information if necessary in connection with prosecution of the Objection, and all rights are reserved with respect to the assertion of any objections to confirmation of the Plan on any basis whatsoever, whether or not set forth herein.

**WHEREFORE,** the Trustee respectfully requests that the Court deny approval of the Disclosure Statement absent further development and explanation by the Debtors of (i) the treatment of the Bonds and the Trustee's Proof of Claim, and the intended disposition of the Public Finance Corporation and its remaining assets and liabilities; (ii) further disclosure and explanation regarding the treatment of the GDB Claim against the Commonwealth in which the Public Finance Corporation and the Trustee have an interest; (iii) further disclosure and explanation of the scope of the releases under the Plan, and which claims by the Public Finance Corporation, the Trustee, or the GDB, whether against the Commonwealth or any other public entity or instrumentality of the Commonwealth are intended to be released and discharged; (iv) discussion of the provisions

28

for wind-down of the Public Finance Corporation, or discharge of the Trust and the Trustee; and

(v) clarification of the solicitation and confirmation procedures outlined above including without

limitation defining the obligations of the Trustee, the Trustee's right to releases and exculpations

under the Plan, and the manner of compensation for its services.

Respectfully submitted,

By: *Eric A. Tulla* _____

Dated:  June 15, 2021

**RIVERA, TULLA AND FERRER,
LLC**
Eric A. Tulla
USDC-DPR No. 118313
Iris J. Cabrera-Gómez
USDC-DPR No. 221101
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212
Tel: (787)753-0438
Fax:  (787)767-5784  (787)766-0409
etulla@ riveratulla.com
icabrera@riveratulla.com

and

**HOGAN LOVELLS US LLP**
Robin E. Keller, Esq.
Ronald J. Silverman, Esq.
Pieter Van Tol, Esq.
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
robin.keller@hoganlovells.com
ronald.silverman@hoganlovells.com
pieter.vantol@hoganlovells.com

*Counsel to U.S. Bank Trust National
Association*

29

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on this same date a true and exact copy of this motion was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record. Also, a copy of this document will be: (i) served via electronic mail or U.S. mail to all case participants; (ii) filed with the United States District Court, Clerk's Office, 150 Ave. Carlos Chardon Ste. 150, San Juan, P.R. 00918-1767; and (iii) served upon the Office of the United States Trustee, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, P.R. 00901, and a further Certificate of Service will be filed with the Court.

By: *Iris J. Cabrera-Gomez*
Iris J. Cabrera-Gomez