Hearing Date:  July 13, 2021 at 9:30 a.m. (Atlantic Standard Time)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OBJECTION OF THE DRA PARTIES TO THE AMENDED JOINT MOTION
OF THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY
FOR AN ORDER (I) APPROVING DISCLOSURE STATEMENT,
(II) FIXING VOTING RECORD DATE, (III) APPROVING CONFIRMATION
HEARING NOTICE AND CONFIRMATION SCHEDULE,
(IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION
PROCEDURES, (V) APPROVING FORMS OF BALLOTS, AND VOTING AND
ELECTION PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING
STATUS, (VII) FIXING VOTING, ELECTION, AND CONFIRMATION DEADLINES,
AND (VIII) APPROVING VOTE TABULATION PROCEDURES**

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation  (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801).

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................2

BACKGROUND .......................................................................................................................4

I.   The DRA Was Created Pursuant to the GDB Restructuring Act ......................................4

II.  The GDB and its Creditors Underwent a Title VI Restructuring ......................................4

III. The Assets Transferred to the DRA Include the GDB's Commonwealth, PBA, and
     HTA Credits...................................................................................................................5

IV.  The Commonwealth Has Unlawfully Retained the Act 30-31 Revenues, Causing the
     DRA and Other Parties to Seek Relief from the Court........................................................9

     A.   The "Clawback":  The Puerto Rico Constitution and Statutes Protect
          Revenues Pledged for Service of HTA's Debt Obligations Owed to the
          DRA ...................................................................................................................9

     B.   The DRA Sought Relief Based on the Commonwealth's Diversion and
          Retention of the Act 30-31 Revenues ...................................................................11

          1.   The DRA Sought Payment of Adequate Protection or, in the
               Alternative, Relief from the Automatic Stay ...............................................11

          2.   The DRA Seeks Allowance of an Administrative Expense Claim...........11

     C.   The Monolines Sought Relief from the Automatic Stay .....................................12

V.   The FOMB Filed the Third Amended Plan .....................................................................14

OBJECTION...........................................................................................................................16

I.   The Third Amended Plan Is Not Confirmable on Its Face ...............................................16

     A.   Objections Relating to the DRA's HTA Claims...............................................17

          1.   The Third Amended Plan Functions as a Sub Rosa HTA Plan .................17

          2.   The Settlements Contained in the HTA/CCDA PSA Violate
               Bankruptcy Rule 9019 and the Bankruptcy Code....................................22

          3.   The Third Amended Plan Violates Applicable Law Because it
               Provides for Disparate Treatment of Creditors Within the Same Class ....23

          4.   The Third Amended Plan Violates Commonwealth Law.........................27

5.      The Third Amended Plan Violates the DRA's Takings Clause Rights .....28

B.      Objections Relating to the DRA's PBA Claims ......................................29

1.      Separate Classification of Certain DRA PBA Claims from PBA
        General Unsecured Claims is Impermissible .............................................29

2.      The Third Amended Plan Unfairly Discriminates Against the DRA's
        PBA Claims ....................................................................................32

C.      The Third-Party Release, Exculpation and Injunction Provisions in the
        Third Amended Plan Are Improper ........................................................34

II.   The Disclosure Statement Fails to Provide "Adequate Information" Regarding
      Certain Key Issues .........................................................................................36

A.      Disclosure Objections Relating to the DRA's HTA-Related Claims ..................37

1.      The Disclosure Statement Fails to Adequately Disclose the Basis for
        the Plan's Prioritization of HTA Bond Claims Ahead of HTA Loan
        Claims ..................................................................................................37

2.      The Disclosure Statement Must Describe Risks Related to the
        Debtors' Ability to Confirm the Third Amended Plan if the DRA's
        Administrative Expense Claim With Respect to Collateral Diverted
        from HTA is Allowed ..........................................................................39

3.      The Disclosure Statement Must Disclose Risks that the DRA's
        Administrative Expense Claim for Improperly Diverted Act 30-31
        Revenues Cannot Be Discharged Under the Plan .....................................40

4.      The Disclosure Statement Must Disclose the Risks that the Third
        Amended Plan May Not Be Confirmed Because the Plan Violates
        Applicable Law ....................................................................................42

B.      Disclosure Objections Relating to the DRA's PBA Claims ................................45

1.      The Disclosure Statement Must Explain the Separate Classification of
        the DRA's PBA Claims from PBA General Unsecured Claims and
        Provide Justification for the Disparate Treatment of the DRA's PBA
        Claims ....................................................................................................45

2.      The Disclosure Statement Must Adequately Describe the PBA's
        Capital Structure ..................................................................................46

C.      General Disclosure Objections ..............................................................46

1.      The Disclosure Statement Does Not Adequately Disclose Which

|  |  | DRA Assets are Class 60 "CW Appropriation Claims" ..............................46 |
|  | 2. | The Feasibility Analysis Contained in the Disclosure Statement is Outdated.................................................................................................47 |
|  | 3. | Additional Disclosures Are Necessary to Provide an Accurate Record of the Title III Cases ..................................................................................49 |
| III. |  | The Proposed Confirmation Schedule is Prejudicial to Creditors and Should be Extended ..........................................................................................................50 |
|  |  | RESERVATION OF RIGHTS .............................................................................51 |
|  |  | CONCLUSION......................................................................................................51 |

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Acemla De P.R. Inc.*,
   No. 17-02021 (ESL),
   2019 WL 26381 (Bankr. D.P.R. Jan. 22, 2019) ........................................ 44

*In re Acemla De P.R. Inc.*,
   No. 17-02021 ESL,
   2019 WL 311008 (Bankr. D.P.R. Jan. 22, 2019) ...................................... 36

*Armstrong v. United States*,
   364 U.S. 40 (1960) ................................................................................... 28

*In re AWECO, Inc.*,
   725 F.2d 293 (5th Cir.1984) ..................................................................... 22

*In re Barney & Carey Co.*,
   170 B.R. 17 (Bankr. D. Mass. 1994) ........................................... 31, 32, 33

*In re Braniff Airways, Inc.*,
   700 F.2d 935 (5th Cir. 1983) .............................................................. 18, 20

*In re Breitburn Energy Partners LP*,
   582 B.R. 321 (S.D.N.Y. 2018) ................................................................. 24

*In re C.P. del Caribe, Inc.*,
   140 B.R. 320 (Bankr. D.P.R. 1992) .......................................................... 22

*In re CGE Shattuck, LLC*,
   254 B.R. 5 (Bankr. D.N.H. 2000) ............................................................. 23

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) ....................................... 28, 41, 48

*In re City of Detroit*,
   548 B.R. 748 (Bankr. E.D. Mich. 2016) ................................................... 41

*Czyzewski v. Jevic Holdings Corp.*,
   137 S. Ct. 973 (2017) .......................................................................... 23, 33

*In re Dow Corning Corp.*,
   192 B.R. 415 (Bankr. E.D. Mich. 1996) ................................................... 22

*In re EL Comandante Mgmt. Co.*,
   359 B.R. 410 (Bankr. D.P.R. 2006) ................................................. *passim*

iv

*In re Energy Future Holding Corp.*,
    527 B.R. 157 (Bankr. D. Del. 2015) ............................................................18, 20

*In re Ferguson*,
    474 B.R. 466 (Bankr. D.S.C. 2012) ......................................................................47

*In re Ferretti*,
    128 B.R. 16 (Bankr. D.N.H. 1991) ...........................................................37, 39, 47

*In re Filcas of America, Inc.*,
    147 B.R. 297 (Bankr. D.N.H. 1992) .....................................................................16

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    618 B.R. 619 (D.P.R. July 2, 2020) ..........................................................12, 13, 19

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    989 F.3d 170 (1st Cir. 2021) .................................................................................13

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
    748 F.2d 42 (1st Cir. 1984) .....................................................................29, 31, 32

*Henson v. Santander Consumer USA, Inc.*,
    137 S. Ct. 1718 (2017) ..........................................................................................42

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .........................32

*In re Master Mortg. Invest. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).............................................................34, 35

*In re Momenta, Inc.*,
    455 B.R. 353 (Bankr. D.N.H. 2011) .....................................................................40

*Motorola, Inc. v. Official Comm. Of Unsecured Creditors and JPMorgan Chase
    Bank, N.A. (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007)..................................................................................18

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ...............................................................47, 48

*In re National/Northway Ltd. P'ship*,
    279 B.R. 17 (Bankr. D. Mass 2002) .....................................................................30

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (Bankr. D. Del. 2014) ................................................................18, 20

*In re Organogenesis Inc.*,
  316 B.R. 574 (Bankr. D. Mass. 2004) .................................................................31

*In re Palau Corp.*,
  18 F.3d 746 (9th Cir. 1994) ................................................................................31

*In re Phoenix Petroleum Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................36

*In re Quincy Med. Ctr., Inc.*,
  No. 11-16394-MSH,
  2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011).....................................34, 35

*In re Robotic Vision Sys., Inc.*,
  378 B.R. 417 (B.A.P. 1st Cir. 2007) ...................................................................22

*In re Sabana del Palmar, Inc.*,
  No. 12-06177 (ESL),
  2013 WL 2367830 (Bankr. D.P.R. May 29, 2013).............................................30

*In re Tempnology LLC*,
  542 B.R. 50 (Bankr. D.N.H. 2015) ......................................................................18

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013)................................................................................24

*In re Wang Lab'ys, Inc.*,
  164 B.R. 404 (Bankr. D. Mass. 1994) .................................................................31

*In re Wilhelm*,
  101 B.R. 120 (Bankr. W.D. Mo. 1989).................................................................32

**United States Constitution**

U.S. Const. amend. V..............................................................................................44

U.S. Const. amend. V, cl. 5......................................................................................28

**Puerto Rico Constitution**

P.R. Const. art. II, § 19 ...........................................................................................50

P.R. Const. art. VI, § 8 ................................................................................... *passim*

**United States Statutes**

11 U.S.C. § 507.......................................................................................................31

11 U.S.C. § 507(a)(2) ................................................................................................16

11 U.S.C. § 546(a)(1)(A) ...........................................................................................14

11 U.S.C. § 727(b) ...............................................................................................40, 42

11 U.S.C. § 944(b) ...........................................................................................40, 41, 42

11 U.S.C. § 1111(b) ..................................................................................................30

11 U.S.C. § 1122(a) ..................................................................................................29

11 U.S.C. § 1123(a)(4) ...............................................................................................24

11 U.S.C. § 1125(a)(1) ...............................................................................................36

11 U.S.C. § 1129 .......................................................................................................33

11 U.S.C. § 1129(a)(3) .........................................................................................*passim*

11 U.S.C. § 1129(b)(1) ...............................................................................................32

11 U.S.C. § 1141(d)(1)(A) .....................................................................................41, 42

48 U.S.C. §§ 2101-2241 ..............................................................................................1

48 U.S.C. § 2161(e) ..................................................................................................29

48 U.S.C. § 2174 ........................................................................................................6

48 U.S.C. § 2174(b)(3) .........................................................................................27, 43

48 U.S.C. § 2174(b)(7) ...............................................................................................49

*Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA") ............. *passim*

PROMESA § 301(a) .............................................................................................*passim*

PROMESA § 301(e) ..................................................................................................29

PROMESA § 314(b) .............................................................................................16, 47

PROMESA § 314(b)(3) .........................................................................................*passim*

PROMESA § 314(b)(6) ...............................................................................................39

PROMESA § 314(b)(7) ...............................................................................................48

**Puerto Rico Statutes**

9 L.P.R.A. § 5681 ...........................................................................................................10

13 L.P.R.A. § 31751(a)(1)(A)........................................................................................10

13 L.P.R.A. § 31751(a)(1)(C)........................................................................................10

13 L.P.R.A. § 31751(a)(3)(A)........................................................................................10

13 L.P.R.A. § 31751(a)(3)(C)........................................................................................10

23 L.P.R.A. § 104(c)(1)-(5) ...........................................................................................10

Act No. 2004-409.............................................................................................................6

Act No. 242-2011..............................................................................................................6

Act No. 33-1942................................................................................................................6

Act No. 47-2013................................................................................................................6

P.R. Laws Ann. tit. 7, § 3212.........................................................................................14

*Government Development Bank for Puerto Rico Debt Restructuring Act,*
Act No. 109-2017, as amended by Act No. 147-2018......................................1, 4, 5

*Internal Revenue Code for a New Puerto Rico,*
Act No. 1-2011, as amended by Act No. 31-2013......................................... *passim*

*Management and Budget Office Organic Act*, Act. No. 147 (June 18, 1980) ........................10, 11

*Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,* Act No.
21-2016 ......................................................................................................................6

*Puerto Rico Vehicles and Traffic Act,*
Act No. 22-2000, as amended by Act No. 30-2013......................................... *passim*

**Rules of Procedure**

Fed. R. Bankr. P. 3017...................................................................................................36

Fed. R. Bankr. P. 9019..................................................................................22, 23, 24

**Other Authorities**

6 Collier on Bankruptcy ¶ 901.04 (16th ed. 2019) .......................................................41

viii

Hr'g Tr.,
   *In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   Case No. 17-03283 (D.P.R. Apr. 28, 2021)...........................................................................51

**COME NOW** AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the approved qualifying modification for the Government Development Bank for Puerto Rico (the "Qualifying Modification")[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA")[3], by and through the undersigned legal counsel, and respectfully submit this objection (this "Objection") to the *Amended Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Dkt. No. 16756] (the "Amended Disclosure Statement Motion") filed by the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), as representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"),

---

[2]    *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

[3]    PROMESA is codified at 48 U.S.C. §§ 2101-2241.

