# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE COMMONWEALTH OF PUERTO RICO, THE
EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO, AND THE PUERTO RICO PUBLIC
BUILDINGS AUTHORITY,

Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

## OBJECTION OF AMBAC ASSURANCE CORPORATION TO THE DISCLOSURE STATEMENT FOR THE THIRD AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).  Ambac submits this objection in Bankruptcy Cases No. 17-BK-1283-LTS (Commonwealth), 17-BK-3566-LTS (ERS), and 19-BK-5523-LTS (PBA).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................. 5

ARGUMENT ...................................................................................................... 7

I.    THE FLAWS IN THE BOARD'S THEORY OF PREEMPTION MEAN
THAT THE DISCLOSURE STATEMENT CANNOT BE APPROVED............. 8

    A.    Preemption Under PROMESA. ...................................................9

    B.    The Sweeping Preemption Provision.........................................11

    C.    Statutes Obligating the Commonwealth to Appropriate Funds Are
Not Inconsistent with PROMESA. ............................................13

    D.    The Scope of the Preemption Provision Exceeds Congress's Intent. ........15

    E.    The Disclosure Statement Fails to Provide Adequate Information
Concerning the Board's Preemption Theory. ............................17

II.    THE PLAN'S CLASSIFICATION SCHEME VIOLATES *GRANADA
WINES*.............................................................................................. 18

    A.    *Granada Wines* Is Controlling and Mandates Claims of the Same
Legal Character Be Placed in the Same Class. ..........................19

    B.    The Plan Facially Violates *Granada Wines*...............................22

    C.    The Disclosure Statement Fails to Provide Adequate Information
Concerning the Plan's Classification Scheme. ..........................25

III.    UNDER THE BOARD'S OWN FINANCIAL PROJECTIONS, THE
PLAN IS NOT FEASIBLE.................................................................... 25

IV.    UNPRECEDENTED THIRD-PARTY RELEASES RENDER THE PLAN
UNCONFIRMABLE AND REQUIRE SIGNIFICANT
CLARIFICATION. ............................................................................. 26

    A.    The Plan Contains Nonconsensual Third-Party Releases of Non-
Debtors.........................................................................................27

    B.    The Plan's Third-Party Releases Do Not Comply with Applicable
Law. .............................................................................................29

    C.    The Disclosure Statement Must Acknowledge the Extraordinary
Third-Party Releases in the Plan..................................................32

V.    THE UNTIMELY BEST INTERESTS OF CREDITORS REPORT
PRESENTS UNSUPPORTABLY PESSIMISTIC OUTCOMES...................... 34

VI.    THE PLAN SUPPORT AGREEMENTS CONSTITUTE VOTE BUYING. ............................................................................................. 36

    A.    Vote Buying May Prevent Plan Confirmation. ...........................................36

    B.    The Plan Support Agreements Constitute Vote Buying. ...........................37

VII.    THE DISCLOSURE STATEMENT OMITS OTHER CATEGORIES OF INFORMATION CRITICAL TO CREDITORS. .................................................... 40

    A.    The Disclosure Statement Omits Discussion Regarding the Treatment of, and Risks Attendant to, Creditors' Claims Under Section 407 of PROMESA. .......................................................................40

    B.    The Disclosure Statement Does Not Adequately Describe the Voting Rights of Monoline Insurers for Classes 56-58. ...........................42

    C.    The Disclosure Statement Must Clarify How the Commonwealth Is Funding the CCDA Fees. ............................................................................45

    D.    The Disclosure Statement Overstates the Amount of the Commonwealth's Pension Liability and Fails to Disclose the Unreliability of Pensions Data. .................................................................47

    E.    The Disclosure Statement Must Acknowledge That the Fiscal Plan Is Not Insulated from the Court's Review at Plan Confirmation. ..............50

    F.    The Disclosure Statement Does Not Contain Adequate Information on the Scope of "Essential Public Services." ...........................................51

    G.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Commonwealth's Financial Projections. ...........................53

    H.    The Disclosure Statement Does Not Contain Adequate Information Regarding Cash and Non-Cash Assets. .....................................................54

    I.    The Disclosure Statement Does Not Disclose the Value of ERS Assets the Commonwealth Is Purchasing in Connection with the ERS Stipulation. ........................................................................................58

    J.    The Disclosure Regarding the Risk of Non-Occurrence of the Effective Date Should Be Expanded. ........................................................59

    K.    The Disclosure Regarding the Litigation Risk the Board Faces in the Revenue Bond Litigation Should Be Expanded. ................................60

CONCLUSION ....................................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008).............................................................................................9, 10

*Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*,
    471 B.R. 419 (Bankr. E.D. Pa. 2012), *aff'd*, 488 B.R. 303 (E.D. Pa. 2013),
    *aff'd*, 571 F. App'x 139 (3d Cir. 2014)..................................................................33

*Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*,
    488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) .................30

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*,
    477 U.S. 41 (1986)................................................................................................15

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
    860 F. 2d 94 (3d Cir. 1988)...................................................................................36

*Costa v. Robotic Vision Sys. (In re Robotic Vision Sys., Inc.)*,
    2006 WL 929322 (B.A.P. 1st Cir. Apr. 11, 2006)................................................24

*Ferris v. United States*,
    27 Ct. Cl. 542 (1892) ............................................................................................13

*Franklin High Yield Tax-Free Income Fund v. City of Stockton* (*In re City of
    Stockton*),
    542 B.R. 261 (B.A.P. 9th Cir. 2015)......................................................................52

*Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension
    Fund*,
    748 F.2d 42 (1st Cir. 1984).......................................................................... *passim*

*Grant's Dairy—Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural
    Res.*,
    232 F.3d 8 (1st Cir. 2000)......................................................................................10

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012)...................................................................................26

*In re Arrowmill Dev. Corp.*,
    211 B.R. 497 (Bankr. D.N.J. 1997) .......................................................................30

*In re Barney & Carey Co.*,
    170 B.R. 17 (Bankr. D. Mass. 1994) .....................................................................23

*In re Bellows*,
    554 B.R. 219 (Bankr. D. Alaska 2016)....................................................................8

*In re Bjolmes Realty Tr.*,
    134 B.R. 1000 (Bankr. D. Mass. 1991) ..........................................................20, 23

*In re Bos. Harbor Marina Co.*,
    157 B.R. 726 (Bankr. D. Mass. 1993) ............................................................26, 30

*In re Cardinal Congregate I*,
    121 B.R. 760 (Bankr. S.D. Ohio 1990)..................................................................54

*In re CGE Shattuck, LLC*,
    1999 WL 33457789 (Bankr. D.N.H. Dec. 20, 1999).............................................23

*In re CGE Shattuck, LLC*,
    254 B.R. 5 (Bankr. D.N.H. 2000) ........................................................................24

*In re Charles St. African Methodist Episcopal Church of Bos.*,
    499 B.R. 66 (Bankr. D. Mass. 2013) .............................................................31, 32

*In re Chassix Holdings*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015)....................................................................30

*In re CHC Grp. Ltd.*,
    2017 WL 11093971 (Bankr. N.D. Tex. Mar. 3, 2017) .........................................38

*In re City of Detroit*,
    524 B.R. 147 (Bankr. E.D. Mich. 2014)..............................................9, 21, 25, 51

*In re Congoleum Corp.*,
    362 B.R. 167 (Bankr. D.N.J. 2007) ......................................................................29

*In re E. Me. Elec. Co-op., Inc.*,
    125 B.R. 329 (Bankr. D. Me. 1991).......................................................................8

*In re El Comandante Mgmt. Co.*,
    359 B.R. 410 (Bankr. D.P.R. 2006) .......................................................................8

*In re Featherworks Corp.*,
    25 B.R. 634 (Bankr. E.D.N.Y. 1982).....................................................................36

*In re Felicity Assocs., Inc.*,
    197 B.R. 12 (Bankr. D.R.I. 1996) ..........................................................................8

*In re Ferretti*,
    128 B.R. 16 (Bankr. D.N.H. 1991) ...........................................................8, 42, 54

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   297 F. Supp. 3d 269 (D.P.R. 2018), *aff'd*, 927 F.3d 597 (1st Cir. 2019) ........................50, 51

*In re FirstEnergy Sols. Corp.*,
   606 B.R. 720 (Bankr. N.D. Ohio 2019) ..................................................................30, 31, 32

*In re Hanish, LLC*,
   570 B.R. 4 (Bankr. D.N.H. 2017) ..............................................................................19, 20, 24

*In re Hardeman Cty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015) ....................................................................................21

*In re Irving Tanning Co.*,
   496 B.R. 644 (B.A.P. 1st Cir. 2013) ........................................................................10, 12, 15

*In re Jorgensen*,
   66 B.R. 104 (B.A.P. 9th Cir. 1986) ..........................................................................................37

*In re Mahoney Hawkes, LLP*,
   289 B.R. 285 (Bankr. D. Mass. 2002) ..............................................................................18, 30

*In re Main Rd. Props., Inc.*,
   144 B.R. 217 (Bankr. D.R.I. 1992) ..........................................................................................18

*In re Main St. AC, Inc.*,
   234 B.R. 771 (Bankr. N.D. Cal. 1999) ....................................................................................54

*In re Mount Carbon Metro. Dist.*,
   242 B.R. 18 (Bankr. D. Colo. 1999) ........................................................................................26

*In re Nat'l/Northway Ltd. P'ship*,
   279 B.R. 17 (Bankr. D. Mass. 2002) ................................................................................19, 24

*In re Oxford Homes, Inc.*,
   204 B.R. 264 (Bankr. D. Me. 1997) ........................................................................................54

*In re Quigley Co*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................................................................................37

*In re Quincy Med. Ctr.*,
   2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011) ......................................................30, 31

*In re Rexford Props. LLC*,
   558 B.R. 352 (Bankr. C.D. Cal. 2016) ....................................................................................20

*In re Salem Suede, Inc.*,
   219 B.R. 922 (Bankr. D. Mass. 1998) ....................................................................................24

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988)................................................................53, 54

*In re Specialty Equip. Cos.*,
   3 F.3d 1043 (7th Cir. 1993) ......................................................................................30

*In re Stearns Holdings, LLC*,
   607 B.R. 781 (Bankr. S.D.N.Y. 2019).......................................................................29

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ...........................................................................38

*In re Wash. Mut.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ....................................................................29, 30

*In re Winston XXIC, Ltd. P'ship*,
   153 B.R. 322 (Bankr. D. Kan. 1993) .........................................................................36

*In re Wyly*,
   2019 WL 2590035 (Bankr. N.D. Tex. June 22, 2019)................................................29

*Levander v. Prober (In re Levander)*,
   180 F.3d 1114 (9th Cir. 1999) ...................................................................................22

*Matter of Greystone III Joint Venture*,
   995 F.2d 1274 (5th Cir. 1991) ...................................................................................24

*Me. Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) ...............................................................................................13

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)..............................................................................................10, 17

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
   136 S. Ct. 1938 (2016)................................................................................................10

*R.I. Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*,
   929 F.2d 844 (1st Cir. 1991)......................................................................................15

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight &
   Mgmt. Bd. for Puerto Rico)*,
   330 F. Supp. 3d. 685 (D.P.R. 2018), *aff'd*, 945 F.3d 3 (1st Cir. 2019) ..............15, 16

*U.S. Steel Corp. v. EPA*,
   444 U.S. 1035 (1980)..................................................................................................22

*United States v. Sec. Indus. Bank*,
   459 U.S. 70 (1982)......................................................................................................15

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) ..........................................................................................15

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
*   Mgmt. Bd. for P.R.)*,
   945 F.3d 3 (1st Cir. 2019) ....................................................................10, 14, 16

**Statutes**

3 L.P.R.A. § 283b ............................................................................................13

3 L.P.R.A. § 283h ............................................................................................13

23 L.P.R.A. § 104(c)(1) ....................................................................................22

11 U.S.C. § 361 ................................................................................................15

11 U.S.C. § 507(a)(2) .......................................................................................23

11 U.S.C. § 901(a) ............................................................................................21

11 U.S.C. § 928 ................................................................................................15

11 U.S.C. § 1122 .........................................................................20, 21, 24, 25

11 U.S.C. § 1122(a) ...................................................................................19, 22

11 U.S.C. § 1123(a)(4) ...............................................................................37, 38, 46

11 U.S.C. § 1123(a)(5) ...............................................................................10, 12

11 U.S.C. § 1125 ..............................................................................................36

11 U.S.C. § 1125(a) ..........................................................................................53

11 U.S.C. § 1125(a)(1) .................................................................................7, 8

11 U.S.C. § 1125(b) ...........................................................................................7

11 U.S.C. § 1126 .........................................................................................36, 42

11 U.S.C. § 1126(e) ..........................................................................................36

11 U.S.C. § 1129 .........................................................................................25, 36

11 U.S.C. § 1129(a)(3) .............................................................................36, 46, 58

11 U.S.C. § 1129(b)(1) ...............................................................................20, 38

11 U.S.C. § 1129(b)(2)(A) ................................................................................................15

11 U.S.C. § 1129(b)(2)(B)(ii) ..........................................................................................22

48 U.S.C. 2103 (PROMESA § 4) .....................................................................................9

48 U.S.C. § 2126 (PROMESA § 106(e)) ..................................................................50, 51

48 U.S.C. § 2141 (PROMESA § 201(b)(1)(N)) ...............................................................14

48 U.S.C. § 2141 (PROMESA § 201(b)(1)(M)) ..............................................................41

48 U.S.C. § 2141 (PROMESA § 201(b)(1)(B)) ...............................................................51

48 U.S.C. § 2141 (PROMESA § 201) ..............................................................................50

48 U.S.C. § 2142 (PROMESA § 202) ........................................................................11, 13

48 U.S.C. § 2161 (PROMESA § 301(a)) ................................................................. *passim*

48 U.S.C. § 2161 (PROMESA § 301(e)) ..........................................................................21

48 U.S.C. § 2161 (PROMESA § 301(c)(3)) ...............................................................42, 43

48 U.S.C. § 2161 (PROMESA § 301(c)(4)) .....................................................................42

48 U.S.C. § 2174 (PROMESA § 314(b)(3)) .......................................................................9

48 U.S.C. § 2174 (PROMESA § 314(b)(7)) .....................................................................52

48 U.S.C. § 2174 (PROMESA § 314(b)(6)) ...............................................................25, 53

48 U.S.C. § 2195 (PROMESA § 407) .................................................................4, 15, 40, 41

48 U.S.C. § 2195 (PROMESA § 407(a)) ..........................................................................40

48 U.S.C. § 2195 (PROMESA § 407(b)) ....................................................................40, 41

Fiscal Plan Compliance Act (April 29, 2017).................................................................55

Multiemployer Pension Plan Amendments Act of 1980 .................................................21

**Other Authorities**

Fed. R. Bankr. P. 2002(b) ...............................................................................................34

Fed. R. Bankr. P. 3016 ....................................................................................................33

Fed. R. Bankr. P. 3016(c) ...............................................................................................33

Fed. R. Bankr. P. 3018(a) ...........................................................................................43

Fed. R. Bankr. P. 3020(e) ...........................................................................................59

P.R. Const. art. VI, § 8 ..........................................................................................9, 22

Ambac Assurance Corporation ("Ambac") respectfully submits this objection (the "Objection") to the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 16741) ("Disclosure Statement" or "DS").[2]

## PRELIMINARY STATEMENT

1.     Apart from containing an astonishing number of deficiencies in disclosure and defects heralding the Plan's unconfirmability, the Disclosure Statement presented for the Court's approval represents a striking and illogical departure from the path to confirmation proceedings that the Court put in place more than a year ago.

2.     At that time, the Mediation Team recommended, and the Court recognized, that certain "'gating' issues" required "rulings in advance of the approval of the [prior] Disclosure Statement."[3] Key among these was whether holders of bonds issued by HTA, CCDA, and PRIFA (the "Revenue Bondholders") hold "security or other property interests" in revenues pledged to payment of those bonds, and whether the statutes establishing the obligations (the "Revenue Bond Statutes") were preempted by PROMESA. The significant consequences for solicitation and confirmation that would result from the Board being wrong on these issues drove the Mediation Team to recommend the resolution of Revenue Bondholders' property rights "before (or contemporaneously with) approval of the Amended Disclosure Statement and before solicitation commences."[4] But no resolution has been reached on the issue of Revenue Bondholders' security

---

[2] Unless otherwise specified, ECF numbers refer to filings in No. 17-bk-03283-LTS, and internal citations and quotation marks are omitted from case citations. Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Disclosure Statement. "DS Approval Motion" refers to the Board's motion to approve the Disclosure Statement (ECF No. 16756), and "Confirmation Procedures Motion" refers to the Board's motion to establish procedures and deadlines relating to plan confirmation (ECF No. 16757). Contemporaneously herewith, Ambac has filed an objection addressing the scheduling issues raised in those motions.

[3] (ECF No. 10756 at 12; *see* ECF No. 12186 (order implementing Mediation Team recommendations).)

