# **EXHIBIT A**

***The Plan depends on the Title III Court's agreement with and adoption of the Oversight Board's belief that PROMESA, upon its enactment on June 30, 2016, preempted all Commonwealth law allocating money.***

The Plan assumes that, as of the date of PROMESA's enactment, PROMESA preempted all Commonwealth laws then in existence that transfer, appropriate, or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality. The basis for this assumption is the Oversight Board's belief that these laws are inconsistent with Section 202 of PROMESA (which grants the Oversight Board certain powers over the Commonwealth's budget) and are thus preempted by Section 4 of PROMESA.

The Oversight Board's belief that the aforementioned statutes were preempted by PROMESA is disputed by creditors, including, but not limited to, certain creditors in the Revenue Bond Litigation identified Section V.F.5 of the Disclosure Statement. No court has had occasion to rule on the legal merits of the Oversight Board's preemption theory as it concerns the aforementioned statutes. Accordingly, there is risk that the Oversight Board will not prevail in the Revenue Bond Litigation or other contested matters in establishing its view of PROMESA's preemptive effect. If the Title III Court were to conclude that PROMESA does not preempt the aforementioned statutes in the manner described by the Oversight Board, the Plan would no longer be feasible or confirmable by the Title III Court.

***There is risk that the Title III Court, or a court with appellate jurisdiction over the Title III Court, may find that the Plan's classification of claims conflicts with binding First Circuit authority.***

Certain creditors have argued that the Plan fails to comply with the requirements of the decision by the U.S. Court of Appeals for the First Circuit in *Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir. 1984) ("*Granada Wines*"). Those creditors have argued that *Granada Wines* requires that claims with similar legal character must be placed in the same class within a plan of reorganization or adjustment, such as the Plan, and have asserted that the Plan fails to do so with respect to their claims. The Oversight Board has expressed a contrary view, including that *Granada Wines* does not apply to proceedings under PROMESA, and that even if it does, the classification scheme set forth in the Plan is proper. There is risk that the Oversight Board will not prevail on this dispute, and that the Title III Court, or a court with appellate jurisdiction over the Title III Court, will rule that certain claims that are separately classified in the Plan must be classified together. If a court were to so conclude, the Plan would no longer be feasible or confirmable by the Title III Court.

***Creditors may assert claims against the Commonwealth under Section 407 of PROMESA, which could result in significant liability that threatens the Plan's feasibility.***

Section 407(a) of PROMESA makes a transferee liable for the value of transferred property if, while the Oversight Board is in existence, the property of any territorial instrumentality is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors. Section 407(b) grants a private right to any qualifying creditor to bring a direct action against the transferee of such property unless a stay under Title III is in effect.

Following the close of the Commonwealth's Title III case, creditors may bring claims seeking to hold the Commonwealth liable under Section 407 for transferring funds from certain territorial instrumentalities (including HTA, CCDA, and PRIFA) or retaining funds that Commonwealth law required be transferred to those entities. Although the Oversight Board disagrees that these creditors would have viable claims under Section 407, there is risk that, if creditors are successful in securing judgments on account of such claims, the Commonwealth may face significant post-confirmation monetary liability. This significant liability of the Commonwealth would call into question the Plan's feasibility.

***There is risk that the Commonwealth's estimated pension liability set forth in the Disclosure Statement may be significantly overstated, as certain creditors have challenged the accuracy of such data and the methodology by which the pension liability estimate has been calculated.***

The Commonwealth's estimates of its pension liabilities are based entirely on the analysis of its actuarial expert, Milliman, Inc. Those estimates are based on census and population data, among other inputs. Issues with the accuracy or reliability of the underlying data may affect the accuracy of the estimated liability. Milliman has expressly disclaimed any attempt to audit the underlying data on which its analyses rely, and has observed that, if the data underlying Milliman's analysis is incorrect, the outputs of Milliman's actuarial estimates would likewise be incorrect. The information has not been audited or verified by any third party.

The Commonwealth's estimated net pension liability as of June 30, 2016, as calculated by Milliman, was $55.6 billion. The Commonwealth's estimated total pension liability as of June 30, 2017, as calculated by Milliman, was $47.1 billion—a decrease of over $8 billion from the previous year. The Commonwealth does not have a more recent estimate of its pension liability.

Certain creditors have sought disallowance of pension claims premised on the Milliman analysis, alleging additional issues with the data and methodology used to achieve the Commonwealth's pensions liability estimate. These issues include, among others, (i) instances when pension benefits have been paid out to deceased beneficiaries, and (ii) the failure to reflect mortality improvement projection factors in calculating the pensions liability estimate. These creditors assert that correction for the errors and issues they identify would result in a significantly decreased estimate of the Commonwealth's pension liability, resulting in an increased amount of funds available for other purposes, including the Commonwealth's debt and other financial obligations.

