# **<u>EXHIBIT K</u>**

*CERTIFIED TRANSLATION*                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

(H. B. 938)

# LAW NO. 26

## APRIL 29, 2017

To create the "Compliance with the Fiscal Plan Act," in order to take the necessary steps to temper the existing legal and juridical framework to more faithfully comply with the Fiscal Plan approved by the Fiscal Oversight Board created under the Federal PROMESA Act; to establish a uniform system of fringe benefits, including the Christmas bonus and contribution to the health plan, for all public officials and employees of the agencies, instrumentalities, and public corporations of the Government of Puerto Rico, with the exception of the University of Puerto Rico; to amend Section 4.3 subparagraph 2 (a) (e) (m) of Article 4, Section 5.2 of Article 5, Section 6.4 subparagraph 1 (d) and 4 (1), 6.8 subparagraph 2 (b) and 6.9 of Article 6, Section 7.2 subparagraph 3 and 5 of Article 7, a new Article 2.11(a) is added in order to amend Article 3 of Law 125 of June 10, 1967, as amended, to suspend the effectiveness of Article 9 and Section 10.2 of Law 8–2017, known as the "Administration and Transformation of Human Resources in the Government of Puerto Rico Act"; to renumber the current Articles 10 al 20 as Articles 9 through 19; to repeal Law 89-2016, known as the "Temporary Employment in Public Service Act"; to amend Articles 3, 6, and 7 of Law 253-1995, as amended, known as the "Mandatory Liability Insurance for Motor Vehicles Act," in order to expand the mandatory liability insurance coverage from four thousand dollars ($4,000) to four thousand five hundred dollars ($4,500); to authorize for *[sic]* the review of premiums before June 30, 2017; to allow the declaratory of an extraordinary dividend to members of the Mandatory Liability Insurance Joint Underwriting Association, as well as the application of an incentivized tax to such dividend; to provide the distribution of revenues obtained through the incentivized taxes and the adjustment in the premium so that it enters the General Fund; to authorize the Government to use surpluses from the public corporations as "available funds" to contribute to the General Fund; to authorize a Committee comprised by the directors of the Financial Advisory Authority and Fiscal Agency, the Office of Management and Budget, and the Department of the Treasury to modify the rates of the public corporations to comply with the metrics of the Fiscal Plan; to establish the rules and principles that must govern the process of selling real properties of the Government of Puerto Rico; to create the Real Properties Assessment and Disposal Committee; to declare the public policy relative to the sale of real properties; to amend Articles 3, 7, and 8 of Law No. 230 of July 23, 1974, as amended and known as the "Government of Puerto Rico Accountability Act"; in order to establish that allocations and funds without a specific economic year, that have remained on the books without movement of disbursement or obligation for one (1) year will be considered as having fulfilled their purposes, thus, they will be closed and entered into the General Fund; to provide that those special funds created by Law for specific purposes will be credited to the State Treasury's General Fund and will be deposited in the current bank account of the Secretary of the Treasury for the latter to have full dominion over the same. to amend Articles 2 and 6 of Law 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act"; in order to provide that the incremental rise in the item assigned to purchases in the general budget to be granted to

microenterprises, small and medium enterprises will occur if the Government's fiscal situation so allows; to add a new Section 3020.05A and Section 3020.15, and to amend Section 3020.05, Section 3020.13, Section 3020.14, Section 3030.14, Section 3030.18, Section 3050.01, Section 6042.08, and Section 6042.15 of Law 1-2011, as amended, better known as the "Internal Revenue Code for a New Puerto Rico," in order to modify the excise tax applicable to cigarettes and products derived from tobacco to obtain greater liquidity, tackle the economic and fiscal crisis that Puerto Rico faces, and prevent the most vulnerable sectors from being affected, as well as to discourage the use of cigarettes; to amend Article 2 of Law No. 91 of June 21, 1966, as amended, to provide that until Fiscal Year 2020-2021 the annual contribution to the Emergency Fund will be the sum of ten million dollars ($10,000,000) and that as of Fiscal Year 2020-2021, such contribution will be no less than zero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury for the preparation of the Recommended Budget charged to the General Fund; and for other related purposes.

PREAMBLE

Introduction

At present, Puerto Rico is undergoing a historically unprecedented monumental fiscal crisis. This crisis was caused, in part, because of lack of controls over spending, sustainable development measures, and management information systems that promote clarify and transparency in government management.

According to data provided by the U.S. Department of the Treasury, Puerto Rico suffers a cumulative economic contraction of 14.6% in Gross State Product (actual GST) with a prediction of an additional contraction of 3% for the next two years. For years, the Government of Puerto Rico has operated with a structural deficit that has been financed by bond issues and loans to the Government Development Bank. It has been more than one year that the Government of Puerto Rico lacks liquidity and tax refunds, payments to contractors, money of retirees, and intra-governmental loans to substitute the sources of liquidity and spend more money than funds available. The Government Development Bank breached its obligations with the bondholders since May 1, 2016, and it no longer fulfills its role of providing liquidity nor do we have access to the market due to the policies of the past administration that detracted from the Government of Puerto Rico's credibility. The retirement systems are insolvent.

As an example of the policies that brought us here, one can see that from 2001 to 2008 there was a 64% increase in payroll expenses and, after a 33% reduction between 2009 and 2012, there was another substantial increase in the four year period of 2013-2016. To finance that excessive spending, between 2000 and 2008 the public debt rose by 134%. On the other hand, in the past four year period measures were implemented under the philosophy of "first nonpayment, then taxes, then cuts." This philosophy propitiated the continuation of excessive spending and the rejection of public policies that would have allowed the efficient handling of the Government of Puerto Rico's fiscal affairs. This, without having realized the actions necessary to achieve greater operational efficiency in Government, or cuts to excessive government spending. In addition, as the values and economic debacle dropped, the Central Government was incapable of

generating the financial information necessary to comprehend the depth of the problem and present accurate information to Congress, and to other entities with interest in the matter. As a result of all of the foregoing, several degrading of debt classifications of the Government of Puerto Rico materialized and an adverse impact has been triggered across all sectors of the economy.

This crisis has hit Puerto Rican family very hard. The most severe sacrifices have fallen on the most vulnerable people in our society and have caused thousands of Puerto Ricans to abandon the Island seeking better opportunities. The resulting reduction in population becomes one of the challenges to guide us toward recovery.

Puerto Rico's Colonial Status

The colonial status has affected out capacity to confront and resolve this crisis since we lack the sovereign powers that a state has to regulate its local affairs under Amendment X of the United States Constitution. "[F]or the federal Supreme Court, the adoption of the Constitution did not represent a change in the fundamental basis of the constitutional relations between Puerto Rico and the United States. The Supreme Court continued treating Puerto Rico as a political entity subject to the territorial clause of the federal Constitution." See, Pueblo v. Sánchez Valle, et al., 192 D.P.R. 594, 631 (2015). "[T]here never was an assignment of sovereignty, what there was, was a delegation of powers." *Id*. at p. 635. "That delegation of power does not constitute an irrevocable waiver or a termination of Congress' power. The People of the United States granted to Congress, through the Constitution, ample power to administer the territories. For that reason, Congress cannot irrevocably waive a power that was conferred on it by the People of the United States." *Id*., at p. 638.

Thus, "Congress could allow the Commonwealth to remain as a political system indefinitely, or, on the contrary, it has the constitutional authority to amend or revoke the powers of internal administration that the Government of Puerto Rico exercises. Stated otherwise, the system of government that rules internally in Puerto Rico is completely subject to the political will and legal authority of Congress." *Id.,* at p. 641.

The sad truth is that the colonial status places us in such a state of defenselessness that not even the American citizenship that we have treasured since 1917 is guaranteed. Congress has the legislative discretion to grant privileges to the citizens born in the territories, including American citizenship, but that right can be revoked at any time. In fact, the Federal Government has argued before the courts that the right to citizenship does not exist in the territories; rather it is a legislative grace of Congress. See, *for example,* Tuaua v. United States, 788 F.3d 300, (D.C. Cir. 2015).

With respect to the particular issue in question, as an example of the limitations that the colonial status imposes on us we have to mention that the states can obtain the protection of the federal bankruptcy Act but Puerto Rico was excluded from such protections and, because it does not have full representation in Congress, there is little or nothing we can do about it. Nor can we legislate a local bankruptcy since the same federal law that does not protect us prevails and prevents local legislation. *See,* Puerto Rico v. Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938 (2016)

Case:17-03283-LTS Doc#:17008-11 Filed:07/02/21 Entered:07/02/21 16:45:24 Desc:
Exhibit K: Certified Translation 2017 of 26-2017 Page 5 of 73
*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

(declaring unconstitutional the "Puerto Rico Debt Compliance and for the Recovery of the Public Corporations Act," Law 71-2014, better known as the "Creole Bankruptcy Act").

The direct result of our colonial status: PROMESA

The policies of the past, together with our colonial defenselessness, lead the United States Congress to promulgate the law called the *Puerto Rico Oversight, Management, and Economic Stability Act*, known as PROMESA (by its English acronym), Pub. L. 114-187, and delegated very broad power to a Fiscal Oversight Board (hereinafter, the "Oversight Board"). Again, for lack of full representation in Congress, said Law was enacted without actual participation by our People. According to PROMESA, the continuous acts of fiscal planning, budgetary, legislative, and executive acts of Puerto Rico, as well as the restructuring of debts, consensual or not, and the issuance, guarantee, exchange, modification, repurchase, or redemption of debt are subject to oversight.

In its Section 4, PROMESA clearly provides that its provisions "will prevail over any specific or general provisions of the territorial, state laws or territorial or state regulations that are incompatible with this Law." This way, Congress expressly manifests its intention that such Law would displace any state legislation that clashes with PROMESA. This is equally recognized in Section 8 (2), which establishes that the Government of Puerto Rico cannot adopt, implement, or enforce any statute, resolution, policy, or rule that can impair or annul the purposes of PROMESA, as determined by the Oversight Board. Thus, then, it is impossible for us to promulgate legislation that sets aside PROMESA or that impairs its provisions and its scope.

At this juncture, it is necessary to emphasize that under the Tenth Amendment, the Federal Government cannot impose on a state what the federal PROMESA act allows for the territories. Congress imposed a Board on Washington, DC, which is not a state and which is under Congress' direct jurisdiction. The Board for New York City was a creation of its own state legislature and not of Congress. Detroit, which is a city and not a state, participated in a voluntary bankruptcy process. In sum, we cannot lose sight of the fact that the situation we are undergoing and the imposition of the Oversight Board is another consequence of the colonialism that has limited our development for the past 119 years.

Unfortunately, our colonial and consubstantial status lacking in political powers exacerbates the reality that a Federal Law has been imposed on us in Congress that is supreme over all local legislation, including our Constitution, without our having had the opportunity to vote on it or to vote for the President who enacted it. This shows that in order to get out of the economic predicament in which we find ourselves it is essential to solve the problem of our political status. However, it is also an irrefutable fact that we must work within the parameters of PROMESA to initiate the economic and fiscal recovery of Puerto Rico.

On October 30, 2016, the Oversight Board designated the Government of Puerto Rico, the Government Employee Retirement System, the Judiciary Retirement System, the Teachers Retirement System, the University of Puerto Rico, and 21 public corporations of Puerto Rico as "covered entities" subject to fiscal supervision pursuant to PROMESA. Section 405 (b) of

Case:17-03283-LTS Doc#:7908-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2015 Page 6 of 73
*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

PROMESA further imposes a temporary stay of litigations and claims against Puerto Rico and its instrumentalities on various matters, in the hope that the Government of Puerto Rico, in its own name and on behalf of its instrumentalities, will initiate voluntary negotiations with its creditors to reorganize and settle the repayment of its debt obligations and simultaneously undertake a responsible restructuring of the Government of Puerto Rico and its instrumentalities to readjust the essential services required for the health, safety, and wellbeing of the residents of Puerto Rico with the timely repayment of its debt obligations.

After investing millions of dollars in specialized consultants, the past Administration presented a deficient fiscal plan that was rejected by the Oversight Board immediately, since it did not solve the fiscal problems caused by the past administration.

This Law, divided into Chapters, provides different measures that this Administration is taking to comply with the Fiscal Plan imposed according to the provisions of PROMESA. The issues addressed in this Law are germane among each other, since all are aimed at complying with the Fiscal Plan.

Section 17 of Article III of the Puerto Rico Constitution provides, in pertinent part, that "[n]o bill shall become a law... that contains more than one subject, which must be clearly stated in its title, and any part of a law whose subject has not been stated in the title shall be void.["] Such cited section establishes the rule of a single subject that requires that any law enacted by the Legislature regulate a single subject or matter. On this issue, the Puerto Rico Supreme Court has held that such provision "does not require that the title constitute a detailed index of the content of the law, rather merely that it be a definer indicative of the subject covered thereby." Herrero v. Emmanuelli, 179 D.P.R. 277, 295 (2010); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942).

Moreover, the jurisprudence has been consistent in establishing that only when faced with a clear and decisive case is it justified to annul a law for violation that constitutional provision. Dorante v. Wrangler of P.R., 145 D.P.R. 408, 429-431 (1998), and the cases cited therein. Our maximum judicial forum has "adopted a comprehensively lax stance so as not to tie down the legislator." Herrero v. Emmanuelli, *supra*. *See, also,* J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, Editorial Temis S.A., 2009, p. 244. In that sense, the Supreme Court has delimited that "**a strict interpretation of the constitutional provision might impede and hinder the legislative process, since it would force the legislator to enact multiple laws to regulate a single issue or general subject.**" Herrero v. Emmanuelli, *supra*. (Emphasis ours.) See, also, M.H. Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389, 393-394 (1958). That is, "the requirement is not designed as a subterfuge to destroy valid legislation, rather as a guarantee that the legislative process is carried out in a transparent manner, so that each bill is discussed and analyzed fully before being enacted." Herrero v. Emmanuelli, *supra*, pp. 295-296.

Therefore, when examining the validity of a law in light of the rule of a single subject, it is necessary to examine all of its provisions to determine whether they are related to each other and are related to the subject that is stated in its title. *Id.* What comprises "a single subject" is interpreted liberally, without setting aside the purpose and objective of the constitutional

requirement.  In that sense, "a statute can comprise all subjects related to the main issue and all measures that can be fairly considered as ancillary and necessary or appropriate to carry out the purposes that are properly comprised within the general subject." *Id.  See, also,* R.E. Bernier & J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, Second Edition, San Juan, Publicaciones JTS, 1987, p. 81.

This Law seeks a single subject: to faithfully comply with the Fiscal Plan certified by the Board.  For this reason, we promulgate this Law, which addresses several subjects aimed at complying with the Fiscal Plan.

### A New Government: Responsibility before the Oversight Board

As a result of all of the foregoing, when we assumed the reins of the Government, we found a cash deficit of more than $7.6 billion as certified by the U.S. Treasury and the Oversight Board.  This was a government without access to capital markets, with junk category credit, without liquidity, without transparency in the public finances, with inflated government expenditures, and with billions of dollars in debts.  In addition, the Governor faced the titanic task of regaining credibility in of the market and before the Oversight Board.  We must guarantee a Government where the expenses respond to the reality of the revenues.

Since January 2 we have been implementing a concerted plan to control government spending, reactivate our economy, and facilitate conditions for the creation of more and better jobs in the private sector.  We are showing the world that Puerto Rico is open to doing business in an environment of security and government stability.

The bills presented by the Governor and approved by this Legislature during these first three (3) months of mandate have changed Puerto Rico's course to one of fiscal responsibility.

Last February 28, 2017, the Governor presented a Fiscal Plan that is complete, comprehensive, genuine, and at same time sensitive to the needs of our People and of those people who are most vulnerable.  After weeks of uncertainty, reason and wisdom prevailed.  On March 15, 2017, the Oversight Board accepted and certified our Fiscal Plan accompanied by a series of contingencies that guarantee that there will not be dismissals of public employees, without affecting the workday, maintaining access to health services for our People, and protecting the pensions of those persons who are most vulnerable.  This Fiscal Plan is the only alternative to avoid the dismissal of public employees, the elimination of the right to health, and to maintain the solvency of our retirement systems while maintaining an operating government that complies with the parameters to avoid more severe measures that are part of the contingencies of the Plan approved by the Fiscal Oversight Board, such as the total elimination of the Christmas Bonus to all public employees and decreeing a reduction in working hours that would render the Government inoperative.

The Fiscal Plan's approved measures are outlined to comply with the fiscal objectives; but also in promoting economic development, in our capacity to restore credibility; in that change translate not only into a mere cut, but in a long term benefit, and, above all, in ensuring that the most vulnerable sectors and those who work hard, day after day, have a better quality of life.

The validation of the Fiscal Plan represents an acknowledgment of the new Government's credibility. We proved that we went from times of incoherence and improvisation to times of working as a team, and to having results for the good of Puerto Rico. We went from the "it's good enough" and the lack of credibility to having a Fiscal Plan and of socio-economic development that meets the objective of reducing spending, but more important than that, which allows us to build a better society.

The changes we are channeling will not be easy and will take time, but they will also have their results in the first two years. Under the Certified Prosecutor Plan, we will be able to balance the revenues with the expenditures for Fiscal Year 2019. Now it is up to us to perform. The contingencies that accompany the Fiscal Plan require the Government to comply. We must ensure that we have liquid money so as not to affect the salaries of the public employees, the health of the People, and the income of the retirees

This Law is promulgated to temper the legal and juridical framework in order to comply with the demands made by the Oversight Board in the Fiscal Plan approved under the Federal PROMESA Act. In view of the foregoing, pursuant to the power of reason of the State and in accordance with Article II, Sections 18-19, and Article VI, Sections 7-8, of the Constitution of Puerto Rico, given the existence of a serious situation of economic and fiscal urgency in Puerto Rico it is necessary to enact this Law so that the State can count on sufficient liquidity to be able to pay the payroll of public employees and to pay for the essential services it offers its citizens. We exercise this power of reason of state to take the necessary steps to comply with the Fiscal Plan and to put Puerto Rico on the path to economic recovery. Complying with this Plan constitutes an urgent interest of the State in maintaining its operations and protecting those persons who are most vulnerable.

As defined by the Puerto Rico Supreme Court, the power of reason of the State is "that power inherent to the State that is used by the Legislature to prohibit or regulate certain activities in order to encourage or protect the public peach, morals, health, and general wellbeing of the community, which can be delegated to the municipalities." Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Our Highest Forum recently provided that measures taken to deal with an emergency that are necessary and reasonable to advance the important governmental interest are necessary and reasonable. See, Trinidad v. E.L.A., 188 D.P.R. 828 (2013), and Domínguez Castro v. E.L.A., *supra*, pp. 88-89. Likewise, the Supreme Court recognized "the precariousness of the economy as a reality that necessarily influences the definition of the scope of government action under the power of reason of State" and that in the exercise of such power, "the Legislature enjoys ample power to approve economic regulations aimed at promoting the wellbeing of the community." Domínguez Castro v. E.L.A., *supra*, p. 37. Through Associate Justice, Mr. Kolthoff Caraballo, the Court called attention to the fact that both our jurisdiction and the rest of the world "live in very convulsive moments in the economic and financial aspect. It would seem that the economies of the countries of the world are intertwined and tied to the tail of a kite that cannot finally rise." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) certiorari denied, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). In this way, the Court recognized that

Case:17-03283-LTS Doc#:7948-11 Filed:07/06/21 Entered:07/06/21 19:16:45 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 9 of 73
*CERTIFIED TRANSLATION*                                              by: Olga M. Alicea, fcci, njitce-s

it had to be aware that there was a reality that it described as "harsh and unfriendly." Faced with such a historic scenario, the Court considered that it was necessary to aspire to an altruistic interest in which "collective economic wellbeing was pursued at the expense of individual well-being." In addition, this Tribunal reiterated its recognition regarding an economic crisis in our jurisdiction in the case Herrero, *et al.* v. E.L.A., 179 D.P.R. 277 (2010), and emphasized, in the context of providing a remedy involving the disbursement of public funds in order to reimburse money to taxpayers, that it was not "unaware of the difficult state of public finances in our country." *Id.*, at p. 309.

