**Objection Deadline: T.B.D. based on confirmation schedule approved by the Court**
**Hearing Date: T.B.D. based on confirmation schedule approved by the Court**
**Evidentiary Hearing Requested**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## THE DRA PARTIES' MOTION FOR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE CLAIM

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation  (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA")  (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................2

I.      The Commonwealth and HTA Seek Protection Under Title III of PROMESA.................2

II.     The DRA Becomes HTA's Largest Secured Creditor........................................................3

      A.      Pre-Title VI, GDB Makes Significant Loans to HTA Totaling Almost $2 Billion in Principal. ..............................................................................................3

      B.      GDB Owns $200 Million in HTA Secured Bonds. ................................................4

      C.      HTA Assigns, Pledges, and Grants to GDB a Security Interest in the Act 30-31 Revenues to Secure All Its Indebtedness. .................................................4

      D.      GDB Restructures Its Debt Under Title VI of PROMESA and Transfers All Of Its Interest in, and Payments on, HTA's Debt Obligations to the DRA. ......................6

III.    The "Clawback":  The Puerto Rico Constitution and Statutes Protect Revenues Pledged for Service of HTA's Debt Obligations Owed to the DRA. .................................................7

IV.     The Commonwealth Unlawfully Diminishes the DRA's Collateral. ...............................11

V.      The DRA and Other Parties Seek Relief from the Court Following the Commonwealth's and HTA's Improper Diversion of the Act 30-31 Revenues. ...........................................15

VI.     The FOMB Files its Second and Third Amended Plans Reflecting Agreements with Certain Creditor Constituencies ...........................................................................................18

RELIEF REQUESTED.........................................................................................................19

ARGUMENT .......................................................................................................................19

I.      The DRA Has a Valid, Perfected Security Interest in the Act 30-31 Revenues..............20

      A.      The DRA's Pre-Petition Liens Extend Post-Petition. ...........................................21

      B.      No Valid "Clawback" Has Occurred Pursuant to Article VI, Section 8 of the Puerto Rico Constitution.......................................................................................24

i

II.     The DRA is Entitled to the Allowance of an Administrative Expense Claim...................24

        A.      The Commonwealth's Illegal Diversion of DRA's Collateral During the Title III
                Case Constitutes an "Actual and Necessary" Cost and Expense to Preserve the
                Commonwealth During its Title III Proceeding ....................................................24

RESERVATION OF RIGHTS ................................................................................................32

CONCLUSION.......................................................................................................................32

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*Assured Guar. Corp. v. Carrion* (*In re Fin. Oversight & Mgmt. Bd. for P.R.*),
   919 F.3d 121 (1st Cir. 2019)...................................................................................23

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.* (*In re Fin. Oversight
   & Mgmt. Bd. for P.R.*),
   989 F.3d 170 (1st Cir. 2021).....................................................................17, 18, 21

*In re City of Detroit,*
   548 B.R. 748 (E.D. Mich. 2016)...........................................................................31

*Cumberland Farms v. Florida Dep't of Envtl. Prot.*,
   116 F.3d 16 (1st Cir. 1997)....................................................................................26

*In re FBI Distrib. Corp.*,
   330 F.3d 36 (1st Cir. 2003)....................................................................................31

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   481 F. Supp. 3d 60 (D.P.R. 2020)..........................................................................25

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   618 B.R. 619 (D.P.R. 2020).............................................................................16, 17

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   621 B.R. 289 (D.P.R. 2020)....................................................................................24

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   No. 17 BK 3283-LTS,
   2021 WL 1732139 (D.P.R. May 3, 2021)...............................................................25

*In re Heffernan Mem'l Hosp. Dist.*,
   202 B.R. 147 (Bankr. S.D. Cal. 1996) ...................................................................23

*Hicks, Muse & Co. v. Brandt* (*In re Healthco Int'l, Inc.*),
   272 B.R. 510 (B.A.P. 1st Cir. 2002)......................................................................26

*In re La Electronica, Inc.*,
   995 F.2d 320 (1st Cir. 1993)..................................................................................31

*In re Mammoth Mart, Inc.*,
   536 F.2d 950 (1st Cir. 1976)............................................................................26, 31

*Newberry v. City of San Bernardino (In re City of San Bernardino)*,
   558 B.R. 321 (C.D. Cal. 2016) ..............................................................................30

*Reading Co. v. Brown*,
  391 U.S. 471 (1968)....................................................................25, 26, 28, 30

*Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*,
  755 F.2d 200 (1st Cir. 1985).....................................................25, 26, 28, 30

**United States Constitution**

U.S. Const. art. IV, § 3, cl. 2 ...........................................................................2

**Puerto Rico Constitution**

P.R. Const. art. II, § 19 ...................................................................................13

P.R. Const. art. VI, § 7..................................................................................7, 11

P.R. Const. art. VI, § 8 .......................................................................... *passim*

P.R. Const. art. VI, § 9 .......................................................................... *passim*

**United States Statutes**

11 U.S.C. § 361 ...............................................................................................23

11 U.S.C. § 362(d)(1) ......................................................................................23

11 U.S.C. § 503 ...............................................................................................30

11 U.S.C. § 503(b)......................................................................................24, 25

11 U.S.C. § 503(b)(1) ......................................................................................30

11 U.S.C. § 503(b)(1)(A) ...............................................................24, 25, 30, 31

11 U.S.C. § 546(a)(1)(A) .................................................................................21

11 U.S.C. § 552 ...............................................................................................22

11 U.S.C. § 552(a).......................................................................................21, 23

11 U.S.C. § 902 ...............................................................................................22

11 U.S.C. § 902(2).......................................................................................22, 23

11 U.S.C. § 902(2)(B) .....................................................................................22

11 U.S.C. § 902(2)(E) .....................................................................................22

11 U.S.C. § 928 ...............................................................................................22

11 U.S.C. § 928(a) ...........................................................................................21, 23

11 U.S.C. § 944(b) ....................................................................................................31

48 U.S.C. § 2161 (2019) ............................................................................................3

*Puerto Rico Oversight, Management and Economic Stability Act* ("<u>PROMESA</u>").. *passim*

   PROMESA § 301 ............................................................................... *passim*

   PROMESA § 301(c)(5) .......................................................................30

   PROMESA § 305 ...............................................................................19

**Puerto Rico Statutes**

9 L.P.R.A. § 2002 .......................................................................................................3

9 L.P.R.A. § 2004(l) ...................................................................................................3

9 L.P.R.A. § 2021 ...........................................................................................11, 24, 28

9 L.P.R.A. § 5681 ......................................................................................9, 11, 24, 28

13 L.P.R.A. § 31625 ..................................................................................................22

13 L.P.R.A. § 31626(a)(1) .........................................................................................22

13 L.P.R.A. § 31626(a)(3) .........................................................................................22

13 L.P.R.A. § 31627(a) ..............................................................................................22

13 L.P.R.A. § 31627a(a) ............................................................................................22

13 L.P.R.A. § 31751(a)(1)(A) ....................................................................................11

13 L.P.R.A. § 31751(a)(1)(C) ........................................................................11, 24, 28

13 L.P.R.A. § 31751(a)(3)(A) ....................................................................................11

13 L.P.R.A. § 31751(a)(3)(C) ........................................................................11, 24, 28

23 L.P.R.A. § 104(c)(1) .........................................................................................8, 11

23 L.P.R.A. § 104(c)(2) ...............................................................................................8

23 L.P.R.A. § 104(c)(3) ...............................................................................................8

23 L.P.R.A. § 104(c)(4) ...............................................................................................8

v

23 L.P.R.A. § 104(c)(5) ...........................................................................................8

*Government Development Bank for Puerto Rico Debt Restructuring Act*,
     Act No. 109-2017, as amended by Act No. 147-2018 .................................1, 6

*HTA Enabling Act*, Act No. 74-1965 ....................................................................2

*Internal Revenue Code for a New Puerto Rico*,
     Act No. 1-2011, as amended by Act No. 31-2013 ................................. *passim*

*Management and Budget Office Organic Act* ("OMB Act"), Act. No. 147 (June
     18, 1980) ...........................................................................................................8

*Puerto Rico Debt Restructuring Act*, Act No. 109-2017 .................................1, 6

*Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*
     ("First Moratorium")*, Act No. 21-2016 ............................................3, 12, 26

*Puerto Rico Financial Emergency and Fiscal Responsibility Act*
     ("Second Moratorium")*, Act No. 5-2017 .....................................................13

*Puerto Rico Vehicles and Traffic Act*,
     Act No. 22-2000, as amended by Act No. 30-2013 .......................... *passim*

**Other Authorities**

S. Rep. No. 100-506, 100th Cong., 2d Sess. 21 (1988) ......................................23

6 Collier on Bankruptcy ¶ 901.04 (16th ed. 2019) .............................................31

6 Collier on Bankruptcy ¶ 902.03[2] (16th ed. 2019) ........................................23

6 Collier on Bankruptcy ¶ 902.03[5] (16th ed. 2019) ........................................23

**COME NOW** AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the approved Qualifying Modification for the Government Development Bank for Puerto Rico (the "GDB")[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA"), by and through the undersigned legal counsel, and respectfully submit the DRA Parties' *Motion for Allowance of an Administrative Expense Claim* (the "Motion") against the Commonwealth.

