# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>   Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY'S LIMITED OBJECTION TO THE DISCLOSURE STATEMENT FOR THE THIRD AMENDED TITLE III JOINT PLAN OF ADJUSTMENT <u>OF THE COMMONWEALTH OF PUERTO RICO, *ET AL*</u>.**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the elected Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), acting pursuant to the authority granted to it under the *Puerto Rico Fiscal Agency and Financial Advisory Authority Act*, Act 2-2017, respectfully submits this limited objection to approval of the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF 16741] (the "Disclosure Statement ").[2] In support of this limited objection, AAFAF respectfully states as follows:

## PRELIMINARY STATEMENT

1. PROMESA conditions confirmation of a plan of adjustment on obtaining all legislative approvals required under applicable law. *See* PROMESA § 314(b)(5). No such legislation has been enacted—which under Puerto Rico law is necessary to issue debt instruments backed by the full, faith and credit of the Commonwealth and to implement several other provisions contemplated by the proposed Plan. *See* Puerto Rico Constitution Art. VI, § 2. This raises the question of how the Oversight Board intends to implement the Plan absent securing Puerto Rico legislation. The Disclosure Statement does not answer this essential question.

2. This question is particularly salient since such legislation is not imminent and appears unlikely if the Plan continues to include unnecessary pension cuts and freezes. To be clear, Governor Pierluisi's administration is committed to ending the Title III proceedings in order to allow Puerto Rico's economy to grow and prosper. However, the Governor of Puerto Rico has also been clear that his administration opposes any pension cuts and freezes. If deep cuts are imposed on any segment of retirees (who are among the most vulnerable in Puerto Rico's society), they may be forced to choose among food, medicine and shelter when their monthly checks decrease. Mandating forced poverty on any segment of Puerto Rico's retirees will only further

---

[2] Capitalized used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

1

stress the Government's already strained social services programs and increase the future cost of Puerto Rico's welfare programs as retirees struggle to pay for basic necessities. This may require Puerto Rico to spend resources beyond those needed to pay pension benefits in the first place. That result would be inconsistent with PROMESA's goals of generating an economy capable of repaying Puerto Rico's debt, creating financial stability, and sustaining economic growth. Since the Oversight Board has insisted on including pension cuts and freezes as part of the Plan, there is a meaningful risk legislation will not be enacted, and the Disclosure Statement should describe in detail what the Oversight Board thinks will happen in the absence of legislation.

3. In addition to disclosing how the Plan will be implemented absent legislation, the Disclosure Statement must also describe the risks of doing so *(i.e.,* the risk of issuing general obligation debt without supporting legislation). General Obligation debt has never been issued without legislative approval, and new bonds may not be robustly marketable, thereby negatively impacting trading levels and rendering creditor recovery assumptions in the Disclosure Statement overly optimistic. In turn, this could negatively impact Puerto Rico's reentry into the capital markets, including limiting the universe of potential investors in Puerto Rico debt, thus impeding PROMESA's mandate of reestablishing market access. The Disclosure Statement fails to sufficiently disclose these risks, which creditors should be apprised of when voting on the Plan.

4. Aside from legislation, the Disclosure Statement also fails to provide adequate information to allow holders of Active and Retired Employee Benefits Claims in Class 48 to make an informed decision regarding the Plan. While the Oversight Board discusses various risk factors in the Disclosure Statement, the Board fails to disclose the potential effects of impairing pensions, as discussed above. In particular, retirees that live from pension check to pension check (even if such check is minimally above the "poverty line") may be forced to make awful choices between

2

food, medicine and shelter when their monthly checks are decreased through no fault of their own. In forcing poverty on many of Puerto Rico's retirees, the number of individuals the Government will be forced to support may increase, thus impacting Puerto Rico's economic future. The Disclosure Statement must disclose these risks.

