UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| VAQUERIA TRES MONJITAS, INC. and SUIZA DAIRY, INC., | |
| Plaintiffs, | Civil No. 04-1840 (DRD) |
| MYRNA COMAS, in his official capacity, as the Secretary of the Department of Agriculture for the Commonwealth of Puerto Rico, and JOSE PANTOJAS, in his official capacity, as Administrator of the Office of the Milk Industry Regulatory Administration for the Commonwealth of Puerto Rico, | Consolidated with 08-2191 (DRD) |
| | Consolidated with 08-2380 (DRD) |
| Defendants. | |

**AMENDED OPINION AND ORDER NUNC PRO TUNC**

Pending before the Court are: (a) *Post-Hearing Memorandum In Support Of The Imposition Of A Specific Remedy As A Result Of Non-Compliance And In Support Of Petition For Contempt* filed by Suiza Dairy, Inc. (hereinafter "Suiza's Post-Hearing Memorandum"), Docket No. 2225; (b) *Vaquería Tres Monjitas, Inc.'s Memorandum On Compliance Of Amended Preliminary Injunction Order* (hereinafter "VTM's Memorandum"), Docket No. 2228; (c) *Defendants' Opening Compliance Hearing Brief* (hereinafter "Defendants' Brief"), Docket No. 2227; (d) *Memorandum In Response To Docket No. 2227* filed by Suiza (hereinafter "Suiza's Opposition to Defendants' Brief"), Docket No. 2229; (e) *Reply Memorandum To Defendants' Compliance Hearing Brief (Dkt 2227)* filed by VTM (hereinafter "VTM's reply to Defendants' Brief"), Docket No. 2234; (f) *Defendants' Reply Brief*, Docket No. 2232; (g) *Motion for Leave to File Amendment to Dkt. No. 2225 and Include Appendix 1* filed by Suiza on March 5, 2013, Docket No. 2248.

## Introduction

On August 13, 2004, the fresh milk processors, Suiza Dairy, Inc. ("Suiza") and Vaquería Tres Monjitas, Inc. ("VTM"), filed the instant action to challenge the constitutionality of the existing regulation issued by the Office of the Milk Industry Regulatory Administration for the Commonwealth of Puerto Rico ("ORIL") to determine the milk price. The challenge is based on constitutional grounds, as well as timely scientific, rationale grounds, and non-discriminatory parameters within the formula used in the year 2004 and, henceforth, completely obsolete. *See Vaquerías Tres Monjitas, Inc., Suiza Dairy, Inc. v. Irizarry, et al.*, 587 F.3d 464, 482-484 (1st Cir.2009), citing *Duquesne Light & Co. v. Barasch*, 488 U.S. 299, 307 (1989), and *Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013, 1026-1029 (1st Cir.1989).

On July 13, 2007, the Court entered an *Amended Opinion And Order Granting Preliminary Injunction* (hereinafter the "*Injunction Order*"), Docket No. 480. After several appeals to the United States Court of Appeals for the First Circuit (hereinafter the "First Circuit"), and a *certiorari* request denied by the United States Supreme Court ("Supreme Court"), this Court was forced to return to the compliance hearings stage, as to examining the new parameters and the unexpected eliminations as to former parameters and authorized expenses accounts relating to potential constitutional violations of due process, equal protection and takings. *Vaquería Tres Monjitas, Inc.*, 587 F.3d at 482-484. The compliance hearings finalized on December 1, 2012, now the Court must determine whether the defendants have indeed failed to comply with the Court's *Injunction Order* of July 13, 2007, Docket No. 480, based on the evidence submitted by the parties, as well as the prior orders entered by the Court, which are critical to this matter.

Significant events have transpired since the *Injunction Order* was entered on July 13, 2007,

which are worth mentioning, to wit: (a) after the general elections of November 8, 2008, Puerto Rico underwent another change of administration effective January 2009; (b) Puerto Rico, since at least 2006, until today is still severely affected by the worldwide economic crisis, which has had an adverse impact both in the United States' and Puerto Rico's economy; (c) the inflation and the staggering costs of doing business in Puerto Rico are also determinative, as it results in a higher price of fresh milk; and (d) the consumers' declining demand for fresh milk, amongst others.

When considering the parties' legal memorandums, the Court has decided to address the issues under the following topics: (a) the *Experts' Agreement*, Docket No. 1003, and the proposed formula agreed as to critical parameters to be included in the formula as to the price of the fresh milk, the ROE, return on equity, the regulatory accrual, the existence of an unsystematic risk applicable to Puerto Rico, amortization of regulatory accrual, and regulatory accounts based on a document prepared on February 25, 2008, the agreement of the experiment had a wide scope, the Court reiterates its related opinions as to the *Experts' Agreement*, amongst others; (b) the Court also reiterates opinions excluding certain parameters which the Court has ordered to be stricken; (c) the proposed Regulation No. 12, which is intertwined with the milk price formula, and the procedure on how the formula will be implemented amongst the farmers, the milk processors, Indulac, the advertisers, the vendors, intermediaries, agents, and the consumers, amongst others; (d) whether the defendants should be found in contempt for failure to comply with the *Injunction Order* of July 13, 2007;[1] and (e) whether the Court has the inherent power to enforce the *Injunction Order*, by establishing a formula and the implementation procedure through the adoption of a regulation, which

---

[1] The Court has decided to reserve some late arriving issues not subject to the *Injunction Order*, as well as the issues related to the Federal School Luncheon Program, the Special Marketing Fund ("FEM"), established by ORIL through the proposed Regulation No. 12.

3

is a task traditionally delegated to the states, and used as a last resource remedial solution by this Court, if necessary, based on the defendants consistent lack of compliance with the terms and conditions of the *Injunction Order* of July 13, 2007.

At the outset, the Court finds that, at this time, the Court will not establish the price fixing formula nor the corresponding regulation to implement the formula, *see* discussion *infra*. Except that matters that are directly contrary to law as to a potential discretionary matter or because the parties have stipulated a matter and one party, ORIL, is attempting to extricate itself from the *Experts' Agreement* signed by their experts as to the parameters to establish the factors to determine the return on equity (ROE), and other matters relating to the equity formula, and to the establishment of the price of the milk, which is determined by ORIL. *See* Docket entries No. 1697 and 1804, for a more detailed analysis.

The parties shall bear in mind that a reported non-compliance at this critical stage of the proceedings may result in a finding of contempt, fines, and if continued potential findings of criminal contempt. *See* discussion *infra*.

The Court, however, refuses to continue with the "games" staged by the defendant ORIL and its expert. ORIL, as explained *infra* is simply not in compliance and consequently, "cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Technology*, 950 F.2d 13, 22 (1st Cir.1991); *Cruz-Báez, et als. v. Negrón-Irizarry*, 220 F.Supp.2d 77, 79 n.3 (D.P.R.2002), citing *McCoy v. Massachusetts Institute of Technology*, 950 F.2d at 22. Rather, the parties have an affirmative responsibility to put their best foot forward in an effort to present a legal theory that will support their claim, which is in compliance with the Court's injunctive relief, as affirmed by the First Circuit. *Cruz-Báez*, 220 F.Supp.2d at 79, citing *McCoy*, 950 F.2d at 23.

4

Exhibit 2   Page 5 of 102

Likewise, the Court will not tolerate the "games" being played by the defendants to evade compliance with the *Injunction Order* and/or to try to extricate without showing manifest injustice from the *Experts' Agreement*, a matter that will be discussed below. *See* Docket entries No. 1907, 1965. The Court has also determined that ORIL is barred from alleging economic facts as to the economic crisis that Puerto Rico is undergoing as the Government has prevailed in the First Circuit, in the Supreme Court of Puerto Rico, as well as the United States Supreme Court, alleging exactly the contrary as alleged by ORIL and its expert, in the instant case. *See Patriot Cinemas, Inc. v. General Cinemas Corp., et al.*, 834 F.2d 208, 212 (1st Cir.1987) ("playing fast and loose with the courts").

### Factual and Procedural Background

As stated above, the instant case was filed on August 13, 2004 by the fresh milk processors, Suiza and VTM on the grounds of violations of their civil rights, 42 U.S.C. § 1983, as the milk price formula used by ORIL at the time of the filing of the *Complaint* was discriminatory, and was predicated on factors no longer applicable to the Puerto Rico economy. Suiza and VTM also challenged the constitutionality of the milk regulation existing at the time based on due process, equal protection and the takings clause. *Vaquería Tres Monjitas, Inc.*, 587 F.3d at 482-483.

On July 13, 2007, the Court issued an *Injunction Order*, Docket No. 480, granting a preliminary injunction to the fresh milk processors, and directing the defendants to comply with the terms and conditions set forth in the *Injunction Order* to remedy the challenges presented by the plaintiffs. In a nutshell, on July 13, 2007, the Court granted the preliminary injunction to the milk processors and ordered the following remedies:

    (1)    "**Effective immediately**, both the fresh milk processors and Indulac will begin

paying the amount of $0.55 per quart of raw milk to the dairy farmers.  When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk.  Under no circumstances will the fresh milk processors be required to pay more for their raw milk or carry additional costs for the purpose of allowing Indulac's access to raw milk for UHT or fluid milk manufacturing at a lower cost than the cost at which plaintiffs can acquire raw milk from fresh or fluid milk processing.  The Administrator [ORIL] may set at his discretion the prices for raw milk for non fluid milk use."  (Emphasis ours). *See* Docket No. 480, page 94.

(2)    "In a period of no more than thirty (30) days, **the Administrator will put into effect non-discriminatory, rational and scientific regulatory standards that will allow him to determine costs and fair profits return for all the participants in the Puerto Rico regulated milk market**.  Those standards will set the reasonable rate of return that each participant should receive."   (Emphasis ours).  *See* Docket No. 480, page 94.

(3)    **"The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular 'fit' of Puerto Rico into any economic model which may be used from other jurisdictions**.  Any economic figures used from the regulated parties from other jurisdictions are not to be stale but are to be 'for the year in question.'  *Tenoco Oil Co.* [*Tenoco Oil Co., Inc. v. Department of Consumer Affairs*, 876 F.2d 1013 (1st Cir.1989) (granting injunctive relief under Due Process, Equal Protection and Taking Clause)].  **The Administrator is to establish**

6

**a system or incorporate a system or provide for mitigation for regulator accrual for losses properly supported that occur between periods of yearly reviews**. **The price structure of the fresh milk processors will be reviewed immediately under those parameters**. The methodology of the parameters is to be consistent with this *Opinion and Order*." (Emphasis ours). *See* Docket No. 480, page 94.

(4)     "The Administrator is ordered to adopt a temporary mechanism that will allow the processors to recover the rate of return they are entitled to (whatever that may be) for the year 2003 (base cost year of the present structure) and up to the day when they begin to recover said rate based on the new regulatory standards and corresponding order. The Administrator may so act through regulatory accruals, special temporary rates of return or any other available mechanism of his choosing. The Administrator will hold hearings for this purpose with the participation of plaintiffs, and all parties within the milk industry, within a period of thirty (30) days of this *Opinion and Order*. **A decision by the Administrator shall follow promptly**. (Emphasis ours). *See* Docket No. 480, pages 94-95.

In view of the fact that, as of December 1, 2012, the remedial solutions presented by the defendants are: (a) not satisfactory to the plaintiffs; (b) the parties have been unable to reach an agreement to settle this case and/or an agreement on how to implement the agreed formula, and (c) the defendants have yet to enact and approve a regulation to implement the agreed formula. Based on these premises, the Court has decided to rule on this matter based on the evidence submitted during almost two years of having presided several lengthy compliance hearings, as well as the economic reality of Puerto Rico from on or around the year 2006 to 2013. The current economic

7

scenario in Puerto Rico is indeed a critical factor, and it is directly affected by yet another change in the Government's administration.

The sole purpose of the Court is to:  (a) reach a final solution to the ever changing dilemma of implementing the formula agreed by the experts in the *Experts' Agreement*, Docket No. 1003; (b) determine the values of the factors of the agreed formula to be used when determining the milk price on a regular basis and/or when warranted by exigent circumstances and emergency situations, as well as, (c) approve, amend or return for further evaluation to ORIL, the proposed regulation to be used to implement the formula.[2]

After the compliance hearings finalized on December 1, 2012, the Court allowed the parties to file their legal memorandums.  The Court is now faced with the twofold task to make a final determination on: (a) the values of the factors of the agreed formula to determine the price of the milk, and (b) the regulation to implement the formula, notwithstanding that the Court has made clear in the past that it will not sit as a regulatory court expert under a reiterated temerarious, uncontested consent by the Administrator of ORIL.  *See* discussion *infra*.

The Court is cognizant that the analysis and the implementation of the formula is subject to the daily variables of our uncertain economy which is also directly impacted by the global economy. The formula, however, will remain subject to future changes, as the values of each factor of the formula will undoubtedly change frequently, a reality that is out of the control of the Court and the parties, unless the formula is later modified through a new and/or amended experts' agreement.

---

[2]      The Court notes that the parties have been encouraged several times to reach an agreement on how to implement the formula designed by the experts, to no avail.  The Court is cognizant that the *Experts' Agreement* left open certain factors of the formula to be determined at a later stage, but based on a basic methodology stated in the *Experts' Agreement*.  However, almost six years have elapsed with no agreement in sight as to the value of these factors.  This is a matter of high public interest, and certainly the people of Puerto Rico deserve a more diligent effort from the parties.

### The Experts' Agreement Formula

### Introduction

With the purpose of refreshing certain important dates, it is necessary to review the chronology of the case to facilitate the Court's analysis.

1.      The instant action was filed on August 13, 2004 for the reasons set forth above.

2.      After 51 preliminary injunction hearings presided by the undersigned, the Court issued an *Injunction Order* on July 13, 2007, Docket No. 480, page 2.  This opinion triggered several appeals, including a petition for *certiorari* before the United States Supreme Court, which was eventually denied, upon the recommendation of the United States Attorney General.[3]

3.      On August 26, 2008, the parties' experts' witnesses signed a document entitled "*Experts' Agreement*," Docket No. 1003, which is **now** the core of the instant case, at this stage of the proceedings.  The *Experts' Agreement* has also triggered much litigation after the issuance of the *Injunction Order*, as it is instrumental for compliance of the *Injunction Order*.  History and reality of the different changes in politics and economy have been detrimental in implementing the agreed formula, as the agreement covered only up to the year 2007, the year 2008 was left "to be discussed later."  Notwithstanding, there was a methodology approved as to regulatory accrual, and the return on equity ("ROE").  Amortization of the regulatory accrual was also agreed, as well as the establishment of regulatory accounts pursuant

---

[3]      *Vaquería Tres Monjitas, Inc., et al. v. Fabre Laboy*, 587 F.3d at 482; *Vaquería Tres Monjitas, Inc., et al. v. Irizarry, et al.*, 600 F.3d 1 (1st Cir.2010), (*en banc denied*), *cert. denied*, ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (2011).

to the referenced documents dated August 26, 2008. Hence, there are significant parts of the *Experts' Agreement* that are pellucid as to the acceptance of a measuring of the Puerto Rico risk within the ROE. Since the changes in politics and the economy are not controlled by the parties nor the Court, the effort to enforce the *Experts' Agreement* has been a steep uphill task. The Court acknowledges the hard work and dedication of counsel, but the reality is that the Court still has: (a) an *Injunction Order* that has not been fully complied with by the defendants; (b) an *Experts' Agreement* that it is today, except for some recognized exceptions, in the same status that it was at the time of its execution back in August 26, 2008, and (c) the fact that the defendants have refused to enact a regulation to implement the formula agreed under the *Experts' Agreement*.

4.     On December 1, 2012, the compliance hearings finally came to an end, after 75 evidentiary and compliance hearings[4] presided by the undersigned, triggered by the defendants' failure to comply with the *Injunction Order* of July 13, 2007. The Court further notes that it has been: (a) almost nine years since the filing of the instant complaint; (b) six years after the issuance of the *Injunction Order* on July 13, 2007, as well as several appeals during the course of the proceedings, including a writ for *certiorari* filed by the defendants with the United States Supreme Court, and (c) more than five years since the *Experts' Agreement* was executed on August 26,

---

[4]     *See* Docket entries No. 584, 793, 962, 1080, 1168, 1169, 1170, 1171, 1172, 1218, 1240, 1275, 1283, 1367, 1369, 1372, 1377, 1378, 1400, 1427, 1489, 1504, 1508, 1561, 1584, 1629, 1698, 1749, 1778, 1776, 1792, 1821, 1819, 1876, 1899, 1909, 1933, 1943, 1964, 1966, 1968, 1969, 2031, 2032, 2033, 2034, 2040, 2041, 2042, 2043, 2050, 2067, 2068, 2069, 2084, 2085, 2086, 2087, 2088, 2089, 2090, 2091, 2093, 2095, 2103, 2104, 2116, 2120, 2121, 2131, 2143, 2189, 2190, 2195, 2220.

2008, and the parties and their experts have yet to agree on the validity and effect of the formula and its implementation.

### *The Experts' Agreement and the Procedural Aftermath*

As stated above, the parties' experts agreed to meet without counsel with the sole purpose of designing a new formula to determine the price of fresh milk, as the one currently used by the defendant ORIL at the time of the filing of the instant complaint, had been determined by the District Court as obsolete and unconstitutional.  Hence, on August 26, 2008, the parties' experts signed the *Experts' Agreement*, Docket No. 1003, which includes the experts' formula to determine the regulatory accrual and the return of equity.  The *Experts' Agreement* was handed to the Court by the attorneys and duly docketed at 2:45 p.m., pursuant to the Computerized Electronic Filing System of the Court.

The defendants' formulas, as expressed in the *Experts' Agreement*, had not been implemented because at the beginning, after the implementation the parties refused to accept the "regulatory accrual," notwithstanding that the *Injunction Order* specifically so ordered, and defendants refused to accept the ROE (return on equity) formula, and the "measure of Puerto Rico risk or unsystematic risk."  The defendants practically instantly attempted to extricate themselves from accepting practically all of the agreement except those provisions that were in their favor, such as, the "Exclusivities," which are excluded from the regulatory accrual.  *See* Docket No. 1003, page 1, ¶ 1.d. "The actual net income must be adjusted by adding back any payments for "Exclusivities.  Dr. Freyre will provide that information ... ."

The Court reminds the parties that the formula agreed by the experts is valid and enforceable since August 26, 2008, and shall be applied retroactively, as agreed in the *Experts' Agreement*,

11

regardless of the economic circumstances at the time, and the current and most critical economic circumstances that Puerto Rico is undergoing.  That is why, the formula is flexible and the values of its factors shall be adjusted according to the important changing factors, such as, the economy, unemployment rate, the percentage of islanders moving to the United States, the rating and performance of the bonds with a maturity of 20 and 30 years, issued by the public corporations of the Government of Puerto Rico, to wit, the Puerto Rico Electric Power Authority (PREPA) and the Puerto Rico Aqueduct and Sewer Authority (PRASA), the 20-year GO and 30 year Revenue Bonds Bond Buyer Indexes, as well as the Puerto Rico risk factor, also known as "unsystematic risk."

At the end of the year 2008, the Government of Puerto Rico was on the brink of bankruptcy. This critical situation triggered the enactment of the well known "Act No. 7" by then Governor Luis Fortuño, immediately after taking office in the year 2009 to avoid bankruptcy.  The Court is cognizant that "Act No. 7" passed constitutional mustard both by the local and federal courts. *See Amended Opinion and Order* of September 22, 2010, Docket No. 1697; *Opinion and Order* of January 3, 2011, Docket No. 1804; *Order to Show Cause* of March 24, 2011, Docket No. 1907; *Opinion and Order* of June 28, 2011, Docket No. 1965.  But, notwithstanding the *dire* economic position of the Government, the ORIL's Administrator and its expert insisted that the Milk Industry was insulated from the crisis.  However, the economic figures of the sales of milk, which is the most critical indicator, showed that the fresh milk sales were severely decreasing.  *See infra*.

The values of the factors of the formula will vary according the constant economic changes in the market. The agreed formula, as well as the proposed mechanism to implement the formula, that is, the proposed Regulation No. 12 submitted by ORIL, has yet to receive the final approval by the parties before it can be registered with the Puerto Rico Department of State, and it becomes

enforceable.  These subjects will be addressed below in detail.

The Court will now reinstate the procedural background since the signing of the *Experts'*
*Agreement* on August 26, 2008 until the end of the compliance hearings.  Several opinions have been
issued by the Court addressing the *Experts' Agreement*, as well as the defendants' non-compliance
with the *Injunction Order* of July 13, 2007, which are worth revisiting at this time to promote proper
background to the reader.

1.    *Amended Opinion and Order* of September 22, 2010, Docket No. 1697.

In this *Opinion and Order*, the Court addressed several issues, including the fact that,
as of September 22, 2010, "ORIL has yet to act and supplement the formula that is to be adopted.
ORIL continues to procrastinate by not producing a formula for a return of equity not for a regulatory
accrual."   Docket No. 1697, page 9.  "Two years have elapsed since the *Experts' Agreement* was
executed, and no results have been produced, as the defendant ORIL has yet to determine the 'Puerto
Rico risk factor' in order to establish a value to the factors of the CAPM formula and proceed with
the corresponding calculation to enforce the formula."  *Id.*  Moreover, the "experts' disagreement
seems to stem from the words 'plus a measure of Puerto Rico risk,' used in the interpretation either
under the CAPM method or under the Jonathan Lesser's ROE formula."  *Id.*[5]  "Much has been
written, yet the language is clear, 'a measure of Puerto Rico risk' was to be established within the
now agreed upon CAPM formula.  But 'plus a measure' does not signify 'no measure.'" Docket
No. 1697, pages 9-10.  "**The measure is not to be decided by the Court, the measure must be
reasonably, rationally and scientifically structured, and to be determined by ORIL**."  *Id.* at

---

[5]        The Administrator of ORIL chose to follow th CAPM method, as he had the option as the Regulator.

page 10.  (Emphasis ours).  "The Court then reviews in a limited fashion for compliance under due process, equal protection or under a scientifically based reasonable and/or rationale parameters." *Id.* "A regulation takes property without due process of law only if ' "arbitrary, discriminatory or demonstrably irrelevant to the policy the Legislature is free to adopt. ...'" *Tenoco Oil Company, Inc. v. Department of Consumer Affairs, et al.*, 876 F.2d at 1021, (quoting *Pennell v. City of San José*, 485 U.S. 1, 11 (1988) (citations omitted), cited at the *Injunction Order* (Docket No. 480), p.p. 57-59."  "In the instant case, the parties agreed on a specific component of a parameter.  ORIL, however, understands that no agreement was reached and/or that the economics from August 26, 2008 until the present, do not warrant the 'risk.'" *Id.*

The Court further reminded the parties the repercussions of entering into a stipulation, citing *Christian Legal Society Chapter of the University of California, Hastings College of the Law a/k/a Hastings Christian Fellowship v. Martínez, et al.*, ___ U.S. ___, 130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010); *Chao v. Hotel Oasis, Inc., et al.*, 493 F.3d 26, 31-32 (1st Cir.2007) (the court refused to disregard the stipulation reached by counsel "based on the general principle that 'stipulations of attorneys made during a trial may not be disregarded or set aside at will'").[6]  *See* Docket No. 1697, page 11.  In *Chao*, the Court held that the stipulations are highly regarded in our judicial system and "[o]nce entered, parties are 'not generally free to extricate themselves ... [unless] 'it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties.'" 493 F.3d at pages 31-32. *Id.*  The Court further reminded the parties that their respective economists have agreed, and counsel constructively also agreed [to the formula] by counsel's filing of the

---

[6]      The economics of the case were left to the discretion of the experts; they worked on the *Experts' Agreement*; the stipulation was presented to the Court by counsel and filed with the deputy clerk Omar Flaquer in open court.  (*See* the prologue explanation provided by the experts at the *Experts' Agreement*, Docket No. 1003).

stipulation.  Docket No. 1697, page 12.

