# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------ x
                         :

In re:                     :
                     :

THE FINANCIAL OVERSIGHT AND  :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,  :  Title III
                     :

      as representative of      :  Case No. 17-BK-3283 (LTS)
                     :

THE COMMONWEALTH OF PUERTO RICO, *et al.*,  :  (Jointly Administered)
                     :

      Debtors.[1]         :
------------------------------------------------------------------------ x

# OMNIBUS OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) DISCLOSURE STATEMENT FOR THIRD AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF COMMONWEALTH OF PUERTO RICO, *ET AL.* AND (II) RELATED MOTIONS

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 5

I.     PROPOSED PLAN ...................................................................................... 6

    a.    Overview of Plan Treatment of GO/PBA Bond Claims ...................... 6

        i.    CW Bonds Claims ............................................................... 7

        ii.    PBA Bonds Claims ............................................................. 9

        iii.   CW Guarantee Bond Claims ............................................... 9

    b.    Overview of Plan Treatment of Clawback Claims ........................... 11

    c.    Overview of Plan Treatment of ERS Bond Claims ......................... 13

    d.    Overview of Plan Treatment of Various General Unsecured Claims
        Against Commonwealth.................................................................... 14

    e.    Overview of Plan Treatment of Certain Other Claims ..................... 16

OBJECTION ....................................................................................................... 16

I.     LEGAL STANDARD.................................................................................. 16

II.    DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE IT DOES
      NOT PROVIDE ADEQUATE INFORMATION ........................................ 18

    a.    Inadequate Disclosures Regarding Creditor Recoveries.................... 19

        i.    Failure to Provide Estimated Recoveries for CW General
            Unsecured Claims (Class 55)............................................. 19

            1.    Failure to Provide Estimate of Class Size.................... 20

            2.    Inadequate Disclosures Regarding Avoidance Action Trust ....... 22

        ii.    Disclosure Statement Understates Recovery Rates for Settling
            Bond Creditors ................................................................... 23

            1.    All Sources of Recovery Must Be Included in Expected
                Recovery ...................................................................... 24

            2.    Disclosure Statement Must Explain Allowance in Full of
                Original Issue Discount and Corresponding Impact on
                Recovery Rates ............................................................ 29

        iii.   Inadequate Disclosures Regarding Other Favored Classes and
            Unclassified Creditors ........................................................ 31

            1.    Inadequate Disclosures Regarding ACR Procedures and
                Payments to ACR Claimants ........................................ 33

            2.    Inadequate Disclosures Regarding Payments to
                Unclassified Creditors.................................................. 35

# TABLE OF CONTENTS

(continued)

| | | | Page |
|---|---|---|---|

b.   Inadequate Disclosures Regarding Best Interests of Creditors ............................ 37

c.   Inadequate Disclosures Regarding Value and Availability of Debtors' Assets ................................................................................................... 37

    i.   Inadequate Disclosures Regarding Debtors' Assets ................................ 40

    ii.   Inadequate Disclosures Regarding Essential Services ............................ 43

d.   Inadequate Disclosures Regarding Terms of Key Settlements ............................ 44

e.   Inadequate Disclosures Regarding Releases ....................................................... 47

    i.   Inadequate Disclosures Regarding Certain Specific Releases ................ 50

f.   Inadequate Disclosures Regarding Risk Factors ................................................. 51

g.   Inadequate Disclosures Regarding Feasibility .................................................... 53

III.   CLASSIFICATION SCHEME VIOLATES FIRST CIRCUIT'S STRICT APPROACH TO CLASSIFICATION ........................................................................ 53

a.   In the First Circuit, the Only Legal Character of Claims that Matters Is that of Priority or Rights in Property ................................................................... 55

b.   Business, Economic, or Governmental Rationales May Be Relevant In Other Circuits—But Are Irrelevant Under Granada Wines and Under PROMESA ............................................................................................................. 57

c.   Strict Classification Argument Is Not a Gerrymandering Argument or Disguised Unfair Discrimination Argument ........................................................ 58

d.   Differences in Proposed Treatment Do Not Justify Separate Classification ....... 59

    i.   Prepetition Differences Do Not Render Retiree Claims and General Unsecured Claims Dissimilar ................................................................... 60

    ii.   Proposed Treatment Under a Plan Cannot Justify Separate Classification ............................................................................................... 61

IV.   DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE PROPOSED PLAN IS PATENTLY UNCONFIRMABLE .......................................... 63

V.   SOLICITATION PROCEDURES OBJECTION ............................................................ 65

VI.   CONFIRMATION PROCEDURES MOTION OBJECTION ......................................... 68

a.   No Initial Objection Should Be Required ............................................................ 69

b.   Objection/Discovery Procedures Are Inconsistent with Accepted Practice and Unfairly One-Sided ....................................................................................... 72

RESERVATION OF RIGHTS ..................................................................................................... 75

CONCLUSION ............................................................................................................................. 75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 4th St. E. Investors, Inc.*,
2012 WL 1745500 (Bankr. C.D. Cal. May 15, 2012) ...........................................61

*In re Acemla De P.R. Inc.*,
No. 17-02021 ESL, 2019 Bankr. LEXIS 182 (Bankr. D.P.R. Jan. 22, 2019) ........................17

*In re Allegheny Int'l, Inc.*,
100 B.R. 247 (Bankr. W.D. Pa. 1989) .....................................................30

*In re Am. Capital Equip.*,
688 F.3d 145 (3d Cir. 2012)...............................................................64

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
311 U.S. 138 (1940)......................................................................24

*In re Bjolmes Realty Tr.*,
134 B.R. 1000 (Bankr. D. Mass. 1991) .................................................56, 57

*In re Chateaugay Corp.*,
961 F.2d 378 (2d Cir. 1992)..............................................................30

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ............................................. *passim*

*In re City of Detroit, Michigan*,
Case No. 13-53846 (Bankr. E.D. Mich. Feb. 24, 2014) ...............................71, 74

*In re City of Stockton, Cal.*,
486 B.R. 194 (Bankr. E.D. Cal. 2013) ..................................................36

*Class Five Nev. Claimants v. Dow Corning (In re Dow Corning Corp.)*,
280 F.3d 648 (6th Cir. 2002) .........................................................49, 50

*In re Coalinga Reg'l Med. Ctr.*,
608 B.R. 746 (Bankr. E.D. Cal. 2019)...................................................17

*In re Connector 2000 Ass'n, Inc.*,
447 B.R. 752 (Bankr. D.S.C. 2011).....................................................39, 40

*In re County of Orange*,
219 B.R. 543 (Bankr. C.D. Cal. 1997)..................................................16, 17

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*County of Orange v. Merrill Lynch & Co.* (*In re County of Orange*),
   191 B.R. 1005 (Bankr. C.D. 1996) ..................................................................38, 40

*In re Crosscreek Apartments*,
   213 B.R. 521 (Bankr. E.D. Tenn. 1997) ................................................................63

*In re Cumulus Media Inc., et al.*,
   Case No. 17-13381 (SCC) (Bankr. S.D.N.Y. Dec. 21, 2017)................................71

*In re El Comandante Mgmt. Co., LLC*,
   359 B.R. 410 (Bankr. D.P.R. 2006) .....................................................................64

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) .........................................................17, 18, 47

*Franklin High Yield Tax-Free Income Fund v. City of Stockton* (*In re City of
   Stockton*),
   542 B.R. 261 (9th Cir. B.A.P. 2015)..........................................................43, 58, 62

*In re FRG Inc.*,
   121 B.R. 451 (Bankr. E.D. Pa. 1990) ...................................................................66

*In re Fullmer*,
   No. 09-50086-RLJ-11, 2009 WL 2778303 (Bankr. N.D. Tex. Sept. 2, 2009) .......45

*Gato*, 183 B.R. ........................................................................................................57

*Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension
   Fund*,
   748 F.2d 42 (1st Cir. 1984)..................................................................... *passim*

*In re Hanish, LLC*,
   570 B.R. .................................................................................................59

In re 266 Washington Assocs., 141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd sub nom.*,
   *In re Washington Assocs.*,
   147 B.R. 827 (E.D.N.Y. 1992) ...........................................................................59

*In re Jeppson*,
   66 B.R. 269 (Bankr. D. Utah 1986) .....................................................................17

*In re Ligon*,
   50 B.R. 127 (Bankr. M.D. Tenn. 1985) ................................................................37

### TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Lorber v. Vista Irr. Dist.*,
    127 F.2d 628 (9th Cir. 1942) .................................................39

*In re Lower Bucks Hosp.*,
    571 Fed. App'x 139 (3d Cir. 2014).......................................47

*In re Maxus Energy Corp. et al.*,
    Case No. 16-11501 (Bankr. D. Del. Feb. 17, 2017) .............71

*In re Millennium Lab Holdings II, LLC.*,
    945 F.3d 126 (3d Cir. 2019)..................................................49

*In re Monroe Well Serv.*,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ...................................19

*In re Moshe*,
    567 B.R. 438 (Bankr. E.D.N.Y. 2017)..................................64

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ...............................38, 44

*In re Nat'l/Northway Ltd. P'ship*,
    279 B.R. 17 (Bankr. D. Mass. 2002) ..............................57, 60

*Nationwide Mut. Ins. Co. v. Optel, Inc. (In re Optel, Inc.)*,
    60 Fed. App'x 390 (3d Cir.2003)..........................................60

*Nelson v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.)*,
    216 B.R. 175 (Bankr. E.D. Va. 1997)..............................17, 19

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) .....................................45

*PBGC v. Enron Corp.*,
    No. 04 CIV 5499, 2004 U.S. Dist. LEXIS 21810 (S.D.N.Y. Nov. 1, 2004) ...................66, 71

*In re Quigley Co., Inc.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007)..................................64

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*,
    177 B.R. 791 (S.D.N.Y.1995), *aff'd*, 68 F.3d 26 (2d Cir.1995) .............................45

*In re River Valley Fitness One Ltd. P'ship*,
    Case No. 01-12829, 2003 Bankr. LEXIS 1252 (Bankr. D.N.H. Sep. 19, 2003) ...................56

## TABLE OF AUTHORITIES

(continued)

Page(s)

*In re Thornwood Associates*,
  161 B.R. 367 (Bankr. M.D. Pa. 1993) *aff'd*, 162 B.R. 438 (M.D. Pa. 1993) .........................61

*In re Washington Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...............................................................................65

*In re Zolner*,
  173 B.R. 629 (Bankr. E.D. Ill. 1994), *aff'd sub nom, Chicago Truck Drivers v.
  Zolner*, 249 B.R. 287 (N.D. 2000) .................................................................................66

**Statutes**

23 L.P.R.A. § 104(c)(1) .....................................................................................................32

11 U.S.C. § 502(b)(2) ........................................................................................................29

11 U.S.C. § 1103(c)(3)........................................................................................................68

**Other Authorities**

2008 Ann. Surv. of Bankr. Law 6 ......................................................................................30

*2021 Fiscal Plan for Puerto Rico*, Financial Oversight & Management Board for
  Puerto Rico (Apr. 23, 2021), https://drive.google.com/file/d/1reetKnfKsa1uR-
  A0u9l3FM6PfGamHCrx/view ......................................................................................42, 43

6 Collier on Bankruptcy ¶ 943.03 (16th 2021) ................................................................38

*Creditor Mediation Cash Support Materials*, EMMA (Dec. 17, 2020),
  https://emma.msrb.org/P11450397-P11124337-P11535399.pdf ...........................41

Fed. R. Bankr. P. 3018(a) ..................................................................................................66

Fed. R. Civ. Pro. 26(b)(2)(c)............................................................................................73

*Fiscal Plan for the Municipal Revenue Collection Center*, Financial Oversight &
  Management Board for Puerto Rico (Apr. 23, 2021),
  https://drive.google.com/file/d/1KijWkWgzKpJUvGNGwvfBvDCnt6psoBWh
  /view..........................................................................................................................43

Press Release, *New Debt Agreement Opens Path to Exit from Bankruptcy,
  Financial Oversight & Management Board for Puerto Rico* (Feb. 23, 2021),
  https://drive.google.com/file/d/1go1HKPzYdtGFVFSfEotCgGDW7THhtn0j/v
  iew...........................................................................................................................27

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

Reorg Research, *Oversight Board Defends Public Pension Cuts, Cites 'Decades'
of Government Mismanagement, Title III Priority Rules; Gov. Rosselló
Reiterates Opposition to Pension Cuts* (May 17, 2019) .........................................................52

Reorg Research, *Sobrino Says Commonwealth Will Not Approve Legislation to
Issue New Commonwealth Debt If Plan of Adjustment Contains Pension Cuts;
All Other Disputes 'Manageable'*(June 14, 2019) ..................................................................52

Reorg Research, *UPDATE 1: Pierluisi Calls Amended Plan Terms 'Feasible' But
Reiterates Commonwealth Will Not Support Plan With Pension Cuts; Judge
Swain Directs Briefing on Oversight Board's Requested Extension* ......................................52

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee"),[1] respectfully files

this omnibus objection (the "Objection") to (i) the *Disclosure Statement for the Third Amended*

*Joint Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Docket No.

16741] (the "Disclosure Statement") and the related amended motion seeking, among other

things, approval of the Disclosure Statement and the Debtors' proposed solicitation procedures

[Docket No. 16756] (the "Disclosure Statement Motion") and (ii) the *Motion of Debtors for an*

*Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to*

*Confirmation and Discovery in Connection Therewith* [Docket No. 16757] (the "Confirmation

Procedures Motion").  In support of its Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Bankruptcy Code grants debtors the opportunity for relief not otherwise

available—most notably, the extraordinary and powerful relief of the bankruptcy discharge.  The

*quid pro quo* for this relief is compliance with the various requirements of the Bankruptcy Code,

including full and transparent disclosure.

2.      This applies equally to a municipal debtor.  The Tenth Amendment may operate

to limit the extent to which a bankruptcy court may restrict a municipal debtor's use of its

revenue or property during the case, or the extent to which a court may interfere with a municipal

debtor's right to make political or spending decisions as it sees fit.  However, no municipal

debtor has the power to grant itself the affirmative and extraordinary relief available under the

Bankruptcy Code, including to discharge debt.  That power is reserved for the bankruptcy courts,

and the bankruptcy courts alone.

---

[1]     The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and
COFINA.

3. As with any debtor, a municipal debtor seeking a discharge must come to the bankruptcy court—and, as with any debtor, it must be prepared to pay the price of full disclosure: it must be prepared to explain its decisions, to justify its rationales, to articulate its priorities, to defend its conduct, its management, and its spending choices, and to leave no doubt as to why the debtor believes that the sum of these positions satisfies the Bankruptcy Code's confirmation requirements. In providing these disclosures, the debtor—municipal or otherwise—must provide adequate information for creditors to determine, in their own judgment, whether they support the debtor's decisions, priorities, and allocations of value and spending choices, and whether they agree that the debtor has put forth a plan that comports with the Bankruptcy Code's confirmation requirements.

4. Unfortunately, the Oversight Board has filed a Disclosure Statement that—notwithstanding its enormous size of more than 2,000 pages with exhibits—does none of these things and answers none of these questions. Instead, it leaves vital questions unanswered, is misleading with regard to numerous important issues, and glosses over others. For example:

- The Disclosure Statement contains no estimate of (i) the recovery percentage that general unsecured creditors in Class 55 could expect under the Proposed Plan (as defined herein), or (ii) even the size of their class.

- The Disclosure Statement artificially decreases the estimates of the recovery percentages being offered to GO/PBA Creditors and Clawback Creditors (each as defined herein) by attributing a **zero valuation to contingent bonds with a face value of approximately $9 billion** that will be issued in favor of such creditors. Moreover, while the value of these instruments may be hard to precisely determine today, the Oversight Board and the creditors that will receive these instruments know, today, that the performance threshold for payment on these "contingent" instruments have already been achieved, such that these "contingent" instruments **are already "in the money**."

- The Disclosure Statement artificially decreases the estimates of the recovery percentages being offered to certain GO/PBA Creditors by including in the agreed allowed amount of their claim by approximately **$250 million of unamortized original issue discount**, even though the Bankruptcy Code expressly disallows such claims as claims for unmatured interest. Moreover, the Disclosure Statement itself does not even disclose that the allowed claim includes these amounts, and this information is buried instead in an

2

exhibit.  Nor does the Disclosure Statement provide any rationale or justification for
doing so.

- The Disclosure Statement artificially decreases the estimates of the recovery percentages
  being offered to Settling Bond Creditors (as defined herein) by failing to include in such
  estimates up to **$490 million** in various "consent," "consummation," and "support" fees.
  Nor does it identify any legal entitlement to these fees.

- The Disclosure Statement articulates no rationale for the separate classification of various
  types of unsecured claims, or why claims in those classes will receive a recovery
  significantly greater than the recovery offered to unsecured claims in Class 55.

- The Disclosure Statement makes it impossible for creditors that have claims of the type
  covered by the ACR Order (as defined herein) to know if (and if not, why not) they will,
  in fact, be transferred to the ACR process and paid in full, as other ACR claims have
  been.  This includes tens of thousands of employees and union members, represented by
  the Committee, who have grievance claims against the Commonwealth and should be
  transferred to the ACR process.

- The Disclosure Statement does not disclose that the Debtors have been paying certain
  favored prepetition creditors the full amount of their prepetition claim, or explain which
  creditors have been selected for these payments and why.

- The Disclosure Statement does not discuss the value and availability of the Debtors'
  assets (or even contain a "sources and use" analysis), let alone explain to creditors how
  the Oversight Board intends to demonstrate that its decisions about the use, allocation,
  and monetization of its assets represent a reasonable effort to satisfy the Debtors'
  obligations to their creditors.  The Committee believes that there are billions of dollars in
  available assets which could significantly improve recoveries to CW General Unsecured
  Claimants. Moreover, while the Oversight Board recommends a minimum liquidity
  balance of no less than $2.5 billion, there is no disclosure regarding the estimated cash on
  hand as of an assumed Commonwealth Effective Date.

- The Disclosure Statement is bereft of key details regarding the terms on which the
  Oversight Board has agreed to settle viable and pivotal litigation, including litigation
  brought by the Committee challenging the validity and priority of GO and PBA Bonds.  .

- The Disclosure Statement's descriptions of the releases to be provided under the
  Proposed Plan are internally inconsistent, and make it impossible for a reviewing creditor
  to know what claims are being released, who is granting those releases, who is getting
  those releases, and for what consideration.

- The Disclosure Statement does not disclose the extent to which the Proposed Plan is
  dependent on obtaining legislative approval for certain actions under the Proposed Plan,
  or that the Government is actively opposed to, and has passed litigation that would make
  it impossible to consummate, the Proposed Plan.

- The Disclosure Statement disingenuously states, with no qualification, that "following briefing," the Court "issued an order denying the [Committee's Original Rule 3013 Motion.]"  This ignores that the denial was without prejudice and that the Court expressly permitted the Committee to raise those same issue in this Objection.  This misrepresentation is obviously and clearly designed to give creditors the false impression that the issues raised in the Original Rule 3013 Motion have been resolved in the Oversight Board's favor.

*****

5.      The Debtors' bankruptcy is the largest and most complex municipal bankruptcy in history.  If there was ever a case in which full and transparent disclosure should not be compromised, it is this one.  Yet, from the very first day of these Title III cases, and on an almost constant basis since then, creditors of all types and classes have been stymied in their efforts to obtain more complete and transparent disclosure from the Oversight Board and/or the Debtors, who have hid behind the shield of the Tenth Amendment to obscure (among other things) their finances, their decision making, and the their basis for favoring some creditors over others.  Whatever the legality of those years of obfuscation, that must stop now, particularly when the Oversight Board is offering certain disfavored, including local Puerto Rico-based creditors, mere pennies on the dollar.  Unfortunately, the Disclosure Statement is just more of the same: despite its tremendous length, it is startlingly devoid of basic information required of any disclosure statement, and contains numerous misleading and inaccurate statements.

6.      In addition to its failure to provide adequate information, the Disclosure Statement should be denied because the Proposed Plan is premised on a classification a scheme that is not legal under controlling First Circuit precedent or under PROMESA.  Specifically, and as explained herein and in the Prior Rule 3013 Pleadings (as defined herein), retiree benefit claims cannot be classified separately from the general unsecured claims in Class 55 because there is no difference in their respective rights under the Bankruptcy Code.

