# ANEXO N

INFORMES VINCULADOS A LA PRUEBA DEL MEJOR INTERÉS

*Análisis de las recuperaciones de los acreedores en caso de que se desestime el caso de Título III para los acreedores del Estado Libre Asociado de Puerto Rico*

Este análisis evalúa las recuperaciones disponibles para los acreedores del Estado Libre Asociado sobre la base de los remedios disponibles conforme a las leyes diferentes de las de quiebra, incluida la Constitución del Estado Libre Asociado de Puerto Rico. A tenor con la Sección 314(b)(6) de PROMESA, un Plan de Ajuste propuesto debe ser "factible y en el mejor interés de los acreedores, lo que requerirá que el tribunal considere si los remedios disponibles conforme a las leyes diferentes de las de quiebra y la constitución del territorio darían como resultado una recuperación mayor para los acreedores que la proporcionada por dicho plan". Este análisis proporciona un rango estimado de recuperaciones que estarían disponibles para los acreedores si se termina la paralización de la ejecución de la deuda, no se confirma ningún Plan de Ajuste y se desestima el caso de Título III del ELA.

Este documento contiene dos secciones. La primera sección contiene una descripción general de la metodología seguida para desarrollar el análisis. La metodología describe el enfoque adoptado para estimar los recursos disponibles para la amortización de la deuda, estimar las obligaciones pendientes de los acreedores y analizar la prioridad en la que se desembolsan los fondos y el orden en que se supone que se pagan las reclamaciones de los acreedores. La segunda sección presenta el rango probable estimado de recuperaciones disponibles para los acreedores del ELA con base en los recursos identificados.

Este análisis ha sido preparado por McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC[1], asesores legales de la Junta de Supervisión y Administración Financiera para Puerto Rico ("JSAF"), entregó a McKinsey & Company un conjunto de supuestos legales usados en la preparación de este análisis. Los supuestos legales se incluyen en el Apéndice 5 de este documento. Los asesores financieros de la JSAF proporcionaron a McKinsey & Company la información financiera utilizada en la preparación de este análisis. Esta información financiera incluía cronogramas que detallaban estimaciones de la deuda pendiente de bonos, perspectivas sobre los saldos de efectivo y otros datos financieros. McKinsey & Company también se basó en datos publicados o proporcionados directamente por el Gobierno de Puerto Rico o sus asesores.

McKinsey & Company ha aceptado como verdaderos, precisos y apropiados todos los supuestos e información legales y financieros provistos por Proskauer Rose LLP, O'Neill & Borges LLC, otros asesores de la JSAF, y el Gobierno de Puerto Rico y sus asesores. McKinsey & Company no ha verificado independientemente nada de la información ni los supuestos recibidos de parte de Proskauer Rose LLP, O'Neill & Borges LLC, otros asesores de la JSAF o el Gobierno de Puerto Rico y sus asesores, ni adopta ninguna posición independiente con respecto a esta información y estos supuestos.

Los supuestos, las proyecciones y las estimaciones utilizados en este análisis están inherentemente sujetos a incertidumbres comerciales, económicas y políticas y, por lo tanto, están sujetos a cambios. McKinsey & Company no formula ninguna declaración o garantía de que las recuperaciones reales a disposición de o potencialmente realizadas por los acreedores sobre la base de los remedios disponibles en virtud de cualquier ley, incluida la

---

[1] Proskauer Rose LLP y O'Neill & Borges LLC se mencionan colectivamente como "asesores legales de la JSAF" en este análisis.

Constitución de Puerto Rico, se aproximen o no a las estimaciones y supuestos declarados en el análisis, y los resultados reales pueden variar sustancialmente de los que se muestran aquí. Sin embargo, McKinsey & Company declara que el rango de recuperación identificado en este documento es su mejor estimación basada en su conocimiento y en la información recibida.

## I.   Metodología

Siguiendo la orientación proporcionada por los asesores legales de la JSAF, este análisis asume que el caso de Título III del ELA iniciado conforme a PROMESA se desestima, pero que los Títulos I y II de PROMESA continúan aplicándose. Por lo tanto, el análisis asume que la paralización automática de la ejecución de la deuda se levanta y la JSAF se mantiene y continuará certificando los Planes Fiscales del ELA y exigiendo la implementación de los presupuestos, sujeto a cualquier ejecución de la deuda que exceda el presupuesto que ordenen los tribunales de Puerto Rico. El análisis también asume que los acreedores emprenderían acciones legales contra el ELA para recuperar los montos que afirman que se les adeudan.

El análisis se basa en las proyecciones de ingresos y gastos contenidas en el Plan Fiscal Certificado de 2021. Siguiendo la orientación proporcionada por los asesores legales de la JSAF, se realizaron ajustes a ciertas proyecciones del Plan Fiscal para reflejar el impacto de la desestimación del caso de Título III y el supuesto de que no se produce ningún Plan de Ajuste. Estos ajustes son los siguientes:

- El análisis asume que las reducciones en los beneficios de pensión incluidas en el Plan Fiscal no entrarán en vigencia porque se supone que esta medida depende de la confirmación de un Plan de Ajuste. Sin embargo, el análisis incluye escenarios en los que los tribunales del ELA exigen reducciones en las pensiones cuando la deuda de Obligación General (GO) del ELA y la deuda garantizada del ELA que es *pari passu* con la deuda GO ("deuda *pari passu*") están en mora.
- El análisis asume que no se producirá la congelación de las acumulaciones de beneficios en los Sistemas de Retiro de Jueces y Maestros (SRJ/SRM) incluidos en el Plan Fiscal. También se asume que las aportaciones futuras al Seguro Social para jueces y maestros se fijarán en cero, ya que se supone que esos pagos dependerán de la congelación de la acumulación del beneficio de pensión para la que se necesita la confirmación del Plan de Ajuste.
- El análisis asume que no se implementará el aumento en la aportación patronal a la atención médica descrito en el Plan Fiscal de $125 a $170 por empleado por mes para los empleados que son miembros del sindicato AFSCME, maestros, policías, bomberos, miembros del sindicato UAW y otros empleados no sindicalizados, ya que este aumento de beneficio depende de la formalización de un Plan de Ajuste.
- El análisis asume que las aportaciones anuales de PayGo a los participantes del Sistema 2000 —que el Plan Fiscal supone que se eliminarán— continúan. Se asume que la eliminación depende de la confirmación de un Plan de Ajuste.
- El análisis asume que no se producirá ningún gasto mayor de pensión relacionado con acuerdos que dependan de la confirmación de un Plan de Ajuste.

- El análisis ajusta los honorarios profesionales legales y no legales del Título III para reflejar posibles litigios futuros y la posible desestimación del caso de Título III.[2, 3]
- Se supone que la JSAF continuará existiendo ya que los requisitos para la disolución de la Junta según lo definido por PROMESA no se cumplirían si el caso de Título III se desestima porque el ELA no puede recuperar el acceso al mercado y no puede equilibrar un presupuesto que afronte toda la amortización de la deuda requerido sin una restructuración de la deuda.[4] El análisis asume que el ELA financiará las operaciones de la JSAF durante el período de análisis.
- Se asume que no se producirá la transferencia de $130 millones por año hasta el Año Fiscal 2028 al Fondo de Reserva para Emergencias que se describe en el Plan Fiscal. Como se describe en el Apéndice 5, se supone que el dinero reservado para emergencias no está legalmente restringido en este análisis y, por lo tanto, está disponible para la amortización de la deuda.

El análisis también realiza ajustes adicionales para incorporar los riesgos relacionados con la implementación y ejecución de ciertas medidas fiscales y reformas estructurales delineadas en el Plan Fiscal, ya que el análisis asume que la desestimación del caso de Título III podría crear más incertidumbres políticas y económicas que afectarían la implementación de tales medidas. Esos ajustes se describen en la sección denominada "Rango probable estimado de recuperaciones disponibles para los acreedores".

El análisis se basa en los siguientes tres componentes para calcular las recuperaciones disponibles para los acreedores:

- **Dotación de recursos:** el dinero disponible para satisfacer las obligaciones de los acreedores del ELA, incluido el efectivo disponible para la amortización de la deuda, ciertos ingresos por impuestos a la propiedad ("ingresos del CRIM") e ingresos asignables condicionalmente[5], retención de asignaciones a ciertas Unidades del Componente Previsto Independientemente (IFCU), el superávit anual generado por el ELA excluyendo los elementos que se acaban de enumerar anteriormente, y los activos del Sistema de Retiro de Empleados (SRE) disponibles para el ELA.
- **Deuda pendiente:** el capital, los intereses y el calendario de vencimientos de cada grupo de obligaciones de deuda.
- **Prioridades para la distribución de fondos:** la asignación de recursos para el pago de la deuda de acuerdo con las prioridades de uso de los fondos y de los pagos, conforme a la ley de Puerto Rico y los términos señalados en los documentos de bonos.

---

[2] El análisis asume que los honorarios profesionales legales aumentarán con la desestimación de los procedimientos del Título III, ya que los acreedores emprenderán acciones legales para exigir el cumplimiento de sus reclamaciones según la ley de Puerto Rico. Por lo tanto, se asume que los honorarios profesionales legales para la JSAF y el Gobierno de Puerto Rico se duplicarán en el Año Fiscal 2022 en relación con el Año Fiscal 2021 y luego crecerán con la inflación hasta el Año Fiscal 2026. Se asume que los honorarios legales a partir del Año Fiscal 2027 se reducirán a la mitad en relación con el Año Fiscal 2026 y luego crecerán con la inflación hasta el Año Fiscal 2031.

[3] Se asume que la JSAF y el Gobierno de Puerto Rico continuarán requiriendo algún apoyo de asesores no legales en relación con las actividades de litigio en curso. Se asume que los honorarios profesionales no legales disminuirán en un 50 % al desestimarse el caso de Título III y luego crecerán con la inflación hasta el Año Fiscal 2031. Con la desestimación de los procedimientos del Título III, se asume que cesan los honorarios profesionales legales y no legales relacionados con los distintos grupos de acreedores.

[4] Según PROMESA, la JSAF se rescindirá cuando se determine que el gobierno territorial tiene acceso a mercados crediticios de corto y largo plazo a tasas de interés razonables y logró presupuestos equilibrados durante cuatro años consecutivos.

[5] El término "ingresos condicionalmente asignables" se utiliza en este documento para referirse a ciertos ingresos que el ELA asigna condicionalmente a determinados organismos del ELA (anteriormente denominados "ingresos de recuperación").

Se asume que la fecha de vigencia de este análisis es el 30 de junio de 2021 ("Fecha de Vigencia"). El porcentaje de recuperación se calcula como el valor presente[6] del monto total que se espera pagar a los acreedores durante todo el período del análisis como proporción del capital total pendiente y los intereses no pagados al 3 de mayo de 2017, fecha de la petición del Título III del ELA ("fecha de la petición"), o a partir del 27 de septiembre de 2019, fecha de la petición del Título III de la AEP ("fecha de la petición de la AEP") en el caso de los bonos de la AEP. De acuerdo con los debates con los asesores financieros de la JSAF, este análisis asume una tasa de descuento anual del 5 % como razonable para el cálculo del valor presente de los pagos futuros de capital e intereses.

### i. Dotación de recursos

La cantidad total de recursos disponibles para pagar las reclamaciones de los acreedores del ELA en cada año constituye la Dotación de Recursos del ELA. La Dotación de Recursos en cualquier año es la suma de 1) efectivo inicial disponible para la amortización de la deuda, 2) ciertos ingresos por impuestos a la propiedad (ingresos del CRIM), 3) ingresos condicionalmente asignables, 4) otras fuentes disponibles de asignaciones para ciertas IFCU, y 5) el excedente anual generado por el ELA después del pago de sus gastos operativos.[7] En el Año Fiscal 2022, la dotación de recursos se beneficiará de una transferencia única de los activos del SRE disponibles para el ELA.

**1) Efectivo inicial disponible para la amortización de la deuda ("efectivo inicial"):** tal como se describe en el Apéndice 5, el efectivo inicial disponible para la amortización de la deuda a la Fecha de Vigencia de este análisis consiste en efectivo no restringido, menos un supuesto del efectivo mínimo estimado que se requiere para las operaciones gubernamentales normales ("Requisitos Mínimos de Efectivo"):

- **Efectivo no restringido:** son los fondos del ELA que no tienen limitaciones legales para su uso. El efectivo no restringido excluye los fondos que tienen alguna restricción legal, ya que forman parte de cuentas de custodia o fideicomiso, y también excluye los fondos cuyo uso está restringido por un interés garantizado o una orden judicial. Se asume que el efectivo no restringido está disponible para la amortización de la deuda.

- **Supuesto de los Requisitos Mínimos de Efectivo estimado:** de acuerdo con el Análisis de Efectivo de Puerto Rico publicado por la Junta de Supervisión y AAFAF el 19 de diciembre de 2020[8, 9], los Requisitos Mínimos de Efectivo del ELA se estiman en $1,200 millones a $1,700 millones. Este monto se refiere al efectivo disponible que el ELA necesitaría para que el sistema de administración de efectivo del gobierno cuente con los fondos suficientes y garantice el funcionamiento adecuado de las operaciones gubernamentales. Consulte el Apéndice 4 para obtener detalles sobre la estimación de los Requisitos Mínimos de Efectivo.

---

[6]   Valores presentes a la Fecha de Vigencia del análisis, 30 de junio de 2021.

[7]   El superávit anual generado por el ELA incluido en este análisis se presenta de manera diferente al superávit anual generado por el ELA según se establece en el Plan Fiscal. Además de los ajustes realizados para no considerar ningún Plan de Ajuste, este análisis considera los otros cuatro flujos de ingresos que se describen en esta sección como separados del superávit anual general generado por el ELA para los propósitos del pago de la deuda.

[8]   Comunicado de prensa de la JSAF: Presentación sobre mediación por dinero en efectivo (acceso en junio de 2021): https://drive.google.com/file/d/1xb6fo1OEYDElnaOua09cDcgkQmEW9Tki/view?fbclid=IwAR2V6c2iLz9euKMZ0GjJSEth6S_As6KN-98REOxARzAL5U_BuCjv-XRYXIT0

[9]   Análisis de Efectivo de Puerto Rico (acceso en junio de 2021): https://emma.msrb.org/P11450397-P11124337-P11535399.pdf

La suma de efectivo no restringido, menos un supuesto de los Requisitos Mínimos de Efectivo, compone el efectivo inicial total disponible para la amortización de la deuda a la Fecha de Vigencia de este análisis.

De acuerdo con el Análisis de Efectivo de Puerto Rico (mencionado anteriormente), el análisis considera que el efectivo no restringido es de $10,193 millones al 30 de junio de 2020.[10] De acuerdo con los datos disponibles públicamente, las proyecciones del Plan Fiscal y la orientación de los asesores legales de la JSAF, se agrega una estimación de la acumulación de efectivo de $811 millones desde el 1 de julio de 2020 hasta el 30 de junio de 2021 para calcular el saldo de efectivo no restringido al 30 de junio de 2021 (la Fecha de Vigencia del análisis). Después de incorporar estas proyecciones, se asume que el monto de efectivo no restringido al 30 de junio de 2021 es de $11,004 millones.

Después de ajustar los Requisitos Mínimos de Efectivo de $1,200 a $1,700, el efectivo disponible para la amortización de la deuda al 30 de junio de 2021 se estima entre $9,304 millones y $9,804 millones.

*Gráfico 1: Cálculo del efectivo inicial disponible para la amortización de la deuda*

| Efectivo estimado disponible para la amortización de la deuda al 30 de junio de 2021 | |
| --- | --- |
| Millones de dólares | |
| Saldo en efectivo del ELA (6/30/20) | 15,606 |
| (-) Efectivo restringido | (5,413) |
| Saldo de efectivo no restringido del CW (6/30/20) | 10,193 |
| (+) Flujo de efectivo no restringido total estimado entre el 07/01/2020 y el 06/30/2021 | 811[1] |
| Saldo de efectivo no restringido del CW (6/30/21) | 11,004 |
| (-) Requisitos mínimos de efectivo estimado total Año Fiscal 2021 | (1,200) a (1,700)[2] |
| Efectivo disponible para la amortización de la deuda (6/30/21) | 9,304 a 9,804 |

1. Incluye el siguiente efectivo adicional: $480 millones de impuestos diferidos del Año Fiscal 2020 (corporativo, individual e IVU) cobrados en el Año Fiscal 2021, $355 millones de superávit no restringido para el Año Fiscal 2021 del Plan Fiscal Certificado de 2020, $1,288 millones del excedente de rendimiento de ingresos a marzo de 2021, $130 millones agregados para los fondos del Año Fiscal 2021 que de otra forma se asignarían al Fondo de Emergencia, $88 millones de interés de superávit, $50 millones de aportación equivalente de costos de la reserva del CDBG que estarían disponibles para los acreedores, y $124 millones en fondos en la Reserva de la Compañía de Turismo de PR relacionados con la reserva de asignación condicional de la ADCC. Se reduce en $750 millones aportados del ELA para el financiamiento de la Cuenta de Reserva de la AEE, $34 millones de los fondos del Año Fiscal 2019 presupuestados para becas de la UPR pero transferidos, y $920 millones en asignaciones del Año Fiscal 2020 transferidos al Año Fiscal 2021.
2. El rango se calcula en base a los requisitos mínimos de efectivo para las operaciones normales del gobierno y los fondos de reserva de emergencia en diferentes estados. Se pueden consultar detalles adicionales sobre el cálculo en el Apéndice 4.

**2) Ciertos ingresos del impuesto a la propiedad ("Ingresos de CRIM"):** el Centro de Recaudación de Ingresos Municipales ("CRIM", por sus siglas en español) recauda un impuesto anual a la propiedad del 1.03 % sobre bienes muebles e inmuebles, aplicado por el ELA. Los ingresos del CRIM se depositan en un Fondo de Amortización del Estado y se asume que están disponibles para pagar la deuda GO del ELA, siguiendo la orientación de los asesores legales de la JSAF. El Plan Fiscal del CRIM incluye medidas para maximizar la recaudación de impuestos a la propiedad mejorando el cumplimiento.

---

[10] Este análisis considera el saldo total de efectivo del ELA al 30 de junio de 2020 y elimina solo el monto que se ha clasificado explícitamente como legalmente restringido. En consecuencia, se asume que las categorías de "No revisado", "Efectivo potencialmente no disponible" y "Efectivo potencialmente inaccesible" en el Análisis de Efectivo de Puerto Rico no están restringidas.

3) **Recursos condicionalmente asignables:**[11] el ELA cobra ciertos impuestos y honorarios, y luego los asigna a ciertas corporaciones públicas. Conforme a la orientación proporcionada por los asesores legales de la JSAF que se describe en el Apéndice 5, en virtud del Artículo VI, Sección 8, de la Constitución de Puerto Rico, este análisis asume que estos ingresos condicionalmente asignables pueden usarse para pagar bonos GO del ELA y deuda *pari passu* cuando se cumplen dos condiciones: 1) el ELA tiene fondos suficientes para pagar sus gastos operativos, y 2) el resto de la Dotación de Recursos no es suficiente para cubrir los bonos GO y la deuda *pari passu* en un año determinado.

Los ingresos de asignación condicional incluyen impuestos y tarifas específicos cobrados por el ELA en nombre de la Autoridad de Carreteras y Transportación (ACT), la Autoridad Metropolitana de Autobuses (AMA), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (AFI) y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (ADCC).

Para la ACT, los ingresos sujetos a asignación condicional son: 1) las tarifas de licencia de vehículos, 2) el impuesto a la gasolina, 3) el impuesto al gasoil y el diésel, 4) una parte del impuesto a los productos petrolíferos y 5) una parte del impuesto a los cigarrillos. Para la AMA, los ingresos sujetos a asignación condicional son el resto del impuesto a los cigarrillos que no se asigna a la ACT. La AFI recibe el arbitrio sobre el ron y un arbitrio adicional sobre los productos del petróleo. La ADCC recibe una parte del impuesto sobre las habitaciones de hotel que se paga por la ocupación de habitaciones. El Apéndice 5 describe en detalle la reglamentación sobre cada flujo de ingresos sujeto a asignación condicional.

Ciertos estatutos de ingresos asignables exigen que el ELA reembolse a las entidades de ingresos asignables en el año siguiente cuando los ingresos asignables se retengan para pagar los bonos GO y las deudas *pari passu*, y dicha cantidad se acumula a favor de la entidad de ingresos asignables hasta que se reembolse por completo. Estos ingresos son 1) Impuesto a la gasolina (ACT), 2) Tasas de licencia de vehículos (ACT) y 3) Impuestos a las habitaciones de hotel (ADCC).

4) **Retención de asignaciones a ciertas Unidades de Componentes Proyectadas Independientemente (IFCU):** las IFCU son entidades legalmente separadas que han sido establecidas por el ELA. Según la orientación proporcionada por los asesores legales de la JSAF, este análisis asume que los ingresos generados por las IFCU no están disponibles para pagar las obligaciones del ELA en ausencia de legislación o consentimiento. Las IFCU en el Plan Fiscal se indican a continuación.

*Gráfico 2: Unidades de componentes proyectadas independientemente en el plan fiscal certificado*

| Núm. | Acrónimo de la IFCU | Nombre de la IFCU |
|---|---|---|
| 1 | AAFAF | Agencia Fiscal y Autoridad de Asesoría Financiera |
| 2 | ADEA | Administración de Desarrollo de Empresas Agrícolas |
| 3 | ASEM | Administración de Servicios Médicos |
| 4 | ASES | Administración del Seguro de Salud |

---

[11] El Plan Fiscal se refiere a estos ingresos como "ciertos ingresos del ELA que, antes de PROMESA, el ELA asignaba a ciertas instrumentalidades a tenor con los estatutos promulgados por legislaturas anteriores".

| 5 | Cardio | Centro Cardiovascular de Puerto Rico y el Caribe |
| 6 | AFV | Autoridad para el Financiamiento de la Vivienda (AFV) |
| 7 | AEP | Autoridad de Edificios Públicos de Puerto Rico |
| 8 | Puertos | Autoridad de los Puertos de Puerto Rico |
| 9 | ADCC | Autoridad del Distrito del Centro de Convenciones de Puerto Rico |
| 10 | ATI | Autoridad de Transporte Integrado de Puerto Rico |
| 11 | Turismo | Compañía de Turismo de Puerto Rico |
| 12 | CFSE | Corporación del Fondo del Seguro del Estado |

Sin embargo, algunos de los fondos del ELA, que de otro modo se asignarían a las IFCU, pueden estar disponibles para la amortización de la deuda. Como se describe en el Apéndice 5, este análisis asume que el ELA tiene control directo sobre los fondos que asigna en su presupuesto a las IFCU. Parte o la totalidad de la asignación a una IFCU puede estar disponible para la amortización de la deuda del ELA.

Para las IFCU que reciben una asignación que le permite a la IFCU generar un superávit, el análisis asume que el ELA reducirá (o eliminará) dichas asignaciones hasta que la entidad ejecute un presupuesto equilibrado para generar más fondos disponibles para el pago de las obligaciones del ELA. Esto se aplicaría a AAFAF, ADEA, ASEM, ASES, ACT y ATI, ya que estas IFCU históricamente han recibido asignaciones anuales del ELA. Sin embargo, como se da por sentado en el Plan Fiscal, se asume que el ELA financia los déficits operativos de las IFCU que generan déficits operativos en un año determinado.

Para las IFCU que no reciben asignación, se asume que el ELA no tiene acceso a fondos de esa IFCU. Las IFCU que pertenecen a esta categoría son CFSE, Cardio, AEP, ADCC, Puertos y Turismo. Sin embargo, si alguna de estas entidades tiene un déficit en un año determinado, se asume que el ELA, como parte de sus gastos operativos, financiará el déficit porque esas entidades brindan los servicios necesarios para el buen funcionamiento del ELA.

**5) Excedente anual generado por el ELA independientemente de los recursos que se describen en los puntos 1-4 anteriores:** los ingresos totales recibidos por el ELA menos sus gastos operativos y de capital totales constituyen el superávit anual del ELA.[12] Los ingresos del ELA están compuestos por los ingresos fiscales totales del ELA en el Plan Fiscal, así como los ingresos de los Fondos Federales y los Fondos de Ingresos Especiales, excluidas las IFCU.

Los gastos operativos totales del ELA están compuestos por los gastos del Fondo General, Fondo de Ingresos Especiales y Fondo Federal proyectados en el Plan Fiscal con respecto a las entidades del Plan Fiscal del ELA, excluidas las IFCU. El Plan Fiscal describe las siguientes categorías de gastos:

---

[12] El superávit del ELA al que se hace referencia en esta sección excluye el efectivo inicial, los ingresos condicionalmente asignables y los ingresos del CRIM, así como otras fuentes disponibles de la retención de asignaciones a determinadas IFCU.

- **Gastos operativos pertenecientes y no pertenecientes a nómina del Fondo General:** costos de personal y no personal requeridos para el funcionamiento del ELA y sus agencias; estos gastos se describen en el presupuesto anual del ELA.

- **Fondos de ingresos especiales (SRF):** fondos utilizados para gastos gubernamentales y de agencias fuera de los desembolsos del Fondo General o las asignaciones del Fondo Federal de una entidad; estos fondos incluyen tarifas y cargos cobrados por agencias, fondos estatales, transferencias intragubernamentales y otros.

- **Fondos Federales (FF):** fondos utilizados para varios programas sociales federales y, por lo tanto, normalmente fondos transferibles; en algunos casos, los fondos federales también se utilizan para financiar ciertos gastos operativos de agencias.

- **Gastos de Medicaid:**[13] porciones de Medicaid, del Programa de Seguro Médico para Niños (CHIP), del programa de doble elegibilidad de Platino y de otros gastos relacionados con la salud financiados por el Estado y el gobierno federal.

- **Gastos de pensión del ELA:** beneficios de pensión de pagar en la medida que se avanza (PayGo) para los participantes del Sistema de Retiro de Maestros (SRM), el Sistema de Retiro de Jueces (SRJ) y el ex Sistema de Retiro de Empleados (SRE). Como se muestra en el Plan Fiscal, los gastos en pensiones de las IFCU ya se consideran en los gastos operativos de cada IFCU. Los gastos de pensiones se tratan como gastos operativos del ELA en el análisis; por lo tanto, los gastos de pensiones se pagan en su totalidad (como cualquier otro gasto operativo) antes del pago de cualquier deuda.

- **Asignaciones:** aportaciones del ELA a los municipios, la Universidad de Puerto Rico, la Autoridad de Carreteras y Transportación (ACT) y algunas corporaciones públicas, incluidas las IFCU que tienen déficit en un año determinado.

- **Otros gastos operativos y de capital:**[14] pagos del gobierno por costos de servicios públicos a AEE y AAA, ciertos costos de primas de seguros y gastos de capital para proyectos de capital y mantenimiento del ELA.

- **Gastos relacionados con la reconstrucción y la restructuración:** fondos equivalentes del ELA para la asistencia pública y fondos de mitigación de riesgos de FEMA, así como todos los honorarios profesionales relacionados con PROMESA y los costos operativos de la JSAF.

- **Montos brutos por créditos contributivos y recibos de la Corporación Financiera Municipal de Puerto Rico (COFIM):** créditos fiscales a corporaciones y personas, así como los gastos de COFIM (la corporación pública que recauda el 1 % del Impuesto Municipal sobre Ventas y Uso para ciertos municipios); se da por sentado que los ingresos y los créditos fiscales de la COFIM se equilibran todos los años, ya que los ingresos recibidos se corresponden con los gastos salientes.

Las proyecciones para estos grupos de ingresos y gastos toman en consideración el impacto estimado de las medidas fiscales en el Plan Fiscal. Las medidas fiscales son una serie de acciones destinadas a optimizar la recaudación de ingresos, reducir los gastos del Gobierno y racionalizar y transformar el Gobierno de Puerto Rico. Las acciones incluyen: mejorar el cumplimiento de la recaudación fiscal,

---

[13] Una porción de los gastos de Medicaid son SRF.
[14] Formado por gastos de GF y SRF.

implementar cambios en los procesos y otras reformas operativas dentro de las agencias, optimizar el sistema de salud para mejorar la relación calidad-precio, mejorar el sistema de pensiones actual y racionalizar los subsidios a la UPR y los municipios. Se pronostica que las medidas fiscales en el Plan Fiscal Certificado darán como resultado una reducción general en los gastos de la tasa de ejecución, excluyendo los relacionados con fondos federales, del 10 % entre el Año Fiscal 2022 y el Año Fiscal 2026.

Las proyecciones de ingresos y gastos del ELA también incorporan el impacto de las reformas estructurales tal como se describe en el Plan Fiscal. Las reformas estructurales incluyen acciones para mejorar el capital humano y el bienestar, promover la facilidad para hacer negocios en Puerto Rico, mejorar el sistema educativo, y mejorar la disponibilidad y accesibilidad de la energía. Las reformas estructurales están destinadas a promover el crecimiento de la economía, lo que en última instancia aumentaría la generación de ingresos del ELA.

Según la orientación proporcionada por los asesores legales de la JSAF, este análisis refleja modificaciones a las proyecciones del Plan Fiscal de ciertos gastos para dar cuenta de la ausencia de protecciones del Título III y un Plan de Ajuste. Como se mencionó anteriormente, las líneas de gastos específicas del Plan Fiscal que se ajustan son:

- **Costos de pensión:** los costos totales de las pensiones en el análisis no incluyen la reducción en los beneficios de las pensiones que se describe en el Plan Fiscal. Además, los costos de las pensiones en el análisis no incluyen la congelación en la acumulación de beneficios en los planes de retiro de jueces y maestros (SRJ/SRM). El análisis también establece en cero las aportaciones a los pagos de Seguro Social de jueces y maestros. Además, el análisis asume la continuación de las aportaciones de PayGo a los participantes del Sistema 2000, así como la eliminación de cualquier gasto de pensión adicional relacionado con acuerdos que dependan de la confirmación de un Plan de Ajuste. Sin embargo, el análisis incluye escenarios en los que los tribunales del ELA exigen reducciones en ciertas pensiones cuando los bonos GO y la deuda *pari passu* están en incumplimiento.

- **Aportaciones de atención médica:** el análisis asume que no se implementará el aumento en la aportación patronal a la atención médica descrito en el Plan Fiscal de $125 a $170 por empleado por mes para los empleados que son miembros del sindicato AFSCME, maestros, policías, bomberos, miembros del sindicato UAW y otros empleados no sindicalizados, ya que este aumento de beneficio depende de la formalización de un Plan de Ajuste, que se supone no está confirmado.

- **Honorarios profesionales:** el análisis ajusta las proyecciones de costos relacionados con los honorarios profesionales legales y no legales del Título III. Se asume que los honorarios legales se duplicarán en el Año Fiscal 2022 en relación con el Año Fiscal 2021 y luego crecerán con la inflación hasta el Año Fiscal 2026; en el Año Fiscal 2027 se asume que los honorarios legales se reducirán a la mitad en relación con el Año Fiscal 2026 y luego crecerán con la inflación hasta el Año Fiscal 2031. Se asume que los honorarios no legales disminuirán a la mitad al desestimarse el caso de Título III y luego crecerán con la inflación hasta el Año Fiscal 2031. Se asume que todos los pagos relacionados con honorarios legales y no legales para los diversos grupos de acreedores son cero una vez desestimado el caso de Título III.

- **Gastos de la JSAF:** se asume que la JSAF continuará existiendo porque los requisitos para la disolución de la Junta según lo definido por PROMESA no se cumplirían si se desestimara el caso de Título III, ya que el acceso al mercado será inalcanzable sin eliminar los incumplimientos de deuda. El análisis considera que el ELA financiará las operaciones de la JSAF durante el período de análisis.

- **Fondo de Reserva para Emergencias:** se asume que la transferencia de $130 millones por año hasta el Año Fiscal 2028 al Fondo de Reserva para Emergencias que se describe en el Plan Fiscal será de cero. Según

la orientación proporcionada por los asesores legales de la JSAF, se asume que el dinero reservado para emergencias no está legalmente restringido en este análisis.

Una vez que los gastos del ELA se pagan con los ingresos recibidos por el ELA, cualquier monto de ingresos restante constituye el superávit anual del ELA, tal como se describe en el Plan Fiscal. Se asume que el superávit del ELA está disponible para el pago de la deuda. Tal como se describe más adelante en la sección titulada "Rango probable estimado de recuperaciones disponibles para los acreedores", se incorporaron ciertos ajustes a la Dotación de Recursos para tener en cuenta el riesgo de implementación del Plan Fiscal en caso de que se desestime el caso de Título III.

Además, en el Año Fiscal 2022, la dotación de recursos aumentará a partir de una transferencia única de activos del SRE disponibles para el ELA. Según la orientación de los asesores legales de la JSAF, este análisis asume que se confirma un Plan de Ajuste del Título III del SRE, que trata las reclamaciones de los bonistas del SRE de acuerdo con los términos que se describen en la Declaración de Divulgación. Se asume que los activos no restringidos que quedan en el SRE después de los pagos requeridos a los acreedores del SRE se transfieren al ELA. Se asume que un monto de $643 millones en concepto de activos restantes no restringidos del SRE se transferirá al ELA a fines del Año Fiscal 2022. Para obtener información adicional, consulte el Apéndice 5.

### ii. Deuda pendiente

El análisis considera las siguientes clases de reclamaciones y balances asociados según la información proporcionada a McKinsey & Company por los asesores legales y financieros de la JSAF.

