Response Deadline: July 19, 2021, at 4:00PM (Atlantic Standard Time)
Hearing Date:  August 4, 2021, at 9:30AM (Atlantic Standard Time)

<div style="border:1px solid black">

**PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO
TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

</div>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                              Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the Commonwealth and ERS.** |

# THREE HUNDRED FIFTY-THIRD OMNIBUS OBJECTION (SUBSTANTIVE) OF THE COMMONWEALTH OF PUERTO RICO AND THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO TO PARTIAL DUPLICATE, DEFICIENT, AND NO LIABILITY BOND CLAIMS

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Employees Retirement

System of the Government of the Commonwealth of Puerto Rico ("ERS," and together with the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Commonwealth and ERS, the "Debtors"), as the sole Title III representative of the Debtors

pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*

("PROMESA"),[2] files this three hundred fifty-third omnibus objection (the "Three Hundred Fifty-

Third Omnibus Objection") to the proofs of claim listed on **Exhibit A** hereto, each of which is

purportedly based, in part, on (*a*) bonds issued by the Puerto Rico Sales Tax Financing Authority

("COFINA"), (*b*) bond claims that are duplicative of one or more master proofs of claim filed

against the Debtors on behalf of the holders of certain bonds, (*c*) bond claims that assert liabilities

associated with secondarily insured bonds, which, in turn, are duplicative of proofs of claim filed

against the Debtors on behalf of the holders of those bonds, (*d*) an ownership interest in bonds

issued by the Government Development Bank of Puerto Rico ("GDB"), (*e*) one or more

investments in mutual funds, which in turn may have invested in bonds issued by the Debtors,

and/or (*f*) an ownership interest in bonds issued by the Puerto Rico Aqueducts and Sewers

Authority ("PRASA") and/or the Puerto Rico Industrial, Tourist, Educational, Medical and

Environmental Control Facilities Financing Authority ("AFICA"), which are not Title III Debtors,

for amounts for which the Debtors have not guaranteed repayment.  In addition, to the extent the

proofs of claim listed on **Exhibit A** purport to assert additional liabilities beyond the bonds

identified in the supporting documentation attached thereto, they are deficient because they fail to

provide sufficient information to enable the Debtors to reconcile the proofs of claim.  Further, a

portion of each claim listed on **Exhibit A** hereto will remain asserted against the Debtors.  The

Debtors reserve the right to object to any of the remaining amounts asserted in the claims, as

identified in the column titled "Corrected" in **Exhibit A** hereto, on any basis whatsoever.  In

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

support of the Three Hundred Fifty-Third Omnibus Objection, the Debtors respectfully represent as follows:

## JURISDICTION

41.     The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA section 306(a).

42.     Venue is proper in this district pursuant to PROMESA section 307(a).

## BACKGROUND

### A.     The Bar Date Orders

43.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case").   On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (respectively the "ERS Title III Case," and together with the Commonwealth Title III Case, the "Title III Cases").   On June 29, 2017, the Court entered an order granting the joint administration of the Title III Cases for procedural purposes only.  ECF No. 537.[3]

44.     On January 16, 2018, the Debtors filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2255] (the "Bar Date Motion").  Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of*

---

[3] Unless otherwise stated herein, ECF citations refer to documents filed in Bankruptcy Case No. 17 BK 3283-LTS.

*Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Title III Cases.  Upon the informative motion of certain creditors, and the support of the Debtors, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), extending these deadlines to June 29, 2018 at 4:00 p.m. (Atlantic Time).

**B.      Bond Debt Master Proofs of Claim – Commonwealth Title III Case**

45.      Pursuant to the Initial Bar Date Order, indenture trustees, fiscal agents, or any similar agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents.  Initial Bar Date Order, ¶ 5(a). As explained below, master proofs of claim (collectively, the "Master Claims") have been filed in the Commonwealth Title III Case on behalf of the holders of certain bonds or notes issued by ERS, PRASA, the Puerto Rico Highways and Transportation Authority ("HTA"), the Puerto Rico Public Buildings Authority ("PBA"), the Puerto Rico Infrastructure Financing Authority ("PRIFA"); and the Puerto Rico Public Financing Corporation ("PRPFC").

46.      ***PBA***—PBA purportedly issued Revenue Bonds to finance office buildings and other facilities leased to various departments, public agencies and instrumentalities of the Commonwealth.  US Bank and US Bank Trust serve as fiscal agents for certain revenue bonds issued by PBA, as identified in Footnote 3 of Proof of Claim No. 62833 (the "PBA Bonds"), and on behalf of the holders of the PBA Bonds, filed a master proof of claim in the Commonwealth Title III Case for all outstanding amounts owed (the "PBA Master Claim"), which was logged by

4

Prime Clerk, LLC, as Proof of Claim No. 62833.[4]  The PBA Master Claim asserts liquidated claims for approximately \$4 billion in allegedly unpaid principal, \$160 million in allegedly unpaid interest, and reimbursement for fees and expenses of the fiscal agents, in addition to unliquidated and contingent claims for any and all amounts owed "on account of any and all claims the Fiscal Agent has or may have relating to the outstanding Bond obligations, whether known or unknown against the Commonwealth and all those purporting to act on the Commonwealth's behalf . . . ." Rider to PBA Master Claim, ¶¶ 19-21.

47.    Certain bonds or notes issued by PBA have been insured by one of several municipal bond insurers, either on the primary market or on the secondary market.  Municipal bond insurance is obtained on the primary market when the municipality issuing the bonds engages an insurance company to underwrite an insurance policy for that series of bonds.  In the event that a bond is not insured on the primary market, holders of such uninsured bonds may elect to obtain insurance via the secondary market.  Holders of uninsured bonds who seek to obtain insurance in the secondary market contract directly with a municipal bond insurer and the original issuer is not part of this contract process.  When a holder of an uninsured bond obtains an insurance policy on the secondary market, a new CUSIP number is issued which corresponds to the original CUSIP numbers assigned to the bonds at the time of issuance.  Certain bonds issued by PBA have been insured on the secondary market and, accordingly, have been issued new CUSIP numbers which correspond to bonds issued by HTA bearing original CUSIP numbers (the "<u>Secondarily Insured PBA Bonds</u>").

---

[4]  Proof of Claim No. 62833 amended and superseded Proof of Claim No. 13351, which was initially filed by the Fiscal Agent.

48.  __*ERS*__—ERS is an agency of the government, separate and apart from the
Commonwealth government and its other instrumentalities.  *See* 3 L.P.R.A § 775.[5]  Purportedly
pursuant to that certain Pension Funding Bond Resolution, adopted on January 24, 2008, and
certain supplemental resolutions, ERS issued senior and subordinate pension funding bonds (the
"ERS Bonds"), in the aggregate original principal amount of approximately $2.9 billion.[6]  BNYM
serves as the fiscal agent with respect to the ERS Bonds.  On behalf of the holders of ERS Bonds,
BNYM filed a master proof of claim in the Commonwealth Title III Case (the "ERS Master
Claim"), which was logged by Prime Clerk, LLC, as Proof of Claim No. 32004.[7]

49.  __*PRPFC*__—PRPFC is a subsidiary corporation of GDB created pursuant to
Resolution No. 5044 of the Board of Directors of GDB, as amended ("Resolution No. 5044"),
adopted pursuant to the authority granted under Act No. 17 of the Legislature of Puerto Rico,
approved September 23, 1948, as amended.  It provides government agencies, instrumentalities,

---

[5]  On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to
PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS, pursuant to
PROMESA section 304(a), commencing a case under Title III thereof.

[6]  On March 12, 2019, the Official Committee of Unsecured Creditors filed an *Omnibus Objection
to Claims Asserted by Holders of Bonds Issued by ERS* [Case No. 17-3566, ECF No. 381], on the
ground that the bond issuance exceeded ERS's statutory authority and was thus *ultra vires*,
rendering the ERS Bonds null and void.  On April 23, 2019, the Official Committee of Retired
Employees of the Commonwealth of the Puerto Rico filed an *Omnibus Objection Of The Official
Committee Of Retired Employees Of The Commonwealth Of Puerto Rico, Pursuant To Bankruptcy
Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of ERS
Bonds Against ERS And The Commonwealth* [Case No. 17-3283, ECF No. 6482], on the ground,
among others, that the bond issuance was *ultra vires*.  ERS reserves its rights to challenge the bond
issuance on any grounds whatsoever, including on the ground that the ERS Bonds were *ultra vires*,
and any other grounds set forth in the foregoing objections.

[7]  On May 22, 2019, the Commonwealth filed an objection to the ERS Master Proof of Claim.  See
Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section
502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the
Bank of New York Mellon, As Fiscal Agent (Claim No. 16775) [ECF No. 7075].  For the
avoidance of doubt, this Three Hundred Tenth Omnibus Objection is without prejudice to the
parties' rights with respect to such objection, including any rights to intervene, which are reserved.

municipalities and other subdivisions of the Commonwealth with alternative mechanisms to meet their financing needs.  PRPFC has the capacity to borrow money and issue debt through the issuance of bonds and other obligations.  U.S. Bank Trust serves as trustee for certain Series 2012A and Series 2011A and B bonds issued by the PRPFC (the "PRPFC Bonds").  On behalf of the holders of the PRPFC Bonds, US Bank Trust filed a proof of claim against the Commonwealth (the "PRPFC Master Claim"), which was logged by Prime Clerk as Proof of Claim No. 13374.

50.     *HTA*—HTA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA Enabling Act").  HTA is responsible for the construction, operation, and maintenance of highways and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A § 2002.  The HTA Enabling Act authorizes HTA to issue bonds.  *See* 9 L.P.R.A. §§ 2004(g), (h), (l).  Pursuant thereto, HTA issued several series of bonds under two different resolutions (the "HTA Bonds"): (*i*) Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution"), and (*ii*) Resolution No. 98-06, adopted February 26, 1998 (the "1998 Resolution").  As of May 21, 2017, HTA's petition date, approximately $830 million in principal amount of bonds issued under the 1968 Resolution remain outstanding, and approximately $3.4 billion in principal amount of bonds issued under the 1998 Resolution remain outstanding.  BNYM serves as fiscal agent with respect to the HTA Bonds.

51.     On behalf of the holders of HTA Bonds, BNYM filed three master proofs of claim in the Commonwealth Title III Case (the "HTA-CW Master Claims"), each asserting a "secured, contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have against the Commonwealth arising at law or in equity . . . ."  *See* Addendum to Proof of Claim No. 121053, ¶

7

15; Addendum to Proof of Claim No. 120982, ¶ 15; Addendum to Proof of Claim No. 115380, ¶ 15.[8]

52.    Certain bonds issued by HTA have been insured on the secondary market and, accordingly, have been issued new CUSIP numbers which correspond to bonds issued by HTA bearing original CUSIP numbers (the "Secondarily Insured HTA Bonds," and together with the Secondarily Insured PBA Bonds, the "Secondarily Insured Bonds").

53.    *PRASA*—PRASA owns and operates the island-wide public water and wastewater systems in Puerto Rico.  PRASA issued certain revenue bonds (the "PRASA Bonds"), under the Puerto Rico Aqueduct and Sewer Authority Resolution No. 1583, Authorizing and Securing Puerto Rico Aqueduct and Sewer Authority Bonds Guaranteed by the Commonwealth of Puerto Rico, and certain supplemental resolutions.  Banco Popular de Puerto Rico ("Banco Popular") serves as trustee for the PRASA Bonds and filed a master proof of claim against the Commonwealth on behalf of the holders of the PRASA Bonds, which was logged by Prime Clerk, LLC, as Proof of Claim No. 22620 (the "PRASA Master Claim").  The PRASA Master Claim asserts "a contingent claim against the Commonwealth on account of the Bonds in an amount not less than $284,755,000, together with all interest, and premium accruing on the Bonds from and after the Petition Date, and all fees, costs, expenses and other charges accrued, accruing or chargeable with respect thereto."  Addendum to PRASA Master Claim, ¶ 9.

