Response Deadline: July 19, 2021, at 4:00PM (Atlantic Standard Time)
Hearing Date:  August 4, 2021, at 9:30AM (Atlantic Standard Time)

> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the Commonwealth, HTA, and COFINA.** |

### THREE HUNDRED FIFTY-SEVENTH OMNIBUS OBJECTION (SUBSTANTIVE) OF THE COMMONWEALTH OF PUERTO RICO, PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, AND PUERTO RICO SALES TAX FINANCING CORPORATION TO DUPLICATE, DEFICIENT, AND/OR NO LIABILITY BOND CLAIMS

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Highways

and Transportation Authority ("HTA"), and the Puerto Rico Sales Tax Financing Corporation

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

("COFINA," and together with the Commonwealth and HTA, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Debtors pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] file this three hundred fifty-seventh omnibus objection (the "Three Hundred Fifty-Seventh Omnibus Objection") to the proofs of claim listed on **Exhibit A** hereto, each of which purports to be based, in part, on (*a*) bonds issued by COFINA, (*b*) an ownership interest in bonds issued by the Government Development Bank of Puerto Rico ("GDB"), (*c*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*d*) bond claims that assert liabilities associated with secondarily insured bonds that are duplicative of proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*e*) claims that assert liabilities for certain bonds issued by HTA for which the Debtors are not liable, (*f*) one or more investments in mutual funds, which in turn may have invested in bonds issued by the Debtors, and/or (*g*) an ownership interest in bonds issued by the Puerto Rico Aqueducts and Sewers Authority ("PRASA") and/or the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA").  In addition, each of the proofs of claim listed on **Exhibit A** hereto are deficient because they fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim.  Further, the remaining portions of certain of the proofs of claim listed on **Exhibit A** hereto are deficient because they assert liabilities for purported investment losses, but fail to state a claim on which the Debtors can be held liable for their purported investment losses.  In support of the Three Hundred Fifty-Seventh Omnibus Objection, the Debtors respectfully represent as follows:

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

## JURISDICTION

30.     The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA section 306(a).

31.     Venue is proper in this district pursuant to PROMESA section 307(a).

## BACKGROUND

### A.     The Bar Date Orders

32.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case").  On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "COFINA Title III Case").  On May 21, 2017 (the "Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (respectively the "HTA Title III Case" and together with the Commonwealth Title III Case and COFINA Title III Cases, the "Title III Cases").  On June 29, 2017, the Court entered an order granting the joint administration of the Title III Cases for procedural purposes only.  ECF No. 537.[3]

33.     On January 16, 2018, the Debtors filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of*

---

[3] Unless otherwise stated herein, ECF citations refer to documents filed in Bankruptcy Case No. 17 BK 3283-LTS.

*Notice Thereof* [ECF No. 2255] (the "<u>Bar Date Motion</u>").  Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "<u>Initial Bar Date Order</u>"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Title III Cases.  Upon the informative motion of certain creditors, and the support of the Debtors, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "<u>Bar Date Orders</u>"), extending these deadlines to June 29, 2018 at 4:00 p.m. (Atlantic Time).

**B.      Bond Debt Master Proofs of Claim – Commonwealth Title III Case**

34.      Pursuant to the Initial Bar Date Order, indenture trustees, fiscal agents, or any similar agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents.  Initial Bar Date Order, ¶ 5(a). As explained below, master proofs of claim (collectively, the "<u>Commonwealth Master Claims</u>") have been filed in the Commonwealth Title III Case on behalf of the holders of certain bonds or notes issued by PRASA, the Puerto Rico Public Buildings Authority ("<u>PBA</u>"); and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico "<u>ERS</u>").

35.      ***PBA*** — PBA purportedly issued Revenue Bonds to finance office buildings and other facilities leased to various departments, public agencies and instrumentalities of the Commonwealth.  US Bank and US Bank Trust serve as fiscal agents for certain revenue bonds issued by PBA, as identified in Footnote 3 of Proof of Claim No. 62833 (the "<u>PBA Bonds</u>"), and on behalf of the holders of the PBA Bonds, filed a master proof of claim in the Commonwealth

Title III Case for all outstanding amounts owed (the "PBA Master Claim"), which was logged by

Prime Clerk, LLC, as Proof of Claim No. 62833.[4]  The PBA Master Claim asserts liquidated claims

for approximately $4 billion in allegedly unpaid principal, $160 million in allegedly unpaid

interest, and reimbursement for fees and expenses of the fiscal agents, in addition to unliquidated

and contingent claims for any and all amounts owed "on account of any and all claims the Fiscal

Agent has or may have relating to the outstanding Bond obligations, whether known or unknown

against the Commonwealth and all those purporting to act on the Commonwealth's behalf . . . ."

Rider to PBA Master Claim, ¶¶ 19-21.

36.     ***PRASA***—PRASA owns and operates the island-wide public water and wastewater

systems in Puerto Rico.  PRASA issued certain revenue bonds (the "PRASA Bonds"), under the

Puerto Rico Aqueduct and Sewer Authority Resolution No. 1583, Authorizing and Securing Puerto

Rico Aqueduct and Sewer Authority Bonds Guaranteed by the Commonwealth of Puerto Rico,

and certain supplemental resolutions.  Banco Popular de Puerto Rico ("Banco Popular") serves as

trustee for the PRASA Bonds and filed a master proof of claim against the Commonwealth on

behalf of the holders of the PRASA Bonds, which was logged by Prime Clerk, LLC, as Proof of

Claim No. 22620 (the "PRASA Master Claim").  The PRASA Master Claim asserts "a contingent

claim against the Commonwealth on account of the Bonds in an amount not less than

$284,755,000, together with all interest, and premium accruing on the Bonds from and after the

Petition Date, and all fees, costs, expenses and other charges accrued, accruing or chargeable with

respect thereto."  Addendum to PRASA Master Claim, ¶ 9.

---

[4]  Proof of Claim No. 62833 amended and superseded Proof of Claim No. 13351, which was
initially filed by the Fiscal Agent.

37.   **_ERS_**—ERS is an agency of the government, separate and apart from the Commonwealth government and its other instrumentalities.  *See* 3 L.P.R.A § 775.[5]  Purportedly pursuant to that certain Pension Funding Bond Resolution, adopted on January 24, 2008, and certain supplemental resolutions, ERS issued senior and subordinate pension funding bonds (the "ERS Bonds"), in the aggregate original principal amount of approximately $2.9 billion.[6]  BNYM serves as the fiscal agent with respect to the ERS Bonds.  On behalf of the holders of ERS Bonds, BNYM filed a master proof of claim in the Commonwealth Title III Case (the "ERS Master Claim"), which was logged by Prime Clerk, LLC, as Proof of Claim No. 32004.[7]

## C.   Bond Debt Master Proofs of Claim – HTA Title III Case

9.   HTA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA Enabling Act").  HTA

---

[5]   On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS, pursuant to PROMESA section 304(a), commencing a case under Title III thereof.

[6]   On March 12, 2019, the Official Committee of Unsecured Creditors filed an *Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS* [Case No. 17-3566, ECF No. 381], on the ground that the bond issuance exceeded ERS's statutory authority and was thus *ultra vires*, rendering the ERS Bonds null and void.  On April 23, 2019, the Official Committee of Retired Employees of the Commonwealth of the Puerto Rico filed an *Omnibus Objection Of The Official Committee Of Retired Employees Of The Commonwealth Of Puerto Rico, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of ERS Bonds Against ERS And The Commonwealth* [Case No. 17-3283, ECF No. 6482], on the ground, among others, that the bond issuance was *ultra vires*.  ERS reserves its rights to challenge the bond issuance on any grounds whatsoever, including on the ground that the ERS Bonds were *ultra vires*, and any other grounds set forth in the foregoing objections.

[7]   On May 22, 2019, the Commonwealth filed an objection to the ERS Master Proof of Claim.  See Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the Bank of New York Mellon, As Fiscal Agent (Claim No. 16775) [ECF No. 7075].  For the avoidance of doubt, this Three Hundred Fifty-Seventh Omnibus Objection is without prejudice to the parties' rights with respect to such objection, including any rights to intervene, which are reserved.

is responsible for the construction, operation, and maintenance of highways and other transportation systems in the Commonwealth. *See* 9 L.P.R.A § 2002.

10.     In accordance with the HTA Enabling Act, in 2003 HTA issued a series of Special Facility Revenue Refunding Bonds to facilitate the financing of the Teodoro Moscoso Bridge (the "HTA Bridge Bonds").  Holders of HTA Bridge Bonds have received and continue to receive all payments owed to holders of the HTA Bridge Bonds in full as they become due and owing.  The Commonwealth has not guaranteed repayment of the HTA Bridge Bonds, and each of the offering statements issued in connection with the HTA Bridge Bonds states "the [HTA Bridge] Bonds are not a debt of the Commonwealth of Puerto Rico or any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its subdivisions, other than the Authority, is required to pay the Bonds."[8]

11.     On behalf of the holders of certain HTA Bonds, BNYM filed three master proofs of claim in the HTA Title III Case (collectively, the "HTA Title III Master Claims," and together with the Commonwealth Master Claims, the "Master Claims"): Proof of Claim No. 37245, asserting on behalf of holders of bonds issued under the 1968 Resolution approximately $847 million in liabilities plus unliquidated amounts; Proof of Claim No. 38574, asserting on behalf of holders of bonds issued under the 1998 Resolution approximately $3.2 billion in liabilities plus unliquidated amounts; and Proof of Claim No. 32622, asserting on behalf of holders of subordinated bonds issued under the 1998 Resolution approximately $279 million in liabilities plus unliquidated amounts.

12.     Certain bonds or notes issued by HTA have been insured by one of several municipal bond insurers, either on the primary market or on the secondary market.  Municipal bond insurance is obtained on the primary market when the municipality issuing the bonds engages

---

[8]*See, e.g.*, https://emma.msrb.org/Security/Details/A0BC2E92D13DB872F5E9451D490A58D23.

an insurance company to underwrite an insurance policy for that series of bonds.  In the event that

a bond is not insured on the primary market, holders of such uninsured bonds may elect to obtain

insurance via the secondary market.  Holders of uninsured bonds who seek to obtain insurance in

the secondary market contract directly with a municipal bond insurer and the original issuer is not

part of this contract process.  When a holder of an uninsured bond obtains an insurance policy on

the secondary market, a new CUSIP number is issued which corresponds to the original CUSIP

numbers assigned to the bonds at the time of issuance.  Certain bonds issued by HTA have been

insured on the secondary market and, accordingly, have been issued new CUSIP numbers which

correspond to bonds issued by HTA bearing original CUSIP numbers (the "Secondarily Insured

Bonds").

## D.    Bond Debt Issued by the Puerto Rico Aqueducts and Sewers Authority

13.    PRASA was established pursuant to Act Number 40 of May 1, 1945.  PRASA is a

"public corporation and an autonomous government instrumentality" created for the purpose of

providing water and sewer services on the island.  22 L.P.R.A. § 142, 144.

14.    The PRASA Enabling Act authorizes PRASA to issue bonds.  22 L.P.R.A. § 144(g).

Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue

bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution

No. 1583").   In 2008, PRASA issued $159,055,000 principal amount of Series A revenue

refunding bonds (the "2008 Series A Bonds") and $125,700,000 principal amount of Series B

revenue refunding bonds (the "2008 Series B Bonds," and together with the 2008 Senior Series A

Bonds, the "PRASA 2008 Revenue Refunding Bonds").

15.    In 2012, PRASA issued $295,245,000 principal amount of Series 2012 B revenue

bonds (the "2012 Senior Series B Bonds," or the "PRASA Senior Lien Bonds").   Holders of

PRASA Senior Lien Bonds have received and continue to receive all payments owed to holders of

the PRASA Senior Lien Bonds in full as they become due and owing.  Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the PRASA Senior Lien Bonds.[9]  In addition, the Commonwealth has not guaranteed repayment of the Senior Lien Bonds. Accordingly, the offering statements for the PRASA Senior Lien Bonds state that they are "not a debt of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions, other than [PRASA], and neither the Commonwealth of Puerto Rico or any such municipalities or other political subdivisions, other than [PRASA], shall be liable for the payment of the principal of or interest on said Bonds."[10]

**E.      Bond Debt Issued by the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority**

16.      AFICA is a public corporation and government instrumentality of the Commonwealth created by Act No. 121 of the Legislative Assembly of Puerto Rico, approved June 27, 1977 (as amended and supplemented and codified as P.R. Laws Ann. tit. 12, § 1251 *et seq.*).  P.R. Laws Ann. tit. 12, § 1254.  AFICA facilitates project financing in order to promote the economic development of the Commonwealth, including through the development and construction of new industrial, commercial, tourist, agricultural, educational, medical and environmental control facilities.

