UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-----------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

          Debtors. [1]

-----------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

MEMORANDUM OPINION REGARDING MOTION OF THE COMMONWEALTH OF PUERTO RICO
PURSUANT TO BANKRUPTCY CODE SECTION 365 FOR ENTRY OF AN ORDER APPROVING
ASSUMPTION OF SETTLEMENT AGREEMENTS WITH GARCÍA RUBIERA CLASS PLAINTIFFS

Pending before the Court is the *Motion of the Commonwealth of Puerto Rico*

*Pursuant to Bankruptcy Code Section 365 for Entry of an Order Approving Assumption of*

*Settlement Agreements with García Rubiera Class Plaintiffs* (Docket Entry No. 15171 in Case

No. 17-3283, the "Motion").[2]  The Motion, filed by the Financial Oversight and Management

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]    All docket entry references herein are to entries in Case No. 17-3283, unless otherwise specified.

Board for Puerto Rico (the "Oversight Board") acting as the representative of the

Commonwealth of Puerto Rico (the "Commonwealth") under section 315(b) of the Puerto Rico

Oversight, Management, and Economic Stability Act ("PROMESA"), requests entry of an order

assuming two settlement agreements pursuant to section 365(a) of the Bankruptcy Code, 11

U.S.C. § 365(a).[3]

       The Court has subject matter jurisdiction of this contested matter pursuant to 48

U.S.C. § 2166(a).  The Court heard oral argument on the Motion on December 9, 2020.  Having

considered carefully all of the submissions[4] and arguments made in connection with the Motion,

the Court will enter an order granting the Motion for the reasons that follow.

---

[3]     Section 365 of the Bankruptcy Code is made applicable in the above-captioned cases by
Section 301(a) of PROMESA, 48 U.S.C. § 2161(a).

[4]     In addition to the Motion, the Court has reviewed the *Limited Objection of Official
Committee of Unsecured Creditors to Motion of Commonwealth of Puerto Rico Pursuant
to Bankruptcy Code Section 365 for Entry of an Order Approving Assumption of
Settlement Agreements with García Rubiera Class Plaintiffs* (Docket Entry No. 15275,
the "UCC Objection"), the *Answer by García Rubiera Class Plaintiffs to the Limited
Objection of Official Committee of Unsecured Creditors to Motion of Commonwealth of
Puerto Rico Pursuant to Bankruptcy Code Section 365* (Docket Entry No. 15307), the
*Reply in Support of Motion of the Commonwealth of Puerto Rico Pursuant to Bankruptcy
Code Section 365 for Entry of an Order Approving Assumption of Settlement Agreements
with García Rubiera Class Plaintiffs* (Docket Entry No. 15325, the "Reply"), the *Notice
of Filing of Supplemental Documents and Translations Thereof in Connection with
Limited Objection of Official Committee of Unsecured Creditors to Motion of
Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of an
Order Approving Assumption of Settlement Agreements with García Rubiera Class
Plaintiffs* (Docket Entry No. 15387), and the *Joint Report of the Commonwealth of
Puerto Rico and Official Committee of Unsecured Creditors Regarding Motion of the
Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of an
Order Approving Assumption of Settlement Agreements with García Rubiera Class
Plaintiffs* (Docket Entry No. 15457, the "Joint Report").

BACKGROUND

Pursuant to Puerto Rico's Compulsory Motor Vehicle Liability Act, motorists in Puerto Rico are required to pay automotive insurance premiums to the Secretary of the Treasury when they register their vehicles or renew their vehicles' registration.  The Commonwealth transfers such premiums to the Compulsory Liability Joint Underwriting Association of Puerto Rico (the "JUA").  Motorists who acquire private automobile insurance can opt out of the government's insurance scheme and, if they have already paid their premium to the Commonwealth, request reimbursement of the so-called "duplicate premium."

The present dispute concerns the settlement of two lawsuits regarding motorists' overpayment of duplicate premiums.  See generally Gracia-Gracia v. Financial Oversight and Management Board for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 939 F.3d 340, 344-346 (1st Cir. 2019) (detailing the substantive and procedural history of the litigation).  Following well over a decade of litigation concerning whether and to what extent the Commonwealth possesses duplicate premiums rightfully belonging to vehicle owners and the steps that the Commonwealth should be required to take to make a valid disposition of such funds, the Commonwealth in 2016 entered into settlement agreements in two related cases concerning duplicate premiums: the case captioned Gladys García Rubiera, et al., v. Asociación de Suscripción Conjunta, et al., No. KDP2001-1441 in the Commonwealth Court of First Instance (the "Commonwealth Settlement Agreement"), and the case captioned Gladys García Rubiera, et al. v. Hon. Luis G. Fortuño, et al., Case No. 02-1179 (GAG) in the United States District Court for the District of Puerto Rico

(the "Federal Settlement Agreement" and, together with the Commonwealth Settlement

Agreement, the "Settlement Agreements").[5]

Pursuant to the Settlement Agreements, the Commonwealth is obligated to

provide notice to class members—consisting of motorists who paid both compulsory motor

vehicle insurance premiums and private automobile liability insurance premiums between 1998

and 2010 and have not been reimbursed or credited for the duplicate payments—of procedures

by which the class members may submit claims for reimbursement by the Commonwealth of the

duplicate premiums. (Federal Settlement Agreement §§ I, II; Commonwealth Settlement

Agreement § 6.B.) Although the Settlement Agreements contain terms specifying certain of the

form and contents of the notices to potential claimants, the Federal Settlement Agreement

mandates that the notices that are to be published in certain newspapers must "be agreed to by

the parties." (Federal Settlement Agreement § II.1.d.) The Federal Settlement Agreement also

requires that the Secretary of the Treasury create an informational website containing a "full list

of all vehicle owners who may be entitled to reimbursement from the years 1998 to 2010," and

states that the content of the website "will be agreed to by the parties." (Federal Settlement

Agreement § II.1.c.) The Settlement Agreements provide that, after claimants submit the

required applications, the duplicate premiums are to be paid to qualifying claimants, less

withholdings to pay for attorney's fees and litigation costs. (Commonwealth Settlement

Agreement § 6.F.i; Federal Settlement Agreement § IV.) Pursuant to the Commonwealth

Settlement Agreement, the return of duplicate premiums to qualifying claimants will not include

interest. (Commonwealth Settlement Agreement § 6.D.v.)

---

[5]     A certified English translation of the Commonwealth Settlement Agreement is attached
        as Exhibit 1 to the Motion, and the Federal Settlement Agreement is attached as Exhibit 2
        to the Motion.

Following the commencement of the Commonwealth's Title III case, the

plaintiffs in the duplicate premium lawsuits (the "Plaintiffs") sought relief from the automatic

stay to permit enforcement of the Settlement Agreements (see Docket Entry No. 2434, the "Stay

Relief Motion").  Following the completion of briefing of the Stay Relief Motion, the Court

directed the parties to supplement the factual record to address, among other issues, "whether

and to what extent the Commonwealth has 'established and complied with' a constitutionally

sufficient notice and reimbursement procedure" consistent with the First Circuit's order in

García-Rubiera v. Fortuño, 772 F.3d 102 (1st Cir. 2013).  (*Order Directing Supplemental*

*Briefing of Motion Requesting Relief of Stay Under Section 362(D)(1) of the Bankruptcy Code*,

Docket Entry No. 2697.)  In response, the Commonwealth filed the *Supplemental Brief and*

*Declaration in Compliance with March 9, 2018 Court Order* (Docket Entry No. 2795, the

"Supplemental Stay Relief Brief"), and represented the following concerning the outstanding

obligations remaining under the Settlement Agreements:

> The stipulations of both the federal and state cases specified the
> manner and form of notices to be provided to the class members and
> the procedure for class members to request reimbursements for
> unclaimed funds retained by the Commonwealth relating to
> duplicate payments made by class members that purchased private
> insurance and also paid compulsory insurance.  Prior to the filing of
> this Title III case, the parties were in advanced discussions regarding
> the notification list and the Internet Portal developed by the Treasury
> Department, which were the only remaining outstanding items to be
> finalized before implementing the notification process.  All of the
> various notices (regular mail, radio, and newspaper) are drafted but
> have not been delivered.

(Supplemental Stay Relief Brief ¶ 8.)  Following the completion of supplemental briefing, this

Court granted the Stay Relief Motion in part and denied it in part.  See In re Fin. Oversight &

Mgmt. Bd. for P.R., Case No. 17-BK-3283, 2018 WL 9708896, at *4 (D.P.R. Apr. 6, 2018).  On

appeal, the United States Court of Appeals for the First Circuit affirmed in part and vacated in

part the Court's decision and remanded the matter to this Court.  See Gracia-Gracia v. Fin.

Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 939 F.3d 340, 352-

53 (1st Cir. 2019).  The First Circuit ordered the Court, on remand, to make a "preliminary

determination of the parties' respective property interests in" certain premium funds received by

the Commonwealth from the JUA which had been segregated by the Commonwealth, "taking

into consideration both the prima facie showing made by the plaintiffs and the plaintiffs' ultimate

burden on the issue of the debtor's equity in the disputed funds . . . and to reapply the In re

Sonnax factors to these funds in light of that preliminary determination."  Id. at 352 (citations

and quotation marks omitted).

      Before any such determination was made by the Court, the Oversight Board filed

the Motion in an effort to resolve the Stay Relief Motion and the underlying litigation

consensually.

DISCUSSION

      The Official Committee of Unsecured Creditors (the "Committee") has raised two

objections to the Motion.  First, the Committee contends that the Settlement Agreements are not

subject to assumption because they are not "executory contracts" within the meaning of section

365(a) of the Bankruptcy Code.  (UCC Obj. ¶¶ 6-16.)  Second, the Committee argues that the

Oversight Board has not satisfied the business judgment standard generally applicable to section

365(a) motions.  (UCC Obj. ¶¶ 17-20.)  The Court will address each of these arguments in turn.

1.     Whether the Settlement Agreements Are Subject to Assumption Under Section 365(a)

      Section 365(a) of the Bankruptcy Code provides, in relevant part, that "the

trustee, subject to the court's approval, may assume or reject any executory contract or unexpired

lease of the debtor." 11 U.S.C.A. § 365(a) (Westlaw through PL 117-17);[6] see also Eagle Ins.

Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d 291, 295 (1st Cir. 2004)

("Section 365 generally allows the trustee in bankruptcy—or, as in this case, the debtor-in-

possession—to assume or reject any pre-petition executory contract or unexpired lease, subject

to the approval of the bankruptcy court.").

The term "executory contract" is not defined in the Bankruptcy Code. See La

Electronica, Inc. v. Capo-Roman (In re La Electronica, Inc.), 995 F.2d 320, 323 n.3 (1st Cir.

1993). Courts faced with motions to assume or reject contracts principally have applied one of

two approaches to determine whether contracts are "executory" within the meaning of section

365 and therefore the proper subject of motions under section 365(a). Id.; In re WorldCom, Inc.,

343 B.R. 486, 492–93 (Bankr. S.D.N.Y. 2006) ("Most jurisdictions have now come to utilize

either the 'Countryman' test or the 'Functional' approach when determining whether a

prepetition contract is executory."). The first approach, often referred to as the "Countryman"

test or the "material breach" test, defines an executory contract as "one 'under which the

obligation [of] both the bankrupt and the other party to the contract are so far unperformed that

the failure of either to complete performance would constitute a material breach excusing the

performance of the other.'" In re La Electronica, Inc., 995 F.2d at 323 n.3 (quoting Vern A.

Countryman, Executory Contracts in Bankruptcy, Pt. I, 57 Minn. L. Rev. 439, 460 (1973)).)

Stated another way, this approach requires courts to determine whether, under applicable non-

bankruptcy law, parties on both sides of an agreement remain obligated to render substantial

performance. See In re Riodizio, Inc., 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997).

---

[6]    In a case commenced under Title III of PROMESA, the term "trustee," as used in section
       365(a) of the Bankruptcy Code, refers to the Oversight Board. See 48 U.S.C.
       § 2161(c)(7).

Although the Countryman test is favored by many courts, "[s]ome courts have moved away from Professor Countryman's approach and have adopted a 'functional approach' which works 'backward from an examination of the purposes to be accomplished by rejection, and if they have already been accomplished then the contract cannot be executory.'" In re Redondo Constr. Corp., Case No. 02-02887 (ESL), 2019 WL 1549726, at *12 (Bankr. D.P.R. Apr. 8, 2019), aff'd, 621 B.R. 81 (D.P.R. 2020). The relevant "purposes" which courts examine include "(1) taking advantage of contracts which will benefit the estate; (2) relieving the estate of burdensome contracts; (3) promoting the debtor's fresh start; (4) permitting the allowance and determination of claims; and (5) preventing parties from remaining "in doubt concerning their status vis-a-vis the estate." In re Bradlees Stores, Inc., No. 00-16033, 2001 WL 34809984, at *5 (Bankr. S.D.N.Y. Mar. 28, 2001), aff'd, 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001); Laughlin v. Nickless, 190 B.R. 719, 723 (D. Mass. 1996); see also In re Redondo Constr. Corp., 2019 WL 1549726, at *12 ("The 'functional approach' application requires for the court to decide whether a contract is executory by analyzing whether rejection of the contract would benefit the debtor's estate and is thus aligned with the broader purposes of section 365."). Courts that have endorsed the functional approach take the view that "[b]ankruptcy courts should not be bound by static definitions of what is an executory contract, but should strive to satisfy the purposes" of section 365 "in conjunction with the goals of the debtor (or trustee), in order that equity may be served." In re Gladding Corp., 22 B.R. 632, 635 (Bankr. D. Mass. 1982); see also In re Cardinal Indus., 146 B.R. 720, 728 (Bankr. S.D. Ohio 1992) ("This approach has the conceptual advantage of using the underlying purposes of section 365 as benchmarks to define what constitutes an executory contract in bankruptcy."). Application of the functional test also "conserves the time

and effort that the parties and the court otherwise spend resolving the question of executoriness."
In re Riodizio, Inc., 204 B.R. at 422.

Whether the Court strictly applies the Countryman test is significant to the instant

matter because the Committee contends that the Oversight Board has failed to demonstrate that

the Plaintiffs have material obligations outstanding under the Settlement Agreements, and, it

argues, the Settlement Agreements therefore would not be executory contracts under the

Countryman test. The Oversight Board identifies three sets of obligations that allegedly remain

outstanding.

First, the Oversight Board identifies the obligation "to file certain claim forms" as

outstanding. (Reply ¶ 4.) The Settlement Agreements do not, however, require claimants to file

claim forms such that the failure to do so constitutes the breach of a material obligation. Instead,

the Settlement Agreements permit each claimant to file a claim form and, by doing so,

effectively exercise an option to receive a reimbursement of duplicate premiums. See In re

Riodizio, Inc., 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997) ("The optionee's failure to exercise

the option constitutes a failure of condition rather than a breach of duty. The failure to perform a

condition which is not also a legal duty cannot give rise to a material breach, and hence, an

option contract is not executory under the Countryman definition."); see also In re A.J. Lane &

Co., Inc., 107 B.R. 435, 437 (Bankr. D. Mass. 1989) (construing the Countryman test as one of

"practical logic" and thus holding that an option contract is executory: "[A]n option has unusual

characteristics. It is a unilateral contract until exercised; upon exercise, it becomes a bilateral

contract. It is the contingency of exercise which makes the option executory for our purposes.

Upon exercise, substantial performance remains on both sides—conveyance of the property by

the Debtor and payment of the purchase price by Santa Fe.  A material breach would occur

should either party refuse to complete the transaction after exercise.") (citation omitted).

Second, the Oversight Board asserts that Plaintiffs have "obligations to cooperate

with the Commonwealth and jointly develop the contents of the individualized notices to be

provided to Plaintiffs' class members, general publication, [and] radio notices."  (Reply ¶ 4; see

also Mot. ¶ 21 n.4.)  The Oversight Board contends that these notice-related cooperation

requirements are material because the First Circuit has held that the segregated funds cannot

"escheat to the Commonwealth until it has established and complied with a reimbursement

procedure which meets the basic requirements of constitutional due process."  (Joint Report ¶ 20

(quoting García-Rubiera v. Fortuño, 727 F.3d 102, 105, 110 (1st Cir. 2013)).)  However,

although the Federal Settlement Agreement requires that certain notices "will be agreed to by the

parties," forms of notices are attached as exhibits to the Commonwealth Settlement Agreement

(see Docket Entry No. 15387-2), and the Commonwealth has represented to the Court that the

notices were already drafted prior to the commencement of the Commonwealth's Title III case.

(Supplemental Stay Relief Brief ¶ 8.)  Furthermore, although the Oversight Board contends that

"the resolution of the parties to receive individual notices was a central issue" in the underlying

litigation (Reply ¶ 12), the allegedly outstanding stated obligation is to cooperate and agree to the

contents of notices to be published in certain newspapers, not to approve the list of individuals

who will receive other notices.  (See Federal Settlement Agreement § II.1.c ("Once a week

during six consecutive weeks, a full page notice will be published in *El Nuevo Día* (in Spanish)

and in *The San Juan Star* (in English) newspapers, containing the information as agreed herein.

Copies of said notices will be agreed to by the parties.").)  Individualized notices are required by

separate provisions of the Settlement Agreements.  (Federal Settlement Agreement § II.1.a;

Commonwealth Settlement Agreement § 6.B.) Thus, the Oversight Board has presented no basis

to conclude that there remain outstanding cooperation requirements on the part of the Plaintiffs

with respect to individualized notices, publication notices, or radio notices.

Third, the Oversight Board makes substantially the same argument with respect to

the requirement that the contents of a website to be created by the Treasury be agreed to by the

parties. (Reply ¶ 4; see also Mot. ¶ 21 n.4.) Here, although the Commonwealth has stated that

the parties were in "advanced discussions" on the topic prior to the commencement of the Title

III case (Supplemental Stay Relief Brief ¶ 8), the existence of the Plaintiffs' right to approve the

website—and the corresponding prospect that they could withhold such approval and thereby

cloud, complicate, or disrupt completely implementation of the Settlement Agreements—

demonstrates the existence of a substantial obligation. In light of the centrality of issues of

notice and due process to the underlying litigation, Plaintiffs' failure to cooperate in finalization

of the notice website would raise questions as to the Commonwealth's compliance with the due

process elements of the Settlement Agreements and, at the very least, make it imprudent for the

Commonwealth to proceed without further application to the courts that approved the Settlement

Agreements.

Although there is a basis upon which the Court might find the Settlement

Agreements to be executory under the Countryman test, the Court will apply a more functional

test. As noted above, the Court concludes that the website-related obligation, in light of the

centrality of notice issues to the underlying litigation, clearly establish the existence of

unfulfilled substantial obligations. Accordingly, because "each party must still give something

to get something, the [Settlement Agreements are] executory, and the debtor must demonstrate

whether assumption or rejection confers a net benefit on the estate." In re Riodizio, Inc., 204

B.R. at 424. Thus, the Settlement Agreements are executory within the meaning of section

365(a), and the remainder of the Court's inquiry will be directed to the question of whether

assumption of the Settlement Agreements under section 365(a) under the circumstances will

provide a benefit to the Commonwealth.

2.      The Permissibility of Assumption: Applying the Business Judgment Standard

                Having determined that the unperformed obligations render the Settlement

Agreements executory, the Court must next determine whether assumption is merited under

section 365(a). "By permitting debtors to shed disadvantageous contracts but keep beneficial

ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a

fresh start.'" Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d

291, 296 (1st Cir. 2004) (quoting Gannett v. Carp (In re Carp), 340 F.3d 15, 25 (1st Cir. 2003)).

Although the Bankruptcy Code does not prescribe a standard applicable to a court's review of a

motion under Section 365(a), courts typically apply a deferential business judgment standard.

Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 879 F.3d 389, 394

(1st Cir.), rev'd and remanded on other grounds, 139 S. Ct. 1652 (2019).

                "A motion to assume should be considered a summary proceeding, intended to

efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in

the course of the swift administration of the bankruptcy estate. It is not the time or place for

prolonged discovery or a lengthy trial with disputed issues." In re Vent Alarm Corp., No. 15-

09316-MCF11, 2016 WL 1599599, at *3 (Bankr. D.P.R. Apr. 18, 2016). Instead, "a debtor must

simply put forth a showing that assumption or rejection of the executory contract or unexpired

lease will benefit the Debtor's estate." Id. "A court will generally not second-guess a debtor's

business judgment regarding whether the assumption or rejection of a contract will benefit the

debtor's estate." In re Genco Shipping & Trading Ltd., 509 B.R. 455, 463 (Bankr. S.D.N.Y.

2014).  Significantly, the "scope of [a court's] inquiry regarding the business judgment standard

. . . does not include an evaluation of whether the Debtors made the best or even a good business

decision but merely that the decision was made in an exercise of the Debtors' business

judgment."  In re Old Carco LLC, 406 B.R. 180, 196 (Bankr. S.D.N.Y. 2009); see also In re

Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to

reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or

whim or caprice.'") (quoting In re Wheeling–Pittsburgh Steel Corp., 72 B.R. 845, 849-50

(Bankr. W.D. Pa. 1987)).

The Oversight Board characterizes the settlement it wishes to assume as a

reasonable resolution of a long running dispute in a manner that benefits the Commonwealth.

The underlying litigation, which has been pending for nearly two decades, concerns whether and

to what extent the Commonwealth has improperly retained property belonging to motorists.

Through assumption of the prepetition Settlement Agreements, the Oversight Board and the

Plaintiffs seek to finally resolve that dispute and obviate the need for further litigation

concerning the merits of that dispute or concerning relief from the automatic stay.  Assumption,

according to the Oversight Board, provides an efficient benefit to the Commonwealth of final

closure of the litigation.

In response to that rationale, the Committee argues that assumption of the

Settlement Agreements would provide no benefit to the Commonwealth because the Settlement

Agreements contemplate payment in full to the Plaintiffs and therefore fail to "reflect the risks

associated with uncertain litigation outcomes through a compromise in which both sides make

some concession." (Joint Report ¶ 30.) If the Stay Relief Motion were adjudicated on its merits, the Committee contends, "the more likely outcome in the lift stay litigation is a ruling that there is no trust" in favor of the Plaintiffs, thus making the Plaintiffs and their attorneys mere unsecured creditors whose claims would be subject to impairment by an eventual plan of adjustment. (Joint Report ¶ 30.) The Committee therefore argues that assumption of the Settlement Agreements would put the Plaintiffs and their attorneys in a better position—at the potential expense of other creditors of the Commonwealth—than they would otherwise enjoy. (See Joint Report ¶ 27 (emphasis in original) ("[A]ssumption of the Settlement Agreements will only result in the preferred treatment of certain creditors, i.e., the Plaintiffs and their attorneys.").)

The Committee's argument is unpersuasive because it overlooks the benefits of assumption of the Settlement Agreements, discounts the risks of not settling the underlying litigation, and assumes that amounts due to Plaintiffs' attorneys would be subject to impairment by any plan of adjustment. The Oversight Board's decision to seek to assume the Settlement Agreements is supported in part by the self-evident value of ceasing expenditures of Commonwealth resources on litigation. Furthermore, by assuming and performing under the Settlement Agreements, the Oversight Board has reasonably concluded, the Commonwealth would be able to release unused segregated funds that escheat to the Commonwealth. While the Settlement Agreements contemplate a return of 100% of duplicate premiums to participating claimants (less amounts withheld for attorneys' fees), claimants will forgo claims to nearly twenty years of interest from the Commonwealth. The rationality of assumption is also supported by the likelihood that the relatively small dollar amount of the claims by each motorist

will fall within the convenience class of an eventual plan of adjustment and would therefore be

paid out in full under a future plan of adjustment.[7]

Finally, the Committee provides little support for its contention that the "likely

outcome" of the adjudicated resolution of the Stay Relief Motion would be a judicial ruling that

the Plaintiffs are not beneficiaries of a trust.  The First Circuit determined that Plaintiffs "have

made a prima facie showing of traceability and the existence of a trust relationship" with respect

to certain segregated funds held by the Commonwealth, and expressed skepticism as to the

Commonwealth's argument that the recordation requirements of Puerto Rico's Trust Law apply

to the statutory trust theory underlying Plaintiffs' claims.  See Gracia-Gracia, 939 F.3d at 352

("It is true that Puerto Rico's Trust Law requires that trusts be recorded with the Special Trust

Registry 'under penalty of nullity.'  Why this requirement would apply equally to a trust

relationship created by statute, the Commonwealth does not say.").[8]

The Court finds, based on this record, that assumption of the Settlement

Agreements is a sound exercise of the Commonwealth's business judgment and not the product

of bad faith, whim, or caprice.  See In re Genco Shipping & Trading Ltd., 509 B.R. at 463.  The

---

[7]  Although the Committee disputes whether the amounts due on account of attorneys' fees
would be payable dollar-for-dollar under a plan of adjustment, assumption of and
performance under the Settlement Agreement will obviate the need to spend resources
litigating the merits of that issue.  Furthermore, the Settlement Agreements treat the
attorneys' fees as withholdings from the Plaintiffs' individual awards which, as noted
above, the Oversight Board believes likely to come within a class entitled to payment in
full under a plan of adjustment.

[8]  The Committee contends that the Plaintiffs have no rights to trust funds because, the
Committee asserts, execution of the Settlement Agreements has left the Plaintiffs with
only an unsecured right to enforce the Settlement Agreements.  (UCC Objection ¶ 20.)
However, the Oversight Board has determined that unsecured claims on account of
duplicate premiums would likely fall into a convenience class, and it has reasonably
concluded that avoiding additional litigation as to the precise nature of Plaintiffs' rights
warrants assumption of the Settlement Agreements.

decision to assume the Settlement Agreement was the product of, and falls within the exercise of, reasoned business judgment.

CONCLUSION

For the foregoing reasons, the Court will enter a separate order granting the Motion.

Dated: June 29, 2021

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge