## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of,

THE COMMONWEALTH OF PUERTO RICO *et al.*,

     Debtors.[1]

PROMESA Title III

Case No. 17 BK 3283-LTS

(Jointly Administered)

**STATEMENT IN OPPOSITION OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION TO THE OBJECTION OF THE DRA PARTIES TO THE AMENDED JOINT MOTION OF THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY FOR AN ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) FIXING VOTING RECORD DATE, (III) APPROVING CONFIRMATION HEARING NOTICE AND CONFIRMATION SCHEDULE, (IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES, (V) APPROVING FORMS OF BALLOTS, AND VOTING AND ELECTION PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING STATUS, (VII) FIXING VOTING, ELECTION, AND CONFIRMATION DEADLINES, AND (VIII) APPROVING VOTE TABULATION PROCEDURES (ECF NO. 17006)**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................2

BACKGROUND .....................................................................................................................3

        A.      The HTA Bonds and Resolutions ...............................................................3

        B.      The GDB Loan Agreements .......................................................................4

OPPOSITION AND RESERVATION OF RIGHTS .................................................................7

POINT I      THE DRA PARTIES' OBJECTIONS ARE PREMATURE
CONFIRMATION OBJECTIONS.........................................................................7

POINT II     THE DRA PARTIES' OBJECTION TO THE DISCLOSURE
STATEMENT (AND THIRD AMENDED PLAN) BASED ON THEIR
ASSERTED PRIORITY IS ENTIRELY UNSUPPORTED ...................................9

RESERVATION OF RIGHTS ...............................................................................................15

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases:</u>

*Crowe v. Bolduc,*
   365 F.3d 86 (1st Cir. 2004) ..............................................................................14

*In re Am. Cap. Equip., LLC,*
   688 F.3d 145 (3d Cir. 2012) ................................................................................7

*In re Bank of New England Corp.,*
   364 F.3d 355 (1st Cir. 2004) .............................................................................10

*In re Best Prods.,*
   168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................10

*In re Cypresswood Land Partners I,*
   409 B.R. 396 (Bankr. S.D. Tex. 2009) .............................................................11

*In re Dartmoor Homes,*
   175 B.R. 659 (Bankr. N.D. Ill. 1994) ..............................................................11

*In re Ferretti,*
   128 B.R. 16 (Bankr. D.N.H. 1991) .....................................................................7

*In re Northeast Office and Com. Props., Inc.,*
   178 B.R. 915 (Bankr. D. Mass. 1995) .............................................................11

*In re Scioto Valley Mortg. Co.,*
   88 B.R. 168 (Bankr. S.D. Ohio 1988) ................................................................7

*Liakas v. Creditors' Comm. of Déjà Vu Inc.,*
   780 F.2d 176 (1st Cir. 1986) .............................................................................10

## <u>Statutes and Other Authorities:</u>

<u>11 U.S.C.</u>

   § 510(a) ............................................................................................................10
   § 1125(a) .............................................................................................................7
   § 1125(b) .............................................................................................................7

## <u>TABLE OF AUTHORITIES, cont'd</u>

**<u>Page(s)</u>**

<u>9 L.P.R.A.</u>

§ 2004(l) ............................................................................................................................3
§ 2015(c) ...........................................................................................................................5
§ 2015(e) ...........................................................................................................................4


Fed. R. Bankr. P. 3003(c)(2) ............................................................................................11

Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation (together, the "HTA Bondholders") hereby submit this statement in opposition (the "Reply") to the *Objection Of The DRA Parties To The Amended Joint Motion Of The Commonwealth Of Puerto Rico, The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico, And The Puerto Rico Public Buildings Authority For An Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice And Confirmation Schedule, (IV) Approving Solicitation Packages And Distribution Procedures, (V) Approving Forms Of Ballots, And Voting And Election Procedures, (VI) Approving Notice Of Non-Voting Status, (VII) Fixing Voting, Election, And Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures,* ECF No. 17006 (the "DRA Objection" or "DRA Obj.") and respectfully state as follows:[2]

---

[2] Capitalized terms used in this Reply, but not otherwise defined herein, shall have the meanings given to such terms in the DRA Objection.  All references to docket entries shall be to the docket in the Commonwealth's Title III case (Case No. 17-3283-LTS), unless otherwise specified herein.  The terms "DRA" and "DRA Parties" shall refer collectively to AmeriNational Community Services LLC and Cantor-Katz Collateral Monitor in their capacities as servicer and collateral monitor for the GDB Debt Recovery Authority.

## PRELIMINARY STATEMENT

1.      The DRA Objection attempts to raise issues of priority that are more properly addressed in the context of plan confirmation proceedings.  The issue before this Court now is "simply whether the proposed disclosure statement . . . provides information sufficient to permit a hypothetical creditor or investor to make an informed judgment about the proposed Plan of Adjustment."  *See* Transcript of Hearing, Nov. 20, 2018, Case No. 17-3284, ECF No. 374, at 51:4-7.  Objections, such as these, related to the economic treatment of certain creditors or the legality of certain plan provisions should be heard in the context of plan confirmation.

2.      However, should the Court determine to entertain the DRA Objections now, then it would readily conclude that the DRA Parties' arguments are meritless.  The DRA Parties have failed to show that they have any right to priority because they blatantly ignore that the documents governing the DRA Parties' loan claims plainly provide that both the DRA Parties' claims and liens "shall be junior, inferior and subordinate in all respects to the outstanding bonds of the Assignor issued pursuant to the Bond Resolutions." *E.g.*, ECF No. 16276-23 (the "GDB Security Agreement") § 1.2.  Further, the DRA Parties failed to file a proof of claim against the Commonwealth on account of the HTA loans and bonds, and that failure discharged the claims against the Commonwealth that the DRA Parties allege are prejudiced. Nor can the DRA Parties manufacture or pursue a claim now because, under the Transfer Agreement through which the Government Development Bank for Puerto Rico ("GDB") transferred its HTA loans to the DRA Parties (the "Transfer Agreement"), the DRA Parties lack authority to exercise any rights or remedies in this Title III proceeding.  The HTA Bondholders reserve their rights to more comprehensively address and otherwise respond to the DRA Parties'

-2-

substantive arguments at a later date, when the facts will show that the DRA Parties are subordinate "in all respects" to the Bonds.

## **BACKGROUND**

### A.    **The HTA Bonds and Resolutions**

3.    Under Act No. 74 of 1965 (the "Enabling Act"), HTA was authorized to issue bonds, pledge its revenues to secure such bonds, and issue resolutions governing the terms of such bonds. *See* 9 L.P.R.A. § 2004(l). Pursuant to that authority, HTA issued over $4 billion of highway revenue and transportation revenue bonds (the "Bonds"), which were issued pursuant to two bond resolutions (the "Resolutions"). HTA pledged its revenues to secure the repayment of the Bonds. *See, e.g.*, ECF No. 16276-18, §§ 401, 601 and Adv. Proc. No. 20-0005, ECF No. 98-50, 1968 Resolution §§ 401, 601; Adv. Proc. No. 20-0005, ECF No. 98-59, Supplemental Resolution 83-01 (pledging motor vehicle license fees); Adv. Proc. No. 20-0005, ECF No. 98-2, Supplemental Resolution 98-08 (pledging toll revenues); Adv. Proc. No. 20-0005, ECF No. 98-61, 2002 Security Agreement.

4.    Under the Resolutions, HTA committed not to incur any indebtedness ranking equally with or prior to the Bonds. *See*, *e.g.*, ECF No. 16276-18 § 602 (the "1998 Resolution"). Rather, the Resolutions make clear that any documents governing future indebtedness issued by HTA must contain language disclosing that such indebtedness is ***"junior, inferior, and subordinate in all respects to the bonds*** . . . ." *Id.* (emphasis added); *see also* Adv. Proc. No. 20-0005, ECF No. 98-50 (the "1968 Resolution") § 602 (requiring subordination language for any future indebtedness).[3] These commitments constitute integral components of

---

[3] In a similar vein, the Resolutions also prohibit the creation of any preference or priority of one set of Bonds over another, or the grant of any lien senior to that of the bondholders. *See id.* § 802.

-3-

HTA's contracts with its bondholders, and such covenants constitute "valid and binding" obligations. *See* 9 L.P.R.A. § 2015(e), 2015(c).

**B.     The GDB Loan Agreements**

5.     The loan obligations purportedly held by the DRA Parties arose under a series of loan agreements executed between the GDB and HTA (the "GDB Loan Agreements"). Consistent with the Resolutions described above, the GDB Loan Agreements specifically and significantly provide that the repayment of the loans "shall be junior and subordinate to the outstanding bonds of the Borrower." *See* ECF No. 16276-8 (the "2010 Loan Agreement") § 4; *see also* ECF No. 16276-1 (the "2009 Loan Agreement") § 2 ("The Loan shall be junior and subordinate to the outstanding bonds of the Borrower…"); ECF No. 16276-7 (the "2013 Loan Agreement") § 2.6 ("payment of principal and interest on the Loan from the revenues approved by Acts 30-2013 & 31-2013 is junior and subordinated in all respects to the payment of the outstanding bonds of the Borrower"); *id.* § 3.2 (following acceleration of loan obligations, "all repayments shall be on a basis junior, inferior and subordinate in all respects to the bonds issued under the provisions of the Bond Resolutions"). In other words, GDB's rights to repayment— including from Acts 30-31 Revenues—would be postponed until the Bonds were repaid.

6.     The DRA Parties claim that their loans were issued pursuant to various promissory notes (the "Promissory Notes"). *See* DRA Obj. ¶ 9. The Promissory Notes disclose that the obligations issued thereunder are governed by the terms of the GDB Loan Agreements. *See, e.g.*, ECF 16276-16 at 64, *Promissory Note dated August 27, 2013, $47,362,350.75 Loan* ("This Note is under and pursuant to the Loan Agreement dated as of August 27, 2010 . . . and is subject to the terms thereof."); ECF 16276-16 at 49, *Promissory Note dated August 30, 2011, $148,900,000 Loan* ("This Note is under and pursuant to the Loan Agreement dated as of November 9, 2009. . . and is subject to the terms thereof."). And, like the GDB Loan

Agreements, the Promissory Notes further disclose that the loans are subordinate to the Bonds. *See, e.g.,* ECF 16276-16 at 31, *Promissory Note dated February 28, 2014, $61,830,000 Loan* (" . . . all payments under the Loan Agreement and this Note shall be junior, inferior and subordinate to outstanding bonds of the Borrower issued pursuant to the Bond Resolutions."); ECF 16276-16 at 71, *Promissory Note dated August 27, 2013, $70,937,649.25 Loan* ("The Loan shall be junior and subordinate to outstanding bonds of the Authority and shall be subject to certain other terms and conditions, as set forth in the Loan Agreement."); ECF 16276-16 at 64, *Promissory Note dated August 27, 2013, $47,362,350.75 Loan* ("The Loan shall be junior and subordinate to outstanding bonds of the Authority and shall be subject to certain other terms and conditions, as set forth in the Loan Agreement."); ECF 16276-16 at 78, *Promissory Note dated August 27, 2013, $7,350,000 Loan* ("The Loan shall be junior and subordinate to outstanding bonds of the Authority and shall be subject to certain other terms and conditions, as set forth in the Loan Agreement."); ECF 16276-16 at 41, *Promissory Note dated August 27, 2011, $45,000,000 Loan* ("The Loan shall be junior and subordinate to outstanding bonds of the Authority . . .").

7.     In connection with the GDB Loan Agreements, GDB executed a security agreement (as amended, the "GDB Security Agreement"), which contains the exact subordination language required in section 602 of the Resolutions.  Specifically, the GDB Security Agreement provides that the property interest purportedly granted in favor of the lender "shall be junior, inferior and subordinate in all respects to the outstanding bonds of the Assignor issued pursuant to the Bond Resolutions." *See* ECF No. 16276-23 § 1.2; *see also id.* § 2.5 (providing that the security interest purportedly created under that agreement shall be "junior, inferior, and subordinate ***in all respects*** only to the outstanding bonds of the Assignor issued

-5-

pursuant to the Bond Resolutions.").[4]  Thus, the provisions that the DRA Parties themselves cite

as the source of their security interest make clear that the DRA Parties demoted the priority of

their security interest to the Bonds "in all respects."

8.     The GDB Security Agreement also contains a turnover provision, which

requires the lenders to first apply Act 30-31 Revenues to the repayment of the Bonds.  *Id.* § 3.2

("The Revenues assigned and Proceeds acquired under the Collateral shall be applied by the

Bank as follows: (i) to the payment of outstanding bonds of the Assignor issued pursuant to the

Bond Resolutions;… (iii) next, any surplus then remaining to the payment of the

Obligations…").   Therefore, the GDB Security Agreement makes clear that the Bonds have

payment priority over all of GDB's "Obligations" (as defined in the Security Agreement).  If the

Bonds remain unpaid, then revenues (including Act 30-31 Revenues) do not flow to the DRA

Parties.[5]

9.     Consistent with these provisions, the public disclosures to the capital

markets and to creditors—all of which GDB approved—made clear that the GDB loans are

subordinate to the Bonds.  The official statements for the Bonds disclosed that the repayment of

the GDB lines of credit "is subordinate to the Highway Revenue Bonds and the Transportation

---

[4] The DRA Parties have repeatedly cited to certain remarks made by Judge Lipez during oral argument on the lift stay appeals before the First Circuit. *E.g.*, DRA Obj. n. 27.  Those remarks were made based upon the representations of the DRA Parties' counsel concerning the scope and priority of the DRA Parties' security interests.  However, the DRA Parties never disclosed to any court the express language within the GDB Loan Agreements or the GDB Security Agreement that subordinates the DRA Parties' liens and rights to payment to the bondholders.

[5] In subsequent amendments to section 3.2 of the Security Agreement, GDB agreed that the rights to its repayment under section 3.2(a)(iii) would also be subordinate to the payment of HTA's operating expenses.  *See* ECF No. 16276-23, First Amendment to GDB Security Agreement at 13 § 1; Fourth Amendment to GDB Security Agreement at 24 § 1 (extending period of subordination until GDB's obligations were transferred to PRIFA, which never happened); Sixth Amendment to GDB Security Agreement at 33 § 1.

Revenue Bonds."[6]  The UCC financing statements filed by GDB likewise disclose that the liens securing the GDB loans are "junior, inferior, and subordinate to the outstanding bonds of" HTA. *See* ECF No. 16276-24 ( the "GDB UCC Financing Statement, dated March 31, 2015").

## OPPOSITION AND RESERVATION OF RIGHTS

### POINT I

### THE DRA PARTIES' OBJECTIONS ARE PREMATURE CONFIRMATION OBJECTIONS

10.     Section 1125(b) of the Bankruptcy Code requires that before any solicitation of votes on a plan may occur, a disclosure statement must be approved by the court and such disclosure statement must contain "adequate information."   11 U.S.C. § 1125(b). Section 1125 of the Bankruptcy Code defines "adequate information" to generally include "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the history and nature of the debtor . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." *Id.* § 1125(a).

11.     To satisfy the requirements of section 1125, courts have observed that a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  This requirement is distinct from issues related to the legality or economics of the plan, which are addressed in the context of plan confirmation.  *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) ("Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage.") (quotation omitted); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) ("If the creditors oppose their treatment in the plan, but the

---

[6] *See* Official Statement for Series AA Bonds at 32, *available at* https://emma.msrb.org/EP747274.pdf

Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation.").

12.    This Court has previously recognized that the sole issue before the Court with respect to approval of a disclosure statement is "simply whether the proposed disclosure statement as amended provides information sufficient to permit a hypothetical creditor or investor to make an informed judgment about the proposed Plan of Adjustment." *See* Transcript of Hearing, Nov. 20, 2018, Case No. 17-03284-LTS, ECF No. 374, at 51:4-7.  Consequently, issues related to the economics and structure of the plan and the legality of the provisions therein are to be adjudicated in the context of the confirmation of a plan of adjustment. *See id.* at 52: 13-16.  Objections concerning the legality of certain provisions of the Third Amended Plan or the economics and structure of the Third Amended Plan are thus premature. *See id.* at 52.

13.    The DRA Parties' objections exceed the scope of the narrow issue before this Court.  The DRA Parties raise a litany of arguments regarding the confirmability of the Third Amended Plan and the approval of the terms of the settlement with the HTA Bondholders under Bankruptcy Rule 9019.  *See* DRA Objection ¶¶ 29-74.  At bottom, these objections rely upon the unsupported assumption that the DRA Parties have an exclusive lien on Act 30-31 Revenues, and that the DRA Parties are senior to the holders of the Bonds.  *See id.*  The remainder of the DRA Parties' Disclosure Statement objections simply restate the DRA Parties' meritless claims that they are senior to the Bonds and request additional disclosures providing the legal basis for why the Plan does not conform to the DRA Parties' views of the priority of their claims.  *See id.* ¶¶ 79-104.  These objections are plainly objections to the economics and structure of the Third Amended Plan; they are not objections to the adequacy of information in the Disclosure Statement.  Consequently, the DRA Parties' objections need not be considered by the Court at this time.

## POINT II

### THE DRA PARTIES' OBJECTION TO THE DISCLOSURE STATEMENT (AND THIRD AMENDED PLAN) BASED ON THEIR ASSERTED PRIORITY IS ENTIRELY UNSUPPORTED

14.     Even if the DRA Parties' arguments were ripe now, their objections should be summarily overruled because the DRA Parties have failed to show they have any priority.  The DRA Parties assert that the Disclosure Statement "does not disclose why the Third Amended Plan assumes that CW/HTA Claims arising from the HTA Bonds should be senior to (and receive better treatment than) CW/HTA Claims related to the DRA's HTA Loans."  DRA Obj. ¶ 79.  But that objection fails because they fail to prove any right to receive priority treatment.[7]

15.     The DRA Parties' priority argument is misleading.  In describing its alleged security interest, the DRA Parties selectively quote from the GDB Security Agreement, eliding its critical subordination language. *See* DRA Obj. ¶ 13.  The DRA Parties quote section 1.2, stating that "HTA also assigned, pledged and granted to the GDB '[a]s security for the prompt and complete payment and performance when due of all of its Obligations … a continuing security interest … in all of the right, title and interest of [HTA] in the [Act 30-31 Revenues], whether presently held or hereafter acquired and wherever located.'" *Id.*  But the second omission conceals language that subordinates any security interest that the DRA Parties might have to that of the HTA Bondholders: the clause specifies that the "continuing security interest" "shall be junior, inferior and subordinate in all respects to the outstanding bonds of the

---

[7] Given that the arguments raised by the DRA Parties are premature, the arguments set forth herein are not intended to be inclusive of all arguments that the HTA Bondholders may raise in response to the DRA Parties' asserted property interests, claims, and priority vis-à-vis the holders of the Bonds.  The HTA Bondholders reserve their rights to raise additional arguments at a later date (including at the Disclosure Statement hearing), and nothing herein should be construed to limit or waive the HTA Bondholders' rights to raise such arguments.

Assignor issued pursuant to the Bond Resolutions." ECF No. 16276-23, GDB Security Agreement § 1.2. Similarly, while the DRA Parties highlight the assignment language in section 1.1, they entirely ignore section 3.2, which requires the lenders first to apply Act 30-31 Revenues to repay the Bonds. *Id.* § 3.2. Moreover, the DRA Parties ignore language in their loan agreements that specifies that repayment of the loans "shall be junior and subordinate to the outstanding bonds of the Borrower." *See, e.g.*, 2010 Loan Agreement, ECF No. 16276-8 § 4; 2009 Loan Agreement, ECF No. 16276-1 § 2 (same).

16.     These omissions are critical because Section 510(a) of the Bankruptcy Code, made applicable to these Title III proceedings by PROMESA Section 301(a), provides that "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). As courts have explained, a subordination agreement is "simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another." *In re Best Prods.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994). This "subordination alters the normal priority of the junior creditor's claim so that it becomes eligible to receive a distribution only after the claims of the senior creditor have been satisfied." *In re Bank of New England Corp.*, 364 F.3d 355, 362 (1st Cir. 2004). Moreover, the enactment of section 510(a) "means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notions of what may (or may not) be equitable." *Id.* at 362-63. The subordination language that the DRA Parties ignore is therefore enforceable in this Title III proceeding.

17.     Indeed, the DRA Parties cannot prove their HTA loan claims have priority in the Commonwealth's Title III case because the DRA Parties do not have allowed or allowable claims against the Commonwealth with respect to those instruments. The DRA Parties failed to file a proof of claim against the Commonwealth on account of their HTA loan claims. Subject to

limited exceptions that are not applicable here, the Bar Date Order generally required all creditors to file proofs of claims in these Title III cases.  *See* ECF No. 2521 ¶ 4.  Paragraph 11 of the Bar Date Order provides:

> All entities asserting proofs of claim against more than one Debtor are required to file a separate proof of claim with respect to each such Debtor and identify on each proof of claim the particular Debtor (and to the extent reasonably ascertainable, the Commonwealth department or agency, if applicable, for claims asserted against the Commonwealth) against which their claim is asserted.

*Id.* ¶ 11.  This accords with binding First Circuit precedent:  a formal proof of claim filed in one case is ineffective as a claim in an unconsolidated case of an affiliated debtor.  *See Liakas v. Creditors' Comm. of Déjà Vu Inc.*, 780 F.2d 176, 178 (1st Cir. 1986).

18.    In turn, paragraph 12 of the Bar Date Order provides that each proof of claim must "set forth with specificity the legal and factual basis for the asserted claim" and provide supporting documentation.  *Id.* ¶ 12.  The failure to comply with these basic requirements results in severe consequences:  "If a scheduled creditor does not file a timely proof of claim when it is required to do so, that creditor is in the worst of all worlds: it cannot participate in plan voting, will receive no distributions under the plan, and will have its claim discharged." *In re Dartmoor Homes*, 175 B.R. 659, 664 (Bankr. N.D. Ill. 1994); *see also In re Cypresswood Land Partners I*, 409 B.R. 396, 420 (Bankr. S.D. Tex. 2009) (holding that creditor that failed to file proof of claim was barred from voting on plan and collecting cases supporting that holding)*; see also* Fed. R. Bankr. P. 3003(c)(2).  And, when (as here), a creditor fails to file a proof of claim against each debtor in a jointly administered case, then its claims are ineffective against the debtors for which it failed to file proofs of claim. *Liakas*, 780 F.2d at 178; *see also In re Northeast Office and Com. Props., Inc.*, 178 B.R. 915, 919 (Bankr. D. Mass. 1995) ("A proof

of claim, formal or informal, filed in one case has no effect as a claim in another case. To be effective, a claim against a debtor must appear in the record of the debtor's case.").

19.     Here, the Bar Date Order provides that any creditor who fails to timely file a proof of claim prior to the Bar Date shall not be treated as a creditor for purposes of voting on a plan or receiving distributions, and "**the Debtors and their property shall be forever discharged from any and all indebtedness or liability with respect to such claim.**" *Id.* ¶ 15 (emphasis added).

20.     While the DRA Parties filed a proof of claim against HTA (*see* Claim No. 151149), the DRA Parties did not file a proof of claim against the Commonwealth on account of the HTA loans or bonds.  Rather, the only proof of claim filed by GDB or the DRA Parties against the Commonwealth was for unrelated indebtedness and does not mention the HTA loans or bonds.  *See generally* Claim No. 29485, Ex. A (not identifying the HTA loans or bonds as a basis for claims against the Commonwealth); *see also* ECF No. 5628 ("Joint Motion to Clarify Transfer of Claim" clarifying that the GDB proof of claim transferred to the DRA in the Commonwealth case encompassed only the non-HTA-related claims set forth on Exhibit A to the "Joint Motion").[8]  The Bar Date Order required the DRA Parties to file a proof of claim against *each* Debtor, establish the factual and legal basis for the claims against each Debtor, and to provide documentation for each of the claims.  *See* ECF No. 2521 ¶¶ 11-12.

21.     Importantly, the DRA Parties and the DRA are not themselves deemed to be a covered territorial instrumentality,[9] and therefore, no exceptions to the Bar Date Order are

---

[8] While Claim No. 151149 references Claim No. 29485 as a claim that was filed against the Commonwealth (*see* Claim No. 151149, Box 7), Claim No. 29485 merely references unrelated indebtedness and does not set forth any facts establishing claims against the Commonwealth with respect to the HTA loans or bonds owned by the DRA Parties.

[9] *See* Case No. 18-cv-1561-LTS, ECF No. 5-15 at E-28 (noting that the designation of the DRA as a "covered territorial instrumentality" would qualify as event of default under its debt documents).

applicable to any of the claims held by the DRA Parties.  While GDB may have been a covered

territorial instrumentality, nothing in the Bar Date Order exempted transferees of any covered

territorial instrumentalities' claims from the requirements to file proofs of claim.  Recognizing

any exemptions that may be applicable to GDB would not extend to the transferees of its claims,

GDB filed certain proofs of claim because the transferees of its claims (*i.e.*, the DRA Parties)

would need to rely upon GDB's proofs of claim to assert claims within these Title III cases.

However, those proofs of claim did not include claims on account of the HTA loans.

22.     Moreover, the DRA Parties cannot now try to manufacture or pursue a

claim against the Commonwealth on account of the HTA loans and bonds, because under the

Transfer Agreement through which GDB transferred its HTA loans to the DRA Parties, the DRA

Parties lack authority to exercise any rights or remedies in this Title III proceeding. The Transfer

Agreement provides that the DRA Parties'

> rights, remedies and powers in respect of any Non-Municipal Loan
> [*e.g.*, HTA loans] may be exercised solely to the extent necessary
> (i) to assure that the applicable Obligor's funds that are available
> for debt service (consistent with the applicable Fiscal Plan, if any,
> and applicable PROMESA Budget, if any) are applied to such
> Non-Municipal Loan in accordance with the applicable Asset
> Documents, legal priority, security or other pledge rights
> benefiting such Loan Asset, (ii) to preserve, protect or defend any
> security or other pledge rights benefiting such Non-Municipal
> Loan and (iii) **in the case of a Non-Municipal Loan where the
> applicable Obligor is in a proceeding under Title III** or Title VI
> of PROMESA **and such Obligor** *has other creditors with the
> same legal priority, security or pledge rights as [DRA]*, to ensure
> that [DRA] receives treatment in such proceedings that is the same
> as that provided to other creditors with the same legal priority,
> security or pledge rights.

Transfer Agreement, Schedule 1, ECF No. 16276-25 (defining Asset Restrictions) (emphasis

added). As the Transfer Agreement makes clear, during a Title III proceeding, the DRA Parties'

rights, remedies and powers are limited to those enumerated under clause (iii)—that is, ensuring

that they receive treatment that is the same as other creditors with the *same* legal priority, security or pledge rights. If clause (ii) applies during a Title III proceeding to permit the DRA Parties to "preserve, protect or defend any security or other pledge rights"—and that grant of authority is interpreted as permitting the DRA Parties to pursue distributions and raise priority arguments—then the more narrow grant of authority under clause (iii) would be rendered superfluous. Clause (iii) must therefore be read as the only basis for the DRA Parties to exercise their rights in this Title III proceeding. *See Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004) ("[A]n inquiring court should, whenever possible, avoid an interpretation that renders a particular word, clause, or phrase meaningless or relegates it to the category of mere surplusage."); Government Parties' Objection ¶¶ 19–23, ECF No. 16518.

23.     The DRA Parties themselves claim that no other creditors share the same "legal priority, security or pledge rights" as the DRA Parties: they argue that as a "party to a separate Security Agreement," DRA's "security interest in the Act 30-31 Revenues does not suffer from the deficiencies identified by this Court in its orders denying the Monolines stay relief." DRA Obj. ¶ 24. But as explained *supra* ¶¶ 4-9 and 14-21, the DRA Parties' interest is in fact subordinated to the HTA Bondholders' claims. In either case, no creditor has the same "legal priority, security or pledge rights" as the DRA Parties, meaning that the DRA Parties have no authority to exercise their limited rights in a Title III case to pursue a claim against the Commonwealth on account of HTA loans and bonds.

24.     Thus, the DRA Parties' Objection fails to show how the DRA Parties are entitled to priority treatment under the Third Amended Plan. And when the facts are properly and fully presented to the Court, the record will show that the DRA Parties' priority arguments lack any merit.

-14-

## <u>RESERVATION OF RIGHTS</u>

25.     Given that the arguments in the DRA Objections are premature, we have not set forth all of the potential weaknesses in the DRA Parties' positions.  The HTA Bondholders, accordingly, reserve all rights to challenge the DRA Parties' characterization of their asserted property interests and to otherwise challenge the DRA Parties' assertions that they have superior or *pari passu* interests with the Bonds.  The HTA Bondholders further reserve all rights to address any claims asserted by the DRA Parties, including, without limitation, the validity of any claims or property interests asserted by the DRA Parties in these Title III cases. The HTA Bondholders also reserve the right to respond to any other objections or responses to the Disclosure Statement, including at any hearing on the Disclosure Statement.

Dated:  June 29, 2021
New York, New York

CASELLAS ALCOVER & BURGOS P.S.C.

/s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR No. 204,809
Ricardo F. Casellas-Sánchez
USDC-PR No. 203,114
Diana Pérez-Seda
USDC–PR No. 232,014
E-mail: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com
P.O. Box 364924
San Juan, PR 00936-4924
Tel.: (787) 756-1400
Fax: (787) 756-1401

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT
LLP

/s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William Natbony*
Thomas J. Curtin*
Casey J. Servais*
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 504-6666
Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony @cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

* admitted pro hac vice

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC

By:*/s/ Eric Pérez-Ochoa*
   Eric Pérez-Ochoa
   USDC-PR No. 206,314
   E-mail:  epo@amgprlaw.com

By:*/s/ Luis A. Oliver-Fraticelli*
   Luis A.  Oliver-Fraticelli
   USDC-PR NO. 209,204
   E-mail:     loliver@amgprlaw.com
   208 Ponce de Leon Ave., Suite 1600
   San Juan, PR 00936
   Tel.:       (787) 756-9000
   Fax:       (787) 756-9010

*Attorneys for National Public Finance
Guarantee Corp.*

WEIL, GOTSHAL & MANGES LLP

By:*/s/ Robert Berezin*
   Jonathan Polkes*
   Gregory Silbert*
   Robert Berezin*
   Kelly DiBlasi*
   767 Fifth Avenue
   New York, New York 10153
   Tel.:       (212) 310-8000
   Fax:       (212) 310-8007
   Email:     jonathan.polkes@weil.com
          gregory.silbert@weil.com
          robert.berezin@weil.com
          kelly.diblasi@weil.com

* admitted *pro hac vice*

*Attorneys for National Public Finance
Guarantee Corp.*

-17-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the

Court using the CM/ECF System, which will send notification of such filing to all parties of

record in the captioned case.

At New York, New York, the 29th day of June, 2021.


By: _/s/ Howard R. Hawkins, Jr_
    Howard R. Hawkins, Jr.*
    * Admitted pro hac vice

-18-