# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.,* | No. 17 BK 3283-LTS (Jointly Administered) |
| Debtors.[1] | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| Plaintiff, | Adv. Proc. No. _____ in 17 BK 3283-LTS |
| v. | |
| HON. PEDRO R. PIERLUISI URRUTIA in his official capacity as Governor of Puerto Rico; THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; HON. JOSÉ LUIS DALMAU SANTIAGO, in his official capacity as a representative of the Puerto Rico Senate; and HON. RAFAEL HERNÁNDEZ MONTAÑEZ, in his official capacity as a representative of the Puerto Rico House of Representatives, | |
| Defendants. | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S
VERIFIED COMPLAINT AGAINST THE GOVERNOR OF PUERTO RICO, THE
PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, THE
PRESIDENT OF THE SENATE OF PUERTO RICO, AND THE SPEAKER OF THE
HOUSE OF REPRESENTATIVES OF PUERTO RICO**

**To the Honorable United States District Judge Laura Taylor Swain:**

Plaintiff the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), for itself and as Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), hereby brings this complaint against defendants the Honorable Pedro R. Pierluisi Urrutia (the "Governor"), in his official capacity, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Honorable José Luis Dalmau Santiago, in his official capacity as a representative of the Puerto Rico Senate (the "Senate President"), and the Honorable Rafael Hernández Montañez, in his official capacity as a representative of the Puerto Rico House of Representatives (the "Speaker of the House," and together with all defendants, the "Defendants" or the "Government").

## NATURE OF THE ACTION

1.     This action seeks declaratory and injunctive relief pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241 ("PROMESA"). In contravention of PROMESA's requirements, the Legislature enacted and the Governor signed into law a statute designated Act 7-2021 (the "Act"), which makes radical structural changes to the Commonwealth's three primary public retirement systems and purports to supplant the Oversight Board's proposed plan of adjustment.  The Act is a return to the fiscal mismanagement that existed before the passage of PROMESA, where "[t]he Commonwealth was being crushed under the weight of public debt that was larger than its GNP, it had started to default on its debt obligations, and it had lost access to external financing."  2021 Certified Fiscal Plan of the Commonwealth (the "2021 Fiscal Plan") at 18, a true and correct copy of which is attached hereto as **Exhibit 1**.  The Act is contrary to the 2021 Fiscal Plan.

2.     The Act has several main components. First, it purports to impose a new plan of adjustment by prohibiting use of any resources to achieve and enable the Oversight Board's

currently proposed Fourth Plan of Adjustment, ECF No. 17194 in Case No. 17-bk-3283 (the "Plan of Adjustment").  Under the Act's envisioned plan of adjustment, bondholders would receive a lower level of recovery than their consensual settlement provides, pension benefits would supposedly revert to prepetition levels, and defined benefit obligations of the Commonwealth would supposedly be reinstated and continue to accrue.  Second, the Act would create a new pension trust ("FACSiR") funded (a) through diversion of employee contributions that have been deposited in segregated defined contribution accounts under current law and (b) from purported savings from the repayment of less bond debt based on the Legislature's declaration the debt is invalid, even though, based on the Oversight Board's analysis, such savings are highly unlikely to materialize.  Indeed, based on its own analysis, the Oversight Board estimates that FACSiR will likely never be more than 20% funded, and will likely become insolvent as soon as 2053 (and likely much sooner).  Third, the Act would attempt to lock in those changes and mandate the Government repudiate any plan of adjustment, now and in the future, that requires pension reductions, budget cuts, or further bond restructurings.  This would include the Oversight Board's currently proposed Plan of Adjustment.  Through the passage of this Act, this Legislature seeks to tie the hands of the present and all future Commonwealth governments and force the current government to reject any plan of adjustment that is inconsistent with the Act, even when doing so is contrary to the financial interests of the Commonwealth and its residents—today and in the future. The Oversight Board believes these changes mandated under the Act, as a whole, would fundamentally undermine the Commonwealth's ability to achieve fiscal stability and access to capital markets.

3.     The Oversight Board has determined the Act impairs and defeats the purposes of PROMESA, in violation of PROMESA section 108(a)(2), by purporting to dictate the treatment

of billions of dollars in bond debt, thereby usurping the Oversight Board's and Court's exclusive power to confirm a plan of adjustment under PROMESA section 312, and unwinding prior pension reforms to create billions of dollars in new pension liabilities without adequate funding. In addition, the Act is significantly inconsistent with the Commonwealth's 2021 Fiscal Plan, in violation of PROMESA section 204(a); modifies the Commonwealth's debt without Oversight Board approval, in violation of PROMESA section 207; and effectuates an unauthorized and unlawful reprogramming, in violation of PROMESA section 204(c).

4.    Pursuant to its authority under PROMESA sections 104(k), 108(a)(2), 204, and 207, the Oversight Board brings this action for injunctive relief to bar the Government from implementing and enforcing the Act, and to have the Act declared a nullity.

## PARTIES

5.    Plaintiff the Financial Oversight and Management Board for Puerto Rico is an entity within the Commonwealth government established pursuant to PROMESA section 101.

6.    Defendant Pedro R. Pierluisi Urrutia is the Governor of Puerto Rico, vested with the executive power and the obligation to execute the laws.  P.R. Const. art. IV, §§ 1, 4.

7.    Defendant the Puerto Rico Fiscal Agency and Financial Advisory Authority is a Puerto Rico public corporation.  Under Commonwealth law, it is the "fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico," with responsibility "for the collaboration, communication, and cooperation between the Government of Puerto Rico and the Fiscal Oversight Board."  Law 2-2017 § 5(a).

8.    Defendant José Luis Dalmau Santiago is the President of the Senate of Puerto Rico, and its official representative pursuant to S.R. 13, § 6.1(p), 18th Leg., 1st Ord. Sess. (P.R. 2017).

9.     Defendant Rafael Hernández Montañez is the Speaker of the House of Representatives of Puerto Rico, and its official representative pursuant to H.R. 161, § 5.2 (p), 19th Leg., 1st Ord. Sess. (P.R. 2021).

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the action arises under PROMESA, a federal statute, and pursuant to PROMESA §§ 106(a) and 306(a)(2).

11.     The Court has personal jurisdiction over the Defendants pursuant to PROMESA § 306(c) and because the Governor, the Senate President, and the Speaker of the House are officers and AAFAF is an agency of the government of Puerto Rico; each is located in the United States; and each has performed acts giving rise to the claims in this action in Puerto Rico.

12.     Venue is appropriate in this District under PROMESA §§ 106(a) and 307, and 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### PUERTO RICO'S PENSION CRISIS

13.     Puerto Rico is in the midst of a "fiscal emergency" resulting from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."   PROMESA section 405(m)(1).  Among the areas in greatest economic distress are the Commonwealth's three primary retirement plans for public employees—the Employees' Retirement System ("ERS"), the Teachers' Retirement System ("TRS"), and the Judiciary Retirement System ("JRS")—which are liable for more than $50 billion in unfunded pension liabilities.

14.     In September 2019, the Oversight Board published a detailed report analyzing the three retirement systems.  A true and correct copy of the PROMESA Section 211 Report on the Puerto Rico Retirement Systems is attached hereto as **Exhibit 2**.  As a major cause of their

insolvency, the Oversight Board's report observed that the historical "defined-benefit" structure of the retirement systems lacked the appropriate amount of governance and fiscal responsibility. In a defined-benefit plan, a formula determines the benefit payable upon retirement, with the employer bearing responsibility for securing adequate funding to deliver the benefit amount. *See id.* at 7. The funding levels for the plans, however, were never linked to actuarial calculations that would ensure these benefits could actually be paid in the future. The Government's lack of fiscal responsibility was reflected in the consistent underfunding of the retirement systems, which resulted in the depletion of the retirement systems' assets over time as current retirement benefits continued to be paid. Among the various issues, the Commonwealth continued to increase pension commitments without properly funding them. As history shows, despite periodic efforts to improve the fiscal health of those plans, the reforms adopted were too modest to put the Commonwealth on the road to long-term recovery and the plans became insolvent.

15.    In 1999, the Legislature passed Act 305-1999 ("Act 305") to close the ERS defined-benefit program to employees hired on or after January 1, 2000. *Id* at 21. To provide an alternative retirement plan for those employees, Act 305 created the Retirement Savings Account Program ("System 2000"), a hybrid cash-account program in which benefits were based on employee contributions, although those contributions were deposited in the existing ERS pension-trust account. *Id.* at vii. A similar arrangement for new hires was later implemented for TRS and JRS. *Id.*

16.    In 2013, Act 3-2013 froze benefit accruals for employees under the legacy ERS defined-benefit plan as of July 1, 2013, and replaced these benefits with similar hybrid cash-accounts as those already existing under System 2000. *See id.* at 1, 9.

17.     Even with these reforms, the pension systems remained woefully underfunded. Indeed, even the employee contributions to the System 2000 notional accounts were apparently redirected for other governmental purposes.  As of 2016, Puerto Rico had accumulated liabilities for pensions and other retirement benefits which, by the Commonwealth's own estimates, exceeded $50 billion.  *See* 2020 Certified Fiscal Plan of the Commonwealth ("2020 Fiscal Plan"), a true and correct copy of which is attached hereto as **Exhibit 3**.  The 2020 Fiscal Plan and 2021 Fiscal Plan are, collectively, the "Fiscal Plan."

18.     The Oversight Board's 2017 Certified Fiscal Plan for the Commonwealth (the "2017 Fiscal Plan") required several pension reforms, including the adoption of a "pay as you go" funding model under which the Commonwealth and other subject employers (including municipalities that had participated in the ERS system) would pay pension and other retirement benefits as they came due out of the Commonwealth's General Fund, rather than pre-funding through an investment trust.  A true and correct copy of the 2017 Fiscal Plan is attached hereto as **Exhibit 4**.

19.     On August 23, 2017, recognizing the three public retirement systems were "facing [a] serious fiscal emergency" because their liquid assets were nearly depleted, the Commonwealth Legislature passed Act 106-2017 ("Act 106"), which required implementation of a "defined-contribution plan" to cover all ERS and certain TRS participants hired on or after August 1, 2014. *See* Ex. 3 at 239.  Under that defined-contribution plan, individual retirement accounts were funded with employee contributions that were automatically withheld from each employee's paycheck, to allow employees to control their retirement funds, rather than allowing the Government to use those funds to fund benefits for current retirees.  *Id*.

20.    To prevent the Commonwealth (which at this point was in Title III) from bearing these massive legacy pension costs alone, Act 106 also created the PayGo system to fund these defined benefit liabilities accumulated under ERS, TRS, and JRS.  *Id*.  Under the PayGo funding model mandated by Act 106, the Commonwealth is required to pay pension benefits as they come due to retirees.  *Id*.  However, employers (such as municipalities and certain public corporations) are required to fund these liabilities through monthly payments (the "PayGo Fee") to the Commonwealth in the amount of benefits paid by the Commonwealth to each of their respective retirees.  *Id*.  In short, under the PayGo system adopted in the 2017 Fiscal Plan and implemented by Act 106, the Commonwealth became the paying agent for pensions associated with municipalities' and certain public corporations' retirees, but the municipalities and public corporations remained ultimately liable to the Commonwealth to pay those obligations by paying the PayGo Fee.

21.    In passing Act 106, the Legislature recognized that failure to shift pension obligations to public employers would create unsustainable financial liabilities for the Commonwealth while it was already in the midst of a decades-long financial decline.  *See id*.

**THE ACT**

22.    The Act thwarts previous pension-reform efforts by eliminating the PayGo system for accrued benefits under the three pension systems (ERS, TRS, and JRS) and terminating Act 106's defined-contribution plan.  In their place, the Act creates a new retirement system called the Trust for the Joint Administration of the Retirement Systems of Puerto Rico (FACSiR by its Spanish acronym), which assumes all obligations of the retirement systems, including those in force prior to the Commonwealth's Title III filing on May 3, 2017.  The Act also provides for additional benefits to be provided to the extent that FACSiR reaches certain predetermined

funding levels.  A true and correct copy of Act 7 is attached hereto as **Exhibit 5**.[1]  The Act further

provides the retirement benefits it creates cannot be adjusted in Title III.  *Id*.

### New Plan of Adjustment

23.     The Act purports to dictate the terms of a new plan of adjustment, contrary to the

Oversight Board's currently proposed Plan of Adjustment.  The Act would: (*i*) create new

categories of "Uncontested Bonds" and "Contested Bonds"; (*ii*) provide no recovery to the latter;

(*iii*) cap recoveries for the former at an aggregate maximum of 58%; and (*iv*) leave retirement

claims unimpaired.  The Act also purports to prohibit Governmental cooperation with the

preparation and implementation of any plan of adjustment that does not meet the Act's

requirements.  The Act also mandates Government rejection of any plan of adjustment which

results in pension reductions, budget cuts, or restructuring bonds in a manner inconsistent with

the Act's calculation of debt sustainability, and that the Government be precluded from

cooperating with respect to any such plan of adjustment.

24.     After assuming the elimination of billions of dollars of bond obligations, the Act

purports to reallocate every dollar of debt service on that eliminated bond debt to FACSiR, as

though the funds to pay the purportedly eliminated bond debt were fully available for repurposing

by the Government.  Therefore, the Commonwealth would not achieve any debt service relief

under any plan of adjustment that complies with the Act.

25.     By virtue of the fact that all benefits would be paid from FACSiR assets, the Act is

also in direct contravention with this Court's ruling that elimination of municipalities' PayGo

---

[1]  As of the filing of this Complaint, an official certified English translation of Act 7 was not available.
Contemporaneously herewith, the Oversight Board will file a motion seeking leave to obtain and submit a certified
English translation of Act 7.

obligations would impair or defeat PROMESA's purposes, in violation of section 108(a)(2).  *See Law 29 II*, 616 B.R. at 254.

### Creation of FACSiR

26.     The Act creates a trust that is highly unlikely to be adequately funded.  FACSiR would initially be funded by liquidating accounts containing ERS, TRS, and JRS assets, liquidating accounts funded by the General Fund to pay PayGo, and transferring funds from the System 2000 accounts currently designated under the Plan of Adjustment to be deposited in individual employee Act 106 accounts.  The Act also states that FACSiR will be funded by savings resulting from judgments related to Contested Bonds, as well as purported savings in administrative costs.

27.     The Act purports to fund FACSiR on an ongoing basis with employee contributions, starting with the diversion of the entire accrued balances of the employees' segregated accounts under Act 106, and employer contributions, purported savings from eliminating debt service for Contested Bonds, and savings from reduced payments of Uncontested Bonds.  Finally, FACSiR would own any returns generated by the trust.

28.     In fact, neither the initial nor the ongoing funding sources are likely to be sufficient to adequately fund FACSiR.  The Act rests on the unrealistic assumptions that the Commonwealth can afford to pay 100% of the amount of debt service on its prepetition debt, with a substantial portion of prepetition debt-service payments being redirected to fund pensions.  The Oversight Board's estimates show ongoing funding sources are insufficient to offset the estimated benefit payments associated with the Act, and the Government has not provided any projections demonstrating otherwise.  As a result, contributions from current employees will once again be needed to fund retiree benefits.  Specifically, based on the Oversight Board's models, FACSiR would likely never reach a funding level of more than 20%, the funding level would decline from

there and FACSiR would become insolvent as soon as 2053, and potentially much sooner depending on the availability of the Act's contemplated funding mechanisms.

29.    Moreover, the Oversight Board's models are premised on the Act's assumption that 100% of future payments that would have otherwise gone to Contested Bond and Uncontested Bond debt service will instead be paid to FACSiR.  This assumption fails to recognize the Contested Bonds, if litigated, could turn out to be valid, in which case their debt-service claims would have to be fairly treated.  Thus, FACSiR could become insolvent well before 2053.

30.    The Act does not specify what would happen to retiree benefits when FACSiR becomes insolvent.

31.    The Act purports to dictate the terms of an alternative plan of adjustment to the Oversight Board's proposed Plan of Adjustment, and contemplates a pension trust it cannot fund.

32.    The Act also impairs and defeats the purposes of PROMESA because it unwinds prior pension-reform efforts and restructures the public pension system in contravention of Oversight Board policy, and interferes with the Oversight Board's exclusive right to determine treatment of pensions accrued prepetition as part of a plan of adjustment and the PROMESA requirement to adequately fund pensions.

**THE OVERSIGHT BOARD'S WARNINGS PRIOR TO PASSAGE OF THE ACT**

33.    Following the introduction of the House bill ("HB 120" or the "Bill") that eventually became the Act, the Oversight Board advised the Government by letter dated January 29, 2021, that HB 120 was significantly inconsistent with the 2020 Fiscal Plan, in violation of PROMESA section 204(a), and violated multiple other provisions of PROMESA, including sections 108(a), 204(c), and 207, because it proposed to "consolidate all public pension systems under one new entity, reinstate and preserve retirement benefits as defined-benefit plans not subject to any reduction or freeze, and dictate the terms of a plan of adjustment for the

Commonwealth."  A true and correct copy of the January 29, 2021 letter is attached hereto as **Exhibit 6**. As it had done with earlier legislation,[2] the Oversight Board informed the Government of its "determination that HB 120 impairs and defeats PROMESA's purposes" and the Government was therefore "statutorily enjoined from passing and implementing HB 120."  *Id*. The Oversight Board specifically noted that the Act's employer contribution levels were "disconnected from any actuarial assessments of the needs of the plan" and that therefore FACSiR would likely never reach its funding goals.  *Id*.

34.    On February 3, 2021, AAFAF advised one of the legislative committees considering HB 120 that AAFAF was "impeded from endorsing H.B. 120 as written" on the grounds that "given the clear precedents of the Title III Court, bills such as [HB 120] cannot [be] implemented by [the Commonwealth] government without the endorsement of the FOMB."  A true and correct copy of the February 3, 2021 letter is attached hereto as **Exhibit 8**.[3]

35.    AAFAF noted several concerns with HB 120.  It explained HB 120 "is diametrically opposite to the public policy established in [Act 106], which has allowed the payment of the pensions of [Puerto Rico's] public servants during the past three years" and which was created to stave off "the humanitarian crisis that would have arisen if the payments to [Puerto Rico's] retirees were interrupted as a result of the lack of liquid assets of the Retirement

---

[2] Well before the Act was even a bill, the Oversight Board warned the Governor and Legislature against passage of House Bill 2434 ("HB 2434"), a bill nearly identical to the Act.  On June 15, 2020, the Oversight Board informed the Government by letter that because HB 2434 attempted to "consolidate all public pension systems under one new entity, reinstate and preserve retirement benefits as defined-benefit plans not subject to any reduction or freeze, and dictate the terms of a plan of adjustment for the Commonwealth," it was inconsistent with the then effective fiscal plan.  A true and correct copy of the June 15, 2020 letter is attached hereto as **Exhibit 7**.  The Oversight Board informed the Government that because the Oversight Board determined that HB 2434 would impair or defeat the purposes of PROMESA, the Government was enjoined from passing or implementing HB 2434 pursuant to PROMESA section 108(a)(2).  The Government never responded to the Oversight Board's letter.

[3] As of the filing of this Complaint, an official certified English translation of AAFAF's February 3, 2021 letter was not available.  Contemporaneously herewith, the Oversight Board will file a motion seeking leave to obtain and submit a certified English translation of AAFAF's February 3, 2021 letter.

System." *Id.*   Additionally, because HB 120 would prevent AAFAF from agreeing to and cooperating with a plan of adjustment that does not comply with HB 120's terms, HB 120 "basically prohibit[s]" AAFAF "from collaborating in preparation of fiscal plans, budgets, or adjustment plans on behalf of the Government of Puerto Rico" which "entail[s] handing over to the FOMB . . . total control over the destinies of Puerto Rico, without any representation of the democratically elected Government." *Id.*

36.     On February 12, 2021, the Oversight Board issued a resolution concerning HB 120 (the "February 12 Resolution"), announcing its determination that:

> [I]f enacted and implemented, HB 120 will impair and defeat the purposes of PROMESA by, among other things, attempting to interfere with the Oversight Board's exclusive authority under PROMESA to formulate, propose, and prosecute plans of adjustment on behalf of Title III debtors and by eliminating all pension measures contemplated by the Fiscal Plan by reinstating and maintaining failed pension structures in effect as of the commencement of the Commonwealth's Title III case.

A true and correct copy of the February 12 Resolution is attached hereto as **Exhibit 9**.

37.     Pursuant to the February 12 Resolution, the Oversight Board:

> (1) Directe[d] the Legislature not to enact HB 120; (2) Directe[d] the Legislature and the Government not to enact any law based on HB 120; and (3) Approve[d] taking legal action, if necessary, against the Legislature and the Governor, pursuant to its authority under PROMESA sections 104(k), 108(a)(2), 201, 202, 204 and 207, to enjoin the enactment and implementation of HB 120 and if necessary have it declared a nullity, should the Legislature and Government refuse the Oversight Board's request to stop enacting and implementing the law.

*Id.*

38.     On February 17, 2021, Natalie A. Jaresko, Executive Director of the Oversight Board, and Oversight Board staff met with the Speaker of the House to present the Oversight Board's preliminary assessment of HB 120 (the "Preliminary Assessment"), which determined that HB 120 defied the objectives of PROMESA; retained the burdens of prepetition debt service;

created an insufficiently funded pension trust in FACSiR; was significantly inconsistent with the

Fiscal Plan; and used employee contributions to fund current pension obligations.

39.     On February 20, 2021, the Oversight Board wrote to the Government to explain its

concerns regarding HB 120's impact on the Commonwealth, its future, and the Fiscal Plan.  A

true and correct copy of the February 20, 2021 letter is attached hereto as **Exhibit 10**.  The

Oversight Board specifically noted that HB 120 "purports to dictate the terms of a plan of

adjustment" and "contemplates an insufficiently funded pension trust ('FACSiR'), which will not

and cannot cover HB 120's increased benefit payments."  *Id.* at 2.  The Oversight Board therefore

informed the Government that "[b]ased on the Oversight Board's determination that HB 120

impairs and defeats the purposes of PROMESA, PROMESA section 108(a)(2) enjoins the

Legislature and Governor from enacting, implementing, or enforcing HB 120 or any law based

on HB 120."  *Id.* at 3.

40.     Specifically, the Oversight Board informed the Government HB 120 "will violate

section 108(a)(2) [48 U.S.C. 2129(a)(2)] as  . . . the Oversight Board has determined it would

impair and defeat the purposes of PROMESA"; "will certainly violate section 204(a) [48 U.S.C.

2144(a)], because the Governor could not accurately certify HB 120 is not significantly

inconsistent with the Fiscal Plan"; "would violate section 204(c) [48 U.S.C. 2144(c)] because its

new pension system requires initial expenses not provided for in the Fiscal Plan or Budget"; "will

violate section 207 [48 U.S.C. 2147] because it improperly purports to modify and redeem

Commonwealth debt (*i.e.*, its tens of billions of dollars in pension obligations) without Oversight

Board review and approval"; and "defies the Title III court's prior ruling nullifying Law 29."  *Id.*

at 4.

41.     The Oversight Board urged the Government to engage with it to avoid litigation
and reach a positive outcome for the people of Puerto Rico, but reserved its right to seek court
assistance including to enforce PROMESA's bar against the implementation and enforcement of
HB 120.  *Id.*

42.     On February 23, 2021, despite the Oversight Board's warnings, the Puerto Rico
House of Representatives passed HB 120.

43.     On March 9, 2021, a group of 26 legislators wrote a letter in response to the
Oversight Board's January 29 letter to the Government, stating their position that PROMESA
section 108(a)(2) does not empower the Oversight Board to enjoin legislation that it determines
to be inconsistent with the Fiscal Plan.  A true and correct copy of the March 9, 2021 letter is
attached hereto as **Exhibit 11**.  The letter invited the Oversight Board to engage with the
legislature in negotiations, using the terms set out in HB 120 as a "point of departure."  *Id.* at 7.

44.     On March 16, 2021, the Senate Finance Committee sent a letter to the Oversight
Board requesting certain information regarding HB 120 to calculate the funding ratio for FACSiR,
because the Committee believed that the information provided by the Bill's proponents was
insufficient to allow a meaningful analysis of the Bill's fiscal impact.  A true and correct copy of
the March 16, 2021 letter is attached hereto as **Exhibit 12**.  The letter also requested the Oversight
Board to comment on the many assumptions upon which the proponents of HB 120 based their
conclusion that FACSiR would have adequate funding to support HB 120's newly created pension
system.  *Id.*

45.     By letter dated March 19, 2021, in response to the 26 legislators, the Oversight
Board reminded the group that HB 120 impairs or defeats the purposes of PROMESA, as
determined by the Oversight Board, and the Act should not be enacted or implemented.  A true

and correct copy of the March 19, 2021 letter is attached hereto as **Exhibit 13**.  The Oversight Board further reminded the legislators that this Court has already twice confirmed the Oversight Board's authority under section 108(a)(2).  *Id*.  The Oversight Board explained that it had determined that HB 120 would impair or defeat the purposes of PROMESA because: (1) it attempts to dictate the treatment of billions of dollars of Commonwealth bond debt, usurping the Oversight Board's exclusive power to file plans of adjustment under PROMESA section 312; (2) it transfers every dollar of debt service on eliminated bond debt to the proposed new pension trust FACSiR, and thereby fails to achieve any debt relief for the Commonwealth; and (3) even assuming the legislature's assumptions regarding the availability of funding sources were correct, FACSiR will likely never cover more than 20% of the Commonwealth's pension obligations and would be likely insolvent by 2053.  *Id*.  The Oversight Board stated it would be pleased to meet with the Government and explain its concerns regarding HB 120 in further detail.  *Id*.

46.    By letter dated March 25, 2021, in response to the Senate Finance Committee, the Oversight Board reiterated that HB 120 is fundamentally flawed because it purports to dictate the treatment of billions of dollars of Commonwealth debt, and therefore usurps the Oversight Board's exclusive role in confirming a plan of adjustment under PROMESA section 312.  A true and correct copy of the March 25, 2021 letter is attached hereto as **Exhibit 14**.  The letter further reminded the Senate Finance Committee that FACSiR will become insolvent as soon as 2053, and likely much sooner, in large part because the House proponents' analysis relies on speculative and unrealistic funding sources for FACSiR.  *Id*. at 2.  The Oversight Board invited the Government to cooperate to ensure adequate funding of the Commonwealth's pension systems.  *Id*.

47.     Notwithstanding those communications, on May 13, 2021, the Senate approved HB 120.  The Governor signed the Act, now known as Act 7-2021, into law on June 9, 2021.  *See* Ex. 5. At the time, the Governor acknowledged the Act is "significantly inconsistent" with the 2021 Certified Fiscal Plan.[4]

### THE 2021 FISCAL PLAN

48.     On April 23, 2021, the Oversight Board certified the 2021 Fiscal Plan.  *See* Ex. 1. The 2021 Fiscal Plan acknowledges the many financial challenges Puerto Rico continues to face, including recovering from the natural disasters of the past four years and, currently, the COVID-19 pandemic.  *Id*.  Despite these problems, the 2021 Fiscal Plan provides a blueprint for the Commonwealth to achieve PROMESA's requirements of achieving fiscal responsibility and access to capital markets by undertaking structural governmental reforms, including with respect to Puerto Rico's struggling pension system, which remains in "urgent need for reform." *Id.*

49.     The 2021 Fiscal Plan provides for several additional pension-reform initiatives that are expected to lead to $198 million in savings between FY 2022 and FY 2026.  "To avoid creating future pension liabilities and to adequately fund the pensions [of] future retirees," the 2021 Fiscal Plan provides that "the JRS and remaining[5] TRS benefit accruals must be frozen by January 1, 2022."  *See id*. at 274. The 2021 Fiscal Plan also calls for a pension-benefit reduction of up to 8.5% for roughly 28% of current retirees in all three systems.  *Id*.

50.     One of the 2021 Fiscal Plan's key assumptions is that Act 106's PayGo plan will remain in effect, and that each agency of the central government, each public corporation, and each municipality will continue to pay for its retirees' PayGo payments.

---

[4] The Governor's press release is publicly available on the Governor's website: https://www.fortaleza.pr.gov/.

[5] TRS members hired after August 1, 2014 do not receive defined benefits.

## THE GOVERNOR'S CERTIFICATION AND AAFAF'S FINDING OF SIGNIFICANT INCONSISTENCY WITH THE FISCAL PLAN

51.     On June 18, 2021, the Governor, acting through AAFAF, provided to the Oversight Board a certification pursuant to PROMESA section 204(a)(2) stating that Act 7-2021 is "significantly inconsistent" with the 2021 Fiscal Plan (the "Certification").  A true and correct copy of the Certification is attached hereto as **Exhibit 15**.[6]  In the Certification, AAFAF observed the "[t]he reformulation of Puerto Rico's pension system, as stated in Act 7, is contrary to the provisions of the Fiscal Plan and the assumptions of the POA currently filed before the Title III Court."  *Id*. at 7.  AAFAF further noted that the Act's requirements regarding FACSiR—the pension trust purportedly created by the Act—"are significantly inconsistent with the reform measures established [in] Section 20.2 of Chapter 20 of the Certified Fiscal [Plan]."  *Id*.

52.     In the Certification, AAFAF also recognized that Act 7 violates various other provisions of PROMESA including:

a.     Section 108(a)(2):  The Act "could be interpreted as preventing the Oversight Board from discharging its duties by barring government cooperation with the Oversight Board," contrary to PROMESA section 108(a)(2).  *Id*. at 5.

b.     Section 204(c): The Act would require "reprograming budgeted resources since the current Certified Budget and the Oversight Board's proposed budget for FY22 do not contemplate resources for the retirement structure established" in the Act.  *Id*. at 6.  The Oversight Board has neither received a request to reprogram nor granted the Government permission to do so.

c.     Section 207: The Act "could be interpreted to be in conflict with Section 207 of PROMESA and the Certified Fiscal Plan, since it modifies billions of dollars of debt to retirees without the approval of the Oversight Board."  *Id*. at 5.

53.     In a section within the Certification entitled "Fiscal Impact," AAFAF concluded the Act would have a "significant … impact on the expenditures of the Government" because it

---

[6] As of the filing of this Complaint, official certified English translations of two of the attachments to the Certification were not available.  Contemporaneously herewith, the Oversight Board will file a motion seeking leave to obtain and submit certified English translations of the outstanding attachments to the Certification.

"discards the pension reform measures contemplated by the Fiscal Plan and establishes a new pension system that requires an initial funding not contemplated in the FY21 Certified Budget." Specifically, the AAFAF calculated the Act would forgo $198 million in savings from FY 2022 to FY 2026 generated by the Fiscal Plan's restructuring of the pension systems and would require an allocation of $4.5 billion not contemplated in the FY 2021 Certified Budget. *Id.*

54.     On June 22, 2021, in response to the Certification, and in accordance with PROMESA section 204(a)(3)(C), the Oversight Board sent a notification to the Governor and the Legislature that AAFAF certified Act 7 is significantly inconsistent with the Fiscal Plan (the "Notification").  A true and correct copy of the Notification is attached hereto as **Exhibit 16**.  In the Notification, the Oversight Board stated that, based on its own analysis of the fiscal impact of the Act, the Oversight Board agreed with AAFAF's conclusion that Act 7 is significantly inconsistent with the Fiscal Plan.  *Id*. at 3.

55.     In the Notification, and in accordance with PROMESA section 204(a)(4)(B), the Oversight Board further notified the Governor and the Legislature that the Act "cannot be corrected to eliminate the inconsistency, nor can the Government provide an explanation for the inconsistency that the Oversight Board will find reasonable and appropriate."  *Id.*  The Oversight Board therefore directed the Governor to refrain from implementing the Act, and directed the Legislature to repeal the Act immediately.  *Id.*

56.     The Notification also confirmed the Oversight Board's prior determination that the Act impairs and defeats the purposes of PROMESA in violation of PROMESA § 108(a), and the Act's implementation is statutorily barred.  *Id.*

57.     On June 25, 2021, AAFAF, on behalf of the Governor, responded and confirmed again that Act 7 is "significantly inconsistent" with the Fiscal Plan.  A true and correct copy of

the June 25, 2021 letter is attached hereto as **Exhibit 17**.  Nowhere in its June 25, 2021 letter

however, did AAFAF confirm the Governor would not implement the Act, nor did AAFAF state

it would refrain from supporting the Act's implementation.  *See id*.  The Legislature never

responded to the Notification.

**COUNT I**

**INJUNCTION BARRING IMPLEMENTATION OF THE ACT
FOR VIOLATING PROMESA SECTION 108(a)(2)**
(The Governor and AAFAF)

58.     The Oversight Board repeats and realleges every allegation set forth in paragraphs

1 to 57 above as if set forth in full herein.

59.     PROMESA section 108(a)(2) bars the Governor and Legislature from enacting,

implementing, or enforcing any law that would impair or defeat the purposes of PROMESA, as

determined by the Oversight Board.

60.     The Oversight Board's statutory mission is to provide a method for the

Commonwealth to achieve fiscal responsibility and access to capital markets.  *See* PROMESA

§ 101(a).

61.     The Oversight Board determined the Act impairs and defeats the purposes of

PROMESA by, among other things, creating an insufficiently funded pension trust, FACSiR,

which will likely not cover the Act's increased benefit payments.  As set forth above, based on

the Oversight Board's estimates, FACSiR's balance will likely never achieve more than 20%

funded status, and will be insolvent as soon as 2053, and potentially much sooner depending on

the availability of the Act's contemplated funding mechanisms.  The Act also fails to specify what

would happen when FACSiR's assets are depleted, and retirees are left without pension benefits.

62.     In addition, the Act contemplates using contributions from current employees, that

would otherwise be deposited to individual segregated Act 106 accounts, as well as their

19

accumulated Act 106 account balances, to fund the Government's obligations to current retirees. By abandoning the PayGo system and terminating the Act 106 defined-contribution plan, the Act reverts to a pension trust that, like its predecessor ERS, will be woefully underfunded.

63.     Further, the Act contemplates FACSiR will also be funded from the amount of debt service that would otherwise have been paid on the Contested Bonds and 42% of the debt service that would have been paid on the Uncontested Bonds. The Act does not provide for how FACSiR would be funded if these savings do not materialize through judicial action against these bonds. Moreover, even if such savings are realized and paid to FACSiR, the Commonwealth will still be funding the equivalent of 100% of debt service on its prepetition bonds, eliminating any benefits of the debt restructuring.

64.     The Oversight Board also determined the Act impairs or defeats PROMESA's purpose by substantially increasing the Commonwealth's pension liabilities by an estimated $17 billion nominal dollars through FY 2049 arising from restoring previously frozen provisions and subsidizing benefit payments for municipalities and other non-fiscal plan corporations without any plan to pay for those increases, and without coordination with the Oversight Board.

65.     The impact of the Act, as described above, would fundamentally undermine the Commonwealth's ability to achieve fiscal responsibility and access to capital markets, and therefore, in the Oversight Board's determination, impair and defeat the purposes of PROMESA.

66.     The Oversight Board also determined the Act impairs or defeats the purposes of PROMESA because the Act is significantly inconsistent with the Fiscal Plan in violation of PROMESA section 204(a). As set forth above, the Act purports to eliminate the PayGo system, terminate future contributions towards the Act 106 defined-contribution plan, and create FACSiR, which would, in effect, reinstate the failed defined-benefit plans of the past with retirement

benefits that will not be subject to adjustment in the Commonwealth's Title III case.  These measures would effectively eliminate the means by which the Commonwealth would adequately fund pension benefits, as required by PROMESA, and would repeat the same past mistakes that initially led to the insolvency of the pension systems.

67.    The Oversight Board also determined the Act impairs or defeats the purposes of PROMESA because the Defendants failed to comply with PROMESA section 204(a).  The Governor's and AAFAF's Certification determined that the Act is significantly inconsistent with the Fiscal Plan.  Despite the Oversight Board's notification under section 204(a)(3)(A) that it agreed with the Governor's and AAFAF's Certification, and its notification under section 204(a)(4)(B) that these inconsistencies could not be corrected nor could the Government provide an explanation for them that the Oversight Board would find reasonable and appropriate, the Governor has refused to confirm he will refrain from implementing the Act, and the Governor and Legislature have refused to sign a stipulation consenting to its nullification.

68.    The Oversight Board also determined the Act impairs or defeats the purposes of PROMESA because the Defendants failed to comply with PROMESA section 207.  Specifically, the implementation of the Act modifies the Commonwealth's debt by purporting to dictate the treatment of billions of dollars of Commonwealth bond debt, and preventing the Commonwealth government from taking any action to support a plan of adjustment that alters that treatment.  The Act also modifies the Commonwealth's debt by changing frozen pension plans and re-opening the plans to new participants, providing $17 billion in new pension benefits in nominal dollars through FY49, and significantly increasing the Commonwealth's pension obligations, without Oversight Board approval.

69.     The Oversight Board also determined the Act impairs or defeats the purposes of PROMESA because the Defendants failed to comply with PROMESA section 204(c).  The Act necessarily requires reprogramming but the Government has not submitted a reprogramming request to the Oversight Board and the Oversight Board has not provided the Legislature with an analysis that certifies such reprogramming is not significantly inconsistent with the 2021 Fiscal Plan.

70.     Despite the Oversight Board's notice to Defendants of its determination the Act would impair or defeat PROMESA's purposes in violation of PROMESA section 108(a), and its directive not to enact or implement the law, the Governor has refused to confirm he will refrain from implementing the Act, and the Governor and Legislature have refused to sign a stipulation consenting to its nullification.

71.     Under PROMESA section 108(a), Defendants were statutorily barred from enacting or implementing the Act once the Oversight Board determined the Act impaired or defeated the purposes of PROMESA.

72.     Because the Oversight Board determined the Act impairs or defeats the purposes of PROMESA, the Oversight Board is entitled to equitable relief in the form of a mandatory permanent injunction prohibiting the Governor from implementing the Act.

73.     Where, as here, PROMESA section 108(a) already imposes a statutory bar, a judicial injunction must issue without applying the traditional four-factor test for injunctive relief. Regardless, the test would be satisfied.

74.     The Oversight Board is entitled pursuant to PROMESA sections 104(k) and 108(a)(2) to a judicial injunction barring implementation and enforcement of the Act.

## COUNT II

## NULLIFICATION OF THE ACT FOR FAILURE TO SATISFY § 204(a)

75.     The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 74 above as if set forth in full herein.

76.     PROMESA section 204(a)(1) requires the Governor to submit to the Oversight Board new legislation within seven business days of its enactment, and section 204(a)(2) requires the Governor to include with the submission a formal estimate of the law's impact on the Commonwealth's expenditures and revenues and a certification of whether the law is or is not "significantly inconsistent" with the certified fiscal plan.

77.     The Governor's section 204(a) Certification determined that the Act was "significantly inconsistent" with the 2021 Fiscal Plan.

78.     Pursuant to PROMESA section 204(a)(3)(C), the Oversight Board informed the Government that its own analysis had confirmed that the Act was significantly inconsistent with the Fiscal Plan, and that the Act "cannot be corrected to eliminate the inconsistency, nor can the Government provide an explanation for the inconsistency that the Oversight Board will find reasonable and appropriate" as required by section 204(a)(4)(B).  Ex. 16 at 3.  The Oversight Board therefore directed the Governor to refrain from implementing the Act, and directed the Legislature to repeal the Act immediately.

79.     The Government failed to comply with the direction given by the Oversight Board pursuant to PROMESA section 204(a)(4)(B).

80.     The Oversight Board is entitled to an order pursuant to PROMESA section 104(k) and 204(a)(5) enjoining the implementation and enforcement of the Act, and nullifying the Act, on the grounds the Defendants failed to comply with section 204(a).

## COUNT III

### NULLIFICATION OF THE ACT FOR VIOLATION OF § 108(a)(2)
(The Governor and Legislature)

81.     The Oversight Board repeats and realleges every allegation set forth in paragraphs
1 to 80 as if set forth in full herein.

82.     The Oversight Board notified Defendants on January 29, 2021, February 20, 2021,
March 19, 2021, March 25, 2021, and June 28, 2021 that it determined the Act would impair or
defeat PROMESA's purposes and directed the Legislature and Governor not to enact HB 120.
Contrary to PROMESA section 108(a)(2), Defendants knowingly violated its terms and enacted
the Act.

83.     In the Certification, AAFAF stated that the Act "could be interpreted as preventing
the Oversight Board from discharging its duties by barring government cooperation with the
Oversight Board," contrary to PROMESA section 108(a)(2).

84.     The Oversight Board is entitled to an order nullifying the Act.

## COUNT IV

### NULLIFICATION OF THE ACT FOR VIOLATION OF § 207

85.     The Oversight Board repeats and realleges every allegation set forth in paragraphs
1 to 84 as if set forth in full herein.

86.     PROMESA section 207 bars the Government from issuing, guaranteeing,
exchanging, modifying, repurchasing, or redeeming debt (or entering into any similar transaction)
without prior Oversight Board approval.

87.     The enactment, implementation, and enforcement of the Act modifies the
Commonwealth's debt by purporting to dictate the treatment of billions of dollars of

Commonwealth bond debt, and preventing the Commonwealth government from taking any action to support a plan of adjustment that alters that treatment.

88.     The Oversight Board estimates that the enactment, implementation, and enforcement of the Act also modifies the Commonwealth's debt by changing frozen pension plans to provide $17 billion in new pension benefits in nominal dollars through FY49, and significantly increasing the Commonwealth's pension obligations, without Oversight Board approval.

89.     Defendants did not seek or receive prior Oversight Board approval to enact or implement the Act.

90.     In the Act's Certification the Governor stated that the Act "could be interpreted to be in conflict with Section 207 of PROMESA and the Certified Fiscal Plan, since it modifies billions of dollars of debt to retirees without the approval of the Oversight Board."

91.     Pursuant to sections 104(k), 108(a)(2), and 207 of PROMESA, the Oversight Board is entitled to a judicial declaration under 28 U.S.C. § 2201, as well as further relief under 28 U.S.C. § 2202, that the Act is unenforceable and of no effect, and that due to Defendants' violation of PROMESA section 207, Defendants are enjoined from implementing and enforcing the Act, any actions taken under its purported effectiveness must be undone, and the Act shall be deemed a nullity.

**COUNT V**

**NULLIFICATION OF THE ACT FOR FAILURE TO SATISFY § 204(c)**

92.     The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 91 above as if set forth herein.

93.     By AAFAF's own admission in the Certification, the Act increases the Commonwealth's costs by roughly $4.6 billion for the fiscal years covered by the 2021 Fiscal Plan. The Act increases pension payments funded by the Commonwealth by an estimated $17

billion in payments through FY49 including (a) re-opening the plan to future new entrants, (b) restoring benefits previously frozen, and (c) partially funding benefits that would otherwise be covered by municipalities and public corporations. The 2021 Fiscal Plan does not provide funding for or otherwise contemplate the additional payments that result from the Act. As such, the Act necessarily effectuates a reprogramming of funds by appropriating funds for expenses not provided for in the Fiscal Plan.

94.    Further, the Government's estimate of the impact of the Act continues to assume pension payments at levels equivalent to those contained in the Fiscal Plan, without consideration of the modifications the Act makes to the benefit levels provided to plan participants. For example, the pension payments in the Fiscal Plan exclude future payments on account of System 2000 for currently active employees in that plan, because pursuant to the Oversight Board's Plan of Adjustment, their balances will be deposited into their segregated Act 106 accounts thus eliminating future payments. The Government's estimate of the cost of the Act is understated by the future payments that would be owed to over 50,000 Government employees with System 2000 balances.

95.    The Government's estimate of the impact of the Act assumes that the Commonwealth will not achieve the $198 million in savings from FY 2022 to FY 2026 produced by the 2021 Fiscal Plan's restructuring of the pension systems.

96.    The reallocation of funds in the 2021 Fiscal Plan to pay for enhanced retirement benefits under the Act constitutes a reprogramming under section 204(c).

97.    PROMESA section 204(c) prohibits the Legislature from adopting a reprogramming and prohibits any officer or employee of the territorial government from carrying out any reprogramming unless the Oversight Board provides the Legislature with an analysis

certifying that such reprogramming will not be inconsistent with the certified fiscal plan and budget.  § 204(c)(2).

98.    The Oversight Board has not provided the Legislature with the certification required by PROMESA section 204(c)(2) for the Act.

99.    The Act was enacted and will be implemented in violation of PROMESA section 204(c), which bars the Legislature from adopting, and bars all officers and employees of the Commonwealth from carrying out any reprograming, unless the Oversight Board certifies it will not be inconsistent with the certified fiscal plan and budget.

100.    In the Act's Certification the Governor stated that the Act would require "reprograming budgeted resources since the current Certified Budget and the Oversight Board's proposed budget for FY22 do not contemplate resources for the retirement structure established" in the Act.  Ex. 15 at 6.  The Oversight Board has neither received a request to reprogram nor granted the Government permission to do so.

101.    The Oversight Board is entitled to an order pursuant to PROMESA section 104(k) enjoining the implementation and enforcement of the Act, and nullifying the Act and any purported reprogramming implemented or to be implemented under its auspices, on the ground that the Governor failed to comply with section 204(c).

## COUNT VI

**ENJOINING IMPLEMENTATION OF THE ACT FOR VIOLATION OF THE SUPREMACY CLAUSE, U.S. CONST. ART. VI § 2 AND § 4 OF PROMESA**

102.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 101 above as if set forth herein.

103.    As set forth above, the Act, and its provisions, are inconsistent with PROMESA. As such, PROMESA preempts the Act, and its enforcement or implementation would violate the

Supremacy Clause of the United States Constitution. U.S. Const. art IV, § 2 and § 4 of PROMESA. Provisions of the Act that are inconsistent with, and preempted by, PROMESA include, but are not limited to, the following:

a. Article 2.01(b) of the Act requires the Commonwealth government to "reject[ ] . . . any Adjustment Plan or Restructuring Agreement that reduces . . . pensions . . . more than they had already been reduced . . . prior to the filing of the bankruptcy petition on May 3, 2017;"

b. Article 2.01(i) of the Act requires the Commonwealth government to "reject any Adjustment Plan or Restructuring Agreement whose feasibility or payment guarantee for debt service requires increasing or imposing regressive taxes, tariffs or other mechanisms that raise the cost of water, electricity, transportation, education and other essential public services in order to collect public revenues from the pockets of working families and pensioners in Puerto Rico."

c. Article 2.01(j) of the Act requires the Commonwealth government to "reject any Adjustment Plan or Restructuring Agreement whose feasibility or payment guarantee for debt service requires cuts to essential public services provided by the Government of the Commonwealth of Puerto Rico."

d. Article 2.01(l) of the Act requires the Commonwealth government to "clearly and unequivocally state that no action will be taken to permit confirmation of any Adjustment Plan that is inconsistent with the provisions" of the Act.

e. Article 2.01(n) of the Act requires the Commonwealth government to "guarantee that no part of the funds and resources of the State government . . . shall be directed towards the achievement of any Adjustment Plan inconsistent with the provisions" of the Act.

f. Article 2.04 requires that AAFAF, "[w]hile performing its role as fiscal agent, financial advisor, information agent, or representative of the Government of Puerto Rico in the renegotiation or restructuring of the public debt ," to refrain from "propos[ing], endors[ing], creat[ing], recommend[ing], or otherwise us[ing] its powers or authority to advance any Adjustment Plan or Restructuring Agreement that is contrary to" the provisions of the Act.

g. Article 2.14(a) requires the Commonwealth government to "act only to enable an Adjustment Plan that complies with the provisions" of the Act.

h. Article 2.14(b) requires AAFAF to "direct all of its resources, personnel, and specialized contractors currently committed to matters related to Title II, Title III, or Title VI of PROMESA, to draft a proposal for an Adjustment Plan, and its corresponding disclosure document, that is consistent with the provisions" of the Act.

28

104.    Individually and collectively the foregoing sections of the Act are inconsistent with PROMESA in that they (a) require the Commonwealth government to act to prevent implementation of plans of adjustment PROMESA allows, (b) attempt to coerce the Oversight Board to propose a plan of adjustment consistent with the terms required by the Act, and (c) expressly bar use of Commonwealth funds and resources to implement any plan of adjustment formulated by the Oversight Board and confirmed by this Court, if the plan of adjustment is not a plan that complies with the Act.

105.    The Oversight Board is entitled to an order pursuant to Article VI, section 2, of the United States Constitution, and section 4 of PROMESA enjoining the implementation and enforcement of the Act, on the ground the Act, including each of the provisions set forth in paragraph 103, is preempted by PROMESA.

106.    The Oversight Board reserves its right to seek penalties and sanctions for the Defendants failure to comply with the U.S. Constitution and PROMESA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays that judgment be entered for it and against Defendants, and for the following relief:

A.      That each claim be sustained;

B.      That the Act, and any actions taken to implement the Act, be nullified;

C.      That Defendants be permanently enjoined from implementing and enforcing the Act; and

D.      Granting Plaintiff such other and further relief as the Court finds just and proper.


[*Remainder of Page Intentionally Left Blank*]

Dated: July 2, 2021
San Juan, Puerto Rico

*/s/  Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García Benítez
USDC No. 203708
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email: hermann.bauer@oneillborges.com
              carla.garcia@oneillborges.com


*/s/  Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Mark D. Harris (*pro hac vice*)
Hadassa R. Waxman (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
              mharris@proskauer.com
              hwaxman@proskauer.com

*/s/  Timothy W. Mungovan*
Timothy W. Mungovan (*pro hac vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Tel:  (617) 526-9600
Fax:  (617) 526-9899
Email:  tmungovan@proskauer.com

*Attorneys for the Financial Oversight and*
*Management for Puerto Rico*

## VERIFICATION

I am the Executive Director of the Financial Oversight and Management Board for Puerto Rico.  I have read the foregoing Complaint and know the contents thereof, and, based on my personal knowledge, I verify under penalty of perjury that the same are true and correct.

Executed on July 1, 2021

_____
Natalie A. Jaresko
Executive Director
Financial Oversight and Management Board
for Puerto Rico