**(Per #17199) Objection Deadline for motion:  July 19, 2021, at 5:00 p.m. (AST)**
**Hearing Date for motion:  August 4, 2021, at 9:30 a.m. (AST)**
**(Per #17199, oral argument will be August 18, 2021)**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al*.,

        Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

------------------------------------------------------------------x

**[Motion related to Docket #17199, #16918 and #16910, as well as #16756, #16757 and #16758
concerning proposed confirmation procedures urged by Debtors]**

**NOTICE OF HEARING AND MOTION OF INDIVIDUAL BONDHOLDER FOR AN
ORDER DIRECTING THE APPOINTMENT OF A COMMITTEE TO REPRESENT
RETAIL INVESTORS IN THE EIGHT RETAIL INVESTOR CLASSES IN CONNECTION
WITH THE PROPOSED PLAN AND IN PROCEEDINGS RELATED TO CONFIRMATION**

Dated:  July 6, 2021

**PLEASE TAKE NOTICE** that:

1. On July 6, 2021, movant served the subject motion.

2. Any response or objections to the motion must be served upon:

   > Peter C. Hein, pro se
   > 101 Central Park West, Apt. 14E
   > New York, NY 10023
   > petercheinsr@gmail.com

   as well as all other parties entitled to notice under the Court's rules and procedures.

3. Per #17199, the Objection deadline is **July 19, 2021 at 5 p.m. (AST)**.

4. The date of the hearing for which the motion is noticed is **August 4, 2021**. However, per #17199, oral argument will be heard on August 18, 2021.

5. The relief requested in the Motion may be granted by the Court without a hearing if no objection is timely filed and served in accordance with #17199 and the Court's Case Management Procedures.

**MOTION OF INDIVIDUAL BONDHOLDER FOR AN ORDER DIRECTING THE
APPOINTMENT OF A COMMITTEE TO REPRESENT RETAIL INVESTORS
IN THE EIGHT RETAIL INVESTOR CLASSES IN CONNECTION WITH
THE PROPOSED PLAN AND IN PROCEEDINGS RELATED TO CONFIRMATION**

This motion seeks the relief described below and in the accompanying [proposed] order, and as described in the accompanying "Memorandum in Support of Motion of Individual Bondholder for an Order Directing the Appointment of a Committee to Represent Retail Investors in the Eight Retail Investor Classes in connection with the proposed Plan and in Proceedings related to Confirmation", namely:

I.      An order directing the appointment of a committee to represent Retail Investors in the eight Retail Investor classes (classes 6, 8, 10, 15, 28, 35, 38 and 44, as defined and described in the proposed Fourth Amended Title III Plan, Docket #17194) in connection with the proposed Plan and in proceedings related to confirmation.

II.     Any other relief that is just, proper or appropriate to effectuate the objective of this motion.  In particular, if and to the extent this Court believes it appropriate or necessary, this Court should treat the subject motion as a motion to renew in whole or in part my prior motion (#6128) based on new developments and circumstances and, upon such renewal, to grant the relief requested by this motion.

A prior motion was made seeking an order directing the appointment of a committee to represent individual bondholders or, in the alternative, an order directing the appointment of a committee to represent all bondholders (with appropriate representation of individual bondholders), whose members and retained professionals would owe duties to individual bondholders.  Docket #6128, #6487.  The Court denied that motion.  Docket #6534.  However, based on new developments and circumstances, it is appropriate for the Court to now order the appointment of a committee to represent Retail Investors in the eight Retail Investor classes:

- Debtors have proposed a Plan that specifically defines Retail Investor and sets up eight separate Retail Investor classes comprised of individuals whose aggregate holdings of GO bonds are $1 million par amount or less and/or whose aggregate holdings of PBA bonds are $1 million par amount or less.

- Debtors' proposed Plan has a coercive, contingent and not predictable Retail Support Fee provision which may most appropriately be addressed through collective action by what are thousands of currently unorganized Retail Investors in the eight Retail Investor classes, since whether a particular Retail Investor receives the fee is dependent upon the vote of other bondholders in his or her class.

- Debtors have proposed a Plan and confirmation procedures that make it necessary to have adequate representation of these Retail Investors in these eight Retail Investor classes in connection with the proposed Plan and in proceedings related to confirmation, through a committee whose members and professionals owe fiduciary duties to the Retail Investors in the eight Retail Investor classes.

- Other circumstances discussed in the accompanying memorandum likewise support ordering the appointment of a Retail Investor Committee.

As explained in the accompanying "Memorandum in Support of Motion of Individual Bondholder for an Order Directing the Appointment of a Committee to Represent Retail Investors in the Eight Retail Investor Classes in connection with the proposed Plan and in Proceedings related to Confirmation," these new developments and circumstances, and other related developments, warrant the Court at this time ordering the appointment of a committee to represent members of the eight Retail Investor classes in connection with the proposed Plan and in proceedings related to confirmation, notwithstanding the denial of my prior motion (#6128).

This motion was originally made as a cross-motion (#16910).

By order dated June 10, 2021 (#16918) this Court denied the cross-motion without prejudice to re-noticing the motion for an Omnibus hearing.

By order dated June 30, 2021 (#17199) this Court set a schedule for this motion.

July 6, 2021

_____/s/ Peter C. Hein_____
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
petercheinsr@gmail.com
917 539 8487

**[PROPOSED] ORDER GRANTING MOTION FOR AN ORDER DIRECTING THE
APPOINTMENT OF A COMMITTEE TO REPRESENT RETAIL INVESTORS IN THE
EIGHT RETAIL INVESTOR CLASSES IN CONNECTION WITH THE PROPOSED PLAN
AND IN PROCEEDINGS RELATED TO CONFIRMATION**

[Potential alternative language in brackets below]

The Court has considered the Motion of Individual Bondholder for an Order Directing the
Appointment of a Committee to Represent Retail Investors in the Eight Retail Investor Classes in
connection with the proposed Plan and in Proceedings related to Confirmation (Docket Entry No.
_____ in Case No. 17-3283), filed by Peter C. Hein, and the opposing and reply papers thereon, and
has heard oral argument of the motion.[1]

It is hereby ordered that the motion for an order directing the appointment of a committee to
represent Retail Investors in the eight Retail Investor classes (classes 6, 8, 10, 15, 28, 35, 38 and 44,
as defined and described in the proposed Fourth Amended Plan, Docket #17194) in connection with
the proposed Plan and in proceedings related to confirmation, is granted.

It is further ordered that the committee to represent Retail Inventors in the eight Retail
Investor classes, classes 6, 8, 10, 15, 28, 35, 38 and 44, in connection with the proposed Plan and in
proceedings related to confirmation shall be appointed and constituted as promptly as practical.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and
the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the
(i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of
Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy
Case No. l 7-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways
and Transportation Authority ("HTA") (Bankruptcy Case No. l 7-BK-3567-LTS) (Last Four Digits of
Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth
of Puerto Rico ("ERS") (Bankruptcy Case No. l 7-BK-3566-LTS) (Last Four Digits of Federal Tax
ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. l 7-BK-4780-
LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority
("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801)
(Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

The committee shall be empowered to retain professionals to assist it [subject to any conditions the Court may specify]

This Order resolves Docket Entry No. _____ in Case No. 17-3283.

SO ORDERED,

Dated: _____ __, 2021

_____
LAURA TAYLOR SWAIN
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

        Debtors.

-------------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)


**[Motion related to Docket #17199, #16918 and #16910, as well as #16756, #16757 and
#16758 concerning proposed Confirmation Procedures urged by Debtors]**

**MEMORANDUM IN SUPPORT OF MOTION OF INDIVIDUAL BONDHOLDER FOR
AN ORDER DIRECTING THE APPOINTMENT OF A COMMITTEE TO REPRESENT
RETAIL INVESTORS IN THE EIGHT RETAIL INVESTOR CLASSES IN
CONNECTION WITH THE PROPOSED PLAN AND PROCEEDINGS RELATED TO
CONFIRMATION**

Dated:  July 6, 2021

## Table of Contents

Page

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT:  THE COURT SHOULD ORDER THE APPOINTMENT OF A
COMMITTEE TO REPRESENT RETAIL INVESTORS IN THE EIGHT
RETAIL INVESTOR CLASSES ........................................................................1

A.    New Developments warrant ordering the appointment of a committee to
Represent Retail Investors in the Eight Retail Investor Classes. .......................1

1.    Retail Investors are separately classified but, unlike others, do not have a
committee representing them or counsel whose costs are being directly or
indirectly paid by Debtors...........................................................................2

2.    The nature of the Plan and the confirmation procedures proposed by
Debtors underscore why a Retail Investors committee should be
appointed...................................................................................................4

a.    The current proposed Plan (even as clarified in response to my
June 9 and 15 objections to the Disclosure Statement) provides for
the exchange of at least 13 splintered securities for each single
current bond position, a structure that is destructive of value to
Retail Investors. ...........................................................................4

b.    The coercive, contingent and not predictable nature of the "Retail
Support Fee," potentially most appropriately addressed through
collective action, makes a committee imperative. .......................5

c.    The proposed Plan presents other issues of specific concern to
Retail Investors. ...........................................................................6

d.    The complexity of the proposed Plan and Disclosure Statement is
beyond the capabilities of the typical Retail Investor to evaluate. ..............7

e.    FOMB's misuse of the "confidential" component of the data room
and other impediments to individuals' ability to obtain the
information needed to make informed decisions. .......................10

f.    Delays in receipt of Plan documents and notices mailed to
individual Retail Investors make involvement of a committee and
associated professionals imperative in order for Retail Investors to
have appropriate information on a timely basis in light of Debtors'
proposed time frames.................................................................12

g.      The confirmation procedures Debtors propose preclude meaningful
participation by individual bondholders. ..................................................13

B.      The Court has the authority to order the appointment of a Retail Investors
Committee under 11 U.S.C. §1102(a)(2)...........................................................14

1.      Retail Investors' Constitutional "first claim" priority status and secured
position is not a reason to decline to order the appointment of a Retail
Investor Committee...............................................................................14

2.      Any argument that a handful of the Retail Investors may be capable of
representing themselves is not a reason to decline to order the appointment
of a Retail Investor Committee. ...........................................................16

3.      Retail Investors share a commonality of interest irrespective of the specific
series of bonds they may hold...............................................................17

4.      Appointment of a Retail Investor Committee benefits the Court. .........17

5.      Under §1102(a)(2) the Court makes the determination of whether to order
the appointment of an additional Committee.........................................18

C.      Reasonable controls on the Retail Investors Committee's expenses can be set. ..............20

CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Beker Indus. Corp.*,
    55 B.R. 945 (Bankr. S.D.N.Y. 1985)..................................................... 14-15, 16, 17

*In re Diversified Capital Corp*,
    89 B.R. 826 (Bankr. C.D. Cal. 1988)...................................................... 14

*In re McLean Indus., Inc.*,
    70 B.R. 852 (Bankr. S.D.N.Y. 1987).................................................... 18, 19

*Slattery Co. v. U.S.*,
    231 F.2d 37 (5th Cir. 1956) ............................................................ 15

*U.S. v. Contra Costa County Water District*,
    678 F.2d 90 (9th Cir. 1982) ........................................................... 15

**Statutes**

11 U.S.C. §1102(a)(1)........................................................................ 19

11 U.S.C. §1102(a)(2)................................................................... 14, 18, 19

**Rules**

F.R. Evid. 408 ............................................................................. 15

## TABLE OF ABBREVIATIONS AND CITATIONS

#                                Docket entries are referred to in the form of "#__"

Peter C. Hein, pro se, submits this motion seeking an order directing the appointment  of a committee to represent Retail Investors in the eight Retail Investor classes in connection with the proposed Plan and in proceedings related to confirmation.

## PRELIMINARY STATEMENT

As noted in my Response and Objection to Debtors' Application for Approval of Disclosure Statement (#16908, page-1&n.1 and Hein Decl. Exs. A-D),[2] Commonwealth sold its bonds to individual investors nationwide, including in the 50 states, years before PROMESA was even in prospect.[3]  After these proceedings began, approximately 1,700+ individual bondholders filed notices of participation.[4]  Individual bondholders also filed proofs of claim.

Retail Investors are entitled to be on a level playing field with other creditors (including public employees, retirees and retirement plan participants, as well as PSA creditors) whose expenses are being paid by Debtors directly or indirectly (*e.g.*, through administrative expense claims and/or by agreed payments to selected creditors, *see* Plan Art. III).

I previously moved for an ordering directing the appointment of a committee to represent individual bondholders or, in the alternative, at least a committee to represent all bondholders whose members and retained professionals would owe duties to individual bondholders and on which individuals would be represented.  (Docket #6128, #6487).  This Court denied that motion.  (Docket #6534).

### ARGUMENT:  THE COURT SHOULD ORDER THE APPOINTMENT OF A COMMITTEE TO REPRESENT RETAIL INVESTORS IN THE EIGHT RETAIL INVESTOR CLASSES

### A.   New Developments warrant ordering the appointment of a committee to Represent Retail Investors in the Eight Retail Investor Classes.

New developments warrant that this Court re-evaluate the need for a committee to represent Retail Investors, and order the appointment of a committee to represent members of the eight Retail

---

[2]  #16908-page-1-n.1,48,63-64,70,88-90,98-to-112-of-178.

[3]  #16908-page-1-n.1,48,63-64,70,88-90,98-to-112-of-178; #9508-page-11&n.12-to-12; #9508-20, #9508-21, #9508-22-page-10-of-12.

[4]  #7154-page-3&n.6-of-14; #7450-page4-to-5&n.2-of-19.

Investor classes in connection with the proposed Plan and in proceedings related to confirmation. The eight Retail Classes are Classes 6, 8, 10, 15, 28, 35, 38 and 44. (*E.g.*, #17194-page-92-to-94-of-244, Plan §4.1).

        **1.**      **Retail Investors are separately classified but, unlike others, do not have a committee representing them or counsel whose costs are being directly or indirectly paid by Debtors.**

Plan proponents have now proposed eight separate classes of Retail Investors (as defined and described in the Plan, #17194) who are individuals with aggregate holdings of GO bonds of $1 million in par amount or less and/or aggregate holdings of PBA bonds of $1 million in par amount or less. In addition, as discussed in A.2.b below, the Plan has a coercive, contingent and not predictable Retail Support Fee provision which may most appropriately be addressed through collective action by the thousands of currently unorganized Retail Investors in eight Retail Investor classes.

Retail Investors in the eight Retail Investor classes are a significant group of creditors, but — unlike PSA bondholders, public employees and retirees and unsecured creditors — do not have a committee representing them or counsel whose costs are being directly or indirectly paid by Debtors (such as through provision for administrative expense claims or cash payments to be made on the Effective Date as agreed through PSAs, *e.g.*, #17192-2-page-43-of-134 (§6.1(a)); #17192-6-page-18-last-¶,47-last-¶-of-65; #17194-Plan-§§3.1-to-3.4; #17192-pages-385-to-389-of-600).

Hundreds of millions of dollars have been paid or are agreed to be paid to other creditors and their professionals. For example:

- Unsecured creditors, who do ***not*** have the GO bondholders' Constitutional "first claim" priority, or Constitutional and statutory liens, have a committee — comprised of at least two unions who represent public sector employees (AFT and SEIU), as well as trade creditors — whose counsel and various advisors and consultants appear to have incurred about **$89 million** in fees and costs:

- o UCC's primary counsel appear to have incurred over $66 million in fees and costs to date (based on #16067-page-5-of-57 and assuming the run rate continued after 1-31-2021).

- o UCC has a court-approved "financial advisor" who has incurred over $18 million in fees and costs (#16066-page-5-to-10-of-27).

- o UCC has a second, Puerto Rico-based, law firm (over $4.1 million in fees and costs to date) (#16064-1-page-1-to-6-of-45).

- o Approximately $850,000 in compensation and expenses has been incurred by a "communications advisor" to UCC, who has (among other things) "strategized about outreach efforts" in connection with "the recent elections in Puerto Rico, which resulted in the election of new officials" and "advise[d] the Committee and its advisors with respect to public relations issues" (*e.g.*, #16065-pages-5,14,18-19-of-22).

- There is a committee to represent retirees — who likewise lack the Constitutional "first claim" priority and the Constitutional and statutory liens of GO bondholders — whose counsel, advisors and consultants appear to have incurred about **$39 million** in fees and costs, including:

- o A primary counsel has incurred about $20 million in fees and costs to date (*e.g.*, #16054-page-2-of-35).

- o A financial advisor (over $11.8 million in fees and costs, #16055-page-2-of-22).

- o A Puerto Rico law firm (over $3.4 million in fees and costs, #16056-page-2-of-27).

- o An actuarial consultant (over $3 million in fees and costs, #16057-page-2-of-23).

- o An "Information agent" (over $1 million in fees and costs, #16058-page-2-of-23).

- The Plan contemplates payment of $10 million to AFSCME, a public employee union, **plus** payment of the union's professional fees and expenses. *E.g.*, #17192-page-57-of-600; #17192-6-page-18-last-¶,47-last-¶-of-65; #17194-Plan §3.4.

3

- Consummation Costs are to be paid to PSA bondholders, who FOMB struck a deal with, amounting to 1.5% of the aggregate amount of their Commonwealth, PBA and Commonwealth guaranteed bond claims, and part of an overall $350 million cash payment (#17192-pages-48,385-to-389-of-600; #17194-Plan §3.3).  It appears that the Consummation Costs component itself is over $175 million.

Retail Investors are not being represented by the institutions who negotiated the current Plan. These institutions do not have a fiduciary duty to the Retail Investors.  Indeed, the Plan is structured in a fashion that literally destroys value for Retail Investors who end up with at least 13 splintered securities in exchange for each single current bond position, as discussed below.  Furthermore, Initial GO/PBA PSA Creditors negotiated — for themselves — monies allocated in proportion to their bond holdings that Retail Investors do not share, such as the Consummation Costs.

> **2.  The nature of the Plan and the confirmation procedures proposed by Debtors underscore why a Retail Investors committee should be appointed.**

The nature of the Plan and the confirmation procedures proposed by Debtors underscore that it is necessary that a committee be appointed to represent the interests of Retail Investors in connection with the proposed Plan and in proceedings related to confirmation.  Among other things:

> **a.  The current proposed Plan (even as clarified in response to my June 9 and 15 objections to the Disclosure Statement) provides for the exchange of at least 13 splintered securities for each single current bond position, a structure that is destructive of value to Retail Investors.**

The current proposed Plan is structured in a fashion that literally destroys value to Retail Investors, since (even as clarified in response to my June 9 and 15 objections to the Disclosure Statement) the Plan provides at least 13 splintered securities to be issued in exchange for each single current bond position.  (*See also* A.2.d, below, #16977-page-7-to-9-of-20).  To illustrate the impact of this structure on Retail Investors, consider my situation.  I have five GO bond positions of 100,000 par each and one PBA position of 200,000 par.  Under the proposed Plan, I would end up with at least 78 separate splintered positions.  None of these would be marketable at appropriate

4

price levels.  Any attempt to sell the "splinter" bonds or securities would subject me to significant market discounts due to the spreads, transaction fees and/or other costs involved.  And my positions are 100,000 par (or, in one case, 200,000 par), which may be on the high-side for the typical member of the Retail Investor classes.  The impact on a bondholder with positions of only 5000 or 10,000 or 25,000 par would be even more dire.  (#16977-page-8-of-20).  Whatever the attraction of the splinter bond concept to those who negotiated the Plan, it results in a massive destruction of value to Retail Investors.  The eight Retail Investor classes have an interest in this critical issue that is not shared by others.

> **b.  The coercive, contingent and not predictable nature of the "Retail Support Fee," potentially most appropriately addressed through collective action, makes a committee imperative.**

Even the supposed "benefits" of the proposed Plan to Retail Investors are not what they may superficially seem.  Thus, from the point of view of a Retail Investor, the "Retail Support Fee" is:

- **Coercive**:  Plan §1.407 and §3.6, and corresponding provisions governing the treatment of each of the eight Retail Investor classes (§§10.1, 12.1, 14.1, 19.1, 32.1, 39.1, 42.1, 48.1), provide that if a particular Retail Investor class does not vote to accept the Plan, the "Retail Support Fee" otherwise allocable to Retail Investors in such class is reallocated, including to GO/PBA PSA Creditors.  This not only poses an issue as to whether such a Plan provision is improperly coercive to Retail Investors, but also underscores the need for Retail Investors to have a committee to assist them in navigating this coercive element of the Plan.

- **Contingent and not predictable**:  Compounding the coercive nature of the Retail Support Fee provision is that whether or not a particular Retail Investor will receive the Retail Support Fee is contingent on the decisions and votes of others and not something any individual Retail Investor on their own can choose (or not).  This coercive Retail Support Fee provision may most appropriately be addressed through collective action by

thousands of currently unorganized Retail Investors in the eight Retail Investor classes. Again, this underscores the need for a committee.

- **Not quantified as a percent of par in relation to the (unspecified) total amount of Retail Bond claims**:  Further compounding the difficulties a Retail Investor faces under the proposed Plan as a consequence of the coercive, contingent and unpredictable nature of the Retail Support Fee, the Plan and Disclosure Statement do not even quantify what each Retail Investor would receive as a percent of par — even assuming its class approved the Plan — since there is no specification of what the total amount of Retail Bond Claims is and thus no way to assess what the amount of the Retail Support Fee as a percent of par will be for any individual Retail Investor.  Plus, there is no way to know how other Retail Investors in other Retail Investor classes will vote.

Furthermore, the current structure of the Retail Support Fee — whereby all or part of the Retail Support Fee could revert to GO/PBA PSA Restriction Fee Creditors — creates a dynamic whereby confusion among Retail Investors, potentially increasing the likelihood of rejection by Retail Investor classes, inures to the benefit of GO/PBA PSA Creditors.  Putting aside for the moment whether this structure of the Retail Support Fee is legal and proper, at the very least it underscores the need for a committee to represent Retail Investors in the eight Retail Investor classes.

> **c.      The proposed Plan presents other issues of specific concern to Retail Investors.**

Other issues that the proposed Plan presents that are of particular concern to Retail Investors include:

- Whether fractional bonds will be issued (#16977-page-9-of-20).
- What the impact of the loss of marketability of the splinter bonds will be on the value of what is received by a Retail Investor under the Plan.
- Whether the bonds to be issued will all be tax-exempt or whether there will be a future exchange of taxable bonds into tax-exempt bonds (#16977-page-10-to-11-of-20).

6

- The effect of Debtors' proposal of different (and later) record dates for Bond Claims than had been used in the COFINA case and that are being used for other claims in this case. Among the concerns:  under Debtors' proposal, Retail Investors who vote are restricted from transferring bonds through the Effective Date of the Plan, whereas institutional bondholders who vote are apparently released from restrictions almost immediately following the voting deadline.  *See* #16909-page-24-to-27-of-44-Point I.I; #16756-page-101-of-364.

- The tax consequences of an individual retaining his or her current position versus the tax consequences of the exchange pursuant to the Plan (#16977-11-of-20).

- The discount rate used to value the future principal and interest on the new securities to be issued under the Plan (#16977-page-11-to-12-of-20).

- Debtors' willingness to pay, both now and in the future.

- Whether Debtors are preferring other creditors, including individuals who are public employees and retirement system participants, who lack the Constitutional "first claim" priority and Constitutional and statutory secured status of individuals who are Retail Investors.

- The extent of Debtors' ability to pay.

> **d.    The complexity of the proposed Plan and Disclosure Statement is beyond the capabilities of the typical Retail Investor to evaluate.**

The complexity of the 2744 pages of the proposed Plan and Disclosure Statement and their associated exhibits is beyond the capabilities of the typical Retail Investor to evaluate. Consequently, a committee is needed for Retail Investors, with professionals to assist them.  The following example — relating to the important issues of maturity and interest rates and numbers of bonds to be distributed to Retail Investors in the eight Retail Investor classes — helps illustrate the problem.

As noted in points I.B.2 and I.C.2 of my "Response and Objection of Individual Bondholder to Debtors' Application for Approval of Disclosure Statement" (#16908-page-20-to-21,27-of-178), the then most recent version of the Disclosure Statement (filed May 11, 2021, pertaining to the Third Amended Plan) was inaccurate in material respects, including the following:

- The May 11, 2021 version of the Disclosure Statement stated that New GO Bonds will be issued with "eleven (11) different maturity dates" and "the principal amounts, maturities, interest rates, and amortization schedules for the New GO Bonds are as shown in Exhibit J to the Plan."  #16741-page-59,432-of-564-DS-47,420.  In my June 9 Objection to the Disclosure Statement, I pointed out that Exhibit J to the Plan (#16740-1-page-218-of-234) is headed "Description of CVI Terms and Waterfall Provisions"; it does **not** have the information the Disclosure Statement says it does.  (*See* #16908-page-20-to-21-of-178).

- The May 11, 2021 version of the Disclosure Statement also stated that "[t]o the extent the Government Parties and the Initial PSA Creditors determine during the period up to and including the Effective Date to modify the coupons set forth on Exhibit J to the Plan, the amount of par New GO Bonds will either increase or decrease…subject to the amount of the maximum annual debt service provided for in Exhibit J to the Plan."  Docket#16741-page-41-of-564 (DS-29).  However, as noted, Exhibit J to the Plan is "Description of CVI Terms and Waterfall Provisions."  There is no annual debt service cap in Exhibit J (just caps on CVI payments).  (#16908-page-27-of-178).

A new version of the Disclosure Statement (dated June 29, 2021) attempted to address the issues I raised, changing a reference in the Disclosure Statement from Exhibit J to Exhibit I to the Plan.  *See* #17187-page-100-of-716; #17192-page-64-of-600-DS-50.  But Exhibit I, still, does not provide the information a Retail Investor needs, which would include the terms and amount (per 100,000 par of existing bonds) of each maturity of new GO bonds the Retail Investor will receive. There is no way for a Retail Investor to tell from Exhibit I the amount (per 100,000 par of existing

bonds) of new GO bonds of each maturity the Retail Investor will receive.  That key information simply does not appear on Exhibit I.

In addition, Exhibit I conflicts with the Disclosure Statement text reference to "eleven (11) different maturity dates" (#17192-page-64-of-600-DS-50).  Exhibit I is confusing, but I interpret it as implying that there will be 10 maturities of tax-exempt coupon bonds issued to Retail Investors in the 50 states (#17194-page-225-of-244).  There will also be one, higher yielding 2041 maturity taxable coupon bond issued (#17194-page-226-of-244).  And there are two Capital Appreciation Bond (zero coupon) maturities (#17194-page-227-of-244).  One infers Retail Investors in the 50 states will be getting, at least, splinters of 10 tax-exempt coupon maturities, 2 zero coupon maturities, and one CVI.  Perhaps FOMB justifies the "eleven" reference on the theory there is an overlap between the coupon and zero maturities, but the coupon bonds and zeros for a given maturity year are entirely different bonds, thus contributing to the proliferation of splinter bonds to Retail Investors.

Furthermore, it is not clear whether the newly added reference to Exhibit I to the Plan in the June 29, 2021 Disclosure Statement now means that the Annex 1 (to Exhibit I to Exhibit B to the Disclosure Statement) (#17192-2-page-129-of-134) schedule of current interest bonds and capital appreciation bonds, listing 10 coupon bonds and 8 zero bonds, is inoperative.  The reference in the Disclosure Statement to the potential for the Government Parties and Initial GO/PBA PSA Creditors to modify the coupons on the New GO Bonds has now also been changed to Exhibit I to the Plan, not Exhibit J (*see* #17192-page-45-of-600-DS-31).  But that page of the Disclosure Statement still refers to footnote 8 to Annex 2-A to Exhibit I to the GO/PBA PSA (Exhibit B to the Disclosure Statement).  So is one to conclude that while footnote 8 to Annex 2-A to Exhibit I to Exhibit B to the Disclosure Statement is still operative, Annex 1 to Exhibit I to Exhibit B to the Disclosure Statement is no longer operative?

By changing the Exhibit reference in response to my June 9 objection (#16908-page-20-to-21,27-of-178) Debtors acknowledge the May 11, 2021 iteration of the Disclosure Statement was inaccurate.  Nevertheless, despite making some changes, the Disclosure Statement still does not

make a clear and forthright disclosure of what securities, in what amounts per 100,000 par of existing bonds, Retail Investors will receive.  *Compare* #16908-page-26-to-27-of-178.

Also, the fact the May 11, 2021 version of the Disclosure Statement was admittedly (#17187-page-100-of-716) inaccurate in the respects I note above — matters that go to important issues such as (i) the maturity and interest rates and number of bonds to be distributed to Retail Investors, and (ii) where the maximum annual debt service is specified — despite the multiple prior iterations and prior corrections of these documents, shows that even the people who wrote the documents find it challenging to keep all of this straight.  *A fortiori*, one cannot expect individual bondholders in the eight Retail Investor classes to even begin to make sense of this material without the assistance of a committee.

> **e.   FOMB's misuse of the "confidential" component of the data room and other impediments to individuals' ability to obtain the information needed to make informed decisions.**

One appropriate function of a Retail Investor committee (among others) would be to ensure that pertinent information is made available to Retail Investors so they can make informed decisions.  FOMB's repeated misuse of the "confidential" component of the data room, and other impediments to individuals' ability to make meaningful use of the data room, underscore the need for a committee to represent Retail Investors.

I addressed problems with the utility of the data room from the perspective of individual investors in my prior filings.  *E.g.*, #16909-page-18-to-24-of-44; #16387-page-4-to-10-of-22.  In my June 9, 2021 filing I specifically noted that there was no plausible reason that numerous documents were being claimed to be confidential, and detailed how FOMB was claiming "confidential" status in the data room for documents that appear identical to documents Puerto Rico publicly discloses. #16909-page-22-to-24-of-44.

FOMB persists in claiming confidential treatment for publicly disclosed documents. Thus, on June 25, 2021 at 10:00 pm, AAFAF posted on EMMA a document described as FOMB's "public disclosure of claim amount and corresponding outstanding principal amount by CUSIP

number and/or loan, reflecting claims through applicable petition dates, for claims in Classes 1

through 47, 56 through 59, and 62 of the Third Amended Plan of Adjustment."

https://emma.msrb.org/P31428726-P31110213-P31520907.pdf.

Two days later, on June 27 at 2:18 PM I received an email notification that "new

document(s) have been uploaded" to the data room and may be found in the folder

"Confidential\Information Disclosed to Official Committee of Unsecured Creditors in Connection

with Disclosure Statement Discovery Requests."  When I logged into the data room on June 27, I

discovered two documents were posted in this folder.  Recognizing FOMB claims these two

documents are confidential, albeit I dispute that there is any bona fide basis for that claim, I will be

circumspect in what I say; the Court should access the data room and view these documents itself

and make its own evaluation of whether the claim of confidential treatment is legitimate.

One of the two "confidential" documents appears identical to what AAFAF had publicly

posted on EMMA on June 25:  both documents are 17 pages; both are numbered in the lower right

corner in the form "Page 1 of 17" (et seq.); both have 8 vertical columns of information; both start

with the same CUSIP entry and end with the same Loan Agreement entry.  What conceivable basis

is there for claiming "confidential" treatment for a document AAFAF describes as FOMB's "public

disclosure" of information and two days earlier had posted publicly on EMMA?

The second document is a nine page typed document with two columns of text.  The left

column appears to simply quote from various UCC requests.  The right column contains a narrative

response by FOMB.  Typically, FOMB simply refers to public information (*e.g.*, particular sections

of, or exhibits to, the Plan or the Disclosure Statement) or other folders in the data room.  The

handful of snippets of information provided, such as the aggregate amount of the initial PSA

creditors' claims as of the date of the PSA, is the type of information that should have been disclosed

in the Disclosure Statement.  I see nothing on this nine-page word document that warrants

confidential treatment.

      **f.**      **Delays in receipt of Plan documents and notices mailed to individual Retail Investors make involvement of a committee and associated professionals imperative in order for Retail Investors to have appropriate information on a timely basis in light of Debtors' proposed time frames.**

The practical reality is that mailed notices take as long as 10-14 days (or more) to arrive. To illustrate the time frames that mailed notices take, I provide the following examples from my personal experiences in these Title III proceedings:

- Prime Clerk mailed to me and my wife copies of Debtors' 352nd Omnibus Objection on June 18, 2021 (in two separate envelopes postmarked June 18) and we received both envelopes 10 days later, on June 28, 2021.

- Even the short form communication stating one or more Debtors were seeking to disallow our claims, postmarked June 23, did not arrive until June 28, 2021 (we received three of these, so this is not a case of one envelope getting mislaid by the Post Office).

- When Notices need to be mailed to beneficial holders through their brokers — as will be the case for all, or at least most, Retail Investors — yet additional time is required before the mailing is received. In the COFINA situation, the plan documents that were mailed (including a flash drive) did not arrive until December 17, 2018, 19 days after the Court had issued its order approving the COFINA disclosure statement. (#4585-page-27-to-28-of-43; #4382).

It is also not realistic to think that a Retail Investor who requests a hard copy of the 2500 page Disclosure Statement and 244 page Plan will get the hard copies on a timely basis. On May 23, 2021, I requested hard copies of the Plan and Disclosure Statement from the Prime Clerk email address furnished by Debtors (#16758-page-3-of-4). Initially Prime Clerk responded with an email providing a link. I then had to follow-up, on May 24, 2021, to again request a hardcopy. (#16909-page-38-to-42-of-44). Finally, on July 5, 2021, 43 days after I made my request, and after the deadline for objections to the Disclosure Statement had passed, I received hard copies from Prime Clerk.

It is plain from experience that individuals will simply not receive notices and documents in time to react on the timetable Debtors have proposed.  A committee is necessary in light of the time frames Debtors have proposed.

### g. The confirmation procedures Debtors propose preclude meaningful participation by individual bondholders.

The confirmation procedures Debtors propose preclude meaningful participation by Retail Investors.  Individuals on their own are not going to be able to participate in a meaningful way in the discovery process Debtors propose (#16757-page-16-to-18-of-70) or the hearing process outlined in Debtors' proposed procedures (#16757-18-of-70 *et seq*.).

For example, Debtors insist on a certification requirement as a precondition to making discovery requests.  But the data room is a jumble of documents grouped into a limited number of broad categories.  The "pension liabilities" category in the confidential portion of the site has (as of 7/1/2021) 15,988 pages of material, including a jumble of documents produced to a particular party.  The non-confidential "factual source materials" category is a jumble of 3203 pages.  It is possible that large additional quantities of documents will be dumped into the broad categories in the data room.  An individual bondholder should be able to propound specific interrogatories without trying to wade through jumbles of material to see whether (somewhere) the answer may be found in the jumble.  Debtors cannot reasonably both (i) refuse to agree to or accept the appointment of a Retail Investor committee (which could avoid the need for uncoordinated individual bondholder requests for information), and (ii) object to use of interrogatories and insist on burdensome certification procedures that few individuals can meet.

\*   \*   \*

In sum, it is now clear that there is a compelling need to have a committee appointed to represent the interests of Retail Investors in the eight Retail Investor classes, with the assistance of appropriate counsel, in connection with the proposed Plan and in proceedings related to confirmation.

**B.     The Court has the authority to order the appointment of a Retail Investors Committee under 11 U.S.C. §1102(a)(2).**

The Court has the authority to order the appointment of a Retail Investors Committee under 11 U.S.C. § 1102(a)(2), which provides in pertinent part that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders.  The United States trustee shall appoint any such committee."

The statutory test ("necessary to assure adequate representation of creditors") is met here. No existing committee is representing Retail Investors.  And the PSA bondholders likewise are not representing Retail Investors — the Plan in its current form includes (i) a distribution of "splintered" bond fragments that is demonstrably adverse to the interests of Retail Investors, (ii) Consummation Costs for Initial GO/PBA PSA Creditors but not Retail Investors, and (iii) a coercive, contingent and not predictable Retail Support Fee, conditioned on the affirmative vote of each Retail Class, some or all of which reverts to GO/PBA PSA Restriction Fee Creditors if Retail Investor classes do not vote to accept the Plan.

**1.     Retail Investors' Constitutional "first claim" priority status and secured position is not a reason to decline to order the appointment of a Retail Investor Committee.**

It is no answer that Retail Investors may assert Constitutional "first claim" priority status and assert they are secured by Constitutional and statutory liens (positions that have never been adjudicated adverse to them, as noted below).  For example, in *In re Diversified Capital Corp*, 89 B.R. 826 (Bankr. C.D. Cal. 1988), the court "[held] that a committee of creditors, including a committee of secured creditors, may be appointed" (*id.* at 827); Indeed, in *Diversified Capital*, the court ordered the appointment of a committee of secured creditors even "after the confirmation of a Chapter 11 plan, but before the plan is consummated" (*id.*).  Because the U.S. Trustee in that case declined to appoint the members of the committee of secured creditors that the court ordered be established, the court appointed the members of the committee; the court also approved attorneys to represent the committee (*id.* at 831).  Likewise, in *In re Beker Indus. Corp.*, 55 B.R. 945, 949

14

(Bankr. S.D.N.Y. 1985), the fact that the secured subordinated debt held by the public holders was "partially or wholly secured" was actually viewed as a reason to appoint a committee to represent the public holders, since they were refused membership on the unsecured creditors committee.

Unlike a situation where there is an issue about whether an equity securities holders committee should be appointed — given that equity securities are effectively last in line and not likely to recover anything if a debtor is insolvent — here, the Retail Investors hold GO and GO guaranteed bonds, whose "first claim" priority status under Puerto Rico's Constitution and secured status under Puerto Rico's Constitution and statutes has never been successfully challenged in this case.  *See* #16908-page-7-of-178, *citing* #11148, #10702, Adv.Proc.19-292-#5 & #52, Adv.Proc.19-291-#10.  (I recognize various challenges have been asserted, but the Court has declined to adjudicate those challenges, so on the current record there is no decision that undermines the "first claim" secured position of the GO and GO guaranteed bondholders.)

The fact that other bondholders, including hedge funds who bought at distressed prices post-PROMESA, have been willing to settle their claims in no way undermines the Constitutional and statutory "first claim" secured position of GO and GO guaranteed bondholders:  those settling parties are receiving special consideration, including Consummation Costs and other benefits, and, at least as to post-PROMESA purchases, are likely enjoying significant profits even if they receive less than full principal plus full accrued interest to date.

Furthermore, the mediation-negotiation process is shrouded in secrecy, and thus there is no public contemporaneous record of what transpired and what considerations factored into settlement. Furthermore, what settling bondholders agreed to cannot be considered for any purpose.  *See, e.g*., F.R. Evid. 408; *U.S. v. Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (*citing* 408); *Slattery v. U.S*., 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").

Perhaps it may be argued that, since the Retail Investors are Constitutional and statutory "first claim" secured bondholders, they have no need for a committee.  But then they should be treated as such under the Plan — and receive full principal and all accrued interest to date — but they are not so treated under the proposed Plan.  Indeed, no principal or interest has been paid to GO

and GO guaranteed bondholders during the pendency of this Title III, even though Commonwealth has huge cash balances and public employee and public employee retirement system payments have continued.  Retail Investors should either get the benefit of a committee to represent their interests in the confirmation process or receive the full principal and all accrued interest to date that is their due under the law.  Respectfully, one should not decline to decide key legal issues as to Constitutional and statutory priority and secured status, yet also decline to appoint a committee to represent the eight classes of Retail Investors on the theory that they claim such priority and secured status.

> **2.      Any argument that a handful of the Retail Investors may be capable of representing themselves is not a reason to decline to order the appointment of a Retail Investor Committee.**

It is no answer that I hold GO and GO guaranteed bonds, and that I have sought to protect my interests as a bondholder in these proceedings.  From my point of view, I am one person and am limited in what I can do.  From the point of view of what are likely thousands of other individual bondholders — as noted, over 1770 filed notices of participation, and those came from holders of only the few GO series whose bonds had been challenged — I do not represent those other individuals and owe no duties to them.  "Adequate representation" here requires a committee whose members and retained professionals owe fiduciary duties to the Retail Investors in the eight Retail Investor classes.

As the court recognized in *In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985), a case in which the court ordered the appointment of a committee to represent holders of publicly issued secured subordinated debentures, the fact some of the publicly-issued secured subordinated debenture holders in that case may have had the means to represent themselves did not alter the fact that a committee was needed which would have the fiduciary responsibility to act on behalf of all of the holders.

In the *Beker* court's words, "the public debt here is widely held.  While a significant portion, particularly of the public debt, may be held for their own account by institutions having the financial interest and means to represent themselves, the presence of at least 400 holders of small amounts

indicates the need for their representation through an official committee having the fiduciary responsibility of acting on their behalf" (*id.* at 949).  The court stressed that "holders of smaller holdings" "are the people who are most in need of representation" (*id.* at 951).

### 3. Retail Investors share a commonality of interest irrespective of the specific series of bonds they may hold.

It is no answer that there may be some differences in interests of some of the eight Retail Investor classes versus others (*i.e.*, holders of Vintage Bonds versus 2011, 2012 or 2014 bonds).  All Retail Investors share a common interest in not being subject to the massive destruction in value to Retail Investors occasioned by the exchange of at least 13 splintered securities for every existing bond position; in not being adversely affected by forced liquidation of fractional bonds (one consequence of the splinter bond problem); and in having a full disclosure concerning whether a future exchange of taxable bonds into tax-exempt bonds is in prospect (with the resultant risks of *inter alia*, per-splinter bond transaction costs imposed on many individuals by their brokerage firms, another consequence of the splinter bond problem, as well as a potential reduction in coupon interest rate versus what was set forth in the Plan, as occurred in the COFINA situation).  All Retail Investors likewise share a common concern with respect to the coercive, contingent, not predictable and not quantified nature of the Retail Support Fee.  And all Retail Investors share an interest in defending the Constitutional and statutory "first claim" and secured status of their bond holdings.

### 4. Appointment of a Retail Investor Committee benefits the Court.

From the Court's point of view, the spectre of leaving thousands of individual bondholders unrepresented, in the face of obvious issues about whether they are being fairly treated in comparison to others who have a committee or professionals directly or indirectly being paid for by Debtors, would be at least partially addressed if there was a committee with its own professionals who had fiduciary duties to act in the interests of the eight Retail Investor classes.

### 5.   Under §1102(a)(2) the Court makes the determination of whether to order the appointment of an additional Committee.

Section 1102(a)(2) is clear on its face that the Court makes the "adequate representation" determination, and that the Court is not simply charged with reviewing a determination by the U.S. Trustee.  An earlier order of the Court (#5023) relied on ¶ 1102.07 of *Collier* for the proposition that "the Bankruptcy Code vests the United States trustee in the first instance with non-exclusive authority to assess the necessity of appointing additional statutory committees."  But the only authority referred to in Collier for the passage that the Court cited in #5023, *In re McLean Indus., Inc.*, 70 B.R. 852 (Bankr. S.D.N.Y. 1987), actually ruled (repeatedly) to the contrary, stating:

- "Noteworthy is the absence of any indication from the statutory language that the Court's ability to determine the issue of adequate representation is fettered by any constraint other than the requirement that the appointment of one or more additional committees is necessary to achieve the designed goal.  That absence is not surprising.  The legislative history belies the U.S. Trustee's and the Committee's claim that Congress sought to limit the Court's role to a review of a determination by a U.S. trustee."  (*Id.* at 856.)

- "the Court is to determine de novo the issue of whether an additional committee should be appointed."  (*Id.* at 856-57.)

- "In no instance of which this Court is aware was there any notion that one seeking appointment of an additional committee in a pilot district under § 151102(b) must have first 'exhausted administrative remedies' by applying to a U.S. trustee."  (*Id.* at 857.)

- "It thus does not appear that Congress, in amending § 1102(a), had any intention of requiring a movant under § 1102(a)(2) to exhaust administrative remedies or to limit the bankruptcy court's consideration of the issues under § 1102(a)(2) to a review of the determination made by U.S. trustees.  No procedure for such exhaustion was established; Congress sought primarily to take bankruptcy judges out of the

18

appointment process and Congress expressly retained in the bankruptcy courts the ability to decide de novo the question of whether additional committees are necessary to assure adequate representation." (*Id.* at 857-58.)

- "it being plain that Congress left the bankruptcy courts with their initial power to determine the issue of adequate representation, it is also plain that the doctrine of exhaustion of administrative remedies does not apply….The issue presented here could also be considered by U.S. trustees as an appropriate reason under § 1102(a)(1). But, since it is not initially cognizable only by U.S. trustees, the exhaustion doctrine is inapplicable." (*Id.* at 858.)

- "Still, as issues bearing on the ultimate issue of adequate representation, they are not initially cognizable solely by U.S. trustees.  Exhaustion is thus not required." (*Id.* at 858.)

- "But § 1102(a)(2) of the Code requires that there be adequate representation.  That issue is not entrusted to the discretion of U.S. trustees although they may obviously consider it under § 1102(a)(1)." (*Id.* at 859.)

Notably, the U.S. Trustee — in this very case — has expressly stated that a party has no need to first ask the U.S. Trustee to appoint an additional committee.  Thus, when the Ad Hoc Retiree Committee sought by motion to this court to have a Retiree Committee appointed, without first asking the U.S. Trustee to appoint a Retiree Committee, the U.S. Trustee told this Court that "[t]he Ad Hoc Retiree Committee had every right to move the Court for relief under section 1102(a)(2) and not first ask the United States Trustee to exercise his discretion to appoint an additional committee." #192-page-5n.2-of-10.

In any event, here, following the Court's order in #5023, I did request the U.S. Trustee to appoint a committee to represent individual GO bondholders, and the U.S. Trustee declined to do so. #6128-2, #6128-3.

**C.      Reasonable controls on the Retail Investors Committee's expenses can be set.**

I am not suggesting a committee whose professionals would incur costs comparable to costs incurred to date by other parties in these cases.  Indeed, the Court could set appropriate constraints on expenses by the committee's retained professionals, using as a benchmark the levels of fees incurred by professionals retained by existing committees or the levels of cash payments and payments in the form of administrative expense claims that Debtors have agreed to make to other parties.  But in light of the hundreds of millions of dollars paid or agreed to be paid to other creditors and their professionals, and the fact the Plan establishes eight Retail Investor classes and sets up a coercive situation that may most appropriately be dealt with by collective action by what are thousands of currently unorganized individual bondholders, it is neither reasonable nor appropriate to invoke economic constraints as a reason to leave eight classes of Retail Investors without the assistance of a committee and retained professionals who have duties to represent their interests.

## CONCLUSION

This Court should grant this Motion for an order directing the appointment of a committee to represent Retail Investors in the eight Retail Investor classes in connection with the proposed Plan and in proceedings related to confirmation.

July 6, 2021

Respectfully Submitted,


/s/ Peter C. Hein
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
petercheinsr@gmail.com
917-539-8487




Claim 10696
GO Bonds:  500,000 par amount, plus unpaid
interest to date
[5 separate CUSIPS:   74514LVX2
                                    74514LWA1
                                    74514LWM5
                                    74514LWZ6
                                    74514LB63]
PBA Bonds:  200,000 par amount, plus unpaid
interest to date
[CUSIP:  745235M24]


**Declaration pursuant to 28 U.S.C. §1746**


I declare under penalty of perjury that the foregoing statements are true and correct to the best of my
knowledge and belief.


Executed on this 6th day of July 2021.




        /s/ Peter C. Hein
                Peter C. Hein

## **Certificate of Service**

I, Peter C. Hein, certify that I have caused [1] Notice Of Hearing And Motion Of Individual

Bondholder for an Order directing the Appointment of A Committee To Represent Retail Investors

in the Eight Retail Investor Classes in connection with the Proposed Plan and in Proceedings related

to Confirmation, and [2] Memorandum in Support of Motion of Individual Bondholder for an Order

Directing the Appointment of a Committee to Represent Retail Investors in the Eight Retail Investor

Classes in connection with the proposed Plan and in Proceedings related to Confirmation, to be

served via the Court's CM/ECF system.

July 6, 2021

_____/s/Peter C. Hein_____
Peter C. Hein