## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| As representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEE'S RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | |
| Debtors. | |

## INFORMATIVE MOTION WITH EXHIBITS

**TO THE HONORABLE COURT:**

**COMES NOW** creditor Suiza Dairy Corp. ("Suiza"), through the undersigned counsel and, very respectfully state, alleges and pray:

1. Suiza will argue as to the objection to the approval of the Disclosure Statement filed by Suiza.

2. That the Objection has three Exhibits;
   - Exhibit 1 – Unsworn Statement by Dr. Leonardo Giacchino;
   - Exhibit 2 – Amended Opinion and Order, Case 04-1840, Docket 2289, dated September 23rd, 2013; and

- Exhibit 3 – Amended Opinion and Order Granting Preliminary Injunction, Case 04-1840. Docket 430, dated July 13th, 2007.

3. That the undersigned counsel will be participating only in the Approval of Disclosure Statement item of the agenda.

**WHEREFORE**, it is requested from this Honorable Court to take note of the above; and consider Suiza in compliance with Order Regarding Proceeding for Disclosure Statement Hearing at Docket 17210.

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties in the case.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on July 9th, 2021.

By: */s/ Rafael A. González Valiente*
USDC NO. 225209

**Godreau & González Law, LLC**
PO Box 9024176
San Juan, PR  00902-4176
Telephone:  787-726-0077
*rgv@g-glawpr.com*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| As representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEE'S RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | |
| Debtors. | |

## UNSWORN STATEMENT OF DR. LEONARDO GIACCHINO, PH.D.

Dated:      June 15, 2021

Unsworn Affidavit of Leonardo Giacchino, Ph.D.

## I.   BACKGROUND

I, **Leonardo Giacchino**, **Ph.D**, pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

(1) I currently hold the position of Partner at Solutions Economics, LLC in Bethesda, MD. I have worked as a consultant in the milk industry in Puerto Rico since the beginning of 2003.  I have testified as an expert on many occasions in Federal Court in Case 04-1840 (DRD), "Vaquería Tres Monjitas, Inc. and Suiza Dairy Inc. v. Myrna Comas-Pagan, in her official capacity as Secretary of Agriculture of the Commonwealth of Puerto Rico, and José Pantojas López, in his official capacity as Administrator of the Milk Industry Regulatory Office of the Commonwealth of Puerto Rico."

(2) On July 13, 2007 the District Court issued an Amended Opinion and Order Granting Preliminary Injunction (Dkt. No. 480), which was later amended on September 23, 2013 (Dkt. No. 2289).   The Court held that the Commonwealth, through one of its instrumentalities, had performed a regulatory taking in violation of Suiza Dairy's Constitutional rights.

(3) One of the remedies to resolve the violation was the establishment of a regulatory accrual, a regulated market compensation mechanism for the debt owed to the fresh milk processing plants, Suiza Dairy Inc ("Suiza") and Vaquería Tres Monjitas ("VTM"), on account of said taking.

(4) As part of this case, an Experts' Agreement was reached on August 26, 2008 and filed at Dkt. 1003 in Civil Case No. 04-1840.  The Experts' Agreement determines the methodology for the calculation of the regulatory accrual (among other things).  I was one of the experts to draft, participate and sign this Experts' Agreement.

Unsworn Affidavit of Leonardo Giacchino, Ph.D.

(5) The parties came to an agreement on October 29, 2013, which was signed and filed with the Court (Dkt. 2322 of Civil Case No. 04-1840, "Settlement Agreement"). The Settlement Agreement was approved and adopted into law by the Court in the Judgment of November 6, 2013 (Dkt. 2351 of Civil Case No. 04-1840, "Judgment"). Part of the Settlement Agreement was the determination of the official amount of regulatory accrual due to the fresh milk processing plants. I carried out the calculations to determine the amount of regulatory accrual owed to each plant which was incorporated into the Settlement Agreement and the Judgment.

(6) Since the formalization of the Settlement Agreement and Judgment, I have been monitoring the payments made by the milk consumers of Puerto Rico, through their purchases of fluid milk, and by the government of Puerto Rico to Suiza and VTM towards the regulatory accrual. As a regulatory expert in the milk industry in Puerto Rico, I have filed annual reports with the milk regulator, ORIL, describing the status of the regulatory accrual collected. The last report filed was on January 5, 2021.[1]

(7) The Disclosure Statement proposed by the Commonwealth of Puerto Rico, which incorporates a Plan of Adjustment, seeks to discharge the debt owed to Suiza as part of the regulatory accrual to be paid directly by the Commonwealth with a distribution of only 50% of the debt owed.

(8) Neither the Disclosure Statement nor the Plan of Adjustment characterize the debt as a regulatory taking.

---

[1]    Giacchino, Leonardo (2021): "Regulatory Accrual Collected by Suiza Dairy as of December 31, 2019," January 5 (in Spanish). A copy of the Report is attached as an Exhibit to the Objection.

(9)  As explained in more detail herein-below, the debt owed to Suiza for the part of the regulatory accrual to be paid directly by the Commonwealth, is incorrectly listed in the Disclosure Statement and Plan of Adjustment as to amount.

(10)  I have verified the documents submitted in support of the Objection and certify that to the best of my knowledge they are accurate.

## II.    GOVERNMENT PAYMENTS TO DATE

(11)  As part of the 2013 Settlement Agreement, the Government of Puerto Rico agreed to pay $95 million on behalf of the Puerto Rico consumers.[2]  The portion of this amount to be paid to Suiza is 72.310318% and the portion of this amount to be paid to Vaquería Tres Monjitas (VTM) is 27.689682%, based on each plant's share of the total regulatory accrual amount owed at the time of signing the Settlement Agreement. These allocation factors result in an amount to be paid to Suiza of $68,694,802.10 and an amount to be paid to VTM of $26,305,197.90.

(12)  The payments made by the Government of Puerto Rico to the processing plants to date are shown in **Table 1** below.  The total paid by the Government of Puerto Rico to both plants is $33 million, which leaves a remaining balance of $62 million.

**Table 1: Payments Made by Government of Puerto Rico**

| Payment Date | Total Payment | Payment to Suiza | Payment to VTM |
|---|---|---|---|
| 2/4/2015 | $ 16,000,000.00 | $ 11,569,650.88 | $ 4,430,349.12 |
| 9/6/2016 | $ 3,000,000.00 | $ 2,160,000.00 | $ 840,000.00 |
| 11/7/2016 | $ 3,000,000.00 | $ 2,160,000.00 | $ 840,000.00 |
| 4/11/2017 | $ 3,000,000.00 | $ 2,160,000.00 | $ 840,000.00 |
| 7/26/2017 | $ 3,000,000.00 | $ 2,160,000.00 | $ 840,000.00 |
| 6/12/2018 | $ 3,000,000.00 | $ 2,160,000.00 | $ 840,000.00 |
| 10/22/2020 | $ 2,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 |
| **Total to Date** | **$ 33,000,000.00** | **$ 23,369,650.88** | **$ 9,630,349.12** |

---

[2]    Dkt. 2322 of Civil Case No. 04-1840, Clause 14.

(13)  At present, Suiza is owed $45,325,151.22; the amount to be paid as of 2013 of $68,694,802.10 minus $23,369,650.88 paid by the Puerto Rico Government to date. VTM is owed $16,674,848.78; the amount to be paid as of 2013 of $26,305,197.90 minus $9,630,349.12 paid by the Puerto Rico Government to date.  Of the remaining balance of $62 million to be paid to the plants, the portion owed to Suiza ($45,325,151.22) represents 73.105083% of the total, more than the Settlement Agreement allocation factor of 72.310318%.

(14)  This discrepancy is largely due to the October 2020 payment, in which the Government paid $1,000,000 each to both Suiza and VTM, an allocation of 50% to each plant.  This allocation is not in compliance with the Judgment in Federal Court, which indicates that Suiza should have received 72.310318% of a total payment by the Government and VTM 27.689682%.[3]

## III.   SOLUTIONS FOR THE GOVERNMENT OF PUERTO RICO TO BE IN COMPLIANCE WITH THE JUDGMENT IN FEDERAL COURT

(15) If the Government of Puerto Rico is to pay 50% of the remaining $62 million balance, a sum of $31 million, to allocate this amount using the Court allocation factors would continue the imbalance simply because one payment was made by the Government of Puerto Rico with an improper allocation.  There are three possible ways to rectify this issue.

---

[3]    Before the October 2020 payment, the Government of Puerto Rico also underpaid Suiza in earlier payments based on erroneous rounding of the 72.310318% allocation factor.  The first payment in **Table 1** was correctly allocated. The next five payments (with totals of $3 million, $2.16 million to Suiza) were incorrectly allocated 72% to Suiza, not 72.310318%. This results in an underpayment to Suiza of $9,309.54 per payment, or a total of $46,547.70.  These amounts are taken into consideration in the solutions below in order to reach mathematical exactitude.

Unsworn Affidavit of Leonardo Giacchino, Ph.D.

*Solution 1*

(16)   The first potential solution is illustrated in **Table 2** below.  Rows (a), (b), and (c) show the original planned allocation of the government payments: $68,694,802.10 to Suiza and $26,305.197.90 to VTM out of a total of $95 million.  Row (d) shows the current amounts paid by the Government to each plant: $23,369,650.88 to Suiza and $9,630,349.12 to VTM for a total of $33 million.  Row (e) shows that these payments represent an allocation factor of only 70.817124% to Suiza, below the Federal Court allocation factor of 72.310318%.

**Table 2: Proposed Allocation of Future Government Payments**

| Concept | | Total | Suiza | VTM |
|---|---|---|---|---|
| Total Scheduled Payments by Government | (a) | $ 95,000,000.00 | | |
| Official Allocation to Each Plant | (b) | 100% | 72.310318% | 27.689682% |
| Total Scheduled Payments to Each Plant | (c)=(a)•(b) | $ 95,000,000.00 | $ 68,694,802.10 | $ 26,305,197.90 |
| Total Paid by Government to Date | (d) | $ 33,000,000.00 | $ 23,369,650.88 | $ 9,630,349.12 |
| Percent Paid to Each Plant to Date | (e)=(d)$_{plant}$/(d)$_{total}$ | | 70.817124% | 29.182876% |
| Total Yet to be Paid to Each Plant | (f)=(c)-(d) | $ 62,000,000.00 | $ 45,325,151.22 | $ 16,674,848.78 |
| 50% of Total Yet to be Paid | (g)=(f)•50% | $ 31,000,000.00 | | |
| Total to be Paid by Government with 50% Agreement | (h)=[(d)+(g)]•(b) | $ 64,000,000.00 | $ 46,278,603.52 | $ 17,721,396.48 |
| Remaining to be Paid to Each Plant with 50% Agreement | (i)=(h)-(d) | | $ 22,908,952.64 | $ 8,091,047.36 |
| Amount for Each of 5 Equal Installments | (j)=(i)/5 | | $ 4,581,790.53 | $ 1,618,209.47 |

(17)   Row (f) shows the total yet to be paid of the original $95 million of planned payments: $45,325,151.22 to Suiza and $16,674,848.78 to VTM for a total of $62 million.  If the Government agrees to pay 50% of the remaining $62 million, the resulting additional payments by the Government will amount to $31 million, as shown in row (g).  Summing the $33 million already paid and the $31 million yet to be paid results in total payments by the Government of $64 million.  Based on the Court allocation factors of 72.310318% for Suiza and 27.689682% for VTM, Suiza should be paid $46,278,603.52 of this $64 million and VTM should be paid $17,721,396.48, as shown in row (h).

(18)  Subtracting the $23,369,650.88 already paid to Suiza by the Government from the total of $46,278,603.52 to be paid to Suiza results in $22,908,952.64 which must still be paid to Suiza, shown in row (i).  This represents five equal installments of $4,581,790.53.   Subtracting the $9,630,349.12 already paid to VTM by the Government from the total of $17,721,396.48 to be paid to VTM results in $8,091,047.36 which must still be paid to VTM, shown in row (i).  This represents five equal installments of $1,618,209.47.

*Solution 2*

(19)  Another possible solution which results in Suiza receiving its Court allocation amount out of the total paid is that the Government deduct the amount which VTM has been paid in excess from payments to be made as part of the POA – Class 50 to VTM.  If the payments received by Suiza to date of $23,369,650.88 were to represent 72.310318% of a hypothetical total amount paid by the Government to the plants, 100% of this amount would be equal to $32,318,556.36.  The corresponding payment to VTM would be $8,948,905.48 (= $32,318,556.36 - $23,369,650.88).  Since VTM has in reality been paid $9,630,349.12 by the Government, VTM has received excess payments of $681,443.64 (= $9,630,349.12 - $8,948,905.48).  That excess amount should be refunded in the first installment.

(20)  After VTM's adjustment, the remaining amount to be paid by the government would be $62,681,443.64 instead of $62 million.  Per the POA – Class 50, 50% of this amount is $31,340,721.82.  This amount of $31,340,721.82 could then be allocated to the plants based on the Court allocation factors of 72.310318% and 27.689682%.  This would result in $22,662,575.61 to be paid to Suiza and $8,678,146.21 to be paid to

VTM in five installments. These amounts correspond to five equal installments of $4,532,515.12 to Suiza and $1,735,629.24 to VTM.  To correct the excess payments received by VTM to date, a deduction of $681,443.64 should be applied to VTM's first installment.   This would result in one installment of $1,054,185.61 (= $1,735,629.24 - $681,443.64) followed by four installments of $1,735,629.24 for VTM.

*Solution 3*

(21)   Lastly, the Government could make a lump sum payment to Suiza which results in Suiza having received its Court allocation amount out of the total paid.  If the payments to VTM to date of $9,630,349.12 were to represent 27.689682% of a hypothetical total amount paid by the Government to the plants, 100% of this amount would be equal to $34,779,558.39.  The corresponding payment to Suiza would be $25,149,209.27 (= 34,779,558.39 - $9,630,349.12).  Since Suiza has in reality been paid only $23,369,650.88 by the Government, the correct allocation of payments would be achieved by the Government issuing a lump sum payment to Suiza of $1,779,558.39 (= $25,149,209.27 - $23,369,650.88).

(22)   After the lump sum payment to Suiza, the remaining to be paid by the government would be $60,220,441.61 instead of $62 million.  Per the POA – Class 50, 50% of this amount is $30,110,220.80.  This amount could then be allocated to the plants based on the Court allocation factors of 72.310318% and 27.689682%.  This would result in $21,772,796.41 to be paid to Suiza and $8,337,424.39 to be paid to VTM in five installments.

Unsworn Affidavit of Leonardo Giacchino, Ph.D.

I declare under penalty of perjury that the foregoing information is true and correct.

Executed in Bethesda, MD, on this 15th day of June, 2021.

**Dr. Leonardo Giacchino**
**Partner**
**Solutions Economics, LLC**

**Correction of Mathematical Mistake in Allocation of Government Payments between Suiza and VTM**

The payments made by the Government of Puerto Rico to the processing plants to date are shown in **Table 1** below.  The total paid by the Government of Puerto Rico to both plants is $33 million, which leaves a remaining balance of $62 million.

**Table 1: Payments Made by Government of Puerto Rico**

| Payment Date | Total Payment | Payment to Suiza | Payment to VTM |
|---|---|---|---|
| 2/4/2015 | $          16,000,000.00 | $          11,569,650.88 | $          4,430,349.12 |
| 9/6/2016 | $            3,000,000.00 | $            2,160,000.00 | $             840,000.00 |
| 11/7/2016 | $            3,000,000.00 | $            2,160,000.00 | $             840,000.00 |
| 4/11/2017 | $            3,000,000.00 | $            2,160,000.00 | $             840,000.00 |
| 7/26/2017 | $            3,000,000.00 | $            2,160,000.00 | $             840,000.00 |
| 6/12/2018 | $            3,000,000.00 | $            2,160,000.00 | $             840,000.00 |
| 10/22/2020 | $            2,000,000.00 | $            1,000,000.00 | $          1,000,000.00 |
| **Total to Date** | $          **33,000,000.00** | $          **23,369,650.88** | $          **9,630,349.12** |

As part of the 2013 Settlement Agreement, the Government of Puerto Rico agreed to pay $95 million to the fresh milk processing plants.  The portion of this amount to be paid to Suiza is 72.310318% and the portion of this amount to be paid to Vaquería Tres Monjitas (VTM) is 27.689682%, resulting in an amount to be paid to Suiza of $68,694,802.10 and an amount to be paid to VTM of $26,305,197.90.

At present, Suiza is owed $45,325,151.22; the amount to be paid as of 2013 of $68,694,802.10 minus $23,369,650.88 paid by the Puerto Rico Government to date.   VTM is owed $16,674,848.78; the amount to be paid as of 2013 of $26,305,197.90 minus $9,630,349.12 paid by the Puerto Rico Government to date.  Of the remaining balance of $62 million to be paid to the plants, the portion owed to Suiza ($45,325,151.22) represents 73.105083% of the total, more than the official allocation factor of 72.310318%.

This discrepancy is largely due to the October 2020 payment, in which the Government paid $1,000,000 each to both Suiza and VTM, an allocation of 50% to each plant, which is not in compliance with the Judgement in Federal Court, which indicates that Suiza should have received 72.310318% of a total payment by the Government and VTM 27.689682%.[1]

If the Government of Puerto Rico is to pay 50% of the remaining $62 million balance, a sum of $31 million, to allocate this amount using the Court allocation factors would continue the imbalance simply because one payment was made with an improper allocation.  There are 3 possible ways to rectify this issue.

---

[1]  Before the October 2020 payment, the Government of Puerto Rico also underpaid Suiza in earlier payments based on erroneous rounding of the 72.310318% allocation factor.  These amounts are not significant but are taken into consideration in the solutions below so as to reach mathematical exactitude.

*Solution 1*

The first potential solution is illustrated in **Table 2** below.  Rows (a), (b), and (c) show the original planned allocation of the government payments: $68,694,802.10 to Suiza and $26,305.197.90 to VTM out of a total of $95 million.  Row (d) shows the current amounts paid by the Government to each plant: $23,369,650.88 to Suiza and $9,630,349.12 to VTM for a total of $33 million.  Row (e) shows that these payments represent an allocation factor of only 70.817124% to Suiza, below the Court allocation factor of 72.310318%.

**Table 2: Proposed Allocation of Future Government Payments**

| Concept | | Total | Suiza | VTM |
|---|---|---|---|---|
| Total Scheduled Payments by Government | (a) | $ 95,000,000.00 | | |
| Official Allocation to Each Plant | (b) | 100% | 72.310318% | 27.689682% |
| Total Scheduled Payments to Each Plant | (c)=(a)•(b) | $ 95,000,000.00 | $ 68,694,802.10 | $ 26,305,197.90 |
| Total Paid by Government to Date | (d) | $ 33,000,000.00 | $ 23,369,650.88 | $ 9,630,349.12 |
| Percent Paid to Each Plant to Date | (e)=(d)$_{plant}$/(d)$_{total}$ | | 70.817124% | 29.182876% |
| Total Yet to be Paid to Each Plant | (f)=(c)-(d) | $ 62,000,000.00 | $ 45,325,151.22 | $ 16,674,848.78 |
| 50% of Total Yet to be Paid | (g)=(f)•50% | $ 31,000,000.00 | | |
| Total to be Paid by Government with 50% Agreement | (h)=[(d)+(g)]•(b) | $ 64,000,000.00 | $ 46,278,603.52 | $ 17,721,396.48 |
| Remaining to be Paid to Each Plant with 50% Agreement | (i)=(h)-(d) | | $ 22,908,952.64 | $ 8,091,047.36 |
| Amount for Each of 5 Equal Installments | (j)=(i)/5 | | $ 4,581,790.53 | $ 1,618,209.47 |

Row (f) shows the total yet to be paid of the original $95 million of planned payments: $45,325,151.22 to Suiza and $16,674,848.78 to VTM for a total of $62 million.  If the Government agrees to pay 50% of the remaining $62 million, the resulting additional payments by the Government will amount to $31 million, as shown in row (g).  Summing the $33 million already paid and the $31 million yet to be paid results in total payments by the Government of $64 million.  Based on the Court allocation factors of 72.310318% for Suiza and 27.689682% for VTM, Suiza should be paid $46,278,603.52 of this $64 million and VTM should be paid $17,721,396.48, as shown in row (h).

Subtracting the $23,369,650.88 already paid to Suiza by the Government from the total of $46,278,603.52 to be paid to Suiza results in $22,908,952.64 which must still be paid to Suiza, shown in row (i).  This represents 5 equal installments of $4,581,790.53.  Subtracting the $9,630,349.12 already paid to VTM by the Government from the total of $17,721,396.48 to be paid to VTM results in $8,091,047.36 which must still be paid to VTM, shown in row (i).  This represents 5 equal installments of $1,618,209.47.

*Solution 2*

Another possible solution which results in Suiza receiving its Court allocation amount out of the total paid is that the Government deduct the amount which VTM has been paid in excess from payments to be made as part of the POA – Class 50 to VTM.  If the payments received by Suiza to date of $23,369,650.88 were to represent 72.310318% of a hypothetical total amount paid by the Government to the plants, 100% of this amount would be equal to $32,318,556.36.  The corresponding payment to VTM would be $8,948,905.48 (= $32,318,556.36 - $23,369,650.88).

Since VTM has in reality been paid $9,630,349.12 by the Government, VTM has received excess payments of $681,443.64 (= $9,630,349.12 - $8,948,905.48).  That excess amount should be refunded in the first installment.

After VTM's adjustment, the remaining amount to be paid by the government would be $62,681,443.64 instead of $62 million.  Per the POA – Class 50, 50% of this amount is $31,340,721.82.  This amount of $31,340,721.82 could then be allocated to the plants based on the Court allocation factors of 72.310318% and 27.689682%.  This would result in $22,662,575.61 to be paid to Suiza and $8,678,146.21 to be paid to VTM in five installments. These amounts correspond to five equal installments of $4,532,515.12 to Suiza and $1,735,629.24 to VTM.  To correct the excess payments received by VTM to date, a deduction of $681,443.64 should be applied to VTM's first installment.  This would result in one installment of $1,054,185.61 (= $1,735,629.24 - $681,443.64) followed by four installments of $1,735,629.24 for VTM.

### _Solution 3_

Lastly, the Government could make a lump sum payment to Suiza which results in Suiza having received its Court allocation amount out of the total paid.  If the payments to VTM to date of $9,630,349.12 were to represent 27.689682% of a hypothetical total amount paid by the Government to the plants, 100% of this amount would be equal to $34,779,558.39.  The corresponding payment to Suiza would be $25,149,209.27 (= 34,779,558.39 - $9,630,349.12).  Since Suiza has in reality been paid only $23,369,650.88 by the Government, the correct allocation of payments would be achieved by the Government issuing a lump sum payment to Suiza of $1,779,558.39 (= $25,149,209.27 - $23,369,650.88).

After the lump sum payment to Suiza, the remaining to be paid by the government would be $60,220,441.61 instead of $62 million.  Per the POA – Class 50, 50% of this amount is $30,110,220.80.  This amount could then be allocated to the plants based on the Court allocation factors of 72.310318% and 27.689682%.  This would result in $21,772,796.41 to be paid to Suiza and $8,337,424.39 to be paid to VTM in five installments.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

VAQUERIA TRES MONJITAS, INC. and
SUIZA DAIRY, INC.,

      Plaintiffs,

MYRNA COMAS, in his official capacity, as the
Secretary of the Department of Agriculture for
the Commonwealth of Puerto Rico, and JOSE
PANTOJAS, in his official capacity, as
Administrator of the Office of the Milk Industry
Regulatory Administration for the
Commonwealth of Puerto Rico,

      Defendants.

Civil No. 04-1840 (DRD)

Consolidated with 08-2191 (DRD)

Consolidated with 08-2380 (DRD)

## AMENDED OPINION AND ORDER NUNC PRO TUNC

Pending before the Court are: (a) *Post-Hearing Memorandum In Support Of The Imposition Of A Specific Remedy As A Result Of Non-Compliance And In Support Of Petition For Contempt* filed by Suiza Dairy, Inc. (hereinafter "Suiza's Post-Hearing Memorandum"), Docket No. 2225; (b) *Vaquería Tres Monjitas, Inc.'s Memorandum On Compliance Of Amended Preliminary Injunction Order* (hereinafter "VTM's Memorandum"), Docket No. 2228; (c) *Defendants' Opening Compliance Hearing Brief* (hereinafter "Defendants' Brief"), Docket No. 2227; (d) *Memorandum In Response To Docket No. 2227* filed by Suiza (hereinafter "Suiza's Opposition to Defendants' Brief"), Docket No. 2229; (e) *Reply Memorandum To Defendants' Compliance Hearing Brief (Dkt 2227)* filed by VTM (hereinafter "VTM's reply to Defendants' Brief"), Docket No. 2234; (f) *Defendants' Reply Brief*, Docket No. 2232; (g) *Motion for Leave to File Amendment to Dkt. No. 2225 and Include Appendix 1* filed by Suiza on March 5, 2013, Docket No. 2248.

**Introduction**

On August 13, 2004, the fresh milk processors, Suiza Dairy, Inc. ("Suiza") and Vaquería Tres Monjitas, Inc. ("VTM"), filed the instant action to challenge the constitutionality of the existing regulation issued by the Office of the Milk Industry Regulatory Administration for the Commonwealth of Puerto Rico ("ORIL") to determine the milk price. The challenge is based on constitutional grounds, as well as timely scientific, rationale grounds, and non-discriminatory parameters within the formula used in the year 2004 and, henceforth, completely obsolete. *See Vaquerías Tres Monjitas, Inc., Suiza Dairy, Inc. v. Irizarry, et al.*, 587 F.3d 464, 482-484 (1st Cir.2009), citing *Duquesne Light & Co. v. Barasch*, 488 U.S. 299, 307 (1989), and *Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013, 1026-1029 (1st Cir.1989).

On July 13, 2007, the Court entered an *Amended Opinion And Order Granting Preliminary Injunction* (hereinafter the "*Injunction Order*"), Docket No. 480. After several appeals to the United States Court of Appeals for the First Circuit (hereinafter the "First Circuit"), and a *certiorari* request denied by the United States Supreme Court ("Supreme Court"), this Court was forced to return to the compliance hearings stage, as to examining the new parameters and the unexpected eliminations as to former parameters and authorized expenses accounts relating to potential constitutional violations of due process, equal protection and takings. *Vaquería Tres Monjitas, Inc.*, 587 F.3d at 482-484. The compliance hearings finalized on December 1, 2012, now the Court must determine whether the defendants have indeed failed to comply with the Court's *Injunction Order* of July 13, 2007, Docket No. 480, based on the evidence submitted by the parties, as well as the prior orders entered by the Court, which are critical to this matter.

Significant events have transpired since the *Injunction Order* was entered on July 13, 2007,

which are worth mentioning, to wit: (a) after the general elections of November 8, 2008, Puerto Rico
underwent another change of administration effective January 2009; (b) Puerto Rico, since at
least 2006, until today is still severely affected by the worldwide economic crisis, which has had an
adverse impact both in the United States' and Puerto Rico's economy; (c) the inflation and the
staggering costs of doing business in Puerto Rico are also determinative, as it results in a higher price
of fresh milk; and (d) the consumers' declining demand for fresh milk, amongst others.

When considering the parties' legal memorandums, the Court has decided to address the
issues under the following topics: (a) the *Experts' Agreement*, Docket No. 1003, and the proposed
formula agreed as to critical parameters to be included in the formula as to the price of the fresh
milk, the ROE, return on equity, the regulatory accrual, the existence of an unsystematic risk
applicable to Puerto Rico, amortization of regulatory accrual, and regulatory accounts based on a
document prepared on February 25, 2008, the agreement of the experiment had a wide scope, the
Court reiterates its related opinions as to the *Experts' Agreement*, amongst others; (b) the Court also
reiterates opinions excluding certain parameters which the Court has ordered to be stricken; (c) the
proposed Regulation No. 12, which is intertwined with the milk price formula, and the procedure
on how the formula will be implemented amongst the farmers, the milk processors, Indulac, the
advertisers, the vendors, intermediaries, agents, and the consumers, amongst others; (d) whether the
defendants should be found in contempt for failure to comply with the *Injunction Order* of July 13,
2007;[1] and (e) whether the Court has the inherent power to enforce the *Injunction Order*, by
establishing a formula and the implementation procedure through the adoption of a regulation, which

---

[1]    The Court has decided to reserve some late arriving issues not subject to the *Injunction Order*, as
well as the issues related to the Federal School Luncheon Program, the Special Marketing Fund ("FEM"),
established by ORIL through the proposed Regulation No. 12.

is a task traditionally delegated to the states, and used as a last resource remedial solution by this Court, if necessary, based on the defendants consistent lack of compliance with the terms and conditions of the *Injunction Order* of July 13, 2007.

At the outset, the Court finds that, at this time, the Court will not establish the price fixing formula nor the corresponding regulation to implement the formula, *see* discussion *infra*. Except that matters that are directly contrary to law as to a potential discretionary matter or because the parties have stipulated a matter and one party, ORIL, is attempting to extricate itself from the *Experts' Agreement* signed by their experts as to the parameters to establish the factors to determine the return on equity (ROE), and other matters relating to the equity formula, and to the establishment of the price of the milk, which is determined by ORIL. *See* Docket entries No. 1697 and 1804, for a more detailed analysis.

The parties shall bear in mind that a reported non-compliance at this critical stage of the proceedings may result in a finding of contempt, fines, and if continued potential findings of criminal contempt. *See* discussion *infra*.

The Court, however, refuses to continue with the "games" staged by the defendant ORIL and its expert. ORIL, as explained *infra* is simply not in compliance and consequently, "cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Technology*, 950 F.2d 13, 22 (1st Cir.1991); *Cruz-Báez, et als. v. Negrón-Irizarry*, 220 F.Supp.2d 77, 79 n.3 (D.P.R.2002), citing *McCoy v. Massachusetts Institute of Technology*, 950 F.2d at 22. Rather, the parties have an affirmative responsibility to put their best foot forward in an effort to present a legal theory that will support their claim, which is in compliance with the Court's injunctive relief, as affirmed by the First Circuit. *Cruz-Báez*, 220 F.Supp.2d at 79, citing *McCoy*, 950 F.2d at 23.

4

Likewise, the Court will not tolerate the "games" being played by the defendants to evade compliance with the *Injunction Order* and/or to try to extricate without showing manifest injustice from the *Experts' Agreement*, a matter that will be discussed below. *See* Docket entries No. 1907, 1965. The Court has also determined that ORIL is barred from alleging economic facts as to the economic crisis that Puerto Rico is undergoing as the Government has prevailed in the First Circuit, in the Supreme Court of Puerto Rico, as well as the United States Supreme Court, alleging exactly the contrary as alleged by ORIL and its expert, in the instant case. *See Patriot Cinemas, Inc. v. General Cinemas Corp., et al.*, 834 F.2d 208, 212 (1st Cir.1987) ("playing fast and loose with the courts").

## Factual and Procedural Background

As stated above, the instant case was filed on August 13, 2004 by the fresh milk processors, Suiza and VTM on the grounds of violations of their civil rights, 42 U.S.C. § 1983, as the milk price formula used by ORIL at the time of the filing of the *Complaint* was discriminatory, and was predicated on factors no longer applicable to the Puerto Rico economy. Suiza and VTM also challenged the constitutionality of the milk regulation existing at the time based on due process, equal protection and the takings clause. *Vaquería Tres Monjitas, Inc.*, 587 F.3d at 482-483.

On July 13, 2007, the Court issued an *Injunction Order*, Docket No. 480, granting a preliminary injunction to the fresh milk processors, and directing the defendants to comply with the terms and conditions set forth in the *Injunction Order* to remedy the challenges presented by the plaintiffs. In a nutshell, on July 13, 2007, the Court granted the preliminary injunction to the milk processors and ordered the following remedies:

    (1)    "**Effective immediately**, both the fresh milk processors and Indulac will begin

paying the amount of $0.55 per quart of raw milk to the dairy farmers. When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk. Under no circumstances will the fresh milk processors be required to pay more for their raw milk or carry additional costs for the purpose of allowing Indulac's access to raw milk for UHT or fluid milk manufacturing at a lower cost than the cost at which plaintiffs can acquire raw milk from fresh or fluid milk processing. The Administrator [ORIL] may set at his discretion the prices for raw milk for non fluid milk use." (Emphasis ours). *See* Docket No. 480, page 94.

(2)    "In a period of no more than thirty (30) days, **the Administrator will put into effect non-discriminatory, rational and scientific regulatory standards that will allow him to determine costs and fair profits return for all the participants in the Puerto Rico regulated milk market**. Those standards will set the reasonable rate of return that each participant should receive." (Emphasis ours). *See* Docket No. 480, page 94.

(3)    "**The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular 'fit' of Puerto Rico into any economic model which may be used from other jurisdictions**. Any economic figures used from the regulated parties from other jurisdictions are not to be stale but are to be 'for the year in question.' *Tenoco Oil Co.* [*Tenoco Oil Co., Inc. v. Department of Consumer Affairs*, 876 F.2d 1013 (1st Cir.1989) (granting injunctive relief under Due Process, Equal Protection and Taking Clause)]. **The Administrator is to establish**

6

a system or incorporate a system or provide for mitigation for regulator accrual
for losses properly supported that occur between periods of yearly reviews. **The
price structure of the fresh milk processors will be reviewed immediately under
those parameters**. The methodology of the parameters is to be consistent with this
*Opinion and Order*." (Emphasis ours). *See* Docket No. 480, page 94.

(4)     "The Administrator is ordered to adopt a temporary mechanism that will allow the
processors to recover the rate of return they are entitled to (whatever that may be) for
the year 2003 (base cost year of the present structure) and up to the day when they
begin to recover said rate based on the new regulatory standards and corresponding
order. The Administrator may so act through regulatory accruals, special temporary
rates of return or any other available mechanism of his choosing. The Administrator
will hold hearings for this purpose with the participation of plaintiffs, and all parties
within the milk industry, within a period of thirty (30) days of this *Opinion and
Order*. **A decision by the Administrator shall follow promptly**. (Emphasis ours).
*See* Docket No. 480, pages 94-95.

In view of the fact that, as of December 1, 2012, the remedial solutions presented by the
defendants are: (a) not satisfactory to the plaintiffs; (b) the parties have been unable to reach an
agreement to settle this case and/or an agreement on how to implement the agreed formula, and (c)
the defendants have yet to enact and approve a regulation to implement the agreed formula. Based
on these premises, the Court has decided to rule on this matter based on the evidence submitted
during almost two years of having presided several lengthy compliance hearings, as well as the
economic reality of Puerto Rico from on or around the year 2006 to 2013. The current economic

scenario in Puerto Rico is indeed a critical factor, and it is directly affected by yet another change in the Government's administration.

The sole purpose of the Court is to: (a) reach a final solution to the ever changing dilemma of implementing the formula agreed by the experts in the *Experts' Agreement*, Docket No. 1003; (b) determine the values of the factors of the agreed formula to be used when determining the milk price on a regular basis and/or when warranted by exigent circumstances and emergency situations, as well as, (c) approve, amend or return for further evaluation to ORIL, the proposed regulation to be used to implement the formula.[2]

After the compliance hearings finalized on December 1, 2012, the Court allowed the parties to file their legal memorandums. The Court is now faced with the twofold task to make a final determination on: (a) the values of the factors of the agreed formula to determine the price of the milk, and (b) the regulation to implement the formula, notwithstanding that the Court has made clear in the past that it will not sit as a regulatory court expert under a reiterated temerarious, uncontested consent by the Administrator of ORIL. *See* discussion *infra*.

The Court is cognizant that the analysis and the implementation of the formula is subject to the daily variables of our uncertain economy which is also directly impacted by the global economy. The formula, however, will remain subject to future changes, as the values of each factor of the formula will undoubtedly change frequently, a reality that is out of the control of the Court and the parties, unless the formula is later modified through a new and/or amended experts' agreement.

---

[2]      The Court notes that the parties have been encouraged several times to reach an agreement on how to implement the formula designed by the experts, to no avail. The Court is cognizant that the *Experts' Agreement* left open certain factors of the formula to be determined at a later stage, but based on a basic methodology stated in the *Experts' Agreement*. However, almost six years have elapsed with no agreement in sight as to the value of these factors. This is a matter of high public interest, and certainly the people of Puerto Rico deserve a more diligent effort from the parties.

### The Experts' Agreement Formula

### Introduction

With the purpose of refreshing certain important dates, it is necessary to review the chronology of the case to facilitate the Court's analysis.

1.      The instant action was filed on August 13, 2004 for the reasons set forth above.

2.      After 51 preliminary injunction hearings presided by the undersigned, the Court issued an *Injunction Order* on July 13, 2007, Docket No. 480, page 2. This opinion triggered several appeals, including a petition for *certiorari* before the United States Supreme Court, which was eventually denied, upon the recommendation of the United States Attorney General.[3]

3.      On August 26, 2008, the parties' experts' witnesses signed a document entitled "*Experts' Agreement*," Docket No. 1003, which is **now** the core of the instant case, at this stage of the proceedings. The *Experts' Agreement* has also triggered much litigation after the issuance of the *Injunction Order*, as it is instrumental for compliance of the *Injunction Order*. History and reality of the different changes in politics and economy have been detrimental in implementing the agreed formula, as the agreement covered only up to the year 2007, the year 2008 was left "to be discussed later." Notwithstanding, there was a methodology approved as to regulatory accrual, and the return on equity ("ROE"). Amortization of the regulatory accrual was also agreed, as well as the establishment of regulatory accounts pursuant

---

[3]      *Vaquería Tres Monjitas, Inc., et al. v. Fabre Laboy*, 587 F.3d at 482; *Vaquería Tres Monjitas, Inc., et al. v. Irizarry, et al.*, 600 F.3d 1 (1st Cir.2010), (*en banc denied*), cert. denied, ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (2011).

to the referenced documents dated August 26, 2008. Hence, there are significant parts of the *Experts' Agreement* that are pellucid as to the acceptance of a measuring of the Puerto Rico risk within the ROE. Since the changes in politics and the economy are not controlled by the parties nor the Court, the effort to enforce the *Experts' Agreement* has been a steep uphill task. The Court acknowledges the hard work and dedication of counsel, but the reality is that the Court still has: (a) an *Injunction Order* that has not been fully complied with by the defendants; (b) an *Experts' Agreement* that it is today, except for some recognized exceptions, in the same status that it was at the time of its execution back in August 26, 2008, and (c) the fact that the defendants have refused to enact a regulation to implement the formula agreed under the *Experts' Agreement*.

4.     On December 1, 2012, the compliance hearings finally came to an end, after 75 evidentiary and compliance hearings[4] presided by the undersigned, triggered by the defendants' failure to comply with the *Injunction Order* of July 13, 2007. The Court further notes that it has been: (a) almost nine years since the filing of the instant complaint; (b) six years after the issuance of the *Injunction Order* on July 13, 2007, as well as several appeals during the course of the proceedings, including a writ for *certiorari* filed by the defendants with the United States Supreme Court, and (c) more than five years since the *Experts' Agreement* was executed on August 26,

---

[4]     *See* Docket entries No. 584, 793, 962, 1080, 1168, 1169, 1170, 1171, 1172, 1218, 1240, 1275, 1283, 1367, 1369, 1372, 1377, 1378, 1400, 1427, 1489, 1504, 1508, 1561, 1584, 1629, 1698, 1749, 1778, 1776, 1792, 1821, 1819, 1876, 1899, 1909, 1933, 1943, 1964, 1966, 1968, 1969, 2031, 2032, 2033, 2034, 2040, 2041, 2042, 2043, 2050, 2067, 2068, 2069, 2084, 2085, 2086, 2087, 2088, 2089, 2090, 2091, 2093, 2095, 2103, 2104, 2116, 2120, 2121, 2131, 2143, 2189, 2190, 2195, 2220.

2008, and the parties and their experts have yet to agree on the validity and effect of the formula and its implementation.

### *The Experts' Agreement and the Procedural Aftermath*

As stated above, the parties' experts agreed to meet without counsel with the sole purpose of designing a new formula to determine the price of fresh milk, as the one currently used by the defendant ORIL at the time of the filing of the instant complaint, had been determined by the District Court as obsolete and unconstitutional. Hence, on August 26, 2008, the parties' experts signed the *Experts' Agreement*, Docket No. 1003, which includes the experts' formula to determine the regulatory accrual and the return of equity. The *Experts' Agreement* was handed to the Court by the attorneys and duly docketed at 2:45 p.m., pursuant to the Computerized Electronic Filing System of the Court.

The defendants' formulas, as expressed in the *Experts' Agreement*, had not been implemented because at the beginning, after the implementation the parties refused to accept the "regulatory accrual," notwithstanding that the *Injunction Order* specifically so ordered, and defendants refused to accept the ROE (return on equity) formula, and the "measure of Puerto Rico risk or unsystematic risk." The defendants practically instantly attempted to extricate themselves from accepting practically all of the agreement except those provisions that were in their favor, such as, the "Exclusivities," which are excluded from the regulatory accrual. *See* Docket No. 1003, page 1, ¶ 1.d. "The actual net income must be adjusted by adding back any payments for "Exclusivities. Dr. Freyre will provide that information ... ."

The Court reminds the parties that the formula agreed by the experts is valid and enforceable since August 26, 2008, and shall be applied retroactively, as agreed in the *Experts' Agreement*,

11

regardless of the economic circumstances at the time, and the current and most critical economic circumstances that Puerto Rico is undergoing. That is why, the formula is flexible and the values of its factors shall be adjusted according to the important changing factors, such as, the economy, unemployment rate, the percentage of islanders moving to the United States, the rating and performance of the bonds with a maturity of 20 and 30 years, issued by the public corporations of the Government of Puerto Rico, to wit, the Puerto Rico Electric Power Authority (PREPA) and the Puerto Rico Aqueduct and Sewer Authority (PRASA), the 20-year GO and 30 year Revenue Bonds Bond Buyer Indexes, as well as the Puerto Rico risk factor, also known as "unsystematic risk."

At the end of the year 2008, the Government of Puerto Rico was on the brink of bankruptcy. This critical situation triggered the enactment of the well known "Act No. 7" by then Governor Luis Fortuño, immediately after taking office in the year 2009 to avoid bankruptcy. The Court is cognizant that "Act No. 7" passed constitutional mustard both by the local and federal courts. *See Amended Opinion and Order* of September 22, 2010, Docket No. 1697; *Opinion and Order* of January 3, 2011, Docket No. 1804; *Order to Show Cause* of March 24, 2011, Docket No. 1907; *Opinion and Order* of June 28, 2011, Docket No. 1965. But, notwithstanding the *dire* economic position of the Government, the ORIL's Administrator and its expert insisted that the Milk Industry was insulated from the crisis. However, the economic figures of the sales of milk, which is the most critical indicator, showed that the fresh milk sales were severely decreasing. *See infra*.

The values of the factors of the formula will vary according the constant economic changes in the market. The agreed formula, as well as the proposed mechanism to implement the formula, that is, the proposed Regulation No. 12 submitted by ORIL, has yet to receive the final approval by the parties before it can be registered with the Puerto Rico Department of State, and it becomes

enforceable.  These subjects will be addressed below in detail.

The Court will now reinstate the procedural background since the signing of the *Experts'
Agreement* on August 26, 2008 until the end of the compliance hearings.  Several opinions have been
issued by the Court addressing the *Experts' Agreement*, as well as the defendants' non-compliance
with the *Injunction Order* of July 13, 2007, which are worth revisiting at this time to promote proper
background to the reader.

1.    *Amended Opinion and Order* of September 22, 2010, Docket No. 1697.

In this *Opinion and Order*, the Court addressed several issues, including the fact that,
as of September 22, 2010, "ORIL has yet to act and supplement the formula that is to be adopted.
ORIL continues to procrastinate by not producing a formula for a return of equity not for a regulatory
accrual."   Docket No. 1697, page 9.  "Two years have elapsed since the *Experts' Agreement* was
executed, and no results have been produced, as the defendant ORIL has yet to determine the 'Puerto
Rico risk factor' in order to establish a value to the factors of the CAPM formula and proceed with
the corresponding calculation to enforce the formula."  *Id.*  Moreover, the "experts' disagreement
seems to stem from the words 'plus a measure of Puerto Rico risk,' used in the interpretation either
under the CAPM method or under the Jonathan Lesser's ROE formula."  *Id.*[5]  "Much has been
written, yet the language is clear, 'a measure of Puerto Rico risk' was to be established within the
now agreed upon CAPM formula.  But 'plus a measure' does not signify 'no measure.'" Docket
No. 1697, pages 9-10.  "**The measure is not to be decided by the Court, the measure must be
reasonably, rationally and scientifically structured, and to be determined by ORIL**." *Id.* at

---

[5]    The Administrator of ORIL chose to follow th CAPM method, as he had the option as the
Regulator.

page 10. (Emphasis ours). "The Court then reviews in a limited fashion for compliance under due process, equal protection or under a scientifically based reasonable and/or rationale parameters." *Id.* "A regulation takes property without due process of law only if ' "arbitrary, discriminatory or demonstrably irrelevant to the policy the Legislature is free to adopt. ...'" *Tenoco Oil Company, Inc. v. Department of Consumer Affairs, et al.*, 876 F.2d at 1021, (quoting *Pennell v. City of San José*, 485 U.S. 1, 11 (1988) (citations omitted), cited at the *Injunction Order* (Docket No. 480), p.p. 57-59." "In the instant case, the parties agreed on a specific component of a parameter. ORIL, however, understands that no agreement was reached and/or that the economics from August 26, 2008 until the present, do not warrant the 'risk.'" *Id.*

The Court further reminded the parties the repercussions of entering into a stipulation, citing *Christian Legal Society Chapter of the University of California, Hastings College of the Law a/k/a Hastings Christian Fellowship v. Martínez, et al.*, ___ U.S. ___, 130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010); *Chao v. Hotel Oasis, Inc., et al.*, 493 F.3d 26, 31-32 (1st Cir.2007) (the court refused to disregard the stipulation reached by counsel "based on the general principle that 'stipulations of attorneys made during a trial may not be disregarded or set aside at will'").[6] *See* Docket No. 1697, page 11. In *Chao*, the Court held that the stipulations are highly regarded in our judicial system and "[o]nce entered, parties are 'not generally free to extricate themselves ... [unless] 'it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties.'" 493 F.3d at pages 31-32. *Id.* The Court further reminded the parties that their respective economists have agreed, and counsel constructively also agreed [to the formula] by counsel's filing of the

---

[6]     The economics of the case were left to the discretion of the experts; they worked on the *Experts' Agreement*; the stipulation was presented to the Court by counsel and filed with the deputy clerk Omar Flaquer in open court. (*See* the prologue explanation provided by the experts at the *Experts' Agreement*, Docket No. 1003).

stipulation. Docket No. 1697, page 12.

In order to "extricate" from the *Experts' Agreement*, ORIL has the burden of proof of showing that "it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties." *Chao*, 493 F.3d at 31-32. "The Court has not been impressed by ORIL's proffer, and concludes that the reason adduced are purely pretextual in nature." *See* Docket No. 1697, page 12. "The defendants' experts now claim that 'there is no need to add an additional risk premium to the reasonable rate of return in order to compensate fresh milk processors.'" *Id.* The Court found that the "economic factors produced as of August 2008, simply do not show that the threshold level of 'manifest injustice' pursuant to *Chao*, 493 F.3d at 31-32, has been met in a 'manifestly' fashion." *Id.* The Court concluded that "ORIL has simply not shown to the Court that the Puerto Rican economy had improved in the year 2008 not warranting relief from the *Experts' Agreement* that the parties entered." *Id.* "The application of the formula to other subsequent years will depend on the economics of the Island, as applied to the regulated industry." *Id.* "**That is, the formula for subsequent years can be increased/decreased or even eliminated, if there is a reasonable, rational, and scientific basis**." *Id.* (Emphasis ours). The Court further reiterates notes 4 and 5 of its *Amended Opinion and Order*, Docket No. 1697, page 12.[7]

"ORIL's expert attributes the difference to 'ORIL price regulation,' but does not point

---

[7]         Note 4: VTM calculated the risk modestly at 1.69 percent points, *see* Docket 1192 at p. 19.  The rational of defendants' expert to "extricate" from the *Experts' Agreement* at Docket No. 1676-1, p. 9, fails to address the "clear language" of the agreement, and merely concludes that "there is absolutely no need for an additional 'risk premium,' although accepting that 'the recession is more severe in Puerto Rico,'" compared to the mainland, *see* Docket No. 1676-1, pp. 8-9.

            Note 5: As stated in the *Experts' Agreement*, the CAPM formula was and for an "initial inquiry for the calculation ... as of December 31, 2002." *See* Docket No. 1003, ¶ 1.a.  However, "the calculation is to be performed until December 31, 2007 ... ." *See* Docket No. 1003, ¶ 1.b.

out to specific data." *See* Docket No. 1697, pages 12-13. "Because the onus is with the party that

wishes to "extricate" itself, ORIL is ordered to calculate a rational, reasonable risk premium within

the formula, [denominated in the *Experts' Agreement* as a] "plus a measure of risk" ... agreed by [all

experts], on August 26, 2008, *see* Docket No. 1003." *Id.* at page 13, *Fn.*6.[8]  Note 6: The "measure

of ... risk" is not a permanent fixture, as the ROE formula indeed was originally agreed to calculate

the initial "return of equity" to be established in the year 2007.  The fixture based on scientific

economic data can be technically increased or decreased.  The problem is that ORIL simply has

ignored the impact of its *Experts' Agreement* and simply unilaterally attempts to withdraw from the

effects of the agreement.

The Court reiterates its findings in the *Amended Opinion and Order* of September 22,

2010, Docket No. 1697, page 13, *Fn.*7:[9]

> ORIL and its expert, Dr. Cotterill, have lost track of the fact that the
> rate of return on equity ("ROE") to be calculated, is not merely for the
> year 2008, but it is to be calculated for, at the very least, from the date
> of the filing of the instant complaint, if not retroactive to potentially
> December 31, 2002.  According to Dr. Cotterill, newly surfaced
> economic data does not now require any "measure of Puerto Rico
> risk," "because of the operations of the ORIL pricing system **under**

---

[8]　　　Note 6: The "measure of ... risk" is not a permanent fixture, as the ROE formula indeed was originally agreed to calculate the initial "return of equity" to be established in the year 2007. The fixture based on scientific economic data can be technically increased or decreased. The problem is that ORIL simply has ignored the impact of its *Experts' Agreement* and simply unilaterally attempts to withdraw from the effects of the agreement.

[9]　　　Note 7:  Moreover, the Court notes that the conclusion of the defendants' expert does not offer any raw economic data to "extricate" itself from the August 2008 *Experts' Agreement* that incorporated the specific language of "plus a measure of Puerto Rico risk."  One glaring example constitutes that the market of fresh fluid milk continues to decrease, as fluid milk sales have decreased from 330.5 million quarts in 2006 to 309.7 million quarts in 2008.  Notwithstanding that the UHT milk was ordered by ORIL to increase its price to $1.82 per quart in July 2008, up from $1.35 in July 2007, the sales of fresh fluid milk declined from 254.95 million quarts in 2006 to 239.7 million quarts in calendar year 2008.  Figure No. 9 of defendants' expert, Dr. Cotterill, reflects a further downward trend up to November 12, 2009 from January 2008, in fluid fresh milk sales.  *See* Docket No. 1676-1, Figure No. 9.  VTM reasonably concludes that "thus, fresh milk processors are faced with a declining market, a condition which increases fixed costs per quart."  *See* Docket No. 1192, p. 15.

the 1957 Milk Pricing Law,"[10] *see* Docket No. 1676-1. (Emphasis supplied). However, the ROE is to be established using the data available then in the years 2007 and 2008, when the stipulation was agreed for a determination on the return on equity for a formula to begin on December 31, 2002.

The Court explained in Note 8, that the defendants' expert has stated that the "[e]conomic theory does not include these factors in the analysis of the demand for a good such as milk. Also they do not contribute to the economic analysis of the industry based risk in a regulated industry such as fresh milk in Puerto Rico. Municipal bond rates' lack of applicability is discussed in this report." *See* Docket No. 1676-1, p. 10, n.1." Docket No. 1697, page 15, *Fn*.8.[11] The experts

---

[10]    At the time that the *Experts' Agreement* was reached in August 2008, the poverty rates statistics in the United States had risen to 13.2%, and the poverty level in Puerto Rico had risen to 44.8%. *See* Docket No. 1669-1, Exhibit IV-A. In the year 2007, the average poverty level in the United States was 13.0%, while in the State of Mississippi was 20.6%, and in Puerto Rico was 45.5%. *See* Docket No. 1669-1, p. 48. The poverty level in the United States for the year 1999 was 9.2%, while in the State of Mississippi was 16.0%, and in Puerto Rico was 44.6%. *See* Docket No. 1210-2, Exhibit III and Exhibit III-A. As to the unemployment rate, the Court notes that for the year 2007, the average unemployment percentage in the United States was 4.6%, and in Puerto Rico was 10.9%. *See* Docket No. 1210-2, Exhibit I-A. In the year 2007, the personal income per capita in the United States was $39,392.00, and in the State of Mississippi was $29,542.00. *See* Docket No. 1669-1, p. 29. The personal income per capita in Puerto Rico in the year 2007 was $13,244.00. *See* Government Development Bank for Puerto Rico's website: www.gdb-pur.com/economy/documents/1-AE2009.pdf. The Court can take judicial notice of an unquestioned economic event, which has been reprinted in internet articles describing or confirming the event, or other information, such as, published governmental statistics. *Chhetry v. U.D. Department of Justice*, 490 F.3d 196 (2d Cir. 2007). Further, the States cited constitute official data provided by Government figures [**statistics**].

The Court further notes that the average unemployment rate (seasonally adjusted) in the United States in the year 2008 was 5.8%, and in Puerto Rico was 11.5%. *See* Docket No. 1669-1, p. 13. Further, the average income per capita in the United States in the year 2008 was $40,166.00, being the State of Mississippi, the poorest of the Nation, with an income per capita of $30,383.00. *See* Docket No. 1669-1, p. 29. Puerto Rico's income per capita in the year 2008 was $14,236.00. *See* Docket No. 1210-1, Exhibit II. The above economic scenario, for the years 2007-2008, in August 2008, at the time the *Experts' Agreement* was reached, as to the CAPM (Capital Asset Pricing Model for the milk processors), the above state economic scenario (2007-2008) fails to reach the threshold of constituting a "manifest injustice," *see Chao v. Hotel Oasis, Inc., et al.*, 493 F.2d at 31-32, as to the inclusion by agreement into the CAPM formula to determine the regulatory accrual and/or return of equity, a criteria of a "measure of ... risk" for doing business.

[11]    Note 8: The Court was about to recognize that of all the economic parameters suggested by the Court to analyze the potential economic tendency in the local market, including income per capita, unemployment, bankruptcies, poverty rates and bond ratings, specifically the bond ratings in Puerto Rico had improved (both State and Municipal bonds). (Moody's downgraded the General Obligations of the Commonwealth of Puerto Rico to Baa2 in May 2005, followed by a further downgrade to Baa3 in May 2006. Thereafter, in April 2010, Moody's "recalibrated" the Puerto Rico Commonwealth obligations raising the rate from Baa3 to A3). *See* Docket No. 1669-1, p.p 7-8. However, the defendants' expert states that "municipal bond rates' lack of applicability is discussed in

17

for plaintiffs, Dr. Freyre and Dr. Giachinno, disagreed as well as the Court.

The Court notes that the economic factors stated at *Fn.*6 and *Fn.*7 cited in the instant opinion fully justified the experts' opinion to include within the CAPM formula or the Lesser's formula method, which includes an "unsystematic risk" parameter.

The Court further held the parties shall not use Dean Foods, Inc. ("Dean Foods") as part of the Beta coefficient. *See* Docket No. 1697, page 15. The parties shall use an entity comparable in size and milk production to that of Suiza and VTM. *Id.* at pages 15-17. The Court is cognizant that after the completion of the compliance hearings both Suiza and VTM agreed not to use negative Betas in the formula. But negative betas were insisted upon during the hearings until almost the very end of the procedure. *See Post-Hearing Memorandum In Support Of The Imposition Of A Specific Remedy As A Result Of Non-Compliance And In Support Of Petition For Contempt*, as amended, Docket No. 2248 (hereinafter "Suiza's Post Hearing Memorandum"), and *Vaquería Tres Monjitas, Inc.'s Memorandum On Compliance Of Amended Preliminary Injunction Order*, Docket No. 2228 (hereinafter "VTM's Memorandum"). "The Court understands that it cannot order a specific company to be placed within the ROE formula, as our power is limited to striking actions by the Regulator that violate due process, equal protection, constitute a potential taking, or setting unscientific parameters that are irrational." Docket No. 1697, page 17. "Therefore, the Court strikes Dean Foods or any other company that is not reasonably comparable market to that of Suiza

---

this report." *See* Docket No. 1676-1, p. 10, n.1. The defendants' economic expert stated that: "The Court also asked for U.S. and Puerto Rican [State and] municipal bond rates, and U.S. and Puerto Rican bankruptcy information for all industries, and changes in the value of local investments. Economic theory does not include these factors in the analysis of the demand for a good such as milk. Also they do not contribute to the economic analysis of the industry based risk in a regulated industry such as fresh milk in Puerto Rico. Municipal bond rates' lack of applicability is discussed in this report." *See* Docket No. 1676-1, p. 10, n.1.

and VTM, and is not doing business in a reasonably comparable market to that of Puerto Rico." *Id.*[12]

"ORIL is, thus, ordered to use as part of the Beta Factors reasonably comparable companies, and not

a company that is to assuredly from the very start to decrease unreasonably the risk factor at the Beta

coefficient." *Id.*

> The Court further held:
>
> The Court cannot order a specific Beta Factor of 0.38 nor a determined unsystematic risk of 1.69, as urged by Suiza and/or VTM at Docket No. 1194, p.p. 4-8; the unsystematic risk of 1.69 constitutes a "settlement" proposed by VTM, *see* Docket No. 1192, p. 19. The Court understands that this is a matter for the Administrator to originally determine and not the Court. The Court reiterates that ORIL is ordered to calculate Suiza's and VTM's capital base reconstructing the same through separate regulatory accrual accounts. (Unchallenged Finding of Fact number 54 of the *Injunction Order* at Docket No. 480, p.p. 37-38).
>
> A payment schedule should be presented for examination by the plaintiffs, containing fixed and variable interest (ORIL has created a reserve recognizing the potential debt to the two fresh milk processors).

*See* Docket No. 1697, page 18. The Court granted ORIL until November 3, 2010 to comply with

the requirements set forth in the *Amended Opinion and Order* of September 22, 2010, Docket

No. 1697. The Court also listed the costs and expenses to be included in the amendments to ORIL's

Regulation No. 12, and ordered ORIL to incorporate said amendments to the proposed Regulation

No. 12. The Court set a hearing for October 20, 2010 at 9:00 a.m. to determine the date of

publication and implementation of the amendments to ORIL's Regulation No. 12. *See* Docket

---

[12]    The Court based its analysis to strike on the case of *Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d at 1026-1027 (standing for the proposition that a parameter had to be "rationally related to Puerto Rico," rejecting a former federal standard, no longer applicable by law). Dean Foods, as explained *infra* is forty five times the size in value of sales to the sum of the volume of both Suiza and VTM. Furthermore, Dean Foods does not sell milk in regional calid temperatures, as is Puerto Rico. *See* further data *infra*.

No. 1697, pages 18-20.  An evidentiary hearing was held on October 20, 2010, *see* Docket No. 1749.

2.      *Opinion and Order* of January 3, 2011, Docket No. 1804.

In response to several motions filed by the parties, the Court issued the *Opinion and Order* of January 3, 2011.  Once again, the Court summarized and reinstated its prior holdings; emphasized on the formula agreed by the parties' experts and formalized in the *Experts' Agreement* of August 26, 2008, Docket No. 1003, and the duty of the parties to comply with the terms of the *Experts' Agreement*.  The Court also emphasized on the significance of determining the value of the Puerto Rico risk, the unsystematic risk, a critical and most important factor of the agreed formula. The Court flatly rejected, once again, that the measure of the Puerto Rico risk cannot be zero, as suggested by the defendants.[13]  In the use of the CAPM-ROE formula, the Court emphasized that the comparable surrogate companies to be used must be commercial entities similar in size and production to Suiza and VTM, specifically excluding the use of Dean Foods, Inc., which is one of the largest milk processors of continental United States.  "According to Suiza, [and further not challenged by the Administrator of ORIL], Dean Foods has a capital of $6.759 Billion, **representing 96.3 percent of the capital of the [total] sample used to calculate the Beta**, and is 'close to

---

[13]      The Court had stated in its *Amended Opinion and Order* of September 22, 2010, Docket No. 1697, *Fn*.6,7,8 that the economic figures could not sustain an unsystematic risk of zero [0].  The *Experts' Agreement*, Docket No. 1003, clearly provides as follows: "Return on Equity (ROE). [W]e have agreed the following:

a.      The method to calculate the ROE could either be the Capital Asset Pricing Model (CAPM), as described in Regulation 12, plus a measure of Puerto risk or the method used in the report by Jonathan Lesser plus a measure of Puerto Rico risk [unsystematic risk] ... [or the method used in the report of]

b.      The ROE calculated by Jonathan Lesser will be unlevered using the following equation: ROE is equal to the unlevered ROE plus the debt to equity ratio times the difference of the unlevered ROE and the cost of debt ... [the Jonathan Lesser method plus a measure of Puerto Rico risk [unsystematic risk] to determine the *beta* coefficient component].

20

100 times the reconstructed capital of the fresh milk processors in Puerto Rico.'  *See* Docket

No. 1194, p.p. 2-3 referring to Suiza's Exhibits No. 14 and 15, admitted by the Court."  *See*

*Amended Opinion and Order*, Docket No. 1697, page 16.  A lengthy and detailed analysis made by

the Court followed, leading to the defendants' non-compliance of the *Injunction Order* of July 13,

2007, Docket No. 480.  *See Opinion and Order* of January 3, 2011, Docket No. 1804, pages 1-10.

          The Court further held that the burden of compliance with the *Injunction Order* of

July 13, 2007, rests on defendant ORIL not on plaintiffs.  *See* Docket No. 1804, page 13.   For

example, "[a]s to the 'unsystematic risk' incorporated into the *Experts' Agreement* relating to the

'measure of risk,' the argument made by ORIL is purely conclusive in nature."   *See* Docket

No. 1804, page 13.  "But, the problem was not mitigated by ORIL's fixed price of raw milk since

said price to Indulac was determined to be seriously constitutionally deficient, since the ' fixed price'

was marked up by the Administrator in order to authorize Indulac to purchase raw milk at much

cheaper prices to produce UHT milk, which not only competed with fresh milk, but also slowly but

surely usurped the market from fresh milk.  *Vaquería Tres Monjitas, Inc., et al. v. Irizarry*, 587 F.3d

at 469-470 ("Indulac purchased the surplus raw milk from [the] processors at a price significantly

below the price that the processors paid the dairy farmers for their non-surplus raw milk ..."), unlike

the other milk processors, the price at which Indulac may sell its milk to consumers is not regulated."

*See* Docket No. 1804, page 14.  "This lack of regulation as to Indulac's retail price for milk, coupled

with the relatively low price at which it could purchase surplus raw milk from plaintiffs, allowed

Indulac's profit margin to soar, while the processors struggled."  *Id.* at pages 14-15.  "**And, since**

**Indulac was able to purchase its raw milk at a deflated price, UHT milk became significantly**

**less expensive than fresh milk - a phenomenon unique to Puerto Rico - causing Indulac's**

21

UHT milk to begin to dominate the Puerto Rican market." (Emphasis ours). *Id.* at page 15.

"**Therefore, the price of milk set forth by ORIL was not a mitigating factor for the years 2002 until months after the *Injunction Order* in July 2007**." (Emphasis ours). "Further, the price of raw milk constituted an aggravating factor to the milk processor who had to compete with Indulac, also enjoining the benefit of cheap raw milk." *Id.* "Hence, Indulac competed favorably with both milk processors to the extreme that it 'beg[an] to dominate the Puerto Rican milk market.' *Vaquería Tres Monjitas,* 587 F.3d at 470." "The price of raw milk reached in fact the threshold of a 'taking.' *Vaquería Tres Monjitas*, 587 F.3d at 483. "The [district] court is of the opinion that defendant ORIL *et al.* cannot now shift gears and allege new reasons as to the inclusion of Dean Foods in the Beta factor nor allege new reasons than those previously alleged in its Compliance Memorandum, Docket No. 1193, as reconsideration standards under Fed.R.Civ.P. 59(e) in the First Circuit eschews the parties on reconsideration to 'advance new arguments that could or should been presented prior to [the District Court's resolution] judgment.' *Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc.*, 455 F.3d 7, 15-16 (1st Cir.2006)." *See* Docket No. 1804, page 15.

One of ORIL's arguments is that the *Experts' Agreement* is not final, nor a binding contractual agreement, or a "joint stipulation of facts between the parties as to any particular measure of risk. . . . But the parties here did not agree on the existence, term, or measure of risk premium. *See* Docket No. 1715, p.p. 2-3." *See* Docket No. 1804, page 16. As to ORIL's new argument regarding the non-existence of the *Experts' Agreement*, the Court held:

> The court has previously set forth that the *Experts' Agreement* does not constitute a "*secula seculorum*" type of agreement in terms of time frame going retroactively to 2004 (or 2002) or forward prospectively from August 26, 2008. But, the phrase "**plus a measure of Puerto Rican Risk**" does not mean "**no measure**" of Puerto Rican Risk. (Emphasis ours). [Emphasis in the original]. The

22

specific number within the "measure of risk" is to be determined by the Administrator considering P.R. economic factors then present on August 26, 2008. The court has interpreted that the unsystematic risk factor, future or past, does not constitute a permanent feature, as the original number could be going retroactively or forward, increase, decrease or disappear. But the Administrator does not enjoy unbridled discretion, as the matter of unsystematic risk must be rational, reasonable, and based on scientific data. The court understands that the *Experts' Agreement* on an original measure of unsystematic risk as the economic factors included in our clarification *Order*, Docket No. 1699 at footnotes no. 6 and 7, certainly warranted the *Experts' Agreement* to agree on "measure of Puerto Rican Risk." The court does not interpret the measure as a permanent fixture in the formula as the economic conditions in prior years 2004-2008, could warrant either an increase or a decrease or even an elimination; the same analysis applies going prospectively from August 26, 2008 forward. The court is of the opinion that at least covering the first initial computation, the parties agreed to a risk factor (for example, on the consideration of the Regulatory Accrual, the first period of analysis was set "to be performed until December 31, 2007, and 2008 is to be discussed later"). *See Experts' Agreement*, Docket No. 1003, at ¶ 1(b). From the original date prospectively and retrospectively, the determination could depend on a rational, scientific method to increase, decrease, or eliminate the unsystematic risk. The court interprets the original date to be as to the ROE from December 31, 2007 to December 31, 2008. *See* analysis, infra.

The Court further addressed the point of "no agreement" as to the unsystematic risk.

At the outset, the Court stated in the *Opinion and Order* that the position of ORIL's counsel and its expert witness are different. ORIL's expert insists that "there is no measure of risk, because Regulation No. 12 'true ups' disposition eliminates the risk as Regulation No. 12 signed on July 22, 2008, and effective sometime thereafter, (after publication by the State Department of Puerto Rico pursuant to law), is not retroactive in nature." *See* Docket No. 1804, page 25.[14] "Regulation No. 12

---

[14]    The Court notes that, as of this date, the proposed Regulation No. 12, is still just a proposal, as the parties has yet to agree to the language, and other matters. In sum, the proposed Regulation No. 12 has not been approved by the defendants due to the discrepancies with the plaintiffs, hence, it has not been duly signed and presented to the Puerto Rico State Department for proper registry, and public notice. The Court is cognizant that this case was filed on August 13, 2004, and the *Injunction Order* was entered on July 13, 2007, Docket No. 480. Since

of July 22, 2008 is purely prospective, hence, could not be applied to the ROE (Reasonable Rate of Return or to the Regulatory Accrual also expressly contemplated by the *Experts' Agreement*)." *Id.* "Dr. Cotterill, after being cross-examined by counsel and asked by the court as to the potential retroactivity of Regulation No. 12, then, as a fall back position, claimed that there was no risk retroactively and prospectively, because the major and most recurring cost expense of Suiza and VTM was the price of raw milk, which was set by Regulation. *See* Docket No. 1799, pp. 112-121, wherein Dr. Cotterill described the milk prices as a 'constant.'" *See* Docket No. 1804, page 26. But "true ups" an automatic increase or decrease have never been placed in effect as admitted by Dr. Cotterill, which the Court now adds, up to the date of the signing of this *Opinion and Order*. The Court vehemently disagreed with Dr. Cotterill's position, and held that "the raw milk price constituted a 'taking' banned by the United States Constitution. *Vaquería Tres Monjitas*, 587 F.3d at 484." *See* Docket No. 1804, page 26. "Hence, the price of raw milk paid by the milk processors did not constitute a mitigating measure of risk but on the contrary, constituted an aggravating factor." *Id.* at pages 26-27. "It is the court's opinion that the price of milk paid by the milk processors was precisely one of the most severe constitutional deficiencies established by the predecessors Administrator." *Id.* at page 27.

The Court further held that it "rejects as out-off bounds, and being tardy, the claim that the *Experts' Agreement* was no agreement a 'recent vintage' argument being made after the holding of eleven compliance hearings, wherein the court stated that the agreement would be enforced. *See* Docket No. 1737, p. 5." *See* Docket No. 1804, page 27. Lastly, the Court "rejected the claims of a 'no agreement' as to the unsystematic risk." *Id.*

---

its inception, this case has gone thru three very different political administrations.

As to the Court's position of non-inclusion of Dean Foods under the CAPM formula, the Court reiterated the above analysis that "there is no rational, reasonable nor any analysis whatsoever fitting Dean Foods to the regional calid temperature milk and expensive market of Puerto Rico nor by including such a large company (forty-five time the size in volume of business of the sum of VTM and Suiza), into the Puerto Rican market." *See* Docket No. 1804, pages 27-28. "Contrary to ORIL's argument the court is not improperly substituting ORIL's discretion of an economic standard." *Id.* at page 28. "In *Tenoco*, *supra*, [*Tenoco Oil Co., Inc. v. Department of Consumer Affairs*, 876 F.2d at 1026-1027], as stated above the court struck a state federal economic standard not only as stale but also because the standard could not rationally be applied to 'Puerto Rico alone.'" On September 22, 2010, the court ordered that another comparable company be added or Dean Foods would be stricken, and the Beta component would then be limited to the other four surrogate companies." *See* Docket No. 1804, page 28.

3. *Order To Show Cause* of March 24, 2011, Docket No. 1907.

After several evidentiary hearings and *Opinions and Orders*, the Court issued an *Order To Show Cause* on March 24, 2011, triggered by the defendants' resistance to comply with the *Injunction Order*, Docket No. 480, and the *Opinions and Orders* that followed. In the *Order To Show Cause*, the Court emphasized on the defendants' "inconsistent position relating to negating the effect of their own expert's acceptance in recognizing a risk of doing business in Puerto Rico because of dire economic reasons." *See* Docket No. 1907, page 2. "Defendants in the instant case are steadfastly negating that there exists an economic crisis in the island, notwithstanding in various cases the government has moved the federal and/or local courts to accept that the island is suffering from the 'worst financial crisis in its history.' *United Automobile Aerospace, Agricultural*

*Implement Workers of America International Union, et al. v. Luis Fortuño, et al.*, 633 F.3d 37
(1st Cir.2011) (concurring opinion Boudin, C.J.)." *See* Docket No. 1907, page 2.  The Court
explained that plaintiff UAAIWAIU challenged Governor Fortuño's commonly known as "Act 7,"
enacted as the "Law Declaring a Fiscal State of Emergency and Establishing a Comprehensive Fiscal
Stabilization Plan to Save Puerto Rico Credit."  *Id.*  According to the legislative intent, "Act No. 7
was intended to eliminate Puerto Rico's $3.2 billion structural deficit."  *Id.*

   Prior to *United Automobile Aerospace, Agricultural Implement Workers of America
International Union, et al.*, 633 F.3d 37, the constitutionality of Act No. 7 had been challenged in
the local courts, and the Puerto Rico Supreme Court upheld the constitutionality of Act No. 7.  *See
Olga Domínguez Castro, et al. v. The Commonwealth of Puerto Rico, et al.*, 2010 TSPR 11 (2010).
*See also* Docket No. 1907, page 4.  In *Domínguez Castro*, the constitutionality of Act No. 7 was
challenged by the government employees that were terminated by the implementation of Act No. 7,
which was geared to reduce the size of the government, as an emergency fiscal measure under Act
No. 7.  *See* Docket No. 1907, page 4.  *Domínguez Castro* appealed the ruling of the Puerto Rico
Supreme Court to the United States Supreme Court.  *See Domínguez Castro, et al. v. Government
of the Commonwealth of Puerto Rico, et al.*, 2010 WL 4220510 (*On Petition for a Writ of Certiorari
to the Supreme Court of Puerto Rico*, Brief in Opposition of August 5, 2010).    In its Brief in
Opposition, the Commonwealth of Puerto Rico (the "Government"), was specific as to the dire
economic situation of Puerto Rico since the year 2006, which forced the enactment of Act No. 7,
and accepted that Puerto Rico was undergoing "a grave fiscal emergency" ... "existing since at
least 2006 in Puerto Rico."  *See* Docket No. 1907, page 7. The Government specifically argued in
its brief:

26

The legislature of the Commonwealth of Puerto Rico passed Act No. 7 in March 2009 in response to an unprecedented "fiscal crisis." Pet. App. 291a. In the law's extensive Statement of Motives ( id. 295a-324a), **the legislature explained that the Commonwealth was facing a serious $3.2 billion structural deficit equal to 42 percent of estimated revenues. That deficit resulted from, among other things, negative economic growth since early 2006. The Commonwealth's Planning Board, however, had consistently projected positive economic growth. Thus, tax revenues had fallen far short of what the Commonwealth had anticipated and expenditures had far exceeded revenues**. Id. 295a-301a.

The resulting structural deficit exposed the Commonwealth to a potentially disastrous downgrade in its credit rating. **Although bonds issued by the fifty States have credit ratings of A1 or higher, Puerto Rico bonds had fallen from a rating of Baa1/A- in 2004 to Baa3/BBB- in 2009. That rating left Puerto Rico government debt just a single step above "junk" status**. The downgrading of Puerto Rico's credit to junk status would have reduced the value of its outstanding obligations by 30 to 50 percent. **The impact on the island of such a destruction in wealth would have been devastating, as local owners hold more than $10 billion in Puerto Rico government obligations. The Commonwealth and other government bondholders also would have been required immediately to post almost $900 million in additional collateral to secure their obligations**. Pet. App. 302a-304a.

A downgrade to junk status would also have severely impaired Puerto Rico's ability to carry out its governmental operations. Investors who had traditionally acquired Puerto Rico bonds but who are required to maintain assets in safe investments could not have continued to invest in those bonds. Without recourse to public financing, the government could not have paid employee salaries or provided citizens with essential services. **Those consequences would have had a crippling effect on Puerto Rico's economy, leading to the loss of 130,000 jobs in a jurisdiction whose total population is just four million people. According to the Planning Board's estimates, unemployment could have reached 25 percent**. Pet. App. 304a-306a.  (Emphasis ours).

*See* 2010 WL 4220510, **3-4 (U.S.)(August 5, 2010).  The United States Supreme Court denied the

petition for *certiorari*, ___ U.S. ___, 131 S.Ct. 152, 178 L.Ed.2d 38 (2010).

The Court emphasized in the *Order To Show Cause* that the dire economic crisis in

Puerto Rico is acknowledged by both the First Circuit and the Supreme Court, at the request of the

27

Commonwealth of Puerto Rico,[15] constitutes yet another reason that warrants the legitimacy of the

agreement, as the *Experts' Agreement*'s inclusion of an unsystematic risk (a measure of "Puerto Rico

risk" within the ROE factors) does not warrant that the *Experts' Agreement* be disregarded and set

aside. *See* Docket No. 1907, pages 8-13. Hence, the Government of Puerto Rico was barred from

alleging that there was no economic crisis in Puerto Rico.

> It is potentially clear that the expert's opinion [defendants] was a
> recognition to the depressed status of the world economic crisis
> which the government of Puerto Rico has correctly used to persuade
> courts to enter favorable determinations by the Circuit Court of
> Appeals, the Supreme Court of Puerto Rico and the Supreme Court
> of the United States. The defendants in the instant case are part of the
> government of Puerto Rico as they remain in the instant case strictly
> in their official government capacities. Hence, this court now adds
> simply that the defendants are barred, pursuant to the estoppel
> principles, from alleging contrary reasoning in this case when the
> government has prevailed in other cases using precisely on contrary
> arguments. *Patriot Cinemas, Inc. v. General Cinemas Corp.*,
> 834 F.2d208, 211-212 (1st Cir.1987).

> The court reiterates its limited holding as to "a measure of
> Puerto Rican risk" that the coinage used by the experts was ill stated
> as the court recognized since its inception that the risk should have
> been denominated related to the world economic crisis and not merely
> referring to Puerto Rico." "The court had also clarified [in prior
> decisions on this subject matter] that the 'measure of Puerto Rico risk
> was ill denominated by the experts of ORIL [and that of the
> industrial] milk processors and did not constitute a coinage by the
> district court.'" (Docket 1804 reiterating Docket 1697). The court
> further clarified that the inclusion of "**a measure of unsystematic
> risk**" was **not a permanent fixture** (emphasis supplied at
> Docket 1804) and Docket 1697 [and] could vary potentially "from
> year to year" depending on the economic scientific data of
> Puerto Rico each year.

> Much to the chagrin of the court, notwithstanding an economic

---

[15]     *See Domínguez Castro v. E.L.A.*, 178 D.P.R. 1 (2010); *United Automobile, Aerospace,
Agricultural Implement Workers of America International Union, et al. v. Fortuño, et al.*, 633 F.3d 37 (1st Cir.2011);
*Cortés v. Burset*, 909 F.Supp.2d 91, 94 (D.P.R.2012) (collection of cases cited therein).

depressed world economic scenario urged at the behest of local government which has persuaded the Court of Appeals of the First Circuit court, the Supreme Court of Puerto Rico and the Supreme Court of the United States, all in cases where the government has prevailed, the defendants in the instant case insist on refusing to accept that Puerto Rico has undergone a critical economic scenario since mid June 2005 (the economic vacations forced on government employees) until at least 2010. The court makes no prediction as to 2011 although the court notes an increase in the bond rating of Puerto Rican Bonds to BBB/A-2 effective on January 27, 2011, and later a decrease in unemployment in the United States which may affirmatively affect the Puerto Rican economy this year including a positive stimulus to the unemployment rate in Puerto Rico.

*See* Docket No. 1907, pages 9-10.

The Court ordered the defendants to show cause within the next ten working days, "why they, in their official capacities, should not be totally barred from continuing to reject 'a measure of unsystematic business risk' to be integrated with the CAPM formula to determine plaintiffs' return of investment (ROE), by the estoppel doctrine of 'preclusive inconsistent positions' as expressed in the case of *Patriot Cinemas Inc. v. General Cinemas Corp.*, 834 F.2d at 211-212." *See* Docket No. 1907, page 12. "Further, the defendants are to produce as requested herein within the same ten (10) working days the scientific economic data together with a full scientific rational explanation as to how the unsystematic business risk was calculated after the court struck the inclusion of Dean Foods as to Return of Investment (ROE) calculation also on a year to year basis." *See* Docket No. 1907, pages 12-13.

As of the date of the drafting of the instant *Opinion and Order*, the Court notes that whatever improvements were reflected in the Puerto Rican economy when the Court entered its *Order To Show Cause* of March 24, 2011, Docket No. 1907, no longer exists, as the current economic data is once again grim, and with a negative outlook.

29

4.    *Opinion and Order* of June 28, 2011, Docket No. 1965.  This *Opinion and Order* follows the parties' responses to the Court's *Order To Show Cause*, Docket No. 1907.  Once again the Court found that the defendants have failed to comply with the *Injunction Order* of July 13, 2007.  The Court proceed to make an analysis on why the defendants have yet to comply with the *Injunction Order*, and establishes the rules to be followed by the parties in the compliance hearings. The Court notes that the compliance hearings came to an end on December 1, 2012.

The first ruling was that the Court "will not authorize or consider any proposal or compliance scenario by defendant ORIL that does not fully comply with the *Orders* of the Court at Docket entries No. 1697, 1698 and/or 1804." *See* Docket No. 1965, page 2.  The "defendants will not be authorized to unilaterally 'extricate themselves,' *see Chao v. Hotel Oasis*, 493 F.3d 26, 31-32 (1st Cir.2007), from the clear stipulation entered by all experts on August 26, 2008, including defendants, the Secretary of Agriculture and ORIL's expert at Docket No. 1003, wherein the parties adopted the 'CAPM methodology,' which is the Capital Asset Price Model (CAPM) authored by Ibbotson to calculate the rate of equity of the two processing plants, *see* Docket No. 1003, page 1, Article 2(a)." *Id.  See also Christian Legal Society Chapter of the University of California, Hastings College of the Law a/k/a Hastings Christian Fellowship v. Martínez, et al.*, ___ U.S. ___, 130 S.Ct. at 2983.

The second *Order* was that the Court "will not authorize any unilateral change of the *Experts' Agreement*, Docket No. 1003, specifically as to significant alterations to the CAPM methodology, which the parties explicitly accepted." *See* Docket No. 1965, page 3.  "The Court will only allow the exception timely requested by VTM and Suiza, as to the fact that certain parameters are 'not fit as to Puerto Rico alone,' are to be excluded pursuant to the clear precedent established

30

at *Tenoco Oil Company, Inc. v. Department Of Consumer Affairs*, 876 F.2d 1013, 1024 (1st Cir.1984) (Torruella, J.)." *Id.* "That is, that some limited parameters within the CAPM methodology may be 'locally inapplicable.'" *Id.* "The Court refers to the use of Dean Foods, Inc. ("Dean Foods"), as a surrogate company to be used within the beta coefficient component amongst the four or five companies to determine the beta coefficient of the CAPM methodology, to determine the ROE (return of equity)." *Id.*

The third *Order* was that the Court "will not authorize any tampering with the CAPM formula as originally accepted by the Regulation Number 12, except of course as to the unsystematic "measure of Puerto Rico risk," as expressed by the Administrator. ROE = Rf + b (Rm - Rf) + Rmc." *See* Docket No. 1965, page 4. "'ROE' means return of equity; 'Rf' means risk free rate; 'beta (b)' means unlevered beta for manufacturing of dairy products; 'Rm' means equity risk premium; 'mc' means microscopic risk premium." *Id.* After the Court analyzed the parties' positions, and advised the parties that it will not, "at this stage of the proceedings,, authorize the alteration of the ROE coefficients as originally conceived and proposed under Regulation Number 12 by the then Administrator of ORIL." *See* Docket No. 1965, pages 4-5.

The Court, once again reminded the parties that since September 22, 2010, the parties were ordered "to include in the CAPM formula the 'unsystematic risk of conducting fresh milk fresh milk processing business locally,' all based on a stipulation that specifically incorporated this risk within the CAPM formula, *see* Docket No. 1003 at pages 1-8. The Court further stated that "it cannot accept any proposal of defendant ORIL that does not have within the proposal an unsystematic risk of conduction the milk operations locally under the specific agreement with the agreement of the experts. Docket No. 1003, page 1, § 2(a)." *See* Docket No. 1965, pages 5-6.

31

Furthermore, the Court will "reject any proposal that does not have an unsystematic risk dated from
at least December 31, 2002" [date subject to be adjusted by the Court depending on the proof to be
rendered at the permanent injunction hearing], as the defendants have failed to comply with the proof
requirements set forth in *Christian Legal Society Chapter of the University of California, Hastings
College of the Law a/k/a Hastings Christian Fellowship v. Martínez, et al.*, ___ U.S. ___, 130 S.Ct.
at 2983. "The *Martínez*' case, *supra*, requires the defendants to carry 'the burden' to attempt to
extricate themselves from a stipulation. The test is one of 'manifest justice' as specifically required
under *Chao*, 493 F.3d at 31-32. *See also Board of Regents of the University of Wisconsin System v.
Southworth*, 529 U.S. 2217, 226 (2000)." *See* Docket No. 1965, page 6.

      The Court also reiterated that the defendants "have also failed to calculate the
regulatory accrual, which must be calculated to establish plaintiffs' equity, by using the correct
dates." *See* Docket No. 1965, page 7. "Further, defendants have arbitrarily adjusted the regulatory
accrual beginning in December 2002 up to this date." *Id.* "As of this date, the defendants [have] yet
to make whole, as to a fair rate of return, to be granted to plaintiffs, which commences with the
calculation of the ROE, return of equity, which was ordered to include the yearly regulatory accrual."
*Id.* "VTM had prior thereto proposed similar arguments at Docket No. 1896 in Dr. Freyre's Report,
*see* Docket No. 1896-1, pages 24 to 26." *Id.*

      The Court reminded the defendants all the times during the course of the instant case,
that the defendants have been warned, "when admonishing them [the defendants] that 'every day that
goes by without Suiza receiving its constitutionally mandated revenue requirement only increases
Suiza's, (and VTM's), amount of regulatory accrual,' *see* Docket No. 1891 at page 11." *See* Docket
No. 1965, page 8. "But even without the inclusion of the regulatory accrual, which constitutes an

equitable redress, ORIL has failed to comply." *Id.*

The Court further notes in the *Opinion and Order*, that as of June 28, 2011, ORIL has also "failed to correct the beta factor as required by this Court [the exclusion of Dean Foods as a coefficient factor "locally inapplicable]." *See* Docket No. 1965, page 8. Likewise, the Court distinguished each incident wherein Dr. Cotterill's report is different from the conclusions reached by the plaintiffs' experts, particularly the reports rendered by Dr. Freyre. One important item that Dr. Cotterill failed to consider "without any authorization from the Court, [is] the marketing and advertisements of both Suiza and VTM **while at the same time accepting that of Indulac**, and further leaving Indulac's unaffected marketing and advertisement costs not regulated as a competitor in the fresh milk industry in the local market. (Emphasis in the original)." *See* Docket No. 1965, pages 8-9. "In sum, $5.92 million were unwarrantedly excluded notwithstanding specific language by the Court to the contrary at the *Injunction Order*, Docket No. 480, and repeated at a specific modification required by the Court as to Regulation Number 12, specifically requested by VTM. *See* Docket No. 1697 at page 19 (the problem is not only that Indulac's marketing costs are not regulated but also that the marketing is financed by the fresh milk processors)." *See* Docket No. 1965, page 9.

The Court is cognizant that Suiza is also challenging the Special Marketing Fund ("FEM"), which is a special fund account created by ORIL through the proposed Regulation Number 12. *See* Docket No. 1965, page 9, n.9. Notwithstanding, the Court will only focus on the alternatives proposed by the defendants in compliance with the *Injunction Order* of July 13, 2007, Docket No. 480. The Court left for the permanent injunction hearing the matter of the distribution of the FEM funds, notwithstanding Suiza's strong hint that the funds were not being distributed in violation of the equal protection clause. In other words, a strong allegation of a discriminatory

33

distribution.

At the outset, the Court stated in the *Opinion and Order* that plaintiffs had challenged defendants' offer of Alternatives 1 through 5. *See* Docket No. 1965, page 9. Upon plaintiffs' request, the Court excluded Alternative 5, as it "does not contain a measure of unsystematic risk." *Id.* "Against prior orders of the Court, Alternatives 3 and 4 simply do not include the regulatory accrual and failed in calculating a reasonable margin of return, based on percentage over capital (equity), as required under Regulation Number 12." *Id.*

The Court further analyzed the different scenarios proposed by ORIL under each proposed alternative.

> Further, Dr. Cotterill is, for example, using at scenario 1 of Alternative 3, the "adjusted net worth," an unidentified term totally different [from] than a percentage over "equity capital." Further, the Court finds that ORIL has failed to include the regulatory accrual to the base of Suiza and VTM, in all the different scenarios presented. Alternative 4 is also deficient, as this alternative assumes that Regulation Number 12 has actually been placed in effect, but indeed it has not, as the record shows that said regulation has not been approved, nor it has been recorded with the Puerto Rico State Department (at least part of the Regulation Number 12 has not been in effect, automatic adjustments and part has been altered, . . . Further, Dr. Cotterill uses negative betas not mentioned anywhere at Regulation Number 12, and contraindicated as a reliable parameter by the experts. *See* Docket No. 1891 at page 17, n.133.

> Alternatives 1 through 3 are also severely criticized by VTM since the beta factors are incorrectly and discriminatorily established for the years 2003 to 2007. *See* Docket No. 1896-1 at pages 18-20. *See also* Table prepared by Dr. Cotterill. Suiza joins in a similar argument at Docket No. 1891 at pages 17-19.

> Suiza also balks when Dr. Cotterill assumes that automatic price adjustments cited at Regulation Number 12 were in place, yet he admitted in Court that no such automatic adjustment in price pursuant to Regulation Number 12 has been established since July 2008, as of the date that he testified in Court on November 22, 2010. Further,

34

and most critical, according to Suiza, is the milk price paid to the farmers that was kept artificially high when the cost of feed used for the farmer production of milk had substantially decreased during the period from July 2008 to July 2010. The price of milk should have been lowered when the price of fuel similarly decreased. Yet it has artificially increased when the price reached the levels of again pre-2008 feed prices, *see* Docket No. 1891 at page 19.

Finally, Alternatives number 1 and 2 included the concept of a "profit true up." A different concept not included at Regulation Number 12. A "profit true up" adjust the price using an index, independently of the specific impact cost changes in the financial statements. A true-up mechanism compares costs and revenues, and adjusts prices to allow a regulated company to recoup or return the difference between costs and revenues in the next regulatory period." This concept goes against the remedy ordered of "a reasonable rate of return," but not a "guaranteed profit," as contemplated and explained by Suiza at Docket No. 1891 at pages 20 to 21.

. . .

Defendants cannot explain satisfactorily to the Court the insistence in not including the "unsystematic risk" within the agreed upon formula to determine the ROE and/or not including the regulatory accrual into any proposed alternative in order to eventually determine a reasonable rate of return.

Dr. Cotterill, knowing that Indulac has remained with unbridled discretion as to the advertisement costs, in reiterated reports arbitrarily excludes valid expenses of both VTM and Suiza (marketing and advertising) against the *Injunction Order*, and against the Court ordered amendments to Regulation Number 12. Further, the alteration made by ORIL, of the Ibbotson CAPM coefficients within the ROE formula, as agreed upon by the experts at Docket No. 1003, and as stated *infra* in this opinion, constitutes an effort to perform an "end around run" to the offset of the inclusion of "the unsystematic risk" and/or to offset the exclusion of Dean Foods as a beta factor surrogate company, a giant in the whole United States dairy market, an example of a parameter "not fit in Puerto Rico alone," pursuant to *Tenoco Oil*, 876 F.2d at page 1024.

In essence, ORIL is attempting to continue its policies of producing "a preconceived result" instead of a Constitutional regulation of a market. However, the milk industry constitutes a government

35

regulated market which must be handled by the State under
Constitutionally protected due process, equal protection, and avoiding
unwarranted takings. *Duquesne Light Company v. Barasch*, 438 U.S.
299, 307 (1989); *Vaquería Tres Monjitas, Inc., et al. v. Fabre Laboy*,
587 F.3d 464, 482 (1st Cir.2009); *Vaquería Tres Monjitas, Inc., et
al. v. Irizarry, et al.*, 600 F.3d 1 (1st Cir.2010), (*en banc denied*), *cert.
denied*, ___ U.S. ___, 131 S.Ct. 2441, ___ L.Ed.2d ___ (May 16,
2011)).

*See* Docket No. 1965, pages 10-12.

## Legal Analysis

### *An Update Note*

The Court is cognizant that at the time of this writing, the circumstances in Puerto Rico have

changed dramatically.  For example, as of June 2013, the unemployment rate in Puerto Rico is 13.2%

compared to the unemployment rate in the following States, to wit: Nevada 9.6%, Illinois 9.2%,

Mississippi 9%, Rhode Island 8.9%, North Carolina 8.8%, New Jersey 8.7%.    *See*

www.bls.gov/lau/home.htm, retrieved on August 2, 2013.  However, in the year 2007, the average

unemployment rate in the United States was 4.6% while the average unemployment rate in

Puerto Rico was 10.9%.  Furthermore, the average unemployment rate in the United States for the

yare 2008 was 5.8% while the average unemployment rate in Puerto Rico was 11.5%.  *See Fn.*10,

*infra*.

Similarly, in the year 2007 the poverty rate in the United States was 13.%, in the State of

Mississippi was 20.6%, and in Puerto Rico was 45.5%.  *See Fn.*10, *infra*.  In August 2008, when the

time the *Experts' Agreement* was executed, the level of poverty rate in the United States had risen

to 13.2%, and in Puerto Rico had decreased to 44.8%.  *Id.*  By the year 2011, the average poverty

level in the State of Mississippi had risen to 22.6% while in Puerto Rico was 45.6%.  *See Fourth*

*Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economic*

*Model for U.S. Jurisdictions,*" Docket No. 2176-1 page 15.

The Puerto Rico per capita income continues to decrease, from $18,100 in the year 2008, $17,400 in the year 2009 to $16,300 in the year 2010, and a modest increase to $17,002 of income per capita in the year 2012 because of the immigration from Puerto Rico to the Continental United States.[16] *See also Economy of Puerto Rico*, http://en.wikipedia.org/wiki/Economy_of _Puerto_Rico. Retrieved on June 19, 2013.

Mississippi is the State of the Union with the lowest personal income per capita of $33,073, and Connecticut is the State with the highest personal income per capita of $58,908. *See Fifth Update of the Comparison of Per Capita Personal Income between Puerto Rico, the United States, and all Fifty States*, Docket No. 2282-1, page 2. The average personal income per capita of the poorest States of the United States, that is, Mississippi, Idaho, South Carolina, Utah and West Virginia, is $34,033. *Id.* Meaning that Puerto Rico only achieves about half of the figure. *Id.* According to the statistics, all States, except Nevada, have improved their personal income per capita from the years 2008 to 2012. *Id.* Nevada's personal income per capita decreased from $39,872 in the year 2008 to $37,361 in the year 2012. *Id.* Thus, as of the end of the year 2012, Nevada has more than doubled Puerto Rico's personal income per capita. *See* Docket No. 2282-1, pages 6-7, Exhibit IV-C.

As to the credit ratings of the Puerto Rico Bonds, the bonds were stable from January 1976 until 2004, at the same Baa1 level, with either positive, favorable or stable outlook. *See* Docket No. 2250-1, pages 2-3. In September and May 2005, the ratings remained the same but with a

---

[16]     *See Fifth Update of the Comparison of Per Capita Personal Income between Puerto Rico, the United States, and all Fifty States*, Docket No. 2282-1, page 2.

change from "stable" to "negative," since the year 2004. "Finally, after thirty years of stability there was a downgrade of the Puerto Rico GO bonds from Baa1 to Baa2 in February 2006 and to Baa2 to Baa3 in May 2006." *See* Docket No. 2250-1, page 3. The last downgrade of the Puerto Rico credit ratings coincide with the closing of the "central Government" for a period of two weeks, that is, from May 1-14, 2006. At that time, **the rating of the GO Bonds was Baa3, that is, only one level from the non-investment grade rating of Ba1**. *Id.* "[I]n February and May of 2006, the outlook was **Negative/Credit Watch**." (Emphasis in the original authored by Dr. Freyre), *see* Docket No. 2250-1, page 3.

In the year 2010, the Municipal Bonds were recalibrated to AAA rating, and as a consequence the GO Bonds (state) rating was increased from Baa3 to A3. *See* Docket No. 2250-1, page 6. In August 2011, Moody's downgraded the bonds by one level from A3 to Baa1. On December 13, 2012 Moody's again downgraded the GO Bonds from Baa1 to Baa3, again down to the level of May 2006. In February 2012, "Puerto Rico held the second highest credit rating awarded by the agency [Standard & Poor's] to a Spanish speaking territory in the long term (BBB+, Stable-)." *See Economy of Puerto Rico*, http://en.wikipedia.org/wiki/Economy_of _Puerto_Rico. Retrieved on June 19, 2013. On June 20, 2013, Standard & Poor's (hereinafter "S&P's"), as well as Moody's Investors Service (hereinafter "Moody's") downgraded the rating of the Puerto Rico Electric Power Authority Bonds from Baa2 to Baa3. *See* www.elnuevodia.com/Xstatic/endi/template/... Retrieved on June 20, 2013; www.vocero.com/sp-tambien-degrada-a-la-aee/. Retrieved on June 21, 2013. On July 2, 2013, the credit rating agency Fitch followed Moody's and S&P's credit ratings, and also downgraded the bonds of the Puerto Rico Electric Power Authority from BBB+ to BBB-. *See* www.elnuevodia.com/Xstatic/endi/template/... Retrieved on July 2, 2013. *See also "Update of our*

38

*Previous Report Entitled 'Downgrade Of GO Rating Of The Commonwealth Of Puerto Rico And Ratings Of Related Bond Issues, Including PRASA and PREPA Revenue Bonds'"* of March 25, 2013, authored by Jorge F. Freyre, Ph.D., President of Applied Research, Inc., and expert witness of plaintiff Vaquería Tres Monjitas, Inc. *See* Docket entries No. 2250-1 and 2252-1. On July 26, 2013, Moody's Investor Service rated the next Puerto Rico Energy Power Authority's $600 million bonds' issuance with a classification of Baa3 and a negative outlook. *See Negative Outlook to PREPA's Issuance [of Bonds]*, www.vocero.com/perspectiva-negativa-a-emision-aee/... Retrieved on July 26, 2013. With this new classification, Moody's leveled out the PREPA's bonds classification to the same rate of all the other investments issued by the Government of the Commonwealth of Puerto Rico. *Id.* According to this article, the new Moody's classification of the Government's bonds which are just one step from being classified as "junk bonds" reflects the fragile status of the Puerto Rico economy, and the uncertainty of the Government in its ability to execute a long term of diversification and reduction of costs of PREPA. *Id.* The newly proposed issuance of bonds by PREPA should be ready to be marketed by August and September 2013, a delay of the original issuance date, due to the delay by the public corporations in presenting their financial disclosure statements. *Id.* Although Moody's acknowledged several operational changes, the rating of negative outlook is based on PREPA's lack of cash flow, which is the same situation with the Commonwealth of Puerto Rico and the Government Development Bank, the latter being in charge of all the public instrument issuances. *Id.* Moody's further explains that the new rating may be adversely impacted by the Government's decline in the collection of funds and the leverage of debt with the bondholders. *Id.* The Baa3 rating is by itself a suggestion that PREPA will encounter difficulties in obtaining a competitive interest at the time of placing the bonds in the market. *Id.*

The latest devastating news is a substantial decline of an estimated 20,000 students less that will enroll in the Puerto Rico public school system for the academic year 2013-2014. *See Twenty Thousands Less Students in the Public Schools*, an article dated July 29, 2103, www.elnuevodia.com/Xstatic/endi/template ... Retrieved on July 29, 2013.

A more grim scenario was presented by economist Sergio Marxuach, as he described PREPA's financial situation as one on the verge of bankruptcy, which will force the authority to increase the basic rate on some 6 to 9.5 cents. *See An Electric Shock to the Consumers' Pockets*, dated July 16, 2013, www.vocero.com/corrientazo-al-bolsillo-de-los-abonados/... Retrieved on July 26, 2013. Marxuach stated that PREPA's audited financial disclosure statements for the year 2012 reflect that there is a net loss of $346 million; an increase of 14.08% in PREPA's current liabilities; and a 200.4% reduction in PREPA's net assets. *Id.* Likewise, PREPA has 21.4% reduction in its operating income, and 84.1% reduction in its operating cash flow. *Id.* Marxuach suggested that PREPA is not doing enough to explore other green sources of energy, which will entail an increase in the economic development, as well as new employment opportunities. *Id.* The sooner PREPA starts moving toward the new green technology the better, as new federal and international regulations will force a drastic change in the Puerto Rico's energy system in the near future. *Id. See also PREPA's new Issuance of Bonds Under Fire by the Senate*, dated July 31, 2013, www.elnuevodia.com/Xststic/endi/template/imprimir ... Retrieved on July 31, 2013. The Puerto Rico Senate's inquiry was centered on how PREPA will pay the issuance of the new bonds when PREPA informed that at the end of the year 2012, it had an operational loss of $183 millions and the estimated operational loss for the fiscal year 2014 is $414 millions, and after certain reductions, the estimated loss would be "only" $283 millions. *Id.* (Emphasis in the original).

PREPA, however, assured the Senate commission that there energy rates will not be increased.  *Id.*

In sum, while the economy in the United States is improving, by adding more jobs to the market, the unemployment rate has been consistently decreasing, and the multi factor productivity increases 1.4%, a growth much faster than in the year 2012, while the economy of Puerto Rico does not give any positive signs of revitalizing.  According to the information provided by the Bureau of Labor Statistics of the United States Department of Labor, the current unemployment rate in the United States is 7.4%, as the economy added 162,000 jobs in July 2013 mainly in the area of "retail trade, food services and drinking places, financial activities, and wholesale trade." *See* www.bls.gov. Retrieved on August 2, 2013.  Another positive factor in the recovery of the United States' economy is the demand for new homes' construction, a notable increase of +6.8% in May 2013 and +8.3% in June 2013 compared to -14.8% from April 2013.  *See* United States Census Bureau: Economic Indicators,  www.census.gov/cgi-bin/briefroom/BriefRm.    Retrieved on July 8, 2013, and www.elnuevodia.com/Xstatic/endi/template ... Retrieved on July 24, 2013.  Moreover, according to "the S&P/Case-Schiller home price index was up 12.2% compared to a year ago, slightly better that the 12.1% rise in April.  It was the biggest year-over-year jump in prices since March 2006, near the peak of the housing bubble." *See*    http://money.cnn.com/2013/07/30/news/economy/home-prices/index ...  Retrieved on July 30, 2013.

### Fifth Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economic Model for U.S. Jurisdictions"

On August 2, 2013, Vaquerías Tres Monjitas, Inc. filed an *Informative Motion Updating Various Exhibits and Reports*, *see* Docket entries No.  2261 - 2264.  Although these updates will be thoroughly discussed below under the sub-title of *Puerto Rico Risk Factor*, it is important to note how the general overall decline in Puerto Rico has a serious negative impact on the recovery of

Puerto Rico's economy, and why it will take years to overcome the current economic recession, which started as early in the year 2001,[17] such as, a significant decline in the Puerto Rico population due to the fact that the number of births has consistently decreased, while the number of deaths have remained relatively stable, and the number of emigrants increased to 80,000 from the years 2001 to 2004 (based on the U.S. Census figures as to Puerto Rico). *See Fifth Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economic Model for U.S. Jurisdictions"* (hereinafter the "*Fifth Update*"), Docket No. 2261, pages 7-8. In sum, 369,000 residents of Puerto Rico emigrated between the years 2000-2004 and 2005-2012.[18] *See Fifth Update*, Docket No. 2261, page 9. The fact that the increase in emigrants increased three times more than the increase in population "tends to support the outlook of a continuing decline in the population of Puerto Rico in coming years." *Id.*

"The significant population decline that Puerto Rico has experienced since FY 2005, and which will probably prevail in coming years, is a factor that has negatively affected the demand for goods and services, especially in a recessionary environment, including fresh milk consumption ..." *Id.* "[T]his population decline is one of the factors that must be taken into consideration when evaluating the high specific-investment risk, or non-diversifiable unsystematic risk, of operating a fresh milk business in Puerto Rico, which in the Experts' Agreement, dated August 26, 2008, was named as the "Puerto Rico risk." *See Fifth Update*, Docket No. 2261, pages 9-10. Lastly, during the "period of FY 2004 - FY 2012, the population of Puerto Rico contracted by -160,000 inhabitants

---

[17]     "A process of significant net emigration started in FY 2001 and persisted through FY 2012." Docket No. 2261, page 8.

[18]     "In summary, in the two periods under analysis, 2000-2004 and 2005-2012, total net emigration reached a substantial number of 369,000 residents of Puerto Rico." *See* Docket No. 2261, page 9.

or -4.2%," while in other States of the United States, the "population growth was quite significant." *See Fifth Update*, Docket No. 2261, page 11. Another most important factor to be considered in the constriction of the Puerto Rico population growth is the fact that the number of residents below 45 years old "declined by -316,683 persons, while the nine cohorts of ages 45 years and over experienced an increase of 233,867 inhabitants, in spite the fact that the total population of Puerto Rico dropped from 3,808,605 inhabitants on April 1, 2000 to 3,725,789 on April 1, 2010." *Id.* "It is specially significant that the population under ten years of old declined from 600,564 on April 1, 2000 to 464,760 on April 1, 2010, for a contraction of -135,804 inhabitants, equivalent to -22.6%, during the 2000-2010 decade." *See Fifth Update*, Docket No. 2261, pages 11-12. "This decline in the population of residents under 10 years old was significantly greater than the decrease of -82,816 inhabitants in the total population." *Id.* at page 12. "**The fact that the number of younger people has been shrinking at a significant rate in Puerto Rico is one of the negative factors impinging on fresh milk consumption**." *Id.* (Emphasis ours).

Another significant factor is the high unemployment rate in Puerto Rico, which maintains the economy in a dire status. The Puerto Rico economy was first impacted by recession in the first semester of the year 2006. *See Fifth Update*, Docket No. 2261, page 13. In Puerto Rico, "the level of payroll employment declined from 1,053.3 thousand in FY 2005 to 924.7 thousand in FY 2013, for a loss of 128.6 thousand payroll jobs, equivalent to 12.21% ..." *Id.* "[I]n the period from FY 2005 to FY 2008, payroll employment in the U.S. increased from 132.5 to 137.8 million jobs." *Id.* "Then, in fiscal years 2008 to 2010 payroll employment declined by 8.01 million jobs." *Id.* at pages 13-14. In the United States, however, after FY 2010, "the U.S. economy has recovered 5.05 million jobs." *Id.* at page 14. "U.S. payroll employment in FY 2013

43

(134.8 employees) was also 1.71% above the level of FY 2005 (132.5 employees), while in Puerto Rico payroll employment in FY 2013 (924.7 employees) was -12.21% below the level attained in FY 2005." *Id.* "The really distressing fact is that in a period of eight years (FY 2006 - FY 2013) the Puerto Rican economy has not been able to recover a single payroll lost during the Great Recession." *Id.*

Other important factors which are determinative in the decline of the Puerto Rico economy are, the increase in mortgage loans delinquency and mortgage foreclosures, as well as "mortgage loans that are part of a bankruptcy procedure." *See Fifth Update*, Docket No. 2261, pages 14-21.

"Key economic indicators of the Puerto Rican economy, after showing an improvement and posting positive year-to-year percent changes in the second semester of 2011 and the first semester of 2012, have again slumped into negative year-to-year percent changes since the third quarter of 2012." *See Fifth Update*, Docket No. 2261, page 20. "Thus, at present we do not foresee a clear end to the present recession in Puerto Rico, in contrast with the U.S. experience which shows a consistent expansion in terms of GDP since the first quarter of 2010, and in terms of employment since mid-2010." *Id.* at pages 20-21. Hence, in terms of the "Puerto Rico risk factor," the economy of Puerto Rico has again entered into a deep recessionary environment," based on the statistics of the United States' economic factors v. the Puerto Rico's economic factors. *Id.*

Lastly, the fresh milk consumption in Puerto Rico has been negatively impacted by the economic recession. "In calendar years 2002 to 2012, fresh milk consumption has declined from 292.2 million quarts in 2002 to 217.2 million quarts in 2012." *See Fifth Update*, Docket No. 2261, page 21. "This represents a reduction of 75 million quarts or 25.7% in fresh milk consumption during a ten year period." *Id.* "The negative impact of specific-risk factors has negatively affected

44

both processing plants, Vaquería Tres Monjitas, Inc. (VTM), and Suiza Dairy, Corp. [Inc.] (Suiza)."

*Id.*

In the September 23, 2013 issue of *Forbes*, a reputable well read economic magazine published an article entitled *Do You Have The Next Detroit In Your Mini Fund?* The salient sections of the article reads as follows:

> We're talking about the Commonwealth of Puerto Rico, whose general obligation bonds cling to a Moody's rating of Baa3, one tick above junkdown. Disinclined though you may be to buy any debt issued by the commonwealth, you may own some without realizing it.
>
> . . .
>
> Puerto Rico's small population (3.7 million and dwindling) shoulders a giant debt load: $70 billion on government borrowing plus $33 billion of pension underfunding. Only a fourth of the residents have jobs, and 27% of those jobs are government jobs. Private sector employment is 647,000. That happens to be half the number of people receiving food stamps.
>
> The island is getting to look like a Detroit with beaches. The bankrupt city and the troubled commonwealth have the same problem: It's too easy to leave. Detroit's middle class middle class departed for the suburbs. Puerto Rico's workers are boarding planes to New York and Miami. As U.S. citizens, they don't need green cards.
>
> **Prospects for job growth are dim. In 2009 Governor Luis Fortuño came into office with a Reaganesque plan to promote business, cut taxes and shrink the government. Voters tossed him out last fall in favor of a traditional spender.** (Emphasis in the original).
>
> **Any business courageous enough to set up shop in Puerto Rico faces a headwind in the form of costly electricity from the government-run, oil-fired utility. The utility, itself a chronic borrower, gropes for positive news in a recent prospectus by citing its "energy theft reduction initiatives."** (Emphasis ours).

For a while there was a burst of manufacturing employment as U.S. pharmaceutical companies took advantage of a law that enabled them to lighten their federal tax burden in return for making pills in Puerto Rico. **That congressionally bestowed tax holiday ended in 2006**.

**In part because of the expiration of the tax benefit, says Moody's analyst Lisa Heller, Puerto Rico sank into recession a year ahead of the rest of the U.S., and its GDP is still falling**. (Emphasis ours).

### *The Formula*

On August 26, 2008, the experts Drs. Ronald W. Cotterill for the defendants, Jorge Freyre, Leonardo Giacchino and Mr. Adam Rabinowitz for the plaintiffs executed the *Experts' Agreement*, Docket No. 1003. The experts agreed on a formula "with respect to the implementation of nondiscriminatory, rational and scientific regulatory standards and procedures for regulation of the fresh milk processing plants in Puerto Rico in Civil No. 04-1840." *See Experts' Agreement*, Docket No. 1003. The *Experts' Agreement* subscribed by Dr. Ronald D. Cotterill, Dr. Jorge Freyre and Dr. Leonardo Giacchino and Mr. Adam N. Rabinowitz met in the Judges' chambers to draft a progress report on what they have agreed with respect to the implementation of non-discriminatory, rational and scientific regulatory standards and procedures for the regulation of the fresh milk processing plants in Puerto Rico in Civil No. 04-1840. The agreement provides:

1) <u>Calculation of the Regulatory Accrual</u>: **we have agreed to the following**:

    a.    The initial equity for the calculation is that as of December 31, 2002;

    b.    The calculation is to be performed until December 31, 2007, and 2008 is to be discussed later;

    c.    The value of the regulatory accrual for each year is equal to the difference between the net income that the fresh milk processing plants would have earned and the actual net income. The actual net income can be computed from the

46

fresh milk regulatory income statements presented to ORIL. The net income that the fresh milk processing plants would have earned is calculated following the methodology proposed by Dr. Freyre in "Exhibit" ("Freyre's spreadsheet").

d. The actual net income must be adjusted by adding back any payments for "Exclusivities". Dr. Freyre will provide that information; and

e. The value of the percentage rate to be used in Freyre's spreadsheet has not yet been determined. We might either use a fixed number or a different number for each year.

2) <u>Return on Equity (ROE)</u>: we have agreed to the following:

a. The method to calculate the ROE could either be the Capital Asset Pricing Model (CAPM), as described in Regulation 12, plus a measure of Puerto Rico risk or the method used in the report by Jonathan Lesser plus a measure of Puerto Rico risk;

b. The ROE calculated by Jonathan Lesser will be unlevered using the following equation: ROE is equal to the unlevered ROE plus the debt to equity ratio times the difference of the unlevered ROE and the costs of the debt);

c. The cost of debt and the debt to equity ratio are calculated by using a weighted average from Lesser's proxy using total capitalization as weights;

d. A 10-year maturity for interest rates will be used when dealing with interest rates for debt;

e. Dr. Freyre will collect the following information (to be provided by the Government Development Bank in its capacity as fiscal agent of the Government of Puerto Rico) from July 1st 2006 up to date:

i. Interest rates on the bonds of Puerto Rican public corporations that operate like private firms;

ii. Ratings of those bonds by Moody's and S&P; and

47

iii.　　Bond Buyer Index;

3)　　Amortization of the Regulatory Accrual: we are discussing the need of requiring in the first X number of years that fresh milk processing plants pay out as dividends the amortization and interest of the regulatory accrual received; and

4)　　Regulatory Accounts: the description of the balance sheet accounts as included in the Leonardo Giacchino and Guillermo Israilevich report titled "Proposed Regulatory Accounts, Criteria, and Methodologies for Milk Processors in Puerto Rico, dated February 25, 2008, (Section III.A, pages 9 to 16) are accepted subject to revision and comments by ORIL staff. We will continue discussing the income statement accounts with regard to the description, methods and procedures.

Plaintiff VTM enumerates the defendants' lack of compliance with the *Injunction Order*, as of December 1, 2012:

a.　　Determination of the milk processors reasonable rate of return on their investment.

b.　　Adequate and objective regulatory standards [Exhibit WW], parameters and definitions to be included in Proposed Regulation 12 to determine costs and fair profits return for all participants in the Puerto Rico regulated milk market.

c.　　Determination of the capital base of the fresh milk processors.

d.　　Determination of the specific or unsystematic risk of operating business in Puerto Rico.

e.　　Determination of the procedure to calculate the amount of regulatory accrual of the fresh milk processors which is necessary to calculate their capital base.

*See Vaquería Tres Monjitas, Inc's Memorandum On Compliance Of Amended Preliminary Injunction Order*, Docket No. 2228, pages 15-16 (hereinafter "VTM's Memorandum").

The Court acknowledges that Suiza and VTM have agreed in the non-use of the negative betas, on the ground that the negative betas are unreliable. *See Post-Hearing Memorandum In*

48

*Support Of The Imposition Of A Specific Remedy As A Result Of Non-Compliance An In Support Of Petition For Contempt* filed by Suiza, Docket No. 2225, as amended, Docket No. 2248 (hereinafter "Suiza's Post Hearing Memorandum"). VTM's Memorandum, Docket No. 2228. Defendants, however, defend the use of the negative betas in their *Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, pages 5-16 (hereinafter "Defendants' Hearing Brief").

Defendants allege that, although the "parties agreed that a beta factor must be employed in the CAPM formula used to determine a return on equity for Plaintiffs. But they have two fundamental disagreements on beta-related issues." *See Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, page 5. Defendants insist that the use of the negative/zero betas is scientifically appropriate, as the "the 'beta' factor ... estimates the risk of investing in a particular company by measuring the volatility of its stock as compared to the market as a whole." *See Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, page 5, citing *Puerto Rico Telephone Co., Inc. v. Telecommunications Regulatory Board*, 665 F.3d 309, 327 (1st Cir.2011).

One disagreement is the use of "negative" or "zero" betas when calculating the average or median of the industry beta to be applied in the CAPM formula. *Id.* Another disagreement is the "manner of determining betas for 2009-2011." *See Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, page 11. For example, once the Court determined that large companies, such as, Dean Foods, are not to be considered when calculating the beta, then the other available method to calculate the beta is to use the industry average or median betas of the individual companies similar in size and/or operations to Suiza and VTM. *See* Docket No. 2227, page 11. Defendants reiterate their position to include Dean Foods when determining the beta "within the surrogate set for the Standard Industry Classification 202 ("SIC 2002"). *See* Docket No. 2227, page 15. In any event the

49

use of the betas falls within the sound discretion of ORIL's Administrator, **but subject** to the matter being accepted as reliable by the scientific community as whole.  The Court holds *infra* in this *Opinion and Order* that they are to be eliminated as they are unreliable and not accepted by the community of experts, as a negative beta is usually the result in an inherent error in the data of the company.  *See* Docket No. 2227, page 16.  "ORIL remains free to continue to apply its expertise to distinctively local regulatory facts."  *See* Docket No. 2227, page 3, citing *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d at 476-77.

The Court accepts VTM's and Suiza's agreement as to the inapplicability of the negative *betas* in the formula, hence, the negative betas are not to be used in the experts' formula.  The Court briefly explains.  Throughout the over 100 hearings presided by the undersigned since this case was assigned to the undersigned District Judge, the Court has been consistent that any comparable milk processor entity to be used when determining any values of the experts' formula must be similar in size and operations to plaintiffs' business.  *See Injunction Order* of July 13, 2007, Docket No. 480, pages 12, 14, 21-22.  As of this date, the Court has not been persuaded otherwise by the defendants' evidence.   The Court understands that negative betas are an exception.  In the instant case, the exception is being suggested by the Administrator of ORIL with the only purpose of lowering the ultimate ROE determination, as they are unreliable as to scientific data and constitute yet another example of a newly ex post facto parameter placed to justify a sought determined route.  Even after reviewing *Defendants' Opening Compliance Hearing Brief*, Docket No. 2227, wherein a new approach was taken by including the analysis made in *Puerto Rico Telephone Company, Inc. v. Telecommunications Regulatory Board*, 665 F.3d 309 (1st Cir.2011), the opinion of the Court remains the same.  The analysis of the Court as to the applicability of the *Puerto Rico Telephone*

*Company* opinion and analysis to the instant case are discussed below under a separate sub-title.

### *Reasonable Rate Of Return*

According to the terms and provisions of the *Experts' Agreement*, Docket No. 1003, paragraph 2) "Return of Equity: We have agreed to the following: . . ."

During the years that followed the signing of the *Experts' Agreement*, the experts decided to use the CAPM formula, as described in Regulation 12, to determine the return of equity ("ROE"), instead of the Jonathan Lesser method plus the Puerto Rico risk. *See* Docket No. 1003, ¶ 2a.

As stated in VTM's Memorandum, Docket No. 2228, pages 19-20, the terms of the formula are as follows:

> Consequently, the formula of the CAPM methodology included in the proposed ORIL Regulation 12, with the addition of a term to evaluate the additional risk called "Puerto Rico risk" accepted in the Experts' Agreement, corresponds to the following formula after tax:
>
> $R_{at} = R_f + ß\ [+\ \text{sic}]\ (R_m - R_f) + R_{MC} + R_{PR}$[19]
>
> The terms of this formula are explained as follows:
>
> $R_{at}$ = The reasonable rate of return on net worth after tax that processing plants should obtain from the business of fresh milk in Puerto Rico.
>
> $R_f$ = Risk-free rate estimated based on the bonds issued by the U.S. Government ("Arithmetic Mean of Long- Term Government Bonds Income since 1926, Ibbotson SSBI Valuation Yearbook").
>
> $ß$ = Coefficient that represents the systematic risk of investments in the dairy products sector (SIC-202) in the United States.
>
> $R_m$ = Rate of return of a broad portfolio of stock marketed in the U.S. capital markets, estimated according to the performance of the S&P 500

---

[19] There is a typographical error, as the formula should be $R_m = R_f + B\ (R_m - R_f) + R_{mc} + R_{PR}$. (There should be a period "." and not a "(+)" after "B".)

("Arithmetic Mean of Total Returns of Large Company Stocks since 1926, Ibbotson SSBI Valuation Yearbook").

$R_{MC}$ = Additional risk of smaller companies (Percentiles 9-10) that market their stock in the U.S. capital markets (NYSE/AMEX/NASDAQ), as calculated by Ibbotson Associates ("Micro-Caps - Deciles 9 and 10- Size Premium in Excess of CAPM, Ibbotson SBBI Valuation Yearbooks").

$R_{PR}$ = Additional risk faced by processing plants in the fresh milk business in Puerto Rico. Coefficient $R$ has been calculated based on the average of the two differentials between the rate of return of unsecured long-term bonds with a maturity of 20 and 30 years of Puerto Rico Electric Power Authority (PREPA) and the Puerto Rico Aqueduct and Sewer Authority (PRASA) and the 20-year GO and 30 year Revenue Bonds Bond Buyer indexes.

### *Puerto Rico Risk Factor and the Economic Values*

There is no doubt that the Puerto Rico economic data clearly warrants a systematic risk. Government Bonds had decreased in value; unemployment was high up to 14.8% in January 2013, and high as 12.2% when the *Experts' Agreement* was signed, compared to an average of 10.6% in the year 2005 and 11.0 in 2006. The population not in the labor force has increased from 1.5 million in the year 2000 to 1.7 million in June 2013. *See* Docket No. 2262, pages 14-15. Those employed have been reduced from 1.2 million in August 2008 to 1.0 million in June 2013. *See* Docket No. 2262, page 11.

Government Bonds were in almost junk status since May 2006 at Baa3 until April 2010 when the GO gained briefly a rating of A3 but decreased to Baa1 in August 2011, and back to Baa3 on December 13, 2012. *See* Docket No. 2250-1, pages 5-7. The population in Puerto Rico has been reduced from 3.821 million in the year 2004 to 3.694 million in the year 2012. *See* Docket No. 2262, page 2. The population up to 19 years has been reduced from April 2000 to April 2010 by 188,802. *See* Docket No. 2262, page 4. Finally, the sales of fresh milk have decreased from 292,213,124 in

52

December 2002 to 239,779,814 in December 2008 to 217,177,124 as of December 31, 2012.  *See*

Docket No. 2262, page 44.

### The Values Of The Formula Factors In 2013

The economic crisis is deepening for some economies and Puerto Rico is amongst them.  One

of the most critical factors of the formula which is determinative are the interest rates of the maturity

bonds of the Puerto Rico public corporations that operate like private firms; the ratings of those

bonds by Moody's and S&P, as well as the Bond Buyer Index.  *See Experts' Agreement*, Docket

No. 1003.  These ratings depends directly on the status of the Puerto Rico's economy; the measure

of the Puerto Rico Risk; the Puerto Rico's unemployment rate; Puerto Rico's income *per capita*, and

the Puerto Rico budget and/or budget's deficit.  These are uncertain times, and this reality has a

negative impact on the ratings of the Puerto Rico bonds, not only in the milk industry but all the

sectors of the Puerto Rico economy.

The Court is cognizant that during the present economic crisis it is anything but easy to

predict the changes in the fluctuation of the economy.  Ironically, even when the markets are up, the

unemployment rate is still high (7.7% and more than 12 million workers unemployed in the

United States), hence, the consumers have less money to spend.  Moreover, the sales of fresh milk

are consistently declining, as the fresh milk has turned from being a basic necessity to a high costly

commodity.

It is uncontested that the milk industry is in crisis worldwide, and that many fresh milk

producers are either exploring other alternatives in non-dairy products or simply are closing their

facilities.  *See Milk Industry "in Crisis" Develops New Marketing*, an article dated December 12,

2012, www.vegnews.com/articles ... Retrieved on July 15, 2013:

According to the US Department of Agriculture, per-capita milk consumption has fallen nearly 30 percent since 1975, leaving industry professionals scrambling to develop new ways to market the beverage. Tom Gallagher, CEO of Dairy Management Inc., told the *Wall Street Journal* Tuesday that the industry "is coming to recognize this as a crisis." The new marketing approaches include convenience-size packaging, protein-enhanced varieties, and a red, teardrop-shaped label touting the animal-based milk as "real." The latter a tactic to derail the success of non-dairy milks, which increased in sales by 15.8 percent since 2011, according to the USDA. In October, dairy-industry leaders estimated that 100 facilities would close in California, the nation's largest dairy-producing state, by year's end due to the summer's feed-crop devastation.

*See also America's Milk Business in a "Crisis,"* an article dated December 11, 2012 and published

in *The Wall Street Journal*, www.online.wsj.com/article ... Retrieved on July 15, 2013:

Meanwhile, **Dean Foods, Inc., the largest U.S. dairy producer, last year introduced a low-sugar chocolate milk for kids called TruMoo, and it sell lactose-free milk in grocery stores**. (Emphasis ours as to Dean Foods, Inc.)

But in a sign of how shifts in consumer preferences are shaking up the industry, Dean Foods earlier this year [2012] spun off its fast-growing WhiteWave division, which makes Horizon Organic milk and Silk soy products.

The move was designed to get investors to pay more for shares in a business unit with higher profit margins and faster growth prospects than conventional milk.

In its marketing, the dairy-milk industry is seeking to take some steam out of the plant-based alternatives by tweaking its two-decade-old "Got Milk?" campaign and other advertising efforts.

Based on the slump of the economy, particularly as to fresh milk products, many dairy farmers and processors are selling the milk below cost just to meet their needs and meet the fresh milk supply to the consumers.

A perfect formula to determine the price of milk is worthless if the fresh milk is not

54

affordable to the consumers.  The cost of milk is coming perilously close to inviting others from

outside states to be drawn to the market by importing fresh milk at lower prices than the current

market.

### The Puerto Rico Milk Industry, A Public Utility?

The defendants developed part of their legal analysis based on the opinion of *Puerto Rico*

*Telephone Company, Inc. v. Telecommunications Regulatory Board of Puerto Rico, et al.*, 665 F.3d

309 (1st Cir.2011).  Notwithstanding the thorough analysis made by the United States Court of

Appeals for the First Circuit (hereinafter "First Circuit"), the ultimate question is how the analysis

is applicable to the Puerto Rico milk industry, and to the impending formula to be approved.  The

defendants' lack of discussion on how the *Puerto Rico Telephone Company*'s analysis is parallel to

the situation of the Puerto Rico milk industry failed to persuade the Court to refocus on its analysis.

In a nutshell, the issue in *Puerto Rico Telephone Company* is the applicability of the

Telecommunications Act of 1996 (hereinafter the "1996 Act") to a local carrier Puerto Rico

Telephone Company and its competitor WorldNet Telecommunications, Inc.  Under the 1996 Act,

the carriers have to meet certain requirements, such as, the state commissions have to determine "just

and reasonable rates" for interconnection agreements, and how these rates will be determined.

665 F.3d at 317.  "Such rates shall be 'based on the costs' of providing the individual network

elements, and this 'cost' shall in turn 'be determined without reference to' traditional rate of return

or rate based methods.  47 U.S.C. § 252(d)(1), § 252(d)(1)(a)(i)."  *Id.*  " ... the FCC further defined

this 'cost' as 'forward- looking,' and provided that the cost shall be determined through the ['total

element long-run incremental cost'] TELRIC methodology, which assumes a 'forward-looking cost

over the long run' as well as a 'lowest cost network configuration' that uses 'the most efficient

telecommunications technology currently available.' 47 C.F.R. § 51.505." *Id.* The TELRIC method

has been upheld by the United States Supreme Court in *Verizon Communications, Inc. v. FCC*,

535 U.S. 467, 475-76 (2002). *Id.* Further in the discussion, the Court differentiates between the case

law cited by the Puerto Rico Telephone Company regarding "just and reasonable" which predates

the 1996 Act, and which the 1996 Act now expressly prohibits. 665 F.3d at 323, *Fn*.16: "The other

cases cited by PRTC as support for its position include: *Duquesne Light Co. v. Barasch*, 488 U.S.

299, 310 (1989); *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944);

*Tenoco Oil Company v. Department of Consumer Affairs*, 876 F.2d 1013, 1020 (1ˢᵗ Cir.1989); and

*Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 11168, 1175 (D.C.Cir.1987)." Hence, under the

cases cited in *Fn*.16, the standards of "just and reasonable," "rate of return," "rate based" are

prohibited under the [1996] Act. *Id. Fn*.17. "Accordingly, our prior statement in *Tenoco Oil* - that

'[t]o be just and reasonable, rates must provide not only for a company's costs, but also for a fair

return on investment,' 876 F.2d at 1021 - is no longer an accurate statement of the law in the context

of rates between telecommunications carriers in an arbitrated ICA [interconnection agreement] under

the Telecommunications Act of 1996."

However, the defendants totally failed to explain to the Court how and why the values of the

agreed CAPM formula have to be changed in light of the *Puerto Rico Telephone Company* opinion,

665 F.3d 309, when the Telecommunications Act of 1996 is totally inapplicable to the Puerto Rico

milk industry. The answer is simple, the milk industry is not a public utility. "We may as well say

at once that the dairy industry is not, in the accepted sense of the phrase, a public utility." *Nebbia v.*

*People of the State of New York*, 291 U.S. 502, 514 (1934). In *Nebbia*, the Court held that those

involved in the dairy industry "are in no way dependent upon public grants or franchises for the

56

privilege of conducting their activities." *Id.* "But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle." *Id.* "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property." *Id.*

The Court disagrees with the defendants' argument, as the Court understands that the Puerto Rico milk industry is not a public utility, hence, the analysis made under the Telecommunications Act of 1996, is inapplicable to an industry not subject to the provisions of the 1996 Act. ORIL also forgets that an equal formula would have to be developed for the farmers and for the UHT milk producers. That is simply not possible as their [risk] is not "fit" between a fresh milk processor or a dairy farmer production or as an excess milk buyer such as Indulac. They are simply not "public utilities." The Court, however, is concerned of the impact of not having a constitutionally solid regulation of the milk industry in Puerto Rico, as the Court has stated more than one time that the regulation of the milk industry in Puerto Rico is a matter of high public interest. *See Injunction Order*, Docket No. 480, pages 7, 71 (Legislative History of Act 34 of June 11, 1957, known as the Milk Industry Act, codified as 5 L.P.R.A. §§ 1092, *et seq*.), ("Hence, the public interest lies in the granting go the injunctive relief").

### Notes On Other Subjects

### Negative Betas

The defendants in Proposed Regulation No. 12, as amended, which has not been submitted to the Puerto Rico State Department for approval and publication, as required by law to be enforceable or has been published pursuant to law to constitute a regulation, have finally eliminated

57

Dean Foods, Inc. ("Dean Foods"), as a surrogate company months after the Court ordered its elimination. Also excluded from the Proposed Regulation No. 12 were the "companies whose sales represent more than 75% of the total sales CIC Code 202 [the milk code]." Also excluded were the companies "within two standard deviation of the sales of the two milk plants in Puerto Rico," all designed to prevent the inclusion of a surrogate company with a similarity to Dean Foods, that makes other included surrogates absolutely irrelevant, as one company [Dean Foods] monopolizes the coefficient. However, the inclusion of negative betas within the R2 in the CAPM formula achieves a regulatory return which yield[s] an "illogical and counter intuitive result," as correctly denominated by Suiza in its *Post Hearing Memorandum*, Docket No. 2225, page 39. The inclusion of the negative betas causes a regulated return that ends in a final calculation below the risk free rate. The Court understands that the inclusion of the "negative betas" is not a standard regulatory practice as testified by Dr. Freyre and Dr. Giacchino, and admitted by Dr. Cotterill. *See* Docket No. 2225, page 40, *Fn.*149.

The purpose of the beta component in the CAPM Model is to measure the assets return of the milk processors relative to the market return. The beta of each of the surrogates estimates the company's stock price damages, when the value of the market changes.

Negative betas are most likely due to internal anomalies within the data of the companies are rare events within affecting only a specific company, as explained with credibility by Dr. Giacchino at the June 24, 2011 hearing, *see* Transcript: "Typically there must be a problem with the data or the company," page 34, lines 13-17. Betas resulting from the two instances explained above are not reliable for determining the regulatory rate of return of other companies. Ibbotson, an authority expert on the subject, uses "raw betas less than five (5) and more that zero (0)." *See* Dr. Giacchino's

testimony citing the methodology of Ibbotson, Transcript of June 27, 2012, page 112, line 21, page 113, line 1.  Furthermore, Dr. Cotterill admitted to Dr. Giacchino:

GIACCHINO:  You know you cannot have a negative beta.

COTTERILL:  And I said gee, you're right.  You can't.

*See* Transcript of February 17, 2009, page 65, lines 4-6.

Hence, the Court concludes that negative betas are unreliable, and have been used by Dr. Cotterill in an attempt, once the Court eliminated the use of surrogate company Dean Foods, and other companies not similar to the two milk processors in Puerto Rico, to understate the value of the beta coefficient in the R2 part of the formula.  The use of the negative betas is, therefore, not scientific and not rational.  *See also* Dr. Dudley Wallace and Jay Lew Silver in *Econometrics: An Introduction:* "the cost of under specifying a regression model shows up in terms of biased estimators with various of the coefficients [negative betas] that are generally smaller [zero betas] that would be the correct model ... ."  *See* Docket No. 2225, page 40.  *See also* Phillip I. Good and James W. Harding, *Common Errors in Statistics (And How to Avoid Them)*, "A common error is to misinterpret the confidence interval as a statement about the unknown parameter."  *See* Docket No. 2225, pages 40-41.

### *Risk Free Rate*

Proposed Regulation No. 12 lacks a definition and a methodology to arrive at such figure. The Proposed Regulation No. 12 simply states that "the risk free rate of return is currently at 5.2%," which may constitute an agreement to the suggestion of VTM.  *See infra*.  But this statement standing alone invites mischief and encourages arbitrariness.  It is imperative that a transparent procedure be set forth as to the methodology to obtain the risk free rate.  The Court understands that

pursuant to the *Experts' Agreement*, as testified by Dr. Giacchino, the risk free rate constitutes a long term average of the U.S. Bond Income, as reported by Ibbotson from 1926 to the year of calculation. The use of this methodology coincides with the Proposed Regulation No. 12, and complies with the Court's orders. The Court has defined the risk free rate to be equal to the risk free rate used by the Equity Risk Premium (S & P 500 average return-risk free rate). This risk free rate is acceptable to the Administrator of ORIL, as it proposes the Figure proposed by ORIL in Option No. 1.6 of Exhibit WW.

VTM proposes a risk free rate borrowed from Ibbotson, consistent with the 2012 Valoration Yearbook (SSBBI Yearbooks) using income returns of U.S. Treasury Long Term Bonds from 1926-2007 that updated yields a return component of 5.2% risk free rate. *See* Docket No. 2228, page 20. The Court, therefore, concludes that a correct risk free rate is the one that has been used by the experts since the year 2008, that the U.S. Treasury Long Term Bonds. The Court is not setting forth an appropriate risk free rate as the ultimate figure, but merely following one that has been used by the experts since the year 2008, in this case, and was the one used by the ORIL Administrator. *See* Docket No. 2225, Fn.123 and 124, the definition of risk free must, therefore, be incorporated exactly as stated herein, even if there is an agreement. Further, the economic realities in Puerto Rico in 2007 and 2008, warranted a risk-free factor as one established by all experts precisely in August of 2008. Unfortunately for Puerto Rico, the economic factors, including the latest published by the Government's office as to the latest deficit numbers facing the current Governor. admit the highest budgetary deficit in the history of Puerto Rico. *See* Docket entries No. 2284 and 2284-1, *Additional Informative Motion Regarding Docket No. 2176*, and *Sixth Update of the Report Entitled "Analysis of the Particular 'Fit' of Puerto Rico into any Economy Model for U.S. Jurisdictions"*

dated September 19, 2013.

### *Beta Definition*

The beta coefficient must be defined to avoid ambiguity manifestations and hidden damages. The regulation be enacted and approved must clearly eliminate giant companies, such as, Dean Foods which is 45 times the size of the two local milk producers combined.  The inclusion of companies clearly beyond the size of the two milk processors of Puerto Rico lack a Puerto Rican "fit" pursuant to the case of *Tenoco*, 876 F.2d at 1024.  The inclusion of giant capital interests also nullify totally the other similar corporations that may be included in the group to establish the beta component, as explained by the Court at Docket No. 1804, pages 8-10, a corporation that represents 96.3 within the total beta component moots the presence of the remaining four companies in the beta component and causes an irrational and unreasonable artificially raising of the value of the beta component.

### *Micro Cap Premium*

A micro cap premium is to be included and clearly defined as to its definition and source. The Administrator proposed an "additional risk of smaller companies (20th percentile) that market their stock in the markets of the United States (NYSE/AMEX/NASDAQ as calculated by Ibbotson Ass ...).[20]  Although Dr. Freyre, the only economic expert presented with vast experience on the Milk Market in Puerto Rico deems more reliable the same formula set at 10th percentile, Suiza accepts the 20th percentile figure.  The Court orders that the definition be included as agreed by the parties in Regulation No. 12 to avoid later other interpretations that may induce irrationality, vagueness or

---

[20]    Yet another example of the reliability of Ibbotson Ass., as an accepted expert used by all parties including the Administrator for Micro caps, but curiously rejected by the Administrator without any logical, rational reason for the use of negative betas, which Ibbotson discards as clearly unreliable.

arbitrariliness in subsequent years if regulations.[21]

### *Puerto Rico Risk Premium*

In the *Experts' Agreement*, Docket No. 1003, the parties agreed that a premium was to be added under the Capital Asset Pricing Model "CAPM." The CAPM method as to ROE (Return on Equity) calculation.[22] The premium was perhaps ill denominated as to the impact on the public as "a measure of Puerto Rico Risk" later denominated by the experts as "unsystematic risk." Plaintiff VTM restated correctly the Court's position on this matter, as not a risk of operating business in Puerto Rico per se, but rather a non diversified risk that affects the regulated business of processing fresh milk in Puerto Rico." Docket No. 2228, page 24. The Court also stressed that this component of the ROE formula was not necessarily a permanent fixture but could cease to exist depending on local economic factors.

The *Experts' Agreement* clearly states the methodology which was included by all the signatories of the agreement. The *Experts' Agreement* is correctly summarized by both Suiza and VTM, *see* Docket entries No. 2225, pages 42-44, and Docket No. 2228, pages 24-25. In Suiza's *Memorandum*, the analysis is summarized as follows:

> The methodology ... should be followed every year for end year based on the yields on debt instruments issued by public corporations that operate like private firms [Puerto Rico Aqueduct and Sewage Authority and Puerto Rico Energy Power Authority, as Court's and experts' examples]. The same Maturity Bond Buyer's Index BBI average yield shall be used to calculate the bond ratio. By averaging all the ratios for the given year, a composite ratio shall be obtained.

---

[21]     Option No. 1.6 proposed by ORIL on December 1, 2011, Docket No. 2071-3, pages 7-10, proposes a micro cap of 20 percent. *See also* Docket No. 2225 at page 26, and Exhibit No. 2225-2, as amended by Docket No. 2248, Exhibit No. 1, page 26, and Exhibit No. 2248-5.

[22]     The Administrator followed the CAPM model which the milk processors have not in any manner challenged as the *Experts' Agreement* expressed two methods.  (CAPM and Lesser Methods).

> This composite ratio for the given year will be obtained. [Between "interest rates of bonds of Puerto Rico public corporations that operate like private firms; the ratings of those bonds by Moody's and Standard & Poor's, and the Bond Buyer Index" is obtained." *See Experts' Agreement*, Docket No. 1003]. This composite ratio must be "multiplied by the pre-tax ROE without a risk premium is equal to the Puerto Rican Premium." Docket No. 2225, page 43.

This method of unsystematic risk has been used in evaluating this type of risk in other countries, such as, Mexico, Turkey, Belize and Guatemala, among other countries that have accepted the Damoradaran's Method. *See* Docket No. 2225, page 43, and Fn.168 [Docket 1697, pp. 9-10, Docket 1799, p.23, Docket 1804, p.24]. The Court agrees that the *Experts' Agreement* clearly supports the interpretation followed by Dr. Freyre; and, hence, **the Court orders the Administrator to respect the *Experts' Agreement*, Docket No. 1003, as to an inclusion of an unsystematic risk**. The Court orders that pursuant to the *Experts' Agreement*, the unsystematic risk is to be included in the proposed Regulation No. 12, pursuant to the interpretation of the milk processors, Suiza and VTM, as stated in their respective memorandums at Docket No. 2225, pages 42-43, and Docket No. 2228, pages 24-26.

But the Court clarifies first that the "risk" is not permanent nor will always have the same value at it is an unsystematic risk (non-diversifiable) that affects the milk industry doing business in Puerto Rico. *See* Docket No. 2228, pages 23-25. The formula elaborated at the Experts' Agreement included a valuation of Puerto Rico long-term bonds (PRASA, PREPA, the utility (i.e. water and electric) bonds, respectively) compared of 20-year GO and 30 year Revenue Bonds Bond Buyer indexes. Although bonds of PREPA and PRASA may not have been issued during certain years covered by the complaint, there are new current bonds issued by PRASA and in 2013, there are also bonds issued relating to the sales and use tax, commonly known as IVU for its Spanish

acronym ("Impuesto sobre Ventas y Uso").

The Court understands that the parties reached an agreement over the risk premium and merely asked Dr. Jorge Freyre to seek the raw data to establish the finer number of the Rm. The Court does not provide Dr. Ronald W. Cotterill any credibility that there was no agreement as compared to the credibility of Dr. Jorge Freyre and Dr. Leonardo Giacchino, both well versed in regulated markets, particularly the Puerto Rico regulated milk market as to Dr. Freyre, and in other U.S., Canada and South America regulated milk market as to Dr. Giacchino. Further, and most critical, the economic realities in Puerto Rico in 2007 and 2008, warranted a risk-free factor as one established by all experts precisely in August of 2008. But the phrase "2008 will be discussed later" is merely an acknowledgment that when the stipulation was entered in August 2008, the economic figures for the year 2008 were not yet ready. Unfortunately for Puerto Rico, the economic factors, including the latest published by the Government's office as to the latest deficit numbers facing the current Governor admit the highest budgetary deficit in the history of Puerto Rico.[23]

Suiza has also provided suggestions as to the methodology and definitions, and parameters which the Court also agrees relating to Regulation 12, which the Court determines fails to comply with the original injunctive relief.

---

[23] *See Sixth Update of the Report Entitled "Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions," dated September 19, 2013, Docket No. 2284-1, page 1.*

According to the "Comprehensive Annual Report of the Commonwealth of Puerto Rico" ("CARF"), for the fiscal year ended June 30, 2012, the accumulated deficit of the Commonwealth of Puerto Rico increased from $33,677 million at the end of June 2011, to $39,037 million at the end of June 2012. This represents an increase of $5,360 million in fiscal year 2012.

The annual increase in the public debt of the central government and public enterprises of the Commonwealth of Puerto Rico is an alternative method to measure the deficit of the government of the Commonwealth of Puerto Rico.

1.    Risk-Free Rate and Equity Rate.  The same risk free rate as used in the equity risk premium (S&P 500 average return, risk-free) rate.  The Administrator of ORIL does not seem to have any objections as he uses the same suggestion accepted in Exhibit WW of Defendants (used in Option 1.6 of Exhibit WW).  ORIL has used an equity risk free rate (ERP) since January of 2011.  But ERPs must be defined and currently uses the same risk rate definitions.

Suiza further clarifies that the definition it proposes at Docket No. 2225, page 35, has been used and is consistent with "Dr. Cotterill's position since 2008, and is consistent with the Court's position."  Docket No. 2225, page. 35.  The described criteria must be defined and incorporated in the proposed Regulation No. 12.  The Court does not accept Dr. Cotterill's different risk free rate, which constitutes the use of short term rates, which does not constitute the standard practice in regulatory practice rates.

> "As proxy for risk free rate, long-term rates are the relevant benchmarks when determining the cost of common equity rather than short-term or intermediate-term interest rates."  Morin, Roger A. (2006): *New Regulatory Finance, Public Utilities Reports, Inc.*, p. 151.

Docket No. 2225, note 120 at page 36, and 2225-2, page 11.

### *Regulatory Accrual*

The existence of the regulatory accrual is clearly contemplated in the *Experts' Agreement*[24] signed on August 26, 2008, Docket No. 1003.

---

[24]    The *Experts' Agreement* was one of the principal agreements reached by all experts based on the economic situation in the island that Governor Fortuño alleged in the First Circuit, the Supreme Court of Puerto Rico, and the United States Supreme Court.  Notwithstanding, neither of the past governors, through the Secretary of Agriculture, after August 26, 2008, have accepted the critical economic conditions applicable to the milk industry in Puerto Rico, that is, the Honorable Governors, Sila María Calderón; Aníbal Acevedo Vilá, and Luis Fortuño.  The position of the Honorable Governor Alejandro García Padilla has not yet been expressed to the Court.

1) Calculation of the Regulatory Accrual: we have agreed to the following:

a.    The initial equity for the calculation is that as of December 31, 2002;

b.    The calculation is to be performed until December 31, 2007, and 2008 is to be discussed later;

c.    The value of the regulatory accrual for each year is equal to the difference between the net income that the fresh milk processing plants would have earned and the actual net income. The actual net income can be computed from the fresh milk regulatory income statements presented to ORIL. The net income that the fresh milk processing plants would have earned is calculated following the methodology proposed by Dr. Freyre in "Exhibit" ("Freyre's spreadsheet").

d.    The actual net income must be adjusted by adding back any payments for "Exclusivities". Dr. Freyre will provide that information; and

e.    The value of the percentage rate to be used in Freyre's spreadsheet has not yet been determined.

Docket No. 1003, page 1.

To the Court it is pellucid that in the *Experts' Agreement* a regulatory accrual is included within the formula as the defendants' expert is a signatory to the stipulation. Notwithstanding, Dr. Cotterill and ORIL' Administrator have refused for years after the execution of the stipulation to accept the inclusion of the regulatory accrual as one of the factors within the formula leading to compensation. As in the case of the unsystematic risk, the conduct of the defendants is deplorable and contemptuous. Defendants basically accepted the existence of the regulatory accrual when the proposed Regulation No. 12 was drafted years after the injunctive relief was issued, and years after the *Experts' Agreement* was executed. However, as correctly stated by VTM, the proposed Regulation No. 12 omits all reference to the procedure to determine the "procedure to calculate the

amount of regulatory accrual of the fresh milk processors which is necessary to calculate their capital base." *See* Docket No. 2228, page 17.

ORIL is ordered to comply with the *Experts' Agreement*, and describe the exact procedure to be used in calculating scientifically and rationally the procedure used to calculate the amount of equity base and the regulatory accrual. The Court strongly recommends a thorough review and analysis of the proposal made by VTM at Docket No. 2228, pages 27-30.

### Adjustments made by ORIL to Income and Expenses

There is a gross difference between ORIL's calculation of the milk processing plants net profit before taxes in 2008 and 2009. The difference, to the Court, is to merely achieve a result oriented determination by excluding expenses that have traditionally been accepted to both Indulac and the milk processors or to Indulac and now negated to the milk processors and/or changing the methodology of accepted expenses. Some expenses that the Court ordered to be accepted in the injunctive relief as they have been in the past, have not been accepted by ORIL or have been declined and/or grossly modified. Yet another example of contemptuous deliberate conduct, showing yet another determination and/or lack of due process and/or equal protection. *See Duquesne v. Barasch*, 488 U.S. at 307; *Tenoco*, 876 F.2d at 1026-1027, cited in *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d at 482-483.

VTM in its memorandum at Docket No. 2228, pages 32-34, provides the Court with four examples the merchandisers' expenses traditionally accepted in the past that were surprisingly eliminated in the amount of $823,672.00 demonstrating a gross inconsistency. Other amounts traditionally accepted are marketing and promotion in the amount in excess of $5 million dollars, which added to merchandiser expenses amount to a difference of $6 million dollars. Further, ORIL

has refused to provide quick, efficient measures to mitigate the considerable but costly volatile expenses as electricity, diesel, and resin that occurred early in the year 2012. The Court has strongly recommended several times automatic increases for diesel, electricity, taxes and federal minimum wage increases, as having occurred in the instant case.

The difference in not accepting the past expenses in the year 2009 means that the milk producers companies net profit was changed from a total of $3,346,782.00 equivalent to $1.41 per quart of milk sales to $8,129,301.00 to $0.343 cents per quart in a reducing market of 237 million quarts.[25] The effect is that the "new" determination not only affects a credit to be accounted for determining the price of the product, but also affects the company in the equity it has invested for other criteria and factors of the formula.

Suiza also reports a series of measures that should be considered by the Court to stabilize the regulation to avoid that ORIL continued past policy of a "shifting target," that is the changing of the parameters and the expenses and allowances. *See* Docket No. 2225, pages 44-50. The Court, at this stage of the proceedings, only addresses those expenses and/or parameters that constitute either a clear change or those included in the injunctive relief. The non-inclusion of all simply means that the Court prefers not to address them at the preliminary injunction stage instead of the permanent injunction stage. But an order addressed to a parameter that is disobeyed will clearly count for contempt purposes.

Naturally, VTM and Suiza propose a series of amendments to the proposed Milk Regulation No. 12 ("PMR"), as mitigating and/or clarifying statements, in addition to those matters, which the

---

[25]      In the year of 2004, when the case was filed the fresh milk market, as of December 31, 2004 was 270,139,928 quarts down from 292,213,124 quarts in December 31, 2002. As of December 31, 2012, the market of volume of quarts was down to 217,177,124. *See* Docket No. 2262, page 44.

Court has found that the parties agreed in the *Experts' Agreement* executed on August 26, 2008, Docket No. 2003.

      A.      The Court and all parties accept that the expenses related to raw milk constitutes the greatest expense of the milk processor.  Notwithstanding, at proposed Regulation No. 12, the expenses relating to the Federal School Luncheon Program is ordered to be excluded.  This is clearly irrational, unless the expenses are clearly covered under the Federal Program.

      B.      When estimating the regulated margin for milk pricing payments to the Special Marketing Fund of three cents (3¢); the Accounting Program five cents (5¢), and one and a half cents (1.5¢) to the Regulatory Accrual, do not properly constitutes regulatory expenses under the proposed Regulation No. 12.  These expenditures are improperly excluded.

      C.      Raw milk ingredients must be included as an expense account and must be clearly defined to avoid arbitrariness and irrationality.  A scientific parameter is to be established by ORIL.

      D.      Amortization of none recurring professional fees and contracted services are ordered to be amortized if they constitute a general accepted accounting principle ("GAAP").  Suiza hints that such practice is within  GAAP.  *See* Docket No. 2225, page 46, Fn.198 at Exhibit 2225-3, page 19.  Hence, the amounts for non-recurring expenses, such as, professional fees and service contracts are to be amortized pursuant to the general accepted accounting principles ("GAAP") to be used for tax purposes.

      E.      Shrinkage and deterioration is to be set by a non-discriminatory, rational and scientific method.  As to the proposed Regulation No. 2, ORIL proposes a maximum ceiling of 3.0%.  The Court is aware that a hearing was held wherein Suiza presented a sworn statement of a witness with excellent authoritative credentials as to qualifications.   The witness stated that the correct figure

was 3.25%.  Although, the Court is authorized at preliminary injunction hearings admit sworn

statements, *see Asseo v. Pan American Grains*, 805 F.2d 23, 25-26 (1ˢᵗ Cir.1986), the Court may not

determine credibility issues as to rationality, weighing the rationality of a scientific opinion.[26]

However, any parameter number approved by ORIL must have the support of a scientific rational

analysis.  In the instant case, said number has been currently set at 3% under the proposed Regulation

No. 12, without any explanation.  The Court orders that this matter must be determined rationally,

scientifically not discriminatorily on a year to year basis without any predetermined amount.  Should

this matter not be resolved by ORIL, the Court will ultimately determine the amount as the simple

top or cap figure, sounding as a whim, that is clearly unconstitutional.  *Duquesne Light Co. v.*

*Barasch*, 488 U.S. at 307.

      F.      Marketing and advertisement expenses cannot be arbitrarily established without any

explanation.  At proposed Regulation No. 12 § 6B.21, page 6, ORIL had set a cap of $0.05 per quart

of milk.  *See* Docket No. 2225, page 47, Fn.210-211, Exhibit 2225-3, page 20, citing proposed

Regulation No. 12, § 6B21 and App.C. § 6B2.27, page 12.  Curiously, ORIL authorizes Indulac a

higher amount.  This Court and the First Circuit have clearly stated that ORIL cannot have different

parameters (different prices as to the purchase of raw milk), as they are both competing regulated

entities.  The milk processors are requesting 2.5% should this amount be rational and scientifically

based.  The formula of how this is determined must clearly established in the proposed Regulation

---

[26]     The Court is aware of receiving two different opinions based on sworn statements.  The Court
cannot make credibility determinations as to the weight deserving to the two experts on the matter relating
particularly to whether the scientific method proposed by either one is unreliable.  This matter is left for the
permanent injunctive relief trial.  In the meantime, the Court will authorize an economic parameter containing
definitions and formula that is scientific and reasonable and non-discriminatory proposed by Administrator of ORIL,
but without any cap whatsoever.  The parties are encouraged to attempt to reach an agreement on this particular
subject matter.

No. 12. Further, any amount accepted must have a rational, scientific support. *Duquesne*, 488 U.S. at 307; *Tenoco*, 876 F.2d at 1026-1027. This particular parameter constitutes a clear contempt conduct expressly rejected by the Court. This measure is obviously attempting to offset the effect of ORIL being obligated to accept an "unsystematic risk;" and, having to eliminate the beta parameters of Dean Foods, Inc., a company that represents 40% of the U.S. market of dairy foods, *see* Docket No. 1180, Transcript of February 16, 2009, page 140; Docket No. 1697, *Opinion and Order*, pages 15-17. Dean Foods, Inc. represents 96% of the sum of the capital of the sample of four dairy companies used to calculate the beta and is close to 100 times the reconstructed capital of the fresh milk processors in Puerto Rico, *see* Docket No. 1194, pages 2-3, referring to Exhibits No. 14-15, admitted by the Court, *see* Docket No. 1697, page 16. It is further a reaction to the Court's ordering the acceptance of the stipulation of the *Experts' Agreement* accepting the formula of the ROE expressed at Docket No. 1003, pages 1-2, and the tables attached thereto.

      H.      Discounts as to fluid milk prices. The milk processors aver with the support of reliable expert testimony that discounts to agents from gross revenues from fluid milk and the FFIL constitute reasonable income discounts. But the discount to agents are limited to 6.5% per quart. *See* Docket No. 2225, page 49. There is no justification as the proposed Regulation No. 12 for said limit. Once again, ORIL is ordered to establish a parameter, in a rational non-discriminatory fashion instead of taking a number that is not explained, defined and that can be changed, altered, modified as the number is lacking transparency, and does not provide a rational way of achieving the number of ongoing accounts.

      Suiza and VTM balk at indefinite in time and arbitrary in motive, as to ORIL's regulatory accounting. The most glaring example is that, notwithstanding the recognition of a new rate of

return after the injunctive relief, five years have elapsed and there is yet no existence for a "temporary mechanism that will allow the processors to recover the new rate of return they are entitled to," *see* Docket No. 2225, page 50. **The Court orders that a system to recuperate the new rate of return be established within thirty days of the signing of this *Order*.**

VTM succinctly pointed out the clear errors of ORIL's proposed Regulation No. 12 of July 22, 2008.

- Establishing the capital base of the fresh milk processors and the methodology.

- Establishing the milk processors cost of equity capital and the price of the promoters.

- Establishing the specific systematic or unsystematic risk of operating a milk processing business in Puerto Rico.

- Correct the deficiencies of ORIL's proposed Regulation No. 12 regarding the expenses authorized amount.[27]

- Include all assets, liabilities and capital amounts.

- Provide for reasonable contribution for regulatory accrual reserves payments for the milk processors. *See* Docket No. 2228, page 10.[28]

---

[27]     This matter has been covered in this *Opinion and Order*.

[28]     Prior thereto at Docket No. 197, pages 18-19, VTM also suggested other corrections and/or amendments, as to the proposed Regulation No. 12, that today remain pending approval:

- Raw milk and ingredients (expenses as to raw milk and ingredients containers: the proposed Regulation No. 12 does not recognize the cost of the containers.

- Shrinkage and determination: covered in this *Opinion and Order* as a legitimate expense.

- Professional fees and contracted services: covered in the *Injunction Order*, and in the instant *Opinion and Order*.

This Court has entered several orders relating to ORIL's refusal to follow the directives of the Court. *See Opinion and Order* of September 22, 2010, Docket No. 1697, enforcing the *Experts' Agreement*, Docket No. 1003, as to the calculation of the regulatory accrual, return on equity by applying the Capital Asset Pricing Model (CAPM). The Court specifically address the agreement as to the unsystematic risk; the wrongful beta coefficient wrongfully using Dean Foods; and, correcting the wrongful regulatory practices as to the expenses and/or costs accounts ordered by ORIL. The defendants have never showed "manifest injustice" under *Chao*, 493 F.3d at 31-32, as to the facts accepted and the criteria to be used to determine the "risk of doing business" in Puerto Rico nor the particular "fit" of Dean Foods, as a beta coefficient comparable to VTM and Suiza. *Tenoco*, 876 F.2d at 1024-1025. *See* Docket entries No. 1697, 1804, 1907, 1965.

On March 24, 2011, the Court issued an *Order to Show Cause*, Docket No. 1907, directing the defendants under "judicial estoppel" doctrine expressed in *Patriot Cinemas Inc. v. General Cinemas Corp.*, 834 F.2d 208, 211-212 (1st Cir.1987), citing *Davis v. Wakelee*, 156 U.S. 680 (1985). The doctrine of *Patriot Cinemas*, *supra*, precludes a party from asserting a position in a legal proceeding, which is contrary to a position it has already asserted, and prevailed thereunder in another judicial case.

As the Court understands the matter, the Commonwealth of Puerto Rico has prevailed in the United States Court of Appeal for the First Circuit, as well as the Puerto Rico Supreme Court and a subsequent *certiorari* denied by the United States Supreme Court. Briefly, the Government has

---

- Costs for using its own land: the Court has recognized this matter as a legitimate expense.

- Marketing and advertisement: covered in this *Opinion and Order*.

enacted a comprehensive stabilization law to alleviate a $3.2 billion dollars structural deficiency in the Government of Puerto Rico. Workday reductions, involuntary seniority lay-off, potentially having the repercussion to reduce 40,000 employees. The Government of Puerto Rico was experiencing a thorough and critical economic crisis at the time. Hence, on March 9, 2009, Governor Fortuño enacted the "Law Declaring a Fiscal State of Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Save Puerto Rico Credit," Law No. 7 of March 9, 2009.

In *United Automobile, Aerospace, Agricultural Implement Workers of America International Union, et al. v. Fortuño, et al.*, 633 F.3d 37, 47 (1st Cir.2011), according to the majority opinion authored by Circuit Judge Stahl, the measures taken were not intended "to benefit a special interest at the expense of Puerto Rico's public employees." *Id.* "To the contrary, Act No. 7, on its face, appears to spread the burden of restoring Puerto Rico's fiscal health . . . ." *Id.* The Honorable Circuit Judges Boudin and Howard issued a concurring opinion in *United Automobile*, *supra* at pages 47-49, stating as alleged by the Government of Puerto Rico, that "Puerto Rico has been suffering from one of the worst financial crises in its history, its government has been running a large structural deficit, and its credit has been in jeopardy." (Referring to the Statement of Motives of Act No. 7 of March 9, 2009).

At the local level, in a parallel case, the Puerto Rico Supreme Court held a year earlier that Law No. 7 of March 9, 2009, was constitutional. *See Castro v. Commonwealth of Puerto Rico*, 178 D.P.R. 1, 11. In the petition for *certiorari* to the United States Supreme Court filed in the case of *Castro v. Government of the Commonwealth of Puerto Rico*, 2010 WL 4220510, the Government of Puerto Rico stated at page 4 of the opposition to the petition for *certiorari*, that "the government could not have paid employee salaries or provided citizens with essential services." "Those

74

consequences would have had a crippling effect on Puerto Rico's economy, leading to the loss of 130,000 jobs in a jurisdiction whose total population is just four million people." *Id.* "According to the Planning Board's estimates, unemployment could have reached 25 percent. (Pet. App. 304a-306a)." In its *Certiorari* brief, the Government of Puerto Rico further admitted that, "[a]lthough bonds issued by the fifty States have credit ratings of A1 or higher, Puerto Rico bonds had fallen from a rating of Baa1/A - in 2004 - to Baa3/BBB - in 2009." *Id.* at page 3. "The rating left Puerto Rico government debt just a single step above 'junk' status. (Pet. App. 302a-304a)." *Id. See* Docket No. 1907, pages 6-7. *See also Vaquería Tres Monjitas, Inc. v. Irizarry*, 600 F.3d 1, *cert. denied*, ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (May 17, 2011).

Notwithstanding, the First Circuit finding in the federal case as urged by the local government of Puerto Rico and the admissions of the Government of Puerto Rico in the opposition for the petition for *certiorari* to the Supreme Court of the United States from the Puerto Rico Supreme Court case, the defendant's position illogically insists that there is no crisis in the milk market of Puerto Rico, which does not warrant an unsystematic adjustment to the formula. For once, the fresh milk market in Puerto Rico has decreased considerably from 270, 135, 928 quarts of milk in the year 2004, on or around the date of filing of the instant case, to 217,177,124 quarts of milk in 2012. *See* Docket No. 2262, page 44. Further, the population of Puerto Rico as previously stated in this *Opinion and Order* had decreased in the last ten years around 80,000 and in excess of 10,000 in the last year. Finally, the youth up to 19 years old has substantially declined, precisely the most common clients. *See Fifth Update of the Report Entitled Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions*," filed on August 2, 2013, Docket entries No. 2261-2264.

75

Hence, there is no economic paradise for the milk industry. The systematic risk recognized by the experts back in August 2008 was justified by the economic plight in Puerto Rico which began "since 2006," as admitted by the Government in a *certiorari* opposition to the United States Supreme Court, in the instant case. *See Vaquería Tres Monjitas, Inc.*, 600 F.3d 1, *cert. denied*, ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (May 17, 2011).

There are consistent errors in the calculation of the rate of return. **First, the Administrator is ordered to use the freshest data available and not stale data**. The Administrator of ORIL has consistently used electricity and water expenses that are not current. **Second, the rate of return cannot be established without an analysis of the capital investment, as Suiza has logically demonstrated, also correctly denominated by VTM as "amount of equity" of the processing plants**. (Emphasis ours). *See* Docket No. 2228, page 28. *See* the *Experts' Agreement*, Docket No. 1003, and the tables initialed by the experts' signatories of the *Experts' Agreement*, in which the experts established a procedure to arrive at the rate of return. *Id.*

VTM correctly express the rate of return as a regulated matter, as follows: "In conceptual terms, the regulatory accrual is added to the book value of the net worth of the fresh milk processing plants and a reserve for the payment of income tax and dividends applicable to that Regulatory Accrual is subtracted in order to obtain the estimates of the adjusted net worth." *See* Docket No. 2228, page 28. "The adjusted net worth is the base to which the rate of return is applied to obtain the return of capital to be included in the calculation of the regulated margin." *Id.*

The first year of the calculation of the Regulatory Accrual is 2003, and it is included in the *Experts' Agreement*'s spread sheets. The year 2003 has a recognized operational loss. *See* Docket No. 2228, pages 28-29. In fact, proper calculations were performed at the experts' spread sheets for

76

the year 2003 until and including the year 2007.  *See* Docket No. 1003, pages 3-7.  The Court method

to calculate the ROE is expressed by VTM at Docket No. 2228, page 29.[29]  "This amount of

reasonable profit of calculated by multiplying the rate of return by the total 'Capital and Operating

Surplus' for the previous year 2002, which amounted to $43.59 million **according to the**

**Agreement**."  (Emphasis ours).  *Id.* "The total of these two values is included in the Asset as the

'Gross Regulatory Accrual.'"  *Id.*  Hence, once again the solution to the ROE and the manner

[method] to calculate the amount of equity is clearly contained in the *Experts' Agreement*, Docket

No. 1003, pages 3-7.  The *Experts' Agreement* clearly covers only the years 2003-2007 and leaves

the 2008 "to be discussed later," Docket No. 1003, page 1, as the agreement of the experts was on

the same date it was filed in open court by counsel of all parties, on August 26, 2008 at

about 2:45 p.m. (CM/ECF Computerized Time).

VTM further balks strongly at ORIL's artificial method which the Court has been duly

illustrated an "artificial reduction in the amount of expenses" together with "an artificial upwards

increase in [the] income [of the milk processors]."  *See* Docket No. 2228, page 31.  The Court has

previously noted the practice at the *Injunction Order*, *see* Docket No. 480, page 32, "[t]he

manipulation of plaintiffs' real financial picture is the consistent result, year after year, albeit on

account of ever changing regulatory criteria [as to both authorized expenses and their income]."

VTM alleges that "as a result of ORIL's arbitrary adjustments, losses have converted into profits

and/or the pretax profits of the fresh milk processors have been artificially increased in years 2008,

2009, and 2010."  Docket No. 2228, page 31.

VTM currently notes at the *Experts' Agreement* wherein the defendants' experts, at

---

[29]

Case: 17-03283-4-B-OD
Case: 17-03283-4-B-ODC-04-17-276
Filed: 07/09/239
Filed: 09/28/21
Page 92 of 211
Document    Page 92 of 211

paragraph 1.d. agreed to adjust the net income by "adding back any payments for "Exclusivities." *See* Docket No. 1003, page 1, ¶ 1.d. this meant that "exclusivities" were not to be accepted as an expense. Interestingly, this part of the Agreement is respected and followed by ORIL. *See* Docket No. 2228, pages 32-34 (increase created by eliminating of exclusivities expenses raising net profits which was agreed but adding for the first time prompt payment discounts as an added profit, and the elimination of promotional discounts, which VTM also does not challenge). Notwithstanding, for the first time the amount of $823,672 for merchandisers costs that were eliminated as a recognized expense incurred by VTM until then accepted by ORIL and also previously authorized to Indulac for the year 2009, all as provided by a fiat of the proposed Regulation No. 12 "showing inconsistency of its regulatory practice." Further, marketing and promotional discounts to promote "fresh milk" which generates more sales in order to aid the farmers and avoid the considerable losses as to UHT milk, as less milk has to be purchased and manufactured by Indulac,[30] was not allowed for the first time, for a total of previously allowed expense of $5,185,638. "Thus, these two types of adjustments amounted to $6,009,310 and were the determining factors in ORIL's actions to artificially and substantially increase the net profits before taxes of fresh milk processors." Docket No. 2228, pages 33-34 (referring to merchandisers expenditures and marketing promotional accounts). The Court considers this maneuver by ORIL as a serious violation to the *Injunction Order* of July 13, 2007, Docket No. 480. This example constitutes the most glaring example of "shifting targets," that is changing on accepting a parameter without notice causing a serious double low blow

---

[30]     Indulac is a balancing plant that purchases the excess milk not purchased by the processing plants in order to keep the production of the farmers as stable as possible. Indulac also receives all the milk processors' stale milk for disposal, which represents an added expensive cost to Indulac. However, there are years in which Indulac has dumped product that has became stale and could not be sold, and other years when the milk is practically given away in export sales. Suiza has a pending charge relating to the exportation prices that the farmers accept a lesser price in technical violation to the *Injunction Order* as to equal payment for the raw milk.

to the milk processors.

Moreover, amongst other factors, VTM further notes that ORIL reduced arbitrarily recognizing an inflation during 2010 a series of expenses for 2010. "However, ORIL's projection was based on an income and expense figures arbitrarily and erroneously adjusted in 2009." Docket No. 2228, page 34. Again, ORIL violates the *Injunctive Order* by using improper stale data figures, and to heighten the damages again establishes arbitrary criteria without any rational scientific parameters, and obviously with an intent to violate the *Injunction Order* issued on July 13, 2007, Docket No. 480.

Finally, ORIL not only rapidly adjusted expenses using state data and under no reasonable criteria, but fails to recognize the increase of expenses as to increases in electricity, diesel and resin during the first quarter of 2012, all pursuant to unquestionably known verified data as testified by Dr. Freyre at the hearing held on June 29, 2012, Transcript pages 43-50. Obviously, since the costs have increased and the milk sales have consequently decreased, *see* historical data at Docket No. 2262, page 44, the cost per quart during the years 2010-2012 increases all without any significant scientific relief in the price of milk. *See* Docket No. 2228, page 34.

The Court is of the opinion that ORIL's delay in compliance as to refusing to accept the broad effect of the *Experts' Agreement* resolving most of the controversies as to compliance constitutes the most significant offense to the compliance procedure, as correctly expressed by Suiza in its *Post-Hearing Memorandum*, Docket No. 2225, pages 23-24.[31]

---

[31]    The *Experts' Agreement* has provided a complete framework, except for how to deal with negative betas, the size of the Puerto Rico risk, the period of repayment of the regulatory accrual and the interest on it, and further specificity in the definition of income statement regulatory accounts. The *Experts' Agreement* includes the methodology for the calculation of the regulatory accrual (the starting point being the initial equity as of December 31, 2002, the value for

The other significant controversy is the elimination of Dean Foods as a beta coefficient was handled by the Court making reference to *Tenoco Oil*, 876 F.2d at 1024-1025. Dean Foods simply lacks a "fit" to the two regulated companies as to corporate size and marketing strength in the United States both vertically and horizontally. (Dean Foods constitutes 96.3% of the capital of the five beta company components, which amounts to over 100 times the reconstructed capital of the local fresh milk processors and enjoys 40% of the total U.S. market dairy products, *see Order*, Docket No. 1697, pages 15-17).

Another significant disagreement was ORIL's insistent practice of including the negative betas. They are simply unreliable as expressed by the Ibbotson and other renown experts cited by the Court in this *Opinion and Order*, and not retained by any party. The companies with negative betas were simply experimenting "a problem with the data or something wrong with the company." Dr. Giacchino, Transcript of June 24, 2011, pages 13-17. Dr. Freyre and Ibbotson do not use negative betas. *See* Transcript of September 11, 2011, pages 30-31.

The Court further does not provide any credibility or weight to the testimony of Dr. Cotterill for the reasons stated at the *Defendants' Reply Memorandum*, Docket No. 2229, pages 1-11. Ibbotson and Morning Star, and other experts with greater experience than Dr. Cotterill, merely

---

each year and the elimination of exclusivities, leaving for later if they will use a single return on equity or a yearly one), the methodology for the calculation of the return on equity, instructions on the collection of data for the calculation of the Puerto Rico risk, the payment of dividends for the regulatory accrual received and the adoption of balance sheet accounts for regulatory accounting. The CAPM methodology adopted as of October 30 included the same risk free rate as a standalone rate and within the equity risk premium and the need to not include negative betas, while the experts still disagree on the inclusion of Dean Foods, the size of the Puerto Rico risk and the lag in the calculation of the rate of return. There is no doubt that this Honorable Court has stated that the experts' agreement will be respected and applied. Now is the time to do so. *See* Docket No. 2225, pages 23-24.

report the negative betas "but [do] not include negative betas" in its calculation as coefficient companies to determine the beta component. *See* Docket No. 2229, page 10, Fn.21.

Hence, the Court has ruled that negative betas are unreliable, and non-scientific, to include them as part of the beta component; similar to the inclusion of a giant corporate entity that absolutely has no "fit" to the two regulated entities in the instant case. It appears that recently, after months if not more than one year, the inclusion of negative betas has been abandoned by ORIL.

There are other strong disagreements as the inclusion of the unsystematic risk applicable to Puerto Rico. The Court has addressed this issue in several orders. Time has shown the Court to be correct. The unsystematic risk was clearly included by all experts immediately after the economic crisis in Puerto Rico began and was accepted by the Government, in two separate judicial cases, as having serious repercussions Island wide. The crisis continues to this date in the year 2013. *See Fifth Update of the Report Entitled Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions*, Docket entries No. 2261-2264.[32]

### Contempt by ORIL to the Court's Orders

First, the Court clarifies that the matter of FEP, an alleged private corporation controlled by farmers, allegedly selling raw milk to be processed by Indulac and sold to private brands, or

---

[32]    *See Sixth Update of the Report Entitled "Analysis of the Particular Fit of Puerto Rico into any Economic Model for U.S. Jurisdictions,"* Docket No. 2284-1, page 1.

According to the "Comprehensive Annual Report of the Commonwealth of Puerto Rico" ("CARF"), for the fiscal year ended June 30, 2012, the accumulated deficit of the Commonwealth of Puerto Rico increased from $33,677 million at the end of June 2011, to $39,037 million at the end of June 2012. This represents an increase of $5,360 million in fiscal year 2012.

The annual increase in the public debt of the central government and public enterprises of the Commonwealth of Puerto Rico is an alternative method to measure the deficit of the government of the Commonwealth of Puerto Rico.

processed by VTM is not a matter for consideration at this stage of the proceedings, as FEP was not

a subject at all of the Court's *Injunction Order*, Docket No. 480. Neither is the battle between Suiza

and VTM relating to the Suiza's abandonment of certain routes for the collection of raw milk, and

as a consequence, an alleged benefit was granted to VTM by increasing their participation in the

Federal School Luncheon Program to the detriment of Suiza. (The Court merely maintained the

Federal School Program issue in passing, but never received evidence on the subject matter).

Neither is raw milk "sold for export" at allegedly low prices. Suiza alleges that these are

transgressions of the Court's *Injunction Order* of equal treatment protection. *See* Docket No. 2225,

pages 52-54. The Court defers these matters for the final injunction hearing. The Court deems

judicious to listen to Indulac as to exportation of UHT milk and how that affects Suiza. The Court

deems elementary to grant due process to the farmers on these new developing subject. The

contempt in this case involves potentially ORIL's lack of compliance with the Court's orders in the

*Injunctive Order* or issued thereafter, or after the *Experts' Agreement*, Docket No. 1003.

Contempt is simply lack of compliance by a party with an order of the Court.

*Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 207 (1999). Intent to comply is not an

excuse, as the issue is compliance. *Century ML-Cable Corp. v. Carrillo*, 43 F.Supp. 176

(D.P.R.1998). The Court's dignity is at stake. *Asseo v. Bultman Enterprises, Inc.*, 951 F.supp. 307,

313 (D.P.R.1996). Absence of willfulness is not an element in a civil contempt where the orders are

clear and addressed to a litigating party. *Morales Feliciano v. Rossello González*, 124 F.Supp.2d

774, 787 (D.P.R.2000).

The Court clearly finds contempt in the conduct of ORIL involving several of the directors

of ORIL during various administrators, under three different Government administrations, since

July 2007 until December 2012, and now under a new administration since January 2013.

The Court further clarifies that the *Injunctive Order* issued by the Court on July 13, 2007 was totally affirmed by the First Circuit on November 23, 2009, and published as *Vaquería Tres Monjitas Inc. v. Irizarry*, 587 F.3d 464. Thereafter, a dissent occurred in an *en banc* hearing, as to potential retroactive remedies, published at 600 F.3d 1 (1st Cir.2010), which was eventually denied by the Supreme Court of the United States after receiving the position of the United States Attorney, *see cert. denied* ___ U.S. ___, 131 S.Ct. 2441, 179 L.Ed.2d 1235 (May 17, 2011).

### *The Extraordinary Remedy*

After nearly a decade of litigation, over one hundred hearings in the District Court, and two appeals to the United States Court of Appeals for the First Circuit, three different Governors of Puerto Rico from the two leading political parties in Puerto Rico, having refused to comply, through the conduct of different Secretaries of Agriculture and several ORIL's administrators, the Court's patience is throughly exhausted. In that time, the Court has witnessed first-hand repeated delays, stall tactics and general obstinance from Milk Industry Regulation Administration, ORIL. The Court, amongst other episodes, has observed ORIL's sheer refusal to adopt a non-discriminatory pricing formula based on rationale, scientific and economic methods; apparently indifferent to the pending litigation, ORIL has, time and again, attempted to implement an unjust pricing formula at the expense of milk producers in violation of the Due Process Clause. The Court, sadly, recognizes that after years of litigation, of hearings upon hearings, little to no progress has been made to remedy the Constitutional violations that were the basis for the preliminary injunction. Again, the Court's patience is exhausted. The time for action is fast upon us.

In light of this pattern of evasion and defiance, the Court reluctantly concludes that such

extraordinary conduct by ORIL may be met in kind with extraordinary action by the Court.  The Court remains ever cognizant of its place in a tripartite system of governance whereby the Legislature enacts laws; the Executive Branch promulgates regulations implementing those laws; and the Judiciary adjudicates controversies pursuant to those laws and regulations.  However, the Court will not, and indeed cannot, sit idly by while Constitutional rights are violated and purposely trampled over and over again in front of the Court's eyes.  Although the Court adamantly strives to avoid usurping the proper roles of the Legislature and the Executive, and provides proper deference to the principals of federalism, the  Court must exercise its "traditional attributes of equity power" to ensure that any Constitutional violations cease.  *Brown v. Board of Education II*, 349 U.S. 294, 299-300 (1955).  Thus, should the resolution of the permanent injunction be similar to the resolution of the preliminary injunction, and the Court does not pre-judge the issue to suggest the outcome one way or the other, **the Court will proceed to implement a formula regulating the price of milk**.  *See  Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15 (1971)  ("Once a right and a violation have been shown*,* the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

In taking this approach, the Court finds that no separation of powers boundaries or federalism concerns will be violated as the exercise of the Court's remedial power will be limited to ensure that "[t]he remedy [is] related to the condition" that "offend[s] the Constitution."  *Milliken v. Bradley*, 418 U.S. 717, 738 (1974); *see Swann*, 402 U.S. at 16 (the scope of a federal district court's remedial power is "determined by the nature and scope of the constitutional violation."); *Missouri v. Jenkins II*, 515 U.S. 70, 88 (1995)(Court's remedial powers are appropriate provided that they are framed by "the violation, [which] means that federal court decrees must directly address and relate

84

to the constitutional violation itself.").

Additionally, the Court is fully justified in this approach as the present controversy is analogous but not totally equal in dimension to racial desegregation of schools and school busing. *See Griffin v. County School Board*, 377 U.S. 218, 233 (1964)("the District Court may, if necessary to prevent further racial discrimination, require the Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system . . . ."); *Missouri v. Jenkins*, 495 U.S. 33, 55 (1990)("The Fourteenth Amendment . . . was avowedly directed against the power of the States, and so permits a federal court to disestablish local government institutions that interfere with its commands.")(internal citations and quotations omitted); *Swann,* 402 U.S. at 16 ("In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system.").

Reform of state prisons provides yet another compelling example. In *Hutto v. Finney*, 437 U.S. 678 (1978), the District Court entered a series of detailed remedial orders upon finding that the conditions in the Arkansas prison system constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The Court of Appeals affirmed the District Court's order placing a maximum limit of 30 days on confinement in punitive isolation. The Supreme Court also affirmed, stating:

> In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation. The District Court had given the Department repeated opportunities to remedy the cruel and unusual conditions in the isolation cells. If petitioners had fully complied with the court's earlier orders, the present time limit might well have been unnecessary. But taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance.

85

*Hutto*, 437 U.S. at 687.

Similarly, in *Brown v. Plata*, ___ U.S. ___, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011), the Supreme Court upheld a three judge court's[33] ruling to reduce the population of California's penal system after years of litigation had revealed, and not corrected, violations of the Cruel and Unusual Punishments Clause.  The Supreme Court found, *inter alia*, that the lower court's decision was narrowly drawn, extended no further than necessary to correct the violation of a federal right, and was the least intrusive means necessary to correct the  violations in compliance with the explicit language of the PLRA.  *See* 18 U.S.C. § 3626(a).

Each of these litigation paradigms, racial desegregation of schools, school busing and prison reform,[34] similarly involved obstinate and recalcitrant state and local government, whose years of inaction and non-compliance with Court directives necessitated the need for federal judicial intervention to safeguard the Constitution.  Although these cases arguably implicate loftier civil rights objectives than what is presently before the Court, the Court cannot tolerate repeated and

---

[33]    Pursuant to the Prison Litigation Reform Act of 1996 (the "PLRA"), "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court." *Brown*, 131 S. Ct. at 1922 (citing 18 U.S.C. § 3626(a)).

[34]    The Court also notes that in *Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus*, 634 F.3d 3 (1st Cir.2011) the First Circuit held that Jehovah's Witnesses have a right to proselytize door-to door, notwithstanding a state law permitting neighborhoods to restrict vehicular and pedestrian access to the residential streets within the neighborhood.  Of particular interest to the present inquiry, the Circuit Court stated:

> On remand the district court needs to take prompt action to bring the municipalities and urbanizations into compliance with this decision . . . .The district court can adopt categorical guidelines and make use of magistrate judges or other facilitators as needed.

> To assure compliance might seem a daunting task because of the number of urbanizations, but we would expect the district court--if confronted with undue delay or repeated noncompliance--promptly to direct open access for all visitors unless and until the urbanization brings itself into compliance. Further, unreasonable delay creates a risk of contempt and of damages and attorneys' fees, 42 U.S.C. § 1988(b); *see Boston's Children First v. City of Boston*, 395 F.3d 10, 14 (1st Cir. 2005), providing an additional incentive for defendants to act promptly.

*Watchtower Bible*, 634 F.3d at 17.

rampant Constitutional violations which not only dramatically affect two large corporations, with the distinct possibility of bankrupting these entities, but also implicate the health and nutrition of the people and children of Puerto Rico. Accordingly, the Court affirms that it has the authority to implement the requisite regulations to ensure full and complete Constitutional compliance.

However, as this extraordinary action is indeed very strong medicine, and the instant litigation remains at preliminary injunction phase, the Court is only willing to dispense such strong medicine at the permanent injunction phase, if necessary. *See United States v. Santana*, 6 F.3d 1, 10 (1st Cir. 1993) (warning that "potent elixirs should not be casually dispensed"). **The Court, thus, also affirms that the Court will exercise such authority in the event that Plaintiffs prevail at the permanent injunction hearing, and the defendants continue with their current conduct of delay, changing the parameters, not authorizing clearly acceptable economic expenses that traditionally have been accepted and are only changed to artificially decrease the rights of the milk processors in a regulated market**.

The Court hereby sets the Permanent Injunction Hearings for **November 18-22, 2013 at 9:00 a.m.**, in Old San Juan Courtroom 4 of the José V. Toledo U.S. Post Office and Courthouse**.**[35]

### *Contempt Findings*

The Court undoubtedly, without any hesitation whatsoever, concludes that Defendant ORIL,

---

[35]    Notwithstanding, the Court strongly recommends that the parties utilize the time between the instant *Opinion and* Order and the Permanent Injunction Hearing to reach an extrajudical resolution to the instant controversy as the Court maintains that the instant matter is best resolved via an agreement. *See Candelario del Moral v. UBS Fin. Servs.*, 699 F.3d 93, 107 (1st Cir. 2012)("we do not think that we are crossing any lines in 'suggesting that this is a case best resolved by settlement.'")(quoting *Bos. Edison Co. v. Fed. Energy Regulatory Comm'n*, 233 F.3d 60, 69 (1st Cir. 2000)).

all the administrators holding office as executives at ORIL, and the expert Dr. Ronald W. Cotterill,[36] have incurred in serious, blatant, and continued violations to the injunctive order of this Court issued on July 13, 2007, Docket No. 480, and to the subsequent Experts' Agreement, Docket No. 1003, filed in open court by the lawyer's present on August 26, 2008 at 2:45 p.m.

The Court begins with the recalcitrant unexpected, but continued attempt by Defendants and their expert, to extricate themselves from what all experts agreed in writing and filed in the afternoon of August 26, 2008, the *Experts' Agreement* and the attached work sheets, Docket No. 1003. Stipulations are, pursuant to *Christian Legal Society, et. al. v. Martínez*, __ U.S. __,130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010), "formal concessions … that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.  Thus, a judicial admission … is conclusive in the case."  In the instant case, the alluded stipulation case was signed by all experts. The Agreement was presented to the Court by counsel and entered in open Court.

The Agreement was broader than originally envisioned by the Court.  The Agreement, Docket No. 1003, eliminated most of the controversies between the parties that had not been resolved by the Court's injunctive relief of July of 2007 (Docket No. 480).

The Agreement included:

•       The acceptance of the regulatory accrual and the methodology as to the calculation thereof (Docket No. 1003, page 1, ¶¶ 1 a-e and 2 a-e), including the starting point of

---

[36]       The Court strongly recommends that Dr. Cotterill retain separate counsel, as the Court is seriously contemplating sanctions against him resulting from the continuing violation of changing the values of parameters and/or establishing new parameters without any scientific and/or reasonable analysis; eliminating traditionally accepted expenses; and the same time, placing those expenses as profit of the company.  Above all, not accepting the obvious numerous agreements as to considerable sections of the ROA formula and the acceptance of regulatory accrual, as well as the acceptance of the unsystematic risk, all relating to the Experts' Agreement, previously signed by Dr. Ronald W. Cotterill.

12/31/2002 and the value for each year's[37] elimination of exclusivities, which was continuously requested upon the insistence by ORIL, the elimination of the exclusivities as part of the *Experts' Agreement*;

• The methodology for the calculation on the ROE, (Docket No. 1003, page 1, a-d);

• The acceptance of the existence of an unsystematic risk denominated as "measure of Puerto Rico risk",[38] and instructions on the proper data for the calculation of said risk as part of the ROE;

• Payment of potential dividends as to the recognized regulatory accrual;

• The CAPM or the LESSER method to calculate the ROE (ORIL chose without any objection of either processors, the CAPM method, capital asset pricing);[39]

• A "risk-free" rate as a "stand alone rate within the equity premium";

Several times during the trial, the Court openly expressed that the Experts' Agreement had to be respected, including in several written orders (Docket Nos. 1697 and 1804 (resolving ORIL's reconsideration)). The Court further expressed various comments on the record as to the legal effect of the stipulation entered by the experts signed by the parties, who were then handing exclusively the economic matters and the parameters to be established as to various pending formulas. *See Memorandum* of Suiza, Docket No. 2255-2, page 1-32. The Court further issued an order to show

---

[37] Hence the parties accepted retroactive effect as to these criteria at least as to using those economic figures.

[38] The measure of Puerto Rico risk was then and now continues to be justified by the economic reality of Puerto Rico as compared to that of the United States and/or the poorest states of the Union. *See Economic Analysis* at *infra*.

[39] ORIL accepting the CAPM method is yet another circumstantial evidence that the Agreement was initially accepted by ORIL.

cause to Defendants at Docket No. 1097 and then issued an Opinion at Docket No. 1965 based on

equitable estoppel to Defendants as being barred under the doctrine *Patriot Cinemas, Inc. v. General

Cinemas Corp.*, 834 F.2d 208, 211-212 (1st Cir. 1987) as the Defendants had prevailed both in the

Circuit Court of Appeals (in the case of *U.A.A.A.I.W.A. International Union v. Luis Fortuño*, 633

F.3d 37 (1st Cir. 2007)) and in the Supreme Court (in the case of *Olga Domínguez Castro v.

Commonwealth of Puerto Rico*, __ U.S. __, 131 S.Ct. 152, 178 L.Ed.2d 38 (2010)).[40]

Finally, at the opposition to the *certiorari*, the Government of Puerto Rico admitted a

crippling effect of the Puerto Rico economy [as opposed to merely a governmental economy],

leading to a loss of 130,000 jobs in a jurisdiction under 4 million [people]" as opposed to merely a

loss of government employment.

Hence, the District Court in the instant case has declined to accept the Government's

recalcitrant position as to negating an accepted and unsystematic risk, accepted and agreed late in

August 2008. The Court declined not only because of the signed Agreement, but also because the

Government had made allegations accepting an economic crisis to the government employees, the

decrease of tax revenues, the almost junk status of the bonds, and the potential unemployment of the

island. Thus, the *Experts' Agreement* of August of 2008, as to an unsystematic risk, was an

agreement of the expert economists based precisely on the economic position of Puerto Rico, which

was later accepted by the Government in judicial cases wherein the Commonwealth prevailed, urging

on the economic crisis that commenced in 2006.

---

[40]       Specifically alleging to all three courts the *dire* economic position of the Government of
Puerto Rico, which had island wide negative repercussions to all "Puerto Rico has been suffering from one of its
worst financial crisis [since 2006] in its history, its Government has been running a large structural deficit and its
credit has been in jeopardy," *see* the Government's opposition to the petition for *certiorari* filed with the
United States Supreme Court. *See Order to Show Cause*, Docket No. 1907, page 4.

ORIL and its experts then alleged that the milk industry as a whole was not affected.  To the Court, that meant a "black hole exception constituting a paradise in the middle of an overwhelming general island wide economic crisis."  The numbers of sold fresh milk concluded otherwise.  Since the instant case, filed in 2004, the numbers of quarts of milk sold have suffered a reduction from 292,213,124 to 217,177,124 quarts in December 31, 2012; and from December of 2008 (after the Experts' Agreement) to December 31, 2008, the reduction in sales was from 239,779,814 to 217,177,124 quarts.  To simplify the analysis, the total sales from 2004 to December 31, 2012, decreased approximately 26%, and total sales from 2008 to 2012, the reduction was approximately 9%.  Therefore, there is no "paradise" for the milk processors.  Consequently, as the number of sales has decreased the cost per quart has obviously increased, that is, even assuming that the costs have remained unchanged - which they have not.  Hence, the inclusion of the systematic risk by the Experts' Agreement, Docket No. 1003, was properly based on the economy of Puerto Rico as a whole, and on the considerable decrease in the total sales of fresh milk.  The denial by ORIL and its experts as to an economic crisis in Puerto Rico an in the milk industry is temerarious and constitutes purely a delay tactic to avoid the implementation of the Experts' Agreement.

Another flagrant delay tactic has been ORIL's averment, notwithstanding orders of the Court to the contrary, insisting on the inclusion of Dean Foods as part of the beta coefficient.  The Court has tackled this attempt in various orders, (Docket No. 1697, relying on Docket No. 1194; and Docket 1965, based on the lack of fit as to the Puerto Rico milk processors following the holding in the case of *Tenoco Oil Co., Inc. v. Dept. of Consumer Affairs*, 876 F.2d at 1024).

> The net result is that a Beta coefficient to be potentially imposed by the Regulator, is "equal to saying that the systematic risk that an investor accepts to operate a fresh milk processing plant, such as Suiza in Puerto Rico, is the same systematic risk accepted by an investor buying the shares of stock

of Dean Foods." *See* Suiza's memorandum at Docket No. 1194, p. 3. VTM reaches the exact same conclusion in their memorandum at Docket No. 1192 at p.p. 6-9. Both fresh milk processors agree that the Administrator in imposing Dean Foods within the Beta factor of the CAPM formula, is artificially lowering the risk factors by importing non-comparable fresh milk processors. *See* Suiza's memorandum at Docket No. 1194, p. 3, and VTM's memorandum at Docket No. 1192, p. 9. VTM correctly stresses that the Injunction Order specifically counseled caution in importing economics models from the Continental United States that did not "fit" the realities of the Puerto Rican market. See Docket No. 1192, p. 9. In the Injunction Order, the Court ordered that "[t]he Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular 'fit' of Puerto Rico into any economic model which may be used from other jurisdictions." *See Injunction Order*, Docket No. 480, p. 94, *see also* VTM's memorandum, Docket No. 1192, p. 9. The Court adds that the "fit" is simply not present, and compares to that which occurred in *Tenoco* by the Department of Consumer Affairs using stale back dated economic figures to set the yearly price reviews that occurred years later of the gasoline rates of return, and costs of gasoline wholesalers by the Department of Consumer Affairs, all of which were found to be unsustainable by the First Circuit Court of Appeals. *See Tenoco*, 876 F.2d at 1024-1025.

…

[9]    Defendants address the inclusion of Dean Foods as one of the companies to 9 determine the Beta coefficient at §§ 10 and 11 of Docket No. 1193. Notwithstanding, the excellent effort, the Court is not impressed by the use of a company that its very own inclusion significantly lowers the Beta coefficient, and as Suiza stresses "repre[sents] 96.3 of the capital of the sample [of five companies] used to calculate the Beta," and this 96.3 of the capital is "close to 100 times the reconstructed capital of fresh milk processors in Puerto Rico." *See* Docket No. 1194, p. 3. The inclusion of Dean Foods, Inc. hardly constitutes a reasonable or rational comparable "fit" for the Puerto Rican market.

Docket No. 1697, page 16-17, and note 9.

The Order of the Court, excluding Dean Foods for lack of fit for its enormous market in the United States and its size comparable to the two local companies, was first entered on September 22, 2010, Docket No. 1697. ORIL's reaction that no other companies could be issued as stated by the company preparing the beta coefficient is not acceptable to the Court, as ORIL simply could have

taken the un-objected other companies and average those, or include an acceptable additional company as close to the companies that had been accepted by all. Hence, ORIL's insistence on their position of including Dean Foods, who had "close to 100 times the reconstructive capital of the [two] fresh milk processors in Puerto Rico" and "represent[ed] 96.3% of the capital sample [of the companies] used to calculate the Beta," was not accepted by the Court since September 22, 2010, Docket 1697, page 16. The Court struck Dean Foods in its Amended Opinion and Order at Docket No. 1697, page 17.[41]

Similar analysis covered in this Opinion is the inclusion of negative Betas by ORIL. the Court will not repeat the analysis. The Defendants and their experts continue up to recently, with the use of negative Betas, which the Court had determined, months prior to defendants' capitulation, to not be scientific and the usage of said negative Beta was unreliable.

The usage of Dean Foods and negative Betas constitutes unreliable and unscientific methods to decrease various coefficients, causing the unsystematic risk and other economic parameters results unfairly unfavorable to the two milk processors. However, ORIL has insisted on the use of these parameters. ORIL and its expert, Dr. Cotterill, are hence in contempt of the Court orders striking both Dean Foods and negative Betas.

One of the most impacting and contentious events of Defendant ORIL constitutes the non-acceptance of the acceptance of merchandisers as an expense to the milk processors in the distribution of the milk to the supermarket food stores and the warehouse sales companies in Puerto Rico The Court considers this matter temerarious. It is a valid expense that must be recognized in

---

[41]     Dean Foods also had a capital in 2010 of $6.75 Billion not similar to the two small milk processors in Puerto Rico VTM and Suiza. Hence, there is no fit considering all the factors stated herein between Dean Foods and VTM and Suiza.

its totality. The non-acceptance of a valid expense constitutes but a delay tactic. After all, the fresh milk cannot be effectively sold from the plants. The merchandiser is part of the distribution chain, taking the milk from the processing plant to the stores where the consumers purchase the milk. The milk processors cannot obligate the food stores to repeatedly, timely place the fresh milk in the refrigerated shelves. VTM clearly examined the effect of ORIL's determination at Docket No. 2228, pages 33-34. In essence, merchandisers' expenses were authorized until then, but "in 2009" ORIL determined that such expense was suddenly not authorized, showing "the inconsistency of [ORIL's] regulatory actions." The law in Puerto Rico mandates that expenses relating to the distribution of the milk be evaluated every four years "for the purpose of revising and keeping the price of fresh milk within a reasonable and equitable margin for the different sectors within the industry, that is, producers, processors, distributors of the product and consumers in general." 5 L.P.R.A. §1107 (e).

In the instant case, the milk processors act as both processors and distributors of their products, hence the merchandisers' costs constitute a cost of placing the product available to the consumers. Placing this key element of the distribution in the hands of the supermarkets and/or large discount department and warehouse stores is dangerous as the product needs to be timely shelved or else, be at risk of turning stale or ruined. However, the Court's reasoning is simpler. The cost of merchandisers were authorized until the injunctive relief was placed under ORIL's scrutiny and consequently unilaterally did change its policy, constituting a clear example of "shifting" targets.

"Marketing and promotional accounts" suffered the same consequences allegedly pursuant to Law 34 of June 11, 1957, 5 L.P.R.A. §§1092 et. seq.

ORIL refers to 5 L.P.R.A. §1111(c), which provides that "[l]iquid milk shall not be sold at any level of distribution at a price other than that fixed by the Administrator for said level."

94

VTM alleges that said discounts entitled "marketing and promotional accounts," and particularly referring to "prompt payment discounts" have not been allowed by ORIL relying on the above transcribed section of the Law. The Court understands that the prompt payment discounts" is equally available to all of those who perform prompt payment.

The administrator has determined a fixed cost of advertisement not to exceed $0.005 per quart at Regulation 12. There is no explanation to the formula as how it was established after the Court made its findings as to the injunctive relief at Docket No. 480, dated July 13, 2007 (findings 44-45). As to the changing or establishment of parameters without notice and without any scientific reasoning, the Court strikes the $0.005 unilateral determination as irrational, without the performance of any analysis nor scientific studies. Further, the establishment of said parameter sounds retaliatory and constitutes further circumstantial evidence of a result oriented determination.

Amortization of non-recurrent professional fees and contracted services are not covered as legitimate expenses. In addition to the surprise non-acceptance of regular legal expert and contracted fees, there is also the deficiency of lack of a parameter for accepting non-recurring professional fees. The Court ORDERS that non-recurring fees are to be accepted and amortized using a scientific, rational parameters used by regulators in markets similar to the Puerto Rico market. This *Order* depends on the practice being accepted under the general accepted accounting principles ("GAAP"). The Court places emphasis on the *Tenoco* requirement as to "fitness" with the Puerto Rico market. See 876 F.2d at 1024.

Shrinkage and Containers Determinations. As explained above, the Court at this time cannot determine, based on a sworn statement, a weighing of evidence between two experts of opposite sides. The Court is concerned, and strikes any parameter that sets a maximum top cap or a minimum

cap amount without any scientific method that has a cap that fails to consider that in one year, high temperatures warrant an allowance higher that the maximum cap.

As to the containers, the proposed Regulation No. 12, the definition provided by ORIL is not sufficiently scientific, as said definition merely states that the cost of the containers shall be equal to or less than the prevailing rate in industries that are similar to the market in Puerto Rico. The Court merely clarifies that there must be a "fit" relating to the size of the companies, the volume of sales and a container that is proper relating to the geographic area of the warm temperature of Puerto Rico. See also suggestion by VTM at 6.B2 (18), *Infra*.

Specific Risk. The Court understands that specific risk premium in Puerto Rico is currently warranted. Specific risk is derived from the CAPM model, accepted by Shannon P. Pratt with Alina V. Niculita, "Valuing a Business. The Analysis and Appraisal of Closely Held Companies," 5th ed. 2008, pp. 198-200.[42]

---

[42] The Court notes that the correct CAPM formula is as follows: $R_{at} = R_f + \beta \cdot R_m - R_f) + R_{MC} + R_{PR}$. The Court also noted that the mathematical operation between the Beta coefficient and the adjusted market rate of return $R_m - R_f$) is a multiplication instead of an addition, as mistakenly stated at Docket No. 2228, page 19-20. The formula's terms are transcribed as follows:

$R_m$ = The reasonable rate of return on net worth after tax that processing plants should obtain from the business of fresh milk in Puerto Rico.

$R_f$ = Risk-free rate estimated based on the bonds issued by the U.S. Government ("Arithmetic Mean of Long- Term Government Bonds Income since 1926, Ibbotson SSBI Valuation Yearbook").

$\beta$ = Coefficient that represents the systematic risk of investments in the dairy products sector (SIC-202) in the United States.

$R_m$ = Rate of return of a broad portfolio of stock marketed in the U.S. capital markets, estimated according to the performance of the S&P 500 ("Arithmetic Mean of Total Returns of Large Company Stocks since 1926, Ibbotson SSBI Valuation Yearbook").

$R_{MC}$ = Additional risk of smaller companies (Percentiles 9-10) that market their stock in the U.S. capital markets (NYSE/AMEX/NASDAQ), as calculated by Ibbotson Associates ("Micro-Caps - Deciles 9 and 10- Size Premium in Excess of CAPM, Ibbotson SBBI Valuation Yearbooks").

$R_{PR}$ = Additional risk faced by processing plants in the fresh PR milk business in Puerto Rico. Coefficient R has been calculated based on the average of the two differentials between the rate of return of unsecured long-term bonds with a maturity of 20 and 30 years of Puerto Rico Electric Power Authority (PREPA) and the Puerto Rico Aqueduct and Sewer Authority (PRASA) and the 20-year GO and 30 year Revenue Bonds Bond Buyer indexes.

Consistent with the injunctive relief: "The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular "fit" of Puerto Rico into any economic model which may be used from other jurisdictions." Docket No. 480, page 94.

Risk-Free Rate and Equity Rate. The same risk free rate as used in the equity risk premium (S&P 500 average return, risk-free) rate. The Administrator of ORIL does not seem to have any objections as he uses the same suggestion accepted in Exhibit WW of Defendants (used in Option 1.6 of Exhibit WW). ORIL has used an equity risk free rate (ERP) since January of 2011. But ERPs must be defined and currently use the same risk rate definitions.

### *Other Clarifications to Regulation No. 12*

Agreed upon modifications. Suiza, at the original brief, Docket No. 2225, adds that Regulation 12 has various terms and parameters that remain undefined and certain regulatory accounts that are missing. Further, Suiza and VTM have used a more precise definition as to certain terms and definitions. Docket No. 2225, page 44, "Other Specified Modifications to ORIL's Proposed Regulation 12 Language." There seems to be no disagreement by the parties as to the above subject matter. *See* Docket No. 2225, pages 44-45 (Section B and § B.1 as to designation of regulatory accounts and procedures to measure reasonable costs, as well as par. B.2 "Section 6.B.1 "Fluid Milk Business Revenue Accounts").

The Court hereby orders the parties to meet within the next ten (10) days of this order and advise the court as to the agreements and/or disagreements within 10 days after the required meeting. Those items that remain in disagreement shall be resolved by the Court at the permanent injunction trial.

97

Excluded accounts agreed by all experts must be clearly stated in the proposed Regulation No. 12. "[T]he plants must pay 3 cents to the Special Marketing Fund, 0.5 cents to the Auditing Program and 1.5 cents to Regulatory Accrual." As these accounts are not authorized as an expense for the calculation of the regulatory margin, they must be clearly excluded. Docket No. 2225, page 46.

Exclusivities. The Court agrees with transparency as is stated for exclusivities. That is that exclusivities must be clearly excluded as authorized expenses. Docket No. 2225, page 46. The fact that "exclusivities" are not included as an expense, is to be clearly set forth.[43]

Bad or Irrefutable Debts. Debts that are nonrecurring and irregular in nature as a bankruptcy, constitute a generally accepted accounting principle ("GAAP"). The Court encourages the Administrator to develop a parameter of acceptance as to this accepted accounting principle.

Return of Damaged Products. In cases of force majeure returns, acts of God, Suiza proposes that a procedure be accepted based on generally accepted accounting principles ("GAAP") to protect the plants from events out of the control of the plants. The court joins in the request, but cannot order the inclusion of said parameters before the permanent injunction determination.

Automatic Adjustments. Both Suiza and VTM request the creation of a procedure for volatile accepted expenses as electricity, diesel, resin, to taxes and minimum wage increases that may be increased. The Court deems that waiting for years for an adjustment in a recognized item that increases over 5% borders on a violation of due process in a regulated market as is the Milk Industry in Puerto Rico of milk. The Court notes that, despite the obligation stated in the Law at 5 L.P.R.A.

---

[43]     Exclusivities are clearly expressed as not included within authorized expenses at the Experts' Agreement. Docket No. 1003, page 2, par. 1.d.

§1107(e), price reviews have not been taking place annually since the Court has been handling this case (i.e., 2004 thru 2013). The last price adjustment was notified to Plaintiffs on January 10, 2011 and became effective on January 20, 2011, Docket entries No. 1814, and 2228 at page 13. All increases in diesel, petroleum, and resin and taxes would have to wait at least 18 months. Having a significant increase on electricity, diesel and/or water, taxes or minimum wages for 18 months without any price adjustments, the Court insists borders on a federal due process violation. This matter, if not accepted by the Administrator, will be decided by the Court at the permanent injunction trial.

The Court considers that 5% of any individual accepted cost item should receive an automatic up or down adjustment. The Court is not, however, ordering said mechanism to be in place. But upon proper legal support, would not hesitate to do so.

Hence, the Court hereby orders that a hearing be held on the amount of the contempt fine, aggravating or mitigating circumstances, the appropriate parties responsible to pay, as well as the amount of the corresponding fine to each party.[44] The Court has enumerated the potential event constituting contempt. The Court may have missed certain other critical areas; enumeration,

---

[44] Sanctions are a matter of discretion, *Angulo Alvarez v. Aponte de la Torre*, 170 F.3d 246 (1st Cir.1999). The appropriateness of a sanction depends on the circumstances of the case. *Torres Vargas v. Pereira*, 431 F.3d 389, 392 (1st Cir.2005). In *Benítez García v. González Vega*, 468 F.3d 1, 5 (1st Cir.2006), quoting from *Robson v. Hallenbeck*, 81 F.3d 1, 2-3 (1st Cir.1996), the Court set the following guidelines when considering the imposition of sanctions:

> Among those commonly mentioned (this list is not complete) are the severity of the violation, the legitimacy of the party's excuse, repetition of violations, the deliberateness vel non of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions.... There is also a procedural dimension.

Sanctions are warranted without any prior warnings. *Vázquez-Rijos v. Anhang*, 654 F.3d 122 (1st Cir.2011). In the instant case, however, the Court has warned the defendants several times.

therefore, is not *numerus clausus*. The hearing is only argumentative and based exclusively on the record. The hearing shall be limited to one hour per side to be shared, if necessary, as follows: VTM/Suiza v. ORIL/Secretary of Agriculture/Dr. Ronald W. Cotterill. The contempt hearing to determine the dollar amount of the fine(s), is scheduled for **October 31, 2013 at 9:00 a.m. at the Old San Juan Courtroom 4**.

### *Remedy as to the Injunction Relief*

As to the injunctive relief requested, the Court orders that Option 1.6, Docket No. 2071-3, page 3 *et seq*., also Exhibit WW, Option 1.6, be placed in effect within the next thirty (30) days from the entering of this *Opinion and Order*, except that all matters ordered within this Court in this *Opinion and Order*, as well as orders entered prior thereto, shall be added to the Option 1.6 in any matter not included in Option 1.6 or that may be contradicted or modified by said Option. The Court warns that any attempt to issue a price order by the Administrator, the Secretary of Agriculture or the Secretary of Consumers Affairs against the clear mandate of this *Opinion and Order* shall cause personal contempt findings, which may be elevated to criminal contempt repercussions. The Court shall also order on October 15, 2013, an appropriate remedial retroactive order as to Option 1.6, as amended. The remedy also includes, as suggested by VTM and Suiza, but is not limited to the establishment of the following:

1.    A capital base of fresh milk processor and the methodology for its calculation.

2.    A cost equity capital and precise parameters for its calculation.

3.    Inclusion in the ROE formula, the specific unsystematic risk, as clearly required in Section (2)(e) of the *Experts' Agreement*.

4.    Establishment of equity accounts to regulate gross income and gross margin of the

two milk processors.

5.    Correction of expense accounts as stated in this *Opinion and Order* and prior orders of the Court.

6.    To provide adequate contribution for a regulatory accrual reserve account for payments to milk processors.

### Denial of a Stay under Fed.R.Civ.P. 62(c)

The Court denies any stay of the instant injunctive *Opinion and Order*, as to lack of compliance, and contempt by various Secretaries of Agriculture, as well as ORIL's executives, pursuant to the provisions of Fed.R.Civ.P. 62(c). The reasoning of the Court is that the *Injunction Order* has been affirmed by the First Circuit on the merits at the appeals level, at an *in banc* hearing, and the petition for *certiorari* was also been denied at the Supreme Court level, after considering the position of the Attorney General of the United States.

Furthermore, defendants' Option 1.6b and Exhibit WW, Docket No. 2064, pages 7-10, includes the following: (a) the regulatory accrual accounts; (b) the non-inclusion of Dean Foods, Inc. as per *Order* of September 22, 2010, Docket No. 1697; (c) a risk free rate as per *Order* of June 28, 2011, Docket No. 1965; (d) return on equity including nonzero "unsystematic risk" premium of 1.53% for all years; and, (e) excludes negative and zero company beta in median and composite estimates. *See* Docket No. 2071-3, page 7. Thus, most of the Court's orders have been included at Exhibit WW, Docket No. 2064, pages 7-10, except: (a) the Puerto Rico risk factor; (b) merchandisers expenses, and (c) marketing and promotions. The Court understands that the legal grounds are the following, due process and equal protection constraints authorized under *Duquesne*, 488 U.S. at 307; *Tenoco*, 876 F.3d at 1026-1027, and *Vaquería Tres Monjitas, Inc.*, 587 F.3d at 482-

101

483.

## Conclusion

For the reasons stated above:

A Contempt Hearing is set for **October 31, 2013 at 9:00 a.m.**

A Final Injunction Hearing is set for **November 18-22, 2013 at 9:00 a.m.**

The Clerk will notify a copy of this *Amended Opinion and Order Nunc Pro Tunc*, by certified

mail return receipt requested to the Puerto Rico Secretary of the Department of Consumers Affairs.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 23d day of September, 2013.

> s/Daniel R. Domínguez
> DANIEL R. DOMINGUEZ
> United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **VAQUERÍA TRES MONJITAS, INC.** and **SUIZA DAIRY, INC.** | **CIVIL CASE NO.: 04-1840 (DRD)** |
| Plaintiffs, | |
| v. | |
| **JOSE O. FABRE LABOY**, in his official capacity, as the Secretary of the Department of Agriculture for the Commonwealth of Puerto Rico, and **JUAN R. PEDRÓ-GORDIÁN**, in his official capacity, as Administrator of the Office of the Milk Industry Regulatory Administration for the Commonwealth of Puerto Rico. | **RE:   INJUNCTIVE AND     DECLARATORY RELIEF** |
| Defendants | |

## AMENDED OPINION AND ORDER GRANTING
## PRELIMINARY INJUNCTION

This matter came on to be heard on a complaint filed by plaintiffs on August 13, 2004. [Dkt. No. 1][1]  Plaintiffs, fresh milk processors, attacked as unconstitutional certain critical aspects of the regulation of the milk market by the Government of the Commonwealth of Puerto Rico.  The complaint and its amendments seek declaratory and injunctive relief. The petition for a preliminary injunction under Fed. R. Civ. P. 65 was filed on August 20, 2004 [Dkt. No. 2] and seeks an order precluding the Administrator of the Milk Industry Regulatory Office (by its Spanish acronym "ORIL") from continuing to implement certain decisions that plaintiffs claim are unconstitutional. Plaintiffs, Vaqueria Tres Monjitas, Inc. (Tres Monjitas) and Suiza Dairy, Inc. (Suiza) challenge the constitutionality, as implemented, of the laws and regulations that

---
[1]

 The complaint was amended on two occasions.  The Amended Complaint was filed on June 13, 2005 (Dkt. No. 143). Second Amended Complaint was filed upon request of this court based on representations by defendants on September 14, 2005 (Docket. No. 206-1).

govern the milk industry in Puerto Rico, particularly the Milk Industry Regulation Act No. 34 of June 11, 1957, 5 P.R. Laws Ann. § 1092-1125 (Act 34) and Regulation No. 1 of June 11, 1957 (Milk Regulation No. 1) as subsequently amended, all under Due Process, Equal Protection, the Takings Clause and, finally, the Dormant Commerce Clause.

Because of the sensitive nature of a constitutional attack on a heavily regulated market, the court held numerous days of hearings and received copious evidence. Fifty-one preliminary injunction hearings were held between February 15, 2005 and August 5, 2006.[2] The hearings were held not only with the participation of plaintiffs and the Government officers in charge of implementing the milk regulations, but also with the participation of interveners Indulac and the Association of Dairy Farmers all of whom are affected/favored by the challenged laws and regulations as later explained in this Opinion and Order.

In addition to presenting evidence, the parties have submitted detailed memorandums of law after the last hearing held on August 5, 2006. The court further granted the parties the reasonable time requested to file memorandums and corresponding oppositions, replies and sur-replies which were all filed by January 3, 2007. Oral arguments were heard on February 7, 2007. Motions containing exhibits to update the record have been filed by the parties.

Subsequently the parties have supplemented the record as the challenged actions continue to occur. Now, having heard and considered the motions, evidence, memorandums and arguments this court is ready to rule. A preliminary injunction is issued for the reasons stated herein.

---

[2]

The undersigned presided over forty-nine (49) of the fifty-one (51) evidentiary hearings held by the court. The first two (2) hearings were presided over by then Magistrate Judge Aida Delgado after Magistrate Judge Justo Arenas disqualified himself "sua sponte". (Docket No. 27) Magistrate Judge Aida Delgado presided over the hearings upon order of District Judge Carmen C. Cerezo. (Docket No. 45) Magistrate Judge Aida Delgado recused herself "sua sponte". (Docket No. 70) The case was reassigned to then Magistrate Judge Gustavo Gelpí. (Docket No. 74) Shortly thereafter, District Judge Carmen C. Cerezo recused herself "sua sponte" as well. (Docket No. 76) The case was then referred to District Judge Pérez Giménez, who also recused himself "sua sponte". Finally the case was assigned to the docket of the undersigned. (Docket Nos. 77, 78 and 79)

# STANDARDS FOR PRELIMINARY INJUNCTION
# IN THE FIRST CIRCUIT

Because injunctive relief has been requested, before setting the factual scenario in the instant case, the court reviews the basic injunctive standard applicable in the First Circuit Court.

For injunctive relief to be issued under Fed.R.Civ.P. 65, the party seeking the preliminary injunction remedy must establish that: (1) it is substantially likely to prevail on the merits of the claim; (2) absent the injunction there is a significant risk of irreparable harm; (3) the balance of hardships weights in its favor; and (4) the injunction will not harm public interest.  See New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002). The First Circuit has instructed the trial courts to use the aforementioned quadripartite test when considering requests for preliminary injunctions. See Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).

## A. Likelihood of Success on the merits

As to the first factor, likelihood of success, the First Circuit has stated, "**Our analysis begins with probability of success, as we have often found this furcula to be critical.**" Id., at 6 (*emphasis added*). See also,  Public Service Co. v. West Newbury, 835 F.2d 380, 383 (1st Cir. 1987); Lancor v. Lebannon Housing Auth., 760 F.2d 361, 362 (1st Cir. 1985) ("Of these four factors, the probability-of-success component in the past has been regarded by us **as critical** in determining the propriety of injunctive relief"); Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009-22 (1st Cir. 1981). (Emphasis ours.)

In the same vein, the overseeing appellate court has called the likelihood of success factor the "**sine qua non**" of the preliminary injunction test.[3] "The sine qua non of that

---

[3]*Sine qua non*: Without which not. That without which the thing cannot be. An indispensable requisite or condition. *Black's Law Dictionary*, 1990.

formulation is whether the plaintiffs are likely to succeed on the merits. In the ordinary course,

plaintiffs who are unable to convince the trial court that they will probably succeed on the merits

will not obtain interim injunctive relief."*See* <u>Weaver v. Henderson</u>, 984 F.2d 11, 12 (1st Cir.

1993); *see also*, SEC v. Fife, 311 F.3d 1, 8 (1st Cir. 2002); <u>New Comm. Wireless Serv. Inc. v.</u>

<u>Sprintcom, Inc</u>. 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is

likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to

succeed in his quest, the remaining factors become matters of idle curiosity.") <u>Auburn News Co.</u>

<u>v. Providence Journal Co.</u>, 659 F.2d 273, 277 (1st Cir. 1981) ("[T]he probability-of-success

component has loomed large in cases before this court."), cert. denied, 455 U.S. 921, 102 S. Ct.

1277, 71 L.Ed.2d 461 (1982); <u>LeBeau v. Spirito</u>, 703 F.2d 639, 645 (1st Cir. 1983) (affirming

denial of preliminary injunction and ending inquiry after concluding that plaintiffs were unlikely

to prevail on the merits).

  The First Circuit has further stated, "[t]he heart of this test is... the question whether the

harm caused plaintiff without the injunction, in light of the plaintiff's likelihood of eventual

success on the merits, outweighs the harm the injunction will cause defendants." <u>Vargas-</u>

<u>Figueroa v. Saldana</u>, 826 F.2d 160, 162 (1st Cir. 1987); *see also*, <u>Massachusetts v. Watt</u>, 716

F.2d 946, 953 (1st Cir. 1983); <u>SEC v. World Radio Mission</u>, 544 F.2d 535, 541-42 (1st Cir. 1976)

("To the extent that a defendant can show harm, this must be discounted by the degree that a

plaintiff can show likelihood of success. The more foreseeable is the plaintiff's ultimate success,

the less weight is to be given to the defendant's prospective loss.").

## **B. Irreparable Harm**

  This criteria "must not be assumed, it must be demonstrated ... speculative injury does

not constitute a showing of irreparable harm". <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d at

6, 7 (citations omitted).  However, "[a] deprivation of a [federal] constitutional right 'for even minimal periods of time, unquestionably constitutes irreparable injury." <u>DeNovellis v. Shalala</u>, 135 F.3d 58, 71-72 (1st Cir. 1998); *see also* <u>Justino Acevedo-Luis v. Mercedes Pagan</u>, 478 F. 3d 35, 38 (1st Cir. 2007)("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")(*emphasis on original*)[4](*citing* <u>Elrod v. Burns</u>, 427 U.S. 347, 373, 96 S.Ct. at 2673, 2689-90 (1976); <u>New York Times Co., v. United States</u>, 403 U.S. 713, 91 S. Ct. 2140, 29 L.Ed. 2d 822 (1971).

Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined.  <u>Parks v. Dunlop</u>, 517 F.2d 785 (5th Cir. 1975)  A preliminary injunction will not be issued simply to prevent a mere possibility of injury. A presently existing, actual threat must be shown. 11 C. Wright and A. Miller, Federal Practice and Procedure, §2948; *see also* <u>State of New York v. Nuclear Regulatory Commission</u>, 550 F.2d 745 (2nd Cir. 1977); <u>Crowther v. Seaborg</u>, 415 F.2d 437 (10th Cir. 1969).  However, even under traditional Rule 65 standards, a temporary loss of income which may be recovered later does not usually constitute irreparable injury.   <u>Gately v. Massachusetts</u>, 2 F.3d 1221, 1232 (1st Cir. 1993).  Finally,

> [a] preliminary injunction should not [be] issue[d] except to prevent a real threat of harm. <u>Ross-Simons</u>, 102 F.3d at 19; 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 2948.1, at 153-54 (2d ed.1995). A threat that is either unlikely to materialize or purely theoretical will not do. <u>Ross-Simons</u>, 102 F.3d at 19; <u>Pub. Serv. Co. v. Town of W. Newbury</u>, 835 F.2d 380, 382 (1st Cir.1987). An imminent threat

---

[4]The Court deems necessary to clarify that although in  Justino Acevedo-Luis v. Mercedes Pagan, 478 F. 3d at 38, the First Circuit Court of Appeals stated that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'", this does not help a jury in determining the compensatory damages for redressing a First Amendment violation. The First Circuit went on to clarify that "while the language accurately described one of the requirements for a **preliminary injunction** in a First Amendment case, [ ]it would not be helpful to a jury in determining the compensatory **damages** for a First Amendment violation. Id. (Emphasis on original.) The quoted language, however, is originally from the case of <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) which the First Circuit recognizes at <u>Justino Acevedo.</u> Notwithstanding the constitutional violations in the instant case as to Due Process, Equal Protection and Takings are from at least 2003 and are more than "for minimal periods of time."

that evidence will be lost is one thing-but a claimed threat, unaccompanied by any showing of reasonable grounds for believing that the evidence in question is imperiled, is insufficient to warrant the entry of a prophylactic injunction. Humble Oil & Ref. Co. v. Harang, 262 F.Supp. 39, 42-43 (E.D.La.1966). **Preliminary injunctions are strong medicine, and they should not [be] issue[d] merely to calm the imaginings of the movant.**

Matos ex rel. Matos v. Clinton School District, 367 F.3d 68, 73 (1ˢᵗ Cir. 2004)(*emphasis ours*).

In the instant case violations of Due Process rationality requirements, Equal Protection, acts constituting a taking of property under the Taking Clause and a violation of the Dormant Clause are alleged. The court is of the opinion that should the case pass muster, injunctive relief is in order due to the irreparable harm criteria. See Tenoco Oil Co., Inc. v. Department of Consumer Affairs, 876 F.2d 1013 (1ˢᵗ Cir. 1989) (granting injunctive relief under Due Process, Equal Protection and Taking Clause); Walgreen Co. v. Rullan, 405 F.3d 50 (1ˢᵗ Cir. 2005) (warranting injunctive relief under the Dormant Commerce Clause).

## C. Balancing of the Relevant Equities

This criteria requires the court to examine, performing a balancing, on which side do equity lies. "[T]he heart of the matter is whether 'the harm caused plaintiff without the injunction, in the light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause the defendants'." *See* DeNovellis, 135 F.3d at 77. In other words, the court should focus upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does, and the effect of the court's action on the public interest. *See* Matos ex rel. Matos, 367 F.3d at 73 (*citations omitted*). Finally, this criteria is the result of a comparison between the injury suffered by plaintiff outweighing any harm which granting injunctive relief would inflict on the defendant. Planned Parenthood League, 641 F.2d at 1009.

## D. The Effect on the Public Interest of a Grant or a Denial of the Restrainer

This criteria requires the Court to weigh where do the public interest lies by the granting or the denial of the injunctive relief. It constitutes a balancing of interest between the granting or the denial based on public interest. The effect on the public interest is measured by whether the public interest would be better served by issuing rather than by denying the injunction. <u>Massachusetts Coalition of Citizens with Disabilities, et al., v. Civil Defense Agency and Office Emergency Preparedness</u>, 649 F.2d 71, 74 (1st Cir. 1981).

## FINDINGS OF FACTS

This court specifically finds the following facts proven:[5]

1.     ORIL is an administrative office attached to the Department of Agriculture of Puerto Rico. The Secretary of Agriculture is the head of said Department. [6] ORIL is statutorily empowered to regulate all aspects of the Puerto Rican milk market. [7]

2.     The Administrator of ORIL is also the Chairman of the Board of the *Fondo de Fomento de la Industria Lechera* ("FFIL")[8], an entity created by law which is

---

[5] The court has included public policy facts that the court does not challenge. The court does not question any "political" motives, nor does the court wishes to "sit as a super legislature to weight the wisdom of the Legislature." <u>Tenoco Oil Co. Inc. v. Department of Consumer Affairs</u>, 876 F.2d 1013, 1021 (1st Cir. 1989) (internal citations omitted). These facts are included only to provide the reader the benefit of a fuller record enabling a deeper comprehension of the constitutional challenge as to the laws and regulations as applied under Due Process, Equal Protection, the Takings Clause and the Dormant Commerce Clause of the Constitution. The court only challenges the law as applied as it may transgress the Due Process, Equal Protection, Takings Clause and/or the Dormant Commerce Clause.

[6] See Act 34 of June 11, 1957, P.R. Laws Ann. Title 5 §§ 1092 to 1118, as amended ("Act 34"). All future references to Act 34 are made indicating the P.R. Laws Ann. Title 5 § number, unless otherwise noted. P.R. Laws Ann. §1093 and 1099(e).

[7] See Legislative History and Declaration of Purpose, as well as the text of Act 34, P.R. Laws Ann. Title 5 § 1092, et seq. approved June 11, 1957.

[8] See Transcript of the Hearing held on November 1, 2005 p. 36 lines 20-24; P.R. Laws Ann. Title 5 § 1099 (e).

the sole owner of intervener Indulac.[9]  Up until after this case was initiated, the Administrator of ORIL was also the Chairman of the Board of Directors of Indulac.[10]  As of today, he continues as a member of said board.[11] The FFIL is designed and required to promote the consumption of fresh milk.[12]

3.     Both the FFIL and Indulac are entities under the full control of the dairy farmers.[13]  The FFIL pays for ORIL's Administrator's automobile and other expenses.[14]

4.     Indulac, ORIL and the FFIL share among themselves the same building facility.[15]  Mr. José Benítez, a former dairy farmer is the Chief Executive Officer of the FFIL and also the Chief Executive Officer of Indulac.[16] Mr. Benitez' compensation derives from the FFIL.[17]

5.     Mr. Luis Fullana, another dairy farmer and fact and expert lay witness for ORIL is one of the former Administrators of ORIL.[18]

6.      Indulac is the only entity authorized in Puerto Rico to manufacture UHT milk, a kind of fluid milk that needs no refrigeration prior to opening.[19]  Indulac sells

---

[9]
See Plaintiff's Exhibit 22 § 4(a) and Plaintiff's Exhibit 57 Art. 2; Transcript of the Hearing held on October 24, 2005, p. 116 lines 6-7; Transcript of the Hearing held on October 25, 2005, p. 10 lines 9-10; Transcript of the  Hearing held on November 1, 2005, p. 20 lines 9-11; Transcript of the Hearing held on February 15, 2005, p. 23 line 13-18.

[10]
See Transcript of the Hearing held on February 28, 2006, p. 21 lines 7-9; p. 63, line 11 - p. 67 line 1.

[11]
See Plaintiff's Exhibit 69, Art. 3, § 1 (a); Transcript of the Hearing held on February 28, 2006, p. 67 line 5 - p. 69 line 8.

[12] See Transcript of the Hearing held on October 24, 2005, p. 44 lines 2-8.

[13]
See P.R. Laws Ann. Title 5 §1099(e); Transcript of the Hearing held on February 28, 2006, p. 72 lines 15-17; Transcript of the Hearing held on March 2, 2006, p. 19 lines 15-20.

[14]
See Transcript of the Hearing held on February 28, 2006, p. 16 line 16 - p. 18 line 6.

[15]
See Transcript of the Hearing held on February 28, 2005, p. 48 line 18 – p. 49 line 1.

[16]
See Transcript of the Hearing held on June 5, 2006 p. 69 line 2 – p. 70 line 10.

[17] See Transcript of the Hearing held on June 16, 2006 p. 35 lines 7-8; see also Transcript of the Hearing held on February 15, 2005, p. 29 lines 11-17.

[18]
See Transcript of the Hearing held on October 18, 2005, p. 18 line 7 - p. 19 line 5.

[19]
See Transcript of the Hearing held on August 22, 2005, p. 23 lines 4-7; p. 58 lines 2-3.

locally manufactured UHT under sixteen different private brands. Indulac devotes, by far, most its raw milk to the manufacture of UHT.[20] At all times of the hearings Indulac was in control of approximately 70% of the UHT market in Puerto Rico.[21] The rest of the UHT market belongs to out-of-state producers.[22]

7.   Fresh milk and UHT (two forms of fluid milk) are at least imperfect substitutes.[23] When the price of one of those products goes up the quantity demanded for the same goes down and demand for the other product rises accordingly.[24] Fresh milk and UHT are competitors in the fluid milk market. Their respective level of success is strongly influenced by their relative prices.[25] The price of fresh milk at all market levels is regulated. Pursuant to law, the maximum price set by the Administrator eliminated any adjustments to the income of the fresh milk processors resulting from price discounts previously considered, except as to the last price review issued by ORIL on April 19, 2007. On this date after being confronted with allowance of said adjustments to Indulac's price discounts were then re-established. The net effect is that the maximum price operates also as a minimum price for any margin calculations.

---

[20] See Transcript of the Hearing held on March 1, 2006, p. 27 lines 12-21; See also Transcript of the Hearing held on March 2, 2006, p. 17 line 23 – p. 18 line 5.

[21] See Plaintiff's Exhibits 24 and 25 and Defendant's Exhibit KK; See also Transcript of the Hearing held on August 22, 2005, p. 27 lines 14-15.

[22] Id.

[23] See Transcript of the Hearing held on August 22, 2005, p. 45 lines 7-8; Transcript of the Hearing held on September 16, 2005, p. 39 lines 23-25; Transcript of the Hearing held on February 16, 2005, p. 429 lines 13-15; Transcript of the Hearing held on July 6, 2005, p. 121 lines 24-25; Transcript of the Hearing held on July 7, 2005, p. 33 lines 23-24; Transcript of the Hearing held on July 26, 2006, p. 110 lines 21-22.

[24] See Transcript of the Hearing held on August 22, 2005, p. 44 lines 22-25; Transcript of the Hearing held on September 23, 2005, p. 34 lines 6-14; Transcript of the Hearing held on July 24, 2006, p. 132 lines 6-20.

[25] See Transcript of the Hearing held on February 24, 2006, p. 61 lines 5-8; Transcript of the Hearing held on August 4, 2006, p. 46 line 20 – p. 47 line 3.

The price of UHT is not regulated at any level. The price of UHT in Puerto Rico is customarily below that of fresh milk. [6][2]

8. The Association of Dairy Farmers groups the Puerto Rico dairy farmers and represents its interests. The dairy farmers have always opposed allowing the fresh milk processors to manufacture fluid milk in the form of UHT milk.[27] The dairy farmer sector has attempted several times to purchase the fresh milk processors.[28] The dairy farmers control the FFIL and control Indulac and want to consolidate in their hands the control of the whole industry.[29] The efforts to control the totality of the industry by eliminating the fresh milk processors, continued throughout the hearings.[30] Those efforts entail the participation of officials of the Government of Puerto Rico involved directly and indirectly in the milk industry and its price setting scheme.[31] The more desperate the financial condition of the fresh milk processors, the easier for the dairy farmers to acquire them or eliminate them.[32]

---

[26] See Transcript of the Hearing held on September 16, 2005, p. 89 line 6; Transcript of the Hearing held on September 23, 2005, p. 14 lines 8-9; Transcript of the Hearing held on November 1, 2005, p. 47 lines 11 -17; Transcript of the Hearing held on July 31, 2006, p. 11 line 19.

[27] See Transcript of the Hearing held on November 1, 2005, p. 69 line 24 – p. 70 line 19; Transcript of the Hearing held on June 20, 2006, p. 37 lines 2-14.

[28] See Defendant's Exhibit C; Transcript of the Hearing held on October 24, 2005, p. 82 line 16 – p. 83 line 2; Transcript of the Hearing held on July 10, 2006, p. 8 line 13 – p.11 line 11; p. 17 line 8; Transcript of the Hearing held on August 1, 2006, p. 48 lines 5 – 7; Transcript of the Hearing held on May 9, 2006, p. 129 line 20 - p. 130 line 5.

[29] See Plaintiff's Exhibits 54 p. 2, 62 and 114; See also Transcript of the Hearing held on August 1, 2006, p. 26 line 2 – p. 27 line 20 and p. 29 line 8 – p. 30 line 22 and p. 36 line 11 – p. 37 line 7; Transcript of the Hearing held on May 9, 2006, p. 129 line 20 - p. 133 line 1.

[30] See Plaintiff's Exhibits 62 and 114; See also Transcript of the Hearing held on August 1, 2006, p. 26 line 2 – p. 27 line 20 and p. 29 line 8 – p. 30 line 22 and p. 36 line 11 – p. 37 line 7.

[31] See Transcript of the Hearing held on March 2, 2006, p. 2 line 22 - p. 3 line 16; Transcript of the Hearing held on June 30, 2006, p. 27 line 8 - p. 34 line 14.

[32] See Transcript of the Hearing held on September 26, 2005, p. 33 line 24 – p. 34 line 22.

9.      Plaintiffs are the only fresh milk processors currently operating in Puerto Rico. Suiza Dairy controls approximately 65.3% of the fresh milk market and Vaquería Tres Monjitas ("VTM") controls 34.7%.[33]  Suiza Dairy formally requested a license to manufacture and market UHT milk and the same was denied by the Administrator.[34]  Suiza presently sells an insignificant amount of UHT manufactured by Indulac under the brand Puerto Rico Dairy.  That insignificant supply of UHT milk by Indulac to Suiza is deemed  neither reliable nor consistent.[35]

10.      Before the filing of this complaint, plaintiffs and the Administrator were still meeting  to try to reach a solution to the milk industry controversy subject of this complaint.[36]  To represent him in those conversations, the Administrator of ORIL appointed Mr. Samuel Torres, Esq.  Mr. Torres is also an attorney for Indulac.[37]  Mr. Torres is also the same person that on behalf of ORIL's Administrator stated in an ORIL hearing that the fresh milk processors had not been and never would be allowed to manufacture UHT milk.[38]  Further, Fernando Toledo, a Secretary of Agriculture, who is a life long dairy farmer, is the person who appointed the two public sector representatives of the Board of the   FFIL.[39]  Mr. Toledo is the same person that has been involved in the

---

[33]  See Defendant's Exhibit CC, Table 22. These numbers may have been slightly modified in favor of Tres Monjitas because of the routes resigned by Suiza assigned to Tres Monjitas. See Docket No. 446, Motion by Suiza advising of resignation of routes.

[34]  See Plaintiff's Exhibits 9 and 10; Transcript of the Hearing held on November 1, 2005, p. 48 lines 11-15; p. 57 line 19 - p. 59 line 2; Transcript of the Hearing held on February 15, 2005, p. 140 line 16 – p.141 line 9.

[35]  See Transcript of the Hearing held on February 15, 2005, p. 141 line 10- p. 142 line 6.

[36] See Plaintiff's Exhibits 2, 3, 4 and 5; see also Transcript of the Hearing held on February 28, 2006, p. 65 lines 2-11.

[37] See Transcript of the Hearing held on February 28, 2006, p. 80 line 20 - p. 82 line 22 and p. 87 lines 14-17.  See also Plaintiff's Exhibit 2, 3, 4 and 5.

[38]  See Plaintiff's Exhibits 78.

[39] See Transcript of the Hearing held on February 28, 2005, p. 6 line 8 - p. 7 line 7.

negotiations to buy the fresh milk processing plants, Suiza and VTM, co-plaintiffs in the instant case.[40]

11.    The regulatory background of the underlying regulations is the following: Act 34 of June 11, 1957, P.R. Laws Ann. Tit. 5 §§ 1092-1118, as amended ("Act 34") provides ORIL broad authority to regulate the price of milk within the Commonwealth of Puerto Rico. Act 34 authorized the setting of minimum sales prices for raw milk and maximum sales prices for processed milk.  In order to meet the legislative intent and mandates of Act 34, the Administrator of ORIL promulgated Regulation No. 1, with the approval of the Secretary of Agriculture.[41]

Article 16 of Act 34 (P.R. Ann. Tit. 5 §1107 (a)(e)) authorizes the Administrator to set the prices of milk at all levels.  The law further establishes that "at least once a year" the Administrator is required to review the price of milk and make the necessary adjustment according to the increase and decrease of production costs as well as the operational expenses at all levels.

From August 13th, 2004 and until recently (even after oral arguments), the Administrator of ORIL has been constantly and frequently shifting the targeted regulations by issuing a series of new regulations and administrative orders (not merely the yearly price regulations required by statute), changing the milk industry rules while the instant case was developing. During this period of time, ORIL amended the existing regulations and enacted new orders and resolutions changing the rules of the game of at least the following milk industry issues: (1)

---

[40]See Transcript of the Hearing held on February 15, 2005, p. 66 lines 6-17 and Transcript of the Hearing held on February 16, 2005, p. 243 line 21-p. 244 line 8.
[41] See Plaintiff's Exhibit 49.

the price paid for the retained milk, (2) the price paid for the dairy farmers production within and over quotas, (3) the transportation reimbursement, (4) the reassignment of a determined number of dairy farmers from one processing plant to the other, and adjusting without holding a hearing a profitable and rentable fresh milk market shared by both processing plants, the school luncheon program and (5)the price paid by Indulac for surplus milk.

On August 12, 2005, defendants confirmed and admitted that the Regulation #1 had been vacated by the enactment of a new regulation, Regulation #10.[42]  This representation led the Court to order plaintiff to amend the complaint to include the new regulation.[43]  Subsequently, after expressing the court serious concerns about the validity of Regulation #10[44], defendants indicated that they were to begin the rule making process anew since they agreed that Regulation #10 was invalid.[45] The Administrator of ORIL then began the process of enacting another regulation, Regulation #11, admitting that Regulation #10 was defective because the same had not been properly published.[46] As of this date, Regulation #11 has not been enacted.

---

[42] See Plaintiff's Exhibit 59 and Transcript of the Hearing held on August 12, 2005, p. 21, lines 22-25 and p. 22 lines 1-3.

[43] See Docket No. 206.

[44] See Transcript of the Hearing held on September 16th, 2005.

[45] See Transcript of the Hearing held on September 23, 2005, p. 58 line 18; See also 'Defendant's Informative Motion Regarding Regulation 10 and the Mootness Argument' filed on September 23, 2005 [Docket No. 210].

[46] See Transcript of the Hearing held on November 1, 2005, p. 14, lines 13-16.

Moreover, a year after the evidentiary hearings began on February 24, 2006 ORIL issued a Provisional Administrative Order[47] modifying the dairy farmer's compensation system and setting the price to be paid by Indulac at .32 cents.[48]

On November 30, 2006 ORIL issued a Provisional Administrative Order allowing Vaquería Tres Monjitas to use surplus milk to substitute powdered milk used in the processing of ice cream, milk shakes and sour cream at the price of .25 cents per quart. [49]

On January 3, 2007 two new administrative orders were issued, one eliminating the .10 cents payment over quota of the dairy farmers' production[50] and the other one banning the leasing and sale of the dairy farmer's assigned quotas.

On January 31, 2007 ORIL enacted a Provisional Administrative Order authorizing Suiza to use surplus milk to substitute powder milk to manufacture the product Nesquik. Suiza was allowed to pay .25 cents per quart for the surplus milk used for this purpose. [51]

On February 7, 2007, without holding hearings of any kind, ORIL issued an Administrative Order transferring the production of certain dairy farmers from co-plaintiff Suiza to co-plaintiff Vaquerías Tres Monjitas. This change made an adjustment in the participation of the processing plants without a hearing in profitable fresh milk market, including the school luncheon program.[52]

---

[47] See Defendant's Exhibit AA.

[48] See detailed discussion on finding of fact # 36, 37, 38 of this Opinion and Order.

[49] See Exhibit 6 of Docket No. 448. Please refer to Exhibit 6 of Docket No. 464 for the certified translation of the same.

[50] See Exhibit 10 of Docket No. 446. Please refer to Exhibit 10 of Docket No. 469 for the certified translation of the same.

[51] See Exhibit 8 of Docket No. 448. Please refer to Exhibit 8 of Docket No. 464 for the certified translation of the same.

[52] See Exhibit 8 of Docket No. 450.

On March 27, 2007 ORIL issued another Administrative Order that unilaterally and again without holding hearings, readjusted the participation of the processing plants in the school luncheon programs, decreasing 5.06% of Suiza's share and increasing Vaquerías Tres Monjitas' participation in the same equivalent amount. This order was subsequently amended on April 5, 2007 to establish that the same will be effective for the next school period, starting on August of 2007.[53] The court will not address any challenge as to the school luncheon program amongst the fresh milk processors since the court has held no hearings as to these matters. [54][55]

ORIL also issued another Administrative Order on April 5, 2007. As per Indulac's request, ORIL allowed Indulac to pay less than the .32 cents established by the Administrative Order of February 24, 2006 for the milk used to manufacture products others than UHT as cheese, powdered milk and evaporated milk.[55]

On April 19, 2007 ORIL issued a new Price Resolution[56] that left untouched the fresh processors price structure and failed to address properly any adjustments, nor a reasonable rate of return of the processing plants. [57] Finally, on June 13, 2007 ORIL issued an order reducing the farmers' compensation for raw milk.[58] None of these newly issued orders have diminished the merits of plaintiffs' claims.

---

[53] See Exhibit 1 of Docket Nos. 456 and 465. Please refer to Exhibit 1 of Docket No. 470 for the certified translation of the same.

[54] Further there is no claim amongst the two fresh milk processors.

[55] See Exhibit 11 of Docket No.446. Please refer to Exhibit 11 of Docket No. 469 for the certified translation of the same.

[56] See Exhibit 12 of Docket No. 446. Please refer to Exhibit 12 of Docket No. 469 for the certified translation of the same.

[57] See detailed discussion on finding of fact #54 of this Opinion and Order.

[58] See Docket No. 474, Addendum 3.

12.     The production of milk in Puerto Rico is cyclical,[59] meaning that less raw milk
is produced during the hottest months of the year and more raw milk is produced
during the coldest months.[60]

13.     In 1952, Indulac was created with the purpose of handling the volume of raw
milk produced in excess of the demands for raw milk in certain periods of the
year.[61]  Originally, and for many years, both the dairy farmers and the fresh milk
processors had the same representation on Indulac's Board of Directors.[62]

14.     For decades, fresh milk was the only kind of fluid milk that could be produced.
At that time, milk produced in excess of the demands for fresh milk had to be
turned into alternative products or destroyed.[63]  For many years after its
incorporation, Indulac was devoted to the production of  cream, butter and
cheese, products which have a lower rentability than fresh milk, but which do
not compete with fresh milk.[64]

15.     Production of raw milk is much more expensive in Puerto Rico than anywhere
else in the continental United States and more than in most other countries in the
world.[65]

16.     Initially, the agreement between the fresh milk processors and milk producers
related to Indulac was that the same would operate to manage the volume of

---

[59] See Transcript of the Hearing held on October 18, 2006, p. 34 line 21 - p. 36 line 4.

[60] See Transcript of the Hearing held on March 1, 2006, p. 8 line 12 - p. 9 line 25; Transcript of the Hearing held on June 6, 2006, p. 19 line 16 – p. 21 line 6 and p. 30 lines 13 – 19.

[61] See Indulac's Certificate of Incorporation, Plaintiff's Exhibit 21.

[62] See Plaintiff's Exhibit 21.

[63] See Plaintiff's Exhibit 78, p. 32, lines 20-24; See also Transcript of the Hearing held on February 16, 2005, p. 416 line 13 – p. 417 line 10.

[64] See Plaintiff's Exhibit 21; See also Transcript of the Hearing held on February 16, 2005, p. 417 line 20 – p. 418 line 1.

[65] See Transcript of the Hearing held on June 6, 2006, p. 77 lines 6-9.

milk that in certain periods of the year exceeded the demand for fresh milk and turn said "surplus" into by-products that would not compete with fresh milk.[66]

17.    For many years and as of this writing, pursuant to the decisions of the Administrator of ORIL and the regulations in place, the fresh milk processors have been required to collect all milk produced by the dairy farmers. The fresh milk processors would retain whatever milk they needed to satisfy the requirements of the fresh milk market and would then transport the rest of the raw milk ("surplus milk" according to the law) to Indulac for the manufacturing of milk by-products.[67]. The cost of transporting Indulac's raw milk to Indulac's plants is reimbursed to the fresh milk processors through a formula approved by ORIL.[68] The legal definition of surplus milk is milk produced in excess of the market demands for fresh milk.[69] But as of this writing, since fluid milk is processed as UHT by Indulac and warehoused without refrigeration, there is no surplus of fluid milk in Puerto Rico. If surplus is defined as milk processed in excess of fluid milk market demands, Puerto Rico does not produce enough fluid milk to satisfy itself on a yearly basis and thus no surplus exists.[70] Surplus milk constitutes a legal, not an economic, characterization.

18.    The milk retained for production by the fresh milk processors had to be paid to the dairy farmers at the price set by the Administrator.[71] That price has always been one that is well over what is required by the dairy farmers to cover costs

---

[66] See Transcript of the Hearing held on February 16, 2005, p. 416 line 16 – p. 418 line 8 and p. 445 lines 10-16. See also Plaintiff's Exhibit 21.

[67] See Plaintiff's Exhibit 49 § 6.

[68] See Plaintiff's Exhibits 64 and 65.

[69] Act 34 § 1096 (b)(4).

[70] See Defendant's Exhibit KK and Transcript of the Hearing held on March 2, 2006, p. 109 line 6 – p. 111 line 17. See also Transcript of the Hearing held on June 20, 2006, p 76 line 8 – p. 77 line 11.

[71] See Plaintiff's Exhibit 49.

and make a reasonable profit.[72]  This permitted the surplus milk purchased by Indulac to manufacture UHT to be paid by said entity at a price <u>much lower</u> than that required by the farmers to cover production costs.[73]

19.  The farmers for years, and until the February 2006 order, received as compensation for their raw milk a weighted average resulting from the number of quarts of milk produced by fresh milk processors multiplied by the price set by the Administrator and the number of quarts declared surplus multiplied by the price of $0.10, which until the year 2006 remained the price set for surplus milk.[74]  But de facto,  Indulac has for years never paid less than $0.10 and in most cases did pay much more than $0.10 per quart for surplus milk.[75]  Although Indulac before 2006, was not obligated to pay more than $0.10 per quart per surplus milk, it did so because that payment increased the amount of money received per quart by the dairy farmers. [76]

20.  Although legally only the Administrator had the authority and duty to set the margin of the dairy farmers, the Administrator before 2006 never prohibited Indulac from increasing the same by increasing the amount paid for surplus milk. Thus Indulac, on its own, increased the farmers' margin.[77]  Indulac has traditionally taken the position that its existence is justified precisely to increase

---

[72] See Transcript of the Hearing held on May 8, 2006 p.39 lines 24-25 and p. 40 lines 1-2

[73] See Transcript of  the Hearing held on  March 1, 2006 p. 28 lines 4-6.

[74] See Plaintiff's Exhibits 124-126 and Defendant's Exhibit AA, Art. 8.

[75] See Defendant's Exhibit W.

[76] See Defendant's Exhibit W; See also Transcript of the Hearing held on October 24, 2005, p. 60-62; Transcript of the Hearing held on February 16, 2005, p. 438 line 13 - p. 439 line 9.

[77] See Transcript of the Hearing held on February 27, 2006, p. 43; Transcript of the Hearing held on March 2, 2006, p. 131-132; Transcript of the Hearing held on May 8, 2006, p. 21; p. 26 line 3 - p. 29 line 12; Transcript of the Hearing held on  May 11, 2006, p. 32-33.

the benefits to the farmers as high as possible, independently of ORIL's pricing regulations. [8][7]

21.     In other words, Indulac payments were generally as follows. Indulac paid $0.10 cents per quart of raw milk. If that was enough to reach or exceed the farmers' weighted average compensation as set by Indulac, Indulac did not pay more. If with that contribution the farmer's weighted average did not reach Indulac's predetermined desired level, Indulac would put in the additional monies until that level was reached.  In both cases, Indulac would contribute further amounts to finance certain FFIL's programs and to service through the FFIL loans taken for Indulac's benefit. [9][7]

22.     Even by paying the dairy farmer an amount greater than the regulated amount of $0.10 per quart for surplus,[80] the total cost of milk to Indulac was well below the production cost of the dairy farmers. [81] This fact is economically correct even if Indulac's contribution to the FFIL programs and the debt service of Indulac's loans are considered as cost of milk, as Indulac did.[82]

23.     Indulac pays  well below production costs for its raw material as the  processors of fresh milk are required to pay much more than production cost and reasonable profit for each quart of milk they retain for fresh milk.  Through said imposed method, the farmer's average is not affected by Indulac's below cost price. The

---

[78]

 See Transcript of the Hearing held on October 25, 2005, p. 32 line 23 - p. 33 line 8; Transcript of the Hearing held on October 24, 2006, p. 64; Transcript of the Hearing held on February 16, 2005, p. 423; Transcript of the Hearing held on November 3, 2005, p. 171-172; Transcript of the Hearing held on June 5, 2006, p. 74 line 22 – p. 75 line 2.

[79]
 See Transcript of the Hearing held on March 2, 2006, p. 132 line 14 - p. 133 line 20; Transcript of the Hearing held on May 9, 2006, p. 141 line 11 - p. 148 line 25; p. 143 lines 15-24; Transcript of the Hearing held on May 10, 2006, p. 10-11; Transcript of the Hearing held on June 30, 2006, p. 34 line 17 - p. 39 line 2.

[80] See Defendant's Exhibit W.

[81]See Transcript of the Hearing held on February 24, 2006, p. 56 lines 1 – 6.

[82]
 See Plaintiff's Exhibit 52 p. 3

final result is unquestionably that fresh milk processors in effect subsidize with their very high cost per quart Indulac's very low cost.

24.    During the mid-eighties, a change was introduced to the farmer's compensation system. Up to that moment, the weighted average received by the farmer for the totality of his production within quota varied depending on the processor to which the farmer sold his milk. This was the case as different processors had different levels of retained vs. surplus milk. Dairy farmers selling their milk to processors with a high percentage of retained milk received a higher weighted average than those dairy farmers selling milk to fresh milk processors with a higher percentage of surplus. In the year 1985, when Mr. Luis Fullana was head of ORIL, a regulatory change was introduced pursuant to which the weighted average for all dairy farmers on the Island was to be calculated on the basis of island-wide proportion of retained milk vs. surplus regardless of the situation of each individual processor. From that time on, every dairy farmer in Puerto Rico has received the same compensation per quart of raw milk for every single quart produced within quota, regardless of the processor to which that farmer is attached. [3][8]

25.    By the year 1998, Indulac was aggressively marketing UHT and devoting as much surplus milk as possible to its production.[84] Indulac's main product today is unquestionably the manufacture of UHT.[85] Indulac's pricing strategy for its UHT is to meet or beat the low price at which that product is introduced into

---

[83]

[84] See Transcript of the Hearing held on October 18, 2005, p. 19 line 6 - p. 23 line 7.

[85] See Transcript of the Hearing held on March 1, 2006, p. 29.

See Transcript of the Hearing held on August 22, 2005, p. 32 lines 22-23; Transcript of the Hearing held on March 1, 2006, p. 21-27.

Puerto Rico by foreign producers.[86] For years that price has been consistently and substantially lower than the price of fresh milk. [7][8]

26.     The price at which UHT milk is sold in Puerto Rico is basically set by imported UHT milk since the Continental United States enjoys a lower price for raw milk than the cost in Puerto Rico.[88]  That milk comes into Puerto Rico from mainland United States and is sold to the consumer. However, contrary to what occurs in mainland United States, where UHT is normally sold at a price much higher than fresh milk, the opposite is true in Puerto Rico.[89] UHT consumer prices in Puerto Rico have been consistently lower than the regulated price of fresh milk.[90] In order to compete with UHT imports, Indulac has to match or beat that low price.    In doing so, Indulac competes against both UHT imports and plaintiffs' fresh milk.[91]  Due to the high cost of producing milk in Puerto Rico, Indulac can only so act by paying for raw milk a price well below actual production cost of the dairy farmers.[92] Without its regulatory subsidized price by the fresh milk processors for raw milk, Indulac would not be able to compete with the UHT importers. Indulac consequeantly takes over a substantial portion

---

[86]

 Transcript of the Hearing held on August 22, 2005, p. 86 lines 11-14; Transcript of the Hearing held on July 24, 2006, p. 129 lines 21-25; Transcript of the Hearing held on July 24, 2006, p. 131 lines 3-5; p. 158 lines 13-16; Transcript of the Hearing held on June 19, 2006, p. 68 lines 6-8; p. 71 lines 11-25; p. 76 lines 14-17; p. 78 lines 10-25.

[87] See Transcript of the Hearing held on September 16, 2005 p. 38 lines 18-22 see also Transcript of the Hearing held on February 15, 2005, p. 42 lines 8-16.

[88]

 See Transcript of the Hearing held on August 4, 2006, p. 36 lines 1-9; Transcript of the Hearing held on June 19, 2006, p. 70 lines 4-8.

[89]

[90] See Transcript of the Hearing held on August 22, 2005 p. 80 lines 7-9.

[91] See Plaintiff's Exhibits 34, 46 and 71 at p.3.

 See Transcript of the Hearing held on October 24, 2005, p. 151-152; Transcript of the Hearing held on February 16, 2005, p. 422 line 19-21; Transcript of the Hearing held on July 7, 2005, p. 63 line 6-14; Transcript of the Hearing held on June 19, 2006, p. 69 line 20 - p. 71 line 18; Transcript of the Hearing held on August 1, 2006, p. 45-46.

[92]

 See Transcript of the Hearing held on June 19, 2006, p. 70 lines 1-23, p. 76 lines 1-25; Transcript of the Hearing held on August 4, 2005, p. 30; Transcript of the Hearing held May 9, 2006, p. 128 lines 13-16.

of the Puerto Rico fluid milk market and enjoys a competitive edge over the importers. [93]  Undisputably, the purpose and effect of Indulac's subsidized price for raw milk is to deprive importers of UHT of their natural low price advantage in order to preserve the local milk market for the local milk producers.  The admissions of defendants themselves so demonstrate. The Administrator of ORIL said on the stand:

> "If right now, instead of .32 cents we were to raise the price of surplus milk to .53, .55 cents, and we lower the price of fresh milk to .53 or .55 cents in order for Indulac to be able to have a profit and continue in operation, we are going to have to raise the price of UHT milk to 1.30 or 1.50 per liter or quart.  And if we are going to do that today without these two [protectionist] bills of law, the imported UHT milk is going to take over the entire [UHT] market and it will make Indulac go bankrupt..."[94]

At another point Mr. Pedró answered as follows a question in cross examination:

> **Q**. (Mr. Escalera) Mr. Pedró, the fact is that you know that without the subsidy we have just discussed, Indulac would not be capable to compete with imported UHT.  Right?
> **A.** Yes.[95]

The Chief Executive Officer of Indulac Mr. Benítez responded as follows in cross examination:

> **Q.** (Mr. Escalera) So, Indulac has to buy its raw milk well below production cost in order to be able to compete with imported UHT, right?
> **A.** That's correct.[96]

Both the expert for the Farmers Association, Mr. Feliciano, and the expert for

---

[93] See Transcript of the Hearing held on May 9, 2006, p. 128 lines 13 - 16. See also Transcript of the Hearing held on June 19, 2006, p. 70 lines 1-23 and p. 76 lines 1-25.
[94] See Transcript of the Hearing held on February 27, 2006, p. 34 line 19 - p. 35 line 3.
[95] See Transcript of the Hearing held on May 9, 2006, p. 128.
[96] See Transcript of the Hearing held on June 19, 2006, p. 76 lines 14-17.

Indulac, Mr. Schaffer, testified in the same sense.[97]

27.    This regulatory created scheme has provoked a consistent growth in UHT and a consistent decline in the sales of fresh milk.[98] From 1998 through 2004 fresh milk sales declined from 318.50 million quarts to 275.27 million quarts. In the same periods, sales of UHT milk increased from 38.40 million quarts to 69.93 million quarts. Fresh milk sales have decreased at 2.4% per year while UHT milk has increased 10.5% per year since 1998. Evidently, since plaintiffs are not allowed to process UHT, they retain only the raw milk necessary to satisfy the declining demand for fresh milk.  When the demand for fresh milk falls, less fresh milk is retained and less milk at the higher price went originally into the weighted average calculation (and now into the money pool) from which the farmer is paid for its raw milk.  Stated differently, a decrease in the demand of fresh milk (made from retained milk) and an increase in the demand for UHT (made from surplus) affected negatively the farmer's average and now the possibility of paying the farmer at the established level.[99]  Before the February 2006 order, this problem was dealt with by voluntary increases in the amounts contributed by Indulac for farmers' compensation and mandatory increases required by ORIL in the price paid by fresh milk processors for retained milk.[100]  Indulac's increased contributions to the average came out of its high profits (multimillion dollars) in the UHT business achieved by subsidized price of raw milk.[101]

---

[97] See Transcript of the Hearng held on July 24, 2006 p. 129 and Transcript of August 4, 2006 p. 6.

[98] See Plaintiff's Exhibits 28-30; Transcript of the Hearing held on August 22, 2005, p. 39 line 21 - p. 40 line 2; Transcript of the Hearing held on September 20, 2005, p. 67 lines 4-11; Transcript of the Hearing held on August 24, 2005, p. 43-44.

[99] See Transcript of the Hearing held on May 8, 2006, p. 10 lines 10-17, 22.

[100] See Defendant's Exhibit W and Plaintiff's Exhibit 12; Transcript of the Hearing held on October 24, 2005, p. 74-77.

[101] See Plaintiff's Exhibit 36, 102, 102A, 108 and 109; see Transcript of the Hearing held on February 27, 2006, p. 34-p. 35.

28.    By the year 2002, the Board of Indulac began to guarantee a minimum payment to the farmer.[102] That guarantee was set by Indulac and not by ORIL. This meant that in every biweekly liquidation in which the weighted average would go below the guaranteed minimum payment, Indulac would put whatever amount was necessary over the $0.10 it was required to pay for surplus milk, in order to take the average for the totality of production within quota to the now guaranteed level.[103] This level was the amount necessary to cover the farmer's cost and a profit as determined by Indulac. Through this method the farmer had the certainty that what Indulac would pay for the raw milk over and above the required $0.10 would in turn translate into a certain fixed minimum guaranteed compensation per quart for each and every farmer. Indulac increased the farmer's guarantee several times since 2002.[104] The Administrator did not intervene with this guarantee nor did he at any time impede the farmer's margin as set by Indulac.[105] There has never been statutory or regulatory authority for these acts by Indulac.

29.    After contributing the money for the farmer's guarantee, Indulac proceeded to contribute to the FFIL programs and to pay the debt service of its loans.[106]

30.    The UHT business has been extremely productive to Indulac to the point that Indulac  decided to devote all its milk to UHT while buying milk in the United States to manufacture Puerto Rican cheese.[107] The key to Indulac's profitability is precisely Indulac's purchase of raw milk at below cost of production prices. That low price as stated before is possible only because of the fresh milk

---

[102] See Transcript of the Hearing held on May 8, 2006, p. 22 line 23 - p. 24 line 3.

[103] See Transcript of the Hearing held on October 24, 2005, p. 60, 64; Transcript of the Hearing held May 8, 2006, p. 21; Transcript of the Hearing held June 6, 2006, p. 45 lines 8-16.

[104] See Transcript of the Hearing held on May 8, 2006, p. 22 lines 23 – p. 23 line 18.

[105] See Transcript of the Hearing held on May 8, 2006, p. 21 lines 5-19 and p. 25 line 19-p. 27 line 4.

[106] See Transcript of the Hearing held on June 16, 2006, p. 16 lines 8-18.

[107] See Transcript of the Hearing held on March 2, 2006, p. 21 lines 9 – 19.

processors excessively high price for the same milk.[108]

31.    In December of that same year, 2002, the law regulating the milk industry was
amended to give the farmers full and "*de jure*" control of the FFIL.[109]   At the
same time, the by-laws and certificate of incorporation of Indulac (which for
years had provided for equal representation of farmers and fresh milk processors
on Indulac's board) were amended to exclude the fresh milk processors from the
Board of Indulac against their will.[110]   These amendments also included the
elimination of the prohibition to Indulac to enter into the fresh milk business and
an express authorization for Indulac to fully compete in all areas with the fresh
milk processors and other participants of the milk and related industries.[111]  All
legal limitations Indulac previously had to operate as a full and modern corporate
competitor as to fresh milk were then eliminated; however, the fresh milk
processor (Suiza) continued with a denial of a permit to manufacture UHT.[112]

32.    The UHT phenomena turned Indulac into a major player in the fluid milk market
in Puerto Rico.  Despite this obvious fact, Indulac continued to operate within a
regulated market but in an unregulated fashion.[113]  Indulac continued to decide
without the Administrator's participation how much to pay the dairy farmers for
the surplus milk.[114]   Indulac did so despite the fixed price set for this milk by the

---

[108] See Transcript of the Hearing held on February 16, 2005, p. 431 lines 8-13.

[109] P.R. Laws Ann.Tit. 5 § 1099 as amended by Act No. 278 of December 19, 2002

[110] See Exhibits 7, 8, 22, Article 6(a), (b), 57, Article 6, 66 p. 7, 67, 68, and 69; Transcript of the Hearing held on November 1, 2005, p. 45 line 23 - p. 46 line 24; Transcript to Hearing held on February 28, 2006, p. 26, 29; p. 31 line 25 - p. 45 line 2; p. 55-60; Transcript to Hearing held on October 24, 2005, p. 68 line 1 - p. 69 line 7; Transcript to Hearing held on February 15, 2005,  p. 21 line 7 - p. 22 line 14.

[111] See Plaintiff's Exhibit 22; Transcript of the Hearing held on July 7, 2005, p. 119 lines 22-24; Transcript of the Hearing held on May 9, 2006, p. 128 line 19 – p. 129 line 19

[112] Of course, a license to produce UHT for the fresh milk processors is meaningless unless they are given the same low price for said milk that Indulac receives.

[113] See Transcript of the Hearing held on October 24, 2005, p. 65 lines 13-17; see also Transcript of the Hearing held on June 16, 2006, p. 47.

[114] See Transcript of the Hearing held on May 8, 2006, p.l 21 lines 5-19.

regulation in place. Furthermore, although the operation of the fresh milk

processors was subject to analysis and review every year in order to set prices for

all levels of fresh milk, Indulac was never subject to a similar examination or

audit.[115]  By deciding how much extra money to pay for its raw milk, Indulac was

deciding de facto the level of compensation of the dairy farmer that was by

statute to be set by the Administrator.[116]

33.     Since the Board of Indulac is composed of dairy farmers, the decision of those

        farmers to set the margin of the producers was in fact a decision to set their own

        personal margins.[117]

34.     Indulac was not only entitled to decide how much to pay for it's raw milk, but it

        was free to decide how much to charge for it's processed UHT.[118]  In other

        words, this fluid milk competitor within the regulated milk market of Puerto Rico

        could decide freely its own margin and profit, and further was able to determine

        the profit of the dairy farmers.  Of the three major players of the Puerto Rican

        milk industry (dairy farmers, Indulac and the fresh milk processors) only the

        latter was not controlled by the farmers and only the latter had its margin actually

        regulated by the Administrator.[119]

35.     On account of a dispute regarding which price regulation issued by ORIL was

        actually in place, well into in the middle of these injunction hearings, the

        Administrator issued on February 2006 a provisional order that modified the

---

[115]
See Transcript of the Hearing held on October 24, 2005, p. 51-55; Transcript of the Hearing held on June 16, 2006, p. 47 lines 16-18; Transcript of the Hearing held on June 30, 2006, p. 41 lines 8-10.

[116]
See Transcript of the Hearing held on July 26, 2006, p. 124 line 11 – p. 125 line 3; Transcript of the Hearing held on March 2, 2006, p. 131 line 11 - p. 132 line 12; Transcript of the Hearing held on June 6, 2006, p. 46 lines 15-18; p 49 line 16 – p. 50 line 14; p. 52 lines 5-7.

[117]
See Transcript of the Hearing held on July 26, 2006, p. 124 line 11 – p. 125 line 3, p. 127 lines 10-21.

[118]
See Transcript of the Hearing held on July 26, 2006, p. 124 line 11 – p. 125 line 3 and  p. 127 lines 10-21; see also Transcript of the Hearing held on May 8, 2006 p. 10 lines 4-17.

[119]
See Transcript of the Hearing held on October 24, 2005, p. 51-55.

dairy farmers' compensation system. Without holding hearings of any kind, and without ever having conducted an examination of the operations of Indulac[120], the Administrator set the price to be paid by Indulac for raw milk at $0.32.[121] This payment was not only coincidentally the price at which Indulac had unilaterally decided shortly before to pay for the milk,[122] but also the price which Indulac had represented in writing to the Administrator that it could pay for the milk and still make a reasonable profit.[123] The Administrator took Indulac's word at face value. The fresh fluid producers were never consulted. Indulac's profit projections presented to the Administrator contemplated substantial income from the juice business, an unregulated activity which is the main source of income to the fresh milk processors. Indulac was to continue to pay below cost for raw milk and use that advantage to further compete with the fresh milk processors in their other profitable lines of unregulated business. At that time, Indulac began to compete with the fresh milk processors in the juice business.[124]

36.     The February 2006 order capped Indulac's risk by setting the price Indulac was to pay for its raw milk at the level Indulac requested, that is $0.32.[125] Indulac no longer was at risk of having to invest additional monies to raise the weighted average to the level of the guarantee. Indulac was thus insulated from the risk of

---

[120] See Transcript of the Hearing held on October 24, 2005, p. 51-55; Transcript of the Hearing held on June 16, 2006, p. 47 lines 16-18.

[121] See Defendant's Exhibit AA.

[122] See Plaintiff's Exhibits 102, 110, and Defendant's Exhibit CCC; See also Transcript of the Hearing held on March 2, 2006, p. 35 line 13 – p. 36 line 24;Transcript of the Hearing held on May 12, 2006, p. 41 line 19 - p. 42 line 18; p. 45 lines 14-24.

[123] See Transcript of the Hearing held on February 27, 2006, p. 23 lines 2-6; Transcript of the Hearing held on May 12, 2006, p. 42 line 4-6.

[124] See Transcript of the Hearing held on June 19, 2006, p. 32 line 18 - p. 33 line 24; Transcript of the Hearing held on May 12, 2006, p. 41 lines 1-6; Transcript of the Hearing held on May 11, 2006, p. 27 line 24 - p. 28 line 9.

[125] See Defendant's Exhibit AA, Art. 8; Transcript of the Hearing held on June 12, 2006, p. 20 line 16 - p. 21 line 16; Transcript of the Hearing held on May 8, 2006, p. 50 lines 13 – 15.

financial exposure on account of a rise in the amount of raw milk devoted to UHT ("surplus") vs. the amount devoted to fresh milk ("retained milk"). ORIL relieved Indulac of the economic burden of having to increase payment for milk (to stabilize the farmers' income) as the demand for fresh milk continued to decrease at least in part because of Indulac's own efforts to market UHT. Additionally, Indulac was relieved of the burden of paying for the Fund's loans taken for Indulac's benefit and programs which would now come out of the money paid by Indulac and the processors of fresh milk as opposed to coming exclusively from Indulac's profits.[126] Despite these benefits to Indulac the Administrator's order did nothing to alleviate the problems created by Indulac's subsidized UHT or plaintiffs excessive cost of raw milk.

37.    Under this provisional order, the payment fund has been in deficit practically from day one.[127] From the monies contributed by the fresh milk processors and Indulac the farmers are paid first, the loans and programs are second in line, and any remaining amount returns to the fresh milk processors. But, the system is running a multi-million dollar deficit simply to satisfy loans and programs and, as we will see, even to pay the farmers.[128] Evidently, if no money is left to pay for loans, programs and the farmers much less is there to be money available to alleviate the critical situation of the processing plants. A loan of over $2 million by Indulac to the Fund reduced the deficit to $1 million in February of 2007. In only three months the deficit of the Fund went from $1 million to almost $4 million.[129] The deficit in the last biweekly period of the month of May 2007 grew

---

[126]   See Transcript of the Hearing held on March 2, 2006, p. 132 line 14 - p. 133 line 20; Transcript of the Hearing held on May 10, 2006, p. 10 line 6 – p.11 line 9; Transcript of the Hearing held on June 30, 2006, p. 34 line 17 - p. 39 line 2.

[127]   See Plaintiff's Exhibits 84-93, and 95.

[128]   See Plaintiff's Exhibits 124-126.

[129]   See Exhibit 1 of Docket No. 463.

by almost $1 million in just two weeks[130]. The deficit as of June 13, 2007 was already $6,110,940.34. The situation has reached to the point that the money available is not even enough to pay the farmers, the first priority of the payment fund[131]. This fault occurred even though now the over-quota milk is not paid for at all. Over quota milk is milk produced by a farmer in excess of that farmer's production quota. That is, of course, different from "surplus" which is the island-wide production of milk that in a particular period exceeds the market demand for fresh milk. This milk was for decades paid at 10 cents per quart. These situations provoked a new order dated April 19, 2007.[132] In this order the compensation of the farmer is further reduced. Although the Administrator concluded that for the year 2005 in which the last price increase became effective, the dairy farmers suffered a reduction in margin from 8.84 cents per quart to 5.28 cents per quart, their milk is now going to be paid as follows: 5% of the milk produced within quota will not be paid at all, 95% of the quota will be paid according to the following scale: 70% at $0.55 per quart, 20% at $0.50 per quart and 10% at $0.30 cents per quart. It was the Dairy Farmers Association itself that suggested these reductions on June 6, 2007. Despite the fact that this is an order of price setting, it took the Administrator less than a week to find that suggestion acceptable and to adopt it in its order. The Fund now is incapable of providing monies neither for the payment of the programs nor for the servicing of Indulac's loans, or even to keep the farmers' compensation at the 2005 level.

38.     This system is about to cause the industry to collapse. In no market of the United

---

[130] See Exhibit 1 of Docket No. 463 and addendum of Docket No. 474.
[131] See Exhibits 1 to 8 of Docket No. 446, Exhibit 1 of Docket No. 463 and Addendums 1 and 2 of Docket No. 474.
[132] See Exhibit 12 of Docket No. 446.

States does UHT play the large role it plays in Puerto Rico.[133] The evidence shows that fresh milk is in continuous rapid pace decline. The system is also placing the farmer's compensation at risk, as the milk transportation infrastructure is exclusively provided by fresh milk processors and consequently[134] a threat to them is a threat to the industry. Lately the amount of surplus milk has increased beyond Indulac's handling and marketing capabilities. As a result, substantial amounts of raw milk are being destroyed.[135]

39.     The February 2006 order establishes the farmer's compensation (recovery of costs and profit) at $0.55 per quart of raw milk produced within quota. This amount is coincidentally exactly the same guarantee that Indulac had in effect for the farmers before the provisional order.[136] The February 2006 order set the fresh milk processors' price at 66.125 cents for the same milk for which Indulac merely paid $0.32 per quart.[137] But now, not only the farmers' compensation has been reduced as indicated but the Administrator has also reduced Indulac's cost of milk. On April 5, 2007 the Administrator issued another order [138] establishing new prices for Indulac's raw milk according to the use to which said milk was to be destined. The new order reduced the price substantially for important portions of Indulac's raw milk. Indulac's new raw milk price structure is as follows: UHT milk $0.32, evaporated milk and powdered milk $0.12, cheese $0.20. Again, ORIL established those prices exactly as requested by Indulac. The Administrator made it clear that this new advantageous price structure would be

---

[133] See Transcript of the Hearing held on July 11, 2006, p. 87 lines 9-24; p. 105 lines 5-10; p. 134 lines 13-20; Transcript of the Hearing held on August 4, 2006, p. 21 lines 13-25.

[134] See Plaintiff's Exhibits 49 and Defendant's Exhibit AA.

[135] See Plaintiff's Exhibit 111, p.2; See also Transcript of the Hearing held on June 20, 2006, p. 51 lines 5-18.

[136] See Transcript of the Hearing held on June 16, 2006, p. 53 line 25 – p. 54 lines 1- 3.

[137] See Defendant's Exhibit AA.

[138] See Addendum 11 of Docket No. 446.

available <u>exclusively</u> to Indulac. The liquidations for the period ended May 6, 2007[139] demonstrates via a proffer by Suiza that the Administrator has basically reduced Indulac's raw milk price from $0.32 to approximately $0.265. This is a reduction in Indulac's cost of milk and contribution to the farmers' payment fund of 17.3%.

40. ORIL is required by law to review every year the situation of the milk industry and adjust the prices of fresh milk accordingly.[140] At least one year ORIL conducted no price review simply because Suiza had changed owners.[141] On another occasion ORIL did not issue a resolution regarding the price of milk because lack of auditing staff to perform the task .[142] ORIL has no mechanism in place for automatic price adjustments on the basis of changes in costs between yearly price revisions. Since all price reviews are prospective and normally the order is effective months after the end of the cost period used for evaluation, the fresh milk processors never recover the losses on account of increased expenses and decreased volumes in the interval between reviews. Additionally ORIL has no regulatory standards whatsoever to judge fairly the profit margin of the fresh milk processors. [143]The rules of cost analysis (if they exist) are not notified in advance and they in fact vary from year to year. The net result is an artificial reduction in the amount of expenses allowed to the plants[144] and an artificial upwards increase in their income.[145] The 2007 price order achieves this increase by considering as fresh milk income money derived from unregulated business

---

[139] See Exhibit 8 of Docket 446.
[140] See Act 34 § 1107(e).
[141] See Transcript of the Hearing held on November 3, 2005, p. 83 lines 11-21. See also Transcript of the Hearing held on February 15, 2005, p. 190 line 4 - p. 191 line 13.
[142] See Transcript of the Hearing held on February 24, 2006, p. 76 lines 10-19.
[143] See Transcript of the Hearing held on September 23, 2005 p. 9 lines 10 – 22.
[144] See Transcript of the Hearing held on September 20, 2005, p. 21 line 19 - p. 22 line 15.
[145] See Transcript of the Hearing held on September 20, 2005, p. 26 lines 3- 20 and p. 57 lines 4 – 13.

activities.[146] This manipulation of plaintiffs' real financial picture is the consistent result, year after year, albeit on account of ever changing regulatory criteria.

41.     The last price change for fresh milk processors was effective in May 2005. For the same, ORIL used cost numbers of the natural year 2003[147] despite the fact that ORIL had available the cost numbers for the first half of the year 2004.[148] ORIL concluded despite being well aware that certain very important cost items such as fuel, electricity and resin had sky-rocketed for the year 2004.[149]

42.     This decision by ORIL seriously underestimated the costs of the plants for the period in which the new prices would be in effect.  Even as of the date of this order, the plants continue to operate under a price structure based on the year 2003 cost numbers and volumes[150], despite a proffered increase by Suiza to the plants of 61.60% in the cost of gasoline, 41.22% in the cost of electricity and 49.59% increase and in the cost of resin to Suiza together with a continuously sharp decrease of sales volumes.[151]

43.     During the review process for the price increase effective May 2005, ORIL for the first time, adjusted upwards the income from fresh milk sales by plaintiff.[152] Instead of determining the real amount of money collected by plaintiff on account of those sales, the Administrator simply established the plants' income

---

[146]See Exhibit 12 of Docket No. 446.

[147] See Transcript of the Hearing held on May 8, 2006, p. 71 line 18 – p. 72 line 25; Transcript of the Hearing held on September 20, 2005, p. 16 line 24 – p. 17 line 7.

[148]See Transcript of the Hearing held on May 8, 2006, p. 48 line 23 - p. 49 line 25.

[149] See Transcript of the Hearing held on September 23, 2005, p. 15 lines 19-23; Transcript of the Hearing held on September 20, 2005, p. 62 lines 1-10; Transcript of the Hearing held on May 9, 2006, p. 65 lines 1-20.

[150] See Defendant's Exhibit K; Transcript of the Hearing held on August 4, 2006, p. 103 line 25 - p. 107 line 11.

[151] See Exhibits 13 and 14 of Docket No. 446. See Exhibit 13 of Docket No. 469 for the certified translation of the same.

[152] See Plaintiff's Exhibit 81.  See also Transcript of the Hearing held on May 8, 2006, p. 75 line 17 - p. 76 line 15.

by multiplying the amount of milk sold by the regulated price.[153]   By doing this,
ORIL for the first time in unannounced fashion eliminated the adjustments made
to sales figures by the plants on account of milk returns as similar loss factors
that had been previously accepted.  ORIL had no regulatory parameters on this
issue, nor did it provide any evidence rationale to support this decision.
Nevertheless, although the 2007 price order left untouched the price structure of
plaintiffs, those adjustments and disallowances were not made.[154]

44.    Similary, for the order effective May 2005, the Administrator was disallowing
the adjustments to income resulting from discounts to agents and other
promotions.  The position of the Administrator was that these discounts were
illegal.[155]   Nonetheless, ORIL had previous to 2005 admitted at least certain
amounts of adjustments on account of these promotions and discounts without
regulatory parameters for the same.[156]   Competitor Indulac also in the milk
business regularly provided discounts not opposed by the regulator as an essential
part of its marketing strategy.[157]   The Administrator has never intervened with
Indulac in this regard.  The same law that the Administrator interpreted to apply
to the fresh milk processors and was used by the Administrator for these
disallowances, applied equally to Indulac.[158] (The Administrator also sits on the
Board of Indulac.)  Lastly, Indulac incurs in the same agents' cost as the fresh
milk processors without ORIL's intervention.[159]   As a matter of fact, in a letter to

---

[153] See Transcript of the Hearing held on May 8, 2006, p. 74, lines 10-25.

[154] See Exhibit 12 of Docket No. 446.  See Exhibit 12 of Docket No. 469 for the certified translation of the same.

[155] See Transcript of the Hearing held on May 8, 2006, p. 129 lines 14-23.

[156] See Transcript of the Hearing held on November 3, 2005, p. 54 line 1 – p. 57 line 15.

[157] See Transcript of the Hearing held on May 8, 2006, p. 140 lines 10 – 15 and p. 95 lines 7 – 21.

[158] See Transcript of the Hearing held on May 8, 2006, p. 139 line 21 – p. 140 line 6.

[159] See Defendant's Exhibits P and Q; Transcript of the Hearing held on May 9, 2006, p. 4 line 7- p. 5 line 15.

the Administrator following up on Indulac's September 8, 2006 letter requesting

a price reduction to the Administrator, Indulac openly states to ORIL that offers

and discounts of UHT would last three months and estimates that it would have a

total of $1,840,000.00 of offers and discounts.   In the following paragraphs

Indulac admits that during the year 2006 it has granted substantial offers and

discounts due to inventory obsolescence.[160]

45.     Shrinkage is the loss of milk production inherent to any milk manufacturing

process.   The price order effective in the year 2005 made a substantial reduction

on the shrinkage factor claimed by the plants.   ORIL simply explained this

adjustment by stating that the shrinkage factor it was applying has been

historically used by ORIL.   The evidence demonstrates this to be totally  untrue.

The 2005 shrinkage factor of $0.0075 had never been applied before.[161]   The

Administrator has never performed a study to determine the reasonable shrinkage

factor that should be applicable in Puerto Rico, nor has he approved any

regulatory standard on the same.[162]   The shrinkage factor claimed by plaintiffs

compares very favorably with the average shrinkage factors accepted in

geographic parallel regions less affected by heat in Continental United States,

although temperature constitutes undisputably a key critical factor  increasing

shrinkage.[163]   In the 2007 price order the shrinkage factor "historically applied"

changed to $0.0088.[164]

46.     For the price order effective May 2005, the Administrator examined the cost of

---

[160]See Exhibit 2 to Indulac's motion Docket No. 448.  Please refer to Exhibit 2 of Docket No. 464 for a certified translation of the same.

[161]See Plaintiff's Exhibit 81; Transcription of Hearing held on May 8, 2006, p. 91 line 13 – p. 93 line 3.

[162]See Transcript of the Hearing held on May 8, 2006, p. 106 line 13 – p. 107 line 6; Transcript of the Hearing held on September 20, 2005, p. 36 lines 2-10.

[163]See Transcript of the Hearing held on September 23, 2005, p. 20 lines 18-22; Transcript of the Hearing held on May 8, 2006, p. 109 line 23 – p. 110 line 24.

[164]See Exhibit 12 of Docket No. 446.

plastic and professional fees of both plants.[165]  In each case, he used for both the lowest of the figures presented by either of the two plants.  ORIL had no evidence that Suiza was paying its plastic caps and bottles above market price.[166]  ORIL had no evidence of overpayment by Vaquería Tres Monjitas for professional fees.[167]

47.  ORIL disallowed the experts' fees paid by the fresh milk processors for work related to the rate proceedings and regulation by ORIL.[168]  It did so without any evidence that these expenses were excessive.[169]

48.  To determine the price at which milk should be sold to allow the fresh milk processors to obtain a reasonable profit by way of a reasonable return on capital, ORIL determines the capital base, divides it by the number of quarts sold and obtains the capital per quart of milk sold.[170]  But in using said method  ORIL uses the amount of milk sold during the base year of examination, which for the order effective on May 2005 was calendar year 2003.[171]  ORIL did this although by the time it issued its April 2005 order, the year 2004 had transpired demonstrating that the amount of fresh milk sold during that year had substantially decreased compared to the year 2003.  This decreasing trend has been consistent for the last

---

[165] See Transcript of the Hearing held on September 20, 2005, p. 39 line 20 – p. 44 line 2; p. 45 line 24 – p. 47 line 10; Transcript of the Hearing held on September 23, 2005, p. 15; Transcript of the Hearing held on November 3, 2005, p. 25 line 19 - p. 27 line 9; p. 49 line 2 – p. 51 line 24; Transcript of the Hearing held on May 9, 2006, p. 33 line 13 – p. 38 line 18; p. 38 line 19 – p. 42 line 17.

[166] See Transcript of the Hearing held on September 23, 2005, p. 15; Transcript of the Hearing held on May 9, 2006, p. 39 lines 15-24.

[167] See Transcript of the Hearing held on September 23, 2005, p. 24 line 4 – p. 27 line 3; Transcript of the Hearing held on May 9, 2006, p. 33 line 14 – p. 34 line 7.

[168] See Transcript of the Hearing held on September 20, 2005, p. 53 lines 1-9; Transcript of the Hearing held on May 9, 2006, p. 110 lines 17-25.

[169] Id.

[170] See Transcript of the Hearing held on May 9, 2006, p. 44 line 12 - p. 49 line 17.

[171] See Transcript of the Hearing held on May 8, 2006, p. 71 line 18 - p. 72 line 25; Transcript of the Hearing held on May 9, 2006, p. 50 lines 3-18; p. 45 line 16 – p. 46 line 8.

few years.[172]  Despite the decreasing trend, ORIL issued its year 2005 order with year 2003 volumes that it knew were fictitious since the Administrator had then available figures prepared by his own office.

49.     Furthermore, ORIL has repeatedly stated that on every occasion the price of fresh milk has been increased the demand decreases.[173]  ORIL failed to take into consideration that the year 2005 price increase would further decrease volumes for that year making even more unreliable the 2003 volume numbers used for year 2005 price determination and rate of return calculations.[174]

50.     By over-estimating the amount of milk to be sold during the period of the price increase, ORIL was artificially reducing the amount of capital per quart of the fresh milk processors.  The application of a certain rate of return to an artificially lowered capital base provides an artificially diminished level of reasonable profit required.[175] By 2005, when the new prices went into effect prospectively, the 2004 decrease in volume of sales had further eroded the capital of fresh milk processors.

51.     ORIL uses a 10% rate of return over capital.  ORIL has no regulatory parameters for this rate of return and has never conducted a study to determine what that rate of return should be.[176]  ORIL's only basis for the 10% rate of return is the 1997 US publication entitled Milk Fact which cited this figure as the national average.[177]  The parameter is obviously outdated, stale, and fails to take into

---

[172]

See Plaintiff's Exhibits 28 and 29; Defendant's Exhibit KK; Transcript of the Hearing held on February 16, 2005, p. 423-425; Transcript of the Hearing held on August 22, 2005, p. 29-30; Transcript of the Hearing held on September 23, 2005, p. 9-10; Transcript of the Hearing held on May 8, 2006, p. 71 line 18 – p. 72 line 25.

[173]See Defendant's Exhibits S and T; see also Transcipt of the Hearing held on May 8, 2006, p. 7 line 23 - p. 9 line 17.

[174]See Defendant's Exhibit K.

[175] See Transcript of the Hearing held on September 23, 2005, p. 33 lines 17 -23.
[176]

See Transcript of the Hearing held on May 9, 2006, p. 120 line 19 - p. 122 line 22.
[177]

See Transcript of the Hearing held on May 9, 2006, p. 109 line 18 - p. 110 line 11.

consideration the economic conditions of doing business in the market in Puerto Rico after May 2006, when the Bonds of Puerto Rico were considerably devaluated by Moody's.[178]

52.     The evidence presented by plaintiffs demonstrates that the average rate of return reasonable for the milk industry in Puerto Rico is the figure around 15%. That evidence was not disputed by ORIL.[179] The Department of Consumer Affairs of Puerto Rico uses a reasonable rate of 15.81% return for gasoline wholesalers in Puerto Rico, also a commodity obviously highly affected by increasing fuel costs and electricity.[180] The court does not question the established fee per se; the error is in not performing a reasonable, timely economic study setting the reasonable rate and the continuing usage of stale data as to rate of return (1997), and further not considering currently doing business in the Puerto Rican market under current economic realities. The court does not hint at any figure as to reasonable rate of return. This rate belongs to the setting by the Administrator, not the court.

53.     Prior price orders issued by ORIL have demonstrated year after year that even with the downwards adjustments made by said office to the fresh milk processors' capital base, when actual real numbers were reviewed the following year plaintiffs were never able to obtain even the 10% return over the adjusted base ORIL had estimated they would make.[181]

54.     The regulatory system of ORIL has created for the fresh milk processors yearly losses that have consistently diminished their capital base. The normal

---

[178]The court takes judicial notice of an economic event which took place in Puerto Rico, is undisputable and has obvious economic repercussions . Further the court is authorized to take judicial notice of events published in the internet. Chhetry v. U.S. Department of Justice, ___F.3d___,2007 WL 1759472.

[179]See Transcript of the Hearing held on September 20, 2005, p. 76 line 23 - p. 77 line 4.

[180]See Transcript of the Hearing held on May 9, 2006, p. 110 lines 17-25.

[181]See Defendant's Exhibits K, S, T and Plaintiff's Exhibit 81 and Transcript of the Hearing held on May 9, 2006, p. 51 line 10 – p. 67 line 21; p. 70 line 2 – p. 74 line 17.

regulatory way of dealing with this issue is by creating a capital account of "regulatory accrual" that would add to the capital base the erosion experienced because of this regulatory system.[182]  By providing in future rates a rate of return over the real capital plus the capital losses, the companies could be made whole and be provided the necessary recovery of cost and reasonable profit.  ORIL has refused to recognize a regulatory accrual account as part of the capital base.[183]

The last order of ORIL resulting from a yearly price revision was issued on April 19, 2007.[184]  Again, this order was issued without first establishing the applicable regulatory parameters.   The fresh milk processors' price structure, last determined on the basis of year 2003 sales volumes and costs, remained untouched. This time the Administrator authorized the adjustments allowing discounts to agents and other promotions despite having previously sustained in the court proceedings that the discounts were illegal.[185]  The shrinkage factor that the Administrator applied this time is different to the one applied in the order effective May 2005.   Despite this, the Administrator again justifies this shrinkage factor by saying that it is the shrinkage factor "historically applied". For the first time, the Administrator adjusted the revenue of the plants by including as income of the regulated fresh milk processing business the income of separate corporations related to plaintiffs, operating in the unregulated plastic business.  ORIL did so despite a firm and final judgment from the local court providing that ORIL could only use in its price reviews revenue from fresh milk

---

[182] See Transcript of the Hearing held on September 20, 2005, p. 74 lines 6-12.

[183] See Defendant's Exhibit V and Transcript of the Hearing held on November 3, 2005, p. 127 line 25 – p. 129 line 2; Transcript of the Hearing held on May 9, 2006, p. 47 line 11 – p. 48 line 17; Transcript of the Hearing held on September 20, 2005 p. 74 – lines 5-14.

[184] See Exhibit 12 of Docket No. 446.  Please refer to Exhibit 12 of Docket No. 469 for a certified translation of the same.

[185] See Transcript of the Hearing held on May 8, 2006 p. 129 lines 14- 24.

sales.[186] The critical matter for constitutional repercussions is not a violation of a local court opinion, but that again there is yet another unannounced change in conditions used for the first time against the milk processors. This is yet another change in conditions.  The Administration makes no conclusion that the plastic pricing of plaintiff included in their books is excessive in terms of market availability but adjusts the same nonetheless. [187] Under the new order, the Administrator indicated that he had no available information on increased costs for electricity and fuel although those costs are available from Government agencies in Puerto Rico and is a matter of simply applying the figures to the 2003 figures he is continuously using.[188]

55.    By incurring in the regulatory actions described above ORIL, has not allowed plaintiffs to recover costs and make a reasonable profit.[189]

56.    The financial situation of the fresh milk business of the fresh milk processors has greatly deteriorated on account of these administrative acts.[190]   The fresh milk processor's market share of the fluid milk market of Puerto Rico continues to go down while UHT's market share of that same market continues to grow.  Milk is being destroyed at farm level because Indulac can no longer absorb the huge amount of surplus created by the pricing scheme.[191]

57.    The milk payment fund under the February 2006 order is not now capable of

---

[186] See Transcript of the Hearing held on May 11, 2006 p.49 lines 17-25; See also Defendant's Exhibit E.
[187] See Transcript of the Hearing held on September 23, 2005, p. 14 line 22 – p. 15 line 4; and May 9, 2006 p. 39 lines 15-24.
[188] See undisputed facts regarding the information available from the Government agencies in Puerto Rico on Docket No. 446.
[189] See Transcript of the Hearing held on September 20, 2005, p. 90 lines 14-16 and p. 90 line 24 – p. 91 line 7.
[190] See Plaintiff's Exhibits 38, 40, 41 and Transcript of the Hearing held on September 16, 2005, p. 65 lines 19-23; p. 66 lines 3-9.
[191] See Exhibit Plaintiff's Exhibit 111, p. 2; Transcript of the Hearing held on June 20, 2006, p. 51 lines 5-18.

even paying neither for Indulac's loans nor for the FFIL's programs.[192] Worst
still, the last liquidations show that the Fund is running short for over $400,000
every two weeks on the money needed to pay the farmers compensation.[193] In
other words, the system is deteriorating so rapidly that now even the farmers'
payment is jeopardized as Indulac no longer provides money for said purposes
because its responsibility is now limited to less than $0.32 per quart of surplus.[194]
Despite the fact that in every biweekly period the deficit increases substantially,
and that there is not even enough money to pay the farmers, the Administrator
has further reduced the cost of milk to Indulac through an order dated April 5,
2007.[195] Pursuant to that order, the price of raw milk used by Indulac to
manufacture evaporated milk and powder milk has gone down. In the liquidation
period which ended May 2, 2007 the price reduction for Indulac only resulted in
reducing Indulac's payment for milk 17.3%. [196] Although Indulac is the only
entity in Puerto Rico presently manufacturing those products, the fact that the
order makes it clear that said pricing will be available only to Indulac eliminates
any incentive to the fresh milk processors to proceed with the manufacture of the
same.

58.     The Administrator has also allowed the fresh milk processors to buy milk for
certain by-products uses at below the level of 66.125 cents. This has had a very
limited impact in reducing the fresh milk processors contribution to the payment

---

[192]

 See Plaintiff's Exhibits 124-126. See also Exhibits 1-8 of Docket No. 446. Please refer to Exhibits 1- 8 of Docket No.
469 for the certified translation of the same.
[193] See Exhibit 1 of Docket No. 463.
[194]

 See Transcript of the Hearing held on March 2, 2006, p. 132 line 14 - p. 133 line 20; Transcript of the Hearing held on
May 9, 2006, p. 141 line 11 - p. 149 line 25; Transcript of the Hearing held on May 10, 2006, p. 10 line 6 – p. 11 line
9.
[195] See Exhibit 11 of Docket No. 446. Please refer to Exhibit 11 of Docket No. 469 for the certified translation of the
same.
[196] See Exhibit 8 of Docket No. 446. Please refer to Exhibit 8 of Docket No. 469 for the certified translation of the
same.

Fund. This is the case as the amount of milk for by-products in the case of plaintiffs is not substantial. Furthermore, in the case of Suiza the amount of milk that Suiza is now buying at below 66.125 cents is an amount of milk that Suiza previously imported as powder milk.[197] Suiza is therefore now contributing higher amounts to the payment Fund than before because it is buying in Puerto Rico milk that it used to import as powder milk. The price reduction to Suiza, as proffered by Suiza, pursuant to the liquidation of May 2, 2007, amounts to less than one cent from the 66.125. On the other hand, the reduction granted to Indulac for evaporated milk, powdered milk and cheese is 5.5 cents from 32 cents per quart. Indulac's percentage price reduction is around 17.5% as compared to 1.3% for Suiza. (See Docket 446, Ex. 8, and Translation at Docket 469.)

59. ORIL has attempted to maintain the fresh milk price to the consumer as low as possible in order to make that staple readily available. This is a valid public policy and also prevents the decrease in demand that accompanies high prices. However, at the same time, ORIL has been squeezing the fresh milk processors preventing them from recovering reasonably incurred costs and making a reasonable profit by forcing them to operate with the insufficient margin between an artificially high cost for raw milk. This creates an artificial capital credit in that fictitious stale sales of milk are calculated in the formula and results in a mistaken price to plaintiffs' clients.[198]

60. The procedure in its totality is designed to allow Indulac to purchase raw milk well below cost without affecting the farmers' income. With this below cost

---

[197] See Exhibit 8 of Docket No. 448. Please refer to Exhibit 8 of Docket No. 464 for the certified translation of the same.

[198] See Transcript of the Hearing held on September 20, 2005 p. 8 lines 11-17 and p. 9 lines 6-7.

milk, Indulac competes against both the fresh milk processors and the importers of UHT milk.

61.    As admitted by the Administrator of ORIL, Mr. Pedró, and the Chief Executive Officer of Indulac, Mr. Benítez, without a much below cost price for its raw milk Indulac would not be able to compete with imported UHT.[199] When Indulac requested in December of 2006 a further decrease in pricing for raw milk; the UHT sole local producer openly admitted that it needed additional price accommodations in order to be able "to compete with importers of UHT milk."[200] Indulac controls most of the UHT market of Puerto Rico because of its well below cost price for raw milk. Without the economic benefit, not available to importers, the importers would take over the UHT market in Puerto Rico.[201]

62.    The FFIL has as one of its most important roles, the promotion of the consumption of fresh milk.[202] The FFIL has indicated that fresh milk is preferable to UHT for health reasons.[203]

63.    Puerto Rico in the last years has not produced enough fluid milk to satisfy yearly local fluid milk demand.[204]

---

[199] See Transcript of the Hearing held on February 27, 2006, p. 34 line 19 – p. 35 line 3.; Transcript of the Hearing held on June 19, 2006, p. 76 lines 2-17.

[200] See Exhibit 1 of Docket No. 448. Please refer to Exhibit 1 of Docket No. 464 for a certified Translation of the same.

[201] See footnote 5 at p. 2 of Exhibit 1 of Docket No. 448. Please refer to Exhibit 1 of Docket No. 464 for a certified translation of the same.

Facts Nos. 26, 40, 59, 60, 61 and 65 are critical to the remedy under the Dormant Commerce Clause. The facts are the establishment by application of a regulation of a price scheme only applicable to the only manufacturer of local UHT. Indulac is authorized to purchase raw milk at well below cost price of the dairy farmers financed by the fresh milk processors who ultimately pay more than required. The procedure allows the local producer to favorably compete with the UHT importers. The procedure of purchasing raw milk to manufacture UHT, powdered milk, evaporated milk, at well below cost is authorized exclusively to that local producer, Indulac, as the Administrator stated: "Without these two Bills of Law (sic) the imported UHT milk (sic) is going to take over the entire market. . . Further, as admitted by the Chief Executive Officer of Indulac, without the below cost price of raw milk Indulac can not compete with the importers. (See § 26 infra.)

[202] Transcript of the Hearing held on June 6, 2006, p. 5 lines 1-4.

[203] See Exhibits Defendant's Exhibit PP and Plaintiff's Exhibit 118; Transcript of the Hearing held on June 6, 2006, p. 11 line 15 - p. 12 line 23.

[204] See Defendant's Exhibit KK.

64.    Classified milk pricing is the system prevalent in milk markets throughout the United States.[205] This system classifies raw milk for the manufacturing of fluid milk at the highest price.[206] No distinction is made between UHT and fresh milk.[207] The years before UHT, Puerto Rico was operating under a classified pricing system allowing the purchase of raw milk for milk by-products to be paid at a lower price than milk for fluid milk manufacturing.

65.    In no jurisdiction of the United States is a fresh milk processor required to pay a price well above cost and profit for raw milk so that a local UHT producer can pay much less than cost and profit for the same raw material. The purchasing scheme allowing the exclusive UHT local manufacturer to purchase raw milk well below cost of fresh milk prices and below cost of the dairy farmers allows the local UHT manufacture to compete favorably with the importers.[208]

66.    At the end of 2006, Indulac was requesting from ORIL a reduction in the price of raw milk paid by Indulac.[209] Indulac was further requesting to be relieved of the obligation to pay for the amount of milk that is now destroying at the farm level.[210] In the year 2006, this amounted to more than 7.7 millions quarts.[211] Furthermore, Indulac requested the Administrator that it be allowed to pay for any milk received over 83 million quarts according to the final rentability of that milk.[212] The last liquidations of the year 2007 reflect that Indulac is not paying

---

[205]
See Kenneth W. Barley, Marketing and Pricing of Milk and Dairy Products in the United States, Iowa State University Press, 1997, page 118; Transcript of the Hearing held on September 16, 2005, p. 41 line 24 – p. 42 line 5.

[206]
See Transcript of the Hearing held on August 22, 2005, p. 74 line 24 – p. 75 line 5; p. 77 line 7; Transcript of the Hearing held on September 26, 2005, p. 36 line 20; p. 37 line 4.

[207]
See Transcript of the Hearing held on September 16, 2005, p. 41 lines 19-24.

[208]
See Transcript of the Hearing held on August 22, 2005, p. 75, lines 22-25.

[209]See Exhibit 2 of Docket No. 448. Please refer to Exhibit 2 of Docket No. 464 for a certified translation of the same.

[210]Id.

[211]See p. 2 of Exhibit 1 of Docket No. 448. Please refer to Exhibit 1 of Docket No. 464 for a certified translation of the same.

[212] See Exhibit 11 of Docket No. 446. Please refer to Exhibit 11 of Docket No. 469 for the certified translation of the same.

for destroyed milk.[213] Indulac, as well as the other participants in the market, has been operating to maximize its profits.

67.     During this year the biweekly money available to pay the farmers is running short by several hundred thousand dollars per biweekly period, reaching the highest deficit ($726,212.84) in the biweekly period of May 30, 2007.  In the last biweekly period that shortage to pay the farmers was of over $600,000.[214]

## ESSENTIAL FACTS AS TO DUE PROCESS, EQUAL PROTECTION AND TAKINGS COMMERCE CLAUSE VIOLATIONS

1.     The Administrator of ORIL has created a price scheme wherein the local manufacturer of UHT purchases raw milk at below cost of production of the dairy farmers while the milk processors, in order to make up the economic deficit, must pay substantially over cost and reasonable profit rates for the same raw milk.

2.     The milk industry in general is regulated at the level of dairy farmers' price as to the price paid by the two milk processors for raw milk and at the price paid by the fresh milk consumers. UHT is regulated in Indulac's favor as to the price paid for the fresh raw milk to the dairy farmer. The UHT milk is not regulated at the price to the consumer.

3.     For many years, the fresh milk producers have been financing the low cost of raw milk paid by the UHT local manufacturer.

4.     The UHT manufacturer is not audited by ORIL as the two fresh milk processors are audited.

---

[213] See Exhibit 1 of Docket No. 463.
[214] Ex. 1 of Docket No. 474.

5.   Notwithstanding the legal requirement of auditing the entire milk market in Puerto Rico, for years the only parties actually being regulated are the fresh milk industrial processor as well as the dairy farmers. The dairy farmers are technically regulated with a price of milk sold to the milk processor and a price for UHT and other milk products sold to Indulac. However, said price for years has been unilaterally increased by Indulac, a government-controlled entity who in turn is controlled by the dairy farmers. Indulac is not regulated as to the price of fresh milk to consumers and receives raw milk at extremely low, below cost prices.

6.   The Administrator set new prices for Indulac in February 2006 for purchase of raw milk at $0.32 per quart for fresh milk without a hearing and granting in only one week exactly the price requested by Indulac. Further, Indulac is permitted by administrative inaction to unilaterally increase the price it pays to the farmer.

7.   Indulac was partially relieved by the order of February 2006 of paying loan payments and programs paid to Fund (FFIL) previously by Indulac for the well being of the milk industry; the program then was being paid by Indulac and the milk processors. Said order again decreased the price of fresh milk to be actually paid by Indulac.

8.   Indulac was relieved of payment through the order of February 2006 of the economic burden of having to increase payment of milk (to stabilize farmers' income) as the demand of fresh milk continued.

9.   The order of February 2006 continued the price of raw milk paid by fresh milk processors to dairy farmers at 0.66125 and set the recovery cost and profit of dairy farmers at 0.55 per quarts, while Indulac's price was set at

0.32 per quart (plus Indulac relieved of prior obligations as set at § 7 and 8
supra).

10.    By order of April 5, 2007, the Administrator granted a further reduction to
Indulac in its net payment of raw milk to dairy farmers of $0.32. Milk used
by Indulac for the production of evaporated milk was reduced to $0.12 as
well as powdered milk to $0.12.  Raw milk used by Indulac to produce
cheese is to be purchased at $0.20. The net result is that the price of raw
milk to Indulac is now reduced to $0.265 (as calculated by Suiza).  Said
reduction in prices is not authorized for the two fresh milk processors.

11.    Similarly, fresh milk processors were granted a moderate decrease in
purchase price of raw milk destined for certain milk by-products, mainly
powdered milk. However, the amount constitutes in total a decrease of less
than one cent from the price paid of 66.125. The reduction, as calculated by
Suiza, to Indulac is substantial  since the diminishment of the price
constitutes 5.5 cents less than the 32 cents paid for a quart. The final result
is that the price reduction for Indulac constitutes around 17.5% as
compared to 1.3% reduction to Suiza.

12.    The price scheme has caused substantially, or at least partially, a
considerable loss in the market of fresh milk and a considerable increase in
the UHT market to the point that Indulac has ceased to be a "balancing
plant," a tamed "toothless" tiger, to purchase excess milk produced by the
dairy farmers and is now an aggressive competitor armed with an economic
regulatory formula that allows purchase of its principal raw material at
much less than one half the payment made by the two fresh milk producers.
The sales of fresh milk from 1998 to 2004 have decreased  2.4% per year

for a total reduction of 14%. On the other hand,  the sales of UHT have

increased during the period at the rate of 10.5% per year for a total of 82%.

(See Exhibit 29.)[215]

13.    Suiza has been denied by ORIL a permit to operate an UHT processing

plant, a determination which has been repeatedly reiterated by dairy

farmers.

14.    The Administrator of ORIL is ordered to "at least once a year" perform the

necessary adjustments according to the increase and/or reduction of the

production costs, as well as operational expenses at all levels, and to

review the price of milk purchased from the dairy farmers as well as the

price of finished fresh milk produced by the industrial process. P.R. Laws

Ann. Tit. 5 § 1107 (a)-(e). The Administrator failed to comply with his

obligation in one year, alleging a change in ownership and/or control of

Suiza. Said exception is not authorized by any statute, creating de facto a

presumption of illegality as to Suiza due to a change in stock ownership

and prejudiced the other milk processor, Tres Monjitas.

15.     ORIL has no mechanisms in place for automatic price adjustments (higher

or lower) based upon recurring production costs necessary for both the

dairy farmers and/or the fresh milk processor. (Indulac does not have their

price to the consumer regulated.) There are certain costs that are critical

and recurrent wherein the matter can be easily handled, ie.  fuel costs,

electricity cost, labor costs, resin, food, grain costs, and supplements for

the cows.

16.    There is no mechanism in place for the milk processors and dairy farmers

---

[215] Total sales of UHT in 1998 were 38.40 million quarts and in 2004, 69.93 million quarts. (Ex. 29); fresh milk had
a market of 318.50 million quarts reduced to 275.27 million quarts for 2004 (See Ex. 28-30).

to recuperate the losses on the basis of higher costs basis that occur from year to year. There is simply no regulatory accrual to recuperate interim losses that occur from one year to another. There is, therefore, no remedy to recuperate for past losses. The Administrator has made no adjustment to mitigate for the losses of the milk processors from year to year that occur either by an increase in cost or as result of a loss in market.

17. The Administrator uses stale 2003 figures of the milk processors to determine 2005-2007 costs and also to determine a reasonable process to the consumer of the finished fresh milk and to determine a reasonable profit for the industrial milk processors. Equally, in using sales to the public figures that are stale even though recent figures are available (2004 for price set in 2005), the Administrator uses said figures even though the market of sales has actually declined  in the case of fresh milk market. In using stale figures, the Administrator uses said figures and fictitiously increases the capital of the milk processors and further fictitiously considers sales that are below actual sales.[216]

18. Using stale sales figures of 2003, as was the case of the price order of April 2007, is particularly prejudicial since the volume of sales of the fresh milk processors has decreased (as is known to the Administrator) during said period by around 10%. Further, that the costs of certain critical production costs such as electricity and fuel have undoubtedly increased are matters of public knowledge[217], and are consequently readily available. (The Administrator alleges that these figures have not been provided–

---

[216] The court does not understand the use of stale sales figures since the Administrator has actual sales at least every quarter of a year.
[217] Fuel costs are regulated by the Consumer Affairs Department and electric costs are public since the electricity is provided by a public government corporation.

notwithstanding the figures are public and can be simply adopted and
applied to the 2003 figures being reiterately used by ORIL as to the two
processing plants.

The rules of cost analysis are constantly being changed from year to year,
sometimes directly in contradiction, some are added, some are eliminated, all to the
detriment of the fresh milk processors and without any notice whatsoever. The court
provides highlights.

A)    Other non-related Business– In the April 2007 price review the milk
processors profit in other non dairy markets (juices) was taken into account
as a profit for the first time notwithstanding said criteria never before
having been applied. Further, there exits a prior court final decision to the
contrary holding that profits of non regulated businesses would not be
taken into account. The legal issue for federal due process purposes is not
that there is a violation to a local judicial decision, but that this parameter
was unannounced and retroactively applied creating  due process concerns.

B)    Price Discounts– Price discounts in considerable dollar amounts have been
unchallenged by the Administrator of ORIL as to Indulac. The position of
the Administrator relating to discounts as to the fresh milk producers has
been in constant flux and outright contradiction. During the review of
2005, the Administrator bluntly denied any type of discount to agents
and/or for other promotions. Prior thereto they had been at least partially
allowed. In 2005 without making any conclusion as to any antitrust and/or
price discrimination violation the discounts were deemed "illegal." Yet in
the past the Administrator allowed some discounts yet rejected others.
Notwithstanding, similar discounts in the amount of 1.8 million dollars

were allowed to Indulac in 2006 and Indulac also claimed additional

discounts due to inventory obsolescence in 2006. In April 2007, the

Administrator surprisingly allowed discounts without stating any reasons

whatsoever. Notwithstanding, the milk processors have lost any and all

credit from the year 2005 until 2007 and have yet to have a defined

parameter.

C)      Returns of Product– During 2005 the Administrator changed the rules as to

income from sales of fresh milk. In the past, any amount of monies

genuinely proven returned to clients for the product were not counted as

income. In 2005, returns for the first time were not included as a credit and

hence total sales were fictitiously increased as milk returns were rejected

without any reasoning whatsoever. Again there was no defined parameter.

D)      Shrinkage constitutes the loss of milk inherent to any milk manufacturing

process. The principal factor causing shrinkage is temperature. For the first

time in the price order of 2005 the Administrator made a reduction in the

allowance of shrinkage factors. The Administrator alleged "historical"

factor figures as to the change. At the hearings in court the reasoning was

not proven. The low factor authorized was not proven to be "historical."

See Finding of Fact #45. The shrinkage factor claimed by the fresh milk

processors in court compares favorably with average shrinkage factors in

geographic parallel regions in the Continental United States less affected

by heat. In the year 2007 the historical factor was changed again without

providing any reasoning. Again the court notes the lack of standards and/or

of applying standards at random or not being rationally set.

E)      Plastic Container cost and professional fees.  The Administrator uses

constantly for cost analysis the lower figure presented by either of the two

plants for plastic containers and professional fees independent of the

legitimacy of either plants actual legitimate numbers.

ORIL'S disallowance as to cost of professional fees as to price regulations

without making any findings or providing reasoning seems, at best,

arbitrary.[218]

F)    Cost analysis using stale sale figures.

The use of 2003 figures and/or of long past years overstates the amount of

milk sold as the evidence provides a clear market loss by the fresh milk

producers. ORIL is hence artificially reducing the capital per quart of the

fresh milk processor (stated otherwise the capital of the milk processors is

also artificially increased since it deems sales for interim years as made and

profit realized when said calculated profit was never materialized as

wrongful sales figures are applied.) The error is simply in that actual sales

are not those reflected in past years since sales of fresh milk are decreasing

in alarming numbers. The court does not understand said use of stale

figures since ORIL has updated sales at least up to the last  quarter of the

current year.[219] The application to a certain wrongful sales figure to a rate

of return per quart lowers the capital base and results in a diminished level

of profit.

G)    Cost analysis using stale cost figures. Using stale cost figures further

breeds mischief as to the final result. As stated herein it is unquestionable

that certain critical costs have increased in Puerto Rico since 2003 as to at

---

[218]At worst it is vindictive since the determination to deny professional fees  was made after the hearings in the
instant injunctive hearing began. Anyway, there is no reasoning provided by ORIL.
[219]In fact the Administrator has updated figures as to raw fresh milk sales up to the last fifteen day monthly
liquidation of the current year. The liquidation of the last fifteen days of June 2007 is currently available.

least electricity and fuel costs. Placing outdated 2003 figures into this category will obviously yield an artificial, unfair result to the real costs of the fresh milk industrial processors, Suiza and Tres Monjitas.

H)    Rate of Return (Profit)

The rate of return is 10%, which is the average rate of return for the milk industry in the Continental United States for the year 1997. The parameter even when instituted and now questioned, is not based on any study as to where Puerto Rico fit into the 1997 national U.S. average. Further, it is now stale and fails to take into consideration the economic conditions of doing business in Puerto Rico, particularly after May 2006 when the Bonds of Puerto Rico where considerably devaluated by Moody's.[220]

FACTS PARTICULARLY CRITICAL AS TO THE CLAIM UNDER THE

DORMANT COMMERCE CLAUSE

As a preliminary matter the court reiterates an emphasis on economic reality as to this case. Indulac, the exclusive UHT manufacturer in Puerto Rico, is a public corporation now controlled by the dairy farmers as opposed to a corporation with participation by the fresh milk processors as was in the past. The FFIL is also exclusively controlled by the dairy farmers (five Board members out of nine) and is an entity dedicated to "promoting the production, sale, processing, and consumption of fresh milk and its by products and

---

[220]The court takes judicial notice of an unquestioned economic event which occurred in Puerto Rico, the devaluating of Puerto Rican Bonds by Moody's occurring in May 2006 as reprinted in internet articles describing and confirming the event. Chhetry v. U.D. Department of Justice, ___F.3d___, 2007 WL 1759472 (CA 2). ("...The BIA did not err in taking administrative notice of changed country conditions [current events] based on articles found on Yahoo.com or the web sites of CNN and BBC News") (citing Hoxhallori v. Gonzalez, 468 F.3d 179, 186 N.5 (2nd Cir. 2006).) The court has found at least three articles in the web published at USA Today.com published May 8, 2006 entitled "Puerto Rico Bond cut to near junk"; an article published at NY Times.com entitled "Puerto Rico's woes lead to Protest and fears of worsening financial Fallout" published May 8, 2008; and an article published at www.free republic.com entitled "Puerto Rico Government shut down: Bonds became junk," published on May 8, 2006, all reiterating the reality that Moody's had down graded Puerto Rico credit by degrading 4 (four) billion dollars in bonds and describing the degrading matter as a "fiscal crisis."

    Further, the matter being taken as judicial notice by the court is authorized at preliminary injunction level hearing notwithstanding its hearsay contents. Asseo v. Pan American Grain Company, Inc. Et al., 805 F.2d 23, 26 (1st Cir. 1986) ("Affidavits and other hearsay materials are often received in preliminary injunction proceedings).

any other activity for the advancement of the milk industry." P.R. Laws Ann. Tit 5 § 1099.

The dairy farmers, therefore, control both the FFIL and Indulac and can therefore create

plans to promote UHT, exclude Indulac from payments to certain programs, obligate fresh

milk to contribute by themselves for certain other programs and above all can manipulate

the price of raw milk to be paid to themselves thru Indulac, as they have actually done,

notwithstanding regulation from the Administrator.

The dairy farmers oppose allowing fresh milk processors to manufacture fluid milk

in UHT form. The dairy farmers have in the past and throughout the injunctive

proceedings attempted to purchase the fresh milk processors. The dairy farmers have

attempted to control the entire market including the milk processors, the FFIL and

Indulac. Those efforts entail the participation of officials of the Government of Puerto

Rico involved directly and indirectly in the milk industry and price setting scheme. The

more desperate the financial condition of the two fresh milk processors, the easier for the

two dairy farmers to acquire them or eliminate them. The dairy farmers thus de jure hold

the reigns of power in the industry.[221]  Under this factual scenario as to the actual power of

the dairy farmers the court sets forth the facts relative to the violation of the Dormant

Commerce Clause. (See generally Finding of Fact No. 8.)

ORIL has developed a sophisticated price scheme authorizing for years the only

UHT local manufacturer, Indulac, to purchase raw milk at well below cost production

price and reasonable profit to the dairy farmers compared to the price paid by fresh milk

producers. The below cost price established by regulation is financed by the fresh milk

processors who are obligated to pay by regulation a much higher price in order to offset

the below cost sale to the UHT milk producer. The purpose is to enable the UHT producer

to favorably compete with the UHT importers and to compete with the fresh milk

---

[221]The Administrator of ORIL was formally the Chairman of the Board of Indulac, now a Director and receives indirect compensation by the payment of the car used and other expenses for the FFIL.

processors. The deal of purchasing fresh raw milk in below cost fashion to manufacture

UHT is only available to local UHT manufacturer. The Administrator of ORIL stated at

the injunctive hearing: "Without these two Bills of Law (sic) the imported UHT milk (sic)

is going to take over the entire [UHT] market." Further, the Chief Executive Officer of

Indulac openly admitted that without the below cost price of raw milk, Indulac can not

compete with the importers. See Findings of Fact No. 26. See also Findings 40, 59, 60, 61,

and 65.  Other economic incentives have also been provided to Indulac, such as canceling

debts and discontinuing economic contributions to the FFIL, and paying even lower

amounts for other by-products of milk in order to even further lower their costs of milk in

order to be able to favorably compete with the importers.

Finally, in the House Bill 126 to the Legislative History and Declaration of

Purposes of Law No. 34, known as the Milk Industry Regulation Act, codified at P.R.

Laws Ann. Tit. 5 § 1092 et sec., the Declaration of Legislative History and Purposes states

the following as to the solution to the then chaotic critical situation of the local milk

industry relating to the importation of dairy products:

> "(1) Instrument regulation that will allow to dispose of the milk surplus in such a
> manner that, without affecting the interests of the persons engaged in the operation
> of the business in the different phases of the industry, the consumer would be
> provided dairy products that will generally substitute."

Hence, through the milk surplus program back in 1957, "the consumer would be

provided dairy products that will gradually substitute imported products." They have

evidently complied and set forth the program by over-providing to Indulac, the purchaser

of the excess milk, with a program of incentives and economic relief. The regulation now

adds purchase of cheap raw milk designed to fight the importers and now fifty years later

to be an aggressive competitor of the two plants taking considerable part of the market to

the point of enabling the purchase of the two plants at less than their economic value.

The Administrator has not instituted a neutral program as to a classified pricing

system to compete with the importers, but rather an aggressive program in direct violation

to the Milk Industry Regulation Act to provide undue advantage to the local

manufacturers over importers and to be to curtail the fresh milk market and increase its

UHT market.

JUSTICIABILITY

Before entering on the merits the court deems appropriate to dispose of potential

justiciability doctrines resulting from the interpretation of Article II, §2, of the United

States Constitution as to "cases" and "controversies." The United States Supreme Court in

the past has reiterately stated that the justiciability requirement as to "case" and

"controversy" imposes substantial constitutional limits on the federal judicial system.

Further, other justiciability requirements are derived not from the Constitution but from

prudent judicial administration. These last doctrines are turned "prudential." The

prudential requirements are self-imposed by the Supreme Court and may be overriden by

Congress.  Warth v. Seldin, 422 U.S. 490, 501 (1975) (Congress may grant an express

right of action to persons who otherwise would be barred by prudential standing rules).

These principles are related to justiciability. First, the justiciability doctrine is related to

separation of powers. Flast v. Cohen, 392 U.S. 83, 95; 88 S. Ct. 1942 (1968). Second, the

doctrine of justiciability serves to "conserve judicial resources."  Federal Jurisdiction,

Erwin Chemerisnky, 4th Edition Aspen Press. 2003, p. 45. Third, the doctrines of

justiciability are geared to impose judicial resolution making by providing "the federal

courts with concrete controversies best suited for judicial resolution." Id., p. 46. See also

Flast v. Cohen, 392 U.S. at 75. This principle ensures that concrete controversies and

proper litigants are before the court. Baker v. Carr, 369 U.S. 186, 204 (1962). Finally, the

justiciability doctrine presents "fairness especially to litigants that are not properly before

the court." Chemerinsky, p. 46.

The court has paused to examine the prudential doctrines' requirements since there exists a challenge of defendant specially as to "standing," particularly as to the Dormant Commerce Clause cause of action claimed by plaintiffs.

The case is obviously ripe since the regulations challenged, in an applied fashion by plaintiff, are in effect. Some had been in place since years prior to the challenge, others were enacted prior to the filing, and others enacted and applied after the case began, and finally others have been established after the close of the hearings. The application of the regulation, hence, is a final decision of the regulatory agency and is ripe for a challenge under the Due Process, Equal Protection and Takings Fifth Amendment Clauses and/or the Just Compensation Clause. Williamson County Regional Planning Com'n v. Hamilton Bank, 473 U.S. 172, 186, 105 S.Ct. 3116 (1985) ("a claim that the application of government regulations effects a taking of property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulation.") The quoted threshold has been met in the instant case.

Plaintiffs have obvious standing to challenge the regulations issued by ORIL since a price is set to them as milk processors as to the purchase of raw milk from the farmer. Further, a price of sale to the consumer is established resulting from the challenged regulations. Hence, the court must conclude as to the Due Process, Equal Protection and Taking Clause challenge that plaintiffs have standing under  Baker v. Carr, 369 U.S. at 204-208.

There is, further, a challenge under the Burford[222] abstention doctrine. However, Burford does not apply "when the effect of an entire state regulatory scheme is challenged as unconstitutional." Tenoco Oil Company v. Department of Consumer Affairs, 876 F.2d

---

[222]Burford v. Sun Oil Co., 319 U.S. 315, 63 S. Ct. 1098 (1943).

1013, 1029 N. 23 (1st Cir. 1989). The court understands that this boundary has been met as

plaintiffs are challenging the price paid to the consumer; the parameters used by the

Commissioner, the change in parameters, the use of stale figures, the lack of regulatory

accrual to recuperate interim losses; the low price of raw milk paid by UHT manufacturer,

Indulac, all financed by the milk processors; the use of a fair return rate figure to the milk

processors set forth in 1997 from an average United States Continental figure applicable

to the Puerto Rican market in 2005-2007.

Plaintiffs are hence challenging the entire regulatory scheme as applied and hence

there is no Burford abstention as counseled by the First Circuit Court in Tenoco Oil, Id.


**APPLICABLE LAW AN DISCUSSION**

A.      **Due Process, Equal Protection and Taking Clauses**.

*Due Process and Equal Protection Clauses*

The Due Process, Equal Protection and Taking Clauses unquestionably apply to

Puerto Rico.  Tenoco Oil Company, Inc. v. Department of Consumer Affairs, et al.,

876 F.2d at 1017 n.9.  In Tenoco, the plaintiffs alleged that the orders issued by the

Secretary of the Department of Consumer Affairs regulating the gasoline prices violated

constitutional and statutory provisions of Puerto Rico law, as well as the due process and

taking clauses of the United States Constitution.  The Court of Appeals stated as follows:

> The Supreme Court has held that one or another or both of
> the Constitution's two due process clauses (that in the Fifth
> Amendment and that in the Fourteenth) apply to Puerto Rico
> even though the latter is not a state.  Calero-Toledo v.
> Pearson Yacht Leasing Co., 416 U.S. 663, 668-69 n.5,
> 94 S.Ct. 2080, 2084-85 n. 5, 40 L.Ed.2d 452 (1974).
>
> The Supreme Court has not ruled definitely on the
> application to Puerto Rico of the takings clause of the Fifth
> Amendment, which provides that "private property [shall
> not] be taken for public use without just compensation,"
> U.S. Const., Amend. 5.  But see Webb's Fabulous

> Pharmacies v. Beckwith, 449 U.S. 155, 159, 101 S.Ct. 446,
> 449-50, 66 L.Ed.2d 358 (1980) ("takings" clause
> incorporated into the Fourteenth Amendment, applicable to
> the states). We have no doubt, however, that the takings
> clause, like the due process and equal protection clauses,
> applies to the Commonwealth of Puerto Rico. See, e.g.,
> Culebras Enterprises Corp. v. Rivera Ríos, 813 F.2d 506
> (1st Cir. 1987) (assuming applicability). See generally
> J.R. Torruella, The Supreme Court and Puerto Rico: The
> Doctrine of Separate and Unequal (1985).

Tenoco Oil Co., 876 F.2d at 1017, n. 9.

As to the question of whether the gasoline prices regulation [milk price regulation]

being challenged violates the takings and due process clauses, the appellate court held that

"[a] regulation takes property without due process of law only if "arbitrary,

discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt ..."

Tenoco Oil Co., 876 F.2d at 1021 (citing Pennell v. City of San José, 485 U.S. 1,

108 S.Ct. 849, 857, 67 L.Ed.2d 1 (1988) (quoting Permian Basin Area Rate Cases,

390 U.S. 747, 769-70, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968) (quoting Nebbia v.

New York, 291 U.S. 502, 539, 54 S.Ct. 505, 516-17, 78 L.Ed. 940 (1934). The regulation

will stand if a rational relationship exists between it and a legitimate governmental

objective. Tenoco Oil Co., 876 F.2d at 1021; Nebbia, 291 U.S. at 537, 54 S.Ct. at 516.

See also PFZ Props. Inc. v. Rodríguez, 928 F. 2d 28, 31-32 (1st Cir. 1991).


A similar analysis governs regulatory classifications under the Equal Protection

Clause. Medeiros v. Vincent, 431 F. 3d. 25, 32-33 (1st Cir. 2005) (citing Eastern

Enterprises v. Chater, 110 F. 3d 150, 159 (1st Cir. 1997)) ("[A] court must apply

substantially the same [rational basis] analysis to both substantive due process and equal

protection challenges"). To meet the constitutional requirements, a regulation must

rationally pursue a legitimate governmental interest. The government, however, cannot

pursue its interest(s) in an arbitrary manner.

In the instant case, the milk regulatory scheme appears to be defective, as it only purports to pursue a legitimate state interest without first establishing a rational nexus between the basis for the regulation and the governmental legitimate interest. As stated above, the enacted regulations are primarily relevant to a policy that ORIL was indeed impaired to pursue. The ultimate result, however, is two-fold as the regulatory scheme has an adverse impact on plaintiffs, the milk industry and the consumer.

The milk regulatory scheme has forced plaintiffs to "subsidize" now a strong competitor, Indulac, by providing this governmental entity a distinct edge over its mainland competitors in the market of the UHT milk to benefit those in control of Indulac, that is, the dairy farmers. The regulatory scheme provides UHT a significant advantage by granting Indulac the right to purchase the raw milk below the cost of the dairy farmers to compete against the **fresh milk producers**, and the evidence reveals a high market increase by UHT and a declining market obtained at least partially by the low cost of pricing the raw milk. Further, the farmers also obtain the purchase of all within quota of their dairy production, and most critically have expressed their continued interest in purchasing the fresh milk processors. The economic value of milk processors is in continued decline resulting at least partially from the increased UHT market created by the purchase of financed low priced raw milk by the milk processors who are forced to pay higher prices to the dairy farmers to offset the low price paid by Indulac.

The Court notes, however, that the current subsidy program also serves a local or state interest, as it eliminates the cost advantages of the out-of-state producers in a potential violation of the Dormant Commerce Clause.

Puerto Rico, as many other jurisdictions in the United States, has a legitimate state interest in promoting the local milk industry and the consumption of derivative milk products produced locally. Puerto Rico also has a legitimate interest in protecting the

employment opportunities created by both the dairy farmers and the processing sectors of the milk industry. However, the state must pursue this legitimate interest within the boundaries set forth by the Equal Protection, Due Process and Takings Clauses, as well as the Dormant Commerce Clause, which are all fully applicable to Puerto Rico. A discussion on the applicability of the dormant Commerce Clause to Puerto Rico is discussed under a separate sub-title.

As stated above, the Government of Puerto Rico has a legitimate interest in promoting the consumption of fresh milk, particularly the milk that is locally produced. The FFIL, a governmental entity existing to promote the fresh milk consumption, has confirmed that fresh milk is healthier that the UHT milk. However, it appears that there is no rational nexus between the current milk regulatory pricing scheme of raw milk and the alleged governmental legitimate interest being pursued, as the pricing regulation clearly favors Indulac, the sole processor of UHT milk, and the purchase of subsidized low priced raw milk dwindles at least partially a considerable part of the milk market from the fresh milk processors.

The core of the Puerto Rico milk regulatory pricing scheme is the fixed price of raw milk, which is currently below the production cost, and it is fully controlled and regulated by the defendants, in order to subsidize Indulac, who is an exclusive local UHT milk market participant, and who also is an entity created by the government. As it stands, Indulac is allowed to pay a fixed price below the production cost for the raw milk it uses to produce the UHT milk, in order to compete in the fluid milk market in Puerto Rico, and compete with the UHT importers, their principal competitors. To prevent the dairy farmer from being affected by the low price, the plaintiffs, that is, the fresh milk processors, are required to pay an unreasonable high amount of money, more than double, to allow the dairy farmer to recuperate insufficient costs and make a profit not paid by

Indulac. Hence, the price is inflated to the manufacturers of processed milk, and

contrariwise sold below cost to Indulac. This scenario causes UHT to increase its market

share at the expense of the fresh milk processors. Further, the dairy farmers who control

the FFIL and Indulac have openly admitted their desire to purchase plaintiffs' business.

Indulac's principal product is the UHT milk, which is not currently regulated.

Indulac, however, is a participant in the regulated fluid milk market of Puerto Rico that

obtains the raw material at a subsidized below production cost, and has virtually no

restrictions in the free market competition of fluid milk, and it is not affected by the

government's milk pricing scheme. Except that through the challenged regulation,

Indulac is able to purchase its principal raw material at an inexpensive price.

The court harbors serious constitutional doubts as to the methodology used by

ORIL in seeking to arrive at just compensation. The court briefly explains.

The use of cost and operation expenses used by ORIL. ORIL used 2003 figures as

to cost and operational figures where figures were available as to at least half the year of

2004. The stale figures were used in establishing the 2005 pricing regulation as well as the

2006 and the February 2007 pricing regulation wherein the Administrator continued to use

the economic figures of 2003. The Court of Appeals in <u>Tenoco Oil Co.</u>, 876 F.2d 1013,

clearly contraindicated the use of stale figures being used by the Consumer Affairs

Department in the establishment of both the "reasonable operational costs" and a "fair

return" of the fuel industry. The court stated the following:

> By1986, the 8.6¢ figure, last used by federal authorities in 1981, was five years
> old. The federal regulator has regularly used then current nationwide economic
> data to update their margins, the 8.6¢ figure in 1981 being the most recent product
> of such efforts. That a figure devised in 1981 for regulating gasoline wholesaler
> prices throughout the United States and Puerto Rico (taken as a whole) would still
> be the right one for regulating prices in 1986 in *Puerto Rico alone* is by no means
> obvious. **One would have expected the agency to be able to support such an**
> **essential figure by specific economic data projecting the wholesalers'**
> **reasonable operating costs and a fair return or investment for the year in**
> **question, 1986**. (Emphasis ours.)

In the instant case the use of stale figures for establishing the reasonable
operational cost and expenses of the milk processors for 2005, 2006[223] and 2007 figures
for 2003 were used when 2004 figures were available. The court opines that said
regulatory procedure is clearly "arbitrary" within the due process mandate cited at <u>Tenoco</u>
<u>Oil</u>, 876 F.2d at 1024. Using stale sales figures of the year 2003 as was the case of the
2005, 2006, and 2007 order is particularly prejudicial since the volume of sales of the milk
processors is constantly diminishing and said figure is well known by ORIL. During said
period the volume of sale of fresh milk was reduced by more than 10%. The use of stale
figures further creates a loss in the capital of the manufacturing milk processing plants[224].
As stated above, the use of said stale figures are particularly prejudicial since the use of by
ORIL of said figures provides a fictional figure of income and of capital to the two plants
given that  the volume is clearly fictional as the true sales are diminishing, causing a
fictitious credit for the plants in the establishment of the reasonable final profit number of
the two manufacturing plants. The reiterated use of fictional, stale, economic figures as to
sales volume for the annual price regulation reviews of 2005, 2006, and 2007 constitutes
an arbitrary determination in violation of due process. <u>Tenoco Oil</u>, 876 F.2d at 1013.

Further, in the year 2005, for the first time, the Administrator adjusted the income
in sales by refusing to accept, as in the past was unquestioned, a credit for bonafide
returns of milk to the milk process manufacturers. This action created again an artificially
higher volume of sales producing an artificial income, another erratic credit within the
formula. The problem constitutes not only in an error against the milk processors but also
a due process violation in that the change was unannounced and provided no reason or
justification for the alteration in the method of calculating sales. Again the determination

---

[223]The price to purchase raw milk from the dairy farmers for the two fresh milk producers in 2006 remained the same
at .66125. The price to purchase raw milk by Indulac was reduced to .32 per quart of raw milk.
[224]The fictional profit, of course, alters in turn the reasonable return of capital since ORIL determines the capital
base, divides by the number of quarts sold and obtains the capital per quart of milk sold.

creates a fiction in the income of the plants as the bonafide credit provided to the

consumer or the retailer means that there exists a real unrecognized loss in total sales

volumes and income derived therefrom. (No finding was made by the Administrator that

the returns were not genuine.) This change in methodology, producing a fictitious higher

volume of sales and income, is deemed capricious and arbitrary[225] and banned under

Tenoco Oil. Id.

Similarly the rules of the regulation are in constant flux and outright contradiction

as to allowances for discounts. Prior to the 2005, certain discounts were allowed, partially

allowed at random, but no set known parameter was apparent. However, in 2005 **all**

discounts were disallowed as to agents and/or other promotions. In 2005 without

making any conclusion of facts and/or any antitrust determination or price discrimination

the Administrator banned **all** discounts claimed by the fresh milk processors terming the

discounts as "illegal." Notwithstanding, similar discounts were being authorized to

Indulac, a competitor in 2006, in the amount of 1.8 million dollars and separately and

quietly accepting them as to Indulac due to inventory obsolescence. In the 2007 regulatory

review, ORIL authorized discounts from the two plants. No reason was provided.

Notwithstanding, the 2005 and 2006 reviews incurred in the error of not allowing

discounts, yet the competitor Indulac was allowed discounts corroborated at least as to the

review of 2006. Again the regulatory procedure is "arbitrary" in violation of due process

requirements under Tenoco Oil, Id. As to this particular parameter the methodology of

ORIL is also "discriminatory" as to a violation of Equal Protection (competitors not being

treated equally by the regulator). Medeiros v. Vincent, 431 F.3d at 29.

As stated prior thereto in this order, the Administrator has changed the parameters

as to the allowance of loss related to the shrinkage factor in the production of fresh milk.

---

[225]The court notes a proclivity of ORIL to changes the rules of the regulation against the plaintiffs almost as if the
regulator needed to arrive at a final predetermined price determined through unannounced changes without providing
any reasons for the change in parameters.

This factor is mostly determined by the temperature of geographic regional area wherein the fresh milk is processed. For the first time, at the regulation process of 2005, the Administrator lowered the shrinkage factor alleging a "historical" factor; plaintiffs proved otherwise in unrebutted fashion. The shrinkage factor was lowered in the regulatory review of 2005 to 0.0075 which used a lower factor that had never been applied. No reason was provided; only a fictional "historic" reason was provided. The Administrator failed to prove that a study on shrinkage had been performed. The shrinkage factor claimed by plaintiff is favorable compared to shrinkage in parallel regions in the Continental United Stated less affected by temperature. In the 2007 regulatory revision the "historically" applied factor changed to 0.0088. Again no explanation was provided. Notwithstanding, the price reviews of 2005 and 2006 were made with yet another parameter changed and lowered causing prejudice to plaintiffs without any explanation from ORIL. Again the court must conclude an arbitrary determination in violation of due process.[226]

The cost of plastic containers and professional fees should have been accepted in the normal cause of examination as production costs of the final product delivered to the consumer (plastic containers/caps) as well the operational costs of professional fees. Notwithstanding, the administrator used the lowest figure as to each cost item of each individual plant. ORIL had no evidence that Suiza was overpaying plastics nor that there was overpayment by Tres Monjitas as to professional fees. In this particular case the conduct seems to the court irrational and not justified without making particular findings as to inflated costs by either plant. The same occurred with expert fees as to rate regulation proceedings required by law carried on by ORIL. P.R. Laws Ann. Tit 5 § 1107(e) (rate reviews "once a year" and market analysis "at least every four years)." The

---

[226] Curiously at the hearing of June 30, 2006 it was admitted that the shrinkage factor of Indulac was 8% and that of the plants was around 1%– Tr. June 30, 2006, p. 55-57. The Administrator of ORIL made a similar admission at the hearing of May 8, 2006, p. 116-119 stating the shrinkage factor of Indulac at 8%.

Administrator denied this operational expense notwithstanding the necessity of both plants to be prepared with economic, marketing and legal experts to present their interest before ORIL. See generally <u>Driscoll v Edison Light & Power Co.</u>, 307 U.S. at 120-121 (allowing professional expenses as operational costs as well as expert fees.). Said action by ORIL is arbitrary[227] under the doctrines of <u>Tenoco Oil</u>, 876 F.2d 1021.

The rate of return of capital has been incorrectly determined by ORIL by using stale figures. ORIL uses the 1997 Continental national average to determine "fair return rates or investment" of 2005, 2006, 2007. However, there is no study of the local market to determine how Puerto Rico "fits" into the national average. Second and most critical, a study of 1997 is being used to determine reasonable rate of returns in 2005, 2006, 2007. The Court of Appeals clearly counseled as to the use of stale statistics in rigorously regulated markets:

> "One would have expected the agency to be able to support such an essential figure [devised in 1981] by specific economic data projecting the wholesalers' reasonable operating costs and a fair return of investment **for the year in question**, 1986." <u>Tenoco Oil</u>, 876 F.2d at 1024.

The message is quite clear– the regulating administrative agencies may not use stale figures and/or economic studies that are clearly not current. Again the court must find that the fair return or investment rate established at 10% is clearly arbitrary on two grounds, stale and lack of nexus between the Continental average and Puerto Rico in the sense that it is unknown where Puerto Rico "fits" within the national average. Finally, in this particular era wherein price of electricity and fuel has undoubtedly raised pursuant to public figures maintained by the Consumer Affairs Department and the government controlled Electric Power Agency and after the significant devaluation of Puerto Rican Government Bonds, the market of Puerto Rico must be thoroughly analyzed to determine

---

[227] Again the court does not understand the refusal to accept professional fees and/or the retaining of experts as part of operational cost which is traditionally accepted in the price regulation scheme. The specter of a predetermined result raises as these types of traditional operational cost previously unquestioned are unexpectedly denied without any finding whatsoever.

the real costs of doing business in Puerto Rico and the economic realities of doing

business in the island in 2007 rather than merely applying average rates of return of 1997

in the Continental United States. The use of fuel and electricity costs dating back to 2003

suffers equal infirmity as the use of 1997 figures of rate of return applied to 2005-2007

price regulations.. Again the court must conclude that the "reasonable rate of return or

investment" set forth by ORIL is "arbitrary" for the reasons set forth herein.[228]

The law requires ORIL to at least "once a year" review the price regulations.

However, there is no regulatory accrual for losses from one year to another. That is losses

that occur from one year to another are not accrued allowing for the loss incurred in a past

year in a regulated market to be recuperated. A loss to the processing plants is imbued in

the pricing system by the decrease in sales of fresh milk from year to year;

notwithstanding yet the regulator uses past years sales which are higher than actual sales.

The same occurs with electricity, fuel costs that have undoubtedly increased in the last

four years but ORIL uses 2003 figures. The Administrator makes no provisions and takes

no measures to offset the loss.[229] The Administrator further refused to comply with

holding yearly reviews as to prices for a year in which that was a change in control of

Suiza. No statutory allowance is provided for said exception. In fact a change of

ownership amounted to an unwarranted de facto determination of an illegal act by mere

change of control in ownership which is, of course, plainly in error under any corporate

law standards. The change of ownership of Suiza prejudiced and punished Tres Monjitas,

a separately owned milk processor company. Further in the order of 2007, the rules were

substantively changed  for the first time to consider as income of the two plants income

---

[228]The companies suggested a rate of return or investment similar to the rate of return granted by the Consumer
Affairs Department of Puerto Rico recently to the fuel wholesalers of 15.81%. However, the court does not hint as to
the appropriate standard; the court does not sit as a super-administrator to set the standards.

[229]The court has strongly suggested that as to increases in fuel, electricity, certain raw materials, dairy supplements
and foods for the agricultural herds, ORIL set forth a system of rapid/automatic increases/decreases be established
though accelerated procedures similar to that established by the Consumer Affairs Department in the regulation of
the cement industry in the early 1970's. This matter is, however, purely discretional but which may avoid further
constitutional challenges on these grounds.

derived from other non regulated business as is the case of the sale of juices. Up to said date by virtue of a final court order, unregulated business income was not to be counted, be it loss or profit. Again the court notes a change in the regulating parameters. The federal constitutional deficiency is not the open violation to a final court Commonwealth order but to the establishment of a new parameter without any prior notice to the plants and showing no nexus with the regulated dairy industry.[230] The court concludes that all parameters/criteria discussed in this paragraph taken as a whole are deemed "arbitrary" in violation of due process.[231]

Finally and most critical the court tackles the thorny issue of Indulac being regulated exclusively to receive a price which is currently less than one half of the price of the cost of the dairy farmers. The price is financed by the fresh milk processors who pay more than the price deemed reasonable by the Administrator. The cost plus fair return rate of the dairy farmers was last established at 55cents per quart of milk. The actual price of a quart of milk paid by Indulac is 26-1/2 cents as calculated by Suiza.[232] Further, the cost of 26-1/2 per quart for purchase by Indulac as compared to around 65 cents per quart being paid by Suiza (counting the credit granted to Suiza to purchase raw milk for powdered milk production), the difference in price is substantial and prima facie discriminatory if considered that Indulac is now a strong competitor in the market and is no longer a mere "balancing plant" to purchase the surplus milk not used by the fresh milk processors. The

---

[230]This is yet another parameter-altered change providing the impression that a net result is originally sought and later the parameters are added/subtracted to justify the net result.

[231]The court is aware that the Legislature has placed the Administrator of ORIL in a difficult, potentially conflicting situation of wearing two hats. On the one hand he regulates the industry including the price scheme favoring the purchase of un-expensive raw milk by Indulac. On the other hand the Administrator sits in the Board of Directors of Indulac, a regulated party. A chamber of horrors factual scenario can very well occur. On the one hand the Administrator establishes one day a price for raw milk for Indulac to be purchased from the dairy farmers and within the next few days he sits as a Board of Director to approve Indulac's action, as they have done, to unilaterally increase the price paid by Indulac to the dairy farmers although said unilateral conduct may be against the law. P.R. Laws Ann. Tit. 5 § 1111(Unfair business practices; disrruption of the market– prohibiting in the regulated market undermining the prices set of raw milk by the Administrator; prohibiting in the regulated marked reduction in prices in any distribution medium.

[232]Even if the price is only 32 cents without taking into account the recent reduction of April 5, 2007 for raw milk used for cheese, powdered milk, evaporated milk production was allowed to be purchased at 20 cents and 12 cents for the last two productions, the final below cost payment is substantial.

current regulation requires the milk produced within quota to be purchased by Indulac. Fresh milk processors pay at .66125 (except powdered milk); Indulac pays 0.32 except for raw milk purchased for the production of cheese, evaporated milk and powdered milk (totaling 0.26 -1/2 for all purchases of raw milk). The milk processors purchase most of the milk; Indulac purchase the excess.[233]

Armed with a low cost of raw milk Indulac has increased their share of the general milk market from 38.40 million quarts in 1998 to 69.93 million quarts (increase of 82%) (Ex. 29) and on the other hand the fresh milk market has declined from 318.50 million quarts in 1998 to 275.27 million quarts in 2004 (Ex. 28-30)(14% decrease). Further and most critical the dairy farmers in control of both the FFIL and Indulac have expressed, even throughout the period of the injunctive hearing, a desire to purchase the two fresh milk industrial plants. The court notes the obvious, the lower the market sales of the fresh milk plants and the higher the market of Indulac, controlled by the dairy farmers, the lower the economic value of the two plants enabling a cheaper price for the purchase. Further the gains in the market of Indulac are undoubtedly caused at least partially by the purchase of raw milk at extremely low prices.

However, the court finds that the elimination of the fresh milk processors is contraindicated by various sections of the law of the enabling law. The court explains.

Article §16 of Act 34 known as The Milk Industry Act of June 11 of 1957 codified at P.R. Laws Ann. Tit. 5 § 1092 particularly at § 1107(b) states the following:

(B) In determining the limit of the regulation of the industry, the Administrator shall take into account the needs and interests of the different sectors within the industry so that any measure adopted will tend to stabilize and stimulate the progress in the production and marketing of milk and its byproducts and therefore

---

[233] As a result in the continued loss of the FFIL Capital fund discussed supra at the Findings of Fact section of this Opinion and Order the over quota milk produced by the dairy farmers is no longer liquidated at 100% of the quota. Recently the first 5% of the quota assigned is also not liquidated. Order of Jan. 3, 2006 (Docket No. 446, Order at Addendum #10). Further, FFIL now liquidates pursuant to recent order of June 13, 2007 as follows– 5% within quota not liquidated; thereafter 10% within quota liquidated at 30 cents; 20% within quota liquidated at 50 cents; 70% within quota liquidated at 70 cents. See Order at Docket No. 474, Addendum #3).

further the prosperity of the industry.

This particular section emphasizes that the regulation of the industry is geared to "stabilize and stimulate the progress and marketing of milk and its by products" and "therefore further the **prosperity of the industry**"as opposed to one section of the industry or one particular party of the industry.

Further, at Subsection (e) the law mandates the following:

. . .He shall, likewise, make thorough economic studies, at least every four (4) years, for the purpose of revising and keeping the price of fresh milk within a reasonable and equitable margin for the different sectors within the industry, that is, producers, processors, distributors of the product and consumers in general.

This section in particular requires that every four years a thorough economic study be made by the Administrator of the "fresh milk" to provide a "reasonable and equitable margin for **the different sectors within the industry** that is the producers (dairy farmers); processors (fresh milk as well as UHT processors); distributors . . . and consumers . . ." The court notes that the protected market is fresh milk considering equitable margins to all within the industry including the dairy farmers and the processors.

The court finds nowhere within the law a purpose of eliminating the milk processors through purchase of the dairy farmer or of creating an absolute control of the entire industry by the dairy farmers. To the contrary the protection offered by the mandate of the law is to all the industry as opposed to a particular section.

Further, Legislative History and Declaration of Purposes of the law narrates  the purposes of the law.

"To regulate the dairy industry and provide for the creation of a Fund for its development; to create the Office of the Administrator of the Regulation of the Dairy Industry, determine its power and to empower it to regulate said industry; to create a Consultive Board; to establish penalties for violations to this law; to derogate Law No. 106 of June 28, 1956 and to validate the official actions pursuant to said statute and for other purposes.

LEGISLATIVE HISTORY AND DECLARATION OF PURPOSES

In the middle of last year, the Special Committee created by Resolution Number 77 of the Senate conducted a study on the production, manufacture and distribution of milk in Puerto Rico. The study revealed that the dairy industry was in crisis: a chaotic situation affected the consumers, producers and manufacturers of milk due to the deficient commercial relations that existed among the manufacturers themselves and between them and the producers.

The detailed investigation performed and the testimonies rendered by the persons who attended the public hearings held by the Special Senate Committee served as a reasonable basis to reach conclusions to the effect that: there existed a chaotic situation in the dairy industry due to the interests in conflict among the manufacturers themselves and between them and the producers, the efforts of the producers and the manufacturers to resolve the chaos had been unsuccessful because they had not been able to reach an agreement, if said situation continued a collapse would occur in this important industry in detriment to the health and economy of the country, the factory for the manufacture of surplus established by the manufacturers and products had not been able to function well due to the conflict between the producers and the manufacturers, there had been an enormous amount of milk destroyed at said factory for which there is a potential market in Puerto Rico since the average consumption of milk in the country is less than 50 percent of what is advisable, and despite the increase registered in the production of milk and of the surplus that was wasted, the consumer price remains static or tends to increase.

All of the interested parties that concurred to the hearings held by the Special Senatorial Committee -producers, manufacturers and consumers- requested that the Government create an organism that would regulate the relations between the parties in order to establish the definite basis for the development and the stability of the dairy industry, and to seek a way to better distribute and market the main product and it by-products.

In view of this evidence presented at the public hearings referred to above, the report of the Special Senatorial Committee recommended the creation of a regulatory body for the dairy industry and that it be given powers, among others, to: (1) instrument regulations that will allow to dispose of the milk surplus in such a manner that, without affecting the interests of the persons engaged in operating businesses in the different phases of the industry, the consumer would be provided dairy products that will gradually substitute imported products, (2) organize educational campaigns geared to increasing the consumption of fresh milk, (3) organize the elaboration, distribution and marketing of fresh milk, instrumenting a better distribution that will consider the best methods to reduce costs.

In attention to the recommendations of the Special Senatorial Committee, and due to the grave crisis that exists in the dairy industry, the Office of the Administrator of the Regulation of the Dairy Industry was created. This organism was granted ample power to create regulations to adequately resolve the chaotic situation which the dairy industry was experiencing.

The Legislative Assembly through this law clarifies and ratifies its original intention with regard to the regulation of the dairy industry. In this manner the

Legislative Assembly wishes to emphasize its intention that the State, in the exercise of its police power and for the purpose of promoting the general welfare, intervene directly with the dairy industry, so that through adequate regulations it will be able to straighten its course so that the public interest will be adequately served through the greatest production of milk and pure dairy products by a vigorous, sound and progressive industry that operates efficiently and that can offer milk and dairy products to the consumer at fair and reasonable prices.

It is evident that the disagreements of today existed fifty years ago in 1957 between dairy farmers and fresh milk processors[234]; a collapse of the milk industry was very near; the problem of excess milk and the disposal thereof was one of the disagreements between dairy farmers and fresh milk processors (as it is today). All agreed that principal commodity to be protected was the fresh milk and all further agreed that the solution to the problem was to develop a method to handle excess milk "without affecting the interest of the persons engaged in guiding business."  The solution contemplated was not to hurt any of the entities within the milk industry. Obviously, the solution is not hurting a party by a regulation wherein the price of milk is lowered for one of the competitor, to the point of being purchased by a competitor, or by one of the members of the industry, as is occurring in the instant case. Further, the elimination of one of the key players of the industry purchased by another or a de facto monopoly of the industry to one of the parties within the industry was not contemplated and in fact was contraindicated by the express language of "without affecting the interest" to the entities at "engaged in operating the business." The different price scheme favoring one of the parties is discriminatory, against public policy and hence irrational.

The court must, therefore, conclude that the elimination of one of the components of the industry is "demonstrably irrelevant to the policy the Legislature is free to adopt." Tenoco Oil Co., 876 F.2d at 1024. Hence, the court must strike the policy of establishing

---

[234] The Supreme Court of the United States has recognized the control of local dairy industry by dairy farmers and the potential clashes with the milk processors, together with the "political effectiveness of the local dairy farmers."  See West Lynn Creamery v. Healy, 512 U.S. 186 (1994) N. 22, citing G. Miller "The Industrial organization of Political Production," 149 Journal of Institutional and Theoretic Economics 769 (1993)."

the discriminatory practice of purchasing raw milk by Indulac at below cost numbers of

the dairy farmers as compared to over cost payment by the milk processors. Said practice

is prohibited by this court in any subsequent order of the Administrator of ORIL.

The current milk pricing scheme, however, has contributed to a continuous

decrease in the demand for fresh milk and in the economic resources available to satisfy

the demands of the milk industry.  The alarming increase in the liquidation deficits and the

FFIL's inability of payment in the last liquidations clearly show that there is not enough

money available to pay the dairy farmers, hence, a clear proof of a decadent market.   In

sum, as the demand for fresh milk decreases, the larger the amount of surplus milk, which

translates in less money available for compensation to the daily farmer.  Thus, the Court is

forced to conclude that the milk pricing scheme is not sustainable, as the nexus between

the government's legitimate interest and the rationality of the regulation to pursue this

interest is lacking.

### *The Takings Clause*

The First Circuit, as well as other circuits, have clearly established that an

economic regulation may be irrational enough in its enforcement, as to violate the Due

Process and Equal Protection Clauses, also resulting in violation of the Takings Clause.

Tenoco Oil Co., 876 F.2d at 1026-1027.  "A price regulation which forces wholesalers to

sell gasoline for a price which does not cover operating costs and a reasonable profit may,

in short order, become so onerous that the wholesalers will be unable ever to recover their

earlier cumulative losses through subsequent price increases and may be forced out of

business."  Id.

In Duquesne Light Company v. Barasch, 488 U.S. 299, 307 (1989), the

Court held:

> The guiding principle has been that the Constitution protects
> [regulated businesses] from being limited to a charge for

their property serving the public which is so "unjust" as to be confiscatory. <u>Covington & Lexington Turnpike Road Co. v. Sandford</u>, 164 U.S. 578, 597 (1896) (A rate is too low if it is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and in so doing "practically deprive[s] the owner of property without due process of law"); <u>Federal Power Commission v. Natural Gas Pipeline Co. Of America</u>, 315 U.S. 575, 585 (1942) ("By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense"); <u>Federal Power Commission v. Texaco Inc.</u>, 417 U.S. 380, 391-392 (1974) ("All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level"). **If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments. As has been observed, however, "[h]ow such compensation may be ascertained, and what are the necessary elements in such an inquiry, will always be an embarrassing question."** <u>Smyth v. Ames</u>, 169 U.S. 466, 546 (1898). <u>See also</u> <u>Permian Basin Area Rate Cases</u>, 390 U.S. at 790 ("[N]either law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders"). (Emphasis ours).

The analysis of whether confiscation or a taking of property in a regulated market has actually occurred cannot be done in a vacuum. After all, "… the impact of certain rates can only be evaluated in the context of the system under which they are imposed." <u>Id.</u> In this context, the court "must examine the manner in which the [agency] has employed the methods of regulation which it has itself selected…" <u>Permian Basin</u>, 390 U.S. 747, 792 (1968).

ORIL has lacked stability in the use of regulatory standards for the determination of allowable costs and reasonable prices, which provides the Administrator unlimited discretion to arbitrarily allow and disallow costs and change the rules applicable to operating and costs' expenses at will, in order to keep milk prices low, while forcing the fresh milk processors to pay the excessively high price for raw milk to subsidize Indulac. ORIL's "decision to arbitrarily switch back and forth between methodologies" to achieve

that result raises "serious constitutional questions." Duquesne, 488 U.S. at 315. The lack

of regulatory rules has been the instrument through which plaintiffs have been denied the

recovery of their costs, as well as a "fair profit" in their fresh milk business.[235]

In a pricing scheme, the expenses may be disallowed provided that an abuse of

discretion on the part of the regulated corporation is established. State of Missouri ex rel.

Southwestern Bell Telephone Co. v. Public Service Commission of Missouri, 262 U.S.

276, 289 (1923). A presumption of correctness favors the books of a public service

corporation. West Ohio Gas Company v. Public Utility Commission of Ohio (#1), 294

U.S. 63, 68 (1935). Thus, the expenses are presumed to be incurred in good faith. West

Ohio Gas Company, 294 U.S. at 72; State of Missouri, 262 U.S. at 288-289. These legal

principals are particularly applicable to the instant case, as to the cost of plastic

containers; professional and expert fees necessary for annual review; discounts to agents

and promotions; shrinkage factors; returned milk, and other criteria not well handled by

ORIL as previously discussed herein.

The Court finds that ORIL has failed to follow these principles and has

intentionally squeezed plaintiffs between the cap of a fixed regulated price and an

irrational high price for raw milk. ORIL has intentionally issued this administrative

measure in order to protect Indulac in the competition with the local fresh milk industry

---

[235] There is really no comparison between the situation of plaintiffs here and that of plaintiffs in Duquesne Light Co. v. Barasch, 488 U.S. 299 (1989). In the first place, the regulatory activity in Duquesne was supported by clear regulatory parameters. Secondly, plaintiff in Duquesne was protesting the regulatory body's refusal in allowing it to recover the investment costs (capital expenses) associated with the construction of plants that later on turned to be unnecessary. But plaintiffs in Duquesne were not trying to recover legitimate operating expenses but investment expenses that were never intended for public use. The Supreme Court, however, refused to intervene because plaintiffs admitted that they were recovering a reasonable return on investment even without recovering this particular investment cost. In this case we have concluded, that plaintiffs are not recovering even their operational costs because of the arbitrary way in which ORIL has manipulated the numbers for regulatory purposes. Needless to say, much less are plaintiffs recovering a reasonable rate of return on the capital investment, as has been discussed in this opinion and order. Lastly, in Duquesne no argument has been made that the regulated "rates jeopardize the financial integrity of the companies, even by leaving them insufficient operating capital or by impeding their ability to raise future capital. Nor has it been demonstrated that these rates are inadequate to compensate current equity holders for the risk associated with their investments under a modified prudent investment scheme." Duquesne at 312. The opposite, however, constitutes the facts in the instant case.

and the continental importers. The evidence shows, from admissions of the farmers, that ORIL's price fixing scheme is designed to fulfill these goals. Based upon the expense statistics for the year 2003, and even before adjusting the same downwards, ORIL was acting in a regulatory defective way. ORIL should have used the actual 2004 expense statistics that it had. W. Ohio Gas v. Public Utility Commission of Ohio (#2), 294 U.S. 79, 82 (1935). Moreover, ORIL had enough evidence available to support an advanced forecast on the impact that the expenses' increase will have on the fresh milk processors for the year in which the rates were to be in place, that is, in April 2005 and forward.

The taking of property may also be triggered by ORIL's lack of announced known regulatory standards, which allows ORIL to switch back and forth freely on the methodology used to make different adjustments at will so as to bring the cost of the milk processors down. ORIL's practice raises serious constitutional questions. Duquesne, 514 U.S. at 315. In Duquesne, *supra*, a case similar to the case at bar, when the volume of milk produced was excessively high, a "decision to arbitrarily switch back and forth between methodologies" for an income adjustment was discretionary allowed in order to make the necessary adjustments on the return of capital and investments calculations, professional fees, and transfer of prices, provided that these adjustments were made within the scope of the abuse of discretion rule cited therein. Id. Hence, in the instant case, ORIL has acted improperly by eliminating the processors' costs for experts' fees and professional fees that were related to the pricing rate scheme or as part of operational costs. Driscol v. Edison Light and Power Company, 307 U.S. 104, 120-121 (1939).

Plaintiffs further argue that they are convinced that ORIL is not willing to objectively address plaintiffs' financial costs and/or fair rate of return or investment within the milk pricing scheme simply because these needs are contrary and incompatible with the economic interests of Indulac, the dairy farmers, causing a fictitious need to

maintain the cost of the milk to the consumer low.  The Court does not quarrel with the Government's laudable interest to maintain the price of milk low to the consumer.  The problem is in the methodology used to set the price, the cost of production and cost of operations, and lack of adequate standards in that they are constantly in a flux, sometimes recognized other times banned. Above all the fair rate of return is based on a stale national average figure dating back to 1997, which is outdated when it is used for the years 2003 to 2007, particularly after  May 2006, the date when the Puerto Rican Bonds were devaluated by Moodys.  The Court is mindful that Indulac was created by the government to develop a side market within the milk industry by producing milk related products derived from milk that otherwise would have been discarded, and to protect the dairy farmers from suffering a production loss.

It is plaintiffs' contention that ORIL's announcing its intention of adopting an automatic price revision rule to take into account certain major increases in expenses, means very little.  Any automatic adjustment formula must begin with a rational price level to be fairly established according to preexisting and pre-announced regulatory parameters.  Since Puerto Rico has never determined prices in a scientific non-arbitrary way, an automatic price adjustment formula makes little sense until an initial scientific price determination is adopted.

The most glaring example of a taking is the establishment of a fair return rate or investment.  The same is based on a stale average of rate of return in the continental United States published in 1997.  But there is no scientific method used as to how Puerto Rico "fits" within the average.   The average in the United States was published in 1997 but applied in Puerto Rico in 2003 through 2007, in stale fashion against the guidance provided in Tenoco Oil, 836 F.2d at 1024 (stating that a price regulation is stale if the figures are not current - five years deemed stale).  Further, the rate of return does not take

into consideration critical economic facts that occurred in Puerto Rico in May 2006, such

as the devaluation of Puerto Rico bonds by the evaluation of Moodys.

Further, the regulatory scheme fails in that there is no procedure allowing for

regulatory accrual of losses which occur from one yearly review to the next.  The losses

that occur from one year to the subsequent year are not accrued allowing for the losses

incurred in a regulated market to be recuperated.

In sum, the current milk price scheme clearly represents a taking of property for

the milk processors by not allowing them to recover their true costs and the allowance of a

fair profit.  The current situation of the milk price scheme is responsible for the dire

financial situation of plaintiffs today.

B.    **The Dormant Commerce Clause**.

Article I,  Section 8, Cl. 3 of the United States Constitution confers upon Congress

the affirmative power "to regulate commerce … among the several States."    This

affirmative power to regulate includes "a negative aspect, known as the dormant

Commerce Clause" Grant's Dairy--Maine, LLC v. Commissioner of Maine Department of

Agriculture, Food & Rural Resources, 232 F.3d 8, 18 (1st Cir. 2000). As summarized  by

First Circuit in Pharmaceutical Research and Manufacturers of America v. Concannon,

249 F.3d 66, 79 (1st  Cir. 2001):

> The constitutional provision affirmatively granting Congress
> the authority to legislate in the area of interstate commerce
> "has long been understood, as well, to provide 'protection
> from state legislation inimical to the national commerce
> [even] where Congress has not acted…' " National Foreign
> Trade Counsel v. Natsios, 181 F.3d 38, 61 (1st Cir. 1999)
> (alterations in original) (quoting Barclays Bank PLC v.
> Franchise Task Board of California, 512 U.S. 298, 310
> (1994)), aff'd *sub nom*. Crosby v. National Foreign Trade
> Council, 530 U.S. 363 (2000).  This negative command
> known as the dormant Commerce Clause, prohibits states
> from acting in a manner that burdens the flow of interstate
> commerce.  Oklahoma Task Commission v. Jefferson Lines,
> Inc., 514 U.S. 175, 179-180 (1995); Healy v. Beer Institute,

491 U.S. 324, 326 n.1 (1989).

The purpose of the Dormant Commerce Clause doctrine is to prohibit "protectionist state regulation designed to benefit in-state economic interests." Grant's Dairy, 232 F. 3d at 18 (citing Fulton Corporation v. Faulkner, 516 U.S. 325, 330 (1996) and New Energy Company v. Limbach, 486 U.S. 269, 273-274 (1988)).

Following the mandate of the Supreme Court in West Lynn Creamery v. Healy, 512 U.S. 186 (1994), the First Circuit has indicated that the application of the Dormant Commerce Clause doctrine requires a "sensitive, case-by-case analysis of purposes and effects" Id. at 201; Grant's Dairy, 232 F. 3d at 18-19; Walgreen Co.v. Rullán, 405 F. 3d 50, 55 (1st Cir. 2005).

Official state action can be discriminatory against interstate commerce in three different ways, to wit, (a) facially, (b) purposefully, or (c) in practical effect. Wyoming v. Oklahoma, 502 U.S. 437, 454-55 (1992). A facial discrimination against interstate commerce almost always results in a constitutional infirmity, that is *per se* invalid. Foulton Corp. v. Faulkner, 516 U.S. 325 (1996) ("State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.'") quoting Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Oregon, 511 U.S. 93 (1994)). Discriminatory effect results in a balancing approach with strict scrutiny for the state's justification. Since this is a constitutional attack on the application of regulatory power, the Court concentrates on the last two forms of discrimination under the analytical formulation of the First Circuit in Walgreen Co., 405 F. 3d at 55:

> Under the dormant Commerce Clause, if a state law has either the purpose or effect of significantly favoring in–state commercial interests, over out-of-state interests, the law will "routinely" be invalidated "unless discrimination is demonstrably justified by a valid factor unrelated to economic protectionism" (citing Houlton Citizens' Coalition v. Town of Houlton, 175 F. 3d 178, 184 (1st Cir. 1999) which in turn quoted West Lynn Creamery, 512 U.S. at 192-

193.)

As the Supreme Court itself has indicated, the legitimate purpose justifying the

local discriminatory action has to be one that "cannot be served by reasonable

nondiscriminatory alternatives." Oregon Waste Systems, Inc. v. Department of

Environmental Quality, 511 U.S. 93, 101 (1994) (citing New Energy Co. of Indiana v.

Limbach, 486 U.S. 269, 278 (1988)).  See Walgreen Co., 405 F.3d at 59 (citing Hunt v.

Washington State Apple Advertising Com'n, 432 U.S. 333, 353 (1977)).  Justifications for

"discriminatory restrictions on commerce must pass the 'strictest scrutiny'".  Oregon

Waste Systems, Inc., 511 U.S. at 101 (citing Hughes v. Oklahoma, 441 U.S. 322, 377

(1979)). This balancing approach is called the Pike Test.  Pike v. Bruce Church, Inc. 397

U.S. 137 (1970).  Rotunda and Nowack have stated:

> In these decisions one factor becomes imperative to the
> judicial tribunal, a legitimate state regulation must not
> burden interstate commerce in either purpose or effect
> unless the extent of that burden is outweighed by a
> legitimate state objective that cannot be achieved in a less
> burdensome manner. Rotunda and Nowak Treatise on
> Constitutional Law, Thompson-West (2007) s. 11.6 p. 199.
> (Emphasis added).

The Dormant Commerce Clause doctrine applies to Puerto Rico on the same

terms that it applies to the states.  Trailer Marine Transport Corp. v. Rivera Vázquez, et

al., 977 F.2d 1, 8-9 (1st Cir. 1992).  As to the applicability of the Commerce Clause to

Puerto Rico, the Court of Appeals held:

> Both the Supreme Court and this court [First Circuit] have
> long held or assumed that Congress has power under the
> Commerce Clause to regulate commerce with Puerto Rico.
> See Secretary of Agriculture v. Central Refining Co.,
> 338 U.S. 604, 616, 70 S.Ct. 403, 409, 94 L.Ed. 381 (1950)
> (Sugar Act of 1948 applied to Puerto Rico through the
> Commerce Clause); Puerto Rico Tel. Co. v. F.C.C.,
> 553 F.2d 694, 701 (1st Cir. 1977) (Federal Communications
> Commission regulations applied via the Commerce Clause
> to government-owned telephone company in Puerto Rico).
> Thus, in one aspect, the question "whether the Commerce

Clause applies to Puerto Rico" has been settled in the affirmative for many years; the more precise issue posed in this case, is whether the dormant Commerce Clause doctrine also applies to Puerto Rico.

The Supreme Court has resolved this silence by holding that the power granted Congress under the Commerce Clause is not invariably exclusive of the states but only sometimes so. Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). Pertinently, the Court's decisions hold, in an application that is opaquely called the dormant Commerce Clause, that state laws or local regulations are invalid under the Commerce Clause *ex propio vigore* where they unduly burden or discriminate against interstate or foreign commerce. City of Philadelphia v. New Jersey, 437 U.S. 617, 623-24, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

**The central rationale of the dormant Commerce Clause doctrine, as the Supreme Court has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation's commerce**. H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537-38, 69 S.Ct. 657, 664-65, 93 L.Ed. 865 (1949). **This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as to any state in the Union. In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an "intermediate boundary"separating it from the rest of the country**. Torres v. Com. of Puerto Rico, 442 U.S. 465, 472, 99 S.Ct. 2425, 2430, 61 L.Ed.2d 1 (1979). **There is no reason to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise**. *E.g.*, 48 U.S.C. § 738 (no duties may be imposed on trade between Puerto Rico and the United States); 48 U.S.C. § 741a (Puerto Rico can tax imported goods but cannot discriminate in favor of goods made in Puerto Rico).

If the government of Puerto Rico were nothing other than the alter ego or immediate servant of the federal government, then the dormant Commerce Clause doctrine would have no pertinence, for a doctrine designed to safeguard federal authority against usurpation has no role when the federal government itself is effectively the actor. (Citations omitted). Whatever the ultimate source of its authority or its exact constitutional status, Puerto Rico today certainly has sufficient actual autonomy to justify treating it

as a public entity distinct from Congress and subject to the
dormant Commerce Clause doctrine.  In the Supreme
Court's words, "the purpose of Congress in the 1950 and
1952 legislation was to accord to Puerto Rico the degree of
autonomy and independence normally associated with States
of the Union ...."  Examining Board v. Flores de Otero,
426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).
See also Córdova & Simonpietri Ins. Co. v. Chase
Manhattan Bank, N.A., 649 F.2d 36, 40-41 (1st Cir. 1981).
(Emphasis added).

As to the First Circuit's prior holding in Buscaglia v. Ballester, 162 F.2d 805

(1st Cir. 1945), *cert. denied*, 332 U.S. 816 (1947), the appellate court overturned and

succinctly stated "that Buscaglia will no longer be followed."  Trailer Marine, 977 F.2d at

9.  See also Antilles Cement Corporation v. Acevedo Vilá, 408 F.3d 41, 46 (1st Cir. 2005)

("The dormant Commerce Clause and its doctrinal accouterments apply to Puerto Rico as

though Puerto Rico were a state"); Walgreen Co. v. Rullán, 405 F.3d 50, 55 (1st Cir.

2005),  *cert. denied*, ____ U.S. ____, 126 S.Ct. 1059, 163 L. Ed.2d 928 (2006) ("The

dormant Commerce Clause doctrine, . . . applies to Puerto Rico on the same terms as it

applies to the states"); United Egg Producers v. Department of Agriculture of the Com. of

Puerto Rico, et al., 77 F.3d 567, 570-571 (1st Cir. 1996).

In a recent Puerto Rico Supreme Court opinion, Asociación Puertorriqueña de

Importadores de Cerveza, Inc. v. Estado Libre Asociado de Puerto Rico, et al.,

_____ D.P.R. _____, 2007 TSPR 92, 2007 WL 1630877 (May 16, 2007), Justice Rebollo,

in his concurring decision, cited Trailer Marine, *supra*, in support of his finding on the

applicability of the Dormant Commerce Clause to Puerto Rico.  Justice Rebollo explained

that in Trailer Marine, the First Circuit made a thorough analysis on the applicability of

the Dormant Commerce Clause to the then territory of Alaska and the United States

Virgin Islands, citing Anderson v. Mullaney, 191 F.2d 123, 127 (9th Cir. 1951), and

JDS Realty Corp. v. Government of Virgin Islands, 824 F.2d 256, 259-260 (3rd Cir.1987):

But we cannot conceive that in granting legislative power to

the Territorial Legislature it **was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce.** The words "all rightful subjects of legislation" describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. § 77, do not include the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. "All rightful subjects of legislation" must be held to refer to matters local to Alaska. Anderson v. Mullaney, 191 F.2d at 128. (Emphasis added).

Asociación Puertorriqueña de Importadores de Cerveza, Inc., 2007 WL1630877. See also

United Egg Producers v. Department of Agriculture, 77 F.3d 567 (1st Cir. 1996); Starlight

Sugar, Inc. v. Soto, 253 F.3d 137 (1st Cir. 2001); Walgreen Co. v. Rullán, 405 F.3d 50

(1st Cir. 2005), cert. denied, ____ U.S. ____, 126 S.Ct. 1059, 163 L.Ed.2d 928 (2006).

Justice Rebollo further stressed that:

> There can surely be no doubt in anyone's mind that the United States – at least in trade commerce matters – enjoys broad powers to **prevent** what the United States Supreme Court has characterized as "**the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.**" Granholm v. Heald, 544 U.S. 460, 472 (2005) (citing Hughes v. Oklahoma, 441 U.S. 322, 325-326 (1979)).

Most critical to Justice Rebollo was the express language provided in the Puerto Rican Federal Relations Act:

> Finally, in the absence of an express provision excluding Puerto Rico from the application of the dormant Commerce Clause, [n.13] there is no reason to believe that Congress authorized Puerto Rico to discriminate against interstate and foreign commerce. Likewise, it would be risky to argue otherwise, **given the existence of a prohibitive in the Federal Relations Act that orders the Legislature of the Commonwealth** "*that no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico.*" Federal Relations Act sec. 3, L.P.R.A., vol. 1.

Moreover, Justice Rebollo found persuasive the analysis made by Constitutional law commentator Laurence H. Tribe:

> According to the distinguished commentator Laurence H.
> Tribe, the United States Supreme Court's approach to this
> matter lays great emphasis on the question whether the
> statute at issue discriminates against interstate or foreign
> [out-of-state] commerce. Tribe, *supra*, at 1059.
> Consequently, a state law that discriminates against
> interstate commerce, ***either on its face or in its practical
> effect***, will be invalidated unless the state shows that the
> statute serves a legitimate local purpose and that this
> purpose cannot be served as well by nondiscriminatory
> means. Id. (Emphasis added).

Asociación Puertorriqueña de Importadores de Cerveza, Inc., 2007 WL1630877. See

also Ramos v. Puerto Rico Medical Examining Bd., ____ F.Supp.2d ____, 2007 WL

1745654, *3, n.4 (D.Puerto Rico) (June 18, 2007):

> In order to resolve the present controversy it is unnecessary
> to determine whether the Privileges and Immunities Clause
> of the United States Constitution applies to Puerto Rico *ex
> propio vigore*. The court notes, however, that like the
> Commerce Clause, the Privileges and Immunities Clause
> derives from Art. IV of the Articles of the Confederation,
> and was intended to create a national economic union.

In the instant case, defendants challenge the standing of plaintiffs. The Court,

however, finds that plaintiffs have *prima facie* standing to proceed with this Dormant

Commerce Clause challenge. As stated above, plaintiffs are required to pay for the raw

milk an amount much higher than the amount constituting the farmers' cost and

reasonable profit in order for Indulac to be able to buy the same milk at a price way below

that level, without affecting the dairy farmers' income. When Indulac turns this milk into

fluid milk it directly competes with the fresh milk processors and affects their market

share and their general competitiveness in the fluid milk market of Puerto Rico. The milk

pricing scheme currently under attack exists only because most of the financial burden is

carried by plaintiffs. Indeed, plaintiffs carry on with the recovery of expenses, reasonable

profit of the dairy farmers, and the competitive weight of having their market share in the

Puerto Rico fluid milk market eroded by Indulac's activities, their subsidized competitor.

The market share has caused an adverse erosion in plaintiffs' financial condition.

Contrary to defendants' position, it is clear that a plaintiff in dormant Commerce Clause cases does not have to be a member of the class of entities against which the state measure discriminates. In <u>Houlton Citizens' Coalition v. Town of Houlton</u>, 175 F. 3d. 178, 183 (1st Cir. 1999), the Court said:

> In Commerce Clause jurisprudence, cognizable injury is not restricted to those members of the affected class against whom states or their political subdivisions ultimately discriminate. See <u>General Motors Corporation v. Tracy</u>, 519 U.S. 278, 286 (1997). <u>Thus, and in-state-business which meets constitutional and prudential requirements due to the direct or indirect effect of a law purported to violate the dormant Commerce Clause has standing to challenge that law.</u> (Emphasis added).

In <u>Houlton</u>, 175 F.3d at 183, the Court set forth the normal prudential considerations of standing:

> Here, Faulkner, a co-plaintiff satisfies both the constitutional requirements and the prudential conditions for standing. He has lost the business of his residential customers in Houlton; that injury can be traced directly to the Town's neoteric waste management scheme; and the injury would be adequately redressed by equitable relief and/or damages against the Town. As a classic plaintiff asserting his own economic interests under the Commerce Clause (a constitutional provision specifically targeted to protect those interests) Faulkner **avoids any concerns relative either to *jus tertii*,** <u>Warth v. Selding</u>, 422 U.S. 490, 499 (1975), **or to the "zone of interest" requirement**, <u>see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 475 (1982). (Emphasis added).

Further, in <u>Alliance of Auto. Mfrs v. Gwadosky</u>, 430 F. 3d 30 (1st Cir. 2005), the First Circuit again followed <u>Houlton</u>, and held that the state measure under attack discriminated against interstate commerce by favoring in-state automobile dealers at the expense of out-of-state automobile dealers. But the financial burden of the system that the state had in place was carried mainly by the Ford Motor Company and other automobile

manufacturers.  These entities were not competitors of the automobile dealers of either

state, thus, not similarly situated amongst them.   However, Ford paid the financial burden

of the barrier that was erected against interstate commerce; therefore, the association to

which Ford belonged was granted standing.  See also Bacchus Imports, Ltd. v. Dias,

468 U.S. 263 (1984);  General Motors Corp. v. Tracey, 519 U.S. 278, 286 (1997).   In the

instant case, plaintiffs have the financial burden of subsidizing Indulac, the dairy farmers,

and ultimately, the responsibility of keeping the milk industry afloat, regardless of the

cost.  Hence, plaintiffs have standing to challenge the government's violation of the

Dormant Commerce Clause.

The price discrimination regulation under scrutiny fails both the "purpose" and

"effect" tests.[236]  There is no dispute on the record on any of the two counts.  The

Administrator of ORIL, Juan Pedró González, testified about the pricing of $0.32 per

quart of surplus milk for Indulac contained in the provisional administrative order of

February 24, 2006. Very eloquently, he explained the need for that discriminatory pricing

in the following way:

> "If right now, instead of .32 cents we were to raise the price of surplus milk to .53,
> .55 cents, and we lower the price of fresh milk to .53 or .55 cents in order for
> Indulac to be able to have a profit and continue in operation, we are going to have
> to raise the price of UHT milk to 1.30 or 1.50 per liter or quart.  And if we are
> going to do that today without these [protective] two bills of law, the imported
> UHT milk is going to take over the entire market and it will make Indulac go
> bankrupt." See Transcript of February 27, 2006, at pages 34-35.

This statement of the Regulator is confirmed by the testimony of Mr. Benítez, a dairy

farmer and President of Indulac, who indicated that Indulac could not pay more than 32 cents

---

[236] When considering a possible Dormant Commerce Clause violation, the Court shall carefully examine the circumstances
on a case-by-case basis.  All "[f]ormulas for applying the dormant Commerce Clause are, if flexible enough to be valid,
usually too general to resolve concrete cases.  Still, the formulas offer a starting point and, under the precedents, state
action that 'discriminates against interstate commerce'" stands condemned." Trailer Marine Transport v. Rivera, 977
F. 2d 1, 28 (1st Cir. 1992). (citations omitted)   See also Walgreen v. Rullán, 405 F. 3d at 55.  Here, our purpose and
effect analysis is firmly grounded in the specific facts proven on the record.  West Lynn Creamery, 512 U.S. at 201.  The
Court's justification to apply the Dormant Commerce Clause to Puerto Rico is simply because Puerto Rico "…may not
place itself in a position of economic isolation".  Baldwin v. G.A.F. Seelig, 294 U.S. 511, 527 (1935).

because "We would not be able to compete with imported UHT or it [Indulac] would sustain
economic losses." Both experts for defendants admitted that the justification for this price
discrimination was the competition faced by Indulac from the UHT milk importers.  The record
shows that as recent as the year 2006, Indulac was requesting to the Administrator further price
reductions in order to compete with imported UHT milk, and they were successful as the price
was further reduced by allowing milk used for products, such as cheese, evaporated milk, etc.,
and by reducing required payments to be made to the FFIL by Indulac.

In the instant case, the record amply supports a finding of a constitutional violation of the
Dormant Commerce Clause, as the milk pricing scheme is invalid *per se*.  The mere purpose to
discriminate against interstate commerce is sufficient to trigger a constitutional challenge of the
Dormant Commerce Clause:

> If a state law discriminates against interstate commerce because of
> its interstate nature, the state law should be held to be a *per se*
> violation of the dormant Commerce Clause.  Because the purpose
> of the law is illegitimate, there is no need for the Court to engage in
> any balancing test: Rotunda and Nowak, Treatise on Constitutional
> Law Thompson-West 2007 S.11.8 p. 220.[237]

Indulac's price subsidy is also questionable under the balancing "effect" test.  As admitted
by Mr. Pedró himself, if no protectionist laws are enacted, and Indulac is forced to pay an amount
equal to the farmer's cost and a reasonable profit, then the imported UHT milk taking would take
over the market forcing Indulac into bankruptcy.  Hence, Indulac's price benefit not only has the
purpose of stopping or at least limiting the market share of imports but it is having the desired
effect.[238]

---

[237]  The Court is mindful of the fact that the Supreme Court has "also recognized that there is no clear line separating the
category of state regulation that is virtually *per se* invalid under the Commerce Clause and the category subject to the
Pike v. Bruce Church balancing approach.  In either situation the critical consideration is the overall effect of the statute
on both local and interstate activity."  Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 US 573,
579 (1986). See also Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298 n. 12 (1997) ("There is, however, no clear
distinction between these two strands of analysis").

[238]  The milk production cost in Puerto Rico is much higher than that in the Continental United States.  Indulac presently
holds about 70% of the UHT milk market in Puerto Rico, a fact that makes the challenged regulation discriminatory.
In sum, Indulac has control of almost 3/4 of the UHT milk market in Puerto Rico, simply because it has no competition,
as Indulac subsidized price for raw milk cannot be defeated by UHT milk importers.

Puerto Rico's situation is similar to other milk cases already entertained by the United

States Supreme Court finding a violation to the Commerce Clause.  Puerto Rico is trying to

compensate, through a subsidy paid by plaintiffs, the natural cost advantage of out-of-state milk

producers in order to protect the local milk market as well as the local dairy farmers.  The

Supreme Court has consistently struck down such type of measures despite any local ingenuity.

 "Nice distinctions between direct and indirect burdens [are] irrelevant" when purpose and

effect is to suppress or mitigate interstate competition.  (Polar Ice Cream & Creamery Co. v.

Andrews, 375 U.S. 361, 374 (1964) (citing Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935))

because they have the same effect as an interstate tax or custom duty).  Oregon Waste Systems,

Inc., 511 U.S. at 106 (1994) ("… regulating interstate commerce in such a way so as to give those

who handle domestic articles of commerce a cost advantage over their competitors handling

similar items produced elsewhere, constitutes … protectionism").  Measures that neutralize the

natural advantages possessed by lower cost out-of-state producers are routinely held

unconstitutional.  See Baldwin, 294 U.S. at 527 (elimination of milk regulation "designed to

neutralize advantages belonging to the [out-of-state] place of origin"); West Lynn Creamery,

512 U.S. at 194 (milk market); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984) (liquor); Hunt,

432 U.S. at 351 (statute invalidated because it had "the effect of stripping away from the

Washington apple industry the competitive and economic advantages it has earned for itself");

and other cases of this kind cited in West Lynn Creamery, 512 U.S. at 194 (calling them

"legion").

 In West Lynn Creamery, 512 U.S. 186, the "avowed purpose" and "undisputed effect" of

the measures therein under attack were to "enable higher cost Massachusetts dairy farmers to

compete with lower cost dairy farmers of other states" and to allow "Massachusetts dairy farmers

who produce at higher costs to sell at or below the price charged by lower cost out-of-state

_____

producers."

The situation in West Lynn Creamery, *supra*, is similar to the case at bar. In West Lynn Creamery, the State of Massachusetts imposed a tax on all the raw milk sold by dealers (both in and out-of-state) to Massachusetts retailers, and distributed the tax proceeds to Massachusetts' dairy farmers only. In the instant case, the Puerto Rico government imposes a surcharge on fresh milk processors that allows Indulac to receive low priced raw milk to compete with imported UHT milk while at the same time maintaining an elevated price for all the raw milk produced by the Puerto Rico dairy farmers. Both the West Lynn Creamery tax and the Puerto Rico surcharge are designed to and have the effect of interfering with commerce while channeling money to the local dairy farmer. Cf. Bacchus Imports, Ltd., Id. (same effect achieved by exempting certain local liquor from state tax).

The record is devoid of any suggestion that this discriminatory pricing scheme is supported by any legitimate state interest unrelated to protectionism, and that said interest cannot be achieved by lawful means. These measures do not pass judicial scrutiny. To argue that this is a measure needed by Puerto Rico's "struggling" milk industry, is not enough. Bacchus, 468 U.S. at 272 ("…we perceive no principle of Commerce Clause jurisprudence supporting the distinction between thriving and struggling enterprises under these circumstances, and the state cites no authority for its proposed distinction"). ("[T]he propriety of economic protectionism may not be allowed to hinge upon the state's (or this Court's) characterization of the industry as either 'thriving' or 'struggling'"). Id. at 273. See also West Lynn Creamery, 512 U.S. at 205 (rejecting this same argument with respect to the alleged possible collapse of the milk industry in Massachusetts, and citing for the same proposition another milk case, Baldwin, 294 U.S. at 522-523.)

Defendants' discriminatory practice is not saveable with the argument that it simply promotes the local products and that it does not intent to discriminate against the foreign

products. Bacchus, 468 U.S. at 273 ("… it is irrelevant to the Commerce Clause inquiry that the motivation of the Legislature was the desire to aid the makers of the locally produced beverage rather than to harm out-of-state producers"). A desire to either increase the market share of local producers or simply mitigate the declined demand for their products does not pass muster either. West Lynn Creamery, 512 U.S. at 196, n.12 ("For Commerce Clause purposes, it does not matter whether the challenged regulation actually increases the market share of local producers or whether it merely mitigates a projected decline"). The fact that for years Indulac has produced by-products that did not make a profit is irrelevant to our analysis of the Dormant Commerce Clause challenge. Firstly, Indulac is today a significantly profitable entity that has generated much of its profits from the UHT milk business for several years. Secondly, "the dormant Commerce Clause is applicable to activities undertaken without the intention of earning a profit." Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 584-85 (1997) (citing Edwards v. People of State of California, 314 U.S. 160 (1941).

Finally, the fact that the discriminatory measure allows Indulac to favorably compete with out-of-state interests, such as the UHT milk importers, as well as intrastate interests, such as the fresh milk processors, makes no difference. Walgreen Co., 405 F. 3d at 58. Courts have invalidated laws under the Commerce Clause because "they discriminate against out-of-state entities and some in-state entities in order to favor a subset of in-state interests." Id. (citing C & A Cardone, Inc. v. Clarkstown, 511 U.S. 383, 394 (1994)).

It is immaterial whether the competition from Indulac's UHT milk is a main cause for the declining volume of fresh milk or simply one of the factors. Every witness testifying on the subject agreed that it was at least a factor. The degree at which fresh milk is affected by UHT milk competition has no bidding for this constitutional analysis. Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 269 (1984). In Baldwin v. G. A. S. Selig, Inc., 294 U.S. 511 (1935), a unanimous Supreme Court rejected the notion that a direct-indirect burden distinction could be relayed upon

by the state to defend otherwise non-competitive scheme. <u>Associated Industries of Missouri v. Lohman</u>, 511 U.S. 641, 650 (1994) ("Actual discrimination, whatever it is found is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred"); <u>Maryland v. Louisiana</u>, 451 U.S. 725 (1981).

The Court must cease its analysis at this point having determined the applicability of the Dormant Commerce Clause, having further set forth sufficient facts showing a strong federal factual scenario as to a *prima facie* violation, and having determined standing. The Court stops as it finds that any potential remedy as to the Dormant Commerce Clause has already been provided under <u>Permian Basin Area Rate Cases</u>, 390 U.S. at 769-70. The Court stated that a regulation begins to take property without due process of law only if "arbitrary, discriminatory or <u>demonstrably irrelevant to the policy the legislature is free to adopt</u>." (Emphasis ours). Based on the highlighted above quote, the Court has already found unconstitutional the regulation granting Indulac the privilege of purchasing raw milk at below cost process of the dairy farmers based on the fact that Indulac is using said benefit to give a competitive edge over the fresh milk processors, and the farmers are also using said regulatory scheme to attempt to purchase the two processing plants at a bargain price. The net result under either alternative is that the fresh milk processors are eliminated from the market which is clearly contraindicated by the Statement of Motives set forth in Law No. 34. The Milk Industry Regulatory Act clearly indicates that when establishing a procedure "to dispose of the milk surplus" the matter would be handled "in such a manner that [would not] affect [ ] the interest of the persons engaged in [the] operating [of the] businesses in the different phases of the industry." Hence, no milk industry party would be affected by the procedure of "dispos[ing] of the milk surplus through a regulation." The Court found, therefore, that the milk processors are steadily losing their market through the regulatory procedure of granting Indulac the right to produce milk at below cost of the dairy farmers. The Court struck said remedy as unconstitutional, which is the only remedy that can be achieved

through the Dormant Commerce Clause.  Hence, the Court finds that said remedy is, at this point, academic and under justiciability standards the court refuses to  continue any further analysis.

INJUNCTIVE RELIEF REVISITED

Injunctive relief under Fed. R. Civ. P. 65 requires that a party seeking injunctive relief comply with a quadripartite test. New Comm Wireless Services, Inc. V. SprintCom, Inc., 287 F.3d at 8-9.

The first criteria to be complied is likelihood of success, the sine qua non requirement. Weaver v. Henderson, 984 F.2d at 12. Should said requirement not be present, "the remaining factors become matters of iddle curiosity." Auburn News Co., Inc. v. Providence Journal Co., 659 F.2d at 277. The court finds, as more fully described infra, violations of Due Process, Equal Protection and the Takings Clause, a pattern of lack of standards, change in standards with unfettered discretion, use of stale figures, and lack of an appropriate standard as to fair rate of return in the regulations set by the regulator all pointing to a taking "pursuant" to Duquesne Light Co., 488 U.S. at 307; Tenoco Oil, 826 F.2d at 1026-1027.

The second criteria constitutes the presence of non-speculative irreparable harm. Narrangansett Indian Tribe v. Guilbert, 934 F.2d at 6-7. The court finds that said criteria has been reached since the two processing plants are losing market and have suffered for the periods from 2003 to 2007 a Due Process and Equal Protection violation reaching levels of a "taking."  The record is abundant as to the continuous violations for said period, including a  methodology deficiency in parameters and unlimited discretion of the Administrator in changing, adding, subtracting, from year to year, parameters. Further, there is no system for a regulatory accrual to recuperate interim losses that occur from year to year, yet a stale system to determine "fair rate of return" is in place. These deficiencies point to permanent loss in market and long-standing violations of constitutional rights for extensive protracted periods of time. The court opines this criteria to have surpassed the required threshold.

The third criteria requires the court to perform a balancing of equities under <u>Matos ex rel.</u>
<u>Matos v. Clinton School Dist.</u>, 367 F.3d at 73. The court balances whether "the harm caused
plaintiff without the injunction, in light of plaintiffs likelihood of success in the merits,
outweighs  the harm the injunction will cause defendants." <u>DeNovellis v. Shalala</u>, 135 F.3d at 77.

Plaintiff is merely requesting that the regulations promulgated provide a "fair rate of
return" and that the parameters set not be arbitrary. Defendants potentially will suffer the loss of
continuing with an unquestionable discriminatory price preference as to the purchase of raw milk,
financed by plaintiff, which is being used at least partially to dwindle plaintiffs share of the fluid
milk market. Further, the dairy farmers are using said loss of market in an attempt to purchase the
good will and market of plaintiff at a low price, all caused or partially caused by the preferential
price scheme whereby Indulac buys raw milk at more than half the cost of plaintiffs and under the
cost of the dairy farmers. The matter is not close. The constitutional rights of plaintiff override,
with its consequential permanent loss of market and potential fire sale of its plants, the rights of
defendant to continue with a preferential purchase price of raw milk which is prima facie
discriminatory and  must be ceased.

<u>The effect on the public interest</u>. Without the injunctive relief, the plants are close to being
sold at very low prices, an important independent element of the industry is about to be lost and
the industry is then close to being monopolized by one party of the milk industry. The public
interest has been clearly set by the law: The court concedes that the excess milk be properly
attended by government regulation; however, by disposition of the law (Legislative History and
Purposes of the "Milk Industry Regulation Act") said regulative procedure is to be performed
"without affecting the interest of the persons engaged in operating [the] business . . . of the
industry."

Hence, the public interest lies in the granting of the injunctive relief.[239]

---

[239] The defendants allege that the court should not issue an injunctive relief based on the doctrine of "clean hands" as
Plaintiffs acted as Director of Indulac and hence participated in the decision of Indulac. The court is of the opinion
that the doctrine should not apply. <u>Dr. José S. Belaval, Inv. v. Pérez-Perdomo</u>, 488 F.3d 11 (1st Cir. 2007) (clean

## THE REMEDY

In view of the foregoing, plaintiffs' petition for preliminary injunctive relies if

hands doctrine "only applies when claimant's misconduct is directly related to the merits of the controversy between the parties . . . ")  First, the court clarifies that plaintiffs' industrial fresh milk processors, ceased to be members of the Board of Indulac on September 2, 2003 (Ex. 7, Transcript February 15, 2005, pp. 134-135). Further, the court has issued injunctive relief based on arbitrary parameter determinations relating exclusively to ORIL's conduct in accepting or rejecting production and/or operational costs and/or using stale figures in determining manufacturing and operational costs and/or in changing from year to year the parameters and/or in the application of a 1997 United States stale average "fair rate of return" to the 2003 to 2007 fair rates of return as to the milk industry in Puerto Rico. The conduct which the court attributes to ORIL as violating Due Process, Equal Protection and the Takings Clause of the Federal Constitution  in regulating the milk industry lacks any participation by the two plants.

The court sets forth various illustrative examples. The two plants did not participate at all in the following:

– ORIL's decision in 2005 to terminate the credit for bona fide returned milk credited to retailers or wholesalers which fictitiously increased the real capital income of the two plants (in the past returns were accepted by ORIL).

– The plaintiffs did not participate in the decision of the Administrator in using sales figures of the plants of 2003 as basis for regulating industry prices in 2005, 2006, 2007. The use of stale cost figures does not allow for obvious increases in cost and operations such as electricity, fuel, resin and labor that have occurred since 2003 to 2007. Sales had decreased as, known by ORIL, and again the capital base of the two plants on past sales is fictitious since the sales of fresh milk have actually decreased from 2003 to 2007. Tenoco Oil Co., 876 F.2d 1024 (criticizing use of stale figures of years past the actual year of the review.)

– ORIL used as "fair return rates of investments" as to the plants a 1997 United States average figure of 10% applied to the regulatory prices set in 2003, 2005, 2006, 2007, without a study as to how Puerto Rico "fit" into the national average. The United States average of 10% is further stale being used in 2003 to 2007. Tenoco Oil Co., Id. (The use of stale rates of return from the Continental United States to Puerto Rico fuel industry not found reasonble.) Finally, as to the yearly review of the price regulation for 2007, ORIL failed to take into consideration the economic reality of the devaluation of Four Billion Dollars of governmental Bonds of Puerto Rico by Moody's in May of 2006.

– The two claimants had no participation in the change of parameters by ORIL of discounts to agents although in years immediately before discounts were granted by ORIL; further discounts being actually taken by Indulac in amounts of around $1.8 million dollars and the regulator did nothing to stop these discounts. No parameters as to discounts are present since one year they are accepted by ORIL without reasoning and the next year they are surprisingly rejected.

– The credit granted as to shrinkage (loss of raw milk due to temperature) was diminished by ORIL without any explanation. The "historical factor" alleged by ORIL was proved to be nonexistent.

– ORIL refused to grant credit for operational costs of professional fees and use of experts relating to the annual review hearing; a criteria accepted to be credited by the Supreme Court. Driscoll v. Edison Light & Power Co., 307 U.S. 104.

– There is no mechanism to recuperate losses occurring between yearly periods of price review. That is, there is no regulatory accrual for the losses that occur from year to year. Hence, the plants must carry the losses and never are able to recuperate losses.

– In the 2007 review ORIL for the first time counted the revenue of the plants in non-regulated business (sale of non-regulated juice business) notwithstanding state court's final order to the contrary respected until 2007. The constitutional deficiency being again the changing of parameters.

– ORIL refused to hold a yearly increase regulatory hearing merely because of a change of ownership of Suiza; Tres Monjitas, a separately owned and managed company, suffered prejudice. The regulating statute contains no exception to the yearly reviews merely due to a change in ownership. A mere change in ownership fails to warrant a presumption of illegality under any corporate law analysis. Again the federal deficiency is a change in parameters.

– The current difference in prices of raw milk from the dairy farmers purchased by Indulac (around 26.5 cents) and that of the plaintiffs (around .65 cents) is a matter of legislation wherein the two plants have no determinative nor regulative capacity.

The court, therefore, considers that since the injunctive relief has been granted based on Due Process, Equal Protection and the Takings conduct attributed to ORIL where Suiza and Tres Monjitas are not involved in any "misconduct . . . directly related to the merits of the controversy between the parties" the doctrine of clean hands does not apply. Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 888 (1st Cir. 1995).

**GRANTED** as follows:

Effective immediately, both the fresh milk processors and Indulac will begin paying the amount of $0.55 per quart of raw milk to the dairy farmers. When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk. Under no circumstances will the fresh milk processors be required to pay more for their raw milk or carry additional costs for the purpose of allowing Indulac's access to raw milk for UHT or fluid milk manufacturing at a lower cost than the cost at which plaintiffs can acquire raw milk from fresh or fluid milk processing. The Administrator may set at his discretion the prices for raw milk for non fluid milk use.

In a period of no more than thirty (30) days, the Administrator will put into effect non-discriminatory, rational and scientific regulatory standards that will allow him to determine costs and fair profits return for all the participants in the Puerto Rico regulated milk market. Those standards will set the reasonable rate of return that each participant should receive. The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular "fit" of Puerto Rico into any economic model which may be used from other jurisdictions. Any figures used from other jurisdictions are not to be stale but are to be "for the year in question." <u>Tenoco Oil Co.</u>. The Administrator is to establish a system or incorporate a system or provide for mitigation for regulator accrual for losses properly supported that occur between periods of yearly reviews. The price structure of the fresh milk processors will be reviewed immediately under those parameters. The methodology of the parameters is to be consistent with this Opinion and Order.

The Administrator is ordered to adopt a temporary mechanism that will allow the processors to recover the new rate of return they are entitled to (whatever that may be) for the year 2003 (base cost year of the present structure) and up to the day when they begin to recover said rate based on the new regulatory standards and corresponding order. The Administrator may

so act through regulatory accruals, special temporary rates of return or any other available mechanism of his choosing. The period for this special recovery shall be reasonably determined by the Administrator. The Administrator will hold hearings for this purpose with the participation of plaintiffs, and all parties within the milk industry, within a period of thirty (30) days of this Opinion and Order. A decision by the Administrator shall follow promptly.

The court will retain jurisdiction until full compliance has been duly met with this preliminary injunction.

Upon compliance with the dispositions of this Opinion and Order, the parties shall forthwith move the court to schedule a hearing on the permanent injunction.

**IT IS SO ORDERED.**

At San Juan, Puerto Rico, this 13th day of July 2007.


s/ Daniel R. Domínguez
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**