**<u>EXHIBIT A</u>**

## **OVERSIGHT BOARD EXHIBIT 1**

Debtors' Omnibus Reply Charts to Objections to the Disclosure Statement and Solicitation
Procedures Motion

## TABLE OF CONTENTS

I.   **Objections to Disclosure Statement** ..................................................................1

Best Interest Test.................................................................................................1

Cash Restrictions ...............................................................................................1

Essential Services ..............................................................................................3

Feasibility...........................................................................................................3

Fiscal Plan ..........................................................................................................4

Good Faith ..........................................................................................................5

Dischargeability .................................................................................................5

Classification......................................................................................................6

Treatment ...........................................................................................................8

Preemption .......................................................................................................11

Releases............................................................................................................12

Pensions ...........................................................................................................17

PSAs .................................................................................................................19

Description of Litigations .................................................................................21

Risk Factors .....................................................................................................22

Audited Financial Statements ..........................................................................24

Add'l Disclosures.............................................................................................25

Misc. Objections ..............................................................................................37

II.   **Objections to Solicitation Procedures** ..........................................................40

## I.   OBJECTIONS TO DISCLOSURE STATEMENT

| Party | Objection | Response |
|-------|-----------|----------|
| **Best Interest Test** | | |
| Ambac | • Certain issues in the Best Interests Report suggest glaring unconfirmability defects in the Plan. The reports are based on intentionally pessimistic and negative assumptions. Because the Plan caps recoveries available to revenue bond creditors like Ambac, and caps them very low, it is well within the realm of the probable that Ambac and others will face superior recoveries outside of the Plan, contrary to the Board's presentation in the Best Interests Report.  Ambac Obj. at 34-35. | The objectors raise factual issues regarding the Plan's satisfaction of the best interest test that should be addressed at confirmation.  As noted in the *Order Denying Urgent Motion for Extension of Time to Object to Best Interest Analysis of Disclosure Statement* [ECF No. 16960], the best interest test pursuant to PROMESA section 314(b)(6) is a confirmation requirement and parties will have the opportunity to assert that the proposed Plan fails to meet the best interest test at confirmation. |
| UCC | • The Disclosure Statement fails to include information about the value, availability, and allocation of the Commonwealth's assets, making it impossible for creditors to determine if they believe that the Proposed Plan represents "a reasonable effort by the [Commonwealth]" to repay its creditors, and that the Proposed Plan "affords all creditors the potential for the greatest economic return from Debtor's assets." UCC Obj. at 39-40. | |
| Hein | • The Best Interests Test Reports do not provide "adequate information" because the economic and financial information has not been verified by the Oversight Board, the Commonwealth, or any advisors.  Hein Obj. at point 1.<br><br>• The Best Interests Test Reports should include various additional information and analyses.  Hein Obj. at point 2-14. | Nonetheless, the Disclosure Statement and Fiscal Plan provide detailed reports on available cash, revenue, and expenses. |
| SIM | • The legal reasoning in the Best Interest Report is lacking. Without the documentation or the legal reasoning as to the restricted funds, an average investor cannot make an informed decision. SIM Obj. at 4. | |
| **Cash Restrictions** | | |
| SIM | • The cash restriction analysis does not provide information on legal reasoning for restrictions.  SIM Obj. at 4.<br><br>• Neither the IFAT Report by Duff & Phelps nor the Disclosure Statement provide the documentation upon which Duff & Phelps based its statement nor the legal reasoning in such report. Id. | These objections seek information and data regarding the rationale for certain decisions underlying the Debtors' analyses or related analyses in support of confirmation of the Plan—in particular whether certain assets would be available to creditors outside a Title III case which asserts a "best interest" objection..  As noted in the *Order Denying Urgent* |

| Party | Objection | Response |
|-------|-----------|----------|
| | | *Motion for Extension of Time to Object to Best Interest Analysis of Disclosure Statement* [ECF No. 16960], the best interest test pursuant to PROMESA section 314(b)(6) is a confirmation requirement and parties will have the opportunity to assert that the proposed Plan fails to meet the best interest test at confirmation. |
| Ambac | Assets of Title III entities:<br><br>• The Disclosure Statement does not adequately disclose information regarding the cash and non-cash assets of the Commonwealth or its agencies, instrumentalities, and public corporations. Ambac Obj. at 55-56.<br><br>• The Disclosure Statement does not disclose non-cash assets, such as real property, and whether they would be available to creditors outside of Title III. Id. at 55-56, 56 n.93.<br><br>• The Disclosure Statement does not disclose cash held by the Commonwealth and related entities, and transfers of funds to the Commonwealth, which could potentially be accessible or available to the Commonwealth. Id. at 56-57, 57 n.95.<br><br>Working capital/external financing:<br><br>• The Disclosure Statement conveys the Board's conclusion that the Commonwealth should maintain an unrestricted liquidity balance of at least $2.5 billion, reserve an additional $750 million in funds purportedly needed for the Commonwealth's Disaster Aid Revolving Fund, maintain a $1.3 billion emergency reserve, and provide approximately $900 million for the LUMA Funding Requirement, but it provides little justification for these significant retentions. Id. at 57, 57 n.97. | These requests largely echo Ambac's discovery requests in the *Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 16812], to which the Court noted "the vast majority are directed to challenges to confirmability of the proposed Plan, Ambac's contention that there are better alternatives, and investigation of additional Commonwealth assets potentially available to creditors" in denying Ambac's motion, except to the extent the Oversight Board agreed to provide Ambac certain information. *Memorandum of Decision and Order on Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 17058] at 8.  The Oversight Board concurs and submits that confirmation issues should be addressed at the confirmation hearing.<br><br>The Disclosure Statement provides a report on cash.  *See* Disclosure Statement § III.E.  Title III does not require the value of non-cash assets to be paid to creditors.  Puerto Rico is not required to sell its beaches to pay creditors in Title III or outside Title III. |
| UCC | • The UCC has identified billions of dollars in assets, including, but not limited to, cash, past due receivables, proceeds from the monetization of assets, and issuance of additional bonds that could be used to provide CW General Unsecured Claims with recoveries well in excess of the amount contemplated under the Proposed Plan. The Disclosure Statement must be revised to explain the value and availability of the Debtors' assets. UCC Obj. at 40-43. | The UCC raises factual issues regarding whether certain assets would be available to creditors outside a Title III case—*i.e.*, the Plan's satisfaction of the best interest test—that should be addressed at confirmation.  As noted in the *Order Denying Urgent Motion for Extension of Time to Object to Best Interest Analysis of Disclosure Statement* [ECF No. 16960], the best interest test pursuant to PROMESA section 314(b)(6) is a confirmation requirement and parties will have the opportunity |

| Party | Objection | Response |
|---|---|---|
| | | to argue that the proposed Plan fails to meet the best interest test at confirmation. |
| **Essential Services** | | |
| SIM | • The Disclosure Statement does not provide a definition of essential services.<br><br>    o In order to determine if the Plan is consistent with the Fiscal Plan, one must see if essential services are being "adequately funded." In order to do so, one must know what are essential services. <u>SIM Obj.</u> at 9. | SIM's contention is wrong. The confirmation hearing is not a hearing on the Fiscal Plan, which funds essential services. PROMESA requires that the plan of adjustment be consistent with the Fiscal Plan. The Disclosure Statement provides information regarding the Oversight Board's position regarding "essential services" pursuant to PROMESA. That parties disagree with the Oversight Board's position, or that parties contend a definition of "essential services" is necessary to assess the Plan's consistency with the certified fiscal plan or the best interest test, is not an issue for approval of adequacy of the information contained in the Disclosure Statement, but rather, an issue to be addressed at confirmation, if at all.<br><br>Ambac erroneously contends the Fiscal Plan is "incorporated into the Plan." It is not. The Plan simply cannot incur debt in excess of the Fiscal Plan's debt sustainability analysis.<br><br>As stated fully on pages 163-164 of the Disclosure Statement, the definition of "essential services" has no application for purposes of Plan confirmation.<br><br>Nonetheless, the Debtors have added the following to page 168 of the Disclosure Statement:<br><br>"Certain parties assert that "essential services" must be specifically identified." |
| Ambac | • The Board must amend the Disclosure Statement to disclose to creditors the scope of "essential public services" the Commonwealth intends to provide. <u>Ambac Obj.</u> at 52-53.<br><br>• Creditors cannot make an informed voting decision regarding whether the Plan is in their best interests without understanding how the Fiscal Plan, incorporated into the Plan, intends to allocate resources among "essential public services" and creditors, so they may compare that allocation to what would be "available . . . under the non-bankruptcy laws and constitution of the territory." PROMESA § 314(b)(6). . ." <u>Ambac Obj.</u> at 52. | |
| UCC | • The Debtors should provide disclosure of the debtor's essential services and how much of the debtor's available assets are taken up in paying for those services. <u>UCC Obj.</u> at 43-44. | |
| **Feasibility** | | |
| Ambac | • The Plan fails under 314(b)(6) because the Fiscal Plan expressly contemplates that the Commonwealth will be operating at a sustained deficit by no later than fiscal year 2036, while also issuing GO debt maturing in 2037, 2041, and 2046. <u>Ambac Obj.</u> at 25-26. | Ambac raises factual issues as to the feasibility of the proposed Plan, which should be addressed at confirmation. As the Court noted in the *Order Denying Urgent Motion for Extension of Time to Object to Best Interest Analysis of Disclosure Statement* [ECF No. 16960] with respect to the best interest test pursuant to PROMESA section 314(b)(6), the |

| Party | Objection | Response |
|-------|-----------|----------|
| | | feasibility of the plan is a confirmation requirement pursuant to PROMESA section 314(b)(6) and parties will have the opportunity to challenge the feasibility of the Plan at confirmation. |
| UCC | • The Disclosure Statement relies on a one-page summary stating that the Oversight Board believes that the Proposed Plan is feasible because it is consistent with the certified fiscal plan (Disclosure Statement at 477). UCC Obj. at 53.<br><br>• The Disclosure Statement does not, however, provide creditors any information they would require to reach an informed judgment as to the accuracy or completeness of that belief. Id. | See immediately above.  A copy of the certified fiscal plan is Exhibit G to the Disclosure Statement.  Accordingly, creditors will be able to review and confirm for themselves the consistency of the certified fiscal plan to the Plan. |
| DRA Parties | • The Disclosure Statement should be revised to either explain why the feasibility analysis is based on outdated and superseded financial projections and debt sustainability analysis, or clarify that the feasibility analysis is based on the 2021 projections and fiscal plan. DRA Obj. at 47. | Page 504 of the Disclosure Statement has been revised to reference the latest certified fiscal plan. |
| FGIC | • Disclosure statement does not adequately disclose risks regarding feasibility of plan.  FGIC Obj. at 4.<br><br>• Revenue bond litigation risks:<br>    ○ Does not disclose risks related to a loss by the Commonwealth with respect to the Revenue Bond Litigation (Id. at 8)<br>    ○ FGIC requests disclosure language regarding the assumption of the litigation outcome of the historically allocated funds in the risk factor (¶13) (Id. at 8-9): | The Debtors have included the following risk factor on page 523 of the Disclosure Statement:<br><br>"The Fiscal Plan assumes the Commonwealth's retention of funds historically allocated to HTA, CCDA, and PRIFA to pay revenue bonds issued by the aforementioned Commonwealth instrumentalities was a valid exercise of its authority and the Commonwealth will continue to have access to the Pledged Revenues.  Should the parties challenging the Commonwealth's retention of such funds prevail in the revenue bond litigation described in section [V.F.] of this Disclosure Statement, the accuracy of Fiscal Plan projections will be impacted." |
| | **Fiscal Plan** | |
| Ambac | • The Disclosure Statement should be amended to acknowledge the risk that the Court may find that the Fiscal Plan compels the Plan to violate confirmation requirements, and that the Board may be required to amend the Fiscal Plan in order to achieve a confirmable Plan.  Ambac Obj. at 51. | The Debtors have included the following language on Page 508 of the Disclosure Statement:<br><br>"Furthermore, the Title III Court may find that, although the Plan is consistent with the Fiscal Plan and therefore satisfies Section 314(b)(7) of PROMESA, the Plan nonetheless fails to |

| Party | Objection | Response |
|-------|-----------|----------|
| | | meet one or several other confirmation requirements set forth in Section 314(b)." |
| **Good Faith** | | |
| UCC | • The Plan is not proposed in good faith because the Debtors do not explain their decision to favor certain unclassified creditors—including the payments to a select group of prepetition creditors, as well as the transfer of certain claims to the ACR process.  UCC Obj. at 65<br><br>• The proposed Plan was filed dishonestly because the Debtors failed to comply with specific contractual obligations in the negotiation thereof, specifically by breaching the Oversight Board's post-petition agreement to include the UCC in settlement discussions regarding their joint objection to the 2012 and 2014 GO Bonds.  Id. | Whether the Plan was proposed in good faith pursuant to section 1129(a)(3) is a factual issue that will be addressed in connection with confirmation.  Notwithstanding, (a) the classification of claims is appropriate, consistent with PROMESA, the Bankruptcy Code and applicable law, (b) the transfer of claims to the ACR process is consistent with an order of the Court (*see, e.g.*, ECF Nos. 17128, 12274), and (c) negotiations regarding the development of the Plan were conducted in accordance with the guidance of the Court-appointed mediation team. |
| **Dischargeability** | | |
| DRA Parties | • The plan amounts to a Fifth Amendment taking because it proposes to divert the Act 30-31 Revenues.  DRA Obj. at 28-29.<br><br>• Any claim arising under the Takings Clause is non-dischargeable and cannot be adjusted or compromised by a plan of adjustment. Id. at 44. | See discussion of issues relating to the dischargeability of claims in the Omnibus Reply.  Whether a determination that such claim is non-dischargeable will render the proposed Plan unfeasible is a factual issue that will be determined at confirmation. |
| PFZ | • The Plan proposes to impair and discharge PFZ's claim and would violate the Takings Clause.  Id. at 2-3, 10-19. | |
| Demetrio Amador | • The proposed impairment and discharge of Takings Clause claims renders the Plan patently unconfirmable.  Amador Joinder at 2, 5. | |
| Maruz Real Estate | • The proposed impairment and discharge of Takings Clause claims renders the Plan patently unconfirmable.  Maruz Joinder at 2, 4-5. | |
| Finca | • The Plan is patently unconfirmable because it proposes to impair and discharge constitutional claims arising from the Takings Clause of the U.S. Constitution.  Finca Obj. at 12-13, 17-19. | |
| DRA Parties | • The plan also violates the DRA's rights under the Takings Clause, which should be disclosed. DRA Obj. at 44. | |

| Party | Objection | Response |
|---|---|---|
| AMC Group | • The Plan improperly treats the Medical Centers' Claims, which must be paid in full on account of all or some of the claims being claims under the Medicare Act, administrative expense, and non-dischargeable Federal public health and safety claims.  AMC Obj. at 4-5.<br><br>• To the extent the Plan purports to serve as a "claim objection" for the allowance of the Med Center Claims by seeking to "set" the amount of the Med Center Claims, and further seeks to deprive the Medical Centers' of an allowed claim amount for which they are rightfully entitled if the class votes to reject the Plan or otherwise, the Medical Centers object to the usage of the Plan as a procedurally inappropriate and substantively insufficient claim objection and improper use of the "death trap". AMC Obj. at 5.<br><br>• Based on (higher) recoveries of other unsecured classes, the Plan provides for impermissible disparate treatment of unsecured creditors. AMC Obj. at 5-6. | The AMC Group objects to the allowed amount, treatment (including use of the "death trap"), and discharge of its claim pursuant to the proposed Plan, which will be addressed at confirmation. |
| VTM | • Asserts that VTM's claim is non-dischargeable. VTM Obj. at 2.<br><br>• Requests that the Disclosure Statement specify that VTM's Claim is non-dischargeable because the Claim arose on account of a violation of the Fifth Amendment's Takings Clause. Id. at 6-7.<br><br>• Asserts that the failure to disclose that VTM's claim is non-dischargeable is a fatal flaw in the Disclosure Statement. Id. at 8. | VTM and Suiza object to the discharge of their claims pursuant to the proposed Plan, which will be addressed at confirmation and as explained in the Omnibus Reply. |
| Suiza | • Asserts that Suiza's Claim is non-dischargeable. Suiza Obj. at 19-22.<br><br>• Requests that the Disclosure Statement specify that Suiza's Claim is a non-dischargeable claim. Id. at 26. | |
| **Classification** | | |
| Ambac | • The current classification of claims renders the Plan facially unconfirmable, and the § 1122 violation cannot be cured even with cramdown at confirmation.  Ambac Obj. at 18-25.<br><br>• _Granada Wines_ is the controlling precedent in the First Circuit, and mandates claims of the same legal character to be placed in the same class. Id. at 19-22. | See discussion of issues relating to the classification of claims and Bankruptcy Rule 3013 in the Omnibus Reply. |

| Party | Objection | Response |
|-------|-----------|----------|
| | • The Plan facially violates *Granada Wines*. Id. at 22-25.<br><br>    o Revenue Bondholders should not be classified as unsecured creditors. Id. at 22.<br><br>    o The GO/PBA Bondholders and Revenue Bondholders both hold "mere unsecured, non-priority claims arising from preempted statutes" that they should not be classified separately, as their legal character is the same. Id. at 23.<br><br>• The Disclosure Statement fails to provide adequate information concerning classification scheme. Ambac Obj. at 18.<br><br>    o In the event that the Oversight Board's preemption theory is correct, the discussion of classification needs further elaboration and disclosure as to the mechanisms of the scheme. | |
| UCC | • The classification scheme in the Proposed Plan is inconsistent with controlling law in the First Circuit and approval of the Disclosure statement and solicitation of the Proposed Plan should not go forward unless and until this defect is cured because: (UCC Obj. at 55-63)<br><br>    o In First Circuit, the Only Legal Character of Claims that Matters is that of Priority or Rights in Property<br><br>    o Business, Economic, or Governmental Rationales May be Relevant in Other Circuits—But Are Irrelevant Under *Granada Wines* and Under PROMESA (Id. at 57-58).<br><br>    o Strict Classification Argument is Not a Gerrymandering Argument or Disguised Unfair Discrimination Argument (Id. at 58-59).<br><br>    o Differences in Proposed Treatment Do Not Justify Separate Classification (Id. at 59-63). | See discussion of issues relating to the classification of claims and Bankruptcy Rule 3013 in the Omnibus Reply. |
| DRA Parties | • The separate classification of the DRA's PBA/DRA Unsecured Claim and the deficiency attributable to the PBA/DRA Secured Claim from PBA General Unsecured Claims renders the plan unconfirmable as to PBA. This classification violates section 1122(a), as the DRA's PBA deficiency | See discussion of issues relating to the classification of claims and Bankruptcy Rule 3013 in the Omnibus Reply. |

| Party | Objection | Response |
|-------|-----------|----------|
| | and unsecured claims have the same legal character, including their unsecured status and priority of recovery, as other PBA general unsecured claims. <u>DRA Obj.</u> at 29. | |
| DRA Parties | • The Disclosure Statement must disclose the basis for the separate classification and disparate treatment of the DRA's claims. <u>DRA Obj.</u> at 45.<br><br>• The DRA/PBA Unsecured Claims are separately classified from the PBA General Unsecured Claims.<br><br>• The Disclosure Statement fails to explain why the PBA/DRA Unsecured Claims (which the DRA Parties contend are secured) is treated as an unsecured claim. | The Debtors have included the following language on page 20 of the Disclosure Statement:<br><br>"The Oversight Board believes that the disputed DRA PBA Claims are legally and factually different than the PBA General Unsecured Claims, and, regardless, may be classified separately pursuant to section 1122(a).  The DRA Parties allege both that such claims are secured, and that if not, such claims must be in the same class as the PBA General Unsecured Claims.  The Oversight Board disagrees, and believes it will carry its burden at the confirmation hearing that the plan complies with section 1122(a) and that the DRA PBA Claims are unsecured." |
| AAFAF | • The Plan improperly classifies all Retirees together, even though some (those earning below $1,500 per month) are not impaired, while others (those above) are impaired.  This Classification violates the requirement that all Claims in a Class be treated equally and there is a risk that the unimpaired portion of the Class vote in favor of the Plan in an amount that supersedes what would otherwise be a vote against the Plan by the impaired Retirees. <u>AAFAF Obj.</u> ¶ 6. | Class 48 has been revised in the Plan to separate impaired and unimpaired retiree claims. |
| Finca | • The Disclosure Statement does not mention the existence of inverse condemnation claims.  <u>Finca Obj.</u> at 10.<br><br>• The Plan is patently unconfirmable because it unfairly discriminates between different types of eminent domain claims, giving direct condemnation claimholders better recovery than inverse condemnation claimholders. <u>Id.</u> at 13-15. | Inverse condemnation claims are included in the CW General Unsecured Claims, which generally include myriad types of claims not treated in any other class, among other things.<br><br>See discussion of issues relating to the classification of claims and Bankruptcy Rule 3013 in the Omnibus Reply. |
| | **Treatment** | |
| UCC | • The Proposed Plan unfairly discriminates in favor of a number of creditor groups. For example, the less than 5% recovery offered to CW General Unsecured Claims is exponentially less than the recovery of upwards of 70%, and perhaps as much as 100%, being offered to GO/PBA Bond | Whether the plan unfairly discriminates against certain creditors is a confirmation issue pursuant to Bankruptcy Code section 1129(b)(1), which will be addressed at confirmation. The GO/PBA bond creditors had disputed priority claims |

| Party | Objection | Response |
|-------|-----------|----------|
| | Creditors; under any standard of unfair discrimination, this is grossly discriminatory. UCC Obj. at 64-65. | being settled, unlike the claims in the UCC's constituency which have no priority claims. |
| DRA Parties | • The plan violates section 1129(b)(1) by unfairly discriminating against the DRA PBA Claims in comparison to PBA General Unsecured Claims. The claims in Classes 11, 12, and 13 are substantially similar and must be treated the same way. DRA Obj. at 32-34.<br><br>• The plan presumes that the entire PBA/DRA Secured Claim is unsecured, which the DRA Parties dispute. If the PBA/DRA Secured Claim is fully or partially secured, then the Plan cannot be confirmed because it provides distributions to lower-priority creditors (the holders of the PBA General Unsecured Claims) while providing no distributions on account of the secured portion of the PBA/DRA Secured Claim without the consent of the DRA. Id. | |
| Group Wage Creditors | • The Plan discriminates unfairly in the proposed classification of group wage claims, which the Group Wage Creditors assert are substantially similar to, and must be classified with, AFSCME employees, because they are of the same legal rank and character by virtue of the fact that the claims emerge in the ordinary course of employment matters and from contractual obligations created by a statutory framework that regulates public employment. Group Wage 3013 Motion at 11-24.<br><br>• The ACR and ADR procedures present a problem not only of effective management of claims, but also concerning the Debtors fiduciary duties and evaluating the individual transactions, since there exists a world of possibilities where the Debtor might be doing out of court settlements, and distributional choices to favor creditors, and where this Court is in no position to intervene. Id. at 24-26. | See immediately above. Furthermore, the nature of the AFSCME employee claims arise from collective bargaining agreements, which are different in legal nature from the claims asserted by the Group Wage Creditors.<br><br><br>The ACR and ADR procedures have been approved by the Court and are currently being implemented, with notices being filed with the Court, claims being designated on the Title III claims registry as "Subject to ACR" or "Subject to ADR," and claims being either reconciled by the Commonwealth using its administrative processes or subject to the ADR Procedures. The Group Wage Creditors' objection to such procedures (which were not raised prior to entry of the ACR order) are not relevant to evaluating the adequacy of the information contained in the Disclosure Statement. |
| DRA Parties | • The Plan provides for disparate treatment of creditors within the same class. DRA Obj. at 23-27. | The Plan treats all holders of claims in Class 56 similarly, as each will receive its Pro Rata Share of the CW/HTA Clawback Recovery.<br><br>The Oversight Board believes that the HTA Loan claims are subordinate to the HTA Bond claims. However, in |

| Party | Objection | Response |
|-------|-----------|---------|
| | o   The plan violates section 1123(a)(4) because it treats holders of the HTA Bonds in Class 56 (CW/HTA claims) more favorably than the holders of HTA Loan claims in the same class. Id. at 24. | recognizing that such a determination has not been made in this or any court, the Plan provides that certain payments to holders of claims in Class 56 will not be made until the "Distribution Conditions" are satisfied, including the "GDB Loan Priority Documentation", pursuant to which this Court will determine either the relative priority of the GDB HTA Loans or that the DRA Parties do not have an allowable claim in the Commonwealth Title III Case in the first instance.  The DRA Parties complain that certain distributions to holders of HTA bonds are premature in light of this uncertainty; however, the Oversight Board will demonstrate at confirmation that the Plan is feasible, and that all payments to either the DRA Parties or holders of HTA Bonds will be able to be made by the Reorganized Commonwealth independent of this Court's determination, settlement, or otherwise, with respect to the GDB Loan Priority Documentation.  Furthermore, the Interim Distributions are on account of the holders of HTA 68 Bonds and HTA 98 Senior Bonds agreement to the HTA/CCDA Plan Support Agreement, and is subject to the satisfaction of the Distribution Conditions.  Plan § 82.1(b)(xv).

Assured and National's consent rights are on account of their agreement to the HTA/CCDA Plan Support Agreement, and do not constitute disparate treatment under section 1123(a)(4), which the Oversight Board will demonstrate at confirmation.

Likewise, the Oversight Board will demonstrate at confirmation that timing of distribution of HTA Clawback CVIs is in accordance with applicable law. |
| | o   The plan cannot assume that HTA Loan claims are subordinate to the HTA Bond claims and provides greater recoveries to HTA Bondholders without justification. Id. | |
| | o   The interim distributions to HTA 68 Bonds and HTA 98 Senior Bonds of $264 million from HTA are premature. Id. at 25. | |
| | o   Creditors party to the HTA/CCDA PSA are receiving up to $140 million in PSA Restriction Fees and up to $125 million in HTA Consummation Costs (as each is defined in the HTA/CCDA PSA).  Separately, Assured and National are receiving $58.5 million in fees for structuring the settlement set forth in the HTA/CCDA PSA. Id. | |
| | o   Payment of the HTA Clawback CVIs on account of the DRA's HTA Loan claims is subject to distribution conditions that can only be satisfied with the consent of certain named creditors that are parties to the HTA/CCDA PSA, including that certain documents must be complete to the satisfaction of Assured and National, and the DRA does not have the same consent rights. Id. | |
| | o   The timing for when HTA Clawback CVIs are distributed to holders of CW/HTA Claims may violate Puerto Rico law.  The plan provides that a portion of HTA Clawback CVIs must be held in reserve pending the Court's determination of relative creditor priorities at HTA.  However, that section could be overridden if the "Distribution Conditions" are satisfied. Id. at 26. | |
| FGIC | •   Plan classifies FGIC Insured Bonds in the same class as other insured GO bonds, but provides disparate treatment in violation of 1123(a)(4) due to a difference in distribution scheme for FGIC Insured Bonds, rendering the plan unconfirmable. FGIC Obj. at 13-15.

•   Section 71.4 of the Plan will only be approved if 50.1% of FGIC Insured Bonds agree; proposes separate class instead and specification of how | Whether the plan provides disparate treatment in violation of section 1123(a)(4) is a confirmation issue, which will be addressed at confirmation.  Nonetheless, pursuant to the Plan, the consideration provided on account of FGIC Insured Bonds is the same as other insured GO bonds in the same class. |

| Party | Objection | Response |
|-------|-----------|----------|
| | FGIC Insured Bonds will receive distribution absent creation of FGIC Trust. Id. | |
| | **Preemption** | |
| Ambac | • Ambac asserts that the viability of the Plan is contingent on preemption, and in the event that the Revenue Bond Statutes are not preempted, the Plan cannot satisfy PROMESA § 314(b)(3). At a minimum, Ambac requests the identification for each class of claims what role preemption played in the Oversight Board classification and treatment of claims and identify risks if theory rejected ((¶46) (language provided at Ex. A at 1). Ambac Obj. at 9. <br><br>• Asserts that the list of statutes in Exhibit K is insufficient, that analysis and a Court ruling is necessary to determine which statutes are preempted. Id. at 11-13. <br><br>• Further, Ambac asserts that the statutes obligating the Commonwealth to appropriate funds are not inconsistent with PROMESA. Ambac asserts that the Board's power extends to discretion to direct expenditures and disbursements for budgeting each fiscal year, but that these are "obligation" creating statutes that are not consistent with PROMESA and not preempted. Id. at 13-15. <br><br>• Ambac asserts that the Preemption Provision relies on an overbroad interpretation of the powers vested to the Oversight Board by Congress; but that power is not "unlimited, and unspecified, authority to meddle with the Commonwealth's governmental functions." (¶41). Ambac claims Congress would have been more explicit if intended the broad reach of legislative functionality of the Oversight Board. Id. at 15-17. | See discussion of issues relating to preemption in the Omnibus Reply. |
| DRA Parties | • The plan cannot be confirmed because it allows for the Commonwealth to permanently retain the Act 30-31 Revenues in contravention of Article VI, Section 8 of the Puerto Rico Constitution and other applicable Commonwealth law. DRA Obj. at 9-11. | See discussion of issues relating to preemption in the Omnibus Reply. |
| US Bank | • The Disclosure Statement ignores the Commonwealth's obligations under Commonwealth law, fails to explain the basis and decisionmaking, or the factual and legal basis upon which they have been abrogated, fails to address the Commonwealth's obligations under the GDB Claim, and fails | See discussion of issues relating to preemption in the Omnibus Reply. |

| Party | Objection | Response |
|-------|-----------|----------|
|  | to address the Oversight Board's obligations to the Trustee described above.  US Bank PFC Obj. at 22. |  |
| DRA Parties | • With respect to the Oversight Board's position as to preemption, the Disclosure Statement should be revised to note the DRA Parties' disagreement with the Oversight Board's position, and the DRA Parties' position as to the Clawback Executive Orders and the moratorium legislation.  DRA Obj. at 49-50. | The Debtors have included the following language on page 65 of the Disclosure Statement:<br><br>"The GDB Debt Recovery Authority disagrees with the Oversight Board's position or characterization regarding preemption and will take the position, in connection with confirmation of the Plan, that PROMESA does not preempt Acts 30 and 31.  In addition, the GDB Debt Recovery Authority asserts that the Commonwealth did not satisfy the requirements of Article VI, Section 8 of the Puerto Rico Constitution (and other applicable Commonwealth statutes) when it retained certain allocated revenues.  Moreover, the GDB Debt Recovery Authority does not believe that the excise tax revenues are legislative appropriations that may rescinded in the absence of legislative action by the Commonwealth.<br><br>"The GDB Debt Recovery Authority contends that the Clawback Executive Orders and the moratorium legislation that was put into effect beginning in 2016 in response to the Commonwealth's fiscal crisis were unlawful even though they were purportedly made pursuant to Article VI, Section 8 and/or Article II, Section 19 of the Puerto Rico Constitution, and that an unconstitutional diversion of revenues has continued during the Title III proceedings for the Commonwealth and HTA." |
| | **Releases** | |
| Ambac | • Creditors are not apprised of the existence of the non-Debtor releases or the consequences of the Plan on their claims against third parties like HTA, CCDA, or PRIFA. Ambac Obj. at 30, 32-33. | The Plan has been revised to resolve this concern.  *See* Plan § 1.256. |
| Ambac | The non-consensual third-party release renders the Plan patently unconfirmable: | The Plan has been revised to resolve this concern.  *See* Plan § 1.256. |

| Party | Objection | Response |
|---|---|---|
| | • Plan section 88.2(a) suggests that claims against instrumentalities that are not Debtors under the Plan—including HTA, CCDA, and PRIFA—may be included in the scope of the Section 88.2(a) release.<br><br>• Plan section 82.1(g) confirms that the Plan seeks to impact claims against these entities.<br><br>• Plan seeks to discharge claims arising from bonds issued by certain entities (with respect to CCDA and PRIFA), including claims against those very entities, but for whom no restructuring process has yet begun. Ambac Obj. at 27-32. | |
| UCC | • The Disclosure Statement does not clearly explain whether releases are being granted merely by the Debtors or by all creditors (whether or not such creditors support the Proposed Plan). UCC Obj. at 47-48.<br><br>   o Section W.5 of the Disclosure Statement refers to releases "by the Debtors and Reorganized Debtors."<br><br>   o However, the "Injunction on Claims" at section W.3 of the Disclosure Statement enjoins "any party who has held, holds, or might hold claims or any other debt or liability that is released pursuant to the Plan."<br><br>   o Further, the "Injunction Related to Releases" at section W.6 of the Disclosure Statement enjoins "all entities that have held, currently hold, or may hold a Released Claim."<br><br>   o In addition, the term "Released Claim" is defined in the Plan broadly to include, among other things, claims that "are related to . . | The Plan has been amended to provide further clarification regarding the releases.  Nonetheless, the UCC raises confirmation issues that are not appropriately considered at the Disclosure Statement Hearing stage.  As noted in the Omnibus Reply, courts that refused to approve a disclosure statement because the proposed plan was determined to be patently unconfirmable did so because a key portion of the relevant plan was determined to be contrary to law in a manner that the debtors could not fix at the confirmation hearing.[1]  The same is not true here—if the Court were to determine certain releases the UCC objects to cannot be approved or further clarification is necessary, the Oversight Board could amend the Plan, at that time, to rectify the problem. |

---

[1]   *See, e.g., In re Criimi Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) (considering whether proposed treatment of debtor's main secured creditor under the Plan without affording them a credit bid violated the Bankruptcy Code); *In re E. Me. Elec. Coop., Inc.*, 125 B.R. at 339 (violations of absolute priority rule obvious on the face of the plan rendered plan patently unconfirmable); *In re Pecht*, 53 B.R. 768, 769-70 (Bankr. E.D. Va. 1985) (same); *In re Bjolmes Realty Tr.*, 134 B.R. 1000 (same); *In re O'Leary*, 183 B.R. 338, 341–42 (Bankr. D. Mass. 1995) (same); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294–304 (considering whether plan violated binding First Circuit precedent and whether certain other provisions of the plan would be permissible, where factual record relating to those provisions was already fully developed).

| Party | Objection | Response |
|-------|-----------|----------|
| | . the Debtors or their Assets in the Title III Cases," and claims that "otherwise . . . relate to the Title III cases."<br><br>   ○  Supplemental Injunction" at section W.11 of the Disclosure Statement enjoins, among others, "all entities who have held or asserted, currently hold or assert, or may hold or assert, any Released Claims against any of the Released Parties based upon or relating to the Title III Cases." As with section W.6, section W.11 contradicts section W.5 by suggesting that releases are to be granted not only by the Debtors, but by all creditors (whether or not such creditors support the Plan).<br><br>•  The Disclosure Statement does not explain who is receiving releases under the Plan. <u>Id.</u> at 48.<br><br>   ○  Releases run in favor of the "Released Parties" defined as the Debtors and the parties to PSAs with the Debtors.<br><br>   ○  The Plan purports to enjoin actions regarding Released Claims without regard to which parties such Released Claims are asserted against.<br><br>   ○  The definition of "Released Claim" does not clarify the matter, as under that definition, a Released Claim may be a claim asserted against any party as long as it is somehow "related to the Debtors" or "related to the Title III case[s]."<br><br>•  The Disclosure Statement lacks of clarity regarding what claims are being released. <u>Id.</u> at 49-50.<br><br>   ○  The Plan provides an injunction with respect to "any Claim or other debt or liability that is discharged pursuant to the Plan," which injunction purports expressly to benefit the Released Parties, a group that includes non-Debtors such as the GO/PBA PSA Creditors, the Retiree Committee, and AFSCME. The Debtors cannot provide a discharge for non-Debtor parties. | |

| Party | Objection | Response |
|-------|-----------|----------|
| |    o  The Debtors must clarify (a) whether they are in fact seeking nonconsensual third party releases and (b) what rationale would support such releases in these Title III cases.<br><br>• The Disclosure Statement lacks an adequate explanation regarding the rationale for such releases. Id. at 50.<br><br>   o  The only explanation for the releases provided to Non-Debtors is that the releases "are integral to obtaining the value provided under the settlements in the Plan" and are "essential to the implementation of the Plan." This generalized boilerplate language is insufficient to justify the Debtors' consensual grant of releases and non-consensual third party releases. Id. at 50.<br><br>• The scope of the proposed releases renders the Plan patently unconfirmable. UCC Obj. at 64.<br><br>• The Proposed Plan appears to seeks to impose extraordinarily broad non-consensual third party releases without establishing the existence of the unique circumstances under which such releases may be approved.<br><br>• The Proposed Plan grants exculpation provisions to non-fiduciaries, including GO/PBA PSA Creditors and HTA/CCDA PSA Creditors (and their Related Persons). Id. at 64-65. | |
| UCC | • The Disclosure Statement offers no explanation or rationale for releasing the Invalidity Actions as against prior bondholders. Creditors are entitled to know what value is being left on the table and why, including what consideration is being received in exchange for these releases. UCC Obj. at 51. | The UCC seeks to challenge the settlements reached with other parties, which is appropriate for consideration at confirmation. *See Memorandum of Decision and Order on Official Committee of Unsecured Creditors' urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 17029] at 4, 9 (limiting the UCC's discovery requests in connection with the Oversight board's rationale and decision making behind particular provisions of the proposed Plan and settlements therein). |
| DRA Parties | • The plan includes impermissibly broad releases, including third-party releases, which includes the Debtors and their agencies (and "may" include HTA), creditors party to the GO PSA and HTA/CCDA PSA, and their respective current and former officers and directors. DRA Obj. at 34-35. | The Plan has been revised to resolve this concern. *See* Plan §§ 1.255 and 1.256. |

15

| Party | Objection | Response |
|---|---|---|
| DRA Parties | • Certain exculpations in the plan, such as those given to Assured and National, are impermissibly broad, and fail the *Master Mortgage* test. <u>DRA Obj.</u> at 34-35. | The DRA Parties raise issues regarding the scope of the exculpations in the Plan that will be addressed at confirmation. |
| US Bank | • The Plan includes vague and expansive releases, injunctions, and exculpations that could be construed to impact claims relating to the PREPA Bonds.  Proposes revised language to include in the Plan. <u>US Bank PREPA Obj.</u> at 4, 9. | The Plan has been revised to resolve this concern.  *See* Plan §§ 1.255 and 1.256. |
| US Bank | • No discussion in the Disclosure Statement of the existence of the Trustee's claim or the reason why it appears to be deemed released and discharged for no consideration or on what ground, or the consequences to other creditors if in fact some or all of the claim is allowed. <u>US Bank PREPA Obj.</u> at 5. | The Plan has been revised to resolve this concern.  *See* Plan §§ 1.255 and 1.256. |
| US Bank | • The Disclosure Statement fails to clearly state whether the Trustee is obtaining releases and exculpations, or whether the Trustee or any holders of Bonds are deemed to grant any releases. <u>US Bank PREPA Obj.</u> at 5. | The Plan has been revised to resolve this concern.  *See* Plan §§ 1.255 and 1.256. |
| US Bank | • The Plan's releases and exculpations are overly broad and do not provide adequate information on parties to be released/exculpated.  <u>US Bank PRIFA Obj.</u> at 11-13. | The Plan has been revised to resolve this concern.  *See* Plan §§ 1.255 and 1.256. |
| US Bank | • The Plan provides for extremely broad releases, including releases of "all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth." See Plan, Art. I 1.248. This definition appears to include Commonwealth entities that have issued bonds for which U.S. Bank, in its capacity as trustee, has filed claims on behalf of bondholders. The Disclosure Statement does not provide sufficient information regarding the releases of claims by or against UPR, PRIDCO, MFA, CT or AFICA, by the Debtors, the Trustee, or any other governmental entities or third parties.  <u>US Bank PRIFA Obj.</u> at 12. | The Plan has been revised to resolve this concern.  *See* Plan § 1.256. |
| US Bank | • The Disclosure Statement does not adequately explain how the Plan cancels or finally terminates the obligations of PRIFA under the PRIFA Bonds, in the context of resolving a claim filed against the Commonwealth, nor does it indicate if the Trustee will be covered by the Releases and Exculpations under the Plan, as are other Trustees. <u>US Bank PRIFA Obj.</u> at 9. | Page 490 of the Disclosure Statement provides that, on the Effective Date, the Debtors and Reorganized Debtors will be discharged and released form any and all claims, causes of action and any other debtors that arose prior to the Effective Date (including prior to the Petition Date). |

| Party | Objection | Response |
|---|---|---|
| Underwriters / Merrill | • The Disclosure Statement fails to provide adequate information with respect to the non-consensual releases of the defensive rights. <u>Underwriter Obj.</u> at 11-12.<br><br>• Plan is not confirmable if it strips the Defensive Rights.<br><br>   ○ The Plan cannot bar defenses.  The Defensive Rights, which include rights of recoupment, setoff, and other defenses and allocations of liability in the Litigations, must survive discharge under Bankruptcy Code Section 524 and allow a claimant to proceed against a discharged debtor for purposes of establishing liability, provided that doing so would not result in an affirmative recovery against the discharged debtor.  <u>Underwriter Obj.</u> at 12-19.<br><br>   ○ The non-consensual releases of defensive rights in the monoline actions fail the test for approval of third-party releases. <u>Underwriter Obj.</u> at 14-18<br><br>• The Plan cannot bar rights of setoff or recoupment; they are to be treated as secured claims that cannot be unilaterally stripped or rendered unsecured. <u>Underwriter Obj.</u> at 18-19. | The Plan has been revised to resolve this concern.  *See* Plan § 88.2(e). |
| | **Pensions** | |
| Ambac | The Disclosure Statement Overstates the Amount of the Commonwealth's Pension Liability and Fails to Disclose the Unreliability of Pensions Data<br><br>• Ambac's Rule 2004 investigation regarding the Commonwealth's finances suggests that the $55.6 billion figure in the Retiree Committee's proof of claim is based on unreliable data and unreasonable assumptions, which have resulted in a significant overstatement of pension liabilities. The unaudited and unverified data that has been used by the Board's consultants is stale and patently unreliable. <u>Ambac Obj.</u> at 47-49.<br><br>• The Board states, at the beginning of the Disclosure Statement, that it has "retained experts to help verify and understand" certain data, "such as for pension liabilities[.]" (DS at iii.) This misleadingly suggests the data underlying the Board's pension analyses has been verified—not so. The | Ambac fails to note that, following the passage it quoted on page iii of the Disclosure Statement, the Oversight Board notes "Accordingly, while the Oversight Board has used its best efforts to procure accurate and complete information, it is limited to using the Commonwealth's systems and data as its sources and ***cannot independently vouch for the correctness of such data*** . . . ." (emphasis added).<br><br>Furthermore, this risk is addressed on page 526 of the Disclosure Statement (see section "The Fiscal Plan is modeled on the most recently available data provided by the Government and is reliant on assumptions to project future pension expenses"), which, among other things, notes that "to the extent that actual experience is different than assumed, the projected costs of the plan could vary significantly." |

| Party | Objection | Response |
|---|---|---|
| | Disclosure Statement must be amended to clarify where experts "verified" data as opposed to simply aiding the Board's understanding. <u>Id.</u> at 49 n.82. <br><br>• The Disclosure Statement must disclose the reliability concerns regarding the underlying data and the likely effect on the calculation of the pension liability should the data prove to be materially inaccurate. <u>Ambac Obj.</u> at 50. | The Debtors' have included the following language on page 526 of the Disclosure Statement: <br><br>"Certain creditors have challenged the accuracy of the data and the methodology by which the pension liability estimate has been calculated." |
| Ambac | • The Disclosure Statement must state clearly the amount of pension liability being allowed under the Plan.  <u>Ambac Supp. Obj.</u> ¶ 9. <br><br>• The Disclosure Statement must clarify whether the Retiree Committee Claim will be disallowed under the Plan, or if allowed, in what amount. <u>Ambac Supp. Obj.</u> ¶ 10. <br><br>• The Disclosure Statement must identify the bases on which, and methodology by which, the Plan's allowed pension liability amount was determined and calculated, including from which data, reports, and analyses the allowed amount was derived. <u>Ambac Supp. Obj.</u> ¶ 11. | Ambac confuses the Retiree Committee Claim with the Commonwealth's actual obligations to retirees, which are the obligations that are subject to treatment under the.  The claims of retirees are for future payments of benefits that accrued prior to the Commonwealth petition date.  The Plan provides for the adjustment of these payments pursuant to a formula applied to the monthly benefit amount, and not a percentage recovery on a set lump sum claim amount or estimate.  As discussed in the Oversight Board's response to Ambac's proposed briefing schedule for the Pension Claim Objection, the Retiree Committee Claim is irrelevant to the treatment of the retirees and to the adequacy of the Disclosure Statement. <br><br>Furthermore, Ambac's objection is to the terms of the Plan, and whether and what amount the pension claims should be allowed pursuant to the Plan.  The Disclosure Statement is intended to disclose the terms of the Plan, and not rewrite them. <br><br>The requests for the methodology and liability information largely echo Ambac's discovery requests in the *Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 16812], which the Court noted "the vast majority are directed to challenges to confirmability of the proposed Plan, Ambac's contention that there are better alternatives, and investigation of additional Commonwealth |

| Party | Objection | Response |
|-------|-----------|----------|
| | | assets potentially available to creditors" in denying Ambac's motion, except to the extent the Oversight Board agreed to provide Ambac certain information. *Memorandum of Decision and Order on Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 17058] at 8. Nonetheless, the relevant information is the projection of PayGo payments, which is set forth in the certified Commonwealth Fiscal Plan (attached as Exhibit G to the Disclosure Statement). |
| | **PSAs** | |
| Ambac | • The Disclosure Statement states that CCDA bondholders who have executed the HTA/CCDA PSA shall receive the CCDA Fees, payable in cash as an administrative expense claim under the Plan.<br><br>• The Board's use of CCDA bondholders' collateral to pay a "support fee" to only some of the bondholders secured by that collateral raises a host of confirmation issues, including (among others) unequal treatment of holders of claims in Class 57, a lack of good faith in using assets of a separate entity to fund distributions to Commonwealth creditors, and a claim for conversion. <u>Ambac Obj.</u> at 46-47.<br><br>• If the CCDA Fees is not being taken from the funds in the FirstBank account or from other accounts held by the Tourism Company, the Disclosure Statement should clarify the source of the funds it will use to pay the CCDA Fees.<br><br>• If the CCDA Fees is being taken from funds on which this Court has held that CCDA bondholders may have a lien and over, the Disclosure Statement must disclose this, so that affected creditors may take action and so that all creditors may understand the risks to confirmation of the Plan. <u>Id.</u> at 47. | CCDA is <u>not</u> a Title III debtor and the payment of the CCDA Fees by CCDA pursuant to the HTA/CCDA PSA is not before the Court. |
| Ambac | • The Disclosure Statement must reveal what the Oversight Board believes to be the value of the "ERS assets" the Commonwealth is purchasing, and how that value was determined. This information will enable voting creditors to assess the reasonableness of the settlements in the Plan, as well | These requests largely echo Ambac's discovery requests in the *Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 16812], which the Court noted |

| Party | Objection | Response |
|-------|-----------|----------|
| | as make an informed judgment with respect to the "good faith" of the process by which the Plan has been proposed.  Ambac Obj. at 58-59. | "the vast majority are directed to challenges to confirmability of the proposed Plan, Ambac's contention that there are better alternatives, and investigation of additional Commonwealth assets potentially available to creditors" in denying Ambac's motion except to the extent the Oversight Board agreed to provide Ambac certain information.  *Memorandum of Decision and Order on Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 17058] at 8.  The issues of the reasonableness of the settlements contained in the Plan and whether the Plan has been proposed in good faith pursuant to Bankruptcy Code section 1129(a)(3) will be addressed at confirmation. |
| Ambac | • The GO/PBA PSA and the HTA/CCDA PSA offer cash to those creditors that joined the agreements after they were negotiated in exchange for no consideration other than their affirmative votes. The Joinder Creditors are not contributing anything to merit receipt of the Plan Support Fees apart from their commitment to support the Plan. Ambac Obj. 37-38.  • In addition to the Plan Support Fees, several other provisions of the PSAs demonstrate that the Board impermissibly purchases Joinder Creditors' votes: Cap on PSA participation, restriction on sale of claims, limited termination rights, and amendment to allow retail Joinder Creditors to join the HTA/CCDA PSA. Ambac Obj. at 39.  • This is vote-buying, a bad-faith solicitation practice. The Court should strike the Plan Support Fees for Joinder Creditors from the PSAs. Alternatively, the Court should decline to approve the Disclosure Statement until the PSAs are modified to strike the Plan Support Fees for Joinder Creditors. Ambac Obj. at 40. | The cap on PSA participation for the HTA/CCDA PSA has been removed.  Furthermore, retail holders will also receive the retail support fee if the relevant class votes to accept the Plan.  Furthermore, pursuant to the *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, ECF No. 560] (the "COFINA Confirmation Order"), the Court approved similar payments. *See* COFINA Confirmation Order ¶¶ 70-74. |
| DRA Parties | • The settlements contained in the HTA/CCDA PSA violate Rule 9019 and the Bankruptcy Code's priority scheme.  It prematurely seeks to definitely establish the priority of claims against HTA and requires that $264 million in interim distributions to be made to certain HTA bondholders before the priority of their claims has been determined. DRA Obj. at 22-23. | The Plan does not address HTA.  To the extent CVIs are distributed, it will be allocated per Court order at confirmation or thereafter.  Nonetheless, the DRA Parties object to the reasonableness of the settlements contained in the HTA/CCDA PSA and incorporated into the proposed Plan, which objection is |

| Party | Objection | Response |
|-------|-----------|----------|
| | | appropriately addressed in connection with confirmation of the Plan. |
| | **Description of Litigations** | |
| AMC Group | • The Disclosure Statement does not provide an adequate explanation of the history of the litigation with the health centers, or an explanation of why the Class 53 creditors are receiving the treatment proposed under the Plan. <u>AMC Obj.</u> at 3-4. | The Debtors have included the below language requested by the AMC Group. *See* <u>Disclosure Statement</u> at 283.<br><br>"Since 2001 and 2006, the Atlantic Centers[2] have been involved in Commonwealth and federal litigation, respectively, seeking injunctive relief to enforce their payment rights dating back to 1997. The Atlantic Centers believe that the Commonwealth court has issued various orders of partial summary judgement ordering the Commonwealth to make some payments to the Health Centers and assert that, on November 8, 2010, the U.S. District Court for the District of Puerto Rico, directed the Commonwealth to implement a system compliant with the 42 U.S.C. § 1396a(bb) payment formula. The Atlantic Centers have argued that, to date, the Commonwealth has only made estimated payments and has yet to implement a federally compliant payment system. Additionally, the Atlantic Centers have asserted ongoing claims against the Commonwealth as they continue to provide services to Medicaid beneficiaries. The Atlantic Centers assert that the U.S. First Circuit Court of Appeals has found that the Health Centers have payment rights enforceable under 42 U.S.C. § 1983 for services they provide to the Commonwealth of Puerto Rico Medicaid program beneficiaries." |
| SIM | • There is no discussion as to the stage of the litigation against professionals, personnel, and vendors on pages 306-308 of the Disclosure Statement, or how much money has been collected. <u>SIM Obj.</u> at 6. | The Debtors have included revisions to pages 322-25 of the Disclosure Statement. |

---

[2] The "<u>Atlantic Centers</u>" include Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos, Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.

| Party | Objection | Response |
|-------|-----------|----------|
| | **Risk Factors** | |
| Ambac | • Creditors may assert claims against the Commonwealth under Section 407 of PROMESA, which could result in significant liability that threatens the Plan's feasibility. Ambac Obj. at 40-42. | Ambac raises factual issues as to the feasibility of the proposed Plan, which will be addressed at confirmation. As the Court noted in the *Order Denying Urgent Motion for Extension of Time to Object to Best Interest Analysis of Disclosure Statement* [ECF No. 16960] with respect to the best interest test pursuant to PROMESA section 314(b)(6), the feasibility of the plan is a confirmation requirement and parties will have the opportunity to challenge the feasibility of the Plan at confirmation.<br><br>Nonetheless, the Disclosure Statement notes as a risk factor that the Title III Court may not confirm the Plan. Disclosure Statement at 480. |
| FGIC | • The legal conclusions contained in the restricted cash analysis is subject to active litigation and may be incorrect. FGIC Obj. at 12-13.<br><br>• Creditors may pursue claims pursuant to PROMESA § 407 to recover the value of certain inter-debtor transfers after the expiration of lifting of the stay under PROMESA § 406.<br><br>• There may be a material risk to the feasibility of the proposed Plan if some or all of the funds designated as "restricted" are not, in fact, restricted or if funds designated as "unrestricted" are indeed restricted by constitutional provision or enabling legislation.<br><br>• Debtors have not identified "committed" resources in addition to restricted in accordance with GASB 54. FGIC Obj. at 11. | See immediately above. |
| Ambac | • Disclosure should be amended to reflect that failure to achieve the Effective Date by January 31, 2022, may give parties to the GO/PBA PSA the right to terminate that agreement yet still claim Plan Support Fees thereunder. Ambac Obj. at 59. | The Debtors have included additional language on page 509 of the Disclosure Statement:<br><br>"If the Effective Date does not occur by January 31, 2021, parties to the GO/PBA PSA may terminate the GO/PBA PSA and assert payment of the PSA Restriction Fee and Consummation Costs in an aggregate amount of |

| Party | Objection | Response |
|---|---|---|
| | | $100,000,000.00 as an administrative expense claim." |
| Ambac | • There is a significant risk that the Revenue Bond Litigation will not be concluded by the Board's desired time for a confirmation hearing, which may delay confirmation and the Effective Date or necessitate the creation and funding of an appropriate reserve to ensure adequate recoveries for the claims asserted therein. Ambac Obj. at 60. | The Debtors have included additional language on page 508-09 of the Disclosure Statement:<br><br>"Certain litigation concerning such claims, including the Revenue Bond Litigation identified in Section V.F.5 of the Disclosure Statement, is continuing, and may not be completed by the time the Confirmation Hearing is scheduled to begin. The Court scheduled a hearing on September 15, 2021 on certain summary judgment motions.  *See* ECF No. 17137. If this litigation is not resolved prior to the Confirmation Hearing, the Confirmation Hearing and Effective Date may be delayed to allow for resolution of these disputed claims. Alternatively, the Oversight Board may be required to establish an appropriate reserve to ensure adequate recoveries on the claims sought to be disallowed in the Revenue Bond Litigation if the Oversight Board is unsuccessful.<br><br>If such and other similar claims are ultimately allowed, or if the Oversight Board is required to establish an appropriate reserve in respect of such disputed claims pending their resolution, the Plan may not be confirmable without amendments that may materially change its proposed distributions, but material changes would be subject to new votes by the affected claimholders." |
| DRA Parties | • The Disclosure Statement should disclose the risk that the plan may not be confirmed and the GO PSA may be terminated if the DRA Administrative Expense Claim Motion is granted.  DRA Obj. at 39-40.<br><br>• The Disclosure Statement does not disclose that the DRA's administrative expense claim, if granted, is non-dischargeable, and therefore will survive the Commonwealth's Title III proceeding. DRA Obj. at 40-42. | The Debtors have included additional language on page 508 of the Disclosure Statement:<br><br>"The DRA Parties assert that the Plan may not be confirmed and the GO/PBA PSA may be terminated if the DRA Administrative Expense Claim Motion were granted, which would entitle the DRA Parties to approximately $800 million in administrative expense claims.  The Oversight Board does not believe the DRA Administrative Expense Claim Motion is meritorious, and will request a briefing schedule in connection |

| Party | Objection | Response |
|---|---|---|
| | | therewith so that such motion can be determined either before or at the confirmation hearing." <br><br> "The DRA Parties assert that their administrative expense claim, if granted, is non-dischargeable, and therefore will survive the Commonwealth's Title III case." |
| DRA Parties | • The DRA will take the position at confirmation that the plan violates Commonwealth law because it permits the Commonwealth to continue to violate Article VI, Section 8 of the Puerto Rico Constitution by diverting secured revenue streams (including the Act 30-31 Revenues) that are otherwise required to be allocated to HTA. <u>DRA Obj.</u> at 43-45. | Parties will have an opportunity to brief their position and object to the confirmation of the proposed Plan pursuant to the Debtors' proposed confirmation schedule.  The Debtors have included the following disclosure in connection with the risk factor that the Title III Court may not confirm the Plan: <br><br> "Various parties have indicated they will object to the confirmation of the Plan, including, without limitation: Ambac, FGIC, the DRA Parties, and the UCC."  <u>Disclosure Statement</u> at 508. <br><br> See also the discussion on preemption in the Omnibus Reply. |
| | **Audited Financial Statements** | |
| SIM | • The 2017-2020 audited financial statements are missing. <br><br><br><br> • The Board states it cannot certify the accuracy of the financial information provided by the Commonwealth. Creditors cannot make an informed decision as to the plan if there is no certainty of the authenticity or reliability of the financial information.  <u>SIM Obj.</u> at 3-4. | Audited financial statements for the Debtors for the years 2017 to 2020 are not available.  It is not a requirement of Bankruptcy Code section 1125(a)(1), for the Debtors to disclose information that is not available. <br><br> Financial information in a disclosure statement may be unaudited. *See, e.g.*, *In re Fox*, No. 98-20105-11, 2000 Bankr. LEXIS 1713, at *51 (Bankr. D. Kan. Aug. 4, 2000) ("Congress did not decree that financial information used in a disclosure statement, plan or confirmation hearing must be audited."). The only requirement accompanying the use of unaudited information is that the debtor not warrant or represent that all of the information is accurate. *See In re Baumgarten*, No. 93 B 40188 (FGC), 1993 Bankr. LEXIS 1933, at *5 (Bankr. S.D.N.Y. Dec. 30, 1993) (where efforts had been made to be accurate and the plan's proponents did not warrant the accuracy of the information, a disclosure statement, though not |
| Ambac | • The Disclosure Statement does not provide adequate information concerning the Commonwealth's financial condition. <u>Ambac Obj.</u> at 53. <br><br>   o The 2017-2020 audited financial statements for the Commonwealth have not been released. | |

| Party | Objection | Response |
|-------|-----------|----------|
| | o   The Board has not attested to the accuracy of any financial information in the Disclosure Statement or the Fiscal Plan. | subject to a certified audit, presented adequate information to creditors pursuant to Bankruptcy Code Section 1125.). |
| Hein | • Current audited financial information for the Debtors must be disclosed, including for the Commonwealth and PBA. Hein Obj. at 26. | Further, disclaimers similar to the one in the Disclosure Statement are common and have been included in numerous disclosure statements filed and approved in other municipal bankruptcies. *See, e.g.*, *In re City of Detroit* Disclosure Statement, Case No. 13-53846 (Bankr. E.D. Mich. May 5, 2014) [ECF No. 4391] at 3 ("Except where specifically noted, the financial information contained in this Disclosure Statement and in its Exhibits has not been audited by a certified public accountant and may not have been prepared in accordance with standards promulgated by the Government Accounting Standards Board or generally accepted accounting principles in the United States."); *In re City of San Bernardino* Disclosure Statement, Case No. 12-bk-28006 (Bankr. C.D. Cal. July 29, 2016) [ECF No. 1881]) at 12 ("The City's professional advisors have not independently verified the financial information provided in this Disclosure Statement, and, accordingly, they make no representations or warranties as to its accuracy."). |
| Hein | • The Disclosure Statement should specify for each Debtor:<br><br>The days delay between the end of the fiscal year and the issuance of audited financials for each of the 5 fiscal years prior to PROMESA becoming effective, and for each year after PROMESA became effective. Id. at 27. | The Disclosure Statement provides an extensive discussion of the delayed filing of the Commonwealth's audited financial statements, including reasons for such delays and the date on which the audited financial statement was filed. Disclosure Statement at 575-78. |
| **Add'l Disclosures** | | |
| SIM | Avoidance action trust terms | • At pages 433-36, the Disclosure Statement discusses the Avoidance Action Trust to handle the continuation of the litigation. This Trust will be created after the Plan is approved. Creditors have no way to know the nature of the Trust or who will chair it. SIM Obj. at 6. | General information relating to the terms of the Avoidance Action Trust has been included in the Plan and the Disclosure Statement.  Additional information, including the form of trust agreement, will be provided in a Plan Supplement, which will be filed seven (7) days prior to the Voting Deadline. |

| Party | | Objection | Response |
|---|---|---|---|
| Ambac | Underlying data and assumptions | • The Disclosure Statement does not provide the data and assumptions underlying the Disclosure Statement, the Plan, and the Fiscal Plan. Ambac Obj. at 53.<br><br>• Such disclosures should include the data, methodologies, assumptions, and analyses underlying the financial information and projections in the Disclosure Statement, Plan, and Fiscal Plan. Id. at 54 n.87. | Ambac seeks information in connection with its challenge to the confirmation of Plan and such information is not necessary to include in the Disclosure Statement. These requests largely echo Ambac's discovery requests in the *Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 16812], which the Court noted "the vast majority are directed to challenges to confirmability of the proposed Plan, Ambac's contention that there are better alternatives, and investigation of additional Commonwealth assets potentially available to creditors" in denying Ambac's motion except to the extent the Oversight Board agreed to provide Ambac certain information. *Memorandum of Decision and Order on Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery from the Government Parties in Connection with the Disclosure Statement* [ECF No. 17058] at 8. |
| Ambac | Voting Rights of Monoline Insurers | • The solicitation procedures do not acknowledge the right of any monoline insurer other than Assured and National to vote their respective claims in Class 56 (the CW/HTA Claims), 57 (the CW/Convention Center Claims), and 58 (the CW/PRIFA Rum Tax Claims), despite the fact that Assured and National's Clawback Claims are identical to Ambac's. Ambac Obj. at 42<br><br>• The Disclosure Statement states that "each holder" of the Clawback Claims has the right to vote such claims, but states: "However, Assured and National are entitled to vote on account of such Allowed Claims insured by Assured and National, respectively." The implication is that Assured and National are not "holders" of these claims entitled to vote under PROMESA, meaning that other monoline insurers similarly are not "holders" of Clawback Claims. Id. at 43. | The Debtors have included the following language on page 53 of the Disclosure Statement:<br><br>"Ambac and FGIC assert they are entitled to vote the Claims in Classes 4, 18, 24, and 56-58 corresponding to the Allowed Claims insured by such insurer."<br><br>If there is a dispute as to whether Ambac or the holders of the bonds Ambac insures is entitled to vote on the Plan, that dispute will be resolved by the Court. |

| Party | | Objection | Response |
|-------|---|-----------|----------|
| | | • The Disclosure Statement suggests that Ambac's, and other insurers', right to vote on the Plan is contingent upon an agreement to support the Plan. This is both misleading as to Ambac's rights, and could lead holders of Ambac-insured bonds to believe that they are entitled to vote under the Plan. *Id.* at 44-45. | |
| UCC | Disclosure regarding Class 55 | • The Debtors' Disclosure Statement does not provide "full and honest disclosure" because it neither sets forth the estimated amount of the CW General Unsecured Claims in Class 55, nor the expected recovery on account of such claims.  UCC Obj. ¶ 47. | The Disclosure Statement has been revised to include estimated amount of claims in Class 55 and estimated recoveries. |
| UCC | Avoidance actions against professionals and vendors | • It is unclear whether the Avoidance Actions will include claims under the Bankruptcy Code's avoiding powers that have not yet been filed, including claims subject to tolling agreements. Nor does the Disclosure Statement even attempt to provide an approximate value for these actions, or even take the simple step of listing the aggregate amounts sought in the various complaints.  Id. at 22.<br><br>• The Disclosure Statement does not disclose the extent of the escrowed settlement funds.<br><br>• The Disclosure Statement offers no explanation of which "actions seeking affirmative recoveries" will be transferred to the Avoidance Action Trust, and what is the Debtors' estimate of the approximate value of those claims. | The UCC seeks information in connection with its challenge to the confirmation of the Plan and such information is not necessary to include in the Disclosure Statement.  This request echoes the UCC's discovery requests in the *Official Committee of Unsecured Creditors' Urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 16811], which the Court noted "the vast majority are directed to challenges to confirmability of the Proposed Plan, investigation of the rational[e] for proposing this particular plan, and to the Committee's contention that there are alternatives that are better for the unsecured creditors" in denying the UCC's motion except to the extent the Oversight Board agreed to provide the UCC certain information. *Memorandum of Decision and Order on Official Committee of Unsecured Creditors' Urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 17029] at 9. |
| UCC | Disclosures regarding other "favored" classes and unclassified creditors | • The Disclosure Statement offers no explanation for favoring the unsecured claims in certain classes over Class 55.  If the Oversight Board believes that it is important to discriminate in favor of the creditors in these Classes, it must say so—and explain why. Similarly, the Disclosure Statement must explain why | The Disclosure Statement includes disclosures of the basis for the claims in Classes 12, 50, 52, 53, and 64.  The UCC objects to the asserted disparate treatment and reasonableness of the settlements in connection with such claims, which is appropriately addressed at confirmation.<br><br>As will be explained more fully in connection with confirmation of the Plan, claims in Classes 50, 52, and 53 arise |

| Party | | Objection | Response |
|---|---|---|---|
| | | this specific recovery is the "right" number. <u>Id.</u> at 31-32.<br><br>• The UCC anticipates that the Oversight Board will explain that it has favored these (or some of these) unsecured creditors because they have asserted certain priorities, security interests, rights to, or ownership of, specific funds, or other rights. If so, the Disclosure Statement must explain this and the strengths and weaknesses of these assertions—and how payment of 100% of a claim reflects a "settlement." | from creditors of industries or programs that are vital to the well-being and economy of the Commonwealth. The Gracia-Gracia claims in Class 64 are subject to a dispute with respect to such holders' property interests in certain duplicate insurance premiums, and given the low amounts of such claims, would nonetheless fall within the Convenience Claims in Class 65 and receive the same treatment. |
| UCC | ACR | • The Disclosure Statement does not include the Debtors' estimate that the number of claims subject to the ACR process total almost 100,000.<br><br>• The Disclosure Statement does not explain why the remaining 80,000 claims have not been transferred into the ACR process, or if and when they will be. <u>Id.</u> at 33-35.<br><br>• The ACR Procedures require payment in full of "the amount due and owing in the ordinary course." CW General Unsecured Claims in Class 55 will receive only a tiny fraction of their allowed claims.<br><br>• The Disclosure Statement's description of the CW General Unsecured Claims in Class 55 states that the Class excludes "any claim subject to the provisions of the ACR Order." The Disclosure Statement does not clarify whether claims "subject to the provisions of the ACR Order" are claims that have already been transferred into the ACR process, claims that are eligible for such transfer (even if not yet transferred), or some other category entirely. | The UCC complains that the Disclosure Statement does not include a "precise definition of 'tax refund claims, union grievance claims, public employee claims, and pension claims'." UCC Obj. at 34. But the Disclosure Statement cites to the ACR Order [ECF No. 12274], and that order—to which the UCC did not object, and which was entered over a year ago, on March 12, 2020—already provides a comprehensive definition of those categories of claims.<br><br>The UCC also objects to the Disclosure Statement because it does not indicate when claims eligible for transfer into ACR will be transferred into the procedures. Claims have been periodically transferred into ACR in compliance with the ACR Order's requirements. The number of claims included on any individual transfer notice (as described in the ACR Order), and the timing of filing thereof, has been determined in light of a number of factors, including the status of the Debtors' review of claims potentially eligible for ACR and the number of claims to be processed by the Commonwealth. However, all claims that the Debtors have determined, based on their analysis to date, to be eligible for ACR will be transferred into ACR on or before July 14, 2021.<br><br>Further, the Debtors have revised the Disclosure Statement to include the following language: |

| Party | Objection | Response |
|-------|-----------|----------|
| | • The Disclosure Statement must be revised to explain and/or clarify, at a minimum:<br><br>   o which creditors are or will be subject to the ACR process, including by providing precise definitions of "tax refund claims, union grievance claims, public employee claims, and pension claims";<br><br>   o the treatment of claims actually transferred to the ACR process;<br><br>   o that holders of ACR-eligible claims not yet transferred to the ACR process will have a right to vote on the Proposed Plan;<br><br>   o whether any claims eligible for ACR under the ACR Order will not be transferred to ACR and, if so, the rationale for this exclusion; and<br><br>   o whether creditors with claims eligible for ACR have a right to have their claims transferred into ACR under the ACR Order.<br><br>• The Disclosure Statement does not tell creditors<br><br>   o whether their claim was in a category eligible for ACR,<br><br>   o whether their claim was in a category eligible for ACR but nonetheless not transferred into the ACR process,<br><br>   o what was the rationale, legal basis, and process used by the Oversight Board in determining not to transfer the claim, and | "Based on the Debtors' review to date, a total of approximately 47,428 claims are eligible for transfer into the ACR Procedures.  The Debtors currently expect that the remaining 12,949 claims not yet transferred into ACR will be transferred on or before July 14, 2021.  As set forth in the ACR Order, all claims transferred into ACR will be designated as "Subject to Administrative Reconciliation" on the Title III claims registry.  Claims that are transferred into ACR will not be entitled to vote on the Plan, but will be paid in full in the ordinary course, pursuant to the terms of the ACR Order."<br><br>Finally, holders of ACR-eligible claims will <u>not</u> have the right to vote on the Proposed Plan. |

| Party | | Objection | Response |
|---|---|---|---|
| | | o   whether other similar claims were transferred into the ACR process. | |
| UCC | Recovery for settling bond creditors | • The Disclosure Statement fails to (i) account for the value of the CVIs being offered to the GO/PBA Creditors and to the Clawback Creditors, (ii) account for other sources of recovery, including fees and other payments offered to the Settling Bond Creditors, and (iii) explain (or justify) the impact of including original issue discount in the allowed claim being granted to the GO/PBA Bond Creditors.  UCC Obj. at 23. | The Debtors have added an illustrative chart of the GO CVI value under the 2021 Fiscal Plan SUT projections and the maximum payments is included on page 24 of the Disclosure Statement. |
| UCC | Payments to unclassified creditors | • The Disclosure Statement fails to disclose payments in full to certain prepetition unsecured creditors.  Id. at 35. | The UCC seeks information in connection with its challenge to the confirmation of the Plan and is not necessary to include in the Disclosure Statement.  This request echoes the UCC's discovery requests in the *Official Committee of Unsecured Creditors' Urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 16811], which the Court noted "the vast majority are directed to challenges to confirmability of the Proposed Plan, investigation of the rational[e] for proposing this particular plan, and to the Committee's contention that there are alternatives that are better for the unsecured creditors" in denying the UCC's motion except to the extent the Oversight Board agreed to provide the UCC certain information. *Memorandum of Decision and Order on Official Committee of Unsecured Creditors' Urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 17029] at 9. |
| UCC | Reasonableness of key settlements | • The Disclosure Statement does not provide information regarding the rationale for the settlements incorporated into the Plan or the Debtors' ability to satisfy Bankruptcy Rule 9019 with respect to the proposed settlements.  Id. at 45. | Whether the settlements incorporated into the Plan satisfy the requirements for approval under Bankruptcy Rule 9019 is an issue appropriately addressed at confirmation. |

| Party | Objection | | Response |
|---|---|---|---|
| SIM | Structural reforms | • At pages 170-174 of the Disclosure Statement, the Board lists recommendations it made to the Commonwealth in 2020, but does not explain whether these recommendations have been adopted or rejected by the Commonwealth, or whether these recommendations were adopted by the 2021 Fiscal Plan. SIM Obj. at 4-5.<br><br>• The Disclosure Statement does not identify previous Board recommendations that the Commonwealth has declined to adopt. Id. at 5.<br><br>• The Disclosure Statement does not identify any of the recommendations in the Kobre & Kim Report discussed on pages 296-97 that have been put into effect. Id. | Revisions to the Disclosure Statement have been made to address SIM's concerns. See Disclosure Statement at 175-85, 317-18. |
| SIM | Demographics and federal funding | • The 2021 Fiscal Plan states that the PR population was approximately 2,928,000, but the 2020 census places it at 3,285,874. SIM Obj. at 6-7. The fiscal plan projections should include the Biden administration's plan to provide Federal Funding.<br><br>• The Disclosure Statement fails to mention US v. Vaello and Peña-Martinez v. USDHHS. SIM Obj. at 7.<br><br>• The Disclosure Statement does not mention Salud Integral en la Montaña v. USA, 18-1045, which could have an impact in the availability of federal funds in Puerto Rico. Id. at 7-8. | The certified fiscal plan is not subject to Court approval or review pursuant to PROMESA sections 106(e) and 201.<br><br><br>United States v. Vaello-Madero and Peña Martinez v. U.S. Department of Health and Human Services are discussed on page 125 of the Disclosure Statement.<br><br>The Disclosure Statement notes the certified fiscal plan projections assume current federal and Puerto Rico healthcare law, and changes in such laws could impact the accuracy of the projections. It is not necessary to disclose every litigation that could potentially impact the assumptions in the Oversight Board's projections. Disclosure Statement at 522. |
| SIM | Act 154 and tax reform | • There is no information as to what the efforts by the Commonwealth to maintain Act 154 are or whether the US Treasury has responded. There is no information on what contingency plans the | Revisions to the Disclosure Statement have been made to address SIM's concerns. See Disclosure Statement at 111-12, 128. |

31

| Party | | Objection | Response |
|---|---|---|---|
| | | Commonwealth may, or may not have, to deal with the elimination of Act 154 income. <u>SIM Obj.</u> at 8.<br><br>• The Disclosure Statement has no information on the possible impact of the G-7 agreement of a minimum 15% tax for all their jurisdictions. <u>Id.</u> | |
| SIM | Governor's support for the Plan | • The Disclosure Statement does not explain or mention whether the Executive Branch of the Government of Puerto Rico supports the Plan of Adjustment. <u>SIM Obj.</u> at 9. | The Disclosure Statement provides information regarding the Government's position as to the Plan, including that, in connection with entry into the GO/PBA PSA, the Government noted that although "[t]he economic terms of the agreement announced by the FOMB and the Creditor Group have many positive aspects for Puerto Rico" the Government could not join the GO/PBA PSA because the "Plan of Adjustment should not be structured in a way that affects even more from our pensioners." <u>Disclosure Statement</u> at 13-14; *see also* <u>id.</u> at 7. |
| DRA Parties | Failure to disclose basis for priorities | • The Disclosure Statement should be revised to explain (i) why the plan ranks the HTA bondholders' CW/HTA Claims senior to and ahead of the DRA's HTA Loan claims and (ii) why such treatment is justified given the infirmities of the bondholders' liens and the DRA having an exclusive security interest in the Incremental Act 30-31 Revenues. <u>DRA Obj.</u> at 38. | The Debtors have included the following language on page 436 of the Disclosure Statement:<br><br>"The Oversight Board believes that based on the language of the indenture for the HTA 68 Bonds, the HTA 98 Bonds, the DRA Parties' loans with GDB, and the HTA Enabling Act, among other documents, the DRA's HTA Loan claims are subordinate to the CW/HTA Claims, and proposed to treat them accordingly.  However no distributions of the Clawback CVIs will be made until there is a determination of the relative priority of the DRA parties and the HTA bondholders." |
| DRA Parties | Failure to disclose reserves | • The Disclosure Statement should be revised to explain why the plan only reserves for a potential scenario where the DRA's HTA Loans are pari passu with the HTA 98 Bonds but does not reserve for a situation where the DRA's HTA Loans are senior to either the HTA 68 Bonds or HTA 98 Bonds.  <u>DRA Obj.</u> at 38. | As discussed above, the Oversight Board will demonstrate at confirmation that the Plan is feasible, including with respect to payment of the claims in respect of the DRA HTA Loans. |

| Party | | Objection | Response |
|-------|---|-----------|----------|
| DRA Parties | Failure to disclose PBA's structure | • The Disclosure Statement fails to reference the $137 million in the principal amount owed by PBA to the DRA. The Disclosure Statement should be revised to include certain language.  DRA Obj. at 46. | The Debtors have included the following language on page 86 of the Disclosure Statement:<br><br>"The DRA Parties assert that, in addition to PBA's bond debt, PBA is obligated to the GDB Debt Recovery Authority under four loan agreements. As of PBA's petition date, the aggregate balance due under these four loan agreements is in the principal amount of $137 million. Three of the DRA's loans are unsecured and one loan is secured by the sale proceeds of certain real property owned by PBA. The Plan proposes to separately classify the GDB Debt Recovery Authority's claims from PBA general unsecured claims and provide the GDB Debt Recovery Authority with no recovery. The GDB Debt Recovery Authority believes it is improper for the Plan to separately classify the GDB Debt Recovery Authority's loan claims from general unsecured claims and provide the GDB Debt Recovery Authority's claims with materially less favorable treatment than PBA general unsecured claims, which are projected to recover in full." |
| DRA Parties | Failure to disclose claim information | • The Disclosure Statement does not disclose which of the DRA's assets allegedly fall within the class of CW Appropriations claims and the legal bases to justify not providing these claims with any recovery.  DRA Obj. at 47. | The Disclosure Statement and Plan provide that the CW Appropriations Claims includes "loans payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Restructuring Authority or the GDB Public Entity Trust." Disclosure Statement at 414-15.<br><br>The legal basis for the treatment of such claims and whether the proposed Plan treatment satisfies the requirements for confirmation will be addressed at confirmation. |
| AAFAF | Legislative action / Means of implementation | • The Plan relies upon (i) the issuance of New GO Bonds and CVIs, both backed by the full faith and credit of the Commonwealth, and (ii) pension freezes and cuts, including to non-Title III public pension systems (the Judiciary Retirement System and Teachers Retirement System).  Both of these aspects require new legislation to implement, but there is no indication that any such legislation is pending or forthcoming, and the government has stated its refusal | See Omnibus Reply ¶¶ 83-88. |

| Party | | Objection | Response |
|-------|--|-----------|----------|
| | | to cut pensions.  The Disclosure Statement does not provide any description as to how this Plan would be implemented absent such legislation.  <u>AAFAF Obj.</u> at 5-9. | |
| UCC | Legislative action / Means of implementation | • The Disclosure Statement must be revised to acknowledge the government's opposition to the Plan, describe House Bill 120 and other legislative barriers to government support for the Plan, identify the legal basis upon which the Oversight Board intends to override governmental opposition, and discuss the likelihood of success of litigation seeking the imposition of contemplated legislation over the government's opposition. <u>UCC Obj.</u> at 52. | The Debtors have included a summary of House Bill 120 on pages 162-64 of the Disclosure Statement. |
| AAFAF | Disclosures regarding Class 48 retirees | • The Disclosure Statement fails to inform retirees that they had previously had their pensions cut prior to the Petition Date and that the proposed cuts in the Plan are in addition to those prior cuts. <u>AAFAF Obj.</u> at 9-10.  <br><br>• Pension cuts would further strain Puerto Rico's social services and that the Disclosure Statement does not adequately disclose the risk that either (i) costs related to social services increase as a result of pension cuts or (ii) certain retirees may find themselves unable to afford basic life necessities.  <u>AAFAF Obj.</u> at 11. | Revisions to the Disclosure Statement have been made to address AAFAF's concerns.  *See* <u>Disclosure Statement</u> § III.A.2, at 529-30. |
| VTM | Claim amount | • The Disclosure Statement states the incorrect amount of VTM's claim by not including accrued interest. VTM Obj. ¶ 26.  <br><br>• The correct amount owed is $20,388,628 plus interest. | VTM disagrees with the allowed amount of its claim pursuant to the Plan, which is not an issue for the approval of the adequacy of the information contained in the Disclosure Statement. |
| Suiza | Claim amount | • The Disclosure Statement states the incorrect amount of Suiza's claim. <u>Suiza Obj.</u> at 23-25.  <br><br>• The correct amount owed is $45,325,151.22. | Suiza disagrees with the allowed amount of its claim pursuant to the Plan, which is not an issue for the approval of the adequacy of the information contained in the Disclosure Statement. |
| Suiza | Nature of claim | • The Disclosure Statement fails to inform creditors of the correct nature of Suiza's Claim (settlement of a regulatory taking).  <u>Suiza Obj.</u> at 4. | The Debtors have revised the Disclosure Statement at page 431 to note the basis of the Dairy Producer Claims. |

| Party | Objection | | Response |
|-------|-----------|---|----------|
| US Bank | Failure to disclose disposition of Public Finance Corporation | • No provision is made in the Disclosure Statement with respect to the Public Finance Corporation relating to the wind-down or dissolution of the entity, and termination of the Trust and the Trustee's obligations. US Bank PFC Obj. at 23. | The Public Finance Corporation is not a Title III debtor. To the extent this objection relates to the terms of the Plan, it will be addressed at confirmation. |
| Hein | Confidential mediation and negotiation process | • Objects to any references to the mediation-negotiation process in the Disclosure Statement. Hein Obj. 28-29.<br><br>• Requests additional disclosures if there is references to the mediation-negotiation process, including:<br><br>  o Which bondholders participated in the negotiation process, identifying, for each, the name of the holder and the amount of holdings by class of such holder.<br><br>  o Whether any Retail Investor participated in the negotiation of the Plan, identifying who (if anyone) participated, and the specifics of their participation.<br><br>  o If true, a statement that no Retail Investors in the 50 states participated in the negotiation of the Plan. | The information Mr. Hein requests is subject to the confidential mediation process ordered by the Court, and the relevant mediation agreement thereto. |
| Hein | New Bonds | • Additional information is needed for the classification and treatment of claims and the descriptions of the New GO Bonds and CVIs for clarity. Hein Obj. at 20.<br><br>• Requests clarification of references to Plan Exhibit J regarding annual debt service cap. Id. at 21-22. | The Debtors have added the following language to page 49 of the Disclosure Statement:<br><br>"The maturities, interest rates and amortization schedules for the New GO Bonds are included as Exhibit I to the Plan."<br><br>The reference to the Plan exhibit has been revised to reference Exhibit I of the Plan. |
| Hein | Accessibility for retail investors and individual bondholders | • The Disclosure Statement is too long, the formatting of the introductory disclosures is difficult to read, the summaries are not clear enough. Hein Obj. at 2-3. | The length of the Disclosure Statement is a result of the extensive history, myriad of litigation, and complexity of these Title III Cases. |

| Party | Objection | Response |
|---|---|---|
| | • Requests language regarding the filing of objections to confirmation of the Plan and how to submit a Ballot. <u>Id.</u> at 3. | The Confirmation Hearing Notice and the Ballots will contain information regarding how to file an objection to confirmation of the Plan, and how to submit a Ballot, respectively. Accordingly, it is unnecessary to include duplicative informative—in particular given Mr. Hein's objection to the length of the Disclosure Statement. |
| | • Requests information explaining the different consideration received by Puerto Rico Investors and Retail Investors.  <u>Id.</u> at 4. | A summary of the consideration and form of consideration provided to each class is already provided on pages 19-23 of the Disclosure Statement. |
| | • Requests a disclosure that the Court denied a motion to appoint a committee to represent individual bondholders, and that no fiduciary representing Retail Investors participated in negotiating the Plan or has reviewed, approved or recommended the Plan.  <u>Id.</u> at 5. | Page 217 of the Disclosure Statement provides information regarding the statutory committees that have been appointed in these Title III Cases. |
| Hein | Comparison of recoveries | • Requests charts comparing various recoveries.  *See also* <u>Hein Obj.</u> at 16-17 [ECF No. 16908]. | A chart of various recoveries by Class is already available on pages 19-23 of the Disclosure Statement. |
| Hein | Information requests | • Seeks information relating to, among other things, all communications with/applications to the IRS, whether certain actions will be taken in the future, whether certain events will occur in the future, the identity of holders of certain claims, the rationale for classification and treatment of claims pursuant to the Plan, the basis for payment of Consummation Costs pursuant to the GO/PBA PSA, data regarding the "actual" liabilities of ERS, TRS, and JRS, and the justification of payment of certain retiree benefits. | These requests relate to the feasibility of the proposed Plan and whether the Plan satisfies the best interest test, and therefore will be considered at confirmation, if at all relevant. Notably, in denying in part the UCC's and Ambac's motions to compel discovery in connection with the Disclosure Statement, the Court noted "the vast majority are directed to challenges to confirmability of the Proposed Plan, investigation of the rational[e] for proposing this particular plan, and to the Committee's contention that there are alternatives that are better for the unsecured creditors." *Memorandum of Decision and Order on Official Committee of Unsecured Creditors' Urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 17029] at 9; *see also Memorandum of Decision and Order on Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Company to Compel Discovery* |

| Party | | Objection | Response |
|---|---|---|---|
| | | | *from the Government Parties in Connection with the Disclosure Statement* [ECF No. 17058] at 8. |
| Hein | Commonwealth's ability to pay | • Requests various disclosures in connection with, among other things, the 1.03% property tax, the Commonwealth's historical debt service, cash positions, fees and compensation paid to Oversight Board professionals, number of public employees paid, and any transfers of Commonwealth property. <u>Hein Obj.</u> at 29-32. | See immediately above. |
| Hein | Treatment of Retail Investors | • The Plan should be revised so that all consideration to the Retail Investor classes is distributed without regard to the votes of such classes or any individual bondholders themselves . <u>Hein Obj.</u> at 32.<br><br>• Requests the inclusion of a table that addresses the consequences of objecting (or not) or voting (yes, no, or not voting). <u>Hein Obj.</u> at 33. | This is an objection to the terms of the Plan that is appropriately addressed in connection with confirmation. |
| | | **Misc. Objections** | |
| Ambac | Rule 3020(e) Automatic Stay | • Disclosure should be amended to reflect that certain creditors may object to any waiver of the automatic stay of the entry of the confirmation order and may seek a stay of the confirmation order (thereby lengthening the time before the Effective Date may occur). | The Debtors have included the following language (<u>Disclosure Statement</u> at 509):<br><br>"Certain creditors have indicated an intent to object to the waiver or shortening of the automatic 14-day stay of confirmation orders under Federal Rule of Bankruptcy Procedure 3020(e) (made applicable to the Title III Cases by PROMESA Section 310)." |
| Hein | Rule 3020(e) Automatic Stay | • Objects to any waiver of Rule 3020(e) automatic stay in the Plan or in any order related to the Plan. <u>Hein Obj.</u> at 34. | See above.  Mr. Hein will have an opportunity to object to the waiver of Bankruptcy Rule 3020(e)'s stay in connection with confirmation of the Plan. |
| DRA Parties | Sub Rosa HTA plan | • The Third Amended Plan Functions as a Sub Rosa HTA Plan. <u>DRA Obj.</u> at 17-22. | As a matter of law, the plan is not a broad settlement amounting to a de facto HTA plan of reorganization, as neither HTA nor the monolines are granting mutual releases, the monolines' ongoing adversary proceeding asserting a property |

| Party | Objection | Response |
|-------|-----------|----------|
| | o   The plan allocates HTA Clawback CVIs under the assumption that the DRA's HTA Loan claims are subordinate to the HTA bondholders' claims.<br><br>o   The plan makes distributions of HTA assets to holders of HTA Bonds outside of a confirmed HTA plan of adjustment.  Specifically, section 82.1(b)(xv) of the plan requires that HTA make an interim distribution of $264 million to holders of HTA 68 Bonds and HTA 98 Senior Bonds. | interest in certain revenues, and distributions being made to the monolines in the plan are not on account of their claims against HTA.<br><br>The court will make the GDB Loan Priority Determination at confirmation.  That determination will not change the amount of the HTA Clawback CVIs, but merely to whom payments thereunder might be made.<br><br>Finally, the HTA/CCDA PSA provides for a <u>separate</u> HTA plan of adjustment to be filed, and, subject to the HTA/CCDA PSA, the Oversight Board reserves all rights with respect thereto. |
| FGIC<br><br>Section 78.1 | •   Requests clarification of Plan section 78.1 and whether Bond Claims are eligible to receive distributions under the Plan.  <u>FGIC Obj.</u> at 15. | FGIC's objection relates to the terms of the Plan itself, which will be addressed in connection with confirmation. |
| Ad Hoc FGIC Noteholders<br><br>Plan / FGIC Trust | •   The Clawback CVIs distributed on account of HTA Bonds, CCDA Bonds, and PRIFA Bonds insured by FGIC should be placed into a trust for the benefit of such holders, similar to the treatment of GO Bonds insured by FGIC.  Provides Plan language modifications.  <u>Ad Hoc FGIC</u> at 4-6. | This is an objection to the terms of the Plan that will be addressed in connection with confirmation. |
| Group of Section 1983 Claimants<br><br>Treatment of Section 1983 Claims | •   Disclosure Statement does not provide information on whether costs of representation and payment of any adverse judgments owed to § 1983 plaintiffs in Case No. 17-1770 will be paid.  <u>Sec. 1983 Claimants Obj.</u> at 5.<br><br>•   Disclosure Statement does not provide the number of § 1983 claims made against the CW, their monetary value, and whether the CW will continue to provide benefits for claims filed pre- or post-petition.  <u>Id.</u> | The classification, treatment, and amount of general unsecured claims is provided on page 23 of the Disclosure Statement (Class 55), which has been revised to include an estimated claim amount.<br><br>Page 490 of the Disclosure Statement discloses that the Plan will provide for a discharge from any and all claims, causes of action, and any other debts that arose prior to the Effective Date (including prior to the Petition Date).<br><br>To the extent claimants object to the discharge of their claims, such issue is properly addressed at confirmation as discussed in the Omnibus Reply. |

| Party | Objection | | Response |
|---|---|---|---|
| APJ | Challenge to pension cuts | • Reduction of pensions for active and retired judges violates separation of powers, including the Republican Form of Government Clause of United States Constitution; Art. VI, Sec. 11 of the Puerto Rico Constitution; and Public Laws 600 and 447. APJ Obj. at 4-6. | This objection relates to the confirmation of the Plan and will be addressed at confirmation.  *See also* the discussion regarding preemption in the Omnibus Reply. |
| *Pro se* objectors[3] | Treatment | • Objects to the treatment of claims in the Plan. | The *pro se* objections generally disagree with the proposed treatment of claims pursuant to the Plan.  Accordingly, such objections do not raise issues regarding the adequacy of the information contained in the Disclosure Statement. |

---

[3]  Such objectors include:  Antonio Martin Cervera, Maria Teresita Martin, Ana Nunez Velazquez, Wanda Ortiz Santiago, Nancy Negron Lopez, Yashei Rosario, and Luis Roland Ruiz.

## II.     OBJECTIONS TO SOLICITATION PROCEDURES

| Party | Topic | Objection | Response |
|-------|-------|-----------|----------|
| US Bank<br><br>[ECF Nos. 16981, 16983, 16989] | Role of Trustee | • The Disclosure Statement and the Solicitation Procedures Motion do not provide guidance on the noticing and distribution obligations of the Trustee for the PRIFA Bonds whose holders will receive distributions under the Plan. US Bank PREPA Obj. at 7-8.<br><br>• The Disclosure Statement and Plan are silent on:<br><br>    o the method of distribution for the Class 58 CW/PRIFA Rum Tax Claims, for which U.S. Bank as successor trustee filed a proof of claim on behalf of PRIFA Bond holders, and<br><br>    o the Trustee's role in facilitating the CW/PRIFA Rum Tax Clawback Recovery, as well as the Trustee's role, if any, in managing the Clawback CVIs. | The trustee will not be involved in the distribution of Solicitation Packages. As explained in the Disclosure Statement Motion and proposed order, the Debtors will obtain from DTC a listing of the Nominees and cause the mailing of Solicitation Packages (as applicable) to the Nominees with instructions to cause the Solicitation Packages to be forwarded immediately to the Beneficial Owners of the Bonds. Disclosure Statement Motion ¶ 38.<br><br>U.S. Bank's objection regarding the method of distribution relates to the terms of the Plan, and is not appropriately an issue of adequate disclosure. |
| US Bank<br><br>[ECF No. 16981, 16983] | Payment of fees to Trustee | • The Disclosure Statement does not provide instructions by which the PRIFA trustee can assert the amount of outstanding fees and costs to be paid pursuant to the Plan. US Bank PRIFA Obj. at 8-9.<br><br>• The Disclosure Statement fails to mention whether outstanding fees and costs of outside counsel to the Trustee will be paid, and if so, the manner in which those fees and costs must be asserted against the Commonwealth. | The Disclosure Statement is not intended to establish procedures for the filing of trustee fees and costs. U.S. Bank should consult its counsel regarding the assertion of its claims, if any. |

| Party | Topic | Objection | Response |
|-------|-------|-----------|----------|
| FGIC | Voting methodology | • Disclosure Statement fails to provide the non-PSA monolines a mechanism by which to assert their rights to vote or resolve any disputes. FGIC Obj. at 6-7.<br><br> o FGIC holds significant claims in Classes 4, 18, and 24, as well as right to vote all Class 56, 57, and 58 claims<br><br> o Because the Oversight Board or other parties may contest FGIC's status as a claim holder for certain claims, the Court should include in the scheduling for voting and tabulating ballots a schedule to hear any such disputes. | Disputes between monoline insurers and the holders of bonds they insure as to which of them are entitled to vote the insured bonds are not the responsibility of the Debtors and have nothing to do with the Plan or Disclosure Statement.  The Oversight Board does not object to setting a separate briefing schedule to address FGIC's (and Ambac's) asserted right to vote claims arising from bonds insured by such insurers. |
| UCC | Limitations on voting | • Any creditor that has or will receive a request for estimation should be entitled to vote on the Plan and receive a Solicitation Package to the extent that such claim is not contingent or unliquidated. UCC Obj. at 66.<br><br>• Any claim objection and the Notice of Non-Voting Status sent to holders of claims subject to an objection, and which claim has not been expunged, should be accompanied by a form Bankruptcy Rule 3018(a) motion, which should be posted on Prime Clerk's website, instruct the creditor to identify itself and provide the relevant claim number, and leave space to set forth the ground for the creditors' request for temporary allowance of its claim.<br><br>• In order to allow sufficient time for holders of general unsecured claims to review any objection to their claim(s), file the Rule 3018(a) motion, and for the Court to consider such motion(s), the last date by which the Debtors should be authorized to file objections to proofs of claim should be forty (40) days prior to the Voting Deadline, not the twenty (20) days proposed by the Debtors. | Disputed claims are not entitled to vote.  If entities holding disputed claims desire to request the ability to vote and/or an estimate of the claim for voting purposes, they can do so.  The proposed voting procedures is consistent with the voting procedures the Court approved in connection with COFINA.  *See Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17-3284, ECF No. 375] ("COFINA DS Order") at 15.<br><br>The Oversight Board does not object to the inclusion of a form of Rule 3018(a) motion with the Notice of Non-Voting Status to send to holders of claims subject to an objection, and providing such form on Prime Clerk's website.<br><br>The 20-day period is consistent with the schedule the Court approved in COFINA.  *See* COFINA DS Order at 15. |

| Party | Topic | Objection | Response |
|-------|-------|-----------|----------|
| UCC | Method of service | • Serving the Disclosure Statement and Proposed Plan on a flash drive may not be "the most effective method of serving such a population of prospective voters." UCC Obj. at 67.<br><br>• The Debtors should serve on the parties entitled to receive the Solicitation Package a paper summary of the Proposed Plan (in English and in Spanish), including a hard copy of the UCC's recommendation letter and instructions for how and where creditors can obtain and review hard copies of all the Disclosure Statement and Proposed Plan.<br><br>• The Debtors should establish certain "centers" where such hard copies will be available.<br><br>• The Solicitation Package should include a letter from the UCC setting forth the UCC's recommendation to holders of CW General Unsecured Claims in Class 55 with respect to whether to vote to accept or reject the Proposed Plan. | The proposed solicitation procedures, including serving a flash drive containing the Disclosure Statement, is consistent with the solicitation procedures the Court approved in connection with COFINA. *See Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17-3284, ECF No. 375].<br><br>Parties will receive a paper copy of the Confirmation Hearing Notice, which includes instructions on how to obtain a paper copy of the Disclosure Statement and Plan. Copies of the Disclosure Statement and Plan will be available at the various collection centers for viewing. |
| Hein | Briefing Schedule | • Debtors should file full moving papers supporting confirmation, including Debtors' opening brief, as well as declarations and supporting documents, and including anticipated objections, at least 30 days before the deadline for final objections. Otherwise, objectors will have no opportunity to respond in written form to Debtors' positions. Hein Obj. at 10-12. | The Plan provides the basis for parties to object to confirmation of the Plan. Mr. Hein's proposed schedule is inconsistent with bankruptcy practice and similar schedules approved in chapter 11 and chapter 9 cases, and in connect with COFINA. *See* Second Amended Order Establishing Procedures, Deadlines and Hearing Dates relating to the Debtor's Plan of Adjustment, *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich. Mar. 6, 2014) [ECF No. 2937] (setting plan objection deadlines prior to deadline for the debtor to file its pretrial briefs); Order: (A) Approving Third Amended Disclosure Statement with Respect to the Third Amended Plan for the Adjustment of Debts (May 27, 2016); and (B) Setting Certain Deadlines Regarding Voting to Accept or Reject the Third Amended Plan and Related Matters, *In re City of San Bernardino, California*, Case No. 12-28006 (Bankr. C.D. Cal. July 6, 2016) [ECF No. 1873] (same); Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation hearing Notice, (IV) Approving |

| Party | Topic | Objection | Response |
|-------|-------|-----------|----------|
| | | | Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Election Deadlines, and (VII) Approving Vote Tabulation Procedures, *In re Puerto Rico Sales Tax Financing Corp.*, Case No. 17-3284 (D.P.R. Nov. 29, 2018) [ECF No. 375] ¶¶ 16, 19. |
| Hein | Voting Record Date | • The voting record date for bond classes is not identified clearly. It should be no later than Disclosure Statement hearing, as in COFINA. Hein Obj. at 19-20. | As explained in the Disclosure Statement Motion, there is no need for a voting record date for bond classes because voting will be conducted on ATOP, which requires that any holder that seeks to vote or make an election tender their bonds through the ATOP system. Accordingly, only holders of bonds may vote or make an election on or before the Voting Deadline or Election Deadline. Disclosure Statement Motion ¶ 34. |
| Hein | Transfer Restrictions | • In a departure from COFINA, (i) since retail bond claims can be purchased through the voting deadline, effectively there is no record date and (ii) Retail Investors are restricted from transferring their bonds from the time they vote through the Effective Date of the Plan but institutions are not. Hein Obj. at 20-22. | As explained in the Disclosure Statement Motion, voting will be conducted on ATOP, which requires that any holder that seeks to vote or make an election tender their bonds through the ATOP system. Disclosure Statement Motion ¶ 34. |
| Hein | Confirmation Hearing Notice | • The format of the proposed notice should be changed to clarify the objection deadline and address. A clear statement of the deadline to object should be set out in bold on page one of the notice. Hein Obj. at 5-6. | Revision included in revised Confirmation Hearing Notice. |
| Hein | Notice | • Debtors should promptly "post" the confirmation hearing notice, Plan and Disclosure Statement, as well as any future updates or modifications, on EMMA. Hein Obj. at 24.<br>• Publication of the confirmation hearing notice is not sufficient to reach individual 50-states investors. Publication should occur in the Wall Street Journal since few retail investors read Bond Buyer. Id. | The proposed notice procedures are consistent with the procedures approved in COFINA, and include eight (8) different publications. *See* COFINA DS Order ¶ 14. As noted in the Disclosure Statement Motion, the publication notice is intended to provide notice to "(i) those creditors to whom no other notice will be sent and who are unknown and not reasonably ascertainable by the Debtors, (ii) known creditors with addresses unknown by the Debtors, and (iii) creditors with potential Claims unknown by the Debtors . . . ." Disclosure Statement Motion ¶ 45. The Solicitation Package, together with |

| Party | Topic | Objection | Response |
|-------|-------|-----------|----------|
|       |       |           | the Confirmation Hearing Notice, will be provided to bondholders through the Nominees as provided by DTC.  *Id.* ¶ 38.  Nonetheless, the Debtors will work with the Government to post the Confirmation Hearing Notice on EMMA. |

## <u>OVERSIGHT BOARD EXHIBIT 2</u>

Debtors' Omnibus Reply Chart to Objections to Confirmation Procedures Motion

**DEBTORS' OMNIBUS REPLY CHART TO OBJECTIONS TO CONFIRMATION PROCEDURES MOTION**

| Objections[1] | Response(s) |
|---|---|
| **Initial Objections** | |
| 1. The initial objections deadline is too early (Hein Obj. at 7, DRA Obj. ¶ 8, Ambac/FGIC Obj. ¶ 17, UCC Obj. ¶ 172) | The Debtors will serve the Confirmation Hearing Notice by the later of July 20, 2021 or five (5) business days after entry of the order granting the relief requested in the motion seeking approval of the Disclosure Statement.  This Notice will provide creditors who have not been following these proceedings with information regarding how to access the Plan, including (i) from Prime Clerk's website at https://cases.primeclerk.com/puertorico/; (ii) by telephoning Prime Clerk at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available); or (iii) by emailing Prime Clerk at puertoricoinfo@primeclerk.com.  As a result, all creditors will have sufficient time to review the plan and submit their Initial Objections. |
| 2. There is no detail as to what the initial objections require (Ambac/FGIC Obj. ¶ 14, DRA Obj. ¶ 1) | No additional details are needed.  The Confirmation Procedures Motion already requires the Initial Objections to state the legal and factual bases for the Initial Objection.  The Initial Objections are intended to serve as a starting point for confirmation-related discovery and briefing.  In their Supplemental Objections, creditors will be able to provide additional information regarding their objections to the Plan based on information produced in connection with Plan discovery.  Also, no additional detail is needed because many creditors already know the bases for at least some of their objections. |

---

[1] Individual objections are numbered and grouped, where appropriate, for the convenience of the Court.  This does not constitute a waiver of the Debtors' rights to respond to any objections or arguments at the hearing(s) to consider approval of the disclosure statement or confirmation of the plan.  The Debtors deny many of the factual and legal assertions and characterizations contained in the Objections. Nothing contained herein shall be deemed an admission or acceptance of any statement contained in the Objections.

| Objections[1] | Response(s) |
|---|---|
| 3. The scope of discovery is limited to the bases set forth in the initial objections, which, among other things, violates due process and will encourage creditors to file broad objections (Hein Obj. at 7-8, DRA Obj. ¶ 7, Ambac/FGIC Obj. ¶¶ 9-12, UCC Obj. ¶ 169) | There is no violation of due process.  An objection must be filed to create a contested matter, and a contested matter must be created for the discovery provisions in the Federal Rules of Civil Procedure to apply.  *See* Fed. R. Bankr. P. 9014.<br><br>Creditors may file broad Initial Objections as long as they comply with the requirements set forth in the Confirmation Procedures Motion.  They can then use documents produced in connection with any Eligible Creditor's Production Requests to supplement (and, if they so choose, narrow) their objections.<br><br>The Debtors' proposal to limit the scope of discovery to issues identified in Initial Objections will reduce the burden on the Debtors, who otherwise may receive baseless Production Requests whose relation to the Plan are tenuous at best.  This is consistent with the confirmation discovery protocols entered by other courts.  *See In re Enron Corp., et al.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Feb. 13, 2004), *Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 16233]. |
| 4. Calling objection deadlines "Initial" and "Supplemental" is likely to confuse individual bondholders and discourage them from studying the materials and submitting objections by October 8 (Hein Obj. at 8) | The Confirmation Procedures Motion adequately explains the purpose of Initial Objections and Supplemental Objections, including the requirement that Eligible Creditors file Initial Objections in order to propound discovery requests on the Debtors. |
| 5. The schedule set for objections and other proceedings needs to take into account the inevitable delay that the multi-step process of identifying beneficial owners will entail (Hein Obj. at 2) | *See* response to 1 above.  Parties will have advance notice of the objection deadlines before receiving solicitation packages. |

| Objections[1] | Response(s) |
|---|---|
| | Therefore, the process to determine beneficial owners is irrelevant. |
| **Limitations on Permissible Discovery** | |
| 6. Creditors are precluded from serving interrogatories (Hein Obj. at 13, Ambac/FGIC Obj. ¶ 29, UCC Obj. ¶ 177) | Confirmation discovery protocols often do not include interrogatories when other, more efficient and useful discovery mechanisms are available.  *See, e.g.*, *Energy Future* Order ¶ 15 (limiting interrogatories to identification of witnesses).  The complexity of the Plan and the Title III cases warrant using document requests and depositions to provide information to Eligible Creditors, rather than engaging in the burden and waste inherent in responding to and litigating over interrogatories. |
| 7. Creditors are required to submit a certification "stating the relationship of such Production Request to the Initial Objection . . . and setting forth why the additional Production is reasonably necessary given the availability of information in the Depository."  (Hein Obj. at 22-23, Ambac/FGIC ¶ 5, UCC at 72) | The certification requirement will ensure that any discovery requests are targeted and focused.  This requirement is minimally burdensome on Eligible Creditors, as it merely asks them to certify they have reviewed documents in the Plan Depository, in relation to the substantial costs that would be imposed on the Debtors if they had to respond to an enormous volume of requests that are duplicative of what they have already made available. |
| 8. There is no opportunity to serve follow-up requests based on information uncovered during the discovery process (Ambac/FGIC Obj. ¶ 5, DRA Obj. at 18)) | Allowing Eligible Creditors to serve multiple rounds of follow-up discovery requests is impractical given the size and scale of these Title III cases.  All eligible Creditors will have the opportunity to review all documents produced in response to Production Requests made by all other Eligible Creditors and can incorporate that discovery in the next phases of the confirmation process, including depositions.

Notwithstanding the above, the Debtors will amend the proposed procedures to include a deadline of September 7 for follow-up |

| Objections[1] | Response(s) |
|---|---|
| | requests for admission on the limited topic of authentication of documents produced in response to Production Requests. |
| 9. Requests for Admission are limited to authentication of documents (Ambac/FGIC Obj. ¶ 27, DRA Obj. ¶¶ 24-25) | Limitations on requests for admission are an accepted feature of confirmation discovery protocols in light of the availability of other, more efficient forms of discovery such as document requests and depositions. *See, e.g., Energy Future* Order ¶ 16 (requiring leave of court to serve requests for admission). |
| 10. The proposal unreasonably consolidates both fact and expert depositions (Ambac/FGIC Obj. at 18-19, DRA Obj. ¶ 27) | The Debtors will amend the Confirmation Procedures Motion and accompanying proposed order so there are separate time periods for fact and expert depositions. |
| 11. The proposal provides inadequate time to identify witnesses and prepare for depositions (Ambac/FGIC Obj. ¶ 32, DRA Obj. ¶ 19) | The deadlines allow the Debtors to hold a confirmation hearing by the end of 2021, in line with the terms of the relevant plan support agreements.  Eligible Creditors will have ample time to review information put forth in the Plan Depository in order to identify witnesses and prepare for depositions.

The proposed procedures also provide for witness lists to be provided by all parties by August 13, 2021, which Eligible Creditors can review before determining who they wish to depose. |
| 12. The proposal contains one-sided exceptions regarding depositions and witness lists, to the Debtors' benefit (Ambac/FGIC Obj. ¶ 5, DRA Obj. ¶¶ 18-23, UCC Obj. at 72-74).  Specifically, certain Objecting Parties complain that: (1) the Debtors, but not creditors, are allowed to supplement their witness lists (*e.g.*, Ambac/FGIC Obj. ¶ 5, DRA Obj. at 18); (2) the 7-hour time limit for depositions should apply to all parties equally (.*e.g.*, UCC Obj. at 74, DRA Obj. at 18); and (3) the | The proposed Confirmation Procedures reflect the practical challenges faced by the Debtors, who must address discovery requests that could be served by tens of thousands of creditors.

Notwithstanding the above, the Debtors will amend the proposed procedures to make clear that only the Debtors' examination of deponents they have proffered for a deposition shall be excluded from the seven (7) hour limitation set forth in Rule 30(d)(1) of the Federal Rules of Civil Procedure. |

| Objections[1] | Response(s) |
|---|---|
| Court should permit rebuttal witnesses for all parties regardless of position (DRA Obj. at 22). | |
| 13. Discovery should not be limited to materials "relied upon" by Debtors (Hein Obj. at 23) | The Confirmation Procedures Motion does not limit discovery to "non-privileged materials relied upon by Debtors," and Hein's interpretation of the Motion to limit discovery in this manner is incorrect.  As provided in the Confirmation Procedures Motion, the Plan Depository will contain *at least* relevant non-privileged documents relied upon by Debtors in analyzing the various claims and causes of action being compromised and settled and/or assets referenced in Article II of the Plan; as well as the Debtors' relevant non-privileged documents concerning the Best Interests Test Reports provided in conjunction with the Disclosure Statement.  Conf. Proc. Mot. ¶ 35. |
| 14. Third party discovery is not clearly permitted (Ambac/FGIC Obj. ¶ 33) | The Confirmation Procedures Motion does not place an affirmative prohibition on third party discovery.  The Debtors cannot prevent subpoenas from being issued.  Ambac and FGIC cite paragraph 7 of the Confirmation Procedures Motion to support their assertion the Confirmation Procedures Motion precludes third-party discovery, but that language is not related to third-party discovery.  Instead, it simply reinforces the point that creditors who oppose the plan must file initial objections in order to obtain discovery. |
| 15. Parties are required to file an Informative Motion prior to cross-examining a witness that discloses the nature of the cross-examination (UCC Obj. at 74) | One of the most time-consuming aspects of trial in a large case is the direct and cross-examination of witnesses.  The bankruptcy court is directed by Federal Rule of Evidence 611(a), which is made applicable to these contested matters by Bankruptcy Rule 9017, to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless |

| Objections[1] | Response(s) |
|---|---|
| | consumption of time, and (3) protect witnesses from harassment or undue embarrassment." The filing of an informative motion prior to cross-examination accomplishes the foregoing objectives, and ensures that such an examination will not exceed the proper bounds. |
| 16. The Oversight Board can choose not to respond to a request, which will lead to disputes and delay (DRA Obj. ¶ 11) | By the time formal discovery commences, creditors should already have obtained access to a substantial number of relevant documents via the Plan Depository. Nevertheless, the Debtors will make every effort to produce relevant, non-duplicative documents responsive to creditors' discovery requests expeditiously and will produce responsive documents on a rolling basis when identified. |
| **Plan Depository** | |
| 17. The Debtors should be required to prepare a privilege log, which should be populated into the Depository by a date certain (UCC Obj. ¶ 177) | The purpose of the Plan Depository is to make available "Debtors' relevant *non-privileged* documents relied upon by Debtors in analyzing the various claims and causes of action being compromised and settled and/or assets referenced in Article II of the Plan," "Debtors' relevant *non-privileged* documents concerning the Best Interests Test Reports set forth in the Disclosure Statement," and other documents related to confirmation. Conf. Proc. Mot. ¶ 35 (emphasis added).<br><br>Given the scope of the Debtors' review of documents in connection with populating the Plan Depository, a privilege log is unnecessary. As a general matter, communications and drafts are materials typically subject to being withheld from production and recorded on a privilege log on the basis of privilege. Communications are often of minimal, if any, relevance, and their review is highly burdensome because of the likelihood they may contain privileged material. *See In re Fin. Oversight &* |

| Objections[1] | Response(s) |
|---|---|
| | *Mgmt. Bd. for P.R.*, 385 F. Supp. 3d 130, 135-37 (D.P.R. 2019). Drafts are likewise often of minimal relevance, and are highly likely to be privileged. *Id.* at 137-38.  For those reasons, the Debtors do not intend to review either drafts or communications prior to populating the Depository, and, accordingly, creating a privilege log would require a vast amount of work and resources with no corresponding benefit.  For those reasons, the Debtors do not intend to review either drafts or communications prior to populating the Depository, and accordingly, creating a privilege log would require a vast amount of work and resources with no corresponding benefit. |
| 18. The proposal does not clearly set forth the date by which the Debtors must produce documents (UCC Obj., DRA Obj. ¶ 14) | *See* response to 16. above |
| 19. The Oversight Board already has in its possession materials relevant to plan confirmation that it is withholding (DRA Obj. ¶ 17) | This Objection is baseless, as the Debtors have not been served with requests for production of materials relevant to plan confirmation, and therefore cannot be withholding responsive materials. Moreover, the Debtors are in the process of gathering materials in order to populate the Plan Depository. |
| 20. The depository is impractical to use (Hein Obj. at 14-19) | The Plan Depository is in accordance with the Court's *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures In Connection Therewith, and (V) Granting Related Relief* [ECF No. 16681]. Further, no other Objecting Party has lodged complaints about the depository. |
| 21. Public, press and media should have access (Hein Obj. at 19) | Mr. Hein made this same objection in connection with the Disclosure Statement Depository Procedures, and the Court overruled it in its approval of those procedures.  As explained in |

| Objections[1] | Response(s) |
|---|---|
| | connection with the Disclosure Statement Depository Procedures, Mr. Hein lacks standing to represent the public, press, and media.   Further, providing open access to the depository to the public could overload the depository's site, thereby preventing any users, including Eligible Creditors, from accessing the site. |
| 22. Information provided in discovery, regardless of which party served the requests, should be placed in the Depository and grouped in labeled folders (Hein Obj. at 13) | Each Eligible Creditor will have access via the Plan Depository to documents produced in response to Production Requests made by every other Eligible Creditor. |
| **Discovery & Confirmation Schedule** | |
| 23. The proposed schedule ignores key gating issues in the Revenue Bond Adversary Proceedings that must first be decided before confirmation (Ambac/FGIC Obj. ¶ 1) | The Court has set September 15, 2021 for a hearing on the Revenue Bond Adversary Proceedings.  Accordingly, the Court will have the opportunity to address those matters prior to the proposed commencement date for a Confirmation Hearing of November 8, 2021. |
| 24. The proposed schedule fails to provide creditors with sufficient time to review and object to issues with the Debtors' proposed confirmation order before the close of objections (AAFAF Obj. ¶ 2, DRA Obj. ¶ 8 ) | Creditors will have sufficient time to review and raise concerns regarding the Debtors' proposed confirmation order, either prior to or at the confirmation hearing. |
| 25. Secured creditors should have until January 31, 2022 to submit their Section 1111(b) elections in writing (DRA Obj. at 20) | Pursuant to Bankruptcy Rule 3014, the election may be made any time prior to the conclusion of the disclosure statement hearing or "within such later time as the court may fix."   The DRA Parties provide no basis for their assertion they require until January 31, 2022 to make their Section 1111(b) elections, and accordingly, their request to submit their elections at a time later than the conclusion of the Disclosure Statement Hearing should be denied. |
| 26. The one-month pretrial period is too compressed (Ambac/FGIC Obj. ¶¶ 34-35) | The proposed schedule leading up to the confirmation hearing takes into account the need for expediency in allowing the Debtors to exit their Title III cases by the end of 2021.  Under |

| Objections[1] | Response(s) |
|---|---|
| | the Debtors' proposed schedule, all parties will have sufficient time to prepare for the confirmation hearing, and the Court may set additional deadlines as appropriate.  *See also* response to 11 above. |
| 27. The confirmation hearing should take place over a period of thirty days (Ambac/FGIC Obj. ¶ 37, DRA Obj. at 22) | At this time, there is no need for the confirmation hearing to span a thirty-day period.  Should any of the parties submit witness lists that potentially necessitate going beyond the confirmation hearing dates proposed in the Confirmation Procedures Motion, the parties may discuss at the August 23, 2021 status conference or at another pre-hearing status conference to be scheduled by the Court. |
| **Discovery Disputes** | |
| 28. The Board's proposed procedure should be amended to require that both (or all) sides to any discovery dispute collectively inform the Court of the existence of any discovery dispute (Ambac/FGIC Obj. § III) | The Oversight Board will amend the procedures so that all parties to any discovery dispute jointly inform the Court. |
| **Filing, Notice, Service** | |
| 29. Individual bondholders should be permitted to either a) submit objections to an email address, to be forwarded for filing, b) mail to a specified court address and forwarded for filing, or c) be given the option to file using the CM/ECF system, and notified they have that option (Hein Obj. at 5-6) | There are suitable procedures in place for all creditors, including unrepresented creditors, to make filings with the Court (as evidenced by the number of Objections to the Disclosure Statement that were filed by *pro se* parties). |
| 30. Individual bondholders who have expressed interest in receiving notices by hard copy should at the outset be sent hard copy of the Plan and Disclosure Statement.  Alternatively, they should be sent access to PDFs smaller than 25MBs (Hein Obj. at 12) | Providing hard copies to all individual bondholders is unnecessarily costly, given the thousands of pages of materials and the costs of mailing.  The Oversight Board's notice and filing procedures are otherwise consistent with the *Fifteenth Amended Notice, Case Management and Administrative Procedures* [ECF No. 17127-1] (the "CMO"), which requires |

| Objections[1] | Response(s) |
|---|---|
| | that all Documents be served, in the manner described in the CMO, on the Master Service List (each as defined in the CMO). CMO § II. |
| 31. Flash drives are not sufficient because users will legitimately hesitant based on fears of viruses, the drive is too small, and is in a form that is too difficult to read (Hein Obj. at 4-5) | By this point in the Title III cases, the Oversight Board and Prime Clerk have successfully communicated thousands of times with individual claimants throughout Puerto Rico and the mainland United States, often times receiving and sending documents with sensitive information.  A creditor will not be deceived by an official mailing from Prime Clerk that contains a flash drive and instructions on how to use it.  Producing the disclosure statement and other related documents via a flash drive will also preserve Commonwealth resources by reducing postage and printing costs.  Moreover, the use of flash drives is routinely approved by courts in the interest of preserving the estate's limited resources.  *See, e.g., Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17-3283, ECF No. 4382] ¶ 8 (authorizing the debtor to transmit solicitation documents through flash drive); *In re GT Advanced Technologies Inc.*, Case No. 14-11916-HJB (Bankr. D.N.H. Feb. 2, 2016) (authorizing the debtors to transmit solicitation documents in electronic format); *In re Buckingham Oil Interests, Inc.*, Case No. 15-13441-JNF (Bankr. D. Mass. Dec. 22, 2015) (same); *In re Women's Apparel Group, LLC*, Case No. 11-16217-JNF (Bankr. D. Mass. May 10, 2012) (same); *In re GST* |

| Objections[1] | Response(s) |
|---|---|
| | *Autoleather, Inc.*, No. 17-12100 (LSS) (Bankr. D. Del. Mar. 12, 2018) (same). |
| 32. Prompt notice of the Plan and Disclosure Statement should be sent by U.S. mail to the many individual holders who have filed notices of participation and/or proofs of claim, and who have already provided mailing addresses and email addresses (Hein Obj. at 3) | The notice and filing procedures are consistent with the *Fifteenth Amended Notice, Case Management and Administrative Procedures* [ECF No. 17127], which requires that all Documents be served, in the manner described in the CMO, on the Master Service List (each as defined in the CMO).  CMO ¶ II.E. |
| **Protective Order** | |
| 33. The Debtors' proposed protective order should require creditors to acknowledge that the Debtors do not make any representations or warranties as to the accuracy or completeness of Confidential Information.  Creditors should not be precluded from seeking relief based on failure to provide accurate and complete information.  Ordering such acknowledgment is a violation of free speech (Hein Obj. at 22-23). | The Court has already overruled this objection by approving the Disclosure Statement Depository Procedures.  The Debtors explicitly do not intend to make any representations as to the accuracy or completeness of Confidential Information; there is no reason to await disputes on this issue.  Moreover, debtors commonly warrant that they do not make any representations as to the accuracy or completeness of information in disclosure statements. |
| **Confidentiality** | |
| 34. If confidentiality restrictions are maintained by Court order, then there should be no use of, or any reference to, the mediation process in any Court filings and proceedings by anyone (Hein Obj. at 24) | The Objection does not cite any authority for the proposition that the parties cannot even reference the existence of mediation.  The parties are bound by the relevant mediation agreements to not discuss the contents of mediation, but neither Federal Rule of Evidence 408 nor 501 prohibit the parties from discussing the fact that mediation took place.  The Oversight Board has not, and will not, attempt to use direct communications shared during mediation in support of confirmation of the Plan, and the Oversight Board will produce in the Plan Depository any documents it seeks to use in support of Plan confirmation. |
| 35. Significant portion of documents appear miscategorized as confidential.  A number of documents appear to be identical to | Should an Eligible Creditor dispute the confidentiality designation of documents uploaded to the Plan Depository (or |

| Objections[1] | Response(s) |
|---|---|
| publicly disclosed documents. Such miscategorization, and resulting preclusion from retail investors who do not sign the protective order, press, and media, prejudices retail investors. Every document labeled as confidential should require affirmative showing, by motion, that confidentiality, rather than redaction, is needed (Hein Obj. at 18-19) | the Disclosure Statement Depository), it may follow the procedure set forth to challenge such confidentiality designations in Exhibit 2 to the DS Hearing Scheduling Order. |
| 36. References to the robust nature of mediation should be a waiver of confidentiality because it is meant to enhance credibility of the outcome without full facts (Hein Obj. at 24) | *See* response to 34 above. |

## <u>OVERSIGHT BOARD DEMONSTRATIVE EXHIBIT 1</u>

Revised Proposed Discovery Deadlines

**Revised Proposed Discovery Deadlines**

| Summary of Proposed Discovery Deadlines | |
|---|---|
| **August 6, 2021** | Deadline to Serve Requests for Admission other than Requests for Admission Related Solely to the Authenticity of Documents Produced in Response to Request for Production (All Parties) |
| | Deadline for Eligible Creditors to Serve Requests for Production of Non-Depository Documents |
| | Deadline for the Debtors to Serve Requests for Production |
| **August 13, 2021** | Deadline to File Fact Witness List and Topics (All Parties) |
| **August 16, 2021** | Deadline to Serve Responses and Objections to Requests for Admission, and Requests for Production (All Parties) |
| **August 17, 2021** | Deadline to Serve Notices of Deposition, Topics, and Requested Times for Depositions (All Parties) |
| **August 23, 2021** | Status Conference on Deposition Notices |
| **August 25, 2021** | Filing of Deposition Schedule |
| **August 30, 2021** | Serve Opening Expert Disclosures (All Parties) |
| **September 3, 2021** | Opening Expert Reports Due |
| **September 7, 2021** | Deadline to Serve Requests for Admission Related Solely to the Authenticity of Documents Produced in Response to Request for Production (All Parties) |
| **September 13 through September 22, 2021** | Fact Witness Depositions |
| **September 24, 2021** | Serve Rebuttal Expert Disclosures |
| **October 1, 2021** | Serve Rebuttal Expert Reports |
| **September 23 through October 4, 2021** | Expert Witness Depositions |
| **October 8, 2021** | Deadline to File Supplemental Objections to Confirmation |
| | Deadline to File Motions in Limine (limited to 5 pages) and Daubert Motions (All Parties) |
| **October 11, 2021** | Deadline to Serve Exhibit Lists and Deposition Designations (All Parties) |
| **October 15, 2021** | Deadline to File Objections to Motions in Limine (limited to 5 pages) and Daubert Motions (All Parties) |
| **October 18, 2021** | Deadline to Exchange Objections to Exhibit Lists, Counter-Designations, Objections to Deposition Designations, and Designation of Witnesses for Cross-Examination (All Parties) |
| **October 25, 2021** | Deadline to Exchange Objections to Counter-Designations |
| | Deadline to File Replies to Motions in Limine (limited to 3 pages) and Daubert |

| Summary of Proposed Discovery Deadlines | |
|---|---|
| | Motions (All Parties) |
| **October 29, 2021** | Deadline for the Debtors to File Affidavits, Replies to Objections to Confirmation of Plan of Adjustment, and Proposed Order and Findings of Fact |
| **November 1, 2021** | Deadline for Objectors to File Witness Declarations |