# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

---

## DISCLOSURE STATEMENT FOR THE FIFTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813 |

*Attorneys for the Financial Oversight and Management Board for Puerto Rico as Representative for the Debtors in their Title III Cases*

Dated: July 12, 2021

---

For inquiries regarding this Disclosure Statement, contact the Solicitation Agent, Prime Clerk LLC:
**Telephone** (available 10:00 a.m. to 7:00 p.m. AST): (844) 822-9231 (toll free for U.S. and Puerto Rico)
(646) 486-7944 (for international callers)
**Email**: puertoricoballots@primeclerk.com (reference "Commonwealth Plan of Adjustment" in the subject line)
Please note that Prime Clerk LLC is not authorized to provide, and will not provide, legal advice.

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations). The Oversight Board submits this Disclosure Statement in Cases No. 17 BK-1283-LTS (Commonwealth), 17 BK-3566-LTS (ERS), and 17 BK-5523-LTS (PBA).

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN OF ADJUSTMENT. VOTES MAY NOT BE SOLICITED UNTIL THE TITLE III COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE TITLE III COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

NO OTHER INFORMATION HAS BEEN JUDICIALLY APPROVED.

THE OVERSIGHT BOARD, AS THE DEBTORS' REPRESENTATIVE IN THESE TITLE III CASES PURSUANT TO PROMESA SECTION 315(b), HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE PLAN OR THE DEBTORS, OR THE VALUE OF THE DEBTORS' PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER.[2]  HOLDERS OF CLAIMS SHOULD UNDERSTAND THAT ANY INFORMATION, REPRESENTATIONS, WARRANTIES, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF, OR OBTAIN AN ELECTION TO SETTLE CERTAIN CLAIMS PURSUANT TO, THE PLAN HAVE NOT BEEN APPROVED BY THE TITLE III COURT.  FURTHER, HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION DISTRIBUTED VIA SOCIAL MEDIA, INCLUDING, BUT NOT LIMITED TO, FACEBOOK, TWITTER, AND INSTAGRAM.

THE PLAN IS THE PRODUCT OF SUBSTANTIAL NEGOTIATIONS AMONG THE OVERSIGHT BOARD (AS THE SOLE REPRESENTATIVE OF THE DEBTORS IN THEIR RESPECTIVE TITLE III CASES), PARTIES TO THE PLAN SUPPORT AGREEMENTS (COLLECTIVELY, THE "SUPPORTING PARTIES"), AND OTHER PARTIES.  THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES BELIEVE THE PLAN REPRESENTS A FAIR AND REASONABLE OUTCOME FOR ALL CREDITORS OF THE DEBTORS AND, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

FOR THE AVOIDANCE OF DOUBT, THIS DISCLOSURE STATEMENT WAS DRAFTED BY THE OVERSIGHT BOARD, AND SOME OF THE STATEMENTS HEREIN MAY BE DISPUTED BY CERTAIN CREDITORS OR THE GOVERNMENT, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING THE INTERPRETATION OF PROMESA AND RIGHTS AND REMEDIES OF THE DEBTORS AND CREDITORS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE VIEWS EXPRESSED IN THIS DISCLOSURE STATEMENT ARE THE VIEWS OF THE OVERSIGHT BOARD AND THE DEBTORS ONLY AND MAY NOT

---

[2]  Capitalized terms used but not defined in this Disclosure Statement have the respective meanings given to them in the Plan.

BE ATTRIBUTED TO ANY OF THE SUPPORTING PARTIES OR ANY OTHER PARTY.

### IMPORTANT INFORMATION

**OVERSIGHT BOARD AUTHORITY.** THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT ("PROMESA") PROVIDES THAT THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO (THE "OVERSIGHT BOARD") MAY TAKE ANY ACTION NECESSARY TO PROSECUTE A CASE UNDER TITLE III OF PROMESA OF A DEBTOR, INCLUDING FILING A TITLE III PETITION, SUBMITTING A PLAN OF ADJUSTMENT FOR A DEBTOR, AND OTHERWISE GENERALLY SUBMITTING FILINGS IN RELATION TO THE TITLE III CASE. PROMESA ALSO PROVIDES THAT ONLY THE OVERSIGHT BOARD MAY FILE A PLAN OF ADJUSTMENT OF THE DEBTS OF A DEBTOR. PROMESA REQUIRES THAT THE PLAN OF ADJUSTMENT FOR A TITLE III DEBTOR BE FILED IN ITS TITLE III CASE TOGETHER WITH A DOCUMENT CALLED A DISCLOSURE STATEMENT.

**PURPOSE OF DISCLOSURE STATEMENT.** THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE FIFTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.* DESCRIBED HEREIN (THE "PLAN"). THE FUNCTION OF A DISCLOSURE STATEMENT IS TO PROVIDE A HYPOTHETICAL INVESTOR TYPICAL OF THE CLAIMHOLDERS IN THE CASE INFORMATION REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND CONDITIONS OF THEIR BOOKS AND RECORDS TO ENABLE THE HYPOTHETICAL INVESTOR TO MAKE AN INFORMED JUDGMENT TO ACCEPT OR TO REJECT THE PLAN.

**LIST OF DEBTORS.** THIS DISCLOSURE STATEMENT ACCOMPANIES A JOINT PLAN OF ADJUSTMENT FOR THE FOLLOWING DEBTORS:

- THE COMMONWEALTH OF PUERTO RICO (THE "COMMONWEALTH" OR "PUERTO RICO"),

- THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO ("ERS"), AND

- THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA").

**SOURCE OF DATA.** THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND FILED BY THE OVERSIGHT BOARD ON BEHALF OF THE DEBTORS.

THE UNITED STATES GOVERNMENT CREATED THE OVERSIGHT BOARD ON JUNE 30, 2016.  THE PRESIDENT OF THE UNITED STATES (THEN PRESIDENT BARACK OBAMA) APPOINTED THE OVERSIGHT BOARD'S SEVEN VOTING MEMBERS ON AUGUST 31, 2016.  AT ITS INCEPTION, THE OVERSIGHT BOARD HAD NO INFORMATION OR DATABASE OF ITS OWN, BUT HAD THE LEGAL RIGHT TO PROCURE INFORMATION AND DATA FROM THE COMMONWEALTH.

ORIGIN OF FINANCIAL INFORMATION.  ALL FINANCIAL INFORMATION HEREIN IS BASED ON DATA THE OVERSIGHT BOARD HAS EITHER RECEIVED FROM THE COMMONWEALTH AND ITS INSTRUMENTALITIES, OR THAT IS PUBLICLY AVAILABLE. AS OF THE DATE OF THIS DISCLOSURE STATEMENT, THE COMMONWEALTH HAD NOT YET PUBLISHED AUDITED FINANCIAL STATEMENTS FOR ITS 2019, 2020, AND 2021 FISCAL YEARS.  IN SOME CASES, SUCH AS FOR PENSION LIABILITIES AND DETERMINATIONS OF AVAILABLE CASH, THE OVERSIGHT BOARD RETAINED EXPERTS TO HELP VERIFY AND UNDERSTAND THE DATA.  ACCORDINGLY, WHILE THE OVERSIGHT BOARD HAS USED ITS BEST EFFORTS TO PROCURE ACCURATE AND COMPLETE INFORMATION, IT IS LIMITED TO USING THE COMMONWEALTH'S SYSTEMS AND DATA AS ITS SOURCES AND CANNOT INDEPENDENTLY VOUCH FOR THE CORRECTNESS OF SUCH DATA.  THIS DISCLOSURE STATEMENT AND THE ECONOMIC AND FINANCIAL INFORMATION PROVIDED HEREIN HAVE NOT BEEN APPROVED BY THE COMMONWEALTH'S FISCAL AGENT, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY.[3]

COURT REVIEW.  THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO (THE "TITLE III COURT") HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED IT CONTAINS ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b)[4] AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE ON, OR ELECTION OF THE FORM OF DISTRIBUTION TO BE RECEIVED UNDER, THE PLAN.  THE COURT HAS NOT, HOWEVER, DETERMINED THE CORRECTNESS OR COMPLETENESS OF ANY INFORMATION HEREIN.

VOTE AFTER CONSIDERING RISK FACTORS.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN, OR MAKE AN ELECTION THEREUNDER, ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OR MAKING AN ELECTION THEREUNDER. SEE SECTION VIII

---

[3]   The Government of Puerto Rico, and its agencies and instrumentalities (including AAFAF), have not independently verified or approved the information contained or the statements made in this Disclosure Statement.

[4]   All provisions of Title 11 of the United States Code (the "Bankruptcy Code") referenced herein are made applicable to these Title III cases by PROMESA section 301(a).

OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

**FORWARD LOOKING STATEMENTS**. THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN FEDERAL SECURITIES LAWS. ALL STATEMENTS CONTAINED HEREIN THAT ARE NOT CLEARLY HISTORICAL IN NATURE ARE FORWARD-LOOKING AND THE WORDS "ANTICIPATE," "BELIEVE," "COULD," "SHOULD," "EXPECT," "ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT, INCLUDING STATEMENTS ABOUT THE PLAN, STRATEGIES, PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND THE DEBTORS' FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES. WHILE THESE STATEMENTS REPRESENT THE DEBTORS' CURRENT JUDGMENT ON WHAT THE FUTURE MAY HOLD, AND THE DEBTORS BELIEVE THESE JUDGMENTS ARE BASED UPON REASONABLE ASSUMPTIONS UNDER THE CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY EVENTS OR FINANCIAL RESULTS, AND THE DEBTORS' ACTUAL RESULTS MAY DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS AND PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF THE PLAN, ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, UNLESS OTHERWISE SPECIFIED. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY LAW. ALL FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL, WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTORS CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE ACHIEVED. FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM THE DEBTORS' EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED HEREIN UNDER SECTION VIII, "CERTAIN RISK FACTORS TO BE CONSIDERED." THE DEBTORS URGE HOLDERS OF CLAIMS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

**FACTS CAN CHANGE**. THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS

OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE
SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT
SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE UNCHANGED
SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF.  EACH HOLDER
OF A CLAIM ENTITLED TO VOTE ON, OR MAKE AN ELECTION WITH RESPECT
TO, THE PLAN MUST RELY ON ITS OWN EVALUATION OF THE DEBTORS AND
ITS OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO
ACCEPT OR REJECT, OR MAKE AN ELECTION PURSUANT TO, THE PLAN.

PLAN SUPPLEMENT.  A PLAN SUPPLEMENT CONTAINING DRAFT
OR FINAL VERSIONS OF PRIMARY DOCUMENTS REQUIRED TO CONSUMMATE
THE TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BE FILED WITH THE
TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN
SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE,[5] OR ON SUCH OTHER DATE
AS THE TITLE III COURT ESTABLISHES.  THE PLAN SUPPLEMENT SHALL BE
DEEMED INCORPORATED INTO AND PART OF THE PLAN AS IF SET FORTH
THEREIN IN FULL.

DISCLOSURE STATEMENT IS SOLELY FOR VOTING AND/OR
ELECTIONS.  THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS
DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS
OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT, OR ELECT THE FORM
OF DISTRIBUTION PURSUANT TO, THE PLAN.  NOTHING IN THIS DISCLOSURE
STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.  THE
CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS
PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER
ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH
ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL,
SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS
DISCLOSURE STATEMENT AND THE PLAN.

JUDICIAL APPROVAL DOES NOT MEAN ALL FACTS ARE CORRECT.
THIS DISCLOSURE STATEMENT AND THE TITLE III COURT'S APPROVAL OF
THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND
MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY,
STIPULATION, OR WAIVER.[6]  FURTHER, THE TITLE III COURT'S APPROVAL OF
THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE
THE TITLE III COURT'S DETERMINATION THAT THE INFORMATION HEREIN IS
CORRECT OR COMPLETE AND DOES NOT MEAN THE COURT WILL CONFIRM
THE PLAN.  THE TITLE III COURT HAS SCHEDULED A HEARING ON [_____], 2021

---

[5]  The "Voting Deadline" is defined as 5:00 pm (Atlantic Standard Time) on [_____, 2021], unless such time is extended.

[6]  For the avoidance of doubt, the use of the term "clawback" in this Disclosure Statement shall not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver in current or future litigation regarding monies historically conditionally appropriated by the Commonwealth to certain Commonwealth instrumentalities.

TO CONSIDER CONFIRMATION OF THE PLAN UNDER PROMESA AND THOSE SPECIFIC BANKRUPTCY CODE PROVISIONS MADE APPLICABLE TO THE TITLE III CASES PURSUANT TO PROMESA SECTIONS 301 AND 314.

NO GOVERNMENTAL APPROVAL. NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

UNREGISTERED SECURITIES. NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN WILL HAVE BEEN REGISTERED WITH THE SECURITIES & EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

CONSEQUENCES OF HOLDING SECURITIES ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT. THE DEBTORS RECOMMEND POTENTIAL RECIPIENTS OF NEW GO BONDS AND CONTINGENT VALUE INSTRUMENTS TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

TAX CONSIDERATIONS. THE TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS ARE COMPLEX, AND DEPEND IN PART ON BOTH THE TYPE OF CLAIM HELD AND THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS CONSULT THEIR OWN RESPECTIVE TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, TERRITORIAL (INCLUDING PUERTO RICO), LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN IN THEIR RESPECTIVE INDIVIDUAL CIRCUMSTANCES.

PLAN OF ADJUSTMENT CONTROLS OVER THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO THE DEBTORS. THE DEBTORS BELIEVE THESE SUMMARIES ARE FAIR AND ACCURATE. NO OTHER PARTY, INCLUDING ANY PARTY TO A PLAN SUPPORT AGREEMENT, MAKES ANY REPRESENTATION AS TO THE FAIRNESS OR ACCURACY OF THESE SUMMARIES OR THE DESCRIPTIONS OF PARTIES' LEGAL RIGHTS AND REMEDIES CONTAINED HEREIN. IF THERE IS ANY INCONSISTENCY OR DISCREPANCY

**BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OF THE OTHER DOCUMENTS OR FINANCIAL INFORMATION REFERENCED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN, OR SUCH OTHER DOCUMENT OR FINANCIAL INFORMATION, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.**

**PLAN OF ADJUSTMENT MAY BE AMENDED. THE OVERSIGHT BOARD RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE PLAN AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENTS, THE PLAN, AND PROMESA TITLE III.**

## Table of Contents

**Page**

I.    Preface .................................................................................................................. 1

II.   Introduction ..................................................................................................... 15

    A.    PROMESA Title III Plan of Adjustment: An Overview ..................................... 18

    B.    Summary of Key Components of the Plan of Adjustment ................................. 19

    C.    Holders of Claims Entitled to Vote on the Plan of Adjustment .......................... 54

    D.    Solicitation and Voting Procedures .................................................................. 58

    E.    Confirmation Hearing and Deadline for Objections to Confirmation ................. 58

III.  Overview of the Debtors ................................................................................... 59

    A.    General Information ......................................................................................... 59

    B.    Debtors' Financial Obligations as of the Petition Date ..................................... 68

    C.    Puerto Rico's Revenue and Tax Regime ......................................................... 95

    D.    The Debtors' Cash Management Systems ..................................................... 133

    E.    Debtors' Cash Accounts ............................................................................... 140

    F.    Commonwealth's Liquidity and Minimum Cash Needs Analysis ................... 149

IV.  Significant Events Leading to Commencement of the Title III Cases .......................... 156

    A.    The Commonwealth's Steady Operational and Financial Decline .................... 156

    B.    Legislation Enacted by the Commonwealth to Address the Fiscal and Debt
Crisis .......................................................................................................... 160

    C.    PROMESA ................................................................................................. 169

    D.    Adoption of Commonwealth Fiscal Year Budgets and Fiscal Plans ................. 204

    E.    Negotiations with Creditors .......................................................................... 235

V.   Overview of the Debtors' Title III Cases ............................................................ 237

    A.    Commencement of the Debtors' Title III Cases .............................................. 237

    B.    Hurricanes Irma, Maria, and Dorian, the January 2020 Earthquakes,
COVID-19, Tropical Cyclone 9, Tropical Storm Laura, and Hurricane
Isaias, and the Oversight Board's Response ................................................. 238

    C.    Claims Process and Bar Date ....................................................................... 249

    D.    Rejection or Assumption of Unexpired Leases of Nonresidential Real
Property ...................................................................................................... 253

    E.    Title III Stay Matters ................................................................................... 255

    F.    Significant Adversary Proceedings and Related Litigation .............................. 275

| | G. | Rule 2004 Motions | 314 |
| | H. | Oversight Board's Investigation of Potential Causes of Action | 317 |
| | I. | The Stay Order and Mediation Team Reports | 353 |
| | J. | Related Debt Restructurings | 356 |
| | K. | Fees and Expenses Incurred During the Title III Cases | 373 |
| VI. | | The Title III Plan of Adjustment | 375 |
| | A. | General | 375 |
| | B. | Overview of the Plan of Adjustment | 376 |
| | C. | Compromise and Settlement of Disputes / Restructuring of Entities | 377 |
| | D. | Provisions for Payment of Administrative Expense Claims | 380 |
| | E. | Classification and Treatment of Claims | 385 |
| | F. | Provisions Regarding the New GO Bonds, CVIs and Additional Indebtedness | 462 |
| | G. | Provisions Regarding Assured Insured Bonds, National Insured Bonds, and Syncora Insured Bonds | 473 |
| | H. | Treatment of Executory Contracts and Unexpired Leases | 480 |
| | I. | Rights and Powers of Disbursing Agent | 482 |
| | J. | Provisions Governing Distributions | 482 |
| | K. | Avoidance Actions Trust | 487 |
| | L. | Prosecution and Extinguishment of Claims Held by the Debtors | 495 |
| | M. | Acceptance or Rejection of the Plan, Effect of Rejection by One or More Classes of Claims | 495 |
| | N. | Rights and Powers of Disbursing Agent | 495 |
| | O. | Procedures for Treatment of Disputed Claims | 496 |
| | P. | Governance and Provisions Regarding Pension Reserve | 498 |
| | Q. | Conditions Precedent to Confirmation of the Plan | 499 |
| | R. | Conditions Precedent to the Effective Date | 500 |
| | S. | Modification, Revocation, or Withdrawal of the Plan | 504 |
| | T. | Corporate Governance and Management of Reorganized Debtors | 505 |
| | U. | Provisions Regarding Oversight Board and Compliance with PROMESA | 506 |
| | V. | Provisions Regarding Committees | 506 |
| | W. | Miscellaneous Provisions | 509 |
| VII. | | Confirmation of the Plan of Adjustment | 521 |

| | | |
|---|---|---|
| A. | Confirmation Hearing | 521 |
| B. | Deadlines to Object to Confirmation | 521 |
| C. | Requirements for Confirmation of the Plan of Adjustment | 521 |
| **VIII.** | **Certain Risk Factors to Be Considered** | **527** |
| A. | Risks Related to the Title III Cases | 527 |
| B. | Risks Related to the Debtors | 530 |
| C. | Risks Related to the New GO Bonds | 531 |
| D. | Risks Related to the CVIs | 533 |
| E. | Risks Related to the Assured Election | 535 |
| F. | Risks Related to the Assured Bondholder Elections | 535 |
| G. | Risks Related to the Election of National Commutation Treatment | 536 |
| H. | Risks Related to the National Non-Commutation Treatment | 536 |
| I. | Risks Related to Making or Declining to Make the National Commutation Election | 536 |
| J. | Risks Related to the National Certificates | 537 |
| K. | Risks Related to the National Escrow Account | 538 |
| L. | Risks Related to the Election of Syncora Commutation Treatment | 538 |
| M. | Risks Related to the Syncora Non-Commutation Treatment | 538 |
| N. | Risks Related to Making or Declining to Make the Syncora Commutation Election | 539 |
| O. | Risks Related to the Syncora Certificates | 539 |
| P. | Risks Related to the Syncora Escrow Account | 540 |
| Q. | Risks Related to Projections in Revenues and Expenses in the Commonwealth Fiscal Plan | 540 |
| R. | Risks Related to the Collection of Revenues Supporting the Payment of New GO Bonds | 547 |
| S. | Risk Factors Related to Future Judicial Actions | 551 |
| T. | Risk Factors Related to Legislative Action | 552 |
| U. | Risk Factors Related to Tax Treatment of New GO Bonds | 553 |
| **IX.** | **Certain Material United States Federal Income Tax Considerations** | **556** |
| A. | General | 556 |
| B. | U.S. Holders | 557 |
| C. | Puerto Rico Individuals and Puerto Rico Corporations | 574 |

D.      Non-U.S. Holders .................................................................................. 577

X.      Certain Material Puerto Rico Income Tax Considerations ........................................ 579

A.      General ................................................................................................ 579

B.      P.R. Holders ......................................................................................... 579

C.      Non-P.R. Holders .................................................................................. 590

XI.     Applicability of Certain Federal and State Securities Laws ....................................... 592

A.      New GO Bonds ..................................................................................... 592

B.      CVIs ................................................................................................... 593

XI.     Financial Information and Projections .................................................................. 595

A.      Historical Financial Reporting ................................................................. 595

B.      Commonwealth Fiscal Plan and Projections .................................................. 599

XII.    Additional Information .................................................................................... 601

XIII.   Conclusion .................................................................................................. 601

## Table of Exhibits

**Exhibit A** – Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, *et al.* and Supporting Documents

**Exhibit B** – Plan Support Agreement (the "GO/PBA PSA"), dated as of February 22, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority, and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, certain GO Bondholders and PBA Bondholders, Assured Guaranty Corp. and Assured Municipal Corp., Syncora Guarantee Inc., and National Public Finance Guarantee Corporation

**Exhibit C** – Plan Support Agreement (the "HTA/CCDA PSA"), dated as of May 5, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority, certain holders of HTA Bond Claims, certain holders of CCDA Bond Claims, Assured Guaranty Corp. and Assured Municipal Corp., and National Public Finance Guarantee Corporation

**Exhibit D** – Stipulation (the "ERS Stipulation"), dated as of April 2, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, and certain ERS Bondholders

**Exhibit E** – Plan Support Agreement ("Retiree Committee PSA"), dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the Official Committee of Retirees appointed in the Commonwealth's Title III Case

**Exhibit F** – Plan Support Agreement ("AFSCME PSA," and together with the PSA and the Retiree Committee PSA, the "Plan Support Agreements"), dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the American Federation of State, County, and Municipal Employees International Union, AFL-CIO

**Exhibit G** – Certified Commonwealth Fiscal Plan (which includes ERS and PBA)

**Exhibit H** – Certified Commonwealth Budget (which includes ERS and PBA)

**Exhibit I** – Oversight Board Report on Pensions

**Exhibit J** – Summary Chart of the Debtors' Outstanding Bonds

**Exhibit K** – List of Entities that Comprise the Commonwealth Central Government

**Exhibit L** – List of Debtors' Bank Accounts, Balances, and Preliminary Restriction Categorizations as of December 31, 2020

**Exhibit M** – Latest Audited Financial Statements for the Debtors

**Exhibit N** – Actions to be Transferred to the Avoidance Actions Trust

**Exhibit O** – Best Interests Test Report

**<u>Exhibit P</u>** – Certified COFINA Fiscal Plan, Certified COFINA Budget, and Latest Audited Financial Statements for COFINA

> THE FOLLOWING STATEMENTS IN THESE SECTIONS I AND II ARE QUALIFIED
> IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION CONTAINED
> ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN AND THE
> EXHIBITS TO EACH.

## I.   Preface[7]

*The Commonwealth's Economic Decline.*  Over the last several decades, a multitude of factors contributed to the steep economic downturn of the Commonwealth of Puerto Rico (the "Commonwealth"), including a contracting economy, population decline, and changes in tax status and available credits under the U.S. tax code. From the early 2000s through 2016, Puerto Rico's public debt rose rapidly, in part from borrowing to cover deficits including to pay debt service, and the outlook for Puerto Rico's economy continued declining.

By 2016, Puerto Rico was "in the midst of a fiscal crisis."[8]  The Commonwealth was "being crushed under the weight of a public debt that [was] larger" than its gross national product, "it ha[d] started to default on its debt obligations," and it had lost access to external financing.[9]  The Commonwealth had over $120 billion in combined debt and unfunded pension liabilities. Even worse, these calamitous financial circumstances threatened a humanitarian crisis for the over 3 million U.S. citizens living on the island of Puerto Rico.  As the United States Secretary of the Treasury observed, the Commonwealth's ability to provide "basic healthcare, legal, and education services" was in serious doubt.[10]

*Enactment of PROMESA.*  Consequently, on June 30, 2016, the President signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 *et seq.*, to work toward a remedy to the ongoing fiscal and humanitarian crisis in Puerto Rico.  The goal of PROMESA is to meet Puerto Rico's immediate need to provide its citizens effective services, to formulate a debt restructuring, and to implement fiscal reform leading to a sustainable economy, fiscal responsibility, and market access.

*Main Components of PROMESA.*  PROMESA establishes two primary mechanisms for restoring fiscal responsibility.  First, Titles I, II, IV, and V of PROMESA create the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and provide it powers and duties governing the review and certification of multi-year fiscal plans, annual budgets, and infrastructure revitalization, and fast-tracking key infrastructure projects.[11]  Second, Titles III and

---

[7]   Capitalized terms used herein not otherwise defined shall have the meaning ascribed to such term in the Plan (as defined below).

[8]   *Puerto Rico v. Franklin Cal. Tax–Free Tr.*, 136 S. Ct. 1938, 1942 (2016).

[9]   *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gómez*, 174 F. Supp. 3d 585, 602 (D.P.R. 2016); H.R. Rep. No. 114- 602, at 40 (2016).

[10]   Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives (Jan. 15, 2016), https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

[11]   The U.S. House Natural Resources Committee is evaluating proposed amendments to PROMESA that would include, among other things, a more specific definition of protected essential services (including public healthcare,

VI of PROMESA provide for debt restructurings, similar to bankruptcy cases and out-of-court restructurings, respectively, for Puerto Rico and its instrumentalities.[12]  By incorporating many provisions of Title 11 of the United States Code (the "Bankruptcy Code") into Title III of PROMESA, which provides for restructurings similar to restructurings under chapters 9 and 11 of the Bankruptcy Code, the statute also protects the debtors from creditor debt-enforcement actions[13] that otherwise could extract billions of dollars from the Commonwealth and inflict irreparable damage on Puerto Rico's economy.  The statute includes unique attributes, such as an automatic stay triggered once the bill was signed into law.  The Oversight Board is the sole representative of any debtor entity in a Title III case, with the exclusive authority to propose a plan of adjustment.  PROMESA Title VI provides an alternate, out-of-court restructuring process conditioned on voting thresholds.

   *Historic Problems Leading to Oversight Board.*  To overcome decades of severe economic decline, operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing,[14] PROMESA established an independent entity within Puerto Rico's government—the Oversight Board.[15]  The Oversight Board is "an entity within the territorial government," rather than a "department, agency, establishment, or instrumentality of the Federal Government."[16]  The Oversight Board is statutorily charged with restoring to the Commonwealth fiscal responsibility and market access.[17]  To achieve success in carrying out its statutory mission, the Oversight Board is granted authority to oversee the restructuring of the Commonwealth's and its instrumentalities' debt and to require fiscal reforms.  Elements of this authority have been challenged,[18] but have been confirmed by the United States District Court for the District of Puerto Rico (the "Title III Court"), the United States Court of Appeals for the First Circuit (the "First Circuit"), and the United States Supreme Court (the "Supreme Court").[19]

---

[12]  48 U.S.C. § 2161.

education, safety and pensions); provision of federal funding for the Oversight Board; guaranteed funding for the University of Puerto Rico; an audit of the Commonwealth's public debt; and permission for the Commonwealth government to discharge certain debts.  At a hearing held on June 11, 2020 and in subsequent follow-up inquiries, the Oversight Board and AAFAF each communicated their respective concerns to the Natural Resources Committee.

[13]  11 U.S.C. § 362(a) (incorporated into the Title III case by 48 U.S.C. § 2161(a)).

[14]  PROMESA § 405(m)(1).

[15]  48 U.S.C. § 2121(a)(1).

[16]  *Id.* § 2121(c)(2); *see also* 48 U.S.C. § 2194(i)(2) (defining the term "Government of Puerto Rico" to include the Oversight Board for purposes of that section); 48 U.S.C. § 2127(b) (providing that the Oversight Board is funded exclusively by the territorial government of Puerto Rico).

[17]  PROMESA § 101(a).

[18]  The summaries of court filings in this Disclosure Statement are fully qualified by the corresponding publicly filed documents.

[19]  As further described in section VI.C.3, on July 5, 2018, then-Governor Ricardo Rosselló Nevares ("Governor Rosselló") sued the Oversight Board, contending, among other things, that "any matters that constitute recommendations (whether or not styled as recommendations) under the Fiscal Plan that the Government has rejected or may rejected [sic] in the future (whether set forth herein or otherwise) are non-binding on the Government and do not need to be implemented by the Government."  Governor's Complaint against Oversight

***Oversight Board's Initial Actions to Fulfill PROMESA's Mandate.*** On August 31, 2016, President Obama appointed the seven voting members of the Oversight Board, who under PROMESA serve with no compensation, but are entitled to reimbursement of reasonable and necessary expenses incurred by reason of their service.[20] When appointed, the Oversight Board had no staff, no office, and no data. It commenced assembling the facilities and expertise it needed to carry out its statutory functions. At the time, the Commonwealth had approximately $74 billion of funded debt, estimated pension liabilities of approximately $55.6 billion[21], and insufficient resources to meet those obligations. On September 30, 2016, the Oversight Board (i) announced a process for the development, submission, approval, and certification of fiscal plans for the Commonwealth and for covered territorial instrumentalities, (ii) designated an initial group of 63 entities as covered entities under PROMESA,[22] (iii) requested a significant amount of financial and budgetary information from the Governor as a first step to develop improvements to the Government's fiscal governance, accountability, internal controls, and financial affairs, and (iv) began the critical projects process authorized under Title V of PROMESA by developing selection criteria and processes for expediting certain critical energy and infrastructure projects. Furthermore, the Oversight Board commenced meetings with representatives of multiple groups of creditors ranging from retirees to holders of general obligation bonds (the "GO Bonds," and the holders of GO Bonds, the "GO Bondholders"), bond insurers, insured and uninsured bondholders, on-island bondholders, Government Development Bank for Puerto Rico ("GDB") bondholders, Puerto Rico Highways and Transportation Authority ("HTA") bondholders and insurers, Puerto Rico Aqueduct and Sewer Authority ("PRASA") bondholders, Puerto Rico Electric Power Authority ("PREPA") bondholders and insurers, and many others.

---

Board, dated July 5, 2018, Adv. Proc. No. 18-00080-LTS in 17 BK 3283-LTS (D.P.R.), at ¶ 83. By opinion and order dated August 7, 2018, the Title III Court ruled against the then-Governor on that issue, explaining: "The power bestowed on the Oversight Board by Section 205(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations ..." *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.* [Adv. Proc. No. 18-00080-LTS ECF No. 33], at 25. On appeal brought by then-Governor Rosselló, the United States Court of Appeals for the First Circuit affirmed the District Court decision, confirming there is nothing in PROMESA section 205 "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board has the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázauez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 5 (1st Cir. 2019). The Legislative Assembly of Puerto Rico (the "Legislature") also contested the Oversight Board's budget power. It claimed "the Board's decision to certify its Budget over the Legislative Assembly's was an 'unlawful[] encroach[ment] upon the Legislative Assembly's exclusive legislative power under the Puerto Rico Constitution.'" *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019). The Title III Court ruled against the Legislature and the United States Court of Appeals for the First Circuit affirmed, ruling: ". . . Under PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA].'" *Id.*

[20]   PROMESA § 101(g).

[21]   GASB 67 Net Pension Liability for ERS, TRS, and JRS as of June 30, 2016 as reported in the June 30, 2016 Actuarial Valuation Reports by the system's actuary. Excludes medical insurance plan contributions measured under GASB 45.

[22]   On May 9, 2019, the Oversight Board also designated 78 municipalities as covered entities.

***First Commonwealth Certified Fiscal Plan.*** The development of the first certified fiscal plan for the Commonwealth stretched over two administrations. On October 14, 2016, then-Governor Alejandro Javier García Padilla submitted his administration's fiscal plan proposal for the Commonwealth. By letter dated November 29, 2016, then-Governor García Padilla rejected the Oversight Board's request for certain fiscal plan revisions to be submitted by December 15, 2016, asserting that any efforts to reduce government spending would worsen the economic crisis and should be abandoned. Then, on January 1, 2017, Governor Rosselló took office and submitted a proposed Commonwealth fiscal plan on February 28, 2017. The Oversight Board and its advisors had worked with the then-Governor and his administration for months on developing fiscal plans for the Commonwealth and certain of its instrumentalities. On March 13, 2017, the Oversight Board certified a Commonwealth fiscal plan comprised of the Governor's fiscal plan with certain amendments added by the Oversight Board. The Oversight Board also worked with the Government to develop and eventually certify fiscal plans for other covered instrumentalities, including GDB, HTA, PRASA, and PREPA on April 28, 2017.

***Commencement of Title III Cases.*** When PROMESA was enacted, it imposed a temporary automatic stay protecting the Commonwealth and its instrumentalities from creditor actions to enforce debt against them until May 1, 2017.[23] After the expiration of the PROMESA stay, the Oversight Board commenced Title III cases for the Commonwealth on May 3, 2017, for the Puerto Rico Sales Tax Financing Corporation ("COFINA") on May 5, 2017, for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") and HTA on May 21, 2017, for PREPA on July 2, 2017, and for PBA on September 27, 2019. The commencement of Title III cases triggered the operation of the automatic stay in Bankruptcy Code section 362, thereby providing those entities continued protection from enforcement actions for the duration of their Title III cases.[24]

***A New Landscape – Hurricanes Irma and Maria.*** In September 2017, the difficulty of improving Puerto Rico's financial status worsened as Puerto Rico was devastated by Hurricanes Irma and Maria. The hurricanes destroyed much of Puerto Rico's infrastructure and upended the daily lives of all Puerto Ricans and the work of the Oversight Board.

Immediately after the hurricanes struck, the Oversight Board provided the Government with the flexibility to reapportion up to $1 billion in budgeted expenditures to cover disaster-related expenses. Through several meetings, letters, Congressional testimony, and other interactions with the federal government and authorities in Puerto Rico, the Oversight Board actively advocated for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity.

***Recent Earthquakes and Aftershocks.*** On December 28, 2019, the first of many significant earthquakes and aftershocks struck Puerto Rico, registering at a magnitude of 4.7 of the Richter scale. On January 6, 2020, Puerto Rico experienced a 5.8 magnitude earthquake and the next day experienced a 6.4 magnitude earthquake, the Caribbean's strongest and most destructive

---

[23] PROMESA §§ 5(11), 405(b). The PROMESA stay was initially set to expire on February 15, 2017 but the Oversight Board extended the stay by 75 days as permitted under PROMESA section 405(d)(1)(B).

[24] PROMESA § 301(a).

earthquake in a century.  Then, on May 2, 2020, another 5.4 magnitude earthquake struck Puerto Rico's southwestern coast. The seismic event, which briefly knocked out power in some areas, hit near the city of Ponce where hundreds of structures, including homes and houses of worship, remain damaged or destroyed from the devastating earthquakes earlier in 2020.

These earthquakes represent only four of more than 1,000 overall earthquakes of magnitude 3 or greater in Puerto Rico during 2020, with six being over a 5.5 magnitude. According to a January 29, 2020 report published by the United States Geological Survey, there is a high likelihood of continued, material aftershocks over the course of the next several years.[25] These earthquakes have caused significant damage to homes and buildings on Puerto Rico's southern coast, as well as significant damage to PREPA's Costa Sur power plant, which would typically provide approximately 21% of Puerto Rico's power.  In response, the Oversight Board authorized the use of the balance of $160 million in Emergency Reserve funds to respond to the earthquakes. On January 6, 2020, President Trump signed a major disaster declaration authorizing Individual Assistance and Public Assistance for impacted Municipalities and Hazard Mitigation Commonwealth-wide, enabling a range of federal assistance under the Stafford Act.  The declaration authorizes disaster assistance funding to supplement Commonwealth and local government recovery efforts in the aftermath of the earthquakes.

***COVID-19 Impact and Response.***  On March 11, 2020, the World Health Organization declared the Coronavirus Disease 2019 ("COVID-19") a global pandemic.  As a result of the health threat and to contain the virus spread across Puerto Rico, then-Governor Vázquez-Garced issued an executive order on March 12, 2020, declaring a state of emergency in Puerto Rico to concentrate all efforts and implement necessary measures to safeguard the health, well-being, and public safety of the citizens of Puerto Rico.  The executive order authorized the Commonwealth's Secretary of the Treasury and the Director of the Office of Management and Budget of the Commonwealth (PROMB) to set up a special budget, from any available funds, including the Emergency Reserve, to cover all necessary costs for the containment of COVID-19 throughout Puerto Rico and sharing information with municipalities.

To combat the economic challenges associated with the pandemic, federal and local government funds were provided to individuals, families, businesses, nonprofits, and other organizations across the United States, including Puerto Rico.  On March 3, 2020, the Oversight Board made an initial $5 million of Emergency Reserve Funds available to the Government to contain and mitigate COVID-19. On March 13, 2020, the Oversight Board made the remainder of the $160 million of Emergency Reserve Funds available to respond to the pandemic. On March 23, 2020, the Government and the Oversight Board agreed to provide $787 million in financial support (Emergency Measures Support Package) to those on the front line of the COVID-19 pandemic and those most affected by the emergency measures that have resulted.

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act, Public Law No. 116-136 (the "CARES Act"), was signed into law by President Donald J. Trump.  The CARES Act created the Coronavirus Relief Fund ("CRF"), which provided $150 billion in general assistance for domestic governments.  Under the CARES Act, $2.2 billion of relief was directed

---

[25] U.S. Geological Survey, 2020 Southwest Puerto Rico Earthquake Sequence (January 29, 2020).

to Puerto Rico.  The deadline for spending CRF funds was initially December 30, 2020, but was extended through December 31, 2021, by the Consolidated Appropriations Act, 2021, Public Law No. 116-260, which was signed into law on December 27, 2020.  In addition to the extension, the Act also combines $900 billion in stimulus relief for the COVID-19 pandemic in the United States with a $1.4 trillion omnibus spending bill for the 2021 federal fiscal year.  Of the approximately $900 billion of stimulus relief, Puerto Rico is estimated to receive $7 billion.  On March, 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021 ("ARP").  The bill provides $1.9 trillion nationally in funding, program changes and tax policies aimed at mitigating the continuing effects of the pandemic.  ARP provided a further $350 billion in aid to state and local governments, of which Puerto Rico (including municipalities) is to receive $4 billion.

*New Fiscal Plans.*  Because the 2017 hurricanes created a new reality for Puerto Rico, the Oversight Board initiated a process for rewriting the fiscal plans for the Commonwealth and its covered instrumentalities in October 2017.  During the nine months following Hurricanes Irma and Maria, the Oversight Board collaborated with the Government to develop new fiscal plans with the overarching goal of fulfilling PROMESA's mandates.  To do so, the fiscal plans would require a series of ambitious structural reforms and fiscal measures to restore growth and opportunity to the people and businesses of Puerto Rico.

While the Oversight Board and the Government eventually reached broad agreement on several aspects of each fiscal plan, including agreed labor and welfare reform, ease of doing business reform, energy reform, and infrastructure reform, among other things, the Government disagreed with some of the reforms, including at-will employment for private sector employees.  The Oversight Board eventually reached an accommodation with then-Governor Rosselló to change the law of Puerto Rico to make it an employment at-will jurisdiction for private sector employees, the same as in 49 of the 50 states. The Legislature, however, did not pass the necessary legislation, leaving Puerto Rico's labor law as-is.

At the conclusion of this months-long process with the Government, the Oversight Board developed and certified its own fiscal plan for the Commonwealth on June 29, 2018, which contained many fiscal measures necessary to right-size the Government.  The Oversight Board's fiscal plan did not include a comprehensive reform of the private sector labor market because that proposal had failed to garner the necessary legislative support as described above.

Over the last several years, the Oversight Board has certified further revised Commonwealth fiscal plans to reflect new information, updated financial projections, and additional natural disaster and public health crises. For example, new Commonwealth fiscal plans were certified on October 23, 2018 and May 9, 2019 to include new fiscal year ("Fiscal Year" or "FY") 2018 financial information, revised federal disaster spending estimates, and updated demographic projections.  On May 27, 2020, the Oversight Board certified its own new fiscal plan for the Commonwealth to reflect the substantial impacts of the 2020 earthquakes and COVID-19 pandemic, along with slower implementation of structural reforms. The 2020 Fiscal Plan implemented a one-year pause in fiscal measures to allow the Government to focus on implementing reforms.

On April 23, 2021, the Oversight Board certified the 2021 Fiscal Plan for the Commonwealth. The certified 2021 Fiscal Plan factors in the economic and fiscal impact of the

COVID-19 pandemic as well as substantial federal and local stimulus (over $45 billion from COVID-19 relief funds), slower than expected disaster relief funding spending, and updated estimates of the potential impact of structural reforms. The 2021 Fiscal Plan also restores key fiscal measures—including the University of Puerto Rico and municipal subsidy reductions, healthcare measures, and agency efficiency measures—while adding funding for civil service reform and other government priorities.

*Election of Governor Pierluisi.* On November 3, 2020, Pedro Pierluisi was elected Governor of Puerto Rico. Governor Pierluisi was sworn into office for a four-year term on January 2, 2021, and has stated that the Commonwealth will not support cuts or adjustments to government pension benefits.

*Oversight Board's Policy Reforms.* Concurrently with the development of the fiscal plans and budgets, the Oversight Board and the Government worked together to enact significant legal and governance reforms. These legislative actions have resulted in Puerto Rico undertaking significant reform projects, including an operational and structural transformation of Puerto Rico's electric grid, measures to increase the Government's financial transparency, and budgetary controls.[26] In Fiscal Year 2019, the Oversight Board implemented a consolidated budget review process for the General Fund,[27] Special Revenue Funds,[28] other funds, and federal funds, along with public agencies without independent fiscal plans, to increase transparency of funding, monitoring of funds, and understanding of operational trends of the Government. In Fiscal Year 2020, efforts to improve transparency continued with the Oversight Board's decision to budget cash grants and incentives in the Special Revenue Funds. In Fiscal Year 2021, many of these funds were moved from Special Revenue Funds to the General Fund such that they fall under the Government's budgeting purview and more accurately reflect the true nature of those funds.

The Oversight Board sought to achieve cost savings by consolidating many of the Commonwealth's over 100 government agencies, while ensuring the delivery of more efficient government services. Consolidation would also have the effect of making the Government more manageable over time. The policy reforms also reinvest a portion of those savings in areas with the highest needs. The Oversight Board authorized, for instance, a considerable increase in teacher and police salaries. The Oversight Board also accommodated changes to enable police officers to enroll in Social Security, further enhancing their retirement security for police officers who achieve the required forty quarters of contributions to Social Security.

The Oversight Board also made major strides in promoting financial transparency within the Government by providing the people of Puerto Rico better access to higher quality information on government reforms, government spending, and government administration. The Oversight Board has required financial transparency so that the general public has full access to information

---

[26] FOMB, Annual Report, Fiscal Year 2018, at 8-11.5; FOMB, Annual Report, Fiscal Year 2019, at 37-52.

[27] The term "General Fund" is an accounting term used throughout the Disclosure Statement to describe the Commonwealth's primary operating fund.

[28] The term "Special Revenue Fund" is an accounting term used throughout this Disclosure Statement, and does not imply that monies in Special Revenue Funds are special revenues. The Debtors reserve all their rights with respect thereto.

about the spending of taxpayer dollars. The public reports now available online include budget-to-actual reporting, cash reporting, bank balances, and attendance reporting. The Oversight Board certified budgets for the Commonwealth and certain of its instrumentalities and public corporations now include more detail about the nature of Government spending. The Oversight Board also mandated oversight over all outside contracting and new debt issuances. Finally, the Oversight Board posts online all progress on implementation plans submitted by Government agencies.

Transparency and accountability of public finances are critical to responsible governance. Where transparency was not possible, the Oversight Board pursued building the database to make it so. The Oversight Board commissioned a report detailing the bank and investment account balances of certain entities and instrumentalities of the Commonwealth. The analysis of the cash is ongoing and is described further in section III.D.1.

In 2017, the Oversight Board hired the law firm Kobre & Kim to provide a complete, independent review of the Government's debt. In August 2018, the Oversight Board received the result of this investigation and presented the Kobre & Kim report. Subsequently, the Oversight Board created a Special Claims Committee which has challenged approximately $6 billion worth of GO Bonds, among other debt, issued by the Commonwealth and its instrumentalities and public corporations.

***The Debtors' Title III Cases and Related Restructurings.*** Throughout the course of the Title III cases, the Oversight Board has led or approved Government-led debt restructuring negotiations with the view that consensual negotiations are often better than contested resolutions. Working closely with the Government and its creditors, the Oversight Board and Government completed two restructurings involving more than $22 billion in public bond debt including (i) approximately $17.6 billion under a Title III plan of adjustment for COFINA, and (ii) approximately $4.7 billion under a Title VI Qualifying Modification for the GDB. The Oversight Board also entered into plan support agreements with certain supporting creditors affecting over $50 billion in pension claims at the Commonwealth and, an additional $35 billion of Commonwealth-related bond and "clawback" claims, as well as a restructuring support agreement with $9 billion of PREPA bond claims.

In November 2018, the Government and the Oversight Board completed the GDB Qualifying Modification. The GDB had more than $4 billion in legacy bond debt and approximately $8 billion in total liabilities. These claims were resolved with the issuance of $2.6 billion in new bonds under PROMESA's Title VI procedure. Those bonds are mainly secured by the cash flow from loans GDB previously made to Puerto Rico municipalities and other GDB assets. The policy goals of the Oversight Board and the Government in the GDB restructuring were to ensure that these new bonds are payable solely from legacy GDB assets, without recourse to any future general government appropriations from the Commonwealth, and to cushion the financial effect of the GDB restructuring on the many Puerto Rico municipalities who also were creditors of GDB.

The Oversight Board and the Government also negotiated with COFINA's stakeholders regarding a gating issue over whether certain sales and use taxes ("SUT") were property of the Commonwealth or COFINA. These negotiations led to a consensual allocation of SUT revenues

8

and ultimately the successful confirmation of a plan of adjustment for COFINA on February 5, 2019, reducing COFINA's debt from approximately $17 billion to $12 billion. The settlement of the dispute over ownership of the SUT brought the Commonwealth one step closer to restructuring its debt because it eliminated uncertainty over billions of dollars claimed by both the Commonwealth and COFINA.

In May 2019 and September 2019, the Oversight Board, PREPA, and AAFAF entered into a restructuring support agreement with a substantial majority of PREPA's uninsured bondholders and all monoline insurers of PREPA's bonds to restructure PREPA's legacy debt. If implemented, the PREPA restructuring support agreement would reduce PREPA's debt by up to 32.5%, protect consumers from uncapped electricity price hikes to pay debt service, and save Puerto Rico's residents and businesses that depend on its electricity supply about $3 billion in debt service payments over the next 10 years. The agreement was designed to support the transformation and modernization of Puerto Rico's energy system to deliver affordable, reliable power to the people of Puerto Rico, while shifting much of the risk of the potential for reduced customer demand for PREPA electricity to the bondholders and away from the residents and businesses served by PREPA.

In August 2019, PRASA and AAFAF entered into a consensual restructuring of approximately $1 billion of PRASA's outstanding obligations under U.S. Department of Agriculture ("USDA"), Rural Development bonds and loans under U.S. Environmental Protection Agency ("EPA") State Revolving Fund programs. The Oversight Board approved the restructuring pursuant to PROMESA Section 207. This restructuring would save PRASA nearly $400 million in the first 10 years, eliminated approximately $1 billion in guaranty claims against the Commonwealth, and restarted new federal funding from the EPA and USDA through various clean water programs to support PRASA's ongoing effort to improve water quality and safety for the people of Puerto Rico. Moreover, this consensual restructuring granted PRASA significant benefits without requiring PRASA enter into a Title III or Title VI proceeding.

In December 2020, the Oversight Board approved pursuant to PROMESA Section 207, the issuance by PRASA of $1,351,300,000 aggregate principal amount of its Revenue Refunding Bonds, Series 2020A (Senior Lien) and $18,775,000 aggregate principal amount of its Federally Taxable Revenue Refunding Bonds, Series 2020B (Senior Lien) (collectively, the "PRASA 2020 Bonds"). The proceeds of the PRASA 2020 Bonds were used to (i) refinance a portion of PRASA's outstanding Revenue Bonds, Series A and Series B (Senior Lien), (ii) refinance all of PRASA's outstanding Revenue Refunding Bonds, 2008 Series A and 2008 Series B, each guaranteed by the Commonwealth and (iii) pay the costs of issuance of the PRASA 2020 Bonds.

***Reasons for Disagreements.*** While the Oversight Board took on the challenges identified by Congress in PROMESA accrued from prior decades, exacerbated by Hurricanes Irma and Maria, the ongoing earthquakes, and the current COVID-19 pandemic, various creditors, stakeholders, and, at times, the Government, disagreed with the Oversight Board's reforms and sought to challenge the Oversight Board's exercise of its authority and mandate pursuant to PROMESA to bring the Commonwealth and its covered instrumentalities to economic stability and access to capital markets. Some of the disputes arose out of differing interpretations of PROMESA, the Commonwealth Constitution, bond resolutions, and other contracts and applicable

laws. For the most part, reasonable people could differ, and they did differ and brought their disputes to court.

*Litigation Affecting the Debt Restructurings.* In a Title III case under PROMESA, the plan of adjustment is required to be consistent with the debtor's certified fiscal plan.[29] In turn the fiscal plan must contain, among other things, a debt sustainability analysis.[30] Creditors who believed the Commonwealth's certified fiscal plan contained a debt sustainability analysis showing the Commonwealth could issue less new debt to pay creditors' claims than the creditors believed was sustainable, sued and sought to enjoin the Oversight Board from proposing any plan of adjustment consistent with the Commonwealth's certified fiscal plan. Some creditors also asked to nullify the Commonwealth's certified fiscal plan, and to compel turnovers of billions of dollars of revenues. *See* section V.F of this Disclosure Statement for a summary of litigation against the Oversight Board.

PROMESA expressly provides "[t]here shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this chapter."[31] No creditor procured any injunction against the Oversight Board, and creditors' claims for turnovers of revenues were either dismissed for lack of jurisdiction or denied on the merits. Specifically, the trial and appellate courts ruled Bankruptcy Code section 922(d) does not require application of pledged special revenues, to special revenue debt during the Title III Cases, and the United States Supreme Court denied two petitions for *certiorari* requesting further review.[32]

*Initial Agreements with Creditor Groups Leading to the Initial Plan of Adjustment and Amended Plan of Adjustment with Additional Creditor Support.* In May 2019, the Oversight Board reached agreements with several major creditor groups on the treatments of their claims, pursuant to separate plan support agreements, which treatments were embodied in the proposed plan of adjustment dated September 27, 2019 [ECF No. 8765] (the "Initial Plan"). Those groups included: (a) the Official Committee of Retirees (the "Retiree Committee"), whose constituency asserts outstanding obligations in excess of $50 billion in connection with pension claims, (b) the American Federation of State, County, and Municipal Employees ("AFSCME"), which represents more than 10,900 current employees of the Commonwealth and its instrumentalities, and (c) bondholder groups owning bonds issued by the Public Buildings Authority ("PBA Bonds," and the holders of PBA Bonds, "PBA Bondholders") and guaranteed by the good faith, credit and taxing power of the Commonwealth, and GO Bonds issued by the Commonwealth. The Plan Support Agreement, dated as of May 31, 2019 (the "Initial PSA"), among the Oversight Board, and certain holders of GO Bonds and PBA Bondholders, included the compromise and settlement of a key dispute between the Commonwealth and PBA as to whether the leases between the two entities were leases for purposes of Bankruptcy Code section 365 or were actually financings, and

---

[29] PROMESA § 314(b)(7).

[30] PROMESA § 201(b)(1)(I).

[31] PROMESA § 106(e).

[32] *Assured Guar. Corp. v. Carrion (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121 (1st Cir. 2019), *cert. denied*, No. 19-391, 2020 U.S. LEXIS 237 (Jan. 13, 2020).

the optional settlement of certain challenges to GO Bonds, including validity, priority, and secured status.

Following the filing of the Initial Plan, the Oversight Board continued to engage stakeholders in negotiations to build greater support for the Plan. Those negotiations, facilitated by the Mediation Team,[33] culminated in an agreement in principle with groups holding a majority of outstanding PBA Bonds and GO Bonds, and providing a framework for the treatment of PBA Bonds and GO Bonds, and the proposed settlement of all challenges to the validity, priority, and secured status of such bonds. This agreement in principle was memorialized in the Plan Support Agreement, dated February 9, 2020 (the "2020 PSA"), among the Oversight Board, as representative of the Commonwealth, ERS, and PBA, certain holders of GO Bonds, and certain holders of PBA Bonds.[34] The 2020 PSA was signed by the holders of approximately $8 billion in claims of GO Bonds and PBA bonds. The 2020 PSA also allowed each holder of GO Bonds or PBA Bonds with a face amount of such bonds in excess of one million dollars to join the 2020 PSA. Holders of an additional $2 billion in GO Bonds or PBA Bonds joined the 2020 PSA. The Government was not a signatory to the 2020 PSA.

In furtherance of the 2020 PSA, on February 28, 2020, the Oversight Board filed an amended proposed plan of adjustment [ECF No. 11946], related disclosure statement [ECF No. 11947], and the *Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. 11950].[35]

On March 10, 2020, the Title III Court entered the *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* [ECF No. 12187] establishing June 3-4, 2020 as the dates for the hearing to consider the adequacy of the information contained in the Disclosure Statement and related deadlines. In response to the spread of COVID-19 globally and throughout Puerto Rico, and its effects on the people and economy of Puerto Rico, the Oversight Board sought to adjourn the hearing to consider approval of the Disclosure Statement and related deadlines, subject to further status reports to be

---

[33] The "Mediation Team" is the mediation team led by Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas (the "Mediation Team Leader") as established by the Title III Court under its *Order Appointing Mediation Team*, dated June 23, 2017 [ECF No. 430].

[34] In connection with the execution of the 2020 PSA, the Initial PSA was terminated on February 9, 2020.

[35] In connection with the 2020 PSA, the Mediation Team has recommended that any litigation regarding the validity, priority, and secured status of the GO/PBA/PRIFA BANs claims be stayed pending a decision on confirmation of the Plan. *Amended Report and Recommendation of the Mediation Team* [ECF No. 10756], pp. 9-10.

provided to the Title III Court [ECF No. 12485], which the Title III Court granted by order dated March 27, 2020 [ECF No. 12549]. Over the last year, the Oversight Board resumed discussions, under the guidance of the Mediation Team, with AAFAF and creditors that were party to the 2020 PSA concerning the terms of a plan of adjustment and what, if any, modifications or amendments need to be proposed in light of the uncertainty created by COVID-19.

*New Plan Support Agreement and Further Amended Plan of Adjustment.* On October 29, 2020, the Title III Court entered the *Order on Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [ECF No. 14987] (the "Plan Scheduling Order"), which directed the Oversight Board to file on or before February 10, 2021 the proposed terms of a plan of adjustment and a motion for approval of a proposed timetable for filing an amended plan and proposed disclosure statement, among other things. In accordance with the Plan Scheduling Order, and with the guidance of the Mediation Team, the Oversight Board participated in (a) group or individual informational and negotiation mediation sessions (as and when scheduled by the Mediation Team) or (b) informal sessions with the Commonwealth, the parties to the 2020 PSA, the Monolines (as defined below), the Official Committee of Unsecured Creditors, the Retiree Committee, and various unions, all designed to establish a framework and timeline for the development for a consensual debt restructuring.

On February 9, 2021, the Oversight Board announced that, as a result of discussions led by the Mediation Team, the Oversight Board and the principal parties to the 2020 PSA reached an agreement in principle regarding the terms of an amended plan of adjustment, subject to the execution of definitive documentation. On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the GO/PBA PSA, among the Oversight Board, as representative of the Commonwealth, ERS, and PBA, certain holders of GO Bonds, certain holders of PBA Bonds, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, Syncora Guarantee Inc., as holder of, subrogee with respect to, or insurer of GO Bond Claims and PBA Bond Claims, and National Public Finance Guarantee Corporation ("National"), solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to GO Bonds and PBA Bonds.

As further described below, the GO/PBA PSA contemplates, among other things:

(a) total nominal, principal GO/PBA consideration of $14.438 billion, which consists of

    1. $7.024 billion of cash,[36] and

    2. $7.414 billion of New GO Bonds;

---

[36] $350 million of cash consideration is contingent upon FY 2021 revenue outperformance exceeding $350 million (e.g., if $349 million of outperformance, additional cash will be $0, but if $351 million of outperformance, additional cash will be $1 million).

(b) the issuance of the following New GO Bonds by the Commonwealth in the original principal amount of:

    1. $6,683,315,000 of current interest bonds,

    2. $442,506,553.50 of 5.375% capital appreciation bonds, and

    3. $288,241,989.75 of 5.000% capital appreciation bonds;

(c) the issuance of certain contingent value instruments by the Commonwealth from which payments will be made only if 5.5% Sales and Use Tax Collections outperform the May 2020 Commonwealth Certified Fiscal Plan (subject to an annual cap of $200 million and a lifetime cap of $3,500 million, in the following manner:

    1. GO CVIs are subject to an annual cap of $200 million, plus any unused amounts from previous years, subject to the annual payment not being greater than $400 million, and a lifetime cap of $3,500 million.

(d) payment of a PSA Restriction Fee to the initial parties to the GO/PBA PSA, and certain parties who joined the GO/PBA PSA on or before March 9, 2021, up to an aggregate of $350 million and the payment of up to an aggregate of $50 million to classes of retail investors holding GO Bonds or PBA Bonds in aggregate face amount equal to or less than one million dollars ($1,000,000) each if such class accepts the Plan; and

(e) the global settlement of all issues and disputes among all GO/PBA bondholders, holders of PRIFA BANs,[37] the Oversight Board, the Commonwealth, and PBA, including the validity, priority, and secured status of the CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims, in exchange for the consideration proposed in the Plan.

If the Plan is confirmed, the Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims is necessary as the Plan will effect a global settlement of any such disputes, binding on all parties in interest in the Title III Cases.

In connection with the Oversight Board's announcement of the GO/PBA PSA the Government of Puerto noted that although "[t]he economic terms of the agreement announced by the FOMB and the Creditor Group have many positive aspects for Puerto Rico" the Government could not join the GO/PBA PSA because the "Plan of Adjustment should not be structured in a way that affects even more from our pensioners."[38]  The Oversight Board intends to engage in meaningful discussions with the Government in the hopes that a consensual resolution can be reached.

---

[37] PRIFA BANs refer to that certain indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated March 1, 2015, between PRIFA and The Bank of New York Mellon, as trustee.

[38] AAFAF February 23, 2021 Press Release, https://aafaf.pr.gov/press-room/.

Following the entry into the GO/PBA PSA, on April 2, 2021, the Oversight Board reached an agreement with certain groups of holders of bonds issued by ERS and The Bank of New York Mellon, as fiscal agent for the ERS Bonds, regarding the proposed treatment and settlement of disputes relating to the ERS Bonds.

On May 5, 2021, the Oversight Board reach an agreement with certain holders of bonds issued by HTA, certain holders of bonds issued by the Puerto Rico Convention Center District Authority ("CCDA"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA bonds and CCDA bonds, and National, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA bonds, regarding the proposed treatment and settlement of, among other things, certain "clawback claims" against the Commonwealth.

[*Remainder of Page Left Intentionally Blank*]

14

## II.   Introduction

*Commencement of Title III Cases*.  On May 3, 2017 (the "Commonwealth Petition Date"), the Oversight Board issued a restructuring certification for the Commonwealth pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "Commonwealth Title III Case").

On May 21, 2017 (the "ERS Petition Date"), the Oversight Board issued a restructuring certification for ERS pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "ERS Title III Case").

On September 27, 2019 (the "PBA Petition Date," and, collectively with the Commonwealth Petition Date and ERS Petition Date, as applicable, the "Petition Date"), the Oversight Board issued a restructuring certification for PBA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PBA pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "PBA Title III Case," and together with the Commonwealth Title III Case, and the ERS Title III Case, the "Title III Cases").  Pursuant to PROMESA section 315, the Oversight Board is the sole representative of the Debtors[39] in their Title III cases.

*Certification of Proposed Plan of Adjustment*.  On July 12, 2021, pursuant to PROMESA section 104(j), the Oversight Board certified the submission of the fifth amended joint plan of adjustment for the Debtors (the "Plan").  On July 12, 2021, the Debtors filed (a) the *Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. _____], and (b) this disclosure statement [ECF No. _____] (the "Disclosure Statement").[40]

*Disclosure Statement Approval and Confirmation Hearing Date*.  On [_____], 2021, the Title III Court entered the Disclosure Statement Order approving the Disclosure Statement (the "Disclosure Statement Order").  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE TITLE III COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  THE TITLE III COURT WILL CONSIDER CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING SCHEDULED FOR [_____, 2021].**

The Confirmation Hearing may be adjourned or continued from time to time.  Therefore, parties in interest should check the online docket at https://cases.primeclerk.com/puertorico to confirm the latest scheduled date and time of the Confirmation Hearing.

---

[39] The Oversight Board, in its capacity as representative of the Commonwealth, ERS, and PBA is referred to collectively as the "Debtors" and individually as "Commonwealth Debtor," "ERS Debtor," or "PBA Debtor," as applicable.

[40] References to the docket are to Case No. 17-BK-3283-LTS, unless otherwise specified.

The Title III Court has set the following schedule in connection with the confirmation proceedings:

- **July 13, 2021:** Hearing to consider the adequacy of the information contained in the Disclosure Statement;
- **[____] 2021:** Commencement of confirmation discovery;
- **[____] 2021:** Deadline to mail approved solicitation package;
- **[____] 2021:** Deadline to file objections to confirmation of the plan and confirmation discovery;
- **[____] 2021:** Plan confirmation pretrial hearing;
- **[____] 2021:** Voting and election deadline; and
- **[____] 2021:** Confirmation hearing.

The Debtors are furnishing this Disclosure Statement as the proponents of the Plan pursuant to Bankruptcy Code section 1125 and in connection with the solicitation of votes to accept or reject, elections to settle certain claims pursuant to, and elections of the form of distributions pursuant to, the Plan, as it may be amended or supplemented from time to time in accordance with PROMESA Title III and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to Title III pursuant to PROMESA section 310.

This Disclosure Statement provides the information required by Bankruptcy Code section 1125 and summarizes the Plan, the Debtors' operations, their financial condition, including financial projections, as well as other related matters, including the treatment of holders of Claims against the Debtors. This Disclosure Statement also describes certain potential federal and Puerto Rico income tax consequences to holders of Claims, voting and settlement election procedures, and the confirmation process.

***Ballot and Election Forms.*** A ballot for the acceptance or rejection of the Plan (a "Ballot") and/or a notice of election pursuant to the Plan (an "Election Notice") is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes entitled to vote to accept or reject the Plan, elect to settle certain claims pursuant to the Plan, and/or elect the form of distributions pursuant to the Plan. The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the Plan. The Election Notice includes information regarding the election deadline and detailed instructions for making an election to settle certain claims and/or to elect the form of distributions pursuant to the Plan. Before voting and/or making the applicable election, each holder of a Claim entitled to vote and/or make an election should read this Disclosure Statement (including the exhibits and documents incorporated by reference herein) and the instructions accompanying the Ballot and Election Notice. These documents contain, among other things, important information concerning the classification of Claims for voting and tabulation of votes. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, as it may be amended, the Disclosure Statement Order, and Bankruptcy Code section 1125.

*Exhibits to Disclosure Statement.* This Disclosure Statement includes the following exhibits and supplements:

- **Exhibit A** – Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, *et al.* and Supporting Documents

- **Exhibit B** – Plan Support Agreement, dated as of February 22, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority, and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, certain GO Bondholders and PBA Bondholders, Assured Guaranty Corp. and Assured Municipal Corp., Syncora Guarantee Inc., and National Public Finance Guarantee Corporation

- **Exhibit C** – Plan Support Agreement, dated as of May 5, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority, certain holders of HTA Bond Claims, certain holders of CCDA Bond Claims, Assured Guaranty Corp. and Assured Municipal Corp., and National Public Finance Guarantee Corporation

- **Exhibit D** – Stipulation, dated as of April 2, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, and certain ERS Bondholders

- **Exhibit E** – Plan Support Agreement, dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the Official Committee of Retirees appointed in the Commonwealth's Title III Case

- **Exhibit F** – Plan Support Agreement, dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the American Federation of State, County, and Municipal Employees International Union, AFL-CIO

- **Exhibit G** – Certified Commonwealth Fiscal Plan (which includes ERS and PBA)

- **Exhibit H** – Certified Commonwealth Budget (which includes ERS and PBA)

- **Exhibit I** – Oversight Board Report on Pensions

- **Exhibit J** – Summary Chart of the Debtors' Outstanding Bonds

- **Exhibit K** – List of Entities that Comprise the Commonwealth Central Government

17

- **Exhibit L** – List of Debtors' Bank Accounts, Balances, and Preliminary Restriction Categorizations as of December 31, 2020

- **Exhibit M** – Latest Audited Financial Statements for the Debtors

- **Exhibit N** – Actions to be Transferred to the Avoidance Actions Trust

- **Exhibit O** – Best Interests Test Report

- **Exhibit P** – Certified COFINA Fiscal Plan, Certified COFINA Budget, and Latest Audited Financial Statements for COFINA

To the extent any inconsistencies exist between this Disclosure Statement, any of the Plan Support Agreements (and any exhibit or term sheet attached thereto), and the Plan, the terms and provisions of the Plan will govern.

## A.   PROMESA Title III Plan of Adjustment: An Overview

Confirmation of a Title III plan of adjustment by the Title III Court binds the debtor, any issuer of securities under the plan of adjustment, any person acquiring property under the plan of adjustment, and any creditor of a debtor. Except as provided in PROMESA, the plan of adjustment or the confirmation order, confirmation of a plan of adjustment discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the applicable obligations specified in the confirmed plan of adjustment.

The Title III Court will confirm a plan of adjustment if it satisfies both PROMESA section 314(b) and the incorporated subsections of Bankruptcy Code section 1129, which are further discussed in section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment." Among other things, PROMESA section 314(b) requires that (i) the plan of adjustment comply with the provisions of PROMESA and the applicable provisions of the Bankruptcy Code, (ii) all the required legislative, regulatory, or electoral approvals necessary to carry out any provision of the plan of adjustment shall have been obtained, or such provision is conditioned upon such approval, (iii) the plan of adjustment is feasible and in the best interests of creditors, and (iv) the plan of adjustment is consistent with the applicable fiscal plan certified by the Oversight Board under PROMESA Title II.

While the Debtors believe all classes of Claims should vote to accept the Plan, the Plan may be confirmed without acceptance by all classes. Bankruptcy Code section 1129(b)(1) provides that, if all the applicable requirements of section 1129(a) (including the requirement that at least one impaired class accepts the plan of adjustment) other than acceptance by all classes (as provided in section 1129(a)(8)) are met with respect to a plan of adjustment, the Title III Court, on request of the proponents, shall confirm the plan of adjustment if it does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the plan of adjustment.

**B.** **Summary of Key Components of the Plan of Adjustment**

Except for Administrative Claims and Professional Claims, which are not classified and do not vote on the Plan, all Claims that existed on the Petition Date are divided into classes under the Plan. Under the Bankruptcy Code, a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class. Under section 301(e) of PROMESA, in determining whether claims are "substantially similar" to one another, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims. The following table shows the classes of claims against the Debtors, the approximate estimated claim amount, and approximates the percentage return or range of percentage returns proposed to be paid to the claims in each class. The amount a creditor may actually recover could vary materially from the estimates below.

| Claim[41] | Class | Estimated Claim Amount | Approx. Fixed Recovery From Debtors (%)[42] | Form of Fixed Consideration |
|---|---|---|---|---|
| Vintage PBA Bond Claims | Class 1 | 2,049,817,786.66 | 23.0% [†] | Cash |
| Vintage PBA Bond Claims (Assured) | Class 2 | 207,035,580.89 | 23.0% [†] | Cash |
| Vintage PBA Bond Claims (National) | Class 3 | 218,888,864.87 | 23.0% [†] | Cash |
| Vintage PBA Bond Claims (Other Insured) | Class 4 | 166,398,746.29 | 23.0% [†] | Cash |
| Vintage PBA Bond Claims (Syncora) | Class 5 | 19,098,898.35 | 23.0% [†] | Cash |
| Retail Vintage PBA Bond Claims | Class 6 | [43] | 23.0% [†] | Cash |
| 2011 PBA Bond Claims | Class 7 | 1,335,422,892.78 | 23.0% [‡] | Cash |

---

[41]

[†]   Estimate excludes recovery on account of an Allowed Vintage CW Guarantee Claim against the Commonwealth. Total recovery on account of both (I) an Allowed Vintage PBA Bond Claim, Allowed Vintage PBA Bond Claim (Assured), Allowed Vintage PBA Bond Claim (National), Allowed Vintage PBA Bond Claims (Syncora), Allowed Vintage PBA Bond Claim (Other Insured), or Retail Vintage PBA Bond Claim, as applicable, and (II) an Allowed Vintage CW Guarantee Bond Claim, Allowed Vintage CW Guarantee Bond Claim (Assured), Allowed Vintage CW Guarantee Bond Claim (National), Allowed Vintage CW Guarantee Bond Claim (Other Insured), Allowed Vintage CW Guarantee Bond Claim (Syncora), or Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 80.4%.

[‡]   Estimate excludes recovery on account of an Allowed 2011 CW Guarantee Claim against the Commonwealth. Total recovery on account of both (I) (a) an Allowed 2011 PBA Bond Claim, or (b) a Retail 2011 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2011 CW Guarantee Bond Claim or (y) an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 79.6%.

[*]   Estimate excludes recovery on account of an Allowed 2012 CW Guarantee Claim against the Commonwealth. Total recovery on account of both (I) (a) an Allowed 2012 PBA Bond Claim, or (b) a Retail 2012 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2012 CW Guarantee Claim, or (y) an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 74.8%.

[§]   Amount depends upon how many holders of Allowed Claims are eligible and elect to be treated under such class.

[±]   Total recovery on account of both (I) an Allowed Vintage PBA Bond Claim, Allowed Vintage PBA Bond Claim (Assured), Allowed Vintage PBA Bond Claim (National), Allowed Vintage PBA Bond Claim (Other Insured), or Retail Vintage PBA Bond Claim, as applicable, and (II) an Allowed Vintage CW Guarantee Bond Claim, Allowed Vintage CW Guarantee Bond Claim (Assured), Allowed Vintage CW Guarantee Bond Claim (National), Allowed Vintage CW Guarantee Bond Claim (Other Insured), Allowed Vintage CW Guarantee Bond Claim (Syncora), or Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 80.4%.

[£]   Total recovery on account of both (I) (a) an Allowed 2011 PBA Bond Claim, or (b) a Retail 2011 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2011 CW Guarantee Bond Claim or (y) an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 79.6%.

[42]   Does not include any recoveries on account of CVIs.

[43]   Included in Vintage PBA Bond Claims Amount.

| Claim[41] | Class | Estimated Claim Amount | Approx. Fixed Recovery From Debtors (%)[42] | Form of Fixed Consideration |
|---|---|---|---|---|
| Retail 2011 PBA Bond Claims | Class 8 | [44] | 23.0% [‡] | Cash |
| 2012 PBA Bond Claims | Class 9 | 674,308,470.06 | 23.0% [*] | Cash |
| Retail 2012 PBA Bond Claims | Class 10 | [45] | 23.0% [*] | Cash |
| PBA/DRA Secured Claim | Class 11 | 66,222,028 | 10% | Cash |
| PBA General Unsecured Claims | Class 12 | 410,252,419 | 10% | Cash |
| PBA/DRA Unsecured Claim[46] | Class 13 | 134,357,497 | 10% | Cash |
| Vintage CW Bond Claims | Class 14 | 3,495,194,571.99 | 77.6% | New GO Bonds / Cash |
| Retail Vintage CW Bond Claims | Class 15 | [47] | 77.6% | New GO Bonds / Cash |
| Vintage CW Bond Claims (Assured) | Class 16 | 1,129,725,670.51 | 77.6% | New GO Bonds / Cash |
| Vintage CW Bond Claims (National) | Class 17 | 897,708,496.22 | 77.6% | New GO Bonds / Cash |
| Vintage CW Bond Claims (Other Insured) | Class 18 | 293,269,428.20 | 77.6% | New GO Bonds / Cash |
| Vintage CW Bond Claims (Syncora) | Class 19 | 27,354,745.97 | 77.6% | New GO Bonds / Cash |
| Vintage CW Bond Claims (Taxable Election) | Class 20 | [§] | 77.6% | New GO Bonds / Cash |
| Vintage CW Guarantee Bond Claims | Class 21 | 1,578,940,452.56 | 74.5% [±] | New GO Bonds / Cash |
| Vintage CW Guarantee Bond Claims (Assured) | Class 22 | 159,476,054.86 | 74.5% [±] | New GO Bonds / Cash |
| Vintage CW Guarantee Bond Claims (National) | Class 23 | 168,606,441.80 | 74.5% [±] | New GO Bonds / Cash |
| Vintage CW Guarantee Bond Claims (Other Insured) | Class 24 | 128,174,178.94 | 74.5% [±] | New GO Bonds / Cash |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 25 | 14,711,562.85 | 74.5% [±] | New GO Bonds / Cash |

---

[44] Included in 2011 PBA Bond Claims Amount.

[45] Included in 2012 PBA Bond Claims Amount.

[46] The Oversight Board believes that the disputed DRA PBA Claims are legally and factually different than the PBA General Unsecured Claims, and, regardless, may be classified separately pursuant to section 1122(a). The DRA Parties allege both that such claims are secured, and that if not, such claims must be in the same class as the PBA General Unsecured Claims. The Oversight Board disagrees, and believes it will carry its burden at the confirmation hearing that the plan complies with section 1122(a) and that the DRA PBA Claims are unsecured.

[47] Included in Vintage CW Bond Claims Amount.

| Claim[41] | Class | Estimated Claim Amount | Approx. Fixed Recovery From Debtors (%)[42] | Form of Fixed Consideration |
|---|---|---|---|---|
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 26 | § | 74.5% ± | New GO Bonds / Cash |
| 2011 CW Bond Claims | Class 27 | 250,580,732.35 | 73.0% | New GO Bonds / Cash |
| Retail 2011 CW Bond Claims | Class 28 | 48 | 73.0% | New GO Bonds / Cash |
| 2011 CW Bond Claims (Assured) | Class 29 | 225,917,592.71 | 73.0% | New GO Bonds / Cash |
| 2011 CW Bond Claims (Taxable Election) | Class 30 | § | 73.0% | New GO Bonds / Cash |
| 2011 CW Guarantee Bond Claims | Class 31 | 1,028,653,981.06 | 73.5% £ | New GO Bonds / Cash |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 32 | § | 73.5% £ | New GO Bonds / Cash |
| 2011 CW Series D/E/PIB Bond Claims | Class 33 | 634,719,627.45 | 76.5% | New GO Bonds / Cash |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 34 | 10,953,484.03 | 76.5% | New GO Bonds / Cash |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 35 | 49 | 76.5% | New GO Bonds / Cash |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 36 | § | 76.5% | New GO Bonds / Cash |
| 2012 CW Bond Claims | Class 37 | 2,540,851,157.04 | 72.4% | New GO Bonds / Cash |
| Retail 2012 CW Bond Claims | Class 38 | 50 | 72.4% | New GO Bonds / Cash |
| 2012 CW Bond Claims (Assured) | Class 39 | 393,576,302.36 | 72.4% | New GO Bonds / Cash |
| 2012 CW Bond Claims (Taxable Election) | Class 40 | § | 72.4% | New GO Bonds / Cash |
| 2012 CW Guarantee Bond Claims | Class 41 | 519,408,567.83 | 67.3% 51 | New GO Bonds / Cash |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 42 | § | 67.3% | New GO Bonds / Cash |
| 2014 CW Bond Claims | Class 43 | 3,836,611,111.11 | 67.8% | New GO Bonds / Cash |

---

[48] Included in 2011 CW Bond Claims Amount.

[49] Included in 2011 CW Series D/E/PIB PBA Bond Claims Amount.

[50] Included in 2012 CW Bond Claims Amount.

[51] Total recovery on account of both (I) (a) an Allowed 2012 PBA Bond Claim, or (b) a Retail 2012 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2012 CW Guarantee Claim, or (y) an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 74.8%.

| Claim[41] | Class | Estimated Claim Amount | Approx. Fixed Recovery From Debtors (%)[42] | Form of Fixed Consideration |
|---|---|---|---|---|
| Retail 2014 CW Bond Claims | Class 44 | [52] | 67.8% | New GO Bonds / Cash |
| 2014 CW Bond Claims (Taxable Election) | Class 45 | § | 67.8% | New GO Bonds / Cash |
| 2014 CW Guarantee Bond Claims | Class 46 | 346,242,219.86 | 67.8% | New GO Bonds / Cash |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 47 | § | 67.8% | New GO Bonds / Cash |
| Retired ERS Participant Below-Threshold Claims | Class 48A | Average Monthly Total Retirement Benefit[53] of $749 | 100%[54] | Paygo |
| Retired JRS Participant Below-Threshold Claims | Class 48B | Average Monthly Total Retirement Benefit[53] of $1,158 | 100%[54] | Paygo |
| Retired TRS Participant Below-Threshold Claims | Class 48C | Average Monthly Total Retirement Benefit[53] of $988 | 100%[54] | Paygo |
| Retired ERS Participant Above-Threshold Claims | Class 48D | Average Monthly Total Retirement Benefit[53] of $2,286 | 92.5%[54] | Paygo |
| Retired JRS Participant Above-Threshold Claims | Class 48E | Average Monthly Total Retirement Benefit[53] of $5,124 | 91.5%[54] | Paygo |
| Retired TRS Participant Above-Threshold Claims | Class 48F | Average Monthly Total Retirement Benefit[53] of $2,074 | 91.9%[54] | Paygo |
| Active ERS Participant Claims | Class 48G | Average Monthly Total Retirement Benefit[53] of $717 | 99.7%[54] | Paygo / DC Cash |
| Active JRS Participant Claims | Class 48H | Average Monthly Total Retirement Benefit[53] of $3,139 | 94.5%[54] | Paygo |
| Active TRS Participant Claims | Class 48I | Average Monthly Total Retirement Benefit[53] of $843 | 99.5%[54] | Paygo/New CBA[55] |

---

[52] Included in 2014 CW Bond Claims Amount.

[53] Estimated claim for Classes 48A through 48L, with the exception of Class 48J, is based for each respective class on Monthly Total Retirement Benefit, which represents the sum of the monthly pension benefit currently in payment or payable in the future based on employment through May 4, 2017 plus the monthly equivalent of any Summer, Christmas or Medicine Bonuses for those eligible. Therefore, the claims estimates do not include the impact of the freeze of the JRS and TRS pension systems or the elimination of any COLAs under the Plan.

[54] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

[55] If, and only if, AMPR enters into a plan support agreement with the Commonwealth on or before September 30, 2021, treatment of Active TRS Participant Claims will include improved pension freeze terms and a new five-year

| Claim[41] | Class | Estimated Claim Amount | Approx. Fixed Recovery From Debtors (%)[42] | Form of Fixed Consideration |
|---|---|---|---|---|
| System 2000 Participant Claims | Class 48J | $1,172,728,743 | 100% | DC Cash |
| VTP Payroll Participant Below-Threshold Claims | Class 48K | Average Monthly Total Retirement Benefit[53] of $1,025 | 100%[54] | Payroll |
| VTP Payroll Participant Above-Threshold Claims | Class 48L | Average Monthly Total Retirement Benefit[53] of $1,869 | 93.8%[54] | Payroll |
| AFSCME Claims | Class 49 | Not quantified | Impaired, not quantified[56] | New CBA |
| Dairy Producer Claims | Class 50 | 61,999,999 | 50% | Cash |
| Eminent Domain Claims | Class 51 | 326,554,832 | 3.98%[57] | Cash |
| Energy Incentive Claims | Class 52 | 466,772 | 100% | Cash |
| Med Center Claims | Class 53 | If Class accepts, $293,583,772.78; if Class rejects, $145,982,458.41 | 50% | Cash |
| Tax Credit Claims | Class 54 | 1,972,113,081 | 100% | Cash |
| CW General Unsecured Claims | Class 55 | 2,814,191,851 | Up to 40%[58] | Cash |
| CW/HTA Claims | Class 56 | 6,257,585,807.42 | Contingent | - |
| CW/Convention Center Claims | Class 57 | 386,637,854.25 | Contingent | - |
| CW/PRIFA Rum Tax Claims | Class 58 | 1,928,867,051.00[59] | Contingent | - |
| CW/MBA Claims | Class 59 | 30,106,786.87 | Contingent | - |
| CW Appropriations Claims | Class 60 | Unknown | 0% | - |
| Section 510(b) Subordinated Claims | Class 61 | Unknown | 0% | - |
| ERS Bond Claims | Class 62 | 3,168,698,776.55 | 14.0%[60] | Cash / ERS Private Equity Portfolio |

collective bargaining agreement, as set forth on Exhibit F-2 of the Plan and as summarized below at section II.B.1.f) and Exhibit F-2 of the Plan.

[56] Claim is based on rejection of existing CBAs, which has not been asserted or quantified. Treatment is a new five-year CBA under terms summarized below at section II.B.1.e) and Exhibit G of the Plan.

[57] *See* note 58 below. Does not account for the distribution of monies on deposit with the Court of First Instance with respect to the condemned property.

[58] Pursuant to Sections 1.269 and 59.1(a) of the Plan, recoveries are subject to a cap of 40%. Any net recoveries by the Avoidance Actions Trust will not count towards attaining such cap.

[59] Claim subject to dispute as to allowance in the Title III Court.

[60] Recovery on account of $373 million cash consideration and the ERS Private Equity Portfolio, which for purposes of calculating recovery for ERS Bond Claims, is assumed to have a value in the amount of the ERS Portfolio Price.

| Claim[41] | Class | Estimated Claim Amount | Approx. Fixed Recovery From Debtors (%)[42] | Form of Fixed Consideration |
|---|---|---|---|---|
| ERS General Unsecured Claims | Class 63 | 1,506,819 | 33.18%[61] | Cash |
| Gracia-Gracia Claims | Class 64 | 10,600,000 | 100% | Cash |
| Convenience Claims | Class 65 | 5,378,056 | 100% | Cash |
| Federal Claims | Class 66 | 1,109,741,657 | 100% | Cash |

**Bond Recovery Categories:**

| Bond Recovery Category | Classes Included |
|---|---|
| Vintage PBA Bond Claims | 1, 2, 3, 4, 5, and 6 |
| 2011 PBA Bond Claims | 7 and 8 |
| 2012 PBA Bond Claims | 9 and 10 |
| Vintage CW Bond Claims | 14, 15, 16, 17, 18, 19, and 20 |
| 2011 CW Series D/E/PIB Bond Claims | 33, 34, 35, and 36 |
| 2011 CW Bond Claims | 27, 28, 29, and 30 |
| 2012 CW Bond Claims | 37, 38, 39, and 40 |
| 2014 CW Bond Claims | 43, 44, 45, 46, and 47 |
| Vintage CW Guarantee Bond Claims | 21, 22, 23, 24, 25, and 26 |
| 2011 CW Guarantee Bond Claims | 31 and 32 |
| 2012 CW Guarantee Bond Claims | 41 and 42 |

---

Excludes payments made pursuant to the 2017 ERS stipulation (Case No. 17-03566-LTS, ECF No. 170) and adequate protection payments.

[61] *See* note **Error! Bookmark not defined.** above.

**Illustrative GO CVI Value:**

| Assumption | Discount Rate | | | |
|---|---|---|---|---|
| | 5.0% | 10.0% | 15.0% | 20.0% |
| 2021 Fiscal Plan SUT Projections | 1,173 | 750 | 524 | 392 |
| Maximum Payment | 2,296 | 1,622 | 1,218 | 959 |

**GO CVI Allocation Summary:**

| Claim | Applicable Classes | GO CVI Allocation % |
|---|---|---|
| Vintage CW Bond Claim | Classes 14, 15, 16, 17, 18, 19, 20 | 32.244% |
| 2011 CW Series D/E/PIB Bond Claim | Classes 33, 34, 35, 36 | 3.514% |
| 2011 CW Bond Claim | Classes 27, 28, 29, 30 | 2.479% |
| 2012 CW Bond Claim | Classes 37, 38, 39, 40 | 15.157% |
| 2014 CW Bond Claim, 2014 CW Guarantee Bond Claims | Classes 43, 44, 45, 46, 47 | 20.266% |
| Vintage CW Guarantee Claims | Classes 21, 22, 23, 24, 25, 26 | 15.194% |
| 2011 CW Guarantee Bond Claims | Classes 31, 32 | 7.552% |
| 2012 CW Guarantee Bond Claims | Classes 41, 42 | 3.594% |

**Clawback CVI Allocation Summary:**

| Claim | Applicable Classes | Clawback CVI Allocation % |
|---|---|---|
| CW/HTA Claims | Class 56 | 68.6% |
| CW/Convention Center Claims | Class 57 | 4.0% |
| CW/PRIFA Rum Tax Claims | Class 58 | 27.0% |

| Claim | Applicable Classes | Clawback CVI Allocation % |
|-------|:------------------:|:-------------------------:|
| CW/MBA Claims | Class 59 | 0.4% |

The Debtors believe the Plan's contemplated restructuring is feasible and in the best interests of the Debtors' creditors. If confirmation of the Plan were to be denied, the Debtors' options would be either for the Oversight Board to propose an alternate Title III plan of adjustment after re-engaging and re-negotiating with creditors or for the Title III Cases to be dismissed, in which event the automatic stay would be terminated and multi-party, multifaceted litigation would ensue (including litigation commenced by bondholders and other parties against the Commonwealth, its officials and instrumentalities), as holders of claims compete for the limited resources available to pay those claims.

The following overview summarizes certain key components of the Plan. The overview is qualified in its entirety by the full text of the Plan.

1.    **Implementation of Plan Support Agreements in the Plan of Adjustment**

a)    **Plan Support Agreement with Certain Holders of CW Bond Claims and PBA Bond Claims**

On February 23, 2021, the Oversight Board, as representative of the Debtors in their Title III Cases, announced that, following extensive discussions, it had entered into the GO/PBA PSA with certain holders of in excess of $11.7 billion of CW Bond Claims and PBA Bond Claims, which include traditional municipal investors and monoline bond insurers Assured, Syncora, and National, on the framework of a plan of adjustment that proposes to resolve the outstanding disputes with the holders of GO Bonds and holders of PBA Bonds, including their validity, priority, and asserted secured status. The GO/PBA PSA reduces the Commonwealth's debt service (including principal and interest from restructured COFINA Bonds) by 62%, to $34.1 billion from $90.4 billion.

The GO/PBA PSA provides for the proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico constitutional debt limit, as set forth in Article VI. section 2 of the Commonwealth Constitution (the "Constitutional Debt Limit")[62] and disputes regarding the priorities of the GO Bonds pursuant to the Constitution of the Commonwealth of Puerto Rico (the "Commonwealth Constitution") relative to other Commonwealth debts. *See* section III.B.1.a) of this Disclosure Statement for a summary of such disputes and section V.H.7 for a detailed description.

The agreement also provides for the resolution of disputes between the Commonwealth and PBA regarding (i) the characterization of purported leases between PBA and the

---

[62] *See* section V.H.7.a)(i) for a detailed description.

Commonwealth as disguised financing transactions, (ii) the amount, if any, of administrative rent the Commonwealth may owe PBA for the use and occupancy of PBA facilities following the commencement of the Commonwealth Title III Case, and (iii) the ownership of certain PBA facilities and property as between the Commonwealth and PBA (collectively, the "PBA Litigation").  *See* section III.B.1.c) of this Disclosure Statement for a summary of such disputes.

Finally, the GO/PBA PSA provides for the resolution of disputes regarding the PRIFA BANs. *See* section V.H.7.e) of this Disclosure Statement for a description of such disputes.

***Settlement of Outstanding Disputes Relating to GO Bonds, PBA Bonds, and PRIFA BANs***.  In exchange for the consideration to be provided in the Plan, the following disputes in connection with the GO Bonds, PBA Bonds, and PRIFA BANs will be compromised and settled pursuant to the confirmation of the Plan, which includes disputes regarding the validity, priority, and asserted secured status of the GO Bonds and PBA Bonds (such disputes are summarized in section III.B.1.a) of this Disclosure Statement):

- **Debt Related Objections**:

  o   Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [ECF No. 4784],

  o   Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [ECF No. 7057],

  o   Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [ECF No. 8141],

  o   Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [ECF No. 9730],

  o   Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims,

  o   Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim

Number 29,485) [Case No. 17-3283-LTS, ECF. No. 8000], solely as it relates to CW Bond Claims and CW Guarantee Bond Claims,

o   Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [ECF No. 10638], and

o   any other objections or joinders to these or such other objections that may be filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Guarantee Bond Claims, or CW Bond Claims.

- **Invalidity Actions:**[63]

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC*, Adv. Proc. No. 19-00281,

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec*, Adv. Proc. No. 19-00282,

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co.*, Adv. Proc. No. 19-00283,

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E*, Adv. Proc. No. 19-00284,

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A*, Adv. Proc. No. 19-00285,

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B*, Adv. Proc. No. 19-00286,

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C*, Adv. Proc. No. 19-00287, and

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D*, Adv. Proc. No. 19-00288.

- **Lien Challenge Actions:**

---

[63] *See* section V.H.7.b) of this Disclosure Statement for a detailed summary of the Invalidity Actions.

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd.*, Adv. Proc. No. 19-00291,

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro y Credito de Rincon*, Adv. Proc. No. 19-00292,

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta*, Adv. Proc. No. 19-00293,

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez*, Adv. Proc. No. 19-00294,

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso*, Adv. Proc. No. 19-00295,

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman*, Adv. Proc. No. 19-00296, and

o *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt.*, Adv. Proc. No. 19-00297.

- **PBA Litigation**:

  o *The Financial Oversight and Management Board for Puerto Rico v. Puerto Rico Public Buildings Authority*, Adv. Pro. No. 18-AP-149-LTS.[64]

- **PRIFA BANs Takings Litigation**:

  o *Puerto Rico BAN (VL) LLC, et al., v. United States of America*, Case No. 19-482C (Fed. Cl. filed Apr. 1, 2019), currently pending in the United States Court of Federal Claims.[65]

- **PRIFA BANs Litigation**:

  o *The Financial Oversight and Management Board for Puerto Rico v. The Bank of New York Mellon et al.*, Adv. Pro. No. 19-AP-269-LTS.[66]

---

[64] *See* sections III.A.3 and III.B.1.c) of this Disclosure Statement.

[65] *See* section V.F.2.f) of this Disclosure Statement.

[66] *See* section V.H.7.e) of this Disclosure Statement.

The Oversight Board has assessed the litigation risk related to the above actions and has determined that the proposed recoveries reasonably reflect the litigation risk related to the disputes in connection with the GO Bonds, PBA Bonds, and PRIFA BANs. The Oversight Board submits that the resolution of the challenges to GO Bonds, PBA Bonds, and PRIFA BANs embodied in the Plan is reasonable and fair, and should be approved.

*Framework for Treatment of Commonwealth Bond Claims and Guarantee Claims*. The principal terms of the treatment of GO Bonds and claims against the Commonwealth on account of the Commonwealth's guarantee of (a) bonds issued by PBA, and (b) the PRIFA BANs incorporated into the Plan include the following:[67]

- **Total GO/PBA Consideration Provided in Plan of Adjustment:** $14.438 billion.

    - $7.024 billion of cash (of which $350 million is contingent upon Fiscal Year 2021 revenue outperformance exceeding $350 million).

    - Issuance of $7.414 billion in New GO Bonds.

    - Issuance of CVIs by the Commonwealth from which payments will be made only if 5.5% Sales and Use Tax Collections outperform the May 2020 Commonwealth Certified Fiscal Plan (subject to (i) annual caps of $50 million to $400 million and (ii) lifetime caps of $3,500 million for GO CVIs).

    - In settlement of the PBA Litigation, the Commonwealth will provide $1.073 billion of cash to PBA as an allowed administrative expense claim in the Commonwealth's Title III Case.

- **New GO Bonds Structure:**

    - The following New GO Bonds will be issued by the Commonwealth, the payment of which will be backed by the good faith, credit and taxing power of the Commonwealth under the Commonwealth Constitution:

        - $6,683,315,000 in aggregate original principal amount of current interest bonds,

        - $442,506,553.50 of 5.375% in aggregate original principal amount capital appreciation bonds, and

        - $288,241,989.75 of 5.000% in aggregate original principal amount capital appreciation bonds;

---

[67] Additional or modified terms are included in the HTA/CCDA PSA. The summary below is limited to the terms included in the PSA.

- **Deemed Issuance Date of New GO Bonds:** July 1, 2021.

- **New GO Bonds – Tax-Exempt / Taxable Status**:

  - As more particularly described in Sections 74.1-74.4 of the Plan, in the event a determination from the IRS or an opinion from Section 103 Bond Counsel is obtained prior to the Effective Date providing that the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date to the total aggregate amount of New GO Bonds is less than thirteen percent (13%), the taxable New GO Bonds determined to be tax-exempt will receive tax-exempt New GO Bonds issued pursuant thereto with coupons for all maturities equal to the coupons on the corresponding tax-exempt New GO Bonds set forth on Exhibit I to the Plan. To the extent the Government Parties and the Initial GO/PBA PSA Creditors determine during the period up to and including the Effective Date to modify the coupons set forth on Exhibit I to the Plan, the amount of par New GO Bonds will either increase or decrease, on a dollar-for-dollar basis, depending upon the coupon structure, subject to the amount of the maximum annual debt service provided for in Exhibit I to the Plan, and any such modification being applied to creditors pro rata on a post-application of GO/PBA PSA Restriction Fee and GO/PBA Consummation Costs recovery basis as described in footnote 8 to Annex 2-A to Exhibit I to the GO/PBA PSA.

  - As more particularly described in Sections 71.1-71.4 of the Plan, if such determination or opinion is obtained subsequent to the Effective Date, and the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date to the total aggregate amount of New GO Bonds is less than thirteen percent (13%), the holders of the affected taxable bonds will be invited to exchange their bonds for converted bonds and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such exchange offer, the interest rate on the converted bonds will be the same as the interest on affected taxable bonds of the same type, interest rate, series, and maturity.

- **Taxable Bond Waterfall:**

  - Taxable New GO Bonds will be distributed first to Puerto Rico Investors who elect to receive a taxable bond distribution.

  - Remaining taxable New GO Bonds after distribution to Puerto Rico Investors will be distributed pro rata to all CW Bond Claims and CW Guarantee Bond Claims.

- **CVI Structure:**

- Outperformance Metric:

  - Measured as of the end of each FY, beginning FY22.

  - 5.5% SUT Baseline for FY2022 to FY2043 included as Exhibit J to the Plan.

- The Commonwealth will pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the CVIs.

- Notional and Lifetime Cap:

  - GO CVIs:

    - $3,500 million, with maximum annual payment of $200 million for GO CVIs plus any unused amounts from previous years, subject to annual payments not being greater than $400 million for GO CVIs.

- Outperformance Condition:

  - CVI holders receive the lesser of, on an annual basis:

    - 50% of cumulative outperformance, starting on July 1, 2021, less payments previously made, and 75% of annual outperformance (the "<u>Outperformance Amount</u>").

  - Annual payment waterfall:

    - First $100 million to GO CVIs, and

    - Next $11,111,111 to Clawback CVIs

- Deemed Issuance Date: July 1, 2021

- Term:

  - GO CVIs: 22 year term.

  - Clawback CVIs: 30 year term.

- **Treatment of Original Issue Discount:**[68]

---

[68] Capital appreciation bonds are accreted to the Commonwealth Petition Date or PBA Petition Date (as applicable) in all distributions.

- Allocation of plan consideration between classes of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims are made ratably according to the claim amount as of the Commonwealth Petition Date or PBA Petition Date (as applicable), including unmatured interest (i.e., par plus accrued interest).

- Distribution within a class of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims are made ratably according to the claim amount as of the Commonwealth Petition Date or PBA Petition Date (as applicable), excluding unmatured interest (i.e., par less unaccreted original issue discount plus accrued interest).

- **Sources of Payments:** Some holders of CW Bond Claims and CW Guarantee Bond Claims assert their bonds are secured by the 1.03% of the property tax levied pursuant to Act 83-1991 (the "1.03% of Property Tax") and collected by the Municipal Revenues Collection Center ("CRIM") and by monies historically conditionally appropriated to certain instrumentalities but, pursuant to Article VI, section 8 of the Commonwealth Constitution, retained by the Commonwealth when available revenues (including surplus) for a given year are insufficient to meet appropriations. While the Commonwealth Debtor disagrees that the GO Bonds and guaranties are secured by the 1.03% of Property Tax and/or the historically conditionally appropriated monies, to eliminate these legal disputes, pursuant to the global settlement provided in the GO/PBA PSA, the CW Bond Claims' recovery will be distributed each Fiscal Year from: (i) first, the 1.03% property tax levied pursuant to Act 83-1991 and collected by the Municipal Revenues Collection Center of the Commonwealth with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, (ii) second, the monies arising from the operation of Article VI, Section 8 of the Puerto Rico Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and (iii) third, and other resources of the Commonwealth.

*Framework for Treatment of PBA Bond Claims*. The principal terms of the treatment of the PBA Bond Claims incorporated into the Plan includes the following:

- **PBA Settlement:** In settlement of the PBA Litigation, the Commonwealth will provide $1.073 billion of cash to PBA as an allowed administrative expense claim in the Commonwealth's Title III Case in consideration of unpaid rent since the Commonwealth Petition Date and ownership and valuation of certain property to which the PBA holds title. Such funds will be distributed by PBA to allowed PBA Bond Claims.

- **Allowance of PBA Bond Claims**:[69]  Holders of PBA Bonds will have an allowed claim against PBA equal to the principal amount outstanding of PBA Bonds, plus accrued and unpaid interest thereon, as of the PBA Petition Date.

  - Solely for purposes of distribution under the Plan, the CW Guarantee Claim against the Commonwealth on account of the Commonwealth's guarantee of PBA Bonds is calculated as such amount less the settlement amount of $1.073 billion.

*GO/PBA Consummation Costs*.  Creditors party to the GO/PBA PSA at its execution on February 22, 2021 are entitled to a pro rata share of cash in an amount equal to 1.50% of the aggregate amount of such holders' or insurers' PBA Bond Claims, GO Bond Claims, and CW Guarantee Bond Claims (without duplication).  The GO/PBA Consummation Costs are in consideration for the fees and expenses incurred by such holders or insurers in connection with the negotiation and execution of the PSA and the prosecution of the approval of the Disclosure Statement and confirmation of the Plan.

*GO/PBA Restriction Fee*.  An aggregate amount of $350 million in cash will be paid to certain parties to the GO/PBA PSA.  Such aggregate amount is reduced by the GO/PBA Consummation Costs paid.  The GO/PBA Restriction Fee is in consideration for executing the PSA and agreeing to "lock-up" such party's bonds in accordance with the terms of the GO/PBA PSA.

The following parties are eligible to receive the GO/PBA PSA Restriction Fee:

- Creditors party to the GO/PBA PSA at its execution on February 22, 2021.

- Any GO/PBA PSA Creditors who join as parties to the GO/PBA PSA on or before the earlier to occur of: (a) March 9, 2021, and (b) the date and time at which the parties to the GO/PBA PSA entitled to receive the GO/PBA PSA Restriction Fee own seventy percent (70%) of the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication).

*Retail Support Fee*.  To provide all holders of GO Bonds and PBA Bonds an opportunity to receive a PSA fee, an aggregate amount of fifty million dollars ($50,000,000.00) in cash is made available to Retail Investors holding GO Bonds and PBA Bonds. Retail Investors are such holders who hold GO Bonds or PBA Bonds in the aggregate face amount of equal to or less than one million dollars ($1,000,000.00).  The Retail Support Fee will be available to each class of retail investors who vote, as a class, to accept the Plan.  If a class of Retail Investors votes to reject the Plan, the share of the Retail Support Fee allocable to such class will be reallocated pro rata to the classes of Retail Investors who have voted to accept the Plan, and parties eligible to receive the GO/PBA Restriction Fee.

---

[69] Pursuant to the Plan Classes, the PBA Bond Claims as defined in the Plan Support Agreement also includes the PBA Bond Claims (Insured).

b)    **Plan Support Agreement with Certain Holders of HTA Bond Claims and CCDA Bond Claims**

On May 5, 2021, the Oversight Board, as representative of the Commonwealth and HTA in their Title III Cases, announced that, following extensive discussions, it had entered into the HTA/CCDA PSA (attached hereto as <u>Exhibit C</u>) with certain holders of in excess of $2 billion of claims against HTA, including more than 85% of HTA 1968 Bonds, nearly 50% of HTA 1998 Senior Bonds, and nearly 40% of CCDA Bonds, which include traditional municipal investors and monoline bond insurers Assured and National, on the framework of plans of adjustment that proposes, among other things, to resolve asserted "clawback claims" against the Commonwealth and the issuance of certain contingent value instruments based on potential outperformance of Puerto Rico's 5.5% Sales and Use Tax relative to projections in the 2020 Certified Fiscal Plan, as explained more fully in Exhibit I to the HTA/CCDA PSA.

*Settlement of Outstanding Disputes Relating to "Clawback Claims*."  In exchange for the consideration to be provided in the Plan, the following disputes in connection with the "clawback claims" as they relate to Assured and National will be compromised and settled pursuant to the confirmation of the Plan:

- **Clawback Actions**:

  o  *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Pro. No. 20-00005-LTS,

  o  *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Pro. No. 20-00004-LTS,

  o  *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Pro. No. 20-00003-LTS, and

  o  *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Pro. No. 20-00007-LTS.

- **Lift Stay Motions:**

  o  *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico*, filed in the HTA Title III Case [Dkt. No. 673],

  o  *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [Dkt. No. 10104],

  o  *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [Dkt. No. 10602],

  o  *AmeriNational Community Services, LLC, et al. v. The Financial Oversight Management Board of Puerto Rico*, filed in the HTA Title III Case [Dkt. No. 591],

  o  *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit,

o *Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.*, Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit,

o *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], and

o any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

The Oversight Board has assessed the litigation risk related to the above actions and has determined that the proposed recoveries reasonably reflect the litigation risk related to the disputes in connection with the "clawback claims." The Oversight Board submits that the resolution of the challenges in connection with the "clawback claims" embodied in the Plan is reasonable and fair, and should be approved.

c) **Stipulation with Certain ERS Bondholders**

On March 9, 2021, the Oversight Board, as representative of the Commonwealth and ERS in their Title III Cases, entered into a stipulation (attached hereto as <u>Exhibit D</u>) with certain ERS Bondholders (as amended on April 2, 2021, the "<u>ERS Stipulation</u>") that provides for, among other things, the resolution of disputes regarding the scope of ERS Bondholders' alleged security interests in various payments and assets, including asserted administrative expense claims, and claims based on the Commonwealth's enactment of the PayGo legislation, and grants the Commonwealth and ERS Bondholders certain rights to purchase the ERS private equity portfolio (the "<u>Private Equity Portfolio</u>"), as set forth in greater detail below.

***Dismissal and/or Denial of Pending Actions***. In exchange for the consideration to be provided to the ERS Bondholders pursuant to the Plan, the following disputes will be dismissed and/or denied with prejudice:

- **ERS Bondholders' PayGo Challenge Actions:**[70]

   o *Altair Global Credit Opportunities Fund (A), LLC, et al. v. Commonwealth of Puerto Rico, et. al.*, Adv. Proc. Nos. 17-00219; 17-00220.

- **Oversight Board's *Ultra Vires* Objections:**[71]

   o *Special Claims Committee FOMB v. Jefferies LLC et al.*, Adv. Proc. No. 19-00355

   o *Special Claims Committee FOMB v. American Enterprise Investment Servs. Inc. et al.*, Adv. Proc. No. 19-00356

---

[70] *See* section III.B.1.b)(ii) for a description.

[71] *See* section V.H.6 for a description.

- o   *Special Claims Committee FOMB v. First Southwest Company et al.*, Adv. Proc. No. 19-00357

- o    *Special Claims Committee FOMB v. Defendant 1F et al.*, Adv. Proc. No. 19-00358

- o   *Special Claims Committee FOMB v. Defendant 1H et al.*, Adv. Proc. No. 19-00359

- o    *Special Claims Committee FOMB v. Defendant 1G et al.*, Adv. Proc. No. 19-00361

- **The Lien-Scope Adversary Proceedings:** [72]

  - o   *Financial Oversight & Management Board for Puerto Rico v. Andalusian Global Designated Activity Company*, Adv. Proc. No. 19-00366

  - o   *Financial Oversight & Management Board for Puerto Rico v. Glendon Opportunities Fund, L.P.* Adv. Proc. No. 19-00367

- **ERS Bondholders' Administrative Expense and Pre-Petition Claims:** [73]

  - o   *ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims*, Case No. 17-bk-3566, ECF No. 707

  - o   *ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims*, Case No. 17-bk-3566, ECF No. 710

- **ERS Bondholders' Federal Circuit Action Against the U.S. Government:** [74]

  - o   *Altair Global Credit Opportunities Fund (A), LLC, et al., v. U.S.* (Case No. 21-1577) (Fed. Cir. 2021)

*Framework for Treatment of ERS Claims*. The principal terms of the treatment of the ERS Bondholders' claims incorporated into the Plan include the following:

- **Allowance of the Fiscal Agent ERS Proof of Claim**: The proof of claim filed by the Bank of New York Mellon against ERS (Claim No. 16777) (the "Fiscal Agent

---

[72] *See* section III.B.1.b)(ii) for a description.

[73] *See* section III.B.1.b)(v) for a description.

[74] *See* section V.F.6.g) for a description.

ERS Proof of Claim") against ERS will be deemed allowed in an aggregate amount of $3,168,698,776.55.

- **Claims filed against the Commonwealth or ERS with Respect to ERS Bonds**: The Bondholder Proofs of Claim (as defined in the ERS Stipulation), the Fiscal Agent Commonwealth Proof of Claim (as defined in the ERS Stipulation), and all other claims filed against the Commonwealth or ERS with respect to the ERS Bonds shall be deemed satisfied and expunged.

- **Allowed Claims with Respect to ERS Bonds**: The holders of allowed claims with respect to the ERS Bonds shall receive, without setoff or deduction for taxes, (i) $373,000,000.00 in cash distributions, with such cash payments being made available from ERS and the Commonwealth from the purchase of ERS assets, and (ii) ERS shall place the Private Equity Portfolio into a trust (the "ERS Trust"), which trust's documentation will be reasonably acceptable to the ERS Bondholders, and ERS shall continue to manage such assets up to the date that such assets or ERS Trust interests are purchased by the Commonwealth or holders of allowed claims with respect to the ERS Bonds pursuant to the Bondholder Election (as defined in the ERS Stipulation).

*Private Equity Portfolio Purchase*. From the Effective Date, until April 10, 2023, the Commonwealth shall have the right to purchase (the "Commonwealth Election") the Private Equity Portfolio for $70,750,000.00, with the proceeds distributed to holders of Allowed Claims with respect to the ERS Bonds. If the Commonwealth fails to provide written notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed Claims with respect to the ERS Bonds shall have the option to purchase (the "Bondholder Election") all of the interests in the ERS Trust for $70,750,000.00, plus such amounts as may be necessary to reimburse the Commonwealth for any funded shortfall amounts, by providing written notice to the Commonwealth no later than April 15, 2023, with such holders paying such aggregate amount, on a pro rata basis, to the Commonwealth no later than April 20, 2023. If neither the Commonwealth Election nor the Bondholder Election have been exercised, on April 25, 2023, the Commonwealth shall purchase the Private Equity Portfolio for $70,750,000.00. The proceeds arising from the purchase of the Private Equity Portfolio shall be distributed to holders of Allowed Claims with respect to the ERS Bonds without setoff or deduction for taxes.

*Consummation Payments*.[75] ERS Bondholders party to the ERS Stipulation at its execution are entitled to, without setoff or deduction for taxes, their pro rata share $75,000,000.00 in cash distributions.

---

[75] Certain ERS Bondholders who are also holders of bonds issued by the Commonwealth and/or by PBA and are parties to the GO/PBA PSA assert the provision of the Plan providing for the payment of the Consummation Payments to only those ERS Bondholders party to the ERS Stipulation violates sections 4.5(d) of the GO/PBA PSA. The group requested the Oversight Board provide in the Plan an additional cash distribution to those holders in an amount proportionate to the Consummation Payments. The Oversight Board disagrees with this contention.

*ERS Assets*. In consideration for the Commonwealth making payments to support the cash distributions to be made pursuant to the Plan, all other ERS assets shall be transferred to and vest in the Commonwealth.

### d) Plan Support Agreement with Retiree Committee

After significant negotiations, on June 7, 2019, the Oversight Board and the Retiree Committee[76] entered into the Retiree Committee PSA (attached hereto as Exhibit E) providing for the Retiree Committee's support for the terms of the agreed-upon restructuring of the Commonwealth's pension obligations pursuant to the Plan. The Oversight Board has determined the following steps are essential to provide adequate funding for future pension obligations: (a) reducing pension benefits above certain levels to achieve significant savings in pension payments over the next 30 years while leaving the benefits of lower-income retirees unaffected; and (b) establishing a pension reserve fund to provide a guaranteed source of payment in years when the annual budget falls into deficit. These measures are incorporated into the Retiree Committee PSA, and have since been adjusted to increase the threshold at which benefit reductions apply,[77] as described below:

#### (i) *Benefit Reductions*

Pension benefits in ERS, Teachers Retirement System ("TRS"), and Judiciary Retirement System ("JRS") accrued by active and retired employees on or after May 3, 2017, are not subject to any reductions in pension or retirement benefits. Pension benefits in all three systems accrued by active and retired employees before May 3, 2017, are subject to reduction as follows.[78]

For any individual whose Total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution, which will not be reduced at all) is in excess of $1,500 per month (the threshold above which cuts apply), a flat cut percentage equal to 8.5% of the Total Monthly Retirement Benefit, provided that the Total Monthly Retirement Benefit cannot fall below $1,500 per month. The minimum monthly benefit after applying reductions under the Plan will remain at $1,500. Accrued pension amounts and threshold will not be indexed for any reason in the future, except for Pension Benefit Restoration provisions as described below.

---

[76] On June 15, 2017, the United States Trustee appointed the Retiree Committee in the Title III Cases. *Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico*, [ECF No. 340].

[77] These changes represent an update from the 2020 fiscal plan. The Retiree Committee PSA included additional provisions protecting employees who would have received a smaller benefit reduction under the original benefit reduction of 25%. Given the increase to $1,500, these protections are no longer necessary.

[78] As payable under current law as of May 3, 2017 (including any historical benefit modifications as described in Section III.A.2.) System 2000 Participants (defined below) are not subject to such reduction and their claims are treated as provided for in Class 48J.

The reduction in the Total Monthly Retirement Benefit will be calculated in a four step process:

(1) any annual Christmas Bonus will be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, (ii) the total reduction as calculated above is reached, or (iii) the Christmas Bonus is entirely eliminated, whichever occurs first;

(2) any Summer Bonus will next be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, (ii) the total reduction as calculated above is reached, or (iii) the Summer Bonus is entirely eliminated, whichever occurs first;

(3) the Monthly Medicine Bonus will next be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, (ii) the total reduction as calculated above is reached, or (iii) the Monthly Medicine Bonus is entirely eliminated, whichever occurs first; and

(4) the Monthly Base Pension will next be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, or (ii) the total reduction as calculated above is reached.

Under no circumstances shall this reduction formula reduce an individual Retiree's Total Monthly Retirement Benefit below the $1,500 monthly benefit threshold. If a Retiree's Total Monthly Retirement Benefit starts out below this threshold, the Retiree Total Monthly Retirement Benefit will be unaffected by the Plan.

(ii) *Benefit Restoration*

All Retirees subject to the Monthly Benefit Reduction described above are also eligible for partial or total restoration of the benefit for any given Fiscal Year in the event there is sufficient surplus cash generated beyond the surplus projected in the Fiscal Plan for that Fiscal Year. The restoration of the benefit will occur in any particular post-confirmation Fiscal Year so long as the Commonwealth Debtor achieves a budget surplus of more than $100 million in excess of the surpluses projected in the Fiscal Plan for that year. If such an excess surplus is achieved, then 10% of the excess surplus shall be distributed on or before October 1 following that Fiscal Year to Retirees on a pro-rata basis to restore partially or fully the benefit reduction experienced by Retirees in such year. Each Retiree will receive a Monthly Benefit Restoration pro-rated based on the amount of total cuts experienced, and the restoration of benefits will be capped by the reduction experienced by each Retiree. If the excess surplus achieved in any given Fiscal Year is less than $100 million, no restoration payments will be made for that year unless additional restoration payments are included in the certified budget. Such benefit restoration payments may be achieved for any post-confirmation Fiscal Year through and including Fiscal Year 2033.

(iii) *Pension Reserve Trust*

On the Effective Date of the Plan, the Commonwealth Debtor will establish a Pension Reserve Trust. The Pension Reserve Trust will be held in trust for the sole benefit of the Retirees, and managed by the three-member Pension Reserve Investment Committee appointed pursuant to the Plan. The funding of the administrative cost of the investment adviser will come from the Pension Reserve Trust.

The Plan provides that the Commonwealth will make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund for eight (8) Fiscal Years beginning in the Fiscal Year following the Fiscal Year in which the Effective Date occurs, in an amount no less than $175 million per year; provided further that for any Fiscal Year ending after the Plan Effective Date (as defined in the Plan) in which the projected Fiscal Plan Surplus is at least $1.750 billion, the Commonwealth shall make a contribution to the Pension Reserve Trust from the Commonwealth General Fund in an amount equal to 25% of the projected Fiscal Plan Surplus that year (such amount, the "Base Contribution").[79]   Subsequent to entry into the Retiree Committee PSA, the parties further negotiated and agreed, and the Plan provides at paragraph 79.2, that the Commonwealth's annual contribution shall also include: (a) such additional amount calculated as the lower of the actual primary surplus for such Fiscal Year or the projected Fiscal Plan primary surplus for such Fiscal Year minus the sum of (i) the Base Contribution for such Fiscal Year, plus (ii) the Commonwealth debt service obligation pursuant to the plan for such Fiscal Year, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be lower than zero dollars ($0.00), and (b) subject to applicable laws, including, without limitation, Titles I and II of PROMESA, such additional amounts as the Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust.   The annual contribution must be made by October 1 following the end of each Fiscal Year.

Based on the current Fiscal Plan's projections, the Oversight Board estimates deposits into the Pension Reserve Trust during its eight years of funding as described above will total approximately $2.8 billion, and projects that amounts in the Pension Reserve Trust will realize an annual return on investment of 4.5%.

Any withdrawals from the Pension Reserve Trust shall only be used by the Commonwealth for the payment of current pension obligations under PayGo (as defined below).  The Oversight Board projects that withdrawals will not be required to make PayGo payments until Fiscal Year 2036, at which point the amount of the Pension Reserve Trust should be at least $4.5 billion.  Protocols governing the withdrawal and expenditure of funds in the Pension Reserve Trust have not yet been established.

e)      **Plan Support Agreement with AFSCME**

The Oversight Board engaged in negotiations with AFSCME regarding new collective bargaining agreement or agreements ("CBAs"), the ERS Systems Benefits, and the Upside Fiscal Plan Surplus Sharing Agreement, resulting in an agreement which provides AFSCME's support of the Plan, while providing key benefits to AFSCME's members in exchange for its support.  On June 7, 2019, the Oversight Board and AFSCME, for itself and on behalf of its two local chapters, Servidores Públicos Unidos ("SPU"), AFSCME Council 95 and Capítulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico, entered into a PSA providing for AFSCME's support for terms of CBAs, along with the foregoing restructuring of pension obligations, pursuant to the Plan.  The vote passed with 92% of members voting in favor.  The agreement also provides AFSCME's support of the terms set forth in the Plan with respect to treatment of retirement benefit

---

[79] The PSA and the Plan also provide for an initial contribution of $5 million to fund the initial administrative fees, costs, and expenses of the Pension Reserve Trust.

claims, and AFSCME has agreed to support and encourage those terms with their voting membership. AFSCME will also be provided with institutional representation with direct interaction with the Oversight Board to ensure the perspectives of AFSCME are shared in regards to the Commonwealth fiscal plan, budget, and restructuring process.

The Plan provides the existing CBAs between the Commonwealth and AFSCME or its local affiliates are rejected under Bankruptcy Code section 365 and replaced with modified CBAs. The treatment of claims as a result of such modification will be, in part, the implementation of valid, enforceable modified CBAs. The current CBAs combined with the provisions of the term sheet annexed as Appendix I to the AFSCME PSA (also attached as <u>Exhibit F</u> to this Disclosure Statement) shall constitute the modified CBAs and the modified CBAs shall have a term of five years. The five year contract term locks in fiscal plan economic savings while providing enforceable CBAs and important contractual protections to AFSCME and its members, including, for example, protection from privatization for the contract period. The AFSCME-represented employees are assured that for the term of the new CBAs there will be no changes in base pay, other compensation, leaves, holidays, or other benefits without the express consent of AFSCME. The five-year term also allows for an emergency process to achieve fiscal plan personnel reductions, while providing AFSCME input into cost saving initiatives. The result of the collaborative process maintains the majority of AFSCME's previously negotiated benefits while memorializing said benefits in the modified five-year CBAs.

Claims as a result of such rejection are in Class 48, and the treatment of the rejection damage claims is the proffer of the modified CBAs consistent with the AFSCME PSA, to be executed and effectuated pursuant to the Plan and Confirmation Order. The terms of the CBA cover the following union affiliates:

- Parole Board and Local 3584 / United Public Servants

- Department of Consumer Affairs and Local 3986 / United Public Servants

- Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU) / United Public Servants

- Department of Correction and Rehabilitation / Bureau of Juvenile Institutions and Local 3559 (ACU) / United Public Servants

- Department of Education and Local 3840 covering only employees within AFSCME jurisdiction of PASO

- Department of Natural and Environmental Resources and Local 2082-Unit A / United Public Servants

- Department of Natural and Environmental Resources and Local 3647 (Ranger Corps) / United Public Servants

- Department of Transportation and Public Works and Local 3889 / United Public Servants

43

- Department of Labor and Human Resources / Vocational Rehabilitation Administration and Local 3251 / United Public Servants

- Department of the Family and Local 3227-Unit A / United Public Servants

- Department of the Family and Local 3234-Unit B (UPETEC) / United Public Servants

- Bureau of Forensic Sciences and Local 2099 / United Public Servants

- Department of Correction and Rehabilitation / Pretrial Services Program and Local 3573 (ACU) / United Public Servants

- Bureau of Transport and Other Public Services and Local 3897 / United Public Servants

The AFSCME PSA provides for a multitude of benefits negotiated between the Oversight Board and AFSCME in an effort to maintain protection of the union members, including as follows.

*Uniform Healthcare*. The AFSCME PSA provides for an enhanced monthly employer contribution of $170.00 per person/per month in comparison to the fiscal plan proposal of $125.00 per person/per month. The PSA also provides for union representation through a negotiated health care administrator, which will facilitate better coverage, a wider array of choices for coverage, and lower overall costs to union members.

*Upside Participation Bonus*. The AFSCME PSA provides a mechanism for union member participants and all other eligible Commonwealth employees to share in any "Excess Cash Surplus" (the terms of which are described below) above and beyond the certified fiscal plan in effect as of the date of the Plan for the Commonwealth. Given the sacrifices already endured by the workers of Puerto Rico and the additional sacrifices required under the Fiscal Plan, the Fiscal Plan Surplus Sharing Agreement provides a mechanism to share any potential upside with those who have endured the current challenges and will be working to stabilize Puerto Rico in future years.

*Support Fee*. AFSCME will receive a one-time payment of $5 million, in recognition of their efforts as the lead negotiator of and as a signatory to the Agreement.

*Additional Fee*. AFSCME will receive a one-time payment of $5 million to AFSCME, to be disbursed in the manner AFSCME designates, as a concession by the Oversight Board for the efforts undertaken by AFSCME to fulfill obligations under the agreement.

*Signing Bonus*. Union member participants will receive a one-time signing bonus of $500.

*System 2000*. Union members will receive full recovery of their contributions under the System 2000 plan, with interest credit through May 3, 2017. The following terms outline the means in which System 2000 participants are treated:

44

- segregate full System 2000 contributions from 2000-2013;

- segregate full System 2000 participant Act 3-2013 contributions from 2013-2017; and

- segregate full Act 3-2013 participant (who had not participated in either Act 1 of 1990 or Act 447, or System 2000 from 2000-2013) contributions through 2017.

System 2000 participants who have not yet retired as of the Plan Effective Date will receive the amount of their contributions into System 2000 (and Act 3 plans from and after 2013) through June 30, 2017, plus accrued interest thereon through the Petition Date. This amount will be rolled into participants' individual defined contribution accounts and invested by default into a target date life-cycle fund, which will result in the unimpairment of their contributions to the system and interest accrual under Puerto Rico law, protection of their retirement savings in new defined contribution accounts, and flexibility for participants to invest the dollars according to their personal preference.

As of the Effective Date, participants with System 2000 contributions will no longer be entitled to future system administered benefits, such as death and disability provisions.

*Act 3-2013 Benefits*. Act 1 of 1990 and Act 447 Participants' (as defined below) pensions will include their contributions under Act 3-2013 from July 1, 2013 through the implementation of the Act 106 defined contribution plan in July 2017, including interest accrued through the Petition Date, as annuitized pursuant to Act 3-2013. The portion of the annuity related to contributions under Act 3-2013 will be exempt from the benefit reduction formula described above in subsection 1.b)(i) for participants who retire after the Effective Date of the Plan. This will serve to further protect workers' retirement benefits.

In addition, it was subsequently agreed that the Act 1 of 1990 and Act 447 Participants who are actively employed and have not yet annuitized or withdrawn their Act 3 contributions would receive $2,600 deposited pre-tax into their Act 106 DC accounts. This amount will be rolled into participants' individual defined contribution accounts and invested by default into a target date life-cycle fund closest to the year in which each participant will reach age 65, unless the participant has affirmatively elected different investment options. These contributions, on average, provide participants their interest accruals on their balances from the plan effective date through their retirement similar to the treatment for System 2000 participants. Upon retirement, these balances will have a 4% interest rate applied to them upon conversion into an annuity.

*Pension Reserve Trust.* Establishment and funding of a Pension Reserve Trust protects both current and future union retirees. The AFSCME PSA provides the Commonwealth shall make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund for eight (8) Fiscal Years beginning in the Fiscal Year following the Fiscal Year in which the Effective Date occurs, in an amount no less than $175 million per year; provided that for any Fiscal Year ending after the Plan Effective Date in which the projected Fiscal Plan Surplus is at least $1.750 billion, the Commonwealth shall make a contribution to the Pension Reserve Trust from

45

the Commonwealth General Fund in an amount equal to 25% of the projected Fiscal Plan Surplus that year.[80]

*Excess Cash Surplus.* The AFSCME PSA provides a mechanism for union members to share in any excess surplus above and beyond the certified fiscal plan in effect as of the Effective Date of the Plan. It provides for a bonus pool for union members to the extent the Commonwealth outperforms the projections included in the Fiscal Plan. Excess Cash Surplus is defined as excess cash surplus above and beyond the projected Fiscal Plan surplus contained in the Certified Fiscal Plan in effect as of the Effective Date. If the Excess Cash Surplus is lower than $100 million, no amounts will be distributed. If the Excess Cash Surplus is $100 million or higher, 25% of the Excess Cash Surplus will be allocated to the Upside Participation Bonus pool, which will be shared proportionally amongst AFSCME-represented participants and all other eligible Commonwealth employees. All recipients of this upside bonus pool will have the choice to allocate any portion of their bonus to their defined contribution account and any remainder will be distributed in cash

*Non-Union Rank-and-File Employees.* For those rank-and-file employees who are not represented by a union, and therefore are not eligible to sign a plan support agreement for the Plan, the Oversight Board will provide them with certain of the benefits afforded to those employees who are represented by a union that does sign a plan support agreement for the Plan. For example, such rank-and-file employees will receive the enhanced monthly employer contribution of $170.00 per person/per month in comparison to the fiscal plan proposal of $125.00 per person/per month and are permitted to participate in the upside participation bonus which shares any excess surplus above and beyond the certified fiscal plan in effect as of the date of the Plan for the Commonwealth.

f)    **Proposed Plan Support Agreement with AMPR**

The Oversight Board engaged in negotiations with AFT, AMPR and AMPR-LS regarding a new collective bargaining agreement and the treatment of TRS System Benefits under the Plan, resulting in a proposed agreement which would provide AFT, AMPR and AMPR-LS's support of the Plan, while providing key benefits to represented members in exchange for its support. While this agreement has not yet been voted on and approved by the union represented employees, the Plan incorporates the provisions of this agreement **contingent upon the execution of a Plan Support Agreement with the Oversight Board on or before September 30, 2021 by the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical** (the "**AFT/AMPR PSA**"). The execution of the AFT/AMPR PSA is further contingent upon AMPR's notification of ratification of and entry into

---

[80] The formula here (defined in the Plan as the Base Contribution) is provided for in the AFSCME PSA (Exhibit F); however, the Plan provides for a more beneficial formula (see the Plan at 79.2), consistent with the revisions to the formula negotiated by the Oversight Board and the Retiree Committee as described above. The Plan establishes an initial contribution of $5 million to fund the initial administrative fees, costs, and expenses of the Pension Reserve Trust. Beginning with the fiscal year in which the Plan Effective Date occurs, the Reorganized Commonwealth will make eight annual contributions to the Pension Reserve Trust in an amount (for each fiscal year) equal to (a) the Base Contribution for such fiscal year, plus (b) such additional amount calculated as the lower of the actual primary surplus for such fiscal year or the projected Fiscal Plan primary surplus for such Fiscal Year minus the sum of (i) the Base Contribution for such fiscal year, plus (ii) the Commonwealth debt service obligation pursuant to the plan for the fiscal year, plus (iii) $200 million.

the AFT/AMPR PSA; however, absent such circumstances, the relevant class is subject to the original proposed treatment under the Plan.

The proposed agreement provides the existing CBA between the Commonwealth and AMPR or its local affiliates are rejected under Bankruptcy Code section 365 and replaced with a modified CBA. The treatment of claims as a result of such modification will be, in part, the implementation of a valid, enforceable modified CBA. The current CBA combined with the provisions of the term sheet attached as Exhibit F-2 to the Plan shall constitute the modified CBA and the modified CBA shall have a term of five years. The five-year contract term locks in fiscal plan economic savings while providing enforceable CBA and important contractual protections to union represented employees. The AMPR-represented employees are assured that for the term of the new CBA there will be no changes in base pay, other compensation, leaves, holidays, or other benefits without the express consent of AMPR. The five-year term also allows for an emergency process to achieve fiscal plan personnel reductions, while providing AMPR input into cost saving initiatives. The result of the collaborative process maintains the majority of AMPR's previously negotiated benefits while memorializing said benefits in the modified five-year CBA.

The proposed agreement provides for a multitude of benefits negotiated between the Oversight Board and AMPR in an effort to maintain protection of union represented employees, and specifically enumerates provisions provided for in the Plan (such as the pension reserve trust and benefit restoration provisions). The benefits below are those within the agreement that are conditional upon execution of a PSA.

*Employer Healthcare Contributions*. The proposed agreement provides for an enhanced monthly employer contribution of $170.00 per person/per month in comparison to the fiscal plan proposal of $125.00 per person/per month.

*Recognition Payment*. Union represented participants (expressly including Transitory Participants) member participants will receive a one-time recognition payment of $3,000.

*Fiscal Plan Surplus Sharing*. The proposed agreement provides participation of Unions, for the term of the Operative CBA, on sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool.

*TRS benefits*. The Plan provides that benefits paid from the TRS pension plan will be frozen as of the effective date of the Plan. The proposed agreement modifies the terms of the proposed pension freeze in the following manner:

- The proposed agreement delays the date in which the freeze ("Freeze Date") occurs 6 months beyond the Plan Effective Date.

- Teachers that are either over 50 or within 3 years of retirement eligibility will retain their original retirement eligibility. Absent the proposed agreement, although

47

participants who are eligible to retire as of the effective date remain eligible to retire, those not yet eligible as of the Freeze Date would have retirement eligibility delayed until Age 63 (or later upon completion of 10 years of service). This provision of the agreement provides that members who are near to achieving retirement eligibility would not incur any delay in retirement timing.

- Teachers who are under 50 and more than 3 years away from retirement eligibility would also retain their original retirement eligibility requirements, although their benefits will be reduced by 7% per year for each year in which their retirement preceeds their revised retirement date. This "Early Retirement Option" provides flexibility in retirement planning for younger teachers.

- The proposed agreement provides an enhancement of the benefit received for participants who attain 30 years of service. As a result of the Freeze, teachers who have not earned 30 years of service by the Freeze Date are not eligible for the enhanced 75% (65% if under 50) of average compensation benefit and will continue to receive the benefit accrued as of the Freeze Date based on 1.8% of average compensation for each year of service earned up to the Freeze Date. The proposed agreement provides that teachers who work 30 years will receive an increase in their plan multiplier from 1.8% to 2.0%. Furthermore, if the participant was under the threshold prior to the increase, they will not be subject to the Benefit Modification as a result of the increase in benefit level.

*Social Security Benefits and Defined Contribution Benefits*. The Plan provides that effective upon the Freeze Date, teachers who had previously not been enrolled in the Defined Contribution Plans established by Act 106-2017 will have their employee contributions directed to these segregated accounts that will be under the control of the employee. Furthermore, a portion of the contribution for those under 45 (and those above 45 that opt in), will instead be directed to the Social Security Administration. The Commonwealth will likewise contribute so that the participants receive credit for their time worked towards earning a future Social Security Benefit. The proposed agreement provides for additional controls to ensure that these changes are /implemented in a timely fashion and provides penalties for non-compliance to ensure that teachers are not harmed by any delays in implementation.

2.        **Holders of Allowed Claims Permitted to Make Elections**

Pursuant to the Disclosure Statement Order and the Plan, certain holders of Claims are entitled to make an election regarding the distribution they will receive under the Plan and the settlement of certain disputes. Below is an overview of the distribution elections and limitations on voting applicable to certain holders of Claims.

*Taxable Bond Election.* If you hold an Allowed Claim in any of the following Classes, you may elect to receive your distribution of New GO Bonds pursuant to the Plan in the form of higher interest rate coupons but your bonds are treated as taxable bonds for federal income tax purposes:

48

| Claims Eligible to Make Taxable Election | |
|---|---|
| **Claim** | **Class** |
| Vintage CW Bond Claims | Class 14 |
| Retail Vintage CW Bond Claims | Class 15 |
| Vintage CW Guarantee Bond Claims | Class 21 |
| 2011 CW Bond Claims | Class 27 |
| Retail 2011 CW Bond Claims | Class 28 |
| 2011 CW Guarantee Bond Claims | Class 31 |
| 2011 CW Series D/E/PIB Bond Claims | Class 33 |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 35 |
| 2012 CW Bond Claims | Class 37 |
| Retail 2012 CW Bond Claims | Class 38 |
| 2012 CW Guarantee Bond Claims | Class 41 |
| 2014 CW Bond Claims | Class 43 |
| Retail 2014 CW Bond Claims | Class 44 |
| 2014 CW Guarantee Bond Claims | Class 46 |

Since residents of Puerto Rico are generally exempt from payment of federal income taxes, to be eligible to make the taxable bond election, a holder of such Allowed Claim must certify that it is a **Puerto Rico Investor**, *i.e.*, that it is either:

- A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

- An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes).

If you make the above-described election, you will be deemed to accept the Plan. If you are determined to be ineligible to make the taxable bond election, your Claim will be treated in accordance with your originally designated Class and you will be deemed to accept the Plan.

AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE EFFECTIVE DATE OF THE PLAN. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION TO RECEIVE TAXABLE BONDS WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

**IF YOU MAKE THE TAXABLE BOND ELECTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING OF TAXABLE NEW GO BONDS, CVIS, AND CASH APPROXIMATELY EQUAL TO THE FOLLOWING:**

| Claim | Class | Approx. Taxable Bond Election Recovery |
|---|---|---|
| Vintage CW Bond Claims | Class 14 | 77.6% |
| Retail Vintage CW Bond Claims | Class 15 | 77.6% |
| Vintage CW Guarantee Bond Claims | Class 21 | 74.5% |
| 2011 CW Bond Claims | Class 27 | 73.0% |
| Retail 2011 CW Bond Claims | Class 28 | 73.0% |
| 2011 CW Guarantee Bond Claims | Class 31 | 73.5% |
| 2011 CW Series D/E/PIB Bond Claims | Class 33 | 76.5% |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 35 | 76.5% |
| 2012 CW Bond Claims | Class 37 | 72.4% |
| Retail 2012 CW Bond Claims | Class 38 | 72.4% |
| 2012 CW Guarantee Bond Claims | Class 41 | 67.3% |
| 2014 CW Bond Claims | Class 43 | 67.8% |
| Retail 2014 CW Bond Claims | Class 44 | 67.8% |
| 2014 CW Guarantee Bond Claims | Class 46 | 67.8% |

**IF YOU <u>DO NOT</u> MAKE THE TAXABLE BOND ELECTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING OF NEW GO BONDS, CVIS, AND CASH APPROXIMATELY EQUAL TO THE FOLLOWING:**

| Claim | Class | Approx. Recovery |
|---|---|---|
| Vintage CW Bond Claims | Class 14 | 77.6% |
| Retail Vintage CW Bond Claims | Class 15 | 77.6% |
| Vintage CW Guarantee Bond Claims | Class 21 | 74.5% |
| 2011 CW Bond Claims | Class 27 | 73.0% |
| Retail 2011 CW Bond Claims | Class 28 | 73.0% |
| 2011 CW Guarantee Bond Claims | Class 31 | 73.5% |
| 2011 CW Series D/E/PIB Bond Claims | Class 33 | 76.5% |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 35 | 76.5% |
| 2012 CW Bond Claims | Class 37 | 72.4% |
| Retail 2012 CW Bond Claims | Class 38 | 72.4% |
| 2012 CW Guarantee Bond Claims | Class 41 | 67.3% |
| 2014 CW Bond Claims | Class 43 | 67.8% |
| Retail 2014 CW Bond Claims | Class 44 | 67.8% |
| 2014 CW Guarantee Bond Claims | Class 46 | 67.8% |

Taxable New GO Bonds distributed to holders making the taxable bond election will have certain repayment terms that differ from those distributed to holders who do not make such election. You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in IX, entitled "Material United States Federal Income Tax Considerations" and section X, entitled "Certain Material Puerto Rico Income Tax Considerations" of this Disclosure Statement, before making the taxable bond election. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. Even if you qualify as a Puerto Rico Investor, you may not be exempt from paying U.S. federal income tax on the Taxable New GO Bonds. The tax consequences described in this Disclosure Statement are not a substitute for careful tax planning and professional tax advice relating to your individual circumstances and you should seek advice from your own tax advisor.

*Assured Bond Claims – Distribution Elections and Voting*. If you are a beneficial holder of Allowed Assured Insured Bond Claims, and solely to the extent Assured (i) declines to make the Assured Election with respect to any Assured Insured Bonds of which you are the beneficial holder and (ii) decides to offer more than one Assured Bondholder Election, you may elect one of the Assured Bondholder Elections on your Election Form to receive in full satisfaction of your Allowed Assured Insured Bond Claim and rights under the applicable Assured Insurance Policy.

Beneficial holders of Allowed Assured Insured Bond Claims, Allowed Assured CW/Convention Center Claims, Allowed Assured CW/HTA Bond Claims, and Allowed Assured CW/PRIFA Rum Tax Claims arising from bonds insured by Assured will not be entitled to vote to accept or reject the Plan. Assured is entitled to vote on account of Allowed Assured Insured Bond Claims, Allowed Assured CW/Convention Center Claims, Allowed Assured CW/HTA Bond Claims, and Allowed Assured CW/PRIFA Rum Tax Claims arising from bonds insured by Assured under the Plan in accordance with Section 301(c)(3) of PROMESA and other applicable law and governing documents.

*National Insured Bond Claims—Distribution Election and Voting*. If you are a beneficial holder of Allowed National Insured Bond Claims, you may elect on your Election Form to receive in full satisfaction, release, and exchange of your Allowed National Insured Bond Claim and rights under the applicable National Insurance Policy, (1) the National Commutation Treatment or (2) the National Non-Commutation Treatment.

Holders of Allowed National Insured Bond Claims and National CW/HTA Bond Claims will not be entitled to vote to accept or reject the Plan. National is entitled to vote on account of Allowed National Insured Bond Claims and Allowed National CW/HTA Bond Claims under the Plan on behalf of beneficial holders thereof in accordance with Section 301(c)(3) of PROMESA and other applicable law and governing documents.

*Syncora Insured Bond Claims—Distribution Election and Voting*. If you are a beneficial holder of Allowed Syncora Insured Bond Claims, you may elect on your Election Form to receive in full satisfaction, release, and exchange of your Allowed Syncora Insured Bond Claim and rights

51

under the applicable Syncora Insurance Policy, (1) the Syncora Commutation Treatment or (2) the Syncora Non-Commutation Treatment.

Holders of Allowed Syncora Insured Bond Claims will not be entitled to vote to accept or reject the Plan. Syncora is entitled to vote on account of Allowed Syncora Insured Bond Claims under the Plan on behalf of beneficial holders thereof in accordance with Section 301(c)(3) of PROMESA and other applicable law and governing documents.

AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE EFFECTIVE DATE OF THE PLAN. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

*Convenience Claim Election*. Holders of Allowed CW General Unsecured Claims (Class 55) and Allowed ERS General Unsecured Claims (Class 63) may elect to:

    (a) reduce the amount of such holder's Allowed Claim to $20,000.00 and receive payment in full in cash of such reduced claim pursuant to the treatment of Convenience Claims in Class 65; and

    (b) accept the Plan as a holder of a Claim in Class 65.

Holders of multiple Allowed CW General Unsecured Claims or multiple Allowed ERS General Unsecured Claims may elect to:

    (a) reduce the amount of such multiple claims to an aggregate amount of $40,000.00 and receive payment in full in cash of such reduced aggregate claim pursuant to the treatment of Convenience Claims in Class 65; and

    (b) accept the Plan as a holder of a Claim in Class 65.

4. **Overview of New GO Bonds and Contingent Value Instruments to be Issued on the Effective Date**

    a) **New GO Bonds**

On the Effective Date, Reorganized Commonwealth will issue the New GO Bonds, consisting of:

    (i) $6,683,315,000.00 in aggregate principal amount of New GO CIBs,

    (ii) $442,506,553.50 in initial principal amount of New GO 5.375% CABs, and

    (iii) $288,241,989.75 in initial principal amount of New GO 5.0% CABs,

with eleven (11) different maturity dates, having an aggregate original principal amount at the time of issuance $7,414,063,543.25.   The New GO Bonds will be secured by a statutory first lien and pledge of the amounts on deposit in the Debt Service Fund and a pledge of the Commonwealth's full faith, credit and taxing power in accordance with Article VI, Section 2 of the Commonwealth Constitution and applicable laws of the Commonwealth as of the Effective Date.  The New GO Bonds will be dated as of, and will accrue or accrete interest from, the earlier of (i) July 1, 2021 and (ii) the Effective Date.

The New GO Bonds will be issued pursuant to the New GO Bonds Indenture and New GO Bonds Legislation.    The New GO Bonds will be distributed as set forth in the Plan. Notwithstanding the timing of the Effective Date, interest on the New GO Bonds will commence to accrue or accrete, as applicable, from the earlier to occur of the Effective Date and July 1, 2021, which earlier date will be designated as the "dated" date of the New GO Bonds.

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties will use their commercially reasonable best efforts to obtain ratings on the New GO Bonds, following consultation with up to two (2) Initial GO/PBA PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Assured (solely to the extent that is has not terminated the PSA as to itself), National (solely to the extent that is has not terminated the PSA as to itself),  and Syncora, each of which will have executed a confidentiality agreement, in form and substance satisfactory to the Oversight Bond and restricting such Initial PSA Creditors from trading New GO Bonds, and to subsequently use their commercially reasonable best efforts to obtain the best possible ratings.

The New GO Bonds will not carry any default rate of interest; provided, however, that the interest will accrue on all overdue debt service, at the regular coupon rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such Taxable New GO Bonds will be distributed to holders of Allowed Claims in the following order of priority:   (1) *first*, to holders of Allowed Taxable Election CW Claims, and (2) *second*, pro rata to all other holders of Allowed Claims and recipients of New GO Bonds, without duplication.

The maturities, interest rates, and amortization schedules for the New GO Bonds are included as Exhibit I to the Plan.

b)      **Contingent Value Instruments**

On the Effective Date, Reorganized Commonwealth will issue the GO CVIs and the Clawback CVIs.  The GO CVIs will have a maximum lifetime cap of $3,500,000,000.00 and a 22-year term.  The Clawback CVIs will have a maximum lifetime cap equal to $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed CW/Convention Center Claims,

$22,580,090 for Allowed CW/MBA Claim, and $1,446,650,288 for Allowed CW/PRIFA Rum Tax Claims (in total, $5,384,127,764),[81] and a 30-year term.

The CVIs will be secured by a pledge of the Commonwealth's full faith, credit, and taxing power under the Commonwealth Constitution and applicable laws of the Commonwealth. Payments on the CVIs will be made only if 5.5% Sales and Use Tax Collections outperform the May 2020 Commonwealth Certified Fiscal Plan. Payments on the CVIs are subject to applicable caps, including the GO CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap.

The Subject to Waterfall Clawback CVI represents a portion of payments to Clawback CVIs made from the Subject to Waterfall Outperformance Amount. The Not Subject to Waterfall Clawback CVI represents a portion of payments to Clawback CVIs made from the Not Subject to Waterfall Outperformance.

## C.    Holders of Claims Entitled to Vote on the Plan of Adjustment

Pursuant to PROMESA Title III and the Bankruptcy Code, only holders of Allowed Claims in classes of claims that are impaired and are not deemed to have automatically accepted or rejected a proposed Title III plan of adjustment are entitled to vote to accept or reject a proposed plan of adjustment. Classes of claims in which the holders of claims are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the plan of adjustment and are also not entitled to vote.

Below is a summary of Classes of Claims (a) entitled to vote to accept or reject the Plan, (b) entitled to make a distribution election, and (c) not entitled to vote to accept or reject the Plan:

|  | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| Vintage PBA Bond Claims | Class 1 | X | - | - |
| Vintage PBA Bond Claims (Assured) | Class 2 | * | - | - |
| Vintage PBA Bond Claims (National) | Class 3 | * | X | - |
| Vintage PBA Bond Claims (Other Insured)* | Class 4 | X | - | - |
| Vintage PBA Bond Claims (Syncora) | Class 5 | * | X | - |
| Retail Vintage PBA Bond Claims | Class 6 | X | - | - |
| 2011 PBA Bond Claims | Class 7 | X | - | - |
| Retail 2011 PBA Bond Claims | Class 8 | X | - | - |
| 2012 PBA Bond Claims | Class 9 | X | - | - |
| Retail 2012 PBA Bond Claims | Class 10 | X | - | - |
| PBA/DRA Secured Claim | Class 11 | X | - | - |

---

[81] Applies to aggregate Clawback CVI payments, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI.

| | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| PBA General Unsecured Claims | Class 12 | X | - | - |
| PBA/DRA Unsecured Claim | Class 13 | X | - | - |
| Vintage CW Bond Claims | Class 14 | X | X | - |
| Retail Vintage CW Bond Claims | Class 15 | X | X | - |
| Vintage CW Bond Claims (Assured) | Class 16 | * | - | - |
| Vintage CW Bond Claims (National) | Class 17 | * | X | - |
| Vintage CW Bond Claims (Other Insured)* | Class 18 | X | - | - |
| Vintage CW Bond Claims (Syncora) | Class 19 | * | X | - |
| Vintage CW Bond Claims (Taxable Election) | Class 20 | - | - | - |
| Vintage CW Guarantee Bond Claims | Class 21 | X | X | - |
| Vintage CW Guarantee Bond Claims (Assured) | Class 22 | * | - | - |
| Vintage CW Guarantee Bond Claims (National) | Class 23 | * | X | - |
| Vintage CW Guarantee Bond Claims (Other Insured)* | Class 24 | X | - | - |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 25 | * | X | - |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 26 | - | - | - |
| 2011 CW Bond Claims | Class 27 | X | X | - |
| Retail 2011 CW Bond Claims | Class 28 | X | X | - |
| 2011 CW Bond Claims (Assured) | Class 29 | * | - | - |
| 2011 CW Bond Claims (Taxable Election) | Class 30 | - | - | - |
| 2011 CW Guarantee Bond Claims | Class 31 | X | X | - |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 32 | - | - | - |
| 2011 CW Series D/E/PIB Bond Claims | Class 33 | X | X | - |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 34 | * | - | - |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 35 | X | X | - |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 36 | - | - | - |
| 2012 CW Bond Claims | Class 37 | X | X | - |
| Retail 2012 CW Bond Claims | Class 38 | X | X | - |
| 2012 CW Bond Claims (Assured) | Class 39 | * | - | - |
| 2012 CW Bond Claims (Taxable Election) | Class 40 | - | - | - |
| 2012 CW Guarantee Bond Claims | Class 41 | X | X | - |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 42 | - | - | - |
| 2014 CW Bond Claims | Class 43 | X | X | - |
| Retail 2014 CW Bond Claims | Class 44 | X | X | - |
| 2014 CW Bond Claims (Taxable Election) | Class 45 | - | - | - |

| | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| 2014 CW Guarantee Bond Claims | Class 46 | X | X | - |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 47 | - | - | - |
| Retired ERS Participant Below-Threshold Claims | Class 48A | - | - | X |
| Retired JRS Participant Below-Threshold Claims | Class 48B | - | - | X |
| Retired TRS Participant Below-Threshold Claims | Class 48C | - | - | X |
| Retired ERS Participant Above-Threshold Claims | Class 48D | X | - | - |
| Retired JRS Participant Above-Threshold Claims | Class 48E | X | - | - |
| Retired TRS Participant Above-Threshold Claims | Class 48F | X | - | - |
| Active ERS Participant Claims | Class 48G | X | - | - |
| Active JRS Participant Claims | Class 48H | X | - | - |
| Active TRS Participant Claims | Class 48I | X | - | - |
| System 2000 Participant Claims | Class 48J | - | - | X |
| VTP Payroll Participant Below-Threshold Claims | Class 48K | - | - | X |
| VTP Payroll Participant Above-Threshold Claims | Class 48L | X | - | - |
| AFSCME Claims | Class 49 | X | - | - |
| Dairy Producer Claims | Class 50 | X | - | - |
| Eminent Domain Claims | Class 51 | X | - | - |
| Energy Incentive Claims | Class 52 | - | - | X |
| Med Center Claims | Class 53 | X | - | - |
| Tax Credit Claims | Class 54 | - | - | X |
| CW General Unsecured Claims | Class 55 | X | X | - |
| CW/HTA Claims | Class 56 | X | - | - |
| CW/Convention Center Claims | Class 57 | X | - | - |
| CW/PRIFA Rum Tax Claims | Class 58 | X | - | - |
| CW/MBA Claims | Class 59 | X | - | - |
| CW Appropriations Claims | Class 60 | - | - | X |
| Section 510(b) Subordinated Claims | Class 61 | - | - | X |
| ERS Bond Claims | Class 62 | X | X | - |
| ERS General Unsecured Claims | Class 63 | X | X | - |
| Gracia-Gracia Claims | Class 64 | - | - | X |
| Convenience Claims | Class 65 | - | - | X |
| Federal Claims | Class 66 | - | - | X |

        * The Plan provides that, for voting purposes, the "holder" of an insured Bond Claim shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such insured Bond Claims. Beneficial holders of Allowed Assured Insured Bond Claims, Allowed Assured CW/HTA Bond Claims, Allowed Assured CW/Convention Center Claims, Allowed Assured CW/PRIFA Rum Tax Claims, Allowed

National Insured Bond Claims, Allowed National CW/HTA Bond Claims, and Allowed Syncora Insured Bond Claims will not be entitled to vote to accept or reject the Plan. Assured, National, and Syncora are entitled to vote on account of Allowed Assured Insured Bond Claims, Allowed Assured CW/HTA Bond Claims, Assured CW/Convention Center Claims, Allowed Assured CW/PRIFA Rum Tax Claims, Allowed National Insured Bond Claims, Allowed National CW/HTA Bond Claims, and Allowed Syncora Insured Bond Claims, as applicable, under the Plan on behalf of beneficial holders thereof in accordance with Section 301(c)(3) of PROMESA and other applicable law and governing documents.[82]

Holders of Allowed Claims in Classes 11 (PBA/DRA Secured Claim), 13 (PBA/DRA Unsecured Claim), 60 (CW Appropriations Claims), and 61 (Section 510(b) Subordinated Claims) will not receive a distribution pursuant to the Plan and shall be deemed to have rejected the Plan and are not entitled to vote.

Holders of ACR-eligible claims will not have the right to vote.

Holders of Allowed Claims in 52 (Energy Incentive Claims), 64 (Gracia-Gracia Claims), 65 (Convenience Claims), and 66 (Federal Claims) are unimpaired pursuant to the Plan and shall be deemed to accept the Plan and are not entitled to vote.

Bankruptcy Code section 1126 defines "acceptance" of a plan of adjustment by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that voted to accept or reject the Plan. Thus, acceptance of the Plan by Claims in each Class entitled to vote on the Plan will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Allowed Claims in such Class that have actually voted their Ballots have voted in favor of the Plan. A vote may be disregarded if the Title III Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of PROMESA or the Bankruptcy Code.

It is important that holders of Claims in the Classes in the chart above that are eligible to vote exercise their right to vote to accept or reject the Plan. **EVEN IF YOU DO NOT VOTE OR DO NOT HAVE THE RIGHT TO VOTE TO ACCEPT THE PLAN, YOU MAY BE BOUND BY THE PLAN IF IT IS CONFIRMED BY THE TITLE III COURT.** The amount and number of votes required for acceptance or rejection of the Plan by a Class are computed on the basis of Claims actually voting to accept or reject the Plan. There are no quorum requirements with respect to the number of Claims in a Class that actually vote.

If at least one impaired class of claims accepts a Title III plan of adjustment (without counting the votes of insiders), Bankruptcy Code section 1129(b), made applicable to Title III of PROMESA pursuant to PROMESA section 301(a), permits the confirmation of the plan of adjustment under certain conditions, notwithstanding the rejection of the plan of adjustment by one or more other impaired classes of claims. Under that section, a plan of adjustment may be confirmed by a court if the plan of adjustment does not "discriminate unfairly" and is "fair and

---

[82] Ambac and FGIC assert they are entitled to vote the Claims in Classes 4, 18, 24, and 56-58 corresponding to the Allowed Claims insured by such insurer.

equitable" with respect to each rejecting class. *See* section VII.C of this Disclosure Statement for more information.

The Debtors' determination as to whether to request confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) will be announced prior to or at the Confirmation Hearing.

## D.   Solicitation and Voting Procedures

On June 29, 2021, the Debtors filed the Revised Disclosure Statement Approval Motion [ECF No. 17187], seeking an order from the Title III Court (i) approving the adequacy of the information contained in the proposed Disclosure Statement, (ii) fixing a Voting Record Date (as defined therein) for voting on the Plan, (iii) approving the Confirmation Hearing Notice (as defined therein) and confirmation schedule, (iv) approving the proposed contents of the Solicitation Package (as defined therein) and procedures for distribution thereof, (v) approving the forms of Ballots, and establishing solicitation, voting, distribution election, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status (as defined therein), (vii) fixing the Voting Deadline (as defined therein), Election Deadline (as defined therein), and confirmation deadlines, and (viii) approving procedures for tabulating creditor votes. On [_____], 2021, the Title III Court entered the Disclosure Statement Order.

For more information regarding the solicitation and voting procedures surrounding the Plan, *see* the Disclosure Statement Order.

## E.   Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Bankruptcy Code section 1128, the Title III Court has scheduled the Confirmation Hearing on whether the Debtors have satisfied the confirmation requirements of PROMESA section 314 and the incorporated subsections of Bankruptcy Code section 1129 on [_____, 2021 at ____ a.m./p.m.] (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge designated by Chief Justice John Roberts of the U.S. Supreme Court to preside over the Commonwealth's Title III Case, Clemente Ruiz Nazario U.S. Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom or via virtual hearing to be later determined. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Title III Court has (i) established a Voting Deadline and Election Deadline of no later than 5:00 p.m. (Atlantic Standard Time) on [____, 2021], and (ii) ordered that objections, if any, to confirmation of the Plan be filed and served on or before [_____] (Atlantic Standard Time).

[*Remainder of Page Left Intentionally Blank*]

### III.    Overview of the Debtors

**A.    General Information**

1.    **The Commonwealth**

Puerto Rico has an area of approximately 3,500 square miles and a population estimated by the U.S. Census Bureau of approximately 3.2 million as of July 1, 2019.

Puerto Rico came under U.S. sovereignty pursuant to the Treaty of Paris of 1898. In 1917, pursuant to the Jones-Shafroth Act, Pub. L. 64-368, citizens of Puerto Rico became citizens of the U.S. In 1950, the U.S. Congress authorized Puerto Rico to approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the U.S. Congress, and subsequently approved by the President of the U.S. in 1952. The Commonwealth Constitution provides for the separation of powers between the executive, legislative and judicial branches of government. The Legislature consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

Since the enactment of PROMESA, Puerto Rico has had five Governors. The first, Alejandro García-Padilla, was elected Governor on November 6, 2012, and was sworn into office for a four-year term on January 2, 2013. The second, Ricardo A. Rosselló Nevares, was elected Governor on November 8, 2016 and was sworn into office for a four-year term on January 2, 2017. On July 24, 2019, then-Governor Rosselló announced his resignation effective as of August 2, 2019. Before his resignation became effective, then-Governor Rosselló appointed former resident commissioner Pedro Pierluisi as Secretary of State, which is the first official in the line of succession to Governor under the Commonwealth Constitution. Despite being confirmed by only the Puerto Rico House of Representatives, but not the Senate, Mr. Pierluisi was sworn in as acting Governor on August 2, 2019. But on August 7, 2019, the Puerto Rico Supreme Court unanimously determined that Mr. Pierluisi was unconstitutionally sworn into office as Governor and Mr. Pierluisi promptly resigned. Later that same day, the Secretary of Justice of Puerto Rico, Wanda Vázquez, was sworn in as Governor pursuant to the Commonwealth Constitution to complete former Governor Rosselló's term through 2020. Pedro Pierluisi was elected Governor on November 3, 2020, and was sworn into office for a four-year term on January 2, 2021

While the people of Puerto Rico are citizens of the United States under the U.S. Constitution, the residents of Puerto Rico have no direct representation in the federal government. Puerto Rico has no electors in the Electoral College to vote for president; however, Puerto Rican residents can participate in U.S. presidential nominating primaries. Consistent with the treatment for all U.S. territories, under current U.S. Congressional rules, Puerto Rico's representation in Congress is limited to a single resident commissioner who does not possess the same parliamentary rights afforded to other members of Congress. The resident commissioner is not permitted to vote on the House floor, is not recorded on the Clerk's roll of Members-elect, and may not vote for Speaker or file or sign discharge petitions. In addition, federal taxes, such as individual income

taxes, except payroll taxes such as Social Security and Medicare taxes, are generally not levied on Puerto Rico source income.[83]

As a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board as an entity within the Commonwealth government with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs and to restructure its debt.

***The Commonwealth's Central Government.***   The central government of the Commonwealth (the "Central Government") provides essential services to the people of Puerto Rico through agencies and other entities. The list of entities that comprise the Central Government is attached as Exhibit K to this Disclosure Statement.[84] The Central Government accounts for the costs of these essential services through its General Fund, Special Revenue Funds, and Federal Funds.

***The Commonwealth's Public Corporations and Instrumentalities.***   In the Commonwealth, many governmental and quasi-governmental functions are performed by legally separate public corporations created by the Legislature with varying degrees of independence from the Commonwealth. Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the Commonwealth. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Puerto Rico Senate. Capital improvements of most of the larger public corporations have been financed historically by bonds issued under trust agreements or bond resolutions or by loan agreements.

Through the years, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the General Fund of the Commonwealth or appropriations of Commonwealth taxes or other revenues, to fund their operations. Certain of these instrumentalities, including the Puerto Rico Health Insurance Administration ("ASES"), the Puerto Rico Medical Services Administration, the Puerto Rico Integrated Transit Authority ("PRITA"), the Puerto Rico and Island Municipalities Maritime Transport Authority, the Metropolitan Bus Authority ("MBA"), HTA, and the University of Puerto Rico ("UPR"), provide services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day-to-day operations. Other subsidized public corporations provide services to the Central Government and other government entities, which in turn provide services to the Commonwealth residents.

Commonwealth appropriations and/or tax revenues have also been used as a principal source of funding for certain public corporations dedicated to fiscal and advisory functions (*e.g.*, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), infrastructure development (*e.g.*, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), and the Puerto Rico Public Private Partnerships Authority), air and maritime transportation and logistics (*e.g.*, the Puerto Rico Ports Authority), and economic, tourism and cultural promotion (*e.g.*, the Puerto Rico

---

[83] The information is based on AAFAF's (as defined below) advice as to the contents of the upcoming Commonwealth Financial Statement.

[84] The list is subject to change.

Tourism Company ("PRTC"), the Puerto Rico Convention Center District Authority ("CCDA"), the Puerto Rico Industrial Development Company ("PRIDCO") (primarily with respect to the Special Fund for Economic Development and the Rums of Puerto Rico Program), and the Institute of Puerto Rican Culture).

Other public corporations, such as COFINA and the Puerto Rico Public Finance Corporation ("PFC"), have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

Notwithstanding the Commonwealth's substantial grants of support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable. If the Commonwealth's financial condition is not improved by the Plan and the reforms the Oversight Board has built into its certified fiscal plans and budgets, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues.

The Commonwealth has approximately $13.7 billion of GO debt and approximately $5 billion of debt guaranteed by its good faith, credit and taxing power. The holders of the GO debt and the Commonwealth guaranteed debt claim they have (i) a first priority right to all "available revenues" of the Commonwealth, and (ii) liens against certain property taxes and the funds historically conditionally appropriated to certain instrumentalities subject to Article VI, section 8 of the Commonwealth Constitution. Under section 8, when "available revenues including surplus for any Fiscal Year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Holders of the GO debt and Commonwealth guaranteed debt assert that until all their accrued interest and matured principal is paid in full, the monies otherwise historically conditionally appropriated to HTA and other entities subject to Article VI, section 8 of the Commonwealth Constitution constitute "available revenues" payable to those holders.

PROMESA section 202 grants the Oversight Board power over the budget. The Oversight Board believes PROMESA section 4 preempts inconsistent Commonwealth laws, which includes laws enacted prior to PROMESA that historically conditionally appropriated certain Commonwealth monies to its instrumentalities. The Oversight Board believes that even if the Commonwealth statutes are not preempted, they allow for these historically conditionally appropriated monies to be used by the Commonwealth to pay GO debt and Commonwealth-guaranteed debt. The Commonwealth has not used such monies to pay GO debt since June 30, 2016, because (a) the enforceability of the priority of GO debt or Commonwealth-guaranteed debt is in Title III has not been decided, and/or (b) the Commonwealth's police power entitles it to use available revenues for the public health, safety, and welfare. Notably, the U.S. Congress found in PROMESA section 405(m)(2) that the Commonwealth was unable to provide its citizens with effective services, which the Oversight Board believes justifies the Commonwealth's use of police power to fund services for its citizens as opposed to debt payments.

2.    **ERS**

Prior to the enactment of Act 106-2017 on August 23, 2017 ("Act 106"),[85] ERS administered a cost-sharing, multiple-employer defined benefit and hybrid defined contribution plan. The benefits provided to participating employees of ERS were established by law. As a cost-sharing plan, the plan's assets were not legally segregated and may therefore have been used to pay benefits to the retirees of any participating employer. Prior to the amendments made in 2013 by Act No. 3-2013 ("Act 3-2013"), ERS consisted of different benefit structures. Members who began to participate before January 1, 2000, participated in a defined benefit program. Members who began to participate prior to April 1, 1990 ("Act 447 Participants"), were entitled to the highest benefits structure, while those who began to participate on or after April 1, 1990 ("Act 1 Participants"), were subject to a longer vesting period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("Act 1 of 1990").

In 1999, Act 447 was amended to close the defined benefit program for new participants and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who began to participate on or after January 1, 2000 ("System 2000 Participants") participated solely in System 2000. Prior to the amendment made by Act 3-2013 (described below), under the System 2000 benefit structure, a participant was entitled to receive a lump-sum payment, which could be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed in cash by such participant and credited earnings on such cash. System 2000 Participants cash balance accounts did not benefit from any Employer Contributions. Employer Contributions made on account of System 2000 Participants were used to reduce the accumulated unfunded pension benefit obligations of ERS.

System 2000 was not established as a separate plan, however, and there are no segregated accounts for System 2000 Participants. Contributions received from System 2000 Participants and Employer Contributions made on account of System 2000 Participants were pooled and invested by ERS together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the defined benefit structure of Act 447 and Act 1 of 1990 and the defined contribution structure of System 2000, as amended by Act 3-2013, were payable, and were paid, from the same pool of assets of ERS.

In April 2013, the Commonwealth enacted Act 3-2013 as a comprehensive reform of ERS to address the growing funding shortfalls that threatened the viability of ERS. The most important aspects of the changes effected to ERS by Act 3-2013 were the following: (i) in the case of active employees who were Act 447 Participants and Act 1 Participants (meaning, those entitled to the defined benefit plan, hired prior to January 1, 2000), all defined benefits accrued through June 30, 2013 were frozen, and thereafter all future benefits accrue under a defined contribution formula which will be paid at retirement through a lifetime annuity similar to System 2000; (ii) the retirement age for Act 447 Participants gradually increases from age 58 to age 61; (iii) the retirement age for System 2000 Participants gradually increases from age 60 to age 65; (iv) the

---

[85] Prior to the enactment of Act 106, the governance of ERS was vested in a Board of Trustees, which set policies and oversaw the operations consistent with applicable law. Act 106 dissolved the Board of Trustees and created a new Retirement Board, as discussed below.

retirement age for new employees increased to age 67, except for new state and municipal police officers, firefighters, and correctional officers, which will be age 58; (v) the employee contribution increased from 8.275% to 10%; (vi) in the case of System 2000 Participants, the retirement benefits will no longer be paid as a lump sum payment and instead will be paid in the form of a lifetime annuity; (vii) with respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 (and is eliminated for future retirees) and the summer bonus ($200) is eliminated; (viii) future retirees will not receive any other post-employment benefits; and (ix) disability and survivor benefits are modified. Additionally, cost of living adjustments (COLAs) were no longer issued following the enactment of Act 3. The overall impact of the reductions from Act 3 led to a reduction in GASB accrued liability in 2013 of $3.27 billion (or 13.5%).

As an integral part of the Act 3-2013 reform, the Commonwealth recognized that an additional annual employer contribution was necessary to maintain sufficient system assets to be able to meet benefit payments when due and maintain a minimum asset balance. As such, Act 3-2013 established an Additional Uniform Contribution ("ERS-AUC") for ERS that the Commonwealth and other participating employers would be required to make annually. The ERS-AUC was established at $120 million for Fiscal Year 2014, and for Fiscal Year 2015 through 2033 was to be the amount certified by ERS's external actuary at least 120 days prior to the start of each Fiscal Year as the amount necessary to avoid having the projected gross assets of ERS during any subsequent Fiscal Year fall below $1 billion. Due to the worsening fiscal crisis since the enactment of Act 3-2013, however, while certain public corporations and municipalities made their ERA-AUC payments, the Commonwealth and other participating employers were unable to pay most of the ERS-AUC and, as a result, ERS projected that it would deplete its liquid assets.

On August 23, 2017, the Legislature enacted Act 106, pursuant to which the Commonwealth adopted a "pay-as-you-go" system ("PayGo") for the payment of pension benefits to retirees of all three Retirement Systems. Act 106 contemplates that the three Retirement Systems would transfer their remaining liquid assets to a segregated PayGo account under the custody of the Department of Treasury. The Commonwealth and other participating instrumentalities were to contribute to the PayGo system in lieu of the prior statutory employer contributions payable to the Retirement Systems to reimburse pension payments made by the Commonwealth to retired participants in the Retirement Systems. Legally separate entities whose employees were receiving pension payments, such as the municipalities, were required to reimburse the Commonwealth the amounts necessary to meet pension benefit payments to their respective retirees. The Fiscal Year 2021 Certified Budget for the Commonwealth includes approximately $2.610 billion to cover the expense, of which $2.055 billion is paid for out of the General Fund budget and $555 million is paid for out of special revenue budgets funded by reimbursements from participating public corporations and municipal employers, pursuant to Act 106.

Act 106 also established a new defined contribution plan for all ERS active participants, as well as TRS's Act 160 participants (discussed below). Generally, the required employee contribution to their defined contribution plan accounts is 8.5%, and such contributions are to be held in individual segregated accounts. Act 106 sets forth corrective measures and criminal penalties if the corresponding PayGo contributions or employee payroll withholdings are not

remitted to the plan without cause. The individual retirement accounts mandated by Act 106 were established in June 2020, allowing employees to direct investments and manage their contributions to the plan.

Act 106 created a thirteen-member Retirement Board for ERS, TRS and JRS composed of: (1) the Executive Director of AAFAF, (2) the Secretary of the Treasury, (3) the Director of the Puerto Rico Office of Management and Budget ("OMB"), (4) the Director of the Human Resources and Transformation Office, (5) an active teacher of the Department of Education designated by the Governor, (6) a representative of public corporations designated by the Governor, (7) a representative from the Judicial Branch designated by the Chief Justice, (8) the President of the Federation of Mayors, (9) the President of the Association of Mayors, (10) a TRS retiree designated by the Governor, (11) an ERS retiree designated by the Governor, (12) a representative of police officers designated by the Governor, and (13) a representative of the public interest designated by the Governor. All powers of the trustee boards of ERS, TRS and JRS were transferred to the new Retirement Board and the independent boards were dissolved.

In 2013, the Commonwealth attempted to reform the TRS and JRS in a similar manner to the ERS through two separate statutes. Before 2013, the TRS consisted of a defined benefit pension plan. Act 160-2013 ("Act 160"), however, sought to freeze the TRS's defined benefit system and replace it with a defined contribution plan. The Puerto Rico Supreme Court rejected part of Act 160 and, as a result, the TRS administers two benefit structures: (i) a defined benefit plan for active employees hired on or before July 31, 2014, and (ii) a hybrid plan for employees hired on or after August 1, 2014 ("Act 160 Participants"), which were then transferred to the defined contribution plan under Act 106.

Act 162-2013 established a new hybrid retirement system (the "Hybrid Program") for judges appointed on or after July 1, 2014. The Hybrid Program includes both defined benefit and defined contribution components. The defined contribution component was structured along the lines of the ERS and TRS reforms and the benefit is based on the balance of the contributions credited to the participant's Hybrid Program account.

Consequently, the pension benefits ascribed to defined benefit participants in the TRS and JRS pension plans prior to 2014 have not been frozen, as discussed above. Pursuant to the Plan, as described below, all remaining defined benefits that continue to accrue under TRS and JRS will be frozen, and participants will be enrolled in the defined contribution plan under Act 106, or similar defined contribution plans.

In May 2019, the Commonwealth enacted Act 29-2019 which, among other things, rendered the Commonwealth solely responsible for PayGo payments to municipality retirees and eliminated the municipalities' obligation to reimburse the Commonwealth. On July 3, 2019, the Oversight Board commenced an action against the Governor to block enforcement or nullify Act 29 on several grounds including that the Commonwealth violated PROMESA sections 108(a)(2), 204, and 207.[86] Following legal proceedings initiated by the Oversight Board challenging the

---

[86] *See* section IV.C.3.h)(iv) of this Disclosure Statement for a discussion of the Oversight Board's action challenging Act 29-2019.

validity of Act 29-2019 under PROMESA, the Title III court ruled that Act 29-2019 violated PROMESA and nullified the law, thereby reinstating the municipalities' obligation to cover PayGo and healthcare payments for their employees. This ruling's consequences enabled the Commonwealth to seek reimbursement for prior payments made under Act 29-2019 and empowered the Commonwealth to act if these contributions are not received (e.g., to withhold payments for utilities, appropriations). The effective date of the court's ruling was delayed until May 7, 2020 to allow the parties to discuss potential solutions to the financial challenges faced by municipalities, particularly in light of the COVID-19 pandemic.

In July 2019, the Commonwealth enacted Act 71-2019, which granted the federal Social Security benefit to certain members of the Puerto Rico Police Bureau. This Law reduces from 8.5% to 2.3% the employee's contribution to his or her defined contribution account created under Law 106-2017. This 6.2% reduction is the minimum contribution that the employee must make to be eligible for Social Security. In the case of those members of the rank and file of the Puerto Rico Police Bureau who have less than ten (10) years left to qualify for mandatory retirement as established in Law No. 447 of May 15, 1951, as amended, the reduction does not apply optionally if they stated that they do not wish to benefit from it within the term provided therefor. The provisions of Act 71-2019 were fully implemented beginning in January 2020.

In August 2020, the Commonwealth enacted Act 80-2020 granting an incentivized retirement program for certain ERS participants, Act 81-2020 granting enhanced benefits to members of the Puerto Rico Police Ranking System, Fire Fighters Corps Bureau, Puerto Rico Custody Officers Corps, and medical emergency technicians of the Medical Emergency Corps Bureau and the Municipal Medical Emergency System, and Act 82-2020 granting credit to retirement benefits arising from unused sick leave balances for participants under the Teachers Retirement System. The Oversight Board has asked the Government to delay implementation of each of these laws until a full and accurate study has been performed to ensure that the Commonwealth has identified a significant source of savings to pay for the costs of the benefits provided under the laws. On November 20, 2020, the Commonwealth notified the Oversight Board that these laws would not be implemented until an agreement was reached with the Oversight Board concerning the financial viability of each Act. See additional discussion regarding these acts below.

ERS has approximately $3.17 billion of bond debt which the ERS bondholders assert is secured by certain assets at ERS and employer contributions to ERS. While Act 106 terminated employer contributions to ERS, the ERS bondholders asserted the new PayGo payments are the equivalent of employer contributions and they claim them as their collateral. On June 27, 2019, however, the Title III Court ruled the ERS bondholders do not have a perfected security interest in any post-petition employer contributions due to Bankruptcy Code section 552, and the First Circuit affirmed on January 30, 2020.[87] That ruling became final and non-appealable after the United States Supreme Court denied the ERS bondholders' request to review the First Circuit's opinion.

---

[87] *Opinion and Order Granting Plaintiff's Motion for Summary Judgment as to Count III and Counterclaims II and III, and Denying Defendants' Motion for Summary Judgment*, dated June 27, 2019 [Case No. 17-03566, ECF No. 251], 385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457 (1st Cir. 2020).

Previously, the Title III Court had ruled the ERS bondholders had never properly perfected any of their security interests but was reversed by the U.S. Court of Appeals for the First Circuit. The ERS bondholders have also asserted takings claims against the Commonwealth and the U.S. Government for having allegedly deprived them unconstitutionally of their original employer contributions. The Court of Federal Claims has ruled the ERS bondholders lack any takings claim against the U.S. Government; the takings claims against the Commonwealth have not been resolved on a final basis as of the date hereof.

3.    **PBA**

PBA is a public corporation created by Act No. 56 of June 19, 1958 (as amended, the "PBA Enabling Act"). PBA was created to design, construct, administer, and provide maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops, and related facilities leased to the Commonwealth or any of its departments, agencies, instrumentalities, public corporations, or municipalities. The annual rent for each leased building is based on the amounts needed by PBA to cover the payment of:

1. Principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings;

2. Operating and maintenance expenses of the buildings, including a reasonable proportional share of administrative expenses, excluding depreciation; and

3. Costs of equipment replacement and extraordinary repairs.

Component (1), referred to as "Debt Service Rent" under applicable leases between PBA and the Commonwealth, is tied to the annual principal and interest payments due on the PBA Bonds. Components (2) and (3), described above, are subject to escalation to permit PBA to recover the costs incurred. Amounts due from departments and governmental agencies of the Commonwealth may be subject to periodic revisions and/or adjustments based on the availability of funds at the Commonwealth level.

The PBA Enabling Act provides that the good faith and credit of the Commonwealth is pledged for the payment of rent under any lease agreement executed pursuant to the PBA Enabling Act with any department of the Commonwealth. The Enabling Act also provides that the Department of the Treasury of the Commonwealth of Puerto Rico (the "Treasury Department") will make advances to PBA for any unpaid portion of rent payable to PBA by any agency or instrumentality of the Commonwealth that has entered into lease agreements with PBA. Such advances are recorded as a reduction of accounts receivable since the responsibility of reimbursement belongs to the agency lessee in accordance with the PBA Enabling Act.

PBA was afforded broad powers under the PBA Enabling Act, including the power to make and execute contracts; acquire properties (including by eminent domain); prepare plans, projects, and cost estimates for construction, improvement, or repair of any property or facility; contract with Commonwealth departments, agencies, instrumentalities, public corporations or officials, or

any private persons or entities with regard to the administration of any properties or facilities of PBA; and borrow money and issue bonds.

PBA is governed by a seven-member board comprised of the Secretary of the Department of Transportation and Public Works ("DTPW"), the Secretary of the Department of Education of the Commonwealth, the Executive Director of AAFAF, and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate with staggered six-year terms. In January 2021, Andrés Rivera Martínez was appointed by Governor Pierluisi to serve as the Executive Director of the PBA.[88]

PBA has constructed over 200 office buildings, including police stations, courthouses, and related parking facilities, with approximately 6.8 million square feet of rentable space for the use of and lease by various departments, agencies, and instrumentalities of the Commonwealth, among others.

PBA has built 376 school buildings with approximately 20.3 million square feet of rentable space. All of the space part of the school buildings program is leased to the Department of Education. The construction cost for the school building program is in excess of $2.5 billion. The funding for the construction was primarily provided by PBA through the issuance of Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution. Additional school building and improvement plans are slated to occur.

PBA has also constructed 18 health facilities with approximately 1.5 million square feet of rentable space which has been leased to the Department of Health. The construction of the health facilities to date has cost approximately $203 million, provided primarily by PBA through the issuance of bonds. In conjunction with the Department of Correction and Rehabilitation (the "Department of Correction"), PBA began a program in 1994 to provide construction, operation, and maintenance of correctional facilities to be leased to the Department of Correction by PBA. PBA constructed eight correctional facilities with approximately 1.7 million square feet of rentable space that cost approximately $287 million. The facilities are operated by the Department of Correction.

PBA has also constructed office buildings, schools, and health facilities that are financed by federal grants and Commonwealth appropriations. PBA is also able to undertake construction on behalf of or as the agent of other public agencies of the Commonwealth.

As of February 2017, PBA had approximately $4 billion in aggregate principal amount of bonds outstanding, which are guaranteed by the Commonwealth. The PBA Bonds are the subject of various claims to be resolved under the Plan. Pursuant to the PBA Enabling Act and the resolutions governing PBA bond issuances, the PBA Bonds are payable from rent payments under the PBA's leases (and a few subleases) to tenants (the "PBA Leases"), and that rent is required to be sufficient, in the aggregate, to pay, when due, the principal of and interest on the PBA Bonds. The Oversight Board has alleged, however, that the PBA Leases are not true leases and obligations

---

[88] http://www.aep.gobierno.pr/det_content.asp?cn_id=67

purportedly due thereunder are simply mischaracterized general obligations of the Commonwealth. *See Complaint* [Adv. Proc. No. 18-00149, ECF No. 1] (the "PBA Lease Complaint"). PBA Bondholders have disputed the allegations raised in the PBA Lease Complaint. *See, e.g., Answers to Complaint* [Adv. Proc. No. 18-000149, ECF Nos. 56-60, 67]. If the Plan is confirmed, the Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the GO/PBA/PRIFA BANs claims is necessary as the Plan will effect a global settlement of any such dispute that is binding on all parties in interest in the Title III Cases.

## B.   Debtors' Financial Obligations as of the Petition Date

### 1.   Bond Resolutions and Outstanding Bonds

#### a)   Commonwealth's Public Debt

The Commonwealth Constitution includes specific provisions regarding "public debt,"[89] which includes (i) GO Bonds and notes issued by the Commonwealth and backed by the good faith, credit, and taxing power of the Commonwealth and (ii) bonds and notes issued by the Commonwealth's public instrumentalities and guaranteed by the good faith, credit, and taxing power of the Commonwealth (the "Commonwealth-Guaranteed Bonds").

Section 8 of Article VI of the Commonwealth Constitution provides "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." If the Commonwealth has insufficient funds to pay all approved appropriations for a given Fiscal Year, the Commonwealth Constitution requires that available resources of the Commonwealth be used to pay "public debt" before being used for other purposes. P.R. Const. art. VI, § 8. Furthermore, the Commonwealth Constitution empowers a holder of bonds or notes evidencing "public debt" to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of and interest on such public debt when due. P.R. Const. art. VI, § 2. The Commonwealth Constitution also provides for a limit on "public debt." The Commonwealth may not issue GO debt if the principal and interest on all such debt payable in any Fiscal Year, together with any amount paid by the Commonwealth in the prior Fiscal Year on account of bonds or notes guaranteed by the Commonwealth,[90] exceeds 15% of the average annual internal revenues of the Commonwealth in the two preceding Fiscal Years (internal revenues consist principally of income taxes, property taxes, excise taxes, the portion of SUT not pledged to COFINA). P.R. Const. art. VI, § 2.

---

[89] "Public debt" is also referred to herein as "General Obligations."

[90] Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% debt limitation has not been exceeded. Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the Commonwealth is required to make payments under its guarantee. Certain bondholders have alleged that payment of rent by the Commonwealth to the PBA under the PBA Leases are payments on account of obligations guaranteed by the Commonwealth and thus should be counted under the debt limit. *See Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth* [ECF No. 9730].

*Historically Conditionally Appropriated Monies Subject to Retention.* Certain excise and other taxes, and fee income of the Commonwealth has been historically conditionally appropriated to certain public corporations or other instrumentalities subject to the provision in section 8 of Article VI of the Commonwealth Constitution,[91] and may be subject to the Commonwealth's police power. These historically conditionally appropriated monies that, by the terms of the applicable governing bond documents and statutes, are subject to the Commonwealth's retention include (i) a portion of the federal excise tax on offshore shipments of rum, which is collected by the U.S. Government, covered over to the Puerto Rico Treasury Department, and a portion of the excise tax on petroleum products, both historically conditionally appropriated by Commonwealth law to PRIFA; (ii) vehicle license fees, excise taxes on gasoline, gas oil and diesel oil, a portion of the excise tax on petroleum products, and a portion of the excise tax on cigarettes, which were historically conditionally appropriated by Commonwealth law to HTA;[92] (iii) a portion of the excise tax on cigarettes, which was historically conditionally appropriated by Commonwealth law to MBA; and (iv) a portion of the hotel room tax, which was historically conditionally appropriated by Commonwealth law to CCDA. Since 2015, the Commonwealth has been retaining such monies pursuant to its constitutional powers. The retention and application of historically conditionally appropriated monies has been challenged by bondholders.[93]

PROMESA section 202 grants the Oversight Board power over the budget. The Oversight Board believes PROMESA section 4, among other provisions, preempts inconsistent Commonwealth laws, which include laws enacted prior to PROMESA that would conditionally appropriate certain Commonwealth monies to its instrumentalities in Fiscal Years where the Commonwealth is subject to the Oversight Board's certified budget. The historically conditionally appropriated monies were retained, and continue to be retained, by the Commonwealth during the Title III cases because the certified fiscal plans and budgets did not appropriate those monies to the respective instrumentalities, and the Oversight Board believes PROMESA preempted the existing statutes conditionally appropriating such monies to the respective instrumentalities. Moreover, the Oversight Board believes the existing statutes were enacted by prior legislatures and are not binding on the current legislature, whether preempted or not.[94]

---

[91] *See* Financial Information and Operating Data Report, p.178, COMMONWEALTH OF PUERTO RICO (December 18, 2016).

[92] A portion of the vehicle license fees are turned over to PRIFA from HTA pursuant to the Financial Assistance Agreement, dated March 1, 2015, between HTA and PRIFA.

[93] *See, e.g.,* section III.B.1 and V.E.4 for more information.

[94] Creditors of HTA, CCDA, and PRIFA dispute this position. See Section V.F.5 of this Disclosure Statement for a summary of such dispute.

The GDB Debt Recovery Authority disagrees with the Oversight Board's position or characterization regarding preemption and will take the position, in connection with confirmation of the Plan, that PROMESA does not preempt Acts 30 and 31. In addition, the GDB Debt Recovery Authority asserts that the Commonwealth did not satisfy the requirements of Article VI, Section 8 of the Puerto Rico Constitution (and other applicable Commonwealth statutes) when it retained certain allocated revenues. Moreover, the GDB Debt Recovery Authority does not believe that the excise tax revenues are legislative appropriations that may be rescinded in the absence of legislative action by the Commonwealth.

*Bond Resolution.*   GO Bonds are issued under specific authorizing legislation or Act No. 33 of December 7, 1942 (as amended, "Act 33"), and pursuant to resolutions authorizing the issuance of such bonds.

*Outstanding Bonds and Other Obligations.*[95]   Currently outstanding GO Bonds[96] were issued between 1998 and 2014, bearing interest rates between 1.86% and 8.00%, and maturing between July 1, 2016 and July 1, 2041.   As of the Commonwealth Petition Date, the Commonwealth had outstanding approximately $12.57 billion aggregate principal amount[97] of GO Bonds.   Approximately $1,647,320,000.00 of the GO Bonds are insured by Assured Guaranty Corp., Assured Guaranty Municipal Corp., and/or their affiliates (collectively, "Assured"), $840,228,793.15 are insured by National, $249,090,000 are insured by Financial Guaranty Insurance Co. ("FGIC"), $24,960,000 are insured by Ambac Assurance Corp. ("Ambac"), and $25,585,000.00 are insured by Syncora Guarantee Inc. ("Syncora").[98]   A schedule of the Commonwealth's outstanding GO Bonds is attached as Exhibit J.

As of the Commonwealth Petition Date, the Commonwealth had outstanding approximately $169.4 million aggregate principal amounts of loans from the GDB, which were subsequently transferred to the Debt Recovery Authority for the Government Development Bank (the "GDB Debt Recovery Authority") pursuant to the GDB's Qualifying Modification (defined below).   Such loans were issued by the Commonwealth pursuant to legislation authorizing the

The GDB Debt Recovery Authority contends that the Clawback Executive Orders and the moratorium legislation that was put into effect beginning in 2016 in response to the Commonwealth's fiscal crisis were unlawful even though they were purportedly made pursuant to Article VI, Section 8 and/or Article II, Section 19 of the Puerto Rico Constitution, and that an unconstitutional diversion of revenues has continued during the Title III proceedings for the Commonwealth and HTA.

[95]   Amounts of outstanding bonds are based on best available public information and may be approximate.

[96]   The Commonwealth's outstanding GO Bonds consist of the following: (i) Public Improvement Refunding Bonds, Series 1998, (ii) Public Improvement Bonds of 1998, (iii) Public Improvement Bonds of 1999, (iv) Public Improvement Refunding Bonds, Series 2000, (v) Public Improvement Bonds of 2001, Series A, (vi) Public Improvement Refunding Bonds, Series 2001, (vii) Public Improvement Refunding Bonds, Series 2002 A, (viii) Public Improvement Bonds of 2002, Series A, (ix) Public Improvement Bonds of 2003, Series A, (x) Public Improvement Refunding Bonds, Series 2003 A, (xi) Public Improvement Bonds of 2003, Series C-7, (xii) Public Improvement Bonds of 2004, Series A, (xiii) Public Improvement Bonds of 2005, Series A, (xiv) Public Improvement Refunding Bonds, Series 2006 A, (xv) Public Improvement Bonds of 2006, Series A, (xvi) Public Improvement Refunding Bonds, Series 2006 B, (xvii) Public Improvement Bonds of 2006, Series B, (xviii) Public Improvement Bonds of 2007, Series A, (xix) Public Improvement Refunding Bonds, Series 2007A, (xx) Public Improvement Refunding Bonds, Series 2007A-4, (xxi) Public Improvement Refunding Bonds, Series 2008 C, (xxii) Public Improvement Refunding Bonds, Series 2008 A, (xxiii) Public Improvement Bonds of 2008, Series A, (xxiv) Public Improvement Refunding Bonds, Series 2009 A, (xxv) Public Improvement Refunding Bonds, Series 2009 B, (xxvi) Public Improvement Refunding Bonds, Series 2009 C, (xxvii) Public Improvement Refunding Bonds, Series 2011 A, (xxviii) Public Improvement Refunding Bonds, Series 2011 C, (xxix) Public Improvement Bonds, Series 2011, (xxx) Public Improvement Refunding Bonds, Series 2011 D, (xxxi) Public Improvement Refunding Bonds, Series 2011 E, (xxxii) Public Improvement Refunding Bonds, Series 2012 B, (xxxiii) Public Improvement Refunding Bonds, Series 2012 A, and (xxxiv) Public Improvement Refunding Bonds, Series 2014 A.

[97]   For capital appreciation bonds, this amount includes the accreted value as of the Commonwealth Petition Date.

[98]   Amounts include bonds insured pursuant to a secondary market insurance policy, if any.

Commonwealth to issue such debt and to pledge its good faith, credit, and taxing power for the repayment thereof. These loans bear interest at a variable rate equal to the U.S. Prime Rate, plus 150 basis points, subject to a floor of 6% and a legal interest rate limit of 12%, and mature on June 30, 2041, 2042, and 2043. For a summary of the GDB's Qualifying Modification under Title VI of PROMESA, *see* section V.J.1.g) of this Disclosure Statement.

On December 26, 2013, the General Services Administration of the Commonwealth ("GSA") entered into a credit agreement with Scotiabank de Puerto Rico ("Scotiabank"), whereby Scotiabank extended GSA a non-revolving term loan up to a maximum of $33,270,451 for the purchase of four helicopters to be used by the Puerto Rico Police Department. This loan is unsecured, bearing interest at 3.02% and matured on July 15, 2020.

Based on the latest publicly available reports, as of the Commonwealth Petition Date, the Commonwealth had outstanding the following approximate amounts of Commonwealth Guaranteed Obligations: (i) $4 billion in PBA Bonds, (ii) $1.26 billion in PRASA Subordinated Bonds,[99] (iii) $226 million in Port of the Americas Authority ("APLA") Bonds, and (iv) $78 million in PRIFA BANs.

Pursuant to Executive Order 2016-30 issued under Act No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (as amended, the "Moratorium Act"), the Governor declared the Commonwealth to be in a state of emergency, suspended payment of interest and principal on all Commonwealth GO Bonds, suspended payments by the Commonwealth of Commonwealth-Guaranteed Obligations and stayed all actions, including suits against the Secretary of the Treasury, to collect on such bonds and notes. On January 29, 2017, the Governor signed into law Act No. 5 of 2017, known as the Puerto Rico Fiscal Emergency and Fiscal Responsibility Act (as amended, "Act 5-2017"), which repealed certain provisions of the Moratorium Act and authorized additional emergency measures. Pursuant to Act 5-2017, however, the executive orders issued under the Moratorium Act would continue in effect until amended, rescinded, or superseded. The emergency period under Act 5-2017 was set to expire December 31, 2019. On January 8, 2020, June 30, 2020, and December 17, 2020, Governor Vázquez Garced issued executive orders extending the emergency period for additional six month periods. Currently, the emergency period is scheduled to expire on June 30, 2021. Some additional powers provided to the Governor through Act 5-2017 included authority to (i) exercise receivership powers to rectify the financial emergency, (ii) exercise general supervisory control over the functions and activities of all government entities within the Executive Branch, and (iii) issue executive orders to implement and enforce compliance with Act 5-2017.

Since July 1, 2016, the Commonwealth has not paid interest or principal on its GO Bonds or Commonwealth-Guaranteed Obligations.[100]

---

[99] The PRASA Subordinated Bonds were refinanced in whole by PRASA in December 2020 and are no longer outstanding.

[100] Based on publicly available information, certain issuances were paid from Commonwealth reserve funds.

*Litigations Related to GO Bonds.*[101]

       (i)     *Aurelius Capital Master, Ltd., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00189[102]

On June 29, 2017, certain holders of GO Bonds and bonds issued by certain Commonwealth instrumentalities that are allegedly guaranteed by the Commonwealth filed a complaint in the Title III Court against the Commonwealth and the Oversight Board seeking declaratory and injunctive relief [Adv. Proc. No. 17-00189, ECF No. 1]. Among other things, the complaint sought declarations that (i) certain property tax and other monies historically conditionally appropriated to certain instrumentalities (collectively, the "Monies") can be applied only to pay public debt; (ii) the Commonwealth lacks an equitable or beneficial property interest in the Monies, and Plaintiffs have statutory liens on the Monies; (iii) Plaintiffs' alleged liens on historically conditionally appropriated monies are liens on special revenues; (iv) the Commonwealth's use of the Monies for any purpose other than to pay the public debt is an unconstitutional taking; and (v) the Monies must be segregated and cannot be used for any purpose other than paying public debt. Plaintiffs also sought an injunction requiring Defendants to segregate and preserve the Monies.

Defendants filed a motion to dismiss the complaint on August 21, 2017 [Adv. Proc. No. 17-00189, ECF No. 35]. Defendants principally argued the claims were precluded by PROMESA section 305, which bars the Title III Court from interfering with property of the Commonwealth without the Oversight Board's consent. Defendants also argued: (i) certain claims were precluded by PROMESA sections 4 and 106(e); (ii) Plaintiffs have no property interests in or liens against the Monies; and (iii) the Commonwealth Constitution does not create a property right recoverable under its debt-repayment priority scheme. On January 30, 2018, the Title III Court granted the Defendants' motion and dismissed the action,[103] holding that (i) certain claims sought impermissible advisory opinions because they were vague or would not resolve any current concrete dispute, (ii) the Takings Clause claim was not ripe because the Commonwealth had not yet proposed how it would compensate Plaintiffs for their alleged collateral in a plan of adjustment, and (iii) other claims were barred by PROMESA section 305 because they would interfere with the Commonwealth's use of its property, revenues, or governmental powers without the consent of the Oversight Board [Adv. Proc. No. 17-00189, ECF No. 124]. On February 1, 2018, Plaintiffs appealed the Title III Court's decision to the U.S. Court of Appeals for the First Circuit, docketed as Case No. 18-1108. On March 26, 2019, the First Circuit issued a written opinion affirming the Title III Court's dismissal of the complaint.[104]

---

[101] If the Plan is confirmed, the Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the GO/PBA/PRIFA BANs claims is appropriate as the Plan will effect a global settlement of any such dispute that is binding on all parties in interest in the Title III Cases.

[102] Opinion available at 918 F.3d 638 (D.P.R. 2019).

[103] Opinion available at 582 B.R. 579 (D.P.R. 2018).

[104] *Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121, 124 (1st Cir. 2019).

    (ii)  Challenges to the Validity of the GO Bonds and Commonwealth Guarantees

    On January 14, 2019, the Oversight Board, through its Special Claims Committee, and jointly with the Official Committee of Unsecured Creditors (the "UCC"),[105] filed an omnibus objection to more than $6 billion of claims asserted by certain GO Bondholders [ECF No. 4784]. The omnibus objection alleged claims of holders of 2012 and 2014 issuances of GO Bonds should be disallowed because those issuances violated the Commonwealth's Constitutional Debt Limit.[106] Subsequently, the UCC and other parties filed objections to additional claims relating to GO and PBA bonds and other bonds guaranteed by the Commonwealth, which objections assert similar legal theories. To provide procedural due process to all purported holders of the GO Bonds, the UCC and the Oversight Board filed a motion to establish procedures with respect to their omnibus objection, which the Title III Court granted [ECF No. 5143]. The Oversight Board and the UCC subsequently filed eight adversary proceedings against approximately 450 purported beneficial owners of the bonds identified by pseudonym and approximately 120 banks disclosed as record holders, seeking to expand the number of bond issuances and CUSIPs alleged to be invalid and seeking to claw back principal and interest payments with respect to the challenged bonds. On July 24, 2019, the Title III Court issued the *Order Regarding Stay Period and Mandatory Mediation* [ECF No. 8244] (the "Stay Order"),[107] which, among other things, stayed the litigation through November 30, 2019, which stay was subsequently extended through March 11, 2020. Notwithstanding the stay, on December 19, 2019, the Title III Court issued an interim case management order [ECF No. 9619] (the "Interim GO/PBA CMO") permitting certain proceedings related to GO Bonds to move forward, including certain issues raised by this objection. Pursuant to that order, on February 5, 2020, Assured, the Ad Hoc Group of Constitutional Debt Holders, the Ad Hoc Group of General Obligation Bondholders, and the Invesco Funds filed a motion to dismiss [ECF No. 10702], and Assured, the Ad Hoc Group of Constitutional Debt Holders, and the Ad Hoc Group of General Obligation Bondholders filed a supplemental memorandum in support thereof [ECF No. 10704]. Also on February 5, 2020, the Lawful Constitutional Debt Coalition filed separate motions to dismiss [ECF No. 10697], and the Qualified School Tax Credit Bonds Noteholder Group (the "QTCB Noteholder Group") joined in part [ECF No. 10705], Assured's, the Ad Hoc Group of Constitutional Debt Holders', the Ad Hoc Group of General Obligation Bondholders', and the Invesco Funds' motion, and on February 19, 2020, a number of parties filed joinders and supplemental motions.[108] On February 10, 2020, the Mediation Team

---

[105]  On June 15, 2017, the U.S. Trustee appointed the UCC in all of the Title III Cases except COFINA. *Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico*, [ECF No. 338].

[106] For instance, on May 21, 2019, the UCC filed the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds*, [ECF No. 7057], challenging the validity of the 2011 GO Bonds on the same grounds as in the Joint Claim Objection (as defined and discussed below). *See* section V.H.7 of this Disclosure Statement for a detailed description of the various objections.

[107] *See* section V.I of this Disclosure Statement for a detailed summary of the Stay Order.

[108] The joinders and motions to dismiss include, *The UBS Trust Company of Puerto Rico, Representing Several Trusts That Hold Certain Commonwealth General Obligation Bonds, Joinder to "Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp., and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted By Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds"*

filed its Amended Report,[109] recommending that this litigation remain stayed to provide the Debtors an opportunity to confirm and consummate the Plan, which would, among other things, resolve all challenges to the validity, priority, and secured status of the GO Bonds and the Commonwealth-Guaranteed Bonds.[110] Following a hearing on March 4, 2020, the Title III Court entered the Final Stay and Mediation Order [ECF No. 12189], which adopted the Mediation Team's recommendation and stayed this litigation pending a decision whether to confirm the Amended Plan. The stay remains in effect at this time. For more information regarding the Final Stay and Mediation Order, *see* section V.I.3.b).

(iii)   <u>Challenges to the Secured Status of the GO Bonds</u>

On May 2, 2019, the Oversight Board, through its Special Claims Committee, and jointly with the UCC, filed seven complaints[111] against more than 450 Defendants seeking declarations that the Defendant holders of bonds issued or guaranteed by the Commonwealth have entirely unsecured claims (to the extent their claims are valid at all), and do not possess liens against any of the Commonwealth's property, including, without limitation, on (i) the Commonwealth's good faith, credit, and taxing power, (ii) the Commonwealth's "available resources" (as referenced in the Commonwealth Constitution Article VI, section 8), (iii) certain monies historically conditionally appropriated to the Commonwealth's instrumentalities under Puerto Rico law, and (iv) property tax revenues authorized under Puerto Rico Act 83-1991. These adversary proceedings also seek judgments (i) declaring the Commonwealth's interest in its property is entitled to priority over any interest the Defendant bondholders claim to possess in the Commonwealth's property, (ii) avoiding any liens bondholders claim to possess pursuant to the

---

[ECF No. 11251]; *The Bank of Nova Scotia's Joinder and Supplemental Motion to Dismiss the Official Committee of Unsecured Creditors' Objection to the Bank of Nova Scotia's Proof of Claim No. 47658 on Constitutional Debt Limit Grounds* [ECF No. 11261]; *Motion of the PRIFA BANs Bondholders to Dismiss the Omnibus Objections Filed by the Official Committee of Unsecured Creditors and the Lawful Constitutional Debt Coalition with Respect to the PRIFA BANs Guaranty* [ECF No. 11267]; *Joinder of the Bank of New York Mellon, as Trustee, to Motion of the PRIFA BANs Bondholders to Dismiss the Omnibus Objections Filed by the Official Committee of Unsecured Creditors and the Lawful Constitutional Debt Coalition with Respect to the PRIFA BANs Guaranty* [ECF No. 11281]; *Cooperativa de Ahorro y Credito Naguabena's Motion to Join the Motion of the PRIFA BANs Bondholders to Dismiss the Omnibus Objections Filed by the Official Committee of Unsecured Creditors and the Lawful Constitutional Debt Coalition. [Dkt. No. 11267]* [ECF No. 11292]; *Joint Motion Requesting Dismissal of "Omnibus Objections" to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 11258] (the "<u>Cooperative Motion</u>"); *DRA Parties' Motion to Dismiss (I) Official Committee of Unsecured Creditors' Objection on Constitutional Debt Limit Grounds to Claim Of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority [Dkt. No. 9735] And (II) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant To Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth [Dkt. No. 9730]* [ECF No. 11260].

[109] As defined in section V.I below.

[110] *See* section V.I. of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended Report.

[111] Adv. Proc. No. 19-00291 through 19-00297.

Bankruptcy Code's avoidance powers, and (iii) disallowing all secured claims filed against the Commonwealth by the Defendant bondholders.

On May 7, 2019, the Oversight Board and the UCC filed a joint motion seeking to (i) extend the deadlines to serve the Defendants in these adversary proceedings and (ii) stay the adversary proceedings until Plaintiffs or any Defendant requests to resume the proceeding for good cause [ECF No. 6857]. Several parties filed objections.[112] On June 13, 2019, the Title III Court partially granted the joint motion and extended the deadline to serve the Defendants and stayed the adversary proceedings until September 1, 2019 [ECF No. 7426]. On July 24, 2019, the Title III Court issued the Stay Order, which stay was extended through March 11, 2020.[113] Notwithstanding the stay, pursuant to the Interim GO/PBA CMO, on February 5, 2020, Assured and National filed a motion to dismiss [Adv. Proc. No. 19-00291, ECF No. 53], and numerous other parties filed joinders to motions to dismiss already on file. In addition, multiple *pro se* defendants have filed answers to the complaints in these adversary proceedings. On February 10, 2020, the Mediation Team filed its Amended Report, recommending that this litigation be stayed.[114] On February 19, 2020, also pursuant to the GO/PBA CMO, certain Cooperativas filed motions to dismiss [No. 11258]. Following a hearing on March 4, 2020, the Title III Court entered the Final Stay and Mediation Order on March 10, 2020, which adopted the Mediation Team's recommendation and stayed this litigation pending a decision whether to confirm the Amended Plan [Adv. Proc. No. 19-00291, ECF No. 57]. For more information regarding the Final Stay and Mediation Order, *see* section V.I.3.b).

(iv)    Challenges to the Priority of the GO Bonds

On February 3, 2020, the UCC filed an omnibus objection to proofs of claim filed by certain GO bondholders asserting priority over Commonwealth unsecured creditors [ECF No. 10638] (the "UCC GO Priority Objection"). The UCC GO Priority Objection seeks an order reclassifying claims on account of GO Bonds or Commonwealth-Guaranteed Obligations as general unsecured claims, and ruling that such claims are not entitled to priority over the claims of other general

---

[112] The objections include, *Objection of Financial Guaranty Insurance Company to Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and Its Special Claims Committee to Extend Time for Service of Summonses and Complaints and to Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds [Dkt. # 6857]* [ECF No. 7114]; *Objection of the Ad Hoc Group of General Obligation Bondholders to the Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and Its Special Claims Committee to Extend Time for Service of Summonses and Complaints and to Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds* [ECF No. 7118]; *Limited Objection and Reservation of Rights of Assured Guaranty Corp. and Assured Guaranty Municipal Corp. with Respect to Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and Its Special Claims Committee to Extend Time for Service of Summonses and Complaints and to Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds* [ECF No. 7119]; *Ambac Assurance Corporation's Objection to the Motion of Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and Its Special Claims Committee to Extend Time For Service of Summonses and Complaints and to Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds* [ECF No. 7135].

[113] *See* section V.I. of this Disclosure Statement for a detailed summary of the Stay Order.

[114] *See* section V.I.3.a) of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended Report.

unsecured creditors.  The UCC GO Priority Objection seeks reclassification because, according to
the UCC, payment priorities created by Puerto Rico law are preempted by PROMESA in the
Commonwealth's Title III case, and are "antithetical" to the overall purpose of PROMESA, the
Bankruptcy Code, and the specific provisions of the Bankruptcy Code incorporated into
PROMESA. In light of that, the UCC contends that the GO bondholders are thus not entitled to a
recovery greater than that received by other general unsecured claimholders.  Moreover, according
to the UCC, PROMESA section 201's requirement that a fiscal plan "respect the relative lawful
priorities" of debt does not establish that the GO Bonds have priority, because the requirement is
found in Title II of PROMESA, not Title III, and therefore does not apply once a Title III case is
filed because it would be "inconsistent with the section 507(a)(2) priority scheme incorporated
into Title III." UCC GO Priority Objection at 14.

On February 9, 2020, the UCC filed a motion seeking to set a briefing schedule for the
UCC GO Priority Objection and to approve forms of notice to affected claimholders [ECF No.
10754] (the "Priority Objection Procedures Motion").  There, the UCC argued that, because the
issues raised by the UCC GO Priority Objection are pure questions of law, no discovery was
needed and the matter could proceed to prompt dispositive motion practice. On February 10, 2020,
the Mediation Team filed its Amended Report, recommending that this litigation be stayed.[115]  The
Oversight Board, the GO/PBA PSA Creditors, and Peter Hein filed objections to the Priority
Objection Procedures Motion [ECF Nos. 11462, 11133, 11150].  The Oversight Board argued the
Priority Objection should be stayed because the Plan would settle the relevant claims, and the UCC
lacked standing to assert claim objections.  The UCC filed a reply in support of its Priority
Objection Procedures Motion on February 26, 2020, arguing that whether the GO Bonds are
entitled to priority is a "gating issue" that needs to be addressed prior to confirmation of the Plan
of Adjustment, and that standing is a legal question that is relevant to the Objection and not the
Procedures Motion [ECF No. 11773].  Following a hearing on March 4, 2020, the Title III Court
entered the Final Stay and Mediation Order on March 10, 2020, which adopted the Mediation
Team's recommendation and stayed this litigation pending a decision whether to confirm the
Amended Plan [ECF No. 12191].  For more information regarding the Final Stay and Mediation
Order, *see* section V.I.3.b).

On July 19, 2020, the UCC filed an urgent motion to modify the Final Stay and Mediation
Order to allow it to pursue the UCC GO Priority Objection.  The UCC argued the basis for the
Court staying the UCC GO Priority Objection—the avoidance of unnecessary litigation of issues
that would be resolved if the Plan of Adjustment were ultimately confirmed—no longer existed
because, according to the UCC, certain economic developments precluded confirmation of the
proposed Plan of Adjustment [ECF No. 13726].  The urgent motion was fully briefed [ECF Nos.
14141, 14142, 14237].  On September 17, 2020, the Title III Court issued an order denying the
UCC's urgent motion to modify the Final Stay and Mediation Order without prejudice [ECF No.
14331].  On October 2, 2020, the UCC filed a motion for reconsideration of the Title III Court's
September 17, 2020 order [ECF No. 14444].  On October 5, 2020, the Title III Court issued an
order denying the UCC's motion for reconsideration [ECF No. 14452].  On October 16, 2020, the
UCC filed a notice of appeal to the First Circuit Court of Appeals of the Title III Court's orders

---

[115] *See* section V.J.9 of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended
Report.

denying the lift stay motion and the motion for reconsideration [ECF No. 14590]. On October 21, 2020, the appeal was docketed in the First Circuit Court of Appeals as Case No. 20-2014 and the, the UCC filed a motion for an expedited briefing schedule and an expedited determination. The Oversight Board opposed the UCC's motion on October 28, 2020, and on October 29, 2020, the UCC filed a reply in support of its motion. On November 9, 2020, the First Circuit issued an order directing the parties to file briefs regarding whether the First Circuit has jurisdiction to consider the appeal. On November 23, 2020, the UCC filed a response to the First Circuit's order, arguing the Title III Court's denial of the lift stay motion was appealable as a final order analogous to an order denying a motion for relief from an automatic stay and, alternatively, as an order having the practical effect of an injunction. On December 10, 2020, the Oversight Board filed a response to the First Circuit's order, arguing (i) denial of the lift stay motion was not final because the Title III Court did not resolve the GO Priority Objection and simply postponed when it would be heard, and (ii) the order was not an injunction given that it concerned only the sequence in which the Title III Court would consider issues. On December 14, 2020, the UCC filed a reply in support of its response to the First Circuit's order. On February 22, 2021, the First Circuit issued a judgment dismissing the appeal for lack of jurisdiction. On March 15, 2021, the First Circuit issued its mandate.

### b)   ERS Debt

Commencing on January 24, 2008, ERS issued its senior pension funding bonds (the "ERS Bonds")[116] as limited, non-recourse obligations of ERS payable solely from, and purportedly secured solely by, certain employer contributions made to ERS by participating employers in the ERS pension plans. The purpose of this offering was to increase the assets of ERS available to invest and pay benefits.

The ERS Bonds were purportedly issued pursuant to the ERS Enabling Act, Act No. 447 of May 15, 1951, and the Pension Funding Bond Resolution, adopted by the Board of Trustees of ERS on January 24, 2008 (as amended, the "ERS General Resolution"). Each series of the ERS Bonds was further issued pursuant to three supplemental resolutions adopted by the ERS Board of Trustees. These supplemental resolutions provided for the issuance and terms of each series of ERS Bonds. Under the General Resolution and supplemental resolutions (collectively, the "ERS Resolution"), the Bank of New York Mellon ("BNYM") acts as fiscal agent for the ERS Bonds.

*Outstanding Bonds.*[117] The ERS Bonds bear interest rates between 5.85% and 6.55%, and mature between July 1, 2023 and July 1, 2058. As of the ERS Petition Date, ERS had outstanding $3.17 billion aggregate principal amount of its ERS Bonds issued under the ERS Resolution.[118]

---

[116] ERS's outstanding ERS Bonds consist of the following: (i) Senior Pension Funding Bonds, Series A (the "Series 2008A Bonds"), (ii) Senior Pension Funding Bonds, Series B (the "Series 2008B Bonds"), and (iii) Senior Pension Funding Bonds, Series C (the "Series 2008C Bonds"). These series are further discussed in the Analysis of the Pensions for the Commonwealth of Puerto Rico (May 2019), attached to this Disclosure Statement as Exhibit I (the "Pension Report").

[117] Amounts of outstanding bonds are based on best available public information and may be approximate.

[118] For capital appreciation bonds, this amount includes the accreted value as of the ERS Commencement Date.

All of the ERS Bonds are uninsured.  A schedule of outstanding  ERS Bonds is attached as Exhibit J.

Pursuant to Executive  Order 2016-31,  issued under the Moratorium Act, the then Governor suspended the Commonwealth's  obligation  to ERS related to pledged funds (up to an amount equal to the debt service payable by ERS during Fiscal Years 2016-2017) and suspended ERS's obligation  to transfer pledged funds to the trustee under the ERS Resolution.

*Litigations Related to ERS Bonds.*  The ERS Bonds were challenged  in several related adversary proceedings described below.  These adversary proceedings have all centered on the same issues: whether the ERS Bonds were validly  issued pursuant to the ERS Enabling  Act, the scope of ERS bondholders' alleged security interest in collateral for the ERS Bonds, and the degree to which perfection of those alleged security interests has occurred.

(i)    *Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Proc. No. 17-00213

On May 31, 2017, certain ERS bondholders  filed a motion  seeking  relief from the Title III automatic  stay [Case No. 17-bk-3566,  ECF No. 26] (the "Adequate Protection Motion").  ERS opposed the Adequate Protection Motion, asserting, among other things, that the security interests against the pledged  property claimed by the ERS bondholders  were not properly perfected.

Following  negotiations  among the parties, ERS and the ERS bondholders  agreed to the terms of a stipulation,  which was ordered by the Title III Court [Case No. 17-bk-3566,  ECF Nos. 170, 171].  The stipulation  provided for adequate protection payments regarding the ERS bondholders' alleged  security interests, established  a post-petition  segregated account, and contemplated ERS would file a complaint by July 21, 2017.  The stipulation also contemplated interest on the ERS Bonds would be paid when due from the segregated account established pursuant to a January 17, 2017 stipulation  and that no further transfers from ERS should be made to such account.  Pursuant to a series of further stipulations  between ERS and the ERS bondholders, ERS made adequate protection payments in the amount of debt service due on its bonds in full from a segregated account through June 2018, subject to a reservation of rights.  The assets in this segregated account were depleted in July 2018 and no additional  payments were made.  Pursuant to the stipulations,  ERS made payments of approximately $200 million  to ERS bondholders, and deposited approximately  $92 million  in the post-petition  segregated account.

On July 21, 2017, ERS, through the Oversight Board, commenced an adversary proceeding, styled *Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC*, Adv. Proc. No. 17-00213 (the "Lien-Challenge  AP").  Defendants are various ERS bondholders  who asserted security interests in a security agreement pursuant to the pension bond funding  resolution  of 2008.  ERS sought (i) declaratory  judgment determining  (a) the scope of any lien and invalidating  Defendants' unperfected  security interests in property of ERS; (b) that any perfected prepetition  security interests do not attach to assets received by ERS since the commencement of its Title III case pursuant to Bankruptcy  Code section 552; (c) that ERS has complied  with its obligations  to certain bondholders  to place pledged property into a segregated account; and (ii) an order directing funds

deposited in an account established by stipulation of the parties be remitted to the Commonwealth.
ERS argued that the security interests claimed by Defendants in ERS's assets were not properly
perfected because, among other things, the collateral description contained in the financing
statements describing the collateral only as "pledged property" was too vague to reasonably
identify the collateral.

The Defendant bondholders filed counterclaims, seeking a judgment that (i) their security
interests were properly perfected, (ii) their security interests were not avoidable in the Title III
case, (iii) PROMESA could not be applied retroactively to eliminate the security interests, (iv)
"pledged property" encompassed various categories of property, and (v) employer contributions
were special revenues under Bankruptcy Code section 928(a) that remained subject to a lien post-
petition [Adv. Proc. No. 17-00213, ECF No. 36].

On November 3, 2017, ERS and the Defendants filed cross-motions for summary judgment
[Adv. Proc. No. 17-00213, ECF Nos. 91, 94]. On August 17, 2018, the Title III Court issued its
*Opinion and Order Granting and Denying in Part Cross Motions for Summary Judgment* [Adv.
Proc. No. 17-00213, ECF No. 215] (the "MSJ Order"), holding (i) the ERS Bondholders' security
interests were unperfected because the applicable financing statements did not contain an adequate
collateral description as required under the Uniform Commercial Code, (ii) purported amendments
to those financing statements failed to identify the debtor by its correct name as required by the
Uniform Commercial Code, (iii) the Oversight Board could avoid the Defendants' unperfected
security interests pursuant to Bankruptcy Code section 544(a), which allows the trustee to avoid
any transfer property or obligation of the debtor in certain instances (applicable in Title III case
pursuant to PROMESA section 301(a)), and (iv) ERS Debtor did not violate a stipulation
pertaining to employer contributions because it had no obligation to segregate the funds after May
1, 2017.

On July 3, 2018, prior to the Title III Court rendering its determination on the cross-motions
for summary judgment, the ERS bondholders filed the *Motion of Certain Secured Creditors of the
Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief
from the Automatic Stay* [ECF No. 3418] (the "Second Adequate Protection Motion"), requesting
relief from the automatic stay, or in the alternative, for adequate protection of their liens against
property of ERS, in which the Commonwealth claims an interest. On August 17, 2018, based upon
the Title III Court's decision on the cross-motions for summary judgment, the Title III Court
denied the Second Adequate Protection Motion [ECF No. 3793].

On September 6, 2018, the Defendants appealed the MSJ Order and the order denying their
Second Adequate Protection Motion. On January 30, 2019, the First Circuit issued an opinion
affirming in part, reversing in part, and vacating in part the MSJ Order. The First Circuit
determined the Defendants met the requirements for perfection of the alleged security interests as
of December 17, 2015, and it remanded to the Title III Court for further consideration. The First
Circuit affirmed the dismissal of the claims regarding the January 17, 2017 stipulation. On April
30, 2019, ERS filed a petition for certiorari to the United States Supreme Court concerning whether
the ERS bondholders' asserted security interests were perfected (docketed as Case No. 18-1389).
The petition was denied on October 7, 2019.

On April 2, 2019, ERS filed the Motion of Debtor for Leave to File an Amended and Supplemented Adversary Complaint (the "Motion to Amend") [Adv. Proc. No. 17-00213, ECF No. 236], requesting the Title III Court grant ERS leave to file an amended complaint to raise issues concerning the nature and extent of the security interests alleged and the proper method of perfection of any security interest, and determine whether Bankruptcy Code section 552(a) operates to prevent the ERS bondholders' asserted lien from attaching to Employers' Contributions generated and received post-petition (the "Undecided Issue"). On May 6, 2019, the Title III Court denied in part and granted in part the Motion to Amend, granting ERS's request to determine the Undecided Issue, but denying ERS's motion insofar as it sought leave to amend the complaint in the Lien-Challenge AP, without prejudice to the filing of a new complaint [Adv. Proc. No. 17-00213, ECF No. 248].

On June 27, 2019, the Title III Court issued an order deciding the Undecided Issue [Adv. Proc. No. 17-00213, ECF No. 251] (the "Section 552 Order"). In the Section 552 Order, the Title III Court granted summary judgment in favor of ERS, holding that Bankruptcy Code section 552 prevents any security interest resulting from liens granted in ERS bondholders' favor prior to the ERS Petition Date from attaching to revenues generated and received by ERS during the post-petition period. That order also held that Employers' Contributions were not special revenues as defined by Bankruptcy Code section 902(a) and (d), and that Bankruptcy Code section 552 should not be construed as applying to only security interests granted after PROMESA's enactment. On July 8, 2019, the Title III Court issued an order and judgment closing the case [Adv. Proc. No. 17-00213, ECF No. 253]. On July 9, 2019, Defendant ERS bondholders filed notices of appeal of the Section 552 Order, and the appeals were docketed as Appeal Nos. 19-1699 and 19-1700. The appeals were consolidated on July 26, 2019. On January 30, 2020, the First Circuit affirmed the Section 552 Order, holding the ERS bondholders did not have a security interest against revenues generated and received by ERS on and after the ERS Petition Date. On February 13, 2020, the ERS bondholders filed a petition for rehearing and rehearing *en banc*. On March 3, 2020, the First Circuit entered an order amending its decision and denying the ERS bondholders' petition for rehearing and rehearing *en banc*. On March 10, 2020, the First Circuit issued its mandate. On July 31, 2020, the ERS bondholders filed a petition for a writ of certiorari, which was docketed as U.S. Supreme Court Case No. 20-126. The ERS bondholders argued the Section 552 Order created a circuit split as to whether Section 552(b)(1) encompasses pre-petition security obligations on future payments and proceeds, and maintained the First Circuit's decision would destabilize secured-lending practices and municipal bond markets by undercutting long-held definitions of covered "property" and "proceeds." On October 8, 2020, the Oversight Board and the Retirees Committee filed oppositions to the ERS bondholders' petition for a writ of certiorari, arguing the absence of circuit split because the cases cited by the ERS bondholders confirmed that state law controls property rights, making Section 552(b)(1) inapplicable where the First Circuit determined that the ERS bondholders lacked a property right in future employer contributions generated by future, post-petition work under Puerto Rico state law. The Oversight Board and the Retirees Committee also argued that the Section 552 Order did not change the fundamental idea under bankruptcy law that security interests can attach to post-petition proceeds arising from property held prior to the petition. On October 27, 2020, the ERS bondholders filed a reply in support of their petition for a writ of certiorari. On October 28, 2020, the petition was distributed for conference. On November 16, 2020, the U.S. Supreme Court issued an order denying the petition.

(ii)    *Altair Global Credit Opportunities Fund (A), LLC, et al. v.*
    *Commonwealth of Puerto Rico, et. al.*, Adv. Proc. Nos. 17-00219; 17-
    00220

On July 27, 2017, holders of allegedly secured bonds issued by ERS in 2008 brought actions concerning Joint Resolution 188, which directed ERS to liquidate and distribute its assets to the General Fund. The Plaintiff sought a declaration that, following the passage of Joint Resolution 188, they remain secured creditors of ERS and/or the Commonwealth because (i) Joint Resolution 188 violates the automatic stay in the ERS Title III Case, and is therefore void; or (ii) if Joint Resolution 188 is not void, their security interest survives the transfer of the purported collateral. In the alternative, Plaintiffs alleged the diversion of their collateral violated the Takings and Contracts Clauses of the U.S. and Commonwealth Constitutions, and that they are entitled to a claim for compensation, equal to the full amount of the bonds, that cannot be impaired in a plan of adjustment. On November 8, 2017, Plaintiffs amended their complaints to make the same allegations about Act 106, which reformed the pension system and, among other things, converted the retirement systems' funding to a PayGo system [Adv. Proc. No. 17-00219, ECF No. 39; Adv. Proc. No. 17-00220, ECF No. 39].

Defendants moved to dismiss on November 17, 2017, generally arguing (i) Plaintiffs' claim of a perfected security interest should be dismissed as duplicative because it is being litigated in an earlier-filed action or, alternatively, dismissed because Plaintiffs did not adequately plead the existence of a perfected security interest, (ii) the automatic stay does not apply to actions by a government to enforce its police and regulatory powers, (iii) Plaintiffs lack standing to enforce the automatic stay, (iv) the ERS Resolution recognizes the Government's power to make legislative changes that may adversely affect ERS bondholders, (v) Plaintiffs do not state a claim for a constitutional taking, and (vi) all claims against the Oversight Board must be dismissed pursuant to PROMESA section 105, which provides the Oversight Board, its members, and its employees shall not be liable for any obligation of or claim against the Oversight Board, its members, its employees, or the territorial government resulting from actions taken to carry out PROMESA [Adv. Proc. No. 17-00219, ECF Nos. 41, 44; Adv. Proc. No. 17-00220, ECF Nos. 41, 44].

On September 6, 2018, the Title III Court stayed these proceedings pending a decision from the First Circuit in the Lien-Challenge AP [Adv. Proc. No. 17-00219, ECF No. 69; Adv. Proc. No. 17-00220, ECF No. 67]. On September 27, 2018, the Title III Court terminated the pending motions to dismiss without prejudice, solely for the Title III Court's statistical purposes and without any ruling on the merits, in view of the stayed proceedings [Adv. Proc. No. 17-00219, ECF No. 70; Adv. Proc. No. 17-00220, ECF No. 68]. As stated above, on January 30, 2019, the First Circuit rendered an opinion on the Lien-Challenge AP.[119] On April 5, 2021, the parties filed

---

[119] On February 26, 2019, Plaintiffs filed a motion to dismiss without prejudice, which the Title III Court granted on March 1, 2019, as to Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. [Adv. Proc. No. 17-00219, ECF No. 72; Adv. Proc. No. 17-00220, ECF No. 70]. As a result, the case was re-captioned *Andalusian Global Designated Activity Co., et al v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. Nos. 17-00219-LTS, 17-00220-LTS (D.P.R.). On March 5, 2019, the Title III Court entered an order allowing Crown Managed Accounts (for and on behalf of Crown/PW SP), LMA SPC (for and on behalf of Map 98 Segregated Portfolio), Oceana Master Fund Ltd., Pentwater Merger Arbitrage Master Fund Ltd., and PWCM Master Fund Ltd. to intervene in the adversary proceedings [Adv. Proc. No. 17-00219, ECF No. 75; Adv. Proc. No. 17-00220, ECF

a joint motion to stay these proceedings [Adv. Proc. No. 17-00219, ECF No. 79; Adv. Proc. No. 17-00220, ECF No. 77]. On April 12, 2021, the Title III Court issued an order granting the joint motion to stay these proceedings [Adv. Proc. No. 17-00219, ECF No. 84; Adv. Proc. No. 17-00220, ECF No. 82].

(iii)      The Lien-Scope Adversary Proceedings

On May 20, 2019, ERS and the UCC filed two new complaints, *Financial Oversight & Management Board for Puerto Rico v. Andalusian Global Designated Activity Company*, [Adv. Proc. No. 19-00366, ECF No. 1] and *Financial Oversight & Management Board for Puerto Rico v. Glendon Opportunities Fund, L.P.* [Adv. Proc. No. 19-00367, ECF No. 1] ) (the "Lien-Scope APs"). The Lien-Scope APs allege the ERS bondholders do not hold valid and enforceable security interests in any of ERS's remaining assets or the proceeds thereof (other than the Accounts Receivable). Those remaining assets include, among other things, (i) certain cash and investments held by ERS, (ii) accounts receivable with respect to Additional Uniform Contributions required to be made by all participating employers beginning in 2013, and (iii) certain loans made to ERS participants, and repayments thereof. On June 26, 2019, the Retiree Committee filed motions to intervene in both adversary proceedings, which the Title III Court granted in part [Adv. Proc. No. 19-00366, ECF No. 33; Adv. Proc. No. 19-00367, ECF No. 55]. On July 24, 2019, the Title III Court issued the Stay Order, which initially stayed these proceedings through November 30, 2020.[120] On October 18, 2019, the parties submitted an *Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [Case No. 17-bk-3566, ECF No. 680] (the "ERS Stay Modification Motion"), which requested a modification of the stay order to permit litigation regarding (i) whether the bonds were *ultra vires*, and (ii) the scope of the liens to move forward.

On October 24, 2019, the Title III Court entered an order modifying the stay and setting a litigation schedule for the issues identified by the parties [Adv. Proc. No. 19-00366, ECF No. 40; Adv. Proc. No. 19-00367, ECF No. 58]. Fact discovery was completed by June 9, 2020. On September 11, 2020, the parties filed cross-motions for summary judgment [Adv. Proc. No. 19-00366, ECF Nos. 91, 92, 93, 95, 96; Adv. Proc. No. 19-00367, ECF Nos. 107, 108, 109, 111, 112]. ERS argued it is entitled to summary judgment declaring the ERS bondholders lack a perfected security interest in any ERS assets except pre-petition Employers' Contributions, as defined in the Resolution, and pre-petition accounts receivable. ERS also argued it is entitled to summary judgment declaring the ERS bondholders lack a perfected security interest in any other employer payments to ERS, including the additional uniform contributions; released funds; employee loans or loan payments; and any proceeds thereof. ERS also argued it is entitled to summary judgment: (i) avoiding any of the bondholders' asserted but unperfected security interests; recovering or preserving the avoided liens for ERS pursuant to Bankruptcy Code Sections 550 and 551; and (ii) disallowing the bondholders' claims to security interests other than pre-petition employers'

---

No. 73]. On October 13, 2020, the Title III Court issued orders closing the adversary proceedings [Adv. Proc. No. 17-00219, ECF No. 78; Adv. Proc. No. 17-00220, ECF No. 76].

[120] *See* section V.I of this Disclosure Statement for a detailed summary of the Stay Order.

contributions and pre-petition accounts receivable and the proceeds thereof under Bankruptcy
Code Section 502(a) [Adv. Proc. 19-00366, ECF No. 92]. The ERS bondholders counterclaimed
that the pledged property included: substantial amounts of, and the rights to receive, employers'
contributions and any proceeds thereof; additional uniform contributions and any proceeds thereof;
remitted funds; traceable funds in deposit accounts; and traceable employee loans, loan payments,
and investments. The bondholders also argued ERS's remaining claims to be moot given the
bondholders assert no security interest in pre-2008 assets or post-petition employer contributions.
The bondholders further argued their security interests in the pledged property are perfected, valid,
and enforceable [Adv. Proc. 19-00366, ECF No. 95]. Also on September 11, 2020, the Retiree
Committee filed a joinder to ERS's motion and the Oversight Board filed a statement of undisputed
material facts [Adv. Proc. No. 19-00366, ECF Nos. 93, 94; Adv. Proc. No. 19-00367, ECF Nos.
109, 110]. On October 28, 2020, the parties filed oppositions to the cross-motions for summary
judgment [Adv. Proc. No. 19-00366, ECF Nos. 108, 110]. In their opposition to ERS's motion,
the ERS bondholders argued summary judgment inappropriate because: (i) no justiciable claim
exists involving pre-2008 assets; (ii) additional uniform contributions are pledged property; (iii)
the bondholders' security interest did not detach when the fiscal agent remitted funds to ERS; (iv)
employee loans and loan payments are original collateral and proceeds of pledged property; and
(v) the bondholders' liens cannot be avoided, recovered, or automatically preserved [Adv. Proc.
19-00366, ECF No. 110]. In its opposition to the bondholders' motion, ERS claimed the
bondholders' definition of "employer contributions" (to which they claimed an interest) is overly
expansive, and that the bondholders lacked a security interest in either released funds or proceeds
of employers' contributions traceable to employee loans, loan payments, and interest pursuant to
Bankruptcy Code Section 554. ERS further argued the dollar amount of assets purportedly subject
to the bondholders' security interest is not properly before the Court and is a disputed material fact
precluding summary judgment in favor of the bondholders [Adv. Proc. 19-00366, ECF No. 108].
Also on October 28, 2020, the Retiree Committee filed a joinder to ERS's opposition and
Defendants filed a response to the Oversight Board's statement of undisputed material facts [Adv.
Proc. No. 19-00366, ECF Nos. 111, 114]. On November 19, 2020, the parties filed replies in
support of their motions for summary judgment [Adv. Proc. No. 19-00366, ECF Nos. 120,
124]. Also on November 19, 2020, the Retiree Committee filed a joinder to ERS's reply and the
Oversight Board filed a reply in support of its statement of undisputed material facts [Adv. Proc.
No. 19-00366, ECF Nos. 121, 123]. On November 24, 2020, Defendants filed a motion to strike
the Oversight Board's reply in support of its statement of undisputed material facts [Adv. Proc.
No. 19-00366, ECF No. 127]. The motion to strike was fully briefed and on February 23, 2021,
the Title III Court issued an order denying Defendants' motion to strike [Adv. Proc. No. 19-00366,
ECF Nos. 130, 135, 148]. On March 10, 2021, the Title III Court issued an order scheduling oral
argument for April 8, 2021 [Adv. Proc. No. 19-00366, ECF No. 158]. On April 2, 2021, the parties
filed a joint statement indicating that they did not need to proceed with oral argument on April 8
and noting their intent to seek a stay of these pending motions [Adv. Proc. No. 19-00366, ECF No.
167]. On April 5, 2021, the parties filed a joint motion to stay these proceedings [Adv. Proc. No.
19-00366, ECF No. 169; Adv. Proc. No. 19-00367, ECF No. 186]. On April 6, 2021, the Title III
Court issued an order adjourning oral argument and scheduling briefing in connection with the
joint motion to stay [Adv. Proc. No. 19-00366, ECF No. 170; Adv. Proc. No. 19-00367, ECF No.
187]. On April 8, 2021, the UCC filed an opposition to the parties' joint motion [Case No. 17-bk-
3566, ECF No. 1128]. On April 9, 2021, the Oversight Board filed a reply in support of the parties'
joint motion, and the Retiree Committee filed a limited joinder [Case No. 17-bk-3566, ECF Nos.

1132, 1133].  On April 12, 2021, the Title III Court issued an order granting the joint motion to stay these proceedings [Adv. Proc. No. 19-00366, ECF No. 175; Adv. Proc. No. 19-00367, ECF No. 192].

(iv)    Commonwealth's Objection to ERS Fiscal Agent Claim

On May 24, 2018, the ERS Fiscal Agent, BNYM, filed a proof of claim against the Commonwealth (Claim No. 16775), seeking recovery for the ERS Bonds on behalf of holders of ERS Bonds.  The ERS Fiscal Agent based its claims on the Commonwealth's enactment of Joint Resolution 188, which directed ERS to liquidate and distribute its assets to the General Fund, and Act 106.  A number of ERS bondholders also filed proofs of claim against the Commonwealth.

On March 12, 2019, the UCC filed an *Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS* [ECF No. 5580], on the ground the bond issuance exceeded ERS's statutory authority and was thus *ultra vires*, rendering the ERS Bonds null and void.  On April 23, 2019, the Retiree Committee filed an *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth* [ECF No. 6482], on the ground, among others, the bond issuance was *ultra vires*.

On April 23, 2019, the Retiree Committee filed an omnibus objection [Case No. 17-bk-3566, ECF No. 469] (the "Retiree Committee's ERS Bond Claims Objection") to all ERS bondholder claims asserted against both ERS and the Commonwealth on the grounds that the ERS Bonds were issued *ultra vires* and that the ERS bondholders have no enforceable claim with respect to the ERS Bonds.  On July 2, 2019, the Retiree Committee filed its own procedures motion related to the adjudication of the Retiree Committee's ERS Bond Claims Objection [Case No. 17-bk-3566, ECF No. 632].

On May 22, 2019, the Oversight Board filed an objection seeking disallowance of the ERS Fiscal Agent's claim because: (a) secured claims resulting from the transfer of the Transferred Assets (assets transferred from ERS to the Commonwealth in exchange for the Commonwealth paying pensioners out of its General Fund) would be determined through the resolution of the Lien-Challenge AP, and even if the Lien-Challenge AP did not resolve the secured claims, UCC section 9-332(b) provides that the Commonwealth received the Transferred Assets free and clear of any such security interest once ERS transferred them to the Commonwealth;  (b) no secured claims result from the cessation of the Employers' Contributions and commencement of the PayGo payments, which are payments made to pensioners from the Commonwealth General Fund, as the Fiscal Agent does not have any security interest in the PayGo payments; and (c) any claims based on the U.S. and Commonwealth Constitutions asserting legislation that implemented a revised retirement system violated the Contracts and Takings Clauses by redirecting the employer contributions away from ERS fail as a matter of law [ECF No. 7075].

On July 24, 2019, the Title III Court entered the Stay Order, which initially stayed the UCC's ERS Bond Claims Objection and the Retiree Committee's ERS Bond Claims Objection

through November 30, 2019.[121]   On October 18, 2019, pursuant to the ERS Stay Modification Motion, the parties presented an agreed-upon schedule for such litigation.   On October 24, 2019, the Title III Court entered an order modifying the stay and setting a litigation schedule for the issues identified by the parties [Case No. 17-bk-3566, ECF No. 687].   Fact discovery was completed by June 9, 2020.  On September 11, 2020, the ERS Bondholders, BNYM, the UCC, the Retirees Committee, and the Special Claims Committee filed motions for summary judgment [Case No. 17-bk-3566, ECF Nos. 971, 976, 978].   On September 18, 2020, UBS filed a joinder to the ERS Bondholders' and BNYM's motions for summary judgment [Case No. 17-bk-3566, ECF No. 987].   On October 28, 2020, BNYM and the ERS Bondholders filed oppositions to the Committees' motion for summary judgment [Case No. 17-bk-3566, ECF Nos. 998, 1005], and the Retirees Committee, UCC, and Special Claims Committee (together, "the Committees") filed a joint opposition to the Bondholders' and BNYM's motions [Case No. 17-bk-3566, ECF No. 1004].   On November 4, 2020, UBS filed a joinder to BNYM's and the ERS Bondholders' oppositions [Case No. 17-bk-3566, ECF No. 1012].   On November 19, 2020, BNYM, the ERS Bondholders, and the Committees filed replies in support of their motions for summary judgment [Case No. 17-bk-3566, ECF Nos. 1023, 1025, 1028].  On November 25, 2020, UBS filed a joinder to BNYM's and the ERS Bondholders' replies in support of their motions for summary judgment [Case No. 17-bk-3566, ECF No. 1035].   On March 10, 2021, the Title III Court issued an order scheduling oral argument for April 8, 2021 [Case No. 17-bk-3566, ECF No. 1101].   On April 2, 2021, the parties filed a joint statement indicating that they did not need to proceed with oral argument on April 8 and noting their intent to seek a stay of these pending motions [Case No. 17-bk-3566, ECF No. 1119].   On April 5, 2021, the parties filed a joint motion to stay these proceedings [Case No. 17-bk-3566, ECF No. 1122].   On April 6, 2021, the Title III Court issued an order adjourning oral argument and scheduling briefing in connection with the joint motion to stay [Case No. 17-bk-3566, ECF No. 1123].   On April 8, 2021, the UCC filed an opposition to the parties' joint motion [Case No. 17-bk-3566, ECF No. 1128].   On April 9, 2021, the Oversight Board filed a reply in support of the parties' joint motion, and the Retiree Committee filed a limited joinder [Case No. 17-bk-3566, ECF Nos. 1132, 1133].   On April 12, 2021, the Title III Court issued an order granting the joint motion to stay these proceedings [Case No. 17-bk-3566, ECF No. 1135].

(v)   Claims Objections Pursuant to an Agreed Upon Order Establishing
Procedures Regarding Objections to Certain ERS Bond Claims

On October 7, 2019, the Title III Court entered an agreed-upon order establishing January 6, 2020 as the date by which objections must be filed to any claims filed by the ERS Fiscal Agent or certain groups of ERS Bondholders represented by Jones Day (the "Jones Day Group") and White & Case (the "White & Case Group"), and each of their members [Case No. 17-03566-LTS, ECF No. 676-2 at 6].  Pursuant thereto, the Oversight Board filed six objections to such claims, including the:

---

[121] *See* section V.I of this Disclosure Statement for a detailed summary of the Stay Order.

1. Commonwealth's supplemental objection to the Fiscal Agent Claim, which added additional grounds for objection to the original objection filed to the Fiscal Agent Claim [ECF No. 9700];

2. ERS's objection to the Fiscal Agent's claim against ERS [ECF No. 9701];

3. Commonwealth's omnibus objection to claims filed by members of the Jones Day Group against the Commonwealth (each of which was substantially similar) [ECF No. 9702];

4. ERS's omnibus objection to claims filed by members of the Jones Day Group against ERS (each of which was substantially similar) [ECF No. 9703];

5. Commonwealth's omnibus objection to claims filed by members of the White & Case Group against the Commonwealth (each of which was substantially similar) [ECF No. 9704]; and

6. ERS's omnibus objection to claims filed by members of the White & Case Group against ERS (each of which was substantially similar) [ECF No. 9705].

*ERS Administrative Expense Claims Scheduling Order.* The October 7, 2019 order also established November 21, 2019 as the deadline to file any post-petition claims relating to the ERS bonds. The Jones Day Group, White & Case Group, and ERS Fiscal Agent filed motions for payment of post-petition and administrative expense claims (the "Post-Petition and Admin Expense Claims Motions") [ECF Nos. 9285, 9294, and 9298]. The ERS bondholders allege that: (1) ERS breached its post-petition obligation to pay principal and interest on the ERS bonds; (2) ERS breached its post-petition obligations under the bonds to ensure it collected all contributions; (3) ERS was unjustly enriched at the Bondholders' expense; (4) the Commonwealth unlawfully enacted post-petition legislation that diverted assets to which the Bondholders were entitled; (5) the Commonwealth and ERS breached a stipulation reached in Case No. 16-02696; and (6) adequate protection had failed. On November 25, 2019, the Title III Court issued a scheduling order, which was superseded by a January 2, 2020 scheduling order [Case No. 17-bk-3283, ECF No. 9322]. The January 2, 2020 scheduling order required the parties to meet and confer regarding discovery and briefing schedules [Case No. 17-bk-3283, ECF No. 9688].

On March 18, 2020, the Title III Court issued an updated scheduling order for the claim objections and the Post-Petition and Admin Expense Claims Motions [Case No. 17-bk-3283, ECF No. 12446]. The March 18, 2020 order lifted any stay orders that applied to these contested matters, and set a briefing schedule for their resolution. On May 6, 2020, pursuant to the ERS claims scheduling order [Case No. 17-bk-3283, ECF No. 12446, amended at ECF No. 12901], the Oversight Board filed the *Motion of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Disallow and Dismiss Claims Asserted or Filed by ERS Bondholders and the ERS Fiscal Agent Pursuant to Bankruptcy Rules 3007(b) and 7012(b)* (the "Motion to Dismiss Post-Petition and Admin Expense Claims") [Case No. 17-bk-3566, ECF No. 891]. This motion seeks dismissal and disallowance of administrative expense and prepetition claims filed against ERS and the Commonwealth based largely on the Commonwealth's enactment of the Post-Petition Legislation. The motion argues,

among other things, that the First Circuit's Section 552 Order (1) precludes any ERS bondholder or fiscal agent administrative expense claims resulting from the Post-Petition Legislation against ERS, (2) precludes all claims against the Commonwealth, and (3) leaves the fiscal agent with only "a prepetition Claim against ERS in the amount of unpaid principal and interest owed on the ERS Bonds as of the ERS Petition Date in amount agreed to by the parties or determined by the Court[,]" subject to resolution of the challenge to the issuance of the ERS Bonds as *ultra vires*. The Retiree Committee also moved to dismiss the claims filed against ERS and the Commonwealth [Case No. 17-bk-3566, ECF No. 892]. AAFAF filed a statement and supplemental memorandum in support of the Oversight Board's motion to dismiss, focusing on what AAFAF describes as "PROMESA section 303's protection of the government's right to legislate for Puerto Rico's people" [Case No. 17-bk-3566, ECF No. 893]. The UCC filed a limited joinder in the Oversight Board and Retiree Committee motions to dismiss [Case No. 17-bk-3566, ECF No. 894]. The ERS Bondholders and the Fiscal Agent filed their opposition to the motions to dismiss on June 17, 2020 [Case No. 17-bk-3566, ECF No. 923]. On July 22, 2020, the Oversight Board, AAFAF, and the Retiree Committee filed replies [Case No. 17-bk-3566, ECF Nos. 947, 948, 949], and the UCC filed a joinder to the Oversight Board's reply [Case No. 17-bk-3566, ECF No. 950].

On June 10, 2020, the ERS Bondholders and Fiscal Agent filed a motion for judgment on the pleadings (together with the Motion to Dismiss Post-Petition and Admin Expense Claims, the "Rule 12 Motions") [Case No. 17-bk-3566, ECF No. 917], arguing that (i) they may assert recourse claims against ERS and (ii) their post-petition claims are entitled to administrative expense treatment and are nondischargeable. On July 8, 2020, the Oversight Board and the Retiree Committee filed oppositions to the motion [Case No. 17-bk-3566, ECF Nos. 930, 932]. Also on July 8, 2020, the UCC filed a joinder to the Oversight Board's opposition [Case No. 17-bk-3566, ECF No. 934]. On August 6, 2020, the ERS Bondholders and the Fiscal Agent filed a reply in support of their motion [Case No. 17-bk-3566, ECF No. 960]. The hearing on the Rule 12 Motions is scheduled for April 29, 2021. On April 2, 2021, the parties filed a joint statement indicating that they did not need to proceed with oral argument and noting their intent to seek a stay of these pending motions [Case No. 17-bk-3566, ECF No. 1119]. On April 5, 2021, the parties filed a joint motion to stay these proceedings [Case No. 17-bk-3566, ECF No. 1122]. On April 12, 2021, the Title III Court granted the parties' joint motion to stay the proceedings. [Case No. 17-bk-3566, ECF No. 1135].

(vi)   *Ultra Vires* Objection

In addition to the six objections described above filed by the Oversight Board, other parties filed objections, including the UCC, which filed, among other things, an additional omnibus objection to claims asserted by ERS Bondholders against the Commonwealth and ERS. The omnibus objection asserted additional arguments to those already brought in the UCC's *ultra vires* objection, in which the Committee objected to all ERS bond-related claims on the grounds that the ERS Bonds were issued *ultra vires*, and the Retirees' Objection, in which the Retirees objected to all ERS-bond related claims on *ultra vires* grounds, among others [ECF No. 9708].[122]

---

[122] On October 25, 2019, the Plaintiffs in *Altair Global Credit Opportunities Fund* filed an informative motion submitting for the Title III Court's consideration their response to certain arguments regarding the validity of bonds issued by ERS. According to Plaintiffs, that response was relevant to certain issues raised by the Government

The UCC argues the ERS Bonds were illegally issued.  The UCC argues ERS's statutory "authorization to incur debt" is limited to "seek[ing] a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts" per the ERS Enabling Act.  The UCC also argues a government entity such as ERS has no inherent power to issue bonds to the public, and any such power must be expressly granted by statute.  The UCC notes that whenever the Puerto Rico Legislative Assembly has granted bonding authority to a Commonwealth instrumentality (both before and after it authorized ERS in 2008 to "seek loans"), it has done so expressly and specified that the bonds may be sold publicly or privately.  Ultimately, the UCC states that because it believes the ERS Bonds were issued *ultra vires*, they are null and void, and the bondholders have no remedy against ERS.

On October 7, 2019, the Title III Court issued a scheduling order for litigating the UCC's *ultra vires* objection [ECF No. 8818].  On September 11, 2020, the UCC, the ERS Bondholders, and BNYM filed cross-motions for summary judgment [ECF Nos. 14241, 14246, 14247].  The ERS bondholders argued the ERS bonds represent valid and binding obligations of ERS because they were authorized by the ERS Enabling Act, even without an explicit statutory reference to "bonds."  The bondholders also argued the bonds are enforceable under UCC section 8-202, and if the bonds are invalid then the bondholders are entitled to recover in equity [ECF No. 14241].  The UCC cross-moved for an order holding the ERS bonds are null, void, and unenforceable because they were issued *ultra vires* and they are not validated by UCC section 8-202 because the bondholders had notice of the bonds' potential invalidity [ECF No. 14246].  The UCC also argued the bondholders have no unjust enrichment remedy.  BNYM, filed its own separate motion arguing the bonds are valid and enforceable obligations of ERS because they satisfy all requirements of UCC section 8-202(b), which applies to *ultra vires* bond issuances [ECF No. 14247].   On September 18, 2020, UBS filed a joinder to the ERS Bondholders' and BNYM's motions for summary judgment, joining both motions in full while reserving all rights with respect to other matters in the Debtors' Title III cases [ECF No. 14347].

(vii)   *Cooperativa de Ahorro y Crédito Vegabajena v. Financial Oversight & Management Board for the Commonwealth of Puerto Rico*, Adv. Proc. No. 19-00028

On March 14, 2019, credit union Cooperativa de Ahorro y Credito Vegabajena filed an adversary complaint against ERS and the Oversight Board alleging it had a statutory (or other) lien against employee contributions made to ERS, which Plaintiff alleged its borrowers had assigned to it.  Plaintiff claimed the statutory lien arose under 2011 L.P.R.A section 196, which allowed financial service entities throughout the Commonwealth to enter into individual loan agreements with Commonwealth employees who participated in ERS.  The Plaintiff credit union alleged further that it had the right to enforce its alleged lien against employee contributions after certain of their borrowers defaulted on their loans.  The Plaintiff credit union had previously filed a motion to lift the automatic stay to enforce its alleged lien [ECF No. 4011], which the Title III Court denied [ECF No. 4401].  On May 3, 2019, ERS filed a motion to dismiss the complaint on the

---

Defendants in their memorandum of law in support of their motion to dismiss in these proceedings [17-AP-0029-LTS ECF No. 76].

ground the employee-borrowers could not have assigned their employee contributions to Plaintiff because the employees did not have a retained right in contributions paid to ERS, and even if Plaintiff had a direct claim to the contributions, any statutory lien was not enforceable against the employee contributions because the property was not traceable to the particular employee-borrowers [Adv. Proc. No. 19-00028, ECF No. 11]. The Plaintiff credit union filed its opposition to the motion to dismiss on May 28, 2019 [Adv. Proc. No. 19-00028, ECF No. 15], and ERS and the Oversight Board filed their reply on June 21, 2019 [Adv. Proc. No. 19-00028, ECF No. 18]. Plaintiff credit union filed a sur-reply on July 16, 2019 [Adv. Proc. No. 19-00028, ECF No. 21]. On November 15, 2019, the Title III Court issued an order requiring supplemental briefing [Adv. Proc. No. 19-00028, ECF No. 22]. On December 2, 2019, the Oversight Board submitted its supplemental brief, and on December 16, 2019, Plaintiff credit union submitted its supplemental brief [Adv. Proc. No. 19-00028, ECF Nos. 23, 24]. On March 27, 2020, the Title III Court issued an order denying the Oversight Board's motion to dismiss, but observing that it would be most efficient to address the issues raised by this adversary proceeding through litigation of claim objections and other contested matters relating to the Amended Plan [Adv. Proc. No. 19-00028, ECF No. 25]. For that reason, the Title III court stayed this proceeding pending litigation on the Plan of Adjustment.

### (viii)   Motion by ERS Bondholders to Appoint a Trustee

On November 19, 2019, ERS Bondholders filed a motion seeking the appointment of a trustee or an independent third-party fiduciary as a trustee under 11 U.S.C. section 926 in the ERS Title III case.[123] ERS Bondholders previously moved for the same relief in February 2019.[124] ERS Bondholders argued the Oversight Board failed to adequately protect their interests by failing to pursue certain purported claims on behalf of ERS against the Commonwealth. ERS Bondholders asserted the Oversight Board declined to pursue such alleged claims against the Commonwealth due to a purported conflict of interest created by the Oversight Board's representation of both the Commonwealth and ERS under PROMESA. ERS Bondholders further alleged the purported conflict of interest could be remedied by appointing a trustee under Bankruptcy Code section 926 to prosecute the alleged avoidance actions against the Commonwealth.

The ERS Bondholders contended that the Oversight Board, in its capacity as Title III representative for ERS, allegedly refused to pursue on two claims on their behalf: an avoidance action under Bankruptcy Code section 549 and an action under Bankruptcy Code section 544 to avoid a transfer. That refusal, according to the ERS Bondholders, merited the appointment of a trustee.

On January 7, 2020, the Title III Court denied the Renewed Motion [Case No. 17-bk-3566, ECF No. 763]. On January 8, 2020, the ERS Bondholders filed a notice of appeal to the First Circuit, which was docketed as Case No. 20-1065. The First Circuit entered an order on January

---

[123] *Renewed Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Appointment as Trustees Under 11 U.S.C. §926* [17-03566-LTS ECF No. 704] (the "Renewed Motion").

[124] *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Appointment as Trustees under 11 U.S.C. § 926* (the "Renewed Motion") [ECF No. 5169].

15, 2020, setting an expedited briefing schedule and oral argument on March 4, 2020. On January 15, 2020, the ERS Bondholders filed their opening brief. On February 7, 2020, AAFAF, the Oversight Board, and the Retirees Committee filed their answering briefs. On February 21, 2020, the ERS Bondholders filed their reply brief. The appeal was argued to the First Circuit on March 3, 2020. By opinion dated March 19, 2020, the First Circuit affirmed the Title III Court's denial of the Renewed Motion [Case No. 20-1065]. On April 9, 2020, the First Circuit issued its mandate.

      c)      **PBA Debt**[125]

      PBA issued multiple series of bonds, the PBA Bonds (as defined above), pursuant to certain bond resolutions, including: (i) Resolution No. 77, adopted on November 16, 1970 (the "1970 Bond Resolution") and (ii) Resolution No. 468, adopted on June 22, 1995 (the "1995 Bond Resolution" and, together with the 1970 Bond Resolution, the "PBA Bond Resolutions"), as supplemented by separate resolutions authorizing the issuance of each series of bonds under the 1995 Bond Resolution, including without limitation, (a) Resolution No. 1596, adopted on August 10, 2011, authorizing the issuance of the PBA Government Facilities Revenue Bonds, Series R (the "Series R Bonds"), and (b) Resolution No. 1618, adopted on December 19, 2011, authorizing the issuance of the PBA Government Facilities Revenue Bonds, Series T (the "PBA Series T Bonds"). By statute, the Commonwealth has guaranteed the payment of (i) rent by any department, agency, public corporation, or instrumentality of the Commonwealth pursuant to any lease agreement with PBA other than municipalities,[126] and (ii) when due, principal of and interest on the PBA Bonds.[127]

      ***Outstanding Bonds***.[128] As of the PBA Petition Date, PBA had approximately $3.968 billion in aggregate principal amount of bonds outstanding under the PBA Bond Resolutions, bearing interest rates between 1.08% and 7.00%. A schedule of outstanding PBA Bonds is attached as Exhibit J.

      Pursuant to the PBA Enabling Act and the PBA Bond Resolutions, the PBA Bonds are payable from "rent" payments under purported "leases" pursuant to which PBA leases its properties to departments, agencies, instrumentalities, authorities, public corporations, and

---

[125] The DRA Parties assert that, in addition to PBA's bond debt, PBA is obligated to the GDB Debt Recovery Authority under four loan agreements. As of PBA's petition date, the aggregate balance due under these four loan agreements is in the principal amount of $137 million. Three of the DRA's loans are unsecured and one loan is secured by the sale proceeds of certain real property owned by PBA. The Plan proposes to separately classify the GDB Debt Recovery Authority's claims from PBA general unsecured claims and provide the GDB Debt Recovery Authority with no recovery. The GDB Debt Recovery Authority believes it is improper for the Plan to separately classify the GDB Debt Recovery Authority's loan claims from general unsecured claims and provide the GDB Debt Recovery Authority's claims with materially less favorable treatment than PBA general unsecured claims, which are projected to recover in full.

[126] 22 L.P.R.A. § 916.

[127] Act No. 17-1968 of the Puerto Rico Legislative Assembly, as amended.

[128] Amounts of outstanding bonds are based on best available public information and may be approximate.

municipalities of the Commonwealth, and that "rent" is required to be sufficient, in the aggregate, to pay, when due, the principal of and interest on the PBA Bonds.[129]

Pursuant to the PBA Bond Resolutions, all payments in respect of debt service on the PBA Bonds must immediately be deposited into certain specified accounts, purportedly to be held in trust for holders of PBA Bonds. The PBA Bonds are purportedly secured by a lien on all funds in such accounts.[130] The PBA Bonds are not secured by mortgages on PBA property or by an assignment of PBA leases.

### *Litigations Related to PBA Bonds.*[131]

#### (i)    Lex Claims Litigation

On July 20, 2016, certain holders of GO Bonds commenced an action in the U.S. District Court for the District of Puerto Rico against the Commonwealth and several of its officials, including the Governor. *Lex Claims, LLC v. García-Padilla*, Case No. 16-02374 (the "Lex Claims Litigation"). Plaintiffs alleged, among other things, that the Commonwealth Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. COFINA bondholders who intervened argued that, because the Commonwealth pledged its good faith and credit for the payment of rent on PBA leases with agencies and instrumentalities of the Commonwealth, PBA bonds should have been included as direct debt of the Commonwealth in the debt limit calculation. The Lex Claims Litigation was dismissed pursuant to the settlement and compromise of the Commonwealth-COFINA Dispute (as defined in Section V.J.9) and confirmation of the COFINA plan of adjustment, as further discussed in section V.J.4.b) of this Disclosure Statement.

#### (ii)    *Financial Oversight & Management Board for Puerto Rico, et al. v. Puerto Rico Public Buildings Authority*, Adv. Proc. No. 18-00149

On December 21, 2018, the Oversight Board, as representative of the Commonwealth, jointly with the UCC, filed a complaint against PBA, seeking a declaratory judgment that the purported leases entered into by PBA with departments, agencies, instrumentalities, authorities, public corporations, and municipalities of the Commonwealth are not arm's-length rental transactions, but rather disguised financing transactions, the sole purpose of which is to provide a vehicle for the Commonwealth to repay more than $4 billion in bonds it issued to finance the acquisition, construction, and/or improvement of office space and other facilities used by various departments, agencies, and instrumentalities of the Commonwealth. Plaintiffs contend PBA has no right under PROMESA or the Bankruptcy Code to receive post-petition rent payments from, or assert administrative claims against, the Debtors. The Complaint seeks declarations that: (1) the leases between PBA and various governmental agencies are not subject to treatment in accordance with Bankruptcy Code section 365(d)(3), which requires the performance of all obligations of the debtor under any unexpired lease of nonresidential real property until such lease is assumed or

---

[129] 22 L.P.R.A. §§ 907(g) and 916; 1995 Bond Resolution §§ 208(c), 701.

[130] *Id.* § 502.

[131] The Plan proposes to resolve all challenges to the PBA Bonds through a global compromise and settlement to be implemented under the Plan.

rejected, and thus the Debtors have no obligation to make payments to PBA under the leases, and (2) PBA is not entitled to a priority administrative expense claim pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).

Several PBA Bondholders and monoline insurers moved to intervene as Defendants and/or under Bankruptcy Code section 1109(b), including the PBA Funds, Assured, Ambac, National, the PBA Funds Sub-Group,[132] the QTCB Noteholder Group, and the LCDC [Adv. Proc. No. 18-00149, ECF Nos. 12, 14, 21, 23, 24, 26, 50]. The Retiree Committee moved to intervene as a Plaintiff [Adv. Proc. No. 18-00149, ECF No. 35]. The Oversight Board did not oppose intervention on the condition that it was subject to certain limitations, which the Title III Court thereafter granted [Adv. Proc. No. 18-00149, ECF Nos. 41, 54].

On March 19, 2019, the Defendant-intervenors filed answers and three of the intervening-Defendants—the QTCB Noteholder Group, the PBA Funds, and Assured—filed counterclaims [Adv. Proc. No. 18-00149, ECF Nos. 56, 57, 58, 59, 60].

On April 24, 2019, the Oversight Board filed motions to dismiss or strike each of the counterclaims [Adv. Proc. No. 18-00149, ECF Nos. 76, 78, 80]. Specifically, the Oversight Board argued: (i) the Oversight Board cannot be sued under PROMESA section 105, which exempts the Oversight Board, its members and employees from liability for actions taken to carry out PROMESA; and (ii) the counterclaims should be dismissed as redundant. The UCC and Retiree Committee filed joinders to the Oversight Board's motions to dismiss [Adv. Proc. No. 18-00149, ECF Nos. 81, 82, 83, 84, 85, 86].

On March 21, 2019, PBA Funds, Assured, and the QTCB Noteholder Group filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) [Adv. Proc. No. 18-00149, ECF No. 63]. The Oversight Board's response was filed on June 6, 2019 [Adv. Proc. No. 18-00149, ECF No. 88]. On June 21, 2019, the Oversight Board filed an urgent motion for modification of deadlines in anticipation of a motion to stay the adversary proceeding pending confirmation of a plan of adjustment (or, alternatively in the case of PBA, a qualifying modification under Title VI of PROMESA). On June 22, 2019, PBA filed a response consenting to the Oversight Board's motion to stay, although many other Defendant-intervenors opposed the urgent motion [Adv. Proc. No. 18-00149, ECF No. 92]. On June 27, 2019, the Oversight Board filed a motion to stay the adversary proceeding pending confirmation of a joint Commonwealth and PBA plan of adjustment (or, alternatively in the case of PBA, a qualifying modification under Title VI of PROMESA) that incorporates the restructuring framework discussed in the Initial PSA [Adv. Proc. No. 18-00149, ECF No. 99]. On June 28, 2019, the Title III Court granted the Oversight Board's urgent request to toll all existing deadlines in the adversary proceeding so that the schedule of the litigation could be assessed in the context of the Oversight Board's stay motion and the proposed settlement [Adv. Proc. No. 18-00149, ECF No. 101]. On July 8, 2019, AAFAF and the PBA filed a joint objection to the Oversight Board's motion to stay, arguing (i) the Initial PSA was negotiated without input from PBA, (ii) PBA was not a Title III debtor, thus the Oversight Board cannot confirm any joint PBA/Commonwealth plan, and (iii) the plan contained supposedly

---

[132] The Oversight Board later stipulated to the PBA Funds Sub-Group dismissing itself without prejudice from the case, which the Title III Court approved [Adv. Proc. No. 18-00149, ECF No. 62].

"untenable provisions" [Adv. Proc. No. 18-00149, ECF No. 102]. On July 9, 2019, (i) the LCDC filed a response in support of the Oversight Board's motion to stay [Adv. Proc. No. 18-00149, ECF No. 107]; (ii) Ambac and Assured filed objections to the Oversight Board's motion to stay [Adv. Proc. No. 18-00149, ECF Nos. 105, 108]; and (iii) PBA filed a response to the Oversight Board's motion to stay stating that it did not oppose the motion [Adv. Proc. No. 18-00149, ECF No. 104]. On July 16, 2019, the QTCB Noteholder Group filed a statement in support of the Oversight Board's motion [Adv. Proc. No. 18-00149, ECF No. 110]. The Oversight Board disagreed with AAFAF's positions or those of the Defendant-intervenors who opposed the stay motion, and on July 17, 2019, the Oversight Board filed its reply in support of the stay [Adv. Proc. No. 18-00149, ECF No. 111].

On July 24, 2019, the Title III Court issued the Stay Order, which was later extended through March 11, 2020[133] [Case No. 17-bk-3283, ECF No. 8244]. On February 10, 2020, the Mediation Team filed its Amended Report, recommending that this litigation continue to be stayed even beyond March 11, 2020[134] [Case No. 17-bk-3283, ECF No. 11258]. Following a hearing on March 4, 2020, the Title III Court entered the Final Stay and Mediation Order on March 10, 2020, which adopted the Mediation Team's recommendation and stayed this litigation pending a decision whether to confirm the Amended Plan [Adv. Proc. No. 19-00291, ECF No. 57]. The stay remains in effect as of this date. For more information regarding the Final Stay and Mediation Order, *see* section V.I.3.b).

(iii)    <u>Challenges to the Validity of PBA Bonds.</u>

Certain parties have also filed objections to the validity of PBA Bonds. The GO Bondholders filed an *Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 6099], asserting that, if PBA is determined to be an "unconstitutional evasion" of the Commonwealth's debt limit, any remedy for that violation would fall on holders of PBA Bonds, and accordingly, PBA Bonds, rather than later-vintage GO Bonds, should be invalidated. The UCC has also filed an *Omnibus Objection of Official Committee of Unsecured Creditors Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds* [ECF No. 8141], which seeks the disallowance of all claims filed or asserted against the Commonwealth based on certain PBA bonds issued in 2011 and 2012, because, according to the UCC, their issuance violated the Constitutional Debt Limit.

On July 24, 2019, the Title III Court issued the Stay Order, staying numerous proceedings raising issues potentially related to a plan of adjustment and ordering the parties to those

---

[133] See section V.I.1 of this Disclosure Statement for a detailed summary of the Stay Order.

[134] *See* section V.I.2 and V.I.3 of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended Report.

proceedings to participate in mandatory mediation related thereto.[135] On February 10, 2020, the Mediation Team filed its Amended Report regarding the progress of mandatory mediation, recommending that this litigation be stayed in light of the GO/PBA PSA. Following a hearing on March 4, 2020, the Title III Court entered the Final Stay and Mediation Order on March 10, 2020, which adopted the Mediation Team's recommendation and stayed this litigation pending a decision whether to confirm the Amended Plan [Adv. Proc. No. 19-00291, ECF No. 57]. The stay remains in effect as of this date. For more information regarding the Final Stay and Mediation Order, *see* section V.I.3.b).

### 2. Pension Obligations

For a description of the Commonwealth's pension obligations, please see the Pension Report, attached hereto as Exhibit I. In accordance with PROMESA section 211, the Oversight Board determined the pension systems of the Commonwealth were materially underfunded. Accordingly, the Oversight Board conducted an analysis of the pension systems to assist the Oversight Board in evaluating the fiscal and economic impact of the pension cash flows. The Pension Report discusses the history of the pension systems, reforms to increase sustainability of pension benefits, the issuances of ERS Bonds, the impact of PayGo expenditures on the Fiscal Plan forecasted annual surplus, and other related issues.[136]

### 3. Other Post-Employment Benefit Obligations

The Commonwealth provides various other post-employment (non-pension) benefits ("OPEB") to retired employees including Christmas and medication bonuses, summer bonuses for JRS retirees, medical insurance plan contributions, disability benefits for high-risk positions, additional minimum death benefits, and other similar benefits for retired and disabled employees. These various benefits are administered by ERS, JRS, and TRS. The medical insurance plans consist of (i) Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution ("ERS MIPC"), covering substantially all full-time employees of the primary governments, certain municipalities of Puerto Rico, and certain component units of the Commonwealth not having their own medical insurance plans; (ii) Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution ("JRS MIPC"), covering all judges of the Judiciary Branch of the Commonwealth; and (iii) Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution ("TRS MIPC"), covering all active teachers of the Department of Education of the Commonwealth and employees of TRS.

The plans were created under Act 95 of June 29, 1963. All three plans were sponsored by the Commonwealth. Benefits were provided through insurance companies whose premiums were

---

[135] *See* section V.I. of this Disclosure Statement for a detailed summary of the Stay Order, the Mediation Team, and the Amended Report.

[136] On June 28, 2019, the U.S. Government Accountability Office ("GAO") released an update to Congressional Committees on the public debt outlook for the five United States territories, including the Commonwealth (the "2019 GAO Report"). The GAO noted that, although the Oversight Board's reforms are intended to stabilize the pension system in the long term, officials and experts have stated that pension payments to current retirees have already begun crowding out spending for other government services due to the "pay-go" system.

paid by the retiree, with the Commonwealth providing a matching share, up to $100 per month. ERS MIPC was an unfunded cost sharing, multiple employer plan, while JRS MIPC and TRS MIPC were unfunded, single employer plans.

For ERS MIPC and TRS MIPC, Commonwealth employees became members upon their date of employment and were eligible for benefits upon reaching the applicable pension benefits retirement age. However, Act 3-2013 eliminated this benefit to ERS MIPC members who retired after June 30, 2013, and Act 160 eliminated this benefit to TRS MIPC member who retired after July 21, 2014. For JRS MIPC, judges of the Judiciary Branch of the Commonwealth became members upon their date of employment and were eligible for benefits upon reaching the age of 60 with 10 years of service.

Each medical insurance plan was financed by the Commonwealth and funded on a pay-as-you-go basis. Funding of the medical insurance plans were provided to the ERS MIPC, JRS MIPC and TRS MIPC through appropriations each July 1 by (i) the Commonwealth's General Fund; (ii) certain corporations with their own treasuries; and (iii) certain public corporations with their own treasuries and municipalities for their former employees. There was no contribution requirement for plan members during active employment. Retirees contributed the amount of the healthcare insurance premium not covered by the Commonwealth. The annual OPEB cost and annual required contribution ("ARC") was computed as part of an actuarial valuation in accordance with GASB Statement No. 45. Under Act 106, these amounts were included in the PayGo pension amounts.

The PSAs that have been entered into with various parties contemplate the reduction of such benefits. *See* section II.B.1.b) of this Disclosure Statement for a more detailed description.

## C.    Puerto Rico's Revenue and Tax Regime[137]

The Commonwealth is funded by internal funds (primarily revenues from taxes, fees and charges), as well as inter-governmental funds and federal funds.[138] The Commonwealth's tax revenues predominantly consist of income taxes, excise taxes and SUT. These taxes are collected pursuant to the provisions of Act No. 1-2011, known as the Puerto Rico Internal Revenue Code of 2011, as amended ("2011 Code"), or other Special Revenue Fund laws. Non-tax revenue sources include registration fees for motor vehicles, fees for services (including for judicial proceedings, public health services, and fulfillment of document requests), fines for motor vehicles, as well as fees for professional licenses, trademarks, housing-related fees, and other fees.

---

[137] This section is not intended to exhaustively describe all Commonwealth revenues, but rather provides an overview of certain of the Commonwealth's most significant sources of revenue. This section is also not intended to provide tax advice, and taxpayers are urged to consult with their tax advisors concerning the U.S. federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan in their respective individual circumstances. For a description of Certain Material United States Federal Income Tax Considerations and Certain Puerto Rico Income Tax Considerations, please refer to Sections XI and XII of the Disclosure Statement, respectively.

[138] Included in inter-governmental revenue sources are the covered over payments resulting from federal excise taxes on beer, wine, and rum exported from Puerto Rico.

The Commonwealth accounts for most of the tax revenue it collects in its General Fund, which is its primary operating fund. However, certain Commonwealth revenues from designated sources are not accounted for in the General Fund. These funds are instead accounted for in Special Revenue Funds ("SRF"), as they are appropriated to designated agencies, or instrumentalities for specified uses.[139] The SRF inputs include:

(i)      certain taxes historically appropriated, subject to certain conditions, through Puerto Rico statutes to agencies, public corporations or other third parties

(ii)     charges and fees for services collected by Commonwealth agencies

(iii)    dividends or other distributions received by the Commonwealth from its public corporations

(iv)     certain other revenues

Certain tax revenues, such as SUT revenues transferred to COFINA and revenues expressly designated as not available revenues of the Commonwealth, are not accounted for in the General Fund or in the SRFs. These revenues are instead administered and managed directly by the relevant government instrumentality. Because the Commonwealth follows the practice of pooling its cash, all revenues accounted for in the General Fund and most revenues accounted for in the SRFs (subject to certain limited exceptions) are deposited in the Commonwealth's centralized cash management system the Treasury Single Account ("TSA").

For Fiscal Year 2021 year-to-date, July 2020 through December 2020, the Commonwealth preliminarily reported collections of approximately $5.19 billion in tax revenues into its General Fund.

For full-year FY2020, the General Fund reported approximately $9.29 billion (see Table 1 below). Given the FY2020 revenue is delayed to FY2021 due to Act 57-2020, the amount reported for the FY2021 year-to-date (July through December) also includes FY2020 tax revenue. As of December 2020, the Commonwealth reported approximately $479 million in such delayed revenue. If this delayed amount is excluded from the $5.19 billion revenue, the FY2021 year-to-date (July through December) revenue is approximately $4.71 billion which is lower compared to approximately $5,220 billion in the same period of FY2020. The decline of year-to-date revenue from FY2020 to FY2021 is partly due to a non-recurring payment of $488 million in FY2020 that increased the corporate income tax revenue while such payment is not available in FY2021. At the same time, if this delayed revenue ($479 million as of December 2020) is added back to the FY2020 revenue, the full-year FY2020 revenue is approximately $9.80 billion—down from $11.38 billion in FY 2019 and approximately $9.31 billion in FY2018, categorized as follows:

---

[139] All such revenues, including those accounted for in the Special Revenue Funds, are accounted for in the "General Fund" for purpose of the annual financial statements of the Commonwealth prepared in accordance with U.S. GAAP.

**Table 1: Key Revenue Components FY 2010 to FY 2021 YTD[140]**

| Tax Category ($ millions) | Revenues[141] | | | | |
|---|---|---|---|---|---|
| | FY2010 | FY2018 | FY2019 | FY2020 | FY2021 YTD |
| | GF | GF | GF | GF | GF |
| (a)  Income Taxes | | | | | |
| • Individual Income Tax | $2,594 | $1,960 | $2,224 | $1,852 | $1,030 |
| • Corporate Income Tax | $1,682 | $1,776 | $2,492 | $2,072 | $1,040 |
| • Nonresident Withholding | $830 | $637 | $630 | $379 | $168 |
| (b)  SUT[142] | $540 | $1,646 | $2,299 | $1,635 | $995 |
| (c)  Excise and Other Taxes | | | | | |
| • Act 154 Excise Tax | - | $1,915 | $2,083 | $1,848 | $729 |
| • Beer/Alcohol Excise Tax | $285 | $264 | $275 | $234 | $137 |
| • Tobacco Excise Tax | $183 | $156 | $101 | $89 | $51 |
| • Motor Vehicle Excise Tax | $351 | $407 | $519 | $382 | $295 |
| • Others | $899 | $325 | $523 | $546 | $595 |
| (d)  Rum cover transfer payments | $352 | $227 [143] | $230 [144] | $251 | $150 |
| **Total** | **$7,716** | **$9,313** | **$11,376** | **$9,289** | **$5,190** |

[140] The FY2020 revenue does not include the partial amount that was delayed to FY2021 due to Act 57-2020, and the FY2021 revenue includes part of the FY2020 revenue collection that is delayed to FY2021. The delayed amount that should be shifted back to FY2020 from the year-to-date collection in FY2021 (July through December) is $479 million.

[141] Sources: http://www.hacienda.gobierno.pr/inversionistas/estadisticas-y-recaudos-statistics-and-revenues/ingresos-netos-al-fondo-general-general-fund-net-revenues

[142] The SUT deposited into the General Fund equals the 10.5% Commonwealth assessed SUT less the 53.65% of the Pledged Sales Tax Base Amount transferred to COFINA each fiscal year.

[143] This amount reflects only the portion of the Rum Excise Taxes from the federal government that are subsequently transferred to the General Fund after a certain portion is retained in a Treasury lockbox account and subsequently distributed to various recipients, including, without limitation, certain on-island rum producers, the Puerto Rico Science, Research and Technology Trust, and the Puerto Rico Conservation Trust. The total tax remittance from the federal government pursuant to 26 U.S.C. § 7652 for fiscal year 2018 was approximately $430 million.

[144] *See supra* n. 119. The total tax remittance from the federal government pursuant to 26 U.S.C. § 7652 for FY 2019 was approximately $433 million.

Many of the Commonwealth's taxes are collected by an integrated tax system, called Sistema Unificado de Rentas Internas ("SURI"), which was deployed from FY 2017–2020 in phases. A major release on February 24, 2020, migrated corporate and individual income taxes to the platform. The benefits of the platform included improved filing and payment capabilities, digital workflows, and integration of previously disparate data sources. These features are expected to, over time, improve the Department of Treasury's ability to serve taxpayers and enhance its compliance capabilities.

The reported decrease in Q1 General Fund revenue between FY 2020 and FY 2021 was 23%. It is important to note that the FY 2021 fourth quarter decrease (39.7%) is partly attributable to the tax filing postponement measures (Act 57-2020), FY 2020 results continue to be updated as data becomes available in relation to delayed receipt of funds related to FY 2020 tax revenue.

**Table 2 - Puerto Rico Total General Fund Revenue, FY 2019-2020 YTD, in millions**

| 2019 | | | | 2020 | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|
| *Q1* | *Q2* | *Q3* | *Q4* | *Q1* | *Q2* | *Q3* | *Q4* | *Q1* | *Q2* |
| 2,244 | 2,154 | 3,150 | 3,828 | 2,808 | 2,412 | 2,259 | 2,307* | 2,161 | 2,532 |
| *Year-over-year change* | | | | *25%* | *12%* | *(28%)* | *(4%)* | *(23%)* | *5%* |

*\* The $2,224 million in FY2020 Q4 includes the Q4 amount that was shifted to FY2021 through October 2021.*

The mandatory COVID-related Commonwealth-wide shut down and subsequent restrictions on business operating hours have critically and adversely impacted substantially all economic activity on the Commonwealth. The true quantifiable impact to Puerto Rico is unknown at this time, as the situation is still ongoing in real time and is being closely monitored.

However, the FY 2021 revenue year-to-date is currently outperforming May 2020 FY projections. There are increases in SUT, Motor Vehicle tax and Other Miscellaneous taxes partly attributable to the large infusion of cash from the federal government (such as stimulus payments, expanded UI benefits, and the PPP program). The final FY2021 year-end surplus remains uncertain to calculate as of the date of this Disclosure Statement.

1.      **2018 Puerto Rico Tax Amendments (Act 257-2018).**

There have been multiple major revisions to Puerto Rico's tax code since 1994, including the enactment of the 2011 Code and at least six adjustments to the 2011 Code since 2013.[145]  For example, on December 10, 2018, Puerto Rico enacted Act 257-2018, which included several amendments to Puerto Rico's 2011 Code. The amendments are described in more detail in the tax discussion sections included in this document.  A guiding tax policy principle embedded in Act 257-2018 is revenue neutrality.

Some of the more noteworthy features of Act 257-2018 are:

---

[145] Reforms include: Act 40-2013, the "Tax Burden Redistribution and Adjustment Act;" Act 120-2014, the "Small and Medium Business Job Generation and Retention Act;" Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011;"  Administrative Orders 2017-01 and 2017-05;  and Act 257-2018,  the "2018 Puerto Rico Tax Reform Act."

- Amendments to income tax provisions applicable to individuals and local corporations
- Changes to SUT provisions, particularly related to prepared foods
- The reintroduction of an Earned Income Tax Credit
- The legalization of authorized games of chance

Other changes in Act 257 include the following.

Act 257-2018 reduced personal income taxes by enacting a 5% non-refundable tax credit and reducing the corporate tax base rate by 1.5%. To compensate for the reduction in tax collections, Act 257-2018 placed greater reliance on the use of a new alternative basic tax ("ABT") and an expansion of the alternative minimum tax ("AMT").

Moreover, Act 257-2018 increased the withholding income tax rate on payments for services rendered in Puerto Rico made after December 31, 2018 from 7% to 10%. However, this does not amend the tax treatment of corporations covered by incentive laws, who benefit from a range of company and industry specific tax credits, exemptions, and deductions.

Starting October 1, 2019, Act 257-2018 reduced the SUT on prepared foods to 7%, subject to the applying business obtaining a certification from the Secretary of Treasury.

Act 257-2018 also exempted certain previously taxable items from the SUT, such as e-books and digital books, female sanitary items, and legal services. Furthermore, Act 257-2018 increased the threshold for the SUT exclusion for business to business services and designated professional services, based on annual volume of business from $50,000 to $200,000 (taking effect after March 1, 2019).

Act 257-2018 also provided for the legalization of certain games of chance by addressing licensing and operations of machines, flow of funds to the government, and the regulatory environment.

On December 27, 2018 the Oversight Board submitted a letter to the Commonwealth which expressed its concern with Articles 132 through 163 of Act 257-2018 which specifically relate to the operation of games of chance machines outside of casinos. The Commonwealth was notified that both regulations must be issued in connection with licensing games of chance machines that operate outside of casinos, and an analysis of the fiscal impact related to Articles 132 through 163 is required per PROMESA Section 204(a). The Oversight Board reserved the right to take necessary actions if the Commonwealth chose to enforce the Articles that are inconsistent with the certified fiscal plan.

Finally, the statutory mandate of Act 257-2018 creates greater interdependencies among taxpayers and the information they are obligated to report, which is expected to enable greater oversight and verification of the information being reported to the government.

Since the enactment of Act 257-2018 there have been 3 major amendments to the 2011 Code and special tax laws: Act 60-2019, Act 40-2020 and Act 57-2020, which are summarized below. Since the enactment of Act 257-2018 there have been at least three (3) other amendments

99

to the 2011 Code and special tax laws, including: Act 60-2019, Act 40-2020 and Act 57-2020, which are explained in sections III.C.2, III.C.3 and III.C.4 of this Disclosure Statement.

### 2. Tax Incentives and Tax Credits

In FY20 regular corporations, incentive corporations, and individuals collectively claimed $386 million in tax credits, reducing net revenue collections. Through December 2020, $330 million in tax credits have been claimed in FY21.

In addition to credits, deductions, and exemptions included in Puerto Rico's 2011 Code, Puerto Rico has passed more than 60 pieces of legislation that offer tax incentives to persons and companies that meet the outlined criteria (collectively, the "Incentive Acts"). Incentive corporations or persons that qualify for treatment under the Incentive Acts generally pay a reduced income tax rate and receive waivers or exemptions from the payment of certain SUT, licensing, municipal, and other taxes and fees.

In June 2021, the Puerto Rico Treasury Department published its second tax expenditure report for tax year 2018, which provides estimates of foregone revenue from tax expenditures in the personal income tax, business tax, SUT and excise tax regimes. The cost estimates do not account for behavioral effects or macroeconomic feedback effects from the implementation of the policies. Overall, Puerto Rico's 2011 Code contains 424 expenditures, of which 108 are for the individual income tax regime, 82 are for the corporate tax, 63 are for the Incentives Acts, 115 are for non-corporate businesses, 27 are for the SUT, and 29 are for the excise tax. The sum of these expenditures in 2018 was $21.1 billion, of which $14.8 billion was from the business tax (corporate, Incentive Acts and non-corporate), $3.8 billion was from the SUT, $2.1 billion was from the individual income tax, and $446 million was from the excise tax.

Relative to the first tax expenditure report for tax tear 2017, the second report contains 112 additional expenditures, primarily due to the addition of expenditures for non-corporate businesses. The sum of expenditures in 2018 declined by approximately $1.2 billion due to a decrease in the combined cost of Act 135-1997 and Act 73-2008.

Described below are several of the Incentive Acts widely used in the Commonwealth.[146] Act 60-2019, described in the next section, repealed and consolidated many of Puerto Rico's Incentive Acts, with the corresponding rules regarding the issuance of tax decrees, incentives, subsidies and tax benefits, into a single statute with conforming benefits. Several of the tax incentives repealed and consolidated by Act 60-2019 are summarized below.

***Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act).*** This act generally provides tax incentives to businesses established in Puerto Rico for manufacturing products on a commercial scale and to businesses engaged in a wide range of specific economic activities, such as scientific research and development, recycling, hydroponics, intangible property licensing, and software development. Qualifying companies receive preferential income tax rates as low as 4% along with varying exemptions on property taxes, municipal license taxes,

---

[146] This is not an exhaustive list of all incentives offered to individuals and corporations, but rather a representative sample of the types of incentives offered by the Government.

construction taxes, and certain SUT taxes. As of June 30, 2020, 784 companies have received tax incentives from Act 73-2008. This act represents $13.8 billion or 65% of the approximately $21 billion tax expenditures estimated by the Department of Treasury in the second tax expenditures report.

*Act 74-2010 (Puerto Rico Tourism Development Act).* Corporations that construct, own, operate or administer hotels and engage in other tourism eligible activities can benefit from the provisions of Act 74-2010, known as the Puerto Rico Tourism Development Act. Exempt businesses receive a tradeable tax credit based on the tourism investment amount, a tax exemption from income and real and personal property taxes, an exemption on municipal license taxes, a tax exemption on municipal construction excise taxes, and a tax exemption on excise taxes and SUT on the acquisition of certain items used in the tourism activity.

*Act 27-2011 (Puerto Rico Film Industry Economic Incentives Act).* This act was designed to subsidize and promote the Puerto Rico film industry. The act offers tax exemptions and tax credits for production companies of short-films, regular films, documentaries, series, mini-series, music videos, commercials, video games, and TV productions such as reality shows. Benefits include a 4% flat income tax rate on the net income derived from the eligible projects and tax exemptions on property taxes, municipal license taxes, construction excise taxes, and other municipal taxes.

*Act 83-2010 (Puerto Rico Green Energy Incentives Act).* This act aims to promote the production of renewable, "green" energy. Puerto Rico defines green energy as sustainable renewable energy and alternative renewable energy. Sustainable renewable energy includes solar, wind, geothermal, biomass, hydropower, marine and hydrokinetic and ocean thermal. Alternative renewable energy includes municipal solid waste, landfill gas, anaerobic digestion and fuels cells. Like other incentive structures, qualifying Act 83-2010 companies receive a 4% fixed income tax rate along with varying exemptions on distributions, property taxes, municipal license taxes and state excise tax and sales and use taxes for raw materials and machinery and equipment used in the production of Green Energy.

*Act 20-2012 (Act to Promote the Exportation of Services).* Act 20-2012 promotes the establishment of export service operations in Puerto Rico. It provides tax incentives to businesses exporting services rendered in Puerto Rico to persons outside of Puerto Rico with no nexus to Puerto Rico. Among the incentives are a 4% income tax rate on net income from export services, no income tax on dividend distributions the business makes out of its earnings and profits derived from eligible activities, an exemption from municipal license taxes on the volume of business derived from eligible activities and an exemption from real and personal property taxes on certain export services activities.

In conformance with the Consolidated Appropriations Act, 2020 (Pub. L. 116-93), the IRS completed and published a study on the interplay between new territorial tax laws (Puerto Rico Acts 20 and 22 of 2012) and section 933 of the U.S. Internal Revenue Code that enables tax avoidance and denies revenues to federal, state, and territorial governments, including Puerto Rico.

*Act 22-2012 (Act to Promote the Relocation of Investors to Puerto Rico).* The tax benefits under Act 20-2012 are often complemented with the tax benefits under Act 22-2012, known as the

Act to Promote the Relocation of Investors to Puerto Rico. Among the incentives for Act 22-2012 residents, is a 100% tax exemption from Puerto Rico income tax on all dividends, a 100% tax exemption from Puerto Rico income tax on all interest, and a 100% tax exemption from Puerto Rico income taxes on net long-term capital gains accrued after the individual resident investor ("IRI") becomes a Puerto Rico resident. To qualify as an IRI under Act 22-2012, an individual must purchase residential property within two years after becoming a Puerto Rico resident, must open a bank account at a bank or credit union located in Puerto Rico, and must make charitable contributions to Puerto Rico charitable entities in the amount of $5,000 annually. As of June 30, 2020, 2,331 grantees are qualified to receive Act 22-2012 benefits. The IRS recently announced it will audit the tax obligations of Act 22 beneficiaries to verify if their financial statements are in compliance with federal tax laws. This comes after the IRS study described above concluded at least 647 Act 22 beneficiaries avoided paying nearly $558 million in federal income tax by enjoying the benefits of the Act 22-2012 decree.

*Act 273-2012 (International Financial Center Regulatory Act).* Act 273-2012 provides tax exemptions to businesses engaged in eligible activities in Puerto Rico. To receive this exemption, a business needs to become an International Financial Entity ("IFE") by applying for a permit and license and obtaining a tax exemption decree. Benefits include a 4% flat income tax rate on the net income and reduced taxes on dividends, real and personal property, and municipal license taxes. Of the income taxes paid by an IFE, 7.5% is deposited in the Special Fund for the Development of Export and Promoter Services of the Department of Economic Development and Commerce, created by the "Export Services Act" to promote growth of services and other eligible businesses in Puerto Rico.

*Act 21-2019 (Development of Opportunity Zones of Economic Development Act of Puerto Rico of 2019).* Approximately 95% of the territory of Puerto Rico is considered a qualified Opportunity Zone under the parameters established under federal law. Act 21-2019 provides supplemental local tax incentives for investments in qualified Opportunity Zones. Businesses receive preferential tax rates, transferable tax credits, and partial exemptions of property and municipal taxes. These provisions, among other benefits like the expedited permitting process, are intended to make Puerto Rico's real estate market more appealing for investors looking to take advantage of Opportunity Zones.

As communicated in a letter dated February 17, 2021 to the Oversight Board, the DDEC has suspended the issuance of guidelines for the implementation of Opportunity Zone incentives offered under Act 60-2019 because the Oversight Board objected to DDEC's proposed regulations as violating the policy and Section 204(b) of PROMESA. The Oversight Board's concerns include that, as drafted, DDEC's proposed regulations expose the Government to risks that would reduce, rather than enhance, revenues and economic development. The DDEC's proposed regulations also provide a worrisome level of discretion to the DDEC Secretary, exposing the agency to accusations of favoritism and corruption. DDEC has requested a meeting with the Oversight Board to develop an action plan for implementing the Opportunity Zone incentives.

*Act 14-2017 (Incentives Act for the Retention and Return of Medical Professionals).* Signed into law on February 21, 2017, the purpose of the Incentives for the Retention and Return of Medical Professionals Act is to guarantee accessible and quality health services for all the residents of Puerto Rico. The statute creates a framework for encouraging

qualified medical professionals to reside and practice in Puerto Rico through attractive tax incentives. The benefits under Act 14-2017 were incorporated into the Incentives Code (Act 60-2019). A qualified physician could request and obtain a tax exemption grant under Act 60-2019 until December 31, 2020 to receive the following tax incentives (for an initial term of 15 years):

- A 4% fixed income tax rate on eligible income generated as a result of offering his/her professional medical services

- A 100% exemption (including AMT) on up to $250,000 received from eligible dividends, per year

- Eligibility to contribute up to 25% of the net income to individual retirement plans (Keogh) or up to 25% of their salary in case of corporate retirement plans, as after tax contributions

The qualified physician can request an extension of the grant for an additional 15 years, if he/she can demonstrate that said extension is in the economic benefit of Puerto Rico.

***Tax Credits and Disbursements Authorization Committee.*** On March 7, 2017, AAFAF issued Administrative Order 2017-01, which created a Tax Credits and Disbursements Authorization Committee (the "Committee"). The Committee evaluated pending and new tax credits applications and set limits on the use and timing of tax credits granted. The Administrative Order also halted the granting of new tax credits authorized by various incentive acts. The Committee was dissolved by Administrative Order 2018-10 issued on July 2, 2018 and all remaining controls and limitations established by the Committee were repealed by Act 60-2019, described more fully below.

On October 31, 2018, the Oversight Board issued a letter to, in part, call for the reinstatement of the Committee with the authority to restrict the percentage of net income that can be offset by tax credits and impose limitations on the number of years over which a tax credit can be claimed. The certified fiscal plan also calls for the government to place a limit on the annual issuance of tax credits. To date, a general oversight committee for tax credits with the authority to approve and limit the award and magnitude of annual tax credits has not been reestablished. Act 60-2019 did establish a "Priority Projects Committee in Areas of Opportunity" with oversight limited to projects eligible for priority tax credit status in Opportunity Zones, and not eligible for alternative Act 60 tax credits.

3.      **Puerto Rico Tax Incentives Code (Act 60-2019)**

On July 1, 2019, the Commonwealth enacted Act 60-2019 (the "Puerto Rico Tax Incentives Code" or "Incentives Code") to prospectively consolidate and amend the tax incentives available under existing laws and adopt a new legal and administrative framework to normalize the way new incentives are created, approved, processed, and monitored. Existing incentive laws, including many of the ones described above, were repealed and replaced by similar incentives in Act 60-2019.

To evaluate the fiscal benefit from each incentive, the legislation uses a Return on Investment ("ROI") approach combined with an assessment of fiscal multipliers to prioritize high

value-added incentives relative to those that do not generate sufficient economic return. The legislation, however, does not include explicit caps on, reductions to, or the elimination of any specific incentives. Rather, the purpose of the Incentives Code is to measure the ROI of tax and economic incentives by grouping them under a transparent and uniform code.

Through the Incentives Code, the term, rate, and characteristics of incentives offered are harmonized across industries and credits. The Incentives Code also creates a centralized Incentives Office for Businesses in Puerto Rico at DDEC and establishes an Incentives Concession Portal to centralize, standardize, and streamline the processes related to the application and approval of decrees, cash grants, tax credits, subsidies, and other incentives.

Act 60-2019 also required the public disclosure of beneficiaries of certain tax incentives. In accordance with that requirement, the DDEC implemented an online database of all beneficiaries, which is updated monthly and offers the name of the grantee, the type of benefit and the decree's issue date, and is updated monthly. At the time of the publication of this document (October 2020), the database discloses 10,809 recipients of certain tax incentives. DDEC released the relevant information for recipients that receive benefits from the following Acts: Act 14-2017 (Physician Retention); Act 20-2012 (Exportation of Services); Act 22-2012 (Investor Relocation); Act 273-2012 (International Financial Center Regulatory Act); and Act 27-2011 (Film Production). DDEC subsequently released additional data on February 11, 2020, disclosing recipients of the following tax expenditures: Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act); Act 83-2010 (Puerto Rico Green Energy Incentives Act).

Many provisions of Act 60-2019 require the drafting and approval of regulations prior to their implementation.[147]   Initial regulations have been submitted to the Oversight Board for its review. The Oversight Board has expressed its reservations on multiple occasions regarding the law and proposed regulations with main highlights summarized below:

- Lack of strategic approach

- Lack of expiration mechanism

- Concentration of authority in the DDEC

- Abnormal role for the legislature

- Flawed evaluation standard

- Public reporting is insufficient

- Audits are not sufficiently rigorous

- Unusual requirement that recipients make cash contributions to non-profit entities

- Availability of improved new tax incentive terms

---

[147] Pursuant to PROMESA section 204(b)(4) and the Oversight Board's policy with respect thereto, proposed rules, regulations, administrative orders and executive orders covered by said policy, including all regulations under Act 60-2019, must be submitted to the Oversight Board before being issued to ensure compliance with the certified Commonwealth fiscal plan.

- Unfettered ability to transfer tax incentives

- Invalid geographic scope

As communicated in a letter dated as of February 17, 2021 to the Oversight Board, the DDEC has suspended the implementation of Act 60-2019 stating the DDEC Secretary may use the regulations in effect under previous similar acts as guidelines for the granting of incentives under Act 60-2019 as long as regulations are not inconsistent with Act 60-2019.

4.     **Commonwealth Taxes**

a)     **Income Taxes**

*Individual Income Tax*. Puerto Rico's 2011 Code stipulates taxes on individuals at rates which range from 0.0% for those individuals making $9,000 or less a year to a maximum marginal rate of 33% for those with an income above $61,500. Residents are taxed on income from nearly all sources, and only receive limited exemptions or deductions from their income, unless they receive a waiver under one of the incentive programs authorized by local law.

| If net taxable income is: | Tax will be: |
|---|---|
| Less than $9,001 | 0% |
| $9,001 to $25,000 | 7% |
| $25,001 to $41,500 | 14% |
| $41,501 to $61,500 | 25% |
| Greater than $61,500 | 33% |

As described above, the recently enacted local tax act, Act 257-2018, reduced the effective income tax rate for individuals by allowing a 5% discount on the tax obligation due by individuals for tax years beginning after December 31, 2018. Consequently, many individual tax filers will only pay 95% of their total tax liability annually going forward. If an individual is subject to the AMT rate, they are not eligible for the 5% discount authorized by Act 257-2018.

This reduction in income tax is paid for, in part, by the establishment of a new optional gross tax-based regime for certain self-employed individuals established as part of Act 257-2018. For tax years beginning after December 31, 2018, self-employed individuals, whose income originates substantially from rendering services, can opt to use a fixed tax rate schedule to determine their income tax liability. The tax rate is determined according to a gross revenue schedule provided in the law, and ranges from 6% to 20%. The full schedule is:

| Gross Revenue Level: | Tax rate will be: |
|---|---|
| Less than $100,001 | 6% |
| $100,001 to $200,000 | 10% |
| $200,001 to $300,000 | 13% |
| $300,001 to $400,000 | 15% |
| $400,001 to $500,000 | 17% |
| Greater than $500,000 | 20% |

For taxable years commencing after December 31, 2019, Act 40-2020 made further adjustments to the 2011 Code by providing an additional discount of 3% for individuals with a gross income not greater than $100,000. It was estimated that this adjustment would cost $26 million. Act 40-2020 also brought other tax adjustments for SUT on services and special contributions for professional and consulting services. These three tax adjustments were estimated to cost the Government $33.6 million. To adequately pay for this loss in annual revenue, Act 40-2020 provided for an increase in the annual filing fee for Act 22-2012 tax decree beneficiaries from $300 to $5,000 as well as other payors including moratorium or repeal of tax credits, caps and issuance limitation on tax credit, and other changes.

Act 40-2020 made further adjustments to the SUT provisions of the 2011 Code by increasing the business to business exemption threshold for services rendered by merchants with annual gross sales from $200,000 to $300,000. It was estimated that this adjustment would cost $5.3 million.

Beginning with tax year 2019, Act 257-2018 also reinstated an earned income tax credit ("EITC") in Puerto Rico. The value of the credit generally ranges from $300 to $2,000, depending on marital status, number of dependents, and adjusted gross income. Given concerns with the implementation of Puerto Rico's previous EITC, the statute established new requirements for married taxpayers to be able to claim the credit. When claimed, the EITC will produce a cost to the government and reduce income tax collections.

On March, 11, 2021, President Biden signed into law ARP. The ARP provides for a dollar for dollar match to Puerto Rico on any expansion above $200 million dollars (up to $600 million in incremental costs). This is contingent on Puerto Rico increasing the work incentives on the existing EITC system, which is typically understood to mean increase the phase-in rate of the EITC (though no formal regulations on this matter currently exist). The Puerto Rico Treasury Department is currently working on an EITC bill that would increase the benefits for all groups of workers, including a large expansion to childless workers. Additionally, the bill would change the current EITC law by including self-employment income, remove the eligibility age of the EITC, increase the age of EITC dependents to 25 from 18, and increase asset limitations to $10,000. However, as of the filing of this Disclosure Statement, the bill has not yet been enacted and has the potential to significantly change.

The ARP also provides for the expansion of Puerto Rico's access to the Child Tax Credit ("CTC"). Currently the CTC provision in Puerto Rico is conditional on having at least three

children, which is removed by the legislation. This makes the CTC available to a much larger share of households in Puerto Rico.

Additional details on actions by the Government, including Executive Orders, to establish cost controls and fiscal policies can be found in section IV.B of this Disclosure Statement.

*Regular Corporation Corporate Income Tax*. Corporations in Puerto Rico generally fall under one of two types, regular corporations or incentive corporations. Unless a corporation qualifies for partial exemption from corporate income and other taxes under the tax incentives programs, it is considered as a regular corporation subject to corporate taxation at graduated rates.

Act 257-2018 reduced the maximum regular corporate income tax rate in Puerto Rico for tax years commencing after December 31, 2018. A 1.5% reduction to the base tax rate was made, from 20% to 18.5%. As a result, the top marginal corporate tax rate, including relevant surtaxes, declined from 39% to 37.5%. The full normal corporate tax schedule is listed below:

| Net income subject to Surtax: | Base Tax: | Surtax: | Total Marginal Corporate Tax Rate: |
|---|---|---|---|
| Less than $75,001 | 18.5% | 5% | 23.5% |
| $75,001 to $125,000 | 18.5% | 15% | 33.5% |
| $125,001 to $175,000 | 18.5% | 16% | 34.5% |
| $175,001 to $225,000 | 18.5% | 17% | 35.5% |
| $225,001 to $275,000 | 18.5% | 18% | 36.5% |
| Greater than $275,001 | 18.5% | 19% | 37.5% |

To pay for the reduction in the corporate tax base rate, Act 257-2018 enables corporate taxpayers engaged in a trade or business, in which income is derived substantially from services, and subject to withholding at source, to elect to use a fixed tax rate to determine their income tax liability. The fixed rate will apply to the gross income derived from the rendering of services as follows:

| Gross Revenue Level: | Tax will be: |
|---|---|
| Less than $100,001 | 6% |
| $100,001 to $200,000 | 10% |
| $200,001 to $300,000 | 13% |
| $300,001 to $400,000 | 15% |
| $400,001 to $500,000 | 17% |
| Greater than $500,000 | 20% |

Moreover, Act 257-2018 increased the withholding income tax rate on payments for services rendered in Puerto Rico made after December 31, 2018, from 7% to 10%. Combined with a new requirement under Act 257-2018 to reconcile returns quarterly, this new process is expected to lead to considerably higher tax collections.

Corporate revenue collections will also likely be enhanced from a recent change in the definition of Puerto Rico source income. Generally, compensation for work performed or personal services rendered outside of Puerto Rico are untaxed, because they are considered as income from sources outside of Puerto Rico. Act 257-2018, however, provides a change whereby payments for services offered outside of Puerto Rico to any agency, dependency, or instrumentality of the government of Puerto Rico, a public corporation, as well as the legislature, the judiciary and municipalities, or any other entity, created by state or federal law, whose funds come, totally or partially, from the General Fund will be considered as income from sources within Puerto Rico and taxed accordingly. This provisions was amended under Act 17-2020 to limit this rule, starting August 1, 2019, to services under a contract that is not remitted to the Office of the Puerto Rico Controller, provided that such contract is not expressly exempt from complying with the remittance requirement to the Office of the Puerto Rico Controller (by virtue of Act No. 18 of October 30, 1975, as amended, or its applicable regulation).

Puerto Rico also maintains an Alternative Minimum Tax regime. The alternative minimum tax rate is 18.5% for taxpayers with a volume of business of less than $3 million. If a taxpayer's volume of business is $3 million or more, the applicable AMT rate is 23%.

In addition to credits, deductions, and exemptions included in Puerto Rico's 2011 Code, Puerto Rico has passed more than 60 pieces of legislation that offer tax incentives to persons and companies that meet certain criteria collectively the Incentive Acts. Incentive Corporations that qualify for treatment under the Incentive Acts generally pay a significantly reduced income tax rate and typically receive waivers or exemptions from the payment of certain SUT, property, municipal, and other taxes and fees.

In July 2019, one of Puerto Rico's largest tax filers completed a one-time corporate transaction, which resulted in a non-recurring revenue of $488 million in Fiscal Year 2020. The Puerto Rico Department of Treasury also projected a $39 million reduction in corporate income taxes as a result of this transaction starting in Fiscal Year 2021. The Puerto Rico Department of Treasury continues to evaluate the long-term impact projection and the forward-looking estimated reduction is subject to change.

Pursuant to various Administrative Determinations issued by the Puerto Rico Treasury Department of Puerto and Act 57-2020, several filing deadlines of certain tax forms and declarations, along with the payment of certain taxes that were due during 2020 were postponed without the imposition of interest, surcharges or penalties. This was in response to the Governor's executive order OE-2020-020 declaring a state of emergency and shuttering essential government services to facilitate the slowing of the spread of the COVID-19 virus.

For FY 2020, the combined General Fund and SRF tax revenues for Commonwealth regular and incentive corporations amounted to approximately $2,124 billion.

As of December 2020, Hacienda reported revenues included in the "Other General Fund Revenues" category which include total collections of $595 million, from which $35 million are deferred taxes from FY20 collected during FY21, $182 million are attributed to partnerships and $205 million are related to other unclassified excise taxes. According to Hacienda, accumulated revenues from partnerships are related to an optional provision included in Act 60-2019 which

allows partnerships to file and pay at the partnership level rather than at the partner level. According to Hacienda, the increase in other excise taxes is attributable to excise tax payments that have been received without a corresponding return or declaration filed. Hacienda continues to analyze these receipts so that they may be allocated to the proper excise tax categories. According to Hacienda, these issues arose during the transition to the SURI platform.

***Non-Resident Withholding Tax.*** In general, non-residents are subject to a withholding tax on certain payments received from Puerto Rico sources. The regular withholding rate on these payments to nonresidents is 29%, however certain taxpayers can enjoy a more favorable tax treatment. By law, 10% of the revenues derived from the withholding tax on royalties paid by companies operating under Act 73-2008 are supposed to be appropriated to the Economic Development Fund ("FEDE"), an incentive fund administered by PRIDCO. The revenues appropriated to FEDE are recorded in the General Fund and are used to provide economic incentive grants to private companies. However, the percentage transferred has historically been smaller than 10%. Section 5010.01(i) of Act 60-2019 created the new Economic Incentives Fund and designated it as the successor of various funds, including the FEDE.

In addition to the tax on royalties, unless an incentive decree is in place, dividends paid to non-resident corporations and individuals are subject to a withholding tax of 10% and 15%, respectively, and interest paid to non-resident affiliates is subject to a withholding tax of 29%.

For Fiscal Year 2020, Commonwealth nonresident withholding tax revenues amount to approximately $379 million in the General Fund and $11 million in SRF.

***Other Income Taxes.*** Revenues from other income taxes include revenues from partnerships, taxes on interests and dividends and estate and gift taxes.

b)   **SUT**

The Commonwealth's SUT was originally enacted in 2006, pursuant to Act No. 117-2006. The SUT replaced the prior 5% (effective 6.6%) general excise tax on imported goods and the 3.6% general excise tax on goods manufactured in Puerto Rico.

The SUT is levied on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

The Commonwealth SUT had an original tax rate of 5.5%. Act 117-2006 also authorized each municipal government to impose a SUT of 1.5% (the Municipal SUT), which generally has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT. Combined, the rate was 7.0%. Act 18-2014 lowered the portion of the Municipal SUT allocated to the municipalities to 1.0% and allocated the other 0.5% to the Municipal Administration Fund, a fund created to provide a financial mechanism to finance the debt of the municipalities.

In 2013, Act 40-2013 eliminated various exemptions to the SUT, which broadened its base, and Act No. 46-2013 required the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

On May 29, 2015, the Commonwealth enacted Act 72-2015 that, among other things,

(i)      increased the Commonwealth SUT rate to 10.5% (effective on July 1, 2015, with the net 4.5% increase being for the benefit of the General Fund), and

(ii)     eliminated several exemptions

Although the provisions enacted under Act 72-2015 have experienced various amendments since their original enactment, the Commonwealth SUT remains at 10.5%. A portion of the SUT is allocated to COFINA, in accordance with a statutory formula, as adjusted under the COFINA Plan of Adjustment, with the balance being allocated to the Commonwealth's General Fund. With the 1.0% allocated to the Municipal SUT, the total SUT rate in Puerto Rico is 11.5%, one of the highest rates in the United States. Separate from the general SUT, there is also a special 4% SUT, imposed by the Commonwealth, that is generally applicable to business-to-business services and designated professional services rendered by merchants with annual volume of business above $200,000 ($300,000 in the case of business-to-business services rendered after July 1, 2020).

Act 257-2018 amended both the rate and items subject to the Commonwealth SUT. Act 257-2018 broadened the SUT base by expanding the taxability of certain categories, including discount shopping clubs and certain types of candies. Act 257-2018 also reduced other portions of the taxable SUT base and rate. Starting October 1, 2019, Act 257-2018 reduced the SUT on prepared foods sold by restaurants to 7.0%, subject to the restaurant obtaining a certification from the Secretary of Treasury. Act 257-2018 also exempted certain previously taxable items from the SUT, including e-books and digital books, female sanitary items, and certain legal services. Finally, Act 257-2018 increased the threshold for the SUT exclusion for business to business and designated professional services based on the merchant's annual volume of business from $50,000 to $200,000 after March 1, 2019. This threshold was increased to $300,000 by Act 40-2020 with respect to business-to-business services rendered after July 1, 2020.

*Medical Cannabis.* The use of medical cannabis has been permitted in Puerto Rico since 2015 through Executive Order No. OE-2015-35 and implemented by the Regulations of the Puerto Rico Department of Health No. 8766, as amended. However, on July 9, 2017, the Governor of Puerto Rico signed into law Act 42-2017, the "Act to Manage the Study, Development and Research of Cannabis for Innovation, Applicable Norms and Limitations," which legalizes and regulates the use of cannabis in Puerto Rico for medical purposes, but keeps recreational use prohibited. With this legislation, the new administration created a robust legal framework to protect patients, and to address the regulation, control, and oversight of the medical cannabis industry. The sale of medical cannabis is subject to the 11.5% SUT. Medical doctors also pay $1,500 every three years for a permit to issue prescriptions to patients.

*Federal Actions.* To mitigate the economic impact of COVID-19, the Federal Government issued a series of emergency stimulus bills to lessen the burden on businesses and individuals in the United States. A summary of COVID-19 stimulus actions from both the U.S. Federal

Government and the Commonwealth of Puerto Rico are provided in the Natural Disasters and COVID-19 section of this disclosure statement.

*Commonwealth Treasury Administrative Determinations*. On January 9, 2020, significant seismic activity was experienced throughout Puerto Rico, resulting in the Governor declaring a state of emergency. As a result of this declaration, the Secretary of the Department of Treasury announced the temporary elimination of the collection and payment of the SUT until 11:59 p.m. (AST) on January 31, 2020. This was done through Administrative Determination 20-01, which notified merchants that individuals were exempt from paying SUT on taxable items considered prepared foods, including carbonated beverages and baked goods and pastries as defined by the 2011 Code. The SUT exemption did not apply to the sales of alcoholic beverages.

On January 31, 2020, the SUT exemption under Administrative Determination 20-01 was extended through Administrative Determination 20-02 for an additional 30 days, until February 29, 2020, for the municipalities under the major disaster declaration.

On March 15, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-03, authorizing a 30-day extension of the deadlines in connection with the 2019 Income Tax Returns filings and tax payments, and the first estimated tax installment for the calendar year 2020 until May 15, 2020. This determination was approved by the Oversight Board on March 25, 2020.

On March 16, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-05, to extend filings and tax payments deadlines for other taxes, including SUT, bonds, and licenses for two months. This determination was approved by the Oversight Board on March 25, 2020.

On March 18, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-07, issuing a temporary SUT Exemption on "Basic Needs Articles" for the period of March 23, 2020 through April 30, 2020. This determination was approved by the Oversight Board on March 16, 2020.

On March 18, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-08, issuing a temporary Sales Tax Exemption on "Prepared Foods" for the period between March 20, 2020 and April 19, 2020. If a merchant, by act or omission, charges a consumer Sales Tax on the sale of prepared food items, the merchant was required to immediately refund the amount of the sales tax charged to the consumer. This determination was approved by the Oversight Board on March 18, 2020.

On March 24, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-09, amending Informative Bulletin 20-08 and repealing Administrative Determinations 20-03 and 20-05. This determination was approved by the Oversight Board on March 25, 2020. Pursuant to Administrative Determination 20-09:

- The deadline for filing the monthly SUT returns and the corresponding payment for the periods of February, March, April, and May 2020 was extended two months;

- Income tax returns which original due date was March 15, 2020 were extended to June 15, 2020; income tax returns with an original due date of April 15, 2020 were extended to July 15, 2020; and income tax returns with an original due date of May 15, 2020 or June 15, 2020 were extended to July 15, 2020;

- Other returns which original due dates were during the months of March and April 2020 were extended to June 2020; and other returns which original due dates were during the months of May and June 2020 were extended to July 2020;

- Any bond that had an expiration date between March 15, 2020 and April 30, 2020 was extended to May 31, 2020; and

- All internal revenue licenses that had an expiration date between March 15, 2020 and April 30, 2020 were extended to May 31, 2020.

On March 24, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-10, establishing cash flow measures on taxes. This determination was approved by the Oversight Board on March 25, 2020. Cash flow measures include:

- No imposition of penalties for the lack or insufficiency of payment of the first and second 2020 estimated tax installments;

- Waiver on withholding tax, but not an exemption of payment; and

- Temporary SUT exemption on import and purchase of taxable items for resale during the period of April 6, 2020 through June 30, 2020.

On March 26, 2020, the Secretary of Treasury of Puerto Rico issued Internal Revenue Circular Letter 20-21, establishing a $500 incentive for self-employed individuals who are residents of Puerto Rico, income is subject to federal social security tax, and are duly registered in SURI as merchants. This letter was approved by the Oversight Board on March 26, 2020 and the extension was approved on May 4. 2020. This incentive was extended via Internal Revenue Circular Letter 20-25 through June 30, 2020, and with Circular Letter 20-27 the incentive eligibility was expanded with the purpose of extending the economic benefits to those individuals who are self-employed and who, after March 15, 2020, have been diligent in complying with their responsibility to obtain their Merchants Registration Certificate in SURI, as required by the 2011 Code. Circular Letter 20-37 extended the deadlines for the incentives in Circular Letter 20-26 and 20-27 until September 15, 2020.

On April 18, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-11 which amended Administrative Determination 20-08 to extend the SUT exemption on prepared food until May 3, 2020.

On May 1, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-12, which amended Administrative Determination 20-07, to extend the SUT exemption on Basic Needs Articles from April 30, 2020 to May 31, 2020.

On May 3, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-13, which amended Administrative Determination 20-11, to extend SUT

exemptions on prepared food through May 25, 2020. On May 26, 2020, the Commonwealth requested a further extension of the temporary SUT exemption on prepared food, but it was denied by the Oversight Board.

On June 1, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-16, amending Administrative Determination 20-07 and 20-12, to extend the SUT exemption on Basic Needs Articles until 11:59 p.m. Tuesday, June 30, 2020. This determination was approved by the Oversight Board on June 1, 2020.

On July 16, 2020, the Secretary of Treasury of Puerto Rico issued Administrative Determination 20-17, which amended Administrative Determination 19-05 to postpone the implementation deadline of the Requirement for the Commercial Lease Exemption to June 30, 2021. The Commercial Lease Exemption exempts qualifying tenants from paying SUT on the rental fee of a commercial property lease to the landlord per Section 4030.14 (b) of the 2011 Code.

In addition, on July 16, 2020, Administrative Determination 20-18 was issued to amend Section 4030.20 (b) of the 2011 Code and extend the SUT exemption on school uniforms and materials from 2 days to 4 days. This determination was issued in accordance with the multiple Executive Orders issued by the Governor for more rigorous safety precautions to help curb the spread of COVID-19. The established SUT exempt period was from July 29, 2020 to August 1, 2020.

On July 29, 2020, the Governor of Puerto Rico issued Executive Order 2020-59 in response to Tropical Storm Isaías, which closed the Government of Puerto Rico agency offices from noon on July 29, 2020 until July 31, 2020. As a result of Administrative Determination 20-20 the following determinations were made:

- Deadline to submit all returns, forms, tax payments (income tax, excise duties and SUT) or deposits of withheld contributions extended from July 31, 2020 until August 7, 2020;
- No penalty would be assessed for any missed bi-weekly SUT payments during the month of July 2020, as long as any outstanding amounts were submitted with the SUT monthly remittance; and
- The first SUT exempt period extension for purchases of school uniforms and materials as determined in Administrative Determination 20-18, was extended until August 4, 2020

On January 20, 2021, the Secretary of Treasury of Puerto Rico issued (i) Administrative Determination 21-01, clarifying the tax treatment of qualified rollover contributions to the new defined contribution plan under Act 106-2017 of the Retirement Plan of the Government of Puerto Rico, and (ii) Administrative Determination 21-02, to exempt International Banking Entities and International Financial Entities from the monthly filing of reports to the Department of Treasury under Act 131 of July 23, 1974, as amended, known as the Transfer of Funds Abroad Act.

***SUT imposed on out of state sellers.*** On June 21, 2018, in *South Dakota v. Wayfair Inc.*, the U.S. Supreme Court reversed the physical presence rule established in *Quill Corp. v. North*

*Dakota*. Under *Quill Corp.*, States were prohibited from imposing SUT on out-of-state sellers, regardless of whether the seller had a physical presence in the State imposing the tax. The *Wayfair* decision further supported the implementation of Puerto Rico Act 25-2017, which was aimed at improving SUT collection from retailers who sold taxable products in Puerto Rico yet had no physical presence in Puerto Rico. Act 25-2017 amended provisions in the Puerto Rico Internal Revenue Code with respect to substantial nexus requirements for SUT. These new provisions include any merchant that sells and directly markets by any means, to Puerto Rican purchasers, via any method of transport, or the merchant sells tangible personal property to a Puerto Rican for use, distribution or consumption in Puerto Rico.

Further, pursuant to Act 173-2020, the SUT withholding obligation is no longer optional, and merchants engaged in the business of sales dispatched by mail are classified as withholding agents and have the obligation of collecting the corresponding SUT. As a result of the same law, any sales transaction dispatched by mail after December 31, 2020, in which a market facilitator performs certain activities, will be considered as a taxable transaction and the market facilitator will be considered a withholding agent with the obligation to collect the SUT on behalf of the seller. Puerto Rico Treasury Department Informative Bulletin 21-02 issued on February 19, 2021 confirmed that the collection obligation is no longer voluntary.

Regulation No. 9237, which amends Regulation No. 8049, establishes an economic nexus by which businesses that do not have a physical location in Puerto Rico are subject to SUT if they have gross sales over $100,000 or at least 200 transactions during the year. This includes marketplace facilitators, marketplace sellers, and other remote sellers. The regulation also defines the term specific digital products as electronically transferred digital audiovisual works, digital audio works, or other digital products, provided that a digital code grants a buyer the right to obtain the product. For these purposes, the term "other digital products" may include digital storage products, computer software applications, and any other products that may be considered a digital product. The regulation also adopts a special sourcing rule with respect to "Specific Digital Products" for SUT purposes. These provisions expand the SUT base. Puerto Rico Treasury Department estimates that the amendment to the regulation will raise an additional $200 million in SUT during the first year of implementation, followed by increases in such revenues in later years.

For FY 2020, the Commonwealth received approximately $1.6 billion in General Fund revenue from the SUT. Pursuant to its plan of adjustment, COFINA received $437 million in SUT revenue in Fiscal Year 2020.

### c)    Excise, Other Taxes, and Other Monies and Revenues

*Act 154 Special Tax*. In 2010, the Commonwealth enacted Act 154-2010 ("Act 154") to address the Commonwealth's fiscal crisis at the time by increasing tax revenues derived and collected from the activities of foreign corporations and partnerships operating in Puerto Rico. In particular, Act 154 modified the income taxation of certain non-resident alien individuals, foreign corporations and foreign partnerships by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation and imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. This excise tax, which is

imposed in lieu of an income tax based on the modified source income rule, affects mostly foreign corporations and partnerships that are principally engaged in the manufacturing of pharmaceuticals and other high-tech products. The special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues. In Fiscal Year 2019, ten companies accounted for more than 90% of the special temporary excise tax revenues.

Although the Act 154 excise tax was originally scheduled to apply for a limited period of time and to decline over time, the continuing of the fiscal crisis resulted in Act 154 being amended in 2013. Under Act 2-2013, the declining rate, at 2.75% at the time, was reset back to 4.0% and the term was extended through 2017. In 2017, under Act 3-2017, the tax was further amended to extend the fixed 4% rate until December 31, 2027.

Upon the scheduled expiration of the Act 154 excise tax on December 31, 2027, Act 154 provides that such tax shall be replaced by the modified source of income rule. It is not clear if the level of tax collection under the modified source of income rule would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154.

On September 29, 2020, the U.S. Treasury Department and the IRS released proposed regulations for foreign derived digital services intangible income, restricting the use of foreign tax credits and the allocation and apportionment of certain expenses (the "Proposed DST Regulation"). The Proposed DST Regulation is directed at certain digital services taxes imposed by a number of Organisation for Economic Co-operation and Development member countries. On their face, the proposed regulations would seem to eliminate the ability of U.S. parents of many firms operating in Puerto Rico to claim a U.S. federal income tax credit for payment of Puerto Rico's Act 154 excise tax. However, according to a press release from Secretary Parés Alicea on October 2, 2020, US Treasury Assistant Secretary for Tax Policy David J. Kautter indicated in a meeting between the two that the proposed regulations were not intended to affect taxpayers' ability to claim a foreign income tax credit under Federal income tax law for Puerto Rico's excise tax under the Act 154 regime.

On February 9, 2021, Treasury Secretary Parés sent a letter to U.S. Treasury Secretary Janet Yellen and Deputy Assistant Treasury Secretary Mark Mazur containing comments on the proposed update to the U.S. IRS's treatment of the foreign tax credit, and subsequently Act 154. The letter highlights the impact Act 154 has on Puerto Rico's revenues, noting that it represents a significant portion of the Commonwealth's General Fund net revenues, and that the Act 154 Excise Tax is imposed on companies that enable over 78,000 direct and indirect jobs on the island. The letter also suggests amendments to the proposed regulations to make clear for a number of policy and technical reasons that they do not apply in Puerto Rico. Finally, while the letter asserts that the Act 154 tax should not be affected by the rules because it complies with certain jurisdictional requirements, it also provides proposed amendments to the regulations to carve out the commonwealth tax from the new rules or, in the alternative, provide a three-year transition period before the rules apply to the tax.

The IRS held a public hearing on April 7, 2021 at which it received comments on the proposed changes to the foreign tax credit regulations that may impact the creditability against US

income taxes of Act 154 tax payments. Among the submissions was the February 9, 2021 letter from the Puerto Rico Treasury Department to the US Treasury.

For Fiscal Year 2020, the Commonwealth collected approximately $1.8 billion in General Fund revenue from Act 154.

*Beer and Alcoholic Beverages Excise Tax*. Distillers, rectifiers, producers, manufacturers, and importers are generally taxed on distilled spirits, wines with 24% or less alcohol content by volume, imported champagne and sparkling or carbonated wines or imitations thereof, and beer, ale, porter, malt extract, and other similar fermented or unfermented products. If wines, champagne, and sparkling carbonated wines or imitations thereof have more than 24% alcohol content by volume, they are considered distilled spirits. The tax is imposed on a per-wine gallon or a per-proof gallon.

Since 1978 (Act 37-1978), the tax rate assessed on beer production has varied depending on whether the beer was brewed locally or imported. The Act 86-2019 reduced excise tax rates for small beer producers. Persons producing fewer than 1.86 million gallons but greater than 400,000 gallons will be taxed at $1.50 per gallon and those producing fewer than 400,000 gallons will be taxed at $0.95 per gallon. Act 86-2019 maintained the existing 5-tier graduated scale for persons producing greater than 1.86 million gallons of beer in a year. The lowest tax in this tier is $2.55 per gallon for companies that produce between 1.86 million and 9 million gallons. The highest tax is $4.35 per gallon for companies that produce more than 31 million gallons, or for imported beers. Act 108-2004 additionally modified the way the tax was assessed, and, thereby the amount paid by any company subject to the tax. Imported beer producers pay the highest tax per gallon on the scale, regardless of their production level. Similarly, the excise tax on distilled spirits obtained from fermentation and distillation of any product other than those derived from sugarcane pay a $31.29 per measured gallon tax.

For FY 2020, the Commonwealth collected approximately $234 million in General Fund revenue from such excise tax.

*Tobacco Products Excise Tax*. The excise tax applicable to cigarettes, which has been increased multiple times in the past decade, is currently $25.50 per hundred cigarettes. The 2011 Code also imposes a tax on cigars, rolling tobacco, chewing tobacco, powdered tobacco (snuff), electronic cigarettes, vaporizers, and other products derived from tobacco.

The 2011 Code provides that the Secretary of Treasury shall deposit the collections resulting from the tobacco products excise taxes directly to the General Fund. Act 26-2017, amended the 2011 Code's provision regarding the assignment of funds to direct the deposit of all funds collected to the General Fund rather than distribute a portion of the funds among the School of Fine Arts (.33%), the Conservatory of Music (.33%) and Musical Arts Corporation (.34%).

A portion of the proceeds of the cigarette excise tax has historically been conditionally appropriated for the payment of HTA and MBA debt obligations. These tax collections were deposited in the TSA or other Commonwealth accounts.

116

Since FY 2016, a portion of the proceeds of the cigarette excise tax has been appropriated for PRITA to cover its operational expenses.

For FY 2020, the Commonwealth collected approximately $89 million from the tobacco products excise tax in the General Fund and $87 million in the SRF.

***Motor Vehicles Excise Tax***. The excise tax applicable to automobiles ranges from $637.50 to $9,253 plus 34% of the taxable price in Puerto Rico in excess of $44,890. Motorcycles and all-terrain vehicles are also subject to an excise tax of 8% and 11.5%, respectively. Other vehicles are subject to different excise tax rates on their taxable price in Puerto Rico (*e.g.*, truck tractors (17%), buses (20%), trucks (10%) and trailers of manual coupling or of light equipment (6.6%)).

A portion of the proceeds of the motor vehicle excise tax ($4.9 million was budgeted in FY20 and $5.8 million was budgeted in FY21) has been appropriated for the Green Energy Fund to provide subsidies to Puerto Rico residents to cover the cost of purchasing energy-efficient materials and equipment. The Economic Incentives Fund under Act 60-2019 is the successor of the Green Energy Fund.

For FY 2020, the Commonwealth collected approximately $382 million in General Fund revenue from the motor vehicles excise tax.

***Custom Duties and Offshore Rum Excise Tax.*** Intergovernmental revenues include remittances from the federal government of federal excise taxes on shipments of rum, beer, and wine imported from Puerto Rico and foreign jurisdictions to the United States mainland, in accordance with section 7652 of the U.S. Internal Revenue Code and the Caribbean Basin Economic Recovery Act of 1983 (P.L. 98-67).

The excise taxes on shipments of certain rum, beer, and wine is imposed and collected by the United States Alcohol and Tobacco Tax and Trade Bureau and covered over to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently at $13.50 per proof gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently covered over to the Commonwealth. Since 1999, the United States Congress has also enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon. The law does not impose any restrictions on how Puerto Rico can use the transferred revenues.

Puerto Rico distributes revenues from the remittances of excise tax on shipments of rum among various governmental entities and private rum producers. In addition to sending funds to the General Fund, revenues from the excise tax are appropriated to, and distributed among (i) the Puerto Rico Conservation Trust Fund (the "Conservation Trust"), a Puerto Rico charitable trust charged with protecting Puerto Rico's natural resources, which receives each Fiscal Year an amount equal to approximately 45 cents per proof gallon of rum of the tax extender amount, (ii) the Puerto Rico Science, Research and Technology Trust Fund (the "Science Trust"), a government-sponsored trust created by Act 214-2004 to set and implement the public policy of the Commonwealth for technological and scientific research and development, which receives $5 million in excise tax revenues each Fiscal Year, and (iii) the Economic Incentive Fund (formerly managed by PRIDCO), for the benefit of the "Rums of Puerto Rico" incentive program, which

117

receives up to $10 million each Fiscal Year to be used to promote local rum industries and the development of the cane industry. This amount does not have to be remitted in any Fiscal Year where there is an accumulated surplus from prior Fiscal Year assignments of at least $50 million dollars.

Finally, up to 46% of the revenues from the excise tax corresponding to the rum sales of certain rum producers is transferred to such rum producers pursuant to certain incentive agreements signed with the Commonwealth. This incentive program was created in direct response to the fact that in 2008, the Government of the U.S. Virgin Islands signed an agreement with Diageo USVI, Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, U.S. Virgin Islands, that would manufacture Captain Morgan branded products, which prior to 2012 were procured through a supply contract with the Serrallés distillery in Puerto Rico. As a result of the termination of the contract between Serrallés and Diageo, after 2011 the income received by the Commonwealth from the federal excise tax on rum shipments materially decreased.

In an effort to support the local rum industry as a result of the threat posed by the U.S. Virgin Islands' agreement with Diageo, and to protect the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, Act No. 178-2010 increased from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to, and promote, the Puerto Rican rum industry. The law also authorized the Governor to increase this percentage up to 46% through Executive Order. Such Executive Order was issued, and the percentage limit was increased to 46% effective July 1, 2012. As contemplated by Act 178-2010 (now incorporated into the 2011 Code), the Commonwealth has entered into definitive agreements with the three main Puerto Rico rum producers. These agreements provide rum producers with 46% of the monies from the excise tax corresponding to the rum sales of each such rum producer. Since May 2015, the federal government has deposited money received from federal rum excise taxes into a lockbox account of the Secretary of the Treasury at a private commercial bank. The commercial bank and the Commonwealth have agreed to distribution instructions for moneys to be transferred from the lockbox to the Central Government, rum producers, and other transferees. Prior to this arrangement, federal rum excise taxes were deposited in the TSA and the Treasury forwarded to PRIDCO the amounts necessary to pay the incentives due to the rum producers.

For FY 2020, General Fund revenues from the federal excise tax on rum shipments were $251 million.

***Slot Machines.*** Slot machines are taxed in accordance with Act 221-1948, the Games of Chance Act. Under the Games of Chance Act, slot machine collections are split between operators and the Commonwealth in varying proportions depending on the total collections. The Commonwealth distributes its portion of the slot machine collections to the General Fund, the PRTC, and the University of Puerto Rico.

The Gaming Commission, as enabled by Act 81-2019, manages the distributions of all slot machine collections. The operating costs of the Gaming Commission are paid prior to distributions to the operators or the Commonwealth. Prior to Act 81-2019, the PRTC managed the slot machine collections and distributions using a private bank account. Act 81-2019 requires the Department

of Treasury to collect the proceeds from the slot machines and place them in a special account to be managed by the Gaming Commission.

In FY 2020, the slot machine collections were $208 million. After $16 million in operational costs, the slot machine waterfall distributes $92 million to operators and $100 million to the Commonwealth.

***Games of Chance Machines Tax.*** Act 257-2018 included provisions for the licensing and operations of Games of Chance machines, flow of funds to the government, and the regulatory environment, among other guidance. Initially, the law legalizes 25,000 machines over two years. An additional 10,000 machines per year (20,000 total) are authorized in years 3 and 4, up to a maximum of 45,000 machines in total if the Gaming Commission's Games of Chance Division concludes, based on a study, that the market for Games of Chance Machines is not saturated.

There is a $1,500 annual license fee per machine payable by wholesale owners. The fee is payable to the Department of Treasury, of which $300 shall be transferred to the Gaming Commission for administrative services. There is also a $3,000 biennial license fee payable to the Department of Treasury by distributors, goods and services providers, and manufacturers. Machines must offer players at least an 83% payback on play activity. The remaining 17% revenue is split between the operator of the machine (67%) and the government (33%).

From the portion of revenue that is sent to the government, the revenue is split in various amounts between the General Fund (the first $40 million, if the license fees under the 2011 Code do not meet that threshold), municipalities for their ASES contribution (45%), and police retirement costs (50%). A small portion (5%) of the government's share also goes to the PRTC for maintenance and operations. Since regulations for this provision of the law have not yet been approved, no revenue has been collected from this revenue stream.

***Sports Betting and eGaming.*** Puerto Rico recently enacted Act 81-2019, which legalizes onsite and online betting on professional and college sports events, as well as videogame and fantasy sports leagues. Act 81-2019 establishes that sports betting will be allowed in casinos, at horse-racing tracks and off-track betting parlors, and over the internet. Additionally, "betting centers or districts" could be established in "strategic places" including tourism zones, historic zones or any other place that complies with the proposed law and regulations imposed by a newly established Gaming Commission that will regulate betting on sports, horse racing, electronic games and slot machines.

Under Act 81-2019, government revenue would be generated from operating license fees and taxes on bets and winnings. In addition to licensing fee collections, the tax rate on bets will be 6% for bets made in person and 11.5% for bets made online. 50% of the revenue, after covering the cost of the newly established Gaming Commission, would be earmarked for public pensions with the remaining revenue being allocated to a range of other areas including youth sports, educational initiatives, law enforcement equipment, municipalities, and to treat gambling addiction.

After communications between the Gaming Commission and the Oversight Board certain of the proposed regulations were approved by the Oversight Board.

119

*Traditional and Electronic Lottery.* Puerto Rico oversees two types of lottery systems, a traditional and electronic lottery. The Puerto Rico Lottery is the oldest modern lottery in the United States. The system began in 1934 and is currently operated by the Puerto Rico Treasury Department. The General Fund will recognize revenue from unclaimed lottery prizes that by law are recorded in the General Fund on a budgetary basis after the term for claiming lottery prizes has expired (180 days). The recording of revenue in the General Fund however does not represent a cash transfer or deposit into the TSA. By law, 35% of annual net revenue from the electronic lottery is funded into the CRIM equalization fund with the purpose of supporting smaller municipalities.

In FY 2020, the General Fund and SRF received approximately $18 million and $47 million in revenue, respectively, from the traditional and electronic lotteries.

*Excise Tax on Petroleum Products and its Derivatives ("crudita").* The gross excise tax on petroleum products and its derivatives is $15.50 per barrel ($6.25 of which does not apply to diesel products). $9.25 of such tax was historically conditionally appropriated for HTA and $6.25 to PRIFA. This tax is subject to adjustment based on consumption and inflation every four years. These tax collections were deposited in the TSA or other Commonwealth accounts.

*Gasoline, Gas Oil and Diesel Oil Excise Tax.* The gasoline excise tax is currently set at $0.16 per gallon, and the tax on gas oil and diesel oil, is currently $0.04 per gallon. These revenues were deposited in the TSA or other Commonwealth accounts.

*Aviation Fuel Tax.* Act 82-1959, as amended, empowers the Puerto Rico Ports Authority to levy and collect a fee from importers of aviation fuel. This fee is currently three cents per gallon of aviation fuel supplied to airlines and other suppliers.

*Hotel Occupancy Tax.* Article 24 of Act 272-2003, as amended, imposes a hotel occupancy tax, collected directly by the PRTC, on all hotels and motel accommodations on the Commonwealth. The Fiscal Year 2020 SRF revenue recognized was $56 million.

Additionally, in accordance with Act 46-2017, the government started collecting the 7% room occupancy tax from short-term rental property operators. The law amended the definition of "innkeeper/host" for the different business models that have entered the market and serve as intermediaries between the hotels and guests. Entities like Airbnb, HomeAway and other digital platforms will collect "room tax" as mandated by the law. Before the enactment of Act 46-2017, on June 22, 2017, the Governor and officials of Airbnb signed a voluntary agreement to directly collect and remit the tax. Between August 2017 and August 2020 Airbnb paid approximately $16 million in room tax collections to the Commonwealth.

*Other Excise Tax Revenues, Insurance Premiums, and Horse Races.* For FY 2020, the Commonwealth collected approximately $254 million in General Fund revenue from other excise taxes, insurance premiums, and horse races. This includes revenues from horse racing, insurance premiums, excise taxes on sugar, coffee, cement, and others. The excise tax applicable to sugar and coffee is appropriated for the Integral Fund for the Development of Agriculture ("FIDA") administered by the Puerto Rico Land Authority.

*Interest Income.* The Government of Puerto Rico has established a program to maximize interest generated through the monthly redistribution of TSA unreserved balances. According to Puerto Rico's Treasury Secretary, the redistribution of government-held bank accounts started in October 2019 and generated revenue interest income for the Commonwealth during Fiscal Year 2020.

5.      **Charges for Services**

The Commonwealth charges fees and penalties for services rendered. The most important of these charges for services are described below.

*Public Health / Patient Fees.* The Department of Health operates three hospitals in Puerto Rico located in San Juan and Bayamon, Puerto Rico. The Department of Health is authorized to bill for medical services rendered in these medical facilities. While the revenues earned are used exclusively for the operation of the medical facilities, appropriations from the General Fund are nevertheless still required to cover a significant amount of operating expenses. All the revenues earned from these fees are recorded in a SRF.

*Judicial Service Fees.* The Judicial Branch of the Commonwealth is authorized by law to charge fees related to the Puerto Rico court system. Such revenues are to be used exclusively by the Judicial Branch of the Government.

*Document Rights Fees.* Commonwealth agencies are authorized by law to charge a fee for certified documents or other official government documents, such as birth certificates and death certificates.

*Motor Vehicle Fines.* Motor vehicle fines are assessed for a range of standing and moving violations. Law 134-2019 was enacted to establish payment plans and incentives for debts on various fines and driver's licenses.

*Motor Vehicles Permits Fees.* The Vehicle and Traffic Law requires that the motor vehicles registration fees collected be used only for the operation of the centers for driving services (known as "CESCOS" for their acronym in Spanish), which are administered by the Department of Transportation and Public Works. As of FY21, revenues from motor vehicle license fees are recorded in the General Fund.

*Other.* Other charges include charges provided by agencies, professional license fees, trademark fees, rental fees, public housing fees and other permit, fine and registration fees. A significant portion of these license fees are recorded in Special Revenue Funds. In FY 2020, all other revenue sources of the Commonwealth represented $313 million in General Fund and $548 million in special revenue fund collections.

6.      **Property Taxes**

Property tax in Puerto Rico is charged on both real property and personal property, including inventory, to companies and individuals, mostly for the benefit of municipalities.

Real property taxes are assessed based on Fiscal Year 1957-1958 property values. No real property reassessment has been made since Fiscal Year 1957-1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in Fiscal Year 1957-1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed 1958 valuation (more than $215,000 in current dollars) in owner-occupied residences is available. Personal property taxes, which accounted for approximately 40% of total property tax collections in Fiscal Year 2020, are self-assessed.

The total property tax rate varies by municipality, with the ranges listed below for the Fiscal Years 2020-2022:

| Category | Real Property | Personal Property |
| --- | --- | --- |
| Basic Fixed Property Tax Rate | 5.72% - 6.00% | 3.72% - 4.00% |
| Add'l. Special Property – State | 1.03% | 1.03% |
| Add'l. Special Property – Muni | Varies – 1.20% to 5.50% | Varies – 1.00% to 5.50% |
| Discount from State | (0.20%) | (0.20%) |
| **Total (Varies by Municipality)** | **8.03% to 12.33%** | **5.80% to 10.33%** |

Property taxes are assessed, determined and collected for the benefit of the municipalities by CRIM. 1.03% of the property tax based on the assessed value of all property (other than exempted property) is deposited in the Commonwealth's Debt Service Redemption Fund (which is not part of the General Fund).

7.    **Federal Funds**

*Federal Grants and Subsidies*. The Commonwealth is the beneficiary of federal funding across numerous federal programs. This includes federal funds for Puerto Rico's Medicaid program and Title I funds from the Federal Elementary and Secondary Education Act for Puerto Rico's Department of Education. The Commonwealth also receives more than $2 billion annually in federal funds to fund its Nutritional Assistance Program ("NAP"), which provides a monthly benefit for food to low-income households.

**Commonwealth agencies receiving federal funds in FY 2021**



The Commonwealth certified budget includes $8.9 billion of federal funds for FY 2021.  There are also federal transfers in the form of direct payments made to individuals, such as social security retirement and disability insurance, Medicare supplementary medical and hospital insurance, or veteran benefits.  Disaster funding flows directly through the Central Office of Recovery, Reconstruction and Resilience ("COR3") and is not reflected in the federal funds' budgets.

The largest recipient of federal funds is the Puerto Rico Health Insurance Administration ("ASES").  The agency is expected to receive $2.8 billion in FY 2021 of federal funding from the U.S. federal government.  ASES is responsible for making monthly payments to the local insurance carriers. It then needs to seek reimbursement of these expenses from the federal government.  The Department of Health submits these claims to the federal government on behalf of ASES.

The second largest recipient of federal funds is the Administration for Socioeconomic Development of the Family, which manages NAP.  In FY 2021, the agency will receive approximately $2 billion in federal funding.

The Puerto Rico Department of Education ("PRDE") is expected to receive approximately $1.5 billion of federal funds in FY 2021.  By federal law, all basic educational services must be paid for using state funds while federal funds are used to provide non-basic services such as special education programs, school lunch programs for low-income students and Title I funding for low-income students.  When drawing down federal funds for most grant programs, the PRDE must provide the required invoices and other documentation to the U.S. Department of Education ("USDE").  Once the drawdown request is approved the funds are transferred to the Department of Treasury where the PRDE must complete disbursements within 3 business days.

In June 2019, USDE imposed specific conditions upon the Commonwealth and PRDE, such as the requirement that PRDE must procure the services of a third-party fiduciary agent to perform the financial management duties of federal funds provided by USDE and ensure compliance with USDE grant requirements. Accordingly, on October 7, 2019, PRDE issued a Request for Proposals ("RFP") for Third-Party Fiduciary Agent Services. The aim of the RFP was

to elicit proposals from qualified business organizations with proven experience providing independent fiscal management and oversight services in the public sector, to perform third-party fiduciary oversight, management and administration of USDE grant funds services to PRDE, in accordance with applicable federal requirements. After a lengthy RFP process, Alvarez & Marsal was selected as fiduciary agent and subsequently approved by the Oversight Board in February 2021.

The Puerto Rico Department of Health ("PRDOH") is expected to receive approximately $449 million of federal funding in FY 2021 from various federal agencies. Approximately $250 million of the amount received is related to the Special Supplemental Nutrition Program for Women, Infants, and Children (known as the WIC Program) which provides funds for supplemental foods, health care and nutritional education for low income women and children who are found to be at nutritional risk. Other programs include bioterrorism preparedness, HIV care grants, maternal and child care grants and others.

Federal stimulus and disaster recovery provisions are discussed in detail through the Natural Disaster and COVID-19 section of this disclosure statement.

*Medicaid Funding.*

On a steady-state basis (*i.e.*, in the absence of supplemental federal legislation), Medicaid costs are funded primarily by the Commonwealth, as there is a cap on available federal funding. Typical annual federal funding streams for the Commonwealth are the following, and are projected based on current law and statutory growth rates:

- Standard annual federal Medicaid funding. Although Puerto Rico has a 55% federal matching assistance percentage (FMAP), the amount of annual federal funding received under Section 1108 is capped each year. For FY 2021, this funding stream is expected to be capped at $391.3 million and, for FY 2022, it is expected to be capped at $402.7M. Although the cap grows each year according to the Medical CPI-U, it does not keep pace with healthcare expenditure growth. Each year, approximately $100 million of these funds are not available to cover premium expenses, but rather are transferred to the Department of Health to cover disbursements to Federally Qualified Health Centers ("Centros 330" or "FQHC") and Medicaid Program operations.

- Children's Health Insurance Program (CHIP) funding. CHIP funding is not subject to a federal funding cap. Without additional legislation, the CHIP matching rate (E-FMAP) for Puerto Rico is expected to be 68.5%. Under the Affordable Care Act, the E-FMAP for Puerto Rico was raised to 91.5% through September 30, 2019; under the 2020 Further Consolidated Appropriations Act, the E-FMAP was increased to 83.2% through September 30, 2021 (with an additional 11.5% increase through September 30, 2020 under the 2018 HEALTHY KIDS Act); and under the Families First Coronavirus Response Act, the E-FMAP was increased to 99.0%. When these pieces of legislation expire in October 2021, the federal cost share is projected to decrease to the standard level (approximately 68.5%).

Since 2011, Puerto Rico has received temporary relief from rising healthcare costs through increased levels of federal reimbursement made available through the passage of time-limited appropriations, such as the Affordable Care Act and the Bipartisan Budget Act of 2018.

In December 2019, Congress enacted appropriations bill, *Further Consolidated Appropriations Act of 2020* (Pub. Law 116-94), whereby it authorized Medicaid reimbursement of approximately $2.6 billion and $2.7 billion, respectively, for the federal Fiscal Years 2020 and 2021. While the Commonwealth has access to these funds, it may not ultimately generate reimbursable spending to completely utilize the available funds. In addition to the reimbursement funds, the new federal legislation increased Federal Medical Assistance Percentages ("FMAP") coverage to 76%, eliminated the Health Insurance Tax ("HIT"), and provided for additional funding of up to $200 million a year if the Medicaid plan covers doctors at least 70% of the Medicare schedule rate is certified and allows payments to health insurers to be audited.

The legislation also includes requirements to improve transparency and fiscal responsibility in Puerto Rico Medicaid administration:

i)      not later than six months after the date of enactment of the law, the agency responsible for the administration of the Puerto Rico Medicaid program will designate an official to act as the Program Integrity Lead of the program;

ii)     not later than 18 months after the date of promulgation, Puerto Rico is required to publish a plan on how it will develop measures to meet the payment error rate measurement ("PERM") requirements, including annual benchmarks and audits scheduled for compliance; and

iii)    a plan must be prepared to meet the Medicaid eligibility quality control ("MEQC") requirements.

Under this legislation, if the established fraud control measures are not complied with, there will be a maximum penalty of 2.5% reduction in the FMAP. Based on current law, the Oversight Board expects the Commonwealth to hit a "Medicaid fiscal cliff" on October 1, 2021, whereby it will be responsible for multi-billion-dollar annual healthcare expenditures that had previously been covered by federal funding since 2011. At that point, the maximum federal funding will be set by Section 1108 of the Social Security Act, which is approximately $400 million, not including additional funding for CHIP and the Enhanced Allotment Program.

In response to the COVID-19 pandemic, the Families First Coronavirus Response Act was passed in March 2020, further increasing both the available federal funds (adding an additional $183 million) and the FMAP (increased by an additional 6.2% for most populations).

While the additional funds ($183 million) are one-time appropriations, the FMAP increase will continue through the end of the Public Health Emergency. The Oversight Board has provided for investments in the Medicaid system enabled by supplemental federal funding through September 30, 2021. These investments are providing Hepatitis C drug coverage and increasing reimbursement rates to specialty and primary care providers and hospitals.

Additionally, in October 2020, the Oversight Board approved the Government's proposal to temporarily expand Medicaid coverage to more than 200,000 Puerto Ricans during the COVID-19 pandemic as long as enhanced federal funding is in place, through the adjustment of the Puerto Rico Poverty Line. The Puerto Rico Poverty Line ("PRPL") expansion is reflected in Q1 of FY2022 in the 2021 Certified Fiscal Plan, and given the loss of Medicaid Funding that would occur under current law at the end of September 2021, the Oversight Board expects the Government to revert to prior eligibility standards beginning in October 2021. The Fiscal Plan also reflects an expansion in enrollment in Q2 of FY2022 due to the expectation of a prolonged, COVID-19-related increase. The Oversight Board has also informed the Government that all costs to the Commonwealth from expansion (*i.e.*, those not covered by federal funding due to eligibility type or matching requirements) must be funded through the existing budgetary resources.

***Federal Disaster Aid.*** Puerto Rico was decimated by Hurricanes Irma and Maria in 2017. As a consequence, the Commonwealth anticipates receiving significant federal aid pursuant to various disaster aid statutes that assist with the rebuilding and reconstruction of damaged infrastructure. Much of this funding is managed by COR3. Public Assistance,[148] where Federal Emergency Management Agency ("FEMA") reimburses the Commonwealth for eligible expenses related to hurricanes Irma and Maria, totals $23.4 billion in obligations so far.

In addition, Puerto Rico was approved for a major disaster declaration following ongoing seismic activities that struck the Commonwealth starting in December 2019. The earthquakes began on December 28, 2019 and continued through July 3, 2020. Fourteen municipalities were declared for Public Assistance, and $278.0 million in approved projects have been obligated across all categories (Categories A-G) as of June 22, 2021. Thirty-four municipalities have been designated for Individual Assistance and over $75.5 million in disaster assistance has been provided directly to individuals and families.

The Puerto Rico Department of Housing ("PRDOH") continues to launch programs in accordance with the action plan in the areas housing, economic development, infrastructure, multi sector, and planning. As of December 31, 2020, a total of $9.7 billion has been made available to Puerto Rico of the over $20 billion appropriated to the U.S. Department of Housing and Urban Development through Community Development Block Grant - Disaster Recovery, ("CDBG-DR"). The largest of the various programs is the housing reconstruction program which is budgeted for $1.1 billion of which approximately $78 million has been spent as of December 31, 2020 according to PRDOH's December 2020 Quarterly Report.

PRDOH submitted the action plan for the $8.285 billion in Community Development Block Grant – Mitigation ("CDBG-MIT") funding on December 3, 2020. The action plan was approved on April 19, 2021.

---

[148] The Public Assistance program reimburses state governments, local governments and certain private non-profit organizations for costs directly related to the declared incident including debris removal, emergency protective measures and repairing or replacing eligible infrastructure (i.e. roads, bridges, buildings and utilities). FEMA obligates funding for Public Assistance to COR3, who is the recipient of the grant funds. COR3 is responsible for the oversight of all sub recipients of grants funds (i.e. departments, agencies, municipalities, and certain PNPs).

On February 2, 2021, the Biden-Harris Administration also announced it would disburse $1.3 billion in disaster relief from the Department of Housing and Urban Development (HUD) for Puerto Rico, with the agency also announcing that they began to loosen restrictions on an additional $4.9 billion.

A large portion of the disaster mitigation funding authorized for Puerto Rico, is directed toward large-scale infrastructure, planning and economic development projects with the goal of ensuring that Puerto Rico will be more resistant to future disasters. The funding is part of broader HUD-Community Development Block Grant-Disaster Relief (CDBG-DR) funding and HUD-Mitigation (CDBG-MIT) funding authorized for Puerto Rico in 2017 following Hurricane Maria.

Puerto Rican officials also announced that they are working with federal authorities to determine a way to lift restrictions on additional disbursements that were imposed on the commonwealth by the previous administration.

*Certain Action Plans for the CDBG-DR and CDBG-MIT are Positioned for Review and Approval Early in 2021.*

| | 2018 Cont. Apprps Act (P.L. 115-56) | Bipartisan Budget Act of 2018 (Pub. L. 115-123) | | | Supplemental Appropriation (Pub. L. 116-20) |
|---|---|---|---|---|---|
| **Appropriation** | $1.507 billion Housing & Economy September 8, 2017 | $8.221 billion Infrastructure February 9, 2018 | $8.285 billion Mitigation February 9, 2018 | $1.9 billion Electric Power February 9, 2018 | $277.85 million Infrastructure[1] June 6, 2019 |
| **Federal Register Notice** | Published February 9, 2018 | Published August 14, 2018 | Published January 27, 2020 | --- | Published January 27, 2020 |
| **Action Plan and Action Plan Amendments** | Submitted to HUD for approval June 14, 2018 / Approved by HUD July 29, 2018 | 1st Amendment Submitted Nov 16, 2018 (Approved Nov 18, 2018) / 2nd Amendment submitted Aug. 15, 2019 (Approved Aug 23, 2019) / 3rd Amendment submitted February 24, 2020 (Approved Feb 24, 2020) | Action Plan submitted to HUD December 4, 2020 (Approved April 19, 2021) | --- | 4th Amendment submitted July 9, 2020 (Approved Aug 17, 2020) / 5th Amendment submitted December 8, 2020 (Approved Feb 5, 2021) / 6th Amendment submitted March 8, 2021 (Approved March 15, 2021) |
| **Grant Agreement** | Executed September 20, 2018 | Partially Executed Divided in 4 disbursements with first being $1.7 billion February 4, 2020 | --- | --- | --- |
| | 19 programs being rolled out $500 mm+ spent | --- (Adds 8 programs, so 27 total) | --- | --- | --- |

On September 18, 2020, Commonwealth and U.S. government officials also announced a $12.8 billion in approved funding relating to Hurricane Maria relief under the 428 Program. The agreement consisted of $10.5 billion for PREPA and nearly $2.3 billion for PRDE. Approximately $11.5 billion is the federal cost share with the balance being covered by local cost-share matching funds.

Federal funding of the $10.5 billion will allow PREPA to repair and/or replace transmission and distribution lines, electrical substations, power generation systems, office buildings, along with general improvements to the power grid. The $2.3 billion were approved for the repair of damaged education system infrastructure.

In January 2021, an agreement was reached on the estimated cost of $3.6 billion for PRASA to repair damages to water systems.

***Additional Federal Funds.*** On May 15, 2020 the Governor issued Informative Bulletin 20-14 to provide notification of the procedure to be followed for the disbursement of Self-Employed Aid. Self-Employed Aid payment was to be paid to all individuals who, as of May 14, 2020, had already received the $500 Incentive through Internal Revenue Circular Letter No. 20-21. Payment of $1,000 would be provided to self-employed individuals through direct deposit. On May 19, 2020 the Oversight Board issued a letter in response, suggesting that rather than providing further support to parts of the population who are being supported through other Federal and local stimulus packages, an action be chosen that helps provide an equitable solution to a broader spectrum of our population. Additional details on the federal response to COVID-19 and economic impact payments to individuals can be found in section V.B.2.b) of this Disclosure Statement.

On May 15, 2020, Governor Vázquez Garced also issued Executive Order 2020-040, adopting a spending plan for the $2.2 billion Puerto Rico is receiving through the Coronavirus Relief Fund ("CRF") created under the CARES Act. Additional details on the federal response to COVID-19 can be found in section V.B.2.b. of this Disclosure Statement.

On August 3, 2020, the District Court held in *Peña Martinez v. U.S. Department of Health and Human Services*, Case No. 18-1206 (D.P.R. 2018), that the federal government's exclusion of Puerto Rico residents from the Supplemental Security Income program ("SSI"); the Supplemental Nutrition Assistance Program ("SNAP"); and the Medicare Part D Low-Income Subsidy program ("LIS") violated the Equal Protection Clause. The *Peña Martinez* decision follows a similar decision by the First Circuit in *United States v. Vaello-Madero*, 956 F.3d 12 (1st Cir. 2020), which held that Puerto Rico residents could not be excluded from SSI.

On March, 1, 2021, the U.S. Supreme Court granted the petition for a writ of certiorari in *Vaello-Madero*.

***Delays in Federal Funds.*** Several governmental entities in Puerto Rico are classified as high-risk grantees, imposing additional compliance and controls before federal funds are released. The intent of these additional conditions is to ensure effective implementation of federal programs through appropriate fiscal management and responsibility. This also, however, has the potential to delay implementation of projects funded by federal dollars.

8.    **Ability to Raise Taxes Further in Puerto Rico**

The capacity of a public entity to raise tax revenue is typically measured by the levels and rates of change in economic activity and the income of its citizens and businesses. The amount of tax paid by individuals and companies relative to total income ("tax burden") is one approximation of capacity to raise additional revenue through taxation. The composition of taxes is also relevant. For example, certain types of activity may be highly sensitive to taxation or incremental costs generally. Imposing or increasing taxes on such activity could significantly curb it or create additional uncertainties, which would undermine both potential tax revenue and economic growth.

Factors that may curb investment or introduce uncertainty include: (i) the availability of substitutable options that are taxed at lower rates than the tax base for which that rate is increasing; (ii) price elasticities between different forms of consumption or uses of resources; (iii) the magnitude of the increase; and (iv) the breadth of commodity coverage and geographic territory of the tax and the mobility of the taxpayer (i.e. where there are neighboring jurisdiction with a lower tax rate).

Consequently, in evaluating Puerto Rico's capacity to raise additional revenue through taxation, one must be mindful of its available base, in the aggregate and in specific categories of activity. On an aggregate basis, economic output and income can be approximated by gross domestic product ("GDP") and GNP. GDP measures expenditures and income earned by residents and nonresidents within Puerto Rico, while GNP includes income earned by residents from local and foreign sources.

The difference between these two measures of economic activity and income is acute in Puerto Rico. According to the World Bank data, 2019 real GNP was about 66.3% of real GDP. This arises from U.S. mainland corporations accounting for a substantial share of production taking place in Puerto Rico through activities of their subsidiaries, particularly in the manufacturing sector. The Commonwealth, however, other than through the Act 154 excise tax, imposes low taxes on these manufacturing activities because it grants tax exemption decrees to many of these companies to incentivize their establishment in Puerto Rico.

**Historical Relationship between Real Gross
National Product (GNP) and Gross Domestic Product (GDP)**
($ millions)

|  | GNP | GDP | GNP as % GDP |
|---|---|---|---|
| 1990 | $54,895 | $61,264 | 89.61% |
| 2000 | $73,336 | $92,069 | 79.65% |
| 2005 | $74,278 | $105,342 | 70.51% |
| 2010 | $64,295 | $98,381 | 65.35% |
| 2011 | $63,415 | $98,029 | 64.69% |
| 2012 | $66,993 | $98,057 | 68.32% |
| 2013 | $67,119 | $97,756 | 68.66% |
| 2014 | $66,012 | $96,593 | 68.34% |
| 2015 | $64,671 | $95,579 | 67.66% |
| 2016 | $62,885 | $94,372 | 66.64% |
| 2017 | $60,257 | $91,648 | 65.75% |
| 2018 | $59,152 | $87,378 | 67.70% |
| 2019 | $58,621 | $88,416 | 66.30% |

Source: World Bank, St. Louis Federal Reserve (FRED).

As a result, using GDP to calculate the current tax burden in Puerto Rico may overstate the capacity of the Commonwealth to raise additional revenue through taxation. Also, comparisons with international jurisdictions that evaluate the tax burden in Puerto Rico based on GDP may be misleading or require adjustments because Puerto Rico demonstrates behaviors more akin to a regional economy rather than a sovereign one, with the free flow of capital, people, and goods between Puerto Rico and the mainland U.S.

Puerto Rico has also already increased its tax burden significantly on various portions of the economy over the past decade, as the government enacted new taxes and fees on Commonwealth residents and businesses. There have been at least eleven significant revisions to Puerto Rico's tax code since 1994, including six adjustments since 2013.[149] This increased the tax burden on the local economy, particularly taxes on consumption and on exports. As examples, recent adjustments in taxes and fees include:

---

[149] Including Act 40-2013, the "Tax Burden Redistribution and Adjustment Act", Act 120-2014, the "Small and Medium Business Job Generation and Retention Act", Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011", Administrative Orders 2017-01 and 2017-05, and Act 257-2018, the "2018 Puerto Rico Tax Reform Act."

**Tax Base** – Act 257-2018 increased the withholding tax and taxes on self-employed individuals and service-based corporations. The law also eliminated many AMT deductions under certain circumstances, further raising taxes on some people and businesses. This followed several other tax base broadening adjustments enacted by the government over the past decade.

**SUT & VAT** – Act 72-2015 increased the SUT from 7.0% to 11.5%, enacted a 4.0% tax on business-to-business services, and introduced a Value Added Tax regime (which would have substituted the SUT regime but was repealed pursuant to Act 54-2016). Recent laws also expanded taxable items, including the collection of sales taxes on internet transactions pursuant to Act 25-2017, business telephone services and various purchases by credit unions, universities.

**Act 154-2010** – In 2013, the Act 154 excise tax was amended under Act 2-2013 to increase the declining rate, at 2.75% at that time, back to 4.0% and extending the term through 2017. It was originally set to be transitioned to a modified source income rule in 2016. Act 3-2017 further extended the 4.0% rate on the excise tax through 2027.

**Excise and Other Taxes** – Act 46-2017 implemented a new tax on short-term rentals, such as HomeAway and Airbnb, while Act 25-2017 improved the SUT collection on online purchases of taxable products in Puerto Rico, and Act 26-2017 increased the tax on cigarettes. Act 42-2017 created the legal framework and ability to tax medical cannabis. More recently, Act 257-2018 legalized and proposed taxing certain games of chance machines and Act 81-2019 implemented taxation on eGaming and sports betting.

**Fees** – Act 24-2017 significantly increased traffic fines and fees for drivers' licenses and vehicle registrations, while other laws introduced a 1.5% contractor fee, added fees on money transactions, and increased vendor license fees for ATMs and video games machines, among others.

**Gross Tax** – Act 40-2013 implemented a new tax on gross sales commonly known as the 'Patente Nacional'. Although the tax was subsequently repealed, its implementation significantly impacted low-margin businesses, such as supermarkets.

**Water** – Utility rates on water have increased by more than 60% since July 2013.

**Petroleum "Crudita" Tax** – The gross excise tax on petroleum products and its derivatives is currently $15.50 per barrel ($6.25 of which does not apply to diesel products). Act 31-2013 increased the wholesale tax on petroleum products from a range between $3.00 to $6.00 per barrel based on the price index per barrel ($3.00 was the tax rate applicable at the time) to a fixed $9.25 per barrel. In January of 2015, Act 1-2015 further increased taxes on petroleum products (other than diesel) by creating a new $6.25 per barrel excise tax.

As shown below, while these tax increases have led to increases in overall collections they also led to a shift in the source of revenue. The Commonwealth Fiscal Plan also calls for further tax and fee increases over time. These changes have made revenue estimates increasingly challenging to forecast and introduced structural complexity, instability, and internal inconsistency to the revenue structure.

Given this reality, while certain tax revenues may increase with an increase in tax rates, the amount of the revenue increase is unlikely to be perfectly correlated to the rate increase itself. An increase in tax revenues is also not guaranteed because in certain circumstances a tax increase could push consumer behavior to pursue non-taxed alternatives that are sufficiently substitutable, potentially reducing tax revenues. Furthermore, increasing taxes beyond a certain point may be counterproductive against efforts to stem the exodus of highly educated professionals and business that are needed to achieve the fiscal plan.

**Puerto Rico General Fund Tax Revenue Sources**
($ in billions)

| Tax | 2010 | 2010 Share of GF Revenue | 2020 | 2020 Share of GF Revenue |
|---|---|---|---|---|
| Individual Income Tax | $2.6 | 34% | $1.9 | 20% |
| Corporate Income Tax | $1.7 | 22% | $2.1 | 22% |
| Nonresident Withholding | $0.8 | 11% | $0.4 | 4% |
| Sales and Use Tax | $0.5 | 7% | $1.6 | 18% |
| Excise Taxes (inc. Act 154) | $0.8 | 11% | $3.1 | 27% |
| Rum Tax Remittances | $0.4 | 4% | $0.2 | 3% |
| Other Taxes | $0.9 | 11% | $0.4 | 6% |
| **Total GF Net Revenue** | **$7.7** | **100%** | **$9.3** | **100%** |

**Global Minimum Tax –** In June 2021, the Group of Seven ("G7") nations reached an agreement to support efforts to impose some form of a global minimum tax at a 15% rate on corporate earnings. The significance of the announcement, however, is unclear. Those countries already have a corporate tax rate above 15%, which may make it easy for them to agree in principle to a tax at that rate.    There are substantial details that remain to be worked out. This is an early step in what may be a long process with an uncertain outcome.    Nonetheless, the announcement clearly shows some support for the international effort and for the Biden Administration's collateral proposal to raise the US tax on Global Intangible Low-Taxed Income ("GILTI"), including GILTI earned by US controlled foreign corporations ("CFC's") in Puerto Rico. Because of the importance of US companies CFCs in Puerto Rico, an increase in the GILTI tax could have a large detrimental effect on employment and other economic activity in Puerto Rico. In 2018, more than 300 US CFCs operated in Puerto Rico. Collectively, they earned $113 billion in total revenue, employed over 74,000 workers, and paid more than $2.5 billion in income and other taxes. Should large numbers of these companies leave, it is apparent that the Puerto Rico's economy would be damaged. Combined with the potential loss of US foreign tax credits for Act 154 tax payments and the Biden Administration's GILTI proposal, the G7 announcement may be an indication that the Commonwealth may benefit from corporate tax reform.

**D.      The Debtors' Cash Management Systems**[150]

**1.      The Commonwealth Cash Management System**

The cash management system of the Commonwealth (the "<u>Central Government Cash Management System</u>") is highly complex. Act No. 230 of July 23, 1974, as amended, provides that the Secretary of the Treasury is the officer in charge of the custody of all public funds of the Commonwealth. The Commonwealth follows the practice of pooling its cash resources of the General Fund, Federal Funds, and Special Revenue Funds for common treasury management and centralized disbursement. Cash is pooled into multiple accounts, collectively referred to as the TSA.

While disaster funds are generally managed outside of the TSA, other federal funds are transferred directly into the TSA. Most non-federal cash flows (e.g. taxes, fees and other charges) of the Commonwealth are swept to the TSA from a collection of other accounts that receive tax and other revenue collections (each, a "<u>TSA Sweep Account</u>"). The TSA and TSA Sweep Accounts are held at several private financial institutions.[151]

The diagram below illustrates the major cash flows relating to the TSA and the TSA Sweep Accounts:



Receipts for the TSA include tax collections, charges for services, intergovernmental collections (such as reimbursements from federal assistance grants), reimbursements from public corporations and municipalities for pension benefits paid and other receipts. Collections into the

---

[150] The Oversight Board's analysis of the Debtors' cash management systems is ongoing and the descriptions herein are subject to revision in all respects.

[151] Discussions of cash in III.E. refer to the combined balances of the TSA accounts.

TSA are substantially comprised of both General Fund revenue and Special Revenue Funds revenue.

At the direction of the Department of Treasury, TSA disbursements include, directly or indirectly, many Central Government agencies payroll and related costs, vendor disbursements, appropriations to public corporations and other non-central government entities, capital outlays, payments authorized under federal grants, disaster relief cost-sharing expenditures or advance payments, tax refunds, payments of current pension benefits and other disbursements.

These TSA disbursements are primarily for Central Government agencies that do not have independent treasuries. For budgeting purposes, these Central Government agencies receive appropriations from the General Fund or Special Revenue Funds. For instance, the Department of Education and the Police Bureau of the Department of Public Safety maintain budgets that are comprised of General Fund appropriations and Special Revenue Funds.

Certain agencies conduct cash management activities independently of the TSA, including: controlling accounts directly, authorizing or executing disbursements, and monitoring and planning cash flows. Some agencies maintain non-TSA accounts to address cash management needs that cannot be served by the centralized TSA structure. For example:

- the Public Housing Administration ("PHA") receives and disburses affordable housing subsidies in accordance with federal grants using non-TSA accounts,

- the Department of Labor manages employer contributions for Puerto Rico unemployment taxes, most of which are held on deposit at the United States Treasury,

- the Puerto Rico Lottery controls accounts for the receipt of ticket purchases and manages cash flows to meet projections for prize payouts, remitting net income back to the TSA.

a)     **Cash Flows of the TSA**

Cash receipts relating to taxes, federal funds, and charges for services are received into TSA Sweep Accounts and automatically or manually swept into the TSA's main operating account. The TSA's main operating account will fund other accounts in the TSA as needed including to replenish fiscally mandated reserves and to invest for income yield. At the direction of the Department of Treasury, the TSA disburses on behalf of many Central Government agencies, for payroll, operating expenses, pension benefits, expenditures related to programs funded by Federal agencies, and various other budgeted appropriations.

AAFAF compiles a report on a weekly basis of the flow of funds in these accounts, titled *Treasury Single Account FY 2020 Cash Flow*, and additionally compiles monthly, and quarterly Cash Flow reports.

The largest tax categories are income taxes (individual and corporate income taxes), SUTs, Act 154 excise tax revenues, and other various types of taxes.

*Income Taxes.* The Central Government collects income taxes from individuals, corporations, partnerships, and non-resident withholding taxes. Income taxes are generally deposited into the applicable account either from physical collection posts or through online collection portals of the Department of Treasury. Tax collections are also received from general tax accounts associated with the SURI tax collection platform. Collections are swept on a two-day lag. Substantially all income taxes are General Fund collections, able to be disbursed from the TSA following general appropriations for payroll, pension benefits, suppliers and operating expenses, capital outlays, tax refunds, and other appropriations.

*SUT.* The Commonwealth SUT rate of 10.5% is deposited into an account from either a physical collection post or through online collection portals of the Department of Treasury. Of that percentage, 5.5% is transferred in an amount up to 53.65% of the Pledged Sales Taxes (as defined in the COFINA Master Trust Indenture dated February 12, 2019) for the applicable Fiscal Year to COFINA's indenture trustee account.[152] The remainder of the Commonwealth SUT is composed of the 4.5% SUT surcharge enacted in 2015, which flows to the General Fund, and 0.5% of the SUT allocated and transferred to the Municipal Administration Fund, which in turn is distributed among three funds: Municipal Development Fund, Municipal Redemption Fund, and the Municipal Improvement Fund.[153] The collections comprising the 4.5% portion of the SUT are swept on a two-day lag. The below illustration presents a simplified flow of funds relating to these types of taxes:

---

[152] In fiscal year 2021, the Pledged Sales Tax is $1,270 million of which approximately $448 million was transferred to COFINA. The Pledged Sales Taxes were adjusted for prepared food exemptions and B2B collections during the creditor mediation process and will differ compared to the COFINA 2020 Fiscal Plan. The amount transferred to COFINA increases by 4.0% per annum until it reaches $1.85 billion. *See Third Amended Plan Supplement and Plan Related Documents of Puerto Rico Sales Tax Financing Corporation*, [ECF No. 578].

[153] These accounts are in the name of Municipal Finance Corporation ("COFIM").



The process for SUT collection and remittance to the TSA has been revised for Fiscal Year 2020. The Department of Treasury implemented a new process for Fiscal Year 2020 for SUT based on the SURI/general tax account system to provide for a real-time reconciliation between types of proceeds deposited into the TSA Sweep Accounts. Prior to this new process, fines, interest payments, and the 4% B2B SUT were included in the waterfall even though the receipts were intended to be excluded. The new cash management process separates these amounts and allows for the collections to be swept to the TSA on an accelerated basis.

*Excise Taxes.* The Commonwealth assesses at least seven different categories of excise taxes, including the Act 154 Special Excise Tax, Beer and Alcoholic Beverages Excise Tax, Tobacco Products Excise Tax, Motor Vehicles Excise Tax, Excise Tax on Petroleum Products and Derivatives, Gasoline, Gas Oil, and Diesel Oil Excise Tax, and Alcohol Excise Tax.

*Motor vehicle license fees, alcoholic beverage license fees, entertainment machine license fees.* Fees from the motor vehicle, alcohol, and entertainment machine license fees are deposited into the TSA.

*Charges for Services.* Certain non-tax charges for services rendered and fees incurred are collected into the TSA as General Fund collections.

*Slot Machine Revenues.* The Puerto Rico Gaming Commission regulates slot machines at multiple casinos, and the Department of Treasury collects all slot machine revenues. The Puerto Rico Gaming Commission transfers 15.15% of slot machine revenues payable to government parties into the General Fund, via the TSA. Such General Fund collections in the Fiscal Year June

30, 2020 were $15 million. The remaining balance of slot machine revenues are appropriated as follows: 25.80% to a Special Fund at the Tourism Company, 13.60% to the Puerto Rico Tourist Industry Development Fund, and 45.45% to the General Fund of University of Puerto Rico, with the remaining balance being transmitted to casino operators.[154]

*Rum Tax Remittances.* Federal excise taxes on rum and other beer, wine and spirits are collected by the federal government and remitted to the Commonwealth ("Rum Tax Remittances") via a lockbox in the name of the Department of Treasury at a commercial bank. This commercial bank distributes the proceeds from three different federal excise taxes (Puerto Rico rum, imported rum, and non-rum spirits) to various recipients, including, but not limited to, the Puerto Rico Department of Treasury, the Puerto Rico Conservation Trust (a private entity), PRIDCO, and eligible Puerto Rico rum producers (through the Paying Agent). Of the total $458 million of Rum Tax Remittances generated during the Fiscal Year ending June 30, 2020, $245 million was transferred directly into the TSA.[155]

*Federal Grants Subsidies.* Federal funds and reimbursements are deposited into the TSA and, in turn, disbursed to the agencies benefiting from the grant or being owed reimbursement. The largest federal transfers include the NAP, Medicaid, FEMA, Title I, and other federal program funding or reimbursements.

b)    **Selected Cash Flows Outside the TSA**

Several entities or agencies perform treasury functions and disburse money independently of the TSA, typically because of statutory or other stipulated requirements. The below is an illustrative list of these agencies and not intended to be complete.

*Public Housing Administration.* The PHA administers federally funded affordable housing grants. Substantially all the PHA budget is comprised of federal fund grants, which have specified that the grants are not to be commingled with other Commonwealth money. All grant money is received into PHA accounts and disbursed to participating property managers.

*Electronic & Traditional Lottery.* The traditional lottery is managed by the Department of Treasury, which collects lottery ticket receipts from vendors in the form of checks and ACH transfers into a main account. There is a weekly transfer to fund the prize awards, which in turn funds the prize-disbursing account. The prize-disbursing account dispenses cash and checks to prize winners. The main account also funds an operational zero-balance account ("ZBA") for payroll and supplier payments. The electronic lottery collects money from ticket sellers via bank transfers into two ZBA accounts that sweep to an investment account. All payments of prizes, payroll, taxes, annuities, or suppliers are disbursed through a different account. The lottery distributes a share of net income to the TSA in accordance with Act 10-1989.

---

[154] Under the Games of Chance Act, slot machine revenue is appropriated between operators and the government in varying proportions depending on the total revenue collected.

[155] The figures presented here are accrual basis. During the fiscal year ending 2019, the cash collected for the Department of Treasury was $230 million of general fund collections relating to Rum Tax Remittances.

***Department of Labor and Human Resources ("DLHR").*** While the DLHR receives appropriations from several fund sources for its various operations, the DLHR also administers certain aspects of the state unemployment insurance program using cash entrusted to it. Employers remit state unemployment tax assessments to the DLHR, which deposits these funds with an account in the name of the U.S. Department of Labor at the U.S. Department of Treasury, which in turn administers the distribution of benefits. The DLHR does reimburse itself penalties assessed on employers and operational costs by transferring amounts from the tax collections to the TSA. As of January 31st, 2021, the DLHR had $293 million on account at the U.S. Treasury for the unemployment insurance program benefits. DLHR also holds accounts used for disbursements under the Work Opportunity Incentive Fund and disbursements to disability benefits program beneficiaries.

***911 Emergency Services Bureau.*** Revenue is generated from remittances sent by the telephone companies for the charges to their subscribers for the payment of the Emergency Service 9-1-1. From these collections, the 9-1-1 Board may distribute a portion of these expenses to the other public safety agencies in accordance with Regulation No. 5303.

***Legislature.*** The Legislature receives a General Fund appropriation of one twelfth of its budget each month. Proceeds are then separated to the legislature's various units (Senate, House, joint committee). The legislative branch manages its appropriations through its own set of accounts to provide funding for legislative needs. The Central Government pays and invoices the Legislature for the payment of PayGo costs.

***Judicial Branch.*** The Judicial branch manages cash to provide funding for non-payroll operating expenses and certain local court costs. The Department of Treasury funds payroll of the judiciary staff directly remitting into the judiciary treasury operations the total of budget appropriations and statutory court fees collected by the Department of Treasury on behalf of the judicial system.

The Judicial branch's treasury holds and funds local accounts at courts throughout Puerto Rico for promptly paying for direct court costs including jury costs as described above. Substantially all the remaining operating costs (consultants, contractors, lease costs, etc.) of the judicial branch are paid by check. Pursuant to Act 69-1991, as amended, and the Regulation of the Judicial Branch for the Management of Funds and Interests, the Judicial Branch is authorized to open bank accounts, deposit funds, accumulate interest on those deposits and spend the interest earned. The first 0.05% of interest accrued is required to be transferred back to the Department of Treasury.

2.      **ERS Cash Management Systems**

ERS has been using internal cash to pay for current operating expenses. Existing cash balances are anticipated to be utilized for creditor settlements and as a result ERS will be receiving a General Fund appropriation to support operations. ERS maintains a segregated account pursuant to the joint stipulation entered as of July 14, 2017 [Case No. 17-03566-LTS, ECF Nos. 170, 171] providing for the deposit of employer contributions made by non-Commonwealth entities until the resolution of various claims among the parties to that stipulation.

138

3.    **PBA Cash Management Systems**[156]

a)    **Cash Inflows**

PBA receives funds from governmental rental charges invoiced directly to other government entities and from other receipts, such as disaster-related recoveries. In Fiscal Year 2020, the PBA received $116.4 million, of which $106.0 million were intergovernmental receipts, $6.6 million were other operating receipts (e.g.., income from third party occupancy, interest income and asset sales) and $3.9 million were disaster-related receipts related to Hurricane Irma and Hurricane Maria FEMA claims.

Through March 2021, there has been a delay in collection of rent receipts, which is expected to be timing related; collection is expected to pick up in the following months. Year-to-date as of March 31, 2021, the PBA has a $2.7 million unfavorable variance from the Liquidity Plan, including a $11.6 million unfavorable variance in receipts, partially offset by a $8.9 million favorable variance in disbursements, much of which is due to reduced headcount and benefit changes. PBA anticipates intergovernmental receipts of $132.1 million, disaster-related receipts of $1.3 million and other operating receipts of $1.1 million in fiscal year 2021.

b)    **Cash Outflows**

PBA's disbursements include operating expenses, PayGo, and disaster related disbursements. Major components of operating expenses in Fiscal Year 2020 are salaries and benefits ($47.4 million), purchased services ($15.4 million), payments for public services ($15.3 million), other operating expenses ($4.5 million). PayGo expenditures were $23.3 million. Disaster related expenditures were $0.4 million and $2.9 million, reimbursable by FEMA and insurance, respectively.

4.    **Bank Rationalization**

The Department of Treasury is conducting a multiphase project to centralize and automate cash management processes and financial reporting for the Central Government and its agencies to increase visibility into the treasury operations and prepare for the implementation of the new Enterprise Resource Planning ("ERP") system. The Department of Treasury has compiled an inventory of the Central Government's bank accounts and is documenting ownership and control information, disposition, and cash flows for each. The Department of Treasury is also identifying accounts for closure to achieve operating efficiencies through the centralization of the bank accounts' structure. This project is intended to provide the Department of Treasury with more control and oversight over the accounts that previously were controlled by parties outside of the Department of Treasury and will support continuous improvement through reporting, controls, and compliance tracking.

---

[156] AAFAF Component Liquidity for the Month of March 2021.

### E.    Debtors' Cash Accounts

The list of the Debtors' bank accounts, balances as of March 31, 2021, and preliminary restriction categorizations is attached hereto as <u>Exhibit L</u>. The list is based on the most current information available to the Oversight Board's professionals and the Oversight Board's legal analysis and judgment regarding restriction categorizations are based on such information.

### 1.    Independent Forensic Analysis Team's Report

On January 31, 2018, the Oversight Board, acting by and through the Special Investigation Committee (the "<u>Special Investigation Committee</u>"),[157] retained Duff & Phelps, LLC (the "<u>Independent Forensic Analysis Team</u>" or "<u>IFAT</u>") to conduct an investigation into bank accounts of government entities, including the entities covered by the Commonwealth fiscal plan, UPR, HTA, ERS, and PREPA. The scope of the assignment included (i) an inventory of cash, cash equivalents, and investments of the Puerto Rico Government, (ii) analysis of the sources and intended uses of these funds, and (iii) any documented legal restrictions on these funds.

The principal goal of the Independent Forensic Analysis Team was the publication of a report that described the processes employed, results obtained, and an opinion from the Independent Forensic Analysis Team on whether or not procedures performed validate the Commonwealth bank and investment accounts identified and account balances were accurately disclosed. The investigation was dependent on the assumption that a significant number of the Commonwealth entities would voluntarily provide the Oversight Board with specific financial information. The design of the investigation was tailored to collect and develop information as to whether the bank accounts identified by the Commonwealth entities contained restricted funds, the quantities, and the nature of restricted funds.

### a)    Investigation Procedures

For purposes of the report, the Independent Forensic Analysis Team identified a measurement date of June 30, 2018 (the "<u>June 2018 Measurement Date</u>"). The investigation included three components: (i) an information gathering process; (ii) an inquiry and data collecting process; and (iii) an analytical and reporting process.

***Information Gathering.*** Gathering information was a sequenced process. A master database was created of government entities and their respective bank accounts as of the June 2018 Measurement Date. The information was primarily received from the Puerto Rico Department of Treasury, AAFAF, and publicly available government information.

***Inquiry and Data Collecting Process.*** Once the master database was created, each government entity that was reported was contacted using a standardized format. The government

---

[157] The Special Investigation Committee of the Oversight Board was at the time comprised of Members Ana J. Matosantos, David A. Skeel, and Judge Arthur J. Gonzalez (Ret.)., and was charged with pursuing investigations pursuant to the authority granted to the Oversight Board by PROMESA Section 104(o) and such other authority vested in the Oversight Board under PROMESA.

entities were contacted to obtain the relevant bank account information, along with authorization from government entities to allow respective financial institutions to provide information directly.

*Analytical and Reporting Process.* The final step was contacting the financial institutions identified to confirm information obtained and verify the self-reported information from the entities.

    b)    **Additional Steps Regarding Independent Forensic Analysis Team's Report**

The Independent Forensic Analysis Team's report suggested additional tasks and activities to more fully develop information referred to in the report, which included updating the June 2018 Measurement Date to a more current measurement date, in consideration of the possibility that amounts may have materially changed between these dates. The changes to balances as of the new measurement dates, as well as additional procedures to reconcile balances and categorize restrictions, are addressed below. As the procedures for this analysis are also ongoing, the Oversight Board will continue to update the analysis on a periodic basis.

    2.    **Ongoing Analysis of Bank Accounts**

Following the release of the Independent Forensic Analysis Team's report, the Oversight Board continued to perform analyses of the cash accounts of the Commonwealth and its instrumentalities on a rolling basis, most recently as of March 31, 2021 (the "March 2021 Measurement Date").

As described below, the Oversight Board's ongoing analyses included the collection, processing, and review of over 9,000 documents provided by financial institutions, agencies, and other government entities. Collection of documents for all accounts include account statements (including bank statements, brokerage statements, certificates of deposit or balance confirmation letter depending on type of account and availability of information), restriction information (including contracts, and federal and local legislation) and signatory information. Other information requested includes agency information, structure documentation, and grant information. The analysis – conducted in English or Spanish via email, phone, in-person meetings, and through accounting and legal review – involved over 2,800 potential bank accounts across more than 140 governmental entities to identify the relevant bank account population for the Commonwealth and its instrumentalities.

    a)    **Summary of Procedures Performed**

The Oversight Board focused on, among other things, (i) confirming the population of bank accounts and establishing their balances, most recently as of the March 2021 Measurement Date, and (ii) assessing, based on available information for the legal analysis, the amount of any restricted funds within those accounts.

The Oversight Board leveraged and enhanced the procedures noted in the IFAT report to rollforward the balances to the March 2021 Measurement Date. Specifically, in addition to obtaining balance information for a set population of accounts through requests to the

governmental entities, the Oversight Board's procedures included obtaining credentials for access to online account platforms for each entity for a majority of the bank account balances. The online account access allows for the rolling forward of balances and identification of the population of accounts at each financial institution for each governmental entity. Requests for financial information were also sent to governmental entities and financial institutions in cases where online access was not available. Further procedures were performed to align financial institution data with information provided by governmental entities to reconcile differences.

Concurrently, the Oversight Board requested documentation regarding any governmental entity's restriction classification. Further procedures were performed to continuously support the governmental entities in providing the documentation for legal due diligence review. The vast majority (99%) of the value of the account balances was concentrated in 75 of the 553 accounts at the Commonwealth, ERS, and PBA. The Oversight Board's legal advisors performed legal due diligence of these accounts with balances in excess of $6.9 million to obtain over 95% coverage of the total cash held as of the March 2021 Measurement Date. The remaining 478 accounts contained $235.8 million and equated to 1% of the total cash balance as of the March 2021 Measurement Date. The individual balances of the 478 accounts were all below the $6.9 million threshold and outside of the review threshold for legal due diligence.

The Oversight Board's procedures focused on governmental entities comprising the Central Government (comprised of executive, legislative, and judicial branch agencies), ERS, and PBA.

### (i) Identifying the Population of Bank Accounts and Establishing Their Balances:

The Oversight Board sent letters in both English and Spanish requesting account balances as of the March 2021 Measurement Date to Financial Institutions ("FIs") for the Debtors' accounts. The letters were sent in conjunction with a list of known accounts held by each governmental entity at the respective FI and requested that the FIs submit the following to the Oversight Board:

- bank or brokerage statements for any cash and/or investment balances for accounts held by the FI relating to the applicable Debtor, or online access for the Oversight Board to obtain the relevant data for each account;

- a list of signatories with authority over each account;

- information pertaining to any known liens, encumbrances, or third-party claims; and

- details for any additional accounts held by a governmental entity that were not included within the initial list of accounts provided.

Simultaneously, letters were sent in conjunction with a list of known accounts to governmental entities in both English and Spanish requesting the following information:

- bank or brokerage statements for any cash and/or investment balances for accounts held by the respective Debtor, or a completed consent form granting online access to obtain the relevant data for each account from a FI;

- status of each account(s), such as open, closed, suspended, etc.;

- a list of signatories with authority over each account;

- details for any accounts related to the governmental entity that were not included within the list of accounts sent to the governmental entity; and

- whether the funds in each account were categorized as restricted, unrestricted, or pooled (as further discussed below).[158]

### (ii)   Determining Whether Accounts and Balances Include Legally Restricted Funds:

As noted, requests sent to governmental entities included information pertaining to account classifications. To help guide them, the agencies were provided with descriptions for various restricted and unrestricted account designations. If viewed as restricted by the governmental entity, the governmental entity was requested to select the applicable category of restriction and send supporting documentation for the restriction, including information about the sources and uses of funds. If viewed as unrestricted by the governmental entity, the governmental entity was requested to provide the sources and uses of funds for the account(s).

A thorough examination of the documents provided was performed by the legal team to investigate and assess the conclusions on the asserted legal restrictions, which included:

- reviewing documentation gathered as part of the IFAT report;

- reviewing over 1,800 newly obtained documents from governmental entities regarding account classifications; and

- working alongside other parties, such as the Puerto Rico Department of Treasury and AAFAF, to obtain and review the documentation required to make preliminary assessments regarding the legal restriction classifications of government bank accounts.

The accounts were then classified in the following categories (the preliminary designation for each account above the review threshold of $6.9 million is provided in Exhibit L):

- **Unreviewed Accounts**: Accounts with a balance below the legal due diligence review threshold of $6.9 million as of the March 2021 Measurement Date. Also includes accounts with confirmation of balances as of the March 2021 Measurement Date pending at the time of the preparation and filing of the Disclosure Statement. Accounts

---

[158] Pooled accounts may contain both restricted and unrestricted funds.

with balances below the legal due diligence review threshold or with unconfirmed balances have been designated as "Unreviewed" in <u>Exhibit L</u>.

- **Restricted Accounts:**

The current classification of Restricted Accounts is based on account review and legal analyses. In the course of the development of the legal restriction analysis, certain restriction categorizations covered cash intended to be used for certain purposes, such as emergency funds, even if the cash were legally available to general creditors. The Oversight Board has since undertaken to limit restriction categorizations to (a) Federal Funds/Law, (b) Third Party Funds, (c) Court Order, and (d) Tax-Exempt Bond Proceeds. These categorizations are subject to change if new information warranting a change is received.

  - **Federal Funds/Law:** Funds received from the federal government or restricted by federal law or regulation for specific uses (e.g., Medicaid funds, low income housing project support funds from the U.S. Department of Housing and Urban Development). Such cash could be recouped or set off by the federal government if not used as designated.

  - **Third Party Funds:** Funds belonging to and held on behalf of third parties (e.g., child support payments held in accounts under the custody of the Child Support Administration).

  - **Court Order:** Funds restricted pursuant to a court order.

  - **Tax-exempt Bond Proceeds:** Bond proceeds with restricted use and limitations under the Internal Revenue Code.

- **Accounts Asserted to be Restricted**: Funds that are subject to active litigation regarding the restriction of funds (e.g., accounts at ERS subject to the determination of the scope of the ERS bondholders' security interest).

- **Inconclusive**: Accounts for which the legal team thus far has insufficient information to determine whether the funds are legally restricted.

- **Unrestricted Accounts**: Accounts with funds that do not have legal restrictions. Unrestricted funds can be used to pay expenses pursuant to the certified fiscal plan and budget, and to pay creditors.

  b)    **Summary of Preliminary Findings**[159]

While the Oversight Board's analysis is ongoing, the preliminary results show the Debtors maintain approximately $16.8 billion in balances as of the March 2021 Measurement Date across

---

[159] The information included herein is a status update as of the date of this Disclosure Statement and should be considered preliminary and subject to material change. Amounts included throughout this Disclosure Statement

534 accounts held at various FIs. An additional 19 accounts (for a total of 553 accounts) are pending supporting balance documentation from FIs and are currently under review. The list of such accounts and the respective governmental entities is attached as Exhibit L, and a summary is set forth below:

| Category | No. of Accts. | 03/31/2021 Balance | Unreviewed | Restricted | Inconclusive | Unrestricted[160] |
|---|---|---|---|---|---|---|
| CW – Agencies | 491 | $ 4,920,411,052 | $ 212,696,328 | $3,227,207,914 | $362,891,774 | $ 1,117,615,036 |
| CW – TSA | 6 | 10,567,397,274 | - | 76,000,000 | - | 10,491,397,274 |
| *CW - Subtotal* | *497* | *15,487,808,326* | *212,696,328* | *3,303,207,914* | *362,891,774* | *11,609,012,310* |
| ERS Total | 22 | 1,232,787,639 | 3,177,056 | 849,003,197 | - | 380,607,386 |
| PBA Total | 34 | 125,249,351 | 19,914,925 | 8,795,782 | 29,944,842 | 66,593,802 |
| **Total** | **553** | **$ 16,845,845,316** | **$ 235,788,309** | **$4,161,006,893** | **$392,836,616** | **$ 12,056,213,497** |

Legal due diligence review for restriction classification was performed for $16.6 billion out of the $16.8 billion in balances for the March 2021 Measurement Date. The remaining accounts totaling approximately $235.8 million were not reviewed for restriction designations as the balances for those accounts were below the review threshold of $6.9 million as of the March 2021 Measurement Date and have been classified as unreviewed. Legal due diligence is continuing; however, out of the $16.6 billion account balances analyzed, approximately $4.1 billion were classified as restricted, and $12.1 billion were classified as unrestricted (some of

---

with respect to the Debtors' cash accounts are subject to modification based on the receipt of additional information and review by legal counsel.

[160] Certain funds in the Commonwealth accounts, including the TSA, and ERS accounts, are subject to litigation in which certain parties assert such funds are restricted, as noted in Exhibit L. These include the (i) litigation, where a settlement has been reached, subject to confirmation of the Joint Plan of Adjustment of the Commonwealth, ERS, and PBA, with ERS bondholders regarding the scope of ERS bondholders' security interest (Adv. Proc. Nos. 19-00366-LTS and 19-00367-LTS), and (ii) litigation involving certain monoline insurers, among others, regarding alleged security interests and other claims against certain revenues that were historically conditionally appropriated to HTA, CCDA, and PRIFA. The monoline insurers, among others, assert security interests and other claims (i) against at least $1.397 billion in Commonwealth accounts which they contend should pay HTA bonds, (ii) against any hotel occupancy tax revenues allegedly unlawfully transferred to the Commonwealth rather than to payment of CCDA bonds, and (iii) against at least the first $117 million of rum taxes received by the Commonwealth each fiscal year which they contend should pay PRIFA bonds. *See, e.g., Financial Oversight and Management Board for Puerto Rico v. Assurance Corp., et al.*, Adv. Proc. No. 20-00004; *Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00005; *Financial Oversight and Management Board for Puerto Rico, et al. v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00007; *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp.. Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* [ECF No. 10102]; *Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* [ECF No. 10104]; *Motion for Leave to Amend Motion of Ambac Assurance Corporation, Assured guaranty Corp., Assured Guaranty Municipal Corp., and Financial Guaranty Insurance Company Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 10109], amending *Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 7176].

which may be restricted if certain parties are successful in litigation regarding their asserted security interests). An additional $392.8 million in account balances were categorized as inconclusive until further documentation becomes available and the legal analysis can be performed.

### (i)    The Commonwealth:

The Commonwealth consists of 89 governmental entities with 497 bank accounts across multiple FIs. Currently, 480 bank accounts totaling approximately $15.5 billion as of the March 2021 Measurement Date have been confirmed through information directly from FIs. An additional 17 accounts were identified that are pending supporting information to complete the analysis on balances. Furthermore, several governmental entities do not maintain bank accounts; rather, their financial activities are managed by other governmental entities. For example, the Department of Treasury manages funds on behalf of 38 governmental entities that do not maintain their own bank accounts.

Six accounts managed by the Department of Treasury, commonly referred to as the TSA accounts, total approximately $10.6 billion of the Commonwealth's approximately $15.5 billion as of the March 2021 Measurement Date. The Commonwealth's TSA accounts receive funds from, for example, sources such as tax collections and federal transfers and disburse funds to, for example, payroll and operational costs.

As of the March 2021 Measurement Date, approximately 99% of the confirmed balances in Commonwealth accounts (including TSA accounts) totaling approximately $15.5 billion were reviewed by the legal due diligence team. Of the approximately $15.3 billion reviewed, approximately $3.3 billion funds were assessed as legally restricted based on currently available information and legal analysis, the majority of which are assessed as restricted by Federal Funds/Law. The majority of the remaining $12.0 billion funds for Commonwealth entities, including the TSA accounts, were assessed as unrestricted although some accounts may ultimately be restricted if certain parties are successful in litigation regarding their asserted security interests. Of this $11.6 billion in unrestricted funds, approximately $10.5 billion are attributable to the TSA[161] and $1.1 billion are attributable to other Commonwealth entities. The preliminary legal restriction of the remaining $0.4 billion is inconclusive. Accounts with balances totaling $212.7 million, representing 1% of this population, are unreviewed for legal restriction classification as the individual balances of these accounts are under the $6.9 million due diligence review threshold.

### (ii)    ERS:

As of the March 2021 Measurement Date, ERS maintains 22 bank accounts across multiple FIs. Of those 22 accounts, 20 bank accounts totaling approximately $1.2 billion, have been confirmed through information directly from the FIs. An additional two accounts were identified that are pending supporting information to complete the analysis on balances.

---

[161] The Oversight Board believes most of the funds in the TSA are generally unrestricted except for Federal Funds remaining in pooled TSA accounts (approximating $76 million as of the March 2021 Measurement Date) and certain funds asserted to be restricted, as noted in fn. **Error! Bookmark not defined.**.

As of the March 2021 Measurement Date, legal due diligence has been performed on over 99% of the confirmed balances in ERS accounts totaling $1.2 billion. Of the approximately $1.2 billion analyzed, $0.8 billion were assessed as legally restricted, Third Party Funds based on currently available information and legal analyses. The remaining $0.4 billion were assessed as unrestricted, subject to litigation with ERS bondholders regarding the scope of their asserted security interest based on currently available information. Accounts with balances totaling $3.2 million, representing less than 1% of this population, are unreviewed for legal restriction classification as the individual balances of these accounts are under the $6.9 million due diligence review threshold.

### (iii) PBA:

As of the March 2021 Measurement Date, PBA maintains 34 bank accounts across multiple FIs. The balances of those 34 accounts, totaling approximately $0.1 billion, have been confirmed through information directly from the FIs.

Legal due diligence has been performed on approximately 84% of the confirmed balances in PBA accounts totaling approximately $105.3 million as of the March 2021 Measurement Date. Of this $105.3 million in balances, $8.8 million were assessed as legally restricted and $66.6 million were assessed as unrestricted, based on currently available information. The remaining $49.8 million funds relate to $29.9 million that is inconclusive and $19.9 million that is currently unreviewed for legal restriction classification as the individual balances of these accounts are under the $6.9 million due diligence review threshold.

### c) Updates to Information Referenced in the IFAT Report

The following provides a summary highlighting the areas of progress made since the IFAT analysis as of June 30, 2018 to the March 2021 Measurement Date:

- Since the June 2018 Measurement Date, 112 new accounts totaling approximately $6.9 billion were identified and supported by financial documents. These new accounts were identified based on information provided by governmental entities and FIs. Five additional accounts were identified and are currently pending support from FIs, resulting in a total of 117 new accounts (~18% increase) added to the previously identified population.

- Since the June 2018 Measurement Date, 225 accounts were removed from the reported population due to closed accounts, duplicate accounts, or non-existent accounts confirmed by FIs or governmental entities. Of these accounts, 33 were deemed as duplicate and 36 as non-existent, totaling approximately $167.5 million and $17.0 million (a total of $184.5 million) as of June 30, 2018, respectively.

### d) Continuation of Tasks and Activities Referenced in the IFAT Report

The IFAT Report suggested nine additional tasks and activities to more fully develop the information. The Oversight Board has adopted the suggestions and continued procedures to

enhance the information subsequent to the release of the IFAT Report. Accordingly, the following provides an update on the nine suggestions:

- The Oversight Board continued and updated its procedures to review and update account balances and legal restriction classifications, most recently as of the March 2021 Measurement Date.

- The Oversight Board updated its procedures to review accounts for legal restriction classifications across the population of accounts of Debtors currently in a Title III case that would result in a review of more than 95% of combined total account balances.

- The procedures to review and update account balances and legal restriction classifications included gathering additional documents for all governmental entities, which were used to update and enhance financial and legal due diligence procedures. Specifically, governmental entities and FIs were contacted regarding accounts and were asked to provide further information regarding closed or suspended accounts, as well as potential duplicate, non-existent, or new accounts. Follow-up calls and meetings were scheduled to clarify and ask questions about the information provided.

- Additional analytical procedures were performed for the review of legal restriction classifications, including obtaining governmental entities' descriptions of the various legal restriction categories for account designation and reviewing sources and uses of funds for accounts.

- Updated procedures were applied to obtain appropriate supporting documentation from governmental entities to inform the legal team's assessment of account designations.

- Updated procedures were applied to identify federal funds within the account balances and were applied to all governmental entities. The procedures included obtaining information from the Puerto Rico Department of Treasury, AAFAF, and other agencies.

- Discrepancies noted in the IFAT Report between agencies and FIs were reconciled through additional procedures, such as obtaining direct confirmation from FIs and clarifying current status of a bank account. Similarly, discrepancies noted between the IFAT Report and AAFAF were reconciled through additional procedures, such as identifying out-of-scope exclusions and timing differences. Currently, the unreconciled differences are less than 5% of the total balance as of the March 2021 Measurement Date.

148

e)  **Status of Review**

Approximately 93% of governmental entities provided a response to requests for information relating to account balances and restriction classifications. Governmental entities also provided online bank account access via the FIs for $15.1 billion held in 269 out of 553 bank accounts (approximately 49% of accounts and 90% of balances in the total population). Online bank account access to an additional $1.0 billion at 23 out of 553 bank accounts (approximately 4% of the total population) is expected to be provided by the agencies via the FIs. However, bank account statements for the remaining $0.7 billion held in 261 out of 553 bank accounts (approximately 47% of the total population) are expected to be obtained directly from the FIs and governmental entities.

The balances reported above as of the March 2021 Measurement Date for the Commonwealth, ERS, and PBA, have been substantively reconciled to the AAFAF Bank Account Balances Report as of March 31, 2021 ("AAFAF Report").[162] Currently, the unreconciled differences are less than 5% of the total March 31, 2021, balance and are attributable to: (i) the AAFAF Report including balances for certain entities, such as public corporations; (ii) the AAFAF Report excluding balances for certain entities, such as legislative and judicial branch agencies; (iii) the AAFAF Report excluding certain investment accounts for certain entities; and (iv) timing differences in the availability of information.

The list of the Debtors' bank accounts, balances as of the March 2021 Measurement Date, and preliminary legal restriction categorizations is attached hereto as Exhibit L. The information presented in Exhibit L includes accounts where balances have been confirmed with FI information as of the March 2021 Measurement Date; follow-up is ongoing to obtain FI information for additional identified accounts.[163] The Oversight Board and its advisors are continuing to analyze the legal restriction assessments for the accounts, and any determinations provided in Exhibit L are preliminary and in all respects subject to change based on new and additional information as it becomes available. The Oversight Board will update this Disclosure Statement to a new measurement date as warranted until it is approved by the Court.

**F.    Commonwealth's Liquidity and Minimum Cash Needs Analysis**

The Commonwealth experienced severe cash shortfalls in the past leading to liquidity crises. The Commonwealth does not maintain a formal policy requiring a minimum unrestricted fund balance or a minimum cash balance to fund government operations. Rather, the government historically addressed these shortfalls through a variety of unsustainable liquidity measures, including: short-term borrowings (tax revenue anticipation notes), delaying the payment of third-party payables or amounts due to public corporations, deferring the disbursement of certain budgetary assignments, triggering, pursuant to Article VI, Section 8 of the Commonwealth

---

[162] *Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of March 31, 2021* published by the AAFAF on April 30, 2021.

[163] The balances for the accounts for which further FI information is required are currently marked as "pending" in Exhibit L.

Constitution, the retention of certain revenues of the Commonwealth for the payment of debt service on GO Bonds and delaying the payment of income tax refunds, among others.

In conformance with Government Finance Officers Association ("GFOA") guidelines, it is essential for the Commonwealth to establish and maintain an adequate level of unrestricted fund and liquidity balance. This minimum cash balance will help ensure the government maintains a prudent level of financial resources at all times to mitigate against current and future liquidity risks (*e.g.*, revenue shortfalls, timing differences and unanticipated expenditures) and to ensure stable tax rates. This financial buffer can soften the need for severe spending cuts or tax increases when the government needs to balance its budget. Because the unrestricted fund balance, coupled with segregated cash reserves, is vital to managing unexpected changes and maintaining fiscal health, its level is also tracked closely by rating agencies and used as a key metric for municipal bond ratings.

The target for an unrestricted fund/liquidity balance is typically calculated as a percentage of a government's General Fund spending, although financial resources available in other funds should also be considered in assessing the adequacy of unrestricted fund balance. This percentage varies greatly between different jurisdictions based on a variety of risk enhancing or risk mitigating factors. For example, governments that may be vulnerable to natural disasters, more dependent on a volatile revenue source, or potentially subject to cuts in state aid and/or federal grants may need to maintain a higher level of unrestricted fund balances.

1.    **General Fund Minimum Liquidity**

In establishing the minimum unrestricted General Fund/liquidity balance needed in Puerto Rico, the Oversight Board considered several risk factors, including: (i) the predictability of the government's General Fund revenues and the volatility of its General Fund expenditures (i.e., higher levels of unrestricted General Fund balance may be needed if significant revenue sources are subject to unpredictable fluctuations or if operating expenditures are highly volatile); (ii) Puerto Rico's perceived exposure to significant one-time outlays (e.g., disasters, immediate capital needs, budget cuts); (iii) the potential drain upon General Fund resources from other funds, as well as, the availability of resources in other funds; (iv) the potential impact on Puerto Rico's future bond ratings and the corresponding increased cost of borrowed funds; and (v) commitments and assignments (i.e., the desire to maintain higher levels of unrestricted fund balance to compensate for any portion of unrestricted fund balance already committed or appropriated by the government for a specific purpose).

The Oversight Board also reviewed several third-party methodologies and approaches, including those proposed by the GFOA, Pew Charitable Trusts, and the U.S. Treasury. Additionally, the Oversight Board evaluated minimum cash balance protocols in other financially distressed U.S. jurisdictions, such as the City of Detroit. Each methodology is described below.

*GFOA*. Founded in 1906, GFOA is a professional association representing more than 20,000 state, provincial, and local government finance officers in the United States and Canada deeply involved in planning, financing, and implementing thousands of governmental operations in each of their jurisdictions. GFOA's mission is to advance excellence in public finance. To meet the many needs of its members, the organization provides best practice guidance and offers

publications on budgeting, internal controls, debt management, treasury management, and other financial management topics.

The GFOA recommends that governments should maintain an unrestricted fund balance that will protect taxpayers and employees from unexpected changes in financial condition. The GFOA recommends that governments, at a minimum, should maintain unrestricted budgetary fund balance in their General Fund of no less than two months of regular General Fund operating revenues or regular General Fund operating expenditures.[164]

*Pew Charitable Trusts ("Pew")*. Founded in 1948, Pew is an independent nonprofit organization dedicated to improving public policy by conducting rigorous analysis, linking diverse interests to pursue common cause and insisting on tangible results. The organization maintains a dedicated research team focused on state fiscal health that frequently publishes thought provoking research and recommendations on state financial conditions, particularly on municipalities in distress.

Pew's research highlights that positive fund balances are needed to manage budgetary uncertainty, including revenue forecasting errors, budget shortfalls during economic downturns, and other unforeseen emergencies, such as natural disasters. The organization indicates this financial cushion can soften the need for severe spending cuts or tax increases when states need to balance their budgets. Building up a positive fund balance is a sign of fiscal recovery, but there is no one-size-fits-all rule on when, how, and how much to save. States with a history of significant economic or revenue volatility may desire larger cushions. Under Pew's methodology, the optimal unrestricted fund balance target depends on three factors: (i) the defined purpose of funds, (ii), the volatility of a state's tax revenue; and (iii) and the level of coverage that the state seeks to provide for its budget.

Based on Pew's research, the 50-state median fund balance for 2019 was 49.7 days of General Fund expenditures.[165]

*Community Disaster Loans ("CDLs")*. In October 2017, shortly after hurricanes Irma and Maria devastated Puerto Rico, Congress appropriated $4.7 billion in CDL funding to Puerto Rico, subject to final negotiations between the Commonwealth and the U.S. Treasury. The CDL Program provides operational funding to help local governments that have incurred a significant loss in revenue, due to a major disaster, that has or will adversely affect their ability to provide municipal services.

As part of the negotiation process, the U.S. Treasury and FEMA transmitted a cash balance policy to Puerto Rico that would govern the Commonwealth's ability to access CDL funding. This cash balance policy, which was ratified by the U.S. Treasury and the Government in March 2018, would permit the Commonwealth to access CDL funding if minimum operating cash balances in

---

[164] GFOA, Fund Balance Guidelines for the General Fund, September 2015.

[165] Pew Charitable Trusts Budget Surpluses Are Helping Many States Boost Their Savings, March 2019.

the Government's TSA declined below certain levels, under which the Government could potentially experience liquidity issues.

*City of Detroit.*  The Oversight Board also evaluated minimum cash balance assumptions used by the City of Detroit, given its recent chapter 9 bankruptcy case.  As part of its restructuring and 40-year projections in the City's plan of adjustment, Detroit projected a minimum cash balance based on two months of payroll through Fiscal Year 2023 and a 5% of General Fund expenditures cash reserve thereafter.  These levels are still maintained annually to preserve fiscal discipline and controls in the City.

### 2.    Additional TSA Analysis of Minimum Liquidity

*TSA Cash Flow Analysis for all funds.*  The Oversight Board also evaluated the projected cash needs of the TSA, the Commonwealth's primary operating account.  The primary inflow for the TSA is tax revenue which is subject to economic risk and carries a seasonality component.  The primary disbursements are payroll and pension related which are fixed in nature.  In estimating the minimum operating cash reserve, these considerations, along with sources of revenue, were taken into account.  The analysis reviewed and assessed the normalized Fiscal Year 2020 liquidity plan cash yields by assuming various month lags in receipts.  The months on hand lag assumptions were determined based on criticality of the payment and funding source.  For example, payroll funded by state collections requires a two-month reserve versus NAP which is a federally funded pass through that requires no reserve.

### 3.    Other Liquidity Needs

*Federal Grants, Subsidies.*  The Commonwealth is the beneficiary of numerous federal programs, which provide funding for government services in the areas of education, health, public safety and housing, among others.  Most of the programs funded by federal government agencies are reimbursement based, meaning that the Commonwealth will typically disburse the funds and then seek reimbursement from the corresponding federal agency.  Certain federal programs, however, provide for advances of federal funds to Puerto Rico to be disbursed by the Commonwealth at a later date.  The TSA received $5.6 billion $9.3 billion and $7.5 billion in federal funds in Fiscal Year 2018, Fiscal Year 2019 and Fiscal Year 2020, respectively.  Variances in timing between federal funds receipts and disbursements contribute to the minimum liquidity requirements of the government.

*Income Tax Refunds.*  The Government collects income taxes from individuals and corporations throughout the Fiscal Year.  Typically, at the end of the Fiscal Year, there is a certain amount of claimed and processed income tax refunds that remain outstanding.  For Fiscal Year 2020, the Commonwealth preliminarily reported General Fund collections of approximately $9.289 billion in tax revenues (net of $684 million reserved for income tax refunds).  The amount of income tax refunds outstanding and payable as of the end of the Fiscal Year contributes to the minimum liquidity requirements of the government.

*Disaster Aid Revolving Fund.*  To advance funds in the form of one or more loans, extensions of credit, or advances to central government agencies, public corporations and municipalities as a bridge to receipt of funding under FEMA programs to allow permanent

recovery projects funded by FEMA programs to commence sooner than otherwise possible to help and expedite economic recovery. The Disaster Aid Revolving Fund will be used to advance the Federal Share of funds reimbursable for permanent work projects which are fully obligated under FEMA's public assistance program and HMGP projects for incurred damages as a result of Hurricane Maria, Hurricane Irma, or the earthquakes declared in January 2020. Advances will be replenished by FEMA-funded reimbursements, insurance proceeds, as well as other sources of funds, including other funding covering the applicant cost share component. This liquidity would allow recovery projects to start earlier than otherwise possible and proceed where the FEMA funding reimbursement process is slower than expected. After submission of a completed application, projects will be evaluated and prioritized under several criteria including: availability of Disaster Aid Revolving Fund, alignment with the government's recovery plan, public need, benefit and exposure, and determinations made by the Reconstruction Council[166] based upon recommendations provided by COR3 and AAFAF.

An initial authorization for the facility was established by Act 139-2020. The law required the establishment of program guidelines, which were reviewed and approved by the Oversight Board. The guidelines include considerable risk mitigation elements around governance and controls, non-payment remediation, project plan, budget, and ongoing reporting requirements. Amendments to Act 139-2020 may be required to ensure its alignment with the Plan of Adjustment.

*PREPA/LUMA Transition Support.* LUMA's service commenced on June 1, 2021. The transition was conditional on PREPA forming certain operating and capital reserve accounts to ensure continuity of operations in the event of future cash flow problems (e.g., problems arising from future natural disasters), but PREPA had insufficient cash to do so. Therefore, to ensure the transfer of control over the power grid to LUMA on time, essential to transformation of the electricity utility, PREPA required funding from the Commonwealth to fund PREPA's reserve accounts required under LUMA's agreement. The Oversight Board amended the Commonwealth's budget for FY 2021 so the Commonwealth could provide this funding through an appropriation to PREPA, rather than as a loan. Transfer of control over the grid to LUMA will help ensure Puerto Rico has a viable, reliable, and resilient power utility and thus will help make Puerto Rico more competitive and pro-growth, leading to a contribution of surplus of approximately $12 billion over 30 years. If not funded by the Commonwealth, PREPA would have needed to fund these reserves through alternate means, such as outside financing serviced by a rate adjustment that would dramatically increase electricity rates in the short term (i.e., the expected period between now and when the reserves will need to be funded). The Commonwealth provided PREPA approximately $750 million, while PREPA funded an additional $250 million from cash on hand. These funds have been deposited in the required reserve accounts.

---

[166]   On January 8, 2021, Governor Pedro R. Pierluisi Urrutia issued Executive Order number OE-2021-011 creating the Reconstruction Council, tasked with identifying and establishing a priority list of critical reconstruction projects.

4.    **Minimum Liquidity Recommendation**

*Minimum liquidity.* After analyzing the recommended values ascribed by each approach above, risk weighting Puerto Rico's financial characteristics, considering all budgets (including PayGo requirements), and evaluating the Commonwealth's revenue volatility, consistent with the GO/PBA PSA, the Oversight Board concluded the Government should maintain an unrestricted liquidity balance of no less than $2.5 billion, although a higher balance could ultimately be needed. In addition, a separate emergency reserve and CDBG-DR funding, as described below and as included in the Certified Fiscal Plan, should be established as well.

*Emergency Reserve.* In addition to the minimum liquidity of $2.5 billion described above, the Oversight Board concluded Puerto Rico must also set aside appropriations annually into an emergency reserve. In light of the overall circumstances, the Oversight Board did not consider whether to fund the emergency reserve through external financing. The purpose of the emergency reserve is different than that of the liquidity balance. It is designed specifically to ensure the government has adequate funds available to respond rapidly to emergency situations, such as natural disasters. According to the International Monetary Fund, the Caribbean region's already high vulnerability to natural disasters is likely to be exacerbated as the frequency and severity of disasters increase from climate change effects.

Following International Monetary Fund guidance provided to other Caribbean islands, the Oversight Board concluded this emergency reserve must eventually total $1.3 billion, or approximately 2.0% of Fiscal Year 2018 GNP, by reserving $130 million per year for 10 years. This would provide an adequate emergency reserve (2% to 4% of GNP). Unlike the fund balance, restrictions placed on these funds must ensure that it is only used in case of an emergency. The Commonwealth is not permitted to disburse any amount from the emergency reserve without approval from the Oversight Board.

This emergency reserve account is currently maintained at a private financial institution. As of December 31, 2020, the reserve account held $301 million, which is lower than the $390 million from the accumulation of budgeted reserves from Fiscal Years 2019 ($130 million), 2020 ($130 million) and 2021 ($130 million). The Oversight Board authorized the use of up to $260 million of the cumulative 2019 and 2020 budgeted reserves for earthquake and COVID-19 relief. The Fiscal Year 2021 Commonwealth budget includes up to $536 million appropriation to replenish the emergency budget reserve used in 2017, 2018, 2019 and 2020, although given the terms of the GO/PBA PSA it is expected that only the Fiscal Year 2019 and 2020 reserves will be replenished.

Following the seismic events in January 2020, the Oversight Board made $260 million from the emergency fund available to the government through January 31, 2020. As a result of the fiscal planning and prioritization embedded in the Certified Fiscal Plan and Certified Budgets, the Government was able to access its own funds on a timely basis to help the people of Puerto Rico, rather than be limited in its response in any way. Due to the urgency of the needs, the funds were made available to the Government on the basis of after-the-fact reporting of the expended funds. After the initial period ended on January 31, 2020, the Oversight Board adjusted the procedure for authorization of the use of funds maintaining an appropriate level of oversight and

due diligence.   The unspent reserves remained available for reasonable earthquake-related needs, but on the basis of a request for release.

*CDBG-DR local match fund.*   The ability to use CDBG-DR funds for local match requirements is not guaranteed.   To be eligible, the funds must follow the program's national objectives, including:  (1) Benefit to low- and moderate- income (LMI) persons; (2) Aid in the prevention or elimination of slums or blight; and (3) Meet a need having a particular urgency (referred to as urgent need).   To assure there are enough resources to fund Puerto Rico's reconstruction, sufficient local funding must be set aside to offset the risk CDBG-DR funding is insufficient and to mitigate the risk anticipated CDBG-DR local match funding is ultimately not permitted.

*[Remainder of Page Left Intentionally Blank]*

### IV.    Significant Events Leading to Commencement of the Title III Cases

### A.    The Commonwealth's Steady Operational and Financial Decline

*General.*  The Commonwealth and certain of its public corporations are in the midst of a profound fiscal crisis.  Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses, and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues.  This is mainly due to years of economic recession, recurring budget deficits, the financing of recurrent expenses with long-term debt, and the failure to adequately fund legacy obligations such as pensions.  The Commonwealth's economic situation was later exacerbated by the devastation caused by the hurricanes in 2017, the earthquakes in 2020, and the COVID-19 pandemic.

The Oversight Board takes the view that the Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring cases under Title III of PROMESA.

*The Commonwealth's Economy.*  The Commonwealth's economy entered a recession in the fourth quarter of Fiscal Year 2006, and the Commonwealth's GNP has contracted (in real terms) every Fiscal Year between 2007 and 2018, except for a 5.6% GNP growth in Fiscal Year 2012.  The GNP growth in Fiscal Year 2012 was due mainly to the large number of stimuli and deficit spending injected into the Commonwealth's economy during the period and not as a result of economic recovery.

In its May 2018 report (GAO-18-387), the GAO listed the following five main factors that contributed to Puerto Rico's economic condition:

- Outmigration and diminishing labor force.  Puerto Rico has experienced a steady decline in its population and labor force.

- Regulatory challenges in doing business in Puerto Rico.  These include the high cost to businesses in complying with Puerto Rico regulations, such as the permitting process for new business, and federal laws such as the minimum wage law that may be a deterrent to employment in some local sectors.

- High cost of importing goods and energy.  Many of the goods used by businesses in Puerto Rico are imported, which increases their cost and Puerto Rico relies mainly on high cost petroleum products for its energy generation.

- Phase-out of the federal tax credit that concluded in 2006.  This affected mostly manufacturing operations in Puerto Rico, although there is no consensus as to the magnitude of the impact.

- Banking and housing struggles.  Puerto Rico banks have struggled, and several have disappeared. Housing prices have fallen by 25% since its peak in 2009.

The Puerto Rico Planning Board (the "Planning Board") has the legal responsibility of creating an annual Economic Report to the Governor and the Legislature, presenting the Commonwealth's economic outlook and an analysis of its economic behavior. According to the Planning Board's report released in June 2020, the Commonwealth's real GNP for Fiscal Years 2016 and 2017 decreased by 1.6% and 3.2%, respectively.  The Planning Board's GNP forecast for the Fiscal Year 2018 estimates a contraction of 4.2% and an increase of 1.5% in 2019. For the Fiscal Year 2020 and 2021, the Planning Board's GNP forecast shows a decline of 5.4% and 2%, respectively.

In Fiscal Year 2019, nominal personal income in the Commonwealth reported by the Planning Board was $69.7 billion and nominal personal income per capita was $21,832.

The economy of the Commonwealth is closely linked to the United States' economy, as most of the external factors that affect the Commonwealth's economy are determined by the policies and performance of the United States' economy.  These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. According to the Planning Board 2019 report, during Fiscal Year 2017, approximately 78% of the Commonwealth's exports went to the United States mainland, which was also the source of approximately 54% of the Commonwealth's imports.

The fiscal plan for the Commonwealth certified by the Oversight Board on April 23, 2021 ("2021 Fiscal Plan") is based on forecasts of macroeconomic and demographic conditions, including Puerto Rico's real GNP, inflation, and resident population growth rates. The 2021 Fiscal Plan recognizes the significant negative impact of Hurricanes Irma and Maria, the 2020 earthquakes, and the COVID-19 health and economic crisis on economic activity, as well as the positive impact of the local and federal relief funding related to such events; it also includes projections of how the real GNP growth rates would have differed due to the shocks with and without fiscal plan measures, structural reforms, and disaster relief spending.  For example, without any fiscal plan measures, structural reforms, or the disaster relief spending, the real GNP growth rate is projected to have been a 3.0% and 0.7% decline in Fiscal Year 2020 and 2021, respectively, due to the natural disasters and the COVID-19 pandemic.  But, with the implementation of the 2020 and 2021 Fiscal Plans, the income-adjusted real GNP growth rates are projected to be only a 1.1% decline in Fiscal Year 2020 and a 3.8% rebound in Fiscal Year 2021.

The real GNP growth trend is projected to turn negative in Fiscal Years 2023 and 2024 due to the cyclical reversal that would follow the significant inflows of COVID-19 stimulus funds in Fiscal Years 2020 and 2021. Afterwards, five years of positive growth, from Fiscal Year 2025 through 2029, are projected to follow due to the positive effects of federal relief funds that are expected to have longer-term impact, like the funding for post-disasters reconstruction or the benefits of permanently extended federal tax credit programs. Finally, the real GNP growth trajectory is projected to turn negative starting in Fiscal Year 2030 and averaging a 0.6% declining rate through 2051.

The Puerto Rico economic projections are also affected by the United States mainland growth projections and incorporate the most recent actual and forecasted data from the Congressional Budget Office on real GDP growth and inflation. Informed by this data, the annual inflation rate in Puerto Rico dropped from the 0.5% rate observed in Fiscal Year 2019 to 0.0% in Fiscal Year 2020 and is projected to be 0.0% in 2021. For subsequent years, as the economy recovers from the COVID-19 shock, the annual inflation rates are projected to remain in the range of 1.1% to 1.9% starting in Fiscal Year 2022.

Additionally, on September 28, 2020, the Bureau of Economic Analysis (the "BEA") published a "Prototype Gross Domestic Product" for Puerto Rico. The published report covers the period 2012 to 2018. The BEA's estimates differ from those produced by the Planning Board. For years 2012 to 2014, the Planning Board estimates show negative real growth while BEA estimates show positive growth. For years 2016 and 2017, BEA estimates show a much more pronounced decrease in GDP than does the Planning Board. BEA estimates of GDP are consistently higher than the Planning Board's estimates.

The 2021 Fiscal Plan also includes a population forecast that shows continuing decline for the next several years. Puerto Rico's population is projected to have experienced a decline of 1.5% in Fiscal Year 2020 and to experience a higher decline of 1.8% in Fiscal Year 2021, due to a more negative trend in Puerto Rico's outmigration. From Fiscal Year 2022, the annual population decline becomes smaller each year, with a 1.5% annual decline as of Fiscal Year 2025.[167]

The U.S. Census Bureau published the results of the 2020 Census of Puerto Rico resident population on April 25, 2021. The Oversight Board is analyzing the results and their implications on the 2021 Fiscal Plan.

***Recurrent Deficits.*** One of the principal causes of the Commonwealth's current fiscal crisis has been its inability to increase its revenues and reduce its expenditures to avoid recurrent structural deficits. These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, or by deferring the cost of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities (such as employee retirement benefits), the ballooning cost of healthcare, and the contraction of the revenue base due to prevailing economic conditions, has led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to generally accepted accounting principles in the United States.

***Employment.*** Total average annual employment, as measured by the Commonwealth's DLHR Household Employment Survey, known as the "Household Survey," has decreased in recent years. The reduction in total employment began in the fourth quarter of Fiscal Year 2007, when total employment was 1,244,333, and continued consistently until the first half of Fiscal Year 2015, after which it mostly stabilized. According to the Household Survey, the unemployment rate averaged 8.4% for Fiscal Year 2019, compared to 10.3% for the prior Fiscal Year. This is down from 16.2% for Fiscal Year 2011. The unemployment rate has declined by 34% since 2015; however, employment has increased by only 1.1%. From the end of Fiscal Year

---

[167] For a full discussion of the projections of the Certified Commonwealth Fiscal Plan, see Chapter 4 of the Certified Commonwealth Fiscal Plan, attached as Exhibit G to this Disclosure Statement.

2019 to the end of Fiscal Year 2020, the unemployment rate increased by 1.2 percentage points, to 8.9%, while employment fell to 943,000, a 1.6% decrease in employment from the end of Fiscal Year 2019.

According to the DLHR's Current Employment Statistics Survey (the "Establishment Survey"), total payroll non-farm employment decreased by 1% during Fiscal Year 2017 as compared to Fiscal Year 2016. Total private employment also fell during Fiscal Year 2017 by 0.1%, which translates to a reduction of almost 700 employees, as compared to the same period for the prior Fiscal Year. Non-farm employment decreased by 1.7% from Fiscal Year 2019 to Fiscal Year 2020. Private employment decreased by 2.1% from Fiscal Year 2019 to Fiscal Year 2020, which translates to a reduction of 14,000 employees.

*Aggregate Debt Burden of the Commonwealth and its Instrumentalities.* As of May 3, 2017, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $72.8 billion (including accreted interest on capital appreciation bonds). Of this amount, approximately $56 billion represents GO Bonds, debt payable from Commonwealth taxes or appropriations and debt of tax-supported public corporations.

For Fiscal Year 2021, the aggregate scheduled annual debt service on all bonds and notes issued by the Commonwealth and certain of its instrumentalities[168] is approximately $2.9 billion. The debt burden of the Commonwealth and its instrumentalities significantly increased during the past decade. A significant portion of the debt issued during this period was used to cover operational expenses of the Commonwealth and its public corporations.

The Commonwealth's ratio of tax-supported debt-to-revenue is more than double that of the U.S. states with the highest debt-to-revenue ratio, and almost seven times the U.S. state median.[169] The Commonwealth's tax-supported debt per capita, as a share of GDP and as a share of personal income, is also disproportionally high when compared to mainland jurisdictions.

*Pension Liabilities.* In addition to debt service on outstanding bonds, notes, and other financial debt obligations, one of the most significant expenditures of the Commonwealth and its public corporations are pension benefits payable to retired employees. The combined Retirement Systems' net pension liability was approximately $55.6 billion as of July 1, 2016.[170] For further

---

[168] Instrumentalities include PBA, HTA, ERS, reorganized COFINA, GDB Debt Recovery Authority, PRIFA, PFC, and CCDA.

[169] Based on data from the 2017 U.S. Census of Governments, the states with the highest levels of debt-to-revenue ratios are Massachusetts and Connecticut. The states with the highest combined state and local government debt-to-revenue ratio are Kentucky, Illinois, and Texas (depending on what measure of revenue is issued). Kentucky also has the highest level of local government debt compared to local revenue.

[170] GASB 67 Net Pension Liability for ERS, TRS, and JRS as of June 30, 2016 as reported in the June 30, 2016 Actuarial Valuation Reports by the system's actuary. Excludes medical insurance plan contributions measured under GASB 45.

discussion and analysis of the pensions for the Commonwealth, see Oversight Board Report on Pensions, attached hereto Exhibit I.

Given the insolvency and impending exhaustion of ERS's liquid assets, the Oversight Board commenced the ERS Title III Case. Furthermore, in August 2017, the Legislature enacted Act No. 106-2017, pursuant to which the Commonwealth adopted a PayGo system for the payment of pension benefits. Under Act No. 106-2017, the Commonwealth makes pension payments from its General Fund.

## B.   Legislation Enacted by the Commonwealth to Address the Fiscal and Debt Crisis [171]

### 1.   Act 7-2009 ("Act 7")

On March 9, 2009, the Commonwealth enacted Act 7, known as the "Special Act to Declare a State of Fiscal Emergency and to establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico." This was the first statute where the Commonwealth exercised its police powers to address its fiscal crisis. Act 7 implemented a number of initiatives, including a gradual operating expense reduction plan through a reduction of operating expenses and the reorganization of the Executive Branch, and a combination of temporary and permanent revenue raising measures. As part of the expenditure reduction measures, Act 7 established a plan for the downsizing of the government's payroll. The first phase of the plan was an incentivized voluntary resignation and voluntary workday reduction program. The second phase was a dismissals plan that went into effect if the expenditure reduction targets were not achieved by the first phase. Such phase covered most Central Government employees and was applied according to employee seniority. Approximately 12,505 government employees were dismissed under the second phase. The plan also imposed a temporary freeze on salary increases and other economic benefits included in laws, CBAs, and any other employee agreements.

### 2.   Act 3-2013

As described above in section III.A.2, on April 4, 2013, the Commonwealth enacted Act 3-2013 as a comprehensive reform of ERS. Act 3-2013 froze all retirement benefits accrued through June 30, 2013 and provided that future benefits would accrue under a defined contribution formula, raised the retirement age of participants, increased the employee contribution and reduced or eliminated post-employment benefits. Similar reforms were enacted for TRS and JRS pursuant to Acts 160-2013 and Act 162-2013, respectively, but some of the TRS and JRS reforms were struck down by the Puerto Rico Supreme Court.

---

[171] Legislation enacted by the Commonwealth before and after the effectiveness of PROMESA on June 30, 2016 is preempted by section 4 of PROMESA to the extent it is inconsistent. Additionally, it violates PROMESA section 204 to the extent the procedures for vetting the legislation for consistency with the certified fiscal plan are not followed, it violates PROMESA section 207 to the extent it modifies debt without Oversight Board consent, and it violates PROMESA section 108(a)(2) to the extent it would impair or defeat the purposes of PROMESA as determined by the Oversight Board. By describing the legislation in this section of the Disclosure Statement, the Oversight Board is not waiving the application of PROMESA to any portion of it.

3. **Act 66-2014 ("Act 66")**

On June 17, 2014, the Commonwealth adopted Act 66, known as the Fiscal and Operational Sustainability Act, which imposed multiple fiscal measures, including: (i) the freezing of benefits under CBAs and the reduction of certain non-salary compensation; (ii) the contribution of the savings generated by certain public corporations to support certain General Fund expenditures; (iii) the freezing of formula appropriation increases to UPR and the municipalities; (iv) the freezing and reduction of formula appropriations to the Judicial Branch, the Legislature and certain other entities; (v) the reduction in school transportation costs; (vi) the reduction of rates for professional and purchased services; (vii) the freezing of water rates for governmental entities; and (viii) the implementation of a payment plan system for legal judgments. The measures were originally scheduled to sunset after Fiscal Year 2017, but most were extended by Act 3-2017 through Fiscal Year 2021.

4. **Act 71-2014 ("Act 71")**

After the rating agencies downgraded the Commonwealth's largest public corporations below investment grade and such entities were facing further liquidity constraints and a loss of access to the capital markets, the Commonwealth enacted Act 71 on June 28, 2014. Known as the Puerto Rico Debt Enforcement and Recovery Act, it provided an orderly process to allow certain public corporations to adjust their debts. Because the U.S. Congress excluded Puerto Rico's municipalities from seeking relief under chapter 9 of the Bankruptcy Code, the Commonwealth enacted Act 71 to fill that void by creating a legal framework that afforded an orderly debt restructuring process.

In June 2014, certain PREPA bondholders challenged the constitutionality of Act 71 before the U.S. District Court for the District of Puerto Rico, which ruled in favor of bondholders and held that Act 71 was preempted by chapter 9 of the Bankruptcy Code.[172] The Court's holding was upheld by the U.S. Court of Appeals for the First Circuit on July 6, 2015[173] and the U.S. Supreme Court on June 13, 2016.[174]

5. **The Moratorium Act and Creation of AAFAF ("Act 21-2016")**

On April 6, 2016, the Government enacted the Moratorium Act, which granted the Governor the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain monies historically conditionally appropriated to public entities for the payment of their obligations to the payment of essential services, and (iii) temporarily stay related creditor remedies. In connection with the Moratorium Act, then-Governor Alejandro Garcia Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities.

---

[172] *Franklin California Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R. Feb. 6, 2015).

[173] *Franklin California Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322 (1st Cir. 2015).

[174] *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938 (2016).

AAFAF was also created under the Moratorium Act for the purpose of assuming GDB's role as fiscal agent, financial advisor, and reporting agent to the Commonwealth and its instrumentalities and municipalities.[175]    In January 2017, the Legislature enacted Act 2-2017, which expanded AAFAF's role to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities approved by the Oversight Board pursuant to PROMESA.

6.    **Act 3-2017 ("Act 3")**

On January 23, 2017, the Commonwealth enacted Act 3, which declared a fiscal and economic crisis and extended until July 1, 2021 the effectiveness of many of the fiscal austerity measures enacted by Act 66 that were originally scheduled to expire on July 1, 2017. Act 3 adopted the following measures: (i) suspension of CBAs; (ii) freezing of compensation and employment benefits; (iii) reduction in the Department of Education's school transportation costs; (iv) implementing limitations on job openings; (v) eliminating 20% of trust employee positions; (vi) limiting the carryover of sick and vacations days between Fiscal Years; and (vii) application of a payment plan system for legal judgments. Such measures may be terminated earlier if certain financial conditions are met, such as GNP growth of at least 1.5%, Commonwealth general obligations receive an investment grade credit rating, and no deficit financing is used by the Commonwealth. Act 3 also extended the 4% excise tax imposed by Act 154 from December 31, 2017 until December 31, 2027.

7.    **Act 4-2017 ("Act 4")**

On January 26, 2017, the Commonwealth enacted Act 4, known as the Transformation and Labor Flexibility Act, to increase participation in the labor market by adding flexibility to overtime regulations, increasing work requirements to become eligible for severance pay, and authorizing longer probationary periods. In addition, work requirements to become eligible for the Christmas bonus were increased and the bonus was reduced by half during an employee's first year of employment. Puerto Rico's law limiting the hours of operation of certain retail businesses on Sundays and certain holidays was also repealed.

8.    **Act 5-2017 ("Act 5")**

On January 29, 2017, the Commonwealth enacted Act 5, known as the Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017, to repeal parts of Act 21-2016 and declare a financial emergency. Although certain provisions of Act 21-2016 were repealed, the debt moratorium orders issued under Act 21-2016 continue in effect pursuant to Act 5. Act 5 also established an emergency period, during which the Governor may issue executive orders designating the priority for the use of available resources. The Governor was also granted broad receivership powers over government agencies in order to rectify the financial emergency.

Act 5 was amended by Act 46-2017 to authorize the Governor to continue extending the emergency period declaration by additional 6-month periods as long as the Oversight Board exists.

---

[175] For a discussion of Act 5-2017, which amended the Moratorium Act, *see* section IV.B.8 of this Disclosure Statement.

The emergency period is currently set to expire on June 30, 2021, unless further extended by the Governor.

Puerto Rico's House of Representatives is currently evaluating new bills, which would, among other things, amend the Legislature's current role in the Commonwealth budget processes and amend Act 5, or the Financial Emergency and Fiscal Responsibility Act, effectively reducing several of the Governor's fiscal emergency powers under the law. The statement of motives in one of the bills says proposed amendments to Act 5 target "excesses" in fiscal emergency powers granted to the Governor including the "unilateral" authority to set payment priorities via executive order and "issue debt, redirect funds, sell assets, and carry out other actions by decree, without the intervention of the legislative assembly, as required by our constitutional system." The Oversight Board has expressed opposition to this legislation.

9.     **Act 26-2017 ("Act 26")**

On April 29, 2017, the Commonwealth enacted Act 26, known as the Fiscal Plan Compliance Act, to implement a broad array of fiscal measures to reduce costs across the Commonwealth and its public corporations and support the Commonwealth's compliance with the fiscal plan certified by the Oversight Board. Some of the most important measures implemented by Act 26 relate to the standardization of fringe benefits across the Central Government and public corporations. The measures adopted by Act 26 among other things: (1) reduced vacation and sick leave benefits; (2) reduced the number of public holidays; (3) reduced the Christmas bonus of employees of public corporations to $600 and conditioned its eligibility to six months of service per year or more; (4) replaced overtime pay for public employees with compensatory time; (5) eliminated the cash-out payment for sick day accruals and capped the liquidation for vacation leave accruals to 60 days; (6) nullified any provision of a CBA that provided public employees fringe benefits in excess of those set forth in Act 26; (7) imposed a special dividend tax on the Joint Underwriting Association; (8) ordered all public corporations and instrumentalities to transfer surplus revenues to the Treasury Department's General Fund; (9) established a process for selling real properties of the government; (10) shortened the effectiveness of most multiyear appropriations; (11) increased taxes on cigarettes and tobacco products; (12) reduced funding for the Conservatory of Music and the School of Plastic Arts; and (13) reduced until Fiscal Year 2021 the annual set aside for the Commonwealth's emergency fund.

Act 26 provides that when the fiscal situation has stabilized and the condition of the public fiscal situation so permits, the Fiscal Plan Compliance Committee established by the Act may suspend its effectiveness. The Committee is composed of three members, with the Governor, the Speaker of the House of Representatives, and the President of the Senate each appointing one member.

10.     **Act 106-2017 ("Act 106")**

On August 23, 2017, the Commonwealth enacted Act 106 to address the imminent depletion of the assets of the Commonwealth's retirement systems. Known as the Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Employees, Act 106 authorized the Commonwealth General Fund to assume the pension payments of the Retirement Systems through a PayGo system. Under the PayGo model, each

employer is required to pay an amount determined by AAFAF corresponding to the actual payments of pension benefits to retirees and beneficiaries of such employer. Act 106 also created a defined contribution system for ERS participants and for TRS participants hired on or after August 1, 2014. All contributions by these participants must now flow into the defined contribution plan.

11.   **Act 29-2019 ("Act 29")**

On May 17, 2019, the Commonwealth enacted Act 29-2019, requiring the Government to fund municipalities' PayGo and Medicaid costs from the General Fund without receiving reimbursement from the municipalities. However, following legal proceedings initiated by the Oversight Board challenging the validity of Act 29-2019 under PROMESA, the Title III Court ruled that Act 29-2019 violated PROMESA and nullified the law, thereby reinstating the municipalities' obligation to cover PayGo and healthcare payments for their employees. This ruling enabled the Commonwealth to seek reimbursement for prior payments made under Act 29-2019 and empowered the Commonwealth to act if these contributions are not received (e.g., to withhold payments for utilities, appropriations). The effective date of the court's ruling was delayed to May 7, 2020 so as to allow for the parties to discuss potential solutions to the financial challenges faced by municipalities, particularly in light of the COVID-19 pandemic. Municipalities are expected to fund their respective contributions for PayGo and healthcare expenditures going forward.

12.   **Incentivized Retirement Program**

a)   **Act 80-2020 ("Act 80")**

The Incentivized Retirement and Justice for Our Public Servants Act No. 80 of 2020 was enacted in August 2020 whereby eligible employees of the Government of Puerto Rico may voluntarily opt for incentivized separation from their employment before retirement age. Act 80 is available to employees of the Government of Puerto Rico who entered the Retirement System (the "System") under Act No. 447 of May 15, 1951, as amended, known as the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico Act ("Act 447-1951"), before April 1, 1990; did not opt to participate in the Retirement Savings Account Program; and have paid a minimum of twenty (20) years to the System as of June 30, 2017. Similarly, the Program offers an early retirement opportunity for employees of eligible agencies, pursuant to Article 4(b) of Act 80-2020,[176] who entered the System under Act No. 1 of February 16, 1990, as amended, ("Act 1-1990"), between April 1, 1990 and December 31, 1999; had not opted to participate in the Retirement Savings Account Program; and have paid a minimum of fifteen (15) years to the System as of June 30, 2017.

The incentives, both for employees under Act 447-1951 and Act 1-1990, include a lifetime retirement pension equivalent to fifty per cent (50%) of their highest yearly gross remuneration earned during any of the last three (3) years prior to the time they enter the Act 80 program; a

---

[176] In February 2020, the Legislature introduced legislation that would seek to amend Act 80-2020 to remove Article 4(b).

monthly employer contribution of one hundred (100) dollars to the medical plan selected by the participant until age sixty two (62); and the liquidation of sick leave and vacation leave accrued up to the date of separation from service to participate in the Act 80 program, in accordance with the caps established by the applicable legislation and regulations, tax free. Likewise, the participants may apply for the disbursement of the benefits from the contributions they have made to the New Defined Contributions Plan, in accordance with the provisions of Article 8 of Act 106 of 2017, as amended.

To pay for the new benefits, the Government proposes that it would freeze all positions vacated by retirees with the possible exception of "vacant positions that are determined to provide essential services for the operation of the agency."[177] The Government's analysis, determined that Act 80 would save the Commonwealth $2.6 billion over the next thirty to fifty years on present value basis. In conducting its own analysis, the Oversight Board determined that the Government's reports substantially overstated Act 80's savings. In total, the Oversight Board estimates the law could potentially cost as much as $4.2 billion. The Oversight Board estimates the incremental cost on the Commonwealth's certified fiscal plan alone could be as much as $2.2 billion. The Oversight Board's analysis shows the law will result in an overall cost increase unless the Government makes significant and permanent reductions in headcount and compensation for its workforce – above and beyond those required by the Commonwealth's certified fiscal plan.

The Oversight Board advised the Government that if the Government wishes to proceed with implementation of Act 80 it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 80 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services. The Government has advised that it will not implement the Act 80 until an agreement is reached with the Oversight Board. The Government has since provided preliminary analysis demonstrating that the implementation of Act 80 would increase costs in the vast majority of the agencies, public corporations, and municipalities but that some employers may be able to achieve savings. The Oversight Board subsequently has reviewed the analysis and in a letter on June 22, 2021 identified conditions under which selective application of Act 80 could be implemented, although it noted that currently Act 80 does not allow for selective implementation.

b)    **Act 81-2020 ("Act 81")**

Act No. 81 of 2020, enacted on August 3, 2020, amends existing pension regimes for police officers, firefighters, correctional officers and emergency technicians, among others (collectively, "Public Emergency Employees"), who entered the System under Act 447-1951 before April 1, 1990 or under Act 1-1990 between April 1, 1990 and December 31, 1999. It allows Public Emergency Employees to retire early with 45 to 55 percent of their final salaries as of retirement date as pension benefits as well as a $100 per month medical plan contribution from their employer.

The Government certified in October 2020 that Act 81 will be implemented in a "budgetary neutral form" by limiting the hiring of new recruits or by hiring at lower rates and, therefore, limiting new payroll expenditures with a present value of $852 million during a period of 30-40

---

[177] Act 80, § 9(b)

years. The Oversight Board's own independent analysis found the costs of providing enhanced benefits to the approximately 8,640 participants expected to meet Act 81's eligibility requirements at retirement is $2.4 billion. The Oversight Board's analysis shows that the law will result in an overall cost increase unless the Government makes significant and permanent reductions in headcount and compensation that is not likely achievable through reductions in public safety personnel and therefore inconsistent with the Commonwealth's certified Fiscal Plan.

The Oversight Board advised the Government that if the Government wished to proceed with implementation of Act 81 it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 81 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services. The Government has advised that it will not implement Act 81 until an agreement is reached with the Oversight Board.

c)    **Act 82-2020 ("Act 82")**

Act 82 enables participants of the Teachers Retirement System to apply unused sick leave towards their retirement eligibility and pension benefit level. The enhanced pension benefits, as well as the likely and unplanned acceleration in the timing of teacher retirements, generate costs and staffing gaps not contemplated by the Fiscal Plan.

The Government certification for Act 82 stated that Act 82 has no cost because employees cannot liquidate their unused sick time. The Oversight Board's independent analysis showed that implementing Act 82 will cost the Commonwealth between $635 million and $1.57 billion over the next thirty years, assuming that as a result TRS participants receive between two and five years of additional service credit. Therefore, the Oversight Board has determined that Act 82 is significantly inconsistent with the Fiscal Plan and is having on-going dialogues with the Government to better understand the assertion that Act 82 has no cost. The Government has advised that it will not implement Act 82 until an agreement is reached with the Oversight Board.

13.    **Act 7-2021 ("Act 7-2021")**

The Law for a Dignified Retirement (Act No. 7 of 2021, "Act 7-2021"), previously known as House Bill 120, was signed into law by Governor Pierluisi on June 9, 2021. It has two primary components. First, it imposes restrictions on the government of Puerto Rico designed to prevent confirmation and implementation of any plan of adjustment inconsistent with terms in Act 7-2021. This would undermine the Oversight Board's proposed plan of adjustment, by compelling bondholders to receive a lower level of recovery than in the currently proposed settlement, and restoring pension benefits to the benefits that existed immediately prior to the enactment of Act 106, without any reduction. Second, it would create a new pension trust ("FACSiR") funded by purported savings from the repayment of less bond debt, regardless of whether such savings materialize after litigation with the holders of such bonds. As a whole, Act 7-2021 is an attempt by the Government to unilaterally dictate the terms of the plan of adjustment including the treatment of prepetition debt obligations, to eliminate all pension reforms contemplated by the 2021 Fiscal Plan along with essential reforms implemented under Act 106, including the PayGo system, to reinstate all public pension systems as they existed prior to Act 106, and to consolidate the source of funding of these unsustainable benefit obligations into one new entity.

In signing Act 7-2021, Governor Pierluisi acknowledged Act 7-2021 is "significantly inconsistent" with the 2021 Fiscal Plan. On June 18, 2021 the Governor provided the Oversight Board a section 204(a) certification (the "Certification") containing AAFAF's conclusion that Act 7-2021 is "significantly inconsistent" with the 2021 Fiscal Plan. The Certification further concluded "the reformulation of Puerto Rico's pension system, as stated in Act 7-2021, is contrary to the provisions of the Fiscal Plan and the assumptions of the POA filed before the Title III court. Accordingly, its provisions could be interpreted as contrary to several provisions of PROMESA and to powers granted to the Oversight Board. See, e.g., Section 108(a), 312 and 313 of PROMESA, 48 U.S.C. sections 2128, 2172-73. In addition, Chapter 3 of Act 7-2021 seeks to have the debt of the Government of Puerto Rico issued, guaranteed and/or modified without the approval of the Oversight Board pursuant to PROMESA Section 207 of PROMESA."

On June 22, 2021, in response to the Certification, the Oversight Board requested the Government confirm by June 25, 2021 that Act 7-2021 will not be implemented. The Oversight Board also requested the Legislature to confirm by the same date it will undertake to repeal Act 7-2021 in its entirety.

On June 25, 2021, AAFAF responded and confirmed again that Act 7-2021 is significantly inconsistent with the 2021 Fiscal Plan. AAFAF did not confirm that the Government will not implement the Act, or support the repeal of the Act. Instead, AAFAF merely asserted that it will pursue alternatives to the Oversight Board's proposed plan of adjustment.

On June 28, 2021, the Oversight Board directed the Governor to confirm that Act 7-2021 will not be implemented and asked the Governor and Legislature to sign a stipulation and proposed order, no later than July 1, 2021, consenting to nullification of Act 7-2021 in its entirety. As of June 29, 2021, the Government's response has not yet been received.

HB 120 (Act 7-2021's predecessor) has been the subject of numerous letters between and among the Commonwealth Government (the Governor, members of the Legislature, AAFAF) and the Oversight Board, including letters dated January 29, 2021, February 20, 2021, March 19, 2021, March 25, 2021, and April 28, 2021. As set forth in the letters, the Oversight Board has determined Act 7-2021 impairs and defeats the purposes of PROMESA for the following reasons.

- First, Act 7-2021 attempts to dictate the treatment of billions of dollars of Commonwealth bond debt and would prevent the Commonwealth government from taking any action to support a plan of adjustment that alters that treatment. Therefore, Act 7-2021 seeks to seize control over the Commonwealth's debt restructuring and usurp the exclusive power of the Oversight Board and the Court to confirm a plan of adjustment under PROMESA section 312.

- Second, Act 7-2021 assumes the elimination of billions of dollars of bond obligations, and would transfer every dollar of debt service on such hypothetically eliminated bond debt to the proposed new pension trust (FACSiR). The Commonwealth would thus achieve no debt relief.

- Third, even assuming that all assumptions made by the Act's proponents regarding the availability of funding sources were correct, the Oversight Board estimates that these sources will be insufficient to fund the retirement benefits Act 7-2021 would reinstate. As explained in the Oversight Board's March 25, 2021 letter detailing the discrepancies between the Oversight Board's analysis and that of the Bill's proponents, the Oversight Board's analysis shows FACSiR will likely never reach a funding level of more than 18 percent of the Commonwealth's pension obligations as established under the Bill, and would be insolvent no later than 2053. And should any of the sources of proposed funding listed in Act 7-2021 become unavailable, such as those from reallocating debt service payments for bonds defined as "Contested Bonds" in Act 7-2021, FACSiR could become insolvent much sooner. Act 7-2021 does not specify what happens when FACSiR becomes insolvent.

- Fourth, Act 7-2021 mortgages the Commonwealth's and its retirees' futures by establishing a vastly underfunded defined benefit plan: Act 7-2021 contemplates using contributions from current employees to fund the Government's obligations to current retirees. This policy eschews segregated and individually controlled accounts introduced by Act 106 in favor of a pension trust that will be woefully underfunded and, like its predecessor ERS, become completely unfunded when today's employees eventually retire. The Act would thus reinstate a failed policy that was a principal cause for the Island's deep financial distress, and a critical problem PROMESA was enacted to fix. Additionally, the Act reverses the proposed System 2000 settlement reflected in the plan of adjustment to fix these past mistakes and instead deposits that money into FACSiR.

- Fifth, Act 7-2021 makes false promises to public pension system participants: Act 7-2021 falsely promises participants an "honorable retirement" via increased benefits which are highly unlikely to be fully provided. The Oversight Board's analysis indicates the fund balance will never exceed 18% of the aggregate actuarial pension obligation the Bill will establish, let alone the 120% funded status threshold necessary to trigger further increased benefits.

- Sixth, as conceded by the Governor and AAFAF, Act 7-2021 is inconsistent with the 2021 Fiscal Plan: the 2021 Fiscal Plan requires that non-fiscal plan entities are responsible for PayGo costs for their retirees, whereas Act 7-2021 only holds non-fiscal plan entities responsible for their employer contribution of 10% of pay, resulting in the Commonwealth subsidizing non-fiscal plan entity benefit costs. Further, by requiring only a formulaic employer contribution to the trust, Act 7-2021 defies the Title III court's prior ruling nullifying Law 29-2019, which law would have relieved municipalities of their obligations to compensate the Commonwealth for paying their retirees' pensions.

On July 2, 2021, in response to the failure of the Government to enter into a stipulation agreeing to nullify Act 7-2021, the Oversight Board filed a lawsuit seeking from the Title III court appropriate judicial injunctions and other appropriate relief arising from the Government's intentional violation of PROMESA sections 108(a), 204 and 207, among other provisions. For a more information regarding the lawsuit, see section IV.C.3.h)ix.

14. **Act 9-2021 ("Act 9")**

On June 30, 2021, the Commonwealth adopted Act 9, known as the Act to Guarantee Collective Bargaining. Act 9, which applies to all executive branch entities, agencies, and public instrumentalities (except for the State Elections Commission, the Office of Government Ethics, Office of the Independent Prosecutor, and the Office of the Electoral Comptroller), established the following: (1) executive branch entities must begin collective bargaining negotiations with their respective units no later than July 1, 2021; and (2) the non-economic clauses included in collective bargaining agreements that expired before June 30, 2021, before July 1, 2021, or those that will expire while Act 9 is in effect will be extended until a new CBA has been reached. During said extension, parties will be precluded from filing petitions for elections and from celebrating decertification elections. Since the extension of the CBA lies in the unit's discretion, if the bargaining unit decides not to extend the CBA nor begin negotiations, it must notify said determination within fifteen (15) days since the enactment of Act 9.

**C. PROMESA**[178]

1. **Enactment of PROMESA**

On June 30, 2016, Congress enacted PROMESA, which provides a framework, among other things, for the Commonwealth and its covered instrumentalities to restructure their indebtedness by establishing:

- the Oversight Board, which provides oversight of the Commonwealth and its covered instrumentalities'[179] restructuring and revitalization efforts by, among other things: (i) certifying fiscal plans and budgets for the Commonwealth and its covered instrumentalities and (ii) representing the Commonwealth and its covered instrumentalities in any cases commenced under Title III of PROMESA;

- a court-supervised, quasi-bankruptcy process similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth and its covered instrumentalities to restructure their indebtedness pursuant to a plan of adjustment; and

---

[178] This section summarizes certain provisions of PROMESA. Although the Debtors believe that this description covers the material provisions of PROMESA, this summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, PROMESA.

[179] On September 30, 2016, the Oversight Board designated certain entities, including the Debtors, as covered instrumentalities. Financial Oversight & Management Board for Puerto Rico, Annual Report, Fiscal Year 2017 (July 30, 2017). On May 9, 2019, the Oversight Board supplemented the list of covered instrumentalities and designated 78 municipalities as covered instrumentalities under PROMESA.

169

- a framework for the designation, oversight, and implementation of critical infrastructure projects aimed at growing the Commonwealth's economy.

2.   **Creation of the Oversight Board**

PROMESA section 101(a) established the Oversight Board for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." The Oversight Board currently consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting *ex officio* member appointed by the Governor.[180]   On August 31, 2016, President Obama appointed the Oversight Board's seven voting members: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González and (7) Ana J. Matosantos.

On August 31, 2020, the resignations of Carlos M. García and José R. González became effective, and on October 5, 2020, the resignation of José B. Carrión III, Chairman of the Oversight Board, became effective.  On October 6, 2020, David A. Skeel, Jr. was designated Chairman of the Oversight Board.  On October 7, 2020, President Trump appointed Justin Peterson to replace Arthur J. González as member of the Oversight Board.  In December 2020, President Trump reappointed Andrew G. Biggs and appointed Antonio L. Medina, John E. Nixon, and Betty A. Rosa as members of the Oversight Board.  In January 2021, President Trump reappointed David A. Skeel, Jr. and appointed Arthur J. González as members of the Oversight Board.  The current seven voting members of the Oversight Board are: (1) David A. Skeel, Jr., (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson, and (7) Betty A. Rosa.  Governor Pedro Pierluisi Urrutia is currently the Commonwealth's non-voting *ex officio* member of the Oversight Board.

Each member of the Oversight Board serves a three-year term without any compensation and may be appointed to an unlimited number of consecutive terms.  When a term expires, Board members serve until replaced.  The President of the United States may remove any member for cause.

In addition to its seven voting members and non-voting *ex officio* member, the Oversight Board also has an executive team, which includes: (i) Natalie A. Jaresko, as Executive Director and Interim Revitalization Coordinator, (ii) Jaime A. El Koury, as General Counsel, and (iii) Kyle A. Rifkind, as Deputy General Counsel and Restructuring Officer.  Pursuant to the Oversight Board's bylaws, the Executive Director acts as the chief executive officer of the Oversight Board with general supervision and direction of its business affairs (including the power to enter into contracts on behalf of the Oversight Board), subject to the supervision and control of the Oversight Board.  The General Counsel acts as the chief legal officer of the Oversight Board.  The Revitalization Coordinator is responsible for executing the duties prescribed under PROMESA section 503 relating to the identification, prioritization, and implementation of critical infrastructure projects for the Commonwealth.

---

[180] For a discussion of litigation related to challenges under the Appointments Clause, *see* section V.F.1 of this Disclosure Statement.

In accordance with PROMESA section 108(a), the Oversight Board acts as an autonomous entity, such that neither the Governor nor the Legislature may exercise any control over the Oversight Board and its activities and cannot take any actions that would impair or defeat the purposes of PROMESA.  Although created by federal statute, the Oversight Board is not a "department, agency, establishment, or instrumentality of the Federal Government."  Instead, as set forth in PROMESA section 101(c)(1), the Oversight Board is deemed "an entity within the territorial government" of the Commonwealth.  The Oversight Board remains a small organization, with a flat hierarchy, and operates from offices located in San Juan, Puerto Rico and New York, New York.  One of its organizational goals during Fiscal Year 2019 was to take advantage of the incredible talent in Puerto Rico to build organizational strength through local recruiting, thereby reducing costs and the use of third-party consultants.  The overwhelming majority of the Oversight Board's new hires are Puerto Ricans, several of whom have returned from the U.S. mainland to help Puerto Rico recover.

In accordance with PROMESA section 209, the Oversight Board will continue in existence until the Oversight Board certifies that: (i) the Commonwealth has adequate access to the short-term and long-term capital markets at reasonable interest rates to meet its borrowing needs and (ii) for at least four consecutive Fiscal Years: (a) the Commonwealth has developed its budgets in accordance with modified accrual accounting standards and (b) the expenditures made by the Commonwealth during each such Fiscal Year did not exceed its revenues during that year, as determined in accordance with modified accrual accounting standards.

3.    **The Oversight Board's Powers and Responsibilities**

*Certification of Fiscal Plans and Budgets*

One of the cornerstones of PROMESA is the development, certification, and enforcement of fiscal plans and budgets for the Commonwealth and its covered instrumentalities.  Such fiscal plans and budgets provide a framework for achieving fiscal responsibility and access to the capital markets.  Fiscal plans are short-term and long-term planning tools, covering a period of at least five Fiscal Years, while budgets cover at least one Fiscal Year.  Budgets must be consistent with the fiscal plan then in effect.

PROMESA contemplates the Oversight Board and the elected government of the Commonwealth will work together to adopt a fiscal plan, but grants the Oversight Board the power to develop and certify its own fiscal plan if the government does not provide it with a proposed fiscal plan it determines to certify.  The process begins with the Oversight Board providing the Governor with a schedule for the development, submission, and certification of fiscal plans for the Commonwealth and any covered instrumentality.  The Governor is required to submit the proposed fiscal plan in accordance with such schedule.  Following submission, the Oversight Board may certify the proposed fiscal plan if it determines that such fiscal plan meets 14 statutory requirements set forth in PROMESA section 201(b), which are designed to "provide a method to achieve fiscal responsibility and access to the capital markets."  The fiscal plan must:

- provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- ensure the funding of essential public services;

- provide adequate funding for public pension systems;

- provide for the elimination of structural deficits;

- for Fiscal Years covered by a fiscal plan in which a stay under Title III or Title IV of PROMESA is not effective, provide for a debt burden that is sustainable;

- improve fiscal governance, accountability, and internal controls;

- enable the achievement of fiscal targets;

- create independent forecasts of revenue for the period covered by the fiscal plan;

- include a debt sustainability analysis;

- provide for capital expenditures and investments necessary to promote economic growth;

- adopt appropriate recommendations submitted by the Oversight Board;

- include such additional information as the Oversight Board deems necessary;

- ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III or a Qualifying Modification approved under Title VI of PROMESA; and

- respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

Fiscal plans must ensure the funding of essential public services. The Oversight Board takes the view that "essential services" is a phrase used to refer, at a minimum, to services which, due to the police power, a court of competent jurisdiction can allow to be paid for from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim. The Oversight Board takes the view that use of such revenues pursuant to the police power may or may not give rise to additional claims of the affected creditors, depending on the circumstances. This Disclosure Statement and the Plan do not define "essential services" or "essential expenses." The Oversight Board takes the view that this is for several reasons, including the following reasons.[181]

*First*, Title II of PROMESA requires that a fiscal plan "ensure the funding of essential public services." This language sets a minimum floor on spending, meaning that the fiscal plan

---

[181] Certain parties assert that "essential services" must be specifically identified.

must fund essential services.  At confirmation, the Title III Court considers the Plan.  The fiscal
plan's certification is outside the subject matter jurisdiction of the Title III Court pursuant to
PROMESA section 106(e).  PROMESA section 314(b)(7) requires that the Plan be consistent with
the fiscal plan, but imposes no testing of the fiscal plan.  Therefore, essential services are not in
issue.

*Second*, each debtor's available revenues are property of each debtor subject to the
exclusive subject matter jurisdiction of the Title III Court pursuant to PROMESA section
306(b).  Title III of PROMESA incorporates the priority in section 507(a)(2) of the Bankruptcy
Code, which grants priority for administrative expenses, but is silent as to the General Obligation
claims in the Commonwealth's Title III case.  Certain bondholders asserting General Obligation
claims are granted priority status, not by the Bankruptcy Code, but by the Commonwealth
Constitution and PROMESA, including sections 201(b)(1)(N), 301(e), and 314(b).  The Oversight
Board's settlement with holders of approximately $10 billion of General Obligation Bond and
PBA Bond claims eliminates the need, in the Oversight Board's view, to litigate whether the
General Obligation claims have priority, and any priority's terms.[182]  Therefore, the Oversight
Board reasons that because the General Obligation claimholders are not claiming under the
settlement revenues otherwise needed to pay essential services, there is no need to define essential
services.  The definition of "essential services" therefore has no application or impact on how a
creditor should vote on the Plan, which is the Disclosure Statement's primary focus.

*Third*, the settlement of the enforceability of the General Obligation claimholder's priority
under the Commonwealth Constitution safeguards the payments to retirees under the Plan which
could be adversely impacted if the General Obligation debtholders have an enforceable claim to
all available revenues.  The settlement also safeguards the carrying out of the certified fiscal plan
because it leaves no basis for the General Obligation debtholders to claim available revenues
otherwise being deployed to pay expenses under the certified budget.  This again avoids disputes
over essential services.  To obtain these benefits and safeguards, the Plan proposes treatments of
holders of General Obligation claims which offer higher returns than the treatments offered to
holders of some non-General Obligation claims.   Therefore, the Oversight Board asserts that there
is no issue under PROMESA as to the priority of General Obligation debt *vis-à-vis* essential
services.

*Fourth*, the Plan provides greater distributions to General Obligation claims than to some
non-General Obligation claims because holders of General Obligation claims may have a relative
seniority to holders of non-General Obligation claims under the Commonwealth Constitution,
which may be enforceable under PROMESA Title III.  This relative seniority, however, impacts
rights of holders of junior claims, but is not a priority claim against the Commonwealth entitling
holders of General Obligation debt to all available revenues.  Therefore, the definition of essential
services has no application for purposes of Plan confirmations.

*Finally*, the concept of "essential services" is not conducive to simple listings of which
services or expenses are essential, and which are not, because essential services may vary greatly

---

[182] The Oversight Board is unaware of any grant of a security interest in available revenues to such General Obligation
claims.

over time and depending on circumstances post-confirmation.  For instance, if Commonwealth economic activity were so low during a period that elimination of any services would prevent sustainable economic growth then the Oversight Board might determine that all such services were essential.  The Commonwealth's certified fiscal plan covers periods of growth and shrinkage, and shows continued population shrinkage.  Accordingly, the best interest analysis for the Commonwealth analyzes creditors' recovery outside Title III by assuming different percentages of the certified fiscal plan and budget expenses are cut (on top of the cuts already in the fiscal plan) by various percentages, rather than engaging in a debate over each expense.  Thus, a definition of essential services is neither required by nor relevant to the best interest analysis pursuant to PROMESA.

After certification of the fiscal plan, the Oversight Board will provide to the Governor and the Legislature a schedule for the development and certification of budgets for the Commonwealth and its covered instrumentalities.  The Oversight Board must also provide to the Governor and the Legislature a revenue forecast for use in developing the budget.  If the Oversight Board determines the proposed Commonwealth budget submitted by the Governor is compliant with the approved fiscal plan, the Oversight Board will approve it and submit it to the Legislature.  If the Oversight Board determines the proposed budget is not compliant with the certified fiscal plan, it will provide a notice of violation to the Governor regarding the budget that includes a description of the necessary corrective action and an opportunity to correct such violation by submitting a revised budget that complies with the certified fiscal plan.  The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits.  However, if the Governor fails to submit a Commonwealth budget that complies with the certified fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit to the Governor and the Legislature a budget that complies with the certified fiscal plan.  The Legislature will then submit to the Oversight Board the budget it adopts so that the Oversight Board can determine whether such budget complies with the certified fiscal plan.  If the budget adopted by the Legislature complies with the certified fiscal plan, the Oversight Board will approve it and such budget shall be in effect on the first day of the Fiscal Year.  If the Oversight Board determines that the budget adopted by the Legislature does not comply with the certified fiscal plan, the Oversight Board will provide to the Legislature a notice of violation that includes a description of the necessary corrective action and an opportunity to correct such violation.  The Legislature may submit as many revised budgets as the schedule established by the Oversight Board permits.  However, if the Legislature fails to adopt a budget that complies with the certified fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop a budget that complies with the certified fiscal plan and submit it to the Governor and the Legislature.  Such budget shall be deemed to be approved by the Governor and the Legislature and will be in effect on the first day of the Fiscal Year.  Budgets of instrumentalities are developed by the Governor and follow a similar process between the Governor and the Oversight Board, whereby the Governor develops an instrumentality budget and the Oversight Board reviews it to determine whether it complies with the instrumentality's certified fiscal plan.  If the Governor fails to develop an instrumentality budget that complies with the corresponding certified fiscal plan, the Oversight Board must develop it.

At the end of each fiscal quarter, the Governor must submit to the Oversight Board a financial report for the Commonwealth and each covered instrumentality describing actual

revenues, expenditures, and cash flows for such quarter. If the Oversight Board determines that actual revenues, expenditures, and cash flows are not consistent with the projected revenues, expenditures, or cash flows set forth in the certified budget for such quarter, the Oversight Board will establish a deadline by which the Government must provide an explanation for the inconsistency that the Oversight Board finds reasonable or the Government must implement corrective actions to address such inconsistency. If the Government fails to provide a reasonable explanation or to correct the inconsistency, the Oversight Board must certify to the President, the United States Congress, the Governor, and the Legislature that the Commonwealth is inconsistent with the certified budget and describe the amount of the inconsistency. After providing such certification and determining that the Government has failed to correct the inconsistency, the Oversight Board can make appropriate reductions in non-debt expenditures to ensure that revenues and expenses are in line with the certified budget. In the case of an instrumentality, the Oversight Board can also institute automatic hiring freezes and prohibit such instrumentality from entering into any contract.

Since the enactment of PROMESA on June 30, 2016, the Oversight Board has certified budgets for the Commonwealth for Fiscal Years 2018, 2019, 2020, and 2021.

In furtherance of the foregoing duties, the Oversight Board has the authority to enforce the certified fiscal plans and budgets by reviewing the activities of the government of the Commonwealth and its instrumentalities. Accordingly, the Commonwealth's proposed legislative acts must be submitted to the Oversight Board and must be accompanied by an estimate of the new law's impact on expenditures and revenues.

Since its creation, the Oversight Board and the former Governor disagreed on many occasions as to whether government reporting has complied with PROMESA and whether certain executive orders and newly enacted laws violated PROMESA and/or certified fiscal plans and budgets.

The Oversight Board also has the authority to review any of the contracts, rules, regulations, and orders of the Commonwealth and its covered instrumentalities for their economic impact on the certified fiscal plans and budgets. If the Oversight Board determines any of the foregoing activities are inconsistent with a certified fiscal plan or budget, the Oversight Board may take any actions necessary to ensure that the enactment of a new law or execution of a new contract will not adversely affect compliance with the certified fiscal plan or budget. In addition, the Oversight Board at any time may submit to the Governor or the Legislature recommendations for actions that would ensure compliance with the fiscal plans or otherwise promote financial stability and management responsibility in the Commonwealth's public corporations. The Commonwealth may adopt or reject such recommendations, subject to providing a report to the President of the United States and Congress on its justifications for rejecting any recommendations. The Oversight Board, however, can in its certified fiscal plan adopt and impose recommendations the Governor declines to adopt.[183]

---

[183]For a discussion of litigation related to the Oversight Board's powers, *see* section IV.C.3.h)(i) of this Disclosure Statement.

PROMESA section 207 also provides the Commonwealth and its covered instrumentalities may not issue any debt without the approval of the Oversight Board.

### Title III of PROMESA

If a consensual restructuring is not accomplished, Title III of PROMESA provides a quasi-bankruptcy option for the adjustment of the indebtedness of the Commonwealth and its covered instrumentalities. Eligibility for the Commonwealth or a Commonwealth instrumentality to be a debtor under Title III of PROMESA is conditioned on satisfaction of certain requirements, as set forth in PROMESA section 302. Pursuant to PROMESA section 304(b), the hearing to consider an objection to a Title III petition cannot commence until the 120th day after the petition is filed. At that hearing, the Title III Court will consider section 302's requirements that: (i) the entity has been designated by the Oversight Board as a covered territorial instrumentality; and (ii) the Oversight Board has issued a restructuring certification determining that (a) prior good-faith efforts were made with creditors to restructure the debt, (b) the entity's audited financial statements are publicly available, (c) the entity previously adopted a fiscal plan (the "Restructuring Certification"), and (iii) the entity desires to effect a plan to adjust its debts. The Oversight Board has exclusive authority, under PROMESA sections 304 and 312, to file a voluntary petition seeking protection under Title III and to file a plan of adjustment for the debtor and make modifications thereto. Furthermore, PROMESA section 315 grants the Oversight Board the right to "take any action necessary on behalf of the debtor to prosecute the cases of the debtor," and the Oversight Board "is the representative of the debtor" in the Title III case.

### Other Powers and Responsibilities

Pursuant to PROMESA section 208, within 30 days after the end of each Commonwealth Fiscal Year, the Oversight Board is required to submit an annual report to the President of the United States, Congress, the Governor, and the Legislature. The annual report must describe the Commonwealth's progress in achieving PROMESA's objectives and how the Oversight Board has assisted such progress. In addition, the Oversight Board must describe the precise manner in which it used its funds during the Fiscal Year. The annual report may also include the Oversight Board's recommendations for further federal action, including amending PROMESA or enacting other legislation, to support compliance with certified fiscal plans.

In addition to the foregoing core responsibilities, the Oversight Board has also been granted other significant powers to assist in achieving its objectives. These additional powers include, among other things:

- holding hearings and sessions;

- obtaining official data from the Commonwealth, the federal government and creditors;

- issuing and enforcing subpoenas;

- entering into contracts;

- certifying voluntary restructuring agreements and protecting certain qualifying pre-existing restructuring agreements between the Commonwealth and its creditors;

- certifying debt modifications under Title VI of PROMESA;

- initiating civil actions to enforce its authority under PROMESA;

- investigating the Commonwealth's disclosure and selling practices related to its bonds;

- ensuring the prompt payment and administration of Commonwealth taxes through the adoption of electronic reporting, payment and auditing technologies;

- analyzing any materially underfunded pensions in the Commonwealth's pension system; and

- intervening in any litigation filed against the Commonwealth or its covered instrumentalities.

***Implementation of Oversight Board Policies***

The Oversight Board implemented various initiatives in its efforts to meet the objectives of PROMESA, including, among other things:

a)   **Improving the Government's Fiscal Governance, Accountability, Internal Controls, and Financial Affairs**

One of the Oversight Board's core responsibilities is to improve the Government's fiscal governance, accountability, and internal controls. Following the commencement of the Title III Cases, the Oversight Board continued to identify and implement structural and process improvements to fulfill its mandate pursuant to PROMESA.

A critical component of the Oversight Board's efforts in this area was the incorporation of the Office of the Chief Financial Officer for Puerto Rico ("OCFO")[184] into the certified fiscal plan for the Commonwealth. The Government previously established the base for the OCFO through an executive order, and the fiscal plan envisions an expansion of the role to implement financial management best practices from other states. The OCFO will centralize all financial management functions, including: (i) treasury and liquidity management; (ii) budget development, monitoring, and performance tracking; (iii) maintenance and integration of financial IT systems; (iv) procurement and human resources; (v) financial reporting including timely issuance of the Annual Comprehensive Financial Reports ("ACFRs"); and (vi) general management and validation of funds, debt, and financial transactions.

---

[184] On June 24, 2019, after the removal of then CFO Raúl Maldonado, the Governor designated AAFAF Executive Director Christian Sobrino to be the Commonwealth's new CFO. Mr. Sobrino resigned from his positions as CFO and AAFAF Executive Director on July 13, 2019. On July 31, 2019, then-Governor Rosselló named Omar Marrero as the Commonwealth's new CFO and executive director of AAFAF. In February 2021, Governor Pedro Pierluisi named Puerto Rico Treasury Secretary Francisco Parés Alicea as the Commonwealth's new CFO.

The Oversight Board has exercised its powers pursuant to section 104(c)(2) of PROMESA which provides the Oversight Board the authority to request "direct access to such information systems, records, documents, information, or data." The Oversight Board entered into a memorandum of understanding with the OCFO to establish the procedures for granting the Oversight Board direct access to the Government's information systems. As part of the memorandum of understanding, and to be more efficient and effective in the transfer of knowledge, the Oversight Board and the OCFO established a working group composed of representatives from OCFO, the Puerto Rico Innovation & Technology Service and the Oversight Board to discuss related information systems and data. The Oversight Board obtained access to certain financial data from the Puerto Rico Integrated Financial Accounting System ("PRIFAS"), one of the Government's payroll system and two applications from OMB. The Oversight Board continues these efforts to gain visibility of the Governments' financial data and get a deeper understanding of current data limitations.

The Oversight Board established a series of reporting requirements to provide more transparency into the Government's financial management, including the TSA reporting requirement for the Central Government and the top agencies and public corporations (the "Component Units") within the Commonwealth fiscal plan. The reports provide a snapshot of the Central Government's liquidity situation as compared to the projected annual liquidity plan. This report is publicly reported by the Government on a weekly and monthly basis.

The Oversight Board also created a budget-to-actuals ("B2A") reporting requirement for the Central Government and the top twenty Component Units, as well as public corporations such as PREPA and PRASA, which has pushed the Government to add resources and capacity to its budgeting and accounting departments. The B2A reporting requirement has enabled the Government to provide greater visibility to stakeholders into its actual spending patterns and an early warning mechanism to alert the Government and the Oversight Board if actual spending deviates from budgeted amounts. The B2A report is publicly reported by the Government on a monthly basis.

Other reporting requirements implemented by the Oversight Board include: (i) monthly public reporting of pension obligation balances for the Government and public corporations, (ii) monthly public reporting of public employee payroll, headcount, and attendance data, (iii) quarterly reporting of revenue forecasts, and (iv) the full text of all Government contracts are on the Comptroller's website.

The Oversight Board also instituted a holdback provision in the General Fund budget which provides that recipients of appropriations may receive only a portion of their budgeted appropriations until the final quarter of the Fiscal Year so that the Government can determine whether revenue will be sufficient to permit the spending of the final appropriations in the fourth quarter. For Fiscal Year 2019, that amount was 95%, meaning the remaining 5% of appropriations were held back. For Fiscal Year 2020, that amount was 97.5%, meaning 2.5% was held back. In addition, for Fiscal Year 2020, the Oversight Board eliminated the ability to use prior year appropriations beyond the first 60 days of the next Fiscal Year, to force the Government to close out the prior Fiscal Year on a timely basis, and established additional emergency reserves whose use is subject to Oversight Board approval. For Fiscal Year 2021, the amount remains unchanged

at a 2.5% holdback, but includes additional exceptions such as amounts designated for consent decrees, economic incentive funds, HTA appropriations, and cigarette and rum distributions.

b)     **Efforts to Drive More Successful Implementation of Fiscal Plan Reforms**

The fiscal plan requires the Government to submit implementation plans to outline timelines and Key Performance Indicators ("KPIs") for all fiscal measures and structural reforms, and to provide monthly progress reports on implementation. These implementation plans and progress reports are essential to ensure the Government is operating within the fiscal envelope and making progress on structural reforms, and to afford the Oversight Board the opportunity to provide feedback on critical efforts to restore fiscal sustainability and balance to Puerto Rico.

The Government was required to submit all implementation plans by June 30, 2018. Approximately 73% of 128 implementation plans were received. In general, the submitted implementation plans were not fully aligned with the certified fiscal plan and did not provide sufficient clarity to support compliance. As such, on September 2018, the Oversight Board provided feedback to the agencies on the implementation plans submitted and requested the Government take corrective actions and complete submissions on missing implementation plans. The Government updated some implementation plans based on the feedback provided, but, as of the date of this Disclosure Statement, still has not submitted all implementation plans as required.

Through a collaborative process, the Oversight Board and the Government established an implementation structure to provide insight into agency activities. Said structure, inclusive of monthly progress reports and working group meetings, provided understanding on the agency activities, risks and likelihood of hitting the savings targets established in the certified fiscal plan.

The Oversight Board has worked diligently to drive more successful implementation through:

1.   monthly meetings with priority agencies to spur implementation progress;

2.   publicly reporting the status of progress achieved in Government implementation plans and progress reports;

3.   utilized readiness assessments based on best practices to provide a framework for agencies to track progress on implementation and understand the scope of the different milestones; and

4.   public hearings on implementation in areas of much needed transformation.

Due to slower than expected implementation of reforms to date, the Oversight Board has held public meetings to get status updates and raise public awareness. In March 2019, for example, the Oversight Board held a Public Hearing on the progress made to date by the Department of Public Safety. On September 26, 2019, the Oversight Board held a Public Hearing on the progress made to date on Ease of Doing Business reforms. On December 19, 2019, the Oversight Board held a Public Hearing on the progress of implementation of the Department of Corrections and

Rehabilitation, and of Correctional Health. In August 2020, the Oversight Board held two Public Hearings on the status of the ACFRs with the Department of Treasury (Hacienda). During the Oversight Board's February 2021 Public Hearing, further recommendations were provided by the Oversight Board to the Department of Treasury regarding the timely completion of ACFRs, implementation of a common ERP system, and the establishment of the Office of the Chief Financial Officer.[185]

c)      **Recommendations**

(i)      *Section 205 Recommendations*

Pursuant to PROMESA section 205, the Oversight Board may, at any time, submit recommendations to the Governor or the Legislature on actions the Government may take to ensure compliance with the certified fiscal plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the Government.

The Oversight Board sent the following 205 Recommendations to the Government in Fiscal Year 2021:

> o   To recommend that the Government reform the Commonwealth's property tax system with the goal of improving its efficiency, effectiveness, and, ultimately, collections. The recommended reforms cover four categories: (1) reduce exemption and exonerations; (2) establish a market value basis for property valuation; (3) levy appropriate property tax rates; and (4) use classification to transparently vary effective tax rates between residential, commercial, and industrial properties, if such variation is justifiable. This recommendation was dated August 26, 2020. The Governor responded in a letter November 24, 2020 that the Administration did "not oppose, in principle" the second and fourth recommendations, but they did "oppose and reject" the first and third recommendations. However, no implementation plans for the second and fourth recommendations or expanations for rejecting the first and third were provided. The Oversight Board sent a letter on April 14, 2021 to provide further analysis supporting their recommendations and to re-engage the Government.

> o   To recommend that the Government take necessary steps to immediately address the weaknesses and deficiencies identified by KPMG, as auditor to the Puerto Rico Department of Treasury, in management letters dated December 7, 2018 and July 3, 2019. This recommendation was dated October 1, 2020. The Oversight Board

---

[185] In February 2021, Governor Pedro Pierluisi named Puerto Rico Treasury Secretary Francisco Parés Alicea as the Commonwealth's new CFO. On March 9, 2021, Governor Pierluisi issued Executive Order 2021-018 to create the position of the CFO and describe the duties and powers of the office. The order also detailed the administration's policy on prioritizing annual audited financial statements.

sent a further section 205 recommendation on February 26, 2021 outlining further
recommendations surrounding fiscal governance.

o   To recommend that the Government develop a plan and timeline to integrate and
improve components of its public transportation system. The recommendation
focuses on agency integration, performance management, and system funding
maximization. These recommendations for a unified, well-performing
transportation system are aligned with the goals of reducing traffic congestion,
increasing citizens' access to multimodal transportation, improving governance of
transportation entities, improving fiscal sustainability of public transportation
agencies, and promoting economic growth and development. This recommendation
was dated January 29, 2021. The Government responded to the recommendations
on April 29, 2021 expressing its commitment to examine paths of implementation.
The Commonwealth 2021 Certified Fiscal Plan and the HTA 2021 Certified Fiscal
Plan both laid out initiatives to support the goals of this recommendation.

o   To recommend that the Government bring the Commonwealth current on its
ACFRs, prioritize implementation of the ERP system over other initiatives (other
than completion of the ACFRs), and create the OCFO which should have a
significant role in financial reporting and auditing, as well as supporting ERP
development and implementation. This recommendation was dated February 26,
2021. In February 2021, Governor Pedro Pierluisi named Puerto Rico Treasury
Secretary Francisco Parés Alicea as the Commonwealth's new CFO. On March 9,
2021, Governor Pierluisi issued Executive Order 2021-018 to create the position of
the CFO and describe the duties and powers of the office. The order also detailed
the administration's policy on prioritizing annual audited financial statements.
Additionally, the Government agreed with the ERP recommendations and an
implementation plan is in process.

The Oversight Board sent the following 205 Recommendations to the Government in
Fiscal Year 2020:

o   To recommend that the Government amend one provision of Act 106-2017. The
proposed amendment would amend the default investment fund option for
participants in the Defined Contribution plans from a principal protected
investment fund to a target date life-cycle fund. This change would have
meaningful positive implications for the retirement security of Puerto Rico's public
sector workers and retirees. On April 13, 2020 the Governor declined to adopt this
recommendation dated January 13, 2020

o   To recommend that the Government of Puerto Rico take necessary steps to publish
with greater frequency, quality, and transparency three reports that provide key
economic statistics for the Island: 1) Quarterly estimates of Gross National Product

181

(GNP), 2) the Puerto Rico Planning Board's Traveler Information Survey, and 3) Input-Output (IO) Tables with corresponding Interindustry Employment Multipliers. On June 2, 2020 the Governor declined to adopt this recommendation dated March 6, 2020

o   To recommend that the Government improve the framework for Land and Property Registration/Recordation, for improvements to the Property Tax Registry, and for establishing and confirming legal ownership and title to lands and property in the Commonwealth of Puerto Rico. Since receiving the reccomendated dated June 5, 2020, the Governor committed to creating a special committee to further analyze the Oversigh Board's recommendation. Further, the Puerto Rico Department of Housing did amend the CDBG-DR Action Plan by revamping its original "Agency Planning Initiative Program" into a new "Puerto Rico Geospatial Framework Program" which was designed to include the scope proposed in the Oversight Board's recommendation

(ii)   ***Recommendations to the Federal Government***

The Oversight Board included the following reccomendations to the Federal Governement in its FY2020 Annual Report.

o   Allow authorities to use disaster relief funds to cover land surveys, land titles and any other taxes or fees associated with property transfer.

o   The following recommendations as they relate to economic development:

   ▪   To encourage proactive dialogue between the Government and federal policymakers to find mutually acceptable solutions to enable and attract increased manufacturing of pharmaceuticals and medical products within the United States, and in particular Puerto Rico. *See* 2021 Fiscal Plan, 63. Growing the pharmaceutical and medical devices manufacturing sector is listed in the April 2021 Fiscal Plan as a proposed reform that has not yet been implemented;

   ▪   To request that the Secretary of Commerce appoint at least one member who has special expertise on tourism in Puerto Rico to the United States Travel and Tourism Advisory Board;

   ▪   To establish a Manufacturing USA institute in Puerto Rico to equip Puerto Rico with the partnerships and resources necessary to continue developing as a world-renowned pharmaceutical manufacturing center and to become a global biotech innovation hub;

- To grant a temporary Jones Act waiver for shipment of LNG within the United States, allowing for the use of foreign-flag vessels while American Jones Act-qualified carriers are built. Some U.S. jurisdictions, including Puerto Rico, are currently forced to buy LNG from foreign suppliers to meet their respective energy needs. Thus, this waiver would allow these jurisdictions to buy American LNG;

- To eliminate the Electronic Export Information filing requirement for goods shipped between the mainland and Puerto Rico. The US Census Bureau has since requested public comments on this topic, however no further action has been taken;

- To direct relevant agencies to support bankable infrastructure projects through reduced red tape, targeted investments, and increased access to credit (*e.g.,* supporting monetization of toll credits), and to keep Puerto Rico top-of-mind for infrastructure funding and improvements; and,

- To encourage the U.S. Army Corps of Engineers and ENLACE to finalize the Project Partnership Agreement for the Caño Martín Peña project.

o The following recommendations as they relate to Medicaid and Medicare:

- To legislate a long-term Medicaid program solution to mitigate the drastic reduction in federal funding for healthcare in Puerto Rico, which will happen when the temporary extension expires;

- To amend federal law so that Medicare beneficiaries in Puerto Rico are automatically enrolled in Medicare Part B with the option to opt out of coverage, the same way their counterparts in every state and other territories are treated; and,

- To provide equitable treatment to residents of Puerto Rico in all Medicare programs. Residents of Puerto Rico pay the same level of Medicare taxes as mainland residents, but Puerto Rico receives substantially lower payments in Medicare programs and substantially lower payments to healthcare providers, which affects Puerto Rico's ability to attract and keep healthcare providers in Puerto Rico.

o The following recommendations as they relate to labor participations:

- To recommend that Congress explore ways to minimize the challenges and maximize the opportunities of extending a Federal Earned Income Tax Credit to residents of Puerto Rico, as it will support the locally implemented

Earned Income Tax Credit, which seeks to promote formal labor force participation, especially among low-to moderate-income workers. The American Rescue Plan, signed into law in March 2021, made permanent changes to EITC that benefit Puerto Rico. For more information see section V.B.2.b). The Puerto Rico Government is in the process of drafting a bill to expand the existing EITC system in order to qualify for the additional federal funding. For more information see section III.C.4.a);

- To collaborate with the Government of Puerto Rico to institute a work/volunteer requirement to be implemented by July 1, 2022, for able-bodied participants aged 18-59 to receive the NAP, which is Puerto Rico's largest welfare program. This work requirement should be established in accordance with the Commonwealth Fiscal Plan. In general, working-age Supplemental Nutrition Assistance Program beneficiaries on the mainland must register for work, cannot turn down a job if offered, and may be required by the state to attend education or work training classes. This recommendation was reiterated in the 2021 Fiscal Plan. The Government has recently committed to a 2-year implementation timeline. Reaching full and timely implementation requires urgent and nimble action from the Government;

- To begin using the Department Health and Human Services ("HSS") Poverty Guidelines to set the income limits that determine who is eligible for the U.S. Department of Housing and Urban Development's housing assistance in Puerto Rico, as it does in most mainland states. If this change were to be applied, more people could enter the formal labor market without the risk of losing housing assistance in the process. According to the U.S. Census Bureau, over 314,000 families in Puerto Rico live in poverty, approximately 54% of which include children. If income limits were to be appropriately adjusted, potentially thousands of low-income families could start to benefit from housing assistance. In other words, it would improve access to affordable housing, economic mobility, labor participation, and ultimately economic development in Puerto Rico. No action has been taken at this time; and,

- To ask the Department of Labor to partner with the Commonwealth to enable the expansion of apprenticeship programs to link education with marketable skills and employment in order to ensure the workforce is prepared for the jobs of the future. The 2020 Fiscal Plan included a set of initiatives that aimed to support the training, learning, and human capital accumulation needs of local residents at all stages in their working life cycles ("Life Cycle Initiatives") in FY2022 and beyond. Life Cycle Initiatives included designing a strategy to create high-quality

apprenticeships to address identified current and future talent gaps. However, the implementation of such initiatives would have required the usage of CDBG-DR funding, as well as the repurposing of recurring WIOA funds. Both are federal funds allocated to Puerto Rico under a specific granting process. The recipient Government agencies have exercised their rights to define the priorities to be pursued with those funds and, as their plans have been approved by the Federal Government, are currently in the process of implementing them. While pursuing the same overarching goals, such plans are different in structure and focus to the initiatives outlined in the 2020 Fiscal Plan. Nonetheless, the Oversight Board believes that the Life Cycle Initiatives would significantly benefit Puerto Rico's labor force development if implemented. The 2021 Fiscal Plan strongly recommends that the Government consider its importance and potential implementation in the near future.

o   The following recommendations as they relate to benefits reform:

- ▪ To provide additional NAP funding to allow the Government of Puerto Rico to continue providing NAP benefits to Puerto Rico's most vulnerable populations for another year while Puerto Rico recovers from the economic distress that the COVID-19 pandemic continues to cause. In both the Coronavirus Response and Relief Supplemental Appropriations Act and American Rescue Plan, additional NAP funding was provided for Puerto Rico along with allocations for other nutrition and food assistance programs;

- ▪ To allow Puerto Rico to participate in the Pandemic-EBT program, so that it can provide benefits on EBT cards to replace the value of school meals for children who would ordinarily receive free- or reduced-price meals, but whose schools are closed for at least five days due to the COVID-19 health crisis;

- ▪ To extend the full federal Child Tax Credit to residents of Puerto Rico to allow otherwise eligible families in Puerto Rico with one child or two children to claim the additional child tax credit. The American Rescue Plan, signed into law in March 2021, made permanent changes to the CTC that expanded Puerto Rico's access to the benefit. For more information see section V.B.2.b) and section III.C.4.a);

- ▪ To address Puerto Rico's nutrition disparities by transitioning Puerto Rico into the SNAP to ensure equitable treatment in federal food nutrition assistance. The federal government has expanded NAP benefits as

185

described above. However, no action has been taken on this recommendation at this time; and,

- ▪ To direct the Health Resources and Services Administration to utilize the Puerto Rico Community Survey when allocating funds to Puerto Rico under the Maternal, Infant, and Early Childhood Home Visiting Program.

o   The following recommendations as they relate to education and employment:

- ▪ To recommend extending federal COVID-19 related unemployment benefits. In August 2020, the Lost Wage Assistance Program was established by the Trump administration, which paid $300 to $400 per week in additional unemployment claims. The program was run through the FEMA, and was allotted $44 billion and ended once those funds had depleted in early 2021. In December 2020, through the Coronavirus Response and Relief Supplemental Appropriations Act, unemployment benefits extensions from the CARES Act were granted for eight programs, and extensions from the FFRCA were granted for two programs. Notably, Pandemic Unemployment Assistance was extended and expanded to provide coverage for independent contractors and self-employed individuals, the Federal Pandemic Unemployment Compensation supplement was restored in an amount equal to $300 per week and extended for 11 weeks, and the Pandemic Emergency Unemployment Compensation program was extended to provide additional weeks of federally funded unemployment benefits for those who exhausted their state benefits. In March 2021, under ARP, Pandemic Unemployment assistance was extended from 50 weeks to 73 weeks through September 6, 2021, the Federal Pandemic Unemployment Compensation supplement of $300 was also extended through September 6, 2021, and the Pandemic Emergency Unemployment Compensation program was extended to 53 weeks from 24 weeks.;

- ▪ To recommend encouraging the Department of Homeland Security to carve out a lower investment floor for EB-5 visas relative to states to tailor visa programs to Puerto Rico's needs; and,

- ▪ To recommend encouraging the National Science Foundation to collaborate with all possible stakeholders to avoid funding loss for the Arecibo Observatory and to increase science and education-focused operations.

o   The following recommendations as they relate to small business:

186

- To recommend extending the Paycheck Protection Program ("PPP") for small businesses; In response to the demand for the PPP funding under the CARES Act, the Paycheck Protection Program and Health Care Enhancement Act was signed into law in April 2020 providing additional funding for the PPP. In December 2020, through the Coronavirus Response and Relief Supplemental Appropriations Act, the PPP was renewed, with updates including an expanded list of eligible expenses. Under ARP, in March 2021, additional funds were directed to the PPP, and the program was again modified to expand eligibility to additional nonprofit organizations including labor unions, benefit plans, agricultural organizations, and recreational clubs, along with certain digital news services. For more information see section V.B.2.b); and,

- To recommend offering greater flexibility for Small Business Administration Programs to help Puerto Rico's small business owners during the prolonged economic crisis. This includes many of the recommendations included in the Congressional Task Force Report:

  - Enact legislation to increase the guaranty rate and require a separate subsidy calculation for 7(a) loans made in Puerto Rico;

  - Consider reducing the small business contribution and increasing the Certified Development Companies ("CDC") contribution;

  - Consider increasing that aggregate limit for the Microloan program in the case of intermediaries located in Puerto Rico;

  - Authorize an intermediary in the Microloan program to use more than 25 percent of its Small Business Administration (the "SBA") provided technical assistance grants on pre-loan assistance if the intermediary provides at least 25 percent of its loan to small firms in Puerto Rico;

  - Establish a contracting preference for small businesses in Puerto Rico with respect to federal contracts performed in Puerto Rico; and,

  - Require the SBA to make an annual Federal and State Technology ("FAST") partnership grant to a Puerto Rico grantee, and to waive the local matching requirement.

o To recommend that the Community Development Financial Institutions Fund website update its maps to represent visually that Puerto Rico is eligible for its programs, encourage it to increase the number of Community Development

Financial Institutions in Puerto Rico, ask that it assist Federal Deposit Insurance Corporation ("FDIC") insured banks in Puerto Rico regarding the Bank Enterprise Award program, and encourage it to appoint an individual with experience and expertise in Puerto Rico to the Community Development Advisory Board.

o   To recommend that the Census Bureau, Bureau of Labor Statistics, Bureau of Justice Statistics, Bureau of Economic Analysis, National Center for Education Statistics, National Center for Health Statistics, and Substance Abuse and Mental Health Services Administration include Puerto Rico in their respective programs, and collect and publish data for Puerto Rico on the same basis as the states to the greatest extent possible.

(iii)   ***Oversight Board Recommendations that the Commonwealth has declined to adopt***

o   The April 2018 Fiscal Plan provided for the implementation of incremental structural reforms, in particular focusing on improving the competitiveness of the local labor market. As a result of Government and Oversight Board discussions concerning the necessary legislative actions to deregulate and make the private sector labor market more competitive, the Oversight Board certified an updated Fiscal Plan in May 2018. This Fiscal Plan provided for a series of investments that would be contingent upon the successful implementation of key labor market reforms. Unfortunately, the lack of political will to enact this much needed private sector labor reform required the Oversight Board to update and certify another Fiscal Plan in June 2018 to reflect the removal of this element of structural reform from the plan and the growth forecasts. *See* 2021 Fiscal Plan, 25.

o   The fiscal and economic turnaround of Puerto Rico cannot be accomplished without the implementation of structural economic reforms that promote the transformation of the Island's economy and its workforce. Puerto Rico struggles from an uncompetitive labor market, unreliable energy and infrastructure, regulatory and other burdens that hinder business productivity, and low educational outcomes and workforce support – all of which prevent it from competing in a global economy and from attaining positive economic growth. Structural reforms—those that seek to strengthen the fundamental drivers of economic growth to encourage job creation, investment, and increased productivity—could transform Puerto Rico's future. Years of successive natural disasters and health crises further underscore the need for comprehensive Government action as outlined in this 2021 Fiscal Plan to reverse the economic challenges that have plagued the Island and its people for far too long. If implemented quickly and widely, structural reforms are projected to drive real economic growth, reversing decades-long economic challenges and enabling the Island's economy and its people to flourish. *See* 2021 Fiscal Plan, 72–3.

o Specifically, the Government must pursue the following structural economic reforms to achieve their forecasted economic impact:

- Human capital and welfare reforms that will improve the well-being and self-sufficiency of all local residents, increase the quality and competitiveness of the workforce, enable investment, and facilitate the economic modernization of the Island, resulting in a cumulative GNP impact of 0.15% by FY2025.
- K-12 education reforms that will position all students to succeed in school and upon graduation by raising the quality of the Island's public schools, resulting in an additional 0.01% GNP impact per year starting in FY2037 (i.e., reaching 0.15% by FY2051).41
- Ease of doing business reforms that will improve conditions for economic activity and business vitality, attracting new investment and creating jobs, resulting in a cumulative GNP impact of 0.30% by FY2026.
- Power sector reforms that will improve the availability, reliability, and affordability of energy for families and businesses, resulting in 0.30% cumulative GNP impact by FY2026.
- Infrastructure reform and capital investment that will improve the flow of goods, services, information, and people across the Island.

*See* 2021 Fiscal Plan, 72–73.

o Unfortunately, while the Government has faced numerous unexpected disasters and crises that impeded implementation, it has also, at times, rejected the deadlines outlined in the Fiscal Plans. Together, this has resulted in delayed implementation on most of the identified structural reforms. For example, the Government has:

- Implemented the Earned Income Tax Credit (EITC) but without a robust campaign to raise awareness of the new benefit and encourage work in the formal sector;
- Delayed implementation of the complementary Nutrition Assistance Program (NAP) work requirement;
- Made little progress in strengthening the Island's workforce development programs;
- Increased on-Island land freight charges and expanded the regulation across incremental sectors of the economy, rather than deregulating as outlined in this and previous Fiscal Plans;
- Implemented very few of the required ease of doing business reforms with sufficient progress to make the Island substantially more competitive and attractive to investors; and

- Undertook almost no discernible efforts to reform the Island's K-12 education system, a situation that is partially explained but also exacerbated by the COVID-19 pandemic.

*See* 2021 Fiscal Plan, 72–73.

These delays have already diminished the projected economic uptick and revenues associated with structural reforms. Had the structural reforms above been implemented at the pace and scale forecasted in the 2019 Fiscal Plan, the Government would have generated 0.14% in additional GNP uptick, worth another $12 billion in tax revenues by FY2051. This shortfall is even more pronounced relative to the structural reform impact forecasted in the April 2018 Fiscal Plan, whereby the Government would have generated 1.09% in additional GNP uptick, worth another $75 billion in tax revenues by FY2051. Not only have the residents of Puerto Rico lost opportunities to gain new skills, experiences and education, but the Island has lost time in attracting incremental investment that would produce jobs and tax revenues to be reinvested again into the people of Puerto Rico. *See* 2021 Fiscal Plan, 72–7f3.

### d)   Title V Critical Projects Process

On April 20-21, 2017, the Oversight Board hosted a summit on P3 and Title V Critical Projects. Throughout the 2017 Fiscal Year, the Oversight Board and interim Revitalization Coordinator developed the criteria and processes for selecting, implementing, and monitoring critical infrastructure projects, particular to the energy industry.

Following the aftermath of Hurricanes Irma and Maria, the Revitalization Coordinator restarted the critical projects process, hiring the requisite personnel, retaining local firms for additional support, and overhauling the project submission website.

On June 27, 2018, Oversight Board designated "Viewpoint at Roosevelt," a public housing development funded with federal funds, as its first critical project. This project is expected to provide both critically needed housing (over 130 housing units) as well as increase ridership in the local rail system because it is located in a "public transport corridor."

On July 31, 2018, the Oversight Board adopted a Title V policy that helped further specify procedural requirements the Revitalization Coordinator must follow when considering potential critical projects. The policy clarifies requirements for projects that involve doing business with any government agency or public corporation, especially, energy related projects that require a Power Purchase and Operating Agreement ("PPOA"). All projects that require obtaining a contract or Request for Proposal ("RFP") award from any government agencies or public corporations must obtain such contract or RFP award prior to the project submission through Title V. In the case of energy related projects, projects that require a PPOA must be validly assumed under Title III of PROMESA in order to satisfy the contract award requirement.

The Title V policy of July 31, 2018 gave way for the Revitalization Coordinator to focus efforts on projects that had obtained valid contract awards or RFP awards, and other projects, such as private to private or with a municipal government.

By the beginning of Fiscal Year 2019, the Revitalization Coordinator evaluated 55 projects totaling an excess of approximately $9 billion dollars. Upon adoption of the Title V policy as of July 31, 2019, active projects had to be withdrawn from participation or placed on hold (at project sponsor's discretion) since approximately 80% were energy related requiring a valid PPOA assumed under Title III and the remaining approximately 19% required a government RFP or similar. The remaining 1% of the 55 evaluated projects constituted a qualifying project (Viewpoint at Roosevelt Project) and a rejected project that did not meet initial requirements. Nevertheless, many energy related project sponsors continued to negotiate their contracts with PREPA through the respective process and demonstrated interest in reactivating their project submission upon successfully complying with the Oversight Board's Title V policy.

On August 26, 2019, the Oversight Board announced that it had designated a $5.3 million expansion of the Fajardo municipal landfill as its second critical project. The project, which will play a significant role in revitalizing Puerto Rico's infrastructure, addresses the Commonwealth's need to diversify energy generation and solve the solid waste management crisis in the aftermath of Hurricanes Irma and Maria.

There are two further projects in the early stages of development. One is currently under consideration and a petition has been received for the other.

e)      **Review of Legislative Acts and Certain Rules, Regulations, Administrative, and Executive Orders**

PROMESA section 204(a) requires that the Government submit to the Oversight Board all new laws, no later than 7 business days after the law is duly enacted. The Governor must also submit certain rules, regulations, and executive orders to the Oversight Board for review and approval pursuant to sections 204(b)(2) and (b)(4) of PROMESA and policies established by the Oversight Board. The singular objective is to assure that all enacted acts as well as any proposed rule, regulation, administrative order, and executive order will have no adverse impact on the certified fiscal plan or budget. The Government has consistently failed to comply with its obligations under section 204(a) to send acts no later than seven business days after enactment. Over 100 signed acts and joint resolutions were not submitted to the Oversight Board as required by PROMESA. Most recently, the Oversight Board sent a letter to Governor Vázquez urging the government to delay implementing Executive Order 2020-10 until after the Oversight Board has the opportunity to review the executive order and supporting documentation to ensure compliance with PROMESA section 204(b)(2). Executive Order 2020-10 would exempt the Commonwealth executive branch from having to follow contracting requirements in an effort to accelerate recovery efforts following the continued earthquakes.

On July 3, 2019, the Oversight Board commenced an action under PROMESA sections 108(a)(2), 204(a)(5), 204(c), and 207 to prevent the implementation of Act 29 and numerous joint resolutions, because such laws are significantly inconsistent with the applicable certified fiscal plan, reprogram funds without Oversight Board approval, modify debt without Oversight Board approval, and/or otherwise were not properly submitted to the Oversight Board pursuant to PROMESA section 204(a). This is the first action filed under PROMESA section 204. *See* section IV.C.3.h)(iv) of this Disclosure Statement for a summary of such actions.

Following the commencement of such action, on October 25, 2019, Governor Vázquez signed Executive Order 2019-057, which creates a procedure for the express purpose of complying with PROMESA section 204(a). The procedure requires, among other things, the OMB and the Puerto Rico Department of Treasury to complete and submit to AAFAF within seven business days of the Governor's signing new legislation a certified analysis of the financial and budgetary impact of that law.

On June 12, 2020, the Governor and AAFAF filed six adversary complaints seeking declaratory judgments that certain Acts and the related certifications satisfy PROMESA's requirements under sections 204(a) and 108(a). *See* section IV.C.3.h)(vi) of this Disclosure Statement for a summary of such action.

f)      **Contract Review**

On November 6, 2017 (as modified on June 18, 2018), the Oversight Board established a policy (the "Contract Review Policy"), pursuant to PROMESA section 204(b)(2), to require prior Oversight Board approval of contracts with an aggregate value of $10 million or more that would be entered into by the Commonwealth or any covered instrumentality. The policy's objectives are to promote market competition and ensure a government contract's consistency with the applicable certified fiscal plan and certified budget. Accordingly, the Oversight Board focuses its review on whether the contract is consistent with the fiscal plan and in the case of disaster aid spending, provide observations regarding the compliance with federal funding and/or reimbursement requirements.

In order to make the contracting policy more transparent, the Oversight Board publishes a status report of each contract under review, including the name of the contracting party, the date of submission, the date of any response from the Oversight Board or from the contracting party, and a copy of all the Oversight Board's formal responses. The policy requires that the government contracting entity submit to the Oversight Board a certification whereby its head or general counsel certifies that no person has unduly intervened, offered anything of value, or wielded any influence in connection with the execution of the contract. The policy requires that contractors submit a similar certification to the Oversight Board and disclose any sharing of any portion of its compensation with any third party. Since the inception of the Contract Review Policy, the Oversight Board has reviewed 197 contracts for a total aggregate value of over $16.5 billion.

Moreover, the Oversight Board included in the fiscal plan a requirement for the text of all government contracts to be made public on the Office of the Comptroller's website by September 30, 2018, and executed a memorandum of agreement with the Office of the Comptroller to promote transparency in government contracting.

On June 8, 2020, the Oversight Board filed a complaint against the Governor and AAFAF seeking injunctive relief and a writ of mandamus in connection with the Governor and AAFAF's failure to produce to the Oversight Board certain documents and information regarding the Commonwealth Government's procurement and negotiation of contracts to purchase COVID-19 testing equipment and other medical supplies. *See* section IV.C.3.h)(v) of this Disclosure Statement for a summary of such action.

g)       **Debt Transaction Approvals**

In December 2017, the Oversight Board established a policy pursuant to PROMESA section 207 to require prior Oversight Board approval of any debt transaction to be entered into by the Commonwealth or any covered instrumentality. The objectives of this policy are to promote fiscal prudence and ensure that the debt transactions are consistent with the applicable certified fiscal plan.

During Fiscal Year 2018, the Oversight Board approved a variety of debt transactions. The Oversight Board approved, among other transactions, a loan from the Commonwealth to PREPA. The Oversight Board also approved the liquidation of guarantees that the GDB or its subsidiaries issued to private developments and the refinancing of certain loans that the Department of Housing and Urban Development issued to the municipalities of Camuy and San Lorenzo.

h)       **Oversight Board Ethics Website**

On June 21, 2019, the Oversight Board announced the launching of its new Ethics Website,[186] an internet-based tool to promote transparency and ethics in the Oversight Board's day-to-day operations. The site contains scores of Oversight Board governance documents, members' quarterly periodic transaction reports and annual financial disclosure reports, an interactive Ethics Advisor Blog, and other resources to guide visitors through the Oversight Board's ethics and good governance policies and actions. The goal of this site is to continue to promote the importance of transparency and ethics in the work that the Oversight Board does for the Debtors' stakeholders, and to provide an interactive tool to share important documents, developments, resources, and mediate to promote ethics and integrity in everyday life, business, and policy.

*Controversies over Board's Powers*

There has been litigation over the scope of the Oversight Board's powers, including recent issues with respect to the certification process of newly passed legislation under PROMESA.[187] The controversies have involved, among other things, whether the Oversight Board can impose what the Government considers policy choices and whether the Governor and Legislature can reprogram budget appropriations from prior years so as to spend money the Oversight Board has not approved. These and certain other controversies are described below.

(i)       *Rosselló Nevares v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 18-00080

On July 5, 2018, then-Governor Rosselló and AAFAF filed a complaint [Adv. Proc. No. 18-00080, ECF No. 1] against the Oversight Board, each individual Oversight Board member, and the Oversight Board's executive director, seeking declarations that (i) the Oversight Board lacks the authority to impose policy initiatives on the Commonwealth Government through a fiscal plan

---

[186] http://www.oversightboard.pr.gov/ethics/

[187] As noted above, the Oversight Board has sent numerous letters to the Commonwealth seeking to rectify violations of PROMESA.

and/or budget, including the June 2018 Fiscal Plan (as defined below) and the Commonwealth budget for Fiscal Year 2019, as certified by the Oversight Board on June 29, 2018; (ii) the substantive policy mandates contained in the June 2018 Fiscal Plan, that were rejected by the Governor pursuant to PROMESA section 205, are null and void; and (iii) the substantive policy mandates contained in the Oversight Board's Fiscal Year 2019 budget exceed the Oversight Board's powers and are null and void. Plaintiffs also sought an injunction prohibiting Defendants from implementing and enforcing certain provisions included in the June 2018 Fiscal Plan that Plaintiffs characterize as recommendations.

On July 12, 2018, the Oversight Board filed a motion to dismiss the complaint [Adv. Proc. No. 18-00080, ECF No. 17]. The motion to dismiss was fully briefed and, on August 7, 2018, the Title III Court entered an order granting in part and denying in part the motion to dismiss [Adv. Proc. No. 18-00080, ECF No. 33]. The Title III Court granted the motion to dismiss the Government's claims regarding (i) agency consolidation and compensation reductions/hiring freezes because there was not a ripe case or controversy, and (ii) budgetary reprogramming because such reprogramming by the Government would be inconsistent with PROMESA's declaration that the budget certified by the Oversight Board is in full force and effect, and therefore preempted by section 4 of PROMESA. The Title III Court did not dismiss claims regarding automatic budget reductions and corrective measures. In so ruling, the Title III Court made certain substantive decisions. Among other things, the Title III Court ruled that "[t]he power bestowed on the Oversight Board by Section 201(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 330 F. Supp. 3d 685, 700 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir. 2019). The Title III Court rejected the Government's argument that unspent funds from prior-year budgets could be spent outside of the strictures of the current year's budget, despite section 204(c)'s prohibition on unapproved reprogramming. The Title III Court ruled: "It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a Fiscal Year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the Fiscal Year. Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget." *Id.* at 704. On August 27, 2018, the Title III Court entered a corrected opinion and order [Adv. Proc. No. 18-00080, ECF No. 40].

On September 10, 2018, Plaintiffs filed an urgent motion requesting certification of the Title III Court's August 7, 2018 opinion and order for immediate appeal under PROMESA sections 306(e)(3)–(4) [Adv. Proc. No. 18-00080, ECF No. 43]. On October 9, 2018, the Title III Court entered a memorandum order certifying certain aspects of the August 27, 2018 opinion and order for interlocutory appeal [Adv. Proc. No. 18-00080, ECF No. 54]. The appeal was docketed as Case No. 18-8021. The Oversight Board answered the complaint's remaining claims on November 2, 2018 [Adv. Proc. No. 18-00080, ECF No. 60].

On November 20, 2018, the United States Court of Appeals for the First Circuit entered a judgment, concluding that review of the certified issues was warranted. The appeal was docketed on November 28, 2018 as Case No. 18-2154. Following briefing, oral argument was held on July

24, 2019. On December 18, 2019, the First Circuit affirmed the Title III Court decision, confirming there is nothing in PROMESA section 205 "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board has the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 6-7 (1st Cir. 2019). The First Circuit further affirmed the Title III Court's ruling on reprogramming, noting "PROMESA prohibits the Governor from spending any funds that are not budgeted regardless of whether the recommendation had been adopted" and "regardless of what any territorial laws say." *Id.* at 8.

Governor Vázquez Garced filed a petition for a writ of certiorari on May 15, 2020, which was docketed as U.S. Supreme Court Case No. 19-1305. On July 20, 2020, the Oversight Board filed its opposition to the Governor's petition. On July 31, 2020, Governor Vázquez Garced filed a reply in support of her petition. On October 5, 2020, the Supreme Court issued an order denying the petition.

      (ii)    <u>*Rivera - Schatz et al v. The Financial Oversight and Management Board for Puerto Rico et al.*</u>, Adv. Proc. No. 18-00081

On July 9, 2018, Plaintiffs, Hon. Thomas Rivera-Schatz, in his official capacity as President of the Senate of Puerto Rico and on behalf of the Senate of Puerto Rico, and Hon. Carlos J. Méndez-Núñez, in his official capacity as Speaker of the House of Representatives of Puerto Rico and on behalf of the House of Representatives (collectively, the "Legislature"), filed a complaint seeking declaratory and injunctive relief against the Oversight Board, and each of its members and its executive director solely in their official capacities [Adv. Proc. No. 18-00081. ECF No. 1].

The Legislature sought declaratory and injunctive relief, arguing the Oversight Board "overreached its powers" by "trying to force" the Legislature to pass a bill retroactively repealing Law 80 (Puerto Rico's wrongful dismissal act) as a condition for the approval of the Commonwealth's budget approved by the Legislature. The complaint also sought an injunction prohibiting Defendants from implementing the Oversight Board's 2019 budget and directing the Oversight Board to certify the 2019 budget approved by the Legislature on June 30, 2018.

On July 17, 2018, Defendants filed a motion to dismiss the complaint [Adv. Proc. No. 18-00081, ECF No. 27]. Following the completion of briefing and after a hearing on July 25, 2018, the Title III Court issued an order dismissing the complaint in its entirety [Adv. Proc. No. 18-00081, ECF No. 46]. The Title III Court held that it lacked jurisdiction to review the Oversight Board's certification decisions, as sought by the complaint, as such review is "directly precluded by Section 106(e)." *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 364, 371 (D.P.R. 2018), *aff'd*, 916 F.3d 98 (1st Cir. 2019). It also affirmed that the Oversight Board may use its "powers in a manner designed to incentivize assent to the policy goals supported by the Board." *Id.* at 373.

On August 13, 2018, Plaintiffs filed a notice of appeal to the United States Court of Appeals for the First Circuit, which was docketed as Case No. 18-1777. On February 22, 2019, following

briefing, the First Circuit affirmed the Title III Court's decision, ruling, among other things, that "[u]nder PROMESA's preemption provision, the grant of authority to the Board at sections 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA],'" and that "[w]hen the Board certified the 2019 Fiscal Plan and Budget … it [properly] exercised authority granted to it under PROMESA." *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019).

(iii)   *Autonomous Municipality of San Juan v. The Financial Oversight & Management Board for Puerto Rico, et al.*, Case No. 19-cv-1474

On May 19, 2019, the Autonomous Municipality of San Juan ("San Juan") filed a complaint against the Oversight Board in the District Court for the District of Puerto Rico alleging that (i) the Oversight Board's designation of San Juan as a covered entity for purposes of oversight under PROMESA is without a rational basis; (ii) PROMESA is unconstitutional because it does not provide sufficient bounds to the Oversight Board's discretion and therefore violates the non-delegation doctrine; and (iii) the designation is invalid because the Oversight Board's members were appointed in violation of the Appointments Clause [Case No. 19-cv-1474, ECF No. 1]. On July 1, 2019, the Oversight Board filed a motion to transfer the case to the Title III Court [Case No. 19-cv-1474, ECF No. 36], which the District Court granted after briefing [Case No. 19-cv-1474, ECF No. 40]. On August 9, 2019, the Oversight Board filed a motion to dismiss, which was fully briefed [Case No. 19-cv-1474, ECF No. 46, 51, 52]. On December 5, 2019, the Title III Court issued an order granting the motion to dismiss counts I and II of the complaint and staying count III pending the Supreme Court's decision in the Appointments Clause litigation described below in Section V.F.1.a) [Case No. 19-cv-1474, ECF No. 61].

On September 18, 2020, San Juan filed a motion for entry of judgment dismissing the remaining count with prejudice [Case No. 19-cv-1474, ECF No. 63]. On September 21, 2020, the Title III Court issued a judgment dismissing the remaining count with prejudice and closing the case [Case No. 19-cv-1474, ECF No. 64].

On September 25, 2020, San Juan filed a notice of appeal of the Title III Court's order granting Defendants' motion to dismiss [Case No. 19-cv-1474, ECF No. 65]. On October 9, 2020, the appeal was docketed by the United States Court of Appeals for the First Circuit as Case No. 20-1983. On November 23, 2020, San Juan filed its opening brief. On January 22, 2021, the Oversight Board filed its answering brief. On April 27, 2021, San Juan filed a motion to voluntarily dismiss the appeal. On April 29, 2021, the First Circuit issued its judgment dismissing the appeal and its mandate.

(iv)   *The Financial Oversight & Management Board for Puerto Rico v. Hon. Vázquez Garced, et al.*, Adv. Proc. No. 19-00393

On July 3, 2019, the Oversight Board filed a complaint against then-Governor Rosselló and AAFAF, challenging Act 29-2019, which eliminates the obligation of municipalities to reimburse the Commonwealth for pension payments to municipality retirees and make payments to the Commonwealth's health plan, as well as 23 joint resolutions. Specifically, the complaint

196

alleges that (i) Act 29-2019, including its enactment and enforcement, violates PROMESA sections 204(a), 204(c), and 207; (ii) the Oversight Board is entitled to a permanent injunction prohibiting Defendants from implementing Act 29-2019; (iii) the Oversight Board is entitled to an injunction compelling the Governor to submit PROMESA section 204(a) certifications for Act 29-2019, the other newly enacted laws and joint resolutions not yet certified; (iv) Act 29-2019 and the joint resolutions violate PROMESA section 108(a) and are not enforceable and are of no effect because they impair and/or defeat the purposes of PROMESA, as determined by the Oversight Board; and (v) the Governor's alleged policy of not providing certifications for newly passed legislation as required under PROMESA section 204 violates PROMESA section 108(a) because it impairs and/or defeats the purposes of PROMESA, as determined by the Oversight Board.

Defendants filed a motion to dismiss on July 15, 2019 [Adv. Proc. No. 19-00393, ECF No. 17]. On August 15, 2019, after the motion to dismiss was fully briefed, the Title III Court heard oral argument. On August 22, 2019, the Title III Court issued an order and opinion denying the Governor's motion to dismiss [Adv. Proc. No. 19-00393, ECF No. 66]. Defendants answered the complaint on September 10, 2019 [Adv. Proc. No. 19-00393, ECF No. 73]. On December 13, 2019, the Oversight Board filed a motion for summary judgment [Adv. Proc. No. 19-00393, ECF No. 77]. After the motion was fully briefed, oral argument was held before the Title III Court on March 5, 2020.

On April 15, 2020, the Title III Court granted the Oversight Board's motion for summary judgment on five of the eight counts [Adv. Proc. No. 19-00393, ECF No. 107]. The Title III Court granted the Oversight Board's request for permanent injunctions on Law 29 and the Joint Resolutions under PROMESA §§ 204(c), 204(a), and 108(a)(2), holding that Law 29 and the Joint Resolutions effectuate reprogrammings outside of the Fiscal Plan and certified Budget without Oversight Board approval, in violation of PROMESA § 204(c), and are unenforceable and of no effect. The Title III Court also held Defendants did not comply with the procedures required by PROMESA § 204(a) with regard to new legislation and Defendants' formal estimate, purporting to detail the cost of Law 29, was facially noncompliant. The Title III Court held Law 29 and the Joint Resolutions are also invalid under PROMESA § 108(a)(2), finding that the Oversight Board's determination that the laws defeat and/or impair the purposes of PROMESA is entitled to deference under an arbitrary and capricious standard of review. The Title III Court denied summary judgment on the Oversight Board's claim for a permanent injunction as to the other laws for which Defendants had not submitted 204(a) certifications based on Defendants' submission of facts showing certifications for the vast majority of these laws had, after the filing of the lawsuit, been submitted. The Title III Court also declined to grant summary judgment on the Oversight Board's claim that the Governor had a policy of noncompliance with PROMESA § 204(a), in light of the disputed facts raised by Defendants regarding the reasons for past non-compliance and then Governor Vázquez Garced's efforts to improve compliance. Lastly, the Title III Court declined to address the Oversight Board's motion for summary judgment for its PROMESA § 207 claim, finding Count II to be moot because the relief requested in that claim was already granted in the Title III Court's other rulings.

On June 2, 2020, San Juan filed a motion requesting an extension of the effective date of the Title III Court's order to allow for negotiations [Adv. Proc. No. 19-00393, ECF No. 111].

197

(v)     *La Liga de Ciudades de Puerto Rico v. The Financial Oversight and Management Board for Puerto Rico, et. al.*, Adv. Proc. No. 21-00026

On March 14, 2021, La Liga de Ciudades de Puerto Rico ("La Liga"), a non-profit corporation claiming to have as members mayors of Puerto Rico's municipalities, filed a complaint against the Oversight Board, AAFAF, the Municipal Revenues Collection Center ("CRIM"), the Puerto Rico Health Insurance Administration ("ASES"), and Luis M. Collazo Rodríguez, in his capacity as administrator of ERS (collectively, "Defendants"). The complaint alleges that CRIM, ASES, and the Retirement System are collecting and withholding money from Puerto Rico's municipalities based on an incorrect interpretation of an order entered by the court in earlier litigation regarding Law 29-2019 ("Law 29") [Adv. Proc. No. 21-00393, ECF No. 16039] (the "Law 29 Litigation").

The Law 29 Litigation commenced on July 3, 2019, when the Oversight Board filed a complaint against then-Governor Rosselló and AAFAF, challenging Law 29, which eliminated the municipalities' obligations to make health care contributions to ASES and retirement contributions to PayGo. [Adv. Proc. No. 19-00393, ECF No. 1]. Specifically, the Oversight Board alleged Law 29 violated PROMESA §§ 108(a), 204(a), 204(c), and 207, and sought a permanent injunction. The Oversight Board moved for summary judgment and the Title III Court granted the Oversight Board's motion for summary judgment on five of the eight counts in its April 15, 2020 Order (the "April 15 Order"). [Adv. Proc. No. 19-00393, ECF No. 107]. The Title III Court granted the Oversight Board's request for permanent injunction of Law 29 under PROMESA §§ 204(c), 204(a), and 108(a)(2), declaring Law 29 "unenforceable and of no effect." The April 15 Order went into effect on May 6, 2020. For more details regarding the Law 29 Litigation, *see* Section IV.C.3.h)(iv).

After the April 15 Order went into effect, CRIM held back funds that otherwise would have been disbursed to the municipalities in order to pay ASES and ERS the health care and retirement contributions that, but for Law 29, would have been made during the period prior to the effective date of the April 15 Order. La Liga contends those debts are "inexistent," because the April 15 Order does not apply retroactively. Accordingly, La Liga seeks (i) a declaratory judgment "decreeing that the debts claimed by CRIM, ASES and [ERS] … are "inexistent" and that the withholdings made by CRIM to purportedly offset those inexistent debts are "illegal", (ii) an injunction "prohibiting Defendants from collecting from the [m]unicipalities any of the monies that Law 29 exempted them" from paying prior to the effective date of the April 15 Order, (iii) an order requiring CRIM to immediately disburse any funds withheld to pay for the Law 29-related debts, and (iv) an order requiring ERS and ASES to return to CRIM "any and all monies" received to pay the purported debts.

On May 14, 2021, CRIM, AAFAF, ASES, the ERS Administrator, and the Oversight Board filed motions to dismiss the municipalities [Adv. Proc. No. 21-00026, ECF Nos. 14, 15, 18]. On June 18, 2021, La Liga filed oppositions to CRIM, AAFAF, ASES, the ERS Administrator, and the Oversight Board's motions to dismiss [Adv. Proc. No. 21-00026, ECF Nos. 22, 23, 24].

(vi)     *Hernandez-Montanez v. Pierlusi*, Adv. Proc. No. 21-00042 (D.P.R. filed Apr. 21, 2021)

On April 21, 2021, the Speaker of the Puerto Rico House of Representatives, acting on behalf of the Puerto Rico House of Representatives, filed a complaint against the Governor, AAFAF, the Oversight Board, the President of the Puerto Rico State Elections Commission, and the Secretary of the Puerto Rico Treasury Department (collectively, "Defendants"), seeking declaratory and injunctive relief prohibiting Defendants from distributing certain election-related funds [Adv. Proc. No. 21-00042, ECF No. 1].

This case arises out of a dispute regarding Act 167 of 2020, which called for a special election (the "Special Election") on May 16, 2021 to select a six-member delegation to be sent to Washington, D.C. in order to press for Puerto Rico's admission as a state. Because Puerto Rico's certified budget for the 2020-2021 fiscal year did not allocate funds for this special election, the Governor sought authorization from the Oversight Board to reprogram funds. The Oversight Board informed the Governor that, in the unique circumstances presented here, the reprogramming request must be submitted to both the Oversight Board and the Legislature. Subsequently, the Governor requested a budget amendment to appropriate funds for the Special Election and submitted a proposed amended budget to the Oversight Board pursuant to PROMESA section 202. The Oversight Board determined the Governor's proposed amended budget was a compliant budget, as required by PROMESA section 202(c)(1), and submitted it to the Legislature. Thereafter, the Legislature informed the Oversight Board that a bill identical to the Governor's proposed amended budget was defeated during a markup session vote and that it would not comply with the budget amendment process. As a result, the Oversight Board issued a resolution stating, among other things, that (i) the Governor and the Legislature were at an impasse concerning the appropriation of funds to cover the cost of the Special Election; (ii) PROMESA section 402 constrained the Oversight Board from adopting an interpretation of PROMESA that might restrict Puerto Rico's determination of its political status; (iii) the Oversight Board desired to allow the Commonwealth government to adopt or not to adopt the proposed amended budget the same as would occur absent PROMESA; and (iv) therefore, the original Commonwealth budget would remain in effect without revision. Thereafter, AAFAF informed the Oversight Board that the Governor authorized the disbursement of funds to fund the Special Election.

Plaintiff seeks orders declaring that PROMESA's budgetary provisions apply to all budgetary expenditures, including those relating to contested election-related funds, and that section 402 did not exempt the proposed reallocation of funds from PROMESA's budgetary provisions. Plaintiffs also seek an order enjoining the Governor and Secretary of the Treasury from allegedly misappropriating and distributing those funds.

On April 22, 2021, Plaintiff filed a motion seeking a temporary restraining order or preliminary injunction prohibiting Defendants from distributing certain election-related funds pending resolution of the complaint [Adv. Proc. No. 21-00042, ECF No. 3]. On April 24, 2021, Plaintiff filed a proposed preliminary injunction order [Adv. Proc. No. 21-00042, ECF No. 6]. On April 27, 2021, Defendants filed oppositions to Plaintiff's motion [Adv. Proc. No. 21-00042, ECF Nos. 12, 16], and the New Progressive Party and its Electoral Commissioner filed a motion to intervene [Adv. Proc. No. 21-00042, ECF No. 22]. On April 27, 2021, the Title III Court issued an order denying the motion to intervene [Adv. Proc. No. 21-00042, ECF No. 23]. On April 28, 2021, Plaintiff filed an omnibus reply in support of its motion [Adv. Proc. No. 21-00042, ECF No.

26].  On April 29, 2021, the Title III Court issued an order denying Plaintiff's motion seeking a temporary restraining order or preliminary injunction [Adv. Proc. No. 21-00042, ECF No. 32].

On June 4, 2021, the Executive Branch Defendants and the Oversight Board filed motions to dismiss Plaintiff's complaint [Adv. Proc. No. 21-00042, ECF Nos. 47, 49].

(vii)    *The Financial Oversight & Management Board for Puerto Rico v. Hon. Vázquez Garced, et al.*, Adv. Proc. No. 20-00078

On June 8, 2020, the Oversight Board filed a complaint against the Governor and AAFAF seeking injunctive relief and a writ of mandamus in connection with the Governor and AAFAF's failure to produce to the Oversight Board certain documents and information regarding the Commonwealth Government's procurement and negotiation of contracts to purchase COVID-19 testing equipment and other medical supplies [Adv. Proc. No. 20-00078, ECF No. 1].  On June 23, 2020, the Governor and AAFAF filed a motion to dismiss, arguing the Title III Court lacks jurisdiction over the claim, the Oversight Board lacks standing, and the complaint fails to state a claim for mandamus relief [Adv. Proc. No. 20-00078, ECF No. 11].  On July 24, 2020, the Oversight Board filed a notice of voluntary dismissal of the action [Adv. Proc. No. 20-00078, ECF No. 18].  On August 3, 2020, the adversary proceeding was closed.

(viii)    *Hon. Vázquez Garced, et al. v. The Financial Oversight & Management Board for Puerto Rico*, Adv. Proc. Nos. 20-00080, 20-00081, 20-00082, 20-00083, 20-00084, 20-00085

On June 12, 2020, the Governor and AAFAF (the "Government") filed six adversary complaints seeking declaratory judgments that Acts 47, 82, 90, 138, 176, and 181 and the related certifications satisfy PROMESA's requirements.  In short, Act 47 expands the group of health professionals eligible for tax benefits under the Puerto Rico Incentives Code, reducing revenues without any offsetting cost savings.  Act 82 establishes a new office within the Puerto Rico Department of Health ("PRDH") to further regulate various entities that contract services from pharmacies in Puerto Rico.  Act 82 also prevents Pharmacy Benefit Managers from controlling the cost of prescription medications.  Act 138 forces public health insurance companies such as MCOs to accept into their networks all medical providers regardless of price.  Act 138 also bars health-insurance organizations, insurers, and other medical plans from including in any contract or stipulation with a healthcare provider a right to unilaterally terminate the contract.  Act 176 increases the accrual rate for vacation days and sick days for public employees.  Act 181 provides for a salary increase to firefighters amounting to almost $3 million per year.

On July 16, 2020, the Government voluntarily dismissed the adversary complaint related to Act 90 [Adv. Proc. No. 20-00081, ECF No. 5].  On July 17, 2020, the Oversight Board filed answers and counterclaims in connection with the five remaining adversary complaints related to Acts 47, 82, 138, 176, and 181 (the "Five Acts") [Adv. Proc. No. 20-ap-00080, ECF No. 5; Adv. Proc. No. 20-ap-00082, ECF No. 5; Adv. Proc. No. 20-ap-00083, ECF No. 6; Adv. Proc. No. 20-ap-00084, ECF No. 5; Adv. Proc. No. 20-00085, ECF No. 5].  The Oversight Board's counterclaims sought to nullify and enjoin the Five Acts pursuant to PROMESA sections 204(a) and 108(a), and with respect to Act 82 and Act 181, pursuant to PROMESA section 204(c) as well.  Specifically, the Oversight Board challenged Act 47 on the grounds that the law is significantly

inconsistent with the Fiscal Plan (as it is not revenue neutral) and the Governor's certification lacked sufficient specificity needed for a formal estimate of Act 47's impact on expenditures and revenues, as PROMESA requires. The Oversight Board challenged Act 82 on the grounds that the law is significantly inconsistent with the Fiscal Plan and will reduce the competitive market for quality healthcare services in Puerto Rico. The Oversight Board challenged Act 138 on the grounds that the law is significantly inconsistent with the Fiscal Plan, will inhibit MCOs' ability to control healthcare costs, and deprives Puerto Rico of a competitive market for quality healthcare services and increases healthcare costs by eliminating incentives for doctors to compete on price and quality. The Oversight Board challenged Act 176 on the grounds that the law is significantly inconsistent with the Fiscal Plan, among other things, undermining right-sizing measures contemplated in the Fiscal Plan. The Oversight Board challenged Act 181 on the grounds that the law is significantly inconsistent with the Fiscal Plan and the Governor never demonstrated to the Oversight Board how the salary increase for firefighters would or could be funded through a new tax.

Also on July 17, 2020, Coopharma filed a motion for leave to appear as amicus on behalf of the Government [Case No. 17-bk-3283, ECF No. 13717]. On July 20, 2020, the Title III Court issued an order denying Coopharma's motion [Case No. 17-bk-3283, ECF No. 13739]. On November 24, 2020, Coopharma filed a second motion for leave to appear as amicus on behalf of the Government [Case No. 17-bk-3283, ECF No. 15238]. On December 7, 2020, the Government filed a statement in support of Coopharma's second motion [Adv. Proc. No. 20-00080, ECF No. 63], and the Oversight Board filed an opposition [Adv. Proc. No. 20-00080, ECF No. 65]. On December 10, 2020, Coopharma filed a reply in support of its second motion [Adv. Proc. No. 20-00080, ECF No. 66].

On July 30, 2020, the Oversight Board filed a motion to consolidate the five remaining adversary proceedings [Adv. Proc. No. 20-00080, ECF No. 8], and the Title III Court issued an order granting the motion [Adv. Proc. No. 20-00080, ECF No. 9]. The Government filed answers to the Oversight Board's counterclaims in connection with the Five Acts on August 3, 2020 [Adv. Proc. No. 20-00080, ECF No. 11; Adv. Proc. No. 20-00082, ECF No. 9; Adv. Proc. No. 20-00083, ECF No. 10; Adv. Proc. No. 20-00084, ECF No. 10; Adv. Proc. No. 20-00085, ECF No. 9].

On September 28, 2020, the Government filed motions for summary judgment in connection with Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 12; Adv. Proc. No. 20-00083, ECF No. 13]. On October 5, 2020, the Oversight Board filed motions for summary judgment in connection with Acts 47, 82, and 181 [Adv. Proc. No. 20-00080, ECF Nos. 14, 16; Adv. Proc. No. 20-00084, ECF Nos. 13, 15; Adv. Proc. No. 20-00085, ECF Nos. 12, 13]. On October 19, 2020, the Oversight Board filed its oppositions to the Government's motions for summary judgment and cross-motions for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF Nos. 28, 29; Adv. Proc. No. 20-00083, ECF Nos. 29, 30]. On October 23, 2020, the Government filed oppositions to the Oversight Board's motion for summary judgment in connection with all claims and counterclaims related to Acts 47, 82, and 181 and moved for relief under Rule 56(d) [Adv. Proc. No. 20-00080, ECF No. 36; Adv. Proc. No. 20-00084, ECF No. 35; Adv. Proc. No. 20-00085, ECF No. 34]. On November 4, 2020, the Government filed its reply in further support of its motions for summary judgment and opposition to the Oversight Board's cross-motions for summary judgment in

connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 37; Adv. Proc. No. 20-00083, ECF No. 38]. On November 5, 2020, the Oversight Board filed replies in support of its motions for summary judgment in connection with Acts 47, 82, and 181 [Adv. Proc. No. 20-00080, ECF No. 49; Adv. Proc. No. 20-00084, ECF No. 47; Adv. Proc. No. 20-00080, ECF No. 46]. On November 11, 2020, the Oversight Board filed a reply in support of its cross-motion for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 40; Adv. Proc. No. 20-00083, ECF No. 41]. On November 24, 2020, the Title III Court held a hearing regarding the motions and cross-motions for summary judgment.

On December 23, 2020, the Title III Court issued an order: (i) denying the Government's motion for summary judgment in connection with Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 52; Adv. Proc. 20-00083, ECF No. 53]; and (ii) partially granting both the Oversight Board's (a) motions for summary judgment in connection with Acts 47, 82, and 181, and (b) cross-motions for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00080, ECF No. 72; Adv. Proc. No. 20-00084, ECF No. 61; Adv. Proc. No. 20-00085, ECF No. 60]. With respect to Act 47, the Title III Court dismissed Count II of the Act 47 Complaint, which sought declaratory relief concerning PROMESA section 108(a)(2), and granted summary judgment on Act 47 Counterclaim III, which sought injunctions barring implementation of the relevant laws under PROMESA section 108(a)(2). The Title III Court concluded that the Oversight Board's determination that Act 47 violates PROEMSA section 108(a)(2) is supported by a rational basis and substantial evidence. With respect to Act 82, the Title III Court dismissed Count I of the Act 82 Complaint, which sought declaratory relief concerning PROMESA section 204(a), and granted summary judgment on Act 82 Counterclaim II, which sought injunctions under PROMESA section 104(k). The Title III Court found the Oversight Board's conclusions that the implementation of Act 82 should be prevented as it would involve significant expenditures that are not clearly provided for in the fiscal plan are neither arbitrary nor capricious. With respect to Act 138, the Title III Court dismissed Count I of the Act 138 Complaint, which sought declaratory relief concerning PROMESA section 204(a), and granted summary judgment on Act 138 Counterclaim II, which sought injunctions under PROMESA section 104(k). The Title III Court reasoned that the Oversight Board's challenges to Act 138 were supported by rational concerns given the Government's failure to comply with the Oversight Board's directives under PROMESA section 204(a)(4)(A) to correct deficiencies with the Act 138 Certificate. With respect to Act 176, the Title III Court dismissed Count II of the Act 176 Complaint, which sought declaratory relief concerning PROMESA section 108(a)(2), and granted summary judgment on Act 176 Counterclaim III, which sought injunctions barring implementation of the relevant laws under PROMESA section 108(a)(2). The Title III Court concluded that the Oversight Board's determination that Act 176 will impair or defeat PROMESA's purposes was rational and supported by substantial evidence on the record. With respect to Act 181, the Title III Court granted summary judgment on Act 181 Counterclaim IV, which sought an injunction under PROMESA section 104(k) barring implementation of Act 181 under PROMESA section 204(c). The Title III Court ruled that Act 181 violated PROMESA section 204(c) because it creates a revenue deficiency that the Government would likely need to remedy through reprogramming that has neither been requested nor authorized.

Also on December 23, 2020, the Title III Court issued an order directing the parties to show cause why the Title III Court should not dismiss the remaining claims and counterclaims [Adv. Proc. No. 20-00080, ECF No. 73; Adv. Proc. No. 20-00082, ECF No. 53; Adv. Proc. No. 20-00083, ECF No. 54; Adv. Proc. No. 20-00084, ECF No. 62; Adv. Proc. No. 20-00085, ECF No. 61].  On January 4, 2021, the parties filed a joint stipulation dismissing the remaining claims without prejudice [Adv. Proc. No. 20-00080, ECF No. 74; Adv. Proc. No. 20-00082, ECF No. 54; Adv. Proc. No. 20-00083, ECF No. 55; Adv. Proc. No. 20-00084, ECF No. 63; Adv. Proc. No. 20-00085, ECF No. 62].  On January 7, 2021, Judge Swain issued an order dismissing the remaining claims without prejudice, and the court clerk issued judgment and closed the cases relating to all five acts: 47, 82, 181, 176, and 138 [Adv. Proc. No. 20-00080, ECF Nos. 75, 76; Adv. Proc. No. 20-00082, ECF Nos. 55, 56; Adv. Proc. No. 20-00083, ECF Nos. 56, 57; Adv. Proc. No. 20-00084, ECF Nos. 63, 64; Adv. Proc. No. 20-00085, ECF Nos. 63, 64].  On February 4, 2021, the parties filed a joint motion for entry of an order approving a joint stipulation modifying the injunction regarding Act 181 [Adv. Proc. No. 20-00084, ECF No. 72].  The parties agreed to the extent tax revenues from tax on insurance premiums and revenues from safety inspections on commercial properties covered the salary increase of $125 per month for the firefighters, the Oversight Board would have no further objection to the increase as provided by Act 181.  The parties informed the Title III Court that the pay increase would be put into effect.  On February 5, 2021, Judge Swain issued an order approving the stipulation [Adv. Proc. No. 20-00084, ECF No. 73].

On January 21, 2021, the Government filed a notice of appeal in connection with the Title III Court's December 23, 2020 orders on the summary judgment motions [Adv. Proc. No. 20-00080, ECF No. 78; Adv. Proc. No. 20-00082, ECF No. 58; Adv. Proc. No. 20-00083, ECF No. 60; Adv. Proc. No. 20-00084, ECF No. 67; Adv. Proc. No. 20-00085, ECF No. 66].  On January 27, 2021, the appeal was docketed by the United States Court of Appeals for the First Circuit as Case No. 21-1071 [Adv. Proc. No. 20-00080, ECF No. 81].  On April 19, 2021, Appellants filed their opening brief.  On May 10, 2021, the Speaker of the Puerto Rico House of Representatives filed a motion for leave to file an amicus brief in support of Appellants and his proposed brief.  On June 16, 2021, the First Circuit issued an order granting the Speaker's motion and accepting the brief for filing.  On July 7, 2021, Appellee filed its answering brief.

(ix)     *The Financial Oversight and Management Board for Puerto Rico v. Hon. Pierluisi Urrutia, et al.*, Adv. Proc. No. 21-00072 (D.P.R. filed July 2, 2021).

On July 2, 2021, the Oversight Board filed a lawsuit against the Governor of Puerto Rico, Pedro Pierluisi Urrutia, in his official capacity; AAFAF; the Honorable José Luis Dalmau, in his official capacity as a representative of the Puerto Rico Senate; and the Honorable Rafael Hernández Montañez, in his official capacity as a representative of the Puerto Rico House of Representatives, in the U.S. District Court for the District of Puerto Rico to enjoin the enforcement and to nullify Act 7-2021 [Adv. Proc. No. 21-00072, ECF No. 1].  As set forth in the complaint, Act 7-2021 replaces the Commonwealth's reformed pension systems with a new, defined-benefit pension system, and mandates that the Government repudiate any plan of adjustment that requires pension reductions, budget cuts, or further bond restructurings.  Specifically, the complaint alleges that (i) Act 7-2021 violates PROMESA section 108(a) because it impairs and/or defeats the purposes of PROMESA, as determined by the Oversight Board; (ii) Act 7-2021 violates

PROMESA sections 204(a), 204(c), and 207; (iii) Act 7-2021violates the Supremacy Clause of the U.S. Constitution and PROMESA section 4; and (iv) the Oversight Board is entitled to an order enjoining and nullifying Act 7-2021 and any actions taken to implement Act 7-2021. More details on Act 7-2021 may be found in Section IV.B.13.

## D.    Adoption of Commonwealth Fiscal Year Budgets and Fiscal Plans

*Fiscal Plans.* The Oversight Board is tasked with interacting with the Governor for fiscal plans and the Governor and legislature for budgets in the development, submission, approval, and certification of fiscal plans and budgets. Thus, starting as early as September 2016, the Oversight Board alongside its economists, municipal consultants, and financial advisors spent hundreds of hours researching and hosting working sessions to understand the dire situation in Puerto Rico, and to research various ways in which states and sovereigns have exited such dire circumstances. The Oversight Board also held numerous internal and external meetings with the government officials and the various creditor groups. The Oversight Board analyzed the many fiscal challenges that Puerto Rico faced and within only a few months was in a position to formulate its own fiscal plan or evaluate the Government's proposed fiscal plan.

The Oversight Board is tasked with determining in its sole discretion whether proposed fiscal plans comport with PROMESA section 201(b). Among PROMESA's goals is that the fiscal plan provides Puerto Rico with permanent, pro-growth fiscal reforms,[188] and a method to achieve fiscal responsibility and access to the capital markets.

Through a collaborative process with the Commonwealth Government, the Oversight Board has certified fiscal plans that strive to restore fiscal accountability and achieve measurable objectives. For example, the fiscal measures in the certified fiscal plans focus on enhancing tax payment processes so that revenue collection can increase while improving user experience. They also highlight achieving efficient government services through right-sizing measures that improve services while reducing cost, as well as reduction of subsidies to non-Central Government entities who currently over-rely on Central Government support. These fiscal measures have been carefully developed by and through collaboration with the Government, while also emphasizing the effectiveness of government through thoughtful assessments and benchmark studies which bring measurable targets and milestones for quantitative and qualitative improvements. The certified fiscal plans also endeavor to meet the future funding needs by planning for and developing initiatives to address various anticipated fiscal issues, including rapidly rising healthcare and pensions costs.

In addition to instituting fiscal measures, the Oversight Board has been working closely with the Government to counter over a decade of real economic decline – compounded by the devastating damages of the hurricanes – by identifying a series of structural reforms to ensure the competitiveness and rebuilding of Puerto Rico's economy. Those reforms span from ease of doing

---

[188] PROMESA § 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

business reform to make it easier for new businesses to start and firms to invest, labor reform, energy reform, infrastructure reform, and to long-term educational investments.

*Annual Budgets*.  PROMESA section 202(c)(1) sets forth a process for the approval of annual budgets that must comply with the certified fiscal plan.  In the first instance, PROMESA section 202(c)(1) provides the Governor with the initial opportunity to develop and submit to the Oversight Board a budget for the applicable Fiscal Year.  The Oversight Board then conducts a detailed review of the proposed budgets to ensure that governmental appropriations are consistent with the certified fiscal plan, including priority government services, such as public safety, education, and healthcare, while implementing cost saving measures.

The preparation of a certified budget is a year-long process that the Oversight Board has refined to ensure that the certified budget contains the desired transparency and spending controls. As part of that process, the Oversight Board put in place significant controls on spending to restore fiscal discipline while outlining specific measures to promote efficiency and improved delivery of government services.  This currently includes controls on disbursements of appropriations such that 2.5% is set aside and held until the 4th quarter each Fiscal Year, any modifications to the certified budget must be submitted to the Oversight Board for its review and approval, and limitations on the use of prior year appropriations.

The Oversight Board also conducts due diligence on individual agencies requiring the government to submit support for their requested budgets.  The process includes a review of spending trends by concept of spend while incorporating budget requirements for new programs and services. For Fiscal Year 2020, the Oversight Board conducted dozens of meetings with OMB and individual agencies to discuss their spending patterns as well their planned spending for Fiscal Year 2020.  The meetings allowed agencies to highlight key areas of risk, anticipated changes in Fiscal Year 2020, required headcount, and their ability to implement measures as set forth in the certified fiscal plan.

The certified budget groups individual agencies that are expected to be consolidated as proposed by the Government and the fiscal plan. Each agency's budget provides detailed spending by concept of spend and by object code (*e.g.,* salaries, overtime, healthcare, leases, maintenance & repairs) to provide greater government spending transparency.  OMB and specific agencies further refined the budget by program within these parameters.

The certified budget that contains the spending appropriations for each agency specifies the manner in which funds are disbursed on a monthly basis to various governmental entities, obligate the Department of Treasury to provide updated net revenue forecasts, rescind prior year appropriations (except where specifically exempted), require AAFAF to certify unused appropriations of the prior year, suspending OMB's, AAFAF's, or the Department of Treasury's rights to reprogram or extend appropriations, and reiterate the requirement to comply with reporting requirements in the certified fiscal plans.  In addition, the certified budget requires that the Governor provide to the Oversight Board a quarterly report of revenue and expenditures consistent with PROMESA section 203.

1.      **Development and Certification of the March 2017 Commonwealth Fiscal Plan**

On October 14, 2016, then-Governor Alejandro García Padilla presented the Oversight Board with a fiscal plan that contemplated a budget deficit of $4.8 billion for Fiscal Year 2017, after the implementation of expenditure measures and revenue enhancements, and before allocating money for debt service.

On November 10, 2016, the Oversight Board issued a public invitation to interested third parties to comment on the October 14, 2016 fiscal plan submission.

The Oversight Board declined to certify the Governor's October 2016 fiscal plan as it did not believe the plan met the requirements of PROMESA. Among other things, the Oversight Board was not satisfied that the proposed fiscal plan included sufficient measures to rein in expenses or grow revenue. In rejecting the fiscal plan, the Oversight Board provided substantial comments and guidance, including by listing the five principles that would guide the Oversight Board in its decision whether to certify the next proposed fiscal plan. These five principles addressed the temporal period of the fiscal plan and the 14 criteria under PROMESA section 201(b), the goals of the fiscal plan to stabilize the economic situation and increase resilience, an assessment of fiscal outlook and base-case scenario, an inclusion of appropriate mix of structural reforms, fiscal adjustment and debt restructuring, and an accompaniment of operational plan for the changes and reforms.

The prior administration did not submit a revised fiscal plan by December 15, 2016, as the Oversight Board had requested. However, the Oversight Board continued to provide substantive detail on the goals and framework for the fiscal plan to then-Governor Alejandro García Padilla and then-Governor Rosselló in a letter dated December 20, 2016, with the hope of achieving a certifiable fiscal plan by January 31, 2017.

On January 2, 2017, the administration of newly elected Governor Rosselló took office. He immediately requested an extension of the fiscal plan submission deadline and engaged in collaborative discussions with the Oversight Board through in-person meetings and written correspondence. The Oversight Board responded on January 18, 2017, with a proposed extension of the submission deadline to February 28, 2017 and provided detailed information on the specific goals, objectives, and fiscal parameters needed for a certifiable fiscal plan.

On February 28, 2017, the new administration submitted a proposed fiscal plan to the Oversight Board. The Oversight Board raised concerns regarding the proposed fiscal plan. After reviewing the proposed fiscal plan with the Governor's representatives and analyzing and deliberating over it, the Oversight Board informed the Governor on March 9, 2017 of its determination that the Governor's proposed fiscal plan did not satisfy PROMESA's requirements. The Oversight Board identified violations and recommended revisions.

Then-Governor Rosselló submitted a revised proposed fiscal plan on March 11, 2017, and representatives of the Governor and of the Oversight Board engaged in extensive discussions on March 11 and 12, 2017. After the new administration complied with the requirements the Oversight Board had specified and submitted a final revised version on March 13, 2017, the

Oversight Board determined the final revised fiscal plan, with two amendments relating to (i) right-sizing measures and related implementation plan, liquidity plan, and cash reserve generation, and (ii) pension benefits, would comply with the requirements for certification. The Oversight Board voted unanimously to certify the fiscal plan on March 13, 2017 (the "March 2017 Fiscal Plan"). By letter dated April 15, 2017, the Oversight Board informed the Governor and the Legislature that it certified a revised version of the March 2017 Fiscal Plan (which had included the two Board imposed amendments) with corrections of certain typographical and formatting errors and the other minor data-conforming changes. The changes and the corrections did not materially alter the substance of the March 2017 Fiscal Plan, or the Oversight Board's view of such plan. On May 31, 2017, the Government requested to amend the certified March 2017 Fiscal Plan with the revised revenue forecast, which was also incorporated in the proposed Fiscal Year 2018 budget. On May 31, 2017, the Oversight Board unanimously re-certified the March 2017 Fiscal Plan with AAFAF's suggested revenue forecast revision.

2.    **Highlights of the March 2017 Certified Fiscal Plan**

The March 2017 Fiscal Plan (with its subsequent certified revisions in April and May 2017) was the first fiscal plan developed in accordance with PROMESA and marked a historic achievement by the Commonwealth and the Oversight Board to commit to fiscal responsibility and sustainability for the residents of Puerto Rico and the capital market stakeholders. The March 2017 Fiscal Plan provided for significant fiscal and economic measures projected to result in an economic recovery.

The March 2017 Fiscal Plan was built upon the two pillars of fiscal reform and structural reform. Fiscal reform measures were aimed at (1) enhancing revenues, (2) right-sizing the government while improving its efficiency, (3) adjusting healthcare spending, and (4) restructuring the pension system. Structural reform measures were aimed at increasing economic growth by (a) aiding business activity, (b) improving capital efficiency, (c) implementing energy reforms, and (d) promoting economic development through new investment / tourism institutions. Together, these reforms were estimated to improve the ten-year financial projections by $39.6 billion and to achieve a surplus of approximately $7.9 billion over ten years.

Specifically, the March 2017 Fiscal Plan projected to achieve $13.9 billion of additional revenue and $25.7 billion of expense savings through various measures.

Moreover, the March 2017 Fiscal Plan signaled the Government's initiatives to improve efficiencies and develop a new healthcare model and to overhaul the pension system and switch to a pay-as-you-go model, with prospective employee contributions segregated from the existing fund. The Oversight Board additionally required the Government to reduce annual benefit outlays by 10% while preventing retirees from falling into poverty.

Lastly, the March 2017 Fiscal Plan outlined several structural reforms that would improve the overall competitiveness of the economy and increase GNP growth. These structural reforms centered on improving the ease of business activities, improving capital efficiencies, leveraging and facilitating expedited private sector investments in modernizing energy sector, and promoting economic development.

3.     **The April 2018 Fiscal Plan Certification**

After the fiscal plan certification and the Fiscal Year 18 budget certification in June 2017, the Oversight Board and the Government focused on implementation of the March 2017 Fiscal Plan. The Government, however, disagreed with the pension reform and right-sizing measures that the Oversight Board imposed as part of the fiscal plan certified in March. On August 4, 2017, the Oversight Board held a public meeting about these measures.

Because the Government continued to disagree and indicate its refusal to comply with the certified fiscal plan requirement, the Oversight Board filed an adversary complaint against the Government on August 28, 2017 regarding the fiscal plan implementation.

Yet, before the issues could be adjudicated or settled further, Hurricanes Irma and Maria hit and devastated Puerto Rico in September 2017. The Oversight Board immediately acted to reallocate the fiscal resources that could help with the recovery efforts. On September 21, 2017, the day after Hurricane Maria made landfall, the Oversight Board also authorized the Governor to implement good-faith modifications to the certified Fiscal Year 2018 budget to reapportion up to $1 billion for emergency measures. On September 30, 2017, the Oversight Board urged maximum support for Puerto Rico from the federal government, announced its voluntary dismissal of the fiscal plan implementation litigation, and postponed discussions on fiscal plans until the next Fiscal Year.

Noting that the hurricanes "fundamentally changed Puerto Rico's reality," the Oversight Board engaged with the Government in an extensive, iterative and collaborative process over the next six months to determine the hurricane damages and to develop fiscal plans to account for the altered economic and demographic landscape. The Oversight Board also increased public engagement in the development of the Fiscal Plans. The Oversight Board held its tenth public meeting on October 31, 2017 during which it proposed three public listening sessions to invite public input and discussion of various assumptions and considerations for fiscal plan development purposes and set December 22, 2017 as the deadline for the Government to submit a proposed fiscal plan with a goal of final certification by February 2, 2018. The three public listening sessions on the proposed post-hurricane fiscal plans were held on November 16, 2017, November 30, 2017, and December 4, 2017. Discussions during these listening sessions included presentations by experts and community leaders as well as comments by residents of Puerto Rico.

On December 20, 2017, the Oversight Board granted Governor Rosselló's request to extend the deadline for submission of the Commonwealth's proposed fiscal plan to January 10, 2018. Accordingly, the Oversight Board also indicated its expectation to certify a fiscal plan by February 23, 2018. On January 10, 2018, the Oversight Board granted another two-week extension for the Government to submit a Commonwealth fiscal plan that would be aligned with the proposed fiscal plans for PREPA and PRASA by January 24, 2018. On January 24, 2018, the Government submitted proposed revised fiscal plans for the Commonwealth, PREPA, and PRASA.

On February 5, 2018, the Oversight Board issued a notice of violation under PROMESA section 201(c)(3)(B)(i) regarding the Commonwealth proposed fiscal plan. The Government submitted a revised proposed fiscal plan by the deadline indicated on the notice of violation,

February 12, 2018.  On February 16, 2018, the Oversight Board also announced that it expected to certify a fiscal plan for the Commonwealth by March 30, 2018.

After extensive discussion between the Oversight Board and the Government, each with and through its advisors, the proposed fiscal plan continued to be revised.  On March 23, 2018, Governor Rosselló submitted a new revised fiscal plan that projected a cumulative $5.5 billion surplus over the next six years.  The Oversight Board cancelled a public meeting that had been scheduled for March 26, 2018 regarding fiscal plan certification consideration and instead began reviewing the Government's submission.

On March 28, 2018, the Oversight Board outlined in a letter to Governor Rosselló changes that had to be made to the proposed fiscal plan in order to be compliant with the PROMESA requirements and objectives.  These included, among others, changes to the proposed labor reforms and pension plan reforms.  The Oversight Board required the Government to submit the next revision incorporating the indicated changes by April 5, 2018.

Governor Rosselló responded, on multiple occasions, by publicly disagreeing with the labor reform and pension plan reform parameters required by the Oversight Board.  The Government's next submission on April 5, 2018 also did not contain all of the required changes.

On April 15, 2018, the Oversight Board announced public meetings on April 19 and 20, 2018 for certification considerations of fiscal plans of the Commonwealth and of various instrumentalities.  Prior to the public meeting, the Oversight Board also released its own version of the fiscal plan on April 18, 2018.  After public presentations and discussions of the Government's proposed fiscal plan and the Oversight Board's proposed fiscal plan, the Oversight Board certified its proposed fiscal plan for the Commonwealth under PROMESA section 201(d)(2) and (e)(2) during the public meeting on April 19, 2018.

The Fiscal Plan for the Commonwealth certified on April 19, 2018 (the "April 2018 Fiscal Plan") estimated the hurricanes created tens of billions of dollars in damages and that approximately $62 billion of disaster relief funds would be provided from federal and private sources.  It also projected to generate $2.3 billion from revenue measures and $10.0 billion from expense measures for Fiscal Years 2018 through 2023.  From Fiscal Year 2018 through Fiscal Year 2048, the April 2018 Fiscal Plan projected to generate an approximately $39 billion cumulative surplus before debt service.

Although the April 2018 Fiscal Plan largely maintained and incorporated most of the fiscal measures developed under the March 2017 Fiscal Plan, the new certified fiscal plan also included additional information relating to the various industry trends and benchmarking from mainland states to refine the reforms.  It also included more robust reference to the current conditions in the Commonwealth and the implementation plan action items, milestones, and measurable performance targets.

For example, in the April 2018 Fiscal Plan, the government right-sizing measure provided for a detailed bottom-up approach for agencies representing over 80% of government spend, along with tested merger and efficiency benchmarks for personnel and non-personnel spend for other agencies.  The payroll freeze was also extended in the April 2018 Fiscal Plan and uniform

healthcare insurance contributions were confirmed as a separate measure. Specific initiatives were identified for healthcare reform, and tax reform in the April 2018 Fiscal Plan also required revenue neutrality for every proposed change.

The structural reforms in the April 2018 Fiscal Plan were also more robust than those in the March 2017 Fiscal Plan. They included specific benchmark assessments of the current state of Puerto Rico's economy, and referenced specific targets for labor reforms, ease of doing business reforms, energy and power regulatory reforms, and infrastructure reforms. The April 2018 Fiscal Plan outlined strategic reinvestments of over $1 billion in Puerto Rico for long-term prosperity and sustainability which would be possible if greater structural reforms were implemented. As the Oversight Board had highlighted that increasing labor participation could be the single most important reform for Puerto Rico's long-term economic well-being, the April 2018 Fiscal Plan provided detailed descriptions for the need for comprehensive labor reform and the goals, among others, to become an at-will employment jurisdiction, reduce mandated paid leave by half, make the Christmas bonus voluntary for private sector employees, institute a work requirement for the NAP and introduce an EITC program.

4.    **The May 2018 Fiscal Plan Certification**

Despite their different perspectives on labor reform, the Oversight Board and then-Governor Rosselló continued to engage in dialogue during April and May 2018 in a good-faith effort to reach common ground. After several rounds of good-faith negotiations, the Oversight Board and the Governor announced on May 20, 2018 that they reached an accommodation—in order to approve labor reform and thereby reduce fiscal plan implementation risks and avoid costly litigation—to amend the April 2018 Fiscal Plan. As part of the "accommodation" publicly released on May 30, 2018, the Legislature and the Governor would have to enact a law repealing Law 80 on or before June 27, 2018.

In exchange for the repeal of Law 80, the accommodation provided for implementation of certain Commonwealth-proposed fiscal plan provisions, including: (i) restoration of the Christmas bonus for public employees through Fiscal Years 2019 to 2023; (ii) additional annual $25 million appropriation to UPR for means-tested student scholarship through Fiscal Years 2019 to 2023; (iii) an additional annual $50 million appropriation for municipality economic development fund through Fiscal Years 2019 to 2023; and (iv) replacement of reinvestment initiatives provided in chapter 11 of the April 2018 Fiscal Plan with the authority of the Government to spend up to $345 million for Fiscal Years 2019 to 2023 on reform implementation, infrastructure and economic development initiatives in specified categories.

In compliance with the terms of the accommodation, then-Governor-Elect Rosselló announced on May 28, 2018, that he had submitted a bill to fully repeal Law 80. Also, the Oversight Board submitted a comprehensive report of nearly 2,200 pages, dated May 30, 2018, discussing labor reform and published it on its website.

On May 30, 2018, the Oversight Board published and unanimously re-certified a revised Commonwealth Fiscal Plan that incorporated the effects of the accommodation, including the anticipated repeal of Law 80 (the "May 2018 Fiscal Plan").

In the May 2018 Fiscal Plan, the Oversight Board agreed to revise several fiscal measures and reinvestment initiatives from the April 2018 Fiscal Plan and support the Government's proposals to provide for the annual Christmas bonus for public employees, $25 million annual student scholarships at the UPR, $50 million annual appropriations for the economic development initiatives, and $345 million multiyear fund for various economic development and reform implementation initiatives. The Government's achievement of comprehensive labor and welfare reform would also enable the elimination of the cuts to the budgets of the Legislature and Judiciary required under the April 2018 Fiscal Plan. The May 2018 Fiscal Plan also included a new structural reform relating to trading across borders reform in order to improve the ease of doing business. This reform focused on domestic transportation and congestion as well as border compliance issue and was anticipated to counter the reduction in growth from excluding certain parts of labor reform from the accommodation.

The May 2018 Fiscal Plan projected to generate $2.3 billion from revenue measures and $9.5 billion from expense measures for Fiscal Years 2018 through 2023. It also projected that the cumulative surplus from Fiscal Years 2018 to 2048 to be approximately $36 billion before debt service.

5.    **The June 2018 Fiscal Plan Certification**

On June 4, 2018, the President of the House Government Affairs Committee, Hon. Jorge Navarro, sent a letter to the Oversight Board noting the "different scope" between the proposal of the complete Law 80 repeal and the effect of the amendment to grandfather the Law 80 protections for existing employees, and inquiring about the consequence of noncompliance with the terms of the accommodation.

The Oversight Board responded the same day in a letter that outlined the consequence of noncompliance with the accommodation, which would essentially be the reversal of the accommodation terms and, at a minimum, the return to the assumptions and requirements underlying the April 2018 Fiscal Plan.

Even though Governor Rosselló voiced his support for the Law 80 repeal on multiple occasions and the two houses of the Legislature contemplated some modified repeal of Law 80, the Legislature ultimately failed to pass any repeal of Law 80 provisions by June 27, 2018. On June 28, 2018, the Oversight Board cancelled the public meeting that had been scheduled for June 29, 2018 regarding the Fiscal Year 2019 budget certification, and announced its intention to re-certify the April 2018 Fiscal Plan, with some technical changes and updates to the macroeconomic information based on those reforms that were not implemented.

On June 29, 2018, the Oversight Board unanimously re-certified its revised version of the fiscal plan (the "June 2018 Fiscal Plan") that reverted to the April 2018 Fiscal Plan's fiscal measure requirements, with some important changes. The June 2018 Fiscal Plan highlighted the Legislature's failure to institute the Oversight Board's most critical structural reform, the repeal of Law 80. Therefore, the projected economic growth stemming from the labor reform was reduced significantly below both the April and May 2018 Fiscal Plans. The work requirement for NAP, EITC program, and the increased target of greater ease of doing business reform relating to trading across borders were preserved in the June 2018 Fiscal Plan. References to tax law initiatives or

any tax reform were removed given the Oversight Board's understanding that true tax reform was no longer being contemplated. Finally, changes related to updated financial information and estimates as reflected in the May 2018 Fiscal Plan were maintained in the June 2018 Fiscal Plan, apart from changes needed in order to make the certified fiscal plan match the certified Fiscal Year 2019 budget (e.g., allocation of previously unallocated capital expenditure, inclusion of reapportionments made in Fiscal Year 2018, etc.).

The June 2018 Fiscal Plan highlighted the importance of promoting public integrity and transparency at every part of the Government. In recognition of the Governor's efforts in prioritizing the oversight and fiscal responsibility, the June 2018 Fiscal Plan noted that the budgets for the Office of the Comptroller and the Office of Government Ethics would not be affected by the agency-specific right-sizing measures.

In addition, the June 2018 Fiscal Plan projected approximately $12.6 billion from revenue measures and expense measures for Fiscal Years 2018 through 2023. It also projected that the cumulative surplus from Fiscal Years 2018 to 2048 to be approximately $14.4 billion before debt service. The June 2018 Fiscal Plan also incorporated many of the measures that the Government declined to adopt in a letter dated September 27, 2018.

The events surrounding the Oversight Board's Commonwealth fiscal plan certifications in April, May, and June 2018 and related Fiscal Year 2019 budget certifications became the focus of the two adversary complaints by Governor Rosselló and by the Legislature filed in July 2018, as further discussed in sections IV.C.3(h)(i) and (ii) of the Disclosure Statement.

6.      **The October 2018 Fiscal Plan Certification**

On August 1, 2018, the Oversight Board announced it would revise the June 2018 Fiscal Plan in order to incorporate material new information, including full Fiscal Year 2018 revenue and expenditure actuals, revised federal disaster relief spending estimates, and an adjustment to demographic projections.

The Oversight Board established a schedule for the Commonwealth to develop and submit a revised fiscal plan by August 17, 2018 and the Oversight Board to certify a new fiscal plan by September 21, 2018. On August 15, 2018, the Oversight Board approved the Commonwealth's request to extend the submission deadline to August 20, 2018. The Commonwealth submitted its proposed revised fiscal plan according to the extended deadline. The proposed fiscal plan also included consideration of the COFINA settlement discussion.

On August 20, 2018, the Oversight Board hosted a public webinar to discuss demographic assumptions used for the June 2018 Certified Fiscal Plan. The webinar included detailed presentation of key forecast fundamentals and data sources and sought public suggestions and feedback.

On August 30, 2018, the Oversight Board sent a letter to Governor Rosselló formulating a notice of violation pursuant to PROMESA section 201(c)(3)(B) in regards to the Commonwealth's proposed fiscal plan. The letter indicated that the proposed fiscal plan did not reflect all the latest information for baseline projections and included several new policies that were inconsistent with

212

PROMESA's mandate and the reforms and measures identified in the previous June 2018 Fiscal Plan. The Oversight Board set September 7, 2018 as the deadline for the Commonwealth to submit a revised, proposed fiscal plan, including all financial and right-sizing models.

On September 7, 2018, the Commonwealth submitted its revised, proposed fiscal plan in response to the Oversight Board's notice of violation letter. This proposed plan incorporated the COFINA debt restructuring deal terms.

The initial target certification date of September 21, 2018 was extended based on the ongoing negotiations between the Oversight Board and the Commonwealth administration. The Oversight Board scheduled a public hearing for October 23, 2018 to review the proposed fiscal plan.

On October 19, 2018, the Oversight Board filed the proposed plan of adjustment for COFINA that was consistent with the COFINA fiscal plan certified on October 18, 2018, its related disclosure statement and settlement motion.

On October 22, 2018, the Oversight Board published a draft proposed fiscal plan for the Commonwealth that incorporated the COFINA restructuring. During the public hearing on October 23, 2018, the Oversight Board unanimously certified its version of the fiscal plan ("October 2018 Fiscal Plan").

The October 2018 Fiscal Plan revised its estimated disaster relief funding to approximately $82 billion from federal and private sources and updated projected roll-out of this spend based on information from FEMA and other sources. It also developed different pass-through rates for the impact of funding to the economy given new data related to the impact of various types of spending. Details surrounding population projections were updated, and revenue and expenditure actuals from Fiscal Year 2018 were used to update projections. The October 2018 Fiscal Plan indicated lower GNP growth upticks stemming from structural reforms versus those seen in the June 2018 Fiscal Plan. This was due to poorer-than-expected progress on structural reform implementation, especially related to the NAP work requirement and trading across borders reform (the latter of which was removed from the fiscal plan). Other changes included updating revenue projections based on actual results, which were higher than anticipated and updates for actual expenditures, specifically around payroll which had shown evidence of historical over-budgeting.

While various initiatives and goals of the October 2018 Fiscal Plan largely remained consistent from the June 2018 Fiscal Plan, the revised fiscal plan also incorporated the terms of the COFINA settlement and projected $12.4 billion of additional surplus from revenue measures and expense measures from Fiscal Year 2018 through Fiscal Year 2023. The October 2018 Fiscal Plan also projected nearly breakeven cumulative performance before debt service for Fiscal Year 2018 through Fiscal Year 2058.

Shortly after certification of the October 2018 Fiscal Plan, the Oversight Board launched an interactive, web-based reporting dashboard to track compliance with certified fiscal plans.

7.      **The May 2019 Fiscal Plan Certification**

Since October 2018, the Oversight Board continued to assess and respond to various constituencies regarding the objectives, assumptions, and projections of the October 2018 Fiscal Plan. The Oversight Board's efforts included ongoing discussions with the Government.

During the COFINA disclosure statement hearing on November 20, 2018, the Oversight Board disclosed that it discovered a pension payment forecast calculation error in the October 2018 Fiscal Plan. On November 30, 2018, the Oversight Board announced that it had concluded that the pension forecast error resulted in an understatement of pension forecasts and projected PayGo payments of $3.35 billion.

On January 18, 2019, the Oversight Board sent a letter to the Government laying out the schedule to develop, submit, approve, and certify a revised fiscal plan for the Commonwealth and the Fiscal Year 2020 budget for the Commonwealth. The January 18, 2019 letter provided for the Governor to submit a proposed fiscal plan by February 22, 2019 and the Oversight Board to expect certification by April 26, 2019. Per the Government's request, the Oversight Board granted an extension for the Government to submit a proposed fiscal plan on February 22, 2019 to March 8, 2019. The expected certification date remained unchanged at April 26, 2019.

On March 10, 2019, the Government submitted a revised fiscal plan draft. On March 15, 2019, the Oversight Board sent a letter to Governor Rosselló formulating a notice of violation pursuant to PROMESA section 201(c)(3)(B) in regards to the Commonwealth's proposed fiscal plan. The letter indicated the proposed fiscal plan required certain significant revisions (*e.g.*, within pension reform and healthcare reform) and additional supporting information. The letter also highlighted that the Government's proposal included several new policies that were inconsistent with PROMESA's mandate and lacked detailed critical structural reform initiatives and the latest information for baseline projections. The Oversight Board set March 22, 2019 as the deadline for the Government to submit a revised proposed fiscal plan.

Upon the Government's request, the deadline for submission of a revised draft was extended to March 27, 2019. On March 27, 2019, the Government submitted a revised draft along with a letter responding to the Oversight Board's March 15, 2019 notice of violation.

The Oversight Board also held a public hearing on March 28, 2019, with the Puerto Rico Department of Public Safety on the implementation of the certified fiscal plan, including rightsizing and reporting measures. This highlighted several deficiencies in the department's approach to efficiency efforts.

On April 21, 2019, the Oversight Board sent a letter to the Government, outlining a new schedule for certification given delays from the initial schedule and the iterative process of requesting additional supporting information. The Oversight Board set the new expected certification date of May 9, 2019. On May 6, 2019, the Oversight Board announced that a public hearing would be held on May 9, 2019, as planned, to consider certification of the fiscal plan.

On May 9, 2019, the Oversight Board published a draft proposed fiscal plan for the Commonwealth. During the public hearing that same day, the Oversight Board certified its version

214

of the fiscal plan.[189]  The May 2019 Fiscal Plan incorporates a number of important updates for new information and data, such as slower disaster recovery funding rollout; updated population forecast; lower structural reform GNP growth upticks due to delays in or inadequate implementation of labor and welfare, ease of doing business, and power sector reform; a revised pensions expenditure forecast; updated Medicaid enrollment data; updated Medicaid enrollment data and healthcare reform measures; and additional funding for Special Revenue Fund capital expenditure.  In addition, the May 2019 Fiscal Plan refined assumptions related to the unwinding of disaster relief spending and fiscal measures, estimating it would happen in five as opposed to ten years; this means that GNP growth rates would contract faster, out-migration would increase faster, and population would decline further than previously projected.  Importantly, the May 2019 Fiscal Plan also incorporated the Fiscal Year 2020 budgetary decisions.

In addition to incorporating new information, the May 2019 Fiscal Plan urged the Government to take action to address the missed milestones and accelerate the pace of change based on inadequate implementation progress in Fiscal Year 2019.  Further, as part of its focus on transparency of spend, the May 2019 Fiscal Plan (and Fiscal Year 2020 budget) reduced spending in low-transparency areas like professional services and "line items with aggregated expenditures," and included investments in priority areas.  These investment areas include police compensation (which was brought to mainland averages) and equipment, healthcare staffing and capital expenditures, additional educational compensation and scholarship supports, firefighter salaries and equipment, the Forensics Sciences Institute payroll and equipment, and additional capital expenditure funding.

The May 2019 Fiscal Plan projects to generate $2.5 billion from revenue measures and $11 billion from expense measures for Fiscal Year 2019 through Fiscal Year 2024.  It also projects approximately $23 billion of cumulative surplus before debt service from Fiscal Years 2018 to 2048.  In addition, the May 2019 Fiscal Plan highlights that the Government has struggled to timely implement and report progress on the reforms and measures to date.  For example, the Government did not submit many implementation plans required under previous certified fiscal plans for submission by June 30, 2018 until September 2018, and some implementation plans were submitted as late as April 2019.  As a result, progress has been inconsistent and incomplete.  Therefore, the May 2019 Fiscal Plan adds monthly performance report requirements to ensure implementation progress and monitoring.[190]  Moreover, in many agencies where the Government has achieved budget targets set in the May 2019 Fiscal Plan, it has been through overreliance on

---

[189] Despite the substantial progress that has been made between the Commonwealth Government and the Oversight Board to narrow their differences, the May 2019 Fiscal Plan was certified with measures over the Commonwealth Government's objections.

[190] The GAO noted in its 2019 GAO Report that experts, as well as Puerto Rico officials, have expressed concern that the GDB Title VI restructuring and the COFINA Title III restructuring are based on an unrealistically optimistic expectation of Commonwealth economic growth.  However, the GAO reported that the May 2019 Fiscal Plan contains much more conservative projections for economic growth than previous fiscal plans.  The GAO also raised concerns about the feasibility of the May 2019 Fiscal Plan's proposed structural reforms to yield projected economic benefits, and that the Oversight Board overestimated the volume and timeliness of federal hurricane relief funds.

voluntary transition policies, rather than more tailored policies, which may have the effect of reducing the Government's effectiveness over the medium to long term.

### 8.     Highlights of Priority Investments

Over the course of developing each certifiable fiscal plan, the Oversight Board has kept in mind the needs of the people of Puerto Rico and made priority investments in areas such as public safety, healthcare, and education. Most recently, the May 2019 Fiscal Plan continued and expanded upon these investments which aim to improve the quality of public services.

Paramount among these investments is an effort to improve public safety. First, the May 2019 Fiscal Plan invests in police officer compensation to improve competitiveness given the significant attrition the Puerto Rico Police Bureau ("PRPB") has experienced. Therefore, a salary and required benefits increase of 30% (approximately $11,500) over two years and $250 per sworn officer per year for life and disability insurance have been included. Additional investments include Social Security contributions for sworn officers, $122 million per year from Fiscal Year 2019 to Fiscal Year 2021 for police officers who are owed payment for past services, and $42 million in capital expenditure funding in Fiscal Year 2020.

Beyond investing in the PRPB, the Oversight Board also included more than $5 million in personnel funding and $15 million in non-personnel funding to other public safety agencies. Specifically, these investments will allow $500 compensation increases per employee for firefighters and purchases of new vehicles and safety equipment at the Puerto Rico Fire Bureau. The Forensics Science Institute will receive funding to hire more than 90 new employees and invest in forensic laboratory supplies.[191]

The Oversight Board also included investments in several agencies that provide healthcare services. First and foremost, the May 2019 Fiscal Plan provides an additional $1.4 billion in Medicaid funding from Fiscal Year 2019 to Fiscal Year 2024 in order to improve the stability of the healthcare system. Additionally, more than $15 million in annual funding has been invested to maintain nurse staffing levels, and $12 million has been provided to the Psychiatric Hospital so that it can achieve its Medicare certification. Lastly, more than $25 million in Special Revenue Funds expenditures have been approved in Fiscal Year 2020 to allow the Comprehensive Cancer Center to become fully functional.

The education of the children of Puerto Rico and their successful entrance into the workforce is also a core goal of Puerto Rico Department of Education and the Oversight Board, as these outcomes have been shown to drive long-term economic growth. With that objective in mind, the Oversight Board has expanded upon prior investments in teacher and director salaries and textbooks to include an additional $500 compensation increase per employee for all teachers and directors in the May 2019 Fiscal Plan. This investment increases teacher compensation by a total of more than $2,000 since the Oversight Board's inception, which represents the only increases received by teachers in the last decade.

---

[191] The fiscal year 2020 budget includes a salary increase of $1,500/year per firefighter (versus $500/year in the fiscal plan). The EMS fiscal year 2020 budget increased by $4.8 million over the fiscal year 2019 budget.

The set of investments highlighted above represents the Oversight Board's commitment to the successful reform of the Government. Though not an exhaustive list, the investments will enhance service levels in areas that impact long-term economic success of the Commonwealth.

9.     **The May 2020 Fiscal Plan Certification Process**

Following the certification of the May 2019 Fiscal Plan and Fiscal Year 2020 Budget, the Oversight Board implemented a regular monitoring and reporting cadence for Government agencies (and agency groupings). In addition to monthly reporting, the Oversight Board held a series of Public Hearings throughout Fiscal Year 2020 to further increase transparency on the implementation of the structural and fiscal reforms outlined in the May 2019 Fiscal Plan. These included Public Hearings focused on implementation progress for the (a) Department of Economic Development and Commerce (DDEC) and Ease of Doing Business, (b) Department of Education (PRDE), and (c) Department of Corrections and Rehabilitation (DCR).

The Oversight Board announced on December 12, 2019 that it would conduct its annual process to certify a revised Fiscal Plan and sent a letter to the Government laying out an updated schedule for developing and certifying a revised Fiscal Plan for the Commonwealth, in accordance with PROMESA. Soon thereafter, Puerto Rico was hit by a series of earthquakes, which caused substantial damage to the southwestern part of Puerto Rico.

Per the Government's request, the Oversight Board granted an extension for the Government to submit a proposed Fiscal Plan and, on January 30, 2020, required the Governor to submit a proposed Fiscal Plan by February 28, 2020 for consideration by the Oversight Board. The letter stated that the Oversight Board expected to complete certification by April 30, 2020.

On February 28, 2020, the Government submitted a draft Fiscal Plan. On March 13, 2020, the Oversight Board sent a letter to Governor Vázquez formulating a Notice of Violation pursuant to PROMESA section 201(c)(3)(B) in regards to the Commonwealth's draft submission. The letter indicated the Government's proposed Fiscal Plan was inconsistent with PROMESA for several reasons, including: policy positions not consistent with PROMESA's mandate (e.g., statehood advocacy), inclusion of Act-29 provisions which were ruled as inconsistent with PROMESA, halting of healthcare reforms, lowering of targets for right-rating tax revenues, reduction in savings to be achieved through agency efficiencies and elimination of reforms to be undertaken for key agencies, and a lack of concrete milestones for implementation. The letter set March 23, 2020, as the deadline for the Government to submit a revised proposed Fiscal Plan.

In March 2020, the COVID-19 pandemic hit Puerto Rico, requiring the Oversight Board and the Government to urgently focus on public health and fiscal actions to mitigate the pandemic's impact on residents. In response to a request from the Government, the deadline for submission of a revised proposed Fiscal Plan was extended to May 3, 2020. On May 3, 2020, the Government submitted a revised Fiscal Plan along with a letter responding to the Oversight Board's March 13, 2020, Notice of Violation. On May 23, 2020, the Oversight Board announced that a public board meeting would be held (via videoconference) on May 27, 2020, to consider certification of a new Commonwealth Fiscal Plan.

On May 27, 2020, the Oversight Board published a draft Fiscal Plan for the Commonwealth. During the public board meeting, the Oversight Board certified the 2020 Fiscal Plan.

### 10.    Overview of the May 2020 Certified Fiscal Plan

The 2020 Fiscal Plan incorporated a number of modifications to assumptions due to new information or events, such as the projected roll out of federal disaster recovery funding and the impact of structural reforms. With the outbreak of COVID-19 pandemic, the 2020 Fiscal Plan included updates to the macroeconomic forecast to reflect the impact of this global crisis, such as lower U.S. mainland growth and the net effect of projected income loss due to unemployment and federal and local stimulus for COVID-19 relief. Additionally, the 2020 Fiscal Plan incorporated other updates, such as updated expenditure projections, Medicaid enrollment data, and pension actuarial projections.

Similar to past Fiscal Plans, the 2020 Fiscal Plan included major structural reforms to restore competitiveness and enable growth. These included human capital and welfare reforms to advance successful participation in the formal labor market, reforms to streamline the ease of doing business on Puerto Rico and stimulate job creation, proposals to enable reliable power and stable energy infrastructure, and reforms within the education system. In addition, the 2020 Fiscal Plan focused on fiscal reforms aimed at improving the responsiveness and efficiency of the Government, while reducing unnecessary administrative expenses and mitigating the escalating growth of healthcare costs. The Fiscal Plan forecasted $2 billion in surplus from revenue measures and $6 billion from expense measures for FY 2020 through FY 2025. The 2020 Fiscal Plan also projected approximately $22 billion of cumulative deficit from FY 2020 to FY 2049, including $24 billion in surplus from structural reforms, which enhance GNP growth.

The 2020 Fiscal Plan also included an emphasis on improving the Government's capabilities in digital delivery to achieve critical benefits via PRITS, which was created in 2017 but had not made significant progress toward fulfilling the responsibilities it was given. Similar to previous Fiscal Plans, the 2020 Fiscal Plan placed an emphasis on the creation of a robust and centralized Office of the CFO and acceleration of completion of ACFRs for past years.

The 2020 Fiscal Plan continued to reflect the need to reduce Commonwealth appropriation to municipalities and UPR over time. The 2020 Fiscal Plan encouraged consolidation of services across municipalities, and urged CRIM to implement measures to capture unrealized property tax revenues. For UPR, the 2020 Fiscal Plan reflected both the declining enrollment of the university as well as the sizeable opportunity to diversify revenue sources and transform operations through greater utilization of shared services and other administrative streamlining across its 11 campuses.

The Oversight Board was cognizant that, given the current circumstances of the COVID-19 pandemic and the recent earthquakes, the Government needed to invest time and effort in achieving the measures previously required and not yet implemented, while supporting Puerto Rico residents. Therefore, the 2020 Fiscal Plan paused incremental agency efficiency measures until Fiscal Year 2022. This pause reduced savings expectations for most categories of agency rightsizing as well as savings targets for healthcare reform to allow the Government to focus on implementation. It also reduced health reform measure expectations in future years, while

incorporating incremental federal funding in Fiscal Years 2020-2022 due to recent federal legislation. Further, the plan maintained the subsidies to the UPR and the municipalities at the Fiscal Year 2020 levels for Fiscal Year 2021 as previously envisioned to approximately $452 million by Fiscal Year 2025. For UPR, after the pause in 2021, the gradual decrease in its appropriation continued as previously envisioned to approximately $452 million by FY2025.

The 2020 Fiscal Plan also incorporated certain provisions from the Plan of Adjustment dated February 28, 2020. These provisions primarily related to pension reform measures, including a decrease in the proposed pension benefit reduction and the specific treatment of System 2000 members under the proposed Plan of Adjustment. Specifically, the 2020 Fiscal Plan incorporated a decrease of pension benefits reductions from 10% to 8.5% (with protections for participants close to the poverty level), with the goal of having a balanced approach to restoring fiscal health to Puerto Rico.

Finally, to ensure successful completion of needed reforms and to allocate resources to the areas of highest need, the 2020 Fiscal Plan included investments outlined below. The 2020 Fiscal Plan also included detailed timelines and milestones that required urgent action over several years by the Government to make progress. The Oversight Board approved incremental investments in the Medicaid program for Fiscal Years 2020-2022 to expand benefits (e.g., Hepatitis-C drug coverage), enabled by the increased federal funding. Finally, the 2020 Fiscal Plan incorporated preliminary Fiscal Year 2021 budgetary decisions.

## 11.    Investment in COVID-19 response and other core priority investments

Over the course of developing each certified fiscal plan, the Oversight Board has kept in mind the needs of the people of Puerto Rico and made priority investments in areas such as public safety, healthcare, and education. Specifically, the 2020 Fiscal Plan included $5.5 billion in investments over Fiscal Years 2020-2025 to speed up Puerto Rico's recovery in light of the natural disasters and COVID-19 pandemic by allocating funds to strengthen Puerto Rico's public healthcare system, human capital, and telecommunications infrastructure, among others.

Immediate support for COVID-19 pandemic response included payroll incentives for frontline workers (including public and private nurses and technicians, police, medical and public safety supplies and capital expenditures, distance learning in the public education system, and $100 million in support for municipalities facing reductions in revenue due to the pandemic.

Beyond the immediate response to the COVID-19 pandemic, the 2020 Fiscal Plan included $313 million of investment in addressing critical infrastructure gaps in public hospitals, instituting and expanding the use of Electronic Health Record programs, expanding access to care through development of telehealth infrastructure. Additionally, the Oversight Board directed $586 million to improve the availability and quality of care under the Medicaid system, maintain nurse and health professional staffing levels, increase hospital capacity through major capital projects, operationalize the Comprehensive Cancer Center, and enable operational efficiencies.

Furthermore, the 2020 Fiscal Plan added to previous investments to safeguard public safety by enabling $1.3 billion in public safety funding including providing more competitive salaries

219

and benefits to sworn officers, supporting salary increases to firefighters, funding to provide public safety equipment, materials, and vehicles, among others.

In order to drive educational outcomes, the 2020 Fiscal Plan included over $760 million for strengthening English Language Learning training for teachers, bringing psychologists on staff to provide evidence-based therapies for Special Education students, hiring additional public-school nurses, driving digitization to improve management and reporting, and compensating transitory teachers and directors.

Similarly, in order to strengthen the technology sector and address the digital divide in Puerto Rico, the 2020 Fiscal Plan included $400 million to expand access to broadband for the residents of Puerto Rico, thereby improving economic opportunities for those in rural areas. It also included $50 million in funding to invest in workforce development, specifically focused on business- and technology-related disciplines.

Other priority investments included $43 million in Fiscal Year 2021 for the UPR scholarship fund, $179 million over Fiscal Years 2020-2025 to meet the needs of the most financially vulnerable students, and $94 million to transform government services by hiring additional staff in core programs. Finally, the 2020 Fiscal Plan also included liquidity facilities such as $185 million available to municipalities through July 31, 2020 to ensure that monthly property tax remittances can continue to be advanced, and $750 million in working capital to be made available to facilitate FEMA-approved reconstruction efforts.

12.    **The April 2021 Fiscal Plan Certification Process**

Following the certification of the May 2020 Fiscal Plan and the Fiscal Year 2021 Budget, the Oversight Board continued with the regular monitoring and reporting cadence for Government agencies (and agency groupings) and hosted 9 public meetings on a range of topics, from the need for more robust transportation reform, the Government's need to scale its Time and Attendance project to reduce compensation being paid to absentee or non-existent employees, and to the implementation status of structural reforms in Puerto Rico. The Oversight Board announced on January 19, 2021 that it would conduct its annual process to certify a revised Fiscal Plan and sent a letter to the Government laying out a schedule for developing and certifying a revised Fiscal Plan for the Commonwealth, in accordance with PROMESA. Per the letter, the Government was requested to submit a proposed updated Fiscal Plan to the Oversight Board on February 20, 2021.

Per the Government's request, on February 19, 2021, the Oversight Board granted an extension for the Government to submit a proposed Fiscal Plan, and required the Governor to submit a proposed Fiscal Plan by March 8, 2021. The letter stated that the Oversight Board expected to complete certification by April 23, 2020.

On March 8, 2021 the Government submitted a draft Fiscal Plan. On March 15, 2021, the Oversight Board sent a letter to Governor Pierluisi formulating a Notice of Violation pursuant to PROMESA section 201(c)(3)(B) in regards to the Commonwealth's draft submission. The letter indicated the Government's proposed Fiscal Plan was inconsistent with PROMESA for several reasons. These included: policy positions not consistent with PROMESA's mandate (e.g., references to statehood), the inclusion of Medicaid federal funding levels that are not in line with

current enacted legislation, a removal of further reductions to municipalities and UPR appropriations, and a lack of concrete milestones for implementation of fiscal measures and structural reforms. The letter set March 26, 2021 as the deadline for the Government to submit a revised proposed Fiscal Plan.

On March 26, 2021, the Government submitted a revised Fiscal Plan along with a letter responding to the Oversight Board's March 15, 2021 Notice of Violation. On April 21, 2021, the Oversight Board announced that a public board meeting would be held (via videoconference) on April 23, 2021 to consider certification of a new Commonwealth Fiscal Plan.

On April 22, 2021, the Oversight Board published a draft Fiscal Plan for the Commonwealth. During the public board meeting on April 23, 2021, the Oversight Board certified the 2021 Fiscal Plan.

13.     **The April 2021 Fiscal Plan Certification**

The 2021 Fiscal Plan incorporates a number of modifications to assumptions due to new information or events. For example, the macroeconomic projection was updated with the most recent outlook of the U.S. economy published by the Congressional Budget Office. Several other macroeconomic variables have been also updated to reflect the latest data made available by federal agencies and international macroeconomic forecasting institutions like the World Bank and the International Monetary Fund. The projected roll out of federal disaster recovery funding was updated based on actual disbursements to-date, which have been slower than initially forecast. The impact of structural reforms was adjusted in light of missed implementation milestones and/or lack of required actions to effectuate reform.

One year after the outbreak of the COVID-19 pandemic, the 2021 Fiscal Plan includes updates to the macroeconomic forecast to reflect the impact of this global crisis. This includes an updated estimation of the net effect of the pandemic on income and growth based on unemployment actuals and projections, estimations of the positive impact of income replacement programs, and an updated estimation of allocations to Puerto Rico for all other stimulus programs included in all five rounds of federal stimulus (the Preparedness and Response Supplemental Appropriations Act, the Families First Act, the Coronavirus Aid, Relief, and Economic Security (CARES) Act, the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, and the American Rescue Plan (ARP) Act). Additionally, the 2021 Fiscal Plan incorporates a number of other updates, including updated revenue streams and expenditure projections, Medicaid enrollment data, and pension actuarial projections.

The 2021 Fiscal Plan continues to include major structural reforms to restore competitiveness and enable growth in Puerto Rico. These include human capital and welfare reforms to advance successful participation in the formal labor market, reforms to enhance the business environment in Puerto Rico (e.g., streamline paying taxes, property registration, and permitting processes) and stimulate investment attraction and job creation, initiatives to enable reliable power and stable energy infrastructure for businesses and households, and reforms within the education system to improve student outcomes. The 2021 Fiscal Plan also includes an extended version of the infrastructure reform that incorporates a set of initiatives to transform the public

transportation system more broadly by, for example, integrating all transit assets under PRITA, so it can act as a unitary transit authority.

Additionally, the 2021 Fiscal Plan focuses on fiscal reforms aimed at improving the responsiveness and efficiency of the Government, while reducing unnecessary administrative expenses and mitigating the escalating growth of healthcare costs. The 2021 Fiscal Plan forecasts $2.2 billion in surplus from revenue measures and $7.6 billion from expense measures for Fiscal Year 2022 through Fiscal Year 2026. The 2021 Fiscal Plan also projects approximately $5.4 billion of cumulative deficit from Fiscal Year 2022 to Fiscal Year 2051, which includes $30.7 billion in surplus from structural reforms, which enhance GNP growth.

The 2021 Fiscal Plan continues to emphasize (a) the importance of improving the Government's capabilities in digital delivery to achieve critical benefits via PRITS, (b) the creation of a robust and centralized Office of the CFO, and (c) the acceleration of completion of ACFRs for past years.

The 2021 Fiscal Plan continues to reflect the need to reduce Commonwealth appropriation to municipalities over time. The municipalities have made little (if any) progress towards implementing the fiscal discipline required in light of declining population in many areas. It also encourages consolidation of services across municipalities, and urges CRIM to implement measures to capture unrealized property tax revenues by increasing tax compliance and improving overall collection rates.

The 2021 Fiscal Plan also reflects the need to reduce the Commonwealth appropriation to UPR over time. It reflects both the declining enrollment of the university as well as the sizeable opportunity to diversify revenue sources and transform operations through greater utilization of shared services and other administrative streamlining across its 11 campuses. The 2021 Fiscal Plan maintains the UPR appropriation level at approximately $466M in Fiscal Year 2022. Thereafter, a gradual decrease in the UPR appropriation will continue as previously envisioned to approximately $455 million by Fiscal Year 2025. In April 2021, the U.S. Department of Education released additional formal guidance on how to calculate the Maintenance of Effort (MOE) requirements associated with the Elementary and Secondary School Emergency Relief (ESSER) Fund and the Governor's Emergency Education Relief (GEER) Fund, which is also provided under the CARES and CRRSA/ARP Acts. The guidance explains how states and territories should determine what level of state spending on elementary, secondary, and higher education (e.g., for PRDE and UPR) is required in order to comply with the MOE requirements in these relief packages, as well as procedures for seeking waivers. The Oversight Board is analyzing this guidance to determine what, if any, implications the MOE requirements have on the Commonwealth, UPR, and PRDE funding provided in the 2021 Fiscal Plan and future budgets.

The 2021 Fiscal Plan also incorporates revised assumptions for the reduction in pension benefits. Although the benefit reduction remains at 8.5% as in the 2020 Fiscal Plan, the reduction will not apply to those with monthly pension benefits of less than $1,500 per month and will not reduce anyone's monthly benefits below such level. This represents an enhancement to the original threshold of $1,200 agreed under the Plan Support Agreement reached with the Committee of Retirees, which was already a smaller reduction than the original terms proposed by the Oversight Board. The 2021 Fiscal Plan also assumes that the TRS and JRS freeze in benefit accruals will be

effective January 1, 2022, a delay of six months relative to the initiative under the 2020 Fiscal Plan.

The 2021 Fiscal Plan also acknowledges Puerto Rico's intent to join the Medicaid Drug Rebate Program (MDRP) in Fiscal Year 2022. Starting April 1, 2022, the U.S. Secretary of Health and Human Services has ruled that Puerto Rico – like other territories – must either join in the Medicaid Federal Drug Rebate Program (MDRP) or opt out with a waiver. MDRP is a program governed by the Center for Medicare and Medicaid Services that negotiates 'rebates' with over 600 drug manufacturers to reduce the price of prescription drugs to both the federal government and U.S. states. Historically, Puerto Rico has not participated in the MDRP, instead operating its own preferred prescription drug list with territory-specific rebates and purchasing arrangements with manufacturers. After weighing alternatives with third-party advisors (Milliman and Mercer), ASES has decided to join MDRP. This will necessitate updating their drug reimbursement claiming methodology (CMS-64) to be more in line with federal reporting requirements; doing so will require new administrative expense. Puerto Rico can also expect access to higher, federally-negotiated rebate rates. The Oversight Board is working with the Government to estimate the net financial impact and timing of the shift to the MDRP, including by seeking guidance from CMS on what funding, if any, must be returned to the Federal Government.

As Puerto Rico aims to navigate through the COVID-19 pandemic and rebuild both economically and fiscally, the 2021 Fiscal Plan builds on what has been multi-year strategic investment program to improve government services, increase competitiveness, and create the conditions for growth that can benefit all residents. Multiple Fiscal Plans have called for investments in front-line services that residents depend on for health, safety, and economic opportunity. This has included investments to support the Government, as well as individuals and businesses, in combating the COVID-19 pandemic. The 2021 Fiscal Plan preserves investments included in prior Fiscal Plans and supplements them in priority areas such as broadband infrastructure, developing the technology-oriented workforce of Puerto Rico, and ensuring robust civil service reform. The Government must deploy these funds efficiently and effectively to maximize their benefit for the Island's people and economy.

## 14.   Implementation Progress

The Government has struggled to report on reform progress in a timely and comprehensive manner. The Oversight Board will continue collaborating with the AAFAF (as the Project Management Office for the Government's implementation actions) to monitor implementation of reforms. As needed, the Oversight Board will also continue holding public hearings or public meetings to review implementation progress. Should there be underperformance in agency efficiency savings for any grouping, the Oversight Board may rely on its powers and rights pursuant to PROMESA to take measures to enforce reductions in the amount of unrealized savings.

## 15.   Fiscal Year 2018 Budget Certification

Based on the March 2017 Fiscal Plan certification (and subsequent revisions), the Oversight Board initially set April 30, 2017 as the deadline pursuant to PROMESA section 202(a) for the Governor's submission to the Oversight Board for his proposed budget for Fiscal Year

2018 that complies with the March 2017 Fiscal Plan, a detailed implementation plan for the measures contained in the March 2017 Fiscal Plan, and a revised liquidity plan for the Commonwealth, including measures to generate a $200 million cash reserve by June 30, 2017 above the balances reflected in the March 2017 Fiscal Plan. The Oversight Board also provided the forecast of revenues for the Fiscal Year 2018 pursuant to PROMESA section 202(b). The Government made the requested submissions on April 30, 2017.

The process of elaborating the budget for Fiscal Year 2018 was a joint effort between the Government and the Oversight Board.

On June 2, 2017, the Oversight Board approved the submission to the Legislature of the Governor's proposed Fiscal Year 2018 budget pursuant to PROMESA section 202(c)(1)(A)(i), but also noted material concerns regarding budget allotments for certain programs and activities and significant outstanding questions regarding the implementation plans of spending reductions. The Oversight Board also set June 19, 2017 as the deadline for the Legislature to submit its adopted budget for the Oversight Board's review.

On June 27, 2017, the Oversight Board issued a notice of violation of the Legislature's June 26, 2017 budget submission pursuant to PROMESA section 202(d)(1)(B) based on the following analyses: (i) $16 million over-allocation of legislative expenditures; (ii) $78 million over-allocation of non-legislative expenditures; (iii) need for $25 million additional reductions on earmarks and special expenditure appropriations; (iv) need for specific implementations relating to at least $200 million of potential savings on the size of the government; and (v) correction of technical error relating to the Judiciary Branch appropriation. The Oversight Board requested a revised adopted version of the Legislature's budget by June 29, 2017. Upon the failure of the Legislature to adopt a complaint budget by June 29, 2017, the Oversight Board revised the Fiscal Year 2018 budget that would comply with the certified March 2017 Fiscal Plan and submitted it to the Governor and the Legislature under PROMESA section 202(e)(3) on June 30, 2017.

As noted, two months after the certification of compliant Fiscal Year 2018 budget, the Oversight Board authorized the Government to implement good-faith modifications to the certified Fiscal Year 2018 budget up to $1 billion for emergency measures following the devastating impact of Hurricanes Irma and Maria on Puerto Rico.

16.  **Fiscal Year 2019 Budget Certification**

The Oversight Board's review and certification of Fiscal Year 2019 budget under PROMESA section 202 also went through several deadline extensions and modified proposals in accordance with the changes in the fiscal plan certification process. In Fiscal Year 2019, the Oversight Board was guided by several key objectives, consistent with goals of the fiscal plan:

a.  Improving long-term growth through structural reforms;

b.  Improving the business environment for firms and entrepreneurs in Puerto Rico;

c.  Promoting public safety in Puerto Rico;

d.      Improving education outcomes for children in Puerto Rico;

e.      Investing in preventative healthcare and higher quality healthcare;

f.      Enhancing transparency through a focus on fiscal controls and reporting; and

g.      Increasing the resiliency of critical infrastructure through modernization.

On December 12, 2017, the Oversight Board sent a letter to then-Governor Rosselló that outlined six guiding principles and set a submission timeline, starting from December 22, 2017 to June 29, 2018 as the expected date for the Oversight Board to certify the Fiscal Year 2019 budget. The six guiding principles provided that: (i) all budgets be compliant with their applicable fiscal plan and developed in accordance with modified accrual accounting standards; (ii) revenue forecasts to be provided by the Oversight Board to the Governor, Legislature, and Boards of Directors for use in developing relevant budgets; (iii) budgeted expenses be properly justified; (iv) reporting blueprint templates be agreed to by the Governor and the Oversight Board and the Government to report pursuant to these templates; (v) clear responsibility for enforcement of all elements of the budget and reporting deemed to be critical; and (vi) all expenditures, including capital expenditures, of the Commonwealth and instrumentalities to be made only pursuant to a budget certified by the Oversight Board.

On December 21, 2017, based on the extension of the proposed fiscal plan submission deadline, the Oversight Board also revised the Fiscal Year 2019 budget review timeline. Similarly, after then-Governor Rosselló submitted a proposed fiscal plan on February 12, 2018 and the Oversight Board extended the fiscal plan certification deadline from February 23, 2018 to March 30, 2018, the Oversight Board again revised the Fiscal Year 2019 budget review schedule accordingly.

After the April 2018 Fiscal Plan was certified, then-Governor Rosselló presented a draft recommended Fiscal Year 2019 budget on May 4, 2018. On May 10, 2018, the Oversight Board issued a notice of violation under PROMESA section 202(c)(1)(B) regarding the draft Fiscal Year 2019 budget and required revisions by May 15, 2018. On May 14, 2018, then-Governor Rosselló announced that he was in discussion with the Oversight Board regarding fiscal plan and therefore would not submit a revised budget proposal by the May 15 deadline. The Oversight Board also granted an extension for submission and on May 18, 2018, the administration submitted a revised recommended Fiscal Year 2019 budget.

After the May 2018 Fiscal Plan was certified in accordance with the terms of the accommodation, the Oversight Board set out the necessary revisions to budgeted revenue on May 31, 2018, to make it consistent with the new certified fiscal plan. The Governor submitted another draft resolution on the Fiscal Year 2019 budget the next day.

On June 5, 2018, the Oversight Board determined that the Governor's June 1 budget proposal was not compliant with the newly certified fiscal plan and posted its own version of a revised Fiscal Year 2019 budget that was compliant with the May 2018 Fiscal Plan.

After the Governor and the Legislature reviewed the proposed Fiscal Year 2019 budget and held public hearings, the Legislature considered its own version of the budget that was based on higher revenue projections and room for spending than the Oversight Board had projected.

Although the Oversight Board scheduled a June 29, 2018 public meeting to consider the Fiscal Year 2019 budget certification, this meeting was cancelled following the Legislature's failure to repeal Law 80 by the June 27, 2018 deadline per the accommodation.

On June 29, 2018, the Legislature approved an $8.71 billion Fiscal Year 2019 General Fund budget for submission to the Oversight Board. But, on June 30, 2018, the Oversight Board unanimously certified a compliant Fiscal Year 2019 budget for the Commonwealth and instrumentalities. The Oversight Board's version of the budget provided for expenditures of $8.76 billion of General Fund and $20.66 billion for the consolidated funds. This certified budget was deemed to be compliant with the certified fiscal plans and deemed approved by the Governor and Legislature pursuant to PROMESA section 202(e)(3).

### 17.    Fiscal Year 2020 Budget Certification[192]

The Fiscal Year 2020 budget review and certification by the Oversight Board under PROMESA section 202 went through several deadline extensions and modified proposals as a result of the changes in the fiscal plan certification process.

Following consultation with the Governor and the Legislature, the Oversight Board established a reasonable schedule for the development of the Fiscal Year 2020 budgets. On January 18, 2019, the Oversight Board sent a letter to the Government detailing the agreed upon schedule for developing, submitting, and certifying the Fiscal Year 2020 budget for the Commonwealth (which complemented the Fiscal Plan certification schedule).

On January 30, 2019, the Oversight Board sent a letter to then-Governor Rosselló that outlined the requirements for a compliant Fiscal Year budget and, in accordance with PROMESA section 202(b), a forecast of revenues, agency spending targets, and other requirements. The Oversight Board provided expenditure targets for Fiscal Year 2020 by agency. In particular, the Oversight Board provided parameters for agency payroll and operating expenditures as adjusted from the Fiscal Year 2019 budgets. The adjustments and reinvestments were proposed in an effort to facilitate additional savings contemplated by the certified fiscal plan and to reduce areas of spend that required more transparency. The Oversight Board requested that in the budget professional service contracts be identified in one of the following categories: Accounting/Financial, Legal, Information Technology, or Other. The category "Other" is only utilized if the contract is not best categorized in one of the three distinct categories or "Medical" and "Education" categories, which were added during the budget review process for specific agencies. It was also asserted that the "Other" category should not be more than 10% of the professional services budget. The same level of granularity was also applied to other personnel and non-personnel spend categories to enable tracking of savings and overall transparency.

---

[192]   A presentation on the fiscal year 2020 budget is accessible on the Oversight Board's website https://oversightboard.pr.gov/.

On March 23, 2019, the Oversight Board provided an updated schedule for the certification of the Fiscal Year 2020 budget following a request from the Government. The revised schedule required the Commonwealth to submit a proposed Fiscal Year 2020 budget based on the January 28, 2019 targets. On April 8, 2019, the Commonwealth publicly posted its proposed budget submission on the AAFAF website. Also, the budget submission and review schedule was revised on April 21, 2019, in order to provide sufficient time to allow for the iterative process of information exchange and to incorporate the most up-to-date information available.

On May 11, 2019, the Oversight Board provided revised targets for Fiscal Year 2020 in order to incorporate data provided by the agencies, risks identified by agencies, focused investments, and fiscal priorities. The revised targets were compliant with the May 2019 Fiscal Plan. The Government's original Fiscal Year 2020 budget submission was not compliant with the May 2019 Fiscal Plan and required resubmission. The Oversight Board laid out in detail the areas in which the Fiscal Year 2020 proposed budget needed to be revised, as well as provided a revised revenue forecast. The Oversight Board's letter also included agency-specific requirements and budget resolution language revisions.

On May 13, 2019, Governor Rosselló announced the Government's intention to submit the revised proposed budget by the May 17 deadline. On May 17, 2019, the administration requested an extension on the submission deadline until May 22, 2019. On May 20, 2019, the Board granted the extension while reiterating the additional information requirements supporting the budget submission, which included professional service contracts to be identified in specified categories; allocation of capital expenditures utilities, insurance premiums, and PayGo by agency, per the certified fiscal plan; and level of detail required by the Oversight Board in the budget resolution.

Although the Government submitted a revised budget on May 22, 2019, the Government's budget submission remained incomplete and non-compliant; the proposed budget still exceeded the spending targets in the May 2019 Fiscal Plan, while lacking sufficient detail and documentation. On May 28, 2019, the Oversight Board submitted a compliant budget to the Legislature along with a letter to Governor Rosselló, President Rivera Schatz, and Speaker Méndez to notify them of the compliant Fiscal Year 2020 budget. The budget was submitted following a review of the Governor's March 28, 2019 submission of the proposed Commonwealth Budget for Fiscal Year 2020.

On June 3, 2019, the Oversight Board sent a letter to President Rivera Schatz, president of the Senate of Puerto Rico, detailing the ways in which the Oversight Board determined the Governor's latest budget submission was not compliant with PROMESA. Specifically, the Government's proposed Fiscal Year 2020 budget exceeded the budget targets by $573 million.

On June 9, 2019, Governor Rosselló made a budget address arguing the Commonwealth had sufficient resources to finance the proposed non-compliant $9.624 billion budget. The proposed budget for Fiscal Year 2020 was subsequently filed with the Legislature on June 11, 2019. The House Treasury, Budget and PROMESA Committee was slated to open public hearings on the spending package on June 12, 2019.

On June 12, 2019, the Oversight Board sent a letter to Governor Rosselló, President Rivera Schatz, and Speaker Méndez regarding the Compliance Certification dated June 3, 2019 that was

227

submitted in relation to Act 29. The certification was deemed deficient in two aspects: (1) it was lacking the formal estimate required by PROMESA section 204(a)(2)(A), in order to lay out the "impact, if any, that the law will have on expenditures and revenues"; and (2) it did not provide an analysis of the impact that Act 29 will have on the May 2019 Fiscal Plan. Relying on PROMESA section 204(a)(4)(A), the Oversight Board directed the Commonwealth to provide (1) the missing estimate within seven business days and (2) an amended compliance certification reflecting such estimates.

A second letter was sent on June 12, 2019 extending the deadline for the Legislature to submit a compliant budget. The Oversight Board reiterated their concerns that a compliant budget had been submitted by the Oversight Board to the Government on May 28, 2019, but the Government had not submitted it to the Legislature.

The Legislature failed to submit a Fiscal Year 2020 budget to the Oversight Board to review for compliance with the May 2019 Fiscal Plan. As such, on June 30, 2019, the Oversight Board certified its own Fiscal Year 2020 budget for the Commonwealth.

The Fiscal Year 2020 Central Government budget was $20.21 billion, of which $9.05 billion was General Fund spending.

The certified Fiscal Year 2020 budget also accounted for previously unbudgeted appropriations to enhance transparency and visibility with overall spending. The bulk of additional cost relative to Fiscal Year 2019 came from local Medicaid spending because of the expiration of 100% federal fund matching for that cost. Total local Medicaid spending in Fiscal Year 2020 increased to $917 million from $15 million in Fiscal Year 2019.

The certified Fiscal Year 2020 budget also provided an improved level of transparency to the general public on how the government spends its resources. The budget resolutions were combined into one document, included specific concepts of spending for each agency, minimized funds in pooled custody accounts, and limited unidentified allocations and identified professional services spending. The budget also attempted to cover all Commonwealth spending.

The budget also included significant budget compliance mechanisms to control spending.

Subsequent Events

On March 3, 2020, the Oversight Board announced that it would be making an initial $5 million available from the Emergency Reserve fund for prevention and cure of COVID-19. On March 18, 2020, the Oversight board approved a temporary exemption from Sales and Use Tax on Prepared Foods and on March 21, 2020, the Oversight Board presented a motion in court to adjourn consideration of the proposed Plan of Adjustment's disclosure statement hearing until further notice.

On March 25, 2020, the Oversight Board approved urgent budgetary support for Puerto Rico for an Emergency Measures Support Package amounting to $787 million and on March 26, 2020, the Government submitted a proposed compliant budget for the Emergency Measures Support Package. The $787 million package was funded by a $500 million budget amendment

certified on April 2, 2020, a $157 million reapportionment within the Fiscal Year 2020 budget, and $131 million from federal funds. The majority of the $500 million budget amendment was appropriated in the form of direct payments to self-employed individuals ($100 million) and small businesses ($60 million), bonuses to medical personnel ($126 million), bonuses to certain Department of Public Safety employees ($68 million), hospital investments for materials and supplies ($30 million), and support for municipalities ($100 million).

In Fiscal Year 2020, the United States Department of Education imposed specific conditions over the Puerto Rico Department of Education in order to ensure appropriate fiscal management of grant funds, compliance with federal grant requirements, and fiscal accountability. The federal government has "frozen" more than $1.5 billion in federal education funds assigned to Puerto Rico until the Puerto Rico Department of Education hires a third-party administrator to manage the funding awarded to the agency and other conditions are met.

18.     **Fiscal Year 2021 Budget Certification[193]**

The Fiscal Year 2021 budget review and certification by the Oversight Board under PROMESA section 202 went through several deadline extensions driven by the uncertainties impacting the Commonwealth as a result of the 2020 earthquakes and the COVID-19 pandemic.

Following consultation with the Governor and the Legislature, the Oversight Board established a reasonable schedule for the development of the Fiscal Year 2021 budgets. On November 6, 2019, the Oversight Board sent a letter to Governor Vázquez detailing the agreed upon schedule for developing, submitting, and certifying the Fiscal Year 2021 budget for the Commonwealth (which complemented the Fiscal Plan certification schedule). The Fiscal Year 2021 budget process began two months earlier than the Fiscal Year 2020 process to provide the Government more time to analyze the agency needs and gather detailed supporting information.

The letter to Governor Vázquez outlined the requirements for a compliant Fiscal Year budget and, in accordance with PROMESA section 202(b), included a forecast of revenues, agency spending targets, and other requirements. The Oversight Board provided specific targets for agency level expenditures after applying fiscal measures based on the 2019 Fiscal Plan. The Oversight Board also provided an information request list to support the Government's budget submission. The Fiscal Year 2021 request list expanded on the information requested in the prior year to include additional details around consent decrees, professional services, and purchases with abnormal procurement cycles.

On February 14, February 28, and May 8, 2020, the Governor submitted proposed budgets for the Commonwealth for Fiscal Year 2021. The Oversight Board and its advisors held extensive discussions with the Governor's representatives about the proposed budget. Over a period of several months, the Board and its advisors held meetings with over 30 agencies to review proposed amounts and supporting details.

---

[193] A presentation on the fiscal year 2021 budget is accessible on the Oversight Board's website, https://oversightboard.pr.gov/.

After substantial analyses and deliberations, on June 1, 2020, the Oversight Board issued a budget Notice of Violation. The Notice of Violation included revised agency targets for Fiscal Year 2021 in order to incorporate the impact of COVID-19, data provided by the agencies, risks proposed by agencies, focused investments, and fiscal priorities. Consistent with the 2020 Fiscal Plan, the revised targets reflected a one-year pause in most measures to allow the Government to focus on implementation of efficiency reforms. The Oversight Board laid out in detail the areas in which the Government's Fiscal Year 2021 budget needed to be revised, as well as provided a revised revenue forecast. The most significant items of non-compliance which were in violation of the Oversight Board's 2020 Fiscal Plan and budget milestones guidelines included $169 million in excess of the budget, little explanation as to the "other professional services" classification, no agency consolidation, and incomplete and inconsistent data.

On June 7, 2020, the Governor submitted a revised budget for the Commonwealth for Fiscal Year 2021 that was $169 million greater than the 2020 Fiscal Plan. Following review of the Governor's June 7 submission, the Oversight Board determined that the budget remained incomplete and non-compliant. On June 10, 2020, the Oversight Board submitted a compliant budget to the Legislature along with a letter to the Governor Vázquez, President Rivera Schatz, and Speaker Méndez to notify them of the compliant Fiscal Year 2021 budget.

On June 24, 2020, at the Legislature's request, the Oversight Board agreed on a revised schedule that allowed the Legislature until June 25, 2020 to present a compliant budget to the Oversight Board. The Legislature did not submit a Fiscal Year 2021 budget to the Oversight Board for review for compliance with the 2020 Fiscal Plan. As such, on June 30, 2020, the Oversight Board certified its own Fiscal Year 2021 budget for the Commonwealth.

The Fiscal Year 2021 Central Government budget was $22.23 billion, of which $10.05 billion is General Fund spending $8.9 billion is Federal Fund spending and $3.3 billion is Special Revenue Fund spending.





The certified Fiscal Year 2021 budget provides an unprecedented level of transparency to the general public on how the government spends its resources. In addition to the increased levels of transparency from the certified Fiscal Year 2020 budget, the certified Fiscal Year 2021 budget resolutions include program level budgeting, increased payroll detail to enhance visibility into Trust employee salaries, increased professional services detail to show more visibility into "other" categories, consolidation of several agency groupings, distributions to the Casinos, UPR, and the Tourism Company included in the Gaming Commission slot machine revenues, and adequate and segregated funding to meet consent decree federal requirements.

Critical investments included in the certified Fiscal Year 2021 budget comprised of economic development to enhance broadband infrastructure, healthcare investments in facilities and technology, public safety investments in personnel and equipment, education investments to improve student outcomes, and infrastructure investments to improve rural areas and road maintenance.

The budget also includes significant budget compliance mechanisms to control spending. These budget controls go beyond those incorporated in prior year budgets.

19.     **Fiscal Year 2022 Budget Certification[194]**

On November 17, 2020, the Oversight Board sent a letter to the Governor detailing the schedule for developing, submitting, and certifying the Fiscal Year 2022 budget for the Commonwealth, which complemented the Fiscal Plan certification schedule.

The letter to the Governor outlined the requirements for a compliant Fiscal Year budget and, in accordance with PROMESA section 202(b), included a forecast of revenues, agency spending targets, and other requirements. The Oversight Board provided specific targets for agency level expenditures after applying fiscal measures based on the 2020 Fiscal Plan. The Oversight Board also provided an information request list to support the Government's budget submission.

On February 2 and May 4, 2021, the Governor submitted proposed budgets for the Commonwealth for Fiscal Year 2022. The Oversight Board and its advisors held extensive discussions with the Governor's representatives about the proposed budget. Over a period of several months, the Oversight Board and its advisors held meetings with multiple representatives from large agency categories such as education, public safety, health, economic development which represents over half of the total General Fund budget, to review proposed amounts and supporting details.

The February 2 Governor's budget included $704 million in excess of the budget targets submitted by the Oversight Board. The most significant items of non-compliance which were in violation of the Oversight Board's Fiscal Plan included a higher UPR appropriation, higher Municipality appropriation, additional capital projects, and various staffing and salary increases. This initial budget request also did not adequately consider federal relief acts.

---

[194]   A presentation on the fiscal year 2022 budget is accessible on the Oversight Board's website, https://oversightboard.pr.gov/.

On April 27, 2021, after substantial analyses and deliberations, the Oversight Board issued a budget Notice of Violation based on the 2021 Certified Fiscal Plan. The Notice of Violation included revised agency targets for Fiscal Year 2022 which incorporated COVID-19 impacts, data provided by the agencies focused investments, and fiscal priorities. The Oversight Board also laid out in detail the areas in which the Government's Fiscal Year 2022 budget needed to be revised, as well as provided a revised revenue forecast.

On May 4, 2021, the Governor submitted a revised budget for the Commonwealth for Fiscal Year 2022. The Government's revised budget requested a total of $79.5 million in increased appropriations and proposed to fund most of these with the Oversight Board's approved one-time funding for the 2020 Caribbean Games, while Puerto Rico had withdrawn its bid for the Games. Following review of the Governor's May 4 submission, the Oversight Board determined that the budget remained non-compliant, but adopted several of the Governor's requested initiatives such as social justice programs, funding for a Grant's Management office, and funding for climate change initiatives.

On May 10 2021, after substantial deliberations, the Oversight Board determined that the proposed budget for the Commonwealth was not a compliant budget as required by PROMESA Section 202(c)(2) and developed a revised compliant budget, which the Oversight Board submitted to the Governor and the Legislature.

On June 18, 2021, at the Legislature's request, the Oversight Board agreed on a revised schedule that allowed the Legislature until June 22, 2021 to present a compliant budget to the Oversight Board.

On June 22, 2021, the Legislature submitted a proposed budget for the Commonwealth for fiscal year 2022 for the Oversight Board's review.

Following multiple reviews, on June 25, 2021, the Oversight Board sent a Notice of Violation to the Legislature regarding the Legislature's proposed budget. Although the aggregate total General Fund spend in the Legislature's proposed budget remained unchanged from that of the Oversight Board's, there were, among other things, (i) reallocations amongst sources and uses of funding, (ii) changes to resolution appropriations between cost concepts and agencies, and (iii) amendments and additions to control language, that together were not compliant with the 2021 Fiscal Plan.

To collaboratively certify a budget, the Oversight Board provided detailed commentary on each of Legislature's proposals that were not compliant with the 2021 Fiscal Plan. This led to the Legislature submitting an amended proposed budget approved by the Legislature and signed by the Governor on June 30, 2020. Following review of this submission, the Oversight Board determined the budget was compliant for fiscal year 2022 pursuant to Section 202(e)(1) of PROMESA.

As shown in the following chart, the Fiscal Year 2022 Central Government budget totals $21,412 million, excluding instrumentalities, of which $10,112 million is General Fund spending.



**Total public sector spending**
**$26.9 billion**

| $ in millions | |
|---|---|
| General Fund ("GF")[2] | $8,053 |
| Federal Funds ("FF") | 7,784 |
| Special Revenue Funds ("SRF") | 2,994 |
| **Central Government** | **$18,831** |
| PayGo | 2,581 |
| **Central Government** | **$21,412** |
| | |
| Puerto Rico Electric Power Authority ("PREPA") | $3,128 |
| Puerto Rico Aqueduct and Sewer Authority ("PRASA") | 1,030 |
| UPR (excludes GF appropriations) | 922 |
| Puerto Rico Highway and Transportation Authority ("HTA") (excludes GF appropriations) | 628 |
| Puerto Rico Industrial Development Company | 62 |
| Municipal Revenue Collections Center ("CRIM") | 31 |
| Public Corp for the Supervision and Deposit Insurance of Puerto Rico ("COSSEC") | 12 |
| Puerto Rico Sales Tax Financing Corp. ("COFINA") | 1 |
| **Instrumentalities** | **$5,454** |
| | |
| **Total public sector spending** | **$26,866** |

Note: Due to rounding, numbers presented may not add up precisely to the totals provided
Source: FY22 certified budget and 2021 CW Fiscal Plan
1. Excludes individual municipality budgets
2. Includes General Fund PayGo for Employee Retirement System ("ERS"), Teacher Retirement System ("TRS"), and Judicial Retirement System ("JRS") systems. See appendix for a more detailed breakdown of PayGo

Critical investments in the certified Fiscal Year 2022 budget include funding for essential services such as Education, Health, Public Safety, Corrections, Economic Development, and Social Welfare. Additionally, the budget increases funding to social service priority areas such as community health and drug rehabilitation centers, families and children social services, public housing assistance, infrastructure, and supports alternative education programs for high risk students. The additional funding in the budget will be used to fight gender violence and child poverty, hire additional social workers, and support students with the continued and increased funding of an independently managed UPR scholarship endowment fund. Adequate funding to meet the Governor's and individual agency requests for key initiatives such as civil service reform, parametric insurance, and road repair has been included and funding has been established for budget incentives tied to the achievement of certain critical milestones. Necessary funding is provided to meet the requirements of consent decrees for Police, Corrections, Mental Health, Education, and the Clean Water Act. The budget focuses on operational improvements through agency consolidation, the creation of the Office of the Chief Financial Officer (OCFO), Medicaid reform, enhancing tax compliance, optimizing taxes and fees, and reforming the Island's pension systems.

The certified Fiscal Year 2022 budget also introduces additional budget compliance mechanisms to further improve fiscal responsibility. The budget introduces additional exceptions on roll-forward appropriations and improves fiscal controls over the emergency reserve, matching funds, and reapportionments. Further additions included conditions on the appropriations for PREPA employees transferred into vacant positions in Commonwealth agencies and detailing controls on the new UPR Endowment Fund to assist students with financial needs.

E.  **Negotiations with Creditors**

1.  **Negotiations with Creditors Prior to the Enactment of PROMESA**

During Fiscal Year 2016, the Commonwealth presented various proposals to bondholders and bond insurers seeking to reach an agreement for a voluntary restructuring of the debt of the Commonwealth and that of its public corporations.

On February 1, 2016, the Commonwealth published a proposal that sought to exchange $49.2 billion of tax-supported debt into $26.5 billion of mandatorily payable bonds and $22.7 billion in variable payment bonds (payable only in the event the Commonwealth outperformed certain revenue projections). The proposal contemplated no interest payments until Fiscal Year 2018, no principal payments until Fiscal Year 2021, maximum annual debt service of $1.7 billion starting Fiscal Year 2021 and a final maturity in Fiscal Year 2051. Several bondholder groups, particularly monoline bond insurers, issued statements after the Commonwealth published its proposal that were critical of such proposal.

On June 21, 2016, the Commonwealth published a second proposal that provided an incremental $52.7 billion of mandatorily payable debt service to creditors as compared to the Commonwealth's February 1, 2016 offer. The proposal continued to contemplate cash flow relief during the first four years but increased cash interest payments during such period and added a non-cash interest portion (payable-in-kind). Maximum annual debt service was set at $2.05 billion starting Fiscal Year 2031, with a final maturity in Fiscal Year 2071. Certain holders of GO Bonds responded with a counterproposal that would have exchanged existing GO Bonds (approximately $18 billion face amount) for new GO Bonds at 89% of the existing face amount and new contingent bonds for the remaining 11% of the original principal amount, provided liquidity relief over the first five years, required new collateral guarantees, and validation through Title III or Title VI of PROMESA if such legislation was enacted by Congress. And an ad hoc group of COFINA senior bondholders also developed a counterproposal that included principal haircuts, liquidity relief, and required implementation through PROMESA with validation under Title III or VI.

The Commonwealth's proposals sought to ensure that debt service would never exceed 15% of projected consolidated revenues (as defined in the public presentation explaining the proposal) for the Commonwealth and its tax supported instrumentalities. Both proposals were also predicated upon a number of key assumptions (many of which are not under the control of the Commonwealth), including: (i) a 100% participation rate, (ii) Congress continuing the current level of health care funding provided to Puerto Rico under the Affordable Care Act, (iii) the Commonwealth extending the Act 154 excise tax and the IRS continuing to allow such tax to be creditable against U.S. federal income taxes (along with no further erosion of the Act 154 tax base), (iv) the implementation of all the measures contemplated by the Fiscal and Economic Growth Plan dated September 9, 2015, and (v) the Commonwealth achieving a 2% nominal growth rate.

2.  **Negotiations with Creditors Prior to Title III Filings**

The Commonwealth also made extensive efforts to reach a consensual restructuring with creditors prior to its Title III filing. From December 2016 through March 2017, the Oversight

Board and the Commonwealth held more than thirty meetings with creditor representatives to seek a consensual restructuring of the Commonwealth's debt. In addition, prior to the termination of the PROMESA Title IV stay, the Oversight Board and the Commonwealth convened mediation on April 13, 2017, to find common ground and a consensual resolution. Before the filing of the Title III Cases, AAFAF made a proposal under Title VI of PROMESA that would have restructured GO Bonds, COFINA bonds, and bonds of certain instrumentalities that historically received certain conditionally appropriated monies from the Commonwealth, and a group of GO bondholders made a counterproposal. Those efforts were ultimately unsuccessful.

*[Remainder of Page Left Intentionally Blank]*

# V.    Overview of the Debtors' Title III Cases

## A.    Commencement of the Debtors' Title III Cases

### 1.    Filing of the Title III Petitions

After negotiations with its creditor constituencies, the Commonwealth determined it was unable to negotiate—and saw no prospect of negotiating—an out-of-court resolution that would address its financial situation and lay a foundation for economic recovery and prosperity going forward without a renegotiation of outstanding debts. Pursuant to PROMESA section 405, the establishment of the Oversight Board operated as a temporary stay of all actions, claims, and proceedings in any court or tribunal with respect to any liability, as defined in PROMESA section 405(a), of the Commonwealth and its territorial instrumentalities.   As soon as the PROMESA section 405 stay expired, numerous pending lawsuits against the Commonwealth and its territorial instrumentalities would be allowed to continue, and dozens of creditors threatened to file or pursue lawsuits against the Commonwealth and its territorial instrumentalities.   Accordingly, on May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing the Commonwealth Title III Case.   On May 21, 2017, the Oversight Board issued restructuring certifications for ERS and HTA pursuant to PROMESA sections 104(j) and 206 and filed voluntary petitions for relief for ERS and HTA pursuant to PROMESA section 304(a) in the Title III Court.   On September 26, 2019, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PBA pursuant to PROMESA section 304(a), commencing the PBA Title III case.   On June 29, 2017, the Title III Court entered an order granting the joint administration of the Title III cases of the Commonwealth, HTA, and ERS, for procedural purposes only [ECF No. 537].   On October 9, 2019, the Title III Court entered an order granting the joint administration of the initial Title III cases and the new PBA Title III case for procedural purposes only [ECF 8829].

**Appointment of Statutory Committees.**   On June 15, 2017, the UCC and the Retiree Committee were appointed [ECF Nos. 338, 340].   The current members of the UCC are (i) The American Federation of Teachers ("AFT"), (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) Service Employees International Union ("SEIU"), (v) Unitech Engineering, (vi) Baxter Sales and Distribution Puerto Rico Corp., and (vii) Tradewinds Energy Barceloneta, LLC [ECF No. 3947].   The current members of the Retiree Committee are (i) Blanca E. Paniagua, (ii) Carmen Haydee Núñez, (iii) Juan Ortiz Curet, (iv) Lydia R. Pellot, (v) Marcos A. López Reyes, (vi) Miguel J. Fabre Ramírez, (vii) Milagros Acevedo Santiago, and (viii) Rosario Pacheco Fontán [ECF No. 340].

**Mediation Team.**   On June 23, 2017, the Title III Court entered the *Order Appointing Mediation Team* [ECF No. 430] "to further the goal of the successful, consensual resolution of the issues raised in these debt adjustment proceedings."   The members of the Mediation Team currently include: (1) Judge Barbara Houser (Bankr. N.D. Tex.); (2) Judge Thomas Ambro (3d. Cir.); (3) Judge Nancy Atlas (S.D. Tex.); and (4) Judge Roberta Colton (Bankr. M.D. Fla.).   The Oversight Board and Debtors owe their utmost gratitude to the mediators who are each sitting

federal judges and who, without compensation, have tirelessly and indefatigably worked successfully to promote increasing consensus and progress towards a revitalized Puerto Rico.

**B.  Hurricanes Irma, Maria, and Dorian, the January 2020 Earthquakes, COVID-19, Tropical Cyclone 9, Tropical Storm Laura, and Hurricane Isaias, and the Oversight Board's Response**

***Hurricanes Irma and Maria.***  Shortly after the commencement of the Title III Cases, in September 2017, Hurricanes Irma and Maria struck Puerto Rico.  The hurricanes caused widespread damage throughout Puerto Rico and exacerbated the economic challenges described above.  Hurricane Maria made landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period.  Hurricane Maria crossed Puerto Rico diagonally, entering through the southeast and exiting through the northwest region of Puerto Rico.  The hurricane caused catastrophic destruction in Puerto Rico, leaving Puerto Rico completely without power and flooding many streets and roads.  Only two weeks prior to Hurricane Maria, Hurricane Irma—one of the strongest hurricanes ever recorded in the Atlantic—passed by Puerto Rico's northern coast.  As a result of the massive impact of the hurricanes, the Government and the Oversight Board undertook a series of actions to address the crisis.

On September 21, 2017, the Oversight Board authorized the Government to "reallocate" up to $1 billion of its budget for emergency funding to recover from the hurricane's effects and to ensure it had resources to begin immediate emergency response and recovery efforts in anticipation of federal funds.  This would enable the Government to act quickly to reapportion (reprogram) funds as needed, without seeking the Oversight Board's approval prior to movement of funds.

In a letter to Congressional Leadership dated October 3, 2017, the Oversight Board sought federal support in the following areas: maximum amount of federal assistance, access to an emergency liquidity program, parity treatment for Medicaid funding, and waivers of caps and local share requirements for federal assistance.[195]

In an October 6, 2017 letter to President Trump, the Oversight Board reiterated the request to support Governor Rosselló's request and those requests outlined in the October 3, 2017 letter to the Congressional leadership.[196]

In an October 10, 2017 letter to Secretary Mnuchin, the Oversight Board urged the Department of the Treasury to consider a proposal that the Oversight Board developed with the Government to address the pressing liquidity needs of the Commonwealth and its instrumentalities.[197]

---

[195]Letter from José B. Carrión to United States Congressional Leaders, October 3, 2017, https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view.

[196] Letter from José B. Carrión to United States President Trump, October 6, 2017, https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view.

[197] Letter from Jose B. Carrión to Treasury Secretary Mnuchin, October 10, 2017, https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0IkLR1tCih6/view; press release "The Governor and

The Oversight Board collaborated with the Government to provide short term and medium term worst case liquidity estimates, considering revenue shortfalls that the Commonwealth could experience, and to address funds needed to advance rebuilding efforts. The Oversight Board held several meetings with the U.S. Treasury to discuss Puerto Rico's access to Community Disaster Loans.

The Oversight Board certified the recovery plan directed by Congress in the Bipartisan Budget Act on August 28, 2018. However, it provided two caveats to its certification. First, the Oversight Board expressed concern regarding the lack of detail and high amount of estimated Federal funding sources compared to values in the then-certified fiscal plan for Puerto Rico projects. Second, the Oversight Board indicated that the recovery plan did not address oversight of federal funds and the recovery process. Moreover, the Oversight Board did not receive the recovery plan for consideration until after the Government had provided it to Congress.

On October 4, 2017, to better focus on restoring services to residents, which were diminished due to the destruction across Puerto Rico, the Oversight Board withdrew the litigation it had initiated to enforce the Government's compliance with certain measures in the certified fiscal plan and postponed the implementation of any furloughs measures for at least a year.

During this period, members and executive staff of the Oversight Board were active in Washington D.C. advocating for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity to maintain services. The Oversight Board joined the Governor in requesting cost-sharing waivers, lifting funding caps, increased financial assistance, and expedited responses to the Governor's requests. The Oversight Board participated in numerous meetings, with members of Congress, Congressional staff, federal agencies (including The Office of Management and Budget, U.S. Treasury), and dozens of informational meetings with reporters, think-tanks, and universities.

Oversight Board officials appeared before several Congressional committees to testify. On November 7, 2017, Ms. Natalie A. Jaresko (Executive Director of the Oversight Board) and Mr. Noel Zamot (Executive Staff of the Oversight Board) testified before the U.S. House of Representatives' Committee on Natural Resources "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board." On November 14, 2017, Ms. Natalie A. Jaresko testified before the U.S. Senate's Committee on Energy and Natural Resources "Hurricane Recovery Efforts in Puerto Rico and the U.S. Virgin Islands."

***Tropical Storm Dorian.*** On August 27, 2019, President Trump issued an emergency declaration to address Tropical Storm Dorian. The declaration authorized FEMA Category B under the Public Assistance program, limited to direct federal assistance for the needed support in coordinating disaster relief efforts. On August 28, 2019, the Oversight Board authorized the use of $260 million in aggregate emergency reserve funds from Fiscal Year 2019 and Fiscal Year 2020 to address Tropical Storm Dorian.

---

the Financial Oversight and Management Board Each Ask the Trump Administration to Address Liquidity Issues Following Hurricane Maria," October 10, 2017, https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

*January 2020 Earthquakes.*  Beginning on December 28, 2019, a series of earthquakes and aftershocks struck Puerto Rico.  Since then, Puerto Rico has experienced approximately 300 earthquakes with a magnitude greater than three.  The earthquakes caused significant damage to homes and buildings on Puerto Rico's southern coast as well as significant damage to PREPA's Costa Sur power plant, which would typically provide approximately 21% of Puerto Rico's power. In response to a magnitude six earthquake that struck Puerto Rico on January 7, 2020, the President approved an emergency declaration for all 78 municipalities for Category B, limited to direct federal assistance to supplement the Commonwealth and local government response efforts, following a request from Governor Vazquez.  The Oversight Board authorized the use of the balance of $160 million in Emergency Reserve funds to respond to the earthquakes.  This Emergency Reserve fund was in the certified fiscal plan and is funded with $130 million annually, and between FY 2019 and FY 2020, the Oversight Board set aside $260 million in reserves; $100 million was used to respond to Tropical Storm Dorian and to the recent earthquakes.  These emergency reserve funds were included and certified by the Oversight Board in the FY 2019 and FY 2020 budgets to ensure preparedness of the Commonwealth to fund emergency needs in the event of another natural disaster.  On January 16, 2020, President Trump signed a major disaster declaration authorizing Individual Assistance, Public Assistance, and Hazard Mitigation programs, enabling a range of federal assistance under the Stafford Act.  The declaration supplements Commonwealth and local government recovery efforts in the aftermath of the continued earthquakes.  The declaration (and later amendments to the same) designated 34 municipalities for Individual Assistance and 14 municipalities for Category A through G under Public Assistance at a reimbursement rate of 75% federal and 25% local share and all areas eligible for assistance under the Hazard Mitigation Grant Program.  The municipalities designated for Public Assistance include: Adjuntas, Guanica, Guayanilla, Jayuya, Juana Diaz, Lajas, Las Marias, Mayaguez, Penuelas, Ponce, Sabana Grande, San Germán, Utuado and Yauco.

*COVID-19.*  On March 13, 2020, then President Trump issued an emergency declaration to address the global pandemic, which began in the United States on January 20, 2020.  On March 27, 2020, President Trump approved the Puerto Rico major disaster declaration for COVID-19, which authorized Individual Assistance (limited to the Crisis Counselling Program) and Public Assistance (emergency protective measures Category B) to Puerto Rico.  The incident period for the response to COVID-19 is continuing, based on the extensions of the Public Health Emergency.

*Tropical Cyclone 9.*  On July 29, 2020, President Trump issued an emergency declaration to address the potential Tropical Cyclone 9.  The declaration authorized emergency protection measures (Category B) under the Public Assistance program and is limited to direct federal assistance and reimbursement for mass care, including evacuation and shelter support, at 75% federal funding.

*Tropical Storm Laura.*  On August 22, 2019, President Trump approved an emergency declaration in response to Tropical Storm Laura. The declaration authorized emergency protection measures (Category B) under the Public Assistance program and is limited to direct federal assistance under the Public Assistance program and reimbursement for mass care, including evacuation and shelter support, at 75% federal funding.

*Hurricane Isaias.*  On September 9, 2020, President Trump approved a major disaster declaration in response to Hurricane Isaias.  Four Puerto Rican municipalities were designated for Individual Assistance.

*Severe Storm and Flooding.*  On November 5, 2020, President Trump approved a major disaster declaration in response to a severe storm and flooding.  One municipality was designated for Individual Assistance.

1. **Federal Disaster Assistance Funding**

   a) **Extent of Damage**

There are multiple views on how to measure the impact and extent of damage caused by Hurricanes Irma and Maria, the earthquakes in January of 2020, and subsequent events—ranging from assessing only the damage to productive capital assets, to the cost of all rebuilding needed for the Commonwealth.  The following sources provide various methods of measuring Hurricanes Irma's and Maria's impact and extent of damage:

- Puerto Rico's Build Back Better ("BBB") plan, published in November 2017 estimates rebuilding cost at $94.4 billion—this includes costs related to healthcare, resiliency spend, among others.[198]

- Puerto Rico's "Transformation and Innovation in the Wake of the Devastation," certified by the Oversight Board in August 2018, outlines the Government of Puerto Rico's perspective on the full set of capital investments needed for Puerto Rico to recover from Hurricanes Irma and Maria.  Fully funding these roughly 270 actions would require approximately $139 billion over calendar years 2018 - 2028.[199]

- The NOAA estimate of damage in Puerto Rico and the U.S. Virgin Islands due to Hurricane Maria is $90 billion, with a 90% confidence range of +/- $25.0 billion, or $65.0 to $115.0 billion.[200]

- In December 2018, the Puerto Rico Planning Board issued a report citing that the storm's impact on the economy was $43.135 billion,[201] with this figure including included both physical damage and business interruption (e.g., losses due to systems going down, etc.).

---

[198]  Governor of Puerto Rico, *Build Back Better Puerto Rico* (Nov. 2017), *available at* http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[199]  Central Office for Recovery, Reconstruction and Resiliency, *Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico* (Aug. 8, 2017), *available at* https://recovery.pr/tpbackend_prod/api/document/download/566.

[200]  Richard J. Pasch, Andrew B. Penny, & Robbie Berg, *National Hurricane Center Tropical Cyclone Report: Hurricane Maria* (National Hurricane Center) (Feb. 14, 2019), *available at* https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf.

[201]  *See* Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, Dec. 4, 2018.

As of June 22, 2021, projects under the Public Assistance program are still being formulated from damages caused by the earthquakes and storms, with 8,376 obligated projects with funds totaling $23,883,703,895. As projects continue through the disbursement process, the certified fiscal plan will be updated to reflect any changes in total funding.

b)     **Federal Aid Provided and To Be Expected**

The 2021 Fiscal Plan projects that approximately $84 billion of disaster relief funding in total from federal and private sources will be disbursed in the reconstruction effort. Such amount will be used for a mix of funding for individuals (*e.g.*, reconstruction of houses, personal expenditures related to the hurricanes, such as clothing and supplies), funding for the public (*e.g.*, reconstruction of major infrastructure, roads, and schools), and to cover part of the Commonwealth's share of the cost of disaster relief funding (recipients often must match some portion of federal public assistance spend).[202]

Of the total $84 billion, $48 billion is estimated to come from FEMA's Disaster Relief Fund ("DRF") for public assistance, hazard mitigation, mission assignments, and individual assistance. An estimated $7.4 billion will come from private and business insurance payouts, and $7.7 billion is related to other federal funding. The 2021 Fiscal Plan includes approximately $20 billion from the CDBG- DR / CDBG-MIT.

The major sources of disaster relief funding are detailed below:

- **FEMA Disaster Relief Fund (DRF):** FEMA provides individual assistance to individuals and families who have sustained damage from a declared event and in a declared area. FEMA also provides public assistance for both emergency work (debris removal and emergency protective measures) and permanent work (assistance to repair or replace infrastructure). The Public Assistance program also encourages protection of these damaged facilities from future events through mitigation measures for the damaged elements of infrastructure. Mitigation opportunities are also available through FEMA's Hazard Mitigation Grant Program, which provides broader opportunities to fund projects that reduce or eliminate long-term risks.

  - **Section 428 – The Alternative Procedures Pilot Program**. The Alternative Procedures Pilot Program (the "428 Program"), authorizes a set of alternative procedures for FEMA's Public Assistance program. The 428 Program makes possible the consolidation of multiple projects into a single fixed-cost sub-grant, which allows greater flexibility rebuilding or restoring disaster damages. The 428 Program goals include: (1) to reduce costs to the federal government stemming from public assistance, (2) to increase flexibility administering that assistance, (3) to expedite aid to the state, tribal or local government or owner of a non-profit, and (4) to provide financial incentives and disincentives for timely and cost-effective Public Assistance projects.

---

[202] Puerto Rico's cost-match responsibility was estimated using FEMA-provided data, adjusted by category as necessary for waivers and exceptions

On September 18, 2020, Commonwealth and U.S. government officials announced a $12.8 billion in approved funding relating to Hurricane Maria relief under the 428 Program. The agreement consisted of $10.5 billion for PREPA and nearly $2.3 billion for PRDE. Approximately $11.5 billion is the federal cost share with the balance being covered by local cost-share matching funds.

Federal funding of the $10.5 billion will allow PREPA to repair and/or replace transmission and distribution lines, electrical substations, power generation systems, office buildings, along with general improvements to the power grid. The $2.3 billion funds allocated for the repair or replacement of damaged Department of Education infrastructure.

In January 2021, an agreement was reached on the estimated cost of $3.6 billion for PRASA to repair damages to water systems.

In June 2021, FEMA approved $16.6 million in several Water Distribution and Control Facilities projects for PRASA. The projects included repairs to several water distribution and control facilities, demolishing structures that were devastated after Hurricane María, engineering studies, and constructing a new building.

Although the 428 Program provides a flexible source of funding, it is not without risks. The 428 Programs is a fixed cost capped grant and places all the risk of managing cost overruns on the Commonwealth. Conversely, the program provides guidance on the use of funds from a cost underrun. Currently, the deadline for applicants to reach consensus on 428 program grants is December 31, 2021.

- **HUD Community Development Block Grant-Disaster Recovery (CDBG-DR):** Based on the action plan submitted by the Puerto Rico Department of Housing ("PRDOH"),[203] HUD provides CDBG-DR funding that can be used for assistance to individuals (e.g., housing repair) and public assistance (e.g., infrastructure development), or by the Government for certain operational costs (e.g., to cover their disaster relief cost match). The action plan was approved by HUD on July 29, 2018. However, amendments are submitted to HUD for a variety of reasons, including changes in approved funding, guidance changes, budget changes and other program changes. The first action plan outlined the uses for the approximately $1.5 billion in CDBG-DR made available by Congress on February 1, 2018. Subsequent amendments of the action plan have further allocated an additional $8.2 billion for Puerto Rico, including an additional $277 million in unmet infrastructure need. On April 10, 2018, after the initial $1.5 billion was announced, Congress made available an additional $18.5 billion in recovery funds, including funds targeted to the electric grid and mitigation activities. The parameters within which the remaining funds may be spent have been agreed upon by HUD and

---

[203] The Governor of Puerto Rico appointed PRDOH as the responsible agency to administer the CDBG-DR grant program in close collaboration with the COR3. Non-Substantial Amendment 2 was submitted to HUD in August 2019. The action plan and subsequent amendments *available at* https://www.cdbg-dr.pr.gov/en/action-plan/.

PRDOH.  Fund disbursement has begun for the $1.5 billion obligated in the first tranche of funding.  As of December 31, 2020, PRDOH has drawn down $150,256,275.37.

- **Private insurance funding:** Large personal property and casualty losses have been incurred in the aftermath of Hurricane Maria.  Early analysis of data from the Office of the Insurance Commissioner of Puerto Rico, adjusted for self-insured and other types of coverage, was used to determine the amount that will be paid out to individuals and businesses for major damages.

- **Disaster Aid Revolving Fund:**  In November 2020, the Governor enacted Act 139-2020 to create a $750 million revolving credit facility and authorize the Treasury Secretary, on behalf of the Government, to provide or extend loans, credit facilities or advances to central government agencies, public corporations, instrumentalities and municipalities to fund redevelopment projects until FEMA reimbursements are remitted.

  - The overall intent of the fund is to advance funding to applicants with approved projects for short-term liquidity and accelerate recovery.  The Oversight Board recently worked with COR3 and AAFAF to approve the program guidance.

- **Other supplemental federal funding:** Additional federal funding has been allocated to various agencies and projects in Puerto Rico.  This money is directed at a wide range of recovery efforts, from reconstruction of damaged buildings (e.g., funding to repair damage to Job Corps centers in Puerto Rico) to funding for health programs and environmental management (e.g., USDA funding to repair water systems in rural areas).

2.     **COVID-19 Pandemic Response**

a)     **COVID-19 Pandemic Background and Anticipated Economic Impact**

*Background.*  Coronavirus disease 2019 ("COVID-19") is an infectious viral disease whereby most people infected with the COVID-19 virus experience mild to moderate respiratory illness and recover without requiring special treatment.  The elderly, and those with underlying medical conditions like cardiovascular disease, diabetes, chronic respiratory disease, and cancer appear more likely to develop serious illness and, in some cases, die.  As of June 15, 2021, three vaccines have been authorized and recommended for use in the United States.

On March 11, 2020, the World Health Organization declared the rapidly spreading COVID-19 outbreak a pandemic.  As of June 16, 2021, there have been over 176 million confirmed cases worldwide detected in over 190 countries, including all 50 States of the United States and has resulted in over 3.8 million deaths.

*Economic Impact To Puerto Rico.*  The mandatory Commonwealth-wide shut-downs and temporary restrictions have critically and adversely impacted all economic activity on the Commonwealth.  The labor market witnessed an unprecedented dislocation, with unemployment rates reaching levels much higher than in the U.S. and followed by a slower job recovery in the case of Puerto Rico.  Similarly, K-12 education faced significant challenges that have raised

244

concerns over student outcomes. These factors suggest the pandemic may leave deep scars in the Puerto Rican economy through multiple channels, including lower investment, erosion of human capital, and lower productivity. The true quantifiable impact to Puerto Rico is not yet completely known, and although closely monitored, the situation is still ongoing.

b)      **Federal Response and Impact on Puerto Rico and the Commonwealth**

In order to mitigate the economic impact of COVID-19, the federal government issued a series of emergency stimulus bills to lessen the burden on businesses and individuals in the United States.

*Emergency Bill 1.* On March 6, 2020, President Trump signed an $8.3 billion spending bill, called the "Coronavirus Preparedness and Response Supplemental Appropriations Act," to fund efforts to fight the pandemic.

*Emergency Bill 2.* On March 18, 2020, President Trump signed a stimulus-relief bill with over $100 billion in funding, called the "Families First Coronavirus Response Act."

*Emergency Bills 3 and 3.5.* On March 27, 2020, President Trump signed the $2.2 trillion stimulus-relief bill, known as the "Coronavirus Aid, Relief, and Economic Security Act'' (the "CARES Act"). The CARES Act was divided into two divisions, Division A titled "Keeping Workers Paid and Employed, Health Care System Enhancements, and Economic Stabilization" (approximately $1.9 trillion), and Division B titled "Emergency Appropriations for Coronavirus Health Response and Agency Operations" (approximately $350 billion). On April 24, 2020, President Trump signed an expansion to the CARES Act, known as the "Paycheck Protection Program and Health Care Enhancement Act" (the "PPPHCEA") to provide additional money for testing, hospital and healthcare facilities, and SBA PPP loans.

The 2021 Fiscal Plan includes an estimate of what portion of these federal funds will be allocated to Puerto Rico, relying on a combination of direct federal government sources and agency announcements, and, in some cases, based on historical analogy (*e.g.*, the American Recovery and Reconstruction Act of 2009). The 2021 Fiscal Plan estimates that Puerto Rico would receive $17.2 billion of the $2.9 trillion in federal stimulus bills 1 through 3.5. While this amount includes the estimated unemployment benefits payments covered by the Federal Government, it does not include the regular Unemployment Insurance payments, which are covered by the local government and that are estimated on $0.8 billion for the period covered by the CARES Act.

*Emergency Bill 4.* On December 27, 2020, President Trump signed into law the Consolidated Appropriations Act, 2021, which combines $900 billion in stimulus relief for the COVID-19 pandemic in the United States with a $1.4 trillion omnibus spending bill for the 2021 federal Fiscal Year. The stimulus relief provisions were contained within two divisions, Division M titled "Coronavirus Response and Relief Supplemental Appropriations Act, 2021," and Division N titled "Additional Coronavirus Response and Relief."

The Consolidated Appropriations Act also extended the deadline within which states could spend the $350 billion of Coronavirus Relief Funds (created by the CARES Act) from December 30, 2020 to December 31, 2021.

Of the approximately $900 billion of stimulus relief in the Consolidated Appropriations Act, it is estimated that Puerto Rico will receive $7.3 billion, with the majority of that funding supporting individuals and businesses. Similar to Emergency Bills 3 and 3.5, this amount includes only the federal share of unemployment benefit payments. In addition, the 2021 Fiscal Plan estimates $0.1 billion of unemployment benefits funded by the local government through the regular Unemployment Insurance Program.

*Emergency Bill 5.* On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021. The bill provides $1.9 trillion in funding, program changes and tax policies aimed at mitigating the continuing effects of the pandemic. Major components of the Act include a third round of Economic Impact Payments of up to $1,400 per eligible taxpayer, expansion of the Child Tax Credit and Earned Income Tax Credit for Puerto Ricans, extension of unemployment insurance, and $350 billion in emergency funding for state, local, territorial, and tribal governments. Other significant programs include $122.7 billion to K-12 education, $47.8 billion for COVID-19 testing, $24 billion Child Care Stabilization funding, $21.6 billion for emergency rental assistance, $15 billion for vaccine related funding, and a $28.6 billion Restaurant Revitalization Fund.

Of the $1.9 trillion to be disbursed in the American Rescue Plan, it is estimated that Puerto Rico will be allocated $17.5 billion. As in Emergency Bills 3, 3.5, and 4, this amount includes federally funded unemployment benefits, and excludes the locally funded share of it that the 2021 Fiscal Plan estimates at $0.2 billion. In addition, permanently increased federal funding is forecasted to flow into Puerto Rico due to the extended EITC and CTC programs approved under the American Rescue Plan Act.

### c)   Oversight Board Approved Responses by the Commonwealth

In addition to the responses issued by the Federal Government, the Oversight Board approved a series of emergency measures, as well as executive orders and government actions issued by Governor Vázquez, to lessen the impact of COVID-19 to its economy, businesses and citizens.

*Emergency Reserve Fund.* On March 5, 2020, the Oversight Board made available an initial $5 million from the Emergency Reserve fund for COVID-19 prevention and preparedness.

On March 13, 2020, the Oversight Board authorized the utilization of additional Emergency Reserve Funds from Fiscal Years 2019 and 2020 as needed by the Government of Puerto Rico. Approximately $160 million was authorized to be used for Commonwealth emergency expenses related to the COVID-19 pandemic, including preparedness and detection, public awareness, and improving the public healthcare sector's capacity. This Emergency Reserve fund was established in the Commonwealth Certified Fiscal Plan.

As of December 4, 2020, $70 million has been expensed.

*Emergency Measures Support Package.* On March 23, 2020, the Oversight Board granted urgent budgetary support in the form of an Emergency Measures Support Package, authorizing the Government of Puerto Rico to use $787 million to fight the COVID-19 emergency. This package includes:

- $237 million in one-time bonuses for public and private nurses, technicians, emergency medical services personnel, correction officers, and other staff in the front lines of the fight against COVID-19;

- $50 million for investments in hospitals and public safety, to restock medical supplies and invest in equipment for a period of at least two months;

- $160 million in one-time direct payment to self-employed individuals and small businesses whose incomes have been affected by the disruption of their work and income;

- $240 million for the Department of Education to support and enable online learning while schools are closed, to buy tablets for every student and teacher, and provide teachers and students with software and training; and

- $100 million for municipalities, providing support for lost revenues as a result of the emergency measures implemented to fight COVID-19.

As of June 11, 2021, $520 million was disbursed in FY 2020 and FY 2021.

*Executive Orders and Government Actions.* Since March 2020, the Governor has issued a series of executive orders in response to the COVID-19 pandemic. The executive orders have included the declaration of a state of emergency, activation of the National Guard Medical Unit, establishment and extension of a curfew, emergency purchase of personal protection equipment, mandatory 14-day quarantine for travelers and other travel restrictions, and the closure of businesses and other lockdown measures. The executive orders concerning travel restrictions, business closures, curfews and other lockdown measures have had a material negative impact on economic activity in Puerto Rico.

### d)      Other Government Stimulus and Relief Actions

On April 14, 2020, Governor Vázquez signed into law Joint Resolutions 26-2020 and 27-2020, requiring financial creditors in Puerto Rico to establish a voluntary moratorium on the payments to personal loans, auto loans, mortgage loans, and credit cards (for personal, family, or domestic use) corresponding to the months of March through August 2020. Upon approval, the date of termination of the loan will be extended for a period equal to the number of payments not made. The debtor may request that the amount due for the missed payments be distributed among the remaining payments due under the loan.

On April 16, 2020, the Governor Vázquez signed into law Act No. 40-2020, which amends several important provisions of the Puerto Rico Internal Revenue Code of 2011, among other

247

special laws, as part of the measures taken to provide relief during the ongoing COVID-19 pandemic. *See* section III.C.4 of this Disclosure Statement for a summary of Act 40-2020.

On April 26, 2020, the Oversight Board provided the Commonwealth with recommendations on ways to deploy funding received under the Coronavirus Relief Fund ("CRF") created under the CARES Act, suggesting the $2.2 billion be used on the following areas:

- Monitoring and Assessment System: significantly increase the supply of COVID-19 test kits and purchase high-tech networks for tracking infection;

- Health Service Infrastructure: put in place a storage and distribution plan to manage inventory, and ration supplies and equipment like personal protective equipment, ventilators and virus detection tests;

- Distance Learning and Student Outcomes: enhance distance learning to recuperate lost learning, and to prepare for a possible reemergence of COVID-19;

- Small Businesses: training and coaching to help navigate the new economic reality;

- Long Term Unemployed: invest in strengthening work development; and

- Reimbursement to the Commonwealth: a portion of the $500 million in incremental funds that are a part of the $787 million Emergency Measures Support Package may be reimbursable expenses under the CARES Act.

On May 15, 2020, Governor Vázquez issued Executive Order 2020-040, adopting a spending plan for the $2.2 billion Puerto Rico is receiving through the CRF created under the CARES Act. This order would provide $990 million to public entities, and roughly $811 million to the private sector. Furthermore, the Government would hold $440 million in a reserve fund to be used based on Puerto Rico's future needs and the status of the COVID-19 health emergency.

***Emergency Assistance Loans.***  In November 2020, the Governor enacted Joint Resolution 82, which authorized the Government to provide Emergency Assistance (as defined in the resolution) in the form of one or more loans or credit facilities to Government Borrowing Entities (as defined in the resolution) to address the liquidity challenges of said entities in connection with the COVID-19 emergency and with the necessary measures taken as a result of said emergency. This Emergency Assistance would be available until June 30, 2021.  To fund the Emergency Assistance, Joint Resolution 82 authorizes the use of uncommitted funds from the State Treasury, if necessary, or the use of reapportioned funds from other agencies as determined by The Office of Management and Budget.  The resolution establishes that repayment could be structured through an undefined mechanism of compensation as well as from reimbursements of state or federal funds distributed for such purposes. This legislation is still subject to Oversight Board approval pursuant to Section 204 of PROMESA and the fund has not yet been established.

### C.    Claims Process and Bar Date

#### 1.    Section 924/925 Lists

Bankruptcy Code section 924 requires debtors to file a list of creditors.  Bankruptcy Code section 925 provides that "[a] proof of claim is deemed filed" for claims set forth on the list of creditors required by Bankruptcy Code section 924 except as to claims that are "listed as disputed, contingent, or unliquidated."  11 U.S.C. § 925.[204]

#### 2.    Bar Date Orders (the Debtors, Other Than PBA)

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order") and *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), the Title III Court established the following bar dates for filing proofs of claim in the Title III Cases for the Commonwealth and ERS:

- June 29, 2018 at 4:00 p.m., Atlantic Standard Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is 35 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is 35 days after the date that a notice of an amendment to the List of Creditors is served on a claimant as the bar date for any Claims relating to such amendment to the List of Creditors.

The Bar Date Orders authorized the following parties to file master proofs of claim on behalf of the constituencies described below:

- The indenture trustees, fiscal agents, or any similar agent or nominee (each a "Bond Representative") for each respective series of bonds issued by a debtor or non-debtor (to the extent such Bond Representative exists) may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents;

---

[204] *See Notice of Filing of Creditor List for the Commonwealth of Puerto Rico*, [ECF No. 1215]; *Notice of Filing of Amendments to Creditor List for the Commonwealth of Puerto Rico*, [ECF No. 2582]; *Notice of Filing of Creditor List for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, [17-BK-3567-LTC ECF No. 207]; *Notice of Filing of Creditor List for Puerto Rico Public Buildings Authority*, [19-bk-5523 ECF No. 33].

- Each union may file a separate master proof of claim on behalf of its respective constituents against the applicable Debtor on account of all obligations due under their respective CBAs or applicable statutes; and

Each agent under any credit agreement may file a separate master proof of claim against the applicable debtor on behalf of itself and all lenders under such credit agreement.

### 3.   ERS Pre-Solicitation Procedures

On February 11, 2020, the Debtors filed a motion[205] to establish procedures to obtain complete or updated information from holders of Active and Retired Employee Retirement Benefit Claims (Class 48), which will assist the Debtors to reduce the number of solicitation packages returned undeliverable, and ensure the claim amounts for holders of claims in Active and Retired Employee Retirement Benefit Claims (Class 48) of the Plan are accurately calculated. The motion has been fully briefed. On March 6, 2020, March 9, 2020, and June 11, 2020, the Debtors filed revised proposed orders. On June 11, 2020, the Title III Court granted the motion and entered an order establishing the procedures [ECF No. 13402].

Pursuant to the *Order (A) Establishing Pre-Solicitation Procedures for Certain Holders of Retirement Benefit Claims, (B) Establishing Procedures and Deadlines for Submission of Information Necessary for Solicitation of Acceptance or Rejection of Plan of Adjustment, and (C) Approving Form and Manner of Notice Thereof* [Case No. 17-3566, ECF No. 837] (the "ERS Pre-Solicitation Procedures Order") and *Order Granting Motion of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Entry of an Order (A) Extending the Return Date for Filing of Information Forms and (B) Approving Form and Manner of Notice Thereof* [ECF No. 918], the Title III Court established the following Pre-Solicitation Procedures in ERS's Title III Case:

- July 29, 2020 is the Return Date by which Employee Claimants must submit the Information Form with the Requested Information to Prime Clerk;

- all Information Forms must: (i) be written in English or Spanish; (ii) include an original or electronic signature of the Employee Claimant or an authorized agent of the Employee Claimant; and (iii) substantially conform to the Information Form; and

- all Information Forms shall be delivered and received by Prime Clerk no later than 4:00 p.m. (Atlantic Standard Time) on the Return Date.

---

[205] *Motion of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for an Order (A) Establishing Pre-Solicitation Procedures for Certain Holders of Retirement Benefit Claims, (B) Establishing Procedures and Deadlines for Submission of Information Necessary for Solicitation of Acceptance or Rejection of Plan of Adjustment by Such Claimants, and (C) Approving Form and Manner of Notice Thereof*, [ECF No. 10839].

4.      **The PBA Bar Date Order**

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [Case No. 19-05523-LTS, ECF No. 55] (the "PBA Bar Date Order") and *Order Granting Motion of the Puerto Rico Public Buildings Authority for Entry (A) Extending the Deadline for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 88], the Title III Court established the following bar dates for filing proofs of claim in PBA's Title III Case:

- July 29, 2020 at 4:00 p.m., Atlantic Standard Time, as the General Bar Date, except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is 35 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any PBA Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is 35 days after the date that a notice of an amendment to the PBA Creditor List is served on a claimant as the bar date for any PBA Claims relating to such amendment to the PBA Creditor List.

The PBA Bar Date Order authorizes the following parties to file master proofs of claim on behalf of the constituencies described below:

- The Bond Representatives for each respective series of bonds issued by PBA (to the extent such Bond Representative exists) may file a master proof of claim against PBA on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond document; and

- Each union may file a separate master proof of claim on behalf of its respective constituents against PBA on account of all obligations due under their respective CBAs or applicable statutes.

5.      **Alternative Dispute Resolution Procedures**

On June 5, 2019, the Debtors filed the *Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 7224], seeking an order establishing an alternative dispute resolution procedure ("ADR Procedures") for resolving certain general unsecured claims, including unliquidated litigation claims, asserted against the Commonwealth, PBA, or ERS (as well as other Title III Debtors), and approving a proposed mailing to creditors whose claims did not provide sufficient information to enable the Debtors to reconcile their claims.

At the July 24, 2019 omnibus hearing, the Title III Court requested certain modifications to the proposed ADR Procedures. By order dated August 13, 2019, the Title III Court approved the proposed mailing, and adjourned consideration of the ADR Procedures and forms of notice pending the submission of revised proposed procedures and forms of notice consistent with the guidance provided by the Title III Court [ECF No. 8453].

On January 7, 2020, the Debtors filed their *Amended Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 9718] (the "Amended ADR Motion"). The Amended ADR Motion seeks approval of amended ADR procedures (the "Amended ADR Procedures") that would allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to identify claims that will be resolved through ADR. The Amended ADR Procedures establish a process for the Debtors and the claimants to attempt to resolve the amount of the claim through an exchange of offers and counteroffers, and if no resolution is reached, a streamlined mediation procedure. If the claim remains unresolved following these processes, the Amended ADR Procedures further provide for the claimant to elect whether to resolve their claim using one of three methods: (1) litigation before the Commonwealth's courts (subject to certain restrictions); (2) binding arbitration; or (3) litigation before the Title III Court. At the January 29, 2020 omnibus hearing, the Title III Court approved the Amended ADR Motion, subject to the submission of revised procedures and forms of notice consistent with the Title III Court's comments on the record at the hearing. On March 24, 2020, the Oversight Board filed a notice of presentment of a revised proposed order in accordance with the Title III Court's instructions. On April 1, 2020, the Title III Court entered an order authorizing the amended ADR procedures and approving the additional forms of notice [ECF No. 12576]. On December 29, 2020, the Title III Court entered an order amending the ADR procedures [ECF No. 15505]. To date, the Debtors have filed thirteen notices of transfer, transferring approximately 327 claims into the ADR procedures.

6.     **Administrative Claims Reconciliation**

On October 8, 2019, the Debtors filed their *Motion for Entry of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8827] (the "ACR Motion"). The ACR Motion seeks approval of ACR procedures (the "ACR Procedures") that would allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to determine which claims will be resolved through ACR. The ACR Procedures establish a process for the Title III Court to permit certain types of claims which are administrative in nature—including tax refund claims, union grievance claims, public employee claims, and pension claims—to be resolved by the Commonwealth's existing administrative processes.

At the October 30, 2019 omnibus hearing, the Title III Court provisionally approved the ACR Motion, pending the submission of revised proposed ACR Procedures. On March 12, 2020, the Title III Court issued an order approving the revised proposed order [ECF No. 12274]. To date, the Debtors have filed fourteen notices of transfer, transferring 34,479 claims into the ACR procedures, of which 23,014 have already been marked as resolved.

Based on the Debtors' review to date, approximately 47,428 are eligible for transfer into the ACR Procedures. The Debtors currently expect that the remaining 12,949 claims not yet transferred into ACR will be transferred on or before July 14, 2021. As set forth in the ACR Order, all claims transferred into ACR will be designated as "Subject to Administrative Reconciliation" on the Title III claims registry. Claims that are transferred into ACR will not be entitled to vote on the Plan, but will be paid in full in the ordinary course, pursuant to the terms of the ACR Order.

### 7.    Significant Claim Objections Filed to Date

As of the date of this Disclosure Statement, approximately 116,600 proofs of claim have been filed in the Title III Case against the Commonwealth, totaling approximately $33.2 trillion in asserted liabilities plus unliquidated amounts. Approximately 53,022 proofs of claim have been filed in relation to, or reclassified to be asserted against, ERS totaling approximately $10.2 trillion in asserted liabilities, plus unliquidated amounts. Approximately 390 proofs of claims have been filed in relation to, or reclassified to be asserted against, PBA, totaling approximately $6.8 billion in asserted claims, in addition to unliquidated amounts asserted. In accordance with the terms of the Bar Date Orders, the Debtors believe that many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended or duplicative of other proofs of claim, including master proofs of claim filed against the Debtors on behalf of certain bondholders.

Pursuant to the *Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (c) Granting Related Relief* [ECF Nos. 4230, 4230-1] (the "Initial Objection Procedures"), and the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), (C), Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440], the Commonwealth, HTA, ERS, and COFINA, through the Oversight Board have filed three hundred fifty-nine omnibus objections and fifty-three individual objections to claims. Those omnibus objections sought to disallow certain claims on the bases that they lacked sufficient information to permit the Oversight Board to reconcile the claim, were asserted against the incorrect debtor, were subsequently amended, were duplicative of other proofs of claim, or, otherwise asserted amounts for which the asserted debtor entity are not liable. ERS and the Commonwealth have also filed individual objections and omnibus objections to proofs of claim filed by the ERS Fiscal Agent and certain ERS bondholders against ERS and the Commonwealth. To date, over 100,000 claims have been expunged, withdrawn, or resolved, or were docketed in error.

Significant claim objections were also filed to certain bondholder claims, and are described in section III.B.1 of this Disclosure Statement.

## D.    Rejection or Assumption of Unexpired Leases of Nonresidential Real Property

The Commonwealth is party to hundreds of nonresidential real estate leases (the "Real Estate Leases"). The decision to assume or reject the Real Property Leases involves the consideration of various factors, not all of which can be addressed expeditiously. On July 21, 2017, the Commonwealth Debtor filed a motion seeking approval of an extension of time to assume or reject any unexpired Real Estate Leases pursuant to Bankruptcy Code section 365(d)(4) (the "365(d)(4) Deadline"), made applicable to these cases by PROMESA section 301(a) [ECF

No. 705].  On August 10, 2017, the Title III Court entered an order extending the deadline to November 29, 2017 [ECF No. 994].  Following the filing of the PBA Title III case, the Title III Court extended the order entered in the Commonwealth case to PBA, and provided that PBA's deadline to assume or reject leases is extended to April 23, 2020, with all rights reserved for PBA to seek further extensions  [Case No. 19-05523-LTS,  ECF No. 13].

The Commonwealth Debtor sought further extensions of the 365(d)(4) Deadline with the lessors' consent pursuant to Bankruptcy Code section 365(d)(4)(B)(ii).  For that purpose, the Commonwealth Debtor bifurcated its deadline extensions requests into (i) PBA Leases and (ii) leases with other entities as lessors.

(i)  PBA Leases.  On February 13, 2018, the Commonwealth Debtor sought to extend the 365(d)(4) Deadline for PBA Leases through and including September 25, 2018, with PBA Debtor's consent [ECF No. 2494].  On February 28, 2019, the QTCB Noteholder Group filed the *Reservation of Rights of the QTCB Noteholder Group to Motion for Entry of Third Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Bankruptcy Code section 365(d)(4)* [ECF No. 2602].  After a hearing, a revised order was granted extending the 365(d)(4) Deadline for PBA Leases through and including July 27, 2018, and it expressly preserved bondholders' rights.[206]  Thereafter, the Commonwealth Debtor, with PBA's consent, has been further extending the 365(d)(4) Deadline for PBA Leases.  The current 365(d)(4) Deadline for PBA Leases is July 29, 2021 [ECF No. 15770].

(ii)  Leases with Other Entities.  On November 22, 2017, the Commonwealth Debtor sought to extend the 365(d)(4) Deadline for leases with other entities until the earlier of (i) January 1, 2019, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for each Debtor [ECF No. 1852].  The Commonwealth is party to leases with hundreds of lessors.  Despite contacting each lessor, it was unlikely the Commonwealth Debtor could receive affirmative consent from each lessor as a direct consequence of the widespread destruction and mass power outages on the island of Puerto Rico following Hurricane Maria that has made it extremely difficult for parties to communicate with each other.  In turn, the Debtors and their advisors had been unable to obtain written consent of all their landlords to grant the requested extension of time for the Debtors to assume or reject Real Property Leases.  Accordingly, the Commonwealth Debtor sought to extend the 365(d)(4) Deadline for leases with other entities that either provided affirmative consent or did not expressly decline such consent.  The rights of parties whose consent was "deemed" because consent was not expressly denied were preserved [ECF No. 2292].  No party expressly denied consent.

---

[206] "Except as expressly stated in this Order, nothing in the Motion or this Order shall (a) impair or modify the rights and claims of PBA under or related to the PBA Leases under PROMESA or applicable law; nor (b) impair or modify the rights or claims of any holders of bonds issued by PBA, either directly or as third party beneficiaries, under or related to the PBA Leases under PROMESA or applicable law." *Order Granting Motion for Entry of A Third Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Under Which the Puerto Rico Public Buildings Authority is the Lessor Pursuant to Bankruptcy Code Sections 365(d)(4)*, [ECF No. 2689].

The 365(d)(4) Deadline was extended by the Title III Court on multiple occasions. *See* ECF Nos. 4977 and 9670. The current 365(d)(4) Deadline for the Debtors, other than PBA, is the earlier of (i) January 1, 2022, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for each Debtor [ECF No.15574].

## E.     Title III Stay Matters

### 1.     Generally

Upon commencement of a Title III case, Bankruptcy Code section 362(a), made applicable by PROMESA section 301(a), provides for an automatic stay of certain actions by non-debtor third parties (the "Title III Stay"). On June 29, 2017, the Title III Court confirmed the applicability of Bankruptcy Code section 362(a) to the Title III Cases pursuant to the *Order Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 Confirming (I) Application of the Automatic Stay to Government Officers, Agents, and Representatives, (II) Stay of Prepetition Lawsuits, and (III) Application of Contract Protections* [ECF No. 543]. Since the applicable Petition Date, the Debtors have taken steps to preserve the important "breathing spell" the Title III Stay provides, address the Debtors' financial condition, and expeditiously develop a plan of adjustment.

### 2.     Lift Stay Protocol

In order to reduce the burden on the Title III Court, and to efficiently address requests for relief from the Title III Stay in these unprecedented Title III Cases, the Debtors developed a protocol by which parties may request relief from the Title III Stay, and by which the Debtors may consensually resolve such requests. On August 17, 2017, the Title III Court entered an order implementing a protocol for filing motions for relief from the Title III Stay [ECF No. 1065-1] (the "Lift Stay Protocol"). Under the Lift Stay Protocol, a movant is required to (a) send notice to counsel to the Oversight Board and AAFAF to advise them of movant's intent to seek relief from the Title III Stay at least fifteen (15) business days prior to filing a motion seeking such relief, and (b) meet and confer with the Debtors during such 15-day period. On October 24, 2017, the Lift Stay Protocol was amended (a) to allow the Debtors (i) to enter into stipulations modifying or lifting the Title III Stay without further order of the Title III Court, and (ii) in their discretion, to modify or lift the Title III Stay with respect to any prepetition ordinary course civil action against a debtor without the filing of a notice or order of the Title III Court; and (b) to require the Debtors to file an omnibus lift stay motion every sixty (60) days, identifying each modification to the Title III Stay agreed to by the Debtors during the relevant period and seeking retroactive court approval of such modifications as of the relevant modification date [ECF No. 1512-1].

### 3.     Omnibus Lift Stay Motions

Since the implementation of the Lift Stay Protocol, the Debtors have filed twenty-one omnibus lift stay motions, involving approximately 2,342 actions, seeking retroactive court approval of modifications to the Title III Stay.

4. **Significant Stay Matters**

a) ***Gracia-Gracia, et al. v. Commonwealth of Puerto Rico*, Case No. 18-1463 (1st Cir.)**

A class of vehicle owners who purchased private insurance after paying mandatory premiums ("Gracia-Gracia") filed an action in the Commonwealth Court of First Instance seeking reimbursement of duplicative automobile insurance premiums paid to the Commonwealth (collectively, the "Gracia-Gracia Prepetition Action"). Gracia-Gracia alleged that the transfer of duplicative premiums to the Secretary of the Treasury violated the Takings Clause, Due Process Clause, and Equal Protection Clause of the U.S. Constitution. Following a number of appeals and decisions on remand, the United States Court of Appeals for the First Circuit determined that due process required the Commonwealth to give claimants at least one year to make reimbursement claims after adequate notice.

In 2016, following the First Circuit's decision, the parties to the Gracia-Gracia Prepetition Action entered into settlements that require the Commonwealth to provide notice to class members about claims procedures for reimbursement of duplicative premiums, the processing of claims for reimbursement, and the payment of attorneys' fees.

On February 7, 2018, Gracia-Gracia filed a motion to modify the automatic stay to allow the enforcement of the entered settlements [ECF No. 2434]. The Title III Court granted the request in part, modifying the automatic stay to permit the notice and claim submission and review process, but denying the request in all other respects, including the payment of reimbursements and attorneys' fee awards [ECF No. 2858].

Plaintiffs appealed and argued the duplicate premiums held in the Commonwealth's reserve account, and subject to the automatic stay, belong to the class members and are not the property of Debtors. The Debtors disagreed with this contention. The appeal was argued to the First Circuit on June 5, 2019.

By opinion dated September 25, 2019, the First Circuit affirmed the portion of the Title III Court's decision denying stay relief in respect of the unsegregated insurance premiums, and in respect of the segregated premiums, remanded for a new determination on stay relief based on a preliminary determination of whether the premium funds were property of the Commonwealth or property of plaintiffs.[207]  On October 16, 2019, the First Circuit issued a mandate in connection with the judgment dated September 25, 2019.  On October 15, 2020, Gracia-Gracia and the Commonwealth informed the Title III Court they had finalized a stipulation to resolve the Gracia-Gracia Plaintiffs' request for stay relief [ECF No. 14588].

Pursuant to the stipulation, the Commonwealth filed the *Motion of the Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of Order Approving Assumption of Settlement Agreements with García Rubiera Class Plaintiffs* [ECF No. 15171] (the "Gracia-Gracia Assumption Motion").  On November 25, 2020, the UCC filed its limited objection to the

---

[207] Claims of the Gracia-Gracia claimants are unimpaired pursuant to the Plan because the Plan proposes to assume the settlement agreements.

Gracia-Gracia Assumption Motion [ECF No. 15275]. Gracia Gracia filed its reply on December 2, 2020 [ECF No. 15307], and the Commonwealth filed its reply on December 3, 2020 [ECF No. 15325]. The Title III Court heard oral argument on the Gracia-Gracia Assumption Motion on December 9, 2020. On December 16, 2020, the Commonwealth and the UCC filed their joint supplemental briefing setting forth the parties' "respective positions concerning whether the Court should apply the Countryman standard, or another standard for which there is precedent, in resolving the [Gracia-Gracia Assumption Motion]" [ECF No. 15457]. On June 29, 2021, the Title III Court issued a memorandum opinion and order granting the Gracia-Gracia Assumption Motion [ECF Nos. 17185, 17186].

b)   ***Autonomous Municipality of Ponce v. Commonwealth of Puerto Rico***, **Case No. 18-2194 (1st Cir.)**

On May 4, 2018, the Autonomous Municipality of Ponce ("AMP") filed a motion [ECF No. 3019] to modify the automatic stay to allow AMP to enforce a judgment in a previous action: *Municipio de Ponce v. Autoridad de Carreteras y Transportación,* Case No. AC93-0485. The former judgment required the Commonwealth, HTA, and PREPA to complete certain municipal improvement projects pursuant to an agreement between the Commonwealth and AMP. On November 2, 2018, the Title III Court denied AMP's request to modify the stay because AMP failed to demonstrate cause [ECF No. 4157]. AMP appealed.

AMP's appeal was docketed by the First Circuit on December 27, 2018, as No. 18-2194. AMP filed its opening brief on March 18, 2019, and the Oversight Board filed a brief in opposition on May 1, 2019. On June 5, 2019, AMP filed its reply. Oral argument took place on September 11, 2019. By opinion dated September 25, 2019, the First Circuit affirmed the Title III Court's decision denying stay relief and ruled that AMP's right to specific performance was a "claim" subject to the stay because money damages could be substituted for specific performance. On October 16, 2019, the First Circuit issued its mandate.

c)   ***PFZ Properties, Inc. v. Commonwealth of Puerto Rico***, **Adv. Proc. No. 18-00056**

The Commonwealth commenced eminent domain proceedings in 2008 against PFZ Properties, Inc. ("PFZ") with respect to certain beachfront land comprising approximately 1,300 acres located in the Municipality of Loiza. The Commonwealth voluntarily dismissed the proceedings without prejudice due to a lack of resources to litigate or to pay PFZ.

On May 14, 2018, PFZ commenced an adversary proceeding seeking (i) a declaration that the Commonwealth effected a regulatory taking of the property for which the Takings Clause of the Fifth Amendment of the U.S. Constitution requires just compensation in the amount of $75.55 million, and (ii) interest plus attorney's fees on account of certain conduct of the Commonwealth which PFZ alleges caused unreasonable delay, and for any damages it may have suffered on account of the taking of the property and subsequent voluntary dismissal of proceedings.

PFZ and the Commonwealth entered into a stipulation whereby PFZ agreed to dismiss the adversary proceeding without prejudice and the Commonwealth agreed to partially lift the Title III stay for the limited purpose of determining the amount, if any, of PFZ's claims. On July 30,

2018, the Title III Court dismissed the action without prejudice [Adv. Proc. No. 18-00056, ECF No. 16].

d)    ***Mandry-Mercado v. Commonwealth of Puerto Rico, et al.*, 17-2168, 18-2035, 19-1208**

Pro se plaintiff Javier Mandry-Mercado ("Mandry-Mercado") filed a combined motion to vacate and reconsider an order granting limited relief from the automatic stay on July 25, 2017 [ECF No. 822]. The Title III Court's order allowed the parties in a long-running inverse condemnation dispute to continue litigating in the Commonwealth Court of First Instance [ECF No. 600]. Plaintiff filed his motion on the ground that the attorney who moved for stay relief allegedly provided misleading information to the Title III Court. On August 2, 2017, the Title III Court denied Mandry-Mercado's motion to vacate and reconsider [ECF No. 844]. He filed a notice of appeal, which was docketed by the First Circuit as Case No. 17-2168.

On November 19, 2018, the appeal was submitted to a Panel of the First Circuit. On January 30, 2019, the Panel summarily affirmed for lack of a substantial question. Mandry-Mercado petitioned for rehearing on February 11, 2019, which the First Circuit denied on May 16, 2019. On May 23, 2019, the First Circuit issued a mandate.

On July 6, 2018, Mandry-Mercado filed a motion seeking standing to assert certain claims on behalf of the Commonwealth [ECF No. 3475]. On July 11, 2018, the Title III Court denied the motion [ECF No. 3489]. Mandry-Mercado appealed, and on October 22, 2018, the notice of appeal was docketed by the First Circuit as Case No. 18-2035. On November 13, 2018, the First Circuit issued a notice of default because Mandry-Mercado had failed to timely file a transcript order form. On January 17, 2019, the First Circuit ordered Mandy-Mercado to show cause why the appeal should not be dismissed as untimely. After Mandry-Mercado failed to respond to the First Circuit's show cause order, the First Circuit dismissed the appeal on February 5, 2019. On February 6, 2019, Mandry-Mercado moved for reconsideration and petitioned for panel rehearing. On April 7, 2020, the First Circuit denied the motion and petition. On May 7, 2020, the First Circuit issued its mandate.

On August 27, 2018, Mandry-Mercado sent an email to the Title III Court indicating that he wished to file an adversary complaint in the Commonwealth's and HTA's Title III cases. AAFAF and Mandry-Mercado met and conferred and filed a joint status report on September 19, 2018 [ECF No. 3948]. On September 20, 2018, the Title III Court denied all relief sought by Mandry-Mercado [ECF No. 3952]. On November 19, 2018, Mandry-Mercado moved for reconsideration [ECF No. 4362], which the Title III Court denied on December 7, 2018 [ECF No. 4429].

On February 28, 2019, Mandry Mercado appealed to the First Circuit. The appeal was docketed as No. 19-1208. On March 15, 2019, the First Circuit issued a notice of default for failure to file a transcript order form. On April 8, 2019, the First Circuit ordered Mandry-Mercado to show cause why the appeal should not be dismissed for lack of jurisdiction. Mandry-Mercado responded to the show cause order on April 17, 2019, arguing that his appeal was actually a petition for mandamus. On April 7, 2020, the First Circuit denied Mandry-Mercado's mandamus petition

for lack of a substantial question and dismissed the appeal.  On May 28, 2020, the First Circuit issued its mandate.

### e)      The DRA Parties' Lift-Stay Motion

On June 25, 2019, Cantor-Katz Collateral Monitor LLC, monitor for the Government Development Bank Debt Recovery Authority ("DRA"), and AmeriNational Community Services LLC, servicer for the GDB DRA bonds issued pursuant to GDB's PROMESA Title VI qualifying modification (collectively, the "DRA Parties"), filed a motion for relief from the automatic stay to exercise remedies against DRA's asserted HTA collateral, including gasoline taxes, gas oil and diesel oil taxes, motor vehicle and license fees, toll revenues, petroleum products taxes and cigarette taxes [ECF No. 7643].  To secure obligations to DRA pursuant to the GDB DRA bonds, the DRA Parties claimed GDB transferred, among other things, its HTA loan, bond assets, and claimed collateral to DRA.

The DRA Parties argued that (i) the Commonwealth and HTA's alleged depletion of the HTA collateral without providing adequate protection provides cause to lift the stay, and (ii) the Commonwealth and HTA lack any property interest or equity in the HTA collateral, which are unnecessary for an effective reorganization.

In the alternative, the DRA Parties requested the Title III Court require the Commonwealth and HTA to provide adequate protection by paying current interest under the HTA loans and bonds. Pursuant to a stipulation among the DRA Parties, AAFAF, and the Oversight Board, the Title III Court ordered that the briefing and hearing schedule regarding the motion be bifurcated to first consider the issue of the DRA Parties' standing to seek the relief requested in the motion [ECF No. 7832].

On August 15, 2019, AAFAF, the Oversight Board, and the DRA Parties filed a joint stipulation to the Stay Order, which made the DRA Lift Stay Motion subject to the Stay Order, as described below in section V.I.1 of this Disclosure Statement. The Title III Court approved the joint stipulation on August 16, 2019 [ECF No. 8481].  As described in more detail in section V.I.2, the Mediation Team's Interim Report included a proposed schedule for litigation of the DRA Lift Stay Motion.

On December 18, 2019, AAFAF, the Oversight Board, and the DRA Parties filed an amended joint stipulation regarding the DRA Parties' motion for relief from the stay [ECF No. 9615], which the Title III Court approved by order dated December 19, 2019 [ECF No. 9622]. Pursuant to the amended joint stipulation and order, the briefing and hearing schedule regarding the lift stay motion will continue to be bifurcated to first determine the DRA Parties' standing to bring the stay motion.

On February 19, 2020, the parties filed a further joint stipulation providing the DRA Parties' lift-stay motion would be stayed until the Title III Court ruled on certain gating issues in the HTA lift-stay motion [ECF No. 11285], which joint stipulation the Title III Court approved by order dated February 20, 2020 [ECF No. 11346].  *See infra* Section V.E.4.h.  Relatedly, on March 3, 2020, the Title III Court issued an order, which *inter alia*, granted the DRA Parties the right to

participate in the HTA lift-stay motion under certain conditions [ECF No. 12005]. Further information regarding the HTA lift-stay motion is available in section V.E.4.g) below.

On September 25, 2020, the Government Parties and the DRA Parties filed yet another amended joint stipulation further amending the briefing schedule for the DRA Parties' Lift Stay Motion [ECF No. 14407]. On September 28, 2020, the Title III Court issued an order approving the amended joint stipulation [ECF No. 14417]. On March 31, 2021, the DRA Parties filed an amended lift stay motion [ECF No. 16276]. All issues concerning the merits of the amended DRA lift stay motion will be stayed pending resolution of the standing issue. The Government Parties filed an opposition to the DRA Parties' amended lift stay motion only with respect to the standing issue on April 21, 2021 [Case No. 17-bk-3567, ECF No. 1009], and the UCC filed a joinder to the opposition [Case No. 17-bk-3567, ECF No. 1010]. On May 19, 2021, the DRA Parties filed a response to the Government Parties' opposition [Case No. 17-bk-3567, ECF No. 1021].

f)      **CCDA Lift Stay Motion**

On January 16, 2020, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation and FGIC (the "Monolines"), together with The Bank of New York Mellon, as the fiscal agent, (collectively "Movants") filed a motion for (i) an order that the automatic stay does not apply to their proposed action to enforce CCDA bondholders' rights to revenues from hotel taxes, or, in the alternative, (ii) relief from the automatic stay to pursue the proposed action, or, in the further alternative, (iii) adequate protection for their collateral (the "CCDA Lift Stay Motion") [ECF No. 10104].

Movants alleged the Monolines insure bonds issued by CCDA, which are secured by tax revenues generated under the Hotel Occupancy Tax Act. Movants also alleged the automatic stay does not apply to their proposed action because the Commonwealth has no property interest in the revenues, which they contended are the property of the CCDA bondholders. Movants further asserted that if the automatic stay does apply, it should be lifted because (i) the Commonwealth has no equity in the Hotel Taxes and they are unnecessary to an effective reorganization under Bankruptcy Code section 362(d)(2); (ii) Movants lack adequate protection under Bankruptcy Code section 362(d)(1); and (iii) the Commonwealth has violated PROMESA, Commonwealth law and the Constitution by taking bondholders' property.

On January 31, 2020, the Title III Court entered an Amended Interim Case Management Order [ECF No. 10595] setting deadlines for opposition and reply briefs limited to issues of standing and secured status and scheduling a March 5, 2020 preliminary hearing on the CCDA Lift Stay Motion on whether the movants have standing to sue and security or other property interests in the relevant revenues.

On February 12, 2020, the Monolines filed an urgent motion seeking to adjourn the hearing on the CCDA Lift Stay Motion, as well as other lift stay motions involving bonds insured by HTA and PRIFA discussed below (the "HTA Lift Stay Motion" and "PRIFA Lift Stay Motion") until April 22, 2020, and to extend the deadline for their replies in support of their lift stay motions until April 6, 2020 [ECF No. 10841]. According to the movants in the three lift stay motions, this adjournment was necessary in order to permit time to obtain discovery. On February 14, 2020, the Title III Court entered an order granting the motion and adjourning the preliminary hearing

until April 2, 2020, and allowed for certain discovery by the movants to occur [ECF No. 11057].
The Title III Court also entered an order referring any discovery disputes (associated with such
discovery) to Magistrate Judge Dein, and setting a hearing on any discovery disputes for March 4
and 5, 2020 [ECF No. 11058].   On February 24, 2020, Ambac, Assured, and FGIC filed a joint
motion to compel the production of documents in connection with the CCDA Lift Stay Motion
and the PRIFA Lift Stay Motion [ECF No. 11687].   On March 5, 2020, Magistrate Judge Dein
entered an order partially granting the joint motion to compel production of documents [ECF No.
12080].   On March 12, 2020, Magistrate Judge Dein issued a supplemental discovery order [ECF
No. 12275].

On February 3, 2020, the Commonwealth filed an opposition to the CCDA Lift Stay
Motion [ECF No. 10615].   The UCC and AAFAF filed partial joinders to the Commonwealth's
opposition [ECF Nos. 10636, 10640].

On April 30, 2020, Movants filed their reply in support of the CCDA Lift Stay Motion
[ECF No. 12997].   On May 18, 2020, the Commonwealth filed a sur-reply in opposition to the
CCDA Lift Stay Motion [ECF No. 13160].   On May 26, 2020, Movants filed a response to the
Commonwealth's sur-reply [ECF No. 13225].

On July 2, 2020, the Title III Court issued its *Opinion and Order in Connection with
Preliminary Hearing Regarding Motion Concerning Application of the Automatic Stay to the
Revenues Securing the CCDA Bonds* [ECF No. 13540] holding that: (i) the CCDA Enforcement
Action is subject to the automatic stay, (ii) Movants have a colorable claim to a security interest
in funds deposited in the Transfer Account (defined therein), and (iii) Movants had shown a
reasonable likelihood that the Tourism Company bank account at Scotiabank Puerto Rico with an
account number ending in "5142" ("Scotiabank -5142") is the Transfer Account and, thus, the
Movants have a colorable claim to a security interest in the funds that have been deposited therein,
and (iv) Movants had failed to establish a colorable claim to any funds beyond those deposited in
the Transfer Account. The Title III Court denied the CCDA Lift Stay Motion to the extent it seeks
stay relief with respect to Hotel Taxes other than those that have been deposited in the Transfer
Account. The Title III Court also directed the parties to meet and confer and file a joint report as
to their positions on the nature, scope, and scheduling of further proceedings in connection with
the CCDA Lift Stay Motion, including any proceedings concerning stay relief with respect to the
Movants' assertion of unsecured claims.

The parties filed their *Joint Status Report With Respect To Further Proceedings Regarding
The Revenue Bond Stay Relief Motions* [ECF No. 13601] on July 9, 2020.   On July 10, 2020, the
Title III Court issued its *Order Scheduling Further Proceedings In Connection With The Revenue
Bond Stay Relief Motions* [ECF No. 13607] directing the parties to file supplemental briefing
addressing, for the CCDA Lift Stay Motion, the HTA Lift Stay Motion, and the PRIFA Lift Stay
Motion, whether "cause" exists to justify lifting the automatic stay and, for the CCDA Lift Stay
Motion, (i) whether stay relief is warranted under 11 U.S.C. § 362(d)(2), and (ii) whether litigation
in the CCDA Revenue Bond Adversary Proceeding (Adv. Proc. 20-00004) concerning the identity
of the Transfer Account would obviate any need for stay relief.

Movants filed their supplemental brief [ECF No. 13744] on July 20, 2020, and, on July 31,
2020, the Oversight Board and AAFAF filed a joint response to the Movants' supplemental brief

[ECF No. 13906].  Also on July 31, 2020, the UCC filed a limited joinder to the Oversight Board and AAFAF's joint response [ECF No. 13906].  On August 6, 2020, Movants filed a consolidated reply in further support of the CCDA Lift Stay Motion, HTA Lift Stay Motion and PRIFA Lift Stay Motion [ECF No. 13992].

On September 9, 2020, the Title III Court issued its *Memorandum Order Regarding CCDA Revenue Bond Stay Relief Motion* [ECF No. 14187] denying the CCDA Lift Stay Motion insofar as it sought relief from the automatic stay to pursue remedies with respect to monies other than the alleged Transfer Account monies.  The Title III Court adjourned the final hearing with respect to the remainder of the CCDA Lift Stay Motion pursuant to 11 U.S.C. § 362(e), and held the final hearing would be deemed to have occurred when the Title III Court issues its final decisions in the CCDA Adversary Proceeding (Adv. Proc. No. 20-00004)[208] concerning the identity of the Transfer Account and the parties' respective rights in the alleged Transfer Account monies.  On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the CCDA Lift Stay Motion [ECF No. 16739].  On May 18, 2021, the DRA Parties filed a reservation of rights in connection with Assured, National, and the Oversight Board's joint motion [ECF No. 16775].  Also on May 18, 2021, Ambac and FGIC filed an objection to Assured, National, and the Oversight Board's joint motion [ECF No. 16776].  On May 21, 2021, Assured, National, and the Oversight Board filed replies in support of their joint motion [ECF Nos. 16786, 16787].  On May 25, 2021, the Title III Court issued an order granting Assured, National, and the Oversight Board's joint motion [ECF No. 16796].

g)    **HTA Lift Stay Motion**

On August 23, 2019, Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp., and National (collectively "Movants"), filed a motion for (i) relief from the automatic stay to allow them to enforce the application of pledged toll and excise tax revenues to the payment of bonds issued by HTA, or, in the alternative, (ii) adequate protection of their alleged interests in the pledged revenues [ECF No. 8536].

Movants alleged they insure bonds issued by HTA secured by toll revenues collected directly by HTA and excise taxes collected on behalf of HTA by the Commonwealth.  Movants contend they have a first priority lien on these pledged revenues, which they claim have been improperly diverted from HTA to the Commonwealth.  Movants asserted the Title III Court should lift the stay because (i) the revenues are unnecessary to an effective reorganization because the Commonwealth lacks a property interest in them, and (ii) Movants lack adequate protection under Bankruptcy Code section 362(d)(1).

On July 24, 2019, the Title III Court issued the Stay Order, which stay was extended through March 4, 2020.  Notwithstanding the Stay Order, on December 19, 2019, the Title III Court entered an interim case management order regarding certain issues related to revenue bonds

---

[208] For further discussion of the CCDA Adversary Proceeding, see 0.

[ECF No. 9620] (the "Initial Interim Revenue Bonds CMO"), which required that any amendments to the lift stay motion be filed by January 16, 2020.

On January 16, 2020, Assured, National, Ambac, and FGIC filed an amended lift stay motion [ECF No. 10102] (the "HTA Lift Stay Motion"), which included the above mentioned allegations and further alleged the Title III Court should lift the automatic stay because otherwise Movants' due process rights would be violated. The HTA Lift Stay Motion requested the same relief as Movants' original lift stay motion.

On January 31, 2020, the Title III Court entered an Amended Interim Case Management Order [Case No. 17-bk-3567, ECF No. 678] setting deadlines for opposition and reply briefs limited to issues of whether Movants have standing to bring the HTA Lift Stay Motion and security or other property interests in the relevant revenues, and scheduling a March 5, 2020 preliminary hearing on such issues. On February 3, 2020, the Oversight Board filed an opposition to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 680]. The UCC and AAFAF filed partial joinders to the Commonwealth's opposition.

On February 11, 2020, the DRA Parties filed a notice that the DRA is a party in interest and can participate in the HTA Lift Stay Motion, or in the alternative, a motion to permit their intervention in the HTA Lift Stay Motion [ECF No. 10835]. On February 19, 2020, the parties entered into a joint stipulation regarding the DRA Parties' participation in the HTA Lift Stay Motion [ECF No. 11285-1]. On March 3, 2020, Magistrate Judge Dein issued an order approving the joint stipulation [ECF No. 12005].

On February 12, 2020, Movants filed an urgent motion seeking to adjourn the preliminary hearing on the HTA Lift Stay Motion, the CCDA Lift Stay Motion, and the PRIFA Lift Stay Motion until April 22, 2020 and to extend the deadline for replies in support of the three lift stay motions until April 6, 2020. According to Movants, the requested adjournment was necessary to permit time to obtain discovery. On February 14, 2020, the Title III Court entered an order granting the motion and adjourning the preliminary hearing until April 2, 2020, and allowing for certain discovery by Movants to occur [ECF No. 11057]. The Title III Court also entered an order referring any discovery disputes (associated with such discovery) to Magistrate Judge Dein, and setting a hearing on any discovery disputes for March 4 and 5, 2020 [ECF No. 11058]. On February 24, 2020, Ambac, Assured, and FGIC filed joint motions to compel the production of documents in connection with the HTA Lift stay Motion, CCDA Lift Stay Motion and PRIFA Lift Stay Motion [ECF No. 11686, 11687].

On March 16, 2020, the DRA Parties filed an opening response to the HTA Lift Stay Motion and to the Oversight Board's objection to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 741]. On March 23, 2020, Movants filed a response and reservation of rights [Case No. 17-bk-3567, ECF No. 748]. Also on March 23, 2020, the Oversight Board filed a response to the DRA Parties' opening response [Case No. 17-bk-3567, ECF No. 749], and the UCC filed a limited joinder to the Oversight Board's response.

On April 30, 2020, Movants filed a reply in support of the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 777]. Also on April 30, 2020, the DRA Parties filed a reply in support of their opening response to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 779]. On

May 18, 2020, the Oversight Board filed a sur-reply in opposition to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 807]. On May 26, 2020, Movants and the DRA Parties filed their respective responses to the Oversight Board's sur-reply [Case No. 17-bk-3567, ECF Nos. 819, 821].

On July 2, 2020, the Title III Court issued its *Opinion and Order in Connection with Preliminary Hearing Regarding Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate Protection (Docket Entry No. 10102)* [Case No. 3:17-bk-03283, ECF No. 13541] (the "HTA Lift Stay Opinion and Order"), holding Movants had not made the preliminary showing necessary to allow the HTA Lift Stay Motion to proceed to a final hearing to the extent that the HTA Lift Stay Motion seeks stay relief or adequate protection with respect to liens or other property interests in revenues other than those that have been deposited in the Resolution Funds (defined therein, as certain special funds with enumerated sub-accounts created by Section 401 of each of the Bond Resolutions ). The Title III Court denied the HTA Lift Stay Motion to the extent it seeks stay relief or adequate protection with respect to liens or other property interests in revenues other than those that have been deposited in the Resolution Funds. The Title III Court directed the parties to meet and confer and, no later than July 9, 2020, file a joint report as to their positions on the nature, scope and scheduling of further proceedings that they may believe are necessary in connection with the HTA Lift Stay Motion, including any proceedings concerning stay relief with respect to the Movants' assertion of unsecured claims. The Title III Court advised the parties that if no further proceedings were necessary, the Title III Court would enter an order terminating the HTA Lift Stay Motion as denied for the reasons stated in the HTA Lift Stay Opinion and Order.

On July 20, 2020, the Movants filed a supplemental brief arguing that cause existed to lift the stay notwithstanding the District Court's ruling on their asserted liens and property interests. The Oversight Board filed a supplemental response on July 30, 2020, and the Movants filed a supplemental reply on August 5, 2020.

On September 9, 2020, the Title III Court issued its *Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions* [ECF No. 14186] (the "Memorandum Opinion") denying the HTA Lift Stay Motion and the PRIFA Lift Stay Motion. The Title III Court found: (i) Movants had failed to establish that PROMESA section 305 creates any due process impediment that provides "cause" for relief from the automatic stay; (ii) cause did not exist for stay relief under section 362(d)(1) of the Bankruptcy Code; and (iii) cause did not exist to lift the automatic stay under the *Sonnax* factors (*In re Sonnax Industries, Inc*., 907 F.2d 1280, 1285 (2d Cir.1990)).

On September 23, 2020, Movants filed a notice of appeal of the Title III Court's Memorandum Opinion [ECF No. 14389]. On September 24, 2020, the United States Court of Appeals for the First Circuit Court of Appeals docketed the appeal as Case No. 20-1930. On October 28, 2020, Movants (as the appellants) filed their opening brief. Movants argued the Title III Court's decision should be reversed because (i) they have a contractual security interest in the excise taxes and toll revenues; (ii) the excise tax statutes make them and HTA, not the Commonwealth, equitable owners of the excise taxes; and (iii) the excise tax statutes impose a

statutory lien on the excise taxes.  On December 4, 2020, the DRA Parties filed a brief as
"Appellees."  In their brief, the DRA Parties asserted they did not take a position on what they
described as the issue on appeal—whether Movants had "demonstrated a colorable claim to the
excise tax revenues"—and represented they had joined in the briefing on appeal to request that any
decision "be written in a way that preserves" the DRA Parties claimed interests. On December 7,
2020, the Oversight Board filed its answering brief.  The Oversight Board argued the Title III
Court did not abuse its discretion in denying the HTA Lift Stay Motion on the ground the Title III
Court already was adjudicating Movants' claims on the merits in the Commonwealth-HTA Claim
Challenge Action described below in section V.F.5.b) of this Disclosure Statement.   The
Commonwealth further argued the Title III Court's decision should be affirmed because, among
other reasons, (i) the plain language of the Resolutions grant Movants a security interest only in
moneys deposited with the Fiscal Agent, and (ii) the excise tax statutes do not give Movants
beneficial ownership of, or any property rights in, the excise taxes.  Also on December 7, 2020,
AAFAF and the UCC filed partial joinders to the Oversight Board's response brief.  On December
21, 2020, Movants filed their reply brief.  On January 20, 2021, Appellants filed a 28(j) letter
submitting supplemental authority regarding the Title III Court's ruling granting limited discovery
in connection with the Oversight Board's motion for partial summary judgment.   On January 22,
2021, the Oversight Board filed a response to Movants' 28(j) letter.  Oral argument was heard on
February 4, 2021, and the appeal was taken under submission.  On March 3, 2021, the First Circuit
issued a combined opinion in this case and in Case No. 20-1931 affirming the Title III Court's
denial of the PRIFA Lift Stay Motion and the HTA Lift Stay Motion.  The First Circuit held that
the Title III Court did not abuse its discretion in denying relief from the automatic stay.  In
particular, the First Circuit held lifting the automatic stay would not serve the interests of judicial
economy and would interfere with the bankruptcy proceedings.  On March 24, 2021, the First
Circuit issued its mandate.  On May 11, 2021, Assured, National, and the Oversight Board filed a
joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending
confirmation of the Commonwealth and HTA plans of adjustment, including the HTA Lift Stay
Motion [ECF No. 16739].  For further discussion of this motion, see Section V.E.4.(f).

While the HTA Lift Stay Motion was pending, on July 17, 2020, Movants, along with
FGIC (the "Section 926 HTA Movants"), filed a motion for entry of an order appointing them as
co-trustees under section 926 of the Bankruptcy Code in order to pursue certain avoidance claims
pursuant to Bankruptcy Code sections 549, 544, and 548 on behalf of HTA against the
Commonwealth [Case No. 17-bk-3567, ECF No. 871] (the "Section 926 Motion").  According to
the Section 926 HTA Movants, HTA had avoidance claims against the Commonwealth that the
Oversight Board has unjustifiably refused to pursue, and the Oversight Board suffers from an
unresolvable conflict of interest because it simultaneously represents both HTA and the
Commonwealth in their respective Title III proceedings.  The statute of limitations for those
avoidance claims was set to expire on August 14, 2020.  The Section 926 HTA Movants further
state that they disagree with the Title III Court's HTA Lift Stay Opinion and Order and submit the
Section 926 Motion to preserve their rights under section 926.  Also on July 17, 2020, the DRA
Parties filed a joinder to the Section 926 Motion [Case No. 17-bk-3567, ECF No. 873].  The motion
was fully briefed.  On August 11, 2020, the Title III Court issued an order denying the Section 926
Motion [Case No. 17-bk-3567, ECF No. 912].  The Title III Court noted in the order it had wide
discretion to decide whether a trustee should be appointed, particularly in light of the constitutional
and federalism concerns inherent in municipal bankruptcy proceedings, and the Oversight Board's

sole authority to propose plans of adjustment under PROMESA. The Title III Court held the Section 926 Motion was based on a legal theory—that certain tax revenues are owned by HTA, and not the Commonwealth—the Oversight Board had declined to adopt and the Court found lacking. The Title III Court also noted the First Circuit had already concluded the Oversight Board's representation of multiple debtors did not create an automatic, irreconcilable conflict.

On August 25, 2020, the Section 926 HTA Movants filed a notice of appeal [Case No. 17-bk-3567, ECF No. 914]. On September 16, 2020, the First Circuit Court of Appeals docketed the appeal as Case No. 20-1847. On September 30, 2020, Appellants filed a motion to hold the appeal in abeyance pending a decision on the Movants' appeal of the Title III Court's Memorandum Opinion. On October 13, 2020, Appellees filed an opposition to Appellants' motion to hold the appeal in abeyance and a cross-motion to dismiss the appeal as moot. The motions were fully briefed. On December 22, 2020, the First Circuit issued an order denying Appellants' motion to hold the appeal in abeyance. On February 17, 2021, Appellants filed their opening brief and the DRA Parties filed a partial joinder to Appellants' opening brief. On February 23, 2021, the DRA Parties filed a motion for leave to file a joinder to Appellants' opening brief. On April 1, 2021, the First Circuit issued an order denying the DRA Parties' motion for leave to file a joinder to Appellants' opening brief. On April 12, 2021, the DRA Parties filed a motion to intervene. On April 19, 2021, Appellees filed their answering briefs. On May 24, 2021, Appellants filed their reply brief. On June 4, 2021, the Court entered an order granting the DRA Parties' motion to intervene.

### h)      PRIFA Lift Stay Motion

On May 30, 2019, Ambac filed a motion for (i) an order that the automatic stay does not apply to its action against the United States Treasury for an equitable lien on pledged rum taxes before they are transferred to the Commonwealth and its action against the Commonwealth to enforce its lien on pledged rum taxes, or, in the alternative, (ii) relief from the automatic stay to pursue the actions, or, in the further alternative, (iii) adequate protection for its collateral. Ambac alleges that the automatic stay does not apply because the Commonwealth does not have a property interest in the pledged rum taxes. Ambac further alleged that the Commonwealth had violated PROMESA and Commonwealth law by diverting the pledged rum taxes [ECF No. 7176].

On June 6, 2019, the Oversight Board filed an urgent motion to dismiss Ambac's motion, alleging, among other things, that only the bond trustee has standing to institute an action relating to bonds issued by PRIFA [ECF No. 7262]. On June 7, 2019, the Title III Court denied the Oversight Board's urgent motion without prejudice to the Oversight Board raising the same arguments in its opposition to Ambac's motion [ECF No. 7324]. On July 3, 2019, the Oversight Board and AAFAF filed oppositions to the lift stay motion [ECF Nos. 7827, 7829]. The Oversight Board's opposition incorporated its argument from its motion to dismiss that Ambac lacks standing to institute the motion. On July 16, 2019, Ambac and FGIC filed a reply [ECF No. 8022]. On July 19, 2019, the Oversight Board filed a sur-reply [ECF No. 8164].

On July 24, 2019, at Ambac's request and the Oversight Board's consent, the Title III Court included the PRIFA Lift Stay Motion in the Stay Order, which stay was extended through March 11, 2020. Pursuant to the Initial Interim Revenue Bonds CMO, any motion for leave to amend the lift stay motion was to be filed by January 16, 2020.

On January 16, 2020, Ambac, FGIC, Assured Guaranty Corp., Assured Guaranty Municipal Corp. and U.S. Bank Trust National Association (the "Movants") filed a motion for leave to amend the lift stay motion previously filed by Ambac [ECF No. 10109], which proposed adding (i) the trustee as a moving party, (ii) discussion of the First Circuit's decision in *Gracia-Gracia v. Financial Oversight & Management Board*, 939 F.3d 340 (1st Cir. 2019), and (iii) discussion of factual developments regarding the pledged rum taxes.

In the proposed amended motion, Movants removed the argument that the automatic stay does not apply, and argued the stay should be lifted because (i) the Commonwealth lacks equity in the rum tax remittances deposited in the TSA, and (ii) the rum taxes are unnecessary to an effective reorganization because the Commonwealth lacks a property interest in them.

On January 22, 2020, the Oversight Board filed its opposition to the motion to amend [ECF No. 10274] and AAFAF and Destilería Serrallés Inc. filed limited joinders to the Oversight Board's opposition [ECF Nos. 10275, 10277]. On January 25, 2020, Movants filed a reply in support of their motion to amend [ECF No. 10400]. On January 31, 2020, the Title III Court granted Ambac's motion for leave to amend [ECF No. 10591]. Also on January 31, 2020, the Title III Court entered an Amended Interim Case Management Order [ECF No. 10595] limiting briefing on the lift stay to issues of standing and movants' security interest and setting a March 5, 2020 preliminary hearing on whether the movants have standing to sue and security or other property interests in the relevant revenues.

On January 31, 2020, Movants filed the PRIFA Lift Stay Motion [ECF No. 10602].

On February 3, 2020, the Commonwealth filed a supplemental opposition to the PRIFA Lift Stay Motion [ECF No. 10611]. The UCC and AAFAF filed limited joinders to the Commonwealth's opposition [ECF Nos. 10635, 10641]. Bacardi International Limited and Bacardi Corporation (together with Bacardi International Limited, "Bacardi") filed its own opposition to the PRIFA Motion [ECF No. 10609]. Destilería Serrallés Inc. joined the Commonwealth and Bacardi's oppositions [ECF No. 10612]. On February 12, 2020, Assured, Ambac, National, and FGIC filed an urgent motion seeking to adjourn the hearing on the CCDA Lift Stay Motion, the HTA Lift Stay Motion, and the PRIFA Lift Stay Motion until April 22, 2020 and to extend the deadline for their replies in support of their lift stay motions until April 6, 2020 [ECF No. 10841]. According to the movants, this adjournment was necessary in order to permit time to obtain discovery. On February 14, 2020, the Title III Court entered an order granting the motion and adjourning the preliminary hearing until April 2, 2020, and allowed for certain discovery by the movants to occur [ECF No. 11057]. The Title III Court also entered an order referring any discovery disputes (associated with such discovery) to Magistrate Judge Dein, and setting a hearing on any discovery disputes for March 4 and 5, 2020 [ECF No. 11058]. On February 24, 2020, Ambac, Assured, and FGIC filed a joint motion to compel the production of documents in connection with the HTA, PRIFA, and CCDA lift-stay motions [ECF No. 11687]. On March 5, 2020, Magistrate Judge Dein entered an order partially granting Assured, Ambac, and FGIC's joint motion to compel production of documents in connection with the CCDA and PRIFA lift-stay motions [ECF No. 12080].

On April 30, 2020, Ambac, FGIC, Assured, and U.S. Bank filed a reply in support of the PRIFA Lift Stay Motion [ECF No. 12995]. On May 18, 2020, the Commonwealth filed a sur-

reply in opposition to the PRIFA Lift Stay Motion [ECF No. 13159]. On May 26, 2020, Ambac, Assured, FGIC, and U.S. Bank filed a response to the Commonwealth's sur-reply in opposition to the PRIFA Lift Stay Motion [ECF No. 13228].

On July 2, 2020, the Title III Court issued the *Opinion and Order in Connection with Preliminary Hearing Regarding Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 13542] (the "PRIFA Lift Stay Opinion and Order"), holding Movants had not made the preliminary showing necessary to allow the PRIFA Lift Stay Motion to proceed to a final hearing because they had failed to demonstrate that they have a colorable claim to a security or beneficial interest in the Rum Tax Remittances (as defined therein) other than those Rum Tax Remittances deposited into a certain Sinking Fund. The Title III Court denied the PRIFA Lift Stay Motion to the extent it seeks stay relief or adequate protection with respect to the Rum Tax Remittances other than those Rum Tax Remittances that have been deposited in the Sinking Fund. The Title III Court directed the parties to meet and confer and, no later than July 9, 2020, file a joint report as to their positions on the nature, scope and scheduling of further proceedings that they may believe are necessary in connection with the PRIFA Lift Stay Motion, including any proceedings concerning stay relief with respect to the Movants' assertion of unsecured claims. The Title III Court advised the parties that if no further proceedings were necessary, the Title III Court would enter an order terminating the PRIFA Lift Stay Motion as denied for the reasons stated in the PRIFA Lift Stay Opinion and Order.

The parties filed their *Joint Status Report With Respect To Further Proceedings Regarding The Revenue Bond Stay Relief Motions* [ECF No. 13601] on July 9, 2020. On July 10, 2020, the Title III Court issued its *Order Scheduling Further Proceedings In Connection With The Revenue Bond Stay Relief Motions* [ECF No. 13607] directing the parties to file supplemental briefing addressing, for the PRIFA Lift Stay Motion, the HTA Lift Stay Motion and the CCDA Lift Stay Motion, whether "cause" exists to justify lifting the automatic stay.

Movants filed their supplemental brief [ECF No. 13744] on July 20, 2020, and, on July 31, 2020, the Oversight Board and AAFAF filed a joint response to Movants' supplemental brief [ECF No. 13906]. Also on July 31, 2020, the UCC filed a limited joinder to the Oversight Board and AAFAF's joint response [ECF No. 13906]. On August 6, 2020, Movants filed a consolidated reply in further support of the PRIFA Lift Stay Motion, HTA Lift Stay Motion and CCDA Lift Stay Motion [ECF No. 13992].

On September 9, 2020, the Title III Court issued its Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions [ECF No. 14186] (the "Memorandum Opinion") denying the PRIFA Lift Stay Motion and the HTA Lift Stay Motion on a final basis. The Title III Court found: (i) Movants had failed to establish that PROMESA section 305 creates any due process impediment that provides "cause" for relief from the automatic stay; (ii) cause did not exist for stay relief under section 362(d)(1) of the Bankruptcy Code; and (iii) cause did not exist to lift the automatic stay under the *Sonnax* factors (*In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir.1990)).

On September 23, 2020, Movants filed a notice of appeal of the Title III Court's Memorandum Opinion [ECF No. 14390]. On September 24, 2020, the United States Court of Appeals for the First Circuit docketed the appeal as Case No. 20-1931. On October 28, 2020, Appellants filed their opening brief on appeal. Appellants argued that the Title III Court's decision was incorrect because (i) bondholders have a security interest in the first $117 million of Rum Tax Remittances, (ii) the relevant statutes created a trust in favor of PRIFA and its bondholders, and (iii) the relevant statutes created a trust in favor of PRIFA and its bondholders, and (iii) the relevant statutes and agreements created a constitutionally protected interest. On December 7, 2020, the Oversight Board filed its answering brief. The Oversight Board argued that the Title III Court did not abuse its discretion because Appellants' claims are being decided on a final basis by the Title III Court and that the Title III Court's decision was correct because, among other reasons, (i) the plain language of the Trust Agreement limits Appellants' security interest to monies deposited in the Sinking Fund, (ii) the relevant statute merely contains a promise by the Commonwealth to appropriate certain monies to PRIFA for its corporate purposes, subject to its ability to retain the monies under subject to Section 8 of Article VI of the Commonwealth Constitution, and (iii) Appellants' claims are unsecured and dischargeable under PROMESA. Also on December 7, 2020, AAFAF and the UCC filed partial joinders to the Oversight Board's response brief. On December 21, 2020, Appellants filed their reply brief. On January 20, 2021, Appellants filed a 28(j) letter submitting supplemental authority regarding the Title III Court's ruling granting limited discovery in connection with the Oversight Board's motion for partial summary judgment. On January 22, 2021, the Oversight Board filed a response to Appellants' 28(j) letter. Oral argument was heard on February 4, 2021, and the appeal was taken under submission. On March 3, 2021, the First Circuit issued a combined opinion in this and Case No. 20-1930 affirming the Title III Court's denial of the PRIFA Lift Stay Motion and the HTA Lift Stay Motion. The First Circuit ruled that the Title III Court did not abuse its discretion in denying relief from the automatic stay. The First Circuit also ruled lifting the automatic stay would not serve the interests of judicial economy and would interfere with the bankruptcy proceedings. On March 24, 2021, the First Circuit issued its mandate. On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the PRIFA Lift Stay Motion [ECF No. 16739]. For further discussion of this motion, see Section V.E.4.(f).

### i)        Federally Qualified Health Centers Lift Stay Motions

Various federally qualified health centers ("FQHCs") have filed motions to lift the automatic stay, which are summarized below.

### (i)        *SIM Motion*

Salud Integral en la Montaña, Corporación de Servicios de Salud y Medicina Avanzada, NeoMed Center, Migrant Health Center, HPM Foundation (d/b/a HealthproMed), Morovis Community Health Center, and Concilio de Salud Integral de Loiza (collectively the "SIM Movants") filed their *Motion of Salud Integral en la Montaña, Coproración de Servicios de Salud y Medicina Avanzada, Neomed Center, Migrant Health Center, HPM Foundation, Morovis Community Health Center, and Concilio de Salud Integral de Loiza for Allowance and Payment of Administrative Expense Claim, or in the Alternative, Relief from the Automatic Stay* [ECF No.

13582] ("SIM Motion") on July 7, 2020.  The SIM Movants were seeking allowance of an administrative claim pursuant to Bankruptcy Code section 503(b)(1) or in the alternative, for stay relief under Bankruptcy Code section 362(d)(1).

The SIM Movants and others are plaintiffs in a civil action styled *Rio Grande Community Health Center, Inc., et al. v. Hon. Rafael Rodriguez Mercado, Secretary, Department of Health Commonwealth of Puerto Rico*, Case No. 03-1640 (Consolidated with Case Nos. 06-1291, 06-1524) (the "Federal Action"), in the District Court for the District of Puerto Rico.  Plaintiffs in the Federal Action seek injunctive relief ordering the Commonwealth to make certain payments to the plaintiffs in connection with their provision of medical services to Commonwealth residents who are Medicaid recipients.

In their lift stay motion, the SIM Movants assert administrative expense status for allegedly unpaid quarterly estimated "wraparound" payments that, through a stipulation, were allowed to be made by the Commonwealth pursuant to a formula ("Permitted Quarterly Payments"). ("Wraparound" payments are a common term for certain types of supplemental payments that may be owed by a state or territory to an FQHC in connection with administering a managed care Medicaid model.[209])  In the alternative to an allowed administrative expense, the SIM Movants requested the Court lift the automatic stay to permit the District Court in the Federal Action to enforce the Commonwealth's payment obligations.

The Commonwealth and the SIM Movants agreed to adjourn the hearing and associated deadlines for responsive pleadings to the SIM Motion on several occasions [ECF Nos. 13996, 14032, 14074].  On August 21, 2020, the Commonwealth and the SIM Movants filed a stipulation in which they agreed to resolve the SIM Motion; therein, the Commonwealth agreed, *inter alia*, to pay the SIM Movants allege to be a $11,699,116.70 shortfall in wraparound payments owed.  The stipulation was approved by the Court on August 25, 2020.  [ECF No. 14093].  Pursuant to the terms of the August 21, 2020 stipulation, the SIM Movants withdrew the SIM Motion on September 3, 2020, approved by the Court on September 16, 2020. [ECF No. 14322].

(ii)      ***Atlantic Motion***

Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc. (collectively the "Atlantic Movants") filed their *Motion of Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Medicos Primarios y Prevencion de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc. Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castaner, Inc. Seeking (I) Enforcement of the Court's Prior Order and (II) Relief from the Automatic Stay* [ECF No. 12918] (the "Atlantic Motion") on April 21, 2020.  The Atlantic

---

[209] The methodology of the calculation of such payments, among other things, is a pending issue of dispute between certain FQHCs and the Commonwealth.

Movants seek an order (i) enforcing a stipulation between the Commonwealth and Atlantic Movants dated July 19, 2019, and compelling the Commonwealth to make Permitted Quarterly Payments, including the immediate payment of an alleged shortfall; (ii) lifting the automatic stay to allow the Federal Action to continue; and (iii) enforcing payment of ongoing payments due pursuant to 42 U.S.C. § 1396a(bb).

The Commonwealth and the Atlantic Movants agreed to adjourn the deadlines for responsive pleadings to and the hearing on the Atlantic Motion pursuant to a stipulation, which was approved by the Court. [ECF Nos. 13279, 13303]. The Commonwealth subsequently filed, and the Court approved, additional consensual motions for the extension of deadlines. The latest of these consensual motions was granted on January 13, 2021 [ECF No. 15608]. On February 24, 2021, the Commonwealth filed its opposition [ECF No. 15883], noting that although the Commonwealth and the Atlantic Movants (along with other FQHCs) were engaged in negotiations to settle their claims, the Commonwealth was filing an opposition to preserve its rights pursuant to the Atlantic Motion. The Atlantic Movant filed its reply on March 3, 2021. A hearing is scheduled for March 10, 2021.

(iii)     ***Med Centro Motion***

Med Centro, Inc. ("Med Centro") filed its *Med Centro Inc.'s Motion for Relief From the Automatic Stay* [ECF No. 13748] (the "Med Centro Motion") on August 4, 2020. Med Centro is seeking relief from the automatic stay order to proceed with a prepetition action in the District Court to seek (1) the enforcement of a prepetition confidential settlement agreement dated October 7, 2011 (the "CSA"); (2) compliance with 42 U.S.C. § 1396a(bb)(3), from the first quarter of 2018 onwards; and (3) for the District Court to extend its enforcement jurisdiction of the CSA beyond October 7, 2020.

The Commonwealth filed an objection to the Med Centro Motion on August 4, 2020 and Med Centro filed a reply on August 11, 2020. Upon being informed that the Commonwealth and Med Centro agreed to have the Court decide the Med Centro Motion upon submission, the Court ordered the parties, at ECF No. 14251, to submit a status report on whether a need remained to have oral argument on certain issues the Court identified and wished to have heard. After the parties filed a status report, the Court canceled the hearing to consider the Med Centro Motion [ECF No. 14313] and took the motion on submission. On September 17, 2020 the Court issued an order [ECF No. 14330] lifting the automatic stay solely to permit Med Centro to 1) apply for an extension of the enforcement jurisdiction of the District Court over the CSA without prejudice to the parties' respective positions as to whether such extension should be granted; and 2) invoke and pursue the dispute resolution process set forth in section III.D of the CSA, provided that the stay remains in place, and the Court retains jurisdiction with respect to the execution and enforcement of any decision rendered through that process.[210]

---

[210] Under paragraph 6 of the *Eleventh Omnibus Order Granting Relief from the Automatic Stay* (ECF No. 8499 in Case No. 17-3283) the "Court shall retain jurisdiction to hear and determine all matters . . . concerning the execution or enforcement in the Title III cases of any judgment entered in a prepetition ordinary course civil action where the Debtors agreed to modify or lift the Title III Stay to allow the action to proceed to judgment by the underlying court."

j) ***Ambac Assurance Corp. v. Autopistas Metropolitanas de Puerto Rico, LLC*, Case No. 20-cv-1094**

On February 19, 2020, Ambac filed a complaint against Autopistas Metropolitanas de Puerto Rico, LLC ("Metropistas") in the District Court for the District of Puerto Rico, alleging Metropistas acted in bad faith by agreeing to pay HTA only $115 million in exchange for a ten-year extension to a concession agreement pursuant to which Metropistas operated two Puerto Rico highways, PR-5 and PR-22 [3:20-cv-01094; ECF No. 1]. Ambac argued Metropistas paid far less than the reasonably equivalent value for the rights to operate the highway. Ambac sought to reclaim through rescission, unjust enrichment, the value of the concession granted to Metropistas to secure the payment of obligations owed by HTA to Ambac, and a declaration that Ambac has a valid, continuing lien on certain toll revenues collected by Metropistas.

On March 2, 2020, Metropistas filed a motion to reassign the case to Judge Swain and sought a stay pending reassignment [3:20-cv-01094; No. 10]. On March 16, 2020, Ambac responded to Metropistas' motion, opposing the motion to stay pending reassignment, but not opposing the motion to reassign the case [3:20-cv-01094; ECF No. 20].

On March 31, 2020, the Oversight Board, on behalf of the Commonwealth and HTA, filed a motion seeking an order directing Ambac to withdraw its complaint, arguing the litigation violates Bankruptcy Code Section 362 because, among other things, it (i) interferes with HTA's property rights; (ii) seeks a declaratory judgment with respect to Ambac's lien; and (iii) seeks to recover on a claim against HTA [17-bk-3567-LTS; ECF No. 757]. On April 1, 2020, Metropistas filed a joinder to the Oversight Board's motion [17-bk-3567-LTS; ECF No. 759].

On April 18, 2020, Metropistas and Ambac filed a joint motion to extend the deadline to respond to the complaint and to stay the case pending resolution of the Oversight Board's motion [ECF No. 21]. On April 20, 2020, Judge Delgado-Hernandez issued a text-only order staying the case [3:20-cv-01094; ECF No. 22].

On April 28, 2020, Ambac filed an opposition to the Oversight Board's motion, arguing the litigation did not interfere with HTA's property rights and that Ambac had standing to pursue claims against Metropistas because, among other things, (i) HTA had abandoned Section 544(b) claims against Metropistas; and (ii) Ambac's conduct did not violate the automatic stay [17-bk-3282-LTS; ECF No. 12964]. On May 27, 2020, the Oversight Board filed a reply [17-bk-3567-LTS; ECF No. 822], and on May 29, 2020, the Oversight Board filed an informative motion in connection with its reply [17-bk-3567-LTS; ECF No. 824].

On June 16, 2020, Judge Swain issued an order granting the Oversight Board's motion and directed Ambac to withdraw its complaint. Judge Swain ruled the complaint violated the automatic stay (and specifically section 362(a)(1), (3), (4) and (6)) because, among other things, Ambac's claims (i) attempted to exercise control over HTA's property rights, and (ii) sought to enforce a lien against property of HTA [17-bk-3567-LTS; ECF No. 845]. On June 23, 2020, and pursuant to Judge Swain's order, Ambac filed a notice of withdrawal of its complaint [3:20-cv-01094; ECF No. 23].

On June 30, 2020, Ambac filed a notice of appeal as to Judge Swain's order granting the Oversight Board's motion directing Ambac to withdraw its complaint [17-bk-3567-LTS; ECF No. 850]. On July 20, 2020, Judge Delgado-Hernández issued a text-only order granting Ambac's notice of withdrawal of its complaint, and issued a judgment closing the case [3:20-cv-01094; ECF Nos. 24 and 25].

On July 30, 2020, the appeal was docketed as *Ambac v. Commonwealth,* Case No. 20-1657. On October 19, 2020, Ambac filed its opening brief, arguing the Title III court had erred in finding that its complaint violated the automatic stay.

On December 18, 2020, the Oversight Board filed its answering brief in the appeal, reasserting its arguments that Ambac's complaint violated multiple aspects of the automatic stay under Section 362. Among other points, the Oversight Board argued Ambac attempted to exercise control over HTA's property and sought to enforce a lien against HTA's property. Metropistas filed a joinder to the Oversight Board's answering brief. On December 21, 2020, the Court issued an order regarding Metropistas' joinder to the Oversight Board's brief. On February 12, 2021, Appellant filed its reply brief. The appeal was argued to the First Circuit on March 8, 2021.

k)   ***Yashei Rosario v. The Financial Oversight and Management Board for Puerto Rico***, **Case No. 20-cv-01307**

On November 27, 2017, Yashei Rosario, for herself and in her capacity as the President of the non-profit organization Development Socioeconomic Sustainable Fideicomiso of Vieques, CODESU, Inc. ("CODESU, Inc.") (collectively "Plaintiff"), filed a *pro se* complaint with the Puerto Rico District Court against the Commonwealth, the President of the Puerto Rico House, Carlos Johnny Méndez, the President of the Puerto Rico Senate, Thomas Rivera-Schatz, and then-Governor Ricardo Rosselló. The Complaint asserted the Commonwealth had historically mismanaged the municipality of Vieques and failed to represent its interests. The complaint further alleged the Commonwealth was in violation of the Voting Rights Act, 52 U.S.C. § 10301 *et seq.* and violated Plaintiff's First Amendment rights, by "abridg[ing] their voices in Congress." To remedy those alleged violations, the complaint sought an order compelling the Commonwealth to hold a referendum regarding the political status of the municipality of Vieques. The complaint also sought certain relief to facilitate the proposed referendum, as well as monetary relief. Plaintiff alleged the relief sought was not related to the Title III cases because Plaintiff would "pay the Electoral Commission of Puerto Rico" for the referendum's costs.

On December 8, 2017, Plaintiff filed a motion requesting the District Court to issue an order prohibiting Commonwealth agencies "holding properties in land in Vieques" from selling that land. According to Plaintiffs, the requested order was necessary to prevent the Commonwealth from selling land that would otherwise be owned by the proposed, separate United States territory of Vieques. If so ordered, Plaintiffs requested federal authorities "take charge" of the land until the requested referendum could be held. The District Court did not rule on this request.

On December 29, 2017, Plaintiff filed a motion for class certification (although the complaint was not styled as a class action). On April 20, 2018, and without any filed opposition,

273

the District Court denied Plaintiff's motion for class certification because Plaintiffs could not provide sufficient information to conduct the certification analysis.

On June 29, 2018, the District Court dismissed the complaint without prejudice for failing to file proofs of service.

Plaintiff subsequently appealed the dismissal to the First Circuit [No. 18-1782]. On September 24, 2018, the First Circuit entered an order directing Plaintiff to show cause whether the automatic stay applied to all or any part of the appeal. On October 9, 2018, Plaintiff responded to the order to show cause, asserting the automatic stay did not apply to the underlying complaint and the appeal because the relief sought "does not involve any budgetary nor financial request from the Commonwealth." On October 16, 2018, the Commonwealth and Governor Rosselló filed their response, arguing the automatic stay did apply because, although Plaintiff framed the complaint as seeking only an order to perform a referendum, the cause of action was actually for equitable and injunctive relief, and plaintiff sought to exercise at least some degree of control over the Commonwealth's resources, and litigation of the allegations in the Complaint would force the Commonwealth to spend funds.

On November 27, 2018, the First Circuit summarily ordered the appeal stayed "[i]n view of the petition to restructure its debts filed by the Commonwealth of Puerto Rico . . . ." Following entry of the Stay Order, Movants filed a series of status reports and motions for reconsideration that requested the First Circuit lift the stay. The First Circuit denied various requests by Plaintiff for reconsideration. In its most recent order denying reconsideration, entered March 26, 2020, the First Circuit directed Movant to "the Title III court to seek stay relief if such relief is desired."

On June 30, 2020, and presumably in response to the First Circuit's directive, Plaintiff filed a complaint with the District of Puerto Rico, which was styled as a "Motion of Stay Relief Based on Modern Legal Genocide." [Case No. 20-cv-01307, ECF No. 3]. On July 9, 2020, Chief Judge Gelpi entered an order stating the District Court would "construe the [20-1307] Complaint's request for stay relief as a motion for relief from the automatic stay" and "transfer it to Case No. 17-3283 for consideration as a contested matter in the Commonwealth's Title III case." The motion for stay relief was subsequently docketed in the Commonwealth's Title III case, and the Title III Court issued a briefing schedule. On July 23, 2020, the Oversight Board, on behalf of the Commonwealth, filed an opposition to the request for relief from stay [ECF No. 13816]. The Commonwealth argued the automatic stay was applicable, and the motion should be denied because (i) Plaintiff had not established, or even attempted to demonstrate, that "cause" exists to lift the automatic stay, and (ii) the *Sonnax* factors, which Plaintiff failed to address, weighed heavily against lifting the stay. On July 24, 2020, Yashei Rosario filed a reply in support of her motion for relief from the automatic stay [ECF No. 13864]. On August 5, 2020, the Title III Court issued an order denying the motion [ECF No. 13990].

Notwithstanding the denial of the motion for stay relief, on December 15, 2020, Yashei Rosario filed a motion regarding the Title III Court's order [Case No. 20-cv-01307, ECF No. 11]. On December 23, 2020, Chief Judge Gelpí issued an order and judgment dismissing the case for failure to state a claim [Case No. 20-cv-01307, ECF Nos. 13, 15]. On December 29, 2020, the case was closed. On January 26, 2021, Plaintiff filed a motion for reconsideration of Chief Judge

274

Gelpí's order dismissing the case [Case No. 20-cv-01307, ECF No. 16], which Chief Judge Gelpí denied in a text-only order on January 27, 2021 [Case No. 20-cv-01307, ECF No. 17]. On February 2, 2021, Plaintiff filed a motion for a preliminary injunction [Case No. 20-cv-01307, ECF No. 18], which Chief Judge Gelpí denied in a text-only order on February 19, 2021 [Case No. 20-cv-01307, ECF No. 19]. On March 9, 2021, Plaintiff filed a motion for reconsideration of Chief Judge Gelpí's January 27 and February 19 orders [Case No. 20-cv-01307, ECF No. 20], which Chief Judge Gelpí denied in a text-only order on March 15, 2021 [Case No. 20-cv-01307, ECF No. 21].

## F.    Significant Adversary Proceedings and Related Litigation

Over the course of the Title III cases, the Oversight Board has represented the Debtors' interests in numerous, multi-billion-dollar adversary proceedings, contested matters, and lawsuits brought primarily by creditors, but also by the government or legislature in a few instances. To date, there have been 95 adversary proceedings filed against the Oversight Board, the Commonwealth, and the instrumentalities, as well as over 300 avoidance actions filed against creditors.

As discussed above, included in these actions, in addition to cases filed by creditors, were actions initiated by the Government and municipalities in efforts to enjoin the Oversight Board from fulfilling what it regards as its duties, *see* section IV.C.3.h). The Oversight Board has attempted to uphold and reaffirm the operation of PROMESA as a tool to restructure Puerto Rico's debt, and to date the courts have not granted any relief preventing the Oversight Board from continuing its statutory mission.

### 1.    Appointments Clause Litigation

#### a)    *Aurelius Investments, LLC, et al. v. Commonwealth of Puerto Rico, et al.*, Case Nos. 18-1671; 18-8014 (1st Cir.)

On August 7, 2017, Appellants Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius") moved to dismiss the Commonwealth's Title III petition [ECF No. 913]. Aurelius alleged that the Oversight Board lacked authority to initiate the Title III case because its members were appointed in violation of the Appointments Clause of the United States Constitution, U.S. Const. art. II, § 2, and the principle of separation of powers. In response, the Oversight Board argued that its members were not "Officers of the United States" under the Appointments Clause, and that the Oversight Board's powers were purely local, not federal, and thus the Appointments Clause did not apply [ECF No. 1622]. The Oversight Board also argued that even if its members were federal officers, the Appointments Clause was not violated because Board members exercised authority in Puerto Rico, where the Territories Clause endows Congress with plenary powers. In the alternative, the Oversight Board argued that the appointment of its members' did not require advice and consent of the Senate because they were "inferior officers."

On July 13, 2018, the Title III Court denied Aurelius' motion to dismiss the Commonwealth's Title III petition [ECF No. 3503]. Aurelius appealed. On September 7, 2018, the First Circuit consolidated the Aurelius appeal with similar appeals involving Appointments

Clause challenges to the Oversight Board (discussed below) brought by Union de Trabajadores de la Industria Electrica y Riego (UTIER) and Assured Guaranty Corp.

On February 15, 2019, the First Circuit ruled that the appointment of the Oversight Board's members was unconstitutional.   However, the First Circuit affirmed the Title III Court's decision declining to dismiss the Title III petitions, holding that actions taken by the Oversight Board prior to the First Circuit's ruling were valid under the *de facto* officer doctrine.  The First Circuit stayed its ruling for 90 days to allow the President and the Senate to cure the defective appointments.

The Oversight Board filed a petition for a writ of certiorari on April 23, 2019, which was docketed as U.S. Supreme Court Case No. 18-1334.  On April 24, 2019, the Oversight Board moved with the First Circuit to stay the mandate pending the disposition of its petition for certiorari.  On May 6, 2019, the First Circuit extended the stay of the mandate by 60 days until July 15, 2019.

On May 24, 2019, Aurelius filed a petition for a writ of certiorari challenging the First Circuit's *de facto* officer ruling, which was docketed as U.S. Supreme Court Case No. 18-1475.  The UCC, which appeared as an appellee in the appeal at the First Circuit, filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1496.  The United States filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1514.  UTIER filed a petition for a writ of certiorari on June 5, 2019, which was docketed as U.S. Supreme Court Case No. 18-1521.

On June 18, 2019, the Oversight Board moved the First Circuit to extend the stay of the mandate until resolution of the above cases by the Supreme Court. On June 19, 2019, the Supreme Court granted all of the petitions for certiorari and consolidated the cases. U.S. Supreme Court Case No. 18-1334 was designated as the lead case. On July 2, 2019, the First Circuit granted the Oversight Board's motion to stay the mandate pending a merits decision by the Supreme Court.

On July 25, 2019, the Oversight Board, AAFAF, the Retirees Committee, the United States, and the UCC filed briefs at the Supreme Court challenging the First Circuit's Appointments Clause ruling.   On August 22, 2019, UTIER and Aurelius filed their consolidated opening briefs, supporting the First Circuit's ruling on the Appointments Clause and challenging its ruling on the *de facto* officer doctrine.  Amicus briefs were filed by Anthony Michael Sabino (a constitutional law professor), Alan Mygatt Tauber (a constitutional law scholar), Aníbal Acevedo-Vilá (a former Governor of Puerto Rico), and the DRA Parties.  Sabino and Acevedo-Vilá recommended that the Supreme Court affirm the First Circuit's decision on the Appointments Clause issue, while Tauber recommended a reversal on that issue.  The DRA Parties recommended the same as Tauber and also argued that the Supreme Court should affirm the First Circuit's *de facto* officer ruling.   On September 19, 2019, the Oversight Board, AAFAF, the Retirees Committee, the United States, and the UCC filed replies in support of their challenges to the First Circuit's Appointments Clause ruling and supporting the First Circuit's ruling on the *de facto* officer doctrine.   The COFINA Senior Bondholders' Coalition filed a brief that was limited to supporting the First Circuit's ruling on the *de facto* officer doctrine.  On October 4, 2019, and October 8, 2019, UTIER and Aurelius filed reply briefs.  Oral argument was held on October 15, 2019.

On June 1, 2020, the United States Supreme Court reversed the First Circuit's February 15, 2019 decision. The Court held that the Appointments Clause does not apply to the appointment of the Oversight Board's members. Because the Oversight Board's statutory responsibilities consist of "primarily local duties"—namely, representing Puerto Rico "in bankruptcy proceedings and supervising aspects of Puerto Rico's fiscal and budgetary policies"—the Oversight Board's members are not "Officers of the United States" and thus not subject to the Appointments Clause. The Supreme Court declined to consider the application of the *de facto* officer doctrine since it held that the Oversight Board's members were validly appointed. Justices Sotomayor and Thomas issued opinions concurring in the judgment. Justice Sotomayor "reluctantly" concurred in the judgment but wrote to underscore the autonomy of Puerto Rico. Justice Thomas concurred that the appointment of the members of the Oversight Board did not violate the U.S. Constitution but took issue with the majority's "amorphous" test distinguishing between an officer's local and federal duties.

b) <b><i>Assured Guaranty Corp., et al. v. Financial Oversight and Management Board for Puerto Rico, et al.</i>, Adv. Proc. No. 18-00087</b>

On July 23, 2018, Plaintiffs Assured Guaranty Corp. and Assured Guaranty Municipal Corp., like Aurelius, filed a complaint challenging the constitutionality of the appointment of the Oversight Board's members. Assured sought declarations that the appointment of the Oversight Board's members violated the Appointments Clause and that the Oversight Board's actions were null and void. Assured also sought to enjoin the Oversight Board and its voting members from taking any further action until its members were lawfully appointed.

On August 3, 2018, the Title III Court issued a stipulated judgment [Adv. Proc. No. 18-00087, ECF No. 14] for the Oversight Board on the ground that the claims raised in Assured's complaint had already been found defective by the Title III Court in the *Aurelius* matter. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 318 F. Supp. 3d 537 (D.P.R. 2018). Assured filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-1746. That appeal was consolidated with the *Aurelius* appeal (discussed above) and was resolved on the same grounds.

c) <b><i>UTIER v. Puerto Rico Electric Power Authority, et al.</i>, Adv. Proc. No. 17-00228</b>

On August 6, 2017, Plaintiff UTIER brought a nearly identical Appointments Clause challenge to the appointment of the Board's members as Aurelius and Assured. UTIER sought (i) declaratory judgments that PROMESA violated the Appointments Clause and all of the Oversight Board's acts to date were invalid, and (ii) and order enjoining the Oversight Board from exercising any authority granted to it by PROMESA. On November 10, 2017, UTIER amended its complaint [Adv. Proc. No. 17-00228, ECF No. 75].

On November 20, 2017, the Oversight Board moved to dismiss the amended complaint [ECF No. 88].

On August 15, 2018, the Title III Court granted the Oversight Board's motion on the ground that there was no violation of the Appointments Clause. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 318 F. Supp. 3d 537, 557 (D.P.R. 2018).

277

On August 16, 2018, UTIER appealed to the First Circuit (docketed as Case No. 18-1787). On September 7, 2018, the First Circuit consolidated the UTIER appeal with the appeals brought by Aurelius and Assured discussed above. UTIER's appeal was resolved in the same manner as the Aurelius and Assured appeals. *See* section V.F.1.a) above.

### d)   *Hernandez-Montañez, et al. v. Financial Oversight & Management Board for Puerto Rico, et al.*, Adv. Proc. No. 18-00090

On July 25, 2018, certain members of the minority Popular Democratic Party serving in the Puerto Rico House of Representatives and Senate filed a complaint seeking declaratory judgments that (i) the Oversight Board's members were appointed in a manner that violates the Appointments Clause of the U.S. Constitution, (ii) the delegation of executive and legislative authority to the Oversight Board is a violation of the separation of powers doctrine, and (iii) the Oversight Board's use of its budgetary powers to allegedly encourage adoption of its preferred policies constitutes "impermissible interference" with Puerto Rico's autonomy. Plaintiffs also sought orders enjoining the Oversight Board from exercising its authority under PROMESA and enjoining the Oversight Board from supposedly interfering with the legislative process.

On August 27, 2018, the parties filed a joint status report in which Plaintiffs agreed (1) to stay their Appointments Clause claim while Aurelius's Appointments Clause appeal was pending and (2) dismiss their legislative autonomy claim [Adv. Proc. No. 18-00090, ECF No. 18]. The parties disagreed as to whether Plaintiffs' remaining claim that PROMESA violates the separation-of-powers doctrine should be stayed pending resolution of the Aurelius Appointments Clause appeal. On November 20, 2018, Magistrate Judge Dein entered an order [Adv. Proc. No. 18-00090, ECF No. 32] staying the case pending resolution of the consolidated appeals in *Aurelius Investments, LLC v. Commonwealth of Puerto Rico*, No. 18-1671, *Assured Guaranty Corp. v. Financial Oversight & Management Board for Puerto Rico*, No. 18-1746, and *UTIER v. Puerto Rico Electric Power Authority, et al.*, No. 18-1787. For more information on those appeals, *see* section V.F.1.a) above.

On August 19, 2020, after the Supreme Court's decision in Aurelius, Plaintiffs moved to lift the stay [Adv. Proc. No. 18-00090, ECF No. 33]. On September 11, 2020, the United States and the Oversight Board filed notices of non-opposition to Plaintiffs' motion [Adv. Proc. No. 18-00090, ECF Nos. 35, 36]. On September 14, 2020, the Title III Court lifted the stay [Adv. Proc. No. 18-00090, ECF No. 37]. On November 30, 2020, the Oversight Board moved to dismiss Plaintiff's complaint, asserting that it fails to state a claim for relief [Adv. Proc. No. 18-00090, ECF No. 45]. Also on November 30, 2020, the United States filed a brief in support of the constitutionality of PROMESA [Adv. Proc. No. 18-00090, ECF No. 47]. On February 26, 2021, Plaintiffs filed an opposition to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00090, ECF No. 52]. On March 29, 2021, the Oversight Board filed its reply in support of its motion [Adv. Proc. No. 18-00090, ECF No. 53]. On May 7, 2021, the Title III Court issued an order granting the Oversight Board's motion to dismiss, as to Count I of the complaint [Adv. Proc. No. 18-00090, ECF No. 54]. On May 14, 2021, the parties filed a joint stipulation of dismissal with prejudice as to Count III of the complaint [Adv. Proc. No. 18-00090, ECF No. 55]. On July 8, 2021, the Title III Court issued an order approving the parties' joint stipulation of dismissal [Adv. Proc. No. 18-00090, ECF No. 58]. On July 9, 2021, the Title III Court issued a judgment

dismissing the case with prejudice, and the adversary proceeding was closed [Adv. Proc. No. 18-00090, ECF No. 59].

2.   **Bondholder Litigation**

a)   ***Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.,***
***Adv. Proc. No. 17-00155; 17-00156***

On June 3, 2017, Assured and certain other Plaintiffs who insure bonds issued by HTA filed actions against the Commonwealth, HTA, and other Defendants, alleging Defendants illegally diverted what Plaintiff's described as certain HTA special revenues to the Commonwealth's General Fund. The Plaintiffs sought declaratory and injunctive relief, arguing Defendants violated the special revenue provisions of the Bankruptcy Code (sections 902, 922(d), and 928(a)), which exempt pledged post-petition special revenues from the automatic stay. Plaintiffs argued the bonds in question were special revenue bonds under section 902 and were not subject to the automatic stay under section 922(d). Plaintiffs sought enforcement of these provisions in the form of an injunction ordering Defendants to pay the special revenues.

On July 23, 2017, the Plaintiffs filed amended complaints alleging AAFAF improperly directed BNYM to refrain from applying or delivering funds held in HTA's Debt Service Reserve Accounts to the Existing HTA Bonds [Adv. Proc. No. 17-00155, ECF No. 39; Adv. Proc. No. 17-00156, ECF No. 41]. According to Plaintiffs, the funds in those accounts are the property of the bondholders, not the Debtor.

On July 28, 2017, Defendants filed motions to dismiss, arguing among other things (i) Plaintiffs failed to state a claim under sections 922(d) and 928(a) of the Bankruptcy Code because they did not allege facts showing they had a perfected security interest in HTA's revenues; (ii) sections 922(d) and 928(a) do not require the pledged special revenues, if any were alleged, be turned over; (iii) Plaintiffs did not allege facts establishing an enforceable lien on HTA revenues; (iv) the Title III Court lacked subject matter jurisdiction over the relief requested in the Complaint under PROMESA section 305, which limits the jurisdiction and the powers of the Title III Court; and (v) Plaintiffs did not state a claim to the funds from the Reserve Accounts, as they do not own the accounts [Adv. Proc. No. 17-00155, ECF No. 46; Adv. Proc. No. 17-00156, ECF No. 48].

On January 30, 2018, the Title III Court granted the motions to dismiss [Adv. Proc. No. 17-00155, ECF No. 125; Adv. Proc. No. 17-00156, ECF No. 121]. On February 9, 2018, Plaintiffs filed an appeal to the United States Court of Appeals for the First Circuit. The appeal was docketed as Case Nos. 18-1165 and 18-1166. On March 26, 2019, the First Circuit affirmed the Title III Court's decision, finding that it did not err when it dismissed the amended complaint on the ground neither Bankruptcy Code section 922(d) nor section 928(a) entitle the plaintiffs to the relief they sought. The First Circuit held these sections "permit, but do not require, continued payment during the pendency of the bankruptcy proceedings" and "stand for the premise that any consensual prepetition lien secured by special revenues will survive the period of municipal bankruptcy, and, accordingly, municipalities can elect to voluntarily continue payment on these debts during the course of the bankruptcy proceedings so as to not fall behind and thus be at risk of being unable to secure financing in the future." *Assured Guar. Corp.*, 919 F.3d at 132-33. On September 20, 2019, Appellants filed a petition for a writ of certiorari with the Supreme Court, which was docketed as

Case No. 19-391.  The petition was fully briefed and on January 13, 2020, the Supreme Court denied the petition.

> b)   ***Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.,***
> ***Adv. Proc. No. 18-00059***

On May 23, 2018, Assured Guaranty Corp. and FGIC filed actions against the Commonwealth, AAFAF, Governor Rosselló and other Defendants, alleging the April 2018 Commonwealth Fiscal Plan and related acts and orders violate PROMESA and the United States Constitution.  Plaintiffs insure GO Bonds, which they allege are entitled to first priority payment under the Commonwealth Constitution.  Plaintiffs also insure bonds issued by HTA, CCDA, and PRIFA which they allege are secured by enforceable and perfected liens against special revenues. Plaintiffs allege the Fiscal Plan disregards these priorities.  Plaintiffs seek declaratory judgments that (i) the April 2018 Commonwealth Fiscal Plan violated PROMESA sections 201(b) (delineating the requirements for the approval of fiscal plans), 303 (reserving the rights of covered territories to control their own instrumentalities and territories and preempting moratorium laws and unlawful executive orders), and 407 (prohibiting, among other things, transfers of property of any territorial instrumentality of Puerto Rico "in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on . . .") and Bankruptcy Code section 928(a) (stating that special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case); (ii) the Oversight Board lacked the authority to certify the Fiscal Plan; (iii) the April 2018 Fiscal Plan did not constitute a "Fiscal Plan" under PROMESA section 5; (iv) a plan of adjustment could not be confirmed based on the April 2018 Fiscal Plan and the Title III Court should not hold a confirmation hearing based on the April 2018 Commonwealth Fiscal Plan; (v) the challenged actions violate the Contracts, Takings, and Due Process Clauses and Article I, Section 1 of the United States Constitution; and (vi) the challenged actions violate PROMESA section 303(1) (concerning applicability of the sections of PROMESA to cases), and PROMESA section 303(3) (reserving the rights of covered territories to control their own instrumentalities and territories).

Defendants filed an urgent motion to stay the litigation on June 25, 2018 [Adv. Proc. No. 18-00059, ECF No. 14], arguing the issues raised in this adversary proceeding are substantially similar to those raised in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00159 (described in section V.F.2.b) below).  Magistrate Judge Dein granted the motion to stay this litigation pending a decision from the First Circuit in *Ambac*, determining that many of the questions on appeal in *Ambac* overlap with the issues in this case and that the requested stay does not significantly delay litigation [Adv. Proc. No. 18-00059, ECF No. 23].  On August 27, 2018, Plaintiffs filed an objection to the Magistrate Judge Dein's order [Adv. Proc. No. 18-00059, ECF No. 24], and on September 18, 2018, Defendants filed a response [Adv. Proc. No. 18-00059, ECF No. 28].  On November 2, 2018, the Title III Court entered an order affirming the stay [Adv. Proc. No. 18-00059, ECF No. 32].  On August 20, 2019, the UCC filed a motion to intervene in this action [Adv. Proc. No. 18-00059, ECF No. 38].  On August 28, 2019, the parties filed a joint motion [Adv. Proc. No. 18-00059, ECF No. 41] requesting that the litigation be subject to the Stay Order, which stay was extended through March 11, 2020, as described in section V.I of this Disclosure Statement.  On February 10, 2020, the Mediation Team filed its Amended Report,

recommending that this litigation remain stayed pending the Court's decision on the confirmation of the April 2018 Commonwealth Fiscal Plan.[211] On March 10, 2020, the Court issued a Final Order, continuing the stay of this litigation [Adv. Proc. No. 18-00059, ECF No. 51].[212] On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment [Case No. 17-bk-3283, ECF No. 16739]. For further discussion of this motion, see Section V.E.4.(f).

### c)   *Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al*., Adv. Proc. No. 17-00159

On June 6, 2017, Ambac filed a complaint against the Commonwealth, HTA, the Oversight Board, AAFAF, and various government officials claiming the Defendants violated Ambac's constitutional and statutory rights as insurer of the HTA Revenue Bonds. Ambac alleged it has issued financial guaranty insurance policies covering payment of principal and interest on approximately $494 million in net par accreted value of HTA's bonds and claimed further to directly own approximately $16 million in such bonds. Ambac asserted the HTA Bonds are secured by liens on (i) revenues from toll facilities; (ii) gasoline, diesel, crude oil and other special excise taxes; and (iii) special excise taxes consisting of motor vehicle license fees (collectively, the "Pledged Special Revenues").

Ambac claimed Defendants diverted the alleged Pledged Special Revenues in such a way that junior unsecured debts were prioritized over senior secured debt. These actions, Ambac alleged, caused unnecessary payment defaults on the HTA Revenue Bonds. Due to these alleged defaults, Ambac paid claims totaling approximately $52 million to bondholders.

Ambac sought declaratory and injunctive relief, claiming (i) the Moratorium Legislation and Moratorium Orders, the Fiscal Plan, and the Fiscal Plan Compliance Act, which HTA allegedly acted pursuant to in order to divert the Pledged Special Revenues, were unconstitutional, violated the Contracts Clause, and null; (ii) the diversion violated the Takings and Due Process Clauses; (iii) the Moratorium Orders' alleged deprivation of Ambac's access to the Title III Court was unconstitutional; and (iv) Defendants violated sections 303 and 407 of PROMESA and sections 922 and 928 of the Bankruptcy Code.

Defendants argued the Title III Court lacked jurisdiction to decide the issues raised in Ambac's complaint. Specifically, Defendants asserted (i) Ambac had no standing to file the complaint because it had not suffered any concrete injury, and (ii) any and all rights will not be determined until the filing of a proposed plan of adjustment [Adv. Proc. No. 17-00159, ECF No. 48].

The Title III Court dismissed the complaint, holding (i) Ambac had standing to file the complaint, but (ii) the Title III Court lacked subject matter jurisdiction regarding the Plaintiff's

---

[211] *See* section V.I.3 for a detailed description of the Mediation Team and the Amended Report.

[212] *See* section V.I.3 for a detailed description of the Mediation Team, the Amended Report, and the March 10, 2020 Final Order.

lien interest and otherwise ruled that Ambac failed to state a claim upon which relief could be granted [Adv. Proc. No. 17-00159, ECF No. 156]. Ambac filed an appeal with the First Circuit, docketed as Case No. 18-1214. On June 24, 2019, the First Circuit issued an opinion and order affirming the Title III Court's decision, holding that, pursuant to PROMESA sections 106(e) and 305, the Title III Court lacks the authority to grant the declaratory and injunction relief that Ambac seeks. On September 23, 2019, Appellants filed a petition for certiorari, which was docketed as Case No. 19-387. On January 13, 2020, after briefing had concluded, the Supreme Court denied the petition.

d)   ***Peaje Investment, LLC v. Puerto Rico Highways & Transportation Authority, et al., Adv. Proc. Nos. 17-00151; 17-00152***

On May 31, 2017, Peaje Investment, LLC ("Peaje"), a holder of over $64 million in 1968 bonds issued by HTA, brought an action for declaratory and injunctive relief regarding (i) the validity of its lien and (ii) HTA's supposedly improper use of toll revenues to fund other debt obligations. Peaje alleged that HTA toll revenues deposited with BNYM had been wrongfully diverted by HTA to pay other debt obligations or other expenses since May of 2016, leaving the bondholders' account nearly drained. Further, the Plaintiff alleged that it has a first priority statutory lien on the toll revenues. According to Peaje, this purported statutory lien protects "pledged special revenues" on the bonds from stay restrictions under certain provisions of the Bankruptcy Code. Accordingly, Peaje sought a judgment ordering the Defendants to resume depositing toll revenues with BNYM as fiscal agent. Moreover, the Plaintiff asserted the wrongful diversion of the toll revenues to pay "necessary operating expenses" of HTA violates the Takings Clause under the Fifth Amendment of the U.S. Constitution. Alternatively, the Plaintiff argued its priority liens can only be subordinated to expenses to preserve a "project or system" that generates specific collateral securing the bonds. Peaje also filed a motion for a temporary restraining order and preliminary injunction to (i) enjoin HTA from continuing to take the toll revenues for purposes other than paying the bonds, and (ii) seek adequate protection for its purported collateral [Adv. Proc. No. 17-00151, ECF No. 2; Adv. Proc. No. 17-00152, ECF No. 2].

Plaintiff's arguments in its motion for preliminary and permanent injunctive relief became the subject of a full evidentiary hearing. The Title III Court issued a ruling denying Plaintiff's request for injunctive relief on the basis that Peaje failed to demonstrate (1) it has a valid statutory lien and (2) it would suffer irreparable harm without injunctive relief [Adv. Proc. No. 17-00151, ECF No. 240; Adv. Proc. No. 17-00152, ECF No. 228]. Further, the ruling concluded that even if the lien were found to have been valid, expert testimony had demonstrated that Peaje is adequately protected. Immediately after the ruling, Plaintiff filed a notice of appeal to the First Circuit, docketed as Case No. 17-2165; 17-2166. On August 8, 2018, the First Circuit entered a ruling affirming the Title III Court's conclusion regarding the absence of a statutory lien.

Shortly after filing the notice of appeal to the First Circuit, Peaje filed amended complaints in the Title III actions seeking a declaration that its lien is valid and perfected and an injunction to ensure that HTA resumes depositing the toll revenue [Adv. Proc. No. 17-00151, ECF No. 246; Adv. Proc. No. 17-00152, ECF No. 234]. This time, Peaje included references to UCC financing statements to evidence perfection. Peaje also expanded upon its assertion in its original complaint that it is exempt from any stay. It declared in the amended complaint that it is not bound by various emergency measures enacted by the Commonwealth, and not bound by PROMESA and the

282

certification of the fiscal plan, which allow the government to appropriate funds to service general debt obligations. Peaje's amended complaint also contained numerous claims resembling the *Ambac* adversary proceeding described above.

The Oversight Board filed an answer to the amended complaint and denied the material allegations [Adv. Proc. No. 17-00151, ECF No. 256; Adv. Proc. No. 17-00152, ECF No. 242]. HTA also asserted various affirmative defenses to the amended complaint. HTA argued, among other things, the UCC financing statements do not bear the correct name of the Debtor, rendering them insufficient to perfect a security interest as a matter of law. The Defendants also challenged Peaje's assertion that the Title III Court could adjudicate certain claims, arguing the Title III Court lacks subject matter jurisdiction under provisions of PROMESA that prohibit the Title III Court from reviewing fiscal plan certifications and preclude interference with political or governmental powers of the debtor, any of its property or revenue, or the use and enjoyment by the debtor of any income-producing property. Moreover, HTA asserted that the Plaintiff's Takings Clause claim is not viable because the Plaintiff possesses no "cognizable" property right.

On October 26, 2018, Peaje filed a petition for a writ of *certiorari* regarding the denial of its claim to a statutory lien with the U.S. Supreme Court, which was docketed October 30, 2018 as Case No. 18-560. On February 19, 2019, the U.S. Supreme Court denied the petition for a writ of *certiorari*.

On December 16, 2019, the parties filed a joint status report informing the Title III Court that (i) Assured and Ambac filed petitions for writ of certiorari to the U.S. Supreme Court that have been distributed for conference on January 10, 2020, and (ii) the U.S. Supreme Court heard oral argument in the Appointments Clause cases on October 15, 2019. The U.S. Supreme Court subsequently denied both petitions. On February 14, 2020, the parties filed a joint status report, noting that the Oversight Board had filed complaints objecting to the proofs of claim filed by Peaje against the Commonwealth and HTA [Adv. Proc. No. 17-00151, ECF No. 298; Adv. Proc. No. 17-00152, ECF No. 286]. On April 20, 2020, the parties filed a joint status report, noting that summary judgment practice was about to commence in the Commonwealth and HTA Revenue Bond adversary proceedings to which Peaje is a party. On July 20, 2020, the parties filed a joint status report, noting that the U.S. Supreme Court had resolved the Appointments Clause litigation in the Oversight Board's favor, and that summary judgment briefing in the Commonwealth and HTA Revenue Bond adversary proceedings was ongoing [Adv. Proc. No. 17-00151, ECF No. 303; Adv. Proc. No. 17-00152, ECF No. 291]. On February 19, 2021, the parties filed a joint status report, noting that discovery in the Commonwealth and HTA Revenue Bond adversary proceedings was ongoing, and the appeal of the Title III Court's denial of the PRIFA Lift Stay Motion and the HTA Lift Stay Motion had been submitted to the First Circuit [Adv. Proc. No. 17-00151, ECF No. 314; Adv. Proc. No. 17-00152, ECF No. 302].

     e)     ***Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 18-00028**

On March 22, 2018, several credit unions chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, the Oversight Board and its members, and other Commonwealth instrumentalities (including COFINA, HTA, ERS, PREPA, and GDB), seeking declaratory judgments that their Puerto Rico debt holdings are not dischargeable and seeking

monetary damages for alleged fraud in connection with the credit unions' purchase of Puerto Rico debt instruments. On August 6, 2018, the Oversight Board, for itself and as representative of the Debtors, moved to dismiss the complaint [Adv. Proc. No. 18-00028, ECF No. 29]. Also on August 6, 2018, GDB filed a separate motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 32]. In addition, several parties filed joinders to the motions to dismiss or were granted leave from the Title III Court to file joinders.

On April 16, 2019, Plaintiffs filed an amended complaint, which eliminated claims premised on securities law and added claims for fraud, negligence, misrepresentation, violation of the Puerto Rico Organized Crime Law, and violation of the Takings Clause of the U.S. and Commonwealth Constitutions [Adv. Proc. No. 18-00028, ECF No. 79].

On February 5, 2019, the Title III Court issued an Amended Confirmation Order confirming COFINA's Third Amended Plan of Adjustment [Case No. 17-bk-3284, ECF No. 561]. On February 12, 2019, COFINA's Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to paragraph 30 of the Amended Confirmation Order, "the plaintiffs in that certain adversary proceeding before the Title III Court, captioned *Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 18-00028, shall be entitled to continue pursuit of such litigation against all parties other than COFINA and Reorganized COFINA, subject to all available rights and defenses with respect to claims and causes of action asserted therein."

On July 22, 2019, Defendants filed motions to dismiss the amended complaint [Adv. Proc. No. 18-00028, ECF Nos. 88, 91, 94, 97]. On December 6, 2019, Plaintiffs filed a motion for leave to file a second amended complaint [Adv. Proc. No. 18-00028, ECF No. 116]. The motion was fully briefed, and on April 14, 2020, the Title III Court issued an order granting Plaintiffs' motion for leave to file and setting a briefing schedule [Adv. Proc. No. 18-00028, ECF No. 125].

On April 16, 2020, Plaintiffs filed their second amended complaint [Adv. Proc. No. 18-00028, ECF No. 126]. Also on April 16, 2020, the Title III Court dismissed without prejudice the Oversight Board's, GDB's and GDB DRA's motions and the UCC's, AAFAF's and COSSEC'S joinders to the motions to dismiss the first amended complaint. [Adv. Proc. No. 18-00028, ECF No. 127]. On April 20, 2020, as per the Title III Court's briefing schedule, the Oversight Board [Adv. Proc. No. 18-00028, ECF No. 128], GDB [Adv. Proc. No. 18-00028, ECF No. 129], and the DRA Parties [Adv. Proc. No. 18-00028, ECF No. 130] refiled their motions to dismiss the first amended complaint as motions to dismiss the second amended complaint. Also on April 20, COSSEC [Adv. Proc. No. 18-00028, ECF No. 131] and the UCC [Adv. Proc. No. 18-00028, ECF No. 132] filed joinders to the Oversight Board's motion to dismiss. On April 24, AAFAF filed a joinder to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 138].

On May 11, 2020, Judge Swain issued an order referring the motions to dismiss the second amended complaint to Magistrate Judge Dein for a report and recommendation [Adv. Proc. No. 18-00028; ECF No. 142]. On May 21, 2020, the Oversight Board [Adv. Proc. No. 18-00028; ECF No. 143], GDB [Adv. Proc. No. 18-00028; ECF No. 145] and GDB DRA [Adv. Proc. No. 18-00028; ECF No. 146] filed supplemental briefs in support of their motions to dismiss. AAFAF filed a joinder to the Oversight Board's and GDB's briefs [Adv. Proc. No. 18-00028; ECF No. 147]. On May 22, 2020, COSSEC filed a joinder to the Oversight Board's and GDB's motions to

dismiss [Adv. Proc. No. 18-00028; ECF No. 148]. Also on May 22, the UCC filed a limited joinder to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00028; ECF No. 151]. On August 11, 2020, Plaintiffs filed an opposition to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 166-1]. On August 11, 2020, Plaintiffs filed oppositions to GDB's [Adv. Proc. No. 18-00028, ECF No. 167], GDB DRA's [Adv. Proc. No. 18-00028, ECF No. 168], AAFAF's [Adv. Proc. No. 18-00028, ECF No. 169], and COSSEC's [Adv. Proc. No. 18-00028, ECF No. 170] motions to dismiss. On October 20, 2020, Defendants filed a reply in support of the motions to dismiss Plaintiffs' second amended complaint [Adv. Proc. No. 18-00028, ECF No. 178]. The GDB-GDRA also filed a reply in support of its motion to dismiss Plaintiffs' second amended complaint [Adv. Proc. No. 18-00028, ECF No. 179]. AAFAF and the GDB filed a reply in support of its motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 180]. COSSEC filed a reply in support of its motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 181]. On March 5, 2021, the GDB-DRA filed an informative motion submitting supplemental authority in connection with its reply [Adv. Proc. No. 18-00028, ECF No. 186]. On March 17, 2021, Plaintiffs filed an opposition to the GDB-GDRA's informative motion [Adv. Proc. No. 18-00028, ECF No. 187].

f)   ***Puerto Rico BAN (VL) LLC, et al., v. United States***, Case No. 19-482C

On April 1, 2019, certain holders of PRIFA BANs (the "PRIFA BANs Holders") filed a complaint [Case No. 19-482C, ECF No. 1] in the U.S. Court of Federal Claims asserting a claim against the United States government for alleged violations of the Takings Clause. According to the PRIFA BANs Holders, the United States government, acting by and through the Oversight Board, "planned, directed, and implemented legislative action" that reallocated funds away from PRIFA, resulting in a taking of the PRIFA BANs Holders' property. The PRIFA BANs Holders seek just compensation for the alleged taking.

On July 29, 2019, the United States government filed a motion to dismiss [Case No. 19-482C, ECF No. 12] arguing (i) the U.S. Court of Federal Claims lacks jurisdiction over the claim; (ii) PRIFA defaulted on the BANs even before the Oversight Board, the entity allegedly responsible for taking the PRIFA BANs Holders' property, existed, such that there was no taking, and (iii) the frustration of a contractual expectancy is insufficient to establish a taking. According to the order granting the PRIFA BANs Holders' latest motion to extend, their response to the motion to dismiss is due by May 24, 2021 [Case No. 19-482C, ECF No. 37].

g)   **AmeriNational Community Services, LLC, et al., v. Ambac Assurance Corporation, et al., Adv. Proc. No. 21-00068**

On June 26, 2021, AmeriNational, as servicer for certain loans and bonds assigned by GDB to DRA, and Cantor-Katz Collateral Monitor LLC, as collateral monitor for Wilmington Trust, N.A. in connection with new bonds issued by the DRA, (collectively, the "DRA Parties") filed an adversary complaint against Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, FGIC, Peaje Investments LLC, and The Bank of New York Mellon, as fiscal agent for holders of certain bonds issued by HTA (collectively the "Defendants"). The complaint requests the entry of various declaratory judgments regarding the validity, extent, seniority and priority of the DRA Parties' and the Defendants' alleged rights with respect to certain revenues established by Acts 30-2013 and 31-2013 ("Act 30-31 Revenues"), the 1968 HTA Bonds and 1998 HTA Bonds, the 15 loan agreements entered into by GDB and HTA between March

2008 and January 2014 (as amended, amended and restated, supplemented or otherwise modified, the "Loan Agreements"), and the assignment and security agreement executed by and between HTA and GDB on August 28, 2013 (as amended, supplemented or otherwise modified, the "Security Agreement") in connection with the Loan Agreements. The complaint requests several judicial declarations. First, the DRA Parties request a judicial declaration that the DRA is the only party with a valid, perfected lien on and security interest in, and right to collect from, the Act 30-31 Revenues, including the right to receive such revenues. Second, the DRA Parties request judicial declarations that the 1968 HTA Bonds and the 1998 HTA Bonds are: (i) secured only by specified bond revenues "actually received by HTA and actually deposited in applicable bond revenue accounts; (ii) limited recourse obligations to be satisfied solely from the specified bond revenues. Third, the DRA Parties request a judicial declaration that the DRA has the right to collect (in connection with its claims) from the specified bond revenues to the extent they are not deposited in the certain specified bond revenue accounts. Fourth, the DRA Parties request a judicial declaration that the subordination language contained in the Loan Agreements and the Security Agreement does not cause any of the DRA Parties' alleged liens or claims to be subordinated to the HTA bondholders' alleged liens or claims. Pursuant to a stipulation by and among the DRA Parties and Defendants, the Court has set an August 27, 2021 deadline for Defendants to respond, answer, and/or otherwise plead to the complaint. On June 28, 2021, the Title III Court issued an order referring the case to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 21-00068, ECF No. 3].

3. **Union Litigation**

a) ***American Federation of State, County, & Municipal Employees v. Financial Oversight & Management Board for Puerto Rico***, **Adv. Proc. Nos. 17-00242; 17-00243**

On August 22, 2017, AFSCME, a collective bargaining representative for certain Commonwealth employees, filed two identical complaints arguing the Oversight Board violated PROMESA by adopting and implementing amendments to a Fiscal Plan proposed by the Governor that the Oversight Board had already approved. Plaintiff claimed the amendments to the Fiscal Plan violated the Takings Clause of the United States Constitution and the Takings and Due Process Clauses of the Commonwealth Constitution by allegedly taking employees' individual retirement account balances. Plaintiff further alleged violations of PROMESA section 201, which delineates the requirements for approval of Fiscal Plans and section 203, which outlines the Oversight Board's powers if finding noncompliance with the budget, breach of fiduciary duty, and unjust enrichment.

Before Defendants responded, AFSCME moved to stay the proceedings, and the Title III Court stayed both cases on October 23, 2017 [Adv. Proc. No. 17-00242, ECF No. 32; Adv. Proc. No. 17-00243, ECF No. 21]. On December 13, 2018, in Adv. Proc. No. 17-00242, AFSCME filed a Notice of Dismissal and on December 14, 2018, the Title III Court entered judgment without prejudice [Adv. Proc. No. 17-00242, ECF No. 41]. On April 3, 2019, AFSCME moved to dismiss Adv. Proc. No. 17-00243 without prejudice. The Title III Court issued an order dismissing the case without prejudice on April 5, 2019 [Adv. Proc. No. 17-00242, ECF No. 31].

b)   ***Hermandad de Empleados del Fondo del Seguro del Estado, Inc., et al.
v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 18-00091**

On July 25, 2018, two unions, (i) Hermandad de Empleados del Fondo del Seguro del Estado, Inc. a/k/a Union de Empleados de la Corporacion del Fondo del Seguro del Estado ("UECFSE"), a union of CFSE employees, and (ii) Union de Medicos de la Corporacion del Fondo del Seguro del Estado Corp. ("UMCFSE"), a union of physicians who are responsible for providing medical services to injured workers, filed an action against the Commonwealth, the Oversight Board, and the exclusive provider of work-related insurance coverage, the State Insurance Fund Corporation ("CFSE"). Plaintiffs, who participate in the Employees Retirement System for the Government of the Commonwealth of Puerto Rico and characterize themselves as creditors of the Commonwealth, seek relief declaring (i) CFSE is a protected essential public service; (ii) various legislation relating to labor-reform (Acts 66-2014, 3-2017, 8-2017, and 26-2017) violate the Contracts Clause of the U.S. Constitution and the right to collective bargaining in the Commonwealth's Constitution; and (iii) the June 2018 Fiscal Plan is unconstitutional and enjoining the Oversight Board from filing a plan of adjustment until the June 2018 Fiscal Plan complies with PROMESA, the U.S. Constitution, and the Commonwealth's Constitution.

On August 3, 2018, the Title III Court entered an order [Adv. Proc. No. 18-00091, ECF No. 10] adjourning Defendants' deadline to respond until after the pending motions to dismiss in *UTIER v. Puerto Rico Electric Power Authority*, Adv. Proc. No. 17-00229, in which another union (UTIER) pled similar violations of the Contracts Clause based on the same labor-reform statutes, was decided. That other motion was decided on September 26, 2018, with the Title III Court partially granting the *UTIER* Defendants' motions to dismiss [Adv. Proc. No. 17-00229, ECF No. 62]. Defendants the Oversight Board and the Government Officials (Rosselló Nevares, et al.) both moved to dismiss the UECFSE complaint on January 25, 2019 based on constitutional principles and the Title III Court's holdings in the *UTIER* case, Adv. Proc. No. 17-00229 [Adv. Proc. No. 18-00091, ECF Nos. 22, 25]. Plaintiffs filed their omnibus opposition on March 7, 2019 [Adv. Proc. No. 18-00091, ECF No. 31]. The Oversight Board and the Government Officials both filed their replies on April 5, 2019 [Adv. Proc. No. 18-00091, ECF No. 36, 37]. On September 27, 2019, the Title III Court issued an order granting Defendants' motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim [Adv. Proc. No. 18-00091, ECF No. 39].

On October 4, 2019, Plaintiffs filed an appeal in the First Circuit, which was docketed as Case No. 19-2028. Appellants filed their opening brief on December 17, 2019. Appellees filed their answering brief on February 18, 2020, and AAFAF's Executive Director filed a joinder thereto on February 19, 2020. On March 17, 2020, State Insurance Fund Corporation ("SIFC") filed a joinder to Appellee's answering brief. On May 27, 2020, Appellees filed a letter submitting supplemental authority. On June 3, 2020, UECFSE filed a response to Appellees' letter. The case was argued on July 27, 2020.

On October 28, 2020, the First Circuit issued its opinion and judgment affirming the Title III Court's order. The Court found first that the request for injunctive relief as to certain challenged statutes was not moot and that Appellants had standing because their claims were limited to damages while the challenged laws were in effect. Next, the Court rejected Appellants' Contracts Clause claims because Appellants had not pleaded sufficient facts to establish that the challenged laws were not reasonable or necessary to serve an important interest. Finally, the Court held that

Appellants' claims under the Collective Bargaining Clause of the Commonwealth Constitution were time-barred because the claims accrued at the time the statutes were enacted and were not continuing violations.  On November 11, 2020, Appellants filed a petition for rehearing en banc. On December 11, 2020, the First Circuit issued an order denying Appellants' petition.  On December 18, 2020, the First Circuit issued its mandate.  On April 16, 2021, Appellants filed a petition for a writ of certiorari, which was docketed as U.S. Supreme Court Case No. 20-1466.

c)   ***Union de Empleados de la Corporacion del Fondo del Seguro del Estado v. Government of the United States of America, et al.*, Adv. Proc. No. 18-00066**

On May 30, 2018, UECFSE, UMCFSE, and two union members filed an action against the United States, the Governor, the Commonwealth and the Oversight Board.  In their second amended complaint, filed on October 5, 2018, Plaintiffs allege PROMESA violates the United States Constitution and various international treaties and charters.  Plaintiffs' claims are based primarily on their views on the *Insular Cases*, which gave the United States unilateral authority over its territories, and the United States' alleged treatment of Puerto Rico as a colony.  Plaintiffs seek declaratory judgments that (i) PROMESA violates the First, Fifth, Thirteenth, Fourteenth, and Fifteenth Amendments; and (ii) the Oversight Board's acts to date are unconstitutional and null.  Plaintiffs further request that the Title III Court (i) overturn the *Insular Case*; (ii) enjoin Defendants from acting pursuant to the authority granted by PROMESA; and (iii) direct Congress to decolonize Puerto Rico.

On December 19, 2018, the Oversight Board and the United States filed motions to dismiss, arguing (i) Plaintiffs lack standing; (ii) Plaintiffs' claims regarding decolonizing Puerto Rico and international law seek advisory opinions; (iii) the international treaties do not create judicially enforceable rights; (iv) Plaintiffs fail to state claims for violations of the First, Fifth, Thirteen, Fourteenth, and Fifteenth Amendments; and (v) Plaintiffs' request that the Title III Court overrule the *Insular Cases* fails to state a claim [Adv. Proc. No. 18-00066, ECF Nos. 46, 48].

On March 1, 2019, Plaintiffs filed an omnibus opposition brief, arguing (i) Plaintiffs have standing; and (ii) Plaintiffs have stated claims for violations of the First, Fifth, Thirteenth, Fourteenth, and Fifteenth Amendments, as well as for violations of international law [Adv. Proc. No. 18-00066, ECF No. 59].  The U.S. Government filed its reply in support of its motion to dismiss on April 5, 2019 [Adv. Proc. No. 18-00066, ECF No. 64].  The Oversight Board filed its reply in support of its motion to dismiss on April 8, 2019 [Adv. Proc. No. 18-00066, ECF No. 65].

On November 15, 2019, the Title III Court issued an opinion and order granting Defendants' motions to dismiss the second amended complaint [Adv. Proc. No. 18-00066, ECF No. 66].  On November 26, 2019, Plaintiffs filed a notice of appeal to the First Circuit, which was docketed as Case No. 19-2243.  On January 27, 2020, the Oversight Board filed a motion noting that it disputes the arguments concerning the merits of the appeal raised in Appellants' motion. On March 23, 2020, Appellants filed their opening brief.  On May 4, 2020, Appellees, the Oversight Board and the United States, filed their answering briefs.  On May 26, 2020, Appellants filed their reply brief.  On June 3, 2020, the United States filed a letter submitting supplemental authority.  The case was argued on July 27, 2020.  On April 16, 2021, the First Circuit issued an opinion and judgment affirming the Title III Court's order dismissing Plaintiffs' complaint for lack

of standing.  On June 1, 2021, Appellants filed a petition for rehearing or rehearing *en banc*.  On June 15, 2021, the First Circuit denied Appellants' petition.  On June 22, 2021, the First Circuit issued its mandate.

    d)      ***American Federation of Teachers, et al. v. Commonwealth of Puerto Rico, et al.,* Adv. Proc. No. 18-00134.**

On November 15, 2018, two labor unions representing Puerto Rico Government employees, filed an action against the Commonwealth, the Retirement Board of the Government of Puerto Rico, AAFAF and their respective officers.  The Unions claim to be aggrieved because (i) the Commonwealth has not implemented the transition to individual defined-contribution retirement accounts within the time frame purportedly contemplated by Puerto Rico Law 106-2017, which restructured the payment of pensions; (ii) the Oversight Board failed to compel them to do so; and (iii) Banco Popular de Puerto Rico has been enriched because the relevant employee contributions have been kept in a Banco Popular account bearing little or no interest.  On the basis of these allegations, Plaintiffs seek (i) relief for violation of Law 106 (against all Defendants except the Oversight Board and Banco Popular); (ii) relief for breach of fiduciary duty or aiding and abetting breach of fiduciary duty (against all Defendants); (iii) relief for unjust enrichment (against the Commonwealth and Banco Popular); and (iv) an accounting (against the Commonwealth and Banco Popular).

On January 8, 2019, the Oversight Board filed a motion to dismiss [Adv. Proc. No. 18-00134, ECF No. 11].  The parties filed several joint motions to extend the briefing deadlines to continue their discussions regarding the implementation of Law 106, and the Title III Court granted the motions [Adv. Proc. No. 18-00134, ECF Nos. 16, 18, 20, 22, 24].  On October 29, 2019, the Title III Court issued an order directing the parties to file a joint status report [Adv. Proc. No. 18-00134, ECF No. 25].  That same day, Plaintiffs filed a status report stating that there is no imminent need to proceed with litigation because although the Commonwealth had yet to implement the individual retirement accounts mandated by Law 106, the Commonwealth had taken certain necessary preliminary steps to do so [Adv. Proc. No. 18-00134, ECF No. 26].

On January 24, 2020, the parties filed a joint status report stating the Commonwealth is continuing to take steps to establish the retirement accounts [Adv. Proc. No. 18-00134, ECF No. 31].  On May 1, 2020, the parties filed a joint status report.  Magistrate Judge Dein issued an order directing the parties to file the further joint status report by July 15, 2020 [Adv. Proc. No. 18-00134, ECF No. 35].  On June 24, 2020, AAFAF filed a status report on the progress to implement the defined contribution plan under Act 106 [Adv. Proc. No. 18-00134, ECF No. 36].  On July 15, 2020, the parties filed a motion to adjourn all deadlines and response dates until August 28, 2020 [Adv. Proc. No. 18-00134, ECF No. 38].  On August 25, 2020, Plaintiffs filed a notice of voluntary dismissal of the action [Adv. Proc. No. 18-00134, ECF No. 40].  On September 11, 2020, the Title III Court issued an order dismissing the case without prejudice [Adv. Proc. No. 18-00134, ECF No. 41].

e)   ***Asociación de Profesoras y Profesores del Recinto v. Commonwealth of
     Puerto Rico, et al., Adv. Proc. No. 17-00197***

On July 9, 2017, Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. ("APRUM"), an organization of teachers at the University of Puerto Rico ("UPR"), filed a complaint against the Commonwealth, Oversight Board, the Governor, Gerardo Portela Franco, Hon. Raúl Maldonado Gautier, José Iván Marrero Rosado, and Natalie A. Jaresko. A second amended complaint was filed on May 11, 2018 [Adv. Proc. No. 17-00197, ECF No. 57]. APRUM alleged that the Commonwealth and the UPR fiscal plans and budgets failed to meet the requirements of PROMESA section 201, which delineates the requirements for approval of Fiscal Plans because they reduced the budgeted subsidies from the Commonwealth to UPR. Plaintiff contended the appropriations to UPR were lower than previously set by Puerto Rico Act 3-2017, which was passed to adjust judicial and legal framework to allow compliance with the Fiscal Plan, and that without the enactment of new legislation, such reduction was "illegal."

On July 2, 2018, Defendants filed their motion to dismiss the second amended complaint [Adv. Proc. No. 17-00197, ECF No. 63]. The Defendants argued (i) the Title III Court lacks subject matter jurisdiction because the claims did not arise under Title III; (ii) the Title III Court lacks subject matter jurisdiction to review certified fiscal plans and budgets under section 106(e), which precludes U.S. district courts from reviewing challenges to the Oversight Board's certification determinations; (iii) the Plaintiff lacks constitutional or prudential standing and is not a party in interest under Bankruptcy Code section 1109; (iv) PROMESA prohibits the Title III Court from interfering with the Commonwealth's decisions about the use of its property and revenues; and (v) PROMESA sections 4 and 108, which include definitions and guarantee the autonomy of the Oversight Board, provide that PROMESA, and the certification of fiscal plans and budgets pursuant thereto, prevail over any inconsistent territorial law and preclude enforcement of any statute that would impair or defeat the purpose of Title III.

On July 27, 2018, APRUM filed an urgent motion to hold the adversary proceeding in abeyance and to amend the briefing schedule, so that APRUM could assess how or whether to proceed with this action [Adv. Proc. No. 17-00197, ECF No. 69]. Magistrate Judge Dein issued an order granting APRUM's motion [Adv. Proc. No. 17-00197, ECF No. 71].

On August 21, 2018, APRUM filed a motion to voluntarily dismiss its amended complaint, which the Title III Court granted [Adv. Proc. No. 17-00197, ECF No. 74].

f)   ***Asociación Puertorriqueña de Profesores Universitarios, et al. v.
     University of Puerto Rico, et al., Adv. Proc. No. 19-00034***

On April 16, 2019, Asociación Puertorriqueña, an organization of active and retired professors at UPR, and several beneficiaries of the UPR retirement plan filed a complaint against UPR, its governing board, members of the governing board, the university president, and the Oversight Board. The complaint sought, among other things, declaratory judgments and injunctions providing that the Oversight Board's oversight acts in relation to the Retirement System are "null and void," allegedly because the UPR retirement system is a trust that is not a covered instrumentality and is outside the Oversight Board's power, and that the UPR Governing Board cannot comply with the Oversight Board's fiscal plans and budgets impacting the retirement

system. The complaint also sought (i) an order directing the Governing Board to comply with certain funding requirement for the retirement system and UPR, (ii) an order directing UPR to pay purported damages relating to trust property to the retirement system, (iii) orders removing UPR's Governing Board as trustee of the retirement system and replacing it with the retirement system board.

Plaintiffs filed an amended complaint on July 10, 2019, which included the additional allegation that the Oversight Board induced the Governing Board to breach its fiduciary duty to the retirement system [Adv. Proc. No. 19-00034, ECF No. 13]. The amended complaint also added an additional prayer for relief seeking compensatory damages. On August 23, 2019, the Oversight Board and UPR filed motions to dismiss the amended complaint [Adv. Proc. No. 19-00034, ECF Nos. 17, 18]. The motions to dismiss were fully briefed, and on November 1, 2019, Judge Swain issued an order referring the motions to dismiss to Magistrate Judge Dein for report and recommendation [Adv. Proc. No. 19-00034, ECF No. 26].

On June 10, 2020, Magistrate Judge Dein issued a report and recommendation, allowing Defendants' motions to dismiss for Plaintiffs' lack of standing and the Title III Court's lack of subject matter jurisdiction [Adv. Proc. No. 19-00034, ECF No. 27]. Magistrate Judge Dein also declined to exercise supplemental jurisdiction over the state law claims against UPR. On June 24, 2020, Plaintiffs filed an objection to Magistrate Judge Dein's report and recommendation [Adv. Proc. No. 19-00034, ECF No. 28]. On July 10, 2020, Plaintiffs filed a motion for leave to file a second amended complaint [Adv. Proc. No. 19-00034, ECF No. 32]. On August 10, 2020, the Oversight Board and UPR filed oppositions to Plaintiffs' objection to Magistrate Judge Dein's report and recommendation and motion for leave to file an amended complaint [Adv. Proc. No. 19-00034, ECF Nos. 33, 34]. On August 31, 2020, Plaintiffs filed a reply to Defendants' oppositions to Plaintiffs' objection to Magistrate Judge Dein's report and recommendation [Adv. Proc. No. 19-00034, ECF No. 36].

4.    **Healthcare Center Litigation**

a)    *Asociación de Salud Primaria de Puerto Rico, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00227

Prior to the commencement of the Commonwealth Title III Case, various not-for-profit corporations that provide comprehensive primary and preventive health care services throughout the Commonwealth to patients that lack health insurance filed an action in the Puerto Rico Court of First Instance, San Juan (the "Commonwealth Court") against the Commonwealth and related government offices and officials seeking a money judgment for supplemental payments that should have been paid by the Commonwealth for Medicaid services provided by the Plaintiffs. On August 2, 2017, certain other creditors of the Plaintiffs removed the action to the Title III Court, asserting that the Title III Court has jurisdiction in the action because it arises "under," arises "in" or is "related to" the Commonwealth Title III Case.

On November 14, 2017, the Puerto Rico Department of Justice, on behalf of the Commonwealth, filed a motion for abstention seeking to have the case remanded to the Puerto Rico Court of First Instance [Adv. Proc. No. 17-00227, ECF No. 29]. On December 8, 2017, the Title III Court entered an amended order referring the case to Magistrate Judge Dein and for a

report and recommendation regarding the Commonwealth's motion for abstention [Adv. Proc. No. 17-00227, ECF No. 43]. On April 2, 2018, Magistrate Judge Dein recommended that the Title III Court remand the adversary proceeding to the Puerto Rico Court of First Instance [Adv. Proc. No. 17-00227, ECF No. 55]. Plaintiffs filed objections to Magistrate Judge Dein's report and recommendation [Adv. Proc. No. 17-00227, ECF Nos. 58, 60]. On July 10, 2018, the Title III Court overruled these objections and adopted Magistrate Judge Dein's report and recommendation to abstain from the proceeding [Adv. Proc. No. 17-00227, ECF No. 64]. On February 16, 2019, the Plaintiffs filed an appeal to the United States Court of Appeals for the First Circuit. The appeal was docketed as Case No. 19-1189. The Commonwealth moved to dismiss the appeal for lack of jurisdiction on September 23, 2019. On October 3, 2019, Appellants filed an opposition to the motion to dismiss the appeal. On October 8, 2019, the Commonwealth filed a reply in support of its motion to dismiss the appeal. On October 28, 2019, Appellants filed their opening brief on appeal. Appellee filed its answering brief on December 16, 2019. Appellants' reply brief on appeal was due on January 3, 2020, but Appellants did not file one. On April 1, 2020, the First Circuit entered a judgment dismissing the appeal for lack of jurisdiction. On April 22, 2020, the First Circuit issued its mandate.

b)  ***Atlantic Medical Center, Inc., et al. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00278**

Since 2001 and 2006, the Atlantic Centers[213] have been involved in Commonwealth and federal litigation, respectively, seeking injunctive relief to enforce their payment rights dating back to 1997. The Atlantic Centers believe that the Commonwealth court has issued various orders of partial summary judgement ordering the Commonwealth to make some payments to the Health Centers and assert that, on November 8, 2010, the U.S. District Court for the District of Puerto Rico, directed the Commonwealth to implement a system compliant with the 42 U.S.C. § 1396a(bb) payment formula. The Atlantic Centers have argued that, to date, the Commonwealth has only made estimated payments and has yet to implement a federally compliant payment system. Additionally, the Atlantic Centers have asserted ongoing claims against the Commonwealth as they continue to provide services to Medicaid beneficiaries. The Atlantic Centers assert that the U.S. First Circuit Court of Appeals has found that the Health Centers have payment rights enforceable under 42 U.S.C. § 1983 for services they provide to the Commonwealth of Puerto Rico Medicaid program beneficiaries.

On November 17, 2017, various non-profit healthcare entities (the "Atlantic Medical Plaintiffs") filed a complaint seeking declaratory judgments that their claims for payments for Medicaid services owed by the Commonwealth cannot be discharged or impaired in a Title III case because PROMESA requires the Commonwealth to satisfy any obligations under federal grant programs.

Plaintiffs seek a declaratory judgment that their claims for all supplemental payments for Medicaid services owed by the Commonwealth for the years since 1997—and that are the object

---

[213] The "Atlantic Centers" include Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos, Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.

of Adversary Proceeding No. 17-00227 (LTS)—are non-dischargeable under PROMESA and otherwise unimpaired by the Commonwealth's Title III case. Plaintiffs rely on PROMESA section 7 (48 U.S.C. § 2016), which states that PROMESA "shall not be construed as impairing or in any manner relieving a territorial government from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory," PROMESA section 204(d), which bars the Oversight Board from taking actions to impede the Commonwealth's ability to comply with federal programs, and PROMESA section 304(h), which precludes discharge of obligations arising under federal policy or regulatory laws, including those relating to public safety.

On February 2, 2018, the Title III Court entered an order [Adv. Proc. No. 17-00278, ECF No. 25] consolidating this case with a separate adversary proceeding seeking identical relief filed by Corporación De Servicios Integrales de Salud del Area de Barranquitas, Comerio, Corozal, Naranjito y Orocovis ("CSI"). *See Corporación De Servicios Integrales De Salud Del Area De Barranquitas, Comerio, Corozal, Naranjito Y Orocovis v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00292. The consolidation order specified that all motions should be filed under Atlantic Medical Center, the lead case.

The Commonwealth moved to dismiss the consolidated complaints on February 22, 2018, arguing the claims were unripe, as they required the Title III Court to determine dischargeability but a plan of adjustment had not yet been proposed [Adv. Proc. No. 17-00278, ECF No. 26].

On August 7, 2018, Magistrate Judge Dein issued a report and recommendation on the Commonwealth's motion to dismiss recommending that the motion to dismiss be granted and both complaints be dismissed without prejudice as unripe [Adv. Proc. No. 17-00278, ECF No. 57]. On November 27, 2018, the Title III Court issued an order overruling objections to and adopting the report and recommendation [Adv. Proc. No. 17-00278, ECF No. 66].

On December 10, 2018, the Atlantic Medical Plaintiffs filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-2228. On December 13, 2018, CSI filed a notice of appeal to the First Circuit, which was docketed as Case No. 19-1202, appealing the Order overruling objections and adopting the report and recommendation and the judgement dismissing the underlying case. On March 6, 2019, this case was consolidated with the appeal that the Atlantic Medical Plaintiffs had filed (Case No. 18-2228).

The Atlantic Medical Plaintiffs, as appellants, filed their opening brief on April 18, 2019, and CSI filed its opening brief on May 10, 2019. The Commonwealth, as appellee, filed its consolidated answering brief on July 11, 2019. The Atlantic Medical Plaintiffs filed their reply brief on August 5, 2019 and CSI filed its reply brief on August 13, 2019. On March 4, 2020, at the Court's request, the parties filed supplemental briefs regarding the effect the Commonwealth's proposed plan of adjustment had on the ripeness of the consolidated complaints. The case was argued at the First Circuit on March 6, 2020. On March 23, 2020, the First Circuit issued an opinion and judgment remanding the case to the Title III Court for reconsideration of the ripeness issue in light of the filing of the proposed plan of adjustment. On May 13, 2020, the First Circuit issued its mandate.

Following the parties' filing of a joint status report on June 1, 2020 [Adv. Proc. No. 17-00278, ECF No. 79], the Title III Court issued an order on June 5, 2020 [Adv. Proc. No. 17-00278, ECF No. 80] setting a briefing schedule for a renewed motion to dismiss the consolidated complaints. On July 1, 2020, Defendant filed its motion to dismiss [Adv. Proc. No. 17-00278, ECF No. 81], which was fully briefed. The Atlantic Medical Plaintiffs filed an opposition to the Commonwealth's motion to dismiss on August 3, 2020, and the Commonwealth filed a reply on September 1, 2020. In the reply, the Commonwealth stated that it was engaging in ongoing negotiations with the Atlantic Medical Plaintiffs and other FQHCs, and that it would not object to a stay of the Atlantic Medical Plaintiffs' adversary proceeding in order to continue such negotiations [Adv. Proc. No. 17-00278, ECF No. 84]. On January 20, 2021, in response to this proposal the Title III Court issued an order denying without prejudice the Commonwealth's motion to dismiss and staying proceedings pending further order of the Court [Adv. Proc. No. 17-00278, ECF No. 85]. The Title III Court's order allowed the parties to object to the contents of the order until February 3, 2021. No parties objected. On February 5, 2021, the Title III Court entered an order affirming the deadlines in the order dated January 20, 2021 [Adv. Proc. No. 17-00278, ECF No. 86].

c)   ***Corporación De Servicios Integrales De Salud Del Area De Barranquitas, Comerio, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00298**

On December 28, 2017, Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerio, Corozal, Naranjito, y Orocovis ("CSI") filed a complaint seeking declaratory judgment against the Commonwealth that sections 28 and 29 of Law 66-2014, which establish payment plans for judgments against the Commonwealth and provide that the Commonwealth may not be compelled to pay judgments if it does not have the funds, violate (i) the Due Process and Contracts Clauses of the United States Constitution and are preempted by federal Medicaid law, (ii) section 903 of the Bankruptcy Code, which reserves the power of a state to control municipalities, and (iii) PROMESA section 303, which reserves the power of a covered territory to control instrumentalities and its own territory. In a prepetition action, Plaintiff obtained a $51 million judgment against the Commonwealth for failure to make Medicare payments in a Commonwealth court.

On March 28, 2018, the Commonwealth moved to dismiss the complaint, arguing Plaintiff's challenges to Law 66-2014 fail because, (i) since the Commonwealth filed its Title III case, it is the automatic stay, rather than Law 66-2014, that bars collection of the judgment; (ii) the one-year statute of limitations for challenging the law, which was passed in 2014, has expired; (iii) the judgment is not a "contract" that is protected by the Contracts Clause; and (iv) PROMESA aims to require continued compliance with federal law, not to mandate that the Commonwealth remedy its past failure to make Medicaid payments [Adv. Proc. No. 17-00298, ECF No. 10].

On September 25, 2018, Magistrate Judge Dein *sua sponte* issued an order [Adv. Proc. No. 17-00298, ECF No. 22] staying the motion to dismiss pending a ruling by the First Circuit related to *Asociacion de Salud Primaria de Puerto Rico v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00227, and a ruling on the objections to Magistrate Judge Dein's report and recommendation dismissing the complaint in *Atlantic Medical Center v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00278. On October 2, 2019, Plaintiffs filed an objection to the Title III Court's order

staying the case [Adv. Proc. No. 17-00298, ECF No. 24].  On April 5, 2019, Judge Swain issued an order affirming Magistrate Judge Dein's order staying the case and overruling Plaintiffs' objection  [Adv. Proc. No. 17-00298, ECF No. 31].

5.      **Revenue Bond Litigation**

On July 24, 2019, the Title III Court issued the Stay Order, which temporarily stayed certain adversary proceedings and contested matters identified therein, including certain matters related to revenue bonds.  As part of the stay, the Title III Court ordered the parties to enter into a period of mandatory mediation to, among other things, facilitate the preparation and filing of proposed scheduling orders with respect to certain adversary proceedings and contested matters relating to revenue bonds issued by certain Commonwealth instrumentalities.  The Commonwealth, the Oversight Board, and certain creditors met extensively with the Mediation Team and drafted and submitted proposed scheduling orders regarding certain "gating issues," including issues related to the revenue bonds.  On November 27, 2019, the Mediation Team filed an *Interim Report and Recommendation* with proposed interim orders, including a proposed interim order for the preliminary scheduling of the litigation of issues related to the revenue bonds [ECF No. 9365].  On December 19, 2019, the Title III Court entered an Interim Case Management Order for Revenue Bonds [ECF No. 9620] (the "Revenue Bond Interim CMO") and set a January 10, 2020 deadline for the Mediation Team to file an Amended Report (which was subsequently extended to February 10, 2020).  For further information regarding the Mediation Team and the Amended Report, please *see* section V.I.3.  The Revenue Bond Interim CMO was amended on January 31, 2020 [ECF No. 10595].  On March 10, 2020, the Title III Court issued the currently operative case management order [ECF No. 12186], which, over the objection of certain creditors, provided for the determination of certain issues through the filing of partial summary judgment motions on certain claims.  All sides were permitted to file such motions.

The Revenue Bond Interim CMO directed, among other things, the filing and preliminary litigation of four adversary complaints relating to proofs of claim filed by certain revenue bond creditors and monoline insurers against the Commonwealth and/or HTA in respect of HTA, PRIFA and CCDA revenue bonds.  Each of these proceedings is described below.

a)      ***Financial Oversight and Management Board for Puerto Rico, et al. v.
Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00007**

On January 16, 2020, Plaintiffs the Oversight Board, acting in its capacity as representative of HTA, and the UCC[214] filed an action against Ambac, Assured, National, FGIC, Peaje, and BNYM, as fiscal agent for bonds issued by HTA (collectively, the "HTA Defendants"), challenging the proofs of claim filed against HTA and other lien claims asserted by the HTA Defendants as insurers, trustee, and/or holders of certain bonds issued by HTA (the "HTA Bonds") (the "HTA Claim Challenge Action").  The HTA Defendants filed proofs of claim (or alleged other claims of liens) in the HTA Title III case asserting, among other things, (i) the HTA Bonds are secured by statutory or equitable liens against certain of HTA's property, (ii) HTA Defendants

---

[214] The UCC is co-plaintiff with respect to certain claims asserted in this adversary proceeding that are substantially similar to the counts asserted in the prior pending HTA lien challenge adversary proceedings filed on May 20, 2019 [Adv. Proc. Nos. 19-362, 19-363, 19-364, and 19-365].

hold ownership interests in certain of HTA's property, (iii) HTA Defendants have first priority, perfected security interests against HTA's property extending beyond the security interests (if any) granted in the documents governing the HTA Bonds, (iv) breaches of contract and tort claims arising from the Commonwealth's retention of revenues from gasoline and cigarette taxes and vehicle license fees levied and collected by the Commonwealth which were historically conditionally appropriated and transferred to HTA, (v) violations of the Commonwealth and U.S. Constitutions, and (vi) their security interests continue to attach to revenues received by HTA postpetition.

Plaintiffs allege the HTA Defendants' purported secured HTA Bond claims should be disallowed except as to those amounts deposited and held in certain specified deposit accounts by the fiscal agent pursuant to the HTA Enabling Act and documents governing the HTA Bonds. In addition, Plaintiffs seek disallowance of all HTA Defendants' proofs of claim (or other claims of lien) related to the HTA Bonds on the grounds that, among other things, (i) the HTA Defendants' proofs of claim other than BNYM's are duplicative of the master proofs of claim filed by BNYM, as fiscal agent, (ii) the HTA Enabling Act and documents governing the HTA Bonds do not create statutory or equitable liens, (iii) the HTA Defendants do not have an ownership interest in any HTA revenues, (iv) security interests against any other funds not held by the fiscal agent are unperfected and avoidable pursuant to Bankruptcy Code sections 544 and 551, (v) HTA's revenues are not special revenues as defined in Bankruptcy Code section 902(2), (vi) claims for postpetition revenues and interest must be disallowed pursuant to Bankruptcy Code sections 502(b)(2) and 552, (vii) the HTA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (viii) the HTA Defendants do not have an allowable claim under PROMESA section 407, and (ix) the HTA Defendants do not properly allege any tort claims against HTA.

On February 11, 2020, the UCC moved to intervene in those counts in the HTA Claim Challenge Action in which the UCC is not a co-plaintiff [Adv. Proc. No. 20-00007, ECF No. 15]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as intervenors under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00007, ECF No. 20]. Also on February 18, 2020, the Monolines filed a joint opposition to the UCC's motion [Adv. Proc. No. 20-00007, ECF No. 22]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00007, ECF No. 31]. On March 2, 2020, Magistrate Judge Dein issued an order partially granting the UCC's motion to intervene [Adv. Proc. No. 20-00007, ECF No. 39]. On March 16, 2020, the UCC filed a limited objection to Magistrate Judge Dein's order [Adv. Proc. No. 20-00007, ECF No. 46]. On March 17, 2020, the Title III Court issued an order holding in abeyance the UCC's limited objection [Adv. Proc. No. 20-00007, ECF No. 47].

Also on February 11, 2020, the DRA Parties moved to intervene in the HTA Claim Challenge Action [Adv. Proc. No. 20-00007, ECF No. 14]. On February 18, 2020, the Oversight Board filed its response objecting to the DRA Parties' motion [Adv. Proc. No. 20-00007, ECF No.

23].  On February 25, 2020, the DRA Parties filed a reply in support of their motion [Adv. Proc. No. 20-00007, ECF No. 28].  On March 10, 2020, the Title III Court issued an order partially granting the motion to intervene [Adv. Proc. No. 20-00007, ECF No. 44].  Also on February 18, 2020, the Monolines filed a joint opposition to the motion [Adv. Proc. No. 20-00007, ECF No. 21].  On February 27, 2020, Assured, Ambac, National, FGIC and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00007, ECF No. 35].  Peaje filed a joinder to the motion [Adv. Proc. No. 20-00007, ECF No. 36].  On February 28, 2020 the Ad Hoc Group of FGIC Noteholders filed a motion to intervene [Adv. Proc. No. 20-00007, ECF No. 37].  On April 7, 2020, HTA filed a response to the Ad Hoc Group of FGIC Noteholders' motion to intervene [Adv. Proc. No. 20-00007, ECF No. 49].  On April 13, 2020, Magistrate Judge Dein issued an order denying without prejudice the motion to intervene [Adv. Proc. No. 20-00007, ECF No. 50].

On March 10, 2020, the Title III Court issued an amended Case Management Order in connection with the revenue bond complaints, which stayed this adversary proceeding [Adv. Proc. No. 20-00007, ECF No. 43].  On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the revenue bonds complaints.  [Case No. 17-bk-3283, ECF No. 16739].  For further discussion of this motion, see Section V.E.4.(f).

b)   ***Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00005**

On January 16, 2020, Plaintiff (the Oversight Board, acting in its capacity as representative of the Commonwealth) filed an action against the HTA Defendants challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the HTA Defendants as insurers and/or holders of HTA Bonds (the "Commonwealth-HTA Claim Challenge Action").  The HTA Defendants filed proofs of claim (or alleged other claims of liens) in the Commonwealth Title III case asserting, among other things, (i) the Commonwealth has liability for not appropriating and transferring certain revenues from gasoline and cigarette taxes and vehicle license fees levied and collected by the Commonwealth which were historically conditionally appropriated and transferred to HTA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contends the HTA Bonds are non-recourse, and the Commonwealth has no liability with respect to the HTA Bonds as it is neither an issuer nor a guarantor of the HTA Bonds pursuant to the HTA Enabling Act and documents governing the HTA Bonds.  The Oversight Board seeks disallowance of all HTA Defendants' proofs of claim (or other claims of lien) related to the HTA Bonds as against the Commonwealth on the grounds that, among other things, (i) the HTA Defendants' proofs of claim other than BNYM's are duplicative of the master proofs of claim filed by BNYM, as fiscal agent, (ii) the HTA Defendants lack standing to assert a claim against the Commonwealth as to the Bonds, (iii) the HTA Defendants' purported security interests are limited to those funds received by HTA and deposited in specified deposit accounts held by the fiscal agent, (iv) the HTA Defendants lack subrogation, reimbursement, or contribution rights, (v) the pre-PROMESA retention of HTA revenues by the Commonwealth was permitted by Commonwealth law, the HTA Enabling Act and the documents governing the HTA Bonds, (vi) the Commonwealth's retention of HTA revenues is neither a breach of contract nor a tort against

the Commonwealth, (vii) any purported Commonwealth obligation to appropriate and transfer funds to HTA was preempted by PROMESA, (viii) the HTA Defendants do not have an allowable claim under the Contract, Due Process, or Takings Clauses of the Commonwealth and U.S. Constitutions, (ix) the HTA Defendants do not have a secured claim, a priority claim, a perfected security interests, or a claim for postpetition revenues, (x) the HTA Defendants do not have an ownership interest in any HTA revenues, and (xi) the HTA Defendants do not have an allowable claim under PROMESA section 407.

On February 11, 2020, the UCC moved to intervene in the Commonwealth-HTA Claim Challenge Action [Adv. Proc. No. 20-00005, ECF No. 9]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as interveners under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00005, ECF No. 16]. Also on February 18, 2020, the Monolines filed a joint opposition to the UCC's motion [Adv. Proc. No. 20-00005, ECF No. 19]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00005, ECF No. 30]. On March 2, 2020, Magistrate Judge Dein issued an order partially granting the UCC's motion to intervene [Adv. Proc. No. 20-00005, ECF No. 37].

Also on February 11, 2020, the DRA Parties moved to intervene in the Commonwealth-HTA Claim Challenge Action [Adv. Proc. No. 20-00005, ECF No. 11]. On February 18, 2020, the Oversight Board filed its response objecting to the DRA Parties' motion [Adv. Proc. No. 20-00005, ECF No. 17]. Also on February 18, 2020, the Monolines filed a joint opposition to the motion [Adv. Proc. No. 20-00005, Adv. Proc. No. 20-00005, ECF No. 18]. On February 25, 2020, the DRA Parties filed a reply in support of their motion [Adv. Proc. No. 20-00005, ECF No. 26]. On March 10, 2020, Magistrate Judge Dein issued an order partially granting the motion to intervene [Adv. Proc. No. 20-00005, ECF No. 41]. On February 27, 2020, Assured, Ambac, National, FGIC and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00005, ECF No. 34]. On February 25, 2020, the Oversight Board and Peaje filed a joint motion to extend the deadline for Peaje to respond to the adversary complaint. On February 26, 2020, the Title III Court issued an order granting the motion [Adv. Proc. No. 20-00005, ECF No. 29]. On March 19, 2020, the Oversight Board and Peaje filed a joint motion to stay and extend the deadlines in connection with certain counts alleged against Peaje [Adv. Proc. No. 20-00005, ECF No. 45], and the Title III Court granted the joint motion [Adv. Proc. No. 20-00005, ECF No. 46].

On April 28, 2020, the Oversight Board filed a motion for partial summary judgment to disallow certain claims described in the *Complaint Objecting to Defendant's Claims and Seeking Related Relief* [Adv. Proc. No. 20-00005, ECF No. 55]. Specifically, the Oversight Board moved on: (i) Counts 5, 9, 10, 11, 15, 17, 18, and 22 alleged against Ambac; (ii) Counts 28, 32, 33, 34, 38, 40, 41, and 45 alleged against AGC; (iii) Counts 51, 55, 56, 57, 61, 63, 64, and 68 alleged against AGMC; (iv) Counts 74, 78, 79, 80, 84, 86, 87, and 91 alleged against National; (v) Counts 97, 101, 102, 103, 107, 109, 110, and 114 alleged against FGIC; and (vi) Counts 162, 166, 167, 168, 172, 174, 175, , 183, 187, 188, 189, 193, 195, 196, and 200 alleged against BNYM. Also on

April 28, the UCC filed a limited joinder to the Oversight Board's motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF No. 64]. On July 16, 2020, the Monolines and DRA Parties filed responses to the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF Nos. 94, 99]. The Monolines also filed a declaration of Casey Servais, which sought discovery prior to a ruling on the pending motion, pursuant to Fed. R. Civ. P. 56(d) [Adv. Proc. No. 20-00005, ECF No. 97]. On August 31, 2020, the Oversight Board filed a reply in support of its motion for partial summary judgment and an opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00005, ECF Nos. 102, 103, 104, 105]. Also on August 31, 2020, the UCC filed a joinder to the Oversight Board's reply in support of its motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF Nos. 106]. On September 13, 2020, the DRA Parties filed a sur-reply in support of their opposition to the Oversight Board's motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF No. 112]. On September 13, 2020, the Monolines filed a sur-reply in support of their opposition to the Oversight Board's motion for partial summary judgment and a response to the Oversight Board's opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00005, ECF Nos. 113, 114]. A hearing on the motions for summary judgment was held on September 23, 2020.

On January 20, 2021, the Title III Court issued an Order Regarding Discovery in Connection with Motions of the Commonwealth of Puerto Rico, by and through the Financial Oversight and Management Board, Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims [Adv. Proc. No. 20-00005, ECF No. 129] (the "Rule 56(d) Order"). The Rule 56(d) Order authorized discovery into certain of the topics addressed in the Rule 56(d) declaration Defendants had submitted on July 26, 2020.

The Court ordered the parties to meet-and-confer regarding a proposed schedule and file a joint status report by February 3, 2021. Consistent with the Rule 56(d) Order, the parties met and conferred and filed a Joint Status Report setting forth their respective positions regarding scheduling [Adv. Proc. No. 20-00005, ECF No. 132]. On February 5, 2021, the Court issued its Order Setting Discovery Schedule [Adv. Proc. No. 20-00005, ECF No. 133] (the "Discovery Schedule Order"). Following the grant of the parties' joint motion to modify the discovery schedule [Adv. Proc. 20-00005, ECF No. 157], the Discovery Schedule Order requires discovery authorized in the Rule 56(d) Order be completed by May 19, 2021, unless otherwise ordered by the Court. Discovery under the Rule 56(d) Order commenced on February 8, 2021 and was completed on June 11, 2021 pursuant to Magistrate Judge Dein's Order [Adv. Proc. No. 20-00005, ECF No. 214].

On March 3, 2021, Defendants filed a motion to compel, which sought an order directing Plaintiffs to (1) expand the scope of their search for additional documents and (2) produce certain information regarding accounting practices [Adv. Proc. No. 20-00005, ECF No. 137]. The motion to compel was fully briefed [Adv. Proc. No. 20-00005, ECF Nos. 141, 144], and was argued on March 17, 2021. On March 26, 2021, Magistrate Judge Dein issued an order partially granting the motion [Adv. Proc. No. 20-00005, ECF No. 153]. On April 23, 2021, Magistrate Judge Dein issued an order scheduling briefing on the parties' forthcoming discovery motions [Adv. Proc. No. 20-00005, ECF No. 179]. On April 30, 2021, Defendants filed a motion to compel and the Government Parties filed a motion for a protective order [Adv. Proc. No. 20-00005, ECF Nos. 185, 186]. On May 3, 2021, the Government Parties filed an opposition to Defendants' motion to

compel [Adv. Proc. No. 20-00005, ECF No. 191]. Also on May 3, 2021, Defendants filed an opposition to the Government Parties' motion for a protective order [Adv. Proc. No. 20-00005, ECF No. 190]. On May 6, 2021, Assured and National filed an informative motion informing the Title III Court they were suspending their participation in the parties' pending discovery motions [Adv. Proc. No. 20-00005, ECF No. 193]. Also on May 6, 2021, the Government Parties filed a reply in support of their motion for a protective order, and Defendants filed a reply in support of their motion to compel [Adv. Proc. No. 20-00005, ECF Nos. 194, 195]. On May 19, 2021, the Title III Court issued an order denying Defendants' motion to compel and the Government Parties' motion for a protective order [Adv. Proc. No. 20-00005, ECF No. 204].

On April 6, 2021, the Oversight Board filed a motion for entry of an order amending the Case Management Order to allow the Oversight Board to file partial summary judgment motions regarding certain counts [Adv. Proc. No. 20-00005, ECF Nos. 154, 155]. On April 13, 2021, Ambac, BNYM, U.S. Bank, and the GO/PBA PSA Creditors filed objections to the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF No. 158; Case No. 17-bk-3283, ECF No. 16401]. Also on April 13, 2021, the UCC filed a response in support of the Oversight Board's motion and a cross-motion for entry of an order amending the Case Management Order to allow the UCC to file limited objections to disallow certain proofs of claim [Adv. Proc. No. 20-00005, ECF No. 159]. On April 14, 2021, FGIC filed an objection to the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF No. 161]. On April 19, 2021, Assured and National filed a reservation of rights in connection with the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF No. 169]. On April 21, 2021, the Monolines and the Oversight Board filed objections to the UCC's cross motion [Adv. Proc. No. 20-00005, ECF Nos. 173, 176, 177]. Also on April 21, 2021, the Oversight Board filed a reply in support of its motion and a response to the GO/PBA PSA Creditors' objection [Adv. Proc. No. 20-00005, ECF Nos. 174, 175]. On April 24, 2021, the UCC filed a reply in support of its cross-motion [Adv. Proc. No. 20-00005, ECF No. 180]. On May 5, 2021, the Title III Court issued an order denying the Oversight Board's motion and the UCC's cross motion [Adv. Proc. No. 20-00005, ECF No. 192].

On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the revenue bonds complaints. [Case No. 17-bk-3283, ECF No. 16739]. For further discussion of this motion, see Section V.E.4.(f).

c)   <em><strong>Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al., Adv. Proc. No. 20-00003</strong></em>

On January 16, 2020, Plaintiff the Oversight Board, acting in its capacity as representative of the Commonwealth, filed an action against Ambac, Assured,[215] FGIC, and U.S. Bank Trust National Association ("U.S. Bank"), as trustee for holders of PRIFA Bonds (collectively, the "PRIFA Defendants") challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the PRIFA Defendants as holders and/or insurers of certain bonds issued by PRIFA (the "PRIFA Bonds") (the "PRIFA Claim Challenge Action"). The PRIFA Defendants

---

[215] Only Assured Guaranty Corp., not Assured Guaranty Municipal Corp. or any other affiliates, is a defendant.

filed proofs of claim (or alleged other claims of liens) in the Commonwealth Title III Case asserting, among other things, (i) the Commonwealth has liability for not appropriating and transferring certain excise tax revenues on rum produced in Puerto Rico and sold on the U.S. mainland, levied and collected by the Commonwealth, which were historically conditionally appropriated and transferred to PRIFA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contends the PRIFA Bonds are non-recourse, and the Commonwealth has no liability with respect to the PRIFA Bonds as it is neither an issuer nor a guarantor of the PRIFA Bonds pursuant to the PRIFA Enabling Act and documents governing the PRIFA Bonds. The Oversight Board seeks disallowance of all PRIFA Defendants' proofs of claim (or other claims of lien) related to the PRIFA Bonds as against the Commonwealth on the grounds that, among other things, (i) the PRIFA Defendants' proofs of claim other than U.S. Bank's are duplicative of the master proof of claim filed by U.S. Bank, as trustee, (ii) the PRIFA Defendants lack standing to assert a claim against the Commonwealth as to the PRIFA Bonds, (iii) the PRIFA Enabling Act and documents governing the PRIFA Bonds do not create statutory or equitable liens, (iv) the PRIFA Defendants do not have an ownership interest in any rum excise tax revenues, (v) the PRIFA Defendants' purported security interests are limited to those funds received by PRIFA and deposited in specified deposit accounts held by the fiscal agent, (vi) the PRIFA revenues are not special revenues as defined in Bankruptcy Code section 902(2), (vii) the PRIFA Defendants lack subrogation, reimbursement, or contribution rights, (viii) the retention of the rum excise tax revenues by the Commonwealth was permitted by Commonwealth law, the PRIFA Enabling Act and the documents governing the PRIFA Bonds, (ix) the Commonwealth's retention of the rum excise tax revenues is neither a breach of contract nor a tort against the Commonwealth, (x) any purported Commonwealth obligation to appropriate and transfer funds to PRIFA was preempted by PROMESA, (xi) the PRIFA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (xii) the PRIFA Defendants do not have an allowable claim under PROMESA section 407, and (xiii) the PRIFA Defendants do not have a secured claim, a priority claim, a perfected security interests, or a claim for postpetition revenues.

On February 11, 2020, the UCC moved to intervene in the PRIFA Claim Challenge Action [Adv. Proc. No. 20-00003, ECF No. 9]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as interveners under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00003, ECF No. 14]. Also on February 18, 2020, Assured, Ambac, and FGIC filed an opposition to the UCC's motion [Adv. Proc. No. 20-00003, ECF No. 15]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00003, ECF No. 18]. On March 2, 2020, Magistrate Judge Dein issued an order partially granting the motion to intervene [Adv. Proc. No. 20-00003, ECF No. 27].

On February 27, 2020, Ambac, Assured and FGIC filed a joint motion to dismiss [Adv. Proc. No. 20-00003, ECF No. 21] the PRIFA Claim Challenge Action. U.S. Bank filed a joinder to the motion [Adv. Proc. No. 20-00003, ECF No. 20]. The motion remains stayed pursuant to the amended Case Management Order described above [ECF No. 10595].

On April 28, 2020, the Oversight Board filed a motion for partial summary judgment to disallow certain claims described in the *Complaint Objecting to Defendant's Claims and Seeking Related Relief* [Adv. Proc. No. 20-00003, ECF No. 43]. Specifically, the Oversight Board moved on: (i) Counts 5, 7, 11, 16, 17, 18, 22, and 24 alleged against Ambac; (ii) Counts 31, 33, 37, 42, 43, 44, 48, and 50 alleged against AGC; (iii) Counts 57, 59, 63, 68, 69, 70, 74, and 76 alleged against FGIC; and (iv) Counts 82, 84, 87, 92, 93, 94, 98, and 100 against U.S. Bank. On April 28, 2020, the UCC filed a limited joinder to the Oversight Board's motion for partial summary judgment [Adv. Proc. No. 20-00003, ECF No. 52]. On July 16, 2020, the Monolines filed their response to the Oversight Board's motion [ECF No. 80] and a declaration of John Hughes, which sought discovery prior to a ruling on the pending motion, pursuant to Fed. R. Civ. P. 56(d) [Adv. Proc. No. 20-00003, ECF No. 82]. On August 31, 2020, the Oversight Board filed a reply in support of its motion for partial summary judgment and an opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00003, ECF Nos. 88, 89, 90, 91]. Also on August 31, 2020, the UCC filed a joinder to the Oversight Board's reply in support of its motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF Nos. 92]. On September 13, 2020, the Monolines filed a sur-reply in support of their opposition to the Oversight Board's motion for partial summary judgment and a response to the Oversight Board's opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00003, ECF Nos. 96, 98]. Also on September 13, 2020, U.S. Bank filed a joinder to the Monolines' sur-reply and response [Adv. Proc. No. 20-00003, ECF No. 100]. A hearing on the motions for summary judgment was held on September 23, 2020.

On January 20, 2021, the Title III Court issued the Rule 56(d) Order [Adv. Proc. No. 20-00003, ECF No. 115]. The Rule 56(d) Order authorized discovery into certain of the topics addressed in the Rule 56(d) declaration Defendants had submitted on July 26, 2020.

The Court ordered the parties to meet-and-confer regarding a proposed schedule and file a joint status report by February 3, 2021. Consistent with the Rule 56(d) Order, the parties met and conferred and filed a Joint Status Report setting forth their respective positions regarding scheduling [Adv. Proc. No. 20-00003, ECF No. 118]. On February 5, 2021, the Court issued the Discovery Schedule Order [Adv. Proc. No. 20-00003, ECF No. 119]. Following the grant of the parties' joint motion to modify the discovery schedule [Adv. Proc. 20-00004, ECF No. 136], the Discovery Schedule Order requires discovery authorized in the Rule 56(d) Order be completed by May 19, 2021, unless otherwise ordered by the Court. Discovery under the Rule 56(d) Order commenced on February 8, 2021 and was completed on June 11, 2021 pursuant to Magistrate Judge Dein's Order [Adv. Proc. No. 20-00003, ECF No. 201].

On March 3, 2021, Defendants filed a motion to compel, which sought an order directing Plaintiffs to (1) expand the scope of their search for additional documents and (2) produce certain information regarding accounting practices [Adv. Proc. No. 20-00003, ECF No. 126]. The motion to compel was fully briefed [Adv. Proc. No. 20-00003, ECF Nos. 129, 132], and was argued on March 17, 2021. On March 26, 2021, Magistrate Judge Dein issued an order partially granting the

motion [Adv. Proc. No. 20-00003, ECF No. 141]. On April 23, 2021, Magistrate Judge Dein issued an order scheduling briefing on the parties' forthcoming discovery motions [Adv. Proc. No. 20-00003, ECF No. 167]. On April 30, 2021, Defendants filed a motion to compel and the Government Parties filed a motion for a protective order [Adv. Proc. No. 20-00003, ECF Nos. 173, 174]. On May 3, 2021, the Government Parties filed an opposition to Defendants' motion to compel [Adv. Proc. No. 20-00003, ECF No. 179]. Also on May 3, 2021, Defendants filed an opposition to the Government Parties' motion for a protective order [Adv. Proc. No. 20-00003, ECF No. 178]. On May 6, 2021, Assured and National filed an informative motion informing the Title III Court they were suspending their participation in the parties' pending discovery motions [Adv. Proc. No. 20-00003, ECF No. 181]. Also on May 6, 2021, the Government Parties filed a reply in support of their motion for a protective order, and Defendants filed a reply in support of their motion to compel [Adv. Proc. No. 20-00003, ECF Nos. 182, 183]. On May 19, 2021, their Title III Court issued an order denying Defendants' motion to compel and the Government Parties' motion for a protective order [Adv. Proc. No. 20-00003, ECF No. 191].

On April 6, 2021, the Oversight Board filed a motion for entry of an order amending the Case Management Order to allow the Oversight Board to file partial summary judgment motions regarding certain counts [Adv. Proc. No. 20-00003, ECF Nos. 142, 143]. On April 13, 2021, Ambac, BNYM, U.S. Bank, and the GO/PBA PSA Creditors filed objections to the Oversight Board's motion [Adv. Proc. No. 20-00003, ECF No. 146; Case No. 17-bk-3283, ECF No. 16401]. Also on April 13, 2021, the UCC filed a response in support of the Oversight Board's motion and a cross-motion for entry of an order amending the Case Management Order to allow the UCC to file limited objections to disallow certain proofs of claim [Adv. Proc. 20-00003, ECF No. 147]. On April 14, 2021, FGIC filed an objection to the Oversight Board's motion [Adv. Proc. No. 20-00003, ECF No. 149]. On April 19, 2021, Assured and National filed a reservation of rights in connection with the Oversight Board's motion [Adv. Proc. No. 20-00003, ECF No. 157]. On April 21, 2021, the Monolines and the Oversight Board filed objections to the UCC's cross motion [Adv. Proc. No. 20-00003, ECF Nos. 161, 164, 165]. Also on April 21, 2021, the Oversight Board filed a reply in support of its motion and a response to the GO/PBA PSA Creditors' objection [Adv. Proc. No. 20-00003, ECF Nos. 162, 163]. On April 24, 2021, the UCC filed a reply in support of its cross-motion [Adv. Proc. No. 20-00003, ECF No. 168]. On May 5, 2021, the Title III Court issued an order denying the Oversight Board's motion and the UCC's cross motion [Adv. Proc. No. 20-00003, ECF No. 180].

On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the revenue bonds complaints. [Adv. Proc. No. 20-00003, ECF No. 200]. For further discussion of this motion, see Section V.E.4.(f).

d) ***Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00004**

On January 16, 2020, Plaintiff the Oversight Board, acting in its capacity as representative of the Commonwealth, filed an action (the "CCDA Claim Challenge Action") against Ambac,

Assured,[216] FGIC, and BNYM, as fiscal agent (collectively, the "CCDA Defendants"), challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the CCDA Defendants as holders and/or insurers of certain bonds issued by CCDA (the "CCDA Bonds"). The CCDA Defendants filed proofs of claim (or other claims of liens) in the Commonwealth Title III case asserting, among other things, (i) the Commonwealth has liability for not appropriating and ensuring the transfer certain hotel occupancy taxes, which were historically conditionally appropriated and transferred by the Puerto Rico Tourism Company to CCDA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contends the CCDA Bonds are non-recourse, and the Commonwealth has no liability with respect to the CCDA Bonds as it is neither an issuer nor a guarantor of the CCDA Bonds pursuant to the CCDA Enabling Act and documents governing the CCDA bonds. The Oversight Board seeks disallowance of all CCDA Defendants' proofs of claim (or other claims of liens) related to the CCDA Bonds as against the Commonwealth on the grounds that, among other things, (i) the CCDA Defendants' proofs of claim other than BNYM's are duplicative of the master proof of claim filed by BNYM, as fiscal agent, (ii) the CCDA Enabling Act and the documents governing the CCDA Bonds expressly exclude the Commonwealth from liability, (iii) the CCDA Defendants lack subrogation, reimbursement, or contribution rights, (iv) the pre-PROMESA retention of the hotel occupancy tax revenues by the Commonwealth was permitted by Commonwealth law and the documents governing the CCDA Bonds, (v) all laws purportedly appropriating the hotel occupancy tax revenues to CCDA were preempted by PROMESA, (vi) the Commonwealth's retention of the hotel occupancy tax revenues is not a breach of contract or a tort against the Commonwealth, (vii) the CCDA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (viii) the CCDA Defendants do not have an allowable claim under PROMESA section 407, (ix) the CCDA Defendants do not have a secured claim, a priority claim, perfected security interests, or a claim for postpetition revenues, and (x) the CCDA Defendants do not have an ownership interest in any occupancy tax revenues.

On February 11, 2020, the UCC moved to intervene in the CCDA Claim Challenge Action [Adv. Proc. No. 20-00004, ECF No. 11]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as interveners under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00004, ECF No. 16]. Also on February 18, 2020, Assured, Ambac, and FGIC filed an opposition to the UCC's motion [Adv. Proc. No. 20-00004, ECF No. 17]. On February 26, 2020, the UCC filed a reply in support of its motion [Adv. Proc. No. 20-00004, ECF No. 20]. On March 2, 2020, Magistrate Judge Dein issued an order partially granting the motion [Adv. Proc. No. 20-00004, ECF No. 25].

---

[216] Only Assured Guaranty Corp., not Assured Guaranty Municipal Corp. or any other affiliates, is a defendant.

On February 27, 2020, Ambac, Assured, FGIC and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00004, ECF No. 22]. The motion remains stayed pursuant to the amended Case Management Order described above [ECF No. 10595].

On April 28, 2020, the Oversight Board filed a motion for partial summary judgment [Adv. Proc. No. 20-00004, ECF No. 40]. Also on April 28, the UCC filed a limited joinder to the Oversight Board's motion for partial summary judgment [Adv. Proc. No. 20-00004, ECF No. 51]. On July 16, 2020, the Monolines filed their response to the Oversight Board's motion [Adv. Proc. No. 20-00004, ECF No. 78] and a declaration of John Hughes, which sought discovery prior to a ruling on the pending motion, pursuant to Fed. R. Civ. P. 56(d) [Adv. Proc. No. 20-00004, ECF No. 80]. On August 31, 2020, the Oversight Board filed a reply in support of its motion for partial summary judgment and an opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00004, ECF No. 84]. Also on August 31, the UCC filed a joinder to the Oversight Board's reply [Adv. Proc. No. 20-00004, ECF No. 87]. On September 13, 2020, the Monolines filed a sur-reply in support of their opposition to the Oversight Board's motion for partial summary judgment and a response to the Oversight Board's opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00004, ECF No. 91]. A hearing on the motion was held on September 23, 2020.

On January 20, 2021, the Title III Court issued the Rule 56(d) Order [Adv. Proc. No. 20-00004, ECF No. 108]. The Rule 56(d) Order authorized discovery into certain of the topics addressed in the Rule 56(d) declaration Defendants had submitted on July 26, 2020.

The Court ordered the parties to meet-and-confer regarding a proposed schedule and file a joint status report by February 3, 2021. Consistent with the Rule 56(d) Order, the parties met and conferred and filed a Joint Status Report setting forth their respective positions regarding scheduling [Adv. Proc. No. 20-00004, ECF No. 111]. On February 5, 2021, the Court issued the Discovery Schedule Order [Adv. Proc. No. 20-00004, ECF No. 112]. Following the grant of the parties' joint motion to modify the discovery schedule [Adv. Proc. 20-00004, ECF No. 136], the Discovery Schedule Order requires discovery authorized in the Rule 56(d) Order be completed by May 19, 2021, unless otherwise ordered by the Court. Discovery under the Rule 56(d) Order commenced on February 8, 2021 and was completed on June 11, 2021 pursuant to Magistrate Judge Dein's Order [Adv. Proc. No. 20-00004, ECF No. 189].

On March 3, 2021, Defendants filed a motion to compel, which sought an order directing Plaintiffs to (1) expand the scope of their search for additional documents and (2) produce certain information regarding accounting practices [Adv. Proc. No. 20-00004, ECF No. 117]. The motion to compel was fully briefed [Adv. Proc. No. 20-00004, ECF Nos. 120, 123], and was argued on March 17, 2021. On March 26, 2021, Magistrate Judge Dein issued an order partially granting the motion [Adv. Proc. No. 20-00004, ECF No. 132]. On April 23, 2021, Magistrate Judge Dein issued an order scheduling briefing on the parties' forthcoming discovery motions [Adv. Proc. No. 20-00004, ECF No. 158]. On April 30, 2021, Defendants filed a motion to compel [Adv. Proc. No. 20-00004, ECF No. 164]. On May 3, 2021, the Government Parties filed an opposition to Defendants' motion to compel [Adv. Proc. No. 20-00004, ECF No. 168]. On May 6, 2021, Assured and National filed an informative motion informing the Title III Court they were suspending their participation in the motion to compel [Adv. Proc. No. 20-00004, ECF No. 170]. Also on May 6, 2021, Defendants filed a reply in support of their motion to compel [Adv.

Proc. No. 20-00004, ECF No. 171]. On May 19, 2021, the Title III Court issued an order denying Defendants' motion to compel [Adv. Proc. No. 20-00004, ECF No. 179].

On April 6, 2021, the Oversight Board filed a motion for entry of an order amending the Case Management Order to allow the Oversight Board to file partial summary judgment motions regarding certain counts [Adv. Proc. No. 20-00004, ECF Nos. 133, 134]. On April 13, 2021, Ambac, BNYM, U.S. Bank, and the GO/PBA PSA Creditors filed objections to the Oversight Board's motion [Adv. Proc. No. 20-00004, ECF No. 137; Case No. 17-bk-3283, ECF No. 16401]. Also on April 13, 2021, the UCC filed a response in support of the Oversight Board's motion and a cross-motion for entry of an order amending the Case Management Order to allow the UCC to file limited objections to disallow certain proofs of claim [Adv. Proc. No. 20-00004, ECF No. 138]. On April 14, 2021, FGIC filed an objection to the Oversight Board's motion [Adv. Proc. No. 20-00004, ECF No. 140]. On April 19, 2021, Assured and National filed a reservation of rights in connection with the Oversight Board's motion [Adv. Proc. No. 20-00004, ECF No. 148]. On April 21, 2021, the Monolines and the Oversight Board filed objections to the UCC's cross motion [Adv. Proc. No. 20-00004, ECF Nos. 152, 155, 156]. Also on April 21, 2021, the Oversight Board filed a reply in support of its motion and a response to the GO/PBA PSA Creditors' objection [Adv. Proc. No. 20-00004, ECF Nos. 153, 154]. On April 24, 2021, the UCC filed a reply in support of its cross-motion [Adv. Proc. No. 20-00004, ECF No. 159]. On May 5, 2021, the Title III Court issued an order denying the Oversight Board's motion and the UCC's cross motion [Adv. Proc. No. 20-00004, ECF No. 169].

On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the revenue bonds complaints. [Case No. 17-bk-3283, ECF No. 16739]. For further discussion of this motion, see Section V.E.4.(f).

6.    **Miscellaneous Litigation**

a)    ***Pinto-Lugo, et al. v. United States, et al.*, Adv. Proc. No. 18-00041**

Various labor unions and non-profit organizations filed an action on April 24, 2018 against the United States, the Oversight Board, and the Governor. On July 27, 2018, Magistrate Judge Dein granted Plaintiffs' motion for leave to file an amended complaint [Adv. Proc. No. 18-00041, ECF No. 30]. Also on July 27, Plaintiffs filed their amended complaint [Adv. Proc. No. 18-00041, ECF No. 29]. The Amended Complaint alleges PROMESA is unconstitutional because it purportedly violates the First, Fifth, and Fourteenth Amendments to the United States Constitution, international treaties, and the Declaration of Independence. Plaintiffs primarily base their arguments on the *Insular Cases* and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs request (i) a declaration that PROMESA violates the aforementioned constitutional provisions, and various human rights provisions in the Declaration of Independence, the United Nations Charter, the United Nations Declaration of Human Rights, and the International Covenant of Civil and Political Rights; (ii) the removal of two Oversight Board members; (iii) a stay of the Title III Cases and the adoption of fiscal plans until an audit of the Commonwealth's debt can occur and any persons engaging in illegal conduct surrounding the sale of bonds is held liable; (iv) the United States assume the Commonwealth's public debt; and (v) an order prohibiting any interference with PREPA or UPR.

On August 23, 2018, the United States, the Oversight Board, and the Governor each separately moved to dismiss the case [Adv. Proc. No. 18-00041, ECF Nos. 34, 36, 38]. In its motion to dismiss, the Oversight Board argued (i) Plaintiffs lack standing, (ii) certain claims are barred by PROMESA sections 4, which grants debtors the power to sell and also preempts anything inconsistent in the Commonwealth Constitution; 105, which exempts the Oversight Board, its members and employees from liability for actions taken to carry out PROMESA; and 210(a), which states that the United States is not responsible for payment of principal and interest on Puerto Rico-issued obligations, (iii) the treaties do not create binding domestic legal obligations, (iv) the Declaration of Independence cannot form the basis of a claim and does not give rise to a private cause of action, (v) Congress is not constrained by separation of powers principles when it legislates pursuant to the Territories Clause, (vi) the Title III Court does not have the authority to remove Oversight Board members, and (vii) the Oversight Board is not obligated to conduct an audit under PROMESA.

On October 24, 2018, Plaintiffs filed an opposition to the motion to dismiss and request for partial declaratory judgement [Adv. Proc. No. 18-00041, ECF No. 48]. On October 29, 2018, Defendants moved to strike Plaintiffs' opposition on the ground it was non-compliant [Adv. Proc. No. 18-00041, ECF No. 49]. The Title III Court granted Defendants' urgent motion on November 27, 2018 with leave for Plaintiffs to file a compliant opposition by December 21, 2018 [Adv. Proc. No. 18-00041, ECF No. 54] (which deadline was later extended to January 4, 2019 [Adv. Proc. No. 18-00041, ECF No. 58]).

On January 4, 2019, Plaintiffs filed their opposition to the motions to dismiss, asserting that (i) the amended complaint satisfies the pleading standard; (ii) the Oversight Board violates the Declaration of Independence in that Puerto Ricans have not consented to grant it power; (iii) Congress does not have plenary power over residents of the territories under the Territories Clause; (iv) regulations enacted under the Territories Clause must be needful; (v) the Oversight Board violates the First Amendment, the Due Process Clause, and certain international treaties; (vi) Plaintiffs have standing; and (vii) the United States is obligated to assume the public debt of Puerto Rico [Adv. Proc. No. 18-00041, ECF No. 59].

Defendants filed their replies in support of their motions to dismiss on March 18, 2019 [Adv. Proc. No. 18-00041, ECF Nos. 71, 72, 73]. Plaintiffs' sur-reply was filed, with leave of Court, on April 20, 2019 [Adv. Proc. No. 18-00041, ECF No. 79]. On August 7, 2019, the Title III Court issued an order granting Defendants' motion to dismiss because Plaintiffs lacked standing to assert their claims and giving Plaintiffs leave to file a motion to seek permission to file an amended complaint [Adv. Proc. No. 18-00041, ECF No. 80].

On October 7, 2019, Plaintiffs filed a motion for leave to file a second amended complaint [Adv. Proc. No. 18-00041, ECF No. 90]. On October 11, 2019, Defendants filed a joint motion to strike Plaintiffs' motion for leave because it did not attach the proposed second amended complaint [Adv. Proc. No. 18-00041, ECF No. 91]. On October 14, 2019, Plaintiffs filed their proposed second amended complaint [Adv. Proc. No. 18-00041, ECF No. 92]. Plaintiffs filed an opposition to Defendants' joint motion to strike on October 18, 2019 [Adv. Proc. No. 18-00041, ECF No. 95]. Magistrate Judge Dein issued an order denying Defendants' motion to strike on October 22, 2019 [Adv. Proc. No. 18-00041, ECF No. 97]. On November 15, 2019, Governor Vázquez Garced and the Oversight Board filed oppositions to Plaintiffs' motion for leave to file a second amended

complaint [Adv. Proc. No. 18-00041, ECF Nos. 99, 100]. On December 9, 2019, Plaintiffs filed a reply in support of their motion for leave to file a second amended complaint [Adv. Proc. No. 18-00041, ECF No. 106].

On May 25, 2020, Plaintiffs filed a motion requesting adjudication of Plaintiffs' motion for leave to file a second amended complaint [Adv. Proc. No. 18-00041, ECF No. 110]. On June 3, 2020, the Oversight Board filed a response to Plaintiffs' motion [Adv. Proc. No. 18-00041, ECF No. 111]. On July 13, 2020, Magistrate Judge Dein issued a report and recommendation on Plaintiffs' motion, recommending that the motion be denied because the amendments in the proposed second amended complaint did not demonstrate Plaintiffs' standing [Adv. Proc. No. 18-00041, ECF No. 112]. On July 27, 2020, Plaintiffs filed an objection to Magistrate Judge Dein's report and recommendation [Adv. Proc. No. 18-00041, ECF No. 113]. The objection was fully briefed [Adv. Proc. No. 18-00041, ECF Nos. 117, 118, 119, 123]. On March 22, 2021, Judge Swain issued a memorandum order overruling Plaintiffs' objection and adopting Magistrate Judge Dein's report and recommendation, and the court clerk issued judgment and closed the case [Adv. Proc. No. 18-00041, ECF Nos. 124, 125]. On April 4, 2021, Plaintiffs filed a notice of appeal of Judge Swain's memorandum order [Adv. Proc. No. 18-00041, ECF No. 126]. The appeal was docketed as Case No. 21-1283.

> b)  ***Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v. Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico, et al., Adv. Proc. No. 19-00389***

On July 1, 2019, Plaintiffs, a group of credit unions, filed a complaint against the Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico ("COSSEC"), the Commonwealth, and the Oversight Board seeking declaratory and injunctive relief in connection with COSSEC's ability to provide share and deposit insurance to the Plaintiffs and other credit unions. Plaintiffs argued that they had complied with the requirements to avail themselves of coverage provided by COSSEC, which they alleged had been undercapitalized. Plaintiffs sought a preliminary and permanent injunction commanding COSSEC to resort to the resources of the Puerto Rico Treasury Department so that COSSEC could adequately provide share and deposit insurance to Plaintiffs. Also on July 1, Plaintiffs filed a motion to seal the proceeding [Adv. Proc. No. 19-00389, ECF No. 2]. On July 2, 2019, the Title III Court issued an order directing Plaintiffs to show cause why the proceeding should be sealed [Adv. Proc. No. 19-00389, ECF No. 4]. Plaintiffs filed a reply in support of their motion to seal on July 9, 2019 [Adv. Proc. No. 19-00389, ECF No. 6]. On July 15, 2019, Plaintiffs filed a motion for an order to show cause and request for a preliminary injunction [Adv. Proc. No. 19-00389, ECF No. 11]. On July 18, 2019, the Oversight Board (on behalf of itself and the Commonwealth) and COSSEC filed responses to Plaintiffs' request for a preliminary injunction [Adv. Proc. No. 19-00389, ECF Nos. 14, 15]. On July 19, 2019, the Oversight Board filed a response to Plaintiffs' motion to seal, stating that it did not take any position regarding the motion to seal [Adv. Proc. No. 19-00389, ECF No. 16]. On July 24, 2019, Defendants filed a motion to stay all responses to the complaint until 30 days after the Title III Court issued a ruling on Plaintiffs' motion for a preliminary injunction hearing [Adv. Proc. No. 19-00389, ECF No. 20]. On July 26, 2019, the Title III Court issued an order denying (i) Plaintiffs' motion to seal and (ii) Plaintiffs' motion for a preliminary injunction hearing [Adv. Proc. No. 19-

00389, ECF No. 24].  On July 29, Plaintiffs filed a notice of appeal of the order [Adv. Proc. No. 19-00389, ECF No. 26].

On August 6, 2019, in the First Circuit, Plaintiffs filed a motion to stay the order denying their motion to seal in Case No. 19-1755.  On August 7, 2019, Defendants (and Appellees) filed their response.  On August 9, 2019, the First Circuit issued an order temporarily staying the Title III Court's order to unseal the adversary proceeding.  On August 14, 2019, the First Circuit issued an order withdrawing the interim stay of the unsealing of the adversary proceeding effective August 16, 2019.  On August 16, 2019, in the Title III Court, Plaintiffs filed a motion to temporarily extend the stay, which the Title III Court denied [Adv. Proc. No. 19-00389, ECF No. 37].  On January 15, 2020, in the First Circuit, Appellants filed a motion to voluntarily dismiss the appeal without prejudice.  On February 3, 2020, the First Circuit issued its mandate and judgment dismissing the appeal without prejudice.

On October 30, 2020, Plaintiffs filed their amended complaint [Adv. Proc. No. 19-00389, ECF No. 55].  On February 5, 2021, the Oversight Board filed a motion to dismiss Plaintiffs' amended complaint [Adv. Proc. No. 19-00389, ECF No. 57].  Also on February 5, 2021, COSSEC filed a motion to dismiss and joinder to the Oversight Board's motion [Adv. Proc. No. 19-00389, ECF No. 59].  On February 8, 2021, Magistrate Judge Dein issued an order scheduling briefing in connection with the Oversight Board's motion to dismiss Plaintiffs' amended complaint [Adv. Proc. 19-00389, ECF No. 60].  On April 23, 2021, Plaintiffs filed oppositions to the Oversight Board's and COSSEC's motions to dismiss [Adv. Proc. 19-00389, ECF Nos. 64, 66].  Defendants are to reply by July 7, 2021.

c)   ***Puerto Rico Horse Owners Association, Inc. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 19-00392***

On July 2, 2019, a non-profit organization, Puerto Rico Horse Owners Association, filed an action against the Commonwealth, the Oversight Board and its executive director (in her official capacity), the Governor of Puerto Rico and certain government officials (in their official capacities) seeking declaratory relief that funds from uncashed winning tickets bet on horse races are not property of the Commonwealth, and should be paid to the Racing Administrator for distribution to certain Puerto Rico horse breeders.  On July 3, 2019, Plaintiff filed an amended complaint purporting to correct a clerical error [Adv. Proc. No. 19-00392, ECF No. 3].  On September 3, 2019, the Commonwealth, the Oversight Board and Natalie Jaresko; the individual government defendants; and AAFAF filed motions to dismiss the amended complaint [Adv. Proc. No. 19-00392, ECF Nos. 13, 14, 15].  On October 15, 2019, Plaintiff filed an omnibus opposition to the motions to dismiss [Adv. Proc. No. 19-00392, ECF No. 20].

On November 3, 2019, Plaintiff filed a second amended complaint [Adv. Proc. No. 19-00392, ECF No. 29].  On November 4, 2019, Defendants filed motions to dismiss the second amended complaint [Adv. Proc. No. 19-00392, ECF Nos. 30, 31, 32].  On November 18, 2019, Plaintiff filed an opposition to the motions to dismiss [Adv. Proc. No. 19-00392, ECF No. 33].  On December 2, 2019, the Oversight Board and AAFAF filed replies in support of their motions to dismiss [Adv. Proc. No. 19-00392, ECF No. 34, 35].  On February 28, 2020, Plaintiffs filed a motion for an order directing Defendants to state their position in connection with the motions to dismiss [Adv. Proc. No. 19-00392, ECF No. 36].  Therein, Plaintiffs asserted that the funds which

had been the subject of the lawsuit had been disbursed, and requested payment of their attorneys' fees.  On March 16, 2020, Wanda Vázquez Garced, Francisco Parés-Alicea, and José Alberto Maymó-Azize filed an opposition to Plaintiffs' motion [Adv. Proc. No. 19-00392, ECF No. 38]. On March 20, 2020, the Oversight Board and AAFAF filed oppositions to Plaintiffs' motion [Adv. Proc. No. 19-00392, ECF Nos. 39, 40].  On March 23, 2020, Plaintiffs filed a reply in support of their motion for an order directing Defendants to submit a more definite statement [Adv. Proc. No. 19-00392, ECF No. 41].  On March 25, 2020, the Title III Court issued an order and judgment dismissing the case as moot [Adv. Proc. No. 19-00392, ECF Nos. 42, 43].

d)      **UCC Objection to Claims Based on Commonwealth Guarantees**

On July 15, 2019, the UCC filed an objection to GDB's claim against the Commonwealth based on (i) section 502(d) of the Bankruptcy Code, which instructs courts to disallow claims by transferees of a voidable transfer if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises; and (ii) section 502(b)(1), which states that unenforceable claims may not be allowed [ECF No. 8000] (the "UCC GDB Objection").  The UCC argued that GDB received both constructive and actual fraudulent transfers from the Commonwealth in the form of 2014 GO Bonds because, among other things, the transfers were made to benefit GDB, the Commonwealth was undercapitalized, the Commonwealth did not receive reasonably equivalent value in exchange for the transfers, and the GDB received preferential transfers.  The UCC cited to the Kobre & Kim report, which stated that GDB abused its position as a lender to the Title III Debtors by increasing their debt load in a way that benefitted GDB as a creditor relative to other creditors.  The UCC furthermore alleged that GDB could not substantiate its claims.  On September 9, 2019, the Title III Court issued an order subjecting the UCC GDB Objection to the Stay Order, which stay was extended through March 10, 2020.[217]  On March 10, 2020, the Title III Court issued the Final Stay and Mediation Order, which ordered the UCC GDB Objection remain stayed pending a decision on confirmation of the Amended Plan [ECF No. 12189].

On January 8, 2020, the UCC filed an omnibus objection to proofs of claim filed by GDB and Scotiabank and to all claims against the Commonwealth based on its guaranty of certain PRIFA notes [ECF No. 9735].  The UCC's objection incorporated its earlier objection to claims asserted by certain GO Bondholders [ECF No. 4784] and claims filed or asserted against the Commonwealth based on certain PBA bonds issued in 2011 and 2012 [ECF No. 8141].  It argued that the Commonwealth Constitution prevented the Commonwealth from guaranteeing any bonds or notes if the Debt Service Limit had been exceeded.  The UCC argued that because the Debt Service Limit had already been exceeded when certain Commonwealth guaranties were issued, those guaranties were invalid.  For a discussion of the procedural history and current status of this objection, see section III.B.1.a)(ii) ("Challenges to the Validity of the GO Bonds and Commonwealth Guarantees").

---

[217] *See* section V.L of this Disclosure Statement for a detailed summary of the Mediation Report.

e)     *Ambac Assurance Corporation v. The Financial Oversight and
Management Board for Puerto Rico, et al.*, Adv. Proc. No. 20-00068

On May 26, 2020, Ambac Assurance Corp. filed a complaint against the Oversight Board and its members [Adv. Proc. No. 20-00068, ECF No. 1] alleging that PROMESA is a non-uniform bankruptcy law in violation of the Bankruptcy Clause's requirement that Congress "establish . . . uniform laws on the subject of bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Ambac alleged that PROMESA is non-uniform because it applies only to municipal restructurings that occur in Puerto Rico, while restructurings in other parts of the United States are governed by Chapter 9. As a remedy, Ambac sought (1) a declaration that Titles I, II, and III of PROMESA are unconstitutional and unenforceable as violations of the Bankruptcy Clause's uniformity requirement; and (2) an injunction prohibiting the Oversight Board and its members from implementing or effectuating Titles I, II, and III of PROMESA.

On May 28, 2020, the Title III Court certified Ambac's constitutional challenge to the Attorney General of the United States [Adv. Proc. No. 20-00068, ECF No. 4-1]. On July 10, 2020, the United States moved to extend its deadline to decide whether to intervene in the matter [Adv. Proc. No. 20-00068, ECF No. 20]. On July 13, 2020, Magistrate Judge Dein directed the parties to meet and confer and file a joint status report regarding the United States' motion to extend [Adv. Proc. No. 20-00068, ECF No. 22]. On July 14, 2020, the parties submitted a joint status report [Adv. Proc. No. 20-00068, ECF No. 25]. On July 15, 2020, Magistrate Judge Dein granted the motion to extend [Adv. Proc. No. 20-00068, ECF No. 26]. On August 14, 2020, the United States filed a notice of participation in the matter [Adv. Proc. No. 20-00068, ECF No. 35].

On June 25, 2020, the Retiree Committee moved to intervene [Adv. Proc. No. 20-00068, ECF No. 12]. On July 9, 2020, AAFAF moved to intervene [Adv. Proc. No. 20-00068, ECF No. 16]. On July 11, 2020, the Retiree Committee filed an informative motion regarding its motion to intervene [Adv. Proc. No. 20-00068, ECF No. 21]. On July 17, 2020, Ambac filed a limited objection to the Retiree Committee's motion to intervene [Adv. Proc. No. 20-00068, ECF No. 27]. On July 31, 2020, Magistrate Judge Dein issued an order partially granting the Retiree Committee's and AAFAF's motions to intervene [Adv. Proc. No. 20-00068, ECF No. 31].

On August 17, 2020, the Oversight Board moved to dismiss Ambac's complaint [Adv. Proc. No. 20-00068, ECF No. 37]. In support, the Oversight Board argued that (i) Article I's uniformity requirement does not apply to PROMESA because Congress enacted PROMESA pursuant to its Article IV power to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," U.S. Const. art IV, § 3, cl. 2; (ii) even if the uniformity requirement did apply, PROMESA is a uniform statute; (iii) PROMESA section 3(b) bars the invalidation remedies sought by Ambac; and (iv) Ambac is contractually and equitably barred from bringing its complaint. On August 18, 2020, AAFAF and the Retiree Committee filed briefs in support of the Oversight Board's motion to dismiss [Adv. Proc. No. 20-00068, ECF Nos. 38, 39]. On October 2, 2020, the United States filed a memorandum of law in support of the constitutionality of PROMESA [Adv. Proc. No. 20-00068, ECF No. 45]. On October 23, 2020, Ambac opposed the Oversight Board's motion to dismiss [Adv. Proc. No. 20-00068, ECF No. 49]. On November 23, 2020, the Oversight Board, AAFAF, and the Retiree Committee filed replies in

support of the Oversight Board's motion to dismiss [Adv. Proc. No. 20-00068, ECF Nos. 52, 53, 54]. On January 12, 2021, the motion was argued. The Title III Court took the motion *sub judice.*

### f) *Finca Matilde, Inc. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 20-00124

On October 13, 2020, Finca Matilde, Inc. filed an adversary complaint against the Commonwealth, AAFAF, and the Oversight Board [Adv. Proc. No. 20-00124, ECF No. 1]. Plaintiff asserted it held an outstanding judgment against the Commonwealth on account of a legislative taking, which allegedly occurred pre-petition under Commonwealth Act 227-2008. Plaintiff alleged it had filed a proof of claim based on the judgment. Plaintiff contended the Plan filed by the Oversight Board on February 28, 2020 did not provide a classification for holders of eminent domain judgments and Plaintiff's claim was classified in a manner that would improperly discharge its claim. The complaint asserted four causes of action, all related to the alleged non-dischargeability of what it contended was a Takings Clause claim under the Fifth Amendment of the U.S. Constitution. Plaintiff's first and second causes of action sought a declaratory judgment, respectively, that (1) its alleged Takings Clause claim cannot be discharged by the Oversight Board's Plan of Adjustment; and (2) its Takings Clause claim must be included in the Plan and must be paid in full under the Plan. Plaintiff's third cause of action alleged the Oversight Board's failure to account for the Takings Clause claim violated 42 U.S.C. § 1983 and sought an award against the Commonwealth of "over $11 million in damages." Plaintiff's fourth cause of action sought a declaratory judgment that Section 105 of PROMESA is unconstitutional. In particular, Plaintiff contended that in proposing a plan of adjustment under which Plaintiff's claim would not be paid in full, allowing the Oversight Board immunity under Section 105 "would provide mechanisms to override the obligations imposed to Debtor [sic] by the Fifth Amendment."

On December 14, 2020, the Oversight Board and AAFAF filed their motions to dismiss [Adv. Proc. No. 20-00124, ECF Nos. 24, 27]. The Oversight Board argued that (1) Plaintiff's claims were not ripe, and (2) Plaintiff lacked constitutional standing. AAFAF argued, among other things, that Plaintiff's complaint failed to state a claim against AAFAF because it failed to include any specific facts regarding AAFAF. On January 4, 2021, Plaintiff filed an amended complaint [Adv. Proc. No. 20-00124, ECF No. 31]. On January 19, 2021, AAFAF and the Oversight Board filed motions to dismiss the amended complaint [Adv. Proc. No. 20-00124, ECF Nos. 36, 38], making substantially the same arguments they made in moving to dismiss the original complaint. The motions to dismiss were fully briefed [Adv. Proc. No. 20-00124, ECF Nos. 41, 42, 43, 44]. On April 13, 2021, the Title III Court issued an order directing supplemental briefing in connection with the motions to dismiss [ECF No. 46]. On April 19, 2021, AAFAF, Finca Matilde, and the Oversight Board filed supplemental briefs in connection with the motions to dismiss [Adv. Proc. No. 20-00124, ECF Nos. 47, 48, 49]. On April 26, 2021, Finca Matilde filed a response to the Oversight Board's supplemental brief [Adv. Proc. No. 20-00124, ECF No. 51], and the Oversight Board filed a response to Finca Matilde's supplement brief [Adv. Proc. No. 20-00124, ECF No. 52].

g)     ***Altair Global Credit Opportunities Fund (A), LLC. et al., v. United
       States***, **Case No. 17-cv-0970 (Fed. Cl. filed July 19, 2017); Case No. 21-
       1577 (Fed. Cir. filed 2021)**

On July 19, 2017, certain ERS bondholders filed a complaint against the United States of America, alleging the Oversight Board, which was created by PROMESA, a federal statute, had "designed" certain Puerto Rico legislation that allegedly resulted in a taking of the bondholders' alleged property without just compensation. [Case No. 17-cv-0970, ECF Nos. 1, 2]. On October 31, 2017, Plaintiffs filed an amended complaint [Case No. 17-cv-0970, ECF No. 10]. On December 8, 2017, the United States filed a motion to dismiss the amended complaint for lack of jurisdiction and failure to state a claim [Case No. 17-cv-0970, ECF No. 14]. On January 26, 2018, Altair filed an opposition to the United States' motion [Case No. 17-cv-0970, ECF No. 21]. On March 9, 2018, the United States filed a reply in support of its motion [Case No. 17-cv-0970, ECF No. 24].

On July 13, 2018, the court issued an order denying the United States' motion to dismiss the amended complaint, and staying the case pending resolution of the Appointments Clause litigation [Case No. 17-cv-0970, ECF No. 31].

On February 27, 2019, in light of the First Circuit's decision in the Appointments Clause litigation, the court lifted the stay and directed the parties to file supplemental briefing regarding the status of the case. [Case No. 17-cv-0970, ECF No. 44]. On May 2, 2019, the United States filed its opening supplemental brief [Case No. 17-cv-0970, ECF No. 49]. On June 20, 2019, Plaintiffs filed a responsive supplemental brief [Case No. 17-cv-0970, ECF No. 50]. On July 17, 2019, the United States filed its supplemental reply brief [Case No. 17-cv-0970, ECF No. 56].

On August 27, 2019, Judge Hertling issued an order staying the case pending the First Circuit's resolution of *ERS v. Altair*, Case No. 19-1699 [Case No. 17-cv-0970, ECF No. 60]. On October 8, 2019, the parties filed a joint status report informing the Court of the Supreme Court's denial of the Oversight Board's petition for a writ of certiorari [Case No. 17-cv-0970, ECF No. 63]. On January 21, 2020, Judge Hertling issued an order extending the stay pending the First Circuit's resolution of *ERS v. Altair*, Case No. 19-1699 [Case No. 17-cv-0970, ECF No. 66].

On September 3, 2020, Plaintiffs filed a second amended complaint [Case No. 17-cv-0970, ECF No. 76]. On September 11, 2020, the United States filed an opposition to Plaintiffs' motion for leave to file a second amended complaint and a cross-motion to dismiss [Case No. 17-cv-0970, ECF No. 79]. On October 2, 2020, the United States filed a motion for partial summary judgment [Case No. 17-cv-0970, ECF No. 82]. On October 9, 2020, Plaintiffs filed a reply in support of their motion for leave to file a second amended complaint and an opposition to the United States' cross-motion [Case No. 17-cv-0970, ECF No. 83]. On October 23, 2020, the United States filed a reply in support of its cross-motion [Case No. 17-cv-0970, ECF No. 85]. On October 29, 2020, the United States' cross-motion to dismiss was argued.

On October 30, 2020, Plaintiffs filed an opposition to the United States' motion for partial summary judgment [Case No. 17-cv-0970, ECF No. 86]. On November 13, 2020, the United States filed a reply in support of its motion for partial summary judgment [Case No. 17-cv-0970,

313

ECF No. 87].  On November 23, 2020, the Court issued a memorandum opinion and order granting the United States' motion to dismiss [Case No. 17-cv-0970, ECF Nos. 91, 92].  On January 22, 2021, Plaintiffs filed a notice of appeal of the Court's order granting the United States' motion to dismiss [Case No. 17-cv-0970, ECF No. 95].

On January 26, 2021, the appeal was docketed as No. 21-1577.  On March 12, 2021, Appellants filed an unopposed motion to stay the appeal.

## G.    Rule 2004 Motions

### 1.    GO Bondholders/Monolines Rule 2004 Motion Concerning Fiscal Plan Development

On August 25, 2017, National filed a Rule 2004 motion seeking documents regarding the Commonwealth's financial condition and its fiscal plan [ECF No. 1177].  On the same day, the Ad Hoc Group of GO bondholders, Assured, and the Mutual Fund Group filed a joint Rule 2004 motion [ECF No. 1178].  On September 12, 2017, Ambac filed a Rule 2004 motion seeking similar financial information [ECF No. 1283].  On September 19, 2017, FGIC [ECF Nos. 1334, 1335] and the ERS Bondholders [ECF No. 1340] joined National and the GO Group (defined herein) motions, while the Retiree Committee joined all three [ECF No. 1353].  Also on September 19, the UCC filed a response [ECF No. 1344], and the Oversight Board objected to the three Rule 2004 motions [ECF No. 1345].  AAFAF joined the Oversight Board's omnibus objection on October 31, 2017 [ECF No. 1582].  On November 2, 2017, the UCC joined the three Rule 2004 motions [ECF No. 1603].  On November 7, 2017, the GO Group [ECF No. 1665], National [ECF No. 1667], and Ambac [ECF No. 1668] filed replies in support of their respective motions and ERS Bondholders filed a reply in support of their joinder [ECF No. 1670].  On November 17, 2017, the Title III Court issued an order denying the motions without prejudice [ECF No. 1824].

On November 28, 2017, the Ad Hoc Group of GO Bondholders filed a renewed motion for an order authorizing discovery regarding the Commonwealth's financial condition and its fiscal plan, in which numerous parties joined, including the UCC, certain ERS bondholders, Ambac, Assured, and National [ECF No. 1870].  The Commonwealth filed an objection to the renewed joint motion on December 6, 2017, asserting, *inter alia*, that the common interest and deliberative process privileges precluded discovery into development of the fiscal plan [ECF No. 1928].  On February 26, 2018, Magistrate Judge Dein entered an order upholding the assertion of the deliberative process and common interest privileges, but ordering the parties to prepare privilege logs [ECF No. 2590].  On May 21, 2018, Magistrate Judge Dein held a hearing addressing the parties' disputes regarding the assertion of privileges over fiscal plan development materials [ECF No. 3136].  The parties have thereafter engaged in discussions to resolve their disputes.

### 2.    Ambac Rule 2004 Motion Concerning PRIFA Rum Taxes

On June 7, 2019, Ambac filed a Rule 2004 motion concerning PRIFA rum taxes [ECF No. 7328] (the "PRIFA Rum Tax 2004 Motion"), which FGIC [ECF No. 7676] and the UCC [ECF No. 7881] later joined.  The PRIFA Rum Tax 2004 Motion seeks discovery regarding the

identification and quantification of rum tax revenues, as well as any transfers of such tax revenues. The Oversight Board opposed the motion on July 9, 2019, joined by AAFAF [ECF Nos. 7891, 7896]. Bacardi also filed an objection on July 9, 2019 [ECF No. 7897]. Ambac replied in support of its motion on July 16, 2019 [ECF No. 8029]. Further proceedings with respect to the PRIFA Rum Tax 2004 Motion were stayed pursuant to the Title III Court's Stay Order. On February 10, 2020, the Mediation Team filed its Amended Report, recommending that the PRIFA Rum Tax 2004 Motion be denied without prejudice. On March 10, 2020, the Title III Court issued the Final Stay and Mediation Order denying the motion without prejudice [ECF No. 12189].

3.    **Ambac Rule 2004 & Compliance Motions Concerning Pension Liabilities**

On June 18, 2019, Ambac filed a motion to compel compliance with prior orders [ECF No. 7505] and a Rule 2004 motion (together with ECF No. 7505, the "Pension Liabilities Motions") [ECF No. 7507] concerning pension liabilities. The Ad Hoc Group of Constitutional Debtholders [ECF No. 7531], Assured [ECF No. 7588], the Ad Hoc Group of General Obligation Bondholders [ECF No. 7714], and the UCC [ECF No. 7883] joined the Rule 2004 motion; FGIC joined both [ECF No. 7674]. On July 9, 2019 the Oversight Board filed an omnibus opposition [ECF No. 7895] to the motion to compel and Rule 2004 motion. Ambac replied on July 23, 2019 [ECF No. 8230]. At the same time, the parties met and conferred and agreed to productions of certain documents responsive to the requests in the Pension Liabilities Motions. As a result of those efforts, the parties jointly requested several adjournments to any hearing on the Pension Liabilities Motions. On May 29, 2020, Magistrate Judge Dein issued an order denying without prejudice Ambac's pension discovery motions [ECF No. 13265]. The parties have thereafter engaged in consensual negotiations to resolve their disputes.

On December 4, 2020, Ambac filed a Rule 2004 motion seeking authorization to serve a subpoena on Milliman, Inc., an actuarial consultant for the Commonwealth, seeking discovery regarding the calculation of the Commonwealth's pension liabilities [ECF No. 15342]. On December 7, 2020, the UCC filed a joinder to Ambac's Rule 2004 motion [ECF No. 15358]. On December 8, 2020, Assured and National filed joinders to Ambac's Rule 2004 motion [ECF No. 15381]. On December 9, 2020, FGIC, the GO/PBA PSA Creditors, and certain ERS Bondholders filed joinders to Ambac's Rule 2004 motion [ECF Nos. 15389, 15401, 15403]. On December 30, 2020, the Oversight Board and AAFAF filed a notice of no opposition to Ambac's Rule 2004 motion in connection with the disclosure of pension liabilities [ECF No. 15518]. On January 13, 2021, Magistrate Judge Dein issued an order granting Ambac's Rule 2004 motion [ECF No. 15589]. On May 11, 2021, National filed a notice of withdrawal of its joinder to Ambac's Rule 2004 motion [ECF No. 16728], which Magistrate Judge Dein denied in light of her prior ruling granting the motion. Also on May 11, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment [ECF No. 16739]. For further discussion of this motion, see Section V.E.4.(f).

4.    **Rule 2004 Motions Concerning Commonwealth Assets and Commonwealth Cash Restriction**

On October 28, 2019, Ambac filed two Rule 2004 motions: one seeking discovery concerning Commonwealth assets [ECF No. 9022] ("CW Asset Motion"), and the other seeking

discovery concerning the Commonwealth's available cash and analyses regarding restricted versus unrestricted cash ("CW Cash Motion") [ECF No. 9023]. On November 8, 2019, the Oversight Board filed an urgent motion to strike Ambac's Rule 2004 motions and for sanctions, arguing that the CW Asset Motion and the CW Cash Motion violated the mandatory stay imposed by the Title III Court in July 2019 [ECF No. 9131]. On December 3, 2019, Ambac filed an objection to the Oversight Board's urgent motion [ECF No. 9404]. On December 10, 2019, the Oversight Board filed a reply in support of its motion [ECF No. 9531].

On January 23, 2020, the Title III Court denied the Oversight Board's motion to strike [ECF No. 10332]. However, the Title III Court held the discovery requests in the CW Asset Motion and the CW Cash Motion were "sweepingly broad" and "objectively unreasonable." *Id.* The Title III Court ordered the parties to confer and file a joint status report on or before February 12, 2020. *Id.* Numerous parties, including the UCC, Servicios Integrales de la Montana, Assured, National, and FGIC filed joinders, seeking to participate in meet and confer sessions and to receive discovery produced pursuant to the CW Cash and CW Asset Motions. On February 3, 2020, FGIC filed a joinder to the CW Cash and CW Asset Motions [ECF No. 10605]. On February 6, 2020, Magistrate Judge Dein issued an order requiring the parties to respond to the joinders in their joint status report [ECF No. 10727]. On February 12, 2020, the parties filed a joint status report, stating that they are continuing to meet and confer to resolve disputes regarding the scope of the requests [ECF No. 10875]. The parties further stated they did not object to the joinder entities' requests to participate in meet and confers and to receive documents, but reserve the right to object to future requests. On February 26, 2020, the parties filed a further joint status report [ECF No. 11787]. On April 10, 2020, the parties filed another joint status report, stating that the parties were conducting discovery and continuing to meet and confer to resolve disputes regarding the scope of the requests [ECF No. 12711]. The parties further stated that the production of certain materials would be delayed in light of COVID-19. On April 21, 2020, the parties filed a stipulated protective order [ECF No. 12911]. Also on April 21, Magistrate Judge Dein issued an order approving the protective order [ECF No. 12920].

On June 12, 2020, certain ERS Bondholders filed a joinder to Ambac's motion [ECF No. 13414]. On June 19, 2020, Ambac filed a response to the Bondholders' joinder [ECF No. 13468]. On June 24, 2020, Magistrate Judge Dein issued an order partially denying the joinder, but noting that the ERS Bondholders could be included in any discussions regarding discovery [ECF No. 13488]. On June 26, 2020, the Oversight Board and certain ERS Bondholders filed a stipulation binding the ERS Bondholders to the existing protective order [ECF No. 13505], which Magistrate Judge Dein approved on the same day [ECF No. 13507].

On September 1, 2020 [ECF No. 14150] and September 30, 2020 [ECF No. 14438], the parties filed further status reports, indicating that the parties had reached impasse on certain issues, but were continuing to confer productively on others. On November 12, 2020, the Title III Court issued an order denying the CW Cash and CW Asset Motions without prejudice and directed Ambac to file a new 2004 motion, limited to the issues in dispute [ECF No. 15093].

On November 20, 2020, Ambac filed a new Rule 2004 motion seeking discovery concerning the Commonwealth's available cash and analyses regarding restricted versus unrestricted cash ("New CW Cash Motion") [ECF No. 15220]. On November 23, 2020, Assured filed a joinder to Ambac's New CW Cash Motion [ECF No. 15225]. On November 24, 2020, the

ERS Bondholders, FGIC, and National filed joinders to Ambac's New CW Cash Motion [ECF Nos. 15239, 15266, 15268]. On November 25, 2020, the UCC filed a joinder to Ambac's New CW Cash Motion [ECF No. 15279]. On December 4, 2020, Ambac and the Government Parties filed a joint status report regarding Ambac's New CW Cash Motion [ECF No. 15350]. Also on December 7, 2020, the DRA Parties filed a joinder to Ambac's New CW Cash Motion [ECF No. 15366]. On December 16, 2020, Magistrate Judge Dein issued an order partially denying the various joinders, but noting that the parties should include the joining parties in discussions regarding discovery and that the joinders would remain pending to enable the court to address any disputes [ECF No. 15454]. On December 23, 2020, the Oversight Board filed an objection to Ambac's New CW Cash Motion [ECF No. 15495]. On January 8, 2021, Ambac filed a reply in support of its motion [ECF No. 15567]. On January 29, 2021, with court permission, the Oversight Board filed a sur-reply in response to the motion [ECF No. 15783].

On February 4, 2021, Ambac filed a new Rule 2004 motion seeking discovery concerning certain assets owned by various Commonwealth entities ("New CW Asset Motion") [ECF No. 15802]. On February 18, 2021, Assured, FGIC, and National filed a joinder to Ambac's New CW Asset Motion [ECF No. 15859]. On March 2, 2021, the UCC filed a joinder to Ambac's New CW Asset Motion [ECF No. 15899]. On March 4, 2021, Ambac and the Government Parties filed a joint status report regarding Ambac's assets and cash related requests [ECF No. 15930]. On March 5, 2021, the Oversight Board, AAFAF, and GoldenTree Asset Management filed oppositions to Ambac's New CW Asset Motion [ECF Nos. 15956, 15959, 15965]. On March 16, 2021, Ambac filed a reply in support of its motion [ECF No. 16085]. On May 11, 2021, National filed notices of withdrawal of its joinders to Ambac's CW Asset and CW Cash Motions, and to Ambac's New CW Cash Motion and New CW Asset Motion [ECF Nos. 16726, 16727, 16729]. Magistrate Judge Dein denied National's withdrawals of its joinders to Ambac's CW Asset and CW Cash Motions in light of the Title III Court's prior ruling denying the motions, but granted the withdrawals as to Ambac's New CW Asset Motion and New CW Cash Motion. Also on May 11, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment [ECF No. 16739]. For further discussion of this motion, see Section V.E.4.(f). On May 17, 2021, Magistrate Judge Dein issued an order denying Ambac's New CW Asset Motion, and an order partially granting Ambac's New CW Cash Motion [ECF Nos. 16759, 16760].

## H.    Oversight Board's Investigation of Potential Causes of Action

The Oversight Board is vested with broad investigative powers. Pursuant to PROMESA section 104(o), which empowers the Oversight Board to investigate the disclosure and selling practices in connection with the purchase of bonds issued by the Debtors, and related section, the Oversight Board, through its Special Investigation Committee, pursued an investigation into potential causes of actions related to Puerto Rico's fiscal crisis.

### 1.    Independent Investigator Report

#### a)    Process and Mandate

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP (the "Independent Investigator") to conduct

an investigation into certain matters relating to Puerto Rico's fiscal crisis in furtherance of the Oversight Board's mandate pursuant to PROMESA.

Specifically, the Independent Investigator was asked to investigate: (i) the factors contributing to Puerto Rico's fiscal crisis, including changes in the economy, expansion of spending commitments and entitlement programs, changes in the federal funding it receives, and reliance on debt to finance a structural budget deficit; (ii) Puerto Rico's debt, the general use of proceeds, the relationship between the debt and Puerto Rico's structural budget deficit, the range of its debt instruments, and how Puerto Rico's debt practices compare to the debt practices of states and large municipal jurisdictions; and (iii) Puerto Rico's debt issuance, disclosure, and selling practices, including its interpretation of Puerto Rico's Constitutional Debt Limit. In consultation with the Special Investigation Committee and the Oversight Board's General Counsel, the Independent Investigator focused its inquiry on the following specific areas: GDB; Puerto Rico's Public Utilities; COFINA; ERS; Puerto Rico's Budgeting, External Reporting, and Accounting Functions; calculation of the Constitutional Debt Limit; the credit rating agencies; selling practices for Puerto Rico-related Bonds; Puerto Rico's government ethics framework; issuers' use of interest rate swaps; Puerto Rico's lack of a clear mechanism for validating Puerto Rico-related bonds before they issue; and the possession tax credit.

The Special Investigation Committee's principal goals for the investigation were: (i) to identify any policies (or lack of safeguards) that contributed to the Puerto Rico debt crisis, including factors that permitted Puerto Rico and certain of its instrumentalities ("Issuers") to issue significant amounts of debt without adequate sources of repayment; and (ii) to identify potential value recovery from culpable parties and identify matters for regulatory attention, all to assist the Oversight Board in its mission to restore fiscal balance and economic opportunity and to promote Puerto Rico's access to the capital markets.

b)      **Investigation Procedures**

In May 2017, the Oversight Board adopted the PROMESA Investigative Procedures to establish the procedural framework for the investigation.[218]   Those PROMESA Investigative Procedures authorize the Oversight Board to commence an "Informal Investigation" and a "Formal Investigation" to probe activities or conduct for which the Oversight Board has authority to investigate under PROMESA.   The key procedural difference between the two types of investigations is that the Oversight Board is only authorized to issue process to compel testimony and production of investigative materials upon the commencement of a Formal Investigation.[219] The Independent Investigator used both formal and informal investigative techniques to achieve the mandate set out by the Special Investigation Committee.

On October 18, 2017, the Special Investigation Committee, acting on behalf of the Oversight Board, approved a Resolution Initiating Formal Investigation for Purpose of Issuing

---

[218] The PROMESA Investigative Procedures are available at https://oversightboard.pr.gov/documents/.

[219] PROMESA Investigative Procedures, §§ 3.1(b), 3.2(b)(2).  Section 104 of PROMESA vests the Oversight Board with the power to issue subpoenas "requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board." 48 U.S.C. § 2124(f)(1).

Investigative Subpoenas (the "Investigative Subpoenas Resolution").[220]  In general terms, under the Investigative Subpoenas Resolution, a Formal Investigation is deemed initiated for the purpose of authorizing the Independent Investigator to issue Investigative Subpoenas[221] in certain circumstances.[222]

Starting in September 2017, in furtherance of the Informal Investigation, the Independent Investigator delivered letters to more than 90 entities (collectively, the "Document Preservation and Request Letters").  The Document Preservation and Request Letters identified various categories of documents that the Independent Investigator deemed relevant to the Informal Investigation and requested that the recipients of the letters preserve and produce any responsive documents in their possession, custody, or control.  After the Document Preservation and Request Letters were sent, the Independent Investigator scheduled and conducted conferences with the recipients (most by phone, some in person) to reiterate the requests and discuss a process for identification and delivery of documents to the Independent Investigator.

Witnesses, in the main, cooperated with the Independent Investigator, and the Independent Investigator used the tools available through the Informal Investigation.  That cooperation—facilitated by the Independent Investigator's use of its subpoena power only as needed—enabled the Independent Investigator to complete the investigation in an efficient and timely manner, consistent with the objectives of PROMESA and as requested by the Special Investigation Committee.  The Independent Investigator was especially mindful of avoiding the delay and cost of litigating subpoenas.

Over the course of the investigation, the Independent Investigator received a total of approximately 260,800 documents consisting of approximately 2,740,000 pages, from 32 parties.  Those parties include, among others, a number of Puerto Rico entities, financial institutions, rating agencies, financial advisors, professionals, and regulators.

The Independent Investigator also secured direct, read-only access to the email custodial files of dozens of employees and former employees of GDB through its representative, AAFAF.[223]

---

[220] The Investigative Subpoenas Resolution is available at https://oversightboard.pr.gov/documents/.

[221] An "Investigative Subpoena" is defined in section 1.3(a)(16) of the PROMESA Investigative Procedures to mean a subpoena issued by the Oversight Board or its authorized agent pursuant to PROMESA section 104(f)(i), substantially in the form of an exhibit attached to the Investigative Subpoenas Resolution.

[222] Those circumstances would occur where a witness has not voluntarily cooperated with the Independent Investigator's requests for documents or an interview, where the witness has communicated that it cannot voluntarily cooperate with the Independent Investigator's requests, or where the witness has provided an interview but the Independent Investigator, in consultation with the Oversight Board's General Counsel, determines that it would be appropriate to have the witness testify under oath.

[223] That access was obtained through PROMESA section 104(c)(2), which provides as follows: "Notwithstanding any other provision of law, the Oversight Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities under this Act.  At the request of the Oversight Board, the Oversight Board shall be granted direct access to such information systems, records, documents, information, or data as will enable the Oversight Board to carry out its responsibilities under this Act." 48 U.S.C. § 2124(c)(2).

On behalf of GDB, AAFAF produced to the Independent Investigator approximately 36,000 documents from that database.

Pursuant to the Investigative Subpoenas Resolution, the Independent Investigator issued 12 Investigative Subpoenas (five of which were withdrawn after issuance based on the recipient's subsequent agreement to voluntarily cooperate with the Independent Investigator).[224] Without exception, the recipients of the Investigative Subpoenas produced documents to the Independent Investigator in response to those subpoenas.

From December 2017 to August 2018, the Independent Investigator conducted a total of approximately 120 voluntary witness interviews, probing a wide range of topics relevant to the investigation. The individuals interviewed included four former governors of Puerto Rico, former and current senior government officers, underwriters, credit rating agencies, auditors, outside professionals and advisors.

Throughout the investigation, the Independent Investigator engaged in robust cooperation and consultation with the UCC and Retiree Committee. Beginning in November 2017, the Independent Investigator regularly engaged with both the UCC and Retiree Committee regarding the investigation. Specifically, in addition to cooperation and communication by calls and e-mails when needed, the Independent Investigator participated in weekly telephone conferences with counsel for the UCC and Retiree Committee respectively. During those conferences, the Independent Investigator provided information regarding witnesses to be interviewed in the coming week, solicited input on questions to ask of witnesses, provided counsel to the UCC and Retiree Committee with its preliminary observations regarding the results of the investigation in areas in which the UCC and Retiree Committee had expressed interest, and also facilitated the UCC and Retiree Committee's access to materials that were provided to the Independent Investigator.

c)      **Major Findings from the Independent Investigation about the Debtors**

On August 20, 2018, the Independent Investigator published its Final Investigative Report. This Disclosure Statement includes a summary of the Independent Investigator's primary findings relating only to each of the Debtors who are covered by the Plan. The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.[225]

---

[224] The recipients of Investigative Subpoenas (apart from those that were withdrawn) were Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp, and Santander Securities LLC.

[225] A comprehensive overview of the entire Final Investigative Report is available in the Executive Summary, available at the Oversight Board's website at https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

(i)      *Commonwealth of Puerto Rico*

The Final Investigative Report includes findings related to budgeting and accounting, the role of GDB, and the Constitutional Debt Limit, all of which impacted the debt issued by the Commonwealth.

(ii)      *Budgeting and Accounting*

With regard to the Commonwealth's budgeting, external reporting, and accounting functions, discussed in Part VIII of the Final Investigative Report, the Independent Investigator found that the Commonwealth failed to: (i) develop budgets based on accurate growth and revenue estimates, to which it could adhere; (ii) develop the infrastructure and resources it needed to support efficient accounting functions; and (iii) optimize its use of independent auditors. These failures often caused the Commonwealth's external financial reports to be late, which, in turn, resulted in a loss of investor confidence and the ability of interested parties to acquire sufficient transparency into matters that concerned, or were otherwise intertwined with, the Commonwealth's fiscal health. The budgetary failures and reliance on erroneous assumptions of economic growth and unreasonable revenue projections also resulted in substantial deficits.

(iii)      *The Role of GDB*

As addressed in Part IV of the Final Investigative Report, GDB's dual roles as fiscal agent and lender for certain Commonwealth instrumentalities and public corporations were in tension, and that tension became untenable over time. The tension was compounded by structural deficiencies that allowed the policy considerations of various gubernatorial administrations to affect the decision-making of GDB in its capacities as both lender and fiscal agent.

As it related to GO issuances, the tension between GDB's dual roles influenced GDB's decisions to approve new debt issuances for the purpose of "scooping and tossing" older obligations or as an alternative to forcing certain Commonwealth instrumentalities and public corporations to implement measures that would have made them less dependent on borrowed liquidity, but that could have increased the costs of living for voters.

The approximately $3.5 billion of GO Bonds that GDB, in its capacity as fiscal agent, authorized to issue in 2014 (the "2014 GO Bond Issuance") is a specific example of a "scoop and toss" bond issuance. About $1.9 billion of that issuance was to be used to repay loans that Puerto Rico and PBA had drawn from GDB. According to a witness who worked first at GDB and subsequently at an underwriter for Puerto Rico-Related Bonds, the very reason for the 2014 GO Bond Issuance was to help "reliquify" GDB so that it could resume its role as bridge loan provider to the government.

According to the Final Investigative Report, the 2014 GO Bond Issuance also illustrates several respects in which policy considerations influenced GDB's decision-making. The investigation revealed that GDB first considered the issuance in early 2013. At that time, the issuance was contemplated as a way to raise capital that HTA could use to satisfy an outstanding debt of about $2 billion. HTA owed the debt to GDB as a result of loans that HTA had drawn to help bridge its operational deficits. The loans dated back to 2008. But to implement the issuance,

HTA needed to increase its revenues. GDB officials encouraged the Governor to increase the gas tax in order to accomplish that, but the Governor declined to do so. Instead, on June 25, 2013, Puerto Rico increased the portion of the excise tax that HTA received on petroleum products from $3.00 per barrel to $9.25 per barrel, and transferred to HTA the portion of motor vehicle license fee proceeds that was originally due to the Department of Treasury. The anticipated revenues were insufficient to implement the contemplated HTA offering. Due to the combined effect of the unwillingness to increase the gas tax, HTA's prior budget overruns, and its shortfalls in anticipated revenues, an HTA offering was no longer viable. GDB prepared instead to go to market with the 2014 GO Bond Issuance, from which a meaningful portion of the bond proceeds were slated to repay GDB lines of credit.

The Independent Investigator also collected information from witnesses that by approximately March 2014, the GDB Board had realized that Puerto Rico would not be able to issue its financial statements for the Fiscal Year ended 2013 before the May 1, 2014 deadline that the Securities and Exchange Commission ("SEC") Rule 15c2-12 and relevant continuing disclosure agreements required—*unless* GDB could first obtain proceeds from the 2014 GO Bond Issuance. In essence, GDB needed those proceeds so that GDB could demonstrate twelve-months of liquidity on its financial statements and, as a result, appear to still be a "going concern" for accounting purposes. This was because HTA could not repay the $2 billion debt it owed to GDB, and GDB did not otherwise have sufficient cash to appear objectively likely to remain solvent for the foreseeable future.

### (iv) *The Constitutional Debt Limit*

In Part IX of the Final Investigative Report, the Independent Investigator examined Puerto Rico's interpretation of the Constitutional Debt Limit found in section 2 of Article VI of the Commonwealth Constitution and the historical processes and procedures pursuant to which it performed the Constitutional Debt Limit Calculation during the relevant period.

The Independent Investigator found that Puerto Rico has historically interpreted the Constitutional Debt Limit to require that only the following be included in the Debt Limit Calculation: (i) direct obligations for which it is has pledged its good faith, credit and taxing power; and (ii) certain debt servicing payments on bonds or notes it has guaranteed. In other words, debt issued by the public corporations (unless that debt is guaranteed by Puerto Rico) is not included in the Debt Limit Calculation and is not limited by the Constitutional Debt Limit.

The evidence reviewed supports the conclusion that Puerto Rico employed a reasonably robust process for these Debt Limit Calculations. The Independent Investigator found, moreover, that various contingent, yet foreseeable, obligations of Puerto Rico were excluded from the Constitutional Debt Limit Calculation by statute or based on outside legal opinions. For example, through Act No. 39 of August 1, 2005 ("Act 39"), Puerto Rico pledged the "good faith, the credit and the power to impose taxes of the Commonwealth" for amounts payable—interest, specifically—under Swap agreements entered into by the Commonwealth and by PBA. Act 39 expressly excludes, however, any amount payable or to be paid by the Commonwealth in termination fees for Commonwealth Basis Swaps and PBA Swaps from the Debt Limit Calculation.

The Independent Investigator did not find any evidence that Puerto Rico's government personnel thought Puerto Rico misinterpreted the relevant constitutional provision or calculated the debt inaccurately. The Independent Investigator did not take any position as to whether the Constitutional Debt Limit was, in fact, violated or whether certain obligations should have been included in the Debt Limit Calculations.

(v)    **HTA**

As discussed in Part IV of the Final Investigative Report, the investigation revealed that HTA historically relied on GDB to step in to cover operational expenses, particularly when it was unable to access the capital markets. Many of those loans were, according to former GDB officials, used to cover HTA's budget deficits. With regard to HTA in particular, GDB evaluated and approved its loans very quickly, at times within hours, after a request was submitted. According to witnesses, this was to avoid potential adverse consequences stemming from HTA's lack of fiscal health, such as HTA having to shut down the Tren Urbano if its operator had not been paid. There is also evidence that, in certain instances, GDB may have approved financing requests by HTA notwithstanding circumstances that, if GDB and the recipients had been private actors, might have led to additional due diligence.

Gubernatorial will across administrations also affected GDB's decision-making with respect to HTA's debt load. For example, during Governor Fortuño's administration, GDB increased HTA's line of credit to approximately $2 billion. At the time, the total of GDB's loans receivable was approximately $9 billion.[226] GDB did this, according to one witness, so that HTA would not have to raise vehicle registration fees, public transportation fees, tolls, or the gasoline tax; all of which would have increased costs for ordinary voters.

Then, by early 2013, Governor García Padilla's administration decided that GDB should no longer support the public corporations through appropriations. At the same time, however, witnesses reported that the Governor remained reluctant to raise Public Utility rates or related taxes—or would not agree to increase them as much as GDB management recommended.

(vi)    **ERS**

Part VII of the Final Investigative Report presents the results of the investigation into ERS, and specifically into its decision to issue pension obligation bonds of ERS Debtor in 2008 in the aggregate amount of approximately $3 billion.

ERS struggled perennially with unfunded liabilities—by June 30, 2005, it had actuarial liabilities of $12.284 billion, of which only 19% were funded. To address the underfunding, an investment bank proposed that ERS issue bonds secured by the stream of Employer Contributions, which included a recommendation that ERS "issue at least $7 billion" in bonds, to make near-term payments and invest the remainder in an arbitrage strategy.

---

[226] For context, the Commonwealth had a projected budget of approximately $9 billion in 2013. *See* Commonwealth of P.R., *Basic Financial Statements and Required Supplementary Information: Year ended June 30, 2013*, 246 (June 30, 2014).

In the first half of 2008, ERS issued nearly $3 billion of bonds exclusively into the local bond market (*i.e.*, no bonds were made available for purchase by individuals or funds located outside of Puerto Rico). Evidence indicates additional ERS Bonds were not issued in the second half of 2008 because of unanticipated market behavior. Then, in 2009, even as credit markets began to re-open, additional ERS Bonds were not issued as a matter of policy.

Without additional proceeds beyond the initial $3 billion being invested, the arbitrage strategy had little chance of succeeding. The arbitrage strategy may have succeeded if reasonable predictions had held true, but they did not.

By 2017, retirement benefits from the retirement systems for public employees such as ERS had switched to PayGo, meaning that all benefit payments would come out of tax revenue.

(vii)   *PBA*

As discussed in Part IX of the Final Investigative Report, the Independent Investigator found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit. The Independent Investigator did not take a position as to whether the PBA Bonds should have been included in the Debt Limit Calculations.

PBA owns and leases a number of buildings that it leases or subleases to various governmental agencies. PBA has issued PBA bonds, about $4.1 billion outstanding in early 2017, which PBA Bondholders assert are payable from and secured by a pledge of the rental payments owed to PBA by the lessees. Each month, the treasury forwarded funds to GDB for PBA rental payments, which were deposited into a PBA account.

The Independent Investigator found that Puerto Rico has a longstanding practice of treating direct debt and guaranteed debt differently for the purposes of debt limit calculation. Furthermore, several witnesses stated they were not aware of anyone expressing the view that PBA bonds should have been included in the debt limit calculation. Lastly, independent auditors opined in 2013 that the debt limit had not been exceeded.

d)   **Summary of Potential Causes of Action as Relevant to the Debtors**

In its Final Investigative Report, the Independent Investigator evaluated whether its factual findings support the view that any of the parties involved in Puerto Rico's fiscal crisis committed conduct that is actionable under certain U.S. federal, state, and local laws. The Independent Investigator discussed its consideration of certain, but not all, potential claims available to Title III Debtors (or their estates) and investors, among other stakeholders, under applicable U.S. federal law (including securities laws and the Bankruptcy Code, as made applicable by PROMESA), the law in Puerto Rico, and the law of other U.S. jurisdictions as indicated by choice of law analyses. This discussion was undertaken for the statutory purposes outlined in PROMESA and not for reliance by any specific litigant. Its overview of and application of the law is not legal advice and its factual findings do not constitute admissible evidence in any pending or future litigation.

Set forth below is a summary of potential causes of action identified by the Independent Investigator in the Final Investigative Report on a debtor-by-debtor basis.[227]   The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

(i)   ***Commonwealth of Puerto Rico***

The Independent Investigator identified several potential causes of action relating to the 2014 GO Bond Issuance.  First, the Final Investigative Report discusses potential claims (and likely defenses) premised on a violation of securities law disclosure requirements in the Official Statement and related documents concerning the possibility at the time that Puerto Rico would seek to restructure its indebtedness after the 2014 GO Bonds were issued.  Specifically, the Independent Investigator presented available evidence that Puerto Rico failed to disclose that it had engaged financial and legal advisors with reputable restructuring practices until after the 2014 GO Bonds were issued.

Second, the Final Investigative Report discusses potential claims (and likely defenses) premised on a violation of continuing disclosure requirements imposed by applicable securities law on certain entities working on behalf of Puerto Rico—specifically, whether Puerto Rico, its underwriters and/or auditors could be held liable for Puerto Rico's failure, despite repeated assurances to the contrary, to complete and disclose its 2013 audited financial statements prior to the issuance of the 2014 GO Bonds.

Third, the Final Investigative Report discusses potential common law and bankruptcy claims such as unjust enrichment and equitable subordination against one of the underwriters of the 2014 GO Bonds based on the underwriter's decision to underwrite after it had advised against the issuance and to collect a fee for doing so.

Lastly, the Independent Investigator identified potential claims against GDB stemming from certain GO Basis Swaps with Goldman and Morgan Stanley that were entered into in 2006. Specifically, the Final Investigative Report discusses that the basis swaps may have violated Puerto Rico statutory law if their execution was not "for the best interests of the Commonwealth." Potential liability claims against GDB may exist on that basis alone.  Additionally, if GDB's board members owed fiduciary duties to Puerto Rico, claims for breaches of those duties in connection with the Basis Swap also may exist.  As touched on in the Report, strong defenses to these claims may exist as well.

(ii)   ***ERS***

Between January and June 2008—at the onset of the Great Recession—ERS issued three series of pension obligation bonds in an aggregate amount of almost $3 billion.  Proceeds from the bonds were issued to address ERS's short-term cash flow problems, with the remainder to be invested with the expectation that the investment would grow and give the pension an additional

---

[227]   The discussion of potential causes of action spans nearly 100 pages of the Final Investigative Report. The summary herein is qualified in its entirety by the Final Investigative Report, which parties should reference in the event of any ambiguity or conflict.

return after it paid debt service on the bonds, thereby improving ERS's substantial underfunding. In the years following the issuance, various stakeholders publicly disputed the wisdom of this arbitrage strategy, ERS's legal authority to issue the bonds in the first place, and the validity of bondholders' purported security interest in ERS's incoming stream of statutory contributions from Puerto Rico's participating public employers. Against this backdrop, the Independent Investigator identified a number of potential claims and discussed whether they were supported by available evidence.

First, the Final Investigative Report discusses potential claims (and likely defenses) premised on a violation of securities law disclosure requirements in the Official Statement and related documents. According to the Independent Investigator, evidence indicates that disclosures addressed the risks of the arbitrage strategy but may have omitted material details about ERS's authority to issue the bonds, Puerto Rico's ability to eliminate the employer contribution stream into ERS and/or the use of ERS bond proceeds.

Second, the Final Investigative Report discusses potential claims (and likely defenses) that the relevant control persons of ERS and GDB breached their fiduciary duties to ERS. According to the Independent Investigator, such claims are not strongly supported by available evidence and are unlikely to lead to any recovery for ERS stakeholders. Further, if such claims could be sustained, the Final Investigative Report discusses potential claims for aiding and abetting a breach of fiduciary duty which might then be available against various underwriters and advisors of ERS and GDB.

Finally, the Final Investigative Report discusses potential claims based on the selling practices in connection with the ERS Bond issuances. In particular, certain bond underwriters and advisors and their affiliates were engaged by ERS in multiple fee-generating capacities, giving rise to potential conflicts of interest. The Independent Investigator noted that the evidence did not indicate that such conflicts resulted in undue advantage or gain to these entities or detriment to ERS and its other stakeholders. However, if such evidence comes to light, the Independent Investigator discussed the potential for common law and bankruptcy claims to be brought against the relevant underwriter or advisor for professional negligence, unjust enrichment, and/or equitable subordination.[228]

---

[228] Though not mentioned in the Final Investigative Report, ERS did commence litigation against UBS Financial Services prior to the commencement of the Title III cases, stating claims in the nature of, among other things, professional negligence relating to its services advising ERS and underwriting the ERS bond transactions. That litigation is ongoing in the Puerto Rico court of first instance. *See Administracion de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico y Otros v. UBS Financial Services y Otros*, Civil No. K AC2011-1067. On March 30, 2020, UBS Financial Services filed a renewed motion for relief from the automatic stay [ECF No. 853]. On April 1, 2020, various individual Plaintiffs filed an opposition to the motion [ECF No. 12577]. On April 14, 2020, the Oversight Board, through the Special Claims Committee, filed an opposition to the motion [Case No. 17-bk-3566; ECF No. 859]. On April 19, 2020, UBS filed a reply in support of its motion [Case No. 17-bk-3566; ECF No. 869]. On April 22, 2020, the Title III Court issued an order denying the motion without prejudice [Case No. 17-bk-3566; ECF No. 879].

(iii)   *PBA*

The Final Investigative Report did not identify any potential causes of action against PBA, and it found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit.

e)   **Summary of Recommendations Related to the Debtors**

The Final Investigative Report includes recommendations related to each of the topics investigated by the Independent Investigator. This Disclosure Statement includes a summary of the Independent Investigator's recommendations relating only to each of the Debtors (in light of ongoing litigation, the Independent Investigator did not provide specific recommendations related to ERS and PBA). The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

(i)   *Commonwealth of Puerto Rico*

(1)   **Budgeting and Accounting**

The Independent Investigator recommended the following reforms to Puerto Rico's budgeting and accounting systems:

- Adopt a more rigorous budgeting process;
- Continue to transition to GAAP-compliant budgeting;
- Study the viability of creating a dedicated and centralized board that is devoted to:
  - Aggregating critical data; and
  - Preparing and releasing the consolidated external reports.
- Adopt a modernized accounting and budgeting system;
- Create a board to expedite preparation of external reports;
- Reshape responsibilities of Department of Treasury;
- Require that OMB and Planning Board report to Treasury;
- Adopt mechanism to sanction entities which fail to comply with accounting/budgeting system;
- Limit turnover of accounting employees;
- Prohibit turnover of auditors without cause;
- Centralize and streamline the budgeting, accounting, and financial reporting functions;
- Provide online public access to spending data; and
- Adopt a formal deadline for publishing external financial reports.

Since these recommendations were made various efforts have commenced and progressed, including:

1. The 2021 Certified Fiscal Plan requires the Government to create an OCFO. The Government has made some progress towards establishing a strong OCFO, including providing bank account transparency, publishing weekly emergency reserve reports, monthly reporting of budget-to-actuals for select Government agencies, enhancing General Fund collections with technology, and publishing of the 2017 and 2018 tax expenditure reports. The 2021 Certified Fiscal Plan outlines the required next steps the Government must take to fully implement the OCFO, this includes the requirement that ACFRs be issued within six months of year end. Further details on the OCFO can be found at section IV.C.3.a).

2. On February 26, 2021 the Oversight Board issued a series of recommendations pursuant to section 205 of PROMESA regarding ACFRs, the ERP system, and the OCFO.

3. GSA centralized procurement staff and implementation: Starting FY2021 onwards, GSA has been funded with the staff needed to rapidly centralize procurement across the Government, focusing real effort on identifying opportunities to consolidate contracts, bring increased insight into spending, facilitating coordinated and rigorous vendor management, among other best practices.

4. Civil Service Reform Pilot: The 2021 Certified Fiscal Plan includes $10 million in funds during FY2022 for a civil service reform pilot program ("Pilot") to achieve an aligned and sustainable human capital strategy to meet future financial reporting challenges at the Commonwealth. The goal of this Pilot would be to design a workforce with the right people, the right skills, and the right mix to support, optimize, and transform financial management at the Commonwealth. The Pilot would cover financial and accounting positions at Hacienda and OMB and finance departments at PRDE, DCR, DOH and DPS. These human capital investments will enable swift implementation of the OCFO.

5. ERP implementation: In FY2021, capital expenditure funding was provided for the implementation of a new Government ERP system -- $14 million for Wave 1 and $22 million for Wave 2 after the completion of Wave 1. However, Hacienda was unable to complete the required milestones during FY2021 and were not able to access the aforementioned funding. The 2021 Certified Fiscal Plan mandates several implementation actions to progress the ERP initiative.

(2)     **The Role of GDB**

The Independent Investigator recommended that Puerto Rico's political branches should evaluate measures to separate the fiscal agent and lending functions for GDB's successor, and consider reforms for each role. The Independent Investigator recommended that the new fiscal agent:

- Stagger terms, or terms that span gubernatorial administration changes, for board members;

328

- Condition disbursements from the Department of Treasury upon the fiscal agent's review and approval;

- Cast the fiscal agent as an impartial conduit of information to its clients and to the investing public;

- Improve oversight of the Commonwealth instrumentalities and public corporations it advises with access to the joint and integrated accounting systems; and

- Create a separate department or division that is specifically tasked with overseeing all relevant Commonwealth instrumentalities and public corporations and monitoring or even auditing their finances.

The Independent Investigator also recommended that the new lending entity:

- Stagger terms, or terms that span gubernatorial administration changes, for board members;

- Adopt policies and procedures for re-evaluating at quarterly intervals the collectability and other risks associated with existing public-sector financing;

- Consider the role of any statutory repayment guarantee, but that should not be the sole, or controlling, factor to inform the collectability analysis; and

- More closely align credit policies with the framework that a private bank would apply to evaluate risks to its own loan portfolio.

### (3)   Constitutional Debt Limit

The Independent Investigator recommended that the Commonwealth should consider whether it may be worthwhile for its judiciary to review the meaning of section 2 of Article VI of the Commonwealth Constitution, as well as the methods pursuant to which the Commonwealth determines the types of debt servicing payments to be included within the debt limit calculation.

### 2.   Appointment of Special Claims Committee and Retention of Counsel

Within a few days of receiving the published Final Investigative Report, the Oversight Board executed a unanimous written consent appointing the independent Special Claims Committee to pursue claims resulting from the findings of the Investigation.[229]   The Oversight Board then issued a RFP for counsel to the newly formed committee.

On November 28, 2018, the Oversight Board, acting by and through its Special Claims Committee, retained Brown Rudnick LLP as counsel to the Special Claims Committee to assist the Special Claims Committee in the investigation, initiation of negotiation, and/or prosecution of

---

[229] The current members of the Special Claims Committee are Andrew G. Biggs, Arthur J. González, and David A. Skeel, Jr.

potential claims that might arise from conduct described in the Final Investigative Report ("Claims Counsel"). Additionally, in February 2019, the Special Claims Committee retained a financial advisory services firm to assist Claims Counsel in its investigation of potential claims.

The Final Investigative Report did not address Avoidance Actions[230] and did not identify specific claims or causes of action the Commonwealth and its instrumentalities might hold against individuals and entities involved in their financial transactions. Rather, the Final Investigative Report outlined the necessary informative and analytical background which would serve as a springboard for the Special Claims Committee to identify actionable claims that the Commonwealth and its instrumentalities might hold relating to the Commonwealth Debtor's financial crisis.

Thus, immediately after its retention, Claims Counsel began investigating and analyzing the conclusions in the Final Investigative Report to determine and recommend whether there were viable causes of action that the Oversight Board could assert for the benefit of the Commonwealth's taxpayers and legitimate creditors.

3.      **Counsel Investigation and Statute of Limitations Concerns**

Claims Counsel examined the documents related to the Final Investigative Report to assist it in identifying meritorious causes of action. Furthermore, and as described additionally below, the Special Claims Committee made frequent and numerous inquiries to other professionals involved in the Title III Cases, as well as potential Defendants and other parties in order to obtain reports, financial data, presentations, and other materials necessary for the Oversight Board to assert its causes of action. In sum, Claims Counsel reviewed, among other things:

- The 600-page Final Investigative Report;

---

[230] Causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code. There are essentially two different legal theories for these avoidance actions: preference and fraudulent transfer. A *preference* is a payment in the 90 days prior to the bankruptcy to a "preferred" creditor, *i.e.*, someone who got paid more than usual when others in similar situations were not being paid due to Puerto Rico's insolvency. (For parties with family relationships to elected officials, and others with "insider" relationships to the government, the relevant period is one year, not 90 days.) 11 U.S.C. § 547. A *fraudulent transfer* is, most importantly, a payment made for which Puerto Rico did not receive "reasonably equivalent value" in exchange. If not, even if the transfer was not intentionally wrongful or fraudulent, Puerto Rico can recover the funds because the money rightfully should benefit all creditors and citizens. 11 U.S.C. §§ 544, 548. Preferences and fraudulent transfers can be "avoided" and funds recovered by Puerto Rico from the transferees; likewise or in the alternative, the avoidance liability may cause the transferee's claims against Puerto Rico may be set off or disallowed. *See* 11 U.S.C. §§ 502, 545, 550, 553.

Avoidance actions are very common in large bankruptcy proceedings, including those involving government entities. They allow debtors to ensure that money transferred to third parties in the period before bankruptcy was appropriately and fairly spent, and if not, recover that money for the benefit of creditors and taxpayers. Importantly, avoidance actions of this type do not intend to convey that a third party vendor committed any wrongdoing. Rather, avoidance actions ensure no one creditor is favored by payments made prior to the bankruptcy filing and that a fair distribution of a debtor's assets is made in accordance with applicable law. As with any other civil lawsuit, the Plaintiff (*i.e.*, the Oversight Board, in some cases along with the UCC) has the burden to prove each element of the avoidance action by a preponderance of the evidence in order for the third party vendor to be found liable to and have to return the money to the estate.

- Approximately 100,000 documents provided to date that support the facts and legal analysis contained in the Final Investigative Report;

- Records of millions of transfers by the Title III Debtors to third parties during the four-year avoidance period prior to the Petition Date;

- Thousands of documents identifying recipients of purported principal and interest payments on allegedly invalid bonds, through records of tens of thousands of transactions; and

- Over 1,600 notices of participation filed in connection with the Joint Claim Objection (defined below) evidencing current holders of the allegedly invalid bonds.

The Oversight Board's investigative activity and commencement of litigation has been largely driven by applicable statutes of limitations. Most notably, the statute of limitations for avoidance actions pursuant to 11 U.S.C. section 546(a)(1) expired on May 2, 2019 for actions brought on behalf of the Commonwealth, on May 20, 2019 for HTA and ERS, and July 1, 2019 for PREPA. The expiration of the statute of limitations could, in many instances, preclude the Oversight Board's ability to prosecute many of the claims described herein.

The Oversight Board has taken a number of measures to protect its claims against statute of limitations defenses. Foremost among these, the Oversight Board commenced hundreds of adversary proceedings prior to the expiration of the applicable statute of limitations. In some cases described in greater detail below, the Oversight Board has commenced litigation with the explicit intention of preserving rights, notwithstanding that prosecution of its claims would not be an optimal resource allocation at the present time, and has accordingly requested that the litigation itself be stayed for the time being.

Additional measures to preserve claims include efforts to toll the statute of limitations by consent through tolling agreements with parties potentially liable to the Commonwealth Debtor.

4.    **Causes of Action Against Third-Party Professionals and Personnel**

The Oversight Board's investigation suggested that from 2008 through 2014 (the final issuance of bonds by the Commonwealth to date), numerous third-party professionals knowingly participated in bond issuances that may have been unlawful, that deepened the insolvency of the Commonwealth, and that resulted in other harm to the Commonwealth and its instrumentalities, including damage to the Commonwealth's credit. Accordingly, the Oversight Board investigated and commenced pursing claims against numerous parties for wrongful acts in relation to debt issuances by the Commonwealth and certain of its instrumentalities and public corporations. The parties include:

- Underwriters of alleged invalid or wrongfully issued debt;

- Law firms that advised on debt transactions;

- Auditors of the Commonwealth's finances; and

331

- Counterparties to interest rate swap agreements.

Some of these debt transactions are described in greater detail below. In sum, these "Third Party Defendants" provided services that in many cases gave rise to fiduciary obligations to act in the best interests of the Commonwealth. The Third Party Defendants collected substantial fees by facilitating more and more debt transactions, enabling the Commonwealth and its instrumentalities to issue purported debt instruments notwithstanding the Commonwealth's insolvency and the constitutional and statutory limitations on debt issuances.

The Oversight Board filed Adv. Proc. No. 19-00280[231] against the Third Party Defendants. The Oversight Board's complaint articulates claims in the nature of breach of fiduciary duty and aiding and abetting a breach of fiduciary duty,[232] professional malpractice, fraudulent transfer, and unjust enrichment. In addition to filing its complaint, the Oversight Board has negotiated tolling agreements with a number of potential Defendants and will either settle its claims out of court or commence litigation against such parties following further investigation.

Together, these several dozen Third Party Defendants earned nearly $300 million in fees for services that allegedly damaged the Commonwealth. The swap counterparties received an additional $90 million in swap termination fees. Although the Oversight Board is pursuing damages in an amount to be determined, these fee payments are likely the minimum recovery to be sought. Under various other damages theories, the Oversight Board may seek to recover billions of dollars unlawfully transferred by the Commonwealth and/or its instrumentalities to other parties as a result of the Third Party Defendants' malfeasance. On July 24, 2019, the Court entered an order staying this litigation pending confirmation of the Plan. The Plan provides for this litigation to continue after confirmation.

5.   **Avoidance Actions Against Vendors**

The Final Investigative Report focused on large-scale debt financing transactions and did not concern potential avoidance actions relating to the billions of dollars in payments by the Title III Debtors to parties who purported to provide goods and services to Debtors the pursuant to purported contracts (the "Vendor Payments" to "vendors").[233] Accordingly, the Special Claims Committee began investigating the Vendor Payments to ensure that such payments complied with applicable law.

In concert with the UCC, the Oversight Board obtained from AAFAF records of all payments to vendors within the four years prior to commencement of the respective Title III cases.

---

[231] *The Special Claims Committee of the Financial Oversight and Management Board for Puerto Rico, acting by and through Its Members, The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Barclays Capital, et al.*, 19-AP-00280 (the "Underwriter Litigation").

[232] The Oversight Board has alleged that certain parties aided and abetted GDB in GDB's breach of its fiduciary duty to the Commonwealth and its instrumentalities. Claims against GDB itself have been released pursuant to GDB's PROMESA Title VI modification. *See* section V.J.1 of this Disclosure Statement for a brief description of the GDB Title VI modification proceedings.

[233] "Vendors" and "Vendor Payments" refers to contractors and payments made pursuant to contract, respectively, as opposed to transferees of payments made pursuant to legislative appropriation.

The Special Claims Committee, in collaboration with the UCC, reviewed records of millions of individual payments to hundreds of thousands of unique vendors, totaling over $12 billion. After reviewing the contracts on file and excluding government bodies and non-profit organizations, among others, the Oversight Board identified over $4 billion in payments to approximately 345 vendors as potentially recoverable under avoidance theories.[234]

### a) Tolling Agreements and Litigation

After concluding its review and identifying potentially liable parties, the Oversight Board provided the vendors an opportunity to toll the statute of limitations for filing the vendor avoidance actions, *i.e.* extend by agreement the time provided for the Oversight Board to file an avoidance action. As such, in the weeks prior to the respective statute of limitations expirations, Claims Counsel sent to each vendor a cover letter and tolling agreement which the vendors could sign and return in order to avoid the filing of a complaint and preserving the Title III Debtors' rights with respect to its avoidance claims. This effort led to negotiation of approximately 85 tolling agreements with vendors who purportedly contracted with the Commonwealth (and none with HTA or ERS vendors).

After excluding the parties to the tolling agreements, the Oversight Board filed approximately 250 vendor avoidance actions seeking to recover approximately $3 billion in payments to vendors.[235] The Oversight Board has announced its preference to settle these actions, and the potential claims subject to tolling agreements, pursuant to a voluntary out-of-court dispute resolution procedure that is outlined on the notice website in the Title III Cases and described more fully below.

### b) Informal Resolution Procedures

On June 7, 2019, the Oversight Board and the UCC filed an omnibus motion in the Title III cases of the Commonwealth Debtor, HTA, ERS Debtor, and PREPA, requesting approval of case management procedures in the avoidance proceedings brought against vendors.[236] The Vendor Action Procedures Motion specifically requested approval of procedures governing (i) litigation procedures and deadlines, (ii) voluntary mediation, and (iii) settlement (the "Vendor Action Procedures"). On July 12, 2019, the Title III Court entered an order approving the Vendor Action Procedures, which were then served on all Defendants to the vendor avoidance actions along with the summons and complaint.[237]

---

[234] Approximately 335 of the vendors identified contracted with the Commonwealth, one with ERS, and the remainder with HTA. The vast majority of the damages sought, over $4 billion, relate to purported contracts with the Commonwealth.

[235] The UCC joined in some, but not all of these avoidance actions.

[236] *See Notice of Hearing Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [ECF No. 7325] (the "Vendor Action Procedures Motion").

[237] *See Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors*

With respect to the litigation procedures and deadlines, the Vendor Action Procedures provide that court documents must be filed in accordance with the case management orders entered by the Title III Court in the Commonwealth Title III case. *See Thirteenth Amended Notice, Case Management and Administrative Procedures* [ECF No. 13512-1]. The procedures further require service of the procedures and order approving them upon any Defendants, and specify manners and addresses of service consistent with applicable rules. Additionally, the Vendor Action Procedures provide for relaxation of deadlines for responsive and dispositive pleadings, discovery, and other filings, subject to alteration by request of any party. An analogous order governs resolution of claims subject to tolling agreements. *See Order Granting Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to Establish Procedures for the Approval of Settlements* [ECF No. 16791].

These deadlines provided in the Vendor Action Procedures generally continue all litigation deadlines. During the continuance period, since extended by court orders, the Oversight Board and UCC have engaged in an informal resolution process described as the "Information Exchange," whereby the Oversight Board and vendors conduct additional diligence within specified parameters and thereafter commence settlement negotiations.

The Vendor Action Procedures outline a mediation process whereby the Oversight Board and any Defendant(s) may select mediators, schedule mediation, and advise the court of mediation progress. The mediation process is by its own terms fully voluntary and non-binding and adjustable by agreement of the parties; the Vendor Action Procedures merely outline the mediation process and would provide advance approval thereof, obviating the need for parties to seek court approval of a litigation stay during the pendency of the mediation.

Since the filing of the Vendor Action Procedures Motion, the Special Claims Committee and the UCC have been working to resolve the tolling agreements and avoidance actions entered into with or filed against vendors. As of June 22, 2021, approximately one hundred seventy-five adversary proceedings have been dismissed as a result of a vendor-defendant's participation in the informal resolution process and/or continuing efforts by the Special Claims Committee to obtain documents from Commonwealth agencies to substantiate the prepetition payments received by the vendors. Likewise, as of June 22, 2021, approximately sixty tolling agreements with vendors have resulted in no further action from the Special Claims Committee and the UCC for the same reasons.

As of this time, several dozen avoidance action defendants and tolled parties have been resolved by monetary settlement or flagged for potential settlement due to information exchanges suggesting avoidance liability. The Special Claims Committee and the UCC are actively preparing, conducting and/or finalizing settlement discussions with dozens of parties. As of June 22, 2021, the Special Claims Committee and the UCC have taken receipt of approximately $4.3 million in settlement funds. By agreement, the funds are held in escrow and shall be vested in the

---

*to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements,* [ECF No. 7941] (order with attached, revised Vendor Action Procedures).

Avoidance Actions Trust, subject to any outstanding escrow fees, following confirmation of the Plan.

In November, 2019, the Special Claims Committee and the UCC filed a motion to modify the Vendor Action Procedures, and the Title III Court granted the motion, to continue facilitating the informal, out-of-court resolution of the avoidance actions.[238]  The Modified Vendor Action Procedures Order extended the discovery and litigation deadlines several months to allow the parties more time to informally resolve the lawsuits before formal litigation is necessary.  Those deadlines have been further extended until August 2021 to allow more time to informally resolve the lawsuits, particularly in light of challenges posed by COVID-19 [ECF No. 16429].

### 6. ERS Bond Validity Claims

During Claims Counsel's analysis of ERS and its outstanding indebtedness, it determined that there were potential legal infirmities with respect to ERS Bonds that led to the conclusion that bonds may not have been valid or legally binding.  Consistent with Claims Counsel's determination, AAFAF has alleged in related litigation that the ERS Bonds are null and void,[239] and the multiple parties have objected to claims filed against ERS in respect of the bonds.[240]  The Oversight Board additionally commenced litigation to claw back payments made in respect of purported principal and interest obligations to parties holding ERS Bonds in excess of $2.5 million.[241]

The Title III Court's Stay Order issued July 24, 2019 stayed all litigation concerning ERS bond validity through November 30, 2019.  Following Court-ordered mediation, the Oversight Board and other objecting parties reached agreement with groups of ERS bondholders regarding a schedule to litigate debt validity issues to summary judgment, which schedule was approved by an order of the Title III Court.[242]  The Title III Court's ERS debt validity litigation scheduling order provides that the "Invalidity Actions" to avoid past payments in respect of the ERS bonds are

---

[238] See *Order Granting Omnibus Motion To Extend Deadlines In Order Granting Omnibus Motion By The Financial Oversight And Management Board For Puerto Rico, Acting By And Through The Members Of The Special Claims Committee And The Official Committee Of Unsecured Creditors To (I) Establish Litigation Case Management Procedures And (II) Establish Procedures For Approval Of Settlements,* [ECF No. 9476] (the "Modified Vendor Action Procedures Order").

[239] Adv. Proc. No. 17-00219, [ECF No. 44] (motion to dismiss complaint relating to alleged security interests in ERS property).

[240] See *Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico*, Case No. 17-03283, [ECF No. 5580]; *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth*, [ECF No. 6482].

[241] See Adv. Proc. Nos. 19-00355 through 19-00361.

[242] See *Order Granting Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, [ECF No. 8962].

stayed in all substantive respects, subject to defendants' opportunity to participate in the limited form of debt validity litigation permitted by the order.

As further described above in section III.B.1, the Oversight Board has also challenged the validity and scope of the ERS bondholders' collateral. On June 27, 2019, the Title III Court ruled the ERS bondholders do not have a perfected security interest in any post-petition employer contributions due to Bankruptcy Code section 552, and the First Circuit affirmed on January 30, 2020.[243] Previously, the Title III Court had ruled the ERS bondholders had never properly perfected any of their security interests, but was reversed by the U.S. Court of Appeals for the First Circuit. The remaining litigation regarding the ERS bonds described in section III.B.1 remains outstanding. Briefing has concluded and the Court has scheduled summary judgment motions concerning both the validity of the ERS Bonds and scope of liens for oral argument on March 11, 2021.[244]

7.      **Disputes to be Settled Pursuant to the Plan**

As described above, disputes in connection with the GO Bonds, PBA Bonds, and PRIFA BANs will be compromised and settled pursuant to the confirmation of the Plan, which includes disputes regarding the validity, priority, and asserted secured status of the GO Bonds and PBA Bonds.

a)      **Debt-Related Objections**[245]

During Claims Counsel's analysis of the Commonwealth's application of the Commonwealth Constitution's debt limit provision, it determined that there were potential legal infirmities with respect to several PBA and GO Bonds that led to the conclusion that bonds may not have been valid or legally binding.

In sum, the Special Claims Committee, based on advice of its Claims Counsel, determined that the Commonwealth had issued debt in violation of the Constitutional Debt Limit contained in the Commonwealth Constitution. The Commonwealth Constitution ostensibly prevents the Commonwealth from binding its citizens to a level of debt that cannot be repaid without oppressive

---

[243] *Opinion and Order Granting Plaintiff's Motion for Summary Judgment as to Count III and Counterclaims II and III, and Denying Defendants' Motion for Summary Judgment*, dated June 27, 2019 [Case No. 17-03566, ECF No. 251], 385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457 (1st Cir. 2020).

[244] *Order Granting Urgent Motion to Set Oral Argument Concerning Pending Motions in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, [ECF No. 15697].

[245] Additionally, the Plan contemplates a global settlement of the issues raised by the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020*, [ECF No. 10638], and *Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number 29,485)* [Case No. 17-3283-LTS, ECF. No. 8000], solely as it relates to CW Bond Claims and CW Guarantee Bond Claims, described in section III.B.1.a) of this Disclosure Statement.

taxation and sacrificing services necessary to maintain the health, safety, and welfare of Puerto Rico. The Special Claims Committee determined that the Commonwealth and its financiers and related professionals had characterized billions of dollars in debt as an obligation of an entity, PBA, whereas the debt was more properly characterized as direct debt obligations of the Commonwealth Debtor.

### (i)   *Constitutional Debt Limit Concerns*

The Commonwealth's approximately $13 billion in outstanding GO Bonds is among the largest components of Puerto Rico's debt burden. GO Bonds are bonds backed by the Commonwealth's good faith, credit and taxing power, rather than revenues from any particular source. Given their ability to bind the Commonwealth to long-term liabilities that may largely, if not only, be repaid by taxing Commonwealth citizens and businesses, GO bond issuances are restricted by Puerto Rico's constitution in several ways, including a dollar amount limit calculated in relation to available tax revenue.

As provided below, the Oversight Board has alleged, among other things, that certain GO bond issuances violated the Constitutional Debt Limit and accordingly were null and void.[246] Bondholders have disputed the Oversight Board's allegations, raising claims and affirmative defenses in response to the Oversight Board's claims. These disputes are discussed below. Several other parties have joined in, supplemented, or otherwise raised additional objections to claims of purported holders of GO and PBA bonds (such objections together, the "Bond Claim Objections").[247]

### (1)   **Debt Limit Provision and Calculation**

In 1961, the Commonwealth Constitution was amended to limit the Commonwealth's borrowing on the basis of the amount of debt service the Commonwealth would have to pay relative to its historical revenues, establishing the Constitutional Debt Limit. Specifically, Article VI, section 2 of the Commonwealth Constitution provides that:

> [N]o direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the good faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any Fiscal Year and (ii) any amounts paid by the Commonwealth in the

---

[246] *See* Joint Claim Objection.

[247] For the avoidance of doubt, the Bond Claim Objections include the Joint Claim Objection, the Expanded Objection, the PBA Bond Objection, the Conditional Objection, the LCDC Omnibus Objection, and the UCC 2020 Objection, as such objections are described and defined below. The term "Bond Claim Objections" is intended to include all omnibus objections to PBA and GO Bonds relating to such bonds' validity as described herein.

Fiscal Year next preceding the then current Fiscal Year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two Fiscal Years next preceding the then current Fiscal Year; and no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date; and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any Fiscal Year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

The type of obligation described in the first phrase above, referencing obligations of the Commonwealth backed by its good faith, credit and taxing power, is colloquially referred to as "general obligation" or "constitutional" debt. The annual revenues "raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico" are known as the Commonwealth's "internal revenues" and consist primarily of revenues from income taxes, property taxes, SUTs, and excise taxes (subject to certain exceptions).

### (2)     Alleged Debt Limit Violations

As described in greater detail below at sub-part V.H.7.d), the PBA Bonds bear hallmarks suggesting they are general obligations of the Commonwealth backed by the Commonwealth's good faith, credit and taxing power.[248] Moreover, the terms of the PBA Bonds (including certain covenants governing the underlying leases) were disclosed to the public at all relevant times. Nevertheless, in calculating the Constitutional Debt Limit, the Commonwealth did not include the $4 billion in PBA Bonds as "money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the good faith, credit and taxing power of the Commonwealth shall be pledged."

---

[248]Courts have held that a debt issuance may be recognized as a general obligations of a government entity based on such hallmarks, even when the debt is purportedly issued by a third party. *See, e.g.*, *Winkler v. State School Bldg. Authority*, 189 W.Va. 748, 760-63 (1993); *Cerajewski v. McVey*, 225 Ind. 67, 72 (1947); *Rankin v. Love*, 125 Mont. 184, 189-90 (1951); *City of Phoenix v. Phoenix Civic Auditorium & Convention Ctr. Ass'n, Inc.*, 99 Ariz. 270, 282 (1965); *Montano v. Gabaldon*, 766 P.2d 1328, 1329 (N.M. 1989); *Ayer v. Comm'r*, 340 Mass.586, 593-98 (1960); *see also See Suppl. Op. Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing*, at pp. 60-68, *In re City of Detroit*, Case No. 13-53846 (Bankr. E.D. Mich. Dec. 31, 2014), ECF No. 8993 (holding that settlement providing reduced distributions to bondholders in light of analogous bond validity concerns was reasonable).

The UCC has asserted that, when the PBA Bonds are included in the Constitutional Debt Limit calculations, certain PBA and GO Bonds issuances violated the Constitutional Debt Limit beginning in 2011.[249]  To date, the Oversight Board has included in its Joint Claim Objection only the GO bonds issued in 2012 and 2014, reserving the right to expand its objection to additional series of bonds issued prior.[250]  The Oversight Board acknowledges that the 2011 GO Bonds are subject to litigation risk in connection with purported violations of the Constitutional Debt Limit, as reflected in the UCC's objection to the 2011 GO Bond claims.  As of February 2021, the Oversight Board was continuing to analyze issues relating to the 2011 GO Bonds and had previously reserved its determination as to any adjustment to the proposed plan treatment for the 2011 GO Bond claims.  The Oversight Board's views are reflected in the GO/PBA PSA and the Plan, which provide for discounted treatment of 2011 GO Bonds in light of purported debt limit violations.

(3)    **Special Concerns Regarding the 2014 Bonds**

In their objection to the 2012 - 2014 GO bonds, the Oversight Board and UCC assert that, notwithstanding the characterization of PBA Bond debt, the Commonwealth violated the

---

[249] Two groups of objectors dispute the date of any Constitutional Debt Limit breach.  The GO Group has alleged that the debt limit may have been breached earlier than 2011.  *See Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, [ECF No. 6099] (the "Conditional Objection"); *see also* sub-part 7.a.iii below.  The GO Group argues that, to the extent the Title III Court determines that the Oversight Board and UCC's objections are merited, the Title III Court must also find that the pre-2012 bonds are invalid under one or more theories, including among others, that (a) if the Commonwealth engaged in a sham by mischaracterizing PBA debt, then all PBA debt is invalid, and/or (b) that a statute regulating calculation of debt service costs for purposes of the Constitutional Debt Limit need not be applied.  The relief requested in the Joint Claim Objection and related litigation is predicated on a finding that the PBA debt was mischaracterized in relation to the Constitutional Debt Limit, not that the PBA itself or its purported borrowings were unlawful, notwithstanding certain pleadings describing the PBA as a "sham" in colloquial terms.  Likewise, the GO Group argues effectively that if the Title III Court disregards one Constitutional Debt Limit calculation practice, it should discard others as well.  However, the GO Group provides no support for its preferred methodology, which would disregard the purpose and effect of interest rate swap transactions that effectively capped debt service costs, and were recognized by statute as doing so.  For these reasons among others, the Oversight Board believes that the Conditional Objection is not merited, and the Plan does not reflect any diminution in distributions to holders of early vintage bonds subject to the Conditional Objection.

The LCDC has objected to GO and PBA Bonds arguing that PBA Bonds should be treated under the Constitutional Debt Limit not as direct, general obligations of the Commonwealth but as guarantee obligations of the Commonwealth.  *See Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth*, [ECF No. 9730] ("LCDC Omnibus Objection").  As such the LCDC maintains that the PBA Bonds should be counted toward the Constitutional Debt Limit to the extent payments were made by the Commonwealth as opposed to any other purported lessor.  Thus, approximately 80-98% of the face amount of outstanding obligations would apply to the limit under recent payment practices, as opposed to 100% as asserted by the Oversight Board, and as a result the LCDC asserts a breach of the Constitutional Debt Limit at a relatively later date than the Oversight Board.

[250] *See Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, ECF No. 4784 (the "Joint Claim Objection").

Constitutional Debt Limit in 2014 by failing to account for $425 million in debt service costs paid through withholdings against the proceeds of the issuance.

The 2014 GO bonds were issued in the aggregate principal amount of $3.5 billion. However, the Commonwealth effectively borrowed $3.1 billion, withholding approximately $425 million of the proceeds because it understood that it otherwise would lack resources or revenues to pay the first few years of interest on the bonds. Although this type of withheld interest financing is not uncommon in municipal project financing, where a project may take years to begin generating revenues for the payment of debt service, it is not common with respect to general obligation borrowing, and evidences the Commonwealth's inability to pay its debts at the time of the bond issuance.

The $425 million of capitalized interest payments were excluded from the calculation of the Constitutional Debt Limit. None of the issuance documents explain why the payments should not be included in the Constitutional Debt Limit calculation of "principal of and interest on [general obligation] bonds and notes." When properly included in the debt limit calculation, the 2014 GO bonds violate the debt limit, even without inclusion of the PBA debt obligations.

Certain bondholders have argued that the capitalized interest payments were properly excluded from Constitutional Debt Limit calculations.[251] The bondholders' principal argument is that the Constitutional Debt Limit restriction on amounts "payable in any Fiscal Year" cannot apply where there exists a sinking fund reserved and pledged for the payment of existing obligations. Bondholders argue that because the Commonwealth obligated itself to use the sinking fund to make payments on the bonds, the funds were effectively property of bondholders and thus payments to be made using such funds were not "payable" within the meaning of the Commonwealth Constitution.

(ii)    *Validity of Bonds Issued Over Debt Limit, and Defenses*

The Oversight Board argues that bond obligations purportedly incurred in breach of a government issuer's express authority are void.[252] Accordingly, the Bond Claim Objections allege that violations of the Constitutional Debt Limit render certain GO and PBA Bonds null and void.

On and after February 5, 2020 pursuant to the Title III Court's scheduling order governing these matters, bondholders moved to dismiss the Bond Claim Objections. The bondholders argue that, among other things, the PBA Bonds should not be counted as direct obligations for purposes of the Constitutional Debt Limit, and that even if the Commonwealth did violate the Constitutional Debt Limit the appropriate remedy is either not to invalidate the bonds at all, or to invalidate only a portion of the bonds.

---

[251] *See* Ad Hoc Group Motion, 37-41.

[252] *See, e.g., State v. Spring City*, 123 Utah 471, 475 (1953); *State ex rel. Nuveen v. Greer*, 88 Fla. 249, 260 (1924); *Eaton v. Shiawassee Cty.*, 218 F. 588, 591 (6th Cir. 1914); *McCurdy v. Shiawassee Cty.*, 154 Mich. 550, 556 (1908).

To date, several bondholders and groups thereof have filed motions to dismiss the Bond Claim Objections and related memoranda (the "Motions to Dismiss Bond Claim Objections").[253]

In the Motions to Dismiss Bond Claim Objections, bondholders raise a number of arguments to the effect that the GO and PBA Bonds did not breach the Constitutional Debt Limit or should otherwise not be held invalid. These arguments are summarized herein.

- Bondholders argue that Puerto Rico's constitution precludes characterization of PBA Bonds as general obligation or constitutional debt because the Constitutional Debt Limit applies to "money borrowed directly by the Commonwealth" and not money borrowed by the PBA.[254]

---

[253] The Motions to Dismiss Bond Claim Objections include, to date, *Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* [ECF No. 10702] (the "Ad Hoc Group Motion"); *Supplemental Memorandum of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. in Support of Motion to Dismiss* [ECF No. 10704] (the "AHG Supplement"); *The QTCB Noteholder Group's Response to Certain Omnibus Objections and Limited Joinder to the Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* (the "QTCB Response") [ECF No. 10705]; *Individual Commonwealth GO and PBA Bondholder Motion to Dismiss Claims Objections to Claims by Holders of Commonwealth GO and PBA Bonds* [sic] [ECF No. 11148] (the "Hein Motion"); *Response and Joinder of Kenneth Kirschenbaum and Kenneth Kirschenbaum Faily Trust to Motions to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* [ECF No. 11149]; the Cooperative Motion; *DRA Parties' Motion to Dismiss (I) Official Committee of Unsecured Creditors' Objection on Constitutional Debt Limit Grounds to Claim Of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority [Dkt. No. 9735] And (II) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant To Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth [Dkt. No. 9730]* [ECF No. 11260].

Several parties have filed statements joining in the above motions to dismiss and, in some cases, seeking to extend the requested relief to related litigation regarding tort claims and avoidance claims relating to extension of Commonwealth guarantees to debt issued by other entities. *See, e.g.*, ECF Nos. 11153, 11241, 11247, 11251, 11261, 11264, 11267, 11281, 11292.

Additionally, the LCDC has filed the *Omnibus Motion to Dismiss of the Lawful Constituional Debt Coalition, Pursuant to Bankruptcy Rule 7012, of Claim Objections Filed or Asserted by the Financial Management Oversight Board for Puerto Rico and the Official Committee of Unsecured Creditors* [sic] [ECF No. 10697] (the "LCDC Motion"). The LCDC Motion seeks dismissal of objections filed by the Oversight Board and others, but not the LCDC Omnibus Objection. In other words, the LCDC disputes the legal theories asserted in the other Bond Claim Objections but seeks similar relief.

[254] *See, e.g.*, Ad Hoc Group Motion, 13-18.

- Bondholders argue that the PBA's legal existence and history confirms its legitimacy such that the PBA's obligations may not be considered obligations of the Commonwealth.[255]

- Bondholders argue that certain GO Bonds issued in July 2011, denominated and accounted as 2011 bonds, were in fact issued in Fiscal Year 2012 and should be considered 2012 bonds that did not breach the Constitutional Debt Limit even under the Oversight Board's accounting methods.[256]

- Bondholders dispute the Oversight Board's method of accounting for bond validity and requested remedies, arguing that some bond issuances should be held partially valid, and that issuances found to be invalid should not count in calculations with respect to subsequent issuances.[257]

Bondholders have raised additional arguments specific to allegations raised by the LCDC and other parties. For instance, one group of bondholders argued that if the PBA is indeed a "sham designed to circumvent" the Constitutional Debt Limit, its bonds should be held entirely invalid.[258] Others have argued that a holding that bonds are invalid would violate the U.S. Constitution, among other reasons because it would be an unlawful taking under the 5th Amendment.[259]

### (1)    Equitable Defenses

The Motions to Dismiss Bond Claim Objections additionally articulate defenses to the Bond Claim Objections based upon equitable theories such as estoppel and unjust enrichment.[260] In sum, bondholders argue that the Commonwealth received the proceeds of the bond issuances, and it would be unjust to permit the Commonwealth to escape its obligations simply because the Commonwealth failed to ensure it complied with applicable law prior to issuing the bonds. Moreover, bondholders argue that the Commonwealth's recitals in connection with the issuance of the Challenged Bonds, attesting to the Commonwealth and PBA's borrowing authority, foreclose any challenge to the bonds' validity. Relatedly, bondholders argue that principles of

---

[255] *Id.* at 18-23. This argument relies in part upon factual evidence, which the Oversight Board disputes both in substance and on the procedural grounds that such evidence may not be considered by the court within a motion under Fed. R. Bankr. Pro. 7012.

[256] *See id.* at 41. The Commonwealth's fiscal year begins July 1; bonds entered after July 1, 2011 would ordinarily be considered to be fiscal year 2012. The Oversight Board has accounted for such bonds (denominated 2011 Series D/E GO Bonds) within fiscal year 2011 because the Commonwealth appears to have performed relevant Constitutional Debt Limit calculations predicated on the bonds' being issued in fiscal year 2011. Indeed, the information necessary to calculate the Constitutional Debt Limit for bonds and recite legal compliance therewith did not exist at the time the Commonwealth Legislative Assembly approved and issued the bonds together with recitals.

[257] *See id.* at 59-64.

[258] *See* AHG Supplement.

[259] Hein Motion, 6.

[260] *See, e.g.,* Ad Hoc Group Motion; Hein Motion; QTCB Response; Cooperative Motion.

judicial prudence should be applied to limit the Title III Court's decision on these issues to prospective effect, so as to avoid significant hardships to bondholders.[261]   Certain bondholders also argue that the Constitutional Debt Limit constitutes a bar on legislative action and not on bondholder rights or remedies.[262]

The Oversight Board believes these defenses are unlikely to succeed.   The Puerto Rico Supreme Court has "unequivocally rejected" the application of equitable estoppel as developed in the common law for use in its civil law system, and likewise does not recognize unjust enrichment defenses that implicate constitutional public policy concerns.[263]   Relevant case law suggests that a private party transacting with the Commonwealth takes the risk that, if the transaction runs afoul of a clear public policy embodied in a statute or the constitution, no remedy will be available against the Commonwealth.   Courts have remarked that although this doubtless causes significant hardship to the counterparty to an unlawful transaction, the opposite result causes significant hardship to citizens and taxpayers and offends principles of justice and the rule of law.[264]

### (2)   Uniform Commercial Code Defenses

Although not raised in any Motions to Dismiss Bond Claim Objections, the Oversight Board has anticipated that bondholders may raise defenses under Article 8 of the Uniform Commercial Code, adopted in Puerto Rico as Article 8 of the Commercial Transactions Act and codified in Title 19 of the annotated Laws of Puerto Rico.   The Uniform Commercial Code contains two provisions dealing with the issuance of invalid securities.   Section 8-202 provides for the validation of invalid securities under specified conditions as a defense to an issuer's assertion of invalidity.   Section 8-210 provides a remedy to holders of securities issued in excess of the issuer's power.[265]

The Oversight Board believes these Code-based defenses appear unlikely to succeed for a number of reasons, including most prominently that statutes that purport to override the

---

[261]   *See* Ad Hoc Group Motion, 50-54.

[262]   *See* QTCB Response.

[263]   *See CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 76 (D.P.R. 2006) (refusing to recognize estoppel defense); *Hatton v. Municipality of Ponce*, 134 D.P.R. 1001, 1010 (1994) (no unjust enrichment defense where government contract violated clear public policy); *see also Vicar Builders Dev., Inc. v. ELA*, 192 D.P.R. 256, 267-70 (2015) (government may not ratify unlawful contract through later conduct).

[264]   *See Buchanan v. City of Litchfield*, 102 U.S. 278, 293 (1880) (denying relief to aggrieved private party holding bonds in violation of debt limit and declaring that "the settled principles of law cannot, with safety to the public, be disregarded in order to remedy the hardships of special cases"); *City of Litchfield v. Ballou*, 114 U.S. 190, 822-23 (1885) (denying relief to same party on equitable theory, noting that "[t]he money received on the bonds having been expended . . . to impose the amount thereof as a lien upon [public property] would be equally a violation of the constitutional [debt] prohibition . . . The holders of the bonds and agents of the city are *participes criminis* in the act of violating that prohibition, and equity will no more raise a resulting trust in favor of the bondholders than the law will raise an implied *assumpsit* against a public policy so strongly declared.").

[265]   The Uniform Commercial Code provisions most likely to be raised in defense of the GO Bonds are sections 8-202 and 8-210.   For a more detailed analysis of relevant Uniform Commercial Code provisions, see Joint Claim Objection, ¶¶ 106-128.

Commonwealth Constitution are themselves unlawful.[266]    Principles of law enshrined in a constitution cannot be set aside by legislative or judicial action.[267] The Oversight Board articulates additional defenses within its Joint Claim Objection.

### (iii)    *Bond Claim Objections to and Procedures*

Based on Claim Counsel's advice, the Oversight Board, acting by and through the Special Claims Committee, joined the UCC in commencing litigation contending that several 2012 and 2014 issuances of GO Bonds violated Puerto Rico's Constitutional Debt Limit, and that claims by purported holders of the GO Bonds for principal and interest should be disallowed.[268]

Providing procedural due process (including but not limited to appropriate notice) to all potential purported holders of the GO bonds regarding the Joint Claim Objection required that the UCC and Oversight Board propose a robust procedure by which all purported holders of 2012 and 2014 GO Bonds could be notified of the Joint Claim Objection and have an opportunity to respond to the Joint Claim Objection. *See Urgent Motion of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Requesting Related Relief*

---

[266] While this fact is inherent to the constitutional system of laws, it has been repeatedly held true where parties assert statutory defenses to alleged constitutional debt limit violations and related defects in government expenditures. *See, e.g.*, *Weinberger v. Bd. of Pub. Instruction of St. Johns Cty.*, 93 Fla. 470, 481-82 (1927) ("[W]hen bonds are issued in violation of a mandatory provision of the Constitution, as, for instance, when in excess of the debt limit fixed by the Constitution. . .such bonds are void ab initio, and cannot be validated by curative legislation."); *Nolan Cty. v. State*, 83 Tex. 182, 200 (1891) ("Where a contract, which a municipal corporation has attempted to create, is invalid merely for want of legislative authority to create it, it can be made valid by a subsequent law. But if, at the time of its attempted creation, the legislature could not have authorized it, it may be doubted whether the legislature could make it valid, although in the mean time [sic], by a change in the constitution, the restriction upon its own power may have been removed.").

[267] *See* sources cited above; *McPherson v. Foster Bros.*, 43 Iowa 48, 69-70 (1876) ("Th[e] view [that purchasers of unconstitutional bonds should have a remedy] presents the suggestion of an ingenious plan for setting at naught the provision of the Constitution of the State under consideration. It is commended on the ground that, if the Constitution be enforced so as to cure the evil from which it is intended to protect the people of the state, it would operate to ensnare and defraud those who deal with political corporations. In such a case, according to the sentiment of the above quotation, the Constitution becomes an instrument of fraud, and on that ground may be violated. It must be confessed that it is a novel thought, to disregard the supreme law of the state because it operates to ensnare and defraud innocent persons. The error of the quotation is based upon a partial view of the rights of those who are called innocent purchasers, and want of attention to the object and purpose of the constitutional restriction in question.").

[268] *See* Joint Claim Objection. The UCC additionally alleged that the bonds were invalid because they violated Article VI, section 7 of the Commonwealth Constitution, which provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." The Oversight Board did not take a position with respect to whether any GO Bonds violated this constitutional provision, but reserved its rights to raise this or additional objections relating to the GO Bonds. *See* Joint Claim Objection, p. 32 n. 18.

[ECF No. 4788] (the "Initial Procedures Motion" and the procedures contained therein, the "Procedures").

The Title III Court granted the Initial Procedures Motion with modifications to the initially proposed Procedures.[269]  Pursuant to the approved Procedures, (1) the Depository Trust and Clearing Corporation ("DTC") posted a notice of the Joint Claim Objection in its legal notification system; (2) a notice of the Joint Claim Objection was published in several English-language and Spanish-language newspapers; and (3) the affected purported holders of challenged GO Bonds were identified by the thirty-seven (37) CUSIPs identified in the Joint Claim Objection. Furthermore, the Procedures established that purported holders were given sixty (60) days from the date of the Procedures Order granting the Initial Procedures Motion by which to file a Notice of Participation, which was to provide, among other facts, whether the purported holder opposed the Joint Claim Objection.  Purported bondholders filed over one thousand Notices of Participation.

Subsequent to the Joint Claim Objection, and as more fully described below, the Oversight Board and the UCC filed litigation seeking to avoid and recover principal and interest payments in respect of purported bond obligations, including GO and PBA Bonds issued beginning in March 2011.  Later, the UCC filed an objection to claims against the Commonwealth Debtor on account of GO Bonds issued in and after March 2011 and for PBA Bonds issued in and after March 2011.[270]

In tandem with the Joint Claim Objection and Expanded Objection, a group of holders of GO Bonds, the GO Group, filed a so-called "conditional objection" to certain bonds issued prior to 2012.[271]  The GO Group argued that, to the extent the court were to determine that the Oversight Board and UCC's objections are merited, the court would also have to find that the pre-2012 bonds are invalid under one or more theories, including among others, that (a) if the Commonwealth engaged in a sham by mischaracterizing PBA debt, then all PBA debt is invalid, and/or (b) that a statute regulating calculation of debt service costs for purposes of the Constitutional Debt Limit need not be applied.  Regardless, the GO Group took the position that no objection to the GO

---

[269] *See Order, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, Establishing Initial Procedures with Respect to Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Granting Related Relief,* ECF No. 5143 (the "Procedures Order").

[270] *See Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Bonds* [ECF No. 7057] (the "Expanded Objection"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds,* ECF No. 8141 (the "PBA Bond Objection"). The Oversight Board and UCC then requested approval of similar procedures to govern the Expanded Objection and to litigate both the Joint Claim Objection and Expanded Objection in omnibus fashion. *See Amended Motion of (I) Financial Oversight and Management Board, Acting Through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, to (A) Extend Deadlines and (B) Establish Revised Procedures with Respect to Omnibus Objections to Claims of Holders of Certain Commonwealth General Obligation Bonds Issued in 2011, 2012 and 2014, and for Related Relief,* [ECF No. 7154].

[271] *See* Conditional Objection.

Bonds would be merited, including its own Conditional Objection. For that reason among others, the Title III Court denied the GO Group's motion for approval of procedures to litigate the Conditional Objection on grounds of ripeness [ECF No. 6891]. However, the GO Group later renewed its motion for approval, stating that the PSA and the Plan and Disclosure Statement ripen the Conditional Objection.[272]

The LCDC also filed a statement in response to the Joint Claim Objection, supporting it in part and refuting it in part.[273] The LCDC Statement supported invalidating the late vintage GO Bonds but refuted the challenges to the validity of the PBA structure. As an alternative, the LCDC Statement provided that whether the GO bondholder group has an allowable claim is irrelevant, as they are not entitled to any distribution upon the claim because the GO 2012 and 2014 bonds violated the express terms of the Constitutional Debt Limit.

On July 24, 2019, the Title III Court issued the Stay Order, staying, among other things, the Joint Claim Objection, the Expanded Objection and the renewed Conditional Objection, which stay was extended through March 11, 2020. Pursuant to the Interim GO/PBA CMO, both the UCC and the LCDC filed claim objections supplementing the previously filed briefing.[274] The UCC reiterated its arguments from its previous objections and supplemented with challenges to the following bonds and notes as invalid: GDB Notes issued on or about July 2012, July 2013, and June 2016; PBA 2004 and 2006 bonds that were refinanced into a single, Commonwealth-guaranteed bond held by the GDB in 2015; the ScotiaBank Proof of Claim filed on June 13, 2018 for claims on an alleged invalid "Scotiabank Note;" and PRIFA Notes issued in 2015. The UCC asserts that certain GDB notes, certain PBA bond guaranty, the ScotiaBank note, and certain PRIFA guaranty should be disallowed because the notes and guaranties were all issued in violation of the Constitutional Debt Limit, and are therefore null and void.

While the LCDC Omnibus Objection renewed the previous argument that the 2012 and 2014 vintage bonds are null and void, it clarified its position and, with new arguments, asserted that post-2012 PBA bonds were also issued in violation of the Constitutional Debt Limit, along with the PRIFA BANs and the Ports bonds. The LCDC adopted the approach of reading the Commonwealth Constitution to establish two distinct debt limits, one for (i) "direct obligations for bonds issued by the Commonwealth," and one for (ii) "obligations for bonds guaranteed by the Commonwealth provided that the Commonwealth made debt service payments on account of such guarantee obligations." However, the LCDC Omnibus Objection asserted that rental payments

---

[272] *See Notice of Hearing on Renewed Motion of the Ad Hoc Group of General Obligation Bondholders, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Conditional Objection to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, [ECF No. 7814].

[273] *See Statement of Position of the Lawful Constitutional Debt Coalition Regarding Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 6180] ("LCDC Statement").

[274] LCDC Omnibus Objection; *Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico (Claim Number 29485) Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority, (II) Claim of Scotiabank de Puerto Rico (Claim Number 47658) Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority*, [ECF No. 9735] ("UCC 2020 Objection").

from the Commonwealth constitute payments on account of the Commonwealth guarantee, which must therefore be included in the calculation of debt service for bonds issued directly by the Commonwealth.[275]

On February 5, 2020, pursuant to deadlines stated in the Title III Court's interim case management order regarding PBA and GO bond litigation, certain bondholders filed motions to dismiss the PBA and GO bond objections. The movant parties included certain bondholder groups that had actively participated in mediation regarding the scheduling order and PBA and GO validity generally, as well as monoline insurers that had insured GO and PBA bonds. Pursuant to the scheduling order, further motions to dismiss were filed on or before February 19, 2020. [276]

As noted above, on February 9, 2020, the Oversight Board entered into the PSA, which proposes to resolve the bond validity litigation discussed above.

On February 10, 2020, following disclosure of the PSA, the Mediation Team submitted a revised report and recommendation that further litigation under the GO/PBA litigation scheduling order should be stayed in furtherance of plan confirmation. The Oversight Board and consenting bondholders, likewise, have agreed to seek a general stay of all such litigation pending plan confirmation.

(iv)   ***Additional Concerns Raised in Related Filings***

Sub-parts V.H.7.a)(i)-(iii) hereof describes allegations that GO and PBA bonds were invalid as a result of breaches of the Constitutional Debt Limit. The Oversight Board has reserved the right to expand its objections to additional bond series and has alleged additional facts and applicable law giving rise to concerns as to the validity of the GO bonds and related transfers. These additional concerns are discussed below.

(1)   **Balanced Budget Clause Violations**

The Oversight Board believes that, just as the Constitutional Debt Limit restricts the Commonwealth from issuing debt that violates public policy by exceeding Puerto Rico's ability to pay as evidenced by historical revenues, additional constitutional provisions restrict the Commonwealth from issuing debt and using the proceeds for purposes that similarly fail to serve the public good. Article VI, section 7 of the Commonwealth Constitution (the "Balanced Budget Clause") provides that "[t]he appropriations made for any Fiscal Year shall not exceed the total revenues, including available surplus, estimated for said Fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The UCC has alleged in the Joint Claim Objection that certain of the GO Bonds violated the Balanced Budget Clause because the documented and disclosed purpose of the borrowing was

---

[275] *LCDC Omnibus Objection*, [ECF No. 9730], ¶ 2.

[276] The motions described in this paragraph comprise the "Motions to Dismiss Bond Claim Objections" discussed above at sub-part V.H.7.a)(ii).

to finance structural deficits in the Commonwealth budget. The Oversight Board has reserved the right to join in this argument.[277]

General obligation debt proceeds in many jurisdictions may only be used to finance capital projects such as land acquisition and infrastructure development. The practice of "deficit financing," alleviating budget deficits by borrowing money rather than reducing expenses or increasing taxes, is viewed as fiscally unsound and inadvisable for general obligation borrowing. Indeed, GDB at one time advertised the sale of GO Bonds by noting the "forthright and fundamental fact: that deficit financing is specifically prohibited in the Constitution of the Commonwealth." GDB Advertisement, *Barron's* Magazine, February 1974.

Notwithstanding GDB's past assertions, there is some dispute as to the correct interpretation of the Constitution. The English version of the Commonwealth Constitution that was approved by the U.S. Congress provides that "[t]he appropriations made for any Fiscal Year shall not exceed the **total revenues**, including available surplus, estimated for said Fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." Because bond proceeds are not "revenues," the Oversight Board contends that this language is best understood to prohibit deficit financing.

By contrast, the Spanish version of the Commonwealth Constitution adopted by the Legislature uses the term "recursos totales," which in English means "total **resources**," not "total **revenues**," which would be rendered as "rentas totales" in Spanish. The legislative history suggests that the term "recursos totales" was intentionally deployed by the drafters to encompass bond issuances; however, the federal law providing for effectiveness of the Commonwealth Constitution indicates that the English version is to be considered official.

No court has ruled on the question of whether the Commonwealth Constitution forbids deficit financing. Certain bondholders have argued that the UCC's interpretation of the Balanced Budget Clause is incorrect,[278] asserting that the UCC invents a reading based on limits established under various state constitutions but not the text of the Commonwealth Constitution. Moreover, although numerous courts have held that violation of a debt service limit results in a finding that bonds are null and void, few courts have addressed the appropriate remedy for violations of deficit financing restrictions;[279] bondholders have argued that Puerto Rico's Balanced Budget Clause governs appropriations, not borrowing, and that a debt invalidation remedy for an appropriations violation would be inconsistent with the meaning and purpose of the Constitution.[280]

---

[277] Joint Claim Objection, p. 32 fn. 18.

[278] Ad Hoc Group Motion, 42-46.

[279] Several courts have held that bonds are invalid where the language of the relevant constitution explicitly forbids borrowing amounts not payable from budgeted revenues. *See, e.g.*, *City of Winchester v. Winchester Bank*, 306 Ky. 45, 46-47 (1947); *Austin Western Road Mach. Co. v. City of New Madrid*, 185 S.W.2d 850, 855 (Mo. Ct. App. 1945); *State v. Spring City*, 123 Utah 471, 476-78 (Utah 1953).

[280] *See* Ad Hoc Group Motion, 46-48. One court has held that the remedy for an appropriations clause violation was to require budget balancing on a prospective basis. *See Lance v. McGreevey*, 180 N.J. 590, 599 (NJ 2004) (citing N.J. Const. art. VIII, § 2). In that case, the issuer was not alleged to be insolvent and the court expressed concern

### b) Invalidity Actions

As described above, the various objections to the validity of GO and PBA Bonds seek disallowance of the claims filed against the Commonwealth in respect thereof. Another potential consequence of the bonds' invalidity would be that any amounts paid by the Commonwealth on account of such purported bonds (i) were *per se* unlawful and are recoverable under Puerto Rico law, and (ii) are avoidable as fraudulent transfers pursuant to the Bankruptcy Code and Puerto Rico law.

Accordingly, the Oversight Board commenced litigation to "claw back" principal and interest payments on the bonds that had been paid out to purported bondholders in the four years prior to the commencement of the Commonwealth Title III Case.[281, 282] The Oversight Board limited this litigation (to the best of its ability after gathering information, as described below) to holders in excess of $2.5 million in the bonds at issue during the lookback period, in other words, excluding small-scale diversified portfolio investors and pursuing relief only against sophisticated investors that should have understood the bonds' infirmities prior to investing. In the event the request sought in the Invalidity Action is sustained, recipients of payments of principal and interest on account of the Challenged Bonds may be required to return such payments to the respective issuers.

Unlike the claims objections described above, the Invalidity Actions required the Oversight Board to engage in a complicated discovery process to identify the appropriate Defendants.[283] The Oversight Board obtained several orders from the Title III Court requiring numerous banks that held the bonds on behalf of both themselves and "beneficial holder" clientele to produce records of transfers of principal and interest payments to beneficial holders.[284] The Oversight Board then received from the banks a large amount of confidential information identifying the purported bondholders and the transfers at issue.[285] Pursuant to stringent confidentiality restrictions, the Oversight Board then identified the disclosed parties as Defendants by pseudonym in relevant litigation and submitted to the Title III Court under seal a "key" document identifying the parties by name.

---

over "disruption to the State government." *Id.* It is likewise not clear that the facts and law of the case would be applicable to the present circumstances.

[281] These "Invalidity Actions" actions are Adv. Proc. Nos. 19-00281 through 19-00288, inclusive.

[282] PROMESA and Puerto Rico law, among others, permit the Oversight Board to "look back" and avoid transfers made during the four years prior to the commencement of the cases.

[283] For the avoidance of doubt: the objections to claims were filed against *current* holders of GO and PBA Bonds and relate to going-forward obligations. The Invalidity Action is filed against parties who held the same bonds between 2013 and 2017. Overlap may be limited due to active trading.

[284] *See* ECF Nos. 6384, 6493, 6967.

[285] To date, not all of the banks have complied with the discovery orders. To the extent of such non-compliance, the Oversight Board has assumed that the banks, as record holders of the bonds, were likewise the beneficial holders of the bonds and are thus the appropriate Defendants to the Invalidity Action.

On April 30 and May 1, 2019, the Oversight Board and the UCC filed the Invalidity Actions with the Title III Court, commencing eight adversary proceedings in total.[286]   To date, the Invalidity Litigation Defendants include approximately 450 purported beneficial owners of the bonds identified by pseudonym.   More litigation may be filed, and/or new Defendants named to the litigation, as banks continue to provide information identifying beneficial holders of the bonds, notwithstanding that discovery deadlines have now expired.

After filing the Invalidity Actions, the Oversight Board and the UCC requested that the Title III Court stay the litigation and extend service deadlines.[287]   In the Litigation Stay Motion, the Oversight Board and the UCC noted that the Invalidity Actions had been filed in order to preserve rights prior to expiration of the relevant statute of limitations, but that aggressive prosecution of the litigation would not be warranted under the circumstances of the Title III Cases (including the opportunity to settle related disputes by confirmation of a plan of adjustment).   The Title III Court granted the motion in part, extending service and litigation deadlines to September 1, 2019, and requiring the Oversight Board to meet and confer with interested parties and submit a joint case management order to govern the actions no later than July 17, 2019.[288]   The Oversight Board has served the Invalidity Actions complaints and summonses.

Pursuant to the Stay Order as subsequently amended, the Invalidity Actions are stayed through plan confirmation.[289]

The GO/PBA PSA and Plan provide for dismissal of the Invalidity Actions following confirmation.

### c)      Lien Challenge Actions

For a description of the lien challenge actions[290] to be settled pursuant of the Plan, *see* section III.B.1.a) of this Disclosure Statement.

### d)      PBA Litigation

Historically, in calculating general obligations pursuant to subsection (i) of the Constitutional Debt Limit, the Commonwealth included within its accounting of general obligations only those bonds issued directly by the Commonwealth and specifically denominated

---

[286] For logistical reasons relating to law firm conflicts of interest and the Title III Court's document processing capabilities, the Oversight Board was required to file the complaints against Defendants in tranches.

[287] *See Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and Its Special Claims Committee to Extend Time for Service of Summonses and Complaints and to Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds*, [ECF No. 6857] (the "Litigation Stay Motion").

[288] *See Order Regarding Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and its Special Claims Committee to Extend Time for Service of Summonses and Complaints and Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds*, [ECF No. 7426].

[289] *See Final Order Regarding (A) Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto*, [ECF No. 12189].

[290] These actions were brought by the Oversight Board (not its Special Claims Committee).

as GO Bonds.  As provided below, however, the Oversight Board alleges that the Commonwealth simultaneously created and issued bonds that were general obligations but were neither denominated as such nor included in the Constitutional Debt Limit calculation.

PBA ostensibly exists to acquire, develop and manage real property for the benefit of the Commonwealth.  However, PBA in some cases acquires its properties from the Commonwealth itself via lease; such properties are then leased back to the Commonwealth and its agencies.  The Oversight Board and other parties have alleged that the actual function of PBA has been to issue bonds backed by the good faith, credit and taxing power of the Commonwealth, using the aforementioned purported real property sublease obligations to pass funds from the Commonwealth to bondholders without facially implicating the Constitutional Debt Limit.

The Oversight Board has alleged that the PBA Leases are not true leases, should not be entitled to administrative priority, and should be characterized as general obligations of the Commonwealth for purposes of the Constitutional Debt Limit [Adv. Proc. No. 18-00149, ECF No. 1].[291]  As described more fully in the PBA Lease Complaint, among other court filings, the Oversight Board argued that the PBA Leases demonstrate various hallmarks of not being true leases but rather disguised bond payments.  These include:

- "Rent" payments calculated in accordance with debt service requirements, as opposed to PBA's costs or comparative market rent prices.

- Adjustment of rent obligations upward or downward as necessary in relation to PBA Bond financing costs.

- Expiration of PBA Lease obligations on maturity dates of PBA Bonds.

- "Absolute and unconditional obligation" provisions requiring purported lessees to pay "rent" in full at all times and under all circumstances for the remainder of the lease term (*i.e.*, the life of the PBA Bonds), even if the property has been sold or destroyed, and including due to the fault of PBA.

- "Operating Rental" components designed to cause all actual building maintenance and operation expenses to pass through PBA to lessees, so that costs of ownership are paid by lessees in addition to debt service.

Pursuant to the terms of the PBA Leases, the holders of the PBA Bonds are third-party beneficiaries thereof.  The Commonwealth has historically paid a significant portion of the purported lease obligations to PBA, an estimated 80-98% in recent years.

As a result, the Oversight Board and the UCC have concluded that whether flowing through purported leases or directly from the Commonwealth treasury, the Commonwealth makes the payments on the PBA Bonds, irrespective of any purported operations or activities of PBA.  The

---

[291] Additional details regarding this action are provided in Section III.B.1.c).

Bond Claim Objections[292] assert that the PBA Bonds are, in all relevant respects, backed by the Commonwealth's good faith, credit and taxing power, not by revenues from any purported Leases or other PBA operations.

The litigation described herein relating to the infirmities of the PBA bonds is to be settled pursuant to the Plan, on terms described therein and in the GO/PBA PSA, as described above.

### e)    Avoidance of Debt Guarantees (including PRIFA BANs Litigation)

Between 2013 and 2017, the Commonwealth pledged its good faith credit and taxing power to guarantee approximately $830 million in debt issued by certain instrumentalities, including PRASA, APLA, GDB, and PRIFA (the "Guaranteed Indebtedness"). Claims Counsel's investigation identified several potential causes of action with respect to the Guaranteed Indebtedness.

First, for reasons similar to those articulated above with respect to the GO and PBA Bonds, Claims Counsel's investigation suggests the Guaranteed Indebtedness may have violated the debt limit in the Commonwealth Constitution. The Commonwealth Constitution limits the Commonwealth's ability not only to borrow but to extend guarantees once its outstanding debts exceed a certain ratio to its historical revenues.

Second, guarantees by an insolvent debtor of a third party's obligation may be avoided as constructive fraudulent transfers if the debtor did not receive reasonably equivalent value in exchange. In some cases, the Commonwealth did not receive reasonably equivalent value in exchange for its extension of a guarantee because the obligors of the debts did not use the debt proceeds in a manner that provided any benefit to the Commonwealth and because the Commonwealth's guarantee only served to burden it with onerous obligations.

To date, the Oversight Board has filed one avoidance action and has negotiated tolling agreements with the DRA relating to the Guaranteed Indebtedness. The filed action is Adv. Proc. No. 19-00269.[293]   The Oversight Board anticipates that this action will be dismissed upon confirmation of the Plan.

---

[292] The Bond Claim Objections include the objections to the validity of the PBA and GO Bonds filed by the Oversight Board, UCC, and other parties. *See* section V.H.7.a).

[293] *The Special Claims Committee of The Financial Oversight and Management Board for Puerto Rico, acting by and through Its Members and the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as co-trustees respectively, of The Commonwealth of Puerto Rico v. BNY Mellon, et al.*, 19-AP-00269 (the "Guarantee Obligation Avoidance Action").

## I.      The Stay Order and Mediation Team Reports

### 1.      The Stay Order

On July 24, 2019, the Title III Court issued the Stay Order [ECF No. 8244].  The Stay Order stayed the following  adversary proceedings  and contested matters through November 30, 2019:

- the Oversight Board and the UCC's omnibus  objection to claims asserted by certain GO Bondholders,  described in sections  III.B.1.(a)(ii) and V.F.5 of this disclosure statement;

- the seven adversary  proceedings  initiated by the Oversight Board and the UCC against more than 450 Defendants seeking declarations  that holders of bonds issued or guaranteed by the Commonwealth  have entirely unsecured claims, described in section III.B.1.a.(ii) of this disclosure  statement;

- the eight clawback actions filed by the Oversight Board's Special Claims Committee and the UCC seeking to claw back principal  and interest payments against  approximately  600 purported  beneficial  owners of bonds and 50 banks disclosed  as record holders,  described  in sections  III.B.1.a.(ii) and  V.F.5 of this disclosure  statement;

- Ambac's lift-stay motion concerning  PRIFA rum tax bonds (*i.e.*, the PRIFA Lift Stay Motion),  described in section 0 of this disclosure  statement;

- the UCC's omnibus  objection to claims against the Commonwealth  asserted by holders of certain PBA Bonds, described in section III.B.1.c)(iii) of this disclosure statement;

- the adversary  proceeding  initiated by the Oversight Board against PBA seeking a declaration  that PBA leases are not true leases and obligations  purportedly  due thereunder are simply  mischaracterized general obligations  of the Commonwealth, described in section III.B.1.(c)(ii) of this disclosure  statement;

- the UCC's objection to claims of holders of certain ERS Bonds, described in section III.B.1.b)(iv) of this disclosure  statement;

- the two adversary  proceedings  filed by ERS and the UCC against certain ERS Bondholders  challenging  the validity  of certain ERS Bondholders'  purported interests, described in section III.B.1(b)(i) of this disclosure  statement;

- the UCC's objection  to GDB's claim against the Commonwealth;

- and the UCC's objection to claims of holders of certain 2011 GO Bonds, described in section III.B.1.(a)(ii) of this disclosure  statement.

353

Pursuant to the Stay Order, this stay was intended "to avoid piecemeal litigation of potentially overlapping key issues, and in an effort to identify efficiently the issues that must be litigated or otherwise resolved to achieve confirmation of a plan of adjustment for the Commonwealth (and other debtors and potential debtors in Title III proceedings), as well as to prioritize such issues and develop efficient approaches to the resolution of such issues." *See* Stay Order at 1.

During the pendency of the stay, the Stay Order directed the Oversight Board, AAFAF, the UCC, the Official Committee of Retired Employees and the parties in the stayed adversary proceedings and contested matters, as directed by the Honorable Barbara J. Houser, the Mediation Team Leader for the Title III proceedings (the "Mediation Team Leader"), to participate in discussions and communications facilitated by the Mediation Team Leader to address the concerns identified by the Court in the Stay Order (quoted in the preceding paragraph).

During mediation the active ERS litigation parties agreed to accelerate consideration of issues related to ERS. Interim Report at 3; *see Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [ECF No. 8899] ("Joint Urgent Motion"). A motion for approval of agreed procedures for objections to claims by holders of bonds issued by ERS was negotiated by the parties and entered by the Title III Court [ECF Nos. 8761, 8818]. In addition, the ERS litigation parties agreed to a scheduling order to address certain matters pending before the Title III Court that relate to the validity of ERS bonds and the scope of liens held by the ERS bondholders. This proposed order was filed with the Title III Court on October 18, 2019, and entered by the Title III Court on October 24, 2019. Joint Urgent Motion; ECF No. 8962.

## 2.   Interim Report and Recommendation of the Mediation Team

On November 27, 2019, the Mediation Team Leader filed the *Interim Report and Recommendation of the Mediation Team* [ECF No. 9365] (the "Interim Report"). The Interim Report described two tasks concurrently performed by the Mediation Team. First, the Mediation Team addressed the scheduling and sequencing of issues identified in the Stay Order or identified by the parties as issues relevant to confirmation of the plan of adjustment for one or more of the Title III debtors. *See Interim Report.* Second, the Mediation Team engaged the parties in substantive mediation sessions as directed by the Stay Order. *Id.* at 2.

The Interim Report stated (at 4) that, because an amended plan of adjustment might render any scheduling recommendations by the Mediation Team moot, the Interim Report addressed only the scheduling of disputed issues that should proceed in the near-term: scheduling and sequencing of litigation concerning (i) the validity of certain challenged series of GO and PBA bonds, (ii) the secured or unsecured status of claims on GO and PBA bonds, (iii) and the rights, as against the Commonwealth, of holders of "revenue bonds" and other debt issued by certain Puerto Rico instrumentalities. The Interim Report described these issues as among the most fundamental and pivotal issues in the Title III cases, and recommended litigation on these issues commence as soon as practicable. *Id.* at 5. The Interim Report attached proposed scheduling orders for litigation

concerning (i) GO and PBA bonds; (ii) revenue bonds issued by HTA, PRIFA, and CCDA; and (iii) the motion for relief from stay filed by the DRA parties.

On December 6, 2019, numerous parties, including the Oversight Board, Ambac, National, FGIC, Assured, the UCC, the DRA Parties, and Peter C. Hein, filed responses to the Mediation Team's Interim Report [ECF Nos. 9493, 9504, 9440, 9485, 9505, 9503, 9508]. On December 11, 2019, the Title III Court held a hearing to consider the Interim Report, the proposed scheduling orders, and the parties' objections and responses thereto.

On December 19, 2019, the Title III Court entered the proposed scheduling order for litigation concerning the revenue bonds [ECF No. 9620]. The Court also issued an order extending the duration of the stay to January to January 31, 2020, extending the deadline for the Mediation Team to file an amended report to January 10, 2020, and setting a hearing to consider the for January 29, 2020 [ECF No. 9618].

On December 23, 2019, in response to a request by the Mediation Team, the Title III Court entered an order extending the January 10, 2020 deadline for the by one month to February 10, 2020, adjourning the hearing on the to March 4, 2020, and extending the stay to March 11, 2020. [ECF No. 9639].

Numerous parties filed objections or other responses to the court's December 23, 2019 order, including Assured, National, Ambac, FGIC, the DRA Parties, and the UCC. [ECF Nos. 9655, 10251, 10249, 10421, and 10424]. At the January 29, 2020 omnibus hearing, the Title III Court, *inter alia*, considered issues relating to the case management order for litigating issues related to revenue bonds. With respect to the HTA Lift Stay Motion, the PRIFA Lift Stay Motion, and the CCDA Lift Stay Motion, the court bifurcated the issues of standing and secured status, permitted limited discovery on preliminary issues, and scheduled a hearing on the bifurcated Lift Stay Motions for March 5, 2020. On January 31, 2020, the Title III Court entered an amended interim case management order for revenue bonds [ECF No. 10595], reflecting the modifications discussed at the January 29 omnibus hearing.

### 3. Amended Report and Recommendation of the Mediation Team

#### a) February 10, 2020 Amended Report

On February 10, 2020, the Mediation Team filed its *Amended Report and Recommendation of the Mediation Team* [ECF No. 10756] (the "Amended Report"). The Amended Report noted that since the filing of the Interim Report, the 2020 PSA was signed by the Oversight Board and the holders of approximately $8 billion in claims of GO/PBA bonds, notice of which was made publically available on February 9, 2020. Amended Report at 8.

In the Amended Report, the Mediation Team made several recommendations regarding the schedules for litigating issues related to the GO and PBA Bonds, the revenue bonds, and the ERS bonds, as well as proposed scheduling for other litigations subject to the stay. The Mediation Team also set out a potential schedule for the pre-disclosure statement hearing period, the disclosure statement hearing, and the confirmation hearing, *see id.* at 20-26.

Several parties filed responses to the Mediation Team's Amended Report, including Peter C. Hein, AAFAF, Ambac, Assured, National, FGIC, the UCC, and the DRA Parties. [ECF Nos. 11284, 11159, 11482, 11493, 11496, 11497, 11498, and 11495]. Also on February 21, 2020, the Oversight Board and the parties to the 2020 PSA filed statements in support of the Amended Report. [ECF Nos. 11492, 11499].

### b) March 10, 2020 Final Order

The Title III Court held a hearing regarding the Amended Report and the objections and responses on March 4, 2020. On March 10, 2020, the Title III Court issued the *Final Order Regarding (A) Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto* [ECF No. 12189] (the "Final Stay and Mediation Order"). The Final Stay and Mediation Order adopted the recommendations of the Mediation Team with certain modifications, and ordered as follows:

- The Court stayed any contested matters and adversary proceedings relating to the validity and priority of GO obligations pending the Court's decision regarding confirmation of the Amended Plan.

- The Court modified the Amended Interim Revenue Bonds Order consistent with the proposed Final Revenue Bonds Scheduling Order, including schedules for filing partial summary judgment motions and addressing potential intra-debtor conflicts of interest, provisions for limited discovery regarding the HTA Lift Stay Motion, the PRIFA Lift Stay Motion, or the CCDA Lift Stay Motion; and a provision permitting parties to seek certification of decisions on the Revenue Bond Lift Stay Motions for immediate appeal.

The Title III Court further ordered that, unless it subsequently ordered otherwise, contested matters or adversary proceedings identified in Appendix A to the Final Stay and Mediation Order, as well as any contested matters or adversary proceedings that either (i) addressed issues settled by the Amended Plan, or (ii) addressed issues joined by any of the litigations that were stayed pending a decision on confirmation, would be stayed pending the Court's decision whether to confirm the Amended Plan.

Subsequent to issuance of the Final Stay and Mediation Order, and in response to the spread of COVID-19 throughout Puerto Rico, and its effects on the people and economy of Puerto Rico, the Oversight Board sought adjournment of any hearing to consider approval of the Disclosure Statement and related deadlines. *See* section I.A.B.1. of this Disclosure Statement for a summary of the GO/PBA PSA and the development of the Plan.

## J. Related Debt Restructurings

### 1. GDB Title VI Case

#### a) Background

The GDB is a public corporation and governmental instrumentality of the Commonwealth, whose principal functions were to act as fiscal agent, paying agent, financial advisor, financing

source and depositary of funds for the Government and its instrumentalities, public corporations and municipalities.

On April 6, 2016, the former Governor, Alejandro Garcia Padilla, issued a number of executive orders under the Moratorium Act to: (i) declare a state of emergency at GDB, (ii) impose restrictions on the withdrawal of funds deposited with GDB and of other disbursements by GDB, and (iii) implement a moratorium on the payment of debt service on GDB's outstanding notes.

### b) GDB Restructuring Support Agreement

After many months of negotiations, on May 15, 2017, AAFAF, GDB and certain other creditors of GDB entered into a GDB Restructuring Support Agreement (as amended, modified or supplemented, the "GDB RSA") to effectuate a consensual restructuring (a "Qualifying Modification") of certain other creditors of GDB's indebtedness through a Title VI case under PROMESA. The severe damage and devastation inflicted on Puerto Rico by Hurricanes Irma and Maria necessitated certain modifications to the GDB RSA and pushed back the timeframe for consummating the Qualifying Modification. As a result, the GDB RSA underwent six amendments. On May 8, 2018, the Oversight Board certified the GDB RSA, as amended.

### c) Commencement of Title VI Proceeding

On August 10, 2018, GDB commenced an action under Title VI of PROMESA by filing an application seeking approval of the Qualifying Modification with the U.S. District Court for the District of Puerto Rico (the "Title VI Action"). The Title VI Action was pending before Judge Swain and captioned Case No. 18-cv-1561 (LTS).

### d) Solicitation of Votes and Approval of the Qualifying Modification.

The day prior to commencing the Title VI Action, on August 9, 2018, GDB and AAFAF launched a solicitation of votes to approve or reject the Qualifying Modification. The Qualifying Modification was overwhelmingly approved by GDB's creditors, with creditors representing 74.8% of all eligible claims participating in the vote and creditors representing 97.4% of such participating claims voting to approve the Qualifying Modification. In addition, the Oversight Board, as the Administrative Supervisor in Title VI, provided all necessary certifications, as required by PROMESA section 601. The District Court approved the Qualifying Modification on November 7, 2018 [Case No. 18-cv-1561, ECF No. 269].

### e) Terms of the Qualifying Modification

The Qualifying Modification became effective as of November 29, 2018 (the "Closing Date"). The key terms of the Qualifying Modification are described below.

#### (i) *Recovery Authority Bonds*

Holders of outstanding GDB public bonds, net depositors of funds at GDB, and certain claimants of contingent and unliquidated claims held claims totaling approximately $4.23 billion as of the Closing Date (such aggregate claims, the "Participating Bond Claims"). Holders of Participating Bond Claims received on the Closing Date in exchange for their claims new bonds

("Recovery Authority Bonds") issued by a newly formed statutory public trust and government instrumentality of the Commonwealth (the "Recovery Authority") created pursuant to the GDB Restructuring Act enacted on August 24, 2017 and amended on July 18, 2018 (the "GDB Restructuring Act"). Holders of certain claimants of contingent and unliquidated claims that constituted Participating Bond Claims will only receive the Recovery Authority Bonds if their claims materialize in the future.

The following are the principal terms of the exchange and the Recovery Authority Bonds:

- For every $1,000 of claims, holders of Participating Bond Claims received $550 of Recovery Authority Bonds.

- The Recovery Authority's only assets are those GDB transferred to the Recovery Authority on the Closing Date (the "Restructuring Property"). The Restructuring Property includes GDB's municipal loan portfolio, a portion of its public entity loan portfolio, certain real estate property, beneficial interests in causes of action and cash. Holders of Recovery Authority Bonds will receive interest and principal payments solely from the proceeds of the Restructuring Property. There is no recourse against the Commonwealth or GDB with respect to the payment obligations under the Recovery Authority Bonds.

- The Recovery Authority Bonds have a coupon of 7.5% and mature in 2040. Based on cash flow projections, it is unlikely that holders of Recovery Authority Bonds will receive all interest due in cash or that the principal amount of the Recovery Authority Bonds will be paid in full.

- Pursuant to the GDB Restructuring Act, in establishing the net amount of claims or of assets, loans owed to GDB by municipalities, were set off on a one-for-one basis with deposits with GDB by the same municipalities.

(ii)     *Conditions of Exchange*

Concurrently with, and as a condition to, the exchange of claims for the Recovery Authority Bonds, the claims the Commonwealth and other public entities had against GDB were resolved pursuant to the terms of the GDB Restructuring Act and the creation of a separate trust—the Public Entity Trust (the "PET"). The primary purpose of the PET is to provide any available distribution to certain public corporation depositors, as well as administer the restoration of federal funds deposited at GDB. Pursuant to the GDB Restructuring Act, on the Closing Date, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities and affiliates (each a "Non-Municipal Government Entity") and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name on a one-for-one basis against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. Those Non-Municipal Government Entities having net claims against GDB, after giving effect to the foregoing adjustment, received their pro rata share of interests in the PET, which were deemed to be full satisfaction of any and all claims such Non-Municipal Government Entity may have against GDB. As a result of the PET transaction, the Commonwealth's deposit

358

claims against GDB were offset against the Commonwealth's unsecured debts to GDB, resulting in GDB holding a net claim against the Commonwealth in the amount of approximately $926.9 million as of the Closing Date.

The assets of the PET (the "PET Assets") consist of the claim against the Commonwealth, which was the subject of a proof of claim filed in the Commonwealth Title III case, and $20 million cash (as of the Closing Date).

(iii)     *Payment of Surplus Tax Proceeds*

On the Closing Date, GDB paid, in cash, to each municipality that had undisbursed cash deposits at GDB on account of proceeds of the special additional tax which GDB certified as surplus from the Municipal Public Debt Redemption Fund (as defined in the Municipal Financing Act) prior to January 1, 2017 (such surplus, the "Excess CAE"), an amount equal to 55% of such undisbursed Excess CAE. The remaining portion of such undisbursed Excess CAE was discharged and no such municipality with Excess CAE has any further rights or claims against GDB or any other party with respect to such Excess CAE.

f)     **Challenges to the GDB RSA and Qualifying Modification**

A number of parties at different times presented litigation challenges to various aspects of the GDB Title VI process. Some municipalities, bondholders and certain other creditors of GDB, challenged, directly and indirectly, the solicitation and the Qualifying Modification alleging one or more of the following:

- the pools of claimants should have included a separate pool for municipalities with its own voting requirements;

- their deposits with GDB did not constitute "Bonds" as defined in PROMESA and therefore Title VI of PROMESA did not apply;

- some deposits were not the property of GDB but instead were held in trust and therefore belonged to the respective depositors;

- the sale of GDB bonds were offered maliciously and under false pretenses and therefore such bondholders should have been treated differently; and/or

- PROMESA and the actions of the Oversight Board were unconstitutional.

In addition, the UCC sought derivative standing to represent the Commonwealth in the GDB Title VI process, which was denied.

All these challenges were ultimately dismissed, withdrawn, or settled.

g)     **Occurrence of the GDB Qualifying Modification**

The GDB restructuring contemplated by the GDB RSA required the approval of the Oversight Board and an order from the Title III Court. On July 12, 2017, the Oversight Board

authorized GDB to avail itself of Title VI of PROMESA, pursuant to PROMESA section 601(e). On May 8, 2018, the Oversight Board certified the GDB RSA. The Oversight Board gave its final approval pursuant to PROMESA section 601(m)(1)(B) on November 2, 2018 (subject to approval of the Qualifying Modification by the Court). On November 7, 2018, the Title III Court issued an order that the requirements of PROMESA section 601(m)(1)(D) had been satisfied. The Closing Date took place on November 29, 2018, on which date all definitive documents were executed, the GDB assets were transferred to the Recovery Authority and the Public Entity Trust, the Participating Bond Claims were cancelled, all related claims were released, the guarantee provided by the Commonwealth in respect of an aggregate of $110 million of GDB bonds was extinguished, and the Recovery Authority Bonds were issued.

### 2.   HTA Title III Case

#### a)   Background

HTA is a public corporation and governmental instrumentality of the Commonwealth established in 1965 under Act No. 74-1965 (as amended, the "HTA Act") that has responsibility for the construction and maintenance of roads and highways and other transportation systems in Puerto Rico.

HTA is governed by a seven-member board comprised of the Secretary of the DTPW (serving as the President of the board), the President of the Planning Board, the Secretary of the Treasury, the Executive Director of AAFAF, and three other members from the private sector appointed by the Governor with the advice and consent of the Senate. HTA has broad powers to carry out its responsibilities in accordance with DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned, or operated by HTA, the ability to set tolls for the use of the highway facilities, and the power to issue bonds, notes, or other obligations. HTA plans and manages the construction of all major projects relating to the Commonwealth's toll highway system, undertakes major repairs, and maintains the toll ways.

#### b)   Commencement of the HTA Title III Case

On May 21, 2017, the Oversight Board issued restructuring certifications for HTA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) with the Title III Court, commencing cases under Title III of PROMESA.

On June 29, 2017, the Title III Court entered an order granting the joint administration of the Title III cases of the Commonwealth, HTA, and ERS, for procedural purposes only [ECF No. 537].

### 3.   PREPA Title III Case

#### a)   Commencement of the PREPA Title III Case

On July 2, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PREPA, pursuant to PROMESA section 304(a), commencing the PREPA Title III Case.

On October 6, 2017, the Title III Court entered an order granting the joint administration of the Title III Cases of the Commonwealth, HTA, ERS, and COFINA, and the PREPA Title III Case, for procedural purposes only [Case No. 17-4780, ECF No. 340].

#### b)   Significant Developments in the PREPA Title III Case

##### (i)   *The Receiver Motions*

On July 18, 2017, certain holders and monoline insurers of bonds issued by PREPA filed a motion seeking to lift the stay to pursue the appointment of a receiver [Case No. 17-4780, ECF No. 74] ("Initial Receiver Motion").  On September 14, 2017, the Title III Court denied the Initial Receiver Motion because, among other things, the Title III Court considered movants' requested relief prohibited by PROMESA section 305, which limits the jurisdiction and powers of the court over certain matters.  See [Case No. 17-4780, ECF No. 299] ("District Court Receiver Opinion").

On August 8, 2018, the First Circuit reversed and remanded the District Court Receiver Opinion, holding that PROMESA section 305 does not prohibit the Title III Court from lifting the stay to allow PREPA bondholders to seek appointment of a receiver. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13 (1st Cir. 2018) (the "Remand Decision").

On October 3, 2018, certain monoline insurers of bonds issued by PREPA—Assured, National, Syncora—filed a renewed motion to lift the stay to pursue the appointment of a receiver. [Case No. 17-4780, ECF No. 975] (the "Renewed Receiver Motion").  Pursuant to several orders of the Title III Court, see [Case No. 17-4780, ECF Nos. 1176, 1183, 1204], the briefing schedule for the Renewed Receiver Motion was extended by several months.  On May 9, 2019, the Title III Court entered an order staying the briefing on the Renewed Receiver Motion until after the Title III Court's ruling on (i) the PREPA 9019 Motion (as defined below) and (ii) a related motion to dismiss the Renewed Receiver Motion.  See [Case No. 17-4780, ECF No. 1230].

On May 3, 2019, Assured joined the Definitive RSA (as defined below).  On May 10, 2019, the Oversight Board and AAFAF filed a motion to dismiss the Renewed Receiver Motion.  [Case No. 17-4780, ECF No. 1233] (the "Motion to Dismiss").  On September 9, 2019, National and Syncora joined the Definitive RSA.  Pursuant to the Definitive RSA as amended through September 9, 2019, upon entry of an order approving certain settlements and provisions contained in the PREPA 9019 Motion, Assured, National, and Syncora will withdraw the Renewed Receiver Motion.  On September 13, 2019, the Title III Court issued an order staying the briefing on the Motion to Dismiss [Case No. 17-4780, ECF No. 1638].

(ii)     *The PREPA Postpetition Financing Motion*

On January 27, 2018, the Oversight Board and AAFAF filed an urgent joint motion for PREPA to obtain postpetition financing of $1.3 billion secured by a first priming lien. See [Case No. 17-4780, ECF No. 549] ("PREPA Financing Motion"). The Title III Court determined that it would not grant the PREPA Financing Motion, but would hold the motion in abeyance without prejudice to an amendment in the short term limited to a smaller draw-down amount and administrative super-priority, and without prejudice to the possible future request for additional funding and/or priming liens. Feb. 15, 2018 Hr'g Tr. at 232:10-14.

On February 16, 2018, the Oversight Board and AAFAF filed an urgent joint application [Case No. 17-4780, ECF No. 722] (the "Urgent Joint Application"), seeking entry of a revised proposed order approving a $300 million credit facility and granting the lender a superpriority administrative expense claim (the "Revised Financing"). On February 19, 2018, the Title III Court entered an order approving the Revised Financing [Case No. 17-4780, ECF No. 744] (the "PREPA Financing Order"). On March 8, 2019, PREPA repaid all of the outstanding amounts under the Revised Financing.

(iii)     *The PREPA Definitive RSA*

After months of negotiation, on July 30, 2018, the Oversight Board and AAFAF announced that they had entered into a preliminary Restructuring Support Agreement with members of the Ad Hoc Group of PREPA Bondholders (the "Preliminary RSA"). The Preliminary RSA contemplated the inclusion of a variety of restructuring terms in an eventual plan of adjustment, and also contemplated the negotiation and execution of a definitive restructuring support agreement.

Following the Preliminary RSA, the Oversight Board and AAFAF continued negotiating with the Ad Hoc Group of PREPA Bondholders regarding the terms of a definitive Restructuring Support Agreement. Ultimately, Assured joined the negotiations. On May 3, 2019, these efforts to reach a consensual resolution culminated in the execution of a definitive Restructuring Support Agreement ("Definitive RSA"), which provides for the resolution of the claims and entitlements of the Ad Hoc Group of PREPA Bondholders, Assured, and other holders of uninsured PREPA bonds that join the Definitive RSA. Among other things, the Definitive RSA provides that the bondholders and monoline insurers party to the Definitive RSA will support a plan of adjustment for PREPA providing them with a certain level of economic recovery. Parties that do not sign the Definitive RSA are not bound by the deal. On September 9, 2019, the parties to the RSA agreed to amend the Definitive RSA to provide for the joinder of Assured and National.

On May 10, 2019, the Oversight Board and AAFAF filed a motion under Bankruptcy Rule 9019 [Case No. 17-bk-4780, ECF No. 1235] (the "PREPA 9019 Motion") seeking approval of certain of the settlements and compromises embodied in the Definitive RSA. Pursuant to several orders of the Court, briefing on the PREPA 9019 Motion was extended into 2020. *See, e.g.,* [Case No. 17-4780, ECF Nos. 1250, 1361, 1513, 1573, 1636, 1671, 1683, 1713, 1858, 1914]. On March 27, 2020, in response to the emerging threat of COVID-19 and its effects on the people and economy of Puerto Rico, the Oversight Board, PREPA, and AAFAF jointly filed an urgent motion seeking to indefinitely adjourn all deadlines relating to the PREPA 9019 Motion. [Case No. 17-

4780, ECF No. 1947] (the "Adjournment Motion").   On April 2, 2020, the Court granted the
Adjournment Motion.   [Case No. 17-4780, ECF No. 1954].   Pursuant to Court order, the Oversight
Board, PREPA, and AAFAF continue to provide periodic status reports relating to PREPA's
condition and the status of the PREPA 9019 Motion.  *See, e.g.,* [Case No. 17-4780, ECF No. 1992,
2111, 2220].

On May 16, 2020, the Unsecured Creditors Committee filed a reply to a status report by
the Oversight Board and AAFAF wherein they requested the Court to terminate the PREPA 9019
Motion on the asserted basis that the Definitive RSA no longer exists in its current form.  *See* [Case
No. 17-4780, ECF No. 1996].   The Court denied the Unsecured Creditors Committee's request.
*See* [Case No. 17-4780, ECF No. 2006].   On August 18, 2020, the Unsecured Creditors Committee
filed a motion again requesting the Court to terminate the PREPA 9019 Motion.   *See* [Case No.
17-4780, ECF No. 2144] (the "Renewed Motion to Terminate").   On November 4, 2020, the Court
denied the Renewed Motion to Terminate, without prejudice to renewal after April 21, 2021. [
ECF No. 2287].   On December 4, 2020, the Unsecured Creditors' Committee appealed the Court's
denial of its Renewed Motion to Terminate.   [ECF No. 2320 (notice of appeal)].   That appeal is
pending before the United States Court of Appeals for the First Circuit, which has ordered the
Unsecured Creditors Committee to show cause why the appeal should not be dismissed for lack of
jurisdiction.   *See* Case No. 21-2162 (1st Cir. 2020).

The deadlines relating to the PREPA 9019 Motion remain stayed indefinitely.

(iv)    ***The LUMA Administrative Expense Motion***

On April 14, 2020, following an over two-year process, the Oversight Board approved a
contract (the "LUMA Energy Contract") between PREPA, the Puerto Rico Public-Private
Partnerships Authority (the "P3 Authority"), LUMA Energy, LLC ("ManagementCo") and LUMA
Energy ServCo, LLC (together with ManagementCo, "LUMA Energy"), providing for LUMA
Energy to assume operation and management of PREPA's transmission and distribution system
(the "T&D System").   The LUMA Energy Contract is a key development in PREPA's
revitalization and transformation.   Its purpose is to transfer management of the T&D System to a
private entity formed by a highly qualified consortium of industry-leading companies, to ensure
that the T&D System is efficiently run for the benefit of all PREPA stakeholders.   On July 7,
2020, the Oversight Board, PREPA and AAFAF filed a motion to allow certain fees that may
accrue and are not paid in the ordinary course to LUMA Energy under the LUMA Energy Contract
as administrative expenses.   *See* [Case No. 17-4780, ECF No. 2053] (the "LUMA Administrative
Expense Motion").   The LUMA Administrative Expense Motion received a number of objections
and responses.   *See* [Case No. 17-4780, ECF Nos. 2128, 2132, 2133, 2134, 2138, 2146].   On
October 19, 2020, the Court entered an opinion and order granting the LUMA Administrative
Expense Motion (but denying it without prejudice solely with respect to certain "late fees" that
may become due to LUMA if PREPA fails to promptly pay LUMA).   *See* [Case No. 17-4780, ECF
No. 2258].   On October 26, 2020, UTIER and SREAEE filed a notice of appeal as to Judge Swain's
order and opinion partially granting the LUMA Administrative Expense Motion [Case No. 17-
4780, ECF No. 2269].   The appeal was docketed as Case No. 20-2041 in the United States Court
of Appeals for the First Circuit.   Briefing in connection with the appeal remains ongoing.

4. **COFINA Title III Case**

a) **Commencement of COFINA Title III Case**

On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing the COFINA Title III Case.

On June 1, 2017, the Title III Court entered an order granting the joint administration of the Commonwealth Title III Case and the COFINA Title III Case, for procedural purposes only. [ECF No. 242].

b) **Confirmation of COFINA Plan of Adjustment**

On January 16 and 17, 2019, the Title III Court considered the confirmation of the COFINA plan of adjustment with the settlement motion for the settlement and compromise of the Commonwealth-COFINA Dispute, as further described below. On February 4, 2019, the Title III Court confirmed the COFINA plan of adjustment approving the entry into the settlement agreement with respect to COFINA [ECF Nos. 5047, 5048, 5053, 5055, 5104]. On the same day, the Title III Court approved the Settlement Motion.

On February 5, 2019, the Title III Court entered the *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] *and the Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5053]. On February 12, 2019, the COFINA plan of adjustment was substantially consummated and became effective (the "Effective Date of the COFINA Plan of Adjustment").

As further explained in section V.J.9. of this Disclosure Statement, the confirmation of the COFINA Plan of Adjustment approved COFINA's entry into the settlement agreement that provided the terms of the settlement and compromise of the Commonwealth-COFINA Dispute and the allocation of the Disputed SUTs.

c) **Challenges to the Confirmation of COFINA's Plan of Adjustment**

Following the occurrence of the Effective Date of the COFINA Plan of Adjustment, a number of parties commenced challenges to the confirmation of the COFINA Plan of Adjustment and the settlement and compromise of the Commonwealth-COFINA Dispute contained therein.

***Appeals of the Order Confirming the COFINA Plan of Adjustment.*** On February 22, 2019, appellants (i) Rene Pinto-Lugo, Manuel Natal-Albelo, VAMOS, a non-profit organization, and six public employee unions (the "Pinto-Lugo Appellants") (*Pinto-Lugo v. Commonwealth of P.R.*, Case No. 19-1181 (1st Cir.)) (the "Pinto-Lugo Appeal"), (ii) Mark Elliott, Lawrence B. Dvores, and Peter C. Hein (the "Elliott Appellants") (*Elliott v. Commonwealth of P.R.*, Case No. 19-1182 (1st Cir.)) (the "Elliott Appeal"), and (iii) Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandia, Cooperativa de Ahorro y Crédito de Juana Diaz, and Cooperativa de Ahorro y

Crédito de Rincon (the "Cooperativas") (*Cooperativas v. COFINA*, Case No. 19-1391 (1st Cir.)) (the "Cooperativas Appeal") filed separate appeals of the order confirming the COFINA Plan of Adjustment. On April 12, 2019, with respect to the Pinto-Lugo and Elliott Appeals, and on June 28, 2019, with respect to the Cooperativas Appeal, the Oversight Board filed a motion to dismiss each appeal as equitably moot, arguing, among other things, (i) appellants had failed to exercise diligence to stay implementation of the COFINA Plan of Adjustment, (ii) the COFINA Plan of Adjustment had been fully consummated and implemented, and (iii) the COFINA Plan of Adjustment had been relied upon by innocent third parties. Thus, the Oversight Board contended granting the appellants' relief by overturning confirmation of the COFINA Plan of Adjustment would be impractical, inequitable, and almost impossible. In particular, COFINA's obligations under its old bonds had been canceled, new bonds had been issued and had been traded in public markets, substantial distributions had been made to creditors, and various litigation disputes had been dismissed with prejudice.

Also on April 12, 2019, the COFINA Senior Bondholders' Coalition filed a motion to intervene in the Pinto-Lugo and Elliot appeals in support of the Oversight Board, which the First Circuit granted on August 26, 2019.

With respect to the Pinto-Lugo and Elliot appeals, on May 15, 2019, both the Pinto-Lugo Appellants and the Elliot Appellants filed oppositions to the motions to dismiss, arguing the equitable mootness doctrine should not apply to their appeals. The Elliot Appellants also argued that their constitutional objections take precedence over the equitable mootness doctrine, and thus, their appeal should not be dismissed.

On May 29, 2019, the Oversight Board filed replies in support of its motions to dismiss the Pinto-Lugo and Elliot appeals. In its reply to the Pinto-Lugo opposition, the Oversight Board argued, *inter alia*, that, because the equitable mootness doctrine applies in cases brought under chapter 9 of the Bankruptcy Code, it is applicable to the Pinto-Lugo appeal. In its reply to the Elliott opposition, the Oversight Board noted that the Elliott Appellants cited no authority in support of their argument that courts are reticent to apply the equitable mootness doctrine in cases involving constitutional claims. The Pinto-Lugo Appellants filed a sur-reply on July 26, 2019. On August 7, 2019, the First Circuit denied the Oversight Board's motions to dismiss without prejudice to reconsideration by the panel that decides the appeals. On August 29, 2019, the First Circuit issued an order consolidating the Pinto-Lugo and Elliott appeals (the "Pinto-Lugo/Elliott appeal").

Also on August 29, 2019, with respect to the Cooperativas appeal, the Cooperativas Appellants filed an opposition to the motion to dismiss, arguing the equitable mootness doctrine should not apply to their appeal and if it did, it would violate the Cooperativas Appellants' due process rights. The Cooperativas Appellants further argued the equitable and constitutional nature of their claims merit consideration on the merits. On September 16, 2019, the Oversight Board filed a reply in support of its motion to dismiss the Cooperativas appeal. In its reply, the Oversight Board argued the equitable mootness doctrine applies and the merits of the appeal are irrelevant. On October 4, 2019, the First Circuit denied the Oversight Board's motion to dismiss without prejudice to reconsideration by the panel that decides the appeal.

On October 25, 2019, the COFINA Senior Bondholders filed a motion for leave to appear as appellees in the Cooperativas appeal, which the First Circuit granted on January 10, 2020.

In the Pinto-Lugo/Elliott appeal, the Pinto-Lugo and Elliott Appellants (collectively, the "Pinto-Lugo/Elliott Appellants") filed their opening briefs on November 7, 2019, arguing the Title III Court's decision dismissing their objections to the COFINA Plan of Adjustment and their legal and constitutional challenges to the New Bond Legislation violated their due process rights. In the Cooperativas appeal, the Cooperativas Appellants filed their opening brief on December 4, 2019, arguing the Title III Court erred by failing to adjust the language of its order on confirmation to allow Adversary Proceeding No. 18-00028 to continue to be adjudicated. The Oversight Board and the COFINA Senior Bondholders each filed an answering brief in the Pinto-Lugo/Elliott appeal on February 14, 2020 and each filed an answering brief in the Cooperativas appeal on February, 21 2020. On March 13, 2020, the Oversight Board filed a letter seeking to schedule oral argument in connection with the Pinto-Lugo/Elliot appeal and the Cooperativas appeal on the same day.

In the Pinto-Lugo/Elliott appeal, the Pinto-Lugo/Elliott Appellants filed their reply briefs on May 1, 2020. In the Cooperativas appeal, the Cooperativas Appellants filed their reply brief on April 30, 2020.

In the Elliot appeal, the Elliott Appellants filed a 28(j) letter submitting supplemental authority on June 8, 2020. On June 16, 2020, the Oversight Board filed a letter response to the Elliott Appellants' 28(j) letter.

On July 31, 2020, a consolidated oral argument was held. After oral argument, the Oversight Board filed 28(j) letters submitting supplemental authority on August 2, 4, and December 31, 2020, in both the Pinto-Lugo/Elliott and Cooperativas appeals.

On February 8, 2021, the First Circuit issued an opinion and judgment dismissing the Pinto-Lugo/Elliott appeals in their entirety on equitable mootness grounds. The First Circuit applied the following three factors in determining whether to dismiss the appeals: (1) whether the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order; (2) whether the challenged COFINA Plan of Adjustment proceeded to a point well beyond any practicable appellate annulment; and (3) whether providing relief would harm innocent third parties. The First Circuit determined Appellants failed to diligently pursue all available remedies, there is no practical way to revert back to the "pre-confirmation status quo," and doing so would harm innocent third parties. On March 1, 2021, the First Circuit issued its mandate. On April 7, 2021, the Elliott Appellants filed a petition for a writ of certiorari, which was docketed as U.S. Supreme Court Case No. 20-1400. On June 8, 2021, the Oversight Board filed an opposition to the petition. On June 21, 2021, the Elliott Appellants filed a reply in support of their petition. On June 23, 2021, the petition was distributed for conference.

On March 2, 2021, the First Circuit issued an opinion and judgment dismissing the Cooperativas appeal challenging the Title III court's confirmation of the COFINA Plan of Adjustment as equitably moot and remanding the case to the Title III Court. The First Circuit applied the following three factors in determining whether to dismiss the appeal: (1) whether the appellant pursued with diligence all available remedies to obtain a stay of execution of the

objectionable order; (2) whether the challenged COFINA Plan of Adjustment proceeded to a point well beyond any practicable appellate annulment; and (3) whether providing relief would harm innocent third parties. The First Circuit found that the Cooperativas Appellants "were anything but diligent in seeking to obtain a stay or prevent delay," and concluded that overturning the COFINA Plan of Adjustment, which has now been implemented for over two years, would cause harm to third parties. On March 23, 2021, the First Circuit issued its mandate.

One of the Elliot Appellants, Peter Hein, also filed a separate appeal regarding certain issues regarding the disallowance of his proof of claim filed in the COFINA Title III proceeding and related discovery to which he believed he was entitled, but was denied. In this regard, on September 17, 2019, Peter Hein filed a supplemental and amended joint notice of appeal regarding the order confirming the COFINA Plan of Adjustment (the "Elliott Appeal II"). The Elliott Appeal II was docketed as Case No. 19-1960. On October 28, 2019, the First Circuit issued an order consolidating the Elliot II Appeal with Pinto-Lugo and Elliot. On January 2, 2020, Appellant filed his opening brief on the issues raised in his separate appeal. The Oversight Board filed their preliminary answering brief on February 14, 2020. On April 30, 2020, Appellant filed his reply brief. On July 31, 2020, the case was argued to the First Circuit. On February 8, 2021, the First Circuit issued an opinion and judgment affirming the dismissal of Hein's discovery request and the disallowance of his proof of claim against COFINA.

***Natal-Albelo v. Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 19-00003***. Originally filed on December 6, 2018 in the Commonwealth of Puerto Rico Court of First Instance by plaintiffs Manuel Natal-Albelo, a member of the Puerto Rico House of Representatives, Rene Pinto-Lugo, an individual bondholder, VAMOS, a non-profit organization, and six labor unions, the Oversight Board removed this case to the Title III Court on January 14, 2019. The complaint seeks declaratory and injunctive relief providing that (1) approval of the Bill of the House of Representatives 1837 ("Bill 1837"), which later became Act 241-2018, is unconstitutional, and (2) Act 91-2006 ("Act 91"), which originally created COFINA, is unconstitutional. Plaintiffs argue that, among other things, the House of Representatives' actions during the approval of Bill 1837: (i) were unconstitutional and violated plaintiff Natal-Albelo's dignity because they made light of plaintiff Natal-Albelo's requests to speak; (ii) violated the rights of plaintiff Natal-Albelo, a non-partisan Representative, to be heard under the equal protection clauses of the Federal and Commonwealth Constitutions; (iii) violated plaintiff Natal-Albelo's rights of dignity, equal protection of laws, the right to freedom of expression, voting, and due process of law under the federal and Commonwealth Constitutions; and (iv) were taken in bad faith. Plaintiffs further argue that Act 91, under which COFINA was created in 2006, is unconstitutional because it: (a) provides for the issuance of debt that exceeds the constitutional limits of public debt provided in sections 2 and 7 of Article VI of the Commonwealth Constitution and (b) allows the refinancing of the unconstitutional public debt.

On March 21, 2019, the Oversight Board filed a motion to stay the adversary proceeding until a final resolution of the Pinto-Lugo appeal of COFINA's Third Amended Title III Plan of Adjustment [Adv. Proc. No. 19-00003, ECF No. 21].

On the same day, Plaintiffs filed a motion to remand for lack of subject matter jurisdiction [Adv. Proc. No. 19-00003, ECF Nos. 24, 25], which the Title III Court later struck from the record due to procedural issues with the motion [Adv. Proc. No. 19-00003, ECF No. 36]. The Title III

Court permitted Plaintiffs the opportunity to refile a motion for remand and stayed all other briefing, including briefing on the Oversight Board's motion to stay, pending resolution of the renewed remand motion. Plaintiffs filed their renewed motion to remand on May 10, 2019 [Adv. Proc. No. 19-00003, ECF No. 40]. On May 31, 2019, AAFAF filed a motion to intervene [Adv. Proc. No. 19-00003, ECF No. 43], which the Title III Court granted [Adv. Proc. No. 19-00003, ECF No. 51]. On July 31, 2019, the Title III Court issued an order denying Plaintiffs' motion to remand [Adv. Proc. No. 19-00003, ECF No. 57]. On August 13, 2019, the Title III Court issued an order continuing the stay of the proceeding until the resolution of the Pinto Lugo appeal [Adv. Proc. No. 19-00003, ECF No. 59]. On April 9, 2021, Plaintiffs filed a notice of voluntary dismissal of the action [Adv. Proc. No. 19-00003, ECF No. 66]. On May 3, 2021, the adversary proceeding was closed.

### 5. General Background

A dominant issue in the Commonwealth Title III Case was the dispute regarding ownership of the SUTs purportedly transferred by the Commonwealth to COFINA to secure repayment of certain indebtedness of COFINA (the "Commonwealth-COFINA Dispute"). If such revenues were property of COFINA, then there would be approximately $750 million less available per year (which annual amount will increase over time) to pay the Commonwealth Debtor's liabilities and expenses.

### 6. The Commonwealth-COFINA Dispute and the Lex Claims Litigation

On July 20, 2016, certain holders of the GO Bonds commenced an action in the U.S. District Court for the District of Puerto Rico against the Commonwealth and several of its officials, including the Governor. *Lex Claims, LLC v. García-Padilla*, Case No. 16-2374-FAB (D.P.R. June 20, 2016).[294] Plaintiffs argued, among other things, that (i) the Commonwealth Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure, and (ii) the SUTs purportedly transferred to COFINA are an "available resource" pursuant to article VI, section 8 of the Commonwealth Constitution, which provides that if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, section 8.

### 7. Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute

On August 10, 2017, the Title III Court entered an order (the "Procedures Order") [ECF No. 996], which, among other things, provided that (a) the Oversight Board authorized the UCC to serve as the agent for the Oversight Board, as representative of the Commonwealth in the Commonwealth Title III Case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent"); and (b) the Oversight Board authorized Bettina Whyte to serve as the agent for the Oversight Board, as representative of COFINA in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on

---

[294] The Lex Claims Litigation has been dismissed pursuant to the settlement and compromise of the Commonwealth-COFINA Dispute and confirmation of the COFINA plan of adjustment.

behalf of COFINA (the "COFINA Agent" and together with the Commonwealth Agent, the "Agents").[295]   The Procedures Order also expressly acknowledged that the Oversight Board retained its authority to separately develop a settlement to the Commonwealth-COFINA Dispute and propose plans of adjustment for the Commonwealth and COFINA.  Procedures Order ¶ 4(n). The Procedures Order was agreed to by all the major stakeholders after the mediators worked tirelessly to craft a consensus.

### 8.   *Official Committee of Unsecured Creditors v. Whyte*, Adv. Proc. No. 17-00257[296]

On September 8, 2017, the UCC,[297] as Commonwealth Agent, commenced an adversary proceeding to prosecute the Commonwealth-COFINA Dispute, Adv. Proc. No. 17-00257.   On September 15, 2017, the COFINA Agent filed her answer to the Complaint (the "Answer and Counterclaims") [Adv. Proc. No. 17-00257, ECF No. 27].

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and GO bondholders, as well as other parties that had been permitted to intervene in the adversary proceeding, filed counterclaims and cross-claims regarding ownership of the applicable portion of the SUT. On February 21, 2018, the Commonwealth Agent, the COFINA Agent, and several of the intervening parties, filed cross-motions for summary judgment.

Concurrently with the litigation in the adversary proceeding, the Agents participated in court-sanctioned mediation to settle the Commonwealth-COFINA Dispute. Through the auspices of the Mediation Team, the Agents reached an understanding set forth in that certain Agreement in Principle on a settlement of the Commonwealth-COFINA Dispute. On June 7, 2018, the Agents announced the terms of their Agreement in Principle, which contemplates, among other things, that, starting in Fiscal Year 2019, the Commonwealth and COFINA will share the Pledged Sales Tax Base Amount, on a 46.35% and 53.65% basis, respectively. [Adv. Proc. No. 17-00257, ECF No. 486].

On September 27, 2018, in light of the agreements and compromises set forth in the COFINA plan of adjustment and related settlement, the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 3, 2018. [Adv. Proc. No. 17-00257, ECF No. 544].

---

[295] Following the entry of the Procedures Order, the Agents, along with certain creditor parties, engaged in confidential mediation with the Mediation Team Leader.

[296] Pursuant to the settlement and compromise of the Commonwealth-COFINA Dispute and confirmation of the COFINA plan of adjustment, on February 20, 2019, the parties filed a joint stipulation of dismissal with prejudice, which was entered on February 21, 2019.

[297] The UCC is the statutory committee of unsecured creditors appointed in the Commonwealth Title III Case, ERS Title III Case, and HTA Title III Case.

On February 20, 2019, following the occurrence of the effective date of the COFINA plan of adjustment, the parties to the adversary proceeding filed a joint stipulation to dismiss the case with prejudice, which the Title III Court approved [Adv. Proc. No. 17-00257, ECF No. 596].

9.    **Compromise and Settlements**

On February 4, 2019, the Title III Court entered the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "Settlement Order"). On the same day, the Title III Court confirmed the COFINA plan of adjustment, approving the entry into a settlement agreement with respect to COFINA. [ECF Nos. 5047, 5048, 5053, 5055]. On February 12, 2019, the COFINA plan of adjustment was substantially consummated and became effective [ECF No. 5104].

Pursuant to the Settlement Order and section 2.1 of the COFINA plan of adjustment, the Commonwealth-COFINA Dispute was compromised and settled as follows:

a)    **COFINA Interests**

COFINA was granted an ownership interest in the COFINA Pledged Taxes and all rights thereto, including the right to receive the COFINA Pledged Taxes pursuant to the First Dollars Funding[298] in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of a certain minimum fixed amount of the SUT revenues ("Fixed Income") in any given Fiscal Year until the COFINA Bonds have been paid or satisfied in full in accordance with their terms (the "COFINA Portion").

b)    **Commonwealth Interests**

The Commonwealth was granted an ownership interest that is second in priority of payment, funding and collections, in the COFINA Pledged Taxes and all rights thereto subject to the First Dollars Funding. This ownership interest includes the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given Fiscal Year of the Commonwealth, and (b) all COFINA Pledged Taxes after the COFINA Bonds have been paid or satisfied in full in accordance with their terms. The Commonwealth shall have no ownership interest in the COFINA Portion, and the Commonwealth Portion[299] shall exclude the COFINA Portion.

---

[298] The "First Dollars Funding" is defined, for purposes of the Settlement Order and COFINA plan of adjustment, as the allocation of "first dollars" collected from COFINA Pledged Taxes, including, without limitation, the criteria set forth in section 16.5 of the COFINA Plan required to be satisfied in order to permit, among other things, quarterly deposits of "first dollars" collected from COFINA Pledged Taxes.

[299] The "Commonwealth Portion" is define , for purposes of the Settlement Order and COFINA plan of adjustment, as, collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year, and (b) all COFINA Pledged Taxes after the COFINA Bonds have been paid or satisfied in full in accordance with their terms; provided, however, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion; and, provided, further, that (y) subject to the provisions regarding the

c) **Distribution of Amounts Held in BNYM Debt Service, Reserve, and Other Accounts**

(i) *Pre-Fiscal Year 2019 BNYM Deposits*

Of the $78,355,837.63 of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by BNYM, as the Existing COFINA Bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the adversary proceeding, $33,355,837.63 was distributed to the Commonwealth.

(ii) *Fiscal Year 2019 BNYM Deposits*

As of the Effective Date of the COFINA Plan of Adjustment, COFINA received, for purposes of distribution in accordance with the plan of adjustment, one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income, plus any earnings thereon (collectively, the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding.

(iii) *Residual Fiscal Year 2019 BNYM Deposits*

Any remaining FY2019 BNYM Deposits after distribution of the COFINA FY2019 BNYM Deposits was to be distributed to the Commonwealth.

d) **First Dollars Funding**

The COFINA Portion will be funded annually from "first dollars" collected from the COFINA Pledged Taxes until the COFINA Bonds have been paid or satisfied in full in accordance with their terms.

Beginning in Fiscal Year 2024 of the Commonwealth, if (i) for any date of determination at which time the Oversight Board or any successor is in existence, (1) the prior and then-current Fiscal Year budgets are balanced, as determined by the Oversight Board (or its successor in interest), and (2) the Commonwealth is current on its continuing disclosure requirements relating to its audited financial statements; (ii) quarterly bucketing of twenty-five percent (25%) of the

---

Additional Bonds Test and the First Dollars Funding set forth in sections 16.3 and 16.5 of the COFINA Plan, respectively, the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year unless and until COFINA has received the COFINA Portion and (z) the Commonwealth shall have no right to receive Debt Service Savings in any fiscal year unless and until all debt service payments on the COFINA Bonds required to be made or set aside in such fiscal year, including any overdue debt service payments from all prior fiscal years, are made as required, in accordance with the provisions regarding the Additional Bonds Test set forth in section 16.3 of the COFINA Plan; and, provided, further, that the COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and, in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, the COFINA Portion shall not be subject to the automatic stay in any such Commonwealth proceeding.

COFINA Portion associated with the then-current Fiscal Year of the Commonwealth is shown to be necessary to avoid intra-Fiscal Year tax revenue anticipation notes borrowing; and (iii) collection of prior Fiscal Year COFINA Pledged Taxes provided a two times (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Bonds have been paid or satisfied in full in accordance with their terms:

(a)     the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the COFINA Portion associated with the then-current Fiscal Year of the Commonwealth will be deposited into the Revenue Fund for transfer to the Debt Service Fund[300] (the "Post-FY24 Deposits"); and

(b)     thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be deposited in accordance with the "Flow of Funds" established in the COFINA Bonds Indenture.

However, in any quarter in which there is a shortfall in the amounts required to be deposited under the Post-FY24 Deposits, then such shortfall will be added to the amount required to be paid in accordance with the Post-FY24 Deposits in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "Debt Service Fund" held by the trustee for the benefit of, and payment of debt service with respect to, the COFINA Bonds.

### e)     Additional Terms of Compromise and Settlement

The Commonwealth will have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a Fiscal Year of the Commonwealth unless and until COFINA has received the COFINA Portion. The Commonwealth will have no right to receive Debt Service Savings[301] in any Fiscal Year of the Commonwealth unless and until all debt service payments on the COFINA Bonds required to be made or set aside in such Fiscal Year of the Commonwealth, including any overdue debt service payments from all prior Fiscal Years of the Commonwealth, are made as required. The COFINA Portion will not be property of the Commonwealth, and if there is any subsequent Title III case or similar or other proceeding of the Commonwealth, in any forum, it shall not be subject to the automatic stay.

---

[300] The "Debt Service Fund" is defined, for purposes of the Settlement Order and COFINA plan of adjustment, as the account established pursuant to the New Bond Indenture in the name of the trustee for the COFINA Bonds, which account shall be for the purpose of receiving, holding and distributing funds for the benefit and payment of debt service with respect to the COFINA Bonds.

[301] "Debt Service Savings" are defined, for purposes of the Settlement Order and COFINA plan of adjustment, as, for each fiscal year, the difference between (a) principal and interest due on COFINA Bonds and COFINA refunding bonds, then outstanding, prior to the issuance of COFINA refunding bonds and/or Reorganized COFINA's purchase of COFINA Bonds and COFINA refunding bonds in the open market and (b) principal and interest due on COFINA Bonds and COFINA refunding bonds that will remain outstanding after the issuance of such COFINA refunding bonds and/or Reorganized COFINA's purchase of such COFINA Bonds and COFINA reorganized bonds.

f)     **Compromise Date**

The effective date of the compromise and settlement is retroactive to July 1, 2018 and, in addition to receipt of the net Pre-FY 2019 BNYM Deposits and the COFINA FY19 BNYM Deposits on the Effective Date of the COFINA Plan of Adjustment, COFINA owns and is entitled to receive, the COFINA Portion commencing as of Fiscal Year 2019.

## K.     Fees and Expenses Incurred During the Title III Cases

On October 6, 2017, the Title III Court appointed Brady C. Williamson as the Fee Examiner to, among other things, monitor the fees and expenses incurred by various professionals in the Title III Cases. The Oversight Board, through the work of its professionals, has provided significant value to the Debtors. The professional fees and expenses incurred by the Debtors during these Title III cases are a small fraction of the savings that have been created. Notable savings created by the Oversight Board with the assistance of its professionals include, among other matters:

- Claim Objections: As of June 26, 2021, the Oversight Board has eliminated, through omnibus claim objection orders entered by the Title III Court, over 100,000 claims filed against the Debtors in the Title III Cases, in the total aggregate asserted amount of approximately $43.3 trillion. Tens of thousands more claims are either on calendar for potential resolution by the Court or are subject to claim objections that are yet to be filed.

- ERS Bondholder Claims: The Oversight Board's litigation efforts saved approximately $7.5 billion that ERS would otherwise have been obligated to pay to its bondholders. Prior to commencing its Title III case, ERS was required to pay its bondholders approximately $7.8 billion in principal and interest through 2058. The Title III Court held the bondholders' liens did not attach to employer pension contributions arising after the commencement of the ERS Title III Case. Therefore, rather than collecting billions of dollars from pension contributions, the bondholders are restricted to a subset of ERS assets which the Oversight Board believes to be worth approximately $70 to $125 million, in addition to the $200 million already paid to the bondholders during the Title III cases. This litigation is summarized in section III.B.1.b of this Disclosure Statement.

- Law 29 Nullification: By successfully nullifying Law 29, the Oversight Board, through its professionals, saved the Commonwealth approximately $932 million between fiscal years 2020 and 2024. After fiscal year 2024, Law 29 would likely have continued to cost the Commonwealth hundreds of millions of dollars each year. The Law 29 litigation is summarized in section IV.C.3.h(iv) of this Disclosure Statement.

- COFINA Restructuring: The restructuring of COFINA through confirmation of a Title III plan saved Puerto Rico approximately $17.5 billion in debt service payments. The COFINA restructuring is described in section V.J.4 of this Disclosure Statement.

- Out-of-Court Restructurings: In addition to these Title III cases, the Oversight Board negotiated out-of-court restructurings of GDB, PRASA, and PRIFA, resulting in approximately $2.5 billion in aggregate savings.

In addition to the savings described above, significant value will be created through the restructurings contemplated in the Plan.

A summary of the professional fees and expenses submitted to the Fee Examiner through June 13, 2021 is below.

|  | | Through June 13, 2021 |
|---|---|---|
| **Oversight Board** | | |
| *Legal* | $237,794,113.66 | |
| *Financial* | $136,011,120.80 | |
| *Consultant* | $118,906,134.22 | $492,711,368.68 |
| | **$492,711,368.68** | |
| **AAFAF/GPR** | | |
| *Legal* | $143,925,145.45 | |
| *Financial* | $107,701,232.85 | |
| *Consultant* | $32,638,149.09 | $284,264,527.39 |
| | **$284,264,527.39** | |
| **COR/UCC** | | |
| *Legal* | $101,769,172.20 | |
| *Financial* | $31,631,632.44 | |
| *Consultant* | $5,217,576.17 | $138,651,365.83 |
| *Members* | $32,985.02 | |
| | **$138,651,365.83** | |
| **COFINA Agent** | | |
| *COFINA Agent* | $1,217,844.00 | |
| *Law Firms* | $19,482,344.03 | $20,700,188.03 |
| | **$20,700,188.03** | |
| **Mediation** | | |
| *Financial* | $2,810,173.56 | $2,810,173.56 |
| | **$2,810,173.56** | |
| **Total Through June 13, 2021:** | | **$939,137,623.49** |

*[Remainder of Page Left Intentionally Blank]*

## VI.     The Title III Plan of Adjustment

### A.     General

#### 1.     Filing of a Plan of Adjustment

A plan of adjustment provides for the treatment and discharge of the debts of the Title III Debtor. Only the Oversight Board may file a plan of adjustment, either with the petition or by the time set by the court, and it may only do so if it determines, in its sole discretion, that the Plan is consistent with the applicable certified fiscal plan.[302] The Oversight Board may modify the Plan at any time before confirmation, provided that the modified plan meets the requirements of PROMESA Title III.[303]

#### 2.     Contents of a Plan of Adjustment

Notwithstanding otherwise applicable nonbankruptcy law, among other things, a plan of adjustment (i) designates classes of claims (claims in a class must be "substantially similar"),[304] (ii) specifies any classes of claims that are not impaired under the plan of adjustment and specifies the treatment accorded to classes of claims or interests that are impaired, (iii) provides the same treatment for each claim of a particular class unless the holder of a particular claim agrees to less favorable treatment, and (iv) provides adequate means for the plan of adjustment's implementation through, for example the retention of property by the Title III Debtor, the transfer or sale of property to another entity, the satisfaction or modification of any lien or indenture, and the curing or waiving of any default.[305]

A class of claims is impaired under a plan of adjustment, unless the plan of adjustment either (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such a claim or interest; or (ii) notwithstanding applicable nonbankruptcy law that entitles the holder of the claim or interest to demand or receive accelerated payment after default the plan of adjustment cures the default, reinstates the maturity of the claim or interest, compensates the holder for damages incurred as a result of any reasonable reliance by such holder on such applicable nonbankruptcy law and (for failures to perform nonmonetary obligations) compensates the holder for any actual pecuniary loss incurred by such holder, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder.[306]

---

[302] PROMESA §§ 312(a)-(b), 104(j)(3).

[303] PROMESA § 313.

[304] In determining whether claims are "substantially similar," the Oversight Board is to consider whether such claims are secured and whether such claims have priority over other claims. PROMESA § 301(e).

[305] 11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

[306] 11 U.S.C. § 1124.

3.       **Acceptance of a Plan of Adjustment**

The holder of an allowed claim may vote to accept or reject a plan of adjustment. PROMESA specifically excludes from the definition of "holder of a claim or interest" for such purpose any "Issuer" or "Authorized Instrumentality of the Territory Government Issuer" (as defined in PROMESA Title VI) or a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, provided that the other beneficiaries of such claims are not excluded, and provided that with respect to insured bonds, such "holder of a claim or interest" will be the monoline insurer insuring such bonds to the extent such insurer is granted the right to vote insured bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents.[307]

A class that is not impaired under the plan of adjustment is conclusively presumed to accept the plan, and a class that is not entitled under the plan of adjustment to receive or retain any property on account of the holders' claims is deemed not to have accepted the plan of adjustment.[308]   A class of claims accepts a plan of adjustment if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class (other than those designated as not in good faith under Bankruptcy Code section 1126(e)).[309]

4.       **Solicitation of Acceptances of Plan of Adjustment**

Prior to soliciting acceptances or rejections from the holders of claims, the Oversight Board is required to issue, and have the court approve, a disclosure statement providing adequate information to holders of claims and interests in order to solicit acceptances for the Plan.[310]   The type of adequate information provided should enable a hypothetical investor of the relevant class to make an informed judgment about the Plan. The same disclosure statement must be transmitted to each holder of a claim of a particular class, but alternate disclosure statements differing in the amount or kind of information provided may be transmitted to different classes.[311]

**B.       Overview of the Plan of Adjustment**

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT A**.

---

[307] PROMESA § 301(c)(3).

[308] 11 U.S.C. §§ 1126(f)-(g).

[309] 11 U.S.C. § 1126(c).

[310] 11 U.S.C. §§ 1125, 1126(b).

[311] 11 U.S.C. § 1126(c).

Bankruptcy Code section 1123, made applicable to the Title III Case by PROMESA, provides that except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes. Although PROMESA and the Bankruptcy Code give the Debtors significant flexibility in classifying claims, Bankruptcy Code section 1122 dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan identifies 66 Classes of Claims (certain of which encompass numerous individual series of the relevant debt, as set forth on the Exhibits to the Plan). These Classes take into account the differing nature and priority of Claims against the Debtors. Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan (as is required by Bankruptcy Code section 1123(a)(1)) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims. Only certain holders of Claims that are impaired under the Plan are entitled to vote and receive Distributions under the Plan.

For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of Article LXXIII of the Plan, the "holder" of a Claim means any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim. Solely for purposes of Article LXXVI of the Plan and section 1126 of the Bankruptcy Code, the "holder" of any Bond Claims will be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Bond Claims.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim. Upon Confirmation, the Plan will be binding on all holders of a Claim regardless of whether such holders voted on the Plan or voted to accept the Plan.

The following discussion sets forth the classification and treatment of all Claims against the Debtors. It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan.

## C.      Compromise and Settlement of Disputes / Restructuring of Entities

### 1.      Litigation Resolution

The Plan sets forth the terms and conditions for the global compromise and integrated settlement of the following disputes:[312]

- The Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2011 CW Guarantee Bond Claims, 2012 CW Bond Claims,

---

[312] The compromise and settlement of all disputes relating to GO and PBA Bonds includes a release against all GO and PBA bondholders, including former holders of GO and PBA bonds.

2014 CW Bond Claims, 2011 PBA Bond Claims, 2012 PBA Bond Claims, 2014 CW Guarantee Bond Claims, and PRIFA BANs[313]

- The Invalidity Actions[314]

- The Lien Challenge Actions[315]

- Disputes raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA, and PRIFA, as applicable[316]

- Disputes relating to the validity, propriety, secured status and related rights attendant to the GDB HTA Loans

- Disputes set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action[317]

- Disputes between the Commonwealth and PBA regarding (i) the PBA Litigation, (ii) the amount of the Rent Claim, if any, and (iii) the ownership of the PBA Property and claims PBA may assert against the Commonwealth under leases, agreements, and applicable law[318]

- The Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims (as to Assured and National only)[319]

- The PRIFA BANs Litigation[320]

---

[313] *See* section III.B.1.a) of this Disclosure Statement for a summary of such dispute.

[314] *See* section V.H.7.b) of this Disclosure Statement for a summary of such dispute.

[315] *See* section III.B.1.a) of this Disclosure Statement for a summary of such dispute.

[316] *See* section V.F.5 of this Disclosure Statement for a summary of such disputes.

[317] *See* sections III.B.1.a), V.H.1, and V.H.6 of this Disclosure Statement for a summary of such disputes.

[318] *See* section III.B.1.c)(ii) of this Disclosure Statement for a summary of such dispute.

[319] *See* sections V.E.4.e), V.E.4.f), V.E.4.g), V.E.4.h), and V.F.5 of this Disclosure Statement for a summary of such disputes.

[320] *See* section V.H.7 of this Disclosure Statement for a summary of such dispute.

2.    **Allowance of Bond Claims**

For purposes of confirmation and consummation of the Plan, and distributions to be made under the Plan, on the Effective Date, the following claims will be allowed or disputed in the following amounts:[321]

- Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), and Vintage PBA Bond Claims (Syncora) will be allowed in the aggregate amount of $2,661,239,877.05

- 2011 PBA Bond Claims will be allowed in the aggregate amount of $1,335,422,892.78

- 2012 PBA Bond Claims will be allowed in the aggregate amount of $674,308,470.06

- Vintage CW Bond Claims and, the Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), and Vintage CW Bond Claims (Syncora) will be allowed in the aggregate amount of $5,843,252,912.91

- ERS Bond Claims will be allowed in the aggregate amount of $3,168,698,776.55

- 2011 CW Bond Claims and 2011 CW Bond Claims (Assured) will be allowed in the aggregate amount of $476,498,325.06

- 2011 CW Series D/E/PIB Bond Claims and 2011 CW Series D/E/PIB Bond Claims (Assured) will be allowed in the aggregate amount of $645,673,111.48

- 2012 CW Bond Claims and 2012 CW Bond Claims (Assured) will be allowed in the amount of $2,934,427,459.40

- 2014 CW Bond Claims will be allowed in the amount of $3,836,611,111.11

- 2014 CW Guarantee Bond Claims will be allowed in the amount of $346,242,219.86

Solely for purposes of confirmation and consummation of the Plan and the distributions to be made pursuant to the Plan, unless otherwise allowed pursuant to a Final Order of the Title III Court, on the Effective Date, the following claims will be allowed in the following amounts:

- Assured CW/Convention Center Claims will be allowed in the amount of $151,740,605.63

- CW/HTA Claims will be allowed in the amount of $6,257,585,807.42

- CW/MBA Claim will be allowed in the amount of $30,106,786.87

---

[321] Amounts below include principal and accrued and unpaid interest up to, but not including, the Commonwealth Petition, HTA Petition Date, ERS Petition Date, or PBA Petition Date, as applicable.

- Assured CW/PRIFA Rum Tax Claims will be allowed in the amount of $19,697,537.43

3.      **Releases, Injunctions and Exculpation**

The releases, injunctions, and exculpation provided in Article LXXXIX of the Plan are integral to obtaining the value provided under the settlements in the Plan. The releases, injunctions, and exculpation under the Plan and the Plan Support Agreements constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan.

4.      **Purchase and Sale of Certain ERS Assets**[322]

On the Effective Date, the Commonwealth will purchase all of ERS's right, title, and interest in ERS's assets subject to a valid and perfected lien or security interest for an aggregate purchase price in an amount equal to the sum of $373,000,000.00, and in accordance with the terms and provisions of Section 66.2 of the Plan, (i) the Commonwealth will be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, and (ii) if the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders will have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for $70,750,000.00, plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) if the Bondholder Election is not exercised, the Commonwealth will purchase the ERS Private Equity Portfolio for $70,750,000.00.

**D.      Provisions for Payment of Administrative Expense Claims**

Administrative Expense Claims and Professional Claims are not classified and therefore are excluded from the classes outlined in Article IV of the Plan.

1.      **Administrative Expense Claims**

On either the Effective Date or the date on which an Administrative Expense Claim becomes an allowed claim, whichever date is later, the Debtors will pay in full the Administrative Expense Claim or satisfy the Allowed Administrative Expense Claim with an agreement between the Debtors and claimant. However, if the Allowed Administrative Expense Claim was incurred in the ordinary course by the Debtors before the Effective Date, the claim will be paid in full and performed by the Debtors in accordance with the terms of any agreement or documents governing the transactions. Furthermore, if any ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, the ordinary course expense will be barred and the holder of the claim will not be entitled to receive payment for the expense.

---

[322] In reaching the compromise and settlement with GO/PBA bondholders, the Oversight Board took into account the excess value of the ERS assets.

2.      **Professional Compensation and Reimbursement Claims**

All entities awarded compensation or reimbursement will be paid in full in the amount allowed by the Title III Court as soon as reasonably practicable on the later of (i) the Effective Date and (ii) the date of the Final Order from the Court allowing the claims or upon mutually agreed upon terms. However, to qualify for repayment, each professional must file an application to be compensated for the professional services rendered and expenses charged within 120 days after the Effective Date. The Debtors will compensate for professional services and reimburse expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

3.      **GO/PBA Consummation Costs**

In order to compensate certain parties for the cost of negotiation, confirmation, and consummation of the GO/PBA PSA and the Plan, each Initial GO/PBA PSA Creditor will be entitled to receive a pro rata share of cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to 1.50% of the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora, and National, including positions that it holds or has insured), without duplication. Such holder's pro rata share will be based on the holder's respective position as of 5:00pm (EST) on February 22, 2021.

4.      **AFSCME and AMPR Professional Fees**

On the Effective Date, (a) AFSCME will be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions, and (b) in the event that, on or prior to September 30, 2021, (i) AMPR notifies the Oversight Board, in writing, that the Active TRS Participants have ratified the terms set for in the term sheet annexed to the Plan as Exhibit F-2, and (ii) AMPR executes an agreement with the Oversight Board wherein AMPR agrees to, among other things, support confirmation and consummation of the Plan, AMPR will be reimbursed its reasonable professional fees and expenses incurred with respect to confirmation and consummation of such plan support agreement, including any term sheets, and the resolution of issues pertaining to pensions. The reimbursement will occur on the Effective Date and will be treated as an Allowed Administrative Expense Claim.

5.      **GO/PBA Restriction Fee**

In exchange for executing and delivering the GO/PBA PSA (or the Joinder Agreement or Annex Agreement, as applicable) and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Restriction Fee Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond (other than a Monoline-insured Go Bond or PBA Bond insured by Assured, Syncora, or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents an dapplicable law, an d(ii) Assured, Syncora, and National, to the etent Assured, Syncora, or National, as the

case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents, and applicable law) will be entitled to receive the GO/PBA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan. The GO/PBA Restriction Fee available to each GO/PBA PSA Restriction Fee Creditor will equal the GO/PBA Restriction Fee Percentage times the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Restriction Fee Creditor is authorized to vote any such Claim) held or, in the case of Assured, Syncora, or National, held or insured by such GO/PBA PSA Restriction Fee Creditor as of the Effective Date.

If a GO/PBA PSA Restriction Fee Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and, to the extent such claims are Monoline-insured, solely to the extent a GO/PBA PSA Restriction Fee Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents, and applicable law) for which it would have been entitled to receive the GO/PBA Restriction Fee, the purchasing party will be entitled to receive the GO/PBA Restriction Fee on account of such sold bonds.

If the GO/PBA PSA is terminated pursuant to Sections 7.1(b)(iii) (subject to extension, 7.1(c)(i), or 7.1(c)(ii) of the PSA or the Oversight Board terminates the GO/PBA PSA for any reason (other than (i) a breach of the GO/PBA PSA by a non-Government Party, (ii) the denial of confirmation of the Plan (or the Title III Court decides or states it will not confirm the Plan absent a modification that would have a material adverse effect on the Oversight Board and the GO/PBA PSA Creditors' ability to consummate the Plan on the terms consistent with the GO/PBA PSA) (iii) the New GO Bonds Legislation, the CVI Legislation, and the Debt Responsibility Act are not enacted prior to commencement of the Confirmation Hearing, or (iv) the entry of an order with respect to one or more matters set forth in Section 7.1(b)(ii) of the GO/PBA PSA), the aggregate GO/PBA Restriction Fees and GO/PBA Consummation Costs of $100,000,000.00 will be paid, ratably, in cash, as an allowed administrative expense claim under the plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination.

In all other circumstances, upon termination of the GO/PBA PSA, no GO/PBA Consummation Costs or GO/PBA Restriction Fees will be payable to the party to the GO/PBA PSA terminating the GO/PBA PSA.

6.      **Retail Support Fee**

If a Class of Retail Investors (Classes 6, 8, 10, 15, 28, 35, 38, and 44) votes to accept the Plan, the members of such Class will be entitled to receive their pro rata share of such Class's allocable share of the aggregate Retail Support Fee of up to $50,000,000.00 in the amount equal to: the Restriction Fee Percentage times the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication, and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents, and applicable law, held by such accepting Class of Retail investors, as the case may be, as of the date the Title III Court enters the Confirmation Order.

If the entire $50,000,000.00 of the Retail Support Fee is not fully allocated, the balance of the Retail Support Fee will be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and those Retail Investors that are members of Classes that voted to accept the Plan based upon the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication) held by such Initial GO/PBA PSA Restriction Fee Creditor and Retail Investor as of the date the Title III Court enters the Confirmation Order.

The Retail Support Fee allocated to any Class of Retail Investors that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan.

7.      **ERS Restriction Fee**

In exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee) will be entitled to receive, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims held as of April 2, 2021) of $75,000,000.00.

8.      **CCDA Consumption Costs** [323]

In order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA PSA and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, will be entitled to receive on the Effective Date, or as soon thereafter as is practicable but in no event later than 10 Business Days following the Effective Date, an amount equal to 1.00% of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than $15,000,000.00.

9.      **CCDA Restriction Fee** [324]

In exchange for executing the HTA/CCDA PSA, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA PSA, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Assured or National, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMSA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in

---

[323] The CCDA Consumption Costs are anticipated to be paid from a Puerto Rico Tourism Company account.

[324] The CCDA Restriction Fee is anticipated to be paid from a Puerto Rico Tourism Company account.

accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) will be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period.

Each CCDA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Assured or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA PSA Threshold Attainment and the entry of the Confirmation Order.

If an CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party.

In all circumstances, the sum of the aggregate PSA Restriction Fee plus the Consummation Costs attributable to a CCDA Holder's CCDA Bond Claims shall not exceed $15,000,000.00.

In the event the HTA/CCDA PSA is terminated pursuant to the terms of Section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds or Assured with respect to CCDA Bond Claims.

10.   **Non-Severability**

The allowance and payment of the GO/PBA Consummation Costs and GO/PBA PSA Restriction Fees provided in the Plan compensate the GO/PBA PSA Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied in the Plan and are not severable from the other terms and provisions set forth in the Plan.

E.      **Classification and Treatment of Claims**

| Class 1: Vintage PBA Bond Claims | *Classification:* Class 1 consists of all claims against PBA on account of Vintage PBA Bonds that are (a) <u>not</u> insured by Ambac, Assured, FGIC, National, or Syncora and (b) <u>not</u> held by a Retail Investor[325] in the aggregate amount equal to or less than $1,000,000.00. |
|---|---|

The Vintage PBA Bonds include the following:

| | Issue Date |
|---|---|
| Government Facilities Revenue Refunding Bonds, Series C | 1/30/02 |
| Government Facilities Revenue Bonds, Series D | 1/30/02 |
| Government Facilities Revenue Refunding Bonds, Series F | 10/24/02 |
| Government Facilities Revenue Bonds, Series G | 10/24/02 |
| Government Facilities Revenue Refunding Bonds, Series H | 4/03/03 |
| Government Facilities Revenue Bonds, Series I | 6/10/04 |
| Government Facilities Revenue Refunding Bonds, Series K | 5/27/04 |
| Government Facilities Revenue Bonds, Series L | 6/01/93 |
| Government Facilities Revenue Refunding Bonds, Series M-1 | 12/20/07 |
| Government Facilities Revenue Refunding Bonds, Series M-2 | 12/20/07 |
| Government Facilities Revenue Refunding Bonds, Series M-3 | 12/20/07 |
| Government Facilities Revenue Bonds, Series N | 12/20/07 |
| Government Facilities Revenue Refunding Bonds, Series P | 7/01/09 |
| Government Facilities Revenue Refunding Bonds, Series Q | 10/28/09 |

*Treatment:* On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim will receive its Pro Rata Share of the Vintage PBA Bond Recovery,[326] consisting of $611,331,186.05 in Cash.

*Voting*: Class 1 is Impaired by the Plan. Class 1 and each holder of an Allowed Vintage PBA Bond Claim are entitled to vote to accept or reject the Plan.

---

[325] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account. Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[326] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), Vintage PBA Bond Claims (Syncora), and Retail Vintage PBA Bond Claims.

|  |  |
|---|---|
|  | ***Allowed Amount of Claims***: $2,049,817,786.66[327]<br><br>***Projected Recovery from PBA***:  23.0%.<br><br>Total recovery on account of both (i) an Allowed Vintage PBA Bond Claim, and (ii) an Allowed Vintage CW Guarantee Bond Claim or an Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 80.4%. |
| **Class 2:**<br><br>Vintage PBA Bond Claims (Assured) | ***Classification:***  Class 2 consists of all claims against PBA on account of Vintage PBA Bonds, of which the payment of principal and interest has been insured by Assured, including pursuant to a secondary market insurance policy.<br><br>***Treatment:***  Subject to the terms and provisions of Section 71.1 of the Plan, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Assured) will be entitled to receive a Pro Rata Share of the Vintage PBA Bond Recovery,[328] consisting of $611,331,186.05 in Cash.<br><br>***Voting***:  Class 2 is Impaired by the Plan.  Assured is entitled to vote to accept or reject the Plan on account of Allowed Vintage PBA Bond Claims (Assured).<br><br>***Allowed Amount of Claims***: $207,035,580.89<br><br>***Projected Recovery from PBA***:  23.0%.<br><br>Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (Assured), and an Allowed Vintage CW Guarantee Bond Claim (Assured) is approximately 80.4%.<br><br>Assured notes that, because it will be honoring the Assured Insurance Policies, the projected total recovery is 100% (on account of both an Allowed Vintage PBA Bond Claim (Assured), and an Allowed Vintage CW Guarantee Bond Claim (Assured)). |
| **Class 3:**<br><br>Vintage PBA Bond Claims (National) | ***Classification:***  Class 3 consists of all claims against PBA on account of Vintage PBA Bonds, of which the payment of principal and interest has been insured by National.<br><br>***Distribution Election***:  Holders of Allowed Vintage PBA Bond Claims (National) may elect to receive in full satisfaction, release, and exchange |

---

[327] Includes Retail Vintage PBA Bond Claims.

[328] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), Vintage PBA Bond Claims (Syncora), and Retail Vintage PBA Bond Claims.

|  | of such Claim and rights under the applicable National Insurance Policy, (1) the National Commutation Treatment or (2) the National Non-Commutation Treatment. |
|--|--|
|  | **Treatment:** Subject to the terms and provisions of Section 71.2 of the Plan, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (National) will receive its Pro Rata Share of the Vintage PBA Bond Recovery,[329] consisting of $611,331,186.05 in Cash. |
|  | **Voting:** Class 3 is Impaired by the Plan. National is entitled to vote to accept or reject the Plan on account of Allowed Vintage PBA Bond Claims (National). |
|  | **Allowed Amount of Claims:** $218,888,864.87 |
|  | **Projected Recovery from PBA:** 23.0%. |
|  | Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (National), and an Allowed Vintage CW Guarantee Bond Claim (National) is approximately 80.4%. |
| **Class 4:** Vintage PBA Bond Claims (Other Insured) | **Classification:** Class 4 consists of all claims against PBA on account of Vintage PBA Bonds, of which the payment of principal and interest has been insured by Ambac or FGIC. |
|  | **Treatment:** On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Other Insured) will receive its Pro Rata Share of the Vintage PBA Bond Recovery,[330] consisting of $611,331,186.05 in Cash. |
|  | **Voting:** Class 4 is Impaired by the Plan. Class 4 and each holder of an Allowed Vintage PBA Bond Claim (Other Insured) are entitled to vote to accept or reject the Plan. |
|  | **Allowed Amount of Claims:** $166,398,746.29 |
|  | **Projected Recovery from PBA:** 23.0%. |
|  | Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (Other Insured), and an Allowed |

---

[329] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), Vintage PBA Bond Claims (Syncora), and Retail Vintage PBA Bond Claims.

[330] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), and Retail Vintage PBA Bond Claims.

| | Vintage CW Guarantee Bond Claim (Other Insured) is approximately 80.4%. |
|---|---|
| **Class 5:**<br>Vintage PBA Bond Claims (Syncora) | **Classification:** Class 5 consists of all claims against PBA on account of Vintage PBA Bonds, of which the payment of principal and interest has been insured by Syncora.<br><br>**Distribution Election**: Holders of Allowed Vintage PBA Bond Claims (Syncora) may elect to receive in full satisfaction, release, and exchange of such Claim and rights under the applicable Syncora Insurance Policy, (1) the Syncora Commutation Treatment or (2) the Syncora Non-Commutation Treatment.<br><br>**Treatment:** Subject to the terms and provisions of Section 71.3 of the Plan, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Syncora) will receive its Pro Rata Share of the Vintage PBA Bond Recovery,[331] consisting of $611,331,186.05 in Cash.<br><br>**Voting**: Class 5 is Impaired by the Plan. Syncora is entitled to vote to accept or reject the Plan on account of Allowed Vintage PBA Bond Claims (Syncora).<br><br>**Allowed Amount of Claims**: $19,098,898.35<br><br>**Projected Recovery from PBA**: 23.0%.<br><br>Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (Syncora), and an Allowed Vintage CW Guarantee Bond Claim (Syncora) is approximately 80.4%. |
| **Class 6:**<br>Retail Vintage PBA Bond Claims | **Classification:** Class 6 consists of all claims against PBA on account of Vintage PBA Bonds held by a Retail Investor[332] in the aggregate amount equal to or less than $1,000,000.00.<br><br>**Treatment:** On the Effective Date, each holder of an Allowed Retail Vintage PBA Bond Claim will receive its Pro Rata Share of (a) the |

---

[331] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), Vintage PBA Bond Claims (Syncora), and Retail Vintage PBA Bond Claims.

[332] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account. Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

| | |
|---|---|
| | Vintage PBA Bond Recovery,[333] consisting of $611,331,186.05 in Cash, and (b) the Retail Support Fee,[334] consisting of $50,000,000.00 in Cash.<br><br>If Class 6 votes to reject the Plan, holders of Retail Vintage PBA Bond Claims in Class 6 will not receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>***Voting***: Class 6 is Impaired by the Plan. Class 6 and each holder of an Allowed Retail Vintage PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: (Amount Included in Vintage PBA Bond Claims)<br><br>***Projected Recovery from PBA***: 23.0%.[335]<br><br>Total recovery on account of both (i) a Retail Vintage PBA Bond Claim, and (ii) an Allowed Vintage CW Guarantee Bond Claim or an Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 80.4%. |
| **Class 7:**<br>2011 PBA Bond Claims | ***Classification***: Class 7 consists of all claims against PBA on account of 2011 PBA Bonds that are <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2011 PBA Bonds include the following:<br><br>| | Issue Date |<br>\|---\|---\|<br>\| Government Facilities Revenue Bonds, Series R \| 8/24/11 \|<br>\| Government Facilities Revenue Bonds, Series S \| 8/24/11 \|<br>\| Government Facilities Revenue Bonds, Series T \| 12/22/11 \| |

---

[333] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), Vintage PBA Bond Claims (Syncora), and Retail Vintage PBA Bond Claims.

[334] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

[335] Does not account for Retail Support Fee.

|  | *Treatment:* On the Effective Date, each holder of an Allowed 2011 PBA Bond Claim will receive its Pro Rata Share of the 2011 PBA Bond Recovery,[336] consisting of $306,768,911.72 in Cash.<br><br>*Voting:* Class 7 is Impaired by the Plan. Class 7 and each holder of an Allowed 2011 PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: $1,335,422,892.78<br><br>*Projected Recovery from PBA*: 23.0%.<br><br>Total recovery on account of both (i) an Allowed 2011 PBA Bond Claim, and (ii) an Allowed 2011 CW Guarantee Claim or an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 79.6%. |
| **Class 8:**<br><br>Retail 2011 PBA Bond Claims | *Classification:* Class 8 consists of all claims against PBA on account of 2011 PBA Bonds held by a Retail Investor[337] in the aggregate amount equal to or less than $1,000,000.00.<br><br>*Treatment:* On the Effective Date, each holder of an Allowed Retail 2011 PBA Bond Claim will receive its Pro Rata Share of (a) the 2011 PBA Bond Recovery,[338] consisting of $306,768,911.72 in Cash, and (b) the Retail Support Fee,[339] consisting of $50,000,000.00 in Cash.<br><br>If Class 8 votes to reject the Plan, holders of Retail 2011 PBA Bond Claims in Class 8 will not receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>*Voting:* Class 8 is Impaired by the Plan. Class 8 and each holder of an Allowed Retail 2011 PBA Bond Claim are entitled to vote to accept or reject the Plan. |

---

[336] The 2011 PBA Bond Recovery is shared among the 2011 PBA Bond Claims and Retail 2011 PBA Bond Claims.

[337] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account. Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[338] The 2011 PBA Bond Recovery is shared among the 2011 PBA Bond Claims and Retail 2011 PBA Bond Claims.

[339] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | *Allowed Amount of Claims*: (Amount Included in 2011 PBA Bond Claims)<br><br>*Projected Recovery from PBA*: 23.0%.[340]<br><br>Total recovery on account of both (i) a Retail 2011 PBA Bond Claim, and (ii) an Allowed 2011 CW Guarantee Bond Claim or an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 79.6%. |
| **Class 9:**<br>2012 PBA Bond Claims | *Classification:*  Class 9 consists of all claims against PBA on account of 2012 PBA Bonds that are <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2012 PBA Bonds include the following:<br><br><table><tr><td></td><td>**Issue Date**</td></tr><tr><td>Government Facilities Revenue Refunding Bonds, Series U</td><td>6/21/12</td></tr></table><br>*Treatment:*  On the Effective Date, each holder of an Allowed 2012 PBA Bond Claim will receive its Pro Rata Share of the 2012 PBA Bond Recovery,[341] consisting of $154,899,902.23 in Cash.<br><br>*Voting*:  Class 9 is Impaired by the Plan.  Class 9 and each holder of an Allowed 2012 PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: $674,308,470.06<br><br>*Projected Recovery from PBA*:  23.0%.<br><br>Total recovery on account of both (i) an Allowed 2012 PBA Bond Claim and (ii) an Allowed 2012 CW Guarantee Claim or an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 74.8%. |
| **Class 10:**<br>Retail 2012 PBA Bond Claims | *Classification:*  Class 10 consists of all claims against PBA on account of 2012 PBA Bonds held by a Retail Investor[342] in the aggregate amount equal to or less than $1,000,000.00. |

---

[340] Does not account for Retail Support Fee.

[341] The 2012 PBA Bond Recovery is shared among the 2012 PBA Bond Claims and Retail 2012 PBA Bond Claims.

[342] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.  Does not include any holder of a

| | |
|---|---|
| | **Treatment:** On the Effective Date, each holder of an Allowed Retail 2012 PBA Bond Claim will receive its Pro Rata Share of (a) the 2012 PBA Bond Recovery,[343] consisting of $154,899,902.23 in Cash, and (b) the Retail Support Fee,[344] consisting of $50,000,000.00 in Cash.<br><br>If Class 10 votes to reject the Plan, holders of Retail 2012 PBA Bond Claims in Class 10 will not receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>**Voting:** Class 10 is Impaired by the Plan. Class 10 and each holder of an Allowed Retail 2012 PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>**Allowed Amount of Claims:** (Amount Included in 2012 PBA Bond Claims)<br><br>**Projected Recovery from PBA:** 23.0%.<br><br>Total recovery on account of both (i) a Retail 2012 PBA Bond Claim, and (ii) an Allowed 2012 CW Guarantee Bond Claim or an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 74.8%. |
| **Class 11:**<br>PBA/DRA Secured Claims | **Classification:** Class 11 consists of all claims against PBA on account of the loan allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of $66,222,028.00, the repayment of which is asserted to be secured by the proceeds of the sale or disposition of certain PBA Property and subordinated to all rights and recoveries with respect to the PBA Bonds.<br><br>**Treatment:** On the Effective Date, each holder of a PBA/DRA Secured Claims will receive payment, in cash, an amount equal to 10% of such holder's Allowed PBA/DRA Secured Claim.<br><br>**Voting:** Class 11 is Impaired by the Plan. Class 11 and the holder of the PBA/DRA Secured Claim are entitled to vote to accept or reject the Plan. |

---

GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[343] The 2012 PBA Bond Recovery is shared among the 2012 PBA Bond Claims and Retail 2012 PBA Bond Claims.

[344] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | ***Allowed Amount of Claims***: $66,222,028.00<br><br>***Projected Recovery from PBA***: 10% |
| **Class 12:**<br>PBA General Unsecured Claims | ***Classification:***  Class 12 consists of all claims against PBA that are not Vintage PBA Bond Claims, Vintage PBA Bond Claims (Assured), Vintage PBA Bond Claims (National), Vintage PBA Bond Claims (Other Insured), Vintage PBA Bond Claims (Syncora), Retail Vintage PBA Bond Claims, 2011 PBA Bond Claims, Retail 2011 PBA bond Claims, 2012 PBA Bond Claims, Retail 2012 PBA Bond Claims, PBA/DRA Secured Claims, or PBA/DRA Unsecured Claims.<br><br>PBA General Unsecured Claims include claims held by an employee of PBA related to ordinary course employment matters, including, a claim related to termination, holiday pay, vacation, sick leave, back-pay, or other similar claims, but do not include claims related to retiree benefits.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed PBA General Unsecured Claim will receive (a) payment, in cash, an amount equal to 10% of such holder's Allowed PBA General Unsecured Claim, or (b) such other treatment as may be mutually agreed to by and among such holder and Reorganized PBA.<br><br>***Voting***: Class 12 is Impaired by the Plan.  Class 12 and each holder of an Allowed PBA General Unsecured Claim are entitled to vote to accept or reject the Plan.<br><br>***Estimated Claim Amount***: $410,252,419<br><br>***Projected Recovery from PBA***: 10% |
| **Class 13:**<br>PBA/DRA Unsecured Claims | ***Classification:***  Class 13 consists of all claims against PBA on account of the subordinated loans allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of $134,357,497.00.<br><br>***Treatment:***  On the Effective Date, each holder of a PBA/DRA Unsecured Claims will receive payment, in cash, an amount equal to 10% of such holder's Allowed PBA/DRA Unsecured Claim.<br><br>***Voting***: Class 13 is Impaired by the Plan.  Class 13 and the holder of the PBA/DRA Unsecured Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $134,357,497.00<br><br>***Projected Recovery from PBA***: 10% |

| Class 14:<br><br>Vintage CW Bond Claims | **Classification:** Class 14 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are (a) <u>not</u> insured by Ambac, Assured, FGIC, National, or Syncora, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The Vintage CW Bonds include the following:<br><br><table><tr><th></th><th>Issue Date</th></tr><tr><td>Public Improvement Bonds of 1998</td><td>3/15/98</td></tr><tr><td>Public Improvement Bonds of 1999</td><td>12/01/98</td></tr><tr><td>Public Improvement Bonds of 2001, Series A</td><td>6/07/01</td></tr><tr><td>Public Improvement Bonds of 2002, Series A</td><td>10/25/01</td></tr><tr><td>Public Improvement Bonds of 2003, Series A</td><td>8/08/02</td></tr><tr><td>Public Improvement Bonds of 2004, Series A</td><td>10/16/03</td></tr><tr><td>Public Improvement Bonds of 2005, Series A</td><td>10/07/04</td></tr><tr><td>Public Improvement Bonds of 2006, Series A</td><td>8/10/06</td></tr><tr><td>Public Improvement Bonds of 2006, Series B</td><td>8/30/06</td></tr><tr><td>Public Improvement Bonds of 2007, Series A</td><td>10/04/07</td></tr><tr><td>Public Improvement Bonds of 2008, Series A</td><td>9/18/08</td></tr><tr><td>Public Improvement Refunding Bonds, Series 1998</td><td>1/29/98</td></tr><tr><td>Public Improvement Refunding Bonds, Series 1998</td><td>1/15/98</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2000</td><td>4/05/00</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2001</td><td>6/07/01</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2002A</td><td>10/25/01</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2003A</td><td>8/08/02</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2003C-7</td><td>5/06/03</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2006A</td><td>6/23/06</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2006B</td><td>8/10/06</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2007A</td><td>10/16/07</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2007A-4</td><td>10/16/07</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2008A</td><td>5/07/08</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2008C</td><td>5/07/08</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2009A</td><td>9/17/09</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2009B</td><td>11/17/09</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2009C</td><td>12/16/09</td></tr><tr><td>Public Improvement Refunding Bonds, Series 2011A</td><td>2/17/11</td></tr><tr><td>Notas de Ahorro savings notes issued prior to 2011 in the aggregate outstanding principal amount of $242,650.00 by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico</td><td></td></tr></table><br>**Treatment:** On the Effective Date, each holder of an Allowed Vintage CW Bond Claim will receive its Pro Rata Share of the Vintage CW Bond |

|  | Recovery,[345] consisting of $1,940,413,572.68 in Cash, $2,336,226,830.00 in New GO CIBs, $154,683,070.25 in New GO 5.375% CABs, $100,758,182.95 in New GO 5.0% CABs, and 32.244% of the GO CVIs. |
|---|---|
|  | **Taxable Election:** Each holder of an Allowed Vintage CW Bond Claim that is a Puerto Rico Investor[346] may elect to have its Allowed Vintage CW Bond Claim treated as a Vintage CW Bond Claim (Taxable Election) in Class 20 and have its distribution modified by the Vintage Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes.  Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |
|  | **Voting:** Class 14 is Impaired by the Plan.  Class 14 and each holder of an Allowed Vintage CW Bond Claim are entitled to vote to accept or reject the Plan. |
|  | **Allowed Amount of Claims:** $3,495,194,571.99 |
|  | **Projected Fixed Recovery from CW – Taxable Election:** 77.6% |
|  | **Projected Fixed Recovery from CW – No Taxable Election:** 77.6% |
| **Class 15:** Retail Vintage CW Bond Claims | **Classification:** Class 15 consists of all claims against the Commonwealth on account of Vintage CW Bonds held by a Retail Investor[347] in the aggregate amount equal to or less than $1,000,000.00. |
|  | **Treatment:** On the Effective Date, each holder of an Allowed Retail Vintage CW Bond Claim will receive its Pro Rata Share of (a) the |

---

[345] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), Vintage CW Bond Claims (Syncora), and Retail Vintage CW Bond Claims.

[346] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).  Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[347] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.  Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

<table>
<tr><td></td><td>

Vintage CW Bond Recovery,[348] consisting of $1,940,413,572.68 in Cash, $2,336,226,830.00 in New GO CIBs, $154,683,070.25 in New GO 5.375% CABs, $100,758,182.95 in New GO 5.0% CABs, and 32.244% of the GO CVIs, and (b) the Retail Support Fee,[349] consisting of $50,000,000.00 in Cash.

If Class 15 votes to reject the Plan, holders of Retail Vintage CW Bond Claims in Class 15 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.

*Taxable Election*:  Each holder of an Allowed Retail Vintage CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail Vintage CW Bond Claim treated as a Vintage CW Bond Claim (Taxable Election) in Class 20 and have its distribution modified by the Vintage Taxable Bond Distribution.   As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

*Voting*: Class 15 is Impaired by the Plan.  Class 15 and each holder of an Allowed Retail Vintage CW Bond Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: (Amount Included in Vintage CW Bond Claims)

*Projected Fixed Recovery from CW*: 77.6%

</td></tr>
<tr><td>

**Class 16:**

Vintage CW Bond Claims (Assured)

</td><td>

*Classification:*  Class 16 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are insured by Assured, including pursuant to a secondary market insurance policy.

*Treatment:*  Subject to the terms and provisions of Section 72.1 of the Plan, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Assured) will receive its Pro Rata Share of the Vintage CW

</td></tr>
</table>

---

[348] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), Vintage CW Bond Claims (Syncora), and Retail Vintage CW Bond Claims.

[349] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | Bond Recovery,[350] consisting of $1,940,413,572.68 in Cash, $2,336,226,830.00 in New GO CIBs, $154,683,070.25 in New GO 5.375% CABs, $100,758,182.95 in New GO 5.0% CABs, and 32.244% of the GO CVIs.<br><br>***Voting***: Class 16 is Impaired by the Plan. Assured is entitled to vote to accept or reject the Plan on account of Allowed Vintage CW Bond Claims (Assured).<br><br>***Allowed Amount of Claims***: $1,129,725,670.51<br><br>***Projected Fixed Recovery from CW:*** 77.6%<br><br>***Projected Total Recovery***: Assured notes that, because it will be honoring the Assured Insurance Policies, the projected total recovery is 100%. |
| **Class 17:**<br><br>Vintage CW Bond Claims (National) | ***Classification:*** Class 17 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are insured by National.<br><br>***Distribution Election***: Holders of Allowed Vintage CW Bond Claims (National) may elect to receive in full satisfaction, release, and exchange of such Claim and rights under the applicable National Insurance Policy, (1) the National Commutation Treatment or (2) the National Non-Commutation Treatment.<br><br>***Treatment:*** Subject to the terms and provisions of Section 72.2 of the Plan, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (National) will receive its Pro Rata Share of the Vintage CW Bond Recovery,[351] consisting of $1,940,413,572.68 in Cash, $2,336,226,830.00 in New GO CIBs, $154,683,070.25 in New GO 5.375% CABs, $100,758,182.95 in New GO 5.0% CABs, and 32.244% of the GO CVIs.<br><br>***Voting***: Class 17 is Impaired by the Plan. National is entitled to vote to accept or reject the Plan on account of Allowed Vintage CW Bond Claims (National). |

---

[350] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), Vintage CW Bond Claims (Syncora), and Retail Vintage CW Bond Claims.

[351] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), Vintage CW Bond Claims (Syncora), and Retail Vintage CW Bond Claims.

|  | *Allowed Amount of Claims*: $897,708,496.22 |
|  | *Projected Fixed Recovery from CW:* 77.6% |
| **Class 18:** Vintage CW Bond Claims (Other Insured) | *Classification:*  Class 18 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are insured by Ambac or FGIC. |
|  | *Treatment:*  Subject to the terms and provisions  of Sections 72.4 and 72.5 of the Plan, on the Effective Date, each holder  of an Allowed Vintage CW Bond Claim (Other Insured) will  receive its Pro Rata Share of the Vintage CW Bond Recovery,[352] consisting  of $1,940,413,572.68 in Cash, $2,336,226,830.00  in New GO CIBs, $154,683,070.25  in New GO 5.375%  CABs, $100,758,182.95  in New GO 5.0% CABs, and 32.244%  of the GO CVIs. |
|  | *Voting*:  Class 18 is Impaired by the Plan.  Class 18 and each holder of an Allowed Vintage CW Bond Claim (Other Insured) are entitled  to vote to accept or reject the Plan. |
|  | *Allowed Amount of Claims*: $293,269,428.20 |
|  | *Projected Fixed Recovery from CW:* 77.6% |
| **Class 19:** Vintage CW Bond Claims (Syncora) | *Classification:*  Class 19 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are insured by Syncora. |
|  | *Distribution Election*:  Holders of Allowed Vintage CW Bond Claims (Syncora) may elect to receive in full  satisfaction, release, and exchange of such Claim and rights under the applicable  Syncora Insurance Policy, (1) the Syncora Commutation  Treatment or (2) the Syncora Non-Commutation  Treatment. |
|  | *Treatment:*  Subject to the terms and provisions  of Section 72.3 of the Plan, on the Effective Date, each holder of an Allowed  Vintage CW Bond Claim (Syncora) will receive its Pro Rata Share of the Vintage CW Bond Recovery,[353] consisting  of $1,940,413,572.68  in Cash, $2,336,226,830.00  in New GO CIBs, $154,683,070.25  in New GO |

---

[352] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), Vintage CW Bond Claims (Syncora), and Retail Vintage CW Bond Claims.

[353] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (Other Insured), Vintage CW Bond Claims (Syncora), and Retail Vintage CW Bond Claims.

| | |
|---|---|
| | 5.375% CABs, $100,758,182.95 in New GO 5.0% CABs, and 32.244% of the GO CVIs.<br><br>***Voting***: Class 19 is Impaired by the Plan. Syncora is entitled to vote to accept or reject the Plan on account of Allowed Vintage CW Bond Claims (Syncora).<br><br>***Allowed Amount of Claims***: $27,354,745.97<br><br>***Projected Fixed Recovery from CW:*** 77.6% |
| **Class 20:**<br>Vintage CW Bond Claims (Taxable Election) | ***Classification:*** Class 20 consists of all claims against the Commonwealth by a holder of an Allowed Vintage CW Bond Claim or an Allowed Retail Vintage CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such Vintage CW Bond Claim or Retail Vintage CW Bond Claim will be a Vintage CW Bond Claim (Taxable Election) up to such Vintage CW Bond Claim's or Retail Vintage CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a Vintage CW Bond Claim or Retail Vintage CW Bond Claim (as applicable).<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the Vintage Taxable Bond Distribution.<br><br>***Voting***: Class 20 is Impaired by the Plan. However, holders of Claims in Class 20 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: The amount of Claims in Class 20 entitled to a distribution depends upon how many holders of Vintage CW Bond Claims in Classes 14 and 15 elect to be treated under Class 20.<br><br>***Projected Fixed Recovery from CW***: 77.6% |
| **Class 21:**<br>Vintage CW Guarantee Bond Claims | ***Classification:*** Class 21 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds, including, any obligation for which the Commonwealth has pledged its good faith, and credit as authorized by the Legislature on or prior to December 31, 2012 (but not including any Vintage CW Guarantee Bond Claim (Assured), Vintage CW Guarantee |

| | Bond Claim (National), Vintage CW Guarantee Bond Claim (Other Insured), and Vintage CW Guarantee Bond Claim (Syncora)). |
|---|---|
| | **Treatment:** On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim will receive its Pro Rata Share of the Vintage CW Guarantee Bond Recovery,[354] consisting of $653,782,173.81 in Cash, $787,143,256.00 in New GO CIBs, $52,117,257.50 in New GO 5.375% CABs, $33,948,383.17 in New GO 5.0% CABs, and 15.194% of the GO CVIs. |
| | **Taxable Election**: Each holder of an Allowed Vintage CW Guarantee Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Vintage CW Guarantee Bond Claim treated as a Vintage CW Guarantee Bond Claim (Taxable Election) in Class 26 and have its distribution modified by the Vintage Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |
| | **Voting**: Class 21 is Impaired by the Plan. Class 21 and each holder of an Allowed Vintage CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan. |
| | **Allowed Amount of Claims**: $1,578,940,452.56 |
| | **Projected Fixed Recovery from CW**: 74.5%. Total recovery on account of both an Allowed Vintage PBA Bond Claim and an Allowed Vintage CW Guarantee Bond Claim is approximately 80.4%. |
| **Class 22:** Vintage CW Guarantee Bond Claims (Assured) | **Classification:** Class 22 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds that are insured by Assured, including pursuant to a secondary market insurance policy. |
| | **Treatment:** Subject to the terms and provisions of Section 72.1 of the Plan, on the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Assured) will receive its Pro Rata Share of the |

---

[354] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Claims, Vintage CW Guarantee Bond Claims (Assured), Vintage CW Guarantee Bond Claims (National), Vintage CW Guarantee Bond Claims (Other Insured), and Vintage CW Guarantee Bond Claims (Syncora).

|  | Vintage CW Guarantee Bond Recovery,[355] consisting of $653,782,173.81 in Cash, $787,143,256.00 in New GO CIBs, $52,117,257.50 in New GO 5.375% CABs, $33,948,383.17 in New GO 5.0% CABs, and 15.194% of the GO CVIs.<br><br>***Voting***: Class 22 is Impaired by the Plan. Assured is entitled to vote to accept or reject the Plan on account of Allowed Vintage CW Guarantee Bond Claims (Assured).<br><br>***Allowed Amount of Claims***: $159,476,054.86<br><br>***Projected Fixed Recovery from CW***: 74.5%.<br><br>Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (Assured) and an Allowed Vintage CW Guarantee Bond Claim (Assured) is approximately 80.4%.<br><br>Assured notes that, because it will be honoring the Assured Insurance Policies, the projected total recovery is 100% (on account of both an Allowed Vintage PBA Bond Claim (Assured), and an Allowed Vintage CW Guarantee Bond Claim (Assured)). |
|---|---|
| **Class 23:**<br>Vintage CW Guarantee Bond Claims (National) | ***Classification:*** Class 23 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds that are insured by National.<br><br>***Treatment:*** Subject to the terms and provisions of Section 72.2 of the Plan, on the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (National) will receive its Pro Rata Share of the Vintage CW Guarantee Bond Recovery,[356] consisting of $653,782,173.81 in Cash, $787,143,256.00 in New GO CIBs, $52,117,257.50 in New GO 5.375% CABs, $33,948,383.17 in New GO 5.0% CABs, and 15.194% of the GO CVIs.<br><br>***Distribution Election***: Holders of Allowed Vintage CW Guarantee Bond Claims (National) may elect to receive in full satisfaction, release, and exchange of such Claim and rights under the applicable National Insurance Policy, (1) the National Commutation Treatment or (2) the National Non-Commutation Treatment. |

---

[355] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Claims, Vintage CW Guarantee Bond Claims (Assured), Vintage CW Guarantee Bond Claims (National), Vintage CW Guarantee Bond Claims (Other Insured), and Vintage CW Guarantee Bond Claims (Syncora).

[356] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Claims, Vintage CW Guarantee Bond Claims (Assured), Vintage CW Guarantee Bond Claims (National), Vintage CW Guarantee Bond Claims (Other Insured), and Vintage CW Guarantee Bond Claims (Syncora).

| | |
|---|---|
| | ***Voting***: Class 23 is Impaired by the Plan. National is entitled to vote to accept or reject the Plan on account of Allowed Vintage CW Guarantee Bond Claims (National).<br><br>***Allowed Amount of Claims***: $168,606,441.80<br><br>***Projected Fixed Recovery from CW***: 74.5%.<br><br>Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (National) and an Allowed Vintage CW Guarantee Bond Claim (National) is approximately 80.4%. |
| **Class 24:**<br>Vintage CW Guarantee Bond Claims (Other Insured) | ***Classification:***  Class 24 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds that are insured by Ambac or FGIC.<br><br>***Treatment:***  Subject to the terms and provisions of Sections 72.4 and 72.5 of the Plan, on the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Other Insured) will receive its Pro Rata Share of the Vintage CW Guarantee Bond Recovery,[357] consisting of $653,782,173.81 in Cash, $787,143,256.00 in New GO CIBs, $52,117,257.50 in New GO 5.375% CABs, $33,948,383.17 in New GO 5.0% CABs, and 15.194% of the GO CVIs.<br><br>***Voting***: Class 24 is Impaired by the Plan. Class 24 and each holder of an Allowed Vintage CW Guarantee Bond Claim (Other Insured) are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $128,174,178.94<br><br>***Projected Fixed Recovery from CW:*** 74.5%.<br><br>Total recovery on account of both an Allowed Vintage PBA Bond Claim (Other Insured) and an Allowed Vintage CW Guarantee Bond Claim (Other Insured) is approximately 80.4%. |
| **Class 25:**<br>Vintage CW Guarantee Bond Claims (Syncora) | ***Classification:***  Class 25 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds that are insured by Syncora.<br><br>***Distribution Election***: Holders of Allowed Vintage CW Guarantee Bond Claims (Syncora) may elect to receive in full satisfaction, release, and exchange of such Claim and rights under the applicable Syncora |

---

[357] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Vintage CW Guarantee Bond Claims (Assured), Vintage CW Guarantee Bond Claims (National), Vintage CW Guarantee Bond Claims (Other Insured), and Vintage CW Guarantee Bond Claims (Syncora).

| | |
|---|---|
| | Insurance Policy, (1) the Syncora Commutation Treatment or (2) the Syncora Non-Commutation Treatment.<br><br>**Treatment:** Subject to the terms and provisions of Section 72.3 of the Plan, on the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Syncora) will receive its Pro Rata Share of the Vintage CW Guarantee Bond Recovery,[358] consisting of $653,782,173.81 in Cash, $787,143,256.00 in New GO CIBs, $52,117,257.50 in New GO 5.375% CABs, $33,948,383.17 in New GO 5.0% CABs, and 15.194% of the GO CVIs.<br><br>**Voting:** Class 25 is Impaired by the Plan. Syncora is entitled to vote to accept or reject the Plan on account of Allowed Vintage CW Guarantee Bond Claims (Syncora).<br><br>**Allowed Amount of Claims:** $14,711,562.85<br><br>**Projected Fixed Recovery from CW:** 74.5%.<br><br>Total recovery from the Commonwealth and PBA on account of both an Allowed Vintage PBA Bond Claim (Syncora) and an Allowed Vintage CW Guarantee Bond Claim (Syncora) is approximately 80.4%. |
| **Class 26:**<br>Vintage CW Guarantee Bond Claims (Taxable Election) | **Classification:** Class 26 consists of all claims against the Commonwealth by a holder of an Allowed Vintage CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such Vintage CW Guarantee Bond Claim will be a Vintage CW Guarantee Bond Claim (Taxable Election) up to such Vintage CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a Vintage CW Guarantee Bond Claim.<br><br>**Treatment:** On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the Vintage Taxable Bond Distribution. |

---

[358] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Claims, Vintage CW Guarantee Bond Claims (Assured), Vintage CW Guarantee Bond Claims (National), Vintage CW Guarantee Bond Claims (Other Insured), and Vintage CW Guarantee Bond Claims (Syncora).

| | |
|---|---|
| | **Voting**: Class 26 is Impaired by the Plan. However, holders of Claims in Class 26 elected to be treated in such Class and, therefore, are deemed to accept the Plan.

**Allowed Amount of Claims**: The amount of Claims in Class 26 entitled to a distribution depends upon how many holders of Vintage CW Guarantee Bond Claims in Class 21 elect to be treated under Class 26.

**Projected Fixed Recovery from CW**: 74.5%.

Total recovery on account of both an Allowed Vintage PBA Bond Claim and an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) is approximately 80.4%. |
| **Class 27:**<br><br>2011 CW Bond Claims | **Classification:** Class 27 consists of all claims against the Commonwealth on account of 2011 CW Bonds that are (a) <u>not</u> insured by Assured, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.

The 2011 CW Bonds include the following:

| | Issue Date |
|---|---|
| Public Improvement Refunding Bonds, Series 2011C | 3/17/11 |
| Notas de Ahorro savings notes issued in 2011 in the aggregate outstanding principal amount of $53,800.00 by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico | |

**Treatment:** On the Effective Date, each holder of an Allowed 2011 CW Bond Claim will receive its Pro Rata Share of the 2011 CW Bond Recovery,[359] consisting of $148,833,730.95 in Cash, $179,193,425.00 in New GO CIBs, $11,864,510.95 in New GO 5.375% CABs, $7,728,360.35 in New GO 5.0% CABs, and 2.479% of the GO CVIs.

**Taxable Election**: Each holder of an Allowed 2011 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2011 CW Bond Claim treated as a 2011 CW Bond Claim (Taxable Election) in Class 30 and have its distribution modified by the 2011 Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |

---

[359] The 2011 CW Bond Recovery is shared among the 2011 CW Bond Claims, 2011 CW Bond Claims (Assured), and Retail 2011 CW Bond Claims.

| | |
|---|---|
| | ***Voting***: Class 27 is Impaired by the Plan. Class 27 and each holder of an Allowed 2011 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $250,580,732.35<br><br>***Projected Fixed Recovery from CW – Taxable Election:*** 73.0%<br><br>***Projected Fixed Recovery from CW – No Taxable Election***: 73.0% |
| **Class 28:**<br>Retail 2011 CW Bond Claims | ***Classification:*** Class 28 consists of all claims against the Commonwealth on account of 2011 CW Bonds held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed Retail 2011 CW Bond Claim will receive its Pro Rata Share of (a) the 2011 CW Bond Recovery,[360] consisting of $148,833,730.95 in Cash, $179,193,425.00 in New GO CIBs, $11,864,510.95 in New GO 5.375% CABs, $7,728,360.35 in New GO 5.0% CABs, and 2.479% of the GO CVIs, and (b) the Retail Support Fee,[361] consisting of $50,000,000.00 in Cash.<br><br>If Class 28 votes to reject the Plan, holders of Retail 2011 CW Bond Claims in Class 28 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>***Taxable Election***: Each holder of an Allowed Retail 2011 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2011 CW Bond Claim treated as a 2011 CW Bond Claim (Taxable Election) in Class 30 and have its distribution modified by the 2011 Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |

---

[360] The 2011 CW Bond Recovery is shared among the 2011 CW Bond Claims, 2011 CW Bond Claims (Assured), and Retail 2011 CW Bond Claims.

[361] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW Bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | ***Voting***: Class 28 is Impaired by the Plan. Class 28 and each holder of an Allowed Retail 2011 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: (Amount Included in 2011 CW Bond Claims)<br><br>***Projected Fixed Recovery from CW – Taxable Election:*** 73.0%<br><br>***Projected Fixed Recovery from CW – No Taxable Election***: 73.0% |
| **Class 29:**<br>2011 CW Bond Claims (Assured) | ***Classification:*** Class 29 consists of all claims against the Commonwealth on account of 2011 CW Bonds that are insured by Assured.<br><br>***Treatment:*** Subject to the terms and provisions of Section 72.1 of the Plan, on the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Assured) will receive its Pro Rata Share of the 2011 CW Bond Recovery,[362] consisting of $148,833,730.95 in Cash, $179,193,425.00 in New GO CIBs, $11,864,510.95 in New GO 5.375% CABs, $7,728,360.35 in New GO 5.0% CABs, and 2.479% of the GO CVIs.<br><br>***Voting***: Class 29 is Impaired by the Plan. Assured is entitled to vote to accept or reject the Plan on account of Allowed 2011 CW Bond Claims (Assured).<br><br>***Allowed Amount of Claims***: $225,917,592.71<br><br>***Projected Fixed Recovery from CW:*** 73.0%<br><br>***Projected Total Recovery***: Assured notes that, because it will be honoring the Assured Insurance Policies, the projected total recovery is 100%. |
| **Class 30:**<br>2011 CW Bond Claims (Taxable Election) | ***Classification:*** Class 30 consists of all claims against the Commonwealth by a holder of an Allowed 2011 CW Bond Claim or an Allowed Retail 2011 CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2011 CW Bond Claim or Retail 2011 CW Bond Claim will be a 2011 CW Bond Claim (Taxable |

---

[362] The 2011 CW Bond Recovery is shared among the 2011 CW Bond Claims, 2011 CW Bond Claims (Assured), and Retail 2011 CW Bond Claims.

| | |
|---|---|
| | Election) up to such 2011 CW Bond Claim's or Retail 2011 CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2011 CW Bond Claim or Retail 2011 CW Bond Claim, as applicable.<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2011 Taxable Bond Distribution.<br><br>***Voting:*** Class 30 is Impaired by the Plan. However, holders of Claims in Class 30 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims:*** The amount of Claims in Class 30 entitled to a distribution depends upon how many holders of 2011 CW Bond Claims in Class 27 and Retail 2011 CW Bond Claims in Class 28 elect to be treated under Class 30.<br><br>***Projected Fixed Recovery from CW:*** 73.0% |
| **Class 31:**<br>2011 CW Guarantee Bond Claims | ***Classification:*** Class 31 consists of all claims against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2011 up to and including December 31, 2011, and (b) the 2011 PBA Bonds.<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim will receive its Pro Rata Share of the 2011 CW Guarantee Bond Recovery, consisting of $323,523,902.50 in Cash, $389,517,592.00 in New GO CIBs, $25,790,208.46 in New GO 5.375% CABs, $16,799,346.77 in New GO 5.0% CABs, and 7.552% of the GO CVIs.<br><br>***Taxable Election:*** Each holder of an Allowed 2011 CW Guarantee Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2011 CW Guarantee Bond Claim treated as a 2011 CW Guarantee Bond Claim (Taxable Election) in Class 32 and have its distribution modified by the 2011 CW Guarantee Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |

| | |
|---|---|
| | *Voting*:  Class 31 is Impaired by the Plan.  Class 31 and each holder of an Allowed 2011 CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: $1,028,653,981.06<br><br>*Projected Fixed Recovery from CW*: 73.5%.<br><br>Total recovery on account of both an Allowed 2011 PBA Bond Claim and an Allowed 2011 CW Guarantee Claim is approximately 79.6%. |
| **Class 32:**<br>2011 CW Guarantee Bond Claims (Taxable Election) | *Classification:*  Class 32 consists of all claims against the Commonwealth by a holder of an Allowed 2011 CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2011 CW Guarantee Bond Claim will be a 2011 CW Guarantee Bond Claim (Taxable Election) up to such 2011 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2011 CW Guarantee Bond Claim.<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2011 CW Guarantee Taxable Bond Distribution.<br><br>*Voting*:  Class 32 is Impaired by the Plan.  However, holders of Claims in Class 32 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>*Allowed Amount of Claims*: The amount of Claims in Class 32 entitled to a distribution depends upon how many holders of 2011 CW Guarantee Bond Claims in Class 31 elect to be treated under Class 32.<br><br>*Projected Fixed Recovery from CW*: 73.5%.<br><br>Total recovery on account of both an Allowed 2011 PBA Bond Claim and an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) is approximately 79.6%. |
| **Class 33:**<br>2011 CW Series D/E/PIB Bond Claims | *Classification:*  Class 33 consists of all claims against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds that are (a) not insured by Assured, and (b) not held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00. |

The 2011 CW Series D/E/PIB Bonds include the following:

| | Issue Date |
|---|---|
| Public Improvement Bonds of 2011 | 7/12/11 |
| Public Improvement Refunding Bonds, Series 2011D | 7/12/11 |
| Public Improvement Refunding Bonds, Series 2011E | 7/12/11 |

**Treatment:** On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim will receive its Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery,[363] consisting of $211,355,035.74 in Cash, $254,468,074.00 in New GO CIBs, $16,848,493.84 in New GO 5.375% CABs, $10,974,850.30 in New GO 5.0% CABs, and 3.514% of the GO CVIs.

**Taxable Election:** Each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2011 CW D/E/PIB Bond Claim treated as a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) in Class 36 and have its distribution modified by the 2011 CW Series D/E/PIB Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

**Voting:** Class 33 is Impaired by the Plan. Class 33 and each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim are entitled to vote to accept or reject the Plan.

**Allowed Amount of Claims:** $634,719,627.45

**Projected Fixed Recovery from CW – Taxable Election:** 76.5%

**Projected Fixed Recovery from CW – No Taxable Election:** 76.5%

| | |
|---|---|
| **Class 34:**<br><br>2011 CW Series D/E/PIB Bond Claims (Assured) | **Classification:** Class 34 consists of all claims against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds that are insured by Assured.<br><br>**Treatment:** Subject to the terms and provisions of Section 72.1 of the Plan, on the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Assured) will receive its Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery, consisting of $211,355,035.74 in Cash, $254,468,074.00 in New GO CIBs, $16,848,493.84 in New GO |

---

[363] The 2011 CW Series D/E/PIB Bond Recovery is shared among the 2011 Series D/E/PIB Bond Claims, 2011 CW Series D/E/PIB Bond Claims (Assured), and Retail 2011 CW Series D/E/PIB Bond Claims.

|  | 5.375% CABs, $10,974,850.30 in New GO 5.0% CABs, and 3.514% of the GO CVIs.<br><br>***Voting***: Class 34 is Impaired by the Plan.  Assured is entitled to vote to accept or reject the Plan on account of Allowed 2011 CW Series D/E/PIB Bond Claims (Assured).<br><br>***Allowed Amount of Claims***: $10,953,484.03<br><br>***Projected Fixed Recovery from CW:*** 76.5%<br><br>***Projected Total Recovery***: Assured notes that, because it will be honoring the Assured Insurance Policies, the projected total recovery is 100%. |
|---|---|
| **Class 35:**<br><br>Retail 2011 CW Series D/E/PIB Bond Claims | ***Classification:***  Class 35 consists of all claims against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim will receive its Pro Rata Share of (a) the 2011 CW Series D/E/PIB Bond Recovery,[364] consisting of $211,355,035.74 in Cash, $254,468,074.00 in New GO CIBs, $16,848,493.84 in New GO 5.375% CABs, $10,974,850.30 in New GO 5.0% CABs, and 3.514% of the GO CVIs and (b) the Retail Support Fee,[365] consisting of $50,000,000.00 in Cash.<br><br>If Class 35 votes to reject the Plan, holders of Retail 2011 CW Series D/E/PIB Bond Claims in Class 35 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>***Taxable Election***:  Each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2011 CW Series D/E/PIB Bond Claim treated as a 2011 CW Series D/E/PIB Bonds Claim (Taxable Election) in Class 36 and have its distribution modified by the 2011 CW Series D/E/PIB Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject |

---

[364] The 2011 CW Series D/E/PIB Bond Recovery is shared among the 2011 Series D/E/PIB Bond Claims, 2011 CW Series D/E/PIB Bond Claims (Assured), and Retail 2011 CW Series D/E/PIB Bond Claims.

[365] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>*Voting*: Class 35 is Impaired by the Plan. Class 35 and each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: (Amount Included in 2011 CW Series D/E/PIB Bond Claims)<br><br>*Projected Fixed Recovery from CW – Taxable Election:* 76.5%<br><br>*Projected Fixed Recovery from CW – No Taxable Election*: 76.5% |
| **Class 36:**<br><br>2011 CW Series D/E/PIB Bond Claims (Taxable Election) | *Classification:* Class 36 consists of all claims against the Commonwealth by a holder of an Allowed 2011 CW Series D/E/PIB Bond Claim or an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[366]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2011 CW Series D/E/PIB Bond Claim or Retail 2011 CW Series D/E/PIB Bond Claim will be a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) up to such 2011 CW Series D/E/PIB Bond Claim's or Retail 2011 CW Series D/E/PIB Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2011 CW Bond Claim or Retail 2011 CW Bond Claim (as applicable).<br><br>*Treatment:* On the Effective Date, each holder of an Allowed 2011 CW Bond Series D/E/PIB Claim (Taxable Election) will receive its Pro Rata Share of the 2011 CW Series D/E/PIB Taxable Bond Distribution.<br><br>*Voting*: Class 36 is Impaired by the Plan. However, holders of Claims in Class 36 elected to be treated in such Class and, therefore, are deemed to accept the Plan. |

---

[366] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

|  | |
|---|---|
|  | ***Allowed Amount of Claims***: The amount of Claims in Class 36 entitled to a distribution depends upon how many holders of 2011 CW Series D/E/PIB Bond Claims in Class 33 and Retail 2011 CW Series D/E/PIB Bond Claims in Class 35 elect to be treated under Class 36.<br><br>***Projected Fixed Recovery from CW***: 76.5% |
| **Class 37:**<br>2012 CW Bond Claims | ***Classification:*** Class 37 consists of all claims against the Commonwealth on account of 2012 CW Bonds that are (a) <u>not</u> insured by Assured, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2012 CW Bonds include the following:<br><br>**[table below]**<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed 2012 CW Bond Claim will receive its Pro Rata Share of the 2012 CW Bond Recovery,[367] consisting of $909,912,679.73 in Cash, $1,095,520,277.00 in New GO CIBs, $72,535,096.96 in New GO 5.375% CABs, $47,248,251.00 in New GO 5.0% CABs, and 15.157% of the GO CVIs.<br><br>***Taxable Election***: Each holder of an Allowed 2012 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2012 Bond Claim treated as a 2012 CW Bond Claim (Taxable Election) in Class 40 and have its distribution modified by the 2012 CW Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the |

|  | Issue Date |
|---|---|
| Public Improvement Refunding Bonds, Series 2012A | 4/03/12 |
| Public Improvement Refunding Bonds, Series 2012B | 3/29/12 |
| The loan extended pursuant to that certain Credit Agreement, dated as of December 26, 2013, between the General Services Administration of the Commonwealth and Scotiabank de Puerto Rico, which, as of the Commonwealth Petition Date, was in the aggregate outstanding principal amount of approximately $23,764,607.00 |  |
| Hacienda loans (Loan ID Nos. 200017-215-001-003-53 and 200017-215-001-003-56), which, as of the Commonwealth Petition Date, were in the aggregate outstanding principal amount of $169,438,037.76 |  |
| Notas de Ahorro savings notes issued in 2012 in the aggregate outstanding principal amount of $2,533,050.00 by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico |  |

[367] The 2012 CW Bond Recovery is shared among the 2012 CW Bond Claims, 2012 CW Bond Claims (Assured), and Retail 2012 CW Bond Claims.

| | Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***: Class 37 is Impaired by the Plan.  Class 37 and each holder of an Allowed 2012 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $2,540,851,157.04<br><br>***Projected Fixed Recovery from CW – Taxable Election:*** 72.4%<br><br>***Projected Fixed Recovery from CW – No Taxable Election***: 72.4% |
|---|---|
| **Class 38:**<br><br>Retail 2012 CW Bond Claims | ***Classification:***  Class 38 consists of all claims against the Commonwealth on account of 2012 CW Bonds held by a Retail Investor[368] in the aggregate amount equal to or less than $1,000,000.00.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed Retail 2012 CW Bond Claim will receive its Pro Rata Share of (a) the 2012 CW Bond Recovery,[369] consisting of $909,912,679.73 in Cash, $1,095,520,277.00 in New GO CIBs, $72,535,096.96 in New GO 5.375% CABs, $47,248,251.00 in New GO 5.0% CABs, and 15.157% of the GO CVIs, and (b) the Retail Support Fee,[370] consisting of $50,000,000.00 in Cash.<br><br>If Class 38 votes to reject the Plan, holders of Retail 2012 CW Bond Claim in Class 38 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>***Taxable Election***:  Each holder of an Allowed Retail 2012 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2012 Bond Claim treated as a 2012 CW Bond Claim (Taxable Election) in Class 40 and have its distribution modified by the 2012 CW Taxable Bond Distribution.   As a general matter, residents of Puerto Rico are not |

---

[368] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.  Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[369] The 2012 CW Bond Recovery is shared among the 2012 CW Bond Claims, 2012 CW Bond Claims (Assured), and Retail 2012 CW Bond Claims.

[370] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW Bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |
| --- | --- |
| | *Voting*: Class 38 is Impaired by the Plan. Class 38 and each holder of an Allowed Retail 2012 CW Bond Claim are entitled to vote to accept or reject the Plan. |
| | *Allowed Amount of Claims*: (Amount Included in 2012 CW Bond Claims) |
| | *Projected Fixed Recovery from CW – Taxable Election:* 72.4% |
| | *Projected Fixed Recovery from CW – No Taxable Election*: 72.4% |
| **Class 39:**<br><br>2012 CW Bond Claims (Assured) | *Classification:* Class 39 consists of all claims against the Commonwealth on account of 2012 CW Bonds that are insured by Assured, including pursuant to a secondary market insurance policy.<br><br>*Treatment:* Subject to the terms and provisions of Section 72.1 of the Plan, on the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Assured) will receive its Pro Rata Share of the 2012 CW Bond Recovery,[371] consisting of $909,912,679.73 in Cash, $1,095,520,277.00 in New GO CIBs, $72,535,096.96 in New GO 5.375% CABs, $47,248,251.00 in New GO 5.0% CABs, and 15.157% of the GO CVIs.<br><br>*Voting*: Class 39 is Impaired by the Plan. Assured is entitled to vote to accept or reject the Plan on account of Allowed 2012 CW Bond Claims (Assured).<br><br>*Allowed Amount of Claims*: $393,576,302.36<br><br>*Projected Fixed Recovery from CW:* 72.4%<br><br>*Projected Total Recovery*: Assured notes that, because it will be honoring the Assured Insurance Policies, the projected total recovery is 100%. |
| **Class 40:** | *Classification:* Class 40 consists of all claims against the Commonwealth by a holder of an Allowed 2012 CW Bond Claim or an Allowed Retail 2012 CW Bond Claim that elects, deemed or otherwise, |

---

[371] The 2012 CW Bond Recovery is shared among the 2012 CW Bond Claims, 2012 CW Bond Claims (Assured), and Retail 2012 CW Bond Claims.

| | |
|---|---|
| 2012 CW Bond Claims (Taxable Election) | to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[372]

If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2012 CW Bond Claim or Retail 2012 CW Bond Claim will be a 2012 CW Bond Claim (Taxable Election) up to such 2012 CW Bond Claim's or Retail 2012 CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2012 CW Bond Claim or Retail 2012 CW Bond Claim (as applicable).

*Treatment:* On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2012 Taxable Bond Distribution.

*Voting*: Class 40 is Impaired by the Plan. However, holders of Claims in Class 40 elected to be treated in such Class and, therefore, are deemed to accept the Plan.

*Allowed Amount of Claims*: The amount of Claims in Class 40 entitled to a distribution depends upon how many holders of 2012 CW Bond Claims in Class 37 and Retail 2012 CW Bond Claims in Class 38 elect to be treated under Class 40.

*Projected Fixed Recovery from CW*: 72.4% |
| **Class 41:** 2012 CW Guarantee Bond Claims | *Classification:* Class 41 consists of all claims against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered, or enacted pursuant to legislation or resolution between January 1, 2012 to and including December 31, 2013, and (b) 2012 PBA Bonds (but not including any 2012 CW Guarantee Bond Claim (Assured)).

*Treatment:* On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim will receive its Pro Rata Share the 2012 CW Guarantee Bond Recovery, consisting of $149,700,027.24 in Cash, $180,236,434.00 in New GO CIBs, $11,933,569.54 in New GO 5.375% |

---

[372] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

| | |
|---|---|
| | CABs, $7,773,344.30 New GO 5.0% CABs, and 3.594% of the GO CVIs.<br><br>***Taxable Election***: Each holder of an Allowed 2012 CW Guarantee Bond Claim that is a Puerto Rico Investor[373] may elect to have its Allowed 2012 CW Guarantee Bond Claim treated as a 2012 CW Guarantee Bond Claim (Taxable Election) in Class 42 and have its distribution modified by the 2012 CW Guarantee Taxable Bond Distribution.   As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***: Class 41 is Impaired by the Plan. Class 41 and each holder of an Allowed 2012 CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $519,408,567.83<br><br>***Projected Fixed Recovery from CW***: 67.3%.<br><br>Total recovery on account of both an Allowed 2012 PBA Bond Claim and an Allowed 2012 CW Guarantee Claim is approximately 74.8%. |
| **Class 42:**<br><br>2012 CW Guarantee Bond Claims (Taxable Election) | ***Classification:*** Class 42 consists of all claims against the Commonwealth by a holder of an Allowed 2012 CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[374]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2012 CW Guarantee Bond Claim will be a 2012 CW Guarantee Bond Claim (Taxable Election) up to such 2012 CW Guarantee Bond Claim's ratable share of |

---

[373] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[374] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

the Maximum Taxable Bond Election Amount, and the remainder will be a 2012 CW Guarantee Bond Claim.

*Treatment:* On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2012 Taxable Bond Distribution.

*Voting*: Class 42 is Impaired by the Plan. However, holders of Claims in Class 42 elected to be treated in such Class and, therefore, are deemed to accept the Plan.

*Allowed Amount of Claims*: The amount of Claims in Class 42 entitled to a distribution depends upon how many holders of 2012 CW Guarantee Bond Claims in Class 41 elect to be treated under Class 42.

*Projected Fixed Recovery from CW*: 67.3%.

Total recovery on account of both an Allowed 2012 PBA Bond Claim and an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) is approximately 74.8%.

| **Class 43:**<br>2014 CW Bond Claims | *Classification:* Class 43 consists of all claims against the Commonwealth on account of 2014 CW Bonds that are <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00. |
|---|---|

The 2014 CW Bonds include the following:

| | Issue Date |
|---|---|
| General Obligation Bonds of 2014, Series A | 3/17/14 |

*Treatment:* On the Effective Date, each holder of an Allowed 2014 CW Bond Claim will receive its Pro Rata Share of the 2014 CW Bond Recovery,[375] consisting of $1,213,478,877.35 in Cash, $1,461,009,112.00 in New GO CIBs, $96,734,346.00 in New GO 5.375% CABs, $63,011,270.91 in New GO 5.0% CABs, and 20.266% of the GO CVIs.

*Taxable Election*: Each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2014 Bond Claim treated as a 2014 CW Bond Claim (Taxable Election) in Class 45 and have its distribution modified by the 2014 CW Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal

---

[375] The 2014 CW Bond Recovery is shared among the 2014 CW Bond Claims, Retail 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims.

|  | income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

*Voting*: Class 43 is Impaired by the Plan. Class 43 and each holder of an Allowed 2014 CW Bond Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: $3,836,611,111.11[376]

*Projected Fixed Recovery from CW – Taxable Election:* 67.8%

*Projected Fixed Recovery from CW – No Taxable Election*: 67.8% |
|---|---|
| **Class 44:**<br>Retail 2014 CW Bond Claims | *Classification:* Class 44 consists of all claims against the Commonwealth on account of 2014 CW Bonds held by a Retail Investor[377] in the aggregate amount equal to or less than $1,000,000.00.

*Treatment:* On the Effective Date, each holder of an Allowed Retail 2014 CW Bond Claim will receive its Pro Rata Share of (a) the 2014 CW Bond Recovery,[378] consisting of $1,213,478,877.35 in Cash, $1,461,009,112.00 in New GO CIBs, $96,734,346.00 in New GO 5.375% CABs, $63,011,270.91 in New GO 5.0% CABs, and 20.266% of the GO CVIs, and (b) the Retail Support Fee,[379] consisting of $50,000,000.00 in Cash.

If Class 44 votes to reject the Plan, holders of Retail 2014 CW Bond Claim in Class 44 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.

*Taxable Election*: Each holder of an Allowed Retail 2014 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail |

---

[376] Includes Retail 2014 CW Bond Claims.

[377] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account. Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[378] The 2014 CW Bond Recovery is shared among the 2014 CW Bond Claims, Retail 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims.

[379] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | 2014 Bond Claim treated as a 2014 CW Bond Claim (Taxable Election) in Class 45 and have its distribution modified by the 2014 CW Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>*Voting*: Class 44 is Impaired by the Plan. Class 44 and each holder of an Allowed Retail 2014 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Projected Fixed Recovery from CW – Taxable Election:*** *67.8%*<br><br>***Projected Fixed Recovery from CW – No Taxable Election***: *67.8%* |
| **Class 45:**<br><br>2014 CW Bond Claims (Taxable Election) | ***Classification:*** Class 45 consists of all claims against the Commonwealth by a holder of an Allowed 2014 CW Bond Claim or an Allowed Retail 2014 CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[380]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2014 CW Bond Claim or Retail 2014 CW Bond Claim will be a 2014 CW Bond Claim (Taxable Election) up to such 2014 CW Bond Claim's or Retail 2014 CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2014 CW Bond Claim or Retail 2014 CW Bond Claim (as applicable).<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed 2014 CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2014 Taxable Bond Distribution.<br><br>*Voting*: Class 45 is Impaired by the Plan. However, holders of Claims in Class 45 elected to be treated in such Class and, therefore, are deemed to accept the Plan. |

---

[380] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

|  | *Allowed Amount of Claims*: The amount of Claims in Class 45 entitled to a distribution depends upon how many holders of 2014 CW Bond Claims in Class 43 and Retail 2014 CW Bond Claims in Class 44 elect to be treated under Class 45.<br><br>*Projected Fixed Recovery from CW*: 67.8% |
|---|---|
| **Class 46:**<br><br>2014 CW Guarantee Bond Claims | *Classification:* Class 46 consists of all claims against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Commonwealth Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered, or enacted pursuant to legislation or resolution between January 1, 2014 to but not including the Commonwealth Petition Date, (b) the Ports of the Americas Authority bond, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of $225,533,700.45, and (c) PRIFA Bond Anticipation Notes, Series 2015, which, as of the Commonwealth Petition Date, were in the outstanding principal amount of $78,145,000.00.<br><br>*Treatment:* On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim will receive its Pro Rata Share of the 2014 CW Bond Recovery,[381] consisting of $1,213,478,877.35 in Cash, $1,461,009,112.00 in New GO CIBs, $96,734,346.00 in New GO 5.375% CABs, $63,011,270.91 in New GO 5.0% CABs, and 20.266% of the GO CVIs.<br><br>*Taxable Election*: Each holder of an Allowed 2014 CW Guarantee Bond Claim that is a Puerto Rico Investor[382] may elect to have its Allowed 2014 CW Guarantee Bond Claim treated as a 2014 CW Guarantee Bond Claim (Taxable Election) in Class 47 and have its distribution modified by the 2014 CW Guarantee Taxable Bond Distribution.   As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |

---

[381] The 2014 CW Bond Recovery is shared among the 2014 CW Bond Claims, Retail 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims.

[382] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

| | |
|---|---|
| | ***Voting***:  Class 46 is Impaired by the Plan.  Class 46 and each holder of an Allowed 2014 CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $346,242,219.86<br><br>***Projected Fixed Recovery from CW***:  67.8% |
| **Class 47:**<br>2014 CW Guarantee Bond Claims (Taxable Election) | ***Classification:***  Class 47 consists of all claims against the Commonwealth by a holder of an Allowed 2014 CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[383]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2014 CW Guarantee Bond Claim will be a 2014 CW Guarantee Bond Claim (Taxable Election) up to such 2014 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2014 CW Guarantee Bond Claim.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2014 Taxable Bond Distribution.<br><br>***Voting***:  Class 47 is Impaired by the Plan.  However, holders of Claims in Class 47 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: The amount of Claims in Class 47 entitled to a distribution depends upon how many holders of 2014 CW Guarantee Bond Claims in Class 46 elect to be treated under Class 47.<br><br>***Projected Fixed Recovery from CW***:  67.8% |
| **Class 48A:**[384] | ***Classification:***  Class 48A consists of:<br><br>All claims against ERS on account of being or having been a participant in ERS for retiree benefits that accrued through the date of |

---

[383] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion). Does not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Assured, National, or Syncora.

[384] On March 3, 2020, the UCC filed a 3013 motion for entry of an order reclassifying Class 48A (Retiree Claims) (later split into Class 48A–Class 48F) and Class 55 (CW General Unsecured Claims) claims under the then-proposed

| | |
|---|---|
| Retired ERS Participant Below-Threshold Claims | implementation of Act 106 held by a person who, as reflected in the records of ERS, does not benefit from Law 127-1958[385] and either:<br><br>(a) as of April 1, 2021, receives a pension or annuity as a participant or a beneficiary of a participant in ERS, such that the Total Monthly Benefit as of April 1, 2021 is less than or equal to $1,500, or<br><br>(b) Left public service under Law 70-2010 or Law 211-2015 and is entitled to a future annuity payable from ERS, with the future pension or annuity being such that the Total Monthly Benefit at the participant's retirement date is less than or equal to $1,500.<br><br>***Treatment:***<br><br>Adjustment of Benefits. Each holder of an Allowed Retired ERS Participant Below-Threshold Claim will receive, beginning on the Benefit Reduction Date (as defined below),[386] monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below.<br><br>Benefits Earned Before May 4, 2017: All accrued pension benefits earned by participants before May 4, 2017 are treated as follows:<br><br>The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Claimants in class 48A will therefore not receive any cut.<br><br>Benefits Earned On or After May 4, 2017: Accrued pension benefits earned by participants on and after May 4, 2017 will not be reduced.<br><br>Benefits which accrued after January 1, 2013 pursuant to Act 3-2013 for Active ERS Participants hired prior to January 1, 2000 will include the full accumulated contribution value with interest up to, but not including, the Commonwealth Petition Date. |

---

plan of adjustment (the "3013 Motion") [ECF No. 11989]. In the 3013 Motion, the UCC argued the classification scheme in the amended plan cannot be approved under controlling First Circuit precedent requiring a "strict approach" to plan classification. Following briefing on the 3013 Motion, on April 23, 2020, the Title III Court issued an order denying the motion [ECF No. 12952].

[385] High-risk death and disability benefits

[386] The Benefit Reduction Date is the later to occur of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

| | |
|---|---|
| | ***Preemption:*** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Below-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA. |
| | ***Voting:*** Class 48A is Unimpaired by the Plan. Class 48A and each holder of a Retired ERS Participant Below-Threshold Claim is deemed to accept the Plan. |
| | ***Average Total Monthly Benefit:*** [387]  $749 |
| | ***Projected Recovery from CW:*** [388]  100% |
| **Class 48B:**<br><br>Retired JRS Participant Below-Threshold Claims | ***Classification:*** Class 48B consists of:<br><br>All claims against JRS on account of being or having been a participant in JRS for (i) pension benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in JRS form and after the Effective Date, held by a person who, as reflected in the records of JRS, as of April 1, 2021, receives a pension or annuity as a participant or a beneficiary of a participant in JRS such that the Total Monthly Benefit as of April 1, 2021 is less than or equal to $1,500.<br><br>***Treatment:***<br><br>Adjustment of Benefits. Each holder of an Allowed Retired JRS Participant Below-Threshold Claim will receive, beginning on the Benefit Reduction Date (as defined below),[389] monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below. |

---

[387] Estimated claim for Classes 48A through 48L, with the exception of Class 48J, is based for each respective class on Monthly Total Retirement Benefit, which represents the sum of the monthly pension benefit currently in payment or payable in the future based on employment through May 4, 2017 plus the monthly equivalent of any Summer, Christmas or Medicine Bonuses for those eligible. Therefore, the claim estimates do not include the impact of the freeze of the JRS and TRS pension systems or the elimination of any COLAs under the Plan.

[388] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

[389] The Benefit Reduction Date is the later to occur of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

| | |
|---|---|
| | *Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows: <br><br> The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Therefore, although members of Class 48B are below $1,500.00 and are not subject to any benefit reductions, they are still impaired on account of elimination of future COLAs. <br><br> *Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants on and after May 4, 2017 will <u>not</u> be reduced. <br><br> ***Preemption:*** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Below-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA. <br><br> ***Voting***: Class 48B is Impaired by the Plan. Class 48B and each holder of an Allowed Retired JRS Participant Below-Threshold Claims are entitled to vote to accept or reject the Plan. <br><br> ***Average Total Monthly Benefit***: $1,158 <br><br> ***Projected Recovery from CW***:[390]  100% |
| **Class 48C:** <br><br> Retired TRS Participant Below-Threshold Claims | ***Classification:*** Class 48C consists of: <br><br> All claims against TRS on account of being or having been a participant in TRS for (i) pension benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in TRS from and after the Effective Date, held by a person who, as reflected in the records of TRS as of April 1, 2021, receives a pension or annuity as a participant or a beneficiary of a participant in TRS such that the Total Monthly Benefit as of April 1, 2021 is less than or equal to $1,500. <br><br> ***Treatment:*** |

---

[390] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

| | |
|---|---|
| | <u>Adjustment of Benefits</u>. Each holder of an Allowed Retired TRS Participant Below-Threshold Claim will receive, beginning on the Benefit Reduction Date (as defined below),[391] monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below.<br><br>*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 are treated as follows:<br><br>The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Claimants in class 48C will therefore not receive any cut.<br><br>*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants on and after May 4, 2017 will <u>not</u> be reduced.<br><br>***Preemption:*** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Below-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>***Voting***: Class 48C is Unimpaired by the Plan. Class 48C and each holder of a Retired TRS Participant Below-Threshold Claim is deemed to accept the Plan.<br><br>***Average Total Monthly Benefit***: $988<br><br>***Projected Recovery from CW:***[392]  100% |
| **Class 48D:**<br><br>Retired ERS Participant Above-Threshold Claims | ***Classification:***  Class 48D consists of:<br><br>All claims against ERS on account of being or having been a participant in ERS for retiree benefits that accrued through the date of |

---

[391] The Benefit Reduction Date is the later to occur of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

[392] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

implementation of Act 106 held by a person who, as reflected in the records of ERS, and either

(a) is in receipt of an annuity defined payable under the terms of Law 127-1958[393],

(b) as of April 1, 2021, receives a pension or annuity as a participant or a beneficiary of a participant in ERS, such that the Total Monthly Benefit as of April 1, 2021 is greater than $1,500, or

(c) Left public service under Law 70-2010 or Law 211-2015 and is entitled to a future annuity payable from ERS, with the future pension or annuity being such that the Total Monthly Benefit at the participant's retirement date is greater than $1,500.00.

*Treatment:*

Adjustment of Benefits. Each holder of an Allowed Retired ERS Participant Above-Threshold Claim will receive, beginning on the Benefit Reduction Date (as defined below),[394] monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below.

*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts and threshold will not be indexed for any reason in the future (e.g. Cost of Living Adjustments ("COLAs")), except for Pension Benefit Restoration provisions.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

(a) 8.5% of the Total Monthly Benefit has been reduced; or

---

[393] High-risk death and disability benefits

[394] The Benefit Reduction Date is the later to occur of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

(b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

(a) <u>Reduction of Christmas Bonus</u>: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) <u>Reduction of Summer Bonus</u>: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) <u>Reduction of Medicine Bonus</u>: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) <u>Reduction of Base Pension</u>: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants on and after May 4, 2017 will <u>not</u> be reduced.

Benefits which accrued after January 1, 2013 pursuant to Act 3-2013 for Active ERS Participants hired prior to January 1, 2000 will include the full accumulated contribution value with interest up to, but not including, the Commonwealth Petition Date.

<u>Benefit Restoration</u>. During the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. However, such Benefit Restoration will be capped at the

<table>
<tr><td></td><td>

Monthly Benefit Reduction <u>times</u> twelve (12) for each such participant for a particular Fiscal Year.

***Preemption:*** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Above-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA.

***Voting***: Class 48D is Impaired by the Plan. Class 48D and each holder of an Allowed Retired ERS Participant Above-Threshold Claim are entitled to vote to accept or reject the Plan.

***Average Total Monthly Benefit***: $2,286

***Projected Recovery from CW***:[395]  92.5%

</td></tr>
<tr><td>

**Class 48E:**

Retired JRS Participant Above-Threshold Claims

</td><td>

***Classification:*** Class 48E consists of:

All claims against JRS on account of being or having been a participant in JRS for (i) pension benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in JRS from and after the Effective Date, held by a person who, as reflected in the records of JRS, as of April 1, 2021, receives a pension or annuity as a participant or a beneficiary of a participant in JRS such that the Total Monthly Benefit as of April 1, 2021 is greater than $1,500.

***Treatment:***

<u>Adjustment of Benefits</u>. Each holder of an Allowed Retired JRS Participant Above-Threshold Claim will receive, beginning on the Benefit Reduction Date (as defined below),[396] monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below.

***Benefits Earned Before May 4, 2017***: All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:

</td></tr>
</table>

---

[395] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

[396] The Benefit Reduction Date is the later to occur of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts will not be indexed for any reason in the future (e.g. Cost of Living Adjustments ("COLAs")), except for Pension Benefit Restoration provisions.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

(a) 8.5% of the Total Monthly Benefit has been reduced; or

(b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

(a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) Reduction of Summer Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) Reduction of Base Pension: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants on and after May 4, 2017 will not be reduced.

|  | Benefit Restoration. During the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. However, such Benefit Restoration will be capped at the Monthly Benefit Reduction times twelve (12) for each such participant for a particular Fiscal Year.

*Preemption:* All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Above-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA.

*Voting*: Class 48E is Impaired by the Plan. Class 48E and each holder of an Allowed Retired JRS Participant Above-Threshold Claim are entitled to vote to accept or reject the Plan.

*Average Total Monthly Benefit*: $5,124

*Projected Recovery from CW*:[397] 91.5% |
|---|---|
| **Class 48F:**<br><br>Retired TRS Participant Above-Threshold Claims | *Classification:* Class 48F consists of:<br><br>All claims against TRS on account of being or having been a participant in TRS for (i) pension benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in TRS from and after the Effective Date, held by a person who, as reflected in the records of TRS as of April 1, 2021, receives a pension or annuity as a participant or a beneficiary of a participant in TRS such that the Total Monthly Benefit as of April 1, 2021 is greater than $1,500.<br><br>*Treatment:*<br><br>Adjustment of Benefits. Each holder of an Allowed Retired TRS Participant Above-Threshold Claim will receive, beginning on the |

---

[397] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

Benefit Reduction Date (as defined below),[398] monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below.

*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts will not be indexed for any reason in the future, except for Pension Benefit Restoration provisions.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

    (a) 8.5% of the Total Monthly Benefit has been reduced; or

    (b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

    (a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

    (b) Reduction of Summer Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

    (c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

---

[398] The Benefit Reduction Date is the later to occur of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

(d) <u>Reduction of Base Pension</u>:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants on and after May 4, 2017 will <u>not</u> be reduced.

<u>Benefit Restoration</u>.  During the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year.  However, such Benefit Restoration will be capped at the Monthly Benefit Reduction <u>times</u> twelve (12) for each such participant for a particular Fiscal Year.

*Preemption:*  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Above-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA.

*Voting*:  Class 48F is Impaired by the Plan.  Class 48F and each holder of an Allowed Retired TRS Participant Above-Threshold Claim are entitled to vote to accept or reject the Plan.

*Average Total Monthly Benefit*:  $2,074

*Projected Recovery from CW*[399]  91.9%

| | |
|---|---|
| **Class 48G:**<br>Active ERS Participant Claims | *Classification:*  Class 48G consists of all claims against ERS by employees hired before January 1, 2000 on account of being or having been a participant in ERS for retiree benefits that accrued through the |

---

[399] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

date of implementation of Act 106, held by a person who, as reflected in the records of ERS as of April 1, 2021,

    (a) does <u>not</u> receive a pension or annuity as a participant in ERS,

    (b) has not left the Government Service with benefits under Act 70-2010 or Act 211-2015, and

    (c) is not a participant, whose hire date was on or after January 1, 2000, based on participation in System 2000.

***Treatment:***

<u>Adjustment of Benefits</u>. Each holder of an Allowed Active ERS Participant Claim will receive, beginning on the later to occur of the Benefit Reduction Date[400] or the first payment of retirement benefits after such holder's pension commencement date, monthly payments as modified detailed below.

*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 under Act 1 and Act 477 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts will not be indexed for any reason in the future (e.g. Cost of Living Adjustments ("COLAs")), except for Pension Benefit Restoration provisions.

The Total Monthly Benefit will be reduced until the lesser of the following (the "<u>Maximum Reduction</u>"):

    (a) 8.5% of the Total Monthly Benefit has been reduced; or

    (b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

    (a) <u>Reduction of Christmas Bonus</u>: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the

---

[400] The Benefit Reduction Date is the later of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

Maximum Reduction or the Monthly Christmas Bonus has been
eliminated;

(b) Reduction of Summer Bonus: If the reduction of the Total
Monthly Benefit has not reached the Maximum Reduction, second, the
Monthly Summer Bonus will be reduced until the Total Monthly
Benefit reaches the Maximum Reduction, or the Monthly Summer
Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total
Monthly Benefit has not reached the Maximum Reduction, third, the
Monthly Medicine Bonus will be reduced until the Total Monthly
Benefit reaches the Maximum Reduction, or the Monthly Medicine
Bonus has been eliminated;

(d) Reduction of Base Pension: If the reduction of the Total Monthly
Benefit has not reached the Maximum Reduction, fourth, the Monthly
Base Pension will be reduced until the Total Monthly Benefit reaches
the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit
will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Accrued pension benefits
earned by participants from and after May 4, 2017 will not be reduced.

*Exemption from cut formula:* The portion of the calculated pension
related to annuitized Law 3 contributions plus interest accrued at the rate
provided therefor by Puerto Rico law on such contributions through May
3, 2017 will be exempt from the benefit reduction formula. Allowed
Active ERS Participant Claims who have already retired and converted
their contributions to a system paid annuity are not eligible for the
treatment described in this class, but will be subject to the pension
reduction applicable to other Participants in accordance with Class 48A
or Class 48D as applicable.

*Interest on accrued benefits under Law 3 through retirement:*
Participants with contributions under Law 3 and accrued benefits under
Law 1 or ERS Law 447 in Class 48G who are actively employed will receive
a one time contribution of $2,600 to their Act 106 Defined Contribution
account to approximate the lost interest accrual on the accrued benefit at
the Petition Date from the Plan Effective Date through retirement.

Benefit Restoration. During the period from the Benefit Reduction Date
up to and including the conclusion of Fiscal Year 2033, if in a particular
Fiscal Year, the Excess Cash Surplus is equal to or greater than One
Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of

| | |
|---|---|
| | such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. However, such Benefit Restoration will be capped at the Monthly Benefit Reduction <u>times</u> twelve (12) for each such participant for a particular Fiscal Year. <br><br> *Preemption:* All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Active ERS Participant Claims in the Plan, are preempted as inconsistent with PROMESA. <br><br> *Voting*: Class 48G is Impaired by the Plan. Class 48G and each holder of an Allowed Active ERS Participant Claim are entitled to vote to accept or reject the Plan. <br><br> *Average Total Monthly Benefit*: $717 <br><br> *Projected Recovery*:[401] 99.7% |
| **Class 48H:** <br><br> Active JRS Participant Claims | *Classification:* Class 48H consists of all claims against JRS on account of being or having been a participant in JRS for (i) retiree benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in JRS from and after the Effective Date, held by a person who, as reflected in the records of JRS as of April 1, 2021, does <u>not</u> receive a pension or annuity as a participant in JRS. <br><br> *Treatment:* <br><br> <u>Adjustment of Benefits</u>. Each holder of an Allowed Active JRS Participant Claim will receive, beginning on the later to occur of the Benefit Reduction Date,[402] or the first payment of pension benefits after such holder's pension commencement date, monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and further detailed below. |

---

[401] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

[402] The Benefit Reduction Date is the later of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts will not be indexed for any reason in the future (e.g. Cost of Living Adjustments ("COLAs")), except for Pension Benefit Restoration provisions.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

   (a) 8.5% of the Total Monthly Benefit has been reduced; or

   (b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

   (a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

   (b) Reduction of Summer Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

   (c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

   (d) Reduction of Base Pension: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

436

*Benefits Earned On or After May 4, 2017*: Additional benefits for service on or after May 4, 2017 will be frozen as of the Effective Date so such participant is no longer able to accrue pension benefits after such date.

Future pension benefits will be calculated using service and pay accrued through the Effective Date of the Plan.

Additional Modifications.  The calculation of retirement benefits that commence on or after the Effective Date will reflect futher modifications as described in the Plan, including limitations on service transfer, defining the accrued benefit for those not vested at the freeze, COLA elimination, DC and Social Security benefits, and benefit eligibility / definition for different cohorts based on age and service.

Employee contributions to the plan will be replaced with 8.5% of pay contributions to Act 106 Defined Contribution individual segregated accounts. Employees who are either under 45 as of the Effective Date of the Plan or are hired after the Effective Date of the Plan will have their Act 106 Defined Contribution reduced to 2.3%, with the remaining 6.2% being used to pay the employee FICA tax for participation in US Social Secuity. In addition, employees over the age of 45 as of the Effective Date of the Plan will be given a one-time opportunity to elect to similarly reduce their Act 106 Defined Contribution and contribute towards US Social Security. The Retirement Board shall implement appropriate administrative procedures to protect plan participants from unintentionally losing eligibility for Social Security by deferring compensation in excess of levels defined in U.S. Treasury Regulations (*See* U.S. Treas. Reg. 31.3121(b)(7)-2(e)).

Benefit Restoration.  During the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. However, such Benefit Restoration will be capped at the Monthly Benefit Reduction times twelve (12) for each such participant for a particular Fiscal Year.

*Preemption:* All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the

| | |
|---|---|
| | extent inconsistent with the treatment of Allowed Active JRS Participant Claims in the Plan, are preempted as inconsistent with PROMESA. |
| | *Voting*: Class 48H is Impaired by the Plan. Class 48H and each holder of an Allowed Active JRS Participant Claim are entitled to vote to accept or reject the Plan. |
| | *Average Total Monthly Benefit*: $3,139 |
| | *Projected Recovery*:[403] 94.5% |
| **Class 48I:** Active TRS Participant Claims | *Classification:* Class 48I consists of all claims against TRS on account of being or having been a participant in TRS for (i) retiree benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in TRS from and after the Effective Date, held by a person who, as reflected in the records of TRS as of April 1, 2021, does <u>not</u> receive a pension or annuity as a participant in TRS. |
| | *Treatment:* |
| | <u>Adjustment of Benefits</u>. Each holder of an Allowed Active TRS Participant Claim will receive, beginning on the later to occur of the Benefit Reduction Date,[404] or the first payment of pension benefits after such holder's pension commencement date, monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and detailed below. |
| | *Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows: |
| | The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts will not be indexed for any reason in the future, exccept for Pension Benefit Restoration provisions. |

---

[403] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

[404] The Benefit Reduction Date is the later of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

(a) 8.5% of the Total Monthly Benefit has been reduced; or

(b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

(a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) Reduction of Summer Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) Reduction of Base Pension: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Additional benefits for service on or after May 4, 2017 will be frozen as of the Effective Date so that participants are no longer able to accrue pension benefits after such date. Future pension benefits will be calculated using service and pay accrued through the Effective Date of the plan.

Additional Modifications. The calculation of retirement benefits that commence on or after the Effective Date will reflect futher modifications as described in the Plan, including limitations on service transfer, DC and Social Security benefits, and benefit eligibility / definition for different cohorts based on age and service

Employee contributions to the plan will be replaced with 8.5% of pay contributions to Act 106 Defined Contribution individual segregated accounts. Employees who are either under 45 as of the Effective Date of the Plan or are hired after the Effective Date of the Plan will have their Act 106 Defined Contribution reduced to 2.3%, with the remaining 6.2% being used to pay the employee FICA tax for participation in US Social Secuity. In addition, employees over the age of 45 as of the Effective Date of the Plan will be given a one time opportunity to elect to similarly reduce their Act 106 Defined Contribution and contribute towards US Social Security. The Board shall implement appropriate administrative procedures to protect plan participants from unintentionally losing eligibility for Social Security by deferring compensation in excess of levels defined in U.S. Treasury regulations  (*See* U.S. Treas. Reg. 31.3121(b)(7)-2(e)).

Benefit Restoration. During the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. However, such Benefit Restoration will be capped at the Monthly Benefit Reduction times twelve (12) for each such participant for a particular Fiscal Year.

*Preemption:* All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Active TRS Participant Claims in the Plan, are preempted as inconsistent with PROMESA.

*Voting*: Class 48I is Impaired by the Plan. Class 48I and each holder of an Allowed Active TRS Participant Claim are entitled to vote to accept or reject the Plan.

***Average Total Monthly Benefit***: $843

***Projected Recovery:***[405] 99.5%

---

[405] Recovery represents the average percent remaining of the Monthly Total Retirement Benefit after application of the 8.5% pension reduction to benefits over a threshold of $1,500.

| Class 48J:<br><br>System 2000<br>Participant Claims | **Classification:** Class 48J consists of claims by holders of accrued benefits under System 2000 or Act 3, whose hire date was on or after January 1, 2000, who have not already withdrawn or retired and converted their contributions to a system paid annuity as reflected in the records of ERS, as of April 1, 2021.<br><br>**Treatment:**<br><br>Holders of Allowed System 2000 Participant Claims will receive the amount of their contributions to these plans from 2000 through June 30, 2017, plus interest accrued at the rate provided therefor by Puerto Rico law on such contributions through May 3, 2017. Such amount will be deposited into the defined contribution accounts established under Act 106-2017 and invested by default into a target date life-cycle fund.<br><br>If the total amount of contributions to these plans plus interest on such contributions through the Petition Date is less than or equal to $1,500,000,000.00, on the Effective Date, each holder of an Allowed System 2000 Participant Claim will receive such holder's Pro Rata share of such aggregate amount.<br><br>If the total amount of contributions plus interest accrued through the Petition Date exceeds $1,500,000,000.00, the Oversight Board and AFSCME will develop a payment plan mutually acceptable to both parties to pay out the remaining balance of the contributions in excess of $1,500,000,000.00. In all events, the full amount of contributions will be paid to all holders of Allowed System 2000 Participant Claims not later than December 31, 2025.<br><br>As of the Effective Date, holders of Allowed System 2000 Participant Claims with System 2000 contributions from 2000 through June 30, 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability benefits paid or administered by the retirement system (including Act 127 benefits).<br><br>Allowed System 2000 Participant Claims who have already retired and converted their contributions to a system paid annuity as of the Effective Date are not eligible for the treatment described in this class and will not receive a cash payment, but will be subject to the pension reduction applicable to other Participants in accordance with Class 48A or Class 48D as applicable.<br><br>**Preemption:** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce |
|---|---|

| | |
|---|---|
| | employee pension and other benefits that are modified and/or preserved in whole or in part by the Plan, to the extent inconsistent with the treatment of Allowed System 2000 Participant Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>*Voting*: Class 48J is Unimpaired by the Plan. Class 48J and each holder of an Allowed System 2000 Participant Claim is deemed to accept the Plan.<br><br>*Estimated Allowed Amount of Claims*: $1,172,728,743<br><br>*Projected Recovery*: 100% |
| **Class 48K:**<br><br>VTP Payroll Participant Below-Threshold Claims | *Classification:* Class 48K consists of all claims against Commonwealth employers by employees on account of being or having been a participant in ERS for retiree benefits that accrued through the date of implementation of Act 106, held by a person who, as reflected in the records of ERS and OMB based on data used to set the FY 22 budget, left the Government Service with benefits under Act 70-2010, or Act 211-2015 and receives payments from the Acts through Commonwealth Payroll in an amount that does not exceed $1,500 per month.<br><br>This treatment also applies to any future payment of retirement or early termination benefits payable participants in the ERS, TRS, or JRS retirement system.<br><br>*Treatment:*<br><br>Adjustment of Benefits. Each holder of an Allowed VTP Payroll Participant Below-Threshold Claim will receive, beginning on the later to occur of the Benefit Reduction Date[406] or the first payment of benefits under the Acts from payroll, monthly payments as modified by the Monthly Benefit Modification set forth in the Plan and further detailed below.<br><br>*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 under Act 70-2010 and Act 211-2015 will be subject to reduction as follows:<br><br>The Total Monthly Benefit (which includes the Monthly Base Benefit from Act 70-2010 or Act 211-2015 paid through payroll, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any |

---

[406] The Benefit Reduction Date is the later of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

| | |
|---|---|
| | participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Claimants in class 48K will therefore not receive any cut.<br><br>*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants from and after May 4, 2017 will not be reduced.<br><br>**Preemption:** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Below-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>**Voting**: Class 48K is Unimpaired by the Plan. Class 48K and each holder of an Allowed VTP Payroll Participant Below-Threshold Claim is is deemed to accept the Plan.<br><br>**Allowed Amount of Claims**: [____]<br><br>**Projected Recovery**: [____] |
| **Class 48L:**<br><br>VTP Payroll Participant Above-Threshold Claims | **Classification:** Class 48K consists of all claims against Commonwealth employers by employees on account of being or having been a participant in ERS for retiree benefits that accrued through the date of implementation of Act 106, held by a person who, as reflected in the records of ERS and OGP based on data used to set the FY 22 budget, left the Government Service with benefits under Act 70-2010, or Act 211-2015 and receives payments from the Acts through Commonwealth Payroll in an amount exceeding $1,500 per month.<br><br>This treatment also applies to any future payment of retirement or early termination benefits payable participants in the ERS, TRS, or JRS retirement system.<br><br>**Treatment:**<br><br>Adjustment of Benefits. Each holder of an Allowed VTP Payroll Participant Above-Threshold Claim will receive, beginning on the later to occur of the Benefit Reduction Date[407] or the first payment of benefits under the Acts from payroll, monthly payments as modified by the |

---

[407] The Benefit Reduction Date is the later of (a) July 1, 2021, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

Monthly Benefit Modification set forth in the Plan and further detailed below.

*Benefits Earned Before May 4, 2017*: All accrued pension benefits earned by participants before May 4, 2017 under Act 70-2010 and Act 211-2015 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Benefit from Act 70-2010 or Act 211-2015 paid through payroll, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,500.00 per month and any participant receiving $1,500.00 or less per month will not be affected. The minimum benefit threshold will remain at $1,500.00. Accrued pension amounts will not be indexed for any reason in the future, except for Benefit Restoration provisions.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

(a) 8.5% of the Total Monthly Benefit has been reduced; or

(b) the Total Monthly Benefit has reached $1,500.00 per month.

The Total Monthly Benefit will be reduced in the following order:

(a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) Reduction of Summer Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) Reduction of Base Benefit from Act 70-2010 or Act 211-2015 paid through payroll: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Benefit from Act 70-2010 or Act 211-2015 paid through payroll will be

444

| | |
|---|---|
| | reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants from and after May 4, 2017 will not be reduced.

Benefit Restoration. During the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. However, such Benefit Restoration will be capped at the Monthly Benefit Reduction times twelve (12) for each such participant for a particular Fiscal Year.

*Preemption:* All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Above-Threshold Claims in the Plan, are preempted as inconsistent with PROMESA.

*Voting:* Class 48L is Impaired by the Plan. Class 48L and each holder of an Allowed VTP Payroll Participant Above-Threshold Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: [____]

*Projected Recovery*: [____] |
| **Class 49:**

AFSCME Claims | *Classification:* Class 49 consists of all claims against the Commonwealth related to those certain collective bargaining agreements between AFSCME and the Commonwealth, listed on Exhibit G to the Plan.

*Treatment:*

Rejection of AFSCME Collective Bargaining Agreements. On the Effective Date, the existing collective bargaining agreements between the Commonwealth, its applicable agencies and instrumentalities, on the one hand, and AFSCME and its related union affiliates, on the other |

hand, will be rejected pursuant to Bankruptcy Code section 365 and replaced with modified collective bargaining agreements to be entered into in accordance with the terms and conditions set forth on Exhibit J to the Plan.[408] Such modifications include (i) a term of five (5) years beginning as of the Effective Date, (ii) provisions regarding layoffs and downsizing, (iii) terms regarding System 2000, and (iv) terms for sharing Excess Cash Surplus.

Each holder of an Allowed AFSCME Claim will receive the following in full consideration, satisfaction, release and exchange of such holder's Allowed AFSCME Claim resulting from such rejection:

Additional AFSCME Distributions: On or as soon after the Effective Date, AFSCME and its member employees will receive the following additional payments and distributions set forth in Appendix II to Exhibit G of the Plan: (i) a one-time payment of $500 to each of the Union represented participants; (ii) a one-time payment of $5,000,000.00 to AFSCME to be distributed as a one-time cash bonus to its member employees; and (iii) a one-time payment of $5,000,000.00 to AFSCME as a Support Fee.

Pre-Petition Arbitration and Grievance Claims: Any distributions on account of Claims for liquidated damage amounts from the disposition of a pre-petition action brought due to a grievance and arbitration procedures under the CBA between the Commonwealth and AFSCME must be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) 30 days after the disposition and (ii) 60 days after the Effective Date.

*Preemption:* All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed AFSCME Claims in the Plan, are preempted as inconsistent with PROMESA.

*Voting*: Class 49 is Impaired by the Plan. Class 49 and each holder of an Allowed AFSCME Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: Not Quantified

*Projected Recovery from CW*: Impaired; Not Quantified

| | |
|---|---|
| **Class 50:** | *Classification:* Class 50 consists of claims of Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc. arising from and relating to the Dairy |

---

[408] *See* section II.B.1.e) of this Disclosure Statement for a summary of the terms of the AFSCME PSA.

| Dairy Producer Claims | Producer Settlement[409], which as of the Effective Date, will be (a) allowed in the aggregate amount of $61,999,999.00, and (b) allocated to Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. in the amounts of $44,832,199.28 and $17,167,799.92, respectively. |
|---|---|
| | **Treatment:** On the Effective Date, each holder of a Dairy Producer Claim will receive, in full consideration, satisfaction, release and exchange of such holders' Allowed Dairy Producer Claim, an amount equal to 50% of such Allowed Dairy Producer Claim, with such amount being payable by the Commonwealth in five (5) equal installments commencing on the Effective Date and each subsequent payment thereof being made on July 1 of each FY. |
| | **Voting**: Class 50 is Impaired by the Plan. Class 50 and each holder of an Allowed Dairy Producer Claim are entitled to vote to accept or reject the Plan. |
| | **Allowed Amount of Claims**: $61,999,999.00 |
| | **Projected Recovery from CW**: 50% |
| **Class 51:**<br><br>Eminent Domain Claims | **Classification:** Class 51 consists of claims arising form or related to a condemnation action or proceeding commenced by the Commonwealth or an agency or entity thereof in the Court of First Instance in accordance with 32 L.P.R.A. § 2905 to obtain title to real property located in Puerto Rico, and a Final Order has been entered for an amount in excess of the amount deposited by the condemnor. |
| | **Treatment:** On the Effective Date, |
| | (a) to the extent not previously modified, the automatic stay pursuant to section 362 of the Bankruptcy Code will be deemed modified to permit the holder of an Eminent Domain Claim to (i) liquidate such Eminent Domain Claim, and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and |
| | (b) the holder of an Allowed Eminent Domain Claim will be entitled to receive, in full consideration, satisfaction, release, and exchange |

---

[409] The Dairy Producer Settlement refers to the Final Settlement Agreement and Memorandum of Understanding Between the Parties, filed October 29, 2013, in the litigation styled Vaquería Tres Monjitas, Inc. and Suiza Dairy, Inc. v. Naftali Soto Santiago, et al., Civil Case No.: 04-1840 (DRD), then pending in the United States District Court for the District of Puerto Rico.

| | |
|---|---|
| | of such holder's Allowed Eminent Domain Claim, such holder's Pro Rate Share of the CW GUC Recovery.<br><br>The CW GUC Recovery is comprised of:<br><br>(A) $125,000,000.00 in Cash, and<br><br>(B) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.<br><br>***Voting***: Class 51 is Impaired by the Plan. Class 51 and each holder of an Allowed Eminent Domain Claim are entitled to vote to accept or reject the Plan.<br><br>***Estimated Claim Amount***: $326,554,832<br><br>***Projected Recovery from CW***: 3.98%[410] |
| **Class 52:**<br>Energy Incentive Claims | ***Classification:*** Class 52 consists of any and all claims arising from or related to the Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019 (the "Energy Incentive Act"), in connection with promoting the production of renewable energy.<br><br>***Treatment:*** On the Effective Date, (a) the Commonwealth will (i) continue to energy incentive program set forth in the Energy Incentive Act, and (ii) assume the Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date and consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and the related instruments and reservation agreements, the holders of Allowed Energy Incentive Claims will be permitted to exercise and claim the tax incentives created such claims.<br><br>***Voting***: Class 52 is Unimpaired by the Plan. Class 52 and each holder of an Allowed Energy Incentive Claim is deemed to accept the Plan.<br><br>***Estimated Claim Amount***: $466,772<br><br>***Projected Recovery from CW***: 100% |

---

[410] Does not include net recoveries from the Avoidance Actions Trust. As of June 22, 2021, the Special Claims Committee and the UCC have taken receipt of approximately $4.3 million in settlement funds. By agreement, the funds are held in escrow and shall be vested in the Avoidance Actions Trust, subject to any outstanding escrow fees, following confirmation of the Plan.

| Class 53:

Med Center
Claims | ***Classification:*** Class 53 consists of any and all claims of certain federally qualified health centers ("Med Centers" as defined in the Plan) arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb), including, without limitation, (a) any claims and causes of action asserted or which could have been asserted in the Med Center Litigation, (b) any amounts asserted to be due and owing, or which could have been asserted as due and owing, in the Med Center Proof of Claim, and (c) any amounts asserted to be owing and relating to the period from the Commonwealth Petition Date up to and including the Effective Date.

***Treatment:*** On the Effective Date, and provide that Class 53 votes to accept the Plan, each holder of a Med Center Claim will (a) receive an Allowed Med Center Claim in the amount set forth in Column A on Exhibit H to the Plan, and (b) be entitled to receive an amount equal to 50% of such Allowed Med Center Claim, with such amount being payable by the Commonwealth in three (3) equal annual installments commencing on the Effective Date and each subsequent payment being made on the anniversary thereof.

However, if Class 53 votes to reject the Plan, each holder of a Med Center Claim will receive an Allowed Med Center Claim in the amount set forth in Column B on Exhibit H to the Plan.

***Dismissal of Med Center Litigation***: On the Effective Date, the Med Center Litigation, except the Med DC Action, will be deemed dismissed, with prejudice, and each of the Commonwealth and the respective Med Centers will take such action as is necessary to notify the applicable court of such dismissal. All appeals taken from the Med DS Action will be dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such appeals will take such action as is necessary to notify such appellate courts of appeal of such dismissal. The Commonwealth and the Med Centers will file a notice with the clerk of the court in connection with the Med DC Action that (a) all actions in connection with the Med DS Action shall be stayed, and (b) in the event that, from and after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth pay present any and all defenses with respect to such alleged defaults.

***Voting***: Class 53 is Impaired by the Plan. Class 53 and each holder of an Allowed Med Center Claim are entitled to vote to accept or reject the Plan.

***Allowed Amount of Claims***: If Class 53 votes to accept the Plan, $293,583,772.78; if Class 53 votes to reject the Plan, $145,982,458.41. |

|  | *Projected Recovery from CW*: 50% |
|---|---|
| **Class 54:**<br><br>Tax Credit Claims | *Classification:* Class 54 consists of Claims, other than Energy Incentive Claims and Claims related to the payment of personal income taxes, arising under the 2011 Code or an economic incentive law, in each case, resulting in corporate income tax creditors, deductions, or carryforwards.<br><br>*Treatment:* On the Effective Date, (a) the Commonwealth assume Allowed Tax Credit Claims and the related instruments and agreements in existence as of the Effective Date. Holders of Allowed Tax Credit Claims will be permitted to exercise and claim the tax benefits and entitlements with respect to such Allowed Tax Credit Claim in accordance with the terms and provisions of such documents, instruments, and applicable law.<br><br>*Voting*: Class 54 is Unimpaired by the Plan. Class 54 and each holder of an Allowed Tax Credit Claim is deemed to accept the Plan.<br><br>*Estimated Claim Amount*: $1,972,113,081<br><br>*Projected Recovery from CW*: 100% |
| **Class 55:**[411]<br><br>CW General Unsecured Claims | *Classification:* Class 55 consists of:<br><br>(i) the portion of an Eminent Domain Claim in excess of accounts on deposit with the Clerk of the Court of First Instance, and<br><br>(ii) all other Claims against the Commonwealth, except (a) any Claim treated in any other Class under the Plan, (b) an Inter-Instrumentality Claim, (c) any Claim transferred to or subject to the provisions of the ACR Order, (d) the Proof of Claim No. 161091 filed by Concilio Nacional de Policias Inc. and any related proofs of claim asserting claims related to *Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department*, Case No. KAC-2007-4170, (e) all claims for retiree benefits, (f) all Claims against the Commonwealth by any Governmental Unit, (f) ay unsecured deficiency claims with respect to asserted priority and/or secured claims, or (h) any Claim determined by the Title III Court not to be a CW General Unsecured Claim. |

---

[411] On March 3, 2020, the UCC filed a 3013 motion for entry of an order reclassifying Class 48A (later split into Class 48A-Class 48F) and Class 55 claims under the proposed plan of adjustment (the "3013 Motion") [ECF No. 11989]. In the 3013 Motion, the UCC argued the classification scheme in the amended plan cannot be approved under controlling First Circuit precedent requiring a "strict approach" to plan classification. On April 23, 2020, the Title III Court issued an order denying the motion [ECF No. 12952]. On April 13, 2021, the UCC filed a renewed 3013 motion for entry of an order reclassifying Class 48A (later split into Class 48A-Class 48F) and Class 55 claims under the proposed plan of adjustment [ECF No. 16396]. On April 29, 2021, the Title III Court issued an order denying the UCC's renewed 3013 motion [ECF No. 16629].

*Treatment:* On the Effective Date, each holder of an Allowed CW General Unsecured Claim will receive its Pro Rata Share of the CW GUC Recovery, comprised of:

> (A) $575,000,000.00 in Cash, minus (i) up to $15,000,000, as determined by the UCC at or prior to the Confirmation Hearing, as necessary to fund the administration and operation of the Avoidance Actions Trust, (ii) such amount spaid to compensate the UCC appointees to the Avoidance Actions Trust Board and their counsel in connection with their review and analysis of the claims reconciliation process, which shall not exceed $3,000,000, and (iii) such amount of Cash as is necessary to satisfy the payment of Allowed Convenience Claims; and

> (B) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.

Distributions to a holder of an Allowed CW General Unsecured Claim cannot exceed 40% of such holder's Allowed CW General Unsecured Claim. Any net recoveries by the Avoidance Actions Trust will not count towards attaining such cap.

Any funds remaining in the GUC Reserve following attainment of the 40% GUC Recovery Cap and distributions made or reserved on account thereof will be turned over to the Commonwealth for general purposes.

*GUC Reserve*: The GUC Reserve will be funded as follows:

> (a) $200,000,000 on the later to occur of December 31, 2021 and the Effective Date;

> (b) $100,000,000 on or prior to December 31, 2022;

> (c) $100,000,000 on or prior to December 31, 2023;

> (d) $100,000,000 on or prior to December 31, 2024; and

> (e) $75,000,000 on or prior to December 31, 2025.

If the 40% GUC Recovery Cap is reached before a future funding obligation, the Commonwealth will be relieved of such future funding obligation.

All amounts necessary to fund the Avoidance Actions Trust will be funded directly to the Avoidance Actions Trust and not into the GUC Reserve. If the Avoidance Actions Trust ceases pursuit of Avoidance

| | |
|---|---|
| | Actions, all funds in the Avoidance Actions Trust will be transferred to the GUC Reserve.<br><br>All amounts necessary to satisfy Allowed Convenience Claims will be funded directly to the disbursing Agent and not into the GUC Reserve.<br><br>*Voting*: Class 55 is Impaired by the Plan. Class 55 and each holder of an Allowed CW General Unsecured Claim are entitled to vote to accept or reject the Plan.<br><br>*Estimated Claim Amount*: $2,814,191,851<br><br>*Projected Recovery from CW*: up to 40% [412]<br><br>*Election to be Treated as Convenience Claim (Class 65)*: Any holder of an Allowed CW General Unsecured Claim may elect to (a) reduce the amount of such Allowed CW General Unsecured Claim to $20,000.00, and (b) have such reduced claim be treated pursuant to Class 65 (Convenience Claims), receiving a projected recovery of 100% of such reduced claim. Any holder of multiple Allowed CW General Unsecured Claims may elect to (a) reduce the amount of such multiple Allowed CW General Unsecured Claims to an aggregate amount of $40,000.00, and (b) have such reduced claims be treated pursuant to Class 65 (Convenience Claims), receiving a projected recovery of 100% of such reduced claims.<br><br>Such election must be made on the ballot and receive by the Debtors on or prior to the Ballot Date. Any election received on the Debtors after the Ballot Date will not be binding on the Debtors. |
| **Class 56:**<br>CW/HTA Claims | *Classification:* Class 56 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including, without limitation, claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30 and OE-2016-31 and (b) the indebtedness issued by HTA |

---

[412] Pursuant to Sections 1.269 and 59.1(a) of the Plan, recoveries are subject to a cap of 40%. Any net recoveries by the Avoidance Actions Trust will not count towards attaining such cap.

pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.[413]

**Treatment:** On the Effective Date, and subject to the satisfaction of the Distribution Conditions, each holder of an Allowed CW/HTA Claim (including the Monolines) will receive its Pro Rata Share of the CW/HTA Clawback Recovery, comprised of 68.6% of the Clawback CVIs.

Upon satisfaction of the Distribution Conditions, (a) Assured and National will receive their respective shares of the CW/HTA Clawback Recovery on account of the Assured CW/HTA Bond Claims and National CW/HTA Bond Claims, respectively; and (b) the CW/HTA Clawback Recovery allocable to the FGIC CW/HTA Bond Claims will be held in a trust for the benefit of holders of FGIC CW/HTA Bond Claims until the effective date of an HTA plan of adjustment.

**Distribution of the CW/HTA Clawback Recovery:** Upon satisfaction of the Distribution Conditions,[414] the Commonwealth will take such actions

---

[413] The Oversight Board believes that based on the language of the indenture for the HTA 68 Bonds, the HTA 98 Bonds, the DRA Parties' loans with GDB, and the HTA Enabling Act, among other documents, the DRA's HTA Loan claims are subordinate to the CW/HTA Claims, and proposed to treat them accordingly. However, payments on account of the Clawback CVIs will be subject to the CVI Payment Reserve until there has been a GDB Loan Priority Determination, defined as the "determination, in either the Commonwealth Title III Case or the HTA Tile III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery Authority does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans."

[414] The Distribution Conditions consist of the following:

(a) the Effective Date shall have occurred,

(b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents shall have been agreed upon by the Oversight Board, Assured and National,

(c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least 67% of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto), and

(d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least 67% of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto).

Upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

| | |
|---|---|
| | as are necessary to distribute the CW/HTA Clawback Recovery to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit J to the Plan.

Until receipt of the GDB Loan Priority Determination, (a) Cash payable with respect to the HTA Clawback CVI and allocable to the HTA 98 Bonds will be subject to the CVI Payment Reserve, and (b) the CW/HTA Clawback Recovery otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans will not be distributed to holders of the GDB HTA Loans.

Upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed CW/HTA Clawback Recovery will be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (y) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (z) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, Annex 6 within Exhibit J to the Plan.

The HTA Clawback CVI to be issued and distributed pursuant to Article LX of the Plan and any payments made thereunder will be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the Distribution Conditions are satisfied, and, in the event the HTA/CCDA PSA is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof will be released from such reserve or trust as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit J to the Plan.

*Voting*: Class 56 is Impaired by the Plan. Class 56 and each holder of an Allowed CW/HTA Claim are entitled to vote to accept or reject the Plan. However, Assured and National are entitled to vote on account of such Allowed Claims insured by Assured and National, respectively.

***Estimated Claim Amount***: $6,257,585,807.42

***Projected Recovery from CW***: Contingent |
| **Class 57:** | ***Classification:*** Class 57 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention |

| CW/Convention Center Claims | of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including, without limitation, claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31 and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee. |
| --- | --- |
| | *Treatment:* On the Effective Date, each holder of an Allowed CW/Convention Center Claim will receive its Pro Rata Share of the CW/Convention Center Clawback Recovery, comprised of 4.0% of the Clawback CVIs. |
| | Assured will receive its share of the CW/Convention Center Clawback Recovery on account of the Allowed Assured CW/Convention Center Claims. |
| | *Voting*: Class 57 is Impaired by the Plan. Class 57 and each holder of an Allowed CW/Convention Center Claim are entitled to vote to accept or reject the Plan. However, Assured is entitled to vote on account of such Allowed Claims insured by Assured. |
| | *Estimated Claim Amount:* $386,637,854.25 |
| | *Projected Recovery from CW*: Contingent |
| **Class 58:** CW/PRIFA Rum Tax Claims | *Classification:* Class 58 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including, without limitation, claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee. |
| | *Treatment:* On the Effective Date, each holder of an Allowed CW/PRIFA Rum Tax Claim will receive its Pro Rata Share of the CW/PRIFA Rum Tax Clawback Recovery, comprised of 27.0% of the Clawback CVIs. |

| | Assured will receive its share of the CW/PRIFA Clawback Recovery on account of the Allowed Assured CW/PRIFA Rum Tax Claims. |
|---|---|
| | *Voting*:  Class 58 is Impaired by the Plan.  Class 58 and each holder of an Allowed CW/PRIFA Rum Tax Claim are entitled to vote to accept or reject the Plan.  However, Assured is entitled to vote on account of such Allowed Claims insured by Assured. |
| | *Estimated Claim Amount*:  $1,928,867,051.00  (disputed) |
| | *Projected Recovery from CW*:  Contingent |
| **Class 59:** <br> CW/MBA Claims | *Classification:*  Class 59 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order. |
| | *Treatment:*  On the Effective Date, each holder of an Allowed CW/MBA Claim will receive its Pro Rata Share of the CW/MBA Clawback Recovery, comprised of 0.4% of the Clawback CVIs. |
| | *Voting*:  Class 59 is Impaired by the Plan.  Class 59 and each holder of an Allowed CW/MBA Claim are entitled to vote to accept or reject the Plan. |
| | *Estimated Claim Amount*:  $30,106,786.87 |
| | *Projected Recovery from CW*:  Contingent |
| **Class 60:** <br> CW Appropriations Claims | *Classification:*  Class 60 consists of all claims against the Commonwealth arising from or related to (a) indebtedness payable from appropriations of the Commonwealth Legislature under existing loans or legislative resolutions (including notes held by PFC for the repayment of PFC indebtedness), and (b) loans payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Restructuring Authority or the GDB Public Entity Trust. |
| | *Treatment:*  Allowed CW Appropriations Claims will not receive a distribution pursuant to the Plan. |
| | *Voting*:  Class 60 is Impaired by the Plan.  Class 60 and each holder of an Allowed CW Appropriations Claim are deemed to have rejected the Plan. |
| | *Estimated Allowed Amount of Claims*: Unknown |

| | *Projected Recovery from CW*: 0% |
|---|---|
| **Class 61:**<br><br>Section 510(b) Subordinated Claims | *Classification:*  Class 61 consists of all claims, to the extent determine pursuant to a final order, against the Debtors or their assets arising from or relating to (a) rescission of a purchase or sale of an existing security of a Debtor or an affiliate of a Debtor, (b) purchase, sale, or retention of such a security, or (c) reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such claim.<br><br>*Treatment:* Allowed Section 510(b) Subordinated Claims will not receive a distribution pursuant to the Plan.<br><br>*Voting*:  Class 61 is Impaired by the Plan.  Class 61 and each holder of a Section 510(b) Subordinated Claim are deemed to have rejected the Plan.<br><br>*Estimated Allowed Amount of Claims*: Unknown<br><br>*Projected Recovery from CW*: 0% |
| **Class 62:**<br><br>ERS Bond Claims | *Classification:*  Class 62 consists of all claims against ERS arising from or related to the ERS Bonds, including interest accrued thereon during the period up to, but not including, the ERS Petition Date.<br><br>The ERS Bonds include the following:<br><br><table><tr><td></td><td>**Issue Date**</td></tr><tr><td>Senior Pension Funding Bonds, Series 2008A</td><td>1/31/08</td></tr><tr><td>Senior Pension Funding Bonds, Series 2008B</td><td>6/02/08</td></tr><tr><td>Senior Pension Funding Bonds, Series 2008C</td><td>6/30/08</td></tr></table><br><br>*Treatment:* On the Effective Date, each holder of an Allowed ERS Bond Claim will receive its Pro Rata Share of the ERS Bond Recovery, consisting of (a) $373,000,000.00, (b) the right to receive the proceeds of the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, if the Commonwealth or one or more holders of Allowed ERS Bond Claims purchases the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in accordance with the terms and provisions of Section 66.2 of the Plan, and (c) if the Commonwealth does not elect to purchase such assets, the option to purchase the ERS Private Equity Portfolio or the interests in the ERS Trust, as the case may be, for $70,750,000.00, plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio. |

For purposes of distribution, calculations will be based upon the amount of Net Allowed ERS Bond Claims.

***ERS Private Equity Portfolio / ERS Trust***: The Private Equity Portfolio consists of the portfolio of private equity interests held by ERS as of the Effective Date. The ERS Trust is a trust created in accordance with the terms and provisions of the ERS Stipulation to hold ERS' interests in the Private Equity Portfolio and pursuant to which ERS will continue to manage such assets up to and including the purchase thereof in accordance with Section 66.2 of the Plan.

Commonwealth Election to Purchase (Commonwealth Election): From the Effective Date up to and including April 10, 2023, the Commonwealth will have the option to purchase the ERS Private Equity Portfolio for $70,750,000.00, and the proceeds of such purchase will be distributed, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with Section 66.1 of the Plan.

Bondholder Election to Purchase (Bondholder Election): If the Commonwealth declines to purchase the ERS Private Equity Portfolio or fails to provide notice of its exercise of its right to purchase the ERS Private Equity Portfolio by April 10, 2023, any holder(s) of Allowed ERS Bond Claims will have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for $70,750,000.00 plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof that have not been previously reimbursed to the Commonwealth.

If one or more holders of Allowed ERS Bond Claims determine to exercise the Bondholder Election, such electing holder(s) will pay such purchase price, on a pro rata basis calculated with respect to the amount of such holders' Allowed ERS Bond Claims, to the Commonwealth no later than April 20, 2023.

Commonwealth Obligation to Purchase: If neither the Commonwealth Election nor the Bondholder Election is exercised, on April 25, 2023, (i) the Commonwealth will purchase the Private Equity Portfolio for $70,750,000.00, and (ii) the Commonwealth will distribute the proceeds thereof, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the Section 66.1 of the Plan.

***Dismissal of Litigation***: On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions will be dismissed and/or denied, with

| | |
|---|---|
| | prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) will take any and all action as may be reasonably necessary, including filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.<br><br>***Voting***: Class 62 is Impaired by the Plan. Class 62 and each holder of an Allowed ERS Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $3,168,698,776.55<br><br>***Projected Recovery from ERS***: 14.0% |
| **Class 63:**<br>ERS General Unsecured Claims | ***Classification:*** Class 63 consists of all claims against ERS that are not an ERS Bond Claim.<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed ERS General Unsecured Claim will receive its Pro Rata Share of the ERS GUC Pool. The ERS GUC Pool consists of (a) $500,000 in cash plus (b) the net recoveries of the Avoidance Actions Trust. The total amount in the ERS GUC Pool available for distribution may not exceed $5,000,000. Distributions to a holder of an Allowed ERS General Unsecured Claim cannot exceed 100% of such holder's Allowed ERS General Unsecured Claim.<br><br>Amounts in the ERS GUC Pool in excess of the aggregate amount of Allowed ERS General Unsecured Claims, or $5,000,000 will be reallocated, on a pro rata basis, to holders of Allowed CW General Unsecured Claims.<br><br>***Voting***: Class 63 is Impaired by the Plan. Class 63 and each holder of an Allowed ERS General Unsecured Claim are entitled to vote to accept or reject the Plan.<br><br>***Estimated Claim Amount:*** $1,506,819<br><br>***Projected Recovery from ERS***: 33.18%[415] |

---

[415] Does not include net recoveries from the Avoidance Actions Trust. As of June 22, 2021, the Special Claims Committee and the UCC have taken receipt of approximately $4.3 million in settlement funds. By agreement, the

|  | *Election to be Treated as Convenience Claim (Class 65):* Any holder of an Allowed ERS General Unsecured Claim in an amount greater than $20,000.00 may elect to (a) reduce the amount of such Allowed ERS General Unsecured Claim to $20,000.00, and (b) have such reduced claim be treated pursuant to Class 65 (Convenience Claims), receiving a projected recovery of 100% of such reduced claim. |
|  | Any holder of multiple Allowed ERS General Unsecured Claims may elect to (a) reduce the amount of such multiple Allowed ERS General Unsecured Claims to an aggregate amount of $40,000.00, and (b) have such reduced claims be treated pursuant to Class 65 (Convenience Claims), receiving a projected recovery of 100% of such reduced claims. |
|  | Such election must be made on the ballot and receive by the Debtors on or prior to the Ballot Date. Any election received on the Debtors after the Ballot Date will not be binding on the Debtors. |
| **Class 64:** Gracia Gracia Claims | *Classification:* Class 64 consists of all claims against the Commonwealth by a member of the class of vehicle owners who purchased private insurance after paying the compulsory insurance premium, certified in the Gracia Gracia CW Action and Gracia Gracia Federal Action. |
|  | *Treatment:* On the Effective Date, the settlement reached and approved in (a) the Gracia Gracia CW Action pursuant to that certain Joint Motion on Partial Agreement and Stipulation, dated March 29, 2016, as approved pursuant to that certain Partial Judgment, dated July 8, 2016, and (b) the Gracia Gracia Federal Action pursuant to that certain Stipulation for Permanent Injunction, dated February 29, 2016, as approved pursuant to that certain judgment dated March 1, 2016, will be assumed. |
|  | Member of the class certified in the Gracia Gracia CW Action and the Gracia Gracia Federal Action, and the counsel to such classes, will receive funds in accordance with the terms and provisions of the settlements assumed above. Pursuant to the Confirmation Order, all pending motions, applications, litigations, and appeals with respect to the Gracia Gracia CW Action and the Gracia Gracia Federal Action will be withdrawn with prejudice. |
|  | *Voting:* Class 64 is unimpaired by the Plan. Class 64 and each holder of an Allowed Gracia Gracia Claim are deemed to have accepted the Plan. |

---

funds are held in escrow and shall be vested in the Avoidance Actions Trust, subject to any outstanding escrow fees, following confirmation of the Plan.

| | |
|---|---|
| | *Allowed Amount of Claims*:  $10,600,000<br><br>*Projected Recovery from CW*:  100% |
| **Class 65:**<br>Convenience Claims | *Classification:*  Class 65 consists of (a) all Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claim that are equal to or less than $20,000.00, (b) claims held by holders of Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims, as applicable, that have elected to reduce the amount of such Allowed CW General Unsecured Claim to $20,000.00.  In addition, Class 65 includes claims by holders of multiple Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims that have elected to reduce all such Claims to an aggregate amount of $40,000.00.<br><br>*Treatment:*  On the Effective Date (or the date the Convenience Claim becomes an Allowed Claim), each holder of an Allowed Convenience Claim will receive the full amount of such Allowed Convenience Claim, in cash.<br><br>The aggregate consideration to be made available to Convenience Claims will be $65,000,000, unless such limitation is otherwise wavied by the UCC at or prior to the commencement of the Confirmation Hearing.  If Allowed Convenience Claims exceed such amount, and the UCC has not waived such cap, holders of Allowed Convenience Claims will receive a Pro Rata Share of such amount.<br><br>*Voting*:  Class 65 is unimpaired by the Plan.  Class 65 and each holder of an Allowed Convenience Claim are deemed to have accepted the Plan. Holders of Claims that have elected to have their Claim reduced and be treated as a Convenience Claim are deemed to accept the Plan.<br><br>*Estimated Allowed Amount of Claims*: $5,378,056<br><br>*Projected Recovery from the Debtors*:  100% |
| **Class 66:**<br>Federal Claims | *Classification:*  Class 66 consists of any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security and the United States Department of Labor.<br><br>*Treatment:*  On the later to occur of (a) the Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) in their sole and absolute discretion, and in full consideration, satisfaction, release and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and |

discharge such Allowed Federal Claim in accordance with the terms and conditions of such documents evidencing such Allowed Federal Claims or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim in forty (40) equal amount installments, with such payments commencing on the third (3rd) anniversary of the Effective Date and continuing on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as the Reorganized Debtors and the holder of any such Allowed Federal Claim shall agree.

*Voting*: Class 66 is unimpaired by the Plan. Class 66 and each holder of an Allowed Federal Claim are deemed to have accepted the Plan.

*Estimated Amount of Claims*: $1,109,741,657

*Projected Recovery from the Debtors*: 100%

### F.  Provisions Regarding the New GO Bonds, CVIs and Additional Indebtedness

**THE NEW GO BONDS WILL BE ISSUED PURSUANT TO THE TERMS AND PROVISIONS OF THE NEW GO BONDS INDENTURE. THE NEW GO BONDS INDENTURE CONSTITUTES PART OF THE PLAN SUPPLEMENT AND WILL BE FILED SEPARATELY WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE, OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES, IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER. PURSUANT TO THE PLAN SUPPORT AGREEMENT, THE NEW GO BONDS INDENTURE WILL BE CONSISTENT WITH THE PLAN SUPPORT AGREEMENT IN ALL RESPECTS AND OTHERWISE BE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO EACH PARTY TO THE PLAN SUPPORT AGREEMENT. THE DESCRIPTION OF THE TERMS AND PROVISIONS OF THE NEW GO BONDS AND THE NEW GO BONDS INDENTURE IN THIS SECTION VI.F OF THE DISCLOSURE STATEMENT REPRESENTS THE DEBTORS' BEST AVAILABLE DESCRIPTION AS OF THE DATE HEREOF, AND THE ACTUAL TERMS AND PROVISIONS OF THE NEW GO BONDS AND THE NEW GO BONDS INDENTURE ARE SUBJECT TO MATERIAL CHANGE WITHOUT FURTHER NOTICE BY THE DEBTORS EXCEPT AS PROVIDED IN THE PLAN SUPPLEMENT. TO THE EXTENT THERE IS ANY CONFLICT BETWEEN THE DESCRIPTION IN THIS SECTION VI.F OF THE DISCLOSURE STATEMENT AND THE NEW GO BONDS INDENTURE, THE NEW GO BONDS INDENTURE GOVERNS IN ALL RESPECTS.**

### 1.  General

The New GO Bonds will be issued pursuant to the terms and provisions of the New GO Bonds Indenture and will be distributed as set forth in the Plan. The definitive documentation governing the New GO Bonds generally shall provide for the terms set forth in this summary,

subject to the results of any election permitted by the Plan and other adjustments permitted or required by the Plan.

This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the New GO Bonds, the New GO Bonds Indenture, the CVIs, the CVI Indenture and the Plan.

### 2.    The New GO Bonds

On the Effective Date, Reorganized Commonwealth shall issue the New GO Bonds, consisting of:

(i) $6,683,315,000.00 in aggregate principal amount of New GO CIBs,

(ii) $442,506,553.50 in aggregate principal amount of New GO 5.375% CABs, and

(iii) $288,241,989.75 in aggregate principal amount of New GO 5.0% CABs,

with eleven (11) different maturity dates, having an aggregate original principal amount of $7,414,063,543.25. The New GO Bonds will be secured by a statutory first lien and pledge of the Debt Service Fund and a pledge of the Commonwealth's full faith, credit and taxing power in accordance with Article VI, Section 2 of the Commonwealth Constitution and applicable laws of the Commonwealth as of the Effective Date. The New GO Bonds will be issued in $1.00 denominations and dated as of, and will accrue or accrete, as applicable, interest from, the earlier of (i) July 1, 2021 and (ii) the Effective Date.

*The principal amounts, maturities, interest rates, and amortization schedules for the New GO Bonds are as shown in Exhibit J to the Plan.*

Interest on the New GO Bonds will be paid on July 1, 2021 and each January 1 and July 1 thereafter until the New GO Bonds have been paid or satisfied in full in accordance with their terms. All debt service on the New GO Bonds that is not paid when due, whether at or prior to final scheduled maturity shall remain due and outstanding until paid in full and shall be paid. Interest shall accrue or accrete on such overdue debt service at the regular interest or accretion rate, as applicable, and shall compound semi-annually, until the applicable New GO Bonds are paid or satisfied in full in accordance with their terms. Interest on the New GO Bonds will be computed on the basis of a 360-day year consisting of twelve 30-day months. The New GO CIBs will not carry any default rate of interest; provided, however, that the interest shall accrue on all overdue debt service, at the regular coupon rate or accretion rate, as applicable, compounding semi-annually, until paid or satisfied in full in accordance with their terms. The New GO Bonds will be issued as fully registered bonds in denominations to be specified in the New GO Bonds Indenture.

Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) *first*, to holders of Allowed Taxable Election CW

Claims, and (2) *second*, pro rata to all other holders of Allowed Claims which are recipients of New GO Bonds, without duplication.

### a)    Call Provisions/Optional Redemption

The New GO Bonds maturing on July 1, 2023, July 1, 2025, July 1, 2027, July 1, 2029 and July 1, 2031 and the New GO 5.000% CABs are not subject to redemption prior to maturity.

The New GO 5.375% CABs maturing on and after July 1, 2033 are subject to redemption prior to maturity, at the election or direction of Reorganized Commonwealth, in whole or in part in any order of maturity, upon thirty (30) days' prior written notice, on and after July 1, 2031, at a redemption price equal 100% of the accreted value.

The New GO CIBs, but not the New GO 5.375% CABs or the New GO 5.0% CABs, are subject to mandatory sinking fund redemption as set forth in Exhibit J of the Plan. The New GO Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon (or, the case of the 2033 CABs, at the accreted value thereof), upon thirty (30) days' prior written notice.

The call prices for New GO Bonds maturing on July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041, and July 1, 2046 are as follows:  (i) July 1, 2031 through and including to June 30, 2032 is 103% of Par, (ii) July 1, 2032 through and including June 30, 2033 is 102% of Par, (iii) July 1, 2033 through and including June 30, 2034 is 101% of Par, and (iv) July 1, 2034 onwards is 100% of Par.

If less than all the New GO Bonds of a particular series are called for redemption prior to maturity, Reorganized Commonwealth will select the maturity or maturities of such series of the New GO Bonds to be redeemed, and, if less than all the of the New GO Bonds within a maturity have been called for redemption, the Depository Trust Company, on behalf of the New GO Bonds Trustee, will select the New GO Bonds within the same maturity of such series to be redeemed by means of a random lottery.

The New GO Bonds are not subject to redemption prior to maturity at the election of the holders thereof.

### b)    Deemed Annual Allocation

Until the New GO Bonds have been paid or satisfied in full in accordance with their terms, each Fiscal Year, the Reorganized Commonwealth shall satisfy its obligations to holders of New GO Bonds, by allocating to the payment of principal and interest (or accreted value, as applicable) with respect to the New GO Bonds issued to such holders, *first*, the 1.03% property tax levied pursuant to Act 83-1991 and collected by the Municipal Revenues Collection Center with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, *second*, the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and, *third*, other resources of the Reorganized Commonwealth.

c)      **Monthly Deposits of Interest and Principal**

From and after the Effective Date, and until the New GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's annual obligation with respect to the payment of principal (or accreted value, as applicable) on the New GO Bonds.  Upon deposit thereof, pursuant to the New GO Bonds Legislation, the New GO Bond Trustee, on behalf of the holders of New GO Bonds, shall have a valid and perfected statutory lien and security interest on such monies deposited with the New GO Bonds Trustee, which monies shall be held in trust for the benefit of the holders of the New GO Bonds.  On the Effective Date, the Reorganized Commonwealth will deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

d)      **Certain Covenants of Reorganized Commonwealth Relating to the New GO Bonds**

The Definitive Documents, including the New GO Bonds Indenture, the New GO Bonds Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants, including, without limitation, covenants by Reorganized Commonwealth that it will, among other things:

(i)      take no action that would (A) impair the monthly deposits of interest and principal referred to in Section 74.1(f) of the Plan, (B) limit or alter the rights vested in the Debtors or Reorganized Debtors in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New GO Bonds, or (C) impair the rights and remedies of the holders of the New GO Bonds; and

(ii)      do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to holders of any federally tax-exempt New GO Bonds shall be and remain excludable from gross income for federal income tax purposes.

e)      **Rights of Acceleration**

The New GO Bonds shall not have rights of acceleration.

f)      **Residual Interest of the Commonwealth**

Pursuant to the New GO Bonds Indenture, and subject to such additional rights and obligations as provided therein, any funds held by the New GO Bonds Trustee in excess of the required deposits pursuant to the New GO Bonds Indenture will be released by the New GO Bonds

465

Trustee to, or at the discretion of, the Reorganized Commonwealth, such amounts will revert and be distributed to, or at the direction of, the Reorganized Commonwealth.

g)      **Direct Right of Action**

Pursuant to the New GO Bonds Indenture, and subject to such additional rights as provided therein, the New GO Bonds Trustee shall have a direct right of action to enforce the terms of the New GO Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance remedies for any breach of covenants in the New GO Bonds Indenture.

h)      **New GO Bonds Indenture**

Provisions governing, among other things, amendments of or supplements to the New GO Bonds Indenture, events of default, remedies, priority of payments after default under the New GO Bonds Indenture, and defeasance under the New GO Bonds Indenture will be set forth in the New GO Bonds Indenture. The New GO Bonds Indenture will be executed and delivered on or prior to the Effective Date.

i)      **Governing Law**

The New GO Bonds Indenture and the New GO Bonds issued thereunder will be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.

3.      **Contingent Value Instruments (CVIs)**

On the Effective Date, Reorganized Commonwealth will issue the (i) GO CVIs in the aggregate original notional amount of $3,500,000,000.00 having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5,384,127,764.00 having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051. The GO CVIs and Clawback CVIs will each be subject to the provisions set forth in the CVI Indenture, the CVI Legislation, and the Confirmation Order. The GO CVIs and Clawback CVIs shall collectively be referred to as the "CVIs".

a)      **Structure**

The CVIs will be secured by a pledge of the Commonwealth's full faith, credit and taxing power under the Commonwealth Constitution and applicable laws of the Commonwealth for payment of the CVIs. Payments on the CVIs are subject to applicable caps, including the GO CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap.

The Subject to Waterfall Clawback CVI represents a portion of payments to Clawback CVIs made from the Subject to Waterfall Outperformance Amount. The Not Subject to Waterfall Clawback CVI represents a portion of payments to Clawback CVIs made from the Not Subject to Waterfall Outperformance.

"Subject to Waterfall Outperformance Amount" means, the lesser of, on an annual basis: (i) 50% of cumulative outperformance relative to the 5.5% SUT Baseline (which includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to GO CVI and Subject to Waterfall Clawback CVI, and (ii) 75% of annual performance (which includes both outperformance and underperformance). For the avoidance of doubt, the Subject to Waterfall Outperformance Amount may not be less than $0 in a given year.

"Not Subject to Waterfall Outperformance Amount" means, the lesser of, on an annual basis: (i) 40% of cumulative outperformance relative to the 5.5% SUT Baseline (which includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to Not Subject to Waterfall Clawback CVI, and (ii) 95% of annual performance (which includes both outperformance and underperformance), less amounts paid to GO CVI and Subject to Waterfall Clawback CVI for the corresponding fiscal year. For the avoidance of doubt, the Subject to Waterfall Outperformance Amount may not be less than $0 in a given year. All Not Subject to Waterfall Outperformance Amounts are subject to applicable caps, including Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap.

b)    **Annual Payments**

Payment of the GO CVIs is subject to an annual cap of $200,000,000.00, plus any unused amounts from previous years, subject to annual payment not being greater than $400,000,000.00. The GO CVI Maximum Annual Payment is calculated as the lesser of (i) the sum of GO CVI Carryforward Balance *plus* $200 million and (ii) $400 million. To the extent there is a positive GO CVI Carryforward Balance remaining at the end of the GO CVI term, the Commonwealth will not owe any further amounts on the GO CVIs. The GO CVI Carryforward Balance shall be calculated as follows: (a) in year 1, an amount equal to $0, (b) for each year thereafter, the Annual GO CVI Carryforward Amount shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance. The Annual GO CVI Carryforward Amount shall be calculated as the difference between (y) $200 million and (z) CVI payments (if any) made to the GO CVI in the prior fiscal year.

For years 1 – 22, from the Subject to Waterfall Outperformance Amount, the annual payment waterfall (the "Annual Payment Waterfall") is as follows: (a) the first $100,000,000 to GO CVI holders, (b) the next $11,111,111 to Subject to Waterfall Clawback CVI holders and (c) pro rata sharing thereafter of 90% to GO CVI holders and 10% to Subject to Waterfall Clawback CVI holders; *provided* that, to the extent the GO CVI Lifetime Cap of $3,500,000,000 is met in year 21 or prior, 100% of Subject to Waterfall Outperformance Amount would accrue to Subject to Waterfall Clawback CVI holders the following year.

For years 23 – 30, 100% of Subject to Waterfall Outperformance Amount is payable to Subject to Waterfall Clawback CVI holders.

For Years 1-22, the Clawback CVI Maximum Annual Payment is $175 million *plus* any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $350 million) for the Clawback CVIs, including payments to both Subject to Waterfall Clawback CVIs and Not Subject to Waterfall Clawback CVIs.

467

For Years 23-30, the Clawback CVI Maximum Annual Payment is $375 million *plus* any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) for the Clawback CVIs, including payments to both Subject to Waterfall Clawback CVIs and Not Subject to Waterfall Clawback CVIs. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during Years 1-22 is calculated as the lesser of (i) the sum of Clawback CVI Carryforward Balance (see below) and $175 million and (ii) $350 million. During Years 23-30, the Clawback CVI Maximum Annual Payment is calculated as the lesser of (A) the sum of the Clawback CVI Carryforward Balance and $375 million and (B) $750 million. To the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the 30-year term, the Commonwealth will not owe any further amounts on the Clawback CVIs. To the extent that GO CVI Lifetime Cap is met (i.e., aggregate $3,500,000,000 paid to GO CVI) in year 21 or prior, the $375 million annual payment cap – and annual payment cap up to $750 million to the extent sufficient Clawback CVI Carryforward Balance is available – for the Clawback CVIs, including CVI payments to both Subject to Waterfall Clawback CVIs and Not Subject to Waterfall Clawback CVIs would begin in the following year.

c)     **Lifetime Caps**

The GO CVI Lifetime Cap is $3,500,000,000. The Clawback CVI Lifetime Cap is $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed CW/Convention Claims, $22,580,090 for Allowed CW/MBA Claims, and $1,446,650,2881 for Allowed CW/PRIFA Rum Tax Claims, making the total $5,384,127,764. The Clawback CVI Lifetime Cap applies to aggregate Clawback CVI payments, including payments to both Subject to Waterfall Clawback CVIs and Not Subject to Waterfall Clawback CVIs.

d)     **Waterfall Distributions**

The GO CVIs are subject to mandatory redemption in accordance with the payment waterfall and GO CVI Mandatory Redemption provisions. The Clawback CVIs shall be subject to mandatory redemption in accordance with the payment waterfall and Clawback CVI Mandatory Redemption Priorities. This means that until the GO CVIs and the Clawback CVIs have been paid or satisfied in full in accordance with their terms, for each fiscal year, the Commonwealth shall satisfy its obligations to holders of the CVIs from the Subject to Waterfall Outperformance Amount (the "Annual Payment Waterfall") as follows: (i) the first $100,000,000 will be paid to GO CVI holders; (ii) the next $11,111,111 will be paid to Subject to Waterfall Clawback CVI holders, and (iii) pro rata sharing thereafter of 90% to GO CVI holders and 10% to Subject to Waterfall Clawback CVI holders. If the $3,500 million GO CVI Lifetime Cap has been met in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount will accrue to the Subject to Waterfall Clawback CVI holders beginning in the following year. In years 23-30, 100% of the Subject to Waterfall Outperformance Amount will be paid to Subject to Clawback CVI holders.

e)     **Call Provisions**

The GO CVIs will be callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable

U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI.

The Clawback CVI will be callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI.

f)      **Non-Impairment Covenant**

The Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Reorganized Commonwealth will not: (a) take any action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Reorganized Commonwealth to fulfill the terms of any agreements made with respect to the CVIs; or (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT; provided, however, that the foregoing shall not preclude the Reorganized Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Reorganized Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in Exhibit J to the GO/PBA PSA.

g)      **Direct Right of Action**

Pursuant to the CVI Indenture, and subject to such additional rights as provided therein, the CVI Trustee shall have a direct right of action to enforce the terms of the CVI Indenture, including, without limitation, with respect to funding mandatory Redemptions in respect of the CVIs and seeking specific performance remedies and any available remedies for any breach of covenants in the CVI Indenture.

h)      **Governing Law**

The CVI Indenture and the CVIs issued thereunder will be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York shall apply to any action or proceeding arising under the CVI Indenture and the CVIs, *provided*, that the authorization of the CVI Indenture and the issuance of the CVIs by the Commonwealth shall be governed by the laws of the

Commonwealth; and, *provided, further,* that the holders of CVIs shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

4.     **Tax-Exempt Treatment of the New GO Bonds**

Notwithstanding the terms and provisions of Sections 71.1 and 71.2 in the Plan, if the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel that the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date to the total aggregate amount of all New GO Bonds a is less than thirteen percent (13%), the holders of any Claims receiving New GO Bonds will receive tax-exempt New GO Bonds issued pursuant to the coupons for all maturities equal to the coupons on the tax-exempt New GO Bonds set forth on Exhibit I to the Plan.

5.     **Provisions Regarding Additional Indebtedness of Reorganized Commonwealth, its Agencies and Public Corporations**

a)     **Comprehensive Cap on All Net Tax-Supported Debt**

During the Debt Policy Period,[416] pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, (a) the Commonwealth (and the Reorganized Commonwealth, as applicable) shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt[417] of Article IV of the

---

[416] **Debt Policy Period**: The period commencing on the first (1st) calendar day immediately following the Effective Date and ending on the date on which there are no New GO Bonds Outstanding.

[417] **Net Tax-Supported Debt**: Any Tax-Supported Debt, excluding any (a) debt guaranteed by the good faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed fiscal years, (b) Debt being refinanced through the proceeds of the proposed bond or note issuance, and (c) Debt and obligations expressly excluded from the calculation of the Comprehensive Cap in Section 71.5 of the Plan.

**Tax-Supported Debt**: Collectively, without duplication, (a) direct debt of the Commonwealth for the payment of which the full faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds and CVIs), (b) debt issued by any Entity and guaranteed by the full faith, credit and taxing power of the Commonwealth, (c) debt issued by any Entity (including the COFINA Bonds), whether or not guaranteed by the Commonwealth, that is secured by or payable from (i) Debt Policy Revenues, or (ii) lease agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations and (d) any other debt identified as Tax-Supported Debt in the Debt Management Policy; *provided, however,* that the following shall not be considered Tax-Supported Debt: (A) tax and revenue anticipation notes with a final maturity occurring within the same fiscal year of their issuance; and (B) debt issued to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico caused by hurricanes, earthquakes or other natural disasters, pandemics, terrorism and similar emergencies; and, *provided, further,* and without limiting the foregoing, "Tax-Supported Debt" *excludes* (x) revenue bonds of an Entity payable solely from user charges or securitization and transition charges imposed upon customers or former customers of a utility or transportation system, including the self-supporting debt of PRASA, PREPA, HTA or any related securitization entity, and (y) any other debt that is not payable from Debt Policy Revenues, pursuant to the Debt Management Policy, in each case, to the extent such debt is not guaranteed by the full faith, credit and taxing power of the Commonwealth; and, *provided, further,* that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or

Debt Responsibility Act, which cap will be set at 7.94% of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay maximum annual debt service on the COFINA Bonds as of the Effective Date.

Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date.

The Secretary of Treasury's certification of compliance with the debt limit pursuant to this subsection (a) shall be conclusive and binding absent manifest error; *provided*, *however*, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

a)    **Adoption and Maintenance of a Debt Management Policy**

During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past debt issuance practices of the Commonwealth are not repeated. While the Reorganized Commonwealth may revise and update its Debt Management Policy to reflect changing bond market conditions and standards (including, but not limited to, related changes to collections, revenues, taxes, fees, etc.), the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(i)    Long-Term Borrowing for Capital Improvements Only:  To ensure the Reorganized Commonwealth achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Tax-Supported Debt issued after the Effective Date may only be incurred to finance Capital Improvements,[418] as

---

securitized debt sublimit above the levels set forth in Section 71.4 of the Plan, the Debt Management Policy may contain additional provisions and clarifications regarding which debt is considered Tax-Supported Debt..

[418]**Capital Improvements**:  Any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities, including without limitation buildings, park facilities, infrastructure, information technology systems or other

determined by the issuer of such debt approved by AAFAF, or to refinance Tax-Supported Debt in accordance with Section 71.5(d) of the Plan described in (iv) below. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in the issuer's reasonable discretion, are necessary to carry out such Capital Improvements, including any and all expenses incurred in connection with the issuance itself.

(ii)    30-Year Maturity Limitation on All Tax-Supported Borrowing: No Tax-Supported Debt issued on or after the Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such debt may be refinanced by any debt extending such legal final maturity date beyond such original maturity date limitation; provided, however, that, the foregoing shall not apply to (A) Tax-Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution, or (B) Tax-Supported Debt issued to refinance debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to Section 71.5(d) of the Plan described in (iv) below.

(iii)    Required Principal Amortization: No series of Tax-Supported Debt issued from and after the Effective Date may be issued unless its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financings of new construction or reconstruction of Capital Improvements, and continues amortizing in each and every year until such debt is no longer outstanding.

(iv)    Refinancings Permitted only for Cash Flow Savings in every Fiscal Year: Refinancings of Tax-Supported Debt are permitted only if (A) there is no increase in the amount of bond principal and interest payable in any Fiscal Year, and (B) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Reorganized Commonwealth in its Debt Management Policies; provided, however, that refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future Fiscal Year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

---

equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit.

(v)      Fiscal Plan Debt Service: Any post-Effective Date Fiscal Plan shall include provisions for the payment, in each FY of (a) principal and interest with respect to the New GO Bonds, including, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

Notwithstanding the foregoing, nothing contained herein shall prohibit the Reorganized Commonwealth from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## G.    Provisions Regarding Assured Insured Bonds, National Insured Bonds, and Syncora Insured Bonds

### 1.    Treatment of Assured Insured Bond Claims

If Classes 2, 16, 22, 29, 34, and 39 vote to accept the Plan, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force and effect, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the Effective Date, holders of Assured Insured Bond Claims will receive the following treatments.[419]

(a)    *Assured Election*: At Assured's election, Assured will receive the Cash and CVIs allocable to holders of Assured Insured Bonds, and all or any portion of the Assured Insured Bonds selected by Assured will be paid, in full, on the Effective Date, at an Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from:

(a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of Assured Insured Bonds, which Assured New GO Bonds will be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12, and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and

---

[419] Pursuant to Section 72.1 of the Plan, such treatments shall be selected by Assured in its sole and absolute discretion at or prior to the commencement of the Disclosure Statement Hearing and this Disclosure Statement will be updated accordingly. For the avoidance of doubt, Assured has not made any selection pursuant to Section 71.1 of the Plan as of the filing of this Disclosure Statement.

(b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Acceleration Price, amounts equal to such deficiency paid by Assured in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds.

The principal amounts, maturities and interest rates on the Assured New GO Bonds in respect of which Assured has exercised the Assured Election will be determined by Assured in consultation with applicable underwriter(s), such that the interest rates on the Assured New GO Bonds will be the lowest interest rates necessary for such Assured New GO Bonds to be issued with increased par amounts relative to other New GO Bonds and otherwise result in the Assured New GO Bonds being issued at the lowest aggregate yield;

The annual debt service on the Assured New GO Bonds due in any FY will not be greater than the annual debt service that would have been due in such FY if such Assured New GO Bonds had the same terms as the other New GO Bonds. If either (i) at or prior to the time of pricing of Assured New GO Bonds, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (ii) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, then, in either case, Assured (A) may elect, in its sole discretion, to exercise the Assured Acceleration Price Payment Option by paying the applicable Acceleration Price to the holders of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election, and (B) will receive, on the Effective Date, the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash and other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it.

Payment of the applicable Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election or the Assured Acceleration Price Option, will satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b)  ***Assured Insured Bondholder Elections***:  If Assured declines to make the Assured Election with respect to any Assured Insured Bonds as set forth above (or makes the Assured Election but declines to exercise the Assured Acceleration Price Payment Option upon the occurrence of any event that gives Assured the right to exercise such option as described above), each beneficial holder of an Assured Insured Bond with respect to which Assured has not made the Assured Election may elect one of the following Assured Bondholder Elections, in each case on terms acceptable to Assured:

Assured Bondholder Election 1: Such holder will receive from Assured the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured will receive the cash and Assured New Securities allocable to such holder under the Plan, which Assured New Securities, in the case of Assured New GO Bonds, may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it;.

Assured Bondholder Election 2: Such holder will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that would provide such holder with an interest in (A) the applicable Assured Insurance Policy and (B) the Assured New Securities allocable to such holder in accordance with terms acceptable to Assured

Assured Bondholder Election 3: Such holder will, on the Effective Date, and in full satisfaction of Assured's obligations under the applicable Assured Insurance Policies, receive (i) the Cash and Assured New Securities allocable to such holder under the Plan, which, in the case of the Assured New GO Bonds, may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, and (ii) a Cash payment from Assured in an amount to be determined or defined by Assured prior to the commencement of the Disclosure Statement Hearing.

The Assured Bondholder Elections offered to Assured Insured Bondholders will include at least either Assured Bondholder Election 1 or Assured Bondholder Election 2. The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 will be DTC eligible. In the event an Assured Insured Bondholder fails to make an election, such Assured Insured Bondholder will be deemed to have elected Assured Bondholder Election 2.

(c)  *Acceleration of Assured Insured Bonds*.  To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds will be accelerated from and after the Effective Date. Such Assured Insured Bonds will be deemed due and payable from and after the Effective Date at the Assured Acceleration Price of 100% of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)  *Assignment of Redemption Rights*.  On the Effective Date, the Commonwealth, PBA, and CCDA will be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively

by Assured as if it were the Commonwealth, PBA, and CCDA for such purpose. Any amounts due in connection with such redemption will be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

2. **Treatment of National Insured Bond Claims**

If Classes 3, 17, and 23 vote to accept the Plan, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, holders of National Insured Bond Claims will receive the following treatments.

(a) *National Commutation Treatment*: Each holder of an Allowed National Insured Bond Claim will have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the beneficial holder thereof will have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, and (ii) National will receive the National Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed National Insured Bond Claim.

A holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment will be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed National Insured Bond Claim cancelled.

(b) *National Non-Commutation Treatment*: If a holder of an Allowed National Insured Bond Claim timely and validly elects not to receive the National Commutation Treatment, such holder of an Allowed National Insured Bond Claim will receive one or more of the treatments set out more fully in Section 71.2 of the Plan, at Nationals election, which will be exercised by National at or prior to the commencement of the Disclosure Statement Hearing.

(c) *Acceleration of National Insured Bonds*. To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds will be accelerated as of the Effective Date. The National Insured Bonds will be deemed due and payable form and after the Effective Date at an "acceleration price" of 100% of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

476

(d) **_Assignment and Redemption Rights_**. On the Effective Date, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable National Insurance Policy, the Commonwealth and PBA will be deemed to assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption will be equal to the lesser of the applicable redemption price and the National Acceleration Price.

3. **Treatment of Syncora Insured Bond Claims**

If Classes 5, 19, and 25 vote to accept the Plan, holders of Syncora Insured Bond Claims will receive the following treatments.

(a) **_Acceleration of Syncora Insured Bonds_**. To the extent permitted pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds will be deemed accelerated as of the Effective Date. The Syncora Insured Bonds will be due and payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(b) **_Assignment and Redemption Rights_**. On the Effective Date, the Commonwealth and PBA will be deemed to assigned to Syncora any and all rights to redeem and call the Syncora Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Syncora as if it were the Commonwealth or PBA for such purpose. Any amounts due in connection with such redemption will be equal to the lesser of the applicable redemption price and the Syncora Acceleration Price.

4. **Creation of FGIC Trust**

On or prior to the Effective Date, unless otherwise agreed to by the holders of 50.1% of FGIC Insured Bonds, the FGIC Trusts will be formed on behalf of, and for the sole benefit of beneficial holders of, FGIC Insured Bonds. The trustee of the FGIC Trust(s) will be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.

On the Effective Date, the FGIC Trust Assets, consisting of (a) the FGIC Insured Bonds (b) distributions provided in the Plan with respect to such FGIC Insured Bonds, and (c) the FGIC Insurance Policies, will be deposited into the FGIC Trust. The costs, including fees and expenses and any obligation arising under the Plan associated with the formation and operation of the FGIC

477

Trust will be paid from the FGIC Trust Assets and the Commonwealth will have no obligation with respect thereto.

The FGIC Insured Bonds in the FGIC Trust will not be cancelled and all rights and remedies under and in accordance with such FGIC Insured Bonds, the Bond Resolution (other than with respect to the payment obligations of the Commonwealth), and the FGIC Insurance Policies will be preserved and remain in full force and effect. Upon deposit of the FGIC Trust Assets, on a pro rata basis, the FGIC Trust will issue one or more series of FGIC Certificates to the beneficial holders of FGIC Bonds whose allocable shares of the FGIC Trust Bond Distribution have been deposited into the FGIC Trust. The FGIC Certificates will entitle a holder thereof to its Pro Rata Share of value in any distribution of Cash from the respective FGIC Trust, which distribution will (i) in all cases, occur promptly upon receipt thereof by the FGIC Trust, and (ii) automatically reduce the obligation outstanding under the FGIC Insurance Policies as of the date of such distribution to holders of FGIC Certificates in the amount of any such distribution.

FGIC's obligation to pay the scheduled amounts on the underlying GO Bonds as and when due will not be accelerated without the consent of a majority in face amount of holders of FGIC Certificates that vote. A majority in face amount of holders of FGIC Certificates that vote may direct the trustee of the FGIC Trust to take any actions with respect to FGIC Trust Assets, including (i) voting, amendment, acceleration, events of default, election and direction of rights and remedies (including, without limitation, in connection with insolvency proceedings) and (ii) the sale or other distribution of any FGIC Trust Assets. Upon the maturity date of the GO Bonds in the FGIC Trust, FGIC Trust Assets will be distributed pro rata to holders of FGIC Certificates. Any such distribution will automatically reduce the obligation under the FGIC Insurance Policies in the amount of the principal amount of such GO Bonds as of the date of such distribution. Each series of FGIC Certificates will bear unique municipal CUSIPs and will be freely tradable and transferable through the Depository Trust Company.

The FGIC Trust will be a grantor trust formed under Delaware law subject to "pass through" tax treatment supported by an opinion of nationally-recognized municipal finance tax counsel. All Cash distributed by the FGIC Trust will reduce the obligation under the outstanding FGIC Insurance Policies by first being credited against interest due on GO Bonds until fully paid and second against GO Bond principal. At each payment date under the FGIC Insurance Policies, the FGIC Trust will receive Cash at the then-current CCP and the right to DPOs in the amount of the shortfall (each as defined in the Third Amended Plan of Rehabilitation of FGIC). Cash will be distributed to holders of FGIC Certificates as set forth above and the right to receive payment on the DPOs will be held by the FGIC Trust.

5.      **Creation of Ambac Trust**

On or prior to the Effective Date, unless otherwise agreed to by the holders of 50.1% of Ambac Insured Bonds, the Ambac Trusts will be formed on behalf of, and for the sole benefit of beneficial holders of, Ambac Insured Bonds. The trustee of the Ambac Trust(s) will be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.

On the Effective Date, the Ambac Trust Assets, consisting of (a) the Ambac Insured Bonds (b) distributions provided in the Plan with respect to such Ambac Insured Bonds, and (c) the Ambac Insurance Policies, will be deposited into the Ambac Trust. The costs, including fees and expenses and any obligation arising under the Plan associated with the formation and operation of the Ambac Trust will be paid from the Ambac Trust Assets and the Commonwealth will have no obligation with respect thereto.

The Ambac Insured Bonds in the Ambac Trust will not be cancelled and all rights and remedies under and in accordance with such Ambac Insured Bonds, the Bond Resolution (other than with respect to the payment obligations of the Commonwealth), and the Ambac Insurance Policies will be preserved and remain in full force and effect. Upon deposit of the Ambac Trust Assets, on a pro rata basis, the Ambac Trust will issue one or more series of Ambac Certificates to the beneficial holders of Ambac Bonds whose allocable shares of the Ambac Trust Bond Distribution have been deposited into the Ambac Trust. The Ambac Certificates will entitle a holder thereof to its Pro Rata Share of value in any distribution of Cash from the respective Ambac Trust, which distribution will (i) in all cases, occur promptly upon receipt thereof by the Ambac Trust, and (ii) automatically reduce the obligation outstanding under the FGIC Insurance Policies as of the date of such distribution to holders of Ambac Certificates in the amount of any such distribution.

Ambac's obligation to pay the scheduled amounts on the underlying GO Bonds as and when due will not be accelerated without the consent of a majority in face amount of holders of Ambac Certificates that vote. A majority in face amount of holders of Ambac Certificates that vote may direct the trustee of the Ambac Trust to take any actions with respect to Ambac Trust Assets, including (i) voting, amendment, acceleration, events of default, election and direction of rights and remedies (including, without limitation, in connection with insolvency proceedings) and (ii) the sale or other distribution of any Ambac Trust Assets. Upon the maturity date of the GO Bonds in the Ambac Trust, Ambac Trust Assets will be distributed pro rata to holders of Ambac Certificates. Any such distribution will automatically reduce the obligation under the Ambac Insurance Policies in the amount of the principal amount of such GO Bonds as of the date of such distribution. Each series of Ambac Certificates will bear unique municipal CUSIPs and will be freely tradable and transferable through the Depository Trust Company.

The Ambac Trust will be a grantor trust formed under Delaware law subject to "pass through" tax treatment supported by an opinion of nationally-recognized municipal finance tax counsel. All Cash distributed by the Ambac Trust will reduce the obligation under the outstanding Ambac Insurance Policies by first being credited against interest due on GO Bonds until fully paid and second against GO Bond principal.

### H.    Treatment of Executory Contracts and Unexpired Leases

All executory contracts and leases of nonresidential real property with any Debtor will be treated as follows:

| Category | Treatment |
|---|---|
| **Executory Contract or Unexpired Lease Rejected or Assumed and Assigned by an Order of the Title III Court Entered Before the Confirmation Date** | *Treatment.* Will be unaffected by the Plan. The order of Title III Court with respect to such executory contract or unexpired lease will continue to govern. |
| **Executory Contract or Unexpired Lease Listed in Schedule to Plan Supplement** | *Treatment.* The Plan Supplement will include a schedule of executory contracts and unexpired leases that will be assumed, or assumed and assigned as of the Effective Date. The scheduled may be amended at any time before the Confirmation Date. Pursuant to the Bankruptcy Code, as a condition of assumption of an executory contract, the debtor must promptly cure any defaults, and if there is a default, provide adequate assurance that the debtor will continue to perform under the contract.<br><br>*Notice and Cure of Defaults.* At least 20 days before the Confirmation Hearing, the Debtors will file and serve a notice to parties to such contracts or leases. The notice will include the amount to be paid by the Debtors to cure any default for each executory contract or unexpired lease.<br><br>*Objections.* Any party to such executory contract or unexpired lease will have 20 days from the date of service of the notice to file and serve any objection to the cure amounts listed and to any proposed adequate assurance of future performance the debtor may provide. If there are any objections filed, the Title III Court will hold a hearing on the objection. |
| **Collective Bargaining Agreements** | Except as provided in Articles LII and LIII of the Plan (Provisions for Treatment of Active Employee Claims), none of the Debtors' collective bargaining agreements will be (a) treated as executory contracts, or (b) assumed or rejected or otherwise treated under the Plan.<br><br>The Debtors' collective bargaining agreements will remain in effect subject to Puerto Rico Law and Articles LII and LIII of the Plan regarding the payment and ongoing treatment of pension and related claims and obligations. |
| **Executory Contracts and Unexpired Leases of PBA and relating to the lease or sublease of PBA Property** | *Treatment.* Will be unaffected by the Plan. |
| **Executory Contracts and Unexpired Leases that have been registered with the Office of the Comptroller of Puerto Rico or have been approved** | *Treatment.* Will be unaffected by the Plan. |

480

| Category | Treatment |
|---|---|
| by the Oversight Board or authorized by the Title III Court | |
| **All Other Executory Contracts and Unexpired Leases** | ***Treatment.*** Will be rejected by the Debtors as of the Effective Date.<br><br>***Notice.*** Notice of any executory contract or unexpired lease to be rejected will be served on parties to such contract or lease.<br><br>***Rejection Damages.*** Any party seeking to assert a claim for damages resulting from the rejection of an executory contract or unexpired lease must file a proof of claim on or before 30 days after (i) the Confirmation Date, or (ii) the date of the entry of an order by the Title III Court approving the rejection of such executory contract or unexpired lease, whichever is later.<br><br>If a party fails to file a proof of claim for damages resulting from the rejection of an executory contract or unexpired lease within the deadline above, such claim will be forever barred and unenforceable against the Debtors. |

*Insurance Policies.* Each of the Debtors' insurance policies and any related agreements, documents, or instruments will be treated as executory contracts under the Plan. However, such treatment will not discharge or relieve Ambac, Assured, FGIC, National, or Syncora of their respective obligations to holders of claims under policies of insurance and applicable law and governing documents with respect thereto.

*Indemnification and Reimbursement Obligations.* Any obligation of the Debtors to indemnify and reimburse its directors or officers that were directors or officers on or prior to the relevant petition date (including any director and officer insurance policies) will be assumed as of the Effective Date.

Any indemnification obligation of the Debtors arising from conduct of officers and directors from and after the relevant petition date will be treated as Administrative Expense Claims. Under no circumstances will the Debtors or the Reorganized Debtors, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors. *See* section VI.D of this Disclosure Statement for a summary of the treatment of Administrative Expense Claims.

*Disputes Regarding Executory Contracts and Unexpired Leases.* If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors will have 45 days following the entry of a final order resolving such dispute to alter their treatment of such contract or lease.

## I. Rights and Powers of Disbursing Agent

The disbursing agent will be the Commonwealth or an entity/ies designated by the Oversight Board and AAFAF on or before the Effective Date to make or facilitate distributions in accordance with the Plan.

*Powers of the Disbursing Agent*. The Disbursing Agent will be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations of the Plan, and (d) exercise any other powers vested in the Disbursing Agent by an order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the Plan.

*Fees and Expenses Incurred From and After the Effective Date.* The reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, and any reasonable compensation and expense reimbursement claims (*e.g.*, reasonable fees and expenses of counsel) incurred by the Disbursing Agent will be paid in cash without further order of the Title III Court.

*Exculpation*. The Disbursing Agent will be exculpated by all entities (including holders of claims and other parties in interest) from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Disbursing Agent, except for actions or omissions to act arising out of gross negligence or willful misconduct of the Disbursing Agent. No holders of a claim or other party in interest may have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

## J. Provisions Governing Distributions

*Time and Manner of Distributions.*

*Distributions to Holders of Claims*. The Disbursing Agent will make distributions to holders of the following claims within ten (10) business days after the Effective Date. *See* section VI.E of the Disclosure Statement for the applicable distributions to be made to holders of such claims.

- Allowed PBA Bond Claims

- Allowed CW Bond Claims

- Allowed CW Guarantee Bond Claims

- Allowed ERS Bond Claims

- Allowed CW General Unsecured Claims

- Allowed ERS General Unsecured Claims

With respect to Allowed ERS Bond Claims, upon making distributions in accordance with Section 74.1(c) of the Plan, including, without limitation, the distribution of any proceeds from the sale of the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the terms and provisions of Section 66.2 of the Plan, the ERS Fiscal Agent will close and terminate the original CUSIPs with respect to the ERS Bonds and will have no further distribution obligations.

Distribution of the Retail Support Fee, if any, to a holder of an Allowed PBA Bond Claim or Allowed CW Bond Claim is subject to the delivery, on or before the Voting Deadline, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

*Distributions to Holders of Allowed PBA General Unsecured Claims.*  The Disbursing Agent will make distributions to holders of Allowed PBA General Unsecured Claims in the treatment provided for holders of Allowed PBA General Unsecured Claims in Class 12.

***Distributions of Cash to Holders of Certain Other Claims.***  Distributions to holders of Allowed Administrative Expense Claims will be made in cash as soon as practicable after the later of (i) the Effective Date, or (ii) the date on which the claim becomes an allowed claim.

***Timeliness of Payments.***  Any payment or distribution made within ten (10) business days after the date specified in the Plan will be considered timely made. When a distribution is due on a day other than a business day, such distribution will be made on the next business day, without interest, and will be considered to have been made on the date due.

***Distributions by the Disbursing Agent.***  All distributions under the plan will be made by the Disbursing Agent, unless otherwise specified. The Disbursing Agent will hold all property to be distributed under the Plan in trust for all entities entitled to receive such property. The Disbursing Agent will not hold an economic or beneficial interest in such property.

***Manner of Payment under the Plan.***  Cash payments will be made by either check or wire transfer. However, no cash payment will be made until the amount payable is equal to or greater than ten dollars ($10.00).

***Delivery of Distributions.***  Distributions and deliveries to holders of allowed claims will be made (a) at the address of the applicable holder in the schedules filed with the Title III Court, unless the holder filed a proof of claim with an updated address, or the Debtors have been notified in writing of a change of address, or (b) through The Depository Trust Company.

However, initial distributions for holders of the following claims may be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the applicable governing documents for Allowed Bond Claims.

Distributions of the PSA Restriction Fees, Retail Support Fee, Retail Support Fee Return, and Consummation Costs in cash will be made to the applicable parties in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or fiscal agent for each

such obligation will, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents.

The Debtors, its agents and servicers, and the Disbursing Agent have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date. However, the New GO Bonds and CVIs will be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

***Cancellation of Notes, Instruments, Certificates, and Other Documents.*** On the Effective Date, the PBA Bonds, ERS Bonds, GO Bonds and all instruments and documents related thereto will be cancelled, terminated and of no further force or effect against the Debtors. The Debtors and the applicable trustee, paying agent, or fiscal agent will have no continuing obligations or duties and responsibilities under the PBA Bonds, ERS Bonds, and GO Bonds. The obligations of the parties to the Debtors under the PBA Bonds and GO Bonds and all related instruments and documents will be discharged.

However, the PBA Bonds, ERS Bonds, and GO Bonds and related instruments and documents will continue in effect for the limited purposes below:

(i)     to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform related necessary administrative or other functions,

(ii)    to allow holders of Allowed Bond Claims to receive distributions in accordance with the terms and provisions of the Plan,

(iii)   for any trustee, agent, contract administrator or similar entity under all instruments and related documents to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements,

(iv)    to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors,

(v)     to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 72.1 and 72.2 of the Plan, or

(vi)    as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a monoline insurer.

The Oversight Board will request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.

*Undeliverable/Reserved Distributions.*

*Holding of Undeliverable Distributions by the Disbursing Agent.* If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution will be made until the Disbursing Agent is notified, in writing, of such holder's then-current address. Undeliverable distributions will remain in the possession of the Disbursing Agent until the distribution becomes deliverable. All entities ultimately receiving previously undeliverable cash will not be entitled to any interest or other accruals thereon of any kind. The Disbursing Agent is not required to locate any holder of an allowed claim.

*Failure to Claim Undeliverable Distributions.* The Disbursing Agent will file a list with the Title III Court setting forth the names of any entity for which checks have been issued, but have not been cashed, or for which any other distribution has been returned as undeliverable. Such list will be filed within 180 days after the Effective Date (or within 180 days after a claim has been allowed, whichever is later).

Any holder of an allowed claim on such list will have six (6) months from the date the list is filed to identify itself and assert its right to receive a distribution. After six (6) months, such holder will be barred from asserting any entitlement to the undeliverable distribution.

*Withholding and Reporting Requirements.* All distributions under the Plan will be subject to any withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority. Each holder of an allowed claim that will receive a distribution under the Plan will be responsible for paying any taxes imposed on such holder on account of such distribution, including income, withholding and other tax obligations.

Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until the holder of an allowed claim has made arrangements for payment of any withholding tax obligations. If the party issuing any instrument or making any distribution under the Plan fails to withhold a distribution, and is later held liable for the amount of such withholding, the holder must reimburse such party.

The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9. If the holder fails to comply with such a request within one year, the distribution shall be deemed an Unclaimed Distribution.

*Time Bar to Cash Payments.* Checks issued by the Disbursing Agent will be null and void if not cashed within one hundred twenty (120) days from and after the date of issuance. Requests for reissuance of any check must be made directly to the Disbursing Agent.

Any claim related to a voided check must be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of the check, if the check represents a final distribution. After such date, all claims related to voided checks will be discharged and forever barred and the Disbursing Agent will retain all monies for such check to redistribution to holders of allowed claims in accordance with the terms and provisions of the Plan.

485

*Distributions After Effective Date.* Distributions made after the Effective Date to holders of claims that are not allowed claims as of the Effective Date, but which later become allowed claims, will be deemed to have been made in accordance with the terms and provisions of the Plan.

*Setoffs.* The Disbursing Agent may set off against any allowed claim and the distributions to be made pursuant to the Plan, the claims, rights, and causes of action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such allowed claim.

However, neither the failure to effect such a setoff nor the allowance of any claim will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and causes of action that the Debtors or the Reorganized Debtors may possess against such holder.

*Allocation of Plan Distributions Between Principal and Interest.* To the extent that any allowed claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), distributions will be allocated first, to interest accrued and unpaid as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, second, to the principal amount of the claim (as determined for federal income tax purposes), and then to the extent the consideration exceeds the principal amount of the claim to other amounts (such as accrued but unpaid interest).

However, the Debtors or Reorganized Debtor's treatment of any distributions for its tax purposes will not be binding on any creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

*Payment of Trustee Fees and Expenses.* The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses which may be allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts discharged pursuant to the Plan. The Plan does not, nor shall it be construed to, limit the rights of each Trustee/Fiscal Agent to payment of such amounts from the distributions to be made pursuant to the Plan, including the imposition of any Charging Lien.

*Beneficial Owner.* For all purposes of the Plan, including for purposes of distributions pursuant to the Plan, except with respect to Claims arising from bonds insured by Syncora, the "holder" of a Claim means any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim.

However, for purposes of Article LXXIII of the Plan and section 1126 of the Bankruptcy Code, (a) National shall consistute the "holder" of any National Bond Insured Claims and any National CW/HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA and the law and governing documents applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims, (b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA and the law and governing documents applicable to the Assured Insured Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims, and the Assured CW/PRIFA Rum Tax Claims, and (c) the "holder" of any other Insured Bond Claims will be determined in

accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Bond Claims.

*Value of Distributions*.  For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash will be valued in the amount distributed and (b) the New GO Bonds and CVIs will be valued at the original principal amount thereof.

## K.   Avoidance Actions Trust

### 1.   Execution of Avoidance Actions Trust Agreement

On or before the Effective Date, the Debtors and the Avoidance Actions Trustee will execute the Avoidance Actions Trust Agreement and establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests.  The Avoidance Actions Trust and the Avoidance Actions Trust Interests will be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their claims are allowed before or after the Effective Date.

The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those stated in the Plan, but only to the extent that they do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for federal income tax purposes.

### 2.   Purpose of the Avoidance Actions Trust

The Avoidance Actions Trust will be established for the sole purpose of litigating or settling the Avoidance Actions and distributing its assets in accordance with Treasury Regulation section 301.7701-4(d).

### 3.   Avoidance Actions Trust Assets

The Avoidance Actions Trust Assets consist of the Avoidance Actions, funds held in escrow as of the Effective Date relating to the compromise and settlement of certain avoidance actions prior to the Effective Date (net of expenses incurred by the escrow agent), and such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth on Exhibit A to the Plan.  The actions to be transferred to the Avoidance Actions Trust include, but are not limited to, the actions listed on <u>Exhibit N</u> to this Disclosure Statement.

On the Effective Date, the Debtors will transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities as provided in the Plan or the Avoidance Actions Trust Agreement.  The transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors and their predecessors, successors and assigns, and each other Entity will be released pursuant to Section 89.2 of the Plan, and will be discharged and released from all liability with respect to the delivery.

4.    **Administration of the Avoidance Actions Trust**

The Avoidance Actions Trust will be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan. If there are inconsistencies between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement will govern.

5.    **The Avoidance Actions Trustee and the Avoidance Actions Trust Board**

If the Avoidance Actions Trustee dies, is terminated, or resigns for any reason, the Avoidance Actions Trust Board will designate a successor. The Avoidance Actions Trustee cannot be a director or officer of any affiliate of the Avoidance Actions Trust.

The Avoidance Actions Trust Board will consist of three (3) members appointed as of the Effective Date to govern the Avoidance Actions Trust, with two (2) directors selected by the UCC, and one (1) director selected by the Oversight Board.

6.    **Role of the Avoidance Actions Trustee**

The Avoidance Actions Trustee will have the rights, powers, and duties to:

a)    hold, manage, convert to cash, and distribute the Avoidance Actions Trust Assets, including resolving the claims belonging to the Avoidance Actions Trust;

b)    hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, regardless of when their claims are allowed;

c)    investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Avoidance Actions Trust;

d)    file all tax and regulatory forms, returns, reports, and other documents required with respect to the Avoidance Actions Trust;

e)    control, prosecute, and/or settle objections to claims on behalf of the Avoidance Actions Trust; and

f)    hold, manage, and distribute cash or non-cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority.

The Avoidance Actions Trustee will act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

7.    **Avoidance Actions Trustee's Tax Power for Debtors**

From and after the Effective Date, the Avoidance Actions Trustee will prepare and file all tax returns required to be filed or that the Avoidance Actions Trustee otherwise deems appropriate on behalf of the Debtors.

8.      **Transferability of Avoidance Actions Trust Interests**

The Avoidance Actions Trust Interests will not be transferable or assignable except for by will, intestate succession, or operation of law.

9.      **Cash**

The Avoidance Actions Trustee may invest cash as permitted by section 345 of the Bankruptcy Code. The investments must be investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), or under IRS guidelines, rulings, or other controlling authorities.

10.      **Distribution of Avoidance Actions Trust Assets**

The Avoidance Actions Trustee will distribute to the holders of allowed claims on account of their Avoidance Actions Trust Interests, on a semi-annual basis, all unrestricted cash on hand. This includes any cash received from the Debtors on the Effective Date, and treating any permissible investment as cash for purposes of distribution.

However, this semi-annual distribution will not include:

a)      Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust;

b)      Amounts retained in connection with Disputed Claims in accordance with Section 80.3 of the Plan to pay reasonable incurred or anticipated expenses (e.g., taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets).

The Avoidance Actions Trustee will not be required to make a semi-annual distribution if (i) the aggregate, net amount of unrestricted cash available for distribution (taking into account the exclusions above) would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and (ii) such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00). The Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, may decide to forego the first quarterly distribution to holders of Avoidance Actions Trust Interests if the Avoidance Actions Trustee is not prepared to make the distribution. If this occurs, the distribution will be made to such holders as soon as practicable after the Avoidance Actions Trustee is administratively prepared to do so.

11.      **Funding, Costs, and Expenses of the Avoidance Actions Trust**

On the Effective Date, the Avoidance Actions Trust will be funded on a one-time basis in an amount of $15,000,000.00, as determined by the UCC at or prior to the Confirmation Hearing.

The reasonable costs and expenses of the Avoidance Actions Trust, which include the fees and expenses of the Avoidance Actions Trustee and its retained professionals, will be paid out of the Avoidance Actions Trust Assets. Fees and expenses incurred in connection with the

prosecution and settlement of any claims will be considered costs and expenses of the Avoidance Actions Trust.

12.     **Compensation of the Avoidance Actions Trustee**

The Avoidance Actions Trustee will be entitled to reasonable compensation consistent with that of similar functionaries in similar roles, the payment of which will be subject to the approval of the Title III Court, but subject to approval and consent of the Avoidance Actions Trust Board.

13.     **Retention of Professionals/Employees by the Avoidance Actions Trustee**

The Avoidance Actions Trustee may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board, if the Avoidance Actions Trustee deems it appropriate, without Title III Court approval and subject to consent of the Avoidance Actions Trust Board.

14.     **Federal Income Tax Treatment of the Avoidance Actions Trust**

a)     **Avoidance Actions Trust Assets Treated as Owned by Creditors.**

For federal income tax purposes, all parties will treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as

(i)     a transfer of the Avoidance Actions Trust Assets directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the Avoidance Actions Trust Claims Reserve, followed by

(ii)     the transfer of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to the Avoidance Actions Trust Claims Reserve) by the beneficiaries to the Avoidance Actions Trust in exchange for Avoidance Actions Trust Interests.

The Avoidance Actions Trust Beneficiaries will be treated as the grantors and owners of their respective share of the Avoidance Actions Trust Assets for federal income tax purposes (other than Avoidance Actions Trust Assets that are allocable to the Avoidance Actions Trust Claims Reserve). This will also apply to state and local income tax purposes, to the extent allowed by law.

b)     **Tax Reporting.**

(i)     The Avoidance Actions Trustee will file Tax Returns for the Avoidance Actions Trust, treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 74.14 of the Plan. The Avoidance Actions Trustee also will annually send a separate statement regarding the receipts and expenditures of the Avoidance Actions

490

Trust as relevant for U.S. federal income tax purposes to each holder of an Avoidance Actions Trust Interest. The statement will instruct all holders to use the statement in preparing their U.S. federal income tax returns or to forward the appropriate information to the holder's beneficial holders, with instructions to use the statement in preparing their U.S. federal income tax returns. The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(ii)     Pursuant to the Plan, the Avoidance Actions Trustee, in consultation with the Avoidance Actions Board, will, in good faith, value the Avoidance Actions Assets. The Avoidance Actions Trustee shall make the respective values of the Avoidance Actions Assets available from time to time, to the extent relevant, and all parties to the Avoidance Actions Trust (including, without limitation, the Debtors, the Avoidance Actions Trustee and Avoidance Actions Trust Beneficiaries) must consistently use the value of the assets transferred to the Avoidance Actions Trust provided by the Debtors or the Avoidance Actions Trustee pursuant to the Plan for all U.S. federal income tax purposes.

(iii)     Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to the Avoidance Actions Trust Claims Reserve) will be determined by: reference to the manner in which an amount of cash representing the taxable income would be distributed (were the cash allowed to be distributed at the time) if, immediately prior to the distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Avoidance Actions Trust Claims Reserve) to the holders of the Avoidance Actions Trust Interests. The value will be adjusted for prior taxable income and loss and take into account all prior and concurrent distributions from the Avoidance Actions Trust. Taxable loss of the Avoidance Actions Trust will be allocated by: reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. The tax book value of the Avoidance Actions Trust Assets will be equal their fair market value on the Effective Date, adjusted with IRC tax accounting principles, Treasury Regulations, and other applicable authorities.

(iv)     Subject to guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee will

(1)     elect to treat any Avoidance Actions Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9

(2)     to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All other parties (including, without limitation, the Debtors and the Avoidance Actions Trust Beneficiaries) must report for United States federal, state and local income tax purposes consistently with the foregoing.

(v)     The Avoidance Actions Trustee will be responsible for payment of any Taxes imposed on the trust or its assets, including the Avoidance Actions Trust Claims Reserve, out of the Avoidance Actions Trust Assets. If any Cash retained on account of Disputed Claims in the Avoidance Actions Trust Claims Reserve is insufficient to pay the portion of Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets of the Avoidance Actions Trust Claims Reserve), the Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent the Disputed Claims have been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of the Disputed Claims.

c)     **Tax Withholdings by Avoidance Actions Trustee.**

The Avoidance Actions Trustee may withhold and pay taxes on all amounts required to be withheld pursuant to the IRC or foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests. All amounts withheld and paid (or placed in escrow pending resolution of the need to withhold) will be treated as amounts distributed to holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement. The Avoidance Actions Trustee will be authorized to collect tax information from the holders of Avoidance Actions Trust Interests (including social security numbers or other tax identification numbers) that it deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement. In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests will be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings to the extent the Avoidance Actions Trustee deems appropriate. This identification requirement applies to all holders, including those who hold their securities in street name. The Avoidance Actions Trustee may refuse to distribute to any holder of an Avoidance Actions Trust Interest who fails to provide it the information in a timely fashion, and until the information is delivered, may treat the holder's Avoidance Actions Trust Interests as disputed. If the information is not given to the Avoidance Actions Trustee within six (6) months of the original request to provide it, no further distributions will be made to the holder of the Avoidance Actions Trust Interest. Upon the delivery of the information by a holder of an Avoidance Actions Trust Interest, the Avoidance Actions Trustee will make a distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by the delay in providing tax information. If the Avoidance Actions Trustee fails to withhold amounts received or distributable with respect to the holder and the Avoidance Actions Trustee is later held liable for the amount of the withholding, such holder will reimburse the Avoidance Actions Trustee to the extent the amounts were actually distributed to such holder.

d) **The Avoidance Actions Trustee and the Avoidance Actions Trust will be discharged or dissolved, upon the earlier to occur of**

    (i)    all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement;

    (ii)    the Avoidance Actions Trustee determines, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; or

    (iii)    all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made. The Avoidance Actions Trust may not be dissolved later than three (3) years from the Effective Date unless the Title III Court, upon motion six-months prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets. The extension is not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Avoidance Actions Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as an Avoidance Actions trust for United States federal income tax purposes. If at any time the Avoidance Actions Trustee determines, in reliance upon its retained professionals, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Avoidance Actions Trustee may apply to the Title III Court for authority to

    (1)    (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC

    (2)    exempt from United States federal income tax under section 501(a) of the IRC, and

    (3)    dissolve the Liquating Trust.

15. **Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Board**

The Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board, and their employees, agents and professionals (i) will not be liable

494

to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except acts arising out of their own willful misconduct or gross negligence, and (ii) will be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the parties entitled to indemnification will be paid solely from the Avoidance Actions Trust Assets and will be entitled to a priority distribution, ahead of the Avoidance Actions Trust Interests and any other claim to or interest. The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board will be entitled to rely, in good faith, on the advice of its retained professionals.

**L.    Prosecution and Extinguishment of Claims Held by the Debtors**

From and after the Effective Date, the Avoidance Actions Trustee will have the exclusive right and power to (a) litigate any avoidance, recovery, subordination, or other actions or remedies identified in the Plan under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, or under non-bankruptcy law, and (b) compromise and settle such claims with the approval of the Title III Court. The net proceeds of any such litigation or settlement will be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

**M.    Acceptance or Rejection of the Plan, Effect of Rejection by One or More Classes of Claims**

*Impaired Classes to Vote.* As of the Voting Record Date (June 3, 2020), each holder of a claim in the impaired classes below are entitled to vote separately to accept or reject the Plan.

*Acceptance by Class of Creditors.* An impaired class accepts the Plan if (i) at least two-thirds (2/3) in dollar amount of the Allowed Claims of such class who have voted accept the Plan, and (ii) more than one-half (1/2) in the number of the Allowed Claims of such class that have voted accept the Plan.

*Cramdown.* If any impaired class of claims reject, or fail to accept, the Plan, the Debtors may (i) request the Title III Court to confirm the Plan in accordance with the "cramdown" provisions of the Bankruptcy Code, or (ii) subject to the consent of the GO/PBA PSA Creditors, amend the Plan. For a summary of the "cramdown" provisions under the Bankruptcy Code, *see* section VII.C.1 of this Disclosure Statement.

**N.    Rights and Powers of Disbursing Agent**

The disbursing agent will be the Commonwealth or an entity designated by the Oversight Board and the Commonwealth on or before the Effective Date to make or facilitate distributions in accordance with the Plan.

*Powers of the Disbursing Agent.* The Disbursing Agent will be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations of the Plan, and (d) exercise any other powers vested in the Disbursing Agent by an order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the Plan.

*Fees and Expenses Incurred From and After the Effective Date.* The reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, and any reasonable compensation and expense reimbursement claims (*e.g.*, reasonable fees and expenses of counsel) incurred by the Disbursing Agent will be paid in cash without further order of the Title III Court.

*Exculpation.* The Disbursing Agent will be exculpated by all entities (including holders of claims and other parties in interest) from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Disbursing Agent, except for actions or omission to act arising out of gross negligence or willful misconduct of the Disbursing Agent. No holders of a claim or other party in interest may have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

## O.    Procedures for Treatment of Disputed Claims and Claims Subject to ACR Procedures

*Objections to Claims; Prosecution of Disputed Claims.* The Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, will file and serve any objections to claims no later than 180 days following the Effective Date, or such later date as approved by the Title III Court. All objections, affirmative defenses, and counterclaims will be litigated to final order. The Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, will have the authority to file, settle, compromise, or withdraw any objections to claims, without approval of the Title III Court.

Any Bond Claim filed by any entity for amounts due under existing securities will be deemed satisfied, expunged, and removed from the claims registry on the Effective Date.

Claims subject to resolution pursuant to the ADR Procedures and ADR Procedures Order will continue to be addressed under such procedures.

If an order reversing or vacating the Confirmation order with respect to Bond Claims becomes a Final Order, such Bond Claims will be reinstated on the claims registry.

The two UCC appointees to the Avoidance Actions Trust Board will (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that

such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of $500,000.00, such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.

With respect to the foregoing obligations and responsibilities, such appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of $3,000,000.00, which amounts shall be funded from the GUC Reserve.

*Estimation of Claims*. On and after the Effective Date, the Reorganized Debtors may request the Title III Court to estimate for final distribution purposes any contingent, unliquidated, or disputed claim, regardless of whether the Debtors previously objected to or sought to estimate such claim.

The Title III Court will retain jurisdiction to consider any request to estimate any claim.

If the Title III Court estimates any contingent, unliquidated, or disputed claim, the estimated amount will be either the allowed amount of such claim, or a maximum limitation on such claim, as determined by the Title III Court. If the estimate constitutes the maximum limitation on such claim, the Reorganized Debtors may in the future object to the ultimate allowance of such claim.

*Disputed Claims Holdback.* The Reorganized Debtors will hold, for the benefit of each holder of a disputed claim, the distribution such holders would receive if the disputed claim were allowed, until the disputed claim is settled, estimated by the Title III Court, or allowed. The amount of the distribution held back will be the lesser of (i) the liquidated amount stated in the filed proof of claim relating to such disputed claim, (ii) the amount of the disputed claim estimated by the Title III Court as the maximum amount in which such claim may ultimately become an allowed claim, or (iii) such other amount agreed upon by the holder of such disputed claim and Reorganized Debtors. The recovery of any holder of a disputed claim cannot exceed the lesser of (i), (ii), or (iii) above.

To the extent that Reorganized Debtors retain the New GO Bonds or CVIs on behalf of disputed claims holders, Reorganized Debtors shall exercise voting or consent rights with respect to such bonds until such bonds are distributed.

*Allowance of Disputed Claims.* When a disputed claim becomes an allowed claim (in whole or in part), the Reorganized Debtors will make distributions pursuant to the treatment specific under the Plan to the holder of such claim, to the extent the claim is allowed. Such distribution will be made no more than 90 days after such claim is determined to be allowed. With respect to the PBA Bond Distribution, Vintage CW Bond Distribution, and the New GO Bonds held back, any earnings that have accrued on such distribution will also be distributed.

***Non-Accrual of Interest.***  No holder of a claim (allowed or otherwise) will be entitled to interest accruing on or after the relevant petition date on any claim or right.  Interest will not accrue or be paid on any disputed claim with respect to the period from the Effective Date to the date of final distribution,  if such disputed claim becomes an allowed claim.

***Disallowance of Claims.***  If (a) an entity is liable to turn over any property or monies to the Debtors, and (b) such entity has failed to turn over such property or monies to the Debtors by the applicable deadline,  all claims of such entity will be disallowed.

***Authority to Amend List of Creditors.***  Except with respect to Bond Claims, and subject to the limitations  of Section 79.1(b) of the Plan, the Debtors may amend the List of Creditors with respect to any claim and to make distributions  based on such amended List of Creditors without approval of the Title III Court.  If any amendment reduces the amount of a claim or changes the nature or priority  of a claim, the Debtors will  provide the holder of such claim with notice of the amendment.  Such holder will have 20 days to file an objection to the amendment with the Title III Court.  If no objection is filed, distributions  will  be made based on such amended List of Creditors without approval of the Title III Court.

***Claims Subject to ACR Procedures***.  To the extent not already transferred as of the Effective Date in accordance with the terms and conditions  of the ACR Order, the Debtors will transfer Claims as are appropriate in accordance with the terms and conditions  of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable  regulatory and administrative  procedures of the Debtors, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the Plan, shall not be included  in CW General Unsecured Claims to be satisfied from the CW GUC Recovery or Convenience Claims.

The Oversight Board may remove a claim from the ACR process in the event that it was improperly  transferred into the ACR process because it did not qualify  in accordance with the terms and provisions  of the ACR Order, including,  without limitation,  bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the Plan).  Claims that are eligible  to be transferred to the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 51, Class 55, Class 63, Class 65 under the Plan and shall be administered  through the ACR process, in accordance with the terms of the ACR Order and subsections  (a) and (b) of Section 79.7 of the Plan.

## P.   Governance and Provisions Regarding Pension Reserve

***Formation and Responsibilities of Pension Reserve.***  On or before the Effective Date, the Commonwealth  will take all necessary steps to establish the Pension Reserve Trust, a reserve trust which will be utilized  to secure the Commonwealth's  pension obligations  under Act 106.

***Funding of the Pension Reserve.***  On the Effective Date, the Commonwealth  will contribute  to the Pension Reserve Five Million  Dollars ($5,000,000.00)  to fund the initial administrative  fees, costs, and expenses of the Pension Reserve Trust.  From and after the Fiscal Year in which the Effective Date occurs until the Fiscal Year ending seven (7) years after the end of such Fiscal Year, the Reorganized Commonwealth  will  make annual contributions  before

October 1st in the amount equal to (a) the Base Contribution, (b) an additional amount calculated as the lower of the primary surplus for the Fiscal Year and the projected Fiscal Plan primary surplus for such Fiscal Year, minus the sum of (i) the Base Contribution for the Fiscal Year, plus (ii) the Commonwealth debt service obligation under the Plan for the Fiscal Year, plus (iii) Two Hundred Million ($200,000,000); provided, however, that the additional amount cannot be lower than zero dollars, and (c) subject to applicable laws (including PROMESA Titles I and II), such additional amounts as the Reorganized Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust. The Pension Reserve Trust will be managed by an independent entity whose members must meet the independent, professionalism, experience, and qualification standards set forth in the Pension Reserve Deed of Trust, and will be subject to all government contracting, ethics, and conflicts of interest laws and regulations.

*Non-Impairment Covenant.* The Commonwealth will covenant in the Pension Reserve Deed of Trust for the benefit of all participants that, payments and other obligations owed to participants under the Plan (including PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan) will remain in place and unaltered until all obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bonds Legislation. Such obligations are enforceable by the Oversight Board, and any affected ERS Participant, JRS Participant, or TRS Participant. With respect to any such provision, the Pension Reserve Deed of Trust cannot be amended or modified by the Commonwealth (i) without the express prior written consent of the Oversight Board (if in existence), and a majority in number of Retirees receiving benefits pursuant to the Plan, who are affected by such amendment or modification or (ii) pursuant to a new or re-opened Title III case for the Commonwealth and a confirmed new or modified, and effective, plan of adjustment.

## Q.   Conditions Precedent to Confirmation of the Plan

*Conditions Precedent to Confirmation of the Plan.* The following conditions must be satisfied before the Plan may be confirmed:

1.   *Fiscal Plan Certification*: The Oversight Board must certify that a Fiscal Plan is consistent with the Plan, and certify the submission of the Plan (including any modification to the Plan through the Confirmation Date).

2.   *Required Orders*: The Title III Court must have entered orders providing for the following:

   a)   Approving the disclosure statement as containing "adequate information" pursuant to Bankruptcy Code section 1125;

   b)   Authorizing the solicitation of votes and elections with respect to the Plan;

   c)   Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

d)  Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article LXXXIX of the Plan;

e)  Determining that the compromises and settlements set forth in the Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

f)  Determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtors, and the Plan;

g)  Approving the documents in the Plan Supplement, other than the New GO Bonds Legislation and the CVI Legislation (to the extent included in the Plan Supplement) and the Reorganized Debtors By-Laws, and determining that such documents are valid and binding on parties;

h)  Determining that the New GO Bonds Legislation and the CVI Legislation, to the extent enacted, are a valid means for the implementation of the Plan and the issuance of the New GO Bonds and the CVIs, respectively; and

i)  Authorizing the Reorganized Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement, and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement.

3.  *Form of Orders*: The Confirmation Order and the Plan must be in a form and in substance reasonably acceptable to the Oversight Board, the Debtors, and the Initial GO/PBA PSA Creditors and, solely with respect to provisions affecting Classes 51, 55, 63, and 65, the UCC.

4.  *Confirmation Order*: The Confirmation Order must include (i) determinations that all of the settlements and compromises contained in the Plan satisfy the applicable standards under Bankruptcy Code sections 365, 1123(b)(3), and 1129, and Bankruptcy Rule 9019, (ii) the releases, exculpations, and injunctions set forth in Article LXXXIX of the Plan, and (ii) the provisions set forth in Section 81.1(b) of the Plan.

***Waiver of Conditions Precedent to Confirmation***.  Subject to the provisions of the Plan Support Agreements and the Committee Agreement, the Oversight Board may waive each of the conditions above, in whole or in part, by filing a notice with the Title III Court at any time.

## R.    Conditions Precedent to the Effective Date

***Conditions Precedent to the Effective Date.***  The following conditions must be satisfied before the occurrence of the Effective Date and the substantial consummation of the Plan:

1.  *Fiscal Plan Certification*: The Oversight Board must determine that the Plan is consistent with the Debtors' Fiscal Plan, and certify the submission of the Plan

(including any modification to the Plan through the Confirmation Date). The Fiscal Plan certified as of the Effective Date shall include provisions for the payment of principal and interest with respect to the New GO Bonds, including sinking fund payments and the mechanisms and procedures for payment of the CVIs in the event that the Outperformance Condition is satisfied and payment is due in accordance with the CVI Indenture.

2.   *Entry of the Confirmation Order*: The Title III Court must enter the Confirmation Order providing for the following:

    a)   Authorizing the Debtors and the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    b)   Decreeing that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

    c)   Authorizing the Debtors and Reorganized Debtors to (1) make all distributions and issuances as required under the Plan, and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

    d)   Determining the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds and the CVIs, as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture, or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law;

    e)   Determining that the Commonwealth shall have pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest on the New GO Bonds and payment on the CVIs;

    f)   Determining that, pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund, there shall be statutory liens on such monies for the purposes of securing payment of the New GO Bonds, which statutory liens on such monies shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms;

    g)   Determining the Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtors, (2) Reorganized Debtors, (3) the Commonwealth and its instrumentalities, (4) each entity asserting claims or other rights against the Commonwealth or any other

501

Commonwealth instrumentality, including bondholders and holders of beneficial interests in bonds issued by the Debtors, COFINA, or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights are impaired pursuant to the Plan (and if impaired, whether or not such person or entity accepted the Plan), (5) any other entity, and (6) any heirs, successors, assigns, agents or other similar parties of such persons or entities;

h)      Providing that the Fiscal Plan, certified as of the Effective Date, and any post-Effective Date Fiscal Plan include provisions for the payment in each FY of (a) principal and interest payable on the New GO Bonds or the CVIs, as the case may be, including, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

i)      Determining that the statutory first lien on funds once deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights herein and in the Confirmation Order);

j)      Providing that the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to monies on deposit in the Debt Service Fund as of the commencement thereof;

k)      Determining that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth as determined in accordance with modified accrual accounting standards;

l)      Providing that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding;

m)      Determining the Plan is consistent with the Debtors' Fiscal Plans and satisfies section 314(b)(7) of PROMESA;

n) Providing that, in consideration for the agreements set forth in the HTA/CCDA PSA, and upon satisfaction of the Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of $184,800,000.00 and $79,200,000.00, respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

o) Providing that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA PSA, the Commonwealth shall make payments to Assured and National in the amounts of $39,300,000.00 and $19,300,000.00, respectively;

p) Providing that neither the Governor nor the Legislature shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan;

q) Providing that the Governor and the Legislature, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the Plan; and

r) Providing that payment or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

3. *No Injunction*: The Confirmation Order must not be stayed in any respect.

4. *Authorizations:* All (1) authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan (including the New GO Bonds Legislation and the CVI Legislation) have been obtained or enacted or entered and not revoked or reversed, and (2) completion of any other required legislative or other governmental action required to consummate the Plan.

5. *Execution of Documents; Other Actions:* The Definitive Documents and all actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered are in full force and effect.

503

6.  *Opinions:* Usual and customary legal opinions for issuances of the type similar to the New GO Bonds and the CVIs by outside counsel to the Debtors covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the Initial GO/PBA PSA Creditors, must be delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

7.  *Constitutional Claims:* The Title III Court must have entered an order finding that any Claim asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA will be determined to be a Claim arising before the Petition Date and classified in Classes 56 through 59 (except Allowed ERS Bond Claims to the extent secured) and will be dischargeable and discharged pursuant to the Plan or Confirmation Order and the Debtors and the Reorganized Debtors will have no liability on account of such claim.

8.  *Lift Stay Motions and Clawback Actions*: The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

**Waiver of Conditions Precedent.**  Subject to the provisions of the Plan Support Agreements, the Oversight Board may waive each of the conditions above at any time without any notice to any party, other than the GO/PBA PSA Creditors, the UCC, and the Government Parties, and without further notice to or action by the Title III Court.

**Effect of Non-Occurrence of Conditions to Effective Date.**  If the Confirmation Order is vacated by a final order before the Effective Date, the Plan will be null and void in all respects, unless the order vacating the Confirmation Order provides otherwise.

## S.     Modification, Revocation, or Withdrawal of the Plan

**Modification of the Plan.**  The Oversight Board may alter, amend, or modify the Plan or Exhibits at any time prior to or after the Confirmation Date, but before the Effective Date.[420]  A holder of a claim that has accepted the Plan will be deemed to have accepted the Plan as altered, amended, or modified so long as the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the claim of such holder.

**Revocation or Withdrawal of the Plan.**  Subject to the terms and provisions of the Plan Support Agreements and the Committee Agreement, the Oversight Board may revoke or withdraw the Plan at any time before the Confirmation Date.

If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan will be null and void, and nothing in

---

[420] Any such alteration, amendment, or modification is subject to the requirements of sections 104(j) and 313 of PROMESA, Bankruptcy Code sections 942 and 1127(d), and the terms of the Plan Support Agreements and the Committee Agreement.

the Plan will constitute a waiver or release of any claim by the Debtors or any other entity, or prejudice the rights of the Debtors or any other entity in any further proceeding involving the Debtors.

*Amendment of Plan Documents.* From and after the Effective Date, the right to make any amendment, modification, or supplement to the Plan Supplement, Exhibits to the Plan Supplement, or Exhibits to the Plan will be governed by the terms of such document.

*No Admission of Liability.* The submission of the Plan is not intended to be and will not be construed as an admission or evidence in any pending or subsequent suit, action, proceeding or dispute regarding any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any entity with respect to any of the matters addressed in the Plan.

The Plan and any settlement entered, act performed, or document executed in connection with the Plan (i) may not be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any entity; (ii) may not be used as an admission or evidence of any liability, fault or omission of any entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; and (iii) may not be used as an admission or evidence against Reorganized Debtors, the Debtors, or any other person or entity with respect to the validity of any Claim.

The Plan and any settlement entered, act performed, or document executed in connection with the Plan will not be admissible in any proceeding for any purposes, except to carry out the terms of the Plan. However, once the Plan is confirmed, any entity may file the Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## T.     Corporate Governance and Management of Reorganized Debtors

*Corporate Action.* On the Effective Date, all matters under the Plan that would require approval of the directors of the Debtors or Reorganized Debtors (including the authorization to issue the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment of directors and officers of Reorganized Debtors pursuant to the Plan) will be authorized and approved in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents and without further action by any entity under any other applicable law, regulation, order, or rule.

Matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by Reorganized Debtors will be authorized and in effect in accordance with the New GO Bonds Legislation, the CVI Legislation and the new corporate governance documents. After the Confirmation Date, the Debtors and Reorganized Debtors will take any and all actions deemed appropriate in order to consummate the transactions contemplated in the Plan in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable.

*Dissolution of ERS.*  On or as soon as practicable after the Effective Date, ERS will be dissolved and all existing directors and officers of ERS will be relieved of any further duties and obligations.   Upon such dissolution, all remaining assets of ERS will be transferred to the Commonwealth.

*Officers of Reorganized Debtors.*  To the extent applicable, the board of directors of Reorganized Debtors will elect officers of Reorganized Debtors as of or after the Effective Date.

*PBA Governance Structure.*  No changes to the PBA governance structure or PBA collective bargaining agreements will be implemented during or after the PBA Title III Case, unless any such changes are approved by the Oversight Board and AAFAF.

**U.    Provisions Regarding Oversight Board and Compliance with PROMESA**

*Effect of Confirmation.*  Nothing in the Plan or the Confirmation Order will discharge, substitute, alter, or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of each Reorganized Debtor under PROMESA. Beginning on the Effective Date, the Reorganized Debtors will be required to comply with all of the terms and conditions of PROMESA, including Title III of PROMESA.

*Ongoing Role of the Oversight Board.*  Nothing in the Plan or the Confirmation Order will discharge any or all obligations of each Debtor under PROMESA. From and after the Effective Date, the Oversight Board's power and responsibilities under PROMESA will continue and the Debtors' duties and obligations will continue and be unaffected by the Plan and the consummation of the Plan.

*Preemption of Laws.*  Pursuant to PROMESA section 4, all laws of the Commonwealth, other than budgets certified by the Oversight Board, inconsistent with PROMESA, will be preempted. Such preempted laws include, without limitation, laws enacted prior to June 30, 2016 that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws will not be enforceable to facilitate payment of such indebtedness, and will not be enforceable if enforcement of such laws would be inconsistent with any provision of PROMESA having continuing applicability and effectiveness.  A nonexclusive list of Commonwealth laws preempted by PROMESA is attached as Exhibit K to the Plan. Certain litigation relating to any of the statutes or Commonwealth Constitution provisions listed in such exhibit preempted by PROMESA will be dismissed, with prejudice, as of the Effective Date. The list of Commonwealth laws in Exhibit K to the Plan may not include all Commonwealth laws that are preempted by PROMESA. Parties may in the future litigate issues regarding the preemption by PROMESA of Commonwealth laws not specifically listed in Exhibit K to the Plan or Section 71.3 of the Plan.  Preempted Commonwealth laws and regulations are permanently preempted.

**V.    Provisions Regarding Committees**

*Dissolution of Committees.*  On the Effective Date, each of the UCC and the Retiree Committee will be dissolved and will have satisfied all of its respective duties and obligations.

506

The committees will be released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Cases.

If an appeal of the Confirmation Order is taken, neither the UCC nor the Retiree Committee will be dissolved until the Confirmation Order becomes a Final Order. The UCC will not be dissolved with respect to its duties and obligations in connection with the HTA and PREPA Title III cases. Each of the UCC and the Retiree Committee will be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals.

To the extent that, as of the date immediately prior to the Effective Date, either the UCC or the Retiree Committee was a party to a contested matter or adversary proceeding in connection with the Title III Cases, including, the Debt Related Litigation, the PBA Litigation, the Invalidity Actions, the Lien Challenge Actions, the ERS Litigation, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any claim objection, beginning on the Effective Date, the Reorganized Debtors or the Avoidance Actions Trustee will be deemed to have assumed such role and responsibility in connection with the contested matter. Upon assumption, the UCC or the Retiree Committee will be relieved of any role, responsibility or obligation with respect to the contested matter. For the avoidance of doubt, the Avoidance Actions Trustee may not assume any role with respect to the Debt Related Objections, the PBA Litigation, the Invalidity Actions, or the Lien Challenge Actions, which litigation will be settled pursuant to the Plan and the Confirmation Order.

***Retention of Jurisdiction.*** The Title III Court will retain exclusive jurisdiction over any matter arising under PROMESA or related to the Title III Cases and the Plan, or the following:

1.  Matters to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any claim not compromised or settled pursuant to the Plan (including matters addressing the resolution of request for payment of any claim and objections to the secured or unsecured status, priority, amount, or allowance of claims);

2.  Matters related to Executory Contracts or Unexpired Leases. This includes (i) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

3.  Ensuring that distributions to holders of allowed claims are accomplished under the provisions of the Plan and adjudicating any and all disputes arising from or relating to distributions under the Plan;

4.  Adjudicating, deciding, or resolving any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors or Reorganized Debtors that may be pending on the Effective Date or brought after the Effective Date;

5.      Deciding and resolving all matters related to the granting and denying any
applications for allowance of compensation or reimbursement of expenses to
professionals authorized under to PROMESA, the Plan or orders entered by the
Title III Court;

6.      Entering and implementing orders that are either necessary or appropriate to
execute, implement, consummate, or enforce the provisions of (i) contracts,
instruments, releases, indentures, and other agreements or documents approved by
Final Order in the Title III Cases and (ii) the Plan, the Confirmation Order,
Definitive Documents and any other contracts, instruments, securities, releases,
indentures, and other agreements or documents created in connection with the
Plan;

7.      Resolving cases, controversies, suits, disputes or any other challenges that may
arise in connection with the consummation, interpretation or enforcement of the
Plan, the Confirmation Order, Definitive Documents or any other contract,
instrument, security, release or other agreement or document that is entered into
or delivered pursuant to the Plan or any entity's rights arising from or obligations
incurred in connection with the Plan or such documents;

8.      Approving any modification of the Plan, the Confirmation Order, or any contract,
instrument, security, release or other agreement or document created in
connection with the Plan or the Confirmation Order;

9.      Remedying any defect or omission or reconciling any inconsistency in any order,
the Plan, the Confirmation Order or any contract, instrument, security, release or
other agreement or document created in connection with the Plan or the
Confirmation Order, or entering any order in aid of confirmation pursuant to
sections 945 and 1142(b) of the Bankruptcy Code, in a manner as may be
necessary or appropriate to consummate the Plan;

10.     Adjudicating, deciding, or resolving any matters relating to the Debtors'
compliance with the Plan and the Confirmation Order consistent with section 945
of the Bankruptcy Code;

11.     Determining matters that may arise in connection with or relate to the Plan, the
Disclosure Statement, the Confirmation Order, Definitive Documents, or any
contract, instrument, security, release or other agreement or document created,
entered into or delivered in connection with the Plan, the Disclosure Statement or
the Confirmation Order. The Title III Court will only have jurisdiction to the
extent that any related document does not provide for another court or courts to
have exclusive jurisdiction;

12.     Adjudicating all controversies, suits or issues that may arise regarding the validity
of any actions taken by any entity pursuant to or in furtherance of the Plan or
Confirmation Order, including issuance of the New GO Bonds and the CVIs, and

508

entering any necessary or appropriate orders or relief in connection with such adjudication;

13. Entering and implementing orders that are necessary or appropriate to enforce the Plan and Definitive Documents entered to advance rate covenants and non-impairment covenants referenced in Article LV of the Plan;

14. Entering and implementing any orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Entering an order or final decree concluding or closing the Title III Cases pursuant to section 945(b) of the Bankruptcy Code;

16. Enforcing and clarifying any orders previously entered by the Title III Court in the Title III Cases; and

17. Hearing any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## W. Miscellaneous Provisions

### 1. Title to Assets

On the Effective Date, title to all assets and properties of the Debtors enumerated in the Plan will be vested in Reorganized Debtors. Such assets and properties will be free and clear of all liens, except as provided in the Plan and Confirmation Order.

### 2. Discharge and Release of Claims and Causes of Action

a) Distributions provided under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge and release of all claims or causes of action (including any interest on such claims or causes of action from and after the Petition Date) against the Released Parties that arose prior to the Effective Date relating to the Title III Cases, Debtors or Reorganized Debtors or any of their respective assets or interests of any nature, whether or not any property will be distributed or retained pursuant to the Plan.

b) On the Effective Date, the Debtors and Reorganized Debtors will be discharged and released from any and all claims, causes of action and any other debts that arose prior to the Effective Date (including prior to the Petition Date), and Claims of the type specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such Claim is filed, (b) such claim is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a claim voted to accept the Plan.

509

c)    For the avoidance of doubt, nothing contained in the Plan or in the Confirmation Order will release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity. Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

d)    The Confirmation Order will be a judicial determination, as of the Effective Date, of the discharge and release of all claims, causes of action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code. The Confirmation Order's discharge will void any judgment obtained against the Debtors or Reorganized Debtors and their respective assets, and property at any time to the extent such judgment is related to a discharged claim, debt or liability.  As of the Effective Date, each holder of a claim in any Class under the Plan will release, waive and discharge against the Debtors and Reorganized Debtors, and their respective assets, all such claims.

e)    Each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, will:

(i)    be deemed to have released and agreed not to sue or seek to recover damages or any other type of relief against any of the Government Releases based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted, including the Clawback Actions and the Lift Stay Motions;

(ii)    not aid any person in taking any action with respect to the Government Released Claims that is prohibited by section 88.2 of the Plan.

f)    <u>SEC Limitation</u>.  Notwithstanding anything contained in the Plan or in the Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

g)    <u>United States Limitation</u>.  No provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and

environment of persons in such territory, (ii) except to the extent provided in this Article LXXXIX and the Confirmation Order, (A) expand the scope of any discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under Title III, and (B) discharge, release, enjoin, or otherwise bar (1) any liability of the Debtors or the Reorganized Debtors to the United States arising from and after the Effective Date, (2) any liability to the United States that is not a Claim, (3) any affirmative defense or any right of setoff or recoupment of the United States or the Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (4) the continued validity of the obligations of the United States or the Debtors or the Reorganized Debtors, as the case may be, under any United States grant or cooperative assistance agreement, (5) the Debtors' or the Reorganized Debtors' obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, (6) any environmental liability to the United States that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property arising during the period from and after the Effective Date, and (7) any liability to the United States or part of any non-debtor. Without limiting the foregoing, nothing contained herein or in the Confirmation Order shall be deemed (1) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors, (2) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any entity, including, but not limited to, the Debtors and the Reorganized Debtors, (3) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (4) to grant any relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

h)   <u>Underwriter Action</u>. Notwithstanding anything contained in the Plan or in the Confirmation Order to the contrary, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the

parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions.

3.    **Injunction on Claims**

Except as otherwise provided in the Plan, the Confirmation Order or other Final Order of the Title III Court, any party who has held, holds, or might hold claims or any other debt or liability that is released pursuant to the Plan are permanently enjoined from:

a)     commencing or continuing any action on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their assets or property;

b)     enforcing, attaching, collecting or recovering any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan;

c)     creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan; and

d)     asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan, except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment. This injunction extends to all successors and assigns of the Released Parties and their respective assets and property.

4.    **Integral to Plan**

The discharge, injunction, exculpation, and releases in Article LXXXIX of the Plan is essential to the implementation of the Plan. Each of the released parties may independently seek enforcement of every provision of Article LXXXIX.

5.    **Releases by the Debtors and Reorganized Debtors**

On the Effective Date, each of the Debtors, Reorganized Debtors and the Disbursing Agent will irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all claims or causes of action that the Debtors, Reorganized Debtors, and the Disbursing Agent have or may claim in the future. This applies to anyone claiming through the Debtors, Reorganized Debtors or the Disbursing Agent, on their behalf, or for their benefit and includes causes of action for damages, indemnification, contribution, costs, fees or any other basis in law or equity.

512

6.   **Injunction Related to Releases**

As of the Effective Date, all entities that have held, currently hold, or may hold a Released Claim will be permanently barred from the following actions regarding such Released Claim:

a)   commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum;

b)   enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order;

c)   creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien;

d)   setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any entity released under section 88.5 of the Plan; or

e)   continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

The following stipulations will terminate upon the entry of the Confirmation Order:

a)   the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transpiration Authority Regarding the Tolling of Statute of Limitations and Consent Order* [Case No. 173283-LTS, ECF No. 15854], as amended; and

b)   the *Third Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations* [Case No. 17-3283-LTS, ECF No. 15795], as amended.

7.   **Exculpation**

*Government Parties.* The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, will not have or incur any liability to any entity for any act taken in connection with:

a)   the Title III Cases;

513

b)      the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;

c)      the Disclosure Statement; and

d)      any contract, instrument, release or other agreement or document provided for in connection with the consummation of the transactions set forth in the Plan.

The exculpation provision in section 88.8 of the Plan will not affect the liability of any entity from any such act or omission that constitutes intentional fraud or willful misconduct. The exculpation provision in section 88.8(a) of the Plan will not prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals, to assert reliance upon advice of counsel as a legal defense.

***GO/PBA PSA Creditors.*** Each of the GO/PBA PSA Creditors solely in its capacity as a party to the Plan Support Agreements and a Creditor and/or insurer, from the Petition Date up to and including the Effective Date, and each of their respective Related Persons will not have any liability to any entity for any act taken or omitted to be taken in connection with:

a)      the Title III Cases;

b)      the mediation;

c)      the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;

d)      the Disclosure Statement;

e)      the Plan Support Agreements;

f)      the Definitive Documents; and

g)      any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan.

The provisions of section 88.8(b) of the Plan do not affect the liability of any entity resulting from any intentional fraud or willful misconduct.

***Retiree Committee.*** Each of the Retiree Committee members, solely in its capacity as a member of the Retiree Committee and a Creditor and each of the Retiree Committee's Related

514

Persons will not have any liability to any entity for any act taken or omitted to be taken, from the Petition Date up to and including the Effective Date, in connection with:

    a)      the Title III Cases;

    b)      the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;

    c)      the Disclosure Statement;

    d)      the Retiree Committee Plan Support Agreement; and

    e)      any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement.

The provisions of section 88.8(c) of the Plan do not affect the liability of any entity resulting from any intentional fraud or willful misconduct.

***Creditors' Committee.***   Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, from the Petition Date up to and including the Effective and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of Section 89.7(d) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct

***AFSCME.***   Each of AFSCME solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, from the Petition Date up to and including the Effective Date, and each of their respective Related Persons will not have any liability to any entity for any act taken or omitted to be taken in connection with:

    a)      the Title III Cases;

    b)      the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;

    c)      the Disclosure Statement;

    d)      the Settlement Agreement; and

e)    any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement.

The provisions of section 89.7(e) of the Plan do not affect the liability of any entity resulting from any intentional fraud or willful misconduct.

***Monoline Insurers***. Assured, National, Syncora, and their Related Persons will not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan, including in connection with the treatment of Assured Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies.

The terms and provisions of the Plan will not, and will not be construed to, release or exculpate, with respect to any beneficial holder of Assured Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Assured Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Assured Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Assured, National, or Syncora may have against a beneficial holder of Assured Insured Bonds with respect to Assured's, National's or Syncora's applicable obligations under the Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable).

8.    **Appointments Related Litigation / Uniformity Litigation**

If a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the Confirmation Order, any entity receiving distributions pursuant to the Plan agrees that such Final Order will not in any way reverse, affect, or modify the transactions contemplated in the Plan and the Confirmation Order, including the releases, exculpations, and injunctions provided in Article LXXXIX of the Plan.

9.    **Bar Order**

To the extent provided in the Plan, all entities are permanently barred from pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind against any of the Released Parties relating in any way to any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the PSA, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases. This bar includes any claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising from the Title III Cases, either directly or indirectly by any person for the benefit of any Released Party arising from the claims, acts, facts, transactions, occurrences, statements or omissions that are or could have been in the Title III Cases or any other action brought on behalf of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

516

10.     **No Waiver**

The releases and injunctions set forth in sections 89.5 and 89.6 of the Plan will not limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized Debtors, the GO/PBA PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

11.     **Supplemental Injunction**

All entities who have held or asserted, currently hold or assert, or may hold or assert, any Released Claims against any of the Released Parties based upon or relating to the Title III Cases, any claim against the Debtors, whenever and wherever asserted, anywhere in the world, sounding in any theory of law, will be permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of collecting, recovering or receiving any payment with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including:

   a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

   b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

   c)     Creating, perfecting or enforcing any lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

   d)     Asserting, implementing or effectuating any setoff, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

   e)     Taking any act that does not conform to the provisions of the Plan, the Confirmation Order.

12.     **Post-Effective Date Fees and Expenses**

After the Effective Date, Reorganized Debtors may retain professionals and pay reasonable professional fees and expenses incurred related to implementation and consummation of the Plan without further approval from Title III Court. Without limiting the foregoing, from and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtors, pay the fees and reimburse the expenses of the Oversight

517

Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

### 13. Securities Act Exemption

The offering, issuance, and distribution of the New GO Bonds and the CVIs pursuant to the terms hereof will be exempt from registration under:

    a) the Securities Act;

    b) any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of section 5 of the Securities Act; and

    c) any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

### 14. Severability

Subject to the terms and provisions of the GO/PBA PSA and the Plan, if the Title III Court determines before the Confirmation Date that any term or provision of the Plan is invalid, void, or unenforceable, the Title III Court may alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable. The Title III Court's alteration will be consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Subject to the terms and provisions of the GO/PBA PSA, if before the Confirmation Date the Oversight Board determines to modify or amend the Plan, including to remove a Debtor (other than the Commonwealth and PBA) from the treatments set forth in the Plan, the Plan provisions applicable to such modification or amendment will be deemed severed and to be of no force or effect.

### 15. Governing Law

The rights, duties, and obligations arising under the Plan shall be governed by PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and the laws of the Commonwealth (to the extent not inconsistent with PROMESA), unless other federal law is applicable or expressly provided otherwise.

### 16. Closing Case

The Oversight Board will file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court promptly upon the full administration of the Title III Cases. The Title III Court will continue to retain jurisdiction over all matters in Article LXXXVIII of the Plan after the closing of the Title III Cases.

17.     **Inconsistencies**

If there is any inconsistency between the information contained in the Disclosure Statement and the terms of the Plan, the terms of the Plan will govern.

If there is any inconsistency between the terms of the Plan and the terms of the Confirmation Order, the terms of the Confirmation Order will govern and be considered a modification of the Plan, unless the Confirmation Order modifies the economic terms of the Plan.

18.     **Document Retention**

From and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, which can be altered, amended, modified, or supplemented by the Debtors.

19.     **Immediate Binding Effect**

On the Effective Date, the terms of the Plan and the Plan Supplement will be immediately effective and enforceable and deemed binding on any and all holders of claims and their respective successors and assigns (whether or not the claim of any such holder is impaired under the Plan or such holder has accepted the Plan). The releases, exculpations, and settlements effected under the Plan will be operative and subject to enforcement by the Title III Court from the Effective Date.

Once approved by the Title III Court, the compromises and settlements embodied in the Plan, along with the treatment of any associated allowed claims, will not be subject to collateral attack or other challenge by any entity in any court or other forum. As such, any entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement before the Plan is confirmed, and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

20.     **Additional Documents**

On or before the Effective Date, the Oversight Board may file agreements and other documents to evidence the terms and conditions of the Plan. The Debtors and all holders of claims receiving distributions pursuant to the Plan and all other parties in interest may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary to implement the provisions and intent of the Plan.

21.     **Reservation of Rights**

The Plan will have no force or effect unless the Title III Court enters the Confirmation Order. The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement will not be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of claims prior to the Effective Date. The rights and powers of the Government under the Commonwealth Constitution and PROMESA, including sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation imposed by the

519

Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing in the Plan will be deemed a waiver of any such rights and powers except as expressly set forth in the Plan.

22.     **Successors and Assigns**

The rights, benefits, and obligations of any entity named or referred to in the Plan or the Confirmation Order will be binding on, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian of each entity except as expressly provided otherwise in the Plan.

23.     **Term of Injunctions or Stay**

All injunctions or stays in effect in the Title III Cases and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) will remain in full force and effect until the Effective Date, the Plan or the Confirmation Order provides otherwise. All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

24.     **Plan Supplement**

All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if they were included in the Plan. When the Plan Supplement is filed, copies of the documents will be available (1) upon written request to the Oversight Board's counsel at the address on the cover page of this Disclosure Statement, (2) by downloading such documents from https://cases.primeclerk.com/puertorico/, or (3) on the Title III Court's website, available via PACER. The terms of the Plan will govern over the terms of any document in the Plan Supplement, to the extent there are any inconsistencies. With respect to matters governed by the New GO Bond Indenture or the CVI Indenture, to the extent that any provisions of the Plan are inconsistent with the New GO Bond Indenture or the CVI Indenture, the New GO Bonds Legislation or the CVI Legislation, as the case may be, will control.

*[Remainder of Page Left Intentionally Blank]*

## VII.   Confirmation of the Plan of Adjustment

### A.   Confirmation Hearing

PROMESA and the Bankruptcy Code require the Title III Court, after notice, to conduct a Confirmation Hearing at which it will hear arguments in support of the Plan, any objections to the Plan, and consider evidence with respect to whether the Plan should be confirmed.   At the Confirmation Hearing, the Title III Court will confirm the Plan only if all of the requirements of PROMESA section 314 described below are met.

On _____, the Title III Court entered the _____ [ECF No. ___] (the "Scheduling Order"). Among other things, the Scheduling Order provides that the Confirmation Hearing will begin on _____, _____ (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge, at the Title III Court, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined, or via virtual hearing.   The Confirmation Hearing may be adjourned from time to time by the Title III Court or the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.   Deadlines to Object to Confirmation

The Disclosure Statement Order establishes the objection deadline to confirmation of the Plan as _____ at _____ (Atlantic Standard Time).  Objections to confirmation of the Plan must: (1) be in writing and signed; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Title III Court, and served on the U.S. Trustee at the address below so that they are received no later than the applicable deadline set forth above:

- the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico);

For purposes of filing objections in these cases, the address of the Title III Court is: United States District Court, Clerk's Office, 150 Ave. Carlos Chardon Ste. 150, San Juan, P.R. 00918-1767.

### C.   Requirements for Confirmation of the Plan of Adjustment

At the Confirmation Hearing, the Title III Court will determine whether the Plan satisfies the requirements of PROMESA section 314.   The Debtors believe that the Plan will satisfy all of the applicable statutory requirements of PROMESA and the Bankruptcy Code.   Among the requirements for confirmation are that the Plan (1) is accepted by the requisite Holders of impaired Classes of Claims or, if not so accepted, is "fair and equitable" and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of creditors, (3) is feasible, and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

1.    **Acceptance or Cramdown**

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan. Only those holders of claims who actually vote to accept or reject the plan count in the tabulation. The impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code.

a)    **Cramdown**

PROMESA and the Bankruptcy Code provide that the Title III Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The plan of adjustment may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan. The Debtors believe that the Plan and the treatment of all Classes of Claims under the Plan satisfy the following requirements for nonconsensual confirmation of the Plan.

b)    **"Fair and Equitable"**

Uncertainty exists as to the contours of the "fair and equitable" requirement in Title III. Outside of the context of Title III, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims. This is known as the "absolute priority rule." Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases. Courts that have addressed this requirement in context of a chapter 9 case have indicated that, because there are no equity holders in chapter 9 cases (who, in theory, would be junior in priority to a debtor's general unsecured creditors), the absolute priority rule cannot be applied in chapter 9 cases and, thus, in such cases, the "fair and equitable" requirement should not be interpreted as synonymous with the absolute priority rule. Instead, courts have held that the requirement that the "fair and equitable" requirement in chapter 9 is understood as requiring that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan, will receive all that they can reasonably expect under the circumstances.

The Debtors believe that the Plan is "fair and equitable" with respect to Holders of Claims against the Debtors because it provides such Holders of Claims with all they reasonably can expect under the circumstances of the Title III Cases. The commencement of the Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage, and the economic decline and outmigration eroding the Debtors' revenues. The Debtors believe that the Plan is "fair and equitable" because the creditor recoveries proposed therein have been calculated – and, in certain cases, negotiated – to reasonably compensate Holders of Claims while enabling the Debtors to (A) avoid a recurrence of the financial difficulties that led to the commencement of the Title III

Cases and (B) institute desperately-needed reinvestment initiatives to ensure the Debtors' continued operation.

c)     **Unfair Discrimination**

A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN BY ONE OR MORE IMPAIRED CLASSES, THE OVERSIGHT BOARD RESERVES THE RIGHT TO REQUEST THE TITLE III COURT TO CONFIRM THE PLAN IN ACCORDANCE WITH PROMESA AND SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B) OF THE BANKRUPTCY CODE. THE OVERSIGHT BOARD HAS RESERVED THE RIGHT TO MODIFY THE PLAN TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THE PLAN UNDER SECTION 314 OF PROMESA AND SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

d)     **The "Best Interests of Creditors" Test**

Notwithstanding acceptance of the Plan by each impaired Class of Claims, the Title III Court also must determine that the Plan is in the best interests of creditors pursuant to PROMESA section 314(b)(6). The "best interests of creditors" test under PROMESA "shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." The plain language of the test requires the court to consider the recoveries to all creditors collectively, not individual recoveries.[421] The failure of plan confirmation and dismissal of a debtor's title III case, in most instances, would result in a race to the courthouse that would leave many creditors with no recovery at all.

The best interests test analyses (the "Best Interests Test Reports") the Title III Court considers—*i.e.*, of recoveries creditors of each Debtor could expect based on available remedies under the non-bankruptcy laws and the Commonwealth Constitution—that were based on the 2021 Fiscal Plan are attached hereto as Exhibit O. The Debtors believe that the Plan satisfies the best interests of creditors test set forth in PROMESA section 314(b)(6).

---

[421] This interpretation is consistent with the approach taken by courts in chapter 9 cases, where Bankruptcy Code section 943(b)(7) requires the plan to be "in the best interests of creditors," similarly using the plural "creditors." *See In re City of Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014); *see also In re City of Stockton*, 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) ("By its terms, the 'best interests' test in chapter 9 is collective rather than individualized.").

523

The Oversight Board annually certifies a new fiscal plan.[422]  Accordingly, to the extent necessary, the Debtors will submit revised best interests test reports reflecting the new fiscal plan data if applicable.

### e)    Feasibility

PROMESA section 314(b)(6) requires that a plan of adjustment be in the best interests of creditors and feasible.  While the statute explains the best interests of creditors requirement means the court shall consider what creditors would recover pursuant to available remedies outside Title III, the statute does not provide guidance as to what is meant by "feasible," beyond the word itself. Chapter 9 of the Bankruptcy Code is the chapter available to municipalities of the States.  It also imposes a feasibility requirement in its section 943(b)(7) without providing further guidance. Courts have interpreted the feasibility requirement in chapter 9 to mean the municipality will be viable, and the plan offers a reasonable prospect of success and is workable.  The debtor must show it can satisfy the obligations in its plan.  Unlike chapter 9, Title III also contains a requirement that the Title III Plan of Adjustment be consistent with the certified fiscal plan.  Significantly, pursuant to PROMESA section 201(b)(1)(I), the certified fiscal plan must contain a debt sustainability analysis.  Accordingly, the feasibility of the Title III Plan of Adjustment is at least partially determinable by whether the plan provides for an amount of ongoing debt within the range of the debt sustainability analysis in the certified fiscal plan.

***Commonwealth.***  Based on the debt sustainability analysis and projections in the May 2021 Fiscal Plan, Reorganized Commonwealth should be able to pay its debts under the Plan when they come due and the Commonwealth should be viable.  If needed, the Debtors will update the analysis when the new fiscal plan is certified, but expect that under the new fiscal plan, the Commonwealth will be able to pay its debts under the Plan when they come due.

***ERS.***  Pursuant to the Plan, ERS will no longer be responsible for the payment of pension obligations or debt service. ERS's pension obligations are contained as expenditures within the Commonwealth's May 2021 Fiscal Plan through the PayGo system to be funded from Commonwealth sources of revenue and municipal contributions.  ERS continues to have operating expenses of approximately $70 million per year, which amounts are projected to decrease. Based upon the amount of ERS's assets not encumbered by the ERS bondholders' security interests or are otherwise restricted, ERS will be able to pay their operating expenses and satisfy its obligations as they come due.  Therefore, pursuant to the Plan, ERS will not have material future payments.

***PBA.***  Pursuant to the Plan, PBA will not have material future payments.

Accordingly, the Debtors believe that the Plan meets the feasibility requirement of PROMESA section 314(b)(6).

---

[422] A new Commonwealth fiscal plan was certified on April 23, 2021. *See* <u>Exhibit G</u>.

f)      **Compliance with Applicable Provisions of PROMESA and the Bankruptcy Code**

In addition to the foregoing, the Plan must comply with other applicable provisions of PROMESA and the Bankruptcy Code, as follows:

- The Plan must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301 (PROMESA § 314(b)(1));

- The Plan must comply with the provisions of PROMESA Title III (PROMESA § 314(b)(2));

- The Debtors must not be prohibited by law from taking any action necessary to carry out the Plan (PROMESA § 314(b)(3));

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan must provide that on the Effective Date each holder of a claim of a kind specified in 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim (PROMESA § 314(b)(4));

- Any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the Plan must be obtained, or such provision must be expressly conditioned on such approval (PROMESA § 314(b)(5));

- The Plan must be consistent with the Fiscal Plan certified by the Oversight Board under Title III (PROMESA § 314(b)(7));

- The Debtors, as the proponents of the Plan by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); and

- The Plan must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

2.      **Alternatives to Confirmation and Consummation of the Plan**

The Debtors have evaluated numerous alternatives to the Plan, including alternative structures and terms of the Plan and delaying the adoption thereof.  While the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims against the Debtors, if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan of adjustment.  The Debtors (or another party in interest) may also move to dismiss the Title III cases pursuant to 11 U.S.C. § 930 (as incorporated by PROMESA § 301(a)).

The Plan was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Title III

Court (*see* section V.I of this Disclosure Statement).  Under the circumstances, the Debtors believe that the Plan provides the greatest and earliest possible recoveries to Creditors and that acceptance and confirmation of the Plan are in the best interests of the Debtors and all Creditors.  The Debtors further believe that any alternative to the Plan would result in unnecessary delay, uncertainty, litigation, and expense, the net effect of which would result in recoveries to Creditors less than the distributions to be made to Creditors under the Plan.  The Debtors, therefore, believe that confirmation and consummation of the Plan is preferable to potential alternatives.


*[Remainder of Page Left Intentionally Blank]*

## VIII.    Certain Risk Factors to Be Considered

AS WITH ANY INVESTMENT, RECOVERIES ON THE NEW GO BONDS AND CVIS INVOLVE RISKS. YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW REGARDING THE PLAN, THE NEW GO BONDS, AND THE CVIS, AS WELL AS ALL OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE FOLLOWING RISK FACTORS ARE NOT THE ONLY RISKS THE DEBTORS FACE, ARE NOT MEANT TO BE A COMPLETE LIST OF RISKS ASSOCIATED WITH THE PLAN, THE NEW GO BONDS, OR CVIS, AND DO NOT NECESSARILY REFLECT THE RELATIVE IMPORTANCE OF VARIOUS RISKS. ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTORS OR THAT THE DEBTORS DO NOT CURRENTLY CONSIDER TO BE MATERIAL, OR THAT ARE GENERALLY APPLICABLE TO ALL GOVERNMENTAL INSTRUMENTALITIES, ALSO MAY MATERIALLY AND ADVERSELY AFFECT THE DEBTORS AND THE DEBTORS' ABILITY TO CONSUMMATE THE PLAN AND MAKE PAYMENTS ON THE NEW GO BONDS AND THE CVIS. YOU ARE ADVISED TO CONSIDER THE FOLLOWING RISK FACTORS, AMONG OTHERS, AND TO REVIEW THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT BEFORE MAKING ANY DECISIONS WITH RESPECT TO THE PLAN, THE NEW GO BONDS, OR THE CVIS. ANY ONE OR MORE OF THE FACTORS DISCUSSED HEREIN, AND OTHER FACTORS NOT DESCRIBED HEREIN, COULD AFFECT RECOVERIES UNDER THE PLAN OR LEAD TO A DECREASE IN THE MARKET VALUE AND THE LIQUIDITY OF THE NEW GO BONDS OR CVIS. THERE CAN BE NO ASSURANCE THAT OTHER RISK FACTORS NOT DISCUSSED BELOW WILL NOT BECOME MATERIAL IN THE FUTURE.

NEITHER THE DEBTORS NOR ANY FEDERAL, STATE, OR COMMONWEALTH SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE NEW GO BONDS OR CVIS AND OTHER SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT.

### A.    Risks Related to the Title III Cases

***The Title III Court may not confirm the Plan.***

PROMESA section 314(b) and Bankruptcy Code section 1129 (in its incorporated parts) set forth the requirements for confirmation of a Title III plan of adjustment, and require the Title III Court to make a series of specified, independent findings. There can be no assurance that the Title III Court will find that the Plan meets all of these requirements and confirm the Plan. If the Plan is not confirmed, it is uncertain what recoveries, if any, holders would receive with respect to their Claims under an alternative plan of adjustment or under other applicable law if the Title III Court dismisses the Title III Cases. For additional information, *see* section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."

Furthermore, the Title III Court may find that, although the Plan is consistent with the Fiscal Plan and therefore satisfies Section 314(b)(7) of PROMESA, the Plan nonetheless fails to meet one or several other confirmation requirements set forth in Section 314(b).

Various parties have indicated they will object to the confirmation of the Plan, including, without limitation: Ambac, FGIC, the DRA Parties, and the UCC.

***The Title III Court does not find the plan of adjustment is consistent with the applicable certified fiscal plan.***

Under PROMESA section 314(b)(7), the Plan must be consistent with the Commonwealth Fiscal Plan, certified by the Oversight Board. Although the Oversight Board has certified under PROMESA section 104(j)(3) that the Plan is consistent with the Commonwealth Fiscal Plan,[423] PROMESA section 314(b) requires that the Title III Court make an independent determination as to whether the Plan is consistent with the Commonwealth Fiscal Plan. Therefore, there can be no assurance that the Title III Court will find that the Plan is consistent with the Commonwealth Fiscal Plan. To be consistent with the certified fiscal plans, the Plan cannot provide for more debt than the certified fiscal plans' debt sustainability analyses determines should be sustained by each reorganized entity.

***If any claimant is successful in prosecuting and obtaining an allowed (i) administrative expense claim, (ii) priority claim, (iii) secured claim, or (iv) non-dischargeable claim, and any such claim is not contemplated to be paid pursuant to the Plan, the Plan may not be confirmable.***

Various parties have asserted claims against the Debtors that they assert may be administrative expense claims, priority claims, secured claims, or non-dischargeable and that are not contemplated to be paid pursuant to the Plan. If such and other similar claims are ultimately allowed, the Plan may not be confirmable without amendments that may materially change its proposed distributions.[424]

Certain litigation concerning such claims, including the Revenue Bond Litigation identified in Section V.F.5 of the Disclosure Statement, is continuing, and may not be completed by the time the Confirmation Hearing is scheduled to begin. The Court scheduled a hearing on September 15, 2021 on certain summary judgment motions. See ECF No. 17137. If this litigation is not resolved prior to the Confirmation Hearing, the Confirmation Hearing and Effective Date may be delayed to allow for resolution of these disputed claims. Alternatively, the Oversight Board

---

[423] A new Commonwealth fiscal plan was certified on April 23, 2021. *See* <u>Exhibit G</u>.

[424] The DRA Parties assert that the Plan may not be confirmed and the GO/PBA PSA may be terminated if the DRA Administrative Expense Claim Motion were granted, which would entitle the DRA Parties to approximately $800 million in administrative expense claims. The Oversight Board does not believe the DRA Administrative Expense Claim Motion is meritorious, and will request a briefing schedule in connection therewith so that such motion can be determined either before or at the confirmation hearing.

The DRA Parties assert that their administrative expense claim, if granted, is non-dischargeable, and therefore will survive the Commonwealth's Title III case.

may be required to establish an appropriate reserve to ensure adequate recoveries on the claims sought to be disallowed in the Revenue Bond Litigation if the Oversight Board is unsuccessful.

If such and other similar claims are ultimately allowed, or if the Oversight Board is required to establish an appropriate reserve in respect of such disputed claims pending their resolution, the Plan may not be confirmable without amendments that may materially change its proposed distributions, but material changes would be subject to new votes by the affected claimholders.

### The Title III Court may not approve the settlements and compromises in the Plan.

The Debtors believe the significant compromises and settlements reflected in the Plan are fair, equitable, and reasonable. Such compromises and settlements are an integral part of the Plan, and they provide value and certainty for the Debtors and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for the Debtors to emerge from Title III expeditiously.

While parties to the Plan Support Agreements include holders of billions of dollars in Claims against the some of the Debtors, other parties in interest in the Title III Cases may object to those compromises and settlements, as incorporated in the Plan. If the compromises and settlements in the Plan Support Agreements are not approved in the Title III Cases, the Debtors may not be able to confirm the Plan.

The Plan may also be contingent on the approval of other settlements and compromises resolved under the Plan. If the settlements and compromises contained in the Plan require approval, but are not approved, the Debtors may not be able to confirm the Plan.

### The Effective Date may not occur.

Article LVIII of the Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date. Many of the conditions are outside of the control of the Debtors. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Title III Court, there can be no assurance that the Plan will be consummated and the adjustment of the Debtors' debts completed. *See* section VI.R. of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" (description of the conditions to the effectiveness of the Plan). In addition, certain agreements contemplated in the Plan impose conditions that must be satisfied as of the Effective Date. There can be no assurance that such conditions will be timely satisfied or waived.

If the Effective Date does not occur by January 31, 2022, parties to the GO/PBA PSA may terminate the GO/PBA PSA and assert payment of the PSA Restriction Fee and Consummation Costs in an aggregate amount of $100,000,000.00 as an administrative expense claim.

Certain creditors have indicated an intent to object to the waiver or shortening of the automatic 14-day stay of confirmation orders under Federal Rule of Bankruptcy Procedure 3020(e) (made applicable to the Title III Cases by PROMESA Section 310).

*If the Plan Support Agreements are terminated, the ability of the Debtor to confirm the Plan may be materially and adversely affected.*

Each of the Plan Support Agreements contains a number of termination events, upon the occurrence of which certain parties to the Plan Support Agreements may terminate or withdraw from such agreement. For instance, creditor parties may terminate their respective Plan Support Agreement if the Debtors withdraw the Plan, the Disclosure Statement, or the motion seeking entry of an order approving the Disclosure Statement, or file any motion or pleading with the Title III Court, in each case, that is inconsistent with the subject Plan Support Agreement in any material respect and such motion or pleading has not been withdrawn within a specified period of time. If the respective Plan Support Agreement is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the respective Plan Support Agreement, including the obligation to vote in support of the Plan. The withdrawal of support by creditors from, or the termination of, a Plan Support Agreement may have a material adverse effect on the Debtor's ability to confirm the Plan.

## B.    Risks Related to the Debtors

*The financial information contained herein is based upon the Debtors' books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.*

The financial information contained herein has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope. Although the Debtors believe that they have used their reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies. As a result, you are cautioned not to place undue reliance on any of the financial information contained herein.

*The Debtors have no duty to update the statements contained in this Disclosure Statement.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Title III Court or as required under the Bankruptcy Code or Bankruptcy Rules.

*No representations outside this Disclosure Statement are authorized.*

No representations concerning or related to the Debtors, the Title III Cases, or the Plan are authorized by the Title III Court, PROMESA, or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Solicitation Materials that accompany this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

***The Oversight Board will terminate before Plan obligations are fully satisfied.***

After five years of balanced budgets, the Oversight Board terminates. This may occur many years before the obligations under the Plan are fully satisfied. Then, there will no longer be annual fiscal plans, budgets, and monitoring performed by an organization such as the Oversight Board, which is structured to be largely independent from the Government.

***When the Oversight Board terminates, the Government can eliminate controls, protections, and transparency the Oversight Board has created.***

Subject to certain constitutional limitations, every legislature can change prior laws. There is no assurance the Oversight Board's protections and systems will be continued by subsequent administrations, and the Government may object to measures the Oversight Board imposes, and may continue to do so once the Oversight Board is no longer present to enforce the reforms it has imposed. However, covenants and obligations in the Plan, the New GO Bonds Legislation, the CVI Legislation, and the Definitive Documents, inclusive of obligations impacting governmental or political powers pursuant to PROMESA section 305, may be enforced by parties in interest having standing to do so.

***Financial reporting going forward may not be completed on a timely basis.***

The most recent basic audited financial statements prepared by the Commonwealth are for Fiscal Year 2018. The most recent basic audited financial statements prepared by ERS and PBA are for Fiscal Year 2017. No guaranty can be made as to the availability of current audited financial statements or the Debtors' ability to provide financial reporting on a timely basis.

C. **Risks Related to the New GO Bonds**

***The New GO Bonds may not trade at par and limited liquidity may make the New GO Bonds less attractive to investors.***

As a result of concerns with the Commonwealth's current financial circumstances, holders of the New GO Bonds may encounter limited market acceptance upon any attempt to sell the New GO Bonds, making sales at or near par potentially difficult. Holders of the New GO Bonds after the Effective Date may not be able to sell such bonds for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of such bonds before a potential purchaser would be willing to purchase the New GO Bonds. There can be no assurance that a secondary market will exist for any New GO Bonds. The absence of a secondary market for the New GO Bonds or a lack of liquidity in the secondary markets could limit bondholders' ability to resell any New GO Bonds or adversely affect the market value of the New GO Bonds.

The New GO Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The New GO Bonds have not been approved or disapproved by the United States Securities and Exchange Commission, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the

531

New GO Bonds may be limited, and bondholders may not be able to sell the New GO Bonds when they want to do so or obtain the price that they wish to receive for the New GO Bonds, and, as a result, could suffer significant losses.

Given the unique nature of the Plan, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan will differ materially from and be more limited than those typical requirements.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the New GO Bonds and limiting bondholders' ability to sell the New GO Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the New GO Bonds.

### Limited Nature of Remedies.

Upon any declaration of default under the New GO Bonds Indenture, Reorganized Commonwealth's payment of the New GO Bonds cannot be accelerated. However, the New GO Bonds are designed to be secured by a statutory first lien on the Debt Service Fund to be held in trust by the New GO Bond Trustee for the benefit of holders of New GO Bonds, and, if legislation is obtained will be backed by the Commonwealth's good faith, credit and taxing power in accordance with Article VI, Section 2 of the Commonwealth Constitution and applicable laws of the Commonwealth as of the Effective Date, but not by any further assets of the Commonwealth.

### Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating.

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties have agreed to use commercially reasonable best efforts to obtain ratings on the New GO Bonds as soon as reasonably practicable as determined solely by the Government Parties following consultation with up to two (2) Initial GO/PBA PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Assured (solely to the extent that it has not terminated the GO/PBA PSA as to itself), National (solely to the extent that it has not terminated the GO/PBA PSA as to itself), and Syncora, each of which shall have executed a confidentiality agreement, in form and substance satisfactory to the Oversight Bond and restricting such Initial GO/PBA PSA Creditors from trading New GO Bonds, and to subsequently use their commercially reasonable best efforts to obtain the best possible ratings. The New GO Bonds Indenture will not include a covenant by the Government Parties to maintain a specific rating with respect to outstanding New GO Bonds.

Any future rating assigned to the New GO Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the New GO Bonds on their respective maturity dates. Any rating of the New GO Bonds is not a

recommendation to purchase, hold or sell such New GO Bonds and such rating will not address the marketability of such New GO Bonds, their market price, or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for Reorganized Commonwealth or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the New GO Bonds.

***An adverse rating of the New GO Bonds could adversely affect the market price of the New GO Bonds.***

Notwithstanding that the Government Parties may not initially solicit a rating, a rating agency may issue an unsolicited rating on the New GO Bonds, employing quantitative and qualitative factors, including Reorganized Commonwealth's actual or perceived financial strength, the prospects for payment of principal and interest on the New GO Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth. Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of Reorganized Commonwealth's indebtedness or placing Reorganized Commonwealth on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond the Commonwealth's control. The downgrade or withdrawal of any credit rating of Reorganized Commonwealth's indebtedness, including the New GO Bonds, or placing Reorganized Commonwealth on negative outlook for possible future downgrading may have a negative effect on the value of the New GO Bonds.

***The New GO Bonds will not be subject to the Trust Indenture Act.***

The New GO Bonds will not be required to be and will not be issued under an indenture qualified under the Trust Indenture Act of 1939, as amended (the "TIA"). Accordingly, holders of the New GO Bonds will not have the benefit of the protections of the TIA with respect to their investment in the New GO Bonds.

D.   **Risks Related to the CVIs**

***Holders of CVIs may not receive any payment on the CVIs.***

Annual mandatory redemption payments under the CVIs will be made only if 5.5% Sales and Use Tax Collections outperform the May 2020 Commonwealth Certified Fiscal Plan (subject to an annual cap of $200 million and a lifetime cap of $3,500 million, in the following manner: GO CVIs are subject to an annual cap of $200 million, plus any unused amounts from previous years, subject to the annual payment not being greater than $400 million, and a lifetime cap of $3,500 million.

Whether the annual occurrence of the 5.5% Sales and Use Tax Collections outperform the May 2020 Commonwealth Certified Fiscal Plan depends on certain assumptions (the realization of many of which is beyond the control of the Commonwealth), including, without limitation, the occurrence of the Effective Date, successful reorganization of the Commonwealth economy such that collections of the 5.5% Sales and Use Tax outperform the 2020 Certified Fiscal Plan, and sufficient financial recovery of the Commonwealth. Additionally, changes in laws related to the 5.5% Sales and Use Tax could adversely affect the amount of such tax collected in any given year. There can be no assurance that such threshold will ever be exceeded in a given year (or ever) prior to the expiration of the CVIs, at which point the CVIs will expire valueless and the CVI Indenture will terminate and no further payments will be due to CVI holders.

### The CVIs are difficult to value.

Mandatory redemption payments on the CVIs depend on the occurrence of future financial thresholds that cannot be predicted with certainty and final calculations that will not be completed until after conclusion of the preceding fiscal year. Under those circumstance, it may be difficult to value to the CVIs and, therefore, it may be difficult or impossible for holders to resell or transfer their CVIs because the amount of any mandatory redemption payment on the CVIs for any particular fiscal year will not be able to be determined until after the conclusion of the fiscal year.

### An active public market for the CVIs is unlikely to develop, or the CVIs will likely trade at low volumes, both of which may have an adverse effect on the resale price, if any, of the CVIs.

The CVIs are a new instrument for which there is currently no public trading market. An active public trading market for the CVIs may not develop or be sustained. Even if a public trading market were to develop, there may be little or no market demand for the CVIs, making it difficult or impossible to resell the CVIs, which could have an adverse effect on the resale price, if any, of the CVIs. Neither the Oversight Board or the Commonwealth can predict the price, if any, at which the CVIs will trade following the Effective Date.

### The tax treatment of the CVIs is unclear.

As discussed in greater detail in sections IX and X hereof, there is no legal authority directly addressing the United States federal income tax and Puerto Rico tax treatment of the CVIs. Accordingly, the amount, timing and character of any gain, income or loss with respect to the CVIs are uncertain.

### The CVIs present similar, and in certain instances, more significant risks than the New GO Bonds.

Some of the risks related to the New GO Bonds as described above, including limited liquidity, the limited nature of remedies, and the absence of protections under the TIA, may also apply to holders of the CVIs and could present more significant risks for holders of the CVIs. For example, it is likely that liquidity and secondary market activity will be more limited for CVIs than for the New GO Bonds.

534

### E.    Risks Related to the Assured Election

Assured may elect to receive the Cash and CVIs allocable to holders of Assured Insured Bonds and may elect to pay in full all or any portion of the Assured Insured Bonds, as described in Section 72.1(a) of the Plan. Under the Assured Election, holders of the Assured Insured Bonds that are repaid would receive the Acceleration Price, which is an amount equal to the outstanding principal plus accrued and unpaid interest as of the Effective Date. Such payment will satisfy and discharge in full Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bonds.

Holders of the Assured Insured Bonds that are paid under the Assured Election will be dependent on Assured to have sufficient cash to satisfy its payment obligations. Such bonds generally will be paid with proceeds from the sale of Assured New GO Bonds, and Assured will pay any deficiency in accordance with the Assured Insurance Policies. However, there is no certainty that Assured will be solvent or have sufficient funds to pay the Acceleration Price. Moreover, holders of the Assured Insured Bonds that are paid under the Assured Election will not be entitled to any further interest payments on the Assured Insured Bonds, will have no further rights to or interest in the Assured Insurance Policies, the Assured New GO Bonds or the Assured CVIs, and will not be entitled to receive future payments under the Assured CVIs.

### F.    Risks Related to the Assured Bondholder Elections

If Assured declines to make the Assured Election with respect to any Assured Insured Bonds, each beneficial holder is entitled to make one of three elections for treatment of such Assured Insured Bonds, as described in Section 72.1(b) of the Plan. Election 1 would provide the Assured Insured Bond holder a cash payment equal to the outstanding principal plus accrued and unpaid interest of such holder's Assured Insured Bonds as of the Effective Date. Pursuant to Election 2, the holder would opt into a custodial trust, escrow arrangement or similar structure established by Assured that would provide such holder with an interest in the applicable Assured Insurance Policy and the Assured New Securities allocable to such holder. Election 3 would provide the holder with the Cash and Assured New Securities allocable to such holder under the Plan plus a Cash payment from Assured in an amount to be determined by Assured.

Assured Insured Bond holders that opt for Election 1 would not be entitled to any further interest payments on the Assured Insured Bonds and would have no interest in the Assured New Securities. Under Election 2, the Assured Insured Bond holders would be dependent on the trustee, escrow agent or similar intermediary to exercise the bondholders' rights under the applicable Assured Insurance Policy and the Assured New Securities. Additionally, the holder's investment will depend (in a significant part) on the business and financial prospects of Assured. In recent years, many bond insurers have become significantly weaker from a financial perspective. Moreover, any Assured Insured Bondholder that fails to make an election will be deemed to have chosen Election 2. Under Election 3, the Assured New Securities will not be insured, unless Assured elects to insure the Assured New GO Bonds. Thus, the interests of holders that choose Election 3 may not be insured, and such holders would be dependent on the Commonwealth's ability to repay the Assured New Securities.

### G.      Risks Related to the Election of National Commutation Treatment

Each holder of an Allowed National Insured Bond Claim has the option to elect to receive the National Commutation Consideration (the "National Commutation Treatment"). National retains sole discretion to select the form of consideration to be distributed under the National Commutation Treatment. Moreover, any holder that elects the National Commutation Treatment will have no further rights to the applicable National Insurance Policy, any National Trust or National Escrow Account, or the National Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed National Insured Bond Claim.

### H.      Risks Related to the National Non-Commutation Treatment

Each holder of an Allowed National Insured Bond Claim may elect not to receive the National Commutation Treatment. At the time of such election, such holders will know how their claims will be treated. National is entitled to elect from the treatments described in Section 71.2(b) of the Plan, which include custodial trusts, escrow accounts, or cash payments of Accelerated Amounts. To the extent that National elects custodial trusts, Holders receiving such treatment will have no further recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust. To the extent that National elects cash payments, National's obligation to such holders will be fully discharged by payment on the Effective Date. In addition, National and the Oversight Board may formulate an alternative election or implementation option not identified in the Plan with respect to the National Insured Bonds prior to commencement of the Disclosure Statement Hearing. Any holder of an Allowed National Insured Bond Claim that does not timely and validly elect to receive the National Non-Commutation Treatment, or submits an election for less than all its National Insured Bond Claims, shall be deemed to have elected to receive the National Commutation Treatment.

### I.      Risks Related to Making or Declining to Make the National Commutation Election

The Plan of Adjustment provides holders of Allowed National Insured Bond Claims with an option to choose commutation treatment or non-commutation treatment. A holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment will receive the National Commutation Consideration and shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed National Insured Bond Claim cancelled.

The ability of a non-commuting holder of Class 3, Class 17, and Class 23 Claims to recover on account of its Allowed Claims is subject to the collection risk associated with National. The holders of Class 3, Class 17, and Class 23 Claims should investigate the financial condition of National prior to determining whether to make the commutation election under the Plan of Adjustment. Future events could occur that could give rise to payment or other counterparty risks with respect to National. Such risks would attach to the National Certificates and the Debtors can make no guarantee that any holder would be able to realize any particular level of recovery from National.

**J.      Risks Related to the National Certificates**

A holder of an Allowed National Insured Bond Claim that elects not to receive the National Commutation Treatment may, at National's election, be deemed to have received its Pro Rata Share of the National Plan Consideration and National Certificates in consideration for the deposit of such holder's Pro Rata Share of the National Plan Consideration and the National Insured Bonds allocable to such holder and will have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust. Holders that receive National Certificates will be subject to additional risks including, but not limited to, the following:

- The National Certificates are not expected to be liquid. There will be no market for the National Certificates before the issuance of the National Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of the National Certificates;

- Each distribution on the National Certificates will reduce the related obligation of National under the National Insurance Policies. Notwithstanding any tax that is payable by a holder of the National Certificates on account of distributions from the National Trust, the gross amount of the distribution allocable to such holder (without any reduction for taxes payable by such holder) will reduce National's obligations under the National Insurance Policy;

- Early payments may leave a holder of National Certificates unable to reinvest in comparable investments;

- Holders of the National Certificates may not have the right to direct the trustee to take any action with respect to the assets in National Trust. The applicable trust agreement may provide that National will have the right to direct the trustee to dispose of the National Insured Bonds or take certain other actions in respect of the assets in the National Trust, including any actions permitted of a holder of the National Insured Bonds. Accordingly, if so provided, the National Trust may not take actions with respect to the National Insured Bonds (such as selling the National Insured Bonds or enforcing remedies under the National Insured Bonds) that an investor would take if it held the National Insured Bonds directly;

- Except as provided under the applicable National Insurance Policy, holders of the National Certificates will have no recourse to the trustee of the National Certificates, National, or any their Related Persons. Moreover, holders will have no recourse against such persons or their assets for payments on the National Certificates, except as set forth in the applicable National Insurance Policy and the trust agreement. The National Certificates will be obligations of the National Trust. Except as provided into the applicable National Insurance Policy or the trust agreement, the distributions in respect of the National Certificates will only be made out of the National Trust assets;

- There will be no obligation to obtain ratings on the National Certificates. However, a rating agency may issue an unsolicited rating on the National Certificates. Such action may be taken at any time and is beyond the control of National and the holders of the National

537

Certificates. Such rating may have a negative effect on the value of the National Certificates; and

- If National experiences financial difficulties of its own in the future, it may not be able to make payments on the National Insurance Policies deposited as trust assets for the benefit of the trusts. In addition, future events could occur that could give rise to payment or other counter party risks with respect to National. Such risks would attach to the National Trust and the Oversight Board can make no guarantee that any holder would be able to realize any particular recovery from National. The value of the National Certificates will be dependent in part on the business and financial prospects of National. Holders of National Certificates should, in addition to evaluating the ability of the Reorganized Commonwealth to fulfill its obligations under the National Insured Bonds, also evaluate the ability of National to fulfill its obligations under the National Insurance Policies.

### K.     Risks Related to the National Escrow Account

A holder of an Allowed National Insured Bond Claim that elects not to receive the National Commutation Treatment may, at National's election, be required to deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration in the National Escrow Account and such deposited National Plan Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Plan Consideration was deposited in the National Escrow Account under the National Insurance Policies.

### L.     Risks Related to the Election of Syncora Commutation Treatment

Each holder of an Allowed Syncora Insured Bond Claim has the option to elect to receive the Syncora Commutation Consideration (the "Syncora Commutation Treatment"). Syncora retains sole discretion to select the form of consideration to be distributed under the Syncora Commutation Treatment. Moreover, any holder that elects the Syncora Commutation Treatment will have no further rights to the applicable Syncora Insurance Policy, any Syncora Trust or Syncora Escrow Account, or the Syncora Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Syncora Insured Bond Claim.

### M.     Risks Related to the Syncora Non-Commutation Treatment

Each holder of an Allowed Syncora Insured Bond Claim may elect not to receive the Syncora Commutation Treatment. At the time of such election, such holders will not know how their claims will be treated. Syncora is entitled to elect from the treatments described in Section 72.3(b) of the Plan, which include custodial trusts, escrow accounts or cash payments of Accelerated Amounts. To the extent that Syncora elects custodial trusts, Holders receiving such treatment will have no further recourse to Syncora or the Syncora Insurance Policies other than as provided for under the terms of the Syncora Trust. To the extent that Syncora elects cash payments, Syncora's obligation to such holders will be fully discharged by payment on the Effective Date. In addition, Syncora and the Oversight Board may formulate an alternative election or implementation option not identified in the Plan with respect to the Syncora Insured Bonds prior to commencement of the Disclosure Statement Hearing. Any holder of an Allowed Syncora Insured Bond Claim that does

not timely and validly elect to receive the Syncora Non-Commutation Treatment, or submits an election for less than all of its Syncora Insured Bond Claims, shall be deemed to have elected to receive the Syncora Commutation Treatment.

### N.    Risks Related to Making or Declining to Make the Syncora Commutation Election

The Plan of Adjustment provides holders of Allowed Syncora Insured Bond Claims with an option to choose commutation treatment or non-commutation treatment. A holder of an Allowed Syncora Insured Bond Claim that does not validly elect to receive the Syncora Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the Syncora Insured Bonds, including the obligations of Syncora under the related Syncora Insurance Policies, underlying such holder's Allowed Syncora Insured Bond Claim cancelled.

### O.    Risks Related to the Syncora Certificates

A holder of an Allowed Syncora Insured Bond Claim that elects not to receive the Syncora Commutation Treatment may, at Syncora's election, be deemed to have received its Pro Rata Share of the Syncora Plan Consideration and Syncora Certificates in consideration for the deposit of such holder's Pro Rata Share of the Syncora Plan Consideration and the Syncora Insurance Bonds allocable to such holder. Holders that receive Syncora Certificates will be subject to additional risks including, but not limited to, the following:

- The Syncora Certificates are not expected to be liquid. There will be no market for the Syncora Certificates before the issuance of the Syncora Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of the Syncora Certificates;

- Each distribution on the Syncora Certificates will reduce the related obligation of Syncora under the Syncora Insurance Policies. Notwithstanding any tax that is payable by a holder of the Syncora Certificates on account of distributions from the Syncora Trust, the gross mount of the distribution allocable to such holder (without any reduction for taxes payable by such holder) will reduce Syncora's obligations under the Syncora Insurance Policy;

- Early payments may leave a holder of Syncora Certificates unable to reinvest in comparable investments;

- No holder of the Syncora Certificates will have the right to direct the trustee to take any action with respect to the assets in Syncora Trust. The applicable trust agreement will provide that Syncora will have the right to direct the trustee to dispose of the Syncora Insured Bonds or take certain other actions in respect of the assets in the Syncora Trust, including any actions permitted of a holder of the Syncora Insured Bonds. Accordingly, the Syncora Trust may not take actions with respect to the Syncora Insured Bonds (such as selling the Syncora Insured Bonds or enforcing remedies under the Syncora Insured Bonds) that an investor would take if it held the Syncora Insured Bonds directly;

- Except as provided under the Syncora Insurance Policy, holders of the Syncora Certificates will have no recourse to the trustee of the Syncora Certificates, Syncora, or any their Related Persons. Moreover, holders will have no recourse against such persons or their assets for payments on the Syncora Certificates, except as set forth in the Syncora Insurance Policy and the trust agreement;

- There will be no obligation to obtain ratings on the Syncora Certificates. However, a rating agency may issue an unsolicited rating on the Syncora Certificates. Such action may be taken at any time and is beyond the control of Syncora and the holders of the Syncora Certificates. Such rating may have a negative effect on the value of the Syncora Certificates; and

- If Syncora experiences financial difficulties of its own in the future, it may not be able to make payments on the applicable insurance policies. In addition, future events could occur that could give rise to payment or other counter party risks with respect to Syncora. Such risks would attach to the Syncora Trust and the Oversight Board can make no guarantee that any holder would be able to realize any particular recovery from Syncora. The value of the Syncora Certificates will be dependent in part on the business and financial prospects of Syncora. Holders of Syncora Certificates should, in addition to evaluating the ability of the Reorganized Commonwealth to fulfill its obligations under the Syncora Insured Bonds, also evaluate the ability of Syncora to fulfill its obligations under the Syncora Insurance Policies.

## P.    Risks Related to the Syncora Escrow Account

A holder of an Allowed Syncora Insured Bond Claim that elects not to receive the Syncora Commutation Treatment may, at Syncora's election, be required to deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration in the Syncora Escrow Account. In such a case, the holder's investment will depend on the business and financial prospects of Syncora. In recent years, many bond insurers have become significantly weaker from a financial perspective.

## Q.    Risks Related to Projections in Revenues and Expenses in the Commonwealth Fiscal Plan

The 2021 Fiscal Plan[425] and its underlying financial projections are the result of several years of working sessions, dialogue, stakeholder engagement, research and in-depth analysis, as well as Oversight Board and the Commonwealth Government collaboration, that created a deep and rich fact base to underpin the presented macroeconomic trends and revenue and expenditure forecasts. However, the aforementioned have been built upon a set of assumptions and factors that are subject to external and internal risks that could materially impact the expected outcomes. To

---

[425] The Oversight Board may certify a revised fiscal plan at any time. A new Commonwealth fiscal plan was certified on April 23, 2021. *See* Exhibit G.

recognize such risks, the following sections outline those factors that could affect the macroeconomic and 30 year financial projections contained in the 2021 Fiscal Plan.

The aforementioned financial projections contain forward looking statements. Certain of these statements relate to anticipated future events, future results of operations or future financial performance. In some cases, the words "may," "might," "will," "should," "intends," "expects," "plans," "goals," "projects," "forecasts," "anticipates," "believes," "estimates," "predicts," "potential," or "continue" or the negative of these terms or other comparable terminology.

These forward-looking statements are based on material assumptions, are uncertain and involve substantial known and unknown risks, uncertainties and other factors which may cause the actual results, and levels of activity or performance of the Puerto Rican economy and tax collection to be materially different from any future results, levels of activity or performance expressed or implied by these forward-looking statements.

There can be no guaranty as to future results, levels of activity or performance. Undue reliance should not be placed on these forward-looking statements, which speak only as of the date that they were made. There is no intention to update any of these illustrative, forward-looking, statements to conform these statements to reflect actual results, later events or circumstances or to reflect the occurrence of unanticipated events.

The assumptions underlying this financial information are necessarily subjective. There can be no assurance that these assumptions are currently correct or that they will remain correct or accurate in the future. Accordingly, there can be no guaranty that this information fully or correctly demonstrates the relationships among the economic factors comprised by this financial information. There are no representations or warranties that the projections are without flaws in logic or mechanics, although best efforts to design and build the financial information to demonstrate forecasted financial operations and financial performance based on the stated assumptions were undertaken. In addition to the typical limitations of any forecast, the projections also are subject to the additional uncertainties associated with preparing projections regarding the impact of the COVID-19 pandemic during the course of the pandemic and in the context of the evolving public health response.

***The Fiscal Plan model relies on historical data to project GNP and inflation and does not take into account potential external shocks not already experienced.***

The Fiscal Plan model relies on historical data on a key set of economic variables (*e.g.*, oil prices, food prices, output gap, capital growth, net federal transfers) to project GNP and inflation— and layers on the effects of Hurricanes Maria and Irma, the 2020 earthquakes, and the COVID-19 pandemic, as well as the resulting disaster relief and other federal stimulus funding projected to be received by Puerto Rico. It does not take into account potential future external shocks such as unforeseen economic crises, natural disasters, or other changes in global (or local) economic activity that are not currently projected. Because future projections take into account past performance, if economic growth (or inflation) for the United States or Puerto Rico is materially higher or lower than projected, that could significantly affect the accuracy of the subsequent GNP and inflation projections in the Fiscal Plan and thus the accuracy of the revenue and expense projections. Additionally, delayed or ineffective implementation of structural reforms on labor,

energy, ease of doing business and education—which are currently assumed to drive a GNP growth uptick of 0.9%—could impact GNP growth and in consequence, overall revenue performance.

**_The Fiscal Plan model does not incorporate major demographic shifts not currently apparent._**

Population projections in the Fiscal Plan model are driven by projected future economic growth, as well as several demographic factors—such as projected fertility and mortality rates and net outmigration—based on the most recent available data (as of the certification date) from the CDC, Bureau of Transpiration Statistics, and U.S. Census Bureau, among others. Major demographic shifts not currently apparent (*e.g.*, major changes in fertility rates, age-mix of the population, migration patterns) could significantly change the accuracy of population estimates underlying the Fiscal Plan model. Since population serves as an input for certain revenue and expense estimates (*e.g.*, cigarette tax revenues, healthcare costs, education costs), changes in population projections would impact the accuracy of the projected surplus. After certification of the 2021 Fiscal Plan, the US Census Bureau released detailed 2020 Census population figures. While the Census has yet to produce detailed projections by age and other factors, the differences between 2020 Census population figures for Puerto Rico and the current Fiscal Plan projections may result in material changes to the Fiscal Plan surplus projections.

**_Healthcare projections assume current federal and Puerto Rico healthcare law and policy, as well as the latest projections regarding healthcare costs._**

The Fiscal Plan healthcare estimates are based on the current laws and public policies adopted by both the federal government and Puerto Rico government.  As a result, changes to policy could impact the accuracy of current expenditure and funding estimates. For example, if Medicaid eligibility is revised such that a greater number of people are eligible for Medicaid coverage than projected, the Government may bear additional expenses. If federal funding for Medicaid changes significantly, the accuracy of Fiscal Plan projections for Medicaid revenues would also be impacted.

Similarly, projected healthcare expenditures take into account current long-term estimates due to both Medical CPI-U growth and changes in price levels, utilization, and population mix for Medicaid covered expenditures.  If national projections related to healthcare inflation (*e.g.*, due to structural changes to the healthcare market) drastically change, then the accuracy of healthcare expenditure projections would also be affected.

**_The Fiscal Plan uses current data and policies to project the magnitude and roll out of federal funds for disaster relief and other major federal programs._**

The projections in the Fiscal Plan rely on the efficient and timely implementation of receipt and disbursement of federal and private disaster relief funds.  This assumes both federal and local government processes to apply for and disburse funds will speed up after Fiscal Year 2021 and that the latest federal estimates in terms of overall magnitude of funding and roll out are accurate. The projections are also built on current legislation and federal policies governing the use of these funds.  If overall local or federal government efficiency levels or processes change, or there are changes to the appropriations or governing policies (i.e., changes made by Congress, FEMA, HUD, USDA, or other federal agencies), there could be direct impacts on the accuracy of revenue

and expenditure projections given disaster relief funds impact GNP growth estimates (which then impact population projections) as well as estimates regarding local government cost share.

Projected funding levels for standard federal programs and transfers (*e.g.*, TANF, NAP, Title I Funding) are based on the latest federal legislation as well as funding formulas for each program. Similar to disaster relief funds and healthcare federal funds, if the federal formulas or funding levels for other major social programs change, the accuracy of projected revenues and expenditures could materially change.

Moreover, several governmental entities in Puerto Rico are classified as high-risk grantees, imposing additional compliance and controls before federal funds are released. The intent of these additional conditions is to ensure effective implementation of federal programs through appropriate fiscal management and responsibility. This also, however, has the potential to delay implementation of projects funded by federal dollars. The lack of substantial reform progress at the local Department of Education, for instance, recently led federal officials to withhold disbursement of federal dollars to the department until substantial financial effectiveness reforms are implemented. The inability to access federal funds on a timely basis consistent with projections in the Fiscal Plan could impact the ability to achieve Fiscal Plan targets.

### *The outcome of certain litigation may affect the accuracy of Fiscal Plan projections.*

The Fiscal Plan assumes the Commonwealth's retention of funds historically allocated to HTA, CCDA, and PRIFA to pay revenue bonds issued by the aforementioned Commonwealth instrumentalities was a valid exercise of its authority and the Commonwealth will continue to have access to the Pledged Revenues. Should the parties challenging the Commonwealth's retention of such funds prevail in the revenue bond litigation described in section V.F.5 of this Disclosure Statement, the accuracy of Fiscal Plan projections will be impacted.

### *The Fiscal Plan assumes current Puerto Rico and U.S. tax law and effective revenue measure implementation.*

The Fiscal Plan projections take into account current U.S. and Puerto Rico tax laws and assume timely and effective implementation of revenue measures, including establishment of new revenue streams from taxes and fees and increased tax compliance.

Changes in Puerto Rico and U.S. tax law could therefore impact revenues, as could decisions that large businesses (including multinationals) make regarding their scale of operations in Puerto Rico, and their global tax planning. Further, if revenue measures are not effectively implemented, or if they exceed expected revenue yield, revenues could differ materially from those in the Fiscal Plan projections.

### *The Fiscal Plan assumes agency efficiency measures are implemented to achieve savings without adversely impacting the delivery of government services.*

Expense measures assume that the achievement of savings will generally be achieved through reforms that improve government efficiency while maintaining a level of services commensurate with the needs of the population and facilitate economic growth. However, if such

savings are captured via simple attrition or expensive buy-out programs, there would be increased risk that efficiencies are not achieved and that the lower level of expenditures compromise the government's delivery of services, adversely impacting economic sustainability and poverty levels.

***The Fiscal Plan assumes effective and timely implementation of revenue and expense measures.***

The Fiscal Plan projections rely on the effective and timely implementation of various revenue and expense measures. This assumes that any subsequent policy changes or departures from the Fiscal Plan targets and objectives will adhere to the revenue-neutrality and overall spending limits contemplated by the Fiscal Plan and related certified Budgets. In order to assure effective implementation and credibility to the Fiscal Plan objective and projections, the Oversight Board requires the Government to provide periodic reports on financial performance and implementation progress. The Oversight Board has also developed a monitoring mechanism on its website, which can provide further transparency and accountability to the public on the Government's efforts relating to the Fiscal Plan milestones and achievements. Delays or departures from the revenue and expense measure targets, milestones, and reporting specified in the Fiscal Plan could materially alter the Fiscal Plan projections.

***The Fiscal Plan assumes the government will cooperate fully on the implementation of all structural reforms and fiscal measures.***

The Fiscal Plan incorporates a number of reforms that are required to enable the Island to move closer to a reality in which it has low-cost and reliable energy, robust infrastructure, more incentives to enter the formal labor market, an improved regulatory and permitting environment, and a more effective and efficient public sector. There is a risk, however, that the Legislature or Governor refuse to implement these reforms, which could jeopardize the ability to achieve the savings and surplus projected by the Fiscal Plan.

***The Fiscal Plan assumes the projected gains from structural reforms and fiscal measures will materialize as forecast.***

There is a risk that the structural reforms and fiscal measures included in the Fiscal Plan will not generate the entire amount of gains projected, even if those measures are fully implemented by the Government on a timely basis. If gains forecast from these reforms do not materialize as projected, it would reduce the surplus available.

***Additional actions will be required to offset long-term deficits that are projected to reemerge. Without these additional actions, it is possible, Puerto Rico will not be able to service all of its financial obligations in the future.***

The structural reforms and fiscal measures projected in the Fiscal Plan are estimated to be insufficient to allow Puerto Rico to avoid future deficits, which are projected to reemerge in FY2036. Thus, in the near future, the Government could be required to take additional measures, such as improving labor market flexibility through repealing restrictive laws and pursuing meaningful tax reform to broaden the base of collection and lower rates. These incremental structural reforms go beyond the five-year framework of the 2021 Fiscal Plan and are required to

be able to have balanced budgets moving forward. Many of these reforms – which would reduce deficits and therefore make funds available for a variety of potential uses, most importantly to invest in the people of Puerto Rico – have been proposed by the Oversight Board, but the Oversight Board cannot implement them without the support of Puerto Rico's elected Government.

***The Fiscal Plan model is based on historical data reported by the Commonwealth, much of which has not been audited or independently reviewed.***

The Fiscal Plan model is based on the input of historical macroeconomic, revenue and expense data reported by the Commonwealth. The Government has faced challenges in the past in reporting complete and accurate data, and much of the financial information provided by the Government has not been audited or reviewed by any independent accounting firm or third party. Any material inaccuracies or inconsistencies in the data could impact the accuracy of projections based on that data.

***The Fiscal Plan model is based on current data and information to project capital improvement program needs and impact.***

The Fiscal Plan projections incorporate capital expenditure based on current and projected future assessment of capital improvement program needs. The capital expenditure plans may need to be revised periodically due to various factors including, but not limited to, changes in legislative policy, changes in public sector operations, need for acceleration or deferrals of planned improvements, interaction with other governmental agencies, instrumentalities, municipalities, and private investors and financing sources, and other macroeconomic factors. Needs for quantification or increase in structural reform relating to public infrastructure may also impact the capital expenditure projections in the Fiscal Plan. Changes in these expenditure projections as well as any deviations from the projected impact of such capital improvements could also impact the timing and achievement of other financial projections that are inter-dependent on effective accomplishment and existence of underlying framework and infrastructure.

***The Fiscal Plan does not assume major changes in the current political climate in Puerto Rico or the United States subsequent to its certification.***

The Fiscal Plan policies and financial projections are driven by the executive commitment and legislative policies in the United States and Puerto Rico political climate which existed at the time of the Fiscal Plan certification. Much of the financial projections are closely tied to federal funding availability and local political commitment. The Fiscal Plan does not take into account future changes in the political environment – such as those from the Puerto Rican administration, Puerto Rican legislative and regulatory direction, organization and structure of service delivery across governmental entities at the Commonwealth and municipal levels, federal appropriations and funding policies, federal tax exemptions, or Puerto Rico's statehood or relationship with the federal government.

***The Fiscal Plan is modeled on the most recently available data provided by the Government and is reliant on assumptions to project future pension expenses***

The Fiscal Plan relies on data provided for individual pensioners, beneficiaries, and employees entitled to future pension benefits, along with current administrative expense levels, as provided by the Government. This data is utilized by the retirement system's actuaries to develop accounting costs as required by the Governmental Accounting Standards Board (GASB) and undergoes a process by which the actuary reviews the data provided by the Government. In this process, gaps in the data for individual records are identified. Data deficiencies identified include challenges related to paper records being incomplete, delays in availability of data updates, and plan requirements not always being administered as directed by law. Assumptions are made to attempt to provide a directionally reliable projection of plan costs and are monitored by the system actuary. The 2021 Fiscal Plan relied on the latest available data that had been reviewed and was census data as of June 30, 2017.

In order to project future Paygo obligations, the 2021 Fiscal Plan model projected forward the June 30, 2017 data forward with demographic assumptions generally consistent with those utilized by the system actuary for GASB reporting purposes in the most recent publicly available actuarial valuation reports. These include assumptions as to the rates at which individuals retire, terminate employment, become disabled, and die, along with assumptions related to potential beneficiaries. To the extent that actual experience is different than assumed, the projected costs of the plan could vary significantly.

Certain creditors have challenged the accuracy of the data and the methodology by which the pension liability estimate has been calculated.

***The Fiscal Plan is modeled on provisions prescribed by current law as modified by proposed measures. Future changes in pension policy could significantly impact projected costs.***

The Fiscal Plan projects benefits owed to individuals based on the provisions currently in law as modified by the proposed measures. To the extent that the Government enacts laws modifying these provisions, the projected Paygo costs will change.

The Government has shown a propensity to desire modifying the pension benefits payable through a series of laws through the last two years. These include, but are not limited to, Act 40-2020 (providing for creation of a trust that could be used to improve police pensions), Act 80-2020 (providing an incentivized retirement window), Act 81-2020 (providing enhanced benefits to high risk employees), and Act 82-2020 (providing additional sick leave conversion in the pension formula for teachers). Furthermore, additional legislation was introduced in early 2021 to further modify pension benefits. On June 9 2021, the Governor signed Act 7-2021 ("Act 7") into law. Act 7 purports to unilaterally dictate the terms of the plan of adjustment including the treatment of pre-petition debt obligations, eliminate all pension reforms contemplated by the Fiscal Plan along with essential reforms implemented under Act 106-2017 ("Act 106"), reinstate all public pension systems as they existed prior to Act 106, and consolidate the source of funding of these unsustainable benefit obligations into one new trust-funded pension system. As discussed in numerous letters between the Oversight Board and both the Governor and the Legislature, the Oversight Board has determined that Act 7 would impair or defeat the purposes of PROMESA in

violation of PROMESA section 108(a)(2). As such, the implementation of Act 7 is statutorily barred. In addition, the Oversight Board, the Governor and AAFAF agree that Act 7 is significantly inconsistent with the Commonwealth's 2021 certified Fiscal Plan in violation of PROMESA section 204(a). As of this time, the Oversight Board is evaluating its next steps to ensure the enjoinment of Act 7 and its nullification.

***The reductions in benefits provided through Paygo may have an impact in the total expenditures related to Social Services***

The benefit reductions negotiated with the COR implemented a threshold to protect retirees making below $1,500 per month from the 8.5% Benefit Reduction, with the intention of limiting the impact of the reduction on those retirees under the poverty threshold. To the extent that retirees above the threshold are unable to adjust to the income levels from adjusted pensions after the Benefit Reduction, that there will be an increased dependence on Social Services. While the macroeconomic assumptions utilized in the Fiscal Plan consider the overall impact of the amount of pension dollars flowing through the economy, to the extent that there are significant increases in reliance on social services that arise form lower pension income, this would represent a potential increase in the net costs of the Commonwealth.

***The Fiscal Plan assumes Paygo invoices to municipalities and non-fiscal plan public corporations are paid in full to Commonwealth***

Act 106-2017 requires the Commonwealth to pay pensioners their retirement benefits under ERS, TRS, and JRS, with municipalities and public corporations reimbursing the Commonwealth for Paygo costs. The Fiscal Plan assumes that these Paygo costs are fully paid and reimbursed to the Commonwealth. Failure to fully collect these invoiced amounts would result in an increase in the net Paygo costs of the Commonwealth.

***The Fiscal Plan includes assumptions related to the plan effective date and related effective dates for the pension cuts and freeze of Teachers Retirement System (TRS) and Judiciary Retirement System (JRS), and specific provisions related to each of these changes.***

The Fiscal Plan assumes that the TRS and JRS freezes will be effective January 1, 2022 and that the benefit reduction formula agreed to in the Retiree Committee Plan Support Agreement, adjusted to a $1,500 benefit threshold, will be effective July 1, 2022. Changes to these effective dates or the terms related to the freeze and cut would impact and potentially increase Paygo costs of the Commonwealth.

## R.    Risks Related to the Collection of Revenues Supporting the Payment of New GO Bonds

***The Commonwealth has recently enacted new tax legislation which will have an uncertain impact on future tax revenue.***

In December 2018, the Commonwealth enacted Act 257-2018 which made numerous amendments to the 2011 Code including modification to the SUT regime, the alternative basic tax, and alternative minimum tax. Act 257-2018 eliminated certain categories of purchases from the

SUT base and reduced rates on other categories. Act 257-2018 also legalized certain categories of games of chance machines. Additionally, the Commonwealth enacted Act 60-2019, the Puerto Rico Incentives Tax Code, that made additional changes affecting those persons benefiting from the lower tax rates, accelerated deductions, grants and tax credits made available under Act 60-2019. More recently, the Government enacted Act 40-2020 and Act 57-2020, which further adjusted certain elements of the 2011 Code. These changes included a further reduction of individual personal income taxes and larger exemptions on the business to business tax, offset by an increase in other annual filing fees and a limitation on certain other tax credits. The Commonwealth has been unable to certify that that Act 257-2018 is compliant with the fiscal plan. With respect to Act 60-2019, the Commonwealth has certified under section 204 of PROMESA that the act is not "significantly inconsistent" with the fiscal plan. Accordingly, both laws lack certification as to their fiscal plan compliance casting uncertainty on forecasted income tax revenue. While designed to offset any decrease in revenue, increases in revenue designed to make these tax adjustments revenue neutral may not be sufficient to compensate for the reduction in revenues enacted through these laws.

### *Collection Efforts of the Internal Revenue Area of the Department of Treasury*

The Internal Revenue Area of the Department of the Treasury is responsible for administering the Puerto Rico Internal Revenue Code (the "Code"). There are several bureaus under the Internal Revenue Area involved in the administration of the Code, including the Assistant Secretary's Office, Fiscal Audit Bureau, Consumption Tax Bureau, Tax Return Processing Bureau, Collection Bureau, Taxpayer Service Bureau, and Taxpayer Service System. These bureaus are responsible for many activities, such as, (i) conducting audits or investigations of taxpayers tax returns, (ii) developing, administering and evaluating the procedures, functions and activities necessary to carry out the imposition of sales and use tax, (iii) developing, administering and evaluating the tax program on alcoholic beverages, and (iv) serving taxpayers and representatives who visit the Service Centers to request services related to claims for refunds, mathematical errors, refunds credited to debts, employer tax claims and all tax matters related to the returns of individuals and corporations. Any reductions to the Internal Revenue Area's resources could affect its ability to assess and collect tax revenues.

### *The Commonwealth may enact future tax legislation, the effect of which is unknown.*

The Commonwealth may enact other legislation that could adversely affect tax revenue. For example, the Commonwealth recently enacted various laws that amended the 2011 Code, including Act 81-2019 to legalize physical and online sports betting and establish a gaming revenue tax upon such activities, and the aforementioned Act 60-2019. The Commonwealth also enacted Act 40-2020, which amended multiple provisions of the 2011 Code, including a further reduction of individual personal income taxes by increasing from 5% to 8% the non-refundable tax credit for certain individuals, amendments to the thresholds for submitting audited financial statements and changes to the SUT base. Moreover, Act 57-2020 was signed into law in June 2020 and provided tax relief measures to address COVID-19 impact. The Commonwealth has not certified fiscal plan compliance with respect to some of these laws. Accordingly, there is uncertainty as to whether these laws could have a negative effect on future tax revenue.

***The Commonwealth generates significant revenue from a small set of non-resident persons through Act 154 excise taxes and non-resident withholdings, which is expected to decline.***

The Puerto Rico Department of Treasury has historically projected a decline in revenue from Act 154 excise taxes and non-resident withholdings (NRW) as a result of pending expirations of pharmaceutical patents, supply chain diversification, and changes in U.S. federal tax law and regulations. This decline started to materialize in Fiscal Year 2020 and is continuing in line with projections as of March 2021. The fiscal plan assumes that the revenue will continue to decline in the years ahead. It is uncertain how quickly and to what degree these or other risks will impact the taxes paid by this small group of taxpayers.

***The Internal Revenue Service has to date not challenged the creditability against federal income of the Act 154 excise taxes paid to Puerto Rico, however, the issue of creditability has not been fully resolved.***

Foreign taxpayers for Puerto Rico income tax purposes that are otherwise United States taxpayers have benefited by crediting the Act 154 excise taxes paid to Puerto Rico as taxes in lieu of income taxes against their U.S. federal income taxes. The IRS issued Notice 2011-29 to articulate its view that while the creditability issue needs resolution, any resolution against the credit would only be prospective. Such resolution is still pending and it is uncertain how or when the IRS will address creditability and which taxpayers will be materially affected by such a change. An adverse change to the creditability could result in certain taxpayers restructuring their operations in Puerto Rico and impacting the long-term economic outlook of Puerto Rico taxes.

***A recently filed draft regulation pertaining to Digital Service Taxation may have a material effect on the ability to claim Act 154 credits, and, therefore its long-term forecasted collections.***

On September 29, 2020, the U.S. Treasury Department and the IRS released proposed regulations for foreign derived digital services intangible income, restricting the use of foreign tax credits and the allocation and apportionment of certain expenses. There is no assurance, despite requests made by the Government that Puerto Rico will be exempted from the final regulation or be granted a transition period. It is possible Puerto Rico Controlled Foreign Corporations and other businesses operating in Puerto Rico with U.S. affiliates may ultimately find payments attributable to the Act 154 tax may no longer be creditable because of the new regulation, thereby impacting business operations and materially reducing Act 154 collections and contributions. Further, there is no assurance any replacement tax regime for Act 154 will generate sufficient revenue to offset the loss of potential Act 154 tax collections.

***There is no assurance the Government will be able to replace the loss of Act 154 revenues on a timely or substantive basis.***

In September 2019, then U.S. Treasury Secretary Steve Mnuchin asked Governor Wanda Vázquez to present a transition plan to eliminate the temporary credit that has allowed foreign companies to fully credit the 4% excise tax imposed by Act 154. Following the meeting, Puerto Rico's government announced that a working group consisting of government and private sector individuals would be formed to identify potential alternatives to the tax. There is no assurance

these efforts will lead to the successful development and implementation of a reform process that replaces revenues from Act 154 on a timely or substantive basis.

***The recent transaction with one large taxpayer may materially reduce future corporate income, and other, tax collections.***

In July 2019, one of Puerto Rico's largest tax filers completed a one-time corporate transaction, which resulted in a non-recurring revenue of $488 million in Fiscal Year 2020. The Puerto Rico Department of Treasury also projected a $39 million reduction in corporate income taxes as a result of this transaction starting in Fiscal Year 2021. The Puerto Rico Department of Treasury continues to evaluate the long-term impact projection and the forward-looking estimated reduction is subject to change.

***Natural disasters may impact the ability of the government to collect revenue.***

Puerto Rico is located in a region that experiences frequent hurricanes, tropical storms and other weather events. Such weather events and other natural disasters, such as earthquakes, have caused significant damage to facilities and infrastructure in Puerto Rico, including its water and electric systems, discouraged tourism, encouraged outmigration, and severely adversely effected the functioning of the Government and the Puerto Rican economy. Puerto Rico's relatively small size, and the concentrated location of many of its businesses and governmental activity, means that it is possible that a natural disaster could adversely affect numerous businesses and Government operations at the same time. It is possible that weather events and other natural disasters, such as earthquakes, mudslides, or rising sea levels, could disrupt the ability to collect revenues as forecast and could lead to additional outmigration that would also potentially reduce revenues and economic growth.

***Outbreak of Disease; COVID-19.***

The impact that the COVID-19 pandemic is having and will have on commerce, financial markets and Puerto Rico, and the nature of the impact is likely to evolve over the next several years. The Government has experienced reductions in its revenue sources. The information contained in this Disclosure Statement to describe current impacts that the COVID-19 pandemic and related orders have had on Puerto Rico's finances and operations, and to describe some of the actions that Puerto Rico is taking in response. Neither the duration and extent of the COVID-19 public health emergency, nor the magnitude of the impact on Puerto Rico, the regional economy or on collection of tax receipts can be predicted. The COVID-19 outbreak is ongoing, and its dynamic nature leads to uncertainties, including (i) the geographic spread of the virus; (ii) the severity of the disease; (iii) the duration of the outbreak; (iv) actions that governmental authorities may take to contain or mitigate the outbreak; (v) the development and distribution of medical therapeutics and vaccinations; (vi) additional or changed travel restrictions; (vii) the impact of the outbreak on the local or global economy, or on the aviation sector generally; (viii) whether and to what extent the Puerto Rico may order additional public health measures; and (ix) the impact of the outbreak and actions taken in response to the outbreak the collection of tax receipts, expenses and financial condition. It should be assumed that the restrictions and limitations instituted related to COVID-19 may continue, that the current upheaval to the national and global economies and financial markets may continue and/or be exacerbated, at least over the near term, and that the

recovery may be prolonged. Additional local epidemics or pandemics may occur and may occur with greater frequency given trends in globalization.

***The Fiscal Plan includes tax revenues derived from partnerships and miscellaneous excise taxes where there is limited historical data to inform projections.***

Act 60-2019 extended an alternative tax election for taxpayers to pay income taxes at the Partnership level at preferential tax rates. This change in tax administration resulted in a new category of revenue collections of approximately $205 million for Fiscal Year 2021 (as of February 2021, not including deferred taxes from Fiscal Year 2020 collected during Fiscal Year 2021). These payments largely reflect payments that otherwise would have been made by the partners in these entities and therefore would have been reported as personal or corporate income tax. In addition, when the Puerto Rico Department of Treasury moved collections of certain excise taxes to its SURI platform, collections in the "other excise tax" category increased (by over $200 million from Fiscal Year 2018 to Fiscal Year 2021). The Department has not yet been able to reconcile how much of these increased receipts are due to classification issues versus incremental collections. Given that these revenue streams are new and there is limited empirical data upon which to forecast, collections could over or under perform projections included in the Fiscal Plan.

## S.   Risk Factors Related to Future Judicial Actions

***The Bonds are being issued in connection with the Plan that is subject to confirmation pursuant to PROMESA Title III, which is newly enacted legislation that has not been previously used for financial restructuring, and substantial uncertainties related to its construction exists, including uncertainties due to the lack of judicial decisions interpreting PROMESA Title III.***

The Plan is effected pursuant to PROMESA Title III. PROMESA is a new federal statute signed into law in 2016, and a plan of adjustment pursuant to Title III thereof has not yet been confirmed by any court or consummated by any party. As a result, there are uncertainties relating to the successful confirmation and consummation of a plan of adjustment pursuant to PROMESA Title III. For example, it is uncertain to what extent an order of the Title III Court confirming the Plan can be appealed or its effectiveness delayed. While courts likely will borrow from existing precedents from chapters 9 and 11 of the Bankruptcy Code, there can be no assurances that courts would do so or consider other factors when interpreting the provisions of PROMESA. Such uncertainties may affect, among other things, market perception and, therefore, the trading value of the Bonds.

In addition, there is uncertainty associated with the consummation of a plan of adjustment pursuant to PROMESA Title III because there is no judicial experience interpreting the provisions of a plan of adjustment confirmed pursuant to PROMESA Title III. Judicial interpretations of a plan of adjustment confirmed pursuant to PROMESA Title III, including those related to the successful consummation of a plan of adjustment, could affect the value of the bonds issued under the Plan.

*PROMESA is subject to challenges regarding its constitutionality.*

For example, certain parties have challenged the constitutionality of PROMESA on the grounds that appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the U.S. Senate. These parties seek to dismiss the Commonwealth Title III Case and seek declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid.  These parties also seek to enjoin the Oversight Board from exercising any authority granted to it by PROMESA. The Title III Court entered an opinion and order holding that there is no constitutional defect in the method of appointment [ECF No. 3503]. The parties challenging PROMESA appealed to the First Circuit, which reversed the Title III Court and held that the method of appointment was defective. Certiorari was granted by the Supreme Court on this issue, and oral argument took place on October 15, 2019. For additional information, *see* section V.F of this Disclosure Statement, entitled "Significant Adversary Proceedings and Related Litigation."

*The Debtors may be subject to future claims and legal actions.*

The Debtors may be subject to various claims and legal actions arising in the ordinary course of its activities that arise after the Effective Date. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Debtors after their emergence from Title III.

*The enforcement of rights under the New GO Bonds, New GO Bond Indenture, and New Bond Legislation may be limited to the extent Reorganized Commonwealth is subject to a subsequent case under Title III of PROMESA.*

The holders of New GO Bonds may be unable to enforce rights under the New GO Bonds, New Bond Indenture, and New Bond Legislation to the extent Reorganized Commonwealth are subject to a subsequent case under Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition.

*Certain closing conditions and closing deliverables with respect to the Plan may differ in type and scope from those described herein.*

Certain closing conditions and closing deliverables with respect to the Plan may differ in type and scope from those described herein if the Title III Court enters a Confirmation Order that is different than expected.

## T.      Risk Factors Related to Legislative Action

The Plan contemplates legislation will be enacted by the Government on or prior to the Effective Date authorizing the transactions contemplated in the Plan, including the issuance of the New GO Bonds. There is no certainty such legislation will be enacted, and if it is not, the Oversight

Board will seek judicial relief in lieu thereof pursuant to PROMESA Section 305, allowing the Title III Court to interfere with governmental and political powers in a plan of adjustment or with the consent of the Oversight Board and to cause the issuance of the New GO Bonds. There is no certainty the Title III court will grant the foregoing judicial relief, or that it would be upheld on appeal.

In addition, issuing municipal securities without legislative support could negatively impact the market value of such securities. If the legislation authorizing the transactions contemplated in the Plan is enacted, future action by the Legislature could change the pertinent legislation in ways that affect the New GO Bonds. While the Oversight Board will seek to include in the legislation authorizing the New GO Bonds, among other things, a non-impairment covenant, any action of the Government to amend the legislation, as well as the litigation that likely would ensue, might adversely affect the value of the New GO Bonds, and the recoveries on the New GO Bonds. Furthermore, the enforcement of any rights against the Commonwealth under the Commonwealth's statutory non-impairment covenant may be subject to the exercise of judicial discretion and limitations on legal remedies against the Commonwealth or the enforcement of the non-impairment covenant.

In addition, other future actions by the Legislature could also materially adversely affect the value of the New GO Bonds and the recoveries on such bonds

## U.      Risk Factors Related to Tax Treatment of New GO Bonds

***The proportion of New GO Bonds that will be tax-exempt for U.S. federal income tax purposes is uncertain.***

The New GO Bonds will be issued as Tax-Exempt New GO Bonds (as defined in "Certain Material United States Federal Income Tax Considerations") or Taxable New GO Bonds (as defined in "Certain Material United States Federal Income Tax Considerations"), as applicable. The tax status of the New GO Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the interest on the New GO Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) the ratio of the aggregate amount of all Taxable New GO Bonds to be issued on the Effective Date to the total aggregate amount of all New GO Bonds. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims—Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 26), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds and CVIs.*"

**The manner in which interest accruals should be calculated with respect to the New GO Bonds for U.S. federal income tax purposes is uncertain.**

The Debtors do not intend to treat the New GO Bonds as "contingent payment debt instruments" under the applicable Treasury Regulations (as defined in "Certain Material United States Federal Income Tax Considerations"). However, there is limited authority as to the treatment of the New GO Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New GO Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New GO Bonds that may be excluded from gross income for U.S. federal income tax purposes. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds and CVIs*."

**U.S. Holders may be required to report income in certain years in excess of the amount of cash received by such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.**

If, for U.S. federal income tax purposes, the Taxable New GO Bonds (as defined in "Certain Material United States Federal Income Tax Considerations") are issued with more than a *de minimis* amount of original issue discount, generally, 0.25% of the stated redemption price at maturity multiplied by the number of complete years to maturity, then a U.S. Holder of such bonds must include original issue discount in income as it accrues (regardless of the holder's regular method of tax accounting) using a constant yield method under the accrual rules for original issue discount. If interest accruals exceed the cash payments on the Taxable New GO Bonds in any year, a U.S. Holder will have "phantom income" in that year, *i.e.*, taxable income in excess of the cash received, which may be substantial.

In the event of a sale or other taxable disposition of a New GO Bond with accrued market discount, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National)*

*(Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds and CVIs."*

**The treatment of CVIs as notional principal contracts subject to the rules governing caps for U.S. federal income tax purposes is uncertain.**

The U.S. federal income tax treatment of the CVIs is uncertain. The Debtors intend to treat the CVIs as notional principle contracts subject to the rules governing caps. However, there is limited authority as to the treatment of the CVIs, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of CVIs as notional principle contracts. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 28), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds and CVIs.*"

ALL HOLDERS SUBJECT TO UNITED STATES TAXATION SHOULD READ THE DISCUSSION OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NEW GO BONDS AND CVIS THAT IS CONTAINED IN THIS DISCLOSURE STATEMENT UNDER THE HEADING "CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS."

[*Remainder of Page Left Intentionally Blank*]

## IX.      Certain Material United States Federal Income Tax Considerations

### A.      General

A general description of certain material U.S. federal income tax consequences of the Plan to holders of certain Claims is provided below. This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), regulations (including temporary and proposed regulations) promulgated under the IRC (the "Treasury Regulations"), judicial decisions and administrative determinations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause some, or all, of the U.S. federal income tax consequences of the Plan to differ materially from the consequences described below.

The U.S. federal income tax consequences of the Plan are complex and may vary based on the Class of Claims held by a holder. As of the date of this Disclosure Statement, no ruling has been requested from the Internal Revenue Service (the "IRS") as to any aspect of the Plan; no opinion has been requested from the Debtors' counsel concerning any tax consequence of the Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of U.S. federal income taxation that may be relevant to holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers (e.g., regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency for tax purposes is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, individuals receiving Social Security or Railroad Retirement benefits, and persons whose claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, the description does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New GO Bonds or CVIs in the secondary market. Furthermore, the description does not discuss state, territorial (including Puerto Rico), local or non-U.S. income or other tax consequences (including estate or gift tax consequences). Finally, this discussion does not address the U.S. federal income tax consequences to holders of Claims who are deemed to have rejected the Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the U.S. federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan.

**The Puerto Rico tax consequences of the Plan to holders that are bona fide residents of the Commonwealth, and others who may be subject to tax on a gross or net basis by the Commonwealth are not discussed in this section. Such holders should review the section "Certain Material Puerto Rico Income Tax Considerations" below.**

B.     U.S. Holders

1.     **Definition of U.S. Holder**

Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "U.S. Holder" means a beneficial owner of GO Bonds, ERS Bonds and/or PBA Bonds (together, "Existing Securities") on the Effective Date of the Plan that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Existing Securities, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

The term "U.S. Holder" does not include a Puerto Rico Individual or a Puerto Rico Corporation, each as defined below under "—Puerto Rico Individuals and Puerto Rico Corporations." Puerto Rico Individuals and Puerto Rico Corporations should review the certain U.S. federal income tax consequences of the Plan discussed under "— Puerto Rico Individuals and Puerto Rico Corporations."

In addition, solely for purposes of holders of (i) Active and Retired Employee Benefits Claims (Class 48A–48E), and (ii) AFSCME Claims (Class 49), the term "U.S. Holder" does not include any individual that was a Puerto Rico Individual and is now a citizen or resident of the United States.

A U.S. Holder who holds Allowed Claims of more than one Class may have different U.S. federal income tax consequences for each Class of Allowed Claims. U.S. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such U.S. Holder holds, and U.S. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the U.S. federal income tax consequences of each Class of Allowed Claims such U.S. Holder holds.

Certain U.S. Holders that use the accrual method of accounting for U.S. federal income tax purposes generally will be required to include certain amounts in income with respect to the Allowed Claims no later than the time that such amounts are reflected on certain financial statements of such U.S. Holders.  Such U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of the Plan in their individual circumstances.

    2.    **Tax Treatment of Allowed Claims**

    a)    **Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)**

It is expected that, pursuant to the Plan, each U.S. Holder of any of the following: (i) Vintage CW Bond Claims, (ii) Vintage CW Bond Claims (Assured), (iii) Vintage CW Bond Claims (National), (iv) Vintage CW Bond Claims (Other Insured), (v) Vintage CW Bond Claims (Syncora), (vi) Vintage CW Guarantee Bond Claims, (vii) Vintage CW Guarantee Bond Claims (Assured), (viii) Vintage CW Guarantee Bond Claims (National), (ix) Vintage CW Guarantee Bond Claims (Other Insured), (x) Vintage CW Guarantee Bond Claims (Syncora), (xi) 2011 CW Bond Claims, (xii) 2011 CW Bond Claims (Assured), (xiii) 2011 CW Guarantee Bond Claims, (xiv) 2011 CW Guarantee Bond Claims (Assured), (xv) 2011 CW Series D/E/PIB Bond Claims, (xvi) 2011 CW Series D/E/PIB Bond Claims (Assured), (xvii) 2012 CW Bond Claims, (xviii) 2012 CW Bond Claims (Assured), (xix) 2012 CW Guarantee Bond Claims, (xx) 2014 CW Bond Claims, and (xxi) 2014 CW Guarantee Bond Claims will be treated as exchanging such U.S. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds, CVIs and Cash for U.S. federal income tax purposes.  The Debtors intend to report the transaction consistently with this treatment to the IRS, and the remainder of this discussion assumes the expected treatment will be followed by each U.S. Holder.

    (i)    *Tax Treatment of Exchange*

The tender of the GO Bonds for the New GO Bonds, CVIs, and Cash, as applicable, pursuant to the Plan will be considered an exchange under Section 1001 of the IRC.  A U.S. Holder will recognize gain or loss in an amount equal the difference between (i) the sum of any Cash received (other than Cash received attributable to accrued but unpaid interest on the GO Bonds) plus the "issue price" for U.S. federal income tax purposes (determined in the manner described

below under "—Issue Price") for any New GO Bonds and the fair market value for any CVIs received and (ii) the U.S. Holder's adjusted tax basis in the GO Bonds that were tendered therefore (such adjusted tax basis calculated as described below). Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the GO Bonds for the New GO Bonds, CVIs, and Cash, as applicable, pursuant to the exchange will generally be capital gain or loss and, if the U.S. Holder's holding period of the GO Bonds surrendered is more than one year, long-term capital gain or loss. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations.

A U.S. Holder's holding period for any New GO Bonds and CVIs received will begin the day after the exchange. A U.S. Holder's tax basis in the New GO Bonds and CVIs received in the exchange will generally be equal to the issue price of the New GO Bonds (determined in the manner described below under "—Issue Price") and the fair market value of the CVIs on the date of the exchange.

(ii)     *Tax Treatment of Receipt of Cash*

(1)     **Cash**

Cash is expected to be treated as a payment on the GO Bonds for U.S. federal income tax purposes, other than Cash received that is attributable to accrued but unpaid interest. The Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses). Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes. Consistent with such allocation under the Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest. While it is believed that the reporting of distributions to a U.S. Holder in accordance with the Plan is consistent with applicable law and congressional intent, there can be no assurance that the IRS will respect those allocations with respect to payment on the GO Bonds. U.S. Holders should consult their tax advisors to determine the appropriate characterization of payments received.

Subject to the discussion in the previous paragraph, if any of the Cash received is attributable to accrued but unpaid interest on the GO Bonds, the treatment of such Cash paid to a U.S. Holder will depend on whether the accrued but unpaid interest on such U.S. Holder's Claim is, or is not, tax-exempt for U.S. federal income tax purposes. In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be required to include such amount of Cash received as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be entitled to recognize a deductible loss, to the

559

extent that such interest is not satisfied under the Plan.  However, a U.S Holder of a tax-exempt Claim will not be entitled to recognize a deductible loss with respect to any unpaid interest if such U.S. Holder never included such unpaid interest in U.S. gross income.  Additionally, a U.S. Holder that receives a distribution of accrued but unpaid interest on a Claim that is tax-exempt will not be required to include such amount as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest.  Although U.S. Holders generally will not be required to include the foregoing amounts in computing U.S. taxable income, U.S. Holders will likely have to report such amounts to the IRS.

For tax-exempt GO Bonds that are capital appreciation bonds, where the accrual of the original issue discount is treated as tax exempt interest, the amount of such accrual would have increased the tax basis of a bondholder, thereby increasing a bondholder's investment in such capital appreciation bond.  Such increase in tax basis is generally considered an increase in the principal amount of the capital appreciation bond.  U.S. Holders of Claims on which such interest has accrued are urged to consult their own tax advisors regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

(2)      <strong>Consummation Costs and PSA Restriction Fee</strong>

The U.S. federal income tax treatment of the Consummation Costs and the PSA Restriction Fees is unclear.  It is believed that it is appropriate to treat the payment of the Consummation Costs and PSA Restriction Fees as a separate fee that would be reported as ordinary income, rather than an amount paid under the GO Bonds, and such ordinary income generally would not be tax-exempt regardless of whether the underlying GO Bonds were tax-exempt for U.S. federal income tax purposes.  It is possible, however, that the Consummation Costs and the PSA Restriction Fees could instead be treated in the same manner as discussed above under "Cash."  These fees may also be treated as additional consideration paid to holders that would be taken into account in calculating a holder's gain or loss.  U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the Consummation Costs and the PSA Restriction Fees.

(iii)      <em>Market Discount</em>

If a U.S. Holder acquired the GO Bonds for less than the "adjusted issue price" of the GO Bonds and the difference between the U.S. Holder's cost and the "adjusted issue price" exceeded a *de minimis* threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining complete years to maturity), such difference will generally be treated as "market discount."

Any gain recognized on the exchange will generally be treated as ordinary income to the extent of any accrued market discount not previously included in ordinary income with respect to the GO Bonds.  To the extent gain is recognized pursuant to the exchange of GO Bonds for New GO Bonds, a U.S. Holder must include as ordinary income any gain that would have otherwise been treated as capital gain to the extent of the accrued market discount on the GO Bonds, unless the U.S. Holder previously elected to include the market discount in income as it accrued.  See below "—Taxation of New GO Bonds and CVIs—Sale, Retirement or Other Disposition of New GO Bonds and CVIs" for a further discussion regarding the election to include market discount in

560

income as it accrues. U.S. Holders should consult their own tax advisors regarding the tax treatment of market discount pursuant to the exchange, including the interaction of the market discount, original issue discount ("OID") and acquisition premium rules.

(iv)    ***Taxation of New GO Bonds and CVIs***

The New GO Bonds will be issued either as bonds the interest on which is excluded from gross income for U.S. federal income tax purposes (the "Tax-Exempt New GO Bonds"); or, bonds the interest on which is not excluded from gross income for U.S. federal income tax purposes (the "Taxable New GO Bonds"). The tax status of the New GO Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the New GO Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) the ratio of the aggregate amount of all Taxable New GO Bonds to be issued on the Effective Date to the total aggregate amount of all New GO Bonds.

(1)    **Issue Price**

It is expected that the issue price of the New GO Bonds should equal the fair market value of the New GO Bonds on the date of the exchange. This determination is based on the Debtors' conclusion that the GO Bonds as well as the New GO Bonds should be treated as "publicly traded" within the meaning of the applicable Treasury Regulations. The fair market value of the New GO Bonds will be determined by the "trading price" of such Bonds on or about the date of the exchange. There is no specific guidance on how to determine the trading price as of a specific time; however, related Treasury Regulations suggest that a taxpayer may use any consistently applied, reasonable method to determine fair market value when there is more than one sales price or quoted price. The Debtors' determination that the GO Bonds and the New GO Bonds are "publicly traded" will be binding on all holders, unless a holder discloses its contrary position in the manner required by applicable Treasury Regulations. The rules regarding the determination of issue price are complex, and U.S. Holders should consult their own tax advisors regarding the determination of the issue price of the New GO Bonds for U.S. federal income tax purposes.

(2)    **Interest Including OID**

The U.S. federal income tax rules used to determine what amounts are treated as interest are complex. U.S. Holders are urged to consult their own tax advisors regarding what amounts will be treated as interest for U.S. federal income tax purposes in their individual circumstances.

i.    **Tax-Exempt New GO Bonds**

The IRC imposes certain requirements that must be met subsequent to the issuance and delivery of the Tax-Exempt New GO Bonds for interest thereon to be and remain excluded from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC. Noncompliance with such requirements could cause the interest on the Tax-Exempt New GO Bonds to be included in gross income for U.S. federal income tax purposes retroactive to the date of issue of the Tax-Exempt New GO Bonds. When the Tax-Exempt New GO Bonds are issued on the Effective Date, Reorganized Commonwealth will, pursuant to the Definitive Documents, including the New GO Bonds Legislation, covenant to do and perform all acts and things permitted

by law and reasonably necessary or desirable to assure that interest paid to the holders of any Tax-Exempt New GO Bonds shall be and remain excludable from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC. However, as noted above, the tax status of the New GO Bonds has not been determined as of the date of this Disclosure Statement.

Amounts allocable to pre-issuance accrued interest on the Tax-Exempt New GO Bonds will not be treated as tax-exempt interest under Section 103 of the IRC.

### ii.    Taxable New GO Bonds

If interest on the New GO Bonds (or a portion of them) is not treated as exempt from gross income for U.S. federal income tax purposes, then payments or accruals of "qualified stated interest" (as defined below) on such Taxable New GO Bonds (or the relevant portion of them) will be taxable to such U.S. Holder as ordinary interest income at the time received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the debt instrument at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices. Stated interest payments on the New GO Bonds generally are expected to be qualified stated interest for this purpose.

### iii.    OID

The amount of OID on the New GO Bonds, if any, will be equal to the excess of the sum of all principal and stated interest payments (other than qualified stated interest) provided by such New GO Bonds (initially taking into account the payment schedule as described below) over the issue price (determined in the manner described above under "—Issue Price") of such New GO Bonds. Furthermore, the Taxable New GO Bonds would bear OID only if the issue price of the Taxable New GO Bonds, as applicable, is less than its principal amount by more than a *de minimis* amount. OID will be considered *de minimis* if it is less than 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity of such Taxable New GO Bonds. U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, must include the OID on Taxable New GO Bonds in gross income as ordinary income as it accrues on a constant yield to maturity basis, regardless of whether cash attributable to such OID is received at such time. However, the Taxable New GO Bonds may be subject to the acquisition premium rules (described below under "—Acquisition Premium"), which could reduce the amount of OID includible in gross income.

For Taxable New GO Bonds, the amount of OID includible in gross income by a U.S. Holder in any taxable year generally is the sum of the daily portions of OID with respect to a Taxable New GO Bond for each day during such taxable year or portion of such taxable year on which the U.S. Holder holds the Taxable New GO Bond. The daily portion is determined by allocating to each day in any accrual period a pro rata portion of the OID allocable to that accrual period. The accrual period for a Taxable New GO Bond may be of any length and may vary in length over the term of the Taxable New GO Bond provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on either the first day or

the final day of an accrual period. The amount of OID allocable to any accrual period, subject to the possible adjustments described below, will be an amount equal to the product of the Taxable New GO Bond's adjusted issue price at the beginning of the accrual period and its yield to maturity (less payments of qualified stated interest allocable to that period). The yield to maturity of the Taxable New GO Bonds is the discount rate that, when used in computing the present value (as of the issue date) of all principal and interest payments to be made on the Taxable New GO Bonds produces an amount equal to the issue price of such Taxable New GO Bonds. The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price at the beginning of the final accrual period. The adjusted issue price of a Taxable New GO Bond at the beginning of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period and reduced by any payments made on the Taxable New GO Bond, as applicable, during the prior accrual periods (other than payments of qualified stated interest).

For Tax-Exempt New GO Bonds, the amount of OID is excluded from gross income for U.S. federal income tax purposes to the same extent as interest on the Tax-Exempt New GO Bonds is so expected to be excluded. The OID accruals are computed in the same manner as described above for Taxable New GO Bonds, but such accruals will be added to the holder's tax basis for the Tax-Exempt New GO Bonds. The accrual of OID may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Tax-Exempt New GO Bonds even though there will not be a corresponding cash payment. Owners of the Tax-Exempt New GO Bonds with OID are urged to consult with their own advisors with respect to the tax consequences of owning such Tax-Exempt New GO Bonds.

The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders receiving the New GO Bonds could be treated differently than described above. U.S. Holders receiving the New GO Bonds should consult their own tax advisors regarding the potential application of the OID and related U.S. federal income tax rules to the New GO Bonds.

This disclosure assumes that the New GO Bonds will not be considered contingent payment debt instruments within the meaning of the applicable Treasury Regulations. However, there is limited authority as to the treatment of the New GO Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New GO Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New GO Bonds that may be excluded from gross income for U.S. federal income tax purposes.

### (3)    Acquisition Premium

A New GO Bond would be treated as acquired with acquisition premium if the U.S. Holder's initial basis in the New GO Bond is (a) less than or equal to the sum of all amounts payable on the New GO Bond (other than payments of qualified stated interest) and (b) greater than such bond's adjusted issue price for U.S. federal income tax purposes. If a Taxable New GO Bond was acquired with acquisition premium, a U.S. Holder generally would reduce the amount of OID that otherwise would be included in income for each accrual period by an amount equal to (i) the amount of OID otherwise includible in income multiplied by (ii) a fraction, the numerator

563

of which is the excess of the adjusted tax basis of the Taxable New GO Bond immediately after its acquisition by the U.S. Holder over the adjusted issue price of the Taxable New GO Bond and the denominator of which is the excess of the sum of all amounts payable on the Taxable New GO Bond after the purchase date, other than payments of qualified stated interest, over the Taxable New GO Bond's adjusted issue price. If a Tax-Exempt New GO Bond were acquired with acquisition premium, a U.S. Holder will reduce the Tax-Exempt New GO Bond's tax basis during each accrual period using the same method described above for a Taxable New GO Bond.

As an alternative to reducing the amount of OID that otherwise would be included in income during an accrual period or reducing the tax basis of the Tax-Exempt New GO Bond, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above; provided, however, that if a U.S. Holder chooses to make such election, the election shall also apply with respect to all other bonds held by such U.S. Holder at the beginning of the taxable year to which the election applies and to any bonds thereafter acquired, and such election generally may not be revoked. U.S. Holders who acquire New GO Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

(4)     <strong>CVIs</strong>

The U.S. federal income tax treatment of the CVIs is uncertain. In particular, it is unclear which U.S. federal income rules are properly applicable to interests in a trust, or interests in the corpus of a trust, which have no stated principal amount, no guaranteed repayment of principal, and periodic payments linked to government receipts such as sales taxes. There may be alternative reasonable methods of reporting the federal income tax treatment of the CVIs. No ruling from the U.S. Internal Revenue Service (IRS) has been issued or will be requested in respect of the CVIs, nor has any counsel opined on the U.S. federal income tax treatment of the CVIs, and no assurance can be given that the IRS will not assert or that a court will not rule that the tax treatment of the CVIs should be other than as described herein. Holders of CVIs are strongly encouraged to consult their own tax advisors as to the U.S. federal and other tax consequences of receiving, holding, and disposing of CVIs in their individual circumstances.

In the absence of any specific authority specifically governing the U.S. federal income tax treatment of the CVIs, and because the CVIs provide for payments at annual intervals that, subject to the discussion below, can be described as calculated by reference to a specified index (the receipt of Sales & Use Taxes imposed by the government of Puerto Rico, the "Sales Taxes Receipts") on a notional amount in exchange for specified consideration (a portion of the Eligible Securities tendered in the Offer), it would be reasonable to treat the CVIs as financial instruments generally subject to the U.S. federal income tax rules governing notional principal contracts ("NPCs"). In order for a financial instrument to be properly characterized as an NPC, the determination of the amount of the payments under the instrument must be based on current, objectively determinable economic information that is not within the control of the issuer (a "specified index"). It is not certain whether Sales Taxes Receipts would be properly treated as a specified index for purposes of the NPC rules. In the absence of administrative or judicial guidance to the contrary, it is reasonable to treat the Sales Taxes Receipts-linked formula as a specified index for purposes of the NPC rules and to treat payments to holders of CVIs for U.S. federal income tax purposes as payments made in respect of an NPC.

564

The NPC rules have a specific regime applicable to NPCs that are properly characterized as "caps." In order to receive payment with respect to the CVIs, the Sales Taxes Receipts must outperform the CW Fiscal Plan (the "Sales Taxes Trigger"). If the Sales Taxes Trigger is met, payments will be made subject to, among other restrictions, notional and lifetime caps, which differ for GO CVIs and Clawback CVIs; see *Framework for Treatment of Commonwealth Bond Claims and Guarantee Claims – CVI Structure* for a complete description. If the Sales Taxes Trigger is not met within a given year, the amount otherwise payable for that year will be carried-over to the next year, but subject to an increased payment limit for that subsequent year of $400,000,000 for the GO CVIs and $350,000,000 (increasing to $750,000,000 for years 23-30) for the Clawback CVIs. There is a risk that even if the Sales Taxes Trigger is met, the general obligation fund of Puerto Rico from which payments are to be made will not have sufficient funds with which to provide payment for that year. While the matter is not free from doubt, payments made to holders of the CVIs may reasonably be treated as payments made in respect of an NPC subject to the rules governing caps.

Based on the discussion above, the fair market value of the CVIs (as described above) should be treated as the purchase price or premium paid to receive payments under the CVIs. A holder then would be required to allocate the purchase price or premium of the CVIs to each year in which the payments may be made over the term of the CVIs. For this purpose, a holder generally would allocate purchase price or premium to each payment under the CVIs, based on the prices of a series of cash-settled options contracts with respect to each such payment. The amount realized by a holder from each payment on a CVI a holder holds therefore generally should equal the amount of such payment, reduced by the portion of the purchase price allocated to each such payment. The calculations and allocations described in this paragraph are extremely complex. Holders of New Securities and CVIs should consult their own tax advisors about the implications of these calculations and allocations in their individual circumstances.

Regardless of a holder's method of accounting for U.S. federal income tax purposes, a holder of a CVI treated as an NPC subject to the "cap" rules generally must include in gross income on the last day of the taxable year in which a holder holds such a CVI the ratable daily portion of all payments under such CVI reduced by any relevant portion of the purchase price or premium, as described above, allocable to such taxable year. If the amount of a payment is not yet determinable at the end of your taxable year, then a holder generally should recognize the ratable daily portion of such payment (if any) calculated based on whether and to what extent the Sales Tax Trigger has been met or exceeded as of the last day of such taxable year. If a holder of such a CVI determines that the method described in the preceding sentence does not provide a reasonable estimate of whether and to what extent the Sales Tax Trigger will be met or exceeded as of the next payment date on such CVI, then such a holder may elect to use a reasonable estimate of Sales Taxes collected, provided that you use the same method to reasonably estimate Sales Taxes collected consistently each year and use such estimate for all purposes, including for purposes of financial reports to equity holders and creditors of such a holder. Holders of CVIs should consult their individual advisors as to the consequences of making the election described in the preceding sentence.

Any difference between the actual payment received on a CVI and the estimated payment amount determined by a holder as described in the preceding paragraph generally would be taken into account as an adjustment to the income or loss from the CVIs in the taxable year during which the actual amount of the payment becomes fixed (regardless of whether that is the taxable year in which such payment is actually received, in whole or in part). In certain circumstances, it is possible that the difference between the estimated amount of a payment on a CVI in one or more taxable years, the actual amount of a payment received on a CVI in one or more taxable years, and the taxable year in which the actual amount of any payment on a CVI becomes fixed may result in the acceleration of income, or inclusion of income in one taxable year that is ultimately offset by a loss in a subsequent taxable year. Regardless of the timing of any payment under the CVIs or the taxable year in which income or loss is required to be recognized for U.S. federal income tax purposes, any such income or loss generally would be treated as ordinary income or loss, as the case may be, and any such income generally would be treated as fixed or determinable, annual or periodical (FDAP) income for a holder that is not a U.S. person and who does not hold the CVIs in connection with a trade or business in the United States.

If the CVIs were, instead, treated as NPCs that were not subject to the "cap" rules, the rules for determining the precise amount of a payment required to be included in gross income for U.S. federal income tax purposes would be somewhat different; however, any amounts of income or loss required to be recognized generally would still be treated as ordinary income or loss. Holders of CVIs should consult their individual advisors as to potential alternative applications of the NPC rules to the CVIs in their individual circumstances.

As mentioned above, there may be other reasonable methods of reporting payments made on the CVIs for federal income tax purposes. For example, use of a cost recovery method that allocates the CVI purchase price (i.e., the fair market value to the initial holders) may be appropriate. Such a method might involve determining the portion of each payment on the CVIs allocable to the purchase price based on applying certain imputed interest rules to each payment, based on the period from the date of the exchange to the date of payment using the published applicable federal rates.

It is possible that the IRS could take the view that the CVIs do not qualify as notional principal contracts under the NPC rules, which could affect the timing and character of income recognized with respect to the CVIs. If the IRS were to successfully assert that the CVIs were properly treated as indebtedness for U.S. federal income tax purposes, the CVIs likely would be treated as contingent payment debt instruments, which would have significantly different tax consequences than those discussed here, including requiring holders to recognize substantial amounts of income under the original issue discount rules prior to the receipt of such income in cash. Alternatively, if the IRS were to successfully assert that the CVIs were properly treated as equity for U.S. federal income tax purposes, holders of CVIs would be subject to materially different U.S. federal income tax consequences than those discussed here. Holders are urged to consult their own tax advisors as to the federal income tax treatment of the acquisition, ownership and disposition of the CVIs.

(5)    **Sale, Retirement or Other Disposition of New GO Bonds and CVIs**

A U.S. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a New GO Bond or CVI equal to the difference, if any, between (i) the amount realized upon such disposition (other than cash received attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of such New GO Bond or CVI. A U.S. Holder's adjusted tax basis in a New GO Bond or CVI will generally equal such U.S. Holder's tax basis on such New GO Bond or CVI on the date the U.S. Holder acquired such New GO Bond or CVI, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any Cash payments (other than payments of qualified stated interest) previously received on such New GO Bond or CVI by the U.S. Holder. U.S. Holders should consult with their own tax advisors as to the tax basis of their New GO Bonds and CVIs on the date of acquisition.

Subject to the discussion of market discount below, any gain or loss that a U.S. Holder recognizes upon the sale or other taxable disposition of a New GO Bond or CVI should generally constitute capital gain or loss and will be long-term capital gain or loss if such holder's holding period in the New GO Bond or CVI is greater than one year. A U.S. Holder's holding period in New GO Bonds and CVIs received pursuant to the exchange will begin the day after the exchange. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations. Upon a taxable disposition of the New GO Bonds, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued. A U.S. Holder can elect to include market discount in income as it accrues, in which case such income would be treated as ordinary interest income at the time it is recognized and the U.S. Holder would increase its basis in the New GO Bonds by the amount of the market discount recognized. Such election is made by including market discount in income on a timely filed U.S. federal income tax return and attaching a statement to the return providing that such election has been made.

If such election is made, the election applies to all market discount bonds acquired by the U.S. Holder during the year for which the election is made and all subsequent years.

b)    **Holders of Retail Vintage CW Bond Claims (Class 15), Retail 2011 CW Bond Claims (Class 28), Retail 2011 CW Series D/E/PIB Bond Claims (Class 35), Retail 2012 CW Bond Claims (Class 38), and Retail 2014 CW Bond Claims (Class 44)**

It is expected that pursuant to the Plan, each U.S. Holder of any of the following: (i) Retail Vintage CW Bond Claims; (ii) Retail 2011 CW Bond Claims; (iii) Retail 2011 CW Series D/E/PIB Bond Claims; (iv) Retail 2012 CW Bond Claims; and (v) Retail 2014 CW Bond Claims will be treated as exchanging such U.S. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds, CVIs, and Cash for U.S. federal income tax purposes. The remainder of this discussion assumes this will be the case.

(i)     *Tax Treatment of Exchange*

Generally, it is expected that the U.S. federal income tax consequences to each of the above-mentioned U.S. Holders for the exchange of a portion of such U.S. Holder's GO Bonds for New GO Bonds and CVIs and Cash should be as described above under "*—Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange.*"

(ii)     *Tax Treatment of Receipt of Cash*

It is expected that, to the extent that any of the above-mentioned U.S. Holders receives its pro rata share of Cash under the Plan, the U.S. federal income tax consequences to such U.S. Holder should be as described above under "*—Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Receipt of Cash.*" To the extent that such U.S. Holder voted to accept the Plan and thereby receives its pro rata share of Retail Support Fees, although, not free from doubt, it is expected that Retail Support Fees generally shall be treated similarly to the description above of Consummation Costs under "*—Tax Treatment of Receipt of Cash—Consummation Costs and PSA Restriction Fee.*"

(iii)     *Taxation of New GO Bonds and CVIs*

It is expected that the New GO Bonds and CVIs should be treated for U.S. federal income tax purposes as described above under "*—Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class*

*25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW
Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW
Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW
Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond
Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds
and CVIs.*"

c)    **Holders of Vintage CW Bond Claims (Taxable Election) (Class 20),
Vintage CW Guarantee Bond Claims (Taxable Election) (Class 26),
2011 CW Bond Claims (Taxable Election) (Class 30), 2011 CW
Guarantee Bond Claims (Taxable Election) (Class 32), 2011 CW
Series D/E/PIB Bond Claims (Taxable Election) (Class 36), 2012 CW
Bond Claims (Taxable Election) (Class 40), 2012 CW Guarantee Bond
Claims (Taxable Election) (Class 42), 2014 CW Bond Claims (Taxable
Election) (Class 45), and 2014 CW Guarantee Bond Claims (Taxable
Election) (Class 47)**

In general, this discussion does not apply to holders of (i) Vintage CW Bond Claims
(Taxable Election); (ii) Vintage CW Guarantee Bond Claims (Taxable Election); (iii) 2011 CW
Bond Claims (Taxable Election); (iv) 2011 CW Guarantee Bond Claims (Taxable Election); (v)
2011 CW Series D/E/PIB Bond Claims (Taxable Election); (vi) 2012 CW Bond Claims (Taxable
Election); (vii) 2012 CW Guarantee Bond Claims (Taxable Election); (viii) 2014 CW Bond Claims
(Taxable Election); and (ix) 2014 CW Guarantee Bond Claims (Taxable Election). Any holder of
any such Claim that files a U.S. federal income tax return should consult their tax advisor regarding
the U.S. federal income tax consequences of holding such Claim and making a taxable bond
election. As described above, the term "U.S. Holders" as defined herein does not include Puerto
Rico Individuals and Puerto Rico Corporations, each as defined below under "—*Puerto Rico
Individuals and Puerto Rico Corporations.*" Puerto Rico Individuals and Puerto Rico
Corporations should see the discussion below under "—*Puerto Rico Individuals and Puerto Rico
Corporations.*"

d)    **Holders of ERS Bond Claims (Class 62)**

It is expected that pursuant to the Plan, each U.S. Holder of ERS Bond Claims will be
treated as exchanging such U.S. Holder's ERS Bonds that are the subject of this Class of Allowed
Claims for its pro rata share of the ERS Bond Recovery, which includes $373,000,000 and (1) a
right to receive $70,750,000 if the Commonwealth exercises its right to purchase the ERS Private
Equity Portfolio, (2) a right to purchase the ERS Private Equity Portfolio for $70,750,000 if the
Commonwealth chooses not to exercise its right to purchase such portfolio, and (3) a right to force
the Commonwealth to purchase the ERS Private Equity Portfolio for cash equal to $70,750,000 if
the former bondholders do not exercise their right to purchase such portfolio. It is reasonable to
conclude, given the expected economic incentives of the various rights a U.S. Holder of ERS Bond
Claims will receive under the Plan, that a U.S. Holder of ERS Bond Claims will be treated as
receiving its pro rata share of $373,000,000 and its pro rata share of a future payment of
$70,750,000 as of the Effective Date. The remainder of this discussion assumes this will be the
case.

Given that the second payment is anticipated in April, 2023, it may be reasonable to treat the receipt of a U.S. Holder's pro rata share of the ERS Bond Recovery as subject to the U.S. federal income tax rules governing installment sales. If the total aggregate value of the U.S. Holder's pro rata share of the ERS Bond Recovery is less than its adjusted tax basis in its ERS Bonds exchanged under the Plan, the U.S. Holder will recognize its entire loss in the year of the exchange. If the total aggregate value of the U.S. Holder's pro rata share of the ERS Bond Recovery is greater than its adjusted tax basis in its ERS Bonds exchanged under the Plan, the U.S. Holder will recognize a portion of its gain in the year of payment and will recognize the remaining gain in the year that it receives the second payment. A portion of the deferred gain will be subject to recharacterization as interest income, and there may be additional interest charges or other limitations depending, amongst other things, on the amount of gain a U.S. Holder will defer and other attributes that a U.S. Holder may possess. A U.S. Holder may elect out of the rules governing installment sales, in which case all gain (if any) will be recognized in the year of the exchange. The rules governing installment sales are complicated, and U.S. Holders of ERS Bonds should consult with their own tax advisors as to the application of the rules governing installment sales, and as to whether such U.S. Holders should elect out of the rules governing installment sales.

Accordingly, except as otherwise described above, it is expected that the U.S. federal income tax consequences to the U.S. Holders of Allowed ERS Bond Claims for the exchange of ERS Bonds for the ERS Bond Recovery should be as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Receipt of Cash.*"

e)      **Holders of ERS General Unsecured Claims (Class 63)**

It is expected that pursuant to the Plan, each U.S. Holder of a ERS General Unsecured Claim should be treated as exchanging such U.S. Holder's ERS Bonds that are the subject of this Class of Allowed Claims for Cash for U.S. federal income tax purposes. The remainder of this discussion assumes this will be the case.

The tender of a U.S. Holder's ERS Bonds in exchange for a pro rata share of the ERS GUC Pool, which is comprised of $500,000 in cash and the net recoveries of the Avoidance Actions Trust, will be treated as a taxable exchange of the ERS Bonds for Cash for U.S. federal income tax purposes. It is expected that the U.S. federal income tax consequences to the U.S. Holders of Settling ERS Bonds Claims of such exchange should be as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage*

*CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Receipt of Cash.*"

f) **Holders of Vintage PBA Bond Claims (Class 1), Vintage PBA Bond Claims (Assured) (Class 2), Vintage PBA Bond Claims (National) (Class 3), 2011 PBA Bond Claims (Class 4), Vintage PBA Bond Claims (Syncora) (Class 5), 2011 PBA Bond Claims (Class 7), 2012 PBA Bond Claims (Class 9), PBA/DRA Secured Claims (Class 11), PBA General Unsecured Claims (Class 12) and PBA/DRA Unsecured Claims (Class 13)**

It is expected that pursuant to the Plan, each U.S. Holder of any of the following: (i) Vintage PBA Bond Claims; (ii) Vintage PBA Bond Claims (Assured); (iii) Vintage PBA Bond Claims (National); (iv) 2011 PBA Bond Claims; (v) Vintage PBA Bond Claims (Syncora); (vi) 2011 PBA Bond Claims; (vii) 2012 PBA Bond Claims; (viii) PBA/DRA Secured Claims; (ix) PBA General Unsecured Claims; and (x) PBA/DRA Unsecured Claims will be treated as exchanging such U.S. Holder's PBA Bonds for Cash for U.S. federal income tax purposes.

Generally, it is expected that the U.S. federal income tax treatment of receipt of Cash should be as described above under "*—Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Receipt of Cash.*"

g) **Holders of Retail Vintage PBA Bond Claims (Class 6), Retail 2011 PBA Bond Claims (Class 8), and Retail 2012 PBA Bond Claims (Class 10)**

It is expected that pursuant to the Plan, each U.S. Holder of any of the following: (i) Retail Vintage PBA Bond Claims; (ii) Retail 2011 PBA Bond Claims; and (iii) Retail 2012 PBA Bond Claims will be treated as exchanging such U.S. Holder's PBA Bonds for Cash plus the Retail Support Fee for U.S. federal income tax purposes.

Generally, it is expected that the U.S. federal income tax treatment of receipt of Cash should be as described above under, "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Receipt of Cash.*" To the extent that such U.S. Holder voted to accept the Plan and thereby receives its pro rata share of Retail Support Fees, although, not the matter is not free from doubt, it is expected that Retail Support Fees generally should be treated similarly to the description above of Consummation Costs under "—*Tax Treatment of Receipt of Cash—Consummation Costs and PSA Restriction Fee.*"

h) **Holders of Dairy Producer Claims (Class 50), Eminent Domain Claims (Class 51), Med Center Claims (Class 53), CW General Unsecured Claims (Class 55), CW/HTA Claims (Class 56), CW/Convention Center Claims (Class 57), CW/PRIFA Rum Tax Claims (Class 58), CW/MBA Claims (Class 59), Convenience Claims (Class 65), and Federal Claims (Class 66)**

It is expected that pursuant to the Plan, each U.S. Holder of any of the following: (i) Dairy Producer Claims; (ii) Eminent Domain Claims; (iii) Med Center Claims; (iv) CW General Unsecured Claims; (v) CW/HTA Claims; (vi) CW/Convention Center Claims; (vii) CW/PRIFA Rum Tax Claims; (viii) CW/MBA Claims; (ix) Convenience Claims; and (x) Federal Claims will be treated as receiving a distribution in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims. The consequences of the receipt of such distribution will vary depending on the U.S. Holders individual circumstances. U.S Holders are urged to consult their tax advisors regarding the tax consequences of the receipt of such distribution in their individual circumstances.

i) **Holders of Active and Retired Employee Retirement Benefits Claims (Class 48A-48L) and AFSCME Claims (Class 49)**

In general, this discussion does not apply to holders of (i) Active and Retired Employee Retirement Benefits Claims (Class 48A-48L) and (ii) AFSCME Claims (Class 49). Any holder of any such Claim that files a U.S. federal income tax return should consult their tax advisor regarding the U.S. federal income tax consequences of holding such Claim.

j) **Energy Incentives Claims (Class 52)**

It is expected that pursuant to the Plan, from and after the Effective Date, (a) the Commonwealth shall (i) continue the energy incentive program set forth in the Energy Incentive

572

Act, and (ii) in connection therewith, assume the Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date, and, consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and terms and provisions of the instruments and reservation agreements entered into in connection therewith, the holders of Allowed Energy Incentive Claims shall be permitted to exercise and claim the tax incentives created thereunder.

Therefore, determination under the Plan does not constitute a taxable event and no gain or loss shall be recognized by the U.S. Holders of Energy Incentives Claims for U.S. federal income tax purposes as a result of the adoption of the Plan.

3.    **Bad Debt and/or Worthless Securities Deduction**

A U.S. Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction or a worthless securities deduction. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims should consult their tax advisors with respect to their ability to take such a deduction and as to what taxable year.

4.    **Medicare Tax**

A U.S. Holder of Taxable New GO Bonds and CVIs that is an individual, estate or trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% Medicare surtax on the lesser of (1) the U.S. Holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year, which includes, among other items, interest (including original issue discount) on debt and capital gains from the sale or other taxable disposition of debt, and (2) the excess of the U.S. Holder's modified adjusted gross income (or adjusted gross income in the case of an estate or trust) for the taxable year over a certain threshold (which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances). A U.S. Holder that is an individual, estate or trust should consult its own tax advisors regarding the applicability of the Medicare surtax to its income and gains in respect of its exchanges and their ownership of the New GO Bonds and CVIs.

5.    **Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange; (ii) payments of principal and interest and OID, if any, on the New GO Bonds; (iii) payments from CVIs; and (iv) payments of proceeds of the sale or other disposition of the New GO Bonds and CVIs.

Additionally, backup withholding may apply to any payments if such U.S. Holder (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends

required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding. The application for exemption is available by providing a properly completed IRS Form W-9 (or suitable substitute).

Backup withholding is not an additional tax. A U.S. Holder generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain U.S. Holders are not subject to information reporting and backup withholding in some cases, provided they properly identify themselves as exempt. U.S. Holders should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

## C.    Puerto Rico Individuals and Puerto Rico Corporations

### 1.    Definition of Puerto Rico Individuals and Puerto Rico Corporations

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Bond Claim, a New GO Bond or CVIs that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the IRC and the Treasury Regulations for the entire taxable year that includes the Effective Date. As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Bond Claim, a New GO Bond or CVIs that is a corporation organized under the laws of the Commonwealth.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Puerto Rico Individuals and Puerto Rico Corporations. The discussion does not include any non-U.S. (including Puerto Rico) tax considerations. A Puerto Rico Individual or a Puerto Rico Corporation should review the Section "Certain Material Puerto Rico Income Tax Considerations" below for the Puerto Rico tax consequences of the Plan.

The rules governing the U.S. federal income tax consequences to Puerto Rico Individuals and Puerto Rico Corporations are complex. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the consummation of the Plan in their own circumstances.

### 2.    Tax Treatment of Exchange

A Puerto Rico Individual generally will not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan. A Puerto Rico Corporation generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, unless such gain is effectively connected with such Puerto Rico Corporation's conduct of a trade or business in the United States, in which case the gain will be subject to tax in the same manner as effectively connected income as described below under "—*Sale, Retirement or Other Disposition of New GO Bonds and CVIs.*"

3.       **Taxation of New GO Bonds and CVIs**

a)       **Treatment of Interest**

Payments of interest on a New GO Bond, including OID, to a Puerto Rico Individual or a Puerto Rico Corporation, generally, would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New GO Bonds is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

b)       **Treatment of Payments from CVIs**

The income tax treatment of the payments under the CVIs is unclear. Payments from a CVI to a Puerto Rico Individual or a Puerto Rico Corporation, generally, would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and payment from the CVIs is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that payment on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

c)       **Sale, Retirement or Other Disposition of New GO Bonds and CVIs**

Gain realized upon a sale, retirement or other disposition of a New GO Bond or CVIs by a Puerto Rico Individual or a Puerto Rico Corporation generally would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New GO Bond or CVIs by the Puerto Rico Corporation is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

**Certain tax consequences of the Plan to Puerto Rico Individuals and Puerto Rico Corporations are uncertain. Puerto Rico Individuals and Puerto Rico Corporations should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.**

4.    **Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the New GO Bonds and CVIs, (iii) payments from CVIs, and (iv) payments of proceeds of the sale or other disposition of the New GO Bonds and CVIs.

In general, a Puerto Rico Individual will not be subject to backup withholding with respect to any payments on the New GO Bonds and CVIs if it provides a validly completed IRS Form W-9 (or suitable substitute) unless such Puerto Rico Individual (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.

A Puerto Rico Corporation, generally, will not be subject to backup withholding with respect to payments in respect of the exchange or payments of principal and interest and OID, if any, on the New GO Bonds or payments from the CVIs, provided that the Puerto Rico Corporation has provided a validly completed IRS Form W-8BEN-E (or other applicable form) establishing that it is not a U.S. person as defined in the IRC (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person). Information reporting and, depending on the circumstances, backup withholding will apply to payments of proceeds of the sale or other disposition of the New GO Bonds and CVIs made within the United States or conducted through certain United States-related financial intermediaries, unless the Puerto Rico Corporation certifies to the payor under penalties of perjury that it is not a U.S. person (and the payor does not have actual knowledge or reason to know that such Puerto Rico Corporation is a U.S. person), or otherwise establishes an exemption.

Backup withholding is not an additional tax. A Puerto Rico Individual or Puerto Rico Corporation, as applicable, generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain Puerto Rico Individuals and Puerto Rico Corporations are not subject to information reporting and backup withholding in specific circumstances, provided they properly identify themselves as exempt. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

### D.   Non-U.S. Holders

#### 1.   Definition of Non-U.S. Holder

Unless otherwise noted, the discussion below applies only to Non-U.S. Holders. As used herein, the term "Non-U.S. Holder" means a beneficial owner of Existing Securities that is not (i) a U.S. Holder, (ii) a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes or (iii) a Puerto Rico Individual or a Puerto Rico Corporation.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the Plan in their individual circumstances.

#### 2.   Treatment of Exchange

A Non-U.S. Holder generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, unless (i) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case the gain will be subject to tax in the same manner as effectively connected income as described above, for New GO Bonds and CVIs, under "—Sale, Retirement or Other Disposition of New GO Bonds and CVIs" or (ii) such Non-U.S. Holder is a nonresident alien individual who holds the New GO Bonds and CVIs as a capital asset and is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States.

#### 3.   Taxation of New GO Bonds and CVIs

##### a)   *Treatment of Interest*

Payments of interest on a New GO Bond, including OID, and payments from CVIs to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such income is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New GO Bonds or payments from the CVIs is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

b)      *Sale, Retirement or Other Disposition of New GO Bonds and CVIs*

Gain realized upon a sale, retirement or other disposition of a New GO Bond or CVI by a Non-U.S. Holder generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such gain is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New GO Bond or CVI by the Non-U.S. Holder is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

The tax consequences of the Plan to the Non-U.S. Holders are uncertain. Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

4.      **FATCA**

Pursuant to FATCA, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain new information reporting rules with respect to their U.S. account holders and investors or confront a new withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally would be subject to withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodic income, profits and income and certain "foreign passthru payments." Withholding under FATCA generally should not apply to payments of interest (including OID) under a New GO Bond and payment from CVIs because such payments generally should be foreign source income. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Holders should consult with their tax advisors as to the application of FATCA in their individual circumstances.

*[Remainder of Page Left Intentionally Blank]*

## X.      Certain Material Puerto Rico Income Tax Considerations

### A.      General

A general description of certain material Puerto Rico income tax consequences of the Plan to holders of certain Claims is provided below. This description is based on the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Code"), regulations promulgated under the P.R. Code, administrative pronouncements and judicial decisions, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect (collectively, "Applicable P.R. Tax Law"). Changes in Applicable P.R. Tax Law or in their interpretation could cause some of or all the Puerto Rico income tax consequences of the Plan to differ materially from the consequences described below.

The Puerto Rico income tax consequences of the Plan are complex. As of the date of this Disclosure Statement, no ruling has been formally requested from the Puerto Rico Treasury Department (the "P.R. Treasury"); no opinion has been requested from the Debtors' counsel concerning any tax consequence of the Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of Puerto Rico income taxation that may be relevant to Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers (e.g., regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, corporations of individuals, partnerships or other pass-through entities for Puerto Rico income tax purposes, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, the description assumes that a Holder holds Existing Securities, New GO Bonds, and CVIs only as a "capital asset" within the meaning of Section 1034.01(a)(1) of the P.R. Code. This description does not address Puerto Rico taxes other than Commonwealth income taxes, nor does it apply to any person that acquires New GO Bonds or CVIs in the secondary market. Finally, this discussion does not address the Puerto Rico income tax consequences to Holders of Claims who are deemed to have rejected the Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the Puerto Rico tax consequences of the Plan.

### B.      P.R. Holders

#### 1.      Definition of P.R. Holder

Unless otherwise noted, the discussion below applies only to P.R. Holders. As used herein, the term "P.R. Holder" means a beneficial owner of Existing Securities on the Effective Date of the Plan that is, for Puerto Rico income tax purposes:

- An individual who for the entire taxable year is a bona fide resident of Puerto Rico for purposes of Section 933 of the U.S. Internal Revenue Code of 1986, as amended (as determined under Section 937(a) of such Code) and a resident of Puerto Rico for purposes of the P.R. Code;

- a corporation or other entity organized under the laws of Puerto Rico that is treated as a corporation for Puerto Rico income tax purposes, excluding a corporation or any other type of entity subject to pass through tax treatment or any other special tax regime under the P.R. Code;

- an estate, the income of which is subject to Puerto Rico income taxation regardless of its source; or

- a trust (other than a business trust), all of the beneficiaries of which are individual residents of Puerto Rico, as described above.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

A P.R. Holder who holds Allowed Claims of more than one Class may have different Puerto Rico income tax consequences for each Class of Allowed Claims. P.R. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such P.R. Holder holds, and P.R. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the Puerto Rico income tax consequences of each Class of Allowed Claims such P.R. Holder holds.

2. **Tax Treatment of Allowed Claims**

   a) **Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond**

**Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) Vintage CW Bond Claims, (ii) Vintage CW Bond Claims (Assured), (iii) Vintage CW Bond Claims (National), (iv) Vintage CW Bond Claims (Other Insured), (v) Vintage CW Bond Claims (Syncora), (vi) Vintage CW Guarantee Bond Claims, (vii) Vintage CW Guarantee Bond Claims (Assured), (viii) Vintage CW Guarantee Bond Claims (National), (ix) Vintage CW Guarantee Bond Claims (Other Insured), (x) Vintage CW Guarantee Bond Claims (Syncora), (xi) 2011 CW Bond Claims, (xii) 2011 CW Bond Claims (Assured), (xiii) 2011 CW Guarantee Bond Claims, (xiv) 2011 CW Guarantee Bond Claims (Assured), (xv) 2011 CW Series D/E/PIB Bond Claims, (xvi) 2011 CW Series D/E/PIB Bond Claims (Assured), (xvii) 2012 CW Bond Claims, (xviii) 2012 CW Bond Claims (Assured), (xix) 2012 CW Guarantee Bond Claims, (xx) 2014 CW Bond Claims, and (xxi) 2014 CW Guarantee Bond Claims will be treated as exchanging such P.R. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds, CVIs, and Cash.

(i)      *Tax Treatment of Exchange*

The Debtors expect that, and intend to take the position that, the exchange should not qualify as a recapitalization because neither Debtors nor Reorganized Debtors should be classified as corporations for Puerto Rico income tax purposes. If, consistent with Debtors' expectation, the exchange of a portion of the GO Bonds for the New GO Bonds and CVIs pursuant to the Plan does not qualify as a recapitalization, then the exchange will be considered a taxable exchange under the P.R. Code. Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the GO Bonds on the date of the exchange. The amount realized on the exchange of GO Bonds will equal the fair market value of each New GO Bond, CVIs and any Cash received (except for any portion attributable to accrued and unpaid interest). Please refer to the discussion below related to Cash payments for Consummation Costs and the PSA Restriction Fee.

Gain or loss on the exchange of GO Bonds for New GO Bonds and CVIs will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the GO Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the exchange of the GO Bonds for New GO Bonds and CVIs against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 90% of the capital gains realized during any such taxable years.

To the extent that any consideration (i.e. New GO Bonds, CVIs or portion thereof, plus any Cash payment) received by a P.R. Holder in exchange for GO Bonds is attributable to accrued and

unpaid interest on the GO Bonds, that amount of consideration will be considered exempt interest income for Puerto Rico income tax purposes. In that event, the portion allocated to accrued and unpaid interest will reduce the amount realized by the P.R. Holder to compute gain or loss on the exchange.

The Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses). Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes. Consistent with such allocation under the Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest. There is no specific Applicable P.R. Tax Law that considers how payments must be applied in our situation. While the Debtors intend to report distributions to a P.R. Holder in accordance with the Plan, and the Debtors believe that such reporting is consistent with applicable law and congressional intent, there can be no assurance that the P.R. Treasury will respect those allocations with respect to payments on the GO Bonds.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan.

(ii)     *Taxation of New GO Bonds and CVIs*

*Interest on the New GO Bonds*. Interest paid or accrued to P.R. Holders on the New GO Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax. The excess of the principal amount of the New GO Bonds due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

Ownership of the New GO Bonds may result in a portion of the interest paid or accrued by a P.R. Holder and other expenses incurred by the P.R. Holder attributable to interest on the New GO Bonds being disallowed as deductions for Puerto Rico income tax purposes.

*Payments from CVIs*. The Puerto Rico income tax treatment of the payments under the CVIs is unclear. Unless otherwise provided in the CVI Legislation, those payments may be treated as ordinary income subject to Puerto Rico income taxes at ordinary tax rates. P.R. Holders should consult their own tax advisors regarding the Puerto Rico income tax consequences upon the receipt of any payment from CVIs.

*Sale, Exchange or Retirement of the New GO Bonds or CVIs*. Gain or loss on the sale or exchange of New GO Bonds or CVIs will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the New GO Bonds or CVIs is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the

alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the sale or exchange of the New GO Bonds or CVIs against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 90% of the capital gains realized during any such taxable years.

b) **Holders of Retail Vintage CW Bond Claims (Class 15), Retail 2011 CW Bond Claims (Class 28), Retail 2011 CW Series D/E/PIB Bond Claims (Class 35), Retail 2012 CW Bond Claims (Class 38), and Retail 2014 CW Bond Claims (Class 44)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of (i) Retail Vintage CW Bond Claims, (ii) Retail 2011 CW Bond Claims, (iii) Retail 2011 CW Series D/E/PIB Bond Claims, (iv) Retail 2012 CW Bond Claims, and (v) Retail 2014 CW Bond Claims will be treated as exchanging such P.R. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds, CVIs and Cash. These P.R. Holders may also receive Cash payments of Retail Support Fee.

(i) *Tax Treatment of Exchange*

Generally, the Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of (i) Retail Vintage CW Bond Claims, (ii) Retail 2011 CW Bond Claims, (iii) Retail 2011 CW Series D/E/PIB Bond Claims, (iv) Retail 2012 CW Bond Claims, and (v) Retail 2014 CW Bond Claims for the exchanges of GO Bonds for New GO Bonds, CVIs and Cash should be as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange*."

Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the GO Bonds on the date of the exchange. The amount realized on the exchange of GO Bonds will equal the fair market value of each New GO Bond plus any Cash received (except for any portion attributable to accrued and unpaid interest).

(1)  **Retail Support Fee**

The Puerto Rico income tax treatment of the Retail Support Fee is unclear.  The Debtors intend to treat the receipt of the Retail Support Fee similar to the treatment adopted for U.S. federal income tax purposes, thus, they will be part of your amount realized on the exchange and subject to Puerto Rico income taxes as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange*."  However, P.R. Treasury may not agree and consider such payments (or some of them) as a separate payment taxable as ordinary income.

P.R. Holders of (i) Retail Vintage CW Bond Claims, (ii) Retail 2011 CW Bond Claims, (iii) Retail 2011 CW Series D/E/PIB Bond Claims, (iv) Retail 2012 CW Bond Claims, and (v) Retail 2014 CW Bond Claims should consult their own tax advisors regarding the Puerto Rico income tax treatment of distributions received under the Plan, including Cash received as Retail Support Fee.

(ii)  ***Taxation of New GO Bonds and CVIs***

The Debtors expect that the New GO Bonds and CVIs should be treated for Puerto Rico income tax purposes as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds and CVIs*."

c)  **Holders of Vintage CW Bond Claims (Taxable Election) (Class 20), Vintage CW Guarantee Bond Claims (Taxable Election) (Class 26), 2011 CW Bond Claims (Taxable Election) (Class 30), 2011 CW Guarantee Bond Claims (Taxable Election) (Class 32), 2011 CW Series D/E/PIB Bond Claims (Taxable Election) (Class 36), 2012 CW Bond Claims (Taxable Election) (Class 40), 2012 CW Guarantee Bond**

584

**Claims (Taxable Election) (Class 42), 2014 CW Bond Claims (Taxable Election) (Class 45), and 2014 CW Guarantee Bond Claims (Taxable Election) (Class 47)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) Vintage CW Bond Claims (Taxable Election), (ii) Vintage CW Guarantee Bond Claims (Taxable Election), (iii) 2011 CW Bond Claims (Taxable Election), (iv) 2011 CW Guarantee Bond Claims (Taxable Election), (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election), (vi) 2012 CW Bond Claims (Taxable Election), (vii) 2012 CW Guarantee Bond Claims (Taxable Election), (viii) 2014 CW Bond Claims (Taxable Election), and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) will be treated as exchanging such P.R. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds, CVIs and Cash.

(i)     *Tax Treatment of Exchange*

Generally, the Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of (i) Vintage CW Bond Claims (Taxable Election), (ii) Vintage CW Guarantee Bond Claims (Taxable Election), (iii) 2011 CW Bond Claims (Taxable Election), (iv) 2011 CW Guarantee Bond Claims (Taxable Election), (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election), (vi) 2012 CW Bond Claims (Taxable Election), (vii) 2012 CW Guarantee Bond Claims (Taxable Election), (viii) 2014 CW Bond Claims (Taxable Election), and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) for the exchanges of GO Bonds for New GO Bonds, CVIs and Cash should be as described above under "——*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2012 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange*."

P.R. Holders of (i) Vintage CW Bond Claims (Taxable Election), (ii) Vintage CW Guarantee Bond Claims (Taxable Election), (iii) 2011 CW Bond Claims (Taxable Election), (iv) 2011 CW Guarantee Bond Claims (Taxable Election), (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election), (vi) 2012 CW Bond Claims (Taxable Election), (vii) 2012 CW Guarantee Bond Claims (Taxable Election), (viii) 2014 CW Bond Claims (Taxable Election), and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) that are eligible to make a taxable election should consult their own tax advisors regarding the Puerto Rico income tax consequences of making such election and distributions received under the Plan.

(ii)     *Taxation of New GO Bonds and CVIs*

The Debtors expect that the New GO Bonds and CVIs should be treated for Puerto Rico income tax purposes as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Taxation of New GO Bonds and CVIs.*"

d)     **Holders of ERS Bond Claims (Class 62)**

Pursuant to the Plan, each P.R. Holder of ERS Bond Claims shall be entitled to receive such P.R. Holder's pro-rata share of the ERS Bond Recovery, which consists of Cash, and the right to receive the Cash proceeds from the future sale of the ERS Private Equity Portfolio or the interest in the ERS Trust, as the case may be.

It is reasonable to conclude that a P.R. Holder of ERS Bond Claims will be treated as receiving its pro rata share of Cash and its pro rata share of the right to receive the future payment of Cash as of the Effective Date, pending the consummation of the sale of the ERS Private Equity Portfolio or the interest in the ERS Trust, as the case may be, in accordance with the Plan. The remainder of this discussion assumes this will be the case. Generally, the Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of Allowed ERS Bond Claims for the exchanges of ERS Bond Claims for ERS Bond Collateral Recovery should be as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange.*" Therefore, in general, a P.R. Holder will recognize gain or loss equal to the difference between the Cash, including the fair market value of the right to receive the future payments of Cash (except for any portion attributable to accrued and unpaid interest), and the P.R. Holder's adjusted tax basis in the ERS Bonds on the date of the exchange.

For Puerto Rico income tax purposes, the P.R. Holders may not use the installment method of reporting with respect to the amounts that will be received in the future. The tax treatment of such amounts in Puerto Rico is uncertain; therefore, no assurance can be provided with respect to how the amounts received after the Effective Date should be treated. P.R. Holder of ERS Bond Claims are urged to consult their own tax advisors regarding the Puerto Rico income tax implications of the right to receive in the future the Cash proceeds from the sale of the ERS Private Equity Portfolio or the interest in the ERS Trust.

e)   **Holders of Vintage PBA Bond Claims (Class 1), Vintage PBA Bond Claims (Assured) (Class 2), Vintage PBA Bond Claims (National) (Class 3), Vintage PBA Bond Claims (Other Insured) (Class 4), Vintage PBA Bond Claims (Syncora) (Class 5), Retail Vintage PBA Bond Claims (Class 6), 2011 PBA Bond Claims (Class 7), Retail 2011 PBA Bond Claims (Class 8), 2012 PBA Bond Claims (Class 9), Retail 2012 PBA Bond Claims (Class 10), PBA/DRA Secured Claims (Class 11), PBA General Unsecured Claims (Class 12) and PBA/DRA Unsecured Claims (Class 13)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) Vintage PBA Bond Claims, (ii) Vintage PBA Bond Claims (Assured), (iii) Vintage PBA Bond Claims (National), (iv) Vintage PBA Bond Claims (Other Insured), (v) Retail Vintage PBA Bond Claims, (vi) 2011 PBA Bond Claims, (vii) Retail 2011 PBA Bond Claims, (viii) 2012 PBA Bond Claims, (ix) Retail 2012 PBA Bond Claims, (x) PBA/DRA Secured Claims, (xi) PBA General Unsecured Claims, and (xii) PBA/DRA Unsecured Claims will be treated as exchanging such P.R. Holder's Allowed Claim for Cash, plus the Retail Support Fee in the case of P.R. Holders of (i) Retail Vintage PBA Bond Claims, (ii) Retail 2011 PBA Bond Claims, and (iii) and Retail 2012 PBA Bond Claims.

Generally, the Debtors expect that the Puerto Rico income tax treatment of the receipt of Cash (see treatment of Retail Support Fee below) should be as described above under "—*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange.*"

Generally, the Debtors expect that the Puerto Rico income tax treatment of the receipt of the Retail Support Fee should be as described above under "—*Holders of Retail Vintage CW Bond Claims (Class 15), Retail 2011 CW Bond Claims (Class 28), Retail 2011 CW Series D/E/PIB Bond Claims (Class 35), Retail 2012 CW Bond Claims (Class 38), and Retail 2014 CW Bond Claims (Class 44)—Tax Treatment of Exchange—Retail Support Fee.*"

Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized (except for any portion of Cash attributable to accrued and unpaid interest) and the P.R. Holder's adjusted tax basis in the PBA Bonds on the date of the exchange.

f) **Holders of Dairy Producer Claims (Class 50), Eminent Domain Claims (Class 51), Med Center Claims (Class 53), CW General Unsecured Claims (Class 55), CW/HTA Claims (Class 56), CW/Convention Center Claims (Class 57), CW/PRIFA Rum Tax Claims (Class 58), CW/MBA Claims (Class 59), ERS General Unsecured Claims (Class 63), Gracia Gracia Claims (Class 64), Convenience Claims (Class 65), Federal Claims (Class 66)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) Dairy Producer Claims; (ii) Eminent Domain Claims; (iii) Med Center Claims; (iv) CW General Unsecured Claims; (v) CW/HTA Claims; (vi) CW/Convention Center Claims; (vii) CW/PRIFA Rum Tax Claims; (viii) CW/MBA Claims; (ix) ERS General Unsecured Claims; (x) Gracia Gracia Claims; (xi) Convenience Claims; and (xii) Federal Claims will be treated as receiving a distribution in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims. The consequences of the receipt of such distribution will vary depending on the P.R. Holders individual circumstances and the nature of assets being distributed. P.R. Holders are urged to consult their tax advisors regarding the tax consequences of the receipt of such distribution based on their individual circumstances.

g) **Active and Retired Participant Claims (Classes 48A-48L), and AFSCME Claims (Class 49)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of an Active and Retired Participant Claim, including a System 2000 Participant Claim and a VTP Payroll Participant Claim, and AFSCME Claim will receive modified monthly payments in accordance with the terms and provisions of the Plan. The reduction on the amounts of the monthly payments in accordance with the Plan does not constitute a taxable event and no gain or loss shall be recognized by the P.R. Holders for Puerto Rico income tax purposes as a result of such reductions.

The Puerto Rico tax treatment of the monthly modified payments will not be affected by the adjustments under the Plan. Any P.R. Holders of (i) Active and Retired Participant Claims, including System 2000 Participant Claims and VTP Payroll Participant Claims,, and (ii) AFSCME Claims that files a Puerto Rico income tax return should consult their tax advisor regarding the Puerto Rico income tax consequences upon the receipt of any payment from such claims.

h) **Energy Incentives Claims (Class 52)**

The Debtors expect that pursuant to the Plan, from and after the Effective Date, (a) the Commonwealth shall (i) continue the energy incentive program set forth in the Energy Incentive Act, and (ii) in connection therewith, assume the Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date, and, consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and terms and provisions of the

instruments and reservation agreements entered into in connection therewith, the holders of Allowed Energy Incentive Claims shall be permitted to exercise and claim the tax incentives created thereunder.

Therefore, determination under the Plan does not constitute a taxable event and no gain or loss shall be recognized by the P.R. Holders of Energy Incentives Claims for Puerto Rico income tax purposes as a result of the adoption of the Plan.

### i) **Tax Credit Claims (Class 54)**

It is expected that, pursuant to the Plan, on the Effective Date, the Debtors will assume Allowed Tax Credit Claims and the related instruments and agreements in existence as of the Effective Date. As such, Holders of Allowed Tax Credit Claims will be permitted to exercise and claim the tax benefits and entitlements with respect to such Allowed Tax Credit Claim in accordance with the terms and provisions of such documents, instruments, and applicable law.

Therefore, determination under the Plan does not constitute a taxable event and no gain or loss shall be recognized by the P.R. Holders of Allowed Tax Credit Claims for Puerto Rico income tax purposes as a result of the adoption of the Plan.

### 3. **Tax Treatment of Consummation Costs and PSA Restriction Fee**

Certain Holders of Claims may receive Cash payments of Consummation Costs and/or the PSA Restriction Fee. The Puerto Rico income tax treatment of Cash payments of Consummation Costs and the PSA Restriction Fee is unclear. The Debtors intend to treat the receipt of the Consummation Costs and PSA Restriction Fee similar to the treatment adopted for U.S. federal income tax purposes, thus, they will be part of your amount realized on the exchange and subject to Puerto Rico income taxes as described above under "——*Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46)—Tax Treatment of Exchange*." However, P.R. Treasury may not agree and consider such payments (or some of them) as a separate payment taxable as ordinary income.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan, including Cash received as Consummation Costs and PSA Restriction Fee.

## C.    Non-P.R. Holders

### 1.    Definition of Non-P.R. Holders

Unless otherwise noted, the discussion below applies only to Non-P.R. Holders.  As used herein, the term "Non-P.R. Holder" means a beneficial owner of Existing Securities, New GO Bonds or CVIs that is not (i) a P.R. Holder or (ii) a partnership or other entity treated as a partnership or other pass-through entity for Puerto Rico income tax purposes.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities, New GO Bonds or CVIs, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Partners in such a partnership are urged to consult their tax advisors.

The following discussion includes only certain Puerto Rico income tax consequences of the Plan to Non-P.R. Holders.  The discussion does not include any non-Puerto Rico tax considerations.  Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico and foreign tax consequences of the Plan under their individual circumstances.

### 2.    Tax Treatment of Exchange

A Non-P.R. Holder that is not engaged in trade or business in Puerto Rico would not be subject to Puerto Rico income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, including any amount allocated to accrued and unpaid interest.  On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for income tax purposes will be subject to Puerto Rico income tax as a P.R. Holder on any such gain if it is effectively connected with their Puerto Rico trade or business.

### 3.    Taxation of New GO Bonds and CVIs

#### a)    Treatment of Interest

Interest paid or accrued on a New GO Bond to a Non-P.R. Holder will not be subject to Puerto Rico income tax, including the alternate basic tax.  The excess of the principal amount of the New GO Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

The deductions for Puerto Rico income tax purposes of a Non-P.R. Holder engaged in a trade or business in Puerto Rico that are related to interest paid or accrued and other expenses incurred that are attributable to interest on the New GO Bonds may be disallowed.

#### b)    Treatment of Payments from CVIs

The income tax treatment of the payments under the CVIs is unclear. Unless otherwise provided in the CVI Legislation, the payments may be treated as ordinary income for Puerto Rico income tax purposes. In that case, Non-P.R. Holders that are engaged in trade or business in Puerto

590

Rico for income tax purposes may be subject to Puerto Rico income taxation at ordinary income tax rates. On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are not engaged in trade or business in Puerto Rico may be subject to a 29% Puerto Rico income tax withholding at source. Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico income tax consequences upon the receipt of any payment from CVIs. Note that this withholding treatment does not apply to P.R. Holders. For the discussion applicable to P.R. Holders with respect to payments from CVIs, see discussion under "*—P.R. Holders – Tax Treatment of Allowed Claims – Holders of Vintage CW Bond Claims (Class 14), Vintage CW Bond Claims (Assured) (Class 16), Vintage CW Bond Claims (National) (Class 17), Vintage CW Bond Claims (Other Insured) (Class 18), Vintage CW Bond Claims (Syncora) (Class 19), Vintage CW Guarantee Bond Claims (Class 21), Vintage CW Guarantee Bond Claims (Assured) (Class 22), Vintage CW Guarantee Bond Claims (National) (Class 23), Vintage CW Guarantee Bond Claims (Other Insured) (Class 24), Vintage CW Guarantee Bond Claims (Syncora) (Class 25), 2011 CW Bond Claims (Class 27), 2011 CW Bond Claims (Assured) (Class 29), 2011 CW Guarantee Bond Claims (Class 31), 2011 CW Series D/E/PIB Bond Claims (Class 33), 2011 CW Series D/E/PIB Bond Claims (Assured) (Class 34), 2012 CW Bond Claims (Class 37), 2012 CW Bond Claims (Assured) (Class 39), 2012 CW Guarantee Bond Claims (Class 41), 2014 CW Bond Claims (Class 43), and 2014 CW Guarantee Bond Claims (Class 46) – Taxation of New GO Bonds and CVIs*", above.

### c) Sale, Retirement or Other Disposition of New GO Bonds and CVIs

Gain realized on the sale, retirement or other disposition of a New GO Bond and CVIs by a Non-P.R. Holder that is not engaged in a trade or business in Puerto Rico will not be subject to Puerto Rico income tax, by way of withholding or otherwise. On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business in the same manner as a P.R. Holder. In addition, a corporation may be subject to a branch profits tax with respect to such effectively connected income.

*[Remainder of Page Left Intentionally Blank]*

## XI.   Applicability of Certain Federal and State Securities Laws

**A.   New GO Bonds**

1.   **Registration of Securities**

In general, securities issued by Reorganized Commonwealth such as the New GO Bonds are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to governmental entities such as Reorganized Commonwealth and government agencies and instrumentalities thereof under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III Cases pursuant to PROMESA section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor. The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom. Since obligations of the Commonwealth are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized Commonwealth although the provisions of Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code. Creditors of the Debtors who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided to the Commonwealth under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance, resolution and other written actions of the Commonwealth or Reorganized Commonwealth relating to the New GO Bonds will be exempt from qualification under section 304(a)(4) of the TIA.

2.   **Market Disclosure**

a)   **Initial Offer and Sale**

Although exempt from registration, securities issued by Reorganized Commonwealth are subject to the anti-fraud provisions of federal securities laws. Sections 10(b) and 17(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the SEC under the Exchange Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of Reorganized Commonwealth obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the

adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principles of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the Debtors and to hypothetical investors in obligations of the Debtors through a disclosure statement such as this Disclosure Statement.

### b) Continuing Disclosure

Publicly offered securities of Reorganized Commonwealth generally are subject to the requirements of Rule 15c2-12 under the Exchange Act (the "Rule"), unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as Reorganized Commonwealth.

The delivery of the New GO Bonds pursuant to the Plan is not covered by the Rule because the New GO Bonds are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New GO Bonds.

## B.   CVIs

### 1.   Registration of Securities

In general, securities issued by Reorganized Commonwealth such as the CVIs are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to government agencies and instrumentalities such as Reorganized Commonwealth under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III Case pursuant to PROMESA section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor. The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom. Since obligations of Reorganized Commonwealth are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized Commonwealth, although the provisions of Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code. Creditors of the Debtors who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code

should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided to Reorganized Commonwealth under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance, resolution and other written actions of Reorganized Commonwealth relating to the CVIs will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

## 2.    Market Disclosure

### (a)    Initial Offer and Sale

Although exempt from registration, securities issued by Reorganized Commonwealth are subject to the anti-fraud provisions of federal securities laws. Sections 10(b) and 17(a) of the Exchange Act and Rule 10b-5 promulgated by the SEC under the Exchange Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of Reorganized Commonwealth obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the Debtors and to hypothetical investors in obligations of Reorganized Commonwealth through a disclosure statement such as this Disclosure Statement.

### (b)    Continuing Disclosure

Publicly offered securities of Reorganized Commonwealth generally are subject to the requirements of the Rule (that is, Rule 15c2-12 under the Exchange Act (as defined above)), unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issuer of municipal securities, such as Reorganized Commonwealth.

The delivery of the CVIs pursuant to the Plan is not covered by the Rule because the CVIs are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the CVIs.

594

## XI.   Financial Information and Projections

### A.   Historical Financial Reporting

#### 1.   Commonwealth Financial Statements

The Commonwealth has entered into several continuing disclosure undertakings in accordance with Rule 15c2-12 of the SEC in connection with its bond issuances. In accordance with such Rule, the Commonwealth has covenanted to file with the MSRB through EMMA, within 305 days after the end of each Fiscal Year, core financial information and operating data for the prior Fiscal Year, including: (1) audited financial statements and (2) a Financial Information and Operating Data Report (the "Commonwealth Report") which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness of the type generally found in the Commonwealth's Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by the Commonwealth are for Fiscal Year 2018. These financial statements were filed by the Commonwealth with the Municipal Securities Rulemaking Board (the "MSRB") through its Electronic Municipal Markets Access System ("EMMA") on July 1, 2021. The latest Commonwealth Report is dated December 18, 2016, and sets forth unaudited financial information as of June 30, 2016.[426]

The financial statements for Fiscal Year 2018 were audited by KPMG LLP, which did not audit the financial statements of certain activities, funds, and Component Units identified separately in its report dated June 30, 2021, which report expresses qualified and unmodified opinions[427] and includes emphasis of matter paragraphs regarding going concern considerations relating to the Commonwealth, GDB, HTA, PREPA, and UPR.

In a letter dated February 26, 2021 addressed to Governor Pierluisi, the Oversight Board provided the Government's estimated timeline for completion of the financial statements for FY18, FY19, FY20, and FY21. Based on the latest information available at the time of the letter, the Commonwealth expected to finalize the FY18 financial statements in April 2021, FY19 and FY20 financial statements in May 2022, and FY21 financial statements in April 2023.

On June 20, 2019, in connection with a request of information by federal law enforcement agencies, the Government announced the cancellation of certain contracts that the Treasury Department or the OCFO had awarded to the accounting firm BDO Puerto Rico, including a contract related to assisting with the completion of the Commonwealth's 2017 and 2018 financial statements. On June 24, 2019, the Treasury Secretary and Chief Financial Officer, who is the official in charge of preparing the Commonwealth's financial statements, was removed from his

---

[426] The GAO found in its 2019 GAO Report that timely release of audited financial information has long been a problem for Puerto Rico; Puerto Rico's fiscal years 2015 and 2016 financial statements were both released more than 1,000 days after the end of those fiscal years.

[427] A qualified opinion is a statement issued after an audit is completed suggesting that the information being provided is limited in scope; an unmodified opinion is the opinion where auditor expresses an opinion that financial statements are presented, in all material respects, in accordance with applicable financial reporting framework.

position.[428]   Since then, the position has been filled by two more individuals.   These events and executive turnover are likely to cause delays to the expected completion of the financial statements.

**Late Filing of Financial Reports.** As mentioned above, the Commonwealth has not filed its 2020 or 2019 financial statements or its 2020, 2019, 2018, or 2017 Commonwealth Report. Although the Commonwealth has filed all the financial statements and Commonwealth Reports required to be filed for prior years, some of these filings have been made after the Commonwealth's filing deadline, which is normally May 1.[429]

Below is a brief summary of the reasons that have caused filing delays with respect to the Commonwealth Report or the financial statements for Fiscal Year 2008 and onward.

*Fiscal Year 2020.* On April 30, 2021, the Commonwealth gave notice that its audited financial statements and the Commonwealth Report for Fiscal Year 2020 would not be filed by the May 1, 2021 deadline. According to the notice filed on EMMA, the Commonwealth will file such documents as soon as the information is readily available and verifiable.

*Fiscal Year 2019.* On April 30, 2020, the Commonwealth gave notice that its audited financial statements and the Commonwealth Report for Fiscal Year 2019 would not be filed by

---

[428] On June 24, 2019, after the removal of then CFO Raúl Maldonado, the Governor designated AAFAF Executive Director Christian Sobrino to be the Commonwealth's new CFO. Mr. Sobrino resigned from his positions as CFO and AAFAF Executive Director on July 13, 2019. On July 31, 2019, then-Governor Rosselló named Omar Marrero as the Commonwealth's new CFO and executive director of AAFAF. In February 2021, Governor Pedro Pierluisi named Puerto Rico Treasury Secretary Francisco Parés Alicea as the Commonwealth's new CFO. On March 9, 2021, Governor Pierluisi issued Executive Order 2021-018 to create the position of the CFO and describe the duties and powers of the office. The order also detailed the administration's policy on prioritizing annual audited financial statements.

[429] The delay was caused by various reasons. The audited financial statements and Commonwealth Report for fiscal year 2017 were delayed primarily because of the revisions to the fiscal plans for the Commonwealth and certain instrumentalities requested by the Oversight Board after Hurricanes Irma and Maria devastated Puerto Rico, which fiscal plans were needed in final form in order to complete the Commonwealth Report. The audited financial statements and Commonwealth Report for fiscal year 2015 were delayed primarily because of: (a) significant delay on engagement of the Commonwealth audit firm due to significant increase in audit risk and liabilities to the audit firm, (b) implementation of GASB 68, GASB 69 and GASB 72, (c) issues of liquidity and going concern considerations of the Commonwealth and its Component Units, (d) enhanced analysis over the insolvency of the Retirement Systems, (e) impairment analyses of deposits held at GDB and accounts receivable balances of the Primary Government and Component Units, (f) delays in the issuance of audited financial statements for significant Component Units, such as GDB, PREPA, HTA, the Puerto Rico Automobile Accident Compensation Administration, Special Communities Trust, the PR National Guard Trust, the Puerto Rico Agricultural Insurance Authority and the Retirement Systems, among others, (g) significant changes in the composition of the Commonwealth reporting unit, through the inclusion of approximately 10 entities as blended Component Units instead of discretely presented Component Units, and (h) a delay in the issuance of the PREPA financial statements related to the actuarial reports and financial statements of the utility's retirement system, which in turn delayed the financial statements of the Commonwealth. The audited financial statements and Commonwealth Report for fiscal year 2014 were delayed primarily because of: (a) liquidity and going concern considerations of the Commonwealth and its Component Units, (b) required enhanced and complex analysis over a GDB loan reserve, (c) implementation of GASB 67 in the Retirement Systems, (d) enhanced analysis over the depletion date of the Retirement Systems, (d) delays in the issuance of certain Component Units, (e) enhanced and extended audit procedures performed by the Commonwealth auditors and (f) significant adjustments and modifications required to the financial statements relating to going concern considerations of the Commonwealth and its instrumentalities.

the April 30, 2020 deadline. According to the notice filed on EMMA, the Commonwealth will file such documents as soon as the information is readily available and verifiable.

*Fiscal Year 2018.* On May 1, 2019, the Commonwealth gave notice that its audited financial statements and the Commonwealth Report for Fiscal Year 2018 would not be filed by the May 1, 2019 deadline. According to the notice filed on EMMA, the Commonwealth will file such documents as soon as the information is available.

*Fiscal Year 2017.* On May 1, 2018, the Commonwealth gave notice that its audited financial statements and the Commonwealth Report for Fiscal Year 2017 would not be filed by the May 1, 2018 deadline. According to the notice filed on EMMA, the delay was primarily caused by the revisions to the fiscal plans for the Commonwealth and certain instrumentalities requested by the Oversight Board after Hurricanes Irma and Maria devastated Puerto Rico, which fiscal plans were needed in final form in order to complete the Commonwealth Report. The audited financial statements of the Commonwealth for Fiscal Year 2017 were filed on September 1, 2020.

*Fiscal Year 2016.* On April 28, 2017, the Commonwealth gave notice that its audited financial statements for Fiscal Year 2016 would not be filed by the May 1, 2017 deadline. The audited financial statements of the Commonwealth for Fiscal Year 2016 were filed on May 6, 2019.

*Fiscal Year 2015.* The audited financial statements of the Commonwealth for Fiscal Year 2015 were filed after the Commonwealth's filing deadline. The delay was primarily caused by: (a) significant delay on engagement of the Commonwealth audit firm due to significant increase in audit risk and liabilities to the audit firm, (b) implementation of GASB 68, GASB 69 and GASB 72, (c) issues of liquidity and going concern considerations of the Commonwealth and its Component Units, (d) enhanced analysis over the insolvency of the Retirement Systems, (e) impairment analyses of deposits held at GDB and accounts receivable balances of the Primary Government and Component Units, (f) delays in the issuance of audited financial statements for significant Component Units, such as GDB, PREPA, HTA, the Puerto Rico Automobile Accident Compensation Administration, Special Communities Trust, the PR National Guard Trust, the Puerto Rico Agricultural Insurance Authority and the Retirement Systems, among others, (g) significant changes in the composition of the Commonwealth reporting unit, through the inclusion of approximately 10 entities as blended Component Units instead of discretely presented Component Units, and (h) a delay in the issuance of the PREPA financial statements related to the actuarial reports and financial statements of the utility's retirement system, which in turn delayed the financial statements of the Commonwealth.

*Fiscal Year 2014.* The financial statements of the Commonwealth for Fiscal Year 2014 were filed after the Commonwealth's filing deadline. The delay was primarily caused by: (a) liquidity and going concern considerations of the Commonwealth and its Component Units, (b) required enhanced and complex analysis over a GDB loan reserve, (c) implementation of GASB 67 in the Retirement Systems, (d) enhanced analysis over the depletion date of the Retirement Systems, (d) delays in the issuance of certain Component Units, (e) enhanced and extended audit procedures performed by the Commonwealth auditors and (f) significant adjustments and modifications required to the financial statements relating to going concern considerations of the Commonwealth and its instrumentalities.

*Fiscal Year 2013.* The financial statements of the Commonwealth for Fiscal Year 2013 were filed after the Commonwealth's filing deadline. Initially, the delay was primarily caused by (i) a delay in the commencement of the financial close and audit process for Fiscal Year 2013, which did not commence until the completion of the financial statement for Fiscal Year 2012 on September 16, 2013 (delays in the audit of the 2012 financial statements were principally caused by the government transition process after the November 2012 elections), (ii) delays related to the change of the Commonwealth's external auditors, and (iii) the implementation of GASB Statement No. 61, *The Financial Reporting Entity*, which changed the Commonwealth's financial reporting entity. Although the Commonwealth addressed these issues by dedicating additional resources to the financial close and audit process for Fiscal Year 2013, the Commonwealth was unable to finalize the 2013 financial statements due to certain additional unanticipated delays attributable to (i) additional procedures required as part of the audit, (ii) delays in the issuance of the audited financial statements of the three Commonwealth retirement systems resulting from the pension reform legislation enacted in 2013 and the subsequent judicial modification of such reforms, and (iii) delays in the issuance of the audited financial statements of certain other blended and discretely presented Component Units.

*Fiscal Year 2012.* The Commonwealth's audited financial statements for the Fiscal Year ended June 30, 2012 were filed after the Commonwealth's filing deadline due to delays in the audit of such financial statements as a result of the government transition process, as a new administration entered office in January of 2013, and the failure of certain discretely presented Component Units to finalize their audited financial statements. The Commonwealth Report for Fiscal Year 2012 was also filed after the Commonwealth's filing deadline.

*Fiscal Year 2009.* The Commonwealth's audited financial statements for the Fiscal Year ended June 30, 2009 were filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented Component Units of the Commonwealth.

*Fiscal Year 2008.* The Commonwealth's audited financial statements for the Fiscal Year ended June 30, 2008 (and certain prior years) were filed after the Commonwealth's filing deadline, because various governmental agencies did not submit their audited financial statements to the Central Government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth Report for Fiscal Year 2008 was also filed after the Commonwealth's filing deadline.

2.      **ERS Financial Statements**

In accordance with Rule 15c2-12 of the SEC and in connection with its bond issuances, ERS has covenanted to file within 305 days after the end of each Fiscal Year, with the MSRB through EMMA, core financial information and operating data for the prior Fiscal Year, including: (1) audited financial statements and (2) an Annual Financial Information and Operating Data Report, which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness generally found in the Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by ERS are for Fiscal Year 2017. These financial statements were filed by ERS with the MSRB through EMMA on July 1, 2020. The financial statements of ERS for Fiscal Year 2018, Fiscal Year 2019, and Fiscal Year 2020 have not been finalized. The most recent Annual Financial Information and Operating Data Report of ERS was published on May 10, 2021 and sets forth unaudited financial information as of June 30, 2019.

The financial statements for Fiscal Year 2017 were audited by KPMG LLP, whose report includes an emphasis of matter paragraph[430] regarding the uncertainty about the ability of ERS to continue as a going concern.

**Late Filing of Financial Reports.** As mentioned above, ERS has not filed its 2020, 2019, and 2018 financial statements, which have not been finalized. And although ERS has filed all the reports and financial statements required to be filed for prior Fiscal Years, some of these filings have been made after ERS's filing deadline, which is normally May 1.

3. **PBA Financial Statements**

In accordance with Rule 15c2-12 of the SEC and in connection with its bond issuances, PBA has covenanted to file within 305 days after the end of each Fiscal Year, with the MSRB through EMMA, core financial information and operating data for the prior Fiscal Year, including: (1) audited financial statements and (2) an Annual Financial Information and Operating Data Report, which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness generally found in the Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by PBA are for Fiscal Year 2017. These financial statements were filed by PBA with the MSRB through EMMA on June 23, 2020. The most recent Annual Financial Information and Operating Data Report of PBA was published on April 28, 2021 and sets forth unaudited financial information for fiscal years ending on June 30, 2018, June 30, 2019 and June 30, 2020.

The financial statements for Fiscal Year 2017 were audited by Ramirez Flores and Co, PSC. The auditors' report includes an emphasis of matter paragraph regarding the reissuance of June 30, 2017 financial statements and uncertainty about the ability of PBA to continue as a going concern.

**PBA Late Filing of Financial Reports.** PBA has not filed its 2018 or 2017 audited financial statements, which have not been finalized.

B. **Commonwealth Fiscal Plan and Projections**

Attached to this Disclosure Statement as Exhibit G is a copy of the Commonwealth Fiscal Plan, certified by the Oversight Board on April 23, 2021. The Commonwealth Fiscal Plan provides

---

[430] An emphasis of matter paragraph is a paragraph directing the attention of users of financial statements to a matter the auditor believes is fundamental to the users' understanding of the financial statements.

details regarding the Commonwealth's and ERS's projected operations under the Plan, subject to the assumptions and qualifications set forth in the certified Commonwealth Fiscal Plan.[431]

It is important to note the projections described in the Commonwealth Fiscal Plan may differ from actual performance and are highly dependent on significant assumptions concerning the future economic and financial condition of the Commonwealth and its instrumentalities, including ERS, which are affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one Fiscal Year to the next and are frequently the result of actions taken or not taken, not only by the Government, the Oversight Board, and other third-party entities such as the government of the United States.

The financial projections included in the Commonwealth Fiscal Plan assume the successful implementation of the Plan. The financial projections included in the Commonwealth Fiscal Plan should be reviewed in conjunction with the assumptions, notes, and qualifications included in the Commonwealth Fiscal Plan and the assumptions, qualifications, and explanations set forth in this Disclosure Statement, including in the sections titled "Overview of the Debtors," "The Title III Plan of Adjustment," "Certain Risk Factors to Be Considered," "Certain Material United States Federal Income Tax Considerations," "Certain Material Puerto Rico Income Tax Considerations," and "Applicability of Certain Federal and State Securities Laws."

The Commonwealth Fiscal Plan do not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government or ERS and the information contained herein.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of the assumptions and the reliability of the financial projections and should consult with their own advisors.

---

[431] The Debt Sustainability Analysis ("DSA") in the Commonwealth Fiscal Plan was intended to provide a framework for assessing the long-term capacity of the Government to pay debt service on its bonded debt. The DSA included a comparison of existing debt levels between Puerto Rico and U.S. states, finding that Puerto Rico's existing debt levels are far higher than that of peer U.S. States. The DSA also included a comparison of existing debt levels between Puerto Rico and certain European Union ("EU") sovereigns, again finding that Puerto Rico's existing debt levels are far higher than that of the selected EU sovereigns. The DSA included a further analysis of key debt ratios of the ten lowest indebted states, ten highest indebted states, and the mean for all U.S. states to determine a range of implied debt capacity based on debt and fixed cost metrics. The DSA concluded that Puerto Rico must develop and adhere to structurally balanced budgets reflecting ongoing discipline, timely publicize audited financial statements, and restructure its debt load to a sustainable level.

## XII.    Additional Information

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Exhibits to the Plan will be filed with the Title III Court and available for review, free of charge, on the Document Website at https://cases.primeclerk.com/puertorico prior to the Voting Deadline. Copies of all Exhibits to the Plan also may be obtained, free of charge, by contacting the Solicitation Agent, Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com and reference "Commonwealth Plan of Adjustment Exhibits" in the subject line. Please note that Prime Clerk LLC is not authorized to provide, and will not provide, legal advice.

## XIII.    Conclusion

The Oversight Board and the Debtors believe that the Plan is in the best interests of all creditors and urge the Holders of Impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence the acceptance by timely returning their Ballots marked to accept the Plan by the Voting Deadline.