# Exhibit I

2007 GO Refunding Bond Insurance Agreement

## AGREEMENT REGARDING BOND INSURANCE

THIS AGREEMENT REGARDING BOND INSURANCE (the "Agreement"), dated October 16, 2007, is entered into by and between the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") and Banco Popular de Puerto Rico, as registrar (the "Registrar") under a resolution adopted by the Secretary of the Treasury of Puerto Rico and approved by the Governor of Puerto Rico on October 3, 2007 (the "Resolution"), pursuant to which the Commonwealth is issuing, in multiple subseries, its $926,570,000 aggregate principal amount of Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2007A (the "Bonds").

WITNESSETH:

WHEREAS, the Commonwealth has determined to issue the Bonds and, in connection therewith, to obtain (i) a financial guaranty insurance policy (the "Assured Guaranty Policy") to be issued by Assured Guaranty Corp. ("Assured Guaranty"), insuring the payment when due of principal of and interest on certain of the Bonds, to wit: $24,940,000 principal amount maturing July 1, 2017 (being a portion of the Series 2007A-1 Bonds), $50,000,000 principal amount maturing July 1, 2033 (being the Series 2007A-6 Bonds), $50,000,000 principal amount maturing July 1, 2033 (being the Series 2007A-7 Bonds), $50,000,000 principal amount maturing July 1, 2034 (being the Series 2007A-8 Bonds) and $50,000,000 principal amount maturing July 1, 2034 (being the Series 2007A-9 Bonds) (collectively, the "Assured Guaranty Insured Bonds"); (ii) a municipal bond new issue insurance policy (the "FGIC Policy") to be issued by Financial Guaranty Insurance Company ("FGIC"), insuring the payment when due of principal of and interest on certain of the Bonds, to wit: $36,205,000 principal amount maturing July 1, 2021 and $36,830,000 principal amount maturing July 1, 2022 (being a portion of the Series 2007A-1 Bonds, and $100,000,000 principal amount maturing July 1, 2032 (being the Series 2007A-5 Bonds (collectively, the "FGIC Insured Bonds"); (iii) a municipal bond insurance policy (the "FSA Policy") to be issued by Financial Security Assurance Inc. ("FSA"), insuring the payment when due of principal of and interest on certain of the Bonds, to wit: $99,450,000 principal amount maturing July 1, 2029 (being the Series 2007A-2 Bonds), $99,500,000 principal amount maturing July 1, 2029 (being the Series 2007A-3 Bonds), and $96,825,000 principal amount maturing July 1, 2031 (being the Series 2007A-4 Bonds) (collectively, the "FSA Insured Bonds"); and (iv) a financial guaranty insurance policy (the "MBIA Policy") to be issued by MBIA Insurance Corporation ("MBIA"), insuring the payment when due of principal of and interest on certain of the Bonds, to wit: $53,215,000 principal amount maturing July 1, 2019 and $39,290,000 principal amount maturing July 1, 2020 (being a portion of the Series 2007A-1 Bonds) (collectively, the "MBIA Insured Bonds") the Assured Guaranty Policy, the FGIC Policy, the FSA Policy and the MBIA Policy are hereinafter sometimes collectively referred to as the "Policies," and Assured Guaranty, FGIC, FSA and MBIA are hereinafter sometimes collectively referred to as the "Bond Insurers"); and

WHEREAS, as a condition to the issuance of the Policies, the Bond Insurers have requested that the Commonwealth and the Registrar agree to certain provisions;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein set forth, the Commonwealth and the Registrar hereby agree as follows:

**Section 1. Assured Guaranty Policy; Assured Guaranty.** So long as the Assured Guaranty Policy shall be in full force and effect, and Assured Guaranty is not in default thereunder, with respect to the Assured Guaranty Insured Bonds, the Secretary and the Registrar shall comply with the following provisions.

(a) Any notice that is required to be given to holders of the Assured Guaranty Insured Bonds, nationally recognized municipal securities information repositories or state information depositories pursuant to Rule 15c2-12(b)(5) adopted by the Securities and Exchange Commission or to the Registrar pursuant to the Resolution shall also be provided to Assured Guaranty simultaneously with the sending of such notices.

(b) All notices required to be given to Assured Guaranty shall be in writing and shall be sent by registered or certified mail addressed to Assured Guaranty Corp., 1325 Avenue of the Americas, New York, New York 10019, Attention: General Counsel, with a copy to Assured Guaranty, Attention: Risk Management Department – Public Finance Surveillance.

(c) Assured Guaranty shall receive such additional information as it may reasonably request.

(d) The Registrar shall notify Assured Guaranty of any failure of the Commonwealth to provide notices, certificates and other information under the Resolution.

(e) Assured Guaranty shall receive prior written notice of any name change of the Registrar or the removal, resignation or termination of the Registrar.

(f) No removal, resignation or termination of the Registrar shall take effect until a successor, acceptable to Assured Guaranty, shall be appointed.

(g) The Registrar may be removed at any time, at the request of Assured Guaranty, for any breach of its obligations under the Resolution.

(h) Notwithstanding any provision of the Resolution, in determining whether the rights of holder of Assured Guaranty Insured Bonds will be adversely affected by any action taken pursuant to the terms and provisions thereof, the Registrar shall consider the effects on such holders as if there were no Assured Guaranty Policy.

(i) Copies of any amendments or supplements to the Resolution which have been consented to by Assured Guaranty shall be sent to Moody's Investors Service Inc. and Standard & Poor's Rating Service, a division of the McGraw Hill Companies, Inc.

(j) Assured Guaranty shall be deemed to be the holder of all of the Assured Guaranty Insured Bonds for the purpose of granting any consent, direction or approval or taking any action permitted by or required under the Resolution to be granted or taken by the holders of such Assured Guaranty Insured Bonds.

(k) (1) At least two (2) Business Days' prior to each payment date on the Assured Guaranty Insured Bonds, the Registrar will determine whether there will be sufficient funds to pay all principal of and interest on the Assured Guaranty Insured Bonds due on the related payment date and shall immediately notify Assured Guaranty or its designee on the same Business Day by telephone or electronic mail, confirmed in writing by registered or certified mail, of the amount of any deficiency. Such notice shall specify the amount of the anticipated deficiency, the Assured Guaranty Insured Bonds to which such deficiency is applicable and whether such Assured Guaranty Insured Bonds will be deficient as to principal or interest or both. If the deficiency is made up in whole or in part prior to or on the payment date the Registrar shall so notify Assured Guaranty or its designee.

(2) The Registrar shall, after giving notice to Assured Guaranty as provided above, make available to Assured Guaranty and, at Assured Guaranty's direction, to any fiscal agent, the registration books of the Commonwealth maintained by the Registrar and all records relating to the funds maintained under the Resolution.

(3) The Registrar shall provide Assured Guaranty and any fiscal agent with a list of registered owners of Assured Guaranty Insured Bonds entitled to receive principal or interest payments from Assured Guaranty under the terms of the Assured Guaranty Policy, and shall make arrangements with Assured Guaranty the fiscal agent or another designee of Assured Guaranty to (i) mail checks or drafts to the registered owners of Assured Guaranty Insured Bonds entitled to receive full or partial interest payments from Assured Guaranty and (ii) pay principal upon Assured Guaranty Insured Bonds surrendered to Assured Guaranty, the fiscal agent or another designee of Assured Guaranty by the registered owners of Assured Guaranty Insured Bonds entitled to receive full or partial principal payments from Assured Guaranty.

(4) The Registrar shall, at the time it provides notice to Assured Guaranty of any deficiency pursuant to paragraph (k) (1) above, notify registered owners of Assured Guaranty Insured Bonds entitled to receive the payment of principal or interest thereon from Assured Guaranty (i) as to such deficiency and its entitlement to receive principal or interest, as applicable, (ii) that Assured Guaranty will remit to them all or a part of the interest payments due on the related payment date upon proof of its entitlement thereto and delivery to Assured Guaranty or any fiscal agent, in form satisfactory to Assured Guaranty, of an appropriate assignment of the registered owner's right to payment, (iii) that, if they are entitled to receive partial payment of principal from Assured Guaranty, they must surrender the related Assured Guaranty Insured Bonds for payment first to the Registrar which will note on such Assured Guaranty Insured Bonds the portion of the principal paid by the Registrar and second, to Assured Guaranty or its designee, together with an appropriate assignment, in form satisfactory to Assured Guaranty, to permit ownership of each Assured Guaranty Insured Bond to be registered in the name of Assured Guaranty, which will then pay the unpaid portion of principal, and (iv) that, if they are entitled to receive full payment of principal from Assured Guaranty they must surrender the related Assured Guaranty Insured Bonds for payment to Assured Guaranty or its designee rather than the Registrar, together with the appropriate assignment, in form satisfactory to Assured Guaranty, to permit ownership of such Assured Guaranty Insured Bonds to be registered in the name of Assured Guaranty.

(5) In addition, if the Registrar has notice that any holder of the Assured Guaranty Insured Bonds has been required to disgorge payments of principal or interest on the Assured Guaranty Insured Bonds previously due for payment pursuant to a final non-appealable order by a court of competent jurisdiction that such payment constitutes an avoidable preference to such holder within the meaning of any applicable bankruptcy laws, then the Registrar shall notify Assured Guaranty or its designee of such fact by telephone or electronic notice, confirmed in writing by registered or certified mail

(6) The Registrar will be hereby irrevocably designated, appointed, directed and authorized to act as attorney-in-fact for holders of the Assured Guaranty Insured Bonds as follows:

(i) if and to the extent there is a deficiency in amounts required to pay interest on the Assured Guaranty Insured Bonds, the Registrar shall (A) execute and deliver to Assured Guaranty, in form satisfactory to Assured Guaranty, an instrument appointing Assured Guaranty as agent for such holders in any legal proceeding related to the payment of such interest and an assignment to Assured Guaranty of the claims for interest to which such deficiency relates and which are paid by Assured Guaranty, (B) receive as designee of the respective holders (and not as Registrar) in accordance with the tenor of the Assured Guaranty Policy payment from Assured Guaranty with respect to the claims for interest so assigned, and (C) disburse the same to such respective holders; and

(ii) if and to the extent of a deficiency in amounts required to pay principal of the Assured Guaranty Insured Bonds, the Registrar shall (A) execute and deliver to Assured Guaranty, in form satisfactory to Assured Guaranty, an instrument appointing Assured Guaranty as agent for such holder in any legal proceeding related to the payment of such principal and an assignment to Assured Guaranty of the Assured Guaranty Insured Bonds surrendered to Assured Guaranty in an amount equal to the principal amount thereof as has not previously been paid or for which moneys are not held by the Registrar and available for such payment (but such assignment shall be delivered only if payment from Assured Guaranty is received), (B) receive as designee of the respective holders (and not as Registrar) in accordance with the tenor of the Assured Guaranty Policy payment therefor from Assured Guaranty, and (C) disburse the same to such holders.

(7) Payment with respect to claims for interest on and principal of Assured Guaranty Insured Bonds disbursed by the Registrar from proceeds of the Assured Guaranty Policy shall not be considered to discharge the obligation of the Commonwealth with respect to such Assured Guaranty Insured Bonds, and such Assured Guaranty Insured Bonds shall remain outstanding for all purposes, shall not be defeased or otherwise satisfied and shall not be considered paid by the Commonwealth, and Assured Guaranty shall become the owner of such unpaid Assured Guaranty Insured Bonds and claims for the interest in accordance with the tenor of the assignment made to it under the provisions of this subsection or otherwise; and the assignment and pledge of the trust estate and all covenants, agreements and other Assured Guaranty Insured Bonds of the Commonwealth to the registered owners shall continue to exist and shall run to the benefit of Assured Guaranty, and Assured Guaranty shall be subrogated to the rights of such registered owners including, without limitation, any rights that such owners

may have in respect of securities law violations arising from the offer and sale of the Assured Guaranty Insured Bonds.

(8) Irrespective of whether any such assignment is executed and delivered, the Commonwealth and the Registrar hereby agree for the benefit of Assured Guaranty that:

(i) they recognize that to the extent Assured Guaranty makes payments directly or indirectly (e.g., by paying through the Registrar), on account of principal of or interest on the Assured Guaranty Insured Bonds, Assured Guaranty will be subrogated to the rights of such holders to receive the amount of such principal and interest thereon as provided, but and solely from the sources stated in the Resolution and the Assured Guaranty Insured Bonds; and

(ii) they will accordingly pay to Assured Guaranty the amount of such principal and interest, with interest thereon as provided in the Resolution and the Assured Guaranty Insured Bonds, but only from the sources and in the manner provided herein for the payment of principal of and interest of the Assured Guaranty Insured Bonds to holders, and will otherwise treat Assured Guaranty as the owner of such rights to the amount of such principal and interest.

(9) The Commonwealth hereby agrees to pay or reimburse Assured Guaranty, to the extent permitted by law, (i) for all amounts paid by Assured Guaranty under the terms of the Assured Guaranty Policy, (ii) any and all charges, fees, costs and expenses which Assured Guaranty may reasonably pay or incur, including, but not limited to, fees and expenses of attorneys, accountants, consultants and auditors and reasonable costs of investigations, in connection with (A) any accounts established to facilitate payments under the Assured Guaranty Policy (B) the administration, enforcement, defense or preservation of any rights in respect of the Resolution including defending, monitoring or participating in any litigation or proceeding (including any bankruptcy proceeding in respect of the Commonwealth or any affiliate thereof) relating to this Agreement or the Resolution, any party to this Agreement or the transaction contemplated by the Resolution, (C) any amendment, waiver or other action with respect to, or related to, this Agreement or the Resolution whether or not executed or completed; costs and expenses shall include a reasonable allocation of compensation and overhead attributable to time of employees of Assured Guaranty spent in connection with the actions described in paragraphs (k)(2) to (4) above. In addition, Assured Guaranty reserves the right to charge a reasonable fee as a condition to executing any amendment, waiver or consent proposed in respect of this Agreement or the Resolution. To the extent permitted by law, the Commonwealth will pay interest on the amounts owed in this paragraph from the date of any payment due or paid, at the per annum rate of interest publicly announced from time to time by JP Morgan Chase Bank, National Association at its principal office in New York, New York as its prime lending rate (any change in such prime rate of interest to be effective on the date such change is announced by JPMorgan Chase Bank, National Association) plus three percent (3%) per annum (the "Reimbursement Rate"). The Reimbursement Rate shall be calculated on the basis of the actual number of days elapsed over a 360-day year. In the event JPMorgan Chase Bank ceases to announce its prime rate publicly, the prime rate shall be the publicly announced prime rate or base lending rate of such national bank, as Assured Guaranty shall specify.

(10) Assured Guaranty shall be entitled to pay principal or interest on the Assured Guaranty Insured Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Commonwealth (as such terms are defined in the Assured Guaranty Policy) whether or not Assured Guaranty has received a Notice (as defined in the Assured Guaranty Policy) of Nonpayment or a claim upon the Assured Guaranty Policy.

(11) In addition, Assured Guaranty shall to the extent it makes any payment of principal or interest on the Assured Guaranty Insured Bonds become subrogated to the rights of the recipients of such payments in accordance with the terms of the Assured Guaranty Policy, and to evidence such subrogation (i) in the case of claims for interest, the Registrar shall note Assured Guaranty's rights as subrogee on the registration books of the Commonwealth maintained by the Registrar, upon receipt of proof of payment of interest thereon to the registered holders of the Assured Guaranty Insured Bonds, and in the case of claims for principal, the Registrar, if any, shall note Assured Guaranty's rights as subrogee on the registration books of the Commonwealth maintained by the Registrar, upon surrender of the Assured Guaranty Insured Bonds together with receipt of proof of payment of principal thereof.

**Section 2. FGIC Policy; FGIC.** So long as the FGIC Policy shall be in full force and effect, and FGIC is not in default thereunder, with respect to the FGIC Insured Bonds, the Secretary and the Registrar shall comply with the following provisions.

(a) The Commonwealth agrees to provide, for so long as the FGIC Insured Bonds are outstanding, the information described below, directed to Financial Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Risk Management:

(i) notice of any material events pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934, as amended;

(ii) notice of the downgrading by any rating agency of the Commonwealth's underlying public rating, or the rating on the FGIC Insured Bonds or any parity obligations to "non-investment grade";

(iii) notice of redemption, other than mandatory sinking fund redemption, of any of the FGIC Insured Bonds, or of any advance refunding of the FGIC Insured Bonds, including the principal amount, maturities and CUSIP numbers thereof; and

(iv) such additional information as FGIC may reasonably request from time to time.

(b) FGIC shall be deemed to be the holder of all of the FGIC Insured Bonds for the purpose of granting any consent, direction or approval or taking any action permitted by or required under the Resolution to be granted or taken by the holders of such FGIC Insured Bonds.

(c) If the Auction Rate on the FGIC Insured Bonds shall be the Maximum Rate for a period (A) in excess of thirty (30) days, the Commonwealth agrees to take all steps necessary to ensure that the Auction Rate does not exceed the interest rate payable on similar

securities (taking into account the interest period and enhanced/insured rating of the FGIC Insured Bonds) or (B) in excess of sixty (60) days, the Commonwealth agrees to convert, or cause to be converted, all FGIC Insured Bonds to a Long-Term Interest Rate Period or, with the approval of FGIC, to another Interest Rate Period, in each case at the lowest interest rate that will permit the Remarketing Agent to sell all of the FGIC Insured Bonds on the conversion date at a price equal to 100% of the principal amount thereof plus accrued interest thereon. If a default shall have occurred and be continuing under the Resolution or the Commonwealth fails to cause a conversion of the FGIC Insured Bonds to another Interest Rate Period as required by the foregoing sentence, FGIC may, in its discretion, direct the conversion of the FGIC Insured Bonds to a Long-Term Interest Rate Period or any other Interest Rate Period.

(d) (1) The Secretary shall commence the process required by the Resolution to effect a mandatory conversion of the interest rate on the FGIC Insured Bonds to a Long-Term Interest Rate Period (sufficient to accomplish the complete remarketing at par of all FGIC Insured Bonds then held by the Liquidity Facility Provider) on or as soon as practicable after the termination date of the Liquidity Facility, in the case of an Event of Termination pursuant to the Liquidity Facility.

(2) If such a remarketing cannot be effected, the FGIC Insured Bonds shall continue to bear interest at the variable rate and the Remarketing Agent shall attempt at least weekly to convert the FGIC Insured Bonds to a Long-Term Interest Rate sufficient to effect the remarketing at par of all FGIC Insured Bonds then held by the Liquidity Facility Provider.

**Section 3. FSA Policy; FSA.** So long as the FSA Policy issued by FSA shall be in full force and effect, and FSA is not in default thereunder, with respect to the FSA Insured Bonds, the Secretary and the Registrar shall comply with the following provisions.

(a) If, on the third Business Day prior to the related scheduled interest payment date or principal payment date in respect of the FSA Insured Bonds (a "Payment Date") there is not on deposit with the Registrar, after making all transfers and deposits required under the Resolution, moneys sufficient to pay the principal of and interest on the FSA Insured Bonds due on such Payment Date, the Registrar shall give notice to FSA and to its designated agent (if any) ("FSA's Fiscal Agent") by telephone or telecopy of the amount of such deficiency by 12:00 noon, New York City time, on such Business Day. If, on the second Business Day prior to the related Payment Date, there continues to be a deficiency in the amount available to pay the principal of and interest on the FSA Insured Bonds due on such Payment Date, the Registrar shall make a claim under the FSA Policy and give notice to FSA and FSA's Fiscal Agent (if any) by telephone of the amount of such deficiency, and the allocation of such deficiency between the amount required to pay interest on the FSA Insured Bonds and the amount required to pay principal of the FSA Insured Bonds, confirmed in writing to FSA and FSA's Fiscal Agent by 12:00 noon, New York City time, on such second Business Day by filling in the form of Notice of Claim and Certificate delivered with the Policy.

(b) In the event the claim to be made is for a mandatory sinking fund redemption installment, upon receipt of the moneys due, the Registrar shall authenticate and deliver to affected Bondholders who surrender their FSA Insured Bonds a new FSA Insured Bond or FSA Insured Bonds of the same series and maturity in an aggregate principal amount

equal to the unredeemed portion of the FSA Insured Bond surrendered. The Registrar shall designate any portion of payment of principal on FSA Insured Bonds paid by FSA, whether by virtue of mandatory sinking fund redemption, maturity or other advancement of maturity, on its books as a reduction in the principal amount of FSA Insured Bonds registered to the then current Bondholder, whether The Depository Trust Company or its nominee or otherwise, and shall issue a replacement FSA Insured Bond to FSA, registered in the name of Financial Security Assurance Inc., in a principal amount equal to the amount of principal so paid (without regard to authorized denominations); provided that the Registrar's failure to so designate any payment or issue any replacement FSA Insured Bond shall have no effect on the amount of principal or interest payable by the Commonwealth on any FSA Insured Bond or the subrogation rights of FSA.

(c) The Registrar shall keep a complete and accurate record of all funds deposited by FSA into the Policy Payments Account (referred to below) and the allocation of such funds to payment of interest on and principal paid in respect of any FSA Inured Bond. FSA shall have the right to inspect such records at reasonable times upon reasonable notice to the Registrar.

(d) Upon payment of a claim under the FSA Policy the Registrar shall establish a separate special purpose trust account for the benefit of Bondholders referred to herein as the "Policy Payments Account" and over which the Registrar shall have exclusive control and sole right of withdrawal. The Registrar shall receive any amount paid under the Policy in trust on behalf of Bondholders and shall deposit any such amount in the FSA Policy Payments Account and distribute such amount only for purposes of making the payments for which a claim was made. Such amounts shall be disbursed by the Registrar to Bondholders in the same manner as principal and interest payments are to be made with respect to the FSA Insured Bonds under the sections hereof regarding payment of FSA Bonds. It shall not be necessary for any such payments to be made by check or wire transfer separate from the check or wire transfer used to pay debt service with other funds available to make such payments. Funds held in the Policy Payments Account shall not be invested by the Registrar and may not be applied to satisfy any costs, expenses or liabilities of the Registrar.

(e) FSA shall, to the extent it makes any payment of principal of or interest on the FSA Insured Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the FSA Policy.

(f) FSA shall be deemed to be the holder of all of the FSA Insured Bonds for the purpose of granting any consent, direction or approval or taking any action permitted by or required under the Resolution to be granted or taken by the holders of such FSA Insured Bonds.

(g) Unless FSA shall otherwise direct, the Commonwealth shall convert FSA Insured Bonds to a Long-Term Interest Rate Period through the stated maturity of such FSA Insured Bonds, or another Interest Rate Period acceptable to FSA:

(i) upon the failure of a Liquidity Facility Provider to purchase FSA Insured Bonds in accordance with the requirements of the Resolution;

    (ii) upon expiration or termination of the Liquidity Facility with no substitution of a new Liquidity Facility;

    (iii) if FSA Insured Bonds are held as Bank Bonds for forty-five (45) days or more in any twelve-month period;

    (iv) if twice in a twelve-month period (x) the Remarketing Agent has failed to determine the interest rate of FSA Insured Bonds or (y) sufficient funds are not available for the purchase of all tendered FSA Insured Bonds required to be purchased on any Tender Date;

    (v) if FSA Insured Bonds bear interest at the Maximum Bond Interest Rate; or

    (vi) if the Commonwealth fails to replace a Liquidity Facility when required pursuant to the terms of the Resolution.

    (h) Unless FSA shall otherwise direct, the FSA Insured Bonds bearing interest at an Auction Rate shall be converted to a Long-Term Interest Rate Period through the stated maturity of such FSA Insured Bonds, or another Interest Rate Period acceptable to FSA, if such FSA Insured Bonds bear interest at the Maximum Rate for two consecutive Auction Periods.

    (i) FSA shall have the right to direct the Commonwealth to appoint, and the Commonwealth shall have the right to appoint, an additional Broker-Dealer without the consent of any other Broker-Dealer. The Commonwealth and FSA shall each have the right to remove a Broker-Dealer at any time.

    (j) FSA shall have the right to direct the Commonwealth to remove the Auction Agent and to consent to any successors thereto.

**Section 4.** **MBIA Policy; MBIA.** So long as the MBIA Policy shall be in full force and effect, and MBIA is not in default thereunder, with respect to the MBIA Insured Bonds, the Secretary and the Registrar shall comply with the following provisions.

    (a) Copies of any resolutions supplemental to the Resolution which have been consented to by MBIA shall be sent to Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc.

    (b) MBIA shall receive notice of the resignation or removal of the Registrar and the appointment of a successor thereto.

    (c) MBIA shall receive copies of all notices required to be delivered to registered owners of the MBIA Insured Bonds and, on an annual basis, copies of the audited financial statements and annual budget of the Commonwealth. All notices required to be given to MBIA under the Resolution shall be in writing and shall be sent by registered or certified mail addressed to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504 Attention: Surveillance.

    (d) MBIA shall be deemed to be the holder of all of the MBIA Insured Bonds for the purpose of granting any consent, direction or approval or taking any action permitted by

MIAMI/4206434.2    9

or required under the Resolution to be granted or taken by the holders of such MBIA Insured Bonds.

**Section 5.** **Third-Party Beneficiaries**. So long as each of the Policies is in effect, the respective Bond Insurer shall be a third-party beneficiary under the Resolution and this Agreement and may enforce any such right, remedy or claim conferred, given or guaranteed under the Resolution or this Agreement.

**Section 6.** **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same instrument.

**Section 7.** **Definitions**. Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Resolution, unless the context otherwise requires.

Acknowledged and agreed
to by FINANCIAL SECURITY ASSURANCE INC.
as of the 16th day of October, 2007.

FINANCIAL SECURITY ASSURANCE INC.

By: _____
    Name: Michael B. Cooper
    Title: Associate General Counsel


Acknowledged and agreed
to by MBIA INSURANCE CORPORATION
as of the 16th day of October, 2007.

MBIA INSURANCE CORPORATION


By: _____
    Name:
    Title:

Acknowledged and agreed
to by FINANCIAL SECURITY ASSURANCE INC.
as of the 16th day of October, 2007.

FINANCIAL SECURITY ASSURANCE INC.


By: _____
    Name:
    Title:


Acknowledged and agreed
to by MBIA INSURANCE CORPORATION
as of the 16th day of October, 2007.

MBIA INSURANCE CORPORATION


By: _____
    Name: Stephanie Taylor Ciavarello
    Title: Assistant Secretary

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico and Banco Popular de Puerto Rico, have caused this Agreement to be executed by their authorized officers, all as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____
Secretary of the
Treasury of Puerto Rico

BANCO POPULAR DE PUERTO RICO,
As Registrar

By: _____
Authorized Officer

Acknowledged and agreed
to by ASSURED GUARANTY CORP.
as of the 16th day of October, 2007.

ASSURED GUARANTY CORP.

By: _____
    Name:
    Title:

Acknowledged and agreed
to by FINANCIAL GUARANTY INSURANCE COMPANY
as of the 16th day of October, 2007.

FINANCIAL GUARANTY INSURANCE COMPANY

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico and Banco Popular de Puerto Rico, have caused this Agreement to be executed by their authorized officers, all as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____
Secretary of the
Treasury of Puerto Rico

BANCO POPULAR DE PUERTO RICO,
As Registrar

By: _____
Authorized Officer

Acknowledged and agreed
to by ASSURED GUARANTY CORP.
as of the 16th day of October, 2007.

ASSURED GUARANTY CORP.

By: *[signature: Kathleen Evers]*
Name: Kathleen Evers
Title: Managing Director

Acknowledged and agreed
to by FINANCIAL GUARANTY INSURANCE COMPANY
as of the 16th day of October, 2007.

FINANCIAL GUARANTY INSURANCE COMPANY

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico and Banco Popular de Puerto Rico, have caused this Agreement to be executed by their authorized officers, all as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____
Secretary of the
Treasury of Puerto Rico


BANCO POPULAR DE PUERTO RICO,
As Registrar

By: _____
Authorized Officer

Acknowledged and agreed
to by ASSURED GUARANTY CORP.
as of the 16th day of October, 2007.

ASSURED GUARANTY CORP.


By: _____
Name:
Title:


Acknowledged and agreed
to by FINANCIAL GUARANTY INSURANCE COMPANY
as of the 16th day of October, 2007.

FINANCIAL GUARANTY INSURANCE COMPANY


By: _____
Name:
Title: