UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

        Debtors.

-------------------------------------------------------------------x

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)


**[Response to Docket #17093] [Related to Docket # 17304]**


**RESPONSE TO THREE HUNDRED FIFTY-SECOND OMNIBUS OBJECTION TO THE
CLAIMS OF PETER C. HEIN AND ANNE FARLEY – CORRECTED**


Dated:  July 14, 2021

## <u>Table of Contents</u>

**Page**

RESPONSE TO THREE HUNDRED FIFTY-SECOND OMNIBUS OBJECTION TO
THE CLAIMS OF PETER C. HEIN AND ANNE FARLEY ............................................1

I.    SUMMARY OF RESPONSE.............................................................................................2

II.   DEBTORS' OBJECTION SHOULD BE DENIED, OR AT LEAST ANY
ORDER GRANTING DEBTORS' OBJECTION SHOULD BE CONTINGENT
UPON, AND NOT EFFECTIVE UNTIL, A CONFIRMATION ORDER ISSUES .........4

      A.   The asserted basis for Debtors' objection to the Hein and Farley claims is
           wholly conclusory. .................................................................................................4

      B.   The PBA bonds are registered and distributions pursuant to a plan will be
           made through the DTC system; Debtors' 352$^d$ Objection makes no
           showing of an actual risk of "duplicative" payment of the Hein and Farley
           Claims. ....................................................................................................................5

      C.   The Hein and Farley Claims Cannot Be Disallowed as Duplicative of a
           Subsequently Filed Claim by *Debtor PBA's Own Agent*.......................................6

           1.   U.S. Bank is Debtor PBA's own agent. .......................................................6

           2.   U.S. Bank disclaims any right of bondholders to rely upon U.S.
                Bank. ..........................................................................................................8

           3.   The fact U.S. Bank is focused on its role, its compensation and
                whether it will be released underscores that bondholders cannot
                rely upon Debtor PBA's "fiscal agent" U.S. Bank to protect their
                interests. ....................................................................................................9

           4.   The Hein and Farley claims were filed prior to U.S. Bank's claim...........10

           5.   Debtors' 352$^d$ Objection is silent as to what Debtors' position is as
                to the effect of any disallowance of Hein and Farley's claims pre-
                confirmation. ............................................................................................10

      D.   Debtors cannot disallow the Hein and Farley claims unless Debtors
           successfully prosecute to a decision and judgment an adversary
           proceeding against Hein and Farley.......................................................................11

      E.   The Hein and Farley claims assert constitutional and other claims not
           asserted by Debtor PBA's agent U.S. Bank...........................................................13

F.    The rulings on Hein's COFINA claim occurred in the very different
context of post-confirmation proceedings. ..........................................................16

CONCLUSION.................................................................................................................19

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Armstrong* v. *United States*,
  364 U.S. 40 (1960)..................................................................................................12

*Commercial Western Finance (see In re Commercial Western Finance)*

*Dewsnup* v. *Timm*,
  502 U.S. 410 (1992)................................................................................................13

*In re Commercial Western Finance Corp.*,
  761 F.2d 1329 (9th Cir. 1985) ...............................................................................12

*In re Mansaray-Ruffin*,
  530 F.3d 230 (3d Cir. 2008)..............................................................................12, 13

*Koontz* v. *St. Johns River Water Mgt. District*,
  570 U.S. 595 (2013)................................................................................................12

*Lynch* v. *United States*,
  292 U.S. 571 (1934)................................................................................................12

*Mansaray-Ruffin (see In re Mansaray-Ruffin)*

*United States Trust Co.* v. *New Jersey*,
  431 U.S. 1 (1977)....................................................................................................12

*United Student Aid Funds, Inc.* v. *Espinosa*,
  559 U.S. 260 (2010)................................................................................................12

**Constitution - U.S.**

U.S. Const. Art. I, §8, cl. 4 (Bankruptcy clause) ...........................................................15

U.S. Const. Art. I, §9, cl. 3 (prohibition of Ex Post Facto laws) ...................................15

U.S. Const. Art. I, §10, cl. 1 (Contracts clause and prohibition of
Ex Post Facto laws)........................................................................................15

U.S. Const. Art. IV, §2, cl. 1 (Privileges and Immunities clause)..................................15

U.S. Const. Amendment V (Due Process and Takings clauses)......................................15

U.S. Const. Amendment XIV, §1 (Privileges and Immunities, Due Process and
Equal Protection clauses)................................................................................15

**Puerto Rico Constitution**

Article II, Section 7 (Due Process, Equal Protection and Contract Clauses) ................15

Article II, Section 9 (Takings Clause) ...........................................................................15

Article II, Section 12, Clause 2 (prohibition on Ex Post Facto laws)............................15

Article VI Section 2 .............................................................................................15, 16

Article VI Section 6 .............................................................................................15, 16

Article VI Section 8 .............................................................................................15, 16

**Statutes**

11 U.S.C. 506(b) ..........................................................................................................13

11 U.S.C. 1109(b) .........................................................................................................11

48 U.S.C. §2174(b)(6) ..................................................................................................16

48 U.S.C. § 2195(a) ......................................................................................................14

**Rules**

Bankruptcy Rule 3001(b)...............................................................................................17

Bankruptcy Rule 3002(c)...............................................................................................17

Bankruptcy Rule 3003(c)...............................................................................................17

Bankruptcy Rule 3003(c)(1),(5).....................................................................................17

Bankruptcy Rule 3004 ................................................................................................17, 18

Bankruptcy Rule 3007 ...........................................................................................................11

Bankruptcy Rule 3007(b) ......................................................................................................11

Bankruptcy Rule 7001(2) ......................................................................................................12

Fed. R. Civ. P. 60(b)(4) .........................................................................................................12

**Other Authorities**

Committee Notes on Rule 3007—2007 Amendment ................................................................11

## RESPONSE TO THREE HUNDRED FIFTY-SECOND OMNIBUS OBJECTION TO THE CLAIMS OF PETER C. HEIN AND ANNE FARLEY

This response is filed by Peter C. Hein and Anne Farley to the "Three Hundred Fifty-Second Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico, the Puerto Rico Highways and Transportation Authority, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Duplicate and No Liability Bond Claims" (Docket #17093, filed 6/18/2021).  Debtors' Objection is referred to herein as "352$^d$ Objection".

Peter C. Hein and Anne Farley, who are married, have each submitted claims that are the subject of the 352$^d$ Objection.  Peter C. Hein submitted Claim 174229 and Anne Farley submitted Claim 174231 (which appears to have been scanned and logged twice by Prime Clerk, agent for Commonwealth and PBA, the first time as 174231, and the second time as 174264).[1] Both claims 174229 and 174231 were dated July 9, 2020 and stamped "received" by Prime Clerk on July 13, 2020.  Attached to the accompanying Hein Declaration are pertinent excerpts from Peter C. Hein's Claim 174229 (Exhibit A, sequence 001-010) and Anne Farley's Claim 174231 (Exhibit B, sequence 011-019).

The 352$^d$ Objection mixes together 14 claims:  (i) two of the challenged claims are the Hein and Farley claims with respect to PBA bonds (174229 and 174231), and a third is the apparently double-scanned Claim 174264, and (ii) other claims that are completely unrelated to

---

[1] Hein submitted the Hein and Farley claims together, with a cover letter.  Ex. A, sequence 005. Prime Clerk by email confirmed receipt of Claim 174229 and Claim 174231; Prime Clerk's confirming email made no reference to a Claim 174264.  *See* Hein Decl. Ex. E, sequence 071. Perhaps Claim 174264 is simply a result of Prime Clerk scanning and logging, for a second time, what was already logged as Claim 174231.  It looks like Claim 174264 (as scanned by Prime Clerk) includes another copy of Hein's cover letter, which appears not to have been scanned with Claim 174231.  If that is the case, Hein and Farley are prepared to discuss a resolution of Claim 174264 with Debtors, provided Hein and Farley are not substantively or procedurally prejudiced by any steps taken to address what may have been a clerical error by Prime Clerk.  Claim 174264 is not annexed as an exhibit to this response.

our claims, and appear to be **un**related to PBA bonds. Indeed, the Hein and Farley claims may be the only actual PBA Bond claims challenged in the 352[d] Objection.[2]

The wholly unrelated claims that FOMB has included in the 352[d] Objection range from a $55,000 claim submitted without supporting documentation, to claims against Puerto Rico Aqueduct and Sewer Authority, to claims with respect to GDB Bonds, to claims with respect to Puerto Rico Infrastructure Financing Authority Bonds, to claims with respect to HTA Bonds, to claims with respect to ERS Bonds, and to claims with respect to Puerto Rico Industrial Development Company Bonds. Mixing these completely unrelated claims, relating to different debtors or entities, into one Omnibus Objection is very confusing.[3]

## I.    SUMMARY OF RESPONSE

1.    Debtors' 352[d] Objection is wholly conclusory, and does not demonstrate grounds to disallow the Hein and Farley claims as assertedly "duplicative", which is the only grounds for disallowance advanced by Debtors. *See* Point II.A, below.

2.    The PBA bonds are registered and any payments or distributions made in the regular course on the Effective Date will be made through the DTC system. Debtors make no showing that there is any actual risk of "duplicate" payment, absent a specific future determination by debtors or a court that additional payments or distributions should be made to

---

[2] Item 12 on #17093-1-page-3-of-4 suggests uncertainty exists over whether that unrelated claimant actually holds PBA bonds as opposed to securities of another entity.

[3] The 352d Objection was filed on behalf of four separate Debtors. This response responds to all objections of all four Debtors to the Hein and Farley claims at issue in the 352d Objection. As noted in Docket#17304, U.S. Bank in its Notice to Holders dated May 14, 2021 defines itself as the "Fiscal Agent" and expressly states that "[t]he Fiscal Agent is solely the agent of PBA". Hein Decl. Ex. C p.1, sequence 020. U.S. Bank also has relationships with other Puerto Rico entities, including as Trustee of certain bond issues of such entities (*see, e.g.*, #16989, 16984, 16981, 16975) and has filed approximately 19 claims in its capacity as fiscal agent for an entity or as trustee (available in the Prime Clerk "Claim" database; use "Advance Search" on the claims database, and enter "U.S. Bank"). This corrected Response is filed to be more precise that the agency relationship being addressed as pertinent to the issues presented by the 352d Objection is U.S. Bank's role as "agent of PBA."

particular bondholders.  There is no reason to even consider Debtors' objection before the time a confirmation order issues.  *See* Point II.B, below.

3.     The U.S. Bank master proof of claim that the Hein and Farley claims allegedly duplicate:

- Was filed by ***Debtor PBA's own agent***, who disclaims duties or responsibilities to bondholders such as Hein and Farley.

- Was filed on the last possible date for filing claims, over two weeks ***after*** Hein and Farley had filed their claims.

Debtors' objection is completely silent as to why a bondholder who submits a timely claim should be relegated to reliance on a master proof of claim that a ***debtor's own agent*** thereafter submits on the last possible day.  *See* Point II.C, below.

4.     Hein and Farley assert that their PBA bonds have a priority – namely, that under the Puerto Rico Constitution they have a "first claim" on available Commonwealth resources – and that their PBA bonds are secured.  A claim asserting a priority or secured status can only be challenged through an adversary proceeding, which Debtors have not brought against Hein and Farley, much less pressed to decision.  *See* Point II.D, below.

5.     The U.S. Bank master proof of claim does not assert all of the claims encompassed within the Hein and Farley claims.  Hein and Farley have asserted Constitutional and statutory rights and claims that are broader in scope than the claims asserted by Debtor PBA's agent U.S. Bank.  And even if one assumes the U.S. Bank claim should be read to have a breadth equal to that of the Hein/Farley claims, Hein and Farley should not be left – particularly pre-confirmation – to have to rely upon an arguably narrower in scope U.S. Bank claim, since Hein and Farley submitted their own claims and U.S. Bank has not evidenced an intent to press claims on behalf of bondholders to decision or otherwise advocate on behalf of bondholders.  *See* Point II.E, below.

\* \* \*

Debtors' 352$^d$ Objection to the Hein and Farley claims should be denied.  Alternatively, if Debtors' 352$^d$ Objection to the Hein and Farley claims is not outright denied, any ruling on Debtors' 352$^d$ Objection should at least be deferred until after a confirmation order issues.  In the further alternative, were the Court to be inclined to rule prior to a confirmation order being entered, at the very least any order addressing the 352$^d$ Objection, should:

- Be contingent upon, and not effective until, after a confirmation order is entered (if one is entered).

- Be express that any disallowance has no impact whatsoever on Hein and Farley's rights, and that Hein and Farley remain free to assert any and all objections they may have at the confirmation stage, whether or not asserted by U.S. Bank in the master proof of claim and whether or not U.S. Bank modifies or withdraws the master proof of claim.

## II.  DEBTORS' OBJECTION SHOULD BE DENIED, OR AT LEAST ANY ORDER GRANTING DEBTORS' OBJECTION SHOULD BE CONTINGENT UPON, AND NOT EFFECTIVE UNTIL, A CONFIRMATION ORDER ISSUES

### A.  The asserted basis for Debtors' objection to the Hein and Farley claims is wholly conclusory.

Debtors label the 352$^d$ Objection as "substantive", but the sole ground to disallow the Hein and Farley claims asserted is Debtors' assertion that "Claimant asserts liability associated with one or more bonds issued by PBA that are duplicative of the Master Proof Of Claim which was filed in the PBA Title III Case by the fiscal agent".  (#17093-1-page-2-of-4)  This one sentence assertion is presumably referring to the master proof of claim (Claim 174834) filed "[o]n behalf of the holders of the PBA bonds" by U.S. Bank and U.S. Bank Trust "as fiscal agents for certain revenue bonds issued by PBA" referenced in ¶ 19 (#17093-page-10-of-44).

Debtors' one sentence assertion in #17093 of its "reason" for its assertedly "substantive" objection is wholly conclusory.  The supporting Herriman Declaration is equally conclusory and adds no support for Debtors' Objection (#17093-3).  For this reason alone, Debtors' objection should be denied.

**B.**   **The PBA bonds are registered and distributions pursuant to a plan will be made through the DTC system; Debtors' 352$^d$ Objection makes no showing of an actual risk of "duplicative" payment of the Hein and Farley Claims.**

The apparent premise of the 352$^d$ Objection is that – unless the Court acts now to disallow the Hein/Farley claims – added payments or distributions will flow to Hein and Farley, once on the master proof of claim and once on the Hein / Farley individual claims.  However, the 352$^d$ Objection sets forth no actual reason to believe that Hein and Farley will receive "duplicative" payments or distributions if their individual claims are permitted to remain in the record at least through confirmation.  There is no discussion in Debtors' 352$^d$ Objection or the accompanying (perfunctory) declaration of Jay Herriman (#17093-3) as to why there is any reason to believe that Hein and Farley will be paid twice with respect to the same bonds (at least absent a specific future determination by Debtors or a court that additional payments should be made).

The PBA Bonds are "in book-entry only form as registered bonds", and DTC acts as a security depository for the Bonds.  Series Q Official Statement p. 10, 11-13 (Hein Decl. Ex. D, sequence 037, 038-040).  Under DTC procedures, were a Plan confirmed, payments and distributions would be made to DTC, and then to DTC participants, such as broker-dealers, who in turn would pass the payments and distributions on to the beneficial owners who maintain accounts with those broker-dealers.  That will be the case whether individual bondholders have separately filed claims or not.  *See* Hein Ex. F, DTC's current "Asset Services—Reorganization Service Guide", p. 22, sequence 096 ("Processing Mandatory Reorganizations").

An issue of duplicative payment could only arise if – upon a Plan being confirmed – Debtors make payments or distributions directly to individuals, such as Hein and Farley, who submit PBA bond claims, independent of whether such individuals receive payments or distributions through the DTC system into their brokerage accounts.  Presumably Debtors do not intend to do that (absent a future determination that additional payments or distributions are

required) but rather plans to transmit payments or distributions only to DTC, as registered holder through its nominee Cede & Co.

Since no additional payment or distribution will issue to Hein and Farley absent a future determination by the Debtors or a court that additional payments or distributions should be made to particular bondholders, one wonders why Debtors are pressing their 352$^d$ Objection pre-confirmation.

Absent some proof that there actually is a practical risk of duplicative payment (absent a future determination that additional payments or distributions should be made), there is no grounds for granting a "substantive" objection to disallow Hein and Farley's individual claims, and certainly not prior to a confirmation order issuing.

Pre-confirmation disallowance should not be used as a vehicle for potentially compromising a bondholder's full rights to assert his or her own objections in the course of the confirmation process. Hein and Farley should not be subjected to any risk that any objections they may have to the Plan may be compromised in any way by virtue of their individual claims being disallowed as supposedly "duplicative" of Debtor PBA's agent's master proof of claim. Any action on the 352$^d$ Objection at the very least should be deferred until following confirmation.

> **C.      The Hein and Farley Claims Cannot Be Disallowed as Duplicative of a Subsequently Filed Claim by *Debtor PBA's Own Agent.***

As noted, the sole "reason" given for seeking to disallow the Hein and Farley claims is Debtors' assertion that "Claimant asserts liability associated with one or more bonds issued by PBA that are duplicative of the Master Proof Of Claim which was filed in the PBA Title III Case *by the fiscal agent*" (#17093-1-page-2-of-4, emphasis added).

> **1.      U.S. Bank is Debtor PBA's own agent.**

Conspicuously absent from the 352$^d$ Objection is any specification of who U.S. Bank and U.S. Bank Trust are "fiscal agents" for or to whom they owe duties as "fiscal agents". The 352$^d$ Objection does not attach any bond resolution or other documentation describing U.S. Bank's

role, responsibilities and duties as "fiscal agent".  (Hein requested such, *see* Hein Ex. G

(sequence 156-158), but to date it has not been provided to Hein.)

The 352d Objection artfully states "US Bank and US Bank Trust serve as fiscal agents

for certain revenue bonds issued by PBA" (#17093-page-5-of-44; *see also* #17093-page-10-of-

44), but that of course side-steps the important question of: "whose agent?"  Debtors' supporting

declaration of Jay Herriman likewise side-steps the important question of "whose agent?"

(#17093-3), saying nothing at all on the subject and not attaching any documentation that might

answer the question.

The important question of "whose agent?" appears to be answered not by anything in the

352$^d$ Objection (#17093), but rather upon review of statements U.S. Bank has made describing

its role.  Per U.S. Bank, U.S. Bank is ***Debtor PBA's own agent***.  Hein Decl. Ex. C p.1, sequence

020.  U.S. Bank in its Notice to Holders dated May 14, 2021 defines itself as the "Fiscal Agent"

and expressly states that "[t]he Fiscal Agent is ***solely the agent of PBA***".  *Id.* (emphasis added).

Moreover, as discussed in the next section, while U.S. Bank filed a master proof of claim (on the

last possible day for doing so), U.S. Bank is not even purporting to represent or act in the

interests of individual PBA bondholders.

Debtors do not identify any authority that authorizes a fiscal agent who is "solely the

agent of [debtor]" to file a claim on behalf of a creditor who has already timely-filed its claim.

Indeed, the Bankruptcy Rules would appear to rule that out.  *See* Point II.F "second" below.  And

even if Debtor PBA's agent were permitted to file a proof of claim on behalf of bondholders, to

disallow the Hein and Farley claims here would require the Court to take the further step – for

which Debtors likewise cite no authority whatsoever – of ruling that the Debtor's agent's claim

overrode the previously filed claim of a bondholder.  If Debtors have any authority for the

foregoing unsupported propositions, Debtors should have cited that authority in their 352$^d$

Objection.  Likewise, if Debtors have some documentary evidence that U.S. Bank is the

authorized agent of bondholders Hein and Farley, with authority to file a proof of claim on their

behalf, that should have been included in Debtors' 352$^d$ Objection.  If Debtors do come back and

assert some authority for the foregoing propositions in their reply papers, or belatedly supply

documentation on the "whose agent?" question, Hein and Farley respectfully request that the

352$^d$ Objection be adjourned to a future hearing and that they be given permission to submit sur-

reply papers to address the belatedly proffered authority and/or documentation (if any exists).

> **2.     U.S. Bank disclaims any right of bondholders to rely upon U.S. Bank.**

U.S. Bank's "Notice to Holders" of PBA bonds, dated May 14, 2021 (Hein Decl. Ex. C),

states that U.S. Bank, as "Fiscal Agent" "*is solely the agent of PBA* and makes no

recommendations and gives no investment advice and Bondholders *shall not rely upon the*

*Fiscal Agent* as a source of information for any decisions in relation to the Bonds." (Ex. C p.1,

sequence 020, emphasis added).

U.S. Bank's May 14, 2021 Notice goes on to state (in bold type, underscored by U.S.

Bank for emphasis):

> **Please note that the Fiscal Agent is not obligated to take any actions or enforce any remedies on behalf of the holders of the Bonds with respect to the Third Amended Plan of Adjustment and the Disclosure Statement except as specifically set forth in the Resolutions. Thus, you should not rely on the Fiscal Agent to take any action on behalf of the holders of the Bonds in connection with the Plan process, including the filing of any objection to the Plan or Disclosure Statement, and including without limitation the filing of any position with regard to any proceedings to resolve, settle or adjudicate the Claim filed by the Fiscal Agent**. (Ex. C p.3, sequence 022, emphasis in original)

U.S. Bank's May 14, 2021 Notice concludes with the admonition (again, the bold type

for emphasis is by U.S. Bank):

> **The Fiscal Agent makes no recommendations regarding the PBA Title III Case or Third Amended Plan of Adjustment. Bondholders should not rely upon the Fiscal Agent as their sole source of information. The information described herein can change, and the Fiscal Agent does not undertake to monitor or provide notice to holders of any such changes or any other information that may arise in respect of the PBA Title III Case or any related matters. Bondholders should monitor the PBA Title III Case and related developments themselves.** (Ex. C p.4, sequence 023, emphasis on original)

3. **The fact U.S. Bank is focused on its role, its compensation and whether it will be released underscores that bondholders cannot rely upon Debtor PBA's "fiscal agent" U.S. Bank to protect their interests.**

A comparison of (i) the objection of U.S. Bank "as fiscal agent" (#16983) to Debtors' motion for an order approving the Disclosure Statement and proposed confirmation procedures, with (ii) the objections submitted by Peter Hein (#16387, #16908, #16909 and #16977) underscore why individual bondholders cannot rely upon U.S. Bank to protect their interests. U.S. Bank's objection – made "[s]olely in its capacity as Fiscal Agent for the PBA bonds" (#16983-page-4-of-17) – argued that the Disclosure Statement:

- "*fails to adequately address the role of the Fiscal Agent* in the process for providing notices, voting solicitations and distributions to PBA bondholders, and *the role of and compensation of the Fiscal Agent*, its agents and outside counsel both in terms of current fees and costs, and future fees and costs incurred in connection with implementing those matters, and documenting the termination of the PBA Bonds"; and

- "is inadequate *as to whether the Fiscal Agent is included in the scope of release* and exculpations provided by the Plan," as well as seeking "clarification" "regarding the overly broad release provisions the Plan." (#16983-page-4-to-5-of-17, emphasis added).

These objections evidence a focus by U.S. Bank on U.S. Bank's role, compensation and whether it will be released, rather than on U.S. Bank raising and addressing issues of concern to Retail Investors, such as those Hein has identified in his objections. Since U.S. Bank is Debtor PBA's agent — not bondholders' agent — perhaps U.S. Bank is acting consistent with the terms of its agency for Debtor PBA. (As noted, I have requested but have not yet received documents that bear on this question.)

However, even assuming U.S. Bank is acting as per the terms of its agency for Debtor PBA (i) U.S. Bank's role as Debtor PBA's agent, (ii) U.S. Bank's express disclaimer of any role

in advocating for bondholders, and (iii) the limited scope of objections to the disclosure statement and confirmation procedures submitted by U.S. Bank, all underscore why one cannot permit its proof of claim to negate the proof of claims filed by individual bondholders such as Hein and Farley.

### 4. The Hein and Farley claims were filed prior to U.S. Bank's claim.

Hein and Farley filed their claims weeks in advance of the deadline for claims set by the Court. By contrast, the PBA master proof of claim filed by U.S. Bank and U.S. Bank Trust, as fiscal agent of PBA (Claim 174834) was not filed until July 29, 2020, the very last day on which proofs of claims could be submitted (Case-19-05523-LTS-#88-page-2-of-4). Debtors are asking that earlier-filed claims of bondholders be disallowed as duplicative not just of a later-filed claim by Debtors' own agent, but a later filed claim that just made it in on the last possible day for filing claims.

On what theory can a bondholder's individual claim be disallowed based on a later-filed claim by the **Debtor's own agent**? U.S. Bank's claim may supplement Hein and Farley's claim, but FOMB cites no authority or other basis for claiming a later-filed claim submitted by Debtor's own agent supersedes and negates Hein and Farley's earlier filed claims.

### 5. Debtors' 352$^d$ Objection is silent as to what Debtors' position is as to the effect of any disallowance of Hein and Farley's claims pre-confirmation.

Debtors expressly label their objection as "substantive". Is it Debtors' position that disallowance of the Hein and Farley claims will limit their grounds for objection to confirmation based on what the U.S. Bank master proof of claim does (or does not) address? What if U.S. Bank modifies or withdraws its master proof of claim (perhaps ostensibly based on some "settlement" negotiated in a confidential process)? Debtors' objection is silent on all of these points. Debtors' failure to unequivocally foreswear any possible contention that disallowance pre-confirmation will impact on Hein and Farley's substantive rights is in itself reason to, at the very least, defer issuance of any order disallowing the Hein and Farley claims until after a confirmation order issues.

**D.    Debtors cannot disallow the Hein and Farley claims unless Debtors successfully prosecute to a decision and judgment an adversary proceeding against Hein and Farley.**

Hein and Farley assert that the PBA bonds are secured and that under the Puerto Rico Constitution they have a priority, *i.e.*, a "first claim" on available Commonwealth resources.  *See* Exhibits A, B and D (cover and pp. 13-19, sequence 024, 040-046).  Under the law discussed below, a claim asserting priority and/or secured status can only be challenged through an adversary proceeding, which Debtor PBA has not brought against Hein and Farley with respect to their PBA bonds, much less pressed to decision and judgment.[4]

Rule 3007 was amended in 2007 to "prohibit[] a party in interest from including in a claim objection a request for relief that requires an adversary proceeding."  *See* Committee Notes on Rule 3007—2007 Amendment; Rule 3007(b).  (A Debtor is a party in interest, *cf*. 11 U.S.C. 1109(b).)

The Hein and Farley claims assert they have valid, fully secured claims against Debtor and Commonwealth – including not only full principal, but also all accrued unpaid interest to the present date (including interest accruing following the filing of the Title III) – which are entitled to Constitutional priority under Puerto Rico's constitution and that their rights are protected under provisions of the U.S. Constitution and Puerto Rico Constitution, including those cited in their proofs of claim.  *See*, *e.g.*, Exhibit A pp.2,3,5-7, sequence 002, 003, 006-008; Exhibit B pp.2,3,5-7, sequence 012, 013, 015-017.

Even Debtor PBA's fiscal agent, U.S. Bank, makes admissions to this effect — admissions that should be binding on its principal.  For example, U.S. Bank acknowledges that "pursuant to" the terms of specified Puerto Rico statutes, as well as the bond documents, the

---

[4] PBA filed its Title III proceeding on or about September 27, 2019, *see* case 19-5523-LTS.  This was *after* adversary proceedings 19-292 and 19-293 were filed on May 2, 2019.  While adversary 19-292 and 19-293 challenge the validity, enforceability and extent of prepetition liens of Commonwealth general obligation and guaranteed bonds, they do ***not*** appear to challenge other security behind the PBA bonds.  Hein and Farley were named only in their capacities as GO bondholders, and the causes of action in the complaints in 19-292 and 19-293 seek relief only as to "GO Bondholders".  In any event, 19-292 and 19-293 have never been prosecuted to decision and judgment and instead have been stayed since March 2020.

PBA Bonds "are secured by a first priority, perfected, and continuing lien on, and payable from, a pledge of the rental payments of facilities financed or refinanced by the Bonds, owned by PBA, and leased by PBA to departments, agencies, instrumentalities and municipalities of the Commonwealth, among others."  Claim 174834, Rider page 4, ¶10.

Due process and Rule 7001(2) require an adversary proceeding against each bondholder in order to resolve claims where there is an issue as to "the validity, priority, *or* extent of a lien or other interest in property" (Rule 7001(2), emphasis added).  *See In re Mansaray-Ruffin*, 530 F.3d 230, 234-43 (3d Cir. 2008) (*citing* Rule 7001(2)); *In re Commercial Western Finance*, 761 F.2d 1329, 1336-38 (9th Cir. 1985).  (*United Student Aid Funds, Inc.* v. *Espinosa*, 559 U.S. 260 (2010) did not abrogate the requirement of an adversary proceeding.  That case addressed whether a Chapter 13 confirmation order could be set aside under Rule 60(b)(4) at the behest of a creditor who "received actual notice" of a plan, did not object and also did not appeal.  559 U.S. at 269-275.  *United Students* does not alter the rule set forth in *Mansaray* and *Commercial Western Finance* requiring an adversary proceeding in order to disallow or otherwise affect the Hein and Farley claims.)

Here, there is not only the Constitutional and statutory liens granted PBA bondholders such as Hein and Farley, but also the property interest that PBA and Commonwealth's obligations represent.  *See, e.g.*, *Armstrong* v. *United States*, 364 U.S. 40, 44-49 (1960) (lien); *Koontz* v. *St. Johns*, 570 U.S. 595, 613 (2013) (lien); *United States Trust* v. *New Jersey*, 431 U.S. 1, 19n.16, 24&n.22, 26n.25 (1977) ("contract rights" "are a form of property" for purposes of Taking Clause); *Lynch* v. *United States*, 292 U.S. 571, 579 (1934) (same).

Perhaps Debtors may argue that – if the Plan is confirmed in its correct form – confirmation will override both Hein and Farley's claim to priority and secured status and Hein and Farley's constitutional rights.  But that argument only becomes ripe if and when Debtors' proposed Plan is confirmed.

This is yet another reason that, if the Court does not simply deny the 352nd Objection, it should defer the 352d Objection until after confirmation.

-12-

### E.   The Hein and Farley claims assert constitutional and other claims not asserted by Debtor PBA's agent U.S. Bank.

The Hein and Farley claims are broader in scope than the U.S. Bank master proof of claim in a number of ways, including the following:

(1)   The Hein/Farley claims are clear that they seek not just unpaid pre-petition interest, but all interest (including that which "has, will, or should accrue, or has, will, or should be paid, under the terms of the bonds or otherwise", Ex. A. p.6, 007, Ex. B. p.6, 016) – interest to which Hein and Farley are entitled under, *inter alia*, 11 U.S.C. 506(b), as "fully" secured creditors, since the long-settled rule is "that liens pass through bankruptcy unaffected." *Dewsnup* v. *Timm*, 502 U.S. 410, 418-19 (1992); *Mansaray-Ruffin*, 530 F.3d at 235.

Will the claim filed by Debtor PBA's agent U.S. Bank be so read as well?  There is reason for concern, since Debtors appear to contend that there is an issue as to whether PBA bondholders are fully secured and entitled to all interest to date of payment (not just unpaid pre-petition interest), as Debtors have not provided for payment of all interest on the PBA bonds to date of payment  (even post-petition) in their proposed Plan.  Notably:

- The Hein/Farley claims expressly assert that their claims are "fully secured" (Ex. A p.7, 008; Ex. B p.7, 017).  By contrast, while the U.S. Bank claim does assert that the Bonds "are secured by a first priority, perfected, and continuing lien on, and payable from, a pledge of the rental payments" (Claim 174834 Rider p.4 ¶10), the U.S. Bank claim does not appear to expressly assert the Bonds are "fully" secured.

- The Hein/Farley claims are express that they claim not only "all unpaid interest" but also "all additional interest that has, will, or should accrue, or has, will, or should be paid, under the terms of the bonds or otherwise".  (Ex. A p.6, 007; Ex. B p.6, 016) By contrast, the U.S. Bank claim asserts a claim for "interest due" and "all other accrued and unpaid interest … and other contingent unliquidated amounts" (Claim 174834 p.3 Item 8) and "contingent, unliquidated amounts for interest payable in the future, interest accrued and accruing in the future as to past due principal and interest,

fees and costs and indemnity claims of the Fiscal Agents" (Claim 174834 Rider p.9
¶17).  It is not clear what the characterization of certain interest as "contingent" and
"unliquidated" is intended to mean, and whether that characterization limits
entitlement of fully secured creditors to all unpaid interest, whether pre-petition, post-
petition or otherwise, but this qualifier does not appear in the Hein/Farley claim and
there is no such self-imposed limit on the scope of the Hein/Farley claim.

Perhaps the U.S. Bank claim is as broad as the Hein/Farley claim – but Hein and Farley
should not be left – particularly not pre-confirmation – to have to rely only on the U.S. Bank
claim since Hein and Farley submitted their own claim.

(2)        PROMESA, in 48 U.S.C. § 2195(a), expressly provides that "[w]hile an Oversight
Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto
Rico is transferred in violation of applicable law under which any creditor has a valid pledge of,
security interest in, or lien on such property, or which deprives any such territorial
instrumentality of property in violation of applicable law assuring the transfer of such property to
such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable
for the value of such property."

The Hein/Farley Claim, by its terms, consistent with their rights under § 2195(a) and
other law, is expressly asserted "against not only debtor but also Commonwealth and any and all
entities, agencies or departments with responsibility for, or liability on, the claim or who have
assets or monies that should be used to pay the claim or to whom any such assets or monies have
been transferred; and any and all persons and entities who have received or hold or direct or
control funds that should have been used to repay the money provided to the issuer by
Claimant".  (Ex. A p.6-7, 007-008; Ex. B p.6-7, 016-017)  By contrast, the only reference to
"transfer" in the U.S. Bank claim is in a section under the header "Unliquidated and Contingent
Claims" (Claim 174834 Rider pp.10-12, at ¶24).  Perhaps the U.S. Bank claim is as broad as the
Hein/Farley claim – but again, Hein and Farley should not be left – particularly not pre-
confirmation – to have to rely only on the U.S. Bank claim when they submitted their own claim.

-14-

(3)      The Hein / Farley claims are express that their Constitutional claims include, without limitation, claims under the Takings, Due Process, Ex Post Facto, Contracts, Bankruptcy, Equal Protection and Privileges and Immunities clauses of the United States Constitution, and Article II Sections 7, 9 and 12, and Article VI Sections 2, 6 and 8 of the Puerto Rico Constitution.  (Ex. A p.6, 007; Ex. B p.6, 016)  By contrast, the U.S. Bank master proof of claim only refers to claims "arising under U.S. Const. art I, §10, cl. 1 [which includes the Ex Post Facto clause and Contracts clause] and under the Fifth Amendment of the United States Constitution" (Claim 174834 Rider p.9 ¶17) and the Puerto Rico Constitution pledge of "full faith, credit and taxing power to draw from any funds available in the Treasury" to pay principal and interest on the PBA bonds (Claim 174834 Rider p.5 ¶11).

U.S. Bank's master proof of claim does not appear to reference the Due Process, Bankruptcy, Equal Protection and Privileges and Immunities clauses of the U.S. Constitution, or pertinent provisions of the Puerto Rico Constitution, including:

- Article II Section 7 (includes due process, equal protection and non-impairment of contracts),

- Section 9 (no taking except upon payment of just compensation and in the manner provided by law),

- Section 12 (No ex post facto law shall be passed),

- Article VI Section 2 (last clause of which reads "The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof"; notes indicate that this provision is "As amended by the voters at a referendum held Dec. 10, 1961"),

- Section 6 (provides that "If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the Government and for the payment of interest on and amortization of the public debt for the ensuing fiscal year shall not

have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and the Governor shall authorize the payments necessary for such purposes until corresponding appropriations are made"); and

- In addition to Sections 2 and 6, Section 8 provides that "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law".

The foregoing provisions of the Puerto Rico Constitution underscore the Constitutional force of Puerto Rico's pledge of its full faith credit and taxing power supporting its GO and GO guaranteed bonds. These provisions are pertinent to, *inter alia*, whether at confirmation Debtors can show that "the plan is feasible and in the best interests of creditors", which PROMESA directs "shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan". 48 U.S.C. §2174(b)(6).

Hein has also asserted both procedural and substantive objections in these Title III proceedings that may or may not be viewed as encompassed within U.S. Bank's master proof of claim (to our knowledge, U.S. Bank has not previously gone on record with such objections). *See*, *e.g.*, #16387-page-20-of-21. Certainly pre-confirmation Hein and Farley should not have their rights constrained by the claim submitted by Debtor PBA's agent.

### F.   The rulings on Hein's COFINA claim occurred in the very different context of post-confirmation proceedings.

The rulings on Hein's COFINA claim occurred in the very different context of post-confirmation proceedings and do not support the disallowance of the Hein and Farley claims, at least at this stage, prior to any confirmation order being entered.

*First*, because Hein's COFINA claim was adjudicated post-confirmation, debtor could argue that the confirmation order overrode the secured property interest asserted in the COFINA claim.  While Hein disputes that a confirmation order can lawfully under the U.S. Constitution and laws override a secured property interest, even post-confirmation as in the COFINA case, there is no plausible argument that – pre-confirmation in this case – debtors can override or invalidate the Constitutional priority under the Puerto Rico Constitution and other property interests asserted in the Hein and Farley claims in this case.

*Second*, the Bank of New York Mellon COFINA claim that Hein's claim assertedly duplicated was a claim submitted by Bank of New York Mellon acting "in its capacity as trustee" (claim 31920).  That is fundamentally different from the current situation where the claim that purportedly justifies disallowance of the Hein and Farley claims is a subsequent claim filed by Debtor PBA's own agent.

Bankruptcy Rule 3003(c) does provide for the possibility of an ***indenture trustee*** filing a claim "on behalf of all known or unknown holders of securities issued pursuant to the trust instrument under which it is trustee."  See Rule 3003(c)(1),(5).  Rule 3003(c) does ***not*** include a similar authorization for the ***agent of a debtor*** to file a proof of claim on behalf of creditors.

Bankruptcy Rule 3001(b) permits a proof of claim to be executed by "the creditor's authorized agent" (with certain exceptions).  But, as noted above, U.S. Bank expressly states that it "is solely the agent of PBA" (Hein Decl. Ex. C p.1 (sequence 020)), so U.S. Bank does not even claim to be the authorized agent of any creditor.  And Debtors submit nothing in #17093 to show that U.S. Bank is the "authorized agent" of bondholders Hein and Farley.

Bankruptcy Rule 3004 provides that "[i]f a creditor does not timely file a proof of claim under Rule 3002(c) or 3003(c), the debtor or trustee may file a proof of the claim within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c) or 3003(c), whichever is applicable."  But here Hein and Farley indisputably filed timely proofs of claim – indeed, filed before Debtor PBA's agent filed a master proof of claim.  So Rule 3004 would not apply to the extent of a claim encompassed within the Hein/Farley claims.

-17-

There may be practical reasons for this Court authorizing "fiscal agents, or any similar agent or nominee" to file a master proof of claim, in addition to "indenture trustees".  (#12260-page-3-to-4-of-12.)  But disallowing the Hein and Farley claims would be to force bondholders who did timely file proofs of claim to rely on some unidentified (by FOMB) legal authority for Debtor PBA's agent to file a claim on their behalf that is not apparent from a reading of Rule 3003(c) and not cited by FOMB in its 352$^{\text{d}}$ Objection.

Parenthetically, this Court simply provided that "fiscal agents" (as well as indenture trustees) were "permitted and authorized" to file master proofs of claim; they were "not required" to do so.  (#12260-page-3-of-12)  Bondholders would be excused from filing their own proof of claim only "to the extent" that "the relevant Bond Representative files a Bond Debt Master Proof of Claim against PBA" and only if they were content with the "limit[]" specified in the PBA Bar Date order.  (#12260-page-5-to-6-of-12).  The Bar Date order also specifically contemplates that – in addition to any master proof of claim that may be filed – a bondholder must assert any claim that is not limited to repayment of principal, interest and other fees and expenses.  (#12260-page-5-to-6-of-12).  Even apart from not wishing to be thus "limited," it is simply not reasonable to expect a bondholder to wait until the last day for filing claims to see whether Debtor PBA's agent filed a claim on behalf of the bondholder and whether it sufficed to protect the bondholder – if a bondholder waited, they would not know whether U.S. Bank put in a timely and comprehensive claim until the deadline has passed.

*Third*, even assuming that there is (not-yet-cited by FOMB) legal authority for Debtors' agent to file a claim on bondholders' behalf, Debtors' position that Debtor PBA's agent can file a proof of claim on the last possible day for doing so that then negates a previously filed bondholder claim is not supported by any authority cited in Debtors' 352$^{\text{d}}$ Objection.  We object to Debtors holding back any authority for what they are doing to await Debtors' reply papers, and reserve the right to file a sur-reply to any authority Debtors may belatedly submit.  It is notable in this regard, however, that Rule 3004 only authorizes the debtor or trustee to file a proof of claim after the expiration of the time for filing claims.  Nothing in Rule 3004 ("Filing of

Claims by Debtor or Trustee") suggests a claim filed by a debtor's agent can override and negate a previously timely-filed claim by a bondholder.

*Fourth*, because the objection to the Hein COFINA claim was litigated post-confirmation of the COFINA plan, a fundamental threshold issue presented here as to Debtors' failure to make any showing of any actual risk of duplicate payment – given that the PBA bonds are registered and distributions, if a plan is confirmed, will be made pursuant to DTC procedures – was not present in the COFINA situation but is a fundamental threshold issue here (as discussed above in Point II.B).

## CONCLUSION

Debtors' 352$^d$ Objection to the Hein and Farley claims should be denied.  Alternatively, if Debtors' 352$^d$ Objection to the Hein and Farley claims is not outright denied, any ruling on Debtors 352$^d$ Objection should at least be deferred until after a confirmation order issues.  In the further alternative, were the Court to be inclined to rule prior to a confirmation order being entered, at the very least any order addressing the 352$^d$ Objection should:

- Be contingent upon, and not effective until, after a confirmation order is entered (if one is entered).

- Be express that any disallowance has no impact whatsoever on Hein and Farley's rights, and that Hein and Farley remain free to assert any and all objections they may have at the confirmation stage, whether or not asserted by U.S. Bank in the master proof of claim and whether or not U.S. Bank modifies or withdraws the master proof or claim.

July 14, 2021

Respectfully Submitted,

/s/ Peter C. Hein
Peter C. Hein
101 Central Park West, Apt. 14E
New York, NY  10023
917-539-8487
petercheinsr@gmail.com
Claim 174229
PBA Bonds:  200,000 par amount, plus
unpaid interest to date
[CUSIP:  745235M24]


/s/ Anne Farley
Anne Farley
101 Central Park West, Apt. 14E
New York, NY  10023
anne.farley@gmail.com
917-539-8487 (for phone calls)
Claim 174231
PBA Bonds:  100,000 par amount, plus
unpaid interest to date
[CUSIP:  745235P62]

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

         Debtors.

-------------------------------------------------------------------x

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)

**DECLARATION OF PETER C. HEIN ACCOMPANYING RESPONSE TO THREE
HUNDRED FIFTY-SECOND OMNIBUS OBJECTION**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1.      This declaration attaches certain documents, or excerpts therefrom, referred to in the accompanying "Response to Three Hundred Fifty-Second Omnibus Objection to the Claims of Peter C. Hein and Anne Farley."  In some cases, excerpts are submitted to permit the Court to focus on the specific pages pertinent to the points the exhibit supports without overburdening the Court with lengthy documents.  When I submit pertinent excerpts, I refer to the location in the record in this Title III matter or a public website where the full document can be found or I will provide a complete copy if requested by the Court.  The factual statements in the accompanying "Response to Three Hundred Fifty-Second Omnibus Objection" are true and correct to the best of my knowledge and belief.

1.      Attached as Exhibit A (sequence 001-010) are excerpts from proof of claim dated July 9, 2020 and filed July 13, 2020 by Peter C. Hein (claim no. 174229).

2.        Attached as Exhibit B (sequence 011-019) are excerpts from proof of claim dated July 9, 2020 and filed July 13, 2020 by Anne Farley (claim no. 174231).

3.        Attached as Exhibit C (sequence 020-023) are excerpts from U.S. Bank notice to holders of Puerto Rico Public Building Authority bonds, dated May 14, 2021.  This Notice was posted on EMMA but was not mailed or emailed to individual bondholders, to the best of my knowledge.

4.        Attached as Exhibit D (sequence 024-068) are excerpts from the official statement for Puerto Rico Public Building Authority bonds, series Q, dated October 16, 2009.

5.        Attached as Exhibit E (sequence 071-074) is an email dated July 29, 2020 from Prime Clerk to Peter C. Hein, and the email chain preceding that response.

6.        Attached as Exhibit F (sequence 075-155) is DTC's "Asset Services – Reorganization Services Guide."  https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Reorganizations.pdf.  This DTC "Asset Services-Reorganization Services Guide" can also be located by going to "DTCC.com", click on "products & services"; then "settlement & asset services", then scroll down to and click on "corporate actions processing", then scroll down to and click on "Reorg" or "reorganizations";  then scroll down (on the right) under "training and documentation" to "Reorganizations Service Guide".

7.        Attached as Exhibit G (sequence 156-158) are pertinent portions of my July 1, 2021, 6:24 p.m. email to U.S. Bank and July 1, 2021 letter to U.S. Bank requesting copies of the PBA bond resolutions referenced in the U.S. Bank notice to holders.

Dated:  July 14, 2021

_____/s/ Peter C. Hein_____
                              Peter C. Hein

## **Certificate of Service**

I, Peter C. Hein, certify that I have caused the foregoing "Response To Three Hundred

Fifty-Second Omnibus Objection to the claim of Peter C. Hein and Anne Farley" to be served via

the Court's CM/ECF system.

Dated:  July 14, 2021

                                                    /s/ Peter C. Hein
                                                    Peter C. Hein

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO / TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL
DISTRITO DE PUERTO RICO

RECEIVED

JUL 13 2020

PRIME CLERK LLC

**Fill in this information to identify the case. /
Llene esta información para identificar el caso.**

| Puerto Rico Public Building Authority
El Autoridad de Edificios Públicos de Puerto Rico | Case No. 19-bk-05523 | Petition Date:
Sept 27, 2019 |

The Puerto Rico Public Building Authority has listed your claim in their Creditor List in Schedule [CreditorList] as a [CUD] claim in an
$[ScheduleAmount] amount.  You must timely file a proof of claim or be forever barred from participating or sharing in any distribution or being
treated as a claim for purposes of voting or distribution.

El Autoridad de Edificios Públicos de Puerto Rico ha listado su reclamación en la lista de acreedores en el Schedule [CreditorList] como un reclamo
[CUD] por un monto de $ [ScheduleAmount]. Debe presentar una prueba de reclamación oportunamente o se le prohibirá por siempre participar o
compartir en cualquier distribución o ser tratado como un reclamo para fines de votación o distribución.

## Modified Official Form 410 / Formulario Oficial 410 Modificado

# Proof of Claim / Evidencia de reclamación

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a Title III case. Do not use this form to make a
request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make
such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy or subject to confidentiality on this form or on any attached documents. Attach redacted
copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts,
judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not
available, explain in an attachment.

**Lea las instrucciones antes de completar este formulario. Este formulario está diseñado para realizar una reclamación de pago en un caso en
virtud del Título III. No utilice este formulario para solicitar el pago de un gasto administrativo que no sea una reclamación que reúna los
requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b) (9) del U.S.C. Ese tipo de solicitud debe realizarse de
conformidad con el Título 11 § 503 del U.S.C.**

Quienes presenten la documentación deben omitir o editar información que reúna los requisitos para ser tratada con privacidad o confidencialidad en
este formulario o en cualquier otro documento adjunto. Adjunte copias editadas de cualquier otro documento que respalde la reclamación, tales como
pagarés, órdenes de compra, facturas, balances detallados de cuentas en funcionamiento, contratos, resoluciones judiciales, hipotecas y acuerdos de
garantías. **No adjunte documentos originales,** ya que es posible que los documentos adjuntos se destruyan luego de analizarlos. En caso de que los
documentos no estén disponibles, explique los motivos en un anexo.

**Fill in all the information about the claim as of the Petition Date.**

**Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.**

| **Part 1 / Parte 1** | **Identify the Claim / Identificar la reclamación** | [ ✓ ] Date Stamped Copy Returned |
| | | [ ] No Self-Addressed Stamped Envelope |
| | | [ ✓ ] No Copy Provided |

| 1. Who is the current
creditor?

¿Quién es el
acreedor actual? | Peter C. Hein |
| | Name of the current creditor (the person or entity to be paid for this claim)
Nombre al acreedor actual (la persona o la entidad a la que se le pagará la reclamación) |
| | Other names the creditor used with the debtor
Otros nombres que el acreedor usó con el deudor _____ |

| 2. Has this claim been
acquired from
someone else?

¿Esta reclamación
se ha adquirido de
otra persona? | ☒ No / No
☐ Yes. From whom?
     Sí. ¿De quién? _____ | 170328380099659 |

| 3. Where should notices
and payments to the
creditor be sent?

Federal Rule of
Bankruptcy Procedure
(FRBP) 2002(g)

¿A dónde deberían | Where should notices to the creditor be sent?
¿A dónde deberían enviarse las notificaciones al
acreedor?

Peter C. Hein
Name / Nombre

101 Central Park West 14E | Where should payments to the creditor be sent?
(if different)
¿A dónde deberían enviarse los pagos al
acreedor? (En caso de que sea diferente)

Name / Nombre |

Modified Official Form 410

**Proof of Claim**

page 1

| | Number / Número | Street / Calle | | | Number / Número | Street / Calle | |
|---|---|---|---|---|---|---|---|
| enviarse las notificaciones al acreedor? | | New York, New York 10023 | | | | | |
| Norma federal del procedimiento de quiebra (FRBP, por sus siglas en inglés) 2002(g | City / Ciudad | State / Estado | ZIP Code / Código postal | City / Ciudad | State / Estado | | ZIP Code / Código postal |
| | 212 403 1237 or 917 539 8487 | | | | | | |
| | Contact phone / Teléfono de contacto | | | Contact phone / Teléfono de contacto | | | |
| | petercheinsr@gmail.com | | | anne.farley@gmail.com | | | |
| | Contact email / Correo electrónico de contacto | | | Contact email / Correo electrónico de contacto | | | |

**4. Does this claim amend one already filed?**

☒ No / No
☐ Yes.  Claim number on court claims registry (if known)

**¿Esta reclamación es una enmienda de otra presentada anteriormente?**

Sí.  Número de reclamación en el registro de reclamaciones judiciales (en caso de saberlo)_____

Filed on / Presentada el _____ (MM /DD/YYYY) / (DD/MM/AAAA)
                                                                    /

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No / No
☐ Yes. Who made the earlier filing?

**¿Sabe si alguien más presentó una evidencia de reclamación para esta reclamación?**

Sí.  ¿Quién hizo la reclamación anterior?_____

See attachment

---

**Give Information About the Claim as of the Petition Date**

**Complete toda la información acerca de la reclamación desde la fecha en la que se presentó el caso.**

**6. Do you supply goods and / or services to the government?**

☐ No / No
☐ Yes. Provide the additional information set forth below / Sí. Proporcionar la información adicional establecida a continuación:

**¿Proporciona bienes y / o servicios al gobierno?**

Vendor / Contract Number | Número de proveedor / contrato: _____

List any amounts due after the Petition Date (listed above):
Anote la cantidad que se le debe después de la fecha que se presentó el caso (mencionados anteriormente),
$ _____

See attachment

**7. How much is the claim?**

$  244,000  . Does this amount include interest or other charges?
¿Este importe incluye intereses u otros cargos?

**¿Cuál es el importe de la reclamación?**

☐ No / No
☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).
Sí. Adjunte un balance con intereses detallados, honorarios, gastos u otros cargos exigidos por la Norma de Quiebras 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

**¿Cuál es el fundamento de la reclamación?**

Por ejemplo: Venta de bienes, préstamo de dinero, arrendamiento, prestación de servicios, lesiones personales u homicidio culposo, o tarjetas de crédito. Adjunte copias editadas de cualquier documento que respalde la reclamación conforme a lo exigido por la Norma de Quiebras 3001(c). Limite la divulgación de información que reúne los requisitos para ser tratada con privacidad, tal como información sobre atención médica.

See attachment, including item 8 of attachment.

---

| | |
|---|---|
| **9. Is all or part of the claim secured?**<br><br>¿La reclamación está garantizada de manera total o parcial? | ☐ No / No<br>☒ Yes. The claim is secured by a lien on property.<br>Sí. La reclamación está garantizada por un derecho de retención sobre un bien.<br><br>**Nature of property / Naturaleza del bien:**<br>☐ Motor vehicle / Vehículos<br><br>☐ Other. Describe:<br>Otro. Describir: <span style="font-size:small">See attachment, including items 8 and 9 of the attachment and the documents referenced therein.</span><br><br>**Basis for perfection / Fundamento de la realización de pasos adicionales:** _____<br>_____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br>Adjunte copias editadas de documentos, si los hubiere, que demuestre la realización de pasos adicionales para hacer valer un derecho de garantía (por ejemplo, una hipoteca, un derecho de retención, un certificado de propiedad, una declaración de financiamiento u otro documento que demuestre que se ha presentado o registrado un derecho de retención.)<br><br>**Value of property / Valor del bien:**     $_____<br><br>**Amount of the claim that is secured /**<br>**Importe de la reclamación que está garantizado:** $_____<br><br>**Amount of the claim that is unsecured /**<br>**Importe de la reclamación que no está garantizado:** $_____<br>(The sum of the secured and unsecured amounts should match the amount in line 7.)<br>(La suma del importe garantizado y no garantizado debe coincidir con el importe de la línea 7.)<br><br>**Amount necessary to cure any default as of the Petition Date /**<br>**Importe necesario para compensar toda cesación de pago a la fecha que se presentó el caso :** $_____<br>_____<br><br>**Annual Interest Rate** (on the Petition Date)<br>**Tasa de interés anual** (cuando se presentó el caso)_____%<br>☐ Fixed / Fija<br>☐ Variable / Variable |
| **10. Is this claim based on a lease?**<br><br>¿Esta reclamación está basada en un arrendamiento? | ☐ No / No<br>☐ Yes. Amount necessary to cure any default as of the Petition Date.<br>Sí. Importe necesario para compensar toda cesación de pago a partir de la que se presentó el caso $ _____<br><span style="font-size:small">See attachment, including items 8, 9 and 10 of the attachment</span> |
| **11. Is this claim subject to a right of setoff?**<br><br>¿La reclamación está sujeta a un derecho de compensación? | ☒ No / No<br>☐ Yes. Identify the property /<br>Sí. Identifique el bien: _____ |
| **12. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**<br><br>¿La reclamación, total o parcial, cumple los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b)(9) del U.S.C.? | ☐ No / No<br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the Petition Date in these Title III case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.    $_____<br><br>Sí. Indique el importe de la reclamación que surge del valor de cualquier bien recibido por el deudor dentro de los 20 días anteriores a la fecha de inicio en estos casos del Título III, en el que los bienes se han vendido al deudor en el transcurso normal de los negocios del deudor. Adjunte la documentación que respalda dicha reclamación.    See attachment, including items 8, 9 and 10 |

003

| Part 3 / Parte 3: | Sign Below / Firmar a continuación |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**La persona que complete esta evidencia de reclamación debe firmar e indicar la fecha. FRBP 9011(b).**

Si presenta esta reclamación de manera electrónica, la FRBP 5005(a)(2) autoriza al tribunal a establecer normas locales para especificar qué se considera una firma.

Check the appropriate box / Marque la casilla correspondiente:

☒ I am the creditor. / Soy el acreedor.

☐ I am the creditor's attorney or authorized agent. / Soy el abogado o agente autorizado del acreedor.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. / Soy el síndico, el deudor o su agente autorizado. Norma de quiebra 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. / Soy el garante, fiador, endosante u otro codeudor. Norma de quiebra 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

Comprendo que una firma autorizada en esta *Evidencia de reclamación* se considera como un reconocimiento de que al calcular el importe de la reclamación, el acreedor le proporcionó al deudor crédito para todo pago recibido para saldar la deuda

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

He leído la información en esta *Evidencia de reclamación* y tengo motivos razonables para suponer que la información es verdadera y correcta.

I declare under penalty of perjury that the foregoing is true and correct. / Declaro bajo pena de perjurio que lo que antecede es verdadero y correcto.

Executed on date / Ejecutado el ____July 9, 2020____ (MM/DD/YYYY) / (DD/MM/AAAA)

Signature / Firma _____

**Print the name of the person who is completing and signing this claim / Escriba en letra de imprenta el nombre de la persona que completa y firma esta reclamación:**

Name _____Peter C. Hein_____

First name / Primer nombre       Middle name / Segundo nombre       Last name / Apellido

Title / Cargo _____

Company / Compañía _____

Identify the corporate servicer as the company if the authorized agent is a servicer.
Identifique al recaudador corporativo como la compañía si el agente autorizado es un recaudador.

Address / Dirección ___101 Central Park West 14E___

Number / Número       Street / Calle

___New York, New York 10023___

City / Ciudad       State / Estado       ZIP Code / Código postal

Contact phone / Teléfono de contacto___212-403-1237 or 917-539-8487___ Email / Correo electrónico___petercheinsr@gmail.com; anne.farley@gmail.com___

004

Peter C. Hein
101 Central Park West, Apt 14E
New York, NY 10023

petercheinsr@gmail.com
anne.farley@gmail.com
(212) 403-1237

July 9, 2020

Commonwealth of Puerto Rico
Claims Processing Center
c/o Prime Clerk, LLC
Grand Central Station, PO Box 4708
New York, NY 10163-4708

### Re:  **Request for Confirmation That Proofs of Claims Have Been Filed**

TO WHOM IT MAY CONCERN:

Two PBA claims, one for Peter Hein and one for Anne Farley, are enclosed.

I am requesting a confirmation of filing of these claims.

As per the instructions under "Confirmation that the claim has been filed", please email us at petercheinsr@gmail.com and anne.farley@gmail.com.

I can be reached at 917 539 8487 if there are questions.  Thank you for your assistance.

Sincerely

Peter C. Hein

Peter C. Hein

3796200v2

005

7/9/2020

## Attachment to Proof of Claims of Peter C. Hein and Anne Farley

**Debtor:**

Puerto Rico Public Buildings Authority     Case No. 19-bk-05523     Petition Date: Sept. 27, 2019

This attachment supplies additional or more specific information in response to the items on the proof of claim forms to which this attachment is attached.

1.  Creditors:  Peter C. Hein and Anne Farley, who are married (hereinafter "Creditor").

2.  This claim has not been acquired from someone else.

3.  Notices and payments to the creditor should be sent to:

> Peter C. Hein and Anne Farley
> (as specified on the proof of claim form)
> 101 Central Park West, Apt. 14E
> New York, NY 10023
>
> Contact phone:  (212) 403-1237 or 917 539 8487
> Contact email:  petercheinsr@gmail.com
> Second contact email: anne.farley@gmail.com

4.  This claim does not amend one already filed.

5.  Creditor does not know if anyone else has filed a proof of claim for this claim. Both Peter C. Hein and Anne Farley have previously filed proofs of claim against the Commonwealth.

6.  See item 8 below as well as the offering statements for the bonds and the Constitutional and statutory provisions referred to therein.

7.  The current amount of this claim is specified in the response to Item 7 on the proof of claim form to which this attachment is attached, which includes the principal amount of the bonds as reflected on the attached confirmation and the unpaid interest due through July 1, 2020.

Claim is made for all unpaid interest and also for any other fees, expenses or charges for which Creditor is entitled to recover.  In addition to debtor, the claim is asserted against the Commonwealth, and all other entities, agencies or departments with responsibility for, or liability on, the claim or who have assets or monies that should be used to pay the claim or to whom any such assets or

(5)

006

monies have been transferred; and any and all persons and entities who have re-
ceived or hold or direct or control funds that should have been used to repay the
money provided to the issuer by Claimant.

Creditor purchased bonds at or about the original offering price.

In addition claim is made for all additional interest that has, will, or should ac-
crue, or has, will, or should be paid, under the terms of the bonds or otherwise.

8.   Basis of the claim:  Creditor purchased the bonds at or about the original offer-
ing price, which was at par or close to par.  Attached as Exhibit A are copies of
purchase confirmation(s), including the name of the original purchaser and cur-
rent beneficial holder (some brokerage confirmations were issued on a "house-
hold" mailing basis:  Peter C. Hein and Anne Farley are married, and some
"household" mailings may come addressed to Anne Farley even if Peter C. Hein
is the actual purchaser; for confidentiality reasons, in accordance with the in-
structions, account numbers are redacted and thus the name of the purchaser and
beneficial holder is specified instead of account numbers).

The bonds were rated as investment grade investments at the time of issuance
(and of the purchases) by the major rating agencies to rate them.  One premise
of the bond purchases – like other purchases of municipal bonds – is that the is-
suer will comply with contractual, legal and Constitutional obligations in effect
at the time the issuer sells the bonds and accepts the purchaser's money, and
that the administrative, legislative, executive and judicial authorities will adhere
to, and enforce, the rule of law and the United States Constitution.  Claimant as-
serts and reserves all rights and claims, including all rights and claims under ap-
plicable law, including but not limited to the United States Constitution and the
Puerto Rico Constitution, relating to the failure of the issuer, as well as Puerto
Rican and United States administrative, legislative, executive and judicial au-
thorities, to adhere to, and to enforce, the rule of law, including but not limited
to all rights and claims to the return of monies paid by Claimant.  Constitutional
claims include, without limitation, claims under the Takings, Due Process, Ex
Post Facto, Contracts, Bankruptcy, Equal Protection and Privileges and Immun-
ities clauses of the United States Constitution, and Article II Sections 7, 9 and
12, and Article VI Sections 2, 6 and 8 of the Puerto Rico Constitution.  Statu-
tory claims include, without limitation, claims under the statutes referenced in
the offering statements for the bonds.

Claimant also asserts and reserves all rights and claims asserted in these pro-
ceedings by other holders of the type of bonds purchased and held by Claimant.
Claimant asserts and reserves the right to amend or supplement this claim.  This
claim is asserted against not only debtor but also Commonwealth and any and
all entities, agencies or departments with responsibility for, or liability on, the
claim or who have assets or monies that should be used to pay the claim or to
whom any such assets or monies have been transferred; and any and all persons



and entities who have received or hold or direct or control funds that should
have been used to repay the money provided to the issuer by Claimant.

9.   Claimant believes the claim is fully secured.  Reference is made to information
and descriptions of security for the bonds provided in the offering statements for
the bonds, the Constitutional and statutory provisions referenced in the offering
statements, the bond indentures (or similar documents), statements of the issuer
and other Commonwealth agencies and departments (including the GDB), other
documentation and materials, including documentation and materials referenced
in the offering statements or bond indentures (or similar documents) or in other
statements of the issuer and of Commonwealth or other Commonwealth agen-
cies and departments, and applicable Constitutional and statutory provisions.

10.   See response to item 8 and 9 above, as well as the offering statements for the
bonds and the Constitutional and statutory provisions referred to therein.

11.   Claim is not subject to a right of set-off.



P.O. Box 2044
Lakewood, NJ 08701



**Merrill Lynch**
**Office Serving Your Account**
1251 AVE OF THE AMERICAS
24 TH FL NY NY 10020
(212) 382-8500

**TOTAL MERRILL**

****AUTO**3-DIGIT 100



101 CENTRAL PARK WEST #14E
NEW YORK NY 10023-4250

PETER C HEIN
101 CENTRAL PARK W # 14E
NEW YORK NY 10023

Account Number:



# TRADE CONFIRMATION

Date: October 23, 2009

*We confirm the following transaction(s) subject to the agreement below.*

**BOUGHT**   *PUERTO RICO PUB BLDGS AUTH REV GTD GOVT FACS   OID RF SER Q ISSUED*
*10/28/2009 5.5 PCT 7/01/2037*

| Quantity | 200000 | Price | 97.904000 | Amount | | 195808.00 | Trade Date | 10/23/09 |
|---|---|---|---|---|---|---|---|---|
| Processing Fee | | | | | | | Settle Date | 10/28/09 |
| Transaction Fee | | | | | | | ML Symbol | |
| Accrued Interest/Dividends | | | | | | | Security # | N66A9 |
| | | | | | | | Cusip # | 745235M24 |
| **NET AMOUNT** | | | | | | **195808.00** | FA # | 7982 |

YIELD 5.65% @ $97.90 7/01/37 CALLABLE-MAY AFFECT YIELD   DETAILS UPON REQUEST
OFFICIAL STATEMENT TO FOLLOW   NEXT CALL 07/01/14 @ 100.00   ORIGINAL ISSUE
DISCOUNT-INITIAL OFFERING PRICE 97.9044   INTEREST FROM 10/28/09 FIRST COUPON
01/01/10   AS OF 10/16 UNSOLICITED ORDER   WHEN ISSUED SETTLE BOOK ENTRY ONLY

ML ACTED AS PRINCIPAL

Payment for securities or other investment purchased, and delivery of securities or other investments instruments sold, are due on
SETTLEMENT DATE unless otherwise indicated by a DATE DUE. Delivery on or before settlement date will avoid premium charges.
Please preserve this confirmation for income tax purposes. If submitting payment or correspondence, please write your account
number, shown on the bottom of this page, and forward to "Merrill Lynch Office Serving your Account", shown on top right of page
1. If you have moved or plan to move, notify your Financial Advisor of your new address.

Account Number:
903643

Date: 10/23/2009

Page 1 of 2

Puerto Rican Bond Interest Not Received

| ISSUER | DUE DATE | FACE AMT | INT RATE | BROKER | ANN INTEREST | Semi An Int | | Jan | Jul | Default to date |
|---|---|---|---|---|---|---|---|---|---|---|
| Puerto Rico Pub Bldgs Auth Rev Gtd Govt Facs OID RF Ser Q Issued 10/28/2009 5.5 Pct | 7/1/2037 | $ 200,000 | 5.500% | ML | $ 11,000.00 | $ 5,500.00 | 2017 | $ 5,500.00 | $ 5,500.00 | $ 11,000.00 |
| | | | | | | | 2018 | $ 5,500.00 | $ 5,500.00 | $ 22,000.00 |
| | | | | | | | 2019 | $ 5,500.00 | $ 5,500.00 | $ 33,000.00 |
| | | | | | | | 2020 | $ 5,500.00 | $ 5,500.00 | $ 44,000.00 |

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO / TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL
DISTRITO DE PUERTO RICO

RECEIVED

**Fill in this information to identify the case. /**
**Llene esta información para identificar el caso.**

JUL 13 2020

PRIME CLERK LLC

| | Puerto Rico Public Building Authority<br>El Autoridad de Edificios Públicos de Puerto Rico | Case No. 19-bk-05523 | Petition Date:<br>Sept 27, 2019 |

The Puerto Rico Public Building Authority has listed your claim in your Creditor List in Schedule [CreditorList] as a [CUD] claim in an $[ScheduleAmount] amount.  You must timely file a proof of claim or be forever barred from participating or sharing in any distribution or being treated as a claim for purposes of voting or distribution.

El Autoridad de Edificios Públicos de Puerto Rico ha listado su reclamación en la lista de acreedores en el Schedule [CreditorList] como un reclamo [CUD] por un monto de $ [ScheduleAmount]. Debe presentar una prueba de reclamación oportunamente o se le prohíbra por siempre participar o compartir en cualquier distribución o ser tratado como un reclamo para fines de votación o distribución.

## Modified Official Form 410 / Formulario Oficial 410 Modificado

# Proof of Claim / Evidencia de reclamación

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a Title III case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy or subject to confidentiality on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

Lea las instrucciones antes de completar este formulario. Este formulario está diseñado para realizar una reclamación de pago en un caso en virtud del Título III. No utilice este formulario para solicitar el pago de un gasto administrativo que no sea una reclamación que reúna los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b) (9) del U.S.C. Ese tipo de solicitud debe realizarse de conformidad con el Título 11 § 503 del U.S.C.

Quienes presenten la documentación deben omitir o editar información que reúna los requisitos para ser tratada con privacidad o confidencialidad en este formulario o en cualquier otro documento adjunto. Adjunte copias editadas de cualquier otro documento que respalde la reclamación, tales como pagarés, órdenes de compra, facturas, balances detallados de cuentas en funcionamiento, contratos, resoluciones judiciales, hipotecas y acuerdos de garantías. No adjunte documentos originales, ya que es posible que los documentos adjuntos se destruyan luego de analizarlos. En caso de que los documentos no estén disponibles, explique los motivos en un anexo.

Fill in all the information about the claim as of the Petition Date.

Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.

| **Part 1 / Parte 1** | **Identify the Claim / Identificar la reclamación** |

[  ] Date Stamped Copy Returned
[  ] No Self-Addressed Stamped Envelope
[✓] No Copy Provided

| 1. Who is the current creditor?<br><br>¿Quién es el acreedor actual? | Anne Farley |
| | Name of the current creditor (the person or entity to be paid for this claim)<br>Nombre al acreedor actual (la persona o la entidad a la que se le pagará la reclamación) |
| | Other names the creditor used with the debtor<br>Otros nombres que el acreedor usó con el deudor _____ |

170328380099660

| 2. Has this claim been acquired from someone else?<br><br>¿Esta reclamación se ha adquirido de otra persona? | ☒ No / No<br>☐ Yes. From whom?<br>Sí. ¿De quién? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)<br><br>¿A dónde deberían | Where should notices to the creditor be sent?<br>¿A dónde deberían enviarse las notificaciones al acreedor?<br><br>Anne Farley<br>Peter C. Hein<br>Name / Nombre<br><br>101 Central Park West 14E | Where should payments to the creditor be sent?<br>(if different)<br>¿A dónde deberían enviarse los pagos al acreedor? (En caso de que sea diferente)<br><br><br>Name / Nombre |

Modified Official Form 410                  **Proof of Claim**                  page 1

| enviarse las notificaciones al acreedor?

Norma federal del procedimiento de quiebra (FRBP, por sus siglas en inglés) 2002(g | Number / Número   Street / Calle

New York, New York 10023 | | | Number / Número   Street / Calle | | |
| City / Ciudad   State / Estado   ZIP Code / Código postal

212 403 1237 or 917 539 8487 | | | City / Ciudad   State / Estado   ZIP Code / Código postal | | |
| Contact phone / Teléfono de contacto

petercheinsr@gmail.com | | | Contact phone / Teléfono de contacto

anne.farley@gmail.com | | |
| Contact email / Correo electrónico de contacto | | | Contact email / Correo electrónico de contacto | | |

**4. Does this claim amend one already filed?**

**¿Esta reclamación es una enmienda de otra presentada anteriormente?**

☒ No / No

☐ Yes.  Claim number on court claims registry (if known)
Sí.   Número de reclamación en el registro de reclamaciones judiciales (en caso de saberlo)_____

Filed on / Presentada el _____ (MM /DD/YYYY) / (DD/MM/AAAA)

**5. Do you know if anyone else has filed a proof of claim for this claim?**

**¿Sabe si alguien más presentó una evidencia de reclamación para esta reclamación?**

☒ No / No

☐ Yes. Who made the earlier filing?
Sí.  ¿Quién hizo la reclamación anterior?_____

See attachment

██████████  **Give Information About the Claim as of the Petition Date**

**Complete toda la información acerca de la reclamación desde la fecha en la que se presentó el caso.**

**6. Do you supply goods and / or services to the government?**

**¿Proporciona bienes y / o servicios al gobierno?**

☐ No / No

☐ Yes. Provide the additional information set forth below / Sí. Proporcionar la información adicional establecida a continuación:

Vendor / Contract Number | Número de proveedor / contrato: _____

List any amounts due after the Petition Date (listed above):

Anote la cantidad que se le debe después de la fecha que se presentó el caso (mencionados anteriormente),

$ _____

See attachment

**7. How much is the claim?**

**¿Cuál es el importe de la reclamación?**

$_____ 123,500 .  **Does this amount include interest or other charges?**
¿Este importe incluye intereses u otros cargos?

☐ No / No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).
Sí. Adjunte un balance con intereses detallados, honorarios, gastos u otros cargos exigidos por la Norma de Quiebras 3001(c)(2)(A).

**8. What is the basis of the claim?**

**¿Cuál es el fundamento de la reclamación?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Por ejemplo: Venta de bienes, préstamo de dinero, arrendamiento, prestación de servicios, lesiones personales u homicidio culposo, o tarjetas de crédito. Adjunte copias editadas de cualquier documento que respalde la reclamación conforme a lo exigido por la Norma de Quiebras 3001(c). Limite la divulgación de información que reúne los requisitos para ser tratada con privacidad, tal como información sobre atención médica.

see attachment, including item 8 of attachment

| 9. Is all or part of the claim secured?<br><br>¿La reclamación está garantizada de manera total o parcial? | ☐ No / No<br>☒ Yes. The claim is secured by a lien on property.<br>Sí. La reclamación está garantizada por un derecho de retención sobre un bien.<br><br>**Nature of property / Naturaleza del bien:**<br>☐ Motor vehicle / Vehículos<br><br>☐ Other. Describe:   ¿N<br>Otro. Describir:   see attachment, including items 8 and 9 it the attachment and the documents referenced therein<br><br>**Basis for perfection / Fundamento de la realización de pasos adicionales:** _____<br>_____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Adjunte copias editadas de documentos, si los hubiere, que demuestre la realización de pasos adicionales para hacer valer un derecho de garantía (por ejemplo, una hipoteca, un derecho de retención, un certificado de propiedad, una declaración de financiamiento u otro documento que demuestre que se ha presentado o registrado un derecho de retención.)<br><br>**Value of property / Valor del bien:**   $_____<br><br>**Amount of the claim that is secured /**<br>**Importe de la reclamación que está garantizado:** $_____<br><br>**Amount of the claim that is unsecured /**<br>**Importe de la reclamación que no está garantizado:** $_____<br>(The sum of the secured and unsecured amounts should match the amount in line 7.)<br>(La suma del importe garantizado y no garantizado debe coincidir con el importe de la línea 7.)<br><br>**Amount necessary to cure any default as of the Petition Date /**<br>**Importe necesario para compensar toda cesación de pago a la fecha que se presentó el caso :** $_____<br>_____<br><br>**Annual Interest Rate** (on the Petition Date)<br>**Tasa de interés anual** (cuando se presentó el caso)_____%<br>☐ Fixed / Fija<br>☐ Variable / Variable | |
| 10. Is this claim based on a lease?<br><br>¿Esta reclamación está basada en un arrendamiento? | ☐ No / No<br>☐ Yes. **Amount necessary to cure any default as of the Petition Date.**<br>Sí. **Importe necesario para compensar toda cesación de pago a partir de la que se presentó el caso** $_____<br><br>                    See attachment, including items 8, 9 and 10 | |
| 11. Is this claim subject to a right of setoff?<br><br>¿La reclamación está sujeta a un derecho de compensación? | ☒ No / No<br>☐ Yes. Identify the property /<br>Sí. Identifique el bien: _____ | |
| 12. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?<br><br>¿La reclamación, total o parcial, cumple los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b)(9) del U.S.C.? | ☐ No / No<br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received   $_____<br>by the debtor within 20 days before the Petition Date in these Title III case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.<br><br>Sí. Indique el importe de la reclamación que surge del valor de cualquier bien recibido por el deudor dentro de los 20 días anteriores a la fecha de inicio en estos casos del Título III, en el que los bienes se han vendido al deudor en el transcurso normal de los negocios del deudor. Adjunte la documentación que respalda dicha reclamación.<br><br>                    See attachment, including items 8, 9 and 10 | |

013

| Part 3 / Parte 3: | Sign Below / Firmar a continuación |
| --- | --- |

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**La persona que complete esta evidencia de reclamación debe firmar e indicar la fecha. FRBP 9011(b).**

Si presenta esta reclamación de manera electrónica, la FRBP 5005(a)(2) autoriza al tribunal a establecer normas locales para especificar qué se considera una firma.

Check the appropriate box / Marque la casilla correspondiente:

☒ I am the creditor. / Soy el acreedor.

☐ I am the creditor's attorney or authorized agent. / Soy el abogado o agente autorizado del acreedor.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. / Soy el síndico, el deudor o su agente autorizado. Norma de quiebra 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. / Soy el garante, fiador, endosante u otro codeudor. Norma de quiebra 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

Comprendo que una firma autorizada en esta *Evidencia de reclamación* se considera como un reconocimiento de que al calcular el importe de la reclamación, el acreedor le proporcionó al deudor crédito para todo pago recibido para saldar la deuda

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

He leído la información en esta *Evidencia de reclamación* y tengo motivos razonables para suponer que la información es verdadera y correcta.

I declare under penalty of perjury that the foregoing is true and correct. / Declaro bajo pena de perjurio que lo que antecede es verdadero y correcto.

Executed on date / Ejecutado el  07/09/2020  (MM/DD/YYYY) / (DD/MM/AAAA)

Signature / Firma  *Anne Farley*

**Print the name of the person who is completing and signing this claim / Escriba en letra de imprenta el nombre de la persona que completa y firma esta reclamación:**

Name  Anne Farley
First name / Primer nombre        Middle name / Segundo nombre        Last name / Apellido

Title / Cargo

Company / Compañía
Identify the corporate servicer as the company if the authorized agent is a servicer.
Identifique al recaudador corporativo como la compañía si el agente autorizado es un recaudador.

Address / Dirección  101 Central Park West 14E
Number / Número        Street / Calle

New York, New York 10023
City / Ciudad        State / Estado        ZIP Code / Código postal

Contact phone / Teléfono de contacto  212 403 1237  or 917 539 9487   Email / Correo electrónico  pcfarcheins2@gmail.com

anne.farley@gmail.com

7/9/2020

## Attachment to Proof of Claims of Peter C. Hein and Anne Farley

**Debtor:**

Puerto Rico Public Buildings Authority          Case No. 19-bk-05523          Petition Date:
Sept. 27, 2019

This attachment supplies additional or more specific information in response to the items on the proof of claim forms to which this attachment is attached.

1.   Creditors:  Peter C. Hein and Anne Farley, who are married (hereinafter "Creditor").

2.   This claim has not been acquired from someone else.

3.   Notices and payments to the creditor should be sent to:

Peter C. Hein and Anne Farley
(as specified on the proof of claim form)
101 Central Park West, Apt. 14E
New York, NY 10023

Contact phone:  (212) 403-1237 or 917 539 8487
Contact email:  petercheinsr@gmail.com
Second contact email: anne.farley@gmail.com

4.   This claim does not amend one already filed.

5.   Creditor does not know if anyone else has filed a proof of claim for this claim. Both Peter C. Hein and Anne Farley have previously filed proofs of claim against the Commonwealth.

6.   See item 8 below as well as the offering statements for the bonds and the Constitutional and statutory provisions referred to therein.

7.   The current amount of this claim is specified in the response to Item 7 on the proof of claim form to which this attachment is attached, which includes the principal amount of the bonds as reflected on the attached confirmation and the unpaid interest due through July 1, 2020.

Claim is made for all unpaid interest and also for any other fees, expenses or charges for which Creditor is entitled to recover.  In addition to debtor, the claim is asserted against the Commonwealth, and all other entities, agencies or departments with responsibility for, or liability on, the claim or who have assets or monies that should be used to pay the claim or to whom any such assets or

(5)

monies have been transferred; and any and all persons and entities who have received or hold or direct or control funds that should have been used to repay the money provided to the issuer by Claimant.

Creditor purchased bonds at or about the original offering price.

In addition claim is made for all additional interest that has, will, or should accrue, or has, will, or should be paid, under the terms of the bonds or otherwise.

8.   Basis of the claim:  Creditor purchased the bonds at or about the original offering price, which was at par or close to par.  Attached as Exhibit A are copies of purchase confirmation(s), including the name of the original purchaser and current beneficial holder (some brokerage confirmations were issued on a "household" mailing basis:  Peter C. Hein and Anne Farley are married, and some "household" mailings may come addressed to Anne Farley even if Peter C. Hein is the actual purchaser; for confidentiality reasons, in accordance with the instructions, account numbers are redacted and thus the name of the purchaser and beneficial holder is specified instead of account numbers).

The bonds were rated as investment grade investments at the time of issuance (and of the purchases) by the major rating agencies to rate them.  One premise of the bond purchases – like other purchases of municipal bonds – is that the issuer will comply with contractual, legal and Constitutional obligations in effect at the time the issuer sells the bonds and accepts the purchaser's money, and that the administrative, legislative, executive and judicial authorities will adhere to, and enforce, the rule of law and the United States Constitution.  Claimant asserts and reserves all rights and claims, including all rights and claims under applicable law, including but not limited to the United States Constitution and the Puerto Rico Constitution, relating to the failure of the issuer, as well as Puerto Rican and United States administrative, legislative, executive and judicial authorities, to adhere to, and to enforce, the rule of law, including but not limited to all rights and claims to the return of monies paid by Claimant.  Constitutional claims include, without limitation, claims under the Takings, Due Process, Ex Post Facto, Contracts, Bankruptcy, Equal Protection and Privileges and Immunities clauses of the United States Constitution, and Article II Sections 7, 9 and 12, and Article VI Sections 2, 6 and 8 of the Puerto Rico Constitution.  Statutory claims include, without limitation, claims under the statutes referenced in the offering statements for the bonds.

Claimant also asserts and reserves all rights and claims asserted in these proceedings by other holders of the type of bonds purchased and held by Claimant. Claimant asserts and reserves the right to amend or supplement this claim.  This claim is asserted against not only debtor but also Commonwealth and any and all entities, agencies or departments with responsibility for, or liability on, the claim or who have assets or monies that should be used to pay the claim or to whom any such assets or monies have been transferred; and any and all persons



and entities who have received or hold or direct or control funds that should
have been used to repay the money provided to the issuer by Claimant.

9.  Claimant believes the claim is fully secured.  Reference is made to information
and descriptions of security for the bonds provided in the offering statements for
the bonds, the Constitutional and statutory provisions referenced in the offering
statements, the bond indentures (or similar documents), statements of the issuer
and other Commonwealth agencies and departments (including the GDB), other
documentation and materials, including documentation and materials referenced
in the offering statements or bond indentures (or similar documents) or in other
statements of the issuer and of Commonwealth or other Commonwealth agen-
cies and departments, and applicable Constitutional and statutory provisions.

10.  See response to item 8 and 9 above, as well as the offering statements for the
bonds and the Constitutional and statutory provisions referred to therein.

11.  Claim is not subject to a right of set-off.



017

P.O. Box 2044
Lakewood, NJ 08701

**Merrill Lynch**
**Wealth Management**

Merrill Lynch
**Office Serving Your Account**
1251 AVE OF THE AMERICAS
24 TH FL NY NY 10020
(212) 382-8500

ANNE FARLEY
101 CENTRAL PARK WEST #14E
NEW YORK NY 10023

--- -- 0.365

TO THE HOUSEHOLD OF
ANNE FARLEY
101 CENTRAL PARK WEST #14E
NEW YORK NY 10023-4250

TRADE CONFIRMATIONS FOR THE FOLLOWING ACCOUNTS INCLUDED IN THIS PACKAGE

ANNE FARLEY
101 CENTRAL PARK WEST #14E
NEW YORK NY 10023

Account Number:

# TRADE CONFIRMATION          Date: August 11, 2011

We confirm the following transaction(s) subject to the agreement below.

BOUGHT   PUERTO RICO PUB BLDGS AUTH REV GTD GOVT FACS ISSD 8/24/11   OID GUAR SER S

| | | | | |
|---|---|---|---|---|
| Quantity | 100000 | Price | 99.500000 | Amount | 99500.00 |
| Processing Fee | | | | |
| Transaction Fee | | | | |
| Accrued Interest/Dividends | | | | |
| NET AMOUNT | | | | 99500.00 |

| | |
|---|---|
| Trade Date | 08/11/11 |
| Settle Date | 08/24/11 |
| ML Symbol | |
| Security # | RB510 |
| Cusip # | 745235P62 |
| F A # | 7992 |

5.875 PCT 7/01/2039   YIELD 5.91% @ $99.50 7/01/39 CALLABLE-MAY AFFECT YIELD
DETAILS UPON REQUEST. WHEN AS AND IF ISSUED.   NEXT CALL 07/01/16 @ 100.00.
OFFICIAL STATEMENT AVAILABLE @ WWW.EMMA.MSRB.ORG BY SETTLEMENT   DATE. PLEASE
CONTACT YOUR FINANCIAL ADVISOR FOR A PHYSICAL COPY.  ORIGINAL ISSUE
DISCOUNT-INITIAL OFFERING PRICE 99.5023   INTEREST FROM 08/24/11. FIRST COUPON
01/01/12.   UNSOLICITED ORDER. BOOK ENTRY ONLY.   NOT RATED. BASED ON GOOD FAITH
INQUIRY OF SELECTED SOURCES.

ML ACTED AS PRINCIPAL

Payment for securities or other investment instruments purchased, and delivery of securities or other investment instruments sold,
are due not later than SETTLEMENT DATE unless otherwise indicated by a DATE DUE. Please preserve this confirmation for income
tax purposes. If submitting a check, money order or correspondence, please write your account number, forward to "Merrill Lynch
Office Serving your Account", shown at the top of the page above your account number. If you have moved or plan to move notify
your Financial Advisor of your new address.

Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith
Incorporated (MLPF&S) and other subsidiaries of Bank of America Corporation. MLPF&S is a registered broker-dealer, member
Securities Investor Protection Corporation (SIPC) and a wholly owned subsidiary of Bank of America Corporation. Investment
products:

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
|---|---|---|

Account Number:                    Date:  08/11/2011                    Page 1 of 2

8

Puerto Rican Bond Interest Not Received

| | ISSUER | DUE DATE | FACE AMT | INT RATE | BROKER | ANN INTEREST | Semi An Int | | Jan | Jul | Default to date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| m | Puerto Rico Pub Bldgs Auth Rev Gtd Govt Facs issd 8/24/11 OID Guar Ser S | 7/1/2039 | $   100,000 | 5.875% | ML - AF | $    5,875.00 | $  2,937.50 | 2017 | $   2,937.50 | $  2,937.50 | $   5,875.00 |
| | | | | | | | | 2018 | $   2,937.50 | $  2,937.50 | $  11,750.00 |
| | | | | | | | | 2019 | $   2,937.50 | $  2,937.50 | $  17,625.00 |
| | | | | | | | | 2020 | $   2,937.50 | $  2,937.50 | $  23,500.00 |





**IMPORTANT NOTICE**

Notice to Holders of:

**Puerto Rico Public Buildings Authority ("PBA")**
**(Government Facilities Revenue Bonds)**
**Series 2002 C, 2002 D, 2002 F, 2002 G, 2002 H, 2004 I, 2004 K, 1993 L, 2007 M, 2007 N, 2009 P,**
**2009 Q, 2011 R, 2011 S, 2011 T, and 2012 U Bonds (collectively, the "Bonds")**

**CUSIPs [1]**

**Series 2002 C**: 745235G62, 745235G70, 745235G88, 745235G96, 745235H20, 745235H38, 745235H46, **Series 2002 D**: 745235D24, 745235VX6, 745235D32, 745235D40, 745235VY4, 745235VZ1, **Series 2002 F**: 745235RV5, 745235RW3, 745235RX1, 745235RY9, 745235RZ6, 745235SA0, 745235SB8, 745235SC6, **Series 2002 G**: 745235SW2, 745235SX0, **Series 2002 H**: 745235TH4, 745235TG6, 745235TJ0, 745235TK7, 745235TL5, **Series 2004 I**: 745235D57, 745235D65, 745235VR9, **Series 2004 K**: 745235L82, **Series 1993 L**: 745235GJ4, **Series 2007 M1**: 745235ZK0, 745235ZL8, 745235ZM6, 745235ZN4, 745235ZP9, 745235ZQ7, 745235ZR5, 745235ZS3, 745235ZT1, **Series 2007 M2**: 745235B67, 745235B75, **Series 2007 M3**: 745235J93, 745235K26, 745235K34, 745235K42, 745235K59, 745235K67, **Series 2007 N**: 745235ZX2, 745235ZY0, 745235ZZ7, 745235A27, 745235A35, 745235A43, 745235A50, 745235A68, 745235A76, 745235A84, 745235A92, 745235B26, 745235B34, 745235B42, **Series 2009 P**: 745235K75, 745235K83, 745235K91, 745235L25, 745235L33, 745235L41, 745235L58, 745235L66, 745235L74, **Series 2009 Q**: 745235L90, 745235M24, 745235M32, 745235M40, **Series 2011 R**: 745235M57, 745235M81, 745235M73, 745235M65, **Series 2011 S**: 745235M99, 745235N23, 745235N31, 745235N49, 745235N56, 745235N64, 745235N72, 745235N80, 745235N98, 745235P21, 745235P39, 745235P47, 745235P54, 745235P88, 745235P62, 745235P70, **Series 2011 T**: 745235Q20, **Series 2012 U**: 745235R52, 745235R60, 745235R78, 745235S69, 745235R86, 745235R94, 745235S28, 745235S36, 745235S44, 745235R37

**Please forward this notice to beneficial Bondholders.**

**RE: Commonwealth et. al, Third Amended Plan of Adjustment**

Reference is made to the PBA Bond Resolution No. 468, adopted June 22, 1995 (collectively, with all supplements thereto, the "**1995 Resolution**"), and the PBA Bond Resolution No. 77, adopted on November 16, 1970 (collectively, with all supplements thereto, "**Resolution 77**", and collectively, with the 1995 Resolution, the "**Resolutions**"), pursuant to which the Bonds were issued. U.S. Bank is the Fiscal Agent under the Resolutions ("**U.S. Bank**" or the "**Fiscal Agent**").

The Fiscal Agent is solely the agent of PBA and makes no recommendations and gives no investment advice and Bondholders shall not rely upon the Fiscal Agent as a source of information for any decisions in relation to the Bonds.

---

[1] The Fiscal Agent is not responsible for selection or use of CUSIP. It is included solely for Bondholder convenience.

Exhibit C

020

The Fiscal Agent is not providing legal advice herein, and reference is made to the full provisions of the pleadings and laws referred to below for their terms and provisions. Bondholders are urged to consult their own counsel or advisors regarding these pleadings and laws, including their impact on any applicable rights and remedies under the Resolutions.

## I.    TITLE III CASES

Bondholders were previously informed that cases were commenced under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act, H.R. 5278 ("**PROMESA**") for (a) the Commonwealth of Puerto Rico (the "**Commonwealth**"); (b) the Puerto Rican Sales Tax Financing Corporation; (c) the Puerto Rico Highways and Transportation Authority; (d) the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; and (e) the Puerto Rico Electric Power Authority  by authority of the PROMESA Financial Oversight and Management Board (the "**FOMB**") in the United States District Court for the District of Puerto Rico (the "**Court**").[2]  On September 27, 2019, a case was commenced for PBA under Title III of PROMESA (the "**PBA Title III Case**").  Further information regarding the PBA Title III Case, including pleadings filed in the PBA Title III Case is available at https://cases.primeclerk.com/puertorico/Home-Index.  The Title III cases are referred to collectively herein as the "Title III Cases".

On or about June 27, 2018, pursuant to the directions contained in the Order Setting the Bar Date for claims against the Commonwealth, the Fiscal Agent filed a Master Proof of Claim against the Commonwealth relating to the Bonds (the "**Claim**").  Litigation of objections relating to the Claim has been stayed and is proposed to be settled under the Third Amended Plan of Adjustment (defined below).[3]

## II.    COMMONWEALTH, ET AL. PLAN OF ADJUSTMENT FILED

On September 27, 2019, the FOMB filed the first Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, Et. Al (the "**First Plan of Adjustment**") and accompanying Disclosure Statement for the Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority (the "**First Plan of Adjustment Disclosure Statement**"). A prior notice of the First Plan of Adjustment was sent to Bondholders on October 25, 2019.

On March 8, 2021, the FOMB filed the Second Amended Title III Joint Plan of Adjustment of The Commonwealth of Puerto Rico, Et Al. (the "**Second Amended Plan of Adjustment**) [Dkt. # 15976], along with the accompanying Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority (the "**Second Plan of Adjustment Disclosure Statement**") [Dkt. # 15988].

On May 11, 2021, the FOMB filed the Third Amended Title III Joint Plan of Adjustment of The Commonwealth of Puerto Rico, Et. Al. (the "**Third Amended Plan of Adjustment**") [Dkt. # 16740],[4]

---

[2] Information on the Title III Cases can be found at https://cases.primeclerk.com/puertorico/Home-Index. Information regarding the FOMB and the actions it has taken can be found at https://juntasupervision.pr.gov/index.php/en/home.
[3] Copies of the objection can be found on the Commonwealth of Puerto Rico's Title III Docket https://cases.primeclerk.com/puertorico/Home-DocketInfo, Docket Number 6269.
[4] Copies of the Third Amended Plan of Adjustment and related Disclosure Statement can be found on the Commonwealth of Puerto Rico's Title III Docket https://cases.primeclerk.com/puertorico/Home-DocketInfo, Docket Numbers 16740 and 16741.

along with the accompanying Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Buildings Authority (the "**Disclosure Statement**") [Dkt. # 16741]. [5]

The Third Amended Plan of Adjustment and the Disclosure Statement explain in detail the proposed restructuring of the debt of the Commonwealth, and set forth a proposal for treatment of the Bonds. *See* Third Amended Plan of Adjustment, Articles V, VI, VII, VIII, X, XI, XII, XIII, XIV; Disclosure Statement, Article VI(E).

No objection deadline or hearing dates have been set yet with respect to the Third Amended Plan of Adjustment. The Court has set a deadline for objections to the Disclosure Statement of June 15, 2021 and a hearing date of July 13, 2021 on the adequacy of the Disclosure Statement. Notices of such objection deadline, hearing date and related matters are to be sent to all beneficial holders of Bonds by the FOMB.

This notice is not a substitute for nor does it contain all information that may be provided to you in such official Notices from the FOMB.

**Bondholders are urged to consult their own counsel or advisors regarding the Third Amended Plan of Adjustment and the impact of the Third Amended Plan of Adjustment on your Bonds and other rights and remedies. Bondholders are also encouraged to review pleadings in connection with the PBA Title III Case to monitor any modifications that may be filed to the Third Amended Plan of Adjustment or Disclosure Statement, relevant objection and hearing deadlines that may be set by the Court, as well as deadlines for voting on the Third Amended Plan of Adjustment, if any are set.**

**<u>Please note that the Fiscal Agent is not obligated to take any actions or enforce any remedies on behalf of the holders of the Bonds with respect to the Third Amended Plan of Adjustment and the Disclosure Statement except as specifically set forth in the Resolutions. Thus, you should not rely on the Fiscal Agent to take any action on behalf of the holders of the Bonds in connection with the Plan process, including the filing of any objection to the Plan or Disclosure Statement, and including without limitation the filing of any position with regard to any proceedings to resolve, settle or adjudicate the Claim filed by the Fiscal Agent.</u>**

This Notice is being given pursuant to the Resolutions and related documents. Inquiries concerning this notice should be directed in writing to: Laura L. Moran, Vice President, U.S. Bank Trust National Association, One Federal St., Boston, MA 02110. Holders with other questions may contact U.S. Bank at (800) 934-6802, option #7.

The Fiscal Agent may conclude that a specific response to inquiries from particular Bondholders may not be appropriate because the disclosure in question may not be in the best interest of all Bondholders or may not be consistent with the equal and full dissemination of information.

Prior to any distribution to Bondholders, funds held under the Resolutions will be used first for payment of the fees and costs incurred or to be incurred by the Fiscal Agent in performing its duties, as well as for any indemnities owing or to become owing to the Fiscal Agent. This includes fees and costs incurred by counsel and other agents or professionals the Fiscal Agent employs to pursue remedies or other actions to protect the security or other interests of holders, as well as compensation and expense reimbursement for the Fiscal

---

[5] Copies of the Third Amended Plan of Adjustment and related Disclosure Statement can be found on the Commonwealth of Puerto Rico's Title III Docket https://cases.primeclerk.com/puertorico/Home-DocketInfo, Docket Numbers 16740 and 16741.

Agent's extraordinary administration services, including charges for time spent at the Fiscal Agent's currently prevailing hourly rates.

**The Fiscal Agent makes no recommendations regarding the PBA Title III Case or Third Amended Plan of Adjustment.  Bondholders should not rely upon the Fiscal Agent as their sole source of information.  The information described herein can change, and the Fiscal Agent does not undertake to monitor or provide notice to holders of any such changes or any other information that may arise in respect of the PBA Title III Case or any related matters.  Bondholders should monitor the PBA Title III Case and related developments themselves.**

This notice is not an attempt to collect upon any debts and is for informational purposes only.

**U.S. Bank,**                                                              **May 14, 2021**
**as Fiscal Agent**

NEW ISSUE-BOOK ENTRY ONLY

$$\$152,540,000$$

# Puerto Rico Public Buildings Authority
## Government Facilities Revenue Refunding Bonds, Series Q
### Guaranteed by the Commonwealth of Puerto Rico

The Puerto Rico Public Buildings Authority Government Facilities Revenue Refunding Bonds, Series Q (the "Bonds") are being issued by Puerto Rico Public Buildings Authority (the "Authority") pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended ("Act No. 56"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended or supplemented (the "1995 Bond Resolution").

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution are payable from, and are secured by a pledge of, the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth").

**The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Department of Treasury of the Commonwealth (the "Treasury") such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith and credit of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.**

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- The Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Bonds will not receive definitive Bonds.

- Interest on the Bonds will be payable on January 1, 2010 and on each July 1 and January 1 thereafter.

- The Bonds are subject to redemption as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Bonds.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel, and certain other conditions.

- In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Authority and the Commonwealth, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that, interest on the Bonds is exempt from state, Commonwealth and local income taxation. See *Tax Matters*, beginning on page 32 of this Official Statement, regarding certain other tax considerations.

- McConnell Valdés LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Bonds will occur on or about October 28, 2009.

| | | | |
|---|---|---|---|
| **Merrill Lynch & Co.** | | | **Ramirez & Co., Inc.** |
| **Barclays Capital** | **Goldman, Sachs & Co.** | **J.P. Morgan** | **Morgan Stanley** |
| **Popular Securities** | **Santander Securities** | **UBS Financial Services Incorporated of Puerto Rico** | |

October 16, 2009

Exhibit D

**$152,540,000**
**Puerto Rico Public Buildings Authority**
**Government Facilities Revenue Refunding Bonds, Series Q**
**Guaranteed by the Commonwealth of Puerto Rico**

**$8,200,000 Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | CUSIP* |
|---|---|---|---|---|
| 2022 | $8,200,000 | 5.125% | 5.200% | 745235L90 |

**$38,620,000 – 5.500% Term Bonds due July 1, 2037; Yield 5.650% (CUSIP No. 745235M24)[*]**
**$1,150,000 – 6.000% Term Bonds due July 1, 2038; Yield 5.500%† (CUSIP No. 745235M32)[*]**
**$104,570,000 – 5.625% Term Bonds due July 1, 2039; Yield 5.730% (CUSIP No. 745235M40)[*]**

---

[*]   Copyright 2009, American Bankers Association.  CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc.  The CUSIP number listed above is being provided solely for the convenience of bondholders, and the Authority does not make any representation with respect to such number or undertake any responsibility for its accuracy.  The CUSIP number is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of the Bonds.

[†]   Priced at the stated yield to the July 1, 2014 optional redemption date at a redemption price of 100%.  See "Redemption Provisions" under *The Bonds* herein.

ii

The information set forth or incorporated herein by reference has been obtained from the Authority, the Commonwealth, and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter.  The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth since the date hereof.  This Official Statement is submitted in connection with the sale of the Bonds referred to herein and may not be reproduced or used, in whole or in part, for any other purpose.  The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement.  The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS OFFERED HEREBY AND OF OUTSTANDING BONDS OF PUERTO RICO PUBLIC BUILDINGS AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET.  SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

# TABLE OF CONTENTS

INTRODUCTION ....................................................1
RECENT DEVELOPMENTS ...............................3
    Revised Economic Data for Fiscal Year 2009
    and 2010 ..........................................................3
    Results for Fiscal Year 2009................................3
    Approved Budget for Fiscal Year 2010 and Preliminary
    General Fund Revenues for First Two Months of Fiscal
    Year 2010 ........................................................4
    Actuarial Valuation and Cash Shortfall of the
    Employees Retirement System ..........................4
    Amendments to Act No. 7 of March 9, 2009.............4
    Approval of Public-Private Partnerships Act.................5
    Recent Bond Issues by the Commonwealth and Certain
    Instrumentalities .............................................5
    Cost Reduction Measures Adopted by the Authority ....5
    Orders Requiring Reduction in Service Contracts and
    Leases ............................................................5
    Implementation of Second Round of Layoffs under Act
    No. 7 ..............................................................6
    Progress in the Implementation of the Fiscal
    Stabilization Plan ...........................................6
PLAN OF FINANCING ........................................6
    The Bonds ........................................................6
    Use of Proceeds ...............................................10
THE BONDS .........................................................10
    Description of the Bonds....................................10
    Redemption Provisions.....................................10
    Book-Entry Only System..................................11
    Discontinuance of the Book-Entry Only System........13
SECURITY ..........................................................13
    Commonwealth Guaranty ................................14
    Opinion of the Secretary of Justice of the
    Commonwealth ..............................................14
    Lease Agreements ..........................................15
    Pledge of the Commonwealth to Pay or Advance
    Rentals ..........................................................17
    Additional Bonds............................................17
PROVISIONS RELATING TO PUBLIC DEBT OF
THE COMMONWEALTH .....................................17
    Payment of Public Debt....................................17
    Payment Record .............................................18
    Debt Limitation ..............................................18
    Commonwealth Guaranteed Debt..............................19

THE AUTHORITY ...........................................20
    General..........................................................20
    Powers..........................................................20
    Management...................................................21
PROGRAMS AND FACILITIES OF THE
AUTHORITY ....................................................22
    Office Buildings Program .................................22
    School Buildings Program ................................22
    Health Facilities Program.................................23
    Correctional Facilities Program ........................23
    Other Facilities...............................................23
DEBT OF THE AUTHORITY AND DEBT
SERVICE REQUIREMENTS ...............................23
    Debt .............................................................23
    Debt Service Requirements..............................24
SUMMARY OF CERTAIN PROVISIONS OF THE
1995 BOND RESOLUTION.................................25
    Revenues ......................................................25
    1995 Sinking Fund .........................................26
    1995 Redemption Account................................26
    1995 Construction Fund...................................28
    Additional Bonds ...........................................28
    Investment of Funds........................................29
    General Covenants..........................................30
    Modifications .................................................31
    Notice of Default.............................................31
TAX MATTERS ................................................32
    Federal Income Taxes .....................................32
    State Taxes ....................................................32
    Original Issue Discount....................................32
    Original Issue Premium ...................................32
    Ancillary Tax Matters .....................................33
    Changes in Law and Post Issuance Events..................33
UNDERWRITING...............................................33
LEGAL INVESTMENT ........................................34
LEGAL MATTERS ............................................34
GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO .................................................34
RATINGS .........................................................34
CONTINUING DISCLOSURE .....................................35
MISCELLANEOUS ............................................37
APPENDIX I - Proposed Form of Opinion of
    Bond Counsel ...............................................I-1

$152,540,000
# Puerto Rico Public Buildings Authority
### Government Facilities Revenue Refunding Bonds, Series Q
### Guaranteed by the Commonwealth of Puerto Rico

### INTRODUCTION

This Official Statement sets forth information in connection with the sale by Puerto Rico Public Buildings Authority (the "Authority") of $152,540,000 aggregate principal amount of its Puerto Rico Public Buildings Authority Government Facilities Revenue Refunding Bonds, Series Q (the "Bonds").

The Bonds will be issued pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995 (the "1995 Bond Resolution"), as supplemented by Resolution No. 1408, adopted by the Authority on October 16, 2009 (the "Bond Resolution"). Immediately prior to the issuance of the Bonds, the Authority will have outstanding $3,001,849,085 of its Government Facilities Bonds (calculated by excluding all accretion on any existing capital appreciation bonds and convertible capital appreciation bonds) issued under the 1995 Bond Resolution. The fiscal agent under the 1995 Bond Resolution is U.S. Bank National Association (the "1995 Fiscal Agent").

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution (collectively, the "Government Facilities Bonds") are payable from and are secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth. The Bonds are further guaranteed by the Commonwealth.

This Official Statement includes the cover page, the inside cover page, the appendices hereto and the following documents, which have been filed by the Commonwealth through the Electronic Municipal Market Access System ("EMMA") at http://emma.msrb.org established by the Municipal Securities Rulemaking Board ("MSRB"), and are incorporated herein by reference:

(1) the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2008, prepared by the Treasury (the "Commonwealth's Annual Financial Report"). The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2008, which have been audited by KPMG LLP, independent auditors, as stated in their report dated August 12, 2009, accompanying such financial statements. KPMG LLP did not audit the financial statements of the Authority's capital project fund or the Children's Trust special revenue funds (major funds), and certain activities, funds and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and their opinions, insofar as they relate to the amounts pertaining to such activities, funds and component units separately identified in their reports, are based solely on the reports of the other auditors. The report by KPMG LLP contains an emphasis paragraph for the adoption of Governmental Accounting Standard Board (GASB) Statement No. 45 *Accounting and Financial Reporting by Employers for Postemployment Benefits other than Pensions*, during the year ended June 30, 2008;

(2) the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated May 15, 2009 (the "Commonwealth Report"), which is included as Appendix I of the Official Statement dated September 11, 2009 for the $3,425,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2009 A (General Obligation Bonds). The Commonwealth Report includes important information about the Commonwealth, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund (the "General Fund"), the estimated year-end

results of the fiscal 2008 budget, the budgets for fiscal years 2008 and 2009, the proposed budget for fiscal year 2010, and the debt of the Commonwealth's public sector; and

(3)   the basic financial statements of the Authority as of and for the fiscal year ended June 30, 2008, which have been audited by Parissi, P.S.C., San Juan, Puerto Rico, certified public accountants, as stated in their report dated September 29, 2008, accompanying such financial statements (the "Authority's 2008 Financial Statements").

The Commonwealth Report and the Authority's 2008 Financial Statements are also on file with each nationally recognized municipal securities information repository. The Authority's 2008 Financial Statements were filed before the May 1, 2009 deadline. See *Continuing Disclosure*, beginning on page 35 of this Official Statement.

Any Official Statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report, or other document, that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, upon a written or oral request by such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22d Floor, New York, NY 10020, telephone number (212) 333-0364, or to Vice President – General Obligations Division, Government Development Bank for Puerto Rico, PO Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth Report, the Commonwealth's Annual Financial Report and the Authority's 2008 Financial Statements may be obtained by accessing http://emma.msrb.org or by visiting the Government Development Bank's website at www.gdbpr.com.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the operations, financial condition, plans and objectives of the Authority and the Commonwealth. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, including general economic conditions, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

029

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Revised Economic Data for Fiscal Years 2009 and 2010

In August 2009, the Planning Board revised its gross national product forecast for fiscal year 2009 by projecting a base case scenario decline of 4.8% in constant dollars, a further decline of 1.4% from the projection released in February 2009. The Planning Board, however, made an upward revision of its gross national product forecast for fiscal year 2010 by projecting an increase of 0.7% in constant dollars. The Planning Board's revised forecast for fiscal year 2010 takes into account the estimated effect on the Puerto Rico economy of the Commonwealth's fiscal stabilization plan and of the activity expected to be generated by the disbursement of $1.73 billion from the American Recovery and Reinvestment Act of 2009 ("ARRA") and $280.3 million from the Commonwealth's local stimulus package. For a discussion of these plans, see "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in the Commonwealth's Annual Financial Report. The revised forecast also considers the effect on the Puerto Rico economy of general global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors.

Puerto Rico expects to receive approximately $6 billion in stimulus funds from ARRA, of which approximately $3.3 billion will be used to provide consumer and taxpayer relief. As of September 2009, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), which is responsible for the administration of ARRA in Puerto Rico, reported that approximately $906 million in ARRA funds for use in health, housing, and education related projects, among others, had been disbursed. PRIFA expects that an additional $613 million will be disbursed by December 31, 2009.

The Commonwealth has also begun disbursing funds under the local stimulus program. Most municipalities have received disbursements earmarked to pay outstanding debts and fund local projects. The Commonwealth has also disbursed funds allocated towards job training programs, a strategic water distribution project in a southern municipality and the revamping of the Puerto Rico permits system.

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% from the previous fiscal year. The unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008. For the month of August 2009, the unemployment rate was 15.8%.

### Results for Fiscal Year 2009

Total preliminary General Fund revenues for fiscal year 2009 are $7.76 billion, representing a decrease of $598.6 million, or 7.2%, from preliminary fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $145.4 million and in corporate income taxes of $201.2 million, (ii) a decrease of $51.9 million in motor vehicle excise taxes, (iii) a decrease of $60.1 million in miscellaneous non-tax revenues, and (iv) a decrease of $16.1 million in sales and use tax revenues. In fiscal year 2008, General Fund revenues also included $145 million of non-recurring revenues from the sale of certain properties owned by the Commonwealth. The continued decline in General Fund tax revenues reflects primarily the impact of the ongoing economic recession and the effect of tax benefits and incentives granted to certain individual and corporate taxpayers pursuant to previous legislation designed to stimulate economic development. For a detailed explanation of the previous estimate of General Fund revenues for fiscal year 2009, see "Summary and Management's Discussion of General Fund Results" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in the Commonwealth's Annual Financial Report.

Total preliminary General Fund revenues for fiscal year 2009 of $7.76 billion exceeded the revised estimate (made in February 2009) of General Fund revenues for fiscal year 2009 of $7.60 billion by approximately $160 million, or 2.1%. The major changes from the revised estimate for fiscal year 2009 were: (i) an increase of $190.4 million in income taxes withheld from non-residents pursuant to certain closing agreements with the Treasury, and (ii) an increase of $59 million in income taxes from individuals.

**Approved Budget for Fiscal Year 2010 and Preliminary General Fund Revenues for First Two Months of Fiscal Year 2010**

On July 1, 2009, the Governor of the Commonwealth, Luis G. Fortuño (the "Governor"), signed a General Fund budget for fiscal year 2010 of $7.670 billion.  The approved budget is approximately 19% lower than the $9.48 billion budget approved for fiscal year 2009.  The approved budget is lower than the preliminary General Fund net revenues for fiscal year 2009 by $90 million, or 1.2%, and creates a payment schedule for certain Commonwealth debts or other obligations, such as borrowings from Government Development Bank for Puerto Rico (the "Government Development Bank") that did not have a dedicated source of repayment, and accounts payable to public corporations.  The General Fund budget excludes a $2.5 billion Stabilization Fund (the "Stabilization Fund") that will facilitate the orderly implementation of certain expense reduction measures adopted by the Government of the Commonwealth pursuant to Act No. 7 of March 9, 2009 ("Act No. 7").  The Stabilization Fund will provide (i) $1 billion to finance the cost of transitioning public employees to non-governmental sectors and providing vouchers for re-training, self-employment, relocation and salary subsidy alternatives, and (ii) $1.5 billion to cover payroll and operating expenses that are expected to be reduced through fiscal year 2010, but whose savings will not be realized in such fiscal year.  The Stabilization Fund will be funded with proceeds from the bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA" for its Spanish acronym), as described below.

Preliminary General Fund revenues for the first two months of fiscal year 2010 (July and August) were $1.038 billion, approximately $10 million below the revenues for the same period in the prior fiscal year, but approximately $39 million above the budgeted revenues for this period.

**Actuarial Valuation and Cash Shortfall of the Employees Retirement System**

According to the most recent actuarial valuation of the Employees Retirement System (the "Retirement System") submitted by a firm of independent consulting actuaries, as of June 30, 2007, the actuarial accrued liability was $16.770 billion and the actuarial value of assets was $2.892 billion, representing a funding ratio of 17.2% and the resulting unfunded actuarial accrued liability was $13.878 billion.

During fiscal year 2009, the Retirement System had a cash shortfall of approximately $385 million.  This cash shortfall was covered from the sale of certain investments.  The Retirement System's projected cash flow shortfall for fiscal year 2010 is approximately $400 million, which is also expected to be covered from the sale of certain investments.  The Retirement System's cash flow shortfall for fiscal year 2010 could also be affected by the implementation of the fiscal stabilization plan.  The Retirement System continues to evaluate measures to improve the Retirement System's cash flow and funding ratio, as well as the potential impact of the fiscal stabilization plan.

For detailed information regarding the Employees Retirement System, see RETIREMENT SYSTEMS in the Commonwealth's Annual Financial Report.

**Amendments to Act No. 7 of March 9, 2009**

The Legislative Assembly approved a series of amendments to Act No. 7 which declared a state of fiscal emergency in Puerto Rico and adopted a comprehensive plan for fiscal and economic stabilization.  The amendments do not alter the forecast of General Fund revenues for fiscal year 2010, nor do they affect the adoption of on-going expense reduction measures.  Act No. 7 was amended to, among other things: (i) restore the tax-exemption enjoyed by certain securities that were affected by recent changes under the Alternative Minimum Tax; and (ii) introduce, with certain exceptions, a total cap of $40 million for granting tax credits related to Act No. 212 of 2002 (Urban Renewal projects) and establish specific limitations on the claim of such credits.  These amendments also re-introduced the Sales and Use Tax Resale Exemption Certificate to retailers with a proven sales volume higher than $500,000.  Retailers with a lower sales volume may enjoy the exemption subject to approval from the Secretary of Treasury (the "Secretary").  The Secretary retains the right to revoke any Exemption Certificate for the period of a year if a retailer fails to comply with filing requirements related to the Sales and Use Tax.  Finally, the amendments extended the temporary Commonwealth property tax to commercial real estate.  The applicable Commonwealth property tax will be 0.591%.  This temporary tax will be levied for three years or until an aggregated amount of $690 million is collected from this tax, whichever event occurs first.

On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the preliminary injunction requested by a group of government employees and labor organizations in a complaint filed on April 13, 2009 challenging the constitutionality of Act No. 7 and seeking to enjoin its enforcement.  The District Court's decision allows the Government to continue with the implementation of Act No. 7.  The Government has moved to dismiss the complaint and will continue to vigorously defend the constitutionality of Act No. 7.  For a detailed explanation of this lawsuit, see LITIGATION in the Commonwealth's Annual Financial Report.

**Approval of Public-Private Partnerships Act**

On June 8, 2009, the Legislative Assembly approved Act No. 29, establishing a clear public policy and legal framework for public-private partnerships in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs.  On September 1, 2009, the Governor constituted the Board of Directors of the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding public-private partnerships.  On September 2, 2009, David Álvarez was appointed Executive Director of the PPP Authority.  Prior to his appointment, he was Senior Adviser and Assistant to the President of Government Development Bank.  On September 3, 2009, the PPP Authority published for comment proposed regulations to establish the administrative framework for the procurement, evaluation, selection, negotiation and award process for public-private partnerships in Puerto Rico.  The PPP Authority has also engaged a global advisory firm to assist in developing guidelines and procedures for the Commonwealth's public-private partnerships program, including assistance in developing a desirability study methodology adequate for public-private partnership projects.

**Recent Bond Issues by the Commonwealth and Certain Instrumentalities**

On June 18, 2009, COFINA issued its Sales Tax Revenue Bonds, First Subordinate Series 2009A and Sales Tax Revenue Bonds, Senior Series 2009C in the aggregate principal amount at issuance of $4,118,153,700 and $237,875,000, respectively.  On June 25, 2009, COFINA issued to Puerto Rico investors its Sales Tax Revenue Bonds, First Subordinate Series 2009B in the aggregate principal amount at issuance of $1,217,915,799.  On July 23, 2009, COFINA issued to a Puerto Rico institutional investor its Sales Tax Revenue Bonds, First Subordinate Series 2009D Bond Anticipation Notes in an aggregate principal amount of $250,000,000 and committed to borrow an additional $250,000,000.  The bond proceeds were used for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund.

On July 1, 2009, the Authority issued its Government Facilities Revenue Refunding Bonds, Series P in the in the aggregate principal amount of $330,935,000.  The bond proceeds were used to refund certain of the Authority's outstanding bonds and fund certain swap termination payments.

On September 17, 2009, the Commonwealth remarketed $96,835,000 Public Improvement Refunding Bonds, Series 2007 A-4 on a fixed-rate basis and issued $3,425,000 Public Improvement Refunding Bonds, Series 2009 A to refund certain variable rate general obligation bonds.

**Cost Reduction Measures Adopted by the Authority**

As part of its measures to reduce operating expenses, the Authority is implementing a reduction in security guard expenses amounting to approximately $5.0 million in fiscal year 2010.  It has also adopted an involuntary layoff plan for the termination of 160 employees, including, among others, transitory, non-permanent employees.  The layoffs became effective on September 18, 2009.  The Authority, which budgeted a reduction of 31% in operating expenses for fiscal year 2010, expects to achieve cost savings of approximately $4.5 million from this measure.  A group of employees of the Authority has filed a lawsuit before the Puerto Rico Court of First Instance, Superior Part of San Juan, challenging the legality of the layoffs and seeking to enjoin its enforcement.  The Court has ordered the plaintiffs to show cause as to why the lawsuit should not be dismissed and referred to arbitration.  The Authority deems the lawsuit without merit and will vigorously defend itself.

**Orders Requiring Reduction in Service Contracts and Leases**

On September 21, 2009, the Governor issued an executive order requiring all agencies and public corporations of the Commonwealth to reduce, modify or cancel service contracts to achieve a cost reduction of at least 15%. The executive order covers advertising, consulting, information technology, accounting, legal and other services (except for direct services to the public), and grants the Fiscal Restructuring and Stabilization Board created under Act No. 7 (the "Fiscal Board") the power to monitor agencies and public corporations in order to ensure the required 15% minimum cost reduction. Each agency or public corporation has 30 days to report the following to the Fiscal Board: (i) all service contracts currently in effect, (ii) all cancelled and/or modified contracts and the corresponding savings, (iii) justification for any remaining contract in light of the mission of the agency or public corporation, and (iv) the reasonableness of the fees or compensation terms for each remaining contract. The Commonwealth expects to achieve savings of approximately $20 million from these reductions.

On September 23, 2009, the Governor issued an executive order requiring all agencies and public corporations of the Commonwealth to report the following to the Fiscal Board within 30 days: (i) all lease contracts currently in effect, (ii) the uses of leased premises, (iii) the needs for such premises, (iv) the terms and conditions of each lease, and (v) the budgeted amounts for rent and other related expenses. The Commonwealth expects to achieve a cost reduction of at least 15% or approximately $22 million by, among other things, consolidating operations of one or more agencies or public corporations and renegotiating leases to obtain more favorable terms. Leases with the Authority are not affected by this executive order.

**Implementation Second Round of Layoffs under Act No. 7**

On September 25, 2009, the Fiscal Board announced the dismissal of 16,970 government employees in the second and final round of layoffs by the Commonwealth under Phase II of Act No. 7. The majority of the layoffs will become effective on November 6, 2009. Approximately 1,000 of the laidoff employees are expected to be recruited and retrained by the Treasury to perform tax auditing and collection functions and by private collection firms to assist the Treasury in those functions. Also, the Fiscal Board expects that approximately 2,196 of such employees will be hired by workers' cooperatives or private companies to perform school janitorial services for the Education Department. Therefore, the Fiscal Board expects that the net amount of employees affected by these layoffs will be approximately 13,774, which is projected to result in annual savings of approximately $386 million.

**Progress in the Implementation of the Fiscal Stabilization Plan**

As discussed in the Commonwealth Report, in order to achieve fiscal balance, the fiscal stabilization plan established a government-wide operating expense-reduction program aimed at reducing annual payroll and other operating expenses by $2 billion by the end of fiscal year 2010. The Fiscal Board estimates that the annual savings from all cost reduction measures implemented or identified by the Commonwealth as of September 30, 2009 will amount to approximately $1.2 billion, which is approximately 60% of the $2 billion target. The Fiscal Board continues to seek and implement various initiatives to obtain the additional savings necessary in order to achieve the $2 billion target. The additional savings are expected to come from both cost reduction and revenue generating initiatives, which include, among others, improvements in government procurement processes, reorganization and increased fiscal oversight of government agencies and improvements in tax collection and enforcement measures.

**PLAN OF FINANCING**

**The Bonds**

The Authority is issuing the Bonds to (i) refund interest (but not principal) on certain bonds issued under the 1995 Bond Resolution, the 1978 Bond Resolution (as hereinafter defined), and the 1970 Bond Resolution (as hereinafter defined) in the amounts and maturities identified in the table below (the "Refunded Interest"), (ii) repay certain advances made to the Authority by Government Development Bank under a line of credit facility, (iii) pay capitalized interest, and (iv) pay costs of issuance of the Bonds.

**1995 Bond Resolution**

| **Bonds with Refunded Interest** | **Principal Amount** | **Interest Rate** | **Maturity Date** | **Interest Refunded***  |
|---|---|---|---|---|
| Government Facilities Revenue Bonds, Series A | 6,470,000 | 6.250% | 7/1/2010 | 202,187.50 |
| | 6,875,000 | 6.250% | 7/1/2011 | 214,843.75 |
| | 7,305,000 | 6.250% | 7/1/2012 | 228,281.25 |
| Government Facilities Revenue Refunding Bonds, Series C | 14,485,000 | 5.500% | 7/1/2010 | 398,337.50 |
| | 15,250,000 | 5.250% | 7/1/2011 | 400,312.50 |
| | 16,020,000 | 5.500% | 7/1/2012 | 440,550.00 |
| | 10,995,000 | 5.500% | 7/1/2013 | 302,362.50 |
| | 11,600,000 | 5.500% | 7/1/2014 | 319,000.00 |
| | 12,240,000 | 5.500% | 7/1/2015 | 336,600.00 |
| | 12,915,000 | 5.500% | 7/1/2016 | 355,162.50 |
| | 3,905,000 | 5.750% | 7/1/2017 | 112,268.75 |
| | 4,125,000 | 5.750% | 7/1/2018 | 118,593.75 |
| | 4,365,000 | 5.750% | 7/1/2019 | 125,493.75 |
| | 4,620,000 | 5.750% | 7/1/2020 | 132,825.00 |
| | 4,880,000 | 5.750% | 7/1/2021 | 140,300.00 |
| | 17,865,000 | 5.750% | 7/1/2022 | 513,618.75 |
| Government Facilities Revenue Bonds, Series D | 3,000,000 | 5.375% | 7/1/2012 | 80,625.00 |
| | 3,000,000 | 5.000% | 7/1/2016 | 75,000.00 |
| | 3,000,000 | 5.000% | 7/1/2017 | 75,000.00 |
| | 3,000,000 | 5.000% | 7/1/2018 | 75,000.00 |
| | 8,000,000 | 5.125% | 7/1/2020 | 205,000.00 |
| | 2,475,000 | 5.125% | 7/1/2021 | 63,421.88 |
| | 2,410,000 | 5.125% | 7/1/2022 | 61,756.25 |
| | 4,280,000 | 5.125% | 7/1/2024 | 109,675.00 |
| | 16,020,000 | 5.250% | 7/1/2027 | 420,525.00 |
| | 62,585,000 | 5.375% | 7/1/2033 | 1,681,971.88 |
| | 39,140,000 | 5.250% | 7/1/2036 | 1,027,425.00 |
| Government Facilities Revenue Refunding Bonds, Series F | 3,110,000 | 5.000% | 7/1/2013 | 77,750.00 |
| | 3,105,000 | 5.000% | 7/1/2014 | 77,625.00 |
| | 3,100,000 | 5.000% | 7/1/2015 | 77,500.00 |
| | 25,800,000 | 5.250% | 7/1/2017 | 677,250.00 |
| | 10,475,000 | 5.250% | 7/1/2018 | 274,968.75 |
| | 19,025,000 | 5.250% | 7/1/2019 | 499,406.25 |
| | 11,610,000 | 5.250% | 7/1/2020 | 304,762.50 |
| | 12,225,000 | 5.250% | 7/1/2021 | 320,906.25 |
| | 13,605,000 | 5.250% | 7/1/2023 | 357,131.25 |
| | 14,320,000 | 5.250% | 7/1/2024 | 375,900.00 |
| | 15,070,000 | 5.250% | 7/1/2025 | 395,587.50 |

**1995 Bond Resolution**

| Bonds with Refunded Interest | Principal Amount | Interest Rate | Maturity Date | Interest Refunded* |
|---|---|---|---|---|
| Government Facilities Revenue Bonds, Series G | 1,350,000 | 3.250% | 7/1/2010 | 21,937.50 |
| | 1,395,000 | 5.000% | 7/1/2011 | 34,875.00 |
| | 1,465,000 | 5.000% | 7/1/2012 | 36,625.00 |
| | 1,540,000 | 5.250% | 7/1/2013 | 40,425.00 |
| | 1,620,000 | 5.250% | 7/1/2014 | 42,525.00 |
| | 1,705,000 | 5.250% | 7/1/2015 | 44,756.25 |
| | 1,795,000 | 5.250% | 7/1/2016 | 47,118.75 |
| | 1,890,000 | 5.250% | 7/1/2017 | 49,612.50 |
| | 1,990,000 | 5.250% | 7/1/2018 | 52,237.50 |
| | 2,095,000 | 5.250% | 7/1/2019 | 54,993.75 |
| | 2,205,000 | 5.250% | 7/1/2020 | 57,881.25 |
| | 2,320,000 | 5.250% | 7/1/2021 | 60,900.00 |
| | 13,480,000 | 5.000% | 7/1/2026 | 337,000.00 |
| | 21,045,000 | 4.750% | 7/1/2032 | 499,818.75 |
| Government Facilities Revenue Refunding Bonds, Series H (Forward Delivery) | 2,945,000 | 5.000% | 7/1/2010 | 73,625.00 |
| | 14,385,000 | 5.250% | 7/1/2012 | 377,606.25 |
| | 34,670,000 | 5.250% | 7/1/2013 | 910,087.50 |
| | 890,000 | 5.250% | 7/1/2013 | 23,362.50 |
| | 37,425,000 | 5.250% | 7/1/2014 | 982,406.25 |
| | 39,395,000 | 5.250% | 7/1/2015 | 1,034,118.75 |
| | 7,850,000 | 5.500% | 7/1/2016 | 215,875.00 |
| | 33,615,000 | 5.500% | 7/1/2016 | 924,412.50 |
| | 18,890,000 | 5.500% | 7/1/2017 | 519,475.00 |
| | 19,930,000 | 5.500% | 7/1/2018 | 548,075.00 |
| | 2,565,000 | 5.500% | 7/1/2019 | 70,537.50 |
| Government Facilities Revenue Bonds, Series I | 64,670,000 | 5.250% | 7/1/2029 | 1,697,587.50 |
| | 267,395,000 | 5.250% | 7/1/2033 | 7,019,118.75 |
| | 195,775,000 | 5.000% | 7/1/2036 | 4,894,375.00 |
| Government Facilities Revenue Refunding Bonds, Series J | 85,580,000 | 5.000% | 7/1/2028 | 2,139,500.00 |
| | 250,000,000 | 5.000% | 7/1/2036 | 6,250,000.00 |
| Government Facilities Revenue Refunding Bonds, Series K | 50,000,000 | 5.250% | 7/1/2027 | 1,312,500.00 |
| Government Facilities Revenue Refunding Bonds, Series M | 10,950,000 | 5.500% | 7/1/2010 | 301,125.00 |
| | 11,550,000 | 5.500% | 7/1/2011 | 317,625.00 |
| | 12,180,000 | 5.500% | 7/1/2012 | 334,950.00 |

**1995 Bond Resolution**

| Bonds with Refunded Interest | Principal Amount | Interest Rate | Maturity Date | Interest Refunded* |
|---|---|---|---|---|
| | 16,235,000 | 5.500% | 7/1/2013 | 446,462.50 |
| | 17,130,000 | 5.750% | 7/1/2014 | 492,487.50 |
| | 18,115,000 | 5.750% | 7/1/2015 | 520,806.25 |
| | 19,155,000 | 5.750% | 7/1/2016 | 550,706.25 |
| | 20,260,000 | 5.750% | 7/1/2017 | 582,475.00 |
| | 940,000 | 5.000% | 7/1/2018 | 23,500.00 |
| | 3,060,000 | 5.500% | 7/1/2019 | 84,150.00 |
| | 12,545,000 | 6.000% | 7/1/2020 | 376,350.00 |
| | 19,230,000 | 6.250% | 7/1/2021 | 600,937.50 |
| | 27,085,000 | 6.250% | 7/1/2022 | 846,406.25 |
| | 21,385,000 | 6.250% | 7/1/2023 | 668,281.25 |
| | 11,645,000 | 6.000% | 7/1/2023 | 349,350.00 |
| | 34,785,000 | 6.000% | 7/1/2024 | 1,043,550.00 |
| | 29,750,000 | 6.000% | 7/1/2025 | 892,500.00 |
| | 5,740,000 | 6.000% | 7/1/2026 | 172,200.00 |
| | 32,295,000 | 6.000% | 7/1/2027 | 968,850.00 |
| | 35,785,000 | 6.000% | 7/1/2028 | 1,073,550.00 |
| | 66,250,000 | 6.250% | 7/1/2031 | 2,070,312.50 |
| | 69,225,000 | 5.750% | 7/1/2034 | 1,990,218.75 |
| | 60,000,000 | 5.500% | 7/1/2035 | 1,650,000.00 |
| Government Facilities Revenue Refunding Bonds, Series P | 7,690,000 | 5.750% | 7/1/2018 | 221,087.50 |
| | 16,850,000 | 6.000% | 7/1/2019 | 505,500.00 |
| | 21,235,000 | 6.000% | 7/1/2020 | 637,050.00 |
| | 45,000,000 | 7.000% | 7/1/2021 | 1,575,000.00 |
| | 25,000,000 | 6.125% | 7/1/2023 | 765,625.00 |
| | 55,000,000 | 7.000% | 7/1/2025 | 1,925,000.00 |
| | 29,315,000 | 6.250% | 7/1/2026 | 916,093.75 |
| | 47,965,000 | 6.500% | 7/1/2030 | 1,558,862.50 |
| | 82,880,000 | 6.750% | 7/1/2036 | 2,797,200.00 |

**1978 Bond Resolution**

| Bonds with Refunded Interest | Principal Amount | Interest Rate | Maturity Date | Interest Refunded* |
|---|---|---|---|---|
| Public Education and Health Facilities Refunding Bonds, Series M | 32,585,000 | 5.750% | 7/1/2010 | 936,818.75 |

**1970 Bond Resolution**

| Bonds with Refunded Interest | Principal Amount | Interest Rate | Maturity Date | Interest Refunded* |
|---|---|---|---|---|
| Revenue Refunding Bonds, Series L | 6,065,000 | 5.750% | 7/1/2010 | 174,368.75 |
| | 37,315,000 | 5.500% | 7/1/2021 | 1,026,162.50 |

---

* Reflects total amount of interest refunded for January 1, 2010 interest payment date.

**Use of Proceeds**

The proceeds of the Bonds (including any premium and net of original issue discount) are expected to be used as follows:

**Sources**

| | | |
|---|---|---|
| Par Amount of the Bonds | $ | 152,540,000.00 |
| Net Original Issue Discount | | (2,410,905.00) |
| Other Available Moneys | | 38,555,930.20 |
| Total | $ | 188,685,025.20 |

**Uses**

| | | |
|---|---|---|
| Escrow Accounts for Refunded Interest | $ | 71,417,527.15 |
| Repayment of Government Development Bank's Line of Credit | | 93,131,353.82 |
| Capitalized Interest | | 22,707,321.94 |
| Underwriters' discount and estimated legal, printing and financing expenses | | 1,428,822.29 |
| Total | $ | 188,685,025.20 |

## THE BONDS

**Description of the Bonds**

The Bonds will be issued in book-entry only form as registered bonds without coupons, will be dated, will bear interest at the rates, and will mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement.  Principal of and interest on the Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months.  Interest on the Bonds will be payable semiannually on each January 1 and July 1, commencing on January 1, 2010.  The Bonds will be issued in fully registered form, in denominations of $5,000 and any multiple thereof and, when issued, will initially be registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Bonds.

**Redemption Provisions**

*Optional Redemption of the Bonds*.  Except for the Bonds maturing on July 1, 2039, the Bonds shall be subject to redemption, at the option of the Authority, from any moneys that may be available for that purpose (other than moneys deposited in the 1995 Sinking Fund in respect of an amortization requirement), on July 1, 2014 or any date thereafter, in whole or in part, in the principal amount of the Bonds to be redeemed, together with the accrued interest thereon to the date fixed for redemption without premium.

The Bonds maturing on July 1, 2039 shall be subject to redemption, at the option of the Authority, from any moneys that may be available for that purpose (other than moneys deposited in the 1995 Sinking Fund in respect of an amortization requirement), on July 1, 2019 or any date thereafter, in whole or in part, in the principal amount of the Bonds to be redeemed, together with the accrued interest thereon to the date fixed for redemption without premium.

Any such redemptions shall be made in the manner and under the terms and conditions provided in the 1995 Bond Resolution.

*Mandatory Redemption*.  The Bonds maturing July 1, 2039 shall be redeemed upon 30 days' notice in part as set forth below in the principal amounts equal to the respective amortization requirements for such Bonds (less the principal amount of any such Bonds retired by purchase) from moneys in the 1995 Sinking Fund, at a price equal to the principal amount to be redeemed plus accrued interest to the date fixed for redemption, as follows and otherwise subject to adjustments as provided in the 1995 Bond Resolution:

| Amortization Requirements for the Bonds due July 1 | |
| --- | --- |
| **Year** | **2039** |
| 2038 | $ 50,260,000 |
| 2039 | 54,310,000 |
| Average life (years) | 29.194 |

*Notice of Redemption.* At least 30 days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described under the caption "Book-Entry Only System" under *The Bonds*, by first-class mail, postage prepaid, to the registered owners of the Bonds to be redeemed. Each notice of redemption shall contain, among other things, the CUSIP identification number of the Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the 1995 Fiscal Agent, interest on the Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the 1995 Bond Resolution, Bonds or portions of Bonds which have been duly called for redemption, or with respect to which irrevocable instructions to call for redemption have been given, and for the payment of the principal of and the accrued interest on which sufficient moneys or Government Obligations (as defined in the 1995 Bond Resolution) shall be held in separate trust for the owners of such Bonds or portions thereof to be redeemed, shall not be deemed to be outstanding under the 1995 Bond Resolution, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the accrued interest thereon from said separate trust and to receive Bonds (of the same series and maturity) for any unredeemed portion of such Bonds.

*Selection of Bonds to be Redeemed.* If less than all of the Bonds of any one maturity and series shall be called for redemption, the particular Bonds or portions thereof to be redeemed shall be selected by the 1995 Fiscal Agent in such manner as it, in its discretion, may determine to be appropriate and fair; except that so long as the book-entry only system shall remain in effect, the selection of the Bonds to be redeemed shall be determined as provided under the caption "Book-Entry Only System" under *The Bonds*. If during any fiscal year the total principal amount of term Bonds retired by purchase or redemption exceeds the amortization requirement for such term Bonds for such year, the amortization requirement for such term Bonds shall be reduced for subsequent fiscal years in amounts aggregating such excess as shall be determined by the Authority.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from sources (including DTC) that the Authority believes to be reliable, but none of the Authority, the 1995 Fiscal Agent or the Underwriters takes any responsibility for the accuracy of such information.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond will be issued for each maturity of each series of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. Except as otherwise provided below, a Beneficial Owner (as hereinafter defined) of an interest in the Bonds will not be entitled to have the Bonds registered in such owner's name, will not be entitled to definitive Bonds and will not be considered an owner or holder of the Bonds under the 1995 Bond Resolution.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code,

038

and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act").  DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC.  DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participant's accounts.  This eliminates the need for physical movement of securities certificates.  Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations.  DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC").  DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies.  DTCC is owned by the users of its regulated subsidiaries.  Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants").  DTC has Standard & Poor's Ratings Services ("Standard & Poor's") highest rating: AAA.  The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC").  More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records.  The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records.  Beneficial Owners will not receive written confirmation from DTC of their purchase.  Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.  Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners.  Beneficial Owners will not receive definitive Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC.  The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership.  DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners.  The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.  Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the documents governing the Bonds.  For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners.  In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC.  If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date.  The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal of and premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC.  DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the 1995 Fiscal Agent on payable date in accordance with their respective holdings shown on DTC's records.  Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such Participant and not of DTC, the 1995 Fiscal Agent, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time.  Payment of principal, premium, if any, and interest with respect to the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the 1995 Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the 1995 Fiscal Agent.  Under such circumstances, in the event that a successor depository is not obtained, definitive Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository).  In that event, definitive Bonds will be printed and delivered to DTC.

*The Authority, the 1995 Fiscal Agent and the Underwriters will have no responsibility or obligation to DTC, Direct Participants, Indirect Participants or the Beneficial Owners of the Bonds with respect to (i) the accuracy of any records maintained by DTC, any Direct Participant or any Indirect Participant; (ii) the payment by DTC to any Direct Participant or any Indirect Participant of any amount due to any Beneficial Owner in respect of the principal of or premium, if any, or interest on any Bonds; (iii) the delivery of any notice by DTC, any Direct Participant or any Indirect Participant; (iv) the selection of Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (v) any other action taken or omitted to be taken by DTC or any Direct Participant or Indirect Participant.  The current "rules" applicable to DTC are on file with the SEC and current "procedures" of DTC to be followed in dealing with its Participants are on file with DTC.*

**Discontinuance of the Book-Entry Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: (i) principal of and the redemption premium, if any, on the Bonds will be payable in lawful money of the United States of America at the corporate trust office of the 1995 Fiscal Agent in New York, New York; (ii) interest on the Bonds will be payable on each January 1 and July 1 by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1995 Fiscal Agent as of the close of business on the record date therefor as set forth in the 1995 Bond Resolution (June 15 and December 15); (iii) the Bonds will be issued only as registered bonds without coupons in denominations of $5,000 or any multiple thereof, and (iv) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate trust office of the 1995 Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such registration, transfer or exchange.

For every registration or transfer of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## SECURITY

All Government Facilities Bonds will be secured equally and ratably by a pledge of rentals of the facilities leased by the Authority (the "Leased Facilities").  The Leased Facilities will not be mortgaged or otherwise encumbered to secure any Government Facilities Bonds.  The Enabling Act provides that the good faith and credit of the Commonwealth are pledged for the payment of rentals under any lease agreement with any department, agency or instrumentality of the Commonwealth and to the making of advances by the Secretary of Treasury of the Commonwealth to the Authority of any unpaid portion of rentals payable to the Authority by any department, agency or instrumentality of the Commonwealth.  The Enabling Act also provides that the good faith and credit of any

municipality entering into a lease agreement with the Authority are pledged for the payment of any rentals thereunder.

The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Treasury such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds.  The good faith and credit of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.

The rentals received in respect of the leased facilities financed by any Government Facilities Bonds and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any of the Public Buildings Authority Public Education and Health Facilities Bonds or Public Buildings Authority Revenue Bonds issued under the 1978 Bond Resolution and the 1970 Bond Resolution.

**Commonwealth Guaranty**

As provided in Act No. 17 of the Legislature of Puerto Rico, approved on April 11, 1968, as amended (the "Guaranty Act"), the Commonwealth guarantees, among other things, the payment of the principal of and interest on the Government Facilities Bonds.  The Guaranty Act, which was amended by Act No. 321 of December 28, 2003, to increase the amount of the guaranty from $2,500,000,000 to $3,325,000,000, reads as follows:

> The Commonwealth of Puerto Rico hereby guarantees payment of the principal and the interest on bonds outstanding at any given time, in an aggregate principal amount not exceeding $3,325,000,000 issued from time to time by the Public Buildings Authority for any of its purposes authorized by this Enabling Act.  The bonds covered by this warranty shall be those specified by the Authority, and a statement of such warranty shall be set forth on the face of such bonds.  If at any time the revenues or income and any other moneys of the Authority, pledged for the payment of the principal and interest on such bonds, are not sufficient for the payment of such principal and interest when they come due, nor to maintain the reserve fund for the bonds that the Authority has pledged to maintain, the Secretary of Treasury shall withdraw from any available funds in the Treasury of Puerto Rico, such sums as may be necessary to cover the deficiency in the amount required for the payment of such principal and interest, and to bring said reserve fund to the required maximum agreed by the Authority, and shall direct that the sums thus withdrawn be applied to such payment and purpose.  For purposes of this Enabling Act, those bonds under the defeasance provisions of the resolution or resolutions by which they were issued shall not be deemed as outstanding.  The good faith and credit of the Commonwealth are hereby pledged to make the payments described in the above paragraph.

The Bonds have been specified by the Authority in the Bond Resolution to be guaranteed by the Commonwealth under the Guaranty Act.  Following the issuance of the Bonds, the Authority will have $3,154,389,085 aggregate principal amount of bonds outstanding covered by the Guaranty Act, consisting of $43,380,000 of bonds issued under Resolution No. 77, adopted by the Authority on November 16, 1970, as amended (the "1970 Bond Resolution"), $32,585,000 of bonds issued under Resolution No. 158, adopted by the Authority on February 14, 1978, as amended (the "1978 Bond Resolution"), and $3,078,424,085 of bonds issued under the 1995 Bond Resolution, calculated in each case by excluding the accretion on capital appreciation bonds and convertible capital appreciation bonds.  See *Debt of the Authority and Debt Service Requirements*.

To date, no payments have ever been required under the Guaranty Act.

**Opinion of the Secretary of Justice of the Commonwealth**

Prior to the delivery of the Bonds, the Secretary of Justice of the Commonwealth will have rendered his opinion to the Authority to the effect that:

1.    The Authority is lawfully authorized to specify up to $3,325,000,000 aggregate principal amount of bonds of the Authority outstanding at any one time, issued for any of its authorized purposes, to be covered by the guaranty of the Commonwealth under the Guaranty Act, and the Commonwealth will be obligated to pay the principal of and the interest on the bonds so specified to be covered by said guaranty, if and to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient to make such payments as the same become due;

2.    Any amounts required to be paid by the Commonwealth under said guaranty will constitute "public debt" in the meaning of Section 8 of Article VI of the Puerto Rico Constitution, and will accordingly be entitled to the same priority of payment under such Section as the direct bonded indebtedness of the Commonwealth;

3.    The Secretary of Treasury can be required in a court of justice under the provisions of Section 2 of Article VI of the Puerto Rico Constitution to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI, including any payments required to be made under said guaranty, at the suit of any holder of bonds issued by the Authority and guaranteed pursuant to the Guaranty Act; and

4.    The Commonwealth guaranty of the Bonds constitutes a general obligation of the Commonwealth to which its good faith, credit and taxing power are pledged.

**Lease Agreements**

In accordance with the provisions of the 1995 Bond Resolution, the Authority enters into lease agreements (the "Lease Agreements") with various departments, agencies, instrumentalities and municipalities of the Commonwealth with respect to the Leased Facilities. The Lease Agreements require the corresponding lessees to pay to the Authority annual rentals in substantially equal monthly installments. The rentals are calculated by taking into account the following factors:

(1) the interest on and principal of (including any amortization requirements of) and redemption premium, if any, on Government Facilities Bonds issued to finance or refinance such Leased Facilities,

(2) any amounts necessary to pay the general administrative expenses of the Authority related to the Leased Facilities, and

(3) any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

The Lease Agreements may also require the lessees to pay certain amounts on account of the principal of and interest on outstanding notes issued to provide interim financing for the initial development and construction of the Leased Facilities.

Each Lease Agreement with respect to a facility or facilities terminates when the Government Facilities Bonds (as well as any notes issued to provide interim financing) which were issued to finance or refinance the acquisition or construction of such facility or facilities have been paid in full. All Lease Agreements provide for the adjustment of rentals so that the total amounts payable will be sufficient to meet the required debt service charges. Each Lease Agreement provides that the obligation of the lessee to pay rentals is absolute and unconditional.

Under the 1995 Bond Resolution, the Authority is required to forward, upon receipt, the portion of the rental payment from the lessees corresponding to the debt service payments on the Bonds (as well as any notes issued to provide interim financing) to the 1995 Fiscal Agent. From time to time, the Authority experiences delays in the payment of monthly rentals by certain lessees. In an effort to reduce the frequency and length of those delays, on December 7, 2001, the Authority entered into an Inter-Agency Agreement (the "Inter-Agency Agreement") with Government Development Bank, the Puerto Rico Office of Management and Budget ("OMB") and Treasury pursuant to which OMB instructs Treasury to forward funds necessary to pay rentals under Lease Agreements to Government Development Bank by the 10th day of each month, which funds are, in turn, deposited in a special

account of the Authority at Government Development Bank. The portion of such rentals that will be used to pay debt service on the Authority's bonds is kept in such account for delivery to the respective fiscal agents. The remainder is forwarded to the Authority to cover its general and administrative expenses related to the Lease Facilities, as well as any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

During recent fiscal years, the Authority has experienced increased delays in rental payments, as the Commonwealth has experienced growing budget deficits. Given the budgetary constraints of the Commonwealth, in recent fiscal years OMB has not proposed, and, as a result, the Legislature did not appropriate, sufficient funds to provide the Authority with the aggregate amount of rental payments provided for in the Lease Agreements. Consequently, OMB has been unable to instruct Treasury to forward to Government Development Bank the full amount of rental payments payable under the Lease Agreements. Nevertheless, OMB has always instructed Treasury to forward to Government Development Bank sufficient funds to pay all interest on and principal of (including any amortization requirements) and redemption premium, if any, on Government Facilities Bonds, as well as a portion of general and administrative expenses of the Authority related to the Leased Facilities. No funds have been provided to replenish or maintain the reserve for the replacement of major items of equipment comprising a portion of such Leased Facilities, which as of June 30, 2009, had no funds deposited therein.

In recent years there has also been a shortfall between the amounts budgeted by the Authority to cover all of its operational expenses and the actual amounts which the Authority is required to receive in rental payments under Lease Agreements to cover its operating (non-debt service) expenses and contribution to reserves. For fiscal year 2009, OMB budgeted for the payment of rent to the Authority approximately $145 million less than the amount requested by the Authority. As of June 30, 2009, the Authority's accumulated rent receivables were $248,449,000, which represents an increase of $74,004,000 over the balance as of June 30, 2008.

As described above, the shortfalls in rental payments have not affected the Authority's ability to pay its debt service, and there have been no defaults or delays in the payment of the principal of or interest on any indebtedness of the Authority. Although the rental payment delays and the Authority's budgetary shortfalls have caused compliance failures with the Inter-Agency Agreement, OMB, Treasury and Government Development Bank intend to enforce its terms more effectively in the future.

To address the delays and shortfalls in the payment of rental payments, the Authority has undertaken and continues to undertake certain fiscal measures to cover such shortfalls, including:

- Divesting certain real estate that the Authority does not contemplate developing or constructing. During fiscal year 2009, the Authority generated $15 million from the sale of such real estate.

- Ensuring that OMB has proposed sufficient funds in the Commonwealth's proposed budgets for fiscal year 2010 to provide the Authority with the adequate amount of rental payments.

- Implementing various Executive Orders issued by the Governor during the second half of fiscal year 2009 calling for the implementation of measures of austerity, fiscal control and expense reduction, including salary reduction of non-career employees and agency heads, salary freezes, ban on new positions, and the elimination of vacant positions.

- Developing and implementing various operating expense reduction measures, including the implementation of energy reduction, transportation, communication and security services cost savings initiatives, consolidation of office space to obtain additional rental income, and renegotiation of services contracts.

- Implementing effective and consistent collection methods for past due rentals and entering into payment plans with lessees.

The Authority also anticipates that for fiscal year 2010 and beyond, in spite of the Commonwealth's fiscal imbalance, the Legislature will appropriate sufficient funds to cover substantially all the rental payments provided

043

for in the Lease Agreements.  Accordingly, the budgetary shortfalls currently being experienced by the Authority are expected to be reduced.  Although the Authority proposed a balanced operating budget for fiscal year 2010, the Legislature appropriated a budget of $328,297,000 with a projected shortfall of $1,796,414.

OMB and Government Development Bank have established a six-year plan for the repayment of accumulated debt owed by departments, agencies and instrumentalities of the Commonwealth to certain public corporations, including the Authority.  Pursuant to this plan, OMB scheduled and the Legislature appropriated for fiscal year 2010 approximately $51 million for the amortization of overdue rent to the Authority.  This first installment was paid to the Authority on September 17, 2009.  OMB has agreed to continue requesting annual General Fund appropriations for the payment of such debt.

For further information regarding certain provisions required by the 1995 Bond Resolution to be included in each Lease Agreement in respect of facilities financed or refinanced by the Bonds, see *Summary of Certain Provisions of the 1995 Bond Resolution*.

**Pledge of the Commonwealth to Pay or Advance Rentals**

Under the 1995 Bond Resolution, the Authority has covenanted that if any department, agency, instrumentality or municipality fails to pay any rent when due, the Authority will promptly notify the Secretary of Treasury.

As provided in the Enabling Act, the good faith and credit of the Commonwealth are pledged for the payment of the rent payable under any Lease Agreement with the Authority executed by any of the Commonwealth's executive departments, including, among others, the Department of Education, the Department of Health and the Department of Rehabilitation and Correction (the "Department of Correction"), and any other governmental body created by the Legislature of Puerto Rico and depending mainly on legislative appropriations to meet its operating expenses.

The Enabling Act also provides that if any rent payable to the Authority by any agency or instrumentality (other than a department) under a lease contract is not paid when due, the Commonwealth shall advance the unpaid balance to the Authority.  The Commonwealth pledges its good faith and credit to the making of such advances.  Any advances so made are required to be reimbursed by the particular agency or instrumentality involved.

Payments or advances of rentals by the Commonwealth, as described above, are subject to annual appropriations by the Legislature, which appropriations are legally required to be made.  However, the obligation to make such appropriations is not legally enforceable in view of the sovereign immunity of the Commonwealth and, unlike the obligation to make payments under the guaranty of the Bonds, the obligation to pay or advance rentals does not constitute "public debt" within the meaning of Section 8 of Article VI of the Puerto Rico Constitution.

**Additional Bonds**

Under and in accordance with the provisions and restrictions of the 1995 Bond Resolution, the Authority may issue additional Government Facilities Bonds from time to time to finance additional government facilities or complete the construction of existing government facilities or to refund any bonds issued under the 1995 Bond Resolution, the 1970 Bond Resolution or the 1978 Bond Resolution.  Although the Authority reserves the right to issue additional Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution, since the adoption of the 1995 Bond Resolution, the Authority has only issued additional bonds under the 1995 Bond Resolution.

## PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH

**Payment of Public Debt**

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first lien on available Commonwealth taxes and revenues.  Public debt includes general obligation bonds and notes of the

Commonwealth and, according to opinions rendered by the Secretary of Justice of Puerto Rico, any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.  Any such guaranty payments, including guaranty payments under the Guaranty Act, are equal in their claim on such available Commonwealth revenues to claims for the payment of debt service on general obligation bonds and notes of the Commonwealth.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highway Authority").  The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose.  The Commonwealth has never applied such amounts to payment of its public debt.

Since fiscal 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth.  The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose.  The Commonwealth has never applied such amounts to the payment of its public debt.

Since November 2006, the Commonwealth imposes a general sales and use tax of 5.5%.  Half of the 5.5% sales and use tax is transferred to a legislatively mandated Dedicated Sales Tax Fund and is not included as Commonwealth internal revenues consistent with the legislation creating the Sales Tax Financing Corporation, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that it is not available revenues pursuant to the aforementioned Constitutional provisions.  See "Major Sources of General Fund Revenues—Sales and Use Taxes" under *Puerto Rico Taxes, Other Revenues, and Expenditures* in the Commonwealth Report.

The Constitution of Puerto Rico expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of Treasury to require application of available revenues, including surplus, to the payment of principal of and interest on public debt when due.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.  Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.  Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury and motor vehicle fuel taxes and license fees, which are allocated to the Highway Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the constitutional provisions relating to the public debt.

18

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest category by Moody's and Standard & Poor's), none of which is eligible to be used for a legal defeasance under Puerto Rico law ("non-eligible investments").  Since bonds refunded with proceeds of non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $949,276,446 in the fiscal year ending June 30, 2016 (based on the assumption that (i) the bonds refunded with non-eligible investments are treated as being outstanding, (ii) the Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (iii) a portion of the Public Improvement Refunding Bonds, Series 2003C, the Public Improvement Refunding Bonds, Series 2004B, a portion of the Public Improvement Bonds of 2006, Series A, a portion of the Public Improvement Refunding Bonds, Series 2007A and the Public Improvement Refunding Bonds, Series 2008B, each of which are also variable rate bonds, bear interest at 12% per annum, and (iv) the public improvement bonds to which the basis swap and the constant maturity swap relate bear interest at their stated interest rates rather than the rates set forth in said swaps).  This amount ($949,276,446) is equal to 12.36% of $7,679,421,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2008 and the preliminary adjusted internal revenues for the fiscal year ended June 30, 2009.  If bonds refunded with non-eligible investments described in the preceding paragraph were treated as not being outstanding, and the interest on the outstanding bonds described in items (ii) through (iv) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements entered into in respect thereof, the percentage referred to in the preceding sentence would be 10.21%.  Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation.  In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.

The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation.  The proposed Commonwealth budget for fiscal year 2010 does not contemplate the issuance of new Commonwealth general obligation debt.  The Commonwealth is undertaking the refunding and restructuring of several outstanding general obligation bond issues.

Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes.  Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products.  See *Public Corporations* in the Commonwealth Report.  However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case.  Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures.  Debt of public corporations is issued in accordance with their enabling statutes.  Government Development Bank, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

**Commonwealth Guaranteed Debt**

As of July 1, 2009, $3.0 billion of Commonwealth guaranteed bonds of the Authority are outstanding.  Excluding the refunding of the Refunded Interest, maximum annual debt service on these bonds is $250.3 million in fiscal year 2011, with their final maturity being July 1, 2037.  No payments under the Commonwealth guaranty have been required to date for these bonds.

As of June 30, 2009, $267 million of Commonwealth guaranteed bonds of Government Development Bank are outstanding.  No payments under the Commonwealth guaranty have been required for these bonds.

As of June 30, 2009, Government Development Bank holds approximately $181 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth.  The Port of the Americas Authority is authorized to issue and Government Development Bank is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million.  The proceeds from these bonds will be used to continue the development of the Port of the Americas.  No payments under the Commonwealth guaranty have been required for these bonds.  See "Other Public Corporations—Port of the Americas Authority" under *Public Corporations* in the Commonwealth Report.

As of June 30, 2009, the aggregate outstanding principal amount of obligations of the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed by the Commonwealth are $912 million.  This amount consists of $284.7 million in revenue bonds sold to the public, $309.8 million in bonds issued to the United States Department of Agriculture, Rural Development, and $317.5 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA.  From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty.  Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt.  In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee.  See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under *Public Corporations* in the Commonwealth Report.

**THE AUTHORITY**

**General**

The Authority, a body corporate and politic constituting an instrumentality of the Commonwealth exercising public and essential governmental functions, was created on June 19, 1958 by the Enabling Act.  Under the Enabling Act, the primary functions of the Authority are to design and construct office buildings, quarters, courts, warehouses, shops, schools, health facilities, social welfare facilities and related facilities for lease to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities.  The executive offices of the Authority are located at Roberto Sánchez Vilella Government Center, North Building, 6th Floor, De Diego Avenue, San Juan, Puerto Rico 00940, telephone number (787) 722-0101.

**Powers**

The Authority has broad powers under the Enabling Act, including among others:

- to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers;

- to acquire any kind of properties and rights therein in any lawful manner, including, without limitation, acquisition by purchase, either by agreement or through the exercise of the power of eminent domain, lease or bequest, and to possess, lease, use and operate any properties or facilities;

- to prepare plans, projects and cost estimates for the construction, improvement or repair of any property or facility;

- to contract with any Commonwealth department, agency or official, or with any private person or entity with regard to the administration of any properties or facilities of the Authority;

- to borrow money and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds by pledge of all or any of its properties, revenues or income; and

- to do all acts necessary or convenient to carry out the powers granted to it.

**Management**

The Enabling Act provides that the Authority shall be governed by a Governing Board (the "Board") composed of seven members.  The Secretary of Education, the Secretary of Transportation and Public Works, and the President of Government Development Bank serve as *ex officio* members of the Board, and the other four members are appointed by the Governor of the Commonwealth with the advice and consent of the Senate for staggered five-year terms.  At present, there are two vacancies on the Board.

The current members of the Board of the Authority, their occupations and the expiration of terms as Board members are:

| Members of the Board* | Occupation | Expiration of Term |
|---|---|---|
| Carlos Chardón............................... | Secretary of Education | *Ex officio* |
| Rubén Hernández Gregorat ............ | Secretary of Transportation and Public Works | *Ex officio* |
| Carlos M. García.............................. | President and Chairman of the Board of Government Development Bank | *Ex officio* |
| Reynaldo Encarnación.................... | Engineer | March 2012 |
| Luis R. Ortiz ................................... | Attorney | July 2010 |

Jesús F. Méndez has been the Executive Director of the Authority since January 2009.  He was also appointed Executive Vice President of Government Development Bank in charge of Administration, Operations, and Controllership on January 7, 2009.  Before these appointments, from 2005 to 2008, Mr. Méndez held the position of President and Chief Executive Officer of Tresamici Management, Inc., a closely held corporation dedicated to the administration of assisted living facilities, of which he holds a one-third ownership participation.  From 1996 to 2004, he held several senior management positions within Banco Santander S.A. operating entities in Puerto Rico, including President of Santander Asset Management, First Senior Vice President and Trust Officer of Banco Santander Puerto Rico and Managing Director of Santander Securities Corporation.  Prior to joining Santander Securities, Mr. Méndez served as Chief Financial Officer and Managing Director of BP Capital Markets.  He also worked for Credit Suisse First Boston (Puerto Rico, Inc.) as Vice President and for Deloitte and Touche as Senior Auditor.  He also held the position of Assistant Bank Examiner at the Federal Deposit Insurance Corporation in New York City.  Mr. Méndez has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is a Certified Public Accountant.

The Authority's financial management team is comprised of its Executive Aide, Controller and Internal Auditor.

Javier A. Hernández Scimeca, CPA the Executive Aide of the Authority, has over twelve years of experience within the banking, financial and public accounting fields.  He has a bachelor's degree in business administration from the Polytechnic University of Puerto Rico and is an active member of the American Institute of Certified Public Accountants and the Puerto Rico Society of CPAs.

Ivonne Jurado Dávila, CPA the Authority's Controller, has over nine years experience within the public accounting fields.  She has a bachelor's degree and a masters in business administration from the University of Puerto Rico.  Ms. Jurado is an active member of the American Institute of Certified Public Accountants and the Puerto Rico Society of CPAs.

Carolina Guzmán Tejada, CPA, Esq. the Authority's Internal Auditor, has over seven years of experience within the banking and public accounting fields.  She has a bachelor's degree in business administration from the University of Puerto Rico and a Juris Doctor from the Inter-American University of Puerto Rico.  She is an active member of the Puerto Rico Society of Attorneys and admitted to practice by the Puerto Rico Supreme Court.  Ms. Guzmán is also an active member of the American Institute of Certified Public Accountants and the Puerto Rico Society of CPAs.

## PROGRAMS AND FACILITIES OF THE AUTHORITY

The Authority has an approximately $437 million Four-Year Capital Improvement Program (the "CIP"), which reflects the Authority's construction priorities for fiscal year 2009 through fiscal year 2013. The CIP includes office buildings, school buildings, health facilities, correctional facilities, and other facilities, as described below. A portion of the facilities were financed with revenue bonds issued and currently outstanding under the 1995 Bond Resolution (collectively, the "Outstanding Government Facilities Bonds"). The remainder of the costs of the CIP will be paid for through interim financings, future bond issues (subject to the limitations of the Guaranty Act) and Commonwealth appropriations.

### Office Buildings Program

Under its office buildings program, the Authority has completed construction of 333 office buildings (including police stations, courthouses, and related parking facilities), amounting to approximately 7.3 million square feet of rentable space, for the use of and lease to various departments, agencies and instrumentalities of the Commonwealth. As of June 30, 2009, the estimated total cost of construction completed under the office buildings program was approximately $555 million, which was provided principally by the Authority through the issuance of Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

The Authority has under planning and construction three police facilities, one fire station, one parking facility, and improvements to 43 office buildings, at an estimated total cost of $101 million.

The currently outstanding Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of the rentals of public buildings and related facilities financed by such bonds. In addition, these obligations are secured by a pledge of the Commonwealth to pay or advance rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Revenue Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the office buildings program.

### School Buildings Program

Under its school buildings program, the Authority has completed the construction of 610 school building projects, amounting to approximately 21.2 million square feet of rentable space, all of which have been leased to the Department of Education. As of June 30, 2009, the estimated total cost of construction completed under the school buildings program was $2.36 billion, which was provided principally by the Authority through the issuance of Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

The Authority has under planning and construction 16 new school buildings and improvements to 18 school buildings amounting to approximately 1.16 million square feet of rentable space to be leased to the Department of Education. The estimated total cost of construction of such school buildings and improvements is $337 million.

The currently outstanding Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of rentals of public education and health facilities financed by such bonds. In addition, they are secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Public Education and Health Facilities Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the school buildings program.

**Health Facilities Program**

Under its health facilities program, the Authority completed construction of 18 health facilities, amounting to approximately 1.5 million square feet of rentable space, all of which has been leased to the Department of Health. As of June 30, 2009, the estimated total cost of construction completed and owned by the Authority was $203 million, which was provided principally by the Authority through the issuance of Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution.

The currently outstanding Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of rentals of public education and health facilities financed by such bonds. In addition, they are secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Public Education and Health Facilities Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the health facilities program.

**Correctional Facilities Program**

In 1994, the Department of Correction, in cooperation with the Authority, began a program to provide for the construction, operation and maintenance of new Commonwealth correctional facilities to be leased to the Department of Correction by the Authority. These facilities were constructed as part of the Commonwealth's effort to alleviate overcrowding in its correctional system and achieve compliance with certain federal court mandated minimum inmate living space requirements. The Authority has completed the construction of 9 correctional facilities at an approximate cost of $287 million, which facilities are operated by the Department of Correction.

**Other Facilities**

The Authority also constructs office buildings, schools and health facilities that are financed by a combination of federal grants and Commonwealth appropriations. The Authority is also empowered to undertake construction on behalf of and as an agent for other public agencies of the Commonwealth.

Under the Enabling Act, the Authority is also empowered to construct social welfare facilities. Any such facilities that may be constructed can be financed by bonds of the Authority under the 1995 Bond Resolution. The Authority has not issued any bonds or other obligations to finance such facilities.

**DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS**

**Debt**

The following table sets forth the outstanding debt of the Authority:

| | As of July 1, 2009[1] | As Adjusted[2] |
|---|---|---|
| Bonds outstanding under the 1970 Bond Resolution | $ 43,380,000 | $ 43,380,000 |
| Bonds outstanding under the 1978 Bond Resolution | 32,585,000 | 32,585,000 |
| Bonds outstanding under the 1995 Bond Resolution | 2,925,884,085 | 3,078,424,085 |
| Total bonded debt[3] | $ 3,001,849,085 | $ 3,154,389,085 |

_____

(1) Calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds from their respective dates of issuance. These amounts do not reflect Government Development Bank's interim financing of the Authority's CIP.

(2) Reflects the outstanding debt of the Authority after giving effect to the issuance of the Bonds (calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds from their respective dates of issuance).

(3) Totals may not add due to rounding.

The Authority has caused to be deposited to the credit of the respective reserve accounts under the 1970 Bond Resolution and the 1978 Bond Resolution reserve account letters of credit issued by The Bank of Nova Scotia acting through its San Juan Branch ("BNS") (each, a "BNS Reserve Account Letter of Credit" and, collectively, the "BNS Reserve Account Letters of Credit") in the respective amounts required by said resolutions.  The scheduled expiration dates of the BNS Reserve Account Letters of Credit are July 15, 2011 and July 15, 2010, respectively. Among other things, the BNS Reserve Account Letters of Credit authorize drawings thereunder for the payment of any amount required to be paid out of moneys in the reserve account to which such BNS Reserve Account Letter of Credit relates after the withdrawal from the applicable reserve account of all cash and securities therein.

The obligations of the Authority under the reimbursement agreements between BNS and the Authority are not payable from the portion of the rentals received by the Authority in respect of the government facilities financed or refinanced with the proceeds of any Government Facilities Bonds and allocable to such Government Facilities Bonds.

No reserve account is established under the 1995 Bond Resolution.

In the near future, the Authority expects to issue bonds to restructure certain upcoming debt service payments.  The Authority is also considering issuing bonds to repay and restructure outstanding debt with Government Development Bank.

**Debt Service Requirements**

Debt service requirements of the Authority for the bonds outstanding under the 1970, 1978 and 1995 Bond Resolutions (after the refunding of the Refunded Interest) and the Bonds as shown in the following table, consist in any fiscal year of the sum of the amounts required to pay (i) the interest that is payable on January 1 in such fiscal year and July 1 in the following fiscal year, (ii) the principal of serial bonds that is payable on July 1 in the following fiscal year, and (iii) the amortization requirements for term bonds that are payable on July 1 in the following fiscal year.

24

### Puerto Rico Public Buildings Authority
### Debt Service Requirements

| Fiscal Year Ending June 30, | Total Debt Service on Bonds Outstanding under 1970, 1978 and 1995 Bond Resolutions[1] | The Bonds | | | Total Debt Service[3] |
|---|---|---|---|---|---|
| | | Principal | Interest | Total | |
| 2010 | $ 174,646,681 | $ - | $ 5,734,403 | $ 5,734,403 | $ 180,381,085 |
| 2011 | 250,313,737 | - | 8,495,413 | 8,495,413 | 258,809,150 |
| 2012 | 242,738,425 | - | 8,495,413 | 8,495,413 | 251,233,838 |
| 2013 | 222,872,219 | - | 8,495,413 | 8,495,413 | 231,367,632 |
| 2014 | 222,714,007 | - | 8,495,413 | 8,495,413 | 231,209,419 |
| 2015 | 222,558,919 | - | 8,495,413 | 8,495,413 | 231,054,332 |
| 2016 | 222,306,857 | - | 8,495,413 | 8,495,413 | 230,802,269 |
| 2017 | 222,347,907 | - | 8,495,413 | 8,495,413 | 230,843,319 |
| 2018 | 190,402,569 | - | 8,495,413 | 8,495,413 | 198,897,982 |
| 2019 | 187,592,619 | - | 8,495,413 | 8,495,413 | 196,088,032 |
| 2020 | 190,969,432 | - | 8,495,413 | 8,495,413 | 199,464,844 |
| 2021 | 213,451,919 | - | 8,495,413 | 8,495,413 | 221,947,332 |
| 2022 | 166,777,413 | 8,200,000 | 8,495,413 | 16,695,413 | 183,472,825 |
| 2023 | 190,291,100 | - | 8,075,163 | 8,075,163 | 198,366,263 |
| 2024 | 175,397,544 | - | 8,075,163 | 8,075,163 | 183,472,707 |
| 2025 | 203,495,925 | - | 8,075,163 | 8,075,163 | 211,571,088 |
| 2026 | 197,014,549 | - | 8,075,163 | 8,075,163 | 205,089,711 |
| 2027 | 203,164,004 | - | 8,075,163 | 8,075,163 | 211,239,166 |
| 2028 | 203,492,332 | - | 8,075,163 | 8,075,163 | 211,567,494 |
| 2029 | 203,494,162 | - | 8,075,163 | 8,075,163 | 211,569,325 |
| 2030 | 203,490,763 | - | 8,075,163 | 8,075,163 | 211,565,925 |
| 2031 | 203,490,488 | - | 8,075,163 | 8,075,163 | 211,565,651 |
| 2032 | 203,489,138 | - | 8,075,163 | 8,075,163 | 211,564,301 |
| 2033 | 203,490,731 | - | 8,075,163 | 8,075,163 | 211,565,894 |
| 2034 | 203,491,624 | - | 8,075,163 | 8,075,163 | 211,566,786 |
| 2035 | 219,146,576 | - | 8,075,163 | 8,075,163 | 227,221,739 |
| 2036 | 203,491,133 | - | 8,075,163 | 8,075,163 | 211,566,295 |
| 2037 | 23,919,000 | 38,620,000 | 8,075,163 | 46,695,163 | 70,614,163 |
| 2038 | - | 51,410,000 | 5,951,063 | 57,361,063 | 57,361,063 |
| 2039 | - | 54,310,000 | 3,054,938 | 57,364,938 | 57,364,938 |
| **Total** [2] | $ 5,570,051,771 | $ 152,540,000 | $ 237,812,791 | $ 390,352,791 | $ 5,960,404,562 |

(1) Does not include Refunded Interest.
(2) Totals may not add due to rounding.
(3) Total debt service does not reflect capitalized interest.

### SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION

The following statements are brief summaries of certain provisions of the 1995 Bond Resolution.  Such statements do not purport to be complete and reference is made to the 1995 Bond Resolution, copies of which are available for examination at the office of the 1995 Fiscal Agent.  For the purposes of this summary, the terms "Bond" or "Bonds" shall refer to the Government Facilities Revenue Bond or Bonds.

**Revenues**

The Authority covenants that each Lease Agreement which it enters into for any government facilities financed or refinanced under the 1995 Bond Resolution ("Authority Facilities") will require the Lessee thereunder to pay rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the interest on all Bonds issued by the Authority for the financing or refinancing of the Authority Facilities covered by such Lease Agreement, the principal of all such Bonds which are serial Bonds and the amortization requirements and redemption premium for any such Bonds which are term Bonds ("1995 Debt Service Rentals").  (Section 701).  All 1995 Debt Service Rentals received from the leasing of Authority Facilities are pledged as hereinafter provided.

25

**1995 Sinking Fund**

A special fund is created by the 1995 Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds Sinking Fund" (the "1995 Sinking Fund"). Two separate accounts are created in the 1995 Sinking Fund, namely, the "1995 Bond Service Account" and the "1995 Redemption Account" (Section 502).

The Authority covenants that all 1995 Debt Service Rentals will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the following accounts in the following order:

(1)     To the 1995 Bond Service Account, such amount thereof as may be required to make the amount then to the credit of the 1995 Bond Service Account equal to the amount of interest then due and payable and the interest which will accrue up to the next interest payment date on all Bonds of each series then outstanding and the principal of all serial Bonds, if any, which will become due and payable within the next ensuing twelve months;

(2)     To the 1995 Redemption Account, such amount of the balance remaining after making the deposit under paragraph (1) above as may be required to make the amounts so deposited in the then current fiscal year equal to the amortization requirements, if any, for such fiscal year for the term Bonds of each series then outstanding, plus the premium, if any, which would be payable on a like principal amount of Bonds if such principal amount of Bonds should be redeemed on the next redemption date from moneys in the 1995 Sinking Fund; and

(3)     The balance, if any, shall be deposited to the credit of the 1995 Bond Service Account. (Section 502).

The requirements specified in paragraphs (1) and (2) above shall be cumulative. (Section 502).

**1995 Redemption Account**

Moneys in the 1995 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1995 Sinking Fund. The 1995 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1995 Bond Service Account and the purchase price from the 1995 Redemption Account, but no such purchase shall be contracted for within the period of 45 days next preceding any interest payment date on which such Bonds are subject to call for redemption under the provisions of the 1995 Bond Resolution.

(b)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall call for redemption on each date on which Bonds are subject to redemption from moneys which are in the 1995 Sinking Fund on the 45th day prior to such redemption date such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1995 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made in accordance with the provisions of the 1995 Bond Resolution. Not less than 30 days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and from the 1995 Redemption Account and set aside in separate accounts the respective amounts required for paying the principal of and redemption premium, if any, and the interest on the Bonds so called for redemption.

(c)     Moneys in the 1995 Redemption Account shall be applied by the 1995 Fiscal Agent in each fiscal year to the purchase or redemption of Bonds of each series then outstanding in the following order:

first, the term Bonds of each such series to the extent of the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable

053

premium, if any; and if the amount available in such fiscal year shall not be equal thereto, then, in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding, plus the applicable premium, if any;

*second*, any balance then remaining shall be applied to the purchase of any Bonds whether or not such Bonds shall be subject to redemption in accordance with paragraph (a) above;

*third*, any balance then remaining shall be applied to the redemption of term Bonds of each such series in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of such series originally issued under the provisions of the 1995 Bond Resolution.  (Section 504).

The term "Principal and Interest Requirement" for any fiscal year, as applied to the Bonds of any series under the 1995 Bond Resolution, shall mean the sum of:

(a)     the amount required to pay the interest on all outstanding Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year;

(b)     the amount required to pay the principal of all outstanding serial Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year; and

(c)     the amortization requirement for the term Bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(i)     in the case of Capital Appreciation Bonds, the Accreted Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of the principal or amortization requirements in accordance with the above provisions;

(ii)     in the case of Capital Appreciation and Income Bonds, the Appreciated Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of principal or amortization requirements in accordance with the above provisions;

(iii)     the interest rate on Bonds issued with a variable, adjustable, convertible or similar rate of interest shall be the average rate of interest per annum on such Bonds for the preceding twelve months or such shorter period that such Bonds shall have been outstanding, or if such Bonds had not been outstanding prior to the date of calculation, the rate of interest on such Bonds on the date of calculation;

(iv)     in the case of Bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such Bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for amortization requirements and principal payments shall be used; provided, however, that if on the date of calculation the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in (or specified in the agreement authorizing the issuance of) the letter of credit or insurance policy or similar credit or liquidity facility;

(v)     in the case of Bonds the maturity of which may be extended by and at the option of the holder thereof or the Authority, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended; and

(vi)     in the case of Bonds (A) which are expected to be repaid from the proceeds of Bonds or other indebtedness or (B) on which interest is payable periodically and for which 25% or more of the principal amount matures during any one year and for which no amortization requirements have been established, the debt service requirements on the Bonds may be excluded and in lieu thereof the Bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status to that of such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Bonds and issued by issuers having a credit rating, by Moody's or any successors thereto or Standard & Poor's or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities.  (Section 101).

Notwithstanding the foregoing, if the Authority has notified the 1995 Fiscal Agent that an interest rate swap agreement is in effect in respect of any Bonds, then for all purposes of the above paragraphs, except for the purpose of determining the required deposits to the 1995 Sinking Fund pursuant to Section 502 of the 1995 Bond Resolution, the interest rate on such Bonds shall be the interest rate calculated with reference to such interest rate swap agreement; and if such rate calculated with reference to such interest rate swap agreement is a variable rate, the interest rate on such Bonds (except for the purpose specified above in this sentence) shall be the average interest rate calculated with reference to such interest rate swap agreement for the preceding twelve months or such shorter period that the interest rate swap agreement has been in effect, or if such interest rate swap agreement had not been in effect prior to the dates of calculation, the interest rate calculated with reference to such interest rate swap agreement on the date of calculation.  (Section 101).

**1995 Construction Fund**

The balance of proceeds of Bonds issued under Section 208 of the 1995 Bond Resolution available for payment of construction costs is required to be deposited to the credit of the Construction Fund under the 1995 Bond Resolution (the "1995 Construction Fund") and applied to the payment of the cost of the Initial Facilities, Additional Facilities, Improvements and uncompleted Facilities for which such Bonds were issued.  (Section 208).

Payments from the 1995 Construction Fund shall be disbursed by check signed by the Treasurer of the Authority or by any officer or employee of the Authority designated by resolution of the Authority.  (Section 402).  Any balance remaining in the 1995 Construction Fund from time to time after the completion of the Authority Facilities and Improvements theretofore financed by the Authority may, at the option of the Authority, be deposited to the credit of the 1995 Redemption Account or the 1995 Bond Service Account.  (Section 404).

**Additional Bonds**

Additional Bonds may be issued from time to time to provide funds to pay all or any part of any remaining costs of the Initial Facilities or to pay all or any part of the cost of any Additional Facilities or Improvements to Authority Facilities financed under the 1995 Bond Resolution or any uncompleted part of the Initial Facilities or Additional Facilities or Improvements, and to pay any notes or other obligations of the Authority therefore issued, or to repay any advances made from any source, to finance such costs; provided that no such Bonds shall be issued unless under the then existing law such Bonds may be specified by the Authority to be covered by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such Bonds by resolution.  Before any such Additional Bonds may be issued, there must be filed with the 1995 Fiscal Agent, among other things, a certificate signed by the Executive Director of the Authority stating that on the basis of all Lease Agreements or amendments or supplements thereto, as executed and delivered or as expected to be executed and delivered, the 1995 Debt Service Rentals, as calculated by the Authority will be sufficient and timely to pay the principal of; and the redemption premium, if any, and interest on, such Bonds and all Bonds then outstanding.  (Section 208).

Refunding bonds, including crossover refunding bonds, may be issued by the Authority at any time or times for the purpose of providing funds for refunding at or prior to their maturity or maturities all or any part of (i) the outstanding Bonds of any series, or (ii) the outstanding debt of the Authority incurred to finance Authority Facilities as defined in the 1970 Bond Resolution or in the 1978 Bond Resolution, in either case including the payment of any

redemption premium prior thereto; provided that no such refunding bonds shall be issued unless under the then existing law such bonds may be specified by the Authority to be covered (as of the crossover date with respect to crossover refunding bonds) by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such refunding bonds by resolution. (Section 209).

## Investment of Funds

The 1995 Bond Resolution provides for the following types of investments:

(a)    Government Obligations which are (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government, (ii) obligations (including participation certificates) issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, the Farm Credit System, Federal National Mortgage Association and the Student Loan Marketing Association, (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above or (iv) below and which obligations are not subject to redemption prior to the date on which the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations and which municipal obligations are rated in the highest category (without regard to any gradation within such category) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii) and (iii) above held by a national banking association or bank (including the 1995 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligation described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

(b)    Investment Obligations which are (i) Government Obligations, (ii) obligations of any state or territory of the United States of America which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, (iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1995 Fiscal Agent), any trust company or any savings and loan association (including any investment in pools of such bankers' acceptances, certificates, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, national banking association, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1995 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties, (iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth of Puerto Rico or any national banking association (including the 1995 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any or more of the securities described in clause (i) or (ii) above, in which securities the 1995 Fiscal Agent has a perfected first security interest and such securities are held free and clear of claims by third parties, or if not so secured, meets the rating requirements set forth in clause (vii) below, (v) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within such categories) by both Moody's or any successors thereto, and Standard & Poor's or any successors thereto, (vi) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to gradations within such category) and (a) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and meets the requirements of Section 852(a) of said Code for the calendar year; (b) invests all of its assets in Government Obligations or in Investment Obligations described in clause (ii) above; and (c) has at least 98% of

(I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1995 Fiscal Agent or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to any gradations within such category), and (vii) any other investment obligations which are rated, which are issued by issuers which are rated, or which are backed by letters of credit or lines of credit the provider of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto or which are collateralized by such Investment Obligations. (Section 101).

Moneys held in the 1995 Construction Fund, the 1995 Bond Service Account and the 1995 Redemption Account shall, as nearly as practicable, be invested and reinvested in Investment Obligations, which mature, or are subject to redemption by the holder thereof at the option of such holder not later than the dates when the moneys held for the credit thereof will be required for the purposes intended.  (Section 602).

**General Covenants**

The Authority covenants that it will not agree to any amendment, modification or termination of any Lease Agreements of any Authority Facilities (or exercise any right it may have to rescind the lease of any lessee of space in any Authority Facilities) which would reduce the amounts of rental payments below the amounts required by Section 701 of the 1995 Bond Resolution or postpone the times of making such rental payments or which would otherwise materially and adversely affect the security of the bondholders (Section 702), that it will not create or suffer to be created any lien or charge upon the Authority Facilities or any part thereof or upon the 1995 Debt Service Rentals therefrom, other than the liens and charges created or permitted under the 1995 Bond Resolution (Section 705), and that each Lease Agreement will provide that the obligation of the lessee to pay timely the required rentals thereunder shall be absolute and unconditional.  (Section 709).

The Authority covenants that it will not dispose of or encumber any Authority Facilities, unless (a) the Authority determines that notwithstanding such disposition or encumbrance, total rents under each Lease Agreement will be sufficient to provide the sums required under Section 701 of the 1995 Bond Resolution, and (b) the Authority will receive as the price for any such disposition (but not an encumbrance), together with any other available moneys, the total amount of the 1995 Debt Service Rentals which would otherwise have been payable by the lessees of such Authority Facilities during the remaining term of the related Lease Agreements plus such additional amounts as will be necessary to pay the fees and expenses of the 1995 Fiscal Agent and all other expenses in connection with the application of the proceeds of such sale to the payment of the principal of and interest on outstanding Bonds issued by the Authority under the 1995 Bond Resolution including any redemption premiums.  The proceeds of any such disposition (other than an encumbrance) shall be promptly deposited in the 1995 Redemption Account.

The Authority may also from time to time dispose of or encumber any fixtures or movable property in connection with the Authority Facilities or any materials used in connection therewith, if the Authority determines that such articles are no longer needed or useful in connection with the construction or operation or maintenance of the Authority Facilities and the proceeds thereof (other than an encumbrance) shall be applied to the replacement of the property so disposed of or at the option of the Authority shall be deposited to the credit of the 1995 Redemption Account.  (Section 708).

Each Lease Agreement is required to provide that it may not be assigned or otherwise transferred in whole or in part by either party (unless the conditions set forth under the 1995 Bond Resolution for a termination of such Lease Agreement have been met), and will provide that all or any part of the Authority Facilities covered by such Agreement may be subleased as a whole or in part by the lessee if, among other things the following conditions have been met: (a) the sublessee under the sublease shall be a department, agency or instrumentality of the Commonwealth unless the Authority shall have obtained an opinion of nationally recognized bond counsel that such sublease will not cause interest on any Bonds to be includable in gross income of the owners thereof for federal income tax purposes (other than Bonds for which such interest is intended not to be excludable in gross income for such purposes); (b)  such lessee shall acknowledge in writing that it shall continue to remain liable for the payment

30

of all rentals under such Lease Agreement; and (c) there shall have been delivered to the Authority and such lessee (i) if the sublessee is a department of the Commonwealth, a certificate signed by the Secretary or an Assistant Secretary of such department stating that on the basis of budgeted appropriations for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to timely pay all rentals which will be due and payable during such fiscal year, or (ii) if the sublessee is an agency or instrumentality of the Commonwealth, a certificate signed by the chief executive officer of the sublessee stating that on the basis of budgeted appropriations and/or estimate revenues for the sublessee for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to pay timely all rentals which will be due and payable during such fiscal year.  (Section 710).

The Authority covenants that it will cause audits to be made of its books and accounts by an independent firm of certified public accountants chosen by the Authority.  Reports of such audits shall, among other things, set forth the findings of such certified public accountants as to whether the moneys received by the Authority under the 1995 Bond Resolution have been applied in accordance with the provisions thereof.  Copies of such reports shall be filed with the 1995 Fiscal Agent and shall be mailed by the Authority to each bondholder who shall have filed his name and address with the Secretary of the Authority for such purpose.  (Section 712).

**Modifications**

The Authority may adopt resolutions supplemental to the 1995 Bond Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission or to correct any inconsistent provisions or errors in the 1995 Bond Resolution; provided such action shall not adversely affect the interests of the bondholders, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders, or to add to the conditions, limitations and restrictions on the issuance of Bonds, or to add to the covenants and agreements of the Authority in the 1995 Bond Resolution or to surrender any right or power reserved to or conferred upon the Authority.  (Section 901).

The holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1995 Bond Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1995 Bond Resolution; provided, however, that nothing contained in the 1995 Bond Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, (c) the creation of a lien upon or a pledge of 1995 Debt Service Rentals other than the liens and pledges created by or pursuant to the 1995 Bond Resolution, (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution.  (Section 902).  No supplemental resolution may, however, change, amend or modify the rights or obligations of the 1995 Fiscal Agent under the 1995 Bond Resolution without the written consent of the 1995 Fiscal Agent.  (Section 904).

**Notice of Default**

In the event that (i) on the second business day prior to the date on which a payment of interest, principal, or premium, if any, is due on any Bond there is not an amount sufficient in such account or fund as the 1995 Fiscal Agent may draw upon for the payment on such due date of such interest, principal, or premium, or (ii) the Authority shall default in the due and punctual making of any 1995 Sinking Fund deposit required by Section 502 of the 1995 Bond Resolution, the 1995 Fiscal Agent shall promptly give written notice of such insufficiency or default, as the case may be, to the Authority, the Secretary of Treasury and Government Development Bank.  In the event that the Authority shall default in the due and punctual performance of any other covenants or agreements in the Bonds or the 1995 Bond Resolution and the 1995 Fiscal Agent shall have knowledge of, or is notified of, such default, and the Authority shall fail to correct such default within 30 days after notice thereof to the Authority by the 1995 Fiscal Agent, the 1995 Fiscal Agent shall promptly give notice of such default to the Secretary of Treasury and Government Development Bank.  (Section 804).

The 1995 Bond Resolution and the Bonds do not provide for acceleration of the maturities of the Bonds in the event of a default thereunder or in any other circumstances and do not provide that the bondholders may require the 1995 Fiscal Agent to take any action on their behalf.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Authority and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority and the Commonwealth have made certain representations and certifications in the Bond Resolution and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Authority and the Commonwealth described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Bonds is excluded from the adjusted current earnings of corporations for purposes of computing the alternative minimum tax imposed on corporations.

### State Taxes

Bond Counsel is also of the opinion that, under existing statutes, interest on the Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Bonds.

### Original Issue Discount

Bond Counsel is further of the opinion that the difference between the principal amount of all of the Bonds other than the Bonds maturing on July 1, 2022, July 1, 2037 and July 1, 2039 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

### Original Issue Premium

The Bonds maturing on July 1, 2038 (collectively, the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a

constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium).  For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year.  The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Bonds.  Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

**Ancillary Tax Matters**

Ownership of the Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit.  Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Bonds; for certain bonds issued during 2009 and 2010, the American Recovery and Reinvestment Act of 2009 modifies the application of those rules as they apply to financial institutions.  Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations.  In addition, interest on the Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinions attached as *Appendix I*.  Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Law and Post Issuance Events**

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Bonds.  This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Bonds from gross income for Federal or state income tax purposes, or otherwise.  It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Bonds may occur.  Prospective purchasers of the Bonds should consult their own tax advisers regarding such matters.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Bonds may affect the tax status of interest on the Bonds.  Bond Counsel expresses no opinion as to any Federal, state or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

**UNDERWRITING**

The Underwriters, represented by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate purchase price of $149,086,963.43 reflecting an original issue discount of $2,410,905.00 and an

33

underwriters' discount of $1,042,131.57 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover page hereof.  The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased.  The Bonds may be offered and sold to certain dealers (including dealers depositing Bonds into investment trusts) and institutional purchasers at prices lower or yields higher than such public offering prices or yields, and such offering prices or yields may be changed, from time to time, by the Underwriters.

Merrill Lynch and Santander Securities Corporation ("SSC") have agreed to provide services and advice to each other related to the structuring and execution of the underwriting of the Bonds in accordance with the terms and provisions of a joint venture agreement which was entered into between SSC and Banc of America Securities LLC ("BAS") (Merrill Lynch and BAS are now affiliated broker-dealers).  SSC and Merrill Lynch will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth.  Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers.  Compensation with respect to the underwriting of the securities will be allocated between them.

### LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

### LEGAL MATTERS

The proposed form of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, is set forth in *Appendix I* to this Official Statement.  Certain legal matters will be passed upon for the Underwriters by their counsel, McConnell Valdés LLC, San Juan, Puerto Rico.

### GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby.  As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds.  Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations.  Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

### RATINGS

The Bonds have been assigned ratings of "Baa3" by Moody's and of "BBB-" by Standard & Poor's.

The ratings reflect only the respective opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the respective rating agency.  Such rating agencies were

provided with materials relating to the Authority, the Commonwealth, the 1995 Bond Resolution, the Bonds and other relevant information.  No application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that any ratings obtained will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies if, in the judgment of either or both, circumstances so warrant.  Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Commonwealth and the Authority have covenanted to the following for the benefit of the Beneficial Owners (generally the tax owners of the Bonds):

1.      The Commonwealth will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2009, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited annual financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case of the type included or incorporated by reference in this Official Statement;

2.      The Authority will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2009, with the MSRB through EMMA, (i) the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) other financial information or operating data regarding the Authority included herein; and

3.      The Authority will file in a timely manner through EMMA notice of failure of the Commonwealth to comply with clause 1 above and of the Authority to comply with clause 2 above, and notice of any of the following events with respect to the Bonds, if material:

  (a)      principal and interest payment delinquencies;

  (b)      non-payment related defaults;

  (c)      unscheduled draws on debt service reserves reflecting financial difficulties;

  (d)      unscheduled draws on credit enhancements reflecting financial difficulties;

  (e)      substitution of credit or liquidity providers, or their failure to perform;

  (f)      adverse opinions or events affecting the exclusion from gross income for federal income tax purposes of interest on the Bonds;

  (g)      modifications to rights of security holders;

  (h)      bond calls;

  (i)      defeasances;

  (j)      release, substitution, or sale of property, securing repayment of the Bonds; and

  (k)      rating changes.

Event (c) and (e) are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995.  However, events (c) and (e) may not be applicable, since the terms of the Bonds do not provide for "debt service reserves" or "liquidity providers."  In addition, with respect to the following events:

Events (d) and (e). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the Bonds, see *Tax Matters*.

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under *The Bonds*, (ii) the only other issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the holders of the Bonds as required under the terms of the Bonds, and (iv) public notice of the redemption is given pursuant to Exchange Act Release No. 34-23856 of the SEC; even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

The Commonwealth expects to provide the information described in clause 1 above by filing its first official statement or similar disclosure document that includes such information for the preceding fiscal year or, if no such official statement or similar disclosure document is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except hereinafter noted. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009 because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements. The Commonwealth Report for the fiscal years ended June 30, 2004, 2006 and 2008, were filed after the deadline due to a delay in its preparation.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific performance of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if.

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or

36

type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Covenants have been made in order to assist the Underwriters in complying with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1995 Bond Resolution, the Lease Agreements with respect to the facilities that are to be financed or refinanced in whole or in part by the Bonds, the various Acts, and the Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions. Appended to, and constituting a part of, this Official Statement is the proposed form of opinions of Nixon Peabody LLP, Bond Counsel (*Appendix I*).

The information set forth in *Provisions Relating to Public Debt of the Commonwealth* and in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information set forth in this Official Statement, except the information appearing in *Provisions Relating to Public Debt of the Commonwealth*, *Underwriting* and "Book-Entry Only System" under *The Bonds*, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to "Book-Entry Only System" was supplied by DTC.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

This Official Statement will be filed with the MSRB.

**PUERTO RICO PUBIC BUILDINGS AUTHORITY**

/s/   Jesús F. Méndez
Executive Director

APPENDIX I



437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

_____ __, 2009

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Public Buildings Authority (the "Authority"), a body corporate and politic constituting an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended, (the "Enabling Act"), of its $152,540,000 aggregate principal amount of Government Facilities Revenue Refunding Bonds, Series Q Guaranteed by the Commonwealth of Puerto Rico (the "Bonds").  We have also examined Act No. 17 of the Legislature of Puerto Rico, approved April 11, 1968, as amended (the "Guaranty Act"), providing for the guaranty by the Commonwealth of the payment of the principal of and interest on a principal amount of bonds outstanding at any one time of the Authority, not exceeding $3,325,000,000, specified by the Authority to be covered by such guaranty, to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient for that purpose.

The Bonds are being issued under and secured by Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Resolution") and a supplemental resolution thereto fixing the terms of the Bonds, adopted by the Authority on October 16, 2009 (the "Bond Resolution" and together with the 1995 Resolution, the "Resolution").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are being issued to provide funds to refund interest (but not principal) of certain bonds issued by the Authority under the 1995 Resolution.

The Authority is authorized to issue additional bonds for the purpose of paying all or a part of the cost of government facilities and improvements of such facilities and refunding bonds for refunding any bonds issued by the Authority under the provisions of the 1995 Resolution, under Resolution No. 77, adopted by the Authority on November 16, 1970, as supplemented, or under Resolution No. 158, adopted by the Authority on February 14, 1978, as

I-1

supplemented, only upon the terms and conditions set forth in the Resolution, and such bonds, when issued, shall, with all the Bonds, be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the Resolution.

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) the Enabling Act, (ii) the Guaranty Act, (iii) certified copies of the proceedings of the Authority authorizing the issuance of the Bonds (iv) the 1995 Resolution, (v) the Bond Resolution and (vi) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      The Enabling Act is valid.

2.      The Guaranty Act is valid.

3.      The proceedings of the Authority in connection with the authorizing, issuance and sale of the Bonds has been validly and legally taken.

4.      The Authority has properly specified the Bonds to be covered by the guaranty of the Commonwealth under the Guaranty Act.

5.      The Enabling Act and such proceedings show lawful authority of the issuance and sale of the Bonds by the Authority.

6.      The good faith and credit of the Commonwealth are pledged for the payment of any amounts required to be paid by the Commonwealth pursuant to said guaranty.

7.      As authorized by the Enabling Act and by said proceedings, the 1995 Resolution and the Bond Resolution have each been duly adopted by the Authority.

8.      The Bonds have been duly authorized, executed and delivered by the Authority and constitute legal, valid, binding and enforceable obligations of the Authority

I-2

payable from and secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

9.    The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Authority and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority and the Commonwealth have made certain representations and certifications in its Bond Resolution and Tax Certificate.  We have not undertaken to independently verify the accuracy of those certifications and representations.

Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Bonds is excluded from the adjusted current earnings of corporations for purposes of computing the alternative minimum tax imposed on corporations.

10.    The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

11.    Bond Counsel is further of the opinion that the difference between the principal amount of the Bonds maturing on July 1, 2022, July 1, 2037 and July 1, 2039 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for Federal income tax purposes to the same extent as interest on the Bonds.  Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount.  The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 9 through 11 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds.  Furthermore, we express no opinion as to any Federal, state,

Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,



Printed by: ImageMaster, Inc.

**From:** Puerto Rico Inquiry <puertoricoinfo@primeclerk.com>
**Sent:** Wednesday, July 29, 2020 6:23 PM
**To:** petercheinsr@gmail.com
**Subject:** RE: [EXTERNAL] PBA Puerto Rico Public Building Authority - submitted claims of Peter Hein and Anne Farley

Peter,

Thank you for your inquiry.

Please allow this email to confirm that your claim(s) have been processed and assigned claim numbers #174229 and #174231.

You may monitor the status of your claim(s) here:

https://cases.primeclerk.com/puertorico/Home-ClaimInfo

If you require additional information, you may contact our call center at (844) 822 -9231 (toll free for US or Puerto Rico) or (646) 486-7944 (for international callers) available from 10 a.m. to 7:00 p.m. (Atlantic Standard Time).

Prime Clerk is the Claims and Noticing agent appointed in the Title III cases of the Commonwealth of Puerto Rico and the affiliated Debtors. As such, we are not permitted to provide legal or financial advice. Further, Prime Clerk does not determine the validity of claims nor the validity of objections to claims.

Regards,

Prime Clerk Inquiries
Prime Clerk
850 Third Avenue, Suite 412
Brooklyn, NY 11232
primeclerk.com

1

Exhibit E

*The highest level of professionalism, innovation and transparency in bankruptcy administration.
For more information click here:* [http://primeclerk.com/raising-the-bar/](http://primeclerk.com/raising-the-bar/)

--------------- Original Message ---------------
**From:** Peter C. hein [petercheinsr@gmail.com]
**Sent:** 7/29/2020 8:06 AM
**To:** ssanchez@primeclerk.com
**Subject:** RE: [EXTERNAL] PBA Puerto Rico Public Building Authority - submitted claims of Peter Hein and Anne Farley

Thank you for confirming (per your email below) that our claims (copies attached) have been received.  However, in checking the claims database you link below, I still do not see our claims posted and available on line.   Please advise me when I can expect our claims to be available on line.  Thank you.

Peter Hein

Anne Farley

**From:** Sahony Sanchez <ssanchez@primeclerk.com>
**Sent:** Thursday, July 16, 2020 11:49 AM
**To:** petercheinsr@gmail.com
**Cc:** petercheinsr@gmail.com; pc.puertoricoinfo@duffandphelps.com
**Subject:** RE: [EXTERNAL] PBA Puerto Rico Public Building Authority - submitted claims of Peter Hein and Anne Farley

Peter,

Thank you for your inquiry.

Prime Clerk is the Claims and Noticing agent appointed in the Title III cases of the Commonwealth of Puerto Rico and the affiliated Debtors. As such, we are not permitted to provide legal or financial advice.

Please note that all filed claims have to undergo a quality assurance review process.

We are able to confirm that your claims were received and are currently being processed. Please allow a few more business days for your claim to appear on our website here:

[https://cases.primeclerk.com/puertorico/Home-ClaimInfo](https://cases.primeclerk.com/puertorico/Home-ClaimInfo)

Please contact us should you have further questions.

PLEASE NOTE: We are not authorized to accept claims over email, and any documents or information you

have provided via email will not constitute a claim in these cases.

Regards,


Prime Clerk Inquiries
Prime Clerk
850 Third Avenue, Suite 412
Brooklyn, NY 11232
primeclerk.com
*The highest level of professionalism, innovation and transparency in bankruptcy administration.*
*For more information click here: http://primeclerk.com/raising-the-bar/*




--------------- Original Message ---------------
**From:** Peter C. Hein [petercheinsr@gmail.com]
**Sent:** 7/15/2020 6:09 PM
**To:** pc.puertoricoinfo@duffandphelps.com
**Cc:** petercheinsr@gmail.com
**Subject:** [EXTERNAL] PBA Puerto Rico Public Building Authority - submitted claims of Peter Hein and Anne Farley


I mailed the two attached PBA claims to the address on the claim form (address listed on page 6, column 2, which is part of the instructions).


However, I have not yet received a confirmation that these two claims have been filed, and thus per page 5, column 2 of the instructions I am emailing the specified email address to request a confirmation of filing for the attached two claims.


Please confirm the attached two claims have been received and are being filed.


Thank you.


Peter Hein

petercheinsr@gmail.com

This email is confidential and subject to important disclaimers and conditions, including those regarding confidentiality, legal privilege and certain legal entity disclaimers, available at http://www.duffandphelps.com/disclosure. Our Privacy Policy is available at https://www.duffandphelps.com/privacy

ref:_00D1N1uIqY._5003l141Fzg:ref

This email is confidential and subject to important disclaimers and conditions, including those regarding confidentiality, legal privilege and certain legal entity disclaimers, available at http://www.duffandphelps.com/disclosure. Our Privacy

Policy is available at https://www.duffandphelps.com/privacy



# ASSET SERVICES

**REORGANIZATIONS SERVICE GUIDE**

JUNE 17, 2021

# TABLE OF CONTENTS

**Important Legal Information** ................................................................................................................ 7

**About Reorganization Services** ......................................................................................................... 10

   Introduction ...................................................................................................................................... 10

     Overview ...................................................................................................................................... 10

     Reorganization / Proxy Contact Number ..................................................................................... 11

   About the Reorganizations Service .................................................................................................. 11

   Types of Reorganization Event Services........................................................................................... 12

   Preparing to Use the Services ......................................................................................................... 12

   How Reorganizations Work ............................................................................................................. 14

   Associated PTS / PBS and CA Web Functions ................................................................................ 15

**Announcements** ............................................................................................................................... 17

   About the Service ............................................................................................................................ 17

   How the Announcement Service Works ........................................................................................... 17

   How to View Mandatory and Voluntary Reorganization Announcements........................................... 18

   Proxy Announcements .................................................................................................................... 19

     About the Service ........................................................................................................................ 19

     How the Service Works................................................................................................................ 19

     Omnibus Proxy ............................................................................................................................ 20

     Consent Solicitations Without A Record Date .............................................................................. 20

     Consent Solicitation Events for Book-Entry-Only (BEO) Securities ............................................. 21

**Processing**....................................................................................................................................... 22

   Mandatory Reorganizations ............................................................................................................ 22

     About the Service ........................................................................................................................ 22

     How the Service Works................................................................................................................ 22

     Various Types of Mandatory Reorganizations ............................................................................. 23

   Voluntary Offerings......................................................................................................................... 24

     About the Service ........................................................................................................................ 24

     Various Types of Voluntary Reorganizations ............................................................................... 24

About Legal Notices .......................................................................................................... 25

Other Shareholder or Bondholder Services .......................................................................... 25

Dissenters' Rights/Appraisal Rights ..................................................................................... 25

Additional Processes Associated With Reorganization Events ............................................. 26

    Pledged Securities ......................................................................................................... 26

    Segregated Securities .................................................................................................... 26

    Reorganization (RRG) Segregated Account ................................................................... 27

    About Contra-CUSIPs ..................................................................................................... 28

    Pledge of Contra-Securities ........................................................................................... 28

    Chills on Reorg Activities ............................................................................................... 28

    Frozen Letters ................................................................................................................ 28

    Interest Payments, Dividends, Distributions, and Voting Rights for Tendered Securities ............. 29

**Instructions / Expirations** ................................................................................................. **30**

    Relevant Terms .............................................................................................................. 30

    Important Considerations ................................................................................................ 31

    Voluntary Offers by Issuer or Third Party (Processed via PTOP) ..................................... 32

    About DTC's Automated Tender Offer Program (ATOP) .................................................. 32

    Inquiring About ATOP-Eligible Offers ............................................................................. 33

    Accepting an ATOP-Eligible Offer .................................................................................. 34

      Checklist for Submitting an Acceptance ....................................................................... 34

    Submitting a Protect for an ATOP-Eligible Offer ............................................................. 36

      Checklist for Submitting a Protect ................................................................................ 37

    Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges for an ATOP-Eligible Offer ......................................................................................................... 38

      Checklist for Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges .... 39

    Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges on Behalf of Another Participant ............................................................................................ 41

      Checklist for Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges on Behalf of Another Participant ................................................................... 41

    Withdrawing an Acceptance of an ATOP-Eligible Offer ................................................... 42

      Checklist for Withdrawing an Acceptance ..................................................................... 43

    About Rejections of Instructions .................................................................................... 44

DTCC Public (White)

Proration of an Offer ................................................................................................................ 44

Available Reports ..................................................................................................................... 45

Voluntary Offers Representing Attributes of the Security  (processed via various functions) ........................ 45

Use of Functions ..................................................................................................................... 45

Conversions ............................................................................................................................ 46

About the Service ................................................................................................................ 46

About Conversion Features .................................................................................................. 46

How the Service Works ......................................................................................................... 47

Pledge and Transfer of Underlying Securities by Book-Entry .......................................................... 48

Eurobond Conversions ............................................................................................................ 49

About the Service ................................................................................................................ 49

How the Service Works ......................................................................................................... 49

Important Considerations ..................................................................................................... 50

Pledge and Transfer of Eurobond Underlying Securities by Book-Entry ................................... 51

Puts ........................................................................................................................................ 51

About Puts .......................................................................................................................... 51

About the Service ................................................................................................................ 52

Types of Put Options ............................................................................................................ 52

Exercising Put Options ......................................................................................................... 53

Withdrawing Put Option Instructions ..................................................................................... 53

Rejection of Withdrawal of Put Option Instructions ............................................................. 53

Proration of a Repayment Option .......................................................................................... 53

Rejection by DTC or the Agent ............................................................................................. 53

Rejection by DTC .............................................................................................................. 53

Rejection by the Agent ...................................................................................................... 54

Rights Subscriptions ............................................................................................................... 54

About the Service ................................................................................................................ 54

About Rights ....................................................................................................................... 55

Relevant Terms ................................................................................................................... 55

About DTC's Automated Subscription Offer Program (ASOP) ................................................. 56

General Information Regarding ASOP..................................................................................... 57

Subscription Instructions........................................................................................................ 58

Subscription Payments........................................................................................................... 58

Payments with Notices of Guaranteed Delivery..................................................................... 59

Movement of Underlying Securities......................................................................................... 59

Subscription Sub-Accounts.................................................................................................... 59

Schedule for Submitting Instructions..................................................................................... 60

Inquiring About ASOP-Eligible Offers.................................................................................... 60

Accepting an ASOP-Eligible Offer......................................................................................... 61

Checklist for Submitting an Acceptance................................................................................. 62

Submitting a Protect for an ASOP-Eligible Offer................................................................... 64

Checklist for Submitting a Protect.......................................................................................... 64

Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions for an ASOP-Eligible Offer...... 66

Checklist for Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions........................... 67

Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions on Behalf of Another Participant
..................................................................................................................................... 68

Checklist for Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions on Behalf of
Another Participant................................................................................................................. 69

Surrendering Rights for Sale via ASOP................................................................................. 70

Checklist for Submitting Sell Instructions.............................................................................. 70

Rejection of Acceptances, Covers of Protects, or Sell Instructions....................................... 71

Warrant Exercises.................................................................................................................. 72

About the Service................................................................................................................... 72

About Warrants....................................................................................................................... 72

How the Service Works........................................................................................................... 72

Pledge and Transfer of Underlying Securities by Book-Entry................................................ 73

Procedures for Submitting Instructions Outside of PTS/PBS................................................ 74

Submitting the Instruction....................................................................................................... 74

Forms for Instructions Outside PTS/PBS............................................................................... 75

Reorganization Presentments for MMI Issues....................................................................... 77

CD Early Redemptions........................................................................................................... 78

About the Service ................................................................................................... 78

How the Service Works ........................................................................................... 78

Exempt Instructions ................................................................................................ 78

Non-Exempt Instructions ........................................................................................ 79

Issuer Acceptance ................................................................................................. 79

Change Mode of Payment (CMOP) ........................................................................ 79

About the Service ................................................................................................. 79

Allocations ............................................................................................................. 80

About Allocations ................................................................................................. 80

Cash Allocations ................................................................................................. 80

Reorganization Cash Settlement Reporting ........................................................... 80

Stock Allocations ................................................................................................. 80

Solicitation Fees and Transfer Taxes ..................................................................... 80

# IMPORTANT LEGAL INFORMATION

The contents of all Service Guides constitute "Procedures" of The Depository Trust Company ("DTC") as defined in the Rules of DTC. If Participants or other authorized users of DTC's services fail to follow these Procedures precisely, DTC shall bear no responsibility for any losses associated with such failures.

In connection with their use of the Corporation's services, Participants and Pledgees must comply with all applicable laws, including all applicable laws relating to securities, taxation, and money laundering, as well as sanctions administered and enforced by the Office of Foreign Assets Control ("OFAC"). As part of their compliance with OFAC sanctions regulations, all Participants and Pledgees must agree not to conduct any transaction or activity through DTC that violates sanctions administered and enforced by OFAC.

From time to time, DTC receives from outside sources notices and other documents, including corporate action information, and communications concerning financial assets. Although DTC may make certain of such documents and communications, or extracts therefrom ("Information") available to Participants and other authorized users, it shall be under no obligation to do so nor, having once or more done so, shall DTC have a continuing obligation to make available Information of a certain type. Information is not independently verified by DTC and is not intended to be a substitute for obtaining advice from an appropriate professional advisor. Therefore, Participants and other authorized users are advised to obtain and monitor Information independently. In addition, nothing contained in Information made available to Participants and other authorized users shall relieve them of their responsibility under DTC's Rules and Procedures or other applicable contractual obligations to check the accuracy, where applicable, of Participant Daily Activity Statements and all other statements and reports received from DTC and to notify DTC of any discrepancies. DTC DOES NOT REPRESENT THE ACCURACY, ADEQUACY, TIMELINESS, COMPLETENESS, OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY INFORMATION (AS DEFINED ABOVE) PROVIDED TO PARTICIPANTS AND OTHER AUTHORIZED USERS, WHICH IS PROVIDED AS-IS. DTC SHALL NOT BE LIABLE FOR ANY LOSS RELATED TO SUCH INFORMATION (OR THE ACT OR PROCESS OF PROVIDING SUCH INFORMATION) RESULTING DIRECTLY OR INDIRECTLY FROM MISTAKES, ERRORS, OR OMISSIONS, OTHER THAN THOSE CAUSED DIRECTLY BY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF DTC. Further, such Information is subject to change. Participants and other authorized users should obtain, monitor, and review independently any available documentation relating to their activities and should verify independently information received from DTC.

DTC SHALL NOT BE LIABLE FOR: (1) ANY LOSS RESULTING DIRECTLY OR INDIRECTLY FROM INTERRUPTIONS, DELAYS, OR DEFECTS ARISING FROM OR RELATED TO ITS SERVICES; AND (2) ANY SPECIAL, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, OR PUNITIVE DAMAGES.

The services provided by DTC to its Participants and other authorized users are provided only pursuant to the terms and conditions of the Participants Agreement, which references the Rules and Procedures of DTC, and/or other contractual documents (collectively, the "Contractual Documents"). DTC's obligations to Participants and other authorized users are therefore contractual in nature and are limited solely to those obligations expressly set forth in the Contractual Documents. Participants and other authorized users are obligated to, among other things, follow precisely the procedures outlined in the Contractual Documents and provide DTC with complete and accurate information. In accepting financial assets from Participants and/or

DTCC Public (White)

providing services to other authorized users, DTC relies, among other things, upon the duty of Participants and other authorized users to exercise diligence in all aspects of each transaction processed through DTC.

Participants and other authorized users expressly acknowledge that the services provided by DTC are ministerial in nature. Moreover, as further reflected by DTC's fee structure (which typically bears no relationship to the dollar value of any given transaction), DTC does not accept any risk of loss to Participants, other authorized users and possible third party beneficiaries with respect to transactions being processed by DTC.

WHILE THIS SERVICE GUIDE DISCUSSES CERTAIN TAX CONSEQUENCES OF THE VARIOUS CORPORATE ACTIONS DESCRIBED HEREIN, DTC DOES NOT PROVIDE TAX ADVICE. FURTHERMORE, THIS SERVICE GUIDE DOES NOT DISCUSS ALL THE RELEVANT TAX CONSIDERATIONS THAT MAY BE APPLICABLE TO PARTICIPANTS AND OTHER AUTHORIZED USERS. IN ADDITION, THE SUBJECT TAX LAWS AND REGULATIONS MAY BE SUBJECT TO DIFFERING INTERPRETATIONS AND MAY BE CHANGED, PERHAPS RETROACTIVELY. PARTICIPANTS AND OTHER AUTHORIZED USERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING ALL THE RELEVANT TAX CONSEQUENCES OF ANY PARTICULAR CORPORATE ACTION OR OTHER TAXABLE EVENT.

Copyright © 2021 by The Depository Trust Company ("DTC"). All rights reserved. This work (including, without limitation, all text, images, logos, compilation and design) is copyrighted, is proprietary, and is intended for the exclusive use of DTC's Participants and other authorized users of DTC's services. If this work is received in any electronic medium, authorized users of this work are permitted the limited right to make reproductions and transmissions necessary for downloading and storage of this work on the users' computers. Such users are also permitted to print one or more paper copies from the electronic version for their own use. Other than to this limited extent, no part of this work (including any paper copies thereof or print versions thereof) may be altered, reproduced or distributed (including by transmission) in any form or by any means, or stored in any information storage and retrieval system, without DTC's prior written permission.

REDISTRIBUTION BY PARTICIPANTS OF CERTAIN DATA FILES AND THE INFORMATION PROVIDED BY DTC IS STRICTLY PROHIBITED. FOR PURPOSES OF THIS PROCEDURE, "DATA FILES" SHALL MEAN THE BULK CORPORATE ACTIONS DATA FILES PROVIDED BY DTC TO PARTICIPANTS. EACH DATA FILE PROVIDED BY DTC TO A PARTICIPANT IS AND SHALL CONTINUE TO BE THE PROPERTY OF DTC AND NOT OF ANY PARTICIPANT IN RECEIPT THEREOF; THIS PROCEDURE DOES NOT CONSTITUTE THE GRANT OF ANY LICENSE IN, TO OR FOR THE USE OF, ANY DATA FILE OR INFORMATION DISTRIBUTED HEREUNDER OTHER THAN TO DISTRIBUTE TO ITS ACCOUNT HOLDERS INFORMATION CONTAINED IN ANY DATA FILE IT RECEIVES TO THE EXTENT SUCH INFORMATION IS RELEVANT TO THE SECURITY HOLDINGS OF SUCH ACCOUNT HOLDERS, OR IS OTHERWISE REQUIRED BY APPLICABLE LAW.

Participants shall not use, distribute, transmit or otherwise make available any Data File or Information, with or without any service charge or fee, as the basis for or as part of a data product or service offered for commercial gain to any other person. DTC's affiliate DTCC Solutions LLC ("DTCC Solutions") has the right to license usage of the Data Files for purposes other than those permitted in the first paragraph of this Procedure, and any Participant which wishes to use or distribute Data Files other than as contemplated hereby must contract directly with DTCC Solutions prior to any such distribution. This restriction includes, but is not limited to, service bureaus and other third parties, whether or not affiliated with a Participant, regardless of whether such person

DTCC Public (White)

as previously itself received and/or used any Data Files in the past; such entities may obtain the Data Files only upon execution of a license agreement with DTCC Solutions.

DTC shall have the right, but not the obligation, to audit the use and distribution of Information and Data Files by any Participant. Unauthorized use or distribution by Participant, any of its Affiliates or any of its account holders may result in a fine or other reasonable penalty determined by DTC in accordance with its rules in light of the facts and circumstances of such unauthorized use or distribution. By its acceptance of Information or any Data File, each Participant agrees that, in addition to all other remedies that may be available, DTC and its affiliate DTCC Solutions shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach of this Procedure by such Participant, its officers, employees, advisors or agents. Neither DTC nor DTCC Solutions shall be liable for any loss, cost or expense arising out of the use of any Data File or the Information contained therein, or the gross negligence or willful misconduct of any Participant with respect to any Data File or the Information contained therein, provided hereunder, the failure of any Participant to comply with these Rules and Procedures or applicable law, or for any consequential, special or punitive damages related thereto.

The contents of the Service Guides are updated in different formats on a periodic basis. Participants and other authorized users of the Service Guides will find the most current version of the Service Guides, as well as DTC Important Notices which address the contents of the Service Guides, at http://dtcc.com. You can access the Important Notices at http://dtcc.com/legal/important-notices.aspx. DTC shall bear no responsibility for any losses associated with the failure of Participants or other authorized users to follow DTC's most current Service Guides and/or Important Notices.

DTCC Public (White)

# ABOUT REORGANIZATION SERVICES

## Introduction

### Overview

This guide describes DTC's Reorganization services. Each section includes a description of the service, how it works, and a list of associated Participant Terminal System (PTS), Participant Browser Service (PBS) and Corporate Actions Web (CA Web) functions that you can use to access the services, as well as ISO 20022 messaging. With the exception of voluntary reorganization instruction input, the Reorganization services concerning reorganization processing can be accessed on the Corporate Actions Web browser referred to as "CA Web". Functionality for input of voluntary reorganization instructions can be accomplished via associated Participant Terminal System (PTS) and Participant Browser System (PBS) functions.

Subject to the terms of the "Important Legal Information" section, while DTC endeavors to provide Participants with timely and accurate information with respect to Distributions, Redemptions, and Reorganizations events, Participants are responsible for monitoring, obtaining and confirming such information without reliance on DTC, and for reconciling their records in advance of any critical dates, including, but not limited to, dividend, interest payable, redemption, maturity payable, and voluntary and mandatory reorganizations dates.

**Note:**

It is the sole responsibility of Participants to perform a daily reconciliation of their activity and positions with the information, reports and statements provided by DTC.  Participants must immediately report to DTC any discrepancy between their activity and positions with the information, reports and statements provided by DTC or other issues relating to the accuracy of the information, reports and statements provided by DTC.  Such reports must be made to DTC by (i) calling the Client Support hotline at 1-888-382-2721 (and selecting Option 1, Option 1) to speak with a DTC representative and (ii) providing a written detailed description of the discrepancy to the DTC representative, or as otherwise directed by DTC in writing. DTC shall not be liable for any loss resulting or arising directly or indirectly from mistakes, errors, or omissions related to the information, reports or statements provided by DTC, other than those caused directly by gross negligence or willful misconduct on the part of DTC.

**Note:**

Note: DTC, as it deems appropriate, may extend any deadline, timeframe, or cutoff established by DTC, including, without limitation, to (i) address operational or other delays that could reasonably affect the ability of DTC, a Participant or other stakeholder from meeting the deadline, timeframe, or cutoff; or (ii) allow DTC time operationally to exercise its existing rights under the Rules and Procedures.  In addition, times applicable to DTC are standards and not deadlines; actual processing times may vary, based upon the circumstances.  Any action taken by DTC in connection with this paragraph shall not establish a precedent for any situation that may occur in the future (or otherwise bind DTC in any manner).  DTC disclaims all liability for any losses and/or expenses incurred by a Participant, stakeholder or any third-party resulting from, relating to, or arising from (i) any action taken by DTC in connection with this paragraph, (ii) the determination of DTC to decline to take action pursuant to this paragraph, and/or (iii) the failure of a Participant, stakeholder or any third-party to meet any deadline, timeframe, cutoff or requirement established by a party other than DTC.

DTCC Public (White)

## Reorganization / Proxy Contact Number

For more information regarding any aspect of reorganization/proxy processing or a specific event, contact DTC's Customer Support Center at 1-888-382-2721 and follow the menu options.

For general information about Reorganization Services, visit http://www.dtcc.com/settlement-and-asset-services/corporate-actions-processing/reorganizations.

For instructional and reference material, please visit the DTCC Learning Center at https://dtcclearning.com/ and take advantage of the context sensitive help which is directly embedded in the CA Web Application. The help material is available by clicking on any question mark icon appearing throughout CA Web.

# About the Reorganizations Service

DTC's Reorganizations Service provides full lifecycle processing, including sourcing and announcing the details of upcoming events, accepting and acting on instructions, and collecting, allocating, and reporting on the resulting entitlements on behalf of participants holding DTC-eligible securities serviced by the depository.

By centralizing corporate actions processing, including the receipt and allocation of cash and stock entitlements, the Reorganizations Service leverages the economies of scale and experience of DTC to provide cost savings to issuers, agents and participants – and ultimately to securities' beneficial owners. The service enables a single payment by an agent or issuer to be seamlessly translated into multiple allocations to participants, eliminating the need for separate payments to multiple firms across the financial industry. The use of the word "agent" in this guide means an Issuer's auction agent, custodian, depositary, dividend reinvestment plan administrator, exchange agent, issuing and/or paying agent, redemption agent, remarketing agent, registrar, tender agent, transfer agent, subscription agent, conversion agent, balloting agent, information agent, reorganization agent, warrant agent, trustee, trust company, and/or any other person or entity acting in an agency capacity on behalf of the issuer.

DTC employs a harmonized, single-event data model in CA Web. It includes event/sub event type combinations which differ from the legacy activity code model. As part of the data model, DTC manages a reorganization events group lifecycle through one holistic corporate action event identifier (CA ID).

DTC performs several functions in support of reorganization events on behalf of its participants:

**Announcements** - DTC receives and distributes information to you about various reorganization activities, and this includes events that DTC will process and some that DTC will not process for various reasons that will be described later in this document.

**Processing** - this includes:

1.  Instructions/Expirations - the collection of instructions (and locking of positions in a contra-CUSIP/RRG) for voluntary events or mandatory events requiring an election or certification up to an expiration date to instruct.
2.  Allocations - the surrender of position to the agent handling the event and allocation of entitlements based on participants position in the security (for mandatory events) and/or participant instructions (as applicable).

DTCC Public (White)

**Note:**

DTC will also accept and deliver instructions for events that will include entitlements that will not be allocated via DTC's services (e.g., for entitlements that are not DTC eligible). Target position will be taken down based on direction from the offeror. DTC may also accept and deliver consent instructions (without surrendering position) that may not have an entitlement or assign voting or consenting rights to you in conjunction with shareholder meetings or consent solicitations.

These services are available through DTC's Participant Terminal System (PTS), Participant Browser System (PBS), CA Web and automated transmission output (e.g., ISO 20022 and Computer-to-Computer Facilities (CCF).

In certain cases, DTC may not be fully able to support a Reorganizations event. In such cases DTC will announce the event informing the Participants on an action to take outside of DTC (e.g., delivery of securities, hard copy paperwork, etc.). DTC will also notify its Participants when an event will be handled through both DTC and an outside party where an instruction will be required via PTS/PBS with an associated but separate action to be performed by the Participant such as the completion of a hard copy form (that may need to include a VOI instruction reference) delivered directly to the agent. The obligation to ensure both the instruction is made in PTS/PBS and the required documentation is received by the agent by the expiration date is the sole responsibility of the Participant.

**Warning!**

DTC has no obligation to examine for completeness or accuracy any instruction forms or accompanying documents submitted to DTC. Nevertheless, if DTC makes such an examination, and the form or accompanying documents do not appear to be complete or accurate or your general free position is insufficient, the instruction may be rejected by DTC. If possible, DTC will attempt to notify you of the rejection, but DTC cannot guarantee such notification.

## Types of Reorganization Event Services

The following services are announced and processed by the Reorganization Department:

- Voluntary Offerings (including offers by an issuer or third party and offerings based on the structure of the security – e.g., convertible debt)

- Mandatory Reorganizations

- Proxy

## Preparing to Use the Services

In order to use the products associated with this service, you must have access to one of the following:

- The Participant Terminal System (PTS)

- The Corporate Actions Web (CA Web)

DTCC Public (White)

- The Participant Browser Service (PBS)

- ISO 20022 Messages via MQ and file protocols

DTC offers a comprehensive overview of reorganization activity comprised of Announcements, Allocations, Adjustments and applicable alerts via CA Web's Reorganization dashboard which "pushes" data to users.

Understanding the Reorganizations lifecycle and data model are important prerequisites for successful use of the Reorganizations service. DTC offers robust training resources available at its Asset Services Learning Center -- https://dtcclearning.com/products-and-services/asset-services

Contact your Relationship Manager for more information.

---

**Note:**

DTC also provides various reports, including on SMART/Search, and Participants have the ability to export data from CA Web to spreadsheets, for manipulation and analysis.

---

DTCC Public (White)

# How Reorganizations Work

- DTC distributes information electronically in advance of the reorganization or meeting date. This helps you reconcile your records with DTC before the payable date/effective date. Event information includes but is not limited to the following:

  o Corporate Actions Event ID

  o CUSIP

  o Publication Date

  o Expiration Date

  o Record Date

  o Security Rate

  o Cash Rate

- Under the CA ID you will see event level information. Every event has one option and at least one payout. Options indicate what is available as an entitlement to eligible holders.  Examples of option types include cash or securities. A payout should be considered the actual entitlement. Entitlements can include:

  o Principal

  o Interest

  o Cash

  o Securities

  o Accrued Dividends

- DTC provides its participants with information pertaining to their entitlements through the following delivery mechanisms:

  o Corporate Actions Web (CA Web)

  o Computer to Computer Facility (CCF) file transmissions*

  o ISO 20022 Messaging

  o SMART/Search

*CCF files associated with entitlements and allocations will be retired on January 1, 2022.

# Associated PTS / PBS and CA Web Functions

The following PTS / PBS and CA Web functions are used in association with Reorganization events:

| Use this PTS Function | Use this PBS Function | CA Web Function | To | Vol | Mand | PXY |
|---|---|---|---|---|---|---|
| RIPS | CUSIP Search | Announcements | View information concerning reorganization events. | X | | |
| PANS | Proxy Announcements | Announcements | View shareholder meeting information and solicitation announcements. | | | X |
| WARR | Warrant Subscriptions | N/A | View information on warrant exercises and redemptions/maturities. | X | | |
| WARI | Warrant Instruction Inquiry | Announcements | View warrant processing information. | X | | |
| PTOP | Voluntary Tenders and Exchanges | N/A | View information regarding tender and exchange offers + certain mandatory events (for example Cash-in-lieu, tax withholding, waiver of dissents and Canadian settlement elections) + some convertible securities and warrants + some consents – i.e., events that cannot be facilitated via the normal processor | X | X | |
| PUTS | Put Option Bonds | N/A | View information on put option exercises. | X | | |
| CERR | CD Early Redemption Requests | N/A | View information on CD early redemptions. | X | | |
| RCIP | Participant Reorg Conversions | N/A | View information on convertible issues. | X | | |
| DIVA  Replaced by CA Web but available for historical purposes | Dividend and Income Replaced by CA Web but available for historical purposes | Announcements | View all general announcements. | X | X | |

DTCC Public (White)

| Use this PTS Function | Use this PBS Function | CA Web Function | To | Vol | Mand | PXY |
|---|---|---|---|---|---|---|
| GWIZ | Security Detail | N/A | View DTC's Eligible Security Masterfile and pricing information. | X | X | X |
| PART | Participant Activity Research Tool | N/A | View security activity and adjustment information. (Functionality also available via Settlement Web.) | X | X | X |
| RTOP | Release Reorg Transaction | N/A | Release instructions for processing | X | | |
| PSOP | Rights Subscriptions | N/A | View information regarding rights offerings. | X | | |
| RCUR | Foreign Currency Elections | N/A | Receive maturity or redemption payments directly from the Agent in foreign currency for Put Bond options | X | | |
| RCNV | Reorg Conversion | N/A | Enter conversion instructions | X | | |
| CMOP | Change Mode of Payment Instructions | N/A | Change the frequency ("mode") of future dividend or interest payments on certain DTC-eligible securities, such as Unit Investment Trusts (UITs) and Variable Mode Preferred (VMP) stocks by book-entry. | X | | |
| CMPI | Change Mode of Payment Inquiry | N/A | Inquire about the current mode of payment for a specific issue. | X | | |

DTCC Public (White)

090

# ANNOUNCEMENTS

## About the Service

The Announcements service provides you with information regarding the processing of securities undergoing reorganization activity such as:

- Mandatory exchanges, tenders and mergers at a set rate

- Name changes, description changes and reverse splits

- Voluntary tenders and exchange offers and mergers with elections for cash/securities

- Conversions and conversion expirations

- Warrant exercises and warrant expirations

- Mandatory puts and put option exercises

- Rights subscriptions

- Other types of corporate actions (such as bankruptcies, liquidations, consents).


This information is distributed to you electronically via ISO 20022, the Corporate Actions Web (CA Web) and PTS / PBS, and, in limited cases, through Important Notices which are available on DTCC's web site at http://www.dtcc.com/legal.aspx.

**Note:**

For all the event/activity types listed, if the event involves a Canadian issue paying in Canadian dollars, DTC will announce either two events or one event with multiple options to include a US dollar option.

## How the Announcement Service Works

DTC retrieves reorganization information from various outside sources including:

- Prospectuses

- Proxy Statements

- Plans of Reorganization

- Letters of Transmittal or Election Forms

- Notices to Security Holders regarding reorganizations

- NYSE, NASDAQ, and FINRA bulletins

DTCC Public (White)

- Press releases


This information is then communicated to you through PTS RIPS / PBS Reorganizations and Redemptions, online via CA Web and electronically via ISO 20022 messaging.

---

**Warning!**

DTC obtains this information from sources it believes to be reliable, but DTC does not represent the accuracy, adequacy, timeliness, completeness or fitness for any particular purpose of this information, which is provided as is. Furthermore, this information is subject to change. Participants should obtain, monitor and review independently any available documentation relating to the reorganization activity and should verify independently information obtained from DTC.

---

# How to View Mandatory and Voluntary Reorganization Announcements

DTC communicates reorganization announcements for which it has been notified via the CA Web Application, ISO 20022 Announcement messages and, for voluntary events only[1], the Reorganization Inquiry for Participants (RIPS) function. Both CA Web and the ISO 20022 Announcements messages provide the Participant with information critical to processing the event such as but not limited to:

- Security ID (e.g., CUSIP)

- Record Date

- Effective Date

- Instruction Expiration Dates and Times (includes withdrawals, submission of protects, cover of protects)

- Instruction Option Types including informing the Participant which function to use to place an instruction

- Identification of the security being used for encumbrance

- Cash and Security Rates

- Allocation Dates and Times

- Key Dates for restricting security activities also known as "Chills" such as Deposits, Delivery Orders and Pledges

- Meeting Date

---

[1] The RIPS function for mandatory reorganizations announcements will be retired on November 16, 2020.

DTCC Public (White)

- Last Date for Voluntary action

- Dissenter's Rights Applicable Flag

- Ballot Due Date

The Participant can navigate through the CA Web via a series of search mechanisms, overviews and dashboards in order to process the event. Some of the functionality the CA Web lets Participants perform is as follows:

- Search by critical information such as dates, CUSIP and Event Type

- Customize and save search queries

- Event information pushed to the Participant in the form of an overview page in categories such as events expiring within five days, new events added and amended events compiled on a daily basis

- Overview, dashboard and search features allow the Participant to see all events or events where the Participant account holds position

- View past Corporate Actions on a particular security for historical purposes at both the target security and disbursed security levels

Once the event announcement is added to the CA Web and published on the ISO 20022 announcement message, if new or updated information is made available to DTC concerning that announcement, DTC will update CA Web and republish the ISO 20022 announcement message.

## Proxy Announcements

### About the Service

DTC's Proxy Announcements service provides communication between participants and issuers. The most common types of information communicated involve:

- Shareholders' annual, general, extraordinary or special meetings

- Consent solicitations

### How the Service Works

DTC is made aware of a shareholders or bondholders meeting or, consent by the issuer, issuer's attorney, issuer's trustee, or industry vendor. DTC announces the information to you via CA Web Announcements, ISO 20022 messaging, the PTS RIPS / PBS Reorganizations and Redemptions and/or PTS PANS / PBS Proxy Announcements.

DTCC Public (White)                                                093

## Omnibus Proxy

DTC does not vote securities registered in the name of its nominee, Cede & Co. Instead, DTC provides an electronic copy of the Omnibus Proxy to the issuer soon after the record date. The Omnibus Proxy assigns Cede & Co.'s voting rights to those participants that have position in their account at the close of business on the record date. Accompanying the Omnibus Proxy is a security position listing that reflects each participant's closing balance in the issue on the record date. To facilitate communication between issuers and participants, the listing also includes the name, address, telephone number, and proxy contact of each participant listed on the report. DTC provides omnibus proxies and security position reporting via the SPR service which enables issuers, trustees and authorized agents to register online to see the position holdings of DTC participants in the issuer's security as of a specified time period. Issuers and trustees who do not register for this service will receive an omnibus proxy and Security Position Report via hard copy mail.

Each participant is notified via the PTS/PBS PANS function of their position in the issue that they are entitled to vote.

You should obtain the necessary proxy material directly from the issuer. It is the responsibility of DTC participants to maintain current name, address, telephone number, and proxy contact information with DTC to facilitate the communication of proxy materials between issuer and participants.

---

**Note:**

If you wish to vote securities registered in DTC's nominee name, Cede & Co., that have been withdrawn from DTC on or before the record date, you may do so by submitting a request letter that must include the following:

- Authorized signature that has been notarized,
- Certificate numbers evidencing the securities,
- An indemnity clause (provided by DTC),
- Proof from the transfer agent (TA) that the securities were outstanding in Cede & Co. name on the record date, and
- Images (scanned copies) of the front and back of the certificates.

---

Prior to submitting the letter, please contact DTC's Proxy Department via DTC's Customer Support Center at 1-888-382-2721 and follow the menu options.

## Consent Solicitations Without A Record Date

While DTC expects the issuers to establish a record date for consent solicitations, if no record date is established, DTC cannot follow its Omnibus Proxy procedures. To allow a Participant to consent, DTC will, at the request of the Participant, at the Participant's expense, or upon the request of the issuer or the indenture trustee, provide an authorization letter to the issuer or indenture trustee.

The authorization letter of Cede & Co., which will not have a DTC security position listing attached to it, grants you the authority to consent on the quantity of securities specified for you on any DTC security positions listing or listings for any date or dates. It is the responsibility of the issuer or indenture trustee to select the appropriate date or dates on which to obtain a security position listing from DTC and to address any matters resulting from the absence of a record date.

DTCC Public (White)

# Consent Solicitation Events for Book-Entry-Only (BEO) Securities

An agent or issuer soliciting consent solicitation events for book-entry-only (BEO) securities and BEO securities in DTC's Fast Automated Securities Transfer (FAST) Program, where Cede & Co. is the registered holder of the security and holds 100% of the principal in a global note, the agent/issuer is required to use the ATOP consent processing service to solicit and collect consents from participant holders, provided that the consent solicitation satisfies the criteria for ATOP processing:

1. The consent solicitation must be made by the issuer. (Third-party solicitations are handled by DTC's Shareholder Demand Process.)
2. The consent solicitation must be for affirmative consent to modify the terms of the indenture.
3. The consent solicitation is not linked to a security holder meeting, vote, or negative consent.
4. Electronic transmission of consents does not violate the terms of the indenture.
5. Hard-copy documentation is not required to support the consent instructions.
6. Blocking:
   a. If blocking is a requirement of the consent solicitation and the event is predicated on record date, the record date must be equal to the final expiration date of the consent solicitation.
   b. If blocking is a requirement of the consent solicitation, positions are to be returned no more than three (3) days after the expiration of the event and not exceeding forty-five (45) days from the date of the consent solicitation memorandum, unless there is an opportunity for a Participant to withdraw its consent instructions when the issuer extends the consent deadline beyond forty-five (45) days.

---

**Note:**

DTC will block positions only when blocking is a requirement of the consent solicitation. To avoid blocking positions (where there is a record date and blocking is not a requirement of the solicitation), DTC will establish a position in a contra-CUSIP as of the record date (without affecting positions on the target security) for the purposes of collecting, transmitting and processing consents, thereby allowing the target security for the consent to continue to trade and settle in the marketplace.

DTCC Public (White)

# PROCESSING

## Mandatory Reorganizations

### About the Service

The majority of Mandatory Reorganizations are those reorganizations for which no election option exists – i.e., no participant input is required. DTC processes these actions and will act on your behalf. When a mandatory reorganization occurs, DTC will:

- Notify you of the upcoming mandatory corporate action via CA Web Announcements and ISO 20022 messaging

- Process the mandatory corporate action on your behalf

- Submit the affected securities to the agent and collect entitlements from the agent

- Allocate the entitlements to you

Some mandatory corporate actions result in the creation of an escrow CUSIP with position for each participant based on the position as of a certain date in anticipation of future payments. For these CUSIPs, DTC will also perform the actions noted above.

Some mandatory corporate action events allow participants to input an instruction that identifies and/or certifies the beneficial owner's right to a specific entitlement based on the terms of the event (e.g., tax withholding based on residency or a mandatory event with a cash out option for positions held that are less than a certain amount). These events will be set up similar to a Voluntary Reorganization Announcement (as noted in the Voluntary Processing section).

### How the Service Works

When a mandatory reorganization is effective, DTC surrenders the securities to the agent and:

- Reduces your position for the securities surrendered, and

- Increases your position in the new security announced on your Participant Daily Activity Statement (and available via CA Web), and/or,

- Disburses cash proceeds and/or cash in lieu of fractional shares reflected on the Reorganization Cash Settlement List

For those events that the entitlement may vary based on certain qualifications (e.g., residency), a period of time after the effective date will be identified and the PTOP processor utilized to capture instructions. See Voluntary Offerings.

**Note:**

See Dissenters' Rights/Appraisal Rights for information regarding Dissenters' Rights on a mandatory reorganization.

# Various Types of Mandatory Reorganizations

The following events are examples of Mandatory Reorganizations:

| Event | Description |
|---|---|
| Merger (Securities) | The exchange of one company's security for another company's security or securities at a preset rate. |
| Merger (Cash) | The exchange of one company's security for cash at a preset rate. |
| Reverse Split | The exchange of a company's security for the same company's new security at a preset rate. This reduces the number of shares outstanding. |
| Liquidation | The dismantling of a company with the distribution of cash to creditors first (bondholders). A new contra-CUSIP may be assigned to those holders whose original CUSIP was deleted upon receiving the initial distribution proceeds. That new contra-CUSIP will be used for any future disbursements. |
| Merger (Cash/Securities) | The exchange of one company's security for another company's security and cash at a preset rate. |
| Name/Description Change | The changing of a company name. The CUSIP for the security may or may not change as well. |
| Maturity (Securities) | The final repayment, paid in securities by an issuer for the entire issue, or remaining outstanding securities of a specific security on a specified date. |
| Corporate Action | Any mandatory action not categorized as one of the above (such as bankruptcy). |
| Mandatory Puts | The mandatory exchange of all outstanding bonds (with a puttable feature) for cash or a new security, where the target security is remarketed. The issuer may offer holders the right to retain their securities instead of exchanging them. |
| Redemption of Warrants | An event where the issuer pays proceeds to holders at or after the expiration date of the warrant rather than expire the warrant for no cash (worthless). |
| Full Call/Maturity | An event where a convertible security is redeemed for cash in its entirety on a date that is prior to (full call) or on the maturity date (maturity), and for which the holders receive the principal amount of the security. |

DTCC Public (White)

097

# Voluntary Offerings

## About the Service

The Voluntary Offerings service allows you to accept various voluntary offerings within the book-entry environment. When you use this service, DTC will:

- Provide information on voluntary offers for DTC-eligible securities via CA Web Announcements, ISO 20022 messaging and PTS / PBS

- Process your instructions to accept offers via the Automated Tender Offer Program (ATOP) or, in very rare cases, via hard copy instructions

- Forward instructions and securities to agents and balance with those agents throughout the offering period

- Collect offering proceeds from agents and allocate them to you.

Voluntary offerings are in the form of either (1) issuer or third party offers (e.g., tender, exchange, merger with elections), (2) offers that reflect the attributes of the security (e.g., Right, Convertible Security, Put Bond or Warrant) and (3) certain consent-only solicitations (which do not require securities being forwarded to the agent and may not include collecting and allocating proceeds to you).

In addition, this service may require certifications as part of the acceptance of an offer (instruction process) and could include provisions such as conditional tenders and odd-lots.

## Various Types of Voluntary Reorganizations

The following events are examples of Voluntary Reorganizations:

| Event | Description |
|---|---|
| Tender offers | Issuer or 3rd party offers to surrender securities for cash |
| Tender and consent | Issuer offer to surrender securities for cash and instruct to consent |
| Exchange offers | Issuer or 3rd party offers to surrender securities for securities |
| Exchange and consent | Issuer offer to surrender securities for securities and instruct to consent |
| Mergers with elections (cash and securities) | Issuer or 3rd party offers to surrender securities for cash and securities at a set rate subject to proration |
| Bid tenders/ Dutch auctions | Issuer or 3rd party offers to surrender securities for cash at price selected within a range subject to acceptance by offeror |
| Consent-only events | Issuer solicitation for consent to proposed changes to an indenture |
| Conversion | Option of the security to convert debt or preferred shares (normally to underlying common shares) |

DTCC Public (White)

## About Legal Notices

DTC receives legal notices from various sources and makes them available to Participants and non-Participants. You can view these notices via the Legal Notice System.

## Other Shareholder or Bondholder Services

DTC also assists you in exercising other rights available to DTC's nominee as the record holder of securities on deposit at DTC. Examples of the rights that you can exercise through DTC are:

- Assertion of Appraisal or Dissenters' Rights

- Withdrawal of Assertion of appraisal of Dissenters' Rights

- Demand to Inspect a Stock Ledger

- Confirmation of a position

- Demand to Accelerate a Bond

You can seek DTC's assistance in exercising such rights on your own behalf or on behalf of your customers. DTC will act in these matters only upon receipt of written instructions from you.

In order to exercise such rights through DTC, you must complete and submit to DTC a letter identifying the issue and the quantity of securities involved, along with the instruction letter instructing DTC to act.

---

**Note:**

There are standardized forms of the DTC Instruction Letter, and Demands Letter . The sample templates along with other information on submission of these forms can be found on the DTCC website at http://www.dtcc.com/settlement-and-asset-services/issuer-services/proxy-services.

---

## Dissenters' Rights/Appraisal Rights

These rights are available to many stockholders as a remedy when they object to the terms of proposed corporate actions. Such actions can include, but are not limited to, a merger or a sale of assets.

The stockholders assert their dissenters' rights in a signed letter to the corporation. This letter must be signed by the stockholder of record. For participants with securities on deposit at DTC, that record holder is Cede &Co., which is DTC's nominee.

In addition, stockholders may be required to present physical share certificates (or in the case of Direct Registration Service (DRS) only securities, a DRS Statement) to the corporation or a court in connection with their dissent.

To exercise your dissenters' rights or appraisal rights, forward the following to DTC:

DTCC Public (White)

- A letter from you instructing DTC to sign an attached letter in order to assert dissenters' rights or appraisal rights (Instruction Letter; see note below)

- A letter to be signed by Cede & Co. that asserts the dissenters' rights or appraisal rights (Assertion Letter; see note below).

Upon receipt of the above, DTC will:

- Return an executed Assertion Letter to you

- Deliver a Cede certificate representing the appropriate quantity of securities to you.

---

**Note:**

There are standardized forms of the DTC Instruction Letter and Assertion of Appraisal or Dissenters' Rights letters. The sample templates along with other information on submission of these forms can be found on the DTCC website at http://www.dtcc.com/settlement-and-asset-services/issuer-services/proxy-services.

---

**Warning!**

DTC does not represent that any of the example letters are legally sufficient under the laws of any state, and persons seeking to assert such rights through DTC are advised to consult with their own counsel concerning preparation of the Assertion Letters.

---

# Additional Processes Associated With Reorganization Events

## Pledged Securities

For pledged securities, you will not receive payments (cash or securities) resulting from a reorganization until those securities are released.

There are specific processes for pledging on voluntary reorganization events detailed below.

## Segregated Securities

For segregated securities, you will receive payment and your segregated position will be decremented. If your position is split between your free account and Segregated position, both will be decremented with the exception of partial redemptions, in which case your free position will be decremented first and any remaining portion will come from your segregated position.

Additionally, to account for any position movements between the Segregated and Free accounts on allocation date, DTC will execute an additional real time position capture immediately prior to allocation to recognize any adjustments you may have made prior to allocation.

DTCC Public (White)

# Reorganization (RRG) Segregated Account

In certain cases, DTC uses contra-CUSIP numbers and RRG accounts to report reorganization activity on your positions. The RRG account contains numerous subaccounts, organized by the various types of reorganization activities.

Securities undergoing a reorganization are segregated from your general free account into one of the following:

| This RRG sub-account | Is used to segregate |
|---|---|
| B | Basic rights subscriptions. |
| C | Calls without interest (currently not used). |
| D | "Phase one" redemption reorg deposits (Full calls, partial calls and maturities), up to five business days before the redemption date. |
| E | "Phase two" redemption reorg deposits, beginning four business days before the redemption date and continuing onward. |
| F | Foreign currency, allowing you to receive payment in foreign currency directly from the agent. |
| I | IVORS redemptions. |
| L | Legal mandatory reorg deposits. * |
| M | Mandatory reorg deposits. * |
| O | Custody mandatory reorg deposits. * |
| P | Calls with interest (currently not used). |
| R | Custody redemption reorg deposits. * |
| S | Sales of rights. |
| T | Custody tenders. |
| U | Custody mutual funds. |
| V | Rights oversubscriptions. |
| W | Custody warrants. |
| X | Custody conversions. |
| Z | CD redemptions. |
| 3 | Mandatory reorg deposits* (over three years old). |

RRG accounts appear on your statements in this basic format:

B 059-01

- B = The type of instruction (in this case, basic rights subscriptions)

- 059 = The activity code (in this case, rights)

DTCC Public (White)

- 01 = The sequence number

# About Contra-CUSIPs

Contra-CUSIP numbers are generated by DTC and used to segregate your position (representing instructions submitted) for voluntary offers and put bonds options.  The contra-CUSIP contains the first three digits of the issuer number as assigned to the security to be tendered.

**Note:**

For internal processing and input to DTC, you should use the same CUSIP number reserved by DTC for contra-securities.

# Pledge of Contra-Securities

If you have surrendered securities in response to a Voluntary Offering under these procedures, you can pledge the contra-securities that have been credited to your account by book-entry. The surrendered securities have been delivered by book-entry to the agent's account, and from the time of debit from your account are subject solely to the agent's instructions. DTC is in possession of a receipt from the agent for those securities that have been properly surrendered through DTC. Therefore, for the purpose of their pledge, the contra-securities represent your rights through DTC to receive from the agent the cash and/or security payments based on the rate or accepted bid and/or the return of some or all of the surrendered securities in accordance with the terms of the offer.

**Note:**

DTC will not deliver the securities that are the subject of a withdrawal request approved for processing by the agent from the agent's account to your general free account if you have pledged the related position under the contra-CUSIP number. You must release the pledge of the contra-securities before the return of the securities that are the subject of the approved withdrawal request can be processed.

# Chills on Reorg Activities

Certain reorganizations may require that DTC place chills (restrictions) on physical and/or book entry activity. Contra-CUSIPs are generally chilled also. The timing of the chills will vary depending upon the event type or security type such as book-entry only.

# Frozen Letters

In certain instances, DTC will process a book-entry delivery on your behalf for securities that have a chill for deliver order (DO) activities. To request DTC to do so, you must contact DTC at frozenletter@dtcc.com to obtain and complete a frozen position movement request letter form.

DTCC Public (White)

# Interest Payments, Dividends, Distributions, and Voting Rights for Tendered Securities

Property and rights, such as interest payments, dividends, distributions and voting rights with respect to tendered securities including puts, rights subscriptions, surrendered payment securities (warrants), converted securities and underlying securities received or due to be received by DTC as part of a corporate action can be paid or given to Cede & Co., DTC's nominee, during or after the corporate action.

DTC distributes such property and/or rights to the agent and/or participants solely in accordance with instructions received from the agent. Generally, accrued interest paid as a result of a Voluntary Reorganization is paid by the Reorganization department, whereas regular, on-cycle payments are paid by the Distributions department.

---

**Warning!**

If you disagree with such an action, you must take the matter up directly with the agent. DTC's responsibility in such matters is limited to acting in accordance with the agent's instructions, notwithstanding any rights you may have against the agent in respect thereof under the terms of an offer, the attributes of the security or applicable law.

---

DTCC Public (White)

# INSTRUCTIONS / EXPIRATIONS

## Relevant Terms

The following terms are relevant to Voluntary Offerings:

| This term | Refers to |
|---|---|
| Target Security | The security that is the subject of a Voluntary Offering. |
| Contra-CUSIP | The CUSIP used to segregate your position (representing instructions submitted) for voluntary offers. |
| Exchange offer | An offer to surrender securities in exchange for securities, or a combination of securities and cash. |
| Tender Offer or Invitation to Tender | An offer to surrender securities for cash. |
| Conversion | Exchange of a debt or preferred stock for cash and or shares/bonds (usually shares of common stock of the issuing company) |
| Offeror | The party making the offer. |
| Tendered Security | A target security you've surrendered for cash/exchange. |
| Payment | Cash and/or securities in return for tendered securities. |
| Protect Period | The period after the expiration of an offer during which securities may still be tendered (pursuant to a Notice of Guaranteed Delivery or other required documents submitted to the agent prior to the expiration of the offer). |
| Letter of Transmittal | The legal document signed by the securities holder in which it agrees to tender its securities pursuant to the terms of the offer. It contains information about the certificates and quantity being tendered as well as where and to whom the payment should be made. |
| Proration | The percentage of exchanged or tendered securities accepted based on the terms of the offer. |
| Odd Lot Preference | A feature that allows the purchaser to accept odd-lot tenders in full, without proration. |
| Merger with Election | A merger that provides the security holder the option of electing different entitlements, usually cash, stock, or a combination of both. |
| Conditional Tender | A holder placing conditions on the acceptance of their tender by instructing that a minimum number of shares be accepted in the event of a proration. |
| Protect or Notice of Guaranteed Delivery | A notice that allows holders who do not have their securities readily available to accept a tender offer by the expiration date and deliver the securities within the period prescribed in the offer. |
| DTC Expiration Date | The last day you can accept an offer through DTC. This day may be earlier than the actual expiration date established by the Offeror. |
| Sealed Bid Tender Offer | An offer allowing securities owners to choose the price at which they are willing to tender their securities. This is submitted in a sealed bid and sometimes must be within limits prescribed by the Offeror. The Offeror normally reserves the right to accept or reject any or all tenders. |

DTCC Public (White)

## Important Considerations

The following considerations apply to DTC's Voluntary Reorganization Services:

- You must notify DTC's Reorganization Department immediately of any delay or activity problems. Failure to do so could result in losses for which DTC will not be responsible.

- You may not deliver, transfer or physically withdraw securities that have been tendered; however, account transfers (a "swing") may be permitted in certain circumstances.

- The completeness and accuracy of the instructions you submit to DTC are your responsibility. If your instructions are incomplete or your unpledged position is insufficient to permit deduction of the surrendered securities, DTC may reject the instructions.

- In case of rejection, DTC will either return the instructions form to you with a Rejection Notice attached, detailing the reason for the rejection, or notify you electronically via the PTS or PBS functions, as appropriate.

- Where possible, DTC will endeavor to notify your designated coordinator by telephone of a rejection, but DTC cannot guarantee that this will be done.

- If you disagree with any action taken by the agent on your instruction, you must take up the matter directly with the agent. DTC's responsibility in such matters is limited to acting in accordance with the agent's instructions, notwithstanding any rights you may have against the agent in respect thereof under the terms of the event or applicable law.

- It is your responsibility to verify that DTC received the instructions and moved the instructed position into the contra-CUSIP number or RRG account when applicable on the date the instructions were submitted to DTC.

- If you have securities on deposit with DTC that are subject to a put exercise you can accept the put exercise (repayment or retainment) at DTC. If you wish to put a unit comprised of a bond and a certificate evidencing a put option right, and you hold the securities in the form of the individual components, you must combine the components into a unit in order to effect the put.

- Securities that you surrender by book-entry to the agent are subject solely to the agent's instructions. You can pledge by book-entry for collateral loans your rights to receive securities and/or cash payment from the agent in return for surrendered securities and/or the return of some or all of the surrendered securities in accordance with the terms of the offer. Other depository services, including transfers and withdrawals, are not available in the surrendered securities or in such rights.

You must follow established industry reorganization procedures at all times. Failure to do so could result in losses for which DTC will not be responsible.

DTCC Public (White)

## Voluntary Offers by Issuer or Third Party (Processed via PTOP)

PTOP (PTS) / Voluntary Tenders and Exchanges (PBS): PTOP is a function that is used by DTC Participants to complete a variety of actions associated with voluntary offers (as dictated by the offering) and it provides a snapshot of the offer details, inquiry functionality and maintains history of all instruction details.

Actions could include:

- submitting instructions for positions held in the participant's free account

- submitting protects for offers that allow for guaranteed delivery when there isn't sufficient position to cover the amount of the instruction

- submitting instructions to cover prior protect positions once sufficient position is available in the free account

- submitting instructions on behalf of another Participant to cover prior protects submitted by the participant

- submitting withdrawals of instructions previously submitted

All these actions can be taken for a period of time up to the DTC expiration date including events with a short window for the event (which may or may not be the same date and time as the actual expiration date and time for the offer). Participants should use CA Web, PTS (RIPS) and PBS (Reorganizations and Redemptions) to view all expiration windows prior to submitting instructions.

You should check your Participant Settlement account to assure that your transactions were properly processed and recorded. For Voluntary Offerings, the entry on the report is Voluntary Offerings (Account#4444), a two-part entry showing movement from the surrendered security to the contra-security.

## About DTC's Automated Tender Offer Program (ATOP)

DTC's Voluntary Offerings service allows you to accept various voluntary offers in a book-entry environment. The Automated Tender Offer Program (ATOP) allows you to transmit acceptances of offers via the PTS PTOP or PBS Voluntary Tenders and Exchanges functions, or via CCF. Review the PTS PTOP or PBS Voluntary Tenders and Exchanges procedures and use them along with the procedures in this section.

ATOP allows you to:

- Accept an offer and surrender securities using the PTS PTOP or PBS Voluntary Tenders and Exchanges, or via CCF

- Accept an offer by submitting a Notice of Guaranteed Delivery (also known as a protect) to an agent

- Submit instructions on Consent Solicitation events for transmission to agents

- Surrender securities by book-entry through PTS PTOP or PBS Voluntary Tenders and Exchanges, or via CCF after a Notice of Guaranteed Delivery has been submitted (also known as covering a protect)

DTCC Public (White)

- Submit a cover of protect on behalf of another Participant

- Withdraw your acceptance of an offer

Offers eligible for ATOP are identified in information from DTC. The information describing an offer is intended as an aid, and can be viewed via the CA Web Announcements, PTS RIPS or PBS Reorganizations and Redemptions functions. This information is based on the best information available to DTC concerning the offer but may be subject to inaccuracies or omissions. You have the primary responsibility to obtain and monitor announcements of offers involving securities you have on deposit at DTC from all sources, including any documents stating the terms and conditions of the offer obtainable from an agent.

For each offer eligible for ATOP, the agent has entered into a master agreement with DTC providing, among other things, that the delivery by DTC of an Agent's Message to the agent will satisfy the terms of the offer as to the execution and delivery of a Letter of Transmittal or a Notice of Guaranteed Delivery by the participant identified in the Agent's Message.

# Inquiring About ATOP-Eligible Offers

Upon learning that an offer has been made, DTC notifies you via:

- The CA Web Announcements, ISO 20022 messaging and the PTS RIPS or PBS Reorganizations and Redemptions functions, or

- The inquiry sub-functions of PTS PTOP or PBS Voluntary Tenders and Exchanges, or

- Email alert

Notification occurs whether or not the offer is eligible for ATOP.

When notified by DTC of an eligible offer, or after inquiring via CA Web Announcements or ISO 20022 messaging or PTS RIPS or PBS Reorganizations and Redemptions or PTS PTOP or PBS Voluntary Tenders and Exchanges, you should note the following:

1. The last day for submission of original acceptances (including Notices of Guaranteed Delivery) to the agent via PTS PTOP or PBS Voluntary Tenders and Exchanges.
2. If a Guarantee of Delivery period is available, the last day on which deliveries in satisfaction of Notices of Guaranteed Delivery (instructions to cover protects) can be submitted via PTS PTOP or PBS Voluntary Tenders and Exchanges.
3. The contra-CUSIP number identifying the offer (see Note below).
4. Any special conditions of the offer, such as the existence of odd-lot preference or the ability to submit a conditional acceptance, the price range and permissible increments on bid price tenders and early expirations associated with a premium or consent.
5. If a withdrawal of a previously submitted instruction is part of the offer and the timeframes for requesting the withdrawal.

**Note:**

If more than one offer has been made for the target security, or if participants accepting an offer for the target security may elect to receive alternative combinations of cash and/or securities, the different offers or combinations of cash and/or securities will be identified by different contra-CUSIP numbers. You must ensure that the contra-CUSIP you use to transmit an acceptance (including a Notice of Guaranteed Delivery) or an instruction to cover a protect via PTS PTOP or PBS Voluntary Tenders and Exchanges correctly identifies the offer or combination you want to accept.

You should also determine from the information provided by DTC whether there will be any interruption in the availability of any DTC services for the target security, such as a chill on deposits or withdrawals.

# Accepting an ATOP-Eligible Offer

After receiving information from DTC about an ATOP-eligible offer, you can accept the offer and deliver securities on deposit with DTC to the agent via the PTS PTOP or PBS Voluntary Tenders and Exchanges.

**Warning!**

You must accept ATOP-eligible offers via PTS PTOP or PBS Voluntary Tenders and Exchanges;  instructions outside of PTS/PBS and email Letters of Transmittal will not be accepted by DTC during the period when instructions can be input and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but DTC cannot guarantee such notification.

If you intended to accept an offer via PTOP but missed the cutoff for submitting the acceptance via PTOP, it is your responsibility to contact the agent and determine if they will accept an email submission directly. If accepted, the agent will notify DTC and the Participant should submit an acceptance instruction form to DTC via email. DTC will then input the acceptance on behalf of the Participant. The Participant must confirm the acceptance input by DTC is accurate.

The dates on which you can accept an offer via PTOP are specified in the notice about the offer, which you can view via CA Web Announcements, ISO 20022 and PTS RIPS or PBS Reorganizations and Redemptions functions. PTS PTOP or PBS Voluntary Tenders and Exchanges is available for the purpose of transmitting acceptances either until 5:00 p.m. eastern time, (for offers indicated as ATOP I) or 1:00 p.m. eastern time (for offers indicated as ATOP II). If you are unable to use PTOP during this time, the terms of the offer may permit you to accept the offer directly through the agent via a hard copy Notice of Guaranteed Delivery. See Submitting a Protect for an ATOP-Eligible Offer.

## Checklist for Submitting an Acceptance

1. Obtain the Offering Circular/Prospectus and the Letter of Transmittal required by the offer and review the terms of the offer as stated in those documents.
2. Determine the terms of acceptance that you want to transmit via PTOP. Some information may require specific responses. See PTS PTOP or PBS Voluntary Tenders and Exchanges for more information about the following:
   - Odd-lot preference: If there is an odd-lot preference on the offer, indicate whether the acceptance you transmit represents an odd-lot or multiple odd-lots that qualify for the preference. (When you transmit an acceptance via PTS PTOP or PBS Voluntary Tenders and Exchanges, you are required

DTCC Public (White)

to indicate that the acceptance does or does not represent an odd-lot or multiple odd-lots qualifying for the preference.)

- Conditional tender: If the terms of the offer allow you to specify a minimum quantity to be purchased if the offer is prorated, determine whether or not to specify a minimum quantity on the transmitted acceptance. (When you transmit an acceptance via PTS PTOP or PBS Voluntary Tenders and Exchanges, you are required to state such a minimum quantity or to state "0" as a minimum quantity, which indicates that you are not conditioning your acceptance on any minimum quantity of securities to be purchased if the offer is prorated.)

- Special representations: If special representations are required by the Letter of Transmittal, determine your response to such representations to be indicated in the transmitted acceptance. (Based on the offer, you will be required to make these representations in specific fields on the PTS PTOP or PBS Voluntary Tenders and Exchanges screen, or in the Comments field.)

- Comments: If any additional acceptance information is required, prepare a statement of such to enter in the Comments field on the PTS PTOP or PBS Voluntary Tenders and Exchanges screen.

3. Enter and transmit the acceptance via PTS PTOP or PBS Voluntary Tenders and Exchanges during the period when submissions can be input via PTS or PBS for ATOP eligible offers. Your acceptance should indicate the determinations you made in Step 2 above.

4. Acknowledge the Letter of Transmittal. When you transmit an acceptance via PTS PTOP or PBS Voluntary Tenders and Exchanges, a space will be indicated on the PTS PTOP or PBS Voluntary Tenders and Exchanges screen for you to enter an acknowledgment of the Letter of Transmittal required by the offer identified by the contra-CUSIP you specify in your acceptance. If you do not enter the acknowledgment, PTS PTOP or PBS Voluntary Tenders and Exchanges will reject the acceptance. By entering the acknowledgment via PTS PTOP or PBS Voluntary Tenders and Exchanges, you agree that (i) you have received, and will be bound by the terms of, the Letter of Transmittal required by the offer identified in the acceptance and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

---

**Note:**

The Letter of Transmittal referred to in these procedures is the form of the Letter of Transmittal required by the offer when you transmit the acceptance.

---

**Warning!**

Regarding incomplete instructions: An acceptance that was entered via PTS PTOP or PBS Voluntary Tenders and Exchanges but not transmitted to DTC is an incomplete transaction. Neither DTC nor the agent will take action on an incomplete transaction. You are solely responsible for taking additional processing steps to complete your transactions.

---

**Note:**

To identify incomplete transactions, use the inquiry feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges function.

---

DTCC Public (White)

5.   Receive a message acknowledging transmission of the acceptance and reporting the status.

- If the message states that the acceptance was processed (made), confirm that the quantity of securities subject of the acceptance is now shown in your position under the contra-CUSIP specified in the acceptance.

- If the message states that the acceptance was not processed and is now pending (recycling), monitor future messages to determine if the acceptance is subsequently processed. Acceptances are not transmitted to the agent and securities moved into the contra-CUSIP number until the acceptance has been processed (made). You must monitor messages carefully to ensure that all your transactions are processed, and take appropriate action to resolve pending (recycling) acceptances.

- Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

**Note:**

When an acceptance is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your acceptance. This Agent's Message includes your acknowledgment of the Letter of Transmittal.

# Submitting a Protect for an ATOP-Eligible Offer

After receiving information from DTC that an offer is eligible for ATOP and includes a guaranteed delivery (protect), you can accept the offer by submitting a Notice of Guaranteed Delivery to the agent via the Protect Submission feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges functions and subsequently, on or before the end of the period, you will be able to cover your protect by either delivering securities you have on deposit with DTC or having another participant deliver on your behalf to the tender agent via PTS PTOP or PBS Voluntary Tenders and Exchanges. See Submitting a Cover of Protect for more information.

**Warning!**

You must submit Notices of Guaranteed Delivery on ATOP-eligible offers via PTS PTOP or PBS Voluntary Tenders and Exchanges; instructions outside of PTS/PBS will not be accepted by DTC on ATOP-eligible offers during the period when protect submissions can be input via PTOP for ATOP eligible offers and, if submitted during this period, will be rejected. If possible, DTC will attempt to notify you of the rejection, but cannot guarantee such notification. If you intended to submit a protect instruction via PTOP but missed the cutoff for submitting the protect via PTOP, it is your responsibility to contact the agent before the actual expiration of the offer and determine if they will accept an email submission directly. If accepted, the agent will notify DTC and the Participant should email a Protect Submission Form to DTC. Once the communication from both the agent and participant has been received by DTC, with each having provided the appropriate indemnification language, DTC will then input the protect submission on behalf of the Participant. The Participant must confirm the protect submission input by DTC is accurate. If the offer expired prior to the participant contacting the agent, any agreements to handle the protect will be required to be completed outside DTC.

The dates on which you can accept an offer by submitting a Notice of Guaranteed Delivery via PTOP are specified in the notice about the offer, which you can view via CA Web Announcements and the PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the RIPS notice, PTOP is available on those dates for this purpose until 5:00 p.m. eastern time.

DTCC Public (White)

## Checklist for Submitting a Protect

1. Obtain the Offering Circular/Prospectus and the Letter of Transmittal required by the offer and review the terms of the offer as stated in those documents.

2. Determine the terms of acceptance that you want to transmit via PTOP. Some information may require specific responses. See PTS PTOP or PBS Voluntary Tenders and Exchanges functions for more information about the following:

   - Odd-lot preference: If there is an odd lot preference on the offer, indicate whether the acceptance you transmit represents an odd-lot or multiple odd-lots qualifying for the preference. (When you transmit an acceptance by means of a Notice of Guaranteed Delivery through PTS PTOP or PBS Voluntary Tenders and Exchanges functions, you are required to indicate that the acceptance does or does not represent an odd-lot or multiple odd-lots qualifying for the preference.)

   - Conditional tender: If the terms of the offer allow you to specify a minimum quantity to be purchased if the offer is prorated, determine whether or not to specify it on the transmitted acceptance. (When you transmit an acceptance by means of a Notice of Guaranteed Delivery through PTS PTOP or PBS Voluntary Tenders and Exchanges functions, you are required to state such a minimum quantity or to state "0" as a minimum quantity, which indicates that you are not conditioning your acceptance on any minimum quantity of securities to be purchased if the offer is prorated.)

   - Special representations: If special representations are required by the Letter of Transmittal and the Notice of Guaranteed Delivery, determine your response to such representations to be indicated in the transmitted acceptance. (Based on the offer you will be able to make these representations in specific fields on the PTS PTOP or PBS Voluntary Tenders and Exchanges functions screen, or in the Comments field.)

   - Comments: If any additional acceptance information is required for the agent, prepare a statement of such to enter in the Comments field on the PTS PTOP or PBS Voluntary Tenders and Exchanges functions screen.

3. Enter and transmit the Notice of Guaranteed Delivery via PTS PTOP or PBS Voluntary Tenders and Exchanges functions during the period when protect submissions can be input. Your Notice of Guaranteed Delivery should indicate the determinations you made in Step 2 above. See Submitting a Protect for an ATOP-Eligible Offer for more information.

4. Acknowledge the Notice of Guaranteed Delivery. When you transmit an acceptance via a Notice of Guaranteed Delivery, a space will be indicated on the PTS PTOP or PBS Voluntary Tenders and Exchanges functions screen for you to enter an acknowledgment concerning the Notice of Guaranteed Delivery required by the offer identified by the contra-CUSIP you specify in your acceptance. If you do not enter the acknowledgment, PTS PTOP or PBS Voluntary Tenders and Exchanges functions will reject the acceptance. By entering the acknowledgment via PTS PTOP or PBS Voluntary Tenders and Exchanges functions, you agree that (i) you have received, and will be bound by the terms of, the Notice of Guaranteed Delivery required by the offer identified in the acceptance and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

DTCC Public (White)

**Note:**

The Notice of Guaranteed Delivery referred to in these procedures is the form of the Notice of Guaranteed Delivery required by the offer when you transmit the acceptance.

**Warning!**

Regarding incomplete instructions: An acceptance that was entered via PTS PTOP or PBS Voluntary Tenders and Exchanges functions but not transmitted to DTC is an incomplete transaction. Neither DTC nor the agent will take action on an incomplete transaction. You are solely responsible for taking additional processing steps to complete your transactions.

**Note:**

To identify incomplete transactions, use the inquiry feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges functions.

5. Receive a message acknowledging transmission of the acceptance by means of a protect. The message includes the status of the transaction.
   - If the message states that the acceptance was processed (made), confirm that the quantity of securities subject of the acceptance via a Notice of Guaranteed Delivery is shown in the information available through the inquiry feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges functions, under the contra-CUSIP number specified in the submission.

   - You must carefully monitor messages and the PTOP inquiry feature to ensure that all Notices of Guaranteed Delivery are processed, and that you take appropriate action to resolve unprocessed transactions or discrepancies.

   - Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

**Note:**

When an acceptance via a Notice of Guaranteed Delivery is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your acceptance. This Agent's Message includes your acknowledgment of the Notice of Guaranteed Delivery.

# Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges for an ATOP-Eligible Offer

Once you have accepted an offer through the agent via a hard copy Notice of Guaranteed Delivery submitted directly to the agent, you cannot subsequently deliver the securities to the agent via the PTS PTOP or PBS Voluntary Tenders and Exchanges functions. See Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges. Only protects submitted via PTS PTOP or PBS Voluntary Tenders and Exchanges can be covered via PTS PTOP or PBS Voluntary Tenders and Exchanges.

DTCC Public (White)

If you have accepted an offer by submitting a Notice of Guaranteed Delivery to the agent via PTS PTOP or PBS Voluntary Tenders and Exchanges functions, you can subsequently deliver all or a portion of the securities subject to the Notice of Guaranteed Delivery to the agent through DTC via the Cover Protect Submitted via PTS PTOP or PBS Voluntary Tenders and Exchanges feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges functions. See Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges.

**Warning!**

You must submit covers of protects on ATOP-eligible offers (for which protect instructions had been accepted via PTS/PBS) via PTS PTOP or PBS Voluntary Tenders and Exchanges; cover of protect instructions outside of PTS/PBS will not be accepted by DTC on ATOP-eligible offers during the period when instructions can be input via PTOP for ATOP eligible offers nor when the protect was not accepted in PTOP (see warning on page 37), and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but cannot guarantee such notification.

The dates on which you can submit a cover of protect via PTOP are specified in the notice about the offer, which you can view via the CA Web Announcements, PTS RIPS or PBS Reorganizations and Redemptions functions or ISO 20022 message. Unless otherwise specified in the PTS RIPS or PBS Reorganizations and Redemptions notice, PTS PTOP or PBS Voluntary Tenders and Exchanges and the ISO 20022 message are available on those dates for this purpose either until 5:00 p.m. eastern time (for offers indicated as ATOP I), or 1:00 p.m. eastern time (for offers indicated as ATOP II).

**Note:**

DTC shall have no responsibility in respect of your failure to instruct or properly instruct DTC to surrender securities in accordance with acceptances by submission of Notices of Guaranteed Delivery to the agent via PTS PTOP or PBS Voluntary Tenders and Exchanges.

## Checklist for Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges

1. Verify that a protect instruction was submitted and accepted.
2. Verify the existence of sufficient position being available to cover the protect instruction position.
3. Retrieve the specific protect instruction you are looking to cover.
4. Enter and transmit an instruction to surrender securities and cover the protect via PTS PTOP or PBS Voluntary Tenders and Exchanges during the period when cover of protect submissions can be input. (See Cover of Protect on Behalf of Another Participant if another participant is covering the protect on your behalf.)
5. Acknowledge the Letter of Transmittal. When you transmit an instruction to cover a protect via PTS PTOP or PBS Voluntary Tenders and Exchanges, a space will be indicated on the PTS PTOP or PBS Voluntary Tenders and Exchanges screen for you to enter an acknowledgment concerning the Letter of Transmittal required by the offer identified by the contra-CUSIP you specify in your instruction. If you do not enter the acknowledgment, PTS PTOP or PBS Voluntary Tenders and Exchanges will reject the instruction. By entering the acknowledgment via PTS PTOP or PBS Voluntary Tenders and Exchanges, you agree that (i) you have received, and will be bound by the terms of, the Letter of Transmittal required by the offer

DTCC Public (White)

identified in the instruction and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

---

**Note:**

The Letter of Transmittal referred to in these procedures is the form of the Letter of Transmittal required by the offer when you transmit the instruction.

An instruction to deliver securities to cover a Notice of Guaranteed Delivery that was submitted under these procedures can be for a quantity less than, but not more than, the open quantity of the acceptance submitted via PTS PTOP or PBS Voluntary Tenders and Exchanges. You can submit more than one instruction to cover the Notice of Guaranteed Delivery.

---

**Note:**

You must monitor the status of acceptances submitted via PTS PTOP or PBS Voluntary Tenders and Exchanges to ensure that the securities subject to the Notice of Guaranteed Delivery are subsequently delivered by the date indicated and in accordance with the Notice of Guaranteed Delivery and the terms of the offer. Use the PTS PTOP or PBS Voluntary Tenders and Exchanges function's inquiry feature to inquire about the status of Notices of Guaranteed Delivery.

---

**Warning!**

Regarding incomplete instructions: An instruction that was entered via PTS PTOP or PBS Voluntary Tenders and Exchanges but not transmitted to DTC is an incomplete transaction. Neither DTC nor the agent will take action on an incomplete transaction. You are solely responsible for taking additional processing steps to complete your transactions.

---

**Note:**

To identify incomplete transactions, use the inquiry feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges function.

---

6.  Receive a message acknowledging transmission of the cover of protect. The message includes the status of the transaction.

    *   If the message states that the instruction was processed (made), verify that the quantity of securities subject of the instruction is shown in the information available through the inquiry feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges functions, under the contra-CUSIP number specified in the instruction.

    *   If the message states that the instruction was not processed and is now pending (recycling), monitor PTS PTOP or PBS Voluntary Tenders and Exchanges to determine the appropriate action to resolve pending (recycling) acceptances, and to ensure that all of your transactions are processed.

    *   Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

---

DTCC Public (White)

---

**Note:**

When an instruction to cover a protect is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your instruction. This Agent's Message includes your acknowledgment of the Letter of Transmittal.

---

# Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges on Behalf of Another Participant

**Warning!**

If you want to cover a protect via PTS PTOP or PBS Voluntary Tenders and Exchanges, on behalf of another participant, that participant must have either (i) submitted a protect on ATOP-eligible offers via PTS PTOP or PBS Voluntary Tenders and Exchanges, or (ii) have had a protect submitted directly to the agent via email and subsequently communicated to DTC and input to PTOP by DTC; cover of protect instructions outside of PTS/PBS will not be accepted by DTC on ATOP-eligible offers and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but cannot guarantee such notification.

The dates on which you can submit a cover of protect are specified in the notice about the offer, which you can view via CA Web Announcements, ISO 20022 messaging and the RIPS function. Unless otherwise specified in the PTS RIPS or PBS Reorganizations and Redemptions notice, PTS PTOP or PBS Voluntary Tenders and Exchanges are available on those dates for this purpose either until 5:00 p.m. eastern time (for offers indicated as ATOP I) or 1:00 p.m. eastern time (for offers indicated as ATOP II).

---

**Note:**

DTC shall have no responsibility in respect of your failure to instruct or properly instruct DTC to surrender securities in accordance with acceptances by submission of Notices of Guaranteed Delivery to the agent via PTS PTOP or PBS Voluntary Tenders and Exchanges.

---

## Checklist for Submitting a Cover of Protect via PTS PTOP or PBS Voluntary Tenders and Exchanges on Behalf of Another Participant

1. Determine the terms of the acceptance of the protect that were submitted by another Participant through PTS PTOP or PBS Voluntary Tenders and Exchanges, and which you now want to cover via PTS PTOP or PBS Voluntary Tenders and Exchanges, and input the necessary information, including, but not limited to:

   - Protect ID - The Instruction Identification Number for the Protect with an uncovered quantity. The participant ID for the entered Protect ID must not match the signed-on participant ID.

   - Protect Participant ID - A valid participant ID and must not match the signed-on participant ID. Must match the participant ID for the entered Protect ID.

2. Enter and transmit an instruction to cover the protect via PTS PTOP or PBS Voluntary Tenders and Exchanges

DTCC Public (White)

115

3. Acknowledge the Letter of Transmittal. When you transmit an instruction to cover a protect via PTS PTOP or PBS Voluntary Tenders and Exchanges, a space will be indicated on the PTS PTOP or PBS Voluntary Tenders and Exchanges screen for you to enter an acknowledgment concerning the Letter of Transmittal required by the offer identified by the contra-CUSIP you specify in your instruction. If you do not enter the acknowledgment, PTS PTOP or PBS Voluntary Tenders and Exchanges will reject the instruction. By entering the acknowledgment, you agree that (i) you have received, and will be bound by the terms of, the Letter of Transmittal required by the offer identified in the instruction and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

---

**Note:**

The Letter of Transmittal referred to in these procedures is the form of the Letter of Transmittal required by the offer when you transmit the instruction.

---

**Warning!**

Regarding incomplete instructions: An instruction that was entered but not transmitted to DTC is an incomplete transaction. Neither DTC nor the agent will take action on an incomplete transaction. You are solely responsible for taking additional processing steps to complete your transactions.

---

**Note:**

To identify incomplete transactions, use the inquiry feature of the PTOP function.

---

4. Receive a message acknowledging transmission of the cover of protect. This message includes the status of the transaction.

- If the message states that the instruction to cover the protect was processed (made), that the quantity of securities subject of the instruction are now shown in your position under the contra-CUSIP specified in the instruction.

- If the message states that the cover of protect instruction was not processed and is now pending (recycling), monitor PTS PTOP or PBS Voluntary Tenders and Exchanges to determine the appropriate action to resolve pending (recycling) acceptances, and to ensure that all of your transactions are processed.

- When an instruction to cover a protect is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your instruction. This Agent's Message includes your acknowledgment of the Letter of Transmittal.

- Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

## Withdrawing an Acceptance of an ATOP-Eligible Offer

If you have accepted an offer and surrendered the securities through DTC, or accepted via a Notice of Guaranteed Delivery through DTC, you can fully or partially withdraw the acceptance if full or partial withdrawals are permitted by the terms of the offer.

DTCC Public (White)

---

**Warning!**

You must submit withdrawals of acceptances on ATOP-eligible offers via PTS PTOP or PBS Voluntary Tenders and Exchanges; withdrawals outside PTS/PBS will not be accepted by DTC on ATOP-eligible offers during the period when withdrawal of instructions can be input, and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but cannot guarantee such notification.

---

The dates on which you can submit a withdrawal of an acceptance are specified in the notice about the offer, which you can view via the PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the PTS RIPS or PBS Reorganizations and Redemptions notice, PTS PTOP or PBS Voluntary Tenders and Exchanges is available on those dates for this purpose until 5:00 p.m. eastern time.

## Checklist for Withdrawing an Acceptance

1. Retrieve the message reporting that the acceptance you want to withdraw was processed, or retrieve the necessary information via the inquiry feature of PTS PTOP or PBS Voluntary Tenders and Exchanges.
2. Enter and transmit an instruction to withdraw the acceptance via PTS PTOP or PBS Voluntary Tenders and Exchanges. See Submitting a Withdrawal Request for more information. The withdrawal request can be for all or any part of the acceptance previously submitted via PTS PTOP or PBS Voluntary Tenders and Exchanges, and you can submit more than one withdrawal request as long as the quantity of securities indicated in the withdrawal instructions does not exceed the original quantity of the acceptance.

---

**Warning!**

Regarding incomplete instructions: An instruction that was entered but not transmitted to DTC is an incomplete transaction. Neither DTC nor the agent will take action on an incomplete transaction. You are solely responsible for taking additional processing steps to complete your transactions.

---

**Note:**

To identify incomplete transactions, use the inquiry feature of the PTS PTOP or PBS Voluntary Tenders and Exchanges function.

---

3. Receive and retain the message acknowledging transmission of the withdrawal instruction and reporting the status of the instruction as "Pending Agent's Acceptance. "

---

**Note:**

When a withdrawal instruction is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating that your instruction is held in pending status until the agent acts on it. The  agent must accept or reject the withdrawal via the ATOP program. To reject the withdrawal, the agent must provide a comment stating the reason for rejection.

---

4. Verify the acceptance or rejection of the withdrawal request.

---

**Note:**

If the agent accepts the withdrawal of an acceptance in which the securities were surrendered (not an acceptance via a Notice of Guaranteed Delivery), DTC reduces the quantity of the original acceptance by the quantity of the withdrawal accepted by the agent and, in most cases, returns the securities to your account under the original CUSIP number. Securities that are the subject of an accepted withdrawal request that have been pledged under the contra-CUSIP number, however, are not returned to your account in the regular CUSIP number until the pledge has been released.

- You can inquire about your withdrawal instructions and the status thereof via the PTS PTOP or PBS Voluntary Tenders and Exchanges function's inquiry feature.

- Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message

## About Rejections of Instructions

The agent may reject acceptances, including those submitted via Notices of Guaranteed Delivery or instructions to cover protects. In the event of such rejections, it is the obligation of the agent to notify you directly.

DTC will follow the directions of the agent with respect to the delivery of the securities subject of the rejected acceptance (not an acceptance via a Notice of Guaranteed Delivery) or instruction by book-entry from the agent's account to your general free account and the corresponding deduction of securities of like quantity under the contra-CUSIP number from your general free account.

## Proration of an Offer

Proration of an offer may be permitted by the terms of the offer including Put repayments. If proration is required, DTC will communicate the proration rates and percentage as well as the handling of proration for uniquely denominated issues to ensure that the minimum and multiple denominations are maintained. DTC will complete the allocation on the basis of calculations and instructions received from the agent, and will notify you accordingly. Based on the terms of the offer, unaccepted positions as a result of proration will either be returned or applied to another option.

If the unaccepted position is to be returned, the position movements representing the unaccepted position will be reflected on your Participant Daily Activity Statement. The amount not accepted will appear as a Receive in your general free position and as a Deliver in your contra-CUSIP position.

**Note:**

Cancellation of an offer may also be permitted. DTC will notify you of a cancellation as soon as it is notified by the agent.

**Warning!**

Be sure to obtain the release of contra-securities from pledge. Otherwise, the surrendered securities will be subject to the same pledge as the deducted contra-securities and added to your pledged account.

If you disagree with either a proration or cancellation, you must take the matter up directly with the agent. DTC's responsibility in such matters is limited to acting in accordance with the tender agent's instructions, notwithstanding any rights you may have against the agent in respect thereof under the terms of an offer or applicable law.

## Available Reports

Offering information and activity reports are available via DTC's online services, CCF, CA Web, ISO 20022 Announcement messages, and the PTS PTOP or PBS Voluntary Tenders and Exchanges and PTS RIPS or PBS Reorganizations and Redemptions. These online reports provide you with a listing of eligible offers, brief terms of the offer and the details of all instructions submitted. Offering information (such as terms of the offer, critical dates and special processing requirements) is also available via DTC's online services. Allocation information is available through the Reorganization Cash/Stock Settlement Lists and the Participant Daily Activity Statement.

## Voluntary Offers Representing Attributes of the Security (processed via various functions)

| This activity | Accept instruction to | PTS function |
|---|---|---|
| Convertible securities | Surrender security for common shares and/or cash | Primary - RCNV<br>Secondary – PTOP (for cash and/or TBD entitlements) |
| Warrant exercises | Surrender security for common shares at an exercise price either paid in cash or reduced from the entitlement (cashless) | Primary – WARR<br>Secondary – PTOP (for cashless warrants) |
| Rights subscriptions | Surrender security for common shares at the subscription price (may be an assumed price until final price determined) | Primary – PSOP<br>Secondary – PTOP (for non-standard rights offers) |
| Put options | Surrender security for cash, or retain security that would otherwise be mandatorily tendered (for cash or debt securities) | Primary – PUTS<br>Secondary – PTOP (offer to purchase) |

## Use of Functions

RCNV (PTS) / conversions (PBS): RCNV is a function that is used by DTC Participants to submit instructions to convert to underlying security – credit of underlying security is allocated at the time of the instruction. This function provides a snapshot of the offering details, inquiry functionality and maintains history of all instruction details.

WARR (PTS) / warrant exercise (PBS): WARR is a function that is used by DTC Participants to submit instructions to exercise warrants to receive underlying security – credit of underlying security is allocated at the

DTCC Public (White)

time of the instruction. This function provides a snapshot of the offering details, inquiry functionality and maintains history of all instruction details.

PSOP (PTS) / Rights Subscriptions (PBS): PSOP is a function that is used by DTC Participants to submit instructions including oversubscriptions, submit protects, submit cover protects, submit cover protects on behalf of another Participant and submit Rights sell instructions on Rights Subscription events. This function provides a snapshot of the offering details, inquiry functionality and maintains history of all instruction details

PUTS (PTS) / Put Options (PBS): PUTS is a function that is used by DTC Participants to submit instructions to have position redeemed or retained on the pre-determined payment date. This function provides a snapshot of the offering details, inquiry functionality and maintains history of all instruction details.

# Conversions

## About the Service

DTC's Conversions service provides you with an economical and orderly method for exercising conversion privileges. When you use this service, DTC will:

- Notify you of upcoming expirations and record dates for conversion privileges

- Process your instructions on conversions

- Process instructions from U.S. agents to convert Eurobonds into DTC-eligible securities

- Submit securities to agents and collect from them the underlying stock or cash

- Allocate underlying securities to you on the date instructions are processed or move the instructed position into a contra-CUSIP until the entitlements, cash and/or securities, are determined.

You should check your Participant Daily Activity Statement to assure that your transactions were properly processed and recorded. For Conversions, the entry on the report is Conversions (Account#2222/4444), a two-part entry converting an eligible bond or preferred security into the underlying common stock or contra-CUSIP until such date that the entitlement is determined.

## About Conversion Features

Conversion features are dynamic and change as the capital markets evolve. The below features outline some of those scenarios.

Some debt securities and preferred stocks are convertible at the option of holders. Typically, these convertible securities can be exchanged without additional payment for underlying securities (usually common stock) of the issuing corporation.

DTCC Public (White)

Conversions are generally exercisable at a fixed rate any time throughout the life of the convertible securities and are irrevocable or convertible upon a trigger in the market. Conversion privileges will expire when any of the following occur:

- The convertible security is the subject of a partial or full call (conversion privileges expire only for the called securities)

- The security matures

- The conversion privilege expires (based on rules/triggers identified in the indenture) without a pending call.

When this happens, DTC will, upon proper notification from the issuer or its agent, notify you of an impending expiration of a conversion privilege.

Conversion exercises of equity securities are expressed as rates. For example, one share of convertible preferred stock is convertible at the rate of 1.5 shares of the underlying security, with the fractional interest being payable in cash based on the current market value of the securities.

Conversion exercises of debt securities are expressed as prices that are paid from the principal amount. For example, $15.00 of the principal amount is exchanged to receive one share of the underlying security, or $1,000.00 of the principal amount is exchanged for 66.66 shares of the underlying security.

Based on the indenture, the issuer may have the option to elect to pay cash or a combination of cash and securities and may be at a rate to-be-determined. The rate is typically based on the market price either on a set date, or over a period of time, thus it may not be determined at the time of your instruction. If either option applies, DTC will utilize ATOP to accept instructions (see Accepting an ATOP Eligible Offer above) and allocation will not occur at the time of the instruction as in the case with the RCNV function.

## How the Service Works

DTC determines which convertible securities are eligible for the conversion program.

You can enter conversion instructions via the PTS RCNV or PBS Reorg Conversions functions, and view eligible convertible securities via PTS RCIP or PBS Participant/Reorg Conversions functions. Once the processor receives your "made" (completed) conversion instructions, DTC deducts the convertible securities from your account and adds the underlying securities to it.

On conversions where the entitlement could be cash and/or securities at a to-be-determined rate, instructions will be submitted via PTS PTOP or PBS Tender and Exchanges, where instructed positions are moved to a contra-CUSIP and, proceeds are credited to your account after the price determination period. The underlying securities, once allocated, are immediately eligible for all of DTC's services, including book-entry delivery and pledges for collateral loans.

DTC will notify you via CA Web, ISO 20022 and the PTS RIPS or PBS Reorganizations and Redemptions functions when it receives notification from the issuer or its agent of changes to convertibility or terms of the conversion such as:

DTCC Public (White)

- A convertible security is undergoing a partial or full call for redemption. DTC will chill Delivery Orders the evening prior to the redemption date.

- A conversion privilege will expire.

- There is a temporary reduction in the conversion price.

- There was an event triggering convertibility.

The announcement will indicate the cutoff date and time by which you must submit your conversion exercise instructions. If the appropriate instruction platform is not available, you must submit hard copy instructions (see Hard Copy Procedures) to DTC.

---

**Note:**

Legal deposits on convertible securities undergoing any of the above are not permitted.

---

## Pledge and Transfer of Underlying Securities by Book-Entry

When you instruct DTC via PTS RCNV or PBS Reorg Conversion Functions to convert a quantity of convertible securities into a quantity of the underlying securities, DTC will deduct such quantity of convertible securities from your general free account and add the appropriate quantity of underlying securities. Since the conversion process will not have been completed at the time of the addition of the underlying securities to your general free account because DTC will not yet have received the securities from the agent, a credit to any participant's or pledgee's account, whether or not the participant or pledgee has participated in a conversion, of a quantity of the underlying securities will represent:

1. The rights in the quantity of the underlying securities in the custody of DTC or of a custodian bank or of a nominee of either, including underlying securities resulting from a participant's conversion instructions that are held by the agent,
2. The rights in the quantity of convertible securities subject to a participant's conversion instructions which are in the custody of DTC or of a custodian bank or of a nominee of either, including such convertible securities that are held by the agent,
3. The rights, if any, in the underlying securities prior to their issuance pursuant to the terms governing the convertible securities, and
4. The rights against the agent and the issuer arising from the submission of convertible securities to the agent.

If DTC does not receive the underlying securities promptly, DTC will reverse the allocation.

Any instruction given by a participant or a pledgee to transfer, pledge or release from pledge underlying securities by book-entry will be deemed for all purposes of DTC's Rules and Procedures to be an instruction to transfer, pledge or release from pledge the rights described in clauses 1, 2, 3, and 4 of the preceding sentence rather than the underlying securities identified in the instruction. Any instruction given by a participant or a pledgee to withdraw from DTC physical certificates representing underlying securities shall nevertheless be

DTCC Public (White)

deemed to be an instruction to DTC to deliver only the quantity of underlying securities identified in the instruction. Should, for any reason, the underlying securities subject to such withdrawal instruction exceed the amount of underlying securities available for withdrawal, such instruction may be rejected by DTC.

# Eurobond Conversions

## About the Service

The Eurobond Conversions service is part of DTC's Conversions service and allows you to convert Eurobonds into underlying securities eligible for DTC services. The program provides you with the means to exercise conversion options on specific securities that are not eligible for DTC.

## How the Service Works

To determine whether a security qualifies for the program, contact DTC's Customer Support Center at 1-888-382-2721 and follow the menu options.

The conversion process begins outside DTC with the presentation of convertible securities to an authorized conversion agent. Securities may be presented to the conversion agent by:

- A securities depository (such as Clearstream or Euroclear) via its depositary bank

- A DTC participant

- Any other entity wanting the underlying securities to be delivered to a DTC participant account.


The conversion instructions must include:

- The quantity and description of the securities to be converted, including an ISIN or CUSIP number

- Instructions to deliver the underlying securities, registered in DTC's nominee name (Cede &Co.), to DTC

- The account to be credited at DTC, including the DTC participant number and name.


The conversion agent then certifies to DTC that a conversion is in progress and requisitions the underlying securities for delivery to DTC. This Certification of Conversion form, which is signed by an authorized individual:

- Allows DTC to add the quantity of underlying securities to your account

- Represents to DTC that the securities are guaranteed to be delivered, and that DTC will receive any applicable dividend allocations.


DTC then receives the underlying securities.

DTCC Public (White)

## Important Considerations

When using DTC's Eurobond Conversions service, please note the following:

1. The underlying securities are added to your account normally in time for book-entry delivery to other participants on the same day.
2. By accepting the addition to your account, you assign to DTC all of your rights against any person involved in the process that results in the convertible securities being surrendered to any conversion agent and the issuer of the convertible securities and agree to take such action as shall be necessary to permit DTC to assert such rights; in addition, you agree to indemnify and hold harmless DTC, any other DTC participant and any pledgee in DTC and its or their employees, officers, partners, directors, shareholders and agents against any loss, liability, claim, damages or expense, including costs, disbursements, and counsel fees arising (a) by reason of the addition; (b) by reason of the failure of the Principal Bank conversion agent to deliver the underlying securities; (c) by reason of the failure of the issuer of the underlying securities or its agent(s) to pay or make available to DTC any dividend or other distribution or interest payable on, and any voting rights related to, the underlying securities based on a record date that is the same as or after the presentation date stated in the Certification of Conversion form; (d) by reason of any deficiency in the underlying securities delivered to DTC; or (e) for any other reason, except by reason of any wrongful and/or criminal misconduct of DTC or any of its employees.
3. All matters that relate to the underlying securities shall be dealt with by DTC as though delivered to DTC by you, including any liability arising as a result of the rejection of securities by DTC after addition to your DTC account and the transfer, pledge or withdrawal thereof by you, and all agreements between you and DTC and the Rules and Procedures of DTC from time to time in effect shall govern any and all matters relating to the underlying securities.
4. DTC has the right to deduct the underlying securities from your securities account to which they had been added if the underlying securities are not promptly delivered to DTC by the conversion agent. DTC may make such deduction whether or not the underlying securities remain in your account at the time of such deduction.
5. DTC has the right to charge your DTC Dividend/Reorganization Cash Settlement account in the amount of any cash dividend, distribution or interest, and to deduct from your securities account any securities distribution, payable on the underlying securities based on a record date that is the same as or after the presentation date stated in the Certification of Conversion form if not received by DTC whether or not previously credited to your account(s).
6. DTC will make available via email the agent's Certification of Conversion form.
7. DTC has no obligation to examine for completeness or accuracy Certification of Conversion forms that have been submitted to it or, if it does examine them, to conduct a thorough or accurate examination. Nevertheless, if DTC makes such an examination and the forms do not pass such examination, DTC may reject the forms.
8. The Principal Bank conversion agent may or may not be the TA. DTC will not accept securities directly from a TA unless it is also the Principal Bank conversion agent and then only in accordance with DTC's prescribed procedures.

DTCC Public (White)

## Pledge and Transfer of Eurobond Underlying Securities by Book-Entry

After it receives a Certification of Conversion form from the Principal Bank conversion agent, DTC will add the underlying securities to your general free account. Since the conversion process will not have been completed at the time of the addition of the underlying securities to your account because DTC will not yet have received the securities from the agent, a credit to any participant's or pledgee's account, whether or not it has participated in a conversion, of a quantity of the underlying securities will represent rights in:

1.  The quantity of underlying securities in the custody of DTC or of a custodian bank or of a nominee of either, including underlying securities resulting from a conversion certified by a Principal Bank conversion agent by delivery to DTC of a Certification of Conversion form, which are held by the Principal Bank conversion agent,
2.  The quantity of convertible securities subject to the conversion instructions that are held by the conversion agent,
3.  The rights, if any, in the underlying securities prior to their issuance pursuant to the terms governing the convertible securities,
4.  The rights against the conversion agent and the issuer arising from submission of convertible securities to the conversion agent, and
5.  DTC's rights against the participant who receives the addition.

If DTC does not receive the underlying securities promptly, DTC will reverse the allocation.

Any instruction given by a participant or a pledgee to transfer, pledge or release from pledge underlying securities by book-entry will be deemed for all purposes of DTC's Rules and Procedures to be an instruction to transfer, pledge or release from pledge the rights described in 1, 2, 3, 4, and 5 of the preceding sentence rather than the underlying securities identified in the instruction. Any instruction given by a participant or a pledgee to withdraw from DTC physical certificates representing underlying securities shall nevertheless be deemed to be an instruction to DTC to deliver only the quantity of underlying securities identified in the instruction. Should, for any reason, the underlying securities subject to such withdrawal exceed the amount of underlying securities available for withdrawal, such instruction may be rejected by DTC.

## Puts

### About Puts

Put issues are securities (usually bonds) with provisions that generally allow beneficial owners to sell the bonds back to the issuer, or its Agent, within a preset time period at a specified price (usually 100% of its face value). Put provisions can permit exercise of the put at various frequencies (such as semiannually, annually, or only on one specific date) and often have floating or variable interest rates, with the availability of the put linked to the rate change cycle.

**Warning!**

Put provisions differ widely from issue to issue and many issues have unique features that significantly affect your ability to exercise the put provision. For this reason, it is very important that you follow the guidelines in the PTS RIPS or PBS

Reorganizations and Redemptions functions and the indenture or other documents regarding the specific processing details relating to individual options. You are responsible for obtaining and monitoring announcements of put provisions from all sources (including any material available from the agent) involving securities you have deposited at DTC.

## About the Service

The Puts program allows you to view announcements about upcoming repayment options and mandatory tenders, as well as process instructions to exercise repayments and retainments. When you use the Puts program, DTC will:

- Notify you of upcoming repayment options, mandatory tenders and mandatory tenders with the option to retain

- Process your instructions to exercise repayments and retainments

- Submit securities to agents and collect put proceeds from them

- Allocate put proceeds to you on the payment date.

You should check your Participant Daily Activity Statement to assure that your transactions were properly processed and recorded. For Puts, the entry on the report is Puts (Account#1444), a two-part entry showing movement from the surrendered security to the contra-security.

After the expiration of a put exercise period, the agent is obligated to make cash payment or a distribution of securities to DTC for the quantity of surrendered securities accepted in whole or in part. You will receive one of the following:

- Re-marketed securities based on your position in the contra (retainment) security, or

- An allocated cash payment from DTC based on your position in the contra (optional or mortgage-backed)/target (mandatory) security. The contra/target securities will then be deducted from your account.

## Types of Put Options

The following are the types of put bond options that can be processed:

| This type of option | Refers to |
|---|---|
| Optional Repayment | A feature of a bond that entitles the holder to elect to surrender the bond for cash during a predetermined time period with a predetermined payable date. A holder that does not give notice retains the bond under its current or adjusted terms. |
| Mandatory Tender with Retainment | The exchange of bonds for cash, however, holders can elect to keep, or retain, their bonds. |
| Mortgage-Backed/Monthly Put | An early redemption feature that allows the holder to elect to sell the bonds back to the issuer on a monthly basis according to specified priorities. |

DTCC Public (White)

| This type of option | Refers to |
|---|---|
| Put (Survivor Option) | Issue has an early redemption feature. This feature allows the holder to elect to sell bonds back to the issuer on a predetermined basis (excluding monthly) according to specific priorities. |

# Exercising Put Options

Except with respect to put options that have an offer to purchase with no withdrawal privilege, you can submit exercise instructions via the PTS PUTS or PBS Put Option Bonds functions. Instructions relating to put options that have an offer to purchase with a withdrawal privilege can be submitted through the PTS PTOP or PBS Voluntary Tenders and Exchanges functions.

# Withdrawing Put Option Instructions

If allowed under the terms of the indenture (or other document that specifies the put provisions), you can withdraw all or part of your put option instruction using the PTS or PBS function specified in the event details on PTS RIPS, PBS Redemptions and Reorganizations or CA Web. In most cases, you can withdraw previously submitted put option instructions on mortgage-backed securities only.

Questions about the availability of the withdrawal privilege must be directed to the tender agent. DTC will follow the instructions of the agent.

### Rejection of Withdrawal of Put Option Instructions

The agent may reject the withdrawals of a put option exercise you submitted. You will be notified of the rejection by DTC.

# Proration of a Repayment Option

If a Put event is subject to proration, DTC will allow instructions through the PTS PTOP and PBS Voluntary Tenders and Exchanges functions. Refer to the proration details found in the Proration of an Offer section of the About DTC's Automated Tender Offer Program (ATOP) topic of this guide.

# Rejection by DTC or the Agent

### Rejection by DTC

DTC has no obligation to examine for completeness or accuracy any instruction forms or any accompanying documents submitted to DTC. Nevertheless, if DTC makes such an examination and the forms or accompanying documents do not appear to be complete or accurate and/or your general free position is insufficient to permit deduction of the securities that are the subject of the instruction, the instruction may be rejected by DTC.

DTCC Public (White)

### Rejection by the Agent

The agent may reject an instruction forwarded by DTC on your behalf. You will be notified by DTC of such rejection.

DTC will process the entries necessary to give effect to the reject. In the case of a rejected Voluntary Offering instruction, your position in the contra securities will be reduced and your position in the surrendered securities will be increased. In the case of a rejected Conversion instruction or Warrant Subscription instruction, your position in the surrendered security will be increased (upon return of the surrendered security by the agent) as appropriate to reflect the rejection. In addition, with respect to a rejected Warrant Subscription instruction, DTC will process the entries necessary to credit you with any subscription cash payment or payment securities returned to DTC by the agent in connection with the rejection instruction.

- If you disagree with the rejection by the agent, you must take up the matter directly with the agent. DTC's responsibility as to such matter is limited to acting in accordance with the agent's instructions, notwithstanding any rights you may have against the agent in respect thereof under the terms of the Reorganization transaction or applicable law.

- In the case of Voluntary Offerings, be sure to obtain the release of the contra securities from pledge. Otherwise, tendered securities added to your account will be subject to the same pledge as deducted contra securities, and will be added to your pledged account.

If rejection is for a reason other than that your tender price was not accepted or that a pro rata portion of your tender was not accepted, DTC will attempt to notify you by telephone, calling first the coordinator (s) at the telephone number (s) entered on the instructions form, but takes no responsibility therefor.

# Rights Subscriptions

## About the Service

The Rights Subscriptions service allows you to accept a rights offer and receive the entitlements within a fully automated book-entry environment. When you use this service, DTC will:

- Provide information on rights subscriptions involving DTC-eligible securities

- Process your instructions and collect subscription fees when applicable to accept offers via the Automated Subscription Offer Program (ASOP) or, in very rare cases, via hard copy instructions

- Forward instructions, subscription fees and rights to agents and balance with those agents throughout the offering period

- Collect the entitlements and allocate them to you, along with refunds when applicable.

You should check your Participant Daily Activity Statement or Security Position tab on CA Web to assure that your transactions were properly processed and recorded. For Rights, the entry on the report is Rights

DTCC Public (White)                                                           128

Subscriptions (Account#5555), showing that DTC deducted the right from your account and added the entitlements to your reorganization account.

# About Rights

Rights are short term instruments (usually 15 to 30 days) that give the holder the right to purchase shares of new underlying securities (usually common stock) at a given price.

---

**Note:**

Rights usually have limited advance notification, a restricted acceptance period, and specific acceptance requirements. You should refer to the CA Web Announcements, ISO 20022 messages and PTS RIPS or PBS Reorganizations and Redemptions functions to view these requirements before submitting subscription instructions.

---

# Relevant Terms

The following terms are relevant to Rights Subscriptions:

| This term | Refers to |
|-----------|-----------|
| Rights Subscription Offer | An offer made to owners of securities by the issuer entitling them to purchase from the issuer a quantity of new securities related to the quantity of securities presently owned, usually at a favorable market price, as evidenced by rights issued by the issuer. |
| Basic Subscription | The exercise of rights entitling the holder to receive new underlying securities upon the surrendering of rights and payment of the subscription cost. |
| Oversubscription | A provision in a rights offer that allows a holder that fully exercises the basic subscription to subscribe to one or more additional shares, subject to the availability of additional shares. The maximum allowed shares available through the oversubscription privilege is usually a percentage of the basic subscription shares (such as an owner subscribing to 100 shares may oversubscribe to a maximum of 50 additional shares when the oversubscription maximum is 50 percent). |
| Round-up | A provision that permits a record date owner of the underlying security to round up the quantity of rights the owner would otherwise receive in the rights distribution, to an amount that allows the owner to purchase one additional share in lieu of a fractional share. This is exercised between the record date and the distribution date of the rights distribution. In lieu of a round-up privilege, the terms of the rights offer may provide a step-up privilege. |
| Step-up | A provision in an offer that permits you, when you exercise your basic subscription, to subscribe to one additional share of the underlying security in lieu of a fractional share to which you might otherwise be entitled, subject to the availability of the additional full share. A step-up provision may require you to purchase the required quantity of rights to subscribe to the one additional share (for example, the "step-up price"). |
| Subscription price | The cost to subscribe to one share of the underlying security. |
| Subscription rate | The number of rights that must be exercised to subscribe to one share of the underlying security. |
| Assumed Subscription Price | A price determined by the agent to allow for payment at the time of the instruction pending notification of the final or actual price. |

DTCC Public (White)

| This term | Refers to |
|---|---|
| DTC Expiration Date | The last day you can accept an offer by submitting subscription or Notice of Guaranteed Delivery instructions to DTC. This date may be earlier than the date established for this purpose by the Offeror. |
| DTC Cover Expiration Date | The last day you can cover your protects and surrender rights through DTC pursuant to Notices of Guaranteed Delivery. This date may be earlier than the date established for this purpose by the Offeror. |
| Guarantee of Delivery Period | The period after the expiration of an offer during which, under the terms of the offer, rights may be surrendered pursuant to notices of Guaranteed Delivery submitted to the agent prior to the expiration of the offer. The guarantee of delivery period is sometimes called the protect period. |
| Cover of Protect | The surrendering of rights for which a previous protect had been submitted as a guarantee of delivery. |
| DTC Sell Expiration Date | The last day you can surrender rights to the agent to sell and receive the sale proceeds through DTC. |
| Proration | The method used to determine accepted oversubscription of rights. |
| Protect, or Notice of Guaranteed Delivery | A notice delivered to the agent that allows holders who do not have their securities readily available to accept a rights offer by the expiration date and deliver the securities within the period prescribed in the offer. |

## About DTC's Automated Subscription Offer Program (ASOP)

DTC's Automated Subscription Offer Program (ASOP) allows you to accept a rights offer and receive the underlying securities within a fully automated book-entry environment. A right is a privilege granted to holders of an issuer's securities, allowing them to subscribe to shares of new underlying securities (usually common stock). Rights are short-term instruments with a life usually of 15 to 30 days. Rights subscription offers are normally characterized by limited advance notification of the offer, a restricted acceptance period, and specific requirements for the acceptance of an offer. Rights offers can also be characterized by step-up and oversubscription privileges, allowing a holder that fully exercises its rights (the basic subscription) to subscribe to one or more additional shares, over and above the number of shares to which the holder is entitled through the basic subscription, subject to the availability of additional shares.

ASOP allows you to submit subscription instructions, including basic subscriptions and the exercise of step-up and oversubscription privileges, authorizing DTC to surrender the rights and make the subscription payment to the agent.

**Note:**

Rights surrendered by participants and delivered by book-entry to the agent are subject solely to the agent's instructions. DTC effects book-entry delivery of surrendered rights from your account and debits your settlement account with the subscription payment. The surrendered rights and the corresponding subscription payment are credited to an account maintained by DTC on behalf of the agent. When the underlying securities are issued by the agent, DTC distributes the securities to you by book-entry.

DTCC Public (White)

130

Under ASOP, you transmit your subscription instructions to DTC via the PTS PSOP or PBS Rights Subscriptions. The agent can use the ASOP function to receive immediate notification of the subscription instructions you submitted and to obtain other pertinent information.

The PSOP function allows you to transmit subscription instructions to DTC to:

- Accept an offer by means of surrendering rights and making the required subscription payment

- Accept an offer by means of a Notice of Guaranteed Delivery (also known as a protect) and subscription payment

- Surrender rights after having accepted an offer by means of a Notice of Guaranteed Delivery (also known as a cover of protect) submitted either through the PTS PSOP or PBS Rights Subscriptions functions.

- Submit a cover of protect on behalf of another participant

- Surrender rights for the purpose of selling them through the agent

The PTS PSOP or PBS Rights Subscriptions functions also allow you to exercise any step-up or oversubscription privileges when submitting instructions to accept a rights offer.

## General Information Regarding ASOP

The following general information applies to the distribution of rights to participants and the acceptance and surrendering of rights thereafter through ASOP:

- The distribution of rights to record date holders of the underlying security is completed by book-entry in accordance with DTC's Dividend procedures (see the Distributions Service Guide). In the event the rights distribution allows you to exercise a round-up privilege to receive additional rights at the time of the record date distribution, the processing of round-up instructions through DTC is completed in accordance with procedures contained in the information about the rights distribution made available through DTC's Dividend department.

- If a rights CUSIP number is not assigned by the CUSIP Service Bureau, DTC establishes a user (contra) CUSIP number for the rights offer.

- For rights offers that qualify for ASOP, the agent has entered into a master agreement with DTC providing, among other things, that the delivery by DTC of an Agent's Message to the agent satisfies the terms of the rights offer as to the execution and delivery of a Subscription Form or a Notice of Guaranteed Delivery by the participant identified in the Agent's Message.

- For rights held on DTC's behalf at another depository, the agent agrees to accept rights from the other depository in a quantity that fulfills DTC's obligation to deliver rights to the agent for subscription instructions submitted under these procedures by participants.

- Rights offers eligible under ASOP are announced in the CA Web Announcements, ISO 20022, and PTS RIPS and PBS Reorganizations and Redemptions functions. Information about qualifying rights offers is

also available to participants by means of an inquiry option of the PTS PSOP and PBS Rights
Subscriptions functions, and may also be available by means of hard copy notices distributed to you by
DTC.

The information provided by DTC describing a rights offer is intended as an aid, and can be viewed via CA
Web Announcements, ISO 20022 and PTS RIPS and PBS Reorganizations and Redemptions functions. This
information is based on the best information available to DTC concerning the offer but may be subject to
inaccuracies or omissions. It is your responsibility to obtain and monitor announcements from all sources,
including any documents stating the terms and conditions of the offer obtainable from an agent, of offers
involving securities you have on deposit at DTC.

## Subscription Instructions

Participants enter and transmit subscription instructions to DTC via the PTS PSOP or PBS Rights
Subscriptions functions. Subscription instructions entered by PTS RTOP or PBS Release Reorg Transactions
users are automatically applied to the processor controls and must be released and transmitted to DTC via this
function after the instructions have been entered via PTS PSOP or PBS Rights Subscriptions.

When accepting a rights offer by means of surrendering rights or by means of a Notice of Guaranteed Delivery
through PTS PSOP or PBS Rights Subscriptions, you can enter and combine in one instruction up to 12
separate customer instructions. Upon the successful processing of an instruction with multiple customers, DTC
automatically generates separate transactions and Agent's Messages for each customer, and these separate
transactions are treated as individual acceptances thereafter by both DTC and the agent.

## Subscription Payments

In general, the subscription price of a rights offer is established at the outset of the offer and payment is
required when you accept an offer. In these cases DTC automatically calculates and charges the subscription
payment to your settlement account on the same day subscription and Notice of Guaranteed Delivery
instructions are successfully processed.

The terms of some rights offers specify that the subscription price is initially either an unknown or an assumed
price. In these cases, the actual subscription price is established during or after the acceptance period of the
rights offer.

When the subscription price is not known, DTC will accept your subscription instructions, but will not charge
your settlement account until the agent advises DTC of the actual subscription price. At that time, your
settlement account is automatically charged the subscription payment for your previous subscription activities.
Any subsequent activity is also automatically charged to that account.

When there is an assumed subscription price, DTC charges the assumed subscription payment to your
settlement account on the same day instructions are successfully processed. Once the actual subscription
price is known, DTC remits to or collects from the agent the difference between the assumed and actual prices
and credits or debits your account accordingly. Any subsequent activity is automatically charged to your
settlement account. These charges appear on your daily Reorganization Cash Settlement List, CA Web and
ISO 20022 messages.

DTCC Public (White)

# Payments with Notices of Guaranteed Delivery

If the terms of the rights offers specify that subscription payment must accompany your Notice of Guaranteed Delivery, DTC charges the subscription payment to your settlement account on the same day you submit a Notice.

Some offers, however, permit you to make the subscription payment when the rights that are the subject of the Notice of Guaranteed Delivery are surrendered. In this case, the subscription payment is charged to you when the rights are surrendered. These charges appear on your daily Reorganization Cash Settlement List, CA Web and ISO 20022 messages.

# Movement of Underlying Securities

Rights offers are normally subject to cancellation. Therefore, DTC does not provide immediate credit for the underlying securities to your general free account. The underlying securities to which you are entitled, subject to cancellation, availability, or proration, are instead immediately credited to your reorganization account in the underlying security CUSIP number or in some cases, a contra-CUSIP number. In addition, the underlying securities resulting from a step-up or oversubscription privilege are subject to the availability or prorated distribution of new underlying securities. You cannot use the underlying security position credited to your reorganization account for any DTC book-entry services other than those described in this section.

When the underlying securities are made available to the agent, DTC distributes the new securities to your general free account by book-entry and reduces your reorganization account or contra-CUSIP accordingly.

---

**Note:**

In the event a rights offer is neither subject to cancellation nor the availability of new underlying securities, and the new underlying securities are immediately issuable and available, DTC processes entries which results in you receiving immediate credit for new underlying securities in your general free account.

---

# Subscription Sub-Accounts

The underlying securities credited to your reorganization account are further identified by sub-accounts of the reorganization account. There are two subaccounts of the reorganization account for this purpose: the basic subscription and oversubscription subaccounts.

The underlying securities to which you are entitled through the exercise of the basic subscription and any step-up privilege are credited to your basic subscription subaccount. The quantity of underlying securities you want to purchase through an oversubscription privilege, as indicated in the instruction you transmit to DTC via the PTS PSOP or PBS Rights Subscriptions, is credited to your oversubscription subaccount. Both of these subaccount positions are shown in your reorganization account with the underlying security number.

When you surrender rights for the purpose of selling them through the agent, the quantity of rights the subject of the sell instruction is credited to a third subaccount, named the sell subaccount. The sell subaccount position is shown in your reorganization account with the rights CUSIP number until DTC receives and credits your settlement account with the cash proceeds.

DTCC Public (White)

You can view your reorganization account and subaccount activities via CA Web and in your Participant Activity Statement and Reorganization Cash Settlement List.

# Schedule for Submitting Instructions

The dates and times when you can submit instructions via PTS PSOP or PBS Rights Subscriptions are specified in the related CA Web Announcements, ISO 20022 messaging and PTS RIPS or PBS Reorganizations and Redemptions envelope or via the PTS PSOP or PBS Rights Subscriptions inquiry option. Unless otherwise specified in the information from DTC, the following table describes the availability of PTS PSOP or PBS Rights Subscriptions on those dates and times. All times are eastern time.

| For this instruction | The PSOP hours are |
|---|---|
| Basic subscriptions (with step-ups and over-subscriptions) | 8:00 a.m. to 2:15 p.m. |
| Notices of Guaranteed Delivery | 8:00 a.m. to 2:15 p.m. |
| Instructions to sell rights | 8:00 a.m. to 2:15 p.m. |
| Instructions to cover protects | 8:00 a.m. to 2:15 p.m. |

**Note:**

Instructions and/or Notices of Guaranteed Delivery on DTC's expiration date may be permitted between 3:30 p.m. and 5:00 p.m., after DTC's cutoff time for the settlement of cash activities. In such cases, DTC defers charging the subscription payment with respect to Notices of Guaranteed Delivery processed on the last day of the offer until the next business day on which DTC is open for cash settlement services.

# Inquiring About ASOP-Eligible Offers

Upon learning that a rights offer has been made, DTC notifies you via:

- CA Web Announcements, ISO 20022 messaging and the PTS RIPS or PBS Reorganizations and Redemptions functions, or

- The inquiry option of PTS PSOP or PBS Rights Subscriptions, or

- Email alert

When notified by DTC of an eligible offer, or after inquiring via CA Web Announcements or ISO 20022 messaging or PTS PSOP or PBS Rights Subscriptions, you should note the following:

1. The rights CUSIP number and the CUSIP number of the underlying security that can be subscribed to through the offer.
2. The exercise terms of the rights offer, including the number of rights that must be surrendered to subscribe to one share of the underlying security, and the subscription price to purchase each new share.
3. Any step-up privilege, including the step-up prices (if any) and the minimum fractional amount required to exercise the step-up privilege.

4. Any oversubscription privilege, including the subscription prices of the oversubscription privilege and the maximum number of shares to which you can oversubscribe.

5. The last day and time for submission of original acceptances (including Notices of Guaranteed Delivery, if available) to the agent via PTS PSOP or PBS Rights Subscriptions.

6. If a Guarantee of Delivery period is available, the last day and time on which deliveries in satisfaction of Notices of Guaranteed Delivery (instructions to cover protects) can be submitted via PTS PSOP or PBS Rights Subscriptions.

7. If the terms of the rights offer allow rights to be sold through to the agent, the last day and time for the submission of sell instructions via PTS PSOP or PBS Rights Subscriptions.

8. Any special representations required for the acceptance of an offer (for example, when the oversubscription privilege can be exercised only for rights distributed to record date holders of the underlying security and exercised in full).

---

**Note:**

With certain rights subscription events you may be directed to submit your instructions through PTOP.

---

**Note:**

You should also determine from the information provided by DTC if there will be any interruption in the availability of DTC services for the rights, such as a chill on deposits or withdrawals.

---

# Accepting an ASOP-Eligible Offer

After receiving information from DTC about an ASOP-eligible rights offer, you can accept the offer and deliver securities on deposit with DTC to the agent via the PTS PSOP or PBS Rights Subscriptions function.

---

**Warning!**

You must accept ASOP-eligible offers via PTS PSOP or PBS Rights Subscriptions; except as noted in Subscription Instructions, instructions on ASOP-eligible offers outside of PTS/PBS will not be accepted by DTC and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but DTC cannot guarantee such notification.

---

If you intended to accept an offer via PSOP but missed the cutoff for submitting the acceptance via PSOP, it is your responsibility to contact the agent and determine if they will accept an email submission directly. If accepted, the agent will notify DTC and the Participant should submit an acceptance instruction form to DTC via email. DTC will then input the acceptance on behalf of the Participant. The Participant must confirm the acceptance input by DTC is accurate.

Instructions being submitted to DTC after the DTC cutoff must be approved by, and delivered to, the agent handling the event, prior to submission to DTC.

The dates on which you can accept a rights offer and surrender rights and the required subscription payment via PTS PSOP or PBS Rights Subscriptions are specified in the notice about the offer, which you can view via CA Web Announcements and the PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the information from DTC, PTS PSOP or PBS Rights Subscriptions is available for the purpose of transmitting acceptances from 8:00 a.m. to 2:15 p.m. eastern time. The terms of the offer may

permit you to accept the offer directly through the agent via a hard copy Notice of Guaranteed Delivery. See Submitting a Protect for an ASOP-Eligible Offer.

# Checklist for Submitting an Acceptance

1. Obtain the Offering Circular/Prospectus and the Subscription Form required by the offer and review the terms of the offer as stated in those documents.

2. Determine the terms of acceptance that you want to transmit via PTS PSOP or PBS Rights Subscriptions including, but not limited to:

   - Basic subscription: Determine the quantity of rights you want to exercise. When you transmit an acceptance of the rights offer via PTS PSOP or PBS Rights Subscriptions, you must enter this quantity in the field provided.

   - Step-up privilege: If there is a step-up privilege provided by the rights offer, determine if the acceptance must include the exercise of the step-up privilege. When you transmit an acceptance including the step-up privilege, you must respond affirmatively to the step-up privilege in the field provided.

   - Oversubscription privilege: If there is an oversubscription privilege provided by the rights offer, determine if the acceptance must include the exercise of the oversubscription privilege. If so, determine the quantity of underlying securities you want to subscribe to through the oversubscription privilege. When you transmit an acceptance including the oversubscription privilege, you must enter this quantity in the field provided.

   - Subscription payment: Determine the subscription payment that will be charged to your DTC settlement account as a result of the basic subscription and the exercise of any step-up or oversubscription privilege. When you transmit an acceptance, you do not enter the subscription payment dollar amount. This amount is automatically calculated by DTC and displayed to you prior to your approval of the transmission of the acceptance to DTC for processing.

   - Special representations: If special representations are required by the Subscription Form, determine your response to such representations to be indicated in the transmitted acceptance. (Based on the offer, you will be able to make these representations in specific fields on the PTS PSOP or PBS Rights Subscriptions screen, or in the Comments field.)

   - Comments: If any additional acceptance information is required, prepare a statement of such to enter in the Comments field on the PTS PSOP or PBS Rights Subscriptions screen.

---

**Note:**

When you transmit an acceptance, you can combine in a single acceptance a maximum of 12 separate customer instructions to which the above information applies, including the special representations and comments. The PTS PSOP or PBS Rights Subscriptions function's Rights Exercise Customer Breakdown screen will allow you to enter the basic subscription rights quantity, the oversubscription underlying security quantity, and a response to the step-up privilege for each separate customer instruction. The sum of these quantities must equal the respective quantities you enter on the primary Rights Exercise screen.

---

3. Enter and transmit the acceptance via PTS PSOP or PBS Rights Subscriptions during the period when submissions can be input via PTS or PBS for ASOP eligible offers. Your acceptance should indicate the determinations you made in Step 2 above.

4. Acknowledge the Subscription Form. When you transmit an acceptance via PTS PSOP or PBS Rights Subscriptions, a space will be indicated on the PTS PSOP or PBS Rights Subscriptions screen for you to enter an acknowledgment of the Subscription Form required by the offer identified by the rights CUSIP you specify in your acceptance. If you do not enter the acknowledgment, PTS PSOP or PBS Rights Subscriptions will reject the acceptance. By entering the acknowledgment via PTS PSOP or PBS Rights Subscriptions, you agree that (i) you have received, and will be bound by the terms of, the Subscription Form required by the offer identified in the acceptance and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

---

**Note:**

The Subscription Form referred to in these procedures is the form of documentation required by the offer when you transmit the acceptance.

---

5. Receive the PTS PSOP or PBS Rights Subscriptions input response screen after having transmitted to DTC the information entered in Steps 2 and 3 above. The PTS PSOP or PBS Rights Subscriptions input response screen displays error messages for any input errors (such as an error message indicating that the number of shares reflected in the oversubscription field for the PSOP input screen exceeds the maximum allowed by the terms of the offer). If necessary, correct the required fields of the PTS PSOP or PBS Rights Subscriptions input screen and re-transmit the instruction to DTC for editing.

6. Receive the PTS PSOP or PBS Rights Subscriptions input response screen showing that the instruction does not contain errors, and showing the subscription payment that will be charged to your DTC settlement account. Verify the information you have entered and re-transmit the instruction to DTC for processing.

7. Receive a message acknowledging transmission of the acceptance and reporting the status.

   - If the message states that the acceptance was processed (made), confirm that 1) the quantity of rights subject of the instruction has been deducted from your position in the specified rights CUSIP number, 2) that you now have the quantity of underlying securities to which you are entitled through the basic subscription and any step-up privilege shown in your position in the basic subscription sub-account with the underlying security CUSIP number specified in the acceptance and 3) that you now have the quantity of underlying securities to which you are entitled through the exercise of any oversubscription privilege shown in your position in the oversubscription sub-account with the underlying security CUSIP number specified in the acceptance.

   - If the message states that the acceptance was not processed and is pending (recycling), monitor future messages to determine that the acceptance is subsequently processed. Acceptances are not transmitted to the agent and securities are not moved into the reorganization account of the underlying security CUSIP number until the acceptance has been processed (made). You must monitor messages carefully to ensure that all your transactions are processed, and take appropriate action to resolve pending (recycling) acceptances.

   - Participants that subscribe to the ISO 20022 Instruction Statement Report (CAST) will be able to verify instructions status on the message

**Note:**

When an acceptance is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your acceptance. This Agent's Message includes your acknowledgment concerning the Subscription Form.

# Submitting a Protect for an ASOP-Eligible Offer

After receiving information from DTC that a rights offer is eligible for ASOP, and after determining that the terms of the rights offer provide for the acceptance of the offer via a Notice of Guaranteed Delivery, you can accept the offer by submitting a Notice of Guaranteed Delivery to the agent via the Protect Submission option of PTS PSOP or PBS Rights Subscriptions and subsequently, on or before the end of the period, you will be able to cover your protect by either delivering securities you have on deposit with DTC or having another participant deliver on your behalf to the agent via the PTS PSOP or PBS Rights Subscriptions function.

**Warning!**

You must submit Notices of Guaranteed Delivery on ASOP-eligible offers via PTS PSOP or PBS Rights Subscriptions; instructions outside of PTS/PBS will not be accepted by DTC on ASOP-eligible offers and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but cannot guarantee such notification. If you intended to submit a protect instruction via PSOP but missed the cutoff for submitting the protect via PSOP it is your responsibility to contact the agent and determine if they will accept an email submission directly. If accepted, the agent will notify DTC and the Participant should submit a Protect Submission Form to DTC via email. DTC will then input the protect submission on behalf of the Participant. The Participant must confirm the protect submission input by DTC is accurate. The Participant will be able to cover the protect opened by DTC.

The dates on which you can accept an offer by submitting a Notice of Guaranteed Delivery via PSOP or PBS Rights Subscriptions are specified in the notice about the offer, which you can view via the CA Web Announcements, PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the PTS RIPS or PBS Reorganizations and Redemptions functions notice, PTS PSOP or PBS Rights Subscriptions is available on those dates for this purpose from 8:00 a.m. to 2:15 p.m. eastern time on the offer's expiration date only.

The deferred subscription payment procedure may be used (see Schedule for Submitting Instructions). In this case, PTS PSOP or PBS Rights Subscriptions is available until 5:00 p.m. eastern time on the offer's expiration date.

# Checklist for Submitting a Protect

1. Obtain the Offering Circular/Prospectus and the Subscription Form required by the offer and review the terms of the offer as stated in those documents.
2. Determine the terms of acceptance that you want to transmit via PTS PSOP or PBS Rights Subscriptions including, but not limited to:
   - Basic subscription: Determine the quantity of rights you want to exercise. When you transmit an acceptance of the rights offer via PTS PSOP or PBS Rights Subscriptions, you must enter this quantity in the field provided.

DTCC Public (White)

- Step-up privilege: If there is a step-up privilege provided by the rights offer, determine if the acceptance must include the exercise of the step-up privilege. When you transmit an acceptance including the step-up privilege, you must respond affirmatively to the step-up privilege in the field provided.

- Oversubscription privilege: If there is an oversubscription privilege provided by the rights offer, determine if the acceptance must include the exercise of the oversubscription privilege. If so, determine the quantity of underlying securities you want to subscribe to through the oversubscription privilege. When you transmit an acceptance including the oversubscription privilege, you must enter this quantity in the field provided.

- Subscription payment: Determine the subscription payment that will be charged to your DTC settlement account as a result of the basic subscription and the exercise of any step-up or oversubscription privilege. When you transmit an acceptance, you do not enter the subscription payment dollar amount. This amount is automatically calculated by DTC and displayed to you prior to your approval of the transmission of the acceptance to DTC for processing.

- Special representations: If special representations are required by the Subscription Form, determine your response to such representations to be indicated in the transmitted acceptance. (Based on the offer you will be able to make these representations in specific fields on the PSOP screen, or in the Comments field.)

- Comments: If any additional acceptance information is required, prepare a statement of such to enter in the Comments field on the PTS PSOP or PBS Rights Subscriptions screen.

3. Enter and transmit the Notice of Guaranteed Delivery via PTS PSOP or PBS Rights Subscriptions. Your Notice of Guaranteed Delivery should indicate the determinations you made in Step 2 above.
4. Acknowledge the Notice of Guaranteed Delivery. When you transmit an acceptance via a Notice of Guaranteed Delivery, a space will be indicated on the PTS PSOP or PBS Rights Subscriptions screen for you to enter an acknowledgment concerning the Notice of Guaranteed Delivery required by the offer identified by the rights CUSIP you specify in your acceptance. If you do not enter the acknowledgment, PTS PSOP or PBS Rights Subscriptions will reject the acceptance. By entering the acknowledgment via PSOP, you agree that (i) you have received, and will be bound by the terms of, the Notice of Guaranteed Delivery required by the offer identified in the acceptance and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

**Note:**

The Notice of Guaranteed Delivery referred to in these procedures is the form of the Notice of Guaranteed Delivery required by the offer when you transmit the acceptance.

5. Receive the PTS PSOP or PBS Rights Subscriptions input response screen after having transmitted to DTC the information entered in Steps 2 and 3 above. The PTS PSOP or PBS Rights Subscriptions input response screen displays error messages for any input errors (such as an error message indicating that the number of shares reflected in the oversubscription field for the PTS PSOP or PBS Rights Subscriptions input screen exceeds the maximum allowed by the terms of the offer). If necessary, correct

the required fields of the PTS PSOP or PBS Rights Subscriptions input screen and re-transmit the instruction to DTC for editing.

6. Receive the PTS PSOP or PBS Rights Subscriptions input response screen showing that the instruction does not contain errors. Verify the information you have entered and re-transmit the instruction to DTC for processing.

7. Receive a message acknowledging transmission of the acceptance by means of a Notice of Guaranteed Delivery. The message includes the status of the transaction.

- If the message states that the acceptance was processed (made), confirm that the quantity of rights subject of the acceptance via a Notice of Guaranteed Delivery is shown in the information available through the inquiry feature of the PTS PSOP or PBS Rights Subscriptions function, under the rights CUSIP number specified in the submission.

- You must carefully monitor PTS PSOP or PBS Rights Subscriptions and the PTS PSOP or PBS Rights Subscriptions inquiry option to ensure that all Notices of Guaranteed Delivery are processed, and that you take appropriate action to resolve unprocessed transactions or discrepancies.

- Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

**Note:**

When an acceptance via a Notice of Guaranteed Delivery is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your acceptance. This Agent's Message includes your acknowledgment concerning the Notice of Guaranteed Delivery.

## Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions for an ASOP-Eligible Offer

Once you have accepted a rights offer through the Agent via a hard copy Notice of Guaranteed Delivery submitted directly to the Agent, you cannot subsequently deliver the securities to the Agent via the PTS PSOP or PBS Rights Subscriptions function unless the instruction was subsequently input by DTC. Only protects submitted via PTS PSOP or PBS Rights Subscriptions can be covered via PTS PSOP or PBS Rights Subscriptions.

If you have accepted a rights offer through the agent by means of a Notice of Guaranteed Delivery via PTS PSOP or PBS Rights Subscriptions, you can subsequently deliver all or a portion of the rights subject to the Notice of Guaranteed Delivery to the agent through DTC via the Cover Protects Submitted via PTS PSOP or PBS Rights Subscriptions option of the PTS PSOP or PBS Rights Subscriptions function.

**Warning!**

You must accept ASOP-eligible offers via PTS PSOP or PBS Rights Subscriptions; except as noted in Subscription Instructions, instructions outside of PTS/PBS will not be accepted by DTC on ASOP-eligible offers during the period when instructions can be input via PSOP for ASOP eligible offers and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but DTC cannot guarantee such notification.

DTCC Public (White)

The dates on which you can cover a protect via PTS PSOP or PBS Rights Subscriptions are specified in the notice about the offer, which you can view via CA Web Announcements and the PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the CA Web Announcements, PTS RIPS or PBS Reorganizations and Redemptions functions notice, PTS PSOP or PBS Rights Subscriptions are available on those dates for this purpose from 8:00 a.m. to 2:15 p.m. eastern time.

---

**Note:**

DTC shall have no responsibility in respect of your failure to instruct or properly instruct DTC to surrender securities in accordance with acceptances by submission of Notices of Guaranteed Delivery to the agent via PSOP.

---

## Checklist for Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions

1. Verify that a Notice of Guaranteed Delivery and the required subscription payment to the agent via PTS PSOP or PBS Rights Subscriptions was submitted and accepted.
2. Retrieve the specific protect instruction you want to cover.
3. Note: If covering on behalf of another Participant you will be required to provide a valid Protect ID, Protect Sequence Number and the Protect Participant ID (account number) for the Participant that submitted the original protect instruction.
4. Enter and transmit an instruction to cover the protect via PTS PSOP or PBS Rights Subscriptions during the period when cover of protect submissions can be input.
5. Acknowledge the Subscription Form. When you transmit an instruction to cover a protect via PTS PSOP or PBS Rights Subscriptions, a space will be indicated on the PTS PSOP or PBS Rights Subscriptions screen for you to enter an acknowledgment concerning the Subscription Form required by the offer identified by the rights CUSIP you specify in your instruction. If you do not enter the acknowledgment, PTS PSOP or PBS Rights Subscriptions will reject the instruction. By entering the acknowledgment via PTS PSOP or PBS Rights Subscriptions, you agree that (i) you have received, and will be bound by the terms of, the Subscription Form required by the offer identified in the instruction and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

---

**Note:**

The Subscription Form referred to in these procedures is the form of documentation required by the offer when you transmit the instruction.

---

An instruction to deliver rights to cover a Notice of Guaranteed Delivery that was submitted under these procedures can be for a quantity less than, but not more than, the original quantity of the acceptance submitted via PTS PSOP or PBS Rights Subscriptions. You can submit more than one instruction to cover the Notice of Guaranteed Delivery as long as the quantity of rights indicated in those instructions does not exceed the original Notice of Guaranteed Delivery quantity with the total of all cover of protects instructions equaling the amount of the protect submission.

You must monitor the status of acceptances submitted via PTS PSOP or PBS Rights Subscriptions to ensure that the rights subject to the Notice of Guaranteed Delivery are subsequently delivered by the date indicated and in accordance with the Notice of Guaranteed Delivery and the terms of the offer. Use the PTS PSOP or PBS Rights Subscriptions function's Protect Submissions with Uncovered Quantities option to inquire about the status of Notices of Guaranteed Delivery.

---

DTCC Public (White)

6. Receive the PTS PSOP or PBS Rights Subscriptions input response screen after having transmitted to DTC the information entered in Steps 2, 3, and 4 above. The PTS PSOP or PBS Rights Subscriptions input response screen displays error messages for any input errors (such as an error message indicating that the number of shares reflected in the oversubscription field for the PTS PSOP or PBS Rights Subscriptions input screen exceeds the maximum allowed by the terms of the offer). If necessary, correct the required fields of the PTS PSOP or PBS Rights Subscriptions input screen and re-transmit the instruction to DTC for editing.

7. Receive the PTS PSOP or PBS Rights Subscriptions input response screen showing that the instruction does not contain errors. Verify the information you have entered and re-transmit the instruction to DTC for processing.

8. Receive a PTS PSOP or PBS Rights Subscriptions message acknowledging transmission of the cover of protect. The message includes the status of the transaction.

   • Confirm via Settlement Web that 1) the quantity of rights subject of the instruction has been deducted from your position in the specified rights CUSIP number, 2) that you now have the quantity of underlying securities to which you are entitled through the basic subscription and any step-up privilege shown in your position in the basic subscription sub-account with the underlying security CUSIP number specified in the acceptance and 3) that you now have the quantity of underlying securities to which you are entitled through the exercise of any oversubscription privilege shown in your position in the oversubscription sub-account with the underlying security CUSIP number specified in the acceptance.

   • If the cover of protect instruction was not processed and is pending (recycling), monitor future PTS PSOP or PBS Rights Subscriptions messages to determine that the instruction is subsequently processed. Instructions to cover protects are not transmitted to the agent and securities are not moved into the reorganization account of the underlying security CUSIP number until the acceptance has been processed (made). You must monitor PTS PSOP or PBS Rights Subscriptions messages carefully to ensure that all your transactions are processed, and take appropriate action to resolve pending (recycling) acceptances.

**Note:**

When an instruction to cover a protect is processed as reported in the PTS PSOP or PBS Rights Subscriptions message, DTC transmits an Agent's Message to the agent indicating your instruction. This Agent's Message includes your acknowledgment concerning the Subscription Form.

# Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions on Behalf of Another Participant

**Warning!**

To be able to cover a protect via PTS PSOP or PBS Rights Subscriptions on behalf of another participant you must submit protects on ASOP-eligible offers via PTS PSOP or PBS Rights Subscriptions or have had a protect submitted directly to the agent via email and subsequently communicated to DTC and input to PSOP by DTC; cover of protect instructions outside of PTS/PBS will not be accepted by DTC on ASOP-eligible offers and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but cannot guarantee such notification.

DTCC Public (White)

The dates on which you can submit a cover of protect are specified in the notice about the offer, which you can view via CA Web Announcements, ISO 20022 messaging, and the PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the CA Web Announcement, PTS RIPS or PBS Reorganizations and Redemptions functions notice, PTS PSOP or PBS Rights Subscriptions are available on those dates for this purpose from 8:00 a.m. to 2:15 p.m. eastern time.

## Checklist for Submitting a Cover of Protect via PTS PSOP or PBS Rights Subscriptions on Behalf of Another Participant

1. Determine the terms of the acceptance of the protect that was submitted by another Participant through PTS PSOP or PBS Rights Subscriptions, and which you now want to cover via PTS PSOP or PBS Rights Subscriptions and input the information, including, but not limited to:

    - Protect ID: The Instruction Identification Number for the Protect with an uncovered quantity. The participant ID for the entered Protect ID must not match the signed-on participant ID.

    - Protect Sequence Number: The Protect ID Sequence Number for the Cover of Protect instruction. Values 01-12.

    - Protect Participant ID: A valid participant ID and must not match the signed-on participant ID. Must match the participant ID for the entered Protect ID.

2. Enter and transmit an instruction to surrender rights and cover the protect via PTS PSOP or PBS Rights Subscriptions during the period when cover of protect submissions can be input.

3. Acknowledge the Subscription Form. When you transmit an instruction to cover a protect via PTS PSOP or PBS Rights Subscriptions, a space will be indicated on the PTS PSOP or PBS Rights Subscriptions screen for you to enter an acknowledgment concerning the Subscription Form required by the offer identified by the rights CUSIP you specify in your instruction. If you do not enter the acknowledgment, PTS PSOP or PBS Rights Subscriptions will reject the instruction. By entering the acknowledgment, you agree that (i) you have received and will be bound by the terms of the Subscription Form required by the offer identified in the instruction and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

---

**Note:**

The Subscription Form referred to in these procedures is the form of documentation required by the offer when you transmit the instruction.

---

4. If there are errors, you will receive the PTS PSOP or PBS Rights Subscriptions input response screen displaying the input errors. Once you correct the errors, re-transmit the instruction to DTC for processing.

5. If the acceptance was processed (made), verify that the quantity of rights subject of the instruction has been deducted from your position in the specified rights CUSIP number.

---

**Note:**

The entitlement amount based on the rights position covered is credited to the Participant that submitted the original protect.

---

If the cover of protect instruction was not processed and is now pending (recycling), monitor PTS PSOP or PBS Rights Subscriptions to determine the appropriate action to resolve pending (recycling) acceptances, and so your transactions may be appropriately processed.

**Note:**

When an instruction to cover a protect is processed as reported in the PSOP message, DTC transmits an Agent's Message to the agent indicating your instruction. This Agent's Message includes your acknowledgment concerning the Subscription Form. Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

# Surrendering Rights for Sale via ASOP

After you receive information from DTC about an ASOP-eligible rights offer, and after determining that the terms of the rights offer provide for the sale of rights through the agent, you can surrender such rights for the purpose of selling them through the agent via the Sell Instructions option of the PTS PSOP or PBS Rights Subscriptions functions. See Checklist for Submitting a Sell Instruction.

**Warning!**

You must submit sell instructions for ASOP-eligible offers via PTS PSOP or PBS Rights Subscriptions during the period when sell submissions can be input; except as noted in Subscription Instructions, instructions will not be accepted by DTC on ASOP-eligible offers and, if submitted, will be rejected. If possible, DTC will attempt to notify you of the rejection, but DTC cannot guarantee such notification.

The dates on which you can submit instructions to sell rights are specified in the notice about the offer, which you can view via CA Web Announcements, PTS RIPS or PBS Reorganizations and Redemptions functions. Unless otherwise specified in the PTS RIPS or PBS Reorganizations and Redemptions functions, PTS PSOP or PBS Rights Subscriptions is available on those dates for this purpose from 8:00 a.m. to 2:15 p.m. eastern time.

## Checklist for Submitting Sell Instructions

1. Obtain the Offering Circular/Prospectus and review the terms of the rights offer as stated in those documents.
2. Determine the quantity of rights you want to deliver in your instruction to sell the rights via PTS PSOP or PBS Rights Subscriptions.
3. Enter and transmit an instruction to sell rights via the Sell Instructions option of the PTS PSOP or PBS Rights Subscriptions function.
4. Acknowledge the Subscription Form. When you transmit sell instructions via PTS PSOP or PBS Rights Subscriptions, a space will be indicated on the PTS PSOP or PBS Rights Subscriptions screen for you to enter an acknowledgment of the Subscription Form required by the offer identified by the rights CUSIP you specify in your acceptance. If you do not enter the acknowledgment, PTS PSOP or PBS Rights Subscriptions will reject the acceptance. By entering the acknowledgment via PTS PSOP or PBS Rights Subscriptions, you agree that (i) you have received, and will be bound by the terms of the Subscription Form required by the offer identified in the acceptance and (ii) the agreement set forth in the preceding clause (i) may be enforced against you by the Offeror in such offer.

DTCC Public (White)

**Note:**

The Subscription Form referred to in these procedures is the form of documentation required by the offer when you transmit the instruction.

5. Receive the PTS PSOP or PBS Rights Subscriptions input response screen after having transmitted to DTC the information entered in Steps 2 and 3 above. The PTS PSOP or PBS Rights Subscriptions input response screen displays error messages for any input errors (such as an error message indicating that the number of shares reflected in the oversubscription field for the PTS PSOP or PBS Rights Subscriptions input screen exceeds the maximum allowed by the terms of the offer). If necessary, correct the required fields of the PTS PSOP or PBS Rights Subscriptions input screen and re-transmit the instruction to DTC for editing.

6. Receive the PTS PSOP or PBS Rights Subscriptions input response screen showing that the instruction does not contain errors. Verify the information you have entered and re-transmit the instruction to DTC for processing.

7. Receive a message acknowledging transmission of the sell instruction and reporting the status.

   - If the sell instruction was processed (made), confirm via Settlement Web that the quantity of rights subject of the instruction has been deducted from your general free account position and added to your sell sub-account position with the rights CUSIP number you specified in the instruction.

   - If the sell instruction was not processed and is pending (recycling), monitor future PTS PSOP or PBS Rights Subscriptions messages to determine that the instruction is subsequently processed. Instructions to sell rights are not transmitted to the agent and securities are not moved into the reorganization account of the rights CUSIP number until the instruction has been processed (made). You must monitor PTS PSOP or PBS Rights Subscriptions messages carefully to ensure that all your transactions are processed, and take appropriate action to resolve pending (recycling) acceptances.

     Participants that subscribe to the ISO 20022 Instructions Statement Report (CAST) will be able to verify instructions status on the message.

**Note:**

When the sell instruction is processed as reported in the message, DTC transmits an Agent's Message to the agent indicating your acceptance. This Agent's Message includes your acknowledgment concerning the Subscription Form.

## Rejection of Acceptances, Covers of Protects, or Sell Instructions

The agent may reject acceptances, including those by Notices of Guaranteed Delivery, or instructions to cover protects or to sell rights. In the event of such rejections, it is the obligation of the agent to notify you.

DTC will follow the directions of the agent with respect to the delivery of any rights subject of the rejected acceptance or instruction by book-entry from the agent's account to your general free account. At the same time, any subscription payment previously charged to your settlement account with respect to the rejected acceptance or instruction will be credited to your settlement account.

DTCC Public (White)

# Warrant Exercises

## About the Service

DTC's Warrant Exercises service provides you with a method for exercising warrants by book entry as a cash or as a cashless exercise. When you use this service, DTC will:

- Announce key terms and dates related to the warrant as provided by the issuer and/or agent

- Process your instructions on warrants and collect the appropriate cash from your DTC Participant account (for a cash exercise)

- Submit securities to agents and collect from them the underlying stock or cash

- In the case of a cash exercise, allocate underlying securities to you on the date instructions are processed

- In the case of a cashless exercise, allocate into a contra-CUSIP on the date of instruction and subsequently to the underlying securities upon receipt of securities from the agent

**Note:**

You should check your Participant Daily Activity Statement to assure that your transactions were properly processed and recorded. For Warrant Exercises, the entry on the report is Warrant Exercises (Account#3333), showing that DTC has deducted the warrant from your account and added the underlying securities.

## About Warrants

Warrant exercises allow the holder to purchase the underlying security at a preset price. The typical life of a warrant is three to five years, unless it is called for redemption or its maturity is accelerated. There is often a prescribed waiting period during which you cannot exercise the warrant. After the waiting period ends, you can exercise your warrants at any time during the life of the warrants.

## How the Service Works

DTC determines which warrants qualify for Warrant Exercises processing. You can view a cumulative listing of eligible securities via the PTS WARR or PBS Warrant Subscriptions or PTS WARI or PBS Warrant Instructions Inquiry functions.

DTC will notify you via the PTS RIPS or PBS Reorganizations and Redemptions functions when it receives notification from the issuer or its agent that:

- A warrant is called for redemption

- A warrant privilege will expire

- There is a temporary reduction in the warrant price.

The announcement will indicate the cutoff date and time by which you must submit your warrant exercise instructions.

---

**Note:**

Legal deposits on warrants undergoing any of the above are not permitted.

---

Once DTC receives a warrant exercise instruction via PTS WARR / PBS Warrant Subscriptions, DTC deducts the warrant position from your account, debits you the exercise proceeds, and adds the underlying securities to your account. The underlying securities are immediately eligible for all of DTC's services, including book-entry delivery and pledges for collateral loans.

---

**Note:**

A warrant may not be eligible for exercise through DTC if a shareholder is required to be a resident of a certain state in order to exercise the warrant. When this is the case, you must withdraw your position and exercise outside of DTC. When these items are exercisable at DTC, you must certify, with accompanying documentation, that the owner of the warrant is a resident of the state, and submit a hard copy instruction (see Procedures for Submitting Instructions Outside of PTS/PBS).

---

Also, some warrants may not be eligible for the processing of instructions through DTC if, for example, the new shares are not registered with the Securities and Exchange Commission (SEC), or have restrictions placed upon them. If notified of such warrants, DTC will announce these events for the purposes of information only.

## Pledge and Transfer of Underlying Securities by Book-Entry

Since the exercise process will not have been completed at the time of the credit of the underlying securities to your general free account, a credit to any participant's or pledgee's account, whether or not the participant or pledgee has participated in the exercise, will represent rights in:

1. The quantity of underlying securities in the custody of DTC or of a custodian bank or of a nominee of either, including underlying securities resulting from warrant exercise instructions that are held by the agent,
2. The quantity of warrants subject to warrant exercise instructions that are in the custody of DTC or of a custodian bank or a nominee of either, including such warrants that are held by the agent,
3. The cash payments and additional cash payments subject to your warrant exercise instructions that have been debited to your money settlement account and are in the possession of DTC or the agent,
4. The quantity of payment securities subject to your warrant exercise instructions that are in the custody of DTC or of a custodian bank or of a nominee of either, including such securities that are held by the agent,
5. The rights, if any, in the underlying securities prior to their issuance pursuant to the terms governing the warrants, and
6. The rights against the agent and the issuer arising from the submission of warrants and exercise payments to the agent.

Any instruction given by a participant or a pledgee to transfer, pledge or release from pledge underlying securities by book-entry will be deemed for all purposes of DTC's Rules and Procedures to be an instruction to transfer, pledge or release from pledge the rights described in 1, 2, 3, 4, 5, and 6 of the preceding sentence rather than the underlying securities identified in the instruction. Any instruction given by a participant or a

DTCC Public (White)

147

pledgee to withdraw from DTC physical certificates representing underlying securities shall nevertheless be deemed to be an instruction to DTC to deliver only the quantity of underlying securities identified in the instruction. Should, for any reason, the underlying securities subject to such withdrawal exceed the amount of underlying securities available for withdrawal, such instruction may be rejected by DTC.

# Procedures for Submitting Instructions Outside of PTS/PBS

## Submitting the Instruction

No hard copy instructions are accepted by DTC unless specifically authorized in advance.

In the event that a Participant needs to revert to a hard copy instruction, use the following procedure to submit a hard copy instruction to DTC:

- Complete the appropriate form including signature medallion stamp. (See the table at the end of this section for a list of forms.)

- Submit it via email to the appropriate address at DTC as per the chart below.

- Verify that your position (and payment if applicable) has been adjusted according to your instructions and approved by the agent when necessary.

---

**Note:**

If the transaction date is the *dividend record date* for the underlying security, and there is an earlier standard industry *dividend cutoff date* that is not applicable to DTC, enter an X in the Dividend Record Date box.

Also, if the transaction date is DTC's dividend cutoff date, you must enter an X in the Dividend Cutoff Date box. See the Warning below. Deliver the instructions as directed by DTC.

---

**Warning!**

DTC takes no responsibility for arranging the conversion of convertible securities processed by DTC on the dividend record date or the standard industry dividend cutoff date in time to obtain dividend protection on the underlying securities if you do not mark the required box. Also, DTC may reject the instruction if you mark a box that is not required to be marked.

---

**Warning!**

DTC has no obligation to examine for completeness or accuracy any instruction forms or accompanying documents submitted to DTC. Nevertheless, if DTC makes such an examination, and the form or accompanying documents do not appear to be complete or accurate, or your general free position is insufficient, the instruction may be rejected by DTC.

---

**Warning!**

DTC has no obligation to examine for completeness or accuracy warrant exercise instructions that have been submitted to it or, if it does examine them, to conduct a thorough or accurate examination. Nevertheless, if DTC makes such an examination and the instructions do not appear to be complete or accurate, or if your general free position is, at any time after submission of the instructions, insufficient to permit deduction of the warrants to be surrendered or of the payment

---

DTCC Public (White)

securities to be surrendered, or if DTC in its sole judgment elects not to debit your net settlement account for the cash payment or the additional cash payment at any time after submission of the instructions because such action might result in a financial loss to Participants generally or to DTC, DTC may reject the instructions.

Any action taken by DTC pursuant to Warrant Subscription Instructions received by DTC from you on a business day for which, pursuant to the Instructions, an amount is to be debited from your money settlement account with DTC shall not constitute an entry on DTC's books increasing your account for the quantity of underlying securities subject of the Instructions until such time as you pay your Net Debit Balance, if any, as finally determined by DTC for such business day. If DTC, prior to such time, ceases to act for you pursuant to DTC's Rules, DTC shall have the right to complete the transaction contemplated by the Instructions, sell out the underlying securities subject of the Instructions in the manner specified in DTC's Rule and credit the proceeds of such sale to your money settlement account; provided, however, that if any of such securities have been transferred out of or withdrawn from your account, such securities shall be deemed for all purposes to have been delivered to you.

Also, DTC takes no responsibility for arranging the exercise of the warrants processed by DTC on the dividend record date or the standard industry dividend cutoff date in time to obtain dividend protection on the underlying securities if you do not mark the required box. Also, DTC may reject the instruction if you mark a box that is not required to be marked.

**Warning!**

IMPORTANT: To accept offers that are eligible under DTC's Automated Tender Offer Program (ATOP), you must use the PTS PTOP or PBS Voluntary Tenders and Exchanges functions; hard copy Voluntary Offering Instructions forms and Letters of Transmittal will not be accepted. DTC will attempt to notify your designated coordinator by telephone of the rejection, but DTC cannot guarantee that this will be done. ATOP-eligible offers are identified in the PTS RIPS or PBS Reorganizations and Redemptions and/or PTS PTOP or PBS Voluntary Tenders and Exchanges functions.

**Warning!**

Before submitting an instruction, you should carefully review the terms of the offer and make sure you understand the election you are making. You should review the information in the PTS RIPS or PBS Reorganizations and Redemptions functions, CA Web and ISO 20022 messages, as well as the offering materials and Letter of Transmittal prepared by the Offeror.

# Forms for Instructions Outside PTS/PBS

| Event Type | Form | Description | Send To |
|---|---|---|---|
| Tender/Exchanges | Voluntary Offering Instruction (VOI) Form | Use this form for all tender and exchange instructions including guaranteed delivery instructions, bid tenders, odd lots, conditionals, etc. | reorgtenders@dtcc.com |

| Event Type | Form | Description | Send To |
|---|---|---|---|
| Tender/Exchanges | Withdrawal of Voluntary Offering Instruction Form | Use this form for the withdrawal of any previously submitted tender or exchange instruction. | reorgtenders@dtcc.com |
| Puts | Puts – VOI Form | Use this form for all puts offer instructions including repayment or retainment options. | putsprocessing@dtcc.com |
| Puts | Withdrawal of Puts – VOI Form | Use this form for the withdrawal of any previously submitted voluntary puts offer instructions. | putsprocessing@dtcc.com |
| Rights | Rights Subscription Cover Protect Instruction Form | Use this form for the submission of instructions to cover any previously submitted rights subscription protect instructions. | reorgconv@dtcc.com |
| Rights | Rights Subscription/Sell Instruction Form | Use this form for all rights instructions including basic, oversubscription, sell, etc. | reorgconv@dtcc.com |
| Rights | Withdrawal of Sell of Rights Instruction Form | Use this form for withdrawal of any previously submitted rights sell instructions. | reorgconv@dtcc.com |
| Rights | Withdrawal of Rights Subscription Instruction Form | Use this form for withdrawal of any previously submitted basic subscription and oversubscription instructions. | reorgconv@dtcc.com |
| Conversions | Voluntary Conversion Instruction (RCNV) Form | Use this form for all immediate credit conversion instructions via the immediate credit RCNV platform. | reorgconv@dtcc.com |
| Conversions | Voluntary Conversion Instruction (RCNV) Form | Use this form for all immediate credit conversion instructions via the immediate credit RCNV platform. | reorgconv@dtcc.com |
| Conversions | Withdrawal of Voluntary Conversion Instruction (RCNV) Form | Use this form for the withdrawal of any previously submitted immediate credit | reorgconv@dtcc.com |

DTCC Public (White)

| Event Type | Form | Description | Send To |
|---|---|---|---|
| | | conversion instructions via the RCNV platform. | |
| Eurobond Conversions | Conversion Form (Eurobond) | Use this form for all immediate credit of Eurobond conversion instructions. | reorgconv@dtcc.com |
| Warrants | Warrant Exercise Instruction (WARR) Form | Use this form for all immediate credit warrant exercise instructions via the immediate credit WARR platform. | reorgconv@dtcc.com |
| Warrants | Withdrawal of Warrant Exercise Instruction (WARR) Form | Use this form for the withdrawal of any immediate credit instructions previously submitted via the WARR platform. | reorgconv@dtcc.com |

# Reorganization Presentments for MMI Issues

A "Reorganization Presentment" is a Delivery Versus Payment (as defined in Rule 1) of money market instruments (MMI Securities) in response to a reorganization action from the account of a presenting Participant to a designated agent account for that issue, and is subject to, and is processed in accordance with Rule 9(A), Rule 9(B), Rule 9(C) of DTC and the Procedures set forth in the Settlement Service Guide. Reorganization Presentments are not attempted for processing until the issuer's issuing and paying agent (IPA) makes a funding decision in the form of an "MMI Funding Acknowledgment." Once a funding decision is made items will be processed subject to risk controls and the sufficient inventory of the relevant Participants. IPAs and other Participants may submit input and inquiries relating to processing of transactions in MMI Securities through the Settlement User Interface. See the DTC Settlement Service Guide, available at http://www.dtcc.com/~/media/Files/Downloads/legal/service-guides/Settlement.pdf, for the DTC Procedures relating to the processing of transactions in MMI Securities.

# CD Early Redemptions

## About the Service

The CD Early Redemptions service allows you to exercise the early redemption privilege of eligible CDs. When you use the CD Early Redemptions service, DTC will:

- Allow you to view certificates of deposit (CDs) eligible for early redemption

- Process your instructions to redeem your CDs prior to maturity

- Submit securities to redemption agents and allocate redemption proceeds to you upon receipt

This service allows you to exercise the early withdrawal privilege of eligible CDs and receive the resulting redemption proceeds in a fully automated book-entry environment.

## How the Service Works

When you submit an early redemption instruction, DTC deducts the principal amount of the CD securities from your general free account and adds it to your reorganization account. The redemption instruction is then presented by DTC to the issuer for payment. When payment is received from the issuer, the net amount to which you are entitled is credited to your settlement account. On the settlement date, the securities previously segregated in your reorganization account are also removed.

## Exempt Instructions

An exempt instruction allows you to redeem securities for accounts that qualify for an exemption from any early withdrawal penalty that would otherwise be deducted by the issuer from the redemption payment. You can submit early redemption instructions exempt from penalty when the underlying beneficial owner is deceased or has been adjudicated incompetent.

When you submit an exempt instruction via the PTS CERR/PBS CD Early Redemption Requests functions, you must indicate the reason for the exemption and submit the proper documentation to DTC. In those cases where the issuer has agreed to accept instructions without the necessary documentation, you must acknowledge that you have possession of the documentation proving the exemption. You must also indicate that such documentation will be promptly provided to the issuer if requested within 30 months of the redemption payment, or be forwarded to DTC within five business days.

DTC will present the instructions, and required documentation, to the Issuer promptly after receiving them. You are credited the principal and accrued interest amount (if any) after DTC receives payment from the Issuer. DTC does not know in advance the date of payment or the amount of accrued interest.

**Warning!**

If the issuer requests the documentation and you fail to provide it promptly, you will be liable for the payment of any penalty. In such cases, DTC will charge the amount of the penalty to your settlement account and remit it to the requesting issuer.

## Non-Exempt Instructions

A non-exempt instruction allows you to redeem securities for beneficial owners who are not exempt from an early withdrawal penalty. The penalty, which could be forfeited interest earnings and/or part of the principal amount, is determined by the issuer.

DTC will present the instructions, and required documentation, to the issuer promptly after receiving them. The documents must be received by DTC within five days of the instruction otherwise the instruction will drop off the system (i.e., an incomplete instruction) and will have to be reentered into the system to re-initiate the process. You are credited the principal and accrued interest amount (if any) after DTC receives payment from the issuer. DTC does not know in advance the date of payment, amount of accrued interest or the amount of any applicable penalties.

## Issuer Acceptance

Both exempt and non-exempt instructions are subject to acceptance by the issuer. An accepted instruction results in DTC crediting your settlement account with the amount of proceeds received from the issuer. If an instruction is not accepted by the issuer, DTC will return the securities to your general free account.

# Change Mode of Payment (CMOP)

## About the Service

DTC's Change Mode of Payment (CMOP) service allows you to switch between different payment periods on DTC-eligible Unit Investment Trusts (UITs) and Variable Mode Preferred stocks (VMPs). Dividend payment periods are:

- On UITs: annual, semiannual, quarterly and monthly

- On VMPs: 7 days and 49 days.

Each mode is represented by a different CUSIP number.

DTCC Public (White)

153

# Allocations

## About Allocations

Upon receipt of the confirmed position and entitlements from the agent, DTC will allocate cash and stock to participants, ensuring that cash and stock payments are received on a timely basis, and in turn paid out to participants as soon as possible. DTC accomplishes this by maintaining constant contact with the appropriate paying agents and following through with disbursements to participants.

## Cash Allocations

Funds from agents/issuers received by DTC are generally allocated upon receipt. Funds received after the cutoff are allocated the following settlement day. Your DTC position is decreased in the target security and you are allocated the cash entitlement.

## Reorganization Cash Settlement Reporting

The Reorganization Cash Settlement Reporting feature notifies you of cash entitlement. Reporting is available in various forms. ISO 20022 and SMART/Search reports are created daily throughout the day and at end of day. The ISO 20022 transmission is also available in real time throughout the day via MQ and file protocols.

## Stock Allocations

Stock Allocations occur once DTC confirms the payment date and the amount of securities to be received from the agent. Your DTC position is decreased in the target security and your position is increased for the disbursed securities. Fractional shares can be paid in cash in lieu, dropped or rounded up.

## Solicitation Fees and Transfer Taxes

The agent is obligated to pay any solicitation fees directly to the organization identified by you as being entitled to such fees in the Letters of Transmittal or other acceptance documents required by the offer.

Offers qualifying for processing under DTC's program are generally those where transfer taxes, if any, payable as a result of the transfer of surrendered securities to the Offeror are to be paid by the Offeror in accordance with the terms of the offering. Where such transfer taxes are not to be paid by the Offeror, DTC may nevertheless determine that the offer qualifies for processing under DTC's program, in which event DTC describes the procedures for payment of the taxes via CA Web Announcements, ISO 20022 messaging, and PTS RIPS or PBS Reorganizations and Redemptions functions.

DTCC Public (White)

**From:** Peter C. Hein <petercheinsr@gmail.com>
**Sent:** Thursday, July 1, 2021 6:24 PM
**To:** 'Default Processing Shared' <defaultprocessing@usbank.com>
**Cc:** petercheinsr@gmail.com
**Subject:** Attn Laura L. Moran - Puerto Rico Public Building Authority TSC - 695795 - PRPBAGFRF09Q

The attached letter explains why I called.  Please email the requested information to me or forward my letter to Ms. Moran.  Thank you.  Peter Hein

**From:** Vang, Ia <ia.vang1@usbank.com> **On Behalf Of** Default Processing Shared
**Sent:** Thursday, July 1, 2021 4:40 PM
**To:** petercheinsr@gmail.com
**Subject:** TSC - 695795 - PRPBAGFRF09Q

**\*\*\* EXTERNAL EMAIL \*\*\***

Hi Peter,

I received a request to contact you. This is in regards to issue PRPBAGFRF09Q.

This issue did not make it's 07/01/2021 distribution. The Default team is monitoring this deal. When we anticipate new activity, we will inform all holders via mail.

Let me know if you have any question.

Thank you,

1

Exhibit G

156

*Ia Vang*

Operations Processor I Non-Standard Processing I Default
Working Remotely

**U.S. Bank**
**West Side Flats St Paul**
111 Fillmore Avenue E., Saint Paul, MN 55107 | EP-MN-WS2N | usbank.com

U.S. BANCORP made the following annotations

---------------------------------------------------------------------

Electronic Privacy Notice. This e-mail, and any attachments, contains information that is, or may be, covered by electronic communications privacy laws, and is also confidential and proprietary in nature. If you are not the intended recipient, please be advised that you are legally prohibited from retaining, using, copying, distributing, or otherwise disclosing this information in any manner. Instead, please reply to the sender that you have received this communication in error, and then immediately delete it. Thank you in advance for your cooperation.

---------------------------------------------------------------------

**PETER C. HEIN**

101 Central Park West
New York, New York 10023
(917) 539-8487
petercheinsr@gmail.com

July 1, 2021

Laura L. Moran
Vice President
US Trust National Association
One Federal Street
Boston, MA 02110

Re:  <u>Puerto Rico Public Building Authority – June 28, 2021 Notice to Holders</u>

Dear Ms. Moran:

 I am in receipt of U.S. Bank's June 28, 2021 notice to holders.

Please send me, by email or by mail, the PBA bond resolution no. 468 (adopted June 22, 1995), the PBA bond resolution no. 77 (adopted November 16, 1970),  and any currently effective supplements thereto, referenced in such notice.  I am specifically interested in the PBA bond resolutions and supplements that pertain to the Series Q and Series S bonds.

You can email PDFs of such bond resolutions to me at petercheinsr@gmail.com.  Alternatively, if the pertinent resolutions are publicly available on a currently active website, please email to me a link to that website.

Alternatively, you can mail copies of the pertinent resolutions to me at 101 Central Park West, Apt 14E, New York, NY 10023.

Thank you.

Sincerely,

Peter C. Hein

158