```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF PUERTO RICO

3
       In Re:                  )      Docket No. 3:17-BK-3283(LTS)
4                              )
                               )      PROMESA Title III
5      The Financial Oversight and )
       Management Board for    )
6      Puerto Rico,            )      (Jointly Administered)
                               )
7      as representative of    )
                               )
8      The Commonwealth of     )
       Puerto Rico, et al.     )      July 13, 2021
9                              )
                Debtors,       )
10
11     _____
12     In Re:                  )      Docket No. 3:17-BK-3566(LTS)
                               )
13                             )      PROMESA Title III
       The Financial Oversight and )
14     Management Board for    )
       Puerto Rico,            )      (Jointly Administered)
15                             )
       as representative of    )
16                             )
       The Employees Retirement )
17     System of the Government )
       of the Commonwealth of  )
18     Puerto Rico,            )
                               )
19              Debtors,       )
20     _____
21
22
23
24
25
```

```
 1
 2   _____
 3   In Re:                    )      Docket No. 3:19-BK-5523(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for      )
 6   Puerto Rico,              )      (Jointly Administered)
                               )
 7   as representative of      )
                               )
 8   The Puerto Rico Public    )
     Buildings Authority,      )
 9                             )
                  Debtors,     )
10   _____
11
12                  DISCLOSURE  STATEMENT  HEARING
13     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN
14                  UNITED STATES DISTRICT COURT JUDGE
15     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN
16                  UNITED STATES DISTRICT COURT JUDGE
17   _____
18
     APPEARANCES:
19
     ALL PARTIES APPEARING TELEPHONICALLY
20
     For The Commonwealth
21   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                               Mr. Brian S. Rosen, PHV
22                             Ms. Margaret Dale, PHV
23   For Puerto Rico Fiscal
     Agency and Financial
24   Advisory Authority:      Mr. John Rapisardi, PHB
                               Mr. Peter Friedman, PHV
25
```

```
 1  │ APPEARANCES, Continued:
    │
 2  │ For The Official
    │ Committee of Unsecured
 3  │ Creditors of all
    │ Title III Debtors:        Mr. Luc A. Despins, PHV
 4  │
    │
 5  │ For The Official
    │ Committee of Retired
 6  │ Employees:                Mr. Robert Gordon, PHV
    │                           Ms. Catherine Steege, PHV
 7  │
    │
 8  │ For Peter Hein:           Mr. Peter Hein, Pro Se
    │
 9  │ For AmeriNational
    │ Community Services:       Mr. Nayuan Zouairaban, Esq.
10  │                           Mr. Arturo J. Garcia Sola, Esq.
    │
11  │ For Cantor-Katz
    │ Collateral Monitor:       Mr. Douglas Mintz, PHV
12  │                           Mr. Douglas I. Koff, PHV
    │
13  │ For Assured Guaranty
    │ Corp. and Assured
14  │ Guaranty Municipal
    │ Corp.:                    Mr. William J. Natbony, PHV
15  │
    │
16  │ For Financial Guaranty
    │ Insurance Company:        Mr. Martin A. Sosland, PHV
17  │
    │ For Ambac Assurance
18  │ Corporation:              Ms. Atara Miller, PHV
    │
19  │
    │
20  │ For National Public
    │ Finance Guarantee
21  │ Corporation:              Ms. Kelly DiBlasi, PHV
    │
22  │
    │ For The ERS
23  │ Bondholders:              Mr. Benjamin Rosenblum, PHV
    │
24  │ For U.S. Bank National
    │ Association, solely in
25  │ its capacity as
    │ successor trustee:        Mr. Clark T. Whitmore, PHV
```

```
 1   APPEARANCES, Continued:

 2

 3   For U.S. Bank Trust
     National Association:    Mr. Ronald J. Silverman, PHV

 4
     For the Underwriter
 5   Defendants:             Mr. Howard S. Steel, PHV

 6   For Salud Integral
     de la Montana, Inc.:    Mr. John E. Mudd, Esq.

 7
     For PFZ Properties,
 8   Inc., and 1983 Group:   Mr. David Carrion Baralt, Esq.
                             Mr. Russell Del Toro Sosa, Esq.

 9
     For Suiza Dairy Corp.:  Mr. Rafael A. Gonzalez Valiente, Esq.

10
     For Finca Matilde:      Mr. Eduardo Capdevila Diaz, Esq.

11
     For Vaquería
12   Tres Monjitas, Inc.:    Ms. Wendy Marcari, PHV
                             Mr. Gerardo Carlo Altieri, Esq.

13

14   Pro Se Speakers:        Mr. Antonio Martin Cerezo
                             Ms. Nancy Negron Lopez
15                           Ms. Myriam Yashei Rosario

16   Court Interpreter:      Ms. Carol Terry, USCCI

17

18

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                          I N D E X

 2   WITNESSES:                                          PAGE

 3        None.

 4

 5   EXHIBITS:

 6        None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                      San Juan, Puerto Rico

 2                                      July 13, 2021

 3                                      At or about 9:30 AM

 4                         *    *    *

 5          THE COURT:  Good morning.  This is Judge Swain

 6  speaking.

 7          MS. NG:  Good morning, Judge.  This is Lisa, your

 8  courtroom deputy.  Everyone is here.

 9          THE COURT:  Thank you very much.  Ms. Tacoronte?

10          COURTROOM DEPUTY:  Good morning, Your Honor.  This is

11  Maria Luz for the record.

12          The United States District Court for the District of

13  Puerto Rico is now in session.  The Honorable Laura Taylor

14  Swain and also the Honorable Judith Gail Dein presiding.  God

15  save the United States of America and this Honorable Court.

16          Bankruptcy Case No. 17-3283, *In re:  The Financial*

17  *Oversight and Management Board for Puerto Rico, as*

18  *representative of the Commonwealth of Puerto Rico, et al.*, for

19  Disclosure Statement hearing.

20          THE COURT  Thank you, Maria Luz.

21          Buenos dias.  Welcome, counsel, parties in interest,

22  and members of the public and press.  Today's hearing concerns

23  the Oversight Board's request for approval of the Disclosure

24  Statement for the Fifth Amended Title III Joint Plan of

25  Adjustment of the Commonwealth of Puerto Rico, the Employees
```

1  Retirement System of the Government of the Commonwealth of

2  Puerto Rico, and the Puerto Rico Public Buildings Authority,

3  as well as procedures, deadlines, and hearing dates related to

4  that Disclosure Statement and the Proposed Plan of Adjustment.

5  Magistrate Judge Dein and I will be presiding jointly for the

6  confirmation procedures portion of the Agenda.

7        To ensure the orderly operation of today's telephonic

8  hearing, all parties on the line must mute their phones when

9  they are not speaking.  If you are accessing these proceedings

10 on a computer, please be sure to select "mute" on both the

11 Court Solutions dashboard and your phone.  When you need to

12 speak, you must unmute on both the dashboard and the phone.

13       I remind everyone that consistent with court and

14 judicial conference policies and the orders that have been

15 issued, no recording or retransmission of the hearing is

16 permitted by any person, including but not limited to the

17 parties, members of the public, and members of the press.

18 Violations of this rule may be punished with sanctions.

19       I will be calling on each speaker during these

20 proceedings.  When I do, please identify yourself by name for

21 clarity of the record.  After the speakers listed on the

22 Agenda for each of today's matters have spoken, I may provide

23 an opportunity for other parties in interest to address

24 briefly any issues raised during the course of the

25 presentations that require further remarks.

1        If you wish to be heard under these circumstances,

2   please state your name clearly at the appropriate time.  Don't

3   just use the wave functions on the Court Solutions dashboard,

4   because I may not see that.  I will call on the speakers if

5   more than one person wishes to be heard.

6        Please don't interrupt each other or me during the

7   hearing.  If we interrupt each other, it is difficult to

8   create an accurate transcript of the proceedings.  But having

9   said that, I apologize in advance for breaking this rule, as I

10  may interrupt if I have questions or if you go beyond your

11  allotted time.  If anyone has any difficulty hearing me or

12  another participant, please say something right away.

13       The Amended Agenda, which was filed at docket entry

14  no. 17311 in case no. 17-3283 is available to the public at no

15  cost on Prime Clerk for those who are interested.

16       I encourage the speakers to keep track of their own

17  time.  The Court will also be keeping track of the time and

18  will alert each speaker when there are two minutes remaining

19  with one buzz, and when time is up with two buzzes.  Here is

20  an example of the buzz sound.

21       (Sound played.)

22       THE COURT:  If your allocation is two minutes or

23  less, you will just hear the final two buzzes.

24       Our timing today is that the morning session will be

25  from now until 12:50 PM, that is, ten minutes to 1:00, and

1    then we will resume from 2:10 PM to 5:00 PM.  We will take a

2    ten-minute break at around 11:00 AM and around 3:30 PM.  When

3    we take breaks, I will direct everyone to disconnect and dial

4    back in at a specified time.

5         At the June Omnibus Hearing, I explained the need for

6    this Court to be assured that all of the parties have used

7    their best efforts in good faith to consider every potential

8    point of compromise, and to fairly assess that whatever firm

9    positions are taken are sufficiently essential that they are

10   worth risking failure to achieve a confirmable plan of

11   adjustment.

12        I had advised the parties of my intent to rely on

13   Judge Houser as mediation team leader for confirmation of her

14   belief that such good faith best efforts have been made.  I

15   asked her to so confirm in writing by today.  I am pleased to

16   see that Judge Houser has filed that certification at docket

17   entry no. 17314 in case no. 17-3283 this morning.

18        I now turn to the contested matters, the first of

19   which is the Disclosure Statement and solicitation procedures

20   motion.  Before delving into the intricacies of the specific

21   objection arguments, I'm going to invite the Oversight Board

22   to make introductory remarks concerning the newly amended Plan

23   of Adjustment and Disclosure Statement it filed yesterday,

24   including an overview of yesterday's amended materials.  I'd

25   like the Board to specify any changes that are significant in

1    connection with any of the objections that are expected to be

2    heard today, and to share its view of any changes the amended

3    materials might portend for today's Agenda.

4         The Court had originally allocated just five minutes

5    to the Oversight Board for introductory remarks, but I will

6    allow the Oversight Board to speak for up to 30 minutes, if

7    necessary, to address these additional issues.  We will then

8    proceed with the further arguments.

9         So now I call on counsel for the Oversight Board for

10   introductory remarks.

11        MR. ROSEN:  Good morning, Judge Swain.  This is Brian

12   Rosen from Proskauer Rose.  And with me today for the hearing

13   is Mr. Martin Bienenstock and Ms. Margaret Dale, and we will

14   be presenting the various matters that are going to be heard

15   today.

16        THE COURT:  Good morning.

17        MR. ROSEN:  Good morning.

18        Your Honor, as you just noted, we have filed last

19   evening a modified Fifth Amended Plan, as well as a

20   corresponding Disclosure Statement.  Following the Court's

21   directives of several weeks ago, we had continued the

22   mediation process with Judge Houser, and we are happy to

23   report that as a result of those efforts by Judge Houser and

24   Judge Colton, we were able to reach an understanding with the

25   Unsecured Creditors Committee yesterday on the terms of

1    modified treatment for the holders of general unsecured claims

2    and eminent domain claims -- excuse me -- for both ERS and the

3    Commonwealth, for the unsecured, as well as a modified

4    treatment in connection with the convenience class.

5           We also, Your Honor, made some modifications, because

6    we entered into an amended and restated Plan Support Agreement

7    with respect to the GO PBA creditors.  And what I'd like to

8    do, Your Honor, is just to go through what those various

9    changes are and the effect on the plan itself.

10          Specifically, Your Honor, with respect to the

11   Unsecured Creditors Committee, the absolute GUC recovery, as

12   it was referred to in the Plan, was increased from 125 million

13   dollars to 575 million dollars.  Out of that 575 million

14   dollars, however, there will be some monies taken out in

15   connection with the administration of the avoidance actions

16   trust in an amount of up to 15 million dollars that will be

17   determined by the Creditors Committee at or prior to the

18   commencement of the confirmation hearing, and also the amounts

19   of monies necessary to satisfy the convenience class claims.

20          And additionally, Your Honor, because the two

21   appointees to the avoidance action trust board will be

22   involved in monitoring the claims reconciliation process that

23   is undertaken by the Oversight Board and AAFAF, as the case

24   may be, there was an amount of three million dollars on an

25   annual basis to compensate those appointees and their counsel

1    for the work done in connection with the monitoring services.

2           There were some other corresponding changes with

3    respect to the convenience class, Your Honor.  The thresholds

4    were increased from 10,000 dollars per claim or 20,000 dollars

5    per claimant to 20,000 per claim and 40,000 per claimant, with

6    an aggregate cap of convenience claims of 65 million dollars.

7           And in the event that the Creditors Committee -- they

8    do have that right to waive that cap, and if it would be

9    waived or if it's not waived, Your Honor, the convenience

10   class creditors would share their pro rata share of that 65

11   million dollars in connection with those claims.

12          There are some other aspects that are set forth in

13   the committee agreement, Your Honor, that are not really Plan

14   related, but they go to the mechanics of what we're going to

15   be doing, including slight modifications to the Plan that was

16   filed last night, through subsequent conversations that I and

17   counsel for the Creditors Committee had late into the evening.

18   None of which, Your Honor, I believe are material changes, but

19   rather plumbing changes to the Plan.  And that -- we will get

20   to those, Your Honor, in the next few days or so.

21          The other issue that I referred to, Your Honor, was

22   the amended and restated Plan Support Agreement.  When we

23   executed the Plan Support Agreement in February of this year,

24   Your Honor, there was a level of attainment at which point

25   parties who wished to join that Plan Support Agreement would

1   be precluded from receiving any portion of the restriction

2   fees that were available to that.  And, unfortunately, because

3   of the widespread interest in joining that, we immediately --

4   and I say immediately, probably within 12 hours hit the 70

5   percent threshold that was included in that Plan Support

6   Agreement.

7           There were parties who had been party to the prior

8   Plan Support Agreement by way of joinders that were

9   unfortunately, therefore, precluded from joining into the Plan

10  Support Agreement.  So we have been working with those PSA

11  creditors, and Judge Houser, and Judge Colton, for a period of

12  months to try and come up with a way that we can address that

13  situation.

14          Specifically, Your Honor, we have now removed what

15  was the debt service reserve fund obligation within the Plan

16  Support Agreement, meaning the obligation of the Commonwealth

17  to put monies into an account, either on the effective date or

18  over a two-year period, and that money would otherwise be used

19  now to satisfy additional parties who will be party to that

20  Plan Support Agreement.

21          So no longer will there be a 30 percent -- excuse me,

22  a 70 percent threshold.  It will be open to any party that

23  wishes to do so.  As a result of that, there was a calculation

24  modification of the Plan Support Agreement fee, the

25  restriction fee as it's referred to, and that is contained in

1    Article III of the Plan that was filed last evening.

2           There are -- there was another change, Your Honor,

3    that we included in the Plan.  And specifically, again,

4    through the ongoing efforts to reach resolution with multiple

5    parties, the Oversight Board and the Union, AMPR, have reached

6    an understanding with respect to an increased distribution for

7    the holders.

8           That increased distribution is predicated upon the

9    union ratifying the terms of that -- of the new Collective

10   Bargaining Agreement.  And in the event that they do so, and

11   inform us in writing by September 30th that the Plan has --

12   excuse me, the Collective Bargaining Agreement has been

13   ratified, an enhanced treatment will be provided to those

14   holders.

15          So the Plan was modified to provide not only what the

16   Plan treatment would be in the event that they do not ratify

17   the terms of the new Collective Bargaining Agreement, but

18   Exhibit F-2 of the Plan includes this enhanced treatment if,

19   in fact, there is an understanding with this group of union

20   employees.

21          Your Honor, we did make a change with respect to the

22   PBA claims as well.  Specifically, in discussions that we've

23   been having through the mediation team, as well as direct

24   communications with the DRA parties, we've gotten a better

25   understanding of what the claims and causes -- excuse me, the

1    claims might be against PBA that are held by the DRA parties.

2    And as a result of that, we are of the belief that they are

3    unsecured creditors.  And as a result of that, Your Honor, we

4    have modified the treatment for the unsecured creditors and

5    the DRA parties who are similarly unsecured creditors at PBA

6    to provide for a ten percent threshold for recovery on account

7    of those claims.  We believe that's all the funds that are

8    available to PBA.  And the Plan now reflects that change.

9        Your Honor, there are also several federal claims

10   that had not been previously accounted for in the Plan, and

11   specifically these are claims held by the United States

12   Government, many of the departments and agencies of the

13   Federal Government.  And we have included a new class, Class

14   66 of the Plan, which provides for the treatment for these

15   federal claims.  And it also provides for ongoing dialogue

16   with the Federal Government to see if, in fact, there could be

17   an alternative treatment, and that is proposed in the Plan

18   with the Federal Government.

19       Lastly, Your Honor, there were changes that were

20   brought about to address some of the concerns associated with

21   releases, and specifically there was concerns that releases

22   were attempting to provide some releases for some non-Title

23   III debtors.  And so what we have made expressly clear in the

24   modifications to the Plan, is that those entities are carved

25   out from receiving releases pursuant to the Plan.  If, in

1    fact, we might have missed one, which I think someone has told

2    me that we might have missed one this morning, we will look at

3    that and we will try and make sure that we cover that

4    non-Title III debtor as far as a party not receiving a release

5    pursuant to the Plan.

6         So, Your Honor, that would be the executive summary

7    of changes to the Plan.  I would also note, however, that we

8    are still in dialogue with the mediation team, and

9    specifically with Ambac and FGIC on the one hand.  There are

10   proposals outstanding between the parties.  We hope to

11   continue those conversations, even today, if at all possible,

12   during a break in these proceedings.

13        And we are also still -- we've begun a dialogue with

14   the DRA parties as well, not only with respect to the PBA

15   treatment that they are to receive, but across all of the

16   Title III debtors in which they have a claim.  Most notably,

17   Your Honor, in connection with HTA, and with respect to the

18   clawback CBIs that will be issued pursuant to the Commonwealth

19   Plan of Adjustment, and what their share might be with respect

20   to that as a holder or an asserted holder of claims at HTA.

21   So all of those discussions are ongoing, Your Honor.

22        Unless you have any questions, Your Honor, that would

23   be the update on the changes.

24        Your Honor?

25        THE COURT:  Sorry about that.  I muted myself while

1    you were speaking and forgot to unmute myself.

2            MR. ROSEN:  Okay.

3            THE COURT:  So I get a little of my own medicine

4    there.  Apologies for that delay.

5            MR. ROSEN:  No problem.

6            THE COURT:  Thank you very much for the executive

7    summary.  Did you wish to make a further opening statement in

8    respect of the argument of the Disclosure Statement and

9    Solicitation Motion issues?

10           MR. ROSEN:  Very briefly, Your Honor.  As you know,

11   on June 28 we filed an Omnibus Reply to the objections that

12   had been interposed, not only to the Disclosure Statement, but

13   also to the solicitation procedures and with respect to the

14   subsequent motion that's to be heard, the confirmation

15   procedures themselves, and the discovery associated with that.

16           We believe that we have responded to all of the

17   objections that have been interposed by inclusion of

18   additional language in the Disclosure Statement itself.  We've

19   also noted in that Omnibus Reply that there are many issues

20   that were raised by various objectants, which are truly

21   confirmation related issues.  And we'd be happy to address

22   those at the confirmation hearing, rather than belaboring the

23   point here today, because they do not impact in any way the

24   Court's consideration and approval of the adequacy of the

25   Disclosure Statement itself.

1          With me, as I said, Your Honor, is Mr. Bienenstock.

2    To the extent that there are any issues associated with

3    classification or preemption associated with those objections,

4    Mr. Bienenstock will be handling those points, and I will

5    handle the balance of the objections to the Disclosure

6    Statement, Your Honor.

7          So at this point what we would suggest, as we

8    included in the Agenda, we would allow the objecting parties

9    to move forward.  Based upon the committee agreement that was

10   reached last night, I think that perhaps the Unsecured

11   Creditors Committee's presentation would be less than 20

12   minutes, as they are now in full support of the approval of

13   the Disclosure Statement and confirmation, although

14   Mr. Despins may have a few comments to add as well.

15         And I don't know if, in fact, other parties may want

16   to change their position based upon the ongoing nature of

17   discussions that we've continued to have through the mediation

18   team, Your Honor.

19         THE COURT:  Thank you.

20         So what I will do is call on the parties in order of

21   the Agenda; and we'll see what they say, and whether there are

22   any requests for change in the anticipated order of the

23   Agenda.

24         Thank you very much, Mr. Rosen.

25         MR. ROSEN:  Thank you, Your Honor.  I'll mute myself

1    now.

2              THE COURT:  Thank you.

3              Next on the Agenda is Ambac.  So would counsel for

4    Ambac please unmute?

5              MS. MILLER:  Good morning, Your Honor.  Atara Miller

6    from Milbank on behalf of Ambac Assurance Corporation.

7              THE COURT:  Good morning.

8              MS. MILLER:  Good morning.

9              As Mr. Rosen just mentioned, we are still in active

10   discussions with the Oversight Board, you know, so I find

11   myself a little bit in the unfortunate position this morning

12   of standing up in opposition of the Oversight Board's motion

13   to approve the Disclosure Statement, yet still clinging to the

14   hope that we will continue to engage, even today, and that

15   Your Honor will ultimately be presented with a more broadly

16   consensual plan of adjustment.

17             In light of that, we're happy to proceed now.  We do

18   think, though, that it would probably benefit everybody if

19   there were additional time today to see if more progress could

20   be made.  But of course, you know, mindful of your schedule,

21   and the calendar that we have, we defer to Your Honor on how

22   best to proceed.

23             THE COURT:  Well, if you think that ultimately issues

24   could be narrowed and time could be saved by, for instance,

25   deferring your argument to tomorrow morning, I suppose I could

1    hear the other objectors who expect to go forward with their

2    objections one way or another today; and hear the Oversight

3    Board's response to arguments that are made today; and reserve

4    decision on everything; and come back tomorrow morning to see

5    whether you wish to make further argument; and hear any

6    further response to that argument; and then render any rulings

7    that may be necessary tomorrow morning.

8           Many of the issues are intertwined, and it seems to

9    me that some of the other objectors' arguments, or the brevity

10   of those arguments may have been premised on an assumption

11   that you would have made them first.  So, yes, not having

12   really had a chance to think about it until this minute, I'm

13   wondering whether that will be a, you know, time, effort,

14   confusion saving step for us or not if I defer you to tomorrow

15   morning.

16          I'll ask you to respond how you would prefer to go

17   forward, because I can structure it either way.

18          MS. MILLER:  Well, first of all, thank you.  I

19   appreciate -- we appreciate the Court's flexibility on this.

20   You know, understanding the potential complexities that it

21   presents, we really do defer to you in part because we don't

22   want to increase the burden on the Court.  And, you know, I'm

23   not sure that the individual objectors, particularly in light

24   of the fact that objections were all filed simultaneously, are

25   sort of depending on our objection, but I guess it's possible.

1          You know, I will say on that point that we have not

2     coordinated with individual objectors with respect to

3     allocation of arguments or issues.  And so to the extent that

4     that's a reflection of whether or not others are relying on us

5     to take the lead on issues, I don't expect that would be a

6     significant point.

7          So, you know, our preference would be to defer it,

8     but we are extremely sensitive to the complication that it

9     presents.

10          THE COURT:  Well, this is going to be complicated one

11     way or another, so --

12          MR. ROSEN:  Your Honor.

13          THE COURT:  Yes.

14          MR. ROSEN:  I apologize.  This is Brian Rosen.  May I

15     be heard for just a moment?

16          THE COURT:  Yes.

17          MR. ROSEN:  Your Honor, you said it very well earlier

18     when you said many of the objections are intertwined.  Because

19     of the complexity or the breadth of Ambac's objections, they

20     do cover many of the other points that were raised by many of

21     the other objectants.

22          If, in fact, you want to defer Ambac to tomorrow, my

23     suggestion would be, Your Honor, that you allow all of the

24     other objectants to go forward today.  And if, in fact, we

25     don't have closure with Ambac this evening, allow Ambac to go

1   forward tomorrow morning, and then we would respond at one

2   time to all of those.

3        THE COURT:  It certainly would have been my intention

4   to let everybody else go forward today, but you want to

5   reserve your reply to everything, which makes sense.

6        I would just warn everybody that if we are going to

7   have that sort of, you know, quite substantial session

8   tomorrow morning, which we can do, because of other

9   commitments tomorrow that I thought would not conflict with

10  this, we're going to have to have one of those two hour,

11  middle of the day breaks tomorrow, because I am necessarily

12  otherwise occupied between 12:00 and 2:00, if we can't get

13  everything done in the morning.  So that's just a head's up

14  for everybody.

15       So what I will do is grant the request to defer the

16  Ambac argument to tomorrow morning, and anticipate deferring

17  the Oversight Board reply argument to tomorrow morning.  I

18  will hear from the other parties, in opposition and in

19  support, who are on the Agenda today, and we will proceed in

20  that fashion.

21       So Ms. Miller is put over to tomorrow morning.

22       The next party on the Agenda is FGIC, Mr. Sosland.

23  Did you also wish to put over to tomorrow morning?

24       MR. SOSLAND:  Yes, Your Honor.  If it pleases the

25  Court, we are -- as Mr. Rosen noted, we are involved in the

 1  same negotiations with Ambac and the Oversight Board, and I
 2  think it makes sense to go forward at the same time that Ambac
 3  does.
 4          THE COURT:  I agree.  Very well.  Then your time is
 5  put over until tomorrow morning as well.
 6          Next on my list are the DRA parties.
 7          MR. MINTZ:  Good morning, Your Honor.  Doug Mintz of
 8  Schulte Roth.  Can you hear me?
 9          THE COURT:  Yes, I can.  Thank you.  Good morning,
10  Mr. Mintz.
11          MR. MINTZ:  Good morning, Your Honor.  And we are
12  prepared to go forward now.  I will note before I start that,
13  you know, we did -- while our arguments were not intertwined
14  with Ambac's, we were obviously allotted less time than them,
15  so we take certain issues from our briefing that we will
16  address for the Court today.  Our briefing still stands
17  obviously and addresses a wider range of issues that obviously
18  is part of the record here.
19          THE COURT:  I have, of course, reviewed all of the
20  briefing, so I have that in mind.
21          MR. MINTZ:  Okay.
22          THE COURT:  So I have you down for seven minutes, or
23  are you taking -- seven minutes for Cantor-Katz and then seven
24  minutes for AmeriNational Community Services; is that correct?
25          MR. MINTZ:  That's correct, Your Honor.  We'll be

1    splitting the time approximately evenly.

2           THE COURT:  Okay.  Very good.  So we'll start your

3    seven minutes now.

4           MR. MINTZ:  Okay.  Good morning, Your Honor.  Doug

5    Mintz from Schulte Roth for Cantor-Katz Collateral Monitor,

6    LLC, joined by Arturo Garcia of McConnell Valdes for

7    AmeriNational Community Services, as servicer, together on

8    behalf of the GDB debt recovery authority.

9           The Court cannot approve this Disclosure Statement

10   and should not.  As you will hear, there are a number of

11   problems with the proposed Disclosure Statement.  I'll talk to

12   you about why the Commonwealth Plan is unconfirmable on its

13   face, enough the Disclosure Statement cannot be approved, with

14   a focus on the overlap between the Commonwealth Plan and HTA.

15          Mr. Garcia will cover other facial flaws in the

16   Commonwealth Plan with respect to claims with the Commonwealth

17   and PBA, as well as issues like preemption and releases.

18          Look, as you've heard already, people have worked

19   really hard to move this plan forward.  This case can't stay

20   in Title III forever, and no one wants that.  But that doesn't

21   mean the Oversight Board can just say, well, we have the power

22   to preempt all laws, so whatever we say works.  No.  Congress

23   imposes many burdens on the debtor, including complying with

24   applicable law, and at the Disclosure Statement stage,

25   ensuring that the plan is at least facially confirmable.  This

1    one is not.

2        At a disclosure statement hearing, courts examine a

3    plan to determine whether it's so flawed that confirmation is

4    impossible.  If it is, courts cannot approve the disclosure

5    statement.  And that's citing *El Comandante Management*.

6        The Oversight Board responds to the general

7    confirmability objections, as Mr. Rosen did already, by saying

8    each of these are issues for confirmation.  But here, the

9    flaws in the Commonwealth Plan are so problematic they simply

10   render the Commonwealth Plan unconfirmable and the Disclosure

11   Statement plan unapprovable.

12       There are significant flaws related to the Plan as it

13   addresses HTA and the clawback claims.  The principal flaw of

14   the claim is it constitutes a back door sub rosa plan for HTA.

15       A sub rosa plan is a de facto plan of reorganization,

16   bypassing many of the Bankruptcy Code's fundamental creditor

17   protections.  Courts prohibit sub rosa plans because they,

18   quote, short circuit the confirmation requirements of Chapter

19   11, from *Tempnology*, 542 B.R. 50.

20       Here, the Oversight Board, in proposing the

21   Commonwealth Plan, seeks to lock in terms of an HTA plan

22   before they've even gone to the trouble of filing one.  This

23   would truly short circuit the HTA plan process.

24       Among the problematic terms, first, the Oversight

25   Board intends to use the Commonwealth Plan to distribute 264

1    million dollars in HTA assets to HTA bondholders to reduce

2    their HTA claims.  And that's in the new plan at Section

3    83.1(b)(xv), I believe.  This alone renders the plan improper.

4         Second, the Commonwealth Plan attempts to prejudge

5    priority at HTA, before we'd even gotten to the HTA plan

6    process, or any court has determined that priority separately.

7    For example, the proposed plan sets up a CBI payment reserve

8    for claims related to the clawback of revenues from HTA, but

9    the plan creates a waterfall where at the end of Exhibit J,

10   the very back of the PDF, that subordinates the DRA of HTA

11   loan recovery to all the HTA bonds.  And the plan states

12   elsewhere that the DRA's HTA bond claims are almost pari passu

13   with the HTA bond claims.  And in the new plan, that is

14   section 1.162, I believe.

15        There were some changes in the Disclosure Statement

16   last night that seemed to make it worse.  To be honest, we

17   hadn't fully processed what was filed until late in the

18   evening.

19        Third, the release provisions in the Commonwealth

20   Plan are overly broad and may sweep in the likes of claims by

21   and against HTA.  Again, those were modified late last night

22   and we are still evaluating those revisions.  But I don't

23   think it changes our overarching analysis of a sub rosa plan.

24   And Mr. Garcia will talk about the releases a bit more

25   shortly.

 1              We combine all of these --

 2              THE COURT:  A question, just to be clear.

 3              MR. MINTZ:  Yes.

 4              THE COURT:  Your sub rosa plan argument goes beyond

 5       the issue of the release of HTA's claims against -- or the

 6       resolution of HTA's claims against the Commonwealth?  That's

 7       question number one.

 8              MR. MINTZ:  Yes.  So to answer question number one,

 9       yes, the sub rosa plan argument including -- while it does

10       talk about the releases, also includes most critically a

11       determination of priority among HTA creditors, and the

12       distributions, as I said, from HTA to address HTA bondholder

13       claims.

14              THE COURT:  I have read all of the briefing, and I

15       have looked at everything, but I haven't memorized

16       everything --

17              MR. MINTZ:  Of course.

18              THE COURT:  -- so forgive me if I ask a naive

19       question.  So when you talk about the distribution of HTA's

20       assets, are you talking about the clawback funds that are in

21       controversy or are you talking about funds that are actually

22       at HTA?

23              MR. MINTZ:  As we understand section 83.1(b)(xv) of

24       the --

25              (Sound played.)

1            COURT REPORTER:  I'm sorry, Counsel.  Your Honor,

2    this is the court reporter.  If counsel could please state the

3    citation again, because the sound interrupted it.

4            MR. MINTZ:  Yes, of course.  It is 83.1(b)(xv).

5            THE COURT:  Okay.  And you say that that does what?

6            MR. MINTZ:  As we understand that provision, Your

7    Honor, it distributes 264 million dollars from HTA, not from

8    the Commonwealth, to HTA bondholders, 68 and 98 bondholders,

9    and would reduce their HTA claims.

10           THE COURT:  Thank you for that clarification.

11           MR. MINTZ:  Thank you, Your Honor.

12           So we talked about the release provisions.  When you

13   combine all of these provisions, you get the nearly complete

14   frame of an HTA plan.

15           And why are we doing this now?  We look at the HTA

16   PSA, which locks in many of these provisions as part of the

17   deal with Assured and National, which own significant

18   Commonwealth and HTA claims; but the Oversight Board needs to

19   deal with the clawback and similar claims the right way.  They

20   can either return the improperly clawed back funds to HTA

21   where they belong and resolve all issues under an HTA plan, or

22   put those funds in a reserve account with no parties paid

23   before the Court makes any sort of determination.

24           The Oversight Board argues that this is not a sub

25   rosa plan because, for example, those distributions are not

1    being made on account of HTA claims, and that there will be a

2    separate HTA plan of adjustment.  Those arguments don't do the

3    trick.

4            We've addressed many of the points, but the fact that

5    there's a future HTA plan proves our point. This is not an HTA

6    plan.  It is a sub rosa HTA plan without the protections of a

7    plan.  So, to be sure, it's clear the Commonwealth Plan is not

8    just a Commonwealth Plan.  It's a fully baked HTA plan that

9    violates applicable law.

10           Second, with respect to HTA, there is the HTA PSA,

11   which is incorporated into the Commonwealth Plan --

12           (Sound played.)

13           MR. MINTZ:  Your Honor, may I have some additional

14   time in light of my answers to your questions?

15           THE COURT:  You can have two minutes in total.

16           MR. MINTZ:  Thank you, Your Honor.

17           The HTA PSA is incorporated into the Commonwealth

18   Plan and violates Rule 9019 in the Bankruptcy Code's priority

19   scheme.  The issue right today is the HTA appears to be a

20   lynchpin to the Plan.  If the PSA falls apart, we believe the

21   Plan could fall apart.

22           The Oversight Board must show, among other things,

23   that the PSA doesn't violate applicable law, that it is fair

24   and equitable.  A settlement is fair and equitable under

25   Bankruptcy Rule 9019 if the settlement respects the applicable

1    priority of creditors.  The HTA PSA would violate applicable

2    law for the reasons we just discussed, and it's not fair and

3    equitable, because it improperly determines priority at HTA

4    before this Court or any court has made a relevant

5    determination.

6            The latest Disclosure Statement includes comments

7    from the debtor that they believe the HTA loans are

8    subordinate, but no finding has been found.

9            Finally, there's disparate treatment of HTA claims in

10   class 56.  The Commonwealth Plan is facially unconfirmable

11   because it treats those claims in class 56 differently in

12   violation of Section 1123(a)(4) of the Code.  That requires

13   that a plan provide the same treatment for each claim of a

14   particular class.

15           In particular, the Commonwealth Plan treats holders

16   of the HTA bond in class 56 differently and better than

17   holders of the DRA loans in class 56.  As noted, the HTA

18   bondholders are receiving 264 million dollars from HTA,

19   whereas the HTA loan claims do not participate in that

20   recovery.  Second, it would pay the HTA bondholders

21   temporarily and priority wise before the HTA loan claims,

22   despite a lack of finding by the Court that this is

23   appropriate.

24           The Oversight Board responds, there is no disparate

25   treatment, because all class 56 creditors will recover pro

1   rata from the class recovery, but this is simply inaccurate.

2   Even putting aside the 264 million dollar paydown, courts find

3   that paying one creditor earlier than others violates

4   Bankruptcy Code Section 1123(a) as well, and that's from

5   *Brotby*, 303 B.R. 177.

6          So those are the issues with respect to HTA --

7          (Sound played.)

8          MR. MINTZ:  -- and with that, I'll turn things over

9   right on time to Mr. Garcia.

10         THE COURT:  Thank you very much, Mr. Mintz.

11         Mr. Garcia.

12         MR. GARCIA SOLA:  Good morning, Your Honor.  Arturo

13  Garcia Sola from McConnell Valdes, LLC, on behalf of

14  AmeriNational Community Services, LLC.  I will discuss

15  additional DRA objections to the Disclosure Statement.

16         First, the Plan violates the Commonwealth Law and

17  Takings Clause.  The Plan cannot be confirmed, because it

18  contravenes PROMESA Section 314(b)(3), and Bankruptcy Code

19  Section 1129(a)(3), by allowing the Commonwealth to

20  permanently retain the Act 30, 31 revenues.

21         As to violating the Commonwealth law, there is no

22  preemption.  We dispute the FOMB's untenable position that

23  PROMESA has far-reaching preemptive effect and can justify the

24  FOMB ignoring other law.  This is wrong because PROMESA does

25  not preempt all Commonwealth law, including Acts 30 and 31.

1   On the contrary, its text demonstrates an intent to preserve

2   and supplement, not supplant territorial law.

3           Frankly, if the FOMB preemption theory were allowed

4   to stand, it would yield on such -- dictatorial powers that

5   would enable the FOMB to disallow Puerto Rico's Constitution

6   and laws, whenever and wherever it deemed it appropriate.

7   This is not what the U.S. Congress intended when it approved

8   PROMESA.

9           Furthermore, there is no constitutional clawback.

10  The Disclosure Statement and Plan rely upon the Puerto Rico

11  Constitution to justify the illegal retention of the clawback

12  revenues, including the Act 30, 31 revenues, citing to Article

13  VI, Section 8 of the Constitution.

14          The FOMB will not be able to prove that the

15  Commonwealth complied with the Puerto Rico Constitution when

16  it clawed back the excise tax revenues from HTA.  In fact, the

17  FOMB has not put forth any evidence, I underscore, any

18  evidence to prove that it satisfied the conditions to clawback

19  money.

20          To satisfy a constitutional clawback, the FOMB must

21  show, one, that it made a fiscal year by fiscal year analysis

22  on whether there was sufficient available resources; two, that

23  there were no available resources to meet the appropriations

24  for a given fiscal year; and three, that it used the clawback

25  revenues to pay GO debts in that fiscal year.

1      This is as much a disclosure issue as it is a

2   confirmability issue.  The FOMB has not explained how they

3   have satisfied clawback standards for each fiscal year since

4   the filing of the Title III cases, because they simply cannot.

5   By the way, the FOMB also got the legal standard wrong when it

6   attempted to justify the Commonwealth's compliance with the

7   clawback.

8      As to the Takings Clause, the Plan violates the

9   clause by illegally diverting the DRA's collateral without

10   compensation, and such Takings Clause claims are not

11   dischargeable under applicable law.

12      The FOMB takes the position in its reply that even if

13   the Court finds that some or all of the claims are

14   nondischargeable, it can still confirm the Plan, but the FOMB

15   fails to address whether the Plan would still be feasible if

16   such claims are not discharged.  If they are not, it would be

17   futile to go forward with solicitation of such plan, so it is

18   appropriate to address the issue at this Disclosure Statement

19   stage.

20      With respect to our PBA claims, I must start with a

21   statement that the DRA parties are still assessing the Fifth

22   Amended Plan and Disclosure Statement filed less than 18 hours

23   ago, in fact, while we were preparing for today's hearing.

24   Though we continue to fully vet the changes in the Fifth

25   Amended Plan, we know that at least one issue identified in

1    our Disclosure Statement objection appears to have been

2    addressed.  That is the disparate treatment between the DRA's

3    unsecured PBA claims and the PBA's general unsecured claims.

4          However, even though the Fifth Amended Plan now

5    provides that the DRA -- the DRA the same treatment as PBA

6    general unsecured creditors, to PBA unsecured loans, it still

7    does not address why the FOMB continues to place the DRA in a

8    separate class from PBA general unsecured creditors.

9          This separate classification hints at possible,

10   quote, class gerrymandering, unquote, and renders the Plan

11   unconfirmable under Bankruptcy Code Section 1122(a) and

12   PROMESA Section 301(d).

13         Another issue that remains unresolved in the Fifth

14   Amended Plan is the justification for the treatment of the DRA

15   PBA unsecured loans.  Despite recognizing that the DRA's

16   secured PBA claims are supported by the sale proceeds of

17   certain buildings, the Disclosure Statement does not provide

18   any information whatsoever regarding the values of said

19   collateral to justify the estimated recovery to DRA under the

20   Plan.

21         Instead, the Fifth Amended Plan treats the DRA

22   secured PBA claims as if these were wholly unsecured, and does

23   not even disclose or contemplate the possibility that the DRA

24   can make a section 1111(b) election as to them.

25         (Sound played.)

1          MR. GARCIA SOLA:  Lastly, despite treating the

2   unsecured PBA claims as if they were wholly unsecured, the

3   Fifth Amended Plan classifies them separately.

4          I turn now to the plan relief and exculpation

5   clauses, which remain overbroad.  The Disclosure Statement

6   must provide enough information to enable the debtors,

7   creditors, and this Court to make an informed judgment about

8   the Commonwealth Plan.

9          The Disclosure Statement fails to satisfy the

10  standard, because it does not provide adequate information

11  concerning the scope and breadth of the plan release, its

12  injunctions and exculpations as they relate to HTA and its

13  creditors.  In particular, the language contained in the

14  provisions preempts the DRA from determining whether those

15  claims against HTA and its creditors are impaired, and if so,

16  to what extent.

17         Turning now to disclosure objections, I start by

18  noting that the FOMB has not addressed many of our particular

19  disclosure based objections.  We believe that all the DRA

20  disclosure based objections must be addressed in order for the

21  Disclosure Statement to provide adequate information to

22  creditors voting on the plan, but we address two in

23  particular.

24         First, the FOMB has failed to disclose which of the

25  DRA's assets purportedly qualify as class 60 CW appropriations

1   claims.  The DRA needs to understand now which of its assets

2   may qualify as Class 60 claims, because the Plan proposes to

3   provide no recoveries for these claims.

4          Second, the Disclosure Statement fails to disclose

5   the risk that the Plan may not be confirmed and the GO PSA may

6   be terminated.  If the DRA administrative expense claim motion

7   is granted, while the FOMB has to explain the other parties'

8   position on this issue, and to note the FOMB will request a

9   briefing schedule in connection therewith, this new language

10  fails to address how allowance of such claims would impact the

11  Plan feasibility and confirmation.

12         Lastly, Your Honor, I briefly address the opposition

13  to the DRA Disclosure Statement objection that was filed in

14  the motion --

15         (Sound played.)

16         THE COURT:  Okay.  Now start from the beginning of

17  that sentence again and wind up, please.

18         MR. GARCIA SOLA:  Yes.  Thank you, Your Honor.

19         We note simply that while relative priority of the

20  bondholders' clawback claims is not before the Court today, it

21  is an issue that remains unresolved, and must ultimately be

22  addressed by the Court, either in connection with confirmation

23  or in response to adversary complaint against the HTA

24  bondholders.

25         And with that, I rest, Your Honor, unless you have

1    any questions.

2             THE COURT:  Thank you very much, Mr. Garcia.  I don't

3    have any questions for you at this point.

4             MR. GARCIA SOLA:  Thank you.

5             THE COURT:  Thank you.

6             So now we will turn to the Unsecured Creditors

7    Committee.  Mr. Despins.  Mr. Despins, I can't hear you, so

8    have you completely unmuted?

9             MR. DESPINS:  I apologize, Your Honor.  Just still

10   figuring out these mute buttons.

11            THE COURT:  Thank you.  And good morning,

12   Mr. Despins.

13            MR. DESPINS:  Can you hear me?

14            THE COURT:  Yes.  Just please state your name and

15   then start.

16            MR. DESPINS:  Okay.

17            THE COURT:  Can you hear me?

18            MR. DESPINS:  Yes.  I apologize, Your Honor.

19            Luc Despins with Paul Hastings on behalf of the

20   Official Creditors Committee.

21            And, Your Honor, in light of the settlement with the

22   Oversight Board, we have no comments, or we're not going to

23   make any representations to the Court this morning regarding

24   the Disclosure Statement.

25            THE COURT:  Thank you.

 1              MR. DESPINS:  Thank you.

 2              THE COURT:  So now I will turn to the Group Wage

 3      Creditors represented by Ms. Gonzalez Morales.

 4              Ms. Gonzalez Morales, please unmute your phone and

 5      also the dashboard for Court Solutions.

 6              Ms. Ng, is Ms. Gonzalez Morales showing as present on

 7      your dashboard?

 8              MS. NG:  Give me one second, Judge, because I'm

 9      looking.  Judge, I don't see her on.  She was on before.

10              THE COURT:  All right.  I'll ask one more time, is

11      Ms. Gonzalez Morales on?

12              (No response.)

13              THE COURT:  So what I'll do is mark for a second call

14      in case she got dropped and is coming back on.

15              MS. NG:  Judge.  Judge --

16              THE COURT:  Yes.

17              MS. NG:  -- I'm sorry to interrupt.  Hold on one

18      second.

19              UNIDENTIFIED PERSON:   Ms. Gonzalez Morales -- I'm

20      sorry.

21              THE COURT:  Oh, good.  You're on.

22              UNIDENTIFIED PERSON:  Can you hear her?

23              THE COURT:  I can hear somebody.  I can hear whoever

24      said "can you hear her."

25              UNIDENTIFIED PERSON:  Oh, okay.  Sorry.  I am

1    assisting Ms. Gonzalez with the system.  If you can hear me,

2    then you're going to be able to hear her.  I'll pass to her.

3              THE COURT:  Okay.  Very good.

4              MS. GONZALEZ MORALES:  Excuse me, Your Honor.  This

5    is Ivonne Gonzalez speaking.  I represent a group of creditors

6    collectively.  And I apologize for the interruption.

7              To begin with --

8              THE COURT:  No problem.

9              MS. GONZALEZ MORALES:  -- it is important to bring to

10   the consideration of the Court that the group of creditors I

11   represent are almost 14,000 employees that have cases.  Five

12   of them have already final judgments for approximately 84

13   million dollars.  Others are still pending, the cases.  And

14   the back wages are approximately 240 million dollars.

15             We oppose the Disclosure Statement, because there is

16   a reclassification -- a problem with the classification of the

17   claim.  When you examine and compare the class definition of

18   unsecured creditors in class 55, the employee creditors are

19   included in class 55, but the definition excludes the

20   particular wage creditors that are being transferred to the

21   administrative reconciliation procedures.

22             Also, when you examine class 49, they consist of

23   employees of AFSCME, American Federation of State, and their

24   return will be a hundred percent, while the wage creditors I

25   represent will only have almost a three percent recovery.

1   This disparate treatment violates the code -- equity of equal

2   distribution of similar classes.

3          We believe that the Omnibus Reply given by the

4   Oversight Board -- that this issue should be left to the

5   confirmation stage, is not sustained by any valid bankruptcy

6   dispositions.  I think that the classification issue should be

7   resolved in this stage in order to -- in order to make the

8   plan confirmation more equitable.

9          And also regarding the Board's suggestion that the --

10  wait for the confirmation stage, to determine whether -- to

11  determine whether the Plan should be confirmed, we think that

12  it's not a valid reason, and it should be presented and

13  determined by this Court in this stage of the procedures.

14         Well, thank you very much, Your Honor.  That would be

15  all.

16         (Sound played.)

17         THE COURT:  Thank you very much, Ms. Gonzalez.

18         Next I have an allocation of two minutes for an Ad

19  Hoc Group of FGIC Noteholders represented by Mr. Larose.

20         MR. LAROSE:  Good morning, Your Honor.  Can you hear

21  me clearly?

22         THE COURT:  Yes, I can.  Good morning.

23         MR. LAROSE:  Thank you, Your Honor.  This is Lawrence

24  Larose from Sheppard Mullin Richter & Hampton, counsel to the

25  Ad Hoc Group of FGIC Insured Noteholders.  Our members hold

1    over 500 million dollars at par amount of GO, HTA, CCDA, and

2    PRIFA bonds insured by FGIC.

3          Your Honor, I'm pleased to report to you this morning

4    that the Fifth Amended Disclosure Statement and Fifth Amended

5    Plan filed last evening appropriately addressed all of our

6    group's issues raised in our limited objections with respect

7    to the Disclosure Statement and the vast majority of our

8    issues with respect to the Plan.

9          Now, given the fact that we understand negotiations

10   are still ongoing, we must reserve our rights to object or

11   comment in the future on any proposed changes to the

12   Disclosure Statement, or the Plan, or issues raised by other

13   parties.

14         Your Honor, I'd be remiss this morning if I didn't

15   thank counsel to the debtors and the Board, in particular,

16   Mr. Rosen, for cooperatively and tirelessly working through

17   our issues with us.

18         Unless Your Honor has any questions, I will cede my

19   time back to the Court.  Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Larose.

21         So am I correct in understanding that at this point

22   you -- I may treat all of the objections that you raised as

23   having sufficiently been responded to?

24         MR. LAROSE:  Yes, Your Honor, subject to our

25   reservation of any rights on any changes.

1            THE COURT:  Yes.  Thank you very much.

2            MR. LAROSE:  Thank you.

3            THE COURT:  So next I have AAFAF by Mr. Rapisardi.

4            MR. RAPISARDI:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MR. RAPISARDI:  This is John Rapisardi of O'Melveny &
7    Myers on behalf of AAFAF.

8            Your Honor, before the Court is AAFAF's limited
9    objection to the Board's Disclosure Statement for its Fifth
10   Amended Plan.  Since the filing of our limited objection, the
11   Board has made additional settlements as reflected in the
12   Fourth and Fifth Amended Plan of Adjustment.

13           We wish to thank Judge Houser and Judge Colton for
14   their continued help in bringing about the latest settlements.
15   Certainly, without AAFAF's and the Oversight Board's
16   cooperation during the first half of the year, the recent
17   settlements could not have been possible.

18           This is evidence that when we work together as
19   partners, meaningful progress can be achieved in these cases.
20   We also hope that there will continue to be creativity brought
21   to resolve these Title III cases as expeditiously as possible.

22           Unfortunately, in spite of the progress made with the
23   filing of the Fifth Amended Plan of Adjustment, the Board
24   continues to insist upon unnecessary pension cuts and freezes.
25   As we noted in our limited objection, because the Board has

1   insisted on including pension cuts and freezes as part of the

2   Plan, there remains a meaningful risk legislation will not be

3   enacted.

4        I will not belabor the record, Your Honor, with our

5   repeated reasons why pension cuts and freezes are morally

6   wrong, unnecessary, and, in fact, solvable through a more

7   practical, fiscally sound approach.  The fundamental question

8   that must be asked and answered is how the Board intends to

9   move forward with confirmation of this plan, which in numerous

10  instances is intrinsically connected to the passage of

11  legislation.

12       I refer the Court to conditions precedent at section

13  82.1 and 82.2 of the Plan, which includes as a condition, a

14  determination that the Commonwealth shall have pledged its

15  full faith, credit, and taxing power.

16       In the Oversight Board's Omnibus Reply, the Board

17  asserts that PROMESA completely preempts local law, and the

18  full faith, credit, and taxing power of the Puerto Rico

19  Constitution, thereby allowing the Court to order the issuance

20  of bonds, presumably and somehow backed by the full faith and

21  credit and taxing power of the Commonwealth, all without

22  authorizing legislation from the government.

23       But, Your Honor, this is not how the PSA or Plan is

24  structured, which is explicitly conditioned on the enactment

25  of the new GO bonds legislation and CBI legislation.  In fact,

1   if such legislation is not enacted by the commencement of the

2   confirmation hearing, the PSA creditors are entitled to

3   exercise their right of termination under the Plan and collect

4   a 100 million dollar termination fee.

5          The fact of the matter is, Your Honor, that the Plan

6   is modeled after the COFINA Plan of Adjustment, which enjoyed

7   broad support from the Governor, legislature, creditors and

8   the Board.  In connection with confirmation of a COFINA Plan,

9   and in briefing before this Court, all parties implicitly

10  acknowledged the absolute necessity and critical role of

11  enabling legislation.  The unified approach achieved in COFINA

12  is no doubt an important reason for the immense success

13  enjoyed in the aftermath of the implementation of the COFINA

14  Plan.

15         As it relates to the Commonwealth Plan, the Board

16  sidesteps our question by saying that we got it wrong, because

17  PROMESA gave the Board broad and expansive powers to bypass

18  the government with respect to the issuance of securities

19  under the Plan.  The Board's argument and legal gymnastics as

20  it relates to PROMESA Section 314(b)(5) and Bankruptcy Code

21  Section 1123(a)(5)(j), in our view, is wrong and overly

22  expansive.

23         Moreover, the Board neither addresses the inclusion

24  by Congress of the word "legislative" in section 314(b)(5),

25  nor acknowledges the limitations on the preemptive scope of

1    Bankruptcy Code Section 1123(a)(5), as noted by the First

2    Circuit Bankruptcy Appellate Panel's decision in *In re Irving*

3    *Tanning*.

4           However, Your Honor, we will concede --

5              (Sound played.)

6           MR. RAPISARDI:   -- that these are confirmation

7    issues which can be briefed and addressed in detail in

8    connection with a confirmation of a plan of adjustment.

9           We do believe that, as a matter of disclosure, the

10   Board should acknowledge that it's embarking on a risky legal

11   path, an uncharted path that even if successful, will result

12   in the issuance of securities that are different than those

13   bought before, in which the financial markets might accept a

14   discount, thus impeding PROMESA's mandate for achieving fiscal

15   stability, and establishing access to the markets, and

16   creating a free flow of capital.

17          The Board's legal gamble raises now the legal

18   questions which are not addressed in the Disclosure Statement.

19   What kind of securities can be issued without legislation?

20   Would a court ordered security enjoy the full faith and pledge

21   of the Puerto Rico Constitution?  Would such a security

22   benefit from the constitutional payment priority?  Would such

23   a security enjoy tax exempt status?  How would such an

24   unprecedented action adversely effect the Commonwealth's

25   financial rehabilitation?

1              It behooves the Board to provide clear and direct

2      answers to these critical questions as they concern inherent

3      powers of the Government of Puerto Rico, and the relevance of

4      that government at this important point and moment in Puerto

5      Rico's history.  Consistent with the past, when the government

6      enacted legislation to enable the restruction of GDB and

7      COFINA, and the transformation of PREPA, we believe there are

8      many creative ways for the Board and the government to work

9      collaboratively to adjust pensions in a right and just

10     fashion.

11             To this end, the Governor has signaled a willingness

12     to be creative and seek a solution concerning the public

13     pension issue within the confines of the fiscal plan and

14     budgeting process under Title II of PROMESA.

15             Your Honor, the Commonwealth's four year long and

16     difficult journey in Title III is thankfully winding to a

17     close, and the government remains the last party to whom the

18     Board has yet taken seriously.  During that time, we have seen

19     this beautiful island --

20             (Sound played.)

21             MR. RAPISARDI:  -- and its people go through much

22     tragedy and suffering.  Your Honor, I hope and pray that this

23     last stumbling block is not resolved to more litigation and

24     delay, but is overcome to a consensus, and the success we

25     achieved in GDB and COFINA are repeated in a consensual plan

 1    of the Commonwealth, with the Board, the government, and

 2    creditors marching toward that final goal in unison.

 3              Thank you, Your Honor.

 4              THE COURT:  Thank you, Mr. Rapisardi.

 5              And next I have SIM, represented by Mr. Mudd.

 6              MR. MUDD:  Good morning, Your Honor.  John Mudd for

 7    Salud Integral de la Montaña.

 8              THE COURT:  Good morning.

 9              MR. MUDD:  Good morning, Your Honor.

10              First, and I think the most important part of the

11    Disclosure Statement is the financial information.  Now, the

12    problem with the financial information is that the Board --

13    and I understand why -- does not want to certify how reliable

14    that information is.  That's when you go to the part of the

15    financial statements -- which when I filed my motion, we were

16    missing 2017, '18, and '19.

17              On June 30th, the Commonwealth filed the 2017

18    financial -- audited financial statements, but we're still

19    missing two of them.  Without that information, Your Honor, I

20    don't think an investor can make a decision on the Disclosure

21    Statement.

22              THE COURT:  Mr. Mudd, are you still there?  Mr. Mudd?

23              MR. MUDD:  Yes, I'm here.  Yes, I'm here.

24              THE COURT:  Okay.  There was a dramatic pause.

25    Okay.

1          MR. MUDD:  No.  Actually, it was my -- put something

2     in there that was not supposed to go -- okay.

3          Going back to the lack of information as to cash

4     accounts.  Now, we have lots of cash in the accounts, and the

5     Board says some of them are restricted.  Fine.  No problem.

6     But why are they restricted, to give us a general idea of

7     that?

8          And they say, well, the government has told us the

9     reasons why they are, and we agree with them on these.  But we

10    don't know how.  We don't have any information as to that.  I

11    think that's also a very important consideration for the

12    Disclosure Statement.

13         Continuing, there's a whole bunch of litigation, I'm

14    going to call it, about the party -- the professions, which

15    are going to fund the UCC or the unsecured creditors.  Now, we

16    don't know what the state of those litigation is.  We don't

17    know what -- how the trust is going to be functioning, et

18    cetera, and I think that's important information to be

19    brought.

20         Demographics and health care.  This is very

21    important.  We had, in the financing --

22         (Sound played.)

23         MR. MUDD:  We had in the Plan, we have the

24    information as to the population of Puerto Rico was 2.9

25    million, when the census says it's 3.2 million.  There's a

1   difference roughly of 11 percent.  That is important.  It

2   could make a huge difference on these things.

3          And since I don't have much time, I'm going to go

4   directly to something I think is very, very important.  We

5   don't know, we don't have information from the government

6   whether -- if the plan of adjustment is approved as it is

7   presented with the pension cuts, et cetera, will the

8   government execute it.  That is very important.

9          There is a whole bunch of fighting over the pensions,

10  and I understand that.  But if it stands as it stands right

11  now, will the government put it into effect?  And I think

12  that's extremely important.

13         And unless the Court has any questions, I think that

14  would be enough.

15         THE COURT:  Thank you very much, Mr. Mudd.

16         MR. MUDD:  No problem.

17         THE COURT:  So next I have Mr. Kahn for AMC Group.

18         MR. KAHN:  Good morning, Your Honor.  Brad Kahn, Akin

19  Gump.  Can you hear me?

20         THE COURT:  Yes, I can.  Good morning.

21         MR.  KAHN:  Good morning, Your Honor.  Again, for the

22  record, Brad Kahn, Akin Gump Strauss Hauer & Feld on behalf of

23  certain federally qualified health centers that have been

24  referred to as the AMC Group.  We filed a limited objection

25  and reservation of rights with respect to the Disclosure

1 Statement at docket no. 16988.

2 Your Honor, I'm not going to belabor the arguments

3 made there.  I will note that my clients, as well as certain

4 of the other federally qualified health centers, have been

5 engaged in constructive settlement negotiations with the

6 Oversight Board and AAFAF, and we remain optimistic that an

7 agreement can be reached to resolve our objections to the

8 plan, and actually believe that in the Fifth Amended Plan that

9 was filed by the Oversight Board, there were a number of

10 changes made to the treatment of the med centers and there

11 that are part of those ongoing discussions and are being

12 reviewed by the health centers now in the hopes that we can

13 reach a consensual resolution of our issues and concerns.

14 You know, we raise a number of concerns, Your Honor,

15 in the limited objection with respect to the treatment of the

16 health centers' both prepetition and post-petition claims, as

17 well as the path forward for the Commonwealth's compliance

18 with the Medicaid Act.

19 Again, if we're able to reach resolution of the

20 issues, then we won't be asserting any of those objections to

21 confirmation, but we reserve on those items.  In the interim,

22 the Oversight Board did agree to the inclusion of some

23 language in the Disclosure Statement to resolve our disclosure

24 related concerns.

25 And with that, Your Honor, I will end my

1    presentation.  Thank you.

2              THE COURT:  So for clarity, at this point, in light

3    of the developments so far and your optimism, are you not

4    pressing the Disclosure Statement objections that were offered

5    in your limited reservation of rights?

6              MR. KAHN:  That's a fair characterization, Your

7    Honor.

8              THE COURT:  Okay.  Great.  Thank you very much,

9    Mr. Kahn.

10             MR. KAHN:  Thank you.

11             THE COURT:  Next I have Mr. Steel for the Underwriter

12   defendants for five minutes.

13             MR. STEEL:  Good morning, Your Honor.  Can you hear

14   me?

15             THE COURT:  Yes, I can.  Good morning.

16             MR. STEEL:  Thank you, Your Honor.  For the record,

17   Howard Steel of Goodwin Procter on behalf of Goldman Sachs and

18   Citigroup.  I'm here with my co-counsel, Ivan Llado, of have

19   Morell Bauza Cartagena & Dapena, and my partners, Charles

20   Brown and Stacy Dasaro.  I'll preserve the argument of the

21   Underwriting defendants at large.

22             Your Honor, the Underwriting defendants support a

23   plan, support better financial recovery, and have been a

24   constructive participant in that process.  However, due to the

25   Plan contained provisions, that could be read to improperly

1    impair the Underwriter defendants' ability to defend

2    themselves in certain litigations.  And, unfortunately, the

3    Disclosure Statement says nothing about how these provisions

4    operate.

5         The debtors did say in their supplemental reply that

6    the Plan does not, and the debtors do not intend to limit the

7    rights of, the defenses of the Underwriter defendants in the

8    underwriter actions.  That's good.

9         Judge, we would like to hold them to their word.  We

10   sent them language for the Disclosure Statement and the Plan

11   to preserve the defenses, and requested a conference to try to

12   make some progress, but they never picked up the phone.

13        Instead, in their papers they've cited to what is now

14   Section 89.2(f) of the Fifth Amended Plan, and suggest that

15   that preserves the defenses.  But the Disclosure Statement

16   contains no description how that section operates and its

17   impact on the defense of rights.  And, most importantly, there

18   are numerous gaps in the language, which is not addressed in

19   the Disclosure Statement and the Plan, and these gaps persist.

20   And it's our fear that they could imperil our defenses and

21   confirmation of this plan.

22        So where things stand right now, Judge, there's an

23   absence of disclosure.  There are five deficiencies that I'll

24   identify for the Court as it pertains to the Underwriter

25   defendants and the preservation of the defenses.

1          First, Judge, it doesn't cover certain pending cases

2    against the Underwriter defendants.  Our issue is why is the

3    Plan limiting the preservation of defenses to certain select

4    cases only?  That doesn't make any sense to us.

5          Our second issue is it doesn't cover future cases

6    that might be filed against the Underwriters related to bonds

7    issued by the Commonwealth, its instrumentalities, or its

8    agencies.  Again, the question is why are the debtors limiting

9    the preservation of Underwriter defenses to just a few current

10   cases when there's risks that there could be additional

11   litigation?

12         Our third issue, Judge, is it doesn't cover cases

13   that might be brought by other monoline insurers.  Why are the

14   debtors limiting the preservation of our defenses to only a

15   handful of select monolines identified in the Plan?  That

16   doesn't seem fair or just.

17         Our fourth issue, and this is an important one, it

18   doesn't specifically preserve our right to set off a

19   recoupment which can't be discharged under the Plan.  It

20   doesn't, also, preserve our judgment reduction and allocation

21   of false rights.

22         And this one's really curious, Judge.  They put

23   language in 89.2(f) about preservation of, quote, claims and

24   defenses, but it doesn't have the level of specificity to give

25   us the repose that we need.  Our language properly

1    identifies --

2            (Sound played.)

3            MR. STEEL:  -- the right to self recruitment and an

4    allocation of what is preserved, and we think that's what the

5    Disclosure Statement and Plan should say.

6            And our fifth issue is that it permits plan

7    documents, besides the plan, the confirmation order, and the

8    plan supplement to potentially impair these sets of rights.

9    Here, why are we leaving daylight for gamesmanship where

10   documents other than the plan, the confirmation order, or plan

11   supplement is permitted to repair these sets of rights?  This

12   should be buttoned up.

13           In sum, Judge, we're trying to be constructive and

14   solve the disclosure and confirmation issues consensually.

15   We are willing to work today and tomorrow with the debtors to

16   try to work this out.  However, as it currently sits, the

17   Disclosure Statement doesn't contain adequate information on

18   these issues.

19           The debtors haven't provided a description as to why

20   they think the confines of the plan is sufficient to preserve

21   the Underwriter defendants' defenses, or, alternatively, if

22   they are seeking to -- supporting them on a defense of rights.

23   Until these changes are made, Judge, we think the Disclosure

24   Statement cannot be approved.

25           And unless Your Honor has any questions, thank you.

1              THE COURT:  Thank you, Mr. Steel.

2              Next I have Mr. Carrion for the group of Section 1983

3    Claimants.

4              MR. CARRION BARALT:  Good morning, Your Honor.  Can

5    you hear me?

6              THE COURT:  Yes.  Good morning.

7              MR. CARRION BARALT:  Good morning.

8              Let me say our objection to the Third Amended Plan,

9    and since then a Fourth and a Fifth Amended Plan -- I

10   understand there's no changes regarding the particular issues

11   of the 1983 Claimants, but we preserve the right to make

12   further objections after further reviewing.

13             Let me simply state that the claim the 1983 Claimants

14   had is not against the Commonwealth.  It's against the

15   employees of the Commonwealth in their official capacity.  It

16   was -- it was the Commonwealth that voluntarily intervened in

17   those cases to provide legal representation and to assume

18   payment of any adverse judgment that may come at any future

19   time.  The Disclosure Statement doesn't make any mention

20   whatsoever of these claims, and it apparently makes them fall

21   in the general unsecured classification.  That of course --

22             (Sound played.)

23             MR. CARRION BARALT:  -- means that it would be --

24   they would be receiving less than four percent of the

25   compensation that is awarded if in fact what appears to be the

1    Board's position is -- our position is that if the

2    Commonwealth decides to intervene, they cannot adjustment a

3    debt against a third party, which would be the individual

4    employees in their personal capacity.  Doing so is not allowed

5    by neither bankruptcy laws, nor PROMESA specifically.

6         We are concerned regarding the confirmability of the

7    Disclosure Statement, but it wasn't made clear how much

8    litigation there is and what the policy is going to be

9    regarding these 1983 cases.  Is the Commonwealth going to

10   continue to appear on behalf of them and pay the judgments

11   that may come, or are they simply saying no, we are not?  And

12   in that case, would they allow the cases to continue the

13   regular course?

14        In any case, we think that the Plan cannot adjust the

15   debts of third parties, and, as such, it should be not

16   approved if in fact that is what it portends to do.

17        THE COURT:  Thank you, Mr. Carrion.

18        Next I have U.S. Bank with three minutes for

19   Mr. Whitmore and six minutes for Mr. Silverman.

20        MR. WHITMORE:  Thank you, Your Honor.  Clark Whitmore

21   from Maslon, LLP, on behalf of U.S. Bank as the PREPA Bond

22   Trustee.

23        Can you hear me?

24        THE COURT:  Yes, I can.  Good morning.

25        MR. WHITMORE:  Good morning.

1          Your Honor, U.S. Bank, as the PREPA bond trustee,

2    looks forward to the confirmation of a consensual Title III

3    Plan for the PREPA case, but based on the July 11th status

4    report, it looks like the PREPA plan will not be proposed

5    before the end of 2021, and will, therefore, trail behind the

6    Commonwealth Plan.

7          U.S. Bank filed a limited objection to the approval

8    of this Disclosure Statement based upon the releases and scope

9    of releases in the -- what was then the Third Amended

10   Commonwealth Plan.  And U.S. Bank appreciates the correction

11   and clarification to the Commonwealth Plan stating clearly

12   that PREPA is not giving a release or getting a release of the

13   claims based upon the PREPA bonds.  Thank you very much for

14   that.  But there's still unfortunately a big problem relating

15   to the timing of the two plans.

16         This is because the Commonwealth continues in very

17   generic, broad language to seek prospective releases,

18   discharges, exculpations, injunctions, and bar orders in

19   section 89 of what is now the Fifth Amended Plan.  That --

20         (Sound played.)

21         MR. WHITMORE:  -- will potentially insulate the

22   Commonwealth from all Claims broadly defined, and all Causes

23   of Action broadly defined, up through and even after the

24   effective date of the Commonwealth Plan.

25         And this broad prospective release could include

1    claims and causes of action for misusing its governmental

2    powers in a manner inconsistent with the PREPA Authority Act

3    or the Constitution to indirectly impair the claims of the

4    PREPA bondholders as against PREPA.

5          This type of indirect impairment is an important

6    consideration that the Court should take into account in light

7    of the timing of the two plans, and any risk of that should be

8    appropriately disclosed in the Disclosure Statement so that

9    PREPA bondholders won't be misled into thinking that there are

10   no issues associated with the potential impairment of their

11   claims.

12         U.S. Bank has asked that the bond -- the Oversight

13   Board modify the plans to indicate unequivocally that there's

14   nothing in the Plan or the confirmation order that will

15   release, discharge, or enjoin any claims or causes of action

16   arising from or related to the PREPA bonds.  That has been

17   rejected.

18         And if the Oversight Board and the Commonwealth

19   really intend to seek this Court's protection from the

20   consequences of potential governmental violations of statutes

21   or constitutional provisions related to the PREPA bonds, then

22   they should be required to disclose what they're doing clearly

23   in the Disclosure Statement.  Hopefully that's not the case.

24         As I said, U.S. Bank looks forward to a consensual

25   PREPA plan, and appreciates the complexities that people are

1    facing with the timing of these two plans, and looks forward

2    to finding an accommodation of this issue.  But it shouldn't

3    be lost, and there shouldn't be a risk that PREPA  --

4              (Sound played.)

5              MR. WHITMORE:  -- bondholders will not really know

6    what the score is, because of the categorical nature of the

7    Plan language.

8              Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Whitmore.

10             And I have six minutes for Mr. Silverman.

11             MR. SILVERMAN:  Thank you, Your Honor.  This is Ron

12   Silverman.  Can you hear me well?

13             THE COURT:  Yes, I can.  Good afternoon -- Good

14   morning.

15             MR. SILVERMAN:  Just sneaking in the morning, Your

16   Honor.  Good morning.  For the record, Ronald Silverman from

17   Hogan Lovells US, LLP.

18             As Mr. Whitmore just stated, he represents U.S. Bank

19   with respect to certain PREPA bond issuances.  We separately

20   represent U.S. Bank with respect to other bond issuances.

21             We filed four objections to the Disclosure Statement

22   on behalf of U.S. Bank:  One as fiscal agent for PBA Bonds;

23   one as trustee for PRIFA bonds; one as trustee for PFC bonds;

24   and the fourth as trustee for multiple bonds issued by MFA,

25   PRIDCO, Children's Trust, UPR, and AFICA.

60

1        Your Honor, I'll use my minutes today to focus on

2   four key aspects of these objections.  Some of them, such as

3   the third-party release issue, are common to the objections.

4   Some are specific to certain objections, in particular the PFC

5   bonds objections.

6        The first issue is one that's been addressed to some

7   extent by Mr. Rosen today, and by the FOMB's supplemental

8   response required by Your Honor with respect to the Disclosure

9   Statement.  And that is the clarity or lack of clarity on

10  provisions of the Plan that affect third-party releases either

11  in favor of non-debtor entities and/or given by and imposed by

12  the Plan on non-debtor entities.

13       We do think that such third-party releases are

14  improper, but at today's disclosure statement stage, we focus

15  on the need for clarity.  I will say that we're cognizant that

16  the Fourth Amended Plan, and the FOMB supplement, and perhaps

17  now even the Fifth Amended Plan, although obviously we're

18  still evaluating it, attempted to eliminate such third-party

19  releases.  But, unfortunately, Your Honor, we think that's

20  still not clear.  We've explained briefly why it's not clear,

21  and suggest a way to make it clear.

22       The Board supplement to the Omnibus Reply flatly

23  says, and I quote, the Plan has been revised to clarify, but

24  does not release the non-debtor instrumentalities from claims

25  against or bonds issued by those instrumentalities.

1          And, again, this morning Mr. Rosen said that that is

2     their intent; that the non-Title III debtors, if I understood

3     him correctly, are carved out of the releases; they may have

4     missed one; they'll check.  We think, however, that

5     notwithstanding the statements in the reply, or the

6     supplemental reply, and in today's statements, those

7     statements are not what are in the Disclosure Statement, in

8     the Plan, and it's not clear that those documents say just

9     that.

10         What the Plan and Disclosure Statement do, as

11    incorporated into the Fourth and the Fifth Amended Plan, is

12    they say that certain enumerated non-debtor governmental

13    entities are carved out of the definition of release claims;

14    but those do not carve out other non-debtors, such as the GDB.

15    It doesn't carve out its Public Entity Trust in the DRA from

16    granting or giving releases.

17         There are other corporations that U.S. Bank, as

18    trustee, has claims against, such as MFA, PRIDCO, AFICA, and

19    Children's Trust, that are not carved out; and many other

20    government corporations, including those that made notes that

21    have pledged to US Bank as trustee for the PFC bonds, such as

22    Puerto Rico Solid Waste Authority, Puerto Rico Maritime

23    Shipping Authority, and Hotel Development Corporation.  There

24    are others, and that's just by way of example, but I won't

25    belabor it.

1          The point is that if the intent is that non-Title III

2    debtor entities should be carved out from the releases, they

3    should be clearly carved out.  There's a simple way to do

4    that.  There's a clean way to do that with a stand alone

5    section.

6          In fact, even last night, it does appear that with

7    respect to PREPA, at section 89.2, there was a stand alone

8    section provided which talks about and makes statements about

9    GUC releases with respect to PREPA.

10          So, Your Honor --

11          (Sound played.)

12          MR. SILVERMAN:  -- at this point, we're asking for

13    clarity, and in a simple way to make clear what is being

14    released, at least what third party releases are given, what

15    are granted.  And there ought to be a clean, simple way to do

16    that.

17          A second issue, Your Honor, is whether or not claims

18    by the GDB against the Commonwealth are excluded from

19    treatment under the Plan or they're ignored.  There are claims

20    that appear to be by the GDB in class 60 that were -- the GDB

21    appears to have claims that are both appropriation claims and

22    direct claims.  It's unclear if the non-appropriation claims

23    are addressed in class 55, as a GUC or otherwise.

24          The Fifth Amended Plan appears to have said that the

25    claims by the DRA are not in the GUC class, but it's not clear

1    if that applies just to the DRA claims or claims of the GDB

2    held by the Public Entity Trust, which are the other half of

3    the GDB assets that were split up, if those claims are

4    included in class 55 or not, and if not, are they ignored.

5    And there should be clarity in the Plan on that.

6           Similarly, U.S. Bank has preserved claims against the

7    Commonwealth for breach of its obligations to appropriate

8    funds for notes that are owed to PFZ.  Those claims for

9    breach, in addition to the claims on underlying notes

10   themselves, do appear to be classified, as best we can read

11   it, in class 60 of appropriation claims, but received no

12   distributions.

13          To the extent that the breach claims, again, as the

14   underlying claims themselves, allowed to recover, and cannot

15   be in zero distribution class, and they have to be in their

16   own class, in GUC class 55, because they'd be entitled to

17   distribution.  The Disclosure Statement should clarify this

18   and provide for their classification.

19          The third and the fourth issues, Your Honor, that

20   I'll address briefly --

21          (Sound played.)

22          MR. SILVERMAN:  Your Honor, can we have more time or

23   is that the two-minute warning?

24          THE COURT:  I think that was the --

25          (Sound played.)

1              THE COURT:  Yes, that was the double thing, and so

2     please sum up quickly.

3              MR. SILVERMAN:  I will, Your Honor.  With just one

4     minute, I will sum up.

5              THE COURT:  Thank you.

6              MR. SILVERMAN:  What actions will the debtor seek

7     from the bond trustee, such as U.S. Bank, in connection with

8     the bonds and distributions?  Will the trustee be asked to

9     take on work with respect to distributions?   We clarified

10    that won't be the case with respect to limitation.  However,

11    distribution is not addressed.

12             And will the trustee be asked for work in connection

13    with cancellation of bonds or related matters, payment for

14    these services, exculpation?  These are all customary things

15    that are described usually in plans and disclosure statements,

16    and they are silent on here.

17             And the fourth and last area, what will happen to

18    certain governmental entities after the Plan, if it's

19    approved, particularly as applies to PRIFA and PFC, if PFC is

20    being deprived of funding, with respect to PFC -- and has no

21    money to pay its bonds, what will become of it?

22             Will it be canceled in the Disclosure Statement?

23    What will happen to the other entities?

24             Thank you for the extra time, Your Honor.

25             THE COURT:  Thank you, Mr. Silverman.

1          So, Counsel, at this time we will take our morning

2   break.  It is 11:08 by my clock.  So we will reconvene in ten

3   minutes from now.

4          So that the phone system works correctly, please

5   disconnect, hang up, and call back in in ten minutes, and then

6   we will resume.

7          Thank you very much.  Have a good break.

8          (At 11:08 AM, recess taken.)

9          (At 11:22 AM, proceedings reconvened.)

10         THE COURT:  Good morning.  This is Judge Swain back.

11         So the next party that I have for argument on the

12  Disclosure Statement Motion is PFZ for six minutes by

13  Mr. Carrion and/or Mr. Del Toro Sosa.

14         MR. CARRION BARALT:  Good morning, Your Honor.  David

15  Carrion Baralt again appearing on behalf of PFZ Properties.

16  May I proceed?

17         THE COURT:  Yes.  Good morning.

18         MR. CARRION BARALT:  Good morning, Your Honor.

19         PFZ and several other eminent domain claimants object

20  to the Disclosure Statement for the Third, the Fourth, and the

21  Fifth Amended Plan of Adjustment, because the way it is

22  written, it allows a taking without just compensation, which

23  is unconstitutional under the Fifth Amendment of the

24  Constitution of the United States and the Constitution of

25  Puerto Rico.

1          We saw this morning that the Fifth Amended Plan for

2     the first time addressed a shortcoming that we had identified

3     in the sense that it did not have a number of claims or

4     monetary value for them.  We reserve the right to review them

5     and object to them further along the way.

6          We have included in our objections some language that

7     in our opinion would cure the deficiencies if they are

8     included in a future amended disclosure statement.  As the

9     Court requested that we discuss issues of law that were

10    referred for factual and procedural background, we move the

11    Court to our memorandum of law, which was filed at docket

12    16969.

13         Simply stated, the Disclosure Statement as presented

14    by debtors does not allow for the payment of the just

15    compensation that PFZ and other eminent domain creditors are

16    entitled to.  Instead, PFZ and all other eminent domain

17    claimants without a final order seem to have been included in

18    class 55, which includes all unsecured claims, which,

19    according to debtor's statement, will pay an estimate of 3.8

20    cents on the dollar.

21         PFZ's position is simply that eminent domain claims

22    should be paid in full.  They are simply not subject to

23    impairment or reduction in a bankruptcy readjustment plan.

24    Approving such a disclosure statement would render it and the

25    plan to be unconstitutional.

1          We have argued that -- and we repeated here, that

2    since 1935, the Supreme Court of the United States then by

3    voice of Judge Brandeis, in the case of *Louisville Joint Stock*

4    *Land Bank v. Radford,* stated that Congress may not pass laws

5    under its bankruptcy powers that would effect a taking of

6    private property without just compensation.  Bankruptcy power,

7    like other powers of Congress, is subject to the Fifth

8    Amendment.

9          Afterwards, in the cases of *Blanchette* and the case

10   of *Security Industrial Bank,* the Supreme Court reaffirmed

11   *Radford*.  And more recently, in the case of *In re City of*

12   *Detroit*, the Judge stated that *Blanchette* and *Radford*

13   established that bankruptcy proceedings are subject to the

14   Fifth Amendment; there is a prohibition of public takings of

15   private property without just compensation.

16         The way that the Disclosure Statement is currently

17   written is tantamount of taking without just compensation,

18   and, as such, it remains unconfirmable.  The Court should use

19   --

20         THE COURT:  Do you have -- I'm sorry.  I want to ask

21   you if you have a comment on the *Cobb v. City of Stockton* 9th

22   Circuit decision from 2018 that has been cited by the

23   Oversight Board, which makes a distinction between a Takings

24   Clause, where there is still some right in the property, and a

25   Takings Clause claim that has been reduced to or consists of a

1    claim for money holding that the money claim can be adjusted.

2          MR. CARRION BARALT:  Our view of the case of *Cobb* is

3    that this is differential to the case facts.  *Cobb* was decided

4    by a slim majority of two to one on procedural grounds,

5    equitable mootness --

6          (Sound played.)

7          MR. CARRION BARALT:  -- because a person on a

8    particular case had allowed too much time to lapse and lost

9    his cause of action under California law.  And there is a case

10   we understand has the correct arguments, and it addresses Your

11   Honor's concerns regarding the particulars of the way in which

12   that case was presented.

13         It is something that is the only precedent, and it is

14   contrary to what has been decided in other cases, particularly

15   in the case of *Detroit*, whereas, you know, no such distinction

16   was made, and in our opinion, all eminent domain claims, be

17   them by inverse condemnation or direct quick take provisions,

18   they are all, you know, subject to the Fifth Amendment and the

19   full, just compensation should be paid.

20         Most probably, sister counsel Fullana or Eduardo

21   Capdevila will talk in a little more detail regarding that

22   later, but our position is that *Cobb* was wrongly decided, and

23   the dissent should have been the majority opinion.

24         Did I answer your question, Your Honor?

25         THE COURT:  Yes, you did.

1          MR. CARRION BARALT:  Okay.

2          THE COURT:  And you may continue.

3          MR. CARRION BARALT:  Again, the way the Disclosure

4    Statement is written is tantamount to a taking without just

5    compensation.  We ask the Court to use its powers under 11

6    U.S. Code section 944 to order the non-dischargability and

7    non-impairment of these claims.

8          Subject to your questions, that's my presentation.

9          THE COURT:  Thank you very much.  I have no further

10   questions for you.

11         So we will turn to counsel for Finca Matilda.

12         MR. CAPDEVILA DIAZ:  Good morning, Your Honor.  For

13   the record, Eduardo Capdevila on behalf of Finca Matilda.

14         THE COURT:  Good morning, Mr. Capdevila.

15         MR. CAPDEVILA DIAZ:  Yes.  Before I start my

16   presentation, I would like to thank counsel for Amador --

17   Alexis Amador, Inc., and the other counsel, the other eminent

18   domain claimant that yielded its minutes so that we could use

19   our panel time allocation more efficiently.  So I just wanted

20   to make clear on the record that they did not waive their

21   right.  They just yielded their minutes, so I could prosecute

22   like common issues more expediently and use the Court time

23   more -- not be repetitive.

24         THE COURT:  I appreciate that.  So what we'll do is

25   start your six minutes now.

1          MR. CAPDEVILA DIAZ:  Okay.  First, we would like to

2     address the same -- the question that the Court made to

3     Counsel Carrion, the issue that -- the *Cobb* issue.

4          THE COURT:  Yes.

5          MR. CAPDEVILA DIAZ:  Like Counsel Carrion said, it

6     was wrongly -- first, it was decided on a procedural matter,

7     equitable mootness.  That is not the case here, at least for

8     Finca Matilde.

9          Secondly, the *Cobb* case was decided right before the

10    *Knick v. Township of Scott* was decided by the Supreme Court as

11    recently as 2019.  In the *Knick* case, the Supreme Court stated

12    that claimant's right to just compensation is irrevocable, and

13    it's not subject to any post-petition remedy which state law

14    may provide.

15         So the fact that it is reduced to -- an award for

16    just compensation is reduced to a monetary award does not mean

17    that it is dischargeable or that it can be otherwise impaired

18    like a contractual claim.

19         THE COURT:  So may I ask you, so you don't read *Knick*

20    as going primarily to when a takings claim accrues?  You read

21    *Knick* as defining an irreducible, unchangeable quantum of a

22    takings claim as of the time of the taking of the property?

23         MR. CAPDEVILA DIAZ:  Well, I think that *Knick*

24    encompasses much more than when does it accrue.  It also

25    encompasses as to can it be modified, because when *Knick*

1    reached the Supreme Court, there was the *Williams* case that

2    sometimes impaired Takings claimants from going to Federal

3    Court because of post -- post-taking remedies in state court.

4          And the *Knicks* case makes it clear that it doesn't

5    matter post remedy -- what post-taking remedy those creditors

6    have.  It is still irrevocable, and they still have a claim

7    that cannot be revoked or otherwise changed.  That's our

8    reading.

9          THE COURT:  Thank you for making that clear.

10          MR. CAPDEVILA DIAZ:  Does that answer your question?

11          THE COURT:  Yes, it does.  Thank you.

12          MR. CAPDEVILA DIAZ:  For example, the Board also

13    alleges, in bankruptcy court, Section 1983 claims can be

14    modified.  But takings under the Fifth Amendment are not just

15    any Constitution -- it's not a claim for a violation of a

16    Constitution -- it is a just remedy award.  For example, if we

17    compare a violation to the First Amendment, let's say the

18    government violated a First Amendment right, in lieu of that

19    violation, creditors have a right to seek damages.  But the

20    First Amendment, nor the Second Amendment, nor the Fourth

21    Amendment provide a condition.  It just gives a command to the

22    Congress that you cannot enact law to forbid free speech or

23    association.

24          The Fifth Amendment gives the right and the remedy.

25    The Fifth Amendment states that no taking will be made without

1    just compensation.  Just compensation is precisely the

2    constitutional right the taking claimants are seeking.  To

3    confirm -- to confirm a plan, or to even go proceed to

4    confirmation with a plan that specifically seeks to impair

5    that just compensation will never be legal in our position,

6    because the just compensation is part of the Constitution.

7         Now, that --

8         (Sound played.)

9         MR. CAPDEVILA DIAZ:  That was one of the issues we

10   presented.  The other issue we presented is the classification

11   issue.  The Third, Fourth, and Fifth Amendment seek to make an

12   artificial distinction between direct taking claims and

13   indirect takings or direct takings.  Yet it does not establish

14   or disclose why such distinction is made, because the legal

15   foundation of both takings is exactly the same, the Fifth

16   Amendment.

17        So the fact that circumstantially or factually

18   speaking, direct and indirect takings can -- are different, is

19   not a reason to make a different classification for

20   distribution purposes under the PROMESA or the Bankruptcy

21   Code.  And why are we raising those issues in the Disclosure

22   Statement?  Because that makes the Disclosure Statement

23   patently unfeasible.

24        If we go through the hurdle of approving the

25   Disclosure Statement, then waiting for the confirmation

1   hearing so that these issues can be resolved, then that would

2   lead us back to the Disclosure Statement.

3          The actual Disclosure Statement has taken the Board

4   four years.  Of course, this is a big case, and lots of

5   credit, and it's a complex case.  That is why these issues

6   need to be addressed at disclosure statement.

7          And unless the Court has any other questions, that

8   will be our presentation.

9          THE COURT:  Thank you very much, Mr. Capdevila.

10         I will now turn to counsel for Suiza Dairy.

11         MR. GONZALEZ VALIENTE:  Yes.  Good morning, Your

12   Honor.  Attorney Rafael Gonzalez Valiente for the record in

13   representation of Suiza Dairy, Inc.

14         THE COURT:  Good morning, Mr. Gonzalez.

15         MR. GONZALEZ VALIENTE:  Can you hear me?

16         THE COURT:  Yes, I can.

17         MR. GONZALEZ VALIENTE:  Yes.  Thank you.

18         As I said, good morning.  First, I would like to ask

19   the Court to admit into evidence our exhibits which were

20   submitted in accordance with the Court's Order, as can be

21   found at docket 17213 and 17210.  They show the constitutional

22   nature of Suiza's claim as a regulatory taking by the

23   Commonwealth of Puerto Rico.

24         THE COURT:  I will consider those exhibits as part of

25   your --

1          MR. GONZALEZ VALIENTE:    Thank you, Your Honor.

2          THE COURT:   Thank you.

3          MR. GONZALEZ VALIENTE:    For a disclosure statement to

4    be approved, it needs to provide not only sufficient

5    information for an average trader to be informed, to be in a

6    position to vote on the Plan of Adjustment, but it also needs

7    to provide accurate information.

8          As amply discussed already, if a plan is patently

9    unconfirmable for whatever reason, the disclosure statement

10   should not be approved.  There are multiple objections to the

11   approval of the Disclosure Statement and a myriad of issues.

12   Our objection, like the two preceding parties before us, is

13   for the fact that the plan is trying to impair Suiza's

14   constitutional claim for a regulatory taking.  It cannot do

15   that.

16         The proponents argue that the Disclosure Statement

17   provides sufficient information, and that it should be

18   approved, in an attempt to punt all objections to the

19   confirmation stage.  Although we admit that some issues

20   conceivably could be addressed at confirmation, the problem is

21   two-fold.  Not all objections that are raised are to the

22   adequacy of the plan.  And, two, and this is the important

23   one, the sheer number of objections which do go to the

24   adequacy of the plan of adjustment.  And let me explain.

25         If the only confirmation issues, quote, unquote, were

1    dischargeable of the daily producers claims, then the plan

2    proponent's argument could possibly prevail.  But that's not

3    the situation here.  There are a very substantial number of

4    objections to the treatment of claims:  How much the claims

5    are going to be paid; classification of those claims; the

6    dischargeability of claims; and that's in addition to other

7    objections as to general lack of information or the releases.

8         It is that large number of objections that makes the

9    Disclosure Statement deficient. It does not provide

10   sufficient, correct information on the Plan of Adjustment and

11   the treatment of plans for the -- for it to meet the adequacy

12   of information standard.

13        The Plan -- the Plan does not even provide

14   information of what does a --

15        (Sound played.)

16        MR. GONZALEZ VALIENTE:  -- information of the plan

17   are, or what would happen if those objections are granted, or

18   how the plan would be feasible if those objections are

19   granted.

20        For example, if the -- if all the takings claims have

21   to be paid a hundred percent, is the plan feasible?  Would

22   other classes be impaired in as much they would receive

23   substantially less amount of money?

24        Those are questions that have to be answered now, not

25   in confirmation, because if not, the Disclosure Statement

1   simply does not provide sufficient information.

2         As to Suiza Dairy's specific claim, the objection is

3   simple.  Its claim's protected by the Takings Clause of the

4   Constitution.  As brother counsel stated, it may not be

5   impaired.  The Plan proponents say that it can be impaired and

6   compared to Section 1983 claims.  We agree with the conclusion

7   that 1983 claims may not be -- may be impaired because they

8   are created by law.

9         On the other hand, takings claims may not be

10  impaired.  The Constitution itself indicates that the

11  government needs to provide just compensation for the taking.

12  It simply cannot confirm a plan that states takings claims may

13  be impaired, Your Honor.

14        If you have any questions, Your Honor?  If not, that

15  would conclude my presentation.

16        THE COURT:  Thank you very much, Mr. Gonzalez

17  Valiente.

18        The next person I have on my list is counsel for VTM.

19        MS. MARCARI:  Good morning, Your Honor.  This is

20  Wendy Marcari.  Can you hear me?

21        THE COURT:  Yes.  Good morning.

22        MS. MARCARI:  Thank you.  For the record, Wendy

23  Marcari of Epstein Becker & Green, together with my

24  co-counsel, Gerardo Carlo-Altieri, on behalf of Vaquería Tres

25  Monjitas, Inc., which you did and I will refer to as VTM.

1          A moment of context, Your Honor.  VTM and Suiza

2    Dairy, who you just heard from, are the only two fresh milk

3    processing plants in Puerto Rico.  The dairy industry in

4    Puerto Rico was highly regulated.  It is essential to the

5    Puerto Rican economy and to the health and well-being of its

6    citizens.

7          We heard today, and we know that the Fifth Amended

8    Plan includes many negotiated settlements with the Oversight

9    Board and AAFAF.  And VTM similarly hopes to reach a

10   consensual resolution of the treatment of its claim.  We have

11   initiated those discussions, and we hope to continue them and

12   come up with a negotiated resolution, but as of today, there

13   is no such resolution.

14         And, therefore, our objection, similar to the

15   objection of Suiza and the eminent domain creditors that

16   you've just heard from, is that the Disclosure Statement is

17   deficient, because it provides that the claims are

18   dischargeable.  But in this case, the claim of VTM arises from

19   a regulatory taking in violation of the Constitution, which is

20   not dischargeable.  So the Disclosure Statement, it contains

21   inadequate information.  The Plan is not confirmable, and it

22   should not be approved.

23         We also note that the amount of the claim of VTM,

24   which was approximately 20 million dollars as of the petition

25   date, is reflected in the Disclosure Statement as 17 million.

1          The Oversight Board in its reply says that the

2     dischargeability issue is not an impediment to confirmation

3     because they, by amendment to the Plan, or the Court, can

4     simply accept those claims from discharge.  We disagree.  We

5     think that's a demonstration that the Plan itself is not

6     confirmable, it is patently unconfirmable.

7          And as the other counsel have said, there's been no

8     showing that the Plan would be feasible if it was amended to

9     make these nondischargeable claims nondischargeable -- or to

10    provide for payment in full of those claims.  And so for those

11    reasons, VTM submits that the Disclosure Statement does not

12    contain adequate information for creditor -- creditors to make

13    an informed decision regarding their vote on the plan.

14         And I'd like, if possible, to reserve whatever

15    remaining time we have for VTM, to the extent that other

16    objections or concerns are raised that relate to the treatment

17    of VTM's claim under the plan.

18         THE COURT:  I am not precisely sure how much time

19    that would be, but I hear you.  So thank you very much.

20         MS. MARCARI:  Thank you.

21         THE COURT:  So next is Altair Global Credit by

22    Mr. Rosenblum for two minutes.

23         MR. ROSENBLUM:  Thank you.  Benjamin Rosenblum from

24    Jones Day on behalf of certain GO bondholders.

25         Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. ROSENBLUM:  One thing I believe we've resolved,

3  our issues with the Oversight Board with the ERS stipulation,

4  which is appended to the Disclosure Statement.  We did file a

5  reservation of rights with respect to the Disclosure

6  Statement.  We also wanted to note that we were seeking

7  certain clarifications from the Oversight Board.  Through

8  subsequent drafts of the Disclosure Statement, those issues

9  have generally been addressed.

10         We do have some items in the Plan that I think we are

11 still seeking to have addressed with respect to consistency

12 between the Plan and the ERS stipulation.  I anticipate those

13 issues will get cleared up.  And they do not pose an

14 impediment for the work for today.  But I did want to note for

15 the record just to make clear that we aren't intending to

16 waive anything with respect to plan issues, if any.

17         So for clarity, we do not object to approval of the

18 Disclosure Statement, and reserve for another day on any plan

19 issues that may arise.

20         Thank you, Your Honor.

21         THE COURT:  Thank you very much.

22         And next on my list is the Retiree Committee for

23 three minutes.  Mr. Gordon, are you there?  Remember to unmute

24 on both your phone and the Court Solutions dashboard, please.

25         Mr. Gordon?  I still can't hear you.

1          Ms. Ng, is Mr. Gordon showing on the dashboard?

2          MS. NG:  I just unmuted him.

3          Mr. Gordon?

4          MR. GORDON:  Yes.  Can you hear me?

5          THE COURT:  Oh, yes.  Very good.  I can hear you now.

6          MR. GORDON:  I'm sorry, Your Honor.  My computer went

7     dark at the wrong time here essentially.

8          THE COURT:  I hate it with when that happens.

9          MR. GORDON:  I hate it even more, I guess.  So I

10    apologize.  Your Honor, Robert Gordon of Jenner & Block on

11    behalf of the Official Retiree Committee.

12         Your Honor, in our limited response filed on June 15,

13    the Retiree Committee articulated certain concerns that

14    pertain specifically to the Disclosure Statement and plan that

15    we believe needed to be addressed at this juncture in the

16    process, and then other concerns that pertain more

17    specifically to the plan solicitation procedures.

18         We are slotted in the Agenda to address the Court

19    under the Disclosure Statement section and not the

20    solicitation procedures section.  So if it please the Court,

21    we will address both sets of issues, and the resolutions we

22    have reached with the debtors at this time on all of that, if

23    that's okay.

24         THE COURT:  That's fine.

25         MR. GORDON:  Thank you.

```
 1              We have been working through the Retiree Committee's
 2    concerns with the debtor's counsel and advisors for the better
 3    part of two months, and we thank them for the collaboration in
 4    resolving these matters on a consensual basis.
 5              The first issue of concern, Your Honor, is a proposed
 6    classification of retiree claims.  The Third Amended Plan
 7    contemplated all retirees being lumped into one massive class,
 8    including retirees who participated in each of the three
 9    retirement systems, and retirees whose monthly retirement
10    benefits are above and below the monthly benefit threshold for
11    experiencing any benefit reductions.
12              We disagreed with this classification scheme on
13    several grounds.  The primary concern was to ensure that each
14    distinct class of retirees was not diluted --
15              (Sound played.)
16              MR. GORDON: -- and deprived of their voting voice by
17    being lumped in with other retirees.  For example, the retired
18    judges are less than 500 in number, compared to more than
19    40,000 teacher retirees who participated in the TRS system and
20    125 who are ERS retirees.
21              Also, of the TRS and ERS retirees, approximately
22    120,000 combined are not supposed to receive any reduction to
23    the retiree benefits, and as such, they are not impaired and
24    should not be required to vote, and should not vote in a
25    combined class with those who are impaired.
```

1           So we agreed to organize these claims into six

2   classes, a line on ERS, GRS and TRS line, and then above and

3   below the threshold.  And, again, we thank the debtors for

4   their cooperation in resolving this very important issue.

5           The other category of primary concerns of the Retiree

6   Committee arises from the fact that both the sheer amount of

7   information in the Disclosure Statement and Plan and other

8   documents that compose the solicitation package, and in some

9   cases how that information is presented has a potential to

10  confuse and frustrate retirees.  They likely have no previous

11  experience with the bankruptcy system at all, much less this

12  case and complexity.

13          These charges are quite unique to our constituents

14  and require special attention.  Consequently, many retiree

15  committees requested modification to simplify for the retirees

16  the information of how the Plan is supposed to modify retiree

17  benefits and how to access the voting process.

18          These changes will help ensure that those retirees

19  entitled to vote understand the process and are able to submit

20  a proper and timely ballot.  Again, we are pleased to report

21  resolution of those matters.

22          First, the debtor has agreed to issue a very simple

23  and straightforward notice of nonvoting status to all retirees

24  in the ERS below threshold classes.  This is very important.

25  Our Plan Support Agreement protects 74 percent of all current

1    retirees in any reductions in the retirement benefits, but

2    there appears to be much confusion in the retiree community

3    regarding this.  This notice will provide clarity and comfort

4    --

5              (Sound played.)

6              MR. GORDON:  Recently again -- Your Honor, I

7    apologize.  I believe the clock started before I even got

8    started here.  May I have a few seconds more to finish my

9    comments?

10             THE COURT:  Yes.  Yes.

11             MR. GORDON:  Thank you so much.

12             So the debtors also agreed to include in the

13   solicitation packages to holders of retiree claims a plan

14   support letter and a plan information sheet prepared by the

15   Retiree Committee.  And we ask the Court to approve the form

16   of these documents pursuant to Section 1125(d) of the

17   Bankruptcy Code as made applicable by PROMESA.

18             The plan support letter explains in a very clear,

19   concise, and accessible manner how the Plan proposes to treat

20   retiree claims, why the Retiree Committee supports the Plan,

21   and provides retirees with an overview of the voting process.

22   The information sheet provides similar information in a

23   one-page document, front and back, that relies heavily on

24   graphics to provide both visual and textual explanations that,

25   again, are very accessible.

1          The Retiree Committee felt it was very important also

2     to have the ballot be just one page and devoid of any

3     unnecessary and, frankly, intimidating legalese.  Working with

4     the debtor, the Retiree Committee has achieved a form of

5     ballot that meets our requirements.  We have also reached

6     agreement on a form of voting instructions for retirees.

7          We submit that these documents, along with the plan

8     support letter and information sheet, are extremely important

9     to encouraging and facilitating retiree participation in the

10    plan voting process.  The debtor has generally agreed to

11    revise voting and confirmation notice publication dates to

12    being strategically scheduled during the voting period of the

13    Plan, and to provide more radio spots, as requested by our

14    communications advisors.

15         The Retiree Committee was also concerned that the

16    original proposed set of drop-off sites for hand delivery of

17    ballots was not sufficiently comprehensive to ensure a

18    reasonably convenient location for retirees across Puerto

19    Rico.  Working with the debtor and specifically Prime Clerk,

20    Prime Clerk has identified two additional sites, one each in

21    Arecibo and Fajardo.  With these additional sites, our

22    concerns in this regard are resolved.

23         Two other last points, Your Honor.  The plan

24    solicitation procedures motion contemplated giving equal

25    weight to all retiree claims.  We believe it's being proposed

1    out of a concern for logistical challenges in calculating the

2    amount of each retiree claim.  However, we were concerned that

3    to not provide a weighted vote based on the size of each claim

4    would not be consistent with the provisions of the Bankruptcy

5    Code.

6            In conversations between the advisors of the Retiree

7    Committee and the debtor, including the actuaries, we were

8    able to resolve the issue in this regard.  So now ballots will

9    be tabulated on a proper weighted basis, based on the largest

10   size of retiree's monthly pension benefit.

11           Consistent with our plan support agreement and our

12   duties to our retiree constituents, the Retiree Committee

13   intends to also disseminate information to retirees through

14   various methods that include the Retiree Committee's website,

15   social media, direct mailings, radio and printed media, phone

16   banks, and in-person meetings to explain the voting process,

17   et cetera.

18           And we have asked that that process, those

19   activities, also be generally approved under Section 1125(d),

20   and the debtor has kindly amended the order to address this.

21   There are obviously new issues that may arise as a result of

22   the Fifth Amended Plan that was just filed yesterday, and we

23   have not yet been able to digest that.  And we reserve our

24   rights with respect to such issues.

25           With that, Your Honor, the Retiree Committee's issues

1    have been addressed and resolved at this juncture.  Thank you

2    for your time.

3            THE COURT:  Thank you, Mr. Gordon.

4            So there's -- I'm hearing an echo of my own voice

5    now.  So maybe whoever's not muted could mute.

6            So the Agenda is set up to anticipate that we would

7    have reached the pro se objectors at this point.  They have

8    been instructed to come and be ready for two o'clock.

9            So what I will do is skip over them, and return to

10   them immediately after the lunch break, but go on with other

11   arguments for now.  So I'm going to turn to the supporting

12   party statements, the first of which would be for Assured.

13           MR. NATBONY:  Thank you, Your Honor.  This is William

14   Natbony from Cadwalader Wickersham & Taft on behalf of

15   Assured.  Can you hear me all right?

16           THE COURT:  Yes, I can, and good morning.

17           MR. NATBONY:  Good morning.  Thank you very much.

18           So Assured wishes to speak briefly this morning

19   primarily to confirm the appropriate scope of this hearing as

20   relates to certain issues that were raised by the DRA parties

21   in their written disclosure statement objection.

22           As the Court knows, the DRA parties take certain

23   substantive positions with respect to their purported priority

24   and claim to certain HTA revenues.  The monolines, including

25   Assured, disagree with the DRA parties, and assert that their

1    positions have no merit, as the DRA parties are subordinated

2    under the relative loan documents.

3            Yet, Assured and the DRA parties do agree on one

4    thing, that this hearing is not the appropriate time or place

5    to address those priority arguments.  And we have accepted,

6    prior to this hearing, the DRA parties' commitment not to

7    argue these matters to the Court today for determination.

8            We've also agreed that the gating standing issues

9    that were raised in our written submission are more

10   appropriately addressed as part of confirmation.  This Court

11   previously recognized in the context of the COFINA proceedings

12   that with respect to approval of a disclosure statement, the

13   issues are, quote, "simply whether the proposed disclosure

14   statement, as amended, provides information sufficient to

15   permit a hypothetical creditor or investor to make an informed

16   judgment about the proposed plan."

17           Thus, it is our view that objections related to the

18   legality of plan provisions or the economic treatment of

19   creditors under the plan would not properly be before this

20   Court for this hearing.  The DRA parties' priority arguments

21   do not fall within that limited purpose, and, thus, both the

22   DRA parties and Assured are requesting that the Court not

23   reach those priority issues as part of this limited hearing.

24           I should note that the DRA parties and Assured do

25   disagree about with what mechanism, outside this hearing, the

1    priority subordination issues should be addressed.  And while

2    that issue is not before Your Honor today, we do believe the

3    DRA parties' recently filed adversary proceeding raising those

4    issues is subject to being stayed under Your Honor's March 10,

5    2020, order following mediation, and, in any event,

6    dismissible on its face.  We believe the priority issues can

7    and should be addressed as part of confirmation.

8           In addition to the priority issues, the DRA parties

9    raise a number of additional arguments that are labeled by

10   them as Disclosure Statement objections, when in reality some

11   of those arguments address the economics or reasonableness of

12   the HTA, CCDA, PSA, or the Plan, which we expect will be

13   subject to future confirmation proceedings.

14          As with the priority issues, Assured believes these

15   issues are more appropriately addressed in the context of

16   confirmation and the corresponding factual and legal review of

17   the Plan.  And, indeed, in its Omnibus Response, which is at

18   docket 17187 in Exhibit A, the Board has indicated its

19   intention and ability to address and rebut each of these in

20   the other DRA raised arguments as part of the confirmation

21   process.  So Assured joins the Board's view that such

22   arguments can and should be addressed as part of the

23   confirmation process.

24          Unless the Court has further questions, Assured would

25   yield the rest of its time to the Board, if possible.

1          THE COURT:  Thank you.  So we'll turn now to

2     National.

3          MS. DIBLASI:  Good morning -- good afternoon, Your

4     Honor.  Kelly DiBlasi from Weil Gotshal & Manges on behalf of

5     National Public Finance Guaranty Corporation.

6          National supports --

7          THE COURT:  Good morning.

8          MS. DIBLASI:  Thank you, Your Honor.

9          National supports approval of the Disclosure

10    Statement.  We filed jointly with Assured a response to the

11    objections raised by the DRA parties.  In this regard,

12    National joins and supports the comments made this afternoon

13    by Mr. Natbony on behalf of Assured, as well as the filed and

14    to be argued responses to the DRA parties by the Oversight

15    Board.

16         The DRA parties raise issues to be addressed at

17    confirmation, none of which we think have merit, and none of

18    which warrant denial of approval of the Disclosure Statement.

19         Unless the Court has questions, I have nothing

20    further, and would yield the remainder of my time to the

21    Oversight Board's counsel.

22         Thank you, Your Honor.

23         THE COURT:  Thank you, Ms. DiBlasi.

24         I have been informed that Mr. Hein, who is one of the

25    pro se objectors, is on the line present now.  So if Mr. Hein

 1   would like to proceed at this point, I would invite him to

 2   unmute and say so.  We have allotted him eight minutes.

 3            MR. HEIN:  Yes, Your Honor.  Peter Hein.  Can you

 4   hear me?

 5            THE COURT:  Yes, I can.  Good afternoon, Mr. Hein.

 6            MR. HEIN:  Thank you.  I will address several key

 7   disclosure points focusing on information that was not

 8   available before the June 15 deadline for objections as not

 9   discussed in my --

10            (Whereupon the San Juan courtroom was disconnected

11   from the hearing.)

12            (Whereupon the San Juan courtroom reconnected to the

13   hearing.)

14            COURT REPORTER:  The last I heard was Mr. Hein

15   saying, "I will address several key disclosure points focusing

16   on the information that was not available before the June 15

17   deadline for objections as --" and then we were dropped from

18   the hearing, Your Honor.

19            THE COURT:  Very good.  So welcome back, San Juan.

20            Thank you, Ms. Wallace.

21            And, Mr. Hein, we've reset your time to zero.  So if

22   you will begin after that introductory portion of your

23   remarks, we're ready.

24            MR. HEIN:  Thank you.

25            So virtually none of the disclosure deficiencies I've

1   raised have been addressed, including not in what was filed

2   last night.  I continue to press my objections in docket no.

3   16908, 16977, but there was one limited change that the

4   Oversight Board did make.

5          My objection noted that the exhibit to the Disclosure

6   Statement that was supposed to show the particulars of what

7   bondholders would receive, such as maturities, principal

8   amounts, and interest rates did not have that information.

9          The Oversight Board has acknowledged an error.

10  They've added a cross-reference to Exhibit I to the Plan, but

11  even Exhibit I to the Plan does not provide all of the

12  information that needs to be disclosed.

13         There is still no straightforward disclosure in the

14  Disclosure Statement itself, or even Exhibit I, that

15  individual investors will be getting bits and pieces of at

16  least 13 different splintered fragments for every single

17  position they currently own.

18         In my case, for example, I'd be getting 78 splintered

19  fragments, and still no disclosure anywhere of what securities

20  will be issued in the 13 or more fragments that shows a

21  breakdown of the par amount coupon and maturity for a

22  hypothetical bondholder with, say, a 100,000 par position or

23  some other round number.

24         My objection provided a form of chart that could

25  easily have been prepared and included in the Disclosure

1  Statement of that set docket 16908, page 26 of 178.  The

2  specifics concerning the 13 or more fragments is highly

3  material to individual investors.  The proposed exchange in 13

4  splintered fragments for every single position destroys

5  marketability for individual investors, creates an accounting

6  and tax nightmare.

7       Also, in scanning the sections concerning what

8  bondholders will receive and what was filed last night, I see

9  new mistakes.  The July 12 Disclosure Statement, docket 17308

10  in the middle of page 46 of 615, refers to plan section 74.1

11  through 74.4 in a discussion of what may happen depending upon

12  future IRS or bond consult determinations.

13       But when one turns to those sections of the Plan, one

14  finds provisions relating to the time and manner of

15  distribution, provisions that do not appear to have anything

16  to do with the discussion in the Disclosure Statement on page

17  46 of 615.

18       Second, there's no disclosure of whether all new

19  general obligation bonds issued will be tax exempt and, if

20  not, why not.  The Disclosure Statement provides no

21  information regarding whether a ruling has been or is being

22  sought from the IRS in -- it's docket 17308, page 575 of 615.

23  The Oversight Board simply says the tax status of the new GO

24  bonds has not been determined as of the date of the Disclosure

25  Statement.

1        Then at page 570 of 615, they say, as of the date of

2    this Disclosure Statement, no ruling has been requested from

3    the Internal Revenue Service as to any aspect of the Plan.

4    Well, the Oversight Board knows if it's been in contact with

5    the IRS or if it plans to be.

6        We should not have a repeat of the COFINA situation

7    where the IRS ruling request was made after the date of the

8    Disclosure Statement, and the information was withheld until

9    after the confirmation hearing until just the eve of the

10   effective date.  Disclosure of federal tax consequences is an

11   express statutory requirement of 11 U.S.C. 1125(a).

12       Third, the blatantly revealed 2018 audited financials

13   disclosed two weeks ago, and a cash report disclosed last week

14   revealed that Puerto Rico right now could pay all, all past

15   due interest and principal on its GO and GO guaranteed debt,

16   and still have about four billion left over.

17       I refer Your Honor to note 3-D on page 101 of the

18   2018 financials.  It shows that as of May 31, 2021, six weeks

19   ago, the total past due Commonwealth and PBA principal and

20   interest was 6.8 billion.  The cash report released last week

21   shows over 11.5 billion in unrestricted cash on hand in the

22   TSA account.

23       When one does the math, as I said, Puerto Rico could

24   pay all past due principal and interest on its constitutional

25   debt today and still have almost four billion left over.

1    These facts need to be in the Disclosure Statement.

2           Fourth, the Plan provides potentially multibillion

3    dollar added payments to public employees in the form of

4    so-called upside participation bonuses and the restoration of

5    pension benefits, even while not paying its constitutional

6    debt.  I discuss the specifics in my papers, docket 16908,

7    page 15 to 20 of 178.  The provisions in question remain in

8    what was filed last night.

9           The Disclosure Statement needs to disclose what the

10   dollar amount or range of dollar amounts of these payments

11   could be.  New information revealed in the last two weeks

12   indicates that when one plugs the numbers into the excess cash

13   flow calculation that's used to calculate these bonuses for

14   public employees and added pension benefits, that the Plan

15   could pay out literally billions of dollars a year for

16   multiple years as bonuses or restored pension payment to

17   public employees and retirees.  So item one of new

18   information --

19           (Sound played.)

20           MR. HEIN:  -- the belatedly released audited

21   financials, it shows that there was, in 2018, a 3.7 surplus

22   before debt service.  This was over one billion more than the

23   Oversight Board had projected back in 2018.

24           Second, we learned last week of the cash flow filing

25   that I mentioned, and it showed a surplus for 2021 of 3.8

1     billion, running 1.7 billion ahead of plan.

2          Third, there was a bipartisan agreement announced

3     last week that Puerto Rico is purportedly going to get like

4     2.6 billion per year more for Medicaid, which is not factored

5     into the latest fiscal plan.

6          There needs to be a forthright disclosure of the

7     potential multibillion dollar added bonus and restoration of

8     pension payments that the Plan provides for, and the specifics

9     of how these calculations are made has to be spelled out.

10         There also needs to be spelled out -- and I've

11    provided proposed charts -- comparative charts that show

12    exactly what the bondholders are owed and what they're

13    receiving, apples to apples.  What the public employees and

14    retirees are owed and receiving.

15         And this needs to be factoring in the fact that

16    pensions and payments to public employees have been made

17    regularly throughout this process, whereas not a penny has

18    been paid in principal or interest on the constitutional debt.

19    And there needs to be an apples to apples quantification of

20    this.

21         In addition, the fact that there's potentially

22    billions of dollars going out the door in these potential

23    bonuses to public employees, if you believe the Oversight

24    Board's forecast, while there's going to be cash available the

25    next few years, they are projecting that Puerto Rico will go

1  into a deficit position somewhere between 2026 and 2036 prior

2  to the bonds being repaid.

3            (Sound played.)

4            MR HEIN:  So you have a big specter from the

5  bondholder point of view of billions going out the door now

6  with deficits being projected.  All of this needs to be

7  candidly disclosed.

8            Again, Your Honor, I have another minute.  I ask Your

9  Honor if you'll indulge me or --

10           THE COURT:  I need you to wrap up now.

11           MR. HEIN:  Okay.

12           THE COURT:  You're at eight minutes.

13           MR. HEIN:  Yes.  The bottom line is there needs to

14  be, and I provided in the objection, the apples to apples

15  comparative disclosures that need to be made.

16           In addition, I have spelled out how not only apples

17  to apples, but the public employees and the retirees, but also

18  apples to apples to those who have the opportunity for the 50

19  state election or the taxable election where Puerto Rico

20  residents can elect just one bond as opposed to 13 fragments,

21  and the comparison with those who get something beyond what

22  other bondholders with the same bonds get.

23           And with that, Your Honor, I thank you for your time,

24  and refer Your Honor to my objections, 16908 and 16977.  And I

25  rest on those for my additional points.

1            Thank you, Your Honor.

2            THE COURT:  Thank you very much, Mr. Hein.

3            So I have agreed to defer the movants' -- the

4   Oversight Board's -- reply remarks on the Disclosure Statement

5   until after we know whether there will be argument of Ambac's

6   objections.

7            So in the time remaining before the lunch break, I

8   would like to turn to the arguments on objections to the

9   solicitation procedures.  So that is item II of the Agenda, I

10  believe, and I -- the Agenda has us starting with the UCC.

11           MR. DESPINS:  Good afternoon, Your Honor.  Luc

12  Despins with Paul Hastings on behalf of the Committee.

13           Same point, Your Honor, is that we're not pushing our

14  objections given the settlement.  I wanted to just say, Your

15  Honor, that we filed this morning an informative motion

16  attaching a proposed letter to be sent to our constituents

17  supporting the Plan.

18           I assume we would handle that tomorrow when I assume

19  you'll have other comments to the Disclosure Statement and all

20  of that, and the orders, and we can address it at that time.

21  So I wanted to make sure that Your Honor had seen that,

22  although it was filed, you know, probably just before the

23  hearing.

24           THE COURT:  I did see it when it was filed.  So, yes,

25  we will do any necessary clean-up reconciliation of what I'm

1   being asked to approve when we finish up the Disclosure

2   Statement argumentation tomorrow.

3           MR. DESPINS:  Thank you, Your Honor.  Thank you.

4           THE COURT:  Thank you.

5           So next on the list is FGIC.  So, Mr. Sosland, do you

6   want to tell me where you are on this?

7           MR. SOSLAND:  Yes, Your Honor.  I have currently,

8   between the Disclosure Statement and this, I think it's 16

9   minutes total allotted to me, but if Your Honor would indulge

10  this, I would prefer to take care of all of it tomorrow, if we

11  don't have an agreement to announce to you by then.

12          THE COURT:  All right.  We will save you for

13  tomorrow.

14          So, Mr. Hein, would you like to come back and speak

15  to the solicitation procedure objections?

16          MR. HEIN:  Thank you, Your Honor.  Peter Hein.

17          My responses on the procedural issues are in docket

18  16909.  I'll address several points.  First, the absence of a

19  record date and voting procedure provides two concerns.

20  Retail investors are treated differently, to their detriment,

21  from the institutions.  I will quote from the Oversight

22  Board's proposed notice of voting instructions.  I'm quoting

23  from 16756, page 101 of 346, but looking at what was filed

24  last night, 17309-1, page 52 and 53, it appears the same.

25          Retail investors are told they, quote, will be

1   restricted from transferring your bonds through the effective

2   date, closed quote.  Yet, constitutional holders, others bond

3   retail holders, will have their bonds restricted only, quote,

4   until immediately after the voting deadline, closed quote; and

5   that release of their bonds by DTC, quote, is expected to be

6   on or as soon as possible after October 4, 2021, the voting

7   deadline.

8          I made this point in docket 16909, pages 25 to 26 of

9   44, quoting the language of the proposed notice in the FOMB

10  moving papers.  The FOMB reply just ignores what their own

11  notice says.  There's no explanation by FOMB for why

12  individuals are being treated differently than institutions in

13  this respect.

14         The lockup of the retail investors will likely

15  depress the retail vote, and it's also unfair by locking in

16  retail investors who do vote, dooming them to splinter bonds

17  after the effective date.  They don't even have the option to

18  consider selling after the confirmation order issues, if it

19  does, after the vote is in, if it's in.  They don't even have

20  the option of selling before the effective date.

21         Also, there effectively is no record date, and you,

22  thus, have the specter of vote buying to skew the results,

23  which can happen right up to the moment on October 4.

24         The second subject, there's no reasonable opportunity

25  for retail investors to submit an initial objection.  I just

1  looked quickly at what was filed last night, but they may even

2  still be trying to use the same August 3 date.  My actual

3  experience for the time for receipt of mail notice bears on

4  the extent of notice required.

5       Last month I received the direct mailing of an

6  Omnibus Objection from Prime Clerk.  It took ten days from the

7  date it was mailed until I got it.  And the process of mailing

8  a solicitation packet to beneficial holders at accounts of

9  securities firms, which applies to individual investors, is

10 going to take longer than direct mailing.

11      My actual experience in the COFINA case is, from the

12 time Your Honor issued the Disclosure Statement Order until I

13 received the flash drive with the solicitation packet from

14 Prime Clerk, was 19 days.  The Oversight Board says, well --

15      (Sound played.)

16      MR. HEIN:  -- we can send out a flash drive and

17 people can request hard copies of the -- now I think it's over

18 25 or 2600 pages of Plan and Disclosure Statement, by

19 e-mailing or calling Prime Clerk.

20      Well, I did that in May in response to the short form

21 notice sent in May, and I did not receive my hard copies until

22 43 days, 43 days after I made my request.

23      Deadlines should reflect how long the process

24 actually takes based on my actual experience.  I think that

25 for individual investors to have an adequate opportunity to

1    receive, to review, to prepare an objection, I think one needs

2    at least 75 days before the initial objection deadline.

3          Third point, the FOMB's proposal that the Oversight

4    Board put its papers in support of confirmation in after the

5    final deadline for objections is contrary to any concept of

6    due process or proper procedure.

7          It is fundamentally wrong to say that objectors need

8    to submit final objections, say, on October 8th, but the

9    Oversight Board can put its supporting papers in, as long as

10   its reply papers and affidavits and whatever, three weeks

11   later.

12         There's no justification to say, well, this has been

13   used before.  This is a proceeding where there are thousands

14   of unrepresented individual bondholders whose investments are

15   being effected.  They need to be able to see the FOMB

16   supporting papers, and have an opportunity to respond to them.

17         A final point related to standing.  These issues of

18   adequate disclosure and adequate notice directly effect me,

19   because of the fact there's a voting process here where the

20   vote of others can deprive me of my rights.  Plus, candidly,

21   Your Honor, I think that having adequate disclosure for the

22   individual retail investors, and adequate notice to those

23   unrepresented individual retailer investors is clearly the

24   right thing to do under the law in any event.

25         Thank you, Your Honor.

```
 1              (Sound played.)

 2              THE COURT:  Thank you, Mr. Hein.

 3              Do the FOMB representatives want to use some of their

 4    time to respond to Mr. Hein's arguments now?

 5              MR. ROSEN:  Your Honor, this is Brian Rosen.  If you

 6    don't mind, Your Honor, because some of the issues that have

 7    been raised by FGIC and others -- we would like to just

 8    reserve it until tomorrow, if that would be fine with the

 9    Court.

10              THE COURT:  Yes.  I will permit you to reserve it to

11    tomorrow.

12              MR. ROSEN:  Thank you, Your Honor.

13              THE COURT:  So now we still have some time before the

14    lunch break, and so let's begin what arguments we can have

15    today on the confirmation procedures motions.  As to that,

16    Magistrate Judge Dein and I are presiding jointly, so you may

17    hear questions from either of us as the arguments go on.

18              So the first party listed as objecting parties are

19    Ambac and FGIC, and so would someone from that coalition tell

20    me whether you want to wait until tomorrow on those?

21              MS. MILLER:  Atara Miller from Milbank on behalf of

22    Ambac Assurance, Your Honor.  I think it would probably be

23    best to defer in part, because I think some of our objections

24    to the scheduling motion relate largely to the amount of time

25    that would be required to resolve revenue bond related issues,
```

1  and so since there is a direct link between our objection on

2  the scheduling motion and the substantive motion issues that

3  we have --

4         THE COURT:  Understood.  All right.  So we will

5  reserve your time until tomorrow.

6         MS. MILLER:  Thank you, Your Honor.

7         THE COURT:  Thank you.

8         Mr. Despins, will you be pressing any of the

9  objections you had raised to the confirmation procedures

10  motion?

11         MR. DESPINS:  No, Your Honor.  Thank you.

12         THE COURT:  Thank you.  So that takes us to the DRA

13  parties, and I have five minutes split between AmeriNational

14  Community Services and Cantor-Katz.

15         So would whoever's speaking first unmute and identify

16  himself?

17         MR. ZOUAIRABANI:  Yes.  Good morning, Your Honor.

18  This is Attorney Nayuan Zouairabani of McConnell Valdes, LLC,

19  on behalf of AmeriNational Community Services, LLC.  I am

20  joined by my co-counsel, Douglas Koff of Schulte Roth & Zabel

21  for Cantor-Katz Collateral Monitor, LLC, and together we are

22  the DRA parties.

23         THE COURT:  Yes.

24         MR. ZOUAIRABANI:  Your Honor, before my clock starts,

25  I would like to mention something, because we learned about it

1    today at the outset of the hearing.  We had coordinated coming

2    into argumentation today with counsel for Ambac, especially

3    with regard to their demonstrative exhibit at docket 17279-1.

4    And we believed they were going to cover some of the issues

5    that we did, so we didn't want to be repetitive, so we tweaked

6    our argument in light of that.

7          But since we don't know whether Ambac will be

8    pressing on their objection by tomorrow, I would ask the Court

9    if I could at least get one minute to cover some of the issues

10   that we did not envision speaking on because of how we had

11   divided the arguments.

12         THE COURT:  Very well.  So let's say that we will

13   afford you seven minutes altogether, so that's two extra

14   minutes, and that will give you three and a half and three and

15   a half, or however you want to split that up.  Is that

16   acceptable?

17         MR. ZOUAIRABANI:  Yes, Your Honor.  That is

18   acceptable.  Thank you.

19         THE COURT:  Okay.  Very good.  May I start your clock

20   now?

21         MR. ZOUAIRABANI:  Yes, you may.  Thank you, Your

22   Honor.

23         THE COURT:  Okay.  Starting it for three and a half

24   minutes.  Please proceed.

25         MR. ZOUAIRABANI:  Thank you.  All right.

1      Your Honor, I'm sorry.  One thing.  I will be doing

2  most of the argumentation.  I may yield some time to my

3  co-counsel, Douglas Koff, just so the Court is aware.

4      THE COURT:  All right.  So we'll be counting up to

5  seven minutes, and the beeping will be in relation to seven

6  minutes, with a pause if you switch speakers.  Is that

7  acceptable?

8      MR. ZOUAIRABANI:  Yes, it is, Your Honor.  Thank you

9  so much.

10      THE COURT:  Okay.  Very good.  So now we will start

11  the clock.

12      MR. ZOUAIRABANI:  The procedures motion suffers from

13  an overarching deficiency that cannot be easily overcome and

14  cannot be overlooked by this Court.  It favors rushed and

15  condensed time frames to meet artificial deadlines at the

16  expense of standard litigation practices.

17      As the Supreme Court stated in *Protective Committee*

18  *v. Anderson*, 390 U.S. 414, at page 450, quote, "the need for

19  expedition is not a justification for abandoning proper

20  standards," unquote.  This is particularly true here.  With a

21  supposed basis for expedition, FOMB is having to meet

22  milestones and PSAs that were voluntarily agreed between

23  sophisticated parties, all of who are well aware of the proper

24  procedure to confirm a case of this magnitude.

25      As this Court observed in the April 28 Omnibus

1    Hearing, meeting PSA deadlines should not be an appropriate

2    justification for dispensing the due process or short

3    circuiting normal procedures.

4        The procedures motion is ripe with several

5    infirmities that are detailed in our brief and which are also

6    highlighted in Ambac's demonstrative, which the DAR parties

7    also support.  In short, the FOMB's proposal is not sufficient

8    for this case, and we, as well as Ambac, outline alternative

9    schedules that are more appropriate and should be adopted

10   here.

11       Among other things, for example, our proposal

12   provides for a time frame to make a Section 1111(b) election,

13   which is nowhere to be found.  And we refer the Court to our

14   brief for the DRA specific proposal just at that example.  And

15   we also refer the Court to docket 17279-1, to view Ambac's

16   proposal.

17       I would like to focus, Your Honor, for a second on

18   the exemplar cases identified by the FOMB, all of which weigh

19   in favor of the DRA parties' position.  These are *In re*

20   *Cumulus Media, Inc., In re Maximum Energy Corp., In re EnRon*

21   *Corp., and In re City of Detroit, Michigan.*

22       The most analogous of this case is the chapter

23   municipal bankruptcy of Detroit.  Still, that case involved

24   approximately 18 billion of total obligation, and was

25   materially smaller to these cases, which is the largest

1    municipal bankruptcy ever, with 120 billion in total

2    obligations.

3            Not withstanding this, Detroit's procedure was also

4    more favorable than FOMB's proposal.  To-wit, it separated

5    fact and expert witness deposition periods with no overlap.

6    It also allowed for fact witness deposition period of 43 days,

7    and a subsequent expert witness deposition period of 29 days.

8    In contrast, the FOMB proposes a combined 22 days for all fact

9    and expert depositions.

10           In Detroit, the Court planned for a 29-day

11   confirmation trial, whereas the FOMB proposes just seven days

12   for confirmation of a case of this magnitude.

13           The other cases cited by the FOMB are Chapter 11

14   bankruptcies of single corporations, which despite being

15   smaller than Detroit, still provided for more favorable and

16   reasonable discovery deadlines and procedure than FOMB's

17   proposal, including, among others, one document depository

18   that was populated, quote, on or before, quote, a specific

19   date, as opposed to FOMB's proposal that the document

20   depository be populated at some point, quote, on or after, end

21   quote, July 13, 2021.

22           Your Honor, who knows when that after might be.  We

23   could be even at the eve of confirmation.  We don't know.

24   It's too expansive.

25           Second, separate fact and expert discovery, with no

1   overlap.   Three, there's other Chapter 11 cases provided for

2   nondeadline to serve request for admissions to authenticate

3   documents.

4         Four, depositions which span at least eight hours,

5   whereas here they only propose up to seven hours.  Five,

6   additional deposition period for supplemental witnesses.  Six,

7   creditors' witness list, which were due a month after debtors'

8   initial witness list.

9         Seven, the right to supplement fact witness list

10  prior to trial, and to call rebuttal witnesses not previously

11  identified on the list.  Eight, fact discovery period of about

12  two months, an expert discovery period of almost three weeks,

13  and plan objections which were not due until after discovery

14  ended.

15        Your Honor, the procedures motion is clearly

16  prejudicial to the DRA parties who have not taken any

17  discovery in these cases and who, after four years, deserve an

18  opportunity to fully vet their claims, including flushing out

19  the sub rosa issues that were discussed by my co-counsel but

20  was meant -- earlier this morning.  It is for this reason why

21  FOMB's initial objection framework also fails.

22        By limiting the scope of a party's discovery rights

23  to what was included in their initial objections only, and

24  bear in mind that this initial objection is due prior to

25  anyone receiving affirmative discovery --

1          (Sound played.)

2          MR. ZOUAIRABANI:  -- the FOMB is forcing parties to

3     flood the Court with overly broad initial objections to avoid

4     waiving any potential arguments or rights.  That is simply too

5     much wasted paper.

6          The FOMB has failed to explain why parties to a case

7     that is six times larger than Detroit, and a population that

8     is four times greater, should receive lesser treatment.

9     Rather, the opposite should be true.  Because these cases

10    arise under a noble statutory regime, it directly affects the

11    rights of millions of U.S. citizens, and involves numerous

12    complex and novel issues of law.

13         It follows that the discovery and plan confirmation

14    process should be at least as, if not more, expansive than

15    what took place in the FOMB's cited cases.  In the end, the

16    FOMB's proposal hampers fairness for all parties, except the

17    debtors and the PSA parties.

18         And with that, Your Honor, I yield my time to my

19    co-counsel, Douglas Koff, in case he wants to make any

20    additional statement.

21         THE COURT:  Thank you.

22         Mr. Koff.

23         MR. KOFF:  Good afternoon, Your Honor.  We'll rely on

24    the arguments just made and our papers submitted.  I think our

25    time is up as well.

1          THE COURT:  Almost.  Thank you very much, Mr. Koff.

2          So now, Mr. Hein, would you like to come back and

3     make your arguments on the procedures motion?

4          MR. HEIN:  Yes, Your Honor.  Thank you.

5          Two areas that I will briefly address.  Again, I

6     refer Your Honor to my objection on procedural issues, 16909

7     in the docket.  First, on interrogatories.  The notion that

8     because there's a data room, interrogatories should be

9     prohibited ignores the reality, particularly from the point of

10    view of unrepresented individuals, that the data room is a

11    jumble of documents in broad categories.

12         I've tried to use it.  It's extremely difficult for

13    any individual to use.  There's no way an individual can use

14    that data room to find an answer to a specific question.

15         If interrogatories are propounded and the Oversight

16    Board thinks one has been answered or is answered by a

17    document, the FOMB can point to the source of the answer.

18    They could also set up a category in the data room for

19    interrogatory responses.

20         So let's say answering a particular interrogatory,

21    the response is on file, and someone can consult that before

22    propounding additional interrogatories.  That is a way to

23    duplicate -- or avoid duplication of responses.

24         Let me give you an example of an interrogatory.

25         (Sound played.)

1          MR. HEIN:   State the annual amount of the 1.03

2    percentage tax on property, and its billings and collections

3    for each of the past five years.   This tax is the first source

4    of payment of the new bonds.   It secures the existing bonds.

5    Surely Puerto Rico has this information.

6          It should be in the Disclosure Statement.   It's not.

7    It should at least be something one can get through an

8    interrogatory.   And, as I said, interrogatories are probably

9    the only practical means unrepresented individuals without a

10   committee have to participate in discovery here.

11         Second subject:   There's no legitimate reason for a

12   certification requirement.   The data room is just a jumble of

13   documents and broad categories.   Take my example of the

14   question of how much has been billed and collected each year

15   for the 1.03 percent property tax.

16         There's no apparent data room category linked to it,

17   and, therefore, it's just impossible to wade through what is

18   literally a jumble of documents in broad categories to find

19   the answer to that question, if it even exists in that data

20   room.

21         Third, the FOMB continues to place materials in the

22   confidential section of the data room that cannot plausibly be

23   entitled to confidential treatment.   I identified specific

24   examples of publicly released documents placed in the

25   confidential categories of the data room in my June 9 papers

1    of a -- as of Sunday night, they were still in the

2    confidential section.

3          Another example, on June 27, FOMB placed in the

4    confidential folders of the data room in a category for

5    documents disclosed to the UCC a document that appears

6    identical to a document that AAFAF publicly disclosed two days

7    before on EMMA, which was then on EMMA described as FOMB's

8    public disclosure of claim amounts and corresponding

9    outstanding principal amount.

10          The document posted on EMMA --

11          (Sound played.)

12          MR. HEIN:  -- and called a public disclosure cannot

13    legitimately be claimed confidential, but was.  I've noted

14    other inappropriate classification issues in my July 6 papers

15    on the retail investor committee motion.  Those documents, as

16    of Sunday night, are still classified as confidential.

17          Thank you for your time.

18          THE COURT:  Thank you, Mr. Hein.

19          Now, counsel for AAFAF.

20          MR. FRIEDMAN:  Good morning, Your Honor.  It's Peter

21    Friedman from O'Melveny & Myers on behalf of AAFAF.  Let me

22    start by saying that we believe --

23          THE COURT:  Good afternoon.

24          MR. FRIEDMAN:  I'm sorry, Your Honor.

25          THE COURT:  I just said good afternoon.  Now you can

1   start.

2              MR. FRIEDMAN:   Good afternoon.   Sorry, Your Honor.

3              The confirmation process we actually believe should

4   move forward expeditiously.   We think DRA's proposed schedule

5   is vastly excessive, but we do think there is a necessary

6   tweak in the Board's proposed confirmation schedule because,

7   as formulated, there's no opportunity for the government to

8   know how the Board intends to use a confirmation order to

9   effectuate a claim that lacks implementing legislation and

10  other necessary government support if the parties can't get

11  there.

12             Just to reiterate, I think what Mr. Rapisardi said,

13  we clearly hope we can, but the Board claims that without

14  legislation, it can still move forward.   This is an untested

15  theory.   And without legislation implementing regulations from

16  Hacienda, AAFAF, et cetera, an exceptionally detailed

17  confirmation order will have to be proposed with respect to

18  issuance of new bonds and CBIs.

19             The government is going to need meaningful time to

20  object to that kind of detailed order, both on legal grounds

21  -- but the terms proposed may not be lawful -- and on

22  practical grounds, if the terms being forced aren't feasible

23  because they impose unreasonable time constraints on the

24  government, or don't sync with governmental accounting,

25  reporting, or tracking systems.

1        Both of these have serious potential consequences,

2   the first of which, bonds may not be issuable, but the bells

3   and whistles that get stuck into a confirmation order, and the

4   second, the new contracts get instruments that will be court

5   ordered.  It could be done without a full testing whether

6   means and measures to implement them can actually be managed

7   by the government.  That would, of course, affect

8   marketability and, ultimately, potentially undermine the

9   ultimate goal of PROMESA and getting back to the capital

10  markets.

11       To ensure the government has adequate time to object

12  to these novel issues, we'd request that the confirmation will

13  be filed 28 days prior to the confirmation hearing.  And we'd

14  have 14 days to object to specific provisions in the

15  confirmation order, including, if necessary, to submit

16  affidavits as to impracticability of things, to the lack of

17  compatibility of government practices.

18       The Board has seven days to respond, leaving a week

19  before the hearing for the Court to consider full briefing on

20  this.  We hope this can avoided, but these are serious matters

21  that need a full, fair briefing both for this Court and, if

22  necessary --

23       (Sound played.)

24       MR. FRIEDMAN:  -- for a highly expedited appeal.

25       I have nothing further, Your Honor.

 1            THE COURT:  Thank you.

 2            I'd just like to explore with you a little bit more

 3    what you would expect to have decided upon that specific

 4    briefing.  Obviously, with something that important and

 5    something that complex, it would be important to have a

 6    specific record of the elements of the objection to the order,

 7    and a response to those objections.

 8            But before any order could be entered at all, of

 9    course we'd have to have the trial record and the litigation

10    of other issues.  By proposing this seven days for the Court's

11    consideration as a full briefing, are you suggesting that we

12    would have some sort of summary judgment or matter of law type

13    process as to whether the confirmation hearing would go

14    forward on schedule at all, if what the Board is proposing is

15    an order that bypasses legislation?  Or are you just trying to

16    have all of those issues wrapped up so that if I find the Plan

17    is otherwise confirmable, the issues with respect to the order

18    can be dealt with at the tail end in an informed and organized

19    fashion?

20            MR. FRIEDMAN:  The latter, Your Honor.  We want to do

21    as little violence as possible to the concept of moving

22    confirmation along, and so we don't think there have to be

23    gating hearings.  We think -- and in my view, this is just a

24    mechanism to allow a very specific issue to have -- to have

25    full briefing, and to be fair to us, to let us really consider

1    what's being proposed.

2              To have a confirmation order published during the

3    middle of confirmation hearings that would deal with such

4    important issues, I think it wouldn't really be fair, and

5    wouldn't provide an adequate record.  But we're not asking the

6    Court to decide, meaning separately, not to have a summary

7    judgment type proceeding, but, rather, to consider this in the

8    full nature of the confirmation hearing.

9              THE COURT:  Thank you for clarifying that.

10             MR. FRIEDMAN:  Thank you.

11             THE COURT:  Finally, we have the Retiree Committee.

12   Ms. Steege?

13             Ms. Steege, I can't hear you, so if you're there, you

14   need to unmute.

15             Ms. Ng, is Catherine Steege, or Steege, on the list

16   and is she unmuted?

17             MS. NG:  Catherine Steege is on.  Do you want me to

18   unmute her?

19             THE COURT:  Yes, please.

20             MS. NG:  Ms. Steege.

21             MS. STEEGE:  Good afternoon, Your Honor.  Catherine

22   Steege from Jenner & Block on behalf of the Retiree Committee.

23   I hadn't logged onto the dashboard, so I don't know how that

24   muted me, but I apologize for that.

25             We're happy to report that the Retiree Committee has

1    resolved its issues with respect to this motion.  We thank

2    Ms. Dale from the Oversight Board, who worked with us over the

3    weekend to resolve our one remaining issue.

4            So with that, we have nothing further to add.

5            THE COURT:  Thank you.  It's Steege?

6            MS. STEEGE:  Steege, yes, Your Honor.  It sounds like

7    a long A.

8            THE COURT:  Thank you.  At some point I will

9    pronounce your name right in these procedures.  Sorry.  It's

10   taken me four years, and I'm still getting it wrong.  But I

11   try to --

12           MS. STEEGE:  No problem, Your Honor.  Everyone says

13   it in a variety of different ways.

14           THE COURT:  Thank you for being gracious about that.

15           All right.  So I am assuming that the Oversight Board

16   wishes to wait to make its response until after we know what

17   all the arguments are tomorrow morning; is that correct?

18   Mr. Rosen?

19           MS. DALE:  Your Honor, it's Margaret Dale.  I'm going

20   to respond to that.

21           THE COURT:  Okay.

22           MS. DALE:  Good afternoon.  Margaret Dale on behalf

23   of the Oversight Board.

24           Yes, we would like to defer, and we'll address these

25   issues tomorrow, if that's all right with the Court.

1              THE COURT:  Very well.  That's fine.

2          So what we will do in a moment is commence our lunch

3    break, and come back, and after lunch, hear the arguments of

4    the three remaining pro se objectors.  Then, unless I've

5    missed something, I think that will be as far as we can go

6    today.

7          We would plan to reconvene tomorrow morning at 9:30,

8    go until ten minutes before noon, pick up as necessary at ten

9    minutes after 2:00, and then complete the arguments and

10   whatever rulings I can do on the record by the end of the

11   afternoon.

12         So if anyone has a different view about what this

13   afternoon or tomorrow should look like, you can tell me when

14   we come back.  At this point, please all disconnect when I say

15   to disconnect, and be back on and ready to proceed at ten past

16   2:00.  All right.

17         So we're on our lunch break.  Please disconnect.

18   Talk to you at ten past 2:00.

19             Thank you so much.

20             (At 12:53 PM, recess taken.)

21             (At 2:02 PM, proceedings reconvened.)

22         THE COURT:  Buenas tardes.  Good afternoon.  This is

23   Judge Swain speaking.

24         MS. NG:  Hi, Judge.  It's Lisa, your courtroom

25   deputy.

1          THE COURT:  Can you hear me?

2          MS. NG:  Yes, Judge.  Can you hear me?

3          THE COURT:  Very good.  I can hear you.  Is

4    everything ready?

5          MS. NG:  Yes.  Everything's good to go.

6          THE COURT:  Terrific.  Thank you.

7          Again, good afternoon to all.  We are continuing the

8    hearing on the objections to the Disclosure Statement approval

9    motion in *In re:  Financial Oversight and Management Board*,

10   docket no. 17-3283.

11         In this segment of the hearing, we will hear from the

12   pro se objectors, and we have an interpreter present for the

13   individual who has indicated that she wishes to make her

14   remarks in Spanish.  I am not sure whether that individual is

15   there, and so I will give general instructions now.

16         Each pro se speaker is being allotted eight minutes.

17   We will keep track of the time, and we will play a buzz sound

18   when there are two minutes remaining, and two buzz sounds when

19   the speaker's time is up.

20         Mr. Foster, may we have an example of the buzz sound,

21   please?

22         (Sound played.)

23         THE COURT:  Thank you.

24         Thank you, speakers, for your cooperation with this

25   procedure, which is also being followed with the time

1   allocations for the lawyers who have been speaking at this

2   hearing.

3          The first speaker in opposition is Antonio Martin

4   Cerezo.  Mr. Martin Cerezo, are you there?

5          MR. CEREZO:  Good afternoon.  Shall I start?

6          THE COURT:  Good afternoon, sir.  I'm Judge Swain.

7   Good to meet you by telephone.  You may begin your remarks.

8          MR. CEREZO:  Good afternoon.  My name is Antonio

9   Martin Cerezo.  I'm an architect.  I was born in Havana, and I

10  arrived to Puerto Rico on November 8, 1960.  I was then 22

11  years old.

12         In 1963, I wanted to be an independent practitioner.

13  As such, I would not have the benefit of a big company

14  providing me with retirement checks.  I had to start saving

15  immediately.

16         The bonds looked a good instrument for me.  The bonds

17  were sure and trustable.  They were issued by Puerto Rico, and

18  guaranteed by the Puerto Rico Constitution.  The bonds were

19  issued to help finance Puerto Rico development in different

20  areas, to benefit Puerto Rico's transformation.  Economy at

21  that time was full of dreams.  I was also a dreamer.  Bonds

22  were tax free.  That was good for savings.

23         My saving bonds, I had the opportunity to cooperate

24  with the development of the island to become more independent

25  of the United States regarding the political direction that

1   they would take in the future.  I was directed to an important

2   security trading company to protect my investments.  The

3   government at that time was a respectable institution, which

4   denounced corruption and punished it.

5          One day around 2012, things started to go really bad.

6   One day, when I arrived to the company, which I was an

7   investor and I felt so well protected, I saw real sad faces.

8   Happiness had stopped.  They were looking down and walking

9   fast.  All Puerto Rican bonds were reduced to half, one half

10  in one day.

11         First responses were confusing, but I found that

12  allegedly unscrupulous bondholders put their Puerto Rican

13  bonds as guarantee for cheap big loans to spend.  They used

14  cheap money to do quick operations which brought down the

15  value of their respective bonds.  Their actions compromised

16  bona fide bonds of ours.

17         The company director in Puerto Rico was charged, but

18  later nothing happened and nobody was indicted.  Some people

19  filed bankruptcy.  Bonds were worth nothing.  The company

20  invented something to put some dollars in the pockets.

21  Repurchase, they called.  The same company repurchased around

22  full -- half of the client bond portfolios, and at least put

23  some cash in the investors' pocket, but half of the capital

24  never came back.

25         The government had gone nuts.  It was the beginning

1   of the careless government we are immersed now, dedicated to

2   promote spending instead of promote production.  The

3   government interpretation of the legals were at the following.

4   The COFINA bonds all of a sudden were found to be that all the

5   bonds were not equal.  They were juniors or seniors.  The

6   juniors were priced one half of the value of the seniors, and

7   of course I had juniors.

8          Nobody knew.  I had never been shown a real bond in

9   my life, only papers, and nobody spoke about that.   And I

10  paid the same price, and the rest of the people, who buy money

11  or influence, had bought the seniors at the same price.

12         The other good one is that the Constitution did not

13  guarantee all the bonds issued equal.  Of course, mine were

14  not guaranteed.  What about U.S. Constitution?  The money

15  received for our bonds was not used for the purpose as stated

16  on the bond face at all times.  You could have invested in

17  safe -- in retirement, but funds were gone for something else.

18  Nobody knows.  Could that be corruption?  The bonds did not

19  have repayment funds committed.  A completely absurd word for

20  a solid future.

21         Since 2016, the day the bonds were -- fell down and

22  lost their value to 2021, we have had to stay working, and

23  some bonds have been renegotiated at a reduced price.  At

24  2016, I was 78 years old.  I had passed my retirement by 13

25  years.  I am now 82.

1           Now, what are the first government public

2    expressions?  On 2016, the Governor Garcia Padilla's speech,

3    there is no money to pay the debt, he said, with a big smile.

4    I have no bonds.  He was very funny.  We cannot pay even the

5    interest.  Hilarious.  Puerto Rico investors were called

6    names, vultures.  Big smiles.  No comments.  Very funny.

7    People started calling us names.

8           The truth, bona fide investors are broke.  Everybody

9    is making fun of us.  They are calling us vultures.  And that

10   is completely wrong.  We bought with hundred percent dollars.

11   A vulture is supposed to be that that buys at 50 percent and

12   then sells at a hundred.  We're Puerto Rican working people

13   ripped off by the government of Puerto Rico in -- and very

14   little understanding of why are we not entitled to be paid.

15          What I believe the government should do now.  He

16   becomes serious again.  The government has to be -- has to

17   bring responsibility to pay before they issue bonds again.

18   These are the last bonds that are remaining now.  The

19   called -- so-called GOs, the retirement bonds --

20          (Sound played.)

21          MR. CEREZO:  My unpaid bonds are called retirement

22   bonds.  That is what is written on them.

23          I lent my money to pay retirement of public

24   employees.  I believe I shall be paid also my retirement bonds

25   a hundred percent.  Why pay the public employees full, and

1    give us a few cents?  Why not to pay us some of the unpaid

2    interest, too?  No have -- why cannot all of this be done?

3    And prepare the island for a new -- for a full future.

4              Thank you very much.

5              THE COURT:  Thank you very much, sir.  And I am so

6    very sorry to hear about the impact on your own life and --

7              MR. CEREZO:  Thank you.

8              THE COURT:  -- expectations with what has happened

9    with the bonds.  Thank you for sharing this with me publicly.

10             MR. CEREZO:  Thank you.

11             THE COURT:  I now call upon Nancy Negron Lopez.

12             MS. NEGRON LOPEZ:  Good afternoon.  My name is Nancy

13   I. Negron Lopez, and I'm retired, a policewoman.  I served 22

14   years here in Puerto Rico, and I am very grateful to be alive,

15   Honorable Laura Taylor, to state my objections.

16             On the first place, I would like to state that all

17   retirees, we pay our retirement.  It's not a charity.  We

18   serve most of us over 20 years, and we risk our lives.  And

19   many, as myself, I have served honorably in United States

20   Army.

21             Right now, with what we get of our retirement is not

22   even enough to support ourself.  Many of us are working other

23   jobs after they had retired, because they cannot support their

24   families.

25             Therefore, I would like to state, too, that we are

1  trying to see that there is other ways that the investors can

2  collect what -- they already have a place, but they have to

3  put responsibilities on those who has mismanaged those funds

4  that had been already allocated to pay our retirement pension.

5       If we are deduct from this, we will be placing

6  economical bandage.  Therefore, I'm asking to find other ways

7  of collecting for those in investment -- investors who have

8  the right to make a profit.  I'm not saying.  But it cannot be

9  upon the people who were not corrupt or appropriate of those

10 funds.  There must be a better investigation.

11      And those people who are found guilty of those

12 corruption, of mismanage of those funds, should be seized.  If

13 they have a million dollar house, they should be seized of

14 that house to be -- in order to pay for those funds that have

15 been misappropriated, not should be in a burden of honorable,

16 hard working people who have worked all their lives in order

17 to support their families, and be able to be -- living a

18 worthy life, not to be begging.

19      Because as it is, for example, I have to help my

20 mother, who has a terminal cancer.  She's 80.  My dad has

21 Alzheimers.  I have to take care of him.  If it wasn't I help

22 him -- and he help me also economically, because with what I

23 get for my pension is not enough to support myself.  But I

24 work hard with my family, and I help other people.  And I

25 think it's our right not to be decreased on our pension funds.

1              On the contrary, I think all these people who have

2     worked all their life, and especially police people did not

3     invest in Social Security.  At those time, we couldn't.  So

4     many of them, like I said, they are working other jobs to be

5     able to support themselves.  So maybe they should have the

6     right to be increased, their retirement fund.

7              And that's why governments are formed.  The Governor

8     of Puerto Rico should find other ways to have investments in

9     order to pay their debts and not to be a burden on the United

10    States.  We don't want to be a burden.  That's why we have

11    worked all our lives.  Therefore, I think they have the right

12    to have an honest pension, which is not because it has been

13    decreased.  It was supposed at the beginning to be 75 percent.

14    They're giving 42 percent to the majority.

15             I was lucky to have retired with half of my pension,

16    but still, like I said, it's not enough.  And it's not right.

17    It's very unjust.  And I feel like it's to a point illegal

18    that other people misallocated those funds, and we are the

19    ones who have to pay.

20             That's why they are paying some people a great amount

21    of money in order for them to provide with other types of

22    investments that -- right now just sometimes we have the

23    technology that we can send all paperwork by e-mail, and we

24    don't have to spend so much money sending so many papers, that

25    sometimes like myself don't even have the time or the -- the

1   intelligence to know all about it.

2         And it's a waste of money.  There's many -- much

3   money that can be saved by just investing properly.  And I

4   believe that if we do things in that manner, we can be paying,

5   but at the same time, not put the middle class, who have

6   worked and earned their pension in the economical boundary,

7   which Puerto Ricans, which are hard working people who has

8   served the United States Army, Marines, or any other branch,

9   honestly, these are the same rights that everybody.

10        So, therefore, I'm pleading not to be decreased in

11  our pension.  If possible, find many other ways.  That's what

12  they're being paid to investigate, where those funds, and to

13  also make other ways of investments so we can be free of

14  economical boundaries.

15        And I -- and again, I thank you for listening, but

16  these are some of my objections, and stating the rights of

17  many who are like myself, or even worse.

18        THE COURT:  I thank you for coming to court and

19  speaking so plainly about your objections and about your

20  circumstances, and also for the challenges and suggestions

21  that you have made.  Thank you very much, Ms. Negron Lopez.

22        MS. NEGRON LOPEZ:  Thank you.

23        THE COURT:  And I understand that the third speaker,

24  Yashei Rosario, is here.  I will repeat what I said about the

25  procedure.  But first, I will ask the interpreter to introduce

1   him or herself and state whether you are a certified

2   interpreter.

3          THE INTERPRETER:  Yes, Your Honor.  Carol Terry,

4   USCCI.

5          THE COURT:  Thank you.

6          So if you will interpret for Ms. Rosario, I will

7   restate the instructions.

8          Each speaker is being allotted eight minutes in this

9   segment.  We will keep track of the time, and a buzz sound

10  will be played when there are two minutes remaining, and two

11  buzzes will sound when the speaker's time is up.  Here is an

12  example of the buzz sound.

13         (Sound played.)

14         THE COURT:  Madam interpreter, tell me when you're

15  ready for me to continue.

16         THE INTERPRETER:  Yes.  You can continue, Your Honor.

17         THE COURT:  Thank you.  Are you doing simultaneous or

18  sequential?

19         THE INTERPRETER:  No, I will be doing consecutive

20  when she speaks, once she starts speaking.

21         THE COURT:  All right.  But you're doing simultaneous

22  while I'm speaking?

23         THE INTERPRETER:  Yes.

24         THE COURT:  Thank you.

25         Ms. Rosario, thank you for your cooperation with this

1    procedure.  It is the same procedure that is being followed

2    with the time allocations for the lawyers who are speaking at

3    this hearing.

4         So we will set your time at eight minutes, and you

5    may begin speaking.  And work with the interpreter so that the

6    interpreter has time to translate what you are saying into

7    English for me.

8         Thank you.  You may begin now.

9         MS. ROSARIO:  Okay.  (Remarks in Spanish.)

10         THE INTERPRETER:  Good morning.  My name is Myriam

11    Yashei Rosario.

12         THE COURT:  Madam interpreter, I can't hear what

13    you're saying.  I hear Ms. Rosario, but I can't hear you.

14    Perhaps you can change places so that the interpreter is

15    closest to the microphone.

16         I can't hear anyone now.

17         MS. ROSARIO:  (Remarks in Spanish.)

18         THE INTERPRETER:  Go ahead.

19         MS. ROSARIO:  My name is Myriam Yashei Rosario,

20    better known as Yashei Rosario.  I am the president of the

21    Development of Socioeconomic and Sustainable Trust of Vieques.

22    As a people, we organize ourselves to find solutions and

23    options for the survival of our people, and we created a

24    development plan for the Island of Vieques.

25         And this development plan consists of an amusement

1    park and a historical park of the history of Puerto Rico, and

2    Vieques, and the Caribbean.  And this would be the alternative

3    to solve the problems of the island.  And this will allow the

4    creation of recreational activities that you might not

5    believe, but we do not have any on the Island of Vieques.

6         And this will provide for drive-in cinemas, an

7    aquarium, the history of Vieques and Puerto Rico.  And this

8    will create sources of collect -- to be able to create sources

9    of collection, to be able to build and maintain the University

10   of Vieques campus.

11        And also, we do not have a hospital.  And FEMA,

12   having spent 39.5 million dollars since 2017, we still do not

13   have a hospital.  And we would like to build, with these

14   sources of funding, a private hospital of the people of

15   Vieques.

16        MS. ROSARIO:  Owned by the people of Vieques.

17        THE INTERPRETER:  Owned by the people of Vieques.

18        MS. ROSARIO:  And as the creator of this project, I

19   own 30 percent of the shares.  And I am here to donate ten

20   percent of my shares, to pay as a source of repayment of the

21   fiscal debt of Puerto Rico, which means that our offer is

22   better than the restructuring of the Oversight Board.

23        And since we are only a corporation, we're going --

24   we're going to start construction now.  The funds from the IVU

25   sales tax of the corporation can be reserved exclusively to

1    pay the fiscal debt.  Ten percent, plus 10.5 percent, is equal

2    to 20.5 percent, which is the source of -- source of

3    repayment.

4           The Oversight Board or the Government of Puerto Rico

5    do not have a way to repay the bondholders.  And so our

6    corporation provides a solution and an option as a source of

7    repayment to prevent the taking away of the retirement of the

8    pensionees of Puerto Rico.

9           And this would be a public-private alliance, and we

10   would request the collaboration of both the Fiscal Overboard

11   -- the Oversight Board and the government to help with the --

12   to help the people of Vieques, because, for 63 years, they

13   helped with the National Security affairs, and they have never

14   received anything in exchange for that.  And we were hit by

15   over 900,000 live bomb explosions, and received nothing in

16   exchange.

17          (Sound played.)

18          MS. ROSARIO:  But we have visited the Congress, and

19   they informed us, specifically Senator John Sheehan of the

20   Armed Forces Committee, who said that all compensation had

21   been sent to the Government of Puerto Rico.  And we never saw

22   a cent.

23          And now I request the public-private alliance, and

24   for assistance with financing to be able to create the

25   repayment source and get out of this mess we're in.  And I

1    believe this is an extraordinary alternative for me to be

2    offering, just out of the love that I have for Puerto Rico,

3    ten percent of my shares.

4         I believe no politician of the House of

5    Representatives, or the Senate of Puerto Rico, or the

6    Governor's mansion, Fortaleza, would be willing to give up ten

7    percent of their salary each to resolve the problems that they

8    themselves put us in.

9         (Sound played.)

10        MS. ROSARIO:  And I am here before the Honorable

11   Court on behalf of the people of Vieques.  And all this

12   presentation is in the PACER system.  And we request -- we

13   request consideration, because we are at the utmost disposal

14   to resolve this fiscal debt together, because as Puerto

15   Ricans, we voted for these bad managers, and we must assume

16   responsibility for that debt.

17        Thank you.

18        THE COURT:  Thank you.  Thank you, Ms. Rosario, for

19   coming in and sharing your history, and your visions, and your

20   proposal, which has been heard by the Oversight Board and

21   government representatives who are listening.

22        The motion before me is for approval of a

23   description, the Disclosure Statement with respect to the

24   offer that is being made by the Oversight Board at this point,

25   its proposal.  Thank you for indicating publicly your proposal

1    for alternative consideration, and your invitation to the

2    authorities to partner with you.

3            That is the conclusion of our hearing for today.  We

4    will resume by the telephonic arrangements tomorrow morning at

5    9:30 for the conclusion of the arguments and the hearing.

6            Thank you all.  Stay safe, and be well everyone.  We

7    are adjourned.

8            (At 2:43 PM, proceedings concluded.)

9                          *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT     )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 134 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   July 13, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 28 105:24
August 3 100:1
July 12 92:8
July 13, 2021 1:16,
  6:2, 107:20, 134:9
July 6 112:13
June 15 80:11, 90:7,
  90:15
June 27 112:2
June 28 17:11
June 9 111:24
March 10, 2020 88:3
May 31, 2021, six
  93:17
November 8, 1960
  120:9
October 4 99:22
October 4, 2021 99:5
October 8th 101:7
'18 47:16
'19. 47:16


< 0 >
000 12:4


< 1 >
1(b)(xv 28:4
1.03 110:25, 111:14
1.162 26:14
1.7 94:25
10 12:4
10.5 130:25
100 44:4
100,000 91:21
101 93:16, 98:22
11 25:19, 49:1,
  69:4, 93:10,
  107:12, 107:25
11.5 93:20
1111(b 34:24, 106:11
1122(a 34:11
1123(a 31:4
1123(a)(4 30:12
1123(a)(5 45:1
1123(a)(5)(j 44:21
1125(a 93:10
1125(d 83:15, 85:18

1129(a)(3 31:19
11:00 9:2
11:08 65:1, 65:7
11:22 65:8
11th 57:3
12 13:4
120 106:25
120,000 81:21
125 11:12, 81:19
12:00 22:12
12:50 8:25
12:53 118:19
13 91:15, 91:19,
  92:1, 92:2, 96:19,
  122:23
134 134:4
14 114:13
14,000 39:11
15 11:16, 94:6
16 98:7
16756 98:22
16908 91:2, 91:25,
  94:5, 96:23
16909 99:7, 110:5
16909. 98:17
16969. 66:11
16977 91:2
16977. 96:23
16988. 50:1
17 77:24
17-3283 6:16, 8:14,
  9:17
17-3283. 119:9
17-BK-3283(LTS 1:6
17-BK-3566(LTS 1:23
17187 88:17
17210. 73:20
17213 73:20
17279-1 106:14
17279-1. 104:2
17308 92:8, 92:21
17309-1 98:23
17311 8:14
17314 9:17
177. 31:5
178. 91:25, 94:6
18 33:22, 106:23
19 100:13
19-BK-5523(LTS 2:6
1935 67:1

1963 120:11
1983 4:15, 55:2,
  55:11, 55:13,
  56:9, 71:12, 76:5,
  76:6
1:00 8:25


< 2 >
2.6 95:3
2.9 48:24
20 12:4, 18:11,
  77:25, 94:6,
  124:17
20,000 12:5
20.5 131:1
2012 121:4
2016 122:20, 122:23,
  123:1
2017 47:16, 47:17,
  130:11
2018 67:21, 93:11,
  93:17, 94:20
2018. 94:22
2019. 70:10
2021 57:5, 94:24,
  122:21
2026 95:25
2036 95:25
22 107:7, 120:9,
  124:12
240 39:14
25 99:7, 100:17
26 91:25, 99:7
2600 100:17
264 25:25, 28:7,
  30:18, 31:2
28 114:12
29 107:6
29-day 107:9
2:00 22:12, 118:8
2:00. 118:15, 118:17
2:02 118:20
2:10 9:1
2:43 133:7


< 3 >
3-D 93:16
3.2 48:25

3.7 94:20
3.8 66:18, 94:24
30 10:6, 13:21,
   31:20, 31:25,
   32:12, 130:18
301(d 34:12
303 31:5
30th 14:11, 47:17
31 31:20, 32:12
31. 31:25
314(b)(3 31:18
314(b)(5 44:20,
   44:24
346 98:22
3799 134:14
39.5 130:11
390 105:17
3: 1:6, 1:23, 2:6
3:30 9:2

< 4 >
40,000 12:5, 81:18
414 105:17
42 126:13
43 100:21, 107:5
44 99:8
450 105:17
46 92:9, 92:16
49 39:22

< 5 >
50 96:17, 123:10
50. 25:19
500 41:1, 81:17
52 98:23
53 98:23
542 25:19
55 39:18, 39:19,
   62:22, 63:3,
   63:15, 66:17
56 30:11, 30:16,
   30:25
56. 30:10, 30:17
570 92:25
575 11:13, 92:21
5:00 9:1

< 6 >
6.8 93:19
60 35:25, 36:2,
   62:19, 63:10
615 92:9, 92:25
615. 92:16, 92:21
63 131:11
65 12:6, 12:10
66 15:14
68 28:8

< 7 >
70 13:4, 13:22
74 82:24
74.1 92:9
74.4 92:10
75 101:1, 126:12
78 91:17, 122:23

< 8 >
8 32:13
80. 125:19
82. 122:24
82.1 43:13
82.2 43:13
83. 28:4
83.1(b)(xv 26:3,
   27:23
84 39:12
89 57:19
89.2 62:6
89.2(f 52:14, 53:23

< 9 >
900,000 131:14
9019 29:18, 29:25
944 69:5
98 28:8
9:30 6:3, 118:6,
   133:4
9th 67:20

< A >
A. 3:6, 3:32, 4:18,
   47:7
AAFA 112:5

AAFAF 11:23, 42:3,
   42:7, 42:8, 42:15,
   50:6, 77:8,
   112:18, 112:20,
   113:15
abandoning 105:18
ability 52:1, 88:18,
   134:5
able 10:24, 32:14,
   39:2, 50:19,
   82:18, 85:7,
   85:22, 101:14,
   125:16, 126:4,
   130:7, 130:8,
   131:23
above 81:9, 82:1
absence 52:23, 98:17
absolute 11:11,
   44:10
absurd 122:18
accept 45:13, 78:3
acceptable 104:15,
   104:17, 105:6
accepted 87:4
access 45:15, 82:16
accessible 83:18,
   83:24
accessing 7:9
accommodation 59:2
accordance 73:19
according 66:18
account 13:17, 15:6,
   28:22, 29:1, 58:6,
   93:21
accounted 15:10
accounting 92:4,
   113:23
accounts 48:4, 100:7
accrue 70:23
accrues 70:19
accurate 8:8, 74:6,
   134:5
achieve 9:10
achieved 42:19,
   44:11, 46:25, 84:3
achieving 45:14
acknowledge 45:10
acknowledged 44:10,
   91:8
acknowledges 44:25

across 16:15, 84:17
Act 31:20, 32:12,
  50:18, 58:2
Action 11:21, 45:24,
  57:23, 58:1,
  58:15, 68:8
actions 11:15, 52:8,
  64:5, 121:14
active 19:9
activities 85:18,
  130:3
Acts 31:25
actual 73:2, 100:1,
  100:10, 100:23
Actually 27:21,
  48:1, 50:8,
  100:23, 113:2,
  114:5
actuaries 85:6
Ad 40:18, 40:25
add 18:14, 117:3
added 91:9, 94:2,
  94:13, 95:6
addition 63:8, 75:5,
  88:7, 95:20, 96:15
additional 10:7,
  13:19, 17:18,
  19:19, 29:13,
  31:15, 42:11,
  53:10, 84:19,
  84:20, 88:8,
  96:24, 108:5,
  109:19, 110:21
additionally 11:20
address 7:23, 10:7,
  13:12, 15:20,
  17:21, 23:16,
  27:12, 33:15,
  33:18, 34:7,
  35:22, 36:10,
  36:12, 63:19,
  70:1, 80:17,
  80:20, 85:19,
  87:4, 88:10,
  88:18, 90:5,
  90:14, 97:19,
  98:17, 110:4,
  117:23
addressed 29:4,
  34:2, 35:18,

35:20, 36:22,
  41:5, 45:7, 45:18,
  52:18, 60:6,
  62:22, 64:10,
  66:1, 73:5, 74:19,
  79:8, 79:10,
  80:14, 85:25,
  87:9, 87:25, 88:6,
  88:14, 88:21,
  89:15, 90:25
addresses 23:17,
  25:13, 44:23, 68:9
adequacy 17:24,
  74:21, 74:23,
  75:10
adequate 35:10,
  35:21, 54:17,
  78:11, 100:24,
  101:17, 101:20,
  101:21, 114:10,
  116:4
adjourned 133:6
adjust 46:9, 56:14
adjusted 67:25
Adjustment 6:25,
  7:4, 9:11, 9:23,
  16:19, 19:16,
  29:2, 42:12,
  42:23, 44:6, 45:8,
  49:6, 56:2, 65:20,
  74:5, 74:23, 75:9
Administered 1:11,
  1:28, 2:11
administration 11:15
administrative 36:6,
  39:21
admissions 108:1
admit 73:18, 74:18
adopted 106:8
advance 8:9
adversary 36:23,
  88:2
adverse 55:18
adversely 45:24
advised 9:12
advisors 81:1,
  84:13, 85:5
Advisory 2:41
affairs 131:12
affect 60:10, 114:6

affects 109:9
affidavits 101:9,
  114:15
affirmative 108:24
afford 104:12
AFICA 59:25, 61:17
AFSCME 39:23
aftermath 44:13
afternoon 59:13,
  89:2, 89:11, 90:4,
  97:10, 109:22,
  112:22, 112:24,
  113:1, 116:20,
  117:21, 118:10,
  118:12, 118:21,
  119:6, 120:4,
  120:5, 120:7,
  124:11
Afterwards 67:8
agencies 15:12, 53:8
Agency 2:40
Agenda 7:6, 7:22,
  8:13, 10:3, 18:8,
  18:21, 18:23,
  19:3, 22:19,
  22:22, 80:17,
  86:5, 97:8, 97:9
agent 59:22
aggregate 12:6
ago 10:21, 33:23,
  93:12, 93:18
agree 23:4, 48:9,
  50:22, 76:5, 87:2
agreed 81:25, 82:21,
  83:11, 84:9, 87:7,
  97:2, 105:21
Agreement 11:6,
  12:13, 12:22,
  12:23, 12:25,
  13:6, 13:8, 13:10,
  13:16, 13:20,
  13:24, 14:10,
  14:12, 14:17,
  18:9, 50:7, 82:24,
  84:5, 85:10, 95:1,
  98:10
ahead 94:25, 129:17
Akin 49:18, 49:22
al 1:16, 2:35, 6:18
alert 8:18

Alexis 69:16
alive 124:13
allegedly 121:11
alleges 71:12
alliance 131:8,
   131:22
allocated 10:4,
   125:3
allocation 8:22,
   21:3, 40:18,
   53:20, 54:4, 69:18
allocations 119:25,
   129:1
allotted 8:11,
   23:14, 90:1, 98:8,
   119:15, 128:7
allow 10:6, 18:8,
   21:23, 21:25,
   56:12, 66:13,
   115:23, 130:2
allowance 36:10
allowed 32:3, 56:4,
   63:13, 68:7, 107:5
allowing 31:19,
   43:19
allows 65:21
Almost 26:12, 39:11,
   39:25, 93:24,
   108:11, 109:25
alone 26:3, 62:3,
   62:6
already 24:18, 25:7,
   39:12, 74:7,
   125:1, 125:3
Altair 78:20
alternative 15:17,
   106:7, 130:1,
   131:25, 132:25
alternatively 54:21
Although 18:13,
   60:17, 74:18,
   97:21
Altieri 4:24
altogether 104:12
Alzheimers 125:20
Amador 69:15, 69:16
Ambac 3:34, 16:9,
   19:3, 19:4, 19:6,
   21:19, 21:22,
   21:25, 22:16,

23:1, 23:2, 23:14,
   97:4, 102:18,
   102:21, 104:1,
   104:6, 106:5,
   106:7, 106:14
AMC 49:17, 49:24
Amendment 65:22,
   67:7, 67:13,
   68:17, 71:13,
   71:16, 71:17,
   71:19, 71:20,
   71:23, 71:24,
   72:10, 72:15, 78:2
America 6:15
American 39:23
Amerinational 3:17,
   23:24, 24:7,
   31:14, 103:12,
   103:18
Among 25:24, 27:11,
   29:22, 106:10,
   107:16
amount 11:16, 11:24,
   41:1, 75:22,
   77:22, 82:5, 85:1,
   91:20, 94:9,
   102:23, 110:25,
   112:8, 126:19
amounts 11:18, 91:7,
   94:9, 112:7
amply 74:7
AMPR 14:5
amusement 129:24
Amy 134:13, 134:14
analogous 106:21
analysis 26:23,
   32:21
and/or 60:11, 65:12
Anderson 105:17
announce 98:10
announced 95:1
annual 11:25, 110:25
answer 27:8, 68:23,
   71:9, 110:13,
   110:16, 111:18
answered 43:8,
   75:23, 110:15
answering 110:19
answers 29:14, 46:2
anticipate 22:16,

79:11, 86:5
anticipated 18:22
Antonio 4:27, 120:2,
   120:7
apart 29:20, 29:21
Apologies 17:4
apologize 8:9,
   21:14, 37:9,
   37:18, 39:6, 80:9,
   83:6, 116:23
apparent 111:15
apparently 55:20
appeal 114:23
appear 56:10, 62:5,
   62:19, 63:9, 92:14
APPEARANCES 2:30,
   3:1, 4:2
APPEARING 2:32,
   65:14
appears 29:19, 34:1,
   55:25, 62:20,
   62:23, 83:1,
   98:23, 112:4
Appellate 45:2
appended 79:3
apples 95:12, 95:18,
   96:13, 96:15,
   96:16, 96:17
applicable 24:24,
   29:9, 29:23,
   29:25, 30:1,
   33:11, 83:16
applies 62:25,
   64:18, 100:8
appointees 11:21,
   11:25
appreciate 20:19,
   69:23
appreciates 57:10,
   58:25
approach 43:7, 44:11
appropriate 8:2,
   30:23, 32:6,
   33:18, 63:6,
   86:18, 87:3,
   105:25, 106:8,
   125:8
appropriately 41:5,
   58:8, 87:9, 88:14
appropriation 62:20,

63:10
appropriations
   32:23, 35:25
approval 6:23,
   17:24, 18:12,
   57:7, 74:10,
   79:16, 87:11,
   89:8, 89:17,
   119:7, 132:21
approve 19:13, 24:9,
   25:4, 83:14, 97:25
approved 24:13,
   32:7, 49:6, 54:24,
   56:16, 64:18,
   74:3, 74:9, 74:17,
   77:21, 85:18
Approving 66:23,
   72:23
approximately 24:1,
   39:12, 39:14,
   77:23, 81:20,
   106:23
aquarium 130:6
architect 120:8
area 64:16
areas 110:4, 120:19
Arecibo 84:20
argue 74:15, 87:6
argued 66:25, 89:13
argues 28:24
argument 17:8,
   19:25, 20:5, 20:6,
   22:16, 22:17,
   27:4, 27:9, 44:19,
   51:20, 65:10,
   75:1, 97:4, 104:5
argumentation 98:1,
   104:1, 105:1
arguments 9:21,
   10:8, 20:3, 20:9,
   20:10, 21:3,
   23:13, 29:2, 50:2,
   68:9, 86:10, 87:4,
   87:19, 88:8,
   88:10, 88:19,
   88:21, 97:7,
   102:3, 102:13,
   102:16, 104:10,
   109:3, 109:23,
   110:2, 117:16,

118:2, 118:8,
   133:4
arise 79:18, 85:20,
   109:9
arises 77:17, 82:5
arising 58:16
Armed 131:19
Army 124:19, 127:7
around 9:2, 121:4,
   121:20
arrangements 133:3
arrived 120:9, 121:5
Article 14:1, 32:12
articulated 80:12
artificial 72:11,
   105:14
Arturo 3:19, 24:6,
   31:12
aside 31:2
aspect 93:2
aspects 12:12, 60:2
assert 86:24
asserted 16:20
asserting 50:20
asserts 43:17
assess 9:8
assessing 33:21
assets 26:1, 27:20,
   35:25, 36:1, 63:2
assistance 131:23
assisting 39:1
associated 15:20,
   17:15, 18:2, 18:3,
   58:10
Association 3:47,
   4:6, 71:22
assume 55:17, 97:17,
   132:14
assuming 117:14
assumption 20:10
Assurance 3:34,
   19:6, 102:21
Assured 3:25, 3:26,
   9:6, 28:17, 86:11,
   86:14, 86:17,
   86:24, 87:2,
   87:21, 87:23,
   88:13, 88:20,
   88:23, 89:9, 89:12
Atara 3:35, 19:5,

102:20
attaching 97:15
attainment 12:24
attempt 74:17
attempted 33:6,
   60:18
attempting 15:22
attempts 26:4
attention 82:13
Attorney 73:11,
   103:17
audited 47:18,
   93:11, 94:19
authenticate 108:1
authorities 133:1
Authority 2:16,
   2:41, 7:2, 24:8,
   58:2, 61:21, 61:22
authorizing 43:22
available 8:14,
   13:2, 15:8, 32:22,
   32:23, 90:7,
   90:15, 95:23
average 74:4
avoid 109:2, 110:22
avoidance 11:15,
   11:21
award 70:14, 70:15,
   71:15
awarded 55:25
aware 105:2, 105:22
away 8:12, 131:6

< B >
back 9:4, 20:4,
   25:14, 26:10,
   28:20, 32:16,
   38:14, 39:14,
   41:19, 48:3, 65:4,
   65:9, 73:1, 83:22,
   90:18, 94:22,
   98:13, 110:1,
   114:8, 118:2,
   118:13, 118:14,
   121:23
backed 43:20
background 66:9
bad 121:4, 132:14
baked 29:8

balance 18:5
ballot 82:19, 84:1,
    84:4
ballots 84:16, 85:7
bandage 125:5
Bank 3:46, 4:5,
    56:18, 56:21,
    57:1, 57:7, 57:10,
    58:12, 58:24,
    59:18, 59:20,
    59:22, 61:16,
    61:20, 63:5, 64:6,
    67:3, 67:9
bankruptcies 107:13
Bankruptcy 6:16,
    25:16, 29:18,
    29:25, 31:4,
    31:18, 34:11,
    40:5, 44:20, 45:1,
    45:2, 56:5, 66:22,
    67:4, 67:5, 67:12,
    71:12, 72:19,
    82:10, 83:16,
    85:3, 106:22,
    106:25, 121:18
banks 85:15
bar 57:18
BARALT 4:15, 55:4,
    55:7, 55:23,
    65:13, 65:14,
    65:17, 68:1, 68:6,
    68:25, 69:2
Bargaining 14:10,
    14:12, 14:17
Based 18:9, 18:16,
    35:19, 35:20,
    57:3, 57:8, 57:13,
    85:2, 85:8, 100:23
basis 11:25, 81:3,
    85:8, 105:20
Bauza 51:19
bear 108:23
bears 100:2
beautiful 46:19
Becker 76:22
become 64:20, 120:23
becomes 123:15
beeping 105:4
begging 125:17
begin 39:7, 90:21,

102:13, 120:6,
    129:4, 129:7
beginning 36:16,
    121:24, 126:12
begun 16:13
behalf 19:6, 24:8,
    31:13, 37:19,
    42:7, 49:22,
    51:17, 56:10,
    56:21, 59:22,
    65:14, 69:12,
    76:23, 78:23,
    80:10, 86:13,
    89:3, 89:12,
    97:11, 102:20,
    103:18, 112:20,
    116:21, 117:21,
    132:10
behind 57:5
behooves 46:1
belabor 43:4, 50:2,
    61:24
belaboring 17:22
belatedly 94:19
belief 9:14, 15:2
believe 12:18, 15:7,
    17:16, 26:3,
    26:14, 29:20,
    30:7, 35:19, 40:3,
    45:9, 46:7, 50:8,
    79:1, 80:14, 83:6,
    84:24, 88:1, 88:5,
    95:22, 97:9,
    112:21, 113:2,
    123:14, 123:23,
    127:3, 130:4,
    131:25, 132:3
believed 104:3
believes 88:13
bells 114:1
belong 28:21
below 81:9, 82:2,
    82:23
beneficial 100:7
benefit 19:18,
    45:22, 81:9,
    81:10, 85:9,
    120:12, 120:19
benefits 81:9,
    81:22, 82:16,

82:25, 94:4, 94:13
Benjamin 3:44, 78:22
besides 54:7
best 9:7, 9:14,
    19:22, 63:9,
    102:22, 134:5
better 14:24, 30:16,
    51:23, 81:1,
    125:9, 129:19,
    130:21
beyond 8:10, 27:4,
    96:20
Bienenstock 2:35,
    10:13, 18:1, 18:4
Big 57:14, 73:3,
    96:3, 120:12,
    121:12, 123:2,
    123:5
billed 111:13
billings 111:1
billion 93:15,
    93:19, 93:20,
    93:24, 94:21,
    94:25, 95:3,
    106:23, 106:25
billions 94:14,
    95:21, 96:4
bipartisan 95:1
bit 19:11, 26:24,
    115:1
bits 91:14
Blanchette 67:8,
    67:11
blatantly 93:11
Block 46:23, 80:9,
    116:21
bomb 131:14
bona 121:15, 123:7
Bond 26:12, 26:13,
    30:16, 56:21,
    57:1, 58:12,
    59:19, 59:20,
    64:6, 92:11,
    96:19, 99:1,
    102:24, 121:21,
    122:7, 122:15
bondholder 27:12,
    91:21, 96:4
Bondholders 3:44,
    26:1, 28:8, 30:18,

30:20, 36:20, 36:24, 58:4, 58:9, 59:5, 78:23, 91:6, 92:7, 95:11, 96:21, 101:13, 121:11, 131:4
bonus 95:6
bonuses 94:3, 94:12, 94:15, 95:22
born 120:8
bottom 96:12
bought 45:13, 122:10, 123:9
boundaries 127:13
boundary 127:5
Brad 49:18, 49:22
branch 127:7
Brandeis 67:2
breach 63:6, 63:8, 63:12
breadth 21:19, 35:11
break 9:2, 16:12, 65:1, 65:6, 86:9, 97:6, 102:13, 118:2, 118:16
breakdown 91:20
breaking 8:9
breaks 9:3, 22:11
brevity 20:9
Brian 2:36, 10:11, 21:14, 102:4
brief 106:4, 106:13
briefed 45:7
briefing 23:15, 23:16, 23:20, 27:14, 36:9, 44:9, 114:18, 114:20, 115:3, 115:10, 115:24
briefly 7:24, 17:10, 36:12, 60:20, 63:19, 86:17, 110:4
bring 39:9, 123:16
bringing 42:14
broad 26:20, 44:7, 44:17, 57:17, 57:25, 109:2, 110:10, 111:12, 111:17

broadly 19:15, 57:22, 57:23
broke 123:7
Brotby 31:5
brother 76:3
brought 15:20, 42:20, 48:19, 53:13, 121:13
Brown 51:20
budgeting 46:14
Buenas 118:21
Buenos 6:21
build 130:8, 130:12
Buildings 2:16, 7:2, 34:17
bunch 48:13, 49:9
burden 20:22, 125:14, 126:8, 126:9
burdens 24:23
buttoned 54:12
buttons 37:10
buy 122:9
buying 99:21
buys 123:10
buzz 8:19, 8:20, 119:16, 119:17, 119:19, 128:8, 128:11
buzzes 8:19, 8:23, 128:10
bypass 44:17
bypasses 115:14
bypassing 25:16

< C >
Cadwalader 86:13
calculate 94:12
calculating 84:25
calculation 13:23, 94:12
calculations 95:8
calendar 19:21
California 68:8
call 8:4, 10:9, 18:20, 38:13, 48:14, 65:4, 108:9, 124:10
called 112:11,

121:20, 123:4, 123:18, 123:20
calling 7:19, 100:18, 123:6, 123:8
campus 130:9
cancellation 64:12
cancelled 64:21
cancer 125:19
candidly 96:6, 101:19
Cantor-katz 3:21, 23:23, 24:5, 103:13, 103:20
cap 12:6, 12:8
capacity 3:48, 55:15, 56:4
Capdevila 4:20, 68:20, 69:11, 69:12, 69:13, 69:14, 69:25, 70:4, 70:22, 71:9, 71:11, 72:8, 73:8
capital 45:16, 114:8, 121:22
care 48:20, 98:9, 125:20
careless 121:25
Caribbean 130:1
Carlo 4:24
Carlo-altieri 76:23
Carol 4:31, 128:2
Carrion 4:15, 55:2, 55:4, 55:7, 55:23, 56:17, 65:12, 65:13, 65:14, 65:17, 68:1, 68:6, 68:25, 69:2, 70:2, 70:4
Cartagena 51:19
carve 61:13, 61:14
carved 15:24, 61:3, 61:12, 61:18, 62:1, 62:2
cases 33:4, 39:11, 39:13, 42:19, 42:21, 53:1, 53:4, 53:5, 53:10, 53:12, 55:17, 56:9, 56:12, 67:8,

68:13, 82:8,
106:17, 106:24,
107:12, 107:25,
108:16, 109:8,
109:14
cash 48:3, 48:4,
93:12, 93:19,
93:20, 94:11,
94:23, 95:23,
121:22
CAT 4:49
catagory 82:4
categorical 59:6
categories 110:10,
111:12, 111:17,
111:24
category 110:17,
111:15, 112:3
Catherine 3:12,
116:14, 116:16,
116:20
cause 68:8
Causes 14:25, 57:22,
58:1, 58:15
CBI 26:7, 43:25
Cbis 16:18, 113:17
CCDA 41:1, 88:11
cede 41:18
census 48:25
cent. 131:21
centers 49:23, 50:4,
50:10, 50:12,
50:16
cents 66:19, 123:25
CEREZO 4:27, 120:3,
120:4, 120:7,
120:8, 123:20,
124:6, 124:9
certain 23:15,
34:17, 49:23,
50:3, 52:2, 53:1,
53:3, 59:19, 60:4,
61:11, 64:17,
78:23, 79:6,
80:12, 86:19,
86:21, 86:23
Certainly 22:3,
42:15
certification 9:16,
111:11

certified 127:25
certify 47:13, 134:4
cetera 48:18, 49:7,
85:16, 113:15
challenges 84:25,
127:19
chance 20:12
change 14:2, 14:21,
15:8, 18:16,
18:22, 91:2,
129:13
changed 71:6
changes 9:25, 10:2,
11:9, 12:2, 12:18,
12:19, 15:19,
16:7, 16:23,
26:15, 26:23,
33:24, 41:11,
41:25, 50:10,
54:23, 55:10,
82:17
Chapter 25:18,
106:21, 107:12,
107:25
characterization
51:6
charged 121:16
charges 82:12
charity 124:16
Charles 51:19
chart 91:23
charts 95:10
cheap 121:12, 121:13
check 61:4
checks 120:13
Children 59:25,
61:18
cinemas 130:5
Circuit 25:18,
25:23, 45:2, 67:21
circuiting 106:2
circumstances 8:1,
127:19
circumstantially
72:16
citation 28:3
cited 52:13, 67:21,
107:12, 109:14
Citigroup 51:18
citing 25:5, 32:12

citizens 77:5,
109:10
City 67:10, 67:20,
106:20
claim 12:4, 12:5,
16:16, 25:14,
30:13, 36:6,
39:17, 55:13,
67:24, 67:25,
70:17, 70:19,
70:21, 71:5,
71:14, 73:21,
74:13, 76:1, 76:2,
77:9, 77:17,
77:22, 78:16,
85:1, 85:2, 86:23,
112:7, 113:8
claimant 12:5,
69:17, 70:11
Claimants 55:3,
55:11, 55:13,
65:18, 66:16,
71:1, 72:1
claimed 112:12
clarification 28:10,
57:11
clarifications 79:6
clarified 64:8
clarify 60:23, 63:16
clarifying 116:8
clarity 7:21, 51:2,
60:9, 60:15,
62:12, 63:4,
79:16, 83:2
Clark 3:49, 56:20
classes 40:2, 75:21,
82:1, 82:23
classification 18:3,
34:9, 39:16, 40:6,
55:21, 63:17,
72:9, 72:18, 75:4,
81:5, 81:11,
112:13
classified 63:9,
112:15
classifies 35:3
Clause 31:17, 33:8,
33:9, 33:10,
67:23, 67:24, 76:2
clauses 35:5

clawback 16:18,
    25:13, 26:8,
    27:20, 28:19,
    32:9, 32:11,
    32:18, 32:20,
    32:24, 33:3, 33:7,
    36:20
clawed 28:20, 32:16
clean 62:3, 62:14
clean-up 97:24
clear 15:23, 27:2,
    29:7, 46:1, 56:7,
    60:20, 60:21,
    61:8, 62:12,
    62:24, 69:19,
    71:3, 71:8, 79:14,
    83:17
cleared 79:12
clearly 8:2, 40:21,
    57:11, 58:22,
    62:2, 101:22,
    108:14, 113:12
Clerk 8:15, 84:18,
    84:19, 100:5,
    100:13, 100:18
client 121:21
clients 50:3
clinging 19:13
clock 65:1, 83:6,
    103:23, 104:18,
    105:10
close 46:17
closed 99:1, 99:3
closest 129:14
closure 21:25
co-counsel 51:18,
    76:23, 103:19,
    105:2, 108:18,
    109:18
coalition 102:18
Cobb 67:20, 68:1,
    68:2, 68:21, 70:2,
    70:8
Code 25:16, 29:18,
    30:12, 31:4,
    31:18, 34:11,
    40:1, 44:20, 45:1,
    69:5, 72:20,
    83:16, 85:4
COFINA 44:6, 44:8,

    44:11, 44:13,
    46:7, 46:25,
    87:10, 93:5,
    100:10, 122:3
cognizant 60:15
collaboration 81:2,
    131:9
collaboratively 46:9
Collateral 3:22,
    24:5, 33:9, 34:19,
    103:20
collect 44:3, 125:1,
    130:7
collected 111:13
collecting 125:6
collection 130:8
collections 111:1
Collective 14:9,
    14:12, 14:17
collectively 39:6
Colton 10:24, 13:11,
    42:13
Comandante 25:5
combine 27:1, 28:13
combined 81:21,
    81:24, 107:7
comfort 83:2
coming 38:14,
    103:25, 127:17,
    132:18
command 71:20
commence 118:1
commencement 11:18,
    44:1
comment 41:11, 67:20
comments 18:14,
    30:6, 37:22, 83:8,
    89:11, 97:18,
    123:5
commitment 87:5
commitments 22:9
committed 122:18
committees 82:14
common 60:3, 69:21
communications
    14:24, 84:13
Community 3:18,
    23:24, 24:7,
    31:14, 83:1,
    103:13, 103:18

Company 3:32,
    120:12, 121:1,
    121:5, 121:16,
    121:18, 121:20
comparative 95:10,
    96:14
compare 39:17, 71:16
compared 76:5, 81:17
comparison 96:20
compatibility 114:16
compensate 11:25
compensation 33:10,
    55:25, 65:21,
    66:14, 67:5,
    67:14, 67:16,
    68:18, 69:4,
    70:11, 70:15,
    71:25, 72:4, 72:5,
    76:10, 131:19
complaint 36:23
complete 28:13,
    118:8
completely 37:8,
    43:17, 122:18,
    123:9
complex 73:4,
    109:11, 115:4
complexities 20:20,
    58:25
complexity 21:19,
    82:11
compliance 33:6,
    50:17
complicated 21:10
complication 21:8
complied 32:15
complying 24:23
compose 82:7
comprehensive 84:16
compromise 9:8
compromised 121:14
computer 7:10, 80:5
concede 45:4
conceivably 74:19
concept 101:4,
    115:20
concern 46:2, 81:4,
    81:12, 84:25
concerned 56:6,
    84:14, 85:1

concerning 9:22,
    35:11, 46:12,
    92:1, 92:6
concerns 6:22,
    15:20, 15:21,
    50:13, 50:14,
    50:24, 68:10,
    78:15, 80:12,
    80:15, 81:1, 82:4,
    84:21, 98:18
concise 83:18
conclude 76:14
concluded. 133:7
conclusion 76:5,
    133:2, 133:4
condemnation 68:16
condensed 105:14
condition 43:13,
    71:20
conditioned 43:24
conditions 32:18,
    43:12
conference 7:14,
    52:11
confidential 111:21,
    111:22, 111:24,
    112:1, 112:3,
    112:12, 112:15
confines 46:13,
    54:20
confirm 9:15, 33:14,
    72:2, 76:11,
    86:18, 105:23
confirmability 25:7,
    33:2, 56:6
confirmable 9:10,
    24:25, 77:20,
    78:5, 115:16
confirmed 31:17,
    36:5, 40:11
conflict 22:9
confuse 82:9
confusing 121:10
confusion 20:14,
    83:1
Congress 24:22,
    32:7, 44:24, 67:3,
    67:6, 71:21,
    131:17
connected 43:10

connection 10:1,
    11:4, 11:15, 12:1,
    12:11, 16:17,
    36:9, 36:22, 44:8,
    45:8, 64:6, 64:11
consecutive 128:18
consensual 19:16,
    46:25, 50:13,
    58:24, 77:9, 81:3
consensualy 54:14
consensus 46:24
consentual 57:2
consequences 58:20,
    93:9, 113:25
Consequently 82:13
consider 9:7, 73:23,
    99:17, 114:18,
    115:24, 116:6
consideration 17:24,
    39:10, 48:11,
    58:6, 115:10,
    132:12, 132:25
consist 39:22
consistency 79:10
Consistent 7:13,
    46:5, 85:3, 85:10
consisting 134:4
consists 67:24,
    129:24
constituents 82:12,
    85:11, 97:15
constitutes 25:14
Constitution 32:5,
    32:11, 32:13,
    32:15, 43:19,
    45:21, 58:3,
    65:23, 71:14,
    71:15, 72:5, 76:3,
    76:9, 77:18,
    120:17, 122:11,
    122:13
constitutional 32:9,
    32:20, 45:22,
    58:21, 72:1,
    73:20, 74:13,
    93:23, 94:4,
    95:17, 99:1
constraints 113:22
construction 130:23
constructive 50:5,

51:24, 54:13
consult 92:11,
    110:20
contact 93:3
contain 54:17, 78:11
contained 13:25,
    35:13, 51:25
contains 52:16,
    77:19
contemplate 34:23
contemplated 81:6,
    84:23
contested 9:18
context 76:25,
    87:10, 88:14
continue 16:11,
    19:14, 33:24,
    42:20, 56:10,
    56:12, 69:1,
    77:10, 91:1,
    128:14, 128:15
Continued 3:1, 4:2,
    10:21, 18:17,
    42:14
continues 34:7,
    42:24, 57:16,
    111:20
Continuing 48:13,
    119:6
contracts 114:3
contractual 70:17
contrary 32:1,
    68:13, 101:4,
    125:25
contrast 107:7
controvenes 31:18
controversy 27:21
convenience 11:4,
    11:19, 12:3, 12:6,
    12:9
convenient 84:17
conversations 12:16,
    16:11, 85:5
cooperate 120:22
cooperation 42:16,
    82:3, 119:23,
    128:24
cooperatively 41:16
coordinated 21:2,
    103:25

copies 100:16,
  100:20
Corp. 3:26, 3:28,
  4:18, 106:19,
  106:20
Corporation 3:35,
  3:41, 19:6, 61:22,
  89:4, 130:22,
  130:24, 131:5
corporations 61:16,
  61:19, 107:13
correct 23:24,
  23:25, 41:21,
  68:9, 75:9, 117:16
correction 57:10
correctly 61:3, 65:3
corresponding 10:20,
  12:2, 88:15, 112:7
corrupt 125:8
corruption 121:3,
  122:17, 125:11
cost 8:15
Counsel 6:21, 10:9,
  11:25, 12:17,
  19:3, 28:1, 28:2,
  40:24, 41:15,
  64:25, 68:19,
  69:10, 69:15,
  69:16, 70:2, 70:4,
  73:9, 76:3, 76:17,
  78:6, 81:1, 89:20,
  104:1, 112:18
counting 105:3
coupon 91:20
course 7:24, 19:20,
  23:19, 27:17,
  28:4, 55:21,
  56:13, 73:3,
  114:6, 115:8,
  122:6, 122:12
COURTROOM 6:8, 6:10,
  90:9, 90:11,
  118:23
Courts 25:2, 25:4,
  25:17, 31:2
cover 16:3, 21:20,
  24:15, 53:1, 53:5,
  53:12, 104:3,
  104:8
create 8:8, 130:7,

131:23
created 76:7, 129:22
creates 26:9, 92:4
creating 45:16
creation 130:3
creative 46:8, 46:12
creativity 42:20
creator 130:17
Credit 43:15, 43:18,
  43:21, 73:4, 78:20
creditor 25:16,
  31:3, 78:11, 87:14
critical 44:10, 46:2
critically 27:10
cross-reference 91:9
CSR 134:14
Cumulus 106:19
cure 66:6
curious 53:22
current 53:9, 82:24
currently 54:16,
  67:15, 91:16, 98:6
customary 64:13
cuts 42:24, 43:1,
  43:5, 49:7
CW 35:25


< D >
dad 125:19
daily 74:25
Dairy 4:18, 73:9,
  73:12, 76:1, 77:1,
  77:2
Dale 2:37, 10:13,
  117:1, 117:18,
  117:21
damages 71:18
Dapena 51:19
DAR 106:5
dark 80:6
Dasaro 51:20
dashboard 7:11,
  7:12, 8:3, 38:5,
  38:7, 79:23,
  79:25, 116:22
data 110:7, 110:9,
  110:13, 110:17,
  111:11, 111:15,
  111:18, 111:21,

111:24, 112:3
date 13:17, 57:24,
  77:24, 92:23,
  92:25, 93:6, 93:9,
  98:18, 99:1,
  99:16, 99:19,
  99:20, 100:1,
  100:6, 107:18
dates 7:3, 84:10
David 4:15, 65:13
Day 22:11, 78:23,
  79:17, 121:4,
  121:5, 121:9,
  122:20
daylight 54:9
days 12:20, 100:5,
  100:13, 100:21,
  101:1, 101:5,
  107:6, 107:7,
  107:10, 112:5,
  114:12, 114:13,
  114:17, 115:9
de 4:12, 25:15, 47:7
deadline 90:7,
  90:16, 99:3, 99:6,
  101:1, 101:4
Deadlines 7:3,
  100:22, 105:14,
  105:25, 107:15
deal 28:17, 28:19,
  116:2
dealt 115:17
debt 13:15, 24:8,
  56:3, 93:14,
  93:24, 94:5,
  94:21, 95:17,
  123:2, 130:20,
  130:25, 132:13,
  132:15
debtor 16:4, 24:23,
  30:7, 62:1, 64:5,
  66:18, 81:1,
  82:21, 84:3, 84:9,
  84:18, 85:6, 85:19
Debtors 1:18, 1:37,
  2:18, 3:6, 15:23,
  16:16, 35:6,
  41:15, 52:5, 52:6,
  53:8, 53:14,
  54:15, 54:19,

61:2, 66:13,
80:21, 82:2,
83:11, 108:6,
109:16
debts 32:25, 56:15,
126:8
decide 116:5
decided 68:2, 68:13,
68:21, 70:5, 70:8,
70:9, 115:2
decides 56:2
decision 20:4, 45:2,
47:20, 67:21,
78:12
decreased 125:24,
126:12, 127:9
dedicated 121:25
deduct 125:4
deemed 32:6
defend 52:1
Defendants 4:9,
51:12, 51:21,
51:22, 52:1, 52:7,
52:25, 53:2, 54:21
defense 52:17, 54:22
defenses 52:7,
52:11, 52:15,
52:20, 52:25,
53:3, 53:9, 53:14,
53:24, 54:21
defer 19:21, 20:14,
20:21, 21:7,
21:22, 22:15,
97:2, 102:22,
117:23
deferring 19:25,
22:16
deficiencies 52:23,
66:6, 90:24
deficiency 105:12
deficient 75:8,
77:16
deficit 95:25
deficits 96:5
defined 57:22, 57:23
defining 70:20
definition 39:17,
39:19, 61:12
Dein 2:26, 6:14,
7:5, 102:15, 134:8

Del 4:16, 65:12
delay 17:4, 46:24
delivery 84:15
delving 9:20
Demographics 48:20
demonstrates 32:1
demonstration 78:4
demonstrative 104:2,
106:5
denial 89:17
denounced 121:3
departments 15:12
depending 20:25,
92:10
deposition 107:4,
107:5, 107:6,
108:5
depositions 107:8,
108:3
depository 107:16,
107:19
depress 99:14
deprive 101:19
deprived 64:19,
81:15
DEPUTY 6:8, 6:10,
118:24
described 64:14,
112:6
description 52:16,
54:19, 132:22
deserve 108:16
DESPINS 3:6, 18:14,
37:7, 37:9, 37:12,
37:13, 37:16,
37:18, 37:19,
38:1, 97:10,
97:11, 98:2,
103:7, 103:10
Despite 30:22,
34:15, 35:1,
107:13
destroys 92:3
detail 45:7, 68:20
detailed 106:4,
113:15, 113:19
determination 27:11,
28:23, 30:5,
43:14, 87:6
determinations 92:11

determine 25:3,
40:10, 40:11
determined 11:17,
26:6, 40:13, 92:23
determines 30:3
determining 35:14
detriment 98:19
Detroit 67:11,
68:14, 106:20,
106:22, 107:2,
107:9, 107:14,
109:6
Development 61:22,
120:18, 120:23,
129:20, 129:23,
129:24
developments 51:3
devoid 84:1
dial 9:3
dialogue 15:15,
16:8, 16:13
dias 6:21
DIAZ 4:20, 69:11,
69:14, 69:25,
70:4, 70:22, 71:9,
71:11, 72:8
Diblasi 3:41, 89:2,
89:3, 89:7, 89:22
dictatorial 32:4
difference 49:1,
49:2
different 45:12,
72:17, 72:18,
91:15, 117:12,
118:11, 120:18
differential 68:2
differently 30:11,
30:16, 98:19,
99:11
difficult 8:7,
46:16, 110:11
difficulty 8:11
digest 85:22
diluted 81:13
direct 9:3, 14:23,
46:1, 62:21,
68:16, 72:11,
72:12, 72:17,
85:14, 100:4,
100:9, 102:25

directed 120:25
direction 120:24
directives 10:21
directly 49:4,
  101:17, 109:9
director 121:16
disagree 78:3,
  86:24, 87:24
disagreed 81:11
disallow 32:5
discharge 58:15,
  78:3
dischargeability
  75:5, 78:1
dischargeable 33:11,
  70:16, 74:25,
  77:17, 77:19
discharged 33:16,
  53:19
discharges 57:18
disclose 34:23,
  35:24, 36:4,
  58:22, 72:13, 94:8
disclosed 58:8,
  91:11, 93:12,
  96:6, 112:4, 112:5
disclosures 96:14
disconnect 9:3,
  65:4, 118:13,
  118:14, 118:16
disconnected 90:9
discount 45:14
discovery 17:15,
  107:15, 107:24,
  108:10, 108:11,
  108:12, 108:16,
  108:21, 108:24,
  109:12, 111:9
discuss 31:14, 66:8,
  94:5
discussed 30:2,
  74:7, 90:8, 108:18
discussion 92:10,
  92:15
discussions 14:22,
  16:21, 18:17,
  19:10, 50:11,
  77:10
dismissible 88:5
disparate 30:9,

30:24, 34:2, 40:1
dispensing 106:1
disposal 132:12
dispositions 40:6
dispute 31:22
disseminate 85:12
dissent 68:22
distinct 81:13
distinction 67:22,
  68:14, 72:11,
  72:13
distribute 25:25
distributes 28:7
distribution 14:6,
  14:8, 27:19, 40:2,
  63:14, 63:16,
  64:10, 72:19,
  92:14
distributions 27:12,
  28:25, 63:11,
  64:7, 64:8
District 1:1, 1:3,
  2:24, 2:25, 2:27,
  6:12, 134:1,
  134:2, 134:7
diverting 33:9
divided 104:10
Docket 1:6, 1:23,
  2:6, 8:13, 9:16,
  50:1, 66:10,
  73:20, 88:17,
  91:1, 91:25, 92:8,
  92:21, 94:5,
  98:16, 99:7,
  104:2, 106:14,
  110:6, 119:9
document 83:22,
  107:16, 107:18,
  110:16, 112:4,
  112:5, 112:9
documents 54:7,
  54:10, 61:8, 82:7,
  83:15, 84:6, 87:1,
  108:2, 110:10,
  111:12, 111:17,
  111:23, 112:4,
  112:14
Doing 12:15, 28:15,
  56:4, 58:22,
  104:25, 128:16,

128:18, 128:20
dollar 31:2, 44:4,
  94:2, 94:9, 95:6,
  125:12
dollar. 66:19
dollars 11:13,
  11:14, 11:16,
  11:24, 12:4, 12:6,
  12:11, 26:1, 28:7,
  30:18, 39:13,
  39:14, 41:1,
  77:23, 94:14,
  95:21, 121:19,
  130:11
dollars. 123:9
domain 11:2, 65:18,
  66:14, 66:15,
  66:20, 68:15,
  69:17, 77:14
donate 130:18
done 12:1, 22:13,
  114:4, 124:1
dooming 99:15
door 25:14, 95:21,
  96:4
double 63:25
doubt 44:12
Doug 23:7, 24:4
Douglas 3:22, 3:23,
  103:19, 105:2,
  109:18
down 23:22, 121:7,
  121:13, 122:20
drafts 79:7
dramatic 47:24
dreamer 120:20
dreams 120:20
drive 100:12, 100:15
drive-in 130:5
drop-off 84:15
dropped 38:14, 90:16
DTC 99:4
due 51:24, 93:14,
  93:18, 93:23,
  101:5, 106:1,
  108:6, 108:12,
  108:23
duplicate 110:22
duplication 110:22
During 7:19, 7:24,

8:6, 16:12, 42:16,
  46:18, 84:11,
  116:1
duties 85:11


< E >
e-mail 126:22
e-mailing 100:18
E. 4:12
earlier 21:17, 31:3,
  108:19
earned 127:5
easily 91:24, 105:12
echo 86:3
economic 87:17
economical 125:5,
  127:5, 127:13
economically 125:21
economics 88:10
Economy 77:4, 120:19
Eduardo 4:20, 68:19,
  69:12
effect 11:9, 31:23,
  45:24, 49:11,
  67:4, 101:17
effected 101:14
effective 13:17,
  57:24, 93:9,
  98:25, 99:16,
  99:19
effectively 99:20
effectuate 113:8
efficiently 69:18
effort 20:13
efforts 9:7, 9:14,
  10:23, 14:4
Eight 90:1, 96:11,
  108:3, 108:10,
  119:15, 128:7,
  129:3
either 13:17, 20:17,
  28:20, 36:22,
  60:10, 102:16
El 25:5
elect 96:19
election 34:24,
  96:18, 106:11
elements 115:5
eliminate 60:18

elsewhere 26:12
embarking 45:10
eminent 11:2, 65:18,
  66:14, 66:15,
  66:20, 68:15,
  69:16, 77:14
EMMA 112:6, 112:9
employee 39:18
Employees 1:32,
  3:11, 6:25, 14:20,
  39:11, 39:23,
  55:15, 56:4, 94:2,
  94:13, 94:16,
  95:12, 95:15,
  95:22, 96:16,
  123:23, 123:24
enable 32:5, 35:6,
  46:6
enabling 44:11
enact 71:21
enacted 43:3, 44:1,
  46:6
enactment 43:24
encompasses 70:23,
  70:24
encourage 8:16
encouraging 84:8
end 26:9, 46:11,
  50:25, 57:5,
  107:19, 109:14,
  115:17, 118:9
ended 108:13
Energy 106:19
engage 19:14
engaged 50:5
English 129:6
enhanced 14:13,
  14:18
enjoin 58:15
enjoy 45:20, 45:23
enjoyed 44:6, 44:13
enough 24:13, 35:6,
  49:14, 124:21,
  125:22, 126:15
Enron 106:19
ensure 7:7, 81:12,
  82:17, 84:16,
  114:10
ensuring 24:25
entered 11:6, 115:7

entites 62:1
entities 15:24,
  60:11, 60:12,
  61:12, 64:17,
  64:22
entitled 44:2,
  63:15, 66:15,
  82:18, 111:22,
  123:13
Entity 61:14, 63:1
entry 8:13, 9:17
enumerated 61:11
envision 104:9
Epstein 76:22
equal 40:1, 84:23,
  122:4, 122:12,
  130:25
equitable 29:24,
  30:3, 40:8, 68:4,
  70:6
equity 40:1
error 91:8
ERS 3:43, 11:2,
  79:2, 79:11,
  81:19, 81:20,
  82:1, 82:23
especially 104:1,
  126:1
Esq 3:18, 3:19,
  4:12, 4:15, 4:16,
  4:18, 4:20, 4:24
essential 9:9, 77:3
essentially 80:6
establish 72:12
established 67:12
establishing 45:15
estimate 66:18
estimated 34:19
et 1:16, 2:35, 6:18,
  48:17, 49:7,
  85:16, 113:15
evaluating 26:22,
  60:18
eve 93:8, 107:22
evening 10:19,
  12:17, 14:1,
  21:25, 26:18, 41:5
evenly 24:1
event 12:7, 14:10,
  14:16, 88:4,

101:23
Everybody 19:18,
  22:4, 22:6, 22:14,
  123:7, 127:8
Everyone 6:8, 7:13,
  9:3, 117:11, 133:5
Everything 20:4,
  22:5, 22:13,
  27:15, 27:16,
  119:3, 119:4
evidence 32:17,
  32:18, 42:18,
  73:18
exactly 72:14, 95:11
examine 25:2, 39:17,
  39:22
example 8:20, 26:7,
  28:25, 61:23,
  71:11, 71:15,
  75:19, 81:16,
  91:17, 106:10,
  106:13, 110:23,
  111:12, 112:2,
  119:19, 125:18,
  128:11
examples 111:23
except 109:15
exceptionally 113:15
excess 94:11
excessive 113:4
exchange 92:2,
  131:13, 131:15
excise 32:16
excluded 62:17
excludes 39:19
exclusively 130:24
exculpation 35:4,
  64:13
exculpations 35:12,
  57:18
Excuse 11:2, 13:21,
  14:12, 14:25, 39:4
execute 49:8
executed 12:23
executive 16:6, 17:6
exemplar 106:17
exempt 45:23, 92:18
exercise 44:3
Exhibit 14:18, 26:9,
  88:17, 91:4, 91:9,

91:10, 91:13,
  104:2
EXHIBITS 5:9, 73:18,
  73:23
existing 111:3
exists 111:18
expansive 44:17,
  44:22, 107:23,
  109:13
expect 20:1, 21:5,
  88:11, 115:2
expectations 124:7
expected 10:1, 99:4
expediently 69:21
expedited 114:23
expedition 105:18,
  105:20
expeditiously 42:21,
  113:3
expense 36:6, 105:15
experience 82:10,
  100:2, 100:10,
  100:23
experiencing 81:10
expert 107:4, 107:6,
  107:8, 107:24,
  108:11
explain 36:7, 74:23,
  85:15, 109:5
explained 9:5, 33:2,
  60:20
explains 83:17
explanation 99:10
explanations 83:23
explicitly 43:24
explore 115:1
explosions 131:14
express 93:10
expressions 123:1
expressly 15:23
extent 18:2, 21:3,
  35:16, 60:7,
  63:12, 78:14,
  100:3
extra 64:23, 104:12
extraordinary 131:25
extremely 21:8,
  49:12, 84:7,
  110:11

< F >
F-2 14:18
face 24:13, 88:5,
  122:15
faces 121:6
facial 24:15
facially 24:25,
  30:10
facilitating 84:8
facing 59:1
fact 14:19, 15:16,
  16:1, 18:15,
  20:24, 21:22,
  21:24, 29:4,
  32:16, 33:23,
  41:9, 43:6, 43:25,
  44:5, 55:25,
  56:16, 62:5,
  70:14, 72:16,
  74:12, 82:5,
  95:14, 95:20,
  101:18, 107:4,
  107:5, 107:7,
  107:24, 108:8,
  108:10
facto 25:15
factored 95:3
factoring 95:14
facts 68:2, 93:25
factual 66:9, 88:15
factually 72:16
failed 35:24, 109:5
fails 33:15, 35:9,
  36:4, 36:10,
  108:20
failure 9:10
fair 29:23, 29:24,
  30:2, 51:6, 53:16,
  114:20, 115:24,
  116:3
fairly 9:8
fairness 109:15
faith 9:7, 9:14,
  43:15, 43:18,
  43:20, 45:20
Fajardo 84:20
fall 29:21, 55:20,
  87:20
falls 29:20

false 53:21
families 124:23,
  125:16
family 125:23
far 16:4, 51:3,
  118:4
far-reaching 31:23
fashion 22:20,
  46:10, 115:18
fast 121:8
favor 60:11, 106:18
favorable 107:3,
  107:14
favors 105:13
fear 52:20
feasibility 36:11
feasible 33:15,
  75:17, 75:20,
  78:7, 113:21
February 12:23
Federal 15:9, 15:13,
  15:15, 15:16,
  15:18, 71:1, 93:9
federally 49:23,
  50:4
Federation 39:23
fee 13:24, 13:25,
  44:4
feel 126:16
fees 13:2
Feld 49:22
fell 122:20
felt 83:25, 121:6
FEMA 130:10
few 12:20, 18:14,
  53:9, 83:7, 95:24,
  123:25
FGIC 16:9, 22:22,
  40:19, 40:25,
  41:2, 98:4, 102:6,
  102:18
fide 121:15, 123:7
fighting 49:9
figuring 37:10
file 79:3, 110:20
filing 25:22, 33:4,
  42:10, 42:23,
  94:23
final 8:23, 39:12,
  47:2, 66:16,

101:4, 101:7,
  101:16
Finally 30:9, 116:10
Finance 3:40, 89:4,
  120:18
Financial 1:9, 1:26,
  2:9, 2:40, 3:31,
  6:16, 45:13,
  45:25, 47:11,
  47:12, 47:15,
  47:18, 51:23,
  119:8
financials 93:11,
  93:17, 94:20
financing 48:21,
  131:23
Finca 4:20, 69:10,
  69:12, 70:7
find 19:10, 31:2,
  110:13, 111:17,
  115:15, 125:5,
  126:7, 127:10,
  129:21
finding 30:8, 30:22,
  59:2
finds 33:13, 92:13
Fine 48:5, 80:23,
  102:7, 117:25
finish 83:7, 97:25
firm 9:8
firms 100:8
Fiscal 2:39, 32:21,
  32:24, 32:25,
  33:3, 45:14,
  46:13, 59:22,
  95:4, 130:20,
  130:25, 131:9,
  132:13
fiscally 43:7
Five 10:4, 39:11,
  51:12, 52:23,
  103:12, 108:4,
  111:2
flash 100:12, 100:15
flatly 60:22
flaw 25:13
flawed 25:3
flaws 24:15, 25:9,
  25:12
flexibility 20:19

flood 109:2
flow 45:16, 94:12,
  94:23
flushing 108:17
focus 24:14, 60:1,
  60:14, 106:16
focusing 90:6, 90:14
folders 112:3
followed 119:24,
  128:25
Following 10:20,
  88:4, 122:2
follows 109:12
forbid 71:21
forced 113:21
Forces 131:19
forcing 109:1
forecast 95:23
forever 24:20
forgive 27:18
forgot 17:1
form 83:14, 84:3,
  84:5, 91:23, 94:2,
  100:19
formed 126:6
formulated 113:6
Fortaleza 132:5
forth 12:12, 32:17
forthright 95:5
forward 18:9, 20:1,
  20:17, 21:24,
  22:1, 22:4, 23:2,
  23:12, 24:19,
  33:17, 43:9,
  50:17, 57:2,
  58:24, 59:1,
  113:3, 113:13,
  115:13
Foster 119:19
found 30:8, 73:20,
  106:12, 121:10,
  122:3, 125:10
foundation 72:14
Four 46:15, 55:24,
  59:21, 60:2, 73:3,
  93:15, 93:24,
  108:3, 108:16,
  109:7, 117:9
Fourth 42:12, 53:17,
  55:9, 59:24,

60:16, 61:10,
63:18, 64:16,
65:19, 71:19,
72:10, 94:1
fragments 91:15,
91:18, 91:19,
92:1, 92:3, 96:19
frame 28:14, 106:11
frames 105:14
framework 108:20
Frankly 32:3, 84:2
free 45:16, 71:21,
120:21, 127:12
freezes 42:24, 43:1,
43:5
fresh 77:1
FRIEDMAN 2:42,
112:19, 112:20,
112:23, 113:1,
114:23, 115:19,
116:9
front 83:22
frustrate 82:9
full 18:12, 43:15,
43:18, 43:20,
45:20, 66:21,
68:18, 78:9,
114:4, 114:18,
114:20, 115:10,
115:24, 116:7,
120:20, 121:21,
123:24, 124:2
Fullana 68:19
fully 26:17, 29:8,
33:24, 108:17
fun 123:8
functioning 48:17
functions 8:3
fund 13:15, 48:15,
126:5
fundamental 25:16,
43:7
fundamentally 101:6
funding 64:19,
130:13
funds 15:7, 27:20,
27:21, 28:20,
28:22, 63:7,
122:16, 122:18,
125:2, 125:9,

125:11, 125:13,
125:24, 126:17,
127:11, 130:23
funny 123:3, 123:5
futile 33:17
future 29:5, 41:11,
53:5, 55:18, 66:7,
88:12, 92:11,
120:25, 122:19,
124:2

< G >
Gail 2:26, 6:14,
134:8
gamble 45:17
gamesmanship 54:9
gaps 52:18, 52:19
Garcia 3:19, 24:6,
24:15, 26:24,
31:9, 31:11,
31:12, 31:13,
35:1, 36:18, 37:2,
37:4, 123:1
gating 87:7, 115:22
gave 44:17
GDB 24:8, 46:6,
46:25, 61:13,
62:17, 62:19,
62:25, 63:2
general 11:1, 25:6,
34:3, 34:6, 34:8,
48:6, 55:21, 75:6,
92:18, 119:14
generally 79:8,
84:9, 85:18
generic 57:17
Gerardo 4:24, 76:23
gerrymandering 34:10
getting 57:12,
91:14, 91:17,
114:8, 117:9
Give 38:8, 48:6,
53:24, 104:13,
110:23, 119:14,
123:25, 132:5
given 32:24, 40:3,
41:9, 60:11,
62:13, 97:13
gives 71:20, 71:23

giving 57:12, 61:15,
84:23, 126:13
Global 78:20
goal 47:2, 114:8
God 6:14
Goldman 51:17
Gonzalez 4:18, 38:3,
38:4, 38:6, 38:11,
38:19, 39:1, 39:4,
39:5, 39:9, 40:17,
73:10, 73:11,
73:13, 73:14,
73:16, 73:25,
74:2, 75:15, 76:15
Goodwin 51:17
Gordon 3:11, 79:22,
79:24, 79:25,
80:2, 80:3, 80:5,
80:8, 80:9, 80:24,
81:15, 83:5,
83:10, 86:2
Gos 123:18
Gotshal 89:3
gotten 14:24, 26:5
governmental 58:1,
58:20, 61:11,
64:17, 113:23
governments 126:6
Governor 44:7,
46:11, 123:1,
126:6, 132:5
gracious 117:13
grant 22:15
granted 36:7, 62:14,
75:16, 75:18
granting 61:15
graphics 83:23
grateful 124:13
Great 51:8, 126:19
greater 109:7
Green 76:22
grounds 68:3, 81:12,
113:19, 113:21
Group 4:15, 14:19,
38:2, 39:5, 39:10,
40:19, 40:25,
41:6, 49:17,
49:24, 55:2
GRS 82:1
Guarantee 3:40,

121:12, 122:12
guaranteed 93:14,
  120:17, 122:13
Guaranty 3:25, 3:27,
  3:31, 89:4
GUC 11:11, 62:8,
  62:22, 62:24,
  63:15
guess 20:25, 80:8
guilty 125:10
Gump 49:19, 49:22
gymnastics 44:19


< H >
Hacienda 113:15
half 42:16, 63:1,
  104:13, 104:14,
  104:22, 121:8,
  121:21, 121:22,
  122:5, 126:14
hampers 109:15
Hampton 40:24
hand 16:9, 76:8,
  84:15, 93:20
handful 53:15
handle 18:5, 97:17
handling 18:4
hang 65:4
happen 64:16, 64:22,
  75:16, 92:10,
  99:22
happened 121:17,
  124:7
happens 80:7
Happiness 121:7
happy 10:22, 17:21,
  19:17, 116:24
hard 24:19, 100:16,
  100:20, 125:15,
  125:23, 127:6
Hastings 37:19,
  97:11
hate 80:7, 80:8
Hauer 49:22
Havana 120:8
head 22:13
health 48:20, 49:23,
  50:4, 50:12,
  50:16, 77:4

heard 8:1, 8:5,
  10:2, 10:14,
  17:14, 21:15,
  24:18, 77:1, 77:6,
  77:15, 90:13,
  132:19
hearing. 90:10,
  90:12
hearings 115:22,
  116:2
heavily 83:22
Hein 3:15, 89:23,
  89:24, 90:2, 90:4,
  90:5, 90:13,
  90:20, 90:23,
  94:19, 96:3,
  96:10, 96:12,
  97:1, 98:13,
  98:15, 100:15,
  102:1, 102:3,
  110:1, 110:3,
  110:25, 112:11,
  112:17
held 15:1, 15:11,
  63:1
help 42:14, 82:17,
  120:18, 125:18,
  125:20, 125:21,
  125:23, 131:10,
  131:11
helped 131:12
her. 38:24
herself 127:25
highlighted 106:5
highly 77:3, 92:1,
  114:23
Hilarious 123:4
hints 34:9
historical 129:25
history 46:5,
  129:25, 130:6,
  132:18
hit 13:4, 131:13
Hoc 40:19, 40:25
Hogan 59:17
Hold 38:17, 40:25,
  52:9
holder 16:20
holders 11:1, 14:7,
  14:14, 30:15,

30:17, 83:12,
  99:1, 99:2, 100:7
holding 67:25
honest 26:16, 126:11
honestly 127:8
Honorable 2:24,
  2:26, 6:13, 6:14,
  6:15, 124:14,
  125:14, 132:9,
  134:6, 134:8
honorably 124:18
hope 16:10, 19:14,
  42:20, 46:22,
  77:10, 113:12,
  114:19
Hopefully 58:23
hopes 50:12, 77:8
hospital 130:10,
  130:12, 130:13
Hotel 61:22
hour 22:10
hours 13:4, 33:22,
  108:3, 108:4
House 125:12,
  125:13, 132:3
Houser 9:13, 9:16,
  10:22, 10:23,
  13:11, 42:13
Howard 4:9, 51:17
huge 49:2
hundred 39:24,
  75:20, 123:9,
  123:24
hundred. 123:11
hurdle 72:23
hypothetical 87:14,
  91:21


< I >
I. 3:23, 124:12
idea 48:6
identical 112:5
identified 33:25,
  53:15, 66:1,
  84:19, 106:17,
  108:10, 111:22
identifies 54:1
identify 7:20,
  52:24, 103:14

ignored 62:18, 63:3
ignores 99:9, 110:8
ignoring 31:24
II 46:14, 97:8
III 1:8, 1:25, 2:8,
    3:6, 6:24, 14:1,
    15:23, 16:4,
    16:16, 24:20,
    33:4, 42:21,
    46:16, 57:2, 61:2,
    61:25
illegal 32:11,
    126:16
illegally 33:9
immediately 13:3,
    13:4, 86:9, 99:3,
    120:14
immense 44:12
immersed 121:25
impact 17:23, 36:10,
    52:17, 124:5
impair 52:1, 54:8,
    58:3, 72:3, 74:12
impaired 35:15,
    70:16, 71:1,
    75:21, 76:4, 76:6,
    76:9, 76:12,
    81:22, 81:24
impairment 58:5,
    58:10, 66:22
impediment 78:1,
    79:13
impeding 45:14
imperil 52:20
implement 114:5
implementation 44:13
implementing 113:8,
    113:14
implicitly 44:9
important 39:9,
    44:12, 46:4,
    47:10, 48:11,
    48:18, 48:21,
    49:1, 49:4, 49:8,
    49:12, 53:17,
    58:5, 74:21, 82:3,
    82:23, 83:25,
    84:7, 115:3,
    116:3,
    120:25

importantly 52:17
impose 113:22
imposed 60:11
imposes 24:23
impossible 25:4,
    111:16
impracticability
    114:15
improper 26:3, 60:14
improperly 28:20,
    30:3, 51:25
in-person 85:15
in. 99:18, 131:24,
    132:7
inaccurate 31:1
inadequate 77:20
inappropriate 112:13
Inc 73:12
Inc. 4:12, 4:15,
    4:23, 69:16,
    76:24, 106:19
include 57:25,
    83:11, 85:13
included 13:5, 14:3,
    15:13, 18:8,
    39:19, 63:3, 66:5,
    66:7, 66:16,
    91:24, 108:22
includes 14:18,
    27:10, 30:6,
    43:13, 66:17, 77:7
including 7:16,
    9:24, 12:15,
    24:23, 27:9,
    31:25, 32:12,
    43:1, 61:19, 81:7,
    85:6, 86:23,
    90:25, 107:16,
    108:17, 114:14
inclusion 17:17,
    44:23, 50:22
inconsistent 58:2
incorporated 29:11,
    29:17, 61:10
increase 20:22
increased 11:12,
    12:4, 14:6, 14:8,
    126:5
independent 120:11,
    120:23

indicate 58:13
indicated 88:17,
    119:12
indicates 76:9,
    94:11
indicating 132:24
indicted 121:17
indirect 58:5,
    72:12, 72:17
indirectly 58:3
individual 20:23,
    21:2, 56:3, 91:14,
    92:2, 92:4, 100:8,
    100:24, 101:13,
    101:21, 101:22,
    110:12, 119:12,
    119:13
individuals 99:11,
    110:9, 111:8
indulge 96:8, 98:8
Industrial 67:9
industry 77:2
infirmities 106:4
influence 122:10
inform 14:11
informative 97:14
informed 35:7, 74:4,
    78:12, 87:14,
    89:23, 115:17,
    131:18
inherent 46:2
initial 99:24,
    101:1, 108:7,
    108:20, 108:22,
    108:23, 109:2
initiated 77:10
injunctions 35:12,
    57:18
insist 42:24
insisted 43:1
instance 19:24
instances 43:10
Instead 34:21,
    52:13, 66:15,
    122:1
institution 121:2
institutions 98:20,
    99:11
instructed 86:7
instructions 84:5,

98:21, 119:14,
128:6
instrument 120:15
instrumentalities
53:7, 60:24, 60:25
instruments 114:3
insulate 57:21
Insurance 3:32
Insured 40:25, 41:2
insurers 53:13
Integral 4:11, 47:7
intelligence 126:25
intend 52:6, 58:19
intended 32:7
intending 79:14
intends 25:25, 43:8,
85:12, 113:7
intent 9:12, 32:1,
61:2, 61:25
intention 22:3,
88:18
interest 6:21, 7:23,
13:3, 91:7, 93:14,
93:19, 93:23,
95:17, 123:4,
124:1
interested 8:15
interim 50:21
Internal 93:2
interposed 17:12,
17:17
interpret 128:5
interpretation 122:2
INTERPRETER 4:31,
119:11, 127:24,
128:1, 128:2,
128:13, 128:15,
128:18, 128:22,
129:4, 129:5,
129:9, 129:11,
129:13, 129:17,
130:16
interrogatories
110:6, 110:7,
110:14, 110:21,
111:7
interrogatory
110:18, 110:19,
110:23, 111:7
interrupt 8:6, 8:7,

8:10, 38:17
interrupted 28:3
interruption 39:6
intertwined 20:8,
21:18, 23:13
intervene 56:2
intervened 55:16
intimidating 84:2
intricacies 9:20
intrinsically 43:10
introduce 127:24
introductory 9:22,
10:5, 10:10, 90:21
invented 121:19
inverse 68:16
invest 126:2
invested 122:15
investigate 127:11
investigation 125:9
investing 127:2
investment 125:6
investments 101:13,
121:1, 126:7,
126:21, 127:12
investor 47:20,
87:14, 112:14,
121:6
investors 91:14,
92:2, 92:4, 98:19,
98:24, 99:13,
99:15, 99:24,
100:8, 100:24,
101:21, 101:22,
121:22, 123:4,
123:7, 124:25,
125:6
invitation 132:25
invite 9:21, 89:25
involved 11:22,
22:25, 106:22
involves 109:10
irreducible 70:20
irrevocable 70:11
irrevokable 71:5
IRS 92:11, 92:21,
93:4, 93:6
Irving 45:2
Island 46:19,
120:23, 124:2,
129:23, 130:2,

130:4
issuable 114:1
issuance 43:19,
44:18, 45:12,
113:17
issuances 59:19,
59:20
issued 7:15, 16:18,
45:19, 53:7,
59:24, 60:25,
91:19, 92:18,
100:11, 120:16,
120:18, 122:12
item 94:16, 97:8
items 50:21, 79:9
itself 11:9, 17:18,
17:25, 76:9, 78:4,
91:13
Ivan 51:18
Ivonne 39:5
IVU 130:23


< J >
J. 2:35, 3:19, 3:28,
4:6
Jenner 80:9, 116:21
jobs 124:22, 126:3
John 2:41, 4:12,
42:6, 47:6, 131:18
join 12:25
joinders 13:8
joined 24:6, 103:19
joining 13:3, 13:9
joins 88:20, 89:11
Joint 6:24, 67:2
Jointly 1:11, 1:28,
2:11, 7:5, 89:9,
102:15
Jones 78:23
journey 46:16
Juan 6:1, 90:9,
90:11, 90:18
judges 81:17
judgment 35:7,
53:20, 55:18,
87:15, 115:11,
116:6
judgments 39:12,
56:10

judicial 7:14
Judith 2:26, 6:14,
  134:8
July 57:3
jumble 110:10,
  111:11, 111:17
juncture 80:14,
  85:25
June 9:5, 47:17
juniors 122:4,
  122:5, 122:6
justification 34:14,
  101:11, 105:18,
  106:1
justify 31:23,
  32:11, 33:6, 34:19

< K >
KAHN 49:17, 49:18,
  49:21, 49:22,
  51:6, 51:9, 51:10
keep 8:16, 119:16,
  128:8
keeping 8:17
Kelly 3:41, 89:3
key 60:2, 90:5,
  90:14
kind 45:19, 113:19
kindly 85:19
Knick 70:9, 70:10,
  70:18, 70:20,
  70:22, 70:24
Knicks 71:3
known 129:19
knows 86:21, 93:3,
  107:21, 122:17
Koff 3:23, 103:19,
  105:2, 109:18,
  109:21, 109:22,
  109:25

< L >
la 4:12, 47:7
labeled 88:8
lack 30:22, 48:3,
  60:9, 75:6, 114:15
lacks 113:8
Land 67:3

language 17:18,
  35:13, 36:9,
  50:23, 52:10,
  52:18, 53:23,
  53:25, 57:17,
  59:7, 66:5, 99:8
lapse 68:7
large 51:21, 75:7
largely 102:23
larger 109:6
largest 85:8, 106:24
LAROSE 40:19, 40:20,
  40:23, 40:24,
  41:20, 41:24, 42:2
Last 10:18, 12:16,
  14:1, 18:10,
  26:16, 26:21,
  41:5, 46:17,
  46:23, 62:5,
  64:16, 84:22,
  90:13, 91:1, 92:7,
  93:12, 93:19,
  94:7, 94:10,
  94:23, 95:2,
  98:23, 99:25,
  100:4, 123:17
Lastly 15:19, 35:1,
  36:12
late 12:17, 26:17,
  26:21
later 68:21, 101:10,
  121:17
latest 30:6, 42:14,
  95:4
latter 115:19
Laura 2:24, 6:13,
  124:14, 134:7
Law 24:24, 29:9,
  29:23, 30:2,
  31:16, 31:21,
  31:24, 31:25,
  32:2, 33:11,
  43:17, 66:8,
  66:10, 68:8,
  70:12, 71:21,
  76:7, 101:23,
  109:11, 115:11
lawful 113:20
Lawrence 40:23
laws 24:22, 32:6,

  56:5, 67:3
lawyers 119:25,
  129:1
lead 21:5, 73:1
leader 9:13
learned 94:23,
  103:24
least 24:25, 33:25,
  62:13, 70:6,
  91:15, 101:1,
  104:8, 108:3,
  109:13, 111:6,
  121:21
leaving 54:9, 114:17
left 40:4, 93:15,
  93:24
legal 33:5, 44:19,
  45:10, 45:17,
  55:17, 72:4,
  72:13, 88:15,
  113:19
legalese 84:2
legality 87:17
legals 122:2
legislation 43:2,
  43:11, 43:22,
  43:25, 44:1,
  44:11, 45:19,
  46:6, 113:8,
  113:13, 113:14,
  115:14
legislative 44:24
legislature 44:7
legitimate 111:10
legitimately 112:12
lent 123:22
less 8:23, 18:11,
  23:14, 33:22,
  55:24, 75:22,
  81:17, 82:10
lesser 109:7
letter 83:13, 83:17,
  84:7, 97:15
level 12:24, 53:24
lieu 71:17
life 122:8, 124:5,
  125:17, 126:1
light 19:17, 20:23,
  29:14, 37:21,
  51:2, 58:6, 104:5

likely 82:9, 99:13
likes 26:20
limit 52:6
limitation 64:9
limitations 44:25
limited 7:16, 41:6,
    42:8, 42:10,
    42:25, 49:24,
    50:15, 51:5, 57:7,
    80:11, 87:20,
    87:22, 91:2
limiting 53:3, 53:8,
    53:14, 108:21
line 7:8, 82:1,
    89:24, 96:12
link 102:25
linked 111:15
Lisa 6:7, 118:23
list 23:6, 76:17,
    79:21, 98:4,
    108:6, 108:7,
    108:8, 108:10,
    116:14
listed 7:21, 102:17
listening 127:14,
    132:20
literally 94:14,
    111:17
litigation 46:23,
    48:13, 48:16,
    53:11, 56:8,
    105:15, 115:8
litigations 52:2
little 17:3, 19:11,
    68:20, 115:1,
    115:20, 123:13
live 131:14
lives 124:17,
    125:15, 126:10
living 125:16
Llado 51:18
LLC 24:6, 31:13,
    31:14, 103:17,
    103:18, 103:20
LLP 56:21, 59:17
loan 26:11, 30:19,
    30:21, 87:1
loans 30:7, 30:17,
    34:6, 34:15,
    121:12

local 43:17
location 84:17
lock 25:21
locking 99:14
locks 28:16
lockup 99:13
logged 116:22
logistical 84:25
long 46:15, 100:22,
    101:8, 117:6
longer 13:21, 100:9
Look 16:2, 24:18,
    28:15, 118:12
looked 27:15, 99:25,
    120:15
looking 38:9, 98:22,
    121:7
looks 57:2, 57:4,
    58:24, 59:1
LOPEZ 4:28, 124:10,
    124:11, 124:12,
    127:20, 127:21
lost 59:3, 68:7,
    122:21
lots 48:4, 73:3
Louisville 67:2
love 132:1
Lovells 59:17
Luc 3:6, 37:19,
    97:10
lucky 126:14
lumped 81:6, 81:16
lunch 86:9, 97:6,
    102:13, 118:1,
    118:2, 118:16
Luz 6:11, 6:20
lynchpin 29:20


< M >
Madam 128:13, 129:11
Magistrate 2:26,
    7:5, 102:15, 134:8
magnitude 105:23,
    107:11
mail 100:2
mailed 100:6
mailing 100:4,
    100:6, 100:9
mailings 85:14

maintain 130:8
majority 41:7, 68:3,
    68:22, 126:13
managed 114:5
Management 1:10,
    1:27, 2:10, 6:17,
    25:5, 119:8
managers 132:14
mandate 45:14
Manges 89:3
manner 58:2, 83:18,
    92:13, 127:3
mansion 132:5
MARCARI 4:23, 76:18,
    76:19, 76:21,
    76:22, 78:19
marching 47:2
Margaret 2:37,
    10:13, 117:18,
    117:21
Maria 6:11, 6:20
Marines 127:7
Maritime 61:21
mark 38:13
marketability 92:4,
    114:7
markets 45:13,
    45:15, 114:9
Martin 2:35, 3:32,
    4:27, 10:13,
    120:2, 120:3,
    120:8
Maslon 56:21
massive 81:6
material 12:18, 92:2
materially 106:24
materials 9:24,
    10:3, 111:20
math 93:22
Matilda 69:10, 69:12
Matilde 4:20, 70:7
matter 44:5, 45:9,
    70:5, 71:4, 115:11
matters 7:22, 9:18,
    10:14, 64:12,
    81:3, 82:20, 87:6,
    114:19
maturities 91:6
maturity 91:20
Maximum 106:19

Mcconnell 24:6,
  31:13, 103:17
mean 24:21, 70:15
meaning 13:16, 116:5
meaningful 42:19,
  43:2, 113:18
means 55:23, 111:8,
  114:5, 130:20
meant 108:19
measures 114:5
mechanics 12:14
mechanism 87:24,
  115:23
med 50:10
Media 85:14, 106:19
mediation 9:13,
  10:22, 14:23,
  16:8, 18:17, 88:4
Medicaid 50:18, 95:3
medicine 17:3
meet 32:23, 75:10,
  105:14, 105:20,
  120:6
meeting 105:25
meetings 85:15
meets 84:4
members 6:22, 7:17,
  40:25
memorandum 66:10
memorized 27:15
mention 55:19,
  103:24
mentioned 19:9,
  94:24
merit 86:25, 89:16
mess 131:24
methods 85:13
MFA 59:24, 61:17
Michigan 106:20
microphone 129:14
middle 22:11, 92:9,
  116:2, 127:4
Milbank 19:6, 102:20
milestones 105:21
milk 77:1
MILLER 3:35, 19:5,
  19:8, 20:18,
  22:21, 102:20,
  103:5
million 11:12,

11:13, 11:16,
  11:24, 12:6,
  12:11, 26:1, 28:7,
  30:18, 31:2,
  39:13, 39:14,
  41:1, 44:4, 48:25,
  77:23, 77:24,
  125:12, 130:11
millions 109:10
mind 23:20, 102:5,
  108:23
mindful 19:20
mine 122:12
Mintz 3:22, 23:7,
  23:10, 23:11,
  23:21, 23:25,
  24:4, 24:5, 27:3,
  27:8, 27:17,
  27:23, 28:4, 28:6,
  28:11, 29:13,
  29:16, 31:8, 31:10
minute 20:12, 64:3,
  96:7, 104:8
misallocated 126:17
misappropriated
  125:14
misled 58:9
mismanage 125:11
mismanaged 125:2
missed 16:1, 16:2,
  61:4, 118:4
missing 47:16, 47:19
mistakes 92:8
misusing 58:1
modeled 44:6
modification 13:24,
  82:14
modifications 11:5,
  12:15, 15:24
modified 10:19,
  11:1, 11:3, 14:15,
  15:4, 26:21,
  70:24, 71:13
modify 58:13, 82:15
moment 21:15, 46:4,
  76:25, 99:22,
  118:1
monetary 66:3, 70:15
money 13:18, 32:19,
  64:20, 67:25,

75:22, 121:13,
  122:9, 122:13,
  123:2, 123:22,
  126:20, 126:23,
  127:1, 127:2
monies 11:14, 11:19,
  13:17
Monitor 3:22, 24:5,
  103:20
monitoring 11:22,
  12:1
Monjitas 4:23, 76:24
monoline 53:13
monolines 53:15,
  86:23
Monta 47:7
Montana 4:12
month 100:4, 108:6
monthly 81:8, 81:9,
  85:9
months 13:12, 81:2,
  108:11
mootness 68:4, 70:6
MORALES 38:3, 38:4,
  38:6, 38:11,
  38:19, 39:4, 39:9
morally 43:5
Morell 51:19
mother 125:19
Motion 9:20, 17:9,
  17:14, 19:12,
  36:6, 36:14,
  47:15, 65:11,
  84:23, 97:14,
  102:23, 103:1,
  103:9, 105:11,
  106:3, 108:14,
  110:2, 112:14,
  116:25, 119:8,
  132:21
motions 102:14
movants 97:2
move 18:9, 24:19,
  43:9, 66:9, 113:3,
  113:13
moving 99:9, 115:20
MUDD 4:12, 47:5,
  47:6, 47:9, 47:22,
  47:23, 48:1,
  48:23, 49:15,

49:16
Mullin 40:24
multibillion 94:1,
    95:6
multiple 14:4,
    59:24, 74:9, 94:15
Municipal 3:27,
    106:22, 106:25
mute 7:8, 7:10,
    18:25, 37:10, 86:4
muted 16:25, 86:4,
    116:23
Myers 42:7, 112:20
myriad 74:10
Myriam 4:29, 129:9,
    129:18
myself 16:25, 17:1,
    18:25, 19:11,
    124:18, 125:22,
    126:24, 127:16


< N >
naive 27:18
name 7:20, 8:2,
    37:14, 117:8,
    120:7, 124:11,
    129:9, 129:18
names 123:5, 123:6
Nancy 4:28, 124:10,
    124:11
narrowed 19:24
Natbony 3:28, 86:12,
    86:13, 86:16,
    89:12
National 3:39, 3:46,
    4:6, 28:17, 89:1,
    89:4, 89:5, 89:8,
    89:11, 131:12
nature 18:16, 59:6,
    73:21, 116:7
Nayuan 3:18, 103:17
nearly 28:13
necessarily 22:11
necessary 10:7,
    11:19, 20:7,
    97:24, 113:4,
    113:9, 114:14,
    114:21, 118:7
necessity 44:10

need 7:11, 9:5,
    53:25, 60:15,
    73:5, 93:25, 96:9,
    96:14, 101:6,
    101:14, 105:17,
    113:18, 114:20,
    116:13
needed 80:14
needs 28:18, 36:1,
    74:3, 74:5, 76:10,
    91:11, 94:8, 95:5,
    95:9, 95:14,
    95:18, 96:5,
    96:12, 100:25
negotiated 77:7,
    77:11
negotiations 23:1,
    41:9, 50:5
NEGRON 4:28, 124:10,
    124:11, 124:12,
    127:20, 127:21
neither 44:23, 56:5
New 14:9, 14:17,
    15:13, 26:2,
    26:13, 36:9,
    43:25, 85:20,
    92:8, 92:17,
    92:22, 94:10,
    94:16, 111:3,
    113:17, 114:3,
    124:2
newly 9:22
Next 12:20, 19:3,
    22:22, 23:6,
    40:18, 42:3, 47:5,
    49:17, 51:11,
    55:2, 56:18,
    65:10, 76:17,
    78:20, 79:21,
    95:24, 98:4
NG 6:7, 38:6, 38:8,
    38:15, 38:17,
    79:25, 80:1,
    116:14, 116:16,
    116:19, 118:23,
    119:1, 119:4
night 12:16, 18:10,
    26:16, 26:21,
    62:5, 91:1, 92:7,
    94:7, 98:23,

99:25, 111:25,
    112:15
nightmare 92:5
No. 1:6, 1:23, 2:6,
    6:16, 8:14, 9:17,
    24:22, 48:1, 50:1,
    91:1, 119:9
noble 109:9
Nobody 121:17,
    122:7, 122:8,
    122:17
non-appropriation
    62:21
non-debtor 60:11,
    60:12, 60:24,
    61:11
non-debtors 61:13
non-dischargability
    69:5
non-impairment 69:6
non-title 15:22,
    16:4, 61:2, 61:25
nondeadline 108:1
nondischargeable
    33:14, 78:8
None 5:5, 5:11,
    12:18, 89:16,
    90:24
nonvoting 82:22
noon 118:7
nor 44:25, 56:5,
    71:19
normal 106:2
notably 16:16
note 16:7, 23:12,
    36:8, 36:19, 50:3,
    77:22, 79:5,
    79:13, 87:23,
    93:16
noted 10:18, 17:19,
    22:25, 30:17,
    42:25, 45:1, 91:4,
    112:12
Noteholders 40:19,
    40:25
notes 61:19, 63:7,
    63:8
nothing 52:3, 58:14,
    89:18, 114:24,
    117:3, 121:17,

121:18, 131:14
notice 82:22, 83:2,
 84:10, 98:21,
 99:8, 99:10,
 100:2, 100:3,
 100:20, 101:17,
 101:21
noting 35:18
notion 110:6
notwithstanding 61:5
novel 109:11, 114:11
nowhere 106:12
number 24:10, 27:7,
 27:8, 50:9, 50:14,
 66:2, 74:22, 75:2,
 75:7, 81:17, 88:8,
 91:22
numbers 94:11
numerous 43:9,
 52:18, 109:10
nuts 121:24


< O >
o'clock 86:7
O'melveny 42:6,
 112:20
object 41:10, 65:18,
 66:4, 79:16,
 113:19, 114:10,
 114:13
objectants 17:20,
 21:21, 21:24
objecting 18:8,
 102:17
Objection 9:21,
 20:25, 34:1,
 36:13, 42:9,
 42:10, 42:25,
 49:24, 50:15,
 55:8, 57:7, 74:11,
 76:1, 77:13,
 77:14, 86:20,
 91:4, 91:23,
 96:13, 99:24,
 100:5, 100:25,
 101:1, 102:25,
 104:7, 108:20,
 108:23, 110:5,
 115:5

objectors 20:1,
 20:9, 20:23, 21:2,
 86:6, 89:24,
 101:6, 118:3,
 119:11
obligation 13:15,
 13:16, 92:18,
 106:23
obligations 63:6,
 67:1
observed 105:24
Obviously 23:14,
 23:17, 60:17,
 85:20, 115:3
occupied 22:12
offer 130:20, 132:23
offered 51:4
offering 132:1
Official 3:3, 3:9,
 37:20, 55:15,
 80:10, 134:15
Okay 17:2, 23:21,
 24:2, 24:4, 28:5,
 36:16, 37:16,
 38:25, 39:3,
 47:24, 47:25,
 48:2, 51:8, 68:25,
 69:25, 80:22,
 96:10, 104:18,
 104:22, 105:9,
 117:20, 129:8
old 120:10, 122:23
Omnibus 2:23, 9:5,
 17:11, 17:19,
 40:3, 43:16,
 60:22, 88:16,
 100:5, 105:24
once 128:19
one-page 83:22
one. 25:22, 27:7
ones 126:18
ongoing 14:4, 15:15,
 16:21, 18:16,
 41:10, 50:11
open 13:22
opening 17:7
operate 52:4
operates 52:16
operation 7:7
operations 121:13

opinion 66:6, 68:15,
 68:22
opportunity 7:23,
 96:17, 99:23,
 100:24, 101:15,
 108:17, 113:6,
 120:22
oppose 39:15
opposed 96:19,
 107:18
opposite 109:8
opposition 19:12,
 22:18, 36:12,
 120:2
optimism 51:3
optimistic 50:6
option 99:16, 99:19,
 131:5
options 129:22
Order 18:20, 18:22,
 35:20, 40:7,
 43:19, 54:7,
 54:10, 58:14,
 66:16, 69:5,
 73:19, 85:19,
 88:4, 99:17,
 100:11, 113:7,
 113:16, 113:19,
 114:2, 114:14,
 115:5, 115:7,
 115:14, 115:16,
 116:1, 125:13,
 125:15, 126:8,
 126:20
ordered 45:20, 114:4
orderly 7:7
orders 7:14, 57:18,
 97:19
organize 81:25,
 129:21
organized 115:17
original 84:15
originally 10:4
Others 21:4, 31:3,
 39:13, 61:23,
 99:1, 101:19,
 102:6, 107:16
otherwise 13:18,
 22:12, 62:22,
 70:16, 71:6,

115:16
ought 62:14
ourself 124:21
ourselves 129:21
outline 106:7
outset 103:25
outside 87:24
outstanding 16:10,
   112:8
overarching 26:23,
   105:12
Overboard 131:9
overbroad 35:5
overcome 46:24,
   105:12
overlap 24:14,
   107:4, 107:25
overlooked 105:13
overly 26:20, 44:21,
   109:2
overview 9:24, 83:20
owed 63:7, 95:11,
   95:13
own 8:16, 17:3,
   28:17, 63:15,
   86:3, 91:16, 99:9,
   124:5, 130:18
Owned 130:15, 130:16


< P >
PACER 132:11
package 82:7
packages 83:12
packet 100:7, 100:12
Padilla 123:1
PAGE 5:3, 84:1,
   91:25, 92:9,
   92:15, 92:21,
   92:25, 93:16,
   94:6, 98:22,
   98:23, 105:17
pages 99:7, 100:17,
   134:4
paid 28:22, 66:21,
   68:18, 75:4,
   75:20, 95:17,
   122:9, 123:13,
   123:23, 127:11
Panel 45:2, 69:18

paper 109:4
papers 52:13, 94:5,
   99:9, 101:3,
   101:8, 101:9,
   101:15, 109:23,
   111:24, 112:13,
   122:8, 126:23
paperwork 126:22
par 41:1, 91:20,
   91:21
pari 26:12
park 129:25
part 20:21, 23:18,
   28:16, 43:1,
   47:10, 47:14,
   50:11, 72:5,
   73:23, 81:2, 87:9,
   87:22, 88:6,
   88:19, 88:21,
   102:22
participant 8:12,
   51:24
participate 30:19,
   111:9
participated 81:7,
   81:18
participation 84:8,
   94:3
particular 30:14,
   30:15, 35:13,
   35:18, 35:23,
   39:20, 41:15,
   55:10, 60:4, 68:7,
   110:19
particularly 20:23,
   64:18, 68:13,
   105:19, 110:8
particulars 68:10,
   91:5
partner 133:1
partners 42:19,
   51:19
party 13:7, 13:19,
   13:22, 16:4,
   22:22, 46:17,
   48:14, 56:3,
   62:13, 65:10,
   86:11, 102:17,
   108:21
pass 39:2, 67:3

passage 43:10
passed 122:23
passu 26:12
past 46:5, 93:13,
   93:18, 93:23,
   111:2, 118:14,
   118:17
patently 72:22,
   74:7, 78:5
path 45:11, 50:17
Paul 37:19, 97:11
pause 47:24, 105:5
pay 30:20, 32:25,
   56:10, 64:20,
   66:18, 93:13,
   93:23, 94:14,
   123:2, 123:3,
   123:16, 123:22,
   123:24, 123:25,
   124:16, 125:3,
   125:13, 126:8,
   126:18, 130:19,
   130:25
paydown 31:2
paying 31:3, 94:4,
   126:19, 127:3
payment 26:7, 45:22,
   55:18, 64:12,
   66:13, 78:9,
   94:15, 111:3
payments 94:2, 94:9,
   95:7, 95:15
PBA 11:7, 14:22,
   15:1, 15:5, 15:8,
   16:14, 24:17,
   33:20, 34:3, 34:5,
   34:6, 34:8, 34:15,
   34:16, 34:22,
   35:2, 59:22, 93:18
PDF 26:10
pending 39:13, 53:1
penny 95:16
pension 42:24, 43:1,
   43:5, 46:13, 49:7,
   85:9, 94:4, 94:13,
   94:15, 95:7,
   125:3, 125:22,
   125:24, 126:11,
   126:14, 127:5,
   127:10

pensionees 131:7
pensions 46:9, 49:9,
    95:15
People 24:18, 46:21,
    58:25, 100:16,
    121:17, 122:9,
    123:6, 123:11,
    125:8, 125:10,
    125:15, 125:23,
    125:25, 126:1,
    126:17, 126:19,
    127:6, 129:21,
    129:22, 130:13,
    130:15, 130:16,
    131:11, 132:10
per 12:4, 12:5, 95:3
percent 13:5, 13:21,
    13:22, 15:6,
    39:24, 39:25,
    49:1, 55:24,
    75:20, 82:24,
    111:14, 123:9,
    123:10, 123:24,
    126:12, 126:13,
    130:18, 130:19,
    130:25, 131:1,
    132:2, 132:6
percentage 111:1
Perhaps 18:10,
    60:16, 129:13
period 13:11, 13:18,
    84:11, 107:5,
    107:6, 108:5,
    108:10, 108:11
periods 107:4
permanently 31:20
permit 87:14, 102:9
permits 54:6
permitted 7:16,
    54:11
persist 52:19
PERSON 7:16, 8:5,
    38:19, 38:22,
    38:25, 68:6, 76:17
personal 56:4
pertain 80:13, 80:15
pertains 52:24
Peter 2:42, 3:15,
    90:2, 98:15,
    112:19

petition 77:23
PFC 59:23, 60:4,
    61:20, 64:18,
    64:19
PFZ 4:14, 63:7,
    65:11, 65:14,
    65:18, 66:14,
    66:15, 66:20
PHB 2:41
phone 7:11, 7:12,
    38:4, 52:12, 65:3,
    79:23, 85:14
phones 7:8
PHV 2:35, 2:36,
    2:37, 2:42, 3:6,
    3:11, 3:12, 3:22,
    3:23, 3:28, 3:32,
    3:35, 3:41, 3:44,
    3:49, 4:6, 4:9,
    4:23
pick 118:7
picked 52:12
pieces 91:14
place 34:7, 87:3,
    109:14, 111:20,
    124:15, 125:1
placed 111:23, 112:2
places 129:13
placing 125:4
plainly 127:18
plan. 87:15
planned 107:9
plans 25:17, 57:15,
    58:7, 58:13, 59:1,
    64:14, 75:10, 93:4
plants 77:2
plausibly 111:21
play 119:16
played 128:9
pleading 127:9
Please 7:10, 7:20,
    8:2, 8:6, 8:12,
    19:4, 28:2, 36:17,
    37:14, 38:4, 64:1,
    65:3, 79:23,
    80:19, 104:23,
    116:18, 118:13,
    118:16, 119:20
pleased 9:15, 41:3,
    82:19

pleases 22:24
pledge 45:20
pledged 43:14, 61:20
plugs 94:11
plumbing 12:19
Plus 101:19, 130:25
PM 8:25, 9:1, 9:2,
    118:19, 118:20,
    133:7
pocket 121:22
pockets 121:19
point 9:8, 12:24,
    17:23, 18:7, 21:1,
    37:3, 41:21, 46:4,
    51:2, 61:25,
    62:11, 89:25,
    96:4, 97:12, 99:7,
    101:2, 101:16,
    107:19, 110:8,
    110:16, 117:7,
    118:13, 126:16,
    132:23
point. 21:6, 29:5,
    86:6
points 18:4, 21:20,
    29:4, 84:22, 90:6,
    90:14, 96:24,
    98:17
police 126:1
policewoman 124:12
policies 7:14
policy 56:8
political 120:24
politician 132:3
populated 107:17,
    107:19
population 48:24,
    109:6
portend 10:3
portends 56:16
portfolios 121:21
portion 7:6, 13:1,
    90:21
pose 79:12
position 18:16,
    19:11, 31:22,
    33:12, 36:8, 56:1,
    66:20, 68:21,
    72:4, 74:5, 91:16,
    91:21, 92:3,

95:25, 106:18
positions 9:9,
  86:22, 86:25
possibility 34:23
possible 16:11,
  20:25, 34:9,
  42:17, 42:21,
  78:13, 88:24,
  99:5, 115:20,
  127:10
possibly 75:1
post 71:2, 71:4
post-petition 50:16,
  70:12
post-taking 71:2,
  71:4
posted 112:9
potential 9:7,
  20:20, 58:10,
  58:20, 82:8, 95:6,
  95:21, 109:3,
  113:25
potentially 54:8,
  57:21, 94:1,
  95:20, 114:7
power 24:21, 43:15,
  43:18, 43:21, 67:5
powers 32:4, 44:17,
  46:3, 58:2, 67:4,
  67:6, 69:4
practical 43:7,
  111:8, 113:21
practices 105:15,
  114:16
practitioner 120:11
pray 46:22
precedent 43:12,
  68:12
preceding 74:11
precisely 71:25,
  78:17
precluded 13:1, 13:9
predicated 14:8
preempt 24:22, 31:25
preemption 18:3,
  24:17, 31:22, 32:3
preemptive 31:23,
  44:25
preempts 35:14,
  43:17

prefer 20:16, 98:9
preference 21:7
prejudge 26:4
prejudicial 108:15
premised 20:10
PREPA 46:7, 56:21,
  57:1, 57:3, 57:4,
  57:12, 57:13,
  58:2, 58:4, 58:9,
  58:16, 58:21,
  58:25, 59:3,
  59:19, 62:6, 62:8
prepare 100:25,
  124:2
prepared 23:12,
  83:13, 91:24
preparing 33:23
prepetition 50:16
present 38:6, 89:24,
  119:11
presentation 18:11,
  51:1, 69:7, 69:15,
  73:7, 76:14,
  132:11
presentations 7:25
presented 19:15,
  40:12, 49:7,
  66:12, 68:11,
  72:9, 82:8
presenting 10:14
presents 20:21, 21:9
preservation 52:25,
  53:3, 53:9, 53:14,
  53:23
preserve 32:1,
  51:20, 52:11,
  53:18, 53:20,
  54:20, 55:11
preserved 54:4, 63:5
preserves 52:15
president 129:19
presiding 6:14, 7:5,
  102:15
press 6:22, 7:17,
  91:1
pressing 51:4,
  103:7, 104:7
presumably 43:20
prevail 75:1
prevent 131:6

previous 82:9
previously 15:10,
  87:10, 108:9
price 122:9, 122:10,
  122:22
priced 122:5
PRIDCO 59:25, 61:17
PRIFA 41:2, 59:23,
  64:18
primarily 70:19,
  86:18
primary 81:12, 82:4
Prime 8:15, 84:18,
  84:19, 100:5,
  100:13, 100:18
principal 25:13,
  91:6, 93:14,
  93:18, 93:23,
  95:17, 112:8
printed 85:14
prior 11:17, 13:7,
  87:5, 95:25,
  108:9, 108:23,
  114:12
priority 26:5, 26:6,
  27:11, 29:18,
  30:1, 30:3, 30:21,
  36:19, 45:22,
  86:22, 87:4,
  87:19, 87:22,
  87:25, 88:5, 88:7,
  88:13
private 67:5, 67:14,
  130:13
Pro 3:15, 4:27,
  12:10, 30:25,
  86:6, 89:24,
  118:3, 119:11,
  119:15
probably 13:4,
  19:18, 68:19,
  97:21, 102:21,
  111:7
problem 17:5, 39:8,
  39:16, 47:12,
  48:5, 49:16,
  57:14, 74:19,
  117:11
problematic 25:9,
  25:24

problems 24:11,
130:2, 132:6
procedural 66:9,
68:3, 70:5, 98:16,
110:5
procedure 98:14,
98:18, 101:5,
105:23, 107:2,
107:15, 119:24,
127:24, 128:25
procedures 7:3, 7:6,
9:19, 17:13,
17:15, 39:21,
40:13, 80:16,
80:19, 84:23,
97:8, 102:14,
103:8, 105:11,
106:2, 106:3,
108:14, 110:2,
117:8
proceed 10:8, 19:17,
19:22, 22:19,
65:15, 72:2,
89:25, 104:23,
118:14
proceeding 88:2,
101:12, 116:6
Proceedings 4:48,
7:9, 7:20, 8:8,
16:12, 65:8,
67:12, 87:10,
88:12, 118:20,
133:7, 134:6
proceeds 34:16
process 10:22,
11:22, 25:23,
26:6, 46:14,
51:24, 80:15,
82:16, 82:18,
83:20, 84:9,
85:15, 85:17,
88:20, 88:22,
95:16, 100:6,
100:22, 101:5,
101:18, 106:1,
109:13, 113:2,
115:12
processed 26:17
processing 77:2
Procter 51:17

produced 4:48
producers 74:25
production 122:1
professions 48:14
profit 125:7
progress 19:19,
42:19, 42:22,
52:12
prohibit 25:17
prohibited 110:8
prohibition 67:13
project 130:17
projected 94:22,
96:5
projecting 95:24
PROMESA 1:8, 1:25,
2:8, 31:18, 31:23,
31:24, 32:8,
34:12, 43:17,
44:17, 44:20,
45:14, 46:14,
56:5, 72:19,
83:16, 114:8
promote 122:1
pronounce 117:8
proper 82:19, 85:8,
101:5, 105:18,
105:22
properly 53:25,
87:18, 127:2
Properties 4:14,
65:14
property 67:5,
67:14, 67:23,
70:21, 111:1,
111:14
proponant 75:1
proponants 74:15
proponents 76:4
proposal 101:2,
106:6, 106:10,
106:13, 106:15,
107:3, 107:16,
107:18, 109:15,
132:19, 132:24
proposals 16:10
propose 108:4
Proposed 7:4, 15:17,
24:11, 26:7,
41:11, 57:4, 81:4,

84:15, 84:24,
87:12, 87:15,
92:2, 95:10,
97:15, 98:21,
99:8, 113:3,
113:5, 113:16,
113:20, 115:25
proposes 36:2,
83:18, 107:7,
107:10
proposing 25:20,
115:9, 115:13
propounded 110:14
propounding 110:21
prosecute 69:20
Proskauer 10:12
prospective 57:17,
57:25
protect 121:1
protected 76:2,
121:6
protection 58:19
protections 25:17,
29:6
Protective 105:16
protects 82:24
prove 32:14, 32:18
proves 29:5
provide 7:22, 14:15,
15:6, 15:22,
30:13, 34:17,
35:6, 35:10,
35:21, 36:3, 46:1,
55:17, 63:17,
70:13, 71:20,
74:3, 74:6, 75:8,
75:12, 75:25,
76:10, 78:9, 83:2,
83:23, 84:12,
85:2, 91:10,
116:4, 126:20,
130:5
provided 14:13,
54:19, 62:7,
91:23, 95:10,
96:13, 107:14,
107:25
provides 15:14,
15:15, 34:5,
74:16, 77:16,

83:20, 83:21,
87:13, 92:19,
94:1, 95:7, 98:18,
106:11, 131:5
providing 120:13
provision 28:6
provisions 26:19,
28:12, 28:13,
28:16, 35:14,
51:25, 52:3,
58:21, 60:10,
68:16, 85:3,
87:17, 92:13,
92:14, 94:6,
114:13
PSA 13:10, 28:16,
29:10, 29:17,
29:20, 29:23,
30:1, 36:5, 43:23,
44:2, 88:11,
105:25, 109:16
Psas 105:21
Public 2:15, 3:39,
6:22, 7:2, 7:17,
8:14, 46:12,
61:14, 63:1,
67:13, 89:4, 94:2,
94:13, 94:16,
95:12, 95:15,
95:22, 96:16,
112:7, 112:11,
122:25, 123:22,
123:24
public-private
131:8, 131:22
publication 84:10
publicly 111:23,
112:5, 124:8,
132:24
published 116:1
punished 7:18, 121:3
punt 74:17
purported 86:22
purportedly 35:25,
95:2
purpose 87:20,
122:14
purposes 72:19
pursuant 15:25,
16:5, 16:18, 83:15

pushing 97:12
put 13:17, 22:21,
22:23, 23:5,
28:22, 32:17,
48:1, 49:11,
53:22, 101:3,
101:8, 121:11,
121:19, 121:21,
125:2, 127:4,
132:7
putting 31:2

< Q >
qualified 49:23,
50:4
qualify 35:25, 36:2
quantification 95:18
quantum 70:20
question 27:2, 27:7,
27:8, 27:19, 43:7,
44:16, 53:8,
68:23, 70:1, 71:9,
94:6, 110:13,
111:13, 111:18
questions 8:10,
16:22, 29:14,
37:1, 37:3, 41:18,
45:18, 46:2,
49:13, 54:25,
69:7, 69:9, 73:6,
75:23, 76:13,
88:23, 89:18,
102:16
quick 68:16, 121:13
quickly 64:1, 99:25
quite 22:7, 82:12
quote 25:18, 34:10,
53:23, 60:23,
74:24, 87:12,
98:20, 98:24,
99:1, 99:2, 99:3,
99:4, 105:17,
107:17, 107:19,
107:20
quoting 98:21, 99:8

< R >
Radford 67:3, 67:10,

67:11
radio 84:12, 85:14
Rafael 4:18, 73:11
raise 50:14, 88:8,
89:15
raised 7:24, 17:20,
21:20, 41:6,
41:12, 41:22,
74:20, 78:15,
86:19, 87:8,
88:19, 89:10,
90:25, 102:6,
103:8
raises 45:17
raising 72:20, 88:2
range 23:17, 94:9
Rapisardi 2:41,
42:3, 42:4, 42:6,
45:6, 46:21, 47:4,
113:11
rata 12:10, 31:1
rates 91:7
Rather 12:19, 17:22,
109:8, 116:6
ratified 14:13
ratify 14:16
ratifying 14:9
Re 1:6, 1:23, 2:6,
6:16, 45:2, 67:10,
106:18, 106:19,
106:20, 119:8
reach 10:24, 14:4,
50:13, 50:19,
77:8, 87:22
reached 14:5, 18:10,
50:7, 70:25,
80:21, 84:4, 86:6
read 27:14, 51:25,
63:9, 70:18, 70:19
reading 71:7
readjustment 66:22
ready 86:7, 90:22,
118:14, 119:3,
128:14
reaffirmed 67:9
real 121:6, 122:7
reality 88:9, 110:8
really 12:13, 20:12,
20:21, 24:19,
53:22, 58:19,

59:5, 115:24,
116:3, 121:4
reason 40:12, 44:12,
72:18, 74:8,
108:19, 111:10
reasonable 99:23,
107:15
reasonableness 88:10
reasonably 84:17
reasons 30:2, 43:5,
48:9, 78:10
rebut 88:18
rebuttal 108:9
receipt 100:2
receive 16:15,
75:21, 81:21,
91:6, 92:7,
100:20, 100:25,
109:7
received 63:10,
100:4, 100:12,
122:14, 131:13,
131:14
receiving 13:1,
15:25, 16:4,
30:18, 55:24,
95:12, 95:13,
108:24
recent 42:16
Recently 67:10,
70:10, 83:5, 88:2
recess 65:7, 118:19
reclassification
39:16
recognized 87:10
recognizing 34:15
reconciliation
11:22, 39:21,
97:24
reconnected 90:11
reconvene 65:1,
118:6
reconvened. 65:8,
118:20
record 6:11, 7:21,
23:18, 43:4,
49:22, 51:16,
59:16, 69:12,
69:19, 73:11,
76:21, 79:14,

98:18, 99:20,
115:5, 115:8,
116:4, 118:9
recorded 4:48
recording 7:15
recoupment 53:19
recover 30:25, 63:13
recoveries 36:3
recovery 11:11,
15:6, 24:8, 26:11,
30:20, 31:1,
34:19, 39:25,
51:23
recreational 130:3
recruitment 54:3
reduce 26:1, 28:9
reduced 67:24,
70:14, 70:15,
121:8, 122:22
reduction 53:20,
66:22, 81:21
reductions 81:10,
82:25
refer 43:12, 76:24,
93:16, 96:23,
106:12, 106:14,
110:5
referred 11:12,
12:21, 13:25,
49:24, 66:9
refers 92:9
reflect 100:22
reflected 42:11,
77:24
reflection 21:4
reflects 15:8
regard 84:21, 85:7,
89:10, 104:2
regarding 34:18,
37:23, 40:9,
55:10, 56:6, 56:9,
68:10, 68:20,
78:12, 83:2,
92:20, 120:24
regime 109:9
regular 56:13
regularly 95:16
regulated 77:3
regulations 113:14
regulatory 73:21,

74:13, 77:18
rehabilitation 45:25
reiterate 113:11
rejected 58:17
relate 35:12, 78:15,
102:23
related 7:3, 12:14,
17:21, 25:12,
26:8, 50:24, 53:6,
58:16, 58:21,
64:12, 87:16,
101:16, 102:24
relates 44:15,
44:20, 86:19
relating 57:14,
92:13
relation 105:4
relative 36:19, 87:1
release 16:4, 26:19,
27:5, 28:12,
35:11, 57:12,
57:25, 58:15,
60:3, 60:24,
61:12, 99:4
released 62:13,
93:19, 94:19,
111:23
releases 15:21,
15:22, 15:25,
24:17, 26:24,
27:10, 57:8, 57:9,
57:17, 60:10,
60:13, 60:19,
61:3, 61:15, 62:1,
62:8, 62:13, 75:6
relevance 46:3
relevant 30:4
reliable 47:13
relief 35:4
relies 83:22
rely 9:12, 32:10,
109:22
relying 21:4
remain 35:5, 50:6,
94:6
remainder 89:19
remaining 8:18,
78:14, 97:6,
117:2, 118:3,
119:17, 123:17,

128:9
remains 34:13,
    36:21, 43:2,
    46:17, 67:17
Remarks 7:25, 9:22,
    10:5, 10:10,
    90:22, 97:3,
    119:13, 120:6,
    129:8, 129:16
remedies 71:2
remedy 70:12, 71:4,
    71:15, 71:23
Remember 79:22
remind 7:13
remiss 41:14
removed 13:14
render 20:6, 25:10,
    66:23
renders 26:3, 34:10
renegotiated 122:22
reorganization 25:15
repaid 96:1
repair 54:11
repay 131:4
repayment 122:18,
    130:19, 131:2,
    131:6, 131:24
repeat 93:5, 127:23
repeated 43:5,
    46:25, 66:25
repetitive 69:22,
    104:4
Reply 17:11, 17:19,
    22:5, 22:17,
    33:12, 40:3,
    43:16, 52:5,
    60:22, 61:5, 61:6,
    77:25, 97:3, 99:9,
    101:9
report 10:23, 41:3,
    57:4, 82:19,
    93:12, 93:19,
    116:24
Reporter 28:1, 28:2,
    90:13, 134:15
reporting 113:24
repose 53:25
represent 39:5,
    39:11, 39:25,
    59:20

representation
    55:17, 73:12
representations
    37:23
representative 1:13,
    1:30, 2:13, 6:18
Representatives
    102:2, 132:4,
    132:20
represented 38:3,
    40:19, 47:5
represents 59:18
Repurchase 121:20
repurchased 121:20
request 6:23, 22:15,
    36:8, 93:6,
    100:16, 100:21,
    108:1, 114:11,
    131:9, 131:22,
    132:11, 132:12
requested 52:11,
    66:8, 82:14,
    84:12, 93:1
requesting 87:21
requests 18:22
require 7:25, 82:13
required 58:22,
    60:8, 81:23,
    100:3, 102:24
requirement 93:10,
    111:11
requirements 25:18,
    84:4
requires 30:12
reservation 41:25,
    49:25, 51:5, 79:4
reserve 13:15, 20:3,
    22:5, 26:7, 28:22,
    41:10, 50:21,
    66:3, 78:13,
    79:17, 85:22,
    102:7, 102:9,
    103:4
reserved 130:24
reset 90:20
residents 96:19
resolution 14:4,
    27:6, 50:13,
    50:19, 77:9,
    77:11, 77:12,

82:20
resolutions 80:20
resolve 28:21,
    42:21, 50:7,
    50:23, 85:7,
    102:24, 117:2,
    132:6, 132:13
resolved 40:7,
    46:23, 72:25,
    79:1, 84:21,
    85:25, 116:25
resolving 81:3, 82:3
resources 32:22,
    32:23
respectable 121:2
respective 121:14
respects 29:25
respond 20:16, 22:1,
    101:15, 102:3,
    114:17, 117:19
responded 17:16,
    41:23
responds 25:6, 30:24
Response 20:3, 20:6,
    36:23, 60:8,
    80:11, 88:16,
    89:9, 100:19,
    110:20, 115:6,
    117:15
response. 38:12
responses 89:13,
    98:16, 110:18,
    110:22, 121:10
responsibilities
    125:2
responsibility
    123:16, 132:15
rest 36:25, 88:24,
    96:24, 122:9
restate 128:6
restated 11:6, 12:22
restoration 94:3,
    95:6
restored 94:15
restricted 48:5,
    48:6, 98:25, 99:2
restriction 13:1,
    13:25
restruction 46:6
restructuring 130:21

result 10:23, 13:23,
    15:2, 15:3, 45:11,
    85:20
results 99:21
resume 9:1, 65:5,
    133:3
Retail 98:19, 98:24,
    99:2, 99:13,
    99:14, 99:15,
    99:24, 101:21,
    112:14
retailer 101:22
retain 31:20
retention 32:11
Retired 3:10, 81:16,
    124:12, 124:22,
    126:14
Retiree 79:21,
    80:10, 80:12,
    80:25, 81:5,
    81:22, 82:4,
    82:13, 82:15,
    83:1, 83:12,
    83:14, 83:19,
    83:25, 84:3, 84:8,
    84:14, 84:24,
    85:1, 85:5, 85:9,
    85:11, 85:13,
    85:24, 116:10,
    116:21, 116:24
retirees 81:6, 81:7,
    81:8, 81:13,
    81:16, 81:18,
    81:19, 81:20,
    82:9, 82:14,
    82:17, 82:22,
    82:25, 83:20,
    84:5, 84:17,
    85:12, 94:16,
    95:13, 96:16,
    124:16
Retirement 1:32,
    7:1, 81:8, 82:25,
    120:13, 122:16,
    122:23, 123:18,
    123:20, 123:22,
    123:23, 124:16,
    124:20, 125:3,
    126:5, 131:6
retransmission 7:15

return 28:20, 39:24,
    86:8
revealed 93:11,
    93:13, 94:10
Revenue 93:2, 102:24
revenues 26:8,
    31:20, 32:12,
    32:16, 32:25,
    86:23
review 66:3, 88:15,
    100:25
reviewed 23:19,
    50:12
reviewing 55:12
revise 84:10
revised 60:23
revisions 26:22
revoked 71:6
Rican 77:4, 121:8,
    121:11, 123:11
Ricans 127:6, 132:14
Richter 40:24
rights 41:10, 41:25,
    49:25, 51:5, 52:7,
    52:17, 53:21,
    54:8, 54:11,
    54:22, 79:4,
    85:23, 101:19,
    108:21, 109:3,
    109:10, 127:8,
    127:15
ripe 106:3
ripped 123:12
risk 36:5, 43:2,
    58:7, 59:3, 124:17
risking 9:10
risks 53:10
risky 45:10
Robert 3:11, 80:9
role 44:10
Ron 59:11
Ronald 4:6, 59:16
room 110:7, 110:9,
    110:13, 110:17,
    111:11, 111:15,
    111:19, 111:21,
    111:24, 112:3
rosa 25:14, 25:15,
    25:17, 26:23,
    27:4, 27:9, 28:25,

29:6, 108:18
Rosario 4:29,
    127:23, 128:5,
    128:24, 129:8,
    129:10, 129:12,
    129:16, 129:18,
    129:19, 130:15,
    130:17, 131:17,
    132:9, 132:17
Rose 10:12
Rosen 2:36, 10:11,
    10:12, 10:17,
    17:2, 17:5, 17:10,
    18:24, 18:25,
    19:9, 21:12,
    21:14, 21:17,
    22:25, 25:7,
    41:16, 60:7, 61:1,
    102:4, 102:11,
    117:17
ROSENBLUM 3:44,
    78:21, 78:22, 79:1
Roth 23:8, 24:5,
    103:19
roughly 49:1
round 91:22
Rule 7:18, 8:9,
    29:18, 29:25
ruling 92:20, 93:1,
    93:6
rulings 20:6, 118:9
running 94:25
rushed 105:13
Russell 4:16


< S >
S. 2:36, 4:9
S/ 134:13
Sachs 51:17
sad 121:6
safe 122:16, 133:5
salary 132:6
sale 34:16
sales 130:24
Salud 4:11, 47:7
San 6:1, 90:9,
    90:11, 90:18
sanctions 7:18
satisfied 32:18,

33:3
satisfy 11:19,
   13:19, 32:20, 35:9
save 6:15, 98:11
saved 19:24, 127:2
saving 20:14,
   120:13, 120:22
savings 120:21
saw 65:25, 121:6,
   131:20
saying 25:7, 44:16,
   56:11, 90:14,
   112:21, 125:7,
   129:5, 129:12
says 48:5, 48:25,
   52:3, 60:23,
   77:25, 92:22,
   99:10, 100:13,
   117:11
scanning 92:6
schedule 19:20,
   36:9, 113:3,
   113:5, 115:13
scheduled 84:11
schedules 106:8
scheduling 102:23,
   103:1
scheme 29:19, 81:11
Schulte 23:8, 24:5,
   103:19
scope 35:11, 44:25,
   57:8, 86:18,
   108:21
score 59:6
Scott 70:9
Se 3:15, 4:27, 86:6,
   89:24, 118:3,
   119:11, 119:15
Second 26:4, 29:10,
   30:20, 36:4, 38:8,
   38:13, 38:18,
   53:5, 62:16,
   71:19, 92:17,
   94:23, 99:23,
   106:16, 107:24,
   111:10, 114:3
Secondly 70:8
seconds 83:7
sections 92:6, 92:12
secured 34:16, 34:22

secures 111:3
securities 44:18,
   45:12, 45:19,
   91:18, 100:8
Security 45:20,
   45:21, 45:23,
   67:9, 121:1,
   126:2, 131:12
seek 46:12, 57:17,
   58:19, 64:5,
   71:18, 72:10
seeking 54:22, 72:1,
   79:5, 79:10
seeks 25:21, 72:3
seem 53:16, 66:16
seemed 26:16
seems 20:8
seen 46:18, 97:20
segment 119:10,
   128:8
seized 125:11,
   125:12
select 7:10, 53:3,
   53:15
self 54:3
selling 99:17, 99:19
sells 123:11
Senate 132:4
Senator 131:18
send 100:15, 126:22
sending 126:23
seniors 122:4,
   122:5, 122:10
sense 22:5, 23:2,
   53:4, 66:2
sensitive 21:8
sent 52:10, 97:15,
   100:20, 131:20
sentence 36:17
separate 29:2, 34:8,
   34:9, 107:24
separated 107:3
separately 26:6,
   35:3, 59:19, 116:5
September 14:11
sequential 128:17
serious 113:25,
   114:19, 123:15
seriously 46:18
serve 108:1, 124:17

served 124:12,
   124:18, 127:7
Service 13:15, 93:2,
   94:21
servicer 24:7
Services 3:18, 12:1,
   23:24, 24:7,
   31:14, 64:13,
   103:13, 103:18
session 6:13, 8:24,
   22:7
set 12:12, 53:18,
   84:15, 86:5,
   91:25, 110:17,
   129:3
sets 26:7, 54:8,
   54:11, 80:20
settlement 29:24,
   29:25, 37:21,
   50:5, 97:13
settlements 42:11,
   42:14, 42:17, 77:7
Seven 23:22, 23:23,
   24:3, 104:12,
   105:4, 107:10,
   108:4, 108:8,
   114:17, 115:9
several 10:21, 15:9,
   65:18, 81:12,
   90:5, 90:14,
   98:17, 106:3
Shall 43:14, 120:4,
   123:23
share 10:2, 12:10,
   16:19
shares 130:18,
   130:19, 132:2
sharing 124:8,
   132:18
Sheehan 131:18
sheer 74:22, 82:5
sheet 83:13, 83:21,
   84:7
Sheppard 40:24
Shipping 61:22
short 25:18, 25:23,
   100:19, 106:1,
   106:6
shortcoming 66:1
shortly 26:25

shouldn't 59:2, 59:3
show 29:22, 32:21,
   73:20, 91:5, 95:10
showed 94:24
showing 38:6, 78:7,
   79:25
shown 122:7
shows 91:19, 93:17,
   93:20, 94:20
sidesteps 44:16
signaled 46:11
significant 9:25,
   21:6, 25:12, 28:17
silent 64:15
Silverman 4:6,
   56:19, 59:10,
   59:11, 59:12,
   59:15, 59:16,
   62:11, 63:21,
   64:2, 64:5, 64:24
SIM 47:5
similar 28:19, 40:2,
   77:13, 83:21
Similarly 15:5,
   63:5, 77:8
simple 62:2, 62:12,
   62:14, 76:2, 82:21
simplify 82:14
Simply 25:9, 31:1,
   33:4, 36:19,
   55:13, 56:11,
   66:12, 66:20,
   66:21, 75:25,
   76:11, 78:3,
   87:12, 92:22,
   109:3
simultaneous 128:16,
   128:20
simultaneously 20:24
single 91:15, 92:3,
   107:13
sir 120:5, 124:4
sister 68:19
sites 84:15, 84:19,
   84:20
sits 54:16
situation 13:13,
   75:2, 93:5
Six 56:19, 59:10,
   65:11, 69:24,

81:25, 108:5,
   109:6
size 85:2, 85:9
skew 99:21
skip 86:8
slight 12:15
slim 68:3
slotted 80:17
smaller 106:24,
   107:14
smile 123:2
smiles 123:5
sneaking 59:15
so-called 94:3,
   123:18
Social 85:14, 126:2
Socioeconomic 129:20
SOLA 3:19, 31:12,
   31:13, 35:1,
   36:18, 37:4
solely 3:47
Solicitation 9:19,
   17:9, 17:13,
   33:17, 80:16,
   80:19, 82:7,
   83:12, 84:23,
   97:8, 98:14,
   100:7, 100:12
Solid 61:21, 122:19
solution 46:12,
   131:5
Solutions 7:11, 8:3,
   38:5, 79:23,
   129:21
solvable 43:6
solve 54:14, 130:2
somebody 38:23
somehow 43:20
someone 16:1,
   102:18, 110:20
sometimes 71:1,
   126:21, 126:24
somewhere 95:25
soon 99:5
sophisticated 105:22
Sorry 16:25, 28:1,
   38:17, 38:20,
   38:25, 67:19,
   80:5, 104:25,
   112:23, 113:1,

117:8, 124:5
sort 20:25, 22:7,
   28:23, 115:11
Sosa 4:16, 65:12
SOSLAND 3:32, 22:22,
   22:24, 98:4, 98:6
sought 92:21
sounds 117:5, 119:17
source 110:16,
   111:2, 130:19,
   131:1, 131:5,
   131:24
sources 130:7,
   130:13
span 108:3
Spanish 119:13
Spanish. 129:8,
   129:16
speaker 7:19, 8:18,
   119:15, 119:18,
   120:2, 127:22,
   128:7, 128:10
Speakers 4:27, 7:21,
   8:4, 8:16, 105:5,
   119:23
speaking 6:6, 7:9,
   17:1, 39:5, 72:17,
   103:14, 104:9,
   118:22, 119:25,
   127:18, 128:19,
   128:21, 129:1,
   129:4
speaks 128:19
special 82:13
specific 9:20, 60:4,
   76:1, 106:13,
   107:17, 110:13,
   111:22, 114:13,
   115:2, 115:5,
   115:23
Specifically 11:10,
   13:14, 14:3,
   14:22, 15:11,
   15:21, 16:9,
   53:18, 56:5, 72:3,
   80:13, 80:16,
   84:18, 131:18
specificity 53:24
specifics 92:1,
   94:5, 95:7

specified 9:4
specify 9:25
specter 96:3, 99:21
speech 71:21, 123:1
spelled 95:8, 95:9,
   96:15
spend 121:12, 126:23
spending 122:1
spent 130:11
spite 42:22
splinter 99:15
splintered 91:15,
   91:17, 92:3
split 63:2, 103:12,
   104:14
splitting 24:1
spoke 122:8
spoken 7:22
spots 84:12
stability 45:15
Stacy 51:20
stage 24:24, 33:19,
   40:5, 40:7, 40:10,
   40:13, 60:14,
   74:18
stand 32:4, 52:22,
   62:3, 62:6
standard 33:5,
   35:10, 75:11,
   105:15
standards 33:3,
   105:19
standing 19:12,
   87:7, 101:16
stands 23:16, 49:10
start 23:12, 24:2,
   33:20, 35:17,
   36:16, 37:15,
   69:14, 69:24,
   104:18, 105:9,
   112:21, 112:25,
   120:4, 120:13,
   130:23
started 83:6, 83:7,
   121:4, 123:6
Starting 97:9,
   104:22
starts 103:23,
   128:19
State 8:2, 28:2,

37:14, 39:23,
   48:16, 55:13,
   70:12, 71:2,
   96:18, 110:25,
   124:14, 124:15,
   124:24, 127:25
stated 59:18, 66:12,
   67:3, 67:11,
   70:10, 76:3,
   105:16, 122:14
statements 47:15,
   47:18, 61:5, 61:6,
   61:7, 62:7, 86:11
States 1:1, 2:25,
   2:27, 6:12, 6:15,
   15:11, 26:11,
   65:23, 67:1,
   71:24, 76:11,
   120:24, 124:18,
   126:9, 127:7,
   134:7, 134:8
stating 57:11,
   127:15
Statment 60:14,
   61:7, 63:16, 64:21
statments 64:14
status 45:23, 57:3,
   82:22, 92:22
statutes 58:20
statutory 93:10,
   109:9
Stay 24:19, 122:21,
   133:5
stayed 88:3
STEEGE 3:12, 116:11,
   116:12, 116:14,
   116:16, 116:19,
   116:20, 116:21,
   117:4, 117:5,
   117:11
Steel 4:9, 51:11,
   51:13, 51:16,
   51:17, 54:3, 55:1
stenography 4:48
step 20:14
stipulation 79:2,
   79:11
Stock 67:2
Stockton 67:20
stopped 121:7

straightforward
   82:22, 91:12
strategically 84:11
Strauss 49:22
structure 20:17
structured 43:24
stuck 114:2
stumbling 46:23
sub 25:14, 25:15,
   25:17, 26:23,
   27:4, 27:9, 28:24,
   29:6, 108:18
Subject 41:24,
   66:21, 67:6,
   67:12, 68:17,
   69:7, 70:12, 88:3,
   88:12, 99:23,
   111:10
submission 87:8
submit 82:18, 84:6,
   99:24, 101:7,
   114:14
submits 78:10
submitted 73:19,
   109:23
subordinate 30:8
subordinated 86:25
subordinates 26:10
subordination 87:25
subsequent 12:16,
   17:14, 79:7, 107:6
substantial 22:7,
   75:2
substantially 75:22
substantive 86:22,
   103:1
success 44:12, 46:24
successful 45:11
successor 3:49
sudden 122:3
suffering 46:22
suffers 105:11
sufficient 32:22,
   54:20, 74:3,
   74:16, 75:9,
   75:25, 87:13,
   106:6
sufficiently 9:9,
   41:23, 84:16
suggest 18:7, 52:14,

60:21
suggesting 115:10
suggestion 21:23,
   40:9
suggestions 127:19
Suiza 4:18, 73:9,
   73:12, 73:21,
   74:12, 76:1,
   76:25, 77:14
sum 54:13, 64:1,
   64:3
summary 16:6, 17:7,
   115:11, 116:5
Sunday 111:25,
   112:15
supplant 32:2
supplement 32:2,
   54:8, 54:11,
   60:16, 60:22,
   108:8
supplemental 52:5,
   60:7, 61:6, 108:5
Support 11:6, 12:22,
   12:23, 12:25,
   13:5, 13:8, 13:10,
   13:16, 13:20,
   13:24, 18:12,
   22:19, 44:7,
   51:22, 51:23,
   82:24, 83:13,
   83:17, 84:7,
   85:10, 101:3,
   106:6, 113:9,
   124:21, 124:22,
   125:16, 125:22,
   126:4
supported 34:16
supporting 54:22,
   86:10, 97:16,
   101:8, 101:15
supports 83:19,
   89:5, 89:8, 89:11
suppose 19:25
supposed 48:2,
   81:21, 82:15,
   91:5, 105:20,
   123:10, 126:12
Supreme 67:1, 67:9,
   70:9, 70:10,
   70:25, 105:16

Surely 111:4
surplus 94:20, 94:24
survival 129:22
Sustainable 129:20
sustained 40:5
Swain 2:24, 6:5,
   6:14, 10:11, 65:9,
   118:22, 120:5,
   134:7
sweep 26:20
switch 105:5
sync 113:23
System 1:33, 7:1,
   39:1, 65:3, 81:18,
   82:10, 132:11
systems 81:8, 113:24


< T >
T. 3:49
tabulated 85:8
Tacoronte 6:9
Taft 86:13
tail 115:17
taken. 65:7, 118:19
Takings 31:17, 33:8,
   33:10, 67:13,
   67:22, 67:24,
   70:19, 70:21,
   71:1, 71:13,
   72:12, 72:14,
   72:17, 75:19,
   76:2, 76:8, 76:11
talked 28:12
talks 62:7
Tanning 45:3
tantamount 67:16,
   69:3
tardes 118:21
tax 32:16, 45:23,
   92:5, 92:18,
   92:22, 93:9,
   111:1, 111:2,
   111:14, 120:21,
   130:24
taxable 96:18
taxing 43:15, 43:18,
   43:21
Taylor 2:24, 6:13,
   124:14, 134:7

teacher 81:18
team 9:13, 14:23,
   16:8, 18:18
technology 126:22
telephone 120:6
telephonic 7:7,
   133:3
TELEPHONICALLY 2:32
Tempnology 25:19
temporarily 30:21
Ten 8:25, 15:6,
   65:1, 65:4, 100:5,
   118:7, 118:14,
   118:17, 130:18,
   130:25, 132:2,
   132:5
ten-minute 9:2
terminal 125:19
terminated 36:6
termination 44:3,
   44:4
terms 10:25, 14:9,
   14:17, 25:21,
   25:24, 113:20,
   113:21
Terrific 119:5
territorial 32:2
Terry 4:31, 128:2
testing 114:4
text 32:1
textual 83:23
thankfully 46:16
themselves 17:15,
   52:2, 63:9, 63:13,
   126:4, 132:7
theory 32:3, 113:14
thereby 43:19
therewith 36:9
they'll 61:4
They've 25:22,
   52:13, 91:9
thinking 58:9
thinks 110:15
Third 26:19, 53:12,
   55:8, 56:3, 56:15,
   57:9, 62:13,
   63:18, 65:19,
   72:10, 81:5,
   93:11, 95:1,
   101:2, 111:20,

127:22
third-party 60:3,
    60:10, 60:13,
    60:18
Though 19:18, 33:24,
    34:4
thousands 101:12
Three 11:24, 32:24,
    39:25, 56:18,
    79:22, 81:7,
    101:9, 104:13,
    104:22, 107:25,
    108:11, 118:3
threshold 13:5,
    13:22, 15:6, 81:9,
    82:2, 82:23
thresholds 12:3
throughout 95:16
timely 82:19
timing 8:24, 57:15,
    58:7, 59:1
tirelessly 41:16
Title 1:8, 1:25,
    2:8, 3:6, 6:24,
    16:16, 24:20,
    33:4, 42:21,
    46:14, 46:16, 57:2
To-wit 107:3
together 24:7,
    42:18, 76:22,
    103:20, 132:13
tomorrow 19:25,
    20:4, 20:7, 20:14,
    21:22, 22:1, 22:8,
    22:9, 22:11,
    22:16, 22:17,
    22:21, 22:23,
    23:5, 54:15,
    97:17, 98:1, 98:9,
    98:12, 102:7,
    102:10, 102:19,
    103:4, 104:7,
    117:16, 117:24,
    118:6, 118:12,
    133:3
took 100:5, 109:14
Toro 4:16, 65:12
total 29:15, 93:18,
    98:8, 106:23,
    106:25

toward 47:2
Township 70:9
track 8:16, 8:17,
    119:16, 128:8
tracking 113:24
trader 74:4
trading 121:1
tragedy 46:22
trail 57:5
Transcript 4:48,
    8:8, 134:4
transcription 134:5
transferred 39:20
transferring 98:25
transformation 46:7,
    120:19
translate 129:5
treat 41:22, 83:18
treated 98:19, 99:11
treating 35:1
treatment 11:1,
    11:4, 14:13,
    14:16, 14:18,
    15:4, 15:14,
    15:17, 16:15,
    30:9, 30:13,
    30:25, 34:2, 34:5,
    34:14, 40:1,
    50:10, 50:15,
    62:18, 75:3,
    75:10, 77:9,
    78:15, 87:17,
    109:7, 111:22
treats 30:11, 30:15,
    34:21
Tres 4:23, 76:23
trial 107:10, 108:9,
    115:8
trick 29:3
tried 110:11
trouble 25:22
TRS 81:18, 81:20,
    82:1
true 105:19, 109:8,
    134:5
truly 17:20, 25:23
Trust 4:5, 11:16,
    11:21, 48:17,
    59:25, 61:14,
    61:18, 63:1,

129:20
trustable 120:16
Trustee 3:49, 56:22,
    57:1, 59:23,
    59:24, 61:17,
    61:20, 64:6, 64:7,
    64:11
truth 123:7
try 13:12, 16:3,
    52:11, 54:15,
    117:10
trying 54:13, 74:12,
    100:1, 115:14,
    124:25
TSA 93:21
turn 9:18, 31:8,
    35:4, 37:6, 38:2,
    69:10, 73:9,
    86:10, 88:25, 97:7
Turning 35:17
turns 92:12
tweak 113:5
tweaked 104:4
two-fold 74:20
two-minute 63:22
two-year 13:18
type 58:5, 115:11,
    116:6
types 126:20


< U >
UCC 48:15, 97:9,
    112:4
ultimate 114:8
ultimately 19:15,
    19:23, 36:21,
    114:7
unapprovable 25:11
unchangeable 70:20
uncharted 45:11
unclear 62:21
unconfirmable 24:12,
    25:10, 30:10,
    34:11, 67:17,
    74:8, 78:5
unconstitutional
    65:22, 66:24
underlying 63:8,
    63:13

undermine 114:7
underscore 32:17
understand 27:23,
   28:6, 36:1, 41:9,
   47:13, 49:10,
   55:10, 68:9,
   82:18, 127:22
understanding 10:24,
   14:6, 14:19,
   14:25, 20:20,
   41:21, 123:13
Understood 61:2,
   103:3
undertaken 11:23
Underwriter 4:8,
   51:11, 52:1, 52:7,
   52:8, 52:24, 53:2,
   53:9, 54:21
Underwriters 53:6
Underwriting 51:21,
   51:22
unequivically 58:13
unfair 99:14
unfeasible 72:22
unfortunate 19:11
Unfortunately 13:2,
   13:9, 42:22, 52:2,
   57:14, 60:19
UNIDENTIFIED 38:19,
   38:22, 38:25
unified 44:11
Union 14:5, 14:9,
   14:19
unique 82:12
unison 47:2
United 1:1, 2:25,
   2:27, 6:12, 6:15,
   15:11, 65:23,
   67:1, 120:24,
   124:18, 126:8,
   127:7, 134:6,
   134:8
University 130:8
unjust 126:16
Unless 16:22, 36:25,
   41:18, 49:13,
   54:25, 73:6,
   88:23, 89:18,
   118:3
unmute 7:12, 17:1,

19:4, 38:4, 79:22,
   90:1, 103:14,
   116:13, 116:17
unmuted 37:8, 80:1,
   116:15
unnecessary 42:24,
   43:6, 84:2
unpaid 123:20,
   123:25
unprecedented 45:24
unquote 34:10,
   74:24, 105:19
unreasonable 113:22
unrepresented
   101:13, 101:22,
   110:9, 111:8
unresolved 34:13,
   36:21
unrestricted 93:20
unscrupulous 121:11
Unsecured 3:4,
   10:25, 11:1, 11:3,
   11:11, 15:3, 15:4,
   15:5, 18:10, 34:3,
   34:6, 34:8, 34:15,
   34:22, 35:2, 37:6,
   39:18, 48:15,
   55:21, 66:17
untenable 31:22
untested 113:13
Until 8:25, 20:12,
   23:5, 26:17,
   54:23, 93:7, 93:8,
   97:4, 99:3, 100:6,
   100:11, 100:20,
   102:7, 102:19,
   103:4, 108:12,
   117:15, 118:7
update 16:23
UPR 59:25
upside 94:3
USCCI 4:31, 128:3
utmost 132:12


< V >
v. 67:3, 67:20,
   70:9, 105:17
Valdes 24:6, 31:13,
   103:17

valid 40:5, 40:12
Valiente 4:18,
   73:10, 73:11,
   73:14, 73:16,
   73:25, 74:2,
   75:15, 76:16
value 66:3, 121:14,
   122:5, 122:21
values 34:18
Vaquer 4:22, 76:23
variety 117:12
various 10:14, 11:8,
   17:20, 85:13
vast 41:7
vastly 113:4
vet 33:24, 108:17
VI 32:13
Vieques 129:20,
   129:23, 130:1,
   130:4, 130:6,
   130:9, 130:14,
   130:15, 130:16,
   131:11, 132:10
view 10:2, 44:21,
   68:1, 87:16,
   88:20, 96:4,
   106:14, 110:9,
   115:22, 118:11
violate 29:23, 30:1
violated 71:17
violates 29:9,
   29:18, 31:3,
   31:16, 33:8, 40:1
violating 31:21
violation 30:12,
   71:14, 71:16,
   71:18, 77:18
Violations 7:18,
   58:20
violence 115:20
virtually 90:24
visions 132:18
visited 131:17
visual 83:23
voice 67:2, 81:15,
   86:3
voided 114:19
voluntarily 55:16,
   105:21
vote 74:5, 78:12,

81:23, 82:18,
85:2, 99:14,
99:15, 99:18,
99:21, 101:19
voted 132:14
voting 35:22, 81:15,
82:16, 83:20,
84:5, 84:9, 84:10,
84:11, 85:15,
98:18, 98:21,
99:3, 99:5, 101:18
VTM 76:17, 76:24,
76:25, 77:8,
77:17, 77:22,
78:10, 78:14,
78:16
vulture 123:10
vultures 123:5,
123:8


< W >
wade 111:16
Wage 38:2, 39:20,
39:24
wages 39:14
wait 40:10, 102:19,
117:15
waiting 72:24
waive 12:8, 69:19,
79:15
waived 12:9
waiving 109:3
Walker 134:13,
134:14
walking 121:7
Wallace 90:19
wanted 69:18, 79:5,
97:13, 97:20,
120:11
wants 24:20, 109:18
warn 22:6
warning 63:22
warrant 89:17
Waste 61:21, 127:1
wasted 109:4
waterfall 26:9
wave 8:3
ways 46:8, 117:12,
124:25, 125:5,

126:7, 127:10,
127:12
website 85:13
week 93:12, 93:19,
94:23, 95:2,
114:17
weekend 117:2
weeks 10:21, 93:12,
93:17, 94:10,
101:9, 108:11
weigh 106:17
weight 84:24
weighted 85:2, 85:8
Weil 89:3
Welcome 6:21, 90:18
well-being 77:4
Wendy 4:23, 76:19,
76:21
whatever 9:8, 24:22,
74:8, 78:13,
101:9, 118:9
whatsoever 34:18,
55:20
whenever 32:6
whereas 30:19,
68:14, 95:16,
107:10, 108:4
Whereupon 90:9,
90:11
wherever 32:6
whether 18:21, 20:5,
20:13, 21:4, 25:3,
32:22, 33:15,
35:14, 40:10,
40:11, 49:6,
62:16, 87:12,
92:17, 92:20,
97:4, 102:19,
104:6, 114:4,
115:12, 119:13,
127:25
whistles 114:2
Whitmore 3:49,
56:19, 56:20,
56:25, 57:21,
59:5, 59:9, 59:18
whoever 38:23, 86:4,
103:14
whole 48:13, 49:9
wholly 34:22, 35:2

whom 46:17
Wickersham 86:13
wider 23:17
widespread 13:3
William 3:28, 86:12
Williams 70:25
willing 54:15, 132:5
willingness 46:11
wind 36:17
winding 46:16
wise 30:21
wish 8:1, 17:7,
20:5, 22:23, 42:13
wished 12:25
wishes 8:5, 13:23,
86:17, 117:15,
119:12
withheld 93:7
within 13:4, 13:15,
46:13, 87:20
Without 29:6, 33:9,
42:15, 43:21,
45:19, 47:19,
65:21, 66:16,
67:5, 67:14,
67:16, 69:3,
71:24, 111:8,
113:12, 113:14,
114:4
withstanding 107:2
witness 107:4,
107:5, 107:6,
108:6, 108:7,
108:8
WITNESSES 5:3,
108:5, 108:9
wondering 20:13
word 44:24, 52:9,
122:18
work 12:1, 42:18,
46:8, 54:15,
54:16, 64:8,
64:11, 79:13,
125:23, 129:4
worked 24:18, 117:1,
125:15, 126:1,
126:10, 127:5
Working 13:10,
41:16, 80:25,
84:2, 84:18,

122:21, 123:11,
124:21, 125:15,
126:3, 127:6
works 24:22, 65:3
worse 26:16, 127:16
worth 9:10, 121:18
worthy 125:17
wrap 96:9
wrapped 115:15
writing 9:15, 14:11
written 65:21,
67:16, 69:3,
86:20, 87:8,
123:21
wrongly 68:21, 70:5


< Y >
Yashei 4:29, 127:23,
129:10, 129:18,
129:19
year 12:23, 32:21,
32:24, 32:25,
33:3, 42:16,
46:15, 94:14,
95:3, 111:13
years 73:3, 94:15,
95:24, 108:16,
111:2, 117:9,
120:10, 122:23,
122:24, 124:13,
124:17, 131:11
yesterday 9:23,
9:24, 10:25, 85:21
yield 32:4, 88:24,
89:19, 105:1,
109:17
yielded 69:17, 69:20
yourself 7:20


< Z >
Zabel 103:19
zero 63:14
zero. 90:20
Zouairaban 3:18
ZOUAIRABANI 103:16,
103:17, 103:23,
104:16, 104:20,
104:24, 105:7,

105:11, 109:1