1                UNITED STATES DISTRICT COURT

2                DISTRICT OF PUERTO RICO

3

In Re:                              )          Docket No. 3:17-BK-3283(LTS)

4                          )

                         )          PROMESA Title III

5 The Financial Oversight and )

Management Board for        )

6 Puerto Rico,                )          (Jointly Administered)

                         )

7 *as representative of*       )

                         )

8 The Commonwealth of         )

Puerto Rico, *et al.*         )          July 14, 2021

9                          )

             Debtors,     )

10

11 _____

12 In Re:                              )          Docket No. 3:17-BK-3566(LTS)

                         )

13                          )          PROMESA Title III

The Financial Oversight and )

14 Management Board for        )

Puerto Rico,                )          (Jointly Administered)

15                          )

16 *as representative of*       )

                         )

17 The Employees Retirement    )

System of the Government    )

of the Commonwealth of      )

18 Puerto Rico,                )

                         )

19              Debtors,     )

20 _____

21

22

23

24

25

```
 1

 2    _____

 3    In Re:                      )      Docket No. 3:19-BK-5523(LTS)
                                  )
 4                                )
                                  )      PROMESA Title III
 5    The Financial Oversight and )
      Management Board for        )
 6    Puerto Rico,                )      (Jointly Administered)
                                  )
 7    as representative of        )
                                  )
 8    The Puerto Rico Public      )
      Buildings Authority,        )
 9                                )
                   Debtors,       )
10
      _____
11

12               FURTHER DISCLOSURE STATEMENT HEARING

13      BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14                 UNITED STATES DISTRICT COURT JUDGE

15       AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

16                 UNITED STATES DISTRICT COURT JUDGE

17    _____

18
      APPEARANCES:
19
      ALL PARTIES APPEARING TELEPHONICALLY
20
      For The Commonwealth
21    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                               Mr. Brian S. Rosen, PHV
22                             Ms. Margaret Dale, PHV

23    For Puerto Rico Fiscal
      Agency and Financial
24    Advisory Authority:      Mr. John Rapisardi, PHB
                               Mr. Peter Friedman, PHV
25
```

```
 1   APPEARANCES, Continued:

 2   For The Official
     Committee of Unsecured
 3   Creditors of all
     Title III Debtors:        Mr. Luc A. Despins, PHV
 4

 5   For The Official
     Committee of Retired
 6   Employees:                Mr. Robert Gordon, PHV
                               Ms. Catherine Steege, PHV
 7

 8   For Peter Hein:           Mr. Peter Hein, Pro Se

 9   For AmeriNational
     Community Services:       Mr. Nayuan Zouairaban, Esq.
10                             Mr. Arturo J. Garcia Sola, Esq.

11   For Cantor-Katz
     Collateral Monitor:       Mr. Douglas Mintz, PHV
12                             Mr. Douglas I. Koff, PHV

13   For Assured Guaranty
     Corp. and Assured
14   Guaranty Municipal
     Corp.:                    Mr. William J. Natbony, PHV
15

16   For Financial Guaranty
     Insurance Company:        Mr. Martin A. Sosland, PHV
17
     For Ambac Assurance
18   Corporation:             Ms. Atara Miller, PHV

19

20   For National Public
     Finance Guarantee
21   Corporation:             Ms. Kelly DiBlasi, PHV

22
     For The ERS
23   Bondholders:             Mr. Benjamin Rosenblum, PHV

24   For U.S. Bank National
     Association, solely in
25   its capacity as
     successor trustee:       Mr. Clark T. Whitmore, PHV
```

```
 1    APPEARANCES, Continued:

 2

 3    For U.S. Bank Trust
      National Association:    Mr. Ronald J. Silverman, PHV
 4
      For the Underwriter
 5    Defendants:             Mr. Howard S. Steel, PHV

 6    For Salud Integral
      de la Montana, Inc.:    Mr. John E. Mudd, Esq.
 7
      For PFZ Properties,
 8    Inc., and 1983 Group:   Mr. David Carrion Baralt, Esq.
                              Mr. Russell Del Toro Sosa, Esq.
 9
      For Suiza Dairy Corp.:  Mr. Rafael A. Gonzalez Valiente, Esq.
10
      For Finca Matilde:      Mr. Eduardo Capdevila Diaz, Esq.
11
      For Vaquería
12    Tres Monjitas, Inc.:    Ms. Wendy Marcari, PHV
                              Mr. Gerardo Carlo Altieri, Esq.
13

14

15

16

17

18

19

20

21

22    Proceedings recorded by stenography.  Transcript produced by
      CAT.
23

24

25
```

```
 1                           I N D E X

 2   WITNESSES:                                    PAGE

 3        None.

 4

 5   EXHIBITS:

 6        None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    July 14, 2021

 3                                    At or about 9:32 AM

 4                             *     *     *

 5           THE COURT:  Good morning.  This is Judge Swain.

 6           MS. NG:  Good morning, Judge.  This is Lisa, your

 7   courtroom deputy.  Everyone is here.

 8           THE COURT:  Thank you, Ms. Ng.

 9           Maria Luz, would you please call the case?

10           COURTROOM DEPUTY:  Yes, Your Honor.  Good morning.

11           The United States District Court for the District of

12   Puerto Rico is now in session.  The Honorable Laura Taylor

13   Swain and the Honorable Judith Gail Dein presiding.  God save

14   the United States of America and this Honorable Court.

15           Bankruptcy Case No. 17-3283, *In re: The Financial*

16   *Oversight and Management Board for Puerto Rico, as*

17   *representative of the Commonwealth of Puerto Rico, et al.*, for

18   Further Hearing on Disclosure Statement.

19           THE COURT:  Thank you.

20           Good morning, everyone.  Today's session continues

21   yesterday's hearing concerning the Oversight Board's request

22   for approval of the Disclosure Statement for the Fifth Amended

23   Title III Joint Plan of Adjustment, and related procedures and

24   deadlines.  The Amended Agenda is filed at docket entry no.

25   17311 in case no. 17-3283.
```

1          I think that everybody who is on today was likely on

2    yesterday, so I won't go through my full normal introductory

3    instructions, but I do remind everyone that people with live

4    lines should mute until it's their time to speak.  Then when

5    it is their time to speak, they have to unmute their phone.

6    If they are using the Court Solutions dashboard interface,

7    they have to unmute on that Court Solutions dashboard as well.

8          I also remind everyone that no recording or

9    retransmission of the hearing is permitted by anyone,

10   including parties, members of the public, or the press; and

11   that, as usual, I will call on speakers during the hearing.

12   If you are someone I have not called on who feels a need to

13   speak on a particular topic, at an appropriate time, say, "I'm

14   so and so.  I would like to be able to speak."

15          You'll need to unmute and say that, rather than wave

16   on the dashboard, because I won't see you if you wave on the

17   dashboard.  Then I will call on people as necessary.  We have

18   our buzz system in place as we did yesterday.

19          The timing that I have set for today is from now

20   until ten to 12:00, that is 11:50 AM, with a resumption, if

21   necessary, from ten past 2:00, that is 2:10, to 5:00 in the

22   afternoon.  We may be able to go through the morning session

23   without a break.  If we are in an afternoon session that's

24   expected to go full length, I would probably break around

25   3:30, and if we break, I'll direct everyone to disconnect and

1  dial back in at a specified time.

2         I would also like to note that the Court has received

3  and reviewed last night's filing of the Fee Examiner's Status

4  Report and Notice Regarding the Application of Presumptive

5  Standards to Plan Confirmation Hearing Attendance, which was

6  filed at docket entry no. 17322 in case no. 17-3283.

7         In paragraph ten, the Fee Examiner reports that in

8  response to the presumptive standards orders "the

9  professionals subject to review generally have conformed --

10  almost without exception -- their application practices and

11  post-application discussions to the standards and guidelines"

12  approved by this Court.  The Court is grateful for the report

13  and expects continued compliance, and, specifically, efficient

14  staffing and moderation of billings as we engage the efforts

15  to move forward into consideration of a proposed plan of

16  confirmation.

17         I understand that there is an update and a request

18  for me, and so I will turn to Mr. Rosen for the Oversight

19  Board.

20         MR. ROSEN:  Thank you very much, Your Honor.  This is

21  Brian Rosen from Proskauer Rose.  With me this morning again,

22  Mr. Bienenstock and Ms. Dale for this hearing.

23         Yes, Your Honor.  Throughout the day yesterday, the

24  mediation team led by Judges Houser and Colton were working

25  with the Oversight Board, and with Ambac and FGIC.  And as of

1 this morning, we have reached a verbal understanding of an

2 agreement with respect to Plan treatment that would obviate

3 the need to go through their respective objections to the

4 Disclosure Statement, as well as bring about their support for

5 confirmation of a plan.

6 That understanding, however, Your Honor, is subject

7 to some further work that must be done by the parties and the

8 mediation team to bring on further agreement with some parties

9 who were not involved in these last, immediate discussions.

10 And even if there is an understanding there, Your Honor, that

11 would obviously necessitate the documentation of that

12 understanding, not only in probably a plan support agreement,

13 which we would undertake immediately upon notification by the

14 mediation team leader that the other parties are in accord

15 with us; but also, Your Honor, that would then require a

16 further modification of the Plan of Adjustment, and some

17 modifications to the Disclosure Statement as well.

18 So what we would be asking the Court, Your Honor, so

19 that we would not change the position that we are currently

20 in, and by that I mean, as yesterday, we deferred on hearing

21 the Ambac and FGIC objections until conclusion of these

22 conversations, we would ask the Court to adjourn the

23 Disclosure Statement hearing for ten days to allow the further

24 conversations led by the mediation team and documentation to

25 take place.

1      And then in the event that we were unsuccessful, and

2   all the parties unsuccessful, that we would come back and hear

3   the balance of the Ambac and FGIC presentations, as well as

4   the Oversight Board responses to not only those, but the

5   others to which they are actually linked. And that may have

6   been put forth yesterday.

7      There are some other issues, Your Honor, that came up

8   as part of yesterday, and if the Court -- I don't know if it

9   saw the docket, but there were motions filed by both Ambac and

10  FGIC yesterday seeking temporary allowance for voting

11  purposes, with a hearing to be scheduled at the Omnibus

12  Hearing on August 4th, with a very, very truncated briefing

13  response, or response time to those.

14      And as a result of that, Your Honor, we would want to

15  push those back as well, because we would want the time to

16  focus on reaching the subsequent agreement and the papering of

17  that, rather than further litigating and dealing with the

18  temporary allowance. Because in the event that we do reach an

19  accord, more likely than not, Your Honor, the agreement will

20  actually provide for the allowance for voting purposes, and we

21  wouldn't have to address these issues.

22      So, Your Honor, there are a lot of things that were

23  actually up on the board -- I mean, that we would have to take

24  into account. So we would respectfully ask the Court to

25  adjourn the continuation of this Disclosure Statement Hearing

1   for a ten-day period or so, so that we could have what I hope

2   would be a very short responsive time to the objections that

3   were filed yesterday, rather than a much longer period of

4   time.

5           THE COURT:  So taking things in reverse order, first

6   of all, congratulations on what I'm sure was very, very hard

7   and serious work over not only the past few days, but last

8   night.

9           Taking the questions in reverse order, the 3018

10  motions that were filed yesterday, I did notice them, and I

11  saw that they were noticed up for the August Omni.  So what

12  you would be asking is that there be some agreement for them

13  to be taken up not at the August Omni, but afterward, and

14  briefed on a schedule that is not cued to the August Omni?

15          Is that what you're asking with respect to the

16  3018(a) motions?

17          MR. ROSEN:  Yes, Your Honor.

18          My view would be that as long as there is a

19  determination prior to the closing of the voting deadline,

20  there really is no need for expedited consideration of that.

21  So we could certainly lay that out over a longer period of

22  time, and then allow the Court some time to consider it.

23          THE COURT:  I'm amenable to that.  I would just

24  invite you all to meet and confer and propose some consensual

25  schedule that makes sense to you, and that you think would

1   make sense to me.

2           Then, as to the larger question of what, if anything,

3   we do today, we can adjourn.  We can set a next hearing date

4   for July 27th.  I have ascertained that that is available with

5   respect to both courts.  That is a Tuesday.  The Monday of

6   that week is a holiday in Puerto Rico.

7           I will not require Ambac and FGIC to speak to their

8   objections, nor the Oversight Board to respond to the Ambac

9   and FGIC objections today, but my intention coming into this

10  with the possibility of a requested adjournment was that -- to

11  serve the interests of resolving the objections that have been

12  put before the Court, using our time efficiently, and being

13  able to flag disclosure related and solicitation procedure

14  related changes that the Court anticipates requiring, in any

15  event, and not slowing things down any more, and not as a de

16  facto matter, losing the opportunity for confirmation

17  proceedings in the late fall -- what I wanted to do is to have

18  the Oversight Board respond to the arguments that were made

19  yesterday of those parties.

20          I would not resolve the question of approval of the

21  Disclosure Statement, because Ambac and FGIC issues are still

22  outstanding, but I would want, after that argument, to address

23  certain views on the objections that have been submitted and

24  argued.  As I suggested a minute ago, I anticipate directing

25  that certain disclosure-related changes and solicitation

1   procedure related changes be baked into the next iteration of

2   the documents, whatever that may be.

3         Also, setting Plan related discovery mechanisms in

4   motion now, again, with the aim of not losing the opportunity

5   to move into confirmation proceedings in the late fall, if

6   there is no longer a request for me to deny Disclosure

7   Statement approval and/or I approve the Disclosure Statement.

8         MR. ROSEN:  Well, Your Honor, we certainly will

9   follow your lead on all of this and be as responsive as we can

10  be.  As I mentioned yesterday, there are some of the

11  objections that Ambac and FGIC have raised in their papers

12  that cross over to some of those that were articulated

13  yesterday, or in the pleadings of those that spoke yesterday,

14  but we'll do our best.

15        And certainly, to the extent that you can give us

16  guidance on items that you want us to include in the

17  Disclosure Statement, and in solicitation procedures, and in

18  the discovery, we would love to get that as soon as possible

19  so that we could bake those into the respective documents and

20  provide them back to the Court.  And even to the extent of the

21  discovery processes for confirmation, even begin to undertake

22  that so that there is no risk to the fall confirmation

23  schedule that we are hoping to get.

24        So we'll take your lead, Your Honor, and go as you

25  wish.

1          THE COURT:  Great.  So if, as you are responding,

2    there are particular issues that you would like to ask me not

3    to address because of interaction with Ambac and FGIC, you

4    know, feel free to flag those, and try to move forward in a

5    way that is productive and appropriately cautious, but I think

6    that you understand me and my desire to not be at a standstill

7    for this substantial period of time.

8          So in aid of helping to shape some of the dialogue, I

9    first offer some further comments and instructions concerning

10   my intentions.  So, you know, it's clear from the confirmation

11   schedule that the Oversight Board had proposed that if we are

12   working in this fourth quarter, 2021, time frame target for a

13   confirmation hearing, there is little to no room for delays or

14   gamesmanship.

15         So if the Court ultimately approves the Disclosure

16   Statement and accepts the November confirmation schedule

17   requested by the Oversight Board, there are a number of

18   changes that will need to be made to provide us with a

19   realistic chance of advancing discovery and briefing in a

20   manner that is both fair and efficient.

21         So I intend to order the Oversight Board to begin

22   preparing for discovery on a time frame that's substantially

23   consistent with the Oversight Board's proposal, sort of as a

24   practical matter as if we are moving into confirmation

25   procedures, although I haven't granted that motion and would

1    not be granting that motion until after the Ambac and FGIC

2    issues have been argued, if necessary, and resolved.

3         So this will all be subject to any further Court

4    order that would halt the process, if necessary, but this

5    would entail the Board's conversion of the Disclosure

6    Statement depository into a confirmation depository basically

7    today, and uploading all of the documents that you've agreed

8    to upload within a week of today.

9         I understand that the undertaking that you have made

10   to upload documents includes, you know, documents underlying

11   and related to the deals that are set forth in, you know, PSAs

12   that drive the plan provisions.  Obviously, there are certain

13   elements of deals that are still going to be in the

14   negotiation stage.

15        So you can't put, you know, documentation on an

16   Ambac-FGIC deal, and then find out there is no Ambac-FGIC

17   deal, for example; but the other material that, as of the time

18   of the proposed Fifth Amendment, that you would be putting

19   there, would be required to be put there within a week.  I

20   think that's a critical step towards meeting that ambitious

21   time frame.

22        Everybody's going to be expected to act in the utmost

23   good faith in the discovery process.  Judge Dein will be

24   overseeing that.  I'll expect both the Oversight Board and

25   AAFAF again to act in utmost good faith and response to

1    discovery requests without undue delay or obstruction.

2           I will be allowing some interrogatories, and will be

3    setting time frames for responding to written discovery.  So

4    parties that are propounding discovery, also have to use their

5    utmost good faith efforts to limit their request to ones that

6    target critical contested issues, rather than broaden what are

7    arguably overly burdensome fishing expeditions, so that we

8    don't have a lot of discovery disputes as to large volumes of

9    objections that would slow the process down.

10          I also intend to require the Oversight Board to file

11   early on, to essentially make the first disclosure move.  So

12   it would be the Oversight Board that would first file witness

13   and topic lists, together with a brief that gives an overview

14   of its anticipated legal arguments, and proof, and that would

15   come in before the objections to the Plan.

16          Entry into the depository would not require a

17   clairvoyant preview of the objections, but rather a notice of

18   intention to object.  The objections themselves flushed out

19   would come later in the discovery period, and then, of course,

20   the Oversight Board would be replying much later in the

21   discovery period and prior to the, you know, commencement of

22   the trial.

23          Also, the Court's view is that the point of provision

24   of a draft confirmation order well before the trial commences,

25   with opportunity for scrutiny of that, and filing of any

1    objections, so that it's clear what is in contention about

2    legal theories in particular, is a salutary procedure.  So the

3    procedure that I'm contemplating tentatively putting in place

4    so that everyone has a sense of how the timetable would work

5    would also include that sort of early deadline for filing of a

6    proposed confirmation order.  So those are some big picture

7    issues and intentions that I hope will help to guide this

8    discussion.

9         As to the argumentation with respect to approval of

10   the Disclosure Statement, it is my view at this point that the

11   objections that have been made and argued so far did not frame

12   fundamental and patent unconfirmability of a plan, and, thus,

13   don't require the denial of the approval of the Disclosure

14   Statement; but that certain of the arguments regarding

15   insufficiency of disclosure do raise issues that ought

16   properly to be engaged.

17        So, Mr. Rosen, I hope that that is helpful to you in

18   framing your approach to remarks on the matters that were

19   argued yesterday.  Do you want to make any general comments

20   before responding to the Disclosure Statement content

21   arguments, or do you want to jump in?

22        MS. DALE:  Your Honor, this is Margaret Dale.

23        THE COURT:  Yes, Ms. Dale.

24        MS. DALE:  Sorry to interrupt.  Mr. Rosen has just

25   had to reconnect.

1          THE COURT:  Ah.

2          MS. DALE:  So if you could just give us one moment.

3    Sorry.

4          THE COURT:  Sure.

5          MR. ROSEN:  Your Honor, it's Brian Rosen.  I switched

6    phones.  So now I'm on Ms. Dale's dashboard, but hopefully

7    this will work.

8          Your Honor, that does help us considerably, and I

9    appreciate your words with respect to some of the

10   unconfirmability points, because I think that will even

11   shorten some of the issues more for this morning.

12         We can certainly try to do some responding to some of

13   the absolute points right away, or we can try to address the

14   classification issue first, Your Honor.  And if so, I would

15   turn it over to Mr. Bienenstock, who will be addressing that

16   point.

17         THE COURT:  Okay.  Let's start with the

18   classification issue, and we'll start running our timer on the

19   93 minute time frame; but since that also anticipated your

20   responding to Ambac and FGIC, I'm expecting that, you know,

21   you most likely won't need all of that time, but you won't

22   hear a buzz until minute 91.

23         Okay.  So, Mr. Bienenstock?  You need to unmute on

24   the dashboard and your phone.

25         MR. BIENENSTOCK:  Thank you, Judge.

1          Martin Bienenstock of Proskauer Rose, LLP, for the

2    Oversight Board, as the debtors' Title III representative.

3    Good morning.

4          THE COURT:  Good morning.

5          MR. BIENENSTOCK:   On the classification issue, we

6    know all the parties know how thoroughly and carefully the

7    Court goes through the pleadings in advance of the hearing, so

8    I will do my best not to regurgitate what we've put in

9    writing, but just to make some -- what I think are the key

10   points about classification.

11         First, Section 1122(a) of the Code made applicable by

12   301(a) of PROMESA provides permission to put similar claims in

13   the same class, but there's no mandatory language.  So, you

14   know, we start with the statute.  1122 uses the words may

15   place -- the words may place a claim or interest in a

16   particular class, only if such claim or interest is

17   substantially similar to the other claims.

18         And, of course, we explain that our pleadings -- that

19   Section 1129(b)(1)'s provision about unfair discrimination

20   would have no application in the Bankruptcy Code or PROMESA,

21   if you could not have two classes with different treatments in

22   the first place.

23         I understand that the Creditors' Committee -- which

24   as everyone knows we've now settled with, but some people were

25   relying on its pleadings for the classification objection --

1    in its sur-reply, it said that our 1129(b)(1) argument goes to

2    cram down, but that's not really the case.  It wouldn't have a

3    purpose there if you couldn't have two classes in the first

4    place, with similar claims having different treatments.  So

5    the statutory language, we believe, sort of begins and ends

6    the inquiry.

7        The other big issue, though, and -- that the parties

8    seeking or propounding classification objections use is, of

9    course, *Granada Wines*, the First Circuit case.  And, again, so

10   as not to repeat what's in the pleadings, I'll start simply by

11   responding to something that came up in the Committee's

12   sur-reply.

13       In the Oversight Board's pleading, we had commented

14   that, at most, *Granada Wines* contains dicta about having to

15   put unsecured claims all in the same class.  And the response

16   to that in the sur-reply was that it's not dicta.  And it got

17   into a battle with us about, well, what's the definition of

18   dicta.  We said it's just anything that's relevant, but not

19   essential to a holding.  And they said no, it's just anything

20   the Court says in route to its holding.

21       Your Honor, I'd like to offer the Court a completely

22   different view in response to what the sur-reply said about

23   dicta.  The different perspective I would ask the Court to

24   consider is standing.

25       In *Granada Wines*, did any party, the debtor, or the

1    objecting parties to the Plan have standing to assert that all

2    of the unsecured claims had to be put in the same class?  And

3    the answer is clearly no, because there was only one class in

4    the first place.

5           So if no party, if no litigant had standing to get a

6    ruling that all unsecured claims have to be in one class, how

7    could a court comment about that be a holding if no one had

8    Article III standing to ask for it in the first place?

9           And I would submit that that should dispose of the

10   issue, at least the -- one of the arguments demonstrating that

11   the First Circuit's decision in *Granada Wines* is not authority

12   that this Court must follow in terms of classification in a

13   case under PROMESA.

14          And, of course, along with that goes the fact that in

15   *Granada Wines*, not only was there only one class of unsecured

16   claimholders, the concept of two classes came up in the

17   hypothetical that the debtor raised that it could have put

18   claims in separate classes, but it didn't.  As the First

19   Circuit reminded it, it didn't.

20          But the First Circuit did not, in that case, have a

21   situation where there were tens, hundreds, thousands, or in

22   our case, hundreds of thousands of retirees, each having

23   separate claims.  And I can only imagine that if and when this

24   issue comes up to the First Circuit, whether it be in the

25   context of the Commonwealth's case or some totally unrelated

1   reorganization case, it would not be surprising, I submit, if

2   the panelist in the First Circuit burst out laughing that the

3   ruling in *Granada Wines* could be authority to -- could be

4   interpreted today to require classification in one class of

5   thousands of retirees who get pensions based on their

6   lifetimes, and other unsecured commercial claimants who get

7   lump amounts.

8        It's just not rational that appellate judges in the

9   Federal Circuit Courts would have taken *Granada Wines* to issue

10  a rule that would have -- that would have such an implication

11  for a factual situation that was not in front of them.  And

12  along those lines, and tying back to the standing argument

13  that I mentioned earlier, it cites the Court to the Supreme

14  Court's decision in *Baker v. Carr,* 369 U.S. 186, at page 204,

15  which was also quoted in *Valley Forge Christian College v.*

16  *Americans United for Separation of Church and State*, 454 U.S.

17  464, at page 486, where the Court went out of its way to say

18  that, you know, the purpose of the standing requirement for

19  Article III standing is to have concrete adverseness, which

20  sharpens the presentation of issues upon which the Court so

21  largely depends.

22        Clearly, in *Granada Wines,* none of the litigants here

23  can pretend that there was any sharpened presentation to the

24  First Circuit in *Granada Wines* about putting in one class,

25  retirees and commercial claimants.

1          And on the classification issue, I just want to make

2     one final point.  The Committee, in its sur-reply, and even

3     before it's sur-reply, purported to answer a question that the

4     Judge asked -- that Your Honor asked at an Omnibus Hearing a

5     few months earlier about how can you put retirees and

6     commercial claimants in the same class, given that one is paid

7     based on lifetimes and the other is not.

8          And the Committee -- the Committee proposed its

9     solution.  Its solution was a class that contains the

10    commercial claimants and the retirees.  And for the commercial

11    claimants, they get paid their claim, minus something they

12    called a percentage reduction.  And for the retirees, they get

13    paid according to the formulas that we had in our plan.  And

14    one is supposed to be similar to the other, but not identical,

15    which the Committee concedes in its brief.

16         And, Your Honor, I would just say their solution is

17    proof positive that their argument doesn't work, because the

18    solution they proposed violates the Bankruptcy Code in that it

19    gives different treatments to claims in the same class.  And

20    so they tried to come up with a solution, but they couldn't.

21         And subject to any questions the Court has, I would

22    move on from classification at this point, if that's okay.

23         THE COURT:  I do have a couple of questions, and, you

24    know, these go to determining the degree to which *Granada*

25    *Wines* drives the classification determination under PROMESA.

1          Now, am I correct in recalling that *Granada Wines*

2    doesn't either cite Section 1122, or use the phrase

3    "substantially similar" at any point?

4          MR. BIENENSTOCK:  Yes, Your Honor.  You're correct.

5          THE COURT:  It also seems to me that to the extent

6    there's an argument that *Granada Wines* was background

7    interpretation of the law at the time that PROMESA was enacted

8    incorporating Section 1122, that PROMESA didn't assume that

9    litigation under the Title III would necessarily be in the

10   First Circuit, since PROMESA includes the alternative venue

11   provision, which would have allowed the Oversight Board to

12   file in a different district.

13         So I'd invite you to offer any comment you have as to

14   whether -- if we're trying to discern what congressional

15   intent would be as to the interpretation of 1122 under

16   PROMESA, what default rule or background legal rule Congress

17   might likely have had in mind, given that there is a majority

18   approach in the country to which *Granada Wines*, as it's been

19   applied in the First Circuit, appears to be an outlier.

20         MR. BIENENSTOCK:  Yes.  Thank you, Your Honor.

21         So leading up to 1122, as we explained in our

22   briefing, there had been bankruptcy bills in Congress

23   requiring the placement of uninsured claims, similar unsecured

24   claims in the same class, and they were not the bills that

25   finally made it into law.  So that's number one.

1          Number two, you know, *Granada Wines*, as we also

2    pointed out in our pleading, based its -- what we consider its

3    classification dicta on a chapter 10 case that, in turn, based

4    its classification language on the rule for secured claims,

5    which doesn't apply to unsecured claims.

6          In addition, the language in PROMESA Section 301(e),

7    that in the sur-reply, again, they say that since that

8    language says the Court -- the Oversight Board should consider

9    priority in security in classification, that's in putting

10   claims in the same class, it -- there was no need, and it

11   didn't address what should be considered in putting claims in

12   different classes; and, you know, that's why we have the

13   unfair discrimination test in 1129(b)(1), which isn't even

14   triggered if classes accept the Plan.

15         And, again, if there was one rule that Congress could

16   be said to have been aware of, it's that classifications

17   should never be based on gerrymandering.  That is, in creating

18   a class of claims simply to obtain an accepting class for

19   purposes of Section 1129(a)(10) of the Bankruptcy Code.

20         The Plan at issue here in our plan of adjustment, as

21   the Court knows and is undisputed, we have many accepting

22   classes.  We know that because of all of the plan support

23   agreements that we have with different groups.  So

24   gerrymandering is the last -- is just unnecessary here, so

25   that can't be the motive.  The motive is, as we explained, one

1  gets paid for life; the other does not, and that sort of

2  dictates the classification.

3       So I think for all those reasons, if Congress had

4  thought that contrary to what was going on throughout the

5  country, where retiree claims are classified separate from

6  commercial claims, that they wanted a different rule, they

7  would have said something, whether in the statute or the

8  legislative history, but none of the objectants here, Your

9  Honor, cite to any of that, because Congress didn't say it.

10       So they're really basing their argument on

11  legislative silence, which is a very treacherous, treacherous

12  road.

13       THE COURT:  Thank you.  You can go on from

14  classification.

15       MR. BIENENSTOCK:  Okay.  Thank you, Your Honor.

16       The other two topics I plan to cover will be a bit

17  shorter now based on Your Honor's observations just before I

18  started, because as I understand it, we're not here to argue

19  issues that will be confirmation issues.  But the two that I

20  will address, at least to the extent that it might be helpful

21  and might be beyond just confirmation issues, are the

22  preemption issues in the context raised by AAFAF, and

23  dischargeability, which was a separate issue raised by other

24  litigants.

25       I do want to say that on preemption, while AAFAF

1    certainly raised it yesterday in a big way, and I think it's

2    important to address it, it also dovetails with objections

3    that Ambac and FGIC made and other litigants made.  And if

4    it's okay with the Court, I'm only going to address preemption

5    now as it relates to the argument AAFAF made, and would

6    reserve for a hearing that may not be necessary later on the

7    other preemption argument that Ambac and FGIC are making.

8           Now, as I said, other parties did rely on overlap

9    with those.  So if necessary, I'd like to cover that when we

10   reconvene.  But, anyway, I'll start with AAFAF, if that's okay

11   with the Court.

12          THE COURT:  Yes.

13          MR. BIENENSTOCK:  Thank you.

14          First I want to point out some points, a very

15   important point of agreement between AAFAF's argument

16   yesterday and the Oversight Board's position.  First, it

17   mentioned the progress that has been made between the

18   government and the Oversight Board when they've worked

19   together.

20          And I want to double and triple the reaffirmation on

21   the Board's side of the hope that that will carry over to

22   agreement to resolve AAFAF's argument that it made yesterday

23   about the Plan of Adjustment.  And the Oversight Board will

24   definitely be focusing, and ready, willing and able to meet

25   with the government to try to get to a consensual resolution.

1            Second, AAFAF raised the -- its entire argument

2   yesterday was really premised on the importance of pensions

3   for retirees, and it wanted both larger payments and to

4   eliminate the freeze in increasing benefits for active workers

5   in the defined -- in a defined benefit sense.  And the plain

6   agreement that exists between AAFAF and the Oversight Board,

7   it is very important.  I think we both agree that it is

8   critical.  And the retirees of Puerto Rico have every right to

9   dignified retirements.  Those who work for the government,

10  worked for many years during, you know, the best years of

11  their lives.  They were made promises.  And to the maximum

12  extent possible, those promises should be kept so they can

13  have dignified retirements.  There's no disagreement on that,

14  and these are not just words.

15           From the inception of the Oversight Board back in

16  2016 and 2017, when it -- they were able to start getting

17  things done, the treatment of the retirees' pensions has been

18  favored and foremost on the agenda.  It was -- from the

19  outset, the Board proposed a distribution to retirees well in

20  excess of distributions to other unsecured claimants.

21           I mean, frankly, we're now in the 95 percent range.

22  We were always, I think, in the 90s.  And as the Court knows,

23  we've been, on the one hand, criticized for that, that other

24  creditors are getting less, or other creditors saying, we want

25  the same treatment as the retirees.

1              The Board was also instrumental in formulating the

2       Pay-Go plan, because since the pension plans are effectively

3       zeroed out of the funding, the pensions have to be paid from

4       the annual budget.  And the Oversight Board was first in line

5       in making sure that happened, and that the retirees get what

6       they're supposed to get.  And there's been no reduction in the

7       payments to retirees up until now.

8              So those are important points of agreement, I think.

9       And everyone's to be commended for assigning such importance

10      to giving retirees dignified retirements in Puerto Rico.

11             Where we part company, hopefully temporarily, with

12      the government is the government said, well, we want them paid

13      more, and we want to end the freeze.  And AAFAF emphasized at

14      the outset of its argument yesterday that it was just a

15      limited objection.  Your Honor, I want to -- I can't emphasize

16      more, this is no limited objection.

17             Probably not by coincidence in timing, the two houses

18      of the Legislature passed, and the Governor signed what's now

19      called Act 7, which the Oversight Board sued to nullify a few

20      weeks ago.  And Act 7 basically puts the pensions back to the

21      defined benefit program that certainly was a major factor in

22      getting the Commonwealth into financial distress, and went

23      further than that.  And by -- eliminating the freezes in

24      increasing the defined benefits as time goes on, as our

25      complaint explains, increases the liability for pensions that

1  future generations of Puerto Ricans will have to pay

2  approximately 17 billion dollars.

3        In that same legislation, AAFAF says that, or it --

4  the government passed a law that says that the government may

5  not expend resources hoping to achieve or to attain any plan

6  of adjustment that does not correspond to the terms that it

7  built into Act 7, which, again, would reinstate the defined

8  benefit program, increase liabilities 17 billion dollars,

9  increase current payments to pensions under the Plan, so to

10 eliminate any discount whatsoever.

11       And I guess recognizing that money is finite, they

12 put a limit of 57 or 58 percent on the amount that could be

13 paid to the petition date claims.  That's without interest for

14 the last five years.  So 58 percent of the claims, as of 2017,

15 on what can be paid to GO bonds, and a condition that if you

16 happen to own a GO bond that's contested, contested on the

17 ground that it was beyond the authority of the government

18 under the Constitution of Puerto Rico to issue, because it

19 would have exceeded the debt limit and so forth, that you

20 can't get any payment whatsoever unless you litigate and

21 prevail in the very action that is settled in the Plan of

22 Adjustment proposed on the table now.

23       So to go back to explain AAFAF's, "limited,"

24 objection, what AAFAF is saying to the Court and all the

25 parties is, we want to impose 17 billion dollars of additional

1    debt burden on Puerto Rico.  We want to get rid of the Plan of

2    Adjustment on the table that's based on settling with the

3    contested bondholders, settling with the uncontested

4    bondholders.  And by imposing those extra -- the extra debt

5    burden and financial burden of enhanced pensions, they

6    basically scuttle the entire plan we have, because we won't

7    have the money to pay anything that we've promised to pay

8    under the currently proposed plan.

9          Now, AAFAF defended its position.  It didn't spell

10   out the consequences that it was really talking about that are

11   really at issue, but it defended its position on the ground

12   that preemption would not enable the Oversight Board to issue

13   the debt it needs to issue under the Plan to carry out the

14   agreements it's been making with all these creditor groups.

15   And the simple answer to that is that at -- section

16   1123(a)(5)(j) of the Bankruptcy Code, again, incorporated by

17   301(a) of PROMESA, expressly says that the Plan shall provide

18   for the issuance of securities of the debtor, et cetera.

19          So with the express language, we don't think there's

20   much question that preemption allows us to do that.  But what

21   AAFAF is -- although it didn't spell it out again, what it was

22   referring to, we believe, is a more nuanced consequence of the

23   government's failure to cooperate.

24          Its failure to cooperate could mean that there are

25   issues as to whether the new debt will be tax exempt, and

1   issues as to whether the municipal bond market will recognize

2   the debt.  Although, frankly, although AAFAF makes a big issue

3   of getting the Commonwealth's full faith and credit for the

4   new debt, let's look at what the government and Act 7 have

5   done to the Commonwealth's full faith and credit.

6       According to the Commonwealth, first, before PROMESA

7   even existed, they put a moratorium on paying interest on the

8   GO debt that had the full faith and credit of the Commonwealth

9   government.  Now, after about five years of not being paid,

10  they want to eliminate the settlements with the bondholders

11  and limit what they can get for all of their full faith and

12  credit and constitutional protections and priorities.  And

13  they want to force a litigation of those issues.

14      So I guess everyone can reach their own conclusion as

15  to whether the conduct of the government to date has improved

16  or not the image of the Commonwealth's full faith and credit.

17  And the importance of having that in a debt market certainly

18  seems that -- a Federal Court order under a federal statute is

19  a whole lot more clear and comfortable than the full faith and

20  credit, if it's going to turn into what the full faith and

21  credit of the existing bonds has meant during the last five

22  years.

23      Now, I want to go back to the beginning.  There's no

24  good reason why the bondholders should have to put up with

25  less than the maximum value that can be attained for those

1    bonds based on the cooperation of the government and the

2    Oversight Board.  But as much as we want to achieve it -- and

3    for what it's worth, I think we can and will achieve it, and

4    the Board certainly hopes to get there -- the Board has

5    statutory missions of attaining market access for the

6    Commonwealth and fiscal responsibility.

7           Under no circumstance is the Board going to allow the

8    Commonwealth to undermine PROMESA, which makes the Board the

9    sole proposer of a plan of adjustment, and to impose its own

10   plan that increases debt burden 17 billion, creates pension

11   obligations that we submit cannot ever be fulfilled, and will

12   get the Commonwealth back in the exact same position it was in

13   2016 and '17.

14          We need to go in the opposite direction, as does the

15   Commonwealth Government.  And because I think these things are

16   so clear, and a lot of them come down to simple arithmetic, I

17   will close that part of the argument simply by saying I hope

18   we can sit down and reach an agreement that's good for

19   everybody.

20          The requirement and need for the dignity of Puerto

21   Rico's retirees is foremost on the Board's mind, but likewise,

22   we can't accomplish it in a way to put the Commonwealth back

23   in the same position we found it and have worked for four or

24   five years to fix.

25          So I will end that on a ray of hope that we reach

1    agreement, and that's what the Board is going to be focusing

2    its energies on.  If the Court has --

3              THE COURT:  I --

4              MR. BIENENSTOCK:   Go ahead.

5              THE COURT:  I do.  So I certainly encourage the

6    parties to both hope and work toward cooperation, because that

7    clearly would be in the best interest of the people of Puerto

8    Rico and all of the stakeholders.  Having said that, do you

9    have a plan B, a preemption-based plan B that would give you a

10   legal basis for seeking to deliver, through the Court, all of

11   the attributes of the securities that are called for under the

12   Plan, and also dealing with what seem to me to be its

13   statutory repeal and certain statutory enactment features of

14   the Plan as currently proposed.

15             If you do, I think that is one of the disclosure

16   issues that I am concerned about.  I think that has to be

17   spelled out in at least high concept terms, and the risks

18   of -- you know, the risks of failure to get legislation, and

19   risks associated with proceeding and seeking to implement the

20   Plan on the preemption theory would also need to be disclosed.

21   So I invite your response.

22             MR. BIENENSTOCK:   Well, sure.  And thank you, Your

23   Honor.

24             In terms of disclosure, you know, if for some reason

25   it can't be done, it won't be feasible, then, you know,

1   it's -- everyone's vote will be moot.  So we didn't really see

2   it as a disclosure obligation, because votes will only have

3   meaning if the Plan is confirmed.

4        In terms of plan B, as Your Honor referred to it, the

5   plan B starts with 1123(a)(5)(j) asking the Court to, you

6   know, issue a confirmation order that does exactly what

7   (a)(5)(j) says, which is provide for the issuance of the

8   securities.

9        As I explained earlier, the nuance is whether we

10  would get tax exempt treatment from a federal tax point of

11  view, and whether the creditors who wanted the comfort of the

12  Commonwealth legislation would get that.  And what -- whether

13  they -- whether they will feel they need that at the end of

14  the day, as opposed to, if we don't reach a deal with AAFAF,

15  whether they would want to kill the whole plan or go forward

16  in the best way possible.  Hopefully we'll never have to find

17  out, but that's something that would be left to negotiations

18  and discussions ongoing, if it comes to that.

19       I guess if we start the confirmation hearing, and

20  even after that, if we end it without having a deal with AAFAF

21  and the rest of the government -- and I want to emphasize,

22  Your Honor, that today, since the Governor is in a different

23  political party than the two legislative houses, you're really

24  talking about -- there's no one central discussion.  There are

25  three discussions to be had, and it's not simple.

1         So this is -- this is really not -- it can't really

2    be prescripted.  The only thing I think we can say is that we

3    would be simultaneously working with the Governor and the two

4    legislative houses.  We would, as necessary, be working with

5    the IRS, the Federal IRS about the tax exempt treatment, to

6    try to either attain the legislative blessing, which would be

7    optimal, or to get the same outcome for bondholders by getting

8    tax rulings, et cetera.  But I don't know that we can really

9    prescript it now.  We are --

10        THE COURT:  But you can say, and there is a risk that

11   if those efforts are not successful, that the proponent will

12   not be able to demonstrate the feasibility of the Plan.

13        MR. BIENENSTOCK:  Absolutely, Your Honor.  We can

14   definitely add that, Your Honor.

15        THE COURT:  To be confirmed --

16        MR. BIENENSTOCK:  Right, we agree.  We can add that.

17        THE COURT:  Okay.  So you can go on.

18        MR. BIENENSTOCK:  Thank you.

19        I was going to shift now to the dischargeability

20   issue, which, based on Your Honor's earlier comments, I'm

21   inferring that it's a confirmation issue, and I shouldn't

22   really try to argue it now.  And I'm certainly not going to

23   get a ruling now, so I'll just be very high level on that, and

24   then, of course, answer whatever questions the Court may have.

25        THE COURT:  Thank you.

1    MR. BIENENSTOCK:  There are three basic decisions at

2 issue:  There's the 9th Circuit decision in *Cobb v. City of*

3 *Stockton*, 909 F.3d 1256.  And even though that appeal was

4 dismissed for equitable mootness, the 9th Circuit made very

5 clear that they regarded the taking claim as just an unsecured

6 claim that could be impaired like any other unsecured claim.

7    Then there's the 8th Circuit's decision in 1941 under

8 the Bankruptcy Act of 1898, as amended.  *Poinsett Lumber &*

9 *Manufacturing,* at 119 F.2d 270 (8th Cir. 1941), where

10 similarly the Court -- the Court discarded any notion that a

11 claim that it characterized as invested with constitutional

12 sanctity beyond other forms of liability was not simply a

13 claim that could be impaired by the Bankruptcy Act.

14    In opposition to that, various parties cite the City

15 of Detroit case, where the concept of non-dischargeability of

16 takings claims was supported, which we respectfully submit was

17 simply a wrongful decision.  And I would give one example,

18 or if -- it's fairly routine in bankruptcy that, for instance,

19 with adequate protection of secured claimholders, they only

20 get adequate protection, which is a Fifth Amendment concept,

21 of the value of their collateral for diminution in the value

22 of the collateral that occurs because of the bankruptcy after

23 the bankruptcy starts.

24    To the extent that the debtor has been using the

25 collateral, and it's depreciated before the bankruptcy starts,

1    that doesn't count.  The valuation is as of the petition date

2    or the date that the creditor asked for adequate protection.

3         That's really what we have here.  The eminent domain

4    judgments and liabilities are pre-petition liabilities

5    resulting in claims against the Commonwealth for payment.

6    They are unsecured claims.  No different, frankly, than an

7    actor that commits a tort of property damage.

8         If the debtor destroys someone's car in a negligent

9    accident before bankruptcy, they -- the debtor has effectively

10   taken the car.  But the car owner, the victim, doesn't have a

11   non-dischargeable claim for a taking.  The victim has an

12   unsecured claim to be made whole for the car and whatever the

13   debtor can pay.  And that's really the issue that's being teed

14   up here.

15        Now, separately, there are provisions where certain

16   federal advances and credits under Medicare and other statutes

17   may or may not be dischargeable based on specific provisions

18   of PROMESA, and we're obviously dealing with those based on

19   the statute.

20        And to the extent any are non-dischargeable, they

21   will not be discharged, and they're not going to impair

22   feasibility in any meaningful way or in any material way.  But

23   on the dischargeability issue, it's simply that.  We think

24   these are dischargeable unsecured claims, and the Court can

25   decide them at confirmation.

1          THE COURT:  Are there some eminent domain and inverse

2     condemnation claims that have not yet been reduced to

3     judgment?

4          MR. BIENENSTOCK:  Almost certainly, Your Honor,

5     yes.

6          THE COURT:  Because even if you're right about

7     judgments, and right about *Cobb*, *Cobb* did seem to turn to a

8     great degree on whether there had been either a waiver of a

9     claim to, you know, some sort of right to reclaim or have

10    control over the property in a secured sense, and a situation

11    that would be antecedent to that point.

12          *Cobb* cited several statutory provisions in California

13    law under which, by reason of time or by actions, the claimant

14    really had no road of going back and looking to anything other

15    than the money -- money judgments or money awards that had

16    been made.  Here, the situation, the factual situation seems

17    to be different.  The claims in *Cobb* had been filed as

18    unsecured claims, and I don't know that that is entirely the

19    situation here.

20          So what are the core principles of *Cobb* that you

21    would say apply here to the extent that the eminent domain and

22    inverse condemnation claims are not on all fours with the

23    background factual situation in *Cobb*?

24          MR. BIENENSTOCK:  Your Honor, our legal position is

25    really not even -- we think *Cobb* corroborates our position,

1    but our essential position is any pre-petition action, whether

2    it's resulted in a still unliquidated claim, disputed claim,

3    whatever, anything that was a taking pre-petition is a

4    pre-petition unsecured claim.  It's as simple as that.

5              THE COURT:  You can go on.  Thank you.

6              MR. BIENENSTOCK:  Your Honor, Mr. Rosen advises me

7    that in some cases, at the time of the taking, or reasonably

8    contemporaneously with it, there was money put into a reserve

9    in the Court for the claimant for the value of the property.

10   And, you know, to that extent, they may have secured claims,

11   which the Plan would honor obviously.

12             THE COURT:  Thank you.  I'm sorry?

13             MR. BIENENSTOCK:  No.  That's all I was going to say

14   on the dischargeability issue.

15             Your Honor, if I might just make one more comment

16   about preemption, because I know it's probably the premier

17   issue or one of the premier issues raised by the DRA parties,

18   it's simply this.  PROMESA happens to have its Section 4,

19   which says any inconsistent Commonwealth law is preempted.

20             It's important to recognize in the big picture that

21   in every jurisdiction where bankruptcy law or PROMESA can

22   apply, the law, whether statutory jurisprudence, common law,

23   or both, provides for full payment of honest debts.  It's

24   obvious that all of that law in all the jurisdictions

25   throughout the country and all its territories is preempted by

1    bankruptcy laws, because bankruptcy laws could serve no

2    purpose if the law requiring payment of legitimate debts is

3    not preempted.

4           In *Ohio v. Kovacs*, the Supreme Court determined that

5    the fact that an obligation to pay money arises under statute

6    still results in just an unsecured claim that's subject to the

7    bankruptcy laws, and in *Ohio v. Kovacs*, that was a clean-up

8    obligation for environmental contamination.

9           So applying that to this case, there's general

10   Commonwealth law, including in the Puerto Rico Constitution,

11   that, for instance, the GO debt must be paid, and with all

12   available resources, before any other debt.  At least before

13   anything that -- other than what might have to be paid because

14   of the police power.

15          There are other statutes that require the

16   Commonwealth to appropriate money, for instance, to PRIFA,

17   CCDA, HTA, which are at issue with the parties we think and

18   hope we're settling with most recently, with other parties,

19   and -- but those statutes are also statutes that, at least in

20   part, the DRA parties rely on.

21          If the DRA parties were correct that those statutes

22   are not preempted, then the question becomes why did Congress

23   pass PROMESA?  If we have to transfer money to HTA, PRIFA, et

24   cetera, in sufficient quantities to pay all their debts, we

25   can't reorganize the debts.  And if the statutes pop back into

1    existence the day after a plan is confirmed, or pop back into

2    enforceability, then there was no purpose served by the

3    restructuring.

4         So we will argue that at confirmation, but since I

5    sense the Court wanted us, to the maximum extent possible, to

6    address the key arguments that were made yesterday, that's

7    certainly the theme of our preemption arguments, vis-a-vis the

8    DRA parties.  And, Your Honor, those are -- subject to any

9    questions the Court has, those are all the comments I was

10   planning on.

11        And Mr. Rosen is prepared to cover the other

12   arguments that were made yesterday.

13        THE COURT:  I have a couple of additional comments

14   that I think fall generally into the dischargeability bucket.

15   So, first of all, and this comes, to some extent, from the

16   papers, the APJ and the 1983 claimants say they don't see

17   themselves mentioned anywhere in the Disclosure Statement.

18   What is the proposed treatment of those claims?

19        MR. BIENENSTOCK:  We regard them, Your Honor, as

20   general unsecured claims, so they would be in the UCC's

21   constituency.

22        THE COURT:  Atlantic Medical Center made an

23   administrative expense argument in their objection, and

24   neither the argument, nor the question of whether a finding

25   that they have an administrative expense claim that is valid,

1   has implications for feasibility was addressed in the reply.

2       MR. BIENENSTOCK:  Your Honor, if it's okay, Mr. Rosen

3   will respond to that.

4       MR. ROSEN:  Your Honor, this is Brian Rosen.

5       Your Honor, Atlantic Medical is one of the medical

6   centers that we have been having discussions with -- on and

7   off, Your Honor, for almost a year.  We believe that the Plan

8   treatment that is reflected in the current Fifth Amended Plan

9   is consistent with the understanding that we've reached with

10  it.  And although they've included that in their objection,

11  Your Honor, we believe that that will all be withdrawn and not

12  be an issue.

13      THE COURT:  Thank you.  I'll probably repeat this

14  later.  The DRA parties have an outstanding administrative

15  expense motion, and also their adversary proceeding, and there

16  have been statements regarding finding some schedule or way or

17  context of addressing those if they are not to be settled.

18      Given that we are probably looking at a very tight

19  litigation schedule toward the fall, I will be directing the

20  Oversight Board and the DRA parties to meet and confer as to

21  procedural context and methodology for queuing up those

22  issues.  I have in mind a meet and confer within the next

23  week, and a filing of a status report by July 23rd on that.

24      MR. ROSEN:  Thank you, Your Honor.

25      THE COURT:  It's as good a time as any to say that.

1   So let me just see if there is -- okay.  I think that covers

2   my remaining questions on the dischargeability issue.  So

3   thank you very much, Mr. Bienenstock.

4           MR. BIENENSTOCK:  Thank you.

5           THE COURT:  So whoever's next --

6           MR. BIENENSTOCK:  Okay.  Mr. Rosen will pick up then,

7   Your Honor.  Thank you.

8           THE COURT:  Thank you.

9           MR. ROSEN:  Your Honor, this is Brian Rosen.

10          If I could just pick up on the DRA first.  Well, Your

11  Honor, what I'd like to do is based upon what your initial

12  comments were about the unconfirmability aspects, I'm really

13  not going to be addressing those today, as Mr. Bienenstock

14  said.  We'll include those issues in our briefing and in

15  response at the confirmation hearing phase.  So I'd rather

16  deal with some of the specific information that people

17  requested and that was raised yesterday during their

18  presentations.

19          And the first one, Your Honor, is the DRA parties.

20  And I take note of what several of the objectants said

21  yesterday, which was specifically that they got the Disclosure

22  Statement late on Monday night, and they didn't have a chance

23  to look at it, and they didn't know if many of the things had

24  been added.

25          So with that as a premise, I would just note that to

1    the point that you just made, we had included in the

2    Disclosure Statement that got filed on page 528, note 424 --

3    and I apologize for having so many footnotes in a disclosure

4    statement that we have to number one 424 -- but there was

5    express information included in there, Your Honor, with

6    respect to the DRA parties' motion for administrative expense

7    claim for 800 million dollars.  And the fact that we say that

8    the DRA parties assert that their admin expense claim, and I'm

9    shortforming it, if granted is non-dischargeable and,

10   therefore, will survive the Commonwealth's Title III case.

11           Obviously, the Oversight Board and the Commonwealth

12   have a different perspective about that, but we did include

13   language in the Disclosure Statement to reflect the filing of

14   the admin expense motion itself, and the risk that would come

15   about in the event that the Court determined that the admin

16   expense claim was valid and meritorious.

17           There, with respect to the meet and confer, Your

18   Honor, we have no problem doing that.  We know that this is

19   something that is the subject of ongoing mediation efforts by

20   Judges Houser and Colton, and we know that there will be an

21   opportunity to sit down and speak with them, not only about

22   the adversary proceeding that was commenced against the

23   monolines, but also about all of the other issues associated

24   with the Title III cases.

25           THE COURT:  Thank you.

1          MR. ROSEN:  Okay.  Your Honor, the DRA parties also

2     raised an issue about 1111(b), and I just want to say that

3     it's not properly before the Court at this time.  We will

4     follow the dictates of Bankruptcy Rule 3014, and we will be

5     happy to address that issue with them, obviously, as part of

6     the meet and confer process.

7          Your Honor, and before I go through all of the other

8     points that have been raised, and I actually will try to do

9     this rather quickly, as you know, we had filed, in connection

10    with our Omnibus Reply, a detailed chart which set forth the

11    objections that had been raised in one column, the party who

12    had raised it, and as well as our responses, and the inclusion

13    of the language in the Disclosure Statement itself.

14         So I don't want to go through each and every one of

15    those, because I know that the Court and your chambers, your

16    staff, have carefully gone through those, and have your

17    perspective with respect to it.  I'll just try and address

18    very quickly some of the high points that were raised by a few

19    of the other parties yesterday, again, steering clear of the

20    unconfirmability issues, because I don't think they are before

21    the Court today.

22         Your Honor, Mr. Mudd had raised issues in connection

23    with the financial information of the Commonwealth, and,

24    again, that is in our chart.  I don't think I need to address

25    that.

1           There was a comment by Mr. Steel on behalf of the

2    Underwriters; and Mr. Steel didn't really have any concerns

3    about the Disclosure Statement itself, but rather he didn't

4    like the form of the release or the reservation of rights

5    that's provided for under the Plan of Adjustment.  I would

6    just note that at this point in time, the Underwriters, in --

7    which Mr. Steel represents, do not have a right to vote on the

8    Plan, and, therefore, there really isn't an issue for the

9    Disclosure Statement itself.

10          While I will continue to discuss this issue with

11   Mr. Steel, we did incorporate much of the language, but being

12   the dutiful lawyer that he is, he wants more language in

13   there, the belt, suspenders, and pins, and everything else, to

14   make sure that he has the rights preserved, which I think we

15   already did do; but I'm happy to have that conversation with

16   him again, some more.

17          U.S. Bank, Your Honor, did raise some issues.  We

18   think that certainly with respect to the PREPA issue, and the

19   timing of the PREPA plan, that's not anything before the Court

20   today, nor is it anything that we can actually do.  It is

21   going to work within the time frame or the timeline that it

22   can work within.

23          The one thing I will say, Your Honor, is despite what

24   counsel said, the claims against the Commonwealth will go away

25   pursuant to the Plan of Adjustment.  There will not be any

1  preservation of those claims.  They will be discharged one way

2  or the other pursuant to the Plan.

3       To the extent that there is a lack of clarity on that

4  point, I don't think there is, but we will make sure that they

5  go away, and there is disclosure clearly that will state that.

6       Mr. Carrion, on behalf of PFZ, was a the confirmation

7  objection, as well as Finca Matilde.

8       The Suiza points, Your Honor, that were raised by I

9  believe it was Mr. Gonzalez Valiente, he acknowledged at one

10  point that all of the issues that he was raising, besides the

11  fact that he had claimed there was a regulatory taking, and

12  Mr. Bienenstock has already addressed that, they were, in

13  fact, a feasibility issue.  And as a feasibility issue, Your

14  Honor, that, in fact, is a confirmation-related issue, so we

15  will leave that for another day.

16       The other dairy producer as well, Your Honor, was a

17  takings point that Mr. Bienenstock has already addressed.

18       There was a comment by Mr. Rosenblum.  I know that

19  he's looking for some additional language in there to make

20  sure that the Plan and Disclosure Statement are consistent

21  with the ERS stipulation.  I will get together with Mr.

22  Rosenblum, and we will make sure that that is so.

23       Your Honor, that would take me all the way to

24  Mr. Hein, and Mr. Hein started off by pointing out what he

25  considered to be an acknowledgment by the Board of a noted

1   deficiency in putting things in the Plan and Disclosure

2   Statement.  Your Honor, with all due respect, and maybe

3   Mr. Hein didn't notice them before, they've always been in the

4   Plan.  They were in Article 70 at one point.  I think it might

5   now be Article 71, which details all of the provisions of the

6   notes, as well as the exhibits which have always been in the

7   Plan.  To the extent that it was not included in the

8   Disclosure Statement, we did so just as an abundance of

9   caution, to make sure that there was some information there.

10        Mr. Hein refers to the discrepancy between a

11   sectional reference -- page 46, I believe he refers to it as a

12   reference to an Article 74.  If, in fact, it was 74, I think

13   it was just a transcription issue.  It may have been Article

14   71.4 instead of Article 74.1, or section 74.1.  And we'll make

15   sure that that is accurate, Your Honor.

16        There are issues about the financial information, as

17   we included in our reply, Your Honor.  The law with respect to

18   what a disclosure statement needs to provide is pretty clear,

19   and it doesn't mean that we need to provide certified, audited

20   financial information.  Rather, we need to provide the

21   information that we have, and that is exactly what is done.

22        Your Honor, to the extent that the Commonwealth has

23   not gotten to 2018 or 2019 financials, and while the Governor

24   at the public meetings has certainly stated that it's his

25   goal, his intention to make sure that all of those are given

1   as soon as possible, they're just not available at this point.

2   And as soon as they are, they will be made publicly available,

3   and to the extent they are done prior to the voting deadline,

4   we'll certainly put that information out there so people can

5   have it.  But the Disclosure Statement has everything that is

6   out there, and under the applicable law, nothing more need be

7   given.

8           There was a reference, Your Honor, that Mr. Hein

9   noted, or that he was upset about with respect to the voting

10  deadline and the applicability, if you will, to the retail

11  versus the non-retail people.  And there is a reason for the

12  distinction, Your Honor, and it's one because of the retail

13  class itself.  And I know I might be jumping over to

14  solicitation procedures, but inasmuch as that was all

15  together, Your Honor, I thought I would address it.

16          The restrictions on trading to the effective date for

17  the retail class, Your Honor, is necessary, because if a

18  retail class votes to accept the Plan, they will be entitled

19  to receive the retail support fee, and ATOP, which is the

20  organization through which the collection of the ballots takes

21  place, they will then -- ATOP will then need to separate those

22  securities from the non-retail securities in order to

23  distribute the retail support fee to the appropriate retail

24  holders.

25          But conversely, Your Honor, if the retail class votes

1    to reject the Plan, they will not be entitled to the retail

2    support fee, and the restriction will be lifted on the voting

3    deadline, or shortly thereafter, because there will be no need

4    for the restriction, there will not be any need to distribute

5    that fee to those holders.  So Mr. Hein, and any other retail

6    investor, will be free to trade as he wants with respect to

7    those retail securities, and the securities held by retail

8    investors.

9          I hope that was clear, Your Honor.

10          THE COURT:  All right.  So if the retail class, of

11    which Mr. Hein is a member, rejects the plan, then they won't

12    be restricted even as -- even during the confirmation

13    proceedings; is that correct?  That they also won't get the

14    fee?

15          MR. ROSEN:  That's correct.  They will not be

16    entitled to the retail support fee, Your Honor.  So as soon as

17    the votes are calculated post voting deadline, and the

18    determination is made as to whether or not that class accepted

19    or not, and if the answer is not, all of those retail

20    investors within that class will -- the restriction will be

21    lifted, and they will be free to trade at any point forward.

22          So that will be roughly, you know, a month or so

23    prior to the confirmation hearing, they'll be able to do what

24    they want.  They will still receive their distribution

25    pursuant to the Plan.  They just won't receive their allocable

1    share of the retail support fee.

2         THE COURT:  Yes, and if they decide that they want to

3    and can find someone to buy their shares so that they won't be

4    the ones getting the distribution pursuant to the Plan, they

5    would be able to do that?

6         MR. ROSEN:  Absolutely, Your Honor.  They'll be free

7    to trade just like they are today.

8         THE COURT:  You can go on to the next one.

9         MR. ROSEN:  I will.  Let me just check, Your Honor,

10   because I think that really is --

11        THE COURT:  There were some other Hein points I

12   wanted to ask you about.

13        MR. ROSEN:  Okay.  Your Honor, I think those were all

14   that I was going to respond to, so if I could address your

15   questions, I'd be happy to do so.

16        THE COURT:  Yes.  So, Mr. Hein has objected to what

17   he characterizes as lack of clear disclosure concerning the

18   fragmentary bonds that will be issued to investors, and in

19   particular with respect to the smaller retail investors'

20   receipt of such bonds under the Plan.  So I would like you to

21   respond to his suggestion, which, you know, doesn't seem to me

22   irrational, that there be an even clearer disclosure, perhaps

23   in the form of a chart like the one that he presented on page

24   20 of his objection, as to what would be received in exchange

25   for the existing bonds, and the fact that the exchange into

1    fragmentary bonds may have an impact on marketability and

2    raised tax issues, which I suppose you would want to say, if

3    you are mentioning them at all, that the investors should

4    consult with their tax advisors on.

5          But to flag that difference up front in the

6    Disclosure Statement --

7          MR. ROSEN:  Your Honor -- I'm sorry.  Your Honor, I

8    think -- while we're happy to consider a chart or something

9    else, I think Mr. Hein's concern is more that he would be

10   receiving fragments, not with respect to the level of

11   disclosure, but we will put information within the Disclosure

12   Statement, as best we can, to further make clear to retail

13   investors, or any holder for that matter, that they would be

14   getting a menu of securities.

15         If you recall, Your Honor, this was the same issue

16   that was raised by Mr. Hein in the context of the COFINA Plan,

17   and afterwards, and the concern that he had about

18   marketability.  And we pointed out to the Court the way it was

19   done was with the securities being distributed, and then

20   further distributed among respective accounts at the brokerage

21   accounts themselves.

22         But we're happy to include disclosure, and we'll take

23   a look again at that chart, Your Honor, and -- to see what

24   aspects of the chart we can locate and put in.  And we can

25   report back to the Court on the 27th with respect to that.

1          THE COURT:  Okay.  I'll be addressing specific

2    timing, in respect of additional language, in that time frame

3    in advance of the next hearing as we go along, but I

4    appreciate your undertaking there.  He also -- and I do agree

5    that his objection was to the substance of the Plan, which is

6    not a disclosure statement issue, but, also, I heard it as a

7    front-end disclosure issue as well.

8          I recall that in COFINA there were complaints that

9    were at least amplified post hoc over people being caught out

10   unawares with the fragmentary bond situation.  So I think it

11   is appropriate to make sure the distributions contemplated is

12   as clear as possible.

13         So yesterday he also argued that the Disclosure

14   Statement fails to provide information required by Section

15   1125(a)(1) concerning the tax characteristics and consequences

16   of the bonds.

17         MR. ROSEN:  Your Honor, I know that he went into some

18   length in his discussion about the COFINA situation again, and

19   the post effective date IRS determination regarding exemption.

20   Your Honor, we can only actually say what we know, which, at

21   this point, we don't have any closure with respect to the IRS

22   about what will be taxable and what will not be.  But we will

23   go through that once again, Your Honor, and, to the extent

24   possible, we will supplement that so that Mr. Hein, to the

25   best that we can, can be comfortable that we've done

1    appropriate disclosure.

2          But again, Your Honor, we can only say where we are,

3    which is that the efforts have not really -- because the Plan

4    is still being worked on, you don't go to the IRS before you

5    know what is going to be issued, and until you've done the

6    appropriate work with the Commonwealth and its advisors, like

7    you did in the context of COFINA.  So we will give all the

8    information that we have as of this point in time, Your Honor.

9    Absolutely.  So we'll go through that one more time for

10   Mr. Hein.

11         THE COURT:  Thank you.  To the extent that you can

12   explain that there is a constraint on the ability to request

13   advanced rulings, as when provisions are not fully set, that

14   would be, I think, an appropriate contextual point as well.

15         MR. ROSEN:  Thank you, Your Honor.  Will do.

16         THE COURT:  All right.  So I have a note about going

17   back to the DRA parties.  There were general -- lots of

18   arguments about disclosure of value of assets and that sort of

19   thing, and I'll have some things to say about that; but in

20   particular, the DRA parties, I believe, were arguing that one

21   or more of their loan claims are secured by what they consider

22   to be collateral in the form of sale proceeds, but that the

23   Oversight Board has taken the position that that collateral

24   has no value, and has not provided any information as to why

25   it believes that the collateral has no value.

1        So, as a disclosure issue, first of all, is their

2  characterization of your position right?  If it is, why

3  shouldn't there be information in the Disclosure Statement for

4  a holder of such a supposedly secured security as to why the

5  basis of the conclusion that the collateral has no value?

6        MR. ROSEN:  Your Honor, we have been working with

7  local Puerto Rico counsel, who are much more expert in this

8  area than we are with respect to this asserted claim.

9        Just for your benefit, Your Honor, the DRA parties

10  claim that they have a security interest in the disposition --

11  or the proceeds of the disposition of two particular

12  buildings.  We don't agree with that.  There is no mortgage on

13  the property there.  As far as we know, there are no filings.

14  There's only a reference in a document that they would have

15  that entitlement.

16        Your Honor, we will modify the Disclosure Statement

17  to set forth our position in that regard, and state,

18  essentially, why we believe that they are unsecured creditors

19  with respect to those buildings.

20        THE COURT:  Thank you.  Was there anything further

21  that you wanted to say about the disclosure issues?

22        MR. ROSEN:  No, Your Honor.  I believe that our -- as

23  I said before, the reply that we filed is very clear.  It sets

24  forth what can and cannot be -- or what has already been

25  included.  And we further modified two weeks later, Your

1    Honor, by adding more disclosure, and I'll call it the

2    midnight filing before the hearing, although it was earlier

3    than midnight.

4          But we believe we have addressed all of the concerns.

5    And, of course, if the Court would like more things included,

6    we're prepared to do that as well in order to accommodate the

7    Court and any of its determinations.

8          THE COURT:  Thank you.  I did consider the written

9    submissions beforehand, and I'll have some specific things to

10   ask you to address when I get to that stage.

11         So what is next in your argument response agenda?  We

12   can leave aside the remaining solicitation procedure issues

13   for the moment, unless you would like to go on and discuss

14   those?

15         Specifically, in terms of the solicitation

16   procedures, I have two concerns that lead me to have some

17   intentions.  One is the -- well, I would like to have some

18   more clarity as to the extent to which you anticipate further

19   objections to claims that would render additional claimants

20   unable to vote, and how you would expect the 3018 motion

21   process to work where you're only proposing to give notice

22   potentially of objections to claims 20 days out from the

23   voting deadline.

24         MR. ROSEN:  Your Honor, we -- as you know, because

25   we've been flooding you with Omnibus Objections, there are --

1   we've been pretty diligent in filing as many objections to

2   claims as we can, reconcile, or go through and get those

3   before the Court.   And, at this time, we filed yesterday, I

4   believe, a significant number of claims to be transferred to

5   the ACR process, and those, in our view, are not subject to

6   the voting pursuant to the Plan, also.

7          Your Honor, we don't foresee at this point any

8   significant, if at all, objections to claims being filed

9   really before the next scheduled Omnibus Hearing period, which

10  I guess would be in October.  So I think, Your Honor, except

11  for those where there's already an objection on hand, or with

12  respect to things like we've already talked about with respect

13  to Ambac and FGIC, we wouldn't see any others needing to come

14  before the Court for the 3018 purposes.

15         THE COURT:  Now, will you be sending the notice of

16  non-voting status to the people as to whom you have filed

17  objections to claims that will be relevant to the voting

18  period?

19         MR. ROSEN:  Your Honor, I'm not -- I don't recall

20  specifically, but we'll make sure that we do that, because I

21  think they should get that.

22         THE COURT:  What is your plan with respect to voting

23  rights of ADR process claimants?

24         MR. ROSEN:  Well, Your Honor, those are technically,

25  at this point in time -- they are in dispute, although I don't

1    think we've formally -- because we transferred them into ADR,

2    rather than file a formal objection to them, they're not

3    technically objected to.  But I believe, and I would have to

4    confer with my colleague, Mr. Ma, that we would assume that

5    they are non-voting claims at this time, if they are subject

6    to ADR.  And if it's not clear --

7            THE COURT:  Would you tell them that?

8            MR. ROSEN:  Yes, we would, Your Honor.  Absolutely.

9            THE COURT:  You'd provide the same notice as to

10   people as to whom there are claim objections?

11           MR. ROSEN:  Yes, Your Honor.

12           THE COURT:  What is -- I don't think I have seen a

13   notice of intent to request estimation of a claim, but that is

14   referred to in the materials.  So what is that, and how do you

15   expect to provide notice of your intended affect of that

16   notice of intent to request estimation?

17           MR. ROSEN:  Your Honor, we included that as a -- just

18   as we would normally do, as a routine manner in a confirmation

19   process.  At this point in time, we do not have any intention

20   to -- we don't see the need to file a motion to estimate any

21   claims for voting purposes, but if, in fact, we make that

22   determination, we obviously would file a motion to do so.

23           We would provide notice, and in order to allow the

24   claimant to have that opportunity to vote the claim as

25   determined by the Court, we would obviously bring that to the

1  Court's attention, and seek whatever time the Court has in

2  that regard.  But we don't --

3          THE COURT:  Thank you for clarifying.

4          MR. ROSEN:  But we don't see the need right now, Your

5  Honor.

6          THE COURT:  All right.  So back to the mechanics of

7  3018 motion practice.  Especially since there are many small

8  claimholders who have been the subject of objections to

9  claims, it is my intention to make that final claim objection

10  deadline, and the notifications that are tied to that, as an

11  outside date, 40 days before the voting deadline, so that

12  there would be time for someone to send in the 3018 motions.

13  You know, we don't know what kind of volume of them there will

14  be.

15          Then we'll set up -- I think, as I read your

16  Disclosure Statement mechanics, that would mean that they

17  would then within -- I forget what period of time it is, but a

18  fairly short period of time, have to make the 3018 motion.

19  We'll have to set up a procedure for a response and resolution

20  of it, and then they have to get notice of the resolution,

21  because you're requiring them then to ask for a ballot,

22  receive the ballot, and get it in by October 4th.

23          So I don't see how all that could happen in a 20-day

24  period.  A 40-day period seems to me more appropriate and

25  realistic.  Are you going to try to talk me out of --

```
1          MR. ROSEN:  No, I'm not going to try and talk you out

2    of it, Judge.  Let me just say that based upon the agreement

3    that we've reached with the Creditors Committee, and the

4    increased threshold for convenience claims, our thought

5    process with respect to some of those smaller ones may change.

6          MR. DESPINS:  Your Honor.

7          THE COURT:  Yes.

8          MR. DESPINS:  I'm sorry to interrupt.  Luc Despins

9    with Paul Hastings, on behalf of the Committee.

10          I know it's totally unorthodox to do this, but there

11   was a statement made about claims being transferred -- having

12   been transferred to the ADR -- ADR, not ACR -- not having the

13   right to vote.  That is not the way the order works right now

14   in that -- meaning that ADR claimants have the right to vote.

15          And I just want to make -- I didn't want our silence

16   to be deemed acceptance, because the current version does not

17   provide for that.  Basically, it allows ADR claimants the

18   right to vote, which they should have the right to vote.

19          Sorry for the interruption.

20          MR. ROSEN:  Thank you, Luc, Mr. Despins.  And if I am

21   wrong in that, I apologize, but whatever we've already

22   provided, we'll -- and if that's what it says, Luc, that's

23   what it will be.

24          THE COURT:  All right.  If it turns out for some

25   reason that the deal is that -- isn't that, and that they
```

1    wouldn't have the right to vote, they will get the necessary

2    notices?

3              MR. ROSEN:  Yes, Your Honor.

4              THE COURT:  All right.

5              MR. ROSEN:  Your Honor, I apologize.  I just -- you

6    know, as we're in different areas of the country, instead of

7    being all in front of you, I just did get a note that we may

8    have some items for estimation, perhaps ten, maybe one or two

9    more.  So --

10             THE COURT:  So I will assume that you will cue those

11   up as promptly as possible.

12             MR. ROSEN:  Posthaste, as they say.  Very quickly.

13             THE COURT:  Okay.  Sorry.  I'm just looking at my

14   notes.

15             It seems to me that the confirmation hearing notice

16   should make it clear that creditors who either aren't getting

17   to vote, or don't get to vote, or don't vote would still get

18   paid any distribution they're entitled to under any confirmed

19   plan.  Would you have an objection to including such language

20   in the confirmation hearing notice?

21             MR. ROSEN:  No, I wouldn't, Your Honor, with the one

22   caveat that we would just make sure that it reflected that as

23   to the extent that their claims are ultimately allowed.

24             THE COURT:  Yes.  I think -- okay.  So you can go on

25   to -- yes.  I think that those are the questions I wanted to

1   ask you about that.

2          We have about ten more minutes to the break, so are

3   there further arguments or remarks that you want to make

4   before the break?

5          MR. ROSEN:  Your Honor, if you don't mind, Ms. Dale

6   is in the room here with me.  If I could turn it over to her

7   for the confirmation procedures, and she can address those

8   very quickly.

9          THE COURT:  Actually, I realize -- I take it back.  I

10  want to flag for you asset-related questions.  So as to -- it

11  wasn't clear to an objector, and wasn't clear to us, whether

12  certain accounts that were categorized as potentially

13  inaccessible or potentially available in a December 2020

14  presentation, whether those are included in an inconclusive

15  category, and whether a disclosure concerning potentially

16  inaccessible, potentially unavailable accounts would be

17  appropriate?

18         MR. ROSEN:  Your Honor, I apologize.  What I would

19  like to do is just verify that with our two people who worked

20  on the cash restrictions analysis.  And we will look at that,

21  and to the extent that we can further supplement what we've

22  done already, we'll do so.  I just don't have that information

23  in front of me right now, Your Honor.  I'm sorry.

24         THE COURT:  Okay.  Would you also consider during the

25  break, if you can, I have a concern about keeping entirely off

1    of the financial disclosure the potential value of any assets

2    that might be -- or any mention of assets that might be

3    required, that might be subject to the Fiscal Plan Compliance

4    Act cataloging and reporting to the evaluation and disposal

5    committee; and considering whether disclosure that there is

6    the Fiscal Plan Compliance Act, there are creditors who are

7    doing investigations and may contest the Oversight Board's

8    position as to unavailability of the -- of those assets for

9    inclusion in the Plan, which could have implications for

10   feasibility determinations?

11          I think I had some more specific language in mind,

12   but that is the conceptual approach that I was thinking of to

13   disclosure regarding real property that might be subject to

14   that Fiscal Plan Compliance Act provision.  So you can think

15   about that and talk to me after the break.

16          MR. ROSEN:  We will, Your Honor.

17          THE COURT:  Thank you.

18          All right.  Ms. Dale?

19          MS. DALE:  Your Honor, it's Margaret Dale from

20   Proskauer Rose for the Financial Oversight Board.

21          Thank you.  I was going to address the confirmation

22   procedures motion, and I appreciate the remarks that you made

23   at the beginning of the hearing today, because I think you

24   obviated 99.9 percent of what I was going to say with your --

25   you know, with the intentions of the Court.

1          The only thing I wanted to address, Your Honor, was

2     the comments that were made with respect to the Disclosure

3     Statement depository yesterday by Mr. Hein.  I just want the

4     Court to be aware that, you know, it is not a, quote, jumble

5     of documents.  There are 18 categories, with descriptions of

6     the documents.

7          There are a lot of documents in some of the

8     categories, and that's because we included, in particular, the

9     productions that we've made in the cash and asset 2004

10    motions, and we've made all of those documents available.  So

11    in some of the categories, there are very, very many

12    documents, but that was because we wanted to be complete with

13    respect to the disclosures that we've already made with

14    respect to cash and assets, Your Honor.

15         And I just wanted to also point out that other than

16    Mr. Hein's complaint about having difficulty accessing the

17    depository documents, we really only had one other substantive

18    issue, which we worked out.  We think it's been a very

19    successful endeavor.

20         As of July 12, Your Honor, we have 145 data room

21    users.  Fifty-three of them signed on to the protective order.

22    And we're allowing nine law firms to utilize the SFTP access

23    option.

24         And, finally, Your Honor, we will begin to add

25    documents and transition the depository to a confirmation

1    depository immediately.

2              That's all I had, Your Honor.

3              THE COURT:  Thank you.

4              So, at this point, let's begin the mid-day break.

5    Please sign off, and then be back on ready to proceed at ten

6    past 2:00.  Thank you all very much.

7              I'm sorry.  Did anyone else wish to say something?

8              MS. MILLER:  Your Honor.

9              THE COURT:  Yes.

10             MS. MILLER:  Your Honor, Atara Miller from Milbank.

11             I was just wondering if I could take care of one

12   small housekeeping item in the couple of minutes we have

13   before the break.

14             THE COURT:  Sure.

15             MS. MILLER:  Thank you.  And thank you again for your

16   accommodation and flexibility yesterday with the schedule.

17             You know, we're pleased, as Mr. Rosen announced this

18   morning, to have been able to reach an agreement with the

19   Oversight Board.  And we thank the Oversight Board and, of

20   course, the endless efforts of the mediation team, Judge

21   Houser, and Judge Colton in getting it done.

22             Just one housekeeping item.  I know Mr. Rosen

23   mentioned the pending motions that we filed yesterday.  There

24   are also, as you know, supplemental briefings due on Friday in

25   connection with the revenue bond matter, and so I just wanted

1    to flag for the Court that we do intend to file a motion

2    asking the Court to stay those adversaries, so that we don't

3    have to move forward with those briefings on Friday.

4            THE COURT:  Thank you for making that clear.  So I

5    will look forward to that request being filed.

6            MS. MILLER:  Thank you, Your Honor.

7            THE COURT:  Thank you.

8            So if that's it, we will commence the break now, and

9    we'll be speaking again at ten past 2:00.  Thank you all.

10   We're adjourned.

11           Please make sure that you disconnect, and then

12   reconnect at ten past 2:00.

13               (At 11:44 AM, recess taken.)

14               (At 2:12 PM, proceedings reconvened.)

15           THE COURT:  Good afternoon.  This is Judge Swain

16   speaking.

17           MS. NG:  Hi, Judge.  It's Lisa, your courtroom

18   deputy.  Everyone's here.

19           THE COURT:  Thank you, Ms. Ng.

20           So we are continuing the proceedings on the

21   Disclosure Statement approval motions with the limitations as

22   subject matter that we discussed this morning.

23           Mr. Rosen, or Ms. Dale, does the Oversight Board have

24   any further remarks to any of the limited matters that are

25   before the Court today, that being the objections that have

1    been argued to the Disclosure Statement approval motion; the

2    solicitation procedures aspect of that, and also the

3    Confirmation Procedures Motion, insofar as that asks for

4    construction of a model that includes a discovery schedule

5    that, as I said, I intend to get put in place pending the

6    finalization of discussions with the outstanding creditors and

7    the adjournment to July 27th?

8          MR. ROSEN:  Good afternoon, Your Honor.  Brian Rosen,

9    Proskauer Rose.

10          What I wanted to do was just briefly address the two

11    points that you asked me about prior to our break, and, also,

12    just bring up one other matter that caught my attention when

13    Ms. Miller made her request with respect to the stay of the

14    revenue bond litigation.

15          With respect to the latter point, Your Honor, as we

16    noted yesterday, there has been an understanding reached with

17    the Unsecured Creditors Committee, and that's been captured

18    in a -- what we refer to as the committee agreement.  It was

19    noted in the Plan of Adjustment that was filed on Monday.

20          And as part of that, there is a request, or a process

21    to be in place with respect to the adversary proceedings, or

22    the avoidance actions that are going to be transferred into

23    the avoidance actions trust, and the activities that will be

24    undertaken in the interim process by the Special Claims

25    Committee.

1        So as part of that, Your Honor, just like Ms. Miller

2  said with respect to the revenue bond litigation, the

3  Creditors Committee and the Special Claims Committee/Oversight

4  Board will be preparing a motion to seek a stay of those

5  proceedings, a formal litigation stay.

6        That doesn't mean the matters cannot be settled in

7  the interim, and there will be a process for that, but we

8  wanted to stop the litigation process at this point in time

9  until there would be a formal hand-over of those avoidance

10  actions to the trust itself.

11        We just wanted you to be aware of that, Your Honor,

12  because we will be filing it, and there are certain time

13  commitments in the interim.  So just a point of information

14  for the Court.

15        THE COURT:  Thank you.  Judge Dein and I both

16  appreciate that head's up, and we'll look forward to the

17  filing.

18        MR. ROSEN:  Thank you, Your Honor.

19        Your Honor, there are two other points that you asked

20  me about just before the break.  One was with respect to the

21  Fiscal Plan Compliance Act, or I think it's referred to as Act

22  26.  And we had the opportunity, or at least I had the

23  opportunity to drill down a little bit on that during the

24  break, and specifically took note of the Order of Memorandum

25  decision and the Order of Judge Dein on May 17 of this year.

1           And in that decision, Judge Dein went through the

2    process -- and that decision, by the way, Your Honor, was in

3    the context of a discovery request between Ambac, AAFAF, et

4    cetera.  And Judge Dein went through, in the background

5    sections of her decision, the process that has been

6    undertaken, the compliance that has been done by virtually all

7    of the entities, but I believe six.  And it was during that

8    decision where she denied any additional discovery.

9           Your Honor, what we'll do is we have had an

10   opportunity to go through that with AAFAF during the break.

11   We will update the Disclosure Statement to include the

12   information from Judge Dein's decision, as well as any further

13   information that AAFAF is permitted to give us during the

14   period subsequent to May 17th.

15          I hope that answers the Court's question on that

16   one.

17          THE COURT:  Thank you.  I'll look forward to seeing

18   the revision.  It won't surprise you that I haven't memorized

19   Judge Dein's May 17 memorandum decision, so I don't know

20   precisely what you'll be writing, but it sounds like an

21   improvement.

22          MR. ROSEN:  Thank you, Your Honor.  And it was some

23   news to me.  I knew it existed, but I didn't know the details

24   of it.  So I'm glad I read it during the interim.

25          The second question that the Court asked me about was

1   with respect to the cash, and what has either been denoted as

2   potentially inaccessible, potentially unavailable, or

3   inconclusive.  And the information, I think as you correctly

4   noted, was included in a December 2020 blowout or public

5   disclosure.  And the information that was set forth in there

6   has already been uploaded, and has been in the data room for

7   some period of time.

8        Likewise, Your Honor, we have included in the

9   Disclosure Statement itself updated information from that,

10  because we were able to bring it down or bring it more current

11  to March of '21.  And that information has also been uploaded

12  to the data room.

13       We will go through, nevertheless, Your Honor, to make

14  sure that what's in the Disclosure Statement is the most

15  up-to-date, but I believe it is.  But we will try and put some

16  more numbers with respect to some of these categories that may

17  not be as complete as the information that is already in the

18  data room itself for the benefit of anyone who wants to look

19  there.

20       THE COURT:  Thank you.  I think there was also

21  concern about clarification of the nomenclature to what's in

22  the collective term and what's not, so if you can keep that in

23  mind as you go through the truing up and updating, that would

24  be quite helpful.

25       MR. ROSEN:  We will absolutely do that.  I have the

1  so-called definitions, or at least paraphrasing them, that

2  have been given to me, and we will make sure the Disclosure

3  Statement clearly says what they are.

4       THE COURT:  Thank you.

5       MR. ROSEN:  With that, Your Honor, I don't think we

6  have anything further to add with respect to any of the three

7  items, the Disclosure Statement, the solicitation procedures,

8  or the confirmation procedures; and we look forward to hearing

9  additional guidance from you.

10      THE COURT:  Thank you.

11      So, at this point, I will articulate at moderate

12  length my preliminary rulings that flesh out the intentions

13  that I expressed this morning as informed by the arguments

14  yesterday and further remarks today with respect to the

15  objections that were argued yesterday, the confirmation and

16  discovery schedule, and the tweaks to the solicitation

17  procedures.

18      So pending before the Court is the *Amended Joint*

19  *Motion of the Commonwealth of Puerto Rico, the Employees*

20  *Retirement System of the Government of the Commonwealth of*

21  *Puerto Rico, and the Puerto Rico Public Buildings Authority*

22  *for an Order (I) Approving Disclosure Statement, (II) Fixing*

23  *Voting Record Date, (III) Approving Confirmation Hearing*

24  *Notice and Confirmation Schedule, (IV) Approving Solicitation*

25  *Packages and Distribution Procedures, (V) Approving Forms of*

1    *Ballots, and Voting and Election Procedures, (VI) Approving*

2    *Notice of Non-Voting Status, (VII) Fixing Voting Election and*

3    *Confirmation Deadlines, and (VIII) Approving Vote Tabulation*

4    *Procedures.*

5    That motion is at Docket Entry No. 16756 in Case No.

6    17-3283, and I'll refer to it as the "Motion", which was filed

7    by the Oversight Board, as representative of the Commonwealth

8    of Puerto Rico, the Employees Retirement System of the

9    Government of the Commonwealth of Puerto Rico ("ERS"), and the

10    Puerto Rico Public Buildings Authority ("PBA").  The Court

11    will refer to the Commonwealth, ERS, and the PBA together as

12    the Debtors.

13    I note that the Disclosure Statement and Plan have

14    been modified since the objections were originally filed, and

15    so to the extent the Court refers to the latest versions of

16    the Disclosure Statement and Plan of Adjustment, it is

17    referring to the Fifth Amended Plan filed at Docket Entry No.

18    17306 and the Fifth Amended Disclosure Statement filed at

19    Docket Entry No. 17308.

20    The Court has considered carefully the Motion, the

21    objections to the Motion that were argued yesterday, and the

22    responses to those arguments, correspondence directed to the

23    Court regarding the Disclosure Statement and the proposed Plan

24    that are within the scope of matters taken up over the past

25    two days, and as I said, today's argument.

1          As I noted at the beginning of today's agenda, Ambac,

2     FGIC and the Oversight Board have requested, and I have

3     granted, a continuance of this hearing to July 27th with

4     respect to the objections of Ambac and FGIC.  As such,

5     although I will now -- I have considered and will now rule on

6     the objections advanced by parties other than Ambac and FGIC,

7     I will not issue a final ruling or enter an order resolving

8     the Motion until Ambac and FGIC's objections have been

9     resolved one way or another, whether by argument or by

10    withdrawal of those arguments.

11         Many of the objections that I have considered are to

12    specific substantive and economic features or alleged

13    consequences of the Plan of Adjustment, including, among

14    others, the discharge of certain claims, the propriety of the

15    proposed classification, and treatment of claims held by

16    certain creditors, and the economic feasibility of satisfying

17    the Commonwealth's liabilities in the manner contemplated by

18    the Plan of Adjustment.

19         These are serious issues, and they reflect important

20    aspects of the proposed Plan of Adjustment that could affect

21    large numbers of people.  The adequacy and legality of the

22    proposed Plan of Adjustment, however, are issues that

23    principally will be addressed in connection with the Oversight

24    Board's request for confirmation of the Plan of Adjustment.

25         The principal question now is whether the proposed

1    Disclosure Statement provides information sufficient to permit

2    a hypothetical creditor or investor to make an informed

3    judgment about the proposed Plan of Adjustment.  With the

4    exception of some deficiencies that the Court will direct the

5    Oversight Board to remedy, the Court is satisfied that the

6    objections of the parties who have thus far presented their

7    arguments do not present issues with respect to which the

8    Oversight Board has not met its burden of demonstrating the

9    adequacy of the proposed Disclosure Statement, nor do they

10   raise issues that would render the Plan of Adjustment patently

11   unconfirmable.

12        The Court first turns to classification-related

13   objections.  Several parties have raised objections to the

14   classification scheme within the proposed Plan of Adjustment.

15   In relevant part, those parties argue that the First Circuit's

16   decision in Granada Wines, Inc. v. New England Teamsters &

17   Trucking Industry Pension Fund, 748 F.2d 42 (1st Cir. 1984),

18   precludes confirmation of a plan that separately classifies

19   claims that are of equal rank and are against the same

20   property, as a matter of law and regardless of any government

21   or business justification that the Oversight Board might

22   proffer to justify such classification.

23        For convenience, the Court will refer in these

24   remarks to Granada Wines generally, even though we are only

25   concerned today with the legal discussion in section 2.c of

1 the First Circuits's opinion, and not with the First Circuit's

2 other holdings in that decision.

3   Although different parties have raised objections

4 concerning the separate classification of different kinds of

5 claims, the common denominator among these objections is the

6 parties' contention that separate classification of similar

7 claims would conflict with the principles stated in Granada

8 Wines (or in other case law from courts in the First Circuit

9 relying upon Granada Wines) and render the proposed Plan of

10 Adjustment unconfirmable.

11   As to this set of issues, the Court has carefully

12 reviewed the relevant pleadings and listened to and considered

13 the arguments of the past two days.  For the following

14 reasons, the Court will overrule the classification-based

15 objections to -- that have been argued thus far, to approval

16 of the Disclosure Statement, without prejudice to the parties'

17 ability to raise objections in connection with the Plan

18 confirmation process concerning the Oversight Board's

19 justifications for its classification decisions, and whether

20 the classification and treatment proposed in the Plan of

21 Adjustment otherwise meet the requirements of Section 314(b)

22 of PROMESA.

23   The Court recognizes that Granada Wines is, in

24 general, binding law that has not been overruled by the First

25 Circuit.  As such, several of the arguments raised by the

1    Oversight Board concerning _Granada Wines_' underpinnings and,

2    fundamentally, whether it was decided correctly are simply not

3    appropriate bases for adjudication of the issues at hand now.

4         Similarly, although the Oversight Board contends that

5    the relevant portion of _Granada Wines_ cited by the objecting

6    parties is dicta, this Court would not lightly cast aside

7    reasoned analysis from the First Circuit simply because it was

8    not absolutely necessary to the resolution of that case, and

9    so the task before the Court today is to determine whether the

10   principles in _Granada Wines_ preclude, as a matter of law, the

11   classification scheme in the proposed Plan of Adjustment.

12        To begin with, although certain parties have

13   described _Granada Wines_ as a case interpreting section 1122(a)

14   of the Bankruptcy Code, the Court disagrees with that

15   characterization.  As the Bankruptcy Court for the District of

16   Massachusetts noted in _In re Charles Street African Methodist_

17   _Episcopal Church of Boston_, the plain text of section 1122(a)

18   of the Bankruptcy Code "limits the circumstances in which

19   claims may be joined together in a single class.  It does not

20   require that substantially similar claims be joined together

21   in the same class." 499 B.R. 66, 95 (Bankr. D. Mass. 2013).

22   _Granada Wines_ itself does not quote, cite, or even refer to

23   section 1122.  Moreover, although the objecting parties here

24   contend that _Granada Wines_ effectively represents the First

25   Circuit's interpretation of the phrase "substantially

1   similar," that phrase does not appear anywhere in that

2   opinion, nor in any of the three pre-Bankruptcy Code cases

3   cited in the relevant section of that opinion.

4        Accordingly, the Court concludes that the passage of

5   the Granada Wines opinion that is at issue here is not an

6   interpretation of section 1122 in Chapter 11 cases, but,

7   rather, represents the importation of a classification rule

8   from Chapter X of the Bankruptcy Act into the First Circuit's

9   Chapter 11 jurisprudence.

10        With that, the next question is whether that rule

11   derived from Bankruptcy Act jurisprudence was imported into

12   PROMESA, and the Court concludes that it was not.

13        As both this Court and the Court of Appeals have

14   recognized, PROMESA is more akin to Chapter 9 of the

15   Bankruptcy Code than it is to Chapter 11.  "Unlike a

16   commercial bankruptcy, which attempts to balance the rights of

17   creditors and debtors, the principal purpose of Chapter 9,

18   and, by analogy, PROMESA, is to allow municipal debtors the

19   opportunity to continue operations while adjusting or

20   refinancing their creditor obligations."  And that quote is

21   from Andalusian Global Designated Activity Co. v. Fin.

22   Oversight & Mgmt. Bd. for P.R., 954 F.3d 1, 7-8 (1st Cir.

23   2020).

24        The Granada Wines classification rule is one that is

25   protective of the interests of creditors, at the expense of

1   the flexibility of a debtor to craft a plan of reorganization

2   that "focuses on factual and practical considerations, and

3   gives the debtor discretion to form classes based on such

4   considerations." In re Barney & Carey Co., 170 B.R. 17, 23

5   (Bankr. D. Mass. 1994).  Because PROMESA contains provisions

6   that are "respectful and protective of the status of the

7   Commonwealth and its instrumentalities as government," and

8   here I'm quoting from Financial Oversight and Management Board

9   for Puerto Rico v. Ad Hoc Group of PREPA Bondholders, 899 F.3d

10   13, 21 (1st Cir. 2018), the Court does not readily assume that

11   the creditor interest-focused principle adopted in Granada

12   Wines is impliedly adopted by PROMESA.

13       A review of the text of PROMESA reveals that Granada

14   Wines' classification principle simply is not present on the

15   face of the statute, and where Congress wanted to enhance

16   creditor protections within PROMESA, as compared to existing

17   bankruptcy law, it did so.  For example, section 407 creates a

18   cause of action to protect creditors against certain transfers

19   of property that compromise creditors' interests.  And section

20   303(3) of PROMESA expressly preempts certain kinds of unlawful

21   executive orders that alter creditors' rights or divert funds

22   between territorial instrumentalities.

23       Although certain parties have argued that section

24   301(e) of PROMESA recognizes or imports the Granada Wines

25   rule, the plain text of section 301(e) shows that it concerns

1    how the Oversight Board interprets section 1122(a) of the

2    Bankruptcy Code.  It does not expand the scope of section

3    1122(a).  The Granada Wines strict classification approach

4    isn't the majority rule nationwide, so it seems unlikely that

5    Congress would have assumed its applicability as a background

6    rule.  Even though Granada Wines' classification rule has been

7    followed by most courts within the First Circuit, Congress

8    could not have known for certain that venue for Puerto Rico's

9    Title III cases would be placed within the First Circuit;

10   section 307(b) of PROMESA potentially allows venue in any

11   district court in which -- sorry -- in any district in which

12   the Oversight Board maintains an office.

13        At the same time, the flexibility to separately

14   classify and treat claims from different unsecured creditors

15   potentially strengthens Title III debtors' ability to propose

16   plans of adjustment that protect the viability of the

17   government and its instrumentalities, and the ability of the

18   government to continue to provide services to its people, and

19   to ensure the economic viability of the territory.  For

20   example, PROMESA contains multiple provisions that are

21   protective of pensions, and separately classifying and

22   treating pension claims or employee claims could potentially

23   contribute to that broader goal.  As such, the Court finds no

24   basis to import the Granada Wines strict classification

25   principle into PROMESA.

1          The Court notes and wants to make clear that it has

2    not determined that the Plan of Adjustment classification

3    scheme is proper and lawful at this point.  Rather, the Court

4    is simply overruling the Disclosure Statement objections thus

5    far presented that contend that the classification scheme is

6    structurally impossible as a matter of law.  This decision

7    does not preclude factual and legal challenges to the debtors'

8    proffers of justification for classification decisions, nor

9    does it preclude unfair discrimination arguments, objections

10   directed to whether the proposed Plan is in the best interest

11   of creditors, or other objections arising from section 314(b)

12   of PROMESA.

13         The Court next turns to several objections to the

14   Disclosure Statement that have been heard that are now

15   overruled.  To the extent that several objectors complained

16   that certain claims are not dischargeable, be they

17   constitutional claims, claims arising under federal law, or

18   administrative expense claims, the Court has thoroughly

19   considered the objections, and overrules them in connection

20   with this Disclosure Statement motion practice, because such

21   objections challenge the confirmability of the Plan, and none

22   of them poses a pure question of law that would render a

23   confirmation futile or unfeasible at this stage, particularly

24   since this Court has the authority to exercise its power,

25   under section 944(c)(1) of the Bankruptcy Code, to preclude

1    certain debts from discharge at the confirmation stage if it

2    finds doing so necessary.  With respect to the *DRA Parties'*

3    *Motion for Allowance of an Administrative Expense Claim*, which

4    is Docket Entry No. 17009 in Case No. 17-3283, and their new

5    adversary proceeding, AmeriNational Community Services, LLC v.

6    Ambac Assurance Corporation, et al., which is Adversary

7    Proceeding 21-68, the DRA parties are directed to meet and

8    confer with the Oversight Board and other opposing counsel on

9    when and in what procedural context, be that confirmation or

10   otherwise, the DRA parties' administrative expense claim and

11   adversary proceeding contentions should be presented to the

12   Court, and to file a joint status report after they have met

13   and conferred.  That joint status report is to be filed by

14   July 23, 2021, at five o'clock Atlantic Standard Time.

15            To the extent that several objectors complain that

16   the release, exculpation, and injunction provisions of the

17   Disclosure Statement and Plan of Adjustment are impermissibly

18   vague and do not identify the claims and entities that are

19   being released, exculpated, or enjoined, the Court has

20   thoroughly considered those objections and overrules them,

21   because the Court is persuaded that, to the extent such

22   language was formerly unclear, it has since been revised to

23   resolve most of those questions at sections 1.264, 1.265,

24   1.401, and 1.402 of the Fifth Amended Plan, and the Oversight

25   Board's counsel has undertaken again today to review for

1   further clarification and tightening of the language as may be

2   necessary.  Any remaining objections to the specifics and

3   scope of these provisions, including any objections regarding

4   the propriety of third-party releases and invocations of the

5   five-part test articulated in In re Master Mortgage Investment

6   Fund, Inc., 168 B.R. 930, 937-38 (Bankr. W.D. Mo. 1994), no

7   longer pertain to the adequacy of the information contained in

8   the Disclosure Statement, and instead pertain to

9   confirmability.  Such objections are, therefore, overruled in

10  connection with this motion practice.

11          Several parties objected to the lack of information

12  in the Disclosure Statement concerning the risk to the

13  Commonwealth of adverse determinations in the Revenue Bond

14  litigation, or of the risk that the Revenue Bond litigation

15  will not be concluded within the Oversight Board's

16  contemplated confirmation timeframe.  The Oversight Board has

17  addressed that general contention in revisions to the

18  Disclosure Statement, and we have also been informed today of

19  agreements in principle that will also lead to a stay of those

20  proceedings, in contemplation of their resolution through the

21  agreement in principle.  So those objections are overruled.

22          To the extent certain objectors have raised arguments

23  concerning the Oversight Board's theory of preemption of

24  appropriations statutes, the Court concludes that those

25  arguments concern the feasibility of the proposed plan and

1    require further factual development in that they do not render

2    the plan patently unconfirmable.  As objections to the

3    adequacy of the Disclosure Statement, they are overruled.

4         Several parties have raised objections that the Plan

5    violates section 1123(a)(4) by allegedly treating other

6    claimants in the same class or in other classes in a disparate

7    manner.  These objections have not demonstrated that the

8    proposed plan is patently unconfirmable, and the parties may

9    litigate as necessary whether the proposed treatment is the

10   "same" for purposes of section 1123(a)(4) in connection with

11   confirmation.  They are overruled as objections to the

12   adequacy of the Disclosure Statement.

13        Parties' objections concerning whether the plan

14   unfairly discriminates against certain classes or claims are

15   also overruled.  Such arguments are properly raised in

16   connection with plan confirmation as they concern issues that

17   require factual development.

18        The DRA Parties' objections alleging that the

19   proposed plan is a sub rosa HTA plan, that the plan violates

20   Article VI, Section 8 of the Puerto Rico Constitution, and

21   that the settlements underlying the plan should not be

22   approved do not preclude approval of the Disclosure Statement,

23   as they do not meet the high threshold of patent

24   unconfirmability.  Those objections are, therefore, overruled

25   without prejudice to renewal in connection with plan

1   confirmation.

2       Parties' objections concerning the Oversight Board's

3   failure to define essential services in the Disclosure

4   Statement are overruled.  The Oversight Board's revisions to

5   the Disclosure Statement sufficiently address such objections.

6       To the extent parties object to the Disclosure

7   Statement's feasibility analysis as based on outdated

8   financials, such objections are overruled.  The Oversight

9   Board's revisions to the Disclosure Statement sufficiently

10  address the objections.

11      The Court will now turn to the categories of

12  objections that it sustains, and the Court will address each

13  such objection in turn.

14      First, to the extent several objectors have

15  complained that the Disclosure Statement does not hew closely

16  to Rule 3016(c) of the Federal Rules of Bankruptcy Procedure,

17  the Court concurs and hereby directs the Oversight Board to

18  describe in specific and conspicuous language, bold, italic or

19  underlined text, all acts to be enjoined and identify the

20  entities that would be subject to the injunction.  This is, of

21  course, also related to the exculpation and protective

22  language issues that the Oversight Board has undertaken to

23  examine again and tighten up.

24      Certain objections have argued that the proposed

25  Disclosure Statement is inadequate because it does not include

1   and rely upon audited financial statements.  While the Court

2   concludes that audited financial statements are not required,

3   the Oversight Board is directed to include in its risk

4   disclosures a statement that it has used data provided by the

5   government, and that neither the Oversight Board nor the

6   elected government will vouch for the accuracy of that data.

7           Certain objections have argued that the proposed

8   Disclosure Statement is inadequate because it does not include

9   sufficient information concerning cash available to the

10  debtors and the Commonwealth's cash restriction analysis.  The

11  Court sustains such objections to the extent that it hereby

12  orders the Oversight Board to include a disclosure that there

13  are creditors who are conducting their own investigations into

14  cash available to the Commonwealth, and may challenge whether

15  the Oversight Board's restriction analyses are correct.  The

16  additional disclosure should also state that the Court may be

17  asked to determine whether available cash should have been

18  considered in formulating the Proposed Plan, and that if the

19  Court finds that additional cash should have been considered

20  and available for distribution under the Proposed Plan, there

21  is a risk that the Debtors may not be able to demonstrate

22  satisfaction of confirmation standards.

23          I also note here that the Oversight Board has

24  undertaken to update, clarify, and tighten up as necessary its

25  disclosures concerning cash.

1           Several objections concern inadequate disclosure

2    regarding legislative approvals that are contemplated under

3    the Proposed Plan of Adjustment.  The Court sustains the

4    objections to the extent that the Oversight Board is directed

5    to supplement its Disclosure Statement to provide information

6    disclosing: (i) the Commonwealth Government's position on the

7    proposed Plan, (ii) legislative barriers to government support

8    for the Plan, (iii) risks associated with failure to obtain

9    legislative approval for each legislative measure contemplated

10   under the Plan, and (iv) risks associated with Plan

11   implementation should the Oversight Board fail to obtain

12   legislation contemplated in the Plan.

13           The Oversight Board has undertaken to clarify the

14   discussion of the collateral that the DRA parties claim

15   secures a particular loan, and so that is a way of fulfilling

16   this direction that the Oversight Board is directed to

17   supplement or revise the Disclosure Statement to include

18   information as to the basis of its position as to the value of

19   the claimed collateral.

20           Just one moment.

21           As to Mr. Hein's objection, which I also discussed

22   this morning with Oversight Board's counsel concerning

23   potential risks and costs associated with the issuance of

24   multiple kinds and maturities of bonds, and the rationale for

25   structuring distributions in that manner, the Oversight Board

1    has undertaken and is directed to make plain the structure for

2    the distributions, and to disclose risks related to effects on

3    marketability of fractional bonds, and the need to consult

4    with tax advisors regarding the tax implications of the

5    distribution.

6         And an illustrative chart or other plain description

7    of the different maturities and relevant features in a manner

8    that would be comprehensible to hypothetical creditors of the

9    relevant classes is also to be included.

10        With respect to Mr. Hein's objection concerning the

11   failure to disclose tax characteristics and tax consequences

12   of bonds to be issued under the Plan, the Oversight Board is

13   directed to supplement the Disclosure Statement to provide

14   such information, to the extent available, in a manner

15   consistent with section 1125(a) of the Bankruptcy Code.  To

16   the extent tax information is unavailable, the Disclosure

17   Statement should disclose that and explain why.

18        So, in conclusion of this aspect of the preliminary

19   ruling, and for the removal of doubt, to the extent that a

20   particular issue or objection, other than objections of Ambac

21   and FGIC, has not been specifically addressed by this Court,

22   it has been considered thoroughly and is overruled without

23   prejudice to renewal in connection with plan confirmation.

24        I now turn to the solicitation procedures aspect of

25   the Order, and as with my remarks concerning the request for

1    approval of the Disclosure Statement, these rulings approving

2    procedures are subject to change and may be modified in

3    connection with adjudication of objections by Ambac and FGIC.

4         The Court will now make some rulings with respect to

5    the structure of the solicitation procedures proposed by the

6    Oversight Board, and soon after this hearing, the Court will

7    enter an order reflecting these preliminary rulings.  And when

8    the Oversight Board files its next iteration of the Disclosure

9    Statement, these oral rulings are to be incorporated into the

10   written order and appropriate sections of the Disclosure

11   Statement.

12        To the extent that the solicitation procedures seek

13   an order setting a deadline for the filing of initial

14   objections to the Proposed Plan, and adopting the Oversight

15   Board's proposal to require any party who wishes to take

16   discovery to file an initial objection, the Court denies the

17   Oversight Board's request and declines to adopt the initial

18   objection procedure.

19        The Board is hereby directed to re-configure the

20   discovery deadlines in the Solicitation Procedures

21   Confirmation Hearing Notice, and any other relevant schedules,

22   to conform to the revised schedule for confirmation and

23   discovery that the Court will discuss shortly and also

24   summarize in a separate order relating to the Confirmation

25   Procedures Motion.

1          So that is a reminder that there is overlap, and

2     you'll have to reconcile the two orders.

3          The Oversight Board must amend the proposed

4     Confirmation Hearing Notice in the following respects:

5          First, add to paragraph 10(a) a specific requirement

6     that objections and responses to confirmation must be in the

7     English language.

8          Second, clarify that the requirement in paragraph

9     10(d) that objections to confirmation are to be filed

10    electronically  -- I'm sorry, clarify this requirement in

11    paragraph 10(d) that objections to confirmation are to be

12    filed electronically or, if and only if the individual

13    objector is not represented by counsel, with the Clerk's

14    Office at the address provided.

15         As to paragraph 17 of the Proposed Confirmation

16    Hearing Notice, the Oversight Board is to amend it to include

17    a website address for accessing a form Rule 3018 Motion that

18    the Oversight Board has indicated it will have posted on the

19    Prime Clerk website, and that form 3018(a) Motion shall

20    instruct the creditor to identify itself and provide the

21    relevant claim number, and leave space to set forth the

22    grounds for the creditors' request for temporary allowance of

23    its claim, and the form should include instructions for filing

24    and serving the motion.

25         The deadline for filing objections to claims or

1   requests for estimation shall be 40 days prior to the voting

2   deadline, rather than 20 days prior to the deadline.

3        The Solicitation Package shall include a hard copy of

4   the Unsecured Creditors Committee's recommendation letter as

5   to relevant claims, and instructions for how and where

6   creditors can obtain and review hard copies of the Disclosure

7   Statement and Proposed Plan.  And copies of the Disclosure

8   Statement and Proposed Plan should also be made available at

9   the ballot drop centers that the debtors are establishing for

10  submitting ballots.

11       In order to ensure that those who need paper copies

12  get them in a timely fashion, the Court is directing and the

13  Order shall include a provision that upon receipt of a request

14  for a paper copy of the Disclosure Statement and/or Plan of

15  Adjustment, Prime Clerk shall, within one business day of

16  receiving the request, deposit the requested documents with a

17  postal or shipping service to deliver to the requester by

18  service no slower than second-day delivery.

19       The debtor shall also amend the Confirmation Hearing

20  Notice to include a provision that creditors who are not

21  entitled to vote on the Plan or do not vote will still receive

22  any distribution that they are entitled to under a confirmed

23  plan with respect to an allowed claim.  To the extent that the

24  debtors need to clarify which parties have the right to vote,

25  the clarifications should be included in the revised proposed

1    order.

2         Now I turn to the Confirmation Procedures Motion.

3    Before the Court is the *Motion of Debtors for an Order*

4    *Establishing, Among Other Things, Procedures and Deadlines*

5    *Concerning Objections to Confirmation and Discovery in*

6    *Connection Therewith*.  That is Docket Entry No. 16757 in Case

7    No. 17-3283, and I will refer to that as the Confirmation and

8    Discovery Motion.

9         The Court has reviewed the relevant pleadings with

10   care, and listened carefully to the arguments yesterday and

11   today.  These preliminary rulings assume, for present

12   purposes, that a disclosure statement will be approved by

13   around the end of this month, but the Court obviously has not

14   made that decision yet.  Nevertheless, in order for there to

15   be a practical possibility of holding confirmation hearings

16   beginning in November, as proposed by the Oversight Board,

17   discovery will need to begin immediately, and it is important

18   for the parties to have a sense of the overall framework that

19   the Court contemplates.

20        As I have explained earlier, and the Oversight Board

21   has undertaken to do, the Oversight Board is expected to

22   immediately convert the Disclosure Statement Depository into a

23   Plan Depository, and upload within the week the documents that

24   it has agreed to upload in connection with confirmation, so

25   that discovery can begin promptly upon the approval of a

1    disclosure statement.

2         The Court recognizes the importance of bringing these

3    Title III proceedings to closure so that Puerto Rico can move

4    forward, but also recognizes the need for creditors to obtain

5    discovery in order to fairly evaluate the Proposed Plan and to

6    challenge it, if they deem it appropriate.  Fulfillment of the

7    Oversight Board's request to begin confirmation hearings in

8    November is dependant on the Government Parties' cooperation

9    in discovery.

10        As I indicated this morning, the Court expects that

11   the Oversight Board and AAFAF will promptly and fully respond

12   to discovery requests, and I will not hesitate to delay the

13   start of the confirmation hearing if the parties don't act

14   cooperatively, and that includes requesting parties as well.

15        The schedule that I'm prepared to outline could

16   change very quickly if there's a pattern of foot dragging or

17   non-disclosure or unnecessary objections that have to be

18   managed by the Court, and, as I mentioned, this goes for

19   creditors, too.  They need to attend to and moderate the

20   volume and scope of discovery requests so that precious

21   resources are not wasted.  The Court does expect that parties

22   taking discovery will use their best efforts to avoid

23   duplicative discovery requests.

24        The Court also reminds the Oversight Board to be very

25   careful with its confidentiality designations with respect to

1   documents in the depository, and to make sure that only

2   documents that are truly confidential are so designated.

3   Failure to apply appropriately the protections afforded

4   confidential information may have adverse consequences.

5       The Court will now make several rulings with respect

6   to the structure of the confirmation and discovery schedule

7   proposed by the Oversight Board, and I will mention certain

8   key dates and deadlines in my oral preliminary ruling that I'm

9   making now.  These rulings will address the major objections

10  raised by the various objecting parties, and soon after this

11  hearing concludes, the Court will enter an order containing a

12  schedule with aspirational specific discovery and confirmation

13  related deadlines.  The parties will be free to adjust the

14  specific dates set by the Court for any discovery matter

15  without leave of Court except for those dates relating to the

16  filing of matters with the Court and hearing dates, and, of

17  course, any internal adjustments need to be agreed adjustments

18  unless they are made by Court order.

19      Within 24 hours of the Order summarizing this

20  schedule, the Oversight Board is directed to file a revised

21  proposed Confirmation and Discovery Procedures Order that

22  incorporates these rulings.  The Court will not issue a final

23  confirmation and discovery schedule, if it is appropriate to

24  issue one at all, until after a decision on the Motion to

25  Approve the Disclosure Statement is made, but filing an

1   updated revised proposed order will make the parameters that

2   the Court is intending to set that much more available and

3   transparent to people.

4        When the Confirmation Hearing Notice is sent out by

5   the Oversight Board, a copy of the Confirmation and Discovery

6   Procedures Order, as ultimately entered by the Court, must be

7   included.

8        I already talked about conversion of the depository

9   and uploading, so I don't need to repeat that.  Pardon me.

10  I'm working from notes and trying not to be repetitive.

11       The Court declines to adopt the Oversight Board's

12  initial objection provision, and declines to limit the scope

13  of discovery in connection with plan confirmation to the

14  parameters of any such initial objection.  Rather, any

15  creditor or party in interest who wishes to take discovery in

16  connection with plan confirmation must simply file a notice of

17  intent to object to the Plan.  Assuming that a disclosure

18  statement is approved by the end of this month, the notice of

19  intent to object would have to be filed by August 3rd, 2021.

20       The failure to file a notice of intent to object

21  won't prevent anyone from filing an objection to the

22  confirmation of the plan, but it would exclude them from

23  participating in discovery.  Creditors will file their final

24  objections to plan confirmation at the close of the discovery

25  period, which is estimated to be on or about October 19th,

1    2021.

2          The Debtors will be required to file an opening

3    summary brief describing what they believe -- expect to prove

4    at confirmation, and their initial witness list, including the

5    topics for which each witness is expected to testify, and that

6    is to be done at the outset of the discovery period, which is

7    expected to commence on or about August 3rd, 2021.  The

8    Debtors will have an opportunity to amend their witness list

9    and make further filings at the close of discovery and shortly

10   before the confirmation hearing.

11         Creditors will file their initial witness list,

12   including the topics for which each witness is expected to

13   testify, after document production, but before depositions,

14   that is, on or about September 13th, 2021.  Creditors will

15   also have the opportunity to amend their witness lists.

16         The Debtors will not have the right to veto discovery

17   requests, and parties entitled to take discovery do not need

18   to certify that any discovery request is reasonably necessary.

19   If the Debtors believe that any information requested is

20   already in the Plan Depository, they can direct the requesting

21   party to such documents with specificity.

22         Responses and objections to document requests shall

23   presumptively be due ten days after the request is served,

24   unless the parties agree to an extension, where an extension

25   is allowed by the Court.  Follow-up document requests will be

1    permitted provided they are served in time to be answered

2    within the fact discovery period.  Discovery requests directed

3    to third parties will also be permissible provided that such

4    discovery must be completed within the fact discovery period

5    as well.

6          Parties who have filed a notice of intent to object

7    to the Plan may serve up to 15 interrogatories, including

8    subparts, provided that such interrogatories are served with

9    sufficient time to respond before the close of the discovery

10   period.  Unless otherwise agreed or ordered by the Court,

11   answers to interrogatories are due ten days after service of

12   the interrogatories.

13         Parties who have filed a notice of intent to object

14   to the Proposed Plan may serve requests for admissions, but

15   such requests for admissions shall be limited to

16   authentication of documents, and they can be served toward the

17   conclusion of discovery.

18         All depositions shall be limited to a seven-hour

19   timeframe unless otherwise agreed or an exception is ordered

20   by the Court.

21         With respect to the Debtors' obligation to prepare a

22   privilege log, the Court declines to address this issue at

23   this time and will rule on whether a privilege log is

24   necessary in connection with specific discovery disputes.

25         In the event of any discovery dispute, the Debtors

1    and the creditors involved in the dispute shall (1) meet and

2    confer in an attempt to resolve the dispute, and (2) if it is

3    not resolved within one business day of the meet and confer,

4    the Debtors and the relevant creditors shall inform the Court

5    of the existence of such dispute via telephone, and the Court

6    shall schedule a chambers conference, telephonic, virtual or

7    in person as soon as possible to resolve this dispute.

8         When I refer to the Court in this context, I am

9    referring to Magistrate Judge Dein, who will be supervising

10   this process.

11        Each party to the dispute shall provide the Court

12   with a letter, within three business days of the meet and

13   confer, describing the issues and their position.  Pending

14   resolution of the dispute, the parties shall cooperate and

15   provide discovery which is not the subject of the dispute.

16   The discovery will be overseen by Magistrate Judge Dein.

17        Fact discovery will be followed by expert discovery,

18   with a limited period of overlap.  As detailed in the

19   timetable which the Court will enter shortly, fact discovery

20   will take place from August 3rd, 2021, until October 11th,

21   2021, again assuming that there is an approval order for the

22   Disclosure Statement, and that it is consistent with the

23   feasibility of that timeframe.

24        Opening expert reports shall be served on September

25   13th, 2021, and rebuttal expert reports shall be due on

1   October 4th, 2021.  Expert discovery is anticipated to

2   conclude on October 18th, 2021.

3        The Court agrees with AAFAF that the Proposed

4   Confirmation Order should be filed in sufficient time for the

5   creditors to analyze it and to respond.  Therefore, the

6   Proposed Confirmation Order shall be filed on October 8th,

7   2021, objections to the proposed confirmation order shall be

8   filed on October 22nd, 2021, and the Oversight Board's reply

9   shall be filed on October 29th, 2021.

10        In setting the schedule for trial, which will be

11  scheduled to commence on November 8th, 2021, or thereabouts, I

12  reserve the right to determine the specifics and sequence of

13  issues as appropriate.  Direct testimony at the confirmation

14  hearing must be made through a declaration or deposition

15  testimony.  Live testimony for direct examination will not be

16  permitted.  All witnesses must be available for

17  cross-examination and redirect.

18        The Court will issue a trial procedures order closer

19  in time to the confirmation hearing that resolves the

20  remaining issues raised in the Confirmation and Discovery

21  Procedures Motion.  These issues include, without limitation,

22  whether a party who seeks to cross-examine a witness must file

23  an informative motion, page limits for motions in limine, and

24  scheduling of any pretrial status conferences and motions.

25        The Court intends to commence the confirmation

1   hearing on November 8th.  It will continue on November 9th,

2   and 10th, the 12th, the 15th through the 18th, the 22nd, and

3   the 23rd.

4        The Order that the Court will enter following this

5   hearing will have additional dates for discovery deadlines and

6   the filing of pretrial motions to be incorporated into the

7   revised confirmation and discovery schedule proposed order,

8   and, as I stated previously, the parties will be able to

9   consent to adjust the specific dates set by the Court for any

10  discovery matter without leave of Court, except for dates

11  relating to the filing of matters with the Court and hearing

12  dates.

13       The management of the confirmation scheduling, as

14  well as of discovery, will be referred to Judge Dein, and

15  Judge Dein will periodically check in with the parties to

16  ensure that discovery is progressing and will be completed on

17  time for the hearing to begin on November 8th.

18       So by tomorrow morning, the Court will file an order

19  reflecting the modifications that must be made to the next

20  iteration of the Disclosure Statement and to the proposed

21  orders approving the Disclosure Statement and the Confirmation

22  Procedures Motion.  Those have been stated on the record

23  today, but the Order will have some additional details.  As I

24  said, I expect a quick turnaround of the proposed -- the

25  revised proposed Confirmation Procedures Order.

1          As to revised versions of the Disclosure Statement

2     and the proposed order approving the Disclosure Statement,

3     including redlines of each, since we are putting the next

4     phase of this hearing out to July 27th, I want those to come

5     in not the night before July 27th, but over the weekend.  So

6     by the preceding Sunday at 9:00 AM, the revised and redlined

7     documents should be filed.

8          Any written objections to the new disclosure

9     material, and particularly the modifications made in response

10    to these orders and directions must be filed by Monday at 9:00

11    AM, which is 24 hours before the continued hearing with

12    respect to Ambac and FGIC, and those objections will be taken

13    on submission.

14         Thank you all for your patience and for listening

15    carefully.  Any further remarks or questions that need to be

16    asked at this point?

17         MR. ROSEN:  No, Your Honor.  This is Brian Rosen.

18    Thank you very much for this.  We appreciate the time and the

19    thought that went into all of these decisions.

20         THE COURT:  Thank you.

21         And so our next hearing date is July 27th, beginning

22    at 9:30.  It will again be by telephone, and dial in and other

23    instructions will be provided in a procedures order.

24         I again, as always, thank the court staff in Puerto

25    Rico, Boston, and New York for all of their work.  I thank

1  counsel for their arguments and their assistance to the Court

2  with their filings, and in engaging the Court's questions,

3  requests, and orders.

4          Stay safe and keep well, everyone.  We are adjourned.

5          (At 3:14 PM, proceedings concluded.)

6                          *      *      *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 103 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   July 14, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```