# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO<br><br>    -and-<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtors. | PROMESA Title III<br><br>No. 17 BK 3567-LTS<br><br>**Re: ECF No. 1009**<br><br>THIS PLEADING RELATES ONLY TO THESE TITLE III CASES |

**THE GOVERNMENT PARTIES' REPLY SOLELY REGARDING THE DRA PARTIES' STANDING TO SEEK RELIEF FROM THE AUTOMATIC STAY OR IN THE ALTERNATIVE, ORDERING PAYMENT OF ADEQUATE PROTECTION**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations) (collectively, the "Title III Cases").

The Financial Oversight and Management Board for Puerto Rico ("FOMB"), as the Commonwealth's sole Title III representative pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (collectively, the "Government Parties"), respectfully submit this reply (the "Reply") to the DRA Parties response (the "Response") to the objection to the DRA Parties' standing to bring the Lift Stay Motion (the "Objection").[2] In further support of the Objection, the Government Parties represent as follows:

## PRELIMINARY STATEMENT

1. Unable to show the relief sought in the Lift Stay Motion is permissible given the Asset Restrictions, the DRA Parties ask the Court to ignore contractual restrictions barring them from seeking relief and allow them to proceed with wasteful, expensive, and time-consuming litigation. The DRA Parties' arguments rest on a series of flawed and misplaced legal theories, each of which fails.

2. *First*, the DRA Parties argue the Asset Restrictions are irrelevant for standing and movants are only required to show a "colorable claim." Response at ¶ 12. Not so. This Court has previously denied relief on standing grounds where a party contracted away its right to bring the matter through a "no action" clause in a bond indenture.[3] Like a "no action" clause, the Asset Restrictions contractually limit the circumstances in which relief can be sought and create a barrier to standing the DRA Parties cannot overcome. Thus, the Court does not need to address whether the DRA Parties have a colorable claim (they do not), because they lack standing.

---

[1] PROMESA has been codified at 48 U.S.C. §§ 2101-2241.
[2] Capitalized terms used but not otherwise defined herein, have the meaning set forth in the Objection.
[3] *See* [Nov. 7, 2018 Hr'g. Tr. at 49:13–19, Case No. 17-bk-3283, ECF No. 4198] (holding a PREPA bondholder lacks standing to lift the stay where the bondholder failed to comply with the trust agreement's "no action" clause).

3. *Second*, the DRA Parties argue the Court should disregard the Asset Restrictions embodied in the Transfer Agreement, and define the parties' rights by reference to the GDB Restructuring Act—an enabling act passed to "establish the legislative framework for the Restructuring Transaction." *See* Restructuring Act Art. 102. But the Act is just that—a framework that did not preclude the GDB and the DRA from contracting for more specific, limited rights, including the Asset Restrictions. The Act is clear about this: it expressly recognizes that definitive documentation, not the Act, will govern the asset transfer and the parties' rights thereunder. *See* Restructuring Act Art. 404 (the "Recovery Authority Assets shall be transferred by GDB to the Recovery Authority, on the Closing Date and from time to time thereafter, ***in accordance with the Transfer Agreement***, the other Ancillary Agreements and the Qualifying Modification."). This plain language eviscerates the DRA Parties' argument.

4. *Third*, the DRA Parties contend that the Asset Restrictions should be disregarded because they would produce "absurd and unbargained-for results that would prohibit the DRA Parties from speaking during a Title III case." Reply at pg. 3. The Asset Restrictions have not prohibited the DRA Parties from participating in proceedings in the Title III case, and whether they constrain other actions is not relevant to the instant motion where the relief sought in the Objection by the Government Parties is exactly what was bargained for. The Asset Restrictions exist to ensure that the DRA Parties would be a passive actor in any Title III case with respect to the portfolio of non-performing, intergovernmental loans inherited by the DRA. Thus, the result of applying the Asset Restrictions is not absurd; it is precisely what the parties bargained for, as evidenced by the fact that no recovery was attributed to these loans under the Qualifying Modification.

5. But even if the Court rejects the Government Parties' position that, for an entity that filed a Title III petition (like HTA) only clause (iii) of the Asset Restrictions applies, the Lift

2

Stay Motion still fails as it is not an action to "preserve, protect or defend any security or other pledge right." The DRA Parties' response to this point is unavailing. Specifically, the DRA Parties contend "the statute contains no limitations on what these Preserve and Protect Powers encompass, much less confines the DRA and Servicer to a particular set of remedies to perform under them." Reply at ¶ 12. In other words, the DRA Parties view this clause as effectively upending all the Asset Restrictions, allowing them to bring almost any action imaginable. Under the DRA Parties' argument, the exception would swallow the rule. As discussed in the Government Parties' Objection, this clause was included for a very limited purpose—to mirror the customary obligation in the Bond Indenture requiring the Issuer to preserve a security interest—and even by its plain terms is limited to preservation, protection or defensive measures. This does not authorize the DRA Parties to bring affirmative actions to lift the automatic stay or to force HTA or the Commonwealth to make cash payments on account of the Commonwealth's retention of Act 30-31 Revenues, which retention itself preserves and protects any asserted security interest. Under any plausible interpretation of the Asset Restrictions, the DRA Parties lack standing and the Lift Stay Motion is prohibited.

6. Finally, it is worth noting that notwithstanding the DRA Parties' limited rights in a Title III case commenced by their loan obligors, the recently filed Fifth Amended Plan of Adjustment for the Commonwealth, ERS, and PBA (the "Plan") makes the proposed distributions by the Commonwealth to holders of the HTA 68 Bonds and HTA 98 Bonds contingent on a determination on the "relative rights and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans..." *See* Plan at 32 (definition of "GDB Loan Priority Distribution"). Thus the Government Parties are not attempting to exclude the DRA Parties from participating in the HTA and Commonwealth Title III cases, but have

3

preserved the DRA's rights to a determination of the extent the obligations under the DRA Loans are subordinate to the HTA Bonds. For obvious reasons, the Lift Stay Motion is not the vehicle to resolve this issue. And it would be particularly wasteful (and prejudicial to the HTA Bondholders) to proceed with this Lift Stay Motion while the subordination issue remains to be resolved at a later date.

## ARGUMENT

### I. THE ASSET RESTRICTIONS MUST BE ADDRESSED IN DETERMINING STANDING

7. The DRA Parties seek to avoid the Asset Restrictions by arguing that the "only question" the Court should consider at this time is whether the DRA Parties have a "colorable claim." Reply at ¶ 12. This Court has already considered and rejected similar arguments in the context of a different lift stay motion. In adjudicating lift stay motions brought by individual bondholders, this Court held that a creditor lacks standing if such bondholder has contractually limited his or her rights through a bond indenture's no-action provision:

> The Court has considered carefully all of the parties' submissions and arguments, and for the reasons that I will now explain, the motion is denied. I will first take up the question of standing or the power or ability of the movant to make this application in the first place. Due to the collective structure of bondholder rights and remedies under the Operative Trust Agreement, and specifically because of the no-action clause of that agreement, which counsel have discussed, movant does not have standing to unilaterally bring proceedings to enforce collection upon its PREPA bonds . . . Here, as in that case, the operative agreement defines and limits bondholders' rights and centralizes powers to take actions with respect to the bonds. The Court, therefore, finds that notwithstanding the broad provisions of Bankruptcy Code Section 1109, movant lacks standing to bring the present motion in violation of the Trust Agreement's no-action clause.

*See* Nov. 7, 2018 Hr'g. Tr. 49:13–19, Case No. 17-bk-3283, ECF No. 4198.

8. Similarly, in other prior lift stay litigation, this Court bifurcated the issue of standing from the merits of the lift-stay dispute to first determine whether the applicable movants had a contractual right to pursue the relief sought. *See Order Regarding Argument and Discovery*

4

*in Connection with AMBAC Assurance Corp.'s Motion Concerning Application of the Automatic Stay*, Case No. 17-bk-3283, ECF No. 7420.

9. Here, the Asset Restrictions function as a no-action clause, limiting the circumstances in which a creditor—here the DRA Parties—can seek certain types of relief. Accordingly, the Asset Restrictions are directly relevant to standing and should be considered at this time. *See SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 531–33 (E.D.N.Y. 2015) (dismissing claim for failure to comply with no-action clause); *In re Innkeepers USA Tr.*, 448 B.R. 131, 144 (Bankr. S.D.N.Y. 2011) ("no action" clause deprived objector of standing to be heard on the Motion).

10. The cases cited by the DRA Parties for the proposition that the Court should only ask if the DRA Parties have a "colorable claim" merely outline the standard applied in deciding a stay relief motion on the merits.[4] As evidenced by this Court's prior decisions, these cases do not preclude the Court from considering other factors, such as contractual restrictions on initiating an action, in determining standing.

11. But even if the DRA Parties are correct as to the relevance of the Asset Restrictions at this stage—which they are not—it would be a substantial waste of resources to delay adjudication of this gating issue. Litigating the merits of the Lift Stay Motion will consume enormous time and resources for both the parties and the Court. Because the DRA Parties are contractually barred from seeking the relief sought, this Court should determine this gating issue

---

[4] *See, e.g., In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 618 B.R. 619, 630 (D.P.R. 2020) (stating that where "a movant seeks relief from the automatic stay. . . . the court does not fully and finally adjudicate the merits of the parties' underlying claims of security or beneficial interests in resolving the stay relief motion. Rather, the court must determine 'whether the party seeking relief has a colorable claim to property of the estate.'"); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,* 618 B.R. 362, 371 (D.P.R. 2020) ("The resolution of the PRIFA Movants' claims regarding standing to seek stay relief under section 362 of the Bankruptcy Code, cause for such stay relief, and adequate protection is dependent on the determination of whether and to what extent the PRIFA Movants have made the requisite demonstration that they have cognizable and enforceable property interests.")

5

before such time and resources are consumed. It was for this very reason the parties agreed to bifurcate these proceedings and litigate first whether the Asset Restrictions barred the Lift Stay Motion.

## II. THE TRANSFER AGREEMENT, NOT THE RESTRUCTURING ACT, GOVERNS THE TERMS OF THE ASSET RESTRICTIONS

12. The DRA Parties argue their rights are not governed by the Asset Restrictions in the Transfer Agreement, but rather by the GDB Restructuring Act. Reply at ¶ 17-39. This is false. The parties rights are governed by contract here—specifically the Asset Restrictions. The GDB Restructuring Act is simply a broad framework setting forth some enforcement restrictions that by law are placed on the DRA Parties; it does not replace or override the specific terms agreed to between the GDB and the DRA under the Transfer Agreement. Even if the GDB Restructuring Act as written would have allowed the DRA parties to bring the Lift Stay Motion, the rights conferred thereby can be limited by contract. *See 2B Sutherland Statutory Construction* § 55:8 (7th ed.) ("As a general rule, legislation enacted to protect civil rights and govern contracts, which does not carry criminal provisions, may be waived by those affected."); 31 L.P.R.A. § 4 ("Rights granted by the laws may be renounced, provided such renunciation be not contrary to law, to public interest or public order, or prejudicial to the interest of a third person.")

13. In fact, the GDB Restructuring Act expressly provides the Transfer Agreement will govern the specific terms upon which the restructuring property (including the HTA loan portfolio) will be transferred: "The Recovery Authority Assets shall be transferred by GDB to the Recovery Authority, on the Closing Date and from time to time thereafter, *in accordance with the Transfer Agreement*." *See* Restructuring Act Art. 404 (emphasis added).

14. Given that the Restructuring Act expressly defers to the Transfer Agreement, the cases cited by the DRA Parties in support of the argument that the Restructuring Act controls do

6

not help movants. These cases merely provide that where legislation is clear, a court should not substitute its own preconceptions for the plain meaning of legislation.[5] But the Government Parties are not arguing for a deviation from the Restructuring Act's plain meaning—the Restructuring Act should be enforced as written: the provisions of the Transfer Agreement govern this matter.

15. The Transfer Agreement also confirms it embodies the entire agreement between the parties as to the terms set forth therein, including the Asset Restrictions:

> This Agreement, together with all schedules and exhibits hereto and the other Transaction Documents, shall constitute the full and entire understanding and agreement of the Parties and there are no further or other agreements or undertakings, written or oral, in effect between the Parties relating to the subject matter hereof unless expressly referred to herein. All prior negotiations, agreements, representations, warranties, statements and undertakings concerning the subject matter hereof between the Parties are superseded by the foregoing.

Transfer Agreement ¶ 25.

16. To that end, during the several months between the enactment of the Restructuring Act and execution of the Transfer Agreement, the parties negotiated several clarifications to the Asset Restrictions, as reflected in the below comparison of the relevant provisions of the Restructuring Act and the Transfer Agreement:

> ~~solely to the extent necessary~~ (i) to assure that the applicable Obligor's funds that are available for debt service ~~from the obligors under such Non-Municipal Loans, in accordance~~(consistent with ~~and pursuant to~~ the applicable ~~loan documents,~~ Fiscal ~~Plans~~Plan, if any, and ~~Budgets~~applicable PROMESA Budget, if any,) are applied to such Non-Municipal ~~Loans~~Loan in accordance with the applicable Asset documents, legal priority, security or other pledge rights benefiting such ~~Non-Municipal Loans. Furthermore, the Recovery Authority and the Asset Manager (on behalf of the Recovery Authority) shall have all rights and powers to exercise remedies necessary~~Loan Asset, (ii) to preserve, protect or defend any security or

---

[5] *See Scotiabank de Puerto Rico. v. Burgoz (In re Plaza Resort at Palmas, Inc)*, 741 F.3d 269, 274 (1st Cir. 2014) ("Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous"); *See Villamia v. MVP Auto Corp.*, 433 F. Supp. 3d 261, 270 (D.P.R. 2020) ("In view of [the law's] clarity and lack of ambiguity, there is no need to look beyond the letter of the law in search of the legislative intent. When the law is clear, it is not subject to interpretations."); *see also Warner Lambert Co. v. Tribunal Superior,* 1 P.R. Offic. Trans. 527, 559 (1973) (When the law's expression was clear, there was no need for the court to inquire further or enlarge the language as it "would be tantamount to subverting the true sense and purpose of the statute.").

7

other pledge rights benefiting such Non-Municipal ~~Loans. In furtherance of the foregoing, for any~~Loan and (iii) in the case of a Non-Municipal Loan where the ~~obligor~~ applicable Obligor is in a proceeding under Title III or Title VI of PROMESA and such ~~obligor~~Obligor has other creditors ~~that have~~with the same legal priority, security or pledge rights as the ~~Recovery Authority, the Recovery Authority and the Asset Manager (on behalf of the Recovery Authority) shall have all rights and powers to exercise remedies necessary~~Issuer, to ensure that the ~~Recovery Authority~~Issuer receives treatment in such proceedings that is the same as that provided to other creditors ~~that have~~with the same legal priority, security or pledge rights.

17. The DRA Parties provide no legal justification for disregarding these modifications, negotiated in good faith between the GDB and DRA over several months, particularly when such changes do not contravene public policy. *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157, 169 (1994) ("The principle of freedom of contract governs" and subject to laws, morals, and public order, the ability of parties to contract "is only limited by their imagination, the will of the parties being the supreme law between them"). Accordingly, as between the parties to the contract (*i.e.* the GDB and the DRA), there is no basis for the enabling legislation to override the subsequent contract. *Condado 3CFL, LLC v. Acevedo-Kuinlam*, No. 18-1359, 2019 WL 1430191 *4 (D.P.R. Mar. 29, 2019) ("[T]he courts of justice cannot free a party from fulfilling what it contractually agreed to, when said contract is legal and valid, and does not have any defects.").

### III. THE TERMS OF THE ASSET RESTRICTIONS LIMIT THE DRA PARTIES' ENFORCEMENT RIGHTS AGAINST HTA TO CLAUSE (III)

18. As detailed in the Government Parties' Objection, by the Asset Restriction's plain and unambiguous terms, if an obligor is a debtor in Title III, the DRA Parties may only exercise "rights, remedies and powers" pursuant to clause (iii) (*i.e.*, the DRA Parties may seek relief to ensure that the DRA is treated equally compared to other creditors of equal priority). In response, the DRA Parties argue that the use of the conjunction "and" between the second and third clauses

8

means that such clauses are not mutually exclusive. This reading, however, fails the basic canons of contract interpretation.

19. It is well established in both statutory and contractual construction, "the more specific treatment prevails over the general. No direct conflict is required: the rationale against applying a general provision in this circumstance is to protect against 'undermin[ing] limitations created by a more specific provision.'" *Lazarus v. Greater Atlantic Mortgage Corp. (In re Lazarus)*, 478 F.3d 12, 18-19 (1st Cir. 2007) (citing *Verity Corp. v. Howe*, 516 U.S. 489 (1996)); *Hill Const. Corp. v. American Airlines, Inc.*, 996 F. 2d 1315, 1319 (1st Cir.1993) (citing Restatement (Second) of Contracts § 203(c) to the effect that "specific provisions . . . supersede more general contract language.") Here, the specific circumstance of a Title III case was addressed by clause (iii) of the Asset Restrictions to override the general rights that the DRA Parties might hold outside of Title III. Any other reading ignores the specific restraints intended by clause (iii) and improperly renders it superfluous. *Union de Empleados de Muelles de P.R., AFL-CIO, Local 1901, ILA v. Int'l Shipping Agency, Inc.*, No. 12-2056, 2014 WL 12726555 *4 (D.P.R. Feb. 19, 2014) ("In our interpretation of any legal text, we attempt to give effect to 'all of its provisions, so that no part is rendered superfluous.'") (citing *Hibbs v. Winn*, 542 U.S. 88, 89 (2004); *Summit Packaging Sys., Inc. v. Kenyon & Kenyon*, 273 F.3d 9, 12 ("[I]t is a basic principle of contract law that constructions that render contract terms meaningless should be avoided.").

20. Furthermore, in keeping with the maxim of *inclusion unius est exclusion alterius*, the explicit enumeration of the DRA's remedies in the context of Title III precludes the availability of any other remedies in that context. *Fraternidad Internacional Asambleas de Dios Autonomas Hispanas, Inc. v. General Council of the Assemblies of God*, No. 14-1532, 2016 WL 9461326 *5 (D.P.R. Mar. 29, 2016) (applying the doctrine of *inclusion unius est exclusion alterius* (including

9

one excludes the other) to find that inclusion of a prohibition in a contract led to the exclusion of others).

21. Also, the structure of the Asset Restrictions paragraph precludes the DRA Parties interpretation. Clauses (i) and (ii) rely on the reference to "Non-Municipal Loan" which precedes those clauses. In contrast, clause (iii) repeats that phrase. If clauses (i), (ii) and (iii) were intended to be interpreted as a conjunctive series, clause (iii) would have a parallel structure that referred back to the use of "Non-Municipal Loan" that precedes clause (i). Thus, clause (iii) should not be read as part of a series but as a free standing provision. *Commonwealth Of Pennsylvania v. Nevels,* 235 A.3d 1101, 1105 (Pa. 2020) (where matters stated in a row do not use "parallel structure", the "interrupt[ion]" of that sequence by non-parallel wording separates the non-parallel phrase from the other words that do have a parallel structure).

22. Accordingly, because HTA is in Title III, the DRA Parties can only pursue the Lift Stay Motion if permitted to do so under clause (iii) of the Asset Restrictions, and by the DRA Parties own admission, clause (iii) has not been triggered. *See* Reply at ¶ 56.

## IV. THE DRA PARTIES CANNOT AVOID THE ASSET RESTRICTIONS MERELY BECAUSE THEY DO NOT LIKE THE RESULT

23. The DRA Parties contend the Government Parties' interpretation of the Asset Restrictions would lead to an "illogical scenario where the DRA Parties could not even object to the most egregious treatment of their debt and their collateral." Reply at ¶ 56. But any rights of the DRA Parties to object to their treatment in a plan of adjustment is irrelevant to their Motion for relief from the automatic stay. In any event, this assertion has no practical effect as the extent of the HTA subordination provisions is expressly subject to judicial determination. Moreover, limiting the DRA Parties' actions is what the parties agreed to when negotiating the Asset Restrictions. Indeed, a key objective of the Asset Restrictions was to ensure that the DRA Parties

10

remain passive in any Title III case, with the right to object only when they are prejudiced vis-à-vis a creditor of the same priority. Where such circumstances do not exist, under the plain and clear terms of the Asset Restrictions, the DRA Parties have no right to be heard. This reading is further supported by the economics of the Qualifying Modification, which attributed a zero recovery for all of the non-municipal loan portfolio. *See* Solicitation Statement at E-126.

## V. THE LIFT STAY MOTION IS NOT A MEANS TO PRESERVE, PROTECT, OR DEFEND

24. Finally, even if all three clauses of the Asset Restrictions apply to an entity in Title III, the Lift Stay Motion is still not permissible because it is not a means to "preserve, protect, or defend any security or other pledge rights." The Asset Restrictions do not permit the DRA Parties to enforce their security interest through the Lift Stay Motion, or otherwise. In response, the DRA Parties argue that because the Transfer Agreement "does not identify any specific limits on the DRA and the Servicer's rights with respect to preserving, protecting, or defending the DRA's security or pledge rights" any action that furthers such objective is "fair game." *See* Reply at ¶ 54. This argument misses the point. The Government Parties do not disagree that under this provision the DRA has the ability to pursue defensive measures or otherwise seek to preserve or protect its security interest. But none of this gives the DRA Parties the right to affirmatively seek to strike down or invalidate Commonwealth laws, interfere with certified Commonwealth and HTA fiscal plans and budgets, collect payments on account of their purported collateral, or to potentially foreclose on their purported collateral, all as requested by the Lift Stay Motion. The DRA Parties do not explain how the Motion will protect and preserve their alleged collateral when the revenues they claim as security are being retained by the Commonwealth.

25. Generally, to "protect" means "to defend or guard from attack [or] loss . . . , to cover or shield from injury or danger, or to 'screen [or] shelter." *Norfolk S. Ry. Co. v. Perez*, 778

11

F.3d 507, 512-13 (6th Cir. 2015) (citing Webster's Unabridged Dictionary of the English Language 1553 (2d ed.2001). Similarly, to "defend" "means to deny or oppose the right of a plaintiff in . . . a suit or wrong charged." *Governo v. Allied World Insurance Company*, No. 17-11672, 2019 WL 4034810 *5 (D. Mass. Aug. 27, 2019) (internal quotations omitted) (citing *Mount Vernon Fire Ins. Co. v. Visionaid, Inc.*, 477 Mass. 343, 354 (2017), (quoting Webster's Third New International Dictionary 591 (1993))). But here the DRA Parties have not filed suit to preserve or protect their security agreement, but to seek affirmative relief in the form of diverting funds from the Commonwealth—funds which have been properly retained—and forcing HTA to apply such funds to their loans. Nor do the DRA Parties attempt to "preserve" their rights, which is generally understood to mean "keep, guard…, protect…, [or] maintain" (*see In re Brown*, No. 05-41071, 2007 WL 494990 *1 (Bankr. D. Mass. Feb. 13, 2007) (citing Webster's Ninth New Collegiate Dictionary (1986))), as they do not wish to maintain or ascertain their rights, but rather interfere with the status quo under which the Commonwealth retains Act 30-31 Revenues. Accordingly, the remedies sought by the DRA Parties are outside of the scope of any conceivable rights the DRA Parties may exercise under the Asset Restrictions. Indeed, if the Court adopts such a broad reading of the right of the DRA Parties' to "preserve, protect and defend," it is difficult to imagine any actions that would be prohibited by the Asset Restrictions, thereby uprooting one of the most critical elements of the Qualifying Modification.

## CONCLUSION

For the reasons stated above, the Lift Stay Motion should be denied because the DRA Parties lack standing.

Dated: July 21, 2021
       San Juan, Puerto Rico

Respectfully submitted,

**O'MELVENY & MYERS LLP**

*/s/ John J. Rapisardi*
John J. Rapisardi
Matthew P. Kremer
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: jrapisardi@omm.com
nmitchell@omm.com

-and-

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: pfriedman@omm.com

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
**MARINI PIETRANTONI MUÑIZ LLC**
250 Ponce de León Ave., Suite 900
San Juan, PR 00918
Tel: (787) 705-2171
Fax: (787) 936-7494

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

Dated: July 21, 2021
San Juan, Puerto Rico

**PROSKAUER ROSE LLP**

*/s/ Jeffrey W. Levitan*
Jeffrey W. Levitan
Martin J. Bienenstock
Ehud Barak
(Admitted *Pro Hac Vice*)
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
ebarak@proskauer.com

-and-

Michael A. Firestein
Lary Alan Rappaport
(Admitted *Pro Hac Vice*)
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
lrappaport@proskauer.com

*Attorneys for the Financial Oversight and Management Board as representative of the Debtors*

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative of the Debtors*