1

and the Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth

and ERS, the "Debtors").[4]

## PRELIMINARY STATEMENT

The Third Amended Plan is patently unconfirmable and the related Disclosure Statement[5]

fails to disclose certain key information that creditors need to vote on the plan.  As a result, the

Court should not approve the proposed Disclosure Statement and should send the FOMB back to

the drawing board to negotiate a confirmable plan among all key parties—rather than permitting

the FOMB to pick and choose winners and losers as it sees fit.

The Third Amended Plan violates the Bankruptcy Code and other applicable law, which

renders the plan facially unconfirmable.  Most notably, while purporting to address claims only at

the Commonwealth, PBA and ERS, the Third Amended Plan is based on an effort to impose a *sub

rosa* plan to settle claims at HTA without satisfying the applicable confirmation standards for an

HTA plan.  Further, the Third Amended Plan violates Commonwealth law and the U.S.

Constitution by sanctioning the diversion of, upon information and belief, over $800 million of the

DRA's collateral from HTA and into the pockets of the Commonwealth and its creditors, without

even addressing the propriety of that diversion.  The Third Amended Plan also ignores the DRA's

secured PBA claim, and makes unfair and unjustified distinctions among unsecured creditors at

PBA to the detriment of the DRA.  Therefore, the Court should not permit the FOMB to solicit

approval of the Third Amended Plan unless it is revised to rectify these facial infirmities.

Additionally, the Amended Disclosure Statement Motion should not be approved unless

---

[4]  Capitalized terms used but not otherwise defined herein  shall have the meanings assigned to such terms in the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt. No. 16740] (the "Third Amended Plan").

[5]  The "Disclosure Statement" means the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt. No. 16741].

2

the Disclosure Statement is revised to make additional necessary disclosures to provide creditors

with adequate information.  Those disclosures should include, among other things, the fact that the

DRA has an administrative expense claim against the Commonwealth for more than $800 million,

for which the Third Amended Plan does not provide payment and which the Court cannot

discharge.  The Disclosure Statement must also disclose that the potential allowance of this

administrative expense claim would upend the agreed plan support agreements that underpin

support for the Third Amended Plan.

Finally, the Amended Disclosure Statement Motion should not be granted unless the

confirmation schedule and hearing dates are extended as proposed in the Procedures Objection[6] so

that creditors are given a full and fair opportunity to take discovery and prosecute their objections

to confirmation.  The proposed confirmation schedule is inadequate given the complexities of these

cases and, absent revision, it is highly prejudicial to creditors.  As discussed more fully in the

Procedures Objection, the FOMB's proposed confirmation discovery timeline and procedures are

prejudicial to creditors for several reasons—including that they leave creditors with insufficient

time to take discovery for a case of this magnitude.  Because the timeline for parties to take

discovery should be extended, the FOMB's proposed confirmation hearing dates in November

2021 must necessarily change.  Accordingly, the DRA Parties propose that the confirmation

hearing proceed on the timeline proposed in the Procedures Objection.

---

[6]   "Procedures Objection" means the *Objection of the DRA Parties to the Motion of Debtors for an Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* filed contemporaneously with this Objection.

## BACKGROUND

### I.     The DRA Was Created Pursuant to the GDB Restructuring Act

1.     On November 5, 2018, the FOMB certified the Qualifying Modification under PROMESA for the Government Development Bank of Puerto Rico (the "GDB"), which Qualifying Modification this Court subsequently approved by an order dated November 7, 2018. *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).

2.     The DRA is a statutory public trust and governmental instrumentality of the Commonwealth created by the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018 dated July 18, 2018 to facilitate the GDB's Title VI restructuring of certain indebtedness pursuant to the Qualifying Modification. *See* Act No. 109-2017 at Arts. 201 and 204.

### II.    The GDB and its Creditors Underwent a Title VI Restructuring

3.     This Court effectuated the GDB's Title VI restructuring by an order approving the Qualifying Modification dated November 7, 2018. *See Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act*, Dkt. No. 270 of Civil Case No. 18-01561 (LTS) (the "Approval Order").

4.     The GDB's prepetition creditors voted to accept the GDB's Title VI Qualifying Modification, in which existing GDB bondholders received new 7.50% GDB Debt Recovery Authority Bonds (Taxable) due 2040, which were issued by the DRA. *See* Approval Order at ¶ 13. The new bonds have a face amount equal to 55% of the creditor's claim. *See id.*

### III.   The Assets Transferred to the DRA Include the GDB's Commonwealth, PBA, and HTA Credits

5.     To secure the DRA's obligations under the new bonds, the GDB consensually transferred a substantial portion of its assets to the DRA, including debt obligations against the Commonwealth, PBA, and HTA that are subject to the terms of the Third Amended Plan.  *See infra* ¶ 28; Act No. 109-2017; *see also* Master Transfer Agreement, dated November 29, 2018, between the GDB and DRA, § 2.[7]  The following provides an overview of these credits.

6.     ***GO Obligations***.  The DRA is owed $55,883,944.76 in outstanding principal and $7,340,406.94 in outstanding interest under certain bilateral loans (the "GO Loans") made by its predecessor, the GDB, to the Commonwealth in 2012 and 2013 pursuant to two separate promissory notes.[8]  *See* Offering Memorandum for GDB Debt Recovery Authority Bonds (Taxable), dated as of Nov. 7, 2018 (the "OM") at 126.[9]  The obligations under the GO Loans are "public debt" under Article VI, Section 8 of the Puerto Rico Constitution because the Puerto Rico

---

[7]   A true and correct copy of the Master Transfer Agreement was previously filed on the Court's docket as Exhibit G to the DRA Amended Lift Stay Motion (as defined below) [Dkt. No. 16276-25].

[8]   The DRA sold, transferred, and assigned all of its right, title, and interest in two of its GO Loans to SPCP Group, LLC, SPCP Institutional Group, LLC, and SPCP Access Holdings, LLC (collectively, "SPCP").  One of the loans was sold on March 1, 2021, which has an outstanding principal balance of not less than $63,135,000.00, and the other was sold on April 27, 2021, which has an outstanding principal balance of not less than $50,419,093.00.  *See Joint Motion to Inform Regarding Partial Transfer of Claim* [Dkt. No. 16238], *Joint Motion to Inform Regarding Partial Transfer of Claim* [Dkt. No. 16706].  Prior to the assignment of these loans to SPCP, the DRA was owed approximately $169.4 million in the outstanding principal balance of certain bilateral loans made by the GDB to the Commonwealth pursuant to four promissory notes.

[9]   A true and correct copy of the OM was previously filed on the Court's docket as Exhibit B to the DRA Amended Lift Stay Motion [Dkt. No. 16276].

5

legislature passed statutes providing that the debts are backed by a pledge of the Commonwealth's good faith, credit and taxing power.  *See* Act Nos. 242-2011, Act 33-1942 and Act 47-2013.[10]

7.      In addition to the GO Loans, the Commonwealth is also obligated to the DRA under the Commonwealth's guaranty (the "PAA Bond Guaranty") of a 2014 bond (the "PAA Bond") issued by the Port of the Americas Authority ("PAA") in an aggregate principal amount of $225,533,700.45.[11]   *See* Act No. 2004-409.   As of the Commonwealth's petition date, $37,133,239.96 in interest was outstanding under the PAA Bond.  *See* OM at 126.  The PAA Bond refinanced PAA's obligations under a prior 2005 bond issuance.  *See* Bond Purchase Agreement, dated December 31, 2014 between the GDB and PAA at 1.[12]  Similar to the GO Loans, the PAA Bond Guaranty constitutes public debt under the Puerto Rico Constitution because the Commonwealth pledged its good faith and credit to guarantee payments under the PAA Bond.  *See* Act No. 409 § 1.

8.      ***PBA Loans***.  The DRA holds claims against PBA on account of four loans made by the GDB to PBA, which as of PBA's September 27, 2019 petition date, totaled at least $207,332,233.40.  *See* Proof of Claim No. 174309 filed on July 28, 2020 by AmeriNational

---

[10]     Act No. 21-2016, the *Puerto Rico Emergency Moratorium and Rehabilitation Act* ("First Moratorium"), defines "public debt" as "full faith and credit debt protected by the Constitution."

[11]     The DRA has sold, transferred, and assigned all of its right, title, and interest in the PAA Bond Guaranty pursuant to an agreement dated as of June 11, 2021.  The transaction is expected to settle after the filing of this Objection, on June 18, 2021.

[12]     A true and correct copy of the Bond Purchase Agreement was previously filed on the Court's docket as Exhibit 13 to the *DRA Parties' Motion to Dismiss (i) the Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority, (II) Claim of Scotiabank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority [Dkt. No. 9735] and (ii) the Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth [Dkt. No. 9730]* [Dkt. No. 11260].

6

Community Services, as servicer for the GDB Debt Recovery Authority, against PBA.  Three of
the PBA Loans (the "PBA Unsecured Loans") are unsecured obligations of PBA and, as of PBA's
petition date, totaled $88,592,916.04 in principal amount and $50,086,019.67 in interest.  One loan
(the "PBA Secured Loan," and together with the PBA Unsecured Loans, the "PBA Loans"), which
consisted of $48,821,233.11 in principal amount and $19,832,064.58 in interest as of PBA's
petition date, is partially secured by a security interest in the proceeds of the sale or disposition of
two real properties in San Juan consisting of buildings where the Commonwealth's Department of
Justice and Treasury Department are currently located.  *See id*.

9.     ***HTA Loans and Bonds***.  The DRA is likely HTA's single largest secured creditor.
Prior to the GDB's Title VI restructuring, the GDB made significant loans to HTA totaling almost
$2 billion in principal amount (the "HTA Loans") pursuant to 23 separate promissory notes issued
by HTA to the GDB.  As of HTA's petition date, the HTA Loans had an aggregate outstanding
principal balance in excess of $1.7 billion and not less than $420 million in interest, plus fees and
expenses that have accrued under the terms of the loans.  *See* Proof of Claim No. 151149 filed on
June 29, 2018 by AmeriNational Community Services, as servicer for the GDB Debt Recovery
Authority, against HTA.

10.     Obligations under the HTA Loans are secured by the Assignment and Security
Agreement (the "Security Agreement"), dated as of August 28, 2013 between the GDB and HTA.
Pursuant to section 1.1 of the Security Agreement, HTA "absolutely, irrevocably, and
unconditionally assign[ed], convey[ed] and transfer[red] without recourse, to [the GDB all of its]
rights, title, obligations and interest in" the following revenues (collectively, the "Act 30-31
Revenues"):

(a)     The motor vehicle license fees described by Act No. 30-2013 approved by
the Legislature of the Commonwealth on June 25, 2013 ("Act 30");

7

     (b)      Up to $20,000,000 per fiscal year of the excise tax on cigarettes described by Act No. 31-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 31");

     (c)      The proceeds of the sixteen cents per gallon gasoline tax described by Act 31;

     (d)      The proceeds of the first four cents of the gas and diesel oil excise tax described by Act 31; and

     (e)      The proceeds of the petroleum products excise tax described by Act 31.

*See* Security Agreement § 1.1.[13]

11.     Act 30 amended the *Puerto Rico Vehicles and Traffic Act*, Act No. 22-2000, with the purpose of modifying the amount of money to be transferred to HTA, and transferred to HTA the entire amount received from each motor vehicle license fee that exceed $40 per year.[14] Act 31 amended the *Internal Revenue Code for a New Puerto Rico*, Act No. 1-2011, to increase the amounts transferred to HTA from excise taxes imposed, collected, and paid on crude oil, and partially finished and finished oil by-products and any other hydrocarbon mixture (*i.e.*, the petroleum excise taxes).  Among other things, Act 31 removed the cap on the petroleum excise taxes and allocated the entire amount of such funds to HTA, and allocated $20 million per year to HTA from the Commonwealth's excise tax on cigarettes.[15]

12.     The Act 30-31 Revenues include certain incremental revenues that were allocated to the GDB through Acts 30 and 31 (collectively, the "Incremental Act 30-31 Revenues").  The Incremental Act 30-31 Revenues are composed of: (i) the revenues received from each vehicle or trailer license fee in excess of $15; (ii) the revenues received from the petroleum excise taxes in

---

[13]     A true and correct copy of the Security Agreement was previously filed on the Court's docket as Exhibit E to the DRA Amended Lift Stay Motion [Dkt. No. 16276-23].

[14]     Prior to Act 30, HTA received only $15 for each motor vehicle or trailer license fee.

[15]     Prior to Act 31, HTA received a maximum of $120 million per year from the petroleum excise taxes and none of the excise tax on cigarettes.

excess of $120 million per fiscal year; and (iii) $20 million per fiscal year from the excise tax on cigarettes. The DRA is the *exclusive party* with collateral and payment rights with respect to the Incremental Act 30-31 Revenues. HTA bondholders do not have any property rights with respect to the Incremental Act 30-31 Revenues.

13.     Under section 1.2 of the Security Agreement, HTA also assigned, pledged and granted to the GDB "[a]s security for the prompt and complete payment and performance when due of all of its Obligations … a continuing security interest … in all of the right, title and interest of [HTA] in the [Act 30-31 Revenues], *whether presently held or hereafter acquired and wherever located.*" *See id.* § 1.2 (emphasis added). The liens granted to the GDB by the Security Agreement were duly perfected through the filing of UCC Financing Statement No. 2013004677 at the Puerto Rico Department of State on August 29, 2013, as amended on March 31, 2015.

14.     The DRA also holds $200,000,000 in the aggregate original principal amount of Puerto Rico Highway and Transportation Authority, Transportation Revenue Bonds (Series A), which HTA issued under Resolution No. 98-06, adopted by HTA on February 26, 1998. *See* OM at 128. As of HTA's petition date, HTA owed the GDB not less than $1.8 million in accrued interest plus fees and expenses related to these HTA Bonds. *See id*.

## IV.    The Commonwealth Has Unlawfully Retained the Act 30-31 Revenues, Causing the DRA and Other Parties to Seek Relief from the Court[16]

### A.    The "Clawback": The Puerto Rico Constitution and Statutes Protect Revenues Pledged for Service of HTA's Debt Obligations Owed to the DRA

15.     The Puerto Rico Constitution requires that the Commonwealth's annual appropriations not exceed its annual revenues, and, when the Commonwealth's resources are

---

[16]   A complete discussion of this issue can be found in the DRA Administrative Expense Claim Motion (as defined below), which is being filed contemporaneously with this Objection.

9

insufficient to cover its annual appropriations, it requires the Commonwealth to satisfy fiscal-year interest and amortization on general obligation bonds before it satisfies other obligations. *See* P.R. Const. art. VI, § 8.  The *Management and Budget Office Organic Act* (the "OMB Act"), creates a waterfall of payment priorities for "when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year."  Act No. 147 § 4(c) (June 18, 1980). Under this provision, if there are insufficient funds for the fiscal year, the Commonwealth must apply available funds to first pay "payment of interest and amortizations" corresponding to the public debt before any other debts are paid.  23 L.P.R.A. § 104(c)(1)-(5).

16.     Acts 30 and 31 each require that the Act 30-31 Revenues be transferred and conveyed from the Commonwealth to HTA unless Article VI, Section 8 of the Puerto Rico Constitution is invoked. *See* 9 L.P.R.A. § 5681; 13 L.P.R.A. §§ 31751(a)(1)(A), 31751(a)(1)(C), 31751(a)(3)(A), and 31751(a)(3)(C).

17.     On April 6, 2016, the Commonwealth approved the First Moratorium.  Pursuant to the authority granted to him by this Act, then-Governor Garcia-Padilla issued three executive orders (collectively, the "Clawback Executive Orders") that (i) suspended the repayment of HTA's debts (including those owed to the GDB and, subsequently, to the DRA), (ii) continued to withhold various government sources of revenue (including the DRA's collateral), and (iii) redirected the withheld funds to satisfy the operating expenses of the Commonwealth.  *See* Administrative Bulletin OE-2016-018 (May 17, 2016); Administrative Bulletin EO-2016-030 (June 30, 2016); Administrative Bulletin EO-2016-031 (June 30, 2016).

18.     The Commonwealth issued the Clawback Executive Orders without complying with the requirements for the "clawback"—which is the *only* legal and permissible justification for diversion of the revenues.  The Commonwealth made no effort to show how the diversion of

10

the revenues complied with the Puerto Rico Constitution's "clawback" provision and applicable

laws.  Each of the Clawback Executive Orders therefore violated the priority of debt payments set

forth in the Puerto Rico Constitution, the OMB Act, and Acts 30 and 31 by elevating the priority

of the payment of general expenses over the payment of HTA's senior secured debt, including the

HTA Loans and the HTA 98 Bonds.  The Commonwealth's diversion of the Act 30-31 Revenues

has continued throughout the pendency of its Title III case.

> **B.     The DRA Sought Relief Based on the Commonwealth's Diversion and Retention
> of the Act 30-31 Revenues**
>
>> *1.     The DRA Sought Payment of Adequate Protection or, in the Alternative,
>> Relief from the Automatic Stay*

19.     Given the Commonwealth's illegal diversion, retention, and use of the Act 30-31

Revenues, both the DRA and certain monoline insurers (the "Monolines") filed motions seeking

adequate protection or, in the alternative, for relief from the automatic stay.

20.     On June 25, 2019, the DRA Parties filed a motion seeking adequate protection or,

in the alternative, relief from the automatic stay.  *See* Dkt. No. 7643.  The DRA Parties

subsequently amended this motion on March 31, 2021 [Dkt. No. 16276] (the "DRA Amended Lift

Stay Motion").  The DRA Parties asserted that such actions violated the Puerto Rico Constitution

and Puerto Rico statutes and alleged that the dissipation of their collateral remained ongoing.  *See*

DRA Amended Lift Stay Motion ¶¶ 25-34.

>> *2.     The DRA Seeks Allowance of an Administrative Expense Claim*

21.     Contemporaneously with this Objection, the DRA Parties filed their motion for

allowance of an administrative expense claim (the "DRA Administrative Expense Claim Motion").

In that motion, the DRA Parties assert that they are entitled to an administrative expense claim

based on the Commonwealth's illegal post-petition retention of the Act 30-31 Revenues.  Upon

11

information and belief, the Commonwealth has retained more than $800 million of the Act 30-31 Revenues that are *exclusively* for the benefit of the DRA.[17]  Accordingly, as set forth more fully therein, the DRA Administrative Expense Claim Motion seeks allowance of an administrative expense claim equal to the amount of the DRA's collateral that has been unlawfully retained by the Commonwealth for its benefit during the pendency of its Title III case.

### C.    The Monolines Sought Relief from the Automatic Stay

22.    In August 2019 and again in January 2020, the Monolines, as direct holders and insurers of HTA 68 Bonds and HTA 98 Bonds, filed a motion for adequate protection or, in the alternative, for relief from the automatic stay with respect to bonds issued by HTA.  *See* Dkt. Nos. 8536, 10102.  The Monolines alleged that they had a perfected security interest in certain pledged revenues, including some of the Act 30-31 Revenues, and that stay relief was warranted because the Commonwealth had unlawfully diverted the revenues in violation of Article VI, Section 8 of the Puerto Rico Constitution.  *See id.* ¶¶ 4-24.

23.    On July 2, 2020, the Court issued a decision in connection with the Monolines' request for stay relief.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 619 (D.P.R. July 2, 2020).  In that decision, the Court concluded that the Monolines had failed to make the required showing of a *prima facie* security interest in the excise tax revenues (other than those that had been deposited in certain special funds).[18]  *See id.* at 641.  The decision noted that the Act 30-31

---

[17]   As set forth in the DRA Administrative Expense Claim Motion, the Commonwealth has retained more than $2.4 billion in Act 30-31 Revenues during the pendency of its Title III case.  The DRA Parties intend to take discovery in connection with the DRA Administrative Expense Claim Motion to quantify the exact size of the DRA's administrative expense claim.

[18]   Supplemental briefing on the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief From the Automatic Stay, or, in the Alternative, Adequate Protection* [Dkt. No. 10102] (the "Monolines' Amended Lift Stay Motion") was ordered by the Court concerning whether the Monolines could establish cause for stay relief based on certain grounds.  *See* Dkt. No. 13607.  On September 9, 2020, the Court issued a memorandum opinion and order denying the Monolines' Amended Lift Stay Motion as supplemented. *See* Dkt. No. 14186.  The Monolines appealed the Court's lift-stay orders to the United States Court of Appeals

Revenues "are not able to be used or obtained by HTA nor are they at HTA's disposal" and are instead "within the possession and control of the Commonwealth." *Id.* at 634-635. (internal quotations omitted). However, the Court did not reach the question of whether its lack of possession of the Act 30-31 Revenues means that HTA lacked any interest in the Act 30-31 Revenues. The Court also did not address the basis or justification for the Commonwealth's diversion of the revenues away from HTA or whether such diversion is permissible based on the framework of the Act 30-31 Revenues under applicable Puerto Rico law, including the Puerto Rico Constitution.[19]

24. The DRA's security interest in the Act 30-31 Revenues does not suffer from the deficiencies identified by this Court in its orders denying the Monolines stay relief. Unlike the Monolines—who alleged that their security interests were granted through the language in HTA's bond resolutions—the DRA is party to a separate Security Agreement that grants it a valid, perfected security interest in the Act 30-31 Revenues "*whether presently held or hereafter acquired and wherever located*," and the post-petition stream of future revenues stemming therefrom. Security Agreement § 1.2 (emphasis added). The Monolines simply lack this type of security interest in the Act 30-31 Revenues.

25. Moreover, the FOMB has not contested, and cannot contest, the DRA's security interest in the Act 30-31 Revenues, because the FOMB released the DRA from such claims in connection with the GDB's Title VI restructuring. *See* Dkt. No. 270 of Civil Case No. 18- 01561

---

for the First Circuit (the "First Circuit") on September 23, 2020. *See* Dkt. No. 14389. On March 3, 2021, the First Circuit issued its decision affirming the Court's prior orders (the "Monolines' Appeal Opinion"). *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 989 F.3d 170, 175 (1st Cir. 2021).

[19]   The Monolines' Appeal Opinion did not address these questions either or the validity and extent of the DRA's security interest in the Act 30-31 Revenues. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 989 F.3d 170, 175 (1st Cir. 2021).

(LTS) at ¶¶ 25-26, 31, and 35; P.R. Laws Ann. tit. 7, § 3212.  In addition, no other party has challenged the DRA's security interest and, in any event, the statute of limitations for a party to do so expired on May 21, 2019—two years after HTA's petition date.  *See* 11 U.S.C. § 546(a)(1)(A) (providing a trustee with "2 years after the entry of the order for relief" to commence an action to avoid a lien under the trustee's avoidance powers).

## V.    The FOMB Filed the Third Amended Plan

26.    On May 11, 2021, the FOMB filed the Third Amended Plan and Disclosure Statement.  The Third Amended Plan amends prior versions of the plan of adjustment filed on February 28, 2020 and March 8, 2021, and memorializes the terms of settlements set forth in (i) the Plan Support Agreement (the "GO PSA"), dated as of February 22, 2021, between the FOMB and certain holders of general obligation debt, (ii) the HTA/CCDA Related Plan Support Agreement (the "HTA/CCDA PSA"), dated as of May 5, 2021 among the FOMB, Assured Guaranty Corp. and Assured Guaranty Municipal Corp (collectively, "Assured"), National Public Finance Guarantee Corporation ("National"), and certain other holders of HTA and CCDA bonds, and (iii) the *Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to Plan of Adjustment*, dated as of April 2, 2021 between the FOMB and certain ERS bondholders.

27.    On May 13, 2021, the FOMB filed the Amended Disclosure Statement Motion, which seeks approval of the Disclosure Statement and other related relief, including establishment of plan confirmation deadlines.  *See* Amended Disclosure Statement Motion ¶ 25.

28.    The Third Amended Plan classifies and treats the DRA's claims as follows[20]:

---

[20]    As set forth further below, it is possible that certain other DRA claims are subject to the Third Amended Plan because they are purportedly Class 60 "CW Appropriations Claims."  *See infra* ¶¶ 110-112.  However, because

| CLAIM[21] | CLASS | TREATMENT |
|---|---|---|
| PBA Secured Loan – $49M | PBA/DRA Secured Claim (Class 11) | No recovery |
| PBA Unsecured Loans – $88M | PBA/DRA Unsecured Claims (Class 13) | No recovery |
| GO Loans – $56M[22] | 2012 CW Bond Claims (Class 37) | New GO Bonds, GO CVIs and cash, with 72.4% fixed recovery (excluding recoveries on account of GO CVIs) |
| PAA Bond Guaranty – $226M[23] | 2014 CW Guarantee Bond Claims (Class 46) | New GO Bonds, GO CVIs and cash, with 67.7% fixed recovery (excluding recoveries on account of GO CVIs) |
| HTA Loans – $1,734M HTA Bonds – $200M | CW/HTA Claims (Class 56) | HTA Clawback CVIs. Under the Third Amended Plan, distributions of HTA Clawback CVIs will follow a priority waterfall that would pay the DRA's loan claims only after all of the HTA bondholders are paid the full amount of their claims. The distribution of HTA Clawback CVIs between the holders of HTA 98 Bonds and the HTA Loans will be reserved pending a resolution of each party's priority rights. No estimated recovery on account of HTA Clawback CVIs is provided. |

---

the Third Amended Plan and Disclosure Statement are unclear in this regard, the DRA Parties request that the Disclosure Statement be revised to make clear which of the DRA's claims fall into this class of claims. *See infra* ¶¶ 110-112. In the event that Class 60 includes obligations under the loans made by the GDB to the Convention Center District Authority ("CCDA") (which are now property of the DRA), the DRA Parties assert that these CCDA obligations cannot be adjusted pursuant to the Third Amended Plan and reserve all rights with respect thereto.

[21]   Claim amount reflects the principal amount due as of the relevant Debtor's petition date.

[22]   This amount is net of the principal amount attributable to the GO Loans transferred by DRA to SPCP. *See supra* n. 8.

[23]   The DRA has sold its interest in the PAA Bond Guaranty, with the transaction expected to settle on June 18, 2021. *See supra* n. 11.

15

## **OBJECTION**

**I.     The Third Amended Plan Is Not Confirmable on Its Face[24]**

29.     Courts are empowered to disapprove of the disclosure statement when the proposed

plan cannot be confirmed.  *See In re EL Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R.

2006); *In re Filcas of America, Inc.*, 147 B.R. 297, 298 (Bankr. D.N.H. 1992) ("If [the] plan is not

confirmable on its face, the Court will not proceed further with disclosure statement questions

because it will be an obvious exercise in futility.").[25]  At the disclosure statement hearing, courts

may examine the plan to determine whether it is so flawed that confirmation is impossible.  *See*

*EL Comandante Mgmt. Co.*, 359 B.R. at 415 ("At the hearing on the approval of a disclosure

statement, the court may consider issues pertaining to the plan, and may rule upon such issues . . .

when the plan is so fatally, and obviously flawed that confirmation is impossible.") (internal

citations and quotations omitted).  A court may find that a plan is not capable of being confirmed

at the disclosure statement phase if the plan improperly classified claims or it unfairly

discriminates against a class of claims.  *See id.* ("Relevant issues pertaining to the plan are

classification of claims, an artificial classification of a claim, whether the plan unfairly

discriminates against a class of claims, and the solicitation procedure.").

---

[24]    The DRA reserves the right to raise other objections to plan confirmation that are not set forth in this Objection, and nothing herein shall be construed to limit or waive the DRA's right to do so at a later date.

[25]    The requirements for confirmation of a plan of adjustment are set forth in PROMESA section 314(b), which requires that: (1) the plan complies with the Bankruptcy Code; (2) the plan complies with provisions of PROMESA; (3) the debtor is not legally prohibited from taking any action necessary to carry out the plan; (4) the plan provides that each claim holder of a type specified in Bankruptcy Code section 507(a)(2) will receive cash equal to the allowed amount of the claim, except to the extent the claimholder has agreed otherwise; (5) any legislative, regulatory, or electoral approval necessary to effectuate any plan provision has been obtained, or the provision is expressly conditioned on approval; (6) the plan is feasible and in the best interests of creditors, requiring the court to consider possible available non-bankruptcy remedies; and (7) the plan is consistent with the Fiscal Plan certified by the Oversight Board.  *See* 48 U.S.C. § 2174.

30.     As set forth below, the Court should not permit the solicitation of the Third

Amended Plan and Disclosure Statement because the current Third Amended Plan cannot be

confirmed for a number of reasons, including those set forth below.

### A.     *Objections Relating to the DRA's HTA Claims*

#### 1.     *The Third Amended Plan Functions as a Sub Rosa HTA Plan*

31.     While the Third Amended Plan purports to address claims at the Commonwealth,

PBA and ERS only, it also operates as a back door plan for HTA.   The Third Amended Plan,

however, ignores the standards for confirmation of an HTA plan.   Instead, the FOMB attempts to

use the Third Amended Plan to, among other things, (i) definitively establish the priority of claims

against HTA when no court has yet determined such priority, (ii) require that HTA make $264

million in interim distributions to certain HTA bondholders outside of a confirmed HTA plan, and

(iii) provide broad releases that potentially release claims against HTA and certain other parties

(and HTA's claims against the Commonwealth) despite the fact that HTA is not a debtor under the

Third Amended Plan.

32.     The Third Amended Plan materially impacts claims at HTA despite the fact that (i)

HTA is not a party to the proposed plan and (ii) the FOMB has failed to file and satisfy any of the

confirmation standards for an HTA plan, including that it be accepted by creditors of HTA.[26]  The

Court should not permit approval of this *sub rosa* plan for HTA because doing so violates

applicable bankruptcy law, rendering the Third Amended Plan unconfirmable on its face.

33.     Courts have held that a *sub rosa* plan is "a broad settlement that amounts to a de

facto plan of reorganization, which enables a debtor to restructure its debt while bypassing many

---

[26]     The settlement of claims at HTA set forth in the HTA/CCDA PSA and memorialized in the Third Amended Plan
was negotiated without the involvement or inclusion of HTA's single largest creditor, the DRA, which holds more
than $1.7 billion in loan claims at HTA and more than $200 million in principal amount of HTA 98 Bonds.

of the Bankruptcy Code's fundamental creditor protections." *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (Bankr. D. Del. 2015) (citations omitted).  Courts have, therefore, prohibited *sub rosa* plans because such plans "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan." *See In re Tempnology LLC*, 542 B.R. 50, 64 (Bankr. D.N.H. 2015) (citing *Motorola, Inc. v. Official Comm. Of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007).

34.     In determining whether a settlement amounts to a *sub rosa* plan, courts will consider whether the settlement "has the effect of dictating the terms of a prospective Chapter 11 plan." *Energy Future Holding Corp.*, 527 B.R. at 168.  Settlements that require a debtor to make distributions to creditors outside of a confirmed plan or that include broad releases have also been found to constitute *sub rosa* plans.  *In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983) (finding that a plan support agreement constituted a *sub rosa* plan when it, among other things, "changed the composition of [the Debtor's] assets", "had the practical effect of dictating some of the terms of any future reorganization plan" and "provided for the release of claims by all parties against [the Debtor], its secured creditors and its officers and directors."); *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014) (considering whether "funds are going 'out the door'" when determining whether a settlement agreement constituted a *sub rosa* plan).

35.     This is exactly what the FOMB has done here.  The FOMB has settled an array of claims at HTA—despite the fact that no HTA plan has been proposed and confirmed—in an effort to resolve claims at the Commonwealth and other debtors.  The Third Amended Plan constitutes a *sub rosa* HTA plan for several reasons.

36.     *First*, the Third Amended Plan has the practical effect of dictating the terms of an HTA plan of adjustment because it allocates HTA Clawback CVIs under the assumption that the

18

DRA's HTA Loan claims are subordinate to the HTA bondholders' claims before any determination as to the relative priorities of such claims has been made by the Court.  Exhibit J-12 of the Third Amended Plan specifies a distribution waterfall of HTA Clawback CVIs whereby distributions are allocated *first* to "HTA 68 Bond Claims," *second* to "HTA 98 Senior Bond Claims," *third* to "HTA 98 Sub Bond Claims," and *fourth* to the DRA's HTA Loan claims. Similarly, while the Third Amended Plan contemplates that there will be a CVI Payment Reserve pending the Court's determination of the relative priorities of certain HTA Bond claims and the DRA's HTA Loan claims, that reserve (as currently drafted) already assumes that the DRA's HTA Loan claims are, at most, *pari passu* to the HTA 98 Bond Claims and does not account for alternative priorities among these claims.  *See* Third Amended Plan § 1.146 (establishing a CVI Payment Reserve based *only* on a scenario where the DRA's HTA Loans are *pari passu* with the HTA 98 Bonds).  Further, as discussed below, in reliance on the same flawed assumption that the DRA's HTA Loan claims are subordinate or (at most) *pari passu* to the HTA bondholders' claims, the Third Amended Plan requires that HTA make an interim distribution to certain holders of HTA Bonds with no such distributions being made to the DRA on account of its HTA Loan claims.

37.     The Third Amended Plan improperly attempts to definitively establish the relative claim priorities at HTA when, to date, no court has found that the DRA's HTA Loan claims are subordinate to the HTA bondholders' claims.  In fact, the Court's July 2, 2020 order relating to the Monolines' request for stay relief concluded that the Monolines do not have liens on the Act 30-31 Revenues prior to their receipt by HTA and their deposit in certain special funds.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 619, 641 (D.P.R. July 2, 2020).  By contrast, the DRA has a lien "in all of the right, title and interest of [HTA] in the [Act 30-31 Revenues], *whether presently held or hereafter acquired and wherever located*."  *See* Security Agreement § 1.2

(emphasis added).[27]   As noted above, that lien has not been, and cannot be, challenged as the statute of limitations for a party to do so has passed.  *See supra* ¶¶ 12, 25.

38.      *Second*, and even more concerning, is the FOMB's attempt to make distributions of HTA assets to holders of certain HTA Bonds outside of a confirmed HTA plan of adjustment. Specifically, section 82.1(b)(xv) of the Third Amended Plan requires that HTA make an interim distribution of $264 million to the holders of HTA 68 Bonds and HTA 98 Senior Bonds in partial satisfaction of their respective claims outside of a confirmed HTA plan.  As both the *Braniff* and *Nortel Networks* courts have concluded, one of the key hallmarks of a *sub rosa* plan is the attempt to make distributions to creditors outside of a confirmed plan.  *See supra* ¶ 34.  Additionally, the DRA, as the holder of HTA Loan claims, is being deprived of an opportunity to vote on the treatment of such claims when the right to vote is fundamental to the plan confirmation process. *See Energy Future Holding Corp.*, 527 B.R. at 168 (noting that a settlement that "restrict[s] creditors' rights to vote" may constitute a *sub rosa* plan).

39.      *Third*, the Third Amended Plan provides for impermissibly broad releases (including third-party releases) of "all Claims or Causes of Action against the Released Parties" and their "Related Persons", which consist of, among others, the Debtors and their agencies (which may include HTA), creditors party to the GO PSA and HTA/CCDA PSA, and their respective current and former officers and directors.  *See* Third Amended Plan § 88.2(b); § 1.371 (defining "Released Parties"); § 1.369 (defining "Related Persons").  The Third Amended Plan also provides for injunctive relief in connection with the foregoing releases.  *See* Third Amended Plan § 88.3

---

[27]   At the oral argument on the Monolines' appeal of the order denying their lift stay motion, Judge Lipez of the First Circuit suggested that the DRA has stronger liens in the Act 30-31 Revenues than the HTA bondholders because its lien on the excise tax revenues is not dependent on the location of such revenues.  *See* Tr. at 47:2-47:9 (1st Cir. Feb. 4, 2021) ("Do you agree that if the bond resolution contained the kind of language that I just quoted from the [DRA] brief that [the Monolines] would be in a much stronger position to argue that the pledged revenues were not contingent on what HTA or the Commonwealth happened to deposit into the sinking fund").

(enjoining all actions or proceedings relating to "Claims" and "Causes of Action" released under the Third Amended Plan); § 88.9 (enjoining all persons from pursuing any causes of action against any of the "Released Parties" relating to "Claims" and "Causes of Action" released under the Third Amended Plan). In addition, the releases in the Third Amended Plan may potentially cover HTA's claims against the Commonwealth. *See* Third Amended Plan § 88.5 (providing that "each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to . . . waive, release, acquit, and discharge the Released Parties"). The Third Amended Plan is a plan of adjustment for the Commonwealth, not for HTA. It is, therefore, improper and premature for the Third Amended Plan to (i) release claims against HTA or against creditors party to the GO PSA and HTA/CCDA PSA to the extent they relate to the distribution of assets under an HTA plan, or (ii) release HTA's claims against the Commonwealth as well as any other party falling within the scope of the term "Released Parties," as this would potentially have significant ramifications on the value of HTA assets and HTA creditor recoveries. The FOMB cannot short circuit the confirmation requirements for an HTA plan of adjustment and disregard the protections afforded to HTA creditors under PROMESA by shoehorning into the Third Amended Plan releases and injunctions that can only be granted under an HTA plan. *See supra* ¶ 34.

40.     This Court should not permit the FOMB to circumvent confirmation requirements for an HTA plan by using the Third Amended Plan to (i) unilaterally dictate the relative priorities of claims at HTA, (ii) mandate HTA to make distributions to certain of its creditors outside of a confirmed HTA plan (and without allowing *all* of its creditors to vote on such plan), and (iii) provide for impermissibly broad releases (including third-party releases) of HTA and certain of its creditors. The Third Amended Plan, therefore, must be amended to remove all of the impermissible provisions that effectuate a *sub rosa* HTA plan. Absent such amendment, the Third

Amended Plan cannot satisfy Bankruptcy Code section 1129(a)(3) because a *sub rosa* plan violates

the protections afforded to HTA creditors under the Bankruptcy Code.[28]

> 2.    *The Settlements Contained in the HTA/CCDA PSA Violate Bankruptcy*
>       *Rule 9019 and the Bankruptcy Code*

41.    The Third Amended Plan is also not confirmable because the settlements contained

in the HTA/CCDA PSA (which are incorporated into the Third Amended Plan) violate Rule 9019

of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the Bankruptcy

Code's priority scheme.

42.    The FOMB must show that the HTA/CCDA PSA is fair, equitable and otherwise

satisfies the requirements of Bankruptcy Rule 9019 before it can be approved as part of the Third

Amended Plan.  *See In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996)

("Whether the compromise is effected separately or in the body of a reorganization plan will not

affect the approval analysis required of the bankruptcy court."); *see also* Fed. R. Bankr. P. 9019;

*In re Robotic Vision Sys., Inc.*, 378 B.R. 417 (B.A.P. 1st Cir. 2007) (noting that a settlement should

be "fair and equitable and in the best interests of the estate").  A settlement is "fair and equitable"

under Bankruptcy Rule 9019 if the priority of senior creditors over junior ones are respected.  *See*

*In re C.P. del Caribe, Inc.*, 140 B.R. 320, 326 (Bankr. D.P.R. 1992) ("The terms 'fair and

equitable' have been defined to mean that senior interests are entitled to full priority over junior

interests.") (citing *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir.1984)).

43.    The HTA/CCDA PSA settlement incorporated into the Third Amended Plan is

problematic because it prematurely (i) seeks to definitively establish the priority of claims against

HTA (without a plan of adjustment and disclosure statement for HTA even having been filed with

---

[28]    The Third Amended Plan may also effectuate a *sub rosa* plan for CCDA but further information concerning
       CCDA's capital structure is required to make that determination.

the Court), and (ii) requires that $264 million in interim distributions be made to certain HTA bondholders before the priority of their claims (and therefore their entitlement to such funds) has been determined.  *See supra* ¶¶ 31-32.  As noted above, the Third Amended Plan assumes that HTA bondholders' claims are senior to the DRA's HTA Loan claims (and make distributions in reliance thereon) when no court has found that the DRA's HTA Loan claims are subordinate to the HTA bondholders' claims, and when significant HTA creditor constituencies (including the DRA) have been excluded from negotiations.

44.     The FOMB's attempt to effectively make HTA distributions in violation of Bankruptcy Rule 9019 and the Bankruptcy Code should not be countenanced.  *See In re CGE Shattuck, LLC*, 254 B.R. 5, 11 (Bankr. D.N.H. 2000) (refusing to approve a creditor's settlement proposal to make distributions to certain other creditors where "the economic substance and effect" of the proposal would be to sanction a distribution scheme that violates the Bankruptcy Code). The settlements contained in the Third Amended Plan, which attempt to permanently adjudicate the treatment of HTA creditors in contravention of the Bankruptcy Code's priority scheme, was expressly rejected by the United States Supreme Court in *Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973, 986 (2017) (rejecting approval of a settlement which proposes a final distributions of estate assets to particular creditors in contravention to the Bankruptcy Code's priority scheme).

45.     Accordingly, because the Third Amended Plan provides for distributions to certain HTA creditors without satisfying the requirements of the Bankruptcy Code and Bankruptcy Rules, the Third Amended Plan cannot be confirmed under PROMESA section 314(b)(3) and Bankruptcy Code section 1129(a)(3).

3.     *The Third Amended Plan Violates Applicable Law Because it Provides for Disparate Treatment of Creditors Within the Same Class*

23

46.     The Third Amended Plan violates Bankruptcy Code section 1123(a)(4) because it treats holders of the HTA Bonds in Class 56 (CW/HTA Claims), especially those that are party to the HTA/CCDA PSA (principally Assured and National), more favorably than the holders of the HTA Loan claims in the same class.

47.     Under Bankruptcy Code section 1123(a)(4) (which is incorporated into PROMESA through PROMESA section 301(a)), a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." *See* 11 U.S.C. § 1123(a)(4).  It is well settled that equality of treatment means that "all class members receive equal value and pay the same consideration in exchange for their distributions." *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (S.D.N.Y. 2018).  The key inquiry under Bankruptcy Code section 1123(a)(4) is whether all of the claimants in a class "have the same opportunity for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).  The treatment afforded to the DRA's HTA Loan claims in Class 56 violates Bankruptcy Code section 1123(a)(4) for several reasons.

48.     *First*, the DRA is not receiving the same treatment, or the same opportunity for recovery, on account of its HTA Loans as compared to the holders of the HTA Bonds because the Third Amended Plan presupposes that the HTA Loan claims are subordinate to the HTA Bond claims and provides greater recoveries to HTA bondholders without justification. *See* Third Amended Plan §§ 60.1-60.2, Ex. J.  There has been no determination that the HTA bondholders' claims are senior to the DRA's HTA Loan claims.  To the contrary, the DRA has superior interests to those of the bondholders—potentially with respect to a wide swathe of claims, and certainly with respect to the Incremental Act 30-31 Revenues.

24

49.     *Second*, holders of HTA 68 Bonds and HTA 98 Senior Bonds are receiving additional consideration in the form of accelerated distributions of $264 million from HTA, whereas the DRA's HTA Loan claims in the same class are not receiving the same treatment.[29]

50.     *Third*, the creditors party to the HTA/CCDA PSA are receiving up to $140 million in PSA Restriction Fees and up to $125 million in HTA Consummation Costs (as each is defined in the HTA/CCDA PSA). *See* HTA/CCDA PSA § 1.2 (definitions of "HTA Consummation Costs" and "PSA Restriction Fees"); § 4.9(b)(xx) (requiring the $264 million interim HTA distribution). Separately, Assured and National are receiving $58.6 million in fees for structuring the settlement set forth in the HTA/CCDA PSA (the "Structuring Fees"). See HTA/CCDA PSA § 6.1(d). While the payment of (i) the PSA Restriction Fees and HTA Consummation Costs are structured as plan support agreement fees (*see* HTA/CCDA PSA § 6.1), and (ii) the Structuring Fee is considered a condition precedent to plan effectiveness (*see* Third Amended Plan § 82.1(b)(xvi)), these fees are being provided on account of the HTA Bond claims whereas the DRA's HTA Loan claims in the same class are not receiving the same treatment.

51.     *Fourth*, the payment of HTA Clawback CVIs on account of the DRA's HTA Loan claims is subject to distribution conditions that can only be satisfied with the consent of certain named creditors that are parties to the HTA/CCDA PSA. Specifically, sections 60.1 and 60.2 of the Third Amended Plan provide that HTA Clawback CVIs can only be distributed upon the satisfaction of "Distribution Conditions", which is defined to include, among other things, completion of all HTA plan documents *to the satisfaction of Assured and National*. The DRA does not have the same consent rights as Assured and National and, in fact, its ability to receive

---

[29]     While the $264 million of accelerated HTA distributions are structured as a condition precedent to plan effectiveness (*see* Third Amended Plan § 82.1(b)(xv)), this distribution is, as a practical matter, being provided on account of HTA 68 Bond and HTA 98 Senior Bond claims.

distributions on account of its HTA Loan claims, and the timing of its receipt of such distributions, is subject to Assured and National's consent rights.

52.     *Fifth*, the timing for when HTA Clawback CVIs are distributed to holders of CW/HTA Claims may violate Puerto Rico law because it could conflict with the priority rights of creditors in that class. *See infra* at ¶¶ 79-85. Section 60.2 of the Third Amended Plan provides that a portion of HTA Clawback CVIs must be held in reserve pending the Court's determination of relative creditor priorities at HTA. That section, however, also contains an override provision, stating that "[n]otwithstanding the foregoing, the HTA Clawback CVI to be issued and distributed shall be held in a reserve or trust. . . up to and including the date on which the Distribution Conditions are satisfied." *See* Third Amended Plan § 60.2. The "Distribution Conditions" (as defined in the Third Amended Plan) do not include a requirement that there be a determination as to the relative priorities of the HTA Bond claims and HTA Loan claims prior to when distributions are made to holders of HTA Bonds. Therefore, this override provision suggests that HTA Clawback CVIs can be distributed to holders of HTA Bonds even in the absence of any resolution regarding the relative priorities of the HTA Bond claims and HTA Loan claims.

53.     Moreover, section 60.2 of the Third Amended Plan provides that termination of the HTA/CCDA PSA by the FOMB, Assured and/or National results in the automatic release of funds from the CVI Payment Reserve in accordance with the waterfall of priorities set forth on Exhibit J. *See* Third Amended Plan § 60.2 ("[I]n the event the HTA/CCDA Plan Support Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit 'J'"). As previously noted, that waterfall assumes that the DRA's HTA Loan claims are subordinate to the HTA

26

bondholders' claims.  The Third Amended Plan would not be confirmable to the extent HTA

Clawback CVIs are distributed in a manner contrary to the relative priority rights of holders of

CW/HTA Claims.  *See* 11 U.S.C. § 1129(a)(3).

54.     Simply put, there should be no distributions of HTA Clawback CVIs unless and

until the priority of claims at HTA, including the relative priorities of the DRA's HTA Loan claims

and HTA Bond claims, is determined by the Court.

4.     *The Third Amended Plan Violates Commonwealth Law*

55.     Bankruptcy Code section 1129(a)(3), incorporated into PROMESA through

PROMESA section 301(a), prohibits a court from confirming a plan that is "by any means

forbidden by law", and PROMESA section 314(b)(3) requires that the debtor not be prohibited by

law from taking any action necessary to carry out the plan.  11 U.S.C. § 1129(a)(3); 48 U.S.C. §

2174(b)(3).

56.     The Third Amended Plan cannot be confirmed because it allows for the

Commonwealth to permanently retain the Act 30-31 Revenues in contravention of Article VI,

Section 8 of the Puerto Rico Constitution and other applicable Commonwealth law, and to use

such revenues to provide recoveries to Commonwealth creditors (when such revenues should

otherwise be made available to pay HTA creditors under an HTA plan).  *See* Third Amended Plan

§ 82.1(h) ("The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have

been determined by the Title III Court to constitute property of the Commonwealth").

57.     The Commonwealth has not demonstrated that it is legally permitted to retain these

funds.  Because the Commonwealth cannot legally seize ownership of the Act 30-31 Revenues,

27

the Third Amended Plan's conversion of the revenues into property of the Commonwealth is contrary to law, rendering the Third Amended Plan unconfirmable.[30] *See supra* ¶¶ 16-18.

5.    *The Third Amended Plan Violates the DRA's Takings Clause Rights*

58.    Similarly, the Third Amended Plan cannot be confirmed under Bankruptcy Code section 1129(a)(3) or PROMESA section 314(b)(3) because the plan violates the DRA's rights under the Takings Clause of the Fifth Amendment to the United States Constitution (the "Takings Clause").

59.    The Third Amended Plan's proposed conversion of the diverted funds to property of the Commonwealth is contrary to the Takings Clause.  The diverted funds—as property of HTA subject to the DRA's perfected liens—constitute a property interest subject to constitutional protection under the Takings Clause.  *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) (liens "constitute compensable property" and cannot be destroyed without just compensation).  For the reasons previously identified, the Third Amended Plan effects the destruction of preexisting liens and the erasure of creditor priority designations.  *See supra* ¶¶ 36-40.  As such, the DRA has a property interest in the diverted funds that cannot be taken by the Commonwealth without "just compensation".

60.    Moreover, any claim arising under the Takings Clause is non-dischargeable and cannot be adjusted or compromised by a plan of adjustment in a manner that pays the creditor a fractional recovery.  *In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014).  Because the Third Amended Plan proposes to convert the diverted funds to property of the Commonwealth without providing for payment in full of the DRA's resulting Takings Clause claim, the Third

---

[30]   *See, e.g.*, *The DRA Parties' Amended Motion and Memorandum of Law in Support of Their Request for Adequate Protection or Relief from the Automatic Stay* [Dkt. No. 16276].

28

Amended Plan is unconfirmable under PROMESA section 314(b)(3) and Bankruptcy Code section
1129(a)(3).

**B.    *Objections Relating to the DRA's PBA Claims***

1.    *Separate Classification of Certain DRA PBA Claims from PBA General
Unsecured Claims is Impermissible*

61.    The separate classification of the DRA's PBA/DRA Unsecured Claim and the
deficiency attributable to the PBA/DRA Secured Claim from PBA General Unsecured Claims
renders the Third Amended Plan unconfirmable as to PBA.

62.    Bankruptcy Code section 1122(a) (which is incorporated into PROMESA through
PROMESA section 301(a)) provides that "a plan may place a claim or an interest in a particular
class only if such claim or interest is substantially similar to the other claims or interests of such
class."  11 U.S.C. § 1122(a).  Under PROMESA section 301(e), when "determining whether
claims are 'substantially similar' for the purpose of section 1122 of [the Bankruptcy Code], the
Oversight Board shall consider whether such claims are secured and whether such claims have
priority over other claims."  48 U.S.C. § 2161(e).

63.    First Circuit case law interpreting Bankruptcy Code section 1122(a) requires a
debtor to classify unsecured claims together if the claims have similar legal attributes.  *See
Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42,
46 (1st Cir. 1984) ("The general rule regarding classification is that all creditors of equal rank with
claims against the same property should be placed in the same class.  Separate classifications for
unsecured creditors are only justified where the legal character of their claim is such as to accord
them a status different from the other unsecured creditors.") (internal citations omitted).
Unsecured loan claims and deficiency claims arising from non-recourse secured claims have the
same legal character as, and must be classified together with, other general unsecured claims absent

29

a legitimate business reason for separate classification. *See*, *e.g.*, *In re Sabana del Palmar, Inc.*, No. 12-06177 (ESL), 2013 WL 2367830 (Bankr. D.P.R. May 29, 2013) (holding that a debtor may not separate a creditor's unsecured claims, which consisted of an unsecured deficiency claim and an unsecured loan, from the remainder of unsecured claims against the debtor absent a legitimate business reason); *In re National/Northway Ltd. P'ship*, 279 B.R. 17, 29 (Bankr. D. Mass 2002) ("[U]nsecured claims, whether trade or deficiency claims, must be classified together.").

64.     The Third Amended Plan defines the loans made by the DRA to PBA in the outstanding principal amounts of $66,222,028.00 and $134,357,498.00 as the "PBA/DRA Secured Claim" and "PBA/DRA Unsecured Claim," respectively (collectively, the "DRA PBA Claims"). *See* Third Amended Plan §§ 1.341, 1.342.  These claims have been classified into Classes 11 and 13, respectively.  *See* Third Amended Plan §§ 4.1(k), 4.1(m).  Although separately classified, the Third Amended Plan assumes that both claims are unsecured.[31]

65.     Section 1.343 of the Third Amended Plan defines "PBA General Unsecured Claims" to expressly exclude the PBA/DRA Unsecured Claim and the deficiency attributable to the PBA/DRA Secured Claim.  In addition, section 4.1 of the Third Amended Plan places each of the PBA/DRA Unsecured Claim, the PBA/DRA Secured Claim and PBA General Unsecured Claims in separate classes.  As a result, the DRA will not receive any recovery on account of its PBA secured and unsecured claims under the Third Amended Plan, whereas the PBA General Unsecured Claims are deemed unimpaired and will (i) be reinstated, (ii) be paid in full, in cash or (iii) receive such other treatment as may be mutually agreed as between PBA and the applicable

---

[31]     Article XV of the Third Amended Plan presumes that the PBA/DRA Secured Claim does not have the benefit of any collateral securing such claim and, therefore, treats the entire claim as an unsecured deficiency claim.  The DRA Parties disagree with such characterization and treatment of the PBA/DRA Secured Claim and expressly reserve all of their rights with respect to the secured status of such claim.  *See infra* ¶ 70.  Further, the DRA Parties reserve all rights with respect to making an election under Bankruptcy Code section 1111(b) with respect to its PBA/DRA Secured Claim.

claim holder. *See id.* §§ 1.343, 16.1. The FOMB has not, however, satisfied its burden of explaining why the legal character of the PBA/DRA Unsecured Claim and the deficiency attributable to the PBA/DRA Secured Claim justifies different treatment from PBA's other unsecured creditors. *See also In re Barney & Carey Co.*, 170 B.R. 17, 24 (Bankr. D. Mass. 1994) ("[T]he burden is on the debtor to show a legitimate non-gerrymandering reason for the separate classification…. *Granada Wines* requires that the Debtor establish that the legal nature[s] of the separately classified claims differ.") (internal citations omitted).

66.     The DRA's PBA deficiency and unsecured claims have the same legal character, including their unsecured status and priority of recovery, as other PBA general unsecured claims because they are all payable from revenue sources that could be used to pay general unsecured creditors. *See* OM at 132 ("The Loans are unsecured obligations of PBA payable from (i) the proceeds of future PBA bond issuances and (ii) the revenues received by PBA in respect of rental payments corresponding to the facilities financed with the corresponding Loans, which facilities are not identified in the Loan documents.").

67.     The fact that some or all PBA General Unsecured Claims consist of ordinary course wage claims is not a legitimate reason for separate classification. First Circuit case law makes clear that wage claims not statutorily entitled to priority should be classified together with all other general unsecured claims. *See*, *e.g.*, *In re Organogenesis Inc.*, 316 B.R. 574, 589 (Bankr. D. Mass. 2004) (ordering that wage claims not entitled to priority under Bankruptcy Code section 507 be treated as general unsecured claims); *In re Wang Lab'ys, Inc.*, 164 B.R. 404, 405 (Bankr. D. Mass. 1994) (same); *see also In re Palau Corp.*, 18 F.3d 746, 748 (9th Cir. 1994) ("Wage claims not falling in one of [the priorities of 11 U.S.C. § 507] are general unsecured claims against the debtor.") (citations omitted). Accordingly, the DRA's PBA/DRA Unsecured Claim and the

deficiency attributable to the PBA/DRA Secured Claim should be classified together with PBA General Unsecured Claims.

2.    *The Third Amended Plan Unfairly Discriminates Against the DRA's PBA Claims*

68.    The Third Amended Plan cannot be confirmed because it violates Bankruptcy Code section 1129(b)(1) by unfairly discriminating against the DRA PBA Claims in comparison to PBA General Unsecured Claims.

69.    A debtor cannot confirm a plan under section 1129(b) if the plan unfairly discriminates against dissenting impaired creditors. *See* 11 U.S.C. § 1129(b)(1). A plan unfairly discriminates against such creditors if it provides them with disparate treatment when compared to similarly situated creditors. *See Granada Wines, Inc. v. New England Teamsters and Trucky Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984). The purpose of the unfair discrimination standard is to "ensure[] that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). Therefore, a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes. *See id; see also In re Barney & Carey, Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994) ("Section 1129 (b)(1) prohibits a debtor from proposing unreasonably different treatment between classes of similar claims. In other words, regardless of classification, the similarly situated claims […] must not be treated in such a disparate manner as to be unfair."); *In re Wilhelm*, 101 B.R. 120, 123-24 (Bankr.

32

W.D. Mo. 1989) (holding that a plan unfairly discriminated when it provided greater recovery for unsecured nonpriority wage claims than for the similarly situated general unsecured claims).[32]

70.    As set forth above, the Third Amended Plan improperly classifies the PBA/DRA Unsecured Claim and the deficiency attributable to the PBA/DRA Secured Claim separately from PBA General Unsecured Claims without proper justification.  *See supra* ¶¶ 61-67.  Even if there is some justification for such separate classification (which there is not), the claims in Classes 11, 12, and 13 are substantially similar and must be treated the same way.  The Third Amended Plan's disparate treatment of the PBA/DRA Unsecured Claim and the deficiency attributable to the PBA/DRA Secured Claim as compared to the PBA General Unsecured Claims is completely without justification and renders the Plan unconfirmable.  *See*, *e.g.*, *Barney & Carey*, 170 B.R. at 25-26.

71.    Additionally, the Third Amended Plan presumes that the entire PBA/DRA Secured Claim is unsecured (which the DRA Parties dispute) and provides distributions to the holders of the PBA General Unsecured Claims ahead of the holders of PBA/DRA Secured Claim without the DRA's consent.  If it is determined that the PBA/DRA Secured Claim is fully or partially secured, then the Third Amended Plan cannot be confirmed because it provides distributions to lower-priority creditors (the holders of the PBA General Unsecured Claims) while providing no distributions on account of the secured portion of the PBA/DRA Secured Claim without the consent of the DRA—the affected, higher-priority creditor.  *See Jevic*, 137 S. Ct. at 983 (holding

---

[32]    Unfair discrimination is not typically raised as an issue for approval of a disclosure statement because it is generally not yet known whether a particular class will accept or reject the plan.  However, that is not the case here because the DRA is the only creditor in each of classes 11 and 13, and such classes are deemed to reject the Third Amended Plan.  Therefore, it is clear that, for the Third Amended Plan to be confirmable under Bankruptcy Code section 1129, it must not unfairly discriminate against the DRA's claims in classes 11 and 13.

that a bankruptcy court cannot approve a transaction that provides for distributions that do not

follow ordinary priority rules without the affected creditors' consent).

### C.   The Third-Party Release, Exculpation and Injunction Provisions in the Third Amended Plan Are Improper

72.   In addition to the impermissibly broad releases (including third-party releases)

identified earlier, *see supra* ¶¶ 31, 39, other provisions of the Third Amended Plan seek to

exculpate certain third-parties (including Assured and National, and potentially HTA) for all acts

taken in connection with the Title III cases, the Disclosure Statement and the Third Amended Plan

(including settlements contain therein).  *See* Third Amended Plan § 88.7 (providing for the

exculpation of, among others, the Oversight Board, AAFAF, the Debtors, each of the PSA

Creditors, Assured, National, Syncora and certain Related Persons (which may include HTA) of

the forgoing).

73.   In the First Circuit, the lower courts have adopted the five-factor analysis set forth

in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937–38 (Bankr. W.D. Mo. 1994)

when determining whether, and to what extent, to confirm plans containing these types of release,

exculpation and injunction provisions.  *See In re Quincy Med. Ctr.*, Inc., No. 11016394-MSH,

2011 WL 5592907, at *2 (Bankr. D. Mass. Nov. 16, 2011) (describing the various standards courts

have applied to determine the permissibility of plan release, exculpation and injunction provisions,

and noting that a number of courts within the First Circuit apply the 5-factor test articulated in

*Master Mortgage*).[33]

---

[33]   These factors are:

(1) whether there is an identity of interest between the debtor and the third-party being released such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) whether the non-debtor being released has contributed substantial assets to the reorganization;

34

74.    The FOMB has not satisfied any of the *Master Mortgage* factors to justify the overbroad releases, exculpation, and injunction provisions contained in the Third Amended Plan because, among other things: (i) the Commonwealth, HTA, and the creditors party to the GO PSA and HTA/CCDA PSA are separate entities with their own assets and liabilities; (ii) HTA or the creditors party to the GO PSA and HTA/CCDA PSA have not contributed substantial assets to the Commonwealth's reorganization (in fact, the opposite is true as the creditors party to the GO PSA and HTA/CCDA PSA have depleted Commonwealth assets by requiring the payment of various restriction, consummation and other fees in exchange for their entry into the GO PSA and HTA/CCDA PSA); (iii) the broad releases, exculpations and injunctions being granted to the creditors party to the GO PSA and HTA/CCDA PSA are not essential to a successful reorganization of the Commonwealth; (iv) there is no evidence that a "substantial majority" of the creditors will support the plan; and (v) the Third Amended Plan does not provide for payment of "substantially all" of the DRA's claims against HTA while potentially releasing such claims against HTA. *See id.* at *2.

75.    Unless the FOMB can demonstrate that the *Master Mortgage* factors are satisfied, the expansive release, exculpation and injunction provisions contained in the Third Amended Plan cannot be approved.

---

(3) whether the proposed injunction is essential to the reorganization such that there would be little likelihood of success without it;

(4) whether a substantial majority of the creditors agree to the injunction (and, specifically, whether the impacted classes have "overwhelmingly" voted to accept the proposed plan treatment; and

(5) whether the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class affected by the injunction.

*Quincy Med. Ctr.*, 2011 WL 5592907, at *2.

35

## II.     The Disclosure Statement Fails to Provide "Adequate Information" Regarding Certain Key Issues

76.     A court may only approve a disclosure statement if it includes "adequate information." *In re EL Comandante Mgmt. Co.*, 359 B.R. 410, 414-15 (Bankr. D.P.R. 2006) (citing *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001)); Fed. R. Bankr. P. 3017; 11 U.S.C. § 1125(a)(1).  Adequate information is imperative because creditors rely on the disclosure statement to understand what type of distribution or other assets they will receive and the risks they will face.  *In re Acemla De P.R. Inc.*, No. 17-02021 ESL, 2019 WL 311008, at *24 (Bankr. D.P.R. Jan. 22, 2019) ("Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face.") (citations omitted).

77.     What constitutes adequate information is a practical inquiry that is unique to each case.  *EL Comandante*, 359 B.R. at 414.  "Beyond the statutory guidelines described in § 1125(a)(1), the decision to approve or reject a disclosure statement is within the discretion of the bankruptcy [court]."  *Id*. at 414.  Adequacy depends on several factors, including "the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources."  *Id*. at 415.  Here, each of these factors points toward extensive—and clear— disclosure of the potential recoveries and risks around the Third Amended Plan.  This is an extremely large and complex case with a complex plan and a wide-number and range of creditors impacted by the bankruptcy.

78.     Although what is considered adequate information is determined on a case-by-case basis, courts within the First Circuit have identified a non-exclusive list of factors for courts to consider, including: (i) information regarding claims against the estate; (ii) an estimate of all

administrative expenses; (iii) any financial information relevant to creditors' determinations of whether to accept or reject the plan; and (iv) information relevant to the risks being taken by the creditors and interest holders.  *In re Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991).

### A.    *Disclosure Objections Relating to the DRA's HTA-Related Claims*

#### 1.    *The Disclosure Statement Fails to Adequately Disclose the Basis for the Plan's Prioritization of HTA Bond Claims Ahead of HTA Loan Claims*

79.    The Disclosure Statement does not disclose why the Third Amended Plan assumes that CW/HTA Claims arising from the HTA Bonds should be senior to (and receive better treatment than) CW/HTA Claims related to the DRA's HTA Loans.

80.    Section 70.2(c) and Exhibit J of the Third Amended Plan provide that the DRA will not receive any HTA Clawback CVIs until after all of the HTA bondholders' CW/HTA Claims are paid in full.  *See* Third Amended Plan § 70.2(c), Ex. J.  The Disclosure Statement fails to provide justification for such treatment.

81.    In structuring the plan this way, the FOMB ignores this Court's prior decisions which significantly circumscribed the scope of the HTA bondholders' liens in the excise tax revenues (including the Act 30-31 Revenues).  *See supra* ¶¶ 23-24, 37-38.  The HTA bondholders' security interests in the excise tax revenues are limited in scope and, to date, no court has found the DRA's HTA Loan claims to be subordinate to the HTA bondholders' claims.  *See supra* ¶¶ ¶¶ 23-24, 37-38.  As set forth above, the DRA's security interest in the Act 30-31 Revenues is superior to those held by the bondholders.  *See supra* ¶¶ 48.

82.    In addition, the Third Amended Plan's structure ignores the fact that the DRA is the only party with a security interest in the Incremental Act 30-31 Revenues—collateral that is *exclusively* for the benefit of the DRA, and not shared with the bondholders.  *See supra* ¶¶ 12, 48.

37

83.     While the Third Amended Plan provides for a CVI Payment Reserve pending a determination of whether the DRA's HTA Loans are *pari passu* with the HTA 98 Bonds, it fails to account for a scenario where the DRA's HTA Loans are senior to the HTA 68 Bonds and HTA 98 Bonds, or a scenario where the DRA's HTA Loans are *pari passu* with both the HTA 68 Bonds and HTA 98 Bonds. *See supra* at ¶¶ 36-37. The Third Amended Plan assumes that the HTA Loans are, at best, *pari passu* with the HTA 98 Bonds without any justification or explanation.

84.     The structure of the CVI Payment Reserve is also problematic because, if the Court were to ultimately find that the DRA's HTA Loans are senior to the HTA 68 Bonds and/or the HTA 98 Bonds, or that the DRA's HTA Loans are *pari passu* with any of the HTA Bonds, then it is possible that the amount of funds held back in the CVI Payment Reserve (which only reserves amounts that would be allocable to HTA 98 Bond Claims rather than amounts allocable to all CW/HTA Claims) may not be sufficient to cover distributions owed to the DRA on account of its HTA Loan claims. *See* Third Amended Plan, Ex. J.

85.     In light of the foregoing, the Disclosure Statement should be revised to explain (i) why the Third Amended Plan ranks the HTA bondholders' CW/HTA Claims senior to and ahead of the DRA's HTA Loan claims (when there has been no determination as to priority among these claims by the Court) and (ii) why such treatment is justified given the infirmities of the bondholders' liens (as evidenced by this Court's July 2, 2020 ruling on the Monolines' stay relief motion) and the DRA having an exclusive security interest in the Incremental Act 30-31 Revenues. Finally, the Disclosure Statement fails to explain why the Third Amended Plan only reserves for a potential scenario where the DRA's HTA Loans are *pari passu* with the HTA 98 Bonds but does not reserve for a situation where the DRA's HTA Loans are senior to either the HTA 68 Bonds or HTA 98 Bonds.

2.     *The Disclosure Statement Must Describe Risks Related to the Debtors'
Ability to Confirm the Third Amended Plan if the DRA's Administrative
Expense Claim With Respect to Collateral Diverted from HTA is Allowed*

86.     The Disclosure Statement does not account for the fact that the DRA may have an allowed administrative expense claim and the risks that this would pose to the confirmation of the Third Amended Plan.

87.     A disclosure statement should include an estimate of all administrative expense claims. *See, e.g.*, *Ferretti*, 128 B.R. at 18-19. Under PROMESA section 314(b)(6), it is a requirement for confirmation that a plan pay administrative expense claims in full on its effective date.

88.     If the DRA is determined to have an allowed administrative expense claim, this could impact the FOMB's ability to confirm the Third Amended Plan. Upon information and belief, the DRA Parties contend that the amount of the DRA's administrative expense claim is more than $800 million. *See supra* ¶ 12. An administrative expense claim of this magnitude may materially impact the Commonwealth's ability to satisfy PROMESA section 314(b)(6) without needing to reduce the recoveries being offered to certain classes of prepetition claims. At a minimum, this risk should be disclosed in the Disclosure Statement.

89.     Additionally, if the Court determines that the DRA is entitled to an administrative expense claim, this would trigger a termination event under the GO PSA because it would, in turn, evidence that the "clawback funds at issue in any of the Lift Stay Motions or Clawback Actions are determined not to constitute property of the Commonwealth." *See* GO PSA § 7.1(b)(ii)(E).

90.     Accordingly, the Disclosure Statement should disclose the risk that the Third
Amended Plan may not be confirmed and the GO PSA may be terminated if the DRA
Administrative Expense Claim Motion is granted.[34]

     *3.*     *The Disclosure Statement Must Disclose Risks that the DRA's*
     *Administrative Expense Claim for Improperly Diverted Act 30-31*
     *Revenues Cannot Be Discharged Under the Plan*

91.     The Disclosure Statement does not disclose that the DRA's administrative expense
claim, if granted, is non-dischargeable, and will therefore survive the Commonwealth's Title III
proceeding.

92.     Bankruptcy Code section 944(b) (made applicable to these Title III cases pursuant
to PROMESA section 301(a)) provides in relevant part:

> Except as provided in subsection (c) of this section, the debtor is
> discharged from all debts as of the time when—(1) the plan is
> confirmed; (2) the debtor deposits any consideration to be
> distributed under the plan with a disbursing agent appointed by the
> court; and (3) the court has determined—(A) that any security so
> deposited will constitute, after distribution, a valid legal obligation
> of the debtor; and (B) that any provision made to pay or secure
> payment of such obligation is valid.

11 U.S.C. § 944(b).

93.     Unlike the discharge provisions in chapters 7 and 11 of the Bankruptcy Code,
Bankruptcy Code section 944(b) is silent on the dischargeability of post-petition obligations.  *Cf.*
11 U.S.C. § 727(b) ("Except as provided in section 523 of this title, a discharge under subsection
(a) of this section discharges the debtor from all debts that arose before the date of the order for

---

[34]   If a determination as to the allowance of the DRA's administrative expense claim is not made on or prior to the confirmation hearing, then the Third Amended Plan must reserve funds equal to the full asserted amount of such claim.  *See In re Momenta, Inc.*, 455 B.R. 353, 356 (Bankr. D.N.H. 2011) (explaining that significant allowed administrative expense claims may require a debtor to set aside a large cash reserve available on the date of confirmation); *see also EL Comandante Mgmt. Co.*, 359 B.R. at 420 (holding that the plan's inclusion of a reserve account for the payment of certain claims was sufficient information to place the bondholders in a position to vote on the plan).

relief under this chapter . . . ."); 11 U.S.C. § 1141(d)(1)(A) ("Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . ."). Therefore, Bankruptcy Code section 944(b) does not provide for a discharge of post-petition obligations under a plan of adjustment.

94.    The case law addressing this issue confirms that post-petition debts are not discharged by a municipality's plan of adjustment. In *City of Detroit*, for example, the court noted that "[t]he only unresolved question in each motion is whether certain claims arose, for bankruptcy purposes, before the City filed for protection under Chapter 9 . . . because the City's liability on pre-petition claims was discharged when the Plan was confirmed." *In re City of Detroit*, 548 B.R. 748, 751 (Bankr. E.D. Mich. 2016). "Claimants holding post-petition claims," by contrast, "may be entitled to pursue other remedies." *Id.* The court ultimately held that one of the claims arose post-petition and thus was not discharged by confirmation of the plan. *Id.* at 767-70 (finding that a wrongful termination claim was not dischargeable by confirmation because such "claim arose post-petition for bankruptcy purposes").

95.    Collier on Bankruptcy, the leading treatise on bankruptcy law, also concludes that post-petition obligations are not discharged by a municipality's plan of adjustment. *See* 6 Collier on Bankruptcy ¶ 901.04 (16th ed. 2019) ("[C]laims incurred by the municipality during the case will not be discharged, and will remain liabilities of the municipality after confirmation of a plan or dismissal of the case.").

96.    Congress' decision to omit language that allows for the discharge of post-petition obligations when drafting Bankruptcy Code section 944(b) should be respected. Section 944(b) specifies the time at which the discharge becomes effective, but it is silent as to the scope of the

41

discharge.  11 U.S.C. § 944(b).  By contrast, Bankruptcy Code sections 727(b) and 1141(d)(1)(A)

expressly provide for the discharge of all pre-confirmation (including post-petition) debts—"all

debts that arose before the date of the order for relief" (in the case of chapter 7) and "any debt that

arose before the date of . . . confirmation" (in the case of chapter 11).  11 U.S.C. § 727(b); 11

U.S.C. § 1141(d)(1)(A).  Congress thus knew how to provide for the discharge of post-petition

debts, as it did in the chapters 7 and 11 discharge provisions, but it chose to limit the scope of the

Bankruptcy Code section 944(b) discharge by omitting similar language.  The distinction between

Bankruptcy Code section 944(b), on the one hand, and Bankruptcy Code sections 727(b) and

1141(d)(1)(A), on the other hand, has meaning and should be respected.  *Henson v. Santander*

*Consumer USA, Inc.,* 137 S. Ct. 1718, 1723 (2017) ("[W]hen we're engaged in the business of

interpreting statutes we presume differences in language like this convey differences in

meaning.").

97.    Here, the Commonwealth's illegal implementation of the clawback throughout

these Title III cases—a period of nearly four years—has given rise to post-petition claims that are

nondischargeable.[35]   The Disclosure Statement should be modified to explain that, if the

Commonwealth does not compensate the DRA as part of these Title III cases, then the DRA's

post-petition claims should survive confirmation of the plan of adjustment, and the DRA should

be entitled to pursue other remedies after these cases conclude.

4.    *The Disclosure Statement Must Disclose the Risks that the Third Amended*
*Plan May Not Be Confirmed Because the Plan Violates Applicable Law*

98.    The Disclosure Statement should be modified to include a discussion of the risk

that the Third Amended Plan may not be confirmable if the Court finds that the Third Amended

---

[35]    The DRA Parties detail those claims in the DRA Administrative Expense Claim Motion.

Plan violates applicable law—namely, Article VI, Section 8 of the Puerto Rico Constitution and
the Takings Clause.

99.    Bankruptcy Code section 1129(a)(3), incorporated into PROMESA through
PROMESA section 301(a), prohibits a court from confirming a plan that is "by any means
forbidden by law" and PROMESA section 314(b)(3) provides that the debtor must not be
prohibited by law from taking any action necessary to carry out the plan.  11 U.S.C. § 1129(a)(3);
48 U.S.C. § 2174(b)(3).  Together these provisions provide that the Court cannot confirm a plan
that is contrary to applicable law.

100.    The DRA (and likely other creditors) will take the position at confirmation that the
Third Amended Plan violates Commonwealth law because it permits the Commonwealth to
continue to violate Article VI, Section 8 of the Puerto Rico Constitution (and other applicable
Commonwealth statutes) by diverting secured revenue streams (including the Act 30-31 Revenues)
that are otherwise required to be allocated to HTA.  *See supra* ¶¶ 55-57.  The DRA will take the
position at confirmation—as it has in other pleadings—that PROMESA does not preempt Acts 30
and 31 to destroy preexisting liens and erase creditor priority designations, and therefore, such
rights are controlling.  *See, e.g.*, DRA Amended Lift Stay Motion ¶¶ 63-89.

101.    If the Court finds that PROMESA does not preempt Acts 30 and 31 and that the
Commonwealth unlawfully diverted the excise tax revenues from HTA, then the Third Amended
Plan, as currently drafted, cannot satisfy the confirmation requirements set forth in Bankruptcy
Code section 1129(a)(3) and PROMESA section 301(a).  Moreover, section 85.3 of the Third
Amended Plan—which sanctions the Commonwealth's continued retention of the Act 30-31
Revenues by providing that any territorial law inconsistent with the FOMB's fiscal plans and

budgets is deemed preempted—would be rendered ineffective and therefore require the plan to be substantially rewritten. *See* Third Amended Plan § 85.3.

102.    A finding by the Court that PROMESA does not preempt Acts 30 and 31 and that the Commonwealth unlawfully diverted the excise tax revenues from HTA would also trigger a termination event under both the GO PSA and the HTA/CCDA PSA, because it would have "a material adverse effect on the confirmability of the Plan." *See* GO PSA § 7.1(a)(iii); HTA/CCDA PSA § 7.1(a)(iii).  A termination event under either the GO PSA or the HTA/CCDA PSA may effectively render the Third Amended Plan not confirmable because the plan's proposed treatment for the Commonwealth, PBA, and HTA clawback claims is based on the terms negotiated in these agreements. *See* Disclosure Statement at 24-34.  If this were to occur, the holders of more than 70% of the outstanding principal amount of the GO Bonds and PBA Bonds that have agreed to the GO PSA, would no longer be bound to vote for the Third Amended Plan. *See* FOMB Statement, dated February 23, 2021 (disclosing support for the GO PSA).

103.    Similar risks to confirmation also exist if the Court finds that the Third Amended Plan violates the DRA's rights under the Takings Clause, which provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  As previously discussed, the DRA Parties will argue at confirmation that the Third Amended Plan does just that. *See supra* ¶¶ 58-60.  If the Third Amended Plan violates the DRA's rights under the Takings Clause, then either the Third Amended Plan must be revised to unimpair these claims (or, in the alternative, exempt such claims from discharge), *see supra* ¶¶ 58-60, or risk the Third Amended Plan violating PROMESA section 314(b)(3) and Bankruptcy Code section 1129(a)(3).

104.    All of these risks are material and would impact the Court's ability to confirm the Third Amended Plan and, as such, they should be disclosed. *See In re Acemla De P.R. Inc.*, No.

44

17-02021 (ESL), 2019 WL 26381, at *19 (Bankr. D.P.R. Jan. 22, 2019) ("Creditors rely on the

disclosure statement to determine . . . what risks they will face.  Accordingly, the importance of

full and honest disclosure is critical and cannot be overstated.").

> **B.    Disclosure Objections Relating to the DRA's PBA Claims**
>
> > 1.    *The Disclosure Statement Must Explain the Separate Classification of the
> > DRA's PBA Claims from PBA General Unsecured Claims and Provide
> > Justification for the Disparate Treatment of the DRA's PBA Claims*

105.    The Disclosure Statement fails to adequately describe the legal basis for the Third

Amended Plan separately classifying the DRA PBA Claims from PBA General Unsecured Claims,

and providing the DRA PBA Claims with different and materially worse treatment as compared

to the PBA General Unsecured Claims.

106.    The classification of claims, including whether there is artificial classification of

claims, and whether a plan unfairly discriminates against a class of claims, are relevant

considerations when ruling on a motion to approve a disclosure statement.  *See In re El

Comandante Mgmt. Co.,* 359 B.R. 410, 415 (Bankr. D.P.R. 2006).

107.    For reasons not explained in the Disclosure Statement or the Third Amended Plan,

the DRA PBA Claims, though alleged to be unsecured claims, are separately classified from the

PBA General Unsecured Claims, which are expressly defined to include ordinary course wage

claims and to exclude the DRA PBA Claims.  The Disclosure Statement also fails to explain why

the PBA/DRA Secured Claim (which is in fact secured) is treated as an unsecured claim.

108.    The PBA General Unsecured Claims are deemed unimpaired and will (i) be

reinstated, (ii) be paid in full, in cash, or (iii) receive such other treatment as may be mutually

agreed as between the PBA and the applicable claim holder.  *See* Third Amended Plan §§ 1.343,

45

16.1.  In contrast, the DRA PBA Claims are impaired and will receive no recovery under the Third

Amended Plan.  *See id.* § 17.1.

109.    The Disclosure Statement must disclose the basis for the separate classification and

disparate treatment of the DRA PBA Claims.  *See El Comandante Mgmt. Co.*, 359 B.R. at 415.

> 2.    *The Disclosure Statement Must Adequately Describe the PBA's Capital Structure*

110.    Although the Disclosure Statement provides an overview of PBA, its bond debt,

and litigation related thereto, *see* Disclosure Statement at 61-63, 85-89, it fails to reference the

$137 million in the principal amount owed by PBA to the DRA (as of PBA's petition date)

pursuant to four loan agreements, *see supra* ¶ 8.  To provide an accurate picture of PBA's capital

structure, the Disclosure Statement should be revised to include the following disclosure:

> "In addition to PBA's bond debt, PBA is obligated to the GDB Debt Recovery
> Authority under four loan agreements.  As of PBA's petition date, the aggregate
> balance due under these four loan agreements is in the principal amount of $137
> million.  Three of the DRA's loans are unsecured and one loan is secured by the sale
> proceeds of certain real property owned by PBA.  The Plan proposes to separately
> classify the GDB Debt Recovery Authority's claims from PBA general unsecured
> claims and provide the GDB Debt Recovery Authority with no recovery.  The GDB
> Debt Recovery Authority believes it is improper for the Plan to separately classify the
> GDB Debt Recovery Authority's loan claims from general unsecured claims and
> provide the GDB Debt Recovery Authority's claims with materially less favorable
> treatment than PBA general unsecured claims, which are projected to recover in full."

**C.    General Disclosure Objections[36]**

> 1.    *The Disclosure Statement Does Not Adequately Disclose Which DRA Assets are Class 60 "CW Appropriation Claims"*

---

[36]  On June 10, 2021—a mere five days before the deadline to object to the Disclosure Statement—the FOMB filed
its best interest test reports.  *See* Dkt No. 16927.  These reports are a combined 113 pages in length.  The DRA
Parties and their advisors have not had sufficient time to review and analyze the information contained in the
reports.  Therefore, the DRA Parties reserve the right to raise any objections with respect to these reports at an
appropriate time.

111.    The Disclosure Statement fails to explain which of the DRA's assets purportedly qualify as Class 60 "CW Appropriations Claims" that will be adjusted under the plan.

112.    A disclosure statement must clearly and succinctly inform creditors what they are receiving under the plan, when the distribution will be made, and what contingencies there are to getting distribution. *See Ferretti*, 128 B.R. at 18-19; *In re Ferguson*, 474 B.R. 466, 474 (Bankr. D.S.C. 2012) ("A disclosure statement should also provide adequate information regarding the basis for treatment of creditors pursuant to a plan of reorganization.").

113.    Section 1.148 of the Third Amended Plan provides that "CW Appropriations Claims" include "loans only payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Debt Recovery Authority."  Third Amended Plan § 1.148.  The Third Amended Plan proposes to provide no recoveries for these claims.  *See id.* § 64.1.  The Disclosure Statement does not disclose which of the DRA's assets allegedly fall within the class of CW Appropriations Claims and the legal bases to justify not providing these claims with any recovery.  Therefore, the Disclosure Statement should be revised to correct these disclosure deficiencies.

### 2.    The Feasibility Analysis Contained in the Disclosure Statement is Outdated

114.    The Disclosure Statement's feasibility analysis is based on outdated 2019 financials.  The Disclosure Statement should be revised to either explain why the feasibility analysis is based on outdated and superseded financial projections and debt sustainability analysis, or clarify that the feasibility analysis is based on the 2021 projections and fiscal plan.

115.    PROMESA section 314(b) requires that, among other things, a plan must be "feasible."  In the Chapter 9 context, courts have held that the feasibility requirement is necessary to ensure that a plan offers "a reasonable prospect of success and [is] workable."  *In re Mount*

47

*Carbon Metro. Dist.*, 242 B.R. 18, 35 (Bankr. D. Colo. 1999).  This "requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services." *Id.*; *see also In re City of Detroit*, 524 B.R. 147, 222 (Bankr. E.D.Mich. 2014) (stating that the feasibility standard is satisfied where the debtors shows that it "will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default").  "The probability of future success will depend upon reasonable income and expense projections." *Mount Carbon Metro. Dist.*, 242 B.R. at 35.

116.    In its discussion of the Third Amended Plan's feasibility, the Disclosure Statement makes clear that the FOMB believes the Commonwealth (as reorganized) can "pay its debts under the Plan when they come due and the Commonwealth should be viable," "based on a debt sustainability analysis and projections in the *May 2019 Fiscal Plan*."  Disclosure Statement at 477 (emphasis added).  However, elsewhere in the Disclosure Statement, the FOMB discusses the Commonwealth fiscal plan it certified on April 23, 2021, which "recognizes the significant negative impact of Hurricanes Irma and Maria, the 2020 earthquakes, and the COVID-19 health and economic crisis on economic activity, as well as the positive impact of the local and federal relief funding related to such events." *Id.* at 150.

117.    The Disclosure Statement should be revised to disclose why the FOMB is proposing a plan premised on economic data that is antiquated given the significant events, such as the hurricanes and COVID-19, that the FOMB concedes had a material economic impact on the Commonwealth. *See id.*  This Disclosure Statement should also discuss why the FOMB believes it is appropriate to rely on the certified 2019 fiscal plan when PROMESA section 314(b)(7) suggests that the Third Amended Plan must be consistent with the most recent certified fiscal plan.

48

*See* 48 U.S.C. § 2174(b)(7) (a requirement for confirmation of a debt adjustment plan is that it be

"consistent with the applicable Fiscal Plan certified by the Oversight Board").  In the alternative,

if the economic terms of the Third Amended Plan are based on the certified 2021 fiscal plan, the

Disclosure Statement should be revised to make that clear.

       3.    *Additional Disclosures Are Necessary to Provide an Accurate Record of the Title III Cases*

118.    In addition to the foregoing objections, the Disclosure Statement should be

amended to make the following disclosures:

119.    ***The Disclosure Statement Should be Amended to Disclose that Certain Parties***

***Dispute FOMB's Characterization of PROMESA's Preemption of Applicable Commonwealth***

***Law.***  The Disclosure Statement contains several statements regarding the FOMB's position that

PROMESA preempts certain Commonwealth statutes that allocated revenues from the

Commonwealth to its instrumentalities.  *See* Disclosure Statement at 56, 64.  The Disclosure

Statement further provides that even if these Commonwealth statutes are not preempted, "they

allow for these historically conditionally appropriated monies to be used by the Commonwealth to

pay GO debt and Commonwealth guaranteed debt."  *Id.* at 56; *see also id.* at 64.  The DRA Parties

(and likely others) disagree with the FOMB and will object to confirmation on the grounds that

that the Third Amended Plan violates Commonwealth law, which has not been preempted by

PROMESA.  *See supra*  ¶¶ 100-102.

120.    Accordingly, the Disclosure Statement must disclose the parties' dispute regarding

these key issues.  In each instance in the Disclosure Statement where the FOMB's position as to

preemption is provided, the Disclosure Statement should be revised to add the following language:

> "The GDB Debt Recovery Authority disagrees with the Oversight Board's position or characterization regarding preemption and will take the position, in connection with confirmation of the Third Amended Plan, that PROMESA does not preempt Acts 30

and 31 to destroy preexisting liens and erase creditor priority designations. In addition, the GDB Debt Recovery Authority asserts that the Commonwealth did not satisfy the requirements of Article VI, Section 8 of the Puerto Rico Constitution (and other applicable Commonwealth statutes) when it diverted certain excise tax revenues from HTA that were pledged by HTA for the repayment of its debt obligations. Moreover, the GDB Debt Recovery Authority does not believe that the excise tax revenues are legislative appropriations that may rescinded in the absence of legislative action by the Commonwealth."

121.   ***The Propriety of the Commonwealth Government's Legislative and Executive Actions in Response to Fiscal Crisis.***   Although the Disclosure Statement provides a detailed description of the Clawback Executive Orders and the moratorium legislation that was put into effect beginning in 2016 in response to the Commonwealth's fiscal crisis, *see* Disclosure Statement at 66, the Disclosure Statement does not make clear that the legality of these actions are subject to extensive dispute.

122.   The DRA Parties contend that these governmental actions were unlawful even though they were purportedly made pursuant to Article VI, Section 8 and/or Article II, Section 19 of the Puerto Rico Constitution, and that an unconstitutional diversion of revenues has continued during the Title III proceedings for the Commonwealth and HTA.  *See supra* ¶ 18.

123.   Therefore, the Disclosure Statement should be revised to include language consistent with the preceding paragraph so that parties entitled to vote on the Third Amended Plan can understand that the propriety of these governmental actions is in dispute.

## III.   The Proposed Confirmation Schedule is Prejudicial to Creditors and Should be Extended

124.   The proposed confirmation schedule set forth in the Amended Disclosure Statement Motion is condensed and convoluted, especially considering the complexity and magnitude of these cases that have been pending for *four years* without *any* opportunity for the DRA Parties to seek their own discovery.

50

125.     As set forth in the Procedures Objection, the FOMB's proposed confirmation discovery timeline is too short and prejudicial to creditors.  Because the timeline for parties to take discovery and assert objections related to plan confirmation should be extended, the FOMB's proposed confirmation hearing dates must necessarily change.  The DRA Parties propose that the confirmation hearing proceed on the timeline proposed in the Procedures Objection.

126.     The FOMB's arguments that the confirmation hearing must take place in November 2021 so that the FOMB can meet the milestones set forth in the GO PSA, *see id.* ¶ 42, are insufficient to override due process.  *See* Hr'g Tr. at 12:17-25, 13:1-9, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-03283 (D.P.R. Apr. 28, 2021) (holding that the notice period proposed by the FOMB to object to the Disclosure Statement was "too short" and that the FOMB needed to provide parties with notice consistent with the time period set forth in the Bankruptcy Rules).  Parties should not be deprived of a full and fair opportunity to vet the Third Amended Plan, take discovery, assert objections, and participate in the confirmation hearing simply because the FOMB reached a deal with certain creditors who agreed not to object to its plan.

## RESERVATION OF RIGHTS

127.     The DRA Parties do not waive, and expressly reserve, all of their rights to assert further or additional objections to the Disclosure Statement, and/or propound discovery related thereto, either prior to or at the hearing to approve the Disclosure Statement.  In addition, nothing herein shall be construed to limit the DRA Parties' ability to object to confirmation of the Third Amended Plan (or any other plan) on any grounds and/or propound discovery related thereto.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the DRA Parties hereby respectfully request that this Court enter an order denying approval of the Amended Disclosure Statement Motion in its

entirety.  To the extent the Court is inclined to grant the Amended Disclosure Statement Motion, the DRA Parties hereby respectfully request that the Court (i) require the Debtors to amend and supplement the Disclosure Statement consistent with the arguments and proposed revisions set forth in this objection, (ii) order that the confirmation hearing proceed on the timeline proposed in the Procedures Objection, and (iii) make such other additional modifications to the relief requested in the Amended Disclosure Statement Motion, and grant such other relief, as may be just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 15th day of June, 2021.

**WE HEREBY CERTIFY** that, in accordance with the Court's *Fourteenth Amended Notice, Case Management and Administrative Procedures Order* (the "CMP Order") [Dkt. No. 15894-1] on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. We further certify that, on this same date, we served the foregoing upon all the Standard Parties as identified and defined in the CMP Order, as well as upon all of the parties identified in the Master Service List maintained at https://cases.primeclerk.com/puertorico/.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225
Tel:    787-250-5632
Fax:    787-759-9225

By:    */s/ Arturo J. García-Solá*
Arturo J. García-Solá
(USDC No. 201903)
E-mail: ajg@mcvpr.com

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani
(USDC No. 226411)
E-mail: nzt@mcvpr.com

***Attorneys for AmeriNational Community Services, LLC, as Servicer for the GDB Debt Recovery Authority***

**C. CONDE & ASSOC. LAW OFFICES**

By:    */s/ Carmen D. Conde Torres*
Carmen D. Conde Torres
(USDC No. 207312)

*/s/ Luisa S. Valle Castro*
Luisa S. Valle Castro
(USDC No. 215611)

254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel:    787-729-2900
Fax:    787-729-2203
E-mail: condecarmen@condelaw.com

-and-

**SCHULTE ROTH & ZABEL LLP**

By:    */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:    202-729-7470
Fax:    202-730-4520
E-mail: douglas.mintz@srz.com

-and-

53

Douglas Koff (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:    212-756-2000
Fax:    212-593-5955
E-mail: douglas.koff@srz.com
          abbey.walsh@srz.com
          peter.amend@srz.com

***Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for the GDB Debt
Recovery Authority***