[4] (ECF No. 10756 at 12 n.14.) The Court recently affirmed it believes the "structure imposed in 2020 still makes sense." (*Tr. of April 28, 2021 Omnibus Hearing* (ECF No. 16662) at 106:21-22.)

or other property interests, or whether the obligations created by the Revenue Bond Statutes have been preempted.

3.       Yet the Board presses on, seeking approval of a Disclosure Statement that nowhere acknowledges the possibility that the Board's legal arguments may not prevail—*i.e.*, that Revenue Bondholders may in fact hold security interests in, or lawful priorities to, the money that the Plan proposes to distribute to others.  And it does so claiming that the Plan is in the best interests of creditors, while disclosing the purported basis for that conclusion in a 109-page document filed five days before (and presumably served after) creditors' deadline to object to approval of the Disclosure Statement, underscoring the Board's dismissive view of its disclosure obligations.

4.       The Disclosure Statement presents a Plan that is unconfirmable as drafted, and that enjoys the support of certain creditors only through blatant and impermissible vote buying.   The Disclosure Statement also fails to provide creditors adequate (or, often, any) information on numerous key issues that is needed to enable creditors to make an informed judgment on whether to support the Plan.  The Court should not approve the Disclosure Statement.  At a minimum, it should require significant revisions before it commits untold resources in using this document to solicit creditor votes.

5.       *First*, the preemption provision of the Plan relies on the theory that PROMESA, upon its enactment, preempted obligations under any Commonwealth law that appropriates funds to Commonwealth instrumentalities—the same theory the Board has advanced on this "gating" issue in the ongoing Revenue Bond Adversary Proceedings.[5]   Yet the Plan offers no credible explanation as to why these statutes are inconsistent with PROMESA, nor can the Board demonstrate that Congress intended this sweeping preemptive effect.  The preemption theory

---

[5] "Revenue Bond Adversary Proceedings" means the actions No. 20-ap-00003-LTS, No. 20-ap-00004-LTS, and No. 20-ap-00005-LTS.  These proceedings are part of the "Revenue Bond Litigation."  (DS at 273-83.)

undergirding the Plan cannot be justified, and its failure dooms the Plan; as the Board has acknowledged, without it, the Plan is unworkable.[6]

6.      *Second*, if the Court accepts the Board's positions on preemption, this would render the Plan's classification of claims impermissible as a matter of law under *Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir. 1984), which requires that all creditors of equal rank be placed in the same class.  If, as the Board contends, preemption has wiped away obligation-creating statutes and eliminated any Commonwealth law-conferred priorities (including for claims relating to general obligation ("GO") bonds, pensions, and bonds issued by Commonwealth instrumentalities), all such claims must be classified together under *Granada Wines*.  The Plan fails to do this, and is therefore unconfirmable under the Board's own theory of preemption.

7.      *Third*, under the Board's own economic and financial projections, the Plan is not feasible.  Indeed, the Fiscal Plan upon which the Plan is based assumes that the Commonwealth will default on its obligations by fiscal year 2036—a remarkable feature that likewise renders the Plan unconfirmable on its face.

8.      *Fourth*, the Plan contains improper third-party releases, which would prevent creditors from enforcing claims against numerous non-Debtor entities,[7] including HTA, CCDA, and PRIFA.  These releases are mandatory under the Plan—creditors are unable to opt out.  Neither the Disclosure Statement nor the Plan attempts to justify these sweeping, nonconsensual releases, for no justification is possible.  These releases also render the Plan facially unconfirmable.

---

[6] The Board has acknowledged it needs "to know what's preempted and what's not, otherwise, **the Plan can't work after confirmation**[.]"  (*Tr. of March 4, 2020 Omnibus Hr'g.* (ECF No. 12181) at 185:17-186:2 (emphasis added)).

[7] The "Debtors" are the Commonwealth, PBA, and ERS, the entities for which the Board has filed the Plan.

9.      *Fifth*, the Disclosure Statement's belatedly-filed best interests report does not offer a realistic assessment of what creditor recoveries would be under Commonwealth law in the absence of Title III.  Instead, it advances a compromised analysis based on the Board's litigation-driven pessimism regarding the Commonwealth's economic future.

10.      *Sixth*, in two of its plan support agreements ("PSAs"), the Board has pledged cash fees to certain creditors in exchange ***only*** for their affirmative vote in support of the Plan, and no other consideration.  This is vote buying.  The Court should either strike the fees for those creditors from those two PSAs, or decline to approve the Disclosure Statement until the fees for those creditors have been withdrawn from the PSAs and the Plan.

11.      *Finally*, even if the Plan were not patently unconfirmable for the foregoing reasons, the Disclosure Statement, as drafted, does not contain information necessary for creditors to reach an informed judgment on numerous key issues that are highly relevant to creditors' voting decisions.[8]  Those issues include:

- ***Significant post-confirmation liability.***  If the Board is wrong that creditors' claims against the Commonwealth under Section 407 of PROMESA cannot be brought post-confirmation, the Commonwealth's potential liability under those claims could jeopardize the Plan's feasibility.

- ***Monoline voting rights.***  The Disclosure Statement must be amended to accurately reflect the voting rights of monoline insurers with respect to claims arising from bonds they insure.  At present, only the voting rights of those insurers who are party to PSAs with the Board are expressly recognized; the rights of other insurers to vote the claims arising from their insured bonds must be recognized, as well.

- ***Improper use of CCDA bondholder collateral.***  The Board must amend the Disclosure Statement to identify the source of cash that will be used to fund certain fees payable to CCDA bondholders that have signed a PSA, as it appears the Plan may contemplate the improper use of CCDA bondholder collateral to make such payments.

---

[8] Where possible, Ambac has proposed disclosures to correct these deficiencies by apprising creditors of pertinent information.  (*See* **Exhibit A**.)  Unless and until the Board incorporates Ambac's proposed disclosures and remedies the additional disclosure deficiencies identified herein, the Disclosure Statement should not be approved.

- ***Overstated and unreliable pension liability estimate.*** The Disclosure Statement must acknowledge the likely overstatement of the Commonwealth's estimated pension liability and the unreliability of the data on which that estimate is premised.

- ***"Essential public services."*** The Board expressly declines to define what "essential public services" the Commonwealth will provide post-confirmation, despite the relevance of this information to whether the plan is in the best interests of creditors, among other factors creditors will consider in making a voting decision.

- ***The Title III Court's ability to review the inputs and assumptions underlying the Fiscal Plan in evaluating whether the Plan satisfies PROMESA's confirmation requirements.*** The Disclosure Statement takes the position that the Fiscal Plan is categorically unreviewable, including in connection with plan confirmation proceedings. The Disclosure Statement fails to acknowledge that this position is heavily contested, and that the Court has never so ruled. The Disclosure Statement must disclose the risk that the Court will in fact undertake a judicial inquiry into the inputs and assumptions underlying the Fiscal Plan, with which the Plan is statutorily required to comply, and may conclude that the flaws in the Fiscal Plan show that the Plan cannot satisfy other confirmation requirements.

- ***Potentially available resources to fund creditor recoveries.*** The Disclosure Statement must reflect the extent of cash and non-cash assets that may be available to fund creditor recoveries so creditors may determine whether the Plan is in their best interests.

- ***The value the Commonwealth will receive in the transactions contemplated in the ERS Stipulation.*** The Disclosure Statement must quantify the value of the assets the Commonwealth will acquire in certain Plan transactions required by the Board's PSA with ERS bondholders so creditors may assess whether the Commonwealth is receiving commensurate value for the cash payments it pledges to make under that agreement.

- ***Additional curative disclosures.*** Ambac also proposes curative or expanded disclosures herein regarding (i) whether "Bond Claims" are disallowed prior to receipt of distributions thereon, (ii) the risk the Plan's effective date may not occur, and (iii) the risk the Board is unsuccessful in disallowing certain asserted claims, including in the Revenue Bond Litigation.

## BACKGROUND

12.     On May 3, 2017, the Board commenced restructuring proceedings on behalf of the Commonwealth pursuant to Title III of PROMESA, doing the same for HTA and ERS on May 21, 2017, and for PBA on September 27, 2019.

13.     On May 31, 2019, the Board executed a plan support agreement with certain holders of GO and PBA bond claims. On June 7, 2019, the Board executed a plan support agreement (the

"Retiree Committee PSA") with the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee").[9]

14.     On September 27, 2019, the Board filed its first joint plan of adjustment for the Commonwealth, ERS, and PBA, and an accompanying disclosure statement.

15.     On February 9, 2020, the Board and certain holders of GO and PBA bonds disclosed they had reached a settlement in principle outlined in a plan support agreement (the "2020 PSA").  On February 28, 2020, in furtherance of the 2020 PSA, the Board filed an amended plan of adjustment, a disclosure statement, and a motion to approve the disclosure statement.  On March 27, 2020, in response to the COVID-19 pandemic, the Court adjourned consideration of this disclosure statement and plan.  The Board thereafter submitted a series of Court-ordered status reports in which the Board stated that it was continuing to evaluate its options relating to the Plan.

16.     On February 22, 2021, the Board entered into a revised plan support agreement with certain holders of GO bonds and PBA bonds, including monoline insurers Assured, National, and Syncora (the "GO/PBA PSA").[10]  The GO/PBA PSA provided that Assured and National could walk away from the agreement before a date certain, providing those two insurers time to negotiate with the Board on the treatment of other bonds not the subject of the GO/PBA PSA (namely, HTA and CCDA bonds).  On March 8, 2021, the Board filed a second amended plan of adjustment and accompanying disclosure statement, incorporating the agreements reached in the GO/PBA PSA and the Retiree Committee PSA.

17.     On March 9, 2021, the Board announced that it had reached an agreement with certain ERS bondholders on treatment of ERS bond claims and to stay certain ERS-related

---

[9] (See DS Ex. E (*Plan Support Agreement* (June 7, 2019)).)

[10] (See DS Ex. B (*Plan Support Agreement* (Feb. 22, 2021)).)

litigation.  On April 2, 2021, the Board announced a final agreement with the ERS bondholders, which would be incorporated in the forthcoming third amended plan of adjustment.[11]

18.     On April 6, 2021, the Board filed a motion asking the Court to establish a schedule for consideration of its then-forthcoming further amended disclosure statement.  On May 4, 2021, the Court entered an order granting the motion in part, scheduling a hearing on the Disclosure Statement for July 13, 2021, and requiring that any objections to the Disclosure Statement be filed on the twenty-eighth day following service of the disclosure statement hearing notice.

19.     On April 12, 2021, the Board announced it had reached an agreement in principle with certain holders of HTA and CCDA bonds, including Assured and National, regarding the treatment of claims arising from HTA and CCDA bonds, and on May 5, 2021, it entered into a plan support agreement with Assured and National (the "HTA/CCDA PSA").[12]

20.     On May 11, 2021, the Board filed the Plan and the Disclosure Statement, incorporating all of the settlements reflected in the various PSAs.  On May 13, 2021, the Board filed the DS Approval Motion and the Confirmation Procedures Motion.

## ARGUMENT

21.     To obtain court approval, a disclosure statement must contain "adequate information."  11 U.S.C. § 1125(b) (incorporated by PROMESA § 301(a)).  Adequate information means "information of a kind, and in sufficient detail," as would enable creditors "to make an informed judgment about the plan."  *Id.* § 1125(a)(1).  To be "adequate," information included in a disclosure statement must be "clear and comprehensible"—that is, designed to succinctly inform a creditor "what it is going to get, when it is going to get it, and what contingencies there are to

---

[11] (*See* DS Ex. D (*ERS Stipulation* (Apr. 2, 2021)) (the "ERS Stipulation").)

[12] (*See* DS Ex. C (*HTA/CCDA Related Plan Support Agreement* (May 5, 2021)).)  On May 25, 2021, a brief amendment to the HTA/CCDA PSA was published.

getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  The "debtor bears the ultimate burden of proving the adequacy of its disclosure statement." *In re Bellows*, 554 B.R. 219, 225 (Bankr. D. Alaska 2016).

22.     The Disclosure Statement does not contain "adequate information" on a number of subjects that are necessary for creditors to "make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  Where possible, Ambac has provided proposed disclosures that should be included in the Disclosure Statement to remedy some of these deficiencies. (*See* **Exhibit A**.)   Unless amended to correct these deficiencies, however, the Disclosure Statement cannot be approved.

23.     In addition, a court may decline to approve a disclosure statement where the plan "is so fatally, and obviously flawed that confirmation is impossible."  *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006).  Courts will refuse to approve a disclosure statement where, as here, "the plan it describes displays fatal facial deficiencies" that would prevent confirmation.  *In re E. Me. Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face").  For the reasons set forth below, the Disclosure Statement describes a Plan that cannot be confirmed for multiple, independent reasons.

## I.     THE FLAWS IN THE BOARD'S THEORY OF PREEMPTION MEAN THAT THE DISCLOSURE STATEMENT CANNOT BE APPROVED.

24.     Among the Board's cherry-picked gating issues in the Revenue Bond Adversary Proceedings is the question of whether or not the Revenue Bond Statutes have been preempted.[13]

---

[13] (*See* No. 20-ap-00003-LTS (ECF No. 44) ("PRIFA SJ Mot.") ¶¶ 78-87, No. 20-ap-00004-LTS (ECF No. 41) ("CCDA SJ Mot.") ¶¶ 93-101, and No. 20-ap-00005-LTS (ECF No. 56) ("HTA SJ Mot.") ¶¶ 91-100 (seeking disallowance of Revenue Bondholders' claims based on preemption).)

25.     As the Board has long acknowledged, the Plan is dependent on the Board being correct about preemption.  In the absence of preemption, the Commonwealth would still be bound by its statutory pledges, covenants, and commitments to creditors, and the Plan would not be workable.  (*See Tr. of March 4, 2020 Omnibus Hr'g.* at 185:17-186:2 (ECF No. 12181) (noting that the Board will "ask[] for rulings as part of confirmation that the statutes we put on a list that we attach to the Plan are preempted[,]" because the Board needs "***to know what's preempted and what's not, otherwise, the Plan can't work after confirmation***" (emphasis added)).)

26.     That the viability of the Plan is contingent on preemption is confirmed by PROMESA itself.  Section 314(b)(3) of PROMESA requires the Court must find that "the debtor is not prohibited by law from taking any action necessary to carry out the plan."  This provision focuses on a plan's implementation and requires the Court to find that the plan "conforms with all applicable law[.]"  *In re City of Detroit*, 524 B.R. 147, 211-12 (Bankr. E.D. Mich. 2014) (discussing analogous provision in Chapter 9).  But the Plan specifically contemplates that the Commonwealth will no longer perform under the Revenue Bond Statutes while using "the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution" in a manner inconsistent with those statutes.  (Plan § 70.1(e).)  As a result, if the Revenue Bond Statutes are not preempted, the Plan cannot satisfy PROMESA § 314(b)(3).

### A.     Preemption Under PROMESA.

27.     Ambac does not dispute that PROMESA can and does preempt certain Commonwealth laws.  Section 4 of PROMESA provides that the provisions of PROMESA "shall prevail over any general or specific provisions of territory law, State law, or regulation that is ***inconsistent*** with this Act."  PROMESA § 4 (emphasis added).  However, even with an express preemption clause, "the question of the substance and scope of Congress' displacement of state law still remains."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

28.     In determining the scope of PROMESA's preemptive effect, "Congressional intent is the touchstone of preemption analysis." *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 14 (1st Cir. 2000).  Where a "statute contains an express pre-emption clause," courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016).  "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc.*, 555 U.S. 70. at 77.  Finally, the Court must apply a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996).

29.     Consistent with these principles, the First Circuit has held that PROMESA preempts Commonwealth laws that would direct the disbursement of funds outside of a certified budget.  *See Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019) (PROMESA "precludes the territorial government from reprogramming funds from prior fiscal years except to the extent such reprogrammed expenditures are authorized in a subsequent budget approved by the Board, and any Puerto Rico law to the contrary is preempted by virtue of PROMESA section 4.").  And a confirmed plan under Title III can preempt Commonwealth laws, consistent with the Bankruptcy Code provisions incorporated by PROMESA.  *See* PROMESA § 301(a) (incorporating Section 1123(a)(5) of the Bankruptcy Code);  *In re Irving Tanning Co.*, 496 B.R. 644, 661 (B.A.P. 1st Cir. 2013) (Section 1123(a)(5) preempts nonbankruptcy law to provide a plan "adequate means" for its implementation).

- 10 -

30.     In seeking to wipe out the Revenue Bond Statutes that would be an impediment to the Plan, however, the Plan goes well beyond Congressional intent and any accepted (or acceptable) principles of preemption.

### B.     The Sweeping Preemption Provision.

31.     The Plan's "Preemption of Laws" provision asks the Court to affirm that "all laws of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, are preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose . . ."  (Plan § 85.3 (the "Preemption Provision").)  Pursuant to the Preemption Provision, the Board asks the Court to find "[a] nonexclusive list" of statutes in Exhibit K were preempted, noting that the list "may not include all Commonwealth laws that are preempted by PROMESA."  (*See* DS at 461.)

32.     The Disclosure Statement explains that the Preemption Provision is aimed at statutes which appropriate funds, or mandate the appropriation of funds, to Commonwealth agencies and instrumentalities because the Board views them as inconsistent with its budget certification powers under PROMESA § 202.  (*See* DS at 56 ("PROMESA section 202 grants the Oversight Board power over the budget.  The Oversight Board believes PROMESA section 4 preempts inconsistent Commonwealth laws, which includes laws enacted prior to PROMESA that historically conditionally appropriated certain Commonwealth monies to its instrumentalities.").)[14]

---

[14] This purported inconsistency is contradicted by the Board's characterization of these statutes.  The Board insists that such statutes are conditional allocations not binding on the Commonwealth's legislature.  (*See* DS at 64 ("the Oversight Board believes the existing statutes were enacted by prior legislatures and are not binding on the current legislature, whether preempted or not").)  If the Commonwealth's obligations under those statutes are discretionary and non-binding, there is no conflict and preemption is unnecessary.

33.     The Preemption Provision is, in effect, a Trojan Horse.  The Preemption Provision advances the Board's theory of preemption based on its budget certification powers under Title II, but asks the Court to adopt this theory for purposes of Title III.[15]  Under this approach the Court is being charged with determining whether, after the fact, these statutes were preempted by Title II "*as of the time PROMESA was enacted and the Board was created*."  (*Tr. of Hr'g. on Motions held Sept. 23, 2020* (ECF No. 14416) at 152:3-5 (emphasis added).)  And by inserting their Title II theory into the Plan, the Board hopes to get around the temporal limitations even the Board recognizes must limit the preemptive reach of its budgetary powers under Title II.[16]

34.     Neither the Plan nor Disclosure Statement offers any analysis as to why the statutes listed in Exhibit K are preempted, or why they are "inconsistent" with PROMESA.  It is unclear how broad the Board believes this theory goes, or if in the Board's view the Preemption Provision has any meaningful limits on its reach. (*See* ECF No. 10958 ¶ 20 ("Preemption is based not on how a statute is described or what it is called, but on whether it is a prepetition obligation to pay.  *Any prepetition obligations to pay*" are preempted by PROMESA) (emphasis added).)  What is clear, however, is that the Preemption Provision embodies the same failed theories that the Board

---

[15] The Board has long maintained that preemption of the statutes listed in Exhibit K to the Plan has already occurred.  Further, the Plan and the Disclosure Statement say nothing about preemption based upon Title III proceedings and/or preemption necessary to effectuate a plan under 11 U.S.C. § 1123(a)(5). Accordingly, this Objection does not address those theories.  To the extent the Board raises those issues in response to this Objection, Ambac reserves the right to seek leave to submit additional briefing.  If, however, the Preemption Provision is Title III preemption in disguise, as discussed *infra* at II, such preemption would render the Plan classification scheme unlawful, and the Plan unconfirmable.  Further, preemption under Title III itself is subject to important limitations, applicable here and unaddressed by the Board.  *See In re Irving Tanning*, 496 B.R. at 661-63 (Section 1123(a)(5) is not a "license [for a debtor] to rewrite the law to its liking").

[16] (*See id.* at 20:8-21:2, 151:3-152:5) (suggesting that preemption based on fiscal plan and budgets is limited by the periods covered by those materials, but later claiming that under Title III the court can preempt statutes in perpetuity).)

has argued mandate preemption of the Revenue Bond Statutes.  Those arguments fail, as they do in the Revenue Bond Adversary Proceedings.

### C.  Statutes Obligating the Commonwealth to Appropriate Funds Are Not Inconsistent with PROMESA.

35.    The Preemption Provision's failure is rooted in the flawed premise that Commonwealth laws that "transfer, appropriate or require appropriations" to agencies or instrumentalities are "inconsistent" with PROMESA.  (Plan § 85.3; DS at 461.)  This theory centers around the argument that so-called "appropriation" statutes are necessarily inconsistent with the Board's power to certify budgets.  (*See* DS at 56.)  But this theory manufactures inconsistencies where none exists.

36.    Commonwealth budgetary laws distinguish between an "obligation"—a "pledge which is represented by a . . . contract or similar document . . . to encumber the appropriations," 3 L.P.R.A. § 283b(k)—and the authorization of a "disbursement," *i.e.*, an actual expenditure of funds, *id.* § 283h.  And while the Commonwealth can limit the actions it takes and commitments it fulfills by limiting expenditures, the Commonwealth cannot "cancel its obligations, nor defeat the rights of other parties" by controlling expenditures—the two are entirely distinct.  *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892); *see also Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) ("Incurring an obligation, of course, is different from paying one.").

37.    This distinction exposes the central flaw of the Preemption Provision.  The Board's budget certification power is the power to control how the Commonwealth budget is set in each fiscal year.  (*See generally* PROMESA § 202; DS Ex. H at 19 (certified budget for FY 2021 concerns "expenditures authorized in this budget").)  Section 202 does not change the legal impact of Commonwealth budgets.  Rather, PROMESA protects the Board's discretion to **direct** those expenditures and disbursements, and as a result, Commonwealth laws providing for **alternative**

- 13 -

*means for the disbursement of funds that are inconsistent with a certified budget* have been held
to be preempted by PROMESA. *See Vázquez-Garced*, 945 F.3d at 8 (observing that "there can be
no **spending** from sources not listed in that budget," which precludes "unknown **expenditures**" by
the Governor) (emphasis added). Unlike the statutes at issue in *Vázquez-Garced*, **obligation**-
creating statutes establish obligations which are satisfied by separately authorized expenditures
and disbursements. If the Board does not include an appropriation in the certified budget, the
obligation is not erased. Accordingly, obligation-creating statutes are not inconsistent with
PROMESA, and are not preempted.

38.     While Ambac has not undertaken to review every statute listed in Exhibit K to the
Plan (or that might be implicated by the Preemption Provision's sweeping reach), as discussed in
the summary judgment briefing in the Revenue Bond Adversary Proceedings, the Revenue Bond
Statutes are obligation-creating statutes, and an obligation is distinct from the disbursement to
satisfy it.[17] Accordingly, there are no grounds to find that the Revenue Bond Statute are preempted
by the Board's budget certification powers.

39.     Indeed, there is ample textual evidence showing that Congress did not intend
PROMESA to preempt obligation-creating statues such as the Revenue Bond Statutes. For one,
PROMESA plainly contemplates that rights created by the obligation-creating statutes such as the
Revenue Bond Statutes would survive its enactment and be afforded their lawful treatment—
including in any Title III proceeding. That is the only reading of PROMESA that makes sense in
light of its direction that the Board respect "lawful liens" and "lawful priorities" under laws "in
effect prior to the date of enactment of [PROMESA.]" PROMESA § 201(b)(1)(N), and its

---

[17] (*See* No. 20-ap-00003-LTS (ECF No. 80) ("PRIFA SJ Opp.") ¶¶ 153-84; No. 20-ap-00004-LTS (ECF
No. 78) ("CCDA SJ Opp.") ¶¶ 172-202; No. 20-ap-00005-LTS (ECF No. 94) ("HTA SJ Opp.") ¶¶ 122-
146.)

incorporation of statutory protections for creditors, *see, e.g.*, PROMESA § 301(a) (incorporating

secured claim protections of 11 U.S.C. § 1129(b)(2)(A), adequate protection provisions of 11

U.S.C. § 361, and protections in 11 U.S.C. § 928 for creditors' liens on special revenues collected

post-petition). Further, PROMESA § 407 allows a creditor to enforce its rights with respect to a

transfer of property of a territorial instrumentality in violation of "applicable law under which [the]

creditor has a valid pledge of, security interest in, or lien on such property"—which only makes

sense if those applicable laws remain in effect and continue to provide those rights. Finally,

because it is well-established that statutes can[18] (and here, do)[19] create constitutionally-protected

property rights, the absence of any legislative text or history accounting for the obvious "takings

clause concerns" created by preempting *all* statutory appropriations to Commonwealth agencies

and instrumentalities is evidence "Congress cannot have intended" such effects. *In re Irving

Tanning*, 496 B.R. at 665.

> **D.  The Scope of the Preemption Provision Exceeds Congress's Intent.**

40. The Preemption Provision relies on purported conflicts with the Board's budget

certification powers under Section 202 to establish preemption, but this reflects a fundamental

misunderstanding of PROMESA. It is true that Congress vested the Board with "powerful

authority to make certain important policy determinations" for the Commonwealth, including the

power to certify annual budgets. *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R (In re*

---

[18] *See R.I. Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*, 929 F.2d 844, 850 (1st Cir. 1991) (noting "statutorily spawned contract right" can be "a vested property right for purposes of the fifth amendment"); *cf. Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986) ("Congress does not have the power to repudiate its own debts, which constitute property to the lender, simply in order to save money.").

[19] The rights of Revenue Bondholders to specific revenues, backed by the Commonwealth's non-impairment covenant, create vested property rights. *United States v. Winstar Corp.*, 518 U.S. 839, 876 (1996). If the Revenue Bond Statutes were preempted, Revenue Bondholders would be entitled to just compensation. *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) ("The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.").

*Fin. Oversight & Mgmt. Bd. for P. R.)*, 330 F. Supp. 3d. 685, 701 (D.P.R. 2018), *aff'd*, 945 F.3d 3

(1st Cir. 2019).  And Commonwealth laws conflicting with those specified powers are preempted.

*See Vázquez-Garced*, 945 F.3d at 8.

      41.    But Congress did not grant the Board unlimited, and unspecified, authority

to meddle with the Commonwealth's governmental functions simply because the Board desired some

particular outcome.  To the contrary, as this Court has already recognized, when Congress intended

to "infringe[] on the scope of the authority of the elected Government[,]" that infringement was

"***written into law*** by Congress."  *Rosselló Nevares*, 330 F. Supp. 3d at 702 (emphasis added).

Which means, for instance, that the Board's budget certification powers under Section 202 do not

encompass the "power to affirmatively legislate." *Id*. at 701.  Accordingly, the Board cannot effect

"***the repeal or modification of existing Commonwealth law***" to its liking.  *Id*. (emphasis added).

Instead, the Board must depend on its "budgetary tools and negotiations . . . to elicit any necessary

buy-in from the elected officials and ***legislators***." *Id*. (emphasis added).

      42.    The Board's theory that, based on a purported inconsistency with Section 202, all

Commonwealth laws that "transfer, appropriate or require appropriations" to agencies or

instrumentalities were preempted upon PROMESA's enactment is the same preemptive inference

the Court rejected in *Rosselló Nevares*.  The Court has already found that Congress did not, through

its budget certification powers, cloak the Board with the power to "***repeal*** or ***modif[y]***"

Commonwealth law to achieve its policy objectives.  *Id*. (emphasis added).  Accordingly, the mere

existence of those powers is plainly insufficient grounds to find that Congress intended to preempt

all Commonwealth laws that "transfer, appropriate or require appropriations" to agencies or

instrumentalities—in particular, the Revenue Bond Statutes.  If Congress had intended such a

- 16 -

sweeping intrusion into the legislative authority of the Commonwealth, it would have been "***written into law*** by Congress." *Id.* at 702 (emphasis added).

43. Had Congress intended to unsettle the Commonwealth's core legislative functions so dramatically, Congress would have made such preemptive intent "***clear*** and ***manifest***" in PROMESA. *Medtronic*, 518 U.S. at 485 (1996) (emphasis added). Nothing in PROMESA is sufficient to satisfy this standard.[20] Because the scope of preemption sought under the Preemption Provision far exceeds Congress's intent, the Court cannot adopt its terms. Its failure means the Plan is patently unconfirmable.

### E. The Disclosure Statement Fails to Provide Adequate Information Concerning the Board's Preemption Theory.

44. Even if the Court were to decline to find that the Plan is patently unconfirmable on the basis the flawed Preemption Provision, the Court will still need to deny approval of the Disclosure Statement in its current form because it does not adequately disclose information regarding the Board's preemption theory and the risks that the Board is wrong about it.

45. The Board has candidly admitted that the Plan stands and falls on its theory of preemption. (*See supra* ¶ 25.) Yet the Disclosure Statement says precious little about this novel and untested theory, failing to offer any reasoning, explanation, or facts supporting the Board's "belief" concerning the impact of Section 4 of PROMESA on statutes directing appropriations. Creditors need to know what factors support the Board's belief about preemption to make an informed judgment on whether they should vote for the Plan. This is particularly critical since the Board has failed to identify all the Commonwealth laws that have purportedly been preempted by

---

[20] The Board has previously argued that the scope of preemption is determined and limited by reference to the contents of a certified Commonwealth budget. This framework is not presented in the Plan and Disclosure Statement, and it is flatly contradicted by the Board's more recent representations to the Court. (*See Tr. of Hr'g on Motions held Sept. 23, 2020* (ECF No. 14416), at 152:3-5 (statutes preempted "as of the time PROMESA was enacted and the Board was created.").)

PROMESA.  (*See* DS at 461.)  In a similar vein, Section V.F.5. of the Disclosure Statement

provides a procedural summary of the Revenue Bond Litigation, with no context or discussion

regarding the nature of the preemption dispute.  With so little information, creditors can only guess

at how preemption has influenced their treatment under the Plan.

46.      At a minimum, the Disclosure Statement should be amended to affirmatively

identify for each class of claims what role preemption has played in the Board's classification and

treatment of those claims.  The Disclosure Statement must also identify the risks that the Board's

theory will be rejected.  Ambac has drafted a proposed disclosure, attached as **Exhibit A** at 1.

## II.      THE PLAN'S CLASSIFICATION SCHEME VIOLATES *GRANADA WINES*.

47.      In addition to the sweeping Preemption Provision, the Board has also argued that

Commonwealth law priorities have been preempted by Title III of PROMESA.[21]  Although these

two theories rely on different grounds for preemption, the consequence here is the same:  if the

Board is right about the preemptive effect of PROMESA, the Plan is facially unconfirmable

because its proposed classifications violate *Granada Wines*.  Because a Section 1122 violation

under *Granada Wines* cannot be cured at confirmation (including by cramdown), this issue should

be addressed now.  *See In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294-96 (Bankr. D. Mass. 2002)

(evaluating classification of claims at disclosure statement phase for compliance with *Granada*

*Wines*); *In re Main Rd. Props., Inc.*, 144 B.R. 217, 219-21 (Bankr. D.R.I. 1992) (same).

---

[21] (*See, e.g.*, No. 20-ap-00003-LTS (ECF No. 1) ("Board's PRIFA Adv. Compl.") ¶ 156 ("[a]ny
Commonwealth laws purporting to recognize priority claims other than those included in PROMESA Title
III (and the incorporated Bankruptcy Code provisions) are preempted pursuant to PROMESA section 4.").)
Ambac's description of the Board's positions within this section should not be construed as an adoption of
those positions.  Ambac reserves the right to argue that the priority of its claims under Commonwealth law
is enforceable and must be respected in connection with the confirmation of any Title III plan.

A.   *Granada Wines* **Is Controlling and Mandates Claims of the Same Legal Character Be Placed in the Same Class.**

48.   *Granada Wines* is controlling precedent in the First Circuit regarding the classification of claims under Section 1122(a) of the Bankruptcy Code (incorporated into PROMESA by Section 301(a)).[22]   Therein, the First Circuit adopted as the law of this Circuit the "general rule" that "all creditors of equal rank with claims against the same property should be placed in the same class." *Granada Wines*, 748 F.2d at 46.   The First Circuit elaborated that "[s]eparate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors[.]" *Id.* Courts in the First Circuit have recognized that there is a "split among the circuits" with respect to classification of claims under Section 1122(a), and that pursuant to *Granada Wines*, "the First Circuit follows what is known as the 'strict approach' to classification." *In re Hanish*, 570 B.R. 4, 14-15 (Bankr. D.N.H. 2017).   This standard requires "substantially similar" claims—claims of "equal rank with claims against the same property"—be placed in the same class unless differences in their "legal character . . . accord[s] them status different from other unsecured creditors[.]" *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. 17, 25, 27 (Bankr. D. Mass. 2002).

49.   Although courts within the First Circuit have routinely interpreted and applied *Granada Wines* as controlling the classification of claims under Section 1122(a) and mandating that similarly situated creditors ***must*** be classified together, the Board has previously argued to the contrary.   (*See* ECF No. 12726 ("Board Opp. to UCC 3013 Mot.") ¶¶ 41-57.)   Its arguments fail.

50.   The Board's primary argument concerning the application of *Granada Wines* is that Section 1122(a) states that a plan "may" place claims in the same class only if they are

---

[22] Section 1122(a) provides: "Except as provided in subsection (b) of this section [governing administrative convenience classes], a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

"substantially similar," and that this permissive language provides a plan proponent with "wide latitude in determining whether to classify together similar claims." (*See* Board Opp. to UCC 3013 Mot. at ¶¶ 41-42.)  In support of this position, the Board has cited decisions outside of the First Circuit to support the breadth of discretion afforded to debtors in classifying claims in Chapter 9 and Chapter 11 cases. (*See id.* at ¶¶ 42-47.)  The Board asserts that "[v]irtually every circuit that has considered whether there is some limiting principle on a debtor's ability to separately classify claims has adopted a permissive approach." (*Id.* at ¶ 44.)

51.   But this Court is bound to apply the precedents of ***this*** Circuit, not other Circuits. While other Circuits have a permissive approach to classification, the First Circuit in *Granada Wines* plainly stated that "[s]eparate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors." *Granada Wines*, 748 F.2d at 46.  So while the Board makes "fond reference to decisions handed down in other jurisdictions permitting separate classification of claims based upon practical difference among the classes[,]" *In re Bjolmes Realty Tr.*, 134 B.R. 1000, 1003 (Bankr. D. Mass. 1991), those cases are simply inapplicable here.  *In re Hanish, LLC*, 570 B.R. at 15 ("Given that the First Circuit applies the strictest approach . . . other courts have accepted justifications for separate classification that are simply inconsistent with *Granada Wines*.").[23]

52.   The Board has also argued that *Granada Wines* does not control here because it was not a Chapter 9 case (and obviously not a case arising under PROMESA). (*See* Board Opp.

---

[23] The Board has suggested that if similar claims cannot be classified separately under *Granada Wines*, the unfair discrimination test in Section 1129(b)(1) "would serve no purpose[,]" because it permits separate classification absent "unfair discrimination against the class that rejects." (Board Opp. to UCC 3013 Mot. at ¶ 43.)  That wrongly assumes there are *never* grounds sufficient to warrant separate classifications under *Granada Wines*, which would then require a court to apply Section 1129(b)(1) as between different classes of claims that are *not* substantially similar to each other.  And, it ignores that Section 1122 and Section 1129(b)(1) serve distinct purposes and impose distinct obligations. *See In re Rexford Props. LLC*, 558 B.R. 352, 365 (Bankr. C.D. Cal. 2016) (recognizing "doctrinal distinction" between these provisions).

to UCC 3013 Mot. at ¶¶ 46-48.)  But that makes little sense.  Congress decided to incorporate by reference Section 1122 of the Code, *see* PROMESA § 301(a), which is the same approach Congress took under Chapter 9, *see* 11 U.S.C. § 901(a) (incorporating by reference Section 1122 into Chapter 9 proceedings).  Courts in Chapter 9 proceedings routinely turn to Chapter 11 authority to interpret permissible classifications under Section 1122.  *See e.g.*, *In re City of Detroit*, 524 B.R. at 245-46 (exclusively citing Chapter 11 cases to interpret Section 1122); *In re Hardeman Cty. Hosp. Dist.*, 540 B.R. 229, 234 (Bankr. N.D. Tex. 2015) ("The application of § 1122 in chapter 9 cases should be essentially the same as in chapter 11 cases.") (citing Collier on Bankruptcy ¶ 901.04).[24]

53.     The Board has also tried to avoid *Granada Wines* by claiming that its statements on classification are *dicta* because the plan before the First Circuit did not "involve. . . separate classification."  (Board Opp. to UCC 3013 Mot. at ¶¶ 48, 53.)  Again, the Board simply ignores what *Granada Wines* says.  In *Granada Wines*, the debtor argued that, even though pension claims were classified together with other general unsecured claims, the pension claims should "nevertheless be treated as if [they] were in a separate class because the plan treated [them] differently by providing for reduced payment on [those claims]" based on the debtor's interpretation of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA).  *Granada Wines*, 748 F.2d at 46.  The First Circuit rejected this argument, holding that the debtor's proffered rationale was not a "sufficient basis for distinguishing the Pension Fund claim from other general unsecured claims" because the MPPAA "affect[ed] only the allowable amount of the [pension]

_____

[24] In arguing that *Granada Wines* cannot control because it did not interpret classification of claims under PROMESA, the Board ignores what PROMESA ***does*** say about classification of claims.  PROMESA states that, for purposes of evaluating whether claims are "substantially similar" under Section 1122, the Board "***shall*** consider whether such claims are secured and whether such claims have priority over other claims." *See* PROMESA § 301(e) (emphasis added).  Notably, Congress did not direct the Board to consider the business and economic factors relied upon in classifying claims outside the First Circuit.

claim, not its legal nature." *Id.* at 47.  The First Circuit concluded that, because "Granada did not ***and could not*** separately classify" those claims, the debtor's attempt to use Section 1129(b)(2)(B)(ii)'s "cramdown" provision failed.  *Id.* (emphasis added).  Accordingly, separate classification was squarely at issue in *Granada Wines*, and its holding is not *dicta*.[25]

### B.     The Plan Facially Violates *Granada Wines*.

54.     Given the Board's position that *Granada Wines* is not controlling, it is no surprise that the Plan violates the First Circuit's rules for classification under Section 1122(a).

55.     The Plan's first violation of *Granada Wines* is to misclassify Revenue Bondholders as unsecured creditors.[26]  But even if the Board were right that Revenue Bondholders are mere unsecured creditors, under the Board's theory of preemption, the Plan violates *Granada Wines*.

56.     Both   GO/PBA   Bondholders   and   Revenue   Bondholders   claim   statutory, constitutional, and budgetary[27] priorities under Commonwealth law.[28]  But according to the Board, any   differences   in   those   rights   have   been   wiped   away.    Either   they   have   been   wiped   away

---

[25] Even if the First Circuit's holding could be construed as based on two alternative grounds—(i) that the debtor did not in fact classify the claims separately, and (ii) that the debtor could not have classified the claims separately—the Board cannot pick and choose which is the "real" reason and which is *dicta*.  *Cf. Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1123 (9th Cir. 1999) ("When an appellate court has alternative bases for its holding, it cannot be claimed that all but one of the bases is unnecessary dicta.") (Ferguson, J., concurring); *U.S. Steel Corp. v. EPA*, 444 U.S. 1035, 1035 (1980) (an "independent, alternative basis for the decision of the court below, [is] no more dicta than its companion holding[s]").

[26] Ambac acknowledges that the Court has previously ruled, in connection with the lift-stay motions to which Ambac was a party and on the limited record presented there, that Ambac and the other monolines did not demonstrate a colorable claim to a security interest in revenues other than those deposited into certain accounts.  Ambac respectfully disagrees with those rulings, which in any event will not bind the Court in connection with the Board's motions for summary judgment in the Revenue Bond Litigation.

[27] *See* 23 L.P.R.A. § 104(c)(1) (providing that when Article VI, Section 8 is lawfully triggered, the "payment of interest and amortizations" of the public debt is to be paid first).

[28] (*See, e.g.*, No. 19-ap-00291-LTS (ECF No. 10) at 10-18 (GO/PBA bondholders asserting priority payment rights under Commonwealth statutory, constitutional, and budgetary provisions); PRIFA SJ Opp. ¶¶ 13-16, 219-225, CCDA SJ Opp. ¶¶ 15-21, 234-240, and HTA SJ Opp. ¶¶ 19, 179-184 (Revenue Bondholders asserting priority payment rights under Commonwealth statutory, constitutional, and budgetary provisions).)

because (i) under the Preemption Provision, the Commonwealth's statutory obligations to GO/PBA Bondholders and Revenue Bondholders were preempted as of PROMESA's enactment, well before the Title III proceedings began, or (ii) in the Board's view, "[a]ny Commonwealth laws purporting to recognize priority claims other than those included in PROMESA Title III (and the incorporated Bankruptcy Code provisions) are preempted pursuant to PROMESA section 4."[29]

57.    Accordingly, under the Board's theory, both GO/PBA Bondholders and Revenue Bondholders hold mere unsecured, non-priority claims arising from preempted statutes.  But the Plan classifies their claims separately.  That cannot stand under *Granada Wines*.

58.    Under *Granada Wines*, "all creditors of equal rank with claims against the same property should be placed in the same class[,]" and the test is whether the "legal character of . . . claims is such as to accord them a status different from the other unsecured creditors . . . ." *Granada Wines*, 748 F.2d at 46.  Moreover, not any differences in legal character are sufficient. To be pertinent, the difference in legal character must establish "a difference in rank concerning rights against the debtor or its property."  *In re Bjolmes Realty*, 134 B.R. at 1003; *see also In re Barney & Carey Co.*, 170 B.R. 17, 22 (Bankr. D. Mass. 1994) (under *Granada Wines*, "all claims of equal legal priority must be placed in the same class, subject to the administrative convenience exception").  "[B]usiness or economic issues" hold no sway under *Granada Wines*.  *Banc of Am. Com. Fin. Corp. v. CGE Shattuck, LLC* (*In re CGE Shattuck, LLC*), 1999 WL 33457789, at *4 (Bankr. D.N.H. Dec. 20, 1999).

---

[29] (Board's PRIFA Adv. Compl. ¶ 156; *see also, e.g.*, Board's PRIFA Adv. Compl. ¶ 157 ("None of Defendants' claims qualify for priority under PROMESA Title III's sole priority claim in Bankruptcy Code section 507(a)(2) for administrative expenses."); Brief for Defendants-Appellees at 21-22, *Aurelius Capital Master, Ltd., et al. v. Commonwealth of Puerto Rico*, No. 18-1108 (1st Cir. July 2, 2018) ("Appellants' contention that any plan of adjustment must treat GO Debt as having a first priority is simply wrong. . . . As noted above, PROMESA § 301(a) incorporates only one priority into Title III: Bankruptcy Code § 507(a)(2), which grants priority to administrative claims.  No other priorities exist in Title III.").)

59.     If obligation-creating statutes and Commonwealth law priorities have been preempted, any differences the Board can point to between the unsecured, non-priority claims of GO/PBA Bondholders and Revenue Bondholders are irrelevant under *Granada Wines*. Differences in how claims arose do not warrant separate classification under *Granada Wines*.  *See In re Salem Suede, Inc.*, 219 B.R. 922, 933 (Bankr. D. Mass. 1998) ("[a]lthough the Judgment Creditors' claims . . . arose in a different fashion from other unsecured and trade debt, their unsecured claims are of a legal character indistinguishable from that debt[.]").  Nor does the possibility of payment from a source other than the debtor.  *See In re Nat'l/Northway*, 279 B.R. at 29-30 (creditor whose claim is unsecured against the debtor, but separately secured against affiliates of the debtor, cannot be separately classified separately from other unsecured creditors); *In re Hanish*, 570 B.R. at 15 (personal guarantee by a non-debtor "does not alter the legal character of a claim as it relates to the assets of the debtor").  Further, classification turns on the underlying legal characteristics of claims, not how they are treated or construed by private agreements.  *See In re CGE Shattuck, LLC*, 254 B.R. 5, 11 (Bankr. D.N.H. 2000) (refusing to approve a private distribution agreement where "the economic substance and effect of the [private agreement] would be to sanction a distribution scheme" that violates *Granada Wines*); *cf. Costa v. Robotic Vision Sys. Inc. (In re Robotic Vision Sys., Inc.),* 2006 WL 929322, at *3 (B.A.P. 1st Cir. Apr. 11, 2006) ("Parties in a bankruptcy proceeding may not avoid [the bankruptcy priority scheme for distribution of estate property] by private agreement.").

60.     The Board has previously asserted that objections to the classification scheme are really an "unfair discrimination" argument in disguise.  (*See* Board Opp. to UCC 3013 Mot. at ¶ 6.)  They are not.  The underlying purpose of Section 1122 is to prevent debtors from gerrymandering.  *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)

(stating that "thou shalt not classify similar claims differently in order to gerrymander" a consenting impaired class). By limiting a debtor's ability to separately classify claims, Section 1122 is a mechanism to ensure the integrity of the analysis under Section 1129. *See Granada Wines*, 748 F.2d at 47 ("Since *Granada* did not and could not separately classify the Pension Fund claim, its attempt to use the cramdown provision . . . is inappropriate.").

61. Because accepting the Board's preemption theories would mean that the Plan's classification scheme violates *Granada Wines*, the Plan is patently unconfirmable.

### C. The Disclosure Statement Fails to Provide Adequate Information Concerning the Plan's Classification Scheme.

62. If the Board's preemption theory is correct, the Plan cannot be confirmed because its classification scheme violates *Granada Wines*. The Disclosure Statement's discussion of the classification issue, however, is relegated to a footnote simply noting that the Court denied the UCC's Rule 3013 motion on the issue (*see* DS at 394 n.368), omitting that the denial was without prejudice, and overlooking the Court's observations that there were "colorable claims" that the classification scheme violated *Granada Wines*.[30] If Court declines to find the Plan patently unconfirmable because of its classification scheme at this time, the Disclosure Statement must be amended to disclose the risk this may occur at plan confirmation. Ambac's proposed disclosure is attached hereto as **Exhibit A** at 2.

## III. UNDER THE BOARD'S OWN FINANCIAL PROJECTIONS, THE PLAN IS NOT FEASIBLE.

63. PROMESA 314(b)(6) requires the Court to find that the Plan is "feasible," meaning that the Commonwealth will "meet the obligations contemplated in the Plan without the significant probability of a default." *In re City of Detroit*, 524 B.R. at 219-20, 244. While the feasibility

---

[30] (*See Transcript of April 22, 2020 Omnibus Hearing* (ECF No. 12953) at 10:13-23 ("both sides" to the classification dispute "have raised colorable arguments in support of their respective positions").)

inquiry does not require "a plan's success to be guaranteed," it does require that a plan be "reasonably likely to succeed *on its own terms* . . . ." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (emphasis added). For example, a plan is "not feasible if the bonds proposed to be issued will not, under the circumstances contemplated by the plan, be paid in full." *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 36 (Bankr. D. Colo. 1999).

64.     The feasibility requirement dooms the Plan at the outset because the Fiscal Plan, which forms an integral part of the Plan, expressly contemplates that the Commonwealth will be operating at a sustained deficit by no later than fiscal year 2036 (*see* DS Ex. G at 62-63), while contemplating the issuance of new GO debt maturing in 2037, 2041, and 2046. (*See* Plan Ex. I at I-3.) Thus, the Plan itself contemplates that the Commonwealth will fail to meet its obligations under the Plan. This is the very essence of a Plan that is "not feasible[,]" *In re Mount Carbon Metro. Dist.*, 242 B.R. at 36, and the Court should permit voting on a Plan which plans to fail.[31]

## IV.  UNPRECEDENTED THIRD-PARTY RELEASES RENDER THE PLAN UNCONFIRMABLE AND REQUIRE SIGNIFICANT CLARIFICATION.

65.     Although neither the Disclosure Statement nor the Plan uses the terms "third-party release" or "non-debtor release," the Plan contains nonconsensual third-party releases that are so broad as to be entirely without precedent. Confirmation of the Plan as drafted would bar creditors from enforcing claims against numerous non-Debtor parties, including HTA, CCDA, and PRIFA—entities that either have their own, pending Title III proceedings, or for whom *no* restructuring process has yet begun! This release is unprecedented, broader by far than releases found impermissible elsewhere, and its inclusion renders the Plan patently unconfirmable. *See In*

---

[31] To be clear, Ambac believes that the Fiscal Plan is overly conservative and is based on outdated data and faulty assumptions. But the Court must evaluate the Plan as the Board presents it.

*re Bos. Harbor Marina Co.*, 157 B.R. 726, 729-31 (Bankr. D. Mass. 1993) (denying plan confirmation owing to, *inter alia*, plan's inclusion of unjustified releases for non-debtor parties).

66.     If the Board truly intends to seek the Court's approval of this release, the Board must make this abundantly clear to creditors (as case law requires) and must disclose the risk to confirmation its inclusion entails.  If the Board instead seeks more limited relief, the Plan and Disclosure Statement must be modified before solicitation to accurately reflect the relief sought.

### A.      The Plan Contains Nonconsensual Third-Party Releases of Non-Debtors.

67.     ***Release of non-Debtors***.  Plan § 88.2(a), entitled "Discharge and Release of Claims and Causes of Action" (tucked away in the "Miscellaneous Provisions"), provides for the release of "all Claims or Causes of Action against the Released Parties [including "Government Parties"[32]] . . . relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever[.]"  This section, and the defined terms therein, suggest that claims against instrumentalities that are not Debtors under the Plan— including HTA, CCDA, and PRIFA—may be included in the scope of the Section 88.2(a) release.

68.     Section 82.1(g) confirms that the Plan seeks to impact claims against these entities. It requires, as a condition precedent to the Plan's effectiveness, a Court order finding that "any Claim" asserted against HTA, CCDA, or PRIFA (as "public corporation[s] or instrumentalit[ies] of the Commonwealth"), "based on any bonds issued" by such entities, "shall be dischargeable and discharged pursuant to the Plan"; further, HTA, CCDA, and PRIFA "shall have no liability on account of such Claim."  (Plan § 82.1(g).)  *No* limitation is found in the Plan with respect to the foregoing.

---

[32] (Plan § 1.371.)  Plan § 1.246 defines "Government Parties" to include: (a) the Board, (b) committees and subcommittees of the Board, (c) the agencies of the Commonwealth, and (d) AAFAF, as well as their "Related Persons," which includes "Affiliates" (Plan § 1.369), which includes entities "under common control."  (Plan § 1.54.)

69.     And while the Section 88.2(a) release does not specify *who* is releasing all such "Claims and Causes of Action against the Released Parties," Plan § 88.3, entitled "Injunction on Claims," supplies this information:  it permanently enjoins, from and after the Effective Date, "all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 88.2" from enforcing or pursuing in any way whatsoever "any such Claim *or other debt or liability* . . . against any of the Released Parties or any of their respective assets or property."  (Plan § 88.3 (emphasis added).)[33]

70.     *Nonconsensual release.*  As to who is required to give the third-party release:  the Plan makes *no* distinction among the creditors that voted to accept the Plan, voted to reject the Plan, were not entitled to vote, or failed to vote on the Plan.  *All* are bound.  The Plan, and the releases and injunctions it contains, are binding on all holders of Claims, whether or not impaired, "and *whether or not such holder has accepted the Plan*."  (Plan § 88.20 (emphasis added).)[34]

---

[33] Section 88.11 bolsters the Section 88.2 injunction by permanently enjoining all entities who currently, have previously, or will hold "any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors . . . from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims[.]"  (Plan § 88.11.)

[34] The Ballots attached as exhibits to the DS Approval Motion, which suggest that a vote to *accept* the Plan constitutes consent to the releases and injunctions in the Plan, are misleading.  The Ballots state as follows:  "This Ballot is submitted to you to (i) solicit your vote to accept or reject the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated [●], 2021 (as the same may be amended or modified, the "Plan") [ECF No. _____], and (ii) *consent to the injunction and release provisions of the Plan if you vote to accept the Plan*."  (DS Approval Motion, Exhibit A (Proposed DS Approval Order), Schedule 3(b) (Form of Ballot) at 6 (emphasis added); *id.* at Schedules 3(c), 3(d), 3(o)-2, 3(t), 3(u), 3(v), 3(w).)

Even if the Ballots *did* provide that only votes to accept constitute consent to the releases, it is the Plan, not the Ballots, that govern.  (*See* Plan § 88.18 (If there is "any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern.").)

### B.     The Plan's Third-Party Releases Do Not Comply with Applicable Law.

71.     The Plan's releases are beyond the bounds of what any court has found allowable in a confirmable plan—both because they are nonconsensual, and due to their incredible breadth.

72.     ***Unprecedented release of bond debt in non-issuer plan.***  The releases sought here are, in Ambac's understanding, entirely unique.  To be clear:  the Plan purports to release claims on account of entirely separate non-Debtor entities that have issued their own bonds.  This makes no sense.  HTA is undergoing a Title III process; creditors have filed proofs of claim against HTA, including on account of Claims the Plan appears to release.  Moreover, the Plan seeks to discharge claims arising from bonds issued by certain entities (with respect to CCDA and PRIFA), including claims ***against those very entities***, but for whom ***no restructuring process has yet begun***.  Discharging bond debt in a plan other than that of the bonds' issuer is unheard of.  And beyond unprecedented, this is confusing, particularly for creditors holding claims against multiple entities.  It is unclear which claims, against which entities, are being adjusted, released, or preserved.

73.     ***Third-party releases nonconsensual under any standard.***  The nonconsensual nature of the releases push them further beyond the bounds of the acceptable.  Courts generally demand affirmative action by which a creditor manifests its consent to a third-party release, such as an express opt-in or—at very least—an opt-out of the plan releases on their ballots.[35]  A creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt." *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007).

---

[35] *See, e.g.*, *In re Wyly*, 2019 WL 2590035, at *6 (Bankr. N.D. Tex. June 22, 2019) ("The Third-Party Releases are fully consensual because they are only given by those parties who affirmatively opted-in to such releases."); *In re Stearns Holdings, LLC,* 607 B.R. 781, 789 (Bankr. S.D.N.Y. 2019) ("[A]ffected parties were on clear notice of the Third-Party Releases, including the option to opt out of the Third-Party Releases, rendering such releases consensual[.]"); *In re Wash. Mut.*, 442 B.R. 314, 353 (Bankr. D. Del. 2011) (finding that third-party release was appropriate only with respect to those who affirmatively consent to it by voting in favor of the plan ***and*** not opting out).

74.     Here, creditors are given no such option.  Worse yet, they are not apprised of the existence of the non-Debtor releases or the consequences of the Plan on their claims against third parties like HTA, CCDA, or PRIFA.  Hidden releases are by definition nonconsensual.  "[I]f [creditors] had not been given adequate notice of the ramifications of the release as a component of the plan, they could not have knowingly agreed to its terms."  *Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 322 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).

75.     While some courts apply more liberal standards, finding the requisite consent in an affirmative vote to accept the plan,[36] courts generally refuse to find consent by creditors who are not entitled to vote on a plan, fail to vote, or vote to reject a plan.[37]  Here, where the Plan makes **no** distinction in connection with the third-party releases among the creditors that voted to accept the Plan, voted to reject the Plan, were not entitled to vote, or failed to vote, the third-party releases here are nonconsensual even under the lesser standard.

76.     ***Unjustified nonconsensual third-party releases.***  Although the First Circuit has not addressed whether nonconsensual third-party releases in a reorganization plan are permissible,[38] courts around the country acknowledge that extraordinary circumstances must be present to justify such releases.  *See e.g.*, *In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 733–34 (Bankr. N.D. Ohio 2019) ("[n]o circuit has held or even suggested that such releases are anything less than an

---

[36] *See, e.g., In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993) (third-party releases binds only creditors that voted in favor of the plan); *In re Bos. Harbor Marina*, 157 B.R. at 730–31 (third-party release appropriate with respect to creditors who affirmatively accepted the plan).

[37] *See, e.g.*, *In re Chassix Holdings*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (creditors not entitled to vote did not consent to the third-party releases "[s]ince no 'opt in' mechanism was provided"); *In re Quincy Med. Ctr.*, 2011 WL 5592907, at *4 (Bankr. D. Mass. Nov. 16, 2011) (third-party releases impermissible as to creditors deemed to accept the plan); *In re Wash. Mut.*, 442 B.R. at 355 (opt-out mechanism insufficient to support third-party releases, especially in regards to creditors who did not return a ballot); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (it is "not enough for a creditor to abstain from voting for a plan" to manifest consent).

[38] *See In re Mahoney Hawkes*, 289 B.R. at 298 ("The First Circuit has identified but not ruled on this issue.").

extraordinary use of the bankruptcy court's power, [and t]he circuit split occupies the spectrum between 'impossible' and 'very rare'").

77.    To determine whether a proposed nonconsensual third-party release is permissible, courts in the First Circuit consider whether: (1) there is an identity of interest between the debtor and third-party being released, such that a suit against non-debtor is, in essence, a suit against the debtor; (2) the third-party has contributed substantial assets to the reorganization; (3) the proposed injunction is essential to the reorganization and there is little likelihood of success without it; (4) a substantial majority of the creditors agree to the injunction, specifically, whether the impacted classes have "overwhelmingly" voted to accept the proposed plan treatment; and (5) the releasing parties receive consideration in exchange for the releases.  *See, e.g.*, *In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 100-03 (Bankr. D. Mass. 2013); *In re Quincy Med. Ctr.*, 2011 WL 5592907, at *1.  None of these factors is present in the Plan.

78.    Courts have called the first, "identity of interest" factor "the least negotiable." *In re FirstEnergy Sols.*, 606 B.R. at 740.  This looks to whether the released claims "would release and discharge independent, standalone claims" against non-debtor parties.  *Id.* at 739.  In *FirstEnergy*, the court found the third-party releases in the debtors' plan impermissibly broad, and denied approval of the disclosure statement on that basis.  *See id.* (noting that the proposed release "would release and discharge independent, standalone claims against [non-debtor] Parties held by any party that also held a claim against the Debtors, as long as those independent claims also related in some way to the Debtors' electricity generation business" or the debtors' properties).

79.     The same result should obtain here.  The Board has repeatedly contended that there is *no* identity of interest between the Commonwealth and its instrumentalities[39]—this alone is sufficient to render these releases impermissible.[40]  In addition, a nonconsensual third-party release is generally impermissible unless (i) the released parties have "contributed substantial assets" to the debtors' plan; (ii) the plan "replace[s] what it releases with something of indubitably equivalent value to the affected creditor" such that the "release is of virtually no concern"; and (iii) the release is "essential to the debt repayment objectives of the Plan."  *In re Charles St.*, 499 B.R. at 101–04.  The Disclosure Statement provides no evidence that any of these factors is satisfied.

80.     Confirmation of the Plan would bring about an impermissibly broad permanent injunction barring numerous non-Debtor parties from enforcing almost any claims against non-Debtor parties (even claims arising from bonds issued by those same non-Debtor parties) that contributed nothing to the Plan, regardless of whether the releasing parties received anything under the Plan on account of giving up such claims.  Such nonconsensual third-party releases are unprecedented, impermissible, and render the Plan patently unconfirmable.

**C.     The Disclosure Statement Must Acknowledge the Extraordinary Third-Party Releases in the Plan.**

81.     If the Board wishes to prosecute and confirm a Plan including this extraordinary release, it must acknowledge the unprecedented nature of this undertaking.  At present, the Disclosure Statement falls far below the minimum acceptable standard regarding these releases.

82.     As a third-party release discharges non-debtors, an act not expressly provided for in the Bankruptcy Code (or PROMESA), its inclusion imposes a special burden on the debtor to

---

[39] (*See* PRIFA SJ Mot. ¶¶ 5, 13, 37, 49, 89, 96, 179; CCDA SJ Mot. ¶¶ 3, 14, 36, 66, 166; HTA SJ Mot. ¶¶ 5, 10, 102, 110.)

[40] *See In re FirstEnergy Sols. Corp.*, 606 B.R. at 735, 737 (where a released claim is, "in essence, a suit against the debtor," release may be permissible; where "the release would cover a set of claims against nondebtors that do not lie at all against the Debtors," release is impermissible).

"be punctilious in adhering to all of the procedural requirements of the Bankruptcy Code, especially the pre-solicitation disclosure requirements." *Bank of N.Y v. Becker* (*In re Lower Bucks Hosp.*), 471 B.R. 419, 463-64 (Bankr. E.D. Pa. 2012), *aff'd*, 488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3rd Cir. 2014) (a third-party release "is not a routine plan provision that can be mentioned cavalierly in passing in the disclosures to the adversely affected creditors"). That includes Bankruptcy Rule 3016(c), which provides: "If a plan provides for an injunction against conduct not otherwise enjoined under the [Bankruptcy] Code, the plan and disclosure statement **shall** describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c) (emphasis added). Courts uniformly agree that Bankruptcy Rule 3016 applies to third-party releases. *See, e.g.*, *In re Lower Bucks Hosp.*, 471 B.R. at 460, n.62 (citing cases).

83. Not only do the Disclosure Statement and the Plan utterly fail to comply with the **mandatory** requirements of Bankruptcy Rule 3016, but they also fail to indicate **in any way whatsoever** that the Plan contains third-party releases. To the contrary, the terms "third-party" or "non-debtor" release are not found in either document, and the relevant provisions are impermissibly tucked away in "Miscellaneous Provisions" among boilerplate disclosures. *See In re Lower Bucks Hosp.*, 471 B.R. at 461 (disclosures were inadequate where third-party releases were "plac[ed] . . . , without any emphasis, among the disclosure of other, routine, perhaps even superfluous, releases that would result from confirmation of the Plan."). These fatal deficiencies in disclosure must be amended before the Disclosure Statement may be submitted to creditors.[41]

---

[41] A further puzzling Plan provision concerns Bond Claims (defined at Plan § 1.98). Plan § 78.1 suggests that all Bond Claims will be disallowed on the Effective Date and expunged from the claims register, regardless of whether they are Allowed or Disputed and whether or not their holders receive any distribution under the Plan. Ambac does not believe this to be the Board's intended result—among other things, it would arguably preclude any distributions from being made under the Plan—and thus expects that the Plan

## V.   THE UNTIMELY BEST INTERESTS OF CREDITORS REPORT PRESENTS UNSUPPORTABLY PESSIMISTIC OUTCOMES.

84.     As the Court is aware, the Board made Exhibit N to the Disclosure Statement (the "Best Interests Report") available to creditors on the evening of June 10, a month after filing the Plan and Disclosure Statement but just five days before objections to the adequacy of the Disclosure Statement were due.[42]  Ambac has read the Court's order denying additional time for objections to the Best Interests Report at the disclosure statement phase, and noting that confirmation objections regarding best interests are preserved.[43]

Given the limited time available thus far in which to review the Best Interests Report, Ambac has not analyzed the report in depth.[44]  Certain issues in the Best Interests Report merit mention now, however, both because they suggest glaring unconfirmability defects in the Plan and warrant additional disclosures to creditors making voting decisions on the Plan.

85.     Immediately apparent from the face of the Best Interests Report is the pessimistic nature of the assumptions underlying all analysis therein:  increased pension contributions and liabilities (*see* Best Interests Report at 7), ***increased*** legal fees despite dismissal of the Title III cases (*see id.* at 8), and worst-case assumptions regarding "political and economic uncertainties"

---

will be amended to correct this.  To the extent it is the Board's intent to disallow all Bond Claims on the Effective Date, however, the Disclosure Statement must state so openly, and must explain the basis for this extraordinary provision.  Ambac reserves the right, without limitation, to challenge Plan § 78.1 (to the extent it remains unmodified) and any other issues with specific Plan provisions at the appropriate time.

[42] (*See* ECF No. 16927.)

[43] (*See* ECF No. 16960.)

[44] This belated filing has precluded a meaningful review of the Best Interests Report—a 109-page document mixing fact, law, and financial analysis.  The Board's dilatory conduct has prejudiced Ambac's ability to formulate objections to the Disclosure Statement, which is the central purpose of the extended notice period under Rule 2002(b) of Federal Rules of Bankruptcy Procedure.  *See* Adv. Comm. notes to 1983 amendment.  Ambac reserves all rights to make objections related to the Best Interests Report, including arguments not advanced in this Objection, at the hearing to consider the adequacy of this Disclosure Statement.

(*id.* at 8), to name only a few.  These intentionally negative assumptions, "provided by [the Board's] legal advisors" (*id.* at 7), affect every conclusion in the Best Interests Report.

86.    Because the Best Interests Report is premised on a worst-case scenario, the failure of *any* assumption in the Best Interests Report would ***increase*** recoveries.  If there is incremental Medicaid funding for the Commonwealth, if the Commonwealth population shifts to Medicaid from Medicare due to increasing age, if *any* additional federal funds are made available—***any*** change in the "status quo" the Board presents would only improve creditor recoveries.  And all indications are that more, not less, federal attention will be paid, and resources made available, to the Commonwealth.[45]  To drive home the thumb-on-the-scale negativity of the Best Interests Report:  the "high end" of estimated recoveries under the Best Interests Report assumes the Board remains in place but assumes *no* impact from *any* of the structural reforms contained in the Fiscal Plan.  (*Id.* at 20.)  Those reforms equate to $30 billion in long-term surplus.  (*See* DS Ex. G at 12.)

87.    And in a landscape where there are additional resources available to the Commonwealth, Ambac has rights equal, if not senior, to those of many other creditors.[46]  The Plan caps recoveries available to revenue bond creditors like Ambac, and caps them very low (not to mention that the Plan assumes the Commonwealth's near-term return to insolvency, *see supra* at III.).  It is well within the realm of the probable that Ambac and others will face superior recoveries outside of the Plan, contrary to the Board's presentation in the Best Interests Report.

---

[45] *See* The White House, Statement by President Joseph R. Biden, Jr. on Puerto Rico (June 7, 2021), *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/07/statement-by-president-joseph-r-biden-jr-on-puerto-rico/ (reflecting administration policy (i) that "Puerto Rico residents should be able to receive SSI benefits," and to press "Congress to amend the Social Security Act to extend these benefits to residents of Puerto Rico"; and (ii) to "support eliminating Medicaid funding caps for Puerto Rico and moving toward parity for the Supplemental Nutrition Assistance Program to align with States").

[46] *See supra* at II.B.

## VI.    THE PLAN SUPPORT AGREEMENTS CONSTITUTE VOTE BUYING.

88.    The GO/PBA PSA and the HTA/CCDA PSA offer cash to those creditors that joined the agreements after they were negotiated in exchange for no consideration other than their affirmative votes.  This is vote-buying, a bad-faith solicitation practice that may result in denial of confirmation of the Plan.  For the reasons discussed herein, the Court can, and should, address this issue now, before solicitation commences.

### A.    Vote Buying May Prevent Plan Confirmation.

89.    PROMESA incorporates Bankruptcy Code Section 1125 and certain provisions of Sections 1126 and 1129, which require that the Plan be proposed and solicited in "good faith."[47] A court has discretion "to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'"  *Century Glove, Inc. v. First Am. Bank of New York,* 860 F. 2d 94, 97 (3d Cir. 1988); *see In re Featherworks Corp.*, 25 B.R. 634, 639 (Bankr. E.D.N.Y. 1982) (finding vote-buying where an unsecured creditor received $25,000 to change its vote); *In re Winston XXIC, Ltd. P'ship*, 153 B.R. 322, 325–26 (Bankr. D. Kan. 1993) (vote procurement not in good faith where a creditor was offered consideration dependent on rejection of proposed plan).

90.    Vote-buying has significant consequences, resulting either in designation of the creditor's vote (*see* 11 U.S.C. § 1126(e) ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title")), or preventing confirmation:  Where a plan is not

---

[47] *See* PROMESA § 301(a) (incorporating 11 U.S.C. § 1129(a)(3) (a plan must be "proposed in good faith"), 1125(e) (protecting a person "that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title")).

proposed in good faith—including because of bad faith in the solicitation process, like vote-buying—the plan violates Bankruptcy Code Section 1129(a)(3) and cannot be confirmed.[48]

### B.    The Plan Support Agreements Constitute Vote Buying.

91.    The PSAs exist to secure affirmative votes—specifically, as many creditors as are necessary to lock up the classes of claims addressed therein.[49]  But because certain PSAs procure this support by promising cash in exchange for the votes of certain creditors that are contributing **nothing** to the Plan but affirmative votes, the support has been impermissibly obtained.

92.    The GO/PBA PSA and HTA/CCDA PSA allow creditors that did not participate in their negotiation ("Joinder Creditors") to join those agreements after they were finalized.[50]  In so doing, the Joinder Creditors become eligible to share in the significant fees the PSAs promise to their signatories (the "Plan Support Fees"):[51]

- The GO/PBA PSA Fees total $400 million, payable in cash on the Plan's effective date. $350 million is payable *pro rata* to all signatories,[52] and $50 million is payable *pro rata* only to retail GO/PBA PSA creditor signatories (the "Retail Support Fee").[53]

- The "HTA/CCDA PSA Fees" available to all HTA/CCDA PSA signatories[54] total $140 million, and are comprised of:

---

[48] *See, e.g.*, *In re Quigley Co.*, 437 B.R. 102, 129 (Bankr. S.D.N.Y. 2010) (denying confirmation because plan "was proposed in bad faith since it was designed to achieve acceptance through a tainted vote"); *In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986) (affirming the bankruptcy court's denial of confirmation, in part, for lack of good faith where "the court found that the unauthorized payments to some creditors violated the spirit of the Bankruptcy Code").

[49] The Board acknowledges as much in the Disclosure Statement, noting that the PSAs served to "lock-up" the support of their signatories.  (DS at 32, 355, 357.)

[50] (*See* GO/PBA PSA § 1.2 (defining "Joinder Creditors" as parties who are not original signatories but who execute joinders to the agreement prior to a "Joinder Deadline"); HTA/CCDA PSA § 1.2 (same).)

[51] (*See* GO/PBA PSA § 6.1 (Joinder Creditors and original signatories alike eligible to receive Plan Support Fees); HTA/CCDA PSA § 6.1 (same).)

[52] (*See* GO/PBA PSA § 6.1(a)-(b) (Consummation Costs and Restriction Fee); DS at 32, 354-55 (same).)

[53] (*See* GO/PBA PSA § 6.1(c) (Retail Support Fee); *see also* DS at 32, 356 (same).)

[54] Two other HTA/CCDA PSA Fees, totaling $322.6 million, are payable *only* to Assured and National. (*See* HTA/CCDA PSA §§ 4.1, 4.3; DS at 458.)  These fees raise confirmation concerns, both in connection

- o  The <u>HTA Consummation Costs</u> and the <u>HTA Restriction Fee</u>, up to a joint cap of $125 million, payable in cash *pro rata* to creditor signatories holding HTA bond claims on the effective date of the HTA Plan.[55]

- o  The <u>CCDA Consummation Costs</u> and the <u>CCDA Restriction Fee</u> (the "<u>CCDA Fees</u>"), up to a joint cap of $15 million, payable in cash *pro rata* to creditor signatories holding CCDA bond claims on the Plan's effective date.[56]

93.      Fees in connection with plan support agreements are typically justifiable only where the parties receiving such fees contribute tangible consideration to the reorganization—for example, commitment of new capital or agreement to backstop a capital raise.[57]  The original creditor signatories to the GO/PBA PSA and HTA/CCDA PSA are agreeing to settle significant claims against the Commonwealth.[58]  But unlike the original signatories, the Joinder Creditors are not contributing anything to merit receipt of the Plan Support Fees apart from their commitment to support the Plan.  These PSAs provide Joinder Creditors cash-for-votes:  this is vote-buying.[59]

---

with the Plan and with a future HTA plan.  One such fee will "reduce the principal amount" of HTA bonds that Assured and National hold, giving Assured and National *a **100-cent recovery*** on those "reduce[d]" HTA bond claims, prior to confirmation of the HTA plan.  (DS at 458.)  This raises potential issues regarding vote-buying and unequal treatment of claims within a class under 11 U.S.C. § 1123(a)(4).

[55]  (*See* HTA/CCDA PSA § 6.1(a)-(b); DS at 357.)

[56]  (*See* HTA/CCDA PSA § 6.1(c); DS at 357.)  The Disclosure Statement does not adequately disclose the source of these two CCDA-related fees.  (*See infra* at VII.C.)

[57]  *See, e.g.*, *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (approving a backstop fee as consideration for a $225 million commitment and "paid only if the $225 million is funded"); *In re CHC Grp. Ltd.*, 2017 WL 11093971, at *12 (Bankr. N.D. Tex. Mar. 3, 2017) (approving a backstop fee as "consideration paid in return for the Plan Sponsors' agreement to backstop the Rights Offering").

[58]  (*See* GO/PBA PSA, Recital R (reflecting original signatories' agreement to settle identified litigation regarding claims against the Commonwealth); HTA/CCDA PSA §§ 4.7-4.8 (reflecting Assured and National's agreement to settle claims asserted in identified litigation).)

To the extent the original signatories to the HTA/CCDA PSA are receiving consideration from the Commonwealth under the Plan in exchange for agreeing to settle litigation against *other* entities (HTA and CCDA), Ambac reserves the right to object to such fees at confirmation.

[59]  Ambac also believes that the payment of Plan Support Fees renders the Plan unconfirmable—non-signatory creditors with identical legal rights are receiving inferior treatment.  *See* 11 U.S.C. §§ 1123(a)(4), 1129(b)(1).  Ambac reserves the right to so argue at confirmation.

94.     In addition to the Plan Support Fees, several other provisions of the PSAs demonstrate that the Board impermissibly purchases Joinder Creditors' votes:

- ***Cap on PSA participation***.  The Board could have allowed all eligible creditors to join the PSAs.  But it did not:  the number of creditors that may join (and receive the Plan Support Fees) is capped.[60]  This cap serves two purposes:  it provides the Board the requisite amount of support to assure accepting classes (67%), and it preserves the greatest possible payout for the creditors that ***do*** manage to join—for if all similarly-situated creditors were able to join, each creditor's *pro rata* portion of the Plan Support Fees would be diluted.  The participation cap shows the PSAs are not designed to secure the most support possible, but to reward the ***necessary*** support as ***richly*** as possible.

- ***Restriction on sale of claims***.  Each PSA restricts its signatories' ability to sell their claims covered by the agreement:  covered claims may be sold ***only*** to a buyer that is, or soon becomes, a signatory to that same agreement.[61]  This restriction on a signatory's ability to alienate its claims ensures the Board will not lose an affirmative vote once it has been secured.

- ***Limited termination rights***.  Creditor signatories may only terminate their participation in the PSAs in limited circumstances, generally where another party has breached the agreement or if the Plan is found to be unconfirmable.[62]  And termination usually results in forfeiture of the Plan Support Fees,[63] making termination far less likely.  In fact, the Retail Support Fee under the GO/PBA PSA is forfeited if the class fails to accept the Plan.[64]  Accordingly, any commitments a Joinder Creditor has made are likely to remain binding—enabling the Board to count on that vote.

- ***Amendment to allow <u>retail</u> Joinder Creditors to join the HTA/CCDA PSA***.  Where the Board has ***not*** been able to secure enough Joinder Creditor support to ensure class acceptance, it is going to great lengths to do so.  A recent amendment to the HTA/CCDA PSA allows small-dollar holders of HTA 1998 bonds and CCDA bonds to join the HTA/CCDA PSA; the announcement of this amendment takes care to mention that these retail creditors are eligible to "participate in the restriction fees

---

[60] (*See* GO/PBA PSA § 1.2 ("PSA Threshold Attainment" defined as 70% cap); HTA/CCDA PSA § 1.2 ("PSA Threshold Attainment" defined as 67% cap for HTA 1998 senior bond claims, 70% cap for CCDA bond claims, 85% cap for HTA 1968 bond claims).)

[61] (*See* GO/PBA PSA § 4.5(a); HTA/CCDA PSA § 4.5(a).)

[62] (*See* GO/PBA PSA § 7.1(a); HTA/CCDA PSA § 7.1(a).)

[63] (*See* GO/PBA PSA §§ 6.1(b), 7.2(b); HTA/CCDA PSA §§ 6.1(b), 7.2(b).)

[64] "[T]he Retail Support Fee allocated to any class of Retail GO Bonds or Retail PBA Bonds that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to PSA Restriction Fee Creditors and those Retail Investors that are members of classes that voted to accept the Plan[.]"  (GO/PBA PSA § 6.1(c).)

extended pursuant to the PSA."[65]  This amendment confirms that the Board is targeting retail Joinder Creditors in order to reach the necessary support to deliver the class. These features of the PSAs all make plain that the Board is targeting Joinder Creditor votes to ensure that impaired classes will vote in favor of the Plan.  Accordingly, the Court should strike the Plan Support Fees for Joinder Creditors from the PSAs.  While the Board has contended previously that the Court may not review the PSAs,[66] the Board is wrong, for reasons Ambac has explained in other filings.[67]  Alternatively, the Court should decline to approve the Disclosure Statement until the PSAs are modified to strike the Plan Support Fees for Joinder Creditors.

95.     If the Court approves the Disclosure Statement without addressing vote-buying, the can has only been kicked down the road.  If, at that time, the Court concludes that the GO/PBA PSA and HTA/CCDA PSA constitute vote-buying, the Court will be forced either to deny confirmation, to designate tainted votes, and/or to order re-solicitation without the overhang of those PSAs.  These drastic and expensive remedies may be avoided if the Court takes up the question of vote-buying in connection with its review of the Disclosure Statement.

## VII.   THE DISCLOSURE STATEMENT OMITS OTHER CATEGORIES OF INFORMATION CRITICAL TO CREDITORS.

96.     The Disclosure Statement does not contain "adequate information" on a number of additional subjects, detailed below.

### A.   The Disclosure Statement Omits Discussion Regarding the Treatment of, and Risks Attendant to, Creditors' Claims Under Section 407 of PROMESA.

97.     PROMESA § 407(a) makes a transferee liable for the value of transferred property if, while the Board is in existence:

---

[65]  *See* Statement, Fin. Oversight & Mgmt. Bd. for Puerto Rico (May 25, 2021), *available at* https://emma.msrb.org/P21547672.pdf.

[66]  (*See* ECF No. *14460* ¶¶ 18, 23.)

[67]  (*See* ECF No. 14673 ¶¶ 13-36.)

any property of a Commonwealth instrumentality is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors . . . .

Under Section 407(b), creditors may bring an action against the transferee "unless a stay under Title III is in effect." Thus, once the Commonwealth has exited Title III, it is potentially liable to *every* qualifying creditor under Section 407 for the full amount of *every* qualifying transfer. Ambac and other creditors have asserted Section 407 claims against the Commonwealth; the Board has sought to disallow the Section 407 claims in the Revenue Bond Litigation, which remains ongoing.

98.     Yet the Disclosure Statement and the Plan say nothing about the potentially massive risk that the Commonwealth faces in connection with these claims.  Indeed, the only mention of Section 407 anywhere in either document is in the Disclosure Statement's discussion of the litigation history of certain actions in the Title III cases, and even this discussion notes only that certain creditors have raised Section 407 claims.  (*See, e.g.*, DS at 259.)  That is clearly insufficient.

99.     While the Board has taken the position in the Revenue Bond Litigation that Section 407 claims "could not be allowed prior to confirmation of a plan" and that under PROMESA § 201(b)(1)(M), transfers "like the ones described in section 407" can be approved in a plan of adjustment,[68] the Disclosure Statement nowhere addresses the possibility that Section 407 claims may survive confirmation, or the consequences for the Plan if the Board's attempts at disallowance or discharge of these claims proves unsuccessful.

100.     The Disclosure Statement also fails to disclose the risks inherent in the Board's assumption that Section 407 claims can and will be discharged through a Title III plan (among

---

[68] (*See, e.g.*, PRIFA SJ Mot. ¶ 164.)

myriad other overbroad releases), as discussed *infra* at VII.A.  Nor does the Disclosure Statement

disclose the questionable logic that a Title III plan can discharge a claim that creditors were barred

from bringing by virtue of the Title III proceeding itself, *see* PROMESA § 407(b), causing an

express cause of action created by Congress to be rendered nugatory.  And of course, all of this

conceals a potentially massive back-end liability on the other side of confirmation—a risk that all

creditors have an interest in understanding.  *See In re Ferretti*, 128 B.R. at 18-19 (a disclosure

statement should reflect, *inter alia*, "[i]nformation relevant to the risks being taken by creditors"

and "[t]he existence, likelihood and possible success of nonbankruptcy litigation").

101.    The Disclosure Statement should be amended to reflect this significant potential

liability of the Commonwealth, which could call into question the feasibility of the Plan.  Ambac

has drafted a proposed disclosure in this regard, attached hereto as **Exhibit A** at 3.

### B. The Disclosure Statement Does Not Adequately Describe the Voting Rights of Monoline Insurers for Classes 56-58.

102.    The Disclosure Statement, the DS Approval Motion, and the proposed order

annexed to the DS Approval Motion (the "Proposed DS Approval Order")[69] do not acknowledge

the right of any monoline insurer other than Assured and National to vote their respective claims

in Class 56 (the CW/HTA Claims), 57 (the CW/Convention Center Claims), and 58 (the

CW/PRIFA Rum Tax Claims) (collectively, the "Clawback Claims"), despite the fact that Assured

and National's Clawback Claims are identical to Ambac's.

103.    Section 301(c)(3) of PROMESA provides that "[t]he term 'holder of a claim or

interest', when used in section 1126 of title 11 . . . with reference to Insured Bonds, shall mean the

monoline insurer insuring such Insured Bond to the extent such insurer is granted the right to vote

---

[69] (*See* DS Approval Motion, Exhibit A.)

Insured Bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents pursuant to which such Insured Bond was issued and insured."  PROMESA § 301(c)(3).  Among the "Insured Bonds" are those Revenue Bonds issued by HTA, CCDA, and PRIFA and insured by Ambac (collectively, the "<u>Ambac Revenue Bonds</u>").[70]  The documents pursuant to which the Ambac Revenue Bonds were issued unequivocally grant Ambac the right to act *in lieu* of its bondholders for purposes of any action requiring bondholder consent (including directing remedies and consenting to proposed amendments or modifications), and to vote on their behalf on reorganization or liquidation plans.[71]

104.    The Clawback Claims include claims related to the rights or obligations arising under HTA, CCDA, and PRIFA bonds, including the Ambac Revenue Bonds.  (*See* DS at 411, 413-14.)    Because Ambac is entitled to "direct[] remedies" and "consent[] to proposed amendments or modifications" under the Ambac Revenue Bonds' governing documents, Section 301(c)(3) of PROMESA makes Ambac the entity entitled to vote the Claims in Classes 56, 57, and 58 corresponding to the Ambac Revenue Bonds.[72]

105.    The Disclosure Statement improperly recognizes ***only*** the right of Assured and National to vote their Clawback Claims.  Worse yet, the Disclosure Statement purports to

---

[70] PROMESA also provides that "[t]he term 'Insured Bond' means a bond subject to a financial guarantee or similar insurance contract, policy and/or surety issued by a monoline insurer."  PROMESA § 301(c)(4).  The Ambac Revenue Bonds clearly meet this definition.

[71] (*See* **Exhibit B** §§ 2-3 (for any action requiring bondholder consent for HTA 1968 Series AA Bonds, Ambac's consent is required in lieu of its insured bondholders'; Ambac is entitled to vote in lieu of bondholders on reorganization or liquidation plans); **Exhibit C** §§ 2-3 (same for HTA 1998 Series H Bonds); **Exhibit D** § 3(b)-(d) (same for HTA 1968 Series BB Bonds and HTA 1998 Series L Bonds); **Exhibit E** § 3 (b)-(d) (same for HTA 1998 Series N Bonds); **Exhibit F** § 15(b)-(c) (same for CCDA bonds); **Exhibit G** § 23(b)-(c) (same for PRIFA bonds).)

[72] As the Clawback Claims are subject to a pending objection, Ambac intends to file, pursuant to the procedure set forth in the DS Approval Motion, a motion pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for temporary allowance of its Clawback Claims for voting purposes.  This portion of the Objection is premised on the assumption that the relief sought in that motion is granted.

disenfranchise Ambac and other insurers. The Disclosure Statement states that "each holder" of the Clawback Claims has the right to vote such claims, but states: "However, Assured and National are entitled to vote on account of such Allowed Claims insured by Assured and National, respectively."[73] The implication is that Assured and National are not "holders" of these claims entitled to vote under PROMESA, meaning that other monoline insurers similarly are not "holders" of Clawback Claims.

106.    Instead, the Board's position is that Assured and National have earned the right to vote their respective Clawback Claims *by virtue of the fact that they have signed a Plan Support Agreement*. (*See* DS Approval Motion ¶ 80 (noting that "*as a result of extensive negotiations leading to the entry into the PSA and HTA/CCDA PSA*, which include Assured [and] National . . . [Assured and National] are entitled to vote to accept or reject the Plan on account of their [Clawback Claims] arising from securities insured by such parties") (emphasis added).) Consistent with the DS Approval Motion, the Proposed DS Approval Order provides that "Assured and National, as applicable, shall have the sole right to cast the votes to accept or reject the Plan on account of Claims in Classes 56, 57, and 58 solely on account of the applicable Claims arising from securities insured by such parties." (Proposed DS Approval Order ¶ 6.) Ambac, and other insurers not party to Plan Support Agreements, are conspicuously absent from this provision.

107.    The Board's failure to acknowledge Ambac's right to vote claims arising from its Insured Bonds is materially misleading. Absent the language drawing attention to the voting rights of Assured and National, Ambac would have had no reason to believe that the Board would even suggest—in direct contravention of PROMESA—that it was not entitled to vote its Clawback

---

[73] (DS at 413 (HTA); *see id.* (CCDA, with respect to Assured); *id.* at 414 (PRIFA, with respect to Assured).)

Claims.[74]   Yet the Disclosure Statement suggests, counterfactually, that Ambac's, and other

insurers', right to vote on the Plan is contingent upon an agreement to support the Plan.[75]   This is

both misleading as to Ambac's rights, and could lead holders of Ambac-insured bonds to believe

that they are entitled to vote under the Plan.

108.    The Disclosure Statement, DS Approval Motion, and Proposed DS Approval Order

must acknowledge Ambac's right to vote the Claims in Classes 56-58 corresponding to the Ambac

Revenue Bonds.   Ambac has proposed corrective revisions to the Disclosure Statement that so

acknowledge, attached hereto as **Exhibit H**.   If this is not the Board's position, and the Board is

conditioning Ambac's enfranchisement upon support of the Plan, the Board must state the basis

for this position and disclose the risk that it is legally indefensible, as Ambac believes it to be.

### C.    The Disclosure Statement Must Clarify How the Commonwealth Is Funding the CCDA Fees.

109.    The Disclosure Statement states that CCDA bondholders who have executed the

HTA/CCDA PSA shall receive the CCDA Fees, payable in cash as an administrative expense

claim under the Plan, in an amount not to exceed $15 million.   (*See* DS at 357-58; *supra* at VI.B.)

The $15 million in CCDA Fees is one component of the consideration the Board pledges to holders

of CCDA bond claims that have executed the HTA/CCDA PSA.   In total, the HTA/CCDA PSA

promises $112 million in cash to holders of CCDA bond claims:   $97 million in a future CCDA

---

[74] The Board has never before disputed Ambac's right to vote the claims arising from its Insured Bonds. Indeed, Section I.B.2 of the disclosure statement for the plan of adjustment in the Title III Case of COFINA specifically acknowledged Ambac's right to vote the COFINA Bonds Ambac insured.   (*See* No. 17-bk-03284-LTS (ECF No. 368) § I.B.2.)

[75] The Proposed DS Approval Order is also silent on the voting rights of insurers with respect to Insured Bonds in Classes 4 (Vintage PBA Bond Claims (Other Insured)), 18 (Vintage CW Bond Claims (Other Insured)), and 24 (Vintage CW Guarantee Bond Claims (Other Insured))—all of which classes are comprised ***entirely*** of claims arising from Insured Bonds insured by Ambac or FGIC.   (*See* Proposed DS Approval Order ¶ 32; DS at 360, 371, 375.)   This silence stands in contrast to the express voting protections provided for Assured, National, and Syncora (insurers with whom the Board has Plan Support Agreements) with respect to identical claims in Classes 2-3, 5, 16-17, 19, 22-23, and 25.   (*See id.* ¶ 32.)

restructuring,[76] and $15 million in CCDA Fees under the Plan (the latter being available only to HTA/CCDA PSA signatories).  (*See* HTA/CCDA PSA § 6.1(c), *id.* Exhibit J.)

110.    The $112 million figure is well-known to those familiar with the CCDA Lift Stay Motion.  In deciding that motion, the Court held that CCDA bondholders, including Ambac, "have a colorable claim to a security interest in funds deposited in the Transfer Account," and that there is a "reasonable likelihood" that the "Transfer Account" is a certain account held at Scotiabank. (DS at 241.)  Discovery in connection with the ongoing CCDA adversary proceedings has revealed that at the time the HTA/CCDA PSA was being negotiated, the funds in an account at FirstBank—which passed through the Scotiabank account and, thus, are the funds on which CCDA bondholders have established a colorable lien—totaled $112 million.[77]

111.    It is no accident that the CCDA Fees and the proposed distributions to CCDA bondholders in a future CCDA restructuring total the same amount of money in the current CCDA "Debt Service Escrow" account.  The CCDA bondholders' signatories to the HTA/CCDA PSA likely demanded at least that amount, and the Board had little leverage to resist.  What *is* surprising is that the Board appears to be making $15 million of that amount available *only to certain CCDA bondholders*—those who have signed the HTA/CCDA PSA—when the Court has found that this money may constitute collateral of *all* CCDA bondholders.

112.    If the Board proposes to use a portion of the funds in the FirstBank account to fund a distribution only to certain, but not all, CCDA bondholders—and in the *Commonwealth's* (not CCDA's) Title III case, to boot—CCDA bondholders are entitled to clear and express disclosure

---

[76] The HTA/CCDA PSA commits the parties to providing "the same economic treatment contemplated for the CCDA Bond Claims in this Agreement[,]" even if an "alternative methodology" need be used to provide it.  (HTA/CCDA PSA § 7.1(b)-(c).)

[77] (*See* **Exhibit I** (CCDA_STAY0014373-CCDA_STAY0014374) (reflecting a balance of $112,409,565.57 as of January 31, 2021); **Exhibit J** (CCDA_STAY0026236-CCDA_STAY0026240) (reflecting the same balance of $112,409,565.57 as of February 28, 2021).)

of this extraordinary fact.  The Board's use of CCDA bondholders' collateral to pay a "support fee" to only *some* of the bondholders secured by that collateral raises a host of confirmation issues, including (among others) unequal treatment of holders of claims in Class 57 (*see* 11 U.S.C. § 1123(a)(4)) and a lack of good faith in using assets of a separate entity to fund distributions to Commonwealth creditors (*see id.* § 1129(a)(3)), not to mention a claim for conversion.

113.    If the $15 million in CCDA Fees is not being taken from the funds in the FirstBank account or from other accounts held by the Tourism Company, the Disclosure Statement should clarify the source of the funds it will use to pay the CCDA Fees.  If the $15 million in CCDA Fees is being taken from the funds in the FirstBank account,[78] *i.e.*, from funds on which this Court has held that CCDA bondholders may have a lien and over which litigation continues even now,[79] the Disclosure Statement must disclose this, too, so that affected creditors may take action and so that all creditors may understand the risks to confirmation of the Plan.

### D.    The Disclosure Statement Overstates the Amount of the Commonwealth's Pension Liability and Fails to Disclose the Unreliability of Pensions Data.

114.    The Disclosure Statement references estimated pension liabilities of approximately $55.6 billion as of August 31, 2016 (*see* DS at 3; *id.* at 3 n.21), and the Board again relies on this figure when calculating annual pension expenses in the Fiscal Plan.[80]  But as discussed in detail in

---

[78] There is precedent for the Commonwealth diverting funds from Tourism Company-held accounts without notice to (let alone the authorization of) CCDA bondholders.  Discovery in connection with the CCDA Lift Stay Motion revealed that in 2018, the Commonwealth transferred $15 million from an account that held funds subject to the CCDA bondholders' lien, and appears to have spent such funds for the Commonwealth's own purposes, unrelated to CCDA.  (*See* No. 20-ap-00004-LTS (ECF No. 78) ¶ 40.)

[79] Ambac reserves all rights as to whether $112 million is in fact the amount as to which Ambac and other CCDA bondholders have a colorable claim of a security interest.

[80] (*See* DS Ex. G (Certified Fiscal Plan) at 22 (disclosing "over $50 billion in pension liabilities"); *id.* at 273 (providing a summary of actuarial accrued liability for ERS ($36.43 billion), TRS ($18.17 billion), and JRS ($0.65 billion)).)

Ambac's recently filed claim objection challenging the Retiree Committee's proof of claim,[81] Ambac's Rule 2004 investigation regarding the Commonwealth's finances suggests that this $55.6 billion figure is based on unreliable data and unreasonable assumptions, which have resulted in a significant overstatement of pension liabilities—to the tune of approximately ***$9 billion*** (and possibly more). The Board's failure to disclose the overstatement of pension liabilities (or even acknowledge the possibility) renders the Disclosure Statement incomplete and inaccurate.

115.    The $55.6 billion estimated net pension liability figure is based entirely on the actuarial analysis conducted by Milliman, Inc. ("Milliman"), the Commonwealth's longstanding actuarial consultant, as of June 30, 2016 (the "2016 Milliman Report"). Milliman's calculations provide, at best, a stale estimate. Not only was the 2016 Milliman Report nearly a year old as of the Commonwealth's ***petition date***, but the report itself relied on ***2015*** data and evaluated ***2015*** liabilities. (Ambac Pensions Claim Objection at 14.) In fact, the most recent Milliman report, dated June 30, 2017 (the "2017 Milliman Report"; with the 2016 Milliman Report, the "Milliman Reports"), which relies on more recent data (albeit only as of July 1, 2016), reflects total pension liabilities of $47.1 billion—***a decrease of over $8 billion*** from the previous year. (*Id.*) The Disclosure Statement omits any reference to this substantial decrease in total pension liabilities, to say nothing of its failure to rely on current data.

116.    Moreover, the calculations in both Milliman Reports fail to take into account the recent U.S. population mortality experience. Applying the mortality improvement projection factors established by the Society of Actuaries from 2020 to the data relied on in the 2016 Milliman Report would reduce the reported pension liability in that year by approximately $1.4 billion. (*Id.* at 16.) If applied to the data relied on in the 2017 Milliman Report, these projection factors would

---

[81] (*See* ECF No. 16884 (the "Ambac Pensions Claim Objection").)

reduce reported pension liability in that year by approximately $750 million.  (*Id*. at 16-17.)  The Disclosure Statement does not disclose that consideration of the mortality improvement projection factors likely further reduces the Commonwealth's pension liabilities.

117.   Nor does the Disclosure Statement reveal that the data underlying the Board's pension liability estimate is unreliable.  Notwithstanding the massive size of the asserted liability and the clear indicators it is overstated, the Board has done nothing to ensure that the data driving the estimated figure is reliable.   While the Board has engaged third parties to value the Commonwealth's pension liability, it has never audited or verified the census data, participant data, or employer information upon which the pension liability estimates are based.[82]  (*Id*. at 17.) Worse still, the unaudited and unverified data that has been used by the Board's consultants is stale and patently unreliable.  Ambac commissioned an audit to analyze the census data Milliman relied on in its actuarial valuation reports.  A review of a sample of this data revealed a significant number of instances where benefits have been, and continue to be, paid to deceased beneficiaries of the pension systems.  (*Id*.)  The audit estimates that the present value of the benefits paid in respect of deceased retired beneficiaries is approximately $56.5 million, meaning the pension liability figure reflected in the Disclosure Statement inaccurately includes at least $56.5 million earmarked for the payment of benefits to deceased individuals.  (*Id*.)

118.   For these, and other,[83] reasons, the pension liability estimate in the Disclosure Statement must be updated before the Disclosure Statement can be approved.  At a minimum, the

---

[82] The Board states, at the beginning of the Disclosure Statement, that it has "retained experts to help verify and understand" certain data, "such as for pension liabilities[.]"  (DS at iii.)  This misleadingly suggests the data underlying the Board's pension analyses has been verified—not so.  The Disclosure Statement must be amended to clarify where experts "verified" data as opposed to simply aiding the Board's understanding.

[83] A further issue with the estimated pension liability figure arises from the selection of a discount rate in the Milliman Reports that results in an inflated figure.  Ambac has raised the issue of the appropriate discount rate, together with other issues it has identified regarding the accuracy of the Commonwealth's pension liability estimate, in the Ambac Pensions Claim Objection.

Disclosure Statement must disclose the reliability concerns regarding the underlying data and the likely effect on the calculation of the pension liability should the data prove to be materially inaccurate.  If this information is not reflected in the Disclosure Statement, creditors will be misled to believe that billions of dollars are unavailable for debt service and other governmental functions. Ambac has drafted a proposed disclosure in this regard, attached hereto as **Exhibit A** at 4.

  **E.**  **The Disclosure Statement Must Acknowledge That the Fiscal Plan Is Not Insulated from the Court's Review at Plan Confirmation.**

119. While PROMESA vests the Board with sole authority to certify fiscal plans (*see* PROMESA § 201) and insulates those certifications from a direct challenge (*see id.* § 106(e)), it mandates the Court to undertake a thorough review of the Fiscal Plan in evaluating the Plan's compliance with the confirmation requirements of Section 314(b) of PROMESA and the incorporated provisions of Section 1129 of the Bankruptcy Code.  Indeed, while the issue remains undecided, the Court has expressly acknowledged a distinction between a direct attack on a "certification determination" and the Court's inevitable evaluation of whether a plan whose contours are set by a previously certified fiscal plan comports with the governing confirmation requirements.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 297 F. Supp. 3d 269, 284 (D.P.R. 2018) (rejecting challenge to Board's certification of fiscal plan and observing that "it is only at the plan confirmation stage that the Court determines whether a proposed plan of adjustment complies with, among other things, the provisions of Title 11 of the United States Code which have been made applicable to these cases by Section 301 of PROMESA"), *aff'd*, 927 F.3d 597 (1st Cir. 2019).

120. But one would not understand this based on a review of the Disclosure Statement, which asserts that various topics can be of little concern to creditors and the Court because they

relate to issues addressed in the Fiscal Plan.  These include the definition, and scope, of "essential public services."[84]

121.    The Board's suggestion in the Disclosure Statement that PROMESA § 106(e) insulates any review of the Fiscal Plan at plan confirmation contravenes PROMESA's directive that the Court must find that the Plan meets the requirements of Section 314(b).  The Court "has an independent obligation to determine that a proposed plan meets the confirmation requirements." *In re City of Detroit*, 524 B.R. at 202.  Thus, this Court has previously recognized that the fiscal plan can be considered in connection with review of plan confirmation requirements.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 297 F. Supp. 3d at 284.  Although the Court cannot overturn the Board's certification of a budget or fiscal plan, it can (and must) deny confirmation of a plan of adjustment (even one that is consistent with a certified fiscal plan) that does not meet the other confirmation requirements.

122.    The Disclosure Statement should be amended to acknowledge the risk that the Court may find that the Fiscal Plan compels the Plan to violate confirmation requirements, and that the Board may be required to amend the Fiscal Plan in order to achieve a confirmable Plan.  Ambac has proposed such a disclosure at **Exhibit A** at 5.

> **F.    The Disclosure Statement Does Not Contain Adequate Information on the Scope of "Essential Public Services."**

123.    PROMESA requires that a certified fiscal plan "ensure the funding of essential public services."  PROMESA § 201(b)(1)(B).  Further, PROMESA provides that for a plan of adjustment to be confirmed, it must be consistent with the applicable certified fiscal plan.  *See*

---

[84] (DS at 163 ("essential services are not in issue" because "[a]t confirmation, the Title III Court considers the Plan" but "the fiscal plan's certification is outside the subject matter jurisdiction of the Title III Court")).)

PROMESA § 314(b)(7).  Yet the Fiscal Plan does not provide a definition of what constitutes "essential public services."

124.    The Disclosure Statement likewise offers no clarity on what these "essential public services" might be, instead "tak[ing] the view that 'essential services' is a phrase used to refer, at a minimum, to services which, due to the police power, a court of competent jurisdiction can allow to be paid for from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim." (DS at 162.)  The Board acknowledges that this is not, in fact, a definition of "essential services" (*see id.* at 162-63 ("[t]his Disclosure Statement and the Plan do not define 'essential services' or 'essential expenses'")), further asserting that essential public services are "not in issue," "ha[ve] no application or impact on how a creditor should vote on the Plan," or are "neither required by nor relevant to" confirmation analyses.  (*Id.* at 163-64.)

125.    This omitted information is critical to allow creditors to make an informed judgment on the Plan, because absent this information, creditors cannot determine whether the Plan is in their best interests.[85]  In evaluating the best interests of creditors, PROMESA requires the Court to "consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." PROMESA § 314(b)(6).  The best interests test requires the Court to determine whether creditors may do better in the absence of the confirmation of the Plan, and whether the Plan is the "best" proposal compared to any alternative and the "best that is available under the circumstances." *Franklin High Yield Tax-Free Income Fund v. City of Stockton* (*In re City of Stockton*), 542 B.R. 261, 285-86 (B.A.P. 9th Cir. 2015).  How much of the Commonwealth's resources the Fiscal Plan intends to allocate to "essential public services"—and how little to debt expenses—is highly

---

[85] Ambac has sought, but not received, information regarding "essential services" through discovery.

relevant.  Creditors cannot make an informed voting decision regarding whether the Plan is in their

best interests without understanding *how* the Fiscal Plan, incorporated into the Plan, intends to

allocate resources among "essential public services" and creditors, so they may compare that

allocation to what would be "available . . . under the non-bankruptcy laws and constitution of

the territory."  PROMESA § 314(b)(6).

126.    Accordingly, the Board must amend the Disclosure Statement to disclose to

creditors the scope of "essential public services" the Commonwealth intends to provide.

### G.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Commonwealth's Financial Projections.

127.    The Disclosure Statement does not provide adequate information concerning the

Commonwealth's financial condition.  As the Disclosure Statement notes, the Commonwealth has

not released audited financial statements for 2018, 2019, or 2020, and the Board has not attested

to the accuracy of *any* financial information in the Disclosure Statement or Fiscal Plan.  (*See* DS

at iii, Ex. G at 2.)  In addition, the Disclosure Statement does not provide, and the Board has

resisted efforts to take discovery regarding, the data and assumptions underlying the Disclosure

Statement, the Plan, and the Fiscal Plan.  (*See* ECF No. 16812 ¶¶ 28-32, 38-41.)[86]

128.    This omission is inexcusable.  Disclosure statements routinely provide, *inter alia*,

the "accounting and valuation methods used to produce the financial information in the disclosure

statement" and "financial information, valuations or *pro forma* projections that would be relevant

to creditors'" evaluation of a plan.  *In re Scioto Valley Mortg.*, 88 B.R. 168, 170-71 (Bankr. S.D.

Ohio 1988).  The absence of such information here "hinders an informed judgment by the

---

[86] Ambac reserves the right to argue the absence of audited financial information is a bar to confirmation.

hypothetical reasonable investor." *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999).

129.    The Board seems to believe that, because Section 1125(a) does not mandate audited financial information be provided in a disclosure statement (*see* ECF No. 16882 ¶ 34), it has no obligation to provide *any* financial information.  Not so.  Section 1125(a) requires "information of a kind . . . as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records[.]"  If it is not "reasonably practicable" for the Board to provide audited financials, that does not mean the Disclosure Statement can simply omit what data *is* available.  For example, the "underlying data obtained from the Government" upon which the Fiscal Plan is based.  (*See* DS Ex. G at 2.)  Disclosure is not all-or-nothing, and the Disclosure Statement should include the financial information the Commonwealth can reasonably provide.[87]

### H.    The Disclosure Statement Does Not Contain Adequate Information Regarding Cash and Non-Cash Assets.

130.    The Disclosure Statement does not adequately disclose information regarding the cash and non-cash assets of the Commonwealth or its agencies, instrumentalities, and public corporations ("Commonwealth Entities").  Information regarding "all significant assets of the [d]ebtor" is among the "types of information which numerous courts have noted [is] most often included in a disclosure statement." *In re Scioto Valley Mortg. Co.*, 88 B.R. 168 at 171-72; *In re Ferretti*, 128 B.R. at 18 (holding disclosure statement should include "[a] complete description of the available assets and their value"); *In re Oxford Homes, Inc.*, 204 B.R. 264, 269 n.17 (Bankr.

---

[87] Such disclosures should include the data, methodologies, assumptions, and analyses underlying the financial information and projections in the Disclosure Statement, Plan, and Fiscal Plan.  *In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (directing disclosure of "all assumptions made in calculating *pro forma* information[,]" the "facts supporting all estimates[,]" and "[i]nformation regarding the accounting and valuation methods used in preparation of the Disclosure Statement's financial exhibits").

D. Me. 1997) (same).  And it is not uncommon for a disclosure statement to be disapproved for failing to disclose such information.[88]  The same results should obtain here.

### 1.    The Disclosure Statement Does Not Adequately Describe the Non-Cash Assets of the Commonwealth or Commonwealth Entities.

131.    The Disclosure Statement is completely silent with regard to the non-cash assets of the Commonwealth and Commonwealth Entities, which hold (in the Commonwealth's own words) "*countless* real properties in disuse that can be sold to the private sector for various purposes." (**Exhibit K** at 18 (emphasis added).)[89]  For that very reason, the Commonwealth enacted Act 26-2017 (the Fiscal Plan Compliance Act), with the express goal of "maximizing the use of [] available state resources, including the resources of public corporations[,]" and created the Real Property Evaluation and Disposal Committee to dispose of publicly held real properties in disuse. (*Id.* at 18-19.)

132.    Yet the Disclosure Statement provides *no* information whatsoever regarding the Commonwealth and Commonwealth Entities' real property assets, despite their potentially significant aggregate value.[90]  The Board will likely respond, as it has previously,[91] with hyperbolic protestations that Ambac cannot force the sale of the Commonwealth's parks and beaches. Hyperbole is no substitute for adequate disclosure on issues the Court (Dein, M.J.) has already observed may be presented at plan confirmation.[92]  The Disclosure Statement's failure to

---

[88] *See, e.g.*, *In re Scioto Valley Mortg. Co.*, 88 B.R. at 171-72 (refusing to approve disclosure statement for its failure to, *inter alia*, account for the debtor's significant assets); *In re Divine Ripe, L.L.C.*, 554 B.R. at 406, 412 (refusing to approve disclosure statement because it did "not provide adequate information on the [d]ebtor's assets and their value").

[89] **Exhibit K** is a certified translation of the Fiscal Plan Compliance Act (April 29, 2017) ("Act 26-2017").

[90] Ambac's real estate valuation expert has estimated that 81 real properties held by certain Commonwealth Entities have an approximate aggregate value of $1.3 billion.  (*See* ECF No. 15802 ¶¶ 2, 24.)

[91] (*See, e.g.*, ECF No. 16882 ¶ 37.)

[92] (*See* ECF No. 16759 at 10-12.)

comprehensively address the Commonwealth's non-cash assets—it is, as a further example, entirely silent on the Commonwealth's illiquid assets—leaves creditors to guess at the identity and value of such assets, and whether they would be available to creditors outside of Title III.[93]

> **2.    The Disclosure Statement Does Not Adequately Describe Cash Potentially Available to the Commonwealth.**

133.    While the Disclosure Statement purports to describe the cash assets of the Commonwealth (*see* DS at 133-43, Ex. L), it omits information regarding billions in cash held by the Commonwealth and Commonwealth Entities.  The Board has previously disclosed information regarding funds held by the Commonwealth and Commonwealth Entities through the December 2020 Presentation,[94] which classifies approximately $8.1 billion held by Commonwealth public corporations as "potentially inaccessible" and approximately $691 million held by the Commonwealth and its public corporations as "potentially unavailable."  (December 2020 Presentation at 7-9, 11, 13, 15, 18.)  Of course, the Board's classification of such funds as *potentially inaccessible* or *unavailable* to the Commonwealth carries with it the implication that such funds are, indeed, *potentially accessible* or *available* to the Commonwealth, and, therefore, should be discussed in the Disclosure Statement.

134.    Moreover, the Disclosure Statement lacks any information regarding the statutorily mandated transfer of surplus funds from Commonwealth Entities to the Commonwealth pursuant

---

[93] While Ambac believes that additional disclosures regarding the Commonwealth and Commonwealth Entities' cash assets is warranted, it lacks the information needed to propose specific disclosures despite requesting such information in discovery.  At a minimum, such additional disclosures should:  (i) identify the "countless real properties" of the Commonwealth and Commonwealth Entities that are in disuse, the illiquid investments of the Commonwealth and Commonwealth Entities, and the actual or estimated value thereof; (ii) describe any past or present efforts to sell disused real properties or illiquid investments; and (iii) describe the use and/or intended use of any proceeds derived from any such sale.

[94] "December 2020 Presentation" refers to the Board's December 17, 2020 presentation, which was disclosed publicly as part of a periodic release of "cleansing materials" related to ongoing mediation efforts. The presentation is available at https://emma.msrb.org/P11450397-P11124337-P11535399.pdf.

to Chapter 4 of Act 26-2017, notwithstanding their role in "maximizing the use of . . . available state resources," including those of Commonwealth Entities.  (**Exhibit K** at 18.)[95]

### 3. The Disclosure Statement Does Not Provide Sufficient Information to Assess the Validity of the Commonwealth's Use of Its Cash Resources.

135.    The Disclosure Statement is also inadequate in its disclosure regarding the intended use of the Commonwealth's cash assets.  While the Disclosure Statement conveys the Board's conclusion that the Commonwealth should maintain an unrestricted liquidity balance of at least $2.5 billion, reserve an additional $750 million in funds purportedly needed for the Commonwealth's Disaster Aid Revolving Fund, maintain a $1.3 billion emergency reserve, and provide approximately $900 million for the LUMA Funding Requirement (*see* DS at 146-47, 224; December 2020 Presentation at 20), it provides little justification for these significant retentions.[96] The Disclosure Statement should be amended to incorporate additional information regarding the decision to tie up over $5 billion in Commonwealth's cash to fund these initiatives.[97]

---

[95] While Ambac believes that additional disclosures regarding the Commonwealth and Commonwealth Entities' cash assets is warranted, it lacks the information needed to propose specific disclosures despite requesting such information in discovery.  Additional disclosures should, at the very least:  (i) incorporate the Board's analysis of funds currently classified as potentially inaccessible and potentially unavailable and its final determination regarding their availability; (ii) describe all transfers of surplus funds from Commonwealth Entities to the Commonwealth pursuant to Act 26-2017, including the aggregate value of such surplus funds, the means by which such surpluses were calculated, and the Commonwealth Entities from which they were transferred, and (iii) disclose sources and uses of cash in the Plan, including what funds are being used to pay Plan Support Fees.

[96] For example, the Disclosure Statement states, in conclusory fashion, that if external financing (rather than Commonwealth's own monies) were used to meet the LUMA Funding Requirement, electricity rates would be dramatically increased in the short term.  (*See* DS at 147.)  Yet it contains no analysis to support that conclusion.  Nor does the Disclosure Statement address the potential use of external financing for the Disaster Aid Revolving Fund or the $1.3 billion emergency reserve that is also funded using Commonwealth funds.  (*See* DS at 146-48.)

[97] While Ambac believes such additional disclosures are necessary, it lacks the information needed to propose specific disclosures.  Additional disclosures should, at the very least:  (i) address both the arguments for and against these initiatives; (ii) incorporate any analyses performed by the Board and/or its advisors comparing the costs associated with funding the Disaster Aid Revolving Fund, LUMA Funding Requirement, and emergency reserve through external financing or Commonwealth funds; or (iii) to the extent no such analyses have been conducted, disclose as much so that creditors can assess for themselves the degree to which the Commonwealth's intended use of these funds is justified.

I.      **The Disclosure Statement Does Not Disclose the Value of ERS Assets the Commonwealth Is Purchasing in Connection with the ERS Stipulation.**

136.     While the Disclosure Statement discusses the ERS Stipulation, it does not disclose

sufficient information regarding a key feature of the settlement underlying that agreement—the

value of the ERS assets that the Board purports to purchase on behalf of the Commonwealth in

exchange for funding cash distributions to ERS bondholders.  This information will enable voting

creditors to assess the reasonableness of one of the settlements of which the Plan "is the product"

(DS at i), as well as make an informed judgment with respect to the "good faith" of the process by

which the "[P]lan has been proposed[.]"  11 U.S.C. § 1129(a)(3).

137.     The Disclosure Statement contemplates that the Commonwealth will make $518.75

million in cash distributions to holders of ERS bond claims: $373 million, as a Plan distribution to

all holders of allowed ERS bond claims; $75 million, as a fee for the ERS bondholders party to

the ERS Stipulation; and, $70.75 million, as a bid for the Private Equity Portfolio (as defined in

the ERS Stipulation) if the ERS bondholders do not wish to bid for that asset.  (*See* DS at 36.)  The

Disclosure Statement confirms that ***the Commonwealth***, not ERS, will provide the cash necessary

to make these payments:  "[i]n consideration for the Commonwealth making payments to support

the cash distributions to be made pursuant to the Plan, all other ERS assets shall be transferred to

and vest in the Commonwealth."  (*Id.*)

138.     But while the Disclosure Statement discloses the quantum of cash payments to be

made to ERS bondholders and the fact that it is ***the Commonwealth*** that will be making them, it

is silent as to what these assets are, what their value is, and how that value was calculated.[98]

Creditors are entitled to understand whether the value of ERS assets to be transferred to the

---

[98] While the ERS Stipulation states that the parties to the ERS Stipulation performed certain diligence on
the value of the Private Equity Portfolio (*see* ERS Stipulation ¶ BB), nothing in the ERS Stipulation or the
Disclosure Statement indicates that there has been any diligence on the value of the remaining ERS assets.

Commonwealth is reasonably commensurate with the cash payments the Commonwealth is making to ERS bondholders. Although the Plan is a joint plan for multiple Title III Debtors, it does not propose to substantively consolidate such Debtors. ERS and the Commonwealth remain separate legal entities, with separate assets and separate liabilities. If the Commonwealth proposes to use its assets to satisfy the claims of creditors of another Title III Debtor (such as ERS), it must provide meaningful transparency into whether the consideration the Commonwealth will receive for funding such distributions is reasonable.

139.    Accordingly, the Disclosure Statement must reveal what the Board believes to be the value of the "ERS assets" the Commonwealth is purchasing, and how that value was determined. If the Board has not formed a view on the value of these assets, yet still proposes to transfer half a billion dollars to ERS creditors for such assets, creditors should know that as well.

**J.    The Disclosure Regarding the Risk of Non-Occurrence of the Effective Date Should Be Expanded.**

140.    While the Disclosure Statement acknowledges a risk that the Effective Date may not occur (*see* DS at 481-82), this disclosure should be amended to reflect (i) that certain creditors may object to any waiver of the automatic stay of the entry of the confirmation order[99] and may seek a stay of the confirmation order (thereby lengthening the time before the Effective Date may occur), and (ii) that failure to achieve the Effective Date by January 31, 2022, may give parties to the GO/PBA PSA the right to terminate that agreement yet still claim Plan Support Fees thereunder.[100]  Ambac has proposed amendments to the current disclosure in **Exhibit A** at 6.

---

[99] *See* Fed. R. Bankr. P. 3020(e) ("An order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise.").

[100] (*See* GO/PBA PSA § 6.1(b) (entitling certain signatories to $100 million in cash as an administrative expense claim in a future Commonwealth plan if the Effective Date does not occur by January 31, 2022).)

**K.     The Disclosure Regarding the Litigation Risk the Board Faces in the Revenue Bond Litigation Should Be Expanded.**

141.    The Disclosure Statement includes a very brief reference to the risk that certain parties may succeed in asserting administrative expense, priority, secured, or non-dischargeable claims against the Commonwealth.  (*See* DS at 481.)  As discussed in Ambac's objection to the DS Scheduling Motion and Confirmation Procedures Motion, filed contemporaneously herewith, there is a significant risk that the Revenue Bond Litigation will not be concluded by the Board's desired time for a confirmation hearing.  This would, at a minimum, delay confirmation and the Effective Date or necessitate the creation and funding of an appropriate reserve to ensure adequate recoveries for the claims asserted therein (whose funding would necessitate amending the Plan). The Disclosure Statement must meaningfully account for these risks.  Ambac has proposed amendments to the current disclosure in this regard in **Exhibit A** at 7.

## CONCLUSION

142.    For the foregoing reasons, the Disclosure Statement should not be approved.

Dated:  June 15, 2021
         San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
   Roberto Cámara-Fuertes (USDC-PR No.
   219002)
   Sonia Colón (USDC-PR No. 213809)
   221 Ponce de León Avenue, 5th Floor
   San Juan, PR 00917
   Telephone: (787) 766-7000
   Facsimile:  (787) 766-7001
   Email:  rcamara@ferraiuoli.com
           scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
   Dennis F. Dunne (admitted *pro hac vice*)
   Atara Miller (admitted *pro hac vice*)
   Grant R. Mainland (admitted *pro hac vice*)
   John J. Hughes, III (admitted *pro hac vice*)
   Jonathan Ohring (admitted *pro hac vice*)
   55 Hudson Yards
   New York, NY 10001
   Telephone:  (212) 530-5000
   Facsimile:  (212) 530-5219
   Email:  ddunne@milbank.com
           amiller@milbank.com
           gmainland@milbank.com
           jhughes2@milbank.com
           johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com