Although the Oversight Board disagrees with criticisms advanced by these creditors, there is risk that, should they prove successful in their challenge to the amount of the pension liability, the confirmability of the Plan would be called into question. Moreover, the Plan's overstatement of the Commonwealth's pension liability would result in an understatement of the resources available to satisfy claims of other creditors under the Plan.

***There is risk that the Title III Court, or a court with appellate jurisdiction over the Title III Court, will conclude that Section 106(e) of PROMESA does not prevent the Title III Court from reviewing the economic, financial, and other assumptions underlying the Fiscal Plan in evaluating the Plan's confirmability.***

PROMESA sets forth a number of plan confirmation requirements in Section 314(b). One of these confirmation requirements is that the Plan be consistent with the applicable certified fiscal plan (PROMESA Section 314(b)(7)). A disputed issue between creditors and the Oversight Board in the Title III proceedings is whether Section 106(e) of PROMESA, which bars judicial review of "the Oversight Board's certification determinations" under the statute, renders the inputs to the Fiscal Plan immune from judicial review, given the Oversight Board's role in certifying the Commonwealth's fiscal plans.

The Oversight Board believes that Section 106(e) prevents the Title III Court from conducting any inquiry into the economic, financial, and other assumptions underlying the Fiscal Plan. Certain creditors believe that, for the Title III Court to evaluate whether the Plan can satisfy the confirmation requirements set forth in Section 314(b), it necessarily must evaluate the assumptions underlying the Fiscal Plan, and is not barred by Section 106(e) from conducting such judicial review.

Accordingly, there is risk that the Title III Court may find that, although the Plan is consistent with the Fiscal Plan and therefore satisfies Section 314(b)(7) of PROMESA, the Plan nonetheless fails to meet one or several other confirmation requirements set forth in Section 314(b). If the Plan is consistent with the Fiscal Plan but fails to meet another confirmation requirement, even if that failure is due to the Plan's consistency with the Fiscal Plan, the Court will not be able to confirm the Plan.

***The Effective Date may not occur due to creditor challenges to any confirmation order or the failure of applicable conditions precedent to occur under certain plan support agreements.***

Article LVIII of the Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date. Many of the conditions are outside of the control of the Debtors. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan will be satisfied (or waived). **Certain creditors have indicated an intent to object to any attempt to waive or shorten the automatic 14-day stay of confirmation orders under Federal Rule of Bankruptcy Procedure 3020(e) (made applicable to the Title III Cases by PROMESA Section 310).** Accordingly, even if the Plan is confirmed by the Title III Court, there can be no assurance that the Plan will be consummated and the adjustment of the Debtors' debts completed. *See* Section VI.R. of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" (description of the conditions to the effectiveness of the Plan).

In addition, certain plan support agreements impose conditions that must be satisfied as of the Effective Date. **If the Effective Date does not occur by January 31, 2022, parties to the GO/PBA PSA may terminate the GO/PBA PSA and claim entitlement to a $100 million termination fee.** There can be no assurance that such conditions will be timely satisfied or waived.

***If any claimant is successful in prosecuting and obtaining an allowed (i) administrative expense claim, (ii) priority claim, (iii) secured claim, or (iv) non-dischargeable claim, and any such claim is not contemplated to be paid pursuant to the Plan, the Plan may not be confirmable.***

Various parties have asserted claims against the Debtors that they assert may be administrative expense claims, priority claims, secured claims, or non-dischargeable and that are not contemplated to be paid pursuant to the Plan.

**Certain litigation concerning such claims, including the Revenue Bond Litigation identified in Section V.F.5 of the Disclosure Statement, is continuing, and may not be completed by the time the Confirmation Hearing is scheduled to begin. If this litigation is not resolved prior to the Confirmation Hearing, the Confirmation Hearing and Effective Date may be significantly delayed to allow for resolution of these disputed claims. Alternatively, the Oversight Board may be required to establish an appropriate reserve to ensure adequate recoveries on the claims sought to be disallowed in the Revenue Bond Litigation if the Oversight Board is unsuccessful.**

If such and other similar claims are ultimately allowed, **or if the Oversight Board is required to establish an appropriate reserve in respect of such disputed claims pending their resolution,** the Plan ~~may~~ **will** not **be** confirmable without **substantial** amendments that ~~may~~ **will** materially change its proposed distributions.