The Supreme Court validated Law 3-2013 regarding the Public Employees' Retirement System in the case of Trinidad Hernández v. E.L.A., *supra*, understanding that the Legislature had exercised the power of reason of the State to halt the insolvency of the Public Employee's Retirement System. The Supreme Court reasoned that "from the preamble... it appears that the measures adopted are necessary and reasonable to adequately address the financial crisis that it an attempt against the actuarial solvency of this system." It added that, "that certainly constitutes an important public interest since, in guaranteeing the system's economic solvency, all of the participants benefit and it addresses, in part, the fiscal crisis that the Country faces in protection of the wellbeing of all Puerto Ricans." Trinidad Hernández v. E.L.A., *supra*, p. 837. It concluded that the norm is constitutional "because, although there is a substantial impairment of the contractual obligations at issue, the measures implemented are reasonable and necessary to safeguard the actuarial solvency of the Retirement System, and no less onerous measure exists to achieve that end.: *Id.*, p. 839.

Similarly, recently, in the case of Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico, 190 D.P.R. 854 (2014), the Supreme Court passed judgment on the measures approved through Law 160-2013 to solve the crisis of the Teachers Retirement System and it found that the law did not advance the important state interest required by our constitutional system in cases of retirement systems reforms: to guarantee the system's own solvency. Therefore, it held that Law 160–2013, insofar as the impairment of contractual obligations is concerned, is unreasonable and, therefore, unconstitutional. *Id.*, p. 12. On that occasions, the Court was emphatic in emphasizing that the measures approved will be constitutional if they are reasonable and necessary "to advance its actuarial solvency and no less onerous measures exist to achieve that end." *Id.*, p. 8.

Using as the base the legal framework discussed above, this Legislature understands that the measures that are taken in this Law are necessary and reasonable to adequately address the fiscal, economic, and budgetary crisis that Puerto Rico is undergoing. Likewise, it has to do with certain measures required to be able to implement the Fiscal Plan certified by the Oversight Board in accordance with the Federal PROMESA Act. Said Plan establishes fiscal adjustments to stabilize the Government's finances in times when there is no access to the financial market. If these measures are not implemented, Puerto Rico's social and economic wellbeing will suffer irreparable damages, thus, implementing the Fiscal Plan constitutes an urgent interest of the State to ensure the wellbeing of the public interest.

<u>Government Restructuring</u>

On the other hand, the Plan for Puerto Rico that this Administration inspires and that was endorsed by the People of Puerto Rico in the past general elections through the democratic exercise of the vote is intended to implement a new structure of government that significantly lowers public spending and substantially improves its functions. To achieve this, a conscientious assessment is required of the services that the government provides in order to determine which can be consolidated, delegated to the public sector, or eliminated because they are no longer necessary. All of that, without entailing dismissals of public employees, without mobilizing the same according to our citizens' need for services.

Consonant with the foregoing, and as part of the first steps taken by this Administration to curtail the fiscal crisis by reengineering the government's structure, Law 8-2017 was enacted, known as the "Administration and Transformation of Human Resources in the Government of Puerto Rico Act." This Law converts the Government into a Single Employer so that public officials become employees of the Government and not of their different entities, thereby allowing the best use of the human resources where there is an urgent need through the mechanism of mobility, without the employee having to resign his position and begin again in another government instrumentality. Through mobility we seek to reinforce the understanding of what is meant by a balance between the workforce and the rendering of public services. This way, we obtain an efficient distribution of the Government's human resources and we create an agile government structure, based on the continuing assessment of needs and helping the public servant make the adjustments and adaptations required by the current fiscal crisis and future challenges.

During the past four years, Law 89-2016 was enacted, known as the "Temporary Employment in Public Service Act," under the assumption of correcting the disparity in the treatment of temporary employees in public service and forcing the agencies to be diligent in the creation or request for creation of jobs. Also, the same was promulgated under the reasoning that correctly classifying the employees would help in the administration of human resources in public service and would avoid the expenditure of unnecessary funds. Similarly, through said Law, regular employee status was granted to those temporary employees who had been performing duties of permanent need for two (2) years or more, subject to certain eligibility requirements.

However, said Law has had the effect of increasing the government payroll at times when the public finances are undergoing an unprecedented fiscal crisis. The recruiting of temporary employees, whether they were categorized as irregular, transitory, or by contract, must not be used as a subterfuge for the subsequent creation of regular jobs or permanent need thereby overburdening the funds of the State and without measuring the effectiveness of those resources in the rendering of the services the People deserve.

Therefore, guiding Puerto Rico toward the right path requires a change in model, such as the one proposed by this Administration through the Model for the Socioeconomic Transformation of Puerto Rico, set forth in the Plan for Puerto Rico. The mission is to establish a new government that facilitates economic development and whose vision is that of a government based on a scientific model, where evidence and results matter and citizen collaboration is the main axis of its validation. To achieve this goal the government must

*CERTIFIED TRANSLATION*                          BY: OLGA M. ALICEA, FCCI, NJITCE-S

become a facilitator of economic development, implementing genuine, conclusive reforms; the government structure must be cost-effective, efficient, and transparent; and public service must be based on integrity, excellence, responsibility, and accountability.

<u>Equity in Fringe Benefits for All Public Employees</u>

On the other hand, as we have indicated and is known by all, our Island is undergoing a severe fiscal crisis and resources are limited to address all of the government's commitments. In the midst of a novel situation as is the imposition of a Fiscal Oversight Board and given the nonpayment of the debts contracted, the Government of Puerto Rico is forced to restructure every government component and direct its resources to those areas that are most deserving.

Puerto Rico is facing a historic moment where it needs the collaboration of all sectors in adopting immediate solutions that contribute to its economic restoration. This Law responsibly and fairly addresses the absence of uniformity among our public employees with respect to the fringe benefits that they might enjoy during this critical period of our local economy. There is no justification whatsoever to maintain, during these next years prior to fiscal recovery, such a deep gap between the fringe benefits enjoyed by public employees in some government agencies and those enjoyed by public employees of the public corporations. In some public corporations, their employees benefit from double and triple the benefits that employees in the central government have without that responding to the economic reality of Puerto Rico. Worse yet, by acting in this way, an inequality is created among public employees, benefitting a few at the expense of many others. Moreover, the costs of these disparate measures make their compliance unsustainable during this time and the keeping of public jobs. Therefore, this Legislature believes it is prudent to take action that entails savings and allows us to keep all of the public employees without dismissals.

To have an idea of the expenses generated in the Public Corporation due to the payment of all of the fringe benefits, including the Christmas Bonus and health contributions, the recommended budget for Fiscal Year 2017 presented to the Oversight Board establishes that these items would have a budgeted expenditure amounting to $171.877 million, not counting the University of Puerto Rico, the Puerto Rico Electric Power Authority, and the Aqueducts and Sewers Authority. With respect to the payment of overtime, the amount of $23.618 million as budgeted, and for liquidation of sick leave and vacation leave, the sum of $9.906 million. The effect of this is a disparity among the fringe benefits that the employees of the Central Government receive vis-à-vis the employees or officials of the public instrumentalities or corporations. In the Public Corporations, the expenditures in fringe benefits is an average of $10,840 per employee, while in the Central Government an average of $2,523 per employee is spent. Until the local economy recovers, such disparity cannot be justified.

Similarly, according to statistics provided by the Government Development Bank and the Puerto Rico Planning Board, in Fiscal Year 2016, the public corporations were responsible for a debt of $46,861.6 million which represented 72.9% of the total public debt of the Government of Puerto Rico, which is estimated at $64,254 million. The public corporations have increased their participation in the debt from 68.9% in Fiscal Year 2004 to 72.9% in Fiscal Year 2016. In absolute terms, the increase in the total public debt of the public corporations was $23,484

million, which, in turn, represented an increase of 100.5%. This way, in Fiscal Year 2016, the public corporations' debt was estimated at more than doubt what it was in fiscal year 2004.

The reality that has prevailed for years in public corporations is that the economic clauses negotiated in some collective bargaining agreements far outweighed what was established by law, thus compromising the fiscal stability of the government and at the same time placing at risk the jobs of public servants by creating unsustainable fiscal instability at this critical fiscal time. For example, many corporations agreed, even without the resources therefor, to pay overtime at the rate of double and of triple the salary of their employees. Likewise, many reduced the number of hours that had to be accrued to be able to receive economic compensation and not compensatory time.

In Puerto Rico, the right to compensation for overtime is contemplated in Section 16 of Article II, Bill of Rights of the Constitution. There it states that:

> "The right of every employee to choose his occupation freely and to resign therefrom is recognized, as is his right to equal pay for equal work, to a reasonable minimum salary, to protection against risks to his health or person in his work or employment, and to an ordinary-workday which shall not exceed eight hours. An employee may work in excess of this daily limit only if he is paid extra compensation as provided by law, at a rate never less than one and one-half times the regular rate at which he is employed."

Through this Law we repeal Section 10.2 of Law 8-2017, which establishes the method of remunerating overtime work that will be applicable to public employees, to integrate it into this Law and extend its application to the public corporations. The method established for remunerating overtime work set forth in this law establishes that employee will be entitled to receive overtime pay at the rate of time and a half. This way, it fully complies with what is set forth in our Constitution and in the Federal Law that governs the payment of overtime.

On the other hand, the Federal Labor Standards Act (FLSA), 29 U.S.C.S. §§ 201-219, regulates among other issues the payment of overtime and it applies to the public employees of the Government of Puerto Rico. Our Supreme Court has held that, as long as a state law is more beneficial to the employee than the provisions of the FLSA, federal law does not preclude the application of that law as it is not in conflict. The purposes of both laws are, under such circumstances, perfectly reconcilable. <u>Vega v. Yiyi Motos *[sic]*, Inc.</u>, 146 D.P.R. 373 (1998).

The FLSA establishes that employees are paid at time and a half (1.5) the regular rate for the period worked in excess of forty (40) hours per week. The FLSA also provides for the employees of a public agency to receive compensatory time at time and a half (1.5) the regular rate instead of the payment of overtime.

Part of the purposes of this Law is to ensure that the operating expenditures of public corporations be done efficiently, responsibly, and prudently, in order to reduce expenses permanently. The Government of Puerto Rico is urgently interested in controlling payroll expenses to safeguard jobs, the viability of public corporations, as well as its finances. The

precarious fiscal situation of the Government, its General Fund, and its Public Corporation requires establishing controls in payroll spending in excess of what is budgeted to safeguard the viability of the public corporations and, in turn, the workday of the public employees and their salaries.

Likewise, this Law establishes the fringe benefits that all public employees will enjoy during the period of fiscal crisis regardless of the agency or public corporation where they work. This way, the fringe benefits received by the public employees of different government agencies and by the public employees who work in different public corporations, who depending on the corporation in which they are, currently enjoy different fringe benefits, are equaled. Likewise, union public employees in different agencies and public corporations, depending on the collective bargaining agreement, have different fringe benefits even if they are in the same agency or public corporation. There is no reason whatsoever to justify while the fiscal crisis that Puerto Rico is undergoing remains and given the threat by the Oversight Board to eliminate the Christmas Bonus for all public employees and to reduce their working hours, to perpetuate a disproportionate and unreasonable inequality of fringe benefits agreed upon at a time when the fiscal situation of Puerto Rico was different and was not in a crisis of the magnitude that we have today.

As we stated above, in the past, our illustrious Supreme Court has upheld the validity of economic statutes enacted to deal with times of crisis or urgency in Puerto Rico and it has recognized "the possibility that, under emergency circumstances related to economic issues, the Legislature can make use of its ample powers." Domínguez Castro, *supra*, at p. 49 (2010) (cites omitted). Recently, the Honorable Court was also aware of the structural crisis of the Public Employees Retirement System and it upheld the constitutional validity of the statute that, to address this crisis, amended the Public Employees Retirement Act, Law No. 3-2013.

On its part, Article II, Section 7, of our Constitution provides that: "No laws impairing the obligation of contracts shall be enacted." Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tome 1. Said clause does not establish an absolute prohibition that impedes the power of regulation of the State on behalf of the public interest. Bayrón Toro, 119 D.P.R. at p. 619.

The constitutional guarantee against impairment of contractual obligations is only activated when the modification adversely affects the essential terms or conditions of the contract that mainly gave rise to the execution thereof, so that the reasonable expectations of the parties become frustrated. Domínguez Castro, *supra*. See, also, Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 (1978); El Paso v. Simmons, 379 U.S. 497 (1965). The reasonableness of the law is determined by considering primarily the substantiality of the public interest promoted by the statute and the magnitude of the impairment caused by its retroactive application. Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 396 (1973). If the impairment occurs as a result of a reasonable modification necessary to advance a public interest, the court will uphold its validity. Bayrón Toro, *supra*.

Even if the impairment is substantial, the constitutional prohibition is not absolute. The same must accommodate the power of reason of the state. Bayrón Toro, *supra*. When considering the validity of statutes under the impairment clause, the applicable criterion is that of

reasonableness. <u>Warner Lambert v. Tribunal Superior</u>, *supra*. Consequently, the function of the court consists in establishing a reasonable balance between the social interest of promoting the common good and the interest, also social, of protecting the contractual transactions versus the arbitrary and unreasonable application of the laws. *Id.*

Once it is determined that the impairment is substantial, then one must proceed to examine whether the modification seeks to advance an important interest on behalf of the general wellbeing. If the impairment arises as a result of a reasonable and necessary modification aimed at advancing a significant and legitimate public interest, the validity of the law will be upheld. <u>Bayrón Toro</u>, *supra*.

In <u>Buffalo Teachers Union v. Tobe</u>, 464 F.3d 362, 365 (2nd Cir. 2006), the Second Circuit ruled as follows with respect to the examination that an adjudicating forum must perform when assessing a complaint that invokes the constitutional clause regarding impairment of contractual relations:

> When a state is sued for allegedly impairing the contractual obligations . . . <u>the state will not be held liable for violating the Contracts Clause of the United States Constitution unless plaintiffs produce evidence that the state's self-interest rather than the general wellbeing of the public motivated the state's conduct</u>. On this issue, <u>plaintiffs have the burden of proof</u> because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern. (Underscoring ours.)

On the other hand, as a corollary to the doctrine of separation of powers, in assessing the necessity or reasonableness of the measure for purposes of the impairment clause, the Puerto Rico Supreme Court has held that, even though it is not warranted to give complete deference to the Legislator, "this does not mean that the judicial forum should not give any deference to the finding of necessity and reasonableness that the legislator made in the exercise of his constitutional power, especially when dealing with socioeconomic regulations." <u>Domínguez</u>, *supra*. Nor is it necessary to make a finding "*de novo* on the existence of other alternatives for the solution of the problem." *Id.*, at p. 89. Recently, this Court reiterated that "deference must be given to the Legislature's determination as to the necessity and reasonableness of the bill." <u>Trinidad Hernández v. ELA</u>, *supra*. In addition, with respect to the reasonableness of the bill, "it is an established norm that it is not up to the courts to make a *de novo* determination regarding the existence of other alternatives to solve the problem. The determination of the Legislature regarding the bills enacted is an exercise in public policy that merits [...] deference in this system of separation of powers." <u>Trinidad Hernández v. ELA</u>, *supra*.

Let us recall that, if it is understood that an impairment to a contractual relationship exists, a court must analyze whether the laws in question serves a <u>legitimate public purpose</u>. <u>Home Bldg. & Loan Ass'n</u>, *supra*, <u>U.S. Trust</u>, 431 U.S. at 25. The concept of *legitimate public purpose* has been defined as one whose purpose is to remedy "an important general, social, or economic problem rather than providing a benefit to special interests." <u>Buffalo Teacher's Federation</u>, *supra*. Note that it has been upheld that the economic and financial health of a state

is a legitimate interest of public importance. See, <u>Baltimore Teacher's Union v. City Council of Baltimore et al.</u>, 6 F.3d 1012, 1017 (4th Cir. 1993) (holding that a law that reduced salaries to balance the state finances did not violate the contractual impairment clause); <u>In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth.</u>, 375 N.E. 2d 384 (1978) (upholding the constitutional validity of a statute that froze municipal salaries given the fiscal emergency afflicting the state of New York); <u>Buffalo Teachers</u>, *supra* (the freezing of the teachers' salaries was upheld given a fiscal crisis).

Given this situation, the Government of Puerto Rico had to promise through the Fiscal Plan approved by the Oversight Board to implement certain measures in order to be able to safeguard the jobs of thousands of Puerto Ricans, that our employees' workday not be reduced as a result of having a reduction in their monthly salary of up to twenty percent (20%), and the total elimination of the Christmas Bonus. Among the measures that the Government promised to implement is, as we have indicated, standardizing the fringe benefits of all public employees; standardizing the payment of overtime of the Public Corporations to the Central Government, equaling the fringe benefits of the employees of the Central Government and those of the Public Corporations; eliminating the liquidation of excess accrued vacation and sick leave days; and specifically equating the vacation leave of public employees to that which employees in the private sector currently have.

In order to achieve the objectives of this Law and to do so in the least onerous manner for our public employees, it is established that the provisions applicable to leaves and fringe benefits will be of a temporary duration. The same will be restored as certified by the members of the Compliance Committee with the Fiscal Plan.

To be able to comply with the certified Fiscal Plan, the fringe benefit provisions set forth in Law 8-2017, known as the "Administration and Transformation of Human Resources in the Government of Puerto Rico Act," are hereby repealed and they are incorporated into this Law, extending their application to the employees of the Public Corporations. This way, as provided above, the fringe benefits and remuneration for overtime that all public employees may enjoy are equated, regardless of where they work. Similarly, the days that they can accrue per month for the concept of vacations are reduced and are equated to those that workers in the private sector currently have, reducing the vacation leave to fifteen (15) days. Finally, the payment for the concept of excess vacation and sick leave days is eliminated. However, it is mandatory that supervisors implement measures to ensure that our employees do not lose the accrued days and that they can enjoy them.

We cannot ignore the fact that, had the cut in the workday entered into effect immediately as the Oversight Board proposed, Puerto Rico's economy would have suffered a devastating blow with the elimination of the Christmas Bonus and the 20% reduction in the salaries of all of the public employees. It was because of this situation that the alternate means indicated above were established to be able to obtain the funds required without disrupting the employees' workday and their salaries.

<u>PROMESA and the Supremacy Clause</u>

On the other hand, it is important to reiterate the application and the mandate that the United States Congress, pursuant to its plenary powers over the Territory of Puerto Rico, imposed on us when it enacted the PROMESA Act that creates an Oversight Board on whom, within a series of entrustments, it conferred that of approving and supervising the execution of a Fiscal Plan for the economic stabilization of Puerto Rico.

This norm approved on May 4, 2016, establishes a supremacy clause, which we cite:

Sec. 1 ''Puerto Rico Oversight, Management, and Economic Stability Act'' or ''PROMESA''. (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act**. (Emphasis ours).

According to Art. 101 of the PROMESA Act, the Oversight Board, at its full discretion, whenever it considers it appropriate, may designate any territorial instrumentality as a covered territorial instrumentality and subject to the obligations of said Law. At this time, the Oversight Board has designated all of the public corporations as covered entities. On the other hand, according to Article 205 de PROMESA, the Oversight Board may submit at any time recommendations to the Governor or to the Legislature regarding actions that the territorial government should take to guarantee compliance with the fiscal plan or to promote in some other way financial stability, economic growth, administrative responsibility, and efficiency in the rendering of services. Having made the recommendations, the Governor will have to submit a statement indicating whether the government will adopt the recommendation. Should it not adopt it, the Governor must explain to the President of the United States and to Congress his reasons for not adopting them.

This being so, we must go over the tasks assigned to the Fiscal Oversight Board to monitor and ensure that the provisions of the approved Fiscal Plan are fulfilled.

Let us remember that PROMESA enjoys supremacy over any laws of the territory of Puerto Rico that are incompatible with the motives, responsibilities, entrustments, and objectives of the federal norm and the Oversight Board as the entity in charge of the execution thereof. With respect to the instant Law, the Board established that if the government is not able through the implementation of other expense reduction measures that generate sufficient funds and an additional cash reserve of $200 million, by June 30, 2017, a program will enter into effect, effective July 1, 2017, for the reduction of the workday of all public employees, which would represent a reduction in our employees' salaries of up to twenty percent (20%) of their monthly salary. Similarly, they establish that the total elimination of the Christmas Bonus for all public employees would be implemented. The Oversight Board's alternative to reducing the government workday is equivalent to four (4) days a month for most employees of the Executive Branch and two (2) days a month for teachers and first line personnel in institutions that operate 24 hours a day. Likewise, the Oversight Board has establishes that there may be reductions comparable to these savings by a partial reduction in the workday of the Executive Branch for other entities throughout the government, including the public corporations and instrumentalities and the Legislative Branch and the Judiciary. Just as our Governor has mentioned in multiple forums, a reduction in the workday is NOT an option. For this reason, we are taking these

precautionary measure so as not to have to reach that contingency imposed by the Oversight Board.

On the basis of this legal framework, this Legislature is convinced that the measures taken in this Law are necessary and reasonable to adequately address the fiscal, economic, and budgetary crisis that Puerto Rico is undergoing, and they represent a valid legislative exercise.

The actions taken in the instant Law and its application to all union or nonunion public employees who work in the Central Government and in the Public Corporations are not taken lightly. In balancing the interests, at this moment of crisis we understand that the fringe benefits must be tempered to the needs of the times and to the fiscal and structural crisis the Government of Puerto Rico is facing. Given the new state of Law created with the enactment of the PROMESA Act and the arrival of the Oversight Board, this Law constitutes a reasonable, equitable, uniform, and necessary means to confront the current crisis and it is the only option that the Government of Puerto Rico has to be able to comply with the Fiscal Plan certified by the Oversight Board and avoid the imposition of a reduction in workday for our public employees which would be equal to a reduction of their monthly salaries by twenty percent (20%) and, at the same time, the complete elimination of the Christmas Bonus. This Law is promulgated under the authority of this Legislature to enact and promulgate economic legislation aimed at promoting the wellbeing of the Puerto Rican community.

### Extraordinary Dividends to the Compulsory Insurance Joint Underwriting Association

The Compulsory Liability Insurance Joint Underwriting Association (ASC, by its Spanish acronym) was created through Law 253-1995, as amended, as part of the compulsory liability insurance for motor vehicles system that was established since then in Puerto Rico. The purpose of such insurance was to make viable a solution to the problem of damages caused to motor vehicles of third parties as a result of a traffic accident, according to the applicable claim requirements.

From the outset, the compulsory insurance coverage that said law established had a cap of three thousand dollars ($3,000). This cap was increased in 2009 pursuant to Law 201-2009, to four thousand dollars ($4,000). It should be noted that notwithstanding this thirty-three percent (33%) increase in coverage, the insurance premiums, which have a value of ninety-nine dollars ($99) for private passenger vehicles and one hundred forty-eight dollars ($148) for commercial vehicles, remained unaltered.

Since the increase in coverage in 2009, the cost of goods and services in general has continued to increase and the automobile industry has not been exempted from these increases. Thus, the cost of vehicle parts and repairs today is higher than eight (8) years ago. That is why this administration feels it is pertinent that the compulsory insurance coverage be increased to four thousand five hundred dollars ($4,500). Consistently *[sic]* with this increase, the ASC is authorized to revise the cost of the premiums on or before June 30, 2017.

Case:17-03283-LTS Doc#:17008-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 18 of 73
*CERTIFIED TRANSLATION*                                                    by: Olga M. Alicea, fcci, njitce-s

On the other hand, the conditions under which the ASC operated since its inception led to a substantial increase in its capital. Given that the ASC was the sole provider of compulsory motor vehicle liability insurance, it was necessary to maintain a significant capital reserve to cover its operations and to comply with the reserve required by the Insurance Code. For this reason, through Law 60-2013, the declaration of an extraordinary dividend was authorized, accompanied by an incentivized tax, which allowed the generation of an additional one hundred million dollars ($ 100,000,000) in revenues. Likewise, pursuant to Law 157-2015, another extraordinary dividend of forty two million dollars ($42,000,000) was authorized, also accompanied by a special tax. However, as a result of the opening of the market to competition for other insurance companies to be able to offer the service, at the driver's choice, it is unnecessary for the ASC to maintain such a high amount of capital reserves to which the Members of the ASC do not have access, who are the same companies that compete with this entity to offer the compulsory insurance service..

This Law authorizes the declaration of an extraordinary dividend, accompanied by the corresponding incentivized tax. Once the dividend was declared by the members of the ASC, the government would receive the sum of seventy million dollars ($70,000,000).

Unlike the previous administration, which used the funds obtained by laws similar to this one to distribute among some entities that, although many pursued laudable purposes, others led to an unnecessary waste of funds, through this Law we intend to address the Government of Puerto Rico's lack of liquidity to protect the services offered to the citizens, jobs in the public sector, the income of the members of retirement systems, among other similar purposes.

Wherefore, this Legislature authorizes the ASC to declare an extraordinary dividend of seventy million dollars ($70,000,000) from its capital reserves accompanied by a special tax of fifty percent (50%). This way, the ASC will remit the sum of thirty-five million dollars ($35,000,000) that will support the General Fund of the Government of Puerto Rico.

<u>Transfer of Profits from the Public Corporations to the General Fund</u>

One of the measures of major significance that this administration has been able to enact is the "Puerto Rico Financial Emergency and Fiscal Responsibility Act," Law 5-2017. It declares as a public policy of the Government of Puerto Rico "to take all necessary measures for Puerto Rico to establish the necessary fiscal responsibility within the Government and its instrumentalities to satisfy its obligations and to guarantee that the essential government services are provided for the health, safety, and wellbeing of the residents of Puerto Rico." Similarly, said Law declares that the government may "exercise its power of reason of state in a way that recognizes the responsibility of satisfying the financial obligations of the Government of Puerto Rico and its instrumentalities while continuing to provide essential government services for the health, safety, and well-being of the residents of Puerto Rico in light of the limited resources available to the Government of Puerto Rico and its instrumentalities." In other words, the government will take all necessary steps to ensure that the needs of the people are duly served.

Law 5-2017 emphasizes that as a result of the continued financial emergency and the enactment of PROMESA, the Legislature has the responsibility to exercise its power of reason of

state.  In that sense, it points out that the responsibility of meeting the financial obligations of the Government of Puerto Rico and its instrumentalities must be acknowledged while continuing to provide essential government services to safeguard the health, safety, and well-being of the residents of Puerto Rico given the limited resources available from the Government of Puerto Rico and its instrumentalities, all in a manner consistent with PROMESA.

Pursuant to the foregoing, Law 5-2017 empowers the Governor to issue executive orders to require the use of available resources to pay for essential services as the Governor deems necessary to protect the health, safety, and wellbeing of the residents of Puerto Rico and to establish priority standards for the disbursement of public funds when the resources available for the fiscal year are insufficient to cover the allocations made for that fiscal year, among other measures.  This, in view of the limitation of the State's resources.

Given the aforementioned fiscal and economic situation, it is clear that the Government of Puerto Rico must take steps to comply with the Fiscal Plan without affecting the essential services that the citizens receive.  This requires maximizing the use of the available state resources, including the resources of the public corporations.  That is why this legislation orders the public corporations and instrumentalities of the Government of Puerto Rico to transfer to the Department of the Treasury the necessary funds to guarantee the government's liquidity.

The determination of the amount to be contributed by each of the public corporations will be determined by a committee comprised by the Executive Director of the Puerto Rico Financial Advisory and Fiscal Agency Authority (AAFAF, by its Spanish acronym), the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget (OGP, by its Spanish acronym).  For that, the committee will take into consideration the surplus that each corporation has after its operating expenses have been covered and that the services offered by these entities are not affected.  Those funds will be deposited in the General Fund of the Government of Puerto Rico in order to have the liquidity required in the Fiscal Plan.

Wherefore, pursuant to the fiscal and economic emergency that Puerto Rico is undergoing, in the exercise of its power of reason of state, this Legislature acknowledges the need to remedy the financial emergency by promoting the mechanisms set forth In this Law to ensure the liquidity of the Government of Puerto Rico, using the resources available in the public corporations, without this representing a disproportionate burden for the citizens, or affecting the essential services that the government provides.

<u>Disposal of Real Estate of the Executive Branch</u>

On the other hand, the economic and fiscal crisis that the Government faces has affected the entire spectrum of our infrastructure, including our real estate.  The Executive Branch comprised of its agencies, entities, and public corporations has countless real properties in disuse that can be sold to the private sector for various purposes.  Many of the properties have been without any public utilities for years.  However, they have ample spaces in strategic places that can very well be maximized by private industry or trade to develop their activities.  Some properties can even serve to build or be equipped as a residence or for non-profit entities.

Unfortunately, in Puerto Rico there is no coherent and uniform public policy that encourages the efficient, effective, and coordinated sale of real estate of the State. In that sense, it is necessary to establish a legal framework that facilitates the movement of the state real estate market and provides certainty to the transactions of these assets. There would be multiple benefits: on the one hand, the Government will be able to collect more money from the disposal of the inventory of real estate and have more liquidity to mitigate the fiscal crisis it faces; inject into the market an ingredient of economic activity by allowing the private sector to become involved in the acquisition of State property for commercial or residential uses and to function as a generator of jobs; promote social wellbeing given the possibility that properties can be acquired by non-profit entities to offer social services, etc. In short, the possibilities are endless.

Thus, it is important to have an adequate model that propitiates the disposal of real property within a framework of fair competition where the public wellbeing and interest are placed as the standard bearer of each transaction. Therefore, this Law creates the Committee for the Evaluation and Disposal of Real Estate and empowers it to carry out all acts necessary to achieve the disposal of the real estate. This in keeping with the best interests of the State as seller, the buyer, and the general citizens. This Law establishes the general precepts that will guide the approval of regulations and norms that standardize the processes for the sale of property and will give greater certainty to the transactions.

This bill represents one more step in the direction of recusing our People and of overcoming the bad decisions of the past. We have an unwavering commitment to strengthen the component of economic activity. We are sure that the plan established here provides the mechanisms necessary to strengthen the real estate market and to provide more resources to the State in order to confront the crisis and comply with the Fiscal Plan. That is our goal and nothing will stop us.

## Government Accountability Act and Special Funds

The Government of Puerto Rico's financial policy established in Law No. 230 of July 23, 1974, as amended and known as the "Government of Puerto Rico Accountability Act," in connection with the control and accounting of funds and public property requires that the accounts of the Government of Puerto Rico clearly reflect the results of its financial operations, provide the necessary financial information for the administration of government operations and for the preparation and execution of the budget, and provide effective control over revenues, disbursements, funds, property, and other government assets. Likewise, a public policy is established that no special funds or exclusive sources of repayments are to be established for certain particular purposes without considering the public wellbeing. This will allow us to carry out government programs examining the essential services, that the allocation of funds for different government programs be limited to the attentions of a single economic year; and that all Government collection are to be paid into the general fund of the state treasury in order to pay for the Government's programs to the extent and scope the Legislature deems necessary and in accordance with the items established in the approved Fiscal Plan. Unfortunately, over the years, a number of measures have been adopted which have bypassed the above and have created multiple special funds for different programs by distorting the mandate of the Accountability Act.

This Administration is committed to taking all necessary actions so that the Government can meet its obligations and comply with this public policy. The fiscal situation we are undergoing requires that we exercise greater transparency and fiscal responsibility in our expenditures, so that we can achieve fiscal stability and a balanced budget, all of which will lead us toward our economic recovery.

Within the analysis of Government finances, special allocations have been found for a specific purpose or activity and for which the time period of more than one (1) year has been exceeded without the same being used. Allocations have also been identified without being designated a given year, but with annual recurrence without legal grounds. This leads to expenses that are charged against these allocations in future fiscal years, the cash flow of the Department of the Treasury being destabilized without having control over the time and use that is given to such allocations, and, in addition, Is in contravention of the public policy set forth in Law No. 230, cited above.

Given the serious fiscal situation the government is confronting, it is fundamental to implement a new methodology for the development, preparation, and execution of the government budget, which will allow reducing significantly government spending without diminishing the quantity and quality of the services rendered, eliminating inefficient services and Inadequate or obsolete programs. In this sense, the Zero Base Budget is a budgetary strategy and fiscal policy whose main objective is to ensure that a government cannot spend more than it collects, thereby limiting the rise in the public debt and ensuring the short and long term sustainability of the public finances. With the Zero Base Budget implemented by this Administration, each department, agency, or instrumentality of the Government of Puerto Rico must document and justify each program that will be incorporated into and supported by the Government budget, based on the social and economic benefit and in consideration of the available resources. This mechanism entails an annual review of all programs and expenditures of the Government's departments, agencies, or instrumentalities starting from zero without taking into consideration the allocations of previous years. This facilitates the search for new ways to offer more efficient and effective services that allow an improvement in the quality of the services, the elimination of duplication in the offer of services, and a reduction in expenditures.

Similarly, there are a number of special funds created by Law for private purposes. These funds are disorganized and under the control of the government units to which they were assigned. Given this framework, the Secretary of the Treasury currently has direct access to only 65% of the funds of the Government of Puerto Rico, since the other special funds are in accounts in each executive agency without going through the fiscal supervision of the Secretary of the Treasury. This lack of clarity results in poor supervision by the government tax agencies to have full control of the Treasury. With this Law, we provide that the special funds go to the General Treasury and not to individual accounts for private purposes, so that the Secretary of the Treasury can have better dominion and control and to be able to apply the priority of payment that begins with the essential services to our People.

In accordance with all of the foregoing, this Legislature considers it necessary to amend Law No. 230 of July 23, 1974, as amended and known as the "Government of Puerto Rico

Accountability Act" in order to temper it to the best fiscal practices that have been developed In the past years in the continental United States and in the rest of the world. To that end, we consider it important to clarify the meaning of a special allocation and limit its use to a period of one (1) year. Once it fulfills its purpose, or if it is not claimed during its term, this allocation will revert to the General Fund. This way, we continue to improve the services to our citizens and to revitalize the economy of Puerto Rico while complying with the fiscal control mechanisms required by the Certified Fiscal.

Government Procurement Reserves Act

Recognizing that the strengthening of our economy and the creation of jobs are fundamental objectives of the public policy of the Government of Puerto Rico, different pieces of legislation have been enacted aimed at stimulating the development of the local economy. As part of this legislation, we find Law 129-2005, which created the Government Procurement Reserves Act, which was adopted as a mechanism so that the components of the local economy can participate effectively in the government's procurement market and to stimulate job creation and local investment. This Law seeks to give preferential patronage in Government procurement to the very important sector of small and medium-sized enterprises ("Pymes," by its Spanish acronym), helping them increase their sales as an effective strategy for economic development and job creation.

However, given the grave fiscal situation the government is confronting, we believe that it is fundamental to make adjustments in the development, preparation, and execution of the government budget, which will allow a significant reduction in government spending without reducing the quantity and quality of services rendered. With this in mind, we have evaluated all of the economic legislation that has an impact on the general budget of the agencies of the Executive Branch, in order to establish the necessary steps to temper it to our current economic reality.

To this end, this Legislature considers it necessary to amend Law 129-2015 in order to temper it to the fiscal situation that the public finances are going through. To that end, we must fix at twenty percent (20%) the item of the general budget of the instrumentalities of the Government of Puerto Rico allocated to procurement for purchases by micro, small, and medium enterprises, until the fiscal situation of Puerto Rico allows the increase to be applied. Our purpose is to continue contributing to this important sector while at the same time responsibly confronting our fiscal reality and complying with the goals set forth in the Fiscal Plan approved by the Board so that we can aim toward economic recovery.

Taxes on Cigarettes and Tobacco Products

In view of the need to bring in more revenues in order to comply with the Fiscal Plan, to protect public jobs and our most vulnerable sectors, we propose a reconfiguration of the taxes applicable to cigarettes, smokeless tobacco, tobacco products, as well as electronic cigarettes. With this reconfiguration of the taxes applicable to these products, the tax base increases and the current rates rise to fulfill a dual purpose: in addition to raising funds to balance the budget and comply with the parameters set forth in the Fiscal Plan, we also manage to discourage cigarette

consumption and the purchase of tobacco, which, as is known, is detrimental to the public health and is associated with the increase in the incidence of diseases in the airways and of different types of cancer.

One of the causes of death of most concern among the population is due to the use of tobacco. However, this cause is highly preventable. The United States Surgeon General's report on "The Consequences of Smoking on Health" confirms that smoking is related to twenty-nine (29) chronic diseases, such as cancer of the gallbladder, cervix, esophagus, kidneys, larynx, lungs, oral, pancreas, stomach, leukemia, cardiovascular diseases, among many others. It also indicates that tobacco smoke can produce blood clots, heart attacks, and sudden strokes. Recently, more diseases have been found caused by the use of cigarettes, such as liver and color *[sic]*-rectal cancer, diabetes, arthritis, inflammation, and deterioration of the immune function. See, Executive Summary of the Report of the Surgeon General of the United States, <u>The Health Consequences of Smoking – 50 Years of Progress</u>, p. 2 (2014).

In fact, in the period 2005-2009, smoking was the cause of more than 480,000 premature deaths annually in people 35 years of age or older in the United States. In turn, more than 87% of lung cancer deaths, 61% of deaths from lung disease, and 32% of deaths from coronary heart disease were attributable to smoking and exposure to secondhand smoke. *Id.*, p. 3.

On its part, the Center for Disease Control and Prevention (CDC) notes that by 2016, the greatest cause of death, disability, and preventable diseases in the United States is a result of the use of tobacco. Every year nearly half a million Americans die prematurely from smoking or being exposed to cigarette smoke, and another 16 million live with serious illnesses caused from smoking cigarettes. In addition, cigarette smokers have to be absent from work more, visit their doctors more, be hospitalized more frequently, and die 10 or 12 years earlier than people who are non-smokers. The foregoing, not to mention that to treat cigarette-related diseases, the United States spends almost 170 million dollars annually. See, https://www.cdc.gov/chronicdisease/resources/publications/aag/tobacco-use.htm.

The indirect impact of smoking is also highly detrimental to one's health. Specifically, exposure to secondhand smoke has a harmful effect on children. It has been linked to sudden infant death syndrome, acute respiratory diseases, ear infections, and asthma attacks. What is most disturbing is that about 25% of people who do not smoke in the United States (approximately 58 million) are exposed to secondhand smoke, including 15 million children between the ages of 3 and 11. *Id.*

According to data from the CDC, by 2015 in the United States about 15.1% of the population over 18 years of age smoked cigarettes, which is estimated at 36.5 million people. Of these, 16.7% are men and 13.6% are women. In Puerto Rico, although the percentage is lower, it still exceeds the double digit. Puerto Rico Department of Health statistics show that by 2015, 10.7% of the general population 18 years or older smoke cigarettes regularly. Of these, 15.7% are men and 7.4% are women. This is a significant percentage if we take into consideration the effect of secondhand smoke. We must add to the above that the government has to incur significant costs due to the health consequences of smoking.

At present, each pack of cigarettes pays $3.40 in taxes, which, for Fiscal Year 2014-2015, resulted in a collection of $156 million by way of such tax. However, our government spends $19.16 on health costs and lost productivity for every pack of cigarettes consumed, which translates to $924 million. That is, the Government spends $15.76 more than it collects for each pack of cigarettes sold to address the consequences of the use of cigarettes, which means a global difference of $768 million. As a result, raising tobacco taxes is seen as an extremely cost-effective measure to improve public health and to obtain short and long term fiscal revenues.

On the other hand, the World Health Organization's Scientific Advisory Committee on Tobacco Product Regulation has stated that the consumption of non-smoking tobacco is an important part of the general tobacco problem in the world. In its report on smokeless tobacco, the following potential harm exists: (a) its use may encourage individuals to use such products, in addition to continuing smoking; b) the use of non-smoking tobacco products increases the chances of subsequent initiation of smoking; (c) children who have not yet started smoking may begin to use tobacco through easy access to smokeless tobacco; (d) the possibility that "smokeless tobacco" produces considerable long-term harm to the health of its consumers and the increased risk of developing oral cancer cannot be ruled out; and e) the risks of creating addiction are considerable since they mostly have dangerous components such as nicotine and nitrosamines. Similarly, the Surgeon General of the United States of America has determined that the use of "smokeless tobacco" can cause, in addition to oral cancer, gum-related diseases, and conditions. According to the report titled "The Health Consequences of Using Smokeless Tobacco: A Report of the Advisory Committee to the Surgeon General," the prolonged use of "smokeless tobacco" results in an increased risk of suffering oral lesions such as leukoplakias both in adolescents and in adults.

It is and has been the public policy of the Government of Puerto Rico to take steps to promote the prevention and cessation of the use of tobacco. One of the modalities that promotes the prevention and cessation of the use of tobacco are measures related to the implementation of taxes on products derived from tobacco, either smokable or not.

Consonant with the foregoing, this Legislature finds it meritorious that for the fight against nicotine addiction, for the costs of medical services to patients for diseases related to and created by addiction to tobacco products, for the obvious cost and losses In labor productivity and in the economy in general, and for the need to bring in more revenues to the treasury to comply with the Fiscal Plan and avoid cuts that may affect our most vulnerable sectors, the current tax on smokeless tobacco and on cigarettes should be increased.

<u>Emergency Fund</u>

Law No. 91 of June 21, 1966, as amended, creates the Emergency Fund, with the purpose of gathering the necessary resources to confront unexpected and unforeseen public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods, plagues, and in order to protect the lives and property of the people, and the public credit.

Among other provisions, Law No. 91, cited above, establishes that the resources allocated to the Emergency Fund could finance the operating expenses of the State Emergency

Case:17-03283-LTS Doc#:7008-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 25 of 73
*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

Management and Disaster Administration Agency; that said Fund will be financed annually by an amount not less than one fifth of one percent (0.2%) of the total of the Joint Resolution of the Budget; that said contribution will amount of not less than one percent (1%) of the total net income from the previous fiscal year; and that the balance thereof will never exceed one hundred fifty million dollars ($150,000,000), whichever is greater. However, in this last decade it has been repeatedly legislated that the Emergency Fund not be supported during certain fiscal years. What began as a transitional measure initiated in Fiscal Year 2006-2007 became a measure that has since been repeated continuously in most fiscal years.

This Administration acknowledges that, given the grave fiscal situation the government is confronting, it is fundamental to implement a new methodology for the development, preparation, and execution of the government budget, which allows a notable reduction in the State's expenditures without reducing the quantity and quality of the services provided, eliminating inefficient services and inadequate or obsolete programs.  In this sense, it is important to establish and maintain a liquid reserve to meet unexpected and unforeseen public needs, such as those initially described, but considering that the contribution to said Fund must be done according to the fiscal situation.  In view of this, it is established that the contribution to the Emergency Fund in the amount of ten million dollars ($10,000,000) will remain fixed until Fiscal Year 2020-2021.  In addition, as of Fiscal Year 2020-2021, such contribution will be not less than zero point five percent (0.5%) of the estimate of net revenues submitted by the Department of the Treasury for the preparation of the Recommended Budget charged to the General Fund.

In accordance with the foregoing, this Legislature considers it necessary to amend Law No. 91 of July 21, 1966, as amended and known as the "Emergency Fund" to achieve a more efficient use of available resources and to guarantee the availability thereof to deal with emergency or disaster situations that affect the Island during this period of years.

<u>The Road to Recovery Has Begun</u>

Although there are many obstacles to overcome on the road to recovery, there is hope and optimism in our people.  There is a new dawn in our homeland and we cannot disappoint Puerto Rico.  We must take advantage of this moment to face the challenges, and to look for the great changes that Puerto Rico needs.  We must face the crisis as a great challenge, which we can translate into great opportunities.  That is the challenge that can lead us to build a fairer, more dignified and progressive society.  Therefore, Law 7-2017 is the most important step toward the economic, social, and political recovery of Puerto Rico in leading a process of immediate decolonization of the Island.

We now begin a process to transform the Government into a more efficient one, rehabilitating its finances, and regaining the lost trust and credibility.  We are going to have a Government that eliminates the losing expenditures.  A more agile government that can be accountable.  A government where every tax dollar is seen in actions and services to the People.  Now we rise with more force than ever, to live in a society where opportunities are accessible to every child of this land and where we are all proud to honored our homeland.

*BE IT DECREED BY THE PUERTO RICO LEGISLATURE:*

## CHAPTER 1.-INITIAL PROVISIONS

Article 1.01.-Title.

This Law will be known and may be cited as the "Fiscal Plan Compliance Act."

Article 1.02.-Prevalence of this Law

This Law is enacted in its entirety in the exercise of the power of reason of the State, as well as in the constitutional authority that the Legislature has, recognized in Article II, Sections 18 and 19 of the Puerto Rico Constitution, of enacting laws to protect the life, health, and wellbeing of the people, as well as in cases of serious emergency when clearly the public health, security, and essential government services are at risk, as well as under Sections 7 and 8 of Article VI of the Puerto Rico Constitution. Likewise, this Law is enacted pursuant to the acts that are required of Puerto Rico as a territory of the United States under the Federal *Puerto Rico Oversight Management and Economic Stability Act* (PROMESA) and of the Fiscal Plan approved by the Fiscal Oversight Board. For this reason, this Law will have prevalence over any other law.

As of the date of enactment of this Law, all organic acts, general or special acts, article or sections of law, norms, clauses and/or provisions of collective bargaining agreements, agreements, supplementary agreements, administrative orders, policies, employment manuals, circular, certifications, regulations, employment rules and conditions, normative letters, classification or compensation plans, contractual letters, and/or provisions applicable exclusively to fringe benefits that the union or nonunion public officials or employees of the Government of Puerto Rico, including all union or nonunion employees of the Public Corporations of the Government of Puerto Rico that are contrary to the provisions of this Law are vacated. This does not eliminate the right of unions to negotiate working conditions, wages, and other non-economic conditions not contained in this law according to the current legal system.

Article 1.03.-Termination of Fiscal Measures

The Fiscal Plan Compliance Committee is authorized, after determining that the fiscal status has stabilized and that the condition of the public treasury so permits, to increase the benefits granted in this Law and to set aside the fiscal responsibility measures contained in Chapter 2.

## CHAPTER 2.-FRINGE BENEFITS OF THE PUBLIC OFFICIALS OR EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO

Article 2.01.-Applicability

All of the provisions contained in this Law will be applicable to the Entities of the Executive Branch of the Government of Puerto Rico, except when any particular provision expressly excludes an entity. For purposes of this Law, the term "Entity of the Executive

Branch" will be deemed to include all of its agencies, as well as the instrumentalities and public corporations of the Government of Puerto Rico, regardless of the degree of fiscal or budgetary autonomy that otherwise is conferred by its organic act or other applicable legislation.  The University of Puerto Rico will be exempt from the application of this Law.

Article 2.02.-Municipalities

The municipalities will be exempt from the application of this Chapter.  However, they are authorized to adopt its provisions through prior approval of a Municipal Ordinance to those ends.

Article 2.03.-Declaration of Public Policy

Reaffirmed is the Declaration of Public Policy of Law 3-2017, known as the "Law to Address the Economic, Fiscal, and Budgetary Crisis to Guarantee the Operation of the Government of Puerto Rico," which establishes that fiscal responsibility is the key for Puerto Rico to recover its credibility before investors and the financial markets, restore its credit, and return to the patch of responsible handling of the debt and of its finances, achieving an efficient restructuring thereof.

Discipline, control, and reduction of expenses in the agencies, departments, and public corporations of the Government of Puerto Rico are established as a public policy of the Government of Puerto Rico.

The Government of Puerto Rico recognizes the disparity that exists between the fringe benefits that employees of the Central Government receive and those who work in public corporations.  To keep public jobs without dismissals it is necessary to make adjustments to fringe benefits expenses, while Puerto Rico is immersed in the fiscal crisis that afflicts it.  To those ends, this Law promotes the equality and uniformity of fringe benefits that all public officials and employees can enjoy.  All of the agencies and instrumentalities comprised within the Government of Puerto Rico have the responsibility of ensuring that enjoyment of fringe benefits responds to the legislative interest that justified the granting thereof and that is carried out in accordance with an appropriate balance between the employee's needs and the optimum use of the available resources, taking into account the historic moment we are experiencing.

The public policy adopted by his Law guarantees the continuity of public management in essential areas of health, safety, education, social work, and development, among others, as well as the rendering of necessary and indispensable services to the citizens and protecting the jobs of thousands of public officials and employees of the Government of Puerto Rico, while protecting the most vulnerable citizens.  For this reason, and in compliance with the Fiscal Plan approved according to the Federal PROMESA Law, the fringe benefits of the public employees are standardized in order to achieve additional savings.

In order to achieve the objectives of this Law and to do so in the least onerous manner for our public employees, it is established that the provisions of Articles 2.04, 2.05, 2.08 to 2.11, and 2.18 will be of temporary duration and their validity will cease during the next fiscal year after

the Government of Puerto Rico has achieved a balanced budget and overcome the economic crisis. This consideration, we believe, creates a fair balance between the objectives of complying with the Certified Fiscal Plan and the interest to preserve social justice that frame the protection of the benefits received by our public sector workers. The same will be restored as may be certified by the members of the Fiscal Plan Compliance Committee.

For purposes of this Law, the Fiscal Plan Compliance Committee will consist of a representative appointed by the Governor, a representative appointed by the Speaker of the House of Representatives, and a representative appointed by the President of the Puerto Rico Senate. This Committee will establish through regulations its rules and internal operations.

Article 2.04.-Fringe Benefits

The Government of Puerto Rico is responsible for ensuring the enjoyment of the fringe benefits granted to employees and that the same are enjoyed in accordance with a plan that maintains an adequate balance between service needs, employee needs, and the responsible use of available resources. In order to maintain a uniform, responsible, reasonable, equitable, and fair human resources management, the following are the fringe benefits that may be enjoyed by public officials or employees, union or non-union, of the Government of Puerto Rico, including the public corporations, subject to the provisions of Article 2.03 of this Law.

The fringe benefits of the employees of the Executive Branch will be the following:

1. Vacation Leave
   a. As of the effectiveness of this Law, all public employees will have the right to accrue vacation leave, at the rate of one and a quarter (1¼) days for each month of service. Because they are excluded from the Single Employer system created under Law 8-2017, this provision will not apply to teaching staff and school principals, except for the managerial and administrative personnel of the Department of Education, to the teaching staff of any educational entity of the Government of Puerto Rico, and to the law enforcement officers of the Puerto Rico Police who will continue accruing the vacation leave they enjoyed prior to the enactment of this law.
   b. Vacation leave will begin to accrue once the employee completes three (3) months employment and will be retroactive to the date of commencement of employment. Employees at reduced or part-time regular hours will accrue vacation leave in proportion to the number of hours during which they regularly provide services.
   c. Vacation leave may be accrued up to a maximum of sixty (60) business day at the conclusion of any natural year.
   d. Vacation leave is granted to the employee to provide a reasonable period of annual rest. As a general rule, it should be enjoyed during the calendar year in which it was accrued. Each public agency or instrumentality is required to formulate a vacation plan, for each natural year, in coordination with supervisors and employees, which establishes

the period within which each employee will enjoy his vacation, in the manner that is most compatible with the needs for service. Said plan must be established no later than December 31 of each year to enter into effect on January 1 of each subsequent year. It will be the responsibility of the public agencies, instrumentalities, and all employees to strictly comply with said plan. Exceptions may only be made for a duly certified clear and unavoidable need for service.

e.    The public agency or instrumentality is required, diligently and strictly in accordance with the provisions of this Law, to formulate and manage the vacation plan so that employees do not lose vacation leave at the end of the natural year and they enjoy their regular vacation leave.

f.    Every employee will be entitled to enjoy his vacation leave for a period of fifteen (15) business days during each calendar year of which not less than ten (10) days must be enjoyed consecutively.

g.    Employees who cannot enjoy vacation leave during a given natural year due to service needs, evidenced in written form and at the request of the public agency or instrumentality, are exempt from the provisions of subparagraph (e) of this Article. In this case, the public agency or instrumentality is required to make the necessary adjustments so that the employee can enjoy at least the excess leave accrued over the limit of sixty (60) days, as soon as possible, within the term of the first three (3) months of the next calendar year.

h.    The public agency or instrumentality will be required to provide for the enjoyment of the accrued vacation leave, prior to the processing of any separation that constitutes a total and absolute separation from service and to the process of a change to go on to provide services at another public agency or instrumentality.

i.    Normally, vacation leave will not be granted for a period of more than fifteen (15) business days in each natural year. However, the public agency or instrumentality may grant vacation leave in excess of fifteen (15) business days, up to a maximum of fifty (50) days, in any natural year, to those employees who have accrued leave. In granting such leave, consideration will be given to the service needs and other factors, such as the following:

1.    the use of said leave for the employee's personal improvement activities, such as trips, studies, etc.;

2.    an employee's prolonged illness after exhausting the balance of sick leave;

3.    an employee's personal problems that require his personal attention;

4.    if the enjoyment of the leave has been cancelled due to service needs and a request by the agency;

5.    the employee's total accrued leave.

j.    Under special circumstances, vacation leave may be advanced for regular employees who have served the Government of Puerto Rico for more than one (1) year, when it is certain that the employee will be reinstated to

Case:17-03283-LTS Doc#:7008-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 30 of 73
*CERTIFIED TRANSLATION*                    by: Olga M. Alicea, fcci, njitce-s

service.  The vacation leave so advanced may not exceed fifteen (15) business days.  The granting of advanced vacation leave will in any event require the prior written approval of the Appointing Authority.  Any employee who has been given advanced vacation leave and who is separated from service, voluntarily or involuntarily, before providing services for the necessary period required to accrue the totality of the advanced leave will be required to reimburse the Government of Puerto Rico for any sum of money that has been paid to him for the concept of such advanced leave.

k.   In the case of an employee who is granted an unpaid leave, it will not be necessary for the employee to exhaust the vacation leave that he has accrued before using the unpaid leave.

l.   When enjoyment of an employee's accrued or advanced vacation leave is authorized, the payment in advance of the wages corresponding to the leave period may be authorized as long as the employee requests it sufficiently in advance.  Such authorization must be made immediately after approval of the leave.

m.   One or more public employees may assign, on an exceptional basis, to another public employee who works in the same government entity accrued vacation days, up to a maximum of five (5) days, as provided in Law 44-1996, as amended, known as the "Assignment of Vacation Leave Act," when:

1.   The assignee employee has worked continuously, the minimum of one (1) year, with any government entity;

2.   The assignee employee has not engaged in a pattern of unjustified absences, violating the government entity's rules;

3.   The assignee employee has exhausted all of the leaves to which he is entitled, as a result of an emergency;

4.   The assignee employee or his representative proves, faithfully, the emergency and the need to be absence for days in excess of the leaves already exhausted;

5.   The assignor employee has accrued a minimum of fifteen (15) days of vacation leave in excess of the number of days of leave to be assigned;

6.   The assignor employee has submitted in writing to the government entity where he works an authorization agreeing to the assignment, specifying the name of the assignee;

7.   The assignee employee or his representative accepts, in writing, the proposed assignment.

2.   Sick Leave

a   Any employee who has been hired in the Government of Puerto Rico before Law 8-2017, known as the "Puerto Rico Human Resources in Government Administration and Transformation Act," entered into effect

will be entitled to accrue sick leave at the rate of one and a half (1½) days for each month of service.

b.    Any employee who has been hired in the Government of Puerto Rico after Law 8-2017, known as the "Puerto Rico Human Resources in Government Administration and Transformation Act," entered into effect will be entitled to accrue sick leave at the rate of one (1) day for each month of service.

c.    Employees at regular reduced hours or part-time hours will accrue sick leave in proportion to the number of hours they render services regularly.

d.    Sick leave will be used when the employee is sick, disabled, or exposed to a contagious disease that requires his absence from work to protect his health or that of other persons.

e.    Every employee may have up to a maximum of five (5) days a year of accrued sick leave, provided he maintains a minimum balance of twelve (12) days to request a special leave in order to use the same in:

    1.    The care and attention due to illness of his sons or daughters.

    2.    Illness or errands for elderly or disabled persons within the family, meaning fourth degree of consanguinity, second of affinity, or persons living under the same roof, or persons for whom the employee has custody or legal guardianship.

        Provided that the steps taken must be consonant with the purpose of the sick leave; that is, the health-related care and attention of the persons comprised herein.

        a)    An "Elderly Person" will mean any person who is sixty (60) years old or more;

        b)    "Personas with disabilities" will mean any person who has a physical, mental, or sensorial disability that substantially limits one or more essential life activities.

    3.    The first appearance of any petitioner, victim, or plaintiff in administrative and/or judicial proceedings before any Public Department, Agency, Corporation, or Instrumentality of the Government of Puerto Rico, in cases of petitions for child support, domestic violence, sexual harassment in employment, or discrimination by reason of gender. The employee must present evidence issued by the competent authority that confirm such appearance.

f.    Sick leave may be accrued up to a maximum of ninety (90) business days at the end of any natural year. Sick leave will begin to accrue once the employee fulfills three (3) months on the job and it will be retroactive to the date of commencement of employment.

g.    The public agency or instrumentality is required to, diligently and in strict compliance with the provisions of this Law, carry out all adjustment necessary for the employee to be able to make use of the totality of the sick leave he has accrued during any natural year at the moment it is

needed. The employee may make use of all sick leave he has accrued during any natural year.

h.    When an employee is absent from work due to illness for more than three (3) days, he may be required to present a medical certificate, that confirms:

    1.    that he was actually sick, exposed to a contagious disease, or impeded from working during the absence period;

    2.    the illness of his sons or daughters;

    3.    the sickness of the elderly persons or persons with disabilities within the family nucleus, meaning fourth degree of consanguinity, second of affinity, or persons living under the same roof, or persons for whom the employee has custody or legal guardianship.

    In addition to the medical certificate, the employee's inability to attend work for reasons of sickness may be corroborated through any other appropriate means. The foregoing will not apply or be interpreted in such a way that it violates the ADA or the "Family and Medical Leave Act of 1993" (FMLA).

i.    In cases of sickness in which the employee does not have accrued sick leave, up to a maximum of eighteen (18) business days may be advanced to any regular employee who has served the Government of Puerto Rico for a period of not less than one (1) year, when there is reasonable certainty that he will be reinstated to service. Any employee who has been given advance sick leave and who leaves service voluntarily or involuntarily, before having rendered services for the necessary period required to accrue the entire leave that was advanced will be required to reimburse the Government of Puerto Rico any sum of money that is outstanding that has been paid for the concept of said leave.

j.    In cases of prolonged illness, once sick leave is exhausted, employees may use any vacation leave they have accrued, with the supervisor's prior authorization. If the employee exhausts both leaves and continues to be ill, he may be granted unpaid leave.

3.    Maternity Leave

a.    Maternity leave will comprise the prenatal and postpartum rest periods to which all pregnant employees are entitled. Likewise, it will comprise the period to which an employee is entitled who adopts a child, according to the applicable laws.

b.    Every pregnant employee will be entitled to a rest period of four (4) weeks prior to birth and four (4) weeks thereafter. Provided, that the employee may enjoy consecutively four (4) additional weeks for the child's attention and care.

    Birth will mean the act whereby the conceived creature is expelled from the mother's body by natural means, or legally extracted

therefrom through surgical-obstetric procedures.  It will also comprise any premature birth, miscarriage, or involuntary abortion, including, in the latter case, those induced legally by physicians, suffered by the mother any time during the pregnancy.

c.   The employee may choose to take up to only one (1) week of prenatal rest and extend up to seven (7) weeks of postpartum rest to which she is entitled or up to eleven (11) weeks, if the four(4) additional weeks are included for the child's care and attention.  In these cases, the employee must submit to the agency a medical certificate proving that she is capable of rendering services up to one week prior to delivery.

d.   During the maternity leave period the employee will earn her entire salary.

e.   In the case of an employee with a temporary status, the maternity leave will not exceed the appointment period.

f.   If the birth occurs before four (4) weeks have transpired since the pregnant employee began enjoying her prenatal rest, or if she has not begun to enjoy it, the employee may choose to extend the postpartum rest for a period of time equivalent to the prenatal rest she ceased to enjoy.

g.   When the probable date of delivery is erroneously estimated and the woman has enjoyed four (4) weeks of prenatal rest without undergoing delivery, she will be entitled to have the prenatal rest period extended, at full salary, until delivery occurs.  In this case, the employee will keep her right to enjoy the four (4) weeks of postpartum rest as of the date of delivery and the additional four (4) weeks for the child's care and attention.

h.   In cases of premature delivery, the employee will be entitled to enjoy the eight (8) weeks of maternity leave as of the date of the premature delivery and the four (4) additional weeks for the child's care and attention.

i.   An employee who suffers an abortion may claim up to a maximum of four (4) weeks maternity leave.  However, to be credited with such benefits, the abortion must be such that it produces the same physiological effects that regularly arise as a result of childbirth, according to the opinion and certification of the physician who attended her during the abortion.

j.   In the event that the employee experiences any postpartum complication that prevents her from returning to work after completing the postpartum rest period and the four additional weeks for the child's care and attention, the agency must grant her sick leave.

In these cases, a medical certificate will be required that indicates the condition of the employee and the time it is estimated to last.  If she does not have accrued sick leave, vacation leave will be granted to her.  In the event that she does not have accrued sick leave or vacation

leave, she may be granted leave without pay for the time her physician recommends.

k.　An employee who adopts a preschool aged child, meaning a child who is five (5) years old or less, who is not matriculated in an educational institution, pursuant to the laws and legal proceeding in effect in Puerto Rico or any United States jurisdiction, will be entitled to the same maternity leave benefits at full salary as those enjoyed by an employee who gives birth.  In the case of the adoption of a child who is six (6) years old or older, she will be entitled to maternity leave at full salary for a period of fifteen (15) days.  This leave will begin to count as of the date on which the child is received into the family nucleus, which must be confirmed in writing.

l.　Maternity leave will not be granted to employees who are enjoying any other type of leave, with or without pay.  Exempted from this provision are employees who have been authorized vacation leave or sick leave and employees who are on unpaid leave due to complications prior to childbirth.

m.　The pregnant employee or the employee who adopts a child is required to notify the agency in advance as to her plans to enjoy her maternity leave and her plans to return to work.

n.　The agency may authorize advance payment of salaries corresponding to the maternity leave period, provided the employee requests it in advance.  Should the employee return to work before the postpartum rest period has expired, she will be required to reimburse the balance corresponding to the maternity leave not enjoyed.

o.　In the event of the death of the newborn before the maternity leave period has finalized, the employee will be entitled to claim exclusively that part of the postpartum period that completes the first eight (8) weeks of maternity leave not used.  Provided, that the benefit of the four (4) additional weeks for the child's care will cease as of the date of the death of the child.  In these cases, the employee may use any other leave to which she is entitled.

p.　The employee may request that she be reinstated to her job before the postpartum rest period has expired, provided she presents to the agency a medical certificate that confirms that she is in condition to perform her duties.   In this case, it will be understood that the employee waives the balance corresponding to the maternity leave without enjoying that to which she is entitled.

4.　Paternity Leave

a.　Paternity leave will comprise the period of fifteen (15) business days as of the date of the birth of the son or daughter.

b.　When claiming this right, the employee must certify that he is legally married or that he cohabitates with the mother of the child and that he has not engaged in domestic violence.  Such certification must be done by

Case: 17-03283-LTS Doc#: 17808-11 Filed: 06/15/21 Entered: 06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26 Page 35 of 73
*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

filing the form required by the agency to those ends, which will also contain the signature of the child's mother.

c.  The employee will request the paternity leave and as soon as possible must submit the birth certificate.

d.  During the paternity leave period, the employee will earn his entire salary.

e.  In the case of an employee on temporary status, the paternity leave may not exceed the period of appointment.

f.  Paternity leave will not be granted to employees who are enjoying any other type of leave, with or without pay. Exempted from this provision are employees who have been authorized vacation leave or sick leave.

g.  An employee who, together with his spouse or the person he lives with, adopts a child, pursuant to the laws and legal proceedings in effect in Puerto Rico or any United States jurisdiction, will be entitled to a paternity leave that will comprise a period of fifteen (15) days, counted as of the date on which the child is received in the family nucleus, which must be confirmed in writing. When claiming this right, the employee must certify that he is legally married, as may be applicable, and that he has not engaged in domestic violence, a sexual crime, or child abuse. Such certification must be done by filing the form required by the agency for those ends, which will also contain the signature of his spouse.

An employee who individually adopts a preschool age child, meaning a child who is five (5) years old or younger who is not matriculated in an educational institution, pursuant to the laws and legal proceedings in effect in Puerto Rico or any United States jurisdiction, will be entitled to a paternity leave that will comprise the period of eight (8) weeks, counted as of the date on which the child is received in the family nucleus, which must be confirmed in writing. In the event that he adopts a child who is six (6) years old or older, he will be entitled to a paternity leave at full pay for a period of fifteen (15) days.

When claiming this right the employee must certify that he has not engaged in domestic violence, or a crime of a sexual nature, or child abuse.

Sub-subparagraphs (d), (e), and (f) of this subparagraph will be equally applicable in cases in which the employee request the benefits of the leave set forth in the preceding paragraphs.

h.  The employee may ask to be reinstated to his job before the paternity leave to which he is entitled expires. In this case, it will be understood that the employee waives the corresponding balance of paternity leave without enjoying that to which he would be entitled.

5.  Special Leave with Pay for Breastfeeding

a.  Breastfeeding mothers will be granted time so that after enjoying their maternity leave they will have the opportunity to breastfeed their children, during one (1) hours within each full time day, which may be distributed in two (2) thirty minutes periods each or in three (3) twenty (20) minute periods, to go to the place where the child is to breastfeed it, in those cases where the employee has a care center in its facilities or to extract breast milk in the place equipped for this in the workplace.  Such places must guarantee privacy, security, and hygiene for the breastfeeding mother.  The place must have electric power outlets and ventilation.  If the employee is working on a part-time basis and the daily workday exceeds four (4) hours, the period granted will be thirty (30) minutes for every period of four (4) consecutive hours of work.

b.  Within the workshop, the breastfeeding period will have a maximum duration of twelve (12) months, counted as of the employee's reinstatement to her duties.

c.  Employees who wish to avail themselves of this benefit must submit to the employer a medical certification, during the period corresponding to the fourth (4th) and eighty (8th) month of the baby's age, which confirms and certifies that she is breastfeeding her baby.  Such certification must be submitted no later than five (5) days before each period.  Provided, that the employer will designate an area or physical space that guarantees the nursing mother privacy, security, and hygiene, without entailing the creation or construction of physical or organizational structures, subject to the availability of the government entities' resources.  The agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico must establish a regulation on the operation of these spaces for breastfeeding.

6.  Unpaid Leaves

   a.  In the event that the cause for which the leave was granted ceases, the employee must immediately return to his job or notify the public agency or instrumentality as to the reasons why he is not available, or his decision not to return to the job he held.

   b.  In addition to the unpaid leaves that may be granted by each public agency or instrumentality through regulation, the following may be granted:

      1.  To career employees with regular status, to render services at other agencies of the Government of Puerto Rico or private entity.

    2.      To career employees with regular status, to protect the status or the rights to which they may be entitled in cases of:

       a)      A claim of disability before the Government of Puerto Rico's Retirement System or other entity, and the employee has exhausted his sick leave and vacation leave.

       b)      The employee having suffered a work-related accident and being under medical treatment with the State Insurance Fund Corporation or pending some final decision with respect to this accident, and he has exhausted his sick leave and vacation leave.

    3.      To employees who so request it after the birth of a child. Provided, that this type of unpaid leave may be granted for a period of time that may not exceed six (6) months, as of the time the same is authorized.

    4.      To employees with regular status who go on to render services as a trust employee in the Office of the Governor or in the Legislature, while rendering such services.

    5.      To employees with regular status who have been elected in the general elections or are selected to cover vacancies in a public elective position in the Executive or Legislative Branch, including the positions of Resident Commissioner in the United States and Mayor, while rendering such services.

7.      Special Leaves

Public Officials or employees, whether or not union members, will be granted the following special leaves for just cause, with or without pay, as the case may be. Provided, that such leaves will be governed by the special laws that grant them.

    a.      leave to serve as a witness – All employers are prohibited from being able to deduct from their employees' salary or from their vacation or sick leaves the days and hours that an employee, duly subpoenaed by the District Attorney or by a court, uses to appear as a witness in a criminal case.

    b.      leave to serve on jury duty – Any employee who is subpoenaed to appear as a juror will be entitled to enjoy a paid leave and to receive compensation from his employer for food and mileage, according to the regulations established in each agency, instrumentality, and public corporation, as if they were dealing with an official function of such employee or official.

    c.      judicial purposes – Any employee officially subpoenaed to appear before any Court of Justice, District Attorney, administrative or government organism, or government agency will be entitled to enjoy a paid leave for the time he was absent from his job due to such subpoenas.

    d.      leave to donate blood – All employees of the Government of Puerto Rico, its instrumentalities, and public corporations are granted a paid leave, for a period of four (4) hours per year, to go and donate blood.

e.    leave to attend their children's school – All employees of the Government of Puerto Rico, its instrumentalities, and public corporations will be entitled to four (4) business hours, without a reduction in pay or in the balance of their leaves at the end of each school semester to appear at the educational institutions that their children attend to find out about the latter's scholastic achievements. Notwithstanding the foregoing, any employee whose children are enrolled in the Department of Education's Special Education Program will have up to ten (10) hours per semester to go and attend to their children's affairs.

f.    unpaid sports leave – An unpaid sports leave is granted to any public employee who is duly selected and certified by the Puerto Rico Full Time High Performance Athlete Development Board as an athlete in training and coach for the Olympic, Paralympic, Pan American, Central American, and Regional or World Championships. This leave will have a duration of up to one (1) year with the right to renewal provided that it is approved by the Board and notified to the employer on or before thirty (30) days after its expiration. Through this leave the eligible athletes and coaches may be absent from their jobs without loss of time and guaranteeing their job without affecting the benefits and rights acquired during the period in which they were participating in those trainings and/or competitions.

    During the leave period, the Board will be responsible for the salaries of the participants. Therefore, it will be required to send to the employer the amount corresponding to the legal withholdings from the employee made up until that time so that the employer can continue to cover the payments corresponding to these contributions.

g.    special sports leave – A special leave is established for any public employee who is duly certified by the Puerto Rico Olympic Committee as an athlete to represent Puerto Rico in the Olympic Games, Paralympic Games, Pan American Games, Central American Games, or in regional or world championships. The special sports leave will have a cumulative duration that will not be greater than thirty (30) business days per calendar natural year.

h.    leave to renew one's driver's license – all employees may use up to two (2) hours of their workday, without charging it to ay leave and with pay, to renew his driver's license, provided that possession thereof is indispensable for his job due to the nature of the same.

i.    voluntary emergency services leave – Any employee who is a certified American Red Cross disaster service volunteer may be absent from work on paid leave for a period that may not exceed thirty (30) calendar days within a twelve (12) months period to participate in specialized American Red Cross disaster service duties.

Case:17-03283-LTS Doc#:17008-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 39 of 73
*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

This Leave will be granted as long as the official's services are requested by the American Red Cross and with the approval by the agency, instrumentality, and public corporation where the official works. The American Red Cross will issue to the employee a certification of the services rendered and the duration thereof. Said certification must be filed by the employee with the agency, instrumentality, and public corporation where he works.

j.      military leave – Any employee who belongs to the Puerto Rico National Guard or to the United States Armed Forces Organized Reserves will be entitled to be granted up to a maximum of thirty (30) days paid leave every year when rendering military service, as part of training or to attend the camps and exercises required of the employee.

k.      leave to vaccinate their children – Any employee who so requests will be granted up to a maximum of two (2) hours to vaccinate their children in a government or private institution, each time the vaccination becomes necessary, as indicated in the child's immunization card. Employees must present a certification as to the place, date, and time when their children were vaccinated in order to justify the time used, as established for this type of leave. Otherwise, the time used will be charged to compensatory time, vacation leave, or will be deduction from their salary.

l.      Nothing provided in this Law will affected the rights of the *Family and Medical Leave Act* (FMLA) of the public employees who by federal law are currently protected by its provisions.

Article 2.05.-Holidays.

All public officials or employees of the Government of Puerto Rico will be entitled only to the holidays declared as such by the Governor of Puerto Rico or by Law. The days that are listed below will be the holidays that all public employees will enjoy:

1.      New Year's Day, which will be observed on January 1.

2.      Three Kings Day, which will be observed on January 5.

3.      Martin Luther King, Jr. Day, which will be observed on the third Monday of January.

4.      George Washington's Birthday, Presidents Day, and Eminent Puerto Ricans Day: Eugenio Maria de Hostos, José de Diego, Luis Muñoz Rivera, José Celso Barbosa, Ramón Emeterio Betances, Román Baldorioty de Castro, Luis Muñoz Marín, Ernesto Ramos Antonini, and Luis A. Ferré, which will be observed on the third Monday in February.

5.      American Citizenship Day, which will be observed on March 2.

6.      Abolition of Slavery Day, which will be observed on March 22.

7.      Holy Friday, which is observed on movable dates.

8.      Memorial Day, which will be observed on the last Monday in May.

9.      United States Independent Day, which will be observed on July 4.

10.     Labor Day, which will be observed on the first Monday in September.

11.     Discovery of America (Columbus) Day, which will be observed on the second Monday in October.

12.     Veterans Day, which will be observed on November 11.

13.     Puerto Rican Culture and Discovery of Puerto Rico Day, which will be observed on November 19.

14.     Thanksgiving Day, which will be observed on the fourth Thursday of November.

15.     Christmas Day, which will be observed on December 25.

Article 2.06.-Day Care Centers:

All officials or employees of the Government of Puerto Rico, its instrumentalities and public corporations where there are areas that are duly qualified to operate as a Day Care Center and/or to be used for the care of preschool children, will be entitled to use the same. The users of the service will contribute financially for the optimum operation of the Center; provided that each agency, instrumentality, and public corporation will determine what will be a reasonable payment for the use of such facilities and services.

Article 2.07.-Uniform Employer Contribution to Public Corporation Employees Health Plan:

The Executive and Legislative Branches will identify additional savings and resources to avoid affecting employee contributions to the payment of health plans. If the savings projected in the Fiscal Plan cannot be achieved, the difference will be achieved through a program to match Government contributions to the health plan. Only then, as of July 1, 2018, all public officials or employees, union or non-union, who works for any Public Corporation, excluding the University of Puerto Rico, will be entitled to an employer contribution that will be determined by the Fiscal Plan Compliance Committee based on the metrics established in the Fiscal Plan, but which will never be less than the minimum employer contribution of one hundred dollars ($100) established by Law for Central Government employees. AAFAF may negotiate and agree to cheaper insurance coverage with private insurers or under public coverage at the employee's choice in the Government as Single Employer or by agency or groups of agencies. Any reduction to the employer's health plan contribution will require AAFAF to offer a more economical health plan coverage to those public employees. However, any employee of a public or dependent corporation who is currently enrolled in the health plan and who suffers from a

Case:17-03283-LTS Doc#:17908-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26 Page 41 of 73
*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

catastrophic, chronic, or pre-existing terminal illness will keep unaltered the current employer's health insurance contribution for as long as he remains linked to public service.

Article 2.08.-Bonuses.

As of the effective date of this Law, the only economic bonus that will be granted to public employees of the Central Government and its public corporations will be for the concept of the Christmas Bonus. The amount that employees will be entitled to receive will be six hundred dollars ($600.00) in each year during which they have rendered services to the Government of Puerto Rico during at least six (6) months.

Article 2.09.-Remuneration for Work in Excess of the Regular Workday:

The work program of each public agency or instrumentality must be formulated in such a way as to minimize the need for overtime work established in the public agency or instrumentality for employees. However, because of the special nature of the services to be provided, the need for services to protect and preserve the life and property of citizens, for any emergency situation, events of *force majeure*, atmospheric disturbances, unforeseen situations, or of maintenance necessary to continue an essential service, employees may be required to render services in excess of their working day, daily or weekly, or on any day on which services are suspended without charge to a leave by the Governor. In these cases, prior authorization from the employee's supervisor must be obtained, which must be approved by the appointing authority or by the official in whom it is delegated. Supervisors should take steps so that when an employee remains working, it is always pursuant to an express authorization.

Employees will be entitled to receive compensatory time, at the rate of time and a half, for services rendered in excess of their regular, daily or weekly hours, mealtime hours, and for services rendered on holidays, on rest days, or on days when services are suspended without charge to a leave by the Governor. The compensatory time must be enjoyed by the employee within six (6) months of the date that the extra work was done. If due to need for service this is not possible, the compensatory time may be accrued up to a maximum of two hundred forty (240) hours. In cases of employees who perform public safety duties, emergency responses, or seasonal activities, as defined in the "Federal Fair Labor Standards Act," except as provided in Article 10 of Law 53-1996 And Article 2.09 of Law 20-2017, up to four hundred eighty (480) hours may be accrued. Overtime compensation in compensatory time does not apply to the hours that the employee accrues in excess of the limits mentioned. However, in the case of police officers, as provided in Article 2.09 of Law 20-2017, they are to be paid time and a half and they will have the option to choose the payment of these hours without having to accrue it as compensatory time and such overtime payment will not be included in the gross income and will not be taxed. This will not apply to employees of public corporations who will be entitled to the payment of overtime at the rate of time and a half from the first hour accrued to the time established in this Law, unless the applicable collective bargaining agreement provides for the accrual of compensatory time.

Any employee who performs administrative, executive, or professional duties, as these terms are defined in the Federal Fair Labor Standards Act, is excluded from the provisions of subparagraph (2) above.

Article 2.10.-Liquidation of Days in Excess of Vacation and Sick Leave:

Each agency, instrumentality, and public corporation must recognize to all public employees, union and nonunion, the balances of vacation and sick leaves accrued as of the effective date of this Law but will not be able to liquidate in cash the accrued excesses before this Law enters into effect.

The public agencies or instrumentalities are required to immediately establish a plan to exhaust the excess accrued of the balances accrued for employees, both union and nonunion, so that as of December 31, 2017, there will be no accruals in excess of what is permitted in sick or vacation leaves; provided, further, that after that date the excess balance that has not been used will be lost.

As of the effective date of this Law, no public employee, either union or nonunion, who works for the Government of Puerto Rico in any of its agencies, instrumentalities, or public corporations will be entitled to payment of the liquidation of excess days for the concept of vacations or sickness.

Article 2.11.-Final Liquidation of Vacation Leave Accrued in the Event of Separation From Employment of an Employee in Public Service:

As of the effective date of this Law, any public employee, either union or nonunion, will only be entitled to payment of a final liquidation of the days he has available for the concept of vacation leave at the time of termination of services, which may never be more than sixty (60) days. The employee may authorize the allocation of such balance and/or excess that existed prior to the enactment of this Law to his Retirement System to be considered as time worked.

Article 2.11(a).- Article 3 of Law No. 125 of June 10, 1967, as amended, is amended to read as follows:

"The Governor will regulate all matters regarding the granting and enjoyment of leaves and the amount of the final compensation payments, including the payment to beneficiaries in case of death, to the officials appointed by him, with the exception of the members of the Judiciary, the district attorneys, prosecutors, and registrars of property. To the effects of the final compensation payment, which may never exceed the equivalent of two (2) months' salary, the Governor will take into consideration, among others, factors such as the needs of the service, the duration of the term in office, and the fiscal status of the government agency or entity, the nature of the functions performed, and the credits for vacation leave accrued in previous Government employment but not enjoyed upon going on to hold positions appointed by the Governor. Those persons who have received a final compensation payment pursuant to the provisions of this Law will be required to reimburse the amount so received if, due to acts that occurred during the exercise of their public office, they are convicted for the crimes of misappropriation, embezzlement, or theft of public

funds; crimes against the public treasury or public office, as typified in the Puerto Rico Penal Code.

...”

Article 2.12.- Section 4.3 of Article 4 of Law 8–2017, known as the “Puerto Rico Human Resources in Government Administration and Transformation Act,” is amended to read as follows:

“Section 4.3.-Duties and Authorities of the Office and of the Director

In addition to the duties and authorities that are conferred in other provisions of this Law, the Office and the Director will have the following:

...

2.     Duties and authorities of the Office:

a.    To centralize those duties of the Government of Puerto Rico's Management and Transformation of Human Resources System that are compatible with what is ordered in this Law.

b.    ...

c.    ...

d.    ...

e.    To advise in the labor area the agencies of the Executive Branch in all matters relative to the proceedings concerning the election and certification of union organizations, with respect to the negotiations and administration of collective bargaining agreements, and in all those areas related to labor matters provided by Law 45-1998 of the agencies. In discharging advisory duties regarding collective bargaining negotiations according to Law 45-1998, the Office will coordinate and supervise the creation and operation of a Negotiation Committee comprised by its personnel and those designated by the Office of Management and Budget. The Office will conduct comparative studies of collective bargaining agreements and will offer trainings in the labor area to those agencies that request it.

f.    ...

g.    ...

h.    ...

i.    ...

j.    ...

k.    ...

l.    ...

m.    To manage and keep updated the Central Registry of Invitations to Recruitment, Promotions, and Training in

Public Service.  Similarly, an online registry will be maintained; provided that the public agencies, instrumentalities, as well as the public corporations, with the exception of the Office of the Governor, of the Municipalities, of the Supreme Court, of the Offices of the Chief Justice, and the Courts Administrator, of the Legislative Chambers, and of the Municipal Legislatures must comply with the obligation to send on a monthly basis to the Government of Puerto Rico Management and Transformation of Human Resources System the opportunities for recruitment and promotion.  The Office will remit for interview candidates from the list to be maintained by said Office.  All applications for training will be referred to the Government of Puerto Rico's Management and Transformation of Human Resources System, at least thirty (30) days in advance of the training date.  The Office will evaluate the need and convenience of the training and will proceed to approve or reject the same.

n.        ...
o.        ...
p.        ...
q.        ...
r.        ...
s.        ...,"
t.        ..."

Article 2.13.- Section 5.2 of Article 5, of Law 8–2017, known as the "Puerto Rico Human Resources in Government Administration and Transformation Act," is amended to read as follows:

"Article 5.-Government of Puerto Rico Management and Transformation of Human Resources System

Section 5.1.-  ...

Section 5.2.-Exclusions

The provisions of this Law will not be applicable to the following Government agencies and government instrumentalities:

1.        ...
          ...
5.        The Office of the Governor.
          ...
8.        ...

However, in the case of public or public-private corporations these must adopt personnel regulations that incorporate the principle of merit to the administration of their human resources, as provided in this Law and they must submit copies thereof to the Office. The office is authorized to conduct compliance audits regarding the areas essential to the principle of merit.

Similarly, the concept of mobility and the mechanism established by the Office to implement the movement of public employees will apply to the public or public-private corporations, agencies that function as private enterprises or businesses such as the Public Private Participatory Alliances (PPP+A) and the municipalities."

Article 2.14.- Section 6.4, subparagraph 1 (d) and subparagraph 4 (1) is amended, and a subparagraph 5 is added to Article 6 of Law 8–2017, known as the "Puerto Rico Human Resources in Government Administration and Transformation Act," to read as follows:

"Section 6.4.-Provisions Regarding Promotions, Transfers, Demotions, and Mobility

> ...
>
> 1.  ...
>
>     a.  ...
>     b.  ...
>     c.  ...
>     d.  ...
>
>         On the other hand, the special qualifications of the employees will be deemed to be additional experience; academic studies in addition to the minimum requirements and the results obtained from the Evaluation System adopted by the Agencies and developed by the Office.
>
>     e.  ...
>
> 2.  ...
>
> 3.  ...

4.      Mobility

        …

        1.      The Government of Puerto Rico's Management and
                Transformation of Human Resources System together with
                the Office of Management and Budget will have one (1)
                year as of the enactment of this Law to create the mobility
                plans, which must correspond to the immediate needs for
                the rendering of services in the Government of Puerto Rico.

        2.      ...

        3.      ...

        4.      ...

        5.      ...

        6.      ...

        7.      ...

        8.      ...

        9.      ...

        10.     ...

        11.     ...

        12.     ...

        13.     ...

5.      Other Actions

        (a)     Deployment – the temporary assignment of an official or
                employee of an agency of the Executive Branch or
                municipality and vice versa is authorized to render mutual
                services in any of those jurisdictions.  The official or
                employee deployed will continue holding the same position
                and will preserve his rights as an official or employee of
                said agency.  The deployment is an administrative action
                that allow for maximization of the use of human resources
                in a cost effective manner and pursuant to the Principle of
                Merit.  Under exceptional circumstances, the use of this
                mechanism among officials and employees of the
                Executive Branch and other Government Branches is
                permissible, provided that the remuneration paid to the
                official on deployment is restored by the Branch that uses
                him according to the guidelines issued by the Office of
                Management and Budget to those effects.  The deployment

may be used for a term of one (1) year which may be
extendable should the need arise.

(b) Administrative Designation or Assignment – it is the
formal and temporary designation made by an appointing
authority to an employee to render services of like or
similar nature at another division of the same agency."

Article 2.15.- Section 6.8 subparagraph 2 (b) of Article 6 of Law 8–2017, known as the
"Puerto Rico Human Resources in Government Administration and Transformation Act,"
is amended to read as follows:

"Section 6.8.-Qualification in Public Service
...

1.      ...

2.      ...

    a.      ...

    b.      Any convicted public employee who is granted a suspended sentence or
the benefit of parole and who complies with his sentence after being
released from jail under the limitations imposed by the organisms of the
Government's Correctional System may submit his application for
qualification at any time to the Department of Labor and Human
Resources or, otherwise, the Agency for which he renders services will be
required to submit it. The employee will continue working in his position
until the Secretary of Labor and Human resources determines otherwise.

    c.      ...

    d.      ..."

Article 2.16.- Section 6.9 of Article 6 of Law 8–2017, known as the "Puerto Rico Human
Resources in Government Administration and Transformation Act," is amended to read as
follows:

"Section 6.9.-Prohibition

In order to ensure the faithful application of the Merit Principle in Public
Service during pre and post-election periods, the Appointing Authorities of the
agencies, instrumentalities, and public corporations of the Government of Puerto
Rico must refrain from carrying out any personnel transactions that include areas
essential to the Principle of Merit, such as appointments, promotions, demotions,
transfers; nor can they carry out changes or actions of remuneration, or changes in
job categories, nor may an employee's mobility be used during the electoral
prohibition period. Provided, that during said period no personnel changes or
actions of any kind may be processed retroactively nor can it be recorded in the

personnel files. Changes as a result of the conclusion of the probationary period and the imposition of disciplinary measures are exempted from the prohibition period. Failure to comply with this provision will invalidate the transaction. This prohibition will comprise the period of two (2) months before and two (2) months after the holding of the Puerto Rico General Elections.

Upon approval from the Office, an exception to this prohibition may be made for urgent and pressing needs for the service duly evidenced and certified in accordance with the rules issued by the Office on this matter. For purposes of this Article, urgent and pressing need is understood as those essential or indispensable actions that must be carried out urgently in order to comply with the functions of agency, instrumentality, or public corporation. It does not include those actions that are merely convenient or advantageous, the solution of which may be deferred until the ordinary process is carried out."

Article 2.17.- Section 7.2 subparagraphs 3 and 5 of Article 7 of Law 8–2017, known as the "Puerto Rico Human Resources in Government Administration and Transformation Act," is amended to read as follows:

"Section 7.2.-General Rules on Remuneration

The following guidelines are applicable to all government agencies under this Law:

1.      ...

2.      ...

3.      The Office will administer the remuneration plan in connection with the areas essential to the principle of merit. These may not take any action that is an attempt against or is contrary to the principle of merit in transactions involving personnel in career public service.

4.      ...

5.      No amendment or modification of the system of evaluating or assessing jobs can negatively affect the employee's base salary.

..."

Article 2.18.-The enforceability of Article 9 and Section 10.2 of Article 10 of Law 8-2017, known as the "Puerto Rico Human Resources in Government Administration and Transformation Act," is suspended subject to the provisions set forth in Article 2.03 of this Law.

Article 2.19.-Nullity

As from the effective date of this Law, any clause or provision of a collective bargaining agreement, agreement, supplementary agreement, regulation, administrative order, circular, and/or contractual letter will be null and void in the provisions that grant to union or nonunion public officials or employees of the Government, including all union or non-union employees of the Public Corporations of the Government of Puerto Rico, greater fringe benefits than those authorized in this Law. The adoption of any measure authorized to comply with the foregoing by any agency or public corporation of the Government of Puerto Rico will not constitute a violation of existing collective bargaining agreements. Nor will it constitute an illegal practice.

Article 2.20.-Relationship to Other Laws

The following laws in relation to the provision that are not in conflict with this Law remain in full force and effect:

a.      Law 62 of June 23, 1969, as amended, known as the "Puerto Rico Military Code."

b.      Law 122-1996, as amended, known as the "Appearance of Employees as Witnesses in Criminal Cases Act."

c.      Law 44-1996, as amended, known as the "Assignment of Vacation Leave Act."

d.      Law 203-2007, as amended, known as the "Bill of Rights of the Puerto Rican Veteran of the 21st Century."

e.      Law 58-1994, as amended, known as the "Voluntary Emergency Services Leave Act."

f.      Law 122 of July 12, 1986, as amended, known as the "Appearance of Employees as Witnesses in Criminal Cases Act."

g.      Law 281-2003, as amended, known as the "Puerto Rico Jury Duty Service Administration Act."

h.      Law 24-2002, as amended.

i.      Law 49 of June 27, 1987, as amended.

j.      Law 134-1998, as amended.

k.      Law 154-2000, as amended.

l.      With respect to the Municipalities, the provisions of Law 81-1991, as amended, known as the "Puerto Rico Autonomous Municipalities Act," continues in full force and effect and without any impairment.  The provisions of this Law will apply to any Municipality that so determines upon approval of a Municipal Ordinance to that effect.

Article 2.21.-Repeal

Law 89-2016, better known as the "Temporary Employment in Public Service Act," is repealed.

## CHAPTER 3.-COMPULSORY LIABILITY INSURANCE
## JOINT UNDERWRITING ASSOCIATION

Article 3.01.-Subparagraph (m) of Article 3 of Law 253-1995, as amended, is amended to read as follows:

"Article 3.-Definitions.

For purposes of this Law, the following terms and phrases will have the meaning stated as follows:

(a)      ...

         ...

(m)      Compulsory liability insurance. – Means the insurance required by this Law and that responds for damages caused to motor vehicles of third parties as a result of a traffic accident, for which the owner of the vehicle insured by this insurance is legally liable, and as a result of its used such damages are caused, according to the system for the initial determination of liability created under this Law.  The insurance will have a coverage limit of four thousand five hundred dollars ($4,500) per accident.  The Commission, at the request of the insurers that provide the compulsory liability insurance or *motu proprio*, may review and modify the limit and the rate of the compulsory liability insurance every two (2) years, according to the applicable provisions of Chapter 12 of the Code, which take into consideration all insurers in the Compulsory Liability Insurance market.  However, the coverage limit will never be less than three thousand five hundred dollars ($3,500).

         ..."

Article 3.02.-Subparagraphs (f) and (h) of Article 6 of Law 253-1995, as amended, better known as the "Compulsory Liability Insurance for Motor Vehicles Act," is amended to read as follows:

"Article 6.-Joint Underwriting Association – Creation.

(a) ...

    ...

(f)    Insurers that underwrite compulsory liability insurance, including the Joint Underwriting Association, once they receive the premiums corresponding to them after deducting the charge set forth in Article 7(b)(1), must deduct five percent (5%) therefrom, as set forth in Article 7(b)(2). Each insurer and the Joint Underwriting Association will be responsible for remitting to the Department of the Treasury the amount corresponding to the charge on the total premiums underwritten during a month no later than the fifth (5th) day of the following month. The Department of the Treasury will establish through regulation the manner in which this payment will be made and it may design and agree to other methods for collecting for this concept, provided that the change results in an effective and constant collection. On the same date, each insurer and the Joint Underwriting Association will be responsible for remitting to the Department of the Treasury the amount corresponding to the charge set forth in Article 7(b)(3). The Department of the Treasury will establish through regulation the manner in which this payment will be made and it may design and agree to other methods for collecting for this concept, provided that the change results in an effective and constant collection.

    ...

(h)    All of the members of the Joint Underwriting Association will participate annually in the profits and losses of the latter, determined according to the Annual State required pursuant to Article 3.310 of the Code, in the percentage that the direct net premiums underwritten in Puerto Rico during the previous year by each of such insurers, for insurance against any loss, expenses, or liability for the loss or damages caused to persons or property, resulting from the possession, preservation, or use of any land, airborne, or animal drawn or mounted vehicle, or incidental thereto, all in accordance with Article 4.070 of the Code, represents the total direct net premiums underwritten in Puerto Rico during said year for that Class of insurance.

    (1)    ...

    (2)    ...

    (3)    2017 Extraordinary Dividend and Special Payment:

(i)     The Joint Underwriting Association is authorized to declare an extraordinary dividend before June 30, 2017, to its members, subject to the provisions of this subparagraph, in the sum of seventy million dollars ($70,000,000) subject to the imposition of a special and single tax of fifty percent (50%).  The dividends that the private insurer members of the Joint Underwriting Association receive will not be subject to any other tax.  The revenues obtained through the special and single tax provided hereby will not be considered as part of the computation of any of the formulas existing for the calculation of budgetary allocations to be consigned as part of the constitutional budgetary process.

(ii)    Within a term that will not exceed fifteen (15) days after enactment of this Law, the Board will call a meeting and will submit for the approval of all of the members of the Joint Underwriting Association the declaration of the extraordinary dividend authorized.  It is provided that the dividend may be approved with the vote of the members with a combined proportional participation of more than fifty percent (50%) according to the most recent determination made by the Office of the Commissioner of Insurance.  The Members' determination will be binding.

(iii)   In consideration of the public benefit of this measure and its legislative authorization, the provisions of subparagraph (j) of this Article will apply to the actions taken by the Association's Board, members, and personnel.

(iv)    If the declaration of the dividend is endorsed by the members, the Joint Underwriting Association, within a term that may not exceed ninety (90) days, will make a special payment of thirty-five million dollars ($35,000,000) to the Department of the Treasury, which will deposit the funds in the General Fund of the Government of Puerto Rico.  During that same term, the Joint Underwriting Association will disburse to its members the dividends authorized pursuant to each member's proportional participation.

...."

Article 3.03.-Subparagraphs (a), (b) and (d) of Article 7 of Law No. 253 of December 27, 1995, as amended, are amended to read as follows:

"Article 7.-Premiums.-

(a)      The initial uniform premium of the compulsory liability insurance will be ninety-nine dollars ($99) for each private passenger vehicle and one hundred forty-eight dollars ($148) for each commercial vehicle.  A review and adjustment of the premium is authorized on or before June 30, 2017, as provided in subparagraph (e) of this Article.

The Commissioner may fix a premium different from the ones set forth in this subparagraph for the compulsory liability insurance of those vehicles for which the Department of Transportation and Public Works issues temporary or provisional licenses.

(b)      Service Charges

1)      ...

2)      ...

3)      An additional administrative charge is established that will be proportional to the increase in profits for the concept of adjustments to the uniform premium, as provided in subparagraphs (a) and (e) of this Article.  The applicable percentage to determine the corresponding amount in cases of increase in premium will be calculated by dividing the net increase in premium according to the amount set forth in subparagraph (a) of this Article into the total adjusted cost of the premium.  The resulting percentage will be applied to the income generated by the insurers, including the Joint Underwriting Association, after deducting the administrative expenses and costs related to the production of the premium.  The balance resulting from applying the percentage as set forth in this formula will be transferred to the Government of Puerto Rico's General Fund.  This charge does not constitute a tax on premium.

4)      These charges will not apply to those policies issued through traditional insurance and will be considered part of the premium of the compulsory liability insurance and must be guaranteed within the distribution of the premium dollars.

(c)     ...

(d)     Any compulsory liability insurance insurer may present for
        approval by the Commissioner rules and rate plans that contain
        rules for the application of surcharges to the uniform premium of
        private passenger vehicles or commercial vehicles that are insured
        with them, as appropriate, subject to the provisions of Chapter 12
        of the Code taking as the basis the frequency and severity of losses
        of its their insured.

(e)     ...

...."

CHAPTER 4.- TRANSFER OF PUBLIC CORPORATIONS, AGENCIES, AND
INSTRUMENTALITIES TO THE GENERAL FUND; CREATION OF THE COMMITTEE
AND ADJUSTMENT OF CHARGES, FEES, AND RATES.

Article 4.01.-Transfer of Surplus

The public corporations, agencies, and instrumentalities of the Government of Puerto
Rico are ordered to transfer to the Department of the Treasury the surplus from income
generated. These funds will be considered as resources available to the State and deposited by
the Department of the Treasury in the General Fund of the Government of Puerto Rico to comply
with the liquidity requirements contemplated in the Fiscal Plan adopted pursuant to the
provisions of the *Puerto Rico Oversight, Management and Economic Stability Act* of *2016,*
Public Law 114-187, also known as PROMESA.

Article 4.02.-Committee

The sum of the funds that each of the corporations and instrumentalities will contribute
will be determined by a committee consisting of the Executive Director of the Puerto Rico
Financial Advisory Authority and Fiscal Agency, the Secretary of the Department of the
Treasury, and the Executive Director of the Office of Management and Budget who may
establish the rates necessary to comply with the provisions of the Fiscal Plan approved for the
Government of Puerto Rico and that will govern its corporations. This committee will ensure
that the transfer of funds as provided in Article 4.01 of this Law will not affect the services
offered by the public corporations and instrumentalities and that the surplus will be available
after the operating expenses and obligations of those entities have been covered, according to the
expense budget recommended by the Office of Management and Budget for each fiscal year.

In addition, this Committee is authorized to revise the sources of revenue of the public
corporations, agencies, and instrumentalities and to adjust, increase, or decrease any charge,
duty, tariff, export duty, fee, premium, or any revenue of any kind in order to comply with the
metrics provided in the Fiscal Plan for the Government of Puerto Rico. In addition, the
Committee may impose an administrative fee in addition to those taxes it deems necessary that

may be from five percent (5%) up to ten percent (10%), to comply with the metrics of the Fiscal Plan certified by the Fiscal Oversight Board.

This Law will have supremacy over any law that establishes any charge, duty, tariff, export duty, fee, premium, or any revenue of a similar nature and the committee is authorized to revise, increase, or decrease the amount even when the same is provided by Law. The committee will have the authority to revise, increase, or decrease this revenue without being subject to the provisions of any Law, regulation, or administrative order that establishes a particular amount for this revenue.

Any provisions of law, regulation, administrative order, corporate resolution, or any other similar document that restricts or reduces the funds that can be transferred by a public corporation, agency, or instrumentality of the Government of Puerto Rico to the General Fund as provided in this Chapter is suspended.

The committee is empowered to promote any administrative order, circular, or regulation necessary for its operation and for compliance with the provisions of this Law.

Article 4.03.-Exclusions

Excluded from the provisions of this Chapter are the University of Puerto Rico, created pursuant to Law No. 1 of January 20, 1966, as amended, known as the "University of Puerto Rico Act," and the "Public Corporation for the Supervision and Insurance of Puerto Rico Credit Unions," "Municipal Financing Corporation Act," better known as COFIM, Law 19-2014, as amended, "Special Commission on Legislative Funds for Community Impact Act," Law 20-2015, and "Joint Commission on Special Reports of the Controller Act," Law No. 83 of June 23, 1954, as amended. Excluded from the application of this Chapter are funds from public entities and corporations with community purposes, which are funds received by private entities.

As for the "Dedicated Sales Tax Fund Act," better known as COFINA, Law 91-2006, as amended, the Executive [Branch] will be authorized to use the COFINA Funds occasionally, only as a last alternative and subject to the presentation of a sworn certification submitted to the Legislature. The presentation of such certification must not be construed as the Executive [Branch] having an indefinite use of the COFINA funds. Such certification must establish the need, term, and amount of funds to be used, to cover an occasional significant deficiency in the cash flow to comply with the Fiscal Plan of the Government of Puerto Rico. Such certification must be signed and sworn to by the Executive Director of the Financial Advisory Authority and Fiscal Agency (AAFAF, by its Spanish acronym) and by the Director of the Office of Management and Budget. The signature and swearing of these officials on the certification may not be delegated. In said certification, the officials must confirm that the information is correct, exact, and true according to the fiscal reality of the Government of Puerto Rico.

Article 4.04.-Compliance Clause

All transfers carried out pursuant to the provisions of this Chapter will be subject to the requirements of Section 201(b)(1) (M) of Public Law 114-187 known as the *Puerto Rico Oversight, Management and Economic Stability Act or PROMESA.*

CHAPTER 5.-DISPOSAL OF GOVERNMENT REAL ESTATE.

Article 5.01.-Public Policy.

The best use of the real estate that is not being used by the State is declared as a public policy of the Government of Puerto Rico in order to bring more resources to the public treasury. In addition, it is encouraged that such real estate that is currently in total disuse be dedicated to activities for the common wellbeing, whether for nonprofit, commercial, or residential uses that promote the activation of the real estate market and the economy in general.

In order to comply with this public policy, the design of an efficient and effective real estate sales procedure is authorized, where the principles of competition, transparency, economic development, job creation, the public wellbeing and interest prevail.

Article 5.02.-Definitions.

For purposes of this Chapter, the following words will have the following meanings:

A.      Real Estate – That which cannot move by itself or be transferred from one place to another, such as the earth, buildings, etc.; as well as those that are attached permanently to some real property, so that it cannot be separated from the latter without breaking the material or deteriorating the object; and that belong to the agencies, dependencies, instrumentalities, and public corporations of the Executive Branch of the Government of Puerto Rico.

B.      Committee – Refers to the Real Estate Evaluation and Disposal Committee.

C.      Disposal – Process whereby the Government of Puerto Rico assigns the title of ownership, possession, use, or enjoyment of real estate for its best use.

D.      Public Auction Out Loud/In Person – A process where several bidders meet physically at a place and time previously agreed upon to make a direct offer for a specific real estate announced prior to the auction.  The offer is made in person/out loud where the remaining bidders listen to and are aware of the offers.

E.      Public Auction in Sealed Envelope – An auction process where the bidders make their secret offer in a sealed envelope, which procedure will be established by regulation.

F.      Direct Sale – A process to dispose of a property with a party that has met the criteria established by regulation.

Article 5.03.-Real Estate Evaluation and Disposal Committee.

The Real Estate Evaluation and Disposal Committee is created in order to exercise all of the authorities necessary, that are not contrary to this or any other law, for the disposal of real estate of the Executive Branch of the Government of Puerto Rico.

The Committee will be comprised of the following public officials:

a.      The Executive Director of the Puerto Rico Financial Advisory Authority and Fiscal Agency (AAFAF, by its Spanish acronym).

b.      The Director of the Office of Management and Budget.

c.      The Secretary of the Economic Development and Commerce Department.

d.      The Executive Director of the AAFAF will preside the Committee.

The Committee will meet at least once a month, and as often as may be necessary from time to time to expedite the work, at the place and time deemed convenient.  Provided, that the members of the Committee will not earn any salary or compensation for the concept of per diems for exercising the duties and authorities imposed on them by this Law.  Provided, further, that nothing set forth herein will apply to real estate of the Industrial Development Company, the Government Development Bank, the Lands Administration, the Convention Center District Authority, and their respective subsidiaries, insofar as they already have established as of the date this Law enters into effect a real estate sales process consonant with this Chapter.

Article 5.04.-Executive Director.

Having constituted the Committee, the same will designate an Executive Director who will have all of those powers delegated to him by the Committee in connection with the implementation of the public policy established in this Law.  The Executive Director will recommend to the Committee arranging for interagency transfers to integrate human resources to achieve the objectives of this Law, in accordance with Law 8-2017.  The Office of the Executive Director will be located at the place designated therefor by the Committee.

Article 5.05.-Authorities of the Committee.

The Committee will have the following authorities:

a.      To approve the rules, regulations, circulars, and norms that may be necessary to exercise their functions and duties.

b.      To adopt an official seal and alter the same at its convenience.

c.      To sue and to be sued under its own name.

d.      To negotiate, execute contracts, process the disposal of real estate of the Executive Branch of the Government of Puerto Rico, and all of those other instruments and agreements with any natural or juridical person that are necessary or convenient to exercise the powers and duties conferred in this Law.

Case:17-03283-LTS Doc#:7908-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 58 of 73
*CERTIFIED TRANSLATION*                                          by: Olga M. Alicea, fcci, njitce-s

e.      To file any legal action to protect or enforce the public policy established in this Law.

f.      To appoint those officials, agents, and employees that may be necessary for the proper compliance with the ends and purposes for which it has been created and to establish their powers, authorities, and duties, and the terms and conditions of work established by this Law. Provided, that the appointments must be made in accordance with the provisions of Law 8-2017.

g.      To contract to carry out public auctions in person/out loud, according to the provisions of this Chapter and the regulations hereunder.

h.      To create real estate investment trusts of a nature similar to the trusts defined in Section 1082.01(a) of Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico."

i.      To contribute real estate to any real estate investment trust created pursuant to Article 5.05 (h) of this Law. The Government will participate in the development done by the enterprise that contributes according to this paragraph.

Article 5.06.-Duties and Obligations of the Committee.

In order to execute the public policy established hereby, the Committee will have the following duties:

a.      It must establish through regulation a uniform, efficient, and effective procedure for the disposal and transfer of real estate of the Executive Branch of the Government of Puerto Rico, either through public auction in person/out loud, public auction in a sealed envelope, or through direct sale. Such procedure must provide a fair system of competition that guarantees the public interest. The Committee must clearly provide when a direct sale can be done.

b.      It must coordinate, together with the Real Estate Review Board created pursuant to Law 235-2014, the preparation and/or updating of an official inventory of all of the real estate of all of the agencies, divisions, instrumentalities, and public corporations of the Executive Branch of the Government of Puerto Rico, excluding the properties of the University of Puerto Rico.

c.      It must obtain from the Real Estate Review Board a certification that includes all of the real properties that are available for disposal because they need not be equipped by any agency, division, instrumentality, or public corporation of the Executive Branch of the Government of Puerto Rico.

d.      It must evaluate all applications for purchase, lease, or other form of transfer of possession of real property that is submitted to it by any natural or juridical person, for profit or not for profit, including municipalities, and ensure that that

they comply with this Law and all of the rules and regulations that are approved by the Committee.

e.  It must carry out any type of study, inspection, analysis, or other endeavor on the real properties, including ensuring that they are duly recorded in the Registry of Property and that they have the title and any other requirement required by the current laws.

f.  To appraise the real properties object of disposal. For this, it may request and use the necessary personnel, using the mechanism set forth in Law 8-2017.

Article 5.07.-Disposal of Real Estate.

The disposal of real estate of the Executive Branch of the Government of Puerto Rico will be governed by a process that is fair and transparent in which the same opportunities are given to all participants, always safeguarding the public interest and wellbeing. In this sense, all disposals must be framed within the procurement of the purposes established in this Law, maintaining a balance between the need to bring in greater resources to the state, to encourage economic development, to seen the wellbeing of society and/or to create jobs.

The Committee will dispose of the real estate using as the basis the fair market value to be determined through the corresponding evaluation and appraisal process or ensuring the use of the property for the benefit of the public interest.

The Committee's Executive Director or his representative may act as authorized agent to carry out any transaction relative to the title of the real estate.

Article 5.08.-Conflict of Interest.

Any conflict of interest that may arise in the members of the Board during the performance of their duties under this Law will be addressed in conformity with the provisions of Law 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011."

Article 5.09.-Exception Clause.

No real property of the Executive Branch of the Government of Puerto Rico may be dispose of that is being used in usufruct of housing by any person.

CHAPTER 6.- GOVERNMENT OF PUERTO RICO ACCOUNTABILITY ACT.

Article 6.01.-Article 3 of Law No. 230 of July 23, 1974, as amended and known as the "Government of Puerto Rico Accountability Act," is amended to add a new subparagraph (c), which reads as follows:

"Article 3.-Definitions

When used in this Law, the following terms will mean:

(a)     ...

...

(o)     Special Appropriations – Allocations approved through Joint Resolutions that limit the use of allocated funds."

Article 6.02.-Subparagraph (b) is amended and a new subparagraph (e) is added to Article 7 of Law No. 230 of July 23, 1974, as amended and known as the "Government of Puerto Rico Accountability Act," so that they read as follows:

"Article 7.-Revenues from public funds

a)     ...

        All public funds from the agencies that are not intended by law for a specific purpose will be credited to the State Treasury's General Fund and will be deposited in their entirety into the Secretary's account or in any other bank account that he considers should be established. Likewise, it is provided that as of July 1, 2017, all special state funds and other revenues from the agencies and public corporations must be deposited in their entirety in the State Treasury, under the custody of the Secretary of the Treasury or the bank that the Secretary decides is adequate. The Secretary of the Treasury is also authorized to determine the order of priority of the disbursements of payments to be charged to the special state funds and other revenues, according to the approved budget and the Fiscal Plan, without this being construed as a limitation of the powers conferred on the Governor and on the Puerto Rico Financial Advisory and Fiscal Agency Authority pursuant to the provisions of Law 5-2017. This provision will prevail over any other that contravenes or is inconsistent with what is set forth herein. For each fiscal year, any amount in excess of what is budgeted and authorized by the Office of Management and Budget to the public agencies and corporations coming from special state funds will be deposited into the Budgetary Fund created pursuant to Law No. 147 of June 18, 1980, as amended. This provision will not be applicable to those funds that are allocated to the municipalities pursuant to the Sales and Use Tax. This provision will not be applicable to funds coming from private donations that government entities receive with social purposes.

...

e)     As of July 1, 2017, all those special state funds created by law for specific purposes will continue being used for those purposes for which they were allocated by Law, according to the Budget Recommended by the Office of Management and Budget and to the Fiscal Plan. Similarly, the Office of Management and Budget is empowered to create a reserve under its custody, as established through norms, which allows the budgetary control of all expense items charged to the special state funds and other revenues. Should there be any inconsistence between the law and the use of the funds and the Fiscal Plan, the

Case:17-03283-LTS Doc#:7948-11 Filed:07/15/21 Entered:07/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 61 of 73
*CERTIFIED TRANSLATION*                    by: Olga M. Alicea, fcci, njitce-s

purpose provided in the Fiscal Plan approved according to the provisions of the Federal PROMESA Act will prevail."

Article 6.03-Subparagraphs (h), (l), and (m) of Article 8 of Law No. 230 of July 23, 1974, as amended, known as the "Government of Puerto Rico Accountability Act," are amended to read as follows:

(a)    ...

...

(h)    Appropriations and funds without a specific fiscal year, that have remained on the books without any movement of disbursement or obligation for one (1) year, will be considered for purposes of this Law as having fulfilled their purposes so they will be closed and will be deposited immediately into the General Fund, except for allocations and funds without a specific fiscal year assigned to carry out permanent improvements that have been accounted for and carried in the books. These will have a term of three (3) years as of the date of legal effectiveness of the allocation to be disbursed and to comply with the purposes for which they were allocated. After the three (3) years term has transpired, the obligated and non-obligated balances of the permanent improvements funds will be closed and deposited into Fund 301. This provision will only be applicable to allocations made prior to Fiscal Year 2017-2018 and will not be applicable to those allocations made by the Legislature through Legislative Donations or allocations pursuant to the Sales and Use Tax.

In those cases in which the agency or organism that receives the permanent improvements funds understands that the allocation term should be extended for a term of more than three (3) years, it may request as much by justifying the need to keep those resources to the Office of Management and Budget at least three (3) months prior to the expiration of said term. During this period, the Office of Management and Budget will analyze the request and will determine the need to maintain the allocation in effect, the term during which the same will extend, and the amount. Such resources will be reprogrammed by the Legislature.

(i)    ...

...

(l)    Any allocation that remains one (1) year without being carried on the books will be considered, as a general rule, automatically canceled and new legislative action will be required to use the monies so canceled. In exceptional cases in which it is shown that there have been just causes to not carry on the books an allocation during the said one (1) year period, such as delay in the resolution of litigations in the courts and the impossibility of carrying out a public work due to fiscal, technical, or legal difficulties, an appropriation can be used even after said one (1) year period has transpired.

The Secretary will notify the Legislature about the action cancelling allocations under the circumstances contemplated in this subparagraph, during the thirty (30) days following the date on which such cancellation was provided.

(m)    Periodically, the Secretary will transfer to the surplus of the State Treasury's General Fund, in accordance with the law, the balances of deposit accounts that have remained unused or without any movement on the accounting books for one (1) year and that, in his opinion, were not necessary or do not fulfill the purposes for which they were created.  Provided, that any claim that the Secretary is obligated to pay with respect to such balances, after the same have been transferred in the manner provided above, will be paid from any funds available not intended for other considerations."

CHAPTER 7.-GOVERNMENT PROCUREMENT RESERVES ACT.

Article 7.01.- Article 2 of Law 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," is amended to read as follows:

"Article 2.-Declaration of Public Policy.

It will be the public policy of the Government of Puerto Rico to establish a Reserves Program that requires that the Government of Puerto Rico and its instrumentalities assign twenty percent (20%) of the total item assigned to purchases of its general budget to be granted to microenterprises, small and medium businesses, as long as the fiscal situation so permits or produces savings to the public treasury.

Provided that in order to continue strengthening the microenterprises, small and medium enterprises sector, it is established that the percentage of reserves for those purposes will continue incremental increases as follows:

1.    Thirty percent (30%) for fiscal year 2016-2017;

2.    Thirty-two percent (32%) for fiscal year 2017-2018;

3.    Thirty-five percent (35%) for fiscal year 2018-2019;

4.    Thirty-eight percent (38%) for fiscal year 2019-2020;

5.    Forty percent (40%) for fiscal year 2020-2021;

Este incremental increase will apply if the Office of Management and Budget establishes that the fiscal situation allows the increase or if it produces a savings to the public treasury.  In addition, the Secretary of the Treasury will be required to reserve at least three percent (3%) of the cash flow that it receives for the payment of the items on materials procurement from micro, small, and medium enterprises whose invoices have been correctly processed by the

Case:17-03283-LTS Doc#:17808-11 Filed:06/15/21 Entered:06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 63 of 73
*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

Government's departments, agencies, instrumentalities, divisions, municipalities, and public corporations to which this Law applies."

Article 7.02.-Subparagraph (1) of Article 6 of Law 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," is amended to read as follows:

"Article 6.-Reserves Program

(1)     A new expense item will be created to place twenty percent (20%) of the budget of each agency's procurement budget.  Provided, that the expense item of the budget of each agency's procurement budget will increase to thirty percent (30%) for fiscal year 2016-2017, to thirty-two percent (32%) for fiscal year 2017-2018, to thirty-five percent (35%) for fiscal year 2018-2019, to thirty-eight percent (38%) for fiscal year 2019-2020, and to forty percent (40%) for fiscal year 2020-2021, provided that the fiscal situation so permits.  The OMB will establish by regulation that requirement for compliance with such reserves percentage.

        ...."

CHAPTER 8.-EXCISE TAXES ON CIGARETTES AND PRODUCTS
DERIVED FROM TOBACCO.

Article 8.01.- Section 3020.05 of Law 1-2011, as amended, is amended to read as follows:

"Section 3020.05.-Cigarettes

(a)     An excise tax of seventeen dollars ($17.00) will be imposed, paid, and collected on every one hundred or fraction of one hundred (100) cigarettes.  For purposes of this Code, the term "cigarette" will mean any product that contains nicotine and that is designed to be burned or heated under normal use condition, and that consists of, or contains:

        (1)     any roll of natural or synthetic cut tobacco, or cuttings of any natural or synthetic vegetable material, or any mixture thereof, or cuttings of any other solid material or substance, rolled in paper or in any substance or material that does not contain tobacco, which by its appearance, the type of tobacco used in the filler, its rolling or labeling is susceptible to be used, offered, or purchased as a cigarette; and

        (2)     whose length, circumference, and weight do not exceed the length, circumference, and maximum weight established by the Secretary through regulation, circular, or other general administrative determination.

(b)    Cigarettes that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico must have attached to the boxes, packages, or packs in which they are packaged a label with the information and characteristics that are provided by regulation. Each box, package, or pack of cigarettes must have stamped in a visible place and clearly and legibly the word "taxable." These provisions will not apply to cigarettes exempted according to Section 3030.18 of this Code."

Article 8.02.-A new Section 3020.05A is added to Law 1-2011, as amended, to read as follows:

"Section 3020.05A.-Cigarettes, Cigars, Loose Tobacco, Cigarette Paper, and Cigarette Tubes

(a)    In addition to any other excise tax fixed in this Subtitle, an excise tax will be imposed, collected, and paid which may be up to eight dollars and fifty cents ($8.50) on every one hundred or fraction of one hundred (100) cigarettes.

(b)    The excise tax provided below will be imposed, collected, and paid on all cigars, loose tobacco, cigarette paper, and tubes:

    (1)    Cigars: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction of a pound.

    (2)    Loose Tobacco: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction of a pound

    (3)    Cigarette Paper: three dollars ($3.00) for every fifty papers or fraction that does not exceed six and a half inches (6½"). If exceeding six and a half inches (6½"), every two and three quarters of an inch (2¾"), or fraction, will be considered one (1) cigarette paper.

    (4)    Cigarette Tubes: three dollars ($3.00) for every fifty papers or fraction that does not exceed six and a half inches (6½"). If exceeding six and a half inches (6½"), every two and three quarters of an inch (2¾"), or fraction, will be considered one (1) cigarette tube.

(c)    Definitions.- For purposes of this Section and for any other provisions applicable to this Subtitle, the following terms will have the meaning indicated as follows:

Case: 17-03283-LTS Doc#: 7998-11 Filed: 06/15/21 Entered: 06/15/21 16:45:24 Desc:
Exhibit K: Certified Translation of Act 26-2017 Page 65 of 73
*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

(1)     Cigars.- Will mean any product that contains nicotine, and that is designed to be burned or heated under normal use conditions, and consists or, or contains:

    (i)     any roll of natural or synthetic cut tobacco, or cuttings of any natural or synthetic vegetable material, or any mixture thereof, or cuttings of any other solid material or substance, rolled in paper, tobacco leaf, or in any substance or material, which by its appearance, the type of tobacco used in the filler, its rolling or labeling is susceptible to be used, offered, or purchased as a cigar, ciggie, "little cigar," small cigar, or any other product' and

    (ii)    that is not a cigarette, as this term is defined in Section 3020.05 of this Code.

(2)     Loose tobacco.- Will mean any type of tobacco, mixed or not with any other substance, that is not rolled in any materials and that by its appearance, intrinsic characteristics, packaging or labeling, is suitable to being used and may be offered or purchased by consumers, as tobacco for making "roll your own" cigarettes or for being smoked in a pipe.  This term also includes tobacco leaves.

(3)     Cigarette paper.- Will mean any paper, or any other material except tobacco, that is used to roll cigarettes or cigars.

(4)     Cigarette tube- Will mean cigarette paper prepared as a hollow cylinder to be used in the preparation of cigarettes o cigars.

(d)     Cigars, loose tobacco, cigarette paper, and cigarette tubes that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico must have attached to the boxes, packages, or packs in which they are packaged a label with the information and characteristics that are provided by regulation.  Each box, package, wrapper, or pack of cigars, loose tobacco, cigarette paper, or cigarette tubes must have stamped in a visible place and clearly and legibly the word "taxable."  In those cases where the article is sold individually, the same must be stamped in a visible place and clearly and legibly the word "taxable" in the form and manner established by the Secretary.  These provisions will not apply to articles exempted according to Section 3030.18 of this Code."

Article 8.03.- Section 3020.13 of Law 1-2011, as amended, is amended to read as follows:

"Section 3020.13.-Smokeless Tobacco

(a)     An excise tax will be imposed, paid, and collected on "smokeless tobacco," manufactured in or imported to Puerto Rico. For purposes of this subtitle, the term "smokeless tobacco" will mean any product derived from tobacco that:

    (1)     Is intended to be consumed without creating combustion or without being burned, and

    (2)     Is found or is sold in aluminum packages, in loose bags, and/or in small units or in "discrete single-use units" in the form of pills, tablets, bags, soluble tape, among others.

(b)     The excise tax imposed by this Section will be established in the following manner:

    (1)     Chewing tobacco: one dollar ($1.00) for each pound or fraction of a pound. As of May 1, 2017, the excise tax will be five dollars ($5.00) for each pound or fraction of a pound.

    (2)     Snuff or any other derivative of tobacco: three dollars and two cents ($3.02) for each pound or fraction of a pound. As of May 1, 2017, the excise tax will be four dollars and fifty-three cents ($4.53) for each pound or fraction of a pound.

(c)     Products derived from tobacco that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico must have attached to the boxes, packages, or packs in which they are packed and/or packaged a label with the information and characteristics that are provided by regulation. Each box, package, wrapper, or pack must have stamped in a visible place and clearly and legibly the word "taxable." These provisions will not apply to articles exempted according to Section 3030.18 of this Code."

Article 8.04.- Section 3020.14 of Law 1-2011, as amended, is amended to read as follows:

"Section 3020.14.-Allocation of Funds

    The Secretary of the Treasury will deposit the revenues product of Section 3020.05, Section 3020.05A, Section 3020.13, and Section 3020.15, directly into the General Fund."

Article 8.05.-A new Section 3020.15 is added to Law 1-2011, as amended, to read as follows:

"Section 3020.15.- Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a)     Definitions.- For purposes of this Section and of any other provisions applicable to this Subtitle, the following terms will have the meaning indicated as follows:

(1)     Electronic cigarette.- Will mean any type of noncombustible product that uses a heating element, source of energy, electronic circuit, or any electronic, chemical, or mechanical means that can be used to produce nicotine vapor or any other substance as a solution or any other form, which by its appearance, sixe, packaging, or labeling is susceptible to be used, offered, or purchased as an electronic cigarette, electronic cigar, or electronic pipe.

(2)     Nicotine cartridge.-  Will mean a vapor cartridge or any other container of nicotine in a liquid solution that is designed to be used with or in an electronic cigarette or vaporizer.

(3)     Vaporizer.- Will mean any type of noncombustible product that uses a heating element, source of energy, electronic circuit, or any electronic, chemical, or mechanicals means that can be used to produce nicotine vapor or any other substance as a solution or any other form, and that cannot be considered an electronic cigarette according to the definition in subparagraph (1) above.  This term will include, without being construed as a limitation, the product commonly known as "hookah" and the vaporizers used to supply drugs that are not approved by the *Food and Drug Administration* (FDA).

(b)     The excise tax indicated as followed will be imposed, paid, and collected on electronic cigarettes, nicotine cartridges, and vaporizers:

(1)     Electronic cigarette: three dollars ($3.00) for each electronic cigarette.

(2)     Nicotine cartridges: five cents (5¢) for each milliliter of nicotine solution, or of any substance whether or not it contains nicotine, in each nicotine cartridge.  This excise tax will not be prorated.

(3)     Vaporizer: six dollars ($6.00) for each unit.

(c)     Electronic cigarettes, nicotine cartridges, and vaporizers that are manufactured, introduced, sold, transferred, used, or consumed in Puerto

Rico must have attached to the boxes, packages, wrappers in which they are packed, wrapped, and/or packaged a label with the information and characteristics that are established by regulation, provided that in the case of nicotine cartridges these must contain the actual milliliters of nicotine solution in the form and manner established by the Secretary. Each box, package, wrapper, or pack must have stamped in a visible place and clearly and legibly the word "taxable." In those cases where the article is sold individually, the same must have stamped in a visible place and clearly and legibly the word "taxable" in the form and manner established by the Secretary. These provisions will not apply to articles exempted according to Section 3030.18 of this Code."

Article 8.06.- Section 3030.18 of Law 1-2011, as amended, is amended to read as follows:

"Section 3030.18.-Exemption on Cigarettes, Cigars, Loose Tobacco, Cigarette Paper, Cigarette Tubes, Chewing Tobacco, Snuff, Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a)     Exempted from the tax fixed in this Subtitle are cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers sold or transferred to foreign registry ships and ships of the United States of America and those sold to foreign country war ships and to foreign country ships on courtesy visits to Puerto Rico. This exemption will only be granted when the delivery of cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers is done according to the rules and procedures established by the Secretary and violation thereof will entail the obligation to pay the corresponding excise taxes by the introducer or the distributor, as the case may be. Any introducer or distributor that wishes to avail itself of the exemption must post a bond to respond for the payment of such excise taxes.

(b)     Likewise, exempted from the payment of excise taxes are cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers that, after having been withdrawn from the manufacturers or from the ports are taken out of the market because they are improper for normal consumption, provided that they are destroyed under the Secretary's supervision. In such event, the Secretary will reimburse or credit the tax to the person who has paid it.

(c)     Also exempted from the tax fixed in this Subtitle are cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers, when the same are sold or transferred to users, as defined in Law 23-1991, as amended, of

military stores, canteens, or other facilities operated by the Puerto Rico National Guard's Institutional Trust or its Concessionaire.

(d)    Exempted from the excise tax fixed in this Subtitle are cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers introduced or manufactured in Puerto Rico for exporting, subject to those requirements or conditions imposed by the Secretary through regulation, provided that this exemption will not be applicable to cigarettes, cigars, loose tobacco, chewing tobacco, snuff, cigarette paper, cigarette tubes, electronic cigarettes, nicotine cartridges, and vaporizers that are sold in Airline or Maritime Stores and Terminals to persons who do not leave the customs territory of the United States."

Article 8.07.-Subparagraph (a) of Section 3050.01 of Law 1-2011, as amended, is amended to read as follows:

"Section 3050.01.- Wholesale or Retail Dealer License Fees for Certain Articles

(a)    All wholesale or retail dealers, in a fixed or mobile site, of any of the articles detailed below must pay an annual tax for the concept of license fees as established in the following table:

| DEALERS | | FEES |
|---|---|---|
| Cigarettes- Wholesalers | | $750 |
| Cigarettes- Retailers with a Fixed, Mobile Site and for each cigarette vending machine | | $300 |
| Wholesale Sales from Cigarette Motor Vehicles – per vehicle | | $300 |
| Gasoline- Wholesaler | Class A | $6,000 |
| | Class B | $2,500 |
| Gasoline- Retailer | Class A | $900 |
| | Class B | $100 |
| Retailer – Sales of Alcoholic Beverages, Cigarettes, and Vehicle Parts and Accessories - per locale | | $200 |
| Motor Vehicles - Dealers | Class A | $1,000 |
| | Class B | $200 |
| Vehicle Parts and Accessories Wholesale and Retail | Class A | $2,000 |
| | Class B | $800 |
| | Class C | $100 |
| Retail Dealers of Cigarettes and Alcoholic Beverages for a Limited Time (15 days) | | $25 |
| Retail Dealers - "Motor Vehicle Shows" for a Limited Time (Vehicles, Parts, and Accessories) (15 days) | | $100 |

*CERTIFIED TRANSLATION*                                   BY: OLGA M. ALICEA, FCCI, NJITCE-S

| DEALERS | | FEES |
|---|---|---|
| Cement – Manufacturer or Wholesale Dealer | Class A | $250,000 |
| | Class B | $200,000 |
| | Class C | $80,000 |
| Gunsmiths – Arms and Munitions Dealers | | $200 |

(1)      ...

         ...."

Article 8.08.-A new subparagraph (d) is added to Section 6042.08 of Law 1-2011, as amended, to read as follows:

"Section 6042.08.-Cigarette-Related Crimes
a)       ...
b)       ...
c)       ...
(d)      Any person will incur in a misdemeanor and will be sanctioned with a fine of five thousand dollars ($5,000) who:

         (1)      acquires cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers as a user, as defined in Law 23-1991, as amended, from the military stores, canteens, or other facilities operated by the Puerto Rico National Guard's Institutional Trust or its Concessionaire, and who subsequently sells or transfers the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers so acquired to person who are not entitled to the exemption of subparagraph (c) of Section 3030.18 of this Code; or

         (2)      acquires cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers in stores called "Post Exchanges" installed in military establishments of the United States of America in Puerto Rico, and who subsequently sell or transfer the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers so acquired to persons who are not entitled to acquire these articles in those establishments."

Article 8.09.-Subparagraph (a) of Section 6042.15 of Law 1-2011, as amended, is amended to read as follows:

"Section 6042.15.-Penalty for Failing to File the Declaration of Excise Taxes and Monthly Excise Tax Return

(a)     Any person who is required to file the Declaration of Excise Taxes, the Monthly Excise Tax Return, or the Declaration of Sales who fails to file such return required by Sections 3020.08(c)(8), 3020.09(c), and 3020.10, in the form, date, and manner set forth therein will be imposed a penalty of one hundred dollars ($100) or of ten percent (10%) of the tax obligation established in said return or declaration, whichever is greater.

(b)     ...."

Article 8.10.-Temporary Provisions

(a)     Any person subject to the annual tax for the concept of license fees under Section 3050.01 of Law 1-2011 who as of May 1, 2017, holds a valid Wholesale or Retail Dealers License will be subject to the new rates provided in Article 8.07 of this Law as of the due date for the payment of the corresponding license fees according to subparagraph (b) of Section 3060.08 of Law 1-2011.

(b)     The Secretary of the Treasury will establish through regulation, circular, or other general administrative decision the rules necessary for the application of these temporary provisions.

## CHAPTER 9.-EMERGENCY FUND

Article 9.01.-Article 2 of Law No. 91 of July 21, 1966, as amended, is amended to read as follows:

"Article 2.-

Commencing in Fiscal Year 1995-96, the Emergency Fund will be finance annually with an amount of not less than one fifth of one percent (0.2%) of the total of the Joint Resolution on the Budget. After Fiscal Year 1998-99, such contribution will be a sum of not less than one percent (1%) of the total net revenues of the preceding fiscal year. Provided, that until Fiscal Year 2020-2021, such contribution will be in a sum of at least ten million dollars ($10,000,000). As of Fiscal Year 2020-2021, such contribution will be not less than zero point five percent (0.5%) of the estimate net revenues submitted by the Department of the Treasury for the preparation of the Recommended Budget charged to the General Fund. The Governor of Puerto Rico and the Director of the Office of Management and Budget, by delegation of the latter, may order the deposit into the Fund of any sources of income in an amount greater than that fixed herein when it is deemed convenient. The balance of such Emergency Fund may never exceed one hundred fifty million dollars ($150,000,000)."

*CERTIFIED TRANSLATION*                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

## CHAPTER 10.- FINAL PROVISIONS

Article 10.01.-Immunity with respect to Lawsuits and Forums.

This Law does not affect the immunity that the State and its officers or officials have with respect to lawsuits and forums.  None of the provisions of this Law authorizes actions for damages against the State, its officials, or employees for acts or omissions by the latter resulting from compliance with this Law.  Nothing provided herein is to be interpreted as constituting a waiver of the sovereign immunity of the Government of Puerto Rico.

Article 10.02.-Rules of Interpretation.

The words and phrase used in this Law are to be interpreted according to the context and meaning sanctions by common and normal use and the rules of hermeneutics recognized by our legal system.

Article 10.03.-Incompatibility.

All organic, general, or special acts, articles or sections of law, norms, collective bargaining agreements, agreements, supplementary agreements, administrative orders, policies, employment manuals, circulars, certifications, regulations, rules and conditions of employment, normative letters, classification or remuneration plans, contractual letters, and/or applicable provisions that are at odds with the provisions of this Law are hereby repealed.

Article 10.04.-Prevalence.

The provisions of this Law and the regulations or norms adopted in accordance herewith will prevail over any other provisions or law, regulation, or norm that is not in harmony with the former.

Article 10.05.-Severability.

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law is annulled or declared unconstitutional, the resolution, decision, or judgment entered to that effect will not affect, harm, or invalidate the remainder of this Law.  The effect of such judgment will be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part thereof that had been so annulled or declared unconstitutional.  If the application to a person or to a circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law is invalidated or declared unconstitutional, the resolution, decision, or judgment entered to that effect will not affect or invalidate the application of the remainder of this Law to those persons or circumstances on which it can be validly applied.  It is the express and unequivocal will of this Legislature that the courts enforce the provisions and the application of this Law to the greatest extent possible, even if it sets aside, annuls, invalidates, harms, or declares unconstitutional any of its parts, or even if its application to any person or circumstance is set aside, invalidates, or declared unconstitutional.  This

Legislature would have enacted this Law regardless of the determination of severability that the Court may make.

Article 10.06.-Effectiveness.

This Law will enter into effect immediately after its enactment.

CERTIFICATION

I, Olga M. Alicea, an English-Spanish Interpreter and Translator certified to that effect by the Administrative Office of the U.S. Courts and by the National Association of Judiciary Interpreters & Translators (NAJIT), do hereby certify that I have personally translated the foregoing document from Spanish to English and that the translation is true and accurate to the best of my knowledge and abilities.

S/   Olga M. Alicea                                          July 11, 2017
Olga M. Alicea, fcci, njitce-s,     Fed. Cert. No. 98-005                    date