## PRELIMINARY STATEMENT

Since the Commonwealth and HTA filed their Title III cases on May 3, 2017 and May 21, 2017, respectively, the Commonwealth has diverted more than $2.4 billion in Act 30-31 Revenues from HTA to the Commonwealth. Upon information and belief, more than $800 million of this amount is *exclusively* for the benefit of the DRA and is not shared with the bondholders. Those revenues constitute the DRA's collateral—wherever located. Neither HTA nor the Commonwealth has adequately protected the DRA during this time—nor has the Commonwealth demonstrated that it diverted the DRA's collateral in accordance with the Puerto Rico Constitution and applicable law.

---

[2]   *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

1

The Commonwealth has used the DRA's collateral for its benefit—either by paying bondholders and other creditors under the Third Amended Plan (as defined below) or by paying for expenses of the Commonwealth.  As a result, the DRA has more than an $800 million administrative expense claim against the Commonwealth, which must be paid in full, in cash if the Commonwealth wishes to confirm any plan of adjustment in accordance with Title III.

U.S. Supreme Court and First Circuit precedent require debtors to pay administrative expense claims for post-petition actions that harm creditors under the "fundamental fairness" doctrine.  Additionally, the Bankruptcy Code permits administrative expense claims when a transaction during the pendency of a bankruptcy benefits the debtor.  Here, the facts are indisputable—depriving the DRA of its collateral has, in turn, deprived the DRA's bondholders (*i.e.*, former GDB creditors) of hundreds of millions of dollars in recoveries—all for the benefit of the Commonwealth and its creditors.  Therefore, to confirm any proposed plan of adjustment, the Commonwealth must resolve the administrative expense claim detailed below.[3]

## BACKGROUND

I.      **The Commonwealth and HTA Seek Protection Under Title III of PROMESA.**

1.      The Commonwealth of Puerto Rico is an unincorporated territory of the United States of America subject to the Territorial Clause of the United States Constitution.  U.S. Const. art. IV, § 3, cl. 2.

2.      HTA is a public corporation created by Act No. 74-1965 (the "HTA Enabling Act") to assume responsibility for the construction of highways and other transportation systems in

---

[3]      The DRA also has filed a concurrent objection to approval of the Third Amended Disclosure Statement (as defined below) on the grounds that the Third Amended Disclosure Statement must be revised to disclose risks related to the DRA's administrative expense claim, including that the Third Amended Plan may not be feasible should this claim be allowed.

Puerto Rico. *See* 9 L.P.R.A. § 2002. The HTA Enabling Act authorizes HTA to incur indebtedness and secure its debt obligations through a pledge of certain of its revenues, as more fully described below. *See* 9 L.P.R.A. § 2004(l). Congress enacted PROMESA on June 30, 2016. Section 301 of PROMESA established the FOMB. *See* 48 U.S.C. § 2161 (2019).

3.      The FOMB commenced a Title III case under PROMESA for the Commonwealth on May 3, 2017, and for HTA on May 21, 2017. *See Title III Petition for the Commonwealth of Puerto Rico*, Dkt. No. 1[4], and *Title III Petition for Puerto Rico Highways and Transportation Authority (HTA)*, Dkt. No. 1 of Case No. 17-03567 (LTS).

## II.     The DRA Becomes HTA's Largest Secured Creditor.

### A.     Pre-Title VI, GDB Makes Significant Loans to HTA Totaling Almost $2 Billion in Principal.

4.      GDB operated as a banking institution and depository of funds for the Commonwealth, its instrumentalities, public corporations, and municipalities. *See Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority, Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act, for Approval of the Qualifying Modification for GDB*, Dkt. No. 1 of Civil Case No. 18-01561 (LTS) ¶ 8 (Aug. 10, 2018). GDB also acted as a fiscal agent, paying agent, and financial advisor to the Commonwealth and its instrumentalities, public corporations, and municipalities until Act No. 21-2016, the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act* (the "First Moratorium"), transferred its responsibilities to the Puerto Rico Fiscal Agency and Financial Advisory Authority. *See id.* ¶¶ 8, 11; *see also infra* ¶ 31.

---

[4]    Unless otherwise specifically identified in this Motion, the term "Dkt. No." shall refer to Case No. 17-03283 (LTS).

5.     Prior to the commencement of the Title III cases, GDB and HTA entered into individual loan agreements (the "HTA Loan Agreements") and HTA issued 23 separate promissory notes to GDB as evidence of HTA's indebtedness.[5]  Upon information and belief, as of the date hereof, those loans have an aggregate outstanding principal balance in excess of $1.7 billion and not less than $866.4 million in accrued interest, plus fees and expenses that have accrued under the terms of the loans.  *See* HTA Loan Agreements; *see also* Offering Memorandum for GDB Debt Recovery Authority Bonds (Taxable) Due 2040, dated as of November 7, 2018 (the "Offering Memorandum").[6]

### B.    GDB Owns $200 Million in HTA Secured Bonds.

6.     GDB also held $200,000,000 in aggregate original principal amount of Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds (Series A), which HTA issued under Resolution No. 98-06, adopted by HTA on February 26, 1998 (the "1998 Bond Resolution").[7]  Upon information and belief, as of the date hereof, HTA owed GDB not less than $97 million in accrued interest plus fees and expenses related to these HTA bonds.  *See id*;  *see also* Fiscal Plan for the Puerto Rico Highways & Transportation Authority (HTA) FY 2022-FY 2051 (May 26, 2021) (the "2021 HTA Fiscal Plan"), at 110-111.[8]

### C.    HTA Assigns, Pledges, and Grants to GDB a Security Interest in the Act 30-31 Revenues to Secure *All* Its Indebtedness.

---

[5]    True and correct copies of the HTA Loan Agreements were previously filed on the Court's docket as Exhibit A to the Amended Lift Stay Motion (as defined below) [Dkt. No. 16276-1 – 16276-16].

[6]    A true and correct copy of the Offering Memorandum was  previously filed on the Court's docket as Exhibit B to the Amended Lift Stay Motion [Dkt. No. 16276-17].

[7]    A true and correct copy of the 1998 Bond Resolution was previously filed on the Court's docket as Exhibit C to the Amended Lift Stay Motion [Dkt. No. 16276-18].  *See also* Amended Lift Stay Motion, Ex. D [Dkt. No. 16276-19 – 16276-22].

[8]    A true and correct copy of the 2021 HTA Fiscal Plan is attached hereto as Exhibit B.

4

7.      On August 28, 2013, GDB and HTA executed an Assignment and Security Agreement (the "Security Agreement")[9] and a related series of loan agreements.  Pursuant to Section 1.1 of the Security Agreement, HTA "absolutely, irrevocably, and unconditionally assigns, conveys and transfers without recourse, to [GDB all of its] rights, title, obligations and interest in" the following revenues (collectively, the "Act 30-31 Revenues"):

|  |  |
|---|---|
| (A) | The motor vehicle license fees described by Act No. 30-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 30"); |
| (B) | Up to $20,000,000 per fiscal year of the excise tax on cigarettes described by Act No. 31-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 31"); |
| (C) | The proceeds of the sixteen cents per gallon gasoline tax described by Act 31; |
| (D) | The proceeds of the first four cents of the gas and diesel oil excise tax described by Act 31; and |
| (E) | The proceeds of the petroleum products excise tax described by Act 31. |

See Security Agreement § 1.1.

8.      Under Section 1.2 of the Security Agreement, HTA also assigned, pledged and granted to GDB as "security for the prompt and complete payment and performance when due of all of its Obligations … a continuing security interest … in all of the right, title and interest of [HTA] in the [Act 30-31 Revenues], whether presently held or hereafter acquired and wherever located."  See Security Agreement § 1.2.[10]

---

[9]    A true and correct copy of the Security Agreement was previously filed on the Court's docket as Exhibit E to the Amended Lift Stay Motion [Dkt. No. 16276-23].

[10]    Section 5.1 of the Security Agreement defines Obligations to mean "all indebtedness, obligations and liabilities (including, without limitation, guarantees and other contingent liabilities) of [HTA] to the [GDB], including any amounts owned [sic] on account of outstanding obligations of [HTA] with the [GDB] and those arising under or in connection with the Loan Agreement, the Note or the Loan Documents."

5

9.      The liens granted to GDB by the Security Agreement were duly perfected through the filing of UCC Financing Statement No. 2013004677 at the Puerto Rico Department of State on August 29, 2013, as amended on March 31, 2015 (the "30-31 Financing Statement").[11]

**D.      GDB Restructures Its Debt Under Title VI of PROMESA and Transfers All Of Its Interest in, and Payments on, HTA's Debt Obligations to the DRA.**

10.      On July 12, 2017, the FOMB issued a resolution authorizing GDB to use Title VI of PROMESA.  *See* Dkt. No. 1 of Civil Case No. 18-01561 (LTS) ¶ 18 (Aug. 10, 2018).  On August 10, 2018, GDB and AAFAF initiated a proceeding to restructure GDB's debt obligations pursuant to Title VI of PROMESA.  *See generally id*.

11.      Pursuant to GDB's Title VI restructuring, on November 5, 2018, the FOMB certified GDB's Qualifying Modification under PROMESA, which Qualifying Modification this Court subsequently approved by Order dated November 7, 2018.  *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).

12.      To secure the DRA's obligations under the bonds issued to the creditors of GDB in satisfaction of their claims as part of GDB's Title VI restructuring, GDB consensually transferred a substantial portion of its assets, including the loans to HTA described above and the 1998 HTA bonds, to the DRA.  *See* Act No. 109-2017; *see also* Master Transfer Agreement (the "Master Transfer Agreement"), dated November 29, 2018, between GDB and DRA, § 2[12]; *see also* Offering Memorandum at 100-137.

---

[11]   A true and correct copy of the 30-31 Financing Statement was previously filed on the Court's docket as Exhibit F to the Amended Lift Stay Motion [Dkt. No. 16276-24].

[12]   A true and correct copy of the Master Transfer Agreement was previously filed on the Court's docket as Exhibit G to the Amended Lift Stay Motion [Dkt. No. 16276-25].

III.     The "Clawback":   The Puerto Rico Constitution and Statutes Protect
Revenues Pledged for Service of HTA's Debt Obligations Owed to the DRA.

13.     The Puerto Rico Constitution requires that the Commonwealth's annual appropriations not exceed its annual revenues, and, when the Commonwealth's resources are insufficient to cover its annual appropriations, it requires the Commonwealth to satisfy fiscal-year interest and amortization on general obligation ("GO") bonds before it satisfies other obligations.

14.     Article VI, Section 7 of the Puerto Rico Constitution provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." P.R. Const. art. VI, § 7.  Section 7 requires the Commonwealth to increase tax revenue whenever necessary to provide sufficient funds to cover appropriations, including fiscal-year operating expenses and general obligation debt service.  *See id.*  Section 7 also prohibits the Commonwealth from rolling budget shortfalls into successive fiscal years.  *See id*.

15.     Article VI, Section 8 of the Puerto Rico Constitution provides that "[i]n case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8.

16.     Further, Article VI, Section 9 of the Puerto Rico Constitution mandates that "[p]ublic property and funds shall only be disposed of for public purposes . . . pursuant to law." P.R. Const. art. VI, § 9.

17.     To properly understand how the use, disposition, and flow of public funds work in Puerto Rico, we look at applicable law.  In the case of the Act 30-31 Revenues, applicable law

7

means (i) the *Management and Budget Office Organic Act*, Act. No. 147 (June 18, 1980) (the

"<u>OMB Act</u>") and (ii) the mandates of Acts 30 and 31 themselves.[13]

18.     Section 4(c) of the OMB Act creates a waterfall of payment priorities for "when

the available funds for a specific fiscal year are not sufficient to cover the appropriations approved

for that year."   Under this provision, if there are insufficient funds for the fiscal year, the

Commonwealth must apply available funds in the following order:

> (A)     First-priority status applies to the "payment of interest and amortizations
> corresponding to the public debt." 23 L.P.R.A. § 104(c)(1).
>
> (B)     Second-priority status applies to the payment of "commitments entered into
> by virtue of legal contracts in force, judgments of the courts in cases of
> condemnation under eminent domain, and binding obligations to safeguard
> the credit, reputation and good name of the Government of the
> Commonwealth of Puerto Rico . . . ." 23 L.P.R.A. § 104(c)(2). ***These
> obligations include HTA's debt obligations.***
>
> (C)     Third-priority status applies to the payment of "regular expenses" related to
> government operations, including payments for "[c]onservation of public
> health," "[p]rotection of persons and property," "[p]ublic education
> programs," "[p]ublic welfare programs," pension obligations and any
> "remaining public services." 23 L.P.R.A. § 104(c)(3).
>
> (D)     Fourth-priority status applies to expenditures for "construction of capital
> works or improvements" and fifth-priority status applies to "contracts and
> commitments contracted under special appropriations." 23 L.P.R.A.
> § 104(c)(4)–(5).

19.     Act 30 requires that the fees assessed by the statute be transferred and conveyed in

the following fashion:

> […]
>
> Except as otherwise provided in this chapter the amount of the fees collected
> in accordance with §§ 5681 . . . of this title ***shall be covered in its entirety***

---

[13]     True and correct copies of Act No. 30 (2013) and Act No. 31 (2013) were previously filed on the Court's docket
as Exhibits K and L, respectively, to the Amended Lift Stay Motion [Dkt. No. 16276-29 – 16276-30].

*into a Special Deposit in the name and for the benefit of the Highways and Transportation Authority*.

The Authority is hereby authorized to pledge or encumber the proceeds of the taxes collected for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds of the taxes collected shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section does not suffice to attain such purposes. *Otherwise, the proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations*.

9 L.P.R.A. § 5681; Dkt. No. 16276-29 § 1 (emphasis added).

20.     Likewise, Act 31 requires that the tax revenues be transferred as follows:

(1) The sum of the tax collected on gasoline and four cents (4¢) of the gas oil or diesel oil tax established by Section 3020.06 of this Subtitle, and the total amount per fiscal year of the excise tax collected for crude oil, partially finished and finished oil by-products, and any other hydrocarbon mixtures established in Section 3020.07 of this Subtitle, *shall be covered into a special deposit in favor of the Highways and Transportation Authority for its corporate purposes*.

(A) *The Secretary shall transfer every month, or as agreed on with the Highways and Transportation Authority, the amounts covered into said special deposit*, deducting from these the amounts reimbursed according to the provisions of Section 3030.19 and 3030.20 of this Subtitle.

[…]

(C) The Highways and Transportation Authority is hereby authorized to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in Section 3020.06 and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07, for the payment of the principal and the interest on bonds or other obligations or for any other legal purpose of the Authority. Said commitment or pledge shall be subject to the provisions of Section 8 of Item VI of the Constitution of the

9

Commonwealth of Puerto Rico. The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes. ***Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations***.

[…]

(3) The revenues collected from the tax on cigarettes established in Section 3020.05 of this Subtitle up to twenty million dollars ($20,000,000) per fiscal year ***shall be covered into a special deposit account in favor of the Highways and Transportation Authority for its corporate powers and purposes***.

> (A) ***The Secretary shall transfer every month or as agreed on with the Highways and Transportation Authority, the amounts covered into such special deposit account***, deducting therefrom any amounts reimbursed in accordance with the provisions of Section 3030.18 of this Subtitle.

> […]

> (C) The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. ***Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations***.

[…]

10

13 L.P.R.A. §§ 31751(a)(1)(A), 31751(a)(1)(C), 31751(a)(3)(A), and 31751(a)(3)(C); Dkt. No.

16276-30 § 3 (emphasis added).  *See also* Dkt. No. 10107-4.

21.    When read together, the Security Agreement, Article VI, Sections 7 through 9 of

the Puerto Rico Constitution and the foregoing legislation expressly recognize the potential

application of Article VI, Section 8 of the Puerto Rico Constitution to the Act 30-31 Revenues,

but make clear that the Commonwealth may ***only*** use those funds: (i) when the fiscal year begins

with a balanced budget, *see* P.R. Const. art. VI, § 7; (ii) to pay ***only*** interest and amortizations on

GO debt ***if all other available resources for the fiscal year are insufficient to cover such GO debt***

***service***, *see* P.R. Const. art. VI, §§ 8-9; 23 L.P.R.A. § 104(c)(1); 9 L.P.R.A. §§ 2021, 5681; 13

L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C)); and, (iii) once the above is satisfied, to be used

otherwise only to pay obligations of HTA.  *See id.*

22.    Under all other circumstances, the Act 30-31 Revenues shall be used solely

for the payment of principal of and interest on the bonds and other obligations of HTA.

**IV.    The Commonwealth Unlawfully Diminishes the DRA's Collateral.**

23.    Then-Governor Alejandro Garcia-Padilla issued Executive Order 2015-046 on

December 1, 2015, which ordered the Treasury Secretary to "retain the revenues assigned to [HTA]

for the payment of certain [HTA] obligations . . . ."  *See* Admin. Bulletin OE-2015-046 at 2.  This

order unlawfully contradicted Article VI, Section 8 of the Puerto Rico Constitution because it

failed to apply the HTA revenues only to repay GO debt, *see id.* at 3 ("The Department of the

Treasury shall only retain such revenues that are necessary for the payment of public debt, ***while***

***continuing to provide essential services*** . . . .") (emphasis added).  *See also* Dkt. No. 11947-11 at

36.

11

24.    On December 8, 2015, then-Governor Garcia-Padilla issued Executive Order 2015-049, which stated that the Governor or the Director of the Office of Management and Budget "may establish budgetary reserves and restrict those resources that are at the disposal of government entities in the manner that they see fit, when deemed necessary in the course of executing and controlling the budget" and that the Director shall "make any budget adjustments necessary in the allocations contained in the Budget in order to match them with available resources."  Admin. Bulletin OE-2015-049 at 2, 3.  This executive order unlawfully authorized the Commonwealth to use pledged HTA revenues "in the manner that [it] see[s] fit," to pay virtually any other general expense ahead of GO debt.  *See id.* at 2.

25.    To provide guidelines for the disbursement of HTA and other revenues recovered pursuant to these executive orders, the Department of Treasury issued Circular Letter No. 1300-15-16 on December 17, 2015. This letter directed Commonwealth officials to disburse pledged HTA revenues to pay for "essential services," payroll and pensioned persons, expenses necessary to guarantee the stability of the central government of the Commonwealth and the welfare of its inhabitants, and expenses for emergencies.

26.    On April 6, 2016, the Commonwealth approved the First Moratorium, Act No. 21-2016.  Pursuant to the authority granted to him by this Act, then-Governor Garcia-Padilla issued three executive orders (collectively, the "Clawback Executive Orders") that (i) suspended the repayment of HTA's debts (including those owed to GDB and, subsequently, to the DRA), (ii) continued to withhold various government sources of revenue (including the DRA's collateral), and (iii) redirected the withheld funds to satisfy the operating expenses of the Commonwealth. *See* Admin. Bulletin OE-OE-2016-018 (May 17, 2016), Admin. Bulletin EO-2016-30 (June 30, 2016), Admin. Bulletin EO-2016-031 (June 30, 2016); *see also* Dkt. No. 11947-11 at 36-37.

12

27.     The Commonwealth issued the Clawback Executive Orders without complying with the requirements for the "clawback"—which is the **only** legal and permissible justification for diversion of the revenues.  The Commonwealth made no effort to show how the diversion of the revenues complied with the Puerto Rico Constitution's "clawback" provision and applicable laws.  Each of the Clawback Executive Orders therefore violated the priority of debt payments set forth in the Puerto Rico Constitution, the OMB Act, and Acts 30 and 31 by elevating the payment of general expenses over the payment of HTA's senior secured debts, including the HTA loans and the 1998 HTA bonds.

28.     On January 29, 2017, the Commonwealth approved a second moratorium act, Act No. 5-2017, known as the *Puerto Rico Financial Emergency and Fiscal Responsibility Act* (the "Second Moratorium," and jointly with the First Moratorium, the "Moratorium Laws"), which: (i) repealed or replaced certain portions of the First Moratorium; (ii) maintained the Governor's ability to seize pledged revenues during an "Emergency Period"; and (iii) authorized the Governor to "designat[e] the priority for the use of available resources to pay for the essential services the Governor deems necessary to provide for health, safety, and welfare of the residents of Puerto Rico . . . ."  Art. 202 of Act No. 5-2017.  Article 208(e) of the Second Moratorium provides that the Clawback Executive Orders shall remain in place until they are either amended, rescinded or substituted.  *See id*. at art. 208(e).  *See also* Dkt.11947-11 at 36-37.

29.     Even though the Clawback Executive Orders and the Moratorium Laws were purportedly issued pursuant to Article VI, Section 8 and/or Article II, Section 19 of the Puerto Rico Constitution, they violate the Puerto Rico Constitution because the Commonwealth used those revenues to pay for obligations other than its GO bond obligations or HTA's secured debt obligations.  This unconstitutional diversion of revenues has continued during the Title III

13

proceedings for the Commonwealth and HTA.  For example, through May 28, 2021, the
Commonwealth has retained approximately $536 million in Act 30-31 Revenues in just Fiscal
Year 2021.  *See* Treasury Single Account ("TSA") FY 2021 Cash Flow Report for the week of
May 28, 2021, at 10.[14]  These revenues were not applied to GO or HTA debt service.  *See id.*
Because the conditions of the clawback have not been met, the DRA continues to possess an
interest in the Act 30-31 Revenues and is entitled to compensation for the diminution of value
caused by the Debtors' diversion of these funds.

30.     In addition, currently the Commonwealth appears to run a budgetary surplus.
Therefore, it cannot satisfy the conditions set forth in the Puerto Rico Constitution for the use of
the pledged Act 30-31 Revenues for any purpose other than payment of the HTA debt obligations.
*See* 2021 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity (April 23, 2021) (the "2021
CW Fiscal Plan") at 58-59.[15]  As noted above, the Commonwealth may only use available
resources such as the Act 30-31 Revenues to pay GO debts in a fiscal year when the available
resources "are insufficient to meet the appropriations made ***for that year*** . . . ."  P.R. Const. art.
VI, § 8 (emphasis added).  That certainly does not appear to be the case in the current fiscal year
or the preceding years during which the Title III proceedings have been ongoing.  *See* 2021 CW
Fiscal Plan at 43 (April 23, 2021).

31.     The diminution of the DRA's collateral under the Clawback Executive Orders and
the Moratorium Laws remains in effect, and the Commonwealth has not modified those provisions
despite the fact that neither the moratoria nor the Executive Orders satisfy Article VI, Section 8 of

---

[14]   A true and correct copy of the Treasury Single Account ("TSA") FY 2021 Cash Flow Report for the week of May
28, 2021 is attached hereto as Exhibit C.

[15]   A true and correct copy of the 2021 CW Fiscal Plan is attached hereto as Exhibit D.

the Puerto Rico Constitution, as discussed above.[16]  Consequently, the DRA's collateral continues to be unlawfully diverted for purported payment of "essential services" pursuant to the terms of the Clawback Executive Orders and the Moratorium Laws.

32.     Absent a showing that the required conditions for application of the "clawback" have been satisfied, the Commonwealth's and HTA's actions are directly at odds with the mandates of Article VI, Section 9 of the Puerto Rico Constitution and expressly violate Acts 30 and 31.  The Commonwealth and HTA have failed to make such a showing.

**V.     The DRA and Other Parties Seek Relief from the Court Following the Commonwealth's and HTA's Improper Diversion of the Act 30-31 Revenues.**

33.     Given the Commonwealth's illegal diversion and use of the Act 30-31 Revenues, on June 25, 2019, the DRA Parties filed *The DRA Parties' Motion and Memorandum of Law in Support of Their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* (the "DRA Original Lift Stay Motion") [Dkt. No. 7643].  The DRA Parties asserted that such actions violated the Puerto Rico Constitution and Puerto Rico statutes and alleged that the dissipation of their collateral remained ongoing.  *See* DRA Original Lift Stay Motion ¶¶ 21–24, 34.  The DRA Parties therefore sought relief from the automatic stay to exercise remedies or, in the alternative, an order requiring the debtors to provide the DRA with adequate protection of its interest in the Act 30-31 Revenues.  *See generally id*. ¶¶ 43–44.

---

[16]  Although then-Governor Rosselló extended the Emergency Period until June 30, 2019, by virtue of executive orders numbers 2017-031, 2017-076, 2018-023, 2018-053, 2019-030, 2019-066 and 2020-050, none of these orders amended, substituted or rescinded the improper provisions of the Clawback Executive Orders.

34.     In August 2019, several monoline insurers (the "Monolines")[17] filed a similar motion for adequate protection or, in the alternative, for relief from the automatic stay with respect to bonds issued by HTA.  *See* Dkt. No. 8536 (the "Monolines' Original Lift Stay Motion").  The Monolines alleged that they had a perfected security interest in certain pledged revenues, including some of the Act 30-31 Revenues, and that stay relief was warranted because the Commonwealth had unlawfully diverted the revenues in violation of Article VI, Section 8 of the Puerto Rico Constitution.  *See* Monolines' Original Lift Stay Motion ¶¶ 6, 63, 68.

35.     The Court ordered that both the DRA Original Lift Stay Motion and the Monolines' Original Lift Stay Motion be subject to mandatory mediation.  *See, e.g.*, Dkt. Nos. 8481, 8567. Pursuant to a scheduling order entered by the Court, the Monolines amended their lift stay motion in January 2020.  *See* Dkt. No. 10102 (the "Monolines' Amended Lift Stay Motion").

36.     The DRA Parties were granted limited intervention and briefing rights with respect to the Monolines' Amended Lift Stay Motion.  *See* Dkt. Nos. 12005, 12396, 12999, 13226. However, the Court ordered that briefing on the DRA Original Lift Stay Motion would not commence until it ruled on the preliminary issues of whether the Monolines had "standing to sue and security or other property interests in the relevant revenues" (the "Gating Issues").  *See* Dkt. No. 12533.

37.     On July 2, 2020, the Court issued a decision on the Gating Issues.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 619 (D.P.R. 2020) (the "Gating Issues Decision").  In the Gating Issues Decision, the Court concluded that the Monolines had failed to make the required prima facie showing of a security interest in the excise tax revenues (other than those that had been

---

[17]   The term "Monolines" refers, jointly, to Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company.

16

deposited in certain special funds).  *See id.* at 640.  The Gating Issues Decision notes that the Act

30-31 Revenues "are not able to be used or obtained by HTA nor are they at HTA's disposal" and

are instead "within the possession and control of the Commonwealth."[18]  *Id.* at 634-35 (internal

quotations omitted).

38.    However, the Court did not reach the question of whether HTA's lack of possession

of the Act 30-31 Revenues means that it lacked any interest in the Act 30-31 Revenues.  The Court

also did not address the Commonwealth's justification for diverting the revenues away from HTA

or whether such justification is permissible based on the framework of the Act 30-31 Revenues

under applicable Puerto Rico law and the Puerto Rico Constitution.[19]

39.    In reaching its decision, the Court concluded only that the "specific resolutions

govern[ing] the relationship between HTA ***and the Bondholders***" and the excise tax statutes'

"commitments to transfer certain of the Revenues to HTA ***for the benefit of the Bondholders***," do

not purport to grant ***bondholders*** property rights in the Excise Tax Revenues, and therefore

"[n]either the Bond Resolutions nor the Excise Tax Statutes promise ***the Bondholders*** that the

Commonwealth will pay them." *Id.* at 634 (emphasis added); *see also id.* at 635 (noting that

Section 2015 of title 9 expressly provides that the Commonwealth is not liable for HTA's bond

obligations).

---

[18]    In the Gating Issues Decision, this Court also held that Commonwealth excise tax revenue statutes—which require
that certain excise tax revenues received by the Commonwealth "shall be covered into a special deposit in the
name and for the benefit of [HTA]"to pay debt service on the HTA bonds—did not create statutory liens against
those revenues for the benefit of HTA or its bondholders.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618
B.R. 619, 634-35 (D.P.R. 2020).  Although the First Circuit affirmed the Gating Issues Decision, the First
Circuit's ruling was silent on this issue.  *See Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.* (*In re
Fin. Oversight & Mgmt. Bd. for P.R.*), 989 F.3d 170 (1st Cir. 2021).

[19]    The Monolines' Appeal Opinion (as defined below) did not address these questions either or the validity and
extent of the DRA's security interest in the Act 30-31 Revenues.  *See Assured Guar. Corp.,* 989 F.3d 170.

40.     On September 9, 2020, the Court issued a memorandum opinion and order denying the Monolines' Amended Lift Stay Motion as supplemented.  *See Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions*, Dkt. No. 14186) (the "Final Lift Stay Decision," and jointly with the Gating Issues Decision, the "Monolines' Lift Stay Denial").  The Monolines appealed these orders to the First Circuit Court of Appeals on September 23, 2020. *See* Dkt. No. 14389.  On March 3, 2021, the First Circuit issued a decision affirming the Monolines' Lift Stay Denial (the "Monolines Appeal Opinion"). *See Assured Guar. Corp.*, 989 F.3d 170 (1st Cir. 2021).

41.     Following the Court's decision on the Gating Issues, the DRA Parties were permitted to amend their original lift stay motion to reflect new developments that occurred since June 2019.  *See* Dkt. No. 14417.  On March 31, 2021, the DRA Parties filed *The DRA Parties' Amended Motion and Memorandum of Law in Support of their Request for Adequate Protection or Relief from the Automatic Stay* (the "Amended Lift Stay Motion").  *See* Dkt. No. 16276.

**VI.    The FOMB Files its Second and Third Amended Plans Reflecting Agreements with Certain Creditor Constituencies**

42.     On February 22, 2021, the FOMB and certain other Commonwealth economic stakeholders (along with other parties) executed a *Plan Support Agreement* (the "GO PSA"). *See* Dkt. No. 15977-2.

43.     As a result thereof, on March 8, 2021, the FOMB filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Second Amended Plan") [Dkt. No. 15976] and the *Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, Et Al.* [Dkt. 15977].

44.     On May 11, 2021, the FOMB filed the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Third Amended Plan") [Dkt. No.

18

16740], and the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Third Amended Disclosure Statement") [Dkt. No. 16741].

45.     The Third Amended Plan and Third Amended Disclosure Statement incorporate the terms of the HTA/CCDA Related Plan Support Agreement (the "HTA/CCDA PSA"), dated as of May 5, 2021 among the FOMB, Assured Guaranty Corp. and Assured Guaranty Municipal Corp, National Public Finance Guarantee Corporation, and certain other holders of HTA and CCDA bonds.  The Third Amended Plan and Third Amended Disclosure Statement provide that the Commonwealth will retain the Act 30-31 Revenues for payment of Commonwealth creditors only, and that it will not make these revenues available to HTA for the repayment of the DRA's HTA debt.  *See* Dkt. No. 16740 at 2.1, 85.3, K-3, and Dkt. No. 16741 at 63-64.

## RELIEF REQUESTED

46.     The DRA Parties seek an order from the Court, substantially in the form attached hereto as Exhibit A, granting the DRA an allowed administrative expense claim in the Commonwealth Title III case equal to the amount of the DRA's collateral that has been unlawfully retained by the Commonwealth for its benefit during the pendency of its Title III case.[20]

## ARGUMENT

47.     The DRA has a valid, perfected lien on HTA's interest in the Act 30-31 Revenues, which lien continues to attach post-petition.  HTA's interest in the Act 30-31 Revenues cannot be

---

[20]   The DRA Parties intend to take discovery in connection with this Motion to quantify the size of the DRA's administrative expense claim.  In addition, while the DRA seeks an order from this Court granting the DRA an allowed administrative expense claim in the Commonwealth Title III case, the DRA is *not* seeking to have this claim paid immediately.  The DRA expects this claim to be paid through distributions provided under the Commonwealth's plan of adjustment.  As such, the relief requested herein is entirely consistent with Section 305 of PROMESA, which provides that, unless the FOMB consents "*or the plan so provides*," a court shall not interfere with a Title III debtor's use of property.  *See* PROMESA § 305 (emphasis added).

eliminated by the Commonwealth's improper and unconstitutional diversion of those revenues. As such, the Commonwealth's diversion of the Act 30-31 Revenues has deprived (and is continuing to deprive) the DRA of the value of its collateral for the Commonwealth's own benefit. For these reasons, the DRA is entitled to allowance of an administrative expense claim equal to the amount of post-petition Act 30-31 Revenues that the Commonwealth has diverted unlawfully.

**I.     The DRA Has a Valid, Perfected Security Interest in the Act 30-31 Revenues.**

48.    Pursuant to the Security Agreement, HTA "absolutely, irrevocably, and unconditionally assigns, conveys and transfers without recourse, to [GDB all of its] rights, title, obligations and interest in [the Act 30-31 Revenues]." *See* Security Agreement § 1.1.  HTA further pledged these revenues to GDB as "security for the prompt and complete payment and performance when due of all of its Obligations … a continuing security interest … in all of the right, title and interest of [HTA] in the [Act 30-31 Revenues], whether presently held or hereafter acquired and wherever located." *See id*. § 1.2 (emphasis added).   This pledge secures *any* indebtedness that HTA owes to GDB.  *See supra* ¶ 9-12.  GDB perfected its lien through the filing of a UCC financing statement at the Puerto Rico Department of State.  *See supra* ¶ 9.  As successor to GDB, the DRA now holds a perfected security interest in HTA's interest in the Act 30-31 Revenues.

49.    HTA possesses a property interest in the Act 30-31 Revenues.  Commonwealth law requires that the secured revenues be transferred and conveyed to HTA *unless* a valid "clawback" has been properly implemented under Article VI, Section 8 of the Puerto Rico Constitution.  *See supra* ¶¶ 18-28.  Until the FOMB can demonstrate that the Commonwealth has satisfied the required conditions for "clawback"– which they have failed to do – HTA's property interest in the Act 30-31 Revenues remains, and the DRA's security interest continues to attach to HTA's interest

20

in such revenues pursuant to Article VI, Section 9 of the Puerto Rico Constitution.  *See* P.R. Const. art. VI, § 9 ("*[p]ublic property and funds shall only be disposed of . . . pursuant to law*.") (emphasis added).  Accordingly, the Commonwealth's and HTA's actions in diverting these revenues expressly violate Acts 30 and 31, the Puerto Rico Constitution, and other Puerto Rico statutes.

50.     The DRA is party to a bilateral Security Agreement that grants it a valid, perfected security interest in the Act 30-31 Revenues "*whether presently held or hereafter acquired and wherever located*," and the post-petition stream of future revenues stemming therefrom.  *See* Security Agreement § 1.2 (emphasis added); s*ee also supra* ¶¶ 9-12; *infra* ¶¶ 55-61.

51.     Moreover, neither the FOMB nor any other party has challenged the legitimacy of the DRA's security interest in the Act 30-31 Revenues.  The statute of limitations for a party to timely commence such action expired on May 21, 2019—two years after HTA's petition date.[21]

### A.     The DRA's Pre-Petition Liens Extend Post-Petition.

52.     Section 552(a) of the Bankruptcy Code establishes a general rule that a debtor's after-acquired property is not subject to a secured creditor's pre-petition lien.  However, Section 928(a) of the Bankruptcy Code carves out an exception to this rule.  Specifically, it states that, "[n]otwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any

---

[21]     *See* 11 U.S.C. § 546(a)(1)(A) (providing a trustee with "2 years after the entry of the order for relief" to commence an action to avoid a lien under the trustee's avoidance powers).  During oral argument before the First Circuit on the Monolines' Amended Lift Stay Motion appeal, Judge Lipez acknowledged the strength of the DRA's lien, stating that if the bond resolutions contained a pledge of excise tax revenues without qualification of where such funds were located (akin to the provisions in the DRA's Security Agreement), the Monolines "would be in a much stronger position to argue that the pledged revenues were not contingent on what HTA or the Commonwealth happened to deposit into the sinking fund."  *See* Tr. at 47:2-47:9 (1st Cir. Feb. 4, 2021).  Moreover, neither the Gating Issues Decision nor the Monolines' Appeal Opinion alter this fact. As discussed above, *supra* ¶¶ 42-45, the Gating Issues Decision does not have any application to the DRA's liens. Likewise, the Monolines' Appeal Opinion does not modify this outcome. *See Assured Guar. Corp.*, 989 F.3d 170.

21

lien resulting from any security agreement entered into by the debtor before the commencement

of the case."

53.    Section 902(2) of the Bankruptcy Code defines "special revenues" as:

(A)    receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems;

(B)    special excise taxes imposed on particular activities or transactions;

(C)    incremental tax receipts from the benefited area in the case of tax-increment financing;

(D)    other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or

(E)    taxes specifically levied to finance one or more projects or systems, excluding receipts from general property, sales, or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor.[22]

54.    The DRA's collateral—which consists of pledged motor vehicle license fees, taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes—consists of special excise taxes imposed on particular activities or transactions and therefore constitutes "special revenues" within the meaning of Section 902(2)(B) of the Bankruptcy Code. *See, e.g.*, 13 L.P.R.A. §§ 31626(a)(1) (gasoline tax), 31626(a)(3) (gas oil and diesel oil tax), 31627(a) (petroleum products tax), 31627a(a) (non-diesel petroleum products tax), 31625 (cigarette tax). Additionally, the Act 30-31 Revenues are likewise "special revenues" within the meaning of Section 902(2)(E) because they were specifically created to increase HTA's solvency and capacity to pay certain of its debts.

---

[22]    Section 301 of PROMESA incorporates each of Section 902, 928 and 552 of the Bankruptcy Code into PROMESA.

*See* Statement of Motives of Act No. 30-2013, at 2 [Dkt. No. 16276-29]; Statement of Motives of Act No. 31-2013, at 2 [Dkt. No. 16276-30].

55.    The leading bankruptcy treatise, *Collier on Bankruptcy*, has identified "special revenues" to consist of revenue streams created and pledged for the benefit of particular creditors, as opposed to those generally available to all creditors of a borrower.    *See* 6 Collier on Bankruptcy ¶¶ 902.03[2] and 902.03[5] (16th ed. 2019) (citing S. Rep. No. 100-506, 100th Cong., 2d Sess. 21 (1988) (noting, as an example of special revenues, "taxes specifically identified and pledged in . . . bond financing documents and [that] are not 'generally' available to all creditors")).

56.    Here, Sections 1.1 and 1.2 of the Security Agreement exclusively pledged the Act 30-31 Revenues to GDB and later, by assignment, to the DRA.    *See* Security Agreement §§ 1.1-1.2.    This is consistent with the Statements of Motives of Acts 30 and 31, which provide that these statutes were specifically enacted for the purpose of paying down HTA's debt to GDB (now the DRA).    *See* Dkt. No. 16276-29 at 2; Dkt. No. 16276-30, at 2.

57.    Therefore, pursuant to the plain language of Section 928(a) of the Bankruptcy Code, the DRA's lien "remain[s] in place after the filing of the petition, despite the fact that Section 552(a) generally protects property acquired after the petition from being subject to prepetition liens."    *Assured Guar. Corp. v. Carrion* (*In re Fin. Oversight & Mgmt. Bd. for P.R.*), 919 F.3d 121, 128 (1st Cir. 2019).[23]

58.    Accordingly, the DRA possesses a valid lien over the post-petition Act 30-31 Revenues.    *See* 11 U.S.C. §§ 361, 362(d)(1).

---

[23]    Additionally, the fact that the Act 30-31 Revenues may have been imposed by the Commonwealth for the benefit of HTA does not preclude them from qualifying as special revenues under Section 902(2) of the Code.    *See In re Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147 (Bankr. S.D. Cal. 1996).

### B.   No Valid "Clawback" Has Occurred Pursuant to Article VI, Section 8 of the Puerto Rico Constitution.

59.     Under the Security Agreement, the DRA's security interest in the Act 30-31 Revenues can only be contravened *if* the conditions for a valid "clawback" have been met pursuant to Article VI, Section 8 of the Puerto Rico Constitution.  *See* Security Agreement §1.2.  When these conditions have been satisfied, the clawed-back Act 30-31 Revenues can ***only be used*** for the payment of principal of and interest on the GO bonds and other obligations of HTA.  *See* 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).  Pursuant to Article VI, Section 9 of the Constitution, absent these limited extraordinary circumstances, the Commonwealth cannot divert the Act 30-31 Revenues for purposes other than those outlined in Acts 30 and 31.

60.     To date, the FOMB has not demonstrated before this Court (or any other forum) that a valid "clawback" occurred.

61.     Simply put, the Commonwealth and the FOMB cannot meet the required statutory and constitutional predicates necessary to divert the Act 30-31 Revenues.

### II.    The DRA is Entitled to the Allowance of an Administrative Expense Claim

### A.   The Commonwealth's Illegal Diversion of DRA's Collateral During the Title III Case Constitutes an "Actual and Necessary" Cost and Expense to Preserve the Commonwealth During its Title III Proceeding

62.     The Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including—(1)(A) the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b).  Section 301 of PROMESA expressly incorporates Section 503(b) of the Bankruptcy Code.  This Court has determined that creditors in Title III cases may have administrative expenses under Section 503(b)(1)(A).  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 621 B.R. 289, 300 (D.P.R. 2020) ("[T]he Court concludes that section 503(b)(1)(A)

24

of the Bankruptcy Code, as incorporated into PROMESA, makes administrative expense priority available for the 'necessary costs and expenses of preserving' [the debtor] during the course of its Title III case."); *see also In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, No. 17 BK 3283-LTS, 2021 WL 1732139, at *5 (D.P.R. May 3, 2021) (allowing an administrative expense claim under Section 503(b)(1)(A) based on accrued and unpaid amounts required to be paid by PREPA to company providing operational and management services).

63.     This Court has observed that the "fundamental fairness" doctrine permits a court to grant administrative expense priority for "two categories of claims that do not otherwise come within the plain language of Section 503(b)." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 481 F. Supp. 3d 60, 65 (D.P.R. 2020) (citing *Reading Co. v. Brown*, 391 U.S. 471, 488 (1968)); *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.*), 755 F.2d 200, 203 (1st Cir. 1985)). These include "when the debtor's postpetition operations occasion tortious injuries to third parties (*Reading*), or when the claim arises from postpetition actions that deliberately violate applicable law and damage others (*Charlesbank*)." *Id*. (emphasis in original) (citing *Reading*, 391 U.S. at 488; *Charlesbank Laundry*, 755 F.2d at 203). The First Circuit has restricted the application of the "fundamental fairness" exception to claims alleging post-petition harms that arise from post-petition events. *Id*.

64.     In *Reading,* the Supreme Court held that a tort judgment against a receiver for actions within the scope of his authority is an "actual and necessary cost" of preserving the estate entitled to administrative expense priority. *Reading Co. v. Brown*, 391 U.S. 471, 485 (1968). The Supreme Court reasoned that a bankruptcy estate is operated for the benefit of its general creditors and that, where the operation of the estate injures a specific creditor, that creditor should be made whole before other creditors receive their own shares. *Id*. at 482–83.

25

65. The First Circuit has applied the principles of *Reading* to permit the recovery of damages with administrative expense priority in cases where the debtor's conduct injures creditors. *See In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (stating that, under principles of fundamental fairness, parties are entitled to payment of an administrative expense when they are "injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate"). And when the debtor violates applicable law and incurs expenses, courts have awarded administrative expense priority to such claims. *See Cumberland Farms v. Florida Dep't of Envtl. Prot.*, 116 F.3d 16, 21 (1st Cir. 1997) (fundamental fairness requires that a post-petition fine for environmental-law violations be given administrative treatment).

66. The First Circuit extended *Reading* in *Charlesbank Laundry* to apply to intentional acts in addition to negligent torts. *See* 755 F.2d at 203 ("If fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then, *a fortiori*, an intentional act which violates the law and damages other should be so treated."); *see also Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002) (*Reading* authorizes administrative treatment of the claims of those who are injured when the debtor-in-possession's post-petition operation of the estate deliberately violates applicable law and damages others).

67. Here, the Commonwealth has and continues to systematically and intentionally strip away from the DRA each stream of the Act 30-31 Revenues that constitutes its collateral by illegally diverting such funds away from HTA to pay for "essential services" and other general expenses of the Commonwealth. *See* Executive Order 2015-046; Executive Order 2015-049; Act No. 21-2016. The Commonwealth has withheld between $578 and $668 million in Act 30-31 Revenues per year during fiscal years 2018 to 2020. *See infra* ¶ 74. The Commonwealth's latest

26

cash flow report shows that approximately $536 million of Act 30-31 Revenues have been withheld by the Commonwealth from the beginning of Fiscal Year 2021 through May 28, 2021. *See supra* ¶ 29. Upon information and belief, at least $800 million of Act 30-31 Revenues retained by the Commonwealth post-petition is collateral exclusively for the benefit of the DRA. The Commonwealth intends to retain the Act 30-31 Revenues going forward and substitute these funds with a $113 million "variable transfer" (average per year) from the Commonwealth to HTA. *See* 2021 HTA Fiscal Plan at 109. The amount of the variable transfer allocated to HTA each year is less than 25% of the total Act 30-31 Revenues generated during fiscal years 2018 to 2020, leaving a shortfall of approximately $445 and $528 million per year.

68.     Upon information and belief, a portion of such illegally diverted revenues will be used to make distributions under the Commonwealth plan of adjustment. Over $8.2 billion of cash is being used to pay settlements under the Commonwealth plan, made possible by the Commonwealth's growing cash balance, which is attributable, in part, to the retention of the Act 30-31 Revenues.[24] *See* Third Amended Plan §§ 2.1, 2.2, 85.3, Ex. K-3 (noting settlement payments to be made under the Third Amended Plan and PROMESA's alleged preemption of Commonwealth law); Second Amended Plan § 2.1 (noting settlement payments to be made under the Second Amended Plan); *see also* Third Amended Disclosure Statement at 63-64; GO PSA, Ex. I at 1-3; HTA/CCDA PSA at 80-86. Moreover, as discussed previously, the Commonwealth has retained approximately $536 million in Act 30-31 Revenues in Fiscal Year 2021. *See supra* ¶ 29.

---

[24]   For reference, the Treasury Single Account cash balance has ballooned from $1.6 billion in November 2017 (the first bank account balance summary made available post-petition) to $10.1 billion as of February 26, 2021. *See* Summary of Bank Account Balances for Puerto Rico Governmental Instrumentalities as of November 30, 2017 at 6; Summary of Bank Account Balances for Puerto Rico Governmental Instrumentalities as of February 26, 2021 at 7 (indicating increase in cash balance).

69.     The Commonwealth's post-petition diversion of secured revenue streams that constitute the DRA's collateral justifies the allowance of an administrative expense claim based on principles of "fundamental fairness."  The Commonwealth's conduct was tortious and a deliberate violation of Puerto Rico law, which damaged the DRA.  *See Reading*, 391 U.S. at 485; *Charlesbank Laundry, Inc.*, 755 F.2d at 203.

70.     Under the Security Agreement, the Commonwealth may only contravene the DRA's security interest consistent with applicable law.  The Puerto Rico Constitution mandates that the Commonwealth may only transfer the Act 30-31 Revenues away from HTA if the conditions for a valid "clawback" have been met pursuant to Article VI, Section 8 of the Puerto Rico Constitution, and only to be used for the payment of principal of and interest on the GO bonds and other obligations of HTA.  *See* 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).  Pursuant to Article VI, Section 9 of the Puerto Rico Constitution, absent these limited extraordinary circumstances, the Commonwealth cannot, under any circumstances, divert the Act 30-31 Revenues for purposes other than those outlined in Acts 30 and 31.

71.     The Clawback Executive Orders and the Moratorium Laws did not—and still do not—activate the "clawback" provisions of Article VI, Section 8 of the Constitution because the Commonwealth failed to apply the HTA revenues only to repay GO debt.  *See* Admin. Bulletin OE-2015-046 at 3 ("The Department of the Treasury shall only retain such revenues that are necessary for the payment of public debt, while continuing to provide essential services . . . .") (emphasis added); Admin. Bulletin OE-2015-049 at 2, 3 (The Director of the Office of Management and Budget "may establish budgetary reserves and restrict those resources that are at the disposal of government entities in the manner that they see fit, when deemed necessary in the course of executing and controlling the budget" and the Director shall "make any budget

28

adjustments necessary in the allocations contained in the Budget in order to match them with available resources."). As is evident, these legislative actions unlawfully authorized the Commonwealth to use pledged HTA revenues "in the manner that [it] see[s] fit," to pay virtually any other general expense ahead of GO debt. *See* Admin. Bulletin OE-2015-049 at 2, 3.

72. The Commonwealth may only use available resources such as the Act 30-31 Revenues to pay GO debts in a fiscal year when the available resources "are insufficient to meet the appropriations made for that year . . . ." P.R. Const. art. VI, § 8 (emphasis added). That certainly does not appear to be the case in the current fiscal year, during which time the Commonwealth appears to run a budgetary surplus, or the preceding years during which the Title III proceedings have been ongoing. *See* 2021 CW Fiscal Plan at 58-59 (April 23, 2021).

73. Absent a showing that the Commonwealth has satisfied the required conditions for application of the "clawback," the Commonwealth's actions are directly at odds with the mandates of Article VI, Section 9 of the Puerto Rico Constitution and expressly violate Acts 30 and 31. To date, the Commonwealth has failed to demonstrate before this Court (or any other forum) that a valid "clawback" occurred or that required statutory and constitutional predicates necessary to divert the Act 30-31 Revenues have been met.

74. This unconstitutional diversion of revenues has continued during the Title III proceedings. In Fiscal Year 2018 alone, the Commonwealth retained approximately $641 million in Act 30-31 Revenues that it clawed-back from payments on HTA's debt obligations in Fiscal Year 2018 and did not apply to GO debt. *See* Treasury Single Account Cash Flow Report as of June 29, 2018, at 9; Circular Letter No. 1300-15-16 (Dec. 17, 2015) (directing Commonwealth officials to disburse pledged HTA revenues to pay for essential services and other non-GO debt expenses). In Fiscal Years 2019 and 2020, the Commonwealth retained approximately $668

29

million and $578 million, respectively, in Act 30-31 Revenues that were neither applied to GO or HTA debt service.  *See* Treasury Single Account FY 2019 Cash Flow as of June 28, 2019; Treasury Single Account FY 2020 Cash Flow For the Month of June FY20 and Q4 FY20.  In Fiscal Year 2021, the Commonwealth has retained approximately $536 million in Act 30-31 Revenues through May 28, 2021.  *See supra* ¶ 29.

75.    These improper and unconstitutional diversions permit the DRA to seek recompense through a request for allowance of an administrative expense.  *See Newberry v. City of San Bernardino (In re City of San Bernardino)*, 558 B.R. 321, 329–30 (C.D. Cal. 2016) (stating that a party can file a claim for administrative expenses on account of alleged constitutional violations) (citing *Reading*, 391 U.S. at 477); *Charlesbank Laundry*, 755 F.2d at 203 (civil fine for violating a state court injunction imposed upon debtor while debtor was engaged in Chapter 11 reorganization qualified for administrative expense treatment as an actual, necessary expense of preserving the estate).

### B. The DRA is Also Entitled to an Administrative Expense Claim Under the Plain Language of Section 503(b)(1)(A) of the Bankruptcy Code.

76.    Section 503(b)(1)(A) of the Bankruptcy Code provides administrative priority status for "the actual, necessary costs and expenses of preserving the estate."  Section 503 of the Bankruptcy Code applies to these Title III cases pursuant to Section 301 of PROMESA.[25]

77.    The First Circuit has established a two-prong test to determine whether or not a claim qualifies as an administrative expense: "In general, for a claim to qualify as an administrative expense under subsection 503(b)(1), (1) it must have arisen from a transaction with the trustee or

---

[25]    PROMESA Section 301(c)(5) provides:  "The term 'property of the estate,' when used in a section of title 11, United States Code, made applicable in a case under this title by subsection (a), means property of the debtor." In this Motion, when we refer to "property of the estate" and "property of the debtor," we are referring to the property of the Title III debtors:  the Commonwealth and its instrumentalities.

debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *In re FBI Distrib. Corp.*, 330 F.3d 36, 42 (1st Cir. 2003); *Mammoth Mart, Inc.*, 536 F.2d at 954; *see also In re La Electronica, Inc.*, 995 F.2d 320, 322 (1st Cir. 1993) (stating that courts within the First Circuit will grant a claim administrative expense status when "the consideration supporting the claimant's right to payment [is] supplied to and beneficial to the debtor-in-possession in the operation of the business") (internal quotation marks and citation omitted).

78.     The DRA is entitled to an administrative expense claim under the plain language of Section 503(b)(1)(A), as interpreted by the First Circuit. *See In re Mammoth Mart, Inc.*, 536 F.2d at 954. The first requirement—that there be a post-petition transaction between the debtor and creditor—has been satisfied because the Commonwealth continues to impermissibly retain the Act 30-31 Revenues for its benefit after the commencement of its Title III proceeding. *See supra* ¶¶ 67-74. The second requirement—that the consideration supporting the claim must benefit the debtor—is also satisfied because the Commonwealth has used the funds to pay expenses and, upon information and belief, will also use such funds to make payments to creditors under its debt adjustment plan. *See supra* ¶¶ 67-74.[26]

---

[26] If the Court determines that the DRA is not entitled to allowance of an administrative expense claim based on the Commonwealth's unlawful post-petition retention of the Act 30-31 Revenues (or if this Motion is pending at confirmation), then the DRA intends to object to confirmation of the Third Amended Plan on the grounds that Section 944(b) (as made applicable to these Title III cases pursuant to Section 301 of PROMESA) does not provide for a discharge of post-petition obligations under a plan of adjustment. The limited authority available on this issue supports the DRA Parties' position. In *In re City of Detroit*, the court found that a post-petition claim was not discharged by confirmation of the debtor's Chapter 9 plan, because, unlike holders of prepetition claims which are subject to discharge, "[c]laimants holding post-petition claims" "may be entitled to pursue other remedies." 548 B.R. 748, 751 (E.D. Mich. 2016). *Collier on Bankruptcy*, the leading treatise on bankruptcy law, also concludes that post-petition obligations are not discharged by a municipality's plan of adjustment. *See* 6 Collier on Bankruptcy ¶ 901.04 (16th ed. 2019) ("[C]laims incurred by the municipality during the case will not be discharged, and will remain liabilities of the municipality after confirmation of a plan or dismissal of the case.").

## **RESERVATION OF RIGHTS**

79.     The DRA Parties do not waive, and expressly reserve, all rights, claims, counterclaims, defenses and remedies at law or in equity that they have or may have against the Commonwealth and/or any other person or entity.   The DRA Parties reserve the right to assert additional grounds for allowance and payment of an administrative expense claim against the Commonwealth or any of its instrumentalities, and to amend, modify, and/or supplement this Motion and any of its ancillary documents, as needed.

## **CONCLUSION**

80.     In light of the foregoing, the DRA Parties hereby respectfully request this Court enter an order granting the DRA an allowed administrative expense claim in the Commonwealth Title III case equal to the amount of the DRA's collateral that has been retained by the Commonwealth during the pendency of its Title III case for its benefit.  In the alternative, the DRA Parties request this Court order that the Commonwealth's post-petition debts are non-dischargeable.

**WHEREFORE**, the DRA Parties respectfully request this Court to enter an order granting the relief requested herein and further granting such other relief as may be just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 15th date of June, 2021.

**WE HEREBY CERTIFY** that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. We further certify that, on this same date, we served the foregoing upon all the Standard Parties as identified and defined in the Court's *Fourteenth Amended Notice, Case Management and Administrative Procedures Order* [Dkt. No. 15894-1] (the "CMP Order"), as well as upon all of the parties identified in the Master Service List maintained at https://cases.primeclerk.com/puertorico/.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225
Tel:   787-250-5632
Fax:   787-759-9225

By:   */s/ Arturo J. García-Solá*
Arturo J. García-Solá
(USDC No. 201903)
E-mail: ajg@mcvpr.com

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani
(USDC No. 226411)
E-mail: nzt@mcvpr.com

*Attorneys for AmeriNational Community
Services, LLC, as Servicer for the GDB Debt
Recovery Authority*

**C. CONDE & ASSOC. LAW OFFICES**

By:   */s/ Carmen D. Conde Torres*
Carmen D. Conde Torres
(USDC No. 207312)

*/s/  Luisa S. Valle Castro*
Luisa S. Valle Castro
(USDC No. 215611)

254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel:   787-729-2900
Fax:   787-729-2203
E-mail: condecarmen@condelaw.com

-and-

**SCHULTE ROTH & ZABEL LLP**

By:   */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:   202-729-7470
Fax:   202-730-4520
E-mail: douglas.mintz@srz.com

-and-

Douglas Koff (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:   212-756-2000
Fax:   212-593-5955

E-mail:      douglas.koff@srz.com
             abbey.walsh@srz.com
             peter.amend@srz.com

*Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for the GDB Debt
Recovery Authority*

33