5. In addition, the Disclosure Statement should be corrected to adequately describe the significant impairment pensioners sustained prior to commencement of the Commonwealth's Title III case—context which is critical for pensioners to appropriately assess their proposed Plan treatment. As discussed below, over the years several laws effected a broad overhaul of the ERS system that froze certain defined benefit accruals, increased employee contributions, and increased the retirement age to 68. In addition, ERS retirees have not received a cost of living adjustment in over 12 years. Collectively, these and other measures, have resulted in real reductions to ERS retiree benefits estimated to be in excess of 20% since 2013. In fact, in the best interests test analysis that accompanies the Disclosure Statement, the Oversight Board concedes that "Puerto Rico cut public pensions *significantly* before PROMESA was enacted." *See* Disclosure Statement, Ex. N, App. 5 at 7. Hence, pension cuts are legally and morally unnecessary. However, since the Oversight Board insists on including these pension cuts in the Plan, the Disclosure Statement should provide adequate disclosure of the facts and circumstances discussed above so that Class 48 creditors understand that the proposed 8.5% pension cut in the Plan is on top of the 20% reduction implemented prepetition.

6. Finally, the Plan also classifies all retiree claims in one class regardless of whether such retirees' claims are subject to reduction under the Plan. *See* Disclosure Statement at 394 (classifying claims within the class as "[a]ll claims against ERS on account of being or having been a participant in ERS for retiree benefits that accrued through the date of implementation of

3

Act 106 . . .") In other words, both retirees whose monthly pension benefits are less than $1,500 a month—and thus not subject to reduction—and those that exceed $1,500 a month—and subject to reduction—are lumped together, and those unimpaired creditors within the class could out-vote impaired creditors and bind the entire class to the proposed treatment. As a matter of fundamental fairness, the Oversight Board must disclose and make it clear that the votes of retirees not being cut under the Plan may dictate the treatment of those retirees subject to cut. In addition, the Oversight Board should be required to disclose (i) how this proposed classification scheme complies with the Bankruptcy Code section 1122's requirement that all claims within the class be substantially similar, (ii) how the treatment within the class complies with Bankruptcy Code section 1123(a)(4)'s requirement that each claim within a class receive the same treatment, and (iii) the basis for allowing unimpaired creditors within the class to vote.

7. For these reasons, the Disclosure Statement should be amended to provide sufficient information for all creditors—including pensioners—to make an informed choice regarding the Plan.

## ARGUMENT

8. "Disclosure is the 'pivotal' concept in [a bankruptcy] reorganization." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (quoting 5 COLLIER ON BANKRUPTCY, ¶ 1125.03 (15th ed. 1992)); *In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988) (citing same). In particular, in the context of a proposed plan of adjustment, section 1125 of the Bankruptcy Code (made applicable in Title III through PROMESA section 301) requires that the debtor provide "adequate information" sufficient to enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1); *see, e.g., Oneida*, 848 F.2d at 417 ("The importance of full disclosure is underlaid by the reliance placed upon the

4

disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.'").

9. "[T]he purpose of the disclosure statement is 'to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan.'" *In re County of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) (citation omitted);. *In re Pierce County Housing Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) (discussing requirement that a disclosure statement contain adequate information in a chapter 9 case, made applicable by Bankruptcy Code section 901). For a disclosure statement to be approved, a creditor must be able to determine "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

10. Here, the Disclosure Statement fails to provide adequate information in three independent ways: it (i) excludes critical information on how the Oversight Board intends to implement the Plan absent obtaining Puerto Rico legislation (ii) excludes any information on the impact of a failure to secure the enabling legislation on the purported recovery levels under the Plan and (iii) fails to provide adequate information to holders of Active and Retired Employee Benefits Claims in Class 48 regarding their treatment under the Plan.

### A. The Disclosure Statement Lacks Adequate Information Regarding the Risk Puerto Rico Legislation is Not Obtained

11. The Disclosure Statement does not sufficiently disclose how the Oversight Board intends to implement the Plan without Puerto Rico legislation. Because the Plan includes unnecessary (and immoral) pension cuts and freezes, it is highly unlikely that enabling legislation will be approved, as evidenced by recent legislative and executive actions. *See* Act 7-2021 (legislation that bars the Puerto Rico Government from advancing any plan of adjustment that,

5

among other things, "seeks to use Section 1129(b) of the Bankruptcy Code . . . to impose additional cuts to public servants Pensioners and Participants of Retirement Systems . . .") (translation ours). As a condition to plan confirmation, PROMESA requires that all legislation necessary under applicable law be obtained. *See* PROMESA § 314(b)(5) (listing as a confirmation requirement that "legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained."). Here, legislation is required to implement the most critical aspects of the Plan, including issuance of the New GO Bonds and the CVIs, both of which are to be backed by the full faith and credit of the Commonwealth. *See* Puerto Rico Constitution Art. VI, § 2 (providing that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised *as determined by the Legislative Assembly*).

12. The Plan recognizes the need for legislation for this purpose. *See* Plan § 82.1 (listing as a condition to the Effective Date that "[a]ll (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, *including, without limitation, the New GO Bonds Legislation and the CVI Legislation*, have been obtained or enacted or entered and not revoked or reversed . . .").³ The Disclosure Statement does, too. *See* Disclosure Statement at 47 ("the New GO Bonds will be issued *pursuant to the New GO Bonds Indenture and New GO Bonds Legislation*.").

---

³ *See also* Plan § 1.145 (defining CVI Legislation as "[t]he legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs, which legislation may be part of, or included in, the New GO Bonds Legislation"); *Id*. § 1.322 (defining the New GO Bonds Legislation as the "legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the New GO Bonds consistent with the terms set forth herein and in the GO/PBA Plan Support Agreement."); *Id*. § 12.30 (defining the GO CVIs are defined as "the general obligation securities . . . to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the GO CVI Indenture ***and the CVI Legislation***."); *Id*. § 1.320 (defining the New GO Bonds as "(a) New GO CIBs, (b) New GO 5.375% CABs, and (c) New GO 5.0% CABs . . . .to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the New GO Bonds Indenture, ***and the New GO Bonds Legislation*** . . .").

13. In addition, several other key elements of the Plan rely on Puerto Rico legislation, including the following (among others):

- **Statutory Lien** - The Plan provides that the New GO Bonds will be secured by a statutory lien over funds deposited in a Debt Service Fund and a Debt Service Reserve Fund. *See* Plan § 82.1(b)(vii) (including as a condition to the effectiveness of the Plan that "pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund and the Debt Service Reserve Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds. . . .").

- **Commonwealth Non-Impairment Covenant** – Legislation is required for the Commonwealth to provide a non-impairment covenant with respect to the rights and remedies of the holders of the New GO Bonds and the CVIs. *See* Disclosure Statement at 422 ("The Definitive Documents, including the New GO Bonds Indenture, the New GO Bonds Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants, including, without limitation, covenants by Reorganized Commonwealth that it will, among other things (i) take no action that would . . . . impair the rights and remedies of the holders of the New GO Bonds . . .").

- **New York law** – Under Puerto Rico law, legislation is required to authorize the application of the laws of the State of New York to the New GO Bonds and the CVIs, as contemplated by the Plan. *See* Plan § 70.1(l) ) ("The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.").

14. Legislation is also required under Puerto Rico law to implement matters unrelated to the new securities, including certain pension reform measures. The Plan and Disclosure Statement contemplate that two non-Title III public pension trust systems, the Judiciary Retirement System ("JRS") and Teachers Retirement System ("TRS") will undergo extensive legislative modifications (as detailed in Exhibits E and F to the Plan), effectively repealing Acts 12-1954, as amended, and Act 91-2004, as amended. Such modifications or repeals of existing and valid laws clearly require legislation.

15. In particular, the Plan contemplates the following reforms:

- a freeze in the accumulation of benefit for participants in the defined benefit programs of both JRS and TRS;

7

- the elimination of Act 162-2013's hybrid pension plan for certain JRS participants and newly hired judges;

- the establishment of a defined contribution plan for current participants of JRS and TRS (the "Proposed DC Plan")

- the mandatory enrollment of participants of JRS and TRS into the Proposed DC Plan; and

- enrollment of active teachers in the federal Social Security Program.

All of the foregoing reform measures require legislative approvals and the Disclosure Statement fails to explain how the Plan will effectuate this without any legislation.[4]

16. Although the Disclosure Statement acknowledges that there "is no certainty . . . legislation will be enacted," *see* Disclosure Statement at 503, the Disclosure Statement does not inform creditors how precisely the Plan will be implemented absent such legislation and how lack of legislation will impact the recovery levels under the Plan. The Oversight Board merely states, in conclusory fashion, that it "will seek judicial relief in lieu thereof pursuant to PROMESA Section 305, allowing the Title III Court to interfere with governmental and political powers in a plan of adjustment or with the consent of the Oversight Board and to cause the issuance of the New GO Bonds . . ." *Id.* What this means in terms of actual implementation of the Plan remains a mystery. The Board should be required to supplement its disclosure and specify in detail (i) the precise risks of not obtaining legislation (including that the confirmation requirement set forth in PROMESA § 314(b)(5) may not be satisfied and confirmation denied), (ii) the low likelihood that legislation will be obtained if pension cuts and freezes opposed by the Government remain in the Plan; and (iii) how exactly the Board will seek to bypass the legislature and the Governor and

---

[4] Or in the alternative, and equally unclear, if the Plan's intent was to forcibly enroll JRS and TRS participants in the defined contribution plan established pursuant to Act 106-2017 (the "106 Plan") rather than creating the Proposed DC Plan, then the Disclosure Statement also fails to explain how, absent legislative mandate, it can force the enrollment of active teachers and judges in the 106 Plan in clear contravention of Article 2.6 of Act 106-2017, mandating that participation in the 106 Plan by JRS and TRS participants is voluntary.

8

(a) issue the general obligation securities set forth in the Plan (including granting a statutory lien, a non-impairment covenant, and the governing law provisions, etc.) and (b) implement the pension reform measures outlined above.

17. In addition to disclosing how the Oversight Board plans to proceed without legislation, the Disclosure Statement must also adequately disclose the potential negative implications of doing so, including on the marketability of the New GO Bonds and CVIs and the actual recovery levels under the Plan. Indeed, absent legislation, the New GO Bonds and CVIs may not be as marketable and the bonds priced at a materially lower level by the markets for a sustained period of time. And in turn, this could negatively impact Puerto Rico's reentry into the capital market, impeding PROMESA's mandate of reestablishing market access. These risks must be fully disclosed.

### B. The Disclosure Statements Lacks Adequate Information for Retirees in Class 48 to Make an Informed Decision on the Plan

18. The Disclosure Statement also fails to provide adequate information to allow pensioners in Class 48 to make an informed decision regarding the Plan. Unlike other creditors, Puerto Rico's public sector retirees have already been impaired by a reduction to their benefits prior to commencement of the Commonwealth's Title III case. For this and other reasons, Governor Pierluisi's administration opposes the pensions cuts and freezes proposed in the Plan. However, in order to allow retirees to fully understand their proposed treatment under the Plan (*i.e.*, the incremental nature of the proposed pension cuts on the benefit reductions already realized), the Disclosure Statement must accurately disclose information regarding the prepetition cuts, and the inherent risks associated with further cuts.

9

19. Over the last 30 years, the Commonwealth has implemented several pension cuts that have reduced retiree benefits and frozen or diminished cost of living adjustments. For example:

- The Legislature enacted Act 1 of 1990 and Act 305 of 1999, each of which addressed structural imbalances at ERS and reduced prospective benefit accruals for ERS members hired after April 1, 1990 and on or after January 1, 2000, respectively. Notably, while Act 1 and Act 305 did not impair pensioners, the reduced benefit accruals for prospective employees established lower benefit accrual rates, slowed the increase in ERS liabilities, and helped preserve additional cash at the Commonwealth.

- The Legislature later enacted Act 3 of 2013, which went further than Act 1 and Act 305 by effecting a broad overhaul of ERS that froze certain defined benefit accruals, increased employee contributions, and increased the retirement age to 68. As a result, Act 3 reduced ERS' actuarial accrued liability by $3.27 billion (from $24.28 billion to $21.01 billion or 13.5%).

- In addition, ERS retirees have not received a cost of living adjustment ("COLA") in over 12 years. Consequently, the Commonwealth's retirees have experienced a significant reduction in purchasing power today relative to the last COLA adjustment in 2008.

20. The above measures have collectively resulted in real reductions to retiree benefits in excess of 20% over the past decades. The Oversight Board acknowledges the significance of these cuts in the best interests test analysis. *See* Disclosure Statement, Ex. N, App. 5 at 7 (stating that "Puerto Rico cut public pensions significantly before PROMESA was enacted . . .").

21. The Disclosure Statement also fails to adequately disclose the risks to the Government in cutting pensions even further. According to the Oversight Board, the proposed cuts and freezes would reduce the Government's expenses, which is necessary to restructure Puerto Rico's debts and strengthen the economy. But in adopting this position, the Oversight Board has completely ignored the long-term human cost of cuts. While Puerto Rico continues to face significant challenges, it cannot fix its problems by needlessly slashing the long-vested benefits earned by Puerto Rico's public service retirees. To do so would be both unnecessary and immoral.

10

22. Many of these retirees are living at or below the poverty line and unable to afford basic life necessities, such as rent, mortgage payments, medical insurance, or the like. The Disclosure Statement must acknowledge the risk that its financial projections do not properly take into account the added stress to the Government's already strained social services programs that could result from the proposed pension cuts. In addition, the Disclosure Statement must disclose the potential effect of such pension cuts and freezes on the morale of the public sector employees, the potential increase in crime and decaying social atmosphere, and all other negative implications associated with such cuts.

23. Here, the Oversight Board has not addressed the serious risk associated with imposing additional pension cuts on Puerto Rico's most vulnerable populations. The Disclosure Statement should be supplemented to acknowledge this reality.

## **PROPOSED MODIFICATIONS TO DISCLOSURE STATEMENT**

24. The Disclosure Statement must specify in detail how the Oversight Board intends to implement the proposed Plan without legislation and what impact this could have on the marketability of the New Go Bonds and CVIs (and, in turn, on creditor recovery assumptions in the Disclosure Statement). AAFAF acknowledges that the order setting procedures related to consideration of the Disclosure Statement (ECF No. 16681) requires an objecting party to provide "suggested language," but given the nature of this objection, AAFAF is not in a position to speak for the Oversight Board on this critical issue. Rather, this Court should require that the Disclosure Statement be amended and for the Oversight Board to propose adequate disclosure on this topic so that all creditors can make an informed choice regarding the Plan.

25. In addition, the Oversight Board should be required to disclose how the proposed classification scheme for retirees—which puts both retirees that are subject to the proposed cuts

11

and those that are not in the same class—complies with the applicable provisions of the Bankruptcy Code. In particular, the Oversight Board must disclose (i) how this proposed classification scheme complies with the Bankruptcy Code section 1122's requirement that all claims within the class be substantially similar, (ii) how the treatment within the class complies with Bankruptcy Code section 1123(a)(4)'s requirement that each claim within a class receive the same treatment, and (iii) the basis for allowing unimpaired creditors within the class to vote and potentially dictate the treatment of the impaired creditors within the class.

26. In addition to the foregoing disclosures, AAFAF requests that the following risk factors be included in the Disclosure Statement:[5]

***There is a material risk that legislation enabling the Plan will not be enacted and the Oversight Board will not be able to satisfy PROMESA's confirmation requirement that all necessary legislative approvals be obtained.***

As a condition to plan confirmation, PROMESA section 314(b)(5) requires that all "legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained." Many items contemplated by the Plan require Puerto Rico legislation to be effective, including, among others, the following:

- **Issuance of the New GO Bonds and the CVIs** - Under the Puerto Rico Constitution Article VI, section 2, the power of the Commonwealth to contract and to authorize the contracting of debts must be exercised as determined by the Legislative Assembly. Both the New GO Bonds and CVIs are to be backed by the full faith and credit of the Commonwealth, thereby requiring legislation.

- **Statutory Lien** - The Plan contemplates that the New GO Bonds will be secured by a statutory lien over funds deposited in a Debt Service Fund and a Debt Service Reserve Fund. *See* Plan § 82.1(b)(vii) (including as a condition to the effectiveness of the Plan that "pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund and the Debt Service Reserve Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds. . . ."). Such statutory lien, by definition, can only be granted through legislation.

---

[5] In addition, the Best Interests Test Reports attached as <u>Exhibit N</u> to the Disclosure Statement state that the financial information included therein includes information "directly provided by the Government of Puerto Rico and/or its advisors." Any reference to information provided by the Government or its advisors should not be construed as the Government endorsing all or any part of the best interest analysis and Exhibit N should include a clear and unequivocal statement disclosing such non-endorsement.

12

- **Commonwealth Non-Impairment Covenant** – Legislation is required for the Commonwealth to provide a non-impairment covenant with respect to the rights and remedies of the holders of the New GO Bonds and the CVIs, as contemplated by the Plan. *See* Plan § 70.1(i) ("Pursuant to the New GO Bonds Legislation and the New GO Bonds Indenture the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of New GO Bonds . . . the Reorganized Commonwealth will take no action that would . . . . impair the rights and remedies of the holders of the New GO Bonds.").

- **New York Law** – Under Puerto Rico law, legislation is required to authorize the application of the laws of the State of New York to the New GO Bonds and the CVIs, as contemplated by the Plan. *See* Plan § 70.1(l) ) ("The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.").

- **Pension Reform Measures** – The Plan also provides that two non-Title III public pension trust systems, JRS and TRS, will undergo extensive legislative modifications (as detailed in Exhibits E and F to the Plan), effectively repealing Acts 12-1954, as amended, and Act 91-2004, as amended. The following proposed pension modifications, among others, require legislation to be effective:

    - A freeze in the accumulation of benefit for participants in the defined benefit programs of both JRS and TRS;

    - The elimination of Act 162-2013's hybrid pension plan for certain JRS participants and newly hired judges;

    - The establishment of a defined contribution plan for current participants of JRS and TRS (the "Proposed DC Plan");

    - The mandatory enrollment of participants of JRS and TRS into the Proposed DC Plan; and

    - Enrollment of active teachers in the federal Social Security Program.

As of the date of this Disclosure Statement, there is a material risk that Puerto Rico legislation authorizing the above measures will not be obtained, particularly if the Plan continues to include unnecessary pension cuts and freezes, as evidenced by the Government's recent actions. *See* Act 7-2021 (legislation that bars the Puerto Rico Government from advancing any plan of adjustment that, among other things, "seeks to use Section 1129(b) of the Bankruptcy Code . . . to impose additional cuts to public servants Pensioners and Participants of Retirement Systems . . .") (translation ours).

Accordingly, without Puerto Rico legislation, there is a material risk that the Oversight Board cannot satisfy PROMESA's confirmation requirements, including PROMESA section 314(b)(5)'s requirement that all necessary legislation be obtained.

*Issuing municipal securities without legislative support could negatively impact the market value of such securities.*

General Obligation debt has never been issued without legislative approval, and the New GO Bonds and CVIs may not be robustly marketable absent such legislation. Indeed, without legislation, there is a significant risk that the New GO Bonds and CVIs may be priced at a materially lower level by the markets for a sustained period of time, which may in turn render the creditor recovery assumptions in the Plan overly optimistic. This could also negatively impact Puerto Rico's reentry into the capital markets, including limiting the universe of potential investors in Puerto Rico debt, thereby impeding PROMESA's mandate of reestablishing market access.

*The pension cuts proposed in the Plan of Adjustment are incremental to the cuts pensioners have already sustained prior to commencement of the Commonwealth's Title III case.*

Unlike other creditors, Puerto Rico's public sector retirees have already been impaired by a reduction to their benefits prior to commencement of the Commonwealth's Title III case. The treatment for pensioners as set forth in Class 48 of the Plan is incremental and is on top of the pension cuts already realized.

Over the last 30 years, the Commonwealth has implemented several pension cuts that have reduced retiree benefits and frozen or diminished cost of living adjustments. For example:

- The Legislature enacted Act 1 of 1990 and Act 305 of 1999, each of which addressed structural imbalances at ERS and reduced prospective benefit accruals for ERS members hired after April 1, 1990 and on or after January 1, 2000, respectively. Notably, while Act 1 and Act 305 did not impair pensioners, the reduced benefit accruals for prospective employees established lower benefit accrual rates, slowed the increase in ERS liabilities, and helped preserve additional cash at the Commonwealth.

- The Legislature later enacted Act 3 of 2013, which went further than Act 1 and Act 305 by effecting a broad overhaul of ERS that froze certain defined benefit accruals, increased employee contributions, and increased the retirement age to 68. As a result, Act 3 reduced ERS' actuarial accrued liability by $3.27 billion (from $24.28 billion to $21.01 billion or 13.5%).

- In addition, ERS retirees have not received a cost of living adjustment ("COLA") in over 12 years. Consequently, the Commonwealth's retirees have experienced a significant reduction in purchasing power today relative to the last COLA adjustment in 2008.

The above measures have collectively resulted in real reductions to ERS retiree benefits in excess of 20% over the past decades.

14

*Many retirees are living at or below the poverty line and there are potential inherent risks with further cutting pension benefits.*

Many of the retirees that are subject to the pension cuts and freezes proposed by the Plan are living at or below the poverty line and unable to afford basic life necessities, such as rent, mortgage payments, medical insurance, or the like. Retirees that live from pension check to pension check (even if such check is minimally above the "poverty line") may be forced to make awful choices between food, medicine and shelter when their monthly checks are decreased through no fault of their own. In forcing poverty on many of Puerto Rico's retirees, there is a material risk that this will impose additional stress on the Puerto Rico Government's already strained social services programs. In addition, there are other potential negative implications of pension cuts and freezes, including on the morale of the public sector employees and the potential increase in crime and decaying social atmosphere. As a result, the proposed pension cuts and freezes could impact the number of individuals the Government will be forced to support, and have a negative impact on Puerto Rico's economic future.

## **RESERVATION OF RIGHTS**

27. AAFAF reserves the right to submit other and further objections to approval of the Disclosure Statement at or before the hearing if the Disclosure Statement is further supplemented or amended at a later date.

15

WHEREFORE, AAFAF respectfully requests that for the reasons set forth herein, the Court should require the Disclosure Statement be amended and supplemented.

Dated: June 15, 2021
       San Juan, Puerto Rico

Respectfully submitted,

| | |
|---|---|
| /s/ *John J. Rapisardi* | /s/ *Luis C. Marini-Biaggi* |
| John J. Rapisardi | Luis C. Marini-Biaggi |
| Maria J. DiConza | USDC No. 222301 |
| Matthew Kremer | Email: lmarini@mpmlawpr.com |
| (Admitted *Pro Hac Vice*) | |
| **O'MELVENY & MYERS LLP** | Carolina Velaz-Rivero |
| 7 Times Square | USDC No. 300913 |
| New York, New York 10036 | E:mail: cvelaz@mpmlawpr.com |
| Tel: (212) 326-2000 | |
| Fax: (212) 326-2061 | **MARINI PIETRANTONI MUÑIZ LLC** |
| | 250 Ponce de León Ave., Suite 900 |
| -and- | San Juan, Puerto Rico 00918 |
| | Tel: (787) 705-2171 |
| Peter Friedman | Fax: (787) 936-7494 |
| (Admitted *Pro Hac Vice*) | |
| 1625 Eye Street, NW | |
| Washington, D.C. 20006 | |
| Tel: (202) 383-5300 | |
| Fax: (202) 383-5414 | *Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority* |
| *Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority* | |