In order to "extricate" from the *Experts' Agreement*, ORIL has the burden of proof of showing that "it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties."  *Chao*, 493 F.3d at 31-32.  "The Court has not been impressed by ORIL's proffer, and concludes that the reason adduced are purely pretextual in nature."  *See* Docket No. 1697, page 12.  "The defendants' experts now claim that 'there is no need to add an additional risk premium to the reasonable rate of return in order to compensate fresh milk processors.'"  *Id.*  The Court found that the "economic factors produced as of August 2008, simply do not show that the threshold level of 'manifest injustice' pursuant to *Chao*, 493 F.3d at 31-32, has been met in a 'manifestly' fashion."  *Id.*  The Court concluded that "ORIL has simply not shown to the Court that the Puerto Rican economy had improved in the year 2008 not warranting relief from the *Experts' Agreement* that the parties entered."  *Id.*  "The application of the formula to other subsequent years will depend on the economics of the Island, as applied to the regulated industry."  *Id.*  "**That is, the formula for subsequent years can be increased/decreased or even eliminated, if there is a reasonable, rational, and scientific basis**."  *Id.*  (Emphasis ours).  The Court further reiterates notes 4 and 5 of its *Amended Opinion and Order*, Docket No. 1697, page 12.[7]

"ORIL's expert attributes the difference to 'ORIL price regulation,' but does not point

---

[7]        Note 4: VTM calculated the risk modestly at 1.69 percent points, *see* Docket  1192 at p. 19.  The rational of defendants' expert to "extricate" from the *Experts' Agreement* at Docket No. 1676-1, p. 9, fails to address the "clear language" of the agreement, and merely concludes that "there is absolutely no need for an additional 'risk premium,' although accepting that 'the recession is more severe in Puerto Rico,'" compared to the mainland, *see* Docket No. 1676-1, pp. 8-9.

Note 5: As stated in the *Experts' Agreement*, the CAPM formula was and for an "initial inquiry for the calculation ... as of December 31, 2002."  *See* Docket No. 1003, ¶ 1.a.  However, "the calculation is to be performed until December 31, 2007 ... ."  *See* Docket No. 1003, ¶ 1.b.

out to specific data." *See* Docket No. 1697, pages 12-13.  "Because the onus is with the party that

wishes to "extricate" itself, ORIL is ordered to calculate a rational, reasonable risk premium within

the formula, [denominated in the *Experts' Agreement* as a] "plus a measure of risk" ... agreed by [all

experts], on August 26, 2008, *see* Docket No. 1003." *Id.* at page 13, *Fn.*6.[8]  Note 6: The "measure

of ... risk" is not a permanent fixture, as the ROE formula indeed was originally agreed to calculate

the initial "return of equity" to be established in the year 2007.  The fixture based on scientific

economic data can be technically increased or decreased.  The problem is that ORIL simply has

ignored the impact of its *Experts' Agreement* and simply unilaterally attempts to withdraw from the

effects of the agreement.

    The Court reiterates its findings in the *Amended Opinion and Order* of September 22,

2010, Docket No. 1697, page 13, *Fn.*7:[9]

> ORIL and its expert, Dr. Cotterill, have lost track of the fact that the
> rate of return on equity ("ROE") to be calculated, is not merely for the
> year 2008, but it is to be calculated for, at the very least, from the date
> of the filing of the instant complaint, if not retroactive to potentially
> December 31, 2002.  According to Dr. Cotterill, newly surfaced
> economic data does not now require any "measure of Puerto Rico
> risk," "because of the operations of the ORIL pricing system **under**

---

[8]    Note 6: The "measure of ... risk" is not a permanent fixture, as the ROE formula indeed was
originally agreed to calculate the initial "return of equity" to be established in the year 2007.  The fixture based on
scientific economic data can be technically increased or decreased.  The problem is that ORIL simply has ignored the
impact of its *Experts' Agreement* and simply unilaterally attempts to withdraw from the effects of the agreement.

[9]    Note 7:  Moreover, the Court notes that the conclusion of the defendants' expert does not offer any
raw economic data to "extricate" itself from the August 2008 *Experts' Agreement* that incorporated the specific
language of "plus a measure of Puerto Rico risk."  One glaring example constitutes that the market of fresh fluid milk
continues to decrease, as fluid milk sales have decreased from 330.5 million quarts in 2006 to 309.7 million quarts
in 2008.  Notwithstanding that the UHT milk was ordered by ORIL to increase its price to $1.82 per quart in
July 2008, up from $1.35 in July 2007, the sales of fresh fluid milk declined from 254.95 million quarts in 2006 to
239.7 million quarts in calendar year 2008.  Figure No. 9 of defendants' expert, Dr. Cotterill, reflects a further
downward trend up to November 12, 2008 from January 2008, in fluid fresh milk sales.  *See* Docket No. 1676-1,
Figure No. 9.  VTM reasonably concludes that "thus, fresh milk processors are faced with a declining market, a
condition which increases fixed costs per quart."  *See* Docket No. 1192, p. 15.

the 1957 Milk Pricing Law,"[10] *see* Docket No. 1676-1. (Emphasis supplied). However, the ROE is to be established using the data available then in the years 2007 and 2008, when the stipulation was agreed for a determination on the return on equity for a formula to begin on December 31, 2002.

The Court explained in Note 8, that the defendants' expert has stated that the "[e]conomic theory does not include these factors in the analysis of the demand for a good such as milk. Also they do not contribute to the economic analysis of the industry based risk in a regulated industry such as fresh milk in Puerto Rico. Municipal bond rates' lack of applicability is discussed in this report." *See* Docket No. 1676-1, p. 10, n.1." Docket No. 1697, page 15, *Fn*.8.[11] The experts

---

[10]     At the time that the *Experts' Agreement* was reached in August 2008, the poverty rates statistics in the United States had risen to 13.2%, and the poverty level in Puerto Rico had risen to 44.8%. *See* Docket No. 1669-1, Exhibit IV-A. In the year 2007, the average poverty level in the United States was 13.0%, while in the State of Mississippi was 20.6%, and in Puerto Rico was 45.5%. *See* Docket No. 1669-1, p. 48. The poverty level in the United States for the year 1999 was 9.2%, while in the State of Mississippi was 16.0%, and in Puerto Rico was 44.6%. *See* Docket No. 1210-2, Exhibit III and Exhibit III-A. As to the unemployment rate, the Court notes that for the year 2007, the average unemployment percentage in the United States was 4.6%, and in Puerto Rico was 10.9%. *See* Docket No. 1210-2, Exhibit I-A. In the year 2007, the personal income per capita in the United States was $39,392.00, and in the State of Mississippi was $29,542.00. *See* Docket No. 1669-1, p. 29. The personal income per capita in Puerto Rico in the year 2007 was $13,244.00. *See* Government Development Bank for Puerto Rico's website: www.gdb-pur.com/economy/documents/1-AE2009.pdf. The Court can take judicial notice of an unquestioned economic event, which has been reprinted in internet articles describing or confirming the event, or other information, such as, published governmental statistics. *Chhetry v. U.D. Department of Justice*, 490 F.3d 196 (2d Cir. 2007). Further, the States cited constitute official data provided by Government figures [**statistics**].

          The Court further notes that the average unemployment rate (seasonally adjusted) in the United States in the year 2008 was 5.8%, and in Puerto Rico was 11.5%. *See* Docket No. 1669-1, p. 13. Further, the average income per capita in the United States in the year 2008 was $40,166.00, being the State of Mississippi, the poorest of the Nation, with an income per capita of $30,383.00. *See* Docket No. 1669-1, p. 29. Puerto Rico's income per capita in the year 2008 was $14,236.00. *See* Docket No. 1210-1, Exhibit II. The above economic scenario, for the years 2007-2008, in August 2008, at the time the *Experts' Agreement* was reached, as to the CAPM (Capital Asset Pricing Model for the milk processors), the above state economic scenario (2007-2008) fails to reach the threshold of constituting a "manifest injustice," *see Chao v. Hotel Oasis, Inc., et al.*, 493 F.2d at 31-32, as to the inclusion by agreement into the CAPM formula to determine the regulatory accrual and/or return of equity, a criteria of a "measure of ... risk" for doing business.

[11]     Note 8: The Court was about to recognize that of all the economic parameters suggested by the Court to analyze the potential economic tendency in the local market, including income per capita, unemployment, bankruptcies, poverty rates and bond ratings, specifically the bond ratings in Puerto Rico had improved (both State and Municipal bonds). (Moody's downgraded the General Obligations of the Commonwealth of Puerto Rico to Baa2 in May 2005, followed by a further downgrade to Baa3 in May 2006. Thereafter, in April 2010, Moody's "recalibrated" the Puerto Rico Commonwealth obligations raising the rate from Baa3 to A3). *See* Docket No. 1669-1, p.p 7-8. However, the defendants' expert states that "municipal bond rates' lack of applicability is discussed in

for plaintiffs, Dr. Freyre and Dr. Giachinno, disagreed as well as the Court.

The Court notes that the economic factors stated at *Fn.*6 and *Fn.*7 cited in the instant opinion fully justified the experts' opinion to include within the CAPM formula or the Lesser's formula method, which includes an "unsystematic risk" parameter.

The Court further held the parties shall not use Dean Foods, Inc. ("Dean Foods") as part of the Beta coefficient. *See* Docket No. 1697, page 15. The parties shall use an entity comparable in size and milk production to that of Suiza and VTM. *Id.* at pages 15-17. The Court is cognizant that after the completion of the compliance hearings both Suiza and VTM agreed not to use negative Betas in the formula. But negative betas were insisted upon during the hearings until almost the very end of the procedure. *See Post-Hearing Memorandum In Support Of The Imposition Of A Specific Remedy As A Result Of Non-Compliance And In Support Of Petition For Contempt*, as amended, Docket No. 2248 (hereinafter "Suiza's Post Hearing Memorandum"), and *Vaquería Tres Monjitas, Inc.'s Memorandum On Compliance Of Amended Preliminary Injunction Order*, Docket No. 2228 (hereinafter "VTM's Memorandum"). "The Court understands that it cannot order a specific company to be placed within the ROE formula, as our power is limited to striking actions by the Regulator that violate due process, equal protection, constitute a potential taking, or setting unscientific parameters that are irrational." Docket No. 1697, page 17. "Therefore, the Court strikes Dean Foods or any other company that is not reasonably comparable market to that of Suiza

---

this report." *See* Docket No. 1676-1, p. 10, n.1. The defendants' economic expert stated that: "The Court also asked for U.S. and Puerto Rican [State and] municipal bond rates, and U.S. and Puerto Rican bankruptcy information for all industries, and changes in the value of local investments. Economic theory does not include these factors in the analysis of the demand for a good such as milk. Also they do not contribute to the economic analysis of the industry based risk in a regulated industry such as fresh milk in Puerto Rico. Municipal bond rates' lack of applicability is discussed in this report." *See* Docket No. 1676-1, p. 10, n.1.

and VTM, and is not doing business in a reasonably comparable market to that of Puerto Rico." *Id.*[12]

"ORIL is, thus, ordered to use as part of the Beta Factors reasonably comparable companies, and not

a company that is to assuredly from the very start to decrease unreasonably the risk factor at the Beta

coefficient." *Id.*

> The Court further held:
>
> The Court cannot order a specific Beta Factor of 0.38 nor a determined unsystematic risk of 1.69, as urged by Suiza and/or VTM at Docket No. 1194, p.p. 4-8; the unsystematic risk of 1.69 constitutes a "settlement" proposed by VTM, *see* Docket No. 1192, p. 19.  The Court understands that this is a matter for the Administrator to originally determine and not the Court.   The Court reiterates that ORIL is ordered to calculate Suiza's and VTM's capital base reconstructing the same through separate regulatory accrual accounts. (Unchallenged Finding of Fact number 54 of the *Injunction Order* at Docket No. 480, p.p. 37-38).
>
> A payment schedule should be presented for examination by the plaintiffs, containing fixed and variable interest (ORIL has created a reserve recognizing the potential debt to the two fresh milk processors).

*See* Docket No. 1697, page 18.  The Court granted ORIL until November 3, 2010 to comply with

the requirements set forth in the *Amended Opinion and Order* of September 22, 2010, Docket

No. 1697.  The Court also listed the costs and expenses to be included in the amendments to ORIL's

Regulation No. 12, and ordered ORIL to incorporate said amendments to the proposed Regulation

No. 12.   The Court set a hearing for October 20, 2010 at 9:00 a.m. to determine the date of

publication and implementation of the amendments to ORIL's Regulation No. 12.   *See* Docket

---

[12]        The Court based its analysis to strike on the case of *Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d at 1026-1027 (standing for the proposition that a parameter had to be "rationally related to Puerto Rico," rejecting a former federal standard, no longer applicable by law).  Dean Foods, as explained *infra* is forty five times the size in value of sales to the sum of the volume of both Suiza and VTM.  Furthermore, Dean Foods does not sell milk in regional calid temperatures, as is Puerto Rico.  *See* further data *infra*.

No. 1697, pages 18-20.  An evidentiary hearing was held on October 20, 2010, *see* Docket No. 1749.

2.      *Opinion and Order* of January 3, 2011, Docket No. 1804.

In response to several motions filed by the parties, the Court issued the *Opinion and Order* of January 3, 2011.  Once again, the Court summarized and reinstated its prior holdings; emphasized on the formula agreed by the parties' experts and formalized in the *Experts' Agreement* of August 26, 2008, Docket No. 1003, and the duty of the parties to comply with the terms of the *Experts' Agreement*.  The Court also emphasized on the significance of determining the value of the Puerto Rico risk, the unsystematic risk, a critical and most important factor of the agreed formula. The Court flatly rejected, once again, that the measure of the Puerto Rico risk cannot be zero, as suggested by the defendants.[13]  In the use of the CAPM-ROE formula, the Court emphasized that the comparable surrogate companies to be used must be commercial entities similar in size and production to Suiza and VTM, specifically excluding the use of Dean Foods, Inc., which is one of the largest milk processors of continental United States.  "According to Suiza, [and further not challenged by the Administrator of ORIL], Dean Foods has a capital of $6.759 Billion, **representing 96.3 percent of the capital of the [total] sample used to calculate the Beta**, and is 'close to

---

[13]      The Court had stated in its *Amended Opinion and Order* of  September 22, 2010, Docket No. 1697, *Fn*.6,7,8 that the economic figures could not sustain an unsystematic risk of zero [0].  The *Experts' Agreement*, Docket No. 1003, clearly provides as follows: "Return on Equity (ROE). [W]e have agreed the following:

    a.    The method to calculate the ROE could either be the Capital Asset Pricing Model (CAPM), as described in Regulation 12, plus a measure of Puerto risk or the method used in the report by Jonathan Lesser plus a measure of Puerto Rico risk [unsystematic risk] ... [or the method used in the report of]

    b.    The ROE calculated by Jonathan Lesser will be unlevered using the following equation: ROE is equal to the unlevered ROE plus the debt to equity ratio times the difference of the unlevered ROE and the cost of debt ... [the Jonathan Lesser method plus a measure of Puerto Rico risk [unsystematic risk] to determine the *beta* coefficient component].

20

100 times the reconstructed capital of the fresh milk processors in Puerto Rico.' *See* Docket No. 1194, p.p. 2-3 referring to Suiza's Exhibits No. 14 and 15, admitted by the Court." *See Amended Opinion and Order*, Docket No. 1697, page 16.  A lengthy and detailed analysis made by the Court followed, leading to the defendants' non-compliance of the *Injunction Order* of July 13, 2007, Docket No. 480.  *See Opinion and Order* of January 3, 2011, Docket No. 1804, pages 1-10.

The Court further held that the burden of compliance with the *Injunction Order* of July 13, 2007, rests on defendant ORIL not on plaintiffs.  *See* Docket No. 1804, page 13.   For example, "[a]s to the 'unsystematic risk' incorporated into the *Experts' Agreement* relating to the 'measure of risk,' the argument made by ORIL is purely conclusive in nature."  *See* Docket No. 1804, page 13.  "But, the problem was not mitigated by ORIL's fixed price of raw milk since said price to Indulac was determined to be seriously constitutionally deficient, since the ' fixed price' was marked up by the Administrator in order to authorize Indulac to purchase raw milk at much cheaper prices to produce UHT milk, which not only competed with fresh milk, but also slowly but surely usurped the market from fresh milk.  *Vaquería Tres Monjitas, Inc., et al. v. Irizarry*, 587 F.3d at 469-470 ("Indulac purchased the surplus raw milk from [the] processors at a price significantly below the price that the processors paid the dairy farmers for their non-surplus raw milk ..."), unlike the other milk processors, the price at which Indulac may sell its milk to consumers is not regulated." *See* Docket No. 1804, page 14.  "This lack of regulation as to Indulac's retail price for milk, coupled with the relatively low price at which it could purchase surplus raw milk from plaintiffs, allowed Indulac's profit margin to soar, while the processors struggled."  *Id.* at pages 14-15.  "**And, since Indulac was able to purchase its raw milk at a deflated price, UHT milk became significantly less expensive than fresh milk - a phenomenon unique to Puerto Rico - causing Indulac's**

UHT milk to begin to dominate the Puerto Rican market." (Emphasis ours).  *Id.* at page 15.

"**Therefore, the price of milk set forth by ORIL was not a mitigating factor for the years 2002 until months after the *Injunction Order* in July 2007**." (Emphasis ours). "Further, the price of raw milk constituted an aggravating factor to the milk processor who had to compete with Indulac, also enjoining the benefit of cheap raw milk." *Id.* "Hence, Indulac competed favorably with both milk processors to the extreme that it 'beg[an] to dominate the Puerto Rican milk market.' *Vaquería Tres Monjitas,* 587 F.3d at 470." "The price of raw milk reached in fact the threshold of a 'taking.' *Vaquería Tres Monjitas*, 587 F.3d at 483. "The [district] court is of the opinion that defendant ORIL *et al.* cannot now shift gears and allege new reasons as to the inclusion of Dean Foods in the Beta factor nor allege new reasons than those previously alleged in its Compliance Memorandum, Docket No. 1193, as reconsideration standards under Fed.R.Civ.P. 59(e) in the First Circuit eschews the parties on reconsideration to 'advance new arguments that could or should been presented prior to [the District Court's resolution] judgment.' *Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc.*, 455 F.3d 7, 15-16 (1ˢᵗ Cir.2006)." *See* Docket No. 1804, page 15.

One of ORIL's arguments is that the *Experts' Agreement* is not final, nor a binding contractual agreement, or a "joint stipulation of facts between the parties as to any particular measure of risk. . . . But the parties here did not agree on the existence, term, or measure of risk premium. *See* Docket No. 1715, p.p. 2-3." *See* Docket No. 1804, page 16.  As to ORIL's new argument regarding the non-existence of the *Experts' Agreement*, the Court held:

> The court has previously set forth that the *Experts' Agreement* does not constitute a "*secula seculorum*" type of agreement in terms of time frame going retroactively to 2004 (or 2002) or forward prospectively from August 26, 2008.  But, the phrase "**plus a measure of Puerto Rican Risk**" does not mean "**no measure**" of Puerto Rican Risk. (Emphasis ours). [Emphasis in the original]. The

specific number within the "measure of risk" is to be determined by the Administrator considering P.R. economic factors then present on August 26, 2008.  The court has interpreted that the unsystematic risk factor, future or past, does not constitute a permanent feature, as the original number could be going retroactively or forward, increase, decrease or disappear.  But the Administrator does not enjoy unbridled discretion, as the matter of unsystematic risk must be rational, reasonable, and based on scientific data.  The court understands that the *Experts' Agreement* on an original measure of unsystematic risk as the economic factors included in our clarification *Order*, Docket No. 1699 at footnotes no. 6 and 7, certainly warranted the *Experts' Agreement* to agree on "measure of Puerto Rican Risk."  The court does not interpret the measure as a permanent fixture in the formula as the economic conditions in prior years 2004-2008, could warrant either an increase or a decrease or even an elimination; the same analysis applies going prospectively from August 26, 2008 forward.  The court is of the opinion that at least covering the first initial computation, the parties agreed to a risk factor (for example, on the consideration of the Regulatory Accrual, the first period of analysis was set "to be performed until December 31, 2007, and 2008 is to be discussed later").  *See Experts' Agreement*, Docket No. 1003, at ¶ 1(b).  From the original date prospectively and retrospectively, the determination could depend on a rational, scientific method to increase, decrease, or eliminate the unsystematic risk.  The court interprets the original date to be as to the ROE from December 31, 2007 to December 31, 2008.  *See* analysis, infra.

The Court further addressed the point of "no agreement" as to the unsystematic risk.

At the outset, the Court stated in the *Opinion and Order* that the position of ORIL's counsel and its expert witness are different.  ORIL's expert insists that "there is no measure of risk, because Regulation No. 12 'true ups' disposition eliminates the risk as Regulation No. 12 signed on July 22, 2008, and effective sometime thereafter, (after publication by the State Department of Puerto Rico pursuant to law), is not retroactive in nature." *See* Docket No. 1804, page 25.[14]  "Regulation No. 12

---

[14]    The Court notes that, as of this date, the proposed Regulation No. 12, is still just a proposal, as the parties has yet to agree to the language, and other matters.  In sum, the proposed Regulation No. 12 has not been approved by the defendants due to the discrepancies with the plaintiffs, hence, it has not been duly signed and presented to the Puerto Rico State Department for proper registry, and public notice.  The Court is cognizant that this case was filed on August 13, 2004, and the *Injunction Order* was entered on July 13, 2007, Docket No. 480.  Since

of July 22, 2008 is purely prospective, hence, could not be applied to the ROE (Reasonable Rate of Return or to the Regulatory Accrual also expressly contemplated by the *Experts' Agreement*)." *Id.* "Dr. Cotterill, after being cross-examined by counsel and asked by the court as to the potential retroactivity of Regulation No. 12, then, as a fall back position, claimed that there was no risk retroactively and prospectively, because the major and most recurring cost expense of Suiza and VTM was the price of raw milk, which was set by Regulation. *See* Docket No. 1799, pp. 112-121, wherein Dr. Cotterill described the milk prices as a 'constant.'" *See* Docket No. 1804, page 26. But "true ups" an automatic increase or decrease have never been placed in effect as admitted by Dr. Cotterill, which the Court now adds, up to the date of the signing of this *Opinion and Order*. The Court vehemently disagreed with Dr. Cotterill's position, and held that "the raw milk price constituted a 'taking' banned by the United States Constitution. *Vaquería Tres Monjitas*, 587 F.3d at 484." *See* Docket No. 1804, page 26. "Hence, the price of raw milk paid by the milk processors did not constitute a mitigating measure of risk but on the contrary, constituted an aggravating factor." *Id.* at pages 26-27. "It is the court's opinion that the price of milk paid by the milk processors was precisely one of the most severe constitutional deficiencies established by the predecessors Administrator." *Id.* at page 27.

The Court further held that it "rejects as out-off bounds, and being tardy, the claim that the *Experts' Agreement* was no agreement a 'recent vintage' argument being made after the holding of eleven compliance hearings, wherein the court stated that the agreement would be enforced. *See* Docket No. 1737, p. 5." *See* Docket No. 1804, page 27. Lastly, the Court "rejected the claims of a 'no agreement' as to the unsystematic risk." *Id.*

---

its inception, this case has gone thru three very different political administrations.

As to the Court's position of non-inclusion of Dean Foods under the CAPM formula, the Court reiterated the above analysis that "there is no rational, reasonable nor any analysis whatsoever fitting Dean Foods to the regional calid temperature milk and expensive market of Puerto Rico nor by including such a large company (forty-five time the size in volume of business of the sum of VTM and Suiza), into the Puerto Rican market." *See* Docket No. 1804, pages 27-28. "Contrary to ORIL's argument the court is not improperly substituting ORIL's discretion of an economic standard." *Id.* at page 28. "In *Tenoco*, *supra*, [*Tenoco Oil Co., Inc. v. Department of Consumer Affairs*, 876 F.2d at 1026-1027], as stated above the court struck a state federal economic standard not only as stale but also because the standard could not rationally be applied to 'Puerto Rico alone.'" On September 22, 2010, the court ordered that another comparable company be added or Dean Foods would be stricken, and the Beta component would then be limited to the other four surrogate companies." *See* Docket No. 1804, page 28.

3.    *Order To Show Cause* of March 24, 2011, Docket No. 1907.

After several evidentiary hearings and *Opinions and Orders*, the Court issued an *Order To Show Cause* on March 24, 2011, triggered by the defendants' resistance to comply with the *Injunction Order*, Docket No. 480, and the *Opinions and Orders* that followed.  In the *Order To Show Cause*, the Court emphasized on the defendants' "inconsistent position relating to negating the effect of their own expert's acceptance in recognizing a risk of doing business in Puerto Rico because of dire economic reasons." *See* Docket No. 1907, page 2. "Defendants in the instant case are steadfastly negating that there exists an economic crisis in the island, notwithstanding in various cases the government has moved the federal and/or local courts to accept that the island is suffering from the 'worst financial crisis in its history.' *United Automobile Aerospace, Agricultural*

*Implement Workers of America International Union, et al. v. Luis Fortuño, et al.*, 633 F.3d 37 (1st Cir.2011) (concurring opinion Boudin, C.J.)." *See* Docket No. 1907, page 2. The Court explained that plaintiff UAAIWAIU challenged Governor Fortuño's commonly known as "Act 7," enacted as the "Law Declaring a Fiscal State of Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Save Puerto Rico Credit." *Id.* According to the legislative intent, "Act No. 7 was intended to eliminate Puerto Rico's $3.2 billion structural deficit." *Id.*

Prior to *United Automobile Aerospace, Agricultural Implement Workers of America International Union, et al.*, 633 F.3d 37, the constitutionality of Act No. 7 had been challenged in the local courts, and the Puerto Rico Supreme Court upheld the constitutionality of Act No. 7. *See Olga Domínguez Castro, et al. v. The Commonwealth of Puerto Rico, et al.*, 2010 TSPR 11 (2010). *See also* Docket No. 1907, page 4. In *Domínguez Castro*, the constitutionality of Act No. 7 was challenged by the government employees that were terminated by the implementation of Act No. 7, which was geared to reduce the size of the government, as an emergency fiscal measure under Act No. 7. *See* Docket No. 1907, page 4. *Domínguez Castro* appealed the ruling of the Puerto Rico Supreme Court to the United States Supreme Court. *See Domínguez Castro, et al. v. Government of the Commonwealth of Puerto Rico, et al.*, 2010 WL 4220510 (*On Petition for a Writ of Certiorari to the Supreme Court of Puerto Rico*, Brief in Opposition of August 5, 2010). In its Brief in Opposition, the Commonwealth of Puerto Rico (the "Government"), was specific as to the dire economic situation of Puerto Rico since the year 2006, which forced the enactment of Act No. 7, and accepted that Puerto Rico was undergoing "a grave fiscal emergency" ... "existing since at least 2006 in Puerto Rico." *See* Docket No. 1907, page 7. The Government specifically argued in its brief:

26

The legislature of the Commonwealth of Puerto Rico passed Act No. 7 in March 2009 in response to an unprecedented "fiscal crisis." Pet. App. 291a. In the law's extensive Statement of Motives ( id. 295a-324a), **the legislature explained that the Commonwealth was facing a serious $3.2 billion structural deficit equal to 42 percent of estimated revenues. That deficit resulted from, among other things, negative economic growth since early 2006. The Commonwealth's Planning Board, however, had consistently projected positive economic growth. Thus, tax revenues had fallen far short of what the Commonwealth had anticipated and expenditures had far exceeded revenues.** Id. 295a-301a.

The resulting structural deficit exposed the Commonwealth to a potentially disastrous downgrade in its credit rating. **Although bonds issued by the fifty States have credit ratings of A1 or higher, Puerto Rico bonds had fallen from a rating of Baa1/A- in 2004 to Baa3/BBB- in 2009. That rating left Puerto Rico government debt just a single step above "junk" status.** The downgrading of Puerto Rico's credit to junk status would have reduced the value of its outstanding obligations by 30 to 50 percent. **The impact on the island of such a destruction in wealth would have been devastating, as local owners hold more than $10 billion in Puerto Rico government obligations. The Commonwealth and other government bondholders also would have been required immediately to post almost $900 million in additional collateral to secure their obligations.** Pet. App. 302a-304a.

A downgrade to junk status would also have severely impaired Puerto Rico's ability to carry out its governmental operations. Investors who had traditionally acquired Puerto Rico bonds but who are required to maintain assets in safe investments could not have continued to invest in those bonds. Without recourse to public financing, the government could not have paid employee salaries or provided citizens with essential services. **Those consequences would have had a crippling effect on Puerto Rico's economy, leading to the loss of 130,000 jobs in a jurisdiction whose total population is just four million people. According to the Planning Board's estimates, unemployment could have reached 25 percent.** Pet. App. 304a-306a.  (Emphasis ours).

*See* 2010 WL 4220510, **3-4 (U.S.)(August 5, 2010).  The United States Supreme Court denied the

petition for *certiorari*, ___ U.S. ___, 131 S.Ct. 152, 178 L.Ed.2d 38 (2010).

The Court emphasized in the *Order To Show Cause* that the dire economic crisis in

Puerto Rico is acknowledged by both the First Circuit and the Supreme Court, at the request of the

Commonwealth of Puerto Rico,[15] constitutes yet another reason that warrants the legitimacy of the agreement, as the *Experts' Agreement*'s inclusion of an unsystematic risk (a measure of "Puerto Rico risk" within the ROE factors) does not warrant that the *Experts' Agreement* be disregarded and set aside. *See* Docket No. 1907, pages 8-13. Hence, the Government of Puerto Rico was barred from alleging that there was no economic crisis in Puerto Rico.

> It is potentially clear that the expert's opinion [defendants] was a recognition to the depressed status of the world economic crisis which the government of Puerto Rico has correctly used to persuade courts to enter favorable determinations by the Circuit Court of Appeals, the Supreme Court of Puerto Rico and the Supreme Court of the United States. The defendants in the instant case are part of the government of Puerto Rico as they remain in the instant case strictly in their official government capacities. Hence, this court now adds simply that the defendants are barred, pursuant to the estoppel principles, from alleging contrary reasoning in this case when the government has prevailed in other cases using precisely on contrary arguments. *Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d208, 211-212 (1st Cir.1987).

> The court reiterates its limited holding as to "a measure of Puerto Rican risk" that the coinage used by the experts was ill stated as the court recognized since its inception that the risk should have been denominated related to the world economic crisis and not merely referring to Puerto Rico." "The court had also clarified [in prior decisions on this subject matter] that the 'measure of Puerto Rico risk was ill denominated by the experts of ORIL [and that of the industrial] milk processors and did not constitute a coinage by the district court.'" (Docket 1804 reiterating Docket 1697). The court further clarified that the inclusion of "**a measure of unsystematic risk**" was **not a permanent fixture** (emphasis supplied at Docket 1804) and Docket 1697 [and] could vary potentially "from year to year" depending on the economic scientific data of Puerto Rico each year.

> Much to the chagrin of the court, notwithstanding an economic

---

[15]     *See Domínguez Castro v. E.L.A.*, 178 D.P.R. 1 (2010); *United Automobile, Aerospace, Agricultural Implement Workers of America International Union, et al. v. Fortuño, et al.*, 633 F.3d 37 (1st Cir.2011); *Cortés v. Burset*, 909 F.Supp.2d 91, 94 (D.P.R.2012) (collection of cases cited therein).

depressed world economic scenario urged at the behest of local government which has persuaded the Court of Appeals of the First Circuit court, the Supreme Court of Puerto Rico and the Supreme Court of the United States, all in cases where the government has prevailed, the defendants in the instant case insist on refusing to accept that Puerto Rico has undergone a critical economic scenario since mid June 2005 (the economic vacations forced on government employees) until at least 2010.  The court makes no prediction as to 2011 although the court notes an increase in the bond rating of Puerto Rican Bonds to BBB/A-2 effective on January 27, 2011, and later a decrease in unemployment in the United States which may affirmatively affect the Puerto Rican economy this year including a positive stimulus to the unemployment rate in Puerto Rico.

*See* Docket No. 1907, pages 9-10.

The Court ordered the defendants to show cause within the next ten working days, "why they, in their official capacities, should not be totally barred from continuing to reject 'a measure of unsystematic business risk' to be integrated with the CAPM formula to determine plaintiffs' return of investment (ROE), by the estoppel doctrine of 'preclusive inconsistent positions' as expressed in the case of *Patriot Cinemas Inc. v. General Cinemas Corp.*, 834 F.2d at 211-212." *See* Docket No. 1907, page 12.  "Further, the defendants are to produce as requested herein within the same ten (10) working days the scientific economic data together with a full scientific rational explanation as to how the unsystematic business risk was calculated after the court struck the inclusion of Dean Foods as to Return of Investment (ROE) calculation also on a year to year basis." *See* Docket No. 1907, pages 12-13.

As of the date of the drafting of the instant *Opinion and Order*, the Court notes that whatever improvements were reflected in the Puerto Rican economy when the Court entered its *Order To Show Cause* of March 24, 2011, Docket No. 1907, no longer exists, as the current economic data is once again grim, and with a negative outlook.

4.      *Opinion and Order* of June 28, 2011, Docket No. 1965.  This *Opinion and Order* follows the parties' responses to the Court's *Order To Show Cause*, Docket No. 1907.  Once again the Court found that the defendants have failed to comply with the *Injunction Order* of July 13, 2007.  The Court proceed to make an analysis on why the defendants have yet to comply with the *Injunction Order*, and establishes the rules to be followed by the parties in the compliance hearings.  The Court notes that the compliance hearings came to an end on December 1, 2012.

The first ruling was that the Court "will not authorize or consider any proposal or compliance scenario by defendant ORIL that does not fully comply with the *Orders* of the Court at Docket entries No. 1697, 1698 and/or 1804."  *See* Docket No. 1965, page 2.  The "defendants will not be authorized to unilaterally 'extricate themselves,' *see Chao v. Hotel Oasis*, 493 F.3d 26, 31-32 (1st Cir.2007), from the clear stipulation entered by all experts on August 26, 2008, including defendants, the Secretary of Agriculture and ORIL's expert at Docket No. 1003, wherein the parties adopted the 'CAPM methodology,' which is the Capital Asset Price Model (CAPM) authored by Ibbotson to calculate the rate of equity of the two processing plants, *see* Docket No. 1003, page 1, Article 2(a)."  *Id.  See also Christian Legal Society Chapter of the University of California, Hastings College of the Law a/k/a Hastings Christian Fellowship v. Martínez, et al.*, ___ U.S. ___, 130 S.Ct. at 2983.

The second *Order* was that the Court "will not authorize any unilateral change of the *Experts' Agreement*, Docket No. 1003, specifically as to significant alterations to the CAPM methodology, which the parties explicitly accepted."  *See* Docket No. 1965, page 3.  "The Court will only allow the exception timely requested by VTM and Suiza, as to the fact that certain parameters are 'not fit as to Puerto Rico alone,' are to be excluded pursuant to the clear precedent established

30

at *Tenoco Oil Company, Inc. v. Department Of Consumer Affairs*, 876 F.2d 1013, 1024 (1st Cir.1984) (Torruella, J.)." *Id.* "That is, that some limited parameters within the CAPM methodology may be 'locally inapplicable.'" *Id.* "The Court refers to the use of Dean Foods, Inc. ("Dean Foods"), as a surrogate company to be used within the beta coefficient component amongst the four or five companies to determine the beta coefficient of the CAPM methodology, to determine the ROE (return of equity)." *Id.*

The third *Order* was that the Court "will not authorize any tampering with the CAPM formula as originally accepted by the Regulation Number 12, except of course as to the unsystematic "measure of Puerto Rico risk," as expressed by the Administrator.  ROE = Rf + b (Rm - Rf) + Rmc." *See* Docket No. 1965, page 4.  "'ROE' means return of equity; 'Rf' means risk free rate; 'beta (b)' means unlevered beta for manufacturing of dairy products; 'Rm' means equity risk premium; 'mc' means microscopic risk premium." *Id.* After the Court analyzed the parties' positions, and advised the parties that it will not, "at this stage of the proceedings,, authorize the alteration of the ROE coefficients as originally conceived and proposed under Regulation Number 12 by the then Administrator of ORIL." *See* Docket No. 1965, pages 4-5.

The Court, once again reminded the parties that since September 22, 2010, the parties were ordered "to include in the CAPM formula the 'unsystematic risk of conducting fresh milk fresh milk processing business locally,' all based on a stipulation that specifically incorporated this risk within the CAPM formula, *see* Docket No. 1003 at pages 1-8.  The Court further stated that "it cannot accept any proposal of defendant ORIL that does not have within the proposal an unsystematic risk of conduction the milk operations locally under the specific agreement with the agreement of the experts.  Docket No. 1003, page 1, § 2(a)." *See* Docket No. 1965, pages 5-6.

31

Furthermore, the Court will "reject any proposal that does not have an unsystematic risk dated from at least December 31, 2002" [date subject to be adjusted by the Court depending on the proof to be rendered at the permanent injunction hearing], as the defendants have failed to comply with the proof requirements set forth in *Christian Legal Society Chapter of the University of California, Hastings College of the Law a/k/a Hastings Christian Fellowship v. Martínez, et al.*, ___ U.S. ___, 130 S.Ct. at 2983. "The *Martínez*' case, *supra*, requires the defendants to carry 'the burden' to attempt to extricate themselves from a stipulation. The test is one of 'manifest justice' as specifically required under *Chao*, 493 F.3d at 31-32. *See also Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 2217, 226 (2000)." *See* Docket No. 1965, page 6.

The Court also reiterated that the defendants "have also failed to calculate the regulatory accrual, which must be calculated to establish plaintiffs' equity, by using the correct dates." *See* Docket No. 1965, page 7. "Further, defendants have arbitrarily adjusted the regulatory accrual beginning in December 2002 up to this date." *Id.* "As of this date, the defendants [have] yet to make whole, as to a fair rate of return, to be granted to plaintiffs, which commences with the calculation of the ROE, return of equity, which was ordered to include the yearly regulatory accrual." *Id.* "VTM had prior thereto proposed similar arguments at Docket No. 1896 in Dr. Freyre's Report, *see* Docket No. 1896-1, pages 24 to 26." *Id.*

The Court reminded the defendants all the times during the course of the instant case, that the defendants have been warned, "when admonishing them [the defendants] that 'every day that goes by without Suiza receiving its constitutionally mandated revenue requirement only increases Suiza's, (and VTM's), amount of regulatory accrual,' *see* Docket No. 1891 at page 11." *See* Docket No. 1965, page 8. "But even without the inclusion of the regulatory accrual, which constitutes an

equitable redress, ORIL has failed to comply." *Id.*

        The Court further notes in the *Opinion and Order*, that as of June 28, 2011, ORIL has also "failed to correct the beta factor as required by this Court [the exclusion of Dean Foods as a coefficient factor "locally inapplicable]." *See* Docket No. 1965, page 8. Likewise, the Court distinguished each incident wherein Dr. Cotterill's report is different from the conclusions reached by the plaintiffs' experts, particularly the reports rendered by Dr. Freyre. One important item that Dr. Cotterill failed to consider "without any authorization from the Court, [is] the marketing and advertisements of both Suiza and VTM **while at the same time accepting that of Indulac**, and further leaving Indulac's unaffected marketing and advertisement costs not regulated as a competitor in the fresh milk industry in the local market. (Emphasis in the original)." *See* Docket No. 1965, pages 8-9. "In sum, $5.92 million were unwarrantedly excluded notwithstanding specific language by the Court to the contrary at the *Injunction Order*, Docket No. 480, and repeated at a specific modification required by the Court as to Regulation Number 12, specifically requested by VTM. *See* Docket No. 1697 at page 19 (the problem is not only that Indulac's marketing costs are not regulated but also that the marketing is financed by the fresh milk processors)." *See* Docket No. 1965, page 9.

        The Court is cognizant that Suiza is also challenging the Special Marketing Fund ("FEM"), which is a special fund account created by ORIL through the proposed Regulation Number 12. *See* Docket No. 1965, page 9, n.9. Notwithstanding, the Court will only focus on the alternatives proposed by the defendants in compliance with the *Injunction Order* of July 13, 2007, Docket No. 480. The Court left for the permanent injunction hearing the matter of the distribution of the FEM funds, notwithstanding Suiza's strong hint that the funds were not being distributed in violation of the equal protection clause. In other words, a strong allegation of a discriminatory

33

distribution.

At the outset, the Court stated in the *Opinion and Order* that plaintiffs had challenged defendants' offer of Alternatives 1 through 5.  *See* Docket No. 1965, page 9.  Upon plaintiffs' request, the Court excluded Alternative 5, as it "does not contain a measure of unsystematic risk."  *Id.*  "Against prior orders of the Court, Alternatives 3 and 4 simply do not include the regulatory accrual and failed in calculating a reasonable margin of return, based on percentage over capital (equity), as required under Regulation Number 12." *Id.*

The Court further analyzed the different scenarios proposed by ORIL under each proposed alternative.

> Further, Dr. Cotterill is, for example, using at scenario 1 of Alternative 3, the "adjusted net worth," an unidentified term totally different [from] than a percentage over "equity capital."  Further, the Court finds that ORIL has failed to include the regulatory accrual to the base of Suiza and VTM, in all the different scenarios presented. Alternative 4 is also deficient, as this alternative assumes that Regulation Number 12 has actually been placed in effect, but indeed it has not, as the record shows that said regulation has not been approved, nor it has been recorded with the Puerto Rico State Department (at least part of the Regulation Number 12 has not been in effect, automatic adjustments and part has been altered, . . . Further, Dr. Cotterill uses negative betas not mentioned anywhere at Regulation Number 12, and contraindicated as a reliable parameter by the experts.  *See* Docket No. 1891 at page 17, n.133.

> Alternatives 1 through 3 are also severely criticized by VTM since the beta factors are incorrectly and discriminatorily established for the years 2003 to 2007.  *See* Docket No. 1896-1 at pages 18-20.  *See also* Table prepared by Dr. Cotterill.  Suiza joins in a similar argument at Docket No. 1891 at pages 17-19.

> Suiza also balks when Dr. Cotterill assumes that automatic price adjustments cited at Regulation Number 12 were in place, yet he admitted in Court that no such automatic adjustment in price pursuant to Regulation Number 12 has been established since July 2008, as of the date that he testified in Court on November 22, 2010.  Further,

and most critical, according to Suiza, is the milk price paid to the farmers that was kept artificially high when the cost of feed used for the farmer production of milk had substantially decreased during the period from July 2008 to July 2010.  The price of milk should have been lowered when the price of fuel similarly decreased.  Yet it has artificially increased when the price reached the levels of again pre-2008 feed prices, *see* Docket No. 1891 at page 19.

Finally, Alternatives number 1 and 2 included the concept of a "profit true up."  A different concept not included at Regulation Number 12.  A "profit true up" adjust the price using an index, independently of the specific impact cost changes in the financial statements.  A true-up mechanism compares costs and revenues, and adjusts prices to allow a regulated company to recoup or return the difference between costs and revenues in the next regulatory period."  This concept goes against the remedy ordered of "a reasonable rate of return," but not a "guaranteed profit," as contemplated and explained by Suiza at Docket No. 1891 at pages 20 to 21.

. . .

Defendants cannot explain satisfactorily to the Court the insistence in not including the "unsystematic risk" within the agreed upon formula to determine the ROE and/or not including the regulatory accrual into any proposed alternative in order to eventually determine a reasonable rate of return.

Dr. Cotterill, knowing that Indulac has remained with unbridled discretion as to the advertisement costs, in reiterated reports arbitrarily excludes valid expenses of both VTM and Suiza (marketing and advertising) against the *Injunction Order*, and against the Court ordered amendments to Regulation Number 12.  Further, the alteration made by ORIL, of the Ibbotson CAPM coefficients within the ROE formula, as agreed upon by the experts at Docket No. 1003, and as stated *infra* in this opinion, constitutes an effort to perform an "end around run" to the offset of the inclusion of "the unsystematic risk" and/or to offset the exclusion of Dean Foods as a beta factor surrogate company, a giant in the whole United States dairy market, an example of a parameter "not fit in Puerto Rico alone," pursuant to *Tenoco Oil*, 876 F.2d at page 1024.

In essence, ORIL is attempting to continue its policies of producing "a preconceived result" instead of a Constitutional regulation of a market.  However, the milk industry constitutes a government

regulated market which must be handled by the State under
Constitutionally protected due process, equal protection, and avoiding
unwarranted takings. *Duquesne Light Company v. Barasch*, 438 U.S.
299, 307 (1989); *Vaquería Tres Monjitas, Inc., et al. v. Fabre Laboy*,
587 F.3d 464, 482 (1st Cir.2009); *Vaquería Tres Monjitas, Inc., et
al. v. Irizarry, et al.*, 600 F.3d 1 (1st Cir.2010), (*en banc denied*), *cert.
denied*, ___ U.S. ___, 131 S.Ct. 2441, ___ L.Ed.2d ___ (May 16,
2011)).

*See* Docket No. 1965, pages 10-12.

## Legal Analysis

### *An Update Note*

The Court is cognizant that at the time of this writing, the circumstances in Puerto Rico have

changed dramatically.  For example, as of June 2013, the unemployment rate in Puerto Rico is 13.2%

compared to the unemployment rate in the following States, to wit: Nevada 9.6%, Illinois 9.2%,

Mississippi 9%, Rhode Island 8.9%, North Carolina 8.8%, New Jersey 8.7%.   *See*

*www.bls.gov/lau/home.htm*, retrieved on August 2, 2013.  However, in the year 2007, the average

unemployment rate in the United States was 4.6% while the average unemployment rate in

Puerto Rico was 10.9%.  Furthermore, the average unemployment rate in the United States for the

yare 2008 was 5.8% while the average unemployment rate in Puerto Rico was 11.5%.  *See Fn.*10,

*infra*.

Similarly, in the year 2007 the poverty rate in the United States was 13.%, in the State of

Mississippi was 20.6%, and in Puerto Rico was 45.5%.  *See Fn.*10, *infra*.  In August 2008, when the

time the *Experts' Agreement* was executed, the level of poverty rate in the United States had risen

to 13.2%, and in Puerto Rico had decreased to 44.8%.  *Id.*  By the year 2011, the average poverty

level in the State of Mississippi had risen to 22.6% while in Puerto Rico was 45.6%.  *See Fourth*

*Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economic*

*Model for U.S. Jurisdictions*," Docket No. 2176-1 page 15.

The Puerto Rico per capita income continues to decrease, from $18,100 in the year 2008, $17,400 in the year 2009 to $16,300 in the year 2010, and a modest increase to $17,002 of income per capita in the year 2012 because of the immigration from Puerto Rico to the Continental United States.[16]  *See also Economy of Puerto Rico*, http://en.wikipedia.org/wiki/Economy_of _Puerto_Rico.  Retrieved on June 19, 2013.

Mississippi is the State of the Union with the lowest personal income per capita of $33,073, and Connecticut is the State with the highest personal income per capita of $58,908.  *See Fifth Update of the Comparison of Per Capita Personal Income between Puerto Rico, the United States, and all Fifty States*, Docket No. 2282-1, page 2.  The average personal income per capita of the poorest States of the United States, that is, Mississippi, Idaho, South Carolina, Utah and West Virginia, is $34,033.  *Id.*  Meaning that Puerto Rico only achieves about half of the figure.  *Id.*  According to the statistics, all States, except Nevada, have improved their personal income per capita from the years 2008 to 2012.  *Id.*  Nevada's personal income per capita decreased from $39,872 in the year 2008 to $37,361 in the year 2012.  *Id.*  Thus, as of the end of the year 2012, Nevada has more than doubled Puerto Rico's personal income per capita.  *See* Docket No. 2282-1, pages 6-7, Exhibit IV-C.

As to the credit ratings of the Puerto Rico Bonds, the bonds were stable from January 1976 until 2004, at the same Baa1 level, with either positive, favorable or stable outlook.  *See* Docket No. 2250-1, pages 2-3.  In September and May 2005, the ratings remained the same but with a

---

[16]     *See Fifth Update of the Comparison of Per Capita Personal Income between Puerto Rico, the United States, and all Fifty States*, Docket No. 2282-1, page 2.

change from "stable" to "negative," since the year 2004. "Finally, after thirty years of stability there

was a downgrade of the Puerto Rico GO bonds from Baa1 to Baa2 in February 2006 and to Baa2 to

Baa3 in May 2006." *See* Docket No. 2250-1, page 3. The last downgrade of the Puerto Rico credit

ratings coincide with the closing of the "central Government" for a period of two weeks, that is, from

May 1-14, 2006. At that time, **the rating of the GO Bonds was Baa3, that is, only one level from**

**the non-investment grade rating of Ba1**. *Id.* "[I]n February and May of 2006, the outlook was

**Negative/Credit Watch**." (Emphasis in the original authored by Dr. Freyre), *see* Docket No. 2250-

1, page 3.

In the year 2010, the Municipal Bonds were recalibrated to AAA rating, and as a

consequence the GO Bonds (state) rating was increased from Baa3 to A3. *See* Docket No. 2250-1,

page 6. In August 2011, Moody's downgraded the bonds by one level from A3 to Baa1. On

December 13, 2012 Moody's again downgraded the GO Bonds from Baa1 to Baa3, again down to

the level of May 2006. In February 2012, "Puerto Rico held the second highest credit rating awarded

by the agency [Standard & Poor's] to a Spanish speaking territory in the long term (BBB+, Stable-)."

*See Economy of Puerto Rico*, http://en.wikipedia.org/wiki/Economy_of _Puerto_Rico. Retrieved

on June 19, 2013. On June 20, 2013, Standard & Poor's (hereinafter "S&P's"), as well as Moody's

Investors Service (hereinafter "Moody's") downgraded the rating of the Puerto Rico Electric Power

Authority Bonds from Baa2 to Baa3. *See* www.elnuevodia.com/Xstatic/endi/template/... Retrieved

on June 20, 2013; www.vocero.com/sp-tambien-degrada-a-la-aee/. Retrieved on June 21, 2013. On

July 2, 2013, the credit rating agency Fitch followed Moody's and S&P's credit ratings, and also

downgraded the bonds of the Puerto Rico Electric Power Authority from BBB+ to BBB-. *See*

www.elnuevodia.com/Xstatic/endi/template/... Retrieved on July 2, 2013. *See also "Update of our*

*Previous Report Entitled 'Downgrade Of GO Rating Of The Commonwealth Of Puerto Rico And Ratings Of Related Bond Issues, Including PRASA and PREPA Revenue Bonds'"* of March 25, 2013, authored by Jorge F. Freyre, Ph.D., President of Applied Research, Inc., and expert witness of plaintiff Vaquería Tres Monjitas, Inc. *See* Docket entries No. 2250-1 and 2252-1. On July 26, 2013, Moody's Investor Service rated the next Puerto Rico Energy Power Authority's $600 million bonds' issuance with a classification of Baa3 and a negative outlook. *See Negative Outlook to PREPA's Issuance [of Bonds]*, www.vocero.com/perspectiva-negativa-a-emision-aee/... Retrieved on July 26, 2013. With this new classification, Moody's leveled out the PREPA's bonds classification to the same rate of all the other investments issued by the Government of the  Commonwealth of Puerto Rico. *Id.* According to this article, the new Moody's classification of the Government's bonds which are just one step from being classified as "junk bonds" reflects the fragile status of the Puerto Rico economy, and the uncertainty of the Government in its ability to execute a long term of diversification and reduction of costs of PREPA. *Id.* The newly proposed issuance of bonds by PREPA should be ready to be marketed by August and September 2013, a delay of the original issuance date, due to the delay by the public corporations in presenting their financial disclosure statements. *Id.* Although Moody's acknowledged several operational changes, the rating of negative outlook is based on PREPA's lack of cash flow, which is the same situation with the Commonwealth of Puerto Rico and the Government Development Bank, the latter being in charge of all the public instrument issuances. *Id.* Moody's further explains that the new rating may be adversely impacted by the Government's decline in the collection of funds and the leverage of debt with the bondholders. *Id.* The Baa3 rating is by itself a suggestion that PREPA will encounter difficulties in obtaining a competitive interest at the time of placing the bonds in the market. *Id.*

The latest devastating news is a substantial decline of an estimated 20,000 students less that will enroll in the Puerto Rico public school system for the academic year 2013-2014. *See Twenty Thousands Less Students in the Public Schools*, an article dated July 29, 2103, www.elnuevodia.com/Xstatic/endi/template ... Retrieved on July 29, 2013.

A more grim scenario was presented by economist Sergio Marxuach, as he described PREPA's financial situation as one on the verge of bankruptcy, which will force the authority to increase the basic rate on some 6 to 9.5 cents. *See An Electric Shock to the Consumers' Pockets*, dated July 16, 2013, www.vocero.com/corrientazo-al-bolsillo-de-los-abonados/... Retrieved on July 26, 2013. Marxuach stated that PREPA's audited financial disclosure statements for the year 2012 reflect that there is a net loss of $346 million; an increase of 14.08% in PREPA's current liabilities; and a 200.4% reduction in PREPA's net assets. *Id.* Likewise, PREPA has 21.4% reduction in its operating income, and 84.1% reduction in its operating cash flow. *Id.* Marxuach suggested that PREPA is not doing enough to explore other green sources of energy, which will entail an increase in the economic development, as well as new employment opportunities. *Id.* The sooner PREPA starts moving toward the new green technology the better, as new federal and international regulations will force a drastic change in the Puerto Rico's energy system in the near future. *Id. See also PREPA's new Issuance of Bonds Under Fire by the Senate*, dated July 31, 2013, www.elnuevodia.com/Xststic/endi/template/imprimir ... Retrieved on July 31, 2013. The Puerto Rico Senate's inquiry was centered on how PREPA will pay the issuance of the new bonds when PREPA informed that at the end of the year 2012, it had an operational loss of $183 millions and the estimated operational loss for the fiscal year 2014 is $414 millions, and after certain reductions, the estimated loss would be "only" $283 millions. *Id.* (Emphasis in the original).

PREPA, however, assured the Senate commission that there energy rates will not be increased.  *Id.*

In sum, while the economy in the United States is improving, by adding more jobs to the market, the unemployment rate has been consistently decreasing, and the multi factor productivity increases 1.4%, a growth much faster than in the year 2012, while the economy of Puerto Rico does not give any positive signs of revitalizing.  According to the information provided by the Bureau of Labor Statistics of the United States Department of Labor, the current unemployment rate in the United States is 7.4%, as the economy added 162,000 jobs in July 2013 mainly in the area of "retail trade, food services and drinking places, financial activities, and wholesale trade."  *See* www.bls.gov. Retrieved on August 2, 2013.  Another positive factor in the recovery of the United States' economy is the demand for new homes' construction, a notable increase of +6.8% in May 2013 and +8.3% in June 2013 compared to -14.8% from April 2013.  *See* United States Census Bureau: Economic Indicators,  www.census.gov/cgi-bin/briefroom/BriefRm.   Retrieved on July 8, 2013, and www.elnuevodia.com/Xstatic/endi/template ... Retrieved on July 24, 2013.  Moreover, according to "the S&P/Case-Schiller home price index was up 12.2% compared to a year ago, slightly better that the 12.1% rise in April.  It was the biggest year-over-year jump in prices since March 2006, near the peak of the housing bubble."  *See*   http://money.cnn.com/2013/07/30/news/economy/home-prices/index ...  Retrieved on July 30, 2013.

### *Fifth Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economic Model for U.S. Jurisdictions"*

On August 2, 2013, Vaquerías Tres Monjitas, Inc. filed an *Informative Motion Updating Various Exhibits and Reports*, *see* Docket entries No.  2261 - 2264.  Although these updates will be thoroughly discussed below under the sub-title of *Puerto Rico Risk Factor*, it is important to note how the general overall decline in Puerto Rico has a serious negative impact on the recovery of

Puerto Rico's economy, and why it will take years to overcome the current economic recession, which started as early in the year 2001,[17] such as, a significant decline in the Puerto Rico population due to the fact that the number of births has consistently decreased, while the number of deaths have remained relatively stable, and the number of emigrants increased to 80,000 from the years 2001 to 2004 (based on the U.S. Census figures as to Puerto Rico). *See Fifth Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economic Model for U.S. Jurisdictions"* (hereinafter the "*Fifth Update*"), Docket No. 2261, pages 7-8. In sum, 369,000 residents of Puerto Rico emigrated between the years 2000-2004 and 2005-2012.[18] *See Fifth Update*, Docket No. 2261, page 9. The fact that the increase in emigrants increased three times more than the increase in population "tends to support the outlook of a continuing decline in the population of Puerto Rico in coming years." *Id.*

"The significant population decline that Puerto Rico has experienced since FY 2005, and which will probably prevail in coming years, is a factor that has negatively affected the demand for goods and services, especially in a recessionary environment, including fresh milk consumption ..." *Id.* "[T]his population decline is one of the factors that must be taken into consideration when evaluating the high specific-investment risk, or non-diversifiable unsystematic risk, of operating a fresh milk business in Puerto Rico, which in the Experts' Agreement, dated August 26, 2008, was named as the "Puerto Rico risk." *See Fifth Update*, Docket No. 2261, pages 9-10. Lastly, during the "period of FY 2004 - FY 2012, the population of Puerto Rico contracted by -160,000 inhabitants

---

[17] "A process of significant net emigration started in FY 2001 and persisted through FY 2012." Docket No. 2261, page 8.

[18] "In summary, in the two periods under analysis, 2000-2004 and 2005-2012, total net emigration reached a substantial number of 369,000 residents of Puerto Rico." *See* Docket No. 2261, page 9.

or -4.2%," while in other States of the United States, the "population growth was quite significant." *See Fifth Update*, Docket No. 2261, page 11. Another most important factor to be considered in the constriction of the Puerto Rico population growth is the fact that the number of residents below 45 years old "declined by -316,683 persons, while the nine cohorts of ages 45 years and over experienced an increase of 233,867 inhabitants, in spite the fact that the total population of Puerto Rico dropped from 3,808,605 inhabitants on April 1, 2000 to 3,725,789 on April 1, 2010." *Id.* "It is specially significant that the population under ten years of old declined from 600,564 on April 1, 2000 to 464,760 on April 1, 2010, for a contraction of -135,804 inhabitants, equivalent to -22.6%, during the 2000-2010 decade." *See Fifth Update*, Docket No. 2261, pages 11-12. "This decline in the population of residents under 10 years old was significantly greater than the decrease of -82,816 inhabitants in the total population." *Id.* at page 12. "**The fact that the number of younger people has been shrinking at a significant rate in Puerto Rico is one of the negative factors impinging on fresh milk consumption**." *Id.* (Emphasis ours).

Another significant factor is the high unemployment rate in Puerto Rico, which maintains the economy in a dire status. The Puerto Rico economy was first impacted by recession in the first semester of the year 2006. *See Fifth Update*, Docket No. 2261, page 13. In Puerto Rico, "the level of payroll employment declined from 1,053.3 thousand in FY 2005 to 924.7 thousand in FY 2013, for a loss of 128.6 thousand payroll jobs, equivalent to 12.21% ..." *Id.* "[I]n the period from FY 2005 to FY 2008, payroll employment in the U.S. increased from 132.5 to 137.8 million jobs." *Id.* "Then, in fiscal years 2008 to 2010 payroll employment declined by 8.01 million jobs." *Id.* at pages 13-14. In the United States, however, after FY 2010, "the U.S. economy has recovered 5.05 million jobs." *Id.* at page 14. "U.S. payroll employment in FY 2013

(134.8 employees) was also 1.71% above the level of FY 2005 (132.5 employees), while in Puerto Rico payroll employment in FY 2013 (924.7 employees) was -12.21% below the level attained in FY 2005." *Id.* "The really distressing fact is that in a period of eight years (FY 2006 - FY 2013) the Puerto Rican economy has not been able to recover a single payroll lost during the Great Recession." *Id.*

Other important factors which are determinative in the decline of the Puerto Rico economy are, the increase in mortgage loans delinquency and mortgage foreclosures, as well as "mortgage loans that are part of a bankruptcy procedure." *See Fifth Update*, Docket No. 2261, pages 14-21.

"Key economic indicators of the Puerto Rican economy, after showing an improvement and posting positive year-to-year percent changes in the second semester of 2011 and the first semester of 2012, have again slumped into negative year-to-year percent changes since the third quarter of 2012." *See Fifth Update*, Docket No. 2261, page 20. "Thus, at present we do not foresee a clear end to the present recession in Puerto Rico, in contrast with the U.S. experience which shows a consistent expansion in terms of GDP since the first quarter of 2010, and in terms of employment since mid-2010." *Id.* at pages 20-21. Hence, in terms of the "Puerto Rico risk factor," the economy of Puerto Rico has again entered into a deep recessionary environment," based on the statistics of the United States' economic factors v. the Puerto Rico's economic factors. *Id.*

Lastly, the fresh milk consumption in Puerto Rico has been negatively impacted by the economic recession. "In calendar years 2002 to 2012, fresh milk consumption has declined from 292.2 million quarts in 2002 to 217.2 million quarts in 2012." *See Fifth Update*, Docket No. 2261, page 21. "This represents a reduction of 75 million quarts or 25.7% in fresh milk consumption during a ten year period." *Id.* "The negative impact of specific-risk factors has negatively affected

44

both processing plants, Vaquería Tres Monjitas, Inc. (VTM), and Suiza Dairy, Corp. [Inc.] (Suiza)."

*Id.*

In the September 23, 2013 issue of *Forbes*, a reputable well read economic magazine published an article entitled *Do You Have The Next Detroit In Your Mini Fund?* The salient sections of the article reads as follows:

> We're talking about the Commonwealth of Puerto Rico, whose general obligation bonds cling to a Moody's rating of Baa3, one tick above junkdown. Disinclined though you may be to buy any debt issued by the commonwealth, you may own some without realizing it.
>
> . . .
>
> Puerto Rico's small population (3.7 million and dwindling) shoulders a giant debt load: $70 billion on government borrowing plus $33 billion of pension underfunding. Only a fourth of the residents have jobs, and 27% of those jobs are government jobs. Private sector employment is 647,000. That happens to be half the number of people receiving food stamps.
>
> The island is getting to look like a Detroit with beaches. The bankrupt city and the troubled commonwealth have the same problem: It's too easy to leave. Detroit's middle class middle class departed for the suburbs. Puerto Rico's workers are boarding planes to New York and Miami. As U.S. citizens, they don't need green cards.
>
> **Prospects for job growth are dim. In 2009 Governor Luis Fortuño came into office with a Reaganesque plan to promote business, cut taxes and shrink the government. Voters tossed him out last fall in favor of a traditional spender.** (Emphasis in the original).
>
> **Any business courageous enough to set up shop in Puerto Rico faces a headwind in the form of costly electricity from the government-run, oil-fired utility. The utility, itself a chronic borrower, gropes for positive news in a recent prospectus by citing its "energy theft reduction initiatives."** (Emphasis ours).

45

For a while there was a burst of manufacturing employment as U.S. pharmaceutical companies took advantage of a law that enabled them to lighten their federal tax burden in return for making pills in Puerto Rico. **That congressionally bestowed tax holiday ended in 2006**.

**In part because of the expiration of the tax benefit, says Moody's analyst Lisa Heller, Puerto Rico sank into recession a year ahead of the rest of the U.S., and its GDP is still falling**. (Emphasis ours).

### *The Formula*

On August 26, 2008, the experts Drs. Ronald W. Cotterill for the defendants, Jorge Freyre, Leonardo Giacchino and Mr. Adam Rabinowitz for the plaintiffs executed the *Experts' Agreement*, Docket No. 1003. The experts agreed on a formula "with respect to the implementation of nondiscriminatory, rational and scientific regulatory standards and procedures for regulation of the fresh milk processing plants in Puerto Rico in Civil No. 04-1840." *See Experts' Agreement*, Docket No. 1003. The *Experts' Agreement* subscribed by Dr. Ronald D. Cotterill, Dr. Jorge Freyre and Dr. Leonardo Giacchino and Mr. Adam N. Rabinowitz met in the Judges' chambers to draft a progress report on what they have agreed with respect to the implementation of non-discriminatory, rational and scientific regulatory standards and procedures for the regulation of the fresh milk processing plants in Puerto Rico in Civil No. 04-1840. The agreement provides:

1) Calculation of the Regulatory Accrual: **we have agreed to the following**:

    a.    The initial equity for the calculation is that as of December 31, 2002;

    b.    The calculation is to be performed until December 31, 2007, and 2008 is to be discussed later;

    c.    The value of the regulatory accrual for each year is equal to the difference between the net income that the fresh milk processing plants would have earned and the actual net income. The actual net income can be computed from the

fresh milk regulatory income statements presented to ORIL.
The net income that the fresh milk processing plants would
have earned is calculated following the methodology
proposed by Dr. Freyre in "Exhibit" ("Freyre's spreadsheet").

d.      The actual net income must be adjusted by adding back any
payments for "Exclusivities".  Dr. Freyre will provide that
information; and

e.      The value of the percentage rate to be used in Freyre's
spreadsheet has not yet been determined.  We might either use
a fixed number or a different number for each year.

2) Return on Equity (ROE): we have agreed to the following:

a.      The method to calculate the ROE could either be the Capital
Asset Pricing Model (CAPM), as described in Regulation 12,
plus a measure of Puerto Rico risk or the method used in the
report by Jonathan Lesser plus a measure of Puerto Rico risk;

b.      The ROE calculated by Jonathan Lesser will be unlevered
using the following equation: ROE is equal to the unlevered
ROE plus the debt to equity ratio times the difference of the
unlevered ROE and the costs of the debt);

c.      The cost of debt and the debt to equity ratio are calculated by
using a weighted average from Lesser's proxy using total
capitalization as weights;

d.      A 10-year maturity for interest rates will be used when
dealing with interest rates for debt;

e.      Dr. Freyre will collect the following information (to be
provided by the Government Development Bank in its
capacity as fiscal agent of the Government of Puerto Rico)
from July 1st 2006 up to date:

i.      Interest rates on the bonds of Puerto Rican
public corporations that operate like private
firms;

ii.     Ratings of those bonds by Moody's and S&P;
and

47

iii.       Bond Buyer Index;

3)      <u>Amortization of the Regulatory Accrual</u>: we are discussing the need of requiring in the first X number of years that fresh milk processing plants pay out as dividends the amortization and interest of the regulatory accrual received; and

4)      <u>Regulatory Accounts</u>: the description of the balance sheet accounts as included in the Leonardo Giacchino and Guillermo Israilevich report titled "Proposed Regulatory Accounts, Criteria, and Methodologies for Milk Processors in Puerto Rico, dated February 25, 2008, (Section III.A, pages 9 to 16) are accepted subject to revision and comments by ORIL staff.  We will continue discussing the income statement accounts with regard to the description, methods and procedures.

Plaintiff VTM enumerates the defendants' lack of compliance with the *Injunction Order*, as of December 1, 2012:

a.      Determination of the milk processors reasonable rate of return on their investment.

b.      Adequate and objective regulatory standards [Exhibit WW], parameters and definitions to be included in Proposed Regulation 12 to determine costs and fair profits return for all participants in the Puerto Rico regulated milk market.

c.      Determination of the capital base of the fresh milk processors.

d.      Determination of the specific or unsystematic risk of operating  business in Puerto Rico.

e.      Determination of the procedure to calculate the amount of regulatory accrual of the fresh milk processors which is necessary to calculate their capital base.

*See Vaquería Tres Monjitas, Inc's Memorandum On Compliance Of Amended Preliminary Injunction Order*, Docket No. 2228, pages 15-16 (hereinafter "VTM's Memorandum").

The Court acknowledges that Suiza and VTM have agreed in the non-use of the negative betas, on the ground that the negative betas are unreliable.   *See Post-Hearing Memorandum In*

*Support Of The Imposition Of A Specific Remedy As A Result Of Non-Compliance An In Support Of*

*Petition For Contempt* filed by Suiza, Docket No. 2225, as amended, Docket No. 2248 (hereinafter

"Suiza's Post Hearing Memorandum").   VTM's Memorandum, Docket No. 2228.   Defendants,

however, defend the use of the negative betas in their *Defendants' Opening Compliance Hearing*

*Brief*, Docket No. 2227, pages 5-16 (hereinafter "Defendants' Hearing Brief").

Defendants allege that, although the "parties agreed that a beta factor must be employed in

the CAPM formula used to determine a return on equity for Plaintiffs.   But they have two

fundamental disagreements on beta-related issues." *See Defendants' Opening Compliance Hearing*

*Brief*, Docket No. 2227, page 5.   Defendants insist that the use of the negative/zero betas is

scientifically appropriate, as the "the 'beta' factor ... estimates the risk of investing in a particular

company by measuring the volatility of its stock as compared to the market as a whole."   *See*

*Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, page 5, citing *Puerto Rico*

*Telephone Co., Inc. v. Telecommunications Regulatory Board*, 665 F.3d 309, 327 (1st Cir.2011).

One disagreement is the use of "negative" or "zero" betas when calculating the average or

median of the industry beta to be applied in the CAPM formula.   *Id.*   Another disagreement is the

"manner of determining betas for 2009-2011." *See Defendants' Opening Compliance Hearing Brief*,

Docket No. 2227, page 11.   For example, once the Court determined that large companies, such as,

Dean Foods, are not to be considered when calculating the beta, then the other available method to

calculate the beta is to use the industry average or median betas of the individual companies similar

in size and/or operations to Suiza and VTM.   *See* Docket No. 2227, page 11.   Defendants reiterate

their position to include Dean Foods when determining the beta "within the surrogate set for the

Standard Industry Classification 202 ("SIC 2002").   *See* Docket No. 2227, page 15.   In any event the

use of the betas falls within the sound discretion of ORIL's Administrator, **but subject** to the matter being accepted as reliable by the scientific community as whole.  The Court holds *infra* in this *Opinion and Order* that they are to be eliminated as they are unreliable and not accepted by the community of experts, as a negative beta is usually the result in an inherent error in the data of the company.  *See* Docket No. 2227, page 16.  "ORIL remains free to continue to apply its expertise to distinctively local regulatory facts."  *See* Docket No. 2227, page 3, citing *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d at 476-77.

The Court accepts VTM's and Suiza's agreement as to the inapplicability of the negative *betas* in the formula, hence, the negative betas are not to be used in the experts' formula.  The Court briefly explains.  Throughout the over 100 hearings presided by the undersigned since this case was assigned to the undersigned District Judge, the Court has been consistent that any comparable milk processor entity to be used when determining any values of the experts' formula must be similar in size and operations to plaintiffs' business.  *See Injunction Order* of July 13, 2007, Docket No. 480, pages 12, 14, 21-22.  As of this date, the Court has not been persuaded otherwise by the defendants' evidence.   The Court understands that negative betas are an exception.  In the instant case, the exception is being suggested by the Administrator of ORIL with the only purpose of lowering the ultimate ROE determination, as they are unreliable as to scientific data and constitute yet another example of a newly ex post facto parameter placed to justify a sought determined route.  Even after reviewing *Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, wherein a new approach was taken by including the analysis made in *Puerto Rico Telephone Company, Inc. v. Telecommunications Regulatory Board*, 665 F.3d 309 (1st Cir.2011), the opinion of the Court remains the same.  The analysis of the Court as to the applicability of the *Puerto Rico Telephone*

*Company* opinion and analysis to the instant case are discussed below under a separate sub-title.

### Reasonable Rate Of Return

According to the terms and provisions of the *Experts' Agreement*, Docket No. 1003, paragraph 2) "Return of Equity: We have agreed to the following:  . . ."

During the years that followed the signing of the *Experts' Agreement*, the experts decided to use the CAPM formula, as described in Regulation 12, to determine the return of equity ("ROE"), instead of the Jonathan Lesser method plus the Puerto Rico risk.  *See* Docket No. 1003, ¶ 2a.

As stated in VTM's Memorandum, Docket No. 2228, pages 19-20, the terms of the formula are as follows:

> Consequently, the formula of the CAPM methodology included in the proposed ORIL Regulation 12, with the addition of a term to evaluate the additional risk called "Puerto Rico risk" accepted in the Experts' Agreement, corresponds to the following formula after tax:
>
> $R_{at} = R_f + ß [+ sic] (R_m - R_f) + R_{MC} + R_{PR}$[19]
>
> The terms of this formula are explained as follows:
>
> $R_{at}$ = The reasonable rate of return on net worth after tax that processing plants should obtain from the business of fresh milk in Puerto Rico.
>
> $R_f$ = Risk-free rate estimated based on the bonds issued by the U.S. Government ("Arithmetic Mean of Long- Term Government Bonds Income since 1926, Ibbotson SSBI Valuation Yearbook").
>
> $ß$ = Coefficient that represents the systematic risk of investments in the dairy products sector (SIC-202) in the United States.
>
> $R_m$ = Rate of return of a broad portfolio of stock marketed in the U.S. capital markets, estimated according to the performance of the S&P 500

---

[19]     There is a typographical error, as the formula should be $R_m = R_f + B (R_m - R_f) + R_{mc} + R_{PR}$. (There should be a period "." and not a "(+)" after "B".)

("Arithmetic Mean of Total Returns of Large Company Stocks since 1926, Ibbotson SSBI Valuation Yearbook").

$R_{MC}$ = Additional risk of smaller companies (Percentiles 9-10) that market their stock in the U.S. capital markets (NYSE/AMEX/NASDAQ), as calculated by Ibbotson Associates ("Micro-Caps - Deciles 9 and 10- Size Premium in Excess of CAPM, Ibbotson SBBI Valuation Yearbooks").

$R_{PR}$ = Additional risk faced by processing plants in the fresh milk business in Puerto Rico. Coefficient $R$ has been calculated based on the average of the two differentials between the rate of return of unsecured long-term bonds with a maturity of 20 and 30 years of Puerto Rico Electric Power Authority (PREPA) and the Puerto Rico Aqueduct and Sewer Authority (PRASA) and the 20-year GO and 30 year Revenue Bonds Bond Buyer indexes.

### *Puerto Rico Risk Factor and the Economic Values*

There is no doubt that the Puerto Rico economic data clearly warrants a systematic risk. Government Bonds had decreased in value; unemployment was high up to 14.8% in January 2013, and high as 12.2% when the *Experts' Agreement* was signed, compared to an average of 10.6% in the year 2005 and 11.0 in 2006.  The population not in the labor force has increased from 1.5 million in the year 2000 to 1.7 million in June 2013.  *See* Docket No. 2262, pages 14-15.  Those employed have been reduced from 1.2 million in August 2008 to 1.0 million in June 2013.  *See* Docket No. 2262, page 11.

Government Bonds were in almost junk status since May 2006 at Baa3 until April 2010 when the GO gained briefly a rating of A3 but decreased to Baa1 in August 2011, and back to Baa3 on December 13, 2012.  *See* Docket No. 2250-1, pages 5-7.  The population in Puerto Rico has been reduced from 3.821 million in the year 2004 to 3.694 million in the year 2012.  *See* Docket No. 2262, page 2.  The population up to 19 years has been reduced from April 2000 to April 2010 by 188,802.  *See* Docket No. 2262, page 4.  Finally, the sales of fresh milk have decreased from 292,213,124 in

December 2002 to 239,779,814 in December 2008 to 217,177,124 as of December 31, 2012.  *See*

Docket No. 2262, page 44.

### *The Values Of The Formula Factors In 2013*

The economic crisis is deepening for some economies and Puerto Rico is amongst them.  One

of the most critical factors of the formula which is determinative are the interest rates of the maturity

bonds of the Puerto Rico public corporations that operate like private firms; the ratings of those

bonds by Moody's and S&P, as well as the Bond Buyer Index.  *See Experts' Agreement*, Docket

No. 1003.  These ratings depends directly on the status of the Puerto Rico's economy; the measure

of the Puerto Rico Risk; the Puerto Rico's unemployment rate; Puerto Rico's income *per capita*, and

the Puerto Rico budget and/or budget's deficit.  These are uncertain times, and this reality has a

negative impact on the ratings of the Puerto Rico bonds, not only in the milk industry but all the

sectors of the Puerto Rico economy.

The Court is cognizant that during the present economic crisis it is anything but easy to

predict the changes in the fluctuation of the economy.  Ironically, even when the markets are up, the

unemployment rate is still high (7.7% and more than 12 million workers unemployed in the

United States), hence, the consumers have less money to spend.  Moreover, the sales of fresh milk

are consistently declining, as the fresh milk has turned from being a basic necessity to a high costly

commodity.

It is uncontested that the milk industry is in crisis worldwide, and that many fresh milk

producers are either exploring other alternatives in non-dairy products or simply are closing their

facilities.  *See Milk Industry "in Crisis" Develops New Marketing*, an article dated December 12,

2012, www.vegnews.com/articles ... Retrieved on July 15, 2013:

According to the US Department of Agriculture, per-capita milk consumption has fallen nearly 30 percent since 1975, leaving industry professionals scrambling to develop new ways to market the beverage. Tom Gallagher, CEO of Dairy Management Inc., told the *Wall Street Journal* Tuesday that the industry "is coming to recognize this as a crisis." The new marketing approaches include convenience-size packaging, protein-enhanced varieties, and a red, teardrop-shaped label touting the animal-based milk as "real." The latter a tactic to derail the success of non-dairy milks, which increased in sales by 15.8 percent since 2011, according to the USDA. In October, dairy-industry leaders estimated that 100 facilities would close in California, the nation's largest dairy-producing state, by year's end due to the summer's feed-crop devastation.

*See also America's Milk Business in a "Crisis,"* an article dated December 11, 2012 and published

in *The Wall Street Journal*, www.online.wsj.com/article ... Retrieved on July 15, 2013:

Meanwhile, **Dean Foods, Inc., the largest U.S. dairy producer, last year introduced a low-sugar chocolate milk for kids called TruMoo, and it sell lactose-free milk in grocery stores**. (Emphasis ours as to Dean Foods, Inc.)

But in a sign of how shifts in consumer preferences are shaking up the industry, Dean Foods earlier this year [2012] spun off its fast-growing WhiteWave division, which makes Horizon Organic milk and Silk soy products.

The move was designed to get investors to pay more for shares in a business unit with higher profit margins and faster growth prospects than conventional milk.

In its marketing, the dairy-milk industry is seeking to take some steam out of the plant-based alternatives by tweaking its two-decade-old "Got Milk?" campaign and other advertising efforts.

Based on the slump of the economy, particularly as to fresh milk products, many dairy farmers and processors are selling the milk below cost just to meet their needs and meet the fresh milk supply to the consumers.

A perfect formula to determine the price of milk is worthless if the fresh milk is not

affordable to the consumers.  The cost of milk is coming perilously close to inviting others from

outside states to be drawn to the market by importing fresh milk at lower prices than the current

market.

### *The Puerto Rico Milk Industry, A Public Utility?*

The defendants developed part of their legal analysis based on the opinion of *Puerto Rico*

*Telephone Company, Inc. v. Telecommunications Regulatory Board of Puerto Rico, et al.*, 665 F.3d

309 (1ˢᵗ Cir.2011).  Notwithstanding the thorough analysis made by the United States Court of

Appeals for the First Circuit (hereinafter "First Circuit"), the ultimate question is how the analysis

is applicable to the Puerto Rico milk industry, and to the impending formula to be approved.  The

defendants' lack of discussion on how the *Puerto Rico Telephone Company*'s analysis is parallel to

the situation of the Puerto Rico milk industry failed to persuade the Court to refocus on its analysis.

In a nutshell, the issue in *Puerto Rico Telephone Company* is the applicability of the

Telecommunications Act of 1996 (hereinafter the "1996 Act") to a local carrier Puerto Rico

Telephone Company and its competitor WorldNet Telecommunications, Inc.  Under the 1996 Act,

the carriers have to meet certain requirements, such as, the state commissions have to determine "just

and reasonable rates" for interconnection agreements, and how these rates will be determined.

665 F.3d at 317.  "Such rates shall be 'based on the costs' of providing the individual network

elements, and this 'cost' shall in turn 'be determined without reference to' traditional rate of return

or rate based methods.  47 U.S.C. § 252(d)(1), § 252(d)(1)(a)(i)."  *Id.*  " ... the FCC further defined

this 'cost' as 'forward- looking,' and provided that the cost shall be determined through the ['total

element long-run incremental cost'] TELRIC methodology, which assumes a 'forward-looking cost

over the long run' as well as a 'lowest cost network configuration' that uses 'the most efficient

telecommunications technology currently available.' 47 C.F.R. § 51.505." *Id.*  The TELRIC method

has been upheld by the United States Supreme Court in *Verizon Communications, Inc. v. FCC*,

535 U.S. 467, 475-76 (2002).  *Id.*  Further in the discussion, the Court differentiates between the case

law cited by the Puerto Rico Telephone Company regarding "just and reasonable" which predates

the 1996 Act, and which the 1996 Act now expressly prohibits.  665 F.3d at 323, *Fn*.16: "The other

cases cited by PRTC as support for its position include: *Duquesne Light Co. v. Barasch*, 488 U.S.

299, 310 (1989); *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944);

*Tenoco Oil Company v. Department of Consumer Affairs*, 876 F.2d 1013, 1020 (1st Cir.1989); and

*Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 11168, 1175 (D.C.Cir.1987)."  Hence, under the

cases cited in *Fn*.16, the standards of "just and reasonable," "rate of return," "rate based" are

prohibited under the [1996] Act.  *Id. Fn.*17.  "Accordingly, our prior statement in *Tenoco Oil* - that

'[t]o be just and reasonable, rates must provide not only for a company's costs, but also for a fair

return on investment,' 876 F.2d at 1021 - is no longer an accurate statement of the law in the context

of rates between telecommunications carriers in an arbitrated ICA [interconnection agreement] under

the Telecommunications Act of 1996."

However, the defendants totally failed to explain to the Court how and why the values of the

agreed CAPM formula have to be changed in light of the *Puerto Rico Telephone Company* opinion,

665 F.3d 309, when the Telecommunications Act of 1996 is totally inapplicable to the Puerto Rico

milk industry.  The answer is simple, the milk industry is not a public utility.  "We may as well say

at once that the dairy industry is not, in the accepted sense of the phrase, a public utility."  *Nebbia v.*

*People of the State of New York*, 291 U.S. 502, 514 (1934).  In *Nebbia*, the Court held that those

involved in the dairy industry "are in no way dependent upon public grants or franchises for the

privilege of conducting their activities." *Id.* "But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle." *Id.* "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property." *Id.*

The Court disagrees with the defendants' argument, as the Court understands that the Puerto Rico milk industry is not a public utility, hence, the analysis made under the Telecommunications Act of 1996, is inapplicable to an industry not subject to the provisions of the 1996 Act. ORIL also forgets that an equal formula would have to be developed for the farmers and for the UHT milk producers. That is simply not possible as their [risk] is not "fit" between a fresh milk processor or a dairy farmer production or as an excess milk buyer such as Indulac. They are simply not "public utilities." The Court, however, is concerned of the impact of not having a constitutionally solid regulation of the milk industry in Puerto Rico, as the Court has stated more than one time that the regulation of the milk industry in Puerto Rico is a matter of high public interest. *See Injunction Order*, Docket No. 480, pages 7, 71 (Legislative History of Act 34 of June 11, 1957, known as the Milk Industry Act, codified as 5 L.P.R.A. §§ 1092, *et seq.*), ("Hence, the public interest lies in the granting go the injunctive relief").

### Notes On Other Subjects

### Negative Betas

The defendants in Proposed Regulation No. 12, as amended, which has not been submitted to the Puerto Rico State Department for approval and publication, as required by law to be enforceable or has been published pursuant to law to constitute a regulation, have finally eliminated

Dean Foods, Inc. ("Dean Foods"), as a surrogate company months after the Court ordered its elimination.  Also excluded from the Proposed Regulation No. 12 were the "companies whose sales represent more than 75% of the total sales CIC Code 202 [the milk code]."   Also excluded were the companies "within two standard deviation of the sales of the two milk plants in Puerto Rico," all designed to prevent the inclusion of a surrogate company with a similarity to Dean Foods, that makes other included surrogates absolutely irrelevant, as one company [Dean Foods] monopolizes the coefficient.  However, the inclusion of negative betas within the R2 in the CAPM formula achieves a regulatory return which yield[s] an "illogical and counter intuitive result," as correctly denominated by Suiza in its *Post Hearing Memorandum*, Docket No. 2225, page 39.  The inclusion of the negative betas causes a regulated return that ends in a final calculation below the risk free rate.  The Court understands that the inclusion of the "negative betas" is not a standard regulatory practice as testified by Dr. Freyre and Dr. Giacchino, and admitted by Dr. Cotterill.  *See* Docket No. 2225, page 40, *Fn.*149.

The purpose of the beta component in the CAPM Model is to measure the assets return of the milk processors relative to the market return.  The beta of each of the surrogates estimates the company's stock price damages, when the value of the market changes.

Negative betas are most likely due to internal anomalies within the data of the companies are rare events within affecting only a specific company, as explained with credibility by Dr. Giacchino at the June 24, 2011 hearing, *see* Transcript: "Typically there must be a problem with the data or the company," page 34, lines 13-17.  Betas resulting from the two instances explained above are not reliable for determining the regulatory rate of return of other companies.  Ibbotson, an authority expert on the subject, uses "raw betas less than five (5) and more that zero (0)." *See* Dr. Giacchino's

testimony citing the methodology of Ibbotson, Transcript of June 27, 2012, page 112, line 21,

page 113, line 1.  Furthermore, Dr. Cotterill admitted to Dr. Giacchino:

> GIACCHINO:          You know you cannot have a negative beta.
>
> COTTERILL:          And I said gee, you're right.  You can't.

*See* Transcript of February 17, 2009, page 65, lines 4-6.

Hence, the Court concludes that negative betas are unreliable, and have been used by

Dr. Cotterill in an attempt, once the Court eliminated the use of surrogate company Dean Foods, and

other companies not similar to the two milk processors in Puerto Rico, to understate the value of the

beta coefficient in the R2 part of the formula.  The use of the negative betas is, therefore, not

scientific and not rational.  *See also* Dr. Dudley Wallace and Jay Lew Silver in *Econometrics: An*

*Introduction:* "the cost of under specifying a regression model shows up in terms of biased

estimators with various of the coefficients [negative betas] that are generally smaller [zero betas] that

would be the correct model ... ."  *See* Docket No. 2225, page 40.  *See also* Phillip I. Good and

James W. Harding, *Common Errors in Statistics (And How to Avoid Them)*, "A common error is to

misinterpret the confidence interval as a statement about the unknown parameter."  *See* Docket

No. 2225, pages 40-41.

### *Risk Free Rate*

Proposed Regulation No. 12 lacks a definition and a methodology to arrive at such figure.

The Proposed Regulation No. 12 simply states that "the risk free rate of return is currently at 5.2%,"

which may constitute an agreement to the suggestion of VTM.  *See infra*.  But this statement

standing alone invites mischief and encourages arbitrariness.  It is imperative that a transparent

procedure be set forth as to the methodology to obtain the risk free rate.  The Court understands that

pursuant to the *Experts' Agreement*, as testified by Dr. Giacchino, the risk free rate constitutes a long term average of the U.S. Bond Income, as reported by Ibbotson from 1926 to the year of calculation. The use of this methodology coincides with the Proposed Regulation No. 12, and complies with the Court's orders.  The Court has defined the risk free rate to be equal to the risk free rate used by the Equity Risk Premium (S & P 500 average return-risk free rate).  This risk free rate is acceptable to the Administrator of ORIL, as it proposes the Figure proposed by ORIL in Option No. 1.6 of Exhibit WW.

VTM proposes a risk free rate borrowed from Ibbotson, consistent with the 2012 Valoration Yearbook (SSBBI Yearbooks) using income returns of U.S. Treasury Long Term Bonds from 1926-2007 that updated yields a return component of 5.2% risk free rate.  *See* Docket No. 2228, page 20. The Court, therefore, concludes that a correct risk free rate is the one that has been used by the experts since the year 2008, that the U.S. Treasury Long Term Bonds.  The Court is not setting forth an appropriate risk free rate as the ultimate figure, but merely following one that has been used by the experts since the year 2008, in this case, and was the one used by the ORIL Administrator.  *See* Docket No. 2225, Fn.123 and 124, the definition of risk free must, therefore, be incorporated exactly as stated herein, even if there is an agreement.  Further, the economic realities in Puerto Rico in 2007 and 2008, warranted a risk-free factor as one established by all experts precisely in August of 2008. Unfortunately for Puerto Rico, the economic factors, including the latest published by the Government's office as to the latest deficit numbers facing the current Governor. admit the highest budgetary deficit in the history of Puerto Rico.  *See* Docket entries No. 2284 and 2284-1, *Additional Informative Motion Regarding Docket No. 2176*, and *Sixth Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economy Model for U.S. Jurisdictions"*

dated September 19, 2013.

### *Beta Definition*

The beta coefficient must be defined to avoid ambiguity manifestations and hidden damages. The regulation be enacted and approved must clearly eliminate giant companies, such as, Dean Foods which is 45 times the size of the two local milk producers combined.  The inclusion of companies clearly beyond the size of the two milk processors of Puerto Rico lack a Puerto Rican "fit" pursuant to the case of *Tenoco*, 876 F.2d at 1024.  The inclusion of giant capital interests also nullify totally the other similar corporations that may be included in the group to establish the beta component, as explained by the Court at Docket No. 1804, pages 8-10, a corporation that represents 96.3 within the total beta component moots the presence of the remaining four companies in the beta component and causes an irrational and unreasonable artificially raising of the value of the beta component.

### *Micro Cap Premium*

A micro cap premium is to be included and clearly defined as to its definition and source. The Administrator proposed an "additional risk of smaller companies (20th percentile) that market their stock in the markets of the United States (NYSE/AMEX/NASDAQ as calculated by Ibbotson Ass ...).[20]  Although Dr. Freyre, the only economic expert presented with vast experience on the Milk Market in Puerto Rico deems more reliable the same formula set at 10th percentile, Suiza accepts the 20th percentile figure.  The Court orders that the definition be included as agreed by the parties in Regulation No. 12 to avoid later other interpretations that may induce irrationality, vagueness or

---

[20]        Yet another example of the reliability of Ibbotson Ass., as an accepted expert used by all parties including the Administrator for Micro caps, but curiously rejected by the Administrator without any logical, rational reason for the use of negative betas, which Ibbotson discards as clearly unreliable.

arbitrariliness in subsequent years if regulations.[21]

### *Puerto Rico Risk Premium*

In the *Experts' Agreement*, Docket No. 1003, the parties agreed that a premium was to be added under the Capital Asset Pricing Model "CAPM." The CAPM method as to ROE (Return on Equity) calculation.[22] The premium was perhaps ill denominated as to the impact on the public as "a measure of Puerto Rico Risk" later denominated by the experts as "unsystematic risk." Plaintiff VTM restated correctly the Court's position on this matter, as not a risk of operating business in Puerto Rico per se, but rather a non diversified risk that affects the regulated business of processing fresh milk in Puerto Rico." Docket No. 2228, page 24. The Court also stressed that this component of the ROE formula was not necessarily a permanent fixture but could cease to exist depending on local economic factors.

The *Experts' Agreement* clearly states the methodology which was included by all the signatories of the agreement. The *Experts' Agreement* is correctly summarized by both Suiza and VTM, *see* Docket entries No. 2225, pages 42-44, and Docket No. 2228, pages 24-25. In Suiza's *Memorandum*, the analysis is summarized as follows:

> The methodology ... should be followed every year for end year based on the yields on debt instruments issued by public corporations that operate like private firms [Puerto Rico Aqueduct and Sewage Authority and Puerto Rico Energy Power Authority, as Court's and experts' examples]. The same Maturity Bond Buyer's Index BBI average yield shall be used to calculate the bond ratio. By averaging all the ratios for the given year, a composite ratio shall be obtained.

---

[21]    Option No. 1.6 proposed by ORIL on December 1, 2011, Docket No. 2071-3, pages 7-10, proposes a micro cap of 20 percent. *See also* Docket No. 2225 at page 26, and Exhibit No. 2225-2, as amended by Docket No. 2248, Exhibit No. 1, page 26, and Docket No. 2248-5.

[22]    The Administrator followed the CAPM model which the milk processors have not in any manner challenged as the *Experts' Agreement* expressed two methods. (CAPM and Lesser Methods).

> This composite ratio for the given year will be obtained. [Between "interest rates of bonds of Puerto Rico public corporations that operate like private firms; the ratings of those bonds by Moody's and Standard & Poor's, and the Bond Buyer Index" is obtained." *See Experts' Agreement*, Docket No. 1003]. This composite ratio must be "multiplied by the pre-tax ROE without a risk premium is equal to the Puerto Rican Premium." Docket No. 2225, page 43.

This method of unsystematic risk has been used in evaluating this type of risk in other countries, such as, Mexico, Turkey, Belize and Guatemala, among other countries that have accepted the Damoradaran's Method. *See* Docket No. 2225, page 43, and Fn.168 [Docket 1697, pp. 9-10, Docket 1799, p.23, Docket 1804, p.24]. The Court agrees that the *Experts' Agreement* clearly supports the interpretation followed by Dr. Freyre; and, hence, **the Court orders the Administrator to respect the *Experts' Agreement*, Docket No. 1003, as to an inclusion of an unsystematic risk**. The Court orders that pursuant to the *Experts' Agreement*, the unsystematic risk is to be included in the proposed Regulation No. 12, pursuant to the interpretation of the milk processors, Suiza and VTM, as stated in their respective memorandums at Docket No. 2225, pages 42-43, and Docket No. 2228, pages 24-26.

But the Court clarifies first that the "risk" is not permanent nor will always have the same value at it is an unsystematic risk (non-diversifiable) that affects the milk industry doing business in Puerto Rico. *See* Docket No. 2228, pages 23-25. The formula elaborated at the Experts' Agreement included a valuation of Puerto Rico long-term bonds (PRASA, PREPA, the utility (i.e. water and electric) bonds, respectively) compared of 20-year GO and 30 year Revenue Bonds Bond Buyer indexes. Although bonds of PREPA and PRASA may not have been issued during certain years covered by the complaint, there are new current bonds issued by PRASA and in 2013, there are also bonds issued relating to the sales and use tax, commonly known as IVU for its Spanish

acronym ("Impuesto sobre Ventas y Uso").

The Court understands that the parties reached an agreement over the risk premium and merely asked Dr. Jorge Freyre to seek the raw data to establish the finer number of the Rm.  The Court does not provide Dr. Ronald W. Cotterill any credibility that there was no agreement as compared to the credibility of Dr. Jorge Freyre and Dr. Leonardo Giacchino, both well versed in regulated markets, particularly the Puerto Rico regulated milk market as to Dr. Freyre, and in other U.S., Canada and South America regulated milk market as to Dr. Giacchino.  Further, and most critical, the economic realities in Puerto Rico in 2007 and 2008, warranted a risk-free factor as one established by all experts precisely in August of 2008.  But the phrase "2008 will be discussed later" is merely an acknowledgment that when the stipulation was entered in August 2008, the economic figures for the year 2008 were not yet ready.  Unfortunately for Puerto Rico, the economic factors, including the latest published by the Government's office as to the latest deficit numbers facing the current Governor admit the highest budgetary deficit in the history of Puerto Rico.[23]

Suiza has also provided suggestions as to the methodology and definitions, and parameters which the Court also agrees relating to Regulation 12, which the Court determines fails to comply with the original injunctive relief.

---

[23]     *See Sixth Update of the Report Entitled "Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions," dated September 19, 2013, Docket No. 2284-1, page 1.*

> According to the "Comprehensive Annual Report of the Commonwealth of Puerto Rico" ("CARF"), for the fiscal year ended June 30, 2012, the accumulated deficit of the Commonwealth of Puerto Rico increased from $33,677 million at the end of June 2011, to $39,037 million at the end of June 2012.  This represents an increase of $5,360 million in fiscal year 2012.

> The annual increase in the public debt of the central government and public enterprises of the Commonwealth of Puerto Rico is an alternative method to measure the deficit of the government of the Commonwealth of Puerto Rico.

1.    Risk-Free Rate and Equity Rate.  The same risk free rate as used in the equity risk premium

(S&P 500 average return, risk-free) rate.  The Administrator of ORIL does not seem to have

any objections as he uses the same suggestion accepted in Exhibit WW of Defendants (used

in Option 1.6 of Exhibit WW).  ORIL has used an equity risk free rate (ERP) since January

of 2011.  But ERPs must be defined and currently uses the same risk rate definitions.

Suiza further clarifies that the definition it proposes at Docket No. 2225, page 35, has been

used and is consistent with "Dr. Cotterill's position since 2008, and is consistent with the Court's

position."  Docket No. 2225, page. 35.  The described criteria must be defined and incorporated in

the proposed Regulation No. 12.  The Court does not accept Dr. Cotterill's different risk free rate,

which constitutes the use of short term rates, which does not constitute the standard practice in

regulatory practice rates.

> "As proxy for risk free rate, long-term rates are the relevant benchmarks when
> determining the cost of common equity rather than short-term or intermediate-term
> interest rates."  Morin, Roger A. (2006): *New Regulatory Finance, Public Utilities
> Reports, Inc.*, p. 151.

Docket No. 2225, note 120 at page 36, and 2225-2, page 11.

### Regulatory Accrual

The existence of the regulatory accrual is clearly contemplated in the *Experts' Agreement*[24]

signed on August 26, 2008, Docket No. 1003.

---

[24]    The *Experts' Agreement* was one of the principal agreements reached by all experts based on the
economic situation in the island that Governor Fortuño alleged in the First Circuit, the Supreme Court of
Puerto Rico, and the United States Supreme Court.  Notwithstanding, neither of the past governors, through the
Secretary of Agriculture, after August 26, 2008, have accepted the critical economic conditions applicable to the
milk industry in Puerto Rico, that is, the Honorable Governors, Sila María Calderón; Aníbal Acevedo Vilá, and
Luis Fortuño.  The position of the Honorable Governor Alejandro García Padilla has not yet been expressed to the
Court.

1) Calculation of the Regulatory Accrual: we have agreed to the following:

     a.      The initial equity for the calculation is that as of December 31, 2002;

     b.      The calculation is to be performed until December 31, 2007, and 2008 is to be discussed later;

     c.      The value of the regulatory accrual for each year is equal to the difference between the net income that the fresh milk processing plants would have earned and the actual net income. The actual net income can be computed from the fresh milk regulatory income statements presented to ORIL. The net income that the fresh milk processing plants would have earned is calculated following the methodology proposed by Dr. Freyre in "Exhibit" ("Freyre's spreadsheet").

     d.      The actual net income must be adjusted by adding back any payments for "Exclusivities". Dr. Freyre will provide that information; and

     e.      The value of the percentage rate to be used in Freyre's spreadsheet has not yet been determined.

Docket No. 1003, page 1.

To the Court it is pellucid that in the *Experts' Agreement* a regulatory accrual is included within the formula as the defendants' expert is a signatory to the stipulation. Notwithstanding, Dr. Cotterill and ORIL' Administrator have refused for years after the execution of the stipulation to accept the inclusion of the regulatory accrual as one of the factors within the formula leading to compensation. As in the case of the unsystematic risk, the conduct of the defendants is deplorable and contemptuous. Defendants basically accepted the existence of the regulatory accrual when the proposed Regulation No. 12 was drafted years after the injunctive relief was issued, and years after the *Experts' Agreement* was executed. However, as correctly stated by VTM, the proposed Regulation No. 12 omits all reference to the procedure to determine the "procedure to calculate the

amount of regulatory accrual of the fresh milk processors which is necessary to calculate their capital base." *See* Docket No. 2228, page 17.

ORIL is ordered to comply with the *Experts' Agreement*, and describe the exact procedure to be used in calculating scientifically and rationally the procedure used to calculate the amount of equity base and the regulatory accrual. The Court strongly recommends a thorough review and analysis of the proposal made by VTM at Docket No. 2228, pages 27-30.

### Adjustments made by ORIL to Income and Expenses

There is a gross difference between ORIL's calculation of the milk processing plants net profit before taxes in 2008 and 2009. The difference, to the Court, is to merely achieve a result oriented determination by excluding expenses that have traditionally been accepted to both Indulac and the milk processors or to Indulac and now negated to the milk processors and/or changing the methodology of accepted expenses. Some expenses that the Court ordered to be accepted in the injunctive relief as they have been in the past, have not been accepted by ORIL or have been declined and/or grossly modified. Yet another example of contemptuous deliberate conduct, showing yet another determination and/or lack of due process and/or equal protection. *See Duquesne v. Barasch*, 488 U.S. at 307; *Tenoco*, 876 F.2d at 1026-1027, cited in *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d at 482-483.

VTM in its memorandum at Docket No. 2228, pages 32-34, provides the Court with four examples the merchandisers' expenses traditionally accepted in the past that were surprisingly eliminated in the amount of $823,672.00 demonstrating a gross inconsistency. Other amounts traditionally accepted are marketing and promotion in the amount in excess of $5 million dollars, which added to merchandiser expenses amount to a difference of $6 million dollars. Further, ORIL

67

has refused to provide quick, efficient measures to mitigate the considerable but costly volatile expenses as electricity, diesel, and resin that occurred early in the year 2012.  The Court has strongly recommended several times automatic increases for diesel, electricity, taxes and federal minimum wage increases, as having occurred in the instant case.

The difference in not accepting the past expenses in the year 2009 means that the milk producers companies net profit was changed from a total of $3,346,782.00 equivalent to $1.41 per quart of milk sales to $8,129,301.00 to $0.343 cents per quart in a reducing market of 237 million quarts.[25]   The effect is that the "new" determination not only affects a credit to be accounted for determining the price of the product, but also affects the company in the equity it has invested for other criteria and factors of the formula.

Suiza also reports a series of measures that should be considered by the Court to stabilize the regulation to avoid that ORIL continued past policy of a "shifting target," that is the changing of the parameters and the expenses and allowances.  *See* Docket No. 2225, pages 44-50.  The Court, at this stage of the proceedings, only addresses those expenses and/or parameters that constitute either a clear change or those included in the injunctive relief.  The non-inclusion of all simply means that the Court prefers not to address them at the preliminary injunction stage instead of the permanent injunction stage.  But an order addressed to a parameter that is disobeyed will clearly count for contempt purposes.

Naturally, VTM and Suiza propose a series of amendments to the proposed Milk Regulation No. 12 ("PMR"), as mitigating and/or clarifying statements, in addition to those matters, which the

---

[25]       In the year of 2004, when the case was filed the fresh milk market, as of December 31, 2004 was 270,139,928 quarts down from 292,213,124 quarts in December 31, 2002.  As of December 31, 2012, the market of volume of quarts was down to 217,177,124.  *See* Docket No. 2262, page 44.

Court has found that the parties agreed in the *Experts' Agreement* executed on August 26, 2008, Docket No. 2003.

A.      The Court and all parties accept that the expenses related to raw milk constitutes the greatest expense of the milk processor.  Notwithstanding, at proposed Regulation No. 12, the expenses relating to the Federal School Luncheon Program is ordered to be excluded.  This is clearly irrational, unless the expenses are clearly covered under the Federal Program.

B.      When estimating the regulated margin for milk pricing payments to the Special Marketing Fund of three cents (3¢); the Accounting Program five cents (5¢), and one and a half cents (1.5¢) to the Regulatory Accrual, do not properly constitutes regulatory expenses under the proposed Regulation No. 12.  These expenditures are improperly excluded.

C.      Raw milk ingredients must be included as an expense account and must be clearly defined to avoid arbitrariness and irrationality.  A scientific parameter is to be established by ORIL.

D.      Amortization of none recurring professional fees and contracted services are ordered to be amortized if they constitute a general accepted accounting principle ("GAAP").   Suiza hints that such practice is within  GAAP.  *See* Docket No. 2225, page 46, Fn.198 at Exhibit 2225-3, page 19.  Hence, the amounts for non-recurring expenses, such as, professional fees and service contracts are to be amortized pursuant to the general accepted accounting principles ("GAAP") to be used for tax purposes.

E.      Shrinkage and deterioration is to be set by a non-discriminatory, rational and scientific method.  As to the proposed Regulation No. 2, ORIL proposes a maximum ceiling of 3.0%.  The Court is aware that a hearing was held wherein Suiza presented a sworn statement of a witness with excellent authoritative credentials as to qualifications.   The witness stated that the correct figure

was 3.25%.  Although, the Court is authorized at preliminary injunction hearings admit sworn

statements, *see Asseo v. Pan American Grains*, 805 F.2d 23, 25-26 (1st Cir.1986), the Court may not

determine credibility issues as to rationality, weighing the rationality of a scientific opinion.[26]

However, any parameter number approved by ORIL must have the support of a scientific rational

analysis.  In the instant case, said number has been currently set at 3% under the proposed Regulation

No. 12, without any explanation.  The Court orders that this matter must be determined rationally,

scientifically not discriminatorily on a year to year basis without any predetermined amount.  Should

this matter not be resolved by ORIL, the Court will ultimately determine the amount as the simple

top or cap figure, sounding as a whim, that is clearly unconstitutional.  *Duquesne Light Co. v.

Barasch*, 488 U.S. at 307.

     F.     Marketing and advertisement expenses cannot be arbitrarily established without any

explanation.  At proposed Regulation No. 12 § 6B.21, page 6, ORIL had set a cap of $0.05 per quart

of milk.  *See* Docket No. 2225, page 47, Fn.210-211, Exhibit 2225-3, page 20, citing proposed

Regulation No. 12, § 6B21 and App.C. § 6B2.27, page 12.  Curiously, ORIL authorizes Indulac a

higher amount.  This Court and the First Circuit have clearly stated that ORIL cannot have different

parameters (different prices as to the purchase of raw milk), as they are both competing regulated

entities.  The milk processors are requesting 2.5% should this amount be rational and scientifically

based.  The formula of how this is determined must clearly established in the proposed Regulation

---

[26]     The Court is aware of receiving two different opinions based on sworn statements.  The Court cannot make credibility determinations as to the weight deserving to the two experts on the matter relating particularly to whether the scientific method proposed by either one is unreliable.  This matter is left for the permanent injunctive relief trial.  In the meantime, the Court will authorize an economic parameter containing definitions and formula that is scientific and reasonable and non-discriminatory proposed by Administrator of ORIL, but without any cap whatsoever.  The parties are encouraged to attempt to reach an agreement on this particular subject matter.

No. 12.  Further, any amount accepted must have a rational, scientific support.  *Duquesne*, 488 U.S. at 307; *Tenoco*, 876 F.2d at 1026-1027.  This particular parameter constitutes a clear contempt conduct expressly rejected by the Court.  This measure is obviously attempting to offset the effect of ORIL being obligated to accept an "unsystematic risk;" and, having to eliminate the beta parameters of Dean Foods, Inc., a company that represents 40% of the U.S. market of dairy foods, *see* Docket No. 1180, Transcript of February 16, 2009, page 140; Docket No. 1697, *Opinion and Order*, pages 15-17.  Dean Foods, Inc. represents 96% of the sum of the capital of the sample of four dairy companies used to calculate the beta and is close to 100 times the reconstructed capital of the fresh milk processors in Puerto Rico, *see* Docket No. 1194, pages 2-3, referring to Exhibits No. 14-15, admitted by the Court, *see* Docket No. 1697, page 16.  It is further a reaction to the Court's ordering the acceptance of the stipulation of the *Experts' Agreement* accepting the formula of the ROE expressed at Docket No. 1003, pages 1-2, and the tables attached thereto.

H.      Discounts as to fluid milk prices.  The milk processors aver with the support of reliable expert testimony that discounts to agents from gross revenues from fluid milk and the FFIL constitute reasonable income discounts.  But the discount to agents are limited to 6.5% per quart. *See* Docket No. 2225, page 49.  There is no justification as the proposed Regulation No. 12 for said limit.  Once again, ORIL is ordered to establish a parameter, in a rational non-discriminatory fashion instead of taking a number that is not explained, defined and that can be changed, altered, modified as the number is lacking transparency, and does not provide a rational way of achieving the number of ongoing accounts.

Suiza and VTM balk at indefinite in time and arbitrary in motive, as to ORIL's regulatory accounting.  The most glaring example is that, notwithstanding the recognition of a new rate of

return after the injunctive relief, five years have elapsed and there is yet no existence for a "temporary mechanism that will allow the processors to recover the new rate of return they are entitled to," *see* Docket No. 2225, page 50. **The Court orders that a system to recuperate the new rate of return be established within thirty days of the signing of this *Order*.**

VTM succinctly pointed out the clear errors of ORIL's proposed Regulation No. 12 of July 22, 2008.

- Establishing the capital base of the fresh milk processors and the methodology.

- Establishing the milk processors cost of equity capital and the price of the promoters.

- Establishing the specific systematic or unsystematic risk of operating a milk processing business in Puerto Rico.

- Correct the deficiencies of ORIL's proposed Regulation No. 12 regarding the expenses authorized amount.[27]

- Include all assets, liabilities and capital amounts.

- Provide for reasonable contribution for regulatory accrual reserves payments for the milk processors. *See* Docket No. 2228, page 10.[28]

---

[27]   This matter has been covered in this *Opinion and Order*.

[28]   Prior thereto at Docket No. 197, pages 18-19, VTM also suggested other corrections and/or amendments, as to the proposed Regulation No. 12, that today remain pending approval:

- Raw milk and ingredients (expenses as to raw milk and ingredients containers: the proposed Regulation No. 12 does not recognize the cost of the containers.

- Shrinkage and determination: covered in this *Opinion and Order* as a legitimate expense.

- Professional fees and contracted services: covered in the *Injunction Order*, and in the instant *Opinion and Order*.

This Court has entered several orders relating to ORIL's refusal to follow the directives of the Court. *See Opinion and Order* of September 22, 2010, Docket No. 1697, enforcing the *Experts' Agreement*, Docket No. 1003, as to the calculation of the regulatory accrual, return on equity by applying the Capital Asset Pricing Model (CAPM). The Court specifically address the agreement as to the unsystematic risk; the wrongful beta coefficient wrongfully using Dean Foods; and, correcting the wrongful regulatory practices as to the expenses and/or costs accounts ordered by ORIL. The defendants have never showed "manifest injustice" under *Chao*, 493 F.3d at 31-32, as to the facts accepted and the criteria to be used to determine the "risk of doing business" in Puerto Rico nor the particular "fit" of Dean Foods, as a beta coefficient comparable to VTM and Suiza. *Tenoco*, 876 F.2d at 1024-1025. *See* Docket entries No. 1697, 1804, 1907, 1965.

On March 24, 2011, the Court issued an *Order to Show Cause*, Docket No. 1907, directing the defendants under "judicial estoppel" doctrine expressed in *Patriot Cinemas Inc. v. General Cinemas Corp.*, 834 F.2d 208, 211-212 (1st Cir.1987), citing *Davis v. Wakelee*, 156 U.S. 680 (1985). The doctrine of *Patriot Cinemas*, *supra*, precludes a party from asserting a position in a legal proceeding, which is contrary to a position it has already asserted, and prevailed thereunder in another judicial case.

As the Court understands the matter, the Commonwealth of Puerto Rico has prevailed in the United States Court of Appeal for the First Circuit, as well as the Puerto Rico Supreme Court and a subsequent *certiorari* denied by the United States Supreme Court. Briefly, the Government has

---

- Costs for using its own land: the Court has recognized this matter as a legitimate expense.

- Marketing and advertisement: covered in this *Opinion and Order*.

73

enacted a comprehensive stabilization law to alleviate a $3.2 billion dollars structural deficiency in the Government of Puerto Rico.  Workday reductions, involuntary seniority lay-off, potentially having the repercussion to reduce 40,000 employees. The Government of Puerto Rico was experiencing a thorough and critical economic crisis at the time.  Hence, on March 9, 2009, Governor Fortuño enacted the "Law Declaring a Fiscal State of Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Save Puerto Rico Credit," Law No. 7 of March 9, 2009.

In *United Automobile, Aerospace, Agricultural Implement Workers of America International Union, et al. v. Fortuño, et al.*, 633 F.3d 37, 47 (1st Cir.2011), according to the majority opinion authored by Circuit Judge Stahl, the measures taken were not intended "to benefit a special interest at the expense of Puerto Rico's public employees." *Id.*  "To the contrary, Act No. 7, on its face, appears to spread the burden of restoring Puerto Rico's fiscal health . . . ." *Id*.  The Honorable Circuit Judges Boudin and Howard issued a concurring opinion in *United Automobile*, *supra* at pages 47-49, stating as alleged by the Government of Puerto Rico, that "Puerto Rico has been suffering from one of the worst financial crises in its history, its government has been running a large structural deficit, and its credit has been in jeopardy." (Referring to the Statement of Motives of Act No. 7 of March 9, 2009).

At the local level, in a parallel case, the Puerto Rico Supreme Court held a year earlier that Law No. 7 of March 9, 2009, was constitutional.  *See Castro v. Commonwealth of Puerto Rico*, 178 D.P.R. 1,  11.  In the petition for *certiorari* to the United States Supreme Court filed in the case of *Castro v. Government of the Commonwealth of Puerto Rico*, 2010 WL 4220510, the Government of Puerto Rico stated at page 4 of the opposition to the petition for *certiorari*, that "the government could not have paid employee salaries or provided citizens with essential services." "Those

74

consequences would have had a crippling effect on Puerto Rico's economy, leading to the loss of 130,000 jobs in a jurisdiction whose total population is just four million people." *Id.* "According to the Planning Board's estimates, unemployment could have reached 25 percent. (Pet. App. 304a-306a)." In its *Certiorari* brief, the Government of Puerto Rico further admitted that, "[a]lthough bonds issued by the fifty States have credit ratings of A1 or higher, Puerto Rico bonds had fallen from a rating of Baa1/A - in 2004 - to Baa3/BBB - in 2009." *Id.* at page 3. "The rating left Puerto Rico government debt just a single step above 'junk' status. (Pet. App. 302a-304a)." *Id. See* Docket No. 1907, pages 6-7. *See also Vaquería Tres Monjitas, Inc. v. Irizarry*, 600 F.3d 1, *cert. denied*, ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (May 17, 2011).

Notwithstanding, the First Circuit finding in the federal case as urged by the local government of Puerto Rico and the admissions of the Government of Puerto Rico in the opposition for the petition for *certiorari* to the Supreme Court of the United States from the Puerto Rico Supreme Court case, the defendant's position illogically insists that there is no crisis in the milk market of Puerto Rico, which does not warrant an unsystematic adjustment to the formula. For once, the fresh milk market in Puerto Rico has decreased considerably from 270, 135, 928 quarts of milk in the year 2004, on or around the date of filing of the instant case, to 217,177,124 quarts of milk in 2012. *See* Docket No. 2262, page 44. Further, the population of Puerto Rico as previously stated in this *Opinion and Order* had decreased in the last ten years around 80,000 and in excess of 10,000 in the last year. Finally, the youth up to 19 years old has substantially declined, precisely the most common clients. *See Fifth Update of the Report Entitled Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions*," filed on August 2, 2013, Docket entries No. 2261-2264.

Hence, there is no economic paradise for the milk industry.  The systematic risk recognized

by the experts back in August 2008 was justified by the economic plight in Puerto Rico which began

"since 2006," as admitted by the Government in a *certiorari* opposition to the United States Supreme

Court, in the instant case.  *See Vaquería Tres Monjitas, Inc.*, 600 F.3d 1, *cert. denied*, ___ U.S. ___,

131 S.Ct. 2441, 179 L.Ed.2d 1235 (May 17, 2011).

There are consistent errors in the calculation of the rate of return.  **First, the Administrator**

**is ordered to use the freshest data available and not stale data**.  The Administrator of ORIL has

consistently used electricity and water expenses that are not current.  **Second, the rate of return**

**cannot be established without an analysis of the capital investment, as Suiza has logically**

**demonstrated, also correctly denominated by VTM as "amount of equity" of the processing**

**plants**.  (Emphasis ours).  *See* Docket No. 2228, page 28.  *See* the *Experts' Agreement*, Docket

No. 1003, and the tables initialed by the experts' signatories of the *Experts' Agreement*, in which the

experts established a procedure to arrive at the rate of return.  *Id.*

VTM correctly express the rate of return as a regulated matter, as follows:  "In conceptual

terms, the regulatory accrual is added to the book value of the net worth of the fresh milk processing

plants and a reserve for the payment of income tax and dividends applicable to that Regulatory

Accrual is subtracted in order to obtain the estimates of the adjusted net worth."  *See* Docket

No. 2228, page 28.  "The adjusted net worth is the base to which the rate of return is applied to

obtain the return of capital to be included in the calculation of the regulated margin."  *Id.*

The first year of the calculation of the Regulatory Accrual is 2003, and it is included in the

*Experts' Agreement*'s spread sheets.  The year 2003 has a recognized operational loss.  *See* Docket

No. 2228, pages 28-29.  In fact, proper calculations were performed at the experts' spread sheets for

the year 2003 until and including the year 2007.  *See* Docket No. 1003, pages 3-7.  The Court method

to calculate the ROE is expressed by VTM at Docket No. 2228, page 29.[29]  "This amount of

reasonable profit of calculated by multiplying the rate of return by the total 'Capital and Operating

Surplus' for the previous year 2002, which amounted to $43.59 million **according to the**

**Agreement**." (Emphasis ours).  *Id.*  "The total of these two values is included in the Asset as the

'Gross Regulatory Accrual.'" *Id.*  Hence, once again the solution to the ROE and the manner

[method] to calculate the amount of equity is clearly contained in the *Experts' Agreement*, Docket

No. 1003, pages 3-7.  The *Experts' Agreement* clearly covers only the years 2003-2007 and leaves

the 2008 "to be discussed later," Docket No. 1003, page 1, as the agreement of the experts was on

the same date it was filed in open court by counsel of all parties, on August 26, 2008 at

about 2:45 p.m. (CM/ECF Computerized Time).

VTM further balks strongly at ORIL's artificial method which the Court has been duly

illustrated an "artificial reduction in the amount of expenses" together with "an artificial upwards

increase in [the] income [of the milk processors]."  *See* Docket No. 2228, page 31.  The Court has

previously noted the practice at the *Injunction Order*, *see* Docket No. 480, page 32, "[t]he

manipulation of plaintiffs' real financial picture is the consistent result, year after year, albeit on

account of ever changing regulatory criteria [as to both authorized expenses and their income]."

VTM alleges that "as a result of ORIL's arbitrary adjustments, losses have converted into profits

and/or the pretax profits of the fresh milk processors have been artificially increased in years 2008,

2009, and 2010."  Docket No. 2228, page 31.

VTM currently notes at the *Experts' Agreement* wherein the defendants' experts, at

---

[29]

paragraph 1.d. agreed to adjust the net income by "adding back any payments for "Exclusivities."
*See* Docket No. 1003, page 1, ¶ 1.d.  this meant that "exclusivities" were not to be accepted as an
expense.  Interestingly, this part of the Agreement is respected and followed by ORIL.  *See* Docket
No. 2228, pages 32-34 (increase created by eliminating of exclusivities expenses raising net profits
which was agreed but adding for the first time prompt payment discounts as an added profit, and the
elimination of promotional discounts, which VTM also does not challenge).  Notwithstanding, for
the first time the amount of $823,672 for merchandisers costs that were eliminated as a recognized
expense incurred by VTM until then accepted by ORIL and also previously authorized to Indulac for
the year 2009, all as provided by a fiat of the proposed Regulation No. 12 "showing inconsistency
of its regulatory practice."  Further, marketing and promotional discounts to promote "fresh milk"
which generates more sales in order to aid the farmers and avoid the considerable losses as
to UHT milk, as less milk has to be purchased and manufactured by Indulac,[30] was not allowed for
the first time, for a total of previously allowed expense of $5,185,638.  "Thus, these two types of
adjustments amounted to $6,009,310 and were the determining factors in ORIL's actions to
artificially and substantially increase the net profits before taxes of fresh milk processors."  Docket
No. 2228, pages 33-34 (referring to merchandisers expenditures and marketing promotional
accounts).  The Court considers this maneuver by ORIL as a serious violation to the *Injunction Order*
of July 13, 2007, Docket No. 480. This example constitutes the most glaring example of "shifting
targets," that is changing on accepting a parameter without notice causing a serious double low blow

---

[30]     Indulac is a balancing plant that purchases the excess milk not purchased by the processing plants
in order to keep the production of the farmers as stable as possible.  Indulac also receives all the milk processors'
stale milk for disposal, which represents an added expensive cost to Indulac.  However, there are years in which
Indulac has dumped product that has became stale and could not be sold, and other years when the milk is practically
given away in export sales.  Suiza has a pending charge relating to the exportation prices that the farmers accept a
lesser price in technical violation to the *Injunction Order* as to equal payment for the raw milk.

to the milk processors.

Moreover, amongst other factors, VTM further notes that ORIL reduced arbitrarily recognizing an inflation during 2010 a series of expenses for 2010.  "However, ORIL's projection was based on an income and expense figures arbitrarily and erroneously adjusted in 2009."  Docket No. 2228, page 34.  Again, ORIL violates the *Injunctive Order* by using improper stale data figures, and to heighten the damages again establishes arbitrary criteria without any rational scientific parameters, and obviously with an intent to violate the *Injunction Order* issued on July 13, 2007, Docket No. 480.

Finally, ORIL not only rapidly adjusted expenses using state data and under no reasonable criteria, but fails to recognize the increase of expenses as to increases in electricity, diesel and resin during the first quarter of 2012, all pursuant to unquestionably known verified data as testified by Dr. Freyre at the hearing held on June 29, 2012, Transcript pages 43-50.  Obviously, since the costs have increased and the milk sales have consequently decreased, *see* historical data at Docket No. 2262, page 44, the cost per quart during the years 2010-2012 increases all without any significant scientific relief in the price of milk.  *See* Docket No. 2228, page 34.

The Court is of the opinion that ORIL's delay in compliance as to refusing to accept the broad effect of the *Experts' Agreement* resolving most of the controversies as to compliance constitutes the most significant offense to the compliance procedure, as correctly expressed by Suiza in its *Post-Hearing Memorandum*, Docket No. 2225, pages 23-24.[31]

---

[31]    The *Experts' Agreement* has provided a complete framework, except for how to deal with negative betas, the size of the Puerto Rico risk, the period of repayment of the regulatory accrual and the interest on it, and further specificity in the definition of income statement regulatory accounts.  The *Experts' Agreement* includes the methodology for the calculation of the regulatory accrual (the starting point being the initial equity as of December 31, 2002, the value for

The other significant controversy is the elimination of Dean Foods as a beta coefficient was handled by the Court making reference to *Tenoco Oil*, 876 F.2d at 1024-1025. Dean Foods simply lacks a "fit" to the two regulated companies as to corporate size and marketing strength in the United States both vertically and horizontally. (Dean Foods constitutes 96.3% of the capital of the five beta company components, which amounts to over 100 times the reconstructed capital of the local fresh milk processors and enjoys 40% of the total U.S. market dairy products, *see Order*, Docket No. 1697, pages 15-17).

Another significant disagreement was ORIL's insistent practice of including the negative betas. They are simply unreliable as expressed by the Ibbotson and other renown experts cited by the Court in this *Opinion and Order*, and not retained by any party. The companies with negative betas were simply experimenting "a problem with the data or something wrong with the company." Dr. Giacchino, Transcript of June 24, 2011, pages 13-17. Dr. Freyre and Ibbotson do not use negative betas. *See* Transcript of September 11, 2011, pages 30-31.

The Court further does not provide any credibility or weight to the testimony of Dr. Cotterill for the reasons stated at the *Defendants' Reply Memorandum*, Docket No. 2229, pages 1-11. Ibbotson and Morning Star, and other experts with greater experience than Dr. Cotterill, merely

_____

each year and the elimination of exclusivities, leaving for later if they will use a single return on equity or a yearly one), the methodology for the calculation of the return on equity, instructions on the collection of data for the calculation of the Puerto Rico risk, the payment of dividends for the regulatory accrual received and the adoption of balance sheet accounts for regulatory accounting. The CAPM methodology adopted as of October 30 included the same risk free rate as a standalone rate and within the equity risk premium and the need to not include negative betas, while the experts still disagree on the inclusion of Dean Foods, the size of the Puerto Rico risk and the lag in the calculation of the rate of return. There is no doubt that this Honorable Court has stated that the experts' agreement will be respected and applied. Now is the time to do so. *See* Docket No. 2225, pages 23-24.

report the negative betas "but [do] not include negative betas" in its calculation as coefficient companies to determine the beta component. *See* Docket No. 2229, page 10, Fn.21.

Hence, the Court has ruled that negative betas are unreliable, and non-scientific, to include them as part of the beta component; similar to the inclusion of a giant corporate entity that absolutely has no "fit" to the two regulated entities in the instant case.   It appears that recently, after months if not more than one year, the inclusion of negative betas has been abandoned by ORIL.

There are other strong disagreements as the inclusion of the unsystematic risk applicable to Puerto Rico.  The Court has addressed this issue in several orders.  Time has shown the Court to be correct.  The unsystematic risk was clearly included by all experts immediately after the economic crisis in Puerto Rico began and was accepted by the Government, in two separate judicial cases, as having serious repercussions Island wide.  The crisis continues to this date in the year 2013.  *See Fifth Update of the Report Entitled Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions*, Docket entries No. 2261-2264.[32]

### *Contempt by ORIL to the Court's Orders*

First, the Court clarifies that the matter of FEP, an alleged private corporation controlled by farmers, allegedly selling raw milk to be processed by Indulac and sold to private brands, or

---

[32]    *See Sixth Update of the Report Entitled "Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions,"* Docket No. 2284-1, page 1.

According to the "Comprehensive Annual Report of the Commonwealth of Puerto Rico" ("CARF"), for the fiscal year ended June 30, 2012, the accumulated deficit of the Commonwealth of Puerto Rico increased from $33,677 million at the end of June 2011, to $39,037 million at the end of June 2012.  This represents an increase of $5,360 million in fiscal year 2012.

The annual increase in the public debt of the central government and public enterprises of the Commonwealth of Puerto Rico is an alternative method to measure the deficit of the government of the Commonwealth of Puerto Rico.

processed by VTM is not a matter for consideration at this stage of the proceedings, as FEP was not

a subject at all of the Court's *Injunction Order*, Docket No. 480.  Neither is the battle between Suiza

and VTM relating to the Suiza's abandonment of certain routes for the collection of raw milk, and

as a consequence, an alleged benefit was granted to VTM by increasing their participation in the

Federal School Luncheon Program to the detriment of Suiza.   (The Court merely maintained the

Federal School Program issue in passing, but never received evidence on the subject matter).

Neither is raw milk "sold for export" at allegedly low prices.   Suiza alleges that these are

transgressions of the Court's *Injunction Order* of equal treatment protection.  *See* Docket No. 2225,

pages 52-54.  The Court defers these matters for the final injunction hearing.  The Court deems

judicious to listen to Indulac as to exportation of UHT milk and how that affects Suiza.  The Court

deems elementary to grant due process to the farmers on these new developing subject.   The

contempt in this case involves potentially ORIL's lack of compliance with the Court's orders in the

*Injunctive Order* or issued thereafter, or after the *Experts' Agreement*, Docket No. 1003.

Contempt is simply lack of compliance by a party with an order of the Court.

*Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 207 (1999).  Intent to comply is not an

excuse, as the issue is compliance.  *Century ML-Cable Corp. v. Carrillo*, 43 F.Supp. 176

(D.P.R.1998).  The Court's dignity is at stake.  *Asseo v. Bultman Enterprises, Inc.*, 951 F.supp. 307,

313 (D.P.R.1996).  Absence of willfulness is not an element in a civil contempt where the orders are

clear and addressed to a litigating party.  *Morales Feliciano v. Rossello González*, 124 F.Supp.2d

774, 787 (D.P.R.2000).

The Court clearly finds contempt in the conduct of ORIL involving several of the directors

of ORIL during various administrators, under three different Government administrations, since

July 2007 until December 2012, and now under a new administration since January 2013.

The Court further clarifies that the *Injunctive Order* issued by the Court on July 13, 2007 was totally affirmed by the First Circuit on November 23, 2009, and published as *Vaquería Tres Monjitas Inc. v. Irizarry*, 587 F.3d 464. Thereafter, a dissent occurred in an *en banc* hearing, as to potential retroactive remedies, published at 600 F.3d 1 (1st Cir.2010), which was eventually denied by the Supreme Court of the United States after receiving the position of the United States Attorney, *see cert. denied* ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (May 17, 2011).

### *The Extraordinary Remedy*

After nearly a decade of litigation, over one hundred hearings in the District Court, and two appeals to the United States Court of Appeals for the First Circuit, three different Governors of Puerto Rico from the two leading political parties in Puerto Rico, having refused to comply, through the conduct of different Secretaries of Agriculture and several ORIL's administrators, the Court's patience is throughly exhausted. In that time, the Court has witnessed first-hand repeated delays, stall tactics and general obstinance from Milk Industry Regulation Administration, ORIL. The Court, amongst other episodes, has observed ORIL's sheer refusal to adopt a non-discriminatory pricing formula based on rationale, scientific and economic methods; apparently indifferent to the pending litigation, ORIL has, time and again, attempted to implement an unjust pricing formula at the expense of milk producers in violation of the Due Process Clause. The Court, sadly, recognizes that after years of litigation, of hearings upon hearings, little to no progress has been made to remedy the Constitutional violations that were the basis for the preliminary injunction. Again, the Court's patience is exhausted. The time for action is fast upon us.

In light of this pattern of evasion and defiance, the Court reluctantly concludes that such

extraordinary conduct by ORIL may be met in kind with extraordinary action by the Court.  The

Court remains ever cognizant of its place in a tripartite system of governance whereby the

Legislature enacts laws; the Executive Branch promulgates regulations implementing those laws;

and the Judiciary adjudicates controversies pursuant to those laws and regulations.  However, the

Court will not, and indeed cannot, sit idly by while Constitutional rights are violated and purposely

trampled over and over again in front of the Court's eyes.  Although the Court adamantly strives to

avoid usurping the proper roles of the Legislature and the Executive, and provides proper deference

to the principals of federalism, the  Court must exercise its "traditional attributes of equity power"

to ensure that any Constitutional violations cease.  *Brown v. Board of Education II*, 349 U.S. 294,

299-300 (1955).  Thus, should the resolution of the permanent injunction be similar to the resolution

of the preliminary injunction, and the Court does not pre-judge the issue to suggest the outcome one

way or the other, **the Court will proceed to implement a formula regulating the price of milk**.

 *See  Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15 (1971)  ("Once a right

and a violation have been shown*,* the scope of a district court's equitable powers to remedy past

wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

In taking this approach, the Court finds that no separation of powers boundaries or federalism

concerns will be violated as the exercise of the Court's remedial power will be limited to ensure that

"[t]he remedy [is] related to the condition" that "offend[s] the Constitution."  *Milliken v. Bradlev*,

418 U.S. 717, 738 (1974); *see Swann,* 402 U.S. at 16 (the scope of a federal district court's remedial

power is "determined by the nature and scope of the constitutional violation.");  *Missouri v.*

*Jenkins II*, 515 U.S. 70, 88 (1995)(Court's remedial powers are appropriate provided that they are

framed by "the violation, [which] means that federal court decrees must directly address and relate

to the constitutional violation itself.").

Additionally, the Court is fully justified in this approach as the present controversy is analogous but not totally equal in dimension to racial desegregation of schools and school busing. *See Griffin v. County School Board*, 377 U.S. 218, 233 (1964)("the District Court may, if necessary to prevent further racial discrimination, require the Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system . . . ."); *Missouri v. Jenkins*, 495 U.S. 33, 55 (1990)("The Fourteenth Amendment . . . was avowedly directed against the power of the States, and so permits a federal court to disestablish local government institutions that interfere with its commands.")(internal citations and quotations omitted); *Swann*, 402 U.S. at 16 ("In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system.").

Reform of state prisons provides yet another compelling example.  In *Hutto v. Finney*, 437 U.S. 678 (1978), the District Court entered a series of detailed remedial orders upon finding that the conditions in the Arkansas prison system constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.  The Court of Appeals affirmed the District Court's order placing a maximum limit of 30 days on confinement in punitive isolation.  The Supreme Court also affirmed, stating:

> In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation. The District Court had given the Department repeated opportunities to remedy the cruel and unusual conditions in the isolation cells. If petitioners had fully complied with the court's earlier orders, the present time limit might well have been unnecessary. But taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance.

85

*Hutto*, 437 U.S. at 687.

Similarly, in *Brown v. Plata*, ___ U.S. ___, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011), the Supreme Court upheld a three judge court's[33] ruling to reduce the population of California's penal system after years of litigation had revealed, and not corrected, violations of the Cruel and Unusual Punishments Clause.  The Supreme Court found, *inter alia*, that the lower court's decision was narrowly drawn, extended no further than necessary to correct the violation of a federal right, and was the least intrusive means necessary to correct the  violations in compliance with the explicit language of the PLRA.  *See* 18 U.S.C. § 3626(a).

Each of these litigation paradigms, racial desegregation of schools, school busing and prison reform,[34] similarly involved obstinate and recalcitrant state and local government, whose years of inaction and non-compliance with Court directives necessitated the need for federal judicial intervention to safeguard the Constitution.  Although these cases arguably implicate loftier civil rights objectives than what is presently before the Court, the Court cannot tolerate repeated and

---

[33]     Pursuant to the Prison Litigation Reform Act of 1996 (the "PLRA"), "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court." *Brown*, 131 S. Ct. at 1922 (citing 18 U.S.C. § 3626(a)).

[34]     The Court also notes that in *Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus*, 634 F.3d 3 (1st Cir.2011) the First Circuit held that Jehovah's Witnesses have a right to proselytize door-to door, notwithstanding a state law permitting neighborhoods to restrict vehicular and pedestrian access to the residential streets within the neighborhood.  Of particular interest to the present inquiry, the Circuit Court stated:

> On remand the district court needs to take prompt action to bring the municipalities and urbanizations into compliance with this decision . . . .The district court can adopt categorical guidelines and make use of magistrate judges or other facilitators as needed.

> To assure compliance might seem a daunting task because of the number of urbanizations, but we would expect the district court--if confronted with undue delay or repeated noncompliance--promptly to direct open access for all visitors unless and until the urbanization brings itself into compliance. Further, unreasonable delay creates a risk of contempt and of damages and attorneys' fees, 42 U.S.C. § 1988(b); *see Boston's Children First v. City of Boston*, 395 F.3d 10, 14 (1st Cir. 2005), providing an additional incentive for defendants to act promptly.

*Watchtower Bible*, 634 F.3d at 17.

rampant Constitutional violations which not only dramatically affect two large corporations, with the distinct possibility of bankrupting these entities, but also implicate the health and nutrition of the people and children of Puerto Rico.  Accordingly, the Court affirms that it has the authority to implement the requisite regulations to ensure full and complete Constitutional compliance.

However, as this extraordinary action is indeed very strong medicine, and the instant litigation remains at preliminary injunction phase, the Court is only willing to dispense such strong medicine at the permanent injunction phase, if necessary.  *See United States v. Santana*, 6 F.3d 1, 10 (1st Cir. 1993) (warning that "potent elixirs should not be casually dispensed").  **The Court, thus, also affirms that the Court will exercise such authority in the event that Plaintiffs prevail at the permanent injunction hearing, and the defendants continue with their current conduct of delay, changing the parameters, not authorizing clearly acceptable economic expenses that traditionally have been accepted and are only changed to artificially decrease the rights of the milk processors in a regulated market**.

The Court hereby sets the Permanent Injunction Hearings for **November 18-22, 2013 at 9:00 a.m.**, in Old San Juan Courtroom 4 of the José V. Toledo U.S. Post Office and Courthouse**.**[35]

### *Contempt Findings*

The Court undoubtedly, without any hesitation whatsoever, concludes that Defendant ORIL,

---

[35]        Notwithstanding, the Court strongly recommends that the parties utilize the time between the instant *Opinion and* Order and the Permanent Injunction Hearing to reach an extrajudical resolution to the instant controversy as the Court maintains that the instant matter is best resolved via an agreement. *See Candelario del Moral v. UBS Fin. Servs.*, 699 F.3d 93, 107 (1st Cir. 2012)("we do not think that we are crossing any lines in 'suggesting that this is a case best resolved by settlement.'")(quoting *Bos. Edison Co. v. Fed. Energy Regulatory Comm'n*, 233 F.3d 60, 69 (1st Cir. 2000)).

all the administrators holding office as executives at ORIL, and the expert Dr. Ronald W. Cotterill,[36]

have incurred in serious, blatant, and continued violations to the injunctive order of this Court issued

on July 13, 2007, Docket No. 480, and to the subsequent Experts' Agreement, Docket No. 1003, filed

in open court by the lawyer's present on August 26, 2008 at 2:45 p.m.

The Court begins with the recalcitrant unexpected, but continued attempt by Defendants and

their expert, to extricate themselves from what all experts agreed in writing and filed in the afternoon

of August 26, 2008, the *Experts' Agreement* and the attached work sheets, Docket No. 1003.

Stipulations are, pursuant to *Christian Legal Society, et. al. v. Martínez*, __ U.S. __, 130 S.Ct. 2971,

2983, 177 L.Ed.2d 838 (2010), "formal concessions … that have the effect of withdrawing a fact

from issue and dispensing wholly with the need for proof of the fact.  Thus, a judicial admission …

is conclusive in the case."  In the instant case, the alluded stipulation case was signed by all experts.

The Agreement was presented to the Court by counsel and entered in open Court.

The Agreement was broader than originally envisioned by the Court.  The Agreement, Docket

No. 1003, eliminated most of the controversies between the parties that had not been resolved by the

Court's injunctive relief of July of 2007 (Docket No. 480).

The Agreement included:

- The acceptance of the regulatory accrual and the methodology as to the calculation

  thereof (Docket No. 1003, page 1, ¶¶ 1 a-e and 2 a-e), including the starting point of

---

[36]     The Court strongly recommends that Dr. Cotterill retain separate counsel, as the Court is seriously
contemplating sanctions against him resulting from the continuing violation of changing the values of parameters
and/or establishing new parameters without any scientific and/or reasonable analysis; eliminating traditionally
accepted expenses; and the same time, placing those expenses as profit of the company.  Above all, not accepting the
obvious numerous agreements as to considerable sections of the ROA formula and the acceptance of regulatory
accrual, as well as the acceptance of the unsystematic risk, all relating to the Experts' Agreement, previously signed
by Dr. Ronald W. Cotterill.

12/31/2002 and the value for each year's[37] elimination of exclusivities, which was continuously requested upon the insistence by ORIL, the elimination of the exclusivities as part of the *Experts' Agreement*;

• The methodology for the calculation on the ROE, (Docket No. 1003, page 1, a-d);

• The acceptance of the existence of an unsystematic risk denominated as "measure of Puerto Rico risk",[38] and instructions on the proper data for the calculation of said risk as part of the ROE;

• Payment of potential dividends as to the recognized regulatory accrual;

• The CAPM or the LESSER method to calculate the ROE (ORIL chose without any objection of either processors, the CAPM method, capital asset pricing);[39]

• A "risk-free" rate as a "stand alone rate within the equity premium";

Several times during the trial, the Court openly expressed that the Experts' Agreement had to be respected, including in several written orders (Docket Nos. 1697 and 1804 (resolving ORIL's reconsideration)).  The Court further expressed various comments on the record as to the legal effect of the stipulation entered by the experts signed by the parties, who were then handing exclusively the economic matters and the parameters to be established as to various pending formulas.  *See Memorandum* of Suiza, Docket No. 2255-2, page 1-32.  The Court further issued an order to show

---

[37]     Hence the parties accepted retroactive effect as to these criteria at least as to using those economic figures.

[38]     The measure of Puerto Rico risk was then and now continues to be justified by the economic reality of Puerto Rico as compared to that of the United States and/or the poorest states of the Union.  *See Economic Analysis* at *infra*.

[39]     ORIL accepting the CAPM method is yet another circumstantial evidence that the Agreement was initially accepted by ORIL.

cause to Defendants at Docket No. 1097 and then issued an Opinion at Docket No. 1965 based on equitable estoppel to Defendants as being barred under the doctrine *Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208, 211-212 (1st Cir. 1987) as the Defendants had prevailed both in the Circuit Court of Appeals (in the case of *U.A.A.A.I.W.A. International Union v. Luis Fortuño*, 633 F.3d 37 (1st Cir. 2007)) and in the Supreme Court (in the case of *Olga Domínguez Castro v. Commonwealth of Puerto Rico*, __ U.S. __, 131 S.Ct. 152, 178 L.Ed.2d 38 (2010)).[40]

Finally, at the opposition to the *certiorari*, the Government of Puerto Rico admitted a crippling effect of the Puerto Rico economy [as opposed to merely a governmental economy], leading to a loss of 130,000 jobs in a jurisdiction under 4 million [people]" as opposed to merely a loss of government employment.

Hence, the District Court in the instant case has declined to accept the Government's recalcitrant position as to negating an accepted and unsystematic risk, accepted and agreed late in August 2008. The Court declined not only because of the signed Agreement, but also because the Government had made allegations accepting an economic crisis to the government employees, the decrease of tax revenues, the almost junk status of the bonds, and the potential unemployment of the island. Thus, the *Experts' Agreement* of August of 2008, as to an unsystematic risk, was an agreement of the expert economists based precisely on the economic position of Puerto Rico, which was later accepted by the Government in judicial cases wherein the Commonwealth prevailed, urging on the economic crisis that commenced in 2006.

---

[40] Specifically alleging to all three courts the *dire* economic position of the Government of Puerto Rico, which had island wide negative repercussions to all "Puerto Rico has been suffering from one of its worst financial crisis [since 2006] in its history, its Government has been running a large structural deficit and its credit has been in jeopardy," *see* the Government's opposition to the petition for *certiorari* filed with the United States Supreme Court. *See Order to Show Cause*, Docket No. 1907, page 4.

ORIL and its experts then alleged that the milk industry as a whole was not affected. To the Court, that meant a "black hole exception constituting a paradise in the middle of an overwhelming general island wide economic crisis." The numbers of sold fresh milk concluded otherwise. Since the instant case, filed in 2004, the numbers of quarts of milk sold have suffered a reduction from 292,213,124 to 217,177,124 quarts in December 31, 2012; and from December of 2008 (after the Experts' Agreement) to December 31, 2008, the reduction in sales was from 239,779,814 to 217,177,124 quarts. To simplify the analysis, the total sales from 2004 to December 31, 2012, decreased approximately 26%, and total sales from 2008 to 2012, the reduction was approximately 9%. Therefore, there is no "paradise" for the milk processors. Consequently, as the number of sales has decreased the cost per quart has obviously increased, that is, even assuming that the costs have remained unchanged - which they have not. Hence, the inclusion of the systematic risk by the Experts' Agreement, Docket No. 1003, was properly based on the economy of Puerto Rico as a whole, and on the considerable decrease in the total sales of fresh milk. The denial by ORIL and its experts as to an economic crisis in Puerto Rico an in the milk industry is temerarious and constitutes purely a delay tactic to avoid the implementation of the Experts' Agreement.

Another flagrant delay tactic has been ORIL's averment, notwithstanding orders of the Court to the contrary, insisting on the inclusion of Dean Foods as part of the beta coefficient. The Court has tackled this attempt in various orders, (Docket No. 1697, relying on Docket No. 1194; and Docket 1965, based on the lack of fit as to the Puerto Rico milk processors following the holding in the case of *Tenoco Oil Co., Inc. v. Dept. of Consumer Affairs*, 876 F.2d at 1024).

> The net result is that a Beta coefficient to be potentially imposed by the Regulator, is "equal to saying that the systematic risk that an investor accepts to operate a fresh milk processing plant, such as Suiza in Puerto Rico, is the same systematic risk accepted by an investor buying the shares of stock

of Dean Foods." *See* Suiza's memorandum at Docket No. 1194, p. 3. VTM reaches the exact same conclusion in their memorandum at Docket No. 1192 at p.p. 6-9. Both fresh milk processors agree that the Administrator in imposing Dean Foods within the Beta factor of the CAPM formula, is artificially lowering the risk factors by importing non-comparable fresh milk processors. *See* Suiza's memorandum at Docket No. 1194, p. 3, and VTM's memorandum at Docket No. 1192, p. 9. VTM correctly stresses that the Injunction Order specifically counseled caution in importing economics models from the Continental United States that did not "fit" the realities of the Puerto Rican market. See Docket No. 1192, p. 9. In the Injunction Order, the Court ordered that "[t]he Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular 'fit' of Puerto Rico into any economic model which may be used from other jurisdictions." *See Injunction Order*, Docket No. 480, p. 94, *see also* VTM's memorandum, Docket No. 1192, p. 9. The Court adds that the "fit" is simply not present, and compares to that which occurred in *Tenoco* by the Department of Consumer Affairs using stale back dated economic figures to set the yearly price reviews that occurred years later of the gasoline rates of return, and costs of gasoline wholesalers by the Department of Consumer Affairs, all of which were found to be unsustainable by the First Circuit Court of Appeals. *See Tenoco*, 876 F.2d at 1024-1025.

…

[9]     Defendants address the inclusion of Dean Foods as one of the companies to 9 determine the Beta coefficient at §§ 10 and 11 of Docket No. 1193. Notwithstanding, the excellent effort, the Court is not impressed by the use of a company that its very own inclusion significantly lowers the Beta coefficient, and as Suiza stresses "repre[sents] 96.3 of the capital of the sample [of five companies] used to calculate the Beta," and this 96.3 of the capital is "close to 100 times the reconstructed capital of fresh milk processors in Puerto Rico." *See* Docket No. 1194, p. 3. The inclusion of Dean Foods, Inc. hardly constitutes a reasonable or rational comparable "fit" for the Puerto Rican market.

Docket No. 1697, page 16-17, and note 9.

The Order of the Court, excluding Dean Foods for lack of fit for its enormous market in the United States and its size comparable to the two local companies, was first entered on September 22, 2010, Docket No. 1697.   ORIL's reaction that no other companies could be issued as stated by the company preparing the beta coefficient is not acceptable to the Court, as ORIL simply could have

taken the un-objected other companies and average those, or include an acceptable additional company as close to the companies that had been accepted by all.  Hence, ORIL's insistence on their position of including Dean Foods, who had "close to 100 times the reconstructive capital of the [two] fresh milk processors in Puerto Rico" and "represent[ed] 96.3% of the capital sample [of the companies] used to calculate the Beta," was not accepted by the Court since September 22, 2010, Docket 1697, page 16.  The Court struck Dean Foods in its Amended Opinion and Order at Docket No. 1697, page 17.[41]

Similar analysis covered in this Opinion is the inclusion of negative Betas by ORIL.  the Court will not repeat the analysis.  The Defendants and their experts continue up to recently, with the use of negative Betas, which the Court had determined, months prior to defendants' capitulation, to not be scientific and the usage of said negative Beta was unreliable.

The usage of Dean Foods and negative Betas constitutes unreliable and unscientific methods to decrease various coefficients, causing the unsystematic risk and other economic parameters results unfairly unfavorable to the two milk processors.  However, ORIL has insisted on the use of these parameters.  ORIL and its expert, Dr. Cotterill, are hence in contempt of the Court orders striking both Dean Foods and negative Betas.

One of the most impacting and contentious events of Defendant ORIL constitutes the non-acceptance of the acceptance of merchandisers as an expense to the milk processors in the distribution of the milk to the supermarket food stores and the warehouse sales companies in Puerto Rico The Court considers this matter temerarious.  It is a valid expense that must be recognized in

---

[41]     Dean Foods also had a capital in 2010 of $6.75 Billion not similar to the two small milk processors in Puerto Rico VTM and Suiza.  Hence, there is no fit considering all the factors stated herein between Dean Foods and VTM and Suiza.

its totality.  The non-acceptance of a valid expense constitutes but a delay tactic.  After all, the fresh milk cannot be effectively sold from the plants.  The merchandiser is part of the distribution chain, taking the milk from the processing plant to the stores where the consumers purchase the milk.  The milk processors cannot obligate the food stores to repeatedly, timely place the fresh milk in the refrigerated shelves.  VTM clearly examined the effect of ORIL's determination at Docket No. 2228, pages 33-34.  In essence, merchandisers' expenses were authorized until then, but "in 2009" ORIL determined that such expense was suddenly not authorized, showing "the inconsistency of [ORIL's] regulatory actions."  The law in Puerto Rico mandates that expenses relating to the distribution of the milk be evaluated every four years "for the purpose of revising and keeping the price of fresh milk within a reasonable and equitable margin for the different sectors within the industry, that is, producers, processors, distributors of the product and consumers in general."  5 L.P.R.A. §1107 (e).

In the instant case, the milk processors act as both processors and distributors of their products, hence the merchandisers' costs constitute a cost of placing the product available to the consumers.  Placing this key element of the distribution in the hands of the supermarkets and/or large discount department and warehouse stores is dangerous as the product needs to be timely shelved or else, be at risk of turning stale or ruined.  However, the Court's reasoning is simpler.  The cost of merchandisers were authorized until the injunctive relief was placed under ORIL's scrutiny and consequently unilaterally did change its policy, constituting a clear example of "shifting" targets.

"Marketing and promotional accounts" suffered the same consequences allegedly pursuant to Law 34 of June 11, 1957, 5 L.P.R.A. §§1092 et. seq.

ORIL refers to 5 L.P.R.A. §1111(c), which provides that "[l]iquid milk shall not be sold at any level of distribution at a price other than that fixed by the Administrator for said level."

94

VTM alleges that said discounts entitled "marketing and promotional accounts," and particularly referring to "prompt payment discounts" have not been allowed by ORIL relying on the above transcribed section of the Law.  The Court understands that the prompt payment discounts" is equally available to all of those who perform prompt payment.

The administrator has determined a fixed cost of advertisement not to exceed $0.005 per quart at Regulation 12.  There is no explanation to the formula as how it was established after the Court made its findings as to the injunctive relief at Docket No. 480, dated July 13, 2007 (findings 44-45).  As to the changing or establishment of parameters without notice and without any scientific reasoning, the Court strikes the $0.005 unilateral determination as irrational, without the performance of any analysis nor scientific studies.  Further, the establishment of said parameter sounds retaliatory and constitutes further circumstantial evidence of a result oriented determination.

Amortization of non-recurrent professional fees and contracted services are not covered as legitimate expenses.  In addition to the surprise non-acceptance of regular legal expert and contracted fees, there is also the deficiency of lack of a parameter for accepting non-recurring professional fees.  The Court ORDERS that non-recurring fees are to be accepted and amortized using a scientific, rational parameters used by regulators in markets similar to the Puerto Rico market.  This *Order* depends on the practice being accepted under the general accepted accounting principles ("GAAP").  The Court places emphasis on the *Tenoco* requirement as to "fitness" with the Puerto Rico market.  See 876 F.2d at 1024.

Shrinkage and Containers Determinations.  As explained above, the Court at this time cannot determine, based on a sworn statement, a weighing of evidence between two experts of opposite sides.  The Court is concerned, and strikes any parameter that sets a maximum top cap or a minimum

cap amount without any scientific method that has a cap that fails to consider that in one year, high temperatures warrant an allowance higher that the maximum cap.

As to the containers, the proposed Regulation No. 12, the definition provided by ORIL is not sufficiently scientific, as said definition merely states that the cost of the containers shall be equal to or less than the prevailing rate in industries that are similar to the market in Puerto Rico.  The Court merely clarifies that there must be a "fit" relating to the size of the companies, the volume of sales and a container that is proper relating to the geographic area of the warm temperature of Puerto Rico.  See also suggestion by VTM at 6.B2 (18), *Infra*.

<u>Specific Risk</u>.  The Court understands that specific risk premium in Puerto Rico is currently warranted.  Specific risk is derived from the CAPM model, accepted by Shannon P. Pratt with Alina V. Niculita, "Valuing a Business. The Analysis and Appraisal of Closely Held Companies," 5th ed. 2008, pp. 198-200.[42]

---

[42]     The Court notes that the correct CAPM formula is as follows: $R_m = R_f + \beta \cdot R_m - R_f) + R_{MC} + R_{PR}$.  The Court also noted that the mathematical operation between the Beta coefficient and the adjusted market rate of return $R_m$- $R_f$) is a multiplication instead of an addition, as mistakenly stated at Docket No. 2228, page 19-20.  The formula's terms are transcribed as follows:

$R_m$ = The reasonable rate of return on net worth after tax that processing plants should obtain from the business of fresh milk in Puerto Rico.

$R_f$ = Risk-free rate estimated based on the bonds issued by the U.S. Government ("Arithmetic Mean of Long- Term Government Bonds Income since 1926, Ibbotson SSBI Valuation Yearbook").

$\beta$ = Coefficient that represents the systematic risk of investments in the dairy products sector (SIC-202) in the United States.

$R_m$ = Rate of return of a broad portfolio of stock marketed in the U.S. capital markets, estimated according to the performance of the S&P 500 ("Arithmetic Mean of Total Returns of Large Company Stocks since 1926, Ibbotson SSBI Valuation Yearbook").

$R_{MC}$ = Additional risk of smaller companies (Percentiles 9-10) that market their stock in the U.S. capital markets (NYSE/AMEX/NASDAQ), as calculated by Ibbotson Associates ("Micro-Caps - Deciles 9 and 10- Size Premium in Excess of CAPM, Ibbotson SSBI Valuation Yearbooks").

$R_{PR}$ = Additional risk faced by processing plants in the fresh PR milk business in Puerto Rico. Coefficient R has been calculated based on the average of the two differentials between the rate of return of unsecured long-term bonds with a maturity of 20 and 30 years of Puerto Rico Electric Power Authority (PREPA) and the Puerto Rico Aqueduct and Sewer Authority (PRASA) and the 20-year GO and 30 year Revenue Bonds Bond Buyer indexes.

Consistent with the injunctive relief: "The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular "fit" of Puerto Rico into any economic model which may be used from other jurisdictions."  Docket No. 480, page 94.

Risk-Free Rate and Equity Rate.  The same risk free rate as used in the equity risk premium (S&P 500 average return, risk-free) rate.  The Administrator of ORIL does not seem to have any objections as he uses the same suggestion accepted in Exhibit WW of Defendants (used in Option 1.6 of Exhibit WW).  ORIL has used an equity risk free rate (ERP) since January of 2011.  But ERPs must be defined and currently use the same risk rate definitions.

### *Other Clarifications to Regulation No. 12*

Agreed upon modifications.  Suiza, at the original brief, Docket No. 2225, adds that Regulation 12 has various terms and parameters that remain undefined and certain regulatory accounts that are missing.  Further, Suiza and VTM have used a more precise definition as to certain terms and definitions.   Docket No. 2225, page 44, "Other Specified Modifications to ORIL's Proposed Regulation 12 Language."  There seems to be no disagreement by the parties as to the above subject matter.  *See* Docket No. 2225, pages 44-45 (Section B and § B.1 as to designation of regulatory accounts and procedures to measure reasonable costs, as well as par. B.2 "Section 6.B.1 "Fluid Milk Business Revenue Accounts").

The Court hereby orders the parties to meet within the next ten (10) days of this order and advise the court as to the agreements and/or disagreements within 10 days after the required meeting. Those items that remain in disagreement shall be resolved by the Court at the permanent injunction trial.

---

Excluded accounts agreed by all experts must be clearly stated in the proposed Regulation No. 12.  "[T]he plants must pay 3 cents to the Special Marketing Fund, 0.5 cents to the Auditing Program and 1.5 cents to Regulatory Accrual."  As these accounts are not authorized as an expense for the calculation of the regulatory margin, they must be clearly excluded.  Docket No. 2225, page 46.

Exclusivities.  The Court agrees with transparency as is stated for exclusivities.  That is that exclusivities must be clearly excluded as authorized expenses.  Docket No. 2225, page 46.  The fact that "exclusivities" are not included as an expense, is to be clearly set forth.[43]

Bad or Irrefutable Debts.  Debts that are nonrecurring and irregular in nature as a bankruptcy, constitute a generally accepted accounting principle ("GAAP").  The Court encourages the Administrator to develop a parameter of acceptance as to this accepted accounting principle.

Return of Damaged Products.  In cases of force majeure returns, acts of God, Suiza proposes that a procedure be accepted based on generally accepted accounting principles ("GAAP") to protect the plants from events out of the control of the plants.  The court joins in the request, but cannot order the inclusion of said parameters before the permanent injunction determination.

Automatic Adjustments.  Both Suiza and VTM request the creation of a procedure for volatile accepted expenses as electricity, diesel, resin, to taxes and minimum wage increases that may be increased.  The Court deems that waiting for years for an adjustment in a recognized item that increases over 5% borders on a violation of due process in a regulated market as is the Milk Industry in Puerto Rico of milk.  The Court notes that, despite the obligation stated in the Law at 5 L.P.R.A.

_____

[43]        Exclusivities are clearly expressed as not included within authorized expenses at the Experts' Agreement.  Docket No. 1003, page 2, par. 1.d.

98

§1107(e), price reviews have not been taking place annually since the Court has been handling this

case (i.e., 2004 thru 2013). The last price adjustment was notified to Plaintiffs on January 10, 2011

and became effective on  January 20, 2011, Docket entries No. 1814, and 2228 at page 13.  All

increases in diesel, petroleum, and resin and taxes would have to wait at least 18 months.  Having

a significant increase on electricity, diesel and/or water, taxes or minimum wages for 18 months

without any price adjustments, the Court insists borders on a federal due process violation.  This

matter, if not accepted by the Administrator, will be decided by the Court at the permanent injunction

trial.

The Court considers that 5% of any individual accepted cost item should receive an automatic

up or down adjustment.  The Court is not, however, ordering said mechanism to be in place.  But

upon proper legal support, would not hesitate to do so.

Hence, the Court hereby orders that a hearing be held on the amount of the contempt fine,

aggravating or mitigating circumstances, the appropriate parties responsible to pay, as well as the

amount of the corresponding fine to each party.[44]  The Court has enumerated the potential event

constituting contempt.  The Court may have missed certain other critical areas; enumeration,

---

[44]     Sanctions are a matter of discretion, *Angulo Alvarez v. Aponte de la Torre*, 170 F.3d 246
(1st Cir.1999).  The appropriateness of a sanction depends on the circumstances of the case.  *Torres Vargas v.
Pereira*, 431 F.3d 389, 392 (1st Cir.2005).  In *Benítez García v. González Vega*, 468 F.3d 1, 5 (1st Cir.2006), quoting
from *Robson v. Hallenbeck*, 81 F.3d 1, 2-3 (1st Cir.1996), the Court set the following guidelines when considering
the imposition of sanctions:

> Among those commonly mentioned (this list is not complete) are the severity of
> the violation, the legitimacy of the party's excuse, repetition of violations, the
> deliberateness vel non of the misconduct, mitigating excuses, prejudice to the
> other side and to the operations of the court, and the adequacy of lesser
> sanctions.... There is also a procedural dimension.

Sanctions are warranted without any prior warnings.  *Vázquez-Rijos v. Anhang*, 654 F.3d 122
(1st Cir.2011).  In the instant case, however, the Court has warned the defendants several times.

therefore, is not *numerus clausus*.  The hearing is only argumentative and based exclusively on the record.  The hearing shall be limited to one hour per side to be shared, if necessary, as follows: VTM/Suiza v. ORIL/Secretary of Agriculture/Dr. Ronald W. Cotterill.  The contempt hearing to determine the dollar amount of the fine(s), is scheduled for **October 31, 2013 at 9:00 a.m. at the Old San Juan Courtroom 4**.

### *Remedy as to the Injunction Relief*

As to the injunctive relief requested, the Court orders that Option 1.6, Docket No. 2071-3, page 3 *et seq*., also Exhibit WW, Option 1.6, be placed in effect within the next thirty (30) days from the entering of this *Opinion and Order*, except that all matters ordered within this Court in this *Opinion and Order*, as well as orders entered prior thereto, shall be added to the Option 1.6 in any matter not included in Option 1.6 or that may be contradicted or modified by said Option.  The Court warns that any attempt to issue a price order by the Administrator, the Secretary of Agriculture or the Secretary of Consumers Affairs against the clear mandate of this *Opinion and Order* shall cause personal contempt findings, which may be elevated to criminal contempt repercussions.  The Court shall also order on October 15, 2013, an appropriate remedial retroactive order as to Option 1.6, as amended.  The remedy also includes, as suggested by VTM and Suiza, but is not limited to the establishment of the following:

1.    A capital base of fresh milk processor and the methodology for its calculation.

2.    A cost equity capital and precise parameters for its calculation.

3.    Inclusion in the ROE formula, the specific unsystematic risk, as clearly required in Section (2)(e) of the *Experts' Agreement*.

4.    Establishment of equity accounts to regulate gross income and gross margin of the

100

two milk processors.

5.     Correction of expense accounts as stated in this *Opinion and Order* and prior orders
of the Court.

6.     To provide adequate contribution for a regulatory accrual reserve account for
payments to milk processors.

### *Denial of a Stay under Fed.R.Civ.P. 62(c)*

The Court denies any stay of the instant injunctive *Opinion and Order*, as to lack of
compliance, and contempt by various Secretaries of Agriculture, as well as ORIL's executives,
pursuant to the provisions of Fed.R.Civ.P. 62(c).  The reasoning of the Court is that the *Injunction
Order* has been affirmed by the First Circuit on the merits at the appeals level, at an *in banc* hearing,
and the petition for *certiorari* was also been denied at the Supreme Court level, after considering the
position of the Attorney General of the United States.

Furthermore, defendants' Option 1.6b and Exhibit WW, Docket No. 2064, pages 7-10,
includes the following: (a) the regulatory accrual accounts; (b) the non-inclusion of Dean Foods, Inc.
as per *Order* of September 22, 2010, Docket No. 1697; (c) a risk free rate as per *Order* of June 28,
2011, Docket No. 1965; (d) return on equity including nonzero "unsystematic risk" premium of
1.53% for all years; and, (e) excludes negative and zero company beta in median and composite
estimates.  *See* Docket No. 2071-3, page 7.  Thus, most of the Court's orders have been included at
Exhibit WW, Docket No. 2064, pages 7-10, except: (a) the Puerto Rico risk factor; (b)
merchandisers expenses, and (c) marketing and promotions.  The Court understands that the legal
grounds are the following, due process and equal protection constraints authorized under *Duquesne*,
488 U.S. at 307; *Tenoco*, 876 F.3d at 1026-1027, and *Vaquería Tres Monjitas, Inc.*, 587 F.3d at 482-

483.

## Conclusion

For the reasons stated above:

A Contempt Hearing is set for **October 31, 2013 at 9:00 a.m.**

A Final Injunction Hearing is set for **November 18-22, 2013 at 9:00 a.m.**

The Clerk will notify a copy of this *Amended Opinion and Order Nunc Pro Tunc*, by certified

mail return receipt requested to the Puerto Rico Secretary of the Department of Consumers Affairs.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 23$^d$ day of September, 2013.

s/Daniel R. Domínguez
DANIEL R. DOMINGUEZ
United States District Judge