7.      The Oversight Board cannot avoid the disclosure requirements by arguing that the

Committee is likely to recommend to its constituents that they vote to reject the Proposed Plan,

making adequate disclosure unnecessary.  Initially, all creditors—even those who are likely to

reject a proposed plan—are entitled to the level of disclosure required by the Bankruptcy Code.

More importantly, the Committee will not, itself, vote on the Proposed Plan.  Even if the

Committee is likely to recommend to its constituents that they vote against the current Proposed

Plan (which provides less than 5% to the vast majority of unsecured creditors), the Committee

does not, will not, and cannot simply direct its constituents how to vote.  Instead, it owes an

obligation to its constituents to ensure that they have the information they—and to which they

are entitled under the Bankruptcy Code—to empower them to cast their own votes as they see fit.

8.      For all these reasons, and as detailed below, it would be impossible for a

hypothetical investor to make an informed decision about whether to vote to accept or reject the

Proposed Plan based on the information in the Disclosure Statement.  The Disclosure Statement,

therefore, does not meet the Bankruptcy Code's requirements and should not be approved for

distribution to creditors for purposes of soliciting votes on the Proposed Plan.  Lastly, for the

reasons further detailed below, the Court should also deny the Disclosure Statement Motion and

the solicitation procedures therein, as well the Confirmation Procedures Motion.

## **BACKGROUND**

9.      On May 11, 2021, the Oversight Board filed the Disclosure Statement and the

related *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et

al.* [Docket No. 16740] (the "Proposed Plan").[2]  Two days later, on May 13, 2021, the Oversight

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the
Disclosure Statement or the Proposed Plan, as applicable.

Board filed the Disclosure Statement Motion and the Confirmation Procedures Motion.[3]

## I.   **Proposed Plan**

10.     The Proposed Plan provides for sixty-five Classes of claims (not including

subclasses)[4] and reflects the terms of multiple plan support agreements.[5]  While a full description

of the treatment of all claims under the Proposed Plan is beyond the scope of, and not necessary

for, this Objection, the Committee highlights the following provisions regarding the treatment of

certain claims that are most relevant to this Objection.

### a.   **Overview of Plan Treatment of GO/PBA Bond Claims**[6]

11.     The Proposed Plan sets forth 44 separate Classes of claims against the

Commonwealth arising from or relating to the following bonds:[7]

- various vintages of GO Bonds, including separate Classes for GO Bonds insured
  by certain monoline insurers (collectively, the "CW Bond Claims"), *i.e.,* Classes
  14, 15, 16, 17, 18, 19, 20, 27, 28, 29, 30, 33, 34, 35, 36, 37, 38, 39, 40, 43, 44, and
  45, with an aggregate estimated claim amount of approximately $13.74 billion;

- various vintages of PBA Bonds, including separate Classes for PBA Bonds
  insured by certain monoline insurers (collectively, the "PBA Bond Claims"), *i.e.*,
  Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, with an aggregate estimated claim amount
  of approximately $4.67 billion; and

- guarantee claims on account of the Commonwealth's guarantee of, among other
  things, various vintages of PBA Bonds (collectively, the "CW Guarantee Bond

---

[3]   On June 10, 2021, the Oversight Board filed its long-promised Best Interests of Creditors Report [Docket No.
16927 (the "Best Interest Test Report").  The Best Interest Test Report is over 100 pages of complicated legal
and financial analysis, and contains numerous exhibits and annexes and cross-references.  The Committee
continues to analyze the Best Interest Test Report.

[4]   Proposed Plan § 4.1.

[5]   *See* Disclosure Statement §II.B.1.

[6]   This objection includes numerous estimates, based on the Committee's calculations, of the possible recovery
being offered to certain favored creditors (for example, that under certain scenarios, certain creditors could see
recoveries as high as 100%).  The Committee anticipates that the Oversight Board will disagree with the
Committee's calculations, and will advance any number of explanations purporting to show the errors in the
Committee's calculations.  **That, however, is precisely the point**: Because the Disclosure Statement does not
contain adequate information regarding so critical and basic a topic, the Committee has been forced to use its
own assumptions and understanding.  Further, what is abundantly clear, and will be demonstrated herein, is that
the estimates that are in the Disclosure Statement are grossly incomplete and misleading.

[7]   Disclosure Statement §II.B.

Claims"), *i.e.*, Classes 21, 22, 23, 24, 25, 26, 31, 32, 41, 42, 46, and 47, with an aggregate estimated claim amount of approximately $3.94 billion.[8]

12.     The treatment of these various bond claims reflects the terms of the settlement reached with the GO/PBA PSA Creditors pursuant to the GO/PBA Plan Support Agreement, dated as of February 22, 2021.  As detailed below, the recovery rates on account of these bond claims is substantial, and, if all distributions or payments to holders of GO Bond Claims and PBA Bond Claims are taken into account, likely ranges between **72% and 85%**, and could, under certain scenarios, be as high as **100%**.[9]  The lower recovery rates provided in the Disclosure Statement are misleading because they do not take into account all forms of recovery to bondholders, including, most notably, the value of certain contingent value instruments that are currently "in the money," as further detailed below.

        i.   CW Bonds Claims

13.     Under the Proposed Plan, holders of CW Bond Claims will receive:[10]

- cash in the aggregate amount of approximately $4.32 billion;

- new general obligation bonds to be issued by the Commonwealth on the Effective Date of the Proposed Plan (the "New GO Bonds") with an aggregate principal balance of approximately $5.77 billion; and

- new general obligation securities in the form of contingent value instruments to be issued by the Commonwealth on the Effective Date of the Proposed Plan ("GO

---

[8]   CW Guarantee Bond Claims on account of PBA Bonds are reduced by the recovery received on account of the primary PBA Bond Claim against PBA (which recovery is 23%).

[9]   The potential maximum recovery is based on the nominal maximum lifetime recovery cap of the CVIs allocated to GO and PBA bondholders.  The Disclosure Statement does not provide any present value or recovery estimates for such CVIs.  Moreover, these recovery percentages (and the Committee's estimate of the true extent of such recoveries) do not take into account the actual return on investment for many holders of GO Bonds and PBA Bonds.  In particular, many of such holders did not purchase the bonds at issuance at par, but instead purchased them at steep discounts in the secondary market.  By way of example, those bondholders that purchased GO Bonds at 30 cents on the dollar would now obtain a **150% return on their investment**, even without taking into account all the ways that the Disclosure Statement actually understates the true value of likely recoveries.  This is not mere speculation.  In fact, beginning in late 2017 and through early 2018, GO Bonds traded at or below 30 cents and reached a low of 20 cents.

[10]   As noted below, certain holders of CW Bond Claims will also receive an aggregate amount of $400 million in "consent" fees.

CVIs") with a maximum lifetime cap of approximately $2.52 billion (*i.e.*, the portion of the GO CVIs allocated to holders of CW Bond Claims).[11]

14.    The precise allocation of cash, New GO Bonds, and GO CVIs for each Class of CW Bond Claims varies with the vintage of the GO Bonds—with more recent vintages receiving lower recoveries than their fellow bondholders who hold vintage bonds.[12]  According to the Disclosure Statement, the estimated recovery for the various CW Bond Claims ranges from 67.8% to 77.6%.  However, these recovery estimates do not reflect the true recovery percentages to holders of CW Bond Claims.  For one, the recovery estimates in the Disclosure Statement do **not** take into account the value of the GO CVIs, even though the GO CVIs, based on projections in the Commonwealth's current Fiscal Plan, are substantially "in the money"—meaning they have a quantifiable value today.  Even using conservative assumptions, the recovery on account of the GO CVIs likely increases the overall recovery rates for CW Bond Claims by at least 5 percentage points.[13]  In other words, the recovery rates for CW Bond Claims more likely range from **72.8% to 82.6%**.  Moreover, if the GO CVIs were to reach their maximum lifetime cap (*i.e.*, nominal payments of approximately $2.52 billion to holders of CW Bond Claims), the estimated recovery rates could exceed **95%**.[14]

---

[11]    Disclosure Statement § II.B. The value of the GO CVI is based on certain outperformance metrics of the 5.5% sales and use tax ("SUT") revenues compared to the projections contained in the Commonwealth's certified May 2020 Fiscal Plan.  The maximum lifetime cap for all GO CVIs (*i.e.*, GO CVIs to be distributed to holders of CW Bond Claims ($2.52 billion) and holders of CW Guarantee Bond Claims ($980 million)) is $3.5 billion.

[12]    Stated briefly, this is meant to reflect that more recent vintages have greater exposure to certain claims under bankruptcy law and non-bankruptcy law that would result in the disallowance of these claims, invalidity of the bonds, or the like.  Many of these claims now being settled by the Oversight Board were brought, in the first instance, by the Committee, either on its own or as co-plaintiff with the Oversight Board, and the Committee reserves all rights regarding the reasonableness of the agreed discounts based on the parties' respective legal positions, both absolutely and relatively.

[13]    This illustrative calculation is based on the SUT projections included in the Commonwealth's certified 2021 Fiscal Plan.

[14]    The potential maximum recovery is based on the nominal maximum lifetime recovery cap of the CVIs allocated to CW Bond Claims.  The Disclosure Statement does not provide any present value or recovery estimates for such CVIs.

15.     Finally, as further detailed below, the recovery estimates in the Disclosure Statement do not take into account an aggregate of $400 million in "consent" fees to be paid to the GO/PBA PSA Creditors and retail bondholders that vote to accept the Proposed Plan.  Taking these fees into account, would further increase the recovery rates of CW Bond Claims.

ii.   PBA Bonds Claims

16.     The Proposed Plan would award holders of PBA Bond Claims cash in an aggregate amount of $1.073 billion.  According to the Disclosure Statement, the estimated recovery rate for the PBA Bond Claims against PBA is 23.0%.  In addition, because the Commonwealth guaranteed the PBA Bonds, holders of PBA Bond Claims will also obtain a recovery on account of the related CW Guarantee Bond Claims against the Commonwealth. According to the Disclosure Statement, when these guarantee claims are taken into account, the estimated recovery rates for holders of PBA Bond Claims range from 74.8% to 80.4% (depending on the vintage of the PBA Bonds).  However, as noted below, actual recovery rates may be as high as 100% if the Clawback CVIs (as defined below) are taken into account.[15]

17.     As with the recovery estimates for CW Bond Claims, the recovery estimates for PBA Bond Claims also fail to account for the $400 million (aggregate) in "consent" fees to be paid to the GO/PBA PSA Creditors and retail bondholders that vote to accept the Proposed Plan. These fees further increase the recovery rates for PBA Bond Claims.

iii.  CW Guarantee Bond Claims

18.     Under the Proposed Plan, holders of CW Guarantee Claims (together with holders of CW Bond Claim and PBA Bond Claims, the "GO/PBA Creditors") will receive:

---

[15]   The potential maximum recovery is based on the nominal maximum lifetime recovery cap of the CVIs allocated to PBA Bond Claims.  The Disclosure Statement does not provide any present value or recovery estimates for such CVIs.

- cash in the aggregate amount of approximately $1.23 billion;

- new general obligation bonds to be issued by the Commonwealth on the Effective Date of the Proposed Plan ("Unew GO Bonds") with an aggregate principal balance of approximately $1.64 billion; and

- GO CVIs with a maximum lifetime cap of approximately $980 million (*i.e.*, the portion of the GO CVIs allocated to holders of CW Bond Guarantee Claims).

19.     As with the CW Bond Claims, the precise allocation of cash, New GO Bonds, and GO CVIs for each Class of CW Guarantee Bond Claims varies with the vintage of the underlying principal obligation (*e.g.*, the vintage of PBA Bonds).  According to the Disclosure Statement, the estimated recovery rates for the various CW Guarantee Bond Claims (without taking into account recovery on the primary claim) range from 67.3% to 74.5%.  The Disclosure Statement estimates that if the primary recovery on account of the PBA Bond Claims is taken into account, the recovery rates for holders of CW Guarantee Bond Claims range from 74.8% to 80.4%.[16]

20.     Again, these estimated recovery rates do **not** take into account the value of the GO CVIs, which as noted are currently "in the money."  Even using conservative assumptions, the recovery on account of the GO CVIs likely increases the overall recovery rates for CW Guarantee Bond Claims by at least 5 percentage points.  This means that the estimated recovery rates on PBA Bond Claims (including on account of the guarantee claims) more likely range from **79.8% to 85.4%**.  Moreover, if the GO CVIs were to reach their maximum lifetime cap (*i.e.*, nominal payments of approximately $980 million to holders of CW Guarantee Bond Claims), the estimated recovery rates could reach **100%**.[17]

---

[16]   The aggregate recovery rate for holders of PBA Bond Claims is not simply the sum of (a) the recovery rate on the PBA Bond Claim and (b) the recovery rate on the CW Guarantee Bond Claim because the CW Guarantee Bond Claim on account of PBA Bonds is reduced by the recovery received on account of the primary PBA Bond Claim against PBA.

[17]   The potential maximum recovery is based on the nominal maximum lifetime recovery cap of the CVIs allocated to holders of CW Guarantee Bond Claims.  The Disclosure Statement does not provide any present value or recovery estimates for such CVIs.

21.     Finally, the recovery estimates in the Disclosure Statement also do not take into account an aggregate of $400 million in "consent" fees to be paid to the GO/PBA PSA Creditors and retail bondholders that vote to accept the Proposed Plan.  Taking these fees into account further increases the recovery rates for PBA Bond Claims.

### b.  Overview of Plan Treatment of Clawback Claims

22.     The Proposed Plan sets forth four separate Classes of claims against the Commonwealth (Classes 56, 57, 58, and 59) arising from or related to the Commonwealth's retention of funds historically transferred to HTA, PRIFA, CCDA, and MBA in connection with revenue bonds issued by these instrumentalities.  According to the Disclosure Statement, the aggregate estimated claim amount for claims in these four Classes is approximately $8.6 billion (such claims, collectively, the "Clawback Claims" and the holders of Clawback Claims, collectively, the "Clawback Creditors").

23.     The treatment of the Clawback Claims reflects the terms of the settlement reached with the Clawback Creditors pursuant to the HTA/CCDA Plan Support Agreement, dated as of May 5, 2021.[18]  As detailed below, the recovery on account of these bond claims is contingent; however, under certain scenarios, aggregate recoveries on account of Clawback Claims (together with the primary claims against the issuers of the revenues bonds) could reach as high as **83%**.[19]

24.     Under the Proposed Plan, Clawback Creditors will receive new general obligation securities in the form of contingent value instruments to be issued by the Commonwealth on the

---

[18]   As part of this settlement, the Oversight Board has agreed (i) not to press forward with its claims (supported by the Committee) that the Clawback Claims should be **disallowed in their entirety**, (ii) to instead agree that the Clawback Claims should be allowed in the full amount of the face value of the asserted claims, with no discounts, and (iii) to grant the various recoveries based on that agreed allowed amount.

[19]   The potential maximum recovery is based on the nominal maximum lifetime recovery cap of the Clawback CVIs allocated to Clawback Claims.  The Disclosure Statement does not provide any present value or recovery estimates for such claims.

Effective Date of the Proposed Plan ("Clawback CVIs" and, together with the GO CVIs, the "CVIs") with a maximum lifetime cap of approximately $5.38 billion.

25.   The Disclosure Statement does **not** provide an estimated recovery rate for the Clawback Claims, merely noting that the recovery is "contingent."  While technically true, the Clawback CVIs, based on projections in the Commonwealth's current Fiscal Plan, are substantially "in the money."  Even using conservative assumptions, the Clawback CVIs likely represent a recovery of at least 15% against the Commonwealth.  Moreover, if the Clawback CVIs were to reach their maximum lifetime cap, the estimated recovery rates could be substantially higher.

26.   Further, the foregoing recovery is **in addition** to any recovery that the holders of Clawback Claims may obtain against the issuer of the underlying revenue bonds, *i.e.*, HTA, PRIFA, CCDA, and MBA.  While the Proposed Plan does not address the treatment of the bond claims against the issuers, those recoveries could also be material.  For example, according to the HTA/CCDA Plan Support Agreement, recoveries from HTA on account of HTA bonds is approximately 24% and recoveries from CCDA on account of CCDA bonds is approximately 25%.[20]  After taking these anticipated recoveries into account, holders of HTA and CCDA bonds could obtain an aggregate recovery of as high as 83% (assuming Clawback CVIs reach their maximum lifetime cap).

27.   In addition, the recovery estimates in the Disclosure Statement do not take into account an aggregate of approximately $15 million in "consent" fees and approximately $60 million in other fees to be paid by the Commonwealth to the HTA/CCDA PSA Creditors as well

---

[20]   These recoveries at HTA and CCDA are difficult to rationalize given that the Court has already ruled that the Clawback Creditors' asserted security interest are limited to amounts that have been received by those instrumentalities and deposited into certain specific funds and/or accounts.  These amounts are a fraction of the Clawback Creditors' purported security interests (and the asserted amount of their claims).

as an additional $125 million in "consent" fees to be paid (apparently) by HTA.  Taking these

fees into account further increases the recovery rates on account of the Clawback Claims.

### c.  Overview of Plan Treatment of ERS Bond Claims

28.     The Proposed Plan also contains the proposed treatment of claims arising from or

related to the ERS Bonds (the "ERS Bond Claims").  According to the Disclosure Statement, the

aggregate estimated amount of ERS Bond Claims is approximately $3.17 billion.

29.     The treatment of the ERS Bond Claims reflects the terms of the settlement

reached with certain ERS bondholders pursuant to the ERS Stipulation, dated as of April 2, 2021.

In particular, under the Proposed Plan, holders of ERS Bond Claims (together with the GO/PBA

PSA Creditors and the HTA/CCDA PSA Creditors, the "Settling Bond Creditors") will receive:

- cash in the aggregate amount of $373 million; and

- the right to receive the proceeds of the ERS Private Equity Portfolio or
  the interest in a trust that would hold the ERS Private Equity Portfolio (or
  if the Commonwealth does not purchase the ERS Private Equity Portfolio
  or the interests in such trust, the option to purchase the ERS Private
  Equity Portfolio or the interests in such trust for $70.75 million).

30.     According to the Disclosure Statement, the estimated recovery on account of ERS

Bond Claims is approximately 14.0%.  However, this estimate does **not** take into account

approximately $200 million in adequate protection payments that ERS bondholders have

previously received in these Title III cases (and which payments they may retain).  If those

payments are included, the recovery rate is actually 20.3%.

31.     Nor do the recovery estimates in the Disclosure Statement account for an

aggregate of $75 million in "consent" fees to be paid to ERS bondholders party to the ERS

Stipulation.  After taking these fees into account, the recovery rate of ERS Bond Claims further

increases to 22.7%.  While this rate may appear low in comparison to the recoveries to be

obtained by the GO/PBA PSA Creditors (but still more than five times the recovery offered to

general unsecured creditors), the Committee reminds the Court that the ERS bondholders have

not only lost (including in front of the First Circuit) the Oversight Board's litigation challenging

their secured claim to postpetition employee contributions, but the allowance of their claims is

also subject to numerous pending challenges, including that the ERS Bonds were issued *ultra*

*vires*, *i.e.*, without proper statutory authorization.  Under the Proposed Plan, the ERS Bond

Claims would be allowed in the full amount.  This is far different than the treatment offered to

CW General Unsecured Claims, none of which are deemed allowed under the Proposed Plan.  In

other words, a settlement that includes allowance of contested claims and thus guarantees the

percentage recovery on such amounts is worth significantly more than an offer that does not

include deemed allowance.

> **d.   Overview of Plan Treatment of Various General Unsecured Claims Against
> Commonwealth**

32.     The Proposed Plan also sets forth the treatment of various Classes of unsecured

claims, including (a) retirement and pension benefit claims of retirees in Class 48A ("Retiree

Claims") and active employees in Classes 48B, 48C, and 48D (the "Active Participant Claims"),

(b) retirement and pension benefit claims that accrued under the so-called System 2000 in Class

48E (the "System 2000 Participant Claim"), (c) claims of federally qualified health centers in

Class 53 (the "Med Center Claims"), (d) claims of certain dairy producers in Class 50 (the

"Dairy Producer Claims"), and (e) claims of vehicle owners who paid duplicate vehicle

insurance in Class 64 (the "Gracia-Gracia Claims").

33.     Any remaining unsecured claims against the Commonwealth are covered in Class

55 (the "CW General Unsecured Claims").

34.     With the notable exception of the CW General Unsecured Claims in Class 55,

most of the unsecured creditor Classes will see a substantial recovery:

14

- The recovery rates for Retiree Claims and Active Participant Claims (which claims include both pension payments and other post-employment benefits) will range from 92.5% (for those subject to the 8.5% reduction) to 100%;[21]

- Holders of System 2000 Participant Claims will receive the amount of their contributions to System 2000, plus prepetition interest;

- The recovery rate for Med Center Claims is 50%;

- The recovery rate for Dairy Producer Claims is 50%; and

- The recovery rate for Gracia-Gracia Claims is 100%.[22]

35.     However, in stark contrast to the foregoing claims (and the bondholder claims discussed above), the Proposed Plan provides holders of CW General Unsecured Claims with a paltry recovery in the low single digits.  In particular, the Proposed Plan offers holders of CW General Unsecured Claims (i) cash in the amount of $125 million and (ii) the net recoveries from certain avoidance and recovery actions.

36.     The Disclosure Statement itself does not provide a recovery estimate for CW General Unsecured Claims, nor an estimate for the size of the pool of allowed CW General Unsecured Claims, and this is not an accident.  It is not believable that, at this point of these cases, the Oversight Board has no estimate of the allowed claims pool.  The obvious implication is that the Oversight Board does not want to disclose its estimate because it shows a stark, and unconscionable, difference between what other creditors are receiving and what Class 55 is receiving.  That said, the Oversight Board's recently filed Best Interest Test Report estimate that the aggregate amount of CW General Unsecured Claims is at least $3 billion,[23] implying an estimated recovery percentage of approximately **4.2%** under the Proposed Plan.

---

[21]   Only those with retiree benefit payments of more than $1,500 per month are subject to the 8.5% reduction.

[22]   The Proposed Plan also provides that claims in the amount of $10,000 or less will be a separate Convenience Class and receive payment in full (and unsecured creditors with larger claims may elect to receive convenience class treatment by agreeing to reduce their claim amount $10,000).

[23]   The Best Interest Test Report does not specify the size of CW General Unsecured Claims in Class 55, but instead provides estimates of various categories of unsecured claims.  Some of these categories are excluded

### e. Overview of Plan Treatment of Certain Other Claims

37.     The Proposed Plan also sets forth the treatment of various other claims, including

claims against PBA and ERS.  Of particular note, the Proposed Plan provides that unsecured

claims against ERS in Class 63 (the "ERS General Unsecured Claims") will share, on a pro rata

basis, in (a) $500,000 in cash and (b) the net recoveries of certain avoidance actions.  The

Disclosure Statement does not provide an estimate for the amount of unsecured claims against

ERS nor a recovery rate for such claims.  However, according to the Best Interest Test Report,

the Oversight Board estimates that the aggregate amount of such claims is approximately $8

million, implying a recovery percentage of approximately 6.25% under the Proposed Plan.

### OBJECTION[24]

## I.   Legal Standard

38.     Section 1125(b) of the Bankruptcy Code, which is incorporated into PROMESA,

"requires that the disclosure statement contain 'adequate information'" that enables a

"hypothetical reasonable investor to make an informed judgment about the plan."  *In re County*

*of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) (as modified, internal references omitted)

(citing section 901 of the Bankruptcy Code in support of application of section 1125 in chapter

---

from Class 55 (such as claims subject to the ACR Order), and they have also been excluded from the estimate used in this Objection.  For other categories of unsecured claims included in the Best Interest Test Report, such as intergovernmental claims (estimated at approximately $1.2 billion), it is not clear whether such claims are included in Class 55 or not (as further discussed below).  The $3 billion estimate used in this Objection assumes that intergovernmental claims are excluded from Class 55.  However, if intergovernmental claims are, in fact, included in Class 55, then the aggregate estimate of CW General Unsecured Claims would increase to approximately $4.2 billion, implying a recovery percentage of approximately **3.0%**.

[24]   Although there are numerous deficiencies in the Disclosure Statement, this Objection addresses only those issues and deficiencies the Committee believes to be most important.  Accordingly, this Objection is not meant to be exhaustive—nor could it be.  The Committee is continuing to review the thousands of documents the Debtors have placed in the Disclosure Statement Depository and is continuing to request and review additional discovery from the Debtors, including discovery subject to a pending motion to compel.  As such, the Committee is unable, at this stage, to articulate the entirety of its objections to the approval of the Disclosure Statement.

9); *See also In re Coalinga Reg'l Med. Ctr.*, 608 B.R. 746, 756 (Bankr. E.D. Cal. 2019)

("Section 1125, which deals with disclosure statements, is incorporated fully in chapter 9 . . . .").

In a municipal bankruptcy, as in any reorganization under the Bankruptcy Code, the purpose of a

disclosure statement is "to give all creditors a source of information which allows them to make

an informed choice regarding the approval or rejection of a plan." *County of Orange*, 219 B.R.

at 560.

39.     A clear, accessible, and comprehensive disclosure statement is therefore critical to

ensuring a fair and effective plan confirmation process. *See In re Acemla De P.R. Inc.*, No. 17-

02021 ESL, 2019 Bankr. LEXIS 182, at *47 (Bankr. D.P.R. Jan. 22, 2019) ("[T]he importance of

full and honest disclosure is critical and cannot be overstated") (internal citations and quotations

omitted).  "In short, a proper disclosure statement must clearly and succinctly inform the average

unsecured creditor what it is going to get, when it is going to get it, and what contingencies there

are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

40.     "Creditors rely on the disclosure statement to determine what distribution or other

assets they will receive and also what risks they will face." *In re Acemla De P.R. Inc.*, No. 17-

02021 ESL, 2019 Bankr. LEXIS 182, at *47 (Bankr. D.P.R. Jan. 22, 2019) (internal citations and

quotations omitted).  "Creditors form their ideas about what they will receive out of the debtor's

estate from that disclosure statement." *Nelson v. Dalkon Shield Claimants Tr. (In re A.H. Robins

Co.)*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997.  The disclosure statement "plays a pivotal role in

the give and take among creditors and between creditors and the debtor that leads to a confirmed

negotiated plan of reorganization by requiring adequate disclosure to the parties so they can

make their own decisions on the plan's acceptability." *Id.*

41.     Creditors that do not support a plan or are subject to cramdown are entitled to the

same level of disclosure, and all the protections of section 1125 of the Bankruptcy Code.  *See In*

17

*re Jeppson*, 66 B.R. 269, 297 (Bankr. D. Utah 1986) (creditor that sought to cramdown its plan

on all other parties still needed to comply with disclosure statement requirements, as the

"opportunity for parties in interest to appear and effectively express a dissenting voice would be

drastically diminished if these minimal creditor protections were ignored").

42.      Information in a disclosure statement "must be clear and comprehensible" and

"should not contain overly technical language that the average creditor cannot readily

understand." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  Nor should creditors be

faced with "the burden of deciphering the meaning of the treatment of a claim." *Id.*  In short, "a

proper disclosure statement must clearly and succinctly inform the average unsecured creditor

what it is going to get, when it is going to get it, and what contingencies there are to getting its

distribution." *Id.*

## II.   <u>Disclosure Statement Cannot Be Approved Because It Does Not Provide Adequate Information</u>[25]

43.      The Disclosure Statement fails to include adequate, and accurate, information

regarding numerous fundamental issues, including (i) expected recoveries for general unsecured

creditors in Class 55, (ii) the extent of expected recoveries for Settling Bond Creditors, (iii) the

basis for providing other unsecured creditors exponentially greater recoveries than the general

unsecured creditors in Class 55, (iv) the value and availability of the Debtors' assets, (v)

essential services, (vi) the rationale for key settlements, (vii) the extent of, and justification for,

releases to be granted under the Proposed Plan, and (viii) the Debtors' ability to satisfy the

feasibility requirement.

---

[25]   In the interest of avoiding duplication, the arguments in this section focus on the treatment of Commonwealth creditors, including CW General Unsecured Claims in Class 55.  However, the same arguments apply with equal force to the treatment of ERS General Unsecured Claims in Class 63

### a. Inadequate Disclosures Regarding Creditor Recoveries

44.     A disclosure statement cannot enable creditors to make informed voting decisions

if it does not include adequate, and accurate, information regarding estimated creditor recoveries

and the treatment of their claims.  Moreover, creditors are also entitled to full and accurate

disclosures regarding the recovery and treatment of other classes of creditors, especially where

the plan proponent alleges that recoveries are a "zero sum game" (*i.e.*, an increase in recoveries

for one group of creditors can come only at the expense of the recoveries of another group of

creditors).  In addition, creditors are entitled to disclosure of accurate information sufficient for

them to make a reasoned determination of the confirmability of the plan, including confirmation

requirements that turn on the relative treatment of creditors in different classes.

45.     The Disclosure Statement is woefully deficient in meeting these requirements.  It

entirely omits critical and fundamental information regarding creditor recoveries.  Additionally,

the Disclosure Statement fails to provide explanations or rationales for the claim amounts and

recovery percentages that **are** disclosed.  Equally disturbing, what information and explanations

are provided contain numerous inaccurate and misleading statements.

### i. Failure to Provide Estimated Recoveries for CW General Unsecured Claims (Class 55)

46.     It is axiomatic that most creditors would view the amount of their proposed

recovery as among the most important information required for understanding whether to accept

or reject the plan.  *See also Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*,

216 B.R. 175, 180 (Bankr. E.D. Va. 1997) ("Creditors form their ideas about what they will

receive out of the debtor's estate from that disclosure statement.") (internal references omitted);

*In re Monroe Well Serv.*, 80 B.R. 324, 331 (Bankr. E.D. Pa. 1987) ("[T]he crucial matters [for

unsecured creditors] concern . . . what the plan proposes to pay creditors.").

47.     The Debtors' disclosure statement does not provide "full and honest disclosure" because it neither sets forth the estimated amount of the CW General Unsecured Claims in Class 55, nor the expected recovery on account of such claims.  Instead, the Debtors advise holders of CW General Unsecured Claims that they will received their "Pro Rata Share of the CW GUC Recovery, comprised of:  (A) $125,000,000.00 in Cash and (B) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests."[26]  But because the Debtors do not disclose the estimated amount of allowed claims sharing in the CW GUC Recovery nor any estimated value of the Avoidance Actions CW Interests, this information shines very little light on the amount of expected recovery.  In other words, the average holder of a CW General Unsecured Claim could not make even a "back of the envelope" calculation of its expected recovery—let alone find in the Disclosure Statement "adequate information" to make an "informed decision," as required by the Bankruptcy Code.

*1.  Failure to Provide Estimate of Class Size*

48.     While not incorporated into the Disclosure Statement, the Best Interest Test Report (filed only four business days prior to the objection deadline) estimates that the aggregate amount of CW General Unsecured Claims in Class 55 is approximately $3 billion (excluding approximately $1.2 billion in intergovernmental claims).  Applied to the $125 million the Proposed Plan offers to general unsecured creditors, this implies a recovery percentage of approximately 4.2% (or as low as 3.0% if intergovernmental claims are included in Class 55).  It is hard to believe that the Debtors do not have any better understanding at this time about the amount of the Class 55 claims pool given that (a) these cases are more than four years old, (b)

---

[26]   Discl. Stmt.at 410.

the bar date was June 29, 2018, and (c) the Debtors have filed literally hundreds of omnibus objections to proofs of claim.

49.     Furthermore, it is not even clear whether certain types of claims, most notably intergovernmental claims, are included in Class 55.  The Disclosure Statement notes that "Inter-Instrumentality Claims" (a term that is nowhere defined) are <u>excluded</u> from Class 55.[27]  In contrast, the definition of CW General Unsecured Claims in the Proposed Plan does not contain that exclusion.  This is no small matter either, given the substantial size of intergovernmental claims, including (based on the Best Interest Test Report) (i) $600 million in claims by the GDB Title VI Public Entity Trust and (ii) $594 million in intragovernmental claims (including claims by municipalities).

50.     The only conclusion that can be drawn from the Debtors' failure to provide information concerning the amount of the claims pool and the estimated recovery that CW General Unsecured Claims in Class 55 should expect is that the Debtors are trying to delay, for as long as possible, quantifying the paltry recovery offered to Class 55 claimants, and the extent to which the Debtors are favoring other creditors.

51.     If anything, the Oversight Board's inclusion of this information in the Best Interest Test Reports support this inference.  The Best Interest Test Reports are lengthy and complicated, and it is not believable that the Oversight Board did not have an estimate of the size of Class 55 well prior to actually filing the Best Interest Test Report a few days ago.  Moreover, even once filed, the Oversight Board has not updated its Disclosure Statement, to place this critical information front and center (as required by the case law).  Instead, the information is

---

[27]    Discl. Stmt. at 410.

buried in the Best Interest Test Reports, filed four business days prior to the deadline to object to the Disclosure Statement.

## 2.   Inadequate Disclosures Regarding Avoidance Action Trust

52.     The Disclosure Statement provides that the assets of the Avoidance Action Trust include (i) the Avoidance Actions, (ii) certain funds held in escrow relating to the compromise and settlement of avoidance actions, and (iii) "such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth in Exhibit E to the [Proposed] Plan."[28]  However, the Disclosure Statement leaves unanswered key questions about each of these three categories.

53.     First, the Proposed Plan defines Avoidance Actions as the causes of action listed on Exhibit A to the Proposed Plan.  Unclear, however, is whether the Avoidance Actions will include claims under the Bankruptcy Code's avoiding powers that have not yet been filed, including claims subject to tolling agreements.  Nor does the Disclosure Statement even attempt to provide an approximate value for these actions, or even take the simple step of listing the aggregate amounts sought in the various complaints.  Second, the Disclosure Statement does not disclose the extent of the escrowed settlement funds, which should not be difficult.

54.     Third, and perhaps most importantly, the Disclosure Statement offers no explanation of which "actions seeking affirmative recoveries" will be transferred to the Avoidance Action Trust, and what is the Debtors' estimate of the approximate value of those claims.  The Disclosure Statement must be revised to answer these questions, including identifying which "affirmative recovery actions" will be transferred to the Avoidance Actions

---

[28]     Discl. Stmt. at 443.  This appears to be a typographical error, and appears meant to refer to Exhibit B to the Proposed Plan.

Trust, which will not, and why.[29]  For example, the Disclosure Statement must explain whether

(and, if not, then why not) the affirmative recovery actions will include claims identified in the

Final Investigative Report, including claims against underwriters and/or auditors (certain of

which are already subject to pending litigation), as well as other claims against third-party

professionals and personnel not mentioned in the Final Investigative Report.  Included in these

answers should be descriptions of the affirmative recovery actions and amounts sought in the

complaints.

> ii.  <u>Disclosure Statement Understates Recovery Rates for Settling Bond
>      Creditors</u>

55.     Holders of CW General Unsecured Claims in Class 55 (and creditors in other

Classes) cannot be asked to vote to accept or reject the Proposed Plan without knowing what the

Settling Bond Creditors will receive.  However, the Disclosure Statement makes it impossible for

creditors to reliably compare their recovery to the recovery being offered to the Settling Bond

Creditors because the Disclosure Statement contains inadequate and misleading information

about the size of the Settling Bond Creditors' claims, the true value of their recoveries and,

therefore, the true recovery percentages.

56.     Specifically, the Disclosure Statement fails to (i) account for the value of the

CVIs being offered to the GO/PBA Creditors and to the Clawback Creditors, (ii) account for

other sources of recovery, including fees and other payments offered to the Settling Bond

Creditors, and (iii) explain (or justify) the impact of including original issue discount in the

allowed claim being granted to the GO/PBA Bond Creditors.

---

[29]     Exhibit B to the Proposed Plan is titled "Schedule of Affirmative Recovery Actions"—and is blank.

*1.   All Sources of Recovery Must Be Included in Expected Recovery*

57.     Adequate information includes the **total** value of recovery being offered to any

given class of creditors.  *See, e.g.*, *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311

U.S. 138, 144 (1940) (requisite finding that "compensation to be received by the fiscal agent was

reasonable" could not be made "without passing on the worth of the aggregate of all the

emoluments accruing to [the City's fiscal agent] as a result of consummation of the plan").[30]

58.     The Disclosure Statement, however, fails to include in its stated recovery

percentage at least three sources of recovery being given to Settling Bond Creditors: the payment

of a variety of fees, the CVIs, and interest accruing on the New GO Bonds prior to the effective

date of the Proposed Plan.

a.   Disclosure Statement Must Explain Impact of Hundreds of
Millions of Dollars of Fees to Settling Bond Creditors

59.     Under the Proposed Plan, the Settling Bond Creditors will receive hundreds of

millions of dollars in fees.  Specifically:

- Holders of PBA and General Obligation Bonds in Classes 6, 8, 10, 15, 28, 35, 38,
and 44 are entitled to share in the $50 million Retail Support Fee.

- The Initial GO/PBA PSA Creditors are entitled to receive (i) up to $350 million in
GO/PBA Consummation Costs and GO/PBA PSA Restriction Fee **and** (ii) any
portion of the Retail Support Fee not allocated to the initial recipients thereof.

- The Initial HTA/CCDA PSA Creditors that hold CCDA Bonds are entitled to
receive up to $15 million in CCDA Consummation Costs and CCDA Restriction
Fees.[31]

---

[30]   More recent authority also supports this proposition.  Indeed, at least one court has expressly adopted this
requirement, providing in its local rules that a disclosure statement must include "the proposed recovery of each
Class and the timing thereof, and all sources and amounts of funding thereof."  Bankr. N.D. Ill.R. 3016-1.  And
in the *Detroit* bankruptcy, the court explained that, under the particular facts presented to it, it believed that
even third party contributions "should be included in the recovery calculations"—and that "*City of Avon Park*
seems to require that result."  *In re City of Detroit*, 524 B.R. 147, 255, n.24 (Bankr. E.D. Mich. 2014).  If *Avon
Park* requires inclusion into a recovery percentage of payments from third parties, it certainly requires inclusion
of additional payments from the debtor itself.

[31]   Under the HTA/CCDA Plan Support Agreement, Initial HTA/CCDA PSA Creditors that hold HTA Bonds will
receive separate consummation and restriction fee payments in the amount of $125 million under HTA's future

- Parties to the ERS Stipulation will share a $75 million ERS Restriction Fee.

60.     In all, the Proposed Plan would pay these holders of unsecured bonds $490 million in restriction fees, support fees, and consummation costs.  **This is four times the total recovery offered to general unsecured creditors in Class 55**.  Creditors are entitled to understand the impact of hundreds of millions of "fees" on overall recoveries given to other, more favored, classes and creditors.  Yet the Disclosure Statement specifically excludes these amounts from its calculations of the recovery offered the Settling Bond Creditors.

61.     Additionally, the Disclosure Statement must explain how the Oversight Board arrived at these amounts for the fees and similar payments.  For example, the Disclosure Statement explains the GO/PBA Consummation Costs are being paid in "order to compensate certain parties for the cost of negotiation, confirmation, and consummation of the Plan."[32]  The Disclosure Statement does not, however, explain what legal entitlement the GO/PBA Bond Creditors have to this payment, or how $350 million is a fair or reasonable payment for those costs (and is not, instead, a way to increase the percentage recovery to these creditors or prohibited vote-buying).  Similarly, the Disclosure Statement states that if the GO/PBA Plan Support Agreement is terminated, the Debtors will still have to pay the GO/PBA Restriction Fee and the GO/PBA Consummation Costs, up to $100 million.[33]  Absent from the Disclosure Statement, however, is any explanation of why the Debtors would pay $100 million in consummation costs for a deal that was never consummated.[34]

---

plan of adjustment.  Discl. Stmt., Ex. C.  In addition, under the HTA/CCDA Plan Support Agreement, certain monoline insurers are also entitled to approximately $60 million in so-called "structuring" fees.

[32]   Discl. Stmt. at 354.

[33]   *Id.* at 365.

[34]   The Committee reserves all rights regarding the various fees and payments discussed herein including, without limitation, the reasonableness of such amounts and any benefit actually received by the Debtors in connection therewith.

        b.  <u>Disclosure Statement Must Explain Impact of Billions of
Dollars of CVIs</u>

62.     The Disclosure Statement does disclose the face amount of the CVIs the Debtors
will distribute to GO/PBA Creditors and the Clawback Creditors under the Proposed Plan.
Specifically, the Commonwealth will issue (i) GO CVIs with a face amount of $3.5 billion and
(ii) Clawback CVIs with a face amount of approximately $5.4 billion.

63.     Notwithstanding the billions upon billions of dollars of CVIs to be distributed
under the Proposed Plan, the Disclosure Statement specifically excludes the CVIs from those
creditors' recovery percentage.  Indeed, the Disclosure Statement implies that the value of the
CVIs is $0.00.  According to the Disclosure Statement, the "Total GO/PBA Consideration
Provided in Plan of Adjustment" is $14.438 billion, which number includes (i) $7.024 billion in
cash, (ii) $7.414 billion in New GO Bonds, and (iii) issuance of the GO CVIs.  This math works
only if the value ascribed to the GO CVIs, today, is $0.00.[35]  Stated otherwise, the Oversight
Board's position seems to be that a willing buyer paying a fair rate would be willing to pay $0.00
today for the right to receive up to $3.5 billion in future payments under the GO CVIs.  This is,
clearly, disingenuous, and borders on the absurd.

64.     Indeed, while the exact amount of the future payments under the CVIs is
obviously not precisely knowable today, the Oversight Board as well as the GO/PBA Creditors
and the Clawback Creditors know, today, that the CVIs are already "in the money" as explained
herein.  It is inconceivable that the Oversight Board would have agreed to issue billions of
dollars of CVIs without having conducted its own analysis of their value and the resulting likely
payout to bondholders.

---

[35]   The Disclosure Statement also entirely omits from "Total GO/PBA Consideration" the $350 million in fees and
other payments discussed above.

65.    The CVIs are, conceptually, very simple.  Pursuant to the PSA reached with the GO/PBA PSA Creditors, a portion of the bondholders' recovery comes in the form of a CVI (the Oversight Board agreed to similar construct in the subsequent HTA/CCDA Plan Support Agreement reached with the HTA/CCDA Creditors).  The CVIs utilize the 5.5% of Puerto Rico's SUT as the measure for outperformance and only pays out if, and to the extent, "the Puerto Rico economy grows more than projected in the 2020 Certified Fiscal Plan for Puerto Rico."[36]  Stated simply, the 2020 Certified Fiscal Plan projected certain measures of economic growth and, along with that growth, certain amounts of revenues would be collected under the SUT; if actual growth (and related SUT revenues) outpaces this projected growth, the bondholders will receive cash payments under the CVIs.

66.    Critically, these baseline projections in the 2020 Certified Fiscal Plan were prepared at the outset of the global COVID-19 pandemic and, given the uncertainty associated with the impact of the pandemic, have decidedly pessimistic projections.[37]  However, between the certification of the Commonwealth's 2020 Fiscal Plan on May 27, 2020 and the February 9, 2021 announcement of an agreement in principle with the GO/PBA PSA Creditors, these projections improved significantly.  In fact, at the Oversight Board's public meeting held on October 30, 2020, where the Oversight Board first introduced its CVI concept,[38] the presentation materials included an updated analysis, showing a $13.6 billion increase in the cumulative 30-year cash flow (fiscal years 2021 through 2049), as compared to the 2020 Fiscal Plan.

---

[36]    Press Release, *New Debt Agreement Opens Path to Exit from Bankruptcy, Financial Oversight & Management Board for Puerto Rico* (Feb. 23, 2021),
https://drive.google.com/file/d/1go1HKPzYdtGFVFSfEotCgGDW7THhtn0j/view.

[37]    By way of illustration, the 2019 certified fiscal plan projected a **cumulative surplus of $16.4 billion** for the 30-year projection period (FY20 – FY49).  By comparison, the 2020 certified fiscal plan prepared not even a year later at the outset of the pandemic projected a **cumulative $22.2 billion deficit** over the same 30-year timeframe, a $38.6 billion delta.

[38]    The Oversight Board's CVI structure was based on the CVI structure contemplated in the GO/PBA Creditors' August 24, 2020 proposal, which was disclosed to the public (*i.e.*, "blown out") on September 30, 2020.

67.     Nonetheless, rather than establish the baseline performance for the CVIs based on the most current data available, the Oversight Board elected to base the CVIs' outperformance metrics on the already outdated projections in the Commonwealth's certified 2020 Fiscal Plan, thus creating an "in the money" scenario on day one for the CVIs.  Indeed, these projections only continued to improve.  Based on the projections in the Commonwealth's certified 2021 Fiscal Plan, the CVIs are expected to pay out nearly $5.5 billion in nominal dollars over the next 30 years ($2.0 billion to the GO/PBA Creditors and $3.4 billion to the Clawback Creditors).

68.     Not only does the Oversight Board not disclose the expected nominal payments under the CVIs, it also fails to provide disclosure on the value of the "in the money" payment stream.  Clearly, this information is relevant to creditors' assessment of the Proposed Plan, and to the true recovery percentage being awarded to recipients of the CVIs.  The Disclosure Statement, however, explains none of this; to the contrary, the Disclosure Statement seems to take the position that the CVIs have no value at all.

69.     There is no principled reason to exclude from the creditor recoveries the expected payments and value under the CVI, to pretend that the CVIs are worthless, or to fail to explain that the CVIs are already "in the money."  The Disclosure Statement must be revised to address these issues and to reflect the very real, and very significant, value being transferred to certain creditors through the CVIs.

c.     Disclosure Statement Must Explain Impact of Interest Accruing on New GO Bonds Prior to Effective Date of Proposed Plan

70.     Pursuant to the Plan, the New GO Bonds start accruing interest as of July 1, 2021, well before the effective date of the Proposed Plan.[39]  Putting aside whether such pre-effective

---

[39]     Under the Proposed Plan, the New GO Bonds will start accruing interest as of the Deemed Issuance Date, i.e., the earlier of July 1, 2021 or the effective date of the Proposed Plan.  *See* Proposed Plan § 70.1(c).

date accrual is permissible (and the Committee reserves all its rights in this regard),[40] at a minimum the Oversight Board should be required to disclose (i) what effect such pre-effective date interest accrual has on the value, and timing, of the recoveries to GO/PBA Creditors and (ii) what is the rationale behind starting the accrual of interest on the New GO Bonds prior to the effective date of the Proposed Plan.[41]

> 2. *Disclosure Statement Must Explain Allowance in Full of Original Issue Discount and Corresponding Impact on Recovery Rates*

71.     According to the Disclosure Statement, claims in Class 43 (2014 CW Bond Claims) will be allowed in the amount of $3.84 billion, with an estimated recovery percentage of 67.8%.  As explained above, this recovery percentage significantly **understates the true recovery** on these claims because it excludes the bondholders' recovery of substantial fees, as well as any recoveries under the valuable CVIs.

72.     However, the recovery percentage is understated for an additional, and separate reason: the amount of the allowed claim is inflated, thereby making the bondholders' recovery look smaller than it actually is.  This inflation is the result of including in the allowed claim over **$200 million of original issue discount** ("OID").[42]

73.     Including OID in the bondholders' allowed claims is counter to well-established principles of bankruptcy law.  Section 502(b)(2) of the Bankruptcy Code disallows any claim for unmatured (*i.e.*, post-petition) interest on prepetition unsecured claims.  Courts have uniformly

---

[40]   The "Deemed Issuance Date" of July 1, 2021 effectively means that CW Bond Claims and CW Guarantee Claims will begin earning interest as of that date, even though these are unsecured claims that are not entitled to postpetition interest.  *See* 11 U.S.C. § 502(b)(2) (disallowing claims for unmatured interest).

[41]   In this regard, the Committee also notes that there appears to be a typographical error in the Disclosure Statement, which provides that "[i]nterest on the New GO Bonds will be **paid** on July 1, 202**1**."  Discl. Stmt. at 421 (emphasis added).  Given that no interest will have accrued on July 1, 2021, and the New GO Bonds will not even be issued until the effective date of the Proposed Plan, the Committee believes that the reference to the first interest payment date should be updated to July 1, 202**2**.

[42]   Discl. Stmt. Ex. B (Ex. I at 5) (providing that claim will "include[] accrued interest to the relevant filing date and unmatured OID").

held that OID that is unamortized as of the petition date is also disallowed by section 502(b)(2).

*See, e.g.*, *In re Chateaugay Corp.*, 961 F.2d 378, 381 (2d Cir. 1992) (noting that "[t]he courts

that have considered the issue under section 502(b)(2) have held that unamortized OID is

unmatured interest and therefore unallowable as part of a bankruptcy claim" and concluding that

"unamortized OID is 'unmatured interest' within the meaning of section 502(b)(2)"); *In re*

*Allegheny Int'l, Inc.*, 100 B.R. 247, 250 (Bankr. W.D. Pa. 1989) ("[O]riginal issue discount is

unmatured interest, as that term is used in section 502(b)(2)."); 2008 Ann. Surv. of Bankr. Law 6

("[B]ankruptcy courts unanimously have held that nonamortized OID is not allowable as a claim

in bankruptcy."). As of the Petition Date, there was over $200 million of unamortized OID on

the GO Bonds in Class 43, all of which would be disallowed under section 502(b)(2).[43]

74.    Other than an obscure reference buried in an exhibit, the Disclosure Statement

does not explain that the Oversight Board has agreed to allow bondholders' claims inclusive of

OID. In light of the clear case law disallowing unamortized OID, the Disclosure Statement must

be revised to (i) make clear that this is the course the Oversight Board has elected and (ii) explain

this decision.

75.    The Disclosure Statement must also be revised to explain that including

unamortized OID results in higher allowed claim amounts, which, in turn, artificially lowers the

estimated recovery percentage on those claims. For example, as applied to Class 43, the

estimated recovery on $3.64 billion (as opposed to $3.84 billion inclusive of OID) is

approximately 71.3% (as opposed to the 67.8% when including OID).

---

[43]    There is, additionally, over $50 million in unamortized OID attributable to other GO Bonds.

      iii.  <u>Inadequate Disclosures Regarding Other Favored Classes and Unclassified</u>
<u>Creditors</u>

76.    The Proposed Plan also favors other classes of general unsecured claims over the

CW General Unsecured Claims in Class 55.  For example:

- PBA General Unsecured Claims in Class 12 will receive 100% recovery, paid in cash.

- Dairy Producer Claims in Class 50 will receive 50% recovery, paid in cash.

- Energy Incentive Claims in Class 52 will receive 100% recovery, paid in cash.

- Med Center Claims in Class 53 will receive 50% recovery, paid in cash.

- Gracia-Gracia Claims in Class 64 will receive 100% recovery, paid in cash.

77.    The Disclosure Statement offers no explanation for favoring the unsecured claims

in these Classes.  If the Oversight Board believes that it is important to discriminate in favor of

the creditors in these Classes, it must say so—and explain why.  Similarly, the Disclosure

Statement must explain why this specific recovery is the "right" number.

78.    This is especially so as applied to these specific Classes.  Under the proposed

Second Amended Plan of Adjustment [Docket No. 15976], Med-Center Claims and Dairy

Producer Claims were to receive a 40% recovery, which was already substantially greater than

similarly situated creditors in Class 55.  The Disclosure Statement offers no explanation for

increasing that recovery from 40% to 50% while not increasing the recoveries to creditors in

Class 55.

79.    Nor does the Disclosure Statement explain why certain types of claims were not

separated from the CW General Unsecured Claims in Class 55 and marked for higher recoveries.

For example, the Committee understands that Class 55 includes claims for unpaid judgments

arising from civil rights and tort claims (such as police brutality).  The Oversight Board should

explain why some types of unsecured creditors are getting higher recoveries than claimants

31

whose civil rights have been violated (as determined by a Puerto Rico court).  Similarly, the

Oversight Board must explain why certain eminent domain creditors are included in the CW

General Unsecured Claims in Class 55,[44] even though under Puerto Rico law they are entitled to

a second priority behind only constitutional debt—and ahead of retiree benefit claims.[45]  To the

extent there is any discernable guiding principle (beyond who the Debtors like and who they do

not) to the favoritism shown to certain unsecured creditors, the Proposed Plan's structure would

seem to require a separate class for such eminent domain creditors, with recoveries of 100% (or,

at the very least, 50%).

80.   The Committee anticipates that the Oversight Board will explain that it has

favored these (or some of these) unsecured creditors because they have asserted certain priorities,

security interests, rights to, or ownership of, specific funds, or other rights.[46]  If so, the

Disclosure Statement must explain this and the strengths and weaknesses of these assertions—

and how payment of 100% of a claim reflects a "settlement."

---

[44]  The Disclosure Statement does, technically, have a separate class for Eminent Domain Claims (Class 51).
However, the Proposed Plan defines Eminent Domain Claims as a claim for the excess (if any) of the amount (if
any) already deposited by the condemnor to satisfy an eminent domain claim, and such "Eminent Domain
Claims" share in the recovery offered to Class 55.

[45]  *See* 23 L.P.R.A. § 104(c)(1) (payments on "commitments entered into by virtue of legal contracts in force,
judgments of the courts in cases of condemnation under eminent domain" should be paid ahead of (among other
things) "payment of pension to individuals granted under special statutes" and behind only payments of interest
and amortizations corresponding to the public debt").

[46]  For example, the Disclosure Statement notes that certain creditors have asserted that their claims for payments
for Medicaid services are non-dischargeable.  Discl. Stmt. at 270-71.  This description, however, is nothing
more than a summary of pleadings.  Absent from the Disclosure Statement is any explanation of the Oversight
Board's assessment of this claim, rationale for the amount being paid (and why it has increased from 40% to
50%), or even any statement that this higher recovery, in fact, represents a settlement of this litigation.  Further,
the Disclosure Statement explains that this 50% recovery is reduced to 25% if Class 53 votes against the
Proposed Plan.  Absent from the Disclosure Statement is any explanation of why these creditors will continue to
receive a better treatment than the CW General Unsecured Claims in Class 55 even if they reject the settlement
of their claims.  In such an event, the extra amount set aside for creditors in Class 53 had they supported the
Proposed Plan (approximately $74 million) should be added to the CW GUC Recovery.

1. *Inadequate Disclosures Regarding ACR Procedures and Payments to ACR Claimants*

81.     The Disclosure Statement's discussion of the ACR Procedures is limited to two paragraphs explaining, in very generic terms, that (i) the Court approved the ACR Procedures, (ii) the ACR Procedures establish a process for the resolution of certain claims, "including tax refund claims, union grievance claims, public employee claims, and pension claims," and (iii) that, to-date, the Debtors have transferred 20,179 claims into the ACR procedures.[47]  These disclosures are woefully inadequate.

82.     Absent from the Disclosure Statement is the recognition of the Debtors' own estimate that the number of claims subject to the ACR process total almost 100,000.[48]  The Disclosure Statement does not explain why the remaining 80,000 claims have not been transferred into the ACR process, or if and when they will be.  This includes tens of thousands of employees and union members, represented by the Committee, who have grievance claims against the Commonwealth and should be transferred to the ACR process, which, according to the Oversight Board, was specifically designed to encompass Public Employee Claims and Grievance Claims (each as defined in the ACR Motion).

83.     This is critical because—although also conveniently omitted from the Disclosure Statement—the ACR Procedures require payment in full of "the amount due and owing in the ordinary course."[49]  This is a very different result from the treatment of CW General Unsecured Claims in Class 55, which will receive only a tiny fraction of their allowed clams.

---

[47]   Discl. Stmt. Art. IV.C.6 at 232

[48]   *See Debtors' Motion for Entry of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Form of Notice, and (C) Granting Related Relief* [Docket No. 8827] ("ACR Motion") ¶ 11.

[49]   ACR Procedures ¶ 2.

84.     Creating additional confusion, the Disclosure Statement's description of the CW General Unsecured Claims in Class 55 states that the Class excludes "any claim subject to the provisions of the ACR Order."[50]  The Disclosure Statement does not clarify, whether claims "subject to the provisions of the ACR Order" are claims that have already been transferred into the ACR process, claims that are **<u>eligible</u>** for such transfer (even if not yet transferred), or some other category entirely.

85.     The Disclosure Statement must be revised to explain and/or clarify, at a minimum: (i) which creditors are or will be subject to the ACR process, including by providing precise definitions of "tax refund claims, union grievance claims, public employee claims, and pension claims"; (ii) the treatment of claims actually transferred to the ACR process; (iii) that holders of ACR-eligible claims not yet transferred to the ACR process will have a right to vote on the Proposed Plan; (iv) whether any claims eligible for ACR under the ACR Order will not be transferred to ACR and, if so, the rationale for this exclusion; and (v) whether creditors with claims eligible for ACR have a right to have their claims transferred into ACR under the ACR Order.[51]

86.     By not answering these questions, the Disclosure Statement makes it impossible for creditors to make an informed decision about the Proposed Plan.  For example, the tens of thousands of creditors holding ACR-eligible claims not yet transferred to the ACR process will not know how their claims are classified until (and unless) they receive a Class 55 ballot and a copy of the Disclosure Statement.  And, even then, such creditors will find no answers in the Disclosure Statement regarding important and relevant questions, such as (i) whether their claim

---

[50]   Discl. Stmt. at 410.

[51]   *See* ACR Order ¶ 2 ("Pension/Retiree Claims, Tax Refund Claims, Public Employee Claims, Grievance Claims, and such Claims that have been resolved but not yet paid, as defined in the Motion, ***shall be resolved*** through the Debtors' existing administrative reconciliation processes . . . .") (emphasis added).

was in a category eligible for ACR, (ii) whether their claim was in a category eligible for ACR but nonetheless not transferred into the ACR process, (iii) what was the rationale, legal basis, and process used by the Oversight Board in determining not to transfer the claim, and (iv) whether other similar claims were transferred into the ACR process.

87.     The Disclosure Statement also makes it impossible for creditors in Class 55 that are holders of non-ACR claims (including claims that are facially ineligible for transfer into the ACR process) to evaluate the Proposed Plan because the inclusion, or exclusion, of tens of thousands of ACR-eligible claims (or some portion thereof) will have an obvious and significant impact on the size of the Class 55 claims pool and, therefore, on the distribution to creditors in that class.  Further, given that Class 55 claimants will not be receiving payment in full, claimants left behind in Class 55 are entitled to an explanation of the Oversight Board's rationale for paying some prepetition general unsecured creditors in full while offering the CW General Unsecured Claims in Class 55 pennies on the dollar.[52]

### 2.   Inadequate Disclosures Regarding Payments to Unclassified Creditors

88.     Upon information and belief, the Committee understands that, since the Petition Date, the Commonwealth has been selectively paying in full the prepetition claims of certain unsecured creditors.  Indeed, the Oversight Board has apparently acknowledged this practice in recent pleadings.[53]

---

[52]   The Oversight Board has explained that the purpose of the ACR process was to provide a cost-effective and efficient means for resolving" the ACR-eligible claims, all in an effort to "balance[] judicial administrative efficiency with due process rights."  ACR Mot. ¶ 41.  The Committee, however, is not aware of any authority holding that this is a basis to discriminate in favor of those claims.  Indeed, the Committee flagged this issue in its limited objection to the ACR Motion.  *See Limited Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Form of Notice, and (C) Granting Related Relief* [Docket No. 8893], ¶ 9 n.12.

[53]   *See Objection of the Financial Oversight and Management Board for Puerto Rico to Urgent Motion of the Official Committee of Unsecured Creditors to Compel Discovery in Connection with the Third Amended Disclosure Statement* [Docket No. 16883] at 31.

35

89.     The Disclosure Statement, however, fails to disclose these payments, making it

impossible for creditors (including those in Class 55) whose claims are being impaired and

discharged under the Proposed Plan to know which creditors are being favored, how much these

creditors have received, and how the Oversight Board and the Commonwealth have determined

to distinguish between favored and disfavored creditors.

90.     The Committee anticipates that the Oversight Board will contend that it is not

obligated to disclose this information because neither the Bankruptcy Code nor PROMESA

prohibit the Debtors from paying prepetition claims prior to confirmation and without court

approval.  The Court should reject this argument.

91.     The purpose of a disclosure statement is not to determine whether a payment to

any favored creditor (or, as far as other creditors know, hundreds of millions of dollars of

payments to favored creditors) was legally permitted at the time it was made.  The purpose of a

disclosure statement is to provide creditors that have a right to vote (*i.e.*, the creditors that have

**<u>not</u>** received 100% payment on their prepetition claims during the course of the case) with

adequate information for them to determine if they support the proposed plan or not.  This

information is undoubtedly relevant to that determination, as creditors are entitled to the

protection of being able "to litigate the debtor's conduct and management and spending choices

during the case at the time of plan confirmation."  *In re City of Stockton, Cal.*, 486 B.R. 194,

199-200 (Bankr. E.D. Cal. 2013) (noting that "unconstrained settlements" are "perhaps

nefarious" and that "evidence of untoward settlements" is relevant to determination of whether

chapter 9 plan discriminates unfairly, is fair and equitable, has been proposed in good faith, and

is proposed by any means forbidden by law).

92.     Whatever rights a municipal debtor may have to pay prepetition claims during the

case, that such payments may be legal does not mean that they are fair, equitable, or in good

faith.  For the same reasons, creditors are undoubtedly entitled to the information necessary for them to evaluate if they wish to exercise that right to litigate, or if they choose to support the proposed plan notwithstanding such payments.  As such, there is no principled reason to fail to disclose this information in the Disclosure Statement.

### b.  Inadequate Disclosures Regarding Best Interests of Creditors

93.      Pursuant to section 314(b)(6) of PROMESA, the Proposed Plan cannot be confirmed unless it is in the best interests of creditors, and creditors are entitled to know the Oversight Board's position as to why it believes this test will be satisfied.  When filed on May 11, 2021, the Disclosure Statement did not include the Oversight Board's Best Interest Test Reports, stating only that they "will be filed at a later date."[54]

94.      As noted above, the Oversight Board filed the long-promised Best Interest Test Reports on June 10, 2021, four business days prior to the objection deadline.  However, the Best Interest Test Report is long (over 100 pages) and complex.  The Committee has not completed its review of the Best Interest Test Report, and imagines that other parties—especially those with more limited resource—are in the same position.

95.      Accordingly, the Committee reserves all rights regarding the Best Interest Test Reports, including whether it provides information adequate (including backup documentation) for a hypothetical creditor to determine whether, in fact, the Proposed Plan satisfies the best interests of creditors standard.

### c.  Inadequate Disclosures Regarding Value and Availability of Debtors' Assets

96.      Courts have consistently held that a description of assets and their value is an essential element of adequate disclosure.  *See In re Ligon,* 50 B.R. 127, 130 (Bankr. M.D. Tenn.

---

[54]      Discl. Stmt., Ex. N.

1985) ("A description of available assets and their value is a vital element of necessary

disclosure"). This is equally true in a bankruptcy under chapter 9 of the Bankruptcy Code or

under PROMESA (indeed, as shown below, the need for this disclosure is even more acute under

PROMESA).

97.     In a chapter 9 bankruptcy, the "best interest test acts as a floor requiring a

reasonable effort at payment of creditors by the municipal debtor." *In re Mount Carbon Metro.*

*Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999). Bankruptcy "courts must apply the test to require

**a reasonable effort by the municipal debtor**" to repay their creditors. *County of Orange v.*

*Merrill Lynch & Co. (In re County of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. 1996) (as

modified and as emphasized); *see also* 6 Collier on Bankruptcy ¶ 943.03 (16th 2021) ("However,

since the test is designed to protect the dissenting minority of a class that has accepted the plan,

one must not be so carried away with the potentially adverse consequences of the alternative to a

chapter 9 plan that one reaches the conclusion that *any* plan is better than the alternative. A plan

that makes little or no effort to repay creditors over a reasonable period of time may not be in the

best interests of creditors."). As a practical matter, this inquiry requires consideration (and,

therefore, disclosure) of what assets are available and how is the municipal debtor allocating

available value.

98.     Indeed, courts invariably consider exactly that information when determining if a

plan proposed by a municipal debtor satisfies the Bankruptcy Code's requirements. For

example, in *In re City of Detroit*, the court specifically found that the "City has made reasonable

efforts to monetize its assets to satisfy the best interests of creditors test," *In re City of Detroit*,

524 B.R. 147, 219 (Bankr. E.D. Mich. 2014), and that "there is no more money available for

creditors in the City's already tight budget projections" as "every dollar is accounted for in

providing necessary services" and other uses of cash that were "essential to the city's future." *Id.*

38

It was only on the basis of these findings that the court was able to conclude that "the plan will provide creditors all that they can reasonably expect under the circumstances and that it is therefore in their best interests." *Id.* Similarly, in *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 766 (Bankr. D.S.C. 2011), the court determined that the best interests of creditors test was satisfied where the evidence established that "the Plan affords all creditors the potential for the greatest economic return from Debtor's assets."

99.     Courts have also rejected plans that do not make this required showing. In *Lorber v. Vista Irrigation District*,[55] the Ninth Circuit noted that the "informed, independent judgment" that is required to properly appraise a plan requires there must be some basis to "support a conclusion that the payments provided for in the plan of composition are all that the District is reasonably able to pay in the circumstances." *Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (quoting *Consolidated Rock Company v. Du Bois*, 312 U.S. 510 (1941)) (as modified). Applying that standard, the court declined to approve the water district's proposed reorganization where the record did not contain sufficient evidence for the court to determine whether the proposed 55% recovery was, in fact, "all that the District is reasonably able to pay in the circumstances." *Id.* ("So far as the record before us discloses, the District may have been in a position to pay more than the $.55 proposed, or again it may be that that sum is the maximum that the District could reasonably pay. But it is our opinion that the case should be remanded to the District Court to make the findings herein stated to be necessary . . . .").

100.    Accordingly, it cannot be disputed that creditors are entitled to full and accurate disclosure of what assets may be available to maximize creditor recoveries. However, the Disclosure Statement fails to include information about the value, availability, and allocation of

---

[55] This case was decided under Chapter IX of the Bankruptcy Act, the predecessor to chapter 9 of the Bankruptcy Code.

the Commonwealth's assets, making it impossible to for creditors to determine if they believe

that the Proposed Plan represents "a reasonable effort by the [Commonwealth]" to repay its

creditors, *In County of Orange*, 191 B.R. 1005 at 1020, and that the Proposed Plan "affords all

creditors the potential for the greatest economic return from Debtor's assets." *In re Connector*

*2000 Ass'n, Inc.*, 447 B.R. at 766.  For example, without these disclosures, it is impossible for

holders of CW General Unsecured Claims to know if the $125 million they are being offered

represents the requisite reasonable effort, or whether this is an arbitrary number selected

randomly by the Oversight Board and the Debtors.  Stated simply, the Disclosure Statement

offers no way to know if the Oversight Board could have offered CW General Unsecured

Creditors $150 million, $1 billion, or any other amount.[56]

### i. Inadequate Disclosures Regarding Debtors' Assets

101.    The Committee has identified billions of dollars in assets, including but not

limited to cash, past due receivables, proceeds from the monetization of assets, and issuance of

additional bonds that could be used to provide CW General Unsecured Claims with recoveries

well in excess of the $125 million contemplated under the Proposed Plan.  For example:[57]

- The Commonwealth has continued to significantly outperform the fiscal year
  2021 liquidity plan.  As of May 28, 2021, the Commonwealth's revenue
  outperformance is approximately $1.70 billion for the current fiscal year to date
  (*i.e.*, the fiscal year ending June 30, 2021)—of which amount $350 million has
  been committed as part of the cash consideration to GO and PBA bondholders,
  reducing the revenue outperformance to approximately **$1.35 billion**.[58]

---

[56]    This uncertainty does not apply to other large creditor groups in these cases (such as the Settling Bond Creditors
and holders of retiree benefit claims) that have negotiated the amount of their recoveries.

[57]    The specific questions presented in this section of the Committee's Objection are just examples of potentially
available assets of which the Committee is aware.  Further, the Committee has asked the Oversight Board and
the Commonwealth, as applicable, for discovery in connection with these requests; the Oversight Board and the
Debtors have resisted **any** discovery on this topic.  Unable to resolve this consensually, these requests (and
certain others) are the subject of a motion to compel currently pending before Magistrate Judge Dein

[58]    While the Oversight Board will likely assert that a portion of the outperformance is timing related, given the
fact that the fiscal year ends in a few weeks, it would seem hard to argue that none of the outperformance is a
permanent favorable variance.

- In December 2020, the Oversight Board published a presentation related to the Commonwealth's cash position (the "December 2020 Bank Account Presentation").[59]  The December 2020 Bank Account Presentation asserts that **$8.1 billion** in funds held at public corporations as of June 30, 2020 are inaccessible and, accordingly, not available for distribution to creditors.  The Oversight Board's position in this regard is surprising and, at a minimum, questionable.  As the Court will recall, in the COFINA dispute regarding the ownership (as between the Commonwealth and COFINA) of certain sales and use taxes ("SUT"), the Oversight Board did not hesitate to challenge COFINA's asserted ownership interest in SUT revenues despite the fact that such ownership interest was ostensibly granted pursuant to a Commonwealth statute.  The Committee does not understand why other sources of cash that may be subject to internal Commonwealth policies, guidance and rules (as opposed to laws) would not be subjected to any challenge or change, just as the SUT revenues were, especially when a number of these public corporations receive annual appropriations from the Commonwealth's general fund.

- The Oversight Board did not perform legal due diligence on bank accounts where the individual account balances fell below the $6.9 million threshold.  As of December 31, 2020, there were 490 accounts with an aggregate balance of **$214 million** that have not been reviewed.  If the Oversight Board were to perform a legal review of the 48 bank accounts with account balances in excess of $1.5 million, that would represent $163 million (or 76% of the $214 million in unreviewed bank accounts); depending on the outcome of that analysis this could more than double the funds allocated to general unsecured creditors.  Moreover, there are a number of bank accounts that have "pending" balances as of December 31, 2020 that are categorized as unreviewed, and 7% of governmental entities have not responded to requests for information relating to account balances and restriction classifications.

- Additional funds that should be available for creditors relate to lottery funds. The Disclosure Statement describes the Oversight Board's analysis of three bank accounts holding a total of **$257 million** in lottery funds as inconclusive.  In Puerto Rico, unclaimed lottery prize money is forfeited after 180 days, which means that the Oversight Board should be able to quantify the forfeited lottery prize money and ultimately make those funds available for creditor recoveries.

- Based on information provided in the Disclosure Statement and the December 2020 Bank Account Presentation, it appears that ERS has $741 million in assets.[60]  After accounting for the $519 million in consideration to ERS bondholders in

---

[59]  *Creditor Mediation Cash Support Materials*, EMMA (Dec. 17, 2020), https://emma.msrb.org/P11450397-P11124337-P11535399.pdf.

[60]  Per Exhibit L of the Disclosure Statement, ERS has $389 million in cash and investment proceeds as of December 31, 2020 (excluding the $790 million in entrusted funds by participating employees and teachers for defined contribution plan established pursuant to Act 106-2017), a private equity portfolio valued at $70.75 million, and, based on the December 2020 Bank Account Presentation, $281 million in employee loans as of July 2020.

connection with the proposed plan settlement agreement ($373 million cash distribution plus $75 million in consummation payments plus $70.75 million private equity portfolio), there are approximately **$222 million** in ERS assets remaining.  Further, that amount does not even include an additional $316 million held at the Commonwealth's Department of Treasury that was categorized as "asserted to be restricted" in the Disclosure Statement as it was subject to ERS bondholder litigation.  The Disclosure Statement should explain whether and to what extent any of these funds have already been committed to other creditor groups and, to the extent they are not so committed, why such assets should not be made available for distribution to general unsecured creditors.

- The Oversight Board's December 2020 Bank Account Presentation contemplates a minimum cash balance of $2.5 billion.  Included in the minimum cash balance is $894 million in funds to execute the LUMA transaction.  Ultimately, the Commonwealth funded only $750 million for the LUMA transaction, freeing up **$144 million** that was previously committed to fund the LUMA operating and capital accounts.

- Other cash that should be available for creditor recoveries from the December 2020 Bank Account Presentation relates to **$935 million in fiscal year 2020 appropriations that were extended to fiscal year 2021**.  The Committee understands that the analysis to quantify the amount of FY 2020 appropriations spent during fiscal year 2021 is ongoing.  Given the fact that fiscal year 2021 is coming to an end in a matter of weeks and given that the Oversight Board recently certified a revised Commonwealth fiscal plan, the Committee believes this analysis must have been completed prior to certification of the revised fiscal plan, because these amounts would have needed to be quantified and, to the extent unspent, incorporated into the revised Commonwealth certified fiscal plan.  The Oversight Board should be required to disclose whether and to what extent these funds have not been spent, and, to the extent that is the case, the Oversight Board should explain why such excess funds are not being made available for creditors.

- In addition to cash, the Commonwealth has other assets that are available to improve creditor recoveries, including accounts receivable related to reimbursement of past due PayGo obligations from government entities and municipalities.  AAFAF's PayGo report for the month of March 2021 shows past due amounts owed for fiscal years 2018 through 2020 total nearly $172 million with an additional $109 million in unpaid obligations owed for fiscal year 2021.  In accordance with Act 106-2017, government entities and municipalities that participate in ERS are financially responsible to reimburse the Commonwealth for PayGo expenditures paid on their behalf.[61]  The legislation also provides for certain corrective actions in the event of noncompliance with paying the PayGo fee.[62]  One of those corrective actions permits CRIM to remit the delinquent

---

[61]  2021 Fiscal Plan for Puerto Rico, Financial Oversight & Management Board for Puerto Rico (Apr. 23, 2021), https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view at 48-49.

[62]  *Id.* at 281-282.

contribution from the "unencumbered balance of the property tax and other revenues that the Municipalities are entitled to receive."[63]  CRIM's certified fiscal plan dated April 23, 2021, requires CRIM to sell its aged A/R portfolio by the end of fiscal year 2022 resulting in estimated proceeds of $400 million.[64]  According to the Law 29-2019 repayment waterfall, proceeds from the sale of the A/R portfolio "shall be paid to the Commonwealth to further offset remaining obligations."[65]  Given the Oversight Board's previous comments and legal actions taken, the Committee would expect the Oversight Board to ensure government entities and municipalities remit past due amounts in a timely fashion.

- Finally, there are many other sources of potential recoveries to general unsecured creditors that are nowhere discussed in the Disclosure Statement including that (a) the Commonwealth has the ability to sell vacant/unused properties or assets, (b) the Commonwealth's working capital requirement could be further reduced, and (c) the Commonwealth could issue additional bonds and/or contingent value instruments in order to improve creditor recoveries.

102.    The Disclosure Statement must be revised to explain the value and availability of the Debtors' assets, including, without limitation, the specific questions posed herein.

## ii.   Inadequate Disclosures Regarding Essential Services

103.    The corollary to requiring disclosure of the value of a debtor's assets is disclosure of the availability of those assets to satisfy creditor claims—and, in the context of a municipal bankruptcy, this requires disclosure of the debtor's essential services and how much of the debtor's available assets are taken up in paying for those services.  This is because, to confirm a municipal plan, a bankruptcy court must determine that the proposed plan is "the 'best' available proposal for the [debtor] to pay its creditors while maintaining its capacity over time to provide essential services to its citizens."  *Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*, 542 B.R. 261, 286 (9th Cir. B.A.P. 2015).  This is "a factual finding for the bankruptcy court to make in light of the evidence before it." *Id.; see also In re City of*

---

[63]   *Id.*  at 282.

[64]   Fiscal Plan for the Municipal Revenue Collection Center, Financial Oversight & Management Board for Puerto Rico (Apr. 23, 2021), https://drive.google.com/file/d/1KijWkWgzKpJUvGNGwvfBvDCnt6psoBWh/view.

[65]   *Id.* at 45.

*Detroit*, 524 B.R. 147, 219 (Bankr. E.D. Mich. 2014) (best interests test was satisfied as evidence

supported that "there is no more money available for creditors in the City's already tight budget

projections" as "every dollar is accounted for in providing necessary services").

104.    The Oversight Board, however, takes the position that it is not obligated to define

or quantify essential services.[66]  While the Oversight Board presents several arguments in

support of this position, at bottom they share the same assertion: the definition of essential

services has no application or impact on how a creditor would vote on the Proposed Plan because

the Oversight Board has reached a settlement with holders of General Obligation bonds, pursuant

to which the bondholders have agreed not to assert that their claims have precedent over all other

Commonwealth obligations, even essential services.

105.    This argument misstates the law.  A municipal debtor's obligation to show that its

proposed plan strikes the proper balance between doing the best it can to pay its creditors while

continuing to provide essential services applies to **all** creditors—not just those who have asserted

a right to be paid prior to essential services.[67]

### d.  Inadequate Disclosures Regarding Terms of Key Settlements

106.    The Proposed Plan is premised on a series of settlements with various creditor

groups.  Creditors—especially creditors not involved in settlement negotiations—are, therefore,

entitled to understand these settlements—including the rationale for the settlements and the

---

[66]    Discl. Stmt. at 162-63.

[67]    This applies with particular force to PROMESA, as opposed to a case under chapter 9 of the Bankruptcy Code.
The reason that essential services are given special status in a chapter 9 case is that "there is no purpose in
confirming a chapter 9 plan if the municipality will be unable to provide future governmental services."  *In re
Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999).  However, under chapter 9, a municipality
is eligible for relief under chapter 9 only if it is insolvent and the "insolvency test measures whether a
municipality can pay for the services it provides."  *Id.*  In other words, a chapter 9 debtor has already
established that, absent some form of reorganization and restructuring, it cannot both pay its creditors and
continue to provide services.  PROMESA, however, does not incorporate chapter 9's insolvency requirement.
As such, creditors have even less information about the Commonwealth's ability to pay its creditors than
creditors in chapter 9 cases (and, anyway, even those cases require disclosure of the type of information the
Committee now requests).

parties' respective positions and the alternative to the settlements.  *See In re Fullmer*, No. 09-

50086-RLJ-11, 2009 WL 2778303, at *2 (Bankr. N.D. Tex. Sept. 2, 2009) (disclosure statement

could not be approved where it contained insufficient description of proposed settlement that was

"single most important event that has transpired" in the case, as creditors that were not party to

the settlement, "particularly unsecured creditors, would be better informed if they are aware of

[settling party's] articulated reasoning regarding the comprehensive settlement").

107.    The Disclosure Statement, however, does not provide this information, and is

entirely silent regarding the Debtors' ability to satisfy Bankruptcy Rule 9019 with respect to the

proposed settlements, thus leaving creditors in the dark regarding how the Oversight Board

believes it will be able to confirm its Proposed Plan.  *See, e.g.*, *Resolution Trust Corp. v. Best

Prods. Co. (In re Best Prods. Co., Inc*.), 177 B.R. 791, 794 n. 4 (S.D.N.Y.1995) ("Irrespective of

whether a claim is settled as part of a plan . . . or pursuant to separate motion under Bankruptcy

Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68

F.3d 26 (2d Cir.1995); *In re Nutritional Sourcing Corp*., 398 B.R. 816, 832 (Bankr. D. Del.

2008) ("When evaluating a settlement provided for under a plan of reorganization, the

Bankruptcy Court must determine that a proposed compromise forming part of a reorganization

plan is fair and equitable.") (as modified) (internal references omitted).

108.    Here, the Disclosure Statement states that the Oversight Board has settled the

"Debt Related Objections" in connection with the GO, PBA, and PRIFA Bonds, including

disputes regarding the validity, priority, and asserted secured status of the GO and PBA Bonds.[68]

Absent from the Disclosure Statement, however, is any discussion of critical aspects of this

settlement, including:

---

[68]    Discl. Stmt. at 25.

- The legal issues surrounding these disputes and the Oversight Board's assessment of the likelihood of success on the claims it (and other parties) has asserted;

- How the settlement, including, specifically, the near-full recovery awarded to holders of PBA Bond and GO Bonds, can be reconciled with the Oversight Board's repeated and unequivocal assertions throughout these cases that state and territorial law priorities are not incorporated into PROMESA;

- The impact on creditor recoveries if the Debtors prevail on those claims;

- That the Oversight Board is also seeking to settle claims brought by the Committee, which has challenged the ability of the Oversight Board (as a non-fiduciary) to settle the Committee's pending litigation;

- How this settlement compares to settlements of similar issues reached in other cases;

- Whether non-economic considerations other than a pure assessment of the relative legal strengths and weaknesses were part of the Oversight Board's analysis and its decision to settle with these bondholders;

- The rationale for settling these claims;[69]

- The rationale or justification for the relative discounts from full recovery across the various bond series and how that reflects litigation risk across the various series;

- The rationale or justification for agreeing to an allowed claim amount that includes original issue discount;

- The rationale or justification for releasing claims for affirmative recovery from prior holders of GO and PBA bonds, who are not entitled to vote on the Proposed Plan, and have no claim against the Debtors to "discount."

109.    Without answers to these key questions, creditors will not be able to assess this settlement, which is arguably the lynchpin to the entire Proposed Plan.  The Disclosure Statement must be revised to include this information.[70]

---

[69]   The Disclosure Statement's proffered rationale for this settlement is limited to two sentences: That settling the asserted priority claim safeguards (i) payments to retirees, and (ii) the Commonwealth's continued ability to claim available resources.  However, that (exceedingly brief) analysis is buried in an entirely unrelated section of the Disclosure Statement, addressing the Oversight Board's Powers and Responsibilities.  More importantly, it leaves unanswered all of the other questions articulated herein.

[70]   The Disclosure Statement is equally remiss regarding other settlements described in the Disclosure Statement. For example, as noted above the terms of the HTA/CCDA Plan Support Agreement agreed to by the Oversight Board could result in payments to Clawback Creditors well in excess of 80%.  The Disclosure Statement,

### e. Inadequate Disclosures Regarding Releases

110.     Adequate information requires full disclosure of all releases contemplated by a

plan.  Bankruptcy Rule 3016 requires that all injunctions contemplated by a plan be described in

"specific and conspicuous language"—which requirement applies to releases as they are, "for

practical purposes, an injunction."  *In re Lower Bucks Hosp.*, 571 Fed. App'x 139, 142-43 (3d

Cir. 2014) (affirming bankruptcy court's order reconsidering approval of disclosure statement

where release provisions were not adequately disclosed).  As with all aspects of a disclosure

statement, releases should be described in plain English (and Spanish), leaving no confusion

about (i) who is getting a release, (ii) who is granting a release, (iii) what claims are being

released, and (iv) the consideration for the release.  *See generally In re Ferretti*, 128 B.R. 16, 17-

19 (Bankr. D.N.H. 1991) ("information that is provided must be clear and comprehensible" and

"should not contain overly technical language that the average creditor cannot readily

understand").

111.     Contrary to this clear, and commonsense, requirement, the release and related

injunction provisions of the Disclosure Statement are unclear and quite confusing.

112.     First, the Disclosure Statement does not clearly explain who is **<u>granting</u>** a release.

Section W.5 of the Disclosure Statement refers to releases "**<u>by the Debtors and Reorganized</u>**

**<u>Debtors</u>**."  However, the "Injunction on Claims" at section W.3 of the Disclosure Statement

enjoins "**<u>any party</u>** who has held, holds, or might hold claims or any other debt or liability that is

released pursuant to the Plan."  Further, the "Injunction Related to Releases" at section W.6 of

the Disclosure Statement enjoins "**<u>all entities</u>** that have held, currently hold, or may hold a

---

however, makes no effort to explain the Oversight Board's determination that this is a reasonable settlement,
especially in light of the fact that the Court has already ruled that the Clawback Creditors' asserted security
interests are limited to amounts actually deposited into certain funds and/or accounts, which amounts are a
fraction of the Clawback Creditors' asserted claims.

Released Claim."  In addition, the term "Released Claim" is not defined in the Disclosure

Statement, but is defined in the Plan broadly to include, among other things, claims that "are

**related to** . . . the Debtors or their Assets in the Title III Cases,"[71] and claims that "otherwise . . .

**relate to** the Title III cases."[72]  These provisions create confusion regarding whether releases are

being granted merely by the Debtors or by all creditors (whether or not such creditors support the

Proposed Plan).

113.    This lack of clarity continues with the "Supplemental Injunction" at section W.11

of the Disclosure Statement.  This enjoins, among others, "**all entities** who have held or asserted,

currently hold or assert, or may hold or assert, any Released Claims against any of the Released

Parties based upon or relating to the Title III Cases."  As with section W.6, section W.11

contradicts section W.5 by suggesting that releases are to be granted not only by the Debtors, but

by all creditors (whether or not such creditors support the Plan).

114.    The Disclosure Statement is equally deficient in its explanation of who is

**receiving** releases under the Plan.  According to sections W.3, W.5, and W.11 of the Disclosure

Statement, releases run in favor of the "Released Parties" defined as, essentially, the Debtors and

the parties to PSAs with the Debtors.[73]  But section W.6 purports to enjoin actions regarding

Released Claims **without regard to which parties such Released Claims are asserted against**.

Nor does the Proposed Plan definition of Released Claim help clarify the matter, as under that

definition a Released Claim may be a claim asserted **against any party** as long as it is somehow

"related to the Debtors" or "related to the Title III case[s]."[74]  In sum, while it seems clear that

---

[71]    Proposed Plan § 1.370(a).

[72]    Proposed Plan § 1.370(e).

[73]    Defined in the plan as "Collectively, solely to the extent provided in the Plan, (a) the Government Parties, (b) the GO/PBA PSA Creditors, (c) the Retiree Committee, (d) AFSCME and (e) with respect to the foregoing clauses (a) through (d), each of their respective Related Persons."  Plan § 1.371

[74]    Proposed Plan § 87.1.

the Debtors intend to provide releases to certain non-Debtors, it is unclear whether these protected parties include only the Released Parties or any party that could be liable in connection with a Released Claim.

115.    The third major flaw of the Disclosure Statement's discussion of releases is the lack of clarity regarding **what claims are being released**.  Indeed, on this point the injunction at Section W.3 (a-d) of the Disclosure Statement goes beyond lack of clarity into the realm of impossibility, providing an injunction with respect to "any Claim or other debt or liability that is discharged pursuant to the Plan," which injunction, as discussed above, purports expressly to benefit the Released Parties, a group that include non-Debtors such as the GO/PBA PSA Creditors, the Retiree Committee, and AFSCME.  **But the Debtors cannot provide a discharge for non-Debtor parties**.  Neither the subsections of section 524 of the Bankruptcy Code incorporated into PROMESA nor section 944 of the Bankruptcy Code (incorporated in its entirety into PROMESA) provide for the discharge of claims against non-debtors.

116.    Not only does the Disclosure Statement lack clarity regarding releases and related injunctions, but **these issues must be clarified in order to understand the legality and confirmability of the Plan**.  This is because the Disclosure Statement provisions discussed above appear to describe releases and/or injunctions in favor of Non-Debtors, such as Non-Debtor Released Parties or Non-Debtors liable in connection with Released Claims, that would enjoin creditors even if such creditors do not support the Proposed Plan.  Therefore, these provisions may constitute nonconsensual third party releases that are prohibited unless there are unusual and extraordinary circumstances of a kind not apparent from the Disclosure Statement.[75]

---

[75]    *See, e.g.*, *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 139 (3d Cir. 2019) ("Our precedents regarding nonconsensual third-party releases and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such releases and injunctions are to be permitted, and suggest that courts considering such releases do so with caution.") (subsequent history omitted); *Class Five Nev. Claimants v. Dow Corning (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) ("Because such an injunction is a dramatic measure

Simply put, the Debtors must clarify (a) whether they are in fact seeking nonconsensual third

party releases and (b) what rationale would support such releases in these Title III cases.

117.    Finally, regardless of whether the Debtors seek nonconsensual third party

releases, the fourth major flaw with respect to the releases and related injunctions described in

the Disclosure Statement is the lack of an adequate explanation regarding the rationale for such

releases.  In particular, the only explanation for the releases provided to Non-Debtors is that the

releases "are integral to obtaining the value provided under the settlements in the Plan"[76] and are

"essential to the implementation of the Plan."[77]  This generalized boilerplate language is

insufficient to justify even the Debtors' consensual grant of releases, much less non-consensual

third party releases.

i.   <u>Inadequate Disclosures Regarding Certain Specific Releases</u>

118.    One of the groups of claims being released under the Proposed Plan are the

Invalidity Actions commenced to recover principal and interest payments on GO Bonds and

PBA Bonds that the Oversight Board and the Committee have alleged, in other litigation, are

invalid for various reasons.[78]  The Disclosure Statement's entire explanation of the Proposed

Plan's treatment of the Invalidity Actions is the brief statement that "the PSA and the Plan

provide for dismissal of the Invalidity Actions following confirmation."[79]

119.    The Disclosure Statement does not address whether (and which) of the Invalidity

Actions have been asserted against defendants that are no longer holders of GO Bonds or PBA

Bonds, or the total amount of the funds sought to be recovered in those actions.

---

to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is
only appropriate in 'unusual circumstances.'").

[76]   Discl. Stmt. § C.3.

[77]   Discl. Stmt. § W.4.

[78]   Discl. Stmt. at 324-25.

[79]   *Id.*

120.    Nor does the Disclosure Statement explain why the Debtors are releasing their claims against former bondholders—or why it makes sense to do so under the settlement reached with current bondholders.  Unlike the current GO/PBA Creditors, prior holders have no claim against the Debtors.  As such, they are not entitled to vote on the Proposed Plan, and can offer no support in that regard.  And, because these prior holders have no claim on account of the GO Bonds or the PBA Bonds, they cannot offer to discount their claim, offering no savings to the Debtor.  Nor, having no claims, can they assert that their claims are entitled to priority over essential services or any other claims or obligations.

121.    Stated simply, the Disclosure Statement offers no explanation or rationale for releasing the Invalidity Actions as against prior bondholders.  This must be remedied, as creditors are entitled to know what value is being left on the table and why, including what consideration is being received in exchange for these releases.  This is particularly relevant to unsecured creditors, whose recovery is directly tied to the value of avoidance actions like the Invalidity Actions.

### f.  Inadequate Disclosures Regarding Risk Factors

122.    A lynchpin of the Proposed Plan is the issuance of the New GO Bonds, the issuance of which requires legislative approval.  Purportedly recognizing this, section VIII.T. of the Disclosure Statement, which covers Risk Factors related to legislative action, acknowledges "there is no certainty" that the contemplated, and required, legislation will be enacted.

123.    This statement is woefully insufficient to adequately apprise creditors of this issue.  The Disclosure Statement's recitation of the risk factors is generic and boilerplate, as if the risk of the government opposing the Proposed Plan is merely a theoretical possibility.  It is not.

124.    On June 9, 2021, not even a week ago, Governor Pierluisi signed into law House Bill 120.  This legislation, among other things, establishes as the government's policy the payment of pensions in full, directs AAFAF to prepare an alternative plan consistent with such governmental policy, and requires that such alternative plan include deep cuts to the claims of bondholders that are inconsistent with the generous payments proposed in the Oversight Board's Proposed Plan.  This legislation confirms the government's opposition to the Proposed Plan and builds on years of previous opposition to key aspects of the plan by Puerto Rico's lawmakers and government officials documented in legislative resolutions,[80] proposed legislation,[81] press releases,[82] and public statements.

125.    In light of this, the Disclosure Statement must be revised to, among other things, acknowledge the government's opposition to the Plan, describe House Bill 120 and other legislative barriers to government support for the Plan, identify the legal basis upon which the Oversight Board intends to override governmental opposition, and discuss the likelihood of success of litigation seeking the imposition of contemplated legislation over the government's opposition.

---

[80]    *See, e.g.*, Reorg Research, Puerto Rico House Passes Resolution Rejecting Plan of Adjustment Over Pension Cuts, Pledging Not to Approve Related Legislation, dated Oct. 22, 2019; Reorg Research, UPDATE 1: Puerto Rico Senate Approves House Resolution Rejecting Plan of Adjustment Over Pension Cuts, dated Nov. 7, 2019; and Reorg Research, Puerto Rico Legislative Measures Link Pensions to Potential Legislation for Plan of Adjustment; Other Bills Seek Debt Audits, dated Feb. 12, 2021.

[81]    *See e.g.*, Reorg Research, *Policy Bill Filed in Puerto Rico House Would Block Government Action on Plans of Adjustment, Pitches Alternate Plan Complete with Recoveries by Class*, dated Mar. 13, 2020; and Reorg Research, *Puerto Rico Legislative Measures Link Pensions to Potential Legislation for Plan of Adjustment; Other Bills Seek Debt Audits,* dated Feb. 12, 2021.

[82]    *See e.g.*, Reorg Research*, Oversight Board Defends Public Pension Cuts, Cites 'Decades' of Government Mismanagement, Title III Priority Rules; Gov. Rosselló Reiterates Opposition to Pension Cuts,* dated May 17, 2019; Reorg Research, *Sobrino Says Commonwealth Will Not Approve Legislation to Issue New Commonwealth Debt If Plan of Adjustment Contains Pension Cuts; All Other Disputes 'Manageable',* dated June 14, 2019; and Reorg Research, *UPDATE 1: Pierluisi Calls Amended Plan Terms 'Feasible' But Reiterates Commonwealth Will Not Support Plan With Pension Cuts; Judge Swain Directs Briefing on Oversight Board's Requested Extension*, dated Feb. 10, 2021.

### g. Inadequate Disclosures Regarding Feasibility

126.     A disclosure statement must explain to creditors why the plan proponent believes that the proposed plan satisfies the applicable confirmation standards.  As applied here, that means creditors must be able to determine whether the Proposed Plan is feasible (which is a confirmation requirement under section 314(b)(6) of PROMESA).

127.     The Disclosure Statement does not include adequate information in this regard, relying instead on a one-page summary stating that the Oversight Board believes that the Proposed Plan is feasible (Disclosure Statement at 477).  The Disclosure Statement does not, however, provide creditors any information they would require to reach an informed judgment as to the accuracy or completeness of that belief.  In fact, this brief summary does not even provide any insight into the Oversight Board's basis for its belief.  To the contrary, the Disclosure Statement says only that the Proposed Plan is feasible because it is consistent with the May 2019 Fiscal Plan—and even this tepid statement is followed by the immediate qualification that, "if needed," the Oversight Board will update this analysis when the next fiscal plan is certified.  Yet, the Oversight Board has already certified two subsequent fiscal plans, meaning that in addition to being inadequate, this disclosure about feasibility is already outdated and facially deficient.

128.     Creditors are entitled to actual information and supporting data—the Oversight Board's conclusory (and unconvincing) statement does not satisfy its obligation to provide adequate information.

### III.     Classification Scheme Violates First Circuit's Strict Approach to Classification

129.     On April 29, 2021, the Court entered an order[83] denying, without prejudice, the Committee's motion seeking to reclassify certain claims pursuant to Bankruptcy Rule 3013.

---

[83]     *See Order Denying the Official Committee of Unsecured Creditors' Bankruptcy Rule 3013 Motion and Related Scheduling Motion* [Docket No. 16629].

This order provided that the Committee would be able to "present the arguments therein [*i.e.*, in its Rule 3013 motion] as objections in connection with any motion seeking approval of a disclosure statement or confirmation of a plan of adjustment."

130.    Pursuant to that order, the Committee now presents its arguments in support of its claim that the classification scheme in the Proposed Plan is inconsistent with controlling law in the First Circuit and that approval of the Disclosure Statement and solicitation of the Proposed Plan should not go forward unless and until this defect is cured.

131.    The arguments and authorities surrounding this issue have been developed in numerous pleadings, including (i) the Committee's Original Rule 3013 Motion,[84] (ii) the various joinders[85] and objections[86] thereto, (iii) the replies filed by the Committee (the "Rule 3013 Reply"),[87] Ambac (the "Ambac Reply"),[88] and Assured (the "Assured Reply")[89] in support of the Original Rule 3013 Motion, (iv) the Committee's "Renewed Rule 3013 Motion,"[90] (v) the objection of the Service Employees International Union to the Renewed Rule 3013 Motion [Docket No. 16476] (the "SEIU Objection"), (vi) the objection of the American Federation of Teachers to the Renewed Rule 3013 Motion [Docket No. 16477] (the "Second AFT Objection"),

---

[84]    The "Original Rule 3013 Motion" is the *Motion of Official Committee of Unsecured Creditors Pursuant to Federal Rule of Bankruptcy Procedure 3013 for Entry of an Order Reclassifying Class 39A and Class 41 Claims Under Oversight Board's Plan of Adjustment Dated February 28, 2020* [Docket No. 11989].

[85]    Joinders to Original Rule 3013 Motion include: (i) Ambac's Partial Joinder [Docket No. 12691]; (ii) Assured's Partial Joinder [Docket No. 12687]; and (iii) SIM's Joinder [Docket No. 12365].

[86]    Objections to the Original Rule 3013 Motion include: (i) the "Original Oversight Board Objection" [Docket No. 12726]; (ii) the "Original Retiree Objection" [Docket No. 12684], filed by the Official Committee of Retired Employees; (iii) the "Supplemental Retiree Objection" [Docket No. 12725]; (iv) the objection filed by American Federation of State, County, and Municipal Employees International Union [Docket No. 12689] (the "AFSCME Objection"); (iv) objection filed by the Lawful Constitutional Debt Coalition [Docket No. 12724] (the "LCDC Objection"); (v) the objection filed by the QTCB Noteholder Group [Docket No. 12723] (the "QTCB Objection"); and (vi) the objection filed by the American Federation of Teachers [Docket No. 12084] (the "Original AFT Objection").

[87]    *See* Docket No. 12872.

[88]    *See* Docket No. 12873.

[89]    *See* Docket No. 12871.

[90]    *See* Docket No. 16396.

(vii) objections to the Committee's scheduling motion in connection with the Renewed Rule 3013 Motion filed by the Retiree Committee [Docket No. 16486] (the "Second Retiree Objection") and the Oversight Board [Docket No. 16521] (the "Second Oversight Board Objection"), and (viii) the Committee' reply in support of the scheduling motion [Docket No. 16531] (the "Scheduling Reply") (collectively, the "Prior Rule 3013 Pleadings").

132.    The Committee will not unnecessarily duplicate Prior Rule 3013 Pleadings (which are incorporated herein).  That being said, the Committee's focus in its Scheduling Reply was (appropriately) on the narrow scheduling issue relevant at that time, and only superficially addressed certain substantive arguments raised in the responses to the scheduling motion, and did not at all address the substantive objection to the Renewed Rule 3013 Motion itself.  Those points are addressed herein.

### a. In the First Circuit, the Only Legal Character of Claims that Matters Is that of Priority or Rights in Property

133.    In its objection to the Renewed Rule 3013 Motion, the Retiree Committee correctly notes that the First Circuit's *Granada Wines* ruling permits separate classification where there is a difference in the "legal character" of the two claims (or types of claims) at issue. The Retiree Committee then accuses the Committee of ignoring an analysis of the claims of retirees as compared to those of general unsecured claims, and asserts that "the legal nature of a retiree's claim who receives a monthly pension check for life based on a complicated statutory scheme is markedly different from that of a commercial creditor who is paid a lump sum from the Commonwealth's general coffers in accordance with negotiated rates for goods provided or services rendered."[91]

---

[91]    Second Retiree Obj. ¶ 12.

134.    In fact, it is the Retiree Committee that ignores (or fails to understand) what the

First Circuit deems a difference in legal character justifying separate classification.  As explained

in the Original Rule 3013 Motion and the Renewed Rule 3013 Motion, "*Granada Wines* requires

a difference in rank concerning rights against the debtor or its property."  *In re Bjolmes Realty*

*Tr.*, 134 B.R. 1000, 1003 (Bankr. D. Mass. 1991).

135.    Indeed, *Bjolmes Realty* is particularly instructive.  In that case, the court—

agreeing with a minority of cases in the First Circuit—held that an unsecured deficiency claim

could be separately classified because, pursuant to section 1111(b) of the Bankruptcy Code, the

creditor could elect to have its claim treated as secured.  As the court explained, a creditor that so

elects "would not be entitled to share [with unsecured] creditor in other property now in the

bankruptcy estate" and its "sole recourse would then be to look to the mortgaged property.  **Here**

**is the type of dichotomy referred to in _Granada Wines_—a difference in rank with respect to**

**property**" of the estate.  *Id.* at 1003 (emphasis added); *see also In re River Valley Fitness One*

*Ltd. P'ship*, Case No. 01-12829, 2003 Bankr. LEXIS 1252, at *26-27 (Bankr. D.N.H. Sep. 19,

2003) ("Because Ledyard Bank has agreed to subordinate repayment of its claim to other

unsecured creditors, the rank, legal character and status of the Ledyard Bank claim is different

from other unsecured claims and separate classification is permissible under *Granada Wines*.")

136.    No party has (or could) assert that the claims of retirees are secured or are entitled

to priority under sections 503 or 507 of the Bankruptcy Code.  For that matter, no party has (or

could) deny that claims of retirees are general unsecured claims.  As such, and for the reasons

articulated in the Prior Rule 3013 Pleadings, the fact that retiree claims are paid over time while

other general unsecured claims frequently are not, is not a "difference in rank concerning rights

against the debtor or its property," *Bjolmes*, and nor does it demonstrate a difference in the "legal

character of their claims [] as to accord them a status different from the other unsecured

creditors." *Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*,
748 F.2d 42, 46 (1st Cir. 1984).

### b. Business, Economic, or Governmental Rationales May Be Relevant In Other Circuits—But Are Irrelevant Under *Granada Wines* <u>and</u> Under PROMESA

137.    Because it continues to be a theme of the responses to the Renewed Rule 3013
Motion, it bears repeating that the First Circuit has rejected as irrelevant considerations of
relative importance to the debtor as justifications for separate classification.[92]  The objectors'
numerous "fond references"[93] to, for example, discussions in the Detroit bankruptcy of the
contributions of public employees to the functioning of the debtor are, therefore, irrelevant.[94]

138.    Moreover, references to rulings outside of the First Circuit are particularly
unpersuasive because PROMESA has seemingly adopted the strict classification of *Granada
Wines*.  Section 301(e) of PROMESA provides that "[i]n determining whether claims are
'substantially similar' for the purpose of section 1122 of Title 11 . . . the Oversight Board shall
consider <u>whether such claims are secured and whether such claims have priority over other
claims</u>."

---

[92]    *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. 17, 30 (Bankr. D. Mass. 2002) ("The Debtor ignores that the Ninth Circuit has adopted a test less stringent than the strict approach of Granada Wines and [unlike the First Circuit] permits separate classification of claims based upon the economic or business reasons advanced by a debtor."); *CGE Shattuck*, 1999 WL 33457789, at *4 ("*Granada* adopts the strict approach under pre-Code Chapter X cases which required that a plan must classify all legally similar claims together regardless of business or economic issues."); Gato, 183 B.R. at 21 (describing Granada Wines as "rejecting the business justification approach").

[93]    *See Bjolmes*, 134 B.R. at 1003 (dismissing as inconsistent with First Circuit law the debtor's "fond references to decisions handed down in other jurisdictions permitting separate classification of claims based upon practical difference[s] among the classes").

[94]    The various objectors to the Original Rule 3013 Motion and the Renewed Rule 3013 Motion also assert moralistic arguments in favor of their claims that retirees are more deserving of their higher recoveries.  As explained in the Rule 3013 Reply, creditors' needs are not a relevant consideration even in districts that recognize separate classification based on economic or business justifications.  *See In re City of Detroit*, 524 B.R. 147, 258 (Bankr. E.D. Mich. 2014) (explaining that the Court's judgment "necessarily excludes the relative needs of the creditors in the disparately treated classes" and "no case law in any of the rehabilitative chapters suggests that creditors' needs are an appropriate consideration in determining whether a plan unfairly discriminates").

139.     This provision supports the Committee's position, as it effectively codifies

*Granada Wines* by recognizing that the appropriateness of separate classification should turn on

the relative "rank"—*i.e.*, security and/or priority—of the claims.  Moreover, by imposing

requirements (telling the Oversight Board what it "shall" do) that otherwise do not exist under

section 112 of the Bankruptcy Code, section 301(e) of PROMESA restricts the Oversight

Board's flexibility in classification decisions.

### c.  Strict Classification Argument Is Not a Gerrymandering Argument or Disguised Unfair Discrimination Argument

140.     The Committee anticipates that the Oversight Board will renew its claim that the

classification issues raised by the Committee are gerrymandering or unfair discrimination

complaints that will be mooted if all Classes vote to accept the Proposed Plan—and, therefore,

that this issue should not be addressed until confirmation.  This is belied by the actual function of

the Bankruptcy Code, which allows individual creditors to raise issues of proper classification

even if all classes vote in favor of a plan.  *See, e.g.*, *Franklin High Yield Tax-Free Income Fund

v. City of Stockton (In re City of Stockton)*, 542 B.R. 261, 280-83 (9th Cir. B.A.P. 2015)

(addressing classification arguments raised by dissenting creditor while noting that cramdown

analysis is not required when "Franklin is merely a dissenting creditor in the accepting class of

general unsecured creditors" and, therefore, declining to consider Franklin's unfair

discrimination argument).

141.     Accordingly, and unless the Oversight Board argues—and the Court is

persuaded—that every single voter in every single Class (including Class 55) will vote in favor

of the Proposed Plan, whether the Proposed Plan's classification scheme is permissible will not

be mooted even if section 1129(a)(8) is satisfied.

142.     Relatedly, while unfair discrimination is applicable only in a cramdown, proper

classification is a requirement of all plans, even fully consensual ones.  To that end, courts have

repeatedly explained that these are separate concepts.  *See In re 266 Washington Assocs.*, 141

B.R. 275, 286 (Bankr. E.D.N.Y.), *aff'd sub nom.*, *In re Washington Assocs.*, 147 B.R. 827

(E.D.N.Y. 1992) ("Whether or not a plan discriminates unfairly is beside the point at this

juncture.  The Debtor **hopelessly confuses two discrete legal issues** by merging them into a

seamless web.  Unfair discrimination is a cram down issue under 11 U.S.C. § 1129(b)(1).

Classification of claims are 11 U.S.C. §§ 1122 and 1129(a)(10) issues....") (emphasis added)); *In

re Hanish, LLC*, 570 B.R. at 16 (the "First Circuit's strict construction of 11 U.S.C. § 1122(a)

makes detecting gerrymandering substantially easier by creating a strong presumption that

facially similar claims should be classified together.  That is not to say gerrymandering is not an

issue at all.").

### d.   Differences in Proposed Treatment Do Not Justify Separate Classification

143.     In their responses to the Renewed Rule 3013 Motion and the related scheduling

motion, the Oversight Board and the Retiree Committee argue that because retirees receive a

stream of payments over a lengthy period of time (the life of the retiree, generally) retiree benefit

claims must be classified separately from other general unsecured claims.[95]  It is not clear

whether the objectors mean to argue that separate classification is required because of a

difference in (i) the prepetition nature of claims for a stream of payments versus claims for

immediate payment, rendering the claims dissimilar for purposes of classification under section

---

[95]   SEIU asserts a similar objection, claiming that the "structure of the two types of claims are strikingly different.
Retirees receive a promised stream of income, typically paid in monthly increments, until their death or that of
their survivor.  Trade debt is generally a one-off matter."  SEIU Obj. ¶ 7.

1122 of the Bankruptcy Code, or (ii) the proposed treatment of retiree benefit claims versus the proposed treatment of general unsecured claims.[96]  Regardless, both are wrong.

i.   Prepetition Differences Do Not Render Retiree Claims and General Unsecured Claims Dissimilar

144.    It is simply not the case that a claim for a stream of deferred payments is legally different (for purposes of classification and similarity of claims) than a claim for a one-time payment.  As one court has explained, "[w]here the differences are in the rates of interest, in the amounts, in the dates of maturity, in names of payees, **the manner in which the claim arose** and such other minor details, they cannot affect the 'nature,' *i.e.*, the kind of claim, otherwise a separate class would have to be provided for nearly every type of situation."  *In re Nat'l/Northway Ltd. P'ship*, 279 B.R. 17, 28 (Bankr. D. Mass. 2002) (emphasis in original) (internal references omitted).[97]

145.    Further, it "is a basic tenet of the Bankruptcy Code that bankruptcy operates as the acceleration of the principal amount of all claims against the debtor."  *Nationwide Mut. Ins. Co. v. Optel, Inc. (In re Optel, Inc.)*, 60 Fed. App'x 390, 394 (3d Cir.2003) (quotation marks and citations omitted).  As such, after the Petition Date, all claims, regardless of prepetition payments schedules, are indistinguishable from each other in this regard.[98]

146.    Finally, even if differences in timing of payments under non-bankruptcy law were legally relevant to classification (they are not), the objectors have not established that (i) none of

---

[96]   This lack of clarity is unsurprising given that the Oversight Board and the Retiree Committee have never fully briefed this argument.

[97]   Additionally, and as noted above, the only difference recognized in the First Circuit (and under PROMESA) as justifying separate classification of two types of similar claims are differences in the claimants' legal rights against the debtor's property or priority.  If differences in maturity dates rendered claims substantially dissimilar for purposes of classification, that would undermine *Granada Wines* and its progeny to the point of irrelevance.

[98]   If a prepetition entitlement to a stream of payments creates a claim that, for purposes of the Bankruptcy Code, is of a different legal nature than a prepetition entitlement to a lump sum payment, there would be no need for courts to grapple with questions arising from the separate (or joint) classification of trade claims and deficiency claims—yet such cases are legion.

the claims in Class 55 are, like retiree benefit claims, claims for payments over time or (ii) none

of the retiree benefit claims are not claims that, prepetition, were to have been paid in one lump

sum (such as a one-time annuity paid on retirement).

ii.   Proposed Treatment Under a Plan Cannot Justify Separate Classification

147.   The Oversight Board's proposal to pay retiree claims monthly amounts is its

proposed **treatment** of retiree benefit claims.  It is not a feature of the claims themselves, and to

assert otherwise implies that a claim's legal nature for classification purposes is determined by

its proposed treatment under a plan—a position rejected by the caselaw.  *See In re Thornwood*

*Associates*, 161 B.R. 367, 374 (Bankr. M.D. Pa. 1993) *aff'd*, 162 B.R. 438 (M.D. Pa. 1993)

(classification based on treatment was improper because such a "difference is in a debtor's

proposed treatment of a claim rather than in the nature of the claim as it relates to the assets of

the estate.  The latter constitutes the proper test for differential classification."); *see also In re 4th*

*St. E. Investors, Inc.*, 2012 WL 1745500, at *6 (Bankr. C.D. Cal. May 15, 2012) ("No analysis or

authority suggests that similarity of claims should be determined according to how they are

treated in the plan.").

148.   Indeed, *Granada Wines* itself rejects the argument that different treatment

justifies (let alone requires) separate classification.  *Granada Wines*, 748 F.2d 42, 46 (1st Cir.

1984) ("Granada now argues that the withdrawal liability claim should nevertheless be treated as

if it were in a separate class because the plan treated it differently by providing for reduced

payment on it.").

149.   Regardless, there is nothing unique about retiree benefit claims that makes it

impossible to classify such claims together with other general unsecured claims.  In fact, similar

claims have been jointly classified in other municipal cases.  For example, in the Stockton

bankruptcy case, the Bankruptcy Appellate Panel upheld the joint classification of retiree health

benefit claims, the unsecured deficiency claim of a noteholder, and other general unsecured

claims, affirming the bankruptcy court's ruling that these claims "were all in the same spot and

were properly included in Class 12." *In re City of Stockton, California*, 542 B.R. 261, 281

(B.A.P. 9th Cir. 2015) (internal quotation marks omitted).  Like retiree benefit claims, health

benefit claims and other claims for other post-employment benefits are claims for future

payments, generally stretching out for the life of the beneficiary.  That a debtor may determine to

treat these claims differently for any number of reasons (such as negotiating positions or political

considerations) does not mean that separate classification is justified, let alone required.

150.    Finally, the Oversight Board's claim that the timing of the plan payments makes

joint classification of retiree benefits claims and general unsecured claims impossible

misunderstands the basic principles of how bankruptcy affects prepetition rights under existing

state (or territorial) law.

151.    Prior to the Petition Date, all general unsecured creditors had the same basic right

as against the Commonwealth: the right to receive payments in accordance with the terms of

their respective agreements (or statutory provisions) as such payments come due.  There is no

reason that a combined class of retiree benefit claims and general unsecured claims could not

provide that holders of claims in this combined class would receive, under a plan of adjustment,

"payment on their allowed claim as such payments comes due under applicable non-bankruptcy

law."

152.    It would be equally straightforward to build into this structure the mechanism

required to obtain the necessary reductions in payments, as the plan could provide that:

> Each holder of an Allowed Retiree Claim **or CW General Unsecured Claim**
> shall be entitled to receive on account of such Allowed ~~Retiree~~ Claim **the amount
> of such Allowed Claim if and when such Allowed Claim comes due under
> applicable non-bankruptcy law, subject** ~~his or her benefits as modified pursuant~~
> **to, (a) in the case of Allowed Retiree Claims,** the Monthly Benefit Modification,

including, without limitation, the elimination of any cost of living adjustments, subject to the Benefit Restoration**, and (b) in the case of CW General Unsecured Claim, a reduction equal to the Reduction Percentage.**[99]

153.    The Oversight Board has focused on the timing of payments to retirees compared to the timing of payments to other general unsecured creditors.  This structure would maintain the differences in timing of payment both as they existed prior to the petition date and as they exist under the current Proposed Plan.

154.    Rejecting this structure demonstrates, unequivocally, that it is not the timing of payments that concerns the Oversight Board, but rather its unwillingness to treat general unsecured claims in Class 55 as well as retiree benefit claims.  *Cf. In re Crosscreek Apartments*, 213 B.R. 521, 538 (Bankr. E.D. Tenn. 1997) ("no explanation has been offered as to why the trade creditors cannot simply be paid the same amount as [favored creditor], *i.e.*, fifty percent of their claims, such that while the two classes will be paid at different times, the net amount realized will be the same").[100]

155.    For these reasons, and for the reasons set out in the Prior Rule 3013 Pleadings, the Committee respectfully submits that the separate classification of the retiree claims from other similarly situated general unsecured claims is impermissible under controlling precedent in the First Circuit and under section 301(e) of PROMESA.

## IV.    Disclosure Statement Cannot Be Approved Because Proposed Plan Is Patently Unconfirmable

156.    In addition to the requirement that a disclosure statement contain "adequate information" about the plan it describes, the plan it describes must be confirmable.  "If the plan

---

[99]    Reduction Percentage is the defined term used for the 8.5% reduction applied to certain pension claims.

[100]    Indeed, under the Committee's proposed structure, retirees would still be better off than other general unsecured creditors, as all general unsecured creditors would be subject to the Reduction Percentage, but only certain retiree claims would be affected.

is patently unconfirmable on its face, the application to approve the disclosure statement must be

denied, as solicitation of the vote would be futile." *In re Quigley Co., Inc.*, 377 B.R. 110, 115–

16 (Bankr. S.D.N.Y. 2007) (collecting cases); *In re Am. Capital Equip.*, 688 F.3d 145, 154 (3d

Cir. 2012) (a court should "not proceed with the time-consuming and expensive proposition of

hearings on a disclosure statement and plan when the plan may not be confirmable because it

does not comply with [confirmation requirements]"); *In re El Comandante Mgmt. Co., LLC*, 359

B.R. 410, 415 (Bankr. D.P.R. 2006) ("At the hearing on the approval of a disclosure statement,

the court may consider issues pertaining to the plan, and may rule upon such issues, when the

plan defects will make it unconfirmable . . . .").

157.    A plan is patently unconfirmable where (i) it contains confirmation defects that

cannot be overcome by creditor voting results; and (ii) those defects concern matters upon which

all material facts are not in dispute. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir.

2012), quoting *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987). In other

words, a plan is patently unconfirmable where it does not comply with section 1129 and other

applicable provisions of the Bankruptcy Code. *See In re Moshe*, 567 B.R. 438, 444 (Bankr.

E.D.N.Y. 2017) (courts will not subject the estate to the expense of the confirmation process of a

plan that does not comply with section 1129).

158.    The Proposed Plan is patently unconfirmable for multiple reasons.[101]

- <u>Proposed Releases Cannot Be Approved</u>. The Proposed Plan appears to seeks to
  impose extraordinarily broad non-consensual third party releases without
  establishing the existence of the unique circumstances under which such releases
  may be approved. Separately, and contrary to the case law, the Proposed Plan
  grants exculpation provisions to non-fiduciaries, including GO/PBA PSA

---

[101] As the Court will recall, the Committee filed an unopposed motion seeking permission to file a 90-page brief,
which the Court granted in part and denied in part, limiting the Committee to 75 pages. Therefore, the
Committee's discussion of the numerous defects rendering the Proposed Plan patently unconfirmable is
necessarily only a high-level discussion of selected issues, and the Committee reserves all rights to supplement
these arguments and additional arguments.

Creditors and HTA/CCDA PSA Creditors (and their Related Persons). *See In re Washington Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (rejecting exculpation provisions for non-fiduciaries).

- <u>Proposed Plan Is Unfairly Discriminatory</u>. "Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors." *In re Tribune*, 472 B.R. at 243. The Proposed Plan unfairly discriminates in favor of a number of creditor groups. For example, the less than 5% recovery offered to CW General Unsecured Claims is exponentially less than the recovery of upwards of 70%, and perhaps as much as 100%, being offered to GO/PBA Bond Creditors; under any standard of unfair discrimination, this is grossly discriminatory.[102]

- <u>Proposed Plan Is Not Proposed in Good Faith</u>. The unexplained decisions to favor certain unclassified creditors—including the undisclosed payments to a select group of favored prepetition creditors, as well as the unexplained decisions to favor certain creditors by transferring them to the ACR process—meets no cognizable bankruptcy-related objective and is inconsistent with the articulated standard for good faith. Separately, the Proposed Plan was filed dishonestly because the Debtors failed to comply with specific contractual obligations in the negotiation thereof, specifically by breaching the Oversight Board's post-petition agreement to include the Committee in settlement discussions regarding their joint objection to the 2012 and 2014 GO Bonds.[103]

## V.     <u>Solicitation Procedures Objection</u>

159.    The proposed Solicitation Procedures contain a number of important flaws and defects.  <u>First</u>, the Solicitation Procedures prevent not only a creditor whose claim is subject to an objection from voting, but also a creditor that received "a request for estimation."[104]  Not only is this an impossibly vague statement, it is unsupported by the Bankruptcy Code and Bankruptcy

---

[102]   The Committee reserves all rights with respect to other instances of unfair discrimination in the Proposed Plan including, without limitation, recoveries granted to ACR Claimants, unclassified creditors, holders of retiree benefit claims, and Clawback Creditors.

[103]   The Common Interest and Cooperation Agreement Relating to Prosecution of Objection to Certain General Obligation Bond Claims, dated as of January 14, 2019 (the "<u>Cooperation Agreement</u>"), provides that (a) "[t]he FOMB will consult with the Committee in good faith regarding any potential settlement of any claim to which the [2012-2014 GO Claim] Objection relates, whether or not arising from mediation" and (b) the Committee "shall have the right to participate fully in the mediation of any general obligation bond claims to which the [2012-2104 GO Claim] Objection relates with respect to issues raised by or bearing on the [2012-2014 GO Claim] Objection, including, without limitation, the right to . . . participate in all mediation sessions and calls or other communications with mediators."  Cooperation Agreement ¶ 9.

[104]   Disclosure Statement Order at ¶33i.  The Confirmation Hearing Notice should be modified to reflect this change also.

Rules.  Bankruptcy Rule 3018(a) states that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Noticeably absent from that provision is a "request for estimation."  Any creditor that has or will receive a request for estimation should be entitled to vote on the Plan and receive a Solicitation Package to the extent that such claim is not contingent or unliquidated.[105]

160.   Second, given the large number of creditors that are not represented by counsel, any claim objection and the Notice of Non-Voting Status sent to holders of claims subject to an objection, and which claim has not been expunged, should be accompanied by a form Bankruptcy Rule 3018(a) motion (the "Form Motion").[106]  The Form Motion, which should also be posted on Prime Clerk's website, should instruct the creditor to identify itself and provide the relevant claim number, and leave space to set forth the grounds for the creditors' request for temporary allowance of its claim.  The Form Motion would also include instructions for filing the Form Motion with the Court and serving the Form Motion on the relevant notice parties.

161.   This would not impose significant burdens on the Court because a Bankruptcy Rule 3018(a) hearing is a summary hearing.[107]  Further, given the Court's significant discretion to determine the method for temporarily allowing a claim,[108] the Court, with input from the Oversight Board and the Committee, can formulate a process that protects all parties and ensures

---

[105]  The proposed Disclosure Statement Order does not require the Debtors to send a Solicitation Package to a creditor that receive a request for estimation.  *Id.* at ¶ 24.

[106]  Currently, the Notice of Non-Voting Status makes no reference to the right to seek temporary allowance under Bankruptcy Rule 3013(a).  The Notice of Non-Voting Status should be revised to include such information,

[107]  *See In re Zolner,* 173 B.R. 629, 633 (Bankr. E.D. Ill. 1994), *aff'd sub nom, Chicago Truck Drivers v. Zolner,* 249 B.R. 287 (N.D. 2000); *In re FRG Inc.,* 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990).

[108]  *See PBGC v. Enron Corp.,* No. 04 CIV 5499 (HB), 2004 U.S. Dist. LEXIS 21810, *16 (S.D.N.Y. Nov. 1, 2004 ("[t]he temporary analysis of a claim for voting purposes is committed to the sound discretion of the bankruptcy court pursuant to Federal Rule of Bankruptcy Procedure § [sic] 3018(a).").

that a creditor's financial status does not automatically translate into a failure to seek temporary allowance of its claim under Bankruptcy Rule 3018(a) for voting purposes.

162.    <u>Third</u>, especially because the Oversight Board and the Debtors have had years to object to claims, in order to allow sufficient time for holders of general unsecured claims to review any objection to their claim(s), file the Form Motion, and for the Court to consider the Form Motion(s), the last date by which the Debtors should be authorized to file objections to proofs of claim should be forty (40) days prior to the Voting Deadline, not the twenty (20) days proposed by the Debtors.[109]

163.    <u>Fourth</u>, as acknowledged by the Oversight Board in connection with retirees, serving the Disclosure Statement and Proposed Plan on a flash drive may not be "the most effective method of serving such a population of prospective voters."[110]  This fact is true for many other populations of creditors, many of whom may not have easy access to a computer. For this reason, the Court should require the Debtors to serve on the parties entitled to receive the Solicitation Package a paper summary of the Proposed Plan (in English and in Spanish).  This summary is likely more useful to most creditors than a flash drive alone, or even a paper copy of the voluminous Disclosure Statement and Proposed Plan.

164.    Included in this summary should be a hard copy of the Committee's recommendation letter (discussed below), as well as instructions for how and where creditors can obtain and review hard copies of all the Disclosure Statement and Proposed Plan (with all exhibits).  To that end, the Debtors should establish certain "centers" where such hard copies will be available; the Committee suggests that the physical places being established as ballot drop centers would serve this function perfectly.

---

[109]   Disclosure Statement Order ¶33i.
[110]   *Id.* ¶11, n.4.

165.   <u>Finally</u>, in the event that this Court approves the Disclosure Statement, the
Committee requests that the Solicitation Package include a letter from the Committee setting
forth the Committee's recommendation to holders of CW General Unsecured Claims in Class 55
with respect to whether to vote to accept or reject the Proposed Plan, in accordance with the
Committee's fiduciary obligation to "advise those represented by [the Committee] of such
committee's determinations as to any plan formulated." 11 U.S.C. § 1103(c)(3).  Such a
"Committee Recommendation Letter" is common practice in large, complex bankruptcies, and is
particularly appropriate in these cases given the length and complexity of the Disclosure
Statement and the Proposed Plan, and the sheer volume of creditors, many of whom are owed
relatively small amounts and lack the resources to retain counsel or other bankruptcy
professionals (such as financial advisors) to help them review and analyze the voluminous
materials.  Combining the Committee's recommendation letter with the other solicitation
materials is the logical, and most efficient and cost-effective way, to provide this information to
general unsecured creditors.[111]

## VI.   **Confirmation Procedures Motion Objection**

166.   The Oversight Board's proposed confirmation objection and discovery procedures
(the "<u>Objection/Discovery Procedures</u>")[112] should not be approved in their current form.  As set
forth below, the Objection/Discovery Procedures impose hurdles to the participation of general
unsecured creditors in the confirmation process, and place improper on parties seeking discovery
in connection with plan confirmation.

---

[111]   The Committee is unable, at this time, to prepare its letter.  As noted above, the discovery process in connection with the Disclosure Statement has not yet been completed (including discovery the Oversight Board and the Commonwealth have agreed to provide, as well as discovery requests the parties have asked Magistrate Judge Dein to resolve).  The Committee will, however, prepare its recommendation letter with enough time for the Court and the parties in interest to evaluate it before it is distributed together with the Solicitation Package.

[112]   The proposed Objection/Discovery Procedures are set forth in the proposed order annexed as Exhibit A to the Confirmation Procedures Motion.

167.     The Objection/Discovery Procedures are modeled after the procedures approved

by the United States Bankruptcy Court for the Southern District of New York in the *Enron*

chapter 11 bankruptcy cases (the "Enron Procedures"),[113] a case entirely different from the

Debtors' cases before this Court from both factual and legal perspectives.  The similarities

between the two cases end with the unremarkable fact that both cases involved plans that

embodied settlements, as is common practice.  Indeed, as is clear from the Enron Procedures, the

official creditors' committee in that case, as well as other interested parties, had consensually

agreed to the Enron Procedures and the terms of the Enron plan and the committee in Enron was

one of the architects of the plan.  Here, in contrast, the Committee had no involvement with the

formulation of the Proposed Plan or the Objection/Discovery Procedures.

168.     As applied to these cases, the Enron Procedures, as re-interpreted by the

Oversight Board, would create unnecessary hurdles for general unsecured creditors to participate

in the discovery process.  The procedures must be modified as follows.

### a.  No Initial Objection Should Be Required

169.     The Objection/Discovery Procedures require parties that wish to participate in

taking discovery (as opposed to reviewing and observing the results of those taking discovery) to

file and serve an "Initial Objection" on or before August 3, 2021.[114]  Even though a party can

supplement such Initial Objection with additional factual information and legal arguments

learned through the discovery process by the final objection deadline (October 8, 2021), a party

is limited to taking discovery solely as to the issues raised in its Initial Objection.[115]

---

[113]   Obj./Disc. Procedures Mot. at 28.

[114]   Discl. Stmt. at 9; Obj./Disc. Procedures ¶ 6.

[115]   Obj./Disc. Procedures ¶ 6.

170.    There are numerous problems with the Initial Objection requirement.  First, the

Debtors have the burden of proof of establishing that the Proposed Plan meets the confirmation

standards of the Bankruptcy Code.  There is no mystery as to what those requirements are.

Mandating that parties file Initial Objections, and then not allowing them to probe beyond the

arguments raised in such objections during discovery, will only result in parties filing Initial

Objections that identify every issue that could conceivably exist in connection with the plan to

preserve their rights.  The Initial Objection requirement is this unlikely to streamline the

discovery process and will only make it more burdensome for creditors to participate.

171.    Second, the Oversight Board and every other party in these Title III cases is not

entitled to a preview (other than what is set forth herein) of the Committee's legal theories on

confirmation, especially prior to the Committee obtaining discovery.  If the Oversight Board

were likely to require discovery from parties objecting to the Proposed Plan, then perhaps an

Initial Objection requirement would serve some limited purpose.  But the Oversight Board is not

likely to need such discovery given that it bears the burden of proof and is uniquely in possession

of information relevant to plan confirmation.

172.    Third, the Oversight Board's proposed August 3, 2021 deadline for filing Initial

Objection will practically prevent creditors from participating in the discovery process because it

is **before** the Oversight Board's proposed Solicitation Mailing Deadline.[116]

173.    While the Oversight Board intends to serve the Confirmation Hearing Notice on

the later of July 20, 2021 or the date that is five (5) business days after entry of the Disclosure

Statement Order,[117] this notice only informs general unsecured creditors of the approval of the

---

[116]   Discl. Stmt.at 9 (explaining that Oversight Board does not plan on commencing solicitation of the Proposed
Plan until the later of August 10, 2021 or twenty-eight (28) days after entry of the Disclosure Statement Order).
[117]   *Id.*

Disclosure Statement and the Objection/Discovery Procedures; it does not inform creditors of the

terms of the Proposed Plan, other than the injunction, release, discharge, and exculpation

provisions.  For example, the Confirmation Hearing Notice does not inform holders of general

unsecured claims that they can expect little to no recovery.  Instead, under the heading

"Additional Information," the Confirmation Hearing Notice directs creditors to contact Prime

Clerk or visit Prime Clerk's website to obtain copies of the Disclosure Statement and Plan.[118]

174.    Thus, even assuming that a creditor could receive the Confirmation Hearing

Notice by mail as early as July 21, 2021, it will have only two (2) weeks to (a) obtain, read, and

digest the Disclosure Statement, totaling over 2,000 pages (with exhibits), (b) determine whether

to file an Initial Objection and (c) prepare the Initial Objection.  That would be a herculean task

for even a large law firm, let alone a small law firm or a creditor acting *pro se*.

175.    While the Enron Procedures required a preliminary objection, none of the other

cases cited by the Oversight Board in which discovery procedures were ordered by the court

required a creditor to jump through so many legally expensive hoops in order to participate in the

confirmation discovery process.  In both the *Cumulus Media Inc.* and *Maxus Energy*

*Corporation* cases, a party wishing to participate in the discovery process only had to prepare a

simple notice of intent.[119]  In the *Detroit* bankruptcy case, a case more similar to these cases than

*Enron,* there appeared to be no requirement to participate in the discovery process other than to

make written discovery requests by a date certain.[120]

---

[118]   Confirmation Hearing Notice, attached as Schedule 2 to the Disclosure Statement Order ¶ 19.

[119]   *See* Orders in *In re Cumulus Media Inc., et al.,* Case No. 17-13381 (SCC) (Bankr. S.D.N.Y. Dec. 21, 2017)
[Docket No. 148 ¶ 2]; *In re Maxus Energy Corp. et al.,* Case No. 16-11501 (CSS) (Bankr. D. Del. Feb. 17,
2017) [Docket No. 907 ¶ 2].

[120]   *See* Order in *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich. Feb. 24, 2014) [Docket
No. 2727 ¶ 3(c)].

176.     Accordingly, the Court should not require creditors to incur the cost and expense

of preparing Initial Objections in order to participate in the discovery process, and the

Committee and interested creditors should be permitted to take discovery of all matters pertinent

to confirmation of the Proposed Plan.

### b. Objection/Discovery Procedures Are Inconsistent with Accepted Practice and Unfairly One-Sided

177.     The Objection/Discovery Procedures do not provide participants with the equal

discovery rights envisioned by the Federal Rules of Procedure as incorporated by the Federal

Rules of Bankruptcy Procedures.  Instead, the Objection/Discovery Procedures tilt decidedly in

favor of the Oversight Board and are often impractical.

| Problematic Provision | Response |
|---|---|
| • Only the Oversight Board is permitted to supplement its Fact Witness List.[121] | • All parties should be permitted to supplement their respective Fact Witness Lists.<br>• Based upon information learned in discovery, parties may determine that other persons may offer better or different testimony regarding a particular subject, or even add persons identified on the Debtors' Fact Witness List. |
| • The Objection/Discovery Procedures prevent creditors from serving interrogatories.[122] | • Creditors should be entitled to serve interrogatories, which can be limited in scope, once creditors have had the opportunity to review the documents in the Depository. |
| • The Objection/Discovery Procedures require creditors who submit Production Requests to submit a "certification" "stating the relationship of such Production Request to the Initial Objection . . . and setting forth why the additional Production is reasonably necessary given the availability of information in the Depository."[123] | • This requirement unfairly reverses the relative burdens under the Federal Rules of Civil Procedure which require a party from whom discovery is sought to demonstrate that the "discovery is unreasonably cumulative or duplicative, or can be obtained from some other source that is |

---

[121]   Objection/Discovery Procedures ¶2.

[122]   Objection/Discovery Procedures ¶ 12.

[123]   *Id.* ¶ 13.

| | |
|---|---|
| | more convenient, less burdensome, or less expensive."[124]<br>• Even assuming a creditor has been able to review all the information contained in the Depository by August 6, 2021, a creditor is entitled to test whether that is the universe of information relating to any particular Production Request.   Indeed, a creditor may find certain information highly relevant to the Debtors' Plan that the Debtors did not include in the Depository.<br>• Further, the Objection/Discovery Procedures describe only limited amount of additional information to be deposited by the Debtors in the Depository.[125] |
| • The Objection/Discovery Procedures do not clearly set forth the date by which the Debtors must produce documents. | • A deadline should be set for the production and for motions to compel so that creditors can promptly seek relief from the Court.[126]<br>• No party should have to create a Fact Witness List or identify parties not on the Debtors' Fact Witness List that should be subject to deposition until having had an opportunity to review documentary discovery.<br>• Finally, the Debtors should be required to prepare a privilege log, which should be populated into the Depository by a date certain.[127] |
| • In order to take a deposition of a person not on the Debtors' Fact Witness List, the Objection/Discovery Procedures require a creditor to prove why "the additional person's testimony is reasonably necessary, and not duplicative, given the availability of testimony from persons listed on the Debtors' Witness List."[128] | • For the reasons set forth above, this Objection/Discovery Procedures requirement unfairly flips the burden of proof under the Bankruptcy Rules.<br>• Further, this requirement is one-sided: if the Debtor seeks to depose a person not on a creditor's Fact Witness List, the Debtors |

---

[124]   Fed. R. Civ. Pro. 26(b)(2)(c), as incorporated by F. R. Bank. Pro. 7026.

[125]   *See* Objection/Discovery Procedures ¶8 (b) (Debtors to populate the Plan Depository with "at least" documents relating to claims and actions being settled and the "Best Interest Test Reports.").

[126]   The Objection Discovery Procedures ¶ 14 provide that the "Debtors shall respond to a Production Request on or before August 16, 2021."  This is vague and the Debtors should clarify that they will actually produce the documents on that date.

[127]   Even the Enron Procedures required the Debtors to produce a privilege log.  Enron Procedures ¶ 7.

[128]   Objection/Discovery Procedures ¶ 12.

| | |
|---|---|
| | • only need to provide notice of the requested deposition.[129]<br>• A deadline should be set for motions to compel depositions |
| • The Debtors limit creditors' depositions of parties to one (1) day of (7) hours which must be allocated among the parties taking the depositions. The Debtors, however, are *not* subject to the same limitation.[130] | • The 7-hour time limit needs to apply to all parties equally, including the Debtors.[131] |
| • A party filing a Fact Witness List is not "required to present any such person during the Confirmation Hearing." [132] | • This should be clarified to ensure that any person providing direct testimony (by declaration or otherwise) will be made available for cross-examination. |
| • The Debtors may offer witnesses that are not on their Fact Witness List "for the limited purpose of responding to objections to confirmation that may be interposed."[133] | • This is improper —the Debtors will be in receipt of all objections to confirmation well in advance of the hearing and should therefore be required to identify all Fact Witnesses whom they may call to testify, except for unanticipated rebuttal witnesses. |
| • The Debtors and other parties are entitled to proffer testimony at the hearing instead of submitting declarations in advance.[134] | • All direct testimony shall be through the submission of a declaration of such person or the use of deposition testimony in accordance with Bankruptcy Rule 7032. |
| • Parties are required to file an Informative Motion prior to cross-examining a witness that discloses the nature of the cross-examination. [135] | • This requirement should be stricken. Neither the Oversight Board nor any other party is entitled to a free preview of opposing parties' cross-examinations. |
| • If a creditor serves a deposition notice with respect to a person added to the Debtors' Fact Witness List, the Debtors can unilaterally set the date, time and place of the deposition.[136] | • The Debtors and creditors participating in discovery should meet and confer in advance as to scheduling depositions and raising issues with the Court. |

---

[129] *Id.* at 19.  Thus, the normal burdens of proof under the Bankruptcy Rules are satisfactory to the Debtors when they are the ones seeking discovery.

[130] *Id.*, ¶ 17.

[131] If the Debtors want to ask their own witnesses questions during depositions after other parties have expended the 7-hour time limit, they are of course welcome to do so.  But for any other witness that the Debtors themselves are deposing (as opposed to defending), the Debtors must be subject to the same time limit.

[132] *Id.*, ¶ 3.

[133] *Id.*

[134] *Id.* ¶¶ 4, 5.

[135] *Id.* ¶¶ 4, 5.

[136] *Id.* ¶ 16.  As set forth above, the Committee believes that all parties to the discovery process should be able to supplement their respective Fact Witness List, and should be subject to a meet and confer requirement in the event that another party serves a deposition notice.

| • Similarly, in the event of a discovery dispute, the Debtors can unilaterally inform the Court of such dispute.[137] | |
| --- | --- |

178.   For the foregoing reasons, the Objection/Discovery Procedures should be modified to (a) eliminate the requirement for the Initial Objection and (b) correct the unfair one-sided nature of the Objection/Discovery Procedures and reflect standard practices under the discovery and adversary system.

## **RESERVATION OF RIGHTS**

179.   The Committee reserves the right to, among other things, (i) amend or supplement this Objection in the event the Debtors file a further amended disclosure statement, (ii) join in any objection to the Disclosure Statement filed by any other party in interest, (iii) raise additional objections not incorporated herein, and (iv) raise the arguments made herein, and additional arguments, in connection with confirmation, and any objection thereto, of the Proposed Plan (or any other plan of adjustment filed in these Title III cases).

## **CONCLUSION**

180.   The Disclosure Statement simply does not provide creditors the information to which they are entitled and which they require to make an informed decision about whether to vote to accept or reject the Proposed Plan.  It omits critical information and, in some instances, is profoundly misleading.  The Committee respectfully submits that the Disclosure Statement does not contain "adequate information" within the meaning of section 1125 of the Bankruptcy Code, and the Court should not approve the Disclosure Statement or the related Disclosure Statement Motion and Confirmation Procedures Motion.

---

[137]   *Id.* ¶ 20.

WHEREFORE, the Committee respectfully requests that the Court deny the Disclosure
Statement Motion and the Confirmation Procedures Motion and grant such other relief as is just
and proper.

Dated: June 15, 2021                     By:   */s/ Luc A. Despins*

                                         PAUL HASTINGS LLP
                                         Luc A. Despins, Esq. *(Pro Hac Vice)*
                                         G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
                                         200 Park Avenue
                                         New York, New York 10166
                                         Telephone:  (212) 318-6000
                                         lucdespins@paulhastings.com
                                         alexbongartz@paulhastings.com

                                         *Counsel to the Official Committee of Unsecured
                                         Creditors*

                                         By:   */s/ Juan J. Casillas Ayala*

                                         CASILLAS, SANTIAGO & TORRES LLC
                                         Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
                                         Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
                                         Juan C. Nieves González, Esq. (USDC - PR 231707)
                                         Cristina B. Fernández Niggemann, Esq. (USDC - PR
                                         306008)
                                         PO Box 195075
                                         San Juan, Puerto Rico 00919-5075
                                         Telephone: (787) 523-3434 Fax: (787) 523-3433
                                         jcasillas@cstlawpr.com
                                         ifernandez@cstlawpr.com
                                         jnieves@cstlawpr.com
                                         crernandez@cstlawpr.com

                                         *Local Counsel to the Official Committee of Unsecured
                                         Creditors*