*Reclamaciones federales:* se asume que el ELA tiene dos categorías de obligaciones con el Gobierno Federal. Se asume que estas obligaciones se pagarán en su totalidad antes de cualquier otro pago de deuda. Siguiendo la orientación proporcionada por los asesores legales de la JSAF, es probable que el Gobierno Federal recupere toda reclamación impagada reteniendo ciertos Fondos Federales destinados al ELA para compensar el pago insuficiente. Por lo tanto, se supone que estas reclamaciones se pagan antes que otras reclamaciones de deuda:

- **Reclamaciones y obligaciones federales:** hay varias reclamaciones que el Gobierno Federal ha presentado contra el ELA. Dichas reclamaciones incluyen responsabilidades relacionadas con facturas impagadas, así como multas y tarifas relacionadas por violaciones de la ley federal. Siguiendo la orientación proporcionada por los asesores legales de la JSAF, dichas reclamaciones y obligaciones federales representan un monto total de $431 millones a la fecha de la petición, que se pagará una vez que se elimine la paralización actual en la ejecución de la deuda.
- **Rechazo de reclamaciones federales:** se asume que el ELA debe reembolsar los Fondos Federales que gasta pero que luego se determinan no admisibles según los criterios o requisitos de concesión. Se asume que dicha anulación de costos federales representa un

gasto anual recurrente de $65 millones,[15] que debe pagarse en su totalidad antes de realizar el pago de cualquier obligación general u otras reclamaciones. La estimación anterior no incluye ningún monto por rechazo de reclamaciones federales relacionadas con los fondos de recuperación de la FEMA.

***Bonos GO:*** los bonos del ELA fueron emitidos o garantizados por el ELA y respaldados por la buena fe, el crédito y el poder impositivo del ELA dentro de lo estipulado en la constitución de Puerto Rico (colectivamente, los "bonos GO" o la "deuda GO"). Han sido incorporados a este análisis con el calendario de vencimientos proyectado en los documentos de emisión de bonos. A tenor con la Sección 303 de PROMESA, se asume que el capital de la deuda GO acumula intereses durante la paralización actual de la ejecución de la deuda.

Con respecto al valor de estas reclamaciones, la JSAF inició un litigio impugnando la validez de los bonos GO emitidos a partir de 2012, ya que podrían haber sido emitidos por encima del límite constitucional de deuda de Puerto Rico. Siguiendo la orientación proporcionada por los asesores legales de la JSAF, este análisis asume que los bonos GO emitidos a partir de 2012 no son válidos.

Excluyendo los bonos GO emitidos a partir de 2012, el monto total de capital e intereses devengados y no pagados a la Fecha de Vigencia es de $8,395 millones. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición son $6,505 millones y $460 millones, respectivamente.

Tal como se indica en el Apéndice 5, existe un riesgo de litigio adicional relacionado con la validez de ciertos bonos GO. El Comité de Tenedores de Reclamaciones No Garantizados (el "UCC") ha cuestionado la validez de todos los bonos GO emitidos a partir de marzo de 2011 sobre la base de que violan el límite de deuda constitucional. El impacto potencial de este litigio en las recuperaciones se describe en la sección titulada "Resultados alternativos basados en litigios en curso o riesgos de litigios".

***Deuda** pari passu **con bonos GO:*** siguiendo la orientación proporcionada por los asesores legales de la JSAF, se asume que ciertas reclamaciones reciben la misma prioridad que los bonos GO, ya que también tienen una garantía del ELA. Como se describe en el Apéndice 5, este análisis asume que los bonos o préstamos con una garantía del ELA a partir de 2012 se considerarían inválidos y los bonistas que posean dichas reclamaciones no tendrían ningún derecho contra el ELA.

Esta deuda *pari passu* se compone de las siguientes reclamaciones:

- **Bonos de la Autoridad de Edificios Públicos (AEP):** sin incluir los bonos de la AEP emitidos a partir de 2012, los bonos de la AEP se adeudan hasta el Año Fiscal 2041, con un monto total de capital e intereses acumulados y no pagados de $4,323 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición de la AEP son $3,424 millones y $572 millones, respectivamente.[16]
- **Bonos emitidos por la Autoridad de Puertos de las Américas (APLA):** los bonos de la APLA se emitieron en 2005 y fueron comprados por el BGF en 2014 (que luego refinanció

---

[15] Estimación basada en el Informe Financiero Anual Integral del ELA de Puerto Rico (CAFR) de 2016, que muestra que el ELA registró un pasivo de $65.2 millones por rechazo de reclamaciones federales.

[16] La recuperación total proporcionada a los bonistas de la AEP es la suma de la recuperación proporcionada por la AEP, según se detalla en el "Análisis de las recuperaciones de los acreedores en caso de que se desestime el caso de Título III para los acreedores de la Autoridad de Edificios Públicos de Puerto Rico (AEP)", y la recuperación provista por el ELA. Los bonistas de la AEP no pueden cobrar más que el pago total de la deuda contractual en un año determinado de la combinación de la AEP y el ELA.

- dichos bonos).[17] Los bonos de la APLA se adeudan hasta el Año Fiscal 2048. Su capital pendiente total e intereses devengados y no pagados es de $308 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición del ELA son $226 millones y $37 millones, respectivamente.
- **Préstamo de la Administración General de Servicios (ASG)**: la ASG tiene un préstamo con un capital pendiente e intereses devengados impagados de $24 millones y $2 millones, respectivamente. El monto total pendiente de capital e intereses devengados y no pagados a la Fecha de Vigencia de este análisis es de $30 millones. Siguiendo la orientación proporcionada por los asesores legales de la JSAF, este préstamo se considera *pari passu* con la deuda GO.

Siguiendo la orientación proporcionada por los asesores legales de la JSAF, hay ciertos bonos garantizados del ELA *pari passu* con bonos GO que no se consideran en este análisis porque dichas reclamaciones recibieron una garantía del ELA a partir de 2012. Estas reclamaciones son las siguientes:

- **Préstamos de Hacienda:** el total del capital pendiente y saldo de intereses devengados y no pagados es $240 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición del ELA son $169 millones y $29 millones.
- **Notas de anticipación de bonos (BAN) para la Autoridad de Financiamiento de Infraestructura de Puerto Rico (AFI):** las BAN de la AFI se emitieron originalmente en 2015, con un capital pendiente total y un saldo de intereses devengados y no pagados de $108 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición del ELA son $78 millones y $5 millones, respectivamente.

Además, ciertos bonos subordinados de la Autoridad de Acueductos y Alcantarillados de Puerto Rico (AAA) están garantizados por el ELA, pero no se consideran en este análisis. Como se anunció el 9 de agosto de 2019, la AAA reestructuró más de $1,000 millones en deuda que tenía una garantía del ELA. Como parte de este proceso, esta garantía fue cancelada para la mayoría de las reclamaciones de deuda de la AAA, con excepción de $284 millones de dicha deuda, que permanece garantizada por el ELA. Según la orientación proporcionada por los asesores legales de la JSAF en el Apéndice 5, este análisis asume que el ELA no tendría que pagar las reclamaciones de deuda de la AAA porque es poco probable que ocurra un incumplimiento de la AAA.

Tal como se indica en el Apéndice 5, existe un riesgo de litigio adicional relacionado con la validez de cierta deuda *pari passu*. La UCC ha impugnado las reclamaciones relacionadas con los bonos de la AEP emitidos a partir de marzo

---

[17] Los Bonos emitidos por la Autoridad de Puertos de las Américas no están incluidos en los préstamos del Banco Gubernamental de Fomento. Por tanto, se mencionan como dos reclamaciones de deuda independientes.

de 2011. También hay argumentos de que ciertas garantías del ELA emitidas a partir de marzo de 2011 pueden no ser válidas.

***Otras reclamaciones elegibles (reclamaciones no garantizadas):*** tal como se describe en el Apéndice 5, este análisis supone que las reclamaciones no garantizadas solo se pueden pagar después de que se paguen los montos adeudados en un año dado a los tenedores de reclamaciones de deuda *pari passu*. Las demás reclamaciones elegibles incluyen:

- **Litigios contra el ELA:** el total de las reclamaciones se estima en $2,769 millones.
- **Reclamaciones que se resolverán a través del Proceso de Reclamaciones Administrativas:** el total de reclamaciones se estima en $1,009 millones.
- **Reclamación de Fideicomiso de Entidad Pública del Título VI del BGF:** reclamación total de $600 millones que vencería cuando se levante la paralización actual del pago de la deuda del ELA.
- **Reclamaciones intragubernamentales de Puerto Rico:** el total de reclamaciones se estima en $594 millones. Esto incluye reclamaciones presentadas por municipios del ELA y otras entidades gubernamentales de Puerto Rico.
- **Reclamaciones de industrias críticas:** el total de reclamaciones se estima en $355 millones. Se compone de las 330 reclamaciones de litigios del Centro de Salud estimadas en $293 millones y reclamaciones de subsidios para productores de leche estimadas en $62 millones.
- **Reclamaciones de sindicatos contra el ELA:** el total de reclamaciones se estima en $245 millones.
- **Deudas comerciales:** el total de reclamaciones se estima en $175 millones.
- **Reclamaciones de la clase de conveniencia:** el total de reclamaciones se estima en $142 millones.
- **Gracia − Litigios por sobrepago de aseguradora Gracia:** el total de reclamaciones se estima en $28 millones.
- **Reclamaciones relacionadas con impuestos:** el total de reclamaciones se estima en $8 millones.
- **Otras reclamaciones varias:** el total de reclamaciones se estima en $57 millones.

Según la orientación proporcionada por los asesores legales de la JSAF, hay dos reclamaciones conocidas que se asume que se establecen en cero en el análisis. En primer lugar, se supone que los bonos de la Corporación de Finanzas Públicas de Puerto Rico ("bonos CFP") no forman parte del conjunto de reclamaciones. Los documentos de bonos de la CFP revelaron que la Legislatura no está legalmente obligada a obtener fondos apropiados para pagar los bonos, ya que dichos bonos no constituyen una obligación que pueda hacerse cumplir contra el ELA. En segundo lugar, el ELA también garantizó $110 millones en bonos adicionales del BGF, pero cualquier derecho de los tenedores de dichos bonos del BGF con respecto a la garantía del ELA se extinguió con el canje y cancelación de los bonos del BGF a tenor con la reestructuración del Título VI.

### iii. Prioridades de distribución de fondos para la amortización de la deuda

El orden en que se pagan las reclamaciones sigue ciertas prioridades. Según la orientación proporcionada por los asesores legales de la JSAF, este análisis asume que el ELA pagará las reclamaciones federales en

su totalidad antes de cualquier otro pago de deuda porque el Gobierno Federal podría compensar las reclamaciones impagas utilizando ciertos Fondos Federales destinados al ELA. Una vez que se pagan las reclamaciones federales, los fondos de la Dotación de Recursos se asignan a los bonos GO y la deuda *pari passu*, de modo que cada clase reciba la misma tasa de recuperación porcentual sobre la amortización de su deuda pagadera en un año determinado.[18] Una vez que la cantidad adeudada y pagadera de bonos GO de un año determinado y la deuda *pari passu* se pagan en su totalidad, los fondos restantes en la Dotación de Recursos se pueden usar para pagar otras reclamaciones elegibles.

El Gráfico 3 resume el orden en el que se desembolsan los fondos y se pagan las reclamaciones, siguiendo la orientación legal que se describe en el Apéndice 5. Para las reclamaciones consideradas en este análisis, la deuda con la misma prioridad recibe el mismo porcentaje de recuperación de la deuda pagadera en un año dado. Sin embargo, no se permite la aceleración de los pagos, por lo que la recuperación total como porcentaje de la deuda pendiente puede diferir entre las deudas con la misma prioridad pero con diferentes cronogramas de vencimiento.

*Gráfico 3: Flujo de fondos en el análisis*



Según la orientación proporcionada por los asesores legales de la JSAF, el uso de ingresos de CRIM y condicionalmente asignables sigue ciertas reglas establecidas a continuación:

- Si el ELA enfrenta un déficit operativo después de utilizar todos los recursos disponibles excluyendo los ingresos de CRIM y condicionalmente asignables en un año determinado, el análisis asume que el ELA ejercerá el poder del estado para utilizar los ingresos condicionalmente asignables y de CRIM para cubrir los gastos operativos. Si el déficit del ELA se paga en su totalidad con una parte de los ingresos condicionalmente asignables y de CRIM, cualquier ingreso de CRIM restante

---

[18] Esto se refiere al pago total como porcentaje del capital e intereses totales para cada clase de deuda en un año determinado.

se utilizaría para pagar bonos GO y los ingresos condicionalmente asignables se utilizarían para pagar bonos GO y la deuda *pari passu*. Los ingresos condicionalmente asignables y de CRIM se distribuirán de manera que los bonos GO y la deuda *pari passu* reciban el mismo porcentaje de recuperación en un año determinado.

- Si el ELA logra un equilibrio fiscal o tiene un superávit al excluir los ingresos de CRIM y condicionalmente asignables en un año determinado, los ingresos de CRIM se utilizarán para pagar bonos GO y los ingresos condicionalmente asignables se utilizarán para pagar bonos GO y la deuda *pari passu*.[19] Los ingresos condicionalmente asignables y los ingresos de CRIM se distribuirán de manera que los bonos GO y la deuda *pari passu* reciban el mismo porcentaje de recuperación en un año determinado.

- Si se pagan todos los bonos GO y la deuda *pari passu* adeudados y vencidos en un año determinado, los ingresos restantes asignables condicionalmente se asignan a las respectivas corporaciones públicas (es decir, ACT, AMA, AFI y ADCC). Ciertos estatutos de ingresos asignables exigen que el ELA reembolse a las entidades de ingresos asignables en el año siguiente cuando los ingresos asignables se retengan para pagar los bonos GO y las deudas *pari passu*, y dicha cantidad se acumula a favor de dichas entidades de ingresos asignables hasta que se reembolse por completo. Estos ingresos son 1) Impuesto a la gasolina (ACT), 2) Tasas de licencia de vehículos (ACT) y 3) Impuestos a las habitaciones de hotel (ADCC).

Tal como se describe en el Apéndice 5, se da por sentado que los fondos disponibles primero se acreditan contra los intereses acumulados adeudados, y luego al capital de la deuda que vence ese año o antes, si lo hubiera. Se asume que el capital impagado devenga intereses de acuerdo con las tasas originales estipuladas en cada uno de los documentos de deuda relevantes y luego se agrega a la deuda del año siguiente. Se asume que no se devengan intereses sobre los saldos de intereses.

## II. *Rango probable estimado de recuperaciones disponibles para los acreedores*

En un escenario en el que no se confirma un Plan de Ajuste y se desestima el caso de Título III, existen una serie de riesgos que pueden afectar la implementación del Plan Fiscal. Al evaluar el rango probable estimado de recuperaciones disponibles para los acreedores, el análisis ajusta las proyecciones de ingresos y gastos delineadas en el Plan Fiscal para incorporar los riesgos relacionados con la implementación de ciertas reformas estructurales y medidas fiscales.

El análisis establece un rango probable estimado de recuperaciones, donde el extremo superior del rango realiza ciertos ajustes a las proyecciones del Plan Fiscal para reflejar los riesgos de implementación, y el extremo inferior del rango agrega gradualmente más ajustes. Específicamente, el extremo superior del rango probable de recuperaciones estimado asume que el impacto de las reformas estructurales incluidas en el Plan Fiscal no se materializará pero que se implementarán todas las medidas fiscales. El análisis asume que, en una situación donde el caso de Título III ha sido desestimado, Puerto Rico enfrentará una mayor inestabilidad política y financiera, lo que creará importantes dificultades para promulgar leyes y hacer cumplir la cooperación entre agencias para instituir reformas estructurales. Asimismo, el impacto de cualquier acción para introducir reformas estructurales probablemente sea menor en el crecimiento, dado el clima general de

---

[19] El orden de uso de los fondos para pagar los bonos GO y la deuda *pari passu* es el siguiente: ingresos de CRIM, efectivo inicial, superávit del ELA, asignaciones del ELA a ciertas IFCU e ingresos condicionalmente asignables.

inestabilidad. Sin embargo, se asume que las medidas fiscales se darán tal como se describe en el Plan Fiscal, ya que la JSAF continuaría certificando presupuestos coherentes con el Plan Fiscal.

El extremo inferior del rango probable estimado de recuperaciones asume que el impacto de las reformas estructurales no se materializará y asume además que la medida fiscal de la reforma de salud no se implementará. Específicamente, si bien la JSAF tiene la autoridad para establecer niveles de gasto, podría enfrentar dificultades para hacer cumplir los niveles de gasto en salud incluidos en el Plan Fiscal. La reforma de salud en el Plan Fiscal exige acciones complejas y coordinadas entre los diversos actores del sistema de salud, algo que el ELA puede tener un incentivo limitado para emprender en el entorno asumido en este análisis. Por lo tanto, se asume en el extremo inferior del rango de recuperaciones que los ahorros de la reforma de salud no se materializarán.

Además de los ajustes a las Dotaciones de Recursos, el rango probable estimado de recuperaciones se ve afectado por dos variables clave: a) el efectivo inicial disponible para la amortización de la deuda y b) el monto de las reclamaciones no garantizadas. Según la orientación proporcionada por los asesores legales de la JSAF, el análisis asume $5,981 millones para reclamaciones no garantizadas.

Considerando los rangos que se describen anteriormente, en total, todos los supuestos reclamantes válidos[20] recibirían pagos en el rango de $9,700 millones a $11,000 millones.[21] La recuperación implícita es del 56 % al 64 % del total de reclamaciones.[22, 23] Este rango representa las recuperaciones totales estimadas para todos los acreedores si el caso de Título III fuera desestimado y todas las reclamaciones se exigieran según la ley diferente de la de quiebra. Este caso se denomina "caso base" en las páginas siguientes.

*Gráfico 4: Rango probable estimado de recuperación total para los acreedores del ELA*

**Rango probable estimado de las recuperaciones disponibles generales para los acreedores del ELA si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de 2012 se consideran inválidos[1,2]**
VP del pago total en miles de millones de USD, % de recuperación

|  | Extremo inferior del rango | Extremo superior del rango |
| --- | --- | --- |
| Recuperaciones totales | $9.8 64 % | $11.1 74 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de las reclamaciones del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

---

[20] Como se mencionó en la sección "Deuda pendiente" anterior, los bonos GO, los bonos de la AEP y las reclamaciones con una garantía del ELA emitidos a partir de 2012 no son válidos según la orientación legal.

[21] El monto se refiere al valor presente (a la Fecha de Vigencia) de los pagos futuros de la deuda utilizando una tasa de descuento anual del 5 %.

[22] El porcentaje de recuperación se estima como el valor presente (a la Fecha de Vigencia) de la deuda total pagada durante el período completo de análisis como proporción del capital total pendiente y los intereses no pagados a la Fecha de la Petición del ELA (3 de mayo de 2017).

[23] Las pensiones y las reclamaciones del SRE no se incluyen en la estimación de la recuperación total de la deuda. Este análisis asume que las pensiones se pagan en su totalidad todos los años como parte de los gastos operativos. Según la orientación de los asesores legales de la JSAF, este análisis también asume que se confirma un plan de ajuste del Título III del SRE.

La siguiente tabla muestra el rango probable estimado de recuperaciones para cada clase de reclamaciones. Como se menciona en la sección "Deuda pendiente", el cálculo asume que los bonos GO, los bonos AEP[24] y las reclamaciones con una garantía del ELA emitidos a partir de 2012 no son válidos.

*Gráfico 5: Rango probable estimado de recuperaciones disponibles para los acreedores del ELA por clase de deuda*

Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda *pari passu* emitidas a partir de 2012 se consideran inválidos[1, 2]

VP del pago total en miles de millones de USD, % de recuperación

| | Extremo inferior del rango | Extremo superior del rango |
|---|---|---|
| Bonos GO | $6.2<br>89 % | $6.6<br>95 % |
| Reclamaciones *pari passu* con bonos GO | $2.8<br>66 % | $3.3<br>76 % |
| Otras reclamaciones elegibles | $0.8<br>20 % | $1.3<br>34 % |
| Total | $9.8<br>64 % | $11.1<br>74 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

Consulte el Apéndice 2 para obtener detalles adicionales sobre recuperaciones basadas en diferentes niveles de efectivo inicial y reclamaciones de litigios que componen los rangos que se describen anteriormente.

***Resultados alternativos basados en litigios en curso o riesgos de litigios***

El rango probable estimado de recuperaciones disponibles para los acreedores del ELA está sujeto al resultado del litigio en curso como se resume en el Apéndice 5. El impacto de ciertos posibles resultados de litigios en la recuperación de los acreedores se analiza en los escenarios siguientes.

***i. Escenario 1: se asume que los bonos GO y las obligaciones de deuda** pari passu* *emitidos a partir de marzo de 2011 se consideran inválidos*

Tal como se describe en el Apéndice 5, el análisis principal supone que los bonos GO, los bonos de la AEP y las reclamaciones con una garantía del ELA emitidos a partir de 2012 se consideran inválidos. Sin embargo, la UCC ha iniciado un litigio que impugna la validez de los bonos GO, los bonos de la AEP y otras deudas con una garantía del ELA emitida a partir de marzo de 2011. Este escenario asume que las obligaciones antes mencionadas emitidas a partir de marzo de 2011 se consideran inválidas.

---

[24] La recuperación total proporcionada a los bonistas de la AEP es la suma de la recuperación proporcionada por la AEP, tal como se detalla en el "Análisis de Recuperaciones de los acreedores en caso de que se desestime el caso de Título III para los acreedores de la Autoridad de Edificios Públicos de Puerto Rico (AEP)", y la recuperación proporcionada por el ELA. Los bonistas de la AEP no pueden cobrar más que el pago total de la deuda contractual en un año determinado de la combinación de la AEP y el ELA.

Según los datos proporcionados por los asesores financieros, el capital total y los intereses devengados y no pagados pendientes de los bonos GO, excluyendo los emitidos a partir de marzo de 2011, son $7,025 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición del ELA son $5,462 millones y $381 millones, respectivamente.

En este escenario, el capital en circulación y los intereses devengados y no pagados de los bonos de la AEP son $2,869 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición de la AEP son $2,243 millones y $418 millones, respectivamente. Además, los préstamos BAN de la AFI y el BGF se consideran inválidos en este escenario; el valor de estas dos reclamaciones se describe en la sección "Deuda pendiente" de este análisis.

Los resultados de este escenario se presentan en el Gráfico 6. El rango probable estimado de recuperaciones para el grupo GO aumenta del 89 % al 95 % en el escenario base al 98 % al 100 % cuando el análisis considera que las reclamaciones emitidas a partir de marzo de 2011 no son válidas. El rango probable de recuperaciones estimado para la deuda *pari passu* cambia del 66 % al 76 % en el escenario base al 70 % al 75 % en este escenario. El resultado es que el rango probable estimado de pagos totales a los acreedores del ELA, en este escenario, es de $9,300 millones a $10,300 millones.

*Gráfico 6: Rango probable estimado de las recuperaciones para los acreedores del ELA si los bonos GO y las obligaciones de deuda* pari passu *emitidos a partir de marzo de 2011 se consideran inválidos*

Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de marzo de 2011 se consideran inválidos[1, 2]

VP del pago total en miles de millones de USD, % de recuperación

| | Extremo inferior del rango | Extremo superior del rango |
|---|---|---|
| Bonos GO | $5.8 *98 %* | $6.0 *100 %* |
| Reclamaciones *pari passu* con bonos GO[1] | $2.1 *70 %* | $2.2 *75 %* |
| Otras reclamaciones elegibles | $1.6 *39 %* | $2.1 *54 %* |
| Total | $9.4 *73 %* | $10.4 *82 %* |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

Consulte el Apéndice 3 para obtener detalles adicionales sobre recuperaciones basadas en diferentes niveles de efectivo inicial y reclamaciones de litigios que componen los rangos que se describen anteriormente.

**ii. *Escenario 2: Se asume que todas las obligaciones GO y de deuda* pari passu *pendientes se consideran válidas***

Como se describe en el Apéndice 5, es posible que las impugnaciones de ciertas reclamaciones no tengan éxito. En este escenario, se asume que todos los bonos GO, los bonos de la AEP y las reclamaciones con una garantía del ELA en circulación son válidos y, por lo tanto, recibirán pagos siguiendo las prioridades de distribución de fondos que se describen en este análisis.

En este escenario, según los datos proporcionados por los asesores financieros, el capital total y los intereses devengados y no pagados pendientes es de $16,638 millones a la Fecha de Vigencia de este análisis. Para el cálculo de los bonos GO, las recuperaciones, el capital total pendiente y los intereses no pagados a la fecha de la petición son $12,548 millones y $965 millones, respectivamente. Para los bonos de la AEP, el capital pendiente y el saldo de intereses devengados y no pagados son $5,050 millones a la Fecha de Vigencia de este análisis. Para el cálculo de las recuperaciones, el capital total pendiente de los bonos de la AEP y los intereses no pagados a la fecha de la petición son $4,001 millones y $670 millones, respectivamente. Además, se consideran en este escenario los préstamos BAN de la AFI y el BGF; el valor de estas dos reclamaciones se describe en la sección "Deuda pendiente" de este análisis. El Gráfico 7 a continuación muestra el rango probable estimado de recuperaciones.

En este escenario, las reclamaciones GO reciben una recuperación probable estimada del 75 % al 84 %. El rango probable de recuperaciones estimado para la deuda *pari passu* con el GO es del 54 % al 63 % en este escenario. El resultado es que el rango probable estimado de pagos totales a los acreedores del ELA es de $12,900 millones a $14,600 millones.

*Gráfico 7: Rango probable estimado de las recuperaciones para los acreedores del ELA si todos los bonos GO y obligaciones de deuda* pari passu *pendientes se consideran válidos*

**Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si todos los bonos GO y las obligaciones de deuda *pari passu* se consideran válidos[1, 2]**

VP del pago total en miles de millones de USD, % de recuperación

| | Extremo inferior del rango | Extremo superior del rango |
|---|---|---|
| Bonos GO | $10.1 *75 %* | $11.3 *84 %* |
| Reclamaciones *pari passu* con bonos GO | $2.8 *54 %* | $3.3 *63 %* |
| Otras reclamaciones elegibles | $0 *0 %* | $0 *0 %* |
| Total | $12.9 *57 %* | $14.6 *65 %* |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

Consulte el Apéndice 3 para obtener detalles adicionales sobre recuperaciones basadas en diferentes niveles de efectivo inicial y reclamaciones de litigios que componen los rangos que se describen anteriormente. En el Gráfico 8, se muestra un resumen de las recuperaciones de los acreedores para el caso base, el Escenario 1 y el Escenario 2.

*Gráfico 8: Rango probable estimado de recuperaciones para los acreedores del ELA por clase de deuda y escenario*

Rango probable estimado de las recuperaciones disponibles para los acreedores por clase de deuda y escenario[1, 2]
VP del pago total en miles de millones de USD, % de recuperación, desglose por escenario

| | Caso base: los bonos GO y la deuda *pari passu* emitidos a partir de 2012 se consideran inválidos | | Escenario 1: los bonos GO y la deuda *pari passu* emitidos a partir de marzo de 2011 se consideran inválidos | | Escenario 2: todas las reclamaciones pendientes se consideran válidas | |
|---|---|---|---|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango |
| **Bonos GO** | $6.2 89 % | $6.6 95 % | $5.8 98 % | $6.0 100 % | $10.1 75 % | $11.3 84 % |
| **Reclamaciones *pari passu* con bonos GO** | $2.8 66 % | $3.3 76 % | $2.1 70 % | $2.2 75 % | $2.8 54 % | $3.3 63 % |
| **Otras reclamaciones elegibles** | $0.8 20 % | $1.3 34 % | $1.6 39 % | $2.1 54 % | $0 0 % | $0 0 % |
| **Total** | $9.8 64 % | $11.1 74 % | $9.4 73 % | $10.4 82 % | $12.9 57 % | $14.6 65 % |

1. Las recuperaciones en este gráfico incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

### iii.  Escenarios alternativos en los que se asume la reducción ordenada por el tribunal de ciertas obligaciones de pensión para cumplir con ciertas obligaciones de deuda

Según los supuestos legales que se describen en el Apéndice 5, este análisis alternativo asume que la priorización de las obligaciones de pensión por parte del ELA no se considera completamente permisible y está dirigida a usar una parte de los fondos destinados a pagar las pensiones para aumentar la dotación de recursos disponibles para pagar los bonos GO y la deuda *pari passu*. El análisis supone que las pensiones superiores a $1,500 por mes (sin incluir los beneficios del seguro médico) se reducen parcialmente en un 5 % o 10 %, con la reducción limitada de modo que ninguna pensión se reduzca por debajo de $1,500 por mes. Se asume que estas reducciones tendrán lugar a menos que y hasta que los bonos GO y la deuda *pari passu* se paguen en su totalidad, momento en el cual no se requieren más reducciones de pensión.

El Gráfico 9 y el Gráfico 10 muestran el rango probable de recuperaciones estimado para el caso base, el Escenario 1 y el Escenario 2, asumiendo una reducción del 5 % o 10 % ordenada por el tribunal en ciertas obligaciones de pensión tal como se describe anteriormente.

*Gráfico 9: Rango probable estimado de recuperaciones para los acreedores del ELA por clase de deuda y escenario asumiendo una reducción del 5 % ordenada por el tribunal en ciertas obligaciones de pensión*

**Rango probable estimado de las recuperaciones disponibles para los acreedores por clase de deuda y escenario asumiendo una reducción del 5 % ordenada por el tribunal en ciertas obligaciones de pensiones[1, 2]**
VP del pago total en miles de millones de USD, % de recuperación, desglose por escenario

| | Caso base: los bonos GO y la deuda *pari passu* emitidos a partir de 2012 se consideran inválidos | | Escenario 1: los bonos GO y la deuda *pari passu* emitidas a partir de marzo de 2011 se consideran inválidos | | Escenario 2: todas las reclamaciones pendientes se consideran válidas | |
|---|---|---|---|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $6.3 91 % | $6.7 96 % | $5.8 99 % | $6.1 100 % | $10.3 76 % | $11.6 86 % |
| Reclamaciones *pari passu* con bonos GO | $2.9 68 % | $3.3 78 % | $2.1 71 % | $2.2 76 % | $2.9 56 % | $3.4 65 % |
| Otras reclamaciones elegibles | $0.8 20 % | $1.3 34 % | $1.6 39 % | $2.1 54 % | $0 0 % | $0 0 % |
| Total | $10.0 66 % | $11.3 75 % | $9.5 74 % | $10.4 82 % | $13.2 58 % | $15.0 66 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

*Gráfico 10: Rango probable estimado de recuperaciones para los acreedores del ELA por clase de deuda y escenario asumiendo una reducción del 10 % ordenada por el tribunal en ciertas obligaciones de pensión*

**Rango probable estimado de las recuperaciones disponibles para los acreedores por clase de deuda y escenario asumiendo una reducción del 10 % ordenada por el tribunal en ciertas obligaciones de pensiones[1, 2]**
VP del pago total en miles de millones de USD, % de recuperación, desglose por escenario

| | Caso base: los bonos GO y la deuda *pari passu* emitidos a partir de 2012 se consideran inválidos | | Escenario 1: los bonos GO y la deuda *pari passu* emitidas a partir de marzo de 2011 se consideran inválidos | | Escenario 2: todas las reclamaciones pendientes se consideran válidas | |
|---|---|---|---|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $6.4 92 % | $6.8 97 % | $5.8 100 % | $6.1 100 % | $10.6 78 % | $11.8 88 % |
| Reclamaciones *pari passu* con bonos GO | $3.0 70 % | $3.4 79 % | $2.1 71 % | $2.3 77 % | $3.0 57 % | $3.5 67 % |
| Otras reclamaciones elegibles | $0.8 20 % | $1.3 34 % | $1.6 39 % | $2.1 54 % | $0 0 % | $0 0 % |
| Total | $10.2 67 % | $11.4 76 % | $9.5 74 % | $10.5 83 % | $13.6 60 % | $15.4 68 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

### iv. Escenarios alternativos en los que se asume la desestimación del caso de Título III del SRE

Este análisis alternativo asume que se desestima el caso de Título III del SRE. Tal como se describe en el Apéndice 5, si se desestima el caso de Título III del SRE, cualquier activo que quede en SRE después de que se hayan pagado las obligaciones de deuda a los bonistas y acreedores no garantizados a partir de fuentes de seguridad identificadas legalmente se transferirá al ELA de conformidad con la Ley 106-2017. Según el "Análisis de recuperaciones de acreedores en caso de que se desestime el caso de Título III para los acreedores del Sistema de Retiro de Empleados de Puerto Rico (SRE)", se asume que $1,023 millones de activos remanentes no restringidos del SRE se transferirán al ELA en el Año Fiscal 2022 en comparación con los $643 millones del caso base.

Además, según la orientación proporcionada por los asesores legales de la JSAF, este análisis asume que los bonistas del SRE interponen una reclamación no garantizada contra el ELA por la amortización de la deuda restante en cada año que el SRE no paga la deuda.[25] El siguiente gráfico muestra el rango probable estimado de recuperaciones para el caso base, el Escenario 1 y el Escenario 2, asumiendo que los activos no restringidos del SRE transferidos al ELA en el Año Fiscal 2022 ascienden a $1,023 millones y los bonistas del SRE interponen una reclamación no garantizada en cada año que el SRE no paga la deuda en su totalidad.

*Gráfico 11: Rango probable estimado de recuperaciones para los acreedores del ELA por escenario si se desestima el caso de Título III del SRE*

**Rango probable estimado de las recuperaciones disponibles para los acreedores por clase de deuda y escenario si se desestima el caso de Título III del SRE[1,2]**

VP del pago total en miles de millones de USD, % de recuperación, desglose por escenario

| | Caso base: los bonos GO y la deuda pari passu emitidas a partir de 2012 se consideran inválidos | | Escenario 1: los bonos GO y la deuda pari passu emitidas a partir de marzo de 2011 se consideran inválidos | | Escenario 2: todas las reclamaciones pendientes se consideran válidas | |
|---|---|---|---|---|---|---|
| | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango | Extremo inferior del rango | Extremo superior del rango |
| Bonos GO | $6.2 89 % | $6.6 95 % | $5.8 98 % | $6.0 100 % | $10.1 75 % | $11.3 84 % |
| Reclamaciones pari passu con bonos GO | $2.8 66 % | $3.3 76 % | $2.1 70 % | $2.2 75 % | $2.8 54 % | $3.3 63 % |
| Otras reclamaciones elegibles | $1.1 16 % | $1.7 24 % | $1.9 27 % | $2.5 35 % | $0 0 % | $0 0 % |
| Total | $10.2 55 % | $11.5 63 % | $9.7 61 % | $10.7 68 % | $12.9 50 % | $14.6 57 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

---

[25] La recuperación total proporcionada a los bonistas del SRE es la suma de la recuperación proporcionada por el SRE, según se detalla en el "Análisis de recuperaciones de acreedores en caso de que se desestime el caso de Título III para los acreedores del Sistema de Retiro de Empleados de Puerto Rico (SRE)", y la recuperación proporcionada por el ELA como reclamación no garantizada. Las reclamaciones no garantizadas del SRE contra el ELA representan el 35 % del total de reclamaciones no garantizadas interpuestas contra el ELA si se desestima el caso de Título III del SRE en este análisis.

**APÉNDICE 1**

Los siguientes gráficos brindan detalles adicionales sobre el rango probable estimado de recuperaciones disponibles para los acreedores en los diferentes escenarios, incluidos detalles sobre los pagos de intereses que se acumularon desde la fecha de la petición (3 de mayo de 2017, excepto para la AEP, que es el 27 de septiembre de 2019) hasta la Fecha de Vigencia del análisis (30 de junio de 2021).

*Gráfico 12: Rango probable estimado de las recuperaciones disponibles para todos los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda pari passu emitidos a partir de 2012 se consideran inválidos*

**Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de 2012 se consideran inválidos [1,2]**

VP del pago total en miles de millones de USD, % de recuperación

|  | Extremo inferior del rango | | Extremo superior del rango | |
|---|---|---|---|---|
|  | Recuperación total | Pagos al interés devengado después de la petición[3] | Recuperación total | Pagos al interés devengado después de la petición[3] |
| Bonos GO | $6.2<br>89 % | 1.4<br>20 % | $6.6<br>95 % | 1.4<br>20 % |
| Reclamaciones *pari passu* con bonos GO | $2.8<br>66 % | 0.3<br>7 % | $3.3<br>76 % | 0.3<br>7 % |
| Otras reclamaciones elegibles | $0.8<br>20 % | 0.0<br>0 % | $1.3<br>34 % | 0.0<br>0 % |
| Total | $9.8<br>64 % | 1.7<br>11 % | $11.1<br>74 % | 1.7<br>11 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.
3. Calculado como porcentaje de los pagos realizados al interés devengado después de la petición a partir de la deuda pendiente total a la fecha de la petición.

*Gráfico 13: Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda* pari passu *emitidos a partir de marzo de 2011 se consideran inválidos*

Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de marzo de 2011 se consideran inválidos[1,2]
VP del pago total en miles de millones de USD, % de recuperación

| | Extremo inferior del rango | | Extremo superior del rango | |
|---|---|---|---|---|
| | Recuperación total | Pagos al interés devengado después de la petición[3] | Recuperación total | Pagos al interés devengado después de la petición[3] |
| Bonos GO | $5.8 / 98 % | 1.2 / 20 % | $6.0 / 100 % | 1.2 / 20 % |
| Reclamaciones *pari passu* con bonos GO | $2.1 / 70 % | 0.2 / 6 % | $2.2 / 75 % | 0.2 / 6 % |
| Otras reclamaciones elegibles | $1.6 / 39 % | 0.0 / 0 % | $2.1 / 54 % | 0.0 / 0 % |
| Total | $9.4 / 73 % | 1.3 / 11 % | $10.4 / 82 % | 1.3 / 11 % |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.
3. Calculado como porcentaje de los pagos realizados al interés devengado después de la petición a partir de la deuda pendiente total a la fecha de la petición.

*Gráfico 14: Rango probable estimado de las recuperaciones disponibles para los acreedores si todas las reclamaciones pendientes se consideran válidas*

Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si todos los bonos GO y las obligaciones de deuda *pari passu* se consideran válidos[1,2]
VP del pago total en miles de millones de USD, % de recuperación

| | Extremo inferior del rango | | Extremo superior del rango | |
|---|---|---|---|---|
| | Recuperación total | Pagos al interés devengado después de la petición[3] | Recuperación total | Pagos al interés devengado después de la petición[3] |
| Bonos GO | $10.1 / 75 % | 3.1 / 23 % | $11.3 / 84 % | 3.1 / 23 % |
| Reclamaciones *pari passu* con bonos GO | $2.8 / 54 % | 0.4 / 8 % | $3.3 / 63 % | 0.4 / 8 % |
| Otras reclamaciones elegibles | $0 / 0 % | 0.0 / 0 % | $0 / 0 % | 0.0 / 0 % |
| Total | $12.9 / 57 % | 3.5 / 16 % | $14.6 / 65 % | 3.5 / 16% |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.
3. Calculado como porcentaje de los pagos realizados al interés devengado después de la petición a partir de la deuda pendiente total a la fecha de la petición.

APÉNDICE 2

Los siguientes gráficos proporcionan detalles adicionales sobre el rango probable estimado de recuperaciones disponibles para los acreedores. El primer gráfico muestra detalles adicionales sobre las recuperaciones totales para los acreedores y el segundo gráfico muestra las recuperaciones por clase de deuda.

*Gráfico 15: Rango probable estimado de las recuperaciones disponibles para todos los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda* pari passu *emitidos a partir de 2012 se consideran inválidos*

**Rango probable estimado de las recuperaciones generales disponibles para los acreedores del ELA si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de 2012 se consideran inválidos[1,2]**
VP del pago total en miles de millones de USD, % de recuperación

| | | Extremo inferior del rango | Extremo superior del rango | Rango de recuperaciones |
|---|---|---|---|---|
| Reclamaciones no garantizadas = $3.8 | Efectivo inicial = $9.3 | $9.8 65 % | $10.7 71 % | $9.8 – 11.1 64 -74% |
| | Efectivo inicial = $9.8 | $10.3 68 % | $11.1 74 % | |
| Reclamaciones no garantizadas = $4.0 | Efectivo inicial = $9.3 | $9.8 64 % | $10.7 70 % | |
| | Efectivo inicial = $9.8 | $10.3 67 % | $11.1 73 % | |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

*Gráfico 16: Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda y variables si los bonos GO y las obligaciones de deuda* pari passu *emitidos a partir de 2012 se consideran inválidos*

**Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de 2012 se consideran inválidos[1,3]**
VP del pago total en miles de millones de USD, % de recuperación

| | | Efectivo inicial = $9.3 | Efectivo inicial = $9.8 | Rango de recuperaciones |
|---|---|---|---|---|
| Bonos GO | Reclamaciones no garantizadas = $3.8 | $6.2 – 6.6 89 – 95 % | $6.2 – 6.6 89 – 95 % | $6.2 – 6.6 89 – 95 % |
| | Reclamaciones no garantizadas = $4.0 | $6.2 – 6.6 89 – 95 % | $6.2 – 6.6 89 – 95 % | |
| Reclamaciones *pari passu* con bonos GO | Reclamaciones no garantizadas = $3.8 | $2.8 – 3.3 66 – 76 % | $2.8 – 3.3 66 – 76 % | $2.8 – 3.3 66 – 76 % |
| | Reclamaciones no garantizadas = $4.0 | $2.8 – 3.3 66 – 76 % | $2.8 – 3.3 66 – 76 % | |
| Otras reclamaciones elegibles | Reclamaciones no garantizadas = $3.8 | $0.8 – 0.8 20 – 21 % | $1.2 – 1.3 33 – 34 % | $0.8 – 1.3 20 – 34 % |
| | Reclamaciones no garantizadas = $4.0 | $0.8 – 0.8 20 – 21 % | $1.2 – 1.3 33 – 34 % | |
| Total | Reclamaciones no garantizadas = $3.8 | $9.8 – 10.7 65 – 71 % | $10.3 – 11.1 68 – 74 % | $9.8 – 11.1 64 – 74 % |
| | Reclamaciones no garantizadas = $4.0 | $9.8 – 10.7 64 – 70 % | $10.3 – 11.1 67 – 73 % | |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

## APÉNDICE 3

*Gráfico 17: Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda* pari passu *emitidos a partir de marzo de 2011 se consideran inválidos*

Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si los bonos GO y las obligaciones de deuda *pari passu* emitidos a partir de marzo de 2011 se consideran inválidos[1,2]
VP del pago total en miles de millones de USD; % de recuperación

| | | Efectivo inicial = $9.3 | Efectivo inicial = $9.8 | Rango de recuperaciones |
|---|---|---|---|---|
| Bonos GO | Reclamaciones no garantizadas = $3.8 | $5.8 – 6.0 / 98 – 100 % | $5.8 – 6.0 / 98 – 100 % | $5.8 – 6.0 / 98 – 100 % |
| | Reclamaciones no garantizadas = $4.0 | $5.8 – 6.0 / 98 – 100 % | $5.8 – 6.0 / 98 – 100 % | |
| Reclamaciones *pari passu* con bonos GO | Reclamaciones no garantizadas = $3.8 | $2.1 – 2.2 / 70 – 75 % | $2.1 – 2.2 / 70 – 75 % | $2.1 – 2.2 / 70 – 75 % |
| | Reclamaciones no garantizadas = $4.0 | $2.1 – 2.2 / 70 – 75 % | $2.1 – 2.2 / 70 – 75 % | |
| Otras reclamaciones elegibles | Reclamaciones no garantizadas = $3.8 | $1.6 – 1.6 / 40 – 41 % | $2.1 – 2.1 / 53 – 54 % | $1.6 – 2.1 / 39 – 54 % |
| | Reclamaciones no garantizadas = $4.0 | $1.6 – 1.6 / 39 – 40 % | $2.1 – 2.1 / 51 – 52 % | |
| Total | Reclamaciones no garantizadas = $3.8 | $9.4 – 9.9 / 74 – 78 % | $8.9 – 10.4 / 78 – 82 % | $9.4 – 10.4 / 73 – 82 % |
| | Reclamaciones no garantizadas = $4.0 | $9.4 – 9.9 / 73 – 77 % | $8.9 – 10.4 / 77 – 81 % | |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

*Gráfico 18: Rango probable estimado de recuperaciones disponibles para los acreedores del ELA por clase de deuda si todas las reclamaciones se consideran válidas*

Rango probable estimado de las recuperaciones disponibles para los acreedores del ELA por clase de deuda si todos los bonos GO y las obligaciones de deuda *pari passu* se consideran válidos[1,2]
VP del pago total en miles de millones de USD; % de recuperación

| | | Efectivo inicial = $9.3 | Efectivo inicial = $9.8 | Rango de recuperaciones |
|---|---|---|---|---|
| Bonos GO | Reclamaciones no garantizadas = $3.8 | $10.1 – 11.3 / 75 – 84 % | $10.1 – 11.3 / 75 – 84 % | $10.1 – 11.3 / 75 – 84 % |
| | Reclamaciones no garantizadas = $4.0 | $10.1 – 11.3 / 75 – 84 % | $10.1 – 11.3 / 75 – 84 % | |
| Reclamaciones *pari passu* con bonos GO | Reclamaciones no garantizadas = $3.8 | $2.8 – 3.3 / 54 – 63 % | $2.8 – 3.3 / 54 – 63 % | $2.8 – 3.3 / 54 – 63 % |
| | Reclamaciones no garantizadas = $4.0 | $2.8 – 3.3 / 54 – 63 % | $2.8 – 3.3 / 54 – 63 % | |
| Otras reclamaciones elegibles | Reclamaciones no garantizadas = $3.8 | $0 – 0 / 0 – 0 % | $0 – 0 / 0 – 0 % | $0 – 0 / 0 – 0 % |
| | Reclamaciones no garantizadas = $4.0 | $0 – 0 / 0 – 0 % | $0 – 0 / 0 – 0 % | |
| Total | Reclamaciones no garantizadas = $3.8 | $12.9 – 14.6 / 57 – 65 % | $12.9 – 14.6 / 57 – 65 % | $12.9 – 14.6 / 57 – 65 % |
| | Reclamaciones no garantizadas = $4.0 | $12.9 – 14.6 / 57 – 64 % | $12.9 – 14.6 / 57 – 64 % | |

1. Las recuperaciones en este gráfico no incluyen recuperaciones de pensiones, que se asumen pagadas en su totalidad como parte de los ajustes del Plan Fiscal, ni recuperaciones del SRE, que se asumen pagadas de acuerdo con el Plan de Ajuste del SRE.
2. Estas recuperaciones reflejan los ajustes realizados a la Dotación de Recursos dados los riesgos de implementación cubiertos en este análisis.

## *APÉNDICE 4*

De acuerdo con el Análisis de Efectivo de Puerto Rico publicado por la Junta de Supervisión y AAFAF el 19 de diciembre de 2020, los Requisitos Mínimos de Efectivo del ELA se estiman en $1,200 millones a $1,700 millones. Este monto se refiere al efectivo disponible que el ELA necesitaría para que el sistema de administración de efectivo del gobierno cuente con los fondos suficientes y garantice el funcionamiento adecuado de las operaciones gubernamentales. Consulte la tabla a continuación para obtener detalles del análisis.

*Gráfico 19: Análisis de requisitos mínimos de efectivo*[26]

| Categoría | Rango | Descripción |
|---|---|---|
| **Mediana PEW de los 50 estados** | $500m $1,000m $1,500m $2,000m | La mediana de 50 estados para la reserva del saldo total es de **45 días** o aproximadamente **$1,240 millones** de los gastos presupuestados del Fondo General. |
| **Recomendación de GFOA** | $500m $1,000m $1,500m $2,000m | La práctica recomendada de GFOA es de **60 días** de los gastos operativos del Fondo General; esto es aproximadamente **$1,650 millones** de los gastos presupuestados del Fondo General. |
| **Comparable con la municipalidad** | $500m $1,000m $1,500m $2,000m | La ciudad de Detroit mantuvo un saldo mínimo de efectivo de unos $75 millones o 7.5 % de sus gastos del Fondo General. En consecuencia, Puerto Rico conservaría **$1,000 millones**. |
| **Préstamos para desastres en la comunidad (CDL)** | $500m $1,000m $1,500m $2,000m | El Tesoro de los EE. UU. otorgó a Puerto Rico acceso a los CDL, según sea necesario, hasta marzo de 2020 (si se emiten préstamos) si la reserva de efectivo es inferior a **$1,100 millones**. Esto fue un aumento con respecto al saldo original de **$800 millones**. |
| **Enfoque del profesional** | $500m $1,000m $1,500m $2,000m | Los profesionales conservan entre el **5** y el **10** % de los gastos presupuestados del fondo general y de ingresos especiales como reserva. Esto equivale a entre **$667 millones** y **$1,333 millones**. |
| **Solicitud del Gobierno** | $500m $1,000m $1,500m $2,000m | El Gobierno solicita **$1,781 millones** para el saldo mínimo de efectivo. Esta reserva corresponde a la TSA, que incluye flujos de efectivo del fondo general, los fondos federales y los fondos de ingresos especiales. |

[26] Fuente: Análisis de Efectivo de Puerto Rico (acceso en junio de 2021): https://emma.msrb.org/P11450397-P11124337-P11535399.pdf

*APÉNDICE 5*

# Plan del Título III del ELA[1]

## Análisis de prueba de mejores intereses: supuestos

| | Pregunta | Supuesto |
|---|---|---|
| **1.** | **Existencia de PROMESA/Junta:** ¿se debe asumir que se aplican los Títulos I y II de PROMESA? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]:** se aplican los Títulos I y II de PROMESA. No se aplica la paralización automática. La Junta está implementada y certifica y hace cumplir los planes y presupuestos fiscales. Los acreedores pueden obtener sentencias para todas las reclamaciones vencidas. Una vez que los acreedores de GO (incluidos los acreedores que tienen reclamaciones garantizadas por CW) tienen sentencias, pueden reclamar todos los "recursos disponibles" y negociar/litigar con el ELA sobre qué cantidad de los recursos disponibles se pueden aplicar a los gastos operativos a tenor con el poder del estado. El único recurso de los acreedores de garantía no GO y no CW es esperar una asignación legislativa de montos para pagar sus reclamaciones una vez que los GO se hayan pagado en su totalidad.<br><br>**BASE:** la referencia a las "leyes diferentes de las de quiebra" en la Sección 314(b)(6) de PROMESA incluiría los Títulos I y II de PROMESA. No habría una paralización automática según la ley diferente de la de quiebra. Ni el plan fiscal ni el presupuesto liquidan reclamaciones o paralizan acciones. Por lo tanto, se aplicarían el plan fiscal y el presupuesto, como la ley diferente de la de quiebra, y la Junta de Supervisión continuaría existiendo para su cumplimiento. Es posible que sus limitaciones implícitas (es decir, montos presupuestados) no limiten cuánto pueden cobrar los acreedores si exigen el cumplimiento de sus reclamaciones. En tal caso, dependerá de la medida en que el poder del estado impida que los acreedores de GO se apropien de todos los recursos disponibles. Los acreedores no GO dependen de las asignaciones legislativas para el pago. El plan fiscal certificado limitaría lo que se puede asignar para la amortización de la deuda, con sujeción a los derechos de los acreedores de GO de ejercer sus derechos según el Artículo VI, Secciones 6 y 8, de la Constitución de PR para interceptar los recursos disponibles.<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]:** no se aplican los Títulos I y II de PROMESA. No se aplica la paralización automática. La Junta no existe y no hay planes ni presupuestos fiscales certificados. |

---

[1] El Estado Libre Asociado de Puerto Rico se denomina aquí "ELA", "CW" o "PR".

| | Pregunta | Supuesto |
|---|---|---|
| | | **BASE:** el supuesto de que los Títulos I y II de PROMESA continúen aplicándose aumenta la recuperación de los acreedores debido a las medidas y ahorros que la Junta de Supervisión inserta en sus planes fiscales certificados. Los asesores legales de la Junta de Supervisión creen que es posible que los Títulos I y II no se apliquen porque el Congreso los promulgó junto con el Título III y no está claro que tuvieran la intención de continuar en vigencia sin el Título III. Sin embargo, a fin de cuentas, los asesores legales recomendaron que este análisis se hiciera como si los Títulos I y II de PROMESA siguieran aplicándose. |
| 2. | **Superávit:** cada año, ¿el efectivo restante después de pagar todas las deudas vencidas y pagaderas se guarda en una caja de seguridad para los años posteriores con déficit o se transfiere a los recursos del próximo año? | **SUPUESTO**: en la medida en que existan fondos excedentes después del pago de todas las deudas vencidas en cualquier año, los fondos se mantendrán en la hacienda del ELA y un tribunal decidirá el año siguiente si el poder del estado justifica dejar todo o parte de él para los años posteriores con déficit para servicios esenciales. Los bonos GO y los bonos garantizados por CW no prevén la aceleración. El análisis del BIT debe asumir que el superávit está disponible y se utiliza para la amortización de la deuda, y que no se ahorra para futuros años de déficit o para depósito en el sistema de pensiones.

**BASE:** es posible que un tribunal no esté dispuesto a permitir que el ELA reserve grandes sumas para futuros años de déficit si eso significa recortar la recuperación de los acreedores en el futuro inmediato. |
| 3. | **Efectivo restringido/no restringido** | **SUPUESTO:** en general, solo se encuentra disponible efectivo no restringido para la amortización de la deuda, y el efectivo restringido para ciertos acreedores está disponible únicamente para esos acreedores en la medida en que lo exija la normativa legal del ELA u otra ley aplicable.

El efectivo no restringido se refiere a los fondos del ELA que no tienen limitaciones legales en su uso (por ejemplo, están en custodia o cuentas fiduciarias, son garantía de los bonistas o están sujetos a órdenes judiciales, entre otros). Los fondos que no tienen limitaciones legales sobre su uso se consideran efectivo no restringido disponible para la amortización de la deuda. Existe una diferencia entre el dinero reservado para un propósito y el dinero legalmente restringido, como fondos federales o fondos fiduciarios. El dinero reservado para emergencias y obligaciones de reserva igualación de costos no está legalmente restringido.

Además, la estimación de efectivo en el análisis del BIT debe asumir un efectivo mínimo requerido para las operaciones gubernamentales normales ("Requisitos Mínimos de Efectivo"), que es el nivel mínimo de efectivo que el ELA necesitaría para evitar las restricciones de liquidez |

| Pregunta | Supuesto |
|---|---|
| | que podrían poner en riesgo sus operaciones. El supuesto de Requisitos Mínimos de Efectivo también incluye una provisión razonable para emergencias a corto plazo, en consonancia con cómo se hace el presupuesto para los municipios y los estados de EE. UU.<br><br>Finalmente, el análisis de efectivo para el Año Fiscal 21 debe incluir un ajuste por el financiamiento que el ELA proporcionará a la AEE. Estos fondos están relacionados con el contrato LUMA y se supone que se dan como adelanto antes de la fecha de vigencia de este análisis (30 de junio de 2021). El valor estimado preliminar de los fondos de apoyo es de $750 millones, que están relacionados con los pagos contractuales que financian las cuentas operativas del Acuerdo de O&M de T&D.<br><br>**BASE:** el efectivo en cuentas sujetas a otras restricciones no está disponible para la amortización de la deuda si las restricciones son del tipo de garantías prendarias, gravámenes o derechos de compensación o recuperación. Hay otro efectivo disponible, incluso si está "destinado" a un propósito específico, con la excepción de los fondos de emergencia limitados que el tribunal permite que las entidades retengan. |
| 4. | **Ingresos condicionalmente asignables:** ¿las corporaciones públicas que tienen derecho a recibir ingresos condicionalmente asignables ("entidades de ingresos asignables") o sus bonistas pueden interponer una reclamación válida contra el ELA por cualquier monto de ingresos condicionalmente asignables retenidos por el ELA? (Los "ingresos condicionalmente asignables" se refieren a los ingresos recuperables o no asignados según el Artículo VI, Sección 8, de la constitución de Puerto Rico). | **SUPUESTO 1 [SUPUESTO PRINCIPAL]:** una entidad de ingresos asignables o sus bonistas pueden interponer una reclamación contra el ELA por los ingresos asignables que el ELA ha retenido pero no ha utilizado para pagar deuda GO o deudas garantizadas por CW, pero no por ingresos asignables que sí se han utilizado para pagar bonos GO o deudas garantizadas por CW. Esta reclamación es una reclamación no garantizada y no prioritaria (es decir, subordinada a la deuda GO) contra el ELA por falta no autorizada de asignación de ingresos además de cualquier reclamación que los bonistas tengan contra la entidad de ingresos asignables (es decir, el emisor), pero no por la porción utilizada para la amortización de la deuda GO o la amortización de la deuda garantizada por CW. La resolución de la reclamación dependerá de muchos factores, incluido el poder del estado, la preferencia y los hechos subyacentes a cada falta de asignación de ingresos. Las disposiciones de prioridad de deuda GO se aplican de forma agregada y no anual. Estas reclamaciones se reducirán si el ELA reembolsa a las entidades de ingresos asignables en los años subsiguientes en los que el ELA retuvo los ingresos asignables para fines distintos al pago de bonos GO o bonos garantizados por CW.<br><br>**BASE:** los ingresos asignables utilizados para la amortización de la deuda GO según el plan de ajuste en el que las reclamaciones de GO no se pagan en su totalidad no están sujetos a un ataque con el argumento de que los fondos de ingresos asignables se utilizaron para el propósito incorrecto porque, a tenor con la Sección |

| Pregunta | Supuesto |
|---|---|
| | 8 del Artículo VI de la Constitución de PR, los ingresos asignables pueden utilizarse para la amortización de la deuda en obligaciones generales, o porque dichos ingresos asignables fueron sustituidos por los planes fiscales de la Junta. La Sección 8, sin embargo, parece estar sujeta al poder del estado de CW. Los bonistas probablemente también impugnarán la falta de asignación de ingresos (pasados y futuros) sobre la base de que era innecesario porque, en su opinión, había suficientes ingresos disponibles para la amortización de la deuda GO. Según ese argumento o debido a que el poder del estado se utiliza para hacer uso de ingresos asignables a fin de pagar los gastos operativos y no la deuda GO, los bonistas interpondrán reclamaciones contra CW por el monto de ingresos asignables que supuestamente se tomaron innecesariamente para la amortización de la deuda GO o supuestamente se tomaron a tenor con el poder del estado a fin de pagar los gastos operativos de CW o los gastos operativos de la entidad de ingresos asignables. Incluso si no existiera el derecho a no asignar los ingresos, el poder del estado de CW, sujeto en última instancia a la resolución judicial, podría justificar el cese de la asignación de dinero a las agencias de ingresos asignables para la amortización de la deuda y el uso de los fondos para servicios esenciales en CW o en entidades de ingresos asignables. <br><br> Entonces, se asume que, en tanto el ELA no pueda pagar sus gastos en un año determinado, ejerce el poder del estado para no asignar los ingresos y luego los distribuye según las necesidades (es decir, puede usar algunos para cubrir los gastos operativos propios, de las instrumentalidades —incluidas las entidades de ingresos asignables— y para la amortización de la deuda). Se da por sentado que los ingresos asignables se pueden utilizar para pagar la deuda GO y la deuda *pari passu* a los bonos GO cuando el ELA tiene fondos suficientes para pagar sus gastos operativos. En el caso de que no se requiera que los ingresos asignables se utilicen en su totalidad para pagar la deuda GO y la deuda *pari passu* a la deuda GO en un año determinado, cualquier monto de los ingresos asignables restantes se devuelve a sus corporaciones públicas correspondientes. Si el ELA no tiene fondos suficientes para pagar sus gastos operativos en un año determinado, se asume que puede ejercer el poder del estado para utilizar los ingresos asignables para pagar esos gastos, y el poder del estado podría dar lugar a reclamaciones contra CW por el monto de ingresos asignables utilizados. <br><br> Finalmente, ciertos estatutos de ingresos asignables exigen que el ELA reembolse a las entidades de ingresos asignables en el año siguiente cuando los ingresos asignables se retengan para pagar los bonos GO y las deudas garantizadas por CW, en cuyo caso dicho monto se acumula a favor de la entidad de ingresos asignables hasta que se reembolse por completo (y puede surgir una reclamación |

| | Pregunta | Supuesto |
|---|---|---|
| | | únicamente a favor de la entidad de ingresos asignables siempre y cuando los ingresos imputables se retengan ilegalmente).<br><br>Los impuestos y tarifas que se acumulan son: impuestos a la gasolina - ACT (13 LPRA 31751(a)(1)); derechos de licencia - ACT; (9 LPRA 5681) e impuestos hoteleros - ADCC (13 LPRA 2271v).<br><br>Los impuestos y aranceles que no se acumulan son: aumento de las tarifas de licencia - ACT (9 LPRA 2021); impuestos sobre los cigarrillos - ACT (13 LPRA 31751(a)(3)); y los ingresos asignables de la AFI.<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]**:  la  falta de asignación condicional de los ingresos a las entidades de ingresos asignables (ya sea a tenor con la Sección 8 o el poder del estado) estaba permitida, por lo que la entidad de ingresos asignables o sus bonistas no pueden interponer ninguna reclamación como resultado de la falta de asignación de los ingresos.<br><br>**BASE:** a diferencia del Supuesto 1, al ELA se le permitiría usar ingresos asignables para gastos operativos a tenor con su poder del estado sin dar lugar a reclamaciones contra el ELA o porque la falta de asignación no da lugar a una reclamación ejecutable para la asignación. La Junta de Supervisión cree que no existiría una reclamación ejecutable porque (i) las asignaciones de legislaturas anteriores no son vinculantes para las legislaturas posteriores y (ii) las asignaciones y los estatutos que las establecen son revocables a voluntad y no crean derechos para recibirlas. Para evitar disputas sobre este tema, el análisis del BIT asume que las asignaciones crean reclamaciones exigibles en el Supuesto 1.<br><br>**SUPUESTO 3 [RIESGO DE LITIGIO]**:  la  no asignación de ingresos era inadmisible, por lo que la entidad de ingresos asignables o sus bonistas pueden interponer una reclamación como resultado de la no asignación de ingresos destinados tanto a gastos operativos como a bonos GO y deudas garantizadas por CW. Si los Títulos I y II reemplazan las asignaciones estatutarias preexistentes del ELA a la ACT y las otras entidades de ingresos asignables, no hay restricciones sobre el uso de los ingresos asignables por parte del ELA, pero la entidad de ingresos asignables o sus bonistas podrían demandar al ELA por deteriorar las obligaciones de bonos para con ellos e interponer reclamaciones contra el ELA por ese incumplimiento. Específicamente, en cada año en el que no se paga la deuda de bonos de la entidad que de otro modo recibiría ingresos asignables, la JSAF |

| | | Pregunta | Supuesto |
|---|---|---|---|
| | | | supondría que la entidad de ingresos asignables o dichos bonistas pueden interponer una reclamación no garantizada y no prioritaria (es decir, subordinada a la deuda GO) contra el ELA además de su reclamación contra la entidad de ingresos asignables (es decir, el emisor). |

**BASE:** los Títulos I y II permiten no asignar ingresos de manera condicional al otorgar a la Junta de Supervisión el poder sobre las asignaciones presupuestarias, pero aún se puede presentar una reclamación por daños como resultado de esa falta de asignación de ingresos.

**SUPUESTO 4 [RIESGO DE LITIGIO]:** los bonistas tienen interés en los ingresos condicionalmente asignables tan pronto como el ELA los recibe. En consecuencia, reciben dichos ingresos antes de que puedan distribuirse a los bonistas GO o deudas garantizadas por CW.

**BASE:** una vez que el ELA recibe los ingresos condicionalmente asignables, dichos ingresos son propiedad de los bonistas de las entidades de ingresos asignables, porque o bien la garantía prendaria de los bonistas tiene efecto al recibirlos, o el ELA mantiene los ingresos condicionalmente asignables en un fideicomiso. Hasta la fecha, el Tribunal del Título III no ha adoptado este supuesto.

**SUPUESTO 5 [RIESGO DE LITIGIO]:** se determina que los bonistas de entidades que reciben ingresos condicionalmente asignables (ACT, AFI y ADCCPR) tienen una reclamación no garantizada contra el ELA por el monto total de ingresos no asignados y, en consecuencia, reciben distribución como miembros de la categoría de "otras reclamaciones elegibles".

**BASE:** como se explica en la base del Supuesto 1, a tenor con la Sección 8 del Artículo VI de la Constitución de PR, los ingresos asignables pueden usarse para la amortización de la deuda sobre obligaciones generales; sin embargo, en este supuesto, cada dólar retenido conduce a una reclamación no garantizada dólar por dólar por parte del bonista de la entidad de ingresos asignables de la que se retuvo.

6

| | Pregunta | Supuesto |
|---|---|---|
| 5. | Medidas del plan fiscal - Riesgo de implementación: ¿existe el riesgo de que las medidas del plan fiscal no se implementen por completo? | **SUPUESTO**: se asume la existencia de una gama de recuperaciones basadas en un riesgo de implementación alto o medio de medidas fiscales o reformas estructurales.<br><br>**BASE**: una desestimación del caso de Título III y más incertidumbres políticas y económicas podrán afectar la implementación de las medidas del plan fiscal. Antes y durante la agitación de Puerto Rico que condujo a la renuncia del gobernador Rosselló, la Junta de Supervisión descubrió que las medidas y reformas estructurales recomendadas no se estaban implementando a tiempo. Después de la desestimación de los casos de Título III, es muy posible que el gobierno coopere menos con la Junta de Supervisión y los acreedores que buscan maximizar sus recuperaciones. |
| 6. | **Prioridad de gastos operativos (incluidas las pensiones):** ¿se pagarán los gastos operativos antes de que se pague la deuda GO y *pari passu*? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]**: se asume que los gastos operativos que se describen en el plan fiscal certificado se pagan antes de la amortización de la deuda. Demos por sentado, además, que no se congelarán las prestaciones de pensión acumuladas para los maestros (SRM) y los jueces (SRJ). En consecuencia, se asume que los maestros y los jueces no ingresarán al seguro social.<br><br>Además, no se cambiarán los beneficios y gastos operativos que dependan de una confirmación del Plan de Ajuste (por ejemplo, recortes de pensiones incluidos en el Plan Fiscal, aportaciones patronales de salud para los empleados que son miembros del sindicato AFSCME y aportaciones de PayGo a los participantes del Sistema 2000) .<br><br>**BASE:** el plan fiscal ya proyecta reducciones en los gastos operativos a través de una serie de medidas fiscales destinadas a reducir los gastos de todo el gobierno para adaptar el presupuesto a un tamaño apropiado para la población de PR. El plan fiscal certificado proyecta ahorros de ~ $6,000 millones desde el Año Fiscal 2021 hasta el Año Fiscal 2025, lo que representa ~ 12 % de los gastos de referencia en dicho período. Además, Puerto Rico recortó significativamente las pensiones públicas antes de que se promulgara PROMESA. Esta sensibilidad asume que los recortes adicionales serían perjudiciales para la economía de Puerto Rico, pero —en consonancia con el plan fiscal actual— los niveles de pensión se congelarían, lo que daría lugar a demandas judiciales sin garantía.<br><br>Los maestros y jueces actualmente no reciben Seguro Social, ya que este grupo está exento de este beneficio debido al acuerdo de la "Sección 218" entre el ELA y la Administración del Seguro Social, que estipula que los empleados del gobierno pueden estar exentos del Seguro Social si participan en un |

| | Pregunta | Supuesto |
|---|---|---|
| | | plan de retiro "comparable", como uno que incluye el total de aportaciones patronales y de empleados equivalentes a por lo menos el 7.5 % de los salarios de los empleados. Si hubiera una congelación en la acumulación de beneficios en su plan de pensión, los maestros y jueces podrían estar cubiertos por el Seguro Social.<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]:** se asume que el ejercicio del poder del estado que tiene el ELA para pagar las obligaciones de pensión con los ingresos disponibles se limita al pago total de pensiones de hasta $1,500 por mes (excluyendo los beneficios del seguro médico), y las pensiones que superan los $1,500 por mes se reducen en un 5 % o un 10 % (sujeto a un piso de $1,500 por mes) salvo que y hasta tanto la deuda garantizada por GO y CW vencida en dicho año se pague en su totalidad, momento en el cual no se requieren más recortes de pensiones para ese año. Los jubilados tendrán reclamaciones generales no garantizadas contra el ELA por todas las reclamaciones de pensión válidas que no se hayan pagado.<br><br>**BASE:** el poder del estado permite el pago de los gastos esenciales en primer lugar, pero un tribunal puede dictaminar que el poder del estado no libera ingresos disponibles para pagos de pensión que excedan los montos pagados después de recibir los descuentos del 5 % o 10 % previstos anteriormente, con la justificación de que los pagos que exceden los montos descontados son innecesarios para proteger la salud, la seguridad y el bienestar público. |
| 7. | **Bonos de CFP:** ¿los bonos de CFP constituyen reclamaciones admisibles? | **SUPUESTO:** no.<br><br>**BASE:** los Bonos CFP no tienen derecho a pago, que es un requisito para reclamaciones según la ley de CW y el Código de Quiebras, § 101(5). El pago de estos pagarés está sujeto a la asignación discrecional de fondos por parte de la Legislatura. Los documentos de los Bonos de CFP revelaron que (1) la Legislatura no está legalmente obligada a asignar fondos para pagar los Bonos de CFP y (2) los Bonos de CFP no constituyen una obligación de CW. |
| 8. | **BAN de la AFI:** ¿se han pagado las BAN de la AFI con ingresos de Crudita desde 2016? | **SUPUESTO:** las BAN de AFI estuvieron sujetos a la moratoria y no se han pagado. Debe tenerse en cuenta que las BAN de la AFI están garantizadas por el CW. En ausencia de la paralización automática, se puede dictaminar que la moratoria es una violación de la Sección 303 de PROMESA, y las BAN de la AFI tendrán derecho al pago. |

| | Pregunta | Supuesto |
|---|---|---|
| 9. | **Interés adicional:** ¿la deuda (capital + intereses) impagada durante la paralización debería devengar intereses adicionales? | **SUPUESTO:** se asume que, en los años en los que no se realiza el pago total de la deuda vencida, los pagos posteriores se acreditan primero contra los intereses y luego contra el capital.<br>i. **Intereses de la deuda GO durante la paralización:** a tenor con PROMESA § 303, los intereses continúan devengándose a la tasa del contrato durante cualquier moratoria, a menos que el contrato subyacente disponga un interés de demora, en cuyo caso se debe utilizar este último. No existe ninguna disposición legal en cuanto a intereses sobre intereses.<br>ii. **Intereses de la deuda *pari passu* de GO durante la paralización:** se aplican los mismos criterios que para los GO.<br>iii. **Intereses de las reclamaciones no garantizadas durante la paralización:** se asume que no se devengan intereses.<br>iv. **Intereses de las reclamaciones federales durante la paralización:** se asume que los intereses se acumulan durante la moratoria porque el gobierno federal puede, en última instancia, cobrar su deuda e intereses mediante compensaciones con ayuda futura. Los documentos subyacentes a cada reclamación federal pueden establecer las tasas de interés. La tasa de sentencia federal a partir de esta presentación a tenor con 28 U.S.C. § 1961(a) es 0.05 % por año.<br>v. **Intereses de la deuda impagada:** se asume que cualquier deuda impagada devenga intereses de acuerdo con la tasa de cupón promedio ponderada a partir de 2020 proporcionada por Citi (cada grupo de deuda GO *pari passu* tiene su propia tasa).<br>vi. **Intereses sobre intereses durante el Año Fiscal 19–58:** no. La ley de Puerto Rico permite el pago de intereses sobre intereses vencidos bajo ciertas circunstancias, como si fuera expresamente acordado por las partes. Sin embargo, la deuda GO no prevé intereses sobre intereses vencidos. |
| 10. | **Reclamaciones del gobierno federal:** ¿cuál es la prioridad para las reclamaciones federales garantizadas y no garantizadas? ¿Los documentos son exhaustivos? | **SUPUESTO:** las reclamaciones federales deben pagarse en su totalidad.<br><br>**BASE:** el gobierno federal puede compensar reclamaciones impagas contra fondos federales que de otro modo serían recibidos por el ELA; se podría contratar el programa de compensación del Tesoro de los EE. UU. (TOP) de inmediato y el monto total adeudado al gobierno federal se retendría de futuras transferencias federales a CW. |

| | Pregunta | Supuesto |
|---|---|---|
| 11. | **Reclamaciones de los bonistas del SRE:**[2] ¿cuál es el valor de las reclamaciones de los bonistas del SRE contra el ELA? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]:** los bonistas del SRE no tienen reclamaciones contra CW.<br><br>**BASE:** los bonistas del SRE han llegado a un acuerdo con la Junta de Supervisión sobre el tratamiento de sus reclamaciones en el caso de Título III del SRE: la Estipulación SRE (definida a continuación). Dicha estipulación puede no verse afectada por la desestimación del caso de Título III de CW. De lo contrario, incluso si los bonistas del SRE tuvieran una garantía prendaria en derechos de aportación futura, la declaración de oferta de bonos notificó a los bonistas que esos derechos podrían ser modificados o afectados negativamente por el ELA, lo que efectivamente hizo la Ley 106-2017 al eliminar cualquier aportación patronal al SRE. El hecho de que los bonistas del SRE estuvieran al tanto de dicha posible modificación también podría disminuir significativamente sus posibilidades de interponer con éxito una reclamación de deterioro contractual o de expropiación. Adicionalmente, la prueba del interés superior debe asumir que los derechos y los remedios de los bonistas se deben a sus reclamaciones, ya que existían inmediatamente antes de la hipotética desestimación del caso del SRE y no se ajustan según el plan del SRE, es decir, están garantizadas solo por las aportaciones patronales que surjan antes de la Fecha de la Petición del SRE, pero no después, como resultado de la opinión de la Sección 552. Por lo tanto, los bonistas del SRE no tenían derechos contractuales o garantías que fueran deterioradas o eliminadas por la operación de la Ley 106. Alternativamente, los bonistas del SRE no tienen reclamaciones contra CW porque los bonos del SRE fueron una emisión *ultra vires*, y los bonistas no tienen derecho a ningún remedio equitativo.<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]:** los bonistas del SRE interponen con éxito las reclamaciones (cláusulas sobre expropiaciones o contractuales) contra CW. Cada año que no se paga la deuda, los bonistas del SRE pueden reclamar esa cantidad contra el ELA como reclamación no garantizada pagada después de la deuda GO y *pari passu*.<br><br>**BASE:** los bonistas del SRE afirman que la Ley 106-2017, que eliminó las aportaciones patronales según la ley para crear el SRE, generó un deterioro de los derechos contractuales y una expropiación de su garantía, en violación de las Constituciones de Puerto Rico y de los Estados Unidos. Además, § 552, que eliminó la garantía prendaria en las aportaciones patronales que surjan después de la fecha de petición del SRE independientemente del efecto |

---

[2] Para las reclamaciones que los bonistas del SRE tienen contra el SRE, consulte los supuestos para el análisis de prueba de mejores intereses del SRE.

| | Pregunta | Supuesto |
|---|---|---|
| | | de la Ley 106, probablemente ya no se aplicaría después de la desestimación del caso de Título III del SRE, lo que dejaría a la Ley 106 como la única base para la eliminación de su garantía y, por lo tanto, como violación de la Cláusula Contractual o de Expropiaciones.<br><br>**SUPUESTO 3 [RIESGO DE LITIGIO]**: los bonistas del SRE tienen una garantía prendaria en las aportaciones patronales futuras, y se resuelve que los Pagos de PayGo son los mismos que o el producto de las Aportaciones patronales y, por lo tanto, los bonistas del SRE han presentado reclamaciones garantizadas contra el ELA por una garantía prendaria en los Pagos de PayGo. La amortización de su deuda, incluido el capital y los intereses pendientes, se paga antes de la deuda GO o la deuda garantizada por CW.<br><br>Este supuesto debe realizarse como si las reclamaciones garantizadas contra las aportaciones patronales tuvieran un 0 %, 25 %, 50 %, 75 % y 100 % de posibilidades de éxito. Si el CW entra en déficit antes de que los bonos del SRE se paguen en su totalidad, se debe asumir que el CW puede justificar el uso del poder del estado para el pago de todos sus gastos, incluidas las pensiones, en su totalidad, y que no queda dinero para pagar los bonos del SRE u otra deuda.<br><br>**BASE:** los bonistas del SRE han afirmado que los pagos PayGo son el mismo activo que las aportaciones patronales, o los ingresos de las mismas, y por lo tanto están sujetos a la garantía prendaria de los bonistas del SRE, lo que los convierte en acreedores garantizados del ELA. También es probable que afirmen que esta garantía prendaria, incluso si es eliminada por § 552 en la fecha de la petición del SRE, se reinstalaría tras la desestimación del caso de Título III del SRE. |
| 12. | ¿Cuál es el tratamiento de los activos del SRE que no se utilizan para el pago a los bonistas del SRE y otras reclamaciones? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]:** el acuerdo del SRE con sus acreedores basado en los términos incluidos en la Estipulación enmendada y reformulada firmada el 2 de abril de 2021 (la "Estipulación del SRE") permanece en vigor independientemente de si se desestima el caso de Título III del ELA. Por lo tanto, cualquier activo que permanezca en el SRE después de que se hayan pagado las obligaciones de deuda a los bonistas de acuerdo con los términos del Despojo del SRE y a los acreedores no garantizados del SRE, se transferirá al ELA.<br><br>**BASE:** de acuerdo con la Estipulación del SRE, se asume que cualquier activo restante después del pago de los Bonos del SRE y a los acreedores no garantizados se transferirá al ELA en el Año Fiscal 2022. |

| | Pregunta | Supuesto |
|---|---|---|
| | | **SUPUESTO 2 [RIESGO DE LITIGIO]:** la Estipulación del SRE ya no está en vigencia y el caso de Título III del SRE se desestima. Cualquier activo que quede en el SRE después de que se hayan pagado las obligaciones de deuda a los bonistas del SRE y los acreedores no garantizados se transferirá al ELA en el Año Fiscal 2022.<br><br>**BASE:** de acuerdo con la Ley 106-2017, cualquier activo remanente en el SRE después del pago de obligaciones de deuda válidas y a acreedores no garantizados será transferido al ELA. |
| 13. | CRIM (Impuesto a la Propiedad) | **SUPUESTO:** el impuesto especial a la propiedad del 1.03 % recaudado por CRIM se usa para pagar a los bonistas GO, pero CW podría ejercer el poder del estado y usar dichos ingresos para cubrir servicios esenciales si tiene un déficit y todos los demás fondos disponibles se han aplicado a los gastos operativos necesarios o a la amortización de la deuda GO.<br><br>**BASE:** las leyes 39-1976 y 83-1991 exigen que el impuesto especial a la propiedad del 1.03 % se transfiera al Fondo de Amortización GO y se utilice únicamente para el pago de los Bonos GO. En un escenario en el que CW está pagando GO y deuda garantizada de GO, dichos fondos depositados en el Fondo de Amortización GO deben usarse primero para pagar los bonos GO. Como en todos los escenarios, la cantidad pagada a GO y a la deuda garantizada por CW debe ser prorrateada (es decir, la asignación de los ingresos del 1.03 % a los GO no debe resultar en una recuperación mayor para los GO que la deuda garantizada por CW en un año determinado). |
| 14. | IFCU (Unidades de componentes proyectadas independientemente): ¿sus ingresos son "recursos disponibles"? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]:** las IFCU son corporaciones públicas legalmente separadas de CW. Los propios ingresos de la IFCU deben considerarse no disponibles para los acreedores de CW, como por ejemplo los bonistas GO. Si el ELA proporciona una asignación a una IFCU que tiene superávit, se debe asumir que el ELA reducirá la asignación hasta que la IFCU ejecute un presupuesto equilibrado.<br><br>**BASE:** los ingresos generados por los instrumentos legalmente separados del CW no están disponibles para el CW y se requeriría una legislación habilitante para transferir dichos ingresos al CW. Sin embargo, en un escenario en el que el CW ejerce sus poderes del estado para pagar los servicios esenciales, se debería esperar que el CW no otorgue asignaciones a las instrumentalidades con superávit. La legislación propuesta como parte de un plan que pondría excedentes a disposición del CW es efectiva solo en |

12

| | Pregunta | Supuesto |
|---|---|---|
| | | la fecha de vigencia del plan; en consecuencia, si no se confirma ningún plan, dicha legislación no se promulgará.<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]**: el excedente de la IFCU puede ser utilizado por el ELA.<br><br>**BASE:** la Sección 201(b)(1)(M) de PROMESA establece que un plan fiscal "deberá […] garantizar que los activos, fondos o recursos de una instrumentalidad territorial no se presten, se transfieran o de otro modo se utilicen para el beneficio de un territorio cubierto o de otra instrumentalidad territorial cubierta de un territorio cubierto, a menos que lo permita la constitución del territorio, un plan de ajuste aprobado bajo el subcapítulo III, o una Modificación de Calificación aprobada bajo el subcapítulo VI". Como un plan de Título III o una Modificación de Calificación del Título VI no estaría disponible en los escenarios de prueba de mejores intereses, la transferencia podría lograrse en base a la legislación promulgada de acuerdo con la Constitución del ELA. En el pasado, el ELA ha empleado legislación que autorizaba a las IFCU —como CFSE, AACA, Turismo y PRIDCO— a brindar apoyo de liquidez al ELA en forma de préstamos o aportaciones. La Ley 26-2017 también autoriza a CW a obtener recursos de las corporaciones públicas. Probablemente sea asunto de litigio el que estas leyes sean desplazadas por PROMESA. |
| 15. | ¿Se asignan los ingresos fiscales del ELA al Fondo Especial para el Desarrollo Económico de PRIDCO y se asignan los ingresos de las máquinas tragamonedas de la Compañía de Turismo como recursos disponibles? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]**: no son recursos disponibles (en consonancia con el supuesto 13).<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]:** como esas fuentes de ingresos pertenecen al ELA, este puede ejercer sus poderes del estado para capturar esos fondos.<br><br>**BASE:** la Ley 73-2008 ordenó al Secretario de Hacienda la creación del Fondo Especial de Desarrollo Económico ("FEDE") administrado por PRIDCO. FEDE recibe el 10 % de: (1) impuestos pagados por negocios que reciben una subvención tributaria según la Ley 73 o estatutos anteriores de incentivos industriales o (2) retenciones tributarias relacionadas con regalías de operaciones exentas según la Ley 73 o estatutos anteriores de incentivos industriales, tales como 13 L.P.R.A. § 10657(a). Dichos impuestos asignados a FEDE deben considerarse recursos disponibles para el ELA. |

| Pregunta | Supuesto |
|---|---|
| | A tenor con la Sección 8 del Artículo VI de la Constitución de CW, el Secretario de Hacienda puede retener la transferencia de ingresos fiscales a PRIDCO y, en su lugar, utilizarlos para pagar la deuda GO. El CW también podría retenerlos, con sujeción a la aprobación del tribunal, a tenor con su poder del estado.<br><br>Debe tenerse en cuenta que suspender las transferencias a FEDE afectaría el programa de desarrollo económico apoyado por el fondo y la base industrial de Puerto Rico, lo que podría dañar la actividad económica.<br><br>Para los ingresos de las máquinas tragamonedas, la Ley 221-1948 establece que dichos ingresos, recaudados por la Compañía de Turismo, serán depositados en un fondo especial de la Compañía de Turismo. Después de deducir los costos operativos (incluida la nómina) y de amortización relacionados con las máquinas tragamonedas, los ingresos anuales netos se distribuyen a: (1) operadores de casinos, (2) el Fondo General del ELA, (3) la UPR y (4) dos fondos especiales de la Compañía de Turismo.[3]<br><br>Los dos fondos de la Compañía de Turismo son: (1) un fondo especial utilizado para pagar los fines corporativos de la Compañía de Turismo; y (2) el Fondo para el Desarrollo de la Industria del Turismo de Puerto Rico establecido para fortalecer y desarrollar la industria del turismo. La Ley 221 establece una fórmula según la cual una parte de los ingresos de las máquinas tragamonedas se transfiere a cada uno de los fondos.<br><br>El ELA podría usar la Ley 26-2017 ("Ley de Cumplimiento del Plan Fiscal") para extraer ingresos excedentes de la Compañía de Turismo o aprobar una legislación que enmiende la Ley 221 y reasigne los ingresos al ELA. Como se señaló anteriormente con respecto a la suspensión de transferencias a FEDE, eliminar los fondos utilizados para desarrollar la industria turística podría dañar la actividad económica de Puerto Rico. |
| 16. ¿Deben tenerse en cuenta las impugnaciones a los bonos GO y ciertas deudas garantizadas por el ELA? | **SUPUESTO 1 [SUPUESTO PRINCIPAL]:** sí. En este supuesto principal, se asume que algunas de estas impugnaciones son exitosas a partir de 2012, y que los correspondientes bonos (bonos GO y bonos de la AEP emitidos en 2012 y después) y garantías de CW emitidos a partir de 2012 se considerarían inválidos y los bonistas que mantienen estas |

---

[3] 15 L.P.R.A. § 74.

| Pregunta | Supuesto |
|---|---|
| | reclamaciones no tendrían derecho a una reclamación contra el ELA (incluida cualquier reclamación por enriquecimiento injusto u otra reclamación similar).<br><br>**BASE:** en el caso de Título III del ELA, la Junta de Supervisión, a través de su Comité Especial de Reclamaciones, y el comité de reclamantes no garantizados estatutarios (el "UCC") iniciaron un litigio alegando que los bonos GO emitidos en 2012 y 2014 violaban el límite constitucional de deuda de Puerto Rico, y que las reclamaciones por parte de los supuestos tenedores de dichos bonos GO por concepto de capital e intereses debían rechazarse. La Junta de Supervisión también ha alegado que los Arrendamientos de la AEP no son verdaderos arrendamientos y obligaciones supuestamente debidos en virtud de los mismos, sino que son simplemente obligaciones generales del ELA tergiversadas.<br><br>**SUPUESTO 2 [RIESGO DE LITIGIO]:**  sí. Se asume que todas las impugnaciones en el Supuesto 1 son exitosas y que, además, los bonos GO, los bonos de la AEP y las garantías de CW emitidas a partir de marzo de 2011 también se considerarían inválidos, y los bonistas que tuvieran tales reclamaciones no tendrían derecho a reclamar contra el ELA (incluida cualquier reclamación por enriquecimiento injusto u otra reclamación similar).<br><br>**BASE:** además de las impugnaciones mencionadas en la base anterior, el UCC también impugnó las reclamaciones relacionadas con los bonos GO emitidos a partir de marzo de 2011 y las reclamaciones relacionadas con las obligaciones de la AEP emitidas a partir de marzo de 2011. También hay argumentos de que ciertas garantías del ELA emitidas a partir de marzo de 2011 pueden no ser válidas. Este supuesto asume que las objeciones del UCC a reclamaciones relacionadas con bonos GO y de la AEP emitidos a partir de marzo de 2011, y reclamaciones relacionadas con garantías del ELA emitidas a partir de marzo de 2011, se admiten.[4]<br><br>**SUPUESTO 3 [RIESGO DE LITIGIO]:**  no. Se asume que los bonos y garantías mencionados en la pila de deuda a continuación son válidos y ejecutables.<br><br>**BASE:** las impugnaciones explicadas en las bases anteriores podrían no tener éxito. |

---

[4] Tenga en cuenta que este supuesto es solo para fines ilustrativos. La Junta de Supervisión no se ha sumado a la objeción del UCC en cuanto a los Bonos GO emitidos antes de 2012 ni a la objeción a los bonos AEP emitidos a partir de marzo de 2011.

**PILA DE DEUDA**[5]

1. **Costo operativo**
   a. Plan Fiscal del 23 de abril de 2021, Gráfico 22: Medidas previas de las principales categorías de gastos operativos, factores clave de los gastos básicos de referencia (medidas previas):

| | AF 22 | AF 23 | AF 24 | AF 25 | AF 26 |
|---|---|---|---|---|---|
| Nómina (Fondo General) | 3,134 | 3,179 | 3,228 | 3,279 | 3,330 |
| Gastos operativos (Fondo General) | 1,964 | 1,893 | 1,933 | 1,965 | 1,990 |
| Asignaciones de CW | 1,193 | 1,179 | 1,125 | 1,142 | 1,128 |
| Gastos de Medicaid del ELA | 1,968 | 2,654 | 2,754 | 2,856 | 2,974 |
| Gastos de pensión | 2,259 | 2,237 | 2,233 | 2,224 | 2,215 |
| Gastos de SRF de IFCU y CW | 2,279 | 2,297 | 2,320 | 2,357 | 2,400 |
| Gastos de fondos federales | 5,706 | 4,935 | 5,000 | 5,072 | 5,150 |
| Otros[6] | 446 | 339 | 300 | 259 | 210 |
| **Total de gastos operativos financiados por CW**[7] | 18,949 | 18,712 | 18,894 | 19,154 | 19,397 |

   b. **Ajustes del Plan Fiscal**
      i. No se congelarán las pensiones para los beneficiarios del SRJ y el SRM, ni habrá reducción del 8.5 % en las pensiones. Además, también se eliminan las aportaciones futuras al seguro social de los jueces, ya que esos pagos dependen de la congelación del devengo de las prestaciones de pensión. Además, el análisis asume la continuación de las aportaciones de PayGo a los participantes del Sistema 2000, así como

---

[5] La información financiera contenida en este documento se basa en la información disponible en los estados financieros más recientes a disposición del público y, en ciertos casos, en la información recibida de los asesores de la Junta de Supervisión y los asesores del ELA. Los asesores legales no toman posición en cuanto a la veracidad de la información financiera aquí proporcionada.

En ciertas partes de la pila de deuda, solo se incorpora información relacionada con el supuesto principal anterior.

[6] Incluye la Equiparación de Costos de Recuperación en caso de Desastres, Costos de Reestructuración/Título III, Programas Sociales financiados por CW, Fondos de reserva para emergencias e incentivos presupuestarios.

[7] No incluye gastos de capital, fondos empresariales, desembolsos a entidades fuera del Plan Fiscal 2021 y otros gastos no recurrentes.

la eliminación de cualquier gasto de pensión adicional relacionado con acuerdos dependientes de la confirmación de un Plan de Ajuste.

ii. No habrá ningún aumento en la aportación patronal a la atención médica que se describe en el Plan Fiscal de $125 a $170 por empleado por mes para los empleados que son miembros del sindicato AFSCME, maestros, policías, bomberos, miembros del sindicato UAW y otros empleados no sindicados.

iii. Los costos de los honorarios profesionales legales se repiten hasta el Año Fiscal 2031, asumiendo la existencia de necesidades de litigio considerables en ausencia de las protecciones del Título III o un plan de ajuste. Se asume que los honorarios legales se duplicarán desde el Año Fiscal 2021 hasta el Año Fiscal 2022 y luego crecerán con la inflación hasta el Año Fiscal 2026, cuando se supone que los honorarios profesionales se reducirán a la mitad y luego crecerán con la inflación hasta el Año Fiscal 2031. Los honorarios profesionales no legales caen en un 50 % una vez que se desestiman los casos de Título III y crecen por la inflación hasta el Año Fiscal 2031. Se asume que todos los honorarios profesionales del comité de acreedores y del comité de jubilados son cero después de la fecha de vigencia de este análisis (30 de junio de 2021).

iv. Se asume que las reclamaciones federales vencen cuando se levanta la paralización. Estas deben incluirse como una reducción de gastos/ingresos al superávit disponible para la amortización de la deuda, ya que el gobierno federal puede reducir las transferencias a Puerto Rico en la cantidad adeudada. Se asume una reclamación de anulación de costos federales recurrentes, que también debe pagarse en su totalidad.[8] Las reclamaciones federales representan un total de $431 millones, mientras que la anulación de costos federales recurrentes es de $65 millones según el CAFR de 2016.

v. Se asume que en los años que no es posible el pago total de la deuda, el pago provisto se acredita primero contra los intereses y luego contra el capital.

**2. Deuda no garantizada**

a. Monto pendiente de capital e intereses devengados y no pagados de $25,335,493.47 del préstamo de la Administración de Servicios Generales para helicópteros de la policía, con un interés del 3.02 % y con vencimiento el 15 de julio de 2020. Este préstamo está *pari passu* con la deuda GO.

**3. Deuda Pública del ELA según el Artículo VI, Sección 8, de la Constitución del ELA[9]**

a. **Bonos GO**

---

[8] La información sobre los montos de las reclamaciones federales fue provista por otros asesores de la Junta de Supervisión.

[9] Capital pendiente e intereses no pagados a la fecha de la petición del ELA excepto para la AEP, que es a la fecha de la petición de la AEP.

1. Emitidos antes de marzo de 2011: $5,843,252,913
2. Emitidos entre marzo y diciembre de 2011: $1,122,171,437
3. Emitidos a partir de 2012: $6,547,443,991

    b. **Préstamos de Hacienda (Préstamos núm. 200017-215-001-003-53 y 200017-215-001-003-56) (*pari passu* con bonos GO): $198,259,086**

    c. **Bonos garantizados por CW (*pari passu* con bonos GO)[10]**
        i. **Sub-bonos de AAA ($284,755,000)**
            1. Supuesto: se asume un 0 % de responsabilidad pagada por CW
            2. Base: dada la situación financiera de AAA, es poco probable que AAA deje de cumplir la garantía restante.

        ii. **Bonos de la AEP ($4,670,971,240);[11] BAN de la AFI ($83,589,102); y Bonos de APLA (Autoridad de Puertos de las Américas) ($262,653,118)**
            1. Supuesto: los bonistas de garantía pueden presentar sus reclamaciones contra CW de inmediato.
            2. Base: la garantía de CW (especialmente en el caso de la AFI) tiene características que la hacen más parecida a una garantía de pago que a una garantía de cobro.

4. **Otras reclamaciones no garantizadas**
    a. Reclamaciones que se resolverán mediante los Procedimientos de Reconciliación de Reclamaciones Administrativas, o RRA: $1,008,887,588
    b. Reclamaciones de sindicatos que se resolverán mediante el Plan de Ajuste: $244,517,705
    c. Litigio por sobrepago de aseguradora Gracia-Gracia: $28,000,000
    d. Reclamaciones intragubernamentales (reclamaciones presentadas por municipios del ELA, otras entidades gubernamentales de Puerto Rico y el gobierno federal): $1,024,549,014[12]
    e. Reclamaciones relacionadas con impuestos: $8,403,934
    f. Título VI/Reclamación de fideicomiso de entidad pública del BGF: $600,000,000
    g. Reclamaciones por litigios: $2,768,700,759
    h. Cuentas a pagar comerciales: $175,158,294

---

[10] El CW también garantizó $110 millones en bonos del BGF, pero cualquier derecho de los tenedores de dichos bonos del BGF con respecto a la garantía del ELA se extinguió con el intercambio y la cancelación de los bonos del BGF a tenor con el acuerdo del Título VI (BGF Título VI OM, p. 15).

[11] Total del capital e intereses pendientes a la fecha de la petición de la AEP se compone de $2,661,239,877 en bonos emitidos antes de marzo de 2011, $1,335,422,893 en bonos emitidos entre marzo y diciembre de 2011, y $674,308,470 en bonos emitidos después de 2011.

[12] Este dato incluye $430,540,085 en reclamaciones federales; este monto también se indica en la sección 1b (Ajustes del Plan Fiscal).

i.   Otras reclamaciones varias: $56,750,826
j.   Industrias críticas: 330 reclamaciones por litigios en centros de salud estimados en $293 millones, y reclamaciones de subsidios para productores de leche de $62 millones.
k.   Reclamaciones de la clase de conveniencia: $141,945,462
l.   Reclamaciones de los bonistas del Sistema de Retiro de Empleados (SRE): se asume en el caso base que los bonistas del SRE no harán ninguna reclamación contra el ELA.
m.  Reclamaciones de ingresos asignables: se asume en el caso base que los bonistas de la entidad de ingresos asignables podrían exigir una reclamación no garantizada por la parte de los ingresos asignables utilizados para gastos operativos, pero no por la parte utilizada para la amortización de la deuda GO o la amortización de la deuda garantizada por CW.

**<u>Documento de Prueba 1</u>**
**Estatutos sobre ingresos asignables**

**Parte I: Estatutos que asignan ciertos ingresos asignables a la ACT, AMA, AFI, ATI y ADCC**

| ACT | Tarifas de licencia de vehículos automotores | 9 LPRA §§ 2004(l), 2021, 5681 & 5682(e) | Pagadas por cada propietario de un vehículo automotor, sujeto a tarifas anuales de licencia en:<br>• oficinas de ingresos internos; o<br>• estaciones de inspección oficiales; o<br>• bancos; o<br>• cualquier lugar designado por el Secretario de Hacienda | • Hacienda transfiere todo lo recaudado de las tarifas anuales de licencia de vehículos automotores a un depósito especial a nombre y en beneficio de la ACT. | 9 LPRA § 2004(l):<br><br>"Sujeto a las disposiciones de la sec. 2005 de este título, la Autoridad queda facultada para: […] tomar dinero prestado para cualquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante prenda o pignoración sobre todas sus propiedades, ingresos o rentas, y, sujeto a las disposiciones de la Sec. 8 del Art. VI de la Constitución de Puerto Rico, mediante prenda para el pago de dichos bonos y sus intereses, el producto de las aportaciones u otros fondos que se pongan a disposición de la Autoridad para el ELA".<br><br>9 LPRA § 2021:<br><br>"El producto total del aumento de quince dólares ($15) en las tarifas a pagar por licencias de automóviles públicas y privadas se transferirá a un Depósito Especial a favor y en beneficio de la Autoridad de Carreteras y Transportación de Puerto Rico, que será utilizado por la Autoridad para sus fines corporativos. Se autoriza a dicha Autoridad a prendar o pignorar el producto de la recaudación así recibida, al pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad, o para cualquier otro fin legal de la Autoridad; y dicha prenda o pignoración se sujetará a las disposiciones de la § 8 del Artículo VI de la Constitución de Puerto Rico; siempre y cuando, sin embargo, el producto de dicho cobro solo se utilice para el pago de intereses y la amortización de la deuda pública, según lo dispuesto en dicha § 8, hasta que los demás recursos disponibles, a que se refiere dicho apartado, sean insuficientes para tal fin. De lo contrario, el producto de dicha recaudación en la cantidad que sea necesaria se utilizará únicamente para el pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad, y para cumplir con las demás estipulaciones que se acuerden entre la Autoridad y los tenedores de tales bonos u otras obligaciones". |

9 LPRA § 5681:

"Todo propietario de un vehículo automotor sujeto al pago de tarifas de permisos anuales deberá pagar en cualquier oficina de recaudación de impuestos internos de cualquier municipio, en el lugar que designe el Secretario del Departamento de Hacienda, en las estaciones de inspección oficiales, bancos o en el lugar designado por el Secretario, los derechos que le correspondan al vehículo para cada año, según se indique en la notificación que el Secretario deberá remitir para tal efecto. [...]"

[...]

"A menos que se disponga lo contrario en esta Ley, el monto de los derechos recaudados de conformidad con las Secciones 5681 y 5682 de este título deberá ingresarse en su totalidad en un Depósito Especial a nombre y para beneficio de la Autoridad de Carreteras y Transportación".

"La Autoridad está autorizada a prendar o pignorar el producto de la recaudación recibida para el pago del capital y los intereses de los bonos a otras obligaciones o para cualquier otro fin legal de la Autoridad. Dicho compromiso o prenda estará sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicho cobro se utilizará únicamente para el pago de intereses y amortización de la deuda pública, según lo dispuesto en la mencionada Sección 8 del Artículo VI de la Constitución, hasta que los demás recursos disponibles a que se refiere dicha sección resulten insuficientes para tales fines. De lo contrario, el producto de dicho cobro, en la cantidad que sea necesaria, se utilizará únicamente para el pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con las estipulaciones que esta acuerde con los tenedores de tales bonos u otras obligaciones".

9 LPRA § 5682(e):

| | | | | | |
|---|---|---|---|---|---|
| | | | | | "Con respecto a los derechos que se deben pagar en función de este capítulo, se aplicarán las siguientes reglas: […] [s]e mantendrá en beneficio de la Autoridad de Carreteras el Depósito Especial al cual se transferirá la cantidad de quince (15) dólares por cada renovación de registro de autos de servicio público y privado". |
| **ACT** | Impuesto sobre la gasolina, el gasoil y el diésel | 13 LPRA § 31751<br><br>9 LPRA 2004(l) | ▪ 16 centavos por galón de arbitrio sobre la gasolina y 4 centavos por galón de arbitrio sobre gasoil y diésel.<br><br>▪ Cobrado por Hacienda, que luego transfiere todos los meses, o según lo acordado con la ACT, los montos a una cuenta de Depósito Especial a favor de la ACT. | ▪ Lo recaudado de los arbitrios sobre la gasolina, el gasoil y el diésel es transferido por Hacienda a un depósito especial a favor de la ACT. | 13 LPRA 31751:<br><br>"En caso de que el ELA de Puerto Rico utilice cualquier monto del impuesto recaudado sobre la gasolina, de los cuatro (4) centavos del impuesto sobre 'gasoil' o 'diésel' fijado en la Sección 31626 de este título, o de los arbitrios sobre el petróleo crudo, productos parcialmente manufacturados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la Sección 31627 de este título para el pago de intereses y amortización de la deuda pública según se establece en la Sección 8 del Artículo VI de la Constitución, las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y amortización de la deuda serán reembolsadas a la Autoridad de Carreteras y Transportación por los ingresos que reciba el ELA de Puerto Rico en el próximo año fiscal, o en caso de que dicho reembolso no sea posible en el próximo año fiscal, en los años fiscales subsiguientes, excepto aquellos cobros que se hayan destinado a cumplir cualquier obligación. Las ganancias de dichos cobros que se deban utilizar bajo las disposiciones de este artículo para reembolsar a la Autoridad de Carreteras y Transportación los montos utilizados por el ELA de Puerto Rico para el pago de intereses y amortización de la deuda pública no se depositarán en el Fondo General del ELA de Puerto Rico cuando sean cobradas, pero serán transferidas a la Autoridad de Carreteras y Transportación y, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, se utilizarán para reembolsar tales montos a la Autoridad de Carreteras y Transportación".<br><br>9 LPRA 2004(l):<br><br>"Sujeto a las disposiciones de la Sección 2005 de este título, la Autoridad queda facultada para: […] Tomar dinero |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | prestado para cualquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante prenda u otro embargo sobre todas sus propiedades, ingresos o rentas y, con sujeción a las disposiciones de la Sec. 8 del Art. VI de la Constitución de Puerto Rico, mediante prenda para el pago de dichos bonos y sus intereses, el producto de las aportaciones u otros fondos que se pongan a disposición de la Autoridad por parte del ELA". |
| **ACT** | Impuesto a Productos del Petróleo | 13 LPRA § 31571<br><br>9 LPRA 2004(l) | ▪ El Secretario de Hacienda transferirá mensualmente , el monto total de $12.25 por barril o fracciones son transferidas por el Secretario de Hacienda a un Depósito Especial a favor la ACT. | ▪ Hacienda transfiere el monto total de los impuestos sobre el petróleo crudo y los impuestos sobre el petróleo a un depósito especial a favor de la ACT. | 13 LPRA 31571:<br><br>"En caso de que el ELA de Puerto Rico utilice cualquier monto del impuesto recaudado sobre la gasolina, de los cuatro (4) centavos del impuesto sobre 'gasoil' o 'diésel' fijado en la Sección 31626 de este título, o de los arbitrios sobre el petróleo crudo, productos parcialmente manufacturados y productos terminados derivados del petróleo y cualquier otra mezcla de hidrocarburos fijados en la Sección 31627 de este título para el pago de intereses y amortización de la deuda pública según se establece en la Sección 8 del Artículo VI de la Constitución, las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y amortización de la deuda serán reembolsadas a la Autoridad de Carreteras y Transportación por los ingresos que reciba el ELA de Puerto Rico en el próximo año fiscal, o en caso de que dicho reembolso no sea posible en el próximo año fiscal, en los años fiscales subsiguientes, excepto aquellos cobros que se hayan destinado a cumplir cualquier obligación. Las ganancias de dichos cobros que se deban utilizar bajo las disposiciones de este artículo para reembolsar a la Autoridad de Carreteras y Transportación los montos utilizados por el ELA de Puerto Rico para el pago de intereses y amortización de la deuda pública no se depositarán en el Fondo General del ELA de Puerto Rico cuando sean cobradas, pero serán transferidas a la Autoridad de Carreteras y Transportación y, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, se utilizarán para reembolsar tales montos a la Autoridad de Carreteras y Transportación".<br><br>9 LPRA 2004(l): |

| | | | | | "Sujeto a las disposiciones de la Sección 2005 de este título, la Autoridad queda facultada para: […] Tomar dinero prestado para cualquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante prenda u otro embargo sobre todas sus propiedades, ingresos o rentas y, con sujeción a las disposiciones de la Sec. 8 del Art. VI de la Constitución de Puerto Rico, mediante prenda para el pago de dichos bonos y sus intereses, el producto de las aportaciones u otros fondos que se pongan a disposición de la Autoridad por parte del ELA". |
|---|---|---|---|---|---|
| **ACT** | Impuesto a los Cigarrillos | 13 LPRA § 31751 | ▪ El Secretario de Hacienda transfiere $20,000,000 en ingresos por cigarrillos cada año fiscal en cuotas mensuales de hasta $2,500,000. Si durante cualquier mes del año fiscal los ingresos del arbitrio son insuficientes para realizar el pago, el Secretario de Hacienda cubrirá dicha deficiencia utilizando cualquier | ▪ Los ingresos recaudados por el impuesto a los cigarrillos hasta $20,000,000 por año fiscal serán transferidos a una cuenta de depósito especial a favor de la ACT. | "El monto de la contribución recaudada sobre los cigarrillos fijada por la Sección 31625 de este título hasta veinte (20) millones de dólares por año fiscal se depositará en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus facultades y fines corporativos".<br><br>"Se autoriza a la Autoridad de Carreteras y Transportación a comprometer o prendar el producto de la recaudación así recibido del arbitrio de cigarrillos fijado por la Sección 31625, para pagar el capital e intereses de bonos u otras obligaciones, o para cualquier otro fin legal de la Autoridad. Dicho compromiso o prenda estará sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico. El producto de dicho cobro se utilizará únicamente para el pago de intereses y amortización de la deuda pública, según lo dispuesto en la mencionada Sección 8 del Artículo VI de la Constitución, hasta que los demás recursos disponibles a que se refiere dicha sección resulten insuficientes para tales fines. En caso contrario, el producto de dicho cobro, en la cantidad que se requiera, solo se utilizará para el pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con las estipulaciones que acuerde con los tenedores de tales bonos u otras obligaciones". |

| | | | | | |
|---|---|---|---|---|---|
| | | | excedente por encima de $2,500,000 en ingresos recaudados en meses anteriores o posteriores del mismo año fiscal. | | |
| **AMA** | Impuesto a los Cigarrillos | 13 LPRA § 31751 | ▪ El Secretario de Hacienda transferirá $10,000,000 en ingresos por cigarrillos cada año fiscal en cuotas mensuales de hasta $800,000. Si durante cualquier mes del año fiscal los ingresos provenientes de dicho arbitrio no son suficientes para realizar el pago mensual, el Secretario de Hacienda cubrirá dicha deficiencia utilizando cualquier | ▪ Los ingresos recaudados por el impuesto a los cigarrillos hasta $10,000,000 por año fiscal son transferidos por Hacienda a una cuenta de depósito especial a favor de la AMA. | "El monto de la contribución recibida por cigarrillos fijada por la Sección 31625 de este título hasta diez (10) millones de dólares por año fiscal se depositará en un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y facultades corporativas. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses tiene segunda prioridad y está subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto recibido por cigarrillos fijado por la Sección 31625 de este título que se deposita en el depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección". [...] "Se autoriza a la Autoridad de Carreteras y Transportación a comprometer o prendar el producto de la recaudación así recibido del arbitrio sobre los cigarrillos fijado por la Sección 31625 para el pago del capital e intereses de sus deudas y obligaciones o para cualquier otro fin legal de la Autoridad Metropolitana de Autobuses. Dicho compromiso o prenda estará sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico. El producto de dicho cobro se utilizará únicamente para el pago de intereses y amortización de la deuda pública, según lo dispuesto en la mencionada Sección 8 del Artículo VI de la Constitución, hasta que los demás recursos disponibles a que se refiere dicha sección resulten insuficientes para tales fines. En caso contrario, el producto de dicho cobro, en la cantidad que se necesite, solo se utilizará para el pago del |

| | | | | | |
|---|---|---|---|---|---|
| | | | excedente por encima de $800,000 en ingresos recaudados por el arbitrio en meses anteriores o posteriores del mismo año fiscal. | | capital e intereses de las deudas y demás obligaciones de la Autoridad Metropolitana de Autobuses y para cumplir con las estipulaciones que ésta acuerde con los tenedores de dichos bonos u otras obligaciones". |
| **BAN de la AFI** | Impuesto a Productos del Petróleo | 13 LPRA § 31751a | • Hacienda recauda un arbitrio adicional sobre los productos derivados del petróleo por un monto de $3.25 por barril.<br><br>• El Secretario de Hacienda transfiere todos los ingresos recaudados del impuesto adicional de $3.25 a la AFI. | • El producto proveniente del arbitrio de productos derivados del petróleo es transferido por Hacienda a un Fondo Especial de Asistencia Económica en Beneficio de la AFI para el pago de su deuda consolidada. | "El producto de las contribuciones recaudadas en virtud de la sección 31627a se transferirá al Fondo Especial de Asistencia Económica de la Autoridad de Financiamiento de Infraestructura establecido conforme al Artículo 34 de la Ley núm. 44 del 21 de junio de 1988, y se utilizará para (i) reintegrar las obligaciones contraídas por la Autoridad de Financiamiento de Infraestructura de Puerto Rico con el fin de refinanciar o pagar aquellas deudas u obligaciones de la Autoridad de Carreteras y Transportación que ocasionalmente hayan sido asumidas o pagadas por la Autoridad de Financiamiento de Infraestructura de Puerto Rico y (ii) los demás fines autorizados de conformidad con el artículo 34 de la Ley núm. 44 del 21 de junio de 1988, según enmienda. El Secretario transferirá los montos de dichos cobros mensualmente o según se acuerde con la Autoridad de Financiamiento de Infraestructura de Puerto Rico. Se autoriza por el presente al Secretario a establecer un mecanismo de recaudación a través del cual los fondos que serán depositados en el Fondo Especial de Asistencia Económica de la Autoridad de Financiamiento de Infraestructura serán pagados por el contribuyente directamente a la Autoridad de Financiamiento de Infraestructura de Puerto Rico, a una institución financiera designada por el Secretario del Hacienda o la Autoridad de Financiamiento de Infraestructura o la institución financiera que actúa como fiduciario en el contrato de fideicomiso según el que se emiten los bonos de la Autoridad de Financiamiento de Infraestructura de Puerto Rico para los que dichos cobros son la fuente de pago".<br><br>"De acuerdo con el artículo 34 de la Ley núm. 44 del 21 de junio de 1988, según enmienda, y sujeto a las condiciones allí establecidas, el producto de las recaudaciones del arbitrio fijado en la Sección |

| | | | | | 31627a se prenda para garantizar la amortización de los "Bonos de Refinanciamiento", las "Obligaciones Garantizadas" y la "Deuda Transferida", según se definen tales términos en dicho artículo. Por el presente, se autoriza a la Autoridad de Financiamiento de Infraestructura de Puerto Rico, luego de cubrir en cualquier Año Fiscal el pago de capital e intereses y cualquier otra obligación relacionada con dichos Bonos de Refinanciamiento, dichas Obligaciones Garantizadas y dicha Deuda Transferida pagaderos en dicho Año Fiscal, a comprometer o prendar el producto de la recaudación de dicho arbitrio a ser depositado en el Fondo Especial de Asistencia Económica de la Autoridad de Financiamiento de Infraestructura, para el pago del capital y los intereses de otros bonos u otras obligaciones o para sostener las obligaciones y operaciones de la Autoridad de Carreteras y Transportación. Dicho compromiso o prenda estará sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de dicho cobro se utilizará únicamente para el pago de intereses y la amortización de la deuda pública, según se establece en dicha sección 8 del artículo VI de la Constitución, en la medida en que los demás recursos disponibles mencionados en dicha sección resulten insuficientes para tales fines". |
|---|---|---|---|---|---|

| AFI | Arbitrios Federales | 3 LPRA § 1914 | • El Código de Ingresos Internos de los EE. UU., § 7652(a)(3), establece que todos los impuestos recaudados sobre los artículos producidos en PR (por ejemplo, ron) y enviados a los EE. UU., o consumidos en la isla, serán transferidos a la Hacienda de Puerto Rico.<br><br>• Los primeros ingresos de los arbitrios federales remitidos al Departamento de Hacienda de Puerto Rico en cada año fiscal serán transferidos a un Fondo Especial que será mantenido por o en nombre de la AFI, designado como Fondo | • Desde el Año Fiscal 2007 hasta el Año Fiscal 2057, el monto de la transferencia será $117,000,000. | A partir del Año Fiscal 1988-89, independientemente de las disposiciones de la Sección 29A de la Ley núm. 143 del 30 de junio de 1969, según enmienda, las primeras recaudaciones de contribuciones federales enviadas al Departamento de Hacienda de Puerto Rico en cada año fiscal, a tenor con la Sección 7652(a)(3) del Código de Ingresos Internos de los Estados Unidos de 1986, según enmienda, hasta un monto máximo de treinta millones de dólares ($30,000,000), en el caso del Año Fiscal 1988-89, hasta un monto máximo de cuarenta millones de dólares ($40,000,000), en el caso de los Años Fiscales 1989-90 a 1996-97, hasta un monto máximo de sesenta millones de dólares ($60,000,000), en el caso del Año Fiscal 1997-98, hasta un monto máximo de setenta millones de dólares ($70,000,000), en el caso de los Años Fiscales 1998-1999 a 2005-06, y hasta un monto máximo de noventa millones de dólares ($90,000,000), en el caso de los Años Fiscales 2006-07 a 2008-09, y en los años subsiguientes hasta el Año Fiscal 2056-57 la participación será hasta por un monto de ciento dieciséis millones de dólares ($117,000,000), los que se pagarán en el momento de la recepción por parte del Departamento de Hacienda de Puerto Rico en un Fondo Especial a ser mantenido por o en nombre de la Autoridad, designado como el "Fondo de Infraestructura de Puerto Rico" y será utilizado por la Autoridad para sus fines corporativos, los que incluirán el desarrollo de la infraestructura necesaria y conveniente para la culminación de los Juegos Centroamericanos y del Caribe de Mayagüez de 2010.<br><br>[…]<br><br>"Se faculta a la Autoridad a segregar una parte de dichos Fondos en una (1) o más subcuentas y prendar la totalidad o parte de los fondos en una (1) o más subcuentas, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico para el pago del capital e intereses sobre bonos y otras obligaciones de la Autoridad, o para el pago de bonos y otras obligaciones emitidas por una entidad beneficiada, o para cualquier otro fin legal de la Autoridad. Los fondos del Fondo Especial podrán ser utilizados para el pago de intereses y para la amortización de la deuda pública del ELA, según dispone dicha Sección 8, solamente |

| | | | | | |
|---|---|---|---|---|---|
| | | | de Infraestructura de Puerto Rico. | | cuando los demás recursos disponibles, cubiertos en dicha Sección, no sean suficientes para tales fines". |
| ADCC | Impuesto a las habitaciones de hotel | 13 LPRA § 2271v | Pagado por el huésped al momento de pagar la tasa de ocupación de la habitación al hotel. Todo establecimiento hotelero estará obligado a cobrar y remitir dicho impuesto a la Compañía de Turismo de PR. ("CTPR"). | • Cada año, el BGF/la AAFAF determina y certifica a la CTPR la cantidad necesaria para que la ADCC cumpla con la amortización de la deuda. La CTPR realiza pagos mensuales al BGF hasta el monto anual certificado por el BGF. Los ingresos por impuestos a las habitaciones de hotel se depositan en una cuenta de la ADCC mantenida en el [BGF] para beneficio de los bonistas de la ADCC. | "La Compañía [de Turismo] distribuirá todos los fondos recaudados del impuesto establecido en la Sec. 2271o de este título, de la siguiente manera: (a) Antes del inicio de cada año fiscal, el [BGF] determinará y certificará a la Compañía [de Turismo] y a la [ADCC] la cantidad necesaria para que la [ADCC] realice, durante dicho año fiscal y el primer día del siguiente año fiscal: (1) el pago total y puntual, o la amortización del capital y los intereses de las obligaciones contraídas por la [ADCC] con el [BGF] o los bonos, pagarés u otras obligaciones emitidas, asumidas o contraídas por la [ADCC], a tenor con la Ley núm. 142 del 4 de octubre de 2001, según enmienda, con la autorización previa por escrito de la Compañía [de Turismo], para realizar exclusivamente el desarrollo y construcción de un nuevo centro de convenciones y su infraestructura relacionada; (2) el pago total y puntual de las obligaciones de la [ADCC] en virtud de cualquier contrato de financiamiento relacionado con bonos, según se define este término al final de este inciso, celebrado por la [ADCC] con la autorización previa por escrito de la Compañía [de Turismo]; (3) los depósitos necesarios para reponer las reservas establecidas para garantizar el pago del capital y los intereses de dichos bonos, pagarés y otras obligaciones emitidas, asumidas o contraídas por la [ADCC], o las obligaciones en virtud de cualquier acuerdo de financiamiento relacionado con bonos; y (4) cualquier otro gasto incurrido en relación con la emisión de dichos bonos, pagarés u otras obligaciones asumidas o incurridas por la [ADCC], o con cualquier otro acuerdo de financiamiento relacionado con bonos. La aprobación previa por escrito de la Compañía [de Turismo] autorizará específicamente el calendario de amortización del capital de los bonos, pagarés u otras obligaciones que emitirá, asumirá o contraerá la [ADCC] y los términos y condiciones finales de cualquier acuerdo de financiamiento de los bonos a celebrar por la [ADCC]. La suma determinada y certificada |

por el [BGF], como se indica anteriormente, será depositada en una cuenta especial que será mantenida por el [BGF] a nombre de la [ADCC] para beneficio de los bonistas, tenedores de pagarés o tenedores de otras obligaciones de la [ADCC] o en beneficio de las otras partes contratantes en virtud de cualquier acuerdo de financiamiento relacionado con bonos. El [BGF] transferirá las cantidades depositadas en dicha cuenta especial a los fideicomisarios de los bonistas, tenedores de pagarés o tenedores de otras obligaciones de la [ADCC] o de las otras partes contratantes en virtud de cualquier acuerdo de financiamiento relacionado con bonos, de conformidad con las instrucciones escritas proporcionadas al [BGF] por la [ADCC]".

[...]

"Cada año fiscal, la Compañía [de Turismo] deberá transferir al Banco Gubernamental de Fomento para su depósito en dicha cuenta especial el monto establecido en el primer párrafo de este inciso mediante transferencias mensuales, comenzando en el mes inmediato siguiente al mes en que se aprueba esta ley y en el primer mes de cada año fiscal en adelante, equivalentes a una décima parte de esa cantidad que el Banco Gubernamental de Fomento para Puerto Rico determine y certifique como necesaria para los pagos cubiertos en el párrafo introductorio de esta sección [....]"

[...]

"La Autoridad está autorizada, previo consentimiento por escrito de la Compañía [de Turismo], a comprometer o gravar de otra manera el producto de la recaudación del impuesto fijo que debe depositarse en la cuenta especial, según lo exige el primer párrafo de este inciso, como garantía, para el pago del capital y los intereses de los bonos, pagarés u otras obligaciones emitidas, asumidos o incurridas por la Autoridad, según se describe en el primer párrafo de este inciso, o el pago de sus obligaciones bajo cualquier acuerdo financiero relacionado con los bonos, tal como se describe en ese párrafo. Dicho compromiso u obligación estará sujeto a las disposiciones de la Sec. 8 del Artículo VI de la Constitución del ELA

| | | | | | de Puerto Rico. El producto de la recaudación del impuesto se utilizará únicamente para el pago de intereses y la amortización de la deuda pública, según se dispone en la Sección 8 del Art. VI de la Constitución, solo en la medida en que los demás recursos disponibles cubiertos por dicha Sección sean insuficientes para tales fines. De lo contrario, el producto de dicha recaudación en la cantidad que sea necesaria se utilizará únicamente para el pago de capital e intereses sobre bonos, pagarés u otras obligaciones y las obligaciones según cualquier acuerdo financiero relacionado con los bonos cubiertos en este documento, y para cumplir con cualquier estipulación acordada con los tenedores de dichos bonos, pagarés u otras obligaciones o proveedores de acuerdos financieros relacionados con los bonos". |
|---|---|---|---|---|---|
| ATI[13] | Impuesto a los Cigarrillos | 13 LPRA § 31751 | ▪ El Secretario transferirá mensualmente, o según se acuerde con la Autoridad de Transporte Integrado de Puerto Rico, las cantidades depositadas en el depósito especial, deduciendo de ellas las cantidades reembolsadas según lo dispuesto en la sección 31668 de este subtítulo. | ▪ El resultado de dicho producto a ser utilizado según las disposiciones de este artículo para reembolsar a la Autoridad de Transporte Integrado de Puerto Rico las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y la amortización de la deuda pública será transferido a la Autoridad de Transporte Integrado de Puerto Rico. | "El monto del impuesto que se recaude sobre los cigarrillos establecido en la sección 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, comenzando con el Año Fiscal 2015-2016, se depositará en un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y facultades corporativos. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de veinte (20) millones de dólares del monto del impuesto recaudado sobre los cigarrillos establecido en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad de Carreteras y Transportación, según lo dispuesto en la cláusula (3) de este inciso, y al de los diez (10) millones de dólares del monto del impuesto que se cobra a los cigarrillos fijado en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad Metropolitana de Autobuses, según lo dispuesto en la cláusula (4) de este inciso. El monto de la contribución que se recaude sobre los cigarrillos establecido en la Sección 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, a partir de la aprobación del Nuevo Sistema Fiscal de Puerto Rico, ingresará a un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y facultades corporativos. El ingreso de estos treinta y seis (36) millones |

[13] La ATI actualmente no tiene deudas pendientes.

de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de veinte (20) millones de dólares del monto del impuesto recaudado sobre los cigarrillos establecido en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad de Carreteras y Transportación, según lo dispuesto en la cláusula (3) de este inciso, y al de los diez (10) millones de dólares del monto del impuesto que se cobra a los cigarrillos fijado en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad Metropolitana de Autobuses, según dispuesto en la cláusula (4) de este inciso".

[…]

"La transferencia del producto de la recaudación de dicho arbitrio a la Autoridad de Transporte Integrado de Puerto Rico estará sujeta a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico. El producto de dicho cobro se utilizará únicamente para el pago de intereses y la amortización de la deuda pública, según se establece en la Sección 8 del artículo VI de la Constitución, en la medida en que los demás recursos disponibles mencionados en dicha sección resulten insuficientes para tales fines. En el caso de que el ELA de Puerto Rico utilice cualquier monto de los arbitrios de cigarrillos fijados en la Sección 31625 para el pago de intereses y la amortización de la deuda pública según lo establecido en la Sección 8 del Artículo VI de la Constitución, las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y la amortización de la deuda pública se reembolsarán a la Autoridad de Transporte Integrado de Puerto Rico de las ganancias recibidas por el ELA de Puerto Rico en el próximo Año Fiscal, o en caso de que dicho reembolso no sea posible en el próximo año fiscal, en los años fiscales subsiguientes, salvo aquellos recursos que hayan sido comprometidos para cumplir alguna obligación. El producto de dichas ganancias a ser utilizado según las disposiciones de este artículo para reembolsar a la Autoridad de Transporte Integrado de Puerto Rico las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y la amortización de la deuda

| | | | | | pública no se transferirá al Fondo General del ELA de Puerto Rico, cuando se recaude; en cambio, se transferirá a la Autoridad de Transporte Integrado de Puerto Rico y, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, se utilizará para reembolsar dichos montos a la Autoridad de Transporte Integrado de Puerto Rico". |
|---|---|---|---|---|---|

**Parte II: Estatutos sobre ingresos asignables**

| LAY HABILITANTE | CITA DE INGRESOS ASIGNABLES LEGALES |
|---|---|
| | **ACT** |
| 1. **Ley de la Autoridad de Carreteras y Transportación de Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico) | 9 L.P.R.A. § 2004(l) ("Facultades"):<br><br>(l) Tomar dinero prestado para cualquiera de sus fines corporativos, y emitir bonos de la Autoridad en evidencia de tal deuda y garantizar el pago de bonos e intereses sobre los mismos mediante prenda u otro gravamen sobre todas o cualquiera de sus propiedades, rentas u otros ingresos, y sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA, prendar para el pago de dichos bonos e intereses sobre los mismos el producto de cualquier impuesto u otros fondos que el ELA ponga a disposición de la Autoridad.<br><br>9 L.P.R.A. § 2021 ("Depósito especial para beneficio de la Autoridad de Carreteras"):<br><br>El producto total del aumento de quince dólares ($15) en las tarifas a pagar por licencias de automóviles públicas y privadas se transferirá a un Depósito Especial a favor y en beneficio de la Autoridad de Carreteras y Transportación de Puerto Rico, que será utilizado por la Autoridad para sus fines corporativos. Se autoriza a dicha Autoridad a prendar o pignorar el producto de la recaudación así recibida, al pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad, o para cualquier otro fin legal de la Autoridad; y dicha prenda o pignoración se sujetará a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico; siempre y cuando, sin embargo, el producto de dicho cobro solo se utilice para el pago de intereses y la amortización de la deuda pública, según lo dispuesto en dicha § 8, hasta que los demás recursos disponibles, a que se refiere dicho apartado, sean insuficientes para tal fin. De lo contrario, el producto de dicha recaudación en la cantidad que sea necesaria se utilizará únicamente para el pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad, y para cumplir con las demás estipulaciones que se acuerden entre la Autoridad y los tenedores de tales bonos u otras obligaciones.<br><br>El ELA de Puerto Rico acuerda y se compromete con cualquier persona, firma o corporación, o con cualquier agencia de los Estados Unidos de América o de cualquier estado, o el ELA de Puerto Rico, que suscriba o adquiera bonos de la Autoridad de Carreteras y Transportación de Puerto Rico, para cuyo pago el producto del aumento de las tarifas pagadas por licencias de automóviles de servicio público y privado y otros se prenda según lo autorizado por esta sección, a no reducir estas tarifas de licencia. |

| | |
|---|---|
| **2. Subtítulo 17. Código de Ingresos Internos de 2011**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico) | 13 L.P.R.A. § 31751 ("Disposición de fondos")<br><br>(1) El monto del impuesto recaudado sobre la gasolina y el impuesto de cuatro centavos (4¢) de gasoil o diésel fijado en la Sección 31626 de este título, y el monto total por año fiscal del arbitrio recaudado sobre el petróleo crudo, subproductos de petróleo parcialmente terminado y terminado, y cualquier otra mezcla de hidrocarburos fijado en la Sección 31627 de este título, será transferido a un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines corporativos.<br><br>(1)(F) Se autoriza a la Autoridad de Carreteras y Transportación a comprometer o prendar el producto de la recaudación así recibida sobre gasolina y el impuesto de cuatro centavos (4¢) sobre gasoil o diésel fijado en la Sección 31626 de este título y el monto asignado en virtud de este Subtítulo del arbitrio al petróleo crudo, subproductos de petróleo parcialmente terminado y terminado, y cualquier otra mezcla de hidrocarburos fijado en la Sección 31627 de este título, para el pago del capital y los intereses sobre los bonos u otras obligaciones o para cualquier otro fin legal de la Autoridad. Dicho compromiso o prenda estará sujeto a las disposiciones de la Sección 8 del Punto VI de la Constitución del ELA de Puerto Rico.<br>El producto de dicho cobro se utilizará únicamente para el pago de intereses y amortización de la deuda pública, según lo dispuesto en dicha Sección 8 del Punto VI de la Constitución, hasta que los demás recursos disponibles cubiertos en dicha sección sean insuficientes para tales fines. En caso contrario, el producto de dicho cobro, en la cantidad que sea necesaria, se utilizará únicamente para el pago del capital y los intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con las estipulaciones que acuerde con los tenedores de tales bonos u otras obligaciones.<br><br>(1)(E) En caso de que el monto del producto del impuesto sobre gasolina, gasoil o diésel establecido en la Sección 31626 de este título o el monto del arbitrio sobre petróleo crudo, subproductos parcialmente terminados y terminados del petróleo y cualquier otra mezcla de hidrocarburos establecido en la Sección 31627 de este título, asignado o a ser asignado en el futuro a la Autoridad de Carreteras y Transportación, sea en cualquier momento insuficiente para pagar el capital y los intereses de los bonos u otras obligaciones sobre dinero tomado en un préstamo o emitido por la Autoridad de Carreteras y Transportación para sufragar el costo de las instalaciones de tránsito y por cuyo pago el producto del impuesto que grava la gasolina, gasoil o diésel establecido en la Sección 31626 de este título o el monto del arbitrio gravado sobre el petróleo crudo, subproductos parcialmente terminados y terminados de petróleo, y cualquier otra mezcla de hidrocarburos establecido en la Sección 31627 de este título ha sido prendado y los fondos de reserva de la Autoridad de Carreteras y Transportación para el pago de los requisitos de deuda se aplican para cubrir la deficiencia en la cantidad necesaria para realizar dichos pagos, las cantidades de dicho fondo de reserva que se utilicen para cubrir dicha deficiencia serán reembolsadas a la Autoridad de Carreteras y Transportación de las primeras ganancias recibidas en el próximo año fiscal o años fiscales subsiguientes por el Gobierno de Puerto Rico a partir de: (1) cualquier otro impuesto vigente sobre cualquier otro combustible o propulsor utilizado, entre otros fines, para propulsar vehículos automotores; y (2) cualquier porción restante del impuesto sobre gasolina, gasoil o diésel establecido en la Sección 31626 de este título en vigencia. El producto de dichos otros impuestos y la porción restante del impuesto sobre gasolina y gasoil o diésel establecido en la Sección |

31626 de este título, que se utilizará según se dispone en esta sección para reembolsar los fondos de reserva para los requisitos de deuda, no será transferido al Fondo General del Gobierno de Puerto Rico cuando se cobre, sino que será transferido al depósito especial antes mencionado para el beneficio de la Autoridad de Carreteras y Transportación de Puerto Rico y sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, para ser utilizado para reembolsar dicho fondo de reserva para el pago de los requisitos de deuda.

(3) El monto de la contribución recaudada sobre los cigarrillos fijada por la Sección 31625 de este título hasta veinte (20) millones de dólares por año fiscal se depositará en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines y facultades corporativos.

(3)(C) Se autoriza a la Autoridad de Carreteras y Transportación a prendar o gravar el producto del arbitrio sobre los cigarrillos establecido en la Sección 31625 de este título para el pago del capital e intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de tales contribuciones se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con cualquier estipulación acordada por la Autoridad con tenedores de sus bonos y otras obligaciones.

(4) El monto de la contribución recibida por cigarrillos fijada por la Sección 31625 de este título hasta diez (10) millones de dólares por año fiscal se depositarán en un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y facultades corporativos. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses tiene segunda prioridad y está subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto recibido por cigarrillos fijado por la Sección 31625 de este título que se deposita en el depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección.

(4)(C) Se autoriza a la Autoridad Metropolitana de Autobuses a prendar o gravar las ganancias del arbitrio sobre los cigarrillos establecido en la Sección 31625 de este título para el pago del capital e intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad Metropolitana de Autobuses. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de tales contribuciones se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad Metropolitana de Autobuses

| | |
|---|---|
| | y para cumplir con cualquier estipulación acordada por la Autoridad Metropolitana de Autobuses con tenedores de sus bonos y otras obligaciones. |
| **3. Ley de Tránsito y Vehículos de Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico) | "Sección 23.02(c).- Tarifas a pagar."<br><br>Se crea un depósito especial a beneficio de la Autoridad al que se transferirán quince dólares ($15) por cada renovación de registro de automóviles de servicio público y privado.<br><br>"Artículo 23.01.- Procedimiento para el pago de tarifas".<br><br>Salvo disposición en contrario en esta Ley, el monto de los derechos recaudados de conformidad con los Artículos 23.01 y 23.02 de esta Ley se depositará íntegramente en un Depósito Especial a nombre y para beneficio de la [ACT].<br><br>Por el presente, se autoriza a la Autoridad a prendar o gravar el producto de los impuestos recaudados para el pago del capital y los intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de los impuestos recaudados se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con cualquier estipulación acordada por la Autoridad con tenedores de sus bonos y otras obligaciones. |
| **4. Código de Ingresos Internos para un Nuevo Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico) | Se enmienda el inciso (a) del Artículo 3060.11 de la Ley 1-2011, según enmienda, conocida como "Código de Ingresos Internos para un Nuevo Puerto Rico", y se sustituye por el texto siguiente:<br><br>El monto del impuesto recaudado sobre la gasolina y el impuesto de cuatro centavos (4¢) de gasoil o diésel fijado en la Sección 3020.06 de este subtítulo, y el monto total por año fiscal del arbitrio recaudado sobre el petróleo crudo, subproductos de petróleo parcialmente terminado y terminado, y cualquier otra mezcla de hidrocarburos fijado en la Sección 3020.07 de este subtítulo, será transferido a un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus fines corporativos. |

| | |
|---|---|
| **AMA** (Autoridad Metropolitana de Autobuses) | Se autoriza a la Autoridad de Carreteras y Transportación a prendar o gravar el producto del arbitrio sobre los cigarrillos establecido en la Sección 3020.05 para el pago del capital e intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de tales contribuciones se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con cualquier estipulación acordada por la Autoridad con tenedores de sus bonos y otras obligaciones.<br><br>El monto de la contribución recibida por cigarrillos fijada por la Sección 3020.05 de este subtítulo hasta diez (10) millones de dólares por año fiscal se depositarán un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y facultades corporativos. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses tiene segunda prioridad y está subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto recibido por cigarrillos fijado por la Sección 3020.05 de este subtítulo que se depositan en el depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección.<br><br>Se autoriza a la Autoridad Metropolitana de Autobuses a prendar o gravar las ganancias del arbitrio sobre los cigarrillos establecido en la Sección 3020.05 para el pago del capital e intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad Metropolitana de Autobuses. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de tales contribuciones se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad Metropolitana de Autobuses y para cumplir con cualquier estipulación acordada por la Autoridad Metropolitana de Autobuses con tenedores de sus bonos y otras obligaciones. |
| **AFI** | |
| **1. Ley de la Autoridad de Financiamiento de Infraestructura de Puerto Rico** | 3 L.P.R.A. § 1906 ("Facultades generales"):<br><br>(m) Hipotecar o prendar cualquier propiedad para el pago del capital e intereses de cualquier bono emitido por la Autoridad, o bonos emitidos por una entidad beneficiada, y prendar la totalidad o una parte de los ingresos que la Autoridad pueda recibir, lo que incluye, entre otros, y con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución |

| | |
|---|---|
| Entidades involucradas:<br><br>**AFI** (Autoridad de Financiamiento de Infraestructura de Puerto Rico) | del ELA de Puerto Rico, la totalidad o parte de los arbitrios federales u otros fondos que el ELA debería haber transferido a la Autoridad.<br><br>3 L.P.R.A. § 1907 ("Bonos de la Autoridad"):<br><br>(a) Los bonos emitidos por la Autoridad podrán ser pagaderos a partir de la totalidad o parte de los ingresos brutos o netos y otros ingresos derivados por la Autoridad que, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico, pueden incluir el producto de cualquier impuesto u otros fondos que el ELA pueda poner a disposición de la Autoridad según lo dispuesto en el acuerdo de fideicomiso o en la resolución según la que se emiten los bonos. El capital y los intereses de los bonos emitidos por la Autoridad podrán ser garantizados mediante prenda de la totalidad o parte de cualquiera de sus ingresos que, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico, puede incluir el producto de cualquier impuesto u otros fondos que el ELA pueda poner a disposición de la Autoridad, todo según lo dispuesto en el acuerdo de fideicomiso o en la resolución según la que se emiten los bonos. Esta prenda será válida y vinculante desde el momento en que se realice sin necesidad de instrumento público o notariado. Los ingresos así prendados, incluidos los recibidos posteriormente por la Autoridad, quedarán inmediatamente sujetos a dicho gravamen sin necesidad de entrega física de los mismos o cualquier otro acto, y dicho gravamen será válido y vinculante y prevalecerá frente a cualquier tercero que tenga algún tipo de reclamación contra la Autoridad por daños, incumplimiento de contrato u otros motivos, independientemente de que se haya notificado a dicho tercero. Ni el acuerdo de fideicomiso, ni la resolución de los bonos, ni ningún acuerdo de garantía por el que los derechos de la Autoridad sobre los ingresos se comprometan o asignen deberá presentarse o registrarse para perfeccionar el gravamen sobre el mismo contra cualquier tercero, excepto o en los registros de la Autoridad. La resolución o resoluciones que autoricen la emisión de bonos o el contrato de fideicomiso que garantice los bonos podrán contener disposiciones que serán parte del contrato con los tenedores de los bonos emitidos según dicha resolución o resoluciones o según dicho contrato de fideicomiso respecto a la prenda y creación de gravámenes sobre los ingresos y activos de la Autoridad, la creación y mantenimiento de fondos de amortización y reserva, limitaciones relativas a los fines a los que se pueden aplicar las ganancias de los bonos, limitaciones relativas a la emisión de bonos adicionales, limitaciones relativas a la introducción de enmiendas o suplementos a dicha resolución o resoluciones, o al contrato de fideicomiso, el otorgamiento de derechos, poderes y privilegios, y la imposición de obligaciones y responsabilidades al fiduciario en virtud de cualquier acuerdo o resolución de fideicomiso, los derechos, poderes, obligaciones y responsabilidades que surjan en caso de incumplimiento de cualquier obligación en virtud de dicha resolución o resoluciones o en virtud de dicho acuerdo de fideicomiso, o en relación con cualquier derecho, poder o privilegio conferido a los bonistas como garantía de los bonos con el fin de mejorar su comerciabilidad.<br><br>3 L.P.R.A. § 1914 ("Depósito especial"):<br><br>A partir del Año Fiscal 1988-89, independientemente de las disposiciones de la Sección 29A de la Ley núm. 143 del 30 de junio de 1969, según enmienda, las primeras recaudaciones de contribuciones federales enviadas al Departamento de Hacienda de Puerto Rico en cada año |

| | fiscal, a tenor con la Sección 7652(a)(3) del Código de Ingresos Internos de los Estados Unidos de 1986, según enmienda, hasta un monto máximo de treinta millones de dólares ($30,000,000), en el caso del Año Fiscal 1988-89, hasta un monto máximo de cuarenta millones de dólares ($40,000,000), en el caso de los Años Fiscales 1989-90 a 1996-97, hasta un monto máximo de sesenta millones de dólares ($60,000,000), en el caso del Año Fiscal 1997-98 , hasta un monto máximo de setenta millones de dólares ($70,000,000), en el caso de los Años Fiscales 1998-1999 a 2005-06, y hasta un monto máximo de noventa millones de dólares ($90,000,000), en el caso de los Años Fiscales 2006-07 a 2008-09, y en los años subsiguientes hasta el Año Fiscal 2056-57 la participación será hasta por un monto de ciento diecisiete millones de dólares ($117,000,000), los que se pagarán en el momento de la recepción por parte del Departamento de Hacienda de Puerto Rico en un Fondo Especial a ser mantenido por o en nombre de la Autoridad, designado como el "Fondo de Infraestructura de Puerto Rico" y será utilizado por la Autoridad para sus fines corporativos, los que incluirán el desarrollo de la infraestructura necesaria y conveniente para la culminación de los Juegos Centroamericanos y del Caribe de Mayagüez de 2010. En caso de que las recaudaciones de dichos impuestos federales sean insuficientes para cubrir los montos aquí asignados, se autoriza al Secretario de Hacienda a cubrir dicha deficiencia de los fondos disponibles, y el Director de la Oficina de Gerencia y Presupuesto, a solicitud de la Autoridad para el Financiamiento de la Infraestructura, deberá incluir en el presupuesto recomendado del año fiscal correspondiente las asignaciones necesarias para cubrir dichas deficiencias. |
| | |
| | Se faculta a la Autoridad para segregar una parte de dichos Fondos en una (1) o más subcuentas, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico para el pago del capital e intereses sobre bonos y otras obligaciones de la Autoridad, o para el pago de bonos y otras obligaciones emitidas por una entidad beneficiada, o para cualquier otro fin legal de la Autoridad. El dinero del Fondo Especial podrá ser utilizado para el pago de intereses y para la amortización de la deuda pública del ELA, según se dispone en dicha Sección 8, solo cuando los demás recursos disponibles cubiertos por dicha Sección sean insuficientes para tales fines. |
| **ADCCPR** | |
| **1. Ley del Impuesto a la Tasa de Ocupación de Habitaciones de Puerto Rico**<br><br>Entidades involucradas:<br><br>**ADCCPR** (Autoridad del Distrito del Centro de Convenciones de Puerto Rico, una corporación pública del ELA de Puerto | 13 L.P.R.A. § 2271v ("Disposición de fondos")<br><br>La Compañía [de Turismo] distribuirá todos los fondos recaudados del impuesto establecido en la Sec. 2271o de este título, de la siguiente manera:<br>(a) Antes del inicio de cada año fiscal, el [BGF] determinará y certificará a la Compañía [de Turismo] y a la [ADCC] la cantidad necesaria para que la [ADCC] realice, durante dicho año fiscal y el primer día del siguiente año fiscal:<br>(1) el pago total y puntual, o la amortización del capital y los intereses de las obligaciones contraídas por la [ADCC] con el [BGF] o los bonos, pagarés u otras obligaciones emitidas, asumidas o contraídas por la [ADCC], |

| | |
|---|---|
| Rico creada por las Secciones 6401 *et seq.* del Título 23, conocido como 'Ley del Distrito del Centro de Convenciones de Puerto Rico')<br><br>**Compañía de Turismo de Puerto Rico**, corporación pública del ELA de Puerto Rico creada por las Secciones 671 *et seq.* del Título 23 | a tenor con la Ley núm. 142 del 4 de octubre de 2001, según enmienda, con la autorización previa por escrito de la Compañía [de Turismo], para realizar exclusivamente el desarrollo y construcción de un nuevo centro de convenciones y su infraestructura relacionada;<br><br>(2) el pago total y puntual de las obligaciones de la [ADCC] en virtud de cualquier contrato de financiamiento relacionado con bonos, según se define este término al final de este inciso, celebrado por la [ADCC] con la autorización previa por escrito de la Compañía [de Turismo];<br><br>(3) los depósitos necesarios para reponer las reservas establecidas para garantizar el pago del capital y los intereses de dichos bonos, pagarés y otras obligaciones emitidas, asumidas o contraídas por la [ADCC], o las obligaciones en virtud de cualquier acuerdo de financiamiento relacionado con bonos; y<br><br>(4) cualquier otro gasto incurrido en relación con la emisión de dichos bonos, pagarés u otras obligaciones asumidas o incurridas por la [ADCC], o cualquier otro acuerdo de financiamiento relacionado con bonos.<br>La aprobación previa por escrito de la Compañía [de Turismo] autorizará específicamente el calendario de amortización del capital de los bonos, pagarés u otras obligaciones que emitirá, asumirá o contraerá la [ADCC] y los términos y condiciones finales de cualquier acuerdo de financiamiento de los bonos a celebrar por la [ADCC]. La suma determinada y certificada por el [BGF], como se indica anteriormente, será depositada en una cuenta especial que será mantenida por el [BGF] a nombre de la [ADCC] para beneficio de los bonistas, tenedores de pagarés o tenedores de otras obligaciones de la [ADCC] o en beneficio de las otras partes contratantes en virtud de cualquier acuerdo de financiamiento relacionado con bonos. El [BGF] transferirá la s cantidades depositadas en dicha cuenta especial a los fideicomisarios de los bonistas, tenedores de pagarés o tenedores de otras obligaciones de la [ADCC] o de las otras partes contratantes en virtud de cualquier acuerdo de financiamiento relacionado c on bonos, de conformidad con las instrucciones escritas proporcionadas al [BGF] por la [ADCC].<br><br><br>Cada año fiscal, la Compañía [de Turismo] deberá transferir al Banco Gubernamental de Fomento para su depósito en dicha cuenta especial el monto establecido en el primer párrafo de este inciso mediante transferencias mensuales, comenzando en el mes inmediato siguiente al mes en que se apruebe esta ley y en el primer mes de cada año fiscal en adelante, equivalentes a una décima parte de esa cantidad que el Banco Gubernamental de Fomento para Puerto Rico determine y certifique como necesaria para los pagos cubiertos en el párrafo introductorio de esta sección [….]<br><br>Se autoriza a la Autoridad, con el consentimiento previo por escrito de la Compañía, a prendar o gravar de otra manera el producto de los ingresos del impuesto fijo recaudado que se depositará en una cuenta especial según lo exige el primer párrafo de este inciso, como garantía para el pago del capital y los intereses de los bonos, pagarés u otras obligaciones emitidas, asumidas o incurridas por la Autoridad, según se describe en el primer párrafo de este inciso, o para el pago de sus obligaciones en virtud de cualquier contrato de financiamiento relacionado con bonos, según se describe en dicho párrafo. Tal prenda u obligación estará sujeta a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico. El producto de la recaudación del impuesto se utilizará únicamente para el pago de |

| | intereses y la amortización de la deuda pública, según dispone la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico, pero solo en la medida en que los demás recursos disponibles cubiertos por dicha Sección sean insuficientes para tal fin. De lo contrario, el producto de dicha recaudación, en la cantidad necesaria, se utilizará únicamente para el pago del capital y los intereses de los bonos, pagarés u otras obligaciones y las obligaciones derivadas de cualquier contrato de financiamiento relacionado con bonos contemplado en este documento, y para cumplir con cualquier estipulación acordada con los bonistas, tenedores de pagarés o tenedores de otras obligaciones o con los proveedores en virtud de acuerdos de financiamiento relacionados con los bonos.<br><br>En caso de que el producto total del impuesto actualmente asignado o a ser asignado en el futuro a la Autoridad, de conformidad con este inciso, sea utilizado para amortización de la deuda pública y aplicado para cubrir las deficiencias en los montos necesarios para realizar dichos pagos, los montos de esta contribución utilizados para cubrir dicha deficiencia serán reembolsados a la Autoridad con los primeros ingresos recibidos en el próximo año fiscal y en los años fiscales subsiguientes por el ELA de Puerto Rico provenientes de cualquier porción remanente de la contribución entonces vigente, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico. |
|---|---|
| **AMA** | |
| **Código de Ingresos Internos para un Nuevo Puerto Rico**<br><br>Entidades involucradas:<br><br>**ACT** (Autoridad de Carreteras y Transportación de Puerto Rico)<br><br>**AMA** (Autoridad Metropolitana de Autobuses) | Se enmienda el inciso (a) del Artículo 3060.11 de la Ley 1-2011, según enmienda, conocida como "Código de Ingresos Internos para un Nuevo Puerto Rico", y se sustituye por el texto siguiente:<br><br>El monto del impuesto recaudado sobre los cigarrillos fijado por la Sección 3020.05 de este subtítulo hasta veinte (20) millones de dólares por año fiscal se depositará en un depósito especial a favor de la Autoridad de Carreteras y Transportación para sus facultades y fines corporativos.<br><br>Se autoriza a la Autoridad de Carreteras y Transportación a prendar o gravar el producto del arbitrio sobre los cigarrillos establecido en la Sección 3020.05 para el pago del capital e intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de tales contribuciones se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución del Gobierno de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad y para cumplir con cualquier estipulación acordada por la Autoridad con tenedores de sus bonos y otras obligaciones. |

<table>
<tr>
<td></td>
<td>El monto de la contribución recibida por cigarrillos fijada por la Sección 3020.05 de este subtítulo hasta diez (10) millones de dólares por año fiscal se depositarán un depósito especial a favor de la Autoridad Metropolitana de Autobuses para sus fines y facultades corporativas. El ingreso de estos diez (10) millones de dólares por año fiscal al depósito especial a favor de la Autoridad Metropolitana de Autobuses tiene segunda prioridad y está subordinado al ingreso de los veinte (20) millones de dólares del monto del impuesto recibido por cigarrillos fijado por la Sección 3020.05 de este subtítulo que se deposita en el depósito especial a favor de la Autoridad de Carreteras y Transportación según se dispone en el inciso (a)(3) de esta sección.<br><br>Se autoriza a la Autoridad Metropolitana de Autobuses a prendar o gravar las ganancias del arbitrio sobre los cigarrillos establecido en la Sección 3020.05 para el pago del capital e intereses de cualquier bono u otra obligación o para cualquier otro fin legal de la Autoridad Metropolitana de Autobuses. Dicha prenda o gravamen estarán sujetos a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. El producto de tales contribuciones se utilizará únicamente para el pago de los intereses y la amortización de la deuda pública, según lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico, en la medida en que los demás recursos disponibles a que se refiere dicha Sección no sean suficientes para tales fines. De lo contrario, el producto de dicho impuesto, en la cantidad necesaria, se utilizará únicamente para el pago de capital e intereses de los bonos y demás obligaciones de la Autoridad Metropolitana de Autobuses y para cumplir con cualquier estipulación acordada por la Autoridad Metropolitana de Autobuses con tenedores de sus bonos y otras obligaciones.</td>
</tr>
<tr>
<td colspan="2" align="center"><strong>ATI:</strong></td>
</tr>
<tr>
<td><strong>Código de Ingresos Internos para un Nuevo Puerto Rico</strong><br><br>Entidades involucradas:<br><br><strong>ATI</strong> (Autoridad de Transporte Integrado de Puerto Rico)</td>
<td>13 L.P.R.A. § 31751 ("Disposición de fondos")<br><br>El monto del impuesto que se recaude sobre los cigarrillos establecido en la Sección 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, comenzando con el Año Fiscal 2015-2016, se depositará en un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y facultades corporativas. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico está en tercera prioridad y subordinado al ingreso de veinte (20) millones de dólares del monto del impuesto recaudado sobre los cigarrillos establecido en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad de Carreteras y Transportación, según lo dispuesto en la cláusula (3) de este inciso, y al de los diez (10) millones de dólares del monto del impuesto que se cobra a los cigarrillos fijado en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad Metropolitana de Autobuses, según lo dispuesto en la cláusula (4) de este inciso. El monto de la contribución que se recaude sobre los cigarrillos establecido en la Sección 31625 de este título hasta treinta y seis (36) millones de dólares por año fiscal, a partir de la aprobación del Nuevo Sistema Fiscal de Puerto Rico, ingresará a un depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico para sus fines y facultades corporativas. El ingreso de estos treinta y seis (36) millones de dólares por año fiscal al depósito especial a favor de la Autoridad de Transporte Integrado de Puerto Rico</td>
</tr>
</table>

está en tercera prioridad y subordinado al ingreso de veinte (20) millones de dólares del monto del impuesto recaudado sobre los cigarrillos establecido en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad de Carreteras y Transportación, según lo dispuesto en la cláusula (3) de este inciso, y al de los diez (10) millones de dólares del monto del impuesto que se cobra a los cigarrillos fijado en la sección 31625 de este título que ingresa al depósito especial a favor de la Autoridad Metropolitana de Autobuses, según lo dispuesto en la cláusula (4) de este inciso.

El Secretario transferirá mensualmente, o según se acuerde con la Autoridad de Transporte Integrado de Puerto Rico, las cantidades depositadas en el depósito especial, deduciendo de ellas las cantidades reembolsadas según lo dispuesto en el artículo 31668 de este subtítulo.

La transferencia de fondos recaudados del arbitrio de cigarrillos a la Autoridad de Transporte Integrado de Puerto Rico estará sujeta a las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico. El producto de dicho cobro se utilizará únicamente para el pago de intereses y la amortización de la deuda pública, según se establece en la Sección 8 del artículo VI de la Constitución, en la medida en que los demás recursos disponibles mencionados en dicha sección resulten insuficientes para tal fin. En el caso de que el ELA de Puerto Rico utilice cualquier monto de los arbitrios de cigarrillos fijados en la Sección 31625 para el pago de intereses y la amortización de la deuda pública según lo establecido en la Sección 8 del Artículo VI de la Constitución, las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y la amortización de la deuda pública se reembolsarán a la Autoridad de Transporte Integrado de Puerto Rico de las ganancias recibidas por el ELA de Puerto Rico en el próximo Año Fiscal, o en caso de que dicho reembolso no sea posible en el próximo año fiscal, en los años fiscales subsiguientes, salvo aquellos recursos que hayan sido comprometidos para cumplir alguna obligación. El producto de dichas ganancias a ser utilizado según las disposiciones de este artículo para reembolsar a la Autoridad de Transporte Integrado de Puerto Rico las cantidades utilizadas por el ELA de Puerto Rico para el pago de intereses y la amortización de la deuda pública no se transferirá al Fondo General del ELA de Puerto Rico, cuando se recaude; en cambio, se transferirá a la Autoridad de Transporte Integrado de Puerto Rico y, con sujeción a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, se utilizará para reembolsar dichos montos a la Autoridad de Transporte Integrado de Puerto Rico.

**Parte III: Texto sobre ingresos asignables en las resoluciones**

Resoluciones de la ACT

I.      Resolución de la ACT de 1968

El texto sobre los ingresos asignables aparece en tres lugares: una vez en los considerandos y dos veces en la "forma de bonos" incluida en la resolución.

- Considerandos - "POR CUANTO, según la Ley núm. 75, aprobada el 23 de junio de 1965, suplementada por la Ley núm. 50, aprobada el 22 de mayo de 1968, el producto de seis onceavos del impuesto de once centavos por galón a la gasolina gravado por la Ley núm. 2, aprobada el 20 de enero de 1956, según enmienda, fue asignado a la Autoridad para su uso con fines corporativos y esto autorizó expresamente a la Autoridad a prendar el producto de dicho impuesto de seis centavos por galón recibido por ella al pago del capital y los intereses sobre bonos u otras obligaciones de la Autoridad o para cualquier otro fin lícito de la Autoridad, con lo que el producto de los impuestos así prendado estará sujeto a ser aplicado primero al pago de intereses y amortización de la deuda pública de acuerdo con las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico si fuera necesario para ello, pero solo en la medida en que los otros ingresos disponibles del ELA cubiertos por dicha Sección 8 sean insuficientes para tal fin" (Resolución de la ACT de 1968, en 2).

- "Forma de Bonos" - "El producto de los impuestos a la gasolina así asignado a la Autoridad por dicha Ley núm. 75 y los demás impuestos, derechos o cargos que la Legislatura de Puerto Rico pueda asignar a la Autoridad están sujetos a ser aplicados primero al pago de intereses y amortización de la deuda pública de acuerdo con las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico si se requiere para tal fin, pero solo en la medida en que otros ingresos disponibles del ELA a que se refiere dicha Sección 8 sean insuficientes para tal fin". (Resolución de la ACT de 1968, en 17).

- "Forma de Bonos" - "El producto de los impuestos sobre la gasolina, el gasoil y el diésel así asignado a la Autoridad por dicha Ley de Arbitrios de Puerto Rico, el producto de las tarifas de licencia así asignado a la Autoridad por dicha Ley de Vehículos y Tránsito de Puerto Rico y los demás impuestos, derechos o cargos que la Legislatura de Puerto Rico haya asignado y pueda asignar a la Autoridad están sujetos a ser aplicados primero al pago de intereses y amortización de la deuda pública de acuerdo con las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico si se requiere para tal fin, pero solo en la medida en que otros ingresos disponibles del ELA a que se refieren dichas Secciones sean insuficientes para tal fin". (Resolución de la ACT de 1968, en 24).

II.     Resolución de la ACT de 1998

El texto sobre los ingresos asignables aparece en cinco lugares: tres veces en los considerandos y dos veces en la "forma de bonos" incluida en la resolución.

- Considerandos - "POR CUANTO, según el Subtítulo B de la Ley núm. 120, aprobada el 31 de octubre de 1994, según enmienda, el producto del impuesto de dieciséis centavos por galón a la gasolina y la mitad del impuesto de ocho centavos por galón al gasoil y el diésel fue asignado a la Autoridad para su uso con fines corporativos y esto autorizó expresamente a la Autoridad a prendar el producto de dichos dieciséis centavos por galón y cuatro centavos por galón de impuesto recibido para el pago del capital y los intereses de los bonos u otras obligaciones de la Autoridad o para cualquier otro fin lícito de la Autoridad, estando sujeto el producto del impuesto así prendado a ser aplicado primero al pago de intereses y amortización de la deuda pública de conformidad con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico si fuera necesario para ello, pero únicamente en la medida en que los demás ingresos disponibles del ELA cubiertos en dicha Sección 8 sean insuficientes para tal fin" (Resolución de la ACT de 1998, en 2).

- Considerandos - "POR CUANTO, según la Ley núm. 9, aprobada el 12 de agosto de 1982, el producto del aumento de $15 por vehículo de las tarifas anuales de licencia de vehículos automotores impuesto por el ELA fue asignado a la Autoridad para su uso con fines corporativos y esto autorizó expresamente a la Autoridad a prendar el producto de dicho aumento de $15 en las tarifas recibidas para el pago del capital y los intereses de los bonos u otras obligaciones de la Autoridad o para cualquier otro fin lícito de la Autoridad, estando sujetas las tarifas de licencia así prendadas a aplicarse primero al pago de intereses y amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico si fuera necesario para ello, pero únicamente en la medida en que otros ingresos disponibles del ELA cubiertos en dicha Sección 8 sean insuficientes para tal fin" (Resolución de la ACT de 1998, en 2-3).

- Considerandos - "POR CUANTO, según la Ley núm. 34, aprobada el 16 de julio de 1997, según enmienda, los primeros $120 millones de ingresos anuales de la contribución pagados por el uso en Puerto Rico de petróleo crudo, petróleos sin terminar o productos finales derivados del petróleo y cualquier otra mezcla de hidrocarburos fueron asignados a la Autoridad para su uso con fines corporativos y esto autorizó expresamente a la Autoridad a prendar el producto de dicho impuesto recibido para el pago del capital y los intereses de los bonos u otras obligaciones de la Autoridad o para cualquier otro fin lícito de la Autoridad, estando sujeto el producto contributivo así prendado a ser aplicado primero al pago y amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico si fuera necesario para ello, pero únicamente en la medida en que otros ingresos disponibles del ELA cubiertos en dicha Sección 8 sean insuficientes para tal fin" (Resolución de la ACT de 1998, en 3).

- "Forma de Bonos" - "El producto de los impuestos sobre el petróleo crudo y productos derivados así asignado a la Autoridad por dicha Ley núm. 34, el producto de los impuestos sobre la gasolina, el gasoil y el diésel así asignado a la Autoridad por dicha Ley núm. 120, el producto

de las tarifas de licencia así asignado a la Autoridad por dicha Ley de Vehículos y Tránsito de Puerto Rico y los demás impuestos, derechos o cargos que la Legislatura de Puerto Rico pueda asignar a la Autoridad están sujetos a ser aplicados primero al pago de intereses y amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico si se requiere para tal fin, pero únicamente en la medida en que otros ingresos disponibles del ELA cubiertos en dicha Sección 8 sean insuficientes para tal fin". (Resolución de la ACT de 1998, en 19).

- "Forma de Bonos" - "El producto de los impuestos sobre el petróleo crudo y productos derivados así asignado a la Autoridad por dicha Ley núm. 34, el producto de los impuestos sobre la gasolina, el gasoil y el diésel así asignado a la Autoridad por dicha Ley núm. 120, el producto de las tarifas de licencia así asignado a la Autoridad por dicha Ley de Vehículos y Tránsito de Puerto Rico y los demás impuestos, derechos o cargos que la Legislatura de Puerto Rico pueda asignar a la Autoridad están sujetos a ser aplicados primero al pago de intereses y amortización de la deuda pública de acuerdo con lo dispuesto en la Sección 8 del Artículo VI de la Constitución de Puerto Rico si se requiere para tal fin, pero únicamente en la medida en que otros ingresos disponibles del ELA cubiertos en dicha Sección 8 sean insuficientes para tal fin". (Resolución de la ACT de 1998, en 24).

AFI – Declaración oficial de fecha 2 de junio de 2005

La referencia a la disposición de ingresos asignables de la Constitución aparece en tres lugares:

- Portada. "Dichos arbitrios federales, sin embargo, están sujetos a ser aplicados primero al pago de la deuda de obligación general y la deuda garantizada por el ELA, si otros ingresos del ELA no son suficientes para ello".

- Declaración Resumida; S-2. "Los arbitrios federales y otros ingresos recibidos del ELA y depositados en el Fondo de Infraestructura están sujetos a ser aplicados primero al pago de la deuda de obligación general y la deuda garantizada por el ELA, si otros ingresos del ELA no son suficientes para ello".

- Página 10. "*Disposiciones para pago previo*. "La Constitución de Puerto Rico establece que la deuda pública del ELA constituye un primer gravamen sobre los impuestos e ingresos disponibles del ELA. La deuda pública incluye bonos y pagarés del ELA a los que se compromete la plena fe, crédito y poder impositivo del ELA y, de acuerdo con las opiniones emitidas por el Secretario de Justicia del ELA, cualquier pago que deba realizar el ELA en virtud de sus garantías de bonos y pagarés emitidos por sus corporaciones públicas. Los Bonos no constituyen deuda pública del ELA.

  Antes de su aplicación para el pago del capital y los intereses de los Bonos, los Ingresos Fiscales Especiales son ingresos disponibles conforme a la Constitución. En consecuencia, si es necesario, están sujetos a ser aplicados primero al pago de la deuda pública del ELA. Sin embargo, en virtud de la Ley Habilitante, esos ingresos deben utilizarse para dichos pagos solo si y en la medida en que todos los demás ingresos disponibles del ELA según la Constitución sean insuficientes para tal fin. El ELA nunca ha utilizado los Arbitrios Federales para la amortización de la deuda pública".

ADCC – Declaración oficial de fecha 16 de marzo de 2006

La referencia a la disposición de ingresos asignables de la Constitución aparece en tres lugares:

- Portada. **"En la medida en que otros ingresos del ELA de Puerto Rico sean insuficientes para pagar las deudas de obligación general y otras deudas garantizadas del ELA, los ingresos por impuestos de ocupación hotelera están sujetos a ser aplicados primero al pago de dichas deudas y obligaciones del ELA antes de que puedan aplicarse para pagar la deuda de los Bonos".**

- Página 2. **"Si los ingresos del ELA son insuficientes para pagar la deuda de obligación general del ELA y la deuda garantizada por el ELA, la Ley del Impuesto sobre la Ocupación establece que, a tenor con las disposiciones de la Sección 8, Artículo VI, de la Constitución del ELA, los ingresos del Impuesto sobre la Ocupación Hotelera están sujetos a ser aplicados primero al pago de dicha deuda de obligación general del ELA o dicha deuda garantizada antes de que puedan aplicarse para pagar la deuda de los Bonos".**

- Páginas 21-22. "La Constitución del ELA establece que la deuda pública del ELA constituye un primer gravamen sobre los impuestos e ingresos disponibles del ELA. La deuda pública incluye bonos y pagarés del ELA a los que se compromete la plena fe, crédito y poder impositivo del ELA y, de acuerdo con las opiniones emitidas por el Secretario de Justicia del ELA, cualquier pago que deba realizar el ELA en virtud de sus garantías de bonos y pagarés emitidos por sus corporaciones públicas. Los Bonos no constituyen deuda pública del ELA.

  Los ingresos del Impuesto sobre la Ocupación Hotelera son ingresos disponibles según la Constitución. En consecuencia, si es necesario, se pueden aplicar primero al pago de la deuda pública del ELA. Sin embargo, en virtud de la Ley Habilitante, la Ley del Impuesto sobre la Ocupación Hotelera y la Constitución del ELA, esos ingresos deben utilizarse para dichos pagos solo si y en la medida en que todos los demás ingresos disponibles del ELA sean insuficientes para tal fin. Las ganancias de inversión y el dinero en el Fondo de Reserva para la Amortización de la Deuda no se consideran recursos disponibles del ELA".

AMA – Acuerdo de Refinanciamiento de fecha 30 de marzo de 2012 y
Enmienda de fecha 4 de septiembre de 2013 que cambia la garantía del impuesto
a los cigarrillos.

- Acuerdo de Refinanciamiento, Sección 3.17 ("Prohibición de inmunidad"): "Siempre y cuando el Prestamista tenga conocimiento de que la recaudación de los Ingresos por Impuestos al Diésel podrá ser anulada por las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico".

- Acuerdo de Refinanciamiento, Sección 18.12 ("Cuentas operativas"): "El Prestatario entregará inmediatamente al Prestamista copias de cualquier notificación recibida de Hacienda, el Banco Gubernamental de Fomento para Puerto Rico o cualquier otra Autoridad Gubernamental que indique la decisión del ELA (o la inminencia de tal decisión) de exigir el cumplimiento del poder de preferencia del ELA sobre los Ingresos por Impuesto al Diésel otorgados al ELA de conformidad con la Sección 8 del Artículo VI de la Constitución del ELA".

- Enmienda, Sección 7.2: "Siempre y cuando el Prestamista tenga conocimiento de que la recaudación de los Ingresos por Impuesto al Cigarrillo podrá ser anulada por las disposiciones de la Sección 8 del Artículo VI de la Constitución del ELA de Puerto Rico".

- Enmienda, Sección 10: "El Prestatario entregará inmediatamente al Prestamista copias de cualquier notificación recibida de Hacienda, el Banco Gubernamental de Fomento para Puerto Rico o cualquier otra Autoridad Gubernamental que indique la decisión del ELA (o la inminencia de tal decisión) de exigir el cumplimiento del poder de preferencia del ELA sobre los Ingresos por Impuesto al Cigarrillo otorgados al ELA de conformidad con la Sección 8 del Artículo VI de la Constitución del ELA".

ELA – Sección 8 del Artículo VI de la Constitución de Puerto Rico: Disposición de ingresos asignables

- Sección 8 del Artículo VI de la Constitución. "En caso de que los recursos disponibles, incluido el superávit de cualquier año fiscal, sean insuficientes para cubrir las asignaciones realizadas para ese año, primero se pagarán los intereses de la deuda pública y su amortización, y posteriormente se realizarán otros desembolsos de acuerdo con el orden de prioridades establecido por la ley".

*Análisis de las recuperaciones por parte de los acreedores si se rechaza el Caso de Título III de los acreedores del Sistema de Retiro de los Empleados de Puerto Rico (SRE)*

El presente análisis evalúa las recuperaciones al alcance de los acreedores del SRE sobre la base de los remedios disponibles en virtud de las leyes diferentes de las de quiebra, incluida la Constitución del Estado Libre Asociado de Puerto Rico. A tenor con la sección 314(b)(6) de PROMESA, un Plan de Ajuste propuesto debe ser "viable y redundar en el mejor interés de los acreedores, lo cual exigirá al tribunal que determine si los remedios disponibles en virtud de las leyes diferentes de las de quiebra y la Constitución del territorio resultarían en una recuperación mayor para los acreedores que la dispuesta en el plan". En este sentido, el presente análisis proporciona un rango estimatorio de las recuperaciones que estarían disponibles para los acreedores si se levantara la paralización de la ejecución de la deuda, no se consumara ningún acuerdo sobre el Plan de Ajuste del SRE y se rechazara el Caso de Título III del SRE.

Este documento consta de dos secciones. La primera sección brinda un resumen de la metodología que se ha seguido a la hora de elaborar el análisis. Dicha metodología resume el enfoque adoptado a la hora de estimar los recursos disponibles para la amortización de la deuda, para estimar las obligaciones pendientes de los acreedores y para analizar la prioridad a tenor con la cual se desembolsan los fondos, así como el orden según el cual se pagan las reclamaciones de los acreedores. La segunda sección presenta el rango probable estimado de recuperaciones disponibles para los acreedores del SRE sobre la base de los recursos identificados.

Este análisis fue elaborado por McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP,[1] asesor jurídico de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "JSAF"), brindó a McKinsey & Company una serie de suposiciones jurídicas utilizadas en la elaboración del presente análisis. Dichas suposiciones figuran en el Apéndice 1 de este documento e incluyen valores estimados relativos a las categorías de los activos del SRE. Los asesores financieros de la JSAF proporcionaron a McKinsey & Company información financiera utilizada en la elaboración de este análisis. Dicha información financiera incluía calendarios que detallaban estimaciones de la deuda pendiente por bonos, así como otros datos financieros. McKinsey & Company también utilizó datos publicados o directamente proporcionados por el Gobierno de Puerto Rico y/o sus asesores.

McKinsey & Company dio por veraz, correcta y adecuada la totalidad de la información jurídica y financiera, así como las suposiciones proporcionadas por Proskauer Rose LLP, otros asesores de la JSAF, el Gobierno de Puerto Rico y sus asesores. McKinsey & Company no ha verificado, de manera independiente, ninguna de las informaciones o suposiciones recibidas de Proskauer Rose LLP, de otros asesores de la JSAF o del Gobierno de Puerto Rico y sus asesores. Tampoco adopta postura independiente alguna en relación con dichas informaciones y suposiciones.

Las suposiciones, previsiones y estimaciones utilizadas en este análisis quedan sujetas, de manera inherente, a incertidumbres de carácter comercial, económico y político, por lo que podrían variar. McKinsey & Company no realiza ninguna declaración ni ofrece garantía alguna de que las recuperaciones reales disponibles o potencialmente realizadas por los acreedores sobre la base de los remedios a su alcance en virtud de cualquiera de las leyes, incluida la Constitución del Estado Libre asociado de Puerto Rico, se vayan a aproximar o no a las estimaciones y suposiciones que figuran en el análisis, por lo que los resultados reales podrían diferir sustancialmente de los que se ofrecen en el presente documento. No obstante, McKinsey & Company

---

[1]   En este análisis, Proskauer Rose LLP es denominada "asesor jurídico de la JSAF".

declara que el rango de recuperaciones identificado en el presente documento constituye su mejor estimación basada en sus conocimientos y en la información que le ha sido proporcionada.

## I.   Metodología

Tras la orientación proporcionada por el asesor jurídico de la JSAF, en este análisis se hace una suposición de que los casos de Título III de PROMESA son rechazados, pero que los Títulos I y II de PROMESA siguen aplicándose. En consecuencia, en el análisis se hace una suposición de que se ha levantado la paralización automática de la ejecución de la deuda y de que la JSAF se mantiene y seguirá certificando los Planes Fiscales del ELA y ejecutando la implementación de los presupuestos, con sujeción a una ejecución de la deuda en exceso del presupuesto que ordenen los tribunales de Puerto Rico. En el análisis también se hace una suposición de que los acreedores iniciarían acciones judiciales contra el ELA y el SRE para recuperar los montos que alegan que se les adeudan.

El análisis se basa en tres componentes para calcular el rango de posibles recuperaciones al alcance de los acreedores: 1) el Paquete de Recursos disponible para satisfacer las obligaciones de los acreedores del SRE, 2) la deuda pendiente y 3) prioridades de distribución de los fondos en relación con la amortización de la deuda.

La fecha de vigencia del análisis es el 30 de junio de 2021 (la "Vigencia"). El porcentaje de la recuperación se calcula al valor actual[2] del monto total que se prevé que sea pagado a los acreedores durante todo el período del análisis como parte del capital total pendiente e intereses no pagados a la fecha de petición del SRE conforme al Título III, el 21 de mayo de 2017 (la "fecha de petición del SRE"). Sobre la base de las conversaciones con los asesores financieros de la JSAF, este análisis contiene una suposición de que la tasa anual de descuento del 5 % es razonable para el cálculo del valor actual de los futuros pagos del capital y los intereses.

**1) Paquete de Recursos**: el monto total de recursos disponibles para pagar las reclamaciones de los acreedores del SRE cada año constituye el Paquete de Recursos del SRE. Equivale a los activos que quedan en el Sistema de Retiro de los Empleados (los "activos del SRE"). Tras la orientación proporcionada por el asesor jurídico de la JSAF, se considera que los bonos del SRE no constituyen un recurso fuera del Título III, lo cual limita sus fuentes de recuperación a su garantía. En consecuencia, solo los activos del SRE que constituyan garantía de los bonos del SRE podrán ser utilizados para pagar a los bonistas del SRE. Los activos del SRE que no constituyan garantía de los bonos del SRE (los "activos no gravados") se asume que están disponibles para reclamaciones no garantizadas.

Hubo un litigio relacionado con activos adicionales que podrían estar disponibles para pagar a los acreedores del SRE. Tras la orientación proporcionada por el asesor jurídico de la JSAF, este análisis solo tiene en cuenta activos en posesión del SRE (según se presenta en el Apéndice 1) como parte del Paquete de Recursos disponible para los acreedores del SRE, ya que el resultado de posibles litigios futuros es incierto. El litigio y los posibles resultados de dichas incertidumbres se comentan al final de este análisis.

Tras la orientación proporcionada por el asesor jurídico de la JSAF, el valor estimado de la garantía de los bonistas del SRE asciende a $ 142 millones. De acuerdo con dicha orientación, determinados activos con una baja probabilidad de constituir garantía de los bonistas (menos de un 15 %) se han excluido del conjunto de garantías para los bonistas del SRE ya que se prevé que las reclamaciones de los bonistas relativas a dichos activos sean eliminadas una vez que se resuelva el litigio en marcha. Para obtener más información sobre la evaluación de la garantía de los bonistas consulte el Apéndice 1. McKinsey & Company ha aceptado estas estimaciones relativas

_____

[2]   Valor actual a la Vigencia del análisis (el 30 de junio de 2021).

a los activos que constituyen garantía de los bonos del SRE y que han sido debidamente proporcionados por el asesor jurídico de la JSAF, pero McKinsey & Company no ha realizado ningún análisis jurídico ni actuarial independiente.

Sobre la base de la orientación proporcionada por los asesores financieros de la JSAF, el valor total de mercado de los activos del SRE a julio de 2020 se estima en $ 1,174 millones y la suposición es que se mantiene en dicho valor a la Vigencia del presente análisis (30 de junio de 2021). La estimación del valor de los activos del SRE excluye montos anteriormente pagados a los bonistas a través de una cuenta segregada anterior a la petición.

**2) Deuda pendiente**: Sobre la base de información proporcionada por los asesores financieros de la JSAF, la deuda total pendiente a la fecha de petición del SRE es de $ 3,169 millones. Como se indica en el Apéndice 1, la deuda pendiente también asume un monto adicional de $ 8 millones correspondientes a reclamaciones no garantizadas.

Dicho análisis no tiene en cuenta obligaciones adeudadas a los jubilados, ya que el ELA asumió dichas obligaciones a tenor con la Ley 106-2017, según se estipula en el Apéndice 1. En la medida en que no se pague de los activos no gravados del SRE, las obligaciones adeudadas a los jubilados se satisfarán en la medida en que se establezca en la versión del ELA de este análisis, lo cual también se incluye en la Declaración de Divulgación.

**3) Prioridades de distribución de los fondos**: Tras la orientación proporcionada por el asesor jurídico de la JSAF, los fondos que constituyen garantía de los bonos del SRE estarán disponibles para pagar a los bonistas del SRE siguiendo el calendario de pagos conforme a lo estipulado en los documentos de bonos del SRE. En primer lugar la suposición será que los fondos se han abonado para satisfacer los intereses acumulados adeudados y a continuación el capital adeudado que venza en ese año o antes (en su caso). El capital no pagado acumulará intereses a tasas inicialmente estipuladas en cada uno de los documentos de deuda pertinentes, y se sumará a la deuda del año siguiente. Los saldos de los intereses no generarán interés.

Tras la orientación proporcionada por el asesor jurídico de la JSAF, los fondos que no constituyan garantía de los bonos del SRE se considerará que se han utilizado para pagar reclamaciones no garantizadas; cualquier activo restante luego de que se hayan pagado las reclamaciones no garantizadas se considerará que se ha transferido al ELA conforme a la Ley 106-2017 que regula las pensiones y los activos del SRE. En consecuencia, en el análisis se estima que $ 1,023 millones de los activos restantes del SRE serán transferidos al ELA al final del Año Fiscal 2022.

El siguiente anexo resume las prioridades de distribución de los fondos basada en la orientación proporcionada por el asesor jurídico de la JSAF en el Apéndice 1.

*Gráfico 1: Flujo de fondos en el análisis*



Las recuperaciones mostradas en la sección siguiente no incluyen pagos adicionales que los bonistas del SRE pueden recibir del ELA si presentan con éxito reclamaciones contra el ELA. Como se explica en el Apéndice 1, los bonistas del SRE podrán presentar una reclamación no garantizada contra el ELA por un monto adeudado y no pagado en cualquiera de los años. Esta reclamación, en la medida en que sea válida (en su caso), se pagaría como parte del conjunto de las reclamaciones no garantizadas del ELA, y seguiría las prioridades y recuperaciones descritas en la versión del ELA de este análisis, que también se incluye en la Declaración de Divulgación.

## II.  Probables recuperaciones estimadas disponibles para los acreedores

Al evaluar el probable rango de recuperaciones disponibles para los bonistas del SRE, este análisis utiliza los fondos estimados que constituyen garantía de los bonos del SRE. Sobre la base de dichos criterios, la recuperación disponible para los bonistas del SRE es de $ 142 millones. Este monto implica un porcentaje de recuperación de un 4 %.[3]

Las reclamaciones no garantizadas ascienden a un total de $ 8 millones. Los recursos disponibles para reclamaciones no garantizadas superan los $ 8 millones, lo que implica una recuperación del 100 %. Los $ 1,023 millones estimados correspondientes a activos no restringidos restantes tras pagar reclamaciones no garantizadas no pueden utilizarse para pagar los bonos del SRE y se considera que se han transferido al ELA. En total, la recuperación disponible tanto para los bonos del SRE como para las reclamaciones no garantizadas es de $ 151 millones,[4] lo cual implica una recuperación total del 5 %.

---

[3] El porcentaje de recuperación se estima como el valor actual del total de la deuda pagada (a la Vigencia; el 30 de junio de 2021) como una proporción del capital total pendiente y los intereses no pagados a la fecha de petición del SRE (21 de mayo de 2017).
[4] El monto hace referencia al valor actual de futuros pagos de la deuda con una tasa anual de descuento del 5 %.

*Gráfico 2: Probables recuperaciones estimadas disponibles para los acreedores del SRE*

**Probables recuperaciones estimadas disponibles
para los acreedores del SRE por clase de la deuda**

Valor actual del pago total en millones de dólares, % de recuperación

| | |
|---|---|
| Bonos del SRE | $142 *5%* |
| Reclamaciones no garantizadas | $5 *100%* |
| Total | $147 *5%* |

### Resultados alternativos basados en un litigio en marcha o riesgo de litigios

El rango de recuperaciones queda sujeto al resultado de un litigio en marcha sobre la dimensión total de reclamaciones válidas y al conjunto de recursos disponibles para la amortización de la deuda. Puesto que el resultado es incierto, dichas sensibilidades no se tienen en cuenta en las recuperaciones arriba mencionadas.

En primer lugar, hubo un litigio en el que se impugnaba la validez de los bonos del SRE conforme a la legislación de Puerto Rico. Si los bonos del SRE fueran declarados inválidos, los bonistas del SRE no recibirían ningún pago desde los activos que actualmente constituyen garantía de los bonos del SRE. Además, es posible que los bonistas del SRE tengan la obligación de devolver pagos que hayan recibido antes de la fecha de petición del SRE; dichos pagos ascienden aproximadamente a un total de $ 400 millones.

En segundo lugar, hubo controversias judiciales sobre si los pagos actuales de los patronos al sistema de pagar en la medida que se avanza (PayGo) en virtud de la Ley 106-2017 deben considerarse el mismo activo que las aportaciones patronales al SRE anteriores a la Ley 106-2017, con sujeción a la garantía prendaria de los bonistas del SRE. Como se explica en el Apéndice 1, en tal caso los bonos del SRE se pagarían antes de los bonos de Obligación General (OG) del ELA y otra deuda garantizada del ELA que esté en igualdad de condiciones (*pari passu*) con los bonos OG porque los bonistas del SRE tendrían un gravamen contra los pagos PayGo. En consecuencia, los bonistas del SRE recibirían plena recuperación de sus reclamaciones ya que los pagos PayGo son superiores a la deuda por bonos del SRE adeudada en cualquiera de los años. Sin embargo, los pagos a los bonistas del SRE procedentes del ELA podrían reducir la capacidad del ELA de cubrir sus gastos de pensiones. El ELA necesitaría reducir sus gastos operativos en otras áreas para poder pagar a los bonistas del SRE y aun así respetar los límites establecidos en el presupuesto anual.

El resultado de este litigio es incierto; en consecuencia, las recuperaciones estimadas basadas en diferentes sensibilidades se muestran abajo. El cuadro muestra las recuperaciones disponibles para los bonistas del SRE

5

suponiendo que varios montos (por ejemplo, 0 %, 25 %, 50 % y 75 %) de las reclamaciones del SRE se considera que están garantizados por los pagos PayGo.[5] Además de los pagos del flujo de pagos PayGo, los bonistas del SRE también recibirían pagos desde los activos del SRE que constituyan garantía de los bonos del SRE.

*Gráfico 3: Probables recuperaciones estimadas disponibles para los acreedores del SRE si determinada deuda por bonos del SRE está garantizada por los pagos PayGo*

**Probables recuperaciones estimadas disponibles para los acreedores del SRE por clase de la deuda si parte de la deuda por bonos anual del SRE es clasificada como garantizada por los pagos PayGo**

Valor actual del pago total en millones de dólares, % de recuperación

| | | |
|---|---|---|
| **Bonos del SRE** | 0% de la deuda anual garantizada | $142 *5%* |
| | 25% de la deuda anual garantizada | $1,341 *42%* |
| | 50% de la deuda anual garantizada | $2,540 *80%* |
| | 75% de la deuda anual garantizada | $3,739 *100%* |
| **Reclamaciones no garantizadas¹** | | $5 *100%* |

1 La recuperaciones de reclamaciones no garantizadas es el 100% ya que dichas reclamaciones se pagan en su totalidad con los activos no gravados

---

[5] En el cálculo se asume que una parte (por ejemplo, 0 %, 25 %, 50 % y 75 %) del capital total y los intereses adeudados en cualquiera de los años (sobre la base del calendario de la deuda del SRE) está garantizada por los pagos PayGo. Las recuperaciones se calculan como el valor actual del total de la deuda pagada (a la Vigencia; el 30 de junio de 2021) como una proporción del capital total pendiente y los intereses no pagados a la fecha de petición del SRE (21 de mayo de 2017).

*APÉNDICE 1*

**Plan de Título III del SRE**

**Análisis de prueba del mejor interés: suposiciones**

| | Pregunta | Suposición |
|---|---|---|
| 1. | **Existencia de PROMESA/Junta:** ¿deben aplicarse, o considerarse que se aplican, los Títulos I y II de PROMESA? | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]:** los Títulos I y II de PROMESA se aplican. La paralización automática no se aplica. La Junta se mantiene, certifica y ejecuta los planes fiscales y los presupuestos. Los acreedores pueden obtener sentencias en relación con la totalidad de las reclamaciones vencidas. Una vez que los acreedores OG (incluidos los acreedores que posean reclamaciones garantizadas del ELA) hayan obtenido sentencias, podrán reclamar todos los "recursos disponibles" y negociar/litigar con el ELA sobre qué cantidad de los recursos disponibles puede aplicarse a los gastos operativos a tenor con el poder del estado. El único recurso que tendrán los acreedores que no sean de OG ni garantizados del ELA será esperar a las asignaciones legislativas de los montos para pagar sus reclamaciones una vez que las OG se hayan pagado en su totalidad.

**FUNDAMENTO:** la referencia a "leyes diferentes de la de quiebra" en la sección 314(b)(6) de PROMESA incluiría los Títulos I y II de PROMESA. No habría ninguna paralización automática a tenor con las leyes diferentes de las de quiebra. Ni el plan fiscal ni el presupuesto liberan de reclamaciones o acciones de paralización. En consecuencia, tanto el plan fiscal como el presupuesto, en tanto que leyes diferentes de las de quiebra, serían de aplicación y la Junta de Supervisión seguiría existiendo para aplicarlas. Es posible que sus limitaciones implícitas (esto es, montos presupuestados) no limiten la cantidad que los acreedores puedan cobrar al hacer valer sus reclamaciones. Esto dependerá de la medida en la que el poder del estado impida a los acreedores OG recibir la totalidad de los recursos disponibles. Los acreedores que no sean de OG invocan asignaciones legislativas para sus pagos. El plan fiscal certificado limitaría las cantidades que puedan ser asignadas a la amortización de la deuda, con sujeción a los derechos de los acreedores OG a ejercer sus derechos a tenor con el Artículo VI, Secciones 6 y 8, de la Constitución del Estado Libre Asociado de Puerto Rico para interceptar recursos disponibles.

**SUPOSICIÓN 2 [RIESGO DE LITIGIOS]:** los Títulos I y II de PROMESA no se aplican. La paralización automática no se aplica. La Junta no existe y no hay planes fiscales ni presupuestos certificados.

**FUNDAMENTO:** la suposición de que los Títulos I y II de PROMESA siguen aplicándose incrementa la recuperación de los acreedores debido a las medidas y los ahorros que la Junta de Supervisión introduce en sus planes fiscales certificados. Según los asesores jurídicos de la Junta de Supervisión, es posible que los Títulos I y II no se apliquen ya que el Congreso los aprobó junto con el Título III y no queda claro si la intención era que continuaran en vigencia sin el Título III. Sin embargo, los asesores jurídicos recomendaron al final que el presente análisis se realice como si los Títulos I y II de PROMESA continuaran aplicándose. |

| | Pregunta | Suposición |
|---|---|---|
| **2.** | **¿Reclamaciones de los bonistas del SRE contra los activos a la fecha de petición del SRE?** | **SUPOSICIÓN 1**: los bonistas del SRE tienen una garantía prendaria sobre determinados activos restantes del SRE (véase el cuadro abajo) y cobran únicamente desde dichos activos. Las reclamaciones por cobrar del SRE contra el ELA reciben un tratamiento de obligaciones no garantizadas del ELA. |

Se estima que el valor total en los libros de los activos del SRE es de $ 1,069 millones a julio de 2020. El análisis llevado a cabo por los asesores jurídicos de la Junta de Supervisión y por un experto de la JSAF en relación con el procedimiento de sentencia sumaria sobre el alcance de Gravamen identificó la garantía de los bonistas, a tenor con el resumen que se proporciona en el cuadro de abajo. Dichos activos se muestran a la fecha de petición del SRE, por lo que no incluyen la totalidad de los activos del SRE conocidos a día de hoy.

Se parte de la base de que la diferencia entre el total de los activos del SRE y los activos identificados como garantía de los bonistas queda disponible para ser distribuida a titulares de reclamaciones no garantizadas. Cualquier activo no utilizado para pagar a los bonistas y para pagar las reclamaciones no garantizadas se presume transferido al ELA conforme a la Ley 106-2017.

**FUNDAMENTO**: aunque el Tribunal del Primer Circuito determinó que los bonistas del SRE poseen una garantía prendaria sobre determinados activos del SRE, constituida mediante la presentación de estados financieros, en la decisión no se determina qué activos quedan gravados por la garantía prendaria. Los bonos del SRE no quedan sujetos a interposición de ningún recurso y los bonistas carecen de legitimación en relación con los activos sobre los que no posean garantía prendaria.

**SENSIBILIDAD**: activos a la fecha de petición del SRE

| Categoría de activos | Valor en los libros a la fecha de petición (salvo indicación en contrario) de acuerdo con el análisis realizado por el experto de la JSAF | Probabilidad de valor en los libros de los activos objeto de garantía de los bonistas |
|---|---|---|
| Cuentas por cobrar de aportaciones patronales (del ELA, el CRIM y determinadas | $ 85.6 millones, incluidos $ 31.3 millones del ELA, $ 11.7 millones de los municipios pagados por el CRIM y $ 42.6 millones de | 100 % <br><br> Las aportaciones patronales acumuladas antes de la fecha de petición del SRE como resultado del trabajo de los empleados, y no pagadas hasta la fecha, constituyen el derecho a recibir rentas a tenor con los documentos de los bonos y, por tanto, quedan sujetas a la garantía prendaria sobre los activos del SRE anteriores a la petición. |

| | | | corporaciones públicas | |
|---|---|---|---|---|

| | Pregunta | Suposición | | |
|---|---|---|---|---|
| | | instrumental idades) | por las que el ELA es responsable[1,2] | |
| | | Aportaciones Uniformes Adicionales (AUA), cuentas por cobrar | $ 716.8 millones, incluidos $ 545.7 millones del ELA, $ 36.9 millones de los municipios y $ 134,2. millones de corporaciones públicas[3] | 10 %<br><br>Las AUA se realizaron a tenor con las secciones de la Ley Habilitadora diferentes que aquellas en virtud de las cuales los bonistas del SRE tenían una garantía prendaria, de manera que los bonistas del SRE carecen de legitimación con respecto a dichas AUA. El dictamen emitido por el Tribunal del Primer Circuito a tenor con la Sección 552 avala este argumento. Además, no se trata de ingresos garantizados relativos a los derechos de ninguno de los bonistas. |
| | | Préstamos a los empleados y cobros | $ 24.2 millones | 15 %<br><br>Los pagos realizados sobre Préstamos a Empleados no se efectuaron a tenor con ninguna de las secciones de la Ley Habilitadora conforme a las cuales los bonistas del SRE tienen una garantía prendaria. La Resolución tampoco proporciona a los bonistas garantía prendaria sobre los Préstamos a Empleados. En la medida en que los Préstamos a Empleados se hayan realizado con las Aportaciones Patronales, es posible que algunos sean localizables, en cuyo caso tales ingresos podrían considerarse ingresos relativos a la garantía de los bonistas. |
| | | Ingresos de inversiones y | $ 7.9 millones | 15 % |

---

[1] Las cuentas por cobrar al ELA podrían quedar sujetas a compensación.

[2] Los bonistas del SRE han alegado una garantía prendaria sobre los pagos PayGo realizados a tenor con la Ley 106-2017. Incluso si esto fuera así, los pagos PayGo serían propiedad adquirida con posterioridad a la fecha de petición del SRE y, por tanto, estarían libres de cualquier garantía prendaria anterior a la petición a tenor con la sección 552 del Código de Quiebras, aplicable en virtud de la sección 301(a) de PROMESA, como lo ha concluido el Tribunal de Apelaciones del Primer Circuito. No obstante, fuera del Título III la sección 552 no es de aplicación. En consecuencia, los pagos PayGo al ELA podrían quedar sujetos a su garantía prendaria si se consideran aportaciones patronales al SRE anteriores a la Ley 106. Sin embargo, esto resultaría en una reclamación garantizada contra el ELA, como se explica abajo.

[3] Las AUA por cobrar al ELA podrían quedar sujetas a compensación.

4

| | Pregunta | | | Suposición |
|---|---|---|---|---|
| | | distribución | | Las Inversiones no quedan sujetas a ninguna de las secciones de la Ley Habilitadora conforme a las cuales los bonistas del SRE tienen una garantía prendaria. La Resolución tampoco proporciona a los bonistas garantía prendaria sobre las Inversiones. En la medida en que las Inversiones se hayan realizado con las Aportaciones Patronales, es posible que algunas sean localizables, en cuyo caso tales ingresos podrían considerarse ingresos relativos a la garantía de los bonistas. |
| | | Efectivo de los Fondos Liberados | $ 37.4 millones | 10 %<br><br>Los bonistas autorizaron a liberar su garantía prendaria sobre dichos fondos. |
| | | Efectivo de los cobros de las AUA | $ 74.1 millones | 10 %<br><br>Como se explicó anteriormente, las AUA no quedan sujetas a la garantía prendaria de los bonistas. |
| | | Efectivo localizable que lleva a Aportaciones Patronales | $ 56.8 millones | 100 % |
| | | Bonos en posesión de COFINA | $ 66.0 millones (por balance al 31 de mayo de 2017) | 10 %<br><br>La fuente del dinero utilizado para comprar los bonos de COFINA se transfirió de la AFI y se asignó específicamente para comprar los bonos de COFINA. |
| | | | | |
| 3. | ¿Reclamaciones de los bonistas del SRE contra el ELA? | | | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]:** los bonistas del SRE alegan con éxito reclamaciones constitucionales (Incautaciones o Cláusulas Contractuales) contra el ELA. En cada año en el que su amortización de la deuda no sea pagada, los bonistas del SRE podrán reclamar dicho monto al ELA como una reclamación no garantizada pagada luego de la deuda OG y *pari passu*. |

| | Pregunta | Suposición |
|---|---|---|
| | | **FUNDAMENTO**: los bonistas del SRE se apoyan en la Ley 106-2017, la cual eliminó aportaciones patronales a tenor con la ley para crear el SRE, afectó a los derechos contractuales y causó la incautación de su garantía, lo cual supuso un incumplimiento de las Constituciones del Estado Libre Asociado de Puerto Rico y de Estados Unidos. Además, la sección 552, que eliminó la garantía prendaria sobre las aportaciones patronales surgidas después de la fecha de petición del SRE de manera independiente del efecto de la Ley 106, lo más probable es que ya no sea de aplicación tras la desestimación del caso de Título III del SRE, lo cual convertiría a la Ley 106 en el único fundamento para eliminar su garantía y, por ende, supondría un incumplimiento de las Cláusulas Contractuales o de Incautación.

**SUPOSICIÓN 2 [RIESGO DE LITIGIOS]**: los bonistas del SRE poseen una garantía prendaria sobre futuras aportaciones patronales, y los pagos PayGo se consideran equivalentes a las Aportaciones Patronales o ingresos procedentes de estas, por lo que los bonistas del SRE poseen reclamaciones garantizadas contra el ELA que están garantizadas por una garantía prendaria sobre los pagos PayGo. Su amortización de la deuda, incluido el capital pendiente y los intereses, se paga antes de la deuda OG o del ELA garantizada.

Hay que partir de la base de que las reclamaciones garantizadas contra las aportaciones patronales tienen una posibilidad de éxito de un 0 %, 25 %, 50 %, 75 % y 100 %.
Si el ELA incurre en un déficit antes de que los bonos del SRE sean pagados en su totalidad, supongamos que el ELA puede justificar el uso del poder del estado para pagar la totalidad de sus gastos, incluidas las pensiones, y que no queda ningún dinero para pagar los bonos del SRE u otras deudas.

**FUNDAMENTO**: los bonistas del SRE han alegado que los Pagos PayGo son el mismo activo que las aportaciones patronales, o ingresos de las mismas, por lo que quedan sujetos a la garantía prendaria de los bonistas del SRE, lo cual convierte a estos últimos en acreedores garantizados del ELA. También es probable que aleguen que dicha garantía prendaria, aunque haya sido eliminada por la sección 552 llegada la fecha de petición del SRE, sería reconstituida tras la desestimación del caso de Título III del SRE.

**SUPOSICIÓN 3 [RIESGO DE LITIGIOS]**: los bonistas del SRE no tienen reclamaciones contra el ELA.

**FUNDAMENTO**: Incluso si los bonistas del SRE tuvieran una garantía prendaria sobre futuros derechos a aportaciones, los bonistas recibieron un aviso mediante una declaración de oferta de los bonos de que dichos derechos podrían ser modificados o verse afectados negativamente por el ELA, cosa que hizo la Ley 106-2017 al eliminar todas las aportaciones patronales al SRE. El hecho de que los bonistas del SRE hayan sido advertidos de dichas modificaciones potenciales también podría reducir drásticamente sus posibilidades de alegar con éxito |

reclamaciones por afectación contractual o incautación. Además, la prueba del mejor interés debe suponer que los derechos y remedios de los bonistas están vinculados con sus reclamaciones tal como estas existían inmediatamente antes de la hipotética desestimación del caso del SRE y no ajustadas en virtud del plan del SRE, esto es, garantizadas únicamente por las aportaciones patronales surgidas antes de la fecha de petición del SRE, y no después, como resultado del dictamen emitido conforme a la Sección 552.

| | Pregunta | Suposición |
|---|---|---|
| | | En consecuencia, los bonistas del SRE no tenían derechos contractuales ni garantías que hayan sido afectados o eliminados a tenor con la Ley 106. |
| 4. | ¿Reclamaciones de los pensionados contra el SRE y/o el ELA? | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]**: los pensionados poseen una reclamación contra el SRE y el ELA, de manera conjunta, por sus pensiones, que se pagará por el ELA a tenor con la Ley 106-2017. <br><br> **FUNDAMENTO**: el SRE es responsable por los pagos a los pensionados, y estos últimos tienen una reclamación por sus pensiones contra el SRE, con sujeción a la limitación de que los pensionados no pueden cobrar más del monto total de la combinación del SRE y el ELA. No obstante, la Ley 106 exige que el SRE transfiera sus activos al ELA para financiar el sistema de pensiones "pagar en la medida que se avanza ('pay-as-you-go' o 'PayGo', como abreviación en inglés)". De manera que o los pensionados cobran de la totalidad de los activos no gravados del SRE (ya que los bonos no quedan sujetos a interposición de ningún recurso ni tienen ninguna reclamación por garantía insuficiente pagadera de dichos activos), o bien esos activos no gravados se transfieren al ELA para pagar pensiones a través del sistema PayGo. En todo caso, los activos del SRE que constituyan garantía para pagar los bonos del SRE serán utilizados para pagar los bonos del SRE. <br><br> **SUPOSICIÓN 2 [RIESGO DE LITIGIOS]**: los pensionados solo poseen una reclamación contra el ELA por recortes (en su caso) de sus pensiones. <br><br> **FUNDAMENTO**: a tenor con lo dispuesto por la Ley 106, el ELA asumió la responsabilidad de pagar los beneficios de pensiones. En consecuencia, el SRE fue liberado de toda obligación de pagar pensiones, por lo que las reclamaciones de los jubilados deben alegarse contra el ELA como cesionario de las obligaciones de pagar pensiones. |
| 5. | ¿Tienen derecho los bonistas del SRE a acelerar el pago de sus bonos? | **SUPOSICIÓN**: no, los bonos del SRE no permiten aceleración. |
| 6. | ¿Deben los intereses sobre la deuda que quedó impagada durante la paralización generar intereses adicionales? | **SUPOSICIÓN**: supongamos que en los años en los que no se realice el pago completo de la deuda vencida, los pagos posteriores se efectúan primero en concepto de intereses y después en el de capital. <br><br>     i. **Intereses sobre la deuda del SRE durante la paralización**: a tenor con la sección 303 de PROMESA, durante una moratoria los intereses siguen acumulándose a la tasa contractual, salvo que el contrato subyacente establezca intereses de demora, en cuyo caso serán de aplicación estos últimos. No existe ninguna disposición legal que regule los intereses sobre los intereses. |

| | Pregunta | Suposición |
|---|---|---|
| | | ii. **Intereses sobre reclamaciones no garantizadas durante la paralización**: supongamos que no se generan intereses.<br><br>iii. **Intereses sobre la deuda no pagada**: supongamos que cualquier deuda no pagada genera intereses de acuerdo con la tasa media ponderada al año 2020 (proporcionada por Citi).<br><br>iv. **Intereses sobre intereses**: no. La legislación de Puerto Rico permite en determinadas circunstancias el pago de intereses sobre intereses vencidos; por ejemplo, si las partes así lo han acordado. Sin embargo, la Resolución no permite generar intereses sobre intereses vencidos. |
| 7. | **¿Otras reclamaciones por litigios?** | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]**: una reclamación *ultra vires* de que los bonos del SRE fueron emitidos sin autorización carece de fundamento.<br><br>**SUPOSICIÓN 2 [RIESGO DE LITIGIOS]**: una reclamación *ultra vires* elimina las reclamaciones restantes por bonos, aunque los bonistas conservan los pagos que se les hayan efectuado hasta la fecha.<br><br>**SUPOSICIÓN 3 [RIESGO DE LITIGIOS]**: una reclamación *ultra vires* elimina las reclamaciones restantes por bonos, y los bonistas deben devolver aproximadamente $ 400 millones de pagos que se les hayan efectuado como se alega en la demanda presentada por el comité especial de reclamaciones de la JSAF. |

**ESTRUCTURA  DE LA DEUDA**[4]

1. **Costo operativo**
   a. Entre $ 25 millones  y $ 67 millones  al año, según lo previsto en el Plan Fiscal del ELA para el año 2021

2. **Deuda del SRE**
   a. Saldo de los Bonos Prioritarios (Senior) de Financiamiento de Pensiones a la fecha de petición: $3,168,698,777

3. **Otras reclamaciones no garantizadas**
   a. Reclamaciones por litigios:  $1,186,101
   b. Cuentas a pagar comerciales: $59,571
   c. Reclamación por indemnización: $5,769,552
   d. Reclamaciones de la clase de conveniencia: $1,093,821
   e. Reclamaciones varias: $53,840

---

[4] La información financiera contenida en el presente documento se basa en la información disponible en los estados financieros más  recientes publicados y, en algunos casos, en la información recibida de los asesores de la Junta de Supervisión y los asesores del ELA. Los asesores jurídicos no realizan ninguna declaración sobre la exactitud de la información financiera proporcionada en el presente documento.

***Análisis de las recuperaciones por parte de los acreedores si el Caso de Título III es desestimado para
los acreedores de la Autoridad de Edificios Públicos de Puerto Rico (AEP)***

El presente análisis evalúa las recuperaciones al alcance de los acreedores de la AEP sobre la base de los
remedios disponibles en virtud de las leyes diferentes de las de quiebra, incluida la Constitución del Estado
Libre Asociado de Puerto Rico. A tenor con la sección 314(b)(6) de PROMESA, un Plan de Ajuste
propuesto debe ser "viable y redundar en el mejor interés de los acreedores, lo cual exigirá al tribunal que
determine si los remedios disponibles en virtud de las leyes diferentes de las de quiebra y la Constitución
del territorio resultarían en una recuperación mayor para los acreedores que la dispuesta en el plan". En este
sentido, el presente análisis proporciona un rango estimatorio de las recuperaciones que estarían disponibles
para los acreedores si se levantara la paralización de la ejecución de la deuda, no se consumara ningún
acuerdo sobre el Plan de Ajuste y se rechazara el Caso de Título III de la AEP.

Este documento consta de dos secciones. La primera sección brinda un resumen de la metodología que se
ha seguido a la hora de elaborar el análisis. Dicha metodología resume el enfoque adoptado a la hora de
estimar los recursos disponibles para la amortización de la deuda, para estimar las obligaciones pendientes
de los acreedores y para analizar la prioridad a tenor con la cual se desembolsan los fondos, así como el
orden según el cual se pagan las reclamaciones de los acreedores. La segunda sección presenta el rango
probable estimado de recuperaciones disponibles para los acreedores de la AEP sobre la base de los recursos
identificados.

Este análisis fue elaborado por McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey &
Company"). Proskauer Rose LLP y O'Neill & Borges LLC,[1] asesores jurídicos de la Junta de Supervisión
y Administración Financiera para Puerto Rico (la "JSAF"), brindó a McKinsey & Company una serie de
suposiciones jurídicas utilizadas en la elaboración del presente análisis. Dichas suposiciones figuran en el
Apéndice 1 de este documento. Los asesores financieros de la JSAF proporcionaron a McKinsey &
Company información financiera utilizada en la elaboración de este análisis. Dicha información financiera
incluía calendarios que detallaban estimaciones de la deuda pendiente por bonos, previsiones de saldos en
efectivo, así como otros datos financieros. McKinsey & Company también utilizó datos publicados o
directamente proporcionados por el Gobierno de Puerto Rico y/o sus asesores.

McKinsey & Company dio por veraz, correcta y adecuada la totalidad de la información jurídica y
financiera, así como las suposiciones proporcionadas por Proskauer Rose LLP, O'Neill & Borges LLC,
otros asesores de la JSAF, el Gobierno de Puerto Rico y sus asesores. McKinsey & Company no ha
verificado, de manera independiente, ninguna de las informaciones o suposiciones recibidas de Proskauer
Rose LLP, O'Neill & Borges LLC, de otros asesores de la JSAF o del Gobierno de Puerto Rico y sus
asesores. Tampoco adopta postura independiente alguna en relación con dichas informaciones y
suposiciones.

Las suposiciones, previsiones y estimaciones utilizadas en este análisis quedan sujetas, de manera inherente,
a incertidumbres de carácter comercial, económico y político, por lo que podrían variar. McKinsey &
Company no realiza ninguna declaración ni ofrece garantía alguna de que las recuperaciones reales
disponibles o potencialmente realizadas por los acreedores sobre la base de los remedios a su alcance en
virtud de cualquiera de las leyes, incluida la

---

[1] En este análisis, Proskauer Rose LLP y O'Neill & Borges LLC se denominarán conjuntamente "asesores jurídicos de la JSAF".

Constitución del Estado Libre asociado de Puerto Rico, se vayan a aproximar o no a las estimaciones y suposiciones que figuran en el análisis, por lo que los resultados reales podrían diferir sustancialmente de los que se ofrecen en el presente documento. No obstante, McKinsey & Company declara que el rango de recuperaciones identificado en el presente documento constituye su mejor estimación basada en sus conocimientos y en la información que le ha sido proporcionada.

## I. Metodología

Tras la orientación proporcionada por los asesores jurídicos de la JSAF, en este análisis se hace una suposición de que los casos de Título III de PROMESA son rechazados, pero que los Títulos I y II de PROMESA siguen aplicándose. En consecuencia, en el análisis se hace una suposición de que se ha levantado la paralización automática de la ejecución de la deuda y de que la JSAF se mantiene y seguirá certificando los Planes Fiscales del ELA y ejecutando la implementación de los presupuestos, con sujeción a una ejecución de la deuda en exceso del presupuesto que ordenen los tribunales de Puerto Rico. En el análisis se hace una suposición de que los acreedores iniciarían acciones judiciales contra la AEP para recuperar los montos que alegan que se les adeudan.

El análisis se basa en las previsiones de ingresos y gastos contenidas en el Plan fiscal Certificado del ELA para el año 2021. El análisis se basa en tres componentes para calcular posibles recuperaciones al alcance de los acreedores de la AEP: 1) el Paquete de Recursos disponible para satisfacer las obligaciones de los acreedores de la AEP, 2) la deuda pendiente y 3) prioridades de distribución de los fondos en relación con la amortización de la deuda.

La fecha de vigencia del análisis es el 30 de junio de 2021 (la "Vigencia"). El porcentaje de la recuperación se calcula al valor actual[2] del monto total que se prevé que sea pagado a los acreedores durante todo el período del análisis como parte del capital pendiente e intereses no pagados a la fecha de petición de la AEP conforme al Título III, el 27 de septiembre de 2019 (la "fecha de petición de la AEP"). Sobre la base de las conversaciones con los asesores financieros de la JSAF, este análisis contiene una suposición de que la tasa anual de descuento del 5 % es razonable para el cálculo del valor actual de los futuros pagos del capital y los intereses.

**1) Paquete de Recursos**: el monto total de recursos disponibles para pagar las reclamaciones de los acreedores de la AEP cada año constituye el Paquete de Recursos de la AEP. El Paquete de Recursos anual es la suma de los fondos en efectivo disponibles inicialmente para la amortización de la deuda y recibos de alquiler de la AEP luego de pagar gastos operativos.[3]

Sobre la base de la sección correspondiente a las "Cuentas de Efectivo de los Deudores" de la Declaración de Divulgación, el saldo de efectivo de la AEP a diciembre de 2020 era de $ 114 millones. Del saldo total, $ 87 millones son considerados

---

[2] Valor actual a la Vigencia del análisis (el 30 de junio de 2021).

[3] Los bonistas de la AEP podrían recibir pagos adicionales del ELA ya que los bonos de la AEP están garantizados por el ELA. Sin embargo, el presente análisis se limita a lo que la AEP pueda pagar a sus acreedores. Cualquier posible pago adicional procedente del ELA se calcula en la versión del ELA de este análisis, el cual también se incluye en la Declaración de Divulgación. Los bonistas de la AEP no pueden cobrar más que el pago completo de la amortización de la deuda contractual en cualquiera de los años de la combinación de la AEP y el ELA.

no restringidos y disponibles para la amortización de la deuda.[4,5] Este análisis parte de la base de que el monto correspondiente al efectivo no restringido se mantiene sin variar al 30 de junio de 2021, ya que en el Plan Fiscal no se prevé que la AEP genere ningún superávit en el Año Fiscal 2021.

Tras la orientación proporcionada por los asesores jurídicos de la JSAF, los recibos de alquiler de la AEP están disponibles para los bonistas de la AEP luego de pagar los gastos operativos de la AEP. Como se indica en el Apéndice 1, este análisis parte de la base de que la AEP utilizará todos los recibos de alquiler para pagar primero sus gastos operativos y así mantener sus actividades. Ningún otro activo (por ejemplo, el seguro o los ingresos de FEMA) se da por disponible para los pagos a los bonistas.

Como se indica en el Plan Fiscal, los gastos operativos totales de la AEP se integran por las nóminas de la AEP y los gastos de su personal, pagos relativos al mantenimiento y suministros públicos, así como gastos de capital. Los gastos operativos de la AEP también incluyen aportaciones anuales de retiro al sistema PayGo. Las previsiones relativas a grupos de gastos toman en consideración el impacto estimado de las medidas fiscales que figuran en el Plan Fiscal. Las medidas fiscales constituyen una serie de acciones concebidas para reducir los gastos de la AEP y optimizar sus operaciones.

**2) Deuda pendiente**: La deuda total que poseen los acreedores de la AEP y que se examina en este análisis es la suma de la deuda por bonos de la AEP más el total de reclamaciones no garantizadas contra la AEP. En lo que respecta a los bonos de la AEP, la JSAF inició un litigio en el que impugna la validez de los bonos de la AEP emitidos a partir de 2012 (inclusive), ya que dichos bonos podrían haber sido emitidos más allá del límite establecido por la Constitución del Estado Libre Asociado de Puerto Rico. Tras la orientación proporcionada por los asesores jurídicos de la JSAF, este análisis parte de la base de que los bonos de la AEP emitidos a partir de 2012 (inclusive) son declarados inválidos.

Sobre la base de los datos proporcionados por los asesores financieros de la JSAF y excluyendo los bonos emitidos a partir de 2012 (inclusive), la deuda por los bonos de la AEP se integra por la deuda pendiente de los Bonos de Renta de Entidades Gubernamentales y Bonos de Refinanciamiento, con un saldo total de capital pendiente e intereses impagados de $ 4,323 millones a la Vigencia de este análisis. El total de capital e intereses impagados a la fecha de petición de la AEP es de $ 3,424 millones y $ 572 millones, respectivamente. El saldo correspondiente al total de las reclamaciones no garantizadas contra la AEP se estima en $ 447 millones.

Como se indica en el Apéndice 1, existe un riesgo de litigios adicional en relación con la validez de determinados bonos de la AEP. El Comité de Titulares de Reclamaciones no Garantizadas (el "UCC", por sus siglas en inglés) estatutario ha impugnado la validez de los bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) alegando que incumplen el límite constitucional de la deuda. El impacto potencial de este litigio sobre las recuperaciones se explica en la sección "Resultados alternativos basados en un litigio en marcha o riesgo de litigios".

**3) Prioridades de distribución de los fondos**: Los bonistas de la AEP cobran de los fondos en efectivo inicialmente disponibles para la amortización de la deuda y de los recibos de alquiler de la AEP disponibles luego de pagar gastos operativos. Las

---

[4]   Este análisis toma en cuenta el total del saldo en efectivo al 31 de diciembre de 2020 y solo excluye el monto que fue clasificado expresamente como legalmente restringido. En consecuencia, las categorías "sin revisar", "no concluyente" y "dado por no disponible" que figuran en el análisis relativo a las Cuentas de Efectivo de los Deudores de la Declaración de Divulgación son consideradas no restringidas en el presente análisis.

[5]   Sobre la base de la sección de Cuentas de Efectivo de los Deudores de la Declaración de Divulgación, el total del saldo en efectivo no restringido disponible para la amortización de la deuda excluye los $ 18 millones de fondos relativos al reembolso de intereses del IRS que se pagó por error a la AEP. Tras la resolución relativa al reembolso de intereses, se prevé que dicho monto sea transferido de la AEP a la entidad destinataria pertinente.

reclamaciones no garantizadas se pagan con el monto correspondiente a los fondos en efectivo iniciales que no estén pignorados a los bonos de la AEP, monto que se da por $ 0 sobre la base de los datos proporcionados por los asesores financieros de la JSAF. Cualquier monto en efectivo que quede luego de pagar la deuda por bonos de la AEP adeudada en cualquiera de los años será utilizado para pagar reclamaciones no garantizadas.

Tras la orientación proporcionada por los asesores jurídicos de la JSAF, en primer lugar la suposición será que los fondos se han abonado para satisfacer los intereses acumulados adeudados y a continuación el capital adeudado que venza en ese año o antes (en su caso). El capital no pagado acumulará intereses a tasas inicialmente estipuladas en cada uno de los documentos de bonos pertinentes, y se sumarán a la deuda del año siguiente. Los saldos de los intereses no generarán interés.

Tras la orientación proporcionada por los asesores jurídicos de la JSAF que figura en el Apéndice 1, los fondos disponibles para los bonistas de la AEP son distribuidos según se muestra en el siguiente gráfico.

*Gráfico 1: flujo de fondos en el análisis*



Este análisis no toma en consideración ningún pago adicional que los bonistas de la AEP pudieran recibir del ELA, dado que el análisis se limita a lo que la propia AEP paga a sus bonistas. Tras la orientación proporcionada por los asesores jurídicos de la JSAF, los bonos de la AEP cuentan con una garantía del ELA, por lo que tendrían derecho a solicitar pagos del Paquete de Recursos del ELA si sus obligaciones no son pagadas en su totalidad por la AEP en cualquiera de los años. Dichos pagos se efectuarían a tenor con las prioridades y recuperaciones descritas en el documento "Análisis de las recuperaciones de los acreedores si el Caso de Título III es desestimado para los acreedores del estado Libre Asociado de Puerto Rico", el cual también se incluye en la Declaración de Divulgación.

## II.   Probable rango estimado de recuperaciones disponibles para los acreedores

Siguiendo la prioridad de distribución de los fondos anteriormente mencionados, en este análisis se estima que la probable recuperación disponible para los bonistas de la AEP es de $ 258 millones[6] según el "caso base", lo cual implica una recuperación del 6 %.[7] Sobre la base de dicho análisis, las reclamaciones no garantizadas no recibirán ninguna recuperación. En consecuencia, el total de la probable recuperación estimada (esto es, los bonos de la AEP dados por válidos y las reclamaciones no garantizadas) asciende a los $ 258 millones, lo cual implica una recuperación del 6 % del total de las reclamaciones. Dichas recuperaciones solo toman en cuenta bonos de la AEP emitidos antes de 2012, dado que el presente análisis parte de la base de que los bonos de la AEP emitidos a partir de 2012 (inclusive) son declarados inválidos.

*Gráfico 2: probables recuperaciones estimadas disponibles para los bonos de la AEP si los bonos emitidos a partir de 2012 (inclusive) son declarados inválidos*

**Recuperaciones estimadas disponibles para los acreedores de la AEP por clase de la deuda si los bonos emitidos a partir de 2012 (inclusive) son declarados inválidos**
Valor actual del pago total en millones de dólares, % de recuperación

| | |
|---|---|
| Bonos de la AEP | $258 *6%* |
| Reclamaciones no garantizadas | $0 *0%* |
| Total | $258 *6%* |

***Resultados alternativos basados en un litigio en marcha o riesgo de litigios***

El probable rango estimado de recuperaciones disponible para los acreedores de la AEP queda sujeto al resultado de un litigio en marcha sobre la dimensión total de reclamaciones válidas, a tenor con el resumen que figura en el Apéndice 1. El impacto de determinados resultados potenciales de litigios sobre la recuperación por parte de los acreedores se analiza en los escenarios que figuran abajo.

### i. *Escenario 1: Se parte de la base de que los bonos de la AEP emitidos a partir de marzo de 2011 se consideran inválidos*

El UCC ha impugnado la validez de los bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) alegando que incumplen el límite constitucional de la deuda. En este escenario se evalúa el impacto sobre las recuperaciones si los bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) son declarados inválidos. Sobre la base de los datos proporcionados por los asesores financieros y excluyendo los bonos de la AEP emitidos a partir de marzo de 2011 (inclusive), el total de capital e intereses impagados pendientes correspondientes a los bonos de la AEP asciende a $ 2,869 millones a la Vigencia de este análisis. El capital

---

[6]   Representa el valor actual (a la Vigencia del análisis) de la deuda pagada con una tasa de descuento del 5 %.

[7]   El porcentaje de recuperación se estima como el valor actual del total de la deuda pagada (a la Vigencia; el 30 de junio de 2021) como una proporción del capital total pendiente y los intereses no pagados a la fecha de petición de la AEP (27 de septiembre de 2019).

e intereses impagados a la fecha de petición de la AEP ascienden a $ 2,243 millones y $ 418 millones, respectivamente. En el escenario 1, la recuperación total se mantiene en $ 258 millones, pero la tasa de recuperación relativa a los bonos de la AEP considerados válidos se incrementa hasta el 10 %. Sobre la base del análisis, las reclamaciones no garantizadas no reciben ninguna recuperación. El gráfico 3 muestra las probables recuperaciones estimadas a tenor con este escenario.

### ii. Escenario 2: Se parte de la base de que todos los bonos pendientes de la AEP se consideran válidos

Si la totalidad de los bonos de la AEP pendientes son considerados válidos, la dimensión de las reclamaciones de los bonistas de la AEP se vería incrementada. En este escenario, sobre la base de los datos proporcionados por los asesores financieros, el total de capital e intereses impagados pendientes correspondientes a los bonos de la AEP asciende a $ 5,050 millones a la Vigencia de este análisis. El capital pendiente e intereses impagados a la fecha de petición de la AEP son de $ 4,001 millones y $ 670 millones, respectivamente. En el escenario 2, la recuperación total se mantiene en $ 258 millones, y la tasa de recuperación relativa a los bonos de la AEP es del 6 %. Sobre la base del análisis, las reclamaciones no garantizadas no reciben ninguna recuperación. El gráfico 3 muestra el probable rango de recuperaciones estimadas a tenor con este escenario.

*Gráfico 3: probables recuperaciones estimadas disponibles para los acreedores de la AEP sobre la base de escenarios relacionados con la validez de los bonos*

**Probables recuperaciones estimadas disponibles para los acreedores de la AEP por clase de la deuda y escenario**

Valor actual del pago total en millones de dólares, % de recuperación

|  | Caso base: bonos de la AEP emitidos a partir de 2012 (inclusive) son declarados inválidos | Escenario 1: bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) son declarados inválidos | Escenario 2: todos los bonos de la AEP pendientes son declarados inválidos |
|---|---|---|---|
| **Bonos de la AEP** | $258 6% | $ 258 10% | $ 258 6% |
| **Reclamaciones no garantizadas** | $0 0% | $0 0% | $0 0% |
| **Total** | $ 258 6% | $ 258 9% | $ 258 5% |

### iii. Escenarios alternativos si partimos de la base de que los bonos de la AEP carecen de garantía perfeccionada

Según aparece en el Apéndice 1 y como parte de la orientación jurídica proporcionada por los asesores jurídicos de la JSAF, existe un posible problema con el perfeccionamiento con la cesión de los pagos del alquiler. A tenor con la legislación de Puerto Rico, la cesión de un alquiler debe perfeccionarse a través de un documento notarial. Los asesores jurídicos de la JSAF no han podido encontrar ningún acuerdo de cesión formalizado ante notario en los documentos de emisión de los bonos de la AEP a su disposición. Si los bonos de la AEP no poseen una garantía prendaria perfeccionada, los bonistas de la AEP no tendrían prioridad con respecto a los acreedores no garantizados en lo referente a los pagos cedidos de alquiler. En este análisis alternativo, la recuperación disponible para la totalidad de las reclamaciones de la AEP sigue siendo la misma que en cada uno de los escenarios presentados en el Gráfico 3, y lo que varía es la recuperación relativa correspondiente a cada clase de la deuda en función de diferentes escenarios de validez de los bonos. En el Gráfico 4 se muestra el probable rango estimado de recuperaciones por escenario de validez de los bonos partiendo de la base de que los pagos de alquiler no están perfectamente garantizados para los bonistas de la AEP.

*Gráfico 4: probables recuperaciones estimadas disponibles para los acreedores de la AEP
suponiendo que no se ha perfeccionado ninguna garantía para los bonos de la AEP.*

**Probables recuperaciones estimadas disponibles para los acreedores de la AEP por clase de la deuda y escenario
asumiendo que los bonos de la AEP carecen de garantía perfeccionada sobre los pagos de alquiler**

Valor actual del pago total en millones de dólares, % de recuperación

| | Caso base: bonos de la AEP emitidos a partir de 2012 (inclusive) son declarados inválidos | Escenario 1: bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) son declarados inválidos | Escenario 2: todos los bonos de la AEP pendientes son declarados inválidos |
|---|---|---|---|
| **Bonos de la AEP[1]** | $244 *6%* | $ 238 *9%* | $ 246 *5%* |
| **Reclamaciones no garantizadas** | $14 *6%* | $20 *8%* | $12 *5%* |
| **Total** | $ 258 *6%* | $ 258 *9%* | $ 258 *5%* |

1 En este análisis alternativo, los bonos de la AEP no tienen garantía perfeccionada sobre los pagos de alquiler

*APÉNDICE 1*

## Plan de Título III de la AEP

### Análisis de prueba del mejor interés:
### suposiciones

| | Pregunta | Suposición |
|---|---|---|
| 1. | **Existencia de PROMESA/Junta**: ¿debe considerarse que se aplican los Títulos I y II de PROMESA? | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]**: los Títulos I y II de PROMESA se aplican. La paralización automática no se aplica. La Junta se mantiene, certifica y ejecuta los planes fiscales y los presupuestos. Los acreedores pueden obtener sentencias en relación con la totalidad de las reclamaciones vencidas. Una vez que los acreedores OG (incluidos los acreedores que posean reclamaciones garantizadas del ELA) hayan obtenido sentencias, podrán reclamar todos los "recursos disponibles" y negociar/litigar con el ELA sobre qué cantidad de los recursos disponibles puede aplicarse a los gastos operativos a tenor con el poder del estado. El único recurso que tendrán los acreedores que no sean de OG ni garantizados del ELA será esperar a las asignaciones legislativas de los montos para pagar sus reclamaciones una vez que las OG se hayan pagado en su totalidad.  \n\n**FUNDAMENTO**: la referencia a "leyes diferentes de las de quiebra" en la sección 314(b)(6) de PROMESA incluiría los Títulos I y II de PROMESA. No habría ninguna paralización automática a tenor con las leyes diferentes de las de quiebra. Ni el plan fiscal ni el presupuesto liberan de reclamaciones o acciones de paralización. En consecuencia, tanto el plan fiscal como el presupuesto, en tanto que leyes diferentes de las de quiebra, serían de aplicación y la Junta de Supervisión seguiría existiendo para aplicarlas. Es posible que sus limitaciones implícitas (esto es, montos presupuestados) no limiten la cantidad que los acreedores puedan cobrar al hacer valer sus reclamaciones. Esto dependerá de la medida en la que el poder del estado impida a los acreedores OG recibir la totalidad de los recursos disponibles. Los acreedores que no sean de OG invocan asignaciones legislativas para sus pagos. El plan fiscal certificado limitaría las cantidades que puedan ser asignadas a la amortización de la deuda, con sujeción a los derechos de los acreedores OG a ejercer sus derechos a tenor con el Artículo VI, Secciones 6 y 8, de la Constitución del Estado Libre Asociado de Puerto Rico para interceptar recursos disponibles.  \n\n**SUPOSICIÓN 2 [RIESGO DE LITIGIOS]**: los Títulos I y II de PROMESA no se aplican. La paralización automática no se aplica. La Junta no existe y no hay planes fiscales ni presupuestos certificados.  \n\n**FUNDAMENTO**: la suposición de que los Títulos I y II de PROMESA siguen aplicándose incrementa la recuperación de los acreedores debido a las medidas y los |

| | | ahorros que la Junta de Supervisión introduce en sus planes fiscales certificados. Según los asesores jurídicos de la Junta de Supervisión, es posible que los Títulos I y II no se apliquen ya que el Congreso los aprobó junto con el Título III y |
|---|---|---|

| | Pregunta | Suposición |
|---|---|---|
| | | no queda claro si la intención era que continuaran en vigencia sin el Título III. Sin embargo, los asesores jurídicos recomendaron al final que el presente análisis se realice como si los Títulos I y II de PROMESA continuaran aplicándose. |
| 2. | ¿Podrían las proyecciones de superávit de la AEP en el plan fiscal utilizarse para el paquete de recursos de la AEP? | **SUPOSICIÓN**: sí, el superávit de la AEP es un activo de la AEP. |
| 3. | ¿Existen algunos fondos en efectivo iniciales u otros activos que deben tomarse en consideración para pagar a los bonistas de la AEP? | **SUPOSICIÓN**: el único recurso de los bonistas son los pagos de alquiler y las garantías del ELA. Ningún otro activo (por ejemplo, ingresos de seguro) debe darse por disponible para los pagos a los bonistas.<br><br>Los asesores de la Junta pueden proporcionar una cifra actualizada de fondos en efectivo iniciales restringidos y sin restricción en las cuentas bancarias de la AEP. Parte de los fondos en efectivo iniciales en la cuenta bancaria de la AEP podría estar pignorada para los bonistas de la AEP dado que dichos fondos en efectivo corresponden a los recibos de alquiler. El monto de fondos en efectivo iniciales no pignorado para garantizar los bonos de la AEP se presume que es utilizado para pagar reclamaciones no garantizadas. |
| 4. | ¿Cuál es la cascada de pagos correspondiente a los bonos de la AEP? | **SUPOSICIÓN**: luego de un pago de los gastos operativos necesarios de fuentes que no sean de alquiler (en su caso) y a continuación de alquiler o cualquier propiedad arrendada de la AEP, el saldo del alquiler es utilizado para la amortización de la deuda. Cualquier monto en efectivo que quede luego de pagar la deuda por bonos de la AEP adeudada en cualquiera de los años debería utilizarse para pagar reclamaciones no garantizadas.<br><br>Cuando la deuda incurre en mora, los bonistas también podrán alegar sus reclamaciones de garantía contra el ELA; estableciéndose, sin embargo, que los bonistas no pueden cobrar más que el pago completo de la amortización de la deuda contractual de la combinación de la AEP y el ELA. |
| 5. | ¿Cuál debe ser la proyección de futuros alquileres de la AEP? | **SUPOSICIÓN**: los alquileres de la AEP deben seguir las proyecciones en el Plan Fiscal; estableciéndose, sin embargo, que es improbable que el ELA pague alquiler por edificios que no necesite o que no ocupe. Si esto no fuera suficiente para cubrir los pagos de bonos de la AEP que venzan, partimos de la base de que los bonistas de la AEP tratarían de obtener pagos del ELA sobre la base de la garantía del ELA de los bonos de la AEP. |

| | Pregunta | Suposición |
|---|---|---|
| | | |
| 6. | ¿Cómo debe calcularse la recuperación de los bonistas de la AEP? ¿Deben tomarse en consideración pagos desde el ELA y pagos con el superávit de la AEP? | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]**: los pagos a los bonistas de la AEP primero deben provenir de los ingresos de alquiler de la AEP, lo que incluye ingresos de superávit. Las recuperaciones de los bonistas de la AEP relativas a la garantía del ELA no cuentan en la devolución de la AEP. Sin embargo, en general los bonistas de la AEP no pueden cobrar más que el pago completo de la amortización de la deuda contractual de sus dos fuentes de recuperación.<br><br>**SUPOSICIÓN 2 [RIESGO DE LITIGIOS]**: existe un posible problema de perfeccionamiento con la cesión de los pagos de alquiler. A tenor con la legislación de Puerto Rico una cesión de alquiler debe realizarse mediante un documento auténtico con una fecha fija (esto es, a través de un documento notarial). En los documentos de emisión de bonos de la AEP que obran en nuestro poder no hemos encontrado ningún acuerdo de cesión formalizado ante notario. Sin embargo, a tenor con la legislación de Puerto Rico una garantía prendaria que no esté perfeccionada aun así les otorgaría a los bonistas de la AEP el derecho a su reclamación no sujeta a ningún recurso contra la garantía. En un escenario así los bonistas de la AEP tendrían derecho a pagos de alquiler sobre la base de su acuerdo de garantía; sin embargo, puesto que la cesión no está perfeccionada, los bonistas de la AEP no tendrían ninguna prioridad con respecto a aquellos pagos adeudados a otros acreedores no garantizados de la AEP. |
| 7. | ¿Los bonos de la AEP emitidos en 2011 son inválidos ya que incumplieron el límite constitucional de la deuda del ELA? | **SUPOSICIÓN 1 [SUPOSICIÓN PRINCIPAL]**: no, pero los Bonos de la AEP emitidos a partir de 2012 (inclusive) son considerados obligaciones directas del ELA, por lo que incumplen el límite de la deuda. En consecuencia, esos bonos son inválidos.<br><br>**FUNDAMENTO**: la Junta de Supervisión ha alegado que los Arrendamientos de la AEP no constituyen verdaderos arrendamientos ni obligaciones supuestamente contraídas a tenor con tales Arrendamientos; en lugar de eso, se trata de unas obligaciones generales tergiversadas del ELA.<br><br>**SUPOSICIÓN 2 [RIESGO DE LITIGIOS]**: sí. Además de los bonos de la AEP emitidos a partir de 2012 (inclusive), los bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) también incumplen el límite de la deuda, por lo que son inválidos.<br><br>**FUNDAMENTO**: además de la impugnación anteriormente mencionada, el comité de titulares de reclamaciones no garantizadas estatutario ha impugnado los bonos de la AEP sobre esa base desde marzo de 2011. |

| | Pregunta | Suposición |
|---|---|---|
| | | **SUPOSICIÓN 3 [RIESGO DE LITIGIOS]**: no. Los bonos de la AEP emitidos a partir de marzo de 2011 (inclusive) no incumplen el límite de la deuda.<br><br>**FUNDAMENTO**: las impugnaciones explicadas en los fundamentos anteriores podrían no prosperar. |
| **8.** | ¿Tienen derecho los bonistas de la AEP a acelerar el pago de sus bonos? | **SUPOSICIÓN**: no, los bonos de la AEP no permiten aceleración. |
| **9.** | ¿Deben los intereses sobre la deuda que quedó impagada durante la paralización generar intereses adicionales? | **SUPOSICIÓN**: supongamos que en los años en los que no se realice el pago completo de la deuda vencida, los pagos posteriores se efectúan primero en concepto de intereses y después en el de capital.<br><br>i. **Intereses sobre la deuda de la AEP durante la paralización**: A tenor con la sección 303 de PROMESA, durante una moratoria los intereses siguen acumulándose a la tasa contractual, salvo que el contrato subyacente establezca intereses de demora, en cuyo caso serán de aplicación estos últimos. No existe ninguna disposición legal que regule los intereses sobre los intereses.<br><br>ii. **Intereses sobre reclamaciones no garantizadas durante la paralización**: supongamos que no se generan intereses.<br><br>iii. **Intereses sobre la deuda no pagada**: supongamos que cualquier deuda no pagada genera intereses de acuerdo con la tasa media ponderada al año 2020 (proporcionada por Citi).<br><br>iv. **Intereses sobre intereses**: no. La legislación de Puerto Rico permite en determinadas circunstancias el pago de intereses sobre intereses vencidos; por ejemplo, si las partes así lo han acordado. Sin embargo, los bonos de la AEP no permiten generar intereses sobre intereses vencidos. |
| **10.** | ¿Los fondos de FEMA están disponibles para los bonistas? | **SUPOSICIÓN**: no. Los recibos de FEMA se utilizan para financiar gastos relacionados con emergencias, por lo que no están disponibles para los gastos generales de la AEP. |

**ESTRUCTURA  DE LA DEUDA**[1]

1. **Costo operativo**
   a. Una proyección de $ 152 millones de gastos operativos en 2022 a tenor con el Plan Fiscal Certificado de abril de 2021.

2. **Deuda de la AEP (capital pendiente e intereses no pagados a la fecha de petición de la AEP)**
   a. Emitidos antes de marzo de 2011: $2,661,239,877
   b. Emitidos entre marzo y diciembre de 2011: $1,335,422,893
   c. Emitidos a partir de 2012: $674,308,470

3. **Otras reclamaciones no garantizadas**[2]
   a. Reclamaciones que se transferirán a los Procedimientos de Reconciliación de Reclamaciones Administrativas, o RRA:  $175,600
   b. Reclamaciones intragubernamentales, incluidas reclamaciones presentadas por entidades gubernamentales de Puerto Rico o el gobierno federal: $231,866,589
   c. Cuentas a pagar comerciales: $8,337,372
   d. Reclamaciones por litigios: $193,121,520
   e. Otras reclamaciones varias: $2,637,013
   f. Reclamaciones de la clase de conveniencia: $10,710,716

---

[1] La información financiera contenida en el presente documento se basa en la información disponible en los estados financieros más recientes publicados y, en algunos casos, en la información recibida de los asesores de la Junta de Supervisión y los asesores del ELA. Los asesores jurídicos no realizan ninguna declaración sobre la exactitud de la información financiera proporcionada en el presente documento.

[2] Estas cifras están basadas en la información proporcionada por los asesores financieros de la Junta y no han sido verificadas de manera independiente.