54.    *PRIFA*—PRIFA is an affiliate of the Government Development Bank ("GDB") and is a government instrumentality of the Commonwealth.  PRIFA was created in 1988 by Act No. 44-1988 (the "PRIFA Enabling Act").  PRIFA provides financial, administrative and other

---

[8]  While BNYM initially filed three proofs of claim logged by Prime Clerk as Proofs of Claim Nos. 21286, 26541, and 35277, these were superseded and amended by Proofs of Claim Nos. 121053, 120982, and 115380.

types of assistance to the Commonwealth, its public corporations and other instrumentalities responsible for developing and operating infrastructure facilities.  On behalf of the holders of various bonds and notes issued by PRIFA (collectively, the "PRIFA Bonds"), master proofs of claim were asserted against the Commonwealth (collectively, the "PRIFA Master Claims") by BNYM, US Bank, and UMB Bank, N.A.  US Bank filed a master proof of claim with respect to certain PRIFA Bonds, which was logged by Prime Clerk as Proof of Claim No. 13386, on behalf of holders of PRIFA Rum Tax Bonds (Special Tax Revenue Bonds, Series 2005A, 2005B, 2005C, and Series 2006B), asserting "claims for contingent, unliquidated amounts for interest payable in the future, interest accrued and accruing in the future as to past due principal and interest, fees and costs and indemnity claims of the Trustee to be incurred in the future under the Bond Documents, and all other amounts owed on account of any and all claims the Trustee has or may have relating to the outstanding Bond obligations, amount not less than $249,099,446.17 . . . ."  Rider to Proof of Claim No. 13386, ¶ 26.

**C.     Bond Debt Issued by the Puerto Rico Aqueducts and Sewers Authority**

55.     PRASA was established pursuant to Act Number 40 of May 1, 1945.  PRASA is a "public corporation and an autonomous government instrumentality" created for the purpose of providing water and sewer services on the island.  22 L.P.R.A. § 142, 144.

56.     The PRASA Enabling Act authorizes PRASA to issue bonds.  22 L.P.R.A. § 144(g).  Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution No. 1583").  In 2008, PRASA issued $1,316,204,456 principal amount of Series A revenue bonds (the "2008 Senior Series A Bonds").  Additionally, in 2012, PRASA concurrently issued $1,800,450,000 principal amount of Series 2012 A revenue bonds (the "2012 Senior Series A Bonds"), as well as $295,245,000 principal amount of Series 2012 B revenue bonds (the "2012

Senior Series B Bonds," and together with the 2012 Senior Series A Bonds and the 2008 Senior Series A Bonds, the "PRASA Senior Lien Bonds").

57.     Holders of PRASA Senior Lien Bonds have received and continue to receive all payments owed to holders of the PRASA Bonds in full as they become due and owing. Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the PRASA Senior Lien Bonds.[9]  In addition, the Commonwealth has not guaranteed repayment of the Senior Lien Bonds.  Accordingly, the offering statements for the PRASA Senior Lien Bonds state that they are "not a debt of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions, other than [PRASA], and neither the Commonwealth of Puerto Rico or any such municipalities or other political subdivisions, other than [PRASA], shall be liable for the payment of the principal of or interest on said Bonds."[10]

**D.     Bond Debt Issued by the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority**

58.     AFICA is a public corporation and government instrumentality of the Commonwealth created by Act No. 121 of the Legislative Assembly of Puerto Rico, approved June 27, 1977 (as amended and supplemented and codified as P.R. Laws Ann. tit. 12, § 1251 *et seq.*). P.R. Laws Ann. tit. 12, § 1254.  AFICA facilitates project financing in order to promote the economic development of the Commonwealth, including through the development and construction of new industrial, commercial, tourist, agricultural, educational, medical and environmental control facilities.

59.     In 2000, AFICA issued $30,000,000 in Tourism Revenue Bonds, 2000 Series A (the "2000 Series A Palmas del Mar Bonds"), in the aggregate amount of $30,000,000.00, in order

---

[9] *See, e.g.*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[10] *See, e.g.*, Offering Statement for PRASA Revenue Bonds, Series B (Senior Lien), February 15, 2012, available at https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

to finance, in part, improvements to the Palmas del Mar Country Club.  The 2000 Series A Palmas del Mar Bonds are payable solely from repayment of a loan agreement entered into between AFICA and Palmas Country Club, Inc.  The offering statement issued in connection with the 2000 Series A Palmas del Mar Bonds states that the bonds "shall not constitute an indebtedness of the [Commonwealth] or of any of its political subdivisions." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Tourism Revenue Bonds, 2000 Series A (Palmas del Mar Country Club Project), *available                                                                                        at*

https://emma.msrb.org/Security/Details/AD88773EB8772C017819AB0B921B2DAD5.

60.    In 2002, AFICA issued Higher Education Revenue and Revenue Refunding Bonds, 2002 Series A (the "Series 2002 A University Bonds"), in the aggregate amount of $34,330,000.00, in order to provide financing, in part, for (*i*) the construction of certain educational facilities owned or to be owned by the Polytechnic University of Puerto Rico (the "University"), (*ii*) the refunding of certain prior bond issuances, and (*iii*) certain costs incurred in insuring and issuing the 2002 Series A University Bonds.  The Series 2002 A University Bonds are payable solely from repayment of a loan agreement entered into between AFICA and the University.  The offering statement issued in connection with the Series 2002 A University Bonds states that the bonds "shall not constitute an indebtedness of the Commonwealth or of any of its political subdivisions, other than [AFICA], and neither the Commonwealth nor any of its political subdivisions, other than [AFICA], shall be liable thereon." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Higher Education Revenue and Revenue Refunding Bonds, Series 2002 A (Polytechnic University of Puerto Rico Project), *available                                                                                        at*

https://emma.msrb.org/Security/Details/AA9A902D905B8AF8265EDFE55EEC98D6E.

61.    In 2011, AFICA issued Industrial Revenue Refunding Bonds, 2011 Series A (the "2011 Series A Galeria Bonds"), in the aggregate amount of $59,649,744.50, in order to finance, in part, the operation of certain office and commercial retail space owned and operated by Caparra Hills, Inc.  The 2011 Series A Galeria Bonds are payable solely from repayment of a loan agreement entered into between AFICA and Caparra Hills, Inc.  The offering statement issued in connection with the 2011 Series A Galeria Bonds states that the bonds "do not constitute an indebtedness of the Commonwealth or of any of its political subdivisions, other than [AFICA], and neither the Commonwealth nor any of its political subdivisions, other than [AFICA], shall be liable thereon."  *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Industrial Refunding Bonds, 2011 Series A (Galeria Tower at San Patricio Project), *available at* https://emma.msrb.org/Security/Details/A95ABBB582ECE40E0D6ED039C687C3542.

62.    Also, in 2011, AFICA issued Tourism Revenue Refunding Bonds, 2011 Series A (the "2011 Series A Trump Golf Club Bonds," and together with the 2000 Series A Palmas del Mar Bonds, Series 2002 A University Bonds, and the 2011 Series A Galeria Bonds, the "AFICA Bonds"), in the aggregate amount of $26,355,000.00, in order to, in part, refinance a portion of the construction of the Trump International Golf Club Puerto Rico.  The 2011 Series A Trump Golf Club Bonds are payable solely from repayment of a loan agreement entered into between AFICA and Coco Beach Golf & Country Club, S.E.  The offering statement issued in connection with the 2011 Series A Trump Golf Club Bonds states that the bonds "do not constitute an indebtedness of the Commonwealth or of any of its political subdivisions, other than [AFICA], and neither the Commonwealth nor any of its political subdivisions, other than [AFICA], shall be liable thereon."  *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Tourism Revenue Refunding Bonds, 2011

Series   A   (Trump   International   Golf   Club   Puerto   Rico   Project),   *available   at*

https://emma.msrb.org/Security/Details/A1A77B5F6CEF57494504C49A90359E23A.

**E.      The COFINA Title III Case and Resolution of the Commonwealth-COFINA
           Dispute**

63.      COFINA is a public corporation and instrumentality of the Commonwealth

constituting a corporate and political entity independent and separate from the Commonwealth,

created under Act No. 91 of the Legislative Assembly of the Commonwealth.  Pursuant to the

Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as

amended on June 19, 2009, and pursuant to certain supplemental resolutions, COFINA issued a

series of bonds in aggregate approximate amount of $17 billion, to, among other things, defray

certain debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico

Public Finance Corporation (the "COFINA Bonds").  Bank of New York Mellon serves as Trustee

with respect to the COFINA Bonds.

64.      The Oversight Board filed that certain *Third Amended Title III Plan of Adjustment*

*of the Puerto Rico Sales Tax Financing Corporation* (the "Plan") [ECF No. 4652] on January 9,

2019.  The Court considered confirmation of the Plan and any objections thereto at a hearing on

January 16-17, 2019.

65.      On February 4, 2019, the Court confirmed the Plan, which incorporated the

compromise and settlement of the dispute over whether, after considering all procedural and

substantive defenses and counterclaims, including constitutional issues, the sales and use taxes

purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA

under applicable law (the "Commonwealth-COFINA Dispute").  *See Order and Judgment*

*Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing*

*Corporation* [ECF No. 5048].   On the same day, the Court approved the compromise and

settlement of the Commonwealth-COFINA Dispute pursuant to the *Memorandum Opinion and*

*Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "Settlement Order").  On February 5, 2019, the Court issued an *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] (the "Amended Confirmation Order").  The Plan became effective on February 12, 2019 (the "Effective Date"), when the transactions contemplated therein were consummated.  *See Notice of (A) Entry of Order Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [Case No. 17 BK 3284-LTS, ECF No. 587].

**F.     The GDB Title VI Proceedings and Qualifying Modification**

66.     GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by the Legislative Assembly in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth.  On April 28, 2017, the Oversight Board unanimously certified that certain February 2017 GDB Fiscal Plan, which contemplated an orderly wind-down of the operations of GDB based upon the determination that there was no clear path for the long-term viability of GDB based on its then-current financial condition.

67.     On July 12, 2017, the Oversight Board issued a resolution authorizing GDB, pursuant to Section 601(e) of PROMESA, to avail itself of Title VI of PROMESA.  On August 10, 2018, GDB filed an application for approval of a qualifying modification, pursuant to PROMESA section 601(m)(1)(D) (the "Qualifying Modification"), in the United States District Court for the District of Puerto Rico.

14

68.     On November 7, 2018, the Court approved the Qualifying Modification pursuant to PROMESA section 601(m)(1)(D).  *See* ECF No. 270 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Nov. 7, 2018).  The Qualifying Modification provides for, among other things, (i) the issuance of new bonds by the newly-created GDB Debt Recovery Authority in exchange for the cancellation of, among other things, certain participating bonds and guaranteed bond claims (collectively, the "GDB Bonds"); (ii) the extinguishment of the Commonwealth's guarantee of the guaranteed bonds upon the exchange and cancellation of the guaranteed bonds; and (iii) the release of claims of the holders of GDB Bonds against GDB and its affiliates relating to, among other things, any investment with GDB or the purchase, sale, or transfer of any security or interest of GDB, and any action or omission with respect to any indebtedness or loans to GDB (including any notes issued or deposits held by GDB) or from GDB. *Solicitation Statement*, at 57-60, ECF No. 1-15 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Aug. 10, 2018).

69.     On November 29, 2018, GDB announced the consummation of the Qualifying Modification for GDB.  Press Release, *Government of Puerto Rico Announces Consummation of the GDB Qualifying Modification*, Governor of Puerto Rico (Nov. 29, 2018), *available at* http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**G.     Proofs of Claims Filed, Omnibus Objection Procedures, and Claim Objections**

70.     To date, approximately 179,420 proofs of claim have been filed against the Debtors and logged by Prime Clerk, LLC.  Such proofs of claim total approximately $43.59 trillion in asserted claims against the Debtors, in addition to unliquidated amounts asserted.

71.     Of the proofs of claim filed, approximately 116,160 have been filed in relation to, or reclassified to be asserted against, the Commonwealth.  Approximately 53,022 proofs of claim

have been filed in relation to, or reclassified to be asserted against, ERS.  In accordance with the terms of the Bar Date Orders, many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended, not putting forth a claim for which the Debtors are liable, being duplicative of other proofs of claim, or failing to provide information necessary for the Debtors to determine whether the claim is valid.

72.    To efficiently resolve as many of the unnecessary proofs of claim as possible, on October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures Motion").  The Court granted the relief requested in the Omnibus Procedures Motion by order dated November 14, 2018. *See Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus Objection Procedures").  On November 29, 2018, the Court approved English and Spanish versions of the forms of notice for omnibus objections to be filed in accordance with the Initial Omnibus Objection Procedures.  *See Order Approving the English and Spanish Versions of the Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

73.    In the continued interest of resolving any unnecessary proofs of claim in an efficient manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other things, to allow the Debtors to file omnibus objections on substantive bases, to further expand the number of claims that may be included on an objection, and to approve additional forms of notice. *Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091].  On June 14, 2019, the Court

granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440] (the "<u>Amended Omnibus Objection Procedures</u>").

74.     Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus Objection Procedures, to date the Court has held over 14 hearings related to over 140 omnibus objections filed by the Commonwealth, COFINA, HTA, ERS, and/or the Puerto Rico Electric Power Authority ("<u>PREPA</u>").  Based upon rulings and orders of the Court to date, approximately 101,019 claims asserting $43.59 trillion in liability against the Commonwealth, COFINA, HTA, PREPA, and ERS have been disallowed and expunged from the claims registry in the Title III proceedings.

75.     This Three Hundred Fifty-Third Omnibus Objection is filed in accordance with the Court's Amended Omnibus Objection Procedures.

## **OBJECTIONS TO PROOFS OF CLAIM**

76.     The Amended Omnibus Objection Procedures allow the Debtors to file an omnibus objection to multiple proofs of claim on any basis provided for in Federal Rule of Bankruptcy Procedure 3007(d)(1)-(7), in addition to other substantive bases set forth in the Amended Omnibus Objection Procedures.

77.     The Three Hundred Fifty-Third Omnibus Objection seeks to partially disallow, in accordance with the Amended Omnibus Objection Procedures, proofs of claim listed on **Exhibit A** hereto (collectively, the "<u>Claims to Be Partially Disallowed</u>"), each of which purports to assert liabilities arising out of "bonds," "Ownership of bonds as described in the attachments," "Bonds bought/ money lent to the Commonwealth," or other similar terms asserting liabilities associated with investments in government-issued bonds.  In some instances, the Claims to Be Partially

Disallowed provided as supporting documentation a copy of a brokerage statement, or other supporting documentation containing information regarding bonds purportedly held by the claimant, but failed to provide information necessary to enable the Debtors to reconcile the claims, such as the CUSIP numbers or amounts of the specific bonds claimants intended to assert. Further, the amounts of the bonds included in that supporting documentation did not match the amount on the claimant's proof of claim. In other instances, the Claims to Be Partially Disallowed did not contain any supporting documentation.

78.    On August 13, 2019, the Court entered the *Order Granting in Part and Adjourning in Part Debtors' Motion for Entry of An Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8453] (the "Authorized Mailings Order"), which authorized the Debtors to send mailings "to any claimant who has not provided sufficient information to enable Debtors to process their claim." Authorized Mailings Order, ¶ 3.

79.    Pursuant to the Authorized Mailings Order, "[i]f the Debtors mail the Proposed Mailing to a claimant, and the claimant either does not respond or responds but fails to provide sufficient information to permit Debtors to reconcile their claim, the Debtors are authorized to object to the claim as deficient." *Id.*

80.    In accordance with the Authorized Mailings Order, the Debtors have sent at least one letter, substantially in the form of Exhibit 1 to the Authorized Mailings Order, to each claimant subject to this Three Hundred Fifty-Third Omnibus Objection (the "Mailing"). Each Mailing provided, in relevant part:

> Additional information is required in order for the Debtors to continue with assessing your claim. The Debtors are unable to determine from the information you provided the basis for the claim you are attempting to assert against one or more of the Debtors. In responding to this letter, please ensure that you provide all of the information requested and as much detail as possible about your

18

claim.  The descriptions you put on your proof of claim were too
vague for the Debtors to understand the claim you are trying to
assert, so please provide more detail and do not simply copy over
the same information.
*See* ECF No. 8453-1 at 2, 7.

81.     The Mailings received by the claimants subject to this Three Hundred Fifty-Third

Omnibus Objection directed the claimants to respond within thirty days.  *See id*.  Furthermore, the

Mailings cautioned the Claimants that "[i]f you do not respond to this request and do not provide

the requested information and documentation in support of your claim, the Debtors may be forced

to object to your claim."

82.     Each of the Claimants identified in **Exhibit A** either failed to respond to the

Mailings, or submitted a response that still did not contain information necessary to enable the

Commonwealth to reconcile the claim.  Accordingly, the Debtors reviewed the documentation

submitted with the proofs of claim or with the Mailings for assertions of investments related to

government-issued bonds.  Based on that review, the Debtors understand the Claims to Be Partially

Disallowed assert (*a*) bonds issued by COFINA, (*b*) bond claims that are duplicative of one or

more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*c*)

bond claims that assert liabilities associated with secondarily insured bonds that are duplicative of

proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*d*) an ownership

interest in bonds issued by GDB, (*e*) one or more investments in mutual funds, which in turn may

have invested in bonds issued by the Debtors, and/or (*f*) an ownership interest in bonds issued by

PRASA and/or AFICA, which are not Title III Debtors, for amounts for which the Debtors have

not guaranteed repayment.  To the extent each of the Claims to Be Partially Disallowed purport to

assert additional liabilities not associated with the government-issued bonds identified in the proof

of claim, the supporting documentation, or a Mailing response, those portions of each of the proofs

of claim listed on **Exhibit A** hereto are deficient because they fail to provide sufficient information

to enable the Debtors to reconcile the proofs of claim.

### A. No Liability for COFINA Bondholder Claims

43.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport

to assert, in part, claims based on an alleged ownership interest in bonds issued by COFINA

(collectively the "Partial COFINA Bondholder Claims").

44.     As explained above, the Settlement Order resolved the Commonwealth-COFINA

Dispute, and, pursuant to Paragraph 55 of the Settlement Order, all claims against the

Commonwealth arising from or relating to the relationship of the Commonwealth and COFINA

have been released.  Additionally, pursuant to Paragraph 3(c) of the *Settlement Agreement* [ECF

No. 5045-1], dated October 19, 2018, and attached to the Settlement Order (the "Settlement

Agreement"), and Paragraph 7 of the Amended Confirmation Order, the adversary proceeding

between the Commonwealth and COFINA concerning the Commonwealth-COFINA Dispute has

been dismissed with prejudice following the approval of the compromise and settlement of the

Commonwealth-COFINA Dispute.  Furthermore, pursuant to Paragraph 29(f) of the Amended

Confirmation Order, claims, such as the Partial COFINA Bondholder Claims, that arose from or

relate to the relationship of the Commonwealth and COFINA were released.    Amended

Confirmation Order, ¶ 29(f).[11]  For all of these reasons, the Partial COFINA Bondholder Claims

---

[11] Pursuant to the Plan, "Claim" is defined as "[a]ny right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise."  Plan § 1.53.

should be disallowed because these claims based on an alleged ownership interest in COFINA

Bonds have been satisfied, released, and/or discharged pursuant to the Settlement Order,

Settlement Agreement, Amended Confirmation Order, and Plan.

### B.  No Liability for GDB Bondholder Claims

45.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport

to assert, in part, claims based on the alleged ownership of bonds issued by GDB (collectively the

"Partial GDB Bondholder Claims").[12]

46.     Each of the GDB Bondholder Claims purport to be based, in part, on the ownership

of GDB Bonds that were subject to the Qualifying Modification, which provided for the issuance

of new securities in exchange for the cancellation of the GDB Bonds and the extinguishment of

the Commonwealth's guarantee of certain GDB Bonds, and thus the Commonwealth is no longer

liable for these claims.  Accordingly, each of the Partial GDB Bondholder Claims has been

released pursuant to the approval and consummation of the Qualifying Modification.  As noted

above, the Qualifying Modification provides, among other things, that holders of GDB Bonds shall

release GDB and its affiliates from claims relating to the GDB Bonds and any action or omission

of GDB and its affiliates with respect to any indebtedness of or loan to GDB.  GDB is a public

corporation and instrumentality of the Commonwealth.  The Commonwealth, thus, is an affiliate

of GDB within the scope of the release pursuant to the Qualifying Modification.  Accordingly, the

GDB Bondholder Claims were released upon the consummation of the Qualifying Modification

on November 29, 2018.  Because the Partial GDB Bondholder Claims are unenforceable against

---

[12] Another claim subject to the Three Hundred Fifty-Third Omnibus Objection was filed against ERS and asserts GDB Bonds.  To the extent the claim seeks to assert GDB Bond claims against ERS, it has failed to provide a basis to assert such claims against ERS arising from GDB Bonds. To the extent the claim was intended to assert a claim against the Commonwealth, the Commonwealth is not liable for the reasons set forth in paragraph 42 of the Three Hundred Fifty-Third Omnibus Objection.

the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should

be disallowed because they seek recovery of amounts for which the Commonwealth is not liable.

### C.  No Liability for Claims Based on Investments in Mutual Funds

47.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport

to be based in part on investment(s) in one or more mutual funds that, in turn, may have invested

in bonds issued by the Debtors (collectively, the "Partial Mutual Funds Claims").

48.     A claimant bears the burden of establishing standing to file a proof of claim.  *In re

Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).  It is well-established that only a creditor

or the creditor's authorized agent has standing to assert a claim.  Fed. R. Bankr. P. 3001(b); 11

U.S.C. §§ 501(a) ("A creditor or an indenture trustee may file a proof of claim."); *In re Melillo*,

392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Only a creditor or indenture trustee may file a proof of

claim.").  Parties with merely derivative interests lack standing to assert a claim against a debtor's

estate.  *Matter of Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (finding party with

"relationship with Debtor [that] is not direct, but rather derivative" was "a stranger to Debtor's

bankruptcy proceedings," with "no claim against the estate's assets," and "as a general rule has no

standing in Debtor's bankruptcy proceedings"); *see also In re Tower Park Properties, LLC*, 803

F.3d 450, 462-63 (9th Cir. 2015) (holding a trust beneficiary was not a party in interest); *In re

Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest

are asserted, those rights must be asserted by the party in interest, not someone else."); *In re Lopez*,

446 B.R. 12, 17 (Bankr. D. Mass. 2011) (to establish oneself as a party in interest "the moving

party must be asserting its own rights and not those belonging to or derivative of a third party");

*In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (recognizing the "general principle that

'party in interest standing does not arise if a party seeks to assert some right that is purely derivative

of another party's rights in the bankruptcy proceeding'" (quoting *In re Refco*, 505 F.3d at 115 n. 10)).

49.    "A creditor, under the [Bankruptcy] Code, is one who has a claim *against the debtor or the estate*," rather than "a creditor of one of the debtor's creditors." *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997).  Because, at most, the Mutual Funds Claims were filed based on the claimant's status as an alleged creditor of an alleged creditor of the Commonwealth, the Mutual Funds Claims were not filed by an actual creditor of the Commonwealth. *See In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (holding receiver lacked standing to file a proof of claim because it was not a creditor or an authorized agent of a creditor).  Instead, the Mutual Funds Claims are derivative of claims that must be asserted by the mutual funds directly for any claimed recovery to be considered by the Court. *See Matter of Goldman*, 82 B.R. at 896 (finding party with "derivative" relationship has "no claim against the estate's asset" and "as a general rule has no standing in Debtor's bankruptcy proceedings").  Moreover, it is unknown whether the mutual fund still retains ownership of the suspect bonds.

50.    Indeed, under nearly identical circumstances, this Court previously disallowed claims filed against COFINA by investors in mutual funds that in turn allegedly invested in COFINA bonds for "lack of an individual interest in COFINA securities." *Tr. of March 13, 2019 Hr'g Before the Hon. Laura Taylor Swain* [ECF No. 5969], at 64:01-10 ("THE COURT: So just so that I understand, his documentation shows that he is a mutual fund investor.  To the extent any of those mutual funds actually holds COFINA bonds, the mutual fund would be the appropriate claimant, and so he has provided no evidence of a valid direct claim as against COFINA?  MS. STAFFORD: Correct, your Honor.  THE COURT: The objection to the claim is sustained and the claim is disallowed for lack of an individual interest in COFINA securities."); *see also Order Granting Sixty-Fourth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to*

*Claims Based on Investments in Mutual Funds* [ECF No. 9099]; *Memorandum Order Denying Motion to Alter or Amend Order Sustaining Objection (Dkt. 8297) to Claims No. 152470 & No. 152283* [ECF No. 9121].  The First Circuit has upheld that determination.  *See* Case No. 19-2231, Doc. No. 00117746322, dated May 27, 2021.  Accordingly, the claimants are not creditors of the Debtors and lack standing to assert derivative claims.  Because the Debtors cannot be held liable for the Partial Mutual Funds Claims, these claims should be partially disallowed.

### D.  No Liability for Duplicate Bond Claims

51.      As set forth in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport to assert liability, in part, on the basis of bonds issued by, ERS, PRASA, HTA, PBA, PRIFA, and PRPFC (collectively, the "Partial Duplicate Bond Claims").

52.      Each of the Partial Duplicate Bond Claims purports to assert, in part, liability against the Debtors associated with one or more bonds that is duplicative of one or more Master Claims, which as described above were filed in the Title III Cases on behalf of the holders of certain bonds issued by ERS, PRASA, HTA, PBA, PRIFA, and PRPFC.  Any failure to disallow the Duplicate Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Title III Cases.  The holders of the Duplicate Bond Claims will not be prejudiced by the partial disallowance of their claims because the liabilities associated with the Partial Duplicate Bond Claims are subsumed within one or more Master Claims.

### E.  No Liability for Secondarily Insured Bond Claims that Are Duplicative of Master Claims

53.      As identified in **Exhibit A** hereto, certain portions of the Claims to Be Partially Disallowed should be disallowed because they assert liabilities associated with Secondarily Insured Bonds, which correspond to HTA or PBA bonds issued by HTA or PBA that are

duplicative of liabilities asserted by one or more Master Claims (collectively, the "Partial
Secondarily Insured Bond Claims").

54.     Each of the Partial Secondarily Insured Bond Claims asserts liabilities associated
with Secondarily Insured Bonds.  The CUSIP numbers associated with such Secondarily Insured
Bonds correspond to bonds issued by HTA or PBA and/or bearing original CUSIP numbers.  Those
original CUSIP numbers, which reflect bond issuances in which the claimants hold ownership
interests, are listed in one or more Master Claims.  Therefore, the Partial Secondarily Insured Bond
Claims assert liabilities associated with bonds issued by HTA or PBA that are duplicative of
liabilities asserted by one or more Master Claims.

55.     Any failure to partially disallow the Partial Secondarily Insured Bond Claims will
result in the applicable claimants potentially receiving an unwarranted double recovery against the
Debtors, to the detriment of other stakeholders in the Title III Cases.  The holders of the Partial
Secondarily Insured Bond Claims will not be prejudiced by the partial disallowance of their claims
because the liabilities associated are subsumed within one or more Master Claims.  This Three
Hundred Fifty-Third Omnibus Objection in no way constitutes an objection to any claims held by
the insurer of the Secondarily Insured Bonds, but rather to the holder of the Secondarily Insured
Bonds, which are subject to the Master Claims.

### F.  No Liability for PRASA Senior Lien or AFICA Bonds

56.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed purport
to assert claims based, in part, on the alleged ownership of bonds issued by PRASA or AFICA
(collectively, the "Partial PRASA Senior Lien and AFICA Bondholder Claims").

57.     Each of the Partial PRASA Senior Lien and AFICA Bondholder Claims assert
liabilities associated with PRASA Senior Lien Bonds issued by PRASA or AFICA Bonds issued
by AFICA, each of which are not Title III Debtors, and are separate, legally distinct entities from

the Debtors.  In addition, the Debtors have not guaranteed repayment for the Senior Lien Bonds

or AFICA Bonds.  Further, the Partial PRASA Senior Lien and AFICA Bondholder Claims do not

assert a basis for asserting a claim against the Debtors for bonds issued by PRASA or AFICA that

are not guaranteed by the Debtors.  Accordingly, neither the Debtors nor the Court are able to

determine the validity of the Partial PRASA Senior Lien and AFICA Bondholder Claims.

58.     In support of the foregoing, the Debtors rely on the *Declaration of Jay Herriman
in Support of the Three Hundred Fifty-Third Omnibus Objection (Substantive) of the
Commonwealth of Puerto Rico and Employees Retirement System of the Government of the
Commonwealth of Puerto Rico to Partially Duplicate, Deficient, and No Liability Bond Claims*,
dated June 18, 2021, attached hereto as **Exhibit B**.

## NOTICE

59.     In accordance with the Amended Omnibus Objection Procedures and the Court's

Notice Order, the Debtors are providing notice of this Three Hundred Fifty-Third Omnibus

Objection to (a) the individual creditors subject to this Three Hundred Fifty-Third Omnibus

Objection, (b) the U.S. Trustee, and (c) the Master Service List (as defined by the *Fourteenth
Amended Case Management Procedures* [ECF No. 15894-1]), which is available on the Debtors'

case website at https://cases.primeclerk.com/puertorico.  The notice for this Three Hundred Fifty-

Third Omnibus Objection is attached hereto as **Exhibit C**.  Spanish translations of the Three

Hundred Fifty-Third Omnibus Objection and all of the exhibits attached hereto are being filed with

this objection and will be served on the parties.  The Debtors submit that, in light of the nature of

the relief requested, no other or further notice need be given.

## RESERVATION OF RIGHTS

60.     This Three Hundred Fifty-Third Omnibus Objection is limited to the grounds stated

herein.  Accordingly, it is without prejudice to the rights of the Debtors or the rights of any other

party in interest in the Title III Cases to object to the Claims to Be Partially Disallowed or any other claims on any ground whatsoever.  The Debtors expressly reserve all further substantive or procedural objections.  Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (e) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases under PROMESA, the Bankruptcy Code or any other applicable law.

## **NO PRIOR REQUEST**

61.     No prior request for the relief sought in this Three Hundred Fifty-Third Omnibus Objection has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting such other and further relief as is just.

Dated: June 18, 2021
     San Juan, Puerto Rico

Respectfully submitted,

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García-Benítez
USDC No. 203708
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Employees Retirement System for the Government of the Commonwealth of Puerto Rico*

**Fecha límite para responder: 19 de julio de 2021, a las 04:00 p.m. (AST)**
**Fecha de la vista: 4 de agosto de 2021, a las 9:30 a.m. (AST)**

---

**REVISE DETENIDAMENTE LA PRESENTE OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

### TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO

| | |
|---|---|
| *In re*: <br><br> JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, <br><br> como representante del <br><br> ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al.*, <br><br> Deudores.[1] | PROMESA <br> Título III <br><br> Núm. 17 BK 3283-LTS <br><br> (Administrado Conjuntamente) <br><br> **La presente radicación guarda relación con el ELA y el SRE.** |

### TRICENTÉSIMA QUINCUAGÉSIMA TERCERA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y DEL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO A RECLAMACIONES POR BONOS PARCIALMENTE DUPLICADAS, DEFICIENTES Y EN LAS QUE NO EXISTE RESPONSABILIDAD

---

[1] Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y junto con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de casos de quiebra debido a ciertas limitaciones en el programa informático).

A la atención de su señoría, Juez del Tribunal de Distrito de los Estados Unidos, Laura Taylor
Swain:

El Estado Libre Asociado de Puerto Rico (el "ELA") y el Sistema de Retiro de los
Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE", y junto con el ELA,
los "Deudores"), como el único representante de Título III de los Deudores conforme a la sección
315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico*
("PROMESA"), [2] radican esta tricentésima quincuagésima tercera objeción global (la
"Tricentésima quincuagésima tercera objeción global") a las evidencias de reclamaciones que
aparecen en el **Anexo A** del presente documento, cada una de las cuales se basa parcialmente en
*a*) bonos emitidos por la Corporación del Fondo de Interés Apremiante de Puerto Rico
("COFINA"), *b*) reclamaciones por bonos que constituyen duplicados con respecto a una o más
evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados
bonistas, *c*) reclamaciones por bonos que alegan responsabilidades vinculadas con bonos
asegurados en el mercado secundario que, a su vez, constituyen duplicados con respecto a
evidencias de reclamaciones radicadas contra los Deudores en nombre de los tenedores de dichos
bonos, d) una participación patrimonial en bonos emitidos por el Banco Gubernamental de
Fomento para Puerto Rico (el "BGF"), *e*) una o más inversiones en fondos mutuos, que a su vez,
pudieron haber invertido en bonos emitidos por los Deudores, y/o *f*) una participación patrimonial
en bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA")
y/o la Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas,
Médicas y de Control Ambiental (la "AFICA"), que no son Deudores de Título III, por unos
montos por los que los Deudores no han garantizado el reembolso. Además, en la medida en que

---

[2] PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101 a 2241.

las evidencias de reclamaciones que aparecen en el **Anexo A** pretendan alegar responsabilidades

adicionales más allá de los bonos identificados en la documentación justificativa adjunta a dichas

evidencias de reclamaciones, estas son deficientes, puesto que no brindan la información suficiente

para que los Deudores puedan reconciliar las evidencias de reclamaciones. Asimismo, una parte

de cada reclamación que aparece en el **Anexo A** del presente documento seguirá estando radicada

contra los Deudores. Los Deudores se reservan el derecho a oponerse a cualquiera de los montos

restantes alegados en las reclamaciones, según se identifican en la columna titulada "Corregidas"

del **Anexo A** del presente documento, sobre la base de los motivos que fuere. En apoyo de la

Tricentésima quincuagésima tercera objeción global, los Deudores manifiestan respetuosamente

lo siguiente:

## JURISDICCIÓN

1.      El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene

jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme

a la sección 306(a) de PROMESA.

2.      La sede judicial de este distrito es la competente conforme a la sección 307(a) de

PROMESA.

## ANTECEDENTES

**A.      Órdenes de Fecha Límite**

3.      El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de

reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición

voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso

conforme al Título III de dicho cuerpo legal (el "Caso de Título III del ELA"). El 21 de mayo de

2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones

104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el SRE conforme a

3

la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (respectivamente, el "Caso de Título III del SRE", y junto con el Caso de Título III del ELA, los "Casos de Título III"). El 29 de junio de 2017, el Tribunal dictó una orden por la que concedió la administración conjunta de los Casos de Título III únicamente con fines procesales. ECF núm. 537.[3]

4.      El 16 de enero de 2018, los Deudores radicaron su *Moción de una orden que A) fije fechas límite y procedimientos para radicar evidencias de reclamaciones y B) apruebe la forma y la manera de su notificación* [ECF núm. 2255] (la "Moción de Fecha Límite"). Conforme a la *Orden que A) fija fechas límite y procedimientos para radicar evidencias de reclamaciones y B) aprueba la forma y la manera de su notificación* [ECF núm. 2521] (la "Orden Inicial de Fecha Límite"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite y fijó fechas límite y procedimientos para radicar evidencias de reclamaciones en el marco de los Casos de Título III. Luego de la moción informativa de determinados acreedores, y del apoyo de los Deudores, el Tribunal dictó a continuación la *Orden que A) extendió fechas límite para radicar evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF núm. 3160] (conjuntamente con la Orden Inicial de Fecha Límite, las "Órdenes de Fecha Límite"), extendiendo dichas fechas límite hasta el 29 de junio de 2018, a las 04:00 p.m. (AST).

## B.      Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de Título III del ELA

5.      Conforme a la Orden Inicial de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamación

---

[3] Salvo disposición en contrario contenida en el presente documento, las citas ECF harán referencia a documentos radicados en el marco del Caso de Quiebra Núm. 17 BK 3283-LTS.

principal contra el deudor pertinente, en su propio nombre y en el de todos los titulares de las reclamaciones por bonos para la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos de fideicomiso, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite, ¶ 5(a). Como se explica más adelante, se han radicado evidencias de reclamaciones principales (conjuntamente, las "Reclamaciones Principales") en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos emitidos por el SRE, la AAA, la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT"), la Autoridad de Edificios Públicos de Puerto Rico (la "AEP"), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (la "AFI"), y la Corporación para el Financiamiento Público de Puerto Rico (la "CFP").

6.     *AEP*: la AEP supuestamente emitió Bonos de Renta para financiar edificios de oficinas y otras instalaciones arrendadas a varios departamentos, agencias públicas e instrumentalidades del ELA. US Bank y US Bank Trust actúan como agentes fiscales en relación con determinados bonos de renta emitidos por la AEP, conforme a lo explicado en la nota al pie 3 de la Evidencia de reclamación núm. 62833 (los "Bonos de la AEP") y, en nombre de los tenedores de los Bonos de la AEP, radicaron una evidencia de reclamación principal en el marco del Caso de Título III del ELA por todos los montos pendientes de pago adeudados (la "Reclamación Principal de la AEP"), que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 62833. [4]   La Reclamación Principal de la AEP alega reclamaciones liquidadas por aproximadamente $4000 millones en concepto de principal supuestamente impagado, $160 millones en concepto de intereses supuestamente impagados y reembolso de comisiones y gastos de los agentes fiscales, además de reclamaciones no liquidadas y contingentes por la totalidad de

---

[4]  La Evidencia de reclamación núm. 62833 enmendó y sustituyó la Evidencia de reclamación núm. 13351, que fue radicada inicialmente por el Agente Fiscal.

los montos adeudados "en razón de la totalidad de las reclamaciones que el Agente Fiscal tenga o

pueda tener en relación con las obligaciones de Bonos pendientes, conocidos o por conocer, contra

el ELA y aquellos que pretendan actuar en nombre del ELA. . . ." Cláusula Adicional de la

Reclamación Principal de la AEP, ¶¶ 19-21.

7.      Determinados bonos o pagarés emitidos por la AEP han sido asegurados por una o

más aseguradoras de bonos municipales, ya sea en el mercado primario o en el secundario. El

seguro de bonos municipales se obtiene en el mercado primario cuando el municipio emisor de los

bonos contrata una compañía de seguros para suscribir una póliza de seguro en relación con dicha

serie de bonos. En el caso de que un bono no se asegure en el mercado primario, los tenedores de

tales bonos no asegurados podrían optar por obtener un seguro a través del mercado secundario.

Los tenedores de los bonos no asegurados que busquen obtener un seguro en el mercado secundario

entran en una relación contractual directamente con una aseguradora de bonos municipales, por lo

que el emisor original no es parte en dicho proceso de contratación. Cuando un tenedor de un bono

no asegurado obtiene una póliza de seguro en el mercado secundario, se emite un nuevo número

CUSIP que corresponde a los números CUSIP originales asignadas a los bonos en el momento de

su emisión. Determinados bonos emitidos por la AEP han sido asegurados en el mercado

secundario y, en consecuencia, se les han emitido nuevos números CUSIP que corresponden a los

bonos emitidos por la ACT que llevan números CUSIP originales (los "Bonos AEP asegurados en

el mercado secundario").

8.      ***SRE***: el SRE es un organismo gubernamental, aparte e independiente del Gobierno

del ELA y de sus demás instrumentalidades. *Véase* 3 L.P.R.A § 775.[5] Supuestamente conforme a

---

[5] El 21 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración
conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio
para el SRE conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III
de dicho cuerpo legal.

la Resolución sobre bonos para el financiamiento de pensiones, adoptada el 24 de enero de 2008,

y ciertas resoluciones complementarias, el SRE emitió unos bonos prioritarios y subordinados para

el financiamiento de pensiones (los "Bonos del SRE"), por un monto total del principal original de

aproximadamente $2900 millones.[6] BNYM actúa como agente fiscal con respecto a los Bonos del

SRE. Actuando en nombre de los tenedores de los Bonos del SRE, BNYM radicó una evidencia

de reclamación principal en el marco del Caso de Título III del ELA (la "Reclamación Principal

del SRE", que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 32004.[7]

9.     ***CFP***: la CFP es una corporación subsidiaria del BGF creada conforme a la

Resolución núm. 5044 de la Junta Directiva del BGF, en su versión enmendada (la "Resolución

núm. 5044"), adoptada de conformidad con la autoridad concedida en virtud de la Ley núm. 17 de

la Asamblea Legislativa de Puerto Rico, aprobada el 23 de septiembre de 1948, en su versión

enmendada. Proporciona a los organismos públicos, instrumentalidades, municipios y a otras

subdivisiones del ELA mecanismos alternativos para satisfacer sus necesidades de financiamiento.

---

[6] El 12 de marzo de 2019, el Comité Oficial de Acreedores no Asegurados radicó una *Objeción global a reclamaciones radicadas por los tenedores de los bonos emitidos por el SRE* [Caso núm. 17-3566, ECF núm. 381], basándose en que la emisión de los bonos supuso un exceso de la potestad legal del SRE, por lo que era *ultra vires*, anulando de pleno derecho los Bonos del SRE. El 23 de abril de 2019, el Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico radicó una *Objeción Global del Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico, conforme al artículo 502 del Código de Quiebras y la regla 3007 de las Reglas de Quiebras, a reclamaciones radicadas o alegadas por los tenedores de los Bonos del SRE contra el SRE y el ELA* [Caso núm. 17-3283, ECF núm. 6482], basándose, entre otras cosas, en que la emisión de los bonos fue *ultra vires*. El SRE se reserva el derecho a impugnar la emisión de los bonos sobre cualquier motivo, incluso sobre el motivo de que los Bonos del SRE eran *ultra vires*, y cualquier otro motivo recogido en las objeciones precedentes.

[7] El 22 de mayo de 2019, el ELA radicó una objeción a la Evidencia de Reclamación Principal del SRE. Véase Objeción de la Junta de Supervisión y Administración Financiera, conforme al artículo 502 del Código de Quiebras y la regla 3007 de las Reglas de Quiebras, a las reclamaciones radicadas o alegadas contra el ELA por el Bank of New York Mellon, como agente fiscal (Reclamación núm. 16775) [ECF núm. 7075]. En aras de la claridad, la presente Tricentésima décima objeción global se radica sin perjuicio de los derechos de las partes en relación con dicha objeción, incluyendo cualesquiera derechos a intervenir, que quedan reservados.

La CFP tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones. U.S. Bank Trust actúa como fiduciario en relación con unos bonos, serie 2012A y series 2011A y B, emitidos por la CFP (los "Bonos de la CFP"). Actuando en nombre de los tenedores de los Bonos de la CFP, US Bank Trust radicó una evidencia de reclamaciones contra el ELA (la "Reclamación Principal de la CFP"), que fue registrada por Prime Clerk como Evidencia de reclamación núm. 13374.

10.  **_ACT_**: la ACT es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm. 74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT se encarga de la construcción, operación y mantenimiento de carreteras y otros sistemas de transportación en el ELA. *Véase* 9 L.P.R.A § 2002. La Ley para crear la ACT autoriza a la ACT a emitir bonos. *Véase* 9 L.P.R.A. §§ 2004(g), (h), (l). Conforme a dicha normativa legal, la ACT emitió varias series de bonos al amparo de dos resoluciones diferentes (los "Bonos de la ACT"): (*i*) la Resolución núm. 68-18, adoptada el 13 de junio de 1968 (la "Resolución de 1968", y *ii*) la Resolución núm. 98-06, adoptada el 26 de febrero de 1998 (la "Resolución de 1998"). Desde el 21 de mayo de 2017, la fecha de petición de la ACT, aproximadamente $830 millones del monto principal de los bonos emitidos conforme a la Resolución de 1968 quedan pendientes de pago, y aproximadamente $3400 millones del monto principal de los bonos emitidos conforme a la Resolución de 1998 quedan igualmente pendientes de pago. BNYM actúa como agente fiscal con respecto a los Bonos de la ACT.

11.  Actuando en nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias de reclamaciones principales en el marco del Caso de Título III del ELA (las "Reclamaciones Principales ACT-ELA"), cada una de las cuales alegaba "una reclamación garantizada, contingente y no liquidada contra el ELA en razón de la totalidad de las

reclamaciones, causas de acción, derechos y/o remedios que el Agente Fiscal o los Propietarios puedan tener contra el ELA, conforme a derecho o equidad. . . ." *Véase* Adenda de la Evidencia de reclamación núm. 121053, ¶ 15; Adenda de la Evidencia de reclamación núm. 120982, ¶ 15; Adenda de la Evidencia de reclamación núm. 115380, ¶ 15.[8]

12.     Determinados bonos emitidos por la ACT han sido asegurados en el mercado secundario y, en consecuencia, se les han emitido nuevos números CUSIP que corresponden a los bonos emitidos por la ACT que llevan números CUSIP originales (los "Bonos ACT asegurados en el mercado secundario", y junto con los Bonos AEP asegurados en el mercado secundario, los "Bonos asegurados en el mercado secundario").

13.     *AAA*: la AAA es propietaria y opera los sistemas públicos de suministro de agua y de aguas residuales en Puerto Rico. La AAA emitió determinados bonos de renta (los "Bonos de la AAA"), conforme a la Resolución de la Autoridad de Acueductos y Alcantarillados de Puerto Rico núm. 1583, por la que se autorizan y garantizan los bonos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico avalados por el Estado Libre Asociado de Puerto Rico, y algunas resoluciones complementarias. El Banco Popular de Puerto Rico ("Banco Popular") actúa como fideicomisario en relación con los Bonos de la AAA, y radicó una evidencia de reclamación principal contra el ELA en nombre de los tenedores de los Bonos de la AAA, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 22620 (la "Reclamación Principal de la AAA"). La Reclamación Principal de la AAA alega "una reclamación contingente contra el ELA en relación con los Bonos por un importe de al menos $284,755,000, además de todos los intereses y primas generados sobre los Bonos a partir de la Fecha de Petición, así como la totalidad

---

[8]  Aunque BNYM radicó inicialmente tres evidencias de reclamaciones registradas por Prime Clerk como Evidencias de reclamaciones núms. 21286, 26541 y 35277, estas fueron sustituidas y enmendadas por las Evidencias de reclamaciones núms. 121053, 120982 y 115380.

de las tasas, costos y gastos u otros cargos acumulados que hayan devengado o sean cobrables en relación con tales Bonos". Adenda de la Evidencia de Reclamación Principal de la AAA, ¶ 9.

14.    *AFI*: la AFI es una filial del Banco Gubernamental de Fomento (el "BGF") y constituye una instrumentalidad del Gobierno del ELA. La AFI fue creada en 1988 mediante la Ley núm. 44-1988 (la "Ley para crear la AFI"). La AFI brinda asistencia financiera, administrativa y de otro tipo al ELA, a sus corporaciones públicas y a otras instrumentalidades encargadas del desarrollo y del funcionamiento de las infraestructuras. Actuando en nombre de los tenedores de varios bonos y pagarés emitidos por la AFI (conjuntamente, los "Bonos de la AFI"), BNYM, US Bank y UMB Bank, N.A. radicaron evidencias de reclamaciones principales contra el ELA (conjuntamente, las "Reclamaciones Principales de la AFI"). US Bank radicó una evidencia de reclamación principal en relación con determinados Bonos de la AFI, que fue registrada por Prime Clerk como Evidencia de reclamación núm. 13386, en nombre de los tenedores de los Bonos de impuestos sobre el ron de la AFI (Bonos de renta de impuestos especiales, series 2005A, 2005B, 2005C y serie 2006B), alegando "reclamaciones por montos contingentes y no liquidados en relación con los intereses pagaderos a futuro, intereses devengados y a devengar en el futuro en lo referente al principal e intereses vencidos, tarifas y costos y reclamaciones por indemnización del Fiduciario que se incurran en el futuro en virtud de los Documentos de los bonos, así como por la totalidad de los montos adeudados en razón de todas las reclamaciones que tenga o pueda tener el Fiduciario en relación con las Obligaciones de bonos pendientes, monto mínimo de $249,099,446.17. . . ." Cláusula adicional de la Evidencia de reclamación núm. 13386, ¶ 26.

**C.    Deuda de los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico**

15.    La AAA fue creada de conformidad con la Ley núm. 40, de 1 de mayo de 1945. La AAA es una "corporación pública e instrumentalidad gubernamental autónoma", creada para la

prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 142,

144.

16.    La Ley para crear la AAA autoriza a la AAA a emitir bonos.  22 L.P.R.A. § 144(g).

Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA

a emitir bonos, lo que incluye la Resolución núm. 1583, en su versión enmendada y modificada el

7 de marzo de 2008 (la "Resolución núm. 1583"). En 2008, la AAA emitió unos bonos de renta,

Serie A, por un monto del principal de $1,316,204,456 (los "Bonos prioritarios serie A de 2008")

Además en 2012, la AAA emitió simultáneamente unos bonos de renta, Serie 2012 A, por un monto

del principal de $1.800.450.000 (los "Bonos prioritarios serie A de 2012") y unos bonos de renta,

Serie 2012 B, por un monto del principal de $295,245,000 (los "Bonos prioritarios serie B de

2012", y junto con los Bonos prioritarios serie A 2012 y los Bonos prioritarios serie A 2008, los

"Bonos de Gravamen Prioritarios de la AAA").

17.    Los tenedores de los Bonos de Gravamen Prioritarios de la AAA han recibido, y

siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de

la AAA, a medida que estos vencen y se vuelven pagaderos. En consecuencia, en el EMMA se

indica que la AAA no ha enviado ninguna notificación de incumplimiento en relación con los

Bonos de Gravamen Prioritarios de la AAA.[9] Además, el ELA no ha garantizado el reembolso de

los Bonos de Gravamen Prioritarios. En consecuencia, las declaraciones de oferta relativas a los

Bonos de Gravamen Prioritarios de la AAA indican que "no constituyen deuda del Estado Libre

Asociado de Puerto Rico ni de ninguno de sus municipios u otras subdivisiones políticas, con la

excepción de [la AAA], por lo que ni el Estado Libre Asociado de Puerto Rico ni ningunos de

---

[9]                              *Véase,*                     *por*                      *ejemplo*,
https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

dichos municipios u otras subdivisiones políticas, con la excepción de [la AAA], será responsable por el pago del principal o de los intereses sobre los referidos Bonos".[10]

**D.    Deuda de los bonos emitidos por la Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental**

18.    La AFICA es una corporación pública e instrumentalidad gubernamental del ELA creada por la Ley núm. 121 de la Asamblea Legislativa de Puerto Rico, aprobada el 27 de junio de 1977 (en su versión enmendada, complementada y codificada en las Leyes de Puerto Rico Anotadas, título 12, § 1251 *et seq.*). Leyes de Puerto Rico Anotadas, título 12, § 1254. La AFICA facilita el financiamiento de proyectos para fomentar el desarrollo económico del ELA, incluyendo a través del desarrollo y construcción de nuevas infraestructuras industriales, comerciales, turísticas, agrícolas, educativas, médicas y de control medioambiental.

19.    En 2000, la AFICA emitió Bonos de Renta Turística, 2000 Serie A (los "Bonos Palma del Mar 2000 Serie A"), por un monto total de $30,000,000, para financiar, en parte, mejoras en el Palmas del Mar Country Club. Los Bonos Palmas del Mar 2000, Serie A, son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Palmas Country Club, Inc. La declaración de oferta emitida en relación con los Bonos Palmas del Mar 2000 Serie A dispone que los bonos "no constituirán endeudamiento del [ELA] ni de ninguna de sus subdivisiones políticas". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta Turística, 2000 Serie A (Proyecto Palmas del Mar Country Club), *disponible en* https://emma.msrb.org/Security/Details/AD88773EB8772C017819AB0B921B2DAD5.

---

[10] *Véase, por ejemplo,* Declaración de Oferta relativa a los Bonos de Renta de la AAA, Serie B (Gravamen Prioritario), 15 de febrero de 2012, disponible en https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

20.     En 2002, la AFICA emitió Bonos de Renta y de Renta de Refinanciamiento de Educación Superior, 2002 Serie A (los "Bonos de la Universidad Serie 2002 A"), por un monto total de $34,330,000.00, para proporcionar, en parte, financiamiento para *i*) la construcción de determinados centros educativos pertenecientes, o que pertenecerían, a la Universidad Politécnica de Puerto Rico (la "Universidad"), *ii*) el refinanciamiento de determinadas emisiones de bonos anteriores y *iii*) ciertos costos incurridos para asegurar y emitir los Bonos de la Universidad Serie 2002 A. Los Bonos de la Universidad Serie 2002 A son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y la Universidad. La declaración de oferta emitida en relación con los Bonos de la Universidad Serie 2002 A dispone que los bonos "no constituirán endeudamiento del ELA ni de ninguna de sus subdivisiones políticas, salvo [la AFICA], y ni el ELA ni ninguna de sus subdivisiones políticas, salvo [la AFICA], será responsable de su pago". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta y de Renta de Refinanciamiento de Educación Superior Serie 2002 A (Proyecto Universidad Politécnica     de     Puerto     Rico),     *disponible     en* https://emma.msrb.org/Security/Details/AA9A902D905B8AF8265EDFE55EEC98D6E.

21.     En 2011, la AFICA emitió Bonos de Renta de Refinanciamiento Industrial, 2011 Serie A (los "Bonos Galería 2011 Serie A") por un monto total de $59,649,744.50 para financiar, en parte, la operación de cierto espacio comercial minorista y de oficinas perteneciente y operado por Caparra Hills, Inc. Los Bonos Galería 2011 Serie A, son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Caparra Hills, Inc. La declaración de oferta emitida en relación con los Bonos Galería 2011 Serie A dispone que los bonos "no constituyen endeudamiento del ELA ni de ninguna de sus subdivisiones políticas, salvo [la AFICA], y ni el ELA ni ninguna de sus subdivisiones políticas, salvo [la AFICA], será

responsable de su pago". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Refinanciamiento Industrial 2011 Serie A (Proyecto Galería Tower en San Patricio), *disponible                                                                                          en*

https://emma.msrb.org/Security/Details/A95ABBB582ECE40E0D6ED039C687C3542.

22.    También en 2011, la AFICA emitió Bonos de Renta de Refinanciamiento Turístico, 2011 Serie A (los "Bonos Trump Golf Club 2011 Serie A", y junto con los Bonos Palmas del Mar 2000 Serie A, los Bonos de la Universidad Serie 2002 A y los Bonos Galería 2011 Serie A, los "Bonos AFICA"), por un monto total de $26,355,000.00, para refinanciar parcialmente parte de la construcción del Trump International Golf Club Puerto Rico. Los Bonos Trump Golf Club 2011 Serie A son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Coco Beach Golf & Country Club, S.E. La declaración de oferta emitida en relación con los Bonos Trump Golf Club 2011 Serie A dispone que los bonos "no constituyen endeudamiento del ELA ni de ninguna de sus subdivisiones políticas, salvo [la AFICA], y ni el ELA ni ninguna de sus subdivisiones políticas, salvo [la AFICA], será responsable de su pago". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta de Refinanciamiento Turístico 2011 Serie A (Proyecto Trump International Golf Club Puerto Rico), *disponible                                                                                          en*

https://emma.msrb.org/Security/Details/A1A77B5F6CEF57494504C49A90359E23A.

**E.    Caso de Título III de COFINA y resolución de la controversia entre el ELA y COFINA**

23.    COFINA es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm. 91 de la Asamblea Legislativa del ELA. Conforme a la Resolución enmendada y modificada sobre

14

los bonos del fondo de interés apremiante, adoptada el 13 de julio de 2007, en su versión enmendada del 19 de junio de 2009, y de conformidad con otras resoluciones complementarias, COFINA emitió una serie de bonos por un monto total de aproximadamente $17,000 millones para, entre otras cosas, sufragar determinadas obligaciones de deuda del Banco Gubernamental de Fomento para Puerto Rico y de la Corporación para el Financiamiento Público de Puerto Rico (los "Bonos de COFINA"). El Bank of New York Mellon actúa como fiduciario con respecto a los Bonos de COFINA.

24.     La Junta de Supervisión radicó el *Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* (el "Plan") [ECF núm. 4652] el 9 de enero de 2019. El Tribunal examinó la confirmación del Plan y las objeciones formuladas a este en una vista celebrada los días 16 y 17 de enero de 2019.

25.     El 4 de febrero de 2019, el Tribunal confirmó el Plan que incorporaba el pacto y la conciliación de la controversia sobre si, luego de examinar todas las contestaciones y reconvenciones sustantivas y procesales, incluidas cuestiones constitucionales, los impuestos sobre la venta y uso supuestamente empeñados por COFINA para garantizar la deuda son propiedad del ELA o de COFINA conforme a la normativa legal aplicable (la "Controversia entre el ELA y COFINA"). *Véase la Orden y la Sentencia que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF núm. 5048]. Ese mismo día, el Tribunal aprobó el pacto y la conciliación de la Controversia entre el ELA y COFINA conforme al *Dictamen abreviado y orden que aprueba la conciliación entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF núm. 5045] (la "Orden de Conciliación"). El 5 de febrero de 2019, el Tribunal dictó una *Orden y Sentencia enmendadas que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico*

*elaborado conforme al Título III* [ECF núm. 5055] (la "Orden de Confirmación Enmendada"). El Plan entró en vigor el 12 de febrero de 2019 (la "Fecha de entrada en vigor"), una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III, según el Título III de PROMESA, y B) acontecimiento de la Fecha de entrada en vigor* [Caso núm. 17 BK 3284-LTS, ECF núm. 587].

**F.     Procedimientos conforme al Título VI del BGF y modificación calificada**

26.     El BGF es una entidad pública e instrumentalidad gubernamental del ELA, creada por la Asamblea Legislativa en 1948 para ayudar al Gobierno del ELA (el "Gobierno") a llevar a cabo sus tareas fiscales y a desempeñar su responsabilidad con mayor eficacia en relación con el desarrollo de la economía del ELA. El 28 de abril de 2017, la Junta de Supervisión aprobó por unanimidad el Plan fiscal del BGF de febrero de 2017, que contemplaba una terminación ordenada de las actividades del BGF sobre la base de la determinación de que el BGF no era viable a largo plazo dadas sus condiciones financieras vigentes en ese momento.

27.     El 12 de julio de 2017, la Junta de Supervisión dictó una resolución por la que se autorizaba al BGF, conforme a la sección 601(e) de PROMESA, a ampararse en el título VI de PROMESA. El 10 de agosto de 2018, el BGF radicó una solicitud de aprobación de una modificación calificada, conforme a la sección 601(m)(1)(D) de PROMESA (la "Modificación Calificada"), ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

28.     El 7 de noviembre de 2018, el Tribunal aprobó la Modificación Calificada conforme a la sección 601(m)(1)(D) de PROMESA. *Véase* ECF núm. 270 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 7 de nov. de 2018). La Modificación Calificada dispone, entre otras cosas, i) la emisión de nuevos bonos por la recién creada Autoridad de Recuperación de Deuda del BGF (GDB Debt Recovery Authority) a cambio

16

de la cancelación (entre otras cosas) de determinados bonos de participación y reclamaciones de bonos garantizados (conjuntamente, los "Bonos del BGF"); ii) la extinción de la garantía del ELA de los bonos garantizados tras el intercambio y cancelación de los bonos garantizados; y iii) la liberación de reclamaciones de los tenedores de Bonos del BGF contra el BGF y sus afiliados en relación con (entre otras cosas) cualquier inversión con el BGF o la compra, venta o transferencia de cualquier título valor o participación del BGF, y cualquier acción u omisión con respecto a cualquier endeudamiento o préstamo al BGF (incluidos cualesquiera pagarés emitidos o depósitos poseídos por el BGF) o del BGF. *Declaración de Solicitación,* en 57-60, ECF núm. 1-15 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 10 de ago. de 2018).

29.     El 29 de noviembre de 2018, el BGF anunció la consumación de la Modificación Calificada del BGF. Nota de prensa, *el Gobierno de Puerto Rico anuncia la consumación de la Modificación Calificada del BGF*, Gobernador de Puerto Rico (29 de nov. de 2018), disponible en http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

## G.     Evidencias de reclamaciones radicadas, procedimientos relativos a objeciones globales y objeciones a reclamaciones

30.     Hasta la fecha, se han radicado aproximadamente 179,420 evidencias de reclamaciones contra los Deudores, que han sido registradas por Prime Clerk, LLC. Dichas evidencias de reclamaciones ascienden a un total aproximado de $43.59 billones en reclamaciones radicadas contra los Deudores, además de los montos no liquidados reclamados.

31.     De las evidencias de reclamaciones radicadas, aproximadamente 116,160 han sido radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. Aproximadamente 53,022  evidencias de reclamaciones han sido radicadas en relación con el SRE, o reclasificadas como radicadas contra el SRE. De conformidad con las condiciones de las Órdenes

de Fecha Límite, muchas de estas reclamaciones no tenían que haber sido radicadas en absoluto o adolecen de otro tipo de vicios; por ejemplo, haber sido enmendadas posteriormente, no alegar una reclamación por la que los Deudores sean responsables, estar duplicadas en relación con otras evidencias de reclamaciones o no aportar información necesaria para que los Deudores determinen si la reclamación es válida.

32.     Para resolver eficazmente el mayor número posible de las evidencias de reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su *Moción para que se dicte una orden que A) apruebe procedimientos limitados relativos a objeciones globales, B) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) conceda el remedio relacionado* [ECF núm. 4052] (la "Moción de Procedimientos Globales"). El Tribunal concedió el remedio solicitado en la Moción de Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden que A) aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado* [ECF núm. 4230]; *Procedimientos relativos a Objeciones Globales* [ECF núm. 4230-1] (conjuntamente, los "Procedimientos Iniciales relativos a Objeciones Globales"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF núm. 4381] (la "Orden de Notificación").

33.     En aras del interés constante de resolver eficazmente cualesquiera evidencias de reclamaciones innecesarias, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar

18

objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden que A) apruebe Procedimientos Enmendados relativos a Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF núm. 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden que A) aprueba Procedimientos Enmendados relativos a Objeciones Globales, B) exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF núm. 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

34.     Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal ha celebrado hasta la fecha más de 14 vistas vinculadas con más de 140 objeciones globales radicadas por el ELA, COFINA, la ACT, el SRE y/o la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE"). Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, aproximadamente 101,019 reclamaciones que reivindicaban $43.59 billones en responsabilidad contra el ELA, COFINA, la ACT, la AEE y el SRE fueron rechazadas y retiradas del registro de reclamaciones en el marco de los procedimientos radicados conforme al Título III.

35.     Esta Tricentésima quincuagésima tercera objeción global se radica de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

### **OBJECIONES A EVIDENCIAS DE RECLAMACIONES**

36.     Los Procedimientos Enmendados relativos a Objeciones Globales permiten a los Deudores radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las bases recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de

19

Quiebra (*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas establecidas en los Procedimientos Enmendados relativos a Objeciones Globales.

37.     La Tricentésima quincuagésima tercera objeción global pretende rechazar parcialmente, de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales, evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento (conjuntamente, las "Reclamaciones que han de ser rechazadas parcialmente"), cada una de las cuales pretende alegar responsabilidades surgidas de "bonos", "Propiedad de bonos según se describe en el documento adjunto", "Bonos comprados/dinero prestado al ELA" u otros términos similares que alegan responsabilidades vinculadas con inversiones en bonos emitidos por el Gobierno. En algunos casos, las Reclamaciones que han de ser rechazadas parcialmente proporcionaban como documentación justificativa una copia de un extracto de corretaje u otra documentación justificativa que contenía información sobre bonos supuestamente en posesión del reclamante, pero no proporcionaron la información necesaria para que los Deudores puedan reconciliar las reclamaciones; como por ejemplo, los números CUSIP o montos de los bonos concretos que los reclamantes pretenden alegar. Además, los montos de los bonos incluidos en dicha documentación justificativa no correspondían con el monto que figuraba en la evidencia de reclamación del reclamante. En otros casos, las Reclamaciones que han de ser rechazadas parcialmente no contenían ninguna documentación justificativa.

38.     El 13 de agosto de 2019, el Tribunal dictó la *Orden que concedió parcialmente y levantó parcialmente la Moción de los Deudores para dictar una orden que A) autorice procedimientos alternativos de resolución de controversias, B) apruebe formas de notificación adicionales, C) apruebe envíos propuestos y D) conceda el remedio relacionado* [ECF núm. 8453] (la "Orden de Envío Autorizado") que autorizó que los Deudores realizaran envíos "a cualquier

reclamante que no haya proporcionado suficiente información que permitiera a los Deudores

procesar sus reclamaciones". Orden de Envío Autorizado, ¶ 3.

39.    Conforme a la Orden de Envío Autorizado, "[s]i los Deudores realizan el Envío

Propuesto al reclamante, y este último no responde o responde pero no aporta suficiente

información que permita a los Deudores reconciliar su reclamación, los Deudores tendrán derecho

a oponerse a la reclamación como deficiente". *Id.*

40.    De conformidad con la Orden de Envío Autorizado, los Deudores han enviado al

menos una carta a cada reclamante objeto de la presente Tricentésima quincuagésima tercera

objeción global esencialmente en el formato que se adjunta a la Orden de Envío Autorizado como

Anexo 1 (el "Envío"). Cada Envío, en la parte pertinente, rezaba lo siguiente:

> Se requiere información adicional para que los Deudores sigan
> examinando su reclamación. Los Deudores no pueden determinar a
> partir de la información que usted proporcionó cuál es la base de la
> reclamación que trata de alegar contra uno o más Deudores. Al
> responder a esta carta, rogamos se asegure de proporcionar toda la
> información solicitada, así como tantos detalles como sea posible
> aportar sobre su reclamación. Las descripciones que incorporó en su
> evidencia de reclamación eran demasiado vagas para que los
> Deudores comprendieran la reclamación que usted trata de alegar,
> de manera que rogamos proporcione más detalles y no se limite
> simplemente a copiar la misma información.
> *Véase* ECF núm. 8453-1 en 2, 7.

41.    Los Envíos recibidos por los reclamantes objeto de la presente Tricentésima

quincuagésima tercera objeción global exigían a los reclamantes responder en un plazo de 30 días.

*Véase id.* Además, en los Envíos se advertía a los Reclamantes de que "[s]i no responde a esta

solicitud y no proporciona la información y la documentación requeridas para justificar su

reclamación, es posible que los Deudores se vean en la obligación de oponerse a su reclamación."

42.    Cada uno de los Reclamantes identificados en el **Anexo A** o bien no respondió a

los Envíos, o bien envió una respuesta que tampoco contenía la información necesaria que permita

al ELA reconciliar la reclamación. En consecuencia, los Deudores analizaron la documentación

sometida con la evidencia de reclamación o con los Envíos en relación con la alegación de inversiones relacionadas con bonos emitidos por el Gobierno. Sobre la base de dicho análisis, los Deudores entienden que las Reclamaciones que han de ser rechazadas parcialmente alegan *a*) bonos emitidos por COFINA, *b*) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas, *c*) reclamaciones por bonos que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de los titulares de determinados bonos, *d*) una participación patrimonial en bonos emitidos por el BGF, *e*) una o más inversiones en fondos mutuos que a su vez pudieron haber invertido en bonos emitidos por los Deudores, y/o *f*) una participación patrimonial en bonos emitidos por la AAA y/o la AFICA, que no son Deudores de Título III, por unos montos por los que los Deudores no han garantizado el reembolso. En la medida en que cada una de las Reclamaciones que han de ser rechazadas parcialmente pretendan alegar responsabilidades adicionales no vinculadas con bonos emitidos por el Gobierno identificados en la evidencia de reclamación, en la documentación justificativa o en el Envío de réplica, dichas partes de cada una de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento son deficientes porque no proporcionan la información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones.

### A. Ausencia de responsabilidad por reclamaciones de los bonistas de COFINA

43.      Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar, en parte, reclamaciones basadas en una supuesta participación patrimonial en los bonos emitidos por COFINA (conjuntamente, las "Reclamaciones Parciales de los Bonistas de COFINA").

44.      Como se explicó anteriormente, la Orden de Conciliación resolvió la Controversia

entre el ELA y COFINA y, conforme al párrafo 55 de la Orden de Conciliación, la totalidad de las

reclamaciones contra el ELA, surgidas o vinculadas con la relación del ELA y COFINA, han sido

liberadas. Además, conforme al párrafo 3(c) del *Acuerdo de Conciliación* [ECF núm. 5045-1], de

fecha 19 de octubre de 2018, que se adjunta a la Orden de Conciliación (el "Acuerdo de

Conciliación"), y el párrafo 7 de la Orden de Confirmación Enmendada, el procedimiento

contencioso entre el ELA y COFINA sobre la Controversia entre el ELA y COFINA ha sido

desestimado de forma definitiva luego de la aprobación del pacto y la conciliación de la

Controversia entre el ELA y COFINA. Además, conforme al párrafo 29(f) de la Orden de

Confirmación Enmendada, reclamaciones (tales como las Reclamaciones parciales de los bonistas

de COFINA) que surgieron de o están vinculadas con la relación entre el ELA y COFINA, fueron

liberadas. Orden de Confirmación Enmendada, ¶ 29(f). [11] Por todos esos motivos, las

Reclamaciones Parciales de los Bonistas de COFINA deben rechazarse porque dichas

reclamaciones basadas en una supuesta participación patrimonial en los Bonos COFINA han sido

satisfechas, liberadas y/o liquidadas conforme a la Orden de Conciliación, el Acuerdo de

Conciliación, la Orden de Confirmación Enmendada y el Plan.

**B.  Ausencia de responsabilidad por reclamaciones de los bonistas del BGF**

---

[11] Conforme al Plan, una "Reclamación" se define como "[c]ualquier derecho a un pago o
cumplimiento, independientemente de si tal derecho consta en una sentencia, es liquidado, no
liquidado, fijo, contingente, vencido, no vencido, controvertido, no controvertido, legal, en
equidad, garantizado o no garantizado, conocido o desconocido, reclamado o no reclamado; o
cualquier derecho a un remedio en equidad por incumplimiento o ejecución de un cumplimiento,
independientemente de si tal derecho a un remedio en equidad consta en una sentencia, es fijo,
contingente, vencido, no vencido, controvertido, no controvertido, garantizado o no garantizado,
y la totalidad de las deudas, procesos, indemnizaciones por daños y perjuicios, derechos, remedios,
pérdidas, responsabilidades, obligaciones, sentencias, acciones, causas de acción, procedimientos
o reclamaciones de cualquier tipo o naturaleza, en derecho, equidad o de cualquier otra forma".
Plan § 1.53.

45.     Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar, en parte, reclamaciones basadas en la supuesta participación patrimonial en bonos emitidos por el BGF (conjuntamente, las "Reclamaciones Parciales de los Bonistas del BGF").[12]

46.     Cada una de las Reclamaciones de los Bonistas del BGF pretende basarse, en parte, en la participación patrimonial en los Bonos del BGF objeto de la Modificación Calificada, que dispuso la emisión de nuevos títulos valores a cambio de la cancelación de los Bonos del BGF y la extinción de la garantía del ELA relativa a determinados Bonos del BGF, por lo que el ELA ya no tiene responsabilidad con respecto a dichas reclamaciones. En consecuencia, cada una de las Reclamaciones Parciales de los Bonistas del BGF ha sido liberada conforme a la aprobación y la consumación de la Modificación Calificada. Como se señaló anteriormente, la Modificación Calificada dispone, entre otras cosas, que los tenedores de los Bonos del BGF liberarán al BGF y sus afiliados de las reclamaciones relacionadas con los Bonos del BGF, y de cualquier acción u omisión del BGF y sus afiliados con respecto a todo endeudamiento del BGF o préstamo al BGF. El BGF es una entidad e instrumentalidad pública del ELA. En consecuencia, el ELA es un afiliado del BGF dentro del ámbito de la liberación conforme a la Modificación Calificada. Por tanto, las Reclamaciones de los Bonistas del BGF fueron liberadas tras la consumación de la Modificación Calificada el 29 de noviembre de 2018. Puesto que las Reclamaciones Parciales de los Bonistas del BGF son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de

---

[12] Otra reclamación sujeta a la Tricentésima quincuagésima tercera Objeción Global fue presentada contra el SRE y afirma bonos del BGF.  En la medida en que la reclamación busque hacer valer los bonos del BGF contra el SRE, no han pedido proporcionar una base para hacer valer tales reclamaciones contra el SRE que surgen be los bonos del BGF.  En la medida en que la reclamación estaba destinada hacer valer los bonos contra El Estado Libre Asociado de Puerto Rico, El Estado Libre Asociado de Puerto Rico no es responsable por las razones establecido en el párrafo 42 de la Tricentésima quincuagésima tercera Objeción Global.

Quiebras, dichas reclamaciones deben rechazarse puesto que pretenden recuperar montos por los que el ELA no es responsable.

### C. Ausencia de responsabilidad relativa a reclamaciones basadas en inversiones en fondos mutuos

47.     Conforme a lo identificado en el __Anexo A__ del presente, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden basarse parcialmente en inversión(es) en uno o más fondos mutuos que, a su vez, pudieron haber invertido en bonos emitidos por del Deudores (conjuntamente, las "Reclamaciones Parciales de los Fondos Mutuos").

48.     Los reclamantes tienen la carga de demostrar legitimación para radicar una evidencia de reclamación. *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010). Es ampliamente aceptado que solo los acreedores o sus representantes autorizados están legitimados para radicar reclamaciones. Reg. Fed. del Proc. de Quiebr. 3001(b); Título 11 U.S.C., §§ 501(a) ("Los acreedores o fiduciarios autorizados podrán radicar evidencias de reclamaciones"); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Solo los acreedores o fiduciarios autorizados podrán radicar evidencias de reclamaciones".). Las partes que solo tengan intereses derivados carecen de legitimación para radicar reclamaciones contra el patrimonio de un deudor. *Caso Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (donde se concluyó que una parte con "una relación con el Deudor [que] no es directa, sino más bien derivada "era" persona ajena en relación con el procedimiento de quiebra del Deudor", sin "ninguna posibilidad de reclamar contra los activos del patrimonio" y "como regla general, carece de legitimación en relación con el procedimiento de quiebra del Deudor".); *véase también In re Tower Park Properties, LLC*, 803 F.3d 450, 462-63 (9th Cir. 2015) (donde se concluyó que un beneficiario de un fideicomiso no era una parte interesada); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("En la medida en que se hagan valer los derechos de una parte interesada, esos derechos han de hacerse valer por dicha parte interesada, no por un tercero".); *In re López*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (para

constituirse como parte interesada "la parte solicitante deberá hacer valer sus propios derechos y no aquellos que asistan a un tercero o que se deriven en relación con tal tercero".); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (donde se reconoce el "principio general de que 'no se da legitimación de una parte interesada si la parte pretende hacer valer un derecho que es puramente derivado de los derechos de otra parte en el procedimiento de quiebras'" (que cita *In re Refco*, 505 F.3d en 115 n. 10)).

49.    "Un acreedor, conforme al Código [de Quiebras], es aquel que tiene una reclamación *contra el deudor o el patrimonio*", en lugar de "un acreedor de uno de los acreedores del deudor". *S. Blvd., Inc. c. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Ya que, a lo sumo, las Reclamaciones de los Fondos Mutuos fueron radicadas en virtud de la condición del reclamante como supuesto acreedor de un supuesto acreedor del ELA, las Reclamaciones de los Fondos Mutuos no fueron radicadas por un acreedor real del ELA. *Véase In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (donde se concluye que el síndico carecía de legitimación para radicar evidencias de reclamaciones porque no era acreedor ni agente autorizado de un acreedor). En cambio, las Reclamaciones de los Fondos Mutuos se derivan de reclamaciones que deben hacerse valer directamente por los fondos mutuos para que el Tribunal examine cualquier recuperación alegada. Véase el *caso Goldman*, 82 B.R. en 896 (donde se concluye que una parte con una relación "derivada" no tiene "posibilidad de reclamar contra los activos del patrimonio " y "como regla general, carece de legitimación en el procedimiento de quiebras del Deudor"). Es más, no se sabe si el fondo mutuo sigue ostentando la propiedad de los bonos controvertidos.

50.    En efecto, en unas circunstancias casi idénticas, el Tribunal ya rechazó reclamaciones radicadas contra COFINA por unos inversores en los fondos mutuos que, a su vez, supuestamente invirtieron en los bonos de COFINA, por "carecer de interés individual en los títulos valores de COFINA". *Transcripción del 13 de marzo de 2019 de la audiencia ante su*

26

*señoría, Laura Taylor Swain* [ECF núm. 5969], en 64:01-10 ("EL TRIBUNAL: Entonces, para que yo lo entienda, su documentación muestra que es inversor en un fondo mutuo. En la medida en que cualquiera de esos fondos mutuos posea realmente los bonos de COFINA, el fondo mutuo sería el reclamante pertinente, ¿así que no proporcionó ninguna evidencia de una reclamación directa válida contra COFINA? SRA. STAFFORD: Así es, señoría. EL TRIBUNAL: Se concede la objeción a la reclamación, y se rechaza la reclamación por falta de interés individual en títulos valores de COFINA."); *véase también la Orden por la que se concede la Sexagésima cuarta objeción global (sustantiva) del estado Libre Asociado de Puerto Rico a Reclamaciones basadas en las inversiones en fondos mutuos* [ECF núm. 9099]; *Orden de memorando por la que se rechaza la moción para alterar o enmendar la orden que concede la objeción (exp. 8297) a las Reclamaciones núms. 152470 y 152283* [ECF núm. 9121]. El Tribunal del Primer Circuito confirmó dicha determinación. *Véase* Caso núm. 19-2231, Doc. núm. 00117746322, de fecha 27 de mayo de 2021. En consecuencia, los reclamantes no son acreedores de los Deudores y carecen de legitimación para hacer valer reclamaciones derivadas. Puesto que a los Deudores no se les puede atribuir la responsabilidad por las Reclamaciones Parciales de los Fondos Mutuos, dichas reclamaciones deben rechazarse parcialmente.

### D. Ausencia de responsabilidad por reclamaciones duplicadas por bonos

51.     Según se expone en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar responsabilidad, en parte, sobre la base de bonos emitidos por el SRE, la AAA, la ACT, la AEP la AFI y la CFP (conjuntamente, las "Reclamaciones Parcialmente Duplicadas por Bonos").

52.     Cada una de las Reclamaciones Parcialmente Duplicadas por Bonos pretende alegar, en parte, responsabilidad contra los Deudores vinculada con uno o más bonos que están duplicados en relación con una o más Reclamaciones Principales que, según se explicó

anteriormente, fueron radicadas en el marco de los Casos de Título III en nombre de los tenedores de determinados bonos emitidos por el SRE, la AAA, la ACT, la AEP, la AFI y la CFP. Si las Reclamaciones Duplicadas por Bonos no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores en detrimento de otras partes interesadas en los Casos de Título III. Los titulares de las Reclamaciones Duplicadas por Bonos no se verán perjudicados por el hecho de que se rechacen parcialmente sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones Parcialmente Duplicadas por Bonos figuran en una o más Reclamaciones Principales.

**E. Ausencia de responsabilidad por reclamaciones por bonos asegurados en el mercado secundario que son duplicados de Reclamaciones Principales**

53.     Según se identifica en el **Anexo A** del presente documento, determinadas partes de las Reclamaciones que han de ser rechazadas parcialmente deben rechazarse porque alegan responsabilidades vinculadas con Bonos asegurados en el mercado secundario, que corresponden a los bonos de la ACT o la AEP emitidos por la ACT o la AEP que están duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales (conjuntamente, las "Reclamaciones parciales por bonos asegurados en el mercado secundario").

54.     Cada una de las Reclamaciones parciales por bonos asegurados en el mercado secundario alega responsabilidades vinculadas con los Bonos asegurados en el mercado secundario. Los números CUSIP vinculados con dichos Bonos asegurados en el mercado secundario corresponden a bonos emitidos por la ACT o la AEP y/o que llevan los números CUSIP originales. Dichos números CUSIP originales, que reflejan las emisiones de los bonos en los que los reclamantes tienen participación patrimonial, aparecen en una o más Reclamaciones Principales. En consecuencia, las Reclamaciones parciales por bonos asegurados en el mercado

secundario alegan responsabilidades vinculadas con bonos emitidos por la ACT o la AEP que constituyen duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales.

55.     Si las Reclamaciones parciales por bonos asegurados en el mercado secundario no son parcialmente rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores, en detrimento de otras partes interesadas en los Casos de Título III. Los titulares de las Reclamaciones parciales por bonos asegurados en el mercado secundario no se verán perjudicados por el hecho de que se rechacen parcialmente sus reclamaciones, puesto que las responsabilidades relacionadas figuran en una o más Reclamaciones Principales. Esta Tricentésima Quincuagésima Tercera Objeción Global de ninguna forma constituye una objeción a cualquier reclamación de la aseguradora de Bonos asegurados en el mercado secundario, sino que a los tenedores de Bonos asegurados en el mercado secundario, los cuales están sujetos a las Reclamaciones Principales.

### F.  Ausencia de responsabilidad por los Bonos de Gravamen Prioritarios de la AAA o de la AFICA

56.     Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente pretenden alegar reclamaciones parcialmente basadas en una supuesta participación patrimonial en los bonos emitidos por la AAA o la AFICA (conjuntamente, las "<u>Reclamaciones Parciales de Bonistas de Gravamen Prioritario de la AAA y la AFICA</u>").

57.     Cada una de las Reclamaciones Parciales de Bonistas de Gravamen Prioritario de la AAA y de la AFICA alega responsabilidades vinculadas con los Bonos de Gravamen Prioritarios de la AAA emitidos por la AAA o Bonos de la AFICA emitidos por la AFICA, ninguna de las cuales es Deudor de Título III, siendo ambas entidades aparte y jurídicamente independientes de

los Deudores. Además, los Deudores no han garantizado el reembolso de los Bonos de Gravamen Prioritarios ni de los Bonos de la AFICA. Además, Las Reclamaciones Parciales Bonistas de Gravamen Prioritario de la AAA y de la AFICA no proporcionan fundamento alguno para alegar una reclamación contra los Deudores por los bonos emitidos por la AAA o la AFICA que no están garantizados por los Deudores. En consecuencia, ni los Deudores ni el Tribunal pueden determinar la validez de las Reclamaciones Parciales de Bonistas de Gravamen Prioritario de la AAA y de la AFICA.

58.    En apoyo de lo anterior, los Deudores invocan la *Declaración de Jay Herriman en apoyo de la Tricentésima quincuagésima tercera objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico y del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico a Reclamaciones por bonos parcialmente duplicadas, deficientes y en las que no existe responsabilidad*, de fecha 18 de junio de 2021, adjunta al presente como **Anexo B**.

## NOTIFICACIÓN

59.    De conformidad con los Procedimientos Enmendados relativos a Objeciones Globales y la Orden de Notificación del Tribunal, los Deudores notifican la presente Tricentésima quincuagésima tercera objeción global a) a los acreedores individuales objeto de esta Tricentésima quincuagésima tercera objeción global, b) al U.S. Trustee, y c) a la Lista maestra de notificaciones (según se define en los *Procedimientos de administración de casos enmendados núm. 14* [ECF núm. 15894-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.primeclerk.com/puertorico. La notificación de esta Tricentésima quincuagésima tercera objeción global se adjunta al presente como **Anexo C**. Las traducciones al español de la Tricentésima quincuagésima tercera objeción global y de la totalidad de los anexos adjuntos al

presente se están radicando con esta objeción y se trasladarán a las partes. Los Deudores sostienen que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

## **RESERVA DE DERECHOS**

60.     Esta Tricentésima quincuagésima tercera objeción global se limita a los motivos expuestos en este documento. En consecuencia, esta se radica sin perjuicio de los derechos de los Deudores, o de los derechos de cualesquiera otras partes interesadas en dichos Casos de Título III, a objetar a las Reclamaciones que han de ser rechazadas parcialmente o a cualesquiera otras reclamaciones por los motivos que fuere. Los Deudores se reservan expresamente el derecho a radicar toda otra objeción sustantiva o procesal. Ninguna disposición contenida en el presente documento, ni ninguna acción adoptada conforme a tal remedio, tienen por objetivo, ni se interpretarán en el sentido de que: a) constituyan una admisión en cuanto a la validez de cualesquiera reclamaciones contra los Deudores; b) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas en los Casos de Título III, a impugnar cualquier reclamación sobre la base de los motivos que fuere; c) constituyan una promesa o requisito para pagar cualquier reclamación; d) constituyan una solicitud o autorización a asumir cualquier acuerdo, contrato o arrendamiento anteriores a la petición conforme al artículo 365 del Código de Quiebras; o e) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas en los Casos de Título III, conforme a PROMESA, el Código de Quiebras o cualquier otra normativa legal aplicable.

## **AUSENCIA DE SOLICITUDES PREVIAS**

61.     No se ha radicado ninguna solicitud de remedio previa a la presente Tricentésima quincuagésima tercera objeción global ni ante este Tribunal ni ante ningún otro órgano judicial.

[*El resto de la página se deja en blanco intencionadamente*]

POR LO QUE los Deudores solicitan respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda a los Deudores cualesquiera otros remedios que se consideren justos.

Fecha: 18 de junio de 2021  
San Juan (Puerto Rico)

Respetuosamente sometida,

[*Firma en la versión en inglés*]  
Hermann D. Bauer  
USDC núm. 215205  
Carla García-Benítez  
USDC núm. 203708  
Gabriel A. Miranda  
USDC núm. 306704  
**O'NEILL & BORGES LLC**  
250 Avenida Muñoz Rivera, local 800  
San Juan, PR 00918-1813  
Tel.: (787) 764-8181  
Fax: (787) 753-8944

[*Firma en la versión en inglés*]  
Martin J. Bienenstock (*pro hac vice*)  
Brian S. Rosen (*pro hac vice*)  
**PROSKAUER ROSE LLP**  
Eleven Times Square  
New York, NY 10036  
Tel.: (212) 969-3000  
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico.*

32