17.      In 1997, AFICA issued Industrial Revenue Bonds, 1997 Series A (the "1997 Ashford Presbyterian Community Hospital Parking Project Bonds"), in the aggregate amount of $8,540.000, in order to finance, in part, the construction of Ashford Presbyterian Community Hospital Parking Project.  The Ashford Presbyterian Community Hospital Parking Project Bonds are payable solely from an assignment of amounts payable to AFICA under the loan agreement

---

[9] *See, e.g.*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[10] *See, e.g.*, Offering Statement for PRASA Revenue Bonds, Series B (Senior Lien), February 15, 2012, available at https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

entered into between AFICA, on the one hand, and the Ashford Development and Management
Corporation, on the other hand. *See* Puerto Rico Industrial, Tourist, Educational, Medical and
Environmental Control Facilities Financing Authority, Offering Statement, Industrial Revenue
Bonds, Series 1997A (1997 Ashford Presbyterian Community Hospital Parking Project).[11]   The
offering statement issued in connection with the 1997 Ashford Presbyterian Community Hospital
Parking Project Bonds states that the "[1997 Ashford Presbyterian Community Hospital Parking
Project Bonds] do not constitute an indebtedness of Puerto Rico or any of its political subdivisions
other than [AFICA], and neither Puerto Rico nor any of such subdivisions shall be liable thereon."
*Id.*

18.     In 1999, AFICA issued Industrial Revenue Bonds, 1999 Series A (the "1999 Doral
Financial Bonds"), in the aggregate amount of $44,765,000.00, in order to finance, in part, the
construction of Doral Financial Center.  The 1999 Doral Financial Bonds are payable solely from
repayment of a loan agreement entered into between AFICA, on the one hand, and Doral Financial
Corporation and Doral Properties, on the other hand.  The 1999 Doral Financial Bonds were further
"unconditionally guaranteed" by Doral Financial Corporation.  The offering statement issued in
connection with the 1999 Doral Financial Bonds states that the "[1999 Doral Financial Bonds] do
not constitute a debt of the Government of Puerto Rico." *See, e.g.*, Puerto Rico Industrial, Tourist,
Educational, Medical and Environmental Control Facilities Financing Authority, Offering
Statement, Industrial Revenue Bonds, Series 1999A (Doral Financial Center Project), *available at*
https://emma.msrb.org/Security/Details/A3680EBA7C2CF40DB443B3B0E5DA28925.

19.     In 2000, AFICA issued $30,000,000 in Tourism Revenue Bonds, 2000 Series A
(the "2000 Series A Palmas del Mar Bonds"), in the aggregate amount of $30,000,000.00, in order

---

[11] A true and correct copy of the Offering Statement for the 1997 Ashford Presbyterian Community
Hospital Parking Project Bonds is attached hereto as **Attachment A**.

to finance, in part, improvements to the Palmas del Mar Country Club.  The 2000 Series A Palmas del Mar Bonds are payable solely from repayment of a loan agreement entered into between AFICA and Palmas Country Club, Inc.  The offering statement issued in connection with the 2000 Series A Palmas del Mar Bonds states that the bonds "shall not constitute an indebtedness of the [Commonwealth] or of any of its political subdivisions."  *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Tourism Revenue Bonds, 2000 Series A (Palmas del Mar Country Club Project), *available                                                                                                    at* https://emma.msrb.org/Security/Details/AD88773EB8772C017819AB0B921B2DAD5.

### F.   The COFINA Title III Case and Resolution of the Commonwealth-COFINA Dispute

20.   COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth.  Pursuant to that certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009, and pursuant to certain supplemental resolutions, COFINA issued a series of bonds in aggregate approximate amount of $17 billion, to, among other things, defray certain debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico Public Finance Corporation (the "COFINA Bonds").  Bank of New York Mellon serves as Trustee with respect to the COFINA Bonds.

21.   The Oversight Board filed that certain *Third Amended Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation* (the "Plan") [ECF No. 4652] on January 9, 2019.  The Court considered confirmation of the Plan and any objections thereto at a hearing on January 16-17, 2019.

22.    On February 4, 2019, the Court confirmed the Plan, which incorporated the compromise and settlement of the dispute over whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law (the "Commonwealth-COFINA Dispute"). *See Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5048].   On the same day, the Court approved the compromise and settlement of the Commonwealth-COFINA Dispute pursuant to the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "Settlement Order").   On February 5, 2019, the Court issued an *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] (the "Amended Confirmation Order").   The Plan became effective on February 12, 2019 (the "Effective Date"), when the transactions contemplated therein were consummated.   *See Notice of (A) Entry of Order Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [Case No. 17 BK 3284-LTS, ECF No. 587].

**G.     The GDB Title VI Proceedings and Qualifying Modification**

23.    GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by the Legislative Assembly in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth.   On April 28, 2017, the Oversight Board unanimously certified that certain February 2017 GDB Fiscal Plan, which contemplated an orderly wind-down of the operations of GDB based upon the determination that

12

there was no clear path for the long-term viability of GDB based on its then-current financial condition.

24.     On July 12, 2017, the Oversight Board issued a resolution authorizing GDB, pursuant to Section 601(e) of PROMESA, to avail itself of Title VI of PROMESA.  On August 10, 2018, GDB filed an application for approval of a qualifying modification, pursuant to PROMESA section 601(m)(1)(D) (the "Qualifying Modification"), in the United States District Court for the District of Puerto Rico.

25.     On November 7, 2018, the Court approved the Qualifying Modification pursuant to PROMESA section 601(m)(1)(D).  *See* ECF No. 270 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Nov. 7, 2018).  The Qualifying Modification provides for, among other things, (i) the issuance of new bonds by the newly-created GDB Debt Recovery Authority in exchange for the cancellation of, among other things, certain participating bonds and guaranteed bond claims (collectively, the "GDB Bonds"); (ii) the extinguishment of the Commonwealth's guarantee of the guaranteed bonds upon the exchange and cancellation of the guaranteed bonds; and (iii) the release of claims of the holders of GDB Bonds against GDB and its affiliates relating to, among other things, any investment with GDB or the purchase, sale, or transfer of any security or interest of GDB, and any action or omission with respect to any indebtedness or loans to GDB (including any notes issued or deposits held by GDB) or from GDB. *Solicitation Statement*, at 57-60, ECF No. 1-15 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Aug. 10, 2018).

26.     On November 29, 2018, GDB announced the consummation of the Qualifying Modification for GDB.  Press Release, *Government of Puerto Rico Announces Consummation of the GDB Qualifying Modification*, Governor of Puerto Rico (Nov. 29, 2018), *available at*

http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-
modification.pdf.

**H.      Proofs of Claims Filed, Omnibus Objection Procedures, and Claim Objections**

27.      To date, approximately 179,420 proofs of claim have been filed against the Debtors
and logged by Prime Clerk, LLC.  Such proofs of claim total approximately $43.59 trillion in
asserted claims against the Debtors, in addition to unliquidated amounts asserted.

28.      Of the proofs of claim filed, approximately 116,160 have been filed in relation to,
or reclassified to be asserted against, the Commonwealth.  Additionally, approximately 2,260
proofs of claim have been filed in relation to, or reclassified to be asserted against, HTA.
Approximately 3,094 proofs of claim have been filed in relation to, or reclassified to be asserted
against, COFINA.  In accordance with the terms of the Bar Date Orders, many of these claims
need not have been filed at all, or suffer from some other flaw, such as being subsequently
amended, not putting forth a claim for which the Debtors are liable, being duplicative of other
proofs of claim, or failing to provide information necessary for the Debtors to determine whether
the claim is valid.

29.      To efficiently resolve as many of the unnecessary proofs of claim as possible, on
October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (A)
Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy
Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures
Motion").  The Court granted the relief requested in the Omnibus Procedures Motion by order
dated November 14, 2018.  *See Order (A) Approving Limited Omnibus Objection Procedures, (B)
Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF
No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus
Objection Procedures").  On November 29, 2018, the Court approved English and Spanish

versions of the forms of notice for omnibus objections to be filed in accordance with the Initial
Omnibus Objection Procedures.  *See Order Approving the English and Spanish Versions of the
Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

30.     In the continued interest of resolving any unnecessary proofs of claim in an efficient
manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other
things, to allow the Debtors to file omnibus objections on substantive bases, to further expand the
number of claims that may be included on an objection, and to approve additional forms of notice.
*Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection
Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional
Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091].  On June 14, 2019, the Court
granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures,
(B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice,
and (D) Granting Related Relief* [ECF No. 7440] (the "Amended Omnibus Objection
Procedures").

31.     Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus
Objection Procedures, to date the Court has held over 14 hearings related to over 140 omnibus
objections filed by the Commonwealth, COFINA, HTA, ERS, and/or the Puerto Rico Electric
Power Authority ("PREPA").  Based upon rulings and orders of the Court to date, approximately
101,019 claims asserting $43.59 trillion in liability against the Commonwealth, COFINA, HTA,
PREPA, and ERS have been disallowed and will be expunged from the claims registry in the Title
III proceedings upon entry of final orders.

32.     This Three Hundred Fifty-Seventh Omnibus Objection is filed in accordance with
the Court's Amended Omnibus Objection Procedures.

**OBJECTIONS TO PROOFS OF CLAIM**

33.     The Amended Omnibus Objection Procedures allow the Debtors to file an omnibus
objection to multiple proofs of claim on any basis provided for in Federal Rule of Bankruptcy
Procedure 3007(d)(1)-(7), in addition to other substantive bases set forth in the Amended Omnibus
Objection Procedures.

34.     The Three Hundred Fifty-Seventh Omnibus Objection seeks to disallow in their
entirety, in accordance with the Amended Omnibus Objection Procedures, proofs of claim listed
on **Exhibit A** hereto (collectively, the "Claims to Be Disallowed"), each of which purports to be
based, in part, on (*a*) bonds issued by COFINA, (*b*) an ownership interest in bonds issued by GDB,
(*c*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors
on behalf of the holders of certain bonds, (*d*) bond claims that assert liabilities associated with
secondarily insured bonds that are duplicative of proofs of claim filed against the Debtors on behalf
of the holders of certain bonds, (*e*) claims that assert liabilities for certain bonds issued by HTA
for which the Debtors are not liable, (*f*) one or more investments in mutual funds, which in turn
may have invested in bonds issued by the Debtors, and/or (*g*) an ownership interest in bonds issued
by PRASA and/or AFICA.    In addition, each of the proofs of claim listed on **Exhibit A** hereto
are deficient because they fail to provide sufficient information to enable the Debtors to reconcile
the proofs of claim.  Further, the remaining portions of certain of the proofs of claim listed on
**Exhibit A** hereto are deficient because they assert liabilities for purported investment losses, but
do not state a claim pursuant to which the Debtors could be held liable for the purported investment
losses.  **Exhibit A** hereto further specifies why each of the Claims to Be Disallowed should be
disallowed in their entirety.

35.     In each of the Claims to Be Disallowed, the proof of claim purported to assert
liabilities arising out of "money loaned-bonds" "preferred bonds (default)," "money loaned

16

(bonds)" or other similar terms asserting liabilities associated with investments in government-issued bonds.  In some instances, the Claims to Be Disallowed did not contain any supporting documentation indicating which bonds claimants asserted gave rise to liabilities owed by the Debtors.  In other instances, the Claims to Be Disallowed provided as supporting documentation a copy of a brokerage statement, or other supporting documentation containing information regarding bonds purportedly held by the claimant, but the amounts of the bonds included in that supporting documentation did not match the amount on the claimant's proof of claim.

36.     On August 13, 2019, the Court entered the *Order Granting in Part and Adjourning in Part Debtors' Motion for Entry of An Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8453] (the "Authorized Mailings Order"), which authorized the Debtors to send mailings "to any claimant who has not provided sufficient information to enable Debtors to process their claim."  Authorized Mailings Order, ¶ 3.

37.     Pursuant to the Authorized Mailings Order, "[i]f the Debtors mail the Proposed Mailing to a claimant, and the claimant either does not respond or responds but fails to provide sufficient information to permit Debtors to reconcile their claim, the Debtors are authorized to object to the claim as deficient."  *Id.*

38.     In accordance with the Authorized Mailings Order, the Debtors have sent at least one letter, substantially in the form of Exhibit 1 to the Authorized Mailings Order, to each claimant subject to this Three Hundred Fifty-Seventh Omnibus Objection (the "Mailing").  Each Mailing provided, in relevant part:

> Additional information is required in order for the Debtors to continue with assessing your claim. The Debtors are unable to determine from the information you provided the basis for the claim you are attempting to assert against one or more of the Debtors.  In responding to this letter, please ensure that you provide all of the information requested and as much detail as possible about your

claim. The descriptions you put on your proof of claim were too vague for the Debtors to understand the claim you are trying to assert, so please provide more detail and do not simply copy over the same information.
*See* ECF No. 8453-1 at 2, 7.

The Mailings received by the claimants subject to this Three Hundred Fifty-Seventh Omnibus Objection directed the claimants to respond within thirty dates of the date of the letter. *See id*. Furthermore, the Mailings cautioned the Claimants that "[i]f you do not respond to this request and do not provide the requested information and documentation in support of your claim, the Debtors may be forced to object to your claim." *Id.*

39.      Each of the Claimants identified in **Exhibit A** either failed to respond to the Mailings, or submitted a response that still did not contain information necessary to enable the Debtors to reconcile the claim. Accordingly, the Debtors reviewed the documentation submitted with the proofs of claim or with the Mailings for assertions of investments related to government-issued bonds. Based on that review, the Debtors understand the Claims to Be Disallowed should be disallowed because they assert, in part, (*a*) bonds issued by COFINA, (*b*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*c*) one or more investments in mutual funds, which in turn may have invested in bonds issued by the Debtors, and/or (*d*) bonds issued by AFICA (as defined below), which is not a Title III debtor, and whose liabilities are not guaranteed by the Debtors. In addition, each of the proofs of claim listed on **Exhibit A** hereto are deficient because they fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim. Further, the remaining portions of certain of the proofs of claim listed on **Exhibit A** hereto are deficient because they assert liabilities for purported investment losses but fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim.

18

## A.  No Liability for COFINA Bondholder Claims

40.     As identified in **<u>Exhibit A</u>** hereto, certain of the Claims to Be Disallowed purport

to assert, in part, claims based on an alleged ownership interest in bonds issued by COFINA

(collectively the "<u>Partial COFINA Bondholder Claims</u>").

41.     As explained above, the Settlement Order resolved the Commonwealth-COFINA

Dispute, and, pursuant to Paragraph 55 of the Settlement Order, all claims against the

Commonwealth arising from or relating to the relationship of the Commonwealth and COFINA

have been released.  Additionally, pursuant to Paragraph 3(c) of the *Settlement Agreement* [ECF

No. 5045-1], dated October 19, 2018, and attached to the Settlement Order (the "<u>Settlement</u>

<u>Agreement</u>"), and Paragraph 7 of the Amended Confirmation Order, the adversary proceeding

between the Commonwealth and COFINA concerning the Commonwealth-COFINA Dispute has

been dismissed with prejudice following the approval of the compromise and settlement of the

Commonwealth-COFINA Dispute.  Furthermore, pursuant to Paragraph 29(f) of the Amended

Confirmation Order, claims, such as the COFINA Bondholder Claims, that arose from or relate to

the relationship of the Commonwealth and COFINA were released.  Amended Confirmation

Order, ¶ 29(f).[12]  For all of these reasons, the Partial COFINA Bondholder Claims should be

disallowed because these claims based on an apparent alleged ownership interest in COFINA

Bonds have been satisfied, released, and/or discharged pursuant to the Settlement Order,

Settlement Agreement, Amended Confirmation Order, and Plan.

---

[12] Pursuant to the Plan, "Claim" is defined as "[a]ny right to payment or performance, whether or
not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or
asserted or unasserted; or any right to an equitable remedy for breach or enforcement of
performance, whether or not such right to an equitable remedy is reduced to judgment, fixed,
contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits,
damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action,
demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise."  Plan §
1.53.

### B. No Liability for Duplicate Bond Claims

42.     As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed appear to purport to assert liability, in part, on the basis of bonds issued by PBA, HTA, ERS, and PRASA, (collectively, the "Partial Duplicate Bond Claims").

43.     Each of the Partial Duplicate Bond Claims purport to assert, in part, liability against the Debtors associated with one or more bonds that is duplicative of one or more Master Claims, which as described above were filed in the Title III Cases on behalf of the holders of certain bonds issued by PBA, HTA, ERS, and PRASA.  Any failure to disallow the Partial Duplicate Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Debtors' Title III Case.  The holders of the Partial Duplicate Bond Claims will not be prejudiced by the disallowance of their claims because the liabilities associated with the Partial Duplicate Bond Claims are subsumed within one or more Master Claims.

### C. No Liability for Secondarily Insured Bond Claims that Are Duplicative of Master Claims

44.     As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed appear to purport to assert liability, in part, with Secondarily Insured Bonds, which correspond to HTA bonds HTA that are duplicative of liabilities asserted by one or more Master Claims (collectively, the "Partial Secondarily Insured Bond Claims")..

45.     Each of the Partial Secondarily Insured Bond Claims asserts liabilities associated with Secondarily Insured Bonds.  The CUSIP numbers associated with such Secondarily Insured Bonds correspond to bonds issued by HTA and/or bearing original CUSIP numbers. Those original CUSIP numbers, which reflect bond issuances in which the claimants hold ownership interests, are listed in one or more Master Claims.  Therefore, the Partial Secondarily Insured Bond Claims

assert liabilities associated with bonds issued by HTA that are duplicative of liabilities asserted by one or more Master Claims.

46.     Any failure to disallow the Partial Secondarily Insured Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Title III Cases.  The holders of the Partial Secondarily Insured Bond Claims will not be prejudiced by the disallowance of their claims because the liabilities associated are subsumed within one or more Master Claims.  This Three Hundred Fifty-Seventh Omnibus Objection in no way constitutes an objection to any claims held by the insurer of the Secondarily Insured Bonds, but rather to the holder of the Secondarily Insured Bonds, which are subject to the Master Claims.

**D.  No Liability for Claims Based on Investments in Mutual Funds**

47.     As identified in **Exhibit A** hereto, some of the Claims to Be Disallowed purport to be based in part on investment(s) in one or more mutual funds that, in turn, may have invested in bonds issued by the Debtors (collectively, the "Partial Mutual Funds Claims").

48.     A claimant bears the burden of establishing standing to file a proof of claim.  *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).  It is well-established that only a creditor or the creditor's authorized agent has standing to assert a claim.  Fed. R. Bankr. P. 3001(b); 11 U.S.C. §§ 501(a) ("A creditor or an indenture trustee may file a proof of claim."); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Only a creditor or indenture trustee may file a proof of claim.").  Parties with merely derivative interests lack standing to assert a claim against a debtor's estate.  *Matter of Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (finding party with "relationship with Debtor [that] is not direct, but rather derivative" was "a stranger to Debtor's bankruptcy proceedings," with "no claim against the estate's assets," and "as a general rule has no standing in Debtor's bankruptcy proceedings"); *see also In re Tower Park Properties, LLC*, 803

21

F.3d 450, 462-63 (9th Cir. 2015) (holding a trust beneficiary was not a party in interest); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else."); *In re Lopez*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (to establish oneself as a party in interest "the moving party must be asserting its own rights and not those belonging to or derivative of a third party"); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (recognizing the "general principle that 'party in interest standing does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding'" (quoting *In re Refco*, 505 F.3d at 115 n. 10)).

49.   "A creditor, under the [Bankruptcy] Code, is one who has a claim *against the debtor* or the estate," rather than "a creditor of one of the debtor's creditors." *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997).  Because, at most, the Partial Mutual Funds Claims were filed based on the claimant's status as an alleged creditor of an alleged creditor of the Commonwealth, the Partial Mutual Funds Claims were not filed by an actual creditor of the Commonwealth. *See In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (holding receiver lacked standing to file a proof of claim because it was not a creditor or an authorized agent of a creditor).  Instead, the Partial Mutual Funds Claims are derivative of claims that must be asserted by the mutual funds directly for any claimed recovery to be considered by the Court. *See Matter of Goldman*, 82 B.R. at 896 (finding party with "derivative" relationship has "no claim against the estate's asset" and "as a general rule has no standing in Debtor's bankruptcy proceedings").  Moreover, it is unknown whether the mutual fund still retains ownership of the suspect bonds.

50.   Indeed, under nearly identical circumstances, this Court previously disallowed claims filed against COFINA by investors in mutual funds that in turn allegedly invested in COFINA bonds for "lack of an individual interest in COFINA securities." *Tr. of March 13, 2019*

*Hr'g Before the Hon. Laura Taylor Swain* [ECF No. 5969], at 64:01-10 ("THE COURT: So just

so that I understand, his documentation shows that he is a mutual fund investor.  To the extent any

of those mutual funds actually holds COFINA bonds, the mutual fund would be the appropriate

claimant, and so he has provided no evidence of a valid direct claim as against COFINA?  MS.

STAFFORD: Correct, your Honor.  THE COURT: The objection to the claim is sustained and the

claim is disallowed for lack of an individual interest in COFINA securities."); *see also Order*

*Granting Sixty-Fourth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to*

*Claims Based on Investments in Mutual Funds* [ECF No. 9099]; *Memorandum Order Denying*

*Motion to Alter or Amend Order Sustaining Objection (Dkt. 8297) to Claims No. 152470 & No.*

*152283* [ECF No. 9121].  The First Circuit has upheld that determination.  *See* Case No. 19-2231,

Doc. No. 00117746322, dated May 27, 2021.  Accordingly, the claimants are not creditors of the

Commonwealth and lack standing to assert derivative claims.  Because the Commonwealth cannot

be held liable for the Partial Mutual Funds Claims, these portions of the Claims to Be Disallowed

should be disallowed in their entirety

### E.  No Liability for Claims Based on AFICA Bonds

51.     As identified in Exhibit A hereto, certain portions of the Claims to Be Disallowed

purport to assert claims based on an alleged ownership interest in bonds issued by AFICA, which

is not a Title III debtor, and which liabilities are not guaranteed by the Commonwealth (collectively

the "Partial AFICA Bondholder Claims").

52.     Each of the Partial AFICA Bondholder Claims purports to assert, in part, liabilities

against the Commonwealth associated with AFICA Bonds not guaranteed by the Commonwealth.

AFICA is not a Title III debtor, and is a separate, legally distinct entity from the Commonwealth.

Moreover, each of the offering statements issued in connection with the AFICA Bonds states that

the AFICA Bonds are not a debt of the Commonwealth or any of its political subdivisions, other

than AFICA, and that the Commonwealth does not guarantee AFICA's debts.  Further, each of the Partial AFICA Bondholder Claims does not assert a basis for asserting a claim against the Commonwealth for bonds issued by AFICA that are neither guaranteed by nor a debt of the Commonwealth.  Accordingly, the Commonwealth is not liable for the Partial AFICA Bondholder Claims.

### F.  No Liability for PRASA Bonds

53.     As identified in **<u>Exhibit A</u>** hereto, some of the Claims to Be Disallowed purport to assert, in part, claims based on the alleged ownership of bonds issued by PRASA (collectively, the "<u>Partial PRASA Bondholder Claims</u>").

54.     Certain of the Partial PRASA Bondholder Claims assert liabilities associated with PRASA Senior Lien Bonds issued by PRASA, which is not a Title III Debtor, and is a separate, legally distinct entity from the Commonwealth.  Each of the Partial PRASA Bondholder Claims asserts recovery for liabilities associated with Senior Lien Bonds issued by PRASA.  PRASA, however, is not a Title III Debtor, and is a separate, legally distinct entity from the Commonwealth. Moreover, neither the Commonwealth nor any other instrumentality or political subdivision thereof has guaranteed repayment on the PRASA Senior Lien Bonds.  Each of the PRASA Bondholder Claims fails to comply with the applicable rules, however, because it does not assert a basis for asserting a claim against the Commonwealth for bonds issued by PRASA that are not guaranteed by the Commonwealth.  Because of this failure to comply with the applicable rules, neither the Debtors nor the Court are able to determine the validity of the Partial PRASA Bondholder Claims.  Because the Partial PRASA Bondholder Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed because they seek recovery of amounts for which the Commonwealth is not liable.

### G.  No Liability for GDB Bondholder Claims

55.    As identified in **Exhibit A** hereto, certain Claims to Be Disallowed purport to assert, in part, claims based on the alleged ownership of bonds issued by GDB (collectively the "Partial GDB Bondholder Claims").

56.    Each of the Partial GDB Bondholder Claims purports to be based on the ownership of GDB Bonds that were subject to the Qualifying Modification, which provided for the issuance of new securities in exchange for the cancellation of the GDB Bonds and the extinguishment of the Commonwealth's guarantee of certain GDB Bonds, and thus the Commonwealth is no longer liable for these claims.  Accordingly, each of the Partial GDB Bondholder Claims has been released pursuant to the approval and consummation of the Qualifying Modification.  As noted above, the Qualifying Modification provides, among other things, that holders of GDB Bonds shall release GDB and its affiliates from claims relating to the GDB Bonds and any action or omission of GDB and its affiliates with respect to any indebtedness of or loan to GDB.  GDB is a public corporation and instrumentality of the Commonwealth.  The Commonwealth, thus, is an affiliate of GDB within the scope of the release pursuant to the Qualifying Modification.  Accordingly, the GDB Bondholder Claims were released upon the consummation of the Qualifying Modification on November 29, 2018.  Because the Partial GDB Bondholder Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed because they seek recovery of amounts for which the Commonwealth is not liable.

### H.  No Liability for HTA Bridge Bondholder Claims

57.    As identified in **Exhibit A** hereto, certain Claims to Be Disallowed purport to assert, in part, claims based on the alleged ownership of HTA Bridge bonds issued by HTA (collectively the "Partial HTA Bridge Bondholder Claims").

58.    Each of the Partial HTA Bridge Bondholder Claims purports to assert liabilities against the Commonwealth associated with HTA Bridge Bonds not guaranteed by the

Commonwealth.  As described above, however, the Commonwealth has not guaranteed repayment

of the HTA Bridge Bonds, and is not required to make payments to holders in respect of the HTA

Bridge Bonds.  Moreover, the Claims to Be Disallowed do not provide a basis for asserting a claim

against the Commonwealth for the HTA Bridge Bonds, which, as described above, were issued by

HTA and not guaranteed by the Commonwealth.

**I.   Deficient Claims for Investment Losses**

59.     As identified in Exhibit A hereto, certain Claims to Be Disallowed purport to assert

liabilities arising out of alleged investment losses.  However, none of the Claims to Be Disallowed

assert any potential causes of action against the Debtors that might render the Debtors liable for

alleged damages incurred as a result of the claimants' decision to sell their bonds or interests in

mutual funds holding bonds at a loss.  Accordingly, the Debtors are not liable for the amounts

asserted in the Claims to Be Disallowed.  *See English v. Energy Future Holdings (In re Energy*

*Future Holdings)*, 2018 U.S. Dist. LEXIS 49952, at *7 (D. Del., March 27, 2018) (holding

bankruptcy court's order disallowing proof of claim was proper where claimant had sold bonds

issued by the debtor and, thus, neither had any right to payment with respect to the bonds, nor did

claimant show it had any potential cause of action against the debtor for the alleged damages

incurred by the claimant in selling the debtor's bonds at a loss); *In re Allegheny Int'l, Inc.*, 954

F.2d 167, 173 (3d Cir. 1992) (citing *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L.

King, *Collier on Bankruptcy* § 502.02, at 502-22 (15th ed. 1991)) ("Initially, the claimant must

allege facts sufficient to support the claim").

60.     In support of the foregoing, the Debtors rely on the *Declaration of Jay Herriman*

*in Support of the Three Hundred Fifty-Seventh Omnibus Objection (Substantive) of the*

*Commonwealth of Puerto Rico, Puerto Rico Highways and Transportation Authority, and the*

*Puerto Rico Sales Tax Financing Corporation to Duplicate, Deficient, and/or No Liability Bond Claims*, dated June 18, 2021, attached hereto as Exhibit B.

## NOTICE

61.     In accordance with the Amended Omnibus Objection Procedures and the Court's Notice Order, the Debtors are providing notice of this Three Hundred Fifty-Seventh Omnibus Objection to (a) the individual creditors subject to this Three Hundred Fifty-Seventh Omnibus Objection, (b) the U.S. Trustee, and (c) the Master Service List (as defined by the *Fourteenth Amended Case Management Procedures* [ECF No. 15894-1]), which is available on the Debtors' case website at https://cases.primeclerk.com/puertorico.  The notice for this Three Hundred Fifty-Seventh Omnibus Objection is attached hereto as **Exhibit C**.  Spanish translations of the Three Hundred Fifty-Seventh Omnibus Objection and all of the exhibits attached hereto are being filed with this objection and will be served on the parties.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## RESERVATION OF RIGHTS

62.     This Three Hundred Fifty-Seventh Omnibus Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors or the rights of any other party in interest in the Title III Cases to object to the Claims to Be Disallowed or any other claims on any ground whatsoever.  The Debtors expressly reserve all further substantive or procedural objections.  Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of

27

the Bankruptcy Code; or (e) a waiver of the rights of the Debtors or any other party in interest in

the Title III Cases under PROMESA, the Bankruptcy Code or any other applicable law.

## **NO PRIOR REQUEST**

63.      No prior request for the relief sought in this Three Hundred Fifty-Seventh Omnibus

Objection has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting such other and further relief as is just.

Dated: June 18, 2021
      San Juan, Puerto Rico

Respectfully submitted,

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García-Benítez
USDC No. 203708
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, Puerto Rico Highways and Transportation Authority, and the Puerto Rico Sales Tax Financing Corporation*

29

**Fecha límite para responder: 19 de julio de 2021, a las 04:00 p.m. (AST)**
**Fecha de la vista: 4 de agosto de 2021, a las 9:30 a.m. (AST)**

---

**REVISE DETENIDAMENTE LA PRESENTE OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

### TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO

| | |
|---|---|
| *In re*: <br><br> JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, <br><br> como representante del <br><br> ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al*., <br><br> Deudores.[1] | PROMESA <br> Título III <br><br> Núm. 17 BK 3283-LTS <br><br> (Administrado Conjuntamente) <br><br> **La presente radicación guarda relación con el ELA, la ACT y COFINA.** |

---

### TRICENTÉSIMA QUINCUAGÉSIMA SÉPTIMA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, DE LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO Y DE LA CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO A RECLAMACIONES POR BONOS DUPLICADAS, DEFICIENTES Y/O EN LAS QUE NO EXISTE RESPONSABILIDAD

---

A la atención de su señoría, Juez del Tribunal de Distrito de los Estados Unidos, Laura Taylor Swain:

---

[1] Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y junto con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de casos de quiebra debido a ciertas limitaciones en el programa informático).

El Estado Libre Asociado de Puerto Rico (el "ELA"), la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") y la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA", y junto con el ELA y la ACT, los "Deudores"), a través de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como el único representante de Título III de los Deudores conforme a la sección 315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radican esta tricentésima quincuagésima séptima objeción global (la "Tricentésima quincuagésima séptima objeción global") a las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento, cada una de las cuales pretende basarse parcialmente en *a)* bonos emitidos por la COFINA, *b)* una participación patrimonial en bonos emitidos por el Banco Gubernamental de Fomento para Puerto Rico (el "BGF"), *c)* reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas, *d)* reclamaciones por bonos que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de determinados bonistas, *e)* reclamaciones que alegan responsabilidades por determinados bonos emitidos por la ACT por los que los Deudores no son responsables, *f)* una o más inversiones en fondos mutuos que, a su vez, pudieron haber invertido en bonos emitidos por los Deudores, y/o *g)* una participación patrimonial en bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA") y/o la Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental (la "AFICA"). Además, cada una de las evidencias de reclamaciones contenidas en el **Anexo A** del presente documento es deficiente, puesto que no brinda información suficiente para que los Deudores puedan reconciliar las

---

[2] PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101-2241.

evidencias de reclamaciones. Además, las partes restantes de determinadas evidencias de reclamaciones contenidas en el **<u>Anexo A</u>** del presente documento son deficientes, puesto que alegan responsabilidades por supuestas pérdidas por inversión, pero no alegan una reclamación conforme a la cual los Deudores pudieran declararse responsables por sus supuestas pérdidas por inversión. En apoyo de la Tricentésima quincuagésima séptima objeción global, los Deudores manifiestan respetuosamente lo siguiente:

**<u>JURISDICCIÓN</u>**

30.     El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme a la sección 306(a) de PROMESA.

31.     La sede judicial de este distrito es la competente conforme a la sección 307(a) de PROMESA.

**<u>ANTECEDENTES</u>**

A.     **Órdenes de Fecha Límite**

32.     El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "<u>Caso de Título III del ELA</u>"). El 5 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para COFINA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "<u>Caso de Título III de COFINA</u>"). El 21 de mayo de 2017 (la "<u>Fecha de Petición</u>"), la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para la ACT conforme a la sección 304(a)

3

de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (respectivamente, el "Caso de Título III de la ACT", y junto con el Caso de Título III del ELA y el Caso de Título III de COFINA, los "Casos de Título III"). El 29 de junio de 2017, el Tribunal dictó una orden por la que concedió la administración conjunta de los Casos de Título III únicamente con fines procesales. ECF núm. 537.[3]

33.     El 16 de enero de 2018, los Deudores radicaron su *Moción de una orden que A) fije fechas límite y procedimientos para radicar Evidencias de reclamaciones y B) apruebe la forma y la manera de su notificación* [ECF núm. 2255] (la "Moción de Fecha Límite"). Conforme a la *Orden que A) fija fechas límite y procedimientos para radicar evidencias de reclamaciones y B) aprueba la forma y la manera de su notificación* [ECF núm. 2521] (la "Orden Inicial de Fecha Límite"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite y fijó fechas límite y procedimientos para radicar evidencias de reclamaciones en el marco de los Casos de Título III. Luego de la moción informativa de determinados acreedores, y del apoyo de los Deudores, el Tribunal dictó a continuación la *Orden que A) extendió fechas límite para radicar evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF núm. 3160] (conjuntamente con la Orden Inicial de Fecha Límite, las "Órdenes de Fecha Límite"), extendiendo dichas fechas límite hasta el 29 de junio de 2018, a las 04:00 p.m. (AST).

**B.     Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de Título III del ELA**

34.     Conforme a la Orden Inicial de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamación

---

[3] Salvo disposición en contrario contenida en el presente documento, las citas ECF harán referencia a documentos radicados en el marco del Caso de Quiebra Núm. 17 BK 3283-LTS.

4

principal contra el deudor pertinente, en su propio nombre y en el de todos los titulares de las reclamaciones por bonos para la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos de fideicomiso, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite, ¶ 5(a). Como se explica más adelante, se han radicado evidencias de reclamaciones principales (conjuntamente, las "Reclamaciones Principales del ELA") en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos o pagarés emitidos por la AAA, la Autoridad de Edificios Públicos de Puerto Rico (la "AEP") y el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE").

35.     *AEP*: la AEP supuestamente emitió Bonos de Renta para financiar edificios de oficinas y otras instalaciones arrendadas a varios departamentos, agencias públicas e instrumentalidades del ELA. US Bank y US Bank Trust actúan como agentes fiscales en relación con determinados bonos de renta emitidos por la AEP, conforme a lo explicado en la nota al pie 3 de la Evidencia de reclamación núm. 62833 (los "Bonos de la AEP"), y, en nombre de los tenedores de los Bonos de la AEP, radicó una evidencia de reclamación principal en el marco del Caso de Título III del ELA por todos los montos pendientes de pago adeudados (la "Reclamación Principal de la AEP"), que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 62833. [4] La Reclamación Principal de la AEP alega reclamaciones liquidadas por aproximadamente $4000 millones en concepto de principal supuestamente impagado, $160 millones en concepto de intereses supuestamente impagados y reembolso de comisiones y gastos de los agentes fiscales, además de reclamaciones no liquidadas y contingentes por la totalidad de los montos adeudados "en razón de la totalidad de las reclamaciones que el Agente Fiscal tenga o

---

[4] La Evidencia de reclamación núm. 62833 enmendó y sustituyó la Evidencia de reclamación núm. 13351, que fue radicada inicialmente por el Agente Fiscal.

pueda tener en relación con las obligaciones de Bonos pendientes, conocidos o por conocer, contra el ELA y aquellos que pretendan actuar en nombre del ELA. . . ." Cláusula Adicional de la Reclamación Principal de la AEP, ¶¶ 19-21.

36.     _AAA_: la AAA es propietaria y opera los sistemas públicos de suministro de agua y de aguas residuales en Puerto Rico. La AAA emitió determinados bonos de renta (los "Bonos de la AAA"), conforme a la Resolución de la Autoridad de Acueductos y Alcantarillados de Puerto Rico núm. 1583, por la que se autorizan y garantizan los bonos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico avalados por el Estado Libre Asociado de Puerto Rico, y algunas resoluciones complementarias. El Banco Popular de Puerto Rico ("Banco Popular") actúa como fideicomisario en relación con los Bonos de la AAA, y radicó una evidencia de reclamación principal contra el ELA en nombre de los tenedores de los Bonos de la AAA, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 22620 (la "Reclamación Principal de la AAA"). La Reclamación Principal de la AAA alega "una reclamación contingente contra el ELA en relación con los Bonos por un importe de al menos $284,755,000, además de todos los intereses y primas generados sobre los Bonos a partir de la Fecha de Petición, así como la totalidad de las tasas, costos y gastos u otros cargos acumulados que hayan devengado o sean cobrables en relación de tales Bonos". Adenda de la Evidencia de Reclamación de la AAA, ¶ 9.

37.     _SRE_: el SRE es una agencia gubernamental, aparte e independiente del Gobierno del ELA y de sus demás instrumentalidades. _Véase_ 3 L.P.R.A § 775.[5]  Supuestamente conforme a la Resolución sobre bonos para el financiamiento de pensiones, adoptada el 24 de enero de 2008, y ciertas resoluciones complementarias, el SRE emitió unos bonos prioritarios y subordinados para el financiamiento de pensiones (los "Bonos del SRE"), por un monto total del principal original de

---

[5] El 21 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el SRE conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal.

aproximadamente $2900 millones.[6] BNYM actúa como agente fiscal con respecto a los Bonos del SRE. Actuando en nombre de los tenedores de los Bonos del SRE, BNYM radicó una evidencia de reclamación principal en el marco del Caso de Título III del ELA (la "Reclamación Principal del SRE", que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 32004.[7]

**C.    Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de Título III de la ACT**

9.    La ACT es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm. 74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT se encarga de la construcción, operación y mantenimiento de carreteras y otros sistemas de transportación en el ELA. *Véase* 9 L.P.R.A § 2002.

10.    De conformidad con la Ley para crear la ACT, la ACT emitió en 2003 una serie de Bonos de renta de instrumentos financieros especiales para facilitar el financiamiento del puente de Teodoro Moscoso (los "Bonos para el puente de la ACT"). Los tenedores de los Bonos para el puente de la ACT han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos para el puente de la ACT, a medida que estos vencen y se vuelven

---

[6] El 12 de marzo de 2019, el Comité Oficial de Acreedores no Asegurados radicó una *Objeción global a reclamaciones radicadas por los tenedores de los bonos emitidos por el SRE* [Caso núm. 17-3566, ECF núm. 381], basándose en que la emisión de los bonos supuso un exceso de la potestad legal del SRE, por lo que era *ultra vires*, anulando de pleno derecho los Bonos del SRE. El 23 de abril de 2019, el Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico radicó una *Objeción Global del Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico, conforme al artículo 502 Código de Quiebras y la regla 3007 de las Reglas de Quiebras, a reclamaciones radicadas o alegadas por los tenedores de los Bonos del SRE contra el SRE y el ELA* [Caso núm. 17-3283, ECF núm. 6482], basándose, entre otras cosas, en que la emisión de los bonos fue *ultra vires*. El SRE se reserva los derechos a impugnar la emisión de los bonos sobre cualquier motivo, también sobre el motivo de que los Bonos del SRE eran *ultra vires*, y cualquier otro motivo recogido en las objeciones precedentes.

[7] El 22 de mayo de 2019, el ELA radicó una objeción a la Evidencia de Reclamación Principal del SRE. Véase Objeción de la Junta de Supervisión y Administración Financiera, conforme al artículo 502 del Código de Quiebras y la regla 3007 de las Reglas de Quiebras, a las reclamaciones radicadas o alegadas contra el ELA por el Bank of New York Mellon, como agente fiscal (Reclamación núm. 16775) [ECF núm. 7075]. En aras de la claridad, la presente Tricentésima quincuagésima séptima objeción global se radica sin perjuicio de los derechos de las partes en relación con dicha objeción, incluyendo cualesquiera derechos a intervenir, que quedan reservados.

pagaderos. El ELA no ha garantizado el reembolso de los Bonos para el puente de la ACT; además, en cada una de las declaraciones de oferta emitidas en relación con los Bonos para el puente de la ACT se expone que "los Bonos [para el puente de la ACT] no constituyen deuda del Estado Libre Asociado de Puerto Rico ni de ninguna de sus subdivisiones políticas, salvo la Autoridad, por lo que ni el Estado Libre Asociado de Puerto Rico ni ninguna de sus subdivisiones, salvo la Autoridad, tiene la obligación de pagar los Bonos".[8]

11.    Actuando en nombre de los tenedores de determinados Bonos de la ACT, BNYM radicó tres evidencias de reclamaciones principales en el marco del Caso de Título III de la ACT (conjuntamente, las "Reclamaciones Principales de Título III de la ACT", y junto con las Reclamaciones Principales del ELA, las "Reclamaciones Principales"): la Evidencia de reclamación núm. 37245, por la que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de 1968, aproximadamente $847 millones en concepto de responsabilidad más montos no liquidados; la Evidencia de reclamación núm. 38574, por la que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de 1998, aproximadamente $3200 millones en concepto de responsabilidad más montos no liquidados; y la Evidencia de reclamación núm. 32622, por la que se reclama, en nombre de los tenedores de los bonos subordinados emitidos conforme a la Resolución de 1998, aproximadamente $279 millones en concepto de responsabilidad más montos no liquidados.

12.    Determinados bonos o pagarés emitidos por la ACT han sido asegurados por una o más aseguradoras de bonos municipales, ya sea en el mercado primario o en el secundario. El seguro de bonos municipales se obtiene en el mercado primario cuando el municipio emisor de los bonos contrata una compañía de seguros para suscribir una póliza de seguro en relación con dicha

---

[8]    Véase,    por    ejemplo,
https://emma.msrb.org/Security/Details/A0BC2E92D13DB872F5E9451D490A58D23.

serie de bonos. En el caso de que un bono no se asegure en el mercado primario, los tenedores de

tales bonos no asegurados podrían optar por obtener un seguro a través del mercado secundario.

Los tenedores de los bonos no asegurados que busquen obtener un seguro en el mercado secundario

entran en una relación contractual directamente con una aseguradora de bonos municipales, por lo

que el emisor original no es parte en dicho proceso de contratación. Cuando un tenedor de un bono

no asegurado obtiene una póliza de seguro en el mercado secundario, se emite un nuevo número

CUSIP que corresponde a los números CUSIP originales asignados a los bonos en el momento de

su emisión. Determinados bonos emitidos por la ACT han sido asegurados en el mercado

secundario y, en consecuencia, se les han emitido nuevos números CUSIP que corresponden a los

bonos emitidos por la ACT que llevan números CUSIP originales (los "Bonos asegurados en el

mercado secundario").

**D.      Deuda de los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de
Puerto Rico**

13.      La AAA fue creada de conformidad con la Ley núm. 40, de 1 de mayo de 1945. La

AAA es una "corporación pública e instrumentalidad gubernamental autónoma", creada para la

prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 142,

144.

14.      La Ley para crear la AAA autoriza a la AAA a emitir bonos.  22 L.P.R.A. § 144(g).

Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA

a emitir bonos, lo que incluye la Resolución núm. 1583, en su versión enmendada y modificada el

7 de marzo de 2008 (la "Resolución núm. 1583"). En 2008, la AAA unos bonos de renta de

refinanciamiento, Serie A, por un monto de principal de $159,055,000 (los "Bonos Serie A de

2008") y unos bonos de renta de refinanciamiento, Serie B, por un monto de principal de

9

$125,700,000 (los "Bonos Serie B de 2008", y junto con los Bonos Serie A de 2008, los "Bonos de Renta de Refinanciamiento de la AAA de 2008") .

15.     En 2012, la AAA emitió unos bonos de renta, Serie 2012 B, por un monto de principal de $295,245,000 (los "Bonos Prioritarios Serie B de 2012" o los "Bonos de Gravamen Prioritarios de la AAA"). Los tenedores de los Bonos de Gravamen Prioritarios de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de Gravamen Prioritarios de la AAA, a medida que estos vencen y se vuelven pagaderos. En consecuencia, el EMMA refleja que la AAA no ha enviado ninguna notificación de incumplimiento en relación con los Bonos de Gravamen Prioritarios de la AAA.[9] Además, el ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritarios. En consecuencia, las declaraciones de oferta relativas a los Bonos de Gravamen Prioritarios de la AAA indican que "no constituyen deuda del Estado Libre Asociado de Puerto Rico ni de ninguno de sus municipios u otras subdivisiones políticas, con la excepción de [la AAA], por lo que ni el Estado Libre Asociado de Puerto Rico ni ningunos de dichos municipios u otras subdivisiones políticas, con la excepción de [la AAA], será responsable por el pago del principal o de los intereses sobre los referidos Bonos".[10]

**E.     Deuda de los bonos emitidos por la Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental**

16.     La AFICA es una corporación pública e instrumentalidad gubernamental del ELA creada por la Ley núm. 121 de la Asamblea Legislativa de Puerto Rico, aprobada el 27 de junio de 1977 (en su versión enmendada, complementada y codificada en las Leyes de Puerto Rico Anotadas, título 12, § 1251 *et seq.*). Leyes de Puerto Rico Anotadas, título 12, § 1254. La AFICA

---

[9] *Véase, por ejemplo*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[10] *Véase, por ejemplo,* Declaración de Oferta relativa a los Bonos de Renta de la AAA, Serie B (Gravamen Prioritario), 15 de febrero de 2012, disponible en https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

facilita el financiamiento de proyectos para fomentar el desarrollo económico del ELA, incluyendo a través del desarrollo y construcción de nuevas infraestructuras industriales, comerciales, turísticas, agrícolas, educativas, médicas y de control medioambiental.

17.     En 1997, la AFICA emitió unos Bonos de Renta Industrial, 1997 Serie A (los "Bonos del Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital de 1997"), por un monto total de $8,540,000, para financiar, en parte, la construcción del Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital. Los Bonos del Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital son pagaderos únicamente de una cesión de unos montos pagaderos a la AFICA conforme al acuerdo de préstamo celebrado entre la AFICA, por un lado, y Ashford Development and Management Corporation, por el otro. *Véase*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración De Oferta, Bonos de Renta Industrial, Serie 1997A (Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital de 1997).[11] La declaración de oferta emitida en relación con los Bonos del Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital de 1997 dispone que los "[Bonos del Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital de 1997] no constituyen deuda de Puerto Rico ni de ninguna otra de sus subdivisiones políticas salvo [la AFICA], por lo que ni Puerto Rico ni ninguna de dichas subdivisiones serán responsables de tal deuda". *Id.*

18.     En 1999, la AFICA emitió Bonos de Renta Industrial, 1999 Serie A (los "Bonos Doral Financial 1999"), por un monto total de $44,765,000.00, para financiar, en parte, la construcción del Doral Financial Center. Los Bonos Doral Financial 1999 son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA, de una

---

[11] Una copia veraz y correcta de la Declaración de Oferta de los Bonos del Proyecto de Aparcamiento de Ashford Presbyterian Community Hospital de 1997 se adjunta al presente documento como **Documento adjunto A**.

parte, y Doral Financial Corporation y Doral Properties, de la otra. Además, Doral Financial Corporation "garantizó incondicionalmente" los Bonos Doral Financial 1999. La declaración de oferta emitida en relación con los Bonos Doral Financial 1999 dispone que "[los Bonos Doral Financial 1999] no constituyen deuda del Gobierno de Puerto Rico". *Véase*, por ejemplo, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta Industrial, Serie 1999A (Proyecto Doral Financial Center), *disponible en* https://emma.msrb.org/Security/Details/A3680EBA7C2CF40DB443B3B0E5DA28925.

19.     En 2000, la AFICA emitió Bonos de Renta Turística, 2000 Serie A (los "Bonos Palma del Mar 2000 Serie A"), por un monto total de $30,000,000, para financiar, en parte, mejoras en el Palmas del Mar Country Club. Los Bonos Palmas del Mar 2000, Serie A, son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Palmas Country Club, Inc. La declaración de oferta emitida en relación con los Bonos Palmas del Mar 2000 Serie A dispone que los bonos "no constituirán endeudamiento del [ELA] ni de ninguna de sus subdivisiones políticas". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta Turística, 2000 Serie A (Proyecto Palmas del Mar Country Club), *disponible en* https://emma.msrb.org/Security/Details/AD88773EB8772C017819AB0B921B2DAD5.

**F.     Caso de Título III de COFINA y resolución de la controversia entre el ELA y COFINA**

20.     COFINA es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm. 91 de la Asamblea Legislativa del ELA. Conforme a la Resolución enmendada y modificada sobre los bonos del fondo de interés apremiante, adoptada el 13 de julio de 2007, en su versión enmendada del 19 de junio de 2009, y de conformidad con otras resoluciones complementarias,

COFINA emitió una serie de bonos por un monto total de aproximadamente $17,000 millones para, entre otras cosas, sufragar determinadas obligaciones de deuda del Banco Gubernamental de Fomento para Puerto Rico y de la Corporación para el Financiamiento Público de Puerto Rico (los "Bonos de COFINA"). El Bank of New York Mellon actúa como fiduciario con respecto a los Bonos de COFINA.

21.     La Junta de Supervisión radicó el *Tercer plan enmendado de ajuste de la Corporació*n del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III (el "Plan") [ECF núm. 4652] el 9 de enero de 2019. El Tribunal examinó la confirmación del Plan y las objeciones formuladas a este en una vista celebrada los días 16 y 17 de enero de 2019.

22.     El 4 de febrero de 2019, el Tribunal confirmó el Plan que incorporaba el pacto y la conciliación de la controversia sobre si, luego de examinar todas las contestaciones y reconvenciones sustantivas y procesales, incluidas cuestiones constitucionales, los impuestos sobre la venta y uso supuestamente empeñados por COFINA para garantizar la deuda son propiedad del ELA o de COFINA conforme a la normativa legal aplicable (la "Controversia entre el ELA y COFINA"). *Véase la Orden y la Sentencia que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF núm. 5048]. Ese mismo día, el Tribunal aprobó el pacto y la conciliación de la Controversia entre el ELA y COFINA conforme al *Dictamen abreviado y orden que aprueba la conciliación entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF núm. 5045] (la "Orden de Conciliación"). El 5 de febrero de 2019, el Tribunal dictó una *Orden y Sentencia enmendadas que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF núm. 5055] (la "Orden de Confirmación Enmendada"). El Plan entró en vigor el 12 de febrero de 2019 (la "Fecha de entrada en vigor"), una vez consumadas

13

las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III, según el Título III de PROMESA, y B) acontecimiento de la Fecha de entrada en vigor* [Caso núm. 17 BK 3284-LTS, ECF núm. 587].

**G.    Procedimientos conforme al Título VI del BGF y modificación calificada**

23.    El BGF es una corporación pública e instrumentalidad gubernamental del ELA, creada por la Asamblea Legislativa en 1948 para ayudar al Gobierno del ELA (el "Gobierno") a llevar a cabo sus tareas fiscales y a desempeñar su responsabilidad con mayor eficacia en relación con el desarrollo de la economía del ELA. El 28 de abril de 2017, la Junta de Supervisión aprobó por unanimidad el Plan fiscal del BGF de febrero de 2017, que contemplaba una terminación ordenada de las actividades del BGF sobre la base de la determinación de que el BGF no era viable a largo plazo dadas sus condiciones financieras vigentes en ese momento.

24.    El 12 de julio de 2017, la Junta de Supervisión dictó una resolución por la que se autorizaba al BGF, conforme a la sección 601(e) de PROMESA, a ampararse en el título VI de PROMESA. El 10 de agosto de 2018, el BGF radicó una solicitud de aprobación de una modificación calificada, conforme a la sección 601(m)(1)(D) de PROMESA (la "Modificación Calificada"), ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

25.    El 7 de noviembre de 2018, el Tribunal aprobó la Modificación Calificada conforme a la sección 601(m)(1)(D) de PROMESA. *Véase* ECF núm. 270 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 7 de nov. de 2018). La Modificación Calificada dispone, entre otras cosas, i) la emisión de nuevos bonos por la recién creada Autoridad de Recuperación de Deuda del BGF (GDB Debt Recovery Authority) a cambio de la cancelación (entre otras cosas) de determinados bonos de participación y reclamaciones de bonos garantizados (conjuntamente, los "Bonos del BGF"). ii) la extinción de la garantía del ELA

14

de los bonos garantizados tras el intercambio y cancelación de los bonos garantizados; y iii) la liberación de reclamaciones de los tenedores de los Bonos del BGF contra el BGF y sus afiliados en relación con (entre otras cosas) cualquier inversión con el BGF o la compra, venta o transferencia de cualquier título valor o participación del BGF, y cualquier acción u omisión con respecto a cualquier endeudamiento o préstamo al BGF (incluidos cualesquiera pagarés emitidos o depósitos poseídos por el BGF) o del BGF. *Declaración de Solicitación,* en 57-60, ECF núm. 1-15 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 10 de ago. de 2018).

26.    El 29 de noviembre de 2018, el BGF anunció la consumación de la Modificación Calificada del BGF. Nota de prensa, *el Gobierno de Puerto Rico anuncia la consumación de la Modificación Calificada del BGF*, Gobernador de Puerto Rico (29 de nov. de 2018), disponible en http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

H.    **Evidencias de reclamaciones radicadas, procedimientos relativos a objeciones globales y objeciones a reclamaciones**

27.    Hasta la fecha, se han radicado aproximadamente 179,420 evidencias de reclamaciones contra los Deudores, que han sido registradas por Prime Clerk, LLC. Dichas evidencias de reclamaciones ascienden a un total aproximado de $43.59 billones en reclamaciones radicadas contra los Deudores, además de los montos no liquidados reclamados.

28.    De las evidencias de reclamaciones radicadas, aproximadamente 116,160 han sido radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. Además, aproximadamente 2,2560 evidencias de reclamaciones han sido radicadas en relación con la ACT, o reclasificadas como radicadas contra la ACT. Aproximadamente 3,094 evidencias de reclamaciones han sido radicadas en relación con COFINA, o reclasificadas como radicadas contra

COFINA. De conformidad con las condiciones de las Órdenes de Fecha Límite, muchas de estas reclamaciones no tenían que haber sido radicadas en absoluto o adolecen de otro tipo de vicios; por ejemplo, haber sido enmendadas posteriormente, no alegar una reclamación por la que los Deudores sean responsables, estar duplicadas en relación con otras evidencias de reclamaciones o no aportar información necesaria para que los Deudores determinen si la reclamación es válida.

29.     Para resolver eficazmente el mayor número posible de las evidencias de reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su *Moción para que se dicte una orden que A) apruebe procedimientos limitados relativos a objeciones globales, B) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) conceda el remedio relacionado* [ECF núm. 4052] (la "Moción de Procedimientos Globales"). El Tribunal concedió el remedio solicitado en la Moción de Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden que A) aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado* [ECF núm. 4230]; *Procedimientos relativos a Objeciones Globales* [ECF núm. 4230-1] (conjuntamente, los "Procedimientos Iniciales relativos a Objeciones Globales"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF núm. 4381] (la "Orden de Notificación").

30.     En aras del interés constante de resolver eficazmente cualesquiera evidencias de reclamaciones innecesarias, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar

16

objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden que A) apruebe Procedimientos Enmendados relativos a Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF núm. 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden que A) aprueba Procedimientos Enmendados relativos a Objeciones Globales, B) exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF núm. 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

31.     Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal ha celebrado hasta la fecha más de 14 vistas vinculadas con más de 140 objeciones globales radicadas por el ELA, COFINA, la ACT, el SRE y/o la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE"). Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, aproximadamente 101,019 reclamaciones que reivindicaban $43.59 billones en responsabilidad contra el ELA, COFINA, la ACT, la AEE y el SRE fueron rechazadas y serán retiradas del registro de reclamaciones en el marco de los procedimientos radicados conforme al Título III una vez dictadas las órdenes finales.

32.     Esta Tricentésima quincuagésima séptima objeción global se radica de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

## OBJECIONES A EVIDENCIAS DE RECLAMACIONES

33.     Los Procedimientos Enmendados relativos a Objeciones Globales permiten a los Deudores radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las

17

bases recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de Quiebra (*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas establecidas en los Procedimientos Enmendados relativos a Objeciones Globales.

34.    La Tricentésima quincuagésima séptima objeción global pretende que se rechacen en su totalidad, conforme a los Procedimientos Enmendados relativos a Objeciones Globales, evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento (conjuntamente, las "Reclamaciones que han de ser rechazadas"), cada una de las cueles pretende basarse, en parte, en *a*) bonos emitidos por COFINA, *b*) una participación patrimonial en bonos emitidos por el BGF, *c*) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas, *d*) reclamaciones por bonos que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de determinados bonistas, *e*) reclamaciones que alegan responsabilidades por determinados bonos emitidos por la ACT por los que los Deudores no son responsables, *f*) una o más inversiones en fondos mutuos que, a su vez, pudieron haber invertido en bonos emitidos por los Deudores, y/o *g*) una participación patrimonial en bonos emitidos por la AAA y/o la AFICA. Además, cada una de las evidencias de reclamaciones contenidas en el **Anexo A** del presente documento es deficiente, puesto que no brinda información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones. Además, las partes restantes de determinadas evidencias de reclamaciones contenidas en el **Anexo A** del presente documento son deficientes, puesto que alegan responsabilidades por supuestas pérdidas por inversión, pero no alegan una reclamación conforme a la cual los Deudores pudieran declararse responsables por las supuestas pérdidas por inversión. El **Anexo A** especifica además por qué cada una de las Reclamaciones que han de ser rechazadas debe ser rechazada en su totalidad.

18

35. En cada una de las Reclamaciones que han de ser rechazadas, la evidencia de reclamación pretendía alegar responsabilidades surgidas de "bonos de préstamo de dinero", "bonos preferentes (en mora)", "(bonos) de préstamo de dinero" u otros términos similares que alegan responsabilidades vinculadas con inversiones en bonos emitidos por el Gobierno. En algunos casos, las Reclamaciones que han de ser rechazadas no contenían ninguna documentación justificativa que indicase cuáles eran los bonos alegados por los reclamantes que generaban responsabilidades de los Deudores. En otros casos, las Reclamaciones que han de ser rechazadas proporcionaban como documentación justificativa una copia de un extracto de corretaje u otra documentación justificativa que contenía información sobre bonos supuestamente en posesión del reclamante, pero los montos de los bonos incluidos en dicha documentación justificativa no correspondían con el monto que figuraba en la evidencia de reclamación del reclamante.

36. El 13 de agosto de 2019, el Tribunal dictó la *Orden que concedió parcialmente y levantó parcialmente la Moción de los Deudores para dictar una orden que A) autorice procedimientos alternativos de resolución de controversias, B) apruebe formas de notificación adicionales, C) apruebe envíos propuestos y D) conceda el remedio relacionado* [ECF núm. 8453] (la "Orden de Envío Autorizado") que autorizó que los Deudores realizaran envíos "a cualquier reclamante que no haya proporcionado suficiente información que permitiera a los Deudores procesar sus reclamaciones". Orden de Envío Autorizado, ¶ 3.

37. Conforme a la Orden de Envío Autorizado, "[s]i los Deudores realizan el Envío Propuesto al reclamante, y este último no responde o responde pero no aporta suficiente información que permita a los Deudores reconciliar su reclamación, los Deudores tendrán derecho a oponerse a la reclamación como deficiente". *Id.*

38. De conformidad con la Orden de Envío Autorizado, los Deudores han enviado al menos una carta a cada reclamante objeto de la presente Tricentésima quincuagésima séptima

19

objeción global esencialmente en el formato que se adjunta a la Orden de Envío Autorizado como

Anexo 1 (el "Envío"). Cada Envío, en la parte pertinente, rezaba lo siguiente:

> Se requiere información adicional para que los Deudores sigan
> examinando su reclamación. Los Deudores no pueden determinar a
> partir de la información que usted proporcionó cuál es la base de la
> reclamación que trata de alegar contra uno o más Deudores. Al
> responder a esta carta, rogamos se asegure de proporcionar toda la
> información solicitada, así como tantos detalles como sea posible
> aportar sobre su reclamación. Las descripciones que incorporó en su
> evidencia de reclamación eran demasiado vagas para que los
> Deudores comprendieran la reclamación que usted trata de alegar,
> de manera que rogamos proporcione más detalles y no se limite
> simplemente a copiar la misma información.
> *Véase* ECF núm. 8453-1 en 2, 7.

Los Envíos recibidos por los reclamantes objeto de la presente Tricentésima quincuagésima

séptima objeción global exigían a los reclamantes responder en un plazo de 30 días desde la fecha

de la carta. *Véase id.* Además, en los Envíos se advertía a los Reclamantes de que "[s]i no responde

a esta solicitud y no proporciona la información y la documentación requeridas para justificar su

reclamación, es posible que los Deudores se vean en la obligación de oponerse a su reclamación."

*Id.*

39.     Cada uno de los Reclamantes identificados en el **Anexo A** o bien no respondió a

los Envíos, o bien envió una respuesta que tampoco contenía la información necesaria que permita

a los Deudores reconciliar la reclamación. En consecuencia, los Deudores analizaron la

documentación sometida con la evidencia de reclamación o con los Envíos en relación con la

alegación de inversiones relacionadas con bonos emitidos por el Gobierno. En base a dicho

análisis, los Deudores consideran que las Reclamaciones que han de ser rechazadas deben

rechazarse, ya que alegan, en parte, *a*) bonos emitidos por COFINA, *b*) reclamaciones por bonos

que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales

radicadas contra los Deudores en nombre de determinados bonistas, *c*) una o más inversiones en

fondos mutuos que a su vez pudieron haber invertido en bonos emitidos por los Deudores, y/o *d*)

bonos emitidos por AFICA (según se define abajo) que no es un deudor de Título III y cuyas responsabilidades no están garantizadas por los Deudores. Además, cada una de las evidencias de reclamaciones contenidas en el **Anexo A** del presente documento es deficiente, puesto que no brinda información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones. Además, las partes restantes de algunas de las evidencias de reclamaciones contenidas en el **Anexo A** del presente documento son deficientes, puesto que alegan responsabilidades por supuestas pérdidas por inversiones pero no brindan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones.

**A.  Ausencia de responsabilidad por reclamaciones de los bonistas de COFINA**

40.     Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar reclamaciones basadas parcialmente en supuesta participación patrimonial en los bonos emitidos por COFINA (conjuntamente, las "Reclamaciones Parciales de los Bonistas de COFINA").

41.     Como se explicó anteriormente, la Orden de Conciliación resolvió la Controversia entre el ELA y COFINA y, conforme al párrafo 55 de la Orden de Conciliación, la totalidad de las reclamaciones contra el ELA, surgidas o vinculadas con la relación del ELA y COFINA, han sido liberadas. Además, conforme al párrafo 3(c) del *Acuerdo de Conciliación* [ECF núm. 5045-1], de fecha 19 de octubre de 2018, que se adjunta a la Orden de Conciliación (el "Acuerdo de Conciliación"), y el párrafo 7 de la Orden de Confirmación Enmendada, el procedimiento contencioso entre el ELA y COFINA sobre la Controversia entre el ELA y COFINA ha sido desestimado de forma definitiva luego de la aprobación del pacto y la conciliación de la Controversia entre el ELA y COFINA. Además, conforme al párrafo 29(f) de la Orden de Confirmación Enmendada, reclamaciones (tales como las Reclamaciones de los Bonistas de COFINA) que surgieron de o están vinculadas con la relación entre el ELA y COFINA, fueron

21

liberadas. Orden de Confirmación Enmendada, ¶ 29(f). [12] Por todos esos motivos, las

Reclamaciones Parciales de los Bonistas de COFINA deben rechazarse porque dichas

reclamaciones basadas en una supuesta y aparente participación patrimonial en los Bonos de

COFINA han sido satisfechas, liberadas y/o liquidadas conforme a la Orden de Conciliación, el

Acuerdo de Conciliación, la Orden de Confirmación Enmendada y el Plan.

**B. Ausencia de responsabilidad por reclamaciones duplicadas por bonos**

42.     Según se expone en el Anexo A del presente documento, algunas de las

Reclamaciones que han de ser rechazadas parecen pretender alegar responsabilidad, en parte, sobre

la base de bonos emitidos por la AEP, la ACT, el SRE y la AAA (conjuntamente, las

"Reclamaciones Parcialmente Duplicadas por Bonos").

43.     Cada una de las Reclamaciones Parcialmente Duplicadas por Bonos pretende

alegar, en parte, responsabilidad contra los Deudores vinculada con uno o más bonos que están

duplicados en relación con una o más Reclamaciones Principales que, según se explicó

anteriormente, fueron radicadas en el marco de los Casos de Título III en nombre de los tenedores

de determinados bonos emitidos por la AEP, la ACT, el SRE y la AAA. Si las Reclamaciones

Parcialmente Duplicadas por Bonos no son rechazadas, ello resultaría en que los reclamantes en

cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores

en detrimento de otras partes interesadas en el Caso de Título III de los Deudores. Los titulares de

las Reclamaciones Parcialmente Duplicadas por Bonos no se verán perjudicados por el hecho de

---

[12] Conforme al Plan, una "Reclamación" se define como "[c]ualquier derecho a un pago o cumplimiento,
independientemente de si tal derecho consta en una sentencia, es liquidado, no liquidado, fijo, contingente, vencido,
no vencido, controvertido, no controvertido, legal, en equidad, garantizado o no garantizado, conocido o desconocido,
reclamado o no reclamado; o cualquier derecho a un remedio en equidad por incumplimiento o ejecución de un
cumplimiento, independientemente de si tal derecho a un remedio en equidad consta en una sentencia, es fijo,
contingente, vencido, no vencido, controvertido, no controvertido, garantizado o no garantizado, y la totalidad de las
deudas, procesos, indemnizaciones por daños y perjuicios, derechos, remedios, pérdidas, responsabilidades,
obligaciones, sentencias, acciones, causas de acción, procedimientos o reclamaciones de cualquier tipo o naturaleza,
en derecho, equidad o de cualquier otra forma". Plan § 1.53.

que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones Parcialmente Duplicadas por Bonos figuran en una o más Reclamaciones Principales.

**C.  Ausencia de responsabilidad por reclamaciones por bonos asegurados en el mercado secundario que son duplicados de Reclamaciones Principales**

44.  Según se establece en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas parecen pretender alegar responsabilidad, en parte, vinculada con los Bonos asegurados en el mercado secundario, que corresponden a los bonos de la ACT que están duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales (conjuntamente, las "Reclamaciones parciales por bonos asegurados en el mercado secundario").

45.  Cada una de las Reclamaciones parciales por bonos asegurados en el mercado secundario alega responsabilidades vinculadas con los Bonos asegurados en el mercado secundario. Los números CUSIP vinculados con dichos Bonos asegurados en el mercado secundario corresponden a bonos emitidos por la ACT y/o que llevan los números CUSIP originales. Dichos números CUSIP originales, que reflejan las emisiones de los bonos en los que los reclamantes tienen participación patrimonial, aparecen en una o más Reclamaciones Principales. En consecuencia, las Reclamaciones parciales por bonos asegurados en el mercado secundario alegan responsabilidades vinculadas con bonos emitidos por la ACT que constituyen duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales.

46.  Si las Reclamaciones parciales por bonos asegurados en el mercado secundario no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores, en detrimento de otras partes

interesadas en los Casos de Título III. Los titulares de las Reclamaciones parciales por bonos asegurados en el mercado secundario no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas figuran en una o más Reclamaciones Principales. Esta Tricentésima Quincuagésima Séptima Objeción Global de ninguna forma constituye una objeción a cualquier reclamación de la aseguradora de Bonos asegurados en el mercado secundario, sino que a los tenedores de Bonos asegurados en el mercado secundario, los cuales están sujetos a las Reclamaciones Principales.

**D. Ausencia de responsabilidad relativa a reclamaciones basadas en inversiones en fondos mutuos**

47.     Conforme a lo identificado en el **Anexo A** del presente, algunas de las Reclamaciones que han de ser rechazadas pretenden basarse, en parte, en inversión(es) en uno o varios fondos mutuos que, a su vez, pudieron haber invertido en los bonos emitidos por los Deudores (conjuntamente, "Reclamaciones parciales de los fondos mutuos").

48.     Los reclamantes tienen la carga de demostrar su legitimación para radicar una evidencia de reclamación. *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010). Es ampliamente aceptado que solo los acreedores o sus representantes autorizados están legitimados para radicar reclamaciones. Reg. Fed. del Proc. de Quiebr. 3001(b); Título 11 U.S.C., §§ 501(a) ("Los acreedores o fiduciarios autorizados podrán radicar evidencias de reclamaciones"); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Solo los acreedores o fiduciarios autorizados podrán radicar evidencias de reclamaciones".). Las partes que solo tengan intereses derivados carecen de legitimación para radicar reclamaciones contra el patrimonio de un deudor. *Caso Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (donde se concluyó que una parte con "una relación con el Deudor [que] no es directa, sino más bien derivada "era" persona ajena en relación con el procedimiento de quiebra del Deudor", sin "ninguna posibilidad de reclamar contra los activos del patrimonio" y "como regla general, carece legitimación en relación con el procedimiento de

quiebra del Deudor".); *véase también In re Tower Park Properties, LLC*, 803 F.3d 450, 462-63 (9th Cir. 2015) (donde se concluyó que un beneficiario de un fideicomiso no era una parte interesada); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("En la medida en que se hagan valer los derechos de una parte interesada, esos derechos han de hacerse valer por dicha parte interesada, no por un tercero".); *In re López*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (para constituirse como parte interesada "la parte solicitante deberá hacer valer sus propios derechos y no aquellos que asistan a un tercero o que se deriven en relación con tal tercero".); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (donde se reconoce el "principio general de que 'no se da legitimación de una parte interesada si la parte pretende hacer valer un derecho que es puramente derivado de los derechos de otra parte en el procedimiento de quiebras'" (que cita *In re Refco*, 505 F.3d en 115 n. 10)).

49.    "Un acreedor, conforme al Código [de Quiebras], es aquel que tiene una reclamación contra el deudor o el patrimonio", en lugar de "un acreedor de uno de los acreedores del deudor". *S. Blvd., Inc. c. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Ya que, a lo sumo, las Reclamaciones parciales de los fondos mutuos fueron radicadas en virtud de la condición del reclamante como presunto acreedor de un presunto acreedor del ELA, las Reclamaciones parciales de los fondos mutuos no fueron radicadas por un acreedor real del ELA. *Véase In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (donde se concluye que el síndico carecía de legitimación para radicar evidencias de reclamaciones porque no era acreedor ni agente autorizado de un acreedor). En cambio, las Reclamaciones parciales de los fondos mutuos se derivan de reclamaciones que deben hacerse valer directamente por los fondos mutuos para que el Tribunal examine cualquier recuperación alegada. Véase el *caso Goldman*, 82 B.R. en 896 (donde se concluye que una parte con una relación "derivada" no tiene "posibilidad de reclamar contra los activos del patrimonio" y "como regla general, carece de legitimación en el procedimiento de

quiebras del Deudor"). Es más, no se sabe si el fondo mutuo sigue ostentando la propiedad de los bonos controvertidos.

50.     En efecto, en unas circunstancias casi idénticas, el Tribunal ya rechazó reclamaciones radicadas contra COFINA por unos inversores en los fondos mutuos que, a su vez, supuestamente invirtieron en los bonos de COFINA, por "carecer de interés individual en los títulos valores de COFINA". *Transcripción del 13 de marzo de 2019 de la audiencia ante su señoría, Laura Taylor Swain* [ECF núm. 5969], en 64:01-10 ("EL TRIBUNAL: Entonces, para que yo lo entienda, su documentación muestra que es inversor en un fondo mutuo. En la medida en que cualquiera de esos fondos mutuos posea realmente los bonos de COFINA, el fondo mutuo sería el reclamante pertinente, ¿así que no proporcionó ninguna evidencia de una reclamación directa válida contra COFINA? SRA. STAFFORD: Así es, señoría. EL TRIBUNAL: Se concede la objeción a la reclamación, y se rechaza la reclamación por falta de interés individual en títulos valores de COFINA."); *véase también la Orden por la que se concede la Sexagésima cuarta objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico a Reclamaciones basadas en las inversiones en fondos mutuos* [ECF núm. 9099]; *Orden de memorando por la que se rechaza la moción para alterar o enmendar la orden que concede la objeción (exp. 8297) a las Reclamaciones núms. 152470 y 152283* [ECF núm. 9121]. El Tribunal del Primer Circuito confirmó dicha determinación. *Véase* Caso núm. 19-2231, Doc. Núm. 00117746322, de fecha 27 de mayo de 2021. En consecuencia, los reclamantes no son acreedores del ELA y carecen de legitimación para hacer valer reclamaciones derivadas. Puesto que al ELA no se le puede atribuir la responsabilidad por las Reclamaciones parciales de los fondos mutuos, dichas partes de las Reclamaciones que han de ser rechazadas deben rechazarse en su totalidad.

**E.  Ausencia de responsabilidad relativa a reclamaciones basadas en los Bonos AFICA**

51.     Conforme a lo identificado en el Anexo A del presente documento, determinadas partes de las Reclamaciones que han de ser rechazadas pretenden alegar reclamaciones basadas en una supuesta participación patrimonial en bonos emitidos por la AFICA, que no es deudor de Título III y cuyas responsabilidades no están garantizadas por el ELA (conjuntamente, las "Reclamaciones parciales de los bonistas de la AFICA").

52.     Cada una de las Reclamaciones parciales de los bonistas de la AFICA pretende alegar, en parte, responsabilidades contra el ELA vinculadas con los Bonos AFICA que no están garantizados por el ELA. La AFICA no es deudor de Título III y es una entidad aparte y jurídicamente independiente del ELA. Además, cada una de las declaraciones de oferta emitidas en relación con los Bonos AFICA dispone que los Bonos AFICA no constituyen deuda del ELA ni de ninguna de sus subdivisiones políticas, con la excepción de la AFICA, y que el ELA no garantiza las deudas de la AFICA. Además, ninguna de las Reclamaciones Parciales de los Bonistas de la AFICA proporciona fundamento alguno para alegar una reclamación contra el ELA por los bonos emitidos por la AFICA que no están garantizados por el ELA ni constituyen su deuda. En consecuencia, el ELA no es responsablees responsable por las Reclamaciones Parciales de los Bonistas de la AFICA.

**F.  Ausencia de responsabilidad por los Bonos de la AAA**

53.     Conforme a lo identificado en el **Anexo A** del presente documento, algunas Reclamaciones que han de ser rechazadas pretenden alegar, en parte, reclamaciones basadas en una supuesta participación patrimonial en los bonos emitidos por la AAA (conjuntamente, las "Reclamaciones parciales de los bonistas de la AAA").

54.     Algunas de las Reclamaciones parciales de los bonistas de la AAA alegan responsabilidades vinculadas con los Bonos de Gravamen Prioritarios de la AAA emitidos por la AAA, que no es Deudor de Título III, y es una entidad aparte y jurídicamente independiente del

27

ELA. Cada una de las Reclamaciones parciales de los bonistas de la AAA pretende la recuperación

por responsabilidades vinculadas con los Bonos de Gravamen Prioritarios emitidos por la AAA.

Sin embargo, la AAA no es un Deudor de Título III y es una entidad aparte y jurídicamente

independiente del ELA. Además, ni el ELA ni ninguna otra instrumentalidad o subdivisión política

del ELA han garantizado el reembolso de los Bonos de Gravamen Prioritarios de la AAA. Sin

embargo, ninguna de las Reclamaciones de los bonistas de la AAA cumple con las normas

aplicables, ya que no proporciona un fundamento para alegar una reclamación contra el ELA por

los bonos emitidos por la AAA que no están garantizados por el ELA. Como consecuencia de

dicho incumplimiento de la normativa aplicable, ni los Deudores ni el Tribunal pueden determinar

la validez de las Reclamaciones parciales de los bonistas de la AAA. Puesto que las Reclamaciones

parciales de los bonistas de la AAA son inejecutables contra el ELA y sus bienes conforme al

§ 502(b)(1) del Código de Quiebras, dichas reclamaciones deben rechazarse puesto que solicitan

la recuperación de montos por los que el ELA no es responsable.

### G. Ausencia de responsabilidad por reclamaciones de los bonistas del BGF

55.     Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, algunas

Reclamaciones que han de ser rechazadas pretenden alegar reclamaciones basadas, en parte, en la

supuesta participación patrimonial en bonos emitidos por el BGF (conjuntamente, las

"<u>Reclamaciones Parciales de los Bonistas del BGF</u>").

56.     Cada una de las Reclamaciones Parciales de los Bonistas del BGF pretende basarse

en la participación patrimonial en los Bonos del BGF objeto de la Modificación Calificada, que

dispuso la emisión de nuevos títulos valores a cambio de la cancelación de los Bonos del BGF y

la extinción de la garantía del ELA relativa a determinados Bonos del BGF, por lo que el ELA ya

no es responsable con respecto a dichas reclamaciones. En consecuencia, cada una de las

Reclamaciones Parciales de los Bonistas del BGF ha sido liberada conforme a la aprobación y la

consumación de la Modificación Calificada. Como se señaló anteriormente, la Modificación

Calificada dispone, entre otras cosas, que los tenedores de los Bonos del BGF liberarán al BGF y

sus afiliados de las reclamaciones relacionadas con los Bonos del BGF, y de cualquier acción u

omisión del BGF y sus afiliados con respecto a todo endeudamiento del BGF o préstamo al BGF.

El BGF es una corporación pública e instrumentalidad del ELA. En consecuencia, el ELA es un

afiliado del BGF dentro del ámbito de la liberación conforme a la Modificación Calificada. Por

tanto, las Reclamaciones de los Bonistas del BGF fueron liberadas tras la consumación de la

Modificación Calificada el 29 de noviembre de 2018. Puesto que las Reclamaciones Parciales de

los Bonistas del BGF son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del

Código de Quiebras, dichas reclamaciones deben rechazarse puesto que pretenden recuperar

montos por los que el ELA no es responsable.

**H. Ausencia de responsabilidad por reclamaciones de los bonistas del puente de la ACT**

57.     Conforme a lo identificado en el <u>**Anexo A**</u> del presente documento, algunas

Reclamaciones que han de ser rechazadas pretenden alegar, en parte, reclamaciones basadas en

una supuesta participación patrimonial en bonos para el puente de la ACT emitidos por la ACT

(conjuntamente, las "<u>Reclamaciones Parciales de los Bonistas del Puente de la ACT</u>").

58.     Cada una de las Reclamaciones Parciales de los Bonistas del Puente de la ACT

pretende alegar responsabilidades contra el ELA vinculadas con los Bonos para el Puente de la

ACT que no están garantizados por el ELA. Sin embargo, como se explicó anteriormente, el ELA

no ha garantizado el reembolso de los Bonos para el puente de la ACT, por lo que no tiene la

obligación de realizar pagos a los tenedores en relación con los Bonos para el puente de la ACT.

Además, las Reclamaciones que han de ser rechazadas no proporcionan fundamento alguno para

alegar una reclamación contra el ELA por los Bonos para el puente de la ACT, los cuales, como

se señaló anteriormente, fueron emitidos por la ACT y no han sido garantizados por el ELA.

29

**I.    Reclamaciones deficientes relativas a pérdidas por inversiones**

59.    Según se identifica en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar responsabilidades surgidas de supuestas pérdidas por inversiones. Sin embargo, ninguna de las Reclamaciones que han de ser rechazadas alega posible causa de acción alguna contra los Deudores que pueda generar responsabilidad de los Deudores por los supuestos daños y perjuicios sufridos como consecuencia de la decisión de los reclamantes de vender con pérdidas sus bonos o participaciones en fondos mutuos que poseían los bonos.  En consecuencia, los Deudores no son responsables por los montos alegados en las Reclamaciones que han de ser rechazadas. *Véase English c. Energy Future Holdings (In re Energy Future Holdings),* 2018 U.S. Dist. LEXIS 49952, en *7 (D. Del., 27 de marzo de 2018) (que dispone que la orden del tribunal de quiebras por la que se rechaza la evidencia de reclamación era la adecuada, cuando el reclamante había vendido los bonos emitidos por el deudor y, por lo tanto, no tenía ningún derecho a un pago en relación con los bonos ni ha demostrado el reclamante que tuviera posible causa de acción contra el deudor por los supuestos daños y perjuicios sufridos por el reclamante al vender con pérdidas los bonos del deudor); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) (que cita *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (que cita 3 L. King, *Collier on Bankruptcy* § 502.02, en 502-22 (15th ed. 1991)) ("Al principio, el reclamante debe alegar hechos que sean suficientes para sostener la reclamación").

60.    En apoyo de lo anterior, los Deudores invocan la *Declaración de Jay Herriman en apoyo de la Tricentésima quincuagésima séptima objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico, de la Autoridad de Carreteras y Transportación de Puerto Rico y de la Corporación del Fondo de Interés Apremiante de Puerto Rico a Reclamaciones por bonos*

*duplicadas, deficientes y/o en las que no existe responsabilidad*, de fecha 18 de junio de 2021, adjunta al presente como <u>Anexo B</u>.

## <u>NOTIFICACIÓN</u>

61.     De conformidad con los Procedimientos Enmendados relativos a Objeciones Globales y la Orden de Notificación del Tribunal, los Deudores notifican la presente Tricentésima quincuagésima séptima objeción global a) a los acreedores individuales objeto de esta Tricentésima quincuagésima séptima objeción global, b) al U.S. Trustee, y c) a la Lista maestra de notificaciones (según se define en los *Procedimientos de administración de casos enmendados núm. 14* [ECF núm. 15894-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.primeclerk.com/puertorico. La notificación de esta Tricentésima quincuagésima séptima objeción global se adjunta al presente como **<u>Anexo C</u>**. Las traducciones al español de la Tricentésima quincuagésima séptima objeción global y de la totalidad de los anexos adjuntos al presente se están radicando con esta objeción y se trasladarán a las partes. Los Deudores sostienen que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

## <u>RESERVA DE DERECHOS</u>

62.     Esta Tricentésima quincuagésima séptima objeción global se limita a los motivos expuestos en este documento. En consecuencia, esta se radica sin perjuicio de los derechos de los Deudores, o de los derechos de cualesquiera otras partes interesadas en dichos Casos de Título III, a objetar a las Reclamaciones que han de ser rechazadas o a cualesquiera otras reclamaciones sobre la base de los motivos que fuere. Los Deudores se reservan expresamente el derecho a radicar toda otra objeción sustantiva o procesal. Ninguna disposición contenida en el presente documento, ni ninguna acción adoptada conforme a tal remedio, tienen por objetivo, ni se interpretarán en el sentido de que: a) constituyan una admisión en cuanto a la validez de cualesquiera reclamaciones contra los Deudores; b) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera

otras partes interesadas en los Casos de Título III, a impugnar cualquier reclamación sobre la base de los motivos que fuere; c) constituyan una promesa o requisito para pagar cualquier reclamación; d) constituyan una solicitud o autorización a asumir cualquier acuerdo, contrato o arrendamiento anteriores a la petición conforme al artículo 365 del Código de Quiebras; o e) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas en los Casos de Título III, conforme a PROMESA, el Código de Quiebras o cualquier otra normativa legal aplicable.

## <u>AUSENCIA DE SOLICITUDES PREVIAS</u>

63.    No se ha radicado ninguna solicitud de remedio previa a la presente Tricentésima quincuagésima séptima objeción global ni ante este Tribunal ni ante ningún otro órgano judicial.


*[El resto de la página se deja en blanco intencionadamente]*

32

POR LO QUE los Deudores solicitan respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda a los Deudores cualesquiera otros remedios que se consideren justos.

Fecha: 18 de junio de 2021
     San Juan (Puerto Rico)

Respetuosamente sometida,

[*Firma en la versión en inglés*]
Hermann D. Bauer
USDC núm. 215205
Carla García-Benítez
USDC núm. 203708
Gabriel A. Miranda
USDC núm. 306704
**O'NEILL & BORGES LLC**
250 Avenida Muñoz Rivera, local 800
San Juan, PR 00918-1813
Tel.:  (787) 764-8181
Fax:  (787) 753-8944

[*Firma en la versión en inglés*]
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel.:  (212) 969-3000
Fax:  (212) 969-2900

*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico, de la Autoridad de Carreteras y Transportación de Puerto Rico y de la Corporación del Fondo de Interés Apremiante de